1                                                                      1

2        SUPREME COURT OF THE STATE OF NEW YORK
         COUNTY OF SUFFOLK: PART 48
3        ------------------------------------------------x

4        IN RE: OPIOID LITIGATION

5
                                   INDEX NO.:400000/2017
6
         ------------------------------------------------x
7
                                   August 17, 2020
8                                  Central Islip, New York

9
                         MINUTES OF FRYE HEARING
10                       (Testimony of Dr. Kessler)
                           & Mr. James Rafalski
11
         B E F O R E:          HON. JERRY GARGUILO
12                             Supreme Court Justice

13       A P P E A R A N C E S:

14       SIMMONS HANLY CONROY, LLC
         **Attorneys for Suffolk County**
15       112 Madison Avenue
         New York, New York 10016
16       BY:   PAUL J. HANLY, JR., ESQ.
               JAYNE CONROY, ESQ,
17             (212) 784-6401
               phanly@simmonsfirm.com
18             jconroy@simmonsfirm.com

19
         NAPOLI SHKOLNIK, PLLC
20       **Attorneys for Nassau County**
         400 Broadhollow Road, Suite 305
21       Melville, New York 11747
         BY:   HUNTER SKOLNICK, ESQ.
22             SALVATORE C. BADALA, ESQ.
               JOSEPH L. CIACCIO, ESQ.
23             (212)397-1000
               pnapoli@napolilaw.com
24             sbadala@napolilaw.com
               jciaccio@napolilaw.com
25

1                                                                                    2

2       LETITIA JAMES
        **Attorney General for the State of New York**
3       Office of the New York State Attorney General
        28 Liberty Street
4       New York, New York 10005
        BY:  MICHAEL REISMAN, ESQ.
5

6       SEEGER WEISS, LLP
        **Attorneys for Plaintiffs**
7       77 Water Sgtreet, 8th Floor
        New York, New York 10005
8       BY:  PARVIN K. AMINOLROAYA, ESQ.
             (212)584-0700
9

10      O'MELVENY & MYERS, LLP
        **Attorneys for Janssen Pharmaceuticals, Inc.**
11      1625 Eye Street NW
        Washington, DC 20006
12      BY:  STEPHEN D. BRODY, ESQ.
             (202)383-5300
13           sbrody@omm.com

14

15      O'MELVENY & MEYERS, LLP
        **Attorneys for Janssen Pharmaceuticals, Inc.**
16      7 Times Square
        New York, New York 10036
        BY:  NATE ASHER, ESQ.
17

18      JONES DAY
        **Attorneys for Walmart, Inc.**
19      250 Vesey Street
        New York, New York 10281
20      BY:  STEPHANIE H. JONES, ESQ.
             SHARYL A. REISMAN, ESQ.
21           (212) 326-3939
             shjones@jonesday.com
22           sareisman@jonesday.com

23

24

25

1                                                              3

2        KIRKLAND & ELLIS, LLP
         **Attorneys for Allergan Finance, LLC,**
3        **F/K/A Actavis, Inc.,**
         **F/K/A Watson Parmaceuticals, Inc.**
4        655 Fifteenth Street, NW
         Washington, DC 20005
5        BY:   JENNIFER G. LEVY, ESQ.
               (202)879-5000
6              jennifer.levy@kirkland.com

7


8
         COVINGTON & BURLING, LLP
9        **Attorneys for McKesson Corp. and**
         **PSS World Medical, Inc.**
10       The New York Times Building
         620 Eighth Avenue
11       New York, New York 10018
         BY:   Paul W. Schmidt, ESQ.
12             (212)841-1000
               pschmidt@cov.com
13

14

15

16

17

18

19

20

21                      *      *      *

22
                 STEPHANIE CASAGRANDE, CSR, RPR
23                    OFFICIAL COURT REPORTER

24

25

```
                          Opioid Frye/Dr. Kessler        4
```

1                    THE COURT OFFICER:  All rise.

2                    THE CLERK:  Supreme Court, State of New

3          York, County of Suffolk, New York State

4          Opioid Litigation, Part 48 is now in session,

5          the Honorable Jerry Garguilo presiding.

6                    THE COURT:  Good morning, everybody.

7          Welcome back.  Please be seated.

8                    THE CLERK:  This is a continued hearing

9          In Re Opioid Litigation, Index Number 400000

10         of 2017.

11                   THE COURT:  Okay.  Do you want

12         appearances?

13                   THE CLERK:  Counsel, your appearances.

14                   MR. SHKOLNIK:  Hunter Shkolnik, on

15         behalf of Nassau County.  Good morning, your

16         Honor.

17                   THE COURT:  Good morning.

18                   MR. BADALA:  Good morning, your Honor.

19         Salvatore Badala, on behalf of Nassau County.

20                   THE COURT:  Good morning.

21                   MR. CIACCIO:  Good morning, your Honor.

22         Joseph Ciaccio, on behalf of Nassau County.

23                   THE COURT:  Good morning.

24                   MR. ASHER:  Good morning, your Honor.

```
 1                   Opioid Frye/Dr. Kessler          5
 2        Nate Asher, for defendant Janssen.
 3             THE COURT:  Good morning.
 4             MS. CONROY:  Good morning.  Jayne
 5        Conroy, plaintiff.
 6             MS. AMINOLROAYA:  Good morning, your
 7        Honor.  Parvin Aminolroaya, from Seeger
 8        Weiss, for the plaintiff.
 9             THE COURT:  Good morning.  Anyone else?
10        Okay.
11             MR. REISMAN:  Good morning, your Honor.
12        This is Michael Reisman from the New York
13        State Attorney General's office for the State
14        of New York.
15             THE COURT:  Good morning, sir.  I'm
16        sorry, something else?
17             MR. BRODY:  Good morning, your Honor,
18        Steve Brody for the Janssen Defendants.
19             THE COURT:  Good morning.  Anyone else?
20             MS. LEVY:  Good morning, your Honor.
21        Jennifer Levy is here for the Allergan
22        Defendants.
23             THE COURT:  Good morning, Ms. Levy.
24             MR. SCHMIDT:  Good morning, your Honor.
25        Paul Schmidt, for McKesson.  I may ask
```

```
 1                    Opioid Frye/Dr. Kessler              6

 2           questions with the next witness.  I will ask

 3           questions with the witness.

 4                THE COURT:  Good morning.

 5                DR. KESSLER:  Good morning.

 6                THE COURT:  I'll count to five before I

 7           -- remind the witness, please.

 8                THE CLERK:  Dr. Kessler, I'll remind you

 9           you're still under oath.

10                THE WITNESS:  Thank you.

11                THE CLERK:  You can be seated.

12                THE COURT:  Doctor, have a seat.

13                THE WITNESS:  Thank you, your Honor.

14                THE COURT:  Doctor, you recall the

15           pointers I gave you last week, correct?

16                THE WITNESS:  Yes, sir.

17                THE COURT:  Very good.  So I won't

18           repeat them.  You may continue.

19                MR. BRODY:  Thank you, your Honor.

20      CONTINUED CROSS-EXAMINATION

21      BY MR. BRODY:

22           Q.   Good morning, Dr. Kessler.

23           A    Good morning, Mr. Brody.

24           Q.   Dr. Kessler, with the benefit of the

25      weekend to streamline things, I think I have the
```

```
                         Opioid Frye/Dr. Kessler            7
 1
 2     remainder of this down to 45 minutes or less.  So

 3     there will be no issue with you making your 1 p.m.

 4     phone call today.

 5          A    Many thanks, Mr. Brody.

 6          Q.   I want to come back to sort of your

 7     starting point on what you described as your

 8     methodology.  And in this case, you're offering your

 9     opinion that certain marketing by opioid

10     manufacturers violated FDA regulations or departed

11     from industry standards, right?

12          A    The latter, yes.  I don't want to get

13     overly legal on violated, but yes, deviations.

14          Q.   Okay.  Now --

15               MR. BRODY:  I think that we have

16          somebody who is not muted, your Honor.  All

17          right.  That's better.

18     BY MR. BRODY:

19          Q.   Dr. Kessler, can you still hear me?

20          A    I can, sir.

21          Q.   Now, FDA regulations contain terms of

22     art; don't they?

23          A    I think that would be fair.

24          Q.   Now, substantial evidence, that's a term

25     that you referenced in your testimony on Friday
```

                    Opioid Frye/Dr. Kessler                    8

1

2    under questioning from Mr. Shkolnik, right?

3         A    Correct.

4         Q.   Now, I think as you explained it, FDA

5    wants claims about benefits of medications to be

6    supported by substantial evidence as defined in the

7    regulations, right?

8         A    Correct.

9         Q.   And, in fact, substantial evidence is a

10   defined term; isn't it?

11        A    It's defined for effectiveness, yes.

12        Q.   Yeah, and although I think you would say

13   there has been a lot of discussion about it,

14   substantial evidence typically needs two adequate

15   and well-controlled clinical investigations, right?

16        A    That's fair.  It says adequate and

17   well-controlled clinical investigations.  There's an

18   S on that, and that has generally been interpreted

19   more than once, for more than one.

20        Q.   Exactly.  Now, you understand what an

21   open-label study is; don't you?

22        A    Yes.

23        Q.   And an open-label study, just so that

24   we're on the same page, is one where researchers and

25   participants both know which treatment the patient

```
 1                    Opioid Frye/Dr. Kessler            9

 2     is receiving, right?

 3          A    Yes.  It's actually used in a number of

 4     different contexts.  Sometimes people are, are loose

 5     with it, but it just -- that's one interpretation,

 6     yes.

 7          Q.   It can be used to compare different

 8     treatments?

 9          A    Tell me what the "it" is.

10          Q.   An open-label study.

11          A    Well, if it's an open-label study, then

12     it can't be, because it's not adequate and well

13     controlled.  So I'm not sure I'm getting your

14     question.

15          Q.   Well, let me ask it this way.

16               Open-label study results appear in

17     peer-reviewed journals; don't they?

18          A    A lot of things, yes.  I mean, I'm sure

19     they can, yes.

20          Q.   But you would agree that an open-label

21     study, as we have defined it, would not meet FDA's

22     requirements for an adequate and well-controlled

23     clinical investigation, correct?

24          A    Unless there's extenuating

25     circumstances, perhaps.  Certain studies would be
```

```
1                    Opioid Frye/Dr. Kessler            10

2      impossible to do open label, I guess, is what I'm

3      saying.

4           Q.    So, Dr. Kessler, you recall giving a

5      deposition in this case, correct?

6           A    I do.

7           Q.    And if we can bring up, it's page 48 of

8      that deposition on 7 through 11, and you were asked:

9      An open-label study measuring effectiveness would

10     generally not meet FDA's requirements for an

11     adequate and well-controlled study, correct?

12               And you answered:  Fair.

13               That was your testimony, right?

14          A    Yes.

15          Q.    Now, putting aside the idea of an

16     open-label study, we could have a situation where

17     all real world experience supports a promotional

18     statement, but there are no well-controlled clinical

19     investigations and FDA would say that is not

20     substantial evidence in its eyes, right?

21          A    You'd have to give me a little more so I

22     understood it exactly.  You have to give a little

23     more facts so I fully understood, but I think

24     generally I would agree with your point.

25          Q.    Right.  So generally -- well, let's take
```

1                      Opioid Frye/Dr. Kessler              11

2    a situation where there are no well-controlled

3    clinical investigations, but all real world

4    experience supports a statement, the FDA could still

5    say, you know what, you don't have your two adequate

6    and well-controlled clinical investigations to

7    support this statement.

8              So, you know, the DDMAC arm that you

9    talked about could then say, well, you know what, we

10   believe that's false and misleading, right?

11             FDA could say that's not substantial

12   evidence in its eyes?

13        A    Again, I think it's a little more

14   nuanced than that.

15        Q.   Doctor, could we go back to the

16   deposition testimony you gave.

17        A    Sure.

18        Q.   If we could pull up page 54 on 15 to 25.

19             And, Doctor, you were asked:  Let's take

20   a situation where there are no well-controlled

21   clinical investigations, but all real world

22   experience supports the statement.  FDA could still

23   say, you know what, you don't have your two adequate

24   and well-controlled clinical investigations to

25   support this statement.  And so, you know, we,

```
1                    Opioid Frye/Dr. Kessler            12
2       DDEMAC and OPDP, believe that's false and
3       misleading.
4                   And your answer was:  FDA could say that
5       is not substantial evidence in its eyes.
6                   Right?
7            A    FDA could say that, correct.
8            Q.   Now, for the benefit of the Court, OPDP
9       is the Office of Prescription Drug Promotion, right?
10           A    Correct.  The subsequent naming of
11      DDEMAC.
12           Q.   Right.  And you, in your testimony on
13      Friday, referred to DDEMAC.  DDEMAC is now known as
14      OPDP, right?
15           A    Correct, fair.
16           Q.   Every time a manufacturer creates a
17      promotional piece for a medication, a branded
18      promotional piece for a medication, the manufacturer
19      is required, before it starts using that promotional
20      piece, to provide that promotional piece to FDA with
21      what is known as a Form 2253, correct?
22           A    Certainly prior to launch that
23      requirement is accepted, yes.
24           Q.   And, again, prior to use, even post
25      launch, prior to use of a promotional piece, the
```

1

2     manufacturer sends a copy of it with a 2253.  Now,

3     of course, the manufacturer doesn't have to wait for

4     FDA to get back to it, but it does have to submit

5     it, correct?

6          A    I'd have to go back and look at the

7     regs, but to your line in every promotional piece

8     has to be submitted, I don't see every promotional

9     piece submitted.

10          Q.   Well, let's not get tripped up on that.

11     Let's, let's go back to the situation that we were

12     just talking about where we have all real world

13     experience supporting one thing, but we don't have

14     your two adequate and well-controlled clinical

15     investigations, that situation where you acknowledge

16     FDA can say that is not substantial evidence in its

17     eyes, FDA might then send the manufacturer that made

18     the promotional statement a warning letter or an

19     untitled letter for a regulatory violation, right?

20          A    In your hypothetical you left undefined

21     all world -- every -- all world experience.  I mean,

22     I get your point, Mr. Brody.  FDA could, if there's

23     not substantial evidence, send a letter, certainly.

24          Q.   Company sends a warning letter, correct?

25          A    Well, you know, it depends on what

```
1                       Opioid Frye/Dr. Kessler              14

2       points in time FDA's history and what its basis was

3       for a warning letter over an untitled letter.

4            Q.   Right, exactly.  And that letter would

5       use as boilerplate the term false and misleading to

6       describe that promotional statement that was

7       consistent with all real world experience, right?

8            A    Yeah.  I don't -- I won't agree with --

9       excuse me.  I don't want to quibble, but the term

10      boilerplate seems to trivialize.

11               When FDA sends a letter, there's a

12      concern on the part of the agency.  It's usually not

13      just a trivial concern or some bureaucratic concern.

14      It's concerned because patients could be at risk.

15           Q.   So, Doctor, boilerplate is actually your

16      term; isn't it?

17           A    I've certainly used the word

18      boilerplate, no question.

19           Q.   Yeah.  And, in fact, if we can go --

20      you, in fact, have used the word boilerplate to

21      refer to FDA's designation as a statement that

22      violates its regulations as false and misleading;

23      haven't you?

24           A    You'd have to show me exactly what I've

25      said.  I've talked about the last lines in a letter,
```

```
 1                    Opioid Frye/Dr. Kessler              15
 2    if that's what you're referring to, but, you know, I
 3    don't have a perfect recollection exactly how I
 4    phrased it.
 5         Q.   All right.  Let's take a look at your
 6    deposition from this case.  Recall page 55, lines 1
 7    through 12.  And as to this hypothetical situation
 8    that we have been talking about, you were asked:
 9              FDA would then use the term, as it does
10    in warning letters, the term false or misleading to
11    describe the promotional communication, correct?
12              You said:  If there's usually
13    boilerplate sentences that you could look to any of
14    those letters and you would see that it would be
15    probably violative under section so and so, you were
16    asked, right, and you would use the term false and
17    misleading, correct, and you agreed or whatever
18    relevancy there was.  Yes.
19              Do you recall giving that testimony?
20         A    I gave exactly that testimony.
21         Q.   All right.  Now, you, in this case, are
22    not giving any opinion on how the term false and
23    misleading, when used by FDA, compares to any
24    standard that the Court should imply in this case to
25    evaluate the Plaintiffs' claims; are you?
```

```
1                    Opioid Frye/Dr. Kessler        16

2         A    You're correct.  I was giving no legal

3    opinion, and I think I said in my deposition, sir,

4    but I left it to the Court to -- and to the lawyers

5    to discuss relevance of any FDA violations.

6         Q.   All right.  Let's -- and just so we're

7    clear, let's turn to another example of the point we

8    have been discussing.

9              You offered -- well, on Friday I asked

10   you about the Mallinckrodt medication Exalgo; do you

11   recall that?

12        A    Correct.

13        Q.   And you offered the opinion in your

14   expert report in this case, you pointed to the fact

15   that Mallinckrodt was highlighting the

16   physiochemical properties of Exalgo, namely, that it

17   is difficult to crush, and if crushed, it -- and

18   exposed it to water, it forms large particles or I

19   guess the exact word is agglomerates, correct?

20        A    I think that that may be discussed in my

21   report.  I don't remember that from Friday.  Maybe

22   I'm misremembering.

23        Q.   We talked generally about Exalgo.  We

24   did not get to this point, which is why I want to

25   get to this point now.
```

1
2          A    I'm happy to discuss it.  Any specific
3   points on agglomeration and Mallinckrodt, I'd love
4   to pull my notes to refresh my memory, but I'm happy
5   to answer your questions.
6          Q.   Well, let me ask you this question
7   first:  You understand that one of the ways that
8   opioid pills have been abused is when users crush
9   them and then snort or dissolve and inject them,
10  right?
11         A    That's fair.
12         Q.   And so if a pill is difficult to crush,
13  it's harder to abuse that way, right?
14         A    Generally.
15         Q.   Same if particles agglomerate when
16  they're exposed to water, it's harder to dissolve in
17  water to the point where the drug can be injected,
18  right?
19         A    I would leave that to a physical
20  scientist to answer.
21         Q.   Although you -- and this was -- if you
22  want to take a look at it, this was paragraph 523 of
23  your expert report, but my question is:  Although
24  you highlighted and seem to criticize Mallinckrodt
25  for its statements about Exalgo, you have no

```
 1                          Opioid Frye/Dr. Kessler              18

 2      evidence to suggest that it would not be difficult

 3      to crush the pill; do you?

 4           A    Again, if I can, if I can pull my notes,

 5      I could refresh my memory on that specific

 6      circumstance so I can see exactly what I've said.

 7           Q.   Well, why don't we, why don't we --

 8      Doctor, if you could --

 9           A    I just want to get my notes so I can --

10      on that, if that's okay, counselor.

11           Q.   That's fine, Doctor, but my question was

12      a little different.  My question was:  Although you

13      criticize Mallinckrodt for its statements about

14      Exalgo, you have no evidence to suggest that it

15      would not be difficult to crush the pill; do you?

16           A    I'd have to review exactly what I

17      criticized in order to be able to answer that.  I'd

18      need a minute.

19                MR. BRODY:  Ms. Radford, can we bring up

20           Dr. Kessler's deposition, page 189.

21                MR. SHKOLNIK:  Your Honor --

22                MR. BRODY:  Lines 5 through 11.

23                MR. SHKOLNIK:  The doctor was still

24           trying to answer the prior question, was

25           looking at his notes.
```

```
 1                    Opioid Frye/Dr. Kessler          19

 2    BY MR. BRODY:

 3         Q.   Dr. Kessler, do you recall -- you were

 4    asked in your deposition --

 5              THE COURT:  Mr. Brody, Mr. Shkolnik

 6         essentially raised an objection.

 7              You're saying there's an incomplete

 8         answer.  You want the witness to complete the

 9         answer?

10              MR. SHKOLNIK:  Yes.  He was looking at

11         his notes.  Thank you.

12              THE COURT:  That's fine.  Mr. Brody, as

13         we move on -- Mr. Shkolnik, you also, of

14         course -- this is a Frye hearing.

15              And if one were to use buzz words in

16         connection with the elements of a Frye

17         hearing in terms of the testimony, one would

18         expect, in connection with a contested

19         expert, you used the phrase general

20         acceptance, reliability, and in some

21         instances consensus.  That comes from, I

22         believe, Judge Kaye's concurring opinion.

23              I appreciate where you're going, but it

24         sounds to the Court like your questions are

25         more expected perhaps at a trial in terms of
```

Opioid Frye/Dr. Kessler                    20

foundational questions, and if I'm wrong

you'll tell me, and you're going to tell me,

Judge, I'm going to connect this up, I'll let

you do that.

        MR. BRODY:  Your Honor, I am going to

connect it up.

        THE COURT:  That's enough.  Just say

subject to connection.  Go ahead.

        MR. BRODY:  Sure.

BY MR. BRODY:

    Q.    Dr. Kessler, is there anything you

needed to add in response to the question I asked

you?

    A    Right.  I mean, so, again, I need to

look at my exact opinion, but I believe -- well,

with regard to the hard outer shell, I think

Mallinckrodt acknowledges that they could make no

claims concerning that potential, right?  That's my

recollection.  And the issue is could they make

claims without them having that.

        I think that's what the record shows,

but I may be mistaken, and I may have to review

that, Mr. Brody.

        MR. BRODY:  So, Ms. Radford, can we

```
 1                      Opioid Frye/Dr. Kessler              21

 2              bring up page 189, lines 5 through 11,

 3              please.

 4       BY MR. BRODY:

 5              Q.    And, Doctor, you were asked in your

 6       deposition:  What evidence do you have to suggest

 7       that it would not be difficult to crush an Exalgo

 8       tablet?

 9                    And you said:  I'm not making -- I have

10       no such evidence.  I did not seek independent

11       evidence of that, just that it was not proved there

12       was not -- and here we see this term of art again --

13       substantial evidence to support that claim.

14                    That was your testimony, right?

15              A     That was exactly my testimony.

16              Q.    Right.  And what you meant, in fact, was

17       that the crush-resistant claim in your view didn't

18       meet the FDA's substantial evidence definition under

19       the standards, correct?

20              A     I apologize.  I can't remember exactly

21       what I meant at the time, but what would be logical

22       that I meant is that Mallinckrodt itself had said

23       that they were not in possession of such evidence

24       and recognized in the record that it could not make

25       that claim.
```

```
 1                    Opioid Frye/Dr. Kessler          22

 2              So I'm a little confused, Mr. Brody, on

 3       why you're asking me whether I made an independent,

 4       because that was not my -- that was not the basis of

 5       my opinion.  It was that Mallinckrodt didn't have

 6       evidence and acknowledged that.

 7              Q.   In fact, Doctor, you are saying that

 8       there is not substantial evidence, in FDA parlance,

 9       that it's difficult to crush an Exalgo tablet,

10       correct?

11              A    I'm not sure I'm saying I am -- well,

12       I'd have to review the record exactly, if you can

13       show me exactly what I said to be exact, but, in

14       fact, if Mallinckrodt didn't have that evidence and

15       was aware that they didn't have that evidence and

16       yet -- and stated they didn't have that evidence and

17       went ahead and made that claim, then there was not

18       substantial evidence.  So I'm not sure we're

19       differing or not, Mr. Brody.

20                   MR. BRODY:  Ms. Radford, could you bring

21              up page 189, line 12 through page 190 --

22              actually, 12 -- let's go 12 through 18, 189.

23       BY MR. BRODY:

24              Q.   And, Doctor, you were asked:  You're not

25       stating the claim that it's difficult to crush an
```

                          Opioid Frye/Dr. Kessler                23

1
2    Exalgo tablet is false; are you?
3              And you answered:  What I'm saying is
4    there is not substantial evidence of that.
5              Correct?
6         A    I said exactly that, sir.
7         Q.   And when you answered the question that
8    way, you were using the definition of substantial
9    evidence that's the FDA's definition, the agency's
10   definition, correct?
11        A    Sure.
12        Q.   All right.  And as to agglomeration, you
13   are not offering the opinion that it is untrue that
14   when crushed, Exalgo results in large particles; are
15   you?
16        A    Same answer as earlier.  I would leave
17   that to a physical chemist.  I am looking at the
18   record on what Mallinckrodt had about agglomeration.
19   So I'm not giving an independent judgment, you're
20   correct, on agglomeration.
21             I'm basing it on what the record of what
22   Mallinckrodt had as substantial evidence.
23        Q.   So the answer is you're not offering the
24   opinion that it is untrue that when crushed, Exalgo
25   results in large particles?  You're not saying that,

1
2    correct?
3            A    I am not saying that.  What I am saying
4    is that Mallinckrodt said, quote, while we can make
5    no claims concerning abuse potential, physicians may
6    be interested and started talking about
7    agglomeration.  That's what I testified.
8                So they were aware they couldn't make
9    any claims.
10           Q.   So you are not saying that when crushed
11   and exposed to water, Exalgo does not agglomerate?
12   You're not offering any opinion on that, correct?
13           A    No.  I'm telling you on the record, that
14   based on the record that Mallinckrodt had stated
15   that it could not make any claims with regard to
16   abuse potential with regard to agglomeration.
17               That's what I'm saying.  I'm not, I'm
18   not the physical chemist to talk about
19   agglomeration.
20           Q.   And you're saying they couldn't say it
21   based on the FDA's substantial evidence standard,
22   correct?
23           A    No.  I mean -- well, maybe, perhaps.
24   I'd have to look exactly.  What I'm saying is just
25   very simply, looking at Mallinckrodt documents that

```
 1                        Opioid Frye/Dr. Kessler              25

 2      say we can't make any claims about the abuse

 3      potential so -- and yet I went ahead and made those

 4      claims.  So that's my only point here.

 5                   MR. BRODY:  Ms. Radford, can we bring up

 6              page 189, line 20 to page 190, line 1.

 7      BY MR. BRODY:

 8              Q.   And when you were explaining this in

 9      your deposition, you were asked whether you were

10      saying by substantial evidence, you're using the

11      definition of substantial evidence that you used

12      earlier with me when I was questioning you, you

13      said:  I think that's -- generally we would stay

14      within the agency's definition.

15                   That was your testimony, right?

16              A    I've only had one definition of

17      substantial evidence, and it's the same as the FDA's

18      definition.

19              Q.   And, in any event, you didn't go out and

20      ask any New York doctor who prescribed Exalgo

21      whether they held any view on whether it was

22      difficult to crush; did you?

23              A    I -- again, I stayed with the record.  I

24      didn't do anything separate from the record.

25              Q.   So is that a correct -- I'm correct,
```

```
                          Opioid Frye/Dr. Kessler                26
```

1

2    right?  You didn't go out and ask any New York

3    doctors who prescribed Exalgo whether they had any

4    view on whether it was difficult to crush; did you?

5         A    No.  I relied on the surveys and studies

6    in general that the companies did.  I didn't do

7    independent surveys.

8         Q.   Now, Doctor, I want to shift gears here

9    a little bit and ask you a couple of questions about

10   some things that you didn't talk about on Friday.

11        You know what a pill mill is, right?

12        A    Sure.

13        Q.   You know, often times we, you know, and

14   I think we've all read stories about pill mills

15   where doctors have had patients, you know, lined up

16   outside, midnight, one in the morning, handing over

17   cash for things like OxyContin prescriptions, right?

18        A    You and I, I think, agree.  I'm not sure

19   it's midnight, one a.m.  Perhaps we've all seen

20   pictures on the evening news, et cetera, on that,

21   and I'm familiar and have read about such behavior.

22        Q.   You, in this case, you made no effort to

23   quantify the extent to which prescriptions from pill

24   mills led to opioid use disorder in the State of New

25   York; did you?

```
 1                    Opioid Frye/Dr. Kessler          27

 2          A     Not in those terms, no.

 3          Q.    And you made no effort to quantify the

 4    extent to which prescriptions from pill mills led to

 5    overdoses in the State of New York; did you?

 6          A     Specifically, no.

 7          Q.    Same answer for illegal drug sales,

 8    right?

 9          A     I mean, I guess in that narrow sense,

10    you're correct, Mr. Brody.

11          Q.    And you made no effort to quantify how

12    the extent of opioid use disorder from prescriptions

13    that were handed out by pill mills might compare to

14    opioid use disorder in New York patients who

15    received legitimate prescriptions for one of the

16    Defendant manufacturers' medications; did you?

17          A     I made some effort on a portion of that

18    question, but not the way you phrased it.

19          Q.    You didn't make any effort to quantify

20    that?  I mean, if you did, I apologize.  I missed

21    it.  I didn't see it in your report.

22          A     No, no, no.  I did not, I did not make

23    any quantification of pill mills per se.  You're

24    correct.  I mean, or illegal use, per se, beyond the

25    scope.
```

```
1                      Opioid Frye/Dr. Kessler              28
2              Q.   All right.  So one of the things you did
3       talk about on Friday was the elicit drug trade; you
4       recall that, correct?
5              A    Sure.
6              Q.   And I believe the way you put it when
7       you were talking on Friday was you referred to waves
8       of the opioid abuse crisis; am I recalling that
9       correctly?
10             A    Fair.  I used that term.  CDC used that
11      term.  So I used that, yes.
12             Q.   All right.  And you referenced heroin
13      use and the illicit -- I believe the illicit drug
14      trade, right?
15             A    That was generally -- heroin was usually
16      viewed as the second wave I believe.
17             Q.   Right.  Now, in this case, you have not
18      made an effort to determine the extent to which the
19      elicit drug trade in New York has led to opioid use
20      disorder, correct, to quantify that?
21             A    A little more -- I mean, I think that's
22      probably fair, but, again, more complicated because
23      you'd have to go -- I mean, there is data -- I think
24      we've probably talked about it -- of the
25      prescription drug use, you know, in about 80 percent
```

1

2    triggers that illicit use.

3              So just state your question again.

4        Q.   My question is a little different.

5              You made no effort to determine the

6    extent to which the illicit drug trade in New York

7    led to opioid abuse disorder, did you, to quantify

8    that?

9        A    That is correct.  I dealt with an

10   earlier stage of prescription drug use and certainly

11   can comment about how prescription drug use impacted

12   illicit, but I know there's other witnesses that

13   will do that.

14       Q.   Right.  And so you didn't make any

15   effort to determine, to quantify the extent to which

16   the illicit drug trade in New York led to opioid

17   overdoses; did you?

18       A    That's correct.  My other experts will.

19   I focused on prescriptions and prescription's

20   effects on illicit use.

21       Q.   You made no efforts to determine the

22   extent to which -- by the way, do you know what

23   diversion is?

24       A    Sure.

25       Q.   And diversion can take different forms.

1

2    Diversion can be something where somebody gets a

3    prescription for a medication, for an opioid

4    medication, they don't take all of it, they sell the

5    rest on the street or they leave it in a medicine

6    cabinet and it gets taken by somebody who it's not

7    prescribed for.  There's all sorts of different

8    forms that diversion can take, right?

9         A    Fair, Mr. Brody.  When you asked me

10   whether I knew what diversion was, I would have

11   footnoted that and said many people have different

12   definitions.

13        Q.   You made -- one thing we can agree on, I

14   think, is you made no efforts to quantify the extent

15   to which diversion led to opioid use disorder in the

16   State of New York; did you?

17        A    No.  But just -- no.  You'd have to go

18   back the step.  Everything my report deals with how

19   prescription drugs fueled --

20        Q.   Well --

21        A    -- correct.

22        Q.   So same answer for overdoses or illegal

23   drug sales, right, connected to diversion?

24        A    Prescription --

25             MR. SHKOLNIK:  Objection to the form,

```
 1                    Opioid Frye/Dr. Kessler           31
 2           your Honor.
 3                THE COURT:  Doctor, just say -- Doctor,
 4           there's an objection.
 5                MR. BRODY:  I can rephrase.
 6                THE COURT:  Rephrase the question.
 7     BY MR. BRODY:
 8           Q.   You did not conduct any analysis to
 9     quantify the extent to which diversion led to
10     overdoses or illegal drug sales in the State of New
11     York; did you?
12           A    Correct.  Other experts will testify on
13     that.
14           Q.   All right.  I want to focus on something
15     else that --
16                MR. BRODY:  Actually, before we go on
17           there, Ms. Radford, do we still have the
18           demonstrative that we started on Friday?
19                THE COURT:  Okay.
20                MR. BRODY:  So let's knock off analyze
21           the impact of pill mills illicit drugs for
22           diversion.  We'll cross that out.
23                Thank you, Ms. Radford.
24     BY MR. BRODY:
25           Q.   And we will come back to this one more
```

1
2    time before we finish today, Dr. Kessler, but before
3    we get there, when you were answering questions on
4    Friday from Mr. Shkolnik, you indicated that you
5    looked back at the way doctors prescribed opioids
6    before 1990; do you recall that?
7         A    I certainly looked at the history, yes.
8         Q.   One of the things you didn't talk about
9    on Friday was the history of the way the federal
10   government has looked at the issue of chronic pain;
11   did you?
12        A    And the use of opioids?
13        Q.   Correct.
14        A    I think I've looked at that, but, again,
15   you know, I mean, there's always a large history.  I
16   may not have looked at everything.
17        Q.   Are you familiar, Doctor, with the
18   Interagency Committee on New Therapies For Pain and
19   Discomfort?
20        A    The late '70s, if I'm correct.
21        Q.   That would be the one, yes.
22        A    And stipulated by the White House Czar
23   Peter Bourne?
24        Q.   That is right.  Are you familiar with
25   it?

```
 1                      Opioid Frye/Dr. Kessler            33
 2              A     Under President Carter.
 3              Q.    Yes, sir.
 4              A     It's an interesting part of our history,
 5       right?
 6              Q.    It was.  And as part of that history,
 7       you understand that the White House pushed for the
 8       establishment of the Interagency Committee on New
 9       Therapies For Pain and Discomfort, right?
10              A     Dr. Bourne did as the drug czar.
11              Q.    And that interagency committee prepared
12       a report; didn't it;
13              A     Recommendations, yes, sir.
14              Q.    Yeah.  Why don't we take a look at that.
15                    MR. BRODY:  Ms. Radford, this is Tab 11,
16              if we can bring that up.
17       BY MR. BRODY:
18              Q.    And, Dr. Kessler, I think you can see it
19       on the screen there, right?
20              A     I can see it.
21              Q.    Right.  If we go to page 12,
22       Ms. Radford, you will see a list of the members of
23       the committee.  Maybe we can make that a little
24       bigger so we all can see it.
25                    It includes doctors from numerous parts
```

1                        Opioid Frye/Dr. Kessler            34

2      of the Department of Health Education and Welfare

3      now known as HHS, right?

4           A    Yes.  It was stimulated by Seymour

5      Perry.  You left his name off, I think, historically

6      he was the head of -- right above that.  Yes, you're

7      correct.

8           Q.   Right.  Actually, on the next page,

9      Ms. Radford, we'll see that the National Institute

10     on Drug Abuse and the National Institute of Mental

11     Health on the following page was included, along

12     with numerous officials from FDA, including the

13     chief of the drug abuse staff of the Division of

14     Neuropharmacological Drug Products, right?

15          A    Yes, Stuart Nightingale, who worked for

16     me, is on there.

17          Q.   Right.  Now, if we turn ahead to page 50

18     and we pull this out, Ms. Radford, just at the top

19     there so we can see it a little better.

20               The committee held a consensus

21     development conference program on pain, discomfort

22     and humanitarian care in 1979; didn't they?

23          A    Yes.  This was all focused on terminal

24     care, I believe.

25          Q.   Well, you know, let's take a look at

```
                         Opioid Frye/Dr. Kessler              35
```

1     that.  If we go to page 57, and what we see is -- go

2     down a little further to the presentation by

3     Dr. Bonica, Ms. Radford.

4         We see that Dr. Bonica, on the first day

5     of the conference, opened the discussion with a

6     general overview of chronic pain as a serious

7     national health problem, right?

8         A     Sure.

9         Q.     And described the magnitude of disabling

10    chronic pain through statistics advising that about

11    75 million Americans were suffering from some kind

12    of chronic pain and that their disabilities resulted

13    in a loss of approximately 700 million work days

14    every year, correct?

15        A     That's exactly what he says.

16        Q.     The interagency committee built on this

17    meeting and other information to offer its view of

18    what it called the current status of pain therapy.

19    And if we can go ahead, Ms. Radford, to page 180 of

20    the document, and I believe you're correct that part

21    of the focus of the interagency committee was on

22    terminal care.

23        A     I think the -- I don't think it was just

24    -- I'm sorry.  Is there a question?

```
 1                    Opioid Frye/Dr. Kessler              36

 2           Q.   Sure.  Part of it was on terminal

 3    care --

 4           A    No.  I think the major thrust -- sorry.

 5           Q.   I'm sorry.  You need to let me finish my

 6    question.

 7                Part of the focus was on terminal care,

 8    part of the focus was on cancer pain, and part of

 9    the focus was on chronic pain more broadly, correct?

10           A    My memory of this, this was a focus on

11    use of heroin, et cetera, in terminal cancer pain.

12    That's my memory.  The gravamen of this whole thing

13    was on terminal illness.

14           Q.   Well, let's take a look and let's take a

15    look at the current status of pain therapy.

16                There's a section here called Chronic

17    Pain.  And what the committee observed was that

18    chronic pain, defined as pain which persists or

19    recurs at intervals for months and years, is caused

20    not only by chronic pathologic processes in the body

21    or nervous system, but also by psychopathology and

22    environmental influences, right?

23           A    That's what that page says.

24           Q.   And they observed that many patients

25    with chronic pain undergo progressive physical
```

```
 1                    Opioid Frye/Dr. Kessler            37
 2       deterioration, develop anxiety, depression and other
 3       emotional disturbances; didn't they?
 4            A    Yes.
 5            Q.   And they go on to say that chronic pain
 6       can lead people to become estranged from their
 7       families, lose their jobs and even commit suicide,
 8       correct?
 9            A    That's what that says, sure.
10            Q.   And although they indicated that the
11       effects were especially severe in patients with
12       cancer pain, their focus was not so limited.
13            A    I think the report is limited, is
14       focused on terminal illness if you go back to the
15       beginning of the document.  I mean, you have to
16       refresh my memory here, sir.
17                 I mean, I know you're on page 111, but
18       if you go to the beginning pages of this document, I
19       believe this is about terminal illness, and that's
20       really what it was addressing.
21            Q.   Well, let me ask you this, Doctor, since
22       you said that we would need to refresh your
23       recollection on this, this is not -- I believe this
24       is not on the list of materials that were provided
25       to us as materials you considered in arriving at the
```

```
1                        Opioid Frye/Dr. Kessler              38

2       expert opinions that you're offering in this case;

3       am I wrong about that?

4            A    No.  I mean, I did not specifically cite

5       this document.  I cited other documents that showed

6       that opioids were used prior to 1990 primarily in

7       cancer pain.  This is not inconsistent with that.

8            Q.   So one of the other government documents

9       that I want to take a look at is -- and this one I'm

10      sure you're familiar with and probably more familiar

11      with this one than with the interagency committee

12      report, and that is a report from the CDC that came

13      out just two years ago.

14                MR. BRODY:  Ms. Radford, can we go to

15           Tab 12.

16      BY MR. BRODY:

17           Q.   And, Doctor, you are familiar with the

18      Centers for Disease Control's morbidity and

19      mortality weekly report, correct?

20           A    Yes, an MMWR?

21           Q.   Correct.  I assume you're familiar with

22      this report, prevalence -- which includes a

23      discussion of the prevalence of chronic pain and

24      high impact chronic pain among adults in the United

25      States in 2016, correct?
```

1

2          A     Yes.  This is one of a whole host of CDC

3     documents it had issued during the epidemic.

4               MR. BRODY:  And if we go to page 5, CDC

5               on page 5 defines -- and, Ms. Radford, maybe

6               we can just go to the definitional sections

7               at the very bottom in the notes section of

8               the table there.  I'm sorry.  The bottom of

9               the table, just -- I think you have it

10              highlighted.  There you go.  Yeah, right

11              there.  That's perfect.

12    BY MR. BRODY:

13         Q.   CDC defines chronic pain as pain on most

14    days or everyday in the past six months.  And then

15    below that is a definition for high impact chronic

16    pain, which we see chronic pain limiting life or

17    work activities on most days or everyday in the past

18    six months; do you see that?

19         A     Fair, yes.  Good definition.

20              MR. BRODY:  And if we flip back to page

21              3, we see a summary of the findings in this

22              MMWR.  And actually, Ms. Radford, if we can

23              go to the highlighted portion -- perfect.

24    BY MR. BRODY:

25         Q.   In 2016 -- this is four years ago -- an

1

2    estimated 20.4 percent of U.S. adults, 50 million

3    people had chronic pain; and 8 percent of U.S.

4    adults, that's 19.6 million people, had high impact

5    chronic pain.  Those are the definitions that we

6    just looked at from that table, right?

7         A    We did.

8         Q.   And CDC is not the only government

9    agency that has been addressing the prevalence of

10   chronic pain and the impact of chronic pain on

11   Americans; are they?

12        A    The only federal agency, is that what

13   you're asking?

14        Q.   Correct.

15        A    I'm sure that others -- there are other

16   discussions of chronic pain.

17        Q.   Are you familiar with an interagency

18   task force report on pain management best practices

19   that was released just last year?

20        A    I think I've seen it, yes.  So 2019; is

21   that right?

22        Q.   That's correct.

23        A    Yes.

24        Q.   And that was a report put together by

25   multiple federal government agencies; wasn't it?

```
 1                       Opioid Frye/Dr. Kessler            41
 2          A    You'd have to refresh my memory, but I
 3     think that's fair.
 4          Q.   All right.  We can take a look at it,
 5     because they actually put a number on the economic
 6     impact of the CDC, the CDC figures.
 7               First of all, Doctor, this is the cover
 8     of the report.  I assume you're probably familiar
 9     with it.
10          A    I'm sure I've seen it.
11          Q.   Now, if we go to page 11, we will see
12     the task force citing the CDC figures and observing
13     that the cost of pain --
14          A    I'm having a little trouble.  I'm going
15     to try to -- I think you kindly sent me -- may I
16     just pull up my -- you sent me some tabs.
17               Can I open it, because I'm having a
18     little trouble reading?
19          Q.   Yeah.  We can even make it bigger for
20     you on the screen, if that helps.  Just pull out the
21     first paragraph there.  Is that better?
22          A    I'm sorry.  I just don't want to be
23     opening documents that you don't know that I'm
24     opening.  So if you can make it bigger or whatever.
25               MR. SHKOLNIK:  Your Honor, can the
```

```
 1                    Opioid Frye/Dr. Kessler              42
 2          witness be allowed to just pull up his copy
 3          so he has it there so he can see something
 4          above it and below it and not just a sliver?
 5              THE COURT:  Mr. Brody, are you okay with
 6          that?
 7              MR. BRODY:  I'm fine with it.  I just
 8          have one question.
 9              THE COURT:  Good.  Then we'll do that as
10          opposed to requiring counsel to get up on
11          redirect and reproducing the portions both
12          upper and lower.  Good.
13     BY MR. BRODY:
14          Q.   Doctor, I just have one question.  And
15     that's just, you know, we see here reference to the
16     same numbers that we saw in the CDC report, right?
17          A    Yes, I'm sure.  I take your
18     representation.
19          Q.   Well, we see 50 million and 19.6
20     million.  Those are the same numbers we had just
21     looked at, right?
22          A    Yes.
23          Q.   And then the interagency task force goes
24     on to say that the cost of pain to our nation is
25     estimated at between 560 billion and 635 billion
```

```
 1                        Opioid Frye/Dr. Kessler              43

 2    dollars annually, right?

 3         A    Of course.

 4         Q.   Now, Doctor, you have not attempted to

 5    quantify the extent to which the federal

 6    government's focus on the extent and impact of

 7    chronic pain in this country contributed to the way

 8    the medical profession has used opioid medications,

 9    correct?  That's not something you've tried to

10    quantify in your work in this case; is it?

11         A    Sort of an effect on in 2019 on the

12    epidemic?  Is that what you're asking?

13         Q.   My question, Doctor, was:  You have not

14    attempted, as part of your work in this case, to

15    quantify the extent to which the federal

16    government's focus on the extent and impact of

17    chronic pain in this country contributed to the way

18    the medical profession has used opioid medications;

19    have you?

20         A    So I definitely looked at those factors

21    that led up to the 1990s, and I did not see prior to

22    the 1990s the effect of the federal government as a

23    factor, and I did look, but I didn't see that.

24              I'm happy to talk about other factors,

25    but I didn't see anything about the federal
```

1

2    government, so certainly I tried to look at the

3    history.

4         Q.   So if you looked at the history, Doctor,

5    surely you're familiar with the fact that Alza, the

6    company that did the research and development of

7    Duragesic, did so specifically in response to the

8    federal government's request of pharmaceutical

9    manufacturers to develop agents to address pain.

10   You must have come across that, right?

11        A    Again, I'm not familiar with federal

12   government's driving opioid use by Alza, but if you

13   want to refresh my memory, I'm happy to have you do

14   that.

15        Q.   Okay.  I didn't see any discussion of

16   that in your expert report or material.  Did I miss

17   it?

18        A    No.  But I did identify the factors that

19   I saw that contributed to the epidemic.

20        Q.   Doctor, my question was a simple

21   question.  I didn't see any reference to that or to

22   those documents in your expert report or the

23   materials listed.  I didn't miss them; did I?

24        A    I'm not aware of such documents.

25        Q.   Okay.

```
1                    Opioid Frye/Dr. Kessler            45
2          A    Of such documents.  Sorry.
3          Q.   Right.  You did not.  Let me ask you
4     this, Doctor:  Have you done any calculation, made
5     any effort to quantify the extent to which medically
6     unnecessary or inappropriate prescriptions of
7     opioids sold by any of the manufacturer Defendants
8     in this case led to -- let's start with addiction?
9          A    A quantification, just so I can
10    understand exactly what you're asking me, whether
11    there's an association or a correlation between what
12    and what?
13         Q.   I asked whether you, Doctor, as part of
14    your work in this case, made any effort to quantify
15    the extent to which medically unnecessary or
16    inappropriate prescriptions of opioids, medically
17    unnecessary or inappropriate prescriptions of
18    opioids sold by any of the manufacturer Defendants
19    led to addiction?
20         A    Beyond the scope.  Clearly beyond the
21    scope.
22         Q.   So that's no, you have not?
23              THE COURT:  Time out.  Beyond the scope
24         of what?
25              THE WITNESS:  Beyond the scope of what I
```

1

2          looked at and beyond my report.  I have not

3          done that.

4   BY MR. BRODY:

5          Q.    Same answer for opioid abuse?

6          A     Just -- I want to make sure the

7   association of what about opioid abuse, sorry.

8          Q.    I'll tell you what.  I'm going to list

9   -- I have three more things I'm going to ask you

10  about.  I'll list them all at once at the end of the

11  question so that it's clear.

12          You have not made any efforts to

13  quantify the extent to which medically unnecessary

14  or inappropriate prescriptions of opioids sold by

15  any of the manufacturer Defendants led to opioid

16  abuse, misuse or overdose in New York; have you?

17          A     No.  I've not quantified that.  It's

18  beyond the scope of what -- of my report.

19          Q.    Doctor, the bottom line is, I believe,

20  that you personally did not believe that you could

21  go in front of a court and say that you have a

22  learned methodology that is reproducible or

23  acceptable to determine the extent to which a

24  manufacturer is responsible for the opioid crisis;

25  do you?

```
 1                   Opioid Frye/Dr. Kessler              47
 2          A    I certainly have a learned methodology
 3    in front of this Court.
 4          Q.   Doctor, my question -- I want you to
 5    listen to my question, because I think you'll agree
 6    with it.  You personally do not believe that you,
 7    David Kessler, could go in front of a court and say
 8    that you have a learned methodology that is
 9    reproducible or acceptable to determine the extent
10    to which a particular manufacturer is responsible
11    for the opioid crisis; do you?
12          A    So I certainly do.  If you -- you'll
13    have to define extent.  I have certainly a learned
14    methodology to the fact that the manufacturers
15    contributed by their promotional messages, right, to
16    increased use, and that increased use led to
17    increased risk of addiction.
18               I certainly have a learned -- I mean, a
19    methodology for that.
20          Q.   So you've sort of reached an end of the
21    line basic sort of conclusion, if you will?
22          A    I'm not sure I understand what you're
23    saying "end of the line."  It is -- every single
24    statement that I have given and it was listed, you
25    know, that promotion has an effect on prescription
```

```
 1                    Opioid Frye/Dr. Kessler              48

 2      sales and appropriate prescription has an effect on

 3      sales, those sales have increased, make opioids

 4      available and availability affects the risk of use.

 5              All those have strong support.  There's

 6      no end of the line.  At each one of those

 7      statements, there's multiple and multiple levels of

 8      evidence.

 9          Q.   Doctor, putting aside even the question

10      of medically unnecessary or medically inappropriate

11      prescriptions, you didn't do anything to try to

12      measure -- let's just take Duragesic -- the rate of

13      the abuse, misuse or diversion of Duragesic; did

14      you?

15          A    I, I, again, as I've said multiple

16      times, I think as we've discussed, I have relied on

17      the record and specifically companies' documents and

18      surveys of the use.

19          Q.   Doctor, you did a nearly identical

20      report and employed an identical so-called

21      methodology when you offered opinions in the MDL;

22      didn't you?

23          A    There are certainly areas that were

24      explored that were broader in New York than for

25      other areas, but the same essential, essential -- I
```

1

2      mean, the report that I did for Judge Polster's

3      case, that same methodology, I think, would be fair

4      to say I used here.

5           Q.   Doctor, and there, as here, in forming

6      your opinions in the case, you did not do any

7      specific analysis of the question of what the rates

8      of abuse, misuse or diversion of Duragesic are,

9      whether for medically unnecessary prescriptions or

10     any prescriptions at all, correct?

11          A    I, I didn't do anything outside of the

12     record, no.

13          Q.   And so the answer is no, you did not do

14     any specific analysis of that question, correct?

15          A    Well, again, analysis -- you're saying

16     analysis.  I mean, all, all the studies and data

17     that I looked at were either company or other data.

18     I could not generate my own data.

19          Q.   Right.  You did nothing to measure the

20     rate of abuse, misuse or diversion of Duragesic; did

21     you?

22          A    Outside of the record?

23          Q.   You didn't do any specific analysis of

24     that question; did you, Doctor?

25               MR. SHKOLNIK:  Your Honor, objection.

```
 1                     Opioid Frye/Dr. Kessler              50
 2               THE COURT:  Time out.  Objection.
 3               MR. SHKOLNIK:  The objection is this
 4        exact same question --
 5               THE COURT:  Asked and answered, right?
 6               MR. SHKOLNIK:  -- was asked and answered
 7        Friday and today.
 8               THE COURT:  I got it.  Sustained.
 9               Move on.
10    BY MR. BRODY:
11        Q.    Doctor, let me ask it this way:  It's a
12    slightly different question, your Honor, and I
13    apologize.  I think that we may be getting tripped
14    up, Dr. Kessler, on one term.
15               So I'm going to ask it differently, and
16    I thought I had asked it differently.
17               THE COURT:  Go ahead.
18    BY MR. BRODY:
19        Q.    You did nothing to measure, measure the
20    rate of abuse, misuse or diversion of Duragesic; did
21    you?
22               MR. SHKOLNIK:  Objection.
23               Asked and answered.
24               THE COURT:  Why is it different?
25          Mr. Brody, why is it different?
```

```
 1                      Opioid Frye/Dr. Kessler            51
 2               MR. BRODY:  It's different --
 3               THE COURT:  Hang on.  Doctor, can you
 4          handle the question?
 5               THE WITNESS:  Can I handle it, your
 6          Honor?  Is that what you said?  Yeah, I can
 7          handle it.
 8               THE COURT:  Answer the question.  Then
 9          we'll move on.  Go ahead.
10          A    No, I did not do anything outside of the
11     record.
12               MR. BRODY:  Can we, Ms. Radford, pull up
13          the MDL deposition, page 572, lines 10
14          through 15.
15     BY MR. BRODY:
16          Q.   Doctor, you were asked, in forming your
17     opinions in this case, what, if anything, did you do
18     to measure the rate of abuse, misuse or diversion of
19     Duragesic, and you answered:  I did not do any
20     specific analysis on that question.
21               That was your testimony, correct?
22          A    That was exactly my testimony.  Again, I
23     assume there's nothing after that, but that would be
24     correct.
25               MR. BRODY:  So, Ms. Radford, can we
```

```
1                          Opioid Frye/Dr. Kessler          52

2           bring up our demonstrative again, please.

3                I believe we've covered all these

4           questions, so we'll pull the last line up

5           there, and we can cross that one out as well.

6                Now, your Honor, I believe that we have

7           a copy of the final version of the

8           demonstrative for the Court as well as for

9           the Plaintiffs' counsel.

10               We ask that that be marked for

11          identification purposes, and I also, I

12          believe I referred to three different

13          documents today, the task force report from

14          1979, we'd ask that that be marked as Defense

15          Hearing Exhibit 1.

16               That the MMWR report from CDC be marked

17          as Defense Hearing Exhibit 2, and that the

18          2019 pain task force report be marked as

19          Defense Hearing Exhibit 3.

20               THE COURT:  Did you assign a number to

21          the Plaintiffs?

22               THE COURT OFFICER:  No.

23               THE COURT:  One at a time.  What?

24               THE COURT OFFICER:  It should be A.

25               THE COURT:  No, no, not the exhibit, the
```

```
 1                    Opioid Frye/Dr. Kessler         53
 2      sheet.  Thank you.
 3           We gave the Plaintiffs numbers?
 4           THE COURT OFFICER:  Yes.
 5           THE COURT:  How about from 1, 2 and 3 to
 6      B, C and D.  We're already assigning exhibit
 7      identification tags as numbers to the
 8      Plaintiff.  Customarily we do that here.  So
 9      you can have the alphabet.
10           MR. BRODY:  Great.  Thank you, your
11      Honor.  However they're marked is fine.  I
12      just want to be sure that they're marked for
13      the record and that the demonstrative exhibit
14      is marked for the record as well.
15           MR. SHKOLNIK:  Your Honor, if I could
16      just ask a quick question because I'm now
17      confused.
18           The pain management best practices
19      report was -- what did Mr. Brody mark it as,
20      because I'm going to reference these things.
21           THE COURT:  Mr. Brody, can you answer
22      that?
23           MR. BRODY:  So the pain management was a
24      2019 report, and I believe your Honor
25      indicated that would be D.
```

1                    Opioid Frye/Dr. Kessler              54

2              THE COURT:  Right.

3              MR. SHKOLNIK:  D, okay.  And the Carter

4      administration report from 1979 was which?

5              MR. BRODY:  I believe that is B.

6              MR. SHKOLNIK:  B, thank you.

7              MR. BRODY:  And I believe then our

8      demonstrative is Defense Hearing Exhibit A.

9              MR. SHKOLNIK:  Thank you very much.

10             THE COURT:  So noted.

11             MR. BRODY:  Thank you, Dr. Kessler.

12             THE WITNESS:  Thank you, Mr. Brody.

13             MR. BRODY:  And, your Honor, I have one

14     last request, that there be a time limit on

15     redirect.

16             THE COURT:  I enjoy when I hear time

17     limits because the nature, the extent and its

18     efficiency of evidence is not necessarily

19     connected to a time; meaning, if Mr. Shkolnik

20     takes 25 minutes, so be it, but right now I

21     won't assign a time limit, but if my

22     impression is that it's becoming -- it's

23     outside the scope of the cross-examination

24     and -- or it's new matter, I'll end the

25     examination.

```
1                    Opioid Frye/Dr. Kessler              55
2              MR. BRODY:  Thank you, your Honor.
3              THE COURT:  Also, just a heads-up, if I
4         sustain objections three times for asked and
5         answered, generally I consider the
6         examination complete.
7              Mr. Shkolnik, redirect.
8              MR. SHKOLNIK:  I plan on being quick,
9         your Honor.
10             THE COURT:  Okay.  Mr. Brody, I think he
11        answered your question.  He's going to be
12        quick.
13             MR. BRODY:  Thank you, your Honor.
14             THE COURT:  We'll soon find out what
15        that means.
16             MR. SHKOLNIK:  Thank you, your Honor.
17   REDIRECT EXAMINATION
18   BY MR. SHKOLNIK:
19        Q.   Dr. Kessler, good morning.  And I'll be
20   true to my word, and I will be quick.  I'm just
21   going to just quickly --
22        A    Mr. Shkolnik, I can't -- not that it's
23   relevant necessarily, but I can't see you.  You're
24   not in the frame.  You're not even partially --
25   that's just me in my window.  I apologize.
```

```
1                    Opioid Frye/Dr. Kessler          56
2              Now I can see you partially, about a
3    quarter of your face.
4         Q.   How is that, better?
5         A    I don't see you, but I hear you well and
6    I'm happy to proceed.
7         Q.   Okay.  Thank you.  Is there any way for
8    this camera to be showing --
9         A    It's just my window maybe perhaps.
10             THE COURT:  As you move to your left,
11             you're in full view.
12             MR. SHKOLNIK:  There I am.  Thank you.
13             Got it.  I looked better the other way...
14   BY MR. SHKOLNIK:
15        Q.   Dr. Kessler, I just want to go back to a
16   couple of the documents that counsel asked you
17   about, and I'm going to start with the Exhibit B,
18   which was the report generated from the President
19   Carter commission.
20             And you started to answer some questions
21   to counsel about what was the goal of that study or
22   that commission.
23             THE COURT:  It looks like another app is
24             using the camera.  I'm reading what's showing
25             up on the screen.
```

```
 1                    Opioid Frye/Dr. Kessler           57
 2   BY MR. SHKOLNIK:
 3        Q.   Dr. Kessler, I'm taking a page that you
 4   were not shown from the report, and I would just
 5   like you to take a quick look at it, if you would,
 6   and I highlighted them.
 7        A    Counselor, I apologize.  It may be my
 8   age or my eyesight, but there is just no way I can
 9   see that page.
10        Q.   Okay.  I'm going to read it to you to
11   make it a lot easier, Doctor.
12        A    Thank you kindly.
13        Q.   There is something at the beginning of
14   the document.  It says "The foreword" and it says
15   the Interagency Committee on New Therapies for Pain
16   and Discomfort composed of federal commissions and
17   scientists was created in late 1977 to assess the
18   status of research on intractable pain and human
19   care of dying patients and to develop
20   recommendations in these two areas.
21             Is that your recollection of what the
22   commission was focused on back in that 1979 report?
23        A    Yes.  It was on terminal cancer,
24   terminal patients.
25        Q.   And I want to go on and read:  A primary
```

```
1                     Opioid Frye/Dr. Kessler              58

2      objective of the committee is to promote research on

3      the mechanism and appropriate treatment of severe

4      pain and discomfort -- I'm quoting -- experienced by

5      terminally ill patients, closed quotations.

6               Is that your recollection, sir, as to

7      what --

8           A    Yes --

9           Q.   -- this panel was focusing on?

10          A    Yes.  That would be fair.  It was the

11     use of specifically of heroin, marijuana in that

12     terminal cancer patient.

13          Q.   I'm just going to go on in that same

14     vain.  It goes down and says:  In general, the

15     committee was formed in response to express interest

16     of the White House -- that's the Carter

17     administration -- and Peter Bourne, then director of

18     Office of Drug Abuse policy, in the problems of pain

19     and other discomforts of the dying and in fostering

20     research on possible pain relieving characteristics

21     of abused substances not approved for treatment in

22     the United States.

23               Was that your recollection of what they

24     were studying at that time?

25          A    That was what they were studying, yes.
```

```
 1                    Opioid Frye/Dr. Kessler              59
 2          Q.   And, in fact, that panel was looking at
 3   whether or not you should be allowed to prescribe
 4   heroin to those people who were terminally ill and
 5   dying; fair statement?
 6          A    Fair statement.
 7          Q.   Does this have anything whatsoever to do
 8   with the methodology you utilized in this case and
 9   the causes of the opioid epidemic as they exist in
10   New York, as they exist in the United States?
11          A    I don't think so.  I mean, only to the
12   extent that it reinforces my point that prior to the
13   1990s, certainly strong -- the strongest opioids
14   here, heroin, was being thought about for cancer
15   pain, in this case terminal cancer pain.
16               So it reinforces what my report and what
17   I've testified to and what no one was talking about
18   using strong opioids for chronic back pain, or
19   osteoarthritis, or outside of the very severe pain
20   such as terminal illness.
21          Q.   Thank you.  Now I'm going to show you
22   another document that counsel asked you a couple
23   questions about.  He just showed you one sentence or
24   two sentences or a paragraph.  And that is Exhibit
25   D.
```

```
 1                    Opioid Frye/Dr. Kessler            60

 2            And I'm going to put up the executive

 3      summary from the pain management best practices

 4      report from 2019.  I know you're probably not going

 5      to be able to see this one either.  I'm having a

 6      hard time here.

 7               I highlighted a sentence in it, Doctor,

 8      and it says:  At the same time our nation is facing

 9      an opioid crisis.  That over the past two decades

10      has resulted in an unprecedented wave of overdose

11      deaths associated with prescription opioids, heroin,

12      and synthetic opioids.

13               I just read that from the document

14      counsel questioned you about that was issued in

15      2019.

16               Doctor, is that part of the report

17      consistent with your methodology and your opinions

18      in this case?

19            A    Sure.

20            Q.    Could you -- when the report says that

21      we were facing an opioid crisis that over the past

22      two decades has resulted in an unprecedented wave of

23      overdose deaths associated with prescription drugs,

24      is that consistent with your opinions, your

25      methodology and the work you have done over the last
```

```
1                      Opioid Frye/Dr. Kessler              61
2      35 years in the field of prescription medications?
3           A    Sure.
4           Q.   Would I be correct in stating,
5      Dr. Kessler, that the reports from 2019 regarding
6      best practices and how to use prescription opioids
7      has come about because of the unprecedented two
8      decades of deaths associated with prescription
9      opioids?
10          A    It certainly was -- it got people's
11     focus, correct.
12          Q.   And that is consistent with the
13     methodology that you employed in this case, correct,
14     sir?
15          A    Yes, sir.
16          Q.   By the way, over the years, have you
17     been consulted with -- by other commissioners at FDA
18     in terms of your expertise and your knowledge of the
19     regulatory practices to assist them in carrying out
20     their charge and their duties as FDA commissioners?
21               THE COURT:  Just yes or no, Doctor.
22          Just yes or no.
23          A    Yes.
24               THE COURT:  Next question.
25     BY MR. SHKOLNIK:
```

```
 1                      Opioid Frye/Dr. Kessler          62
 2          Q.   You were asked a lot of questions,
 3     quote, did you quantify, dot, dot, dot.
 4               When you were giving answers in response
 5     to those did you quantify questions, you repeatedly
 6     said no, other than relying on the record.
 7               Could you tell the Court and jury how
 8     that comes into play.
 9               THE COURT:  There's no jury here.
10               MR. SHKOLNIK:  Oh.  Sorry.  I miss
11          them...
12     BY MR. SHKOLNIK:
13          Q.   Could you tell the Court how, how you
14     came about utilizing the, quote, record in terms of
15     this issue of quantify in response to the prior
16     questions?
17          A    Sure.  I'd be happy to explain that.
18     Should I go ahead?
19          Q.   Yes, please.
20          A    I mean, so if you, you know, you just
21     look at, for example, Mr. Brody's demonstrative, I
22     don't have it in front of me, but if you just take
23     the first one, for example, I think it was speak to
24     doctors.  All right.
25               I didn't speak to doctors.  I didn't
```

```
 1                        Opioid Frye/Dr. Kessler            63

 2      quantify what doctors said or ask doctors why they

 3      wrote prescriptions.  I didn't do that personally.

 4      But if you look at my report and you look at certain

 5      paragraphs of my report, the companies, the

 6      Defendants did that, but they did it in a systematic

 7      way.

 8                      Relying on appropriate kind of

 9      statistical methodology, they spoke to doctors, they

10      asked doctors why they wrote prescriptions, and to

11      the extent that it was relevant, I cited those

12      surveys in my report in certain paragraphs, and

13      there's a number of them.

14                      So I didn't go beyond the record to

15      quantitate.  The quantification and the evidence is

16      cited in the report, but the companies did that.

17      They spoke to doctors.  They asked doctors why they

18      wrote prescriptions.

19                      They knew, for example, message recall,

20      the effects of their sales force, et cetera.  So

21      they surveyed doctors.  I would not go out.  I did

22      not go out and quantitate separately from their own

23      studies.

24          Q.   Now, Doctor, I put up on the screen

25      Mr. Brody's methodology, I'll refer to it, his
```

1

2  methodology or list of things he wanted you to do.

3           Is that the type of things that you

4  would do as an expert in the field of having come

5  from FDA in terms of reaching your opinions in a

6  case like this?

7       A    No.  If I were at the FDA or as an

8  expert, you know, you go look -- I mean, I won't go

9  out independently and speak to doctors or ask them

10  why they wrote.  I didn't do that when we were

11  taking enforcement actions.

12           I mean, I would look at the actions of

13  the companies and what they did, and I certainly

14  would look at any documents that were relevant about

15  surveys that they did, for example, their message

16  recall, but I wouldn't go out on a sort of ad hoc

17  basis independently to do that.  That's not the way

18  we did things.

19       Q.   When you say "we," we as in the

20  methodology employed at FDA over the years that you

21  were there and since, correct?

22       A    Yeah.  I apologize.  Again, the

23  footnote, I don't represent the FDA.

24       Q.   I understand.

25       A    But if you go look at any DDEMAC letter

```
 1                        Opioid Frye/Dr. Kessler            65

 2     or any enforcement letter, they are looking at the

 3     information that they received -- the companies,

 4     they wouldn't go out independently and speak to

 5     doctors or ask doctors why they wrote prescriptions.

 6               That was not part of the methodology

 7     that was used for enforcement when I was at the

 8     agency.

 9          Q.    I'm going to just show you a

10     demonstrative we made over the weekend, and I think

11     we've updated it since.  Can you see this,

12     Dr. Kessler?  Is it coming through?

13          A     Correct.

14          Q.    Okay.  I have on the left side in this

15     demonstrative Mr. Brody's methodology that he was

16     kind enough to lay out for us over the last day

17     where he has the red writing and the Xs.

18               I'm going to correct my demonstrative,

19     and I'm going to write down Kessler methodology on

20     the right side.  Dr. Kessler methodology.

21               Just so it's clear, in terms of your

22     methodology, as well as the methodology you employed

23     having been with FDA and your experience over the

24     years, would it be custom and practice under

25     methodology to speak to the doctors?
```

```
1                          Opioid Frye/Dr. Kessler              66

2            A     No.  Let me understand.  This is to

3      determine whether -- just so we're clear -- about

4      whether behavior was violative, whether prescription

5      -- whether promotion was improper, correct?

6            Q.   Yes, Doctor.  Yes, Dr. Kessler.

7      Consistent with what Mr. Brody was suggesting in his

8      methodology.  Would you do that?

9            A     I understand.  I just want to reclarify.

10     With regard to whether promotional activity were

11     violative, no, FDA would not speak to doctors.

12           Q.   I'm going to ask you the same question

13     that he asks as his second methodology, Mr. Brody's

14     Number 2.  Ask doctors why they wrote prescriptions.

15     Would that be the appropriate methodology employed

16     if that was suggested?

17           A     No.  That would not be, but if there

18     were, as there is, for example, recall, message

19     recall studies that the company would undertake as I

20     did hear, I think those studies that the company

21     undertook would be relevant.  And I've looked at

22     those, but I wouldn't go out independently and ask

23     doctors why they wrote prescriptions.

24           Q.   And is that because you wouldn't do that

25     if you had been doing this at the time you were with
```

```
1                        Opioid Frye/Dr. Kessler              67

2       FDA?

3              A     Correct.

4              Q.    Let me ask you about the next

5       methodology he's suggesting.  Identify medically

6       unnecessary prescriptions.  Would that be something

7       that you, as an FDA commissioner, expert, would

8       employ in the manner in which Mr. Brody suggested

9       you should be doing it?

10             A     No, I would not.  It would be

11      irrelevant, I mean, at that specific level, at the

12      individual patient level.

13             Q.    Let me ask you the next level of

14      evidence or research that Mr. Brody was suggesting

15      in his methodology.  Read patients' medical records.

16      In the context that Mr. Brody asked you yesterday,

17      would it be appropriate methodology to do that, sir?

18             A     Never.  I mean, to determine whether a

19      promotional activity was violative, you would never.

20      I mean, I can't see how you would do that.

21             Q.    Let me ask you another question from

22      Mr. Brody's methodology.  Review patients' medical

23      history is the way he suggested he wanted you to do

24      that in order to reach opinions as to whether or not

25      his client and the rest of these manufacturers of
```

                        Opioid Frye/Dr. Kessler                68

1

2    opioids improperly promoted and marketed

3    prescription opioids.

4              Would it be appropriate to be looking at

5    the patients' individual medical histories here in

6    Nassau and Suffolk County?

7         A    No, absolutely not.

8         Q.   Why don't you tell us why that would be

9    an improper methodology?

10        A    Well, the basic methodology in

11   determining whether a behavior of a company is

12   violative or deviated would be to look at the

13   evidence in the label, the evidence in the new drug

14   application, the evidence in the medical literature

15   to see whether the activities of the company are

16   supported.

17             I'm not even sure how you would get the

18   -- where the patient's medical history is relevant

19   to determining whether there was a deviation.  I

20   just don't -- I can't compute that.  It would just

21   be outside, completely outside of any standard

22   practice.

23             THE COURT:  Doctor, the issue of

24        relevance goes to your methodology, correct?

25        When you say it's not relevant, you're

```
 1                      Opioid Frye/Dr. Kessler          69
 2            talking about your methodology, the
 3            methodology employed by yourself, correct?
 4                 If I'm not correct, you'll tell me.
 5                 THE WITNESS:  Yes, your Honor.  I think
 6            that's fair, but can I just add, that
 7            methodology is also grounded in what I was
 8            trained and how I did it.  I mean, how we did
 9            it at FDA.
10                 So I mean -- so it's really -- I just
11            want to make sure that it's not just my
12            methodology, you know, that I just pulled
13            out.  I'm trying to bring to the Court, you
14            know, what, how, you know, the generally
15            accepted approach that I, as commissioner, I
16            mean at FDA, would apply.
17                 THE COURT:  So you're telling the Court
18            the methodology that you employed was derived
19            from similar methodology at the FDA?
20                 THE WITNESS:  Yes, I think that's fair,
21            your Honor, yes.
22                 THE COURT:  Yes is fine.
23                 Go ahead.  Next question.
24      BY MR. SHKOLNIK:
25            Q.   And that methodology would be the
```

                              Opioid Frye/Dr. Kessler                70

1

2     consensus followed under FDA regulatory schemes,

3     correct, sir?

4          A    Yes, sir.

5          Q.   And that was deemed to be reliable

6     methodology; was it not?

7          A    It's certainly what our nation has used

8     for the last 50 years in that framework.  Yes, I

9     think it's accepted.

10         Q.   I'm going to just go through the rest of

11    this fairly quickly so we don't be belabor the

12    point, but Mr. Brody's analysis and methodology is

13    suggesting you should be doing a prescription claims

14    analysis.

15              I'm not quite sure what he meant by

16    prescription claims analysis, but what you

17    understood it to mean, would that have been

18    appropriate under the generally accepted consensus

19    methodology of the FDA?

20         A    No.  I understand what he means, but

21    it's not something that FDA would do.

22         Q.   Let's talk about his suggestion that you

23    -- Mr. Brody's methodology review aggregated claims

24    data.  I assume that means like insurance company

25    claims data.

```
 1                    Opioid Frye/Dr. Kessler              71
 2              Would that be something that would be
 3    deemed generally accepted, consensus, reliable based
 4    upon FDA methodology?
 5         A    It would not.
 6         Q.   Why not?
 7         A    Because it's not the way -- I mean, it's
 8    not relevant either to my or to FDA's methodology or
 9    approach to these questions.
10         Q.   Mr. Brody suggested that you should be
11    looking at the review of individual patient
12    outcomes.  You should be coming down here to Nassau
13    and Suffolk County and track down individual patient
14    outcomes as part of a generally accepted consensus,
15    reliable methodology employed by the FDA.  Is he
16    right or is he wrong, sir?
17         A    It's not the way -- it's just not the
18    way it was done at FDA, nor would it be part of my
19    methodology.
20         Q.   And he then suggested that maybe you
21    could have looked at an aggregation, an aggregation
22    of patient outcomes of the people who have died and
23    become addicted here in Nassau and Suffolk County in
24    order for you to properly reach your opinions.
25              Would that be deemed a generally
```

1

2      accepted, consensus, reliable approach?

3             A     No.  Completely beyond any methodology

4      that the FDA would use.

5             Q.    How about, you know, going out and

6      picking up the phone and surveying all the doctors

7      in Nassau and Suffolk County, would that be

8      something that you would have had to do under FDA

9      methodology to be deemed generally accepted,

10     consensus, reliable?  Would you have had to have

11     done that?

12            A     No.  One would not do it that way.

13     Again, as I said, I mean, if there were surveys that

14     were done that were in the possession of the

15     companies, those could be relevant, but not to pick

16     up the phone and call individual doctors.

17            Q.    He also suggested that you should do --

18     this is now conduct a quantitative analysis of New

19     York prescribing.  I didn't quite understand what

20     that meant by Mr. Brody's methodology, but is that

21     something that should appropriately be done in

22     accordance with FDA methodology to be deemed

23     generally accepted, consensus or reliable?

24            A     It would not be.

25            Q.    Why not?

```
 1                    Opioid Frye/Dr. Kessler          73
 2          A    Because, again, it doesn't go to the
 3    question of deviations or violative behavior.
 4          Q.   Today he added two more, two more items
 5    to his methodology:  Analyze impact of pill mill
 6    illicit drugs or diversion.  And I think you said
 7    you didn't do that in the way in which he phrased
 8    it.
 9               Would it have been in accordance with
10    generally accepted practice, FDA practices, the
11    consensus in FDA practices or the reliability of FDA
12    practices and methodology to do as he suggested on
13    his examination this morning?
14          A    No, it would not be.
15          Q.   Why not, sir?
16          A    Because, again, that impact of pill
17    mills doesn't relate to whether there was a
18    deviation or whether it was violative behavior.
19          Q.   And, lastly, he wanted you to, once
20    again, quantify rates of abuse, misuse or diversion.
21    Would that have been -- when I say "he," Mr. Brody's
22    methodology, would that have been in accordance with
23    FDA methodology that was to be employed in your
24    analysis in this case in order to be generally
25    accepted, a consensus or reliable?  Would that have
```

Opioid Frye/Dr. Kessler                    74

1   been an appropriate methodology to do?

2          A    No.

3          Q.   Why not?

4          A    Because, again, it doesn't go to the

5   central question of whether there were deviations in

6   promotional activity.

7                MR. SHKOLNIK:  Your Honor, I have no

8                further questions.  Thank you so much.

9                THE COURT:  Okay.  I recall the Court's

10               order indicates every witness will be subject

11               to direct examination, cross-examination and

12               redirect.  So the witness is excused.  Thank

13               you.

14               MR. BRODY:  Thank you, Doctor.

15               THE COURT:  Hold on.  Mr. Brody, do you

16               have something to say?

17               MR. BRODY:  I was just thanking

18               Dr. Kessler for his time, and thank your

19               Honor as well.

20               THE COURT:  Thank you, Doctor.

21               THE WITNESS:  Thank you, your Honor.

22               And, again, I want to just thank the Court

23               for allowing me to testify remotely in the

24               pandemic.  Thank you very much.

```
 1                    Opioid Frye/Dr. Kessler        75
 2              THE COURT:  No need to, but you're
 3         welcome.
 4              THE WITNESS:  Thank you, your Honor.
 5              THE COURT:  Okay.  I believe
 6         Mr. Rafalski is next, correct?
 7              MR. SHKOLNIK:  Yes, your Honor.
 8              THE COURT:  We'll take ten minutes to
 9         set it up.
10              MR. SHKOLNIK:  Thank you.
11              THE COURT:  And I'll be back.  Thank
12         you.
13              (WHEREUPON, a short recess was taken.)
14              THE CLERK:  Come to order.  Part 48 is
15         now in session.
16              THE COURT:  By the way, I got a message
17         during the recess that all these mics are
18         live.  So certain banter might be being
19         picked up, so don't banter.
20              THE CLERK:  Counsel, your appearance for
21         the record, please.
22              MR. SCHMIDT:  This is Paul Schmidt for
23         McKesson.
24              THE COURT:  Ms. Conroy?
25              MS. CONROY:  Good morning.  And I hope
```

```
 1              Opioid Frye Hearing/Mr. Rafalski        76
 2         that we have -- I see Mr. Rafalski's face on
 3         the camera.
 4              MR. RAFALSKI:  Good morning, your Honor.
 5              MS. CONROY:  Good.  We can hear you as
 6         well.
 7              THE CLERK:  Mr. Rafalski, please raise
 8         your right hand.
 9              (WHEREUPON, J-A-M-E-S  E.
10         R-A-F-A-L-S-K-I, having first been duly sworn
11         by the Clerk of the Court, testified as
12         follows:)
13              THE CLERK:  Please be seated.  Please
14         state your full name, professional title and
15         professional address for the record.
16              THE WITNESS:  James E. Rafalski,
17         R-A-F-A-L-S-K-I.  I'm retired law
18         enforcement.  Last position was a diversion
19         investigator with the Drug Enforcement
20         Administration.
21              UNIDENTIFIED WOMAN SPEAKER:  Good
22         morning.  And I see Mr. Rafalski's face on
23         the camera.
24              THE COURT:  Who was that?
25              UNIDENTIFIED MALE SPEAKER:  Sorry, your
```

1

2   Honor.  That was the monitor in the room I'm

3   in.  Sorry.  It's been corrected, your Honor.

4           THE COURT:  Mr. Rafalski.

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Good morning.

7           THE WITNESS:  Good morning.

8           THE COURT:  I give all witnesses three

9   pointers.  It's just good common sense.  Of

10  course you're going to be asked a lot of

11  questions today.  The first pointer is listen

12  carefully to the question that's put to you,

13  and as best you can, limit your answer to the

14  information sought by the question.

15          Example, if I was in the witness chair

16  and a lawyer was to ask me on which street do

17  I live, I would simply offer the name of the

18  street.  I wouldn't volunteer the town, the

19  state, or the ZIP code because the

20  information sought is simply the identity of

21  the street.

22          Number 2, although it's not impolite in

23  life to commence an answer before a question

24  is complete, because we save time that way,

25  especially when we know exactly where the

```
 1                    Opioid Frye/Mr. Rafalski              78
 2              question is going, of course you understand
 3              in court we require a complete record.  So
 4              even though you may be certain where a
 5              question is going, wait for the question to
 6              be complete before you commence your answer,
 7              okay?
 8                   THE WITNESS:  Yes, sir, your Honor.
 9                   THE COURT:  Number 3, when you hear the
10              word "objection," just stop until I give you
11              direction, understood?
12                   THE WITNESS:  Understand, your Honor.
13                   THE COURT:  Thank you very much.
14                   Ms. Conroy, you may proceed.
15                   MS. CONROY:  Thank you, your Honor.
16      DIRECT EXAMINATION
17      BY MS. CONROY:
18              Q.   Mr. Rafalski, where are you today?
19              A    I'm in Detroit, Michigan, downtown
20      Detroit, Michigan, and I'd like to take the
21      opportunity to thank your Honor and the Court for
22      allowing me to do this remotely.
23                   THE COURT:  No need, but you're welcome.
24                   THE WITNESS:  Well, the two-week
25              quarantine, I greatly appreciate it.
```

```
1                    Opioid Frye/Mr. Rafalski          79
2              THE COURT:  You're very welcome, sir.
3    BY MS. CONROY:
4         Q.   Mr. Rafalski, we're going to get into
5    your background in more detail, but I want to ask
6    you a couple of preliminary questions.
7              What is your profession?
8         A    Currently I'm retired.  Previous to that
9    I was a diversion investigator with the Drug
10   Enforcement Administration.  Currently I'm retained
11   as an expert witness by the Plaintiffs in this case.
12   I guess that would be one of my employments.
13        Q.   Okay.  And what expertise do you bring
14   to this case?
15        A    The same expertise I used with DEA as a
16   diversion investigator performing complex
17   administrative investigations.  There were more
18   duties within my employment than that, but that was
19   the one that I brought to -- brings me here today.
20             MS. CONROY:  Thank you.  And let me show
21             what we have as Slide Number 2, which was
22             your assignment in this case.  Can we bring
23             that slide up.
24             MR. SCHMIDT:  And, Counsel, is there a
25             way to send these slides around if you're
```

```
 1                        Opioid Frye/Mr. Rafalski              80

 2              going to be using them?

 3                   MS. CONROY:  I believe they have been

 4              sent, but if you want to wait a second, but

 5              my understanding is they have been sent.

 6                   MR. SCHMIDT:  I'll try to confirm that.

 7              I don't mean to hold you up.

 8                   THE COURT:  You'll let me know if you

 9              have it.

10      BY MS. CONROY:

11              Q.   Mr. Rafalski, do you see the assignment

12      on the slide?  Can you see that?

13              A    Yes, ma'am, I can.

14              Q.   And would you read it, please.

15              A    Confirm that each Defendant maintained

16      adequate control against diversion and identified

17      blocked and reported suspicious orders.

18              Q.   And did you do that assignment?

19              A    Yes.  That was my assignment upon being

20      hired.

21              Q.   Okay.  And did you do that for Defendant

22      Allergan?

23              A    Yes, ma'am.

24              Q.   Defendant Teva?

25              A    Yes, ma'am.
```

```
1                    Opioid Frye/Mr. Rafalski              81
2            Q.    Defendant Johnson & Johnson, Janssen?
3            A     Yes, ma'am.
4            Q.    Endo Pharmaceuticals, did you do it for
5    that Defendant?
6            A     Yes, ma'am.
7            Q.    Did you do it for AmerisourceBergen?
8            A     Yes, ma'am.
9            Q.    And did you do it for Defendant
10   McKesson?
11           A     Yes, ma'am.
12           Q.    Did you do it for Defendant Cardinal
13   Health?
14           A     Yes, ma'am.
15           Q.    Did you do it for Defendant Walgreens?
16           A     Yes, ma'am.
17           Q.    And did you do it for Defendant CVS?
18           A     Yes, ma'am.
19           Q.    And to complete that assignment, can you
20   tell me briefly just in categories what you did.
21           A     Well, essentially -- not essentially.  I
22   employed the same methodology or the same
23   investigative techniques that I utilized when I was
24   with the DEA.  It was pretty much the standard type
25   of investigation or the way that a standard
```

```
 1                     Opioid Frye/Mr. Rafalski            82

 2     investigation would be completed on these type of

 3     complex administrative matters.

 4                     I first would request lots of documents.

 5     First I'd like the transaction data for the time

 6     period that I was going to analyze.  I was likely to

 7     require -- I'm sorry -- to request the suspicious

 8     order policies, the standard operating procedures,

 9     any of the procedures that had to do with the

10     maintenance of effective controls that would be due

11     diligence type of investigations, outside

12     communications, emails, internal documents.

13                     And upon gaining all of those documents,

14     I would analyze them.

15          Q.    Thank you.  And when you did that, were

16     you using the exact same approach or methodology

17     that you employed when you were a diversion

18     investigator for the DEA?

19          A     Yes, it would be the same.

20          Q.    At DEA you would look at standard

21     operating procedures?

22          A     Yes, ma'am.

23          Q.    At DEA, you would pull records randomly

24     from sample customers?

25          A     Yes, ma'am.  Typically we would call
```

```
 1                    Opioid Frye/Mr. Rafalski           83
 2    those customer files.
 3         Q.   Okay.  You would check to see what was
 4    reported to DEA and what was not?
 5         A    Yes, ma'am.
 6         Q.   You, while at the DEA, would ask for
 7    documents like due diligence files and transactional
 8    data?
 9         A    Yes, ma'am.
10         Q.   And you would use the services of expert
11    data analysts to assist in evaluating that
12    transactional data?
13         A    Yes, ma'am.
14         Q.   Okay.  Would you agree that there was
15    nothing novel or unusual about that process?
16         A    No, I would not.  That's not novel.  It
17    would be a typical DEA investigation.
18         Q.   In your experience was that methodology
19    reliable?
20         A    Yes, ma'am.
21         Q.   Was it generally accepted at DEA?
22         A    Yes, ma'am.
23         Q.   You're being paid for your time,
24    correct?
25         A    Yes, I am.
```

Opioid Frye/Mr. Rafalski                    84

1

2          Q.   And are your opinions that you have

3    reached in this case based on a reasonable degree of

4    professional certainty?

5          A    Yes, ma'am.

6          Q.   Now, mindful of the Court's comments on

7    Friday and this morning, I would like to separate --

8    what we're going to talk about is two separate

9    sections before lunch, hopefully before lunch, maybe

10   we will go a little bit longer.

11              First I want to go through your

12   qualifications as an expert witness who will be

13   asked to offer opinions about the Defendants we

14   listed earlier.

15              And second, we want to explore in more

16   depth the methodology that you used to arrive at

17   your opinions.

18              Does that sound okay?

19         A    Yup.  It sounds fine, ma'am.

20         Q.   Now, you were first hired in this case

21   in 2017, correct?

22         A    Yes, ma'am.

23         Q.   And would it be fair to say by this

24   case, it would be the opioid litigation generally?

25   Nationwide there were cases that were being filed in

```
 1                    Opioid Frye/Mr. Rafalski            85
 2     many jurisdictions by counties and cities against
 3     the manufacturers, the distributors and the chain
 4     pharmacies, correct?
 5          A     That's correct.
 6          Q.    And you filed a report early on in the
 7     case in the Ohio Federal Court litigation, correct?
 8          A     Yes.  Typically that's called CT1,
 9     Cuyahoga and Summit Counties, Ohio.
10          Q.    And that was last winter you filed that
11     report, correct?
12          A     Yes, ma'am.
13          Q.    2019?
14          A     Yes, ma'am.
15          Q.    And then about a year later or close to
16     11 months later, you filed a report here in the New
17     York action in December of 2019, correct?
18          A     Yes, ma'am.
19          Q.    And I think you've just recently filed
20     yet another report, and maybe others, but just last
21     week one in West Virginia; is that correct?
22          A     Yes, sir.  Specifically the -- or yes,
23     ma'am.  Specifically the City of Huntington in
24     Cabell County.
25          A     Thank you.
```

Opioid Frye/Mr. Rafalski                    86

Q.   So let's get to who you are, okay?

So if we can take a look at Slide 3, I'm
going to go down memory lane here.  We'll see if
anybody can figure out which face you are, but in
1976 you graduated from the Wayne County Sheriff's
Police Training Academy; do you remember that,
Mr. Rafalski?

A    I do.

Q.   You know you still look --

THE COURT:  Apparently mustaches were
in.

BY MS. CONROY:

Q.   1976.

A    That was all that was allowed, your
Honor, so that was rebellion to grow a mustache.

Q.   Did you always want to be a police
officer, Mr. Rafalski?

A    No, actually, I did not.  I graduated
from high school with a goal that I wanted to be a
product design engineer, and the economy and other
factors interrupted, you know, that goal, and I met
some friends who had siblings who were police
officers and became interested in the profession,
and I ended up as a police officer.

```
 1                    Opioid Frye/Mr. Rafalski         87
 2              Ironically, with the sheriffs type, I
 3   went with a friend who didn't know how to come down
 4   to Detroit, navigate to take the test, and I took it
 5   with him because I was down here and I --
 6              (Technical Skype video/audio
 7          interruption.)
 8              MS. CONROY:  Are you okay?  Can you hear
 9          us, Mr. Rafalski?
10              THE WITNESS:  I can hear you.
11   BY MS. CONROY:
12          Q.   Okay.  Good.  Now, in 1981 you joined
13   the Romulus Michigan Police Department, correct?
14          A    Yes, ma'am.
15          Q.   Okay.  And you were on the force for 27
16   years; is that right?  You're doing the math?
17          A    Yeah.  I think '81 to 2002.  So I think
18   21 years.
19          Q.   Okay.  And Romulus is where the Detroit
20   International Airport is located to sort of orient
21   everyone, correct?
22          A    Yes.  Uniquely it's -- the airport is an
23   island in the center of the city.  The city is 36
24   square miles.  Right in the middle is the airport,
25   Detroit Metro.
```

Opioid Frye/Mr. Rafalski                                88

1

2          Q.    And if we can take a look at Slide

3     Number 4.  Mr. Rafalski, you were one of the police

4     officers assigned to the scene of this tragic air

5     crash; do you recall that?

6          A    I do.  Actually, yesterday was the

7     anniversary, and I was one of two people from the

8     department that gathered evidence and first body

9     recovery and then evidence at the crash site.

10         Q.    We don't need to dwell on that tragedy,

11    but that was one of the ways that you honed your

12    skills in amassing large amounts of evidence in an

13    investigation, correct?

14         A    I think that would have probably been

15    one of the largest incidents in trying to mark

16    evidence and bodies and body parts to help assess

17    the crash and recover people to their loved ones,

18    yes, ma'am.

19         Q.    But actually much of the time that you

20    spent on the Romulus police force was dedicated to

21    narcotics investigation, correct?

22         A    Yes, ma'am.

23         Q.    Okay.  And can you describe for me while

24    you were a police officer in Romulus, what that

25    meant, what it meant to dedicate yourself to

```
 1                    Opioid Frye/Mr. Rafalski        89

 2   narcotic arrests and prosecutions.

 3        A    It's a unique skill that's a little

 4   above a police officer.  I was tasked to run a

 5   special investigation unit, to form and run a

 6   special investigation unit in Romulus, and it

 7   coincided with the emergence of the crack cocaine

 8   epidemic.

 9             So it was some very trying times.  It

10   essentially teaches you skills, more in depth

11   interview skills, managing of people and

12   interviewing of people, and learning how to navigate

13   investigations to work up through the sources of

14   narcotics starting at the street level and up to a

15   higher supplier level.

16        Q.   Now, in 1991 you were recruited to the

17   Group 3 of the Drug Enforcement Agency field office

18   in Detroit; do you recall that?

19        A    Yes, ma'am.

20        Q.   And what does that mean being recruited

21   to Group 3 of the Drug Enforcement Agency field

22   office?

23        A    So during the time that I was the

24   supervisor of the special investigations unit, we

25   did several high level cases.  And then during doing
```

```
 1                    Opioid Frye/Mr. Rafalski              90

 2     those cases, we sometimes requested assistance from

 3     the DEA.  So I developed a relationship with some of

 4     the agents there.

 5                And I had some cases, some ongoing cases

 6     that they wanted to invite me to become a task force

 7     officer.  There's different types of task force.

 8     Mine was a little unique because I was case

 9     specific.

10                So when I went there I took cases and

11     they were my cases that I worked utilizing being

12     sworn in as a federal task force officer.

13         Q.    Okay.  And I know you told me about one

14     very unique case that sort of attracted the

15     attention of DEA and it involved a dumpster.  Could

16     you tell us about that investigation.

17         A     Yes.  In the course of investigating a

18     cocaine distribution cell, a number of people that

19     were engaged in cocaine distribution, during the

20     investigation I identified a business in Romulus, a

21     gentleman's club in downtown Romulus that was about

22     three blocks from the police department as being

23     involved in the distribution and also potentially

24     money laundering.

25                So one of the tactics I used, the
```

1

2     investigative techniques I used for about a seven-

3     month, seven- to eight-month period, one day a week

4     I would go in the middle of the night with an agent

5     and he would drop me off and I would jump inside of

6     the dumpster, and I would go through all of the

7     documents inside of the dumpster in hopes of finding

8     something useful in the investigation.

9                  It took about eight months until I found

10    the big moment, the second set of books and records.

11    They were keeping two sets of books and records, and

12    somebody had thrown them into the trash.  And that

13    started the basis for the proofs on the money

14    laundering involving the narcotic investigation.

15                  Q.   Thank you.  Now, you started at DEA and

16    you started with some of the more -- started with

17    criminal cases, is that correct, before you moved to

18    administrative cases with DEA?

19                  A    Yes.  But -- so my time as a task force

20    officer was ended in 1996, and I returned back to my

21    police department.  And then, if I understand your

22    question, now we're going to shift to when I became

23    hired as a diversion investigator?

24                  Q.   Yes.  And what year was that?

25                  A    2004.

1

2      Q.   Okay.  And when you were hired as a

3    diversion investigator, that is when you began as a

4    diversion investigator investigating criminal

5    matters, correct?

6      A    Yes.  Diversion matters, but this was in

7    the area of Detroit and the area that was

8    jurisdiction of Detroit, the OxyContin 80 was being

9    prescribed and abused, diverted from high level.

10          So when I graduated from the academy in

11   2004, I was immediately placed in assisting another

12   investigator with a diversion, a doctor

13   investigation, I think, primarily because of my law

14   enforcement skills.

15     Q.   And at some point did you move from

16   criminal investigations as a diversion investigator

17   to larger, more complex administrative

18   investigations?

19     A    Yes, ma'am.  After about six years, the

20   DEA did kind of a reshuffling, a reorganizing, and

21   they shifted diversion investigators, a small number

22   specifically to criminal investigations.  And then a

23   larger number were shifted to just do administrative

24   investigations.

25          I had done quite a few criminal

1
2      investigations, and I was kind of excited about
3      moving from that, doing administrative
4      investigations, something different.
5            Q.   And when you moved to that role of doing
6      administrative investigations, is that when you
7      began to appreciate and broaden your experience with
8      respect to the flow of controlled substances from
9      manufacturers to distributors to pharmacies?  Would
10     that be fair to say?
11           A    Yes, ma'am.
12           Q.   And was there -- were there one or two
13     cases that you could describe for us that helped you
14     in that process of broadening your experience with
15     respect to manufacturers, distributors and chain
16     pharmacies?
17           A    Yes, ma'am.  I think first, my first six
18     years, there were numerous investigations where they
19     centered around pharmacies and doctors.  So it gave
20     me a good basis at the pharmacy level to understand
21     the recordkeeping and the distribution and the
22     dispensing.
23                My first actual large administrative
24     investigation was to Harvard Drug Group, and that
25     was -- I'm sorry.

```
1                    Opioid Frye/Mr. Rafalski              94
2        Q.    Nope.  I didn't say anything.
3              So can you tell us about that Harvard
4    Drug Group investigation?
5        A    Yes, ma'am.  I was tasked -- internally
6    we did a little investigation to see if there were
7    any distributors in the Detroit area of
8    responsibility that were sending Oxycodone 30 pills
9    down to Florida.
10             There was an epidemic of pain clinics
11   down in Florida at that time.  Specifically there
12   were three counties in Florida that were just a
13   large emerging diversion problem.  And one of the
14   distributors that was identified was Harvard Drug
15   Group.  So going in in the investigation, I already
16   had a general idea that there was distribution of
17   Oxycodone 30 specifically to physicians, which is a
18   little different.
19             Pain clinics in Florida weren't
20   registrants in DEA registration.  So the only way
21   they could acquire drugs was to order them through
22   the DEA number of physicians, which was a unique
23   situation nationally.
24             Once I did my background information, I
25   entered the business, and I used the DEA to style an
```

1                    Opioid Frye/Mr. Rafalski          95

2     investigation that we discussed earlier.  I went in

3     and requested certain kind of records.  I entered

4     that facility under an administrative inspection

5     warrant, which is a form of a search warrant, but it

6     is restricted to certain duties and activities.

7              I mirrored their server to obtain all

8     their internal communications and directives and

9     emails.  I asked for their transaction data.  That

10    was an interesting moment, because they were more

11    than willing to give them to me, but they asked me

12    where the semi trucks should go, because back then

13    we were looking at all paper records.

14              So we kind of shifted and worked out a

15    way to get it electronically and confirm the data

16    and not get all of the forms.

17              I asked for their suspicious order

18    policies.  All their policies actually related to

19    maintenance of effective controls, and I also

20    engaged in the interviewing employees.

21              The company was very accommodating and

22    let me interview any employees I wanted.  They gave

23    me full access.

24         Q.   And when you conducted that Harvard

25    investigation, did you employ the same methodology

```
1                    Opioid Frye/Mr. Rafalski              96
2      that we discussed earlier this morning?
3            A    Yes, ma'am.
4            Q.   And was it a reliable and generally
5      accepted methodology?
6            A    Yes, ma'am.  I think that any DEA
7      investigator that would be tasked with this
8      investigation would use generally the same
9      methodology that I used.
10           Q.   Now, after the Harvard case, you
11     investigated another distributor; do you recall that
12     case?
13           A    Yes, ma'am.
14           Q.   And what was that?
15           A    Masters Pharmaceutical, just outside of
16     Cincinnati, Ohio.
17           Q.   And what did that generally, if you
18     could summarize what that involved.
19           A    I was assigned that investigation by the
20     DEA management.  It was a mid-size distributor, and
21     they were also engaged in shipping Oxycodone 30 to
22     Florida.  This time this distributor was shipping it
23     to pharmacies, and they were shipping it in massive
24     numbers.
25                Masters Pharmaceutical, I think, at
```

1

2    times was at least in the top five of all

3    distributors in the United States that were sending

4    Oxycodone 30 products to Florida.

5         Q.    And what time period is this generally?

6         A    I started my investigation there in

7    2011.

8         Q.    And the investigation that you conducted

9    of Masters, did you employ the same methodology that

10   we discussed this morning?

11        A    The same general framework.  All the

12   investigations are a little bit different.  On this

13   one, I did not use an administrative inspection

14   warrant.  Most of the things that I obtained

15   initially was on-site.  I did some initial

16   interviews, and I looked at some customer files

17   on-site.

18             Subsequent to that, I served an

19   administrative subpoena to gain the same kind of

20   record I discussed in the Harvard case, customer

21   files, internal emails, internal documents, all of

22   the policies related to the maintenance of effective

23   controls.

24             I used the on-site opportunity to look

25   at a customer file, some specific customer files in

1

2     the presence of some of the compliance personnel,

3     and some good things come out of that.

4              I still recall I was looking at a

5     customer file, and the vice president interrupted --

6     interjected that that was a pharmacy that

7     specialized in diabetic treatment or diabetic

8     medications.

9              So I was looking at the utilization

10    report, which is a list of all the drugs dispensed,

11    and Oxycodone was at the top 30 in really large

12    numbers and all --

13              (Technical Skype audio/video

14         interruption.)

15         MS. CONROY:  We've lost you,

16         Mr. Rafalski.  I don't know if you're still

17         talking and can hear me.

18              THE COURT:  Any tech people around?

19              THE WITNESS:  I've lost the feed.

20              THE COURT:  Okay.  Hang on a second.

21              MS. CONROY:  Oh, there you are, there

22         you are.

23    BY MS. CONROY:

24         Q.   You were just starting your conversation

25    about the diabetes comment made by the officer at

```
 1                    Opioid Frye/Mr. Rafalski            99

 2    Masters.

 3          A    Yes.  The vice president, he was also a

 4    pharmacist, a registered pharmacist.  And I spun the

 5    file around and slid it across and I said, You're a

 6    pharmacist.  I'm not.

 7                I said, Could you take a look at me and

 8    tell me which drugs are useful in treating of

 9    diabetics.  And the first look on his face, I could

10    tell what the answer was going to be.  He looked at

11    it and he said, I don't really see any on here.

12                I took the file back.  I didn't really

13    address it at that time, and it kind of gave me an

14    indication of where the investigation was going to

15    go.

16                Subsequent to that I served two

17    administrative subpoenas, and I took a number of

18    customer files.  And then subsequent to gaining all

19    the information I needed, I returned back to

20    Detroit, and I started to analyze in the same way

21    that I did from the investigation here in New York.

22          Q.   Okay.  And now you've described two

23    distributor investigations.

24                Was there an opportunity to then look at

25    a manufacturer who was also a distributor while you
```

```
                        Opioid Frye/Mr. Rafalski              100
```

1    were a diversion investigator?

2         A     Yes.  Based on the information that I

3    learned in conducting the Harvard case and the

4    Masters case, specifically in the Harvard case,

5    there was a discussion in the hallway, just a

6    general discussion with the compliance director, and

7    he made a mention of a thing called chargebacks.

8         And that that was a visibility that the

9    manufacturer could see the distribution of their

10   products all the way down to the pharmacy level.

11   That was kind of what I guess you call them an aha

12   moment.

13        I didn't really address it with the

14   compliance.  We talked about it in general terms.  I

15   didn't want to show my excitement, but I thought

16   that was gonna be really useful down the line.

17        When I did the Masters investigation,

18   some of the interviews were with corporate

19   personnel, and they basically indicated that

20   Mallinckrodt also used these chargebacks and that

21   gave them visibility where their product was being

22   distributed.

23        So when I started the Mallinckrodt case,

24   it was with the understanding that Mallinckrodt had

```
                        Opioid Frye/Mr. Rafalski              101
```

1          full visibility of their products being distributed

2          to Florida, specifically the Oxycodone 30 and the

3          Oxycodone 15 milligram products.

4

5                    I did not go on-site with Mallinckrodt,

6          but I started the investigation the same way.  I did

7          some preliminary research on the company, any

8          previous administrative actions, a history, and then

9          to initiate the investigation, I served an

10         administrative subpoena, and I requested all of the

11         same documents I discussed previously for the

12         Harvard and Masters case, and the same type of

13         documents I've used in my evaluation with this

14         litigation.

15                  Q.   Thank you.  And when -- you talked about

16         at Masters going on-site.  Were you on-site at a

17         distribution center?

18                  A    Yes, ma'am.

19                  Q.   Okay.  And can you tell me, have you

20         ever been on-site for any of the Defendants'

21         distribution centers?

22                  A    Yes, ma'am.

23                  Q.   Do you recall which ones?

24                  A    I've been on-site for AmerisourceBergen.

25         I've been on-site with McKesson.  I think that would

1

2        be the only two.

3               Q.   Okay.  Now, Mr. Rafalski, is it fair to

4        say that you have spent years investigating

5        diversion prevention, controls and suspicious order

6        monitoring systems with respect to controlled

7        substances?

8               A    Yes, ma'am.

9               Q.   And what I'd like to do is quickly go

10       over the components of those systems.

11              Now, you are very familiar with the

12       Controlled Substances Act, correct?

13              A    Yes, ma'am.

14              Q.   Okay.  Let's just start with the basics,

15       if we can look at Slide 5.  Now, the Controlled

16       Substances Act talks about a closed system.

17              Can you describe what a closed system is

18       in the context of suspicious order monitoring and

19       drug diversion.

20              MR. SCHMIDT:  I'm sorry to interrupt.

21              Your Honor, I just got a note from

22              Mr. O'Connor, who is designated manufacturer

23              counsel and also counsel for Mallinckrodt,

24              that he's been unable to object to some of

25              those questions regarding Mallinckrodt.  So I

1

2     think he's on the line, but on mute somehow.

3     I don't know if there's a way to unmute him.

4     I apologize.

5          THE COURT:  Can he turn on his mic?

6          Just tell him to activate his mic on his

7     end and then speak up.

8          So there's an objection in connection

9     with testimony that deals with Mallinckrodt;

10    is that correct?

11         MR. SCHMIDT:  I think that's generally

12    right, your Honor, but I'm not in a position

13    to articulate that for him.

14         I assume if we're not hearing him, he's

15    still having the mic problem.

16         THE COURT:  That's Mr. O'Brien you said?

17         MR. SCHMIDT:  O'Connor.

18         THE COURT:  Mr. O'Connor, you can

19    probably hear me.  There's a way for you to

20    access your mic.  Now I'm probably the last

21    person in this courtroom to tell you how to

22    do that, but I suspect that there's an icon

23    somewhere on the screen with a line through

24    it, that if you depress that icon, your mic

25    will be activated.  Am I right?

```
 1                    Opioid Frye/Mr. Rafalski              104
 2              TECHNICIAN:  So we just checked.  He
 3         isn't muted on his computer.  He is not muted
 4         on his computer.  So he may just need to
 5         reboot his computer and join again.
 6              THE COURT:  Mr. O'Connor, you may have
 7         to reboot your computer.  So why don't you
 8         take a few minutes and do that.
 9              MR. SCHMIDT:  And, your Honor, I
10         received a subsequent note from Mr. O'Connor
11         saying he's having his IT people check his
12         connectivity, but we should proceed in the
13         interim.
14              Perhaps we should just note his
15         objection later.  And thank you for
16         accommodating us, your Honor.
17              THE COURT:  Okay.  Go ahead.
18    BY MS. CONROY:
19         Q.   Mr. Rafalski, if you could just describe
20    for us what is meant by the closed system.
21         A    Yes.  The regulations were designed to
22    -- one of the key reasons was the prevention of
23    diversion.  And the closed system in this picture is
24    designed that there is a recordkeeping and security
25    in place to ensure as the drugs flow through the
```

1
2   system, typically through these registrants,
3   importers to the manufacturers to the distributors
4   and to the pharmacies, that there is recordkeeping
5   and security to keep the drugs contained within the
6   closed system so they don't leak out and be
7   diverted.
8          There's many more registrants in this
9   that could be in this closed system, but all of them
10   are bound by those regulations to maintain the
11   integrity of the distribution and no diversion.
12       Q.   Thank you.  And if we could now turn to
13   Slide 5, and here we have some of the requirements
14   and regulations associated with the Controlled
15   Substances Act and some of the implementing
16   regulations that you were familiar with as a DEA
17   diversion investigator, correct?
18       A   Yes, ma'am.
19       Q.   Okay.  And if you just look at the first
20   bullet point where it says, Registration program for
21   manufacturers, distributors and dispensers of
22   controlled substances.  What does that mean, a
23   registration program?
24       A   Companies that want to attain DEA
25   registrations in these business categories have to

1
2    apply to the DEA for a license, and there is an
3    actual set preregistration investigation that the
4    DEA would conduct to prior to issuing DEA licenses
5    to these different business types.
6                One, before even the DEA even moves
7    forward that they would require all of these
8    different business types to obtain a state license,
9    and then once that's obtained, then the DEA moves
10   forward.  It's typically called a preregistration
11   investigation, and that usually or almost always
12   includes an on-site or multiple on-site visits and
13   meetings at the manufacturer and distributor level
14   where there is an evaluation of business practices
15   and security requirements to ensure that before the
16   license issues, they're in compliance with the law
17   and the federal -- the CFR, Code of Federal
18   Regulations.
19        Q.   Okay.  And then the second bullet point
20   is, Must maintain effective control against
21   diversion of particular controlled substances.
22                What does that mean?
23        A    That's both in the law and the
24   regulations, and that's the overarching or the goal
25   of the whole security section is that all of the

Opioid Frye/Mr. Rafalski                     107

1

2      duties that are contained in the security section

3      are all designed that the registrant must maintain

4      effective controls against diversion of particular

5      controlled substances and the prevention of

6      diversion.

7              Q.    And that applies to any registrant,

8      correct, a manufacturer, a distributor or a

9      pharmacy, correct?

10             A     Broader than that.  Every registrant

11     that that applies to their handling of controlled

12     substances.

13             Q.    Okay.  And the third bullet point

14     requires each registrant to report suspicious orders

15     of controlled substances.  What does that mean, the

16     reporting of a suspicious order?

17             A     It's contained in the regulation in

18     regards to suspicious orders.  It actually requires

19     each registrant design and operate a suspicious

20     order system.  And when discovered, that's what's

21     called a suspicious order, then it must be reported

22     upon discovery to the DEA.

23                   It also gives three -- not exclusive,

24     but three types of ways to look at orders to monitor

25     whether or not they're suspicious, unusual size,

1

2    unusual frequency or -- and then unusual pattern.

3         Q.    Okay.  And if we can go to the next

4    slide, we'll look at some of these requirements in a

5    little more depth.

6              So to maintain, any registrant in order

7    to maintain effective controls, one of the first

8    things they need to do is have a comprehensive

9    system to evaluate new customers or a

10   know-your-customer system.

11             Are you familiar with what that is from

12   your experience at DEA?

13        A     Yes, I am.

14        Q.    And how would you describe it?

15        A     That's sometimes called an onboarding.

16   So this is when we can talk -- an example in this

17   case is a distributor is making a determination that

18   they want to take on a new customer, a new retail

19   pharmacy.

20             So they have to conduct some evaluation

21   to get to know that customer.  They have to evaluate

22   what their business model is, what types of drugs

23   they want to use in what types of quantities.  They

24   have to make all of these evaluations first to

25   believe that this customer is actually a viable

1
2    business to handle drugs.
3            They also would use this evaluation to
4    determine what types or what quantities of drugs
5    they want, and that's typically the second bullet
6    threshold, and they have to set those thresholds.
7            Now, that is a new customer that's never
8    handled drugs before.  And in this case in the
9    United States, retail pharmacies often jump from
10   distributor to distributor sometimes purely for
11   price reasons or sometimes there may be other
12   regulatory or diversion problems.
13           So that's a different kind of
14   onboarding.  Still it's the same.  It's a know your
15   customer, but in that case, the distributor has a
16   little more information that they can gain and
17   analyze because there's previous conduct before they
18   make their determination on, one, whether they want
19   to accept the customer, and where they expect the
20   threshold and the types of drugs they want to sell
21   to them.
22           That's just a narrow example between
23   distributors and pharmacies.  There are different
24   examples of different customers, but I'm not going
25   to get into all of those.

```
1                      Opioid Frye/Mr. Rafalski            110
2           Q.    Okay.   When you did the Masters
3      investigation, you looked at customer files,
4      correct?
5           A    Yes, ma'am.
6           Q.    And that's pretty much what you're
7      talking about here, those know-your-customer files?
8           A    Yes.   That would be a part of a customer
9      file.   A customer file would be all of the -- I
10     would expect to see all of the due diligence and all
11     of the interaction that would be specific to the
12     maintenance of effective controls, which should be
13     contained in that customer file in paper, electronic
14     or a combination of both.
15          Q.    If we look at the next bullet point, how
16     are thresholds related to effective controls?
17          A    It's an important assessment for a
18     distributor when deciding to distribute drugs to a
19     customer; in this case discuss specifically a
20     pharmacy.
21               So they have to do an evaluation on how
22     much drugs they are going to sell by type, size, the
23     quantities.   Typically they look at it on a monthly
24     amount, and they have to determine what the company
25     can legitimately dispense during a monthly period.
```

```
 1                  Opioid Frye/Mr. Rafalski              111

 2            That's done through evaluation of

 3     previous conduct or a distributor can analyze other

 4     similar size pharmacies in the same geographic area.

 5     They can use all of their data that they gained from

 6     their business activity to get a good handle on what

 7     would be a good starting threshold.

 8            Q.   Okay.  Then the next one is, Next way to

 9     maintain effective controls is for a registrant to

10     design and operate a system to track orders of

11     unusual size, deviations from a normal pattern and

12     an unusual frequency of orders.

13            I think you touched on this a couple of

14     minutes ago, but can you explain what you're looking

15     for when you are trying to determine whether or not

16     there is a system that will maintain effective

17     controls.

18            A    This is basically called a suspicious

19     order system, and it's whether or not the company

20     has actually designed a way, typically electronic,

21     but it's not required by the law to be electronic,

22     and it's a way that a company that's going to

23     distribute drugs can monitor the orders that they're

24     sending to make sure that they don't break these

25     thresholds, these levels that have been set for
```

1

2    legitimate use.

3          Q.    Okay.  And then we see the next bullet

4    point, Conduct due diligence of orders flagged as

5    suspicious.  And let's just take the first part.

6    What does that mean?

7          A     So when an order reaches and exceeds

8    that threshold, there's an expectation that the

9    company would stop shipment because that would be

10   something outside of the usual.  It would be

11   suspicious, and they would conduct due diligence to

12   understand why it was flagged.

13              Many cases it's as simple as calling the

14   registrant and asking them if -- I think they call

15   it a fat finger order -- if the registrant wanted

16   one and they ordered 11 or they wanted 10 and they

17   accidentally ordered 100.

18              Some of the orders are typically cleared

19   just because they were incorrect or error orders.

20   If that's not the case, then that's where the due

21   diligence needs to be conducted, and they have to

22   get an understanding of why the order exceeded what

23   they had established as a threshold, a legitimate

24   use.

25              There could be an explanation, and so

1

2      they start an investigation.  They look at previous

3      history, and then they get an explanation on why

4      they potentially want to increase the amount.  It's

5      not just what the registrant tells them.

6                      If the registrant was just to say, I'm

7      doing more business, that would not be in itself

8      just a sufficient reason.

9                      Another one may be a new pain clinic

10     opened.  The expectation is they would actually

11     verify some of the things or the things that they

12     were told by the pharmacy independently to make sure

13     that that actually is what is occurring and that

14     these drugs can be handled safely and not be

15     diverted.

16                  THE COURT:  Excuse me.  Is that trigger

17              on this due diligence, does it occur on the

18              very first order that exceeds the thresholds,

19              or is there a pattern?

20                  THE WITNESS:  Your Honor, it would be

21              the very first order.  That would be the

22              expectation.

23                  THE COURT:  So if one order, let's say,

24              in March exceeds by whatever, whatever

25              number, whatever percentage of February, the

```
 1                   Opioid Frye/Mr. Rafalski                114
 2          due diligence aspects of the steps are
 3          triggered?
 4                 THE WITNESS:  I think it's a little --
 5          not quite exactly like that, your Honor.  I
 6          mean, that could be one way.
 7                 I think if they set a threshold average
 8          maybe by -- if I could give you an example.
 9          The previous 12 months order patterns and
10          they've established an average over the last
11          12 months, and now you're in the 13th month
12          and the order amount that exceeds that
13          average, that potentially could be a trigger.
14                 Let's just theoretically say it was
15          20,000 pills.  So any order that exceeded
16          that 20,000, that would stop the shipment,
17          and that would require some kind of a due
18          diligence investigation to understand why
19          they're ordering a greater amount.
20                 THE COURT:  Exceed the 20,000 by how
21          many?  How much?
22                 THE WITNESS:  Your Honor, it could be
23          one bottle of 100 pills.
24                 THE COURT:  Okay.  Thank you.
25                 THE WITNESS:  You're welcome.
```

```
 1                     Opioid Frye/Mr. Rafalski                115
 2      BY MS. CONROY:
 3          Q.    The next bullet point is the due
 4      diligence must be robust, well documented and
 5      retained.  Why is that?  Why must it be well
 6      documented and retained?
 7          A     It paints a historic picture for the
 8      distributor, the person doing the evaluation.  I
 9      kind of liken it to your family doctor.  If you went
10      to your family doctor and there was no records kept,
11      every time you went, it would be a start over again
12      of your symptoms, and there would be no history.
13              I think it's important that the
14      companies are able to look back and see if they've
15      conducted previous due diligence investigations, if
16      there's been prior adjustments to the thresholds and
17      what investigations were previously completed.
18              I would expect those to be retained and
19      be available for review.
20          Q.    And if we just go back to the Judge's
21      example, would that be important, for example, if
22      there was -- the threshold was exceeded, say, in
23      March, would it be more, if that were to happen
24      again, to have some sort of a record to understand
25      why that may have happened if it were to occur
```

```
 1                    Opioid Frye/Mr. Rafalski          116
 2     again?
 3          A    Sure.  If what you're indicating is
 4     there's a pattern of exceeding the thresholds, I
 5     think it's important to maybe take a little deeper
 6     look or a deeper dive at why they're continuing to
 7     exceed the threshold.
 8               It could be, it could be a legitimate
 9     increase in business, and that's why the due
10     diligence investigation is completed, but it also,
11     there may be also some issues involved that are
12     potentially diversion.
13          Q.   And the last bullet point is that the
14     suspicious orders must be reported to DEA when
15     discovered.  What does that mean, "when discovered"?
16          A    That's in the regulation, and that's
17     when the registrant, when that order is triggered
18     and it's a suspicious order, that they're obligated
19     to report it.
20               Now, just for clarification -- well, not
21     clarification.  So two things actually can happen,
22     your Honor.  So the suspicious order could trigger
23     the stop, and it doesn't always require due
24     diligence.
25               If the company decided that they were
```

1

2    going to report the order and not ship those drugs

3    any longer, then that would be the end of it.  They

4    wouldn't do due diligence.

5             But once the system stopped the order

6    and if they determined they desired to continue to

7    ship that product, then they would conduct their due

8    diligence to alleviate the suspicion before they

9    shipped it.

10            Q.   Now, before we really wrap up and talk

11   about an overview of your methodology, I want you to

12   specifically address your report in this case, and

13   let's just mark for identification your report.

14            Do you want one, your Honor?

15            THE COURT:  It looks like you have a

16            spare.  I'll take it.

17            MS. CONROY:  I'm happy not to take them

18            back home again.  We would mark this as

19            Plaintiff's Exhibit 1 for identification.

20            (WHEREUPON, the report was hereby marked

21            as Plaintiff's Exhibit 1 for identification.)

22            MS. CONROY:  Now, if I can go to the

23            next slide.

24            THE WITNESS:  I hope your Honor doesn't

25            compare how I look today to then.

```
 1                      Opioid Frye/Mr. Rafalski          118
 2    BY MS. CONROY:
 3          Q.    The slide struck me because I have fond
 4    memories of those typewriters.  Phones don't look
 5    all that different, but you were drafting
 6    investigation reports and such using a typewriter
 7    like that years ago, but times have really changed.
 8    Would you agree?
 9          A    Oh, yes, they have.  I would agree.
10          Q.    And you have prepared -- I think we
11    talked about it a little bit -- some really
12    significant reports in your career at DEA.  Masters
13    comes to mind.  That was a gigantic report, correct?
14          A    Yes, ma'am.
15          Q.    And in this we talked a little bit about
16    the report that's been filed in this litigation and
17    we can see from Exhibit 1, it's a very significant
18    report and quite in depth, lots of documents cited,
19    correct?
20          A    Yes, ma'am.
21          Q.    Do you endorse everything that is in
22    this report, Exhibit 1, your report?
23          A    Yes, ma'am.
24          Q.    Now, did you receive any assistance from
25    any lawyers in preparing this report?
```

```
 1                    Opioid Frye/Mr. Rafalski            119

 2            A    Yes, ma'am.

 3            Q.   Could you describe for me what kind of

 4      assistance you received.

 5            A    First and foremost is the amounts of

 6      documents in the case are very huge.  I had to

 7      request or to gain access to the documents I need

 8      for my methodology, I request them from the

 9      attorneys, the types of documents, and sometimes or

10      many times I might go back and ask for additional

11      documents related to -- to form my opinion to gain

12      those documents.  That's one of the things where I

13      need assistance.

14            Q.   So would it be fair to say that you have

15      categories of documents that you request that the

16      lawyers or the lawyers' offices help you in

17      retrieving?

18            A    Yes, ma'am.  Actually, at the very onset

19      there was some discussions on what documents I would

20      need to conduct my investigation.  So I think the

21      requests early on were fashioned so that the

22      discovery request would, would obtain those type of

23      documents, yes, ma'am.

24            Q.   Okay.  And at any point up until today,

25      have you ever asked any of the lawyers, or their
```

```
                            Opioid Frye/Mr. Rafalski              120
 1
 2      staff, or the law offices for any document and were
 3      told that you couldn't receive it?
 4             A     No, ma'am.
 5             Q.    Now, I think you know from a deposition
 6      that was taken in this case that the defense lawyers
 7      have tried to assert that you cut and pasted
 8      sections from the New York Complaint into your
 9      report.
10             Can you explain what that's all about,
11      what you actually did.
12             A     Yes, ma'am.  I've obviously thought
13      about that a lot since my first deposition.  It
14      essentially, it isn't a cut and paste.  I didn't
15      take them out of the Complaint and place them into
16      my report.  Those, those passages or sections came
17      to me from the attorney that I worked with, and I
18      knew that they were provided to me by the New York
19      AG's office.
20             I got them, and I evaluated, and I
21      looked at them.  I found them to be more of a
22      factual representation of what was occurring in New
23      York.  I evaluated the statements.  I looked at the
24      supporting documents.
25             In some cases I asked for further
```

```
 1                    Opioid Frye/Mr. Rafalski           121

 2     verification of footnote material or to substantiate

 3     what the statements were.  At some point I adopted

 4     them in my report.

 5              I did not know that they were taken

 6     directly from the Complaint, but I knew that they

 7     were in my report, yes, ma'am.

 8          Q.   And you stand by your report, correct?

 9          A    Yes, ma'am.

10          Q.   All right.  Let's move now to Slide 8,

11     and let's just take a look at an overview of the

12     methodology that you employed in this case.

13              And as I think we've said several times

14     this morning, would you agree that the methodology

15     you employed in this case is the same methodology

16     that you employed in your tenure at DEA?

17          A    Yes, ma'am.

18          Q.   And the first bullet point is the

19     application of the regulatory framework set out in

20     the Controlled Substances Act.  Do you agree that

21     that was a part of your methodology here?

22          A    Yes, ma'am.

23          Q.   Is there anything unusual about applying

24     the regulatory framework of the CSA?

25          A    There's nothing unusual about that,
```

```
                        Opioid Frye/Mr. Rafalski            122
 1
 2    ma'am.
 3         Q.   And then the next piece of your
 4    methodology is to collect Defendants' transactional
 5    data.
 6              Now, there's all sorts of data held by
 7    Defendants, depending on the type of investigation
 8    that you are conducting, but is that always a part
 9    of your methodology, to collect the transactional
10    data?
11         A    That's always at the core of the
12    investigation, whether it's the administrative work
13    at the DEA or whatever is conducted in the
14    methodology for the MDL.
15              I mean, that is the transactional data
16    is the sale of controlled substances, the
17    distribution.  So it's obviously at the core of my
18    evaluation.
19         Q.   And the next bullet point is to review
20    Defendants' compliance program.  And we're going to
21    go through the pieces quickly of the compliance
22    program, but just generally explain why it is that
23    you want to know what the program looks like.
24         A    To get an understanding on whether it
25    meets the criteria of maintaining effective controls
```

1      to prevent diversion, whether these things occurred.

2      And, well, on some of them, I'm looking at documents

3      and information to see if some of them occurred, and

4      I'm looking at other things listed on this list to

5      see if the company was in compliance and whether

6      they were carrying out their responsibilities.

7           Q.   So let's look, first of all, at the

8      standard operating procedures.  And those operating

9      procedures also include record retention policies.

10          Was that a part of your standard

11     methodology while you were at DEA to look at those

12     procedures?

13          A    I'm sorry, yes, ma'am.

14          Q.   And it was part of your procedure and

15     methodology here in this case, correct?

16          A    Yes, ma'am.

17          Q.   Now, the next one is a review of the due

18     diligence files, the suspicious order monitoring and

19     know-your-customer materials; do you see that?

20          A    Yes, ma'am.

21          Q.   And was there anything unusual about a

22     review of those materials?

23          A    No, ma'am.

24          Q.   That was part and parcel of what you did

1

2    as a DEA investigator, and you continued that

3    methodology through to this expert report, correct?

4         A    Yes, ma'am.

5         Q.    The next one is investigations,

6    interviews and witness statements.

7              You didn't talk very much about that,

8    but could you give a brief description of what that

9    category means?

10        A    Whether there are any previous

11   investigations conducted by federal or state units,

12   kind of the history or the background.  Interviews,

13   in this particular case I don't have access or I

14   don't think I have access to go out and conduct my

15   own interviews at these companies.

16             I rely on the depositions more as the

17   interviews and also witness statements.  So I guess

18   that would be one in the same.

19        Q.    Okay.  And then also you would review

20   internal company communications and documents; do

21   you see that?

22        A    Yes, ma'am.

23        Q.    And that's something you did while at

24   DEA, correct?

25        A    Yes.  That was a critical part of my

1

2      administrative investigations.

3           Q.   And was it a critical part of your

4      methodology with respect to this expert report?

5           A    Yes, ma'am.

6           Q.   And the last bullet point, Prior

7      administrative actions; what is that?

8           A    Those particularly were with the DEA.  I

9      wanted to see if there was any, any cases that

10     previously occurred with the DEA where there was

11     administrative action, specifically in regards to

12     the maintenance of effective controls, how the

13     company responded, what the basis for the case was,

14     and kind of just lead -- just get an understanding

15     of the history of the company.

16          Q.   And the final bullet point is your

17     review of data resulting from metrics applied by

18     data analysts.  It's a little thick, but really --

19     well, you explain it.  What does that mean?

20          A    Both at the DEA and in investigations

21     for the MDL and the State of New York, there might

22     be occasion to take data and this would be

23     transaction data, and I would ask a data analyst to

24     do some analysis, apply a metric.

25               It's way outside of my skill set to do

1

2      that.  So I rely on the people that are experts,

3      both at the DEA and the litigation here in New York.

4          Q.   And that would have been a part of your

5      methodology to ask data analysts to review so that

6      you could see what their results were and determine

7      whether or not that was an area that would impact

8      whether or not there were effective controls, is

9      that fair?

10         A    Yes.  That would be one of the primary

11     reasons, yes, ma'am.

12         Q.   Was there --

13              MS. CONROY:  Your Honor, I have about 10

14         or 15 more minutes.  Should we just continue

15         on or should we break for lunch?

16              THE COURT:  When you say you have "10 or

17         15 more minutes" --

18              MS. CONROY:  Correct.

19              THE COURT:  -- to complete what?

20              MS. CONROY:  To complete my direct.

21              THE COURT:  We'll complete it now.

22              MS. CONROY:  Okay.  Great.  Thank you.

23         Q.   Mr. Rafalski --

24              THE COURT:  Let me ask him a question.

25         What's a metric?

1

2          THE WITNESS:  A metric would be, let me

3      give you an example, your Honor.  A metric

4      would be to apply a suspicious order system.

5      Let's say that a company had a suspicious

6      order system where they were doing a rolling

7      average, a one-year 12-month rolling average,

8      which means they take the cumulative

9      purchases of Oxycodone every month for 12

10     months and gives an average, and their

11     suspicious order system then says that they

12     would allow a company to purchase three times

13     the amount of the average, I might take all

14     of the transactional data and see how many

15     orders would trigger that system.

16          THE COURT:  So a metric is an

17     application process?

18          THE WITNESS:  Yes.  It would be the

19     formula to conduct the analysis on the data.

20          THE COURT:  Okay.  Thank you.

21          THE WITNESS:  To do the average and then

22     do the three times, yes, sir, your Honor.

23          THE COURT:  Got it.  Thank you.

24          THE WITNESS:  You're welcome.

25  BY MS. CONROY:

```
 1                    Opioid Frye/Mr. Rafalski              128
 2          Q.   And, Mr. Rafalski, sometimes in this
 3    litigation we call those metrics algorithms or
 4    formulas that are applied to the shipment data to
 5    determine whether or not a particular month or a
 6    particular group of months was over or under a
 7    threshold, correct?
 8          A    Yes.  Most typically, algorithms are not
 9    usually metrics, but that's just the terminology
10    they're using in the litigation here.
11          Q.   Now, one thing I think we would like to
12    clear up a little bit is whether or not it's
13    possible for you conducting the methodology that you
14    did in this case, are you identifying actual, an
15    actual diverted order in, say, for example, Suffolk
16    County, New York?
17          A    No, ma'am.
18          Q.   And why is that?
19          A    First and foremost, is when I met with
20    the attorneys and they gave me the guidelines or the
21    boundaries of what my responsibilities were and what
22    opinions I should, I should work on, it wasn't
23    looking at specific orders.  It wasn't one of the
24    requirements.
25               And, essentially, I can't tell you what
```

1

2    was actually diverted, but my opinion is more likely

3    than not that these orders were diverted.

4         Q.   And would you, when you did, for

5    example, Masters or the Mallinckrodt investigation

6    or the Harvard Drug investigation, you were not

7    looking either at specific diverted orders, correct?

8         A    In none of those cases did I ever have

9    to actually look at and find a specific order that

10   was diverted.  And practically, in a practical

11   sense, it's not impossible, but only one of the few

12   scenarios where you could look at a specific order

13   and whether that specific order would be diverted

14   would be if I happened to be at the pharmacy when

15   the distributor truck came and they opened the door

16   and they handed a box of pills to somebody and they

17   put them in their trunk and drove away.  I mean,

18   then I could say that particular order.

19             But to go back for diversion and look at

20   specific orders, it's, it's -- I'm not saying it's

21   impossible, but it's just, it's just not necessary

22   in looking at the overall failures by the companies.

23        Q.   And when you were a diversion

24   investigator and you were doing your administrative

25   investigations, it would not have been a part of

```
 1                    Opioid Frye/Mr. Rafalski              130
 2     your methodology to go one by one with those
 3     potentially diverted orders; it was different,
 4     correct?
 5             A    Yes, ma'am.  I never did it order by
 6     order.
 7                  MR. SCHMIDT:  Objection, your Honor.
 8             Leading.
 9                  THE COURT:  And the nature of your
10             objection, sir?
11                  MR. SCHMIDT:  Leading.
12                  THE COURT:  Oh, leading?
13                  MR. SCHMIDT:  We've been leading for
14             quite some time.
15                  THE COURT:  Everybody has been leading
16             for two days.  I assure you I will give you
17             the same exact leeway that anybody else is
18             taking in terms of leading.
19                  You know, a leading objection, of
20             course, is very significant when there's
21             people sitting in that box over there, the
22             jury box, the civilians.
23                  I recognize they're leading questions.
24             I'll allow both sides to lead when necessary;
25             however, if it is indeed a critical aspect of
```

```
1                    Opioid Frye/Mr. Rafalski              131
2            the direct testimony, I will ask you,
3            Ms. Conway, not to lead.
4                 MS. CONROY:  Thank you, your Honor.  I
5            know.  I'm looking at you on the screen
6            instead of right at you.
7      BY MS. CONROY:
8            Q.   Mr. Rafalski, have you understood all my
9      questions today?
10           A    Yes, ma'am.
11           Q.   And is there anything that you would
12     like to correct or change?
13           A    No, ma'am.
14           Q.   Was your testimony about the methodology
15     that you used in formulating your opinions based on
16     your education, training, and experience, first of
17     all, as a police officer and then as a diversion
18     investigator for DEA?
19           A    Yes, ma'am.
20           Q.   Was the methodology you used in
21     formulating your opinions in this case the same
22     methodology you used in your role as a diversion
23     investigator for DEA?
24           A    Yes, ma'am.
25           Q.   Are your opinions in this case based on
```

```
1                      Opioid Frye/Mr. Rafalski              132

2       a reasonable degree of professional certainty?

3               A    Yes, ma'am.

4               Q.    And although we didn't discuss all of

5       the factual bases for your opinions, are the facts

6       upon which you relied in formulating your opinions

7       disclosed in your report, Plaintiffs' Identification

8       Exhibit 1?

9               A    Yes, ma'am.

10              MS. CONROY:  Pass the witness, your

11              Honor.

12              THE COURT:  Okay.  We'll recess.

13              MR. O'CONNOR:  Your Honor, if I may,

14              this is Andrew O'Connor from Mallinckrodt.

15              THE COURT:  How are you, Mr. O'Connor?

16              I can see you now.

17              MR. O'CONNOR:  I just want to make sure

18              my objections were clear for the record.  I

19              did attempt to object to the line of

20              questioning about Mallinckrodt on the basis

21              of that testimony is prohibited by federal

22              law.

23                  Mr. Rafalski received a letter from DOJ

24              to this effect, that he was not to rely on or

25              disclose nonpublic information during the
```

```
 1                   Opioid Frye/Mr. Rafalski            133

 2        course of his investigation.

 3             (Technical Skype audio/video

 4        interruption.)

 5             THE COURT:  Are you near an airport?

 6        Maybe a landscaper with a leaf blower.

 7             I understand your objection.  The Court

 8        will not consider that type of information.

 9        As a matter of fact, I believe Judge Polster

10        made a similar ruling that -- this would be

11        his Number Docket 2494, I believe -- yeah,

12        2494.  So I'll sustain your objection.

13             Let's break for lunch.  Two o'clock.

14        Make it a little extra.  They have to police

15        all three courtrooms, you know, the security

16        people.  So around 2:10, okay?  Thank you.

17             MS. CONROY:  Thank you, your Honor.

18             (WHEREUPON, after a luncheon recess, the

19        following was had:)

20             THE COURT OFFICER:  You can remain

21        seated.

22             THE CLERK:  Part 48 is back in session.

23             THE COURT:  Good afternoon, everybody.

24             THE CLERK:  Good afternoon, Judge.

25             THE COURT:  You can sit down.
```

```
 1                  Opioid Frye/Mr. Rafalski              134

 2              Mr. Rafalski, how are you?

 3              THE WITNESS:  I'm good, your Honor,

 4         thank you.

 5              THE COURT:  Remind the witness, please.

 6              THE CLERK:  Mr. Rafalski, I'll remind

 7         you you're still under oath.

 8              THE WITNESS:  Yes, I know that.  Thank

 9         you very much.

10              THE COURT:  Now, I understand we have

11         three lawyers that have asked for the

12         permission to cross-examine the witness.  If

13         not, Miss Conway has no further questions,

14         who's up?

15              MR. SCHMIDT:  I think I am, your Honor.

16         Paul Schmidt from McKesson.  I think there

17         might be a brief question at the very end for

18         one additional lawyer on the defense side,

19         one of the lawyers in court.

20              May I proceed, your Honor.

21              THE COURT:  Yes.

22              MR. SCHMIDT:  Thank you.

23    CROSS-EXAMINATION

24    BY MR. SCHMIDT:

25              Q.   Mr. Rafalski, it's good to see you
```

Opioid Frye/Mr. Rafalski                135

1       again.  I'm sorry, we're seeing each other remotely,

2       but I thank you for joining remotely, just as I

3       thank the Court for the opportunity to be here

4       remotely.

5                   I'm probably just going to spend a

6       little bit more time than Miss Conroy did going

7       through some of your methodological points and how

8       you got to your opinions just to put a little meat

9       on the bones of what you talked with Miss Conroy

10      about.  In doing that, I'm going to try to be as

11      efficient as possible, including asking a lot of yes

12      or no questions.  I'll ask you to do the same in

13      your answers, be as efficient as possible.  If you

14      can say true, false, please do so.  If you can say

15      yes, no, please do so.  Fair?

16          A    Yes, I understand.  If I can answer the

17      questions in those manners, I will.

18          Q.   Thank you, Mr. Rafalski.

19                   Do you have handy your report which the

20      Plaintiffs marked as Plaintiffs' Exhibit 1?

21          A    Yes.

22          Q.   I may refer to that at different times,

23      but I want to ask you some foundational questions

24      about the process that went into your report.

```
1                    Opioid Frye/Mr. Rafalski          136

2              Do you understand that it's important

3        that your report be accurate?

4                    THE COURT:  Give me one second.  Just

5                 hang on.  I received a note.  I don't get

6                 this.  Asking counsel to speak into

7                 microphone.

8                    THE COURT OFFICER:  Everyone who is in

9                 the room, before you speak just make sure you

10                are right in front of a microphone, because

11                the people online are having trouble hearing

12                your objections and what you're saying in the

13                courtroom.

14                   THE COURT:  You said it better than I

15                could.  Thank you.

16                   MS. CONROY:  Understood.

17             Q.   Sure.  Just to re-ask the question, do

18        you understand it's important that your report be

19        accurate?

20             A    Yes, sir.

21             Q.   Do you agree that it's important that

22        the words in your report be your own words and not

23        the words of the lawyers?

24             A    Yes, sir.

25             Q.   Do you still stand behind your report
```

```
1                    Opioid Frye/Mr. Rafalski              137

2      being your words and your opinions in this lawsuit

3      and not the words of the lawyers?

4           A    Yes, sir.

5           Q.   You understand it's important that your

6      report be complete, correct?

7           A    Yes, sir.

8           Q.   And I had the chance to depose you back

9      in February regarding your report; do you remember

10     that?

11          A    Yes, sir.

12          Q.   You told me then that you were ready to

13     testify fully regarding the opinions in your report;

14     is that still true?

15          A    Yes, sir, it is.

16          Q.   You told me then that there was no

17     further work that you needed to do in order to be

18     able to testify based upon what you knew then; is

19     that still true?

20          A    Yes, sir, it is.

21          Q.   You told me you would come back to me

22     and let me know if you did have something new you

23     needed to do and you have not done that, correct?

24          A    That is correct.

25          Q.   You provided no supplement to your
```

```
 1                    Opioid Frye/Mr. Rafalski              138

 2     report, no new list of materials to review, correct?

 3            A    I only provided an errata.

 4            Q.   To the actual deposition, correct?

 5            A    Yes, sir.

 6            Q.   Okay.  Guided by the Judge's July 31st

 7     order, Mr. Rafalski, what I'm going to do is really

 8     focus on your methodology, the processes you used

 9     and how it was you got from the data you were given

10     to the opinions that you reached; does that make

11     sense?

12            A    Yes, sir, I understand.

13            Q.   So to set the stage on that, before you

14     gave a report in this New York case, you gave a

15     report in a federal case in Ohio; is that correct?

16            A    Yes, sir, that's correct.

17            Q.   That Ohio report included a discussion

18     of Ohio pharmacies, alleged suspicious orders in

19     Ohio and conduct by manufacturers and distributors

20     in some pharmacies in Ohio, correct?

21            A    Yes, sir.

22            Q.   That report did not talk about New York

23     pharmacies, New York suspicious orders or conduct by

24     distributors, manufacturers or pharmacy Defendants

25     in New York, correct?
```

```
 1                    Opioid Frye/Mr. Rafalski              139
 2         A     Not specifically in that report.
 3         Q.    And so when you took that report and
 4   adapted it for this case, you had to adapt it with
 5   New York specific facts, correct?
 6         A     That's only partly correct.  Some of the
 7   information contained --
 8         Q.    Let me just ask you, did you adapt it to
 9   specifically information on New York pharmacies that
10   did not appear there before?
11              MS. CONROY:  Objection, your Honor.
12              The witness was attempting to answer the
13         question.
14              THE COURT:  Again?
15              MS. CONROY:  The witness was attempting
16         to answer the question, and he was
17         interrupted.
18              MR. SCHMIDT:  I don't think I
19         interrupted.  I think he paused and then I
20         asked my question.
21              THE COURT:  It's easy.  Mr. Rafalski,
22         did you finish your answer?
23              THE WITNESS:  I did not, your Honor.
24              THE COURT:  Finish your answer and then
25         we'll move on to the next question.
```

```
1                    Opioid Frye/Mr. Rafalski              140
2               THE WITNESS:  Okay, finish my response.
3           It wasn't a completely new report because
4           many of the things in my Cleveland -- my Ohio
5           report were corporate national policies, so
6           there were portions of the report that
7           carried over into the New York report.  Just
8           so it's clear that it wasn't a completely new
9           report.
10          Q.   I didn't ask you that.  I just said you
11     had to adapt it, correct?
12          A    Um, yes.  That's how I interpreted it,
13     I'm sorry.
14          Q.   You added new opinions, for example,
15     regarding pharmacies in New York, correct?
16          A    Yes, sir.
17          Q.   You added new opinions regarding alleged
18     suspicious orders in New York for some of the
19     Defendants in this case, correct?
20          A    Yes, sir.
21          Q.   You added opinions regarding
22     manufacturing and distribution and chain pharmacy
23     activity in New York, correct?
24          A    I think my opinions were consistent with
25     the previous report.
```

```
 1                     Opioid Frye/Mr. Rafalski          141
 2          Q.    Did you add new opinions regarding
 3    manufacturing and distribution in chain pharmacy
 4    activity in New York or do you not have such
 5    opinions regarding activity in New York?
 6          A    I -- I don't recall that my opinions
 7    changed from the original report to this report.
 8          Q.    Okay.  Let's talk about how you took the
 9    facts you received regarding New York and how you
10    got from those facts to your opinions in New York.
11               You were first given access to New York
12    documents on December 9th 2019, correct?
13          A    I don't know if that was the exact date,
14    but it's within and around that timeframe, yes, sir.
15          Q.    And just for precision, because I think
16    this matters, can we pull up Mr. Rafalski's
17    testimony from his deposition in this case, it's tab
18    2, February 7th 2020, at page 33.
19               And if you look up on the screen, sir --
20    actually, let's look at page 34, line 1 through 10,
21    where your answer finishes where in the middle of
22    the question I say, okay, and you say, I think when
23    the documents first come into me where I have
24    access, I believe it's around the 9th, but I'm not
25    positive, then I spent a lot more time looking at
```

```
1                          Opioid Frye/Mr. Rafalski              142

2       specific documents and policies, then once I was in

3       the drafting I would be running back and forth

4       between the draft and policies.

5                   Was that consistent with your

6       understanding that it was around December 9th that

7       you first had access to New York documents?

8            A    Yes, sir.

9            Q.   And you completed your New York

10      report -- you can take that down.

11                  You completed your New York report on

12      December 18th 2018, correct?

13           A    Yes, sir.

14           Q.   So that was nine to ten days after you

15      got New York documents you completed your report

16      containing new opinions on New York pharmacies and

17      New York conduct and New York suspicious orders,

18      correct?

19           A    Yes, sir.

20           Q.   And that limited time meant that you

21      could not conduct a thorough review of the documents

22      specific to New York and specific to this case,

23      correct?

24           A    I don't think that's an accurate

25      statement.  I reviewed -- I reviewed -- if you're
```

```
 1                    Opioid Frye/Mr. Rafalski              143
 2     talking specifically about the documents I cited, I
 3     don't think that's an accurate statement.  If you're
 4     stating I had -- I reviewed all of the documents
 5     involving the discovery, then I would agree with
 6     that as an accurate statement.
 7          Q.   Well, let's talk about the Delta between
 8     what you reviewed and what was produced and what you
 9     had access to.
10               In your original Ohio report, you
11     reviewed about 2,500 documents, correct?
12          A    I don't recall the exact number, sir.
13          Q.   Do you take issue with that we've gone
14     through your list and counted it up; is your list
15     accurate, to the best of your knowledge?  Do you
16     know?
17          A    I believe my list is accurate, yes, sir.
18          Q.   Then we counted about 1,500 additional
19     documents when you came over to New York.
20               Do you take any issue with that as a
21     factual matter?
22          A    No, sir.
23          Q.   In all of those documents that you
24     reviewed, they came from the Plaintiffs' lawyers,
25     correct?
```

```
 1                     Opioid Frye/Mr. Rafalski              144
 2              MS. CONROY:  Objection, your Honor.
 3              THE COURT:  What's your objection?
 4              MS. CONROY:  It's foundation.  It's not
 5         correct.
 6              THE COURT:  Mr. Rafalski, do you
 7         understand the question?
 8              THE WITNESS:  Yes, I think I understand
 9         the question.
10              THE COURT:  If you understand the
11         question, then answer it, go ahead.  And if
12         you don't understand the question, he'll
13         rephrase it.
14              MR. SCHMIDT:  Can I just say one thing?
15         Miss Conroy literally answered the question
16         for the witness.  I don't think that's
17         appropriate in an objection.
18              THE COURT:  It doesn't matter.  We're
19         moving along.  If you understand the
20         question, answer it.
21              Go ahead.
22         A    Yes.  All the documents I received, I
23    don't have any access to those documents, except
24    through -- from the lawyers.
25         Q.   You understand -- and I think you just
```

1

2    told us this, but I want to be clear -- you

3    understand that that 1,500 documents came from a

4    much broader set of documents that have been

5    produced by your lawyers in this case and by the

6    Defendants in this case?

7         A    Yes, I understand that.

8         Q.   I want to just quickly touch on some of

9    the documents you weren't given and then I'll touch

10   on some of the ones you were given.

11            In terms of the documents you were not

12   given, we see no documents from the two counties in

13   this case on your list of materials reviewed, Nassau

14   and Suffolk County.  Do you take any issue with

15   that?

16        A    I don't take issue.  I don't really have

17   an opinion on that.

18        Q.   Okay.  Are you aware that over two

19   million documents in total have been produced by all

20   three Defendants in this case -- all three

21   Plaintiffs in this case:  New York State, Nassau

22   County, Suffolk County, and you've reviewed less

23   than 1,500 of those.  Do you take any issue with

24   that?

25            A    I don't take issue with it.  I really

Opioid Frye/Mr. Rafalski                146

don't have any idea of how many documents to offer

an opinion on that, sir.

        Q.   Do you have any idea what's contained in

those documents that you were not given before you

reached your opinions from the State, from Nassau

County, from Suffolk County?

        A    No, sir.

        Q.   Just to link that up to your

methodology, you talk about conduct in your opinion

and controls against diversion, correct, and

compliance with the CSA?

        A    Yes, sir.

        Q.   You did not read any of the licensing

files that the State of New York generates for any

distributor or any pharmacy or any manufacturer in

this case, correct?

        A    Could you explain what you mean by

"licensing files"?

        Q.   Files generated in connection with

providing licenses to distributors or manufacturers

or pharmacies or their facilities.

        A    No, sir, I did not review those records.

        Q.   So you don't know if, in the context of

those documents, New York State, your client, made

Opioid Frye/Mr. Rafalski                147

1

2      specific findings in the licensing context on the

3      very questions you address, such as whether the

4      distributors, manufacturers, pharmacies were, quote,

5      able to maintain effective controls against

6      diversion, true?

7            A     That's a correct statement.

8            Q.    You don't know whether your client, New

9      York State, made specific findings in those

10     licensing files on another issue you touched on,

11     such as whether the distributors, manufacturers or

12     pharmacies, quote, possess and operate a system to

13     identify and report suspicious orders, correct?  You

14     don't know that?

15           A     I'm not aware of any of that, correct,

16     sir.

17           Q.    Let me give you another example.

18                 You talk about specific pharmacies in

19     your report, correct?

20           A     Yes, sir.

21           Q.    You did not review any State or County

22     investigative files on the New York pharmacies that

23     you addressed, correct?

24           A     That is correct.

25           Q.    Would it be useful to know what kind of

```
 1                    Opioid Frye/Mr. Rafalski              148
 2      information they have, whether it's exculpatory or
 3      inculpatory, regarding those pharmacies?
 4            A    In forming my opinion I think all
 5      information is important and necessary.  I wouldn't
 6      preclude any information, whether it be positive or
 7      negative.
 8            Q.   It would be useful to have that
 9      information from the investigative files if it
10      exists for the pharmacies you looked at, correct?
11            A    In a general term, yes.  Would it be
12      essential?  I'm not sure I would agree with it being
13      essential, but all information is important.
14            Q.   Would you ever conduct an investigation
15      of a distributor or pharmacy or a manufacturer
16      without trying to make a determination of whether
17      they had been previously subject to investigation
18      when you were at the DEA?
19            A    At the State and local level?
20            Q.   At any level.
21            A    At the federal level I would look at
22      their history.  It probably was a resolved matter so
23      it wouldn't impact me -- it wouldn't -- you know, I
24      don't think it would impact my opinion.  I would
25      look for similar conduct or I would integrate it
```

```
 1                    Opioid Frye/Mr. Rafalski          149

 2      into my investigation.

 3                  At the State level, I may look at those,

 4      but whether it would have to deal with a matter I'm

 5      looking at, it would be more of a conduct issue on

 6      whether they complied with regulations, their

 7      history.

 8              Q.   You didn't even determine for the

 9      pharmacies you looked at whether they are, to this

10      day, right now as we sit here in our respective

11      rooms and the folks in court sitting there in court,

12      whether the State of New York and the DEA still

13      licensed the pharmacies you looked at, correct?  You

14      didn't look at that?

15              A    Generally, I would agree, but there was

16      instances that I looked on the internet to try to

17      see if I could find news articles or DEA releases

18      where it might indicate there was adverse action.  I

19      didn't have the ability to -- at the DEA level I

20      didn't have the ability to go in and do a licensed

21      check or verification, so I didn't have a way to

22      accomplish that.

23              Q.   For the State you know they have a

24      public website where you can go and look up whether

25      any pharmacy is licensed.  You didn't go look at
```

```
1                     Opioid Frye/Mr. Rafalski          150

2     that for the pharmacies you discussed, correct?

3              A     I did not, sir.

4              Q.    And you have not reviewed specific

5     testimony from State and County employees regarding

6     their standards for licensing pharmacies, licensing

7     prescribers or investigating pharmacies and

8     prescribers, correct?

9              A     No, sir.

10             Q.    Is what I said correct?

11             A     Yeah, I just paused for a second,

12    because I did review some testimony by the Director

13    of the Bureau of Narcotic Enforcement, but I don't

14    think I reviewed anything specific.  I had to think

15    about the categories you provided.

16             Q.    Got it.  Thank you for being precise,

17    sir.

18                   You talk in your report about some New

19    York doctors and their prescriptions, correct?

20             A     Yes, sir.

21             Q.    New York has a prescription drug

22    monitoring program called I-STOP that tracks

23    prescription drug data in terms of specific doctors

24    and specific prescriptions, correct?

25             A     I'm aware of that, yes, sir.
```

1

2          Q.   And you didn't look at that, correct?

3          A    I looked at some data that was dependent

4     on the PMP.  I'm sorry, the Prescription Monitoring

5     Program's often referred to as a PMP.  I saw some

6     analysis of it, but I didn't look at the raw data

7     from a PMP.

8          Q.   Okay.  You didn't go to PMP and do your

9     own searches or do your own analysis, correct?

10          A    I don't know that that was even

11     possible, but I did not do that.

12          Q.   You didn't read documents from the State

13     and Counties talking about what they think are the

14     actual causes of the opioid crisis outside of this

15     litigation setting; did you?

16          A    No, sir.

17          Q.   Do you -- that's the Plaintiffs' side of

18     the documents you didn't review.  Now I want to talk

19     about the defense side of the documents you didn't

20     review.

21               Are you aware that the Defendants in

22     this case produced well over a million documents in

23     the New York litigation?

24          A    I don't know the actual number, but that

25     would not surprise me.  Actually, I would probably

1

2    say I would think that was low.

3            Q.   And you recognize just from that number,

4    and recognize that it's probably low, that your set

5    of New York documents from the Defendants among that

6    1,500 are only a tiny, tiny fraction of what was

7    produced, correct?

8            A    Yes.  But just for clarification, when

9    I'm conducting my investigation I -- I don't need to

10   see all of the documents.  When I communicate there

11   are certain types and categories of documents I need

12   to review.  If they were just to dump a million

13   documents onto me, it would be much more difficult

14   to focus my investigation and complete my

15   methodologies, because I only need specific

16   documents.  I don't believe the whole one million is

17   specific to formulating my opinion.

18           Q.   Well, let's talk about what you've

19   already told us in your direct examination was

20   important to you in formulating your opinion.

21               You talked about needing to review

22   diligence files; do you remember that?

23           A    Yes, sir.

24           Q.   The truth is you've not reviewed the

25   entirety of the diligence files on New York

```
                        Opioid Frye/Mr. Rafalski                153
```

1
2      pharmacies for any one distributor, correct?
3              A     That is correct.
4              Q.    You talked on direct about reviewing
5      customers' files in the Masters investigation and
6      how important that was to you, correct?
7              A     Yes.  But I -- hopefully, I was clear
8      that I didn't review all of the customer files.  I
9      think I testified under direct that I reviewed a
10     portion of them or a sampling that was significant
11     for me to move forward on that case.
12             Q.    You did not review all of the customer
13     files for the pharmacies you talk about in your
14     report, correct?
15             A     That's correct.  If customer files
16     existed, I did a search for some of them to review
17     and see what records I could find that are in my
18     report.  Some I did find some records.  Some due
19     diligence records.  There are some I could find no
20     records in.
21             Q.    Okay.  And that's searching in the
22     subset of the documents the Plaintiffs' lawyers gave
23     you, correct?
24             A     Myself, yes, and then also I requested
25     searches in relativity.  So, hopefully, that

```
 1                    Opioid Frye/Mr. Rafalski              154

 2    encompasses all of the documents.

 3            Q.    When you flagged suspicious orders, you

 4    did not review all of the diligence on those orders,

 5    correct?

 6            A    Can you explain what you mean by that,

 7    sir?

 8            Q.    Yeah.  Let me just try it.

 9            You have an analysis in your report

10    where you identify trigger orders, correct?

11            A    Yes, sir.   My schedule 2?

12            Q.    Yes, sir.   And my question is:  Do you

13    know if you reviewed all of the subsequent diligence

14    on every one of those triggered orders?

15            A    I did not.

16            Q.    In terms of company emails, you did not

17    purport to review all of the company emails

18    regarding pharmacies in New York for the ten

19    different Defendants you talk about, correct?

20            A    It's my hope that through my request

21    with Plaintiffs' attorneys that I was provided all

22    the emails that were relevant to the topics.  I

23    don't have any way to be able to definitively say

24    yes or no to that question, sir.

25            Q.    You didn't review all of the company
```

```
 1                 Opioid Frye/Mr. Rafalski            155
 2    communications among those ten document -- those ten
 3    Defendants in the less than 1,500 documents you
 4    reviewed, all company communications regarding
 5    distribution and manufacturing and pharmacies in New
 6    York, correct?
 7            A    Same answer.  I can't be absolute that I
 8    saw all the documents, no, sir.
 9            Q.   And you didn't review all of the
10    transactional data for the ten Defendants in the
11    State of New York, correct?
12            A    Can you explain that?
13            Q.   You talked about transactional data in
14    your direct exam; do you remember that?
15            A    Yes, sir.  I think I testified I
16    obtained it.
17            Q.   Did you review it all?
18            A    No, sir.  Not every transaction, no,
19    sir.
20            Q.   So let's look --
21            MR. SCHMIDT:  Can we put up, Mr.
22            Reynolds, on the screen the slides that
23            defense counsel -- Miss Conroy used with
24            Mr. Rafalski, and let's go to Slide 9,
25            please.
```

```
 1                    Opioid Frye/Mr. Rafalski              156
 2         Q.   So bullet 2, collect Defendants'
 3    transactional data.
 4              Do you know if that data was actually
 5    collected as opposed to ARCOS' data?
 6         A    Yes, I believe it was.
 7         Q.   Okay.  And if it was, you did not review
 8    it all, correct?
 9         A    I did not review it all, no, sir.
10         Q.   Put an X next to that one, please.
11              Let's look under compliance program, and
12    let's go to the second bullet, due diligence,
13    suspicious order monitoring and know your customer
14    materials.
15              That's the diligence files we talked
16    about in the customer files that you said you didn't
17    review, and the diligence on all of the suspicious
18    orders that you flagged that you didn't review,
19    correct?
20         A    That's correct.
21         Q.   Put an X next to that one.
22         A    Well, excuse me, could you ask that
23    question one more time, please.
24         Q.   That refers to diligence files that you
25    said you didn't review in their entirety for any one
```

```
 1                     Opioid Frye/Mr. Rafalski          157
 2      distributor, customer files that you did not review
 3      in their entirety and diligence on every one of the
 4      triggered orders you identified, correct, that you
 5      did not review in its entirety?
 6              A    So I just want to make a clarification.
 7      In doing my methodology, there -- there -- I didn't
 8      sense --
 9              Q.   Can you answer my question, sir?
10              A    I'm trying to, sir.
11              Q.   Okay.  My question is simply, this
12      bullet refers to diligence files that you didn't
13      review in their entirety, customer files that you
14      didn't review in their entirety and subsequent
15      diligence files on triggered orders that you
16      identified that you didn't review in their entirety;
17      true or false?
18              A    So it's not a simple true and false
19      answer.  I think there are some instances where I
20      looked at due diligence files, and I believe I
21      looked at at least the totality of what I requested
22      on certain customers.  But if the question is if I
23      looked at the whole universe of due diligence files,
24      the answer to that would be no.
25                   But at the same time, to formulate my
```

```
 1                      Opioid Frye/Mr. Rafalski              158

 2     opinion, it wasn't necessary to look at every

 3     document for all the due diligence.

 4            Q.   Let's just pick out that one example you

 5     just said.  Just a simple yes or no question.

 6                 Did you review the customer files for

 7     all the pharmacies you talked about in the report?

 8            A    No.

 9            Q.   Did you review customer files, the

10     subsequent diligence on every one of the triggered

11     orders you report in your report?

12            A    No, I did not.

13            Q.   Thank you.

14                 Investigators' interviews and witness

15     statements, do you know if you read every bit of

16     testimony from all ten Defendants against whom you

17     give opinions?

18            A    Not every word, no, sir.

19            Q.   Not every deposition or interview

20     either, right?

21            A    I can't say that I didn't read portions

22     of the ten or certain sections, but in completion to

23     read them all, no, sir.

24            Q.   Okay.  Put an X next to that.

25                 And then I asked you this just a moment
```

1    ago, internal company communications and documents,

2    you can't say that you reviewed all of those

3    regarding New York pharmacies or regarding conduct

4    in New York for the ten companies you looked at,

5    correct?

6         A    If you're asking absolute if I'm

7    confident I read every document, the answer would be

8    no, sir.

9         Q.   Okay.  Let's put an X next to that.

10        Let's go to the last one.  Review of

11   data resulting from metrics applied to data

12   analysis; isn't that a reference to your Schedule 2

13   to your report?

14        A    Yes, sir.

15        Q.   And Schedule 2 contains the results of

16   some analysis done by Dr. McCann, correct?

17        A    That's correct.

18        Q.   You did not yourself review the data

19   that you used to perform those analyses, correct?

20        A    Is the question -- so to clarify the

21   question, are you asking if I looked at the actual

22   transaction data instead, analyze?

23        Q.   Yes, sir.

24        A    I did not.

```
1                     Opioid Frye/Mr. Rafalski         160
2          Q.    Okay.  Let's put an X next to that one.
3               MR. SCHMIDT:  And let's mark this as --
4          your Honor, are we starting again at Exhibit
5          A?  Would that be okay?
6               COURT OFFICER:  Judge, the last one was
7          A.
8               MR. SCHMIDT:  I apologize if someone
9          answered that question.  I didn't hear the
10         answer.
11              THE COURT OFFICER:  Just say yes.
12              THE COURT:  I said yes.
13              THE COURT OFFICER:  I don't think he
14         heard you.
15              THE COURT:  Yes.
16              MR. SCHMIDT:  Thank you, your Honor.
17         Let's mark this as Defendant's Exhibit A to
18         Mr. Rafalski's testimony.
19         Q.    I'm asking you about things you didn't
20    review.  I want to switch over to things you did
21    review, if that's okay, the 1,500 documents that you
22    did review.
23         A    Sure.
24         Q.    Before I do, when you did your Masters'
25    investigation, did you put a lot of time into that?
```

```
 1                    Opioid Frye/Mr. Rafalski          161

 2           A    Yes, sir.

 3           Q.   I think you said this on direct, you

 4      spent a lot of time reviewing documents and talking

 5      to people and reading testimony where it existed?

 6           A    I would probably say I would say no to

 7      that because moving forward there is some time

 8      constraints to turning in the Order to Show Cause.

 9      It can't linger forever.  So there was a

10      considerable amount of time, but each investigation

11      is a little bit different.

12           Q.   Okay.  Would it be fair to say you spent

13      hundreds -- you and your colleagues spent hundreds

14      of hours gathering facts, looking at documents,

15      talking to people at the company?

16           A    Yes, sir.

17           Q.   Would that be true for the Harvard

18      matter you talked to as well, hundreds of hours

19      looking at facts, looking at documents, talking to

20      people, putting together information based on the

21      facts you saw?

22           A    Basically, I think that would be an

23      accurate statement.  It was less than Masters.  It's

24      hard, because at the time I'm employed as a DEA

25      investigator and every minute is not spent doing
```

1

2    that, but there is a considerable amount of time,

3    yes, sir.

4         Q.   Let's talk about the 1,500 documents you

5    reviewed.

6              As I understood your direct-examination

7    testimony, those were documents you flagged as

8    important for you to review, correct?

9         A    Well, I had asked for documents in

10   certain categories to cover certain topics, and

11   those would be the documents that were pulled in

12   those areas that are laid out in my methodology that

13   I could review in helping me draft a report.

14        Q.   Well, is it accurate that the documents

15   you were asking for were what you thought were

16   relevant to your report?

17        A    Yes, sir -- well, that I asked for and I

18   hoped they were relevant, yes, sir.

19        Q.   But you're confident you did not read

20   every document they gave you, correct?

21        A    As an absolute, I can't -- I don't want

22   to say that I read every document on that list, no,

23   sir.

24        Q.   In fact, you are confident you haven't

25   read every document on that list, right?

```
 1                      Opioid Frye/Mr. Rafalski           163
 2            A    I'm not sure, your Honor.  I'm not sure.
 3            Q.    Let me see if I can help you out.  Can
 4    we pull up again tab 2, the New York deposition,
 5    February 7th 2020, at page 49, please.  I'm going to
 6    ask you about line 19 to 24, please.  And if you
 7    want to just read the first two lines to yourself.
 8    The question actually starts on line 21, and I'll
 9    read it in just a moment.
10            I asked you in your deposition, Is it
11    fair to say you have not read every document on
12    Exhibit 8, which was your list of materials
13    considered, the 1,500 you've been discussing.
14            Do you see that your answer is, quote,
15    I'm confident that I didn't read every document in
16    Exhibit 8; do you see that answer?
17            A    I do.
18            Q.    Were you testifying truthfully based on
19    your knowledge then when you gave that answer?
20            A    Yes, sir.
21            Q.    Part of the reason you did not review
22    all of the documents in the categories you told the
23    lawyers were important or relevant for you to review
24    is because you had relatively little time in that
25    ten-day window between when you first got access to
```

```
 1
 2    the documents and when you had to turn in your
 3    report, correct?
 4         A    I think that's a fair assessment, the
 5    volume of it, I agree.
 6         Q.   Do you remember telling me in your
 7    deposition that the upper limit of time you spent
 8    actually reviewing New York documents and preparing
 9    your report was about 13.5 hours?  Do you remember
10    testifying to that?
11         A    I don't think I exactly testified to
12    that.  I think I testified that's what I billed.  I
13    think I may have testified, just off my memory, I
14    probably put in time that I didn't bill, which was
15    probably one of my weaknesses.
16              Extensive amount of time, but I'm sure
17    that there was more than 13.5 just for -- I think
18    that's how I testified at the previous deposition.
19         Q.   Let's look at how you testified at the
20    previous deposition, tab 2 again, the February 7th
21    2020 deposition at page 33, line 9, please, and if
22    we can go down to 13 where your answer ends.
23              Fair enough.  The upper limit on time
24    reviewing New York documents for your report was
25    about 13.5 hours.
```

```
 1                    Opioid Frye/Mr. Rafalski            165
 2              Do you see where your answer, I would
 3    say, yes, sir; do you see that?
 4         A    I do see that.
 5         Q.   Were you being truthful when you said
 6    yes, sir, the upper limit of your time was about
 7    13.5 hours; were you being truthful in that
 8    testimony?
 9         A    I was truthful there, but I would like
10    to add that I'm fairly certain that at some point
11    during the 16 hours of deposition that I also
12    answered that one of my weaknesses was my billing,
13    and there was probably a little more time committed
14    to the report than what was billed.
15         Q.   And that 13.5 hours that you talk about
16    here in your sworn testimony on the page, that is
17    documents covering ten Defendants and their distinct
18    activity in the State of New York, right?
19         A    Yes, sir.
20         Q.   It covers distinct manufacturer
21    Defendants, distinct distributor Defendants,
22    distinct pharmacy Defendants, correct?
23         A    Yes, sir.
24         Q.   And for a number of Defendants it covers
25    a number of pharmacies they had some relationship
```

```
 1                    Opioid Frye/Mr. Rafalski          166
 2    with, correct?
 3         A    Yes, sir.
 4         Q.   It covers a range of doctors whose
 5    prescriptions were filled at those pharmacies,
 6    correct?
 7         A    Yes, sir.
 8         Q.   It covers that which you allege are
 9    thousands and thousands of flagged orders billed by
10    some of those ten different Defendants, correct?
11         A    Say that one more time, I'm sorry.
12         Q.   Sure.  That 13.5 hours that you
13    testified about at your deposition as your upper
14    limit, that covers what you allege are thousands and
15    thousands and thousands of flagged orders that some
16    of those Defendants filled, correct?
17         A    I think the application of the metric
18    identified those.  I did not analyze -- I did not do
19    the analysis, and I didn't review the specific
20    orders, if that's what you're asking, sir.
21         Q.   And your 13.5 hours upper limit covers
22    testimony and interviews and documents from those
23    ten Defendants and their witnesses in New York,
24    right?
25         A    Yes, sir.
```

1

2          Q.    You understand the testimony alone runs

3     into the thousands of pages, correct?

4          A     The deposition material?

5          Q.    Yes, the deposition material.

6          A     Yes, sir.  New York examination, yes,

7     sir.

8          Q.    You would agree with me that you had

9     limited time to prepare your report?

10         A     I think in all these matters I wish I

11    had unlimited amount of time, so, yes.  Deadlines

12    are always a limited amount of time.

13         Q.    Okay.  You never have enough time, but

14    in this case it was a very short window to do this

15    type of report, true?

16         A     It was.

17         Q.    You would have liked to have had more

18    time, true?

19         A     As I previously stated, on all of these

20    matters I wished that I had -- with the volume of

21    documents and the volume of material, I wish I had

22    an unlimited amount of time but, unfortunately, I

23    don't.

24         Q.    Do you wish you had more time than 13.5

25    hours for this report in terms of the New York

Opioid Frye/Mr. Rafalski                    168

1

2      documents you were given and the millions you

3      weren't given?

4           A    I wish there was a longer deadline; yes,

5      sir, I would agree with that.

6           Q.   Would it be your generally accepted

7      practice to write up your opinions before you have

8      the facts?

9           A    No, I wouldn't have any opinions.

10          Q.   The truth is --

11          A    If I can clarify that, though.

12               THE COURT:  Yes.

13          Q.   Yes.

14          A    So I had -- I had opinions -- so this

15     case and the work that I did isn't just encompassed

16     in the 13-and-a-half hours.  Much of the work

17     started way back when I started on the MDL because

18     much of the things that are documented in the New

19     York report are hours that I spent when I was

20     working on the MDL report, especially when it

21     relates to all of the companies had policies,

22     corporate policies in regards to due diligence and

23     suspicious orders that are corporate-wide and

24     they're utilized in all of the United States and all

25     throughout the whole country.  So just confirmation

```
 1                    Opioid Frye/Mr. Rafalski          169
 2      that there was nothing different in Ohio than there
 3      was in New York, let me move on on some of those
 4      topics.
 5               So I know when we talked extensively
 6      about just the 13.5 hours, this, to me, is a
 7      cumulative investigation because it continues with
 8      the same companies, it just changes geographical
 9      locations.
10           Q.   That's my question.  We're focused on
11      the 13.5 hours you spent looking specifically at New
12      York facts.
13           A    I understand, sir.
14           Q.   Thank you.
15               The truth is, you actually started
16      writing your New York report before you received
17      documents regarding New York on December 9th, true?
18           A    Well, I started working on a draft, but
19      then part of that was, because some of the
20      information was going to carry over, the corporate
21      conduct by the companies, part of -- the initial
22      part would be trying to identify and remove anything
23      that was related to Cuyahoga and Summit County.  So
24      I think there was some drafting or work on the
25      report before I received the documents.
```

1

2      Q.   Well, sir, you didn't remove everything

3    from your report related to Cuyahoga and Summit

4    County.  There's a lot of information on your report

5    regarding Cuyahoga and Summit County, correct?

6      A     Well --

7      Q.   Is that true?

8      A     Well, there is some in there, but it's

9    not that I failed to -- failed to remove it.

10   There's some in there that I left in there that it

11   was indicative of corporate conduct.  I am aware of

12   one or two places where that it's specific, should

13   have been removed in my report today.

14     Q.   You started writing your New York report

15   on December 1st 2019, correct?

16     A     I think I testified previously that's

17   correct, that's when I put pen to paper.

18     Q.   The only document you had at that time

19   when you put pen to paper on December 1st, the only

20   New York document that you had reviewed at that time

21   is the New York State Complaint against the

22   Defendants, correct?

23     A     I think I had that in my possession.  I

24   had much previous to that date, yes, sir.

25     Q.   You didn't have any of the other

```
                            Opioid Frye/Mr. Rafalski                    171
```

1                          Opioid Frye/Mr. Rafalski                    171

2     categories of documents yet that we went through

3     that were in -- that are specific to New York,

4     right?

5          A    I -- I don't have a direct recollection

6     of exactly when I was provided those documents, sir.

7          Q.   I think we covered it earlier, and I

8     think it's reflected in your invoices, so I'll move

9     on.

10               In terms of a Complaint, you understand

11    that a Complaint is just the allegations from the

12    lawyers, correct?

13         A    Yes.  I -- well, I think a Complaint is

14    filed with the Court, and I think it's allegations

15    that the State contends that they could prove in the

16    legal matter, but, yes, sir, if that answers your

17    question.

18         Q.   I'm going to ask you, if you could, Mr.

19    Rafalski, I'm trying to just ask yes, no questions.

20    If you can answer just yes, no, as you did in your

21    deposition, please do.  I don't want to have to read

22    your deposition testimony on every question, and

23    I'll try to keep some of my questions to yes or no

24    questions.

25               Do you understand that the Complaint --

```
 1                    Opioid Frye/Mr. Rafalski              172
 2      the allegations in the Complaint are one side of the
 3      story, the Plaintiffs' side of the story; yes or no?
 4            A    Yes.
 5            Q.   You understand that we have responses to
 6      those allegations as the Defendants?
 7            A    I think in all matters there's a
 8      response to a Complaint.  As I testified, it's what
 9      the State or the federal government in their
10      Complaint they intend to prove if the matter was to
11      be adjudicated.
12            Q.   So is that a "yes," sir?  You understand
13      we have responses to their Complaint?
14            A    I'm not aware that you could formally
15      respond to a Complaint.
16            Q.   Okay.  You've not reviewed our responses
17      to the Complaint; true or false?
18            A    I have not.
19            Q.   Do you acknowledge that, picking up on
20      something you were asked about on direct, the reason
21      that you were able to prepare your 166-page report
22      with specific opinions on New York so quickly in
23      that ten-day window is because whether you knew it
24      at the time or not, you ended up taking large parts
25      of the Complaint and putting them word for word into
```

                        Opioid Frye/Mr. Rafalski                173

 2   your report?  Are you aware of that now; yes or no?

 3        A    Well, when you ask that question, you --

 4   you indicated whether I knew or not.  I knew that

 5   that was in my report.  It's not a situation where I

 6   did not know.  It's just to clarify, because that's

 7   not a question I can say yes or no to.

 8        Q.   Okay.  Let me try to ask it more

 9   precisely.

10             As you sit here right now, are you aware

11   that the way you were able to prepare your report so

12   quickly in that ten-day window is because large

13   portions of that State Complaint ended up in your

14   report word for word?  Are you aware of that; yes or

15   no?

16        A    I don't want to argue about this.  I

17   don't really think it allowed me to complete my

18   report.  I think those things that were placed in my

19   report are facts -- are primarily factual statements

20   that are in support -- that support my opinion or

21   the result of the conduct of the companies.  I think

22   my report, the opinions on my report stood, whether

23   those facts are put in my report or not.

24        Q.   Let me make it simpler, then I'll move

25   on.  See if you agree with me.

```
 1                    Opioid Frye/Mr. Rafalski              174
 2              Do you agree with me that large parts of
 3      your report are copied word for word from the
 4      Complaint; yes or no?
 5              They're identical word for word to the
 6      Complaint; yes or no?
 7         A    That's a correct statement, I would say
 8      yes.
 9         Q.   You've had a chance to look at the
10      Complaint, right, that's the document you got back
11      on December 1st, right, in 2018?
12         A    I believe I had it much earlier than
13      that, but I acknowledge that I received it.
14              MR. SCHMIDT:  Okay.  And we'll go ahead
15              and mark that, if we could, as Defendants
16              Exhibit B, as in boy.  And it should be in
17              the binder in the package for my colleagues
18              in court who very graciously passing out
19              exhibits, it should be tab 6.  Give the Court
20              and Miss Conroy a copy, and I'll thank Miss
21              Jones immensely on the record for helping me
22              with that.
23         Q.   While they are passing it out, I'm not
24      going to ask you about text on it and, Miss Conroy,
25      if you need me to stop before you have it, I'm going
```

```
 1                      Opioid Frye/Mr. Rafalski              175

 2      to ask general questions.

 3                      Am I correct that you had no role in

 4      drafting the State's Complaint?

 5              A       That is a correct statement.

 6                      MR. SCHMIDT:  Am I correct that -- can

 7              we actually put it up on the screen, 6,

 8              please.

 9              Q.   If you look up in the corner you can see

10      the date.  It's small print, maybe even blow it up,

11      received March 28, 2019; do you see that?

12              A    I can see that, yes, sir.

13              Q.   You only became involved in this case in

14      November, correct?

15              A    I believe November 13th, sir.

16              Q.   Okay.  So it was months and months and

17      months at least before you first saw this after it

18      was drafted, correct?

19              A    I did not see this document until after

20      November 13th.

21                      MR. SCHMIDT:  May I ask that

22              demonstrative 2 from the box be passed out,

23              which I will mark for identification as

24              defense court Exhibit C, as in cat.

25              Q.   And, Mr. Rafalski, while this is being
```

```
 1                  Opioid Frye/Mr. Rafalski          176

 2      passed out -- we can go ahead and put it on the

 3      screen, just the cover -- did you review the motion

 4      we filed regarding you in this case?

 5           A    Yes, sir.

 6           Q.   Did you see the attachment to it that

 7      compared language taken from -- language that was

 8      identical between your Complaint -- your report and

 9      the State's Complaint, the State lawyer allegations?

10           A    Are you speaking of the side by side

11      comparison?

12           Q.   Yes, sir.

13           A    I did.

14           Q.   All right.  So you've had a chance to

15      see this.  We modified it slightly to include some

16      kind of draft numbers.

17                I'm going to go through this very, very

18      quickly, because it's quite long, and I don't want

19      to belabor it.

20                The slide pages are not numbered, but if

21      you flip to Slide 27, and we'll put it up on the

22      screen, it's the one that says McKesson.  It's about

23      a third of the way in.

24                Do you see that on the screen, Mr.

25      Rafalski?
```

```
 1                   Opioid Frye/Mr. Rafalski          177
 2          A    I see McKesson.
 3          Q.   You understand that this section of the
 4     document compares things you say about McKesson in
 5     your report to things that the lawyers had earlier
 6     said word for word in their allegations in the
 7     Complaint, right?
 8          A    Yes, sir.
 9          Q.   Let's look at Slide 28, the first of
10     these.  Do you see the language from your report on
11     the right -- on the left, and the language from the
12     Complaint on the right?
13          A    I do.
14          Q.   And you see that if you take out the
15     first five words on the right from the State's
16     Complaint, your language written in December 2019 is
17     otherwise identical in this paragraph to what you
18     saw in the Complaint, correct?
19          A    Yes, sir.
20          Q.   If you can go to the next slide, Slide
21     29, this one has a series -- has some text and a
22     series of bullet points.
23               Do you see that your language in your
24     report is identical to what the State had earlier
25     drafted as their allegations in the Complaint, the
```

```
1                      Opioid Frye/Mr. Rafalski              178

2        lawyer allegations in the Complaint; do you see

3        that?

4               A    I do.

5               Q.   Now, one difference, the only

6        difference, do you see that you have added footnotes

7        that do not appear in that Complaint?

8               A    Yes, sir.

9               Q.   But the truth is those footnotes came

10       from the lawyers as well, correct?

11              A    Yes.  So when I would review this

12       document if it was a statement that I believe needed

13       to be supported by other information or other

14       documents I went back, and before I would accept

15       them I would ask for the footnotes, the information

16       that would provide this information or what

17       documents would provide these statements.

18              Q.   And the lawyers wrote those for you,

19       correct?

20              A    Wrote the footnotes?

21              Q.   Yes, sir.

22              A    They sent the material, the supporting

23       documents.  They didn't write the footnotes.

24              Q.   Okay.  You didn't even have a chance to

25       verify all the footnotes, correct?
```

```
 1                   Opioid Frye/Mr. Rafalski              179
 2          A    Well, that's another absolute.  I know
 3     that as they came in, I reviewed the footnotes and
 4     compared them with the statements to make sure that
 5     they actually said what they -- what the statements
 6     said they said.  So without saying that I did it for
 7     everyone, because I want to leave that open in case
 8     I missed one or two, I -- I did attempt to do -- to
 9     verify each of the footnotes.  I didn't just insert
10     them and move on.
11          Q.   I'm going to show you your testimony for
12     the deposition.  I think I'm now doing this for the
13     fifth time.  If we look at your February 7, 2020
14     testimony, this time page 496, please.
15               And do you -- if you look at line 11, do
16     you see where you were asked the question:  Did you
17     review all the footnotes, even the ones that
18     appeared for you?  Do you see that question?
19          A    I see it.
20          Q.   Let me read that answer.  "I don't
21     believe every one, because I ran out of time."
22               Did I read that correctly, sir?
23          A    You did, but can I take one second, I'd
24     like to read my deposition prior and after.
25          Q.   Sure.  Let me just ask you a question as
```

```
 1                    Opioid Frye/Mr. Rafalski              180
 2      you look at that.
 3                    Were you being truthful when you gave
 4      that testimony, you don't believe you reviewed every
 5      one because you ran out of time; were you being
 6      truthful?
 7               A    Yes.
 8                    MR. SCHMIDT:  Tell me when you're ready
 9               to move on.
10                    In the meantime, can we put Exhibit C
11               back up on the screen, Chris, it's
12               demonstrative 2.
13                    Thank you.
14                    THE WITNESS:  I've concluded reading my
15               deposition.
16                    MR. SCHMIDT:  I don't think there's a
17               question pending, Mr. Rafalski.
18                    THE WITNESS:  Pardon me?
19                    MR. SCHMIDT:  I don't think there's a
20               question pending.
21                    THE COURT:  Mr. Rafalski, on redirect
22               examination Miss Conroy, if she deems it
23               appropriate, will go back to other portions
24               of your deposition.  I understand your
25               request, but, if necessary, it will happen.
```

```
1                    Opioid Frye/Mr. Rafalski        181

2              Proceed, please.

3              THE WITNESS:  Okay, your Honor.  Thank

4         you.  I'm sorry.

5              Q.  Sir, go to the next slide, please, Slide

6    30.

7              Do you see you cut off the first

8    sentence of the Complaint on the right, but

9    otherwise your subsequent reports were word for word

10   identical to the lawyer allegations?

11             A   Yes, sir.

12             Q.  Next slide, 31, more word for word

13   copying from the lawyer allegations in the

14   Complaint?

15             A   Is that a question, sir?

16             Q.  Yes, sir.

17             A   I agree, sir.

18             Q.  Next slide, more word for word copying

19   from the lawyer allegations, correct?

20             A   Yes, sir.

21             Q.  In the interest of time, let's flip

22   ahead to Slide 44, please.

23             Do you see that this is language about

24   individual pharmacies in the State of New York?

25             A   Yes, sir.
```

```
                         Opioid Frye/Mr. Rafalski              182
 1
 2         Q.   Again, you've combined two paragraphs
 3   from the Complaint, but it's otherwise word for word
 4   copying from the lawyer allegations in the
 5   Complaint, correct?
 6         A    The language from both are the same, I
 7   would agree.
 8         Q.   Okay.  Jump two slides ahead to Slide
 9   46.  More allegations regarding specific New York
10   pharmacies; do you see that?
11         A    I do.
12         Q.   More word for word copying from the
13   Complaint, correct, on these New York specific
14   pharmacies?
15         A    Here, let me just take a look, please.
16   Yes, I agree.
17         Q.   There are a number of other slides in
18   the section, I won't go through, where you, again,
19   have paragraphs on McKesson that are word for word
20   copied on the Complaint lawyer allegations, correct?
21         A    I have reviewed your filing.  I will
22   agree there are more, yes, sir.
23         Q.   Go back to Slide 2, please.  I just want
24   to establish for the record this is the ABDC section
25   or the AmerisourceBergan section.
```

```
 1                    Opioid Frye/Mr. Rafalski              183
 2                If you go to Slide 3, you've removed the
 3       word NYCSA from the Complaint and replaced it with
 4       the word CSA, otherwise copied from the ABDC
 5       section, correct?
 6            A    Yes, sir.
 7            Q.   Slide 4, more word for word copying from
 8       the lawyer allegations in the Complaint?
 9            A    May I make a statement about the last
10       one?  We don't need to go back, but I think there
11       were footnotes added to that also.
12            Q.   Okay.  And we talked about the
13       footnotes.
14                If we go to Slide 4, more word for word
15       copying from the lawyer allegations in the Complaint
16       in terms of ABDC allegations, correct?
17            A    With the inclusion of footnotes
18       supporting the statements, yes, sir.
19            Q.   But the material came from the lawyers,
20       correct?
21            A    Footnotes provided to me that I reviewed
22       from the lawyers, yes, sir.
23            Q.   Slide 5, same thing, more word for word
24       copying from the allegations from the lawyers in the
25       Complaint into your report regarding ABDC; do you
```

```
1                    Opioid Frye/Mr. Rafalski              184

2    see that?

3          A    With the inclusion of a footnote with

4    citing a supporting document, yes, sir.

5          Q.   In the interest of time I'm not going to

6    go through the pages and pages and pages and pages

7    where this happens with ABDC, but you see it goes on

8    and on for ABDC, correct?

9          A    Well, I've reviewed the submission that

10   you made on this matter, but I just -- if there are

11   footnotes which showed a review and a request for

12   verification documents, I'm not asking you that we

13   go through every one, but I think that at least

14   there's some acknowledgment that although the

15   content was copied and pasted, there was a review

16   necessary to review -- to require those supporting

17   documents.

18              THE COURT:  Mr. Rafalski, with the

19         exception of the footnotes, the answer is

20         yes?

21              THE WITNESS:  That is correct, your

22         Honor.

23              THE COURT:  Next question.

24              MR. SCHMIDT:  Thank you for that help,

25         your Honor.
```

```
 1                   Opioid Frye/Mr. Rafalski              185
 2          Q.    Slide 48 is the Mallinckrodt section,
 3     and if we can go to Slide 49, please.
 4                 Do you see that with the exception of
 5     changing the beginning of the section, again, word
 6     for word copied from the Complaint with the
 7     exception of footnotes the lawyers gave you?
 8          A     Yes, sir.
 9          Q.    Same for Slide 50, correct?
10          A     Your statement on the previous is the
11     same, the answer would be yes.
12          Q.    Same for Slide 51, correct, you combined
13     two paragraphs into one but otherwise -- you add the
14     footnote from the lawyers but otherwise word for
15     word copying from the Complaint, correct?
16          A     Well, I would say yes to the word for
17     word copying.
18          Q.    And that goes on and on, I don't have to
19     go through every one, correct?  You know there are
20     many instances of this for Mallinckrodt, correct?
21          A     There are.
22          Q.    And then, finally, if we go to Cardinal
23     on Slide 56, do you see this is the Cardinal
24     section; do you see that, sir?
25          A     I see Cardinal.  I'm sorry, yes.
```

1
2       Q.   That's not the question.
3       A    Okay.  I thought something else was
4    coming up, so I'm sorry.
5       Q.   Something is coming.
6            If you look at the next -- actually,
7    let's look at Slide 58.
8            Do you see that you have a series of
9    bullet points, and you changed the preamble a bit,
10   but with the exception of providing footnotes, the
11   attorneys gave you word for word identical in the
12   bullet points?
13      A    Just a statement, I hope this doesn't
14   anger the Judge.
15      Q.   Well, can you answer the question?
16      A    Yes.  But the way you phrased the
17   footnotes is -- yes, the answer is yes.
18      Q.   Okay.  And then let's turn to Slide 61.
19           Again, you've changed the preamble a
20   bit, added footnotes that you were given, otherwise
21   word for word copied from the Complaint, correct?
22      A    Yes.
23      Q.   There are many other examples of that
24   for Cardinal, correct?
25      A    Yes, there are.

```
 1                    Opioid Frye/Mr. Rafalski              187
 2          Q.   Now, you said you had a chance to review
 3     this filing, and I'm going to ask you a question
 4     that I asked you at your deposition.
 5               Do you take issue with the fact that all
 6     of your discussions in your Complaint about New York
 7     customers of McKesson, Cardinal and ABDC was copied
 8     word for word from the Complaint; do you take issue
 9     with that?
10          A    I'm going to try to answer that
11     consistently with the way I answered it previously.
12     My exception was is that I wasn't told that it was
13     taken from the Complaint and --
14          Q.   Okay.  But you now know that it was,
15     correct?  Everything you say about specifically New
16     York pharmacies was taken word for word from the
17     Complaint, correct?
18          A    I knew that the day of the deposition,
19     yes, sir.
20          Q.   You know that much of what you say about
21     Mallinckrodt customers in New York was pasted from
22     the State's Complaint, whether you knew that at the
23     time or not?
24          A    I was provided material from the State
25     and I reviewed it and inserted in my report.  I just
```

1

2      didn't know that it was taken verbatim from the

3      Complaint.  Does that answer your question?

4             Q.   Yes.

5                  As to Mallinckrodt now, you know that it

6      is taken verbatim from the Complaint?

7             A    I did.  I knew that the day from the

8      first deposition.

9             Q.   Is there any pharmacy you recall reading

10     about in the Complaint that you said I can't give an

11     opinion on this pharmacy?

12            A    No, I don't recall ever having that

13     occur.

14            Q.   There's no pharmacy in your report that

15     doesn't also appear in your Complaint, no New York

16     pharmacy, correct?  You understand?

17            A    I don't know, sir.

18            Q.   Okay.  Is there any allegation in the

19     Complaint that you saw the lawyers make that you

20     said, I can't copy this into my report, that you

21     could point us to sitting here right now?

22            A    No.  I think all of the statements that

23     the -- that were made in those, all the material

24     that I adopted I think were consistent with my

25     opinions.  I don't think conflicted with my

```
 1                    Opioid Frye/Mr. Rafalski              189
 2     opinions, no, sir.
 3            Q.    Now, you compared this report,
 4     Plaintiff's Exhibit 1, your New York report, you
 5     compared it to reports you prepared or work you did
 6     while you were at the DEA, correct?
 7                  Do you remember doing that?
 8            A    I don't know.  I don't understand the
 9     question, sir.
10            Q.    Sure.  I thought, and I might have
11     misunderstood, so if I misunderstood tell me if I
12     misunderstood, but I thought I heard you on direct
13     exam say, may be a comparison between the way you
14     did your report in this case and the way you did
15     reports when you were working at the DEA; did I hear
16     that correctly?
17            A    My methodology, the report wasn't in the
18     same form or format.  I hope I understand your
19     question correctly, but the methodology to get to
20     forming my opinions or to completing my
21     investigation was the same.
22            Q.    Were your reports from the DEA ever
23     written to you by private lawyers bringing a civil
24     lawsuit?
25            A    No.
```

```
 1                    Opioid Frye/Mr. Rafalski              190
 2          Q.   Is that generally accepted practice of
 3     the DEA to have the reports you did and
 4     investigations be written by private lawyers
 5     bringing a civil lawsuit?
 6          A    No, sir.
 7          Q.   You talked briefly, I think if I heard
 8     you right, about visiting McKesson in ABDC
 9     facilities; did I hear that correctly?
10          A    You did.
11          Q.   That's not something you did in your
12     report, that's something you did when you were at
13     DEA, correct?
14          A    In regards to this litigation?
15          Q.   You didn't visit McKesson or ABDC
16     facility with your work here, you did that when you
17     were with DEA, correct?
18          A    Yeah.  When I answered the question I
19     wasn't -- wasn't in my DEA capacity, but the
20     question was was I ever in the facility, and the
21     answer was yes.  It was not in regards to this
22     litigation.
23          Q.   You said you applied the same
24     methodology that you did in your DEA work; is that
25     correct?
```

1

2          A    I -- yes, sir.  I drew my methodology in

3     this report from my experience, training and case

4     investigations while I was at the DEA.  Methodology.

5          Q.   When you were at the DEA, you never

6     found violations at a distribution center for

7     McKesson or a distribution center for ABDC, correct?

8          A    That's correct.

9          Q.   Well, for that matter, Cardinal,

10    correct?

11         A    That's correct.

12         Q.   You never told anyone at ABDC or

13    Cardinal or McKesson that you saw violations,

14    correct?

15         A    That's a correct statement, yes, sir.

16         Q.   Do you know you -- I don't know if I

17    have it precisely right, do you know that you worked

18    pretty closely to a McKesson distribution center,

19    Laconia, correct?

20         A    Yes, sir.

21         Q.   I'm going to ask just a couple more

22    follow-up questions on this issue and then I'll move

23    to another topic.

24              Do you still have your report in front

25    of you?

```
 1                     Opioid Frye/Mr. Rafalski            192
 2          A    I do.
 3          Q.   Look with me, if you would.  I want to
 4    focus on some of the opinions you offer in your
 5    report.
 6               Look with me, if you would, at page 78
 7    of your report.  If we could put that up on the
 8    screen, please.  I think the reference, for your
 9    purposes, will be tab 1.
10          A    And it was page -- oh, you got it there,
11    thank you.
12          Q.   I want to focus just on that first
13    sentence regarding ABDC.
14               Your report said Amerisource compliance
15    policies are flawed from initial mid-customer
16    onboarding; do you see that?
17          A    Yes, sir.
18          Q.   That's an opinion you offer, correct?
19               Mr. Rafalski, I don't know if you heard
20    my question.  Is that an opinion you offer?
21          A    Yes, sir.
22          Q.   Do you know that that opinion came word
23    for word from the lawyer allegations in the
24    Complaint?
25          A    I don't recall if it did or not, sir.
```

```
1                    Opioid Frye/Mr. Rafalski              193
2            Q.   Okay.  I can show it to you, if you
3      want.
4            A    I don't dispute it.  If you say it, I
5      acknowledge it.
6            Q.   Okay.  Let's look at page 62 of your
7      report.
8                 At the top of page 62 you say McKesson
9      CSMP's were riddled with flaws and loopholes that
10     rendered them substantially ineffective; do you see
11     that language?
12           A    I do, sir.
13           Q.   Is that an opinion you offer regarding
14     McKesson in this case?
15           A    Yes, sir.  I think that's accurate to my
16     review of documents and materials and my
17     investigation of this case, yes, sir.
18           Q.   Are you aware that that opinion comes
19     word for word of the lawyer allegations in the
20     Complaint that were given to you?
21           A    I'm not aware of that, but it's
22     consistent with my opinions on the matter.
23           Q.   Okay.  You take issue with that?  Should
24     I show you the Complaint?
25           A    I do not take issue with that.
```

1

2      Q.    Page 66.  Two more of these.

3            You state on page 66, right at the top,

4   McKesson system for identifying and reporting

5   suspicious orders; do you see that sentence?

6      A    Yes.

7      Q.    Inadequate to inscrutable, pretty

8   colorful language; do you see that?

9      A    I do.

10      Q.    That's an opinion that you offer

11   regarding McKesson?

12      A    Yes.  I believe it's consistent with my

13   other opinions, yes, sir.

14      Q.    Do you take issue with the fact that

15   that opinion came word for word from the State

16   Complaint, the lawyer allegations in the State

17   Complaint?

18      A    No, sir.

19      Q.    Last one, page 141, please.

20            THE COURT:  Is there a hardcopy of this

21            document that I can have?

22            MS. CONROY:  Your Honor, I think you

23            have it.  It was an exhibit marked for

24            identification, Number 1, Mr. Rafalski's

25            expert report, but I can get you another one.

```
 1                  Opioid Frye/Mr. Rafalski              195
 2             MR. SCHMIDT:  It's tab 1 in the
 3         response, if that helps.
 4             MS. CONROY:  I think 1 is being passed
 5         up.
 6             MR. SCHMIDT:  Thank you.
 7             THE COURT:  What page did you just refer
 8         to?
 9             MR. SCHMIDT:  The last page.  Let me
10         just quickly go through it for your Honor.
11         The first page I covered was page 78.
12             THE COURT:  And the last page you
13         mentioned was what?
14             MR. SCHMIDT:  Was page 66.  That's with
15         colorful language about being inadequate to
16         inscrutable.
17             THE COURT:  Okay.  Go ahead.
18         Q.   Last one I'm going to do on the
19     opinions, Mr. Rafalski, is -- can we go to page 151.
20         A    151, I'm sorry?
21         Q.   I'm sorry, 141.
22         A    Okay.
23         Q.   141.
24             I just want to confirm that I have the
25     right page.  Yeah, it's about partway down,
```

```
 1                    Opioid Frye/Mr. Rafalski              196
 2      paragraph 6; do you see that?
 3            A    Yes, sir.
 4            Q.   Which is:  Mallinckrodt did not stop
 5      shipments they knew were destined to New York that
 6      were lightly engaged in diversion; do you see that?
 7            A    Yes, sir.
 8            Q.   That's another one of your opinions
 9      regarding Mallinckrodt, correct?
10            A    Yes, sir.
11            Q.   Do you take issue that that comes word
12      for word from the lawyer allegations in the
13      Complaint?
14            A    I do not.
15            Q.   Now, you've recognized that as an expert
16      you're supposed to base your opinions on facts and
17      not advocate for one side or the other, correct?
18            A    Yes, sir, I understand that.
19            Q.   You agree it would be improper for an
20      expert to be biased for one side or the other when
21      giving his opinion, correct?
22            A    Yes, sir.
23            Q.   We've now seen how large portions of
24      your report are word for word identical to the
25      lawyer allegations in the Complaint, correct?
```

```
 1                    Opioid Frye/Mr. Rafalski           197
 2          A    Yes, sir.
 3          Q.   And as best you know, you did that
 4    without seeing our side of the story on that in
 5    terms of what our response was to that, correct?
 6          A    In response to the Complaint, the New
 7    York Complaint?
 8          Q.   Yes, sir.
 9          A    I did not review the New York Complaint,
10    no, sir.
11          Q.   You did not review our response to that,
12    our side of the story, correct?
13          A    Yes, sir, that's what I meant.
14          Q.   You understand that your report is
15    supposed to be your own words, not the words of your
16    lawyers, right?
17          A    Yes, sir.
18          Q.   Do you recall telling me, and I kind of
19    harped on this with that language about that
20    inscrutable to incomprehensible or whatever it was,
21    do you recall telling me in your deposition that
22    some of the words in your report were not typical
23    words you would use?  Do you remember telling me
24    that?
25          A    Yes, sir.
```

```
 1                    Opioid Frye/Mr. Rafalski              198
 2          Q.   Do you remember telling me that if you
 3    had more time to work on your report, it would have
 4    been more in your voice?
 5          A    I don't remember that exact statement,
 6    sir.
 7          Q.   Let's take a look then.
 8          A    Part of my deposition?
 9          Q.   Yes, sir.
10          MR. SCHMIDT:  Can we pull that up, I
11              think it's tab 2, at page 88, please, 11
12              through 14.  Can we put that up on the
13              screen, please.  The February 7th New York
14              deposition.
15          Q.   Do you see where you were asked if you
16    had more time to work on Exhibit 1, it would be more
17    in your voice, correct?  And you answered, Yes.
18               Was that truthful testimony?
19          A    I acknowledge that I answered yes, as
20    you indicated here.  If I could just take one
21    minute, I would like to read it a little more before
22    and after that statement.
23          Q.   The only question we're looking at, Mr.
24    Rafalski, were you being truthful when you said,
25    Yes, if you had more time it would be more in your
```

```
1                      Opioid Frye/Mr. Rafalski          199

2      voice; were you being truthful in that testimony?

3            A     Generally, yes, unless some of the

4      questions before or after either conflict or modify

5      that statement.  I don't want to take a lot of the

6      Court's time.  I just want a quick minute to look.

7            Q.    My next question.

8            A     Okay, I'm good.  We can move on.  Thank

9      you.

10           Q.    Thank you.

11                 You would agree with me that it would be

12     improper to just be a mouth piece for the lawyers

13     and say whatever it is that they want you to say,

14     correct?

15           A     Yes, sir.

16           Q.    You agree that it would be wrong to

17     simply have someone else write your report for you

18     and adopt it word for word, correct?

19                 THE COURT:  Time out.  My screen went

20            blank.  Anyone else's?

21                 MR. SCHMIDT:  I think it's because you

22            just pulled down the document.

23                 THE COURT:  That's fine.

24           Q.    Sir, I ask you -- can you hear me, Mr.

25     Rafalski?
```

```
1                    Opioid Frye/Mr. Rafalski          200
2           A    I can hear you.
3           Q.   Do you agree with me that it would not
4    be proper to simply have someone else write your
5    report for you and adopt it word for word; do you
6    agree with that?
7           A    Yes, I agree with that.
8           Q.   It would be improper to take passages
9    that the lawyers gave you for your report and simply
10   adopt them verbatim, correct?
11          A    Without reviewing them and the
12   supporting documents and adopting it as my own, yes,
13   just to merely take them and put them into my
14   report, I would agree with that.
15          Q.   That would be improper, correct?
16          A    That would be improper.
17          Q.   In this case, we've now been through the
18   fact that very important passages of your report are
19   the identical verbatim words that the lawyers put in
20   their Complaint, which was written close to a year
21   before you wrote your report, correct?
22          A    With the caveat that there were
23   footnotes added to support those statements.
24          Q.   It's not your generally accepted
25   practice to simply take lawyer allegations and adopt
```

```
 1                    Opioid Frye/Mr. Rafalski          201

 2     them as your own; is it?

 3          A    It is not.

 4          Q.   It's not your generally accepted

 5     practice to simply cut and paste lawyer allegations

 6     and adopt them as your own, correct?

 7          A    That is correct.

 8               MR. SCHMIDT:  Okay.  I'm going to shift

 9               gears now and ask you about another topic.

10               I'm through with that topic.

11               Your Honor, I don't know if you want to

12               take a break in the afternoon, I'll keep

13               going if your Honor is good.

14               THE COURT:  We'll take ten minutes.  Ten

15               minutes, everybody.

16               (WHEREUPON, a short recess was taken.)

17               THE COURT:  Okay.  Is everybody back?

18               You may proceed, Mr. Schmidt.

19               MR. SCHMIDT:  Thank you, your Honor.

20          Q.   One more question on the subject I

21     forgot to ask you that we were talking about.

22               A section of the report that you carried

23     over from the Ohio case, do you know if all of that

24     was written by you as opposed to being written by

25     lawyers in the first instance?
```

```
 1                  Opioid Frye/Mr. Rafalski            202
 2            MS. CONROY:  Objection, your Honor.
 3            THE COURT:  What's your objection?
 4            MS. CONROY:  Objection, your Honor.  I
 5       believe that there are orders in place in the
 6       MDL about the drafting of expert reports and
 7       what can be inquired about the expert
 8       reports.
 9            THE COURT:  There are parameters?
10            MS. CONROY:  That's correct, your Honor.
11            THE COURT:  Are you speaking of the
12       order, the decision?
13            MS. CONROY:  I was actually speaking
14       about some of the pretrial orders with
15       respect to the expert reports.  It may, in
16       fact, be in an order as well.  The protocols
17       that we are following and whether or not
18       either side could inquire about the drafting
19       of an expert report.
20            So it's one thing to talk about the
21       drafting of the report in your orders, your
22       Honor, concerning this expert report in New
23       York, but now if we're going to get into the
24       drafting of an expert report in the MDL,
25       that's something different.
```

```
 1                     Opioid Frye/Mr. Rafalski              203
 2              THE COURT:  Okay.  Mr. Schmidt, are you
 3         out of bounds?
 4              MR. SCHMIDT:  There is such an order in
 5         Ohio.  I think it's a different universe when
 6         the report gets incorporated into New York,
 7         but I'll move on.  I think it's evident from
 8         the report.  I'll move on.
 9              THE COURT:  Thank you.
10         Q.   Mr. Rafalski, one of the things the
11    Court talked about in setting up these hearings was
12    the question of causation, and I want to spend a few
13    minutes in the next section of time I have with you
14    talking about how your opinions fit into causation
15    and to do that I want to ask you some questions
16    about the pharmaceutical distribution chain, okay?
17         A    Yes, sir.
18         Q.   Before I do that, I just want to ask
19    some questions about why we have prescription
20    opioids.  You agree they serve an important medical
21    purpose, correct?
22         A    I do.
23         Q.   In fact, when we had the chance to ask
24    you that in your deposition, you said, Absolutely,
25    they serve an important medical purpose, correct?
```

1

2          A     My employment with the DEA division was

3     to ensure the uninterrupted supply to those people

4     who need those drugs, so absolutely I agree with

5     that.

6          Q.    And you anticipated my next question.

7                That's a coordination of the DEA to

8     ensure uninterrupted supply of prescription opioids,

9     correct?

10         A     That's the major part of the mission

11    statement for diversion, yes, sir.

12         Q.    Okay.  So let's talk about how that

13    access to prescription opioids is maintained in our

14    country, and I'm going to put up on the screen, it's

15    in the box as demonstrative Exhibit 3.

16               If we could pass that out and put that

17    on the screen, and if Miss Conroy would like this or

18    if you would like this, Mr. Rafalski, I can show you

19    where this comes from, but you may remember this,

20    it's from a 2020 government watchdog report from the

21    GAO; do you remember seeing this in your deposition?

22         A     I don't see anything yet on the screen.

23    I remember the discussion at my deposition.

24               THE COURT:  Wait until you see something

25               on the screen.

```
1                      Opioid Frye/Mr. Rafalski            205

2            A     Yes, I recall this.

3            THE COURT:  Okay.

4            Q.    You recall this image, this figure

5      coming from a GAO government watchdog report on the

6      DEA, correct?

7            A     Yes, sir.

8            Q.    Let's just breakdown what we're looking

9      at here.

10           In the middle on the right -- and,

11     Chris, I don't know if there's a way to circle the

12     box or something, but we see patients.

13           Do you see that at the end of the middle

14     row of blue items?  Do you see that?

15           A     I see it, sir.

16           Q.    Okay.  And if we go back out, Chris, and

17     let's just circle them, let's not blow them up.

18     Patients, of course, as this image shows, get their

19     prescriptions from healthcare professionals,

20     including doctors, which you see above; do you see

21     that?

22           A     I do.  I can read it without blowing it

23     up, if that helps save time for you.

24           Q.    That helps save an immense amount of

25     time, thank you.
```

                              Opioid Frye/Mr. Rafalski                    206

1

2              And then when they get that prescription

3       from their doctor, they take it to the pharmacy to

4       have the prescription dispensed, and we see the

5       pharmacy to the left of the patient, correct?

6              A     Yes, sir.

7              Q.    The pharmacy, in turn, gets the

8       prescription medication from the distributor, which

9       is the next one over; do you see that?

10             A     Yes, sir.

11             Q.    The distributor, in turn, gets it from

12      the manufacturer, correct?

13             A     Yes, sir.  That's generally how it

14      works.

15             Q.    Okay.  And I want to break this down a

16      little bit more and ask you about some of these

17      entities.  Let's start with doctors.  The ones who

18      write the prescriptions.

19             Doctors are only supposed to write

20      prescription -- opioid prescriptions in response to

21      patient medical needs, true?

22             A     That's one aspect.  The other one would

23      be a doctor/patient -- the existence of a doctor/

24      patient relationship.

25             Q.    Okay.  So let me see if I have it right.

2     Doctors are only supposed to write

3  prescription opioids if they have a doctor/patient

4  relationship and make a judgment about a medical

5  need, correct?

6     A    Yes.  That's not the exact language, but

7  I accept that, yes, sir.

8     Q.   Pharmacies, in turn, can only dispense a

9  prescription opioid in response to getting a

10  prescription from a healthcare professional given to

11  a patient, correct?

12     A    Generally I agree with that, yes.

13     Q.   And that rule applies no matter how many

14  prescription opioids a manufacturer makes or a

15  distributor distributes, the pharmacy is only

16  supposed to dispense the prescription opioid if they

17  get a prescription from a healthcare professional,

18  correct?

19     A    Yes.  Just in the previous question I

20  kind of couched my answer.  The pharmacy just

21  doesn't fill it.  They're supposed to evaluate it,

22  but other than that, I agree with your statement.

23     Q.   Okay.  So just to go back.  Pharmacy

24  can't dispense a prescription opioid without having

25  a prescription in hand from a licensed healthcare

1

2     professional and properly evaluating it, correct?

3          A     Correct.

4          Q.    And that statement is true no matter how

5     many prescription opioids a manufacturer makes or

6     how many prescription opioids a distributor

7     distributes, correct?

8          A     Yes, sir.

9          Q.    In terms of looking at how many pills

10    get dispensed by pharmacies, that's directed by the

11    number of pharmacies -- by the number of

12    prescriptions that get written, correct?

13         A     No, I don't -- I don't agree with that

14    statement.

15         Q.    Okay.  Do you know of any prescription

16    opioids that have been dispensed by a New York

17    pharmacy made by a manufacturer in this case or

18    distributed by a distributor in this case that were

19    dispensed without a prescription being written for

20    them?

21         A     No, I do not.

22         Q.    Is it the case that every prescription

23    opioid that is dispensed by a pharmacy is supposed

24    to be dispensed in response to a prescription

25    written by a healthcare professional?

```
1                    Opioid Frye/Mr. Rafalski          209
2          A    Yes, sir.
3          Q.   Okay.  And what is supposed to guide the
4    number of prescriptions that get dispensed by
5    pharmacies is how many prescriptions physicians
6    write or other healthcare professionals write,
7    correct?
8          A    Can you repeat that one more time, sir?
9          Q.   Sure.  What is supposed to guide the
10   number of prescriptions that get dispensed by a
11   pharmacy is the number of prescriptions that get
12   written by healthcare professionals exercising their
13   obligation to their patients, true?
14         A    Just the word "guide," I don't know if
15   it guides.  Just the number of pills that are
16   dispensed by a pharmacy are dependent on legitimate
17   prescriptions from practitioners, not guiding, I
18   just don't like the word guiding statement.  Other
19   than that, I agree with it.
20         Q.   You said it better than me.
21              The number of pills that a pharmacy
22   dispenses are directed by the number of
23   prescriptions written by healthcare professionals,
24   correct?
25         A    That's correct.
```

Q.    If we look at the bottom of this graph,
the green box down at the bottom, you recognize that
those are different types of diversion that can
occur?

A    Yes, sir.

Q.    Specifically some of them are types of
diversion that can occur from manufacturers and
distributors, correct?

A    Yes, sir.  I don't know that this list
is inclusive of all methods of diversion, but I do
agree that what's stated here is diversion.

Q.    You don't talk in your report about any
instances of diversion from manufacturers or
distributors that occurred while they actually have
the prescription opioids when they go to a pharmacy,
correct?

A    I do not.

Q.    You're aware that throughout the opioid
crisis doctors steadily increased the number of
prescriptions that they were writing for
prescription opioids?

A    Yes, I'm aware of that.

Q.    Do you know when that peaked?

A    Well, that's a general statement and

1                    Opioid Frye/Mr. Rafalski            211

2      there are many drugs.  If we're talking about

3      specifically the opioids, the Oxycodone and

4      hydrocodone, I would say sometime around between the

5      very end of 2011 and mid 2012 for -- and that's not

6      an absolute statement but, generally, I would say

7      that you're going to see the peek somewhere within

8      that range.

9             Q.    Do you give any opinion in this case

10     about whether doctors, medical professionals, by

11     writing prescriptions for prescription opioids and

12     by increasing their volume of prescriptions helped

13     cause or contribute to the opioid crisis?  Do you

14     give such an opinion in this case?

15            A     I do not.  And I was not tasked to

16     research that matter or opine on it.

17            Q.    You don't address the causal role of the

18     medical profession in the opioid crisis, correct?

19            A     No, sir, I do not.

20            Q.    Look back at figure 1 up at the top,

21     it's got another one of those green diversion boxes,

22     right front and center at the top for doctors who

23     write prescriptions improperly; do you see that?

24            A     Yes, sir.

25            Q.    You understand that those are sometimes

1

2    referred to as pill mill doctors, correct?

3         A    That's one of the nicknames they give to

4    them.

5         Q.   And you would say pill mill doctors were

6    definitely a causation of the opioid crisis,

7    correct?

8         A    I would say doctors that were writing

9    outside of a legitimate medical patient relationship

10   and absolutely no medical need would be one of the

11   causation factors.

12        Q.   You haven't addressed the role of pill

13   mill doctors in your report or in your opinions in

14   terms of causing the opioid crisis, correct?

15        A    Same response before.  I was not tasked

16   as an expert to evaluate that and provide an opinion

17   on that matter.

18        Q.   You can't quantify how much

19   responsibility they bear for the opioid crisis,

20   correct?

21        A    Again, the same answer.  I didn't

22   research the matter and provide any opinion on that,

23   so I really have no response to that question.

24        Q.   Okay.  You have no quantification for

25   pill mill doctors, 90 percent responsible, 4 percent

```
1                        Opioid Frye/Mr. Rafalski              213
2      responsible, somewhere in between, correct?
3              A    No, I have no idea on a percentage.  I
4      have no response to that.
5              Q.    Okay.  On the right side of this graph
6      there are instances of patient diversion; do you see
7      that?
8              A    Yes, sir.
9              Q.    The top box refers to something called
10     doctor shoppers; are you familiar with that?
11             A    Oh, yes, sir.
12             Q.    And then below that it refers to
13     patients who can provide legitimately maintained
14     drugs to friends and family for free?
15             A    Yes, sir.
16             Q.    Have you sometimes heard that referred
17     to as diversion from the medical cabinet?
18             A    Yeah.  I don't really agree that that is
19     diversion.  I think medicine cabinet diversion
20     usually happens without the consent or knowledge of
21     patients, but I don't disagree with that statement
22     here.
23             Q.    Okay.
24             A    Not to qualify it as medicine cabinet
25     diversion.
```

```
1                  Opioid Frye/Mr. Rafalski            214
2          Q.    When a patient misuses medication that
3     was prescribed for a legitimate medical purpose,
4     whether it's giving it away or selling it, who's
5     responsible for that?
6          A     The end user, the patient.
7          Q.    When someone steals medication, what you
8     call diversion from the medical cabinet, from a
9     patient who got it by legitimate -- for legitimate
10    medical needs, who's responsible for that
11    wrongdoing?
12         A     I don't think -- as long as they were
13    safely stored, I don't know that there is a person
14    who is responsible for that causation.
15         Q.    Not the person who stole it?
16         A     Well, they would be responsible, but
17    that's a result of their actions.  I don't think
18    they are the causation.  I guess maybe I'm just not
19    agreeing with the actual words.
20         Q.    Okay.  You agree that doctor shopping,
21    giving drugs away for free, selling them as part of
22    a criminal enterprise is a potential crime?
23         A     I think it is a crime, yes, sir.
24         Q.    None of those activities involve
25    distributors, correct?
```

```
 1                    Opioid Frye/Mr. Rafalski            215
 2           A     Not directly, sir.
 3           Q.    Okay.  This is an important one, so I
 4     want to go back to your testimony for this to be
 5     very precise.  February 7th 2020, let's go to page
 6     319.
 7           A     If we're going to my statements on
 8     diversion, I'm aware that I had some thoughts on
 9     that after my testimony.
10           Q.    Okay.  Sir, let me just show you your
11     testimony and then --
12           A     Sure.
13           Q.    -- if Miss Conroy wants to ask you
14     questions, she can.
15                 If you look at the bottom of 319, do you
16     see where I ask you some of those similar questions
17     about patient diversion and -- you don't need to put
18     it all up.  Do you have it in front of you, Mr.
19     Rafalski?
20           A     I see it.
21           Q.    Okay.  Do you see where I ask you some
22     similar questions about these different types of
23     diversion being criminal activity?
24                 And why don't we just show -- if we're
25     going to show it, Chris, why don't we show from line
```

```
 1                    Opioid Frye/Mr. Rafalski              216
 2    13 to line 24.
 3              THE COURT:  Can I see the complete
 4         answer, please.
 5              MR. SCHMIDT:  Yes, of course.  Let's
 6         show it from 13 to 24.  This is more really
 7         just a setup for what I'm going to show you
 8         is impeachment testimony.
 9              THE COURT:  Only because I thought there
10         was more.
11              MR. SCHMIDT:  It carries over to the
12         next page, and I will show what's on the next
13         page, your Honor.  So this orients us to what
14         we're talking about here.
15         Q.   Do you see that I ask you that all three
16    of those activities occur and then we define what
17    we're talking about posing as legitimate patients to
18    give drugs to a family member for free, and, I'm
19    sorry, what's the third one, selling, and I say
20    selling them is part of a criminal enterprise.
21              And you say, I think all three have the
22    potential -- have a potential to -- and then if we
23    carry over to the next page -- to have criminal
24    actions, yes, sir.
25              Do you see that?
```

```
1                    Opioid Frye/Mr. Rafalski        217
2          A    I do.
3          Q.   Okay.  I just did that as a table
4    setting.  This is the question I wanted to ask you.
5               Do you see where I then immediately
6    asked you, and none of those involved distributors,
7    correct?
8          A    I see where it says that, yes, sir.
9          Q.   Do you see your answer, That's correct?
10         A    Yes, sir.
11         Q.   Were you being truthful, as best you
12   could, at that time?
13         A    I was.
14         Q.   Okay.  None of them involve
15   manufacturers, correct?
16         A    That's how I answered at that time.
17         Q.   Were you being truthful?
18         A    At that time, yes, sir.
19         Q.   None of them involved pharmacies,
20   correct?
21         A    I don't -- do I have an answer to that?
22         Q.   I didn't ask you that question.
23              Do any of them involve pharmacies, sir?
24         A    I don't agree with that.
25         Q.   If a patient steals something from a
```

```
 1                    Opioid Frye/Mr. Rafalski              218
 2   medicine cabinet, does that involve a pharmacy?
 3        A    That specific example, no.
 4        Q.   If a patient gets a legitimate
 5   prescription from a pharmacy, then turns around and
 6   sells it for money, does that involve a pharmacy,
 7   sir?
 8        A    No.  Just for clarification, we talked
 9   about doctor shoppers and pill mills and a lot of
10   other circumstances, so that's why I'm just cautious
11   in answering.  Specific examples like that, I could
12   say no.
13        Q.   If a patient gets a legitimate medical
14   prescription for opioids and gives them away for
15   free, does that involve the pharmacy?
16        A    No, sir.
17        Q.   You don't give an opinion in your report
18   or in your testimony about whether --
19             MR. SCHMIDT:  Let's go back to the
20             demonstrative number 2, if we could, please,
21             Mr. Reynolds.  I'm sorry, demonstrative
22             number 3.
23        Q.   You don't give an opinion in your report
24   about the role that individual diversion of the type
25   we've been talking about played in causing the
```

```
 1                    Opioid Frye/Mr. Rafalski          219
 2   opioid crisis, correct?
 3          A    Can you say that one more time, I'm
 4   sorry?
 5          Q.   Yeah, of course.
 6               You don't give an opinion in your report
 7   about whether individual diversion, including like
 8   the type we've been talking about, caused or
 9   contributed to the opioid crisis, and, if so, how
10   much, correct?
11          A    That is not contained within my opinion.
12   I was not asked to research and opine on that.
13               MR. SCHMIDT:  Okay.  Let's go ahead and
14          mark this for identification as Court's
15          Exhibit -- as Defendant's Exhibit, I think
16          we're up to D, as in dog.
17          Q.   Have you seen data indicating that 70 to
18   80 percent of diversion starts in the medicine
19   cabinet at home, sir?
20          A    I do recall that previous question, and
21   I recall my previous testimony in that manner.
22          Q.   You've seen such data, correct?
23          A    Yes, sir.
24          Q.   Let's just show the Judge what we're
25   talking about.  If I could ask my colleagues in
```

```
1                    Opioid Frye/Mr. Rafalski              220

2      court to pass out tab 25, and we'll mark it as

3      Exhibit E, as in excellent.

4              Do you remember being shown this

5      document at the Suffolk County Supreme Court Special

6      Grand Jury for the first time at your deposition?

7          A    I do not.

8          Q.   Okay.  Do you recall that you had not

9      seen this document until I showed it to you?

10         A    I do not.  Is it possible to see that

11     statement in my deposition?

12         Q.   Of course.  Of course.  February 7, 2020

13     deposition, tab 2, at page 306, please.

14         A    306?

15         Q.   Yes, please.  And if we look at 19 --

16              MR. SCHMIDT:  And, Mr. Reynolds, if

17         there's a way, following up on the Judge's

18         question earlier, to put the continued answer

19         on the next page so we can see it all.

20              Nicely done.

21         Q.   The question on 19 is:  I'm giving you a

22     copy of what I've marked as Exhibit 19.  This is a

23     document that says Suffolk County Supreme Court

24     Special Grand Jury, dated April 17th, 2012, and it's

25     titled Grand Jury Report, and it's 99 pages.  Have
```

1                  Opioid Frye/Mr. Rafalski          221

2      you seen this document before today?

3                  You answered:  No, sir.

4           A    I see that.  I have my copy of my

5      deposition.  I acknowledge that's what it says, sir.

6           Q.   That was the testimony?

7           A    Yes, sir.

8           Q.   If you can just orient us as to what

9      this is.  Do you see on the cover of Exhibit E, it

10     states the Suffolk County Supreme Court Special

11     Grand Jury Term 180 was impaneled on January 4th,

12     2012, by order of the Honorable James C. Hudson, to

13     complete an investigation into the diversion and

14     dissemination of controlled substances and issues

15     related thereto; do you see that?

16          A    Yes, sir.

17          Q.   If we flip ahead to page 20 of this

18     document, do you see that there's a heading, it

19     says, The Medicine Cabinet?

20          A    I do.

21          Q.   Below that it says:  Experts estimate

22     that 70 to 80 percent of diversion starts in the

23     medicine cabinet at home; do you see that?

24          A    Yes, sir.

25          Q.   And that's the type of diversion that we

```
1                    Opioid Frye/Mr. Rafalski         222

2      talked about a few minutes ago, it has nothing to do

3      with distributors, manufacturers or pharmacists,

4      correct?

5           A    Yes, sir.

6           Q.   If you look at the footnote, we've

7      talked about footnotes a little bit, this footnote

8      cites the Federal Substance Abuse and Mental Health

9      Services Administration; do you see that?

10          A    Yes, sir.

11          Q.   Have you reviewed that federal data?

12          A    No, sir.

13          Q.   Okay.  Have you seen the 70 to 80

14     percent statistic regarding diversion starting in

15     the medicine cabinet at home; have you seen that in

16     other sources?

17          A    I know it's been discussed previously.

18     I believe in this document that it appears again.

19     But the second time it appears in the document I

20     believe it applies to children.  And I remember this

21     document from my first testimony.  I did not agree

22     with the 70 and 80 percent of diversion.

23               Again, I also didn't agree with the

24     later statement because I didn't ask -- I didn't

25     hear the word children.  If you insert the word
```

1

2     children, my errata that I filed in regards to my

3     last deposition is where I changed my testimony.  If

4     it involved children I would agree with that.

5          Q.    In this statement here, does it say the

6     word children in the statement we violated?

7          A     No, not specifically.

8          Q.    Do you know of another generally

9     accepted number in terms of how much diversion

10    starts in the medicine cabinet at home?  Have you

11    seen another number that you would point us to as

12    generally accepted?

13         A     No.  I'm just drawing on my experience

14    working at DEA as a diversion investigator in both

15    the criminal and the administrative cases, I believe

16    that that's too high of a percent.

17         Q.    That's experience solely in Detroit,

18    correct?

19         A     Yes, sir.  And in reviewing cases and

20    documents and stuff nationwide, for instance, the

21    Florida situation, South Ohio, some involvements in

22    other areas, Toledo, not specifically to Detroit, my

23    experience isn't there.  It just encompasses my time

24    as a diversion investigator reading case studies and

25    other cases and analysis.  So that's where I draw.

1
2      Just based on my experience and some of the
3      knowledge while I was working.
4              Q.   Your experience doesn't include working
5      in Nassau County or Suffolk County or New York
6      State, correct?
7              A    It does not.
8              Q.   In terms of coming up with a different
9      number, you can't give me a specific different
10     estimate, you just believe this number is too high,
11     correct?
12             A    For that specific statement I do.
13             Q.   But you don't have a different number
14     for us; do you?
15             A    I do not.  I do not.
16             Q.   In terms of this specific statement, you
17     haven't done any research or studies or read any
18     periodicals about it, correct?
19             A    Again, I answered that previously.  It's
20     all based on my experience and documents and cases
21     and my exposure to the opioid epidemic.  I have no
22     exact percent that I would adjust it to.
23             Q.   Come back to my question, sir.
24                  Would it be true to say you haven't done
25     any research or studies or read any periodicals

1

2      about this number; would that be true?

3              A    70 to 80 percent, no, sir, I have not.

4              Q.   Let's go back to the image demonstrative

5      Exhibit 3, please.  This doesn't appear on the

6      exhibit, but you recognize that the DEA, your former

7      employer, the Drug Enforcement Administration,

8      overseas this whole prescription drug opioid

9      process?

10             A    Yes.  I was a part of the agency.  That

11     was my task or responsibilities as a diversion

12     investigator.  I agree that this all encompasses my

13     previous employment.

14             Q.   They license every healthcare

15     professional who can write a prescription for a

16     prescription opioid, right?

17             A    Yes, sir.

18             Q.   They license pharmacies that can

19     dispense prescription opioids, right?

20             A    Legitimately, yes, sir.

21             Q.   No one lawfully can prescribe a

22     prescription or dispense one without getting

23     licensed by the DEA and then in periodic intervals

24     having their license or registration reviewed,

25     right?

```
1                    Opioid Frye/Mr. Rafalski          226

2          A    Just with the added caveat that they

3    also must maintain a state license for that state

4    they practice in.

5          Q.    I'm going to come to the State in a

6    minute.  Let's just focus on the DEA first.

7               The DEA has to license every provider

8    and every pharmaceutical, correct?

9          A    Right.  I don't want to argue.  Only if

10   they have a valid New York State license.  They

11   cannot obtain a DEA license without it so.

12         Q.    And in your estimation, the DEA has

13   licensed a good deal of the pill mill doctors in the

14   United States, correct?

15         A    Well, if they're issuing prescriptions

16   with the DEA registration, that would be a true

17   statement.

18         Q.    In fact, based on your experience, you

19   had said it would probably be greater than a

20   thousand pill mill doctors the DEA has licensed,

21   correct?

22         A    Over the course of the opioid epidemic,

23   I would agree with that statement, sir.

24         Q.    And correspondingly, you would agree

25   that there were probably over a thousand pill mill
```

1

2    pharmacies that DEA licensed?

3         A    I would not disagree with that

4    statement.  I don't have an exact number but...

5         Q.   You're aware that they've been

6    criticized for the manner in which they licensed

7    pharmacies and doctors throughout the opioid crisis,

8    correct?

9         A    And the source of that criticism; do you

10   have that?

11        Q.   I'm just asking you, are you aware that

12   there have been some studies and some criticisms

13   over DEA contributing to the opioid crisis?

14        A    I don't know if contributing, but I know

15   there have been some criticism of the DEA, internal

16   or government investigations, I'm aware of those,

17   not the exact language.

18        Q.   Let's go back to your testimony, sir,

19   where I asked you that exact same question, page

20   177, deposition.  Can we -- I think I got the wrong

21   citation in my notes -- no, it's right.  Can we show

22   the bottom.  I think the question starts at the

23   bottom of the page.

24             Can we go back to 177.  It says, Okay,

25   understood, and then if we go to page 28, 178, it

1  
2       says, Let me show you my next exhibit.

3               I asked you about, are you aware that

4       the DEA has been criticized for contributing to the

5       opioid crisis?

6               Do you see that question I just asked

7       you a few moments ago?

8           A    I do.

9           Q.   Do you see your answer was:  Yes, sir.

10      I realize that there have been some studies and some

11      criticisms.  Do you see your answer?

12          A    I do, but I don't recall what the

13      exhibit was or what the source of that questioning

14      in my statement is.  That's the issue I'm having.

15          Q.   Was that truthful testimony at the time?

16          A    I don't know until I see the document.

17          Q.   Okay.  You don't know whether you can

18      stand behind that sworn testimony?

19          A    No.  I'm cautious to say that until I

20      see the document.  I mean, I'm not disagreeing that

21      those were my words I spoke that day.

22               THE COURT:  Time out.  Is the exhibit

23               available?

24               MR. SCHMIDT:  Yes.  And I'm about to

25               show him, your Honor.

1  
2          THE COURT:  Okay.

3          Q.    Let me show you what I'll mark as

4    Exhibit F, it's tab 15 in the binder.  It's from the

5    Office of the Inspector General of the United States

6    Department of Justice.

7               You recognize they are a government

8    watchdog, right?

9          A    I do.

10         Q.    They're a watchdog in the same agency,

11    the Department of Justice, that the DEA is a part

12    of, right?

13         A    They are.

14         Q.    And if you look at the bottom, this is

15    from September 2019; do you see that?

16         A    I see that.

17         Q.    It's entitled:  Review of the Drug

18    Enforcement Administration's regulatory and

19    enforcement actions to control the diversion of

20    opioids; do you see that?

21         A    Yes, sir.

22              MR. SCHMIDT:  May I just ask if the

23              folks in the courtroom have a copy of this?

24              MS. CONROY:  Yes.

25              MR. SCHMIDT:  Does your Honor have a

```
 1                    Opioid Frye/Mr. Rafalski        230

 2          copy?

 3                    THE COURT:  Yes.

 4                    MR. SCHMIDT:  Thank you, Miss Conroy;

 5          thank you, your Honor.

 6          Q.    Let's look at page 15 of this report.

 7          A     15.

 8          Q.    Do you see halfway down the page there's

 9     a heading with the criticism pre-registration

10     investigations did not adequately vet applicants; do

11     you see that?

12          A     I see where it says that.

13          Q.    Look at the second sentence, it says,

14     The purpose of a pre-registration investigation is

15     to determine the fitness and suitability of the

16     applicant to engage in the activities for which

17     registration is requested and to ensure that the

18     applicant is familiar with its responsibilities to

19     prevent diversion; do you see that?

20          A     I do.

21          Q.    That absolutely applies to registration

22     of doctors and pharmacies, correct?

23          A     Yes, sir.

24          Q.    However, we found that DEA's

25     pre-registration process did not appropriately
```

```
 1              Opioid Frye/Mr. Rafalski          231
 2    safeguard against diversion of pharmaceutical
 3    opioids or any other drug, because DEA did not
 4    conduct background checks on all new applicants and
 5    it relied instead on the good faith of applicants to
 6    disclose relevant information, even in cases in
 7    which the applicant had previously engaged in
 8    criminal activity; do you see that?
 9         A    I do.
10         Q.   You're familiar with this criticism of
11    DEA not carrying out its licensing responsibilities
12    correctly?
13         A    I do.  I remember my deposition.  I
14    think I disagreed with that statement.  We had a
15    discussion about it.
16         Q.   Okay.  And just so we're clear which
17    type of registrant we're talking about here, if you
18    look down in the next paragraph, please, it
19    distinguishes between type A and type B registrant.
20              Why don't we pull out that paragraph and
21    then we can continue over to the next page.
22              Are you familiar with that distinction
23    between type A and type B registrant?
24         A    Yes, sir, I am.
25         Q.   B registrant, do you see in the first
```

1

2    sentence includes manufacturers, distributors and

3    other entities?

4         A    I do.

5         Q.   According to the Associate Section Chief

6    of the DEA's regulatory section, this is the first

7    language in the paragraph, DEA conducts

8    pre-registration inspections only on type B

9    registrants, correct?

10        A    Not totally accurate.

11        Q.   Well, let's just read it.  Do you see

12   where it says right at the beginning, According to

13   the Associate Section Chief?

14        A    I acknowledge that's what it says.

15        Q.   That was my question.  That's what it

16   says?

17        A    That's what this statement says, yes,

18   sir.

19        Q.   It goes on to say in language that

20   carries over to the next page, type A registrant,

21   which includes physicians, dentists, pharmacists,

22   are rarely required to undergo a pre-registration

23   investigation; do you see that?

24        A    I see what that document says, yes.

25        Q.   That's the point where this report is

1

2      being critical of DEA, correct?

3           A     Yes.

4           Q.    Are you aware that DEA has been

5      criticized by setting quotas for prescription

6      opioids too high?

7           A     Generally, yes.  I don't know the

8      specific document, but I believe there is some

9      criticism about their handling of the quotas.

10          Q.    Do you agree with that?

11          A     I don't remember the exact criticism.

12     I'm not sure that I have enough experience or

13     knowledge of the quota system being able to

14     participate in to make a comment on that.  Just

15     general positions based on, you know, the level of

16     my employment.

17          Q.    You understand that the DEA every year

18     sets to the pill the amount of prescription opioids

19     that can be manufactured in the United States based

20     on a judgment of medical and other needs?

21          A     I understand the process, yes, sir.

22          Q.    Now, you -- I want to come back to that

23     topic.  You said, in addition to what we've been

24     talking about, the DEA and what the DEA does in

25     terms of licensing, the State of New York, your

```
1                      Opioid Frye/Mr. Rafalski              234

2        client, also has to license every prescriber and

3        every pharmacy and pharmacist in the State of New

4        York, correct?

5              A     Yes, sir.

6              Q.    Both the DEA and the State of New York

7        have the independent ability to keep a pharmacy from

8        issuing prescription opioids or a doctor from

9        writing prescriptions for prescription opioids,

10       correct?

11             A     I agree with that statement.

12             Q.    Manufacturers, distributors and

13       pharmacies can't keep doctors from writing

14       prescriptions for prescription opioids, they don't

15       have that same power, correct?

16             A     Provide me the list again, I'm sorry.

17             Q.    Manufacturers, distributors and

18       pharmacies don't have the same power that the DEA in

19       the State of New York has to keep a doctor or a

20       healthcare professional from writing prescriptions

21       for prescription opioids; they can choose not to

22       fill it, but they can't stop the doctor from writing

23       it and getting it filled somewhere else in the way

24       that the State or the DEA can, correct?

25             A     I agree with that statement.
```

1

2      Q.    Manufacturers and distributors don't

3   have the same power that New York or the DEA has to

4   shut down illegal pharmacies, correct?  They can

5   stop supplying them, but they can't shut them down

6   the way New York or the DEA can?

7      A     They have no state or federal

8   administrative authority, I agree.

9      Q.    Your report does not address and your

10  opinions do not address the causal role of the DEA

11  in the opioid crisis, including up to this point the

12  criticism we talked about or the causal role in the

13  State of New York opioid crisis, correct?

14     A     It does not.  I was not requested by the

15  Plaintiffs' attorneys to formulate an opinion on

16  that or opine on that.

17     Q.    The Plaintiffs' lawyers for the State of

18  New York did not ask you to give an opinion on

19  whether the State of New York caused the opioid

20  crisis?

21     A     No, they did not.

22     Q.    Okay.  Somehow I'm not surprised.

23          Let me ask you a few questions about

24  manufacturers.

25          Manufacturers produce prescription

1

2      drugs, right?

3              A    Yes, sir.

4              Q.   They cannot sell prescription opioids or

5      make them unless they are licensed by both the DEA

6      and the State, right?

7              A    That's an accurate statement, yes, sir.

8              Q.   They can only make as much as the DEA

9      allows through its quota, correct?

10             A    Yes, sir.

11             Q.   Are you aware of any instance --

12             A    Of certain drugs, sir.

13             Q.   Prescription opioids?

14             A    Yes, sir.

15             Q.   Okay.  And I should be precise, but

16     thank you for pointing that out, because I'm just

17     going to focus on prescription opioids.

18                  There's no instance, you're aware of,

19     where a manufacturer who is a Defendant in this case

20     sold a controlled substance to a distributor in New

21     York or a pharmacy in New York that did not have a

22     license in both the State of New York and the DEA,

23     correct?

24             A    I agree with that statement, sir.

25             Q.   On the pharmacy side, pharmacies order

```
 1                    Opioid Frye/Mr. Rafalski            237

 2     directly from distributors and dispenses them to the

 3     patients, correct?

 4          A    Yes, sir.

 5          Q.   You understand that there's a difference

 6     between a lot of the independent pharmacies you talk

 7     about in your report and the four chain pharmacies

 8     that are Defendants in this case?

 9          A    Differences in -- can you elaborate on

10     that?

11          Q.   Sure.  One difference is that the four

12     Defendants who are pharmacies in this case, the

13     chain pharmacy Defendants, they sometimes self-

14     distribute, whether they distribute prescription

15     opioids but only to their own stores, correct?

16          A    I would agree with that.  I just wanted

17     a clarification because in the end they're both

18     retail pharmacies.  It's just the manner they

19     acquire their drugs.

20          Q.   Independent pharmacies don't self-

21     distribute, correct?

22          A    No, not that I'm aware of.

23          Q.   When it comes to independent pharmacies,

24     even the ones you talk about in your report, am I

25     correct that you don't address their role in causing
```

1

2      the opioid crises in your report?

3            A     That's a correct statement.  I wasn't

4      asked to investigate that matter or opine on it.

5            Q.    You're not giving opinions on that,

6      correct?

7            A     I am not.

8            Q.    A distributor -- let's turn to

9      distributors now -- cannot participate in the system

10     without them being registered by the DEA or by the

11     State, correct?

12           A     That's correct.

13           Q.    They can only sell prescription opioids

14     or provide prescription opioids to pharmacies that

15     have a DEA and a State registration, correct?

16           A     Yes.  Just a little clarification on

17     that.  I believe it's a requirement in some states

18     that they may have to have a state license for those

19     states they distribute to also, but just so the

20     record is clear, I don't want that I didn't know

21     that or say that.

22           Q.    Okay.  You're not aware of Cardinal or

23     McKesson or ABDC of selling controlled substances to

24     a pharmacy that was not licensed by the DEA or the

25     State of New York, correct?

1

2      A    I'm not aware of it, but just so it's

3   clear, my testimony is that I'm not saying it didn't

4   occur.

5      Q.    You couldn't point us to an instance

6   where it would have occurred, particularly in New

7   York, right?

8      A    I could not.

9      Q.    I want to ask you three sets of

10  questions about distributors and then I'll move on

11  to my next topic.

12          First, are you aware of how many total

13  distributors are in the United States?

14      A    Since I've left my employment, no, I'm

15  not.

16      Q.    Are you aware that, ballpark, it's

17  hundreds and hundreds?

18      A    I wouldn't disagree with hundreds and

19  hundreds, yes, sir.

20      Q.    You only focus on three in your report,

21  correct, the largest three, to be fair, but three,

22  correct?

23      A    Say that again, I'm sorry.

24      Q.    You only focus on three distributors in

25  your report, correct?

```
 1                      Opioid Frye/Mr. Rafalski              240

 2           A     No.  I think there are other

 3     distributors in my report.

 4           Q.    Which other distributors do you give

 5     opinions about that are not also chain pharmacies?

 6           A     Oh, the other distributors would be

 7     chain pharmacies.  I didn't realize you qualified

 8     that question.

 9           Q.    Yeah, and I just did qualify it, to be

10     fair to you.

11                 The only independent distributors you

12     talk about in your report are McKesson, Cardinal and

13     ABDC?

14           A     I agree with that.  The other

15     distributors are really chain distributors.

16           Q.    Are you aware there are other

17     distributors that you don't talk about that are

18     listed in Defense Exhibit B of the Complaint that

19     tracks through to your report; are you aware of

20     that?

21           A     Yeah, I believe so.  Yes, sir.

22           Q.    For example, do you know who Rochester

23     Drug is?

24           A     I do.

25           Q.    Do you know that there is currently
```

```
1                    Opioid Frye/Mr. Rafalski            241

2     criminal activity involved with Rochester Drug?

3         A    Yes, I do.

4         Q.   Do you know if their standards are

5     better or worse than McKesson, ABDC or Cardinal?

6         A    I didn't review anything for Rochester

7     Drug.

8         Q.   Do you know if they or any of the other

9     hundreds of distributors supplied any of the

10    pharmacies you talk about in your report as to

11    McKesson, Cardinal and ABDC?

12        A    Just generally reply to that in

13    reviewing due diligence records.  I did see that

14    there were some instances where Rochester Drug or

15    RDC was a supplier or secondary supplier on some of

16    the pharmacies.

17        Q.   Did up undertake any effort to ascertain

18    the role of RDC versus the alleged role of McKesson,

19    Cardinal or ABDC?

20        A    No, sir.

21        Q.   Do you know if Rochester Drug or any

22    other distributor that you did not review is

23    responsible for more or less alleged diversion than

24    the Defendants in this case?

25        A    Well, I can answer that just based on my
```

```
1                  Opioid Frye/Mr. Rafalski              242
2      knowledge of the industry, but I don't have a
3      specific evaluation to give you numbers or just
4      say --
5                  MR. SCHMIDT:  I think we lost Mr.
6             Rafalski for a moment.  I take it you all can
7             still hear me.
8                  Mr. Rafalski, can you hear us?
9                  IT TECHNICIAN:  It's on his end.
10                 THE COURT:  Mr. Rafalski?
11                 MS. CONROY:  We'll try to reach them,
12            your Honor, on the phone to see if we can
13            reach them on the phone.
14                 IT TECHNICIAN:  We just removed him from
15            the meeting so if he can rejoin.
16                 THE COURT:  Mr. Schmidt, what kind of
17            mic are you using?
18                 MR. SCHMIDT:  I'm in a room with one of
19            those goofy little cameras on top of a TV,
20            and I think the camera has the mic.  Is it
21            not coming through well?
22                 THE COURT:  It's coming through.  It's
23            like I'm listening to Led Zeppelin all
24            afternoon.  It's kind of loud.
25                 MS. CONROY:  Don't sing.  Don't sing,
```

```
1                    Opioid Frye/Mr. Rafalski        243

2           Mr. Schmidt.

3                MR. SCHMIDT:  I will not.  I will be

4           held in contempt if I did...

5                And I've been trying to speak up, your

6           Honor, because I was worried about being

7           heard, so I'm trying to be a little more

8           muted.

9                THE COURT:  Any luck?

10               MS. LICARDI:  He's not in yet.

11               THE COURT:  Is there some kind of

12          process we should be following now?

13               MS. LICARDI:  I see him asking to be let

14          in, and I let him in.

15               THE COURT:  Welcome back.

16               THE WITNESS:  Thank you, your Honor.

17               THE COURT:  Stephanie, I believe there's

18          an open question; am I correct?

19               (WHEREUPON, the requested portion was

20          read by the reporter.)

21               THE COURT:  Mr. Schmidt, do it again,

22          please.

23          Q.   Did you try to come up with any kind of

24     calculation of the relative role of Rochester Drug

25     or any of the other hundreds of distributors versus
```

```
 1                        Opioid Frye/Mr. Rafalski               244

 2      McKesson, versus ABDC, versus Cardinal in terms of

 3      how effective the controls were comparatively or

 4      anything like that?

 5            A     No, sir.

 6            Q.    Second set of questions on distributors.

 7                  Do you agree that distributors provide

 8      prescription opioids to pharmacies, correct?

 9            A     Yes, sir.  That would be one of the

10      registrants they would distribute to not

11      exclusively.

12            Q.    Distributors and manufacturers don't

13      check the prescriptions that patients bring into the

14      pharmacy, that's what the pharmacy does, correct?

15            A     They don't review it the same way a

16      pharmacist does, if that's what you're asking.  I

17      agree with that.

18            Q.    They don't fill the prescriptions

19      brought to them, that's what a pharmacy does,

20      correct?

21            A     Yes, sir.

22            Q.    In your opinion where it focuses on

23      distributors is focused on obligations that

24      distributors have related to pharmacies, such as

25      walking orders, conspicuous orders, conducting
```

```
1                    Opioid Frye/Mr. Rafalski              245
2    diligence, correct?
3         A    That's the extent of my opinion, yes,
4    sir.
5         Q.   Do you remember me asking you at a
6    deposition about whether independent pharmacies that
7    acted improperly caused the opioid crisis?
8         A    I don't recall that question.
9         Q.   Do you recall giving the answer that, I
10   don't know if I would say caused, they're so far
11   down the line?
12        A    I generally remember.  I think I might
13   have said contributed, but not caused.
14        Q.   And just so we're not talking in the
15   abstract, let's just put up the transcripts, if we
16   could, tab 2, page 167, 168.  167, line 23, down
17   through 168, line 12.  I think in the prior answer
18   you talked about contributed.
19             Why don't we go back up to the question
20   and answer just for completeness.
21             I asked you -- well, let me ask, were
22   pharmacies, independent pharmacies that acted
23   improperly, did they help in terms of dispensing
24   prescription opioids, and you said just now, Mr.
25   Rafalski, you said the cause causes some concern;
```

```
 1                      Opioid Frye/Mr. Rafalski          246

 2      again, I think they contributed.

 3                   And then here's the part I want to ask

 4      you about.  I asked, You contributed, and you said,

 5      I don't think I would stake odds.  They are so far

 6      down the line.

 7                   And then if you want to just read the

 8      rest of the answer to yourself, I'm going to ask

 9      about that "so far down the line" statement.

10           A    I read my response.

11           Q.   Okay.  Do you stand behind that

12      testimony that you don't know if you would say cause

13      as to independent pharmacies, because they are so

14      far down the line?

15           A    I probably wouldn't state that today.  I

16      would probably -- I think I maybe contradict myself

17      a little bit later on in this statement or it's

18      probably not as precise as I'd like, that they're so

19      far down the line.  They're obviously within that

20      close system.  They're not at the level of the

21      manufacturers or the distributors, and I think

22      that's my reference, too, but that's probably not

23      the best language, but I acknowledge I said that.

24           Q.   Okay.

25                   THE COURT:  Excuse me.  Going forward,
```

let's do it right.  Anytime you go into a

transcript, a deposition, you'll notify the

Court the page and the lines, and you'll

phrase your question this way:  Do you recall

being asked this question and giving this

answer and give a complete answer, and then

go from there.

MR. SCHMIDT:  Okay.  Understood, your

Honor.

Q.   Is there any contribution you believe

that you talk about in your report that ABDC,

Cardinal or McKesson made to the opioid crisis that

did not involve providing prescription opioids to

pharmacies in New York?  Anything you talk about in

your report or in your opinions, other than

providing prescription opioids to pharmacies?

A    Well, the distribution aspect of this,

the only thing that I was asked to investigate and

formulate a report on, if there was some -- if there

was some sales activity or some other activity that

contributed to some elicit activity, I wasn't tasked

with researching that aspect of it.  So kind of

that's a long answer but I -- go ahead, I'm sorry.

Q.   Let me see if I can summarize it.

```
 1                    Opioid Frye/Mr. Rafalski              248
 2              You focused only on distribution of
 3     pharmacies, correct?
 4         A    Yes, sir.
 5         Q.   Let me turn to my third point on
 6     distributor.  Remember when I was asking you as
 7     contrasting the power that New York State or the DEA
 8     has to shut down a pharmacy versus the power that --
 9     the absence of that power that distributors or
10     manufacturers have; do you remember me asking you
11     those questions?
12         A    I do.
13         Q.   If a distributor imposes some kind of
14     limit or cuts off a customer a pharmacy will go find
15     some other distributor, correct?
16         A    There's a possibility.
17         Q.   Well, generally speaking, that's true,
18     correct?
19         A    Well, to merely just cut them off or
20     stop shipping to them, I guess if they fail to
21     report a suspicious store, and they fail to notify
22     authorities, if the pharmacy wants to stay in
23     business they would have to go seek out another
24     distributor to continue to receive drugs.  So, in
25     general, I agree with that statement.
```

```
1                    Opioid Frye/Mr. Rafalski          249
2          Q.   Are you aware of the number of instances
3     from this case where the distributor Defendants in
4     this case reported a pharmacy to the DEA or to New
5     York State and no action was taken, and the pharmacy
6     remains open until this date?
7          A    Yeah, I believe we covered that on my
8     first deposition.  I'm aware of that, yes, sir.
9          Q.   Do you know how many instances of that
10    occurred where a distributor reported a pharmacy as
11    suspicious, and the state or the DEA did not act on
12    them, and they remain open until this day?
13         A    I did not research that or investigate
14    that and was not required to put that into my
15    report.  No, sir, I do not know.
16         Q.   You don't know if that happened a dozen
17    times, 100 times, more or less?
18         A    I have no idea.
19         Q.   Have you ever heard of a pharmacy that
20    was cut -- I'm sorry -- have you ever heard of a
21    doctor or a healthcare professional who was
22    inappropriately writing opioid prescriptions and who
23    was stopped because a distributor cut off a specific
24    pharmacy?
25         A    Stopped from writing prescriptions?
```

1                    Opioid Frye/Mr. Rafalski              250

2          Q.    Correct.

3          A     If that's a hypothetical question, if

4    that doctor's conduct was so bad that there was only

5    one pharmacy that was filling his prescriptions,

6    that's a possibility.  It's a hypothetical.  Go

7    ahead.

8          Q.    Did you see any instance of that in your

9    review of New York documents regarding New York

10   pharmacies and New York doctors where cutting off a

11   pharmacy put a doctor who was acting improperly out

12   of business?

13         A     No, sir.

14         Q.    Sir, I just want to wrap this line of

15   questions up.

16              THE COURT:  We're backing up to 4:30.

17         How much more -- how much longer do you think

18         you need on your portion of this examination?

19              MR. SCHMIDT:  I'm going to be done with

20         this section in two minutes.  I have probably

21         another hour or hour-and-a-half after that.

22              THE COURT:  So use the two minutes to

23         exhaust this line and then we'll break.

24              MR. SCHMIDT:  Okay.  Thank you, your

25         Honor.

```
 1                     Opioid Frye/Mr. Rafalski           251

 2           Q.   Just to wrap up, Mr. Rafalski, as I

 3     understand it, I asked you about all these different

 4     entities in the prescription opioid process, patient

 5     distributors, pill mill doctors, medical profession

 6     generally, your mission in your report was not to

 7     analyze all the causes in the opioid crisis,

 8     correct?

 9           A    Yes, correct.  When I was hired and I

10     had meetings in regards to the report, the

11     investigation and report, I was given the specific

12     parameters of what my report would contain and where

13     I would do my research.

14           Q.   Your process, your methodology in your

15     report was meant to consider looking at all factors

16     that may have contributed to the opioid crisis, how

17     much responsibility different individual entities or

18     people bare, correct?

19           A    That's correct.

20           Q.   You haven't purported to go through all

21     the potential factors that played in the opioid

22     crisis and say these are the ones that are the most

23     important factors, these are the ones that are minor

24     factors, correct?

25           A    Yes.  My paper does not look at the
```

```
 1                     Opioid Frye/Mr. Rafalski                252
 2     totality of the opioid crisis and all the
 3     participants or factors.  I agree with that
 4     statement.
 5          Q.   Including identifying who's a
 6     substantial factor, who's an important factor,
 7     correct?
 8          A    I don't agree with that.  I think my
 9     report identifies some substantial factors, but it
10     does not encompass all of the people that
11     participate in the opioid epidemic.
12          Q.   Or even all of the substantial factors,
13     right?
14          A    I would agree there is probably some
15     outside of the area that I covered.
16               MR. SCHMIDT:  This is probably a good
17               place to stop, your Honor, if that's okay
18               with the Court.
19               THE COURT:  Okay.  We'll recess till
20               9:45 tomorrow morning.
21               Am I to expect other defense lawyers
22               examining this witness?  There's
23               correspondence that had gone back and forth
24               suggesting that whenever an expert's opinion
25               cross-divisions, so to speak, manufacturers,
```

1    distributors and pharmacies, that the

2    Defendants were seeking the right to have a

3    separate counsel as to each category.

4         Is that out the window or is that still

5    the menu?

6         MS. REISMAN:  Your Honor, this is Sharyl

7    Reisman on behalf of Walmart.  I intend to

8    ask very few questions, but I will have a few

9    questions.

10         THE COURT:  That's a yes?

11         MS. REISMAN:  That's a yes.

12         MR. O'CONNOR:  Speaking of

13    manufacturers, we may have a few questions as

14    well, but it will be very brief.

15         THE COURT:  Okay.

16         MS. LEVY:  Jennifer Levy.  Your Honor,

17    this is Miss Levy for the Allergan

18    Defendants.  Can I ask a question before we

19    recess for the day about the remainder of the

20    week?

21         MR. SHKOLNIK:  That's why I was standing

22    up, your Honor.

23         THE COURT:  About the remainder of the

24    what, the week?

1

2        MS. LEVY:  Yes, your Honor.

3        THE COURT:  I have some letters on my

4    desk.  I had set forth a schedule in my last

5    Short Form Order that talked about Mr.

6    Rafalski today and tomorrow and Craig McCann

7    on August 19th, and the letters deal with the

8    continuation with the next witnesses, which

9    is scheduled for Thursday and Friday of this

10   week, to take them -- to kick them over into

11   September.  Is that what you're asking me

12   about?

13       MS. LEVY:  Yes, your Honor.

14       THE COURT:  Speak your peace.

15       MS. LEVY:  My question, your Honor, the

16   Plaintiffs had requested that this witness be

17   moved to September 11th.  The defense does

18   not disagree, but we wanted to make sure that

19   your Honor had no problem with the agreed

20   moving of the date for Lacey Keller to

21   September 11th, and if a second day is

22   needed, September the 14th.

23       THE COURT:  We will be down the 20th

24   through the 21st, correct?

25       MS. LEVY:  That's correct, your Honor.

```
1                    Opioid Frye/Mr. Rafalski            255

2          THE COURT:  Just out of curiosity,

3     what's the reason?  I'm curious, what's the

4     reason?

5          MS. CONROY:  Your Honor, Jane Conroy.

6     The reason we had initially done it was there

7     were questions about whether or not a live

8     examination would be possible, because Ms.

9     Keller is going to testify live.  It may not

10    be that the Defendants wish to do that, but

11    the accommodation was originally made so that

12    someone could travel to New York with the

13    quarantine restrictions in order to examine

14    her.  Then we changed the -- so we reached

15    out to the Defendants and, frankly, kind of

16    worked the schedule to make that happen.  So

17    that's why this came about.

18         THE COURT:  But we're still going to do

19    Dr. McCann, right?

20         MS. CONROY:  Yes.  Dr. Craig McCann is

21    scheduled for Wednesday.

22         THE COURT:  So you want to move Lacey

23    Keller to September 11th and 12th, if

24    necessary?

25         MS. CONROY:  That's right.
```

```
1                    Opioid Frye/Mr. Rafalski              256

2             That's a Friday.  So then it would go --

3        she would be Monday, if necessary.  If we

4        don't need that Monday, then our final

5        witness, Dr. Tomarken, would testify.

6             THE COURT:  Sandy, first thing tomorrow

7        morning, let's see if we backed ourselves

8        into anything on September 11th.  If we

9        haven't, we can accommodate you.

10            Okay, let's close the record.

11

12

13

14                        *        *        *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Opioid Frye/Mr. Rafalski              257

 2

 3

 4

 5               C E R T I F I C A T I O N

 6

 7          I, Stephanie Casagrande Hague, CSR, RPR,

 8      an Official Court Reporter of the State of

 9      New York, County of Suffolk, do hereby

10      certify that the above is a true and accurate

11      transcription of my stenographic notes taken

12      in the above-entitled action on this day;

13          Furthermore, photocopies made of this

14      transcript by any party cannot be certified

15      by me to be true and accurate.

16          Therefore, only those copies bearing an

17      original signature in blue ink are official

18      certified copies.

19

20

21      _____

        STEPHANIE CASAGRANDE HAGUE, CSR, RPR
22             Official Court Reporter

23

24

25                            '
```

```
 1                    Opioid Frye/Mr. Rafalski                    258

 2     '70s [1] - 32:20
       '81 [1] - 87:17
 3
                                  1
 4
       1 [19] - 7:3, 15:6, 25:6, 52:15, 53:5, 117:19,
 5     117:21, 118:17, 118:22, 132:8, 135:21, 141:20,
       189:4, 192:9, 194:24, 195:2, 195:4, 198:16, 211:20
 6     1,500 [8] - 143:18, 145:3, 145:23, 152:6, 155:3,
       160:21, 162:4, 163:13
 7     10 [5] - 51:13, 112:16, 126:13, 126:16, 141:20
       100 [3] - 112:17, 114:23, 249:17
 8     10005 [2] - 2:4, 2:7
       10016 [1] - 1:15
 9     10018 [1] - 3:11
       10036 [1] - 2:16
10     10281 [1] - 2:19
       11 [9] - 10:8, 18:22, 21:2, 33:15, 41:11, 85:16,
11     112:16, 179:15, 198:11
       111 [1] - 37:17
12     112 [1] - 1:15
       11747 [1] - 1:21
13     11th [4] - 254:17, 254:21, 255:23, 256:8
       12 [10] - 15:7, 22:21, 22:22, 33:21, 38:15, 114:9,
14     114:11, 127:9, 245:17
       12-month [1] - 127:7
15     12th [1] - 255:23
       13 [3] - 164:22, 216:2, 216:6
16     13-and-a-half [1] - 168:16
       13.5 [10] - 164:9, 164:17, 164:25, 165:7, 165:15,
17     166:12, 166:21, 167:24, 169:6, 169:11
       13th [3] - 114:11, 175:15, 175:20
18     14 [1] - 198:12
       141 [3] - 194:19, 195:21, 195:23
19     14th [1] - 254:22
       15 [8] - 11:18, 51:14, 101:4, 126:14, 126:17, 229:4,
20     230:6, 230:7
       151 [2] - 195:19, 195:20
21     16 [1] - 165:11
       1625 [1] - 2:11
22     166-page [1] - 172:21
       167 [2] - 245:16
23     168 [2] - 245:16, 245:17
       17 [1] - 1:7
24     177 [2] - 227:20, 227:24
       178 [1] - 227:25
25     17th [1] - 220:24
       18 [1] - 22:22
```

```
                    Opioid Frye/Mr. Rafalski                    259

 180 [2] - 35:20, 221:11
 189 [5] - 18:20, 21:2, 22:21, 22:22, 25:6
 18th [1] - 142:12
 19 [4] - 163:6, 220:15, 220:21, 220:22
 19.6 [2] - 40:4, 42:19
 190 [2] - 22:21, 25:6
 1976 [2] - 86:6, 86:14
 1977 [1] - 57:17
 1979 [4] - 34:22, 52:14, 54:4, 57:22
 1981 [1] - 87:12
 1990 [2] - 32:6, 38:6
 1990s [3] - 43:21, 43:22, 59:13
 1991 [1] - 89:16
 1996 [1] - 91:20
 19th [1] - 254:7
 1st [3] - 170:15, 170:19, 174:11
```

**2**

```
 2 [19] - 52:17, 53:5, 66:14, 77:22, 79:21, 141:18,
154:11, 156:2, 159:13, 159:16, 163:4, 164:20,
175:22, 180:12, 182:23, 198:11, 218:20, 220:13,
245:16
 2,500 [1] - 143:11
 20 [2] - 25:6, 221:17
 20,000 [3] - 114:15, 114:16, 114:20
 20.4 [1] - 40:2
 20005 [1] - 3:4
 20006 [1] - 2:11
 2002 [1] - 87:17
 2004 [2] - 91:25, 92:11
 2011 [2] - 97:7, 211:5
 2012 [3] - 211:5, 220:24, 221:12
 2016 [2] - 38:25, 39:25
 2017 [2] - 4:11, 84:21
 2018 [2] - 142:12, 174:11
 2019 [14] - 40:20, 43:11, 52:18, 53:24, 60:4, 60:15,
61:5, 85:13, 85:17, 141:12, 170:15, 175:11, 177:16,
229:15
 202)383-5300 [1] - 2:12
 202)879-5000 [1] - 3:5
 2020 [8] - 1:7, 141:18, 163:5, 164:21, 179:13,
204:20, 215:5, 220:12
 20th [1] - 254:23
 21 [2] - 87:18, 163:8
 212 [2] - 1:17, 2:21
 212)397-1000 [1] - 1:23
 212)584-0700 [1] - 2:8
```

Opioid Frye/Mr. Rafalski                    260

**212)841-1000** [1] - 3:12
**21st** [1] - 254:24
**2253** [2] - 12:21, 13:2
**23** [1] - 245:16
**24** [3] - 163:6, 216:2, 216:6
**2494** [2] - 133:11, 133:12
**25** [3] - 11:18, 54:20, 220:2
**250** [1] - 2:19
**27** [2] - 87:15, 176:21
**28** [4] - 2:3, 175:11, 177:9, 227:25
**29** [1] - 177:21
**2:10** [1] - 133:16

---

**3**

---

**3** [11] - 39:21, 52:19, 53:5, 78:9, 86:3, 89:17, 89:21, 183:2, 204:15, 218:22, 225:5
**30** [7] - 94:8, 94:17, 96:21, 97:4, 98:11, 101:3, 181:6
**305** [1] - 1:20
**306** [2] - 220:13, 220:14
**31** [1] - 181:12
**319** [2] - 215:6, 215:15
**31st** [1] - 138:6
**326-3939** [1] - 2:21
**33** [2] - 141:18, 164:21
**34** [1] - 141:20
**35** [1] - 61:2
**36** [1] - 87:23

---

**4**

---

**4** [4] - 88:3, 183:7, 183:14, 212:25
**400** [1] - 1:20
**400000** [1] - 4:10
**44** [1] - 181:22
**45** [1] - 7:2
**46** [1] - 182:9
**48** [6] - 1:2, 4:5, 10:7, 75:14, 133:22, 185:2
**49** [2] - 163:5, 185:3
**496** [1] - 179:14
**4:30** [1] - 250:16
**4th** [1] - 221:11

---

**5**

---

**5** [7] - 18:22, 21:2, 39:4, 39:5, 102:15, 105:13, 183:23

```
 50  [5]  - 34:17, 40:2, 42:19, 70:8, 185:9
 51  [1]  - 185:12
 523 [1]  - 17:22
 54  [1]  - 11:18
 55  [1]  - 15:6
 56  [1]  - 185:23
 560 [1]  - 42:25
 57  [1]  - 35:2
 572 [1]  - 51:13
 58  [1]  - 186:7
```

## 6

```
 6   [3]  - 174:19, 175:7, 196:2
 61  [1]  - 186:18
 62  [2]  - 193:6, 193:8
 620 [1]  - 3:10
 635 [1]  - 42:25
 655 [1]  - 3:4
 66  [3]  - 194:2, 194:3, 195:14
```

## 7

```
 7   [4]  - 2:15, 10:8, 179:13, 220:12
 70  [5]  - 219:17, 221:22, 222:13, 222:22, 225:3
 700 [1]  - 35:14
 75  [1]  - 35:12
 77  [1]  - 2:7
 78  [2]  - 192:6, 195:11
 784-6401 [1]  - 1:17
 7th [5]  - 141:18, 163:5, 164:20, 198:13, 215:5
```

## 8

```
 8   [4]  - 40:3, 121:10, 163:12, 163:16
 80  [7]  - 28:25, 92:8, 219:18, 221:22, 222:13,
 222:22, 225:3
 88  [1]  - 198:11
 8th [1]  - 2:7
```

## 9

```
 9   [2]  - 155:24, 164:21
 90  [1]  - 212:25
 99  [1]  - 220:25
 9:45 [1]  - 252:20
 9th [4]  - 141:12, 141:24, 142:6, 169:17
```

**A**

a.m [1] - 26:19
ABDC [19] - 182:24, 183:4, 183:16, 183:25, 184:7, 184:8, 187:7, 190:8, 190:15, 191:7, 191:12, 192:13, 238:23, 240:13, 241:5, 241:11, 241:19, 244:2, 247:12
ability [3] - 149:19, 149:20, 234:7
able [9] - 18:17, 60:5, 115:14, 137:18, 147:5, 154:23, 172:21, 173:11, 233:13
above-entitled [1] - 257:12
absence [1] - 248:9
absolute [5] - 155:7, 159:7, 162:21, 179:2, 211:6
Absolutely [1] - 203:24
absolutely [4] - 68:7, 204:4, 212:10, 230:21
abstract [1] - 245:15
Abuse [3] - 34:10, 58:18, 222:8
abuse [16] - 17:13, 24:5, 24:16, 25:2, 28:8, 29:7, 34:13, 46:5, 46:7, 46:16, 48:13, 49:8, 49:20, 50:20, 51:18, 73:20
abused [3] - 17:8, 58:21, 92:9
Academy [1] - 86:7
academy [1] - 92:10
accept [3] - 109:19, 178:14, 207:7
acceptable [2] - 46:23, 47:9
acceptance [1] - 19:20
accepted [19] - 12:23, 69:15, 70:9, 70:18, 71:3, 71:14, 72:2, 72:9, 72:23, 73:10, 73:25, 83:21, 96:5, 168:6, 190:2, 200:24, 201:4, 223:9, 223:12
access [12] - 95:23, 103:20, 119:7, 124:13, 124:14, 141:11, 141:24, 142:7, 143:9, 144:23, 163:25, 204:13
accidentally [1] - 112:17
accommodate [1] - 256:9
accommodating [2] - 95:21, 104:16
accommodation [1] - 255:11
accomplish [1] - 149:22
accordance [3] - 72:22, 73:9, 73:22
according [1] - 232:5
According [1] - 232:12
accurate [14] - 136:3, 136:19, 142:24, 143:3, 143:6, 143:15, 143:17, 161:23, 162:14, 193:15, 232:10, 236:7, 257:10, 257:15
acknowledge [8] - 13:15, 172:19, 174:13, 193:5, 198:19, 221:5, 232:14, 246:23
acknowledged [1] - 22:6
acknowledges [1] - 20:18
acknowledgment [1] - 184:14
acquire [2] - 94:21, 237:19

```
                      Opioid Frye/Mr. Rafalski                    263
 1

 2    act [1] - 249:11
      Act [4] - 102:12, 102:16, 105:15, 121:20
 3    Actavis [1] - 3:3
      acted [2] - 245:7, 245:22
 4    acting [1] - 250:11
      action [5] - 85:17, 125:11, 149:18, 249:5, 257:12
 5    actions [7] - 64:11, 64:12, 101:8, 125:7, 214:17,
      216:24, 229:19
 6    activate [1] - 103:6
      activated [1] - 103:25
 7    activities [6] - 39:17, 68:15, 95:6, 214:24, 216:16,
      230:16
 8    activity [14] - 66:10, 67:19, 74:7, 111:6, 140:23,
      141:4, 141:5, 165:18, 215:23, 231:8, 241:2, 247:21,
 9    247:22
      actual [9] - 93:23, 106:3, 128:14, 128:15, 138:4,
10    151:14, 151:24, 159:22, 214:19
      ad [1] - 64:16
11    adapt [3] - 139:4, 139:8, 140:11
      adapted [1] - 139:4
12    add [5] - 20:13, 69:6, 141:2, 165:10, 185:13
      added [9] - 73:4, 140:14, 140:17, 140:21, 178:6,
13    183:11, 186:20, 200:23, 226:2
      addicted [1] - 71:23
14    addiction [3] - 45:8, 45:19, 47:17
      addition [1] - 233:23
15    additional [3] - 119:10, 134:18, 143:18
      address [10] - 44:9, 76:15, 99:13, 100:14, 117:12,
16    147:3, 211:17, 235:9, 235:10, 237:25
      addressed [2] - 147:23, 212:12
17    addressing [2] - 37:20, 40:9
      adequate [9] - 8:14, 8:16, 9:12, 9:22, 10:11, 11:5,
18    11:23, 13:14, 80:16
      adequately [1] - 230:10
19    adjudicated [1] - 172:11
      adjust [1] - 224:22
20    adjustments [1] - 115:16
      Administration [4] - 76:20, 79:10, 222:9, 225:7
21    administration [2] - 54:4, 58:17
      Administration's [1] - 229:18
22    administrative [21] - 79:17, 82:3, 91:18, 92:17,
      92:23, 93:3, 93:6, 93:23, 95:4, 97:13, 97:19, 99:17,
23    101:8, 101:10, 122:12, 125:2, 125:7, 125:11, 129:24,
      223:15, 235:8
24    adopt [5] - 199:18, 200:5, 200:10, 200:25, 201:6
      adopted [2] - 121:3, 188:24
25    adopting [1] - 200:12
      adults [3] - 38:24, 40:2, 40:4
```

1

2  **adverse** [1] - 149:18
   **advising** [1] - 35:11
3  **advocate** [1] - 196:17
   **affects** [1] - 48:4
4  **afternoon** [4] - 133:23, 133:24, 201:12, 242:24
   **AG's** [1] - 120:19
5  **age** [1] - 57:8
   **agencies** [1] - 40:25
6  **agency** [6] - 14:12, 40:9, 40:12, 65:8, 225:10,
   229:10
7  **Agency** [2] - 89:17, 89:21
   **agency's** [2] - 23:9, 25:14
8  **agent** [1] - 91:4
   **agents** [2] - 44:9, 90:4
9  **agglomerate** [2] - 17:15, 24:11
   **agglomerates** [1] - 16:19
10 **agglomeration** [7] - 17:3, 23:12, 23:18, 23:20, 24:7,
   24:16, 24:19
11 **aggregated** [1] - 70:23
   **aggregation** [2] - 71:21
12 **ago** [7] - 38:13, 39:25, 111:14, 118:7, 159:2, 222:2,
   228:7
13 **agree** [60] - 9:20, 10:24, 14:8, 26:18, 30:13, 47:5,
   83:14, 118:13, 118:9, 121:14, 121:20, 136:21, 143:5,
14 148:12, 149:15, 164:5, 167:8, 168:5, 173:25, 174:2,
   181:17, 182:7, 182:16, 182:22, 196:19, 199:11,
15 199:16, 200:3, 200:6, 200:7, 200:14, 203:20, 204:4,
   207:12, 207:22, 208:13, 209:19, 210:12, 213:18,
16 214:20, 217:24, 222:21, 222:23, 223:4, 225:12,
   226:23, 226:24, 233:10, 234:11, 234:25, 235:8,
17 236:24, 237:16, 240:14, 244:7, 244:17, 248:25,
   252:3, 252:8, 252:14
18 **agreed** [2] - 15:17, 254:19
   **agreeing** [1] - 214:19
19 **aha** [1] - 100:12
   **ahead** [21] - 20:9, 22:17, 25:3, 34:17, 35:20, 50:17,
20 51:9, 62:18, 69:23, 104:17, 144:11, 144:21, 174:14,
   176:2, 181:22, 182:8, 195:17, 219:13, 221:17,
21 247:24, 250:7
   **air** [1] - 88:4
22 **Airport** [1] - 87:20
   **airport** [3] - 87:22, 87:24, 133:5
23 **algorithms** [2] - 128:3, 128:8
   **allegation** [1] - 188:18
24 **allegations** [25] - 171:11, 171:14, 172:2, 172:6,
   176:9, 177:6, 177:25, 178:2, 181:10, 181:13, 181:19,
25 182:4, 182:9, 182:20, 183:8, 183:15, 183:16, 183:24,
   192:23, 193:19, 194:16, 196:12, 196:25, 200:25,

2      201:5
        allege [2] - 166:8, 166:14
3      alleged [4] - 138:18, 140:17, 241:18, 241:23
        Allergan [4] - 3:2, 5:21, 80:22, 253:18
4      alleviate [1] - 117:8
        allow [2] - 127:12, 130:24
5      allowed [4] - 42:2, 59:3, 86:15, 173:17
        allowing [2] - 74:24, 78:22
6      allows [1] - 236:9
        almost [1] - 106:11
7      alone [1] - 167:2
        alphabet [1] - 53:9
8      Alza [2] - 44:5, 44:12
        amassing [1] - 88:12
9      Americans [2] - 35:12, 40:11
        Amerisource [1] - 192:14
10     AmerisourceBergan [1] - 182:25
        AmerisourceBergen [2] - 81:7, 101:24
11     Aminolroaya [1] - 5:7
        AMINOLROAYA [2] - 2:8, 5:6
12     amount [13] - 110:24, 113:4, 114:12, 114:19, 127:13,
        161:10, 162:2, 164:16, 167:11, 167:12, 167:22,
13     205:24, 233:18
        amounts [2] - 88:12, 119:5
14     analyses [1] - 159:20
        analysis [21] - 31:8, 49:7, 49:14, 49:15, 49:16,
15     49:23, 51:20, 70:12, 70:14, 70:16, 72:18, 73:24,
        125:24, 127:19, 151:6, 151:9, 154:9, 159:13, 159:17,
16     166:19, 223:25
        analyst [1] - 125:23
17     analysts [3] - 83:11, 125:18, 126:5
        analyze [10] - 31:20, 73:5, 82:6, 82:14, 99:20,
18     109:17, 111:3, 159:23, 166:18, 251:7
        Andrew [1] - 132:14
19     anger [1] - 186:14
        anniversary [1] - 88:7
20     annually [1] - 43:2
        answer [64] - 12:4, 17:5, 17:20, 18:17, 18:24, 19:8,
21     19:9, 23:16, 23:23, 27:7, 30:22, 46:5, 49:13, 51:8,
        53:21, 56:20, 77:13, 77:23, 78:6, 99:10, 135:17,
22     139:12, 139:16, 139:22, 139:24, 141:21, 144:11,
        144:20, 155:7, 157:9, 157:19, 157:24, 159:8, 160:10,
23     163:14, 163:16, 163:19, 164:22, 165:2, 171:20,
        179:20, 184:19, 185:11, 186:15, 186:17, 187:10,
24     188:3, 190:21, 207:20, 212:21, 216:4, 217:9, 217:21,
        220:18, 228:9, 228:11, 241:25, 245:9, 245:17,
25     245:20, 246:8, 247:7, 247:24
        answered [19] - 10:12, 23:3, 23:7, 50:5, 50:6,

50:23, 51:19, 55:5, 55:11, 144:15, 160:9, 165:12, 187:11, 190:18, 198:17, 198:19, 217:16, 221:3, 224:19

answering [2] - 32:3, 218:11

answers [3] - 62:4, 135:14, 171:16

anticipated [1] - 204:6

anxiety [1] - 37:2

anytime [1] - 247:2

apologize [8] - 21:20, 27:20, 50:13, 55:25, 57:7, 64:22, 103:4, 160:8

app [1] - 56:23

appear [5] - 9:16, 139:10, 178:7, 188:15, 225:5

appearance [1] - 75:20

appearances [2] - 4:13, 4:14

appeared [1] - 179:18

applicant [3] - 230:16, 230:18, 231:7

applicants [3] - 230:10, 231:4, 231:5

application [4] - 68:14, 121:19, 127:17, 166:17

applied [4] - 125:17, 128:4, 159:12, 190:23

applies [5] - 107:7, 107:11, 207:13, 222:20, 230:21

apply [4] - 69:16, 106:2, 125:24, 127:4

applying [1] - 121:23

appreciate [3] - 19:23, 78:25, 93:7

approach [4] - 69:15, 71:9, 72:2, 82:16

appropriate [10] - 48:2, 58:3, 63:8, 66:15, 67:17, 68:4, 70:18, 74:2, 144:17, 180:23

appropriately [2] - 72:21, 230:25

approved [1] - 58:21

April [1] - 220:24

ARCOS' [1] - 156:5

area [6] - 92:7, 94:7, 111:4, 126:7, 252:15

areas [5] - 48:23, 48:25, 57:20, 162:12, 223:22

argue [2] - 173:16, 226:9

arm [1] - 11:8

arrests [1] - 89:2

arrive [1] - 84:16

arriving [1] - 37:25

art [2] - 7:22, 21:12

articles [1] - 149:17

articulate [1] - 103:13

ascertain [1] - 241:17

ASHER [2] - 2:16, 4:25

Asher [1] - 5:2

aside [2] - 10:15, 48:9

aspect [4] - 130:25, 206:22, 247:18, 247:23

aspects [1] - 114:2

assert [1] - 120:7

assess [2] - 57:17, 88:16

```
1                    Opioid Frye/Mr. Rafalski              267

2     assessment [2] - 110:17, 164:4
      assign [2] - 52:20, 54:21
3     assigned [2] - 88:4, 96:19
      assigning [1] - 53:6
4     assignment [5] - 79:22, 80:11, 80:18, 80:19, 81:19
      assist [2] - 61:19, 83:11
5     assistance [4] - 90:2, 118:24, 119:4, 119:13
      assisting [1] - 92:11
6     Associate [2] - 232:5, 232:13
      associated [4] - 60:11, 60:23, 61:8, 105:14
7     association [2] - 45:11, 46:7
      assume [5] - 38:21, 41:8, 51:23, 70:24, 103:14
8     assure [1] - 130:16
      attachment [1] - 176:6
9     attain [1] - 105:24
      attempt [2] - 132:19, 179:8
10    attempted [2] - 43:4, 43:14
      attempting [2] - 139:12, 139:15
11    attention [1] - 90:15
      attorney [1] - 120:17
12    Attorney [3] - 2:2, 2:3, 5:13
      Attorneys [6] - 1:14, 1:20, 2:6, 2:10, 2:18, 3:9
13    attorneys [7] - 2:15, 3:2, 119:9, 128:20, 154:21,
      186:11, 235:15
14    attracted [1] - 90:14
      audio/video [2] - 98:13, 133:3
15    August [2] - 1:7, 254:7
      authorities [1] - 248:22
16    authority [1] - 235:8
      availability [1] - 48:4
17    available [3] - 48:4, 115:19, 228:23
      Avenue [2] - 1:15, 3:10
18    average [8] - 114:7, 114:10, 114:13, 127:7, 127:10,
      127:13, 127:21
19    aware [33] - 22:15, 24:8, 44:24, 145:18, 147:15,
      150:25, 151:21, 170:11, 172:14, 173:2, 173:10,
20    173:14, 193:18, 193:21, 210:19, 210:23, 215:8,
      227:5, 227:11, 227:16, 228:3, 233:4, 236:11, 236:18,
21    237:22, 238:22, 239:2, 239:12, 239:16, 240:16,
      240:19, 249:2, 249:8
22
                              B
23
      backed [1] - 256:7
24    background [4] - 79:5, 94:24, 124:12, 231:4
      backing [1] - 250:16
25    bad [1] - 250:4
      BADALA [2] - 1:22, 4:19
```

Badala [1] - 4:20
ballpark [1] - 239:16
banter [2] - 75:18, 75:19
bare [1] - 251:18
base [1] - 196:16
based [16] - 24:14, 24:21, 71:3, 84:3, 100:3,
131:15, 131:25, 137:18, 161:20, 163:18, 224:2,
224:20, 226:18, 233:15, 233:19, 241:25
bases [1] - 132:5
basic [2] - 47:21, 68:10
basics [1] - 102:14
basing [1] - 23:21
basis [7] - 14:2, 22:4, 64:17, 91:13, 93:20, 125:13,
132:20
bear [1] - 212:19
bearing [1] - 257:16
became [3] - 86:24, 91:22, 175:13
become [3] - 37:6, 71:23, 90:6
becoming [1] - 54:22
began [2] - 92:3, 93:7
beginning [5] - 37:15, 37:18, 57:13, 185:5, 232:12
behalf [4] - 4:16, 4:20, 4:23, 253:8
behavior [5] - 26:21, 66:4, 68:11, 73:3, 73:18
behind [3] - 136:25, 228:18, 246:11
belabor [2] - 70:11, 176:19
below [4] - 39:15, 42:4, 213:12, 221:21
benefit [2] - 6:24, 12:8
benefits [1] - 8:5
best [9] - 40:18, 53:18, 60:3, 61:6, 77:13, 143:15,
197:3, 217:11, 246:23
better [8] - 7:17, 34:19, 41:21, 56:4, 56:13,
136:14, 209:20, 241:5
between [13] - 42:25, 45:11, 109:22, 142:4, 143:7,
163:25, 176:8, 189:13, 211:4, 213:2, 231:19, 231:23,
237:6
beyond [9] - 27:24, 45:20, 45:23, 45:25, 46:2,
46:18, 63:14, 72:3
biased [1] - 196:20
big [1] - 91:10
bigger [3] - 33:24, 41:19, 41:24
bill [1] - 164:14
billed [3] - 164:12, 165:14, 166:9
billing [1] - 165:12
billion [2] - 42:25
binder [2] - 174:17, 229:4
bit [14] - 26:9, 84:10, 97:12, 118:11, 118:15,
128:12, 135:7, 158:15, 161:11, 186:9, 186:20,
206:16, 222:7, 246:17

**blank** [1] - 199:20
**blocked** [1] - 80:17
**blocks** [1] - 90:22
**blow** [2] - 175:10, 205:17
**blower** [1] - 133:6
**blowing** [1] - 205:22
**blue** [2] - 205:14, 257:17
**bodies** [1] - 88:16
**body** [3] - 36:20, 88:8, 88:16
**boilerplate** [6] - 14:5, 14:10, 14:15, 14:18, 14:20, 15:13
**bones** [1] - 135:10
**Bonica** [2] - 35:4, 35:5
**books** [2] - 91:10, 91:11
**bottle** [1] - 114:23
**bottom** [9] - 39:7, 39:8, 46:19, 210:2, 210:3, 215:15, 227:22, 227:23, 229:14
**bound** [1] - 105:10
**boundaries** [1] - 128:21
**bounds** [1] - 203:3
**Bourne** [3] - 32:23, 33:10, 58:17
**box** [8] - 129:16, 130:21, 130:22, 175:22, 204:15, 205:12, 210:3, 213:9
**boxes** [1] - 211:21
**boy** [1] - 174:16
**branded** [1] - 12:17
**break** [6] - 111:24, 126:15, 133:13, 201:12, 206:15, 250:23
**breakdown** [1] - 205:8
**brief** [3] - 124:8, 134:17, 253:15
**briefly** [2] - 81:20, 190:7
**bring** [11] - 10:7, 18:19, 21:2, 22:20, 25:5, 33:16, 52:2, 69:13, 79:13, 79:22, 244:13
**bringing** [2] - 189:23, 190:5
**brings** [1] - 79:19
**broaden** [1] - 93:7
**broadening** [1] - 93:14
**broader** [3] - 48:24, 107:10, 145:4
**Broadhollow** [1] - 1:20
**broadly** [1] - 36:9
**BRODY** [50] - 2:12, 5:17, 6:19, 6:21, 7:15, 7:18, 18:19, 18:22, 19:2, 20:6, 20:10, 20:11, 20:25, 21:4, 22:20, 22:23, 25:5, 25:7, 31:5, 31:7, 31:16, 31:20, 31:24, 33:15, 33:17, 38:14, 38:16, 39:4, 39:12, 39:20, 39:24, 42:7, 42:13, 46:4, 50:10, 50:18, 51:2, 51:12, 51:15, 51:25, 53:10, 53:23, 54:5, 54:7, 54:11, 54:13, 55:2, 55:13, 74:15, 74:18
**Brody** [23] - 5:18, 6:23, 7:5, 13:22, 19:5, 19:12,

Opioid Frye/Mr. Rafalski                                    270

20:24, 22:2, 22:19, 27:10, 30:9, 42:5, 50:25, 53:19,
53:21, 54:12, 55:10, 66:7, 67:8, 67:14, 67:16,
71:10, 74:16
**Brody's** [9] - 62:21, 63:25, 65:15, 66:13, 67:22,
70:12, 70:23, 72:20, 73:21
**brought** [2] - 79:19, 244:19
**Building** [1] - 3:10
**built** [1] - 35:17
**bullet** [18] - 105:20, 106:19, 107:13, 109:5, 110:15,
112:3, 115:3, 116:13, 121:18, 122:19, 125:6, 125:16,
156:2, 156:12, 157:12, 177:22, 186:9, 186:12
**Bureau** [1] - 150:13
**bureaucratic** [1] - 14:13
**BURLING** [1] - 3:8
**business** [13] - 90:20, 94:25, 105:25, 106:5, 106:8,
106:14, 108:22, 109:2, 111:6, 113:7, 116:9, 248:23,
250:12
**but..** [1] - 227:4
**buzz** [1] - 19:15
**BY** [40] - 2:4, 2:8, 2:12, 2:16, 2:20, 7:18, 19:2,
20:11, 21:4, 22:23, 25:7, 31:7, 31:24, 33:17, 38:16,
39:12, 39:24, 42:13, 46:4, 50:10, 50:18, 51:15,
55:18, 56:14, 57:2, 61:25, 62:12, 69:24, 78:17,
79:3, 80:10, 86:13, 87:11, 98:23, 104:18, 115:2,
118:2, 127:25, 131:7, 134:24

## C

**Cabell** [1] - 85:24
**Cabinet** [1] - 221:19
**cabinet** [10] - 30:6, 213:17, 213:19, 213:24, 214:8,
218:2, 219:19, 221:23, 222:15, 223:10
**calculation** [2] - 45:4, 243:24
**camera** [5] - 56:8, 56:24, 76:3, 76:23, 242:20
**cameras** [1] - 242:19
**cancer** [8] - 36:8, 36:11, 37:12, 38:7, 57:23, 58:12,
59:14, 59:15
**cannot** [4] - 226:11, 236:4, 238:9, 257:14
**capacity** [1] - 190:19
**Cardinal** [15] - 81:12, 185:22, 185:23, 185:25,
186:24, 187:7, 191:9, 191:13, 238:22, 240:12, 241:5,
241:11, 241:19, 244:2, 247:13
**care** [6] - 34:22, 34:24, 35:23, 36:3, 36:7, 57:19
**career** [1] - 118:12
**carefully** [1] - 77:12
**carried** [2] - 140:7, 201:22
**carries** [2] - 216:11, 232:20
**carry** [2] - 169:20, 216:23

carrying [3] - 61:19, 123:7, 231:11
Carter [4] - 33:2, 54:3, 56:19, 58:16
Casagrande [1] - 257:7
CASAGRANDE [2] - 3:22, 257:21
case [92] - 7:8, 10:5, 15:6, 15:21, 15:24, 16:14,
26:22, 28:17, 38:2, 43:10, 43:14, 45:8, 45:14, 49:3,
49:6, 51:17, 59:8, 59:15, 60:18, 61:13, 64:6, 73:24,
79:11, 79:14, 79:22, 84:3, 84:20, 84:24, 85:7, 90:8,
90:14, 96:10, 96:12, 97:20, 100:4, 100:5, 100:24,
101:12, 108:17, 109:8, 109:15, 110:19, 112:20,
117:12, 119:6, 120:6, 121:12, 121:15, 123:16,
124:13, 125:13, 128:14, 131:21, 131:25, 138:14,
138:15, 139:4, 140:19, 141:17, 142:22, 145:5, 145:6,
145:13, 145:20, 145:21, 146:17, 151:22, 153:11,
167:14, 168:15, 175:13, 176:4, 179:7, 189:14, 191:3,
193:14, 193:17, 200:17, 201:23, 208:17, 208:18,
208:22, 211:9, 211:14, 223:24, 236:19, 237:8,
237:12, 241:24, 249:3, 249:4
cases [19] - 84:25, 89:25, 90:2, 90:5, 90:10, 90:11,
91:17, 91:18, 93:13, 112:13, 120:25, 125:9, 129:8,
223:15, 223:19, 223:25, 224:20, 231:6
cash [1] - 26:17
cat [1] - 175:24
categories [8] - 81:20, 105:25, 119:15, 150:15,
152:11, 162:10, 163:22, 171:2
category [2] - 124:9, 253:4
causal [3] - 211:17, 235:10, 235:12
causation [6] - 203:12, 203:14, 212:6, 212:11,
214:14, 214:18
caused [6] - 36:19, 219:8, 235:19, 245:7, 245:10,
245:13
causes [4] - 59:9, 151:14, 245:25, 251:7
causing [3] - 212:14, 218:25, 237:25
cautious [2] - 218:10, 228:19
caveat [2] - 200:22, 226:2
CDC [11] - 28:10, 38:12, 39:2, 39:4, 39:13, 40:8,
41:6, 41:12, 42:16, 52:16
cell [1] - 90:18
center [6] - 87:23, 101:17, 191:6, 191:7, 191:18,
211:22
centered [1] - 93:19
Centers [1] - 38:18
centers [1] - 101:21
central [1] - 74:6
Central [1] - 1:8
certain [15] - 7:9, 9:25, 63:4, 63:12, 75:18, 78:4,
95:3, 95:6, 152:11, 157:22, 158:22, 162:10, 165:10,
236:12

certainly [15] - 12:22, 13:23, 14:17, 29:10, 32:7, 44:2, 47:2, 47:12, 47:13, 47:18, 48:23, 59:13, 61:10, 64:13, 70:7
certainty [2] - 84:4, 132:2
certified [2] - 257:14, 257:18
certify [1] - 257:10
cetera [3] - 26:20, 36:11, 63:20
CFR [1] - 106:17
chain [10] - 85:3, 93:15, 140:22, 141:3, 203:16, 237:7, 237:13, 240:5, 240:7, 240:15
chair [1] - 77:15
chance [6] - 137:8, 174:9, 176:14, 178:24, 187:2, 203:23
change [1] - 131:12
changed [6] - 118:7, 141:7, 186:9, 186:19, 223:3, 255:14
changes [1] - 169:8
changing [1] - 185:5
characteristics [1] - 58:20
charge [1] - 61:20
chargebacks [2] - 100:8, 100:21
check [4] - 83:3, 104:11, 149:21, 244:13
checked [1] - 104:2
checks [1] - 231:4
chemist [2] - 23:17, 24:18
chief [1] - 34:13
Chief [2] - 232:5, 232:13
children [5] - 222:20, 222:25, 223:2, 223:4, 223:6
choose [1] - 234:21
Chris [4] - 180:11, 205:11, 205:16, 215:25
Chronic [1] - 36:16
chronic [22] - 32:10, 35:7, 35:11, 35:13, 36:9, 36:18, 36:20, 36:25, 37:5, 38:23, 38:24, 39:13, 39:15, 39:16, 40:3, 40:5, 40:10, 40:16, 43:7, 43:17, 59:18
Ciaccio [1] - 4:23
CIACCIO [2] - 1:22, 4:22
Cincinnati [1] - 96:16
circle [2] - 205:11, 205:17
circumstance [1] - 18:6
circumstances [2] - 9:25, 218:10
citation [1] - 227:21
cite [1] - 38:4
cited [5] - 38:5, 63:11, 63:16, 118:18, 143:2
cites [1] - 222:8
cities [1] - 85:2
citing [2] - 41:12, 184:4
city [2] - 87:23

City [1] - 85:23
civil [2] - 189:23, 190:5
civilians [1] - 130:22
claim [5] - 21:13, 21:17, 21:25, 22:17, 22:25
claims [13] - 8:5, 15:25, 20:19, 20:21, 24:5, 24:9, 24:15, 25:2, 25:4, 70:13, 70:16, 70:23, 70:25
clarification [7] - 116:20, 116:21, 152:8, 157:6, 218:8, 237:17, 238:16
clarify [3] - 159:21, 168:11, 173:6
clear [12] - 16:7, 46:11, 65:21, 66:3, 128:12, 132:18, 140:8, 145:2, 153:7, 231:16, 238:20, 239:3
cleared [1] - 112:18
clearly [1] - 45:20
CLERK [12] - 4:3, 4:9, 4:14, 6:8, 6:11, 75:14, 75:20, 76:7, 76:13, 133:22, 133:24, 134:6
Clerk [1] - 76:11
Cleveland [1] - 140:4
client [4] - 67:25, 146:25, 147:8, 234:2
clinic [1] - 113:9
clinical [9] - 8:15, 8:17, 9:23, 10:18, 11:3, 11:6, 11:21, 11:24, 13:14
clinics [2] - 94:10, 94:19
close [4] - 85:15, 200:20, 246:20, 256:10
closed [7] - 58:5, 102:16, 102:17, 104:20, 104:23, 105:6, 105:9
closely [1] - 191:18
club [1] - 90:21
cocaine [3] - 89:7, 90:18, 90:19
Code [1] - 106:17
code [1] - 77:19
coincided [1] - 89:7
colleagues [3] - 161:13, 174:17, 219:25
collect [3] - 122:4, 122:9, 156:2
collected [1] - 156:5
colorful [2] - 194:8, 195:15
combination [1] - 110:14
combined [2] - 182:2, 185:12
coming [8] - 65:12, 71:12, 186:4, 186:5, 205:5, 224:8, 242:21, 242:22
commence [2] - 77:23, 78:6
comment [3] - 29:11, 98:25, 233:14
comments [1] - 84:6
commission [3] - 56:19, 56:22, 57:22
commissioner [2] - 67:7, 69:15
commissioners [2] - 61:17, 61:20
commissions [1] - 57:16
commit [1] - 37:7
committed [1] - 165:13

```
 1                    Opioid Frye/Mr. Rafalski                274

 2      committee [9] - 33:11, 33:23, 34:20, 35:17, 35:22,
        36:17, 38:11, 58:2, 58:15
 3      Committee [3] - 32:18, 33:8, 57:15
        common [1] - 77:9
 4      communicate [1] - 152:10
        communication [1] - 15:11
 5      communications [6] - 82:12, 95:8, 124:20, 155:2,
        155:4, 159:2
 6      companies [15] - 26:6, 63:5, 63:16, 64:13, 65:3,
        72:15, 105:24, 115:14, 124:15, 129:22, 159:5,
 7      168:21, 169:8, 169:21, 173:21
        companies' [1] - 48:17
 8      company [27] - 13:24, 44:6, 49:17, 66:19, 66:20,
        68:11, 68:15, 70:24, 95:21, 101:7, 110:24, 111:19,
 9      111:22, 112:9, 116:25, 123:6, 124:20, 125:13,
        125:15, 127:5, 127:12, 154:16, 154:17, 154:25,
10      155:4, 159:2, 161:15
        comparatively [1] - 244:3
11      compare [3] - 9:7, 27:13, 117:25
        compared [4] - 176:7, 179:4, 189:3, 189:5
12      compares [2] - 15:23, 177:4
        comparison [2] - 176:11, 189:13
13      Complaint [64] - 120:8, 120:15, 121:6, 170:21,
        171:10, 171:11, 171:13, 171:25, 172:2, 172:8,
14      172:10, 172:13, 172:15, 172:17, 172:25, 173:13,
        174:4, 174:6, 174:10, 175:4, 176:8, 176:9, 177:7,
15      177:12, 177:16, 177:18, 177:25, 178:2, 178:7, 181:8,
        181:14, 182:3, 182:5, 182:13, 182:20, 183:3, 183:8,
16      183:15, 183:25, 185:6, 185:15, 186:21, 187:6, 187:8,
        187:13, 187:17, 187:22, 188:3, 188:6, 188:10,
17      188:15, 188:19, 192:24, 193:20, 193:24, 194:16,
        194:17, 196:13, 196:25, 197:6, 197:7, 197:9, 200:20,
18      240:18
        complete [15] - 19:8, 55:6, 77:24, 78:3, 78:6,
19      81:19, 126:19, 126:20, 126:21, 137:6, 152:14,
        173:17, 216:3, 221:13, 247:7
20      completed [6] - 82:2, 115:17, 116:10, 142:9, 142:11,
        142:15
21      completely [4] - 68:21, 72:3, 140:3, 140:8
        completeness [1] - 245:20
22      completing [1] - 189:20
        completion [1] - 158:22
23      complex [3] - 79:16, 82:3, 92:17
        compliance [10] - 98:2, 100:7, 100:15, 106:16,
24      122:20, 122:21, 123:6, 146:12, 156:11, 192:14
        complicated [1] - 28:22
25      complied [1] - 149:6
        components [1] - 102:10
```

```
1                    Opioid Frye/Mr. Rafalski                    275

2      composed [1] - 57:16
       comprehensive [1] - 108:8
3      compute [1] - 68:20
       computer [4] - 104:3, 104:4, 104:5, 104:7
4      concern [4] - 14:12, 14:13, 245:25
       concerned [1] - 14:14
5      concerning [3] - 20:19, 24:5, 202:22
       concluded [1] - 180:14
6      conclusion [1] - 47:21
       concurring [1] - 19:22
7      Conduct [1] - 112:4
       conduct [25] - 31:8, 72:18, 106:4, 108:20, 109:17,
8      111:3, 112:11, 117:7, 119:20, 124:14, 127:19,
       138:19, 138:23, 142:17, 142:21, 146:10, 148:14,
9      148:25, 149:5, 159:4, 169:21, 170:11, 173:21, 231:4,
       250:4
10     conducted [6] - 95:24, 97:8, 112:21, 115:15, 122:13,
       124:11
11     conducting [5] - 100:4, 122:8, 128:13, 152:9, 244:25
       conducts [1] - 232:7
12     conference [2] - 34:21, 35:6
       confident [4] - 159:8, 162:19, 162:24, 163:15
13     confirm [4] - 80:6, 80:15, 95:15, 195:24
       confirmation [1] - 168:25
14     conflict [1] - 199:4
       conflicted [1] - 188:25
15     confused [2] - 22:2, 53:17
       connect [2] - 20:4, 20:7
16     connected [2] - 30:23, 54:19
       connection [5] - 19:16, 19:18, 20:9, 103:8, 146:20
17     connectivity [1] - 104:12
       CONROY [48] - 1:14, 1:16, 5:4, 75:25, 76:5, 78:15,
18     78:17, 79:3, 79:20, 80:3, 80:10, 86:13, 87:8, 87:11,
       98:15, 98:21, 98:23, 104:18, 115:2, 117:17, 117:22,
19     118:2, 126:13, 126:18, 126:20, 126:22, 127:25,
       131:4, 131:7, 132:10, 133:17, 136:16, 139:11,
20     139:15, 144:2, 144:4, 194:22, 195:4, 202:2, 202:4,
       202:10, 202:13, 229:24, 242:11, 242:25, 255:5,
21     255:20, 255:25
       Conroy [14] - 5:5, 75:24, 78:14, 135:7, 135:10,
22     144:15, 155:23, 174:20, 174:24, 180:22, 204:17,
       215:13, 230:4, 255:5
23     consensus [11] - 19:21, 34:20, 70:2, 70:18, 71:3,
       71:14, 72:2, 72:10, 72:23, 73:11, 73:25
24     consent [1] - 213:20
       consider [3] - 55:5, 133:8, 251:15
25     considerable [2] - 161:10, 162:2
       considered [2] - 37:25, 163:13
```

```
1                    Opioid Frye/Mr. Rafalski              276

2      consistent [10] - 14:7, 60:17, 60:24, 61:12, 66:7,
       140:24, 142:5, 188:24, 193:22, 194:12
3      consistently [1] - 187:11
       conspicuous [1] - 244:25
4      constraints [1] - 161:8
       consulted [1] - 61:17
5      contain [2] - 7:21, 251:12
       contained [7] - 105:5, 107:2, 107:17, 110:13, 139:7,
6      146:4, 219:11
       containing [1] - 142:16
7      contains [1] - 159:16
       contempt [1] - 243:4
8      contends [1] - 171:15
       content [1] - 184:15
9      contested [1] - 19:18
       context [4] - 67:16, 102:18, 146:24, 147:2
10     contexts [1] - 9:4
       continuation [1] - 254:8
11     continue [5] - 6:18, 117:6, 126:14, 231:21, 248:24
       continued [3] - 4:9, 124:2, 220:18
12     CONTINUED [1] - 6:20
       continues [1] - 169:7
13     continuing [1] - 116:6
       contradict [1] - 246:16
14     contrasting [1] - 248:7
       contribute [1] - 211:13
15     contributed [11] - 43:7, 43:17, 44:19, 47:15, 219:9,
       245:13, 245:18, 246:2, 246:4, 247:22, 251:16
16     contributing [3] - 227:13, 227:14, 228:4
       contribution [1] - 247:11
17     control [3] - 80:16, 106:20, 229:19
       Control's [1] - 38:18
18     Controlled [4] - 102:12, 102:15, 105:14, 121:20
       controlled [22] - 8:15, 8:17, 9:13, 9:22, 10:11,
19     10:18, 11:2, 11:6, 11:20, 11:24, 13:14, 93:8, 102:6,
       105:22, 106:21, 107:5, 107:11, 107:15, 122:16,
20     221:14, 236:20, 238:23
       controls [16] - 82:10, 95:19, 97:23, 102:5, 107:4,
21     108:7, 110:12, 110:16, 111:9, 111:17, 122:25,
       125:12, 126:8, 146:11, 147:5, 244:3
22     conversation [1] - 98:24
       Conway [2] - 131:3, 134:13
23     coordination [1] - 204:7
       copied [7] - 174:3, 182:20, 183:4, 184:15, 185:6,
24     186:21, 187:7
       copies [2] - 257:16, 257:18
25     copy [9] - 13:2, 42:2, 52:7, 174:20, 188:20, 220:22,
       221:4, 229:23, 230:2
```

copying [9] - 181:13, 181:18, 182:4, 182:12, 183:7,
183:15, 183:24, 185:15, 185:17
core [2] - 122:11, 122:17
corner [1] - 175:9
Corp [1] - 3:9
corporate [6] - 100:19, 140:5, 168:22, 168:23,
169:20, 170:11
corporate-wide [1] - 168:23
correct [307] - 6:15, 8:3, 8:8, 9:23, 10:5, 10:11,
12:7, 12:10, 12:15, 12:21, 13:5, 13:24, 15:11,
15:17, 16:2, 16:12, 16:19, 21:19, 22:10, 23:5,
23:10, 23:20, 24:2, 24:12, 24:22, 25:25, 27:10,
27:24, 28:4, 28:20, 29:9, 29:18, 30:21, 31:12,
32:13, 32:20, 34:7, 35:15, 35:21, 36:9, 37:8, 38:19,
38:21, 38:25, 40:14, 40:22, 43:9, 49:10, 49:14,
51:21, 51:24, 61:4, 61:11, 61:13, 64:21, 65:13,
65:18, 66:5, 67:3, 68:24, 69:3, 69:4, 70:3, 75:6,
83:24, 84:21, 85:4, 85:5, 85:7, 85:11, 85:17, 85:21,
87:13, 87:21, 88:13, 88:21, 91:17, 92:5, 102:12,
103:10, 105:17, 107:8, 107:9, 110:4, 118:13, 118:19,
121:8, 123:16, 124:3, 124:24, 126:18, 128:7, 129:7,
130:4, 131:12, 137:6, 137:23, 137:24, 138:2, 138:4,
138:15, 138:16, 138:20, 138:25, 139:5, 139:6,
140:11, 140:15, 140:19, 140:23, 141:12, 142:12,
142:18, 142:23, 143:11, 143:25, 144:5, 146:11,
146:17, 147:7, 147:13, 147:15, 147:19, 147:23,
147:24, 148:10, 149:13, 150:2, 150:8, 150:10,
150:19, 150:24, 151:2, 151:9, 152:7, 153:2, 153:3,
153:6, 153:14, 153:15, 153:23, 154:5, 154:10,
154:19, 155:6, 155:11, 156:8, 156:19, 156:20, 157:4,
159:6, 159:17, 159:18, 159:20, 162:8, 162:20, 164:3,
165:22, 166:2, 166:6, 166:10, 166:16, 167:3, 170:5,
170:15, 170:17, 170:22, 171:12, 174:7, 175:3, 175:5,
175:6, 175:14, 175:18, 177:18, 178:10, 178:19,
178:25, 181:19, 182:5, 182:13, 182:20, 183:5,
183:16, 183:20, 184:8, 184:21, 185:9, 185:12,
185:15, 185:19, 185:20, 186:21, 186:24, 187:15,
187:17, 188:16, 189:6, 190:13, 190:17, 190:25,
191:7, 191:8, 191:10, 191:11, 191:14, 191:15,
191:19, 192:18, 196:9, 196:17, 196:21, 196:25,
197:5, 197:12, 198:17, 199:14, 199:18, 200:10,
200:15, 200:21, 201:6, 201:7, 202:10, 203:21,
203:25, 204:9, 205:6, 206:5, 206:12, 207:5, 207:11,
207:18, 208:2, 208:3, 208:7, 208:12, 209:7, 209:24,
209:25, 210:9, 210:17, 211:18, 212:2, 212:7, 212:14,
212:20, 213:2, 214:25, 217:7, 217:9, 217:15, 217:20,
219:2, 219:10, 219:22, 222:4, 223:18, 224:6, 224:11,
224:18, 226:8, 226:14, 226:21, 227:8, 230:22, 232:9,

233:2, 234:4, 234:10, 234:15, 234:24, 235:4, 235:13,
236:9, 236:23, 237:3, 237:15, 237:21, 237:25, 238:3,
238:6, 238:11, 238:12, 238:15, 238:25, 239:21,
239:22, 239:25, 243:18, 244:8, 244:14, 244:20,
245:2, 248:3, 248:15, 248:18, 250:2, 251:8, 251:9,
251:18, 251:19, 251:24, 252:7, 254:24, 254:25
corrected [1] - 77:3
correctly [6] - 28:9, 179:22, 189:16, 189:19, 190:9,
231:12
correlation [1] - 45:11
correspondence [1] - 252:23
correspondingly [1] - 226:24
cost [2] - 41:13, 42:24
couched [1] - 207:20
Counsel [2] - 75:20, 79:24
counsel [12] - 4:14, 42:10, 52:9, 56:16, 56:21,
59:22, 60:14, 102:23, 136:6, 155:23, 253:4
counselor [2] - 18:10, 57:7
count [1] - 6:6
counted [2] - 143:14, 143:18
counties [3] - 85:2, 94:12, 145:12
Counties [2] - 85:9, 151:13
country [4] - 43:7, 43:17, 168:25, 204:14
COUNTY [1] - 1:2
County [29] - 1:14, 1:20, 4:4, 4:16, 4:20, 4:23,
68:6, 71:13, 71:23, 72:7, 85:24, 86:6, 128:16,
145:14, 145:22, 146:7, 147:21, 150:5, 169:23, 170:4,
170:5, 220:5, 220:23, 221:10, 224:5, 257:9
couple [6] - 26:9, 56:16, 59:22, 79:6, 111:13,
191:21
course [14] - 13:3, 19:14, 43:3, 77:10, 78:2, 90:17,
130:20, 133:2, 205:18, 216:5, 219:5, 220:12, 226:22
court [9] - 46:21, 47:7, 78:3, 134:19, 149:11,
174:18, 175:24, 220:2
COURT [167] - 1:2, 3:23, 4:2, 4:7, 4:12, 4:18, 4:21,
4:24, 5:3, 5:9, 5:15, 5:19, 5:23, 6:4, 6:6, 6:12,
6:14, 6:17, 19:5, 19:12, 20:8, 31:3, 31:6, 31:19,
42:5, 42:9, 45:23, 50:2, 50:5, 50:8, 50:17, 50:24,
51:3, 51:8, 52:20, 52:22, 52:23, 52:24, 52:25, 53:4,
53:5, 53:21, 54:2, 54:10, 54:16, 55:3, 55:10, 55:14,
56:10, 56:23, 61:21, 61:24, 62:9, 68:23, 69:17,
69:22, 74:10, 74:16, 74:21, 75:2, 75:5, 75:8, 75:11,
75:16, 75:24, 76:24, 77:4, 77:6, 77:8, 78:9, 78:13,
78:23, 79:2, 80:8, 86:11, 98:18, 98:20, 103:5,
103:16, 103:18, 104:6, 104:17, 113:16, 113:23,
114:20, 114:24, 117:15, 126:16, 126:19, 126:21,
126:24, 127:16, 127:20, 127:23, 130:9, 130:12,
130:15, 132:12, 132:15, 133:5, 133:20, 133:23,

133:25, 134:5, 134:10, 134:21, 136:4, 136:8, 136:14,
139:14, 139:21, 139:24, 144:3, 144:6, 144:10,
144:18, 160:6, 160:11, 160:12, 160:13, 160:15,
168:12, 180:21, 184:18, 184:23, 194:20, 195:7,
195:12, 195:17, 199:19, 199:23, 201:14, 201:17,
202:3, 202:9, 202:11, 203:2, 203:9, 204:24, 205:3,
216:3, 216:9, 228:22, 229:2, 230:3, 242:10, 242:16,
242:22, 243:9, 243:11, 243:15, 243:17, 243:21,
246:25, 250:16, 250:22, 252:19, 253:11, 253:16,
253:24, 254:3, 254:14, 254:23, 255:2, 255:18,
255:22, 256:6

**Court** [28] - 1:12, 4:3, 12:8, 15:24, 16:4, 19:24,
47:3, 52:8, 62:7, 62:13, 69:13, 69:17, 74:23, 76:11,
78:21, 85:7, 133:7, 135:4, 171:14, 174:19, 203:11,
220:5, 220:23, 221:10, 247:4, 252:18, 257:8, 257:22

**Court's** [4] - 74:10, 84:6, 199:6, 219:14

**courtroom** [3] - 103:21, 136:13, 229:23

**courtrooms** [1] - 133:15

**cover** [4] - 41:7, 162:10, 176:3, 221:9

**covered** [5] - 52:3, 171:7, 195:11, 249:7, 252:15

**covering** [1] - 165:17

**covers** [6] - 165:20, 165:24, 166:4, 166:8, 166:14,
166:21

**COVINGTON** [1] - 3:8

**crack** [1] - 89:7

**Craig** [2] - 254:6, 255:20

**crash** [3] - 88:5, 88:9, 88:17

**created** [1] - 57:17

**creates** [1] - 12:16

**crime** [2] - 214:22, 214:23

**criminal** [12] - 91:17, 92:4, 92:16, 92:22, 92:25,
214:22, 215:23, 216:20, 216:23, 223:15, 231:8, 241:2

**crises** [1] - 238:2

**crisis** [26] - 28:8, 46:24, 47:11, 60:9, 60:21,
151:14, 210:20, 211:13, 211:18, 212:6, 212:14,
212:19, 219:2, 219:9, 227:7, 227:13, 228:5, 235:11,
235:13, 235:20, 245:7, 247:13, 251:7, 251:16,
251:22, 252:2

**criteria** [1] - 122:25

**critical** [4] - 124:25, 125:3, 130:25, 233:2

**criticism** [7] - 227:9, 227:15, 230:9, 231:10, 233:9,
233:11, 235:12

**criticisms** [2] - 227:12, 228:11

**criticize** [2] - 17:24, 18:13

**criticized** [4] - 18:17, 227:6, 228:4, 233:5

**cross** [6] - 31:22, 52:5, 54:23, 74:12, 134:12,
252:25

**CROSS** [2] - 6:20, 134:23

cross-divisions [1] - 252:25
cross-examination [2] - 54:23, 74:12
CROSS-EXAMINATION [2] - 6:20, 134:23
cross-examine [1] - 134:12
crush [11] - 16:17, 17:8, 17:12, 18:3, 18:15, 21:7,
21:17, 22:9, 22:25, 25:22, 26:4
crush-resistant [1] - 21:17
crushed [4] - 16:17, 23:14, 23:24, 24:10
CSA [3] - 121:24, 146:12, 183:4
CSMP's [1] - 193:9
CSR [3] - 3:22, 257:7, 257:21
CT1 [1] - 85:8
cumulative [2] - 127:8, 169:7
curiosity [1] - 255:2
curious [1] - 255:3
current [2] - 35:19, 36:15
custom [1] - 65:24
customarily [1] - 53:8
customer [32] - 83:2, 97:16, 97:20, 97:25, 98:5,
99:18, 108:10, 108:18, 108:21, 108:25, 109:7,
109:15, 109:19, 110:3, 110:7, 110:8, 110:9, 110:13,
110:19, 123:20, 153:8, 153:12, 153:15, 156:13,
156:16, 157:2, 157:13, 158:6, 158:9, 192:15, 248:14
customers [6] - 82:24, 108:9, 109:24, 157:22, 187:7,
187:21
customers' [1] - 153:5
cut [7] - 120:7, 120:14, 181:7, 201:5, 248:19,
249:20, 249:23
cuts [1] - 248:14
cutting [1] - 250:10
Cuyahoga [4] - 85:9, 169:23, 170:3, 170:5
CVS [1] - 81:17
Czar [1] - 32:22
czar [1] - 33:10

**D**

data [42] - 28:23, 49:16, 49:17, 49:18, 70:24,
70:25, 82:5, 83:8, 83:11, 83:12, 95:9, 95:15, 111:5,
122:5, 122:6, 122:10, 122:15, 125:17, 125:18,
125:22, 125:23, 126:5, 127:14, 127:19, 128:4, 138:9,
150:23, 151:3, 151:6, 155:10, 155:13, 156:3, 156:4,
156:5, 159:12, 159:19, 159:23, 219:17, 219:22,
222:11
date [5] - 141:13, 170:24, 175:10, 249:6, 254:20
dated [1] - 220:24
David [1] - 47:7
DAY [1] - 2:18

**days** [5] - 35:14, 39:14, 39:17, 130:16, 142:14
**DC** [2] - 2:11, 3:4
**DDEMAC** [5] - 12:2, 12:11, 12:13, 64:25
**DDMAC** [1] - 11:8
**DEA** [96] - 79:15, 81:24, 82:18, 82:20, 82:23, 83:4,
83:6, 83:17, 83:21, 90:3, 90:15, 91:15, 91:18,
92:20, 94:20, 94:22, 94:25, 96:6, 96:20, 105:16,
105:24, 106:2, 106:4, 106:6, 106:9, 107:22, 108:12,
116:14, 118:12, 121:16, 122:13, 123:12, 124:2,
124:24, 125:8, 125:10, 125:20, 126:3, 131:18,
131:23, 148:18, 149:12, 149:17, 149:19, 161:24,
189:6, 189:15, 189:22, 190:3, 190:13, 190:17,
190:19, 190:24, 191:4, 191:5, 204:2, 204:7, 205:6,
223:14, 225:6, 225:23, 226:6, 226:7, 226:11, 226:12,
226:16, 226:20, 227:2, 227:13, 227:15, 228:4,
229:11, 231:3, 231:11, 232:7, 233:2, 233:4, 233:17,
233:24, 234:6, 234:18, 234:24, 235:3, 235:6, 235:10,
236:5, 236:8, 236:22, 238:10, 238:15, 238:24, 248:7,
249:4, 249:11
**DEA's** [2] - 230:24, 232:6
**deadline** [1] - 168:4
**deadlines** [1] - 167:11
**deal** [3] - 149:4, 226:13, 254:7
**deals** [2] - 30:18, 103:9
**dealt** [1] - 29:9
**deaths** [3] - 60:11, 60:23, 61:8
**decades** [3] - 60:9, 60:22, 61:8
**December** [9] - 85:17, 141:12, 142:6, 142:12, 169:17,
170:15, 170:19, 174:11, 177:16
**decided** [1] - 116:25
**deciding** [1] - 110:18
**decision** [1] - 202:12
**dedicate** [1] - 88:25
**dedicated** [1] - 88:20
**deemed** [5] - 70:5, 71:3, 71:25, 72:9, 72:22
**deems** [1] - 180:22
**deeper** [2] - 116:5, 116:6
**Defendant** [11] - 27:16, 80:15, 80:21, 80:24, 81:2,
81:5, 81:9, 81:12, 81:15, 81:17, 236:19
**defendant** [1] - 5:2
**Defendant's** [2] - 160:17, 219:15
**Defendants** [38] - 5:18, 5:22, 45:7, 45:18, 46:15,
63:6, 84:13, 122:7, 138:24, 140:19, 145:6, 145:20,
151:21, 152:5, 154:19, 155:3, 155:10, 158:16,
165:17, 165:21, 165:22, 165:24, 166:10, 166:16,
166:23, 170:22, 172:6, 174:15, 237:8, 237:12,
237:13, 241:24, 249:3, 253:3, 253:19, 255:10, 255:15
**Defendants'** [4] - 101:20, 122:4, 122:20, 156:2

**Defense** [5] - 52:14, 52:17, 52:19, 54:8, 240:18

**defense** [7] - 120:6, 134:18, 151:19, 155:23, 175:24, 252:21, 254:17

**define** [2] - 47:13, 216:16

**defined** [5] - 8:6, 8:10, 8:11, 9:21, 36:18

**defines** [2] - 39:5, 39:13

**definitely** [2] - 43:20, 212:6

**definition** [10] - 21:18, 23:8, 23:9, 23:10, 25:11, 25:14, 25:16, 25:18, 39:15, 39:19

**definitional** [1] - 39:6

**definitions** [2] - 30:12, 40:5

**definitively** [1] - 154:23

**degree** [2] - 84:3, 132:2

**Delta** [1] - 143:7

**demonstrative** [15] - 31:18, 52:2, 52:8, 53:13, 54:8, 62:21, 65:10, 65:15, 65:18, 175:22, 180:12, 204:15, 218:20, 218:21, 225:4

**dentists** [1] - 232:21

**departed** [1] - 7:10

**Department** [4] - 34:2, 87:13, 229:6, 229:11

**department** [3] - 88:8, 90:22, 91:21

**dependent** [2] - 151:3, 209:16

**depose** [1] - 137:8

**deposition** [50] - 10:5, 10:8, 11:16, 15:6, 16:3, 18:20, 19:4, 21:6, 25:9, 51:13, 120:5, 120:13, 138:4, 141:17, 158:19, 163:4, 163:10, 164:7, 164:18, 164:20, 164:21, 165:11, 166:13, 167:4, 167:5, 171:21, 171:22, 179:12, 179:24, 180:15, 180:24, 187:4, 187:18, 188:8, 197:21, 198:8, 198:14, 203:24, 204:21, 204:23, 220:6, 220:11, 220:13, 221:5, 223:3, 227:20, 231:13, 245:6, 247:3, 249:8

**depositions** [1] - 124:16

**depress** [1] - 103:24

**depression** [1] - 37:2

**depth** [4] - 84:16, 89:10, 108:5, 118:18

**derived** [1] - 69:18

**describe** [8] - 14:6, 15:11, 88:23, 93:13, 102:17, 104:19, 108:14, 119:3

**described** [3] - 7:7, 35:10, 99:22

**description** [1] - 124:8

**design** [3] - 86:21, 107:19, 111:10

**designated** [1] - 102:22

**designation** [1] - 14:21

**designed** [4] - 104:21, 104:24, 107:3, 111:20

**desired** [1] - 117:6

**desk** [1] - 254:4

**destined** [1] - 196:5

**detail** [1] - 79:5

1                     Opioid Frye/Mr. Rafalski                    283

2   **deterioration** [1] - 37:2
    **determination** [3] - 108:17, 109:18, 148:16
3   **determine** [15] - 28:18, 29:5, 29:15, 29:21, 46:23,
    47:9, 66:3, 67:18, 109:4, 110:24, 111:15, 126:6,
4   128:5, 149:8, 230:15
    **determined** [1] - 117:6
5   **determining** [2] - 68:11, 68:19
    **Detroit** [12] - 78:19, 78:20, 87:4, 87:19, 87:25,
6   89:18, 92:7, 92:8, 94:7, 99:20, 223:17, 223:22
    **develop** [3] - 37:2, 44:9, 57:19
7   **developed** [1] - 90:3
    **development** [2] - 34:21, 44:6
8   **deviated** [1] - 68:12
    **deviation** [2] - 68:19, 73:18
9   **deviations** [4] - 7:13, 73:3, 74:6, 111:11
    **diabetes** [1] - 98:25
10  **diabetic** [2] - 98:7
    **diabetics** [1] - 99:9
11  **did..** [1] - 243:4
    **died** [1] - 71:22
12  **difference** [4] - 178:5, 178:6, 237:5, 237:11
    **differences** [1] - 237:9
13  **different** [37] - 9:4, 9:7, 18:12, 29:4, 29:25, 30:7,
    30:11, 50:12, 50:24, 50:25, 51:2, 52:12, 90:7, 93:4,
14  94:18, 97:12, 106:5, 106:8, 109:13, 109:23, 109:24,
    118:5, 130:3, 135:23, 154:19, 161:11, 166:10, 169:2,
15  202:25, 203:5, 210:4, 215:22, 224:8, 224:9, 224:13,
    251:3, 251:17
16  **differently** [2] - 50:15, 50:16
    **differing** [1] - 22:19
17  **difficult** [10] - 16:17, 17:12, 18:2, 18:15, 21:7,
    22:9, 22:25, 25:22, 26:4, 152:13
18  **diligence** [35] - 82:11, 83:7, 110:10, 112:4, 112:11,
    112:21, 113:17, 114:2, 114:18, 115:4, 115:15,
19  116:10, 116:24, 117:4, 117:8, 123:19, 152:22,
    152:25, 153:19, 154:4, 154:13, 156:12, 156:15,
20  156:17, 156:24, 157:3, 157:12, 157:15, 157:20,
    157:23, 158:3, 158:10, 168:22, 241:13, 245:2
21  **direct** [12] - 74:12, 126:20, 131:2, 152:19, 153:4,
    153:9, 155:14, 161:3, 162:6, 171:5, 172:20, 189:12
22  **DIRECT** [1] - 78:16
    **direct-examination** [1] - 162:6
23  **directed** [2] - 208:10, 209:22
    **direction** [1] - 78:11
24  **directives** [1] - 95:8
    **directly** [3] - 121:6, 215:2, 237:2
25  **Director** [1] - 150:12
    **director** [2] - 58:17, 100:7

1                        Opioid Frye/Mr. Rafalski                    284

2      disabilities [1] - 35:13
       disabling [1] - 35:10
3      disagree [4] - 213:21, 227:3, 239:18, 254:18
       disagreed [1] - 231:14
4      disagreeing [1] - 228:20
       disclose [2] - 132:25, 231:6
5      disclosed [1] - 132:7
       discomfort [2] - 34:21, 58:4
6      Discomfort [3] - 32:19, 33:9, 57:16
       discomforts [1] - 58:19
7      discovered [3] - 107:20, 116:15
       discovery [3] - 107:22, 119:22, 143:5
8      discuss [4] - 16:5, 17:2, 110:19, 132:4
       discussed [9] - 16:20, 48:16, 95:2, 96:2, 97:10,
9      97:20, 101:11, 150:2, 222:17
       discussing [2] - 16:8, 163:13
10     discussion [9] - 8:13, 35:6, 38:23, 44:15, 100:6,
       100:7, 138:17, 204:23, 231:15
11     discussions [3] - 40:16, 119:19, 187:6
       Disease [1] - 38:18
12     disorder [6] - 26:24, 27:12, 27:14, 28:20, 29:7,
       30:15
13     dispense [6] - 110:25, 207:8, 207:16, 207:24,
       225:19, 225:22
14     dispensed [10] - 98:10, 206:4, 208:10, 208:16,
       208:19, 208:23, 208:24, 209:4, 209:10, 209:16
15     dispensers [1] - 105:21
       dispenses [2] - 209:22, 237:2
16     dispensing [2] - 93:22, 245:23
       dispute [1] - 193:4
17     dissemination [1] - 221:14
       dissolve [2] - 17:9, 17:16
18     distinct [4] - 165:17, 165:20, 165:21, 165:22
       distinction [1] - 231:22
19     distinguishes [1] - 231:19
       distribute [7] - 110:18, 111:23, 237:14, 237:21,
20     238:19, 244:10
       distributed [3] - 100:23, 101:2, 208:18
21     distributes [2] - 207:15, 208:7
       distribution [19] - 90:18, 90:19, 90:23, 93:21,
22     94:16, 100:10, 101:17, 101:21, 105:11, 122:17,
       140:22, 141:3, 155:5, 191:6, 191:7, 191:18, 203:16,
23     247:18, 248:2
       distributor [35] - 96:11, 96:20, 96:22, 99:23,
24     99:25, 106:13, 107:8, 108:17, 109:10, 109:15,
       110:18, 111:3, 115:8, 129:15, 146:16, 148:15, 153:2,
25     157:2, 165:21, 206:8, 206:11, 207:15, 208:6, 208:18,
       236:20, 238:8, 241:22, 248:6, 248:13, 248:15,

```
  1                      Opioid Frye/Mr. Rafalski              285
  2        248:24, 249:3, 249:10, 249:23
         distributors [46] - 85:3, 93:9, 93:15, 94:7, 94:14,
  3        97:3, 105:3, 105:21, 109:23, 138:19, 138:24, 146:21,
         147:4, 147:11, 210:9, 210:15, 214:25, 217:6, 222:3,
  4        232:2, 234:12, 234:17, 235:2, 237:2, 238:9, 239:10,
         239:13, 239:24, 240:3, 240:4, 240:6, 240:11, 240:15,
  5        240:17, 241:9, 243:25, 244:6, 244:7, 244:12, 244:23,
         244:24, 246:21, 248:9, 251:5, 253:2
  6        disturbances [1] - 37:3
         dive [1] - 116:6
  7        diversion [80] - 29:23, 29:25, 30:2, 30:8, 30:10,
         30:15, 30:23, 31:9, 31:22, 48:13, 49:8, 49:20,
  8        50:20, 51:18, 73:6, 73:20, 76:18, 79:9, 79:16,
         80:16, 82:17, 91:23, 92:3, 92:4, 92:6, 92:12, 92:16,
  9        92:21, 94:13, 100:2, 102:5, 102:19, 104:23, 105:11,
         105:17, 106:21, 107:4, 107:6, 109:12, 116:12, 123:2,
 10        129:19, 129:23, 131:17, 131:22, 146:11, 147:6,
         196:6, 204:11, 210:4, 210:8, 210:11, 210:12, 210:14,
 11        211:21, 213:6, 213:17, 213:19, 213:25, 214:8, 215:8,
         215:17, 215:23, 218:24, 219:7, 219:18, 221:13,
 12        221:22, 221:25, 222:14, 222:22, 223:9, 223:14,
         223:24, 225:11, 229:19, 230:19, 231:2, 241:23
 13        diverted [10] - 92:9, 105:7, 113:15, 128:15, 129:2,
         129:3, 129:7, 129:10, 129:13, 130:3
 14        division [1] - 204:2
         Division [1] - 34:13
 15        divisions [1] - 252:25
         Docket [1] - 133:11
 16        doctor [31] - 6:12, 6:14, 11:15, 18:23, 25:20, 31:3,
         42:14, 44:20, 46:19, 47:4, 48:9, 48:19, 49:5, 50:11,
 17        51:3, 51:16, 60:16, 68:23, 92:12, 115:9, 115:10,
         206:3, 206:23, 213:10, 214:20, 218:9, 234:8, 234:19,
 18        234:22, 249:21, 250:11
         Doctor [26] - 11:19, 14:15, 18:8, 18:11, 21:5, 22:7,
 19        22:24, 26:8, 31:3, 32:17, 37:21, 38:17, 41:7, 43:4,
         43:13, 44:4, 45:4, 45:13, 49:24, 57:11, 60:7, 61:21,
 20        63:24, 66:6, 74:15, 74:21
         doctor's [1] - 250:4
 21        doctor/patient [2] - 206:23, 207:3
         doctors [45] - 26:3, 26:15, 32:5, 33:25, 62:24,
 22        62:25, 63:2, 63:9, 63:10, 63:17, 63:21, 64:9, 65:5,
         65:25, 66:11, 66:14, 66:23, 72:6, 72:16, 93:19,
 23        150:19, 150:23, 166:4, 205:20, 206:17, 206:19,
         207:2, 210:20, 211:10, 211:22, 212:2, 212:5, 212:8,
 24        212:13, 212:25, 226:13, 226:20, 227:7, 230:22,
         234:13, 250:10, 251:5
 25        document [37] - 35:21, 37:15, 37:18, 38:5, 57:14,
         59:22, 60:13, 120:2, 155:2, 158:3, 159:8, 162:20,
```

162:22, 162:25, 163:11, 163:15, 170:18, 170:20,
174:10, 175:19, 177:4, 178:12, 184:4, 194:21,
199:22, 220:5, 220:9, 220:23, 221:2, 221:18, 222:18,
222:19, 222:21, 228:16, 228:20, 232:24, 233:8

**documented** [3] - 115:4, 115:6, 168:18

**documents** [99] - 24:25, 38:5, 38:8, 39:3, 41:23,
44:22, 44:24, 45:2, 48:17, 52:13, 56:16, 64:14,
82:4, 82:12, 82:13, 83:7, 91:7, 97:21, 101:11,
101:13, 118:18, 119:6, 119:7, 119:9, 119:11, 119:12,
119:15, 119:19, 119:23, 120:24, 123:3, 124:20,
141:12, 141:23, 142:2, 142:7, 142:15, 142:21, 143:2,
143:4, 143:11, 143:19, 143:23, 144:22, 144:23,
145:3, 145:4, 145:9, 145:11, 145:12, 145:19, 146:2,
146:5, 146:25, 151:12, 151:18, 151:19, 151:22,
152:5, 152:10, 152:11, 152:13, 152:16, 153:22,
154:2, 155:3, 155:8, 159:2, 160:21, 161:4, 161:14,
161:19, 162:4, 162:7, 162:9, 162:11, 162:14, 163:22,
164:2, 164:8, 164:24, 165:17, 166:22, 167:21, 168:2,
169:17, 169:25, 171:2, 171:6, 178:14, 178:17,
178:23, 184:12, 184:17, 193:16, 200:12, 223:20,
224:20, 250:9

**dog** [1] - 219:16

**DOJ** [1] - 132:23

**dollars** [1] - 43:2

**done** [16] - 45:4, 46:3, 60:25, 71:18, 72:11, 72:14,
72:21, 92:25, 111:2, 137:23, 159:17, 220:20, 224:17,
224:24, 250:19, 255:6

**door** [1] - 129:15

**dot** [3] - 62:3

**down** [32] - 7:2, 35:3, 58:14, 65:19, 71:12, 71:13,
86:4, 87:3, 87:5, 94:9, 94:11, 100:11, 100:17,
133:25, 142:10, 164:22, 195:25, 199:22, 206:15,
210:3, 230:8, 231:18, 235:4, 235:5, 245:11, 245:16,
246:6, 246:9, 246:14, 246:19, 248:8, 254:23

**downtown** [2] - 78:19, 90:21

**dozen** [1] - 249:16

**dr** [1] - 56:15

**DR** [1] - 6:5

**Dr** [27] - 1:10, 6:8, 6:22, 6:24, 7:19, 10:4, 18:20,
19:3, 20:12, 32:2, 33:10, 33:18, 35:4, 35:5, 50:14,
54:11, 55:19, 57:3, 61:5, 65:12, 65:20, 66:6, 74:19,
159:17, 255:19, 255:20, 256:5

**draft** [4] - 142:4, 162:13, 169:18, 176:16

**drafted** [2] - 175:18, 177:25

**drafting** [8] - 118:5, 142:3, 169:24, 175:4, 202:6,
202:18, 202:21, 202:24

**draw** [1] - 223:25

**drawing** [1] - 223:13

drew [1] - 191:2
driving [1] - 44:12
drop [1] - 91:5
drove [1] - 129:17
drug [20] - 17:17, 27:7, 28:3, 28:13, 28:19, 28:25, 29:6, 29:10, 29:11, 29:16, 30:23, 31:10, 33:10, 34:13, 68:13, 102:19, 150:21, 150:23, 225:8, 231:3
Drug [20] - 12:9, 34:10, 34:14, 58:18, 76:19, 79:9, 89:17, 89:21, 93:24, 94:4, 94:14, 129:6, 225:7, 229:17, 240:23, 241:2, 241:7, 241:14, 241:21, 243:24
drugs [28] - 30:19, 31:21, 60:23, 73:6, 94:21, 98:10, 99:8, 104:25, 105:5, 108:22, 109:2, 109:4, 109:8, 109:20, 110:18, 110:22, 111:23, 113:14, 117:2, 204:4, 211:2, 213:14, 214:21, 216:18, 236:2, 236:12, 237:19, 248:24
due [23] - 82:10, 83:7, 110:10, 112:4, 112:11, 112:20, 113:17, 114:2, 114:17, 115:3, 115:15, 116:9, 116:23, 117:4, 117:7, 123:18, 153:18, 156:12, 157:20, 157:23, 158:3, 168:22, 241:13
duly [1] - 76:10
dump [1] - 152:12
dumpster [3] - 90:15, 91:6, 91:7
Duragesic [7] - 44:7, 48:12, 48:13, 49:8, 49:20, 50:20, 51:19
during [8] - 39:3, 75:17, 89:23, 89:25, 90:19, 110:25, 132:25, 165:11
duties [4] - 61:20, 79:18, 95:6, 107:2
dwell [1] - 88:10
dying [3] - 57:19, 58:19, 59:5

## E

early [2] - 85:6, 119:21
easier [1] - 57:11
easy [1] - 139:21
economic [1] - 41:5
economy [1] - 86:21
Education [1] - 34:2
education [1] - 131:16
effect [5] - 43:11, 43:22, 47:25, 48:2, 132:24
effective [15] - 82:10, 95:19, 97:22, 106:20, 107:4, 108:7, 110:12, 110:16, 111:9, 111:16, 122:25, 125:12, 126:8, 147:5, 244:3
effectiveness [2] - 8:11, 10:9
effects [3] - 29:20, 37:11, 63:20
efficiency [1] - 54:18
efficient [2] - 135:12, 135:14
effort [11] - 26:22, 27:3, 27:11, 27:17, 27:19,

28:18, 29:5, 29:15, 45:5, 45:14, 241:17
**efforts** [3] - 29:21, 30:14, 46:12
**eight** [2] - 91:3, 91:9
**eight-month** [1] - 91:3
**Eighth** [1] - 3:10
**either** [7] - 49:17, 60:5, 71:8, 129:7, 158:20, 199:4, 202:18
**elaborate** [1] - 237:9
**electronic** [3] - 110:13, 111:20, 111:21
**electronically** [1] - 95:15
**elements** [1] - 19:16
**elicit** [3] - 28:3, 28:19, 247:22
**ELLIS** [1] - 3:2
**emails** [6] - 82:12, 95:9, 97:21, 154:16, 154:17, 154:22
**emergence** [1] - 89:7
**emerging** [1] - 94:13
**emotional** [1] - 37:3
**employ** [3] - 67:8, 95:25, 97:9
**employed** [15] - 48:20, 61:13, 64:20, 65:22, 66:15, 69:3, 69:18, 71:15, 73:23, 81:22, 82:17, 121:12, 121:15, 121:16, 161:24
**employees** [3] - 95:20, 95:22, 150:5
**employer** [1] - 225:7
**employment** [5] - 79:18, 204:2, 225:13, 233:16, 239:14
**employments** [1] - 79:12
**encompass** [1] - 252:10
**encompassed** [1] - 168:15
**encompasses** [3] - 154:2, 223:23, 225:12
**end** [13] - 46:10, 47:20, 47:23, 48:6, 54:24, 103:7, 117:3, 134:17, 205:13, 211:5, 214:6, 237:17, 242:9
**ended** [4] - 86:25, 91:20, 172:24, 173:13
**Endo** [1] - 81:4
**endorse** [1] - 118:21
**ends** [1] - 164:22
**enforcement** [6] - 64:11, 65:2, 65:7, 76:18, 92:14, 229:19
**Enforcement** [7] - 76:19, 79:10, 89:17, 89:21, 150:13, 225:7, 229:18
**engage** [1] - 230:16
**engaged** [5] - 90:19, 95:20, 96:21, 196:6, 231:7
**engineer** [1] - 86:21
**enjoy** [1] - 54:16
**ensure** [5] - 104:25, 106:15, 204:3, 204:8, 230:17
**entered** [2] - 94:25, 95:3
**enterprise** [2] - 214:22, 216:20
**entirety** [7] - 152:25, 156:25, 157:3, 157:5, 157:13,

1

2    157:14, 157:16
entities [4] - 206:17, 232:3, 251:4, 251:17
3    entitled [2] - 229:17, 257:12
environmental [1] - 36:22
4    epidemic [9] - 39:3, 43:12, 44:19, 59:9, 89:8,
94:10, 224:21, 226:22, 252:11
5    errata [2] - 138:3, 223:2
error [1] - 112:19
6    especially [3] - 37:11, 77:25, 168:20
ESQ [13] - 1:16, 1:16, 1:21, 1:22, 1:22, 2:4, 2:8,
7    2:12, 2:16, 2:20, 2:20, 3:5, 3:11
essential [4] - 48:25, 148:12, 148:13
8    essentially [6] - 19:6, 81:21, 89:10, 120:14, 128:25
establish [1] - 182:24
9    established [2] - 112:23, 114:10
establishment [1] - 33:8
10   estimate [2] - 221:21, 224:10
estimated [2] - 40:2, 42:25
11   estimation [1] - 226:12
estranged [1] - 37:6
12   et [3] - 26:20, 36:11, 63:20
evaluate [5] - 15:25, 108:9, 108:21, 207:21, 212:16
13   evaluated [2] - 120:20, 120:23
evaluating [2] - 83:11, 208:2
14   evaluation [9] - 101:13, 106:14, 108:20, 109:3,
110:21, 111:2, 115:8, 122:18, 242:3
15   evaluations [1] - 108:24
evening [1] - 26:20
16   event [1] - 25:19
everyday [2] - 39:14, 39:17
17   evidence [41] - 7:24, 8:6, 8:9, 8:14, 10:20, 11:12,
12:5, 13:16, 13:23, 18:2, 18:14, 21:6, 21:10, 21:11,
18   21:13, 21:18, 21:23, 22:6, 22:8, 22:14, 22:15,
22:16, 22:18, 23:4, 23:9, 23:22, 24:21, 25:10,
19   25:11, 25:17, 48:8, 54:18, 63:15, 67:14, 68:13,
68:14, 88:8, 88:9, 88:12, 88:16
20   evident [1] - 203:7
exact [15] - 16:19, 20:16, 22:13, 50:4, 82:16,
21   130:17, 141:13, 143:12, 198:5, 207:6, 224:22, 227:4,
227:17, 227:19, 233:11
22   exactly [21] - 8:20, 10:22, 14:4, 14:24, 15:3,
15:20, 18:6, 18:16, 21:15, 21:20, 22:12, 22:13,
23   23:6, 24:24, 35:16, 45:10, 51:22, 77:25, 114:5,
164:11, 171:6
24   Exalgo [13] - 16:10, 16:16, 16:23, 17:25, 18:14,
21:7, 22:9, 23:2, 23:14, 23:24, 24:11, 25:20, 26:3
25   exam [2] - 155:14, 189:13
EXAMINATION [4] - 6:20, 55:17, 78:16, 134:23

1                    Opioid Frye/Mr. Rafalski                    290

2    examination [12] - 54:23, 54:25, 55:6, 73:13, 74:12,
     152:19, 162:6, 167:6, 180:22, 250:18, 255:8
3    examine [2] - 134:12, 255:13
     examining [1] - 252:22
4    example [20] - 16:7, 62:21, 62:23, 63:19, 64:15,
     66:18, 77:15, 108:16, 109:22, 114:8, 115:21, 127:3,
5    128:15, 129:5, 140:14, 147:17, 158:4, 218:3, 240:22
     examples [3] - 109:24, 186:23, 218:11
6    exceed [2] - 114:20, 116:7
     exceeded [3] - 112:22, 114:15, 115:22
7    exceeding [1] - 116:4
     exceeds [4] - 112:7, 113:18, 113:24, 114:12
8    excellent [1] - 220:3
     except [1] - 144:23
9    exception [5] - 184:19, 185:4, 185:7, 186:10, 187:12
     excited [1] - 93:2
10   excitement [1] - 100:16
     exclusive [1] - 107:23
11   exclusively [1] - 244:11
     exculpatory [1] - 148:2
12   excuse [4] - 14:9, 113:16, 156:22, 246:25
     excused [1] - 74:13
13   executive [1] - 60:2
     exercising [1] - 209:12
14   exhaust [1] - 250:23
     Exhibit [30] - 52:15, 52:17, 52:19, 54:8, 56:17,
15   59:24, 117:19, 117:21, 118:17, 118:22, 132:8,
     135:21, 160:4, 160:17, 163:12, 163:16, 174:16,
16   175:24, 180:10, 189:4, 198:16, 204:15, 219:15,
     220:3, 220:22, 221:9, 225:5, 229:4, 240:18
17   exhibit [8] - 52:25, 53:6, 53:13, 194:23, 225:6,
     228:2, 228:13, 228:22
18   exhibits [1] - 174:19
     exist [2] - 59:9, 59:10
19   existed [2] - 153:16, 161:5
     existence [1] - 206:23
20   exists [1] - 148:10
     expect [5] - 19:18, 109:19, 110:10, 115:18, 252:21
21   expectation [3] - 112:8, 113:10, 113:22
     expected [1] - 19:25
22   experience [21] - 10:17, 11:4, 11:22, 13:13, 13:21,
     14:7, 65:23, 83:18, 93:7, 93:14, 108:12, 131:16,
23   191:3, 223:13, 223:17, 223:23, 224:2, 224:4, 224:20,
     226:18, 233:12
24   experienced [1] - 58:4
     expert [24] - 16:14, 17:23, 19:19, 38:2, 44:16,
25   44:22, 64:4, 64:8, 67:7, 79:11, 83:10, 84:12, 124:3,
     125:4, 194:25, 196:15, 196:20, 202:6, 202:7, 202:15,

202:19, 202:22, 202:24, 212:16
expert's [1] - 252:24
expertise [3] - 61:18, 79:13, 79:15
experts [4] - 29:18, 31:12, 126:2, 221:21
explain [8] - 62:17, 111:14, 120:10, 122:22, 125:19,
146:18, 154:6, 155:12
explained [1] - 8:4
explaining [1] - 25:8
explanation [2] - 112:25, 113:3
explore [1] - 84:15
explored [1] - 48:24
exposed [3] - 16:18, 17:16, 24:11
exposure [1] - 224:21
express [1] - 58:15
extensive [1] - 164:16
extensively [1] - 169:5
extent [23] - 26:23, 27:4, 27:12, 28:18, 29:6,
29:15, 29:22, 30:14, 31:9, 43:5, 43:6, 43:15, 43:16,
45:5, 45:15, 46:13, 46:23, 47:9, 47:13, 54:17,
59:12, 63:11, 245:3
extenuating [1] - 9:24
extra [1] - 133:14
Eye [1] - 2:11
eyes [4] - 10:20, 11:12, 12:5, 13:17
eyesight [1] - 57:8

# F

F/K/A [2] - 3:3, 3:3
face [5] - 56:3, 76:2, 76:22, 86:5, 99:9
facilities [2] - 146:22, 190:9
facility [3] - 95:4, 190:16, 190:20
facing [2] - 60:8, 60:21
fact [18] - 8:9, 14:19, 14:20, 16:14, 21:16, 22:7,
22:14, 44:5, 47:14, 59:2, 133:9, 162:24, 187:5,
194:14, 200:18, 202:16, 203:23, 226:18
factor [3] - 43:23, 252:6
factors [12] - 43:20, 43:24, 44:18, 86:22, 212:11,
251:15, 251:21, 251:23, 251:24, 252:3, 252:9, 252:12
facts [13] - 10:23, 132:5, 139:5, 141:9, 141:10,
161:14, 161:19, 161:21, 168:8, 169:12, 173:19,
173:23, 196:16
factual [4] - 120:22, 132:5, 143:21, 173:19
fail [2] - 248:20, 248:21
failed [2] - 170:9
failures [1] - 129:22
fair [28] - 7:23, 8:16, 10:12, 12:15, 17:11, 28:10,
28:22, 30:9, 39:19, 41:3, 49:3, 58:10, 59:5, 59:6,

69:6, 69:20, 84:23, 93:10, 102:3, 119:14, 126:9,
135:16, 161:12, 163:11, 164:4, 164:23, 239:21,
240:10

fairly [2] - 70:11, 165:10

faith [1] - 231:5

false [12] - 11:10, 12:2, 14:5, 14:22, 15:10, 15:16,
15:22, 23:2, 135:15, 157:17, 157:18, 172:17

familiar [18] - 26:21, 32:17, 32:24, 38:10, 38:17,
38:21, 40:17, 41:8, 44:5, 44:11, 102:11, 105:16,
108:11, 213:10, 230:18, 231:10, 231:22

families [1] - 37:7

family [4] - 115:9, 115:10, 213:14, 216:18

far [5] - 245:10, 246:5, 246:9, 246:14, 246:19

fashioned [1] - 119:21

fat [1] - 112:15

FDA [46] - 7:10, 7:21, 8:4, 10:19, 11:4, 11:11,
11:22, 12:4, 12:7, 12:20, 13:4, 13:16, 13:17, 13:22,
14:11, 15:9, 15:23, 16:5, 22:8, 34:12, 61:17, 61:20,
64:5, 64:7, 64:20, 64:23, 65:23, 66:11, 67:2, 67:7,
69:9, 69:16, 69:19, 70:2, 70:19, 70:21, 71:4, 71:15,
71:18, 72:4, 72:8, 72:22, 73:10, 73:11, 73:23

FDA's [9] - 9:21, 10:10, 14:2, 14:21, 21:18, 23:9,
24:21, 25:17, 71:8

February [9] - 113:25, 137:9, 141:18, 163:5, 164:20,
179:13, 198:13, 215:5, 220:12

federal [19] - 32:9, 40:12, 40:25, 43:5, 43:15,
43:22, 43:25, 44:8, 44:11, 57:16, 90:12, 106:17,
124:11, 132:21, 138:15, 148:21, 172:9, 222:11, 235:7

Federal [3] - 85:7, 106:17, 222:8

feed [1] - 98:19

few [10] - 92:25, 104:8, 129:11, 203:12, 222:2,
228:7, 235:23, 253:9, 253:14

field [4] - 61:2, 64:4, 89:17, 89:21

Fifteenth [1] - 3:4

fifth [1] - 179:13

figure [3] - 86:5, 205:4, 211:20

figures [2] - 41:6, 41:12

file [7] - 97:25, 98:5, 99:5, 99:12, 110:9, 110:13

filed [9] - 84:25, 85:6, 85:10, 85:16, 85:19,
118:16, 171:14, 176:4, 223:2

files [32] - 83:2, 83:7, 97:16, 97:21, 97:25, 99:18,
110:3, 110:7, 123:19, 146:15, 146:19, 146:20,
147:10, 147:22, 148:9, 152:22, 152:25, 153:5, 153:8,
153:13, 153:15, 156:15, 156:16, 156:24, 157:2,
157:12, 157:13, 157:15, 157:20, 157:23, 158:6, 158:9

filing [2] - 182:21, 187:3

fill [3] - 207:21, 234:22, 244:18

filled [3] - 166:5, 166:16, 234:23

**filling** [1] - 250:5
**final** [3] - 52:7, 125:16, 256:4
**finally** [1] - 185:22
**Finance** [1] - 3:2
**findings** [3] - 39:21, 147:2, 147:9
**fine** [7] - 18:11, 19:12, 42:7, 53:11, 69:22, 84:19, 199:23
**finger** [1] - 112:15
**finish** [5] - 32:2, 36:5, 139:22, 139:24, 140:2
**finishes** [1] - 141:21
**first** [49] - 17:7, 35:5, 41:7, 41:21, 62:23, 76:10, 77:11, 82:4, 82:5, 84:11, 84:20, 88:8, 93:17, 93:23, 99:9, 105:19, 108:7, 108:24, 112:5, 113:18, 113:21, 119:5, 120:13, 121:18, 123:8, 128:19, 131:16, 141:11, 141:23, 142:7, 163:7, 163:25, 175:17, 177:9, 177:15, 181:7, 188:8, 192:12, 195:11, 201:25, 220:6, 222:21, 226:6, 231:25, 232:6, 239:12, 249:8, 256:6
**fit** [1] - 203:14
**fitness** [1] - 230:15
**five** [3] - 6:6, 97:2, 177:15
**flagged** [7] - 112:4, 112:12, 154:3, 156:18, 162:7, 166:9, 166:15
**flawed** [1] - 192:15
**flaws** [1] - 193:9
**flip** [4] - 39:20, 176:21, 181:21, 221:17
**Floor** [1] - 2:7
**Florida** [8] - 94:9, 94:11, 94:12, 94:19, 96:22, 97:4, 101:3, 223:21
**flow** [2] - 93:8, 104:25
**focus** [18] - 31:14, 35:22, 36:7, 36:8, 36:9, 36:10, 37:12, 43:6, 43:16, 61:11, 138:8, 152:14, 192:4, 192:12, 226:6, 236:17, 239:20, 239:24
**focused** [7] - 29:19, 34:23, 37:14, 57:22, 169:10, 244:23, 248:2
**focuses** [1] - 244:22
**focusing** [1] - 58:9
**folks** [2] - 149:11, 229:23
**follow** [1] - 191:22
**follow-up** [1] - 191:22
**followed** [1] - 70:2
**following** [5] - 34:11, 133:19, 202:17, 220:17, 243:12
**follows** [1] - 76:12
**fond** [1] - 118:3
**footnote** [6] - 64:23, 121:2, 184:3, 185:14, 222:6, 222:7
**footnoted** [1] - 30:11
**footnotes** [21] - 178:6, 178:9, 178:15, 178:20,

```
 1                  Opioid Frye/Mr. Rafalski              294

 2        178:23,  178:25,  179:3,  179:9,  179:17,  183:11,
          183:13,  183:17,  183:21,  184:11,  184:19,  185:7,
 3        186:10,  186:17,  186:20,  200:23,  222:7
          force [12]  -  40:18,  41:12,  42:23,  52:13,  52:18,
 4        63:20,  87:15,  88:20,  90:6,  90:7,  90:12,  91:19
          foremost [2]  -  119:5,  128:19
 5        forever [1]  -  161:9
          foreword [1]  -  57:14
 6        forgot [1]  -  201:21
          Form [2]  -  12:21,  254:5
 7        form [5]  -  30:25,  89:5,  95:5,  119:11,  189:18
          formally [1]  -  172:14
 8        format [1]  -  189:18
          formed [1]  -  58:15
 9        former [1]  -  225:6
          forming [4]  -  49:5,  51:16,  148:4,  189:20
10        forms [4]  -  16:18,  29:25,  30:8,  95:16
          formula [1]  -  127:19
11        formulas [1]  -  128:4
          formulate [3]  -  157:25,  235:15,  247:20
12        formulating [5]  -  131:15,  131:21,  132:6,  152:17,
          152:20
13        forth [3]  -  142:3,  252:23,  254:4
          forward [5]  -  106:7,  106:10,  153:11,  161:7,  246:25
14        fostering [1]  -  58:19
          foundation [1]  -  144:4
15        foundational [2]  -  20:2,  135:24
          four [3]  -  39:25,  237:7,  237:11
16        fraction [1]  -  152:6
          frame [1]  -  55:24
17        framework [4]  -  70:8,  97:11,  121:19,  121:24
          frankly [1]  -  255:15
18        free [4]  -  213:14,  214:21,  216:18,  218:15
          frequency [2]  -  108:2,  111:12
19        Friday [14]  -  7:25,  12:13,  16:9,  16:21,  26:10,  28:3,
          28:7,  31:18,  32:4,  32:9,  50:7,  84:7,  254:9,  256:2
20        friend [1]  -  87:3
          friends [2]  -  86:23,  213:14
21        front [8]  -  46:21,  47:3,  47:7,  62:22,  136:10,
          191:24,  211:22,  215:18
22        FRYE [1]  -  1:9
          Frye [2]  -  19:14,  19:16
23        fueled [1]  -  30:19
          full [4]  -  56:11,  76:14,  95:23,  101:2
24        fully [2]  -  10:23,  137:13
          Furthermore [1]  -  257:13
25
```

## G

gain [4] - 97:19, 109:16, 119:7, 119:11
gained [1] - 111:5
gaining [2] - 82:13, 99:18
GAO [2] - 204:21, 205:5
Garguilo [1] - 4:6
GARGUILO [1] - 1:11
gathered [1] - 88:8
gathering [1] - 161:14
gears [2] - 26:8, 201:9
General [3] - 2:2, 2:3, 229:5
general [13] - 19:19, 26:6, 35:7, 58:14, 94:16, 97:11, 100:7, 100:15, 148:11, 175:2, 210:25, 233:15, 248:25
General's [1] - 5:13
generally [42] - 8:18, 10:10, 10:24, 10:25, 16:23, 17:14, 25:13, 28:15, 55:5, 69:14, 70:18, 71:3, 71:14, 71:25, 72:9, 72:23, 73:10, 73:24, 83:21, 84:24, 96:4, 96:8, 96:17, 97:5, 103:11, 122:22, 149:15, 168:6, 190:2, 199:3, 200:24, 201:4, 206:13, 207:12, 211:6, 223:8, 223:12, 233:7, 241:12, 245:12, 248:17, 251:6
generate [1] - 49:18
generated [2] - 56:18, 146:20
generates [1] - 146:15
gentleman's [1] - 90:21
geographic [1] - 111:4
geographical [1] - 169:8
gigantic [1] - 118:13
given [13] - 47:24, 138:9, 141:11, 145:9, 145:10, 145:12, 146:5, 168:2, 168:3, 186:20, 193:20, 207:10, 251:11
goal [4] - 56:21, 86:20, 86:22, 106:24
gonna [1] - 100:17
goofy [1] - 242:19
government [11] - 32:10, 38:8, 40:8, 40:25, 43:22, 44:2, 172:9, 204:20, 205:5, 227:16, 229:7
government's [4] - 43:6, 43:16, 44:8, 44:12
graciously [1] - 174:18
graduated [3] - 86:6, 86:19, 92:10
Grand [4] - 220:6, 220:24, 220:25, 221:11
graph [2] - 210:2, 213:5
gravamen [1] - 36:12
great [2] - 53:10, 126:22
greater [2] - 114:19, 226:19
greatly [1] - 78:25

**green** [2] - 210:3, 211:21
**grounded** [1] - 69:7
**group** [1] - 128:6
**Group** [5] - 89:17, 89:21, 93:24, 94:4, 94:15
**grow** [1] - 86:16
**guess** [8] - 10:2, 16:19, 27:9, 79:12, 100:12, 124:17, 214:18, 248:20
**guide** [3] - 209:3, 209:9, 209:14
**guided** [1] - 138:6
**guidelines** [1] - 128:20
**guides** [1] - 209:15
**guiding** [2] - 209:17, 209:18

## H

**Hague** [1] - 257:7
**HAGUE** [1] - 257:21
**half** [1] - 250:21
**halfway** [1] - 230:8
**hallway** [1] - 100:6
**hand** [2] - 76:8, 207:25
**handed** [2] - 27:13, 129:16
**handing** [1] - 26:16
**handle** [5] - 51:4, 51:5, 51:7, 109:2, 111:6
**handled** [2] - 109:8, 113:14
**handling** [2] - 107:11, 233:9
**handy** [1] - 135:20
**hang** [3] - 51:3, 98:20, 136:5
**HANLY** [2] - 1:14, 1:16
**happy** [7] - 17:2, 17:4, 43:24, 44:13, 56:6, 62:17, 117:17
**hard** [3] - 20:17, 60:6, 161:24
**hardcopy** [1] - 194:20
**harder** [2] - 17:13, 17:16
**harped** [1] - 197:19
**Harvard** [11] - 93:24, 94:3, 94:14, 95:24, 96:10, 97:20, 100:4, 100:5, 101:12, 129:6, 161:17
**head** [1] - 34:6
**heading** [2] - 221:18, 230:9
**heads** [1] - 55:3
**heads-up** [1] - 55:3
**Health** [4] - 34:2, 34:11, 81:13, 222:8
**health** [1] - 35:8
**healthcare** [11] - 205:19, 207:10, 207:17, 207:25, 208:25, 209:6, 209:12, 209:23, 225:14, 234:20, 249:21
**hear** [18] - 7:19, 54:16, 56:5, 66:20, 76:5, 78:9, 87:8, 87:10, 98:17, 103:19, 160:9, 189:15, 190:9,

199:24, 200:2, 222:25, 242:7, 242:8

**heard** [8] - 160:14, 189:12, 190:7, 192:19, 213:16, 243:7, 249:19, 249:20

**Hearing** [4] - 52:15, 52:17, 52:19, 54:8

**HEARING** [1] - 1:9

**hearing** [5] - 4:9, 19:14, 19:17, 103:14, 136:11

**hearings** [1] - 203:11

**held** [4] - 25:21, 34:20, 122:6, 243:4

**help** [5] - 88:16, 119:16, 163:3, 184:24, 245:23

**helped** [2] - 93:13, 211:12

**helping** [2] - 162:13, 174:21

**helps** [4] - 41:20, 195:3, 205:23, 205:24

**hereby** [2] - 117:20, 257:9

**heroin** [7] - 28:12, 28:15, 36:11, 58:11, 59:4, 59:14, 60:11

**HHS** [1] - 34:3

**high** [9] - 38:24, 39:15, 40:4, 86:20, 89:25, 92:9, 223:16, 224:10, 233:6

**higher** [1] - 89:15

**highlighted** [5] - 17:24, 39:10, 39:23, 57:6, 60:7

**highlighting** [1] - 16:15

**hired** [5] - 80:20, 84:20, 91:23, 92:2, 251:9

**historic** [1] - 115:7

**historically** [1] - 34:5

**histories** [1] - 68:5

**history** [17] - 14:2, 32:7, 32:9, 32:15, 33:4, 33:6, 44:3, 44:4, 67:23, 68:18, 101:8, 113:3, 115:12, 124:12, 125:15, 148:22, 149:7

**hoc** [1] - 64:16

**hold** [2] - 74:16, 80:7

**home** [5] - 117:18, 219:19, 221:23, 222:15, 223:10

**HON** [1] - 1:11

**honed** [1] - 88:11

**Honor** [101] - 4:17, 4:19, 4:22, 4:25, 5:7, 5:11, 5:17, 5:20, 5:24, 6:13, 6:19, 7:16, 18:21, 20:6, 31:2, 41:25, 49:25, 50:12, 51:6, 52:6, 53:11, 53:15, 53:24, 54:13, 55:2, 55:9, 55:13, 55:16, 69:5, 69:21, 74:8, 74:20, 74:22, 75:4, 75:7, 76:4, 77:2, 77:3, 78:8, 78:12, 78:15, 78:21, 86:16, 102:21, 103:12, 104:9, 104:16, 113:20, 114:5, 114:22, 116:22, 117:14, 117:24, 126:13, 127:3, 127:22, 130:7, 131:4, 132:11, 132:13, 133:17, 134:3, 134:15, 134:20, 139:11, 139:23, 144:2, 160:4, 160:16, 163:2, 181:3, 184:22, 184:25, 194:22, 195:10, 201:11, 201:13, 201:19, 202:2, 202:4, 202:10, 202:22, 216:13, 228:25, 229:25, 230:5, 242:12, 243:6, 243:16, 247:10, 250:25, 252:17, 253:7, 253:17, 253:23, 254:2, 254:13, 254:15, 254:19, 254:25, 255:5

Opioid Frye/Mr. Rafalski                      298

**Honorable** [2] - 4:6, 221:12
**hope** [5] - 75:25, 117:24, 154:20, 186:13, 189:18
**hoped** [1] - 162:18
**hopefully** [3] - 84:9, 153:7, 153:25
**hopes** [1] - 91:7
**host** [1] - 39:2
**hour** [2] - 250:21
**hour-and-a-half** [1] - 250:21
**hours** [14] - 161:14, 161:18, 164:9, 164:25, 165:7,
165:11, 165:15, 166:12, 166:21, 167:25, 168:16,
168:19, 169:6, 169:11
**House** [3] - 32:22, 33:7, 58:16
**Hudson** [1] - 221:12
**huge** [1] - 119:6
**human** [1] - 57:18
**humanitarian** [1] - 34:22
**hundreds** [9] - 161:13, 161:18, 239:17, 239:18,
239:19, 241:9, 243:25
**hunter** [1] - 4:15
**HUNTER** [1] - 1:21
**Huntington** [1] - 85:23
**hydrocodone** [1] - 211:4
**hypothetical** [4] - 13:20, 15:7, 250:3, 250:6

---

**I**

---

**I-STOP** [1] - 150:22
**icon** [2] - 103:22, 103:24
**idea** [6] - 10:15, 94:16, 146:2, 146:4, 213:3, 249:18
**identical** [10] - 48:19, 48:20, 174:5, 176:8, 177:17,
177:24, 181:10, 186:11, 196:24, 200:19
**identification** [8] - 52:11, 53:7, 117:13, 117:19,
117:21, 175:23, 194:24, 219:14
**Identification** [1] - 132:7
**identified** [6] - 80:16, 90:20, 94:14, 157:4, 157:16,
166:18
**identifies** [1] - 252:9
**identify** [5] - 44:18, 67:5, 147:13, 154:10, 169:22
**identifying** [3] - 128:14, 194:4, 252:5
**identity** [1] - 77:20
**ill** [2] - 58:5, 59:4
**illegal** [5] - 27:7, 27:24, 30:22, 31:10, 235:4
**illicit** [9] - 28:13, 29:2, 29:6, 29:12, 29:16,
29:20, 31:21, 73:6
**illness** [4] - 36:13, 37:14, 37:19, 59:20
**image** [3] - 205:4, 205:18, 225:4
**immediately** [2] - 92:11, 217:5
**immense** [1] - 205:24

**immensely** [1] - 174:21
**impact** [13] - 31:21, 38:24, 39:15, 40:4, 40:10, 41:6, 43:6, 43:16, 73:5, 73:16, 126:7, 148:23, 148:24
**impacted** [1] - 29:11
**impaneled** [1] - 221:11
**impeachment** [1] - 216:8
**implementing** [1] - 105:15
**imply** [1] - 15:24
**impolite** [1] - 77:22
**important** [20] - 110:17, 115:13, 115:21, 116:5, 136:2, 136:18, 136:21, 137:5, 148:5, 148:13, 152:20, 153:6, 162:8, 163:23, 200:18, 203:20, 203:25, 215:3, 251:23, 252:6
**importers** [1] - 105:3
**imposes** [1] - 248:13
**impossible** [3] - 10:2, 129:11, 129:21
**impression** [1] - 54:22
**improper** [7] - 66:5, 68:9, 196:19, 199:12, 200:8, 200:15, 200:16
**improperly** [5] - 68:2, 211:23, 245:7, 245:23, 250:11
**IN** [1] - 1:4
**inadequate** [2] - 194:7, 195:15
**inappropriate** [5] - 45:6, 45:16, 45:17, 46:14, 48:10
**inappropriately** [1] - 249:22
**Inc** [6] - 2:10, 2:15, 2:18, 3:3, 3:3, 3:9
**incidents** [1] - 88:15
**include** [3] - 123:10, 176:15, 224:4
**included** [2] - 34:11, 138:17
**includes** [5] - 33:25, 38:22, 106:12, 232:2, 232:21
**including** [6] - 34:12, 135:12, 205:20, 219:7, 235:11, 252:5
**inclusion** [2] - 183:17, 184:3
**inclusive** [1] - 210:11
**incomplete** [1] - 19:7
**incomprehensible** [1] - 197:20
**inconsistent** [1] - 38:7
**incorporated** [1] - 203:6
**incorrect** [1] - 112:19
**increase** [2] - 113:4, 116:9
**increased** [5] - 47:16, 47:17, 48:3, 210:20
**increasing** [1] - 211:12
**inculpatory** [1] - 148:3
**indeed** [1] - 130:25
**independent** [12] - 21:10, 22:3, 23:19, 26:7, 234:7, 237:6, 237:20, 237:23, 240:11, 245:6, 245:22, 246:13
**independently** [5] - 64:9, 64:17, 65:4, 66:22, 113:12
**Index** [1] - 4:10

```
 1                 Opioid Frye/Mr. Rafalski              300

 2      INDEX [1] - 1:5
        indicate [1] - 149:18
 3      indicated [6] - 32:4, 37:10, 53:25, 100:20, 173:4,
        198:20
 4      indicates [1] - 74:11
        indicating [2] - 116:3, 219:17
 5      indication [1] - 99:14
        indicative [1] - 170:11
 6      individual [9] - 67:12, 68:5, 71:11, 71:13, 72:16,
        181:24, 218:24, 219:7, 251:17
 7      industry [2] - 7:11, 242:2
        ineffective [1] - 193:10
 8      influences [1] - 36:22
        information [25] - 35:18, 65:3, 77:14, 77:20, 94:24,
 9      99:19, 100:3, 109:16, 123:4, 132:25, 133:8, 139:7,
        139:9, 148:2, 148:5, 148:6, 148:9, 148:13, 161:20,
10      169:20, 170:4, 178:13, 178:15, 178:16, 231:6
        initial [3] - 97:15, 169:21, 192:15
11      initiate [1] - 101:9
        inject [1] - 17:9
12      injected [1] - 17:17
        ink [1] - 257:17
13      inquire [1] - 202:18
        inquired [1] - 202:7
14      inscrutable [3] - 194:7, 195:16, 197:20
        insert [2] - 179:9, 222:25
15      inserted [1] - 187:25
        inside [2] - 91:5, 91:7
16      inspection [2] - 95:4, 97:13
        inspections [1] - 232:8
17      Inspector [1] - 229:5
        instance [6] - 201:25, 223:20, 236:11, 236:18,
18      239:5, 250:8
        instances [9] - 19:21, 149:16, 157:19, 185:20,
19      210:14, 213:6, 241:14, 249:2, 249:9
        instead [3] - 131:6, 159:23, 231:5
20      Institute [2] - 34:9, 34:10
        insurance [1] - 70:24
21      integrate [1] - 148:25
        integrity [1] - 105:11
22      intend [2] - 172:10, 253:8
        interaction [1] - 110:11
23      Interagency [3] - 32:18, 33:8, 57:15
        interagency [6] - 33:11, 35:17, 35:22, 38:11, 40:17,
24      42:23
        interest [3] - 58:15, 181:21, 184:5
25      interested [2] - 24:6, 86:24
        interesting [2] - 33:4, 95:10
```

**interim** [1] - 104:13
**interjected** [1] - 98:6
**internal** [7] - 82:12, 95:8, 97:21, 124:20, 159:2, 227:15
**internally** [1] - 94:5
**International** [1] - 87:20
**internet** [1] - 149:16
**interpretation** [1] - 9:5
**interpreted** [2] - 8:18, 140:12
**interrupt** [1] - 102:20
**interrupted** [4] - 86:22, 98:5, 139:17, 139:19
**interruption** [3] - 87:7, 98:14, 133:4
**intervals** [2] - 36:19, 225:23
**interview** [3] - 89:11, 95:22, 158:19
**interviewing** [2] - 89:12, 95:20
**interviews** [8] - 97:16, 100:19, 124:6, 124:12, 124:15, 124:17, 158:14, 166:22
**intractable** [1] - 57:18
**investigate** [3] - 238:4, 247:19, 249:13
**investigated** [1] - 96:11
**investigating** [4] - 90:17, 92:4, 102:4, 150:7
**investigation** [56] - 9:23, 81:25, 82:2, 83:17, 88:13, 88:21, 89:5, 89:6, 90:16, 90:20, 91:8, 91:14, 92:13, 93:24, 94:4, 94:6, 94:15, 95:2, 95:25, 96:8, 96:19, 97:6, 97:8, 99:14, 99:21, 100:18, 101:6, 101:9, 106:3, 106:11, 110:3, 113:2, 114:18, 116:10, 118:6, 119:20, 122:7, 122:12, 129:5, 129:6, 133:2, 148:14, 148:17, 149:2, 152:9, 152:14, 153:5, 160:25, 161:10, 169:7, 189:21, 193:17, 221:13, 230:14, 232:23, 251:11
**investigations** [33] - 8:15, 8:17, 10:19, 11:3, 11:6, 11:21, 11:24, 13:15, 79:17, 82:11, 89:13, 89:24, 92:16, 92:18, 92:22, 92:24, 93:2, 93:4, 93:6, 93:18, 97:12, 99:23, 115:15, 115:17, 124:5, 124:11, 125:2, 125:20, 129:25, 190:4, 191:4, 227:16, 230:10
**investigative** [4] - 81:23, 91:2, 147:22, 148:9
**investigator** [20] - 76:19, 79:9, 79:16, 82:18, 91:23, 92:3, 92:4, 92:12, 92:16, 96:7, 100:2, 105:17, 124:2, 129:24, 131:18, 131:23, 161:25, 223:14, 223:24, 225:12
**investigators** [1] - 92:21
**investigators'** [1] - 158:14
**invite** [1] - 90:6
**invoices** [1] - 171:8
**involve** [7] - 214:24, 217:14, 217:23, 218:2, 218:6, 218:15, 247:14
**involved** [9] - 90:15, 90:23, 96:18, 116:11, 175:13, 217:6, 217:19, 223:4, 241:2

involvements [1] - 223:21
involving [2] - 91:14, 143:5
ironically [1] - 87:2
irrelevant [1] - 67:11
island [1] - 87:23
Islip [1] - 1:8
issue [21] - 7:3, 20:20, 32:10, 62:15, 68:23,
143:13, 143:20, 145:14, 145:16, 145:23, 145:25,
147:10, 149:5, 187:5, 187:8, 191:22, 193:23, 193:25,
194:14, 196:11, 228:14
issued [2] - 39:3, 60:14
issues [3] - 106:16, 116:11, 221:14
issuing [3] - 106:4, 226:15, 234:8
IT [3] - 104:11, 242:9, 242:14
items [2] - 73:4, 205:14
itself [2] - 21:22, 113:7

## J

James [3] - 1:10, 76:16, 221:12
JAMES [2] - 2:2, 76:9
Jane [1] - 255:5
Janssen [5] - 2:10, 2:15, 5:2, 5:18, 81:2
January [1] - 221:11
Jayne [1] - 5:4
JAYNE [1] - 1:16
jciaccio@napolilaw.com [1] - 1:24
jconroy@simmonsfirm.com [1] - 1:18
JENNIFER [1] - 3:5
Jennifer [2] - 5:21, 253:17
jennifer.levy@kirkland.com [1] - 3:6
JERRY [1] - 1:11
Jerry [1] - 4:6
jobs [1] - 37:7
Johnson [2] - 81:2
join [1] - 104:5
joined [1] - 87:12
joining [1] - 135:3
Jones [1] - 174:21
JONES [2] - 2:18, 2:20
Joseph [1] - 4:23
JOSEPH [1] - 1:22
journals [1] - 9:17
JR [1] - 1:16
Judge [7] - 19:22, 20:4, 49:2, 133:9, 133:24,
186:14, 219:24
judge [1] - 160:6
Judge's [3] - 115:20, 138:6, 220:17

1

judgment [3] - 23:19, 207:4, 233:20
July [1] - 138:6
jump [3] - 91:5, 109:9, 182:8
jurisdiction [1] - 92:8
jurisdictions [1] - 85:2
jury [3] - 62:7, 62:9, 130:22
Jury [4] - 220:6, 220:24, 220:25, 221:11
Justice [3] - 1:12, 229:6, 229:11

## K

Kaye's [1] - 19:22
keep [6] - 105:5, 171:23, 201:12, 234:7, 234:13, 234:19
keeping [1] - 91:11
Keller [3] - 254:20, 255:9, 255:23
kept [1] - 115:10
Kessler [22] - 1:10, 6:8, 6:22, 6:24, 7:19, 10:4, 19:3, 20:12, 32:2, 33:18, 47:7, 50:14, 54:11, 55:19, 56:15, 57:3, 61:5, 65:12, 65:19, 65:20, 66:6, 74:19
KESSLER [1] - 6:5
Kessler's [1] - 18:20
key [1] - 104:22
kick [1] - 254:10
kind [27] - 35:12, 63:8, 65:16, 92:20, 93:2, 95:3, 95:14, 97:19, 99:13, 100:12, 109:13, 114:17, 115:9, 119:3, 124:12, 125:14, 147:25, 176:16, 197:18, 207:20, 242:16, 242:24, 243:11, 243:23, 247:23, 248:13, 255:15
kindly [2] - 41:15, 57:12
KIRKLAND [1] - 3:2
knock [1] - 31:20
know-your-customer [3] - 108:10, 110:7, 123:20
knowledge [7] - 61:18, 143:15, 163:19, 213:20, 224:3, 233:13, 242:2
known [3] - 12:13, 12:21, 34:3

## L

label [10] - 8:21, 8:23, 9:10, 9:11, 9:16, 9:20, 10:2, 10:9, 10:16, 68:13
Lacey [2] - 254:20, 255:22
Laconia [1] - 191:19
laid [1] - 162:12
landscaper [1] - 133:6
lane [1] - 86:4
language [17] - 176:7, 177:10, 177:11, 177:16, 177:23, 181:23, 182:6, 193:11, 194:8, 195:15,

197:19, 207:6, 227:17, 232:7, 232:19, 246:23
**large** [12] - 16:18, 23:14, 23:25, 32:15, 88:12, 93:23, 94:13, 98:11, 172:24, 173:12, 174:2, 196:23
**larger** [2] - 92:17, 92:23
**largest** [2] - 88:15, 239:21
**last** [24] - 6:15, 14:25, 40:19, 52:4, 54:14, 60:25, 65:16, 70:8, 76:18, 85:10, 85:20, 103:20, 114:10, 116:13, 125:6, 159:11, 160:6, 183:9, 194:19, 195:9, 195:12, 195:18, 223:3, 254:4
**lastly** [1] - 73:19
**late** [2] - 32:20, 57:17
**latter** [1] - 7:12
**launch** [2] - 12:22, 12:25
**laundering** [2] - 90:24, 91:14
**law** [7] - 76:17, 92:13, 106:16, 106:23, 111:21, 120:2, 132:22
**lawfully** [1] - 225:21
**lawsuit** [3] - 137:2, 189:24, 190:5
**lawyer** [18] - 77:16, 134:18, 176:9, 178:2, 181:10, 181:13, 181:19, 182:4, 182:20, 183:8, 183:15, 192:23, 193:19, 194:16, 196:12, 196:25, 200:25, 201:5
**lawyers** [33] - 16:4, 118:25, 119:16, 119:25, 120:6, 134:11, 134:19, 136:23, 137:3, 143:24, 144:24, 145:5, 153:22, 163:23, 171:12, 177:5, 178:10, 178:18, 183:19, 183:22, 183:24, 185:7, 185:14, 188:19, 189:23, 190:4, 197:16, 199:12, 200:9, 200:19, 201:25, 235:17, 252:21
**lawyers'** [1] - 119:16
**lay** [1] - 65:16
**lead** [4] - 37:6, 125:14, 130:24, 131:3
**leading** [8] - 130:8, 130:11, 130:12, 130:13, 130:15, 130:18, 130:19, 130:23
**leaf** [1] - 133:6
**leak** [1] - 105:6
**learned** [6] - 46:22, 47:2, 47:8, 47:13, 47:18, 100:4
**learning** [1] - 89:12
**least** [4] - 97:2, 157:21, 175:17, 184:13
**leave** [4] - 17:19, 23:16, 30:5, 179:7
**Led** [1] - 242:23
**led** [12] - 26:24, 27:4, 28:19, 29:7, 29:16, 30:15, 31:9, 43:21, 45:8, 45:19, 46:15, 47:16
**leeway** [1] - 130:17
**left** [9] - 13:20, 16:4, 34:5, 56:10, 65:14, 170:10, 177:11, 206:5, 239:14
**legal** [3] - 7:13, 16:2, 171:16
**legitimate** [12] - 27:15, 112:2, 112:23, 116:8, 209:16, 212:9, 214:3, 214:9, 216:17, 218:4, 218:13

1

2  **legitimately** [3] - 110:25, 213:13, 225:20
   **less** [6] - 7:2, 145:22, 155:3, 161:23, 241:23,
3  249:17
   **LETITIA** [1] - 2:2
4  **letter** [12] - 13:18, 13:19, 13:23, 13:24, 14:3,
   14:4, 14:11, 14:25, 64:25, 65:2, 132:23
5  **letters** [4] - 15:10, 15:14, 254:3, 254:7
   **level** [17] - 67:11, 67:12, 67:13, 89:14, 89:15,
6  89:25, 92:9, 93:20, 100:11, 106:13, 148:19, 148:20,
   148:21, 149:19, 149:19, 233:15, 246:20
7  **levels** [2] - 48:7, 111:25
   **LEVY** [7] - 3:5, 5:20, 253:17, 254:2, 254:13, 254:15,
8  254:25
   **Levy** [4] - 5:21, 5:23, 253:17, 253:18
9  **Liberty** [1] - 2:3
   **LICARDI** [2] - 243:10, 243:13
10 **license** [13] - 106:2, 106:8, 106:16, 225:14, 225:18,
   225:24, 226:3, 226:7, 226:10, 226:11, 234:2, 236:22,
11 238:18
   **licensed** [11] - 149:13, 149:20, 149:25, 207:25,
12 225:23, 226:13, 226:20, 227:2, 227:6, 236:5, 238:24
   **licenses** [2] - 106:4, 146:21
13 **licensing** [8] - 146:14, 146:19, 147:2, 147:10,
   150:6, 231:11, 233:25
14 **life** [2] - 39:16, 77:23
   **lightly** [1] - 196:6
15 **likely** [2] - 82:6, 129:2
   **liken** [1] - 115:9
16 **limit** [9] - 54:14, 54:21, 77:13, 164:7, 164:23,
   165:6, 166:14, 166:21, 248:14
17 **limited** [5] - 37:12, 37:13, 142:20, 167:9, 167:12
   **limiting** [1] - 39:16
18 **limits** [1] - 54:17
   **line** [29] - 13:7, 22:21, 25:6, 46:19, 47:21, 47:23,
19 48:6, 52:4, 100:17, 103:2, 103:23, 132:19, 141:20,
   163:6, 163:8, 164:21, 179:15, 215:25, 216:2, 245:11,
20 245:16, 245:17, 246:6, 246:9, 246:14, 246:19,
   250:14, 250:23
21 **lined** [1] - 26:15
   **lines** [7] - 14:25, 15:6, 18:22, 21:2, 51:13, 163:7,
22 247:4
   **linger** [1] - 161:9
23 **link** [1] - 146:9
   **list** [17] - 33:22, 37:24, 46:8, 46:10, 64:2, 98:10,
24 123:5, 138:2, 143:14, 143:17, 145:13, 162:22,
   162:25, 163:12, 210:10, 234:16
25 **listed** [5] - 44:23, 47:24, 84:14, 123:5, 240:18
   **listen** [2] - 47:5, 77:11

```
 1
 2     listening [1] - 242:23
       literally [1] - 144:15
 3     literature [1] - 68:14
       Litigation [2] - 4:5, 4:10
 4     LITIGATION [1] - 1:4
       litigation [11] - 84:24, 85:7, 101:14, 118:16,
 5     126:3, 128:3, 128:10, 151:15, 151:23, 190:14, 190:22
       live [4] - 75:18, 77:17, 255:7, 255:9
 6     LLC [2] - 1:14, 3:2
       LLP [5] - 2:6, 2:10, 2:14, 3:2, 3:8
 7     local [1] - 148:19
       located [1] - 87:20
 8     locations [1] - 169:9
       logical [1] - 21:21
 9     look [86] - 13:6, 15:5, 15:13, 17:22, 20:16, 24:24,
       33:14, 34:25, 36:14, 36:15, 38:9, 41:4, 43:23, 44:2,
10     57:5, 62:21, 63:4, 64:8, 64:12, 64:14, 64:25, 68:12,
       82:20, 86:3, 86:10, 88:2, 97:24, 99:7, 99:9, 99:24,
11     102:15, 105:19, 107:24, 108:4, 110:15, 110:23,
       113:2, 115:14, 116:6, 117:25, 118:4, 121:11, 123:8,
12     123:12, 129:9, 129:12, 129:19, 141:19, 141:20,
       148:21, 148:25, 149:3, 149:14, 149:24, 149:25,
13     151:2, 151:6, 155:20, 156:11, 158:2, 164:19, 174:9,
       175:9, 177:9, 179:13, 179:15, 180:2, 182:15, 186:6,
14     186:7, 192:3, 192:6, 193:6, 198:7, 199:6, 210:2,
       211:20, 215:15, 220:15, 222:6, 229:14, 230:6,
15     230:13, 231:18, 251:25
       looked [29] - 32:5, 32:7, 32:10, 32:14, 32:16, 40:6,
16     42:21, 43:20, 44:4, 46:2, 49:17, 56:13, 66:21,
       71:21, 97:16, 99:10, 110:3, 120:21, 120:23, 148:10,
17     149:9, 149:13, 149:16, 151:3, 157:20, 157:21,
       157:23, 159:5, 159:22
18     looking [28] - 18:25, 19:10, 23:17, 24:25, 59:2,
       65:2, 68:4, 71:11, 95:13, 98:4, 98:9, 111:14, 123:3,
19     123:5, 128:23, 129:7, 129:22, 131:5, 141:25, 149:5,
       161:14, 161:19, 169:11, 198:23, 205:8, 208:9, 251:15
20     looks [3] - 56:23, 117:15, 122:23
       loopholes [1] - 193:9
21     loose [1] - 9:4
       lose [1] - 37:7
22     loss [1] - 35:14
       lost [3] - 98:15, 98:19, 242:5
23     loud [1] - 242:24
       love [1] - 17:3
24     loved [1] - 88:17
       low [2] - 152:2, 152:4
25     lower [1] - 42:12
       luck [1] - 243:9
```

```
1                  Opioid Frye/Mr. Rafalski                307

2      lunch [4] - 84:9, 126:15, 133:13
       luncheon [1] - 133:18
3
```
## M
```
4
5      ma'am [70] - 80:13, 80:23, 80:25, 81:3, 81:6, 81:8,
       81:11, 81:14, 81:16, 81:18, 82:22, 82:25, 83:5,
6      83:9, 83:13, 83:20, 83:22, 84:5, 84:19, 84:22,
       85:12, 85:14, 85:18, 85:23, 87:14, 88:18, 88:22,
7      89:19, 92:19, 93:11, 93:17, 94:5, 96:3, 96:6, 96:13,
       101:18, 101:22, 102:8, 102:13, 105:18, 110:5,
8      118:14, 118:20, 118:23, 119:2, 119:18, 119:23,
       120:4, 120:12, 121:7, 121:9, 121:17, 121:22, 122:2,
9      123:14, 123:17, 123:21, 123:24, 124:4, 124:22,
       125:5, 126:11, 128:17, 130:5, 131:10, 131:13,
10     131:19, 131:24, 132:3, 132:9
       Madison [1] - 1:15
11     magnitude [1] - 35:10
       maintain [9] - 105:10, 106:20, 107:3, 108:6, 108:7,
12     111:9, 111:16, 147:5, 226:3
       maintained [3] - 80:15, 204:13, 213:13
13     maintaining [1] - 122:25
       maintenance [5] - 82:10, 95:19, 97:22, 110:12,
14     125:12
       major [2] - 36:4, 204:10
15     MALE [1] - 76:25
       Mallinckrodt [30] - 16:10, 16:15, 17:3, 17:24,
16     18:13, 20:18, 21:22, 22:5, 22:14, 23:18, 23:22,
       24:4, 24:14, 24:25, 100:21, 100:24, 100:25, 101:5,
17     102:23, 102:25, 103:9, 129:5, 132:14, 132:20, 185:2,
       185:20, 187:21, 188:5, 196:4, 196:9
18     management [5] - 40:18, 53:18, 53:23, 60:3, 96:20
       managing [1] - 89:11
19     manner [4] - 67:8, 219:21, 227:6, 237:18
       manners [1] - 135:18
20     manufactured [1] - 233:19
       manufacturer [23] - 12:16, 12:18, 13:2, 13:3, 13:17,
21     45:7, 45:18, 46:15, 46:24, 47:10, 99:25, 100:10,
       102:22, 106:13, 107:8, 146:15, 148:15, 165:20,
22     206:12, 207:14, 208:5, 208:17, 236:19
       manufacturers [29] - 7:10, 44:9, 47:14, 67:25, 85:3,
23     93:9, 93:15, 105:3, 105:21, 138:19, 138:24, 146:21,
       147:4, 147:11, 210:8, 210:14, 217:15, 222:3, 232:2,
24     234:12, 234:17, 235:2, 235:24, 235:25, 244:12,
       246:21, 248:10, 252:25, 253:14
25     manufacturers' [1] - 27:16
       manufacturing [3] - 140:22, 141:3, 155:5
       March [3] - 113:24, 115:23, 175:11
```

marijuana [1] - 58:11
mark [11] - 53:19, 88:15, 117:13, 117:18, 160:3,
160:17, 174:15, 175:23, 219:14, 220:2, 229:3
marked [11] - 52:10, 52:14, 52:16, 52:18, 53:11,
53:12, 53:14, 117:20, 135:21, 194:23, 220:22
marketed [1] - 68:2
marketing [1] - 7:9
massive [1] - 96:23
masters [3] - 96:15, 96:25, 118:12
Masters [10] - 97:9, 99:2, 100:5, 100:18, 101:12,
101:16, 110:2, 129:5, 153:5, 161:23
Masters' [1] - 160:24
material [9] - 44:16, 121:2, 167:4, 167:5, 167:21,
178:22, 183:19, 187:24, 188:23
materials [10] - 37:24, 37:25, 44:23, 123:20,
123:23, 138:2, 145:13, 156:14, 163:12, 193:16
math [1] - 87:16
matter [18] - 54:24, 133:9, 143:21, 144:18, 148:22,
149:4, 161:18, 171:16, 172:10, 184:10, 191:9,
193:22, 207:13, 208:4, 211:16, 212:17, 212:22, 238:4
matters [7] - 82:3, 92:5, 92:6, 141:16, 167:10,
167:20, 172:7
McCann [4] - 159:17, 254:6, 255:19, 255:20
McKesson [27] - 3:9, 5:25, 75:23, 81:10, 101:25,
134:16, 176:22, 177:2, 177:4, 182:19, 187:7, 190:8,
190:15, 191:7, 191:13, 191:18, 193:8, 193:14, 194:4,
194:11, 238:23, 240:12, 241:5, 241:11, 241:18,
244:2, 247:13
MDL [8] - 48:21, 51:13, 122:14, 125:21, 168:17,
168:20, 202:6, 202:24
mean [43] - 9:18, 13:21, 20:15, 24:23, 27:9, 27:20,
27:24, 28:21, 28:23, 32:15, 37:15, 37:17, 38:4,
47:18, 49:2, 49:16, 59:11, 62:20, 64:8, 64:12,
67:11, 67:18, 67:20, 69:8, 69:10, 69:16, 70:17,
71:7, 72:13, 80:7, 89:20, 105:22, 106:22, 107:15,
112:6, 114:6, 116:15, 122:15, 125:19, 129:17,
146:18, 154:6, 228:20
meaning [1] - 54:19
means [5] - 55:15, 70:20, 70:24, 124:9, 127:8
meant [11] - 21:16, 21:21, 21:22, 70:15, 72:20,
88:25, 104:20, 142:20, 197:13, 251:15
meantime [1] - 180:10
measure [5] - 48:12, 49:19, 50:19, 51:18
measuring [1] - 10:9
meat [1] - 135:9
mechanism [1] - 58:3
Medical [1] - 3:9
medical [22] - 43:8, 43:18, 67:15, 67:22, 68:5,

68:14, 68:18, 203:20, 203:25, 206:21, 207:4, 211:10, 211:18, 212:9, 212:10, 213:17, 214:3, 214:8, 214:10, 218:13, 233:20, 251:5

**medically** [8] - 45:5, 45:15, 45:16, 46:13, 48:10, 49:9, 67:5

**medication** [8] - 12:17, 12:18, 16:10, 30:3, 30:4, 206:8, 214:2, 214:7

**medications** [6] - 8:5, 27:16, 43:8, 43:18, 61:2, 98:8

**Medicine** [1] - 221:19

**medicine** [8] - 30:5, 213:19, 213:24, 218:2, 219:18, 221:23, 222:15, 223:10

**meet** [3] - 9:21, 10:10, 21:18

**meeting** [2] - 35:18, 242:15

**meetings** [2] - 106:13, 251:10

**meets** [1] - 122:25

**Melville** [1] - 1:21

**member** [1] - 216:18

**members** [1] - 33:22

**memories** [1] - 118:4

**memory** [9] - 17:4, 18:5, 36:10, 36:12, 37:16, 41:2, 44:13, 86:4, 164:13

**Mental** [2] - 34:10, 222:8

**mention** [1] - 100:8

**mentioned** [1] - 195:13

**menu** [1] - 253:6

**merely** [2] - 200:13, 248:19

**message** [4] - 63:19, 64:15, 66:18, 75:16

**messages** [1] - 47:15

**met** [2] - 86:22, 128:19

**methodological** [1] - 135:8

**methodologies** [1] - 152:15

**methodology** [94] - 7:8, 46:22, 47:2, 47:8, 47:14, 47:19, 48:21, 49:3, 59:8, 60:17, 60:25, 61:13, 63:9, 63:25, 64:2, 64:20, 65:6, 65:15, 65:19, 65:20, 65:22, 65:25, 66:8, 66:13, 66:15, 67:5, 67:15, 67:17, 67:22, 68:9, 68:10, 68:24, 69:2, 69:3, 69:7, 69:12, 69:18, 69:19, 69:25, 70:6, 70:12, 70:19, 70:23, 71:4, 71:8, 71:15, 71:19, 72:3, 72:9, 72:20, 72:22, 73:5, 73:12, 73:22, 73:23, 74:2, 81:22, 82:16, 83:18, 84:16, 95:25, 96:5, 96:9, 97:9, 117:11, 119:8, 121:12, 121:14, 121:15, 121:21, 122:4, 122:9, 122:14, 123:12, 123:16, 124:3, 125:4, 126:5, 128:13, 130:2, 131:14, 131:20, 131:22, 138:8, 146:10, 157:7, 162:12, 189:17, 189:19, 190:24, 191:2, 191:4, 251:14

**methods** [1] - 210:11

**metric** [6] - 125:24, 126:25, 127:2, 127:3, 127:16,

1

2    166:17
     metrics [4] - 125:17, 128:3, 128:9, 159:12
3    Metro [1] - 87:25
     MEYERS [1] - 2:14
4    mic [7] - 103:5, 103:6, 103:15, 103:20, 103:24,
     242:17, 242:20
5    Michael [1] - 5:12
     MICHAEL [1] - 2:4
6    Michigan [3] - 78:19, 78:20, 87:13
     microphone [2] - 136:7, 136:10
7    mics [1] - 75:17
     mid [3] - 96:20, 192:15, 211:5
8    mid-customer [1] - 192:15
     mid-size [1] - 96:20
9    middle [5] - 87:24, 91:4, 141:21, 205:10, 205:13
     midnight [2] - 26:16, 26:19
10   might [10] - 13:17, 27:13, 75:18, 119:10, 125:21,
     127:13, 134:17, 149:18, 189:10, 245:12
11   miles [1] - 87:24
     mill [10] - 26:11, 73:5, 212:2, 212:5, 212:13,
12   212:25, 226:13, 226:20, 226:25, 251:5
     milligram [1] - 101:4
13   million [10] - 35:12, 35:14, 40:2, 40:4, 42:19,
     42:20, 145:19, 151:22, 152:12, 152:16
14   millions [1] - 168:2
     mills [8] - 26:14, 26:24, 27:4, 27:13, 27:23, 31:21,
15   73:17, 218:9
     mind [1] - 118:13
16   mindful [1] - 84:6
     mine [1] - 90:8
17   minor [1] - 251:23
     minute [5] - 18:18, 161:25, 198:21, 199:6, 226:6
18   minutes [13] - 7:2, 54:20, 75:8, 104:8, 111:14,
     126:14, 126:17, 201:14, 201:15, 203:13, 222:2,
19   250:20, 250:22
     MINUTES [1] - 1:9
20   mirrored [1] - 95:7
     misleading [7] - 11:10, 12:3, 14:5, 14:22, 15:10,
21   15:17, 15:23
     misremembering [1] - 16:22
22   miss [4] - 44:16, 44:23, 62:10, 144:15
     Miss [12] - 134:13, 135:7, 135:10, 155:23, 174:20,
23   174:24, 180:22, 204:17, 215:13, 230:4, 253:18
     missed [2] - 27:20, 179:8
24   mission [2] - 204:10, 251:6
     mistaken [1] - 20:23
25   misunderstood [3] - 189:11, 189:12
     misuse [7] - 46:16, 48:13, 49:8, 49:20, 50:20,

51:18,  73:20

misuses [1]  -  214:2

MMWR [3]  -  38:20,  39:22,  52:16

model [1]  -  108:22

modified [1]  -  176:15

modify [1]  -  199:4

moment [6]  -  91:10,  95:10,  100:13,  158:25,  163:9,
242:6

moments [1]  -  228:7

Monday [2]  -  256:3,  256:4

money [3]  -  90:24,  91:13,  218:6

monitor [3]  -  77:2,  107:24,  111:23

Monitoring [1]  -  151:4

monitoring [5]  -  102:6,  102:18,  123:19,  150:22,
156:13

month [5]  -  91:3,  114:11,  127:9,  128:5

monthly [2]  -  110:23,  110:25

months [12]  -  36:19,  39:14,  39:18,  85:16,  91:9,
114:9,  114:11,  127:10,  128:6,  175:16,  175:17

morbidity [1]  -  38:18

morning [37]  -  4:7,  4:16,  4:18,  4:19,  4:21,  4:22,
4:24,  4:25,  5:3,  5:4,  5:6,  5:9,  5:11,  5:15,  5:17,
5:19,  5:20,  5:23,  5:24,  6:4,  6:5,  6:22,  6:23,  26:16,
55:19,  73:13,  75:25,  76:4,  76:22,  77:6,  77:7,  84:7,
96:2,  97:10,  121:14,  252:20,  256:7

mortality [1]  -  38:19

most [5]  -  39:13,  39:17,  97:14,  128:8,  251:22

motion [1]  -  176:3

mouth [1]  -  199:12

move [19]  -  19:13,  50:9,  51:9,  56:10,  92:15,  121:10,
139:25,  153:11,  169:3,  171:8,  173:24,  179:10,  180:9,
191:22,  199:8,  203:7,  203:8,  239:10,  255:22

moved [3]  -  91:17,  93:5,  254:17

moves [2]  -  106:6,  106:9

moving [4]  -  93:3,  144:19,  161:7,  254:20

MR [134]  -  4:15,  4:19,  4:22,  4:25,  5:11,  5:17,  5:24,
6:19,  6:21,  7:15,  7:18,  18:19,  18:21,  18:22,  18:23,
19:2,  19:10,  20:6,  20:10,  20:11,  20:25,  21:4,  22:20,
22:23,  25:5,  25:7,  30:25,  31:5,  31:7,  31:16,  31:20,
31:24,  33:15,  33:17,  38:14,  38:16,  39:4,  39:12,
39:20,  39:24,  41:25,  42:7,  42:13,  46:4,  49:25,  50:3,
50:6,  50:10,  50:18,  50:22,  51:2,  51:12,  51:15,
51:25,  53:10,  53:15,  53:23,  54:3,  54:5,  54:6,  54:7,
54:9,  54:11,  54:13,  55:2,  55:8,  55:13,  55:16,  55:18,
56:12,  56:14,  57:2,  61:25,  62:10,  62:12,  69:24,
74:8,  74:15,  74:18,  75:7,  75:10,  75:22,  76:4,  79:24,
80:6,  102:20,  103:11,  103:17,  104:9,  130:7,  130:11,
130:13,  132:13,  132:17,  134:15,  134:22,  134:24,

139:18, 144:14, 155:21, 160:3, 160:8, 160:16, 174:14, 175:6, 180:8, 184:24, 195:2, 195:6, 195:9, 195:14, 198:10, 199:21, 201:8, 201:19, 203:4, 216:5, 216:11, 218:19, 219:13, 220:16, 228:24, 229:22, 229:25, 230:4, 242:5, 242:18, 243:3, 247:9, 250:19, 250:24, 252:16, 253:13, 253:22

**MS** [57] - 5:4, 5:6, 5:20, 75:25, 76:5, 78:15, 78:17, 79:3, 79:20, 80:3, 80:10, 86:13, 87:8, 87:11, 98:15, 98:21, 98:23, 104:18, 115:2, 117:17, 117:22, 118:2, 126:13, 126:18, 126:20, 126:22, 127:25, 131:4, 131:7, 132:10, 133:17, 136:16, 139:11, 139:15, 144:2, 144:4, 194:22, 195:4, 202:2, 202:4, 202:10, 202:13, 229:24, 242:11, 242:25, 243:10, 243:13, 253:7, 253:12, 253:17, 254:2, 254:13, 254:15, 254:25, 255:5, 255:20, 255:25

**multiple** [5] - 40:25, 48:7, 48:15, 106:12

**Must** [1] - 106:20

**must** [7] - 44:10, 107:3, 107:21, 115:4, 115:5, 116:14, 226:3

**mustache** [1] - 86:16

**mustaches** [1] - 86:11

**mute** [1] - 103:2

**muted** [4] - 7:16, 104:3, 243:8

**MYERS** [1] - 2:10

## N

**name** [3] - 34:5, 76:14, 77:17

**namely** [1] - 16:16

**naming** [1] - 12:10

**NAPOLI** [1] - 1:19

**narcotic** [2] - 89:2, 91:14

**Narcotic** [1] - 150:13

**narcotics** [2] - 88:21, 89:14

**narrow** [2] - 27:9, 109:22

**Nassau** [12] - 1:20, 4:16, 4:20, 4:23, 68:6, 71:12, 71:23, 72:7, 145:13, 145:21, 146:6, 224:5

**Nate** [1] - 5:2

**NATE** [1] - 2:16

**nation** [3] - 42:24, 60:8, 70:7

**National** [2] - 34:9, 34:10

**national** [2] - 35:8, 140:5

**nationally** [1] - 94:23

**nationwide** [1] - 223:20

**Nationwide** [1] - 84:25

**nature** [2] - 54:17, 130:9

**navigate** [2] - 87:4, 89:12

**near** [1] - 133:5

2    **nearly** [1] - 48:19
     **necessarily** [2] - 54:18,  55:23
3    **necessary** [8] - 129:21,  130:24,  148:5,  158:2,
     180:25,  184:16,  255:24,  256:3
4    **need** [23] - 18:18,  20:15,  36:5,  37:22,  75:2,  78:23,
     88:10,  104:4,  108:8,  119:7,  119:13,  119:20,  152:9,
5    152:11,  152:15,  174:25,  183:10,  204:4,  207:5,
     212:10,  215:17,  250:18,  256:4
6    **needed** [6] - 20:13,  99:19,  137:17,  137:23,  178:12,
     254:22
7    **needing** [1] - 152:21
     **needs** [5] - 8:14,  112:21,  206:21,  214:10,  233:20
8    **negative** [1] - 148:7
     **nervous** [1] - 36:21
9    **Neuropharmacological** [1] - 34:14
     **never** [7] - 67:18,  67:19,  109:7,  130:5,  167:13,
10   191:5,  191:12
     **NEW** [1] - 1:2
11   **new** [16] - 54:24,  68:13,  108:9,  108:18,  109:7,
     113:9,  137:22,  138:2,  140:3,  140:8,  140:14,  140:17,
12   141:2,  142:16,  231:4
     **New** [142] - 1:8,  1:15,  1:21,  2:2,  2:3,  2:4,  2:7,
13   2:16,  2:19,  3:10,  3:11,  4:3,  4:4,  5:12,  5:14,  25:20,
     26:2,  26:24,  27:5,  27:14,  28:19,  29:6,  29:16,  30:16,
14   31:10,  32:18,  33:8,  46:16,  48:24,  57:15,  59:10,
     72:18,  85:16,  99:21,  120:8,  120:18,  120:22,  125:21,
15   126:3,  128:16,  138:14,  138:22,  138:23,  138:25,
     139:5,  139:9,  140:7,  140:15,  140:18,  140:23,  141:4,
16   141:5,  141:9,  141:10,  141:11,  142:7,  142:9,  142:11,
     142:15,  142:16,  142:17,  142:22,  143:19,  145:21,
17   146:15,  146:25,  147:8,  147:22,  149:12,  150:18,
     150:21,  151:23,  152:5,  152:25,  154:18,  155:5,
18   155:11,  159:4,  159:5,  163:4,  164:8,  164:24,  165:18,
     166:23,  167:6,  167:25,  168:18,  169:3,  169:11,
19   169:16,  169:17,  170:14,  170:20,  170:21,  171:3,
     172:22,  181:24,  182:9,  182:13,  187:6,  187:15,
20   187:21,  188:15,  189:4,  196:5,  197:6,  197:9,  198:13,
     202:22,  203:6,  208:16,  224:5,  226:10,  233:25,  234:3,
21   234:6,  234:19,  235:3,  235:6,  235:13,  235:18,  235:19,
     236:20,  236:21,  236:22,  238:25,  239:6,  247:15,
22   248:7,  249:4,  250:9,  250:10,  255:12,  257:9
     **news** [2] - 26:20,  149:17
23   **next** [43] - 6:2,  34:8,  61:24,  67:4,  67:13,  69:23,
     75:6,  108:3,  110:15,  111:8,  112:3,  115:3,  117:23,
24   122:3,  122:19,  123:18,  124:5,  139:25,  156:10,
     156:21,  158:24,  159:10,  160:2,  177:20,  181:5,
25   181:12,  181:18,  184:23,  186:6,  199:7,  203:13,  204:6,
     206:9,  216:12,  216:23,  220:19,  228:2,  231:18,

231:21, 232:20, 239:11, 254:8

**Next** [1] - 111:8

**nicely** [1] - 220:20

**nicknames** [1] - 212:3

**night** [1] - 91:4

**Nightingale** [1] - 34:15

**nine** [1] - 142:14

**NO.:400000/2017** [1] - 1:5

**none** [5] - 129:8, 214:24, 217:6, 217:14, 217:19

**nonpublic** [1] - 132:25

**normal** [1] - 111:11

**note** [4] - 102:21, 104:10, 104:14, 136:5

**noted** [1] - 54:10

**notes** [8] - 17:4, 18:4, 18:9, 18:25, 19:11, 39:7, 227:21, 257:11

**nothing** [7] - 49:19, 50:19, 51:23, 83:15, 121:25, 169:2, 222:2

**notify** [2] - 247:3, 248:21

**novel** [2] - 83:15, 83:16

**November** [3] - 175:14, 175:15, 175:20

**nuanced** [1] - 11:14

**number** [36] - 9:3, 41:5, 52:20, 63:13, 78:9, 90:18, 92:21, 92:23, 94:22, 99:17, 113:25, 143:12, 151:24, 152:3, 165:24, 165:25, 182:17, 208:11, 209:4, 209:10, 209:11, 209:15, 209:21, 209:22, 210:20, 218:20, 218:22, 223:9, 223:11, 224:9, 224:10, 224:13, 225:2, 227:4, 249:2

**Number** [7] - 4:10, 66:14, 77:22, 79:21, 88:3, 133:11, 194:24

**numbered** [1] - 176:20

**numbers** [8] - 42:16, 42:20, 53:3, 53:7, 96:24, 98:12, 176:16, 242:3

**numerous** [3] - 33:25, 34:12, 93:18

**NW** [2] - 2:11, 3:4

**NYCSA** [1] - 183:3

## O

**O'Brien** [1] - 103:16

**o'clock** [1] - 133:13

**O'Connor** [7] - 102:22, 103:17, 103:18, 104:6, 104:10, 132:14, 132:15

**O'CONNOR** [3] - 132:13, 132:17, 253:13

**O'MELVENY** [2] - 2:10, 2:14

**oath** [2] - 6:9, 134:7

**object** [2] - 102:24, 132:19

**objection** [21] - 19:6, 30:25, 31:4, 49:25, 50:2, 50:3, 50:22, 78:10, 103:8, 104:15, 130:7, 130:10,

130:19, 133:7, 133:12, 139:11, 144:2, 144:3, 144:17, 202:2, 202:3
**Objection** [1] - 202:4
**objections** [3] - 55:4, 132:18, 136:12
**objective** [1] - 58:2
**obligated** [1] - 116:18
**obligation** [1] - 209:13
**obligations** [1] - 244:23
**observed** [2] - 36:17, 36:24
**observing** [1] - 41:12
**obtain** [4] - 95:7, 106:8, 119:22, 226:11
**obtained** [3] - 97:14, 106:9, 155:16
**obviously** [3] - 120:12, 122:17, 246:19
**occasion** [1] - 125:22
**occur** [7] - 113:17, 115:25, 188:13, 210:5, 210:8, 216:16, 239:4
**occurred** [6] - 123:2, 123:4, 125:10, 210:15, 239:6, 249:10
**occurring** [2] - 113:13, 120:22
**odds** [1] - 246:5
**OF** [4] - 1:2, 1:2, 1:9
**offer** [9] - 35:18, 77:17, 84:13, 146:2, 192:4, 192:18, 192:20, 193:13, 194:10
**offered** [3] - 16:9, 16:13, 48:21
**offering** [5] - 7:8, 23:13, 23:23, 24:12, 38:2
**Office** [4] - 2:3, 12:9, 58:18, 229:5
**office** [4] - 5:13, 89:17, 89:22, 120:19
**officer** [9] - 86:18, 86:25, 88:24, 89:4, 90:7, 90:12, 91:20, 98:25, 131:17
**OFFICER** [9] - 4:2, 52:22, 52:24, 53:4, 133:20, 136:8, 160:6, 160:11, 160:13
**officers** [2] - 86:24, 88:4
**offices** [2] - 119:16, 120:2
**Official** [2] - 257:8, 257:22
**OFFICIAL** [1] - 3:23
**official** [1] - 257:17
**officials** [1] - 34:12
**often** [3] - 26:13, 109:9, 151:5
**Ohio** [14] - 85:7, 85:9, 96:16, 138:15, 138:17, 138:18, 138:19, 138:20, 140:4, 143:10, 169:2, 201:23, 203:5, 223:21
**on-site** [11] - 97:15, 97:17, 97:24, 101:5, 101:16, 101:20, 101:24, 101:25, 106:12
**onboarding** [3] - 108:15, 109:14, 192:16
**once** [7] - 8:19, 46:10, 73:19, 94:24, 106:9, 117:5, 142:2
**one** [126] - 8:19, 8:24, 9:5, 13:13, 17:7, 19:15, 19:17, 25:16, 26:16, 26:19, 27:15, 28:2, 30:13,

31:25, 32:8, 32:21, 38:8, 38:9, 38:11, 39:2, 42:8,
42:14, 48:6, 50:14, 52:5, 52:23, 54:13, 59:17,
59:23, 60:5, 62:23, 72:12, 79:12, 79:19, 85:21,
88:3, 88:7, 88:11, 88:15, 90:13, 90:25, 91:3, 93:12,
94:13, 97:13, 104:22, 106:6, 108:7, 109:18, 111:8,
112:16, 113:9, 113:23, 114:6, 114:23, 117:14,
119:12, 123:18, 124:5, 124:18, 126:10, 127:7,
128:11, 128:23, 129:11, 130:2, 134:18, 134:19,
136:4, 144:14, 152:16, 153:2, 154:14, 156:10,
156:21, 156:23, 156:25, 157:3, 158:4, 158:10,
159:11, 160:2, 160:6, 164:15, 165:12, 166:11,
170:12, 172:2, 176:22, 177:21, 178:5, 179:8, 179:21,
179:23, 180:5, 183:10, 184:13, 185:13, 185:19,
194:19, 194:25, 195:18, 196:8, 196:17, 196:20,
198:20, 201:20, 202:20, 203:10, 206:9, 206:22,
209:8, 211:21, 212:3, 212:10, 215:3, 216:19, 219:3,
225:21, 225:22, 237:11, 242:18, 244:9, 250:5
**one-year** [1] - 127:7
**ones** [8] - 88:17, 101:23, 145:10, 179:17, 206:17,
237:24, 251:22, 251:23
**ongoing** [1] - 90:5
**online** [1] - 136:11
**onset** [1] - 119:18
**OPDP** [3] - 12:2, 12:8, 12:14
**open** [14] - 8:21, 8:23, 9:10, 9:11, 9:16, 9:20,
10:2, 10:9, 10:16, 41:17, 179:7, 243:18, 249:6,
249:12
**open-label** [8] - 8:21, 8:23, 9:10, 9:11, 9:16, 9:20,
10:9, 10:16
**opened** [3] - 35:6, 113:10, 129:15
**opening** [2] - 41:23, 41:24
**operate** [3] - 107:19, 111:10, 147:12
**operating** [4] - 82:8, 82:21, 123:9
**opine** [4] - 211:16, 219:12, 235:16, 238:4
**opinion** [43] - 7:9, 15:22, 16:3, 16:13, 19:22,
20:16, 22:5, 23:13, 23:24, 24:12, 119:11, 129:2,
145:17, 146:3, 146:10, 148:4, 148:24, 152:17,
152:20, 158:2, 173:20, 188:11, 192:18, 192:20,
192:22, 193:13, 193:18, 194:10, 194:15, 196:21,
211:9, 211:14, 212:16, 212:22, 218:17, 218:23,
219:6, 219:11, 235:15, 235:18, 244:22, 245:3, 252:24
**opinions** [53] - 38:2, 48:21, 49:6, 51:17, 60:17,
60:24, 64:5, 67:24, 71:24, 84:2, 84:13, 84:17,
128:22, 131:15, 131:21, 131:25, 132:5, 132:6, 135:9,
137:2, 137:13, 138:10, 140:14, 140:17, 140:21,
140:24, 141:2, 141:5, 141:6, 141:10, 142:16, 146:6,
158:17, 168:7, 168:9, 168:14, 172:22, 173:22,
188:25, 189:2, 189:20, 192:4, 193:22, 194:13,

```
1                   Opioid Frye/Mr. Rafalski            317

2      195:19,  196:8,  196:16,  203:14,  212:13,  235:10,
       238:5,  240:5,  247:16

3    OPIOID [1] - 1:4

     Opioid [2] - 4:5, 4:10

4    opioid [57] - 7:9,  17:8,  26:24,  27:12,  27:14,  28:8,
     28:19,  29:7,  29:16,  30:3,  30:15,  43:8,  43:18,  44:12,

5    46:5,  46:7,  46:15,  46:24,  47:11,  59:9,  60:9,  60:21,
     84:24,  151:14,  206:20,  207:9,  207:16,  207:24,

6    208:23,  210:19,  211:13,  211:18,  212:6,  212:14,
     212:19,  219:2,  219:9,  224:21,  225:8,  225:16,  226:22,

7    227:7,  227:13,  228:5,  235:11,  235:13,  235:19,  238:2,
     245:7,  247:13,  249:22,  251:4,  251:7,  251:16,  251:21,

8    252:2,  252:11

     opioids [48] - 32:5,  32:12,  38:6,  45:7,  45:16,

9    45:18,  46:14,  48:3,  59:13,  59:18,  60:11,  60:12,
     61:6,  61:9,  68:2,  68:3,  203:20,  204:8,  204:13,

10   207:3,  207:14,  208:5,  208:6,  208:16,  210:16,  210:22,
     211:3,  211:11,  218:14,  225:19,  229:20,  231:3,  233:6,

11   233:18,  234:8,  234:9,  234:14,  234:21,  236:4,  236:13,
     236:17,  237:15,  238:13,  238:14,  244:8,  245:24,

12   247:14,  247:17

     opportunity [4] - 78:21,  97:24,  99:24,  135:4

13   opposed [3] - 42:10,  156:5,  201:24

     order [50] - 18:17,  67:24,  71:24,  73:24,  74:11,

14   75:14,  82:8,  94:21,  95:17,  102:5,  102:18,  107:16,
     107:20,  107:21,  108:6,  111:19,  112:7,  112:15,

15   112:22,  113:18,  113:21,  113:23,  114:9,  114:12,
     114:15,  116:17,  116:18,  116:22,  117:2,  117:5,

16   123:19,  127:4,  127:6,  127:11,  128:15,  129:9,  129:12,
     129:13,  129:18,  130:5,  130:6,  137:17,  138:7,  156:13,

17   202:12,  202:16,  203:4,  221:12,  236:25,  255:13

     Order [2] - 161:8,  254:5

18   ordered [2] - 112:16,  112:17

     ordering [1] - 114:19

19   orders [40] - 80:17,  107:14,  107:18,  107:24,  111:10,
     111:12,  111:23,  112:4,  112:18,  112:19,  116:14,

20   127:15,  128:23,  129:3,  129:7,  129:20,  130:3,  138:18,
     138:23,  140:18,  142:17,  147:13,  154:3,  154:4,

21   154:10,  154:14,  156:18,  157:4,  157:15,  158:11,
     166:9,  166:15,  166:20,  168:23,  194:5,  202:5,  202:14,

22   202:21,  244:25

     orient [2] - 87:20,  221:8

23   orients [1] - 216:13

     original [3] - 141:7,  143:10,  257:17

24   originally [1] - 255:11

     osteoarthritis [1] - 59:19

25   otherwise [7] - 177:17,  181:9,  182:3,  183:4,  185:13,
     185:14,  186:20
```

```
1                    Opioid Frye/Mr. Rafalski              318

2    ourselves [1] - 256:7
     outcomes [3] - 71:12, 71:14, 71:22
3    outer [1] - 20:17
     outside [15] - 26:16, 49:11, 49:22, 51:10, 54:23,
4    59:19, 68:21, 82:11, 96:15, 112:10, 125:25, 151:14,
     212:9, 252:15
5    overall [1] - 129:22
     overarching [1] - 106:24
6    overdose [3] - 46:16, 60:10, 60:23
     overdoses [4] - 27:5, 29:17, 30:22, 31:10
7    overly [1] - 7:13
     overseas [1] - 225:8
8    overview [3] - 35:7, 117:11, 121:11
     own [11] - 49:18, 63:22, 124:15, 136:22, 151:9,
9    197:15, 200:12, 201:2, 201:6, 237:15
     Oxycodone [9] - 94:8, 94:17, 96:21, 97:4, 98:11,
10   101:3, 101:4, 127:9, 211:3
     OxyContin [2] - 26:17, 92:8
11

                                P
12

13   p.m [1] - 7:3
     package [1] - 174:17
14   page [63] - 8:24, 10:7, 11:18, 15:6, 18:20, 21:2,
     22:21, 25:6, 33:21, 34:8, 34:11, 34:17, 35:2, 35:20,
15   36:23, 37:17, 39:4, 39:5, 39:20, 41:11, 51:13, 57:3,
     57:9, 141:18, 141:20, 163:5, 164:21, 165:16, 179:14,
16   192:6, 192:10, 193:6, 193:8, 194:2, 194:3, 194:19,
     195:7, 195:9, 195:11, 195:12, 195:14, 195:19,
17   195:25, 198:11, 215:5, 216:12, 216:13, 216:23,
     220:13, 220:19, 221:17, 227:19, 227:23, 227:25,
18   230:6, 230:8, 231:21, 232:20, 245:16, 247:4
     pages [8] - 37:18, 167:3, 176:20, 184:6, 220:25
19   paid [1] - 83:23
     pain [48] - 32:10, 34:21, 35:7, 35:11, 35:13, 35:19,
20   36:8, 36:9, 36:11, 36:15, 36:18, 36:25, 37:5, 37:12,
     38:7, 38:23, 38:24, 39:13, 39:16, 40:3, 40:5, 40:10,
21   40:16, 40:18, 41:13, 42:24, 43:7, 43:17, 44:9,
     52:18, 53:18, 53:23, 57:18, 58:4, 58:18, 58:20,
22   59:15, 59:18, 59:19, 60:3, 94:10, 94:19, 113:9
     Pain [4] - 32:18, 33:9, 36:17, 57:15
23   paints [1] - 115:7
     pandemic [1] - 74:25
24   panel [2] - 58:9, 59:2
     paper [5] - 95:13, 110:13, 170:17, 170:19, 251:25
25   paragraph [8] - 17:22, 41:21, 59:24, 177:17, 196:2,
     231:18, 231:20, 232:7
     paragraphs [5] - 63:5, 63:12, 182:2, 182:19, 185:13
```

```
 1

 2    parameters [2] - 202:9, 251:12
      parcel [1] - 123:25
 3    pardon [1] - 180:18
      parlance [1] - 22:8
 4    Parmaceuticals [1] - 3:3
      part [36] - 14:12, 33:4, 33:6, 35:21, 36:2, 36:7,
 5    36:8, 43:14, 45:13, 60:16, 65:6, 71:14, 71:18,
      110:8, 112:5, 121:21, 122:8, 123:11, 123:15, 123:25,
 6    124:25, 125:3, 126:4, 129:25, 163:21, 169:19,
      169:21, 169:22, 198:8, 204:10, 214:21, 216:20,
 7    225:10, 229:11, 246:3
      Part [3] - 4:5, 75:14, 133:22
 8    PART [1] - 1:2
      partially [2] - 55:24, 56:2
 9    participants [2] - 8:25, 252:3
      participate [3] - 233:14, 238:9, 252:11
10    particles [4] - 16:18, 17:15, 23:14, 23:25
      particular [7] - 47:10, 106:21, 107:4, 124:13,
11    128:5, 128:6, 129:18
      particularly [2] - 125:8, 239:6
12    partly [1] - 139:6
      parts [4] - 33:25, 88:16, 172:24, 174:2
13    partway [1] - 195:25
      party [1] - 257:14
14    Parvin [1] - 5:7
      PARVIN [1] - 2:8
15    pass [3] - 132:10, 204:16, 220:2
      passages [3] - 120:16, 200:8, 200:18
16    passed [3] - 175:22, 176:2, 195:4
      passing [2] - 174:18, 174:23
17    past [4] - 39:14, 39:17, 60:9, 60:21
      paste [2] - 120:14, 201:5
18    pasted [3] - 120:7, 184:15, 187:21
      pathologic [1] - 36:20
19    patient [20] - 8:25, 58:12, 67:12, 71:11, 71:13,
      71:22, 206:5, 206:21, 206:24, 207:11, 212:9, 213:6,
20    214:2, 214:6, 214:9, 215:17, 217:25, 218:4, 218:13,
      251:4
21    patient's [1] - 68:18
      patients [16] - 14:14, 26:15, 27:14, 36:24, 37:11,
22    57:19, 57:24, 58:5, 205:12, 205:18, 209:13, 213:13,
      213:21, 216:17, 237:3, 244:13
23    patients' [3] - 67:15, 67:22, 68:5
      pattern [4] - 108:2, 111:11, 113:19, 116:4
24    patterns [1] - 114:9
      PAUL [1] - 1:16
25    Paul [4] - 3:11, 5:25, 75:22, 134:16
      paused [2] - 139:19, 150:11
```

```
 1                    Opioid Frye/Mr. Rafalski              320

 2     peace [1] - 254:14
       peaked [1] - 210:24
 3     peek [1] - 211:7
       peer [1] - 9:17
 4     peer-reviewed [1] - 9:17
       pen [2] - 170:17, 170:19
 5     pending [2] - 180:17, 180:20
       people [24] - 9:4, 30:11, 37:6, 40:3, 40:4, 59:4,
 6     71:22, 88:7, 88:17, 89:11, 89:12, 90:18, 98:18,
       104:11, 126:2, 130:21, 133:16, 136:11, 161:5,
 7     161:15, 161:20, 204:3, 251:18, 252:10
       people's [1] - 61:10
 8     per [2] - 27:23, 27:24
       percent [12] - 28:25, 40:2, 40:3, 212:25, 219:18,
 9     221:22, 222:14, 222:22, 223:16, 224:22, 225:3
       percentage [2] - 113:25, 213:3
10     perfect [3] - 15:3, 39:11, 39:23
       perform [1] - 159:20
11     performing [1] - 79:16
       perhaps [5] - 9:25, 19:25, 24:23, 56:9, 104:14
12     Perhaps [1] - 26:19
       period [4] - 82:6, 91:3, 97:5, 110:25
13     periodic [1] - 225:23
       periodicals [2] - 224:18, 224:25
14     permission [1] - 134:12
       Perry [1] - 34:5
15     persists [1] - 36:18
       person [4] - 103:21, 115:8, 214:13, 214:15
16     personally [3] - 46:20, 47:6, 63:3
       personnel [2] - 98:2, 100:20
17     Peter [2] - 32:23, 58:17
       phanly@simmonsfirm.com [1] - 1:17
18     pharmaceutical [4] - 44:8, 203:16, 226:8, 231:2
       Pharmaceutical [2] - 96:15, 96:25
19     Pharmaceuticals [3] - 2:10, 2:15, 81:4
       pharmacies [75] - 85:4, 93:9, 93:16, 93:19, 96:23,
20     105:4, 109:9, 109:23, 111:4, 138:18, 138:20, 138:23,
       139:9, 140:15, 142:16, 146:22, 147:4, 147:12,
21     147:18, 147:22, 148:3, 148:10, 149:9, 149:13, 150:2,
       150:6, 150:7, 153:2, 153:13, 154:18, 155:5, 158:7,
22     159:4, 165:25, 166:5, 181:24, 182:10, 182:14,
       187:16, 207:8, 208:10, 208:11, 209:5, 217:19,
23     217:23, 225:18, 227:2, 227:7, 230:22, 234:13,
       234:18, 235:4, 236:25, 237:6, 237:7, 237:12, 237:18,
24     237:20, 237:23, 238:14, 240:5, 240:7, 241:10,
       241:16, 244:8, 244:24, 245:6, 245:22, 246:13,
25     247:15, 247:17, 248:3, 250:10, 253:2
       pharmacist [5] - 99:4, 99:6, 234:3, 244:16
```

2    **pharmacists** [2] - 222:3, 232:21
     **pharmacy** [54] - 93:20, 98:6, 100:11, 107:9, 108:19,
3    110:20, 113:12, 129:14, 138:24, 140:22, 141:3,
     146:16, 148:15, 149:25, 165:22, 188:9, 188:11,
4    188:14, 188:16, 206:3, 206:5, 206:7, 207:15, 207:20,
     207:23, 208:17, 208:23, 209:11, 209:16, 209:21,
5    210:16, 218:2, 218:5, 218:6, 218:15, 234:3, 234:7,
     236:21, 236:25, 237:13, 238:24, 244:14, 244:19,
6    248:8, 248:14, 248:22, 249:4, 249:5, 249:10, 249:19,
     249:24, 250:5, 250:11
7    **phone** [5] - 7:4, 72:6, 72:16, 242:12, 242:13
     **phones** [1] - 118:4
8    **photocopies** [1] - 257:13
     **phrase** [2] - 19:19, 247:5
9    **phrased** [4] - 15:4, 27:18, 73:7, 186:16
     **physical** [4] - 17:19, 23:17, 24:18, 36:25
10   **physicians** [5] - 24:5, 94:17, 94:22, 209:5, 232:21
     **physiochemical** [1] - 16:16
11   **pick** [2] - 72:15, 158:4
     **picked** [1] - 75:19
12   **picking** [2] - 72:6, 172:19
     **picture** [2] - 104:23, 115:7
13   **pictures** [1] - 26:20
     **piece** [9] - 12:17, 12:18, 12:20, 12:25, 13:7, 13:9,
14   122:3, 199:12
     **pieces** [1] - 122:21
15   **pill** [22] - 17:12, 18:3, 18:15, 26:11, 26:14, 26:23,
     27:4, 27:13, 27:23, 31:21, 73:5, 73:16, 212:2,
16   212:5, 212:12, 212:25, 218:9, 226:13, 226:20,
     226:25, 233:18, 251:5
17   **pills** [8] - 17:8, 94:8, 114:15, 114:23, 129:16,
     208:9, 209:15, 209:21
18   **place** [4] - 104:25, 120:15, 202:5, 252:17
     **placed** [2] - 92:11, 173:18
19   **places** [1] - 170:12
     **Plaintiff** [1] - 53:8
20   **plaintiff** [2] - 5:5, 5:8
     **Plaintiff's** [3] - 117:19, 117:21, 189:4
21   **Plaintiffs** [7] - 2:6, 52:21, 53:3, 79:11, 135:21,
     145:21, 254:16
22   **Plaintiffs'** [11] - 15:25, 52:9, 132:7, 135:21,
     143:24, 151:17, 153:22, 154:21, 172:3, 235:15,
23   235:17
     **plan** [1] - 55:8
24   **play** [1] - 62:8
     **played** [2] - 218:25, 251:21
25   **PLLC** [1] - 1:19
     **PMP** [4] - 151:4, 151:5, 151:7, 151:8

pnapoli@napolilaw.com [1] - 1:23
point [31] - 7:7, 10:24, 13:22, 16:7, 16:24, 16:25, 17:17, 25:4, 59:12, 70:12, 92:15, 105:20, 106:19, 107:13, 110:15, 112:4, 115:3, 116:13, 119:24, 121:3, 121:18, 122:19, 125:6, 125:16, 165:10, 188:21, 223:11, 232:25, 235:11, 239:5, 248:5
pointed [1] - 16:14
pointer [1] - 77:11
pointers [2] - 6:15, 77:9
pointing [1] - 236:16
points [6] - 14:2, 17:3, 135:8, 177:22, 186:9, 186:12
police [11] - 86:17, 86:23, 86:25, 88:3, 88:20, 88:24, 89:4, 90:22, 91:21, 131:17, 133:14
Police [2] - 86:7, 87:13
policies [11] - 82:8, 95:18, 97:22, 123:10, 140:5, 142:2, 142:4, 168:21, 168:22, 192:15
policy [1] - 58:18
Polster [1] - 133:9
Polster's [1] - 49:2
portion [5] - 27:17, 39:23, 153:10, 243:19, 250:18
portions [6] - 42:11, 140:6, 158:21, 173:13, 180:23, 196:23
posing [1] - 216:17
position [2] - 76:18, 103:12
positions [1] - 233:15
positive [2] - 141:25, 148:6
possess [1] - 147:12
possession [3] - 21:23, 72:14, 170:23
possibility [2] - 248:16, 250:6
possible [7] - 58:20, 128:13, 135:12, 135:14, 151:11, 220:10, 255:8
post [1] - 12:24
potential [8] - 20:19, 24:5, 24:16, 25:3, 214:22, 216:22, 251:21
potentially [5] - 90:23, 113:4, 114:13, 116:12, 130:3
power [6] - 234:15, 234:18, 235:3, 248:7, 248:8, 248:9
practical [1] - 129:10
practically [1] - 129:10
practice [8] - 65:24, 68:22, 73:10, 168:7, 190:2, 200:25, 201:5, 226:4
practices [9] - 40:18, 53:18, 60:3, 61:6, 61:19, 73:10, 73:11, 73:12, 106:14
practitioners [1] - 209:17
pre [5] - 230:9, 230:14, 230:25, 232:8, 232:22
pre-registration [5] - 230:9, 230:14, 230:25, 232:8,

232:22
**preamble** [2] - 186:9, 186:19
**precise** [4] - 150:16, 215:5, 236:15, 246:18
**precisely** [2] - 173:9, 191:17
**precision** [1] - 141:15
**preclude** [1] - 148:6
**preliminary** [2] - 79:6, 101:7
**prepare** [3] - 167:9, 172:21, 173:11
**prepared** [3] - 33:11, 118:10, 189:5
**preparing** [2] - 118:25, 164:8
**preregistration** [2] - 106:3, 106:10
**prescribe** [2] - 59:3, 225:21
**prescribed** [6] - 25:20, 26:3, 30:7, 32:5, 92:9, 214:3
**prescriber** [1] - 234:2
**prescribers** [2] - 150:7, 150:8
**prescribing** [1] - 72:19
**Prescription** [2] - 12:9, 151:4
**prescription** [68] - 28:25, 29:10, 29:11, 30:3, 30:19, 30:24, 47:25, 48:2, 60:11, 60:23, 61:2, 61:6, 61:8, 66:4, 68:3, 70:13, 70:16, 150:21, 150:23, 203:19, 204:8, 204:13, 206:2, 206:4, 206:8, 206:20, 207:3, 207:9, 207:10, 207:14, 207:16, 207:17, 207:24, 207:25, 208:5, 208:6, 208:15, 208:19, 208:22, 208:24, 210:16, 210:22, 211:11, 218:5, 218:14, 225:8, 225:15, 225:16, 225:19, 225:22, 233:5, 233:18, 234:8, 234:9, 234:14, 234:21, 235:25, 236:4, 236:13, 236:17, 237:14, 238:13, 238:14, 244:8, 245:24, 247:14, 247:17, 251:4
**prescription's** [1] - 29:19
**prescriptions** [46] - 26:17, 26:23, 27:4, 27:12, 27:15, 29:19, 45:6, 45:16, 45:17, 46:14, 48:11, 49:9, 49:10, 63:3, 63:10, 63:18, 65:5, 66:14, 66:23, 67:6, 150:19, 150:24, 166:5, 205:19, 206:18, 206:20, 208:12, 209:4, 209:5, 209:10, 209:11, 209:17, 209:23, 210:21, 211:11, 211:12, 211:23, 226:15, 234:9, 234:14, 234:20, 244:13, 244:18, 249:22, 249:25, 250:5
**presence** [1] - 98:2
**presentation** [1] - 35:3
**president** [2] - 98:5, 99:3
**President** [2] - 33:2, 56:18
**presiding** [1] - 4:6
**pretrial** [1] - 202:14
**pretty** [4] - 81:24, 110:6, 191:18, 194:7
**prevalence** [3] - 38:22, 38:23, 40:9
**prevent** [2] - 123:2, 230:19
**prevention** [3] - 102:5, 104:22, 107:5

**previous** [17] - 79:8, 101:8, 109:17, 111:3, 113:2, 114:9, 115:15, 124:10, 140:25, 164:18, 164:20, 170:24, 185:10, 207:19, 219:20, 219:21, 225:13

**previously** [10] - 101:11, 115:17, 125:10, 148:17, 167:19, 170:16, 187:11, 222:17, 224:19, 231:7

**price** [1] - 109:11

**primarily** [3] - 38:6, 92:13, 173:19

**primary** [2] - 57:25, 126:10

**print** [1] - 175:10

**private** [2] - 189:23, 190:4

**problem** [4] - 35:8, 94:13, 103:15, 254:19

**problems** [2] - 58:18, 109:12

**procedure** [1] - 123:15

**procedures** [6] - 82:8, 82:9, 82:21, 123:9, 123:10, 123:13

**proceed** [6] - 56:6, 78:14, 104:12, 134:20, 181:2, 201:18

**process** [10] - 83:15, 93:14, 127:17, 135:25, 225:9, 230:25, 233:21, 243:12, 251:4, 251:14

**processes** [2] - 36:20, 138:8

**produce** [1] - 235:25

**produced** [5] - 143:8, 145:5, 145:19, 151:22, 152:7

**product** [3] - 86:21, 100:22, 117:7

**products** [4] - 97:4, 100:11, 101:2, 101:4

**Products** [1] - 34:14

**profession** [6] - 43:8, 43:18, 79:7, 86:24, 211:18, 251:5

**professional** [11] - 76:14, 76:15, 84:4, 132:2, 207:10, 207:17, 208:2, 208:25, 225:15, 234:20, 249:21

**professionals** [5] - 205:19, 209:6, 209:12, 209:23, 211:10

**program** [8] - 34:21, 105:20, 105:23, 122:20, 122:22, 122:23, 150:22, 156:11

**Program's** [1] - 151:5

**progressive** [1] - 36:25

**prohibited** [1] - 132:21

**promote** [1] - 58:2

**promoted** [1] - 68:2

**Promotion** [1] - 12:9

**promotion** [2] - 47:25, 66:5

**promotional** [15] - 10:17, 12:17, 12:18, 12:19, 12:20, 12:25, 13:7, 13:8, 13:18, 14:6, 15:11, 47:15, 66:10, 67:19, 74:7

**proofs** [1] - 91:13

**proper** [1] - 200:4

**properly** [2] - 71:24, 208:2

**properties** [1] - 16:16

```
 1                     Opioid Frye/Mr. Rafalski                     325

 2      prosecutions [1] - 89:2
        protocols [1] - 202:16
 3      prove [2] - 171:15, 172:10
        proved [1] - 21:11
 4      provide [9] - 12:20, 178:16, 178:17, 212:16, 212:22,
        213:13, 234:16, 238:14, 244:7
 5      provided [9] - 37:24, 120:18, 137:25, 138:3, 150:15,
        154:21, 171:6, 183:21, 187:24
 6      provider [1] - 226:7
        providing [4] - 146:21, 186:10, 247:14, 247:17
 7      pschmidt@cov.com [1] - 3:12
        PSS [1] - 3:9
 8      psychopathology [1] - 36:21
        public [1] - 149:24
 9      pull [14] - 11:18, 17:4, 18:4, 34:18, 41:16, 41:20,
        42:2, 51:12, 52:4, 82:23, 141:16, 163:4, 198:10,
10      231:20
        pulled [3] - 69:12, 162:11, 199:22
11      purchase [1] - 127:12
        purchases [1] - 127:9
12      purely [1] - 109:10
        purport [1] - 154:17
13      purported [1] - 251:20
        purpose [4] - 203:21, 203:25, 214:3, 230:14
14      purposes [2] - 52:11, 192:9
        pushed [1] - 33:7
15      put [34] - 28:6, 40:24, 41:5, 60:2, 63:24, 77:12,
        129:17, 135:9, 155:21, 156:10, 156:21, 158:24,
16      159:10, 160:2, 160:25, 164:14, 170:17, 170:19,
        173:23, 175:7, 176:2, 176:21, 180:10, 192:7, 198:12,
17      200:13, 200:19, 204:14, 204:16, 215:17, 220:18,
        245:15, 249:14, 250:11
18      putting [4] - 10:15, 48:9, 161:20, 172:25

19                                  Q

20      qualifications [1] - 84:12
        qualified [1] - 240:7
21      qualify [2] - 213:24, 240:9
        quantification [4] - 27:23, 45:9, 63:15, 212:24
22      quantified [1] - 46:17
        quantify [21] - 26:23, 27:3, 27:11, 27:19, 28:20,
23      29:7, 29:15, 30:14, 31:9, 43:5, 43:10, 43:15, 45:5,
        45:14, 46:13, 62:3, 62:5, 62:15, 63:2, 73:20, 212:18
24      quantitate [2] - 63:15, 63:22
        quantitative [1] - 72:18
25      quantities [3] - 108:23, 109:4, 110:23
        quarantine [2] - 78:25, 255:13
```

Opioid Frye/Mr. Rafalski                     326

**quarter** [1] - 56:3
**questioned** [1] - 60:14
**questioning** [4] - 8:2, 25:12, 132:20, 228:13
**questions** [45] - 6:2, 6:3, 17:5, 19:24, 20:2, 26:9,
32:3, 52:4, 56:20, 59:23, 62:2, 62:5, 62:16, 71:9,
74:9, 77:11, 79:6, 102:25, 130:23, 131:9, 134:13,
135:13, 135:18, 135:24, 147:3, 171:19, 171:23,
171:24, 175:2, 191:22, 199:4, 203:15, 203:19,
215:14, 215:16, 215:22, 235:23, 239:10, 244:6,
248:11, 250:15, 253:9, 253:10, 253:14, 255:7
**quibble** [1] - 14:9
**quick** [6] - 53:16, 55:8, 55:12, 55:20, 57:5, 199:6
**quickly** [9] - 55:21, 70:11, 102:9, 122:21, 145:8,
172:22, 173:12, 176:18, 195:10
**quite** [7] - 70:15, 72:19, 92:25, 114:5, 118:18,
130:14, 176:18
**quota** [2] - 233:13, 236:9
**quotas** [2] - 233:5, 233:9
**quotations** [1] - 58:5
**quote** [6] - 24:4, 62:3, 62:14, 147:4, 147:12, 163:14
**quoting** [1] - 58:4

# R

**R- A- F- A- L- S- K- I** [1] - 76:17
**Radford** [17] - 18:19, 20:25, 22:20, 25:5, 31:17,
31:23, 33:15, 33:22, 34:9, 34:18, 35:4, 35:20,
38:14, 39:5, 39:22, 51:12, 51:25
**Rafalski** [46] - 1:10, 75:6, 76:7, 76:16, 77:4,
78:18, 79:4, 80:11, 86:8, 86:18, 87:9, 88:3, 98:16,
102:3, 104:19, 126:23, 128:2, 131:8, 132:23, 134:2,
134:6, 134:25, 135:19, 138:7, 139:21, 144:6, 155:24,
171:19, 175:25, 176:25, 180:17, 180:21, 184:18,
192:19, 195:19, 198:24, 199:25, 203:10, 204:18,
215:19, 242:6, 242:8, 242:10, 245:25, 251:2, 254:6
**RAFALSKI** [2] - 76:4, 76:10
**Rafalski's** [5] - 76:2, 76:22, 141:16, 160:18, 194:24
**raise** [1] - 76:7
**raised** [1] - 19:6
**ran** [2] - 179:21, 180:5
**randomly** [1] - 82:23
**range** [2] - 166:4, 211:8
**rarely** [1] - 232:22
**rate** [4] - 48:12, 49:20, 50:20, 51:18
**rates** [2] - 49:7, 73:20
**raw** [1] - 151:6
**RDC** [2] - 241:15, 241:18
**RE** [1] - 1:4

**Re** [1] - 4:10
**re** [1] - 136:17
**re-ask** [1] - 136:17
**reach** [4] - 67:24, 71:24, 242:11, 242:13
**reached** [5] - 47:20, 84:3, 138:10, 146:6, 255:14
**reaches** [1] - 112:7
**reaching** [1] - 64:5
**read** [32] - 26:14, 26:21, 57:10, 57:25, 60:13,
67:15, 80:14, 146:14, 151:12, 158:15, 158:21,
158:23, 159:8, 162:19, 162:22, 162:25, 163:7, 163:9,
163:11, 163:15, 171:21, 179:20, 179:22, 179:24,
198:21, 205:22, 224:17, 224:25, 232:11, 243:20,
246:7, 246:10
**reading** [6] - 41:18, 56:24, 161:5, 180:14, 188:9,
223:24
**ready** [2] - 137:12, 180:8
**real** [5] - 10:17, 11:3, 11:21, 13:12, 14:7
**realize** [2] - 228:10, 240:7
**really** [19] - 37:20, 69:10, 98:11, 99:11, 99:12,
100:14, 100:17, 117:10, 118:7, 118:11, 125:18,
138:7, 145:16, 145:25, 173:17, 212:23, 213:18,
216:6, 240:15
**reason** [6] - 113:8, 163:21, 172:20, 255:3, 255:4,
255:6
**reasonable** [2] - 84:3, 132:2
**reasons** [3] - 104:22, 109:11, 126:11
**rebellion** [1] - 86:16
**reboot** [2] - 104:5, 104:7
**recalling** [1] - 28:8
**receive** [3] - 118:24, 120:3, 248:24
**received** [12] - 27:15, 65:3, 104:10, 119:4, 132:23,
136:5, 141:9, 144:22, 169:16, 169:25, 174:13, 175:11
**receiving** [1] - 9:2
**recently** [1] - 85:19
**recess** [7] - 75:13, 75:17, 132:12, 133:18, 201:16,
252:19, 253:20
**reclarify** [1] - 66:9
**recognize** [6] - 130:23, 152:3, 152:4, 210:3, 225:6,
229:7
**recognized** [2] - 21:24, 196:15
**recollection** [7] - 15:3, 20:20, 37:23, 57:21, 58:6,
58:23, 171:5
**recommendations** [2] - 33:13, 57:20
**record** [29] - 20:22, 21:24, 22:12, 23:18, 23:21,
24:13, 24:14, 25:23, 25:24, 48:17, 49:12, 49:22,
51:11, 53:13, 53:14, 62:6, 62:14, 63:14, 75:21,
76:15, 78:3, 97:20, 115:24, 123:10, 132:18, 174:21,
182:24, 238:20, 256:10

recordkeeping [3] - 93:21, 104:24, 105:4
records [13] - 67:15, 82:23, 91:10, 91:11, 95:3, 95:13, 115:10, 146:23, 153:17, 153:18, 153:19, 153:20, 241:13
recover [1] - 88:17
recovery [1] - 88:9
recruited [2] - 89:16, 89:20
recurs [1] - 36:19
red [1] - 65:17
redirect [5] - 42:11, 54:15, 55:7, 74:13, 180:21
REDIRECT [1] - 55:17
refer [4] - 14:21, 63:25, 135:23, 195:7
reference [6] - 42:15, 44:21, 53:20, 159:13, 192:8, 246:22
referenced [2] - 7:25, 28:12
referred [6] - 12:13, 28:7, 52:12, 151:5, 212:2, 213:16
referring [1] - 15:2
refers [4] - 156:24, 157:12, 213:9, 213:12
reflected [1] - 171:8
refresh [6] - 17:4, 18:5, 37:16, 37:22, 41:2, 44:13
regard [4] - 20:17, 24:15, 24:16, 66:10
regarding [27] - 61:5, 102:25, 137:9, 137:13, 140:15, 140:17, 140:21, 141:2, 141:5, 141:9, 148:3, 150:5, 154:18, 155:4, 159:4, 169:17, 170:5, 176:4, 182:9, 183:25, 192:13, 193:13, 194:11, 196:9, 222:14, 250:9
regards [7] - 107:18, 125:11, 168:22, 190:14, 190:21, 223:2, 251:10
registered [2] - 99:4, 238:10
registrant [17] - 107:3, 107:7, 107:10, 107:14, 107:19, 108:6, 111:9, 112:14, 112:15, 113:5, 113:6, 116:17, 231:17, 231:19, 231:23, 231:25, 232:20
registrants [5] - 94:20, 105:2, 105:8, 232:9, 244:10
Registration [1] - 105:20
registration [12] - 94:20, 105:23, 225:24, 226:16, 230:9, 230:14, 230:17, 230:21, 230:25, 232:8, 232:22, 238:15
registrations [1] - 105:25
regs [1] - 13:7
regulation [2] - 107:17, 116:16
regulations [10] - 7:10, 7:21, 8:7, 14:22, 104:21, 105:10, 105:14, 105:16, 106:24, 149:6
Regulations [1] - 106:18
regulatory [8] - 13:19, 61:19, 70:2, 109:12, 121:19, 121:24, 229:18, 232:6
reinforces [2] - 59:12, 59:16
REISMAN [5] - 2:4, 2:20, 5:11, 253:7, 253:12

**Reisman** [2] - 5:12, 253:8
**rejoin** [1] - 242:15
**relate** [1] - 73:17
**related** [8] - 95:18, 97:22, 110:16, 119:11, 169:23, 170:3, 221:15, 244:24
**relates** [1] - 168:21
**relationship** [5] - 90:3, 165:25, 206:24, 207:4, 212:9
**relative** [1] - 243:24
**relatively** [1] - 163:24
**relativity** [1] - 153:25
**released** [1] - 40:19
**releases** [1] - 149:17
**relevance** [2] - 16:5, 68:24
**relevancy** [1] - 15:18
**relevant** [13] - 55:23, 63:11, 64:14, 66:21, 68:18, 68:25, 71:8, 72:15, 154:22, 162:16, 162:18, 163:23, 231:6
**reliability** [2] - 19:20, 73:11
**reliable** [9] - 70:5, 71:3, 71:15, 72:2, 72:10, 72:23, 73:25, 83:19, 96:4
**relied** [4] - 26:5, 48:16, 132:6, 231:5
**relieving** [1] - 58:20
**rely** [3] - 124:16, 126:2, 132:24
**relying** [2] - 62:6, 63:8
**remain** [2] - 133:20, 249:12
**remainder** [3] - 7:2, 253:20, 253:24
**remains** [1] - 249:6
**remember** [23] - 16:21, 21:20, 86:7, 137:9, 152:22, 155:14, 164:6, 164:9, 189:7, 197:23, 198:2, 198:5, 204:19, 204:21, 204:23, 220:4, 222:20, 231:13, 233:11, 245:5, 245:12, 248:6, 248:10
**remind** [4] - 6:7, 6:8, 134:5, 134:6
**remotely** [5] - 74:24, 78:22, 135:2, 135:3, 135:5
**remove** [3] - 169:22, 170:2, 170:9
**removed** [3] - 170:13, 183:2, 242:14
**rendered** [1] - 193:10
**reorganizing** [1] - 92:20
**repeat** [2] - 6:18, 209:8
**repeatedly** [1] - 62:5
**rephrase** [3] - 31:5, 31:6, 144:13
**replaced** [1] - 183:3
**reply** [1] - 241:12
**report** [196] - 16:14, 16:21, 17:23, 27:21, 30:18, 33:12, 37:13, 38:12, 38:19, 38:22, 40:18, 40:24, 41:8, 42:16, 44:16, 44:22, 46:2, 46:18, 48:20, 49:2, 52:13, 52:16, 52:18, 53:19, 53:24, 54:4, 56:18, 57:4, 57:22, 59:16, 60:4, 60:16, 60:20, 63:4, 63:5,

63:12, 63:16, 85:6, 85:11, 85:16, 85:20, 98:10,
107:14, 116:19, 117:2, 117:12, 117:13, 117:20,
118:13, 118:16, 118:18, 118:22, 118:25, 120:9,
120:16, 121:4, 121:7, 121:8, 124:3, 125:4, 132:7,
135:20, 135:25, 136:3, 136:18, 136:22, 136:25,
137:6, 137:9, 137:13, 138:2, 138:14, 138:15, 138:17,
138:22, 139:2, 139:3, 140:3, 140:5, 140:6, 140:7,
140:9, 140:25, 141:7, 142:10, 142:11, 142:15,
143:10, 147:13, 147:19, 150:18, 153:14, 153:18,
154:9, 158:7, 158:11, 159:14, 162:13, 162:16, 164:3,
164:9, 164:24, 165:14, 167:9, 167:15, 167:25,
168:19, 168:20, 169:16, 169:25, 170:3, 170:4,
170:13, 170:14, 172:21, 173:2, 173:5, 173:11,
173:14, 173:18, 173:19, 173:22, 173:23, 174:3,
176:8, 177:5, 177:10, 177:24, 183:25, 187:25,
188:14, 188:20, 189:3, 189:4, 189:14, 189:17,
190:12, 191:3, 191:24, 192:5, 192:7, 192:14, 193:7,
194:25, 196:24, 197:14, 197:22, 198:3, 199:17,
200:5, 200:9, 200:14, 200:18, 200:21, 201:22,
202:19, 202:21, 202:22, 202:24, 203:6, 203:8,
204:20, 205:5, 210:13, 212:13, 218:17, 218:23,
219:6, 230:6, 232:25, 235:9, 237:7, 237:24, 238:2,
239:20, 239:25, 240:3, 240:12, 240:19, 241:10,
247:12, 247:16, 247:20, 248:21, 249:15, 251:6,
251:10, 251:11, 251:12, 251:15, 252:9

**Report** [1] - 220:25

**reported** [6] - 80:17, 83:4, 107:21, 116:14, 249:4, 249:10

**Reporter** [2] - 257:8, 257:22

**reporter** [1] - 243:20

**REPORTER** [1] - 3:23

**reporting** [2] - 107:16, 194:4

**reports** [11] - 61:5, 118:6, 118:12, 181:9, 189:5, 189:15, 189:22, 190:3, 202:6, 202:8, 202:15

**represent** [1] - 64:23

**representation** [2] - 42:18, 120:22

**reproducible** [2] - 46:22, 47:9

**reproducing** [1] - 42:11

**request** [11] - 44:8, 54:14, 82:4, 82:7, 119:7, 119:8, 119:15, 119:22, 154:20, 180:25, 184:11

**requested** [9] - 90:2, 95:3, 101:10, 153:24, 157:21, 230:17, 235:14, 243:19, 254:16

**requests** [1] - 119:21

**require** [6] - 78:3, 82:7, 106:7, 114:17, 116:23, 184:16

**required** [4] - 12:19, 111:21, 232:22, 249:14

**requirement** [2] - 12:23, 238:17

**requirements** [6] - 9:22, 10:10, 105:13, 106:15,

108:4, 128:24
**requires** [2] - 107:14, 107:18
**requiring** [1] - 42:10
**research** [13] - 44:6, 57:18, 58:2, 58:20, 67:14,
101:7, 211:16, 212:22, 219:12, 224:17, 224:25,
249:13, 251:13
**researchers** [1] - 8:24
**researching** [1] - 247:23
**reshuffling** [1] - 92:20
**resistant** [1] - 21:17
**resolved** [1] - 148:22
**respect** [5] - 93:8, 93:15, 102:6, 125:4, 202:15
**respective** [1] - 149:10
**respond** [1] - 172:15
**responded** [1] - 125:13
**response** [18] - 20:13, 44:7, 58:15, 62:4, 62:15,
140:2, 172:8, 195:3, 197:5, 197:6, 197:11, 206:20,
207:9, 208:24, 212:15, 212:23, 213:4, 246:10
**responses** [3] - 172:5, 172:13, 172:16
**responsibilities** [5] - 123:7, 128:21, 225:11,
230:18, 231:11
**responsibility** [3] - 94:8, 212:19, 251:17
**responsible** [9] - 46:24, 47:10, 212:25, 213:2,
214:5, 214:10, 214:14, 214:16, 241:23
**rest** [4] - 30:5, 67:25, 70:10, 246:8
**restricted** [1] - 95:6
**restrictions** [1] - 255:13
**result** [2] - 173:21, 214:17
**resulted** [3] - 35:13, 60:10, 60:22
**resulting** [2] - 125:17, 159:12
**results** [5] - 9:16, 23:14, 23:25, 126:6, 159:16
**retail** [3] - 108:18, 109:9, 237:18
**retained** [4] - 79:10, 115:5, 115:6, 115:18
**retention** [1] - 123:10
**retired** [2] - 76:17, 79:8
**retrieving** [1] - 119:17
**returned** [2] - 91:20, 99:19
**review** [66] - 18:16, 20:23, 22:12, 67:22, 70:23,
71:11, 115:19, 122:19, 123:18, 123:23, 124:19,
125:17, 126:5, 138:2, 142:21, 146:23, 147:21,
150:12, 151:18, 151:20, 152:12, 152:21, 153:8,
153:12, 153:16, 154:4, 154:17, 154:25, 155:9,
155:17, 156:7, 156:9, 156:17, 156:18, 156:25, 157:2,
157:5, 157:13, 157:14, 157:16, 158:6, 158:9, 159:11,
159:19, 160:20, 160:21, 160:22, 162:8, 162:13,
163:21, 163:23, 166:19, 176:3, 178:11, 179:17,
184:11, 184:15, 184:16, 187:2, 193:16, 197:9,
197:11, 241:6, 241:22, 244:15, 250:9

**Review** [1] - 229:17
**reviewed** [27] - 9:17, 142:25, 143:4, 143:8, 143:11, 143:24, 145:13, 145:22, 150:4, 150:14, 152:24, 153:9, 154:13, 155:4, 159:3, 162:5, 170:20, 172:16, 179:3, 180:4, 182:21, 183:21, 184:9, 187:25, 222:11, 225:24
**reviewing** [7] - 153:4, 161:4, 164:8, 164:24, 200:11, 223:19, 241:13
**Reynolds** [3] - 155:22, 218:21, 220:16
**riddled** [1] - 193:9
**rise** [1] - 4:2
**risk** [3] - 14:14, 47:17, 48:4
**Road** [1] - 1:20
**robust** [1] - 115:4
**Rochester** [6] - 240:22, 241:2, 241:6, 241:14, 241:21, 243:24
**role** [12] - 93:5, 131:22, 175:3, 211:17, 212:12, 218:24, 235:10, 235:12, 237:25, 241:18, 243:24
**rolling** [2] - 127:6, 127:7
**Romulus** [7] - 87:13, 87:19, 88:20, 88:24, 89:6, 90:20, 90:21
**room** [3] - 77:2, 136:9, 242:18
**rooms** [1] - 149:11
**row** [1] - 205:14
**RPR** [3] - 3:22, 257:7, 257:21
**rule** [1] - 207:13
**ruling** [1] - 133:10
**run** [2] - 89:4, 89:5
**running** [1] - 142:3
**runs** [1] - 167:2

## S

**safeguard** [1] - 231:2
**safely** [2] - 113:14, 214:13
**sale** [1] - 122:16
**sales** [8] - 27:7, 30:23, 31:10, 48:2, 48:3, 63:20, 247:21
**Salvatore** [1] - 4:20
**SALVATORE** [1] - 1:22
**sample** [1] - 82:24
**sampling** [1] - 153:10
**Sandy** [1] - 256:6
**sareisman@jonesday.com** [1] - 2:22
**save** [3] - 77:24, 205:23, 205:24
**saw** [9] - 42:16, 44:19, 151:5, 155:8, 161:21, 175:17, 177:18, 188:19, 191:13
**sbadala@napolilaw.com** [1] - 1:24

sbrody@omm.com [1] - 2:13
scenarios [1] - 129:12
scene [1] - 88:4
schedule [3] - 154:11, 254:4, 255:16
Schedule [2] - 159:13, 159:16
scheduled [2] - 254:9, 255:21
schemes [1] - 70:2
SCHMIDT [52] - 5:24, 75:22, 79:24, 80:6, 102:20,
103:11, 103:17, 104:9, 130:7, 130:11, 130:13,
134:15, 134:22, 134:24, 139:18, 144:14, 155:21,
160:3, 160:8, 160:16, 174:14, 175:6, 175:21, 180:8,
180:16, 180:19, 184:24, 195:2, 195:6, 195:9, 195:14,
198:10, 199:21, 201:8, 201:19, 203:4, 216:5, 216:11,
218:19, 219:13, 220:16, 228:24, 229:22, 229:25,
230:4, 242:5, 242:18, 243:3, 247:9, 250:19, 250:24,
252:16
Schmidt [9] - 3:11, 5:25, 75:22, 134:16, 201:18,
203:2, 242:16, 243:2, 243:21
school [1] - 86:20
scientist [1] - 17:20
scientists [1] - 57:17
scope [7] - 27:25, 45:20, 45:21, 45:23, 45:25,
46:18, 54:23
screen [20] - 33:19, 41:20, 56:25, 63:24, 103:23,
131:5, 141:19, 155:22, 175:7, 176:3, 176:22, 176:24,
180:11, 192:8, 198:13, 199:19, 204:14, 204:17,
204:22, 204:25
se [2] - 27:23, 27:24
search [2] - 95:5, 153:16
searches [2] - 151:9, 153:25
searching [1] - 153:21
seat [1] - 6:12
seated [4] - 4:8, 6:11, 76:13, 133:21
second [16] - 28:16, 66:13, 80:4, 84:15, 91:10,
98:20, 106:19, 109:5, 136:4, 150:11, 156:12, 179:23,
222:19, 230:13, 244:6, 254:21
secondary [1] - 241:15
section [17] - 15:15, 36:16, 39:7, 106:25, 107:2,
177:3, 182:18, 182:24, 182:25, 183:5, 185:2, 185:5,
185:24, 201:22, 203:13, 232:6, 250:20
Section [2] - 232:5, 232:13
sections [5] - 39:6, 84:9, 120:8, 120:16, 158:22
security [6] - 104:24, 105:5, 106:15, 106:25, 107:2,
133:15
see [153] - 13:8, 15:14, 18:6, 21:12, 27:21, 33:18,
33:20, 33:22, 33:24, 34:9, 34:19, 35:2, 35:5, 39:16,
39:18, 39:21, 41:11, 42:3, 42:15, 42:19, 43:21,
43:23, 43:25, 44:15, 44:21, 55:23, 56:2, 56:5, 57:9,

60:5, 65:11, 67:20, 68:15, 76:2, 76:22, 80:11, 80:12, 83:3, 86:4, 94:6, 99:11, 100:10, 110:10, 112:3, 115:14, 118:17, 123:4, 123:6, 123:20, 124:21, 125:9, 126:6, 127:14, 132:16, 134:25, 145:12, 149:17, 152:10, 153:17, 163:3, 163:14, 163:16, 165:2, 165:3, 165:4, 173:25, 175:9, 175:11, 175:12, 175:19, 176:6, 176:15, 176:24, 177:2, 177:10, 177:14, 177:23, 178:2, 178:6, 179:16, 179:18, 179:19, 181:7, 181:23, 182:10, 184:2, 184:7, 185:4, 185:23, 185:24, 185:25, 186:8, 192:16, 193:10, 194:5, 194:8, 196:2, 196:6, 198:15, 204:22, 204:24, 205:12, 205:13, 205:14, 205:15, 205:20, 206:4, 206:9, 206:25, 211:7, 211:23, 213:6, 215:16, 215:20, 215:21, 216:3, 216:15, 216:25, 217:5, 217:8, 217:9, 220:10, 220:19, 221:4, 221:9, 221:15, 221:18, 221:23, 222:9, 228:6, 228:9, 228:11, 228:16, 228:20, 229:15, 229:16, 229:20, 230:8, 230:11, 230:12, 230:19, 231:8, 231:25, 232:11, 232:23, 232:24, 241:13, 242:12, 243:13, 247:25, 250:8, 256:7

**SEEGER** [1] - 2:6

**Seeger** [1] - 5:7

**seeing** [3] - 135:2, 197:4, 204:21

**seek** [2] - 21:10, 248:23

**seeking** [1] - 253:3

**seem** [1] - 17:24

**self** [2] - 237:13, 237:20

**sell** [5] - 30:4, 109:20, 110:22, 236:4, 238:13

**selling** [5] - 214:4, 214:21, 216:19, 216:20, 238:23

**sells** [1] - 218:6

**semi** [1] - 95:12

**send** [3] - 13:17, 13:23, 79:25

**sending** [3] - 94:8, 97:3, 111:24

**sends** [3] - 13:2, 13:24, 14:11

**sense** [5] - 27:9, 77:9, 129:11, 138:11, 157:8

**sent** [5] - 41:15, 41:16, 80:4, 80:5, 178:22

**sentence** [7] - 59:23, 60:7, 181:8, 192:13, 194:5, 230:13, 232:2

**sentences** [2] - 15:13, 59:24

**separate** [4] - 25:24, 84:7, 84:8, 253:4

**separately** [1] - 63:22

**September** [7] - 229:15, 254:11, 254:17, 254:21, 254:22, 255:23, 256:8

**series** [3] - 177:21, 177:22, 186:8

**serious** [1] - 35:7

**serve** [2] - 203:20, 203:25

**served** [3] - 97:18, 99:16, 101:9

**server** [1] - 95:7

**services** [1] - 83:10

Services [1] - 222:9
session [3] - 4:5, 75:15, 133:22
set [13] - 75:9, 91:10, 106:3, 109:6, 111:25, 114:7, 121:19, 125:25, 138:13, 145:4, 152:4, 244:6, 254:4
sets [3] - 91:11, 233:18, 239:9
setting [4] - 151:15, 203:11, 217:4, 233:5
setup [1] - 216:7
seven [2] - 91:2, 91:3
several [2] - 89:25, 121:13
severe [3] - 37:11, 58:3, 59:19
Seymour [1] - 34:4
Sgtreet [1] - 2:7
SHARYL [1] - 2:20
Sharyl [1] - 253:7
sheet [1] - 53:2
shell [1] - 20:17
Sheriff's [1] - 86:6
sheriffs [1] - 87:2
shift [3] - 26:8, 91:22, 201:8
shifted [3] - 92:21, 92:23, 95:14
ship [2] - 117:2, 117:7
shipment [3] - 112:9, 114:16, 128:4
shipments [1] - 196:5
shipped [1] - 117:9
shipping [4] - 96:21, 96:22, 96:23, 248:20
shjones@jonesday.com [1] - 2:21
Shkolnik [8] - 4:15, 8:2, 19:5, 19:13, 32:4, 54:19, 55:7, 55:22
SHKOLNIK [29] - 1:19, 4:15, 18:21, 18:23, 19:10, 30:25, 41:25, 49:25, 50:3, 50:6, 50:22, 53:15, 54:3, 54:6, 54:9, 55:8, 55:16, 55:18, 56:12, 56:14, 57:2, 61:25, 62:10, 62:12, 69:24, 74:8, 75:7, 75:10, 253:22
shoppers [2] - 213:10, 218:9
shopping [1] - 214:20
Short [1] - 254:5
short [3] - 75:13, 167:14, 201:16
Show [1] - 161:8
show [22] - 14:24, 22:13, 59:21, 65:9, 79:20, 100:16, 179:11, 193:2, 193:24, 204:18, 215:10, 215:24, 215:25, 216:6, 216:7, 216:12, 219:24, 227:21, 228:2, 228:25, 229:3
showed [4] - 38:5, 59:23, 184:11, 220:9
showing [2] - 56:8, 56:24
shown [2] - 57:4, 220:4
shows [2] - 20:22, 205:18
shut [3] - 235:4, 235:5, 248:8
siblings [1] - 86:23

**side** [16] - 65:14, 65:20, 134:18, 151:17, 151:19, 172:2, 172:3, 176:10, 196:17, 196:20, 197:4, 197:12, 202:18, 213:5, 236:25

**sides** [1] - 130:24

**signature** [1] - 257:17

**significant** [4] - 118:12, 118:17, 130:20, 153:10

**similar** [6] - 69:19, 111:4, 133:10, 148:25, 215:16, 215:22

**SIMMONS** [1] - 1:14

**simple** [4] - 44:20, 112:13, 157:18, 158:5

**simpler** [1] - 173:24

**simply** [9] - 24:25, 77:17, 77:20, 157:11, 199:17, 200:4, 200:9, 200:25, 201:5

**sing** [2] - 242:25

**single** [1] - 47:23

**sit** [3] - 133:25, 149:10, 173:10

**site** [12] - 88:9, 97:15, 97:17, 97:24, 101:5, 101:16, 101:20, 101:24, 101:25, 106:12

**sitting** [3] - 130:21, 149:11, 188:21

**situation** [9] - 10:16, 11:2, 11:20, 13:11, 13:15, 15:7, 94:23, 173:5, 223:21

**six** [4] - 39:14, 39:18, 92:19, 93:17

**size** [5] - 96:20, 107:25, 110:22, 111:4, 111:11

**skill** [2] - 89:3, 125:25

**skills** [4] - 88:12, 89:10, 89:11, 92:14

**SKOLNICK** [1] - 1:21

**Skype** [3] - 87:6, 98:13, 133:3

**slid** [1] - 99:5

**Slide** [22] - 79:21, 86:3, 88:2, 102:15, 105:13, 121:10, 155:24, 176:21, 177:9, 177:20, 181:5, 181:22, 182:8, 182:23, 183:2, 183:14, 185:3, 185:9, 185:12, 185:23, 186:7, 186:18

**slide** [13] - 79:23, 80:12, 108:4, 117:23, 118:3, 176:20, 177:20, 181:5, 181:12, 181:18, 183:7, 183:23, 185:2

**slides** [4] - 79:25, 155:22, 182:8, 182:17

**slightly** [2] - 50:12, 176:15

**sliver** [1] - 42:4

**small** [2] - 92:21, 175:10

**snort** [1] - 17:9

**so-called** [1] - 48:20

**sold** [4] - 45:7, 45:18, 46:14, 236:20

**solely** [1] - 223:17

**someone** [5] - 160:8, 199:17, 200:4, 214:7, 255:12

**sometime** [1] - 211:4

**sometimes** [10] - 9:4, 90:2, 108:15, 109:10, 109:11, 119:9, 128:2, 211:25, 213:16, 237:13

**somewhere** [4] - 103:23, 211:7, 213:2, 234:23

1

2  soon [1] - 55:14

3  sorry [31] - 5:16, 35:25, 36:4, 36:5, 39:8, 41:22,
   45:2, 46:7, 62:10, 76:25, 77:3, 82:7, 93:25, 102:20,
   123:14, 135:2, 140:13, 151:4, 166:11, 181:4, 185:25,
   186:4, 195:20, 195:21, 216:19, 218:21, 219:4,
   234:16, 239:23, 247:24, 249:20

5  sort [8] - 7:6, 43:11, 47:20, 47:21, 64:16, 87:20,
   90:14, 115:24

6  sorts [2] - 30:7, 122:6

   sought [2] - 77:14, 77:20

7  sound [1] - 84:18

   sounds [2] - 19:24, 84:19

8  source [2] - 227:9, 228:13

   sources [2] - 89:13, 222:16

9  South [1] - 223:21

   spare [1] - 117:16

10 SPEAKER [2] - 76:21, 76:25

   speaking [5] - 176:10, 202:11, 202:13, 248:17,
11 253:13

   Special [3] - 220:5, 220:24, 221:10

12 special [3] - 89:5, 89:6, 89:24

   specialized [1] - 98:7

13 specific [44] - 17:2, 18:5, 49:7, 49:14, 49:23,
   51:20, 67:11, 90:9, 97:25, 110:11, 128:23, 129:7,
14 129:9, 129:12, 129:13, 129:20, 139:5, 142:2, 142:22,
   147:2, 147:9, 147:18, 150:4, 150:14, 150:23, 150:24,
15 152:15, 152:17, 166:19, 170:12, 171:3, 172:22,
   182:9, 182:13, 218:3, 218:11, 224:9, 224:12, 224:16,
16 233:8, 242:3, 249:23, 251:11

   specifically [24] - 27:6, 38:4, 44:7, 48:17, 58:11,
17 85:22, 85:23, 92:22, 94:11, 94:17, 100:5, 101:3,
   110:19, 117:12, 125:11, 139:2, 139:9, 143:2, 169:11,
18 187:15, 210:7, 211:3, 223:7, 223:22

   spend [2] - 135:6, 203:12

19 spent [10] - 88:20, 102:4, 141:25, 161:4, 161:12,
   161:13, 161:25, 164:7, 168:19, 169:11

20 spun [1] - 99:4

   Square [1] - 2:15

21 square [1] - 87:24

   staff [2] - 34:13, 120:2

22 stage [2] - 29:10, 138:13

   stake [1] - 246:5

23 stand [4] - 121:8, 136:25, 228:18, 246:11

   standard [9] - 15:24, 24:21, 68:21, 81:24, 81:25,
24 82:8, 82:20, 123:9, 123:11

   standards [4] - 7:11, 21:19, 150:6, 241:4

25 standing [1] - 253:22

   start [6] - 45:8, 56:17, 102:14, 113:2, 115:11,

206:17
started [16] - 24:6, 31:18, 56:20, 91:13, 91:15,
91:16, 97:6, 99:20, 100:24, 101:6, 168:17, 169:15,
169:18, 170:14
starting [6] - 7:7, 89:14, 98:24, 111:7, 160:4,
222:14
starts [6] - 12:19, 163:8, 219:18, 221:22, 223:10,
227:22
State [54] - 2:2, 2:3, 4:3, 4:4, 5:13, 26:24, 27:5,
30:16, 31:10, 125:21, 145:21, 146:6, 146:15, 146:25,
147:9, 147:21, 148:19, 149:3, 149:12, 149:23, 150:5,
151:12, 155:11, 165:18, 170:21, 171:15, 172:9,
173:13, 176:9, 177:24, 181:24, 187:24, 194:15,
194:16, 224:6, 226:5, 226:10, 233:25, 234:3, 234:6,
234:19, 234:24, 235:13, 235:17, 235:19, 236:6,
236:22, 238:11, 238:15, 238:25, 248:7, 249:5, 257:8
STATE [1] - 1:2
state [12] - 29:3, 76:14, 77:19, 106:8, 124:11,
194:3, 226:3, 235:7, 238:18, 246:15, 249:11
State's [4] - 175:4, 176:9, 177:15, 187:22
statement [55] - 10:18, 11:4, 11:7, 11:22, 11:25,
13:18, 14:6, 14:21, 47:24, 59:5, 59:6, 142:25,
143:3, 143:6, 147:7, 161:23, 174:7, 175:5, 178:12,
183:9, 185:10, 186:13, 191:15, 198:5, 198:22, 199:5,
204:11, 207:22, 208:4, 208:14, 209:18, 210:25,
211:6, 213:21, 220:11, 222:24, 223:5, 223:6, 224:12,
224:16, 226:17, 226:23, 227:4, 228:14, 231:14,
232:17, 234:11, 234:25, 236:7, 236:24, 238:3, 246:9,
246:17, 248:25, 252:4
statements [16] - 17:25, 18:13, 48:7, 120:23, 121:3,
124:6, 124:17, 158:15, 173:19, 178:17, 179:4, 179:5,
183:18, 188:22, 200:23, 215:7
States [10] - 38:25, 58:22, 59:10, 97:3, 109:9,
168:24, 226:14, 229:5, 233:19, 239:13
states [3] - 221:10, 238:17, 238:19
stating [3] - 22:25, 61:4, 143:4
statistic [1] - 222:14
statistical [1] - 63:9
statistics [1] - 35:11
status [3] - 35:19, 36:15, 57:18
stay [2] - 25:13, 248:22
stayed [1] - 25:23
steadily [1] - 210:20
steals [2] - 214:7, 217:25
stenographic [1] - 257:11
step [1] - 30:18
STEPHANIE [3] - 2:20, 3:22, 257:21
Stephanie [2] - 243:17, 257:7

Opioid Frye/Mr. Rafalski                     339

**STEPHEN** [1] - 2:12
**steps** [1] - 114:2
**Steve** [1] - 5:18
**still** [20] - 6:9, 7:19, 11:4, 11:22, 18:23, 31:17, 86:10, 98:4, 98:16, 103:15, 109:14, 134:7, 136:25, 137:14, 137:19, 149:12, 191:24, 242:7, 253:5, 255:18
**stimulated** [1] - 34:4
**stipulated** [1] - 32:22
**stole** [1] - 214:15
**stood** [1] - 173:22
**STOP** [1] - 150:22
**stop** [10] - 78:10, 112:9, 114:16, 116:23, 174:25, 196:4, 234:22, 235:5, 248:20, 252:17
**stopped** [3] - 117:5, 249:23, 249:25
**store** [1] - 248:21
**stored** [1] - 214:13
**stores** [1] - 237:15
**stories** [1] - 26:14
**story** [4] - 172:3, 197:4, 197:12
**streamline** [1] - 6:25
**Street** [4] - 2:3, 2:11, 2:19, 3:4
**street** [5] - 30:5, 77:16, 77:18, 77:21, 89:14
**strong** [3] - 48:5, 59:13, 59:18
**strongest** [1] - 59:13
**struck** [1] - 118:3
**Stuart** [1] - 34:15
**studies** [11] - 9:25, 26:5, 49:16, 63:23, 66:19, 66:20, 223:24, 224:17, 224:25, 227:12, 228:10
**study** [10] - 8:21, 8:23, 9:10, 9:11, 9:16, 9:21, 10:9, 10:11, 10:16, 56:21
**studying** [2] - 58:24, 58:25
**stuff** [1] - 223:20
**style** [1] - 94:25
**subject** [4] - 20:9, 74:11, 148:17, 201:20
**submission** [1] - 184:9
**submit** [1] - 13:4
**submitted** [2] - 13:8, 13:9
**subpoena** [2] - 97:19, 101:10
**subpoenas** [1] - 99:17
**subsequent** [9] - 12:10, 97:18, 99:16, 99:18, 104:10, 154:13, 157:14, 158:10, 181:9
**subset** [1] - 153:22
**Substance** [1] - 222:8
**substance** [1] - 236:20
**Substances** [4] - 102:12, 102:16, 105:15, 121:20
**substances** [11] - 58:21, 93:8, 102:7, 105:22, 106:21, 107:5, 107:12, 107:15, 122:16, 221:14, 238:23

1

2  substantial [23] - 7:24, 8:6, 8:9, 8:14, 10:20,
   11:11, 12:5, 13:16, 13:23, 21:13, 21:18, 22:8,
3  22:18, 23:4, 23:8, 23:22, 24:21, 25:10, 25:11,
   25:17, 252:6, 252:9, 252:12
4  substantially [1] - 193:10
   substantiate [1] - 121:2
5  suffering [1] - 35:12
   sufficient [1] - 113:8
6  SUFFOLK [1] - 1:2
   Suffolk [15] - 1:14, 4:4, 68:6, 71:13, 71:23, 72:7,
7  128:15, 145:14, 145:22, 146:7, 220:5, 220:23,
   221:10, 224:5, 257:9
8  suggest [3] - 18:2, 18:14, 21:6
   suggested [7] - 66:16, 67:8, 67:23, 71:10, 71:20,
9  72:17, 73:12
   suggesting [5] - 66:7, 67:5, 67:14, 70:13, 252:24
10 suggestion [1] - 70:22
   suicide [1] - 37:7
11 suitability [1] - 230:15
   Suite [1] - 1:20
12 summarize [2] - 96:18, 247:25
   summary [2] - 39:21, 60:3
13 Summit [4] - 85:9, 169:23, 170:3, 170:5
   supervisor [1] - 89:24
14 supplement [1] - 137:25
   supplied [1] - 241:9
15 supplier [3] - 89:15, 241:15
   supply [2] - 204:3, 204:8
16 supplying [1] - 235:5
   support [7] - 11:7, 11:25, 21:13, 48:5, 173:20,
17 200:23
   supported [3] - 8:6, 68:16, 178:13
18 supporting [7] - 13:13, 120:24, 178:22, 183:18,
   184:4, 184:16, 200:12
19 supports [3] - 10:17, 11:4, 11:22
   supposed [9] - 196:16, 197:15, 206:19, 207:2,
20 207:16, 207:21, 208:23, 209:3, 209:9
   sUPREME [1] - 1:2
21 Supreme [5] - 1:12, 4:3, 220:5, 220:23, 221:10
   surely [1] - 44:5
22 surprise [1] - 151:25
   surprised [1] - 235:22
23 surveyed [1] - 63:21
   surveying [1] - 72:6
24 surveys [6] - 26:5, 26:7, 48:18, 63:12, 64:15, 72:13
   suspect [1] - 103:22
25 suspicion [1] - 117:8
   suspicious [33] - 80:17, 82:7, 95:17, 102:5, 102:18,

Opioid Frye/Mr. Rafalski                    341

107:14,  107:16,  107:18,  107:19,  107:21,  107:25,
111:18,  112:5,  112:11,  116:14,  116:18,  116:22,
123:19,  127:4,  127:5,  127:11,  138:18,  138:23,
140:18,  142:17,  147:13,  154:3,  156:13,  156:17,
168:23,  194:5,  248:21,  249:11
**sustain** [2]  -  55:4, 133:12
**sustained** [1]  -  50:8
**switch** [1]  -  160:20
**sworn** [4]  -  76:10,  90:12,  165:16,  228:18
**symptoms** [1]  -  115:12
**synthetic** [1]  -  60:12
**system** [24]  -  36:21,  102:16,  102:17,  104:20,  104:23,
105:2,  105:6,  105:9,  107:20,  108:9,  108:10,  111:10,
111:16,  111:19,  117:5,  127:4,  127:6,  127:11,  127:15,
147:12,  194:4,  233:13,  238:9,  246:20
**systematic** [1]  -  63:6
**systems** [2]  -  102:6,  102:10

## T

**Tab** [2]  -  33:15,  38:15
**tab** [11]  -  141:17,  163:4,  164:20,  174:19,  192:9,
195:2,  198:11,  220:2,  220:13,  229:4,  245:16
**table** [4]  -  39:8,  39:9,  40:6,  217:3
**tablet** [3]  -  21:8,  22:9,  23:2
**tabs** [1]  -  41:16
**tactics** [1]  -  90:25
**tags** [1]  -  53:7
**talks** [1]  -  102:16
**task** [10]  -  40:18,  41:12,  42:23,  52:13,  52:18,  90:6,
90:7,  90:12,  91:19,  225:11
**tasked** [6]  -  89:4,  94:5,  96:7,  211:15,  212:15,
247:22
**teaches** [1]  -  89:10
**tech** [1]  -  98:18
**Technical** [3]  -  87:6,  98:13,  133:3
**TECHNICIAN** [3]  -  104:2,  242:9,  242:14
**techniques** [2]  -  81:23,  91:2
**ten** [17]  -  75:8,  142:14,  154:18,  155:2,  155:10,
158:16,  158:22,  159:5,  163:25,  165:17,  166:10,
166:23,  172:23,  173:12,  201:14
**ten-day** [3]  -  163:25,  172:23,  173:12
**tenure** [1]  -  121:16
**Term** [1]  -  221:11
**term** [14]  -  7:24,  8:10,  14:5,  14:9,  14:16,  15:9,
15:10,  15:16,  15:22,  21:12,  28:10,  28:11,  50:14,
148:11
**terminal** [13]  -  34:23,  35:23,  36:2,  36:7,  36:11,

Opioid Frye/Mr. Rafalski                     342

36:13, 37:14, 37:19, 57:23, 57:24, 58:12, 59:15,
59:20
**terminally** [2] - 58:5, 59:4
**terminology** [1] - 128:9
**terms** [25] - 7:21, 19:17, 19:25, 27:2, 61:18, 62:14,
64:5, 65:21, 100:15, 130:18, 145:11, 150:23, 154:16,
167:25, 171:10, 183:16, 197:5, 208:9, 212:14, 223:9,
224:8, 224:16, 233:25, 244:2, 245:23
**test** [1] - 87:4
**testified** [13] - 24:7, 59:17, 76:11, 153:9, 155:15,
164:11, 164:12, 164:13, 164:18, 164:19, 166:13,
170:16, 172:8
**testify** [6] - 31:12, 74:24, 137:13, 137:18, 255:9,
256:5
**testifying** [2] - 163:18, 164:10
**testimony** [47] - 7:25, 10:13, 11:16, 12:12, 15:19,
15:20, 19:17, 21:14, 21:15, 25:15, 51:21, 51:22,
103:9, 131:2, 131:14, 132:21, 141:17, 150:5, 150:12,
158:16, 160:18, 161:5, 162:7, 165:8, 165:16, 166:22,
167:2, 171:22, 179:11, 179:14, 180:4, 198:18, 199:2,
215:4, 215:9, 215:11, 216:8, 218:18, 219:21, 221:6,
222:21, 223:3, 227:18, 228:15, 228:18, 239:3, 246:12
**Testimony** [1] - 1:10
**Teva** [1] - 80:24
**text** [2] - 174:24, 177:21
**thanking** [1] - 74:18
**THE** [214] - 1:2, 4:2, 4:3, 4:7, 4:9, 4:12, 4:14,
4:18, 4:21, 4:24, 5:3, 5:9, 5:15, 5:19, 5:23, 6:4,
6:6, 6:8, 6:10, 6:11, 6:12, 6:13, 6:14, 6:16, 6:17,
19:5, 19:12, 20:8, 31:3, 31:6, 31:19, 42:5, 42:9,
45:23, 45:25, 50:2, 50:5, 50:8, 50:17, 50:24, 51:3,
51:5, 51:8, 52:20, 52:22, 52:23, 52:24, 52:25, 53:4,
53:5, 53:21, 54:2, 54:10, 54:12, 54:16, 55:3, 55:10,
55:14, 56:10, 56:23, 61:21, 61:24, 62:9, 68:23,
69:5, 69:17, 69:20, 69:22, 74:10, 74:16, 74:21,
74:22, 75:2, 75:4, 75:5, 75:8, 75:11, 75:14, 75:16,
75:20, 75:24, 76:7, 76:13, 76:16, 76:24, 77:4, 77:5,
77:6, 77:7, 77:8, 78:8, 78:9, 78:12, 78:13, 78:23,
78:24, 79:2, 80:8, 86:11, 87:10, 98:18, 98:19,
98:20, 103:5, 103:16, 103:18, 104:6, 104:17, 113:16,
113:20, 113:23, 114:4, 114:20, 114:22, 114:24,
114:25, 117:15, 117:24, 126:16, 126:19, 126:21,
126:24, 127:2, 127:16, 127:18, 127:20, 127:21,
127:23, 127:24, 130:9, 130:12, 130:15, 132:12,
132:15, 133:5, 133:20, 133:22, 133:23, 133:24,
133:25, 134:3, 134:5, 134:6, 134:8, 134:10, 134:21,
136:4, 136:8, 136:14, 139:14, 139:21, 139:23,
139:24, 140:2, 144:3, 144:6, 144:8, 144:10, 144:18,

160:11, 160:12, 160:13, 160:15, 168:12, 180:14,
180:18, 180:21, 181:3, 184:18, 184:21, 184:23,
194:20, 195:7, 195:12, 195:17, 199:19, 199:23,
201:14, 201:17, 202:3, 202:9, 202:11, 203:2, 203:9,
204:24, 205:3, 216:3, 216:9, 228:22, 229:2, 230:3,
242:10, 242:16, 242:22, 243:9, 243:11, 243:15,
243:16, 243:17, 243:21, 246:25, 250:16, 250:22,
252:19, 253:11, 253:16, 253:24, 254:3, 254:14,
254:23, 255:2, 255:18, 255:22, 256:6

**them..** [1] - 62:11

**theoretically** [1] - 114:14

**Therapies** [3] - 32:18, 33:9, 57:15

**therapy** [2] - 35:19, 36:15

**Therefore** [1] - 257:16

**thereto** [1] - 221:15

**they've** [3] - 114:10, 115:14, 227:5

**thick** [1] - 125:18

**third** [4] - 107:13, 176:23, 216:19, 248:5

**thorough** [1] - 142:21

**thoughts** [1] - 215:8

**thousand** [2] - 226:20, 226:25

**thousands** [6] - 166:9, 166:14, 166:15, 167:3

**three** [21] - 46:9, 52:12, 55:4, 77:8, 90:22, 94:12,
107:23, 107:24, 127:12, 127:22, 133:15, 134:11,
145:20, 216:15, 216:21, 239:9, 239:20, 239:21,
239:24

**threshold** [9] - 109:6, 109:20, 111:7, 112:8, 112:23,
114:7, 115:22, 116:7, 128:7

**thresholds** [6] - 109:6, 110:16, 111:25, 113:18,
115:16, 116:4

**throughout** [3] - 168:25, 210:19, 227:7

**thrown** [1] - 91:12

**thrust** [1] - 36:4

**Thursday** [1] - 254:9

**timeframe** [1] - 141:14

**tiny** [2] - 152:6

**title** [1] - 76:14

**titled** [1] - 220:25

**today** [15] - 7:4, 32:2, 50:7, 52:13, 73:4, 77:11,
78:18, 79:19, 117:25, 119:24, 131:9, 170:13, 221:2,
246:15, 254:6

**together** [2] - 40:24, 161:20

**Toledo** [1] - 223:22

**Tomarken** [1] - 256:5

**tomorrow** [3] - 252:20, 254:6, 256:6

**took** [7] - 87:4, 90:10, 91:9, 99:12, 99:17, 139:3,
141:8

**top** [9] - 34:18, 97:2, 98:11, 193:8, 194:3, 211:20,

1

2  211:22, 213:9, 242:19

   **topic** [5] - 191:23, 201:9, 201:10, 233:23, 239:11

3  **topics** [3] - 154:22, 162:10, 169:4

   **total** [2] - 145:19, 239:12

4  **totality** [2] - 157:21, 252:2

   **totally** [1] - 232:10

5  **touch** [2] - 145:8, 145:9

   **touched** [2] - 111:13, 147:10

6  **town** [1] - 77:18

   **track** [2] - 71:13, 111:10

7  **tracks** [2] - 150:22, 240:19

   **trade** [5] - 28:3, 28:14, 28:19, 29:6, 29:16

8  **tragedy** [1] - 88:10

   **tragic** [1] - 88:4

9  **trained** [1] - 69:8

   **training** [2] - 131:16, 191:3

10 **Training** [1] - 86:7

   **transaction** [5] - 82:5, 95:9, 125:23, 155:18, 159:23

11 **transactional** [9] - 83:7, 83:12, 122:4, 122:9,
   122:15, 127:14, 155:10, 155:13, 156:3

12 **transcript** [2] - 247:3, 257:14

   **transcription** [1] - 257:11

13 **transcripts** [1] - 245:15

   **trash** [1] - 91:12

14 **travel** [1] - 255:12

   **treating** [1] - 99:8

15 **treatment** [4] - 8:25, 58:3, 58:21, 98:7

   **treatments** [1] - 9:8

16 **trial** [1] - 19:25

   **tried** [3] - 43:9, 44:2, 120:7

17 **trigger** [5] - 113:16, 114:13, 116:22, 127:15, 154:10

   **triggered** [6] - 114:3, 116:17, 154:14, 157:4,

18 157:15, 158:10

   **triggers** [1] - 29:2

19 **tripped** [2] - 13:10, 50:13

   **trivial** [1] - 14:13

20 **trivialize** [1] - 14:10

   **trouble** [3] - 41:14, 41:18, 136:11

21 **truck** [1] - 129:15

   **trucks** [1] - 95:12

22 **true** [22] - 55:20, 135:15, 137:14, 137:19, 147:6,
   157:17, 157:18, 161:17, 167:15, 167:18, 169:17,

23 170:7, 172:17, 206:21, 208:4, 209:13, 224:24, 225:2,
   226:16, 248:17, 257:10, 257:15

24 **trunk** [1] - 129:17

   **truth** [4] - 152:24, 168:10, 169:15, 178:9

25 **truthful** [11] - 165:5, 165:7, 165:9, 180:3, 180:6,
   198:18, 198:24, 199:2, 217:11, 217:17, 228:15

truthfully [1] - 163:18

try [11] - 41:15, 48:11, 80:6, 135:11, 149:16, 154:8, 171:23, 173:8, 187:10, 242:11, 243:23

trying [11] - 18:24, 69:13, 88:15, 89:9, 111:15, 148:16, 157:10, 169:22, 171:19, 243:5, 243:7

turn [11] - 16:7, 34:17, 103:5, 105:12, 164:2, 186:18, 206:7, 206:11, 207:8, 238:8, 248:5

turning [1] - 161:8

turns [1] - 218:5

TV [1] - 242:19

two [34] - 8:14, 11:5, 11:23, 13:14, 38:13, 57:20, 59:24, 60:9, 60:22, 61:7, 73:4, 78:24, 84:8, 88:7, 91:11, 93:12, 99:16, 99:22, 102:2, 116:21, 130:16, 133:13, 145:12, 145:18, 163:7, 170:12, 179:8, 182:2, 182:8, 185:13, 194:2, 250:20, 250:22

two-week [1] - 78:24

type [21] - 64:3, 81:24, 82:2, 82:11, 87:2, 101:12, 110:22, 119:22, 122:7, 133:8, 167:15, 218:24, 219:8, 221:25, 231:17, 231:19, 231:23, 232:8, 232:20

types [13] - 90:7, 106:5, 106:8, 107:24, 108:22, 108:23, 109:4, 109:20, 119:9, 152:11, 210:4, 210:7, 215:22

typewriter [1] - 118:6

typewriters [1] - 118:4

typical [2] - 83:17, 197:22

typically [10] - 8:14, 82:25, 85:8, 105:2, 106:10, 109:5, 110:23, 111:20, 112:18, 128:8

# U

U.S [2] - 40:2, 40:3

unable [1] - 102:24

undefined [1] - 13:20

under [14] - 6:9, 8:2, 15:15, 21:18, 33:2, 65:24, 70:2, 70:18, 72:8, 95:4, 128:6, 134:7, 153:9, 156:11

undergo [2] - 36:25, 232:22

understood [9] - 10:22, 10:23, 70:17, 78:11, 131:8, 136:16, 162:6, 227:25, 247:9

undertake [2] - 66:19, 241:17

undertook [1] - 66:21

unfortunately [1] - 167:22

UNIDENTIFIED [2] - 76:21, 76:25

uninterrupted [2] - 204:3, 204:8

unique [4] - 89:3, 90:8, 90:14, 94:22

uniquely [1] - 87:22

unit [3] - 89:5, 89:6, 89:24

United [10] - 38:24, 58:22, 59:10, 97:3, 109:9, 168:24, 226:14, 229:5, 233:19, 239:13

Opioid Frye/Mr. Rafalski                    346

units [1] - 124:11
universe [2] - 157:23, 203:5
unless [3] - 9:24, 199:3, 236:5
unlimited [2] - 167:11, 167:22
unmute [1] - 103:3
unnecessary [7] - 45:6, 45:15, 45:17, 46:13, 48:10, 49:9, 67:6
unprecedented [3] - 60:10, 60:22, 61:7
untitled [2] - 13:19, 14:3
untrue [2] - 23:13, 23:24
unusual [9] - 83:15, 107:25, 108:2, 111:11, 111:12, 121:23, 121:25, 123:22
up [78] - 10:7, 11:18, 13:10, 18:19, 20:4, 20:7, 21:2, 22:21, 25:5, 26:15, 33:16, 41:16, 42:2, 42:10, 43:21, 50:14, 51:12, 52:2, 52:4, 55:3, 56:25, 60:2, 63:24, 72:6, 72:16, 75:9, 75:19, 79:23, 80:7, 86:25, 89:13, 89:14, 103:7, 117:10, 119:24, 128:12, 134:14, 141:16, 141:19, 143:14, 146:9, 149:24, 155:21, 163:4, 168:7, 172:19, 172:24, 173:13, 175:7, 175:9, 175:10, 176:21, 180:11, 186:4, 191:22, 192:7, 195:5, 198:10, 198:12, 203:11, 204:14, 205:17, 205:23, 211:20, 215:18, 219:16, 220:17, 224:8, 235:11, 241:17, 243:5, 243:23, 245:15, 245:19, 250:15, 250:16, 251:2, 253:23
updated [1] - 65:11
upper [6] - 42:12, 164:7, 164:23, 165:6, 166:13, 166:21
useful [5] - 91:8, 99:8, 100:17, 147:25, 148:8
user [1] - 214:6
users [1] - 17:8
usual [1] - 112:10
utilization [1] - 98:9
utilized [3] - 59:8, 81:23, 168:24
utilizing [2] - 62:14, 90:11

**V**

vain [1] - 58:14
valid [1] - 226:10
verbatim [4] - 188:2, 188:6, 200:10, 200:19
verification [3] - 121:2, 149:21, 184:12
verify [3] - 113:11, 178:25, 179:9
version [1] - 52:7
versus [5] - 241:18, 243:25, 244:2, 248:8
Vesey [1] - 2:19
vet [1] - 230:10
viable [1] - 108:25
vice [2] - 98:5, 99:3

Opioid Frye/Mr. Rafalski                                347

**video/audio** [1] - 87:6
**view** [5] - 21:17, 25:21, 26:4, 35:18, 56:11
**viewed** [1] - 28:16
**violated** [3] - 7:10, 7:13, 223:6
**violates** [1] - 14:22
**violation** [1] - 13:19
**violations** [3] - 16:5, 191:6, 191:13
**violative** [7] - 15:15, 66:4, 66:11, 67:19, 68:12, 73:3, 73:18
**Virginia** [1] - 85:21
**visibility** [3] - 100:9, 100:22, 101:2
**visit** [1] - 190:15
**visiting** [1] - 190:8
**visits** [1] - 106:12
**voice** [3] - 198:4, 198:17, 199:2
**volume** [4] - 164:5, 167:20, 167:21, 211:12
**volunteer** [1] - 77:18

## W

**wait** [4] - 13:3, 78:5, 80:4, 204:24
**Walgreens** [1] - 81:15
**walking** [1] - 244:25
**Walmart** [2] - 2:18, 253:8
**wants** [3] - 8:5, 215:13, 248:22
**warning** [4] - 13:18, 13:24, 14:3, 15:10
**warrant** [3] - 95:5, 97:14
**Washington** [2] - 2:11, 3:4
**watchdog** [4] - 204:20, 205:5, 229:8, 229:10
**water** [4] - 16:18, 17:16, 17:17, 24:11
**Water** [1] - 2:7
**Watson** [1] - 3:3
**wave** [3] - 28:16, 60:10, 60:22
**waves** [1] - 28:7
**way..** [1] - 56:13
**Wayne** [1] - 86:6
**ways** [3] - 17:7, 88:11, 107:24
**weaknesses** [2] - 164:15, 165:12
**website** [1] - 149:24
**Wednesday** [1] - 255:21
**week** [7] - 6:15, 78:24, 85:21, 91:3, 253:21, 253:25, 254:10
**weekend** [2] - 6:25, 65:10
**weekly** [1] - 38:19
**Weiss** [1] - 5:8
**WEISS** [1] - 2:6
**welcome** [7] - 4:8, 75:3, 78:23, 79:2, 114:25, 127:24, 243:15

**Welfare** [1] - 34:2
**well-controlled** [10] - 8:15, 8:17, 9:22, 10:11, 10:18, 11:2, 11:6, 11:20, 11:24, 13:14
**West** [1] - 85:21
**whatsoever** [1] - 59:7
**WHEREUPON** [6] - 75:13, 76:9, 117:20, 133:18, 201:16, 243:19
**White** [3] - 32:22, 33:7, 58:16
**whole** [7] - 36:12, 39:2, 106:25, 152:16, 157:23, 168:25, 225:8
**wide** [1] - 168:23
**willing** [1] - 95:11
**window** [7] - 55:25, 56:9, 163:25, 167:14, 172:23, 173:12, 253:5
**winter** [1] - 85:10
**wish** [5] - 167:10, 167:21, 167:24, 168:4, 255:10
**wished** [1] - 167:20
**witness** [22] - 6:2, 6:3, 6:7, 19:8, 42:2, 74:11, 74:13, 77:15, 79:11, 84:12, 124:6, 124:17, 132:10, 134:5, 134:12, 139:12, 139:15, 144:16, 158:14, 252:22, 254:16, 256:5
**WITNESS** [37] - 6:10, 6:13, 6:16, 45:25, 51:5, 54:12, 69:5, 69:20, 74:22, 75:4, 76:16, 77:5, 77:7, 78:8, 78:12, 78:24, 87:10, 98:19, 113:20, 114:4, 114:22, 114:25, 117:24, 127:2, 127:18, 127:21, 127:24, 134:3, 134:8, 139:23, 140:2, 144:8, 180:14, 180:18, 181:3, 184:21, 243:16
**witnesses** [4] - 29:12, 77:8, 166:23, 254:8
**WOMAN** [1] - 76:21
**word** [69] - 14:17, 14:20, 16:19, 55:20, 78:10, 158:18, 172:25, 173:14, 174:3, 174:5, 177:6, 181:9, 181:12, 181:18, 182:3, 182:12, 182:19, 183:3, 183:4, 183:7, 183:14, 183:23, 185:5, 185:6, 185:14, 185:15, 185:16, 185:17, 186:11, 186:21, 187:8, 187:16, 192:22, 192:23, 193:19, 194:15, 196:11, 196:12, 196:24, 199:18, 200:5, 209:14, 209:18, 222:25, 223:6
**words** [14] - 19:15, 136:22, 136:23, 137:2, 137:3, 177:15, 197:15, 197:22, 197:23, 200:19, 214:19, 228:21
**works** [1] - 206:14
**World** [1] - 3:9
**world** [7] - 10:17, 11:3, 11:21, 13:12, 13:21, 14:7
**worried** [1] - 243:6
**worse** [1] - 241:5
**wrap** [3] - 117:10, 250:14, 251:2
**write** [12] - 65:19, 168:7, 178:23, 199:17, 200:4, 206:18, 206:19, 207:2, 209:6, 211:23, 225:15
**writing** [12] - 65:17, 169:16, 170:14, 210:21,

Opioid Frye/Mr. Rafalski                          349

211:11,  212:8,  234:9,  234:13,  234:20,  234:22,
249:22,  249:25
**written** [11] -  177:16,  189:23,  190:4,  200:20,
201:24,  208:12,  208:19,  208:25,  209:12,  209:23
**wrongdoing** [1] -  214:11
**wrote** [10] -  63:3,  63:10,  63:18,  64:10,  65:5,  66:14,
66:23,  178:18,  178:20,  200:21

## X

**Xs** [1] -  65:17

## Y

**year** [7] -  35:15,  40:19,  85:15,  91:24,  127:7,
200:20,  233:17
**years** [14] -  36:19,  38:13,  39:25,  61:2,  61:16,
64:20,  65:24,  70:8,  87:16,  87:18,  92:19,  93:18,
102:4,  118:7
**yesterday** [2] -  67:16,  88:6
**YORK** [1] -  1:2
**York** [139] -  1:8,  1:15,  1:21,  2:2,  2:3,  2:4,  2:7,
2:16,  2:19,  3:10,  3:11,  4:4,  5:12,  5:14,  25:20,
26:2,  26:25,  27:5,  27:14,  28:19,  29:6,  29:16,  30:16,
31:11,  46:16,  48:24,  59:10,  72:19,  85:17,  99:21,
120:8,  120:18,  120:23,  125:21,  126:3,  128:16,
138:14,  138:22,  138:23,  138:25,  139:5,  139:9,  140:7,
140:15,  140:18,  140:23,  141:4,  141:5,  141:9,  141:10,
141:11,  142:7,  142:9,  142:11,  142:15,  142:16,
142:17,  142:22,  143:19,  145:21,  146:15,  146:25,
147:9,  147:22,  149:12,  150:19,  150:21,  151:23,
152:5,  152:25,  154:18,  155:6,  155:11,  159:4,  159:5,
163:4,  164:8,  164:24,  165:18,  166:23,  167:6,  167:25,
168:19,  169:3,  169:12,  169:16,  169:17,  170:14,
170:20,  170:21,  171:3,  172:22,  181:24,  182:9,
182:13,  187:6,  187:16,  187:21,  188:15,  189:4,  196:5,
197:7,  197:9,  198:13,  202:23,  203:6,  208:16,  224:5,
226:10,  233:25,  234:4,  234:6,  234:19,  235:3,  235:6,
235:13,  235:18,  235:19,  236:21,  236:22,  238:25,
239:7,  247:15,  248:7,  249:5,  250:9,  250:10,  255:12,
257:9
**yourself** [5] -  69:3,  88:25,  159:19,  163:7,  246:8
**yup** [1] -  84:19

## Z

**Zeppelin** [1] -  242:23
**ZIP** [1] -  77:19