```
 1                                                              1

 2      SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF SUFFOLK: PART 48
 3      ------------------------------------------------x

 4      IN RE: OPIOID LITIGATION

 5
                                 INDEX NO.:400000/2017
 6
        ------------------------------------------------x
 7
                                 August 18, 2020
 8                               Central Islip, New York

 9
                        MINUTES OF FRYE HEARING
10                       (Testimony of James Rafalski)

11      B E F O R E:         HON. JERRY GARGUILO
                             Supreme Court Justice
12
        A P P E A R A N C E S:
13
        SIMMONS HANLY CONROY, LLC
14      Attorneys for Suffolk County
        112 Madison Avenue
15      New York, New York 10016
        BY:   PAUL J. HANLY, JR., ESQ.
16            JAYNE CONROY, ESQ,
              (212) 784-6401
17            phanly@simmonsfirm.com
              jconroy@simmonsfirm.com
18

19      NAPOLI SHKOLNIK, PLLC
        Attorneys for Nassau County
20      400 Broadhollow Road, Suite 305
        Melville, New York 11747
21      BY:   HUNTER SKOLNICK, ESQ.
              SALVATORE C. BADALA, ESQ.
22            JOSEPH L. CIACCIO, ESQ.
              (212)397-1000
23            pnapoli@napolilaw.com
              sbadala@napolilaw.com
24            jciaccio@napolilaw.com

25
```

```
 1                                                              2

 2
        SEEGER WEISS, LLP
 3      Attorneys for Plaintiffs
        77 Water Sgtreet, 8th Floor
 4      New York, New York 10005
        BY:   PARVIN K. AMINOLROAYA, ESQ.
 5            (212)584-0700


 6
        JONES DAY
 7      Attorneys for Walmart, Inc.
        250 Vesey Street
 8      New York, New York 10281
        BY:   STEPHANIE H. JONES, ESQ.
 9            SHARYL A. REISMAN, ESQ.
              (212) 326-3939
10            shjones@jonesday.com
              sareisman@jonesday.com

11

12
        COVINGTON & BURLING, LLP
13      Attorneys for McKesson Corp. and
        PSS World Medical, Inc.
14      The New York Times Building
        620 Eighth Avenue
15      New York, New York 10018
        BY:   Paul W. Schmidt, ESQ.
16            (212)841-1000
              pschmidt@cov.com

17

18      ROPES & GRAY, LLP
        Attorneys for Mallinckrodt, LLC, SpecGX, LLC
19      800 Boylston Street
        Boston, Massachusetts 02199
20      BY:   ANDREW J. O'CONNOR, ESQ.
              (617)235-4650
21            andrew.o'connor@ropesgray.com


22

23                        *       *       *

24             STEPHANIE CASAGRANDE, CSR, RPR
                  OFFICIAL COURT REPORTER
25
```

```
1                    Opioid Frye Hearing              3
2           THE COURT:  Good morning.  Please be
3       seated everybody.  We're waiting for some
4       other people.
5           THE COURT OFFICER:  Yeah.  We're getting
6       them in the hallway.
7           THE COURT:  Good morning, Mr. Rafalski.
8           THE WITNESS:  Good morning, your Honor.
9           THE CLERK:  This is a continued hearing
10      In Re Opioid Litigation, Index Number 400000
11      of 2017.
12          Counsel, your appearance for the record.
13          MS. CONROY:  Jayne Conroy, for
14      Plaintiffs.
15          THE COURT:  Good morning.
16          MS. CONROY:  Good morning.
17          MR. BADALA:  Good morning, your Honor.
18      Salvatore Badala, for Plaintiffs.
19          THE COURT:  Good morning.
20          MR. SHKOLNIK:  Good morning, your Honor.
21      Hunter Shkolnik, for Plaintiffs.
22          THE COURT:  Mr. Shkolnik, good morning.
23          MR. SCHMIDT:  Good morning, your Honor.
24      Paul Schmidt, for McKesson.
25          MS. REISMAN:  Good morning, your Honor.
```

```
1                    Opioid Frye Hearing              4

2         Sharyl Reisman, on behalf of Walmart.

3              THE COURT:  Did you get that name,

4         Stephanie?

5              COURT REPORTER:  Yes.

6              MS. JONES:  Good morning, your Honor.

7         Stephanie Jones, on behalf of Walmart.

8              MR. O'CONNOR:  Good morning, your Honor.

9         Andrew O'Connor, on behalf of Mallinckrodt.

10             THE COURT:  Good morning, Mr. O'Connor.

11             MR. O'CONNOR:  Good morning.

12             THE COURT:  Do you want to remind the

13        witness?

14             THE CLERK:  Mr. Rafalski, I'll remind

15        you you're still under oath.

16             THE WITNESS:  Yes.  Thank you.  I

17        understand.

18             THE COURT:  Mr. Schmidt, you may

19        continue.

20             MR. SCHMIDT:  Thank you, your Honor.

21        May I just ask at the beginning if the sound

22        is okay for the Court and the witness?  I

23        want to avoid any more indications of Led

24        Zeppelin, if I humanly can.

25             THE WITNESS:  Okay.
```

```
 1              Opioid Frye Hearing/Mr. Rafalski        5
 2              THE COURT:  Is there a question there?
 3              THE COURT OFFICER:  No.  Just can you
 4         hear him okay.
 5              THE COURT:  You're fine.
 6              MR. SCHMIDT:  You can hear me okay,
 7         terrific.  And you can hear me, Mr. Rafalski?
 8              THE WITNESS:  Yes, I can hear you.
 9    BY MR. SCHMIDT:
10         Q.   Okay.  Yesterday we talked about how you
11    got from the data you were given to your opinions
12    for the New York pharmacies.
13              Today I want to talk about suspicious
14    orders and about your flagging.  Let me start
15    generally with the obligation to report of
16    suspicious orders.  That applies to orders of
17    unusual size, frequency or pattern, correct?
18         A    Yes, sir.
19         Q.   And that's contained in a regulation,
20    right?
21         A    Yes.  That's, that's, that's not the
22    only requirements, but those are guides contained
23    within the registration.  The registrant can
24    certainly own a system that would -- that could be
25    designed to have other identifiers.
```

```
 1                    Opioid Frye Hearing/Mr. Rafalski          6
 2          Q.    And, sir, can I ask you to focus on my
 3     questions.  There's a regulation that contains that
 4     requirement to report orders of unusual size,
 5     pattern or frequency, correct?
 6          A     That is correct.
 7          Q.    You agree with me that that regulation
 8     gives some guidance on a suspicious order, but you
 9     think the actual full definition is up to the
10     registrar depending on a lot of factors, the scope
11     of their business, and the scope of those customers
12     that receive products from them?
13          A     Yes, sir.
14          Q.    For example, the regulation does not
15     tell distributors how to figure out if an order is
16     of unusual size, correct?
17          A     That's correct.
18          Q.    That's up to the registrar to define,
19     correct?
20          A     Yes.
21          Q.    There's no single generally accepted way
22     to say this is an order of unusual size, correct?
23          A     There's not any language specific to
24     that statement, you mean, no, sir.
25          Q.    There's no single generally accepted way
```

1

2     to say this is an order of unusual frequency or

3     unusual pattern, correct?

4          A     That is correct, sir.

5          Q.    And you're aware that government

6     watchdogs, some of the ones we talked about

7     yesterday, have recommended that it would be good

8     for the DEA to develop additional guidance for

9     distributors and manufacturers when it comes to

10    suspicious order monitoring and suspicious order

11    reporting?

12         A     I am aware of that either publications

13    or that information, yes, sir.

14         Q.    And you agree with that recommendation,

15    correct?

16         A     Generally speaking, yes.  Maybe not --

17    maybe you might interpret that question different

18    than me, but, yes, generally, yes.

19         Q.    Using your words in terms of lack of

20    greater clarity from the DEA, the reason for the

21    lack of greater clarity from the DEA is that you

22    don't really think there's a one-size-fits-all

23    suspicious monitoring system or program, correct?

24         A     Yes.  I don't think I used that exact

25    terminology, but that concept would be consistent

1
2   for the way that I answered about that, yes, sir.

3       Q.   There's no one-size-fits-all suspicious

4   order monitoring system, correct?

5       A   Yes, that's correct.  Yes, sir.

6       Q.   Even today distributors or manufacturers

7   are left to design their own suspicious order

8   monitoring programs, correct?

9       A   They are, yes, sir.

10       Q.   And there's no generally accepted system

11   saying this is exactly what a suspicious order

12   monitoring system has to look like, correct?

13       A   That's correct.

14       Q.   As a result every distributor and every

15   manufacturers' suspicious order monitoring programs

16   are different from each other, right?

17       A   Yes.  Yes.  In some ways there are some

18   differences.

19       Q.   And you read, as part of your

20   preparation in this case, testimony from the DEA's

21   former head of Office of Diversion Control, Joe

22   Rannazzisi, correct?

23       A   I have read some of his deposition

24   testimony, yes, sir.

25       Q.   I take it you saw that when he was asked

1

2       about giving guidance or giving a checklist to

3       registrants as to what's required to be in a

4       suspicious order monitoring system, he said that's a

5       business decision based on what the registrant's

6       needs are, and the Drug Enforcement Administration

7       does not tell a registrant what that specific system

8       should look like.

9                   Do you remember seeing that testimony

10      from him?

11            A    I do not recall that.  I could review

12      it, if you'd like, but I don't disagree with that

13      statement.

14            Q.   Well, that's where I was going.  Maybe I

15      can short circuit it.

16                  Do you agree with the idea that when it

17      comes to designing a suspicious order monitoring

18      system, that's a business decision based on what the

19      registrant's needs are, and the Drug Enforcement

20      Administration does not tell a registrant what that

21      specific system should look like?

22            A    I agree with that statement.

23            Q.   And I lost you for a second.  Did you

24      say you agree with that statement?

25            A    I did.  I agree with that statement,

1  sir.

2     Q.   Evaluating suspicious order monitoring

3  programs has to involve a company-by-company

4  assessment, correct?

5     A    You mean a customer-by-customer

6  assessment?

7     Q.   And companies-by-companies in terms of

8  their business and who they're dealing with.

9     A    Yes.  Yes, sir.

10     Q.   What works for one distributor or

11  manufacturer in your view may not necessarily work

12  for another, correct?

13     A    It may work, but I don't think that I

14  would impose one system from one company on another,

15  but certainly there are some businesses that are

16  very similar that potentially they could work.

17     Q.   In your report you lay out some -- I

18  think you call it key components that you believe

19  should be included in a suspicious order monitoring

20  system; are you aware of that?

21     A    In my report?

22     Q.   Yes, sir.

23     A    I don't know if I say they should be

24  included, if that's my exact language.  I think that

1    
2    I might say that one would expect to see, but yes,
3    sir.
4              Q.   Well, actually, that's where I'm going.
5              Is it possible to have a compliant
6    suspicious order monitoring system without all of
7    those components?
8         A    Depending on the scope of business or
9    the type of customer, I think it's possible to not
10   include some of those things.
11             Q.   Okay.  There are no -- stated
12   differently -- there are no generally accepted set
13   of requirements that every single suspicious order
14   monitoring program must have, correct?
15        A    Correct statement.
16             Q.   Let's look at Plaintiff's Exhibit 1.
17   Chris, it's Tab 1 in the binder that we -- it's Tab
18   1 in our document set that we used yesterday.
19             This is your report, Mr. Rafalski, and
20   could we put that up on the screen, please.  Page
21   45, please.
22             You have a section of your report that
23   says, Analysis of the methodologies to quantify
24   suspicious orders distributed in New York.
25             Do you see that?

1

2          A     Yes, sir.

3          Q.     And if you look down near the bottom

4     there, this refers to some analyses that are

5     contained in Schedule 2 of your report, correct?

6          A     Yes, sir.

7          Q.     And just for ease of the record, I'd

8     like to mark Schedule 2 as a standalone document.  I

9     think we're up to G, if I have my numbers right, G

10    as in good.  And could we pass out Tab 16 and put it

11    up on the screen, please.

12               And what you see here, this is actually

13    the conclusion of your report and the way you

14    formatted it, it feeds straight into Schedule 2.

15    And if we go through, just flip through the next

16    series of pages, these are the calculations that you

17    adopted from Dr. McCann, correct?

18         A     Yes, sir.

19         Q.     And they're all based on two appendices

20    to the McCann report, Appendix 10 and Appendix 11,

21    correct?

22         A     Yes, sir.

23         Q.     These are the only calculations or

24    quantifications contained in your report relating to

25    suspicious orders or flagged orders, correct?

```
 1                    Opioid Frye Hearing/Mr. Rafalski        13
 2           A    Yes, sir.
 3           Q.   At your deposition, if we look at this
 4      exhibit, Schedule 2, there's a Methodology A
 5      starting at the bottom of page 1.  If you go to page
 6      2, there's a methodology.  You see the results of
 7      Methodology A, and then at the bottom there's
 8      Methodology B and so on with a total of five
 9      methodologies, correct?
10           A    Yes, sir.
11           Q.   In truth, you believe that only your
12      first method, Method A, is plausible, correct?
13           A    Well, I think they're all plausible.
14           Q.   Okay.  Let's take a look at Tab 2, your
15      testimony from your deposition, February 7th 2020,
16      page 198, lines 3 through 10.
17                And I'll omit the objection.
18                "QUESTION:  Okay.  Would any much of
19                them be appropriate in your view for
20                detecting suspicious orders?  Would all five?
21                Any of the five?
22                ANSWER:  The first one is the only one
23                that I think would be plausible."
24           Q.   Did I read the question and your answer
25      correctly?
```

1

2      A    Yes.

3      Q.   Do you recall being asked that question

4  and giving that answer under oath?

5      A    Yes.

6      Q.   And, in addition, you agree that you

7  would not use the other four methodologies, other

8  than Method A, correct?

9      A    I don't think that was -- I don't think

10  that was -- I think, I think I made statements in

11  regards to the functioning of them and whether they

12  would be -- so implausible and impossible, in using

13  those words, there was one that I thought was a

14  functioning formula.

15          The other ones I didn't think would,

16  would accomplish or I wouldn't approve -- or I

17  shouldn't say approve, that I don't think would

18  function properly as a suspicious order system.

19          It -- but it wasn't about whether or not

20  they could actually be applied, my understanding.

21      Q.   My question is simply, you would not use

22  the other four, correct?

23      A    Well, it's not -- I did use them.  It's

24  not up to a question of use.  It's just whether or

25  not they could be properly functioning is what my

```
 1                    Opioid Frye Hearing/Mr. Rafalski        15

 2      question -- my responses to those deposition

 3      questions were my beliefs.

 4                   MR. SCHMIDT:  Mr. Reynolds, can we go to

 5               the very next question and answer, lines 11

 6               through 13.

 7                   THE COURT:  Go ahead.

 8      BY MR. SCHMIDT:

 9           Q.   Do you see where you were asked in the

10      very next question:

11               "Okay.  You would not use the other

12      four?

13               ANSWER:  I would not."

14               Do you remember being asked that

15      question and giving that answer under oath?

16           A    Yes, sir.  Again, I believe that was in

17      regards to whether they should be used as a

18      reasonable functioning suspicious order system.

19           Q.   And in your view, Methods B through E

20      should not be used as a reasonably functioning

21      suspicious order system, correct?

22           A    That would be my opinion and based on my

23      experience in my previous investigations, that they

24      would not function properly, that's correct.

25           Q.   So why did you perform those?  Why do
```

1
2     those calculations appear in your report, sir?

3          A    So at one point I was asked by the

4     attorneys to provide some algorithms or diagnostic

5     tools to apply to the transaction data.  I elected

6     to select four of them, which I reviewed as part of

7     the investigation, that were used by the companies.

8              The other one I picked was the Masters'

9     methodology or the Masters' diagnostic tool, and I

10    picked that one because it was reviewed by the

11    Appellate Court and -- reviewed by the Appellate

12    Court.  That was my purpose for picking that one.

13         Q.   Masters being Method A?

14         A    That's correct.

15         Q.   Okay.  Now, you just referred to being

16    asked to perform additional methodologies by the

17    lawyers, and that goes back to a point we addressed

18    several times yesterday when I asked you why didn't

19    you do this analysis, and you said the lawyers

20    didn't ask me to.

21             Here you said you did this analysis

22    because the lawyers asked you to.

23             What I would like to ask you is, is

24    there any analysis contained in your opinions or

25    your report or any opinion you reached without being

asked to conduct that analysis or reach that opinion

by the lawyers?

        A     Can you state it one more time, please.

        Q.    Of course.  Yeah.  I think the feed

froze for a minute.

             Is there any analysis that appears in

your opinions or your report or any opinion you have

offered that appears in your report that you were

not asked to conduct or reach by the lawyers?

        A     No.  If I understand the question, I

think I was tasked to -- my opinion is based on the

guidance or the framework of what my opinion is

based on, and that was to -- the maintenance of

effective controls, suspicious order system, and all

of the things that encompassed the suspicious order

system at the conclusion -- well, not the

conclusion, but after my opinion was pretty much set

by the review of all the documents and the records

in regards to suspicious order systems and due

diligence, then I was requested to provide these

diagnostic tools and apply data.

             I think it confirmed my opinions on the

ineffectiveness of the suspicious order systems and

the due diligence.  Obviously, if they would have

```
 1                  Opioid Frye Hearing/Mr. Rafalski        18

 2     been applied, it wouldn't have triggered any

 3     suspicious orders, then it would have definitely

 4     needed a review.

 5                   It's part of my opinion, but it's not

 6     the guiding post of my opinion.  It's cumulative of

 7     everything, just like drawing back to my experience

 8     with the DEA.

 9          Q.   I'm going to try to simplify my

10     question, because I think we're talking past each

11     other.

12                   Is there any analysis you've undertaken

13     in your opinions or report that you were asked to

14     undertake by the lawyers?

15          A    No, sir.

16          Q.   And is there any opinion you reached

17     without specifically being asked by the lawyers to

18     reach an opinion on that subject?  Yes or no.

19                   THE COURT:  Just yes or no,

20          Mr. Rafalski.

21          A    No.  I'm just thinking about it.  Sorry,

22     your Honor.  No, no, I don't think there is.

23     BY MR. SCHMIDT:

24          Q.   Is there any -- and I'm going to flag

25     this one for the Court and for Ms. Conroy because I
```

1

2      don't think it runs afoul of the objection that was

3      made yesterday, but I want to give that courtesy.

4              Is there any analysis you did in your

5      report entirely independently without taking

6      something that was first prepared by someone like

7      Dr. McCann or by lawyers and, in your words,

8      adopting it as your own?

9      A     This is my report, and these are my

10     words.  All of the information flowed through the

11     attorneys.  Some of it I found independent, but the

12     critical information came from the attorneys, but it

13     was my review and my evaluation of those documents.

14     Q.    But in terms of the actual analysis, is

15     there any of the analysis you did in the first

16     instance yourself without someone else doing it

17     first for you that you could --

18     A     Sure.  One example would be the review

19     of due diligence records.  That was my analysis,

20     looking at the, the policies, the suspicious order

21     systems that are formulas, the algorithms.

22              Many of the stuff I looked on my own.

23     No one told me what the result -- what my opinion

24     should be.  It was my evaluation of that

25     information.

```
  1                  Opioid Frye Hearing/Mr. Rafalski      20
  2          Q.   And did you write that up in the first
  3    instance yourself, or did someone else write that up
  4    in the first instance for you?
  5          A    I think those were all my words and my
  6    writing, my drafts, those critical parts of the
  7    review.
  8          Q.   Okay.  I want to go back to your
  9    methods.  You talked a lot yesterday about what you
 10    did while you were at the DEA.
 11              Am I correct that while you were at the
 12    DEA, the DEA never analyzed ARCOS data using the
 13    methodologies that Dr. McCann presented and you also
 14    presented in your report?
 15          A    That exact specific scenario, no, sir.
 16          Q.   You never used those methodologies,
 17    correct?
 18          A    No, sir.
 19          Q.   And I think the way I'm asking the
 20    question, I just want to make sure we're not talking
 21    past each other, what I said is correct, yes?
 22          A    I never specifically applied these
 23    methodologies during one of my occasions, and I'm
 24    not aware that the DEA did.  I'm not saying they
 25    didn't, but typically these methodologies, no, sir.
```

1

2       Q.   Thank you.  Before I dive into

3   Methodology A, which is the one I'm going to focus

4   on because it's the one that you rely on, I want to

5   cover some general points about your work regarding

6   flagged orders and suspicious orders.

7           And let's go back to Plaintiffs' Exhibit

8   1, your report, specifically the page we were

9   looking at, page 45.

10          And if we call out the first paragraph

11  under Heading 4, I want to focus on the language at

12  the end of that first sentence.

13          I've described in this report the ways

14  in which distributors and manufacturer Defendants

15  inadequate response to their statutory and

16  regulatory requirements to maintain effective

17  controls related to the sales of prescription

18  opioids -- and this is the part I want to ask you

19  about --  would potentially cause the diversion of

20  these pills for nonmedical use.

21          Do you see that language?

22       A   Yes, sir.

23       Q.   Now, yesterday you went further, and if

24  I heard you correctly, you said it's more likely

25  than not that there was diversion, correct?

Opioid Frye Hearing/Mr. Rafalski                    22

1    A    Yes, sir.

2    Q.   That's not what you say in your report

3    here.  In your report you say it would potentially

4    cause diversion of these pills, correct?

5    A    I agree with what I say there, yes, sir.

6    Q.   And I'd like to ask you about the gap

7    between data you have, an analysis you did, and the

8    opinion you seemed to give yesterday that it's more

9    likely than not that there was diversion.

10        You did not review any of the individual

11   orders reflected in this analysis, correct?

12   A    That's correct.

13   Q.   You did not perform an evaluation for

14   any individual order to see if it was suspicious,

15   true?

16   A    That's a true statement.

17   Q.   You were not offering any opinions on

18   whether the orders flagged by your methodology are

19   legitimate or suspicious?

20   A    Can you repeat that, please.

21   Q.   Yes, sir.

22        You do not intend to offer any opinions

23   on whether the orders flagged by Dr. McCann, that

24   you've adopted, are legitimate or suspicious?

1

2          A     And if we're speaking in regards to

3     specific orders at this time, the answer would be

4     that's correct.

5          Q.    You did not review all the diligence

6     files corresponding to triggered orders?

7          A     That's correct.  I did not review every

8     diligence file.

9          Q.    That's true for all distributors?

10          A     Yes, sir.

11          Q.    That's true for all manufacturers?

12          A     Yes, sir.

13          Q.    That's true for pharmacy Defendants in

14     this case?

15          A     Every specific due diligence file,

16     that's a correct statement, yes, sir.

17          Q.    You told us yesterday that it is

18     absolutely important that there be an uninterrupted

19     supply of prescription opioids for patients who need

20     them; do you recall that testimony?

21          A     I stand by that statement.

22          Q.    You agree that manufacturers and

23     distributors and pharmacies play an important role

24     in ensuring an adequate and uninterrupted supply of

25     legitimate prescription opioids, correct?

1

2        A     Yes, sir.

3        Q.    And relevant to ensuring the

4    distributors and pharmacies and manufacturers play

5    that role, that critical role in ensuring an

6    adequate and uninterrupted supply of legitimate

7    prescription opioids, you don't have an estimate as

8    to how much of prescribing or prescriptions are

9    legitimate in terms of prescription opioids?

10       A     I wasn't requested to conduct that

11   analysis so, no, sir, I do not.

12            THE COURT:  Mr. Schmidt, in connection

13            with strictly a Frye analysis, strictly a

14            Frye analysis, where are you going with this

15            line of questioning?

16            Frye analysis over here, and, of course,

17            examination during the trial of foundational

18            material.

19            It seems to the Court, and perhaps it's

20            far from me to question your needs and

21            methods -- pardon the play on the words

22            gentlemen and ladies -- what's the

23            connection?

24            The Frye analysis -- the Court expects

25            to hear a detailed explanation of

1
2    methodology.  The Court expects to hear
3    testimony as to general acceptance or
4    consensus of the methodology and testimony as
5    to reliability.
6         It seems to the Court that a great deal
7    of your examination is dealing with the
8    application of the methodology and
9    information by the witness.  So if I'm
10   mistaken, you'll tell me.
11        MR. SCHMIDT:  Sure.  I think it's
12   directly relevant, and I'm guided by the
13   Court's July 31st order on page 2 of the
14   order quoting, I think it's the opinion --
15   quoting the commentary on Rule 7.01, and the
16   Court states:  The foundation is lacking if
17   the trial court determines that there is
18   simply too great an analytical gap between
19   the data and the opinion offered, and it has
20   a citation.
21        The question boils down to whether the
22   expert's opinion sufficiently relates to
23   existing data, or the contrary, is connected
24   to existing data only by the ipse dixit,
25   unproven word of the expert.

1

2          THE COURT:  Right.  We're talking about

3     what you read.

4          MR. SCHMIDT:  Yes.

5          THE COURT:  We're talking about trial,

6     trial foundation.

7          MR. SCHMIDT:  No, I think that's the

8     Frye foundation.  The Frye inquiry, as we

9     understand it, as I think your Honor

10     explained it in your July 31st opinion is

11     methodology, part of methodology, part of

12     general acceptance is how do they get from

13     Point A data to Point B opinions.

14          And we had a very strong opinion given

15     yesterday that didn't appear in the expert's

16     report.  I'm trying to show that there's no

17     connection between what he did and how he got

18     that opinion.  That's core methodology.

19     That's core general acceptance.

20          THE COURT:  So what you're saying is

21     there's a methodology, and your examination

22     deals with the way, the means and methods of

23     the witness in fulfilling that methodology,

24     whatever that protocol is?

25          MR. SCHMIDT:  Yes, sir.

1

2           THE COURT:  Okay.  Go ahead.

3           MR. SCHMIDT:  Thank you.

4           And I see why the last couple of

5        questions triggered this, because they were

6        more related to merits points, but I was

7        trying to bring them back to the point that

8        -- the last question I asked about, not

9        assessing legitimate medical need.

10   BY MR. SCHMIDT:

11        Q.  Mr. Rafalski, since you didn't look at

12   any prescription data, when it comes to the

13   percentages that you express in your Schedule 2,

14   Court Exhibit G, you don't know what percentage of

15   the orders you flagged went to fill legitimate

16   prescriptions based on legitimate needs of patients,

17   correct?

18        A    That's correct, yes, sir.

19        Q.  You don't know if any of the orders that

20   you flagged in your methodology actually relate to

21   any of the specific pharmacies you discuss in your

22   report?

23        A    Just so I can make a statement in there.

24   I can't tell you --

25        Q.  Move to strike.

```
 1
 2              Sir, can you answer my question?
 3       A    Yes, but -- so you're -- so just so I'm
 4  clear, were actually diverted, my answer would be
 5  no, sir.
 6       Q.   No.  And my question was, you can't tell
 7  me whether any of the orders you flagged in Schedule
 8  2 related to any of the specific pharmacies you
 9  discuss in your report?
10       A    No, sir.
11       Q.   You can't tell me, just as you can't say
12  how many went to legitimate medical prescriptions,
13  you can't say how many of your flagged orders were
14  actually diverted?
15       A    So when you say "actually," I'm unable
16  to tell you.  I can't tell you exact -- actually
17  what was diverted, but my opinion is is that it's
18  more likely than not that, that there was diversion.
19       Q.   How much?
20       A    At least 51 percent.  More likely than
21  not.
22       Q.   How much diversion, sir?
23       A    I think I stated it's just more likely
24  than not.  I don't -- I can't give you an exact
25  percentage.
```

1

2      Q.    I'm asking you a different question,

3   sir.  You identify a number of orders as flagged in

4   your Schedule 2, correct?

5      A    I do.

6      Q.    How many of those orders were likely

7   diverted, in your opinion?

8      A     Well, my opinion is that there's not

9   sufficient due diligence.  It's more likely than not

10   that all of them.

11      Q.    If every single order you flagged were

12   diverted, 51 percent likelihood; is that your

13   testimony?

14      A     Yes, more likely than not.  If there's

15   nothing to clarify whether or not that's a

16   suspicious order, all the subsequent orders would be

17   considered suspicious.

18          I think that's consistent with what

19   Mr. Prevoznik's testimony in his deposition and even

20   some internal documents or documents that I saw

21   related to the companies.

22      Q.    Okay.  Stick with my question, because I

23   think you're answering a question I didn't ask.

24   Let's look at it concretely.

25          Can we put up Exhibit G, as in good, on

Opioid Frye Hearing/Mr. Rafalski                30

1

2      the screen, Tab 16, and can we go to page 2, please.

3      And let's just look at -- first of all, there's no

4      New York calculations here, right, no New York

5      State?

6              A    That's correct.

7              Q.   You don't know if the numbers were

8      changed or would be the same, be higher, or be lower

9      if you did all of New York State, correct?

10             A    I was expecting to see a New York State,

11     and when I wasn't provided that data, I didn't

12     question it.  I probably should have, and it wasn't

13     placed in the report.

14             Q.   And you don't know how different it

15     would be?

16             A    I do not.

17             Q.   Let's look at what you do have.

18                  At the top you've got Nassau County; do

19     you see that?

20             A    I do.

21             Q.   And let's just pick a number from Nassau

22     County.  All right.  I just want to look at

23     something in my notes.  Look, for example, at CVS

24     hydrocodone.  Do you see that?

25             A    I do.

Opioid Frye Hearing/Mr. Rafalski    31

1

2    Q.    88.9 percent?

3    A    Yes, sir.

4    Q.    Is it your opinion, more likely than

5    not, that all 88.9 percent of those -- that all 88.9

6    percent of CVS's total oxycodone distributions in

7    Nassau County were diverted?  Is that your opinion?

8    Yes or no.

9    A    More likely than not, yes.

10    Q.    Okay.  So we've got close to 100 percent

11    diversion from CVS in Nassau County; is that

12    correct?

13    A    That's correct.

14    Q.    There is no -- there's only 10 percent

15    legitimate medical use from CVS pharmacies in Nassau

16    County, correct?  That's your opinion?  Yes or no.

17    A    Yes, sir.

18    Q.    And the same is true for -- if you go

19    through every one of these calculations, almost, at

20    least on your first page in your Method A, the

21    lowest amount of legitimate medical use is less than

22    30 percent, correct?  And I'm looking at Cardinal,

23    oxycodone.

24    A    That's correct.

25    Q.    Have you ever seen, outside of you

1  coming up with this number -- let me ask you this

2  question.

3

4            Have you ever seen any DEA or any

5  scientist or public health official try to estimate

6  actual diversion using this method you've come up

7  with?

8        A    I think I've reviewed some when I was

9  working with some materials that kind of explored

10  the issue, but I've never seen any analysis or any

11  studies that have come up with the actual amounts of

12  diversion, that I'm aware of.

13       Q.   Is there any general acceptance to using

14  this methodology, not to try to flag orders, but to

15  say what you just said, which is this is how much is

16  actually diverted?  Is there any general acceptance

17  to that idea that you can point us to?

18       A    Well, I wasn't the investigator on it.

19  I think in general terms, yes.

20       Q.   Okay.  What general acceptance can you

21  point us to where a human being, in the history of

22  the DEA or the scientific community or the public

23  health community, has ever used this Method A to

24  estimate how much diversion is actually happening?

25       A    Well, then I misunderstood your earlier

1

2      question --

3           Q.    Let me re-ask the question then, and I

4      didn't mean to cut you off.

5           A     Well, yeah, but you did.

6                 So the last question is, is -- was

7      whether or not this type of analysis was used.  I

8      believe that it was in some cases.

9                 Now, was it -- did they use specifically

10     a, you know, methodology or diagnostic tool A, B, C

11     or D, no, but within the DEA, I believe the same

12     type of analysis was conducted to come to some

13     conclusion on some of the cases, yes, sir.

14          Q.    Okay.  That's not my question, sir.

15     Please focus on my question.

16                Can you point me to any time you're

17     aware of when anyone has used Method A to try to

18     estimate, not flagged orders, not even suspicious

19     orders, but actually diverted orders; yes or no?

20          A     No.

21          Q.    Is it generally accepted?  Is there any

22     measure of general acceptance you can point me to

23     for using Method A to estimate, not flagged orders,

24     not suspicious orders, but actually diverted orders,

25     as you have done in your testimony?

1

2          A     No.

3          Q.    Are you aware that the DEA has actually

4    used techniques to try to estimate the amount of

5    diversion?

6          A     Yes.

7          Q.    And are you aware of the numbers that

8    they have come up with when they use those

9    techniques to estimate the actual rate of diversion?

10         A     The actual numbers, no, sir.

11         Q.    Are you aware that it's in the third

12   decimal place .00X percent?

13         A     No, sir.

14         Q.    Would it help to see that?

15         A     If you're asking me if I would see it,

16   then I would answer yes, yes, but I'm not aware of

17   it.

18         Q.    Let's take a look at Tab 39.

19               Do you see that this is -- and let me

20   give a second so the folks in the courtroom can get

21   a copy.  In the meantime, mark this as Exhibit H, H

22   as in happy.

23               Do you see that this document, sir,

24   comes from the Federal Register?

25         A     I do, sir.

```
1                 Opioid Frye Hearing/Mr. Rafalski        35
2            Q.    And you're familiar with publications.
3       If we look in the center, it's from the DEA,
4       Department of Justice, Drug Enforcement
5       Administration.  You're familiar with publications
6       they make in the Federal Register?
7            A    Yes, sir, I am.
8            Q.    Those are official statements of DEA for
9       purposes of their operation; are you aware of that?
10           A    Yes, sir.
11           Q.    And if you look below, this official DEA
12      statement relates to proposed aggregate production
13      quota; do you see that?
14           A    Yes, sir, I do.
15           Q.    That's that quota we were talking about
16      where DEA determines how many prescription opioids
17      exist in the United States, right?
18           A    Yeah.  I believe it actually sets the
19      overall amount of the controlled product utilized.
20      I don't know if it gets as finite as your
21      explanation, but generally, yes.
22           Q.    And if you look at the date at the top,
23      this is from September 12th.  Please scroll up to
24      the top, Chris.
25           A    2019.
```

```
1                    Opioid Frye Hearing/Mr. Rafalski        36
2              Q.   Yeah.   All right.   Let's look at page 3
3         of this document -- page 4.   I'm sorry.
4                   And do you see they have on the bottom
5         left column, diversions estimates for 2018; do you
6         see that?
7              A    May I take one second to look at it,
8         please.
9              Q.   Of course.
10             A    Can you scroll up to the top of the
11        page.
12                  MR. SCHMIDT:   Chris, do you mind doing
13             that.
14                  THE WITNESS:   Okay.
15        BY MR. SCHMIDT:
16             Q.   So you understand that there was a law
17        passed that required the DEA to estimate the amount
18        of diversion, and that's what they're doing here,
19        true?
20             A    Yes, sir.
21             Q.   And specifically, if we scroll back
22        down, they're doing it for 2018?
23             A    Yes, sir.   I'm just looking because you
24        quoted an actual percentage and I'm --
25             Q.   You're not going to see it here.
```

```
 1                   Opioid Frye Hearing/Mr. Rafalski        37
 2           A    Oh, okay, sir.
 3           Q.   It's slightly more complicated than
 4      that.
 5                Do you see that for hydrocodone, it's
 6      24.259 kilograms?
 7           A    Yes, sir.
 8           Q.   And if we look at oxycodone on the next
 9      page, it is 57.051; do you see that?
10           A    Yes, sir.
11                MR. SCHMIDT:  And, Chris, I don't know
12                if there's a way we can kind of grab those
13                numbers and keep them on the screen.  I'm
14                going to need to show the witness a second
15                document.  If there's not, I understand that.
16      BY MR. SCHMIDT:
17           Q.   But you're aware that the DEA publishes
18      on their website their actual quota year by year,
19      right?
20           A    Generally speaking, yes, sir.
21                MR. SCHMIDT:  All right.  If we --
22                Chris, look at Tab 40, please.  If my
23                colleagues in the courtroom could pass out
24                Tab 40, which I'll mark as Exhibit I, and
25                I'll ask if we could just blow up the title a
```

```
1                   Opioid Frye Hearing/Mr. Rafalski        38

2              little bit.

3                   And I will represent to you we can go to

4              the website and literally look at it, if you

5              want, but this is from the Office of

6              Diversion Control website.

7                   If you click on quotas, there's another

8              tab where you can click on and get the

9              aggregate production quota history.

10   BY MR. SCHMIDT:

11              Q.   Do you see that?

12              A    Yes, sir.

13              Q.   We can take that title down.  If you

14   look across the top, there's a year of -- there's a

15   range of years.  I'm going to focus on what DEA was

16   focused on, 2018.  Do you see that?

17              A    Yes.

18              MR. SCHMIDT:  And I'm sorry that this is

19              not the most elegant way to be able to show

20              this to you.  It's hard doing this remotely,

21              but, Chris, could we call out the line for

22              hydrocodone sale and oxycodone sale, please.

23   BY MR. SCHMIDT:

24              Q.   And I hope you can see this with me,

25   Mr. Rafalski.  I just want to lay out what the math
```

1                      Opioid Frye Hearing/Mr. Rafalski          39

2     is, and then I'll tell you what I get from these

3     numbers.

4                    The hydrocodone estimated diversion from

5     the DEA is, if we look at the left, 24.259.  Do you

6     remember that number?

7          A    Yes.

8          Q.   And if we divide that by the 2018 number

9     for total hydrocodone it's 43,027.640, correct?

10         A    Yes, sir.

11         Q.   And that comes up to .056 percent.  Does

12    that sound right to you?

13         A    Yeah.  I wouldn't argue with that.  I'm

14    not going to calculate it, but...

15         Q.   And let's just do the same for

16    oxycodone.  It's kind of covered, if you can pull

17    the left side down a little bit, Chris.  There we

18    go.

19                   So for oxycodone the amount of diversion

20    for 2008 is 57.051; do you see that?

21         A    Yes, sir.

22         Q.   Divided by 79,596.606.  Do you see that?

23         A    I don't see the .606.  Is that the

24    calculation you're doing?

25         Q.   No.  That's the number at the end of --

```
 1              Opioid Frye Hearing/Mr. Rafalski        40
 2              THE COURT:  It's a suggested
 3         calculation.
 4              MR. SCHMIDT:  No, it's actually not.
 5         That's the number reported in Exhibit I of
 6         the table.  It's probably hard to read.
 7         Maybe we can blow up that number a little
 8         bit, the 79,596.606 under 2018, Chris.
 9    BY MR. SCHMIDT:
10         Q.   Do you see that?
11         A    I can see that number, but my
12    understanding is you're doing a calculation to come
13    to a percentage of diversion.
14         Q.   Yes, yes.  So dividing the 57.051 by the
15    79,596.606.
16         A    And the resulting number is?
17         Q.   .072 percent.
18         A    Okay.  Did you -- I'm sorry.  I'd like
19    to write it down, because I'm thinking we may
20    discuss it more, the hydrocodone number, the
21    calculated number.
22         Q.   And I'm rounding off what I understand
23    generally accepted rounding principles.  That's .056
24    percent, as I calculate it, and the oxycodone number
25    is .072?
```

1

2     A     I think the thousandths is fine.  Thank

3  you.

4     Q.    Okay.  And my question is, in terms of

5  the DEA's estimate of how much diversion is

6  occurring, you recognize that as a generally

7  accepted method of calculating the amount of

8  diversion that has occurred?

9     A     That's a very complex question.  I

10  understand the calculations you did, and I

11  understand the data here.  I mean, I don't, I don't

12  know what the basis or how they came to the

13  conclusion on the amount of diversion.

14          Obviously the DEA did it, my former

15  agency, but I don't know what they used for the data

16  to come up with that number.  I accept that these

17  are the numbers that were published, and I accept

18  your mathematics.

19     Q.    Do you have any different methodology

20  for coming up with actual diversion than the numbers

21  that the DEA has -- than the methodology that the

22  DEA has employed here in this Federal Register

23  publication?

24     A     None, other than just looking at the

25  potential volume that these numbers represent, and

1

2    my experience working, and my knowledge of how the

3    opioid epidemic is still, although not as bad, is

4    continuing.

5              It would just be not a scientific study,

6    but I think if I calculated out the dosage units, I

7    probably would not agree with this calculation.

8         Q.   Okay.  You've not done that type of

9    calculation of actual diversion that the DEA has

10   conducted, correct?

11        A    No, I have not.

12        Q.   Okay.  And you don't have alternative

13   numbers using either their methodology or any other

14   methodology for actual diversion for years, other

15   than 2018, correct?

16        A    I do not.

17        Q.   Okay.  Let me go back to some of the

18   questions I was asking you.

19              Do you know if any of the orders that

20   were flagged by Dr. McCann's methodology that you

21   adopted, do you know if any of those orders were

22   actually diverted?

23        A    When you say the word "actually," I have

24   to answer that no, sir.

25        Q.   You don't know?

1

2      A     No, sir.

3      Q.    To the contrary, would you agree with me

4   that just a suspicious order in an amount outside of

5   the normal, which is either an amount that's a large

6   order, orders that are frequent orders, or the other

7   criteria that's listed in the regulation, that in

8   itself doesn't mean guarantee that it's going to be

9   put into an illicit market?

10          Do you agree with that?

11          And I'll just ask, I don't know if you

12   heard the end of what I said.  Someone was not on

13   mute, so I'll just ask that people on the phone be

14   on mute.

15          Did you catch my question, Mr. Rafalski?

16      A     Yeah, but if you would just ask -- I

17   think it's a pretty critical question.  Could you

18   ask me it again, please.

19      Q.    Yeah.  Would you agree with the

20   statement, in itself, just a suspicious order in an

21   amount that's outside of the norm, which is either

22   an amount that's a large order, orders that are

23   frequent orders, or the other criteria that's listed

24   in the regulation, that, in itself, doesn't mean

25   guarantee that it's going to be put into an illicit

1

2      market, there could be an explanation; do you agree

3      with that?

4           A    That's a pretty complex question.  It

5      has a lot of different areas.

6                No, I do not agree with that.

7           Q.   Okay.  Do you recall when you were

8      working at the DEA, you were called on at various

9      times to give testimony in cases?

10          A    Yes, sir.

11          Q.   Do you recall giving testimony in a case

12     involving forfeiture relating to an entity HD Smith

13     in 2011?

14          A    Yes, sir.

15               MR. SCHMIDT:  May I ask that Tab K2 be

16               passed out and put up on the screen.  We'll

17               go ahead and mark this as Exhibit J.  If we

18               could put this up on the screen, please.

19     BY MR. SCHMIDT:

20          Q.   Do you see that this is testimony,

21     deposition testimony from you in a case called U.S.

22     versus 463,497.72 in U.S. currency from Best Bank

23     account dated May 17th 2011; do you see that?

24          A    Yes, sir.

25          Q.   And if we go to the next page, you see

```
 1                  Opioid Frye Hearing/Mr. Rafalski          45
 2      the formal caption, and a third of the way down it
 3      says, Deposition of James Rafalski.
 4                  Do you recognize this as your testimony
 5      in this case while you were an official at the Drug
 6      Enforcement Administration?
 7           A    I remember testifying in this matter,
 8      both here and at trial, yes, sir.
 9           Q.   Let's go to page 98 of your testimony,
10      please, line 6 to 13.  I'm just going to read the
11      question and the answer.
12                  "QUESTION:  Okay.
13                  ANSWER: --"
14           A    Again, one second.
15                  MR. SCHMIDT:  Why don't we limit it just
16                  to the question and answer, Chris, and see if
17                  we can make it a little larger for the
18                  witness and for me, frankly.  It's a curtesy
19                  for us older gentlemen.
20                  It's line 6 through 13, please, page 98.
21      BY MR. SCHMIDT:
22                  Q.   Is that better, Mr. Rafalski?  It is for
23      me.
24           A    Yes, sir.
25           Q.   Okay.  And I'll read starting at line 6:
```

1

2          "QUESTION:  Okay.

3          ANSWER:  In itself, just a suspicious

4       order in an amount that's outside of the

5       norm, which is either an amount that's a

6       large order, orders that are a frequent

7       order, or the other criteria that's listed in

8       the regulation, that in itself doesn't mean

9       guarantee that it's going to be put into an

10       illicit market.  There could be an

11       explanation."

12          Did I read that correctly?

13     A     You did.

14     Q.    Do you recall being asked that question

15  and giving that answer while you were a government

16  official in this case?

17     A     Yes, sir.

18     Q.    Were you being truthful in answering

19  that question?

20     A     I was.

21     Q.    Do you agree that if you have a

22  suspicious order -- I'm sorry.  Do you agree that if

23  you have a suspicious system in place and you get a

24  large order for a specific product which generates a

25  report, that doesn't automatically tell a

1                     Opioid Frye Hearing/Mr. Rafalski        47

2     distributor that they have to stop, cease shipping

3     of all controlled substances?

4          A     The complexity of that, so when an order

5     is identified by the system, and it's identified as

6     suspicious, until you dispel it, it's always going

7     to be suspicious, and there's no way to know.

8               Now, if it's dispelled, there would be

9     an explanation.  That's the due diligence part.  So

10    that's what -- the complexity of your question, it's

11    difficult to just say yes or no.

12         Q.    Could we go to page 96, please, lines 12

13    through 20.

14               "QUESTION:  Okay.

15               ANSWER:  If you had information that a

16          pharmacy or customers engaged in illegal

17          conduct, you should stop all shipping, but if

18          you have a suspicious system in place and you

19          get a large order for a specific product

20          which generates a report, that doesn't

21          automatically tell a distributor that they

22          have to stop, cease shipping of all

23          controlled substances."

24               Did I read that correctly?

25         A     Yes.  And the key to that is to all

controlled substances at the end.

Q. And do you recall being asked that question and giving that answer under oath as a government official?

A I don't have a specific recollection, but I'm not going to dispute the transcript.

Q. Okay. And you were being honest when you answered that question?

A Well, yes, sir.

Q. Okay. You don't know if any specific orders from the Defendants in this case caused harm to the public health; do you?

A In the case that we're reviewing here?

Q. Yes.

A Generally speaking, yes, I do.

Q. Okay. Let's go to your New York deposition, February 7th 2020, Tab 2, page 207. And let me just ask you one more time, sir, before we pull this up.

Do you know if any of these flagged orders actually caused harm to the public health; yes or no?

THE COURT: Page, line, question, answer. Thank you.

```
 1                    Opioid Frye Hearing/Mr. Rafalski        49
 2              MR. SCHMIDT:  I was just giving him
 3         another chance before I went there, your
 4         Honor.
 5              THE COURT:  Page 207, line 11; is that
 6         what you're reading from?
 7              MR. SCHMIDT:  No.  It's 7 to 10.  Let's
 8         do the impeachment.  Can we pull up 7 to 10,
 9         please.
10              MS. CONROY:  I'm sorry, your Honor.
11         Sorry to interrupt.  Can I get this more
12         clearly, the page and line number.
13              MR. SCHMIDT:  Of course, Ms. Conroy.
14              MS. CONROY:  Thank you.  It's very
15         difficult to tell just from the laptop.
16              MR. SCHMIDT:  I apologize, Ms. Conroy.
17              It's the February 7th 2020 transcript,
18         page 207, lines 7 through 10.  And let me
19         know when you're there and I'll continue.
20              MS. CONROY:  I'm there.  Thank you.
21    BY MR. SCHMIDT:
22         Q.   Thank you.
23              "QUESTION:  Okay.  Do you know if any of
24         these flagged orders actually caused harm to
25         the public health?
```

```
 1              Opioid Frye Hearing/Mr. Rafalski        50
 2              ANSWER:  I do not."
 3              Do you recall being asked that question
 4      and giving that answer?
 5         A    Not specifically, but I read it, and I
 6      don't dispute that that's what was asked and that's
 7      what I said.
 8         Q.   And you were trying to testify as
 9      truthfully as you could in giving the answer that, I
10      do not know if these flagged orders actually caused
11      harm to the public health, correct, at that time?
12         A    Yes, sir.  specifically to the word
13      "actually," and I can't read the previous questions
14      and questions subsequent to this, but the word
15      "actually," the answer to that is I do not.
16         Q.   Okay.  So let me just see if I have
17      that.  You don't know if any of your flagged orders
18      actually caused harm to the public health, correct?
19         A    Actually, no.  More likely than not,
20      yes.
21         Q.   Even though you performed these
22      calculations -- well, I'll stand on that and leave
23      it.
24              Even though you performed these
25      calculations on the flagged orders, you don't have
```

```
 1                    Opioid Frye Hearing/Mr. Rafalski          51

 2      an opinion on how many should have been reported in

 3      New York, correct?

 4            A     On each specific order?

 5            Q.    For any of them.  Let me ask the

 6      question differently.

 7                  Do you know how many should have been

 8      reported in New York?

 9            A     Specifically, no.

10            Q.    You're not offering an opinion that any

11      specific order from a manufacturer, distributor or a

12      pharmacy should have been reported but was not

13      reported, correct?

14            A     I wasn't requested to do that analysis,

15      so I don't have an opinion at this time, no, sir.

16            Q.    And you are not suggesting in your

17      report with this analysis that more orders should

18      have been reported as suspicious; are you?

19            A     I think that's what the report says.

20      When there's the application of the methodologies,

21      even the ones that, as you say, I wouldn't -- that I

22      don't accept or wouldn't utilize, even those, those

23      diagnostic tools, the three times multiplier still

24      generate a significant amount of orders that should

25      have been reported suspicious or were suspicious
```

```
 1                    Opioid Frye Hearing/Mr. Rafalski        52

 2      based on triggering the system and not having any

 3      due diligence conducted.

 4              Q.   You used the same methodology in the

 5      MDL, correct, the same Method A?

 6              A    Yes, sir.

 7              Q.   That Dr. McCann performed for you,

 8      right?

 9              A    Yes, sir.

10              Q.   Let's look at your MDL transcript.  This

11      is May 13th 2019, Tab 17, at lines (sic) 179, 9

12      through 25.

13              A    Page, please.

14              MS. CONROY:  Excuse me, your Honor.

15              Could I receive a copy of that transcript,

16              please.

17              THE COURT:  Yes, you can.  Go ahead.

18      BY MR. SCHMIDT:

19              Q.   Let me know when you have it, please,

20      Ms. Conroy.

21              MS. REISMAN:  Paul, can you repeat the

22              tab number?

23              MR. SCHMIDT:  Of course.  17.

24              Do you have it Ms. Conroy?

25              MS. CONROY:  No, I don't.  It looks like
```

```
 1              Opioid Frye Hearing/Mr. Rafalski        53
 2         they're finding something, though.
 3              MS. JONES:  Is that the May 13th 2019
 4         transcript?
 5              MR. SCHMIDT:  Yes, please.
 6              MS. CONROY:  I have it.  Thank you.
 7              MR. SCHMIDT:  Thank you.  And I'm on
 8         page 179, lines 9 through 25.  Please tell me
 9         when you're there.
10              MS. CONROY:  I'm there.  Thank you.
11    BY MR. SCHMIDT:
12         Q.   Okay.  And I'll read the whole portion
13    to you, but I'm going to focus on the first line of
14    your answer.
15              "QUESTION:  Are you suggesting in your
16         report that more orders should have been
17         reported as suspicious?
18              ANSWER:  Well, I don't think it suggests
19         that.  I'll restate it again.
20              So when the system triggers a suspicious
21         order, it doesn't reset to the next order to
22         be a suspicious order.  So how I interpret
23         the regulations and how my training is and
24         how the Masters ruling and some of the
25         documents I've read in regards from McKesson
```

Opioid Frye Hearing/Mr. Rafalski                54

1

2        and Cardinal and Prevoznik's deposition

3        testimony, is that once a suspicious order is

4        identified by registrant, it should be

5        stopped and there should be a due diligence

6        to dispel whether or not that suspicious

7        order is, in fact, suspicious."

8             Do you recall being asked that question

9    and giving that answer about your Method A?

10        A    Yes, sir.

11             MS. CONROY:  Your Honor, the entire

12        answer was not read.

13             THE COURT:  Read the entire answer,

14        Mr. Schmidt, please.

15             MR. SCHMIDT:  Can you scroll down.  I

16        thought I did read the entire answer.  I

17        apologize for that.

18             Oh, you're right.  I apologize.

19    BY MR. SCHMIDT:

20        Q.  "If the registrant takes no action and

21    just continues to ship subsequent orders in that

22    order, then they're all suspicious orders.

23             Now, my last paragraph kind of sums up

24    that this is how I applied this, and, you know, it's

25    in regards to how the Court would or would not

```
1                    Opioid Frye Hearing/Mr. Rafalski         55

2      accept it, and there would be other methodologies.

3      So that's how I interpret it."

4                  Did I read that correctly?

5           A    Yes, sir.

6           Q.   Do you recall being asked that question

7      and giving that answer?

8           A    Yes, I do.

9           Q.   You don't know if the DEA or the State

10     of New York would have taken action on any of these

11     flagged orders if they were reported, true?

12          A    I have no way to know that, no, sir.

13          Q.   And as to orders that were reported, are

14     you aware that there were well over 10,000

15     suspicious orders reported just by McKesson,

16     Cardinal and ABDC in the State of New York?

17          A    Not that specific number.  If you wanted

18     to show me some documents for, you know, to confirm

19     those specific numbers.  I know there were reports,

20     but off the top of my head, I don't know it was

21     10,000.

22          Q.   Are you familiar with the Plaintiffs'

23     expert named Lacey Keller?

24          A    The name, yes, sir.

25          Q.   Have you reviewed her materials and her
```

1

2    estimates of the over 10,000 suspicious order

3    reports that Cardinal, ABDC, McKesson made in the

4    State of New York?

5          A     I have not.

6          Q.    Okay.  As to whatever volume of

7    suspicious orders the Defendants in this case made

8    to the State of New York, you don't know what

9    percentage of the actual suspicious orders that were

10   made were actually acted on by New York, correct, or

11   the DEA?

12         A     No, sir.  You started to interrupt.

13   Sometimes I think you're done when you ask the

14   question, and then you add a little bit.

15         Q.    You're doing fine, sir.  That's a

16   terrible practice I have.  My brain works slowly.

17               In fact, you're not aware of any

18   suspicious order reports regarding pharmacies that

19   led to an investigation, correct?

20         A     Can you ask it again and maybe just a

21   little slower, please.

22         Q.    Yes.  You're not aware of any suspicious

23   order reports regarding pharmacies that led to an

24   investigation?

25         A     That's correct, I am not.

1                    Opioid Frye Hearing/Mr. Rafalski        57

2          Q.    Let's go back to your Schedule 2, to

3    your report, and can we put that back up on the

4    screen.  As you can probably see, I'm having trouble

5    finding my copy of it.

6                Here it is.  It's Exhibit G, please.

7    And look at the first page.  You indicate on the

8    first page -- could we put that up, Chris, Exhibit

9    G.

10               You indicate on the first page that your

11   analysis runs from 1996 to 2018; do you see that?

12         A    Yeah.  Those numbers are incorrect.

13         Q.    Instead of doing it for that 22-year

14   period, you only did it for the nine-year period of

15   2006 to 2014, correct?

16         A    That's correct.

17         Q.    You actually believe the opioid crisis

18   goes back to before 1999, right?

19         A    I don't think I testified to that.  I

20   think that's close to the onset of the internet

21   pharmacies and the OxyContin.

22               I think my prior testimony would say it

23   would be around the 1999 time period.

24         Q.    Okay.  You don't know how your numbers

25   would change if you used the full period you talk

1                    Opioid Frye Hearing/Mr. Rafalski          58

2       about here in terms of evaluating flagged orders,

3       correct?

4              A    If I amended the timeframe?

5              Q.   Yes.

6              A    Since I didn't do those calculations, I

7       don't want to provide any opinions.

8              Q.   Let's go to page 2, please.

9                   You did not perform the math in these

10      calculations; that was done by Dr. McCann, right?

11             A    It was.

12             Q.   You've never talked to Dr. McCann?

13             A    I've talked to him, yes, sir.

14             Q.   You didn't talk to him at the time that

15      you turned in this report; did you?

16             A    Well, your first question was pretty

17      broad.  Specifically about this report, no, sir.

18             Q.   You didn't read his deposition in the

19      New York case; did you?

20             A    I read portions of it.

21             Q.   But not in its entirety?

22             A    No, not the entirety.

23             Q.   You've not checked his calculations;

24      have you?

25             A    Definitely I have not done that, sir.

Opioid Frye Hearing/Mr. Rafalski                59

Q.   And in terms of what we see on this
page, your Method A, this is, again, copied in this
case word for word and number for number from what
Dr. McCann did, correct?

A    That would be my expectations, yes, sir.

Q.   You didn't change anything?

A    I did not.

Q.   And even the format that this appears
in, that was given to you and adopted by you as your
own, in your words, correct?

A    The Excel spreadsheet system, yes, I
didn't design this.  That's correct.

Q.   You didn't know, until we talked at your
deposition, that in coming up with these numbers and
getting from the data to the opinions you offered,
the methodology he used, that you adopted, you
didn't know until we talked at your deposition that
he had to make some judgment calls in coming up with
these numbers; did you?

A    So I remember that testimony, and I
think there were some -- I think the term that was
used was assumptions, and I was a little confused by
that.

I know there was some questions on how

1

2     to apply the methodology, and I -- so I may have

3     answered that I did not know, but I think I was

4     confused by the question.

5          Q.   You knew his algorithm required certain

6     judgment calls?

7          A    Well, I had some discussions or -- not

8     directly with him in regards to the start and stop

9     point, whether it was 30 days or whether it was

10    calendar months, but specifically I know there was a

11    little bit of he needed to make some assumptions or

12    judgments to run it, but specifically, I didn't have

13    any conversations directly with him about it.

14         Q.   And you can't say, one way or another,

15    whether you agree with the judgment calls he made in

16    performing his algorithm, correct?

17         A    That's not a totally true statement.  So

18    on applying the Methodology A, if you went by the

19    calendar months, I would agree.  I agree with that.

20         Q.   Is it true that you don't know the

21    entirety of his judgment calls?

22         A    I reviewed his deposition testimony.  If

23    there's some outside of that, I would not be aware

24    of them.

25         Q.   Okay.  Let's look at your February 7th

1

2    2020 deposition transcript, page 204, line 13 to 22.

3    This is Tab 2, page 204, 13 to 22.

4              "QUESTION:  Okay.  Maybe that answers my

5          next question, which is do you know, can you

6          say one way or the other whether you agree

7          with the judgment calls he made in performing

8          his algorithm?

9              ANSWER:  I don't know the entirety of

10         his judgment call, so I can't, I can't answer

11         that question."

12             Did I read that correctly?

13    A     You did.

14    Q.    Do you recall being asked that question

15    and giving that answer at your deposition?

16    A     I don't specifically recall it, but I

17    don't dispute the deposition record.

18    Q.    Do you dispute the truth of that

19    statement?

20    A     Yes, sir.

21    Q.    You do dispute the truth of that

22    statement that you made?

23    A     I do not.  I'm sorry.

24    Q.    Okay.  And you looked at his testimony.

25    Do you see the part of his testimony where he said,

1    I probably would come up with 5 or 10 different

2    small decisions that needed to be made in order to

3    operationalize it?  Did you see that portion of his

4    testimony?

5          A    I don't specifically recall that.

6          Q.   Okay.  Do you know what the 5 to 10

7    decisions he had to make to be able to perform his

8    Method A calculation that you relied on?  Do you

9    know what those 5 to 10 decisions were?

10         A    No, sir.

11         Q.   So not knowing how he took the data and

12   made the 5 to 10 decisions, you don't know how far

13   of a gap there is between his outputs and that

14   additional data in terms of those 5 to 10 decisions

15   that he made; am I correct in that?

16         A    Yes, sir.  That's correct.  That is a

17   correct statement.

18         Q.   Now, let's show the Judge how your

19   method works in application.

20              Under your Method A, you look to see if

21   the level of opioids in a given month is more than

22   any in the prior single six months, right?

23         A    Trailing six months, yes, sir.

24              MR. SCHMIDT:  And if we illustrate that,

```
 1              Opioid Frye Hearing/Mr. Rafalski        63
 2              can we pull out Demonstrative Exhibit 4?
 3              We'll mark this as Court Exhibit K.  Let me
 4              just give a moment for it to be passed out in
 5              court.
 6     BY MR. SCHMIDT:
 7              Q.   So do you see I've written up on the
 8     screen, Year 1.  I start in February, 5,000, go
 9     through July, and the number of pills vary per
10     month, 5,000, 10,000, 7,000, 8,000, 9,500; do you
11     see that?
12              A    I do.
13              Q.   And do you recognize that these are the
14     very same numbers that Dr. McCann gives as an
15     example in his report?
16              A    Yeah, I believe he does, yes, sir.
17              Q.   Right.  So under your methodology, if we
18     go to page 2 and assume that in August their 10,000
19     pills, that would not be suspicious because it's not
20     higher than March, which is the highest of the prior
21     six months; is that how your methodology works?
22              A    Yes, sir.
23              Q.   Let's go to page 3, and we'll mark that
24     green, just to show that it's not suspicious; fair?
25              A    Yes, sir.
```

```
 1              Opioid Frye Hearing/Mr. Rafalski        64
 2              MR. SCHMIDT:  Okay.  Let's do another
 3         assumption, and I'll do this side by side, if
 4         we can go to page 4.  If instead, and I think
 5         we got the wrong one loaded, Chris.  Could
 6         someone on the line tell me the right one to
 7         ask for, because I think it should be 10,100.
 8              Chris, if we could use the file that has
 9         yesterday's date in the title.  Bear with me.
10         We changed it here in your testimony
11         yesterday to try to make it consistent with
12         your testimony, Mr. Rafalski.
13              THE WITNESS:  I understand.
14    BY MR. SCHMIDT:
15         Q.   There was one point, you'll remember,
16    where the Judge asked you if you had one pill extra,
17    does that trigger your suspicious order.  You said,
18    Well, you know, you don't really see one pill.  You
19    might see one bottle, which is 100 pills.
20              Do you remember saying that?
21         A    I do.
22         Q.   Okay.  And so that's --
23         A    They don't sell the pills one pill at a
24    time, so that's why I made that statement, sir.
25         Q.   Understood, understood.  And that's why
```

1        we changed this overnight.

2                So you'll see page -- I'm going to mark

3        this one as Demonstrative Exhibit 10.  I think your

4        Honor and Ms. Conroy, this is the version that was

5        given out in court.

6                You'll see page -- let's go back to page

7        1, that's the assumption.  Page 2, that's if you

8        have 10,000.  Page 3, that's based on suspicious.

9        And now let's go to where we were on page 4.

10               If instead of having 10,000 pills in

11       August, you have 10,100, you have one bottle extra;

12       do you see the difference between these two?

13       A    I do.

14       Q.   In that scenario, that would be

15       suspicious under your methodology, correct?

16       A    Not my methodology.

17       Q.   Sir, I will withdraw my question and

18       rephrase it.

19               Under Method A, that 10,100 would be

20       flagged, correct?

21       A    The diagnostic tool or the suspicious

22       order system would have flagged that order, yes,

23       sir.

24       Q.   And let's go to the next one and mark it

Opioid Frye Hearing/Mr. Rafalski                    66

red so we can see the difference between what gets
flagged and what doesn't get flagged.

Do you know of any generally accepted
suspicious order methodology that identifies an
order as suspicious based on the amount of a single
pill bottle in one month?

A    I think if there's an established
threshold for any suspicious order system, my answer
to that would be yes.  Anything that would exceed
the threshold would be triggered as a suspicious
order.

I can see that, that this hypothetical
example of 100 pills, I can see that probably the
DEA wouldn't rush into action for a 100-pill bottle,
but that's the integrity of the system.  The person
who designs -- the company that designs the system
designs it, a trigger.

So the 100 is the trigger.  The
resolution of a 100-pill bottle would probably be an
easy resolution, an easy due diligence.
Hypothetically, that August number could be 30,000.
So -- but the answer is yes, the system would stop
that order and it should.

Q.   Would it automatically report it

Opioid Frye Hearing/Mr. Rafalski                    67

1

2     regardless of what that, what the company finds

3     looking at that order?

4          A     The system would report it.  No, sir.

5     That's up to the registrant.

6          Q.    Okay.  Now, your methodology, the six

7     months does not build in slight increases from month

8     to month in the threshold to account for the fact

9     that there are time periods in which prescribing

10    levels were increasing, correct?

11         A     Again, I don't want to correct you.

12    This isn't my methodology.  This was the methodology

13    that was used by Masters, and they elected not to

14    build that component into this system.

15              I just used the system as it was

16    designed.

17         Q.    Sir, this methodology, Methodology A

18    does not build in slight increases from month to

19    month to account for time periods in which doctors

20    were making the medical judgment to prescribe more

21    opioids, right?

22         A     It does not build that in, that's

23    correct.

24         Q.    It doesn't adjust threshold levels at

25    all based on whether doctors are making the judgment

Opioid Frye Hearing/Mr. Rafalski                    68

1

2    to prescribe more legitimate prescription opioids or

3    less, correct?

4         A    There's no components for doctors.  It's

5    up to the company that designed it to make the

6    decision on whether or not to ship increasing

7    amounts of that drug.

8         Q.   Should a suspicious order monitoring

9    program take into account changes in medical

10   practices, such as whether doctors were prescribing

11   more or fewer prescription opioids?  Yes or no.

12        A    There's not a yes-or-no answer to that

13   because of the qualifications.

14        Q.   Okay.  Do you know of any generally

15   accepted methodology for detecting suspicious orders

16   and reporting them that ignores legitimate medical

17   practices and legitimate medical trends in

18   prescribing?  Do you know of any such methodology?

19        A    That's another qualified question that's

20   not a simple yes-or-no answer.

21        Q.   Okay.  And let me just phrase it

22   differently, and then I'll move on.  Can you point

23   me to any generally accepted methodology for

24   identifying and reporting suspicious orders that

25   ignores entirely what the medical community is doing

1                    Opioid Frye Hearing/Mr. Rafalski            69

2     in terms of whether they're making the judgment to

3     prescribe more for legitimate reasons or less for

4     legitimate reasons?  Can you point me to any such

5     methodology?  Yes or no.

6          A    Specific methodology, the answer would

7     be no.

8          Q.   Let's talk about the second part of your

9     calculation.

10              Once an order gets flagged like this

11    10,100, every order from that pharmacy after is

12    flagged, correct?

13         A    Well, that's the assumption I made based

14    on my review.  That's not -- if you're asking if a

15    suspicious order system just in itself, that was a

16    general question.

17              Could you state that one more time,

18    please.

19         Q.   Yes.  Under this method that you're

20    using, once an order is initially flagged, every

21    order after that gets flagged, too, correct?

22         A    Only if the suspicion is not dispelled

23    through a due diligence or a review by the company.

24    If they just ship this amount and continue you on

25    without dispelling it, my answer is yes.

1           Opioid Frye Hearing/Mr. Rafalski          70

2           Q.    If there was an additional flagged order

3      that was flagged as suspicious, you treated every

4      subsequent order as suspicious, correct?

5           A    Based on my review of the documents, the

6      totality of circumstances, that assumption was yes.

7           Q.    Okay.  And --

8           A    Based on the fact that it was just

9      triggered as 100 pills over, still on that example,

10     there's other circumstances that was drawn with my

11     opinion.

12          Q.    Okay.  I don't think you're answering my

13     question, so I'm going to try to make it as simple

14     as possible.  Just answer it yes or no.

15               If there was an initial flagged order

16     that was flagged as suspicious, you treated every

17     subsequent order as suspicious, correct?  Yes or no.

18          A    Yes.

19          Q.    Thank you.

20               And you did that on the assumption that

21     there was no further diligence?  Yes or no.

22          A    No.  There was insignificant or

23     insufficient -- I'm sorry -- due diligence, and it

24     was not -- it was not just specific to that order.

25     It was based on a totality of circumstances.

1

2    Q.   But in terms of the gap, the

3  methodological gap between the data you had and the

4  opinion you reached, the assumptions you used, you

5  didn't look at all the due diligence files to see if

6  it was correct for every one of these orders, there

7  was, in fact, insufficient diligence, true?

8         You didn't review those diligence files?

9    A    If I understand your question, if you're

10  asking order by order, the answer would be I did

11  not.

12    Q.   Okay.  Let's go back to Demonstrative 4,

13  just to illustrate how this method works.  I'm going

14  to take that second example where you have the one

15  extra pill bottle and that triggers it as flagged.

16  And I'm going to telegraph that out over eight

17  years, which is the time period you looked at.

18         Can we go to the next page, please.  And what

19  you will see is I've repeated the pattern from the

20  first six months to 5,000, 10,000, 7,000, 8,000,

21  9,000, 9,500, again and again and again so that no

22  subsequent month exceeds those first six months,

23  only the 10,100 in August does.

24         And if you go to the next page, you'll

25  see it continues out eight years.

```
1              Opioid Frye Hearing/Mr. Rafalski          72
2              Do you see that, Mr. Rafalski?
3       A    I see your, your numbers, yes, sir.
4       Q.   If you go back to the prior page, under
5  your methodology, that one bottle in that one month
6  triggers every subsequent order as suspicious; true
7  or false?
8       A    Under this hypothetical situation and
9  those numbers, I would say that statement is true.
10      Q.   Have you ever heard of the DEA acting
11  against a company, yes or no, based on one bottle
12  going over the threshold in one month?  Yes or no.
13      A    No.
14      Q.   I want to go back to -- and this will
15  lead into my final topic, Mr. Rafalski.
16           I want to go back to, do you remember
17  those PowerPoints that Ms. Conroy walked through
18  with you?
19      A    I do.
20           MR. SCHMIDT:  I want to go back to that
21      PowerPoint.
22           Are you able to pull that up, Chris.
23           And let's go to slide 7, please.  This
24      is where you talk about maintenance of
25      effective controls.
```

```
 1                  Opioid Frye Hearing/Mr. Rafalski        73
 2     BY MR. SCHMIDT:
 3          Q.   Do you see that?
 4          A    Yes, sir.
 5          Q.   And I want to see if I understand some
 6     elements of this.  Let's go first to the second
 7     bullet.  Do you see the second bullet?  It says,
 8     Thresholds.
 9          A    Yes, sir.
10          Q.   You agree with me that you can have an
11     adequate suspicious order monitoring system without
12     having thresholds, correct?  They're not required?
13          A    If your question is, are they
14     specifically stated in the regulation, my answer is
15     I agree with that.
16          Q.   Let's go to bullet 5.  Due diligence
17     must be robust, well documented and retained.
18               Do you see that?
19          A    Yes, sir.
20          Q.   We have the benefit of federal
21     regulations that actually say very specifically
22     certain types of documents need to be retained by
23     companies, correct?
24          A    If you're speaking to the Code of
25     Federal Regulations, there are specific documents
```

1

2    that have a retention that requires a retention

3    period.

4        Q.   And there's nothing in the Code of

5    Federal Regulations that specifically says diligence

6    files have to be maintained, true?

7        A    Nothing in the Code of Federal

8    Regulations specifically speaks to due diligence, I

9    agree.

10       Q.   Are you aware of DEA ever taking action

11   against a distributor solely because they didn't

12   retain diligence files?  Yes or no.

13       A    No.

14       Q.   Did you ever take action against a

15   registrant solely because they did not retain due

16   diligence files when you were at DEA?

17       A    Well, that's a different question.  You

18   said specifically -- your first question was narrow.

19   Just because they didn't retain maintenance of

20   effective -- I mean, due diligence files, I think --

21   can I finish, please?

22            In that question, I want to restate

23   that.  I think I'm not going to answer that, because

24   I'm sure that it's more likely than not that some

25   office maybe did their call letter of admonition and

Opioid Frye Hearing/Mr. Rafalski                75

1  some letter that would have guided a company.

2          It's a low level of punitive nature.  I

3  don't have any knowledge personally of that

4  occurring, but I think it's more likely than not

5  there might have been some action over this entire

6  time period.

7          Your second question, certainly my

8  Masters case was a result of the due diligence in

9  that action, but it was encompassing many things,

10  not specific, but that was one of the core things

11  was the maintenance of records and the type of due

12  diligence.  So I would answer yes to the second

13  question.

14       Q.   Do you remember what the second question

15  was?

16       A    Yes.  Whether the DEA ever took actions

17  by using -- in regards to due diligence files, I

18  think it was a more general question, and it would

19  be part of, not specifically, but I think it

20  broadened -- that second question broadened it.

21       Q.   No.  Let me re-ask my two questions.

22          Do you have any facts you can point us

23  to, any facts, any evidence you can point us to to

24  say the DEA took action at any point in time in the

1    
2    history of the DEA against a registrant, a
3    distributor, manufacturer or pharmacy solely because
4    of their failure to maintain diligence files?  Yes
5    or no.
6              A    No.
7              Q.    Can you point me to any time you, while
8    you were at DEA, ever took action against a
9    registrant solely because of their failure to
10   maintain due diligence files?  Yes or no.
11             A    Let me think a second about that,
12   please.
13                  I don't have any recollection at this
14   time, so I would say no.
15             Q.    Okay.  Now, let me go to one more of
16   these requirements that you list.
17                  Let's look at the fourth one.  Conduct
18   due diligence of orders flagged as suspicious.  And
19   you say, Only when such orders have been cleared of
20   suspicion can they be shipped.  Do you see that?
21             A    Yes, sir.
22             Q.    And that, in kind of industry jargon,
23   refers to something called the do-not-ship
24   requirement, correct?
25             A    Yes, sir.

1

2          Q.   The blocking requirement, correct?

3          A    Yes, sir.

4          Q.   Do you understand the DEA has only

5   directed distributors not to ship until they clear

6   the suspicious orders since 2006?

7          A    No.  I think there's guidance way back

8   into the 1980s in regards to that.

9          Q.   Okay.  Let's talk about that, and that

10  will be my last topic.

11               THE COURT:  We're not talking about the

12               1980s.  Mr. Schmidt, start to wrap it up.

13               You asked for an hour yesterday.  You're

14               about an hour and-a-half now.

15               Despite your comments about this Court's

16               Short Form Order, you're going far afield.

17               Start wrapping it up, sir.

18  BY MR. SCHMIDT:

19          Q.   Okay.  Did you give testimony when you

20  were at the DEA in that Court decision we looked at

21  where you stated your views as a United States

22  official that until 2006 registrants were told --

23  were not told to block orders that they flagged as

24  suspicious?  Did you give such testimony?

25          A    Without seeing the testimony, I think

Opioid Frye Hearing/Mr. Rafalski                    78

1    it's possible at that time I wasn't aware of all

2    these documents that I've since learned about in

3    doing, in part as being asked to give an opinion in

4    this litigation, but it's possible I did say that.

5         Q.   Do you remember me showing you that

6    testimony at your deposition and saying you recall

7    giving it?

8         A    I have a recollection of the discussion,

9    but specifically I'd like you to show it to me, but

10   I don't -- you know, I think that there's a

11   possibility that that did occur.

12             MR. SCHMIDT:  Your Honor, I'm happy to

13        show it to him.  I'm trying to be mindful of

14        your Honor's admonition to wrap it up.  I can

15        wrap it up or I can show it to him, as your

16        Honor directs.

17             THE COURT:  I missed the end of it.

18             MR. SCHMIDT:  I'm sorry, your Honor.  He

19        just asked to see the testimony.  I'm happy

20        to show it to him, but I also want to be

21        mindful about what your Honor said about

22        coming to a conclusion.

23             Can I show him the testimony and then

24        finish, or should I just finish?

```
1                    Opioid Frye Hearing/Mr. Rafalski        79
2               THE COURT:  What do you want to show
3          him?
4               MR. SCHMIDT:  It's the same testimony
5          that you were looking at previously, Exhibit
6          A.
7               THE COURT:  Is this the last thing
8          you're going to show him?
9               MR. SCHMIDT:  Yes, sir.
10              THE COURT:  Go ahead.
11              MR. SCHMIDT:  Thank you, your Honor.
12   BY MR. SCHMIDT:
13        Q.   Do you remember this testimony from the
14   case where you were the lead investigator?
15        A    We're talking at deposition or at the
16   trial?
17        Q.   At the deposition.
18        A    I remember giving testimony for a
19   deposition, yes, sir.
20        Q.   Let's look at page 89 -- I'm sorry -- I
21   think I'm actually talking about the trial
22   testimony.  Hold on.  Yeah, it's this testimony.
23   Let's look at page 89.
24              MS. CONROY:  So, I'm sorry, Mr. Schmidt.
25          I'm to look at the deposition testimony or
```

1    you'll give me the trial testimony?

2         MR. SCHMIDT:  It's the deposition

3    testimony, Ms. Conroy.

4         MS. CONROY:  Thank you.

5         MR. SCHMIDT:  Of course.

6         Look with me at page 89, line 22.

7    Chris, this is Tab 22, Exhibit J, page 89,

8    start with line 22, and then we're going to

9    continue on to page 90.

10        THE COURT:  Mr. Rafalski, is this a

11   forfeiture proceeding?

12        THE WITNESS:  Yes, sir.  It was a civil

13   trial --

14        THE COURT:  You answered my question.

15   You answered my question.

16        THE WITNESS:  -- in regards to -- yes,

17   sir.

18        MR. SCHMIDT:  And let's start with 89,

19   line 22, through page 90, line 13.

20        THE COURT:  Question, answer, question,

21   answer.

22        MR. SCHMIDT:  "QUESTION:  Is it your

23   understanding of the requirement that a

24   distributor is not to ship any suspicious

1

2      orders?"

3          And then I'm going to skip over the

4      lawyer objections.  Let's go to page 90 down

5      to line 13.

6          "THE WITNESS:  If a firm identifies as a

7      suspicious order, they are not supposed to

8      ship it.

9          QUESTION:  Any suspicious order, that's

10     your understanding?

11         ANSWER:  Yes.

12         QUESTION:  And where is it contained in

13     regulations or the statutes that you cited?

14         ANSWER:  It's not contained in those

15     regulations and statutes, but it's been --

16     they've been informed of that policy by the

17     DEA.

18         QUESTION:  Okay.

19         ANSWER:  And these distributors."

20         Did I read those questions and answers

21  correctly?

22     A    I don't dispute those statements.

23     Q.   And then the other quote that tells us

24  when that occurred is page 91, line 17 through 22.

25  You can probably just do line 20 through 22.  91,

1
2     line 20 through 22.
3          "QUESTION:  When was that briefing?
4          ANSWER:  The first briefing was in 2006,
5     I think January 2006."
6          Do you see that?  Did I read that
7     question correctly, and do you recall giving that
8     answer?
9          A    I don't recall specifically, but I don't
10    argue with the record.
11         Q.  If you said earlier you've come to learn
12    that there was actually contrary guidance, that's
13    only since you've been hired as an expert in this
14    litigation, correct?
15         A    That's correct.
16              MR. SCHMIDT:  Thank you, Mr. Rafalski.
17         That's all I have.
18              THE COURT:  Mr. O'Connor?
19              THE WITNESS:  Thanks for the
20         forbearance, your Honor.
21              THE COURT:  Mr. O'Connor, are you with
22         us?
23              MR. O'CONNOR:  Yes, your Honor, I'm
24         here.  If I can suggest that we take a short
25         break now, I'll confer with my manufacturer

1         colleagues, and I may be able to streamline

2         this.

3

4             THE COURT:  Okay.  We'll take ten

5         minutes.  Thank you very much.

6             Mr. Schmidt covered a great deal of

7         territory.

8             MR. O'CONNOR:  I understand.

9             THE COURT:  Thank you.  Ten minutes.

10         (WHEREUPON, a short recess was taken.)

11             THE CLERK:  Remain seated, come to

12         order.

13             THE COURT:  All present and accounted

14         for.  I have to look at something.  Hang on.

15             This is for everybody's information.

16             On July 8th of this year in a case

17         called Guerra, G-U-E-R-R-A, versus Ditta,

18         D-I-T-T-A, July 8, Second Department, Slip

19         Opinion 03771, the Appellate Division made it

20         abundantly clear -- who's that?  Hello?  All

21         right -- separate and distinct from the Frye

22         inquiry is the admissibility question --

23         who's doing that?  Are you picking that up?

24         Any idea?

25            MS. LICARDI:  I just muted them.

Opioid Frye Hearing/Mr. Rafalski                84

1

2          THE COURT:  I'll start again.

3          Separate and distinct from the Frye

4     inquiry is the admissibility question applied

5     to all evidence at trial.  Let me say it

6     again.  At trial.  Hyphen, whether a proper

7     foundation to determine whether the accepted

8     methods were properly employed in a

9     particular case.

10         All right.  So at trial accepted

11    measures were properly employed, all right.

12    The purpose -- by the way, this is not from

13    the case.  This is other cases.

14         The purpose of a Frye hearing is to

15    determine whether proposed expert testimony

16    about scientific techniques were properly

17    performed to generate results that generally

18    are accepted as reliable within the

19    scientific community.

20         That was later extended a bit with use

21    of the word consensus.  Consensus was a word

22    used by Justice Kaye.  I believe it's a

23    concurring opinion in the Mobil Oil case.

24         So going forward, I expect everybody,

25    Plaintiffs and Defendants, to be mindful of

1
2   what the purpose of a Frye hearing is, and
3   rather than choose to cross-examine an expert
4   or examine an expert based upon the A, B, C,
5   Ds and Es through X, Y and Zs of their
6   testimony, should they testify at trial,
7   refrain, because if counsel doesn't raise the
8   objection, the Court will, okay?
9        Mr. O'Connor, go ahead.
10        MR. O'CONNOR:  Thank you, your Honor.
11   After conferring with the other
12   manufacturers, I'm happy to report we can
13   streamline things here by asking the witness
14   to the pharmacies no questions.
15        THE COURT:  Ms. Conroy?  Mr. O'Connor,
16   thank you.
17        MS. REISMAN:   Your Honor, your Honor?
18        THE COURT:  I'm sorry.  You indicated
19   you may have a few questions.
20        MS. REISMAN:   Your Honor, I have
21   literally a handful of questions.
22        THE COURT:  A handful is five.
23        MS. REISMAN:   And I probably won't go
24   over that.  Your Honor, may I approach
25   without a mask?

1
2          THE COURT:  Yes.
3          Do you know what the hardest three words
4      are in a trial lawyer's vocabulary?
5          MS. REISMAN:   What are they, your
6      Honor?
7          THE COURT:  No further questions.
8          MS. REISMAN:   Fair enough, your Honor.
9      Good morning, your Honor.
10          THE COURT:  We have your appearance, of
11      course, right?
12          MS. REISMAN:  Yes.  Sharyl Reisman on
13      behalf of Walmart.
14  CROSS-EXAMINATION
15  BY MS. REISMAN:
16          Q.   Good morning, Mr. Rafalski.  How are
17  you?
18          A    Very good.  Thank you.  Good morning.
19          Q.   We've not had the opportunity to meet
20  before, and this will be very brief.  I just have a
21  few questions for you about the performance of your
22  methodology in this case to confirm what I think is
23  pretty clear from your testimony yesterday and
24  certainly clear from the expert report and reliance
25  materials that you prepared in this case.  So bear

```
 1                    Opioid Frye Hearing/Mr. Rafalski        87
 2      with me.  We'll, I think, get through this pretty
 3      quickly.
 4                  MS. REISMAN:  Mr. Carter, can you bring
 5             up Slide 9 from the Plaintiffs'
 6             demonstratives yesterday.
 7      BY MS. REISMAN:
 8             Q.   Mr. Rafalski, this is the methodology
 9      that you described using in this case to reach the
10      opinion that you set out in your expert report; is
11      that correct?
12             A    Yes, ma'am.
13             Q.   Okay.  So I'm going to try to do this in
14      a summary fashion so that I can keep to my five
15      questions.
16                  THE COURT:  Don't let me stop you.
17                  MS. REISMAN:  No, no, no.  That's fine.
18             Your Honor, I can easily do this quickly.
19      BY MS. REISMAN:
20             Q.   This is the methodology you say you
21      used, and I just want to go through each of these
22      bullet points here and talk to you about your
23      performance of that with respect to Walmart.
24                  The second bullet under the methodology
25      you performed is to collect Defendants'
```

```
 1                 Opioid Frye Hearing/Mr. Rafalski          88

 2       transactional data, correct?

 3             A    Yes.

 4             Q.   And am I correct that neither in your

 5       report, in the footnotes to that report, or in the

 6       reliance materials that you list in Schedule 1 to

 7       the report do you reference, review, or evaluate the

 8       Defendant Walmart's transactional data; is that

 9       correct?

10             A    That's correct.

11             Q.   And moving on to the third bullet, your

12       review of the Defendants' compliance program in your

13       methodology, am I correct that you neither reviewed

14       nor reference nor evaluate any of Walmart's standard

15       operating procedures?

16             A    That is correct.

17             Q.   And moving on to the next task under

18       what you say you did to perform your methodology in

19       reviewing Defendants' compliance programs, am I

20       correct that nowhere in your report, your footnotes,

21       or the Schedule 1 of your reliance materials do you

22       reference, review, or evaluate any due diligence,

23       documentation, or information suspicious ordering

24       monitoring program information or any

25       know-your-customer materials for Walmart?
```

1

2      A     That's correct.  There's nothing in my

3   report that is a review of any Walmart material or

4   any opinions.

5          Q.   And that would include investigations,

6   interviews, and witness statements, which, as you

7   noted yesterday, really takes the form of discovery

8   responses in depositions, in addition to documents,

9   did you reference, review, or evaluate any of those

10  materials for Walmart?

11     A     I did not.

12         Q.   And the same for internal company

13  communications and documents, did you reference,

14  review, or evaluate any internal company

15  communications and documents for Walmart?

16     A     I did not.

17         Q.   And the last task under your methodology

18  for reviewing Defendants' compliance program, did

19  you reference, review, or evaluate any prior

20  administrative actions against Walmart?

21     A     I did not.

22         Q.   So the bottom line is, nowhere in your

23  report do you reference, review, or evaluate any,

24  any compliance program of Walmart, you offer no

25  opinions on Walmart's program; is that correct?

```
 1                   Opioid Frye Hearing/Mr. Rafalski        90

 2        A    Yes, that's correct.  The Plaintiff

 3   attorneys have never asked me to review anything

 4   related to Walmart as of today's date.

 5        Q.    Okay.  And if we just move to the last

 6   bullet of your methodology on Slide 9 of the

 7   demonstrative from yesterday, the review of data

 8   resulting from metric applied by a data analyst,

 9   that would be what you have in your Schedule 2 to

10   your report that you received from Dr. McCann; is

11   that correct?

12        A    That is correct.

13        Q.    And do you reference, review, or

14   evaluate any Walmart data in that schedule or in

15   your report at all?

16        A    I do not.

17        Q.    So in preparing your opinions in the

18   case, you didn't apply your own methodology to reach

19   any opinions on Walmart or to apply any of your

20   general opinions about effective controls against

21   diversion and suspicious order monitoring to

22   Walmart; is that correct?

23             MS. CONROY:  Objection, your Honor.

24        A    That is correct.

25             MS. CONROY:  Your Honor, he's already
```

1                 Opioid Frye Hearing/Mr. Rafalski      91

2   acknowledged that Walmart is not a part of his

3   report.

4               THE COURT:  Okay.

5               MS. REISMAN:  Your Honor, I have no

6           further questions.

7               THE COURT:  That's really not an

8           objection.  It's a comment.  So she's

9           correct.

10              Do you have anything further?

11              MS. REISMAN:  No further questions, your

12          Honor.  Thank you, Mr. Rafalski.

13              THE COURT:  Ms. Conroy, redirect -- Mr.

14          Rafalski, I have a question.

15              THE WITNESS:  Sure, your Honor.

16              THE COURT:  Sometimes or most times when

17          an expert is retained or a potential expert

18          is retained, the expert suggests to the

19          retaining attorney the information and

20          documents they would like to look at.

21              Did that happen here?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  So is it fair to say that

24          you provided the requesting attorney,

25          Plaintiffs' attorneys here, to forward you a

1

2          list of things you would need in order to

3          consider the commission?

4               THE WITNESS:  Yes, sir.  Could I provide

5          a little more information on that?

6               Originally at the discovery, I met with

7          the attorneys and I provided them -- we sat

8          down and I asked what they needed to request

9          the discovery.  And then subsequent to that,

10         I think they knew what they were going to

11         provide me to form my opinions.  So that

12         would be yes, sir.

13              THE COURT:  Okay.  Thank you.

14              Ms. Conroy, I'm sorry.

15              MS. CONROY:  Thank you, your Honor.

16    REDIRECT EXAMINATION

17    BY MS. CONROY:

18         Q.   Mr. Rafalski, one of the first things

19    that Mr. Schmidt did when he was examining you was

20    to show the methodology slide that we had used and

21    then he put some Xs on it; do you recall that?

22         A    I do.

23         Q.   And you were -- well, let me ask you,

24    did you agree with those Xs that were on that --

25    annexed to each of those bullet points?

```
1                    Opioid Frye Hearing/Mr. Rafalski        93
2           A     No.
3           Q.    And did you think it was unfair?
4           A     I don't know if unfair.  I know that
5      federal regulations which --
6                 MR. SCHMIDT:  I don't think it's for the
7                 witness to say what's fair or unfair, your
8                 Honor.  Improper question.
9                 THE COURT:  Who was that?
10                MR. SCHMIDT:  Mr. Schmidt.  I'm back on.
11                THE COURT:  Was that Mr. Schmidt?
12                MR. SCHMIDT:  Yes, it was, your Honor.
13                THE COURT:  Say it again, please.
14                MR. SCHMIDT:  I don't think the witness
15                can testify about what he thinks is fair or
16                not fair.
17                THE COURT:  Generally you're right, but
18                I'll let it go today.
19                Answer the question.
20          A     I just don't think it was fully
21     accurate.  I don't know about being fair or unfair.
22     I just know how the process works, so I didn't look
23     at it in a fairness way.
24     BY MS. CONROY:
25          Q.    And why wasn't it a -- why do you
```

1

2      believe there should not have been an X next to

3      those methodology bullet points?

4           A    I think some of the questions had a

5      narrowness to them, or when you're required to

6      provide a yes-or-no answer, some of the questions

7      are complex answers where they have multiple issues,

8      and it's just not as simple as a yes or no.

9                And my answers were specific to the

10     questions, and then he applied them to a much

11     broader topic in those bullet points.

12          Q.   And when we were talking about your

13     methodology in this case and the methodology that

14     was applied by DEA agents, including yourself, there

15     was never any indication that all due diligence

16     files would be reviewed or all customer files would

17     be reviewed; is that correct?

18          A    Specifically my actions and the cases

19     that I'm aware of, I've never seen where a case that

20     moved forward on administrative action where every

21     customer file was reviewed.

22               It was more of a sampling where there

23     was a sufficient determination of company product,

24     you know, company records, and it's not just -- when

25     we talk about due diligence, everyone focuses on

1

2    just the documents to a specific pharmacy, but it's

3    bigger than that.  It's the totality of

4    circumstances.

5              It's emails, policies, depositions,

6    witness statements, or in this case deposition

7    responses to questions at depositions.  So it's much

8    broader than just talking about a piece of paper for

9    a specific customer.

10        Q.   And, you know, let me ask you something

11   about that to sort of give an example of what you're

12   talking about.

13             If you were a health inspector, and you

14   walked into a restaurant and you saw two giant rats

15   on the counter, would you have to go into the

16   kitchen to determine if there were other rats there

17   to make sure that you didn't have a violation?

18             MR. SCHMIDT:  Objection.

19             Relevance.

20        A    I could provide you a better analogy.

21        Q.   Please do.

22             THE COURT:  Time out.

23        A    Okay.  Never mind.  I'm sorry.

24             THE COURT:  You don't like the vermin

25   analogy?

2    MR. SCHMIDT:  I would state why was that

3    restaurant licensed if there was a restaurant

4    with big rats?  So I don't think it's a fair

5    metaphor.

6    THE WITNESS:  Maybe a pet rat.

7    THE COURT:  Ms. Conway, I get it.  Move

8    on.

9  BY MS. CONROY:

10    Q.   Mr. Rafalski, Mr. Schmidt referred to

11  the time that you spent with the New York report

12  over and over again; didn't he?

13    A    Yes, he did.

14    THE COURT:  13-and-a-half hours,

15    correct?  Is that what you testified to?

16    THE WITNESS:  Well, that's -- and he's

17    looking at specific billing, your Honor.  I

18    think the day I started working on --

19    THE COURT:  No, no, no.  I just asked,

20    it was 13.5 hours, your testimony?

21    THE WITNESS:  For the billing, yes, sir.

22    THE COURT:  Go ahead.

23  BY MS. CONROY:

24    Q.   Mr. Rafalski, let's take a look at your

25  testimony that Mr. Schmidt had you look at about

1

2     that 13-and-a-half hours.  And several times you

3     went back and forth and said that was just one

4     section of your billing; do you recall that?

5            A    Yes, ma'am.

6            Q.   So if we look at page 33 of your

7     deposition, and I just want to have you read the

8     rest of your answers on those pages.

9                 Do you have the deposition there in

10    Detroit?

11           A    I do.  One second, please.

12                Do you have a line, Ms. Conroy?

13           Q.   I do.  If you start at page 3 -- 33, I'm

14    sorry, line 18.

15                THE COURT:  Mr. Schmidt, do you have it?

16                MR. SCHMIDT:  Yes, your Honor.

17                THE COURT:  Okay, good.  You don't have

18                to stand up.  I mean, I appreciate the

19                courtesy, but you were standing up long

20                enough yesterday and today.

21                MR. SCHMIDT:  Thank you, your Honor.

22    BY MS. CONROY:

23           Q.   And, actually, Mr. Rafalski, if you go

24    up on that page a little bit, I believe what was

25    shown to you was starting at line 10.

1
2       The question:  "The upper limit on time
3  reviewing New York documents for your report was
4  about 13.5 hours?"
5       And you responded:  "I would say yes,
6  sir."
7       And the question:  "Next.  Okay.  And
8  you understand you were reviewing documents
9  corresponding to ten different Defendants in this
10  case?"
11       And you responded:  "Yes."
12       Do you see that?
13    A   Yes, sir -- or yes, ma'am.
14       MR. SCHMIDT:  Can you just tell me the
15      page again?
16       MS. CONROY:  33.
17       MR. SCHMIDT:  Thank you.
18       THE COURT:  And the lines?
19       MR. CONROY:  What I just showed you, it
20      was lines 10 to 18, 17 or 18.  I'm not sure
21      what was actually shown on the screen during
22      Mr. Schmidt's examination, but that's my
23      recollection of what was shown.
24       And then if you would take a look,
25      Mr. Rafalski, at lines 18 to the bottom of

1

2        the page 24.  So let me read you the

3        question.

4             "So just a little more than an hour per

5        Defendant; is that right?"

6             And then could you read your answer,

7        sir.

8             THE WITNESS:  "Well, so just for

9        clarification, if I say review documents

10       here, when I'm drafting, reviewing, making

11       changes, I'm probably looking at documents

12       all during that time."

13  BY MS. CONROY:

14        Q.   And if you could turn the page to page

15  34, and there's really no question.  It's just a

16  question, Okay, on line 1.  If you could read lines

17  2 through 10.

18        A    "ANSWER:  I think when the documents

19  first come in to me, I had access.  I believe it was

20  the 9th, around the 9th, but I'm not positive.

21            And then I spent a little more time

22  looking at specific documents and policies.  Then

23  once I was into the drafting, I would go back and

24  forth between the drafts and the policy."

25        Q.   Then there's a question, Okay, line 11.

1  And then could you read 12 through 14, your answer.

2       A    "ANSWER:  I don't want to say the time

3  is very accurate.  My description might be just

4  broad and whatever my duties were."

5       Q.   And then the question on line 15:

6  "Okay.  So if we add in the time that you spent

7  drafting and say maybe you spent some time reviewing

8  documents while you're drafting, it's maybe two or

9  three hours per Defendant?"  And your answer?

10      A    "Yes, sir."

11      Q.   So it was more than 13-and-a-half hours,

12  isn't that correct, for the review of the New York

13  documents?

14      A    Yes.

15      Q.   And that is how you testified in your

16  deposition?

17      A    Yes.

18      Q.   And would it surprise you to learn or

19  maybe you know, do you know how many hours you had

20  spent generally on this report up to the time the

21  New York report was filed in December of 2019?

22      A    I didn't go back and specifically look

23  at the billing so I would -- oh, I'm sorry.

24      Q.   Would it surprise you to learn that it's

1    over 350 hours to complete your report which was

2    marked as Plaintiffs' Exhibit 1 for identification?

3         A    That would not surprise me.

4              MR. SCHMIDT:  Objection, your Honor.

5              I think they're mixing two reports.

6              THE COURT:  Okay.  I don't know that,

7         but, Ms. Conroy, would you respond to that.

8         Q.   Are we mixing two reports, Mr. Rafalski?

9         A    I know that it was more than 13-and-a

10   half, your Honor.  I don't know exactly that I agree

11   or don't disagree with that number, it's probably

12   based on some of the billings that I submitted.

13        Q.   When Mr. Schmidt makes the comment that

14   over 350 hours is related to a different report; is

15   that correct?

16        A    It might encompass I think some of the

17   MDL report.  I'm not sure it was specifically billed

18   to New York, but as I testified before much of the

19   New York report, a lot of the work from the very

20   beginning, it's all corporate policies, and it's

21   made consistent throughout the United States, so I

22   would probably say, if you ask me much of my hours,

23   much greater than 300 hours were also contributed to

24   this New York report.

```
 1              Opioid Frye Hearing/Mr. Rafalski        102
 2         Q.    Exactly.  And that's because you went
 3    and looked for each of the Defendants, you analyzed
 4    their suspicious order monitoring, protocols and
 5    procedures, you followed your methodology with
 6    respect to each one of the Defendants, and that's
 7    what we see when we look at your report, we see
 8    discussions of the nationwide compliance programs
 9    for each one of the Defendants, correct?
10         A    That's correct.  The only thing I needed
11    to do was just to confirm that there was not
12    something specific to New York, and I found no
13    policy that would indicate there was a deviation
14    from the corporate policy or they were doing
15    anything special in New York, and once that I was
16    confident that that wasn't occurring, then I moved
17    on.
18         Q.    And so when you were working on your
19    report and looking at those national policies, you
20    were reading company internal documents, randomly
21    selected due diligence files, you were reading
22    witness testimony and depositions of corporate
23    executives, all of those things were encompassed in
24    the 350-or-so hours to develop your opinions with
25    respect to the nationwide compliance program,
```

1    correct?

2              MR. SCHMIDT:  Your Honor, I'm trying to

3         be mindful of what you said about leading and

4         only objecting to leading on important

5         points.  These last couple of questions are

6         just the lawyer testifying.  Leading.

7              THE COURT:  Sustained.

8    Q.    Mr. Rafalski, can you explain the hours

9    that were spent and the type of -- strike that.

10             Can you describe for me the types of

11   information that you looked at pursuant to your

12   methodology to develop your opinions in this report

13   concerning the national compliance programs for the

14   Defendants.

15   A    First and foremost to me were the

16   written policies.  Those were policies that were

17   accepted and adopted by each of the Defendants.  I

18   think those policies speak for themselves.

19             Second would be the review of internal

20   documents.  Sometimes there's draft policies,

21   communications about the policies.  There's emails

22   that may discuss the policy.  I would also look at

23   those documents.

24             There may be beta testings of things

1    discussed in the policies, and then I would look to

2    see where the deviations were in the policy or the

3    failures to follow those policies.

4                To me the integral part of each

5    corporation was if they had a policy and if they

6    followed it, or if they had no policy, then it

7    became a little more complex, because I would try to

8    understand what they did if they had no written

9    policy, how they actually accomplished the task in

10   complying with the regulation of the law.

11           Q.    Thank you.

12               Now, Mr. Schmidt spent quite a bit of

13   time with a document that was marked as Defendants'

14   Exhibit C, which was a comparison of your report and

15   the New York Attorney General's first amended

16   Complaint; do you recall that?

17           A    I do.

18           Q.    And do you have exhibit, Defendants'

19   Exhibit C handy?

20           A    I do.  One second, please.

21               THE COURT:  It's C, correct?

22               THE WITNESS:  I'm ready when you are,

23           your Honor.

24               MS. CONROY:  Your Honor, I would like to

1                 Opioid Frye Hearing/Mr. Rafalski        105

2                put it on the screen, and I think we're just

3                trying to figure out how to get Defendants'

4                Exhibit onto the screen.  There we are.

5                Thank you.

6                Q.   Now, Mr. Schmidt -- if you can go to the

7        next page, Mr. Lawler (phonetic).

8                     THE COURT:  You said Mr. Schmidt.

9                     MS. CONROY:  Mr. Lawler is the man in

10               the back.

11                    And the next page.

12               Q.   Now, Mr. Schmidt called this a cut and

13       paste from the State's Complaint over to your

14       report, and here's the first page of the Amerisource

15       opinion; do you see that?

16               A    I do.

17               Q.   And for some reason Mr. Schmidt didn't

18       want to recognize all of your footnotes.

19                    MR. SCHMIDT:  There's somebody's open

20               mic, I can't --

21                    MS. LICARDI:  I just muted them.

22                    MR. SCHMIDT:  Okay.  Go ahead.  Sorry.

23               Q.   Mr. Rafalski, this wasn't just a cut and

24       paste, was it, because take a look at your report

25       section, there are footnotes there, correct?

1

2        A     Yes, Ms. Conroy.

3        Q.    And what -- tell us your process again

4    and why you inserted footnotes as you went through

5    and added these facts to your report.

6        A     So the document on the right was -- came

7    to me in a draft form, and I would read these, and I

8    would make a decision on whether to adopt them or

9    not, you know, the relevance.

10            And I think, as I testified before, I

11   think they're all kind of factual situations that

12   was more resolved of the compliance issues, but when

13   I read them I found them to be potentially something

14   I would add to my report.

15            The problem is is that I learned in this

16   process that I just don't make statements unless I

17   apply, I have to reference the information, and so I

18   would go back, not to New York, but I had a contact

19   person that went in between Mr. Elkins (phonetic),

20   and I would send this to Mr. Elkins.  Sometimes in a

21   fashion I'd highlight and make notations and send it

22   back and forth and said I can't use this unless I

23   have the verifying documents, and once I got the

24   documents I would review the content of the

25   documents and then I would make a decision on

1              Opioid Frye Hearing/Mr. Rafalski        107

2     whether to accept them or not to accept them.

3              And so what you see in the footnotes,

4     that just means that -- to me that meant that, you

5     know, I think I tried to testify that I reviewed

6     them and added the footnotes to substantiate some of

7     the statements or the statements that I think that I

8     needed to be supported by the reference.

9              THE COURT:  Can someone display the

10             footnotes for the Court, please.  That's 286

11             to 287.

12        Q.   So in Exhibit 1, Mr. Lawler, if you go

13    to Plaintiffs' Exhibit 1, which is the expert

14    report, and we look at page 72.

15             MS. CONROY:  Your Honor, you can see

16             the -- I don't know if you can actually see

17             it, but we can pull some of those, if you

18             like, but you can see.

19             THE COURT:  286 Sherman-Hynes,

20             examination pages 36 to 37, and 287 is

21             ABDC -- a lot of letters.  This is from the

22             MDL, House Committee on Energy and Commerce,

23             supra note 556 at 184.  Okay.

24        Q.   And, Mr. Rafalski, if you look at this

25    and in order to support the sentence -- if I can

1      find it here -- 286, Mr. Lawler, it's up at the top,

2      right under -- it's the third sentence in the first

3      paragraph from 2007 to 2015.  The program specifics

4      were scattered through a series of policy and

5      procedure documents, and then we see footnote 285,

6      and if we look down at the bottom, and we can pull

7      up this document during the lunch break, but this is

8      a document produced by AmerisourceBergen with that

9      Bates number.

10              Is that familiar to you, Mr. Rafalski?

11     A     Yes, ma'am.

12     Q.    And so before you added the sentence

13     concerning the AmerisourceBergen program specifics,

14     you took a look at that AmerisourceBergen document

15     that is footnoted at 285; that's your methodology,

16     correct?

17     A     Yes.

18     Q.    And if you go to the next footnote where

19     it says that the policies and procedure documents

20     which were not uniform for Bellco and Amerisource --

21     let me ask you this.  What is Bellco?

22     A     Bellco was a company that was acquired

23     by Amerisource.  So it was actually, I guess it

24     would be considered a subsidiary of Amerisource, but

1
2    there was a period of time where they were operating

3    as two different entities to distributors.

4          Q.   And you went back and looked to

5    determine what was or was not uniform for Bellco and

6    Amerisource, the Sherman-Hynes deposition, and you

7    list the pages where Sherman-Hynes testified about

8    that, correct?

9          A    Yes.

10         Q.   And that was part of your methodology in

11   preparing this report, that you didn't just accept

12   facts as they were provided to you, even if they

13   were from a complaint written by the New York State

14   Attorney General's office, you went and looked

15   yourself, correct?

16         A    That's correct.

17         Q.   And that is true throughout your report,

18   correct?

19         A    Yes.

20         Q.   So it wasn't just for the sentences that

21   were isolated in Defendants' Exhibit C, with respect

22   to the New York AG's Complaint, when I look through

23   your report, Exhibit 1, almost every sentence,

24   certainly every paragraph is footnoted; do you see

25   that?

1

2          MR. SCHMIDT:  Objection.

3          Foundation.

4     Q.   Are you looking at the report?

5          THE COURT:  Wait.  There's an objection.

6     Overruled.

7          Go ahead.

8     Q.   Are you looking at the report?

9     A    Yes, I'm sorry, I was waiting for the

10    objection.

11         Yes, you said "almost every sentence."

12    I'm not sure it's almost every sentence, but there

13    is a significant amount of footnotes contained in

14    the report.

15    Q.   How many footnotes?  Can you take a look

16    at page 166.

17    A    906.

18    Q.   Now, let's take a look at your

19    deposition testimony.

20         Mr. Schmidt had referred you to it, page

21    496 of your February 7th deposition.  And if you

22    take a look -- now, if you go to page 496, line 11,

23    and I believe is it your recollection that that was

24    read to you, line 11 through 17, by Mr. Schmidt?

25    A    You want me to read the question, I'm

1
2       sorry?

3           Q.   My question is do you recall when that

4       was read yesterday?

5               THE COURT:  Ms. Conroy, it doesn't

6               matter.

7               MS. CONROY:  Okay.

8               THE COURT:  If you wish to question,

9               answer, question, answer, you're permitted

10              to.  Of course you know you're permitted to

11              reference any part of the deposition during

12              your redirect.

13              MS. CONROY:  Yes, your Honor.  Thank

14              you, your Honor.

15              THE COURT:  As long as it's in the scope

16              of the cross.

17              MS. CONROY:  Thank you.

18          Q.   If you would take a look at line 18

19      through the end of that page 496.  The question is:

20      "So you didn't review all of the footnotes in this

21      report?"

22              And then your answer, if you could read

23      it.

24          A    (READING:)  I am not definitive about

25      that.  I tried, but I'm not positive of that.  I

```
1                   Opioid Frye Hearing/Mr. Rafalski        112
2    should have probably kept some record of each one or
3    checked them off as I started writing, and I said my
4    book, which was discussed later, and I believe I
5    did -- and on to the next page -- but I'm not
6    positive.
7              Q.   And on page 497, lines 2 through 4, the
8    question is:  (READING:)  And just to clarify, when
9    we say -- when I say check the footnote, I mean
10   review the document; that's it?
11             And your answer on line 5?
12             A    (READING:)  Yes.
13             Q.   "QUESTION:  Citing, right?"
14             And then your answer, if you could read
15   it, lines 11 through 10 -- I'm sorry, 7 through 10.
16             A    (READING:)  Yes.  Company report.  Have
17   the report.  Open up the document, review it and the
18   content.  Make sure that I agree with it, what it
19   says, and then move on.
20             Q.   And the question, line 11 to 13.
21             (READING:)  Okay.  But you're not aware,
22   sitting here today, if you did that for every
23   footnote in this report?
24             And your answer at line 16, if you could
25   read that.
```

1

2      A    (READING:)  I'm not positive, because if

3    I missed one or two I don't want to be incorrect.

4      Q.   So what we're talking about from your

5    testimony that day and your memory is that of the

6    906 footnotes, you may have missed out on reading

7    one or two; is that correct?

8      A    Yes, ma'am.

9      Q.   The rest of the footnotes were all

10   reviewed and analyzed by you and used as support for

11   the opinions in your report and the facts that

12   support those opinions, correct?

13     A    Yes, ma'am.

14     Q.   Mr. Schmidt spent quite a bit of time

15   going through Defendants' Exhibit C, which is the

16   comparison of the State Complaint paragraphs and

17   your report.

18          Did he find fault with any of the

19   factual support for any of the statements in your

20   report?

21     A    No, ma'am.

22          MR. SCHMIDT:  Objection, your Honor.

23          THE COURT:  Time out.  Can I have that

24       question?

25          Did you say did he find fault?

1

2      MS. CONROY:  Did Mr. Schmidt, during his

3      examination, find fault with any of the

4      actual facts of the report.

5      THE COURT:  I'll sustain that.  Mr.

6      Schmidt is not a witness; he's an advocate.

7      Was he obligated to stand up and say, by

8      the the way, I find fault?  No, he was not.

9      MS. CONROY:  I understand, your Honor.

10     Thank you.

11     Q.  This morning, Mr. Rafalski, Mr. Schmidt

12 referred to the Federal Register.

13     Do you have that in front of you?  I

14 believe it was marked as Defendants' Exhibit H.

15     THE COURT:  H?

16     MS. CONROY:  H.

17     A    If that is the one that addresses the

18 quota diversion, I don't have that.

19     MS. CONROY:  Is it possible for Mr.

20     Lawler to put it up on the screen.  And if

21     you could go to page 173 and if you could --

22     perfect.  Perfect.

23     Q.  Mr. Rafalski, you were shown this this

24 morning, you didn't have an opportunity to study it;

25 is that correct?

1

2      A     That's correct.

3      Q.    If we could just take a look over on the

4  first column where it says:  Estimates of diversion

5  pursuant to the Support Act; do you see that?

6      A     Yes, ma'am.

7      Q.    And this is to determine -- or this

8  attempts to describe how diversion is estimated and

9  it says -- I'm just reading the first sentence there

10  -- To estimate diversion, as is required by the

11  Support Act, DEA aggregated the API of each covered

12  controlled substance by metric weight where the data

13  was available in the aforementioned databases.

14      Now, what I want to focus your attention on

15  is the next sentence.

16      (READING:)  Based on the individual

17  entries into the aforementioned databases, DEA

18  calculated the estimated amount of diversion by

19  multiplying the strength of the API.

20      And then it goes on to describe how the

21  formula works.

22      Do you see that?

23      A     Yes, ma'am.

24      Q.    And then if you take a look on the

25  second column, do you see the calculation, what that

```
 1                    Opioid Frye Hearing/Mr. Rafalski        116

 2     estimate -- there it is.  Right there.  Those

 3     numbers.  That is the actual calculation for 2018.

 4     Do you see that?

 5          A    Yes, ma'am.

 6          Q.   But then if we take a look over on the

 7     third column in the paragraph that begins, As

 8     discussed above, there's more discussion of what it

 9     is that the DEA -- the actual databases and

10     information that the DEA is using to make those

11     estimations, and if you would -- I'll read that

12     paragraph out loud.

13               (READING:)  As discussed above, DEA

14     considers the extent of diversion of all controlled

15     substances and estimates diversion of covered

16     controlled substances as is required by the recent

17     amendment to the CSA and changes the DEA's own

18     regulations.

19                    The information maintained in the

20     various DEA databases discussed above assist the

21     agency in identifying some forms of diversion of

22     controlled substances.

23                    Do you see where it says "some forms of

24     diversion"?

25          A    Yes, ma'am.
```

1

2    Q.   Do you have any idea which forms of

3    diversion are used for the estimation the DEA is

4    making in this Federal Register?

5    A    I do not.

6    Q.   Do you have any idea of what forms of

7    diversion are not accounted for in this Federal

8    Register?

9    A    From my -- while working as a diversion

10   investigator there was never -- I always question

11   why there was never a program just to account for

12   the diversion that were identified through

13   investigations or administrative actions.  That to

14   me was just one area where they could have

15   accumulated some data to give some idea, but I do

16   not know.

17   Q.   So is it fair to say that we don't know

18   right now if, for example, a distributor had a

19   suspicious order monitoring system that failed to

20   account for threshold when thresholds were exceeded

21   or they did no due diligence at all, that, as far as

22   you know, would not be accounted for in this

23   diversion estimate?

24   MR. SCHMIDT:  Objection.

25   Leading.

1              Opioid Frye Hearing/Mr. Rafalski       118

2                   THE COURT:  Overruled.

3        A    Yes, I don't know exactly how they came

4    up, without looking at this study or maybe

5    discussing it with someone, I have no idea how they

6    came up with those numbers that they utilized in

7    this report in setting this quota.

8        Q.   And all we do know is that some forms of

9    diversion were not accounted for in this estimation,

10   correct?

11       A    I think that is very probable looking at

12   the numbers.

13       Q.   Okay.  And also very probable looking at

14   what it says right there on the page, correct?

15       A    Yes.

16                   MR. SCHMIDT:  Objection.

17                   It's a misread of the document.

18                   THE COURT:  Objection?

19                   MR. SCHMIDT:  To foundation.

20                   THE COURT:  But the document has been

21        produced.  I'll allow it.

22                   MR. SCHMIDT:  I agree.

23       Q.   And if you could read the final sentence

24   in that paragraph just below the highlighting.

25       A    (READING:)  The DEA is committed to

1

2    improving its ability to account for other types of

3    diversion.

4         Q.   So it's a work in progress, correct?

5         A    Yes, it is.

6              THE COURT:  Just so you know, the Court

7              will consider the document for what it

8              actually says as opposed to any

9              interpretation of it, in the absence of it

10             being confusing.  It's not confusing.

11             MR. SCHMIDT:  Thank you, your Honor.

12             MS. CONROY:  Thank you, your Honor.

13        Q.   Mr. Rafalski, there was an objection

14   yesterday by counsel that you had disclosed

15   confidential information when talking about a

16   Mallinckrodt investigation; do you recall that?

17        A    Yes, ma'am.

18        Q.   And did you disclose any confidential

19   information during your testimony yesterday?

20        A    I do not believe I did.  I think

21   everything I discussed was a person could find

22   through information available outside of DEA,

23   internal DEA.

24        Q.   And isn't it also the case that the

25   public press release is also a footnote to your

1   report?

2        A    It is.  More significant in the

3   Mallinckrodt was there was, unfortunately, a leaked

4   document, a complaint, a draft complaint.  There was

5   an article in the Washington Post that gave a lot of

6   internal information, too, and that's readily

7   available to the public.

8        Q.   If we could just go back to footnotes

9   for a bit.  Take a look at your report, which was

10  Exhibit 1, and if you take a look at page 25 of your

11  report.

12       A    One second.  I have limited room, and I

13  have a lot of documents here.

14            Okay.  Page 25.  I'm there.

15            THE COURT:  Wait a second, sir.  They're

16            putting it up.

17       Q.   And do you see the center of the page,

18  it says:  DEA administrative actions?

19       A    Yes, ma'am.

20       Q.   What is an administrative action?

21       A    That's an action that the DEA takes for

22  violations of the Code of Federal Regulations.

23       Q.   And if we take a look, you have a long

24  list of DEA administrative actions that stem -- that

1
2      go from page 25, all the way through page 35.
3                     Do you see that?
4                     MR. SCHMIDT:  Objection.
5                     Well outside the scope of my cross.
6                     THE COURT:  Okay.  You heard the
7              objection.
8                     MS. CONROY:  I did.  We're discussing
9              the support for his report, the methodology,
10             seem to be squarely within the
11             cross-examination.
12                    THE COURT:  Mr. Schmidt, did you hear
13             the response?
14                    MR. SCHMIDT:  Yes.  I think there's a
15             substantive point --
16                    THE COURT:  She's suggesting it goes to
17             methodology.
18                    MR. SCHMIDT:  Yes, I don't think it
19             does.  I didn't ask for the section of the
20             report.  I think Ms. Conroy is trying to make
21             a substantive point here regarding the
22             administrative actions under the ruse of
23             talking about methodology.  This has nothing
24             to do with anything I asked him about.
25                    THE COURT:  Ms. Conroy?

1

2          MS. CONROY:  I am not.

3          THE COURT:  Beg your pardon?

4          MR. SCHMIDT:  I apologize, could I say

5     one more thing, your Honor?

6          THE COURT:  Go ahead.

7          MR. SCHMIDT:  I think the point has

8     already been made about the footnotes.  It

9     would be cumulative anyway, but I don't think

10    that's the purpose of this exam.

11         MS. CONROY:  This is not a ruse, your

12    Honor.  The cross-examination took --

13         THE COURT:  I want to see the report.

14    Hang on a second.

15         Okay.  Apparently, the document sets

16    forth, beginning on page 25, into the terms

17    and conditions resulting from the

18    administrative action; is that correct,

19    everybody?

20         MS. CONROY:  Yes, your Honor.

21         THE COURT:  Okay.

22         MR. SCHMIDT:  Yes.

23         THE COURT:  And Mr. Rafalski --

24         THE WITNESS:  Yes, sir, your Honor.

25         THE COURT:  In connection with

methodology and the means to fulfill all the

steps of the methodology, what significance,

if any, is this document that we're talking

about, these pages we're talking about,

regarding DEA administrative actions?

THE WITNESS:  Two things, your Honor.

One, you started with the review to look at

the history of the different companies; and

then secondly, a part of my experience with

the DEA is companies closely monitor

administrative actions against other

registrants, especially the ones that are

published in the public register.

But secondly, their law firms and

consulting firms and all others, analysis,

and it was also to show that all of these

actions, there was awareness of the diversion

and the issues with suspicious orders and due

diligence and these kind of administrative

matters.

THE COURT:  Okay.  And, Ms. Conroy,

you're offering it as part and parcel of the

methodology?

MS. CONROY:  I am, your Honor.  But in

1

2          particular, we went over for almost two hours

3          some really disparaging comments about

4          cutting and pasting, and what we're showing

5          here is that the statements in the report and

6          that were made throughout were footnoted and

7          that were significant, and here we have DEA

8          administrative actions, which are all

9          footnoted as support.

10              THE COURT:  And have you shown me where

11          they're footnoted?  Will you show me where

12          they're footnoted.

13              MS. CONROY:  Yes.  Each time one is

14          referenced there's a footnote at the bottom.

15              MR. SCHMIDT:  And, your Honor, this

16          appears nowhere in the section in the exhibit

17          that I used with the cutting and the pasting

18          or in my questions, and my concern in making

19          this objection, my biggest objection is that

20          we're now doing a substantive exam on

21          administrative actions.  I don't get recross.

22          So they chose not to ask this on direct, I

23          didn't ask it on cross, and now it's a new

24          topic on recross.

25              It doesn't relate to -- they already

1

2     covered the fact that this section and every

3     other section is footnoted, so the only

4     purpose of this section is to point out

5     administrative actions that I don't get to

6     recross on.

7          THE COURT:  Mr. Rafalski, leave it at

8     this.  Is it fair enough or is it accurate

9     that you footnoted this DEA administrative

10    actions' language in your report?  Yes?

11         THE WITNESS:  Yes, sir.  Everyone of

12    them should have a supporting document

13    footnote.

14         THE COURT:  Just stop right there.

15    Let's move on.  You can leave it at that.

16         MS. CONROY:  Thank you, your Honor.

17         Your Honor, it's just about -- we've got

18    about ten more minutes before lunch.  Can I

19    consult with Nassau County and the State to

20    make sure that there aren't any additional

21    points that we wish to make?

22         THE COURT:  Okay.

23         MS. CONROY:  Can I do that right now?

24         THE COURT:  Yes.  How much time do you

25    need?

1

2          MS. CONROY:  Well --

3          THE COURT:  If we can finish Mr.

4     Rafalski before I take the lunch break, that

5     would be fine.

6          MS. CONROY:  Great.  If you would just

7     give me -- go out of wherever these mics are.

8          THE COURT:  I'll go take a walk.

9          MS. CONROY:  Okay.  Thank you.

10          MR. HANLY:  Your Honor, it's Paul Hanly,

11     for the Plaintiffs.

12          THE COURT:  How are you?

13          MR. HANLY:  I'm fine.

14          We have a significant team of folks that

15     have input, and we just don't think it's

16     going to be possible to finish in three

17     minutes.

18          THE COURT:  We'll see you at two

19     o'clock.

20          MR. HANLY:  Thank you, your Honor.

21          THE COURT:  By the way, before we go off

22     the air, floating around the system here is a

23     Summons with Notice, I think you've all seen

24     it, a Summons with Notice that the Plaintiffs

25     have described as virtually every fire

1  district on Long Island, every township on

2  Long Island, a bunch of villages on Long

3  Island.

4  Now, early on we received what appeared

5  to be a Complaint, not a Verified Complaint,

6  which the Court rejected and sent back.  I

7  understand, and I'll confirm later, that

8  subsequently a Summons with Notice was filed,

9  and I'll call it in that matter.

10  If it's, in fact, floating around, the

11  Court intends to call a conference for

12  purposes of either a preliminary conference

13  order or something else to get a handle on

14  it, because I think -- Sandy, what did we

15  count, I think about 130 people, 130

16  Plaintiffs?

17  MS. LICARDI:  73 Plaintiffs, but no RJI

18  was signed.

19  MS. SHKOLNIK:  If I'm not mistaken, your

20  Honor, we had that quick hearing.  It popped

21  up.  Would you like us to reach out to

22  counsel and find out the status and report?

23  THE COURT:  Yeah, that would be fine.

24  MR. SHKOLNIK:  We'll do it by tomorrow.

1

2          THE COURT:  Ms. Conroy, two o'clock.

3          MS. CONROY:  Yes.  Thank you, your

4     Honor.

5          (WHEREUPON, after a luncheon recess, the

6     following was had:)

7          THE CLERK:  Come to order.  Supreme

8     Court, Part 48 is back in session.

9          THE COURT:  Thank you.  Good afternoon.

10          THE CLERK:  Good afternoon, your Honor.

11          THE COURT:  Please be seated.  Okay.

12          THE CLERK:  Mr. Rafalski, I remind you

13     you're still under oath.

14          THE WITNESS:  Thank you.

15          THE CLERK:  Mr. Rafalski, I'll remind

16     you you're still under oath.

17          THE WITNESS:  Thank you.  I understand.

18          THE COURT:  Okay.

19     CONTINUED REDIRECT EXAMINATION BY

20     MS. CONROY:

21          MS. CONROY:  Hello, Mr. Rafalski.

22          THE WITNESS:  Hi.

23          MS. CONROY:  If I could have Cory put up

24     the methodology slide, please.

25          Thank you.

1                  Opioid Frye Hearing/Mr. Rafalski        129

2          Q.   Now, Mr. Rafalski, if I could direct you

3    to the final slide -- sorry.  I don't think that's

4    the correct slide.

5               Could we go to the exhibit, to the

6    PowerPoint set that we had yesterday.

7               I apologize, your Honor.

8               THE COURT:  It's okay.

9               MS. CONROY:  Thank you.

10         Q.   Do you see that, Mr. Rafalski?

11         A    Yes, ma'am.

12         Q.   Okay.  Do you see this was an attempt to

13   sort of lay out on one slide your methodology that

14   you conducted in this case, correct?

15         A    Yes, ma'am.

16         Q.   And the last bullet point is review of

17   data resulting from metric applied by data analysts;

18   do you see that?

19         A    Yes, ma'am.

20         Q.   Now, you asked data analysts to apply

21   some of the metrics to transactional data; is that

22   correct?

23         A    In the litigation, yes, ma'am.

24         Q.   And that is consistent with what you did

25   at DEA as well, you used data analysts to implement

```
 1                  Opioid Frye Hearing/Mr. Rafalski        130
 2      metrics or algorithms or formulas on data that was
 3      provided by companies?
 4           A    It was one of the methodologies.  It was
 5      not used in all cases but it would be typical of
 6      something that I would do, if required, for an
 7      investigation.
 8           Q.   Now, could we turn to the slide that
 9      references your five metrics in this case.
10                And you see they're somewhat confusing
11      words there, but you recognize those five different
12      metrics as the metrics that were applied by a data
13      analyst in this case, correct?
14           A    Yes, ma'am.
15           Q.   Okay.  Now, you asked for those five
16      metrics to be run because that is what you did at
17      DEA, correct, not necessarily those particular
18      formulas, but that was your -- that was your
19      methodology at DEA and your methodology here in this
20      case?
21           A    Yes.  They're both consistent with the
22      methodology I would use in my employment and similar
23      to the methodology used here.
24           Q.   Now, the first one, maximum monthly
25      trailing six-month threshold.  Is there an easier
```

1
2    way to talk about that one?

3         A    Yeah.  I think we've talked about that a

4    lot.  It's basically the system monitors the

5    previous six months, and if the purchases in the

6    current month exceeds the greatest amount in one of

7    the previous six months, it triggers a suspicious

8    order.

9         Q.  And does that metric come from the

10   Masters case?

11        A   Yes, ma'am.

12        Q.  And the Masters case, the Court will

13   recall, was the case that you were the lead

14   investigator on while at DEA, correct?

15        A   Yes, ma'am.

16        Q.  And that's the case that went all the

17   way up to the DC Court of Appeals and was approved,

18   correct?

19        A   Yes, ma'am.

20        Q.  And now the other four metrics that we

21   see there, and I won't read them out, but those,

22   those are all metrics that you identified for the

23   data analysts, correct?

24        A   Yes, ma'am.

25        Q.  And those metrics come and were reviewed

1

2       by you from the Defendants' files, correct?

3              A     Yes, ma'am.

4              Q.    And that is consistent with what you did

5       at DEA, you would look to the metrics or the formula

6       or the algorithm?

7                    THE COURT:  Time out.

8                    Is this a consistent method you employed

9                    while at the DEA; yes or no?

10                   THE WITNESS:  Yes.

11                   THE COURT:  Okay.  There's five metrics

12                   here.  When do you decide which one to use or

13                   do you use more than one or do they prove

14                   each other?

15                   THE WITNESS:  Typically at DEA, your

16                   Honor, generally you would apply the metric

17                   for that particular company.  You apply their

18                   own formula to see if they were following

19                   their own system to identify orders.

20                   In this case -- go ahead, I'm sorry,

21                   your Honor.

22                   THE COURT:  So you're telling me each --

23                   are you telling me that in this case and only

24                   this case, each company applies one of these

25                   five metrics or are there more metrics out

```
 1                Opioid Frye Hearing/Mr. Rafalski      133

 2         there?

 3              THE WITNESS:  There's an unlimited

 4         number of metrics.

 5              THE COURT:  Okay.

 6              THE WITNESS:  In this case, these are

 7         the metrics.  The bottom four are the ones I

 8         identified in the investigation, and they

 9         were applied to the companies in the

10         investigation, the top one I picked.  These

11         were all used in the real world by some of

12         the companies in the -- in my -- contained in

13         my report.

14              THE COURT:  Okay.  I got it.

15              MS. CONROY:  You can take that slide

16         down.  Thank you.

17         Q.   Mr. Rafalski, there's been a lot of talk

18    about suspicious orders in the Masters metric that

19    identifies -- that actually identifies individual

20    suspicious orders that should have been investigated

21    by a distributor, Masters, correct?

22         A    Yes.  An order.

23         Q.   I'm sorry, I missed --

24         A    Yes.  It identifies an order that would

25    violate the rule, the greater than any of the
```

1

2     highest six-month totals for the purchases.

3          Q.    And if we could go to something that Mr.

4     Schmidt brought up, the recurrent flags, why does

5     your methodology apply recurrent flags to the data?

6          A    It's, it's based on DEA guidance and

7     it's just based on the fact that once the system

8     identifies a suspicious order, if there's nothing

9     done to dispel the order, if it's just shipped and

10    there's no review, then it considers that all of the

11    subsequent orders are suspicious.

12              And we talked about due diligence, and I

13    think I stated earlier it's a totality of

14    circumstances.  It's not just looking at one, you

15    know, like a one file or one piece of paper.

16    It's -- you know, my opinion was based on a review

17    of many things, including the customer file, to see

18    if there was a -- an order was clear by due

19    diligence, and here there was a systemic failure

20    during the time period, so there wasn't a need to

21    look at that specific order.

22         Q.    Now, I would like you to assume that the

23    DEA produced a government witness to officially

24    speak on behalf of the DEA, similar to a 30B6

25    deposition or, your Honor, what we would recognize

1
2    as an 11F witness.

3              And I would like to play a clip, very
4    short clip from that deposition of Mr. Thomas
5    Prevoznik, P-R-E-V-O-Z-N-I-K, who, at least at the
6    time of his testimony, was Section Chief of
7    Pharmaceutical Investigations.

8                   MR. SCHMIDT:  Objection.

9              THE COURT:  You say objection.  It seems
10            to me like the question is framed as a
11            hypothetical.  Is it Miss Conroy?  Are you
12            framing it as a hypothetical?

13            Because when you lead a question I want
14            you to assume in court when there's a
15            proffered expert it signifies that it's a
16            hypothetical.  If it's a hypothetical, it
17            counts only if, either now or later, the
18            assumed facts are placed in evidence.

19            MS. CONROY:  Yes, it is a hypothetical,
20            and I'd like to put those facts into evidence
21            with this clip.

22            THE COURT:  Stay on guard.  I'm going to
23            allow her to reframe the question.  Stay on
24            your toes, as you always are.

25            Go ahead.

```
 1                  Opioid Frye Hearing/Mr. Rafalski        136
 2           Q.   Mr. Rafalski, I would like you to assume
 3      that the DEA has a methodology and a position with
 4      respect to recurrent flags, and I'd like to show you
 5      a video testimony of a witness from DEA.
 6           A    Okay.
 7                MR. SCHMIDT:  Objection.
 8                THE COURT:  Your about to show a witness
 9           video testimony, right?
10                MS. CONROY:  Yes.
11                THE COURT:  Does the other side have
12           this?
13                MS. CONROY:  Yes.  It was listed on our
14           list of exhibits, your Honor.
15                THE COURT:  All right, you can play it.
16                MR. SCHMIDT:  Your Honor --
17                MS. CONROY:  And I will give you the
18           page and line if that's --
19                THE COURT:  Mr. Schultz (sic), you were
20           about to say something.
21                MR. SCHMIDT:  Schmidt, your Honor.
22                THE COURT:  I'm sorry.  Schmidt.  I'm
23           sorry.
24                MR. SCHMIDT:  That's okay.
25                What I'm trying to say is, number 1, I
```

1          think it's an improper hypothetical to say I

2          assume something and then try to show it to

3          him; two, foundation.  He didn't review his

4          full testimony.  I should have, at least,

5          have a transcript, just in the same way that

6          I extended Miss Conroy that courtesy.  I just

7          didn't flash up a video that couldn't be

8          confirmed.

9               THE COURT:  Okay.  Miss Conroy, why

10          don't you do it this way.

11               You know the contents of this video,

12          right?

13               MS. CONROY:  Correct.

14               THE COURT:  Is it long?

15               MS. CONROY:  No, your Honor.  It's about

16          30 seconds.

17               THE COURT:  Then frame the question this

18          way.  Ask the witness to assume the following

19          facts, all right, and as best you can, tell

20          me what's on the video.

21          Q.   Mr. Rafalski, I would like you to assume

22     that the DEA believes that when a wholesale

23     distributor gets a flag for a suspicious order and

24     then that they determine it to be a suspicious

```
 1                    Opioid Frye Hearing/Mr. Rafalski      138
 2      order, that they block that shipment, that they
 3      should terminate all future sales to that same
 4      customer until they are able to rule out diversion
 5      as occurring.  I would like you to assume that fact.
 6                  THE COURT:  Assume that it's assumed,
 7             now ask the question.
 8             Q.   Do you know if the DEA has taken any
 9      position with respect to that assumption?
10             A    Yes, I do.
11                  MS. CONROY:  I'd like to confirm that.
12                  THE COURT:  Yes.
13                  MS. CONROY:  And it is page 77 -- I'm
14             sorry, 771, line 10 to line 20 of the Thomas
15             Prevoznik deposition that is attached to our
16             list of exhibits provided to Defendants a
17             week ago.
18                  MR. SCHMIDT:  Can you hand that around,
19             please.  I might have it.  If you could send
20             that around I'd be grateful.
21                  MS. CONROY:  We're happy to send it
22             around as well.
23                  MR. SCHMIDT:  Thank you.
24                  THE COURT:  I'm waiting for something,
25             right?
```

1
2       MS. CONROY:  Right.  We're waiting for
3       it to play.  We're waiting longer than the
4       length of the clip...
5       (VIDEO PLAYING:
6       Q.   Do you agree that if a wholesale
7   distributor gets a flag of a suspicious order, that
8   they determine to be a suspicious order, and that
9   they blocked that shipment, that they should
10  terminate all future sales to that same customer and
11  so they can rule out that diversion is occurring?
12          Yes, I would agree that is a --)
13      MR. SCHMIDT:  It's hard to say, your
14      Honor.  I still don't have the clip, so I
15      can't tell if there's completeness that would
16      be appropriate, but I think it's probably
17      best at this point to move on.
18      THE COURT:  We'll move on.
19      Q.   Mr. Rafalski, I'd like you to assume
20  that a registrant has a duty to block suspicious
21  orders once they have been identified; is that all
22  right?
23      A    Yes.
24      Q.   Okay.  And I would like to play a clip
25  with respect -- very short clip with respect to that

```
1              Opioid Frye Hearing/Mr. Rafalski          140
2    same issue, also Thomas Prevoznik, Section Chief of
3    Pharmaceutical Investigations at DEA.
4              MR. SCHMIDT:  And I'll object.
5         Foundation.
6              And your Honor said pretty clearly to
7         us, don't do substance.  This seems pure just
8         play their favorite videos and ask Mr.
9         Rafalski to agree.
10             THE COURT:  Do it the same way as you
11        did before.
12             MS. CONROY:  Yes, your Honor.
13             THE COURT:  Phrase it as a hypothetical,
14        give me the facts and play the video.
15   Q.   I'd like you to assume, Mr. --
16             THE COURT:  One second.  By the way, you
17        realize in your Stipulation that you all
18        worked out, any objections here, any evidence
19        that makes its way into this record is
20        subject to objection at trial, right?
21             MS. CONROY:  Absolutely.
22             THE COURT:  You can all reserve all your
23        rights, all right?  Good.
24             MS. CONROY:  Yes, yes.
25   Q.   I'd like you to assume that a registrant
```

1              Opioid Frye Hearing/Mr. Rafalski      141

2    has a duty to block suspicious orders when they are

3    identified as suspicious.

4              Do you accept -- I'm sorry.  I lost Mr.

5    Rafalski.

6         A    I'm here.  I accept that, yes.

7              MS. CONROY:  And I would like to play a

8              clip from Mr. Thomas Prevoznik, from DEA, and

9              the page is also page 771.  It's all one

10             page.

11             MR. SCHMIDT:  What's the line number,

12             please?

13             MS. CONROY:  The line number 10 through

14             20 -- I'm sorry, 7.  7 through 20.

15             (VIDEO PLAYING:

16        Q.   Does the DEA take the position that a

17   registrant of controlled substances has a duty to

18   block shipments of suspicious orders?

19             Yes.

20             Is that now and always been the law in

21   the United States of America?

22        A    Yes.)

23             MS. CONROY:  I have no further

24             questions, your Honor.

25             THE COURT:  Mr. Rafalski, I have one or

1

2          two follow-up questions.

3               Those five metrics that you pointed

4          out --

5               THE WITNESS:  Yes, sir.

6               THE COURT:  -- part of my question

7          before was do they prove each other, and what

8          I meant by that is if you apply metric one to

9          the data and you apply, let's say, metric

10         four to the data, do you come up -- do you

11         come up with the same conclusion, the same

12         findings or different findings?

13              THE WITNESS:  Different findings, your

14         Honor, because they're different formulas,

15         different algorithms.

16              THE COURT:  So is it fair or unfair to

17         suggest that a distributor or a manufacturer,

18         right, can apply one of the -- one of them to

19         the data and come out fine, and another one

20         to the data and come out in trouble?

21              THE WITNESS:  Well, if I understand your

22         question, your Honor, the data, the

23         transactional data is different for each

24         Defendant, so that's a very specific set of

25         purchases.

So if you were to apply the same formula

or the metric, the same formula to each of

the Defendants, the numbers would be

different, because the purchases and the

triggers would be different.

The only common thing that would occur

is the same formula would be applied to the

set of transaction data for each of the

different Defendants.

THE COURT:  Let me get this right.

You determine the metric based upon the

policies, procedures, and means and methods

of the distributor or manufacturer or

whatever, they tell you what the metric is?

THE WITNESS:  Of four of the five.  The

first one was the Masters metric, which was

taken right from their policies.  The other

four metrics were used by one or more of the

Defendants that I examined as part of the

litigation.

For example, the three times 12-month

average, that was used by a couple of the

Defendants in the litigation but not by all

Defendants, but it was applied to each of the

1

2      Defendants.

3              THE COURT:  Okay.  I have nothing

4      further.  You're excused, sir.

5              THE WITNESS:  Okay.  Thank you very

6      much, your Honor.

7              THE COURT:  Thank you.

8              Okay.  Now, the next witness up is

9      Dr. McCann I think, right?

10             MS. CONROY:  Dr. Craig McCann.  He's one

11     of the data analysts.

12             THE COURT:  Beg your pardon?

13             MS. CONROY:  He's one of the data

14     analysts.

15             THE COURT:  Is he available today -- we

16     have him scheduled for tomorrow but is he --

17             MS. CONROY:  Yes, he's not available

18     today.  We have him scheduled for tomorrow

19     morning, and he is available, obviously,

20     tomorrow morning.

21             THE COURT:  All right.  Then we'll --

22     oh, by the way, did any of you get any

23     information for the Court about that Summons

24     with Notice that's floating around.

25             MR. SHKOLNIK:  Your Honor, I haven't had

1
2  a chance to get in touch with that lawyer.
3  As soon as we finish reaching out to them and
4  I'll report to the Court.  I'll, of course,
5  contact Miss Licardi, and I'll let you know
6  ASAP.
7       THE COURT:  All right.  Thank you all.
8  I'll see you tomorrow.
9       Now, there was something else we had
10  discussed at the close of yesterday's
11  testimony.  The issue was on Thursday and
12  Friday of this week.  Do you recall that?
13       MS. CONROY:  Yes, your Honor.
14       THE COURT:  Now, I read the first waive
15  of letters.  The first waive of letters
16  suggested that certain Defendants were
17  opposed to moving, moving those two dates to
18  the end.
19       Then I got another waive of letters that
20  seems to be that everybody is on board with
21  keeping Thursday and Friday open.  Am I
22  right?  Am I wrong?
23       MS. CONROY:  My understanding and,
24  obviously, I won't speak for the Defendants,
25  but I have spoken to them, that both sides

1   are in agreement to move Ms. Keller, who will

2   be a live witness, to September.

3        THE COURT:  Okay.  What I'm waiting to

4   hear is, I think you're aware of the fact

5   that the Administrative Judge had to do a lot

6   of shuffling with judges in order to

7   accommodate us the way he has.

8        This part is dedicated to guardianship

9   matters, and there are matters scheduled for

10  one of the dates that you're suggesting.  I'm

11  waiting to hear from Judge Crecca.  I haven't

12  contacted him yet today, I think my office

13  has to find out if they can accommodate us,

14  so you'll know first thing in the morning.

15       MS. CONROY:  So whether the 11th or the

16  14th would potentially be a problem?

17       THE COURT:  Yes.  The next witness is

18  a -- I think you asked for -- the next

19  witness, that would be Lacey Keller?

20       MS. CONROY:  Right.  But we have a

21  witness, Dr. Lembke, on September 9th.

22       THE COURT:  I have Dr. Lembke on for

23  September 8th.

24       MS. CONROY:  Right.  And then we had a

1   are in agreement to move Ms. Keller, who will

2   be a live witness, to September.

3        THE COURT:  Okay.  What I'm waiting to

4   hear is, I think you're aware of the fact

5   that the Administrative Judge had to do a lot

6   of shuffling with judges in order to

7   accommodate us the way he has.

8        This part is dedicated to guardianship

9   matters, and there are matters scheduled for

10  one of the dates that you're suggesting.  I'm

11  waiting to hear from Judge Crecca.  I haven't

12  contacted him yet today, I think my office

13  has to find out if they can accommodate us,

14  so you'll know first thing in the morning.

15       MS. CONROY:  So whether the 11th or the

16  14th would potentially be a problem?

17       THE COURT:  Yes.  The next witness is

18  a -- I think you asked for -- the next

19  witness, that would be Lacey Keller?

20       MS. CONROY:  Right.  But we have a

21  witness, Dr. Lembke, on September 9th.

22       THE COURT:  I have Dr. Lembke on for

23  September 8th.

24       MS. CONROY:  Right.  And then we had a

1

2      Stipulation at the last pretrial -- at the

3      last conference because of clinical -- there

4      were issues, and you agreed, and the parties

5      agreed to move it one more day to begin on

6      the 9th and then the 10th for Dr. Keyes.  We

7      moved it one day.

8          THE COURT:  Then you want another day;

9      you want September 11th also?

10         MS. CONROY:  Well, because we wanted to

11     move Miss Keller from earlier in the schedule

12     to later in the schedule, so we put her in on

13     September 11th, but we can -- I mean, we can

14     confer, if there are problems with the

15     courtroom, we can confer with Defendants and

16     move those witnesses if there are days that

17     are not available to us.

18         THE COURT:  Because if we back up into

19     September 12th we have a headache, and in my

20     order the Defendants suggest that they need

21     two days with Miss Keller, and I can't have

22     that.  You know, I've created enough -- asked

23     for enough favors to make this work as it is.

24         MS. CONROY:  Your Honor, we could -- our

25     problem was Dr. Lembke on the 8th, if that's

1
2          an open -- if that's an open day, that's an
3          open day for us, and I can't tell you sitting
4          here which witness we could put on the 8th.
5          It wouldn't, obviously, be Dr. Lembke, but
6          one of those other witnesses could go on the
7          8th.
8               THE COURT:  Okay.  We'll jump on it
9          right away.
10               MS. CONROY:  Thank you.
11               THE COURT:  You're welcome.
12
13
14
15
16                    *      *      *
17
18
19
20
21
22
23
24
25

C E R T I F I C A T I O N

I, Stephanie Casagrande Hague, CSR, RPR,

an Official Court Reporter of the State of

New York, County of Suffolk, do hereby

certify that the above is a true and accurate

transcription of my stenographic notes taken

in the above-entitled action on this day;

Furthermore, photocopies made of this

transcript by any party cannot be certified

by me to be true and accurate.

Therefore, only those copies bearing an

original signature in blue ink are official

certified copies.


_____
STEPHANIE CASAGRANDE HAGUE, CSR, RPR
Official Court Reporter

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 0

**00X** [1] - 34:12
**02199** [1] - 2:19
**03771** [2] - 83:19
**056** [2] - 39:11, 40:23
**072** [2] - 40:17, 40:25

## 1

**1** [16] - 11:16, 11:17,
11:18, 13:5, 21:8,
63:8, 65:8, 88:6,
88:21, 99:16, 101:3,
107:12, 107:13,
109:23, 120:11,
136:25
**10** [19] - 12:20, 13:16,
31:14, 49:7, 49:8,
49:18, 62:2, 62:7,
62:10, 62:13, 62:15,
65:4, 97:25, 98:20,
99:17, 112:15,
138:14, 141:13
**10,000** [8] - 55:14,
55:21, 56:2, 63:10,
63:18, 65:9, 65:11,
71:20
**10,100** [5] - 64:7,
65:12, 65:20, 69:11,
71:23
**100** [5] - 31:10, 64:19,
66:14, 66:19, 70:9
**100-pill** [2] - 66:15,
66:20
**10005** [1] - 2:4
**10016** [1] - 1:15
**10018** [1] - 2:15
**10281** [1] - 2:8
**10th** [1] - 147:6
**11** [8] - 12:20, 15:5,
49:5, 99:25, 110:22,
110:24, 112:15,
112:20
**112** [1] - 1:14
**11747** [1] - 1:20
**11F** [1] - 135:2
**11th** [3] - 146:16,
147:9, 147:13
**12** [2] - 47:12, 100:2
**12-month** [1] - 143:22
**12th** [2] - 35:23,
147:19
**13** [8] - 15:6, 45:10,
45:20, 61:2, 61:3,
80:20, 81:5, 112:20
**13-and-a** [1] - 101:10
**13-and-a-half** [3] -
96:14, 97:2, 100:12
**13.5** [2] - 96:20, 98:4

## 2

**130** [2] - 127:16
**13th** [2] - 52:11, 53:3
**14** [1] - 100:2
**14th** [1] - 146:17
**15** [1] - 100:6
**16** [3] - 12:10, 30:2,
112:24
**166** [1] - 110:16
**17** [5] - 52:11, 52:23,
81:24, 98:20, 110:24
**173** [1] - 114:21
**179** [2] - 52:11, 53:8
**17th** [1] - 44:23
**18** [6] - 1:7, 97:14,
98:20, 98:25, 111:18
**184** [1] - 107:23
**198** [1] - 13:16
**1980s** [2] - 77:8, 77:12
**1996** [1] - 57:11
**1999** [2] - 57:18, 57:23

## 2

**2** [20] - 12:5, 12:8,
12:14, 13:4, 13:6,
13:14, 25:13, 27:13,
28:8, 29:4, 30:2,
48:18, 57:2, 58:8,
61:3, 63:18, 65:8,
90:9, 99:17, 112:7
**20** [6] - 47:13, 81:25,
82:2, 138:14, 141:14
**2006** [5] - 57:15, 77:6,
77:22, 82:4, 82:5
**2007** [1] - 108:4
**2008** [1] - 39:20
**2011** [2] - 44:13, 44:23
**2014** [1] - 57:15
**2015** [1] - 108:4
**2017** [1] - 3:11
**2018** [8] - 36:5, 36:22,
38:16, 39:8, 40:8,
42:15, 57:11, 116:3
**2019** [4] - 35:25,
52:11, 53:3, 100:22
**2020** [5] - 1:7, 13:15,
48:18, 49:17, 61:2
**204** [2] - 61:2, 61:3
**207** [3] - 48:18, 49:5,
49:18
**212** [2] - 1:16, 2:9
**212)397-1000** [1] -
1:22
**212)584-0700** [1] - 2:5
**212)841-1000** [1] -
2:16
**22** [9] - 61:2, 61:3,
80:7, 80:8, 80:9,
80:20, 81:24, 81:25,
82:2

## 3

**22-year** [1] - 57:13
**24** [1] - 99:2
**24.259** [2] - 37:6, 39:5
**25** [6] - 52:12, 53:8,
120:11, 120:15,
121:2, 122:16
**250** [1] - 2:7
**285** [2] - 108:6, 108:16
**286** [3] - 107:10,
107:19, 108:2
**287** [2] - 107:11,
107:20

## 3

**3** [5] - 13:16, 36:2,
63:23, 65:9, 97:13
**30** [3] - 31:22, 60:9,
137:17
**30,000** [1] - 66:22
**300** [1] - 101:24
**305** [1] - 1:20
**30B6** [1] - 134:24
**31st** [2] - 25:13, 26:10
**326-3939** [1] - 2:9
**33** [3] - 97:6, 97:13,
98:16
**34** [1] - 99:15
**35** [1] - 121:2
**350** [2] - 101:2, 101:15
**350-or-so** [1] - 102:24
**36** [1] - 107:20
**37** [1] - 107:20
**39** [1] - 34:18

## 4

**4** [7] - 21:11, 36:3,
63:2, 64:4, 65:10,
71:12, 112:7
**40** [2] - 37:22, 37:24
**400** [1] - 1:20
**400000** [1] - 3:10
**43,027.640** [1] - 39:9
**45** [2] - 11:21, 21:9
**463,497.72** [1] - 44:22
**48** [2] - 1:2, 128:8
**496** [3] - 110:21,
110:22, 111:19
**497** [1] - 112:7

## 5

**5** [7] - 62:2, 62:7,
62:10, 62:13, 62:15,
73:16, 112:11
**5,000** [3] - 63:8, 63:10,
71:20
**51** [2] - 28:20, 29:12
**556** [1] - 107:23

## 57.051

**57.051** [2] - 37:9,
39:20, 40:14

## 6

**6** [3] - 45:10, 45:20,
45:25
**606** [1] - 39:23
**617)235-4650** [1] -
2:20
**620** [1] - 2:14

## 7

**7** [7] - 49:7, 49:8,
49:18, 72:23,
112:15, 141:14
**7,000** [2] - 63:10,
71:20
**7.01** [1] - 25:15
**72** [1] - 107:14
**73** [1] - 127:18
**77** [2] - 2:3, 138:13
**771** [2] - 138:14, 141:9
**784-6401** [1] - 1:16
**79,596.606** [3] - 39:22,
40:8, 40:15
**7th** [5] - 13:15, 48:18,
49:17, 60:25, 110:21

## 8

**8** [1] - 83:18
**8,000** [2] - 63:10,
71:20
**800** [1] - 2:19
**88.9** [3] - 31:2, 31:5
**89** [5] - 79:20, 79:23,
80:7, 80:8, 80:19
**8th** [6] - 2:3, 83:16,
146:24, 147:25,
148:4, 148:7

## 9

**9** [4] - 52:11, 53:8,
87:5, 90:6
**9,000** [1] - 71:21
**9,500** [2] - 63:10,
71:21
**90** [3] - 80:10, 80:20,
81:4
**906** [2] - 110:17, 113:6
**91** [2] - 81:24, 81:25
**96** [1] - 47:12
**98** [2] - 45:9, 45:20
**9th** [4] - 99:20, 146:22,
147:6

## A

**ABDC** [3] - 55:16,
56:3, 107:21
**ability** [1] - 119:2
**able** [5] - 38:19, 62:8,
72:22, 83:2, 138:4
**above-entitled** [1] -
149:12
**absence** [1] - 119:9
**absolutely** [2] - 23:18,
140:21
**abundantly** [1] - 83:20
**accept** [9] - 41:16,
41:17, 51:22, 55:2,
107:2, 109:11,
141:4, 141:6
**acceptance** [7] - 25:3,
26:12, 26:19, 32:13,
32:16, 32:20, 33:22
**accepted** [14] - 6:21,
6:25, 8:10, 11:12,
33:21, 40:23, 41:7,
66:4, 68:15, 68:23,
84:7, 84:10, 84:18,
103:18
**access** [1] - 99:19
**accommodate** [2] -
146:8, 146:14
**accomplish** [1] -
14:16
**accomplished** [1] -
104:10
**account** [7] - 44:23,
67:8, 67:19, 68:9,
117:11, 117:20,
119:2
**accounted** [4] - 83:13,
117:7, 117:22, 118:9
**accumulated** [1] -
117:15
**accurate** [5] - 93:21,
100:4, 125:8,
149:10, 149:15
**acknowledged** [1] -
91:2
**acquired** [1] - 108:23
**Act** [2] - 115:5, 115:11
**acted** [1] - 56:10
**acting** [1] - 72:10
**action** [14] - 54:20,
55:10, 66:15, 74:10,
74:14, 75:6, 75:10,
75:25, 76:8, 94:20,
120:21, 120:22,
122:18, 149:12
**actions** [13] - 75:17,
89:20, 94:18,
117:13, 120:19,
120:25, 121:22,

123:6, 123:12, 123:18, 124:8, 124:21, 125:5

**actions'** [1] - 125:10

**actual** [15] - 6:9, 19:14, 32:6, 32:11, 34:9, 34:10, 36:24, 37:18, 41:20, 42:9, 42:14, 56:9, 114:4, 116:3, 116:9

**add** [3] - 56:14, 100:7, 106:14

**added** [3] - 106:5, 107:6, 108:13

**addition** [2] - 14:6, 89:8

**additional** [5] - 7:8, 16:16, 62:15, 70:2, 125:20

**addressed** [1] - 16:17

**addresses** [1] - 114:17

**adequate** [3] - 23:24, 24:6, 73:11

**adjust** [1] - 67:24

**Administration** [4] - 9:6, 9:20, 35:5, 45:6

**administrative** [15] - 89:20, 94:20, 117:13, 120:19, 120:21, 120:25, 121:22, 122:18, 123:6, 123:12, 123:20, 124:8, 124:21, 125:5, 125:9

**Administrative** [1] - 146:6

**admissibility** [2] - 83:22, 84:4

**admonition** [2] - 74:25, 78:15

**adopt** [1] - 106:8

**adopted** [6] - 12:17, 22:25, 42:21, 59:10, 59:17, 103:18

**adopting** [1] - 19:8

**advocate** [1] - 114:6

**afield** [1] - 77:16

**aforementioned** [2] - 115:13, 115:17

**afoul** [1] - 19:2

**afternoon** [2] - 128:9, 128:10

**AG's** [1] - 109:22

**agency** [2] - 41:15, 116:21

**agents** [1] - 94:14

**aggregate** [2] - 35:12, 38:9

**aggregated** [1] -

115:11

**ago** [1] - 138:17

**agree** [31] - 6:7, 7:14, 9:16, 9:22, 9:24, 9:25, 14:6, 22:6, 23:22, 42:7, 43:3, 43:10, 43:19, 44:2, 44:6, 46:21, 46:22, 60:15, 60:19, 61:6, 73:10, 73:15, 74:9, 92:24, 101:11, 112:18, 118:22, 139:6, 139:12, 140:9

**agreed** [2] - 147:4, 147:5

**agreement** [1] - 146:2

**ahead** [12] - 15:7, 27:2, 44:17, 52:17, 79:10, 85:9, 96:22, 105:22, 110:7, 122:6, 132:20, 135:25

**air** [1] - 126:22

**algorithm** [4] - 60:5, 60:16, 61:8, 132:6

**algorithms** [4] - 16:4, 19:21, 130:2, 142:15

**allow** [2] - 118:21, 135:23

**almost** [5] - 31:19, 109:23, 110:11, 110:12, 124:2

**alternative** [1] - 42:12

**amended** [2] - 58:4, 104:16

**amendment** [1] - 116:17

**America** [1] - 141:21

**Amerisource** [5] - 105:14, 108:21, 108:24, 108:25, 109:6

**AmerisourceBergen** [3] - 108:9, 108:14, 108:15

**AMINOLROAYA** [1] - 2:4

**amount** [19] - 31:21, 34:4, 35:19, 36:17, 39:19, 41:7, 41:13, 43:4, 43:5, 43:21, 43:22, 46:4, 46:5, 51:24, 66:6, 69:24, 110:13, 115:18, 131:6

**amounts** [2] - 32:11, 68:7

**analogy** [2] - 95:20, 95:25

**analyses** [1] - 12:4

**analysis** [24] - 16:19, 16:21, 16:24, 17:2, 17:7, 18:12, 19:4, 19:14, 19:15, 19:19, 22:8, 22:12, 24:11, 24:13, 24:14, 24:16, 24:24, 32:10, 33:7, 33:12, 51:14, 51:17, 57:11, 123:16

**Analysis** [1] - 11:23

**analyst** [2] - 90:8, 130:13

**analysts** [6] - 129:17, 129:20, 129:25, 131:23, 144:11, 144:14

**analytical** [1] - 25:18

**analyzed** [2] - 20:12, 102:3, 113:10

**and-a-half** [1] - 77:14

**ANDREW** [1] - 2:20

**Andrew** [1] - 4:9

**andrew.o'connor@ ropesgray.com** [1] - 2:21

**annexed** [1] - 92:25

**ANSWER** [14] - 13:22, 15:13, 45:13, 46:3, 47:15, 50:2, 53:18, 61:9, 81:11, 81:14, 81:19, 82:4, 99:18, 100:3

**answer** [50] - 13:24, 14:4, 15:5, 15:15, 23:3, 28:2, 28:4, 34:16, 42:24, 45:11, 45:16, 46:15, 48:4, 48:25, 50:4, 50:9, 50:15, 53:14, 54:9, 54:12, 54:13, 54:16, 55:7, 61:10, 61:15, 66:9, 66:23, 68:12, 68:20, 69:6, 69:25, 70:14, 71:10, 73:14, 74:23, 75:13, 80:21, 80:22, 82:8, 93:19, 94:6, 99:6, 100:2, 100:10, 111:9, 111:22, 112:11, 112:14, 112:24

**answered** [5] - 8:2, 48:9, 60:3, 80:15, 80:16

**answering** [3] - 29:23, 46:18, 70:12

**answers** [5] - 61:4, 81:20, 94:7, 94:9, 97:8

**anyway** [1] - 122:9

**API** [2] - 115:11,

115:19

**apologize** [5] - 49:16, 54:17, 54:18, 122:4, 129:7

**Appeals** [1] - 131:17

**appear** [2] - 16:2, 26:15

**appearance** [2] - 3:12, 86:10

**appeared** [1] - 127:5

**Appellate** [3] - 16:11, 83:19

**appendices** [1] - 12:19

**Appendix** [2] - 12:20

**application** [3] - 25:8, 51:20, 62:20

**applied** [13] - 14:20, 18:2, 20:22, 54:24, 84:4, 90:8, 94:10, 94:14, 129:17, 130:12, 133:9, 143:8, 143:25

**applies** [2] - 5:16, 132:24

**apply** [14] - 16:5, 17:22, 60:2, 90:18, 90:19, 106:17, 129:20, 132:16, 132:17, 134:5, 142:8, 142:9, 142:18, 143:2

**applying** [1] - 60:18

**appreciate** [1] - 97:18

**approach** [1] - 85:24

**appropriate** [2] - 13:19, 139:16

**approve** [2] - 14:16, 14:17

**approved** [1] - 131:17

**ARCOS** [1] - 20:12

**area** [1] - 117:14

**areas** [1] - 39:13, 82:10

**argue** [1] - 39:13, 82:10

**article** [1] - 120:6

**ASAP** [1] - 145:6

**assessing** [1] - 27:9

**assessment** [2] - 10:5, 10:7

**assist** [1] - 116:20

**assume** [12] - 63:18, 134:22, 135:14, 136:2, 137:3, 137:19, 137:22, 138:5, 138:6, 139:19, 140:15, 140:25

**assumed** [2] - 135:18, 138:6

**assumption** [6] - 64:5, 65:8, 69:13, 70:6, 70:20, 138:9

**assumptions** [3] - 59:23, 60:11, 71:4

**attached** [1] - 138:15

**attempt** [1] - 129:12

**attempts** [1] - 115:8

**attention** [1] - 115:14

**attorney** [2] - 91:19, 91:24

**Attorney** [2] - 104:16, 109:14

**attorneys** [6] - 16:4, 19:11, 19:12, 90:3, 91:25, 92:7

**Attorneys** [6] - 1:14, 1:19, 2:3, 2:7, 2:13, 2:18

**August** [5] - 1:7, 63:18, 65:12, 66:22, 71:23

**automatically** [3] - 46:25, 47:21, 66:25

**available** [7] - 115:13, 119:22, 120:8, 144:15, 144:17, 144:19, 147:17

**Avenue** [2] - 1:14, 2:14

**average** [1] - 143:23

**avoid** [1] - 4:23

**aware** [20] - 7:5, 7:12, 10:21, 20:24, 32:12, 33:17, 34:3, 34:7, 34:11, 34:16, 35:9, 37:17, 55:14, 56:17, 56:22, 60:23, 74:10, 78:2, 94:19, 112:21, 146:5

**awareness** [1] - 123:18

**B**

**bad** [1] - 42:3

**Badala** [1] - 3:18

**BADALA** [2] - 1:21, 3:17

**Bank** [1] - 44:22

**based** [23] - 9:5, 9:18, 12:19, 15:22, 17:12, 17:14, 27:16, 52:2, 65:9, 66:6, 67:25, 69:13, 70:5, 70:8, 70:25, 72:11, 85:4, 101:13, 115:16, 134:6, 134:7, 134:16, 143:12

**basis** [1] - 41:12

**Bates** [1] - 108:10
**bear** [2] - 64:9, 86:25
**bearing** [1] - 149:16
**became** [1] - 104:8
**beg** [2] - 122:3, 144:12
**begin** [1] - 147:5
**beginning** [3] - 4:21, 101:21, 122:16
**begins** [1] - 116:7
**behalf** [5] - 4:2, 4:7, 4:9, 86:13, 134:24
**beliefs** [1] - 15:3
**believes** [1] - 137:23
**Bellco** [4] - 108:21, 108:22, 108:23, 109:5
**below** [2] - 35:11, 118:24
**benefit** [1] - 73:20
**Best** [1] - 44:22
**best** [2] - 137:20, 139:17
**beta** [1] - 103:25
**better** [2] - 45:22, 95:20
**between** [9] - 22:8, 25:18, 26:17, 62:14, 65:13, 66:2, 71:3, 99:24, 106:19
**big** [1] - 96:4
**bigger** [1] - 95:3
**biggest** [1] - 124:19
**billed** [1] - 101:18
**billing** [4] - 96:17, 96:21, 97:4, 100:24
**billings** [1] - 101:13
**binder** [1] - 11:17
**bit** [10] - 38:2, 39:17, 40:8, 56:14, 60:11, 84:20, 97:24, 104:13, 113:14, 120:10
**block** [5] - 77:23, 138:2, 139:20, 141:2, 141:18
**blocked** [1] - 139:9
**blocking** [1] - 77:2
**blow** [2] - 37:25, 40:7
**blue** [1] - 149:17
**board** [1] - 145:20
**boils** [1] - 25:21
**book** [1] - 112:4
**Boston** [1] - 2:19
**bottle** [8] - 64:19, 65:12, 66:7, 66:15, 66:20, 71:15, 72:5, 72:11
**bottom** [9] - 12:3, 13:5, 13:7, 36:4, 89:22, 98:25, 108:7,

124:14, 133:7
**Boylston** [1] - 2:19
**brain** [1] - 56:16
**break** [2] - 82:25, 108:8, 126:4
**brief** [1] - 86:20
**briefing** [2] - 82:3, 82:4
**bring** [2] - 27:7, 87:4
**broad** [2] - 58:17, 100:5
**broadened** [2] - 75:21
**broader** [2] - 94:11, 95:8
**Broadhollow** [1] - 1:20
**brought** [1] - 134:4
**build** [4] - 67:7, 67:14, 67:18, 67:22
**Building** [1] - 2:14
**bullet** [11] - 73:7, 73:16, 87:22, 87:24, 88:11, 90:6, 92:25, 94:3, 94:11, 129:16
**bunch** [1] - 127:3
**BURLING** [1] - 2:12
**business** [5] - 6:11, 9:5, 9:18, 10:9, 11:8
**businesses** [1] - 10:16
**but..** [1] - 39:14
**BY** [30] - 2:4, 2:8, 2:20, 5:9, 15:8, 18:23, 27:10, 36:15, 37:16, 38:10, 38:23, 40:9, 44:19, 45:21, 49:21, 52:18, 53:11, 54:19, 63:6, 64:14, 73:2, 77:18, 79:12, 92:17, 93:24, 96:9, 96:23, 97:22, 99:13, 128:19

## C

**calculate** [2] - 39:14, 40:24
**calculated** [3] - 40:21, 42:6, 115:18
**calculating** [1] - 41:7
**calculation** [9] - 39:24, 40:3, 40:12, 42:7, 42:9, 62:9, 69:9, 115:25, 116:3
**calculations** [11] - 12:16, 12:23, 16:2, 30:4, 31:19, 41:10, 50:22, 50:25, 58:6, 58:10, 58:23
**calendar** [2] - 60:10, 60:19

**cannot** [1] - 149:14
**caption** [1] - 45:2
**Cardinal** [4] - 31:22, 54:2, 55:16, 56:3
**Carter** [1] - 87:4
**Casagrande** [1] - 149:7
**CASAGRANDE** [2] - 2:24, 149:21
**case** [38] - 8:20, 23:14, 44:11, 44:21, 45:5, 46:16, 48:12, 48:14, 56:7, 58:19, 59:4, 75:9, 79:14, 83:16, 84:9, 84:13, 84:23, 86:22, 86:25, 87:9, 90:18, 94:13, 94:19, 95:6, 98:10, 119:24, 129:14, 130:9, 130:13, 130:20, 131:10, 131:12, 131:13, 131:16, 132:20, 132:23, 132:24, 133:6
**cases** [6] - 33:8, 33:13, 44:9, 84:13, 94:18, 130:5
**catch** [1] - 43:15
**caused** [5] - 48:12, 48:22, 49:24, 50:10, 50:18
**cease** [2] - 47:2, 47:22
**center** [2] - 35:3, 120:18
**Central** [1] - 1:8
**certain** [3] - 60:5, 73:22, 145:16
**certainly** [5] - 5:24, 10:16, 75:8, 86:24, 109:24
**certified** [2] - 149:14, 149:18
**certify** [1] - 149:10
**chance** [2] - 49:3, 145:2
**change** [2] - 57:25, 59:7
**changed** [3] - 30:8, 64:10, 65:2
**changes** [3] - 68:9, 99:11, 116:17
**check** [1] - 112:9
**checked** [2] - 58:23, 112:3
**checklist** [1] - 9:2
**Chief** [2] - 135:6, 140:2
**choose** [1] - 85:3
**chose** [1] - 124:22
**Chris** [14] - 11:17,

35:24, 36:12, 37:11, 37:22, 38:21, 39:17, 40:8, 45:16, 57:8, 64:5, 64:8, 72:22, 80:8
**CIACCIO** [1] - 1:22
**circuit** [1] - 9:15
**circumstances** [5] - 70:6, 70:10, 70:25, 95:4, 134:14
**citation** [1] - 25:20
**cited** [1] - 81:13
**Citing** [1] - 112:13
**civil** [1] - 80:13
**clarification** [1] - 99:9
**clarify** [2] - 29:15, 112:8
**clarity** [2] - 7:20, 7:21
**clear** [6] - 28:4, 77:5, 83:20, 86:23, 86:24, 134:18
**cleared** [1] - 76:19
**clearly** [2] - 49:12, 140:6
**CLERK** [7] - 3:9, 4:14, 83:11, 128:7, 128:10, 128:12, 128:15
**click** [2] - 38:7, 38:8
**clinical** [1] - 147:3
**clip** [7] - 135:3, 135:4, 135:21, 139:14, 139:24, 139:25, 141:8
**clip..** [1] - 139:4
**close** [3] - 31:10, 57:20, 145:10
**closely** [1] - 123:11
**Code** [4] - 73:24, 74:4, 74:7, 120:23
**colleagues** [2] - 37:23, 83:2
**collect** [1] - 87:25
**column** [4] - 36:5, 115:4, 115:25, 116:7
**coming** [5] - 32:2, 41:20, 59:15, 59:19, 78:23
**comment** [2] - 91:8, 101:14
**commentary** [1] - 25:15
**comments** [2] - 77:15, 124:3
**Commerce** [1] - 107:22
**commission** [1] - 92:3
**committed** [1] - 118:25
**Committee** [1] -

107:22
**common** [1] - 143:7
**communications** [3] - 89:13, 89:15, 103:22
**community** [4] - 32:22, 32:23, 68:25, 84:19
**companies** [10] - 10:8, 16:7, 29:21, 73:23, 123:9, 123:11, 130:3, 133:9, 133:12
**companies-by- companies** [1] - 10:8
**company** [18] - 10:4, 10:15, 66:17, 67:2, 68:5, 69:23, 72:11, 75:2, 89:12, 89:14, 94:23, 94:24, 102:20, 108:23, 112:16, 132:17, 132:24
**company-by- company** [1] - 10:4
**comparison** [2] - 104:15, 113:16
**complaint** [3] - 109:13, 120:5
**Complaint** [6] - 104:17, 105:13, 109:22, 113:16, 127:6
**complete** [1] - 101:2
**completeness** [1] - 139:15
**complex** [4] - 41:9, 44:4, 94:7, 104:8
**complexity** [2] - 47:4, 47:10
**compliance** [8] - 88:12, 88:19, 89:18, 89:24, 102:8, 102:25, 103:14, 106:12
**compliant** [1] - 11:5
**complicated** [1] - 37:3
**complying** [1] - 104:11
**component** [1] - 67:14
**components** [3] - 10:19, 11:7, 68:4
**concept** [1] - 7:25
**concern** [1] - 124:18
**concerning** [2] - 103:14, 108:14
**conclusion** [7] - 12:13, 17:17, 17:18, 33:13, 41:13, 78:23, 142:11
**concretely** [1] - 29:24
**concurring** [1] - 84:23

**conditions** [1] - 122:17
**conduct** [5] - 17:2, 17:10, 24:10, 47:17, 76:17
**conducted** [4] - 33:12, 42:10, 52:3, 129:14
**confer** [3] - 82:25, 147:14, 147:15
**conference** [3] - 127:12, 127:13, 147:3
**conferring** [1] - 85:11
**confident** [1] - 102:16
**confidential** [2] - 119:15, 119:18
**confirm** [5] - 55:18, 86:22, 102:11, 127:8, 138:11
**confirmed** [2] - 17:23, 137:9
**confused** [2] - 59:23, 60:4
**confusing** [3] - 119:10, 130:10
**connected** [1] - 25:23
**connection** [4] - 24:12, 24:23, 26:17, 122:25
**Conroy** [23] - 3:13, 18:25, 49:13, 49:16, 52:20, 52:24, 65:5, 72:17, 80:4, 85:15, 91:13, 92:14, 97:12, 101:8, 106:2, 111:5, 121:20, 121:25, 123:22, 128:2, 135:11, 137:7, 137:10
**CONROY** [80] - 1:13, 1:16, 3:13, 3:16, 49:10, 49:14, 49:20, 52:14, 52:25, 53:6, 53:10, 54:11, 79:24, 80:5, 90:23, 90:25, 92:15, 92:17, 93:24, 96:9, 96:23, 97:22, 98:16, 98:19, 99:13, 104:25, 105:9, 107:15, 111:7, 111:13, 111:17, 114:2, 114:9, 114:16, 114:19, 119:12, 121:8, 122:2, 122:11, 122:20, 123:25, 124:13, 125:16, 125:23, 126:2, 126:6, 126:9, 128:3, 128:20, 128:21,

128:23, 129:9, 133:15, 135:19, 136:10, 136:13, 136:17, 137:14, 137:16, 138:11, 138:13, 138:21, 139:2, 140:12, 140:21, 140:24, 141:7, 141:13, 141:23, 144:10, 144:13, 144:17, 145:13, 145:23, 146:16, 146:21, 146:25, 147:10, 147:24, 148:10
**consensus** [1] - 25:4, 84:21
**consider** [2] - 92:3, 119:7
**considered** [2] - 29:17, 108:25
**considers** [2] - 116:14, 134:10
**consistent** [8] - 7:25, 29:18, 64:11, 101:22, 129:24, 130:21, 132:4, 132:8
**consult** [1] - 125:19
**consulting** [1] - 123:16
**contact** [2] - 106:18, 145:5
**contacted** [1] - 146:13
**contained** [9] - 5:19, 5:22, 12:5, 12:24, 16:24, 81:12, 81:14, 110:13, 133:12
**contains** [1] - 6:3
**content** [2] - 106:24, 112:18
**contents** [1] - 137:12
**continue** [4] - 4:19, 49:19, 69:24, 80:10
**CONTINUED** [1] - 128:19
**continued** [1] - 3:9
**continues** [2] - 54:21, 71:25
**continuing** [1] - 42:4
**contrary** [3] - 25:23, 43:3, 82:12
**contributed** [1] - 101:24
**Control** [2] - 8:21, 38:6
**controlled** [9] - 35:19, 47:3, 47:23, 48:2, 115:12, 116:14, 116:16, 116:22, 141:17

**controls** [4] - 17:15, 21:17, 72:25, 90:20
**conversations** [1] - 60:13
**Conway** [1] - 96:7
**copied** [1] - 59:3
**copies** [2] - 149:16, 149:18
**copy** [3] - 34:21, 52:15, 57:5
**core** [3] - 26:18, 26:19, 75:11
**Corp** [1] - 2:13
**corporate** [3] - 101:21, 102:14, 102:22
**corporation** [1] - 104:6
**correct** [140] - 5:17, 6:5, 6:6, 6:16, 6:17, 6:19, 6:22, 7:3, 7:4, 7:15, 7:23, 8:4, 8:5, 8:8, 8:12, 8:13, 8:22, 10:5, 10:13, 11:14, 11:15, 12:5, 12:17, 12:21, 12:25, 13:9, 13:12, 14:8, 14:22, 15:21, 15:24, 16:14, 20:11, 20:17, 20:21, 21:25, 22:5, 22:12, 22:13, 23:4, 23:7, 23:16, 23:25, 27:17, 27:18, 29:4, 30:6, 30:9, 31:12, 31:13, 31:16, 31:22, 31:24, 39:9, 42:10, 42:15, 50:11, 50:18, 51:3, 51:13, 52:5, 56:10, 56:19, 56:25, 57:15, 57:16, 58:3, 59:5, 59:11, 59:13, 60:16, 62:16, 62:17, 62:18, 65:16, 65:21, 67:10, 67:11, 67:23, 68:3, 69:12, 69:21, 70:4, 70:17, 71:6, 73:12, 73:23, 76:24, 77:2, 82:14, 82:15, 87:11, 88:2, 88:4, 88:9, 88:10, 88:13, 88:16, 88:20, 89:2, 89:25, 90:2, 90:11, 90:12, 90:22, 90:24, 91:9, 94:17, 96:15, 100:13, 101:16, 102:9, 102:10, 103:2, 104:22, 105:25, 108:17, 109:8, 109:15, 109:16, 109:18, 113:7, 113:12,

114:25, 115:2, 118:10, 118:14, 119:4, 122:18, 129:4, 129:14, 129:22, 130:13, 130:17, 131:14, 131:18, 131:23, 132:2, 133:21, 137:14
**correctly** [8] - 13:25, 21:24, 46:12, 47:24, 55:4, 61:12, 81:21, 82:7
**corresponding** [2] - 23:6, 98:9
**Cory** [1] - 128:23
**counsel** [4] - 3:12, 85:7, 119:14, 127:23
**count** [1] - 127:16
**counter** [1] - 95:15
**counts** [1] - 135:17
**COUNTY** [1] - 1:2
**County** [9] - 1:14, 1:19, 30:18, 30:22, 31:7, 31:11, 31:16, 125:19, 149:9
**couple** [3] - 27:4, 103:6, 143:23
**course** [9] - 17:5, 24:16, 36:9, 49:13, 52:23, 80:6, 86:11, 111:10, 145:4
**court** [4] - 25:17, 63:5, 65:6, 135:14
**COURT** [154] - 1:2, 2:24, 3:2, 3:5, 3:7, 3:15, 3:19, 3:22, 4:3, 4:5, 4:10, 4:12, 4:18, 5:2, 5:3, 5:5, 15:7, 18:19, 24:12, 26:2, 26:5, 26:20, 27:2, 40:2, 48:24, 49:5, 52:17, 54:13, 77:11, 78:18, 79:2, 79:7, 79:10, 80:11, 80:15, 80:21, 82:18, 82:21, 83:4, 83:9, 83:13, 84:2, 85:15, 85:18, 85:22, 86:2, 86:7, 86:10, 87:16, 91:4, 91:7, 91:13, 91:16, 91:23, 92:13, 93:9, 93:11, 93:13, 93:17, 95:22, 95:24, 96:7, 96:14, 96:19, 96:22, 97:15, 97:17, 98:18, 101:7, 103:8, 104:22, 105:8, 107:9, 107:19, 110:5, 111:5, 111:8,

111:15, 113:23, 114:5, 114:15, 118:2, 118:18, 118:20, 119:6, 120:16, 121:6, 121:12, 121:16, 121:25, 122:3, 122:6, 122:13, 122:21, 122:23, 122:25, 123:22, 124:10, 125:7, 125:14, 125:22, 125:24, 126:3, 126:8, 126:12, 126:18, 126:21, 127:24, 128:2, 128:9, 128:11, 128:18, 128:8, 132:7, 132:11, 132:22, 133:5, 133:14, 135:9, 135:22, 136:8, 136:11, 136:15, 136:19, 136:22, 137:10, 137:15, 137:18, 138:6, 138:12, 138:24, 139:18, 140:10, 140:13, 140:16, 140:22, 141:25, 142:6, 142:16, 143:11, 144:3, 144:7, 144:12, 144:15, 144:21, 145:7, 145:14, 146:4, 146:18, 146:23, 147:8, 147:18, 148:8, 148:11
**Court** [26] - 1:11, 4:22, 16:11, 16:12, 18:25, 24:19, 24:24, 25:2, 25:6, 25:16, 27:14, 54:25, 63:3, 77:20, 85:8, 107:10, 119:6, 127:7, 127:12, 128:8, 131:12, 131:17, 144:23, 145:4, 149:8, 149:22
**Court's** [2] - 25:13, 77:15
**courtesy** [3] - 19:3, 97:19, 137:7
**courtroom** [3] - 34:20, 37:23, 147:15
**cover** [1] - 21:5
**covered** [5] - 39:16, 83:6, 115:11, 116:15, 125:2
**COVINGTON** [1] -

2:12
**Craig** [1] - 144:10
**created** [1] - 147:22
**Crecca** [1] - 146:12
**crisis** [1] - 57:17
**criteria** [3] - 43:7,
43:23, 46:7
**critical** [4] - 19:12,
20:6, 24:5, 43:17
**cross** [6] - 85:3,
111:16, 121:5,
121:11, 122:12,
124:23
**CROSS** [1] - 86:14
**cross-examination** [2]
- 121:11, 122:12
**CROSS-
EXAMINATION** [1] -
86:14
**cross-examine** [1] -
85:3
**CSA** [1] - 116:17
**CSR** [3] - 2:24, 149:7,
149:21
**cumulative** [2] - 18:6,
122:9
**currency** [1] - 44:22
**current** [1] - 131:6
**curtesy** [1] - 45:18
**customer** [10] - 10:6,
11:9, 88:25, 94:16,
94:21, 95:9, 134:17,
138:4, 139:10
**customer-by-
customer** [1] - 10:6
**customers** [2] - 6:11,
47:16
**cut** [3] - 33:4, 105:12,
105:23
**cutting** [2] - 124:4,
124:17
**CVS** [3] - 30:23, 31:11,
31:15
**CVS's** [1] - 31:6

**D**

**data** [42] - 5:11, 16:5,
17:22, 20:12, 22:8,
25:19, 25:23, 25:24,
26:13, 27:12, 30:11,
41:11, 41:15, 59:16,
62:12, 62:15, 71:3,
88:2, 88:8, 90:7,
90:8, 90:14, 115:12,
117:15, 129:17,
129:20, 129:21,
129:25, 130:2,
130:12, 131:23,
134:5, 142:9,

142:10, 142:19,
142:20, 142:22,
142:23, 143:9,
144:11, 144:13
**databases** [4] -
115:13, 115:17,
116:9, 116:20
**date** [3] - 35:22, 64:9,
90:4
**dated** [1] - 44:23
**dates** [2] - 145:17,
146:11
**DAY** [1] - 2:6
**days** [3] - 60:9,
147:16, 147:21
**DC** [1] - 131:17
**DEA** [73] - 7:8, 7:20,
7:21, 18:8, 20:10,
20:12, 20:24, 32:4,
32:22, 33:11, 34:3,
35:3, 35:8, 35:11,
35:16, 36:17, 37:17,
38:15, 39:5, 41:14,
41:21, 41:22, 42:9,
44:8, 55:9, 56:11,
66:15, 72:10, 74:10,
74:16, 75:17, 75:25,
76:2, 76:8, 77:4,
77:20, 81:17, 94:14,
115:11, 115:17,
116:9, 116:10,
116:13, 116:20,
117:3, 118:25,
119:22, 119:23,
120:19, 120:22,
120:25, 123:6,
123:11, 124:7,
125:9, 129:25,
130:17, 130:19,
131:14, 132:5,
132:9, 132:15,
134:6, 134:23,
134:24, 136:3,
136:5, 137:23,
138:8, 140:3, 141:8,
141:16
**DEA's** [3] - 8:20, 41:5,
116:17
**deal** [2] - 25:6, 83:6
**dealing** [2] - 10:9,
25:7
**deals** [1] - 26:22
**December** [1] - 100:22
**decide** [1] - 132:12
**decimal** [1] - 34:12
**decision** [6] - 9:5,
9:18, 68:6, 77:20,
106:8, 106:25
**decisions** [5] - 62:3,
62:8, 62:10, 62:13,

62:15
**dedicated** [1] - 146:9
**Defendant** [4] - 88:8,
99:5, 100:10, 142:24
**Defendants** [22] -
21:14, 23:13, 48:12,
56:7, 84:25, 98:9,
102:3, 102:6, 102:9,
103:15, 103:18,
138:16, 143:4,
143:10, 143:20,
143:24, 143:25,
144:2, 145:16,
145:24, 147:15,
147:20
**Defendants'** [11] -
87:25, 88:12, 88:19,
89:18, 104:14,
104:19, 105:3,
109:21, 113:15,
114:14, 132:2
**define** [1] - 6:18
**definitely** [2] - 18:3,
58:25
**definition** [1] - 6:9
**definitive** [1] - 111:24
**Demonstrative** [3] -
63:2, 65:4, 71:12
**demonstrative** [1] -
90:7
**demonstratives** [1] -
87:6
**Department** [2] - 35:4,
83:18
**deposition** [32] - 8:23,
13:3, 13:15, 15:2,
29:19, 44:21, 48:18,
54:2, 58:18, 59:15,
59:18, 60:22, 61:2,
61:15, 61:17, 78:7,
79:15, 79:17, 79:19,
79:25, 80:3, 95:6,
97:7, 97:9, 100:17,
109:6, 110:19,
110:21, 111:11,
134:25, 135:4,
138:15
**Deposition** [1] - 45:3
**depositions** [4] - 89:8,
95:5, 95:7, 102:22
**describe** [3] - 103:11,
115:8, 115:20
**described** [3] - 21:13,
87:9, 126:25
**description** [1] - 100:4
**design** [2] - 8:7, 59:13
**designed** [3] - 5:25,
67:16, 68:5
**designing** [1] - 9:17
**designs** [3] - 66:17,

66:18
**despite** [1] - 77:15
**detailed** [1] - 24:25
**detecting** [2] - 13:20,
68:15
**determination** [1] -
94:23
**determine** [8] - 84:7,
84:15, 95:16, 109:5,
115:7, 137:25,
139:8, 143:12
**determines** [2] -
25:17, 35:16
**Detroit** [1] - 97:10
**develop** [3] - 7:8,
102:24, 103:13
**deviation** [1] - 102:13
**deviations** [1] - 104:3
**diagnostic** [6] - 16:4,
16:9, 17:22, 33:10,
51:23, 65:22
**difference** [2] - 65:13,
66:2
**differences** [1] - 8:18
**different** [21] - 7:17,
8:16, 29:2, 30:14,
41:19, 44:5, 62:2,
74:17, 98:9, 101:15,
109:3, 123:9,
130:11, 142:12,
142:13, 142:14,
142:15, 142:23,
143:5, 143:6, 143:10
**differently** [5] - 11:12,
51:6, 68:22
**difficult** [2] - 47:11,
49:15
**diligence** [37] - 17:21,
17:25, 19:19, 23:5,
23:8, 23:15, 29:9,
47:9, 52:3, 54:5,
66:21, 69:23, 70:21,
70:23, 71:5, 71:7,
71:8, 73:16, 74:5,
74:8, 74:12, 74:16,
74:20, 75:9, 75:13,
75:18, 76:4, 76:10,
76:18, 88:22, 94:15,
94:25, 102:21,
117:21, 123:20,
134:12, 134:19
**direct** [2] - 124:22,
129:2
**directed** [1] - 77:5
**directly** [3] - 25:12,
60:8, 60:13
**directs** [1] - 78:17
**disagree** [2] - 9:12,
101:12
**disclose** [1] - 119:18

**disclosed** [1] - 119:14
**discovery** [3] - 89:7,
92:6, 92:9
**discuss** [4] - 27:21,
28:9, 40:20, 103:23
**discussed** [7] - 104:2,
112:4, 116:8,
116:13, 116:20,
119:21, 145:10
**discussing** [2] -
118:5, 121:8
**discussion** [2] - 78:9,
116:8
**discussions** [2] -
60:7, 102:8
**disparaging** [1] -
124:3
**dispel** [3] - 47:6, 54:6,
134:9
**dispelled** [2] - 47:8,
69:22
**dispelling** [1] - 69:25
**display** [1] - 107:9
**dispute** [6] - 48:7,
50:6, 61:17, 61:18,
61:21, 81:22
**distinct** [2] - 83:21,
84:3
**distributed** [1] - 11:24
**distributions** [1] -
31:6
**distributor** [14] - 8:14,
10:11, 47:2, 47:21,
51:11, 74:11, 76:3,
80:25, 117:18,
133:21, 137:24,
139:7, 142:17,
143:14
**distributors** [10] -
6:15, 7:9, 8:6, 21:14,
23:9, 23:23, 24:4,
77:5, 81:19, 109:3
**district** [1] - 127:2
**Ditta** [1] - 83:17
**DITTA** [1] - 83:18
**dive** [1] - 21:2
**diversion** [42] - 21:19,
21:25, 22:5, 22:10,
28:18, 28:22, 31:11,
32:6, 32:12, 32:24,
34:5, 34:9, 36:18,
39:4, 39:19, 40:13,
41:5, 41:8, 41:13,
41:20, 42:9, 42:14,
90:21, 114:18,
115:4, 115:8,
115:10, 115:18,
116:14, 116:15,
116:21, 116:24,
117:3, 117:7, 117:9,

117:12, 117:23, 118:9, 119:3, 123:18, 138:4, 139:11
**Diversion** [2] - 8:21, 38:6
**diversions** [1] - 36:5
**diverted** [10] - 28:4, 28:14, 28:17, 29:7, 29:12, 31:7, 32:16, 33:19, 33:24, 42:22
**divide** [1] - 39:8
**divided** [1] - 39:22
**dividing** [1] - 40:14
**Division** [1] - 83:19
**dixit** [1] - 25:24
**do-not-ship** [1] - 76:23
**doctors** [4] - 67:19, 67:25, 68:4, 68:10
**document** [19] - 11:18, 12:8, 34:23, 36:3, 37:15, 104:14, 106:6, 108:8, 108:9, 108:15, 112:10, 112:17, 118:17, 118:20, 119:7, 120:5, 122:15, 123:4, 125:12
**documentation** [1] - 88:23
**documented** [1] - 73:17
**documents** [32] - 17:19, 19:13, 29:20, 53:25, 55:18, 70:5, 73:22, 73:25, 78:3, 89:8, 89:13, 89:15, 91:20, 95:2, 98:3, 98:8, 99:9, 99:11, 99:18, 99:22, 100:9, 100:14, 102:20, 103:21, 103:24, 106:23, 106:24, 106:25, 108:6, 108:20, 120:14
**done** [6] - 33:25, 42:8, 56:13, 58:10, 58:25, 134:9
**dosage** [1] - 42:6
**down** [12] - 12:3, 25:21, 36:22, 38:13, 39:17, 40:19, 45:2, 54:15, 81:4, 92:8, 108:7, 133:16
**Dr** [18] - 12:17, 19:7, 20:13, 22:24, 42:20, 52:7, 58:10, 58:12, 59:5, 63:14, 90:10, 144:9, 144:10,

146:22, 146:23, 147:6, 147:25, 148:5
**draft** [3] - 103:21, 106:7, 120:5
**drafting** [4] - 99:10, 99:23, 100:8, 100:9
**drafts** [2] - 20:6, 99:24
**drawing** [1] - 18:7
**drawn** [1] - 70:10
**drug** [1] - 68:7
**Drug** [4] - 9:6, 9:19, 35:4, 45:5
**Ds** [1] - 85:5
**due** [29] - 17:20, 17:25, 19:19, 23:15, 29:9, 47:9, 52:3, 54:5, 66:21, 69:23, 70:23, 71:5, 73:16, 74:8, 74:15, 74:20, 75:9, 75:12, 75:18, 76:10, 76:18, 88:22, 94:15, 94:25, 102:21, 117:21, 123:19, 134:12, 134:18
**during** [9] - 20:23, 24:17, 98:21, 99:12, 108:8, 111:11, 114:2, 119:19, 134:20
**duties** [1] - 100:5
**duty** [3] - 139:20, 141:2, 141:17

**E**

**early** [1] - 127:5
**ease** [1] - 12:7
**easier** [1] - 130:25
**easily** [1] - 87:18
**easy** [2] - 66:21
**effective** [5] - 17:15, 21:16, 72:25, 74:20, 90:20
**eight** [2] - 71:16, 71:25
**Eighth** [1] - 2:14
**either** [7] - 7:12, 42:13, 43:5, 43:21, 46:5, 127:13, 135:17
**elected** [2] - 16:5, 67:13
**elegant** [1] - 38:19
**elements** [1] - 73:6
**Elkins** [2] - 106:19, 106:20
**emails** [2] - 95:5, 103:22
**employed** [4] - 41:22, 84:8, 84:11, 132:8

**employment** [1] - 130:22
**encompass** [1] - 101:17
**encompassed** [2] - 17:16, 102:23
**encompassing** [1] - 75:10
**end** [7] - 21:12, 39:25, 43:12, 48:2, 78:18, 111:19, 145:18
**Energy** [1] - 107:22
**Enforcement** [4] - 9:6, 9:19, 35:4, 45:6
**engaged** [1] - 47:16
**ensuring** [3] - 23:24, 24:3, 24:5
**entire** [4] - 54:11, 54:13, 54:16, 75:6
**entirely** [2] - 19:5, 68:25
**entirety** [4] - 58:21, 58:22, 60:21, 61:9
**entities** [1] - 109:3
**entitled** [1] - 149:12
**entity** [1] - 44:12
**entries** [1] - 115:17
**epidemic** [1] - 42:3
**Es** [1] - 85:5
**especially** [1] - 123:13
**ESQ** [10] - 1:15, 1:16, 1:21, 1:21, 1:22, 2:4, 2:8, 2:9, 2:15, 2:20
**established** [1] - 66:8
**estimate** [12] - 24:7, 32:5, 32:24, 33:18, 33:23, 34:4, 34:9, 36:17, 41:5, 115:10, 116:2, 117:23
**estimated** [3] - 39:4, 115:8, 115:18
**estimates** [1] - 36:5, 56:2, 115:4, 116:15
**estimation** [2] - 117:3, 118:9
**estimations** [1] - 116:11
**evaluate** [8] - 88:7, 88:14, 88:22, 89:9, 89:14, 89:19, 89:23, 90:14
**evaluating** [2] - 10:3, 58:2
**evaluation** [3] - 19:13, 19:24, 22:14
**evidence** [5] - 75:24, 84:5, 135:18, 135:20, 140:18
**exact** [5] - 7:24, 10:25, 20:15, 28:16, 28:24

**Exactly** [1] - 102:2
**exactly** [3] - 8:11, 101:11, 118:3
**exam** [2] - 122:10, 124:20
**EXAMINATION** [3] - 86:14, 92:16, 128:19
**examination** [8] - 24:17, 25:7, 26:21, 98:22, 107:20, 114:3, 121:11, 122:12
**examine** [2] - 85:3, 85:4
**examined** [1] - 143:20
**examining** [1] - 92:19
**example** [10] - 6:14, 19:18, 30:23, 63:15, 66:14, 70:9, 71:14, 95:11, 117:18, 143:22
**exceed** [1] - 66:10
**exceeded** [1] - 117:20
**exceeds** [2] - 71:22, 131:6
**Excel** [1] - 59:12
**excuse** [1] - 52:14
**excused** [1] - 144:4
**executives** [1] - 102:23
**Exhibit** [26] - 11:16, 21:7, 27:14, 29:25, 34:21, 37:24, 40:5, 44:17, 57:6, 57:8, 63:2, 63:3, 65:4, 79:5, 80:8, 101:3, 104:15, 104:20, 105:4, 107:12, 107:13, 109:21, 109:23, 113:15, 114:14, 120:11
**exhibit** [4] - 13:4, 104:19, 124:16, 129:5
**exhibits** [2] - 136:14, 138:16
**exist** [1] - 35:17
**existing** [2] - 25:23, 25:24
**expect** [2] - 11:2, 84:24
**expectations** [1] - 59:6
**expecting** [1] - 30:10
**expects** [2] - 24:24, 25:2
**experience** [4] - 15:23, 18:7, 42:2, 123:10
**expert** [13] - 25:25,

55:23, 82:13, 84:15, 85:3, 85:4, 86:24, 87:10, 91:17, 91:18, 107:13, 135:15
**expert's** [2] - 25:22, 26:15
**explain** [1] - 103:9
**explained** [1] - 26:10
**explanation** [5] - 24:25, 35:21, 44:2, 46:11, 47:9
**explored** [1] - 32:9
**express** [1] - 27:13
**extended** [2] - 84:20, 137:7
**extent** [1] - 116:14
**extra** [3] - 64:16, 65:12, 71:15

**F**

**fact** [10] - 54:7, 56:17, 67:8, 70:8, 71:7, 125:2, 127:11, 134:7, 138:5, 146:5
**factors** [1] - 6:10
**facts** [10] - 75:23, 75:24, 106:5, 109:12, 113:11, 114:4, 115:18, 135:20, 137:20, 140:14
**factual** [2] - 106:11, 113:19
**failed** [1] - 117:19
**failure** [3] - 76:4, 76:9, 134:19
**failures** [1] - 104:4
**fair** [11] - 63:24, 86:8, 91:23, 93:7, 93:15, 93:16, 93:21, 96:4, 117:17, 125:8, 142:16
**fairness** [1] - 93:23
**false** [1] - 72:7
**familiar** [4] - 35:2, 35:5, 55:22, 108:11
**far** [4] - 24:20, 62:13, 77:16, 117:21
**fashion** [2] - 87:14, 106:21
**fault** [4] - 113:18, 113:25, 114:3, 114:8
**favorite** [1] - 140:8
**favors** [1] - 147:23
**February** [6] - 13:15, 48:18, 49:17, 60:25, 63:8, 110:21
**federal** [2] - 73:20, 93:5

**Federal** [10] - 34:24, 35:6, 41:22, 73:25, 74:5, 74:7, 114:12, 117:4, 117:7, 120:23
**feed** [1] - 17:5
**feeds** [1] - 12:14
**few** [2] - 85:19, 86:21
**fewer** [1] - 68:11
**figure** [2] - 6:15, 105:3
**file** [6] - 23:8, 23:15, 64:8, 94:21, 134:15, 134:17
**filed** [2] - 100:22, 127:9
**files** [14] - 23:6, 71:5, 71:8, 74:6, 74:12, 74:16, 74:20, 75:18, 76:4, 76:10, 94:16, 102:21, 132:2
**fill** [1] - 27:15
**final** [3] - 72:15, 118:23, 129:3
**findings** [2] - 142:12, 142:13
**fine** [8] - 5:5, 41:2, 56:15, 87:17, 126:5, 126:13, 127:24, 142:19
**finish** [6] - 74:21, 78:25, 126:3, 126:16, 145:3
**finite** [1] - 35:20
**fire** [1] - 126:25
**firm** [1] - 81:6
**firms** [2] - 123:15, 123:16
**first** [34] - 13:12, 13:22, 19:6, 19:15, 19:17, 20:2, 20:4, 21:10, 21:12, 30:3, 31:20, 53:13, 57:7, 57:8, 57:10, 58:16, 71:20, 71:22, 73:6, 74:18, 82:4, 92:18, 99:19, 103:16, 104:16, 105:14, 108:3, 115:4, 115:9, 130:24, 143:17, 145:14, 145:15, 146:15
**fits** [2] - 7:22, 8:3
**five** [12] - 13:8, 13:20, 13:21, 85:22, 87:14, 130:9, 130:11, 130:15, 132:11, 132:25, 142:3, 143:16
**flag** [4] - 18:24, 32:14, 137:24, 139:7
**flagged** [35] - 12:25,

21:6, 22:19, 22:24, 27:15, 27:20, 28:7, 28:13, 29:3, 29:11, 33:18, 33:23, 42:20, 48:21, 49:24, 50:10, 50:17, 50:25, 55:11, 58:2, 65:21, 65:23, 66:3, 69:10, 69:12, 69:20, 69:21, 70:2, 70:3, 70:15, 70:16, 71:15, 76:18, 77:23
**flagging** [1] - 5:14
**flags** [3] - 134:4, 134:5, 136:4
**flash** [1] - 137:8
**flip** [1] - 12:15
**floating** [3] - 126:22, 127:11, 144:24
**Floor** [1] - 2:3
**flowed** [1] - 19:10
**focus** [7] - 6:2, 21:3, 21:11, 33:15, 38:15, 53:13, 115:14
**focused** [1] - 38:16
**focuses** [1] - 94:25
**folks** [2] - 34:20, 126:14
**follow** [2] - 104:4, 142:2
**follow-up** [1] - 142:2
**followed** [2] - 102:5, 104:7
**following** [3] - 128:6, 132:18, 137:19
**footnote** [7] - 108:6, 108:19, 112:9, 112:23, 119:25, 124:14, 125:13
**footnoted** [8] - 108:16, 109:24, 124:6, 124:9, 124:11, 124:12, 125:3, 125:9
**footnotes** [15] - 88:5, 88:20, 105:18, 105:25, 106:4, 107:3, 107:6, 107:10, 110:13, 110:15, 111:20, 113:6, 113:9, 120:9, 122:8
**forbearance** [1] - 82:20
**foremost** [1] - 103:16
**forfeiture** [2] - 44:12, 80:12
**Form** [1] - 77:16
**form** [3] - 89:7, 92:11, 106:7
**formal** [1] - 45:2

**format** [1] - 59:9
**formatted** [1] - 12:14
**former** [2] - 8:21, 41:14
**forms** [5] - 116:21, 116:23, 117:2, 117:6, 118:8
**formula** [7] - 14:14, 115:21, 132:5, 132:18, 143:2, 143:3, 143:8
**formulas** [4] - 19:21, 130:2, 130:18, 142:14
**forth** [4] - 97:3, 99:24, 106:22, 122:16
**forward** [3] - 84:24, 91:25, 94:20
**foundation** [8] - 25:16, 26:6, 26:8, 84:7, 110:3, 118:19, 137:4, 140:5
**foundational** [1] - 24:17
**four** [9] - 14:7, 14:22, 15:12, 16:6, 131:20, 133:7, 142:10, 143:16, 143:19
**fourth** [1] - 76:17
**frame** [1] - 137:18
**framed** [1] - 135:10
**framework** [1] - 17:13
**framing** [1] - 135:12
**frankly** [1] - 45:18
**frequency** [3] - 5:17, 6:5, 7:2
**frequent** [3] - 43:6, 43:23, 46:6
**Friday** [2] - 145:12, 145:21
**front** [1] - 114:13
**froze** [1] - 17:6
**FRYE** [1] - 1:9
**Frye** [10] - 24:13, 24:14, 24:16, 24:24, 26:8, 83:21, 84:3, 84:14, 85:2
**fulfill** [1] - 123:2
**fulfilling** [1] - 26:23
**full** [3] - 6:9, 57:25, 137:5
**fully** [1] - 93:20
**function** [2] - 14:18, 15:24
**functioning** [5] - 14:11, 14:14, 14:25, 15:18, 15:20
**Furthermore** [1] - 149:13
**future** [2] - 138:3,

139:10

## G

**gap** [5] - 22:7, 25:18, 62:14, 71:2, 71:3
**GARGUILO** [1] - 1:11
**general** [7] - 21:5, 25:3, 26:12, 26:19, 32:13, 32:16, 32:19, 32:20, 33:22, 69:16, 75:19, 90:20
**General's** [2] - 104:16, 109:14
**generally** [20] - 5:15, 6:21, 6:25, 7:16, 7:18, 8:10, 11:12, 33:21, 35:21, 37:20, 40:23, 41:6, 48:16, 66:4, 68:14, 68:23, 84:17, 93:17, 100:21, 132:16
**generate** [2] - 51:24, 84:17
**generates** [2] - 46:24, 47:20
**gentlemen** [2] - 44:22, 45:19
**giant** [1] - 95:14
**given** [5] - 5:11, 26:14, 59:10, 62:22, 65:6
**government** [4] - 7:5, 46:15, 48:5, 134:23
**grab** [1] - 37:12
**grateful** [1] - 138:20
**GRAY** [1] - 2:18
**great** [4] - 25:6, 25:18, 83:6, 126:6
**greater** [4] - 7:20, 7:21, 101:24, 133:25
**greatest** [1] - 131:6
**green** [1] - 63:24
**guarantee** [3] - 43:8, 43:25, 46:9
**guard** [1] - 135:22
**guardianship** [1] - 146:9
**Guerra** [1] - 83:17
**GUERRA** [1] - 83:17
**guess** [1] - 108:24
**guidance** [7] - 6:8, 7:8, 9:2, 17:13, 77:7, 82:12, 134:6
**guided** [2] - 25:12, 75:2
**guides** [1] - 5:22
**guiding** [1] - 18:6

## H

**HAGUE** [1] - 149:21
**Hague** [1] - 149:7
**half** [2] - 77:14, 101:11
**hallway** [1] - 3:6
**hand** [1] - 138:18
**handful** [2] - 85:21, 85:22
**handle** [1] - 127:14
**handy** [1] - 104:20
**hang** [2] - 83:14, 122:14
**HANLY** [5] - 1:13, 1:15, 126:10, 126:13, 126:20
**Hanly** [1] - 126:10
**happy** [5] - 34:22, 78:13, 78:20, 85:12, 138:21
**hard** [3] - 38:20, 40:6, 139:13
**hardest** [1] - 86:3
**harm** [5] - 48:12, 48:22, 49:24, 50:11, 50:18
**HD** [1] - 44:12
**head** [2] - 8:21, 55:20
**headache** [1] - 147:19
**Heading** [1] - 21:11
**health** [8] - 32:5, 32:23, 48:13, 48:22, 49:25, 50:11, 50:18, 95:13
**hear** [9] - 5:4, 5:6, 5:7, 5:8, 24:25, 25:2, 121:12, 146:5, 146:12
**heard** [4] - 21:24, 43:12, 72:10, 121:6
**HEARING** [1] - 1:9
**hearing** [4] - 3:9, 84:14, 85:2, 127:21
**hello** [2] - 83:20, 128:21
**help** [1] - 34:14
**hereby** [1] - 149:9
**Hi** [1] - 128:22
**higher** [2] - 30:8, 63:20
**highest** [2] - 63:20, 134:2
**highlight** [1] - 106:21
**highlighting** [1] - 118:24
**hired** [1] - 82:13
**history** [4] - 32:21, 38:9, 76:2, 123:9
**hold** [1] - 79:22
**HON** [1] - 1:11

**158**

honest [1] - 48:8
Honor [86] - 3:8, 3:17,
3:20, 3:23, 3:25, 4:6,
4:8, 4:20, 18:22,
26:9, 49:4, 49:10,
52:14, 54:11, 65:5,
78:13, 78:17, 78:19,
78:22, 79:11, 82:20,
82:23, 85:10, 85:17,
85:20, 85:24, 86:6,
86:8, 86:9, 87:18,
90:23, 90:25, 91:5,
91:12, 91:15, 92:15,
93:8, 93:12, 96:17,
97:16, 97:21, 101:5,
101:11, 103:3,
104:24, 104:25,
107:15, 111:13,
111:14, 113:22,
114:9, 119:11,
119:12, 122:5,
122:12, 122:20,
122:24, 123:7,
123:25, 124:15,
125:16, 125:17,
126:10, 126:20,
127:21, 128:4,
128:10, 129:7,
132:16, 132:21,
134:25, 136:14,
136:16, 136:21,
137:16, 139:14,
140:6, 140:12,
141:24, 142:14,
142:22, 144:6,
144:25, 145:13,
147:24
Honor's [1] - 78:15
hope [1] - 38:24
hour [3] - 77:13,
77:14, 99:4
hours [14] - 96:14,
96:20, 97:2, 98:4,
100:10, 100:12,
100:20, 101:2,
101:15, 101:23,
101:24, 102:24,
103:9, 124:2
House [1] - 107:22
human [1] - 32:21
humanly [1] - 4:24
HUNTER [1] - 1:21
hunter [1] - 3:21
hydrocodone [6] -
30:24, 37:5, 38:22,
39:4, 39:9, 40:20
Hynes [3] - 107:19,
109:6, 109:7
hyphen [1] - 84:6
hypothetical [9] -

66:13, 72:8, 135:11,
135:12, 135:16,
135:19, 137:2,
140:13
hypothetically [1] -
66:22

**I**

idea [7] - 9:16, 32:17,
83:24, 117:2, 117:6,
117:15, 118:5
identification [1] -
101:3
identified [8] - 47:5,
54:4, 117:12,
131:22, 133:8,
139:21, 141:3
identifiers [1] - 5:25
identifies [6] - 66:5,
81:6, 133:19,
133:24, 134:8
identify [2] - 29:3,
132:19
identifying [2] - 68:24,
116:21
ignores [2] - 68:16,
68:25
illegal [1] - 47:16
illicit [3] - 43:9, 43:25,
46:10
illustrate [2] - 62:25,
71:13
impeachment [1] -
49:8
implausible [1] -
14:12
implement [1] -
129:25
important [3] - 23:18,
23:23, 103:5
impose [1] - 10:15
impossible [1] - 14:12
improper [2] - 93:8,
137:2
improving [1] - 119:2
IN [1] - 1:4
inadequate [1] - 21:15
Inc [2] - 2:7, 2:13
include [2] - 11:10,
89:5
included [2] - 10:20,
10:25
including [2] - 94:14,
134:17
incorrect [2] - 57:12,
113:3
increases [2] - 67:7,
67:18
increasing [1] - 67:10,

68:6
independent [1] -
19:11
independently [1] -
19:5
Index [1] - 3:10
INDEX [1] - 1:5
indicate [3] - 57:7,
57:10, 102:13
indicated [1] - 85:18
indication [1] - 94:15
indications [1] - 4:23
individual [4] - 22:11,
22:15, 115:16,
133:19
industry [1] - 76:22
ineffectiveness [1] -
17:24
information [20] -
7:13, 19:10, 19:12,
19:25, 25:9, 47:15,
83:15, 88:23, 88:24,
91:19, 92:5, 103:12,
106:17, 116:10,
116:19, 119:15,
119:19, 119:22,
120:7, 144:23
informed [1] - 81:16
initial [1] - 70:15
ink [1] - 149:17
input [1] - 126:15
inquiry [3] - 26:8,
83:22, 84:4
inserted [1] - 106:4
insignificant [1] -
70:22
inspector [1] - 95:13
instance [3] - 19:16,
20:3, 20:4
instead [3] - 57:13,
64:4, 65:11
insufficient [2] -
70:23, 71:7
integral [1] - 104:5
integrity [1] - 66:16
intend [1] - 22:23
intends [1] - 127:12
internal [7] - 29:20,
89:12, 89:14,
102:20, 103:20,
119:23, 120:7
internet [1] - 57:20
interpret [3] - 7:17,
53:22, 55:3
interpretation [1] -
119:9
interrupt [2] - 49:11,
56:12
interviews [1] - 89:6
investigated [1] -

133:20
investigation [7] -
16:7, 56:19, 56:24,
119:16, 130:7,
133:8, 133:10
Investigations [2] -
135:7, 140:3
investigations [3] -
15:23, 89:5, 117:13
investigator [4] -
32:18, 79:14,
117:10, 131:14
involve [1] - 10:4
involving [1] - 44:12
ipse [1] - 25:24
Island [3] - 127:2,
127:3, 127:4
Islip [1] - 1:8
isolated [1] - 109:21
issue [3] - 32:10,
140:2, 145:11
issues [4] - 94:7,
106:12, 123:19,
147:4
itself [6] - 43:8, 43:20,
43:24, 46:3, 46:8,
69:15

**J**

James [2] - 1:10, 45:3
January [1] - 82:5
jargon [1] - 76:22
Jayne [1] - 3:13
JAYNE [1] - 1:16
jciaccio@napolilaw.
com [1] - 1:24
jconroy@
simmonsfirm.com
[1] - 1:17
JERRY [1] - 1:11
Joe [1] - 8:21
Jones [1] - 4:7
JONES [4] - 2:6, 2:8,
4:6, 53:3
JOSEPH [1] - 1:22
JR [1] - 1:15
Judge [4] - 62:19,
64:16, 146:6, 146:12
judges [1] - 146:7
judgment [9] - 59:19,
60:6, 60:15, 60:21,
61:7, 61:10, 67:20,
67:25, 69:2
judgments [1] - 60:12
July [5] - 25:13, 26:10,
63:9, 83:16, 83:18
jump [1] - 148:8
Justice [3] - 1:11,
35:4, 84:22

**K**

K2 [1] - 44:15
Kaye [1] - 84:22
keep [2] - 37:13, 87:14
keeping [1] - 145:21
Keller [5] - 55:23,
146:2, 146:20,
147:11, 147:21
kept [1] - 112:2
key [2] - 10:19, 47:25
Keyes [1] - 147:6
kilograms [1] - 37:6
kind [7] - 32:9, 37:12,
39:16, 54:23, 76:22,
106:11, 123:20
kitchen [1] - 95:16
know-your-
customer [1] - 88:25
knowing [1] - 62:12
knowledge [2] - 42:2,
75:4

**L**

Lacey [2] - 55:23,
146:20
lack [2] - 7:19, 7:21
lacking [1] - 25:16
ladies [1] - 24:22
language [5] - 6:23,
10:25, 21:11, 21:21,
125:10
laptop [1] - 49:15
large [5] - 43:5, 43:22,
46:6, 46:24, 47:19
larger [1] - 45:17
last [12] - 27:4, 27:8,
33:6, 54:23, 77:10,
79:7, 89:17, 90:5,
103:6, 129:16,
147:2, 147:3
law [4] - 36:16,
104:11, 123:15,
141:20
Lawler [5] - 105:7,
105:9, 107:12,
108:2, 114:20
lawyer [1] - 81:4,
103:7, 145:2
lawyer's [1] - 86:4
lawyers [8] - 16:17,
16:19, 16:22, 17:3,
17:10, 18:14, 18:17,
19:7
lay [3] - 10:18, 38:25,
129:13
lead [4] - 72:15, 79:14,
131:13, 135:13
leading [4] - 103:4,

103:5, 103:7, 117:25
**leaked** [1] - 120:4
**learn** [3] - 82:11, 100:19, 100:25
**learned** [2] - 78:3, 106:15
**least** [4] - 28:20, 31:20, 135:5, 137:5
**leave** [3] - 50:22, 125:7, 125:15
**Led** [1] - 4:23
**led** [2] - 56:19, 56:23
**left** [4] - 8:7, 36:5, 39:5, 39:17
**legitimate** [16] - 22:20, 22:25, 23:25, 24:6, 24:9, 27:9, 27:15, 27:16, 28:12, 31:15, 31:21, 68:2, 68:16, 68:17, 69:3, 69:4
**Lembke** [4] - 146:22, 146:23, 147:25, 148:5
**length** [1] - 139:4
**less** [3] - 31:21, 68:3, 69:3
**letter** [2] - 74:25, 75:2
**letters** [4] - 107:21, 145:15, 145:19
**level** [2] - 62:22, 75:3
**levels** [2] - 67:10, 67:24
**Licardi** [1] - 145:5
**LICARDI** [3] - 83:25, 105:21, 127:18
**licensed** [1] - 96:3
**likelihood** [1] - 29:12
**likely** [13] - 21:24, 22:10, 28:18, 28:20, 28:23, 29:6, 29:9, 29:14, 31:4, 31:9, 50:19, 74:24, 75:5
**limit** [2] - 45:15, 98:2
**limited** [1] - 120:13
**line** [37] - 24:15, 38:21, 45:10, 45:20, 45:25, 48:24, 49:5, 49:12, 53:13, 61:2, 64:6, 80:7, 80:9, 80:20, 81:5, 81:24, 81:25, 82:2, 89:22, 97:12, 97:14, 97:25, 99:16, 99:25, 100:6, 110:22, 110:24, 111:18, 112:11, 112:20, 112:24, 136:18, 138:14, 141:11, 141:13
**lines** [12] - 13:16, 15:5, 47:12, 49:18,

52:11, 53:8, 98:18, 98:20, 98:25, 99:16, 112:7, 112:15
**list** [7] - 76:16, 88:6, 92:2, 109:7, 120:25, 136:14, 138:16
**listed** [4] - 43:7, 43:23, 46:7, 136:13
**literally** [2] - 38:4, 85:21
**litigation** [5] - 78:5, 82:14, 129:23, 143:21, 143:24
**LITIGATION** [1] - 1:4
**Litigation** [1] - 3:10
**live** [1] - 146:3
**LLC** [3] - 1:13, 2:18
**LLP** [3] - 2:2, 2:12, 2:18
**loaded** [1] - 64:5
**look** [64] - 8:12, 9:8, 9:21, 11:16, 12:3, 13:3, 13:14, 27:11, 29:24, 30:3, 30:17, 30:22, 30:23, 34:18, 35:3, 35:11, 35:22, 36:2, 36:7, 37:8, 37:22, 38:4, 38:14, 39:5, 52:10, 57:7, 60:25, 62:21, 71:5, 76:17, 79:20, 79:23, 79:25, 80:7, 83:14, 91:20, 93:22, 96:24, 96:25, 97:6, 98:24, 100:23, 102:7, 103:23, 104:2, 105:24, 107:14, 107:24, 108:7, 108:15, 109:22, 110:15, 110:18, 110:22, 111:18, 115:3, 115:24, 116:6, 120:10, 120:11, 120:24, 123:8, 132:5, 134:21
**looked** [8] - 19:22, 61:24, 71:17, 77:20, 102:3, 103:12, 109:4, 109:14
**looking** [17] - 19:20, 21:9, 31:22, 36:23, 41:24, 67:3, 79:5, 96:17, 99:11, 99:22, 102:19, 110:4, 110:8, 118:4, 118:11, 118:13, 134:14
**looks** [1] - 52:25
**lost** [2] - 9:23, 141:4
**loud** [1] - 116:12

**low** [1] - 75:3
**lower** [1] - 30:8
**lowest** [1] - 31:21
**lunch** [3] - 108:8, 125:18, 126:4
**luncheon** [1] - 128:5

**M**

**ma'am** [23] - 87:12, 97:5, 98:13, 108:12, 113:8, 113:13, 113:21, 115:6, 115:23, 116:5, 116:25, 119:17, 120:20, 129:11, 129:15, 129:19, 129:23, 130:14, 131:11, 131:15, 131:19, 131:24, 132:3
**Madison** [1] - 1:14
**maintain** [3] - 21:16, 76:4, 76:10
**maintained** [2] - 74:6, 116:19
**maintenance** [4] - 17:14, 72:24, 74:19, 75:12
**Mallinckrodt** [4] - 2:18, 4:9, 119:16, 120:4
**man** [1] - 105:9
**manufacturer** [7] - 10:12, 21:14, 51:11, 76:3, 82:25, 142:17, 143:14
**manufacturers** [6] - 7:9, 8:6, 23:11, 23:22, 24:4, 85:12
**manufacturers'** [1] - 8:15
**March** [1] - 63:20
**mark** [8] - 12:8, 34:21, 37:24, 44:17, 63:3, 63:23, 65:3, 65:25
**marked** [3] - 101:3, 104:14, 114:14
**market** [3] - 43:9, 44:2, 46:10
**mask** [1] - 85:25
**Massachusetts** [1] - 2:19
**Masters** [9] - 16:13, 53:24, 67:13, 75:9, 131:10, 131:12, 133:18, 133:21, 143:17
**Masters'** [2] - 16:8, 16:9

**material** [2] - 24:18, 89:3
**materials** [7] - 32:9, 55:25, 86:25, 88:6, 88:21, 88:25, 89:10
**math** [2] - 38:25, 58:9
**mathematics** [1] - 41:18
**matter** [3] - 45:7, 111:6, 127:10
**matters** [2] - 123:21, 146:10
**maximum** [1] - 130:24
**McCann** [13] - 12:17, 12:20, 19:7, 20:13, 22:24, 52:7, 58:10, 58:12, 59:5, 63:14, 90:10, 144:9, 144:10
**McCann's** [1] - 42:20
**McKesson** [5] - 2:13, 3:24, 53:25, 55:15, 56:3
**MDL** [4] - 52:5, 52:10, 101:18, 107:22
**mean** [11] - 6:24, 10:6, 33:4, 41:11, 43:8, 43:24, 46:8, 74:20, 97:18, 112:9, 147:13
**means** [4] - 26:22, 107:4, 123:2, 143:13
**meant** [2] - 107:4, 142:8
**meantime** [1] - 34:21
**measure** [1] - 33:22
**measures** [1] - 84:11
**Medical** [1] - 2:13
**medical** [9] - 27:9, 28:12, 31:15, 31:21, 67:20, 68:9, 68:16, 68:17, 68:25
**meet** [1] - 86:19
**Melville** [1] - 1:20
**memory** [1] - 113:5
**merits** [1] - 27:6
**met** [1] - 92:6
**metaphor** [1] - 96:5
**method** [7] - 13:12, 32:6, 41:7, 62:20, 69:19, 71:13, 132:8
**Method** [13] - 13:12, 14:8, 16:13, 31:20, 32:23, 33:17, 33:23, 52:5, 54:9, 59:3, 62:9, 62:21, 65:20
**methodological** [1] - 71:3
**methodologies** [11] - 11:23, 13:9, 14:7, 16:16, 20:13, 20:16, 20:23, 20:25, 51:20,

55:2, 130:4
**Methodology** [6] - 13:4, 13:7, 13:8, 21:3, 60:18, 67:17
**methodology** [68] - 13:6, 16:9, 22:19, 25:2, 25:4, 25:8, 26:11, 26:18, 26:21, 26:23, 27:20, 32:14, 33:10, 41:19, 41:21, 42:13, 42:14, 42:20, 52:4, 59:17, 60:2, 63:17, 63:21, 65:16, 65:17, 66:5, 67:6, 67:12, 67:17, 68:15, 68:18, 68:23, 69:5, 69:6, 72:5, 86:22, 87:8, 87:20, 87:24, 88:13, 88:18, 89:17, 90:6, 90:18, 92:20, 94:3, 94:13, 102:5, 103:13, 108:16, 109:10, 121:9, 121:17, 121:23, 123:2, 123:3, 123:24, 128:24, 129:13, 130:19, 130:22, 130:23, 134:5, 136:3
**Methods** [1] - 15:19
**methods** [5] - 20:9, 24:21, 26:22, 84:8, 143:13
**metric** [12] - 90:8, 115:12, 129:17, 131:9, 132:16, 133:18, 142:8, 142:9, 143:3, 143:12, 143:15, 143:17
**metrics** [17] - 129:21, 130:2, 130:9, 130:12, 130:16, 131:20, 131:22, 131:25, 132:5, 132:11, 132:25, 133:4, 133:7, 142:3, 143:19
**mic** [1] - 105:20
**mics** [1] - 126:7
**might** [7] - 7:17, 11:2, 64:19, 75:6, 100:4, 101:17, 138:19
**mind** [2] - 36:12, 95:23
**mindful** [4] - 78:14, 78:22, 84:25, 103:4
**minute** [1] - 17:6
**MINUTES** [1] - 1:9
**minutes** [4] - 83:5,

83:9, 125:18, 126:17
**misread** [1] - 118:17
**Miss** [6] - 135:11, 137:7, 137:10, 145:5, 147:11, 147:21
**missed** [4] - 78:18, 113:3, 113:6, 133:23
**mistaken** [2] - 25:10, 127:20
**misunderstood** [1] - 32:25
**mixing** [1] - 101:6, 101:9
**Mobil** [1] - 84:23
**moment** [1] - 63:4
**monitor** [1] - 123:11
**monitoring** [18] - 7:10, 7:23, 8:4, 8:8, 8:12, 8:15, 9:4, 9:17, 10:3, 10:20, 11:6, 11:14, 68:8, 73:11, 88:24, 90:21, 102:4, 117:19
**monitors** [1] - 131:4
**month** [13] - 62:22, 63:10, 66:7, 67:7, 67:8, 67:18, 67:19, 71:22, 72:5, 72:12, 130:25, 131:6, 134:2
**monthly** [1] - 130:24
**months** [10] - 60:10, 60:19, 62:23, 62:24, 63:21, 67:7, 71:20, 71:22, 131:5, 131:7
**morning** [23] - 3:2, 3:7, 3:8, 3:15, 3:16, 3:17, 3:19, 3:20, 3:22, 3:23, 3:25, 4:6, 4:8, 4:10, 4:11, 86:9, 86:16, 86:18, 114:11, 114:24, 144:19, 144:20, 146:15
**most** [2] - 38:19, 91:16
**move** [12] - 27:25, 68:22, 90:5, 96:7, 112:19, 125:15, 139:17, 139:18, 146:2, 147:5, 147:11, 147:16
**moved** [3] - 94:20, 102:16, 147:7
**moving** [4] - 88:11, 88:17, 145:17
**MR** [108] - 3:17, 3:20, 3:23, 4:8, 4:11, 4:20, 5:6, 5:9, 15:4, 15:8, 18:23, 25:11, 26:4, 26:7, 26:25, 27:3,

27:10, 36:12, 36:15, 37:11, 37:16, 37:21, 38:10, 38:18, 38:23, 40:4, 40:9, 44:15, 44:19, 45:15, 45:21, 49:2, 49:7, 49:13, 49:16, 49:21, 52:18, 52:23, 53:5, 53:7, 53:11, 54:15, 54:19, 62:25, 63:6, 64:2, 64:14, 72:20, 73:2, 77:18, 78:13, 78:19, 79:4, 79:9, 79:11, 79:12, 80:3, 80:6, 80:19, 80:23, 82:16, 82:23, 83:8, 85:10, 93:6, 93:10, 93:12, 93:14, 95:18, 96:2, 97:16, 97:21, 98:14, 98:17, 98:19, 101:5, 103:3, 105:19, 105:22, 110:2, 113:22, 117:24, 118:16, 118:19, 118:22, 119:11, 121:4, 121:14, 121:18, 122:4, 122:7, 122:22, 124:15, 126:10, 126:13, 126:20, 127:25, 135:8, 136:7, 136:16, 136:21, 136:24, 138:18, 138:23, 139:13, 140:4, 141:11, 144:25
**MS** [97] - 3:13, 3:16, 3:25, 4:6, 49:10, 49:14, 49:20, 52:14, 52:21, 52:25, 53:3, 53:6, 53:10, 54:11, 79:24, 80:5, 83:25, 85:17, 85:20, 85:23, 86:5, 86:8, 86:12, 86:15, 87:4, 87:7, 87:17, 87:19, 90:23, 90:25, 91:5, 91:11, 92:15, 92:17, 93:24, 96:9, 96:23, 97:22, 98:16, 99:13, 104:25, 105:9, 105:21, 107:15, 111:7, 111:13, 111:17, 114:2, 114:9, 114:16, 114:19, 119:12, 121:8, 122:2, 122:11, 122:20, 123:25, 124:13, 125:16, 125:23, 126:2, 126:6, 126:9,

127:18, 127:20, 128:3, 128:20, 128:23, 129:9, 133:15, 135:19, 136:10, 136:13, 136:17, 137:14, 137:16, 138:11, 138:13, 138:21, 139:2, 140:12, 140:21, 140:24, 141:7, 141:13, 141:23, 144:10, 144:13, 144:17, 145:13, 145:23, 146:16, 146:21, 146:25, 147:10, 147:24, 148:10
**multiple** [1] - 94:7
**multiplier** [1] - 51:23
**multiplying** [1] - 115:19
**must** [2] - 11:14, 73:17
**mute** [2] - 43:13, 43:14
**muted** [2] - 83:25, 105:21

## N

**name** [2] - 4:3, 55:24
**named** [1] - 55:23
**NAPOLI** [1] - 1:19
**narrow** [1] - 74:18
**narrowness** [1] - 94:5
**Nassau** [7] - 1:19, 30:18, 30:21, 31:7, 31:11, 31:15, 125:19
**national** [2] - 102:19, 103:14
**nationwide** [2] - 102:8, 102:25
**nature** [1] - 75:3
**near** [1] - 12:3
**necessarily** [2] - 10:12, 130:17
**need** [8] - 23:19, 27:9, 37:14, 73:22, 92:2, 125:25, 134:20, 147:20
**needed** [6] - 18:4, 60:11, 62:3, 92:8, 102:10, 107:8
**needs** [4] - 9:6, 9:19, 24:20, 27:16
**never** [11] - 20:12, 20:16, 20:22, 32:10, 58:12, 90:3, 94:15, 94:19, 95:23, 117:10, 117:11

new [1] - 124:23
**NEW** [1] - 1:2
**New** [40] - 1:8, 1:15, 1:20, 2:4, 2:8, 2:14, 2:15, 5:12, 11:24, 30:4, 30:9, 30:10, 48:17, 51:3, 51:8, 55:10, 55:16, 56:4, 56:8, 56:10, 58:19, 96:11, 98:3, 100:13, 100:22, 101:19, 101:20, 101:25, 102:12, 102:15, 104:16, 106:18, 109:13, 109:22, 149:9
**next** [21] - 12:15, 15:5, 15:10, 37:8, 44:25, 53:21, 61:5, 65:25, 71:18, 71:24, 88:17, 94:2, 98:7, 105:7, 105:11, 108:19, 112:5, 115:15, 144:8, 146:18, 146:19
**nine** [1] - 57:14
**nine-year** [1] - 57:14
**NO.:400000/2017** [1] - 1:5
**none** [1] - 41:24
**nonmedical** [1] - 21:20
**norm** [2] - 43:21, 46:5
**normal** [1] - 43:5
**notations** [1] - 106:21
**note** [1] - 107:23
**noted** [1] - 89:7
**notes** [2] - 30:23, 149:11
**nothing** [7] - 29:15, 74:4, 74:7, 89:2, 121:23, 134:8, 144:3
**Notice** [4] - 126:23, 126:24, 127:9, 144:24
**nowhere** [3] - 88:20, 89:22, 124:16
**number** [27] - 29:3, 30:21, 32:2, 39:6, 39:8, 39:25, 40:5, 40:7, 40:11, 40:16, 40:20, 40:21, 40:24, 41:16, 49:12, 52:22, 55:17, 59:4, 63:9, 66:22, 101:12, 108:10, 133:4, 136:25, 141:11, 141:13
**Number** [1] - 3:10
**numbers** [22] - 12:9,

30:7, 34:7, 34:10, 37:13, 39:3, 41:17, 41:20, 41:25, 42:13, 55:19, 57:12, 57:24, 59:15, 59:20, 63:14, 72:3, 72:9, 116:3, 118:6, 118:12, 143:4

## O

**o'clock** [2] - 126:19, 128:2
**O'CONNOR** [6] - 2:20, 4:8, 4:11, 82:23, 83:8, 85:10
**O'Connor** [6] - 4:9, 4:10, 82:18, 82:21, 85:9, 85:15
**oath** [6] - 4:15, 14:4, 15:15, 48:4, 128:13, 128:16
**object** [1] - 140:4
**objecting** [1] - 103:5
**Objection** [2] - 113:22, 135:8
**objection** [21] - 13:17, 19:2, 85:8, 90:23, 91:8, 95:18, 101:5, 110:2, 110:5, 110:10, 117:24, 118:16, 118:18, 119:13, 121:4, 121:7, 124:19, 135:9, 136:7, 140:20
**objections** [2] - 81:4, 140:18
**obligated** [1] - 114:7
**obligation** [1] - 5:15
**obviously** [5] - 17:25, 41:14, 144:19, 145:24, 148:5
**occasions** [1] - 20:23
**occur** [2] - 78:12, 143:7
**occurred** [2] - 41:8, 81:24
**occurring** [5] - 41:6, 75:5, 102:16, 138:5, 139:11
**OF** [4] - 1:2, 1:2, 1:9
**offer** [2] - 22:23, 89:24
**offered** [2] - 17:9, 25:19, 59:16
**offering** [3] - 22:18, 51:10, 123:23
**office** [3] - 74:25, 109:14, 146:13
**Office** [2] - 8:21, 38:5
**OFFICER** [2] - 3:5, 5:3
**Official** [2] - 149:8,

149:22
**official** [8] - 32:5, 35:8, 35:11, 45:5, 46:16, 48:5, 77:22, 149:17
**OFFICIAL** [1] - 2:24
**officially** [1] - 134:23
**Oil** [1] - 84:23
**older** [1] - 45:19
**omit** [1] - 13:17
**once** [8] - 54:3, 69:10, 69:20, 99:23, 102:15, 106:23, 134:7, 139:21
**one** [89] - 7:22, 8:3, 10:11, 10:15, 11:2, 13:22, 14:13, 16:3, 16:8, 16:10, 16:12, 17:4, 18:25, 19:18, 19:23, 20:23, 21:3, 21:4, 31:19, 36:7, 45:14, 48:19, 60:14, 61:6, 64:5, 64:6, 64:15, 64:16, 64:18, 64:19, 64:23, 65:4, 65:12, 65:25, 66:7, 69:17, 71:6, 71:14, 72:5, 72:11, 72:12, 75:11, 76:15, 76:17, 92:18, 97:3, 97:11, 102:6, 102:9, 104:21, 112:2, 113:3, 113:7, 114:17, 117:14, 120:13, 122:5, 123:8, 124:13, 129:13, 130:4, 130:24, 131:2, 131:6, 132:12, 132:13, 132:24, 133:10, 134:14, 134:15, 140:16, 141:9, 141:25, 142:8, 142:18, 142:19, 143:17, 143:19, 144:10, 144:13, 146:11, 147:5, 147:7, 148:6
**one-size-fits-all** [2] - 7:22, 8:3
**ones** [5] - 7:6, 14:15, 51:21, 123:13, 133:7
**onset** [1] - 57:20
**open** [6] - 105:19, 112:17, 145:21, 148:2, 148:3
**operating** [2] - 88:15, 109:2
**operation** [1] - 35:9
**operationalize** [1] -

62:4
**opinion** [35] - 15:22, 16:25, 17:2, 17:8, 17:12, 17:13, 17:18, 18:5, 18:6, 18:16, 18:18, 19:23, 22:9, 25:14, 25:19, 25:22, 26:10, 26:14, 26:18, 28:17, 29:7, 29:8, 31:4, 31:7, 31:16, 51:2, 51:10, 51:15, 70:11, 71:4, 78:4, 84:23, 87:10, 105:15, 134:16
**Opinion** [1] - 83:19
**opinions** [20] - 5:11, 16:24, 17:8, 17:23, 18:13, 22:18, 22:23, 26:13, 58:7, 59:16, 89:4, 89:25, 90:17, 90:19, 90:20, 92:11, 102:24, 103:13, 113:11, 113:12
**opioid** [2] - 42:3, 57:17
**Opioid** [1] - 3:10
**OPIOID** [1] - 1:4
**opioids** [10] - 21:18, 23:19, 23:25, 24:7, 24:9, 35:16, 62:22, 67:21, 68:2, 68:11
**opportunity** [2] - 86:19, 114:24
**opposed** [2] - 119:8, 145:17
**order** [99] - 6:8, 6:15, 6:22, 7:2, 7:10, 8:4, 8:7, 8:11, 8:15, 9:4, 9:17, 10:3, 10:20, 11:6, 11:13, 14:18, 15:18, 15:21, 17:15, 17:16, 17:20, 17:24, 19:20, 22:15, 25:13, 25:14, 29:11, 29:16, 43:4, 43:6, 43:20, 43:22, 46:4, 46:6, 46:7, 46:22, 46:24, 47:4, 47:19, 51:4, 51:11, 53:21, 53:22, 54:3, 54:7, 54:22, 56:2, 56:18, 56:23, 62:3, 64:17, 65:23, 66:5, 66:6, 66:9, 66:12, 66:24, 67:3, 68:8, 69:10, 69:11, 69:15, 69:20, 69:21, 70:2, 70:4, 70:15, 70:17, 70:24, 71:10, 72:6, 73:11, 81:7, 81:9, 83:12, 90:21,

92:2, 102:4, 107:25, 117:19, 127:14, 128:7, 131:8, 133:22, 133:24, 134:8, 134:9, 134:18, 134:21, 137:24, 138:2, 139:7, 139:8, 146:7, 147:20
**Order** [1] - 77:16
**ordering** [1] - 88:23
**orders** [70] - 5:14, 5:16, 6:4, 11:24, 12:25, 13:20, 18:3, 21:6, 22:12, 22:19, 22:24, 23:3, 23:6, 27:15, 27:19, 28:7, 28:13, 29:3, 29:6, 29:16, 32:14, 33:18, 33:19, 33:23, 33:24, 42:19, 42:21, 43:6, 43:22, 43:23, 46:6, 48:12, 48:22, 49:24, 50:10, 50:17, 50:25, 51:17, 51:24, 53:16, 54:21, 54:22, 55:11, 55:13, 55:15, 56:7, 56:9, 58:2, 68:15, 68:24, 71:6, 76:18, 76:19, 77:6, 77:23, 81:2, 123:19, 132:19, 133:18, 133:20, 134:11, 139:21, 141:2, 141:18
**original** [1] - 149:17
**originally** [1] - 92:6
**outputs** [1] - 62:14
**outside** [7] - 31:25, 43:4, 43:21, 46:4, 60:23, 119:22, 121:5
**overall** [1] - 35:19
**overnight** [1] - 65:2
**overruled** [2] - 110:6, 118:2
**own** [9] - 5:24, 8:7, 19:8, 19:22, 59:11, 90:18, 116:17, 132:18, 132:19
**oxycodone** [7] - 31:6, 31:23, 37:8, 38:22, 39:16, 39:19, 40:24
**OxyContin** [1] - 57:21

**P**

**page** [81] - 11:20, 13:5, 13:16, 21:8, 21:9, 25:13, 30:2, 31:20, 36:2, 36:3,

36:11, 37:9, 44:25, 45:9, 45:20, 47:12, 48:18, 48:24, 49:5, 49:12, 49:18, 52:13, 53:8, 57:7, 57:8, 57:10, 58:8, 59:3, 61:2, 61:3, 63:18, 63:23, 64:4, 65:3, 65:7, 65:8, 65:9, 65:10, 71:18, 71:24, 72:4, 79:20, 79:23, 80:7, 80:8, 80:10, 80:20, 81:4, 81:24, 97:6, 97:13, 97:24, 98:15, 99:2, 99:14, 105:7, 105:11, 105:14, 107:14, 110:16, 110:20, 110:22, 111:19, 112:5, 112:7, 114:21, 118:14, 120:11, 120:15, 120:18, 121:2, 122:16, 136:18, 138:13, 141:9, 141:10
**pages** [5] - 12:16, 97:8, 107:20, 109:7, 123:5
**paper** [2] - 95:8, 134:15
**paragraph** [7] - 21:10, 54:23, 108:4, 109:24, 116:7, 116:12, 118:24
**paragraphs** [1] - 113:16
**parcel** [1] - 123:23
**pardon** [3] - 24:21, 122:3, 144:12
**part** [20] - 8:19, 16:6, 18:5, 21:18, 26:11, 47:9, 61:25, 69:8, 75:20, 78:4, 91:2, 104:5, 109:10, 111:11, 123:10, 123:23, 142:6, 143:20, 146:9
**PART** [1] - 1:2
**Part** [1] - 128:8
**particular** [4] - 84:9, 124:2, 130:17, 132:17
**parties** [1] - 147:4
**parts** [1] - 20:6
**party** [1] - 149:14
**PARVIN** [1] - 2:4
**pass** [2] - 12:10, 37:23
**passed** [3] - 36:17, 44:16, 63:4

**past** [2] - 18:10, 20:21
**paste** [2] - 105:13, 105:24
**pasting** [2] - 124:4, 124:17
**patients** [2] - 23:19, 27:16
**pattern** [4] - 5:17, 6:5, 7:3, 71:19
**PAUL** [1] - 1:15
**Paul** [4] - 2:15, 3:24, 52:21, 126:10
**people** [3] - 3:4, 43:13, 127:16
**per** [3] - 63:9, 99:4, 100:10
**percent** [12] - 28:20, 29:12, 31:2, 31:5, 31:6, 31:10, 31:14, 31:22, 34:12, 39:11, 40:17, 40:24
**percentage** [5] - 27:14, 28:25, 36:24, 40:13, 56:9
**percentages** [1] - 27:13
**perfect** [2] - 114:22
**perform** [6] - 15:25, 16:16, 22:14, 58:9, 62:8, 88:18
**performance** [2] - 86:21, 87:23
**performed** [5] - 50:21, 50:24, 52:7, 84:17, 87:25
**performing** [2] - 60:16, 61:7
**perhaps** [1] - 24:19
**period** [9] - 57:14, 57:23, 57:25, 71:17, 74:3, 75:7, 109:2, 134:20
**periods** [2] - 67:9, 67:19
**permitted** [2] - 111:9, 111:10
**person** [3] - 66:16, 106:19, 119:21
**personally** [1] - 75:4
**pet** [1] - 96:6
**phanly@ simmonsfirm.com** [1] - 1:17
**Pharmaceutical** [2] - 135:7, 140:3
**pharmacies** [10] - 5:12, 23:23, 24:4, 27:21, 28:8, 31:15, 56:18, 56:23, 57:21, 85:14

**pharmacy** [6] - 23:13, 47:16, 51:12, 69:11, 76:3, 95:2
**phone** [1] - 43:13
**phonetic** [1] - 106:19
**phonetic)** [1] - 105:7
**photocopies** [1] - 149:13
**phrase** [2] - 68:21, 140:13
**pick** [1] - 30:21
**picked** [3] - 16:8, 16:10, 133:10
**picking** [2] - 16:12, 83:23
**piece** [2] - 95:8, 134:15
**pill** [5] - 64:16, 64:18, 64:23, 66:7, 71:15
**pills** [9] - 21:20, 22:5, 63:9, 63:19, 64:19, 64:23, 65:11, 66:14, 70:9
**place** [3] - 34:12, 46:23, 47:18
**placed** [2] - 30:13, 135:18
**Plaintiff** [1] - 90:2
**Plaintiff's** [1] - 11:16
**Plaintiffs** [9] - 2:3, 3:14, 3:18, 3:21, 84:25, 126:11, 126:24, 127:17, 127:18
**Plaintiffs'** [6] - 21:7, 55:22, 87:5, 91:25, 101:3, 107:13
**plausible** [3] - 13:12, 13:13, 13:23
**play** [10] - 23:23, 24:4, 24:21, 135:3, 136:15, 139:3, 139:24, 140:8, 140:14, 141:7
**PLAYING** [2] - 139:5, 141:15
**PLLC** [1] - 1:19
**pnapoli@napolilaw. com** [1] - 1:23
**point** [21] - 16:3, 16:17, 27:7, 32:17, 32:21, 33:16, 33:22, 60:9, 64:15, 68:22, 69:4, 75:23, 75:24, 75:25, 76:7, 121:15, 121:21, 122:7, 125:4, 129:16, 139:17
**Point** [2] - 26:13
**pointed** [1] - 142:3

**points** [8] - 21:5, 27:6, 87:22, 92:25, 94:3, 94:11, 103:6, 125:21
**policies** [15] - 19:20, 95:5, 99:22, 101:21, 102:19, 103:17, 103:19, 103:21, 103:22, 104:2, 104:4, 108:20, 143:13, 143:18
**policy** [10] - 81:16, 99:24, 102:13, 102:14, 103:23, 104:3, 104:6, 104:7, 104:10, 108:5
**popped** [1] - 127:21
**portion** [2] - 53:12, 62:4
**portions** [1] - 58:20
**position** [3] - 136:3, 138:9, 141:16
**positive** [4] - 99:20, 111:25, 112:6, 113:2
**possibility** [1] - 78:12
**possible** [7] - 11:5, 11:9, 70:14, 78:2, 78:5, 114:19, 126:16
**Post** [1] - 120:6
**post** [1] - 18:6
**potential** [2] - 41:25, 91:17
**potentially** [5] - 10:17, 21:19, 22:4, 106:13, 146:17
**PowerPoint** [2] - 72:21, 129:6
**PowerPoints** [1] - 72:17
**practice** [1] - 56:16
**practices** [2] - 68:10, 68:17
**preliminary** [1] - 127:13
**preparation** [1] - 8:20
**prepared** [2] - 19:6, 86:25
**preparing** [2] - 90:17, 109:11
**prescribe** [3] - 67:20, 68:2, 69:3
**prescribing** [4] - 24:8, 67:9, 68:10, 68:18
**prescription** [9] - 21:17, 23:19, 23:25, 24:7, 24:9, 27:12, 35:16, 68:2, 68:11
**prescriptions** [3] - 24:8, 27:16, 28:12
**present** [1] - 83:13
**presented** [2] - 20:13,

20:14
**press** [1] - 119:25
**pretrial** [1] - 147:2
**pretty** [7] - 17:18, 43:17, 44:4, 58:16, 86:23, 87:2, 140:6
**previous** [4] - 15:23, 50:13, 131:5, 131:7
**previously** [1] - 79:5
**Prevoznik** [4] - 135:5, 138:15, 140:2, 141:8
**PREVOZNIK** [1] - 135:5
**Prevoznik's** [2] - 29:19, 54:2
**principles** [1] - 40:23
**probable** [2] - 118:11, 118:13
**problem** [3] - 106:15, 146:17, 147:25
**problems** [1] - 147:14
**procedure** [2] - 108:6, 108:20
**procedures** [3] - 88:15, 102:5, 143:13
**proceeding** [1] - 80:12
**process** [3] - 93:22, 106:3, 106:16
**produced** [2] - 108:9, 118:21, 134:23
**product** [4] - 35:19, 46:24, 47:19, 94:23
**production** [2] - 35:12, 38:9
**products** [1] - 6:12
**proffered** [1] - 135:15
**program** [12] - 7:23, 11:14, 68:9, 88:12, 88:24, 89:18, 89:24, 89:25, 102:25, 108:4, 108:14, 117:11
**programs** [6] - 8:8, 8:15, 10:4, 88:19, 102:8, 103:14
**progress** [1] - 119:4
**proper** [1] - 84:6
**properly** [6] - 14:18, 14:25, 15:24, 84:8, 84:11, 84:16
**proposed** [2] - 35:12, 84:15
**protocol** [1] - 26:24
**protocols** [1] - 102:4
**prove** [2] - 132:13, 142:7
**provide** [7] - 16:4, 17:21, 58:7, 92:4, 92:11, 94:6, 95:20
**provided** [6] - 30:11,

91:24, 92:7, 109:12, 130:3, 138:16
**pschmidt@cov.com** [1] - 2:16
**PSS** [1] - 2:13
**public** [10] - 32:5, 32:22, 48:13, 48:22, 49:25, 50:11, 50:18, 119:25, 120:8, 123:14
**publication** [1] - 41:23
**publications** [3] - 7:12, 35:2, 35:5
**published** [2] - 41:17, 123:14
**publishes** [1] - 37:17
**pull** [9] - 21:10, 38:21, 39:16, 48:20, 49:8, 63:2, 72:22, 107:17, 108:7
**punitive** [1] - 75:3
**purchases** [4] - 131:5, 134:2, 142:25, 143:5
**pure** [1] - 140:7
**purpose** [6] - 16:12, 84:12, 84:14, 85:2, 122:10, 125:4
**purposes** [2] - 35:9, 127:13
**pursuant** [1] - 103:12, 115:5
**put** [17] - 11:20, 12:10, 29:25, 43:9, 43:25, 44:16, 44:18, 46:9, 57:3, 57:8, 92:21, 105:2, 114:20, 128:23, 135:20, 147:12, 148:4
**putting** [1] - 120:17

## Q

**qualifications** [1] - 68:13
**qualified** [1] - 68:19
**quantifications** [1] - 12:24
**quantify** [1] - 11:23
**QUESTION** [13] - 13:18, 45:12, 46:2, 47:14, 49:23, 53:15, 61:4, 80:23, 81:9, 81:12, 81:18, 82:3, 112:13
**questioning** [1] - 24:15
**questions** [25] - 6:3, 15:3, 27:5, 42:18, 50:13, 50:14, 59:25, 75:22, 81:20, 85:14,

85:19, 85:21, 86:7, 86:21, 87:15, 91:6, 91:11, 94:4, 94:6, 94:10, 95:7, 103:6, 124:18, 141:24, 142:2
**quick** [1] - 127:21
**quickly** [2] - 87:3, 87:18
**quite** [2] - 104:13, 113:14
**quota** [6] - 35:13, 35:15, 37:18, 38:9, 114:18, 118:7
**quotas** [1] - 38:7
**quote** [1] - 81:23
**quoted** [1] - 36:24
**quoting** [2] - 25:14, 25:15

## R

**Rafalski** [48] - 1:10, 3:7, 4:14, 5:7, 11:19, 18:20, 27:11, 38:25, 43:15, 45:3, 45:22, 64:12, 72:2, 72:15, 80:11, 82:16, 86:16, 87:8, 91:12, 91:14, 92:18, 96:10, 96:24, 97:23, 98:25, 101:9, 103:9, 105:23, 107:24, 108:11, 114:11, 114:23, 119:13, 122:23, 125:7, 126:4, 128:12, 128:15, 128:21, 129:2, 129:10, 133:17, 136:2, 137:22, 139:19, 140:9, 141:5, 141:25
**raise** [1] - 85:7
**randomly** [1] - 102:20
**range** [1] - 38:15
**Rannazzisi** [1] - 8:22
**rat** [1] - 96:6
**rate** [1] - 34:9
**rather** [1] - 85:3
**rats** [3] - 95:14, 95:16, 96:4
**re** [2] - 33:3, 75:22
**Re** [1] - 3:10
**RE** [1] - 1:4
**re-ask** [2] - 33:3, 75:22
**reach** [6] - 17:2, 17:10, 18:18, 87:9, 90:18, 127:22
**reached** [3] - 16:25, 18:16, 71:4

**reaching** [1] - 145:3
**Read** [1] - 54:13
**read** [38] - 8:19, 8:23, 13:24, 26:3, 40:6, 45:10, 45:25, 46:12, 47:24, 50:5, 50:13, 53:12, 53:25, 54:12, 54:16, 55:4, 58:18, 58:20, 61:12, 81:20, 82:6, 97:7, 99:2, 99:6, 99:16, 100:2, 106:7, 106:13, 110:24, 110:25, 111:4, 111:22, 112:14, 112:25, 116:11, 118:23, 131:21, 145:14
**readily** [1] - 120:7
**READING** [9] - 111:24, 112:8, 112:12, 112:16, 112:21, 113:2, 115:16, 116:13, 118:25
**reading** [5] - 49:6, 102:20, 102:21, 113:6, 115:9
**ready** [1] - 104:23
**real** [1] - 133:11
**realize** [1] - 140:17
**really** [6] - 7:22, 64:18, 89:7, 91:7, 99:15, 124:3
**reason** [2] - 7:20, 105:17
**reasonable** [1] - 15:18
**reasonably** [1] - 15:20
**reasons** [2] - 69:3, 69:4
**receive** [2] - 6:12, 52:15
**received** [2] - 90:10, 127:5
**recent** [1] - 116:16
**recess** [2] - 83:10, 128:5
**recognize** [6] - 41:6, 45:4, 63:13, 105:18, 130:11, 134:25
**recollection** [5] - 48:6, 76:13, 78:9, 98:23, 110:23
**recommendation** [1] - 7:14
**recommended** [1] - 7:7
**record** [6] - 3:12, 12:7, 61:17, 82:10, 112:2, 140:19
**records** [4] - 17:19, 19:19, 75:12, 94:24

**recross** [3] - 124:21, 124:24, 125:6
**recurrent** [3] - 134:4, 134:5, 136:4
**red** [1] - 66:2
**redirect** [2] - 91:13, 111:12
**REDIRECT** [2] - 92:16, 128:19
**reference** [11] - 88:7, 88:14, 88:22, 89:9, 89:13, 89:19, 89:23, 90:13, 106:17, 107:8, 111:11
**referenced** [1] - 124:14
**references** [1] - 130:9
**referred** [4] - 16:15, 96:10, 110:20, 114:12
**refers** [2] - 12:4, 76:23
**reflected** [1] - 22:12
**refrain** [1] - 85:7
**reframe** [1] - 135:23
**regarding** [5] - 21:5, 56:18, 56:23, 121:21, 123:6
**regardless** [1] - 67:2
**regards** [10] - 14:11, 15:17, 17:20, 23:2, 53:25, 54:25, 60:8, 75:18, 77:8, 80:17
**Register** [6] - 34:24, 35:6, 41:22, 114:12, 117:4, 117:8
**register** [1] - 123:14
**registrant** [12] - 5:23, 9:7, 9:20, 54:4, 54:20, 67:5, 74:15, 76:2, 76:9, 139:20, 140:25, 141:17
**registrant's** [2] - 9:5, 9:19
**registrants** [3] - 9:3, 77:22, 123:13
**registrar** [2] - 6:10, 6:18
**registration** [1] - 5:23
**regulation** [9] - 5:19, 6:3, 6:7, 6:14, 43:7, 43:24, 46:8, 73:14, 104:11
**regulations** [6] - 53:23, 73:21, 81:13, 81:15, 93:5, 116:18
**Regulations** [4] - 73:25, 74:5, 74:8, 120:23
**regulatory** [1] - 21:16
**REISMAN** [16] - 2:9,

3:25, 52:21, 85:17, 85:20, 85:23, 86:5, 86:8, 86:12, 86:15, 87:4, 87:7, 87:17, 87:19, 91:5, 91:11
**Reisman** [2] - 4:2, 86:12
**rejected** [1] - 127:7
**relate** [2] - 27:20, 124:25
**related** [6] - 21:17, 27:6, 28:8, 29:21, 90:4, 101:15
**relates** [2] - 25:22, 35:12
**relating** [2] - 12:24, 44:12
**release** [1] - 119:25
**relevance** [2] - 95:19, 106:9
**relevant** [2] - 24:3, 25:12
**reliability** [1] - 25:5
**reliable** [1] - 84:18
**reliance** [3] - 86:24, 88:6, 88:21
**relied** [1] - 62:9
**rely** [1] - 21:4
**remain** [1] - 83:11
**remember** [12] - 9:9, 15:14, 39:6, 45:7, 59:21, 64:15, 64:20, 72:16, 75:15, 78:6, 79:13, 79:18
**remind** [4] - 4:12, 4:14, 128:12, 128:15
**remotely** [1] - 38:20
**repeat** [2] - 22:21, 52:21
**repeated** [1] - 71:19
**rephrase** [1] - 65:19
**report** [93] - 5:15, 6:4, 10:18, 10:22, 11:19, 11:22, 12:5, 12:13, 12:20, 12:24, 16:2, 16:25, 17:8, 17:9, 18:13, 19:5, 19:9, 20:14, 21:8, 21:13, 22:3, 22:4, 26:16, 27:22, 28:9, 30:13, 46:25, 47:20, 51:17, 51:19, 53:16, 57:3, 58:15, 58:17, 63:15, 66:25, 67:4, 85:12, 86:24, 87:10, 88:5, 88:7, 88:20, 89:3, 89:23, 90:10, 90:15, 91:3, 96:11, 98:3, 100:21, 100:22, 101:2, 101:15,

101:18, 101:20, 101:25, 102:7, 102:19, 103:13, 104:15, 105:14, 105:24, 106:5, 106:14, 107:14, 109:11, 109:17, 109:23, 110:4, 110:8, 110:14, 111:21, 112:16, 112:17, 112:23, 113:11, 113:17, 113:20, 114:4, 118:7, 120:2, 120:10, 120:12, 121:9, 121:20, 122:13, 124:5, 125:10, 127:23, 133:13, 145:4
**reported** [11] - 40:5, 51:2, 51:8, 51:12, 51:13, 51:18, 51:25, 53:17, 55:11, 55:13, 55:15
**Reporter** [2] - 149:8, 149:22
**REPORTER** [2] - 2:24, 4:5
**reporting** [3] - 7:11, 68:16, 68:24
**reports** [6] - 55:19, 56:3, 56:18, 56:23, 101:6, 101:9
**represent** [2] - 38:3, 41:25
**request** [1] - 92:8
**requested** [3] - 17:21, 24:10, 51:14
**requesting** [1] - 91:24
**required** [8] - 9:3, 36:17, 60:5, 73:12, 94:5, 115:10, 116:16, 130:6
**requirement** [4] - 6:4, 76:24, 77:2, 80:24
**requirements** [4] - 5:22, 11:13, 21:16, 76:16
**requires** [1] - 74:2
**reserve** [1] - 140:22
**reset** [1] - 53:21
**resolution** [2] - 66:20, 66:21
**resolved** [1] - 106:12
**respect** [8] - 87:23, 102:6, 102:25, 109:21, 136:4, 138:9, 139:25
**respond** [1] - 101:8
**responded** [2] - 98:5,

98:11
**response** [2] - 21:15, 121:13
**responses** [3] - 15:2, 89:8, 95:7
**rest** [2] - 97:8, 113:9
**restate** [2] - 53:19, 74:22
**restaurant** [3] - 95:14, 96:3
**result** [3] - 8:14, 19:23, 75:9
**resulting** [4] - 40:16, 90:8, 122:17, 129:17
**results** [2] - 13:6, 84:17
**retain** [3] - 74:12, 74:15, 74:19
**retained** [4] - 73:17, 73:22, 91:17, 91:18
**retaining** [1] - 91:19
**retention** [1] - 74:2
**review** [36] - 9:1, 17:19, 18:4, 19:13, 19:18, 20:7, 22:11, 23:5, 23:7, 69:14, 69:23, 70:5, 71:8, 88:7, 88:12, 88:22, 89:3, 89:9, 89:14, 89:19, 89:23, 90:3, 90:7, 90:13, 99:9, 100:13, 103:20, 106:24, 111:20, 112:10, 112:17, 123:8, 129:16, 134:10, 134:16, 137:4
**reviewed** [13] - 16:6, 16:10, 16:11, 32:8, 55:25, 60:22, 88:13, 94:16, 94:17, 94:21, 107:5, 113:10, 131:25
**reviewing** [7] - 48:14, 88:19, 89:18, 98:3, 98:8, 99:10, 100:8
**Reynolds** [1] - 15:4
**rights** [1] - 140:23
**RJI** [1] - 127:18
**Road** [1] - 1:20
**robust** [1] - 73:17
**role** [3] - 23:23, 24:5
**room** [1] - 120:13
**ROPES** [1] - 2:18
**rounding** [2] - 40:22, 40:23
**RPR** [3] - 2:24, 149:7, 149:21
**Rule** [1] - 25:15
**rule** [3] - 133:25,

138:4, 139:11
**ruling** [1] - 53:24
**run** [2] - 60:12, 130:16
**runs** [2] - 19:2, 57:11
**ruse** [2] - 121:22, 122:11
**rush** [1] - 66:15

## S

**sale** [2] - 38:22
**sales** [3] - 21:17, 138:3, 139:10
**Salvatore** [1] - 3:18
**SALVATORE** [1] - 1:21
**sampling** [1] - 94:22
**Sandy** [1] - 127:15
**sareisman@ jonesday.com** [1] - 2:10
**sat** [1] - 92:7
**saw** [3] - 8:25, 29:20, 95:14
**sbadala@napolilaw. com** [1] - 1:23
**scattered** [1] - 108:5
**scenario** [2] - 20:15, 65:15
**schedule** [3] - 90:14, 147:11, 147:12
**Schedule** [11] - 12:5, 12:8, 12:14, 13:4, 27:13, 28:7, 29:4, 57:2, 88:6, 88:21, 90:9
**scheduled** [3] - 144:16, 144:18, 146:10
**SCHMIDT** [95] - 3:23, 4:20, 5:6, 5:9, 15:4, 15:8, 18:23, 25:11, 26:4, 26:7, 26:25, 27:3, 27:10, 36:12, 36:15, 37:11, 37:16, 37:21, 38:10, 38:18, 38:23, 40:4, 40:9, 44:15, 44:19, 45:15, 45:21, 49:2, 49:7, 49:13, 49:16, 49:21, 52:18, 52:23, 53:5, 53:7, 53:11, 54:15, 54:19, 62:25, 63:6, 64:2, 64:14, 72:20, 73:2, 77:18, 78:13, 78:19, 79:4, 79:9, 79:11, 79:12, 80:3, 80:6, 80:19, 80:23, 82:16, 93:6, 93:10, 93:12, 93:14, 95:18,

96:2, 97:16, 97:21, 98:14, 98:17, 101:5, 103:3, 105:19, 105:22, 110:2, 113:22, 117:24, 118:16, 118:19, 118:22, 119:11, 121:4, 121:14, 121:18, 122:4, 122:7, 122:22, 124:15, 135:8, 136:7, 136:16, 136:21, 136:24, 138:18, 138:23, 139:13, 140:4, 141:11
**Schmidt** [30] - 2:15, 3:24, 4:18, 24:12, 54:14, 77:12, 79:24, 83:6, 92:19, 93:10, 93:11, 96:10, 96:25, 97:15, 101:14, 104:13, 105:6, 105:8, 105:12, 105:17, 110:20, 110:24, 113:14, 114:2, 114:6, 114:11, 121:12, 134:4, 136:21, 136:22
**Schmidt's** [1] - 98:22
**Schultz** [1] - 136:19
**scientific** [4] - 32:22, 42:5, 84:16, 84:19
**scientist** [1] - 32:5
**scope** [5] - 6:10, 6:11, 11:8, 111:15, 121:5
**screen** [12] - 11:20, 12:11, 30:2, 37:13, 44:16, 44:18, 57:4, 63:8, 98:21, 105:2, 105:4, 114:20
**scroll** [4] - 35:23, 36:10, 36:21, 54:15
**seated** [3] - 3:3, 83:11, 128:11
**second** [23] - 9:23, 34:20, 36:7, 37:14, 45:14, 69:8, 71:14, 73:6, 73:7, 75:8, 75:13, 75:15, 75:21, 76:11, 87:24, 97:11, 103:20, 104:21, 115:25, 120:13, 120:16, 122:14, 140:16
**Second** [1] - 83:18
**secondly** [2] - 123:10, 123:15
**seconds** [1] - 137:17

**section** [8] - 11:22, 97:4, 105:25, 121:19, 124:16, 125:2, 125:3, 125:4
**Section** [2] - 135:6, 140:2
**see** [90] - 11:2, 11:25, 12:12, 13:6, 15:9, 21:21, 22:15, 27:4, 30:10, 30:19, 30:24, 34:14, 34:15, 34:19, 34:23, 35:13, 36:4, 36:6, 36:25, 37:5, 37:9, 38:11, 38:16, 38:24, 39:20, 39:22, 39:23, 40:10, 40:11, 44:20, 44:23, 44:25, 45:16, 50:16, 57:4, 57:11, 59:2, 61:25, 62:4, 62:21, 63:7, 63:11, 64:18, 64:19, 65:3, 65:7, 65:13, 66:2, 66:13, 66:14, 71:5, 71:19, 71:25, 72:2, 72:3, 73:3, 73:5, 73:7, 73:18, 76:20, 78:20, 82:6, 98:12, 102:7, 104:3, 105:15, 107:3, 107:15, 107:16, 107:18, 108:6, 109:24, 115:5, 115:22, 115:25, 116:4, 116:23, 120:18, 121:3, 122:13, 126:18, 129:10, 129:12, 129:18, 130:10, 131:21, 132:18, 134:17, 145:8
**SEEGER** [1] - 2:2
**seeing** [2] - 9:9, 77:25
**seem** [1] - 121:10
**select** [1] - 16:6
**selected** [1] - 102:21
**sell** [1] - 64:23
**send** [4] - 106:20, 106:21, 138:19, 138:21
**sent** [1] - 127:7
**sentence** [10] - 21:12, 107:25, 108:3, 108:13, 109:23, 110:11, 110:12, 115:9, 115:15, 118:23
**sentences** [1] - 109:20
**separate** [2] - 83:21, 84:3
**September** [7] - 35:23,

146:3, 146:22, 146:24, 147:9, 147:13, 147:19
**series** [2] - 12:16, 108:5
**session** [1] - 128:8
**set** [7] - 11:12, 11:18, 17:18, 87:10, 129:6, 142:24, 143:9
**sets** [2] - 35:18, 122:15
**setting** [1] - 118:7
**several** [2] - 16:18, 97:2
**Sgtreet** [1] - 2:3
**Sharyl** [1] - 4:2
**SHARYL** [1] - 2:9
**sharyl** [1] - 86:12
**Sherman** [3] - 107:19, 109:6, 109:7
**Sherman-Hynes** [3] - 107:19, 109:6, 109:7
**ship** [5] - 54:21, 68:6, 69:24, 76:23, 77:5, 80:25, 81:8
**shipment** [2] - 138:2, 139:9
**shipments** [1] - 141:18
**shipped** [2] - 76:20, 134:9
**shipping** [3] - 47:2, 47:17, 47:22
**shjones@jonesday. com** [1] - 2:10
**SHKOLNIK** [5] - 1:19, 3:20, 127:20, 127:25, 144:25
**Shkolnik** [2] - 3:21, 3:22
**short** [5] - 9:15, 82:24, 83:10, 135:4, 139:25
**Short** [1] - 77:16
**show** [19] - 26:16, 37:14, 38:19, 55:18, 62:19, 63:24, 78:10, 78:14, 78:16, 78:21, 78:24, 79:2, 79:8, 92:20, 123:17, 124:11, 136:4, 136:8, 137:3
**showed** [1] - 98:19
**showing** [2] - 78:6, 124:4
**shown** [5] - 97:25, 98:21, 98:23, 114:23, 124:10
**shuffling** [1] - 146:7
**sic** [2] - 52:11, 136:19
**side** [4] - 39:17, 64:3,

136:11
**sides** [1] - 145:25
**signature** [1] - 149:17
**signed** [1] - 127:19
**significance** [1] - 123:3
**significant** [5] - 51:24, 110:13, 120:3, 124:7, 126:14
**signifies** [1] - 135:15
**similar** [3] - 10:17, 130:22, 134:24
**SIMMONS** [1] - 1:13
**simple** [3] - 68:20, 70:13, 94:8
**simplify** [1] - 18:9
**simply** [2] - 14:21, 25:18
**single** [6] - 6:21, 6:25, 11:13, 29:11, 62:23, 66:6
**sitting** [2] - 112:22, 148:3
**situation** [1] - 72:8
**situations** [1] - 106:11
**six** [10] - 62:23, 62:24, 63:21, 67:6, 71:20, 71:22, 130:25, 131:5, 131:7, 134:2
**six-month** [2] - 130:25, 134:2
**size** [6] - 5:17, 6:4, 6:16, 6:22, 7:22, 8:3
**skip** [1] - 81:3
**SKOLNICK** [1] - 1:21
**slide** [8] - 72:23, 92:20, 128:24, 129:3, 129:4, 129:13, 130:8, 133:15
**Slide** [2] - 87:5, 90:6
**slight** [2] - 67:7, 67:18
**slightly** [1] - 37:3
**Slip** [1] - 83:18
**slower** [1] - 56:21
**slowly** [1] - 56:16
**small** [1] - 62:3
**Smith** [1] - 44:12
**solely** [4] - 74:11, 74:15, 76:3, 76:9
**someone** [7] - 19:6, 19:16, 20:3, 43:12, 64:6, 107:9, 118:5
**sometimes** [1] - 56:13, 91:16, 103:21, 106:20
**somewhat** [1] - 130:10
**soon** [1] - 145:3
**Sorry** [1] - 18:21

**sorry** [28] - 36:3, 38:18, 40:18, 46:22, 49:10, 49:11, 61:23, 70:23, 78:19, 79:20, 79:24, 85:18, 92:14, 95:23, 97:14, 100:24, 105:22, 110:9, 111:2, 112:15, 129:3, 132:20, 133:23, 136:22, 136:23, 138:14, 141:4, 141:14

**sort** [2] - 95:11, 129:13

**sound** [2] - 4:21, 39:12

**speaking** [5] - 7:16, 23:2, 37:20, 48:16, 73:24

**speaks** [1] - 74:8

**SpecGX** [1] - 2:18

**special** [1] - 102:15

**specific** [28] - 6:23, 9:7, 9:21, 20:15, 23:3, 23:15, 27:21, 28:8, 46:24, 47:19, 48:6, 48:11, 51:4, 51:11, 55:17, 55:19, 69:6, 70:24, 73:25, 75:11, 94:9, 95:2, 95:9, 96:17, 99:22, 102:12, 134:21, 142:24

**specifically** [24] - 18:17, 20:22, 21:8, 33:9, 36:21, 50:5, 50:12, 51:9, 58:17, 60:10, 60:12, 61:16, 62:6, 73:14, 73:21, 74:5, 74:8, 74:18, 75:20, 78:10, 82:9, 94:18, 100:23, 101:18

**specifics** [2] - 108:4, 108:14

**spent** [8] - 96:11, 99:21, 100:7, 100:8, 100:21, 103:10, 104:13, 113:14

**spoken** [1] - 145:25

**spreadsheet** [1] - 59:12

**squarely** [1] - 121:10

**stand** [4] - 23:21, 50:22, 97:18, 114:7

**standalone** [1] - 12:8

**standard** [1] - 88:14

**standing** [1] - 97:19

**start** [9] - 5:14, 60:8, 63:8, 77:12, 77:17, 80:9, 80:19, 84:2, 97:13

**started** [4] - 56:12, 96:18, 112:3, 123:8

**starting** [3] - 13:5, 45:25, 97:25

**STATE** [1] - 1:2

**state** [3] - 17:4, 69:17, 96:2

**State** [11] - 30:5, 30:9, 30:10, 55:9, 55:16, 56:4, 56:8, 109:13, 113:16, 125:19, 149:8

**State's** [1] - 105:13

**statement** [18] - 6:24, 9:13, 9:22, 9:24, 9:25, 11:15, 22:17, 23:16, 23:21, 27:23, 35:12, 43:20, 60:17, 61:19, 61:22, 62:18, 64:24, 72:9

**statements** [10] - 14:10, 35:8, 81:22, 89:6, 95:6, 106:16, 107:7, 113:19, 124:5

**states** [1] - 25:16

**States** [4] - 35:17, 77:21, 101:22, 141:21

**status** [1] - 127:23

**statutes** [2] - 81:13, 81:15

**statutory** [1] - 21:15

**stay** [2] - 135:22, 135:23

**stem** [1] - 120:25

**stenographic** [1] - 149:11

**STEPHANIE** [3] - 2:8, 2:24, 149:21

**Stephanie** [3] - 4:4, 4:7, 149:7

**steps** [1] - 123:3

**stick** [1] - 29:22

**still** [7] - 4:15, 42:3, 51:23, 70:9, 128:13, 128:16, 139:14

**Stipulation** [2] - 140:17, 147:2

**stop** [7] - 47:2, 47:17, 47:22, 60:8, 66:23, 87:16, 125:14

**stopped** [1] - 54:5

**straight** [1] - 12:14

**streamline** [2] - 83:2, 85:13

**Street** [2] - 2:7, 2:19

**strength** [1] - 115:19

**strictly** [2] - 24:13

**strike** [2] - 27:25, 103:10

**strong** [1] - 26:14

**studies** [1] - 32:11

**study** [3] - 42:5, 114:24, 118:4

**stuff** [1] - 19:22

**subject** [2] - 18:18, 140:20

**submitted** [1] - 101:13

**subsequent** [9] - 29:16, 50:14, 54:21, 70:4, 70:17, 71:22, 72:6, 92:9, 134:11

**subsequently** [1] - 127:9

**subsidiary** [1] - 108:25

**substance** [2] - 115:12, 140:7

**substances** [7] - 47:3, 47:23, 48:2, 116:15, 116:16, 116:22, 141:17

**substantiate** [1] - 107:6

**substantive** [3] - 121:15, 121:21, 124:20

**sufficient** [2] - 29:9, 94:23

**sufficiently** [1] - 25:22

**SUFFOLK** [1] - 1:2

**Suffolk** [2] - 1:14, 149:9

**suggest** [3] - 82:24, 142:17, 147:20

**suggested** [2] - 40:2, 145:16

**suggesting** [4] - 51:16, 53:15, 121:16, 146:11

**suggests** [2] - 53:18, 91:18

**Suite** [1] - 1:20

**summary** [1] - 87:14

**Summons** [4] - 126:23, 126:24, 127:9, 144:23

**sums** [1] - 54:23

**supply** [3] - 23:19, 23:24, 24:6

**Support** [2] - 115:5, 115:11

**support** [6] - 107:25, 113:10, 113:12, 113:19, 121:9, 124:9

**supported** [1] - 107:8

**supporting** [1] -

125:12

**supposed** [1] - 81:7

**supra** [1] - 107:23

**sUPREME** [1] - 1:2

**Supreme** [2] - 1:11, 128:7

**surprise** [3] - 100:19, 100:25, 101:4

**suspicion** [2] - 69:22, 76:20

**suspicious** [104] - 5:13, 5:16, 6:8, 7:10, 7:23, 8:3, 8:7, 8:11, 8:15, 9:4, 9:17, 10:3, 10:20, 11:6, 11:13, 11:24, 12:25, 13:20, 14:18, 15:18, 15:21, 17:15, 17:16, 17:20, 17:24, 18:3, 19:20, 21:6, 22:15, 22:20, 22:25, 29:16, 29:17, 33:18, 33:24, 43:4, 43:20, 46:3, 46:22, 46:23, 47:6, 47:7, 47:18, 51:18, 51:25, 53:17, 53:20, 53:22, 54:3, 54:6, 54:7, 54:22, 55:15, 56:2, 56:7, 56:9, 56:18, 56:22, 63:19, 63:24, 64:17, 65:9, 65:16, 65:22, 66:5, 66:6, 66:9, 66:11, 68:8, 68:15, 68:24, 69:15, 70:3, 70:4, 70:16, 70:17, 72:6, 73:11, 76:18, 77:6, 77:24, 80:25, 81:7, 81:9, 88:23, 90:21, 102:4, 117:19, 123:19, 131:7, 133:18, 133:20, 134:8, 134:11, 137:24, 137:25, 139:7, 139:8, 139:20, 141:2, 141:3, 141:18

**sustain** [1] - 114:5

**sustained** [1] - 103:8

**system** [38] - 5:24, 7:23, 8:4, 8:10, 8:12, 9:4, 9:7, 9:18, 9:21, 10:15, 10:21, 11:6, 14:18, 15:18, 15:21, 17:15, 17:17, 46:23, 47:5, 47:18, 52:2, 53:20, 59:12, 65:23, 66:9, 66:16, 66:17, 66:23, 67:4, 67:14, 67:15, 69:15, 73:11, 117:19, 126:22,

131:4, 132:19, 134:5

**systemic** [1] - 134:19

**systems** [3] - 17:20, 17:24, 19:21

---

## T

**Tab** [13] - 11:17, 12:10, 13:14, 30:2, 34:18, 37:22, 37:24, 44:15, 48:18, 52:11, 61:3, 80:8

**tab** [2] - 38:8, 52:22

**table** [1] - 40:6

**task** [3] - 88:17, 89:17, 104:10

**tasked** [1] - 17:12

**team** [1] - 126:14

**techniques** [3] - 34:4, 34:9, 84:16

**telegraph** [1] - 71:16

**ten** [4] - 83:4, 83:9, 98:9, 125:18

**term** [1] - 59:22

**terminate** [2] - 138:3, 139:10

**terminology** [1] - 7:25

**terms** [12] - 7:19, 10:8, 19:14, 24:9, 32:19, 41:4, 58:2, 59:2, 62:15, 69:2, 71:2, 122:16

**terrible** [1] - 56:16

**terrific** [1] - 5:7

**territory** [1] - 83:7

**testified** [6] - 57:19, 96:15, 100:16, 101:19, 106:10, 109:7

**testify** [4] - 50:8, 85:6, 93:15, 107:5

**testifying** [2] - 45:7, 103:7

**testimony** [53] - 8:20, 8:24, 9:9, 13:15, 23:20, 25:3, 25:4, 29:13, 29:19, 33:25, 44:9, 44:11, 44:20, 44:21, 45:4, 45:9, 54:3, 57:22, 59:21, 60:22, 61:24, 61:25, 62:5, 64:10, 64:12, 77:19, 77:24, 77:25, 78:7, 78:20, 78:24, 79:4, 79:13, 79:18, 79:22, 79:25, 80:2, 80:4, 84:15, 85:6, 86:23, 96:20, 96:25, 102:22, 110:19, 113:5, 119:19,

135:6, 136:5, 136:9, 137:5, 145:11
**Testimony** [1] - 1:10
**testings** [1] - 103:25
**THE** [192] - 1:2, 3:2, 3:5, 3:7, 3:8, 3:9, 3:15, 3:19, 3:22, 4:3, 4:10, 4:12, 4:14, 4:16, 4:18, 4:25, 5:2, 5:3, 5:5, 5:8, 15:7, 18:19, 24:12, 26:2, 26:5, 26:20, 27:2, 36:14, 40:2, 48:24, 49:5, 52:17, 54:13, 64:13, 77:11, 78:18, 79:2, 79:7, 79:10, 80:11, 80:13, 80:15, 80:17, 80:21, 81:6, 82:18, 82:19, 82:21, 83:4, 83:9, 83:11, 83:13, 84:2, 85:15, 85:18, 85:22, 86:2, 86:7, 86:10, 87:16, 91:4, 91:7, 91:13, 91:15, 91:16, 91:22, 91:23, 92:4, 92:13, 93:9, 93:11, 93:13, 93:17, 95:22, 95:24, 96:6, 96:7, 96:14, 96:16, 96:19, 96:21, 96:22, 97:15, 97:17, 98:18, 99:8, 101:7, 103:8, 104:22, 104:23, 105:8, 107:9, 107:19, 110:5, 111:5, 111:8, 111:15, 113:23, 114:5, 114:15, 118:2, 118:18, 118:20, 119:6, 120:16, 121:6, 121:12, 121:16, 121:25, 122:3, 122:6, 122:13, 122:21, 122:23, 122:24, 122:25, 123:7, 123:22, 124:10, 125:7, 125:11, 125:14, 125:22, 125:24, 126:3, 126:8, 126:12, 126:18, 126:21, 127:24, 128:2, 128:7, 128:9, 128:10, 128:11, 128:12, 128:14, 128:15, 128:17, 128:18, 128:22, 129:8, 132:7, 132:10, 132:11, 132:15, 132:22,

133:3, 133:5, 133:6, 133:14, 135:9, 135:22, 136:8, 136:11, 136:15, 136:19, 136:22, 137:10, 137:15, 137:18, 138:6, 138:12, 138:24, 139:18, 140:10, 140:13, 140:16, 140:22, 141:25, 142:5, 142:6, 142:13, 142:16, 142:21, 143:11, 143:16, 144:3, 144:5, 144:7, 144:12, 144:15, 144:21, 145:7, 145:14, 146:4, 146:18, 146:23, 147:8, 147:18, 148:8, 148:11
**themselves** [1] - 103:19
**Therefore** [1] - 149:16
**they've** [1] - 81:16
**thinking** [2] - 18:21, 40:19
**thinks** [1] - 93:15
**third** [5] - 34:11, 45:2, 88:11, 108:3, 116:7
**Thomas** [4] - 135:4, 138:14, 140:2, 141:8
**thousandths** [1] - 41:2
**three** [5] - 51:23, 86:3, 100:10, 126:16, 143:22
**threshold** [7] - 66:9, 66:11, 67:8, 67:24, 72:12, 117:20, 130:25
**Thresholds** [1] - 73:8
**thresholds** [2] - 73:12, 117:20
**throughout** [3] - 101:22, 109:17, 124:6
**Thursday** [2] - 145:11, 145:21
**timeframe** [1] - 58:4
**title** [3] - 37:25, 38:13, 64:9
**today** [8] - 5:13, 8:6, 93:18, 97:20, 112:22, 144:15, 144:18, 146:13
**today's** [1] - 90:4
**toes** [1] - 135:24
**tomorrow** [5] -

127:25, 144:16, 144:18, 144:20, 145:8
**took** [6] - 62:12, 75:17, 75:25, 76:8, 108:15, 122:12
**tool** [3] - 16:9, 33:10, 65:22
**tools** [3] - 16:5, 17:22, 51:23
**top** [8] - 30:18, 35:22, 35:24, 36:10, 38:14, 55:20, 108:2, 133:10
**topic** [4] - 72:15, 77:10, 94:11, 124:24
**total** [3] - 13:8, 31:6, 39:9
**totality** [4] - 70:6, 70:25, 95:3, 134:13
**totally** [1] - 60:17
**totals** [1] - 134:2
**touch** [1] - 145:2
**township** [1] - 127:2
**trailing** [2] - 62:24, 130:25
**training** [1] - 53:23
**transaction** [2] - 16:5, 143:9
**transactional** [4] - 88:2, 88:8, 129:21, 142:23
**transcript** [8] - 48:7, 49:17, 52:10, 52:15, 53:4, 61:2, 137:6, 149:14
**transcription** [1] - 149:11
**treated** [2] - 70:3, 70:16
**trends** [1] - 68:17
**trial** [15] - 24:17, 25:17, 26:5, 26:6, 45:8, 79:16, 79:21, 80:2, 80:14, 84:5, 84:6, 84:10, 85:6, 86:4, 140:20
**tried** [2] - 107:5, 111:25
**trigger** [3] - 64:17, 66:18, 66:19
**triggered** [5] - 18:2, 23:6, 27:5, 66:11, 70:9
**triggering** [1] - 52:2
**triggers** [5] - 53:20, 71:15, 72:6, 131:7, 143:6
**trouble** [1] - 57:4, 142:20
**true** [17] - 22:16,

22:17, 23:9, 23:11, 23:13, 31:18, 36:19, 55:11, 60:17, 60:20, 71:7, 72:6, 72:9, 74:6, 109:17, 149:10, 149:15
**truth** [3] - 13:11, 61:18, 61:21
**truthful** [1] - 46:18
**truthfully** [1] - 50:9
**try** [10] - 18:9, 32:5, 32:14, 33:17, 34:4, 64:11, 70:13, 87:13, 104:8, 137:3
**trying** [8] - 26:16, 27:7, 50:8, 78:14, 103:3, 105:3, 121:20, 136:25
**turn** [2] - 99:14, 130:8
**turned** [1] - 58:15
**two** [18] - 12:19, 65:13, 75:22, 95:14, 100:9, 101:6, 101:9, 109:3, 113:3, 113:7, 123:7, 124:2, 126:18, 128:2, 137:4, 142:2, 145:17, 147:21
**type** [6] - 11:9, 33:7, 33:12, 42:8, 75:12, 103:10
**types** [3] - 73:22, 103:11, 119:2
**typical** [1] - 130:5
**typically** [2] - 20:25, 132:15

---

## U

**U.S** [2] - 44:21, 44:22
**unable** [1] - 28:15
**under** [20] - 4:15, 14:4, 15:15, 21:11, 40:8, 48:4, 62:21, 63:17, 65:16, 65:20, 69:19, 72:4, 72:8, 87:24, 88:17, 89:17, 108:3, 121:22, 128:13, 128:16
**understood** [2] - 64:25
**undertake** [1] - 18:14
**undertaken** [1] - 18:12
**unfair** [5] - 93:3, 93:4, 93:7, 93:21, 142:16
**unfortunately** [1] - 120:4
**uniform** [2] - 108:21, 109:5
**uninterrupted** [3] -

---

23:18, 23:24, 24:6
**United** [4] - 35:17, 77:21, 101:22, 141:21
**units** [1] - 42:6
**unless** [2] - 106:16, 106:22
**unlimited** [1] - 133:3
**unproven** [1] - 25:25
**unusual** [6] - 5:17, 6:4, 6:16, 6:22, 7:2, 7:3
**up** [62] - 6:9, 6:18, 11:20, 12:9, 12:11, 14:24, 20:2, 20:3, 29:25, 32:2, 32:6, 32:11, 34:8, 35:23, 36:10, 37:25, 39:11, 40:7, 41:16, 41:20, 44:16, 44:18, 48:20, 49:8, 54:23, 57:3, 57:8, 59:15, 59:19, 62:2, 63:7, 67:5, 68:5, 72:22, 77:12, 77:17, 78:15, 78:16, 83:23, 87:5, 97:18, 97:19, 97:24, 100:21, 108:2, 108:8, 112:17, 114:7, 114:20, 118:4, 118:6, 120:17, 127:22, 128:23, 131:17, 134:4, 137:8, 142:2, 142:10, 142:11, 144:8, 147:18
**upper** [1] - 98:2
**utilize** [1] - 51:22
**utilized** [2] - 35:19, 118:6

---

## V

**various** [2] - 44:8, 116:20
**vary** [1] - 63:9
**Verified** [1] - 127:6
**verifying** [1] - 106:23
**vermin** [1] - 95:24
**version** [1] - 65:5
**versus** [2] - 44:22, 83:17
**Vesey** [1] - 2:7
**video** [7] - 136:5, 136:9, 137:8, 137:12, 137:21, 140:14, 141:15
**VIDEO** [1] - 139:5
**videos** [1] - 140:8
**view** [3] - 10:12,

13:19, 15:19
**views** [1] - 77:21
**villages** [1] - 127:3
**violate** [1] - 133:25
**violation** [1] - 95:17
**violations** [1] - 120:23
**virtually** [1] - 126:25
**vocabulary** [1] - 86:4
**volume** [2] - 41:25, 56:6

## W

**wait** [1] - 110:5
**Wait** [1] - 120:16
**waiting** [7] - 3:3, 110:9, 138:24, 139:2, 139:3, 146:4, 146:12
**waive** [3] - 145:14, 145:15, 145:19
**walk** [1] - 126:8
**walked** [2] - 72:17, 95:14
**Walmart** [16] - 2:7, 4:2, 4:7, 86:13, 87:23, 88:25, 89:3, 89:10, 89:15, 89:20, 89:24, 90:4, 90:14, 90:19, 90:22, 91:2
**Walmart's** [3] - 88:8, 88:14, 89:25
**Washington** [1] - 120:6
**watchdogs** [1] - 7:6
**Water** [1] - 2:3
**ways** [2] - 8:17, 21:13
**website** [3] - 37:18, 38:4, 38:6
**week** [2] - 138:17, 145:12
**weight** [1] - 115:12
**WEISS** [1] - 2:2
**welcome** [1] - 148:11
**WHEREUPON** [2] - 83:10, 128:5
**whole** [1] - 53:12
**wholesale** [2] - 137:23, 139:6
**wish** [2] - 111:8, 125:21
**withdraw** [1] - 65:18
**WITNESS** [33] - 3:8, 4:16, 4:25, 5:8, 36:14, 64:13, 80:13, 80:17, 81:6, 82:19, 91:15, 91:22, 92:4, 96:6, 96:16, 96:21, 99:8, 104:23, 122:24, 123:7,

125:11, 128:14, 128:17, 128:22, 132:10, 132:15, 133:3, 133:6, 142:5, 142:13, 142:21, 143:16, 144:5
**witness** [24] - 4:13, 4:22, 25:9, 26:23, 37:14, 45:18, 85:13, 89:6, 93:7, 93:14, 95:6, 102:22, 114:6, 134:23, 135:2, 136:5, 136:8, 137:19, 144:8, 146:3, 146:18, 146:20, 146:22, 148:4
**witnesses** [2] - 147:16, 148:6
**word** [8] - 25:25, 42:23, 50:12, 50:14, 59:4, 84:21
**words** [9] - 7:19, 14:13, 19:7, 19:10, 20:5, 24:21, 59:11, 86:3, 130:11
**works** [7] - 10:11, 56:16, 62:20, 63:21, 71:13, 93:22, 115:21
**World** [1] - 2:13
**world** [1] - 133:11
**wrap** [3] - 77:12, 78:15, 78:16
**wrapping** [1] - 77:17
**write** [3] - 20:2, 20:3, 40:19
**writing** [2] - 20:6, 112:3
**written** [4] - 63:7, 103:17, 104:9, 109:13

## X

**Xs** [2] - 92:21, 92:24

## Y

**Year** [1] - 63:8
**year** [5] - 37:18, 38:14, 57:14, 83:16
**years** [4] - 38:15, 42:14, 71:17, 71:25
**yes-or-no** [3] - 68:12, 68:20, 94:6
**yesterday** [21] - 5:10, 7:7, 11:18, 16:18, 19:3, 20:9, 21:23, 22:9, 23:17, 26:15, 64:11, 77:13, 86:23, 87:6, 89:7, 90:7,

97:20, 111:4, 119:14, 119:19, 129:6
**yesterday's** [2] - 64:9, 145:10
**YORK** [1] - 1:2
**York** [40] - 1:8, 1:15, 1:20, 2:4, 2:8, 2:14, 2:15, 5:12, 11:24, 30:4, 30:9, 30:10, 48:17, 51:3, 51:8, 55:10, 55:16, 56:4, 56:8, 56:10, 58:19, 96:11, 98:3, 100:13, 100:22, 101:19, 101:20, 101:25, 102:12, 102:15, 104:16, 106:18, 109:13, 109:22, 149:9
**yourself** [4] - 19:16, 20:3, 94:14, 109:15

## Z

**Zeppelin** [1] - 4:24
**Zs** [1] - 85:5