Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

5   MDL NO. 2804

6   CASE NO. 17-md-2804

7   Hon. Dan A. Polster

8

9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11  THIS DOCUMENT RELATES TO:

12  TRACK THREE CASES

13

14                     VOLUME I

15             REMOTE VIDEO DEPOSITION OF

16                   JAMES RAFALSKI

17   (CONTAINS TESTIMONY DESIGNATED HIGHLY CONFIDENTIAL)

18                   June 10, 2021

19

20

21

22  REPORTED BY:  Laura H. Nichols

23                    Certified Realtime Reporter,

24                    Registered Professional

25                    Reporter and Notary Public

```
 1                 A P P E A R A N C E S

 2               (All Appearing Remotely)

 3

 4   FOR THE PLAINTIFFS:

 5         Ms. Kathleen Knight

 6            and Mr. A. J. Elkins

 7         Attorneys at Law

 8         McHugh Fuller Law Group

 9         97 Elias Whiddon Road

10         Hattiesburg, Mississippi 39402

11         (601) 261-2220

12         kathleen@mchughfuller.com

13         aj@mchughfuller.com

14   -and-

15         Mr. Daniel P. Goetz

16         Attorney at Law

17         Weisman Kennedy & Berris Co., LPA

18         2900 Detroit Avenue

19         2nd Floor

20         Cleveland, Ohio  44113

21         (216) 781-1111

22         dgoetz@weismanlaw.com

23

24

25
```

1          A P P E A R A N C E S, (CONTINUING)

2              (All Appearing Remotely)

3

4  FOR THE PLAINTIFFS, CONTINUING:

5          Mr. Paul F. Novak

6          Attorney at Law

7          Weitz & Luxenberg, P.C.

8          3011 West Grand Boulevard

9          24th Floor

10         Detroit, Michigan 48202

11         (313) 800-4166

12         pnovak@weitzlux.com

13  -and-

14         Mr. Michael J. Fuller, Jr.

15         Attorney at Law

16         Farrell & Fuller

17         1311 Ponce De Leon

18         Suite 202

19         San Juan, Puerto Rico 00907

20         (939) 293-8244

21         mike@farrellfuller.com

22

23

24

25

1         A P P E A R A N C E S, (CONTINUING)

2            (All Appearing Remotely)

3

4   FOR THE PLAINTIFFS, CONTINUING:

5         Ms. Alexandra Abston

6         Attorney at Law

7         The Lanier Law Firm

8         10940 West Sam Houston Parkway North

9         Suite 100

10        Houston, Texas 77064

11        (713) 659-5200

12        alex.abston@lanierlawfirm.com

13   -and-

14        Ms. Page Poerschke

15            and Ms. Julia A. Metts

16        Attorneys at Law

17        Levin Papantonio Rafferty Proctor

18            Buchanan O'Brien Barr Mougey, P.A.

19        316 South Baylen Street

20        Pensacola, Florida 32502

21        (850) 435-7000

22        ppoerschke@levinlaw.com

23        jmetts@levinlaw.com

24

25

                                                    Page 5

1           A P P E A R A N C E S, (CONTINUING)

2              (All Appearing Remotely)

3

4    FOR THE DEFENDANT MASTERS PHARMACEUTICAL, LLC:

5           Mr. William J. Aubel

6           Attorney at Law

7           Flaherty Sensabaugh Bonasso PLLC

8           200 Capitol Street

9           Charleston, West Virginia  25338-3843

10          (304) 345-0200

11          waubel@flahertylegal.com

12

13   FOR THE DEFENDANT WALMART, INC.:

14          Ms. Tara A. Fumerton

15             and Mr. Patrick J. Beisell

16          Attorneys at Law

17          Jones Day

18          77 West Wacker, Suite 3500

19          Chicago, Illinois  60601-1692

20          (312) 782-3939

21          tfumerton@jonesday.com

22          pbeisell@jonesday.com

23

24

25

Page 6

1          A P P E A R A N C E S, (CONTINUING)

2               (All Appearing Remotely)

3

4   FOR THE DEFENDANTS, GIANT EAGLE, INC. and HBC

5   SERVICE COMPANY:

6          Messrs. Scott D. Livingston,

7               Bernard D. Marcus,

8               Jonathan D. Marcus

9               and Matthew Mazgaj

10         Attorneys at Law

11         Marcus & Shapira LLP

12         One Oxford Centre

13         35th Floor

14         Pittsburgh, Pennsylvania 15219

15         (412) 471-3490

16         livingston@marcus-shapira.com

17         marcus@marcus-shapira.com

18         jmarcus@marcus-shapira.com

19         mazgaj@marcus-shapira.com

20

21

22

23

24

25

Page 7

1              A P P E A R A N C E S, (CONTINUING)

2                   (All Appearing Remotely)

3

4    FOR DEFENDANTS, CVS PHARMACY, INC.; CVS INDIANA,

5    LLC; CVS RX SERVICES, INC.; CVS TN DISTRIBUTION,

6    LLC and OHIO CVS STORES, LLC:

7              Mr. Anthony M. Ruiz

8              Attorney at Law

9              Zuckerman Spaeder

10             1800 M Street Northwest

11             Suite 1000

12             Washington, DC 20036-5807

13             (202) 778-1800

14             aruiz@zuckerman.com

15

16   FOR THE DEFENDANTS, WALGREENS BOOTS ALLIANCE, INC.;

17   WALGREEN CO.; and WALGREEN EASTERN CO., INC.:

18             Ms. Katherine M. Swift

19             Attorney at Law

20             Bartlit Beck

21             Courthouse Place

22             54 West Hubbard Street

23             Chicago, Illinois 60654

24             (312) 494-4400

25             kate.swift@bartlitbeck.com

1        A P P E A R A N C E S, (CONTINUING)

2              (All Appearing Remotely)

3

4    FOR THE DEFENDANTS, RITE AID OF OHIO, INC.; RITE

5    AID HDQTRS. CORP.; RITE AID OF MARYLAND d/b/a

6    MID-ATLANTIC CUSTOMER SUPPORT CENTER; ECKERD

7    CORPORATION d/b/a RITE AID LIVERPOOL DISTRIBUTION

8    CENTER:

9          Ms. Elisa P. McEnroe

10         Attorney at Law

11         Morgan, Lewis & Bockius LLP

12         1701 Market Street

13         Philadelphia, Pennsylvania 19103-2921

14         (215) 963-5076

15         elisa.mcenroe@morganlewis.com

16   -and-

17         Mr. Matthew R. Ladd

18         Attorney at Law

19         Morgan, Lewis & Bockius LLP

20         101 Park Avenue

21         New York, New York 10178-0060

22         (212) 309-6000

23         matthew.ladd@morganlewis.com

24

25

Page 9

1              A P P E A R A N C E S, (CONTINUING)

2                  (All Appearing Remotely)

3

4    FOR THE DEFENDANT HENRY SCHEIN:

5            Ms. Madeleine E. Brunner

6            Attorney at Law

7            Locke Lord LLP

8            2200 Ross Avenue

9            Suite 2800

10           Dallas, Texas  75201

11           (214) 740-8000

12           maddie.brunner@lockelord.com

13

14   OTHERS PRESENT:

15           Mr. David R. Cohen

16           Special Master

17           David R. Cohen Co. LPA

18           24400 Chagrin Boulevard, Suite 300

19           Cleveland, Ohio 44122

20           (216) 831-0001

21           david@specialmaster.law

22

23

24

25

Page 10

1           A P P E A R A N C E S, (CONTINUING)

2               (All Appearing Remotely)

3

4    OTHERS PRESENT, CONTINUING:

5           Ms. Kaitlyn Eekhoff

6           Research Analyst

7           Motley Rice LLC

8           28 Bridgeside Boulevard

9           Mount Pleasant, South Carolina  294644

10          (843) 216-9000

11          keekhoff@motleyrice.com

12

13          Ms. Amanda Unterreiner

14          Litigation Paralegal

15          Motley Rice LLC

16          28 Bridgeside Boulevard

17          Mount Pleasant, South Carolina  294644

18          (843) 216-9000

19          aunterreiner@motleyrice.com

20

21          Mr. Jonathan Jaffe, Consultant

22          i-y-f Consulting

23          Forest Hills, New York

24          (866) 526-1836

25          jjaffe@its-your-internet.com

```
                                                    Page 11

 1            A P P E A R A N C E S, (CONTINUING)

 2                 (All Appearing Remotely)

 3

 4    OTHERS PRESENT, CONTINUING:

 5            Messrs. Drew Riedman

 6                and Bob Behrens

 7            Videographers

 8            Veritext Legal Solutions

 9

10

11        APPEARING VIA REMOTE REALTIME STREAM ONLY

12

13    FOR THE PLAINTIFFS:

14            (Present Via Remote Realtime Stream Only)

15            Messrs. Dave Gilfillan

16                and Jeff Falduto

17            Attorneys at Law

18            Carella, Byrne, Cecchi, Olstein,

19                Brody & Agnello, P.C.

20            5 Becker Farm Road

21            Roseland, New Jersey 07068

22            973-994-1700

23            dgilfillan@carellabyrne.com

24            jfalduto@carellabyrne.com

25
```

```
                                                    Page 12

 1        APPEARING VIA REMOTE REALTIME STREAM ONLY,

 2                      CONTINUING

 3

 4    FOR THE DEFENDANTS, GIANT EAGLE, INC. and HBC

 5    SERVICE COMPANY:

 6            (Present Via Remote Realtime Stream Only)

 7            Mr. David Zwier

 8            Attorneys at Law

 9            Marcus & Shapira LLP

10            One Oxford Centre

11            35th Floor

12            Pittsburgh, Pennsylvania 15219

13            (412) 471-3490

14            zwier@marcus-shapira.com

15

16            Mr. Jay Lichter

17            Attorney at Law

18            Baron & Budd, P.C.

19            15910 Ventura Boulevard

20            Suite 1600

21            Encino, California 91436

22            (818) 839-2333

23            jlichter@baronbudd.com

24

25
```

Page 13

1        INDEX OF EXAMINATION

2

3                                        Page:

4  DEPONENT:  JAMES RAFALSKI                    24

5  EXAMINATION BY MR. LIVINGSTON               24

6  EXAMINATION BY MS. SWIFT                    160

7  EXAMINATION BY MS. MCENROE                  245

8  EXAMINATION BY MS. FUMERTON                 303

9  EXAMINATION BY MR. RUIZ                     339

10

11   INDEX OF DEFENDANT GIANT EAGLE EXHIBITS, VOLUME I

12

13                                        Page:

14  GE Exhibit 2                            31-15

15        Expert Report, Analysis of

16  Distributor Regulatory Compliance to

17  Maintain Effective Controls for the

18  Prevention of Diversion of Controlled

19  Substances on Behalf of Lake and Trumbull

20  Counties, Ohio, Prepared by

21  James E. Rafalski

22  GE Exhibit 6                             86-7

23        Memorandum, beginning with Bates

24  Number CAN_MDL_PRIORPROD_DEA12_00000609

25  (Confidential)

1     INDEX OF DEFENDANT GIANT EAGLE EXHIBITS, VOLUME I,

2                       CONTINUING

3

4                                            Page:

5     GE Exhibit 8                                51-7

6          Expert Report of Craig J. McCann,

7     Ph.D., CFA, March 25, 2019

8     GE Exhibit 9                                52-23

9          Expert Report of Craig J. McCann,

10    Ph.D., CFA, April 16, 2021

11    GE Exhibit 10                               119-23

12          Indexed Comparison of Growth in HCP

13    DEA Quota & In Dispensing by Giant Eagle in

14    Lake & Trumbull Counties, in MME, Bates

15    Number GE_TL00000001

16    GE Exhibit 17                               128-9

17          Volume I, Videotaped Deposition of

18    Kyle J. Wright, February 28, 2019

19    GE Exhibit 18                               133-2

20          Total Prescriptions and Control

21    Prescriptions Filled by Giant Eagle

22    Pharmacies in Lake & Trumbull Counties

23    January 1, 2006 - November 20, 2019

24    (Confidential)

25

Page 15

1    INDEX OF DEFENDANT GIANT EAGLE EXHIBITS, VOLUME I,

2                       CONTINUING

3                                            Page:

4   GE Exhibit 19                              138-1

5        Declaration of Diversion

6   Investigator James E. Rafalski, Under

7   Penalty of Perjury

8   GE Exhibit 20                              134-17

9        Market Share of At-Issue Opioids

10   Lake and Trumbull Counties,

11   January 1, 2008 - December 31, 2018

12   (Confidential)

13   GE Exhibit 24                              114-18

14        Comparison of Rafalski's

15   Methodologies for Flagging Distribution

16   Orders (Methods A to G) Flagged Orders of

17   Hydrocodone, HBC to Giant Eagle Pharmacies

18   in Lake County (Confidential)

19   GE Exhibit 30                              57-20

20        Invoice Submitted by:

21   James E. Rafalski, Billing Hours for

22   November 1 through November 30

23   GE Exhibit 32                              130-16

24        Videotaped Deposition of

25   Joseph Rannazzisi, Volume I, July 16, 2020,

1    INDEX OF DEFENDANT GIANT EAGLE EXHIBITS, VOLUME I<

2                        CONTINUING

3

4                                              Page:

5    GE Exhibit 42                               63-22

6          Bench Trial Transcript - Volume 18,

7    May 26, 2021

8    GE Exhibit 46                               199-06

9          2003 Bill Tracking OH H.B. 377

10   GE Exhibit 49                               141-15

11         Email string, Bates Numbers

12   PPLPC018000279573 through PPLPC018000279574

13   (Confidential)

14   GE Exhibit 50                               150-4

15         Average Monthly Oxycodone 80mg

16   Dosage Units Dispensed OARRS Data, Lake and

17   Trumbull Counties 2008 -2018 (Confidential)

18

19

20    INDEX OF DEFENDANT WALGREENS EXHIBITS, VOLUME I

21

22                                              Page:

23   WAG Exhibit 1                               168-9

24         Opioid Shipments to Pharmacies in

25   Trumbull County, OH, 2006 - 2014

Page 17

1      INDEX OF DEFENDANT WALGREENS EXHIBITS, VOLUME I,

2                        CONTINUING

3

4                                              Page:

5   WAG Exhibit 2                            184-23

6         Opioid Shipments to Pharmacies in

7   Trumbull County, OH, 2006 - 2014

8   WAG Exhibit 3                            190-4

9         Ohio Prescription Drug Abuse Task

10  Force, Final Report, Task Force

11  Recommendations, October 1, 2010

12  WAG Exhibit 4                            196-20

13        Superseding Indictment

14  WAG Exhibit 5                            214-8

15        Remote Videotaped Deposition of Drug

16  Enforcement Agency 30(b)(6) Designee Claire

17  Brennan, Friday, November 13, 2020

18

19

20

21

22

23

24

25

Page 18

1      INDEX OF DEFENDANT RITE AID EXHIBITS, VOLUME I

2

3                                            Page:

4    RITE Exhibit 1                               273-2

5          Email, Kevin Mitchell to

6    blucero@riteaid.com, et al., 1/28/2008,

7    Bates Number Rite_Aid_OMDL_0016954

8    (Confidential)

9    RITE Exhibit 2                               286-15

10         Email, Kimberly Birklin to Heather

11   White, 12/28/2009, Bates Number

12   Rite_Aid_OMDL_0068316 (Confidential)

13   RITE Exhibit 3                               287-10

14         Email, Kimberly Birklin to Heather

15   White, 1/12/2010, Bates Number

16   Rite_Aid_OMDL_0068320 (Confidential)

17   RITE Exhibit 4                               287-17

18         Email, Kimberly Birklin to Heather

19   White, 2/2/2010, Bates Number

20   Rite_Aid_OMDL_0068321 (Confidential)

21   RITE Exhibit 5                               287-25

22         Email, Kimberly Birklin to Heather

23   White, 3/1/2010, Bates Number

24   Rite_Aid_OMDL_0068326 (Confidential)

25

Page 19

1     INDEX OF DEFENDANT RITE AID EXHIBITS, VOLUME I,

2                          CONTINUING

3

4                                          Page:

5   RITE Exhibit 6                           288-5

6        Email, Kimberly Birklin to Heather

7   White, 4/06/2010, Bates Number

8   Rite_Aid_OMDL_0068329 (Confidential)

9   RITE Exhibit 7                           288-11

10       Email, Kimberly Birklin to Heather

11  White, 5/3/2010, Bates Number

12  Rite_Aid_OMDL_0068331 (Confidential)

13  RITE Exhibit 8                           288-14

14       Email, Kimberly Birklin to Heather

15  White, 6/1/2010, Bates Number

16  Rite_Aid_OMDL_0068332 (Confidential)

17  RITE Exhibit 9                           288-19

18       Email, Kimberly Birklin to Heather

19  White, 7/6/2010, Bates Number

20  Rite_Aid_OMDL_0068335 (Confidential)

21  RITE Exhibit 10                          288-24

22       Email, Kimberly Birklin to Heather

23  White, 8/2/2010, Bates Number

24  Rite_Aid_OMDL_0068337 (Confidential)

25

Page 20

1     INDEX OF DEFENDANT RITE AID EXHIBITS, VOLUME I,

2                     CONTINUING

3

4                                        Page:

5   RITE Exhibit 11                          289-4

6         Email, Kimberly Birklin to Heather

7   White, 9/8/2010, Bates Number

8   Rite_Aid_OMDL_0068339 (Confidential)

9   RITE Exhibit 12                          289-9

10        Email, Kimberly Birklin to Heather

11  White, 10/4/2010, Bates Number

12  Rite_Aid_OMDL_0068341 (Confidential)

13  RITE Exhibit 13                          289-14

14        Email string, Bates Numbers

15  Rite_Aid_OMDL_0068346 to

16  Rite_Aid_OMDL_0068347 (Confidential)

17  RITE Exhibit 14                          295-23

18        Email with attachment, Keith Frost

19  to Anna Karn, et al., 7/11/2012, Bates

20  Numbers Rite_Aid_OMDL_0020799 through

21  Rite_Aid_OMDL_0020801 (Confidential)

22

23

24

25

Page 21

1      INDEX OF DEFENDANT WALMART EXHIBITS, VOLUME I

2

3                                          Page:

4   Walmart Exhibit 1                       304-17

5        Rafalski Notes for Deposition

6   Reference:  CVS, Giant Eagle, Rite Aid,

7   Walgreens and Walmart

8

9      INDEX OF CONFIDENTIAL DESIGNATIONS, VOLUME I

10

11                                         Page:

12  Testimony Designated as Confidential      235-11

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 22

1              S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED, by and

3   between the parties, through their respective

4   counsel, that the deposition of JAMES RAFALSKI may

5   be taken before Laura H. Nichols, Commissioner,

6   Certified Realtime Reporter, Registered

7   Professional Reporter and Notary Public;

8              That it shall not be necessary for

9   any objections to be made by counsel to any

10  questions, except as to form or leading questions,

11  and that counsel for the parties may make

12  objections and assign grounds at the time of trial,

13  or at the time said deposition is offered in

14  evidence, or prior thereto.

15

16

17

18

19

20

21

22

23

24

25

Page 23

```
1              I, Laura H. Nichols, a Certified
2     Realtime Reporter and Registered Professional
3     Reporter of Birmingham, Alabama, and a Notary
4     Public for the State of Alabama at Large, acting as
5     Commissioner, certify that on this date, as
6     provided by the Federal Rules of Civil Procedure of
7     the United States District Court, and the foregoing
8     stipulation of counsel, there came before me
9     remotely via Zoom, on June 10, 2021, commencing at
10    8:09 a.m. EDT, JAMES RAFALSKI, witness in the above
11    cause, for oral examination, whereupon the
12    following proceedings were had:

13

14                   *     *     *

15              THE VIDEOGRAPHER:  Good morning.  We
16    are now on the record.  Today's date is June 10th,
17    2021, and the time is now approximately 8:09 a.m.
18    This begins the videotaped deposition of James
19    Rafalski in the matter of National Prescription
20    Opiate Litigation Track 3.
21              All counsel will be identified on the
22    stenographic record.  Will the court reporter
23    please swear in the witness.

24

25
```

1                   JAMES RAFALSKI,

2    having been first duly sworn, was examined and

3    testified as follows:

4

5    EXAMINATION BY MR. LIVINGSTON:

6          Q.    Good morning, Mr. Rafalski.  My name

7    is Scott Livingston, and I represent Giant Eagle in

8    a number of opioids cases, including Track 3.

9          A.    Good morning, Mr. Livingston.

10          Q.    Good morning.  Are you -- where are

11    you located this morning?

12          A.    I am in a conference room at the

13    Detroit Renaissance Hotel in Detroit, downtown

14    Detroit, Michigan.

15          Q.    Is there anybody physically present

16    with you?

17          A.    Attorney Kathleen Knight.

18          Q.    Okay.  I would just ask that counsel

19    for the plaintiffs not talk to Mr. Rafalski off

20    camera during this deposition here today.

21                MS. KNIGHT:  We will follow the

22    rules.  Thanks very much.

23          Q.    (BY MR. LIVINGSTON:)  Mr. Rafalski,

24    do you know who the plaintiffs are in Track 3?

25          A.    Yes, I do.

1         Q.     Who are they?

2         A.     The Ohio counties of Trumbull County

3    and Lake County.

4         Q.     Okay.  And do you know who the

5    defendants are in Track 3?

6         A.     I know the five defendants I provided

7    an opinion on.  I don't know that I know all the

8    defendants.

9         Q.     Okay.  You are aware that there are

10   other defendants in the case, right?

11        A.     Yes.  I just do not know who they

12   are.

13        Q.     Who are the defendants that you are

14   aware of?

15        A.     Walgreens, Walmart, Rite Aid, Giant

16   Eagle and CVS.

17        Q.     And those are all pharmacies,

18   correct?

19        A.     Well, they are -- they are

20   distributors and chain pharmacies.  They are

21   companies, yes, sir.

22        Q.     Well, they are businesses that they

23   operate hundreds of pharmacies throughout the

24   United States, correct?

25        A.     It is one of their business entities,

Page 26

1  yes, sir.

2         Q.     And incidental to that business, they

3  have at some point in time, at least some them, had

4  warehouses that they distributed some of the drugs

5  that they sold to their own pharmacies, correct?

6         A.     Yes.  I would agree with that,

7  Mr. Livingston.

8         Q.     They did not distribute any drugs to

9  any pharmacies other than their own?

10         A.     That is a correct statement.

11         Q.     And there are other defendants in

12  this case who were pure distributors, meaning that

13  they distributed to all kinds of customers who were

14  not a part of their own businesses, correct?  For

15  example, McKesson, Cardinal, AmerisourceBergen,

16  correct?

17         A.     If you mean that they did not own,

18  self-own the pharmacies they were distributing to,

19  yes, I would agree with that.

20         Q.     They were third-party distributors,

21  correct?

22         A.     I don't know that I would call them

23  third-party.  They are just distributors, and they

24  are a standalone, and they don't distribute to

25  their own entities, other than for -- to each of

Page 27

1    their distributors back and forth.

2         Q.    And those companies had thousands,

3    literally thousands of customers, correct?

4         A.    That would be an accurate statement,

5    yes, sir.

6         Q.    Now, before we get into the substance

7    of your deposition here this morning, I want to

8    just go over a few ground rules.  The first is

9    because this is a remote deposition, if for any

10   reason you don't fully hear a question that I ask

11   you, I am asking -- I would ask you that you

12   promise to let me know so that I can repeat the

13   question.  Will you do that for me?

14        A.    I understand, sir.

15        Q.    And if for any reason, again, if you

16   don't fully understand a question, I will re --

17   will you promise to let me know and I will rephrase

18   it for you?

19        A.    I understand, sir.

20        Q.    So if you answer one of my questions

21   here today, can I assume that you both heard and

22   understood the question?

23        A.    Yes, sir.

24        Q.    And you have given testimony in a

25   number of other cases, correct?

Page 28

1          A.     Yes, I have.

2          Q.     And they are all opioids cases,

3    correct?

4          A.     That is correct, sir.

5          Q.     And, in fact, you gave a deposition

6    up in a case pending in one of the New York state

7    courts, correct?

8          A.     Yes, I did.

9          Q.     And that case is going to trial

10   shortly, and you plan to testify in that case,

11   correct?

12         A.     I have been told I am testifying, and

13   I believe they started picking the jury.  So yes, I

14   believe I am testifying.

15         Q.     In your deposition in the New York

16   case, the judge had some instructions that were

17   read and given to all the experts in that case.

18   And I would just like to read that same

19   instruction.

20                And his instruction was, "You are

21   being deposed today because you have been

22   designated as an expert by the plaintiffs in this

23   lawsuit.  Your role as an expert is not one of

24   advocacy.  Your role is to listen to the question

25   and answer the question.  You are not to comment on

1   anything beyond the information sought within the

2   question.  Your role as an expert is to provide

3   answers based upon the facts as you believe them to

4   be or assumptions based on facts your

5   interrogator" -- I guess that would be me in this

6   case -- "asks you to assume is true.  You must be

7   direct and not evade or become evasive.  You are

8   reminded that you are not an advocate.  Be aware

9   that the court will preclude any offer -- any

10  proffer of evidence and/or testimony that is the

11  product of sharp practices, evasiveness, coaching

12  and/or an attempt to run the clock so as to

13  engineer an expiration of the time allotted for the

14  deposition."

15              Do you remember being read that

16  instruction in the New York -- before the start of

17  the New York deposition?

18              MS. KNIGHT:  Objection to the form.

19  Go ahead.

20          A.    Yes, I do.

21          Q.    (BY MR. LIVINGSTON:)  Okay.  And

22  would you agree this morning to follow that

23  instruction?

24              MS. KNIGHT:  Objection to form.

25          A.    Yes.

1      Q.      (BY MR. LIVINGSTON:)  And just to

2   quickly run through it, you have given testimony in

3   the New York case.  You have given testimony in

4   Case Track 1 in the MDL opioids proceeding,

5   correct?

6      A.      Testimony at a deposition, yes, sir.

7      Q.      And you also have given deposition

8   testimony in Case Track 2 in the MDL, correct?

9      A.      Yes, both deposition and trial.

10     Q.      Okay.  Yeah, you recently testified

11  within the last week or two at the trial -- the

12  Track 2 trial that is in Federal Court in West

13  Virginia; is that correct?

14     A.      That's correct, sir.

15     Q.      And I believe you recently made an

16  appearance for a deposition in a case pending in

17  Georgia; is that correct?

18     A.      Yes, sir, that was last week.

19     Q.      Okay.  Are there any other cases that

20  you have testified in relating to opioids?

21     A.      No, sir.  Not -- not as an expert

22  witness.  Obviously before when I was with the DEA.

23     Q.      Right.  With that caveat.  Do you

24  plan or have you been retained to give testimony in

25  any other opioids cases that you are aware of this

Page 31

1   morning?

2          A.     I have a retainer with New Mexico.

3   That would be the State of New Mexico.  And there

4   has been discussion with the State of Nevada, but I

5   don't have a retainer signed.

6          Q.     And is it your practice to enter into

7   a separate retainer agreement for every case that

8   you provide testimony in?

9          A.     I don't demand that.  That is mostly

10  up to the plaintiffs.  It depends on what law firm

11  I would be retained by.

12         Q.     All right.  I would like to ask you

13  to go to Exhibit 2 in the Giant Eagle exhibits

14  binder.

15                (GE Exhibit 2 was marked for

16                identification.)

17         A.     Okay.

18         Q.     (BY MR. LIVINGSTON:)  Do you see that

19  this document is titled Expert Report.  It says it

20  is prepared by you.  Is this -- is Exhibit 2 your

21  expert report for Track 3?

22         A.     Yeah, it appears to be.

23         Q.     Okay.  Before we get into your expert

24  report, I would like to just ask, you know, in

25  light of all this testimony that you have given in

Page 32

1   related opioids proceedings, in order to try to

2   streamline your deposition today, can the

3   defendants rely on the accuracy and truthfulness of

4   your answers in those other proceedings under oath,

5   in depositions and trial testimony?

6           A.     Yes, sir.

7           Q.     Okay.  So we don't have to reask

8   those questions, because if we did that today, you

9   would give the same or very similar responses; is

10  that correct?

11                 MS. KNIGHT:  Objection to form.

12          A.     Yes, sir.

13          Q.     (BY MR. LIVINGSTON:)  Okay.  Now,

14  Exhibit 2 is a hundred and fifty-eight page report,

15  not including the schedules; is that correct?

16          A.     That's correct.

17          Q.     And is everything in this report

18  accurate?  I mean did you make sure and do

19  everything humanly possible to make sure that

20  everything in this report is accurate?

21                 MS. KNIGHT:  Objection to the form.

22          A.     Yes.

23          Q.     (BY MR. LIVINGSTON:)  And you

24  understand that it was imperative that you make

25  sure that everything in this report is accurate,

1  because the plaintiffs in this case are asking for

2  nearly three billion dollars in abatement costs, so

3  the stakes are very high in this litigation,

4  correct?

5          A.      Well, I don't know that I have a

6  comment on what the potential outcome is.  I just

7  know that I prepared a report and I tried very hard

8  to make sure that it was very accurate.

9          Q.      Right.  But you also understand that

10  the stakes in this case are very high, correct?

11                  MS. KNIGHT:  Objection to form.

12          A.      I guess.  I don't really look at the

13  potential results of the case, but I do understand

14  it is a very important case.

15          Q.      (BY MR. LIVINGSTON:)  Well, let me

16  ask you this:  You would certainly consider a

17  request for three billion dollars to be a

18  substantial request; would you not?

19                  MS. KNIGHT:  Objection to form.

20          A.      That is a substantial amount.  But

21  I -- just so I am clear, I don't take into

22  account -- when I do my work and forming of my

23  opinion, I don't take into account what the

24  potential outcome could be for the trial.

25          Q.      (BY MR. LIVINGSTON:)  And you would

Page 34

1   also agree that your report should not be based on

2   mere speculation or assumption; it should be based

3   on facts, correct?

4           A.    Yes, sir.

5           Q.    And would you agree that, in your

6   report, you should not hold the defendant

7   pharmacies to any standards different than the

8   standards you held pharmacies to while you were a

9   DEA diversion investigator?

10              MS. KNIGHT:  Objection to form.

11          A.    Would you restate that question

12  again, please?

13          Q.    (BY MR. LIVINGSTON:)  Yeah.  You

14  would agree that it would not be fair or proper in

15  your report for you to hold the defendant

16  pharmacies to any standards that are different than

17  those you applied to pharmacies while you were a

18  DEA diversion investigator in Detroit?

19          A.    I'm not sure I fully agree with that

20  statement, Mr. Livingston.  I think there's some

21  uniqueness between chain pharmacies and independent

22  pharmacies.  So I think there's a little bit of

23  difference.  So I don't fully agree with that

24  statement, sir.

25          Q.    What are the differences between a

1    chain pharmacy and an independent pharmacy?

2         A.    Well, one is a chain pharmacy is

3    overseen by management, layers of management. I

4    think they have a lot of information available

5    nationwide, whereas the independent works as an

6    independent. I think the type of information and

7    the amounts of information are vastly different.

8    So I think they are somewhat different entities,

9    although I agree they are both licensed as

10    pharmacies.

11            At the pharmacy level, one-on-one,

12    but I guess with your statement of just pharmacies,

13    the chains I think have quite a bit different, more

14    complex type of organization than just a

15    standalone, independent pharmacy.

16         Q.    Well, I think in light of your

17    response, let me refine my question. Would you

18    agree that you should not hold the defendant chain

19    pharmacies to any standards different than those

20    you applied to chain pharmacies while you were a

21    DEA diversion investigator in Detroit?

22         MS. KNIGHT: Objection, form.

23         A.    I would agree with that, yes, sir.

24         Q.    (BY MR. LIVINGSTON:) And would you

25    agree that you should not use standards in your

Page 36

1    expert report that are different than those that

2    your former DEA colleagues applied to the defendant

3    pharmacies over the past ten to fifteen years?

4                    MS. KNIGHT:  Objection to form.

5            A.      I do not agree with that statement,

6    Mr. Livingston.  First, I am not aware of what

7    standards they applied.  And so I guess I cannot

8    agree to that statement, sir.

9            Q.    (BY MR. LIVINGSTON:)  Are you

10   suggesting to the jury that your former DEA

11   colleagues applied standards that were not approved

12   by the DEA?

13                   MS. KNIGHT:  Objection to form.

14           A.     No, I am not saying that.  I am

15   saying I don't know what standards they did apply

16   or how effective they dealt with them or, you know,

17   just in general -- just in general, I don't have

18   any direct knowledge of any specific dealings that

19   I could even comment on.

20                   So not to -- it is difficult for me

21   to agree to something when I really don't have a

22   base of knowledge of how they were treated by other

23   diversion investigators, I mean outside of just how

24   they should be treated as a diversion investigator.

25           Q.     (BY MR. LIVINGSTON:)  All right.  We

```
 1    will try to drill down on that issue a little later
 2    in your deposition today to see if you have
 3    different standards than those that have been
 4    applied by your DEA colleagues over the years to
 5    the defendants in this matter.          Talking
 6    about -- going back to your expert report, is this
 7    report final or preliminary?  I mean is this -- are
 8    these all the opinions that you are going to be
 9    giving to the jury in this case later on?
10           A.     Well, as we speak today, it is
11    submitted and final as to today.  I am aware, I
12    believe, that there's still potentially some
13    ongoing discovery material.  So I guess if
14    necessary, I guess if it is feasible, I potentially
15    could maybe supplement my report.  But it stands
16    today as it is unless, as I said, there's any
17    further discovery material that might affect my
18    opinion.
19           Q.     Did you receive any help in preparing
20    your expert report?
21           A.     Well, "help" is a broad term.  So,
22    yes, and some of the help would be in the form of I
23    would request searches for certain documents or
24    assistance for looking for certain documents.  I
25    would do searches myself, but I would ask for
```

Page 38

1   secondary searches.

2          Q.     Okay.

3          A.     That would be kind of the main crux

4   of the help I would receive.

5          Q.     And is that help that you received --

6   was the source of that help plaintiffs lawyers?

7          A.     Yes, sir.

8          Q.     And did they summarize any

9   depositions or documents for you to review?

10         A.     No.  They provided documents and

11  depositions but not summaries.

12         Q.     All right.  Would you turn to

13  Schedule I in your -- attached to your report,

14  which is Exhibit 2?

15         A.     Yep, I have it.

16         Q.     Okay.  What is the schedule -- what

17  is this listing here of documents and other

18  matters?

19         A.     I'm sorry?

20         Q.     What does Schedule I contain?

21         A.     All the documents I relied on in the

22  completion of my report, sir.

23         Q.     Let me make sure I understand.  Are

24  you saying that you reviewed each one of these

25  documents that you have listed?

1      A.     I can't absolutely say that I have

2   reviewed every document.  I have been working on

3   this litigation now for three years.  So I

4   believe -- I believe that I have looked at each of

5   these documents or maybe not studied them in full

6   but glanced at them or looked through them.  I

7   believe that is a reasonable assumption.

8      Q.     Well, I am just -- how can you rely

9   on a document in formulating your opinions if you

10  haven't -- if you don't actually review the

11  document?

12     A.     Well, I am just answering that

13  because I am not going to give you an absolute in

14  case there's a document in here that I didn't look

15  at or I don't recall looking at.  But these are the

16  documents -- as I moved forward over the last three

17  years in doing reports, I'm confident that these

18  are the documents that I relied on for this report.

19     Q.     Some of the documents listed are

20  depositions.  Did you review each one of those

21  depositions in its entirety?

22     A.     There are probably some depositions

23  that I read portions of and not complete.

24     Q.     And how would you know what portions

25  to read?

1        A.      Well, sometimes I may ask the

2    plaintiffs' attorneys -- in certain depositions, I

3    would be looking for specific topics.  And they

4    would point me to specific areas of the deposition.

5              And so when I find that area, I would

6    generally go, you know, twenty to fifty pages

7    before and after I read the deposition.  Sometimes

8    when I did that, I may read the whole deposition

9    and other times I may only stick with that

10   particular section.

11             There are probably some depositions

12   that I did not read the full deposition.  I know

13   there are some depositions that I started to read

14   and -- maybe a salesperson or didn't find a lot of

15   relevancy, so I may not have completed the

16   deposition.

17        Q.    So with respect to depositions, in a

18   number of cases, plaintiffs' lawyers directed your

19   attention to certain portions of the deposition,

20   correct?

21        A.    Generally -- so if I was working on a

22   specific topic and doing a specific search or if I

23   am reading a deposition, for example, a 30(b)

24   deposition and they are naming other people within

25   their deposition, I may ask if there were certain

Page 41

1   sections of the deposition that I should focus on

2   versus reading the entire deposition.

3          Q.     Okay.  Mr. Rafalski, it is kind of

4   early in your deposition to be violating the New

5   York court's instruction.  Remember just answer --

6   if it is a yes or no question, please answer yes or

7   no so we can keep this thing moving as quickly as

8   possible.

9          MS. KNIGHT:  That is totally

10  inappropriate.  He is answering your questions.  He

11  can explain his answers.

12         Q.     (BY MR. LIVINGSTON:)  Now, you have

13  no opinion at all in this case about the conduct of

14  any pharmacies in Lake and Trumbull Counties other

15  than the five defendant pharmacies in Track 3; is

16  that correct?

17         A.     Yeah, that is a correct statement,

18  sir.

19         Q.     And you have no opinion about whether

20  any of those pharmacies who you didn't examine or

21  offer any opinions about acted lawfully or

22  unlawfully with respect to their filling of opioid

23  prescriptions?

24         A.     I believe that is a correct

25  statement.  I am not offering an opinion on

Page 42

1    anything outside of the five defendants in my

2    report.

3            Q.      Do you even have any sense at all as

4    to how many pharmacies are located in Lake and

5    Trumbull Counties?

6            A.      Yeah, I have a general idea.  It is

7    contained in Mr. McCann's analysis.

8            Q.      How many?

9            A.      I hate to guess without looking.  I

10   know it is contained in Section H of Appendix 9.  I

11   think around a hundred and twenty-five, a hundred

12   and twenty some pharmacies total.

13           Q.      And how many pharmacies do the

14   defendants have in NHTSA-specific?

15           A.      It varies between six and fifteen.  I

16   think the lowest is Walmart at six.  I recall maybe

17   thirteen for CVS, fourteen for Giant Eagle.  I

18   don't have a recollection of the other two off the

19   top of my head, but it is in between -- it is in

20   the thirteen, fourteen or fifteen with the

21   exception of Walmart with six.

22           Q.      And do you know how many of these

23   pharmacies -- pharmacies operated by folks other

24   than the defendants were, let's say from 2006 to

25   the present, were shut down by the Ohio Board of

1   Pharmacy for filling illegal -- filling

2   illegitimate opioid scripts?

3          A.    I know there were some pharmacies

4   closed.  I don't know the number, sir.

5          Q.    Can you even identify for the record

6   a single pharmacy that was closed down by the Ohio

7   Board for illegally filling opioid scripts?

8          A.    No, sir.

9          Q.    And you also in your report offer no

10  opinions at all about whether the defendant's

11  pharmacy stores acted lawfully or unlawfully in any

12  way, shape or form with respect to the filling of

13  opioid prescriptions, correct?

14         A.    Contained in my opinion, in my

15  report, I don't specifically cite any pharmacies

16  that were operating unlawfully, if that is your

17  question, sir.

18         Q.    Maybe I am missing something, but

19  when I read your report, I only saw opinions

20  relating to the defendant pharmacies' distribution

21  activities, correct?

22         A.    Yes, sir.  That is an accurate

23  statement.

24         Q.    Okay.  There is nothing at all in

25  your report relating to the defendant pharmacies'

Page 44

1    activities as pharmacies, i.e., filling

2    prescriptions?

3            A.    That's a correct statement, sir.

4    There's nothing in my report on that matter.

5            Q.    Now, you certainly have the

6    expertise, sir, to offer opinions about the

7    defendant pharmacies' operations at the pharmacy

8    level, correct?

9                 MS. KNIGHT:  Object to form.

10           A.    I'm not sure that I have the

11   expertise of a pharmacist.  I think with my

12   previous employment, I have done cases dealing with

13   pharmacies at a certain level.  But the question

14   you asked was kind of broad.

15                 So I don't have the ability to make

16   judgments on the actual filling of prescriptions.

17   It would be more of a pharmacist expert.

18                 So potentially in certain aspects

19   maybe but not the way I think you have described it

20   or asked the question.

21           Q.    (BY MR. LIVINGSTON:)  Well, didn't

22   you investigate and shut down -- I will say bad

23   pharmacies in the Detroit area?

24           A.    Yes, sir.

25           Q.    And you have never been a

Page 45

```
 1   distributor, correct?
 2           A.     I have not.
 3           Q.     But you have offered opinions about
 4   distribution, correct?
 5           A.     Well, I shut down distributors also
 6   in my employment.
 7           Q.     Yeah, right.  And you have offered
 8   opinions in these various opioid cases about the
 9   conduct of distributors, including the defendant
10   pharmacies in this case, correct?
11           A.     Yeah, that is a correct statement.
12   Just clarification --
13           Q.     Okay.  So a lack of --
14                  MS. KNIGHT:  Scott -- Scott --
15           Q.     (BY MR. LIVINGSTON:)  The fact that
16   you were never a distributor did not prevent you
17   from offering an opinion about distribution,
18   correct?
19                  MS. KNIGHT:  Mr. Livingston, you have
20   got to let him finish answering his questions.  You
21   don't get to cut him off.
22           A.     Just to finish the -- when I was
23   answering, I have not been asked to provide an
24   opinion in regards to a pharmacy.  So I didn't
25   conduct that analysis or do any research or review
```

```
 1   any records to formulate an opinion related at a
 2   pharmacy level, and I was not asked to do that.
 3              I only provided opinions on the
 4   distributors, and that is because that is what I
 5   was asked to do.
 6        Q.    (BY MR. LIVINGSTON:)  That is what I
 7   suspected.  So you could have provided an opinion
 8   about the pharmacy -- the defendant pharmacies'
 9   conduct as pharmacies, but you were not asked to do
10   that and, therefore, you did not do that, correct?
11        A.    That is a correct statement.
12        Q.    Now, so far in all of the opioids
13   cases in which you have offered any opinions and
14   ultimately some testimony, you have always
15   concluded that every suspicious order monitoring
16   system that you examined was -- did not comply with
17   the applicable DEA regulations; is that correct?
18        A.    Generally speaking, I would answer
19   yes.  I think I may have provided testimony that
20   there were certain time periods later -- later in
21   the time frames that I reviewed that they had
22   systems that had the potential to be effective
23   systems.
24        Q.    And we are talking at this point
25   fifteen, twenty defendants whose distribution
```

Page 47

1   activities you have offered opinions about; is that

2   in the ballpark?

3          A.     Yes, I think that would be -- that

4   would be potentially accurate, yes, sir.

5          Q.     Okay.  So, so far the defendants are

6   batting zero with you; is that fair to say?

7                 MS. KNIGHT:  Object to form.

8          A.     Yes, sir, that would be an accurate

9   statement.

10          Q.     (BY MR. LIVINGSTON:)  Okay.  Given --

11   you are aware that we are still in the midst of an

12   opioids crisis, correct?

13          A.     I would agree, yes, sir.

14          Q.     Given that you have concluded that,

15   in your view, all of these various defendants, many

16   of whom are still operating today, do not have

17   systems that comply with DEA regulations, have you

18   reported them to the DEA?  Have you called any of

19   your old colleagues up and said you might want to

20   examine so and so and take a quick look at, you

21   know, this company or that company?

22          A.     I have not, Mr. Livingston.

23          Q.     Now, do you know Dr. McCann?

24          A.     I do.

25          Q.     And you have worked with him to some

1  extent in virtually all of the cases you have

2  testified in so far; is that fair to say?

3           A.    That is an accurate statement,

4  Mr. Livingston.

5           Q.    And just again for the jury's

6  understanding, essentially, what you have done with

7  Mr. -- with Dr. McCann is that you have provided

8  him certain threshold methodologies, I will call

9  them, for suspicious order monitoring systems.  He

10  has then applied those methodologies to the vast

11  amounts of data in this case, and he has identified

12  transactions that flag under each one of those

13  methodologies; is that correct?

14          A.    Yes.  That is a good description of

15  what he did, sir.

16          Q.    And then you then reviewed the

17  results, the mathematical results provided by

18  Mr. -- by Dr. McCann, and then you used those

19  results to reach your conclusions about whether and

20  to what extent the defendants complied with the

21  applicable DEA regulations, correct?

22          A.    Well, generally speaking, I think my

23  opinion is not just driven by the results of

24  Dr. McCann.  My opinions are driven by my review of

25  the records and the review of the depositions and

Page 49

1    internal documents.  It is not just the results of

2    Mr. McCann.

3            Q.    Yeah, I didn't -- I didn't say that

4    that was the only thing you relied on.  I was just

5    asking whether, in fact, that is one of the -- one

6    of the main ingredients that you take into

7    consideration is the results that Dr. McCann comes

8    up with when you formulate your opinions?

9            A.    No.  I don't use -- I don't use

10   documents -- I don't wait for Dr. McCann's results

11   to formulate my opinion.  The results that come up

12   are the results of running the methodologies of the

13   transaction data.  My opinion is formulated through

14   my review of -- as I previously stated, the

15   depositions, the records, the policies and my

16   opinion was formed without the data provided by

17   Dr. McCann.

18           Q.    Well, let's just cut to the chase.

19   In your expert report, you literally replicate a

20   number of the graphs produced by Dr. McCann after

21   running your methodologies -- or applying your

22   methodologies to the data, correct?

23           A.    I don't know -- I utilized his

24   graphs.  I don't replicate them.  I don't

25   understand the question.

1          Q.      You include his graphs in your

2    report, correct?

3          A.      Yes, sir, that is a correct

4    statement.

5          Q.      And why do you do that?

6          A.      Well, because it is an indication on

7    the graphs that I present in the reports that we

8    have in front of us, it shows a sharp increase of

9    distribution of opioids into Trumbull and Lake

10   County.

11         Q.      Now, in Track 1, five defendants

12   pharmacies, in this case Track 3, were also

13   defendants in Track 1; do you recall that?

14         A.      Yes, sir.

15         Q.      And in Track 1, you provided only

16   opinions about the distribution activities of CVS

17   and Walgreens, correct?

18         A.      Yes, sir.

19         Q.      You did not provide an opinion

20   regarding the distribution activities of Giant

21   Eagle, Walmart and Rite Aid; is that correct?

22         A.      That's correct, sir, because I was

23   not asked to.

24         Q.      And in Track 1, unlike yourself,

25   Dr. McCann provided the results of your

1   methodologies for all five of the pharmacy

2   defendants, including the three that you -- whose

3   distribution activities you did not analyze,

4   correct?

5          A.     I don't have any recollection of

6   whether Dr. McCann did that or not.

7                 (GE Exhibit 8 was marked for

8                 identification.)

9          Q.     (BY MR. LIVINGSTON:)  Well, why don't

10  we go to Exhibit 8, try to refresh your

11  recollection real quickly.

12                Do you see that this is Dr. McCann's

13  report dated March 25, 2019 in Case Track 1?

14         A.     I do see that there.

15         Q.     Yeah.  And we didn't provide the

16  whole report.  We didn't want to kill trees.  But

17  if you just go to Pages 59 and 69, the next two

18  pages that we included, and you can see, just as an

19  example, for the trailing six-month maximum

20  threshold flagged transactions for Cuyahoga County,

21  Rite Aid, Walmart and HBC Service Company, which is

22  a Giant Eagle company -- division, made the cut

23  with respect to Dr. McCann, correct?

24         A.     Well, looking at this document, I

25  would agree with you that it appears he applied the

1    methodologies for these defendants.

2            Q.     And Dr. McCann provided this

3    information, all of this information to you when

4    you prepared your report in Track 1, correct?

5            A.     It was contained within Dr. McCann's

6    report.  I don't know that it is something he

7    provided me.  I only utilized the defendants that I

8    was asked to provide an opinion on.

9            Q.     And the number of flagged

10   transactions for Giant Eagle, Walmart and Rite Aid

11   that were identified by Dr. McCann in Track 1 are

12   actually substantially greater than the number of

13   flagged transactions for those three defendants in

14   Track 3, correct?

15           A.     I would have to go back and review my

16   report.  I don't dispute that, but without going

17   back and comparing them, I don't want to take a lot

18   of time to do that.  So I don't dispute what you

19   are saying.

20           Q.     Well, why don't we go to Exhibit 9

21   which is Dr. McCann's report in Track 3 at Pages 65

22   and 68, which is Exhibit 9.

23                  (GE Exhibit 9 was marked for

24                  identification.)

25           Q.     (BY MR. LIVINGSTON:)  And if you just

Page 53

1   do this simple comparison here, the number of

2   transactions in Track 3 for Rite Aid, Giant Eagle

3   and Walmart are substantially less than the ones

4   that were flagged in Cuyahoga and Summit, correct?

5          A.      I would agree with that, sir.

6          Q.      All right.  Now, let's talk a little

7   bit about your consulting job or job that you now

8   have.  So you left the DEA in 2017, correct?

9          A.      Yes, sir, June of 2017.

10         Q.      And within a month or two, you were

11  retained by at least one of the plaintiffs to

12  provide testimony in the opioids litigation; is

13  that correct?

14         A.      That an accurate statement.  I think

15  it was a couple months afterwards when I signed the

16  retainer.

17         Q.      What was your last year roughly --

18  when you were at the DEA, what were you making as a

19  diversion investigator?

20                 MS. KNIGHT:  No, sir.  We are not

21  going to talk about his salary at the DEA.

22                 MR. LIVINGSTON:  I don't think that

23  is a state secret.  We can probably look it up on

24  the internet.

25         Q.      (BY MR. LIVINGSTON:)  You can answer

Page 54

```
 1    the question.
 2               MS. KNIGHT:  If you want to,
 3    Mr. Rafalski.  But you don't have to answer that
 4    question.
 5          A.    I know that -- I don't know exactly
 6    how much I was making.  I would believe it would be
 7    somewhere in the range of a hundred and twenty
 8    thousand a year, one twenty-five maybe.  But it has
 9    been several years, and I don't exactly know what
10    my income was.
11          Q.    (BY MR. LIVINGSTON:)  Okay.
12          A.    I was a Grade 13, I think, a Step 5
13    or 6.
14          Q.    How much roughly -- you know, we are
15    not going to hold you to the penny by any means,
16    but just to give the jury a sense of how much money
17    you earned for your work in Track 1, can you tell
18    us?
19          A.    CT1?
20          Q.    Yeah, CT1.
21          A.    I know that has been provided
22    previously by the plaintiffs' attorneys.  I don't
23    really keep a running track of what I am paid by
24    each litigation.
25          Q.    All right.  Well, let me ask you
```

1   this --

2           A.      I may have -- I am sure I have

3   testified to that before in previous depositions,

4   but I, just off the top of my head, don't have it

5   here today.

6           Q.      Right.  You did testify that you had

7   earned about a hundred thousand dollars in Track 1

8   before the start of your deposition.  But the start

9   of your deposition wasn't the end of the case.  So

10  that is why I don't know how much in total you

11  earned from your efforts in Track 1.

12                  MS. KNIGHT:  Object to form.

13          Q.      (BY MR. LIVINGSTON:)  Maybe we can

14  make this easier.  Is the only way you have been

15  earning a living since you retired from the DEA has

16  been acting as a consultant for the plaintiffs in

17  the opioids litigation?

18          A.      No.  I have a couple of pensions and

19  now Social Security, Mr. Livingston.

20          Q.      Yeah.  But I mean in terms of

21  actually a job, the only thing that you are

22  actually doing -- I mean those are pensions or

23  Social Security, you know, that doesn't have

24  anything to do with -- the only job you have had

25  for which you have been paid since you retired from

Page 56

1   the DEA is acting as a consultant for the

2   plaintiffs in the opioids litigation, correct?

3          A.    That's correct.

4          Q.    All right.  So I don't care about

5   your pension or Social Security revenue.  But how

6   much did you earn in 2017 from your efforts on

7   behalf of the plaintiffs?

8              MS. KNIGHT:  Objection to the form.

9   You don't have to answer that question, but you --

10             THE REPORTER:  I'm sorry, but you're

11  trailing off, Ms. Knight.  I heard "objection to

12  the form.  You don't have to answer that question,

13  but you --"

14             MS. KNIGHT:  But only if you would

15  like to, Mr. Rafalski.  And I am sorry, I will do a

16  better job of speaking up.

17         A.    Mr. Livingston, I don't know.  It

18  was -- 2017 was negligible.

19         Q.    (BY MR. LIVINGSTON:)  All right.  It

20  was negligible.  How about 2018?

21         A.    Everything -- if I was to provide you

22  with any numbers, it would be a guess.  I didn't

23  come prepared to answer those type of questions

24  today.  It was my understanding that that

25  information had been provided to the defendants'

Page 57

1   attorneys by the plaintiffs' attorneys.  That is

2   why I didn't prepare for that today.

3           Q.      Right.  And that is why I am asking

4   for an estimate.  I didn't prepare to testify today

5   about how much I made over the last few years, but

6   I could certainly ballpark it.  Can you do that for

7   us?

8                   MS. KNIGHT:  Objection to form.

9           A.      No, I can't.

10          Q.      (BY MR. LIVINGSTON:)  Okay.  How

11  about last year, do you remember how much you made

12  last year from your efforts on behalf of

13  plaintiffs?

14                  MS. KNIGHT:  Same objection.

15          A.      I would say generally, roughly

16  speaking, about a hundred thousand dollars.

17          Q.      (BY MR. LIVINGSTON:)  Okay.

18          A.      Just generally speaking.

19          Q.      Would you go to Exhibit 30?

20                  (GE Exhibit 30 was marked for

21                  identification.)

22          Q.      (BY MR. LIVINGSTON:)  Do you see that

23  these are your invoices for your work in this case?

24  Can you confirm that?

25          A.      They are.

Page 58

```
1         Q.     Are they accurate?

2                MS. KNIGHT:  Bear with him just a

3    moment, Mr. Livingston.  He is flipping through.

4         A.     Yes, but I will give you the caveat

5    they are probably conservatively accurate.

6         Q.     (BY MR. LIVINGSTON:)  I totaled them

7    up, and they are over seventy thousand.  Does that

8    sound about right to you?

9         A.     I believe that could be potentially

10   right.  I think the hours were somewhere around two

11   twenty-five or two thirty-five.  I know I totaled

12   the hours in case you asked, but I didn't total the

13   dollar amount.

14        Q.     Right.  And obviously these invoices

15   don't include how much you are being paid for your

16   services in the Georgia case, in the Track 2 case

17   or in the New York case, correct?

18        A.     These are only billings for CT3

19   track, sir, you are correct.

20        Q.     And in those other cases, you have

21   billed time in those cases this year, correct?

22        A.     Yes.

23        Q.     Do you have any sense of how much

24   unbilled time you have on all these pending matters

25   that you are working on right now?
```

1                  MS. KNIGHT:  Objection to form.

2          A.     I don't have any unbilled time

3    outside of for the month of June.  I bill at the

4    end of each month.  So that would be the only

5    unbilled time, if that is the question you are

6    asking.

7                  When I said these are conservative, I

8    generally say that -- I say that because there's

9    probably time I spend reading or doing things that

10   I don't bill to the plaintiff attorneys.

11         Q.     (BY MR. LIVINGSTON:)  Okay.  Now I

12   would just like to quickly switch to your years

13   with the DEA.  You were with the DEA from 2004 to

14   2017, correct?

15         A.     Yes, sir.

16         Q.     And in order -- you were during that

17   whole period a DEA diversion investigator; is that

18   correct?

19         A.     That's correct, sir.

20         Q.     Okay.  And what is the next level

21   above a DEA diversion investigator?  Is that a

22   group supervisor?

23         A.     That is correct, a GS14.

24         Q.     And then what is the next level above

25   that?

1          A.     A diversion program manager, that is

2     a GS15.

3          Q.     In those thirteen years, you did not

4     advance to group supervisor, is that correct?

5          A.     No, sir.  I had no desire to be in

6     management.

7          Q.     When you applied to the DEA -- well,

8     before I ask that question, are you aware of the

9     fact that the DEA also has special agents?

10          A.     Yes, I am aware of that.

11          Q.     And unlike a diversion investigator,

12     a special agent has the ability to arrest people,

13     conduct surveillance, serve subpoenas and that sort

14     of thing and arrest people?

15          A.     That would be a correct statement.

16     As a diversion investigator, I am not a law

17     enforcement officer, and the difference would be

18     that special agents are, so they carry guns, have

19     authority to make arrests, search warrants, handle

20     confidential informants, do surveillance.  I am

21     restricted from doing those type of things.

22          Q.     And over the course of your years

23     while you were with the DEA as a diversion

24     investigator, you would oftentimes work with

25     special agents when you were investigating a bad

Page 61

1    pharmacy or a distributor; is that correct?

2         A.    During the first four or five years

3    of my employment -- maybe not the first year, but

4    the second year, for probably at least four years,

5    I partnered up specifically with a special agent

6    in -- well, as a diversion investigator.  It's kind

7    of a unique pairing in the Detroit office.

8         Q.    And at some point in time when you

9    were with the DEA, there was a push to -- I think

10   they're called tactical, you know, diversion

11   squads, or I'm not sure.  I may be getting the

12   acronym wrong.

13             Can you correct me on that?

14        A.    No.  It's the tactical diversion

15   squad.  It was a management change that was made in

16   the DEA sometime late 2010, early 2011, at least in

17   the Detroit office.

18        Q.    Okay.  And would those squads usually

19   include at least somebody like yourself and also a

20   special agent?

21        A.    They would generally be comprised of

22   special agents, task force officers.  Those would

23   be outside police officers that come and work and

24   get a federal authority to work in that capacity.

25   And one or two diversion investigators.

Page 62

1          Q.      When you joined the DEA, or at any

2    point thereafter, did you ever apply to become a

3    special is agent?

4          A.      No.  It's age limited at

5    thirty-seven.  Early in my career as a police

6    officer, I was -- became a task force officer for

7    five years back in the late '80 -- '89 to '95.  So

8    I spent a lot of time with the DEA, but didn't

9    shift over.  Thought about it, but had already

10   established a career in law enforcement, so I

11   stayed at the local level.

12         Q.      So are you saying that the -- you

13   didn't have the opportunity to become a special

14   agent because there was an age cutoff?

15         A.      Later in my career when I became a

16   diversion investigator, yes, sir.

17         Q.      Okay.  Now, your -- the entire time

18   that you were with the DEA, you were in the Detroit

19   office; is that correct?

20         A.      That's correct.  Detroit divisional

21   office.

22         Q.      And that's where you're from, right,

23   Detroit?

24         A.      Yes, sir.  Born and raised in the

25   suburbs outside of Detroit.

1      Q.     Okay.  And the Detroit office was

2  responsible for both Ohio and Michigan; is that

3  correct?

4      A.     So the divisional office has a much

5  greater area of coverage.  But my assignment in

6  diversion in Detroit, I would cover the upper and

7  lower peninsulas of Michigan, and six counties in

8  Ohio that border Michigan.

9      Q.     Yeah.  I thought -- you testified in

10  the Track 2 trial that you were responsible for

11  some counties in northeastern Ohio; is that

12  correct?

13      A.     There's six counties in Ohio.  I

14  think there -- I might have said that.  I think

15  there -- there -- I don't know that there's a

16  northeastern.  They're the counties that fall right

17  under Michigan.  Primarily, the only county I spent

18  a majority of my time was the county with the city

19  of Toledo.

20      Q.     Well, did you misspeak, then, in your

21  Track 2 trial?

22                   (GE Exhibit 42 was marked for

23                   identification.)

24      Q.     I direct your attention to Pages 17

25  and 18 from your testimony on May 26.

Page 64

1          A.     I --

2          Q.     You were asked about your geography

3   and you said, "In the Detroit office, I would cover

4   the lower peninsula of Michigan, the upper

5   peninsula of Michigan, and I would cover six

6   counties in Ohio, six northern east counties in

7   Ohio."

8                 Toledo is northwest, correct?

9          A.     Yes.  Yes.  Thinking about that

10  testimony, not -- not right when I said it, but as

11  you brought it up, and then thinking about the map

12  of Ohio and being aware that it goes quite farther

13  east than Michigan, it would be more correct to say

14  that the northwest -- northwest areas that border

15  Michigan.

16         Q.     All right.  Would you go to Page 7 of

17  your expert report, which is our Exhibit 2?

18                Do you see in the first full

19  paragraph at the top, you say, "As a DEA Diversion

20  Investigator with thirteen years of experience

21  (2004 - 2017), I am uniquely qualified to offer

22  expert opinions regarding compliance with federal

23  regulations governing the distribution of

24  controlled substances."

25                Do you see that statement?

Page 65

1          A.       I do.

2          Q.       You're not telling the jury that

3   you're the only former or current DEA person who is

4   qualified to offer expert opinions regarding the

5   defendants' compliance with DEA regulations, are

6   you?

7          A.       I don't think that statement implies

8   that, Mr. Livingston.

9          Q.       Well, what did you mean by

10  "uniquely"?

11         A.       Well, I've done a couple of

12  significant cases.  The Masters case, the Harvard

13  case and the Mallinckrodt case, that all was

14  related to the distribution of oxycodone,

15  thirty-milligram products to Florida.

16                  And as far as I'm aware, the

17  Mallinckrodt case was the first case that was ever

18  done regarding a manufacturer.

19                  So I think there's some uniqueness to

20  my experience, but I don't mean that to mean that

21  there's not another person that can't testify or be

22  in the same capacity that I'm in.

23         Q.       Yeah.  I mean, the DEA has brought

24  hundreds of cases since you started, if not

25  thousands of cases, against pharmacies and

Page 66

1  distributors throughout the United States since you

2  became a DEA employee in 2004, correct?

3         A.    Well, I think that's accurate,

4  although not many of those cases went to an order

5  of show cause hearing and then rose through the

6  administrator's ruling and then to the federal

7  appellate court.  I think that's one of the unique

8  things about my experience.

9         Q.    Now, when you were at -- in order to

10  become a -- or when you became a DEA diversion

11  investigator, you had to go to a twelve-week

12  training course at Quantico in Virginia, correct?

13         A.    That's correct, sir.

14         Q.    And special agents also have to go to

15  Quantico to be taught about all of the regulations

16  that the DEA has and how to conduct themselves as a

17  special agent, correct?

18         A.    That's a correct statement.  I

19  believe it's longer than twelve weeks, though.

20         Q.    Right.  It's actually six months, as

21  opposed to three months, correct?

22         A.    I don't know the exact number of

23  weeks, but it is longer, sir.

24         Q.    Now, when you were with the DEA, you

25  performed what are called "preregistration

1    investigations," where someone is applying for a

2    DEA controlled substance license.  And you also

3    periodically performed cyclic investigations for

4    current DEA license holders; is that correct?

5              A.     That would be an accurate statement,

6    sir.

7              Q.     And the purpose of those inspections

8    is essentially, if it's a preregistration

9    situation, is to make sure that the registrant will

10   be able to comply with the DEA regulations relating

11   to controlled substances, correct?

12             A.     That's a general statement I agree

13   with.

14             Q.     You would never approve of an

15   applicant's request to become -- you know, to be

16   able to handle controlled substances if you thought

17   that they would not be able to comply with all of

18   the applicable DEA regulations, correct?

19             A.     That was my role as a diversion

20   investigator.  Not knowingly.

21             Q.     Right.  And it wasn't just you.  I

22   mean, that was what all DEA diversion investigators

23   were taught to do is to closely examine a

24   registrant's proposed security systems and to make

25   sure that those systems will comply with the DEA

1    regulations, correct?

2                    MS. KNIGHT:  Objection to form.

3            A.      Well, it's much more detailed than

4    that.  Security is one of the aspects, depending on

5    what type of registrant it is.

6                    Generally speaking, depending on what

7    business activity the registrant is, it complies

8    with those regulations that apply to that

9    registration or business activity.

10           Q.      (BY MR. LIVINGSTON:)  Right.  I

11   didn't mean to suggest that those are the only

12   regulations.  But the security regulations are

13   certainly important regulations that a registrant

14   needs to be able to comply with, correct?

15           A.      Well, I would say they're all

16   important.  But for certain registrants, security

17   is an important aspect.

18           Q.      Okay.  And the Suspicious Order

19   Monitoring Regulation 1301.74(b) is one of those

20   security regulations, correct?

21           A.      Yes, sir, it is.

22           Q.      Okay.  And your opinion, or opinions

23   that are in your expert report, focus exclusively

24   on the defendant's compliance with the -- I'll call

25   it -- is it okay if I use "S-O-M" for short?

1          A.      Yeah.  Or you can say "SOMs."

2          Q.      For compliance with the SOM

3   regulation, your report is entirely limited to

4   that, correct?

5          A.      That's not accurate.

6          Q.      Can you point to me in the report

7   where you talk about the defendants' compliance or

8   noncompliance with any regulation, other than the

9   SOM regulation?

10         A.      Maintenance of effective controls to

11   prevent diversion of controlled substances.

12         Q.      Oh, okay.  Well, that's the

13   overarching regulation, correct, with respect to

14   security?

15         A.      Yes.  Well, in respect to everything

16   contained in the registrant's responsibility.

17         Q.      Right.  And that over -- you have

18   concluded that the defendants, in your view, did

19   not comply with that overarching regulation,

20   correct?

21         A.      That's a correct statement.

22         Q.      Right.  But the basis for your

23   conclusion that they did not comply with that

24   overarching regulation is only the fact that you

25   believe they did not comply with the SOM

Page 70

1    regulation?

2              A.      That's not accurate.

3              Q.      What other -- yeah.  So let me

4    just -- so what other regulation, other than the

5    SOM regulation, do you claim that they did not

6    comply with?

7              A.      Well, within the maintenance of

8    effective controls, it's -- I guess you

9    characterize it as -- it's an umbrella or an

10   overarching -- there's activities that registrants

11   conduct within -- specifically in a compliance

12   program would be due diligence.  And the lack of

13   due diligence would be a failure that would lead to

14   the maintenance of -- the loss of the maintenance

15   of effective controls to prevent diversion.

16                    It's not specifically in a

17   regulation, but it encompasses the activity to

18   ensure the holding of a registration.

19             Q.      Okay.  The due diligence requirement

20   that you speak of is not anywhere in any

21   regulation.  But you believe that that obligation

22   does apply to the defendants with respect to the

23   operation of their SOM systems, correct?

24             A.      It's not just the operation of their

25   SOMs.  It's an activity they do to maintain their

Page 71

1    effective controls to prevent diversion.  I think

2    the ruling in the Masters case would confirm that,

3    in that that's what the Court held, is that due

4    diligence was an essential part of the compliance

5    with the regulation.

6         Q.    All right.  We'll get to those

7    regulations in a little more detail in a little

8    bit.

9              But during these investigations, both

10   preregistration and cyclic, one of the things that

11   you always make sure that you check is the SOM

12   system, if you're dealing with a distributor,

13   correct?

14        A.    I would make sure that -- are we

15   speaking a new registrant?

16        Q.    Well, I -- in both situations, you're

17   going to make sure that they either are going to

18   have a SOM system that complies with the DEA

19   regulations, or that they currently have and are

20   operating a SOM system that complies with the DEA

21   regulations.

22        A.    Generally speaking, I agree with

23   that, yes, sir.

24        Q.    I mean, that's right in the diversion

25   investigator manual, that you're supposed to check

1   the SOM system, correct?

2          A.     That may be something that's in the

3   manual now.  But back at the beginning of my

4   employment, I don't know that there was a specific

5   reference to a SOM system back when I started in

6   2004.

7          Q.     Well, it was your practice, wasn't

8   it, even before it made it into the manual

9   specifically, to always check the SOM system in

10  your preregistration and in your cyclic

11  investigations as well?

12         A.     When applicable to a registrant, I

13  would make sure that a registrant was going to be

14  or was complying with all the regulations that were

15  required under the registration.

16         Q.     And these -- when you're doing a

17  cyclic investigation, that's actually an

18  unannounced investigation where you don't call up

19  the distributor and say, hey, we're going to be

20  there next week or anything, you just show up

21  unannounced, right?

22         A.     That's how I did them, and that's how

23  we were trained as diversion investigators.

24         Q.     And those investigations are pretty

25  thorough where you actually go on-site, correct?

1          A.      They're all thorough.  That's also

2    dependent on the type of registrant that you're

3    conducting the investigation on.

4          Q.      Right.  But you literally go on-site.

5    You meet with management.  You perform an inventory

6    audit, correct, you do things like that?

7          A.      It's much more in-depth than that.

8    Those are some of the things we do.  I'm not

9    sure --

10         Q.      Yeah.

11         A.      -- but it's much more extensive.

12                 Again, it's dependent on what type of

13   registrant you're doing a cyclic on.

14         Q.      I'm sorry?

15         A.      Different investigations for

16   different registrants.

17         Q.      And one of the things that you look

18   at before you start any cyclic investigation --

19   inspection or investigation, is that you look back

20   at the results of prior inspections, correct?

21         A.      I'd have to think about -- I have --

22   they always provide me with a Touhy letter,

23   Mr. Livingston.  And I guess there's some things in

24   there that always -- I draw caution, and that is

25   they all -- the Touhys always say it's something

1  that's not publicly known.  I'm not sure that that

2  particular answer to that question would be

3  something that would be publicly known.

4          Q.    Well, Mr. Colosimo, who was the --

5  one of the inspectors of Giant Eagle's facilities

6  with thirty years' DEA experience testified in this

7  case.  And he did provide the inspection reports

8  for Giant Eagle.  And we're going to get to those.

9  And he also testified and answered that question.

10              So I don't think there's a Touhy

11  issue, so I would ask that you answer the question.

12              MS. KNIGHT:  Objection to form.  And

13  Mr. Rafalski can absolutely invoke Touhy if he

14  thinks it's appropriate, and you cannot override

15  that request.

16              THE REPORTER:  Ms. Knight, I'm still

17  having trouble understanding you.  I don't know,

18  maybe you could get closer to a microphone.

19              MS. KNIGHT:  Yeah.  Is this better?

20              THE REPORTER:  Yes.

21              MS. KNIGHT:  I was sort of --

22              THE REPORTER:  I heard, "Objection to

23  the form.  And Mr. Rafalski can also invoke Touhy

24  if appropriate, and you cannot override that," was

25  kind of what I heard.

1             MS. KNIGHT:  That's exactly what I

2     said.

3             THE REPORTER:  Thank you.

4        A.     Mr. Livingston, I would say that I

5     would -- I would do preparations prior to going

6     on-site.  But I am a little cautious about exactly

7     answering what I would do, what specific things I

8     would do prior to conducting an investigation.

9        Q.     (BY MR. LIVINGSTON:)  All right.  And

10    was it DEA policy and practice, when you were with

11    the DEA, for DEA diversion inspectors to prepare a

12    report after they've completed their

13    preregistration and/or their cyclic inspection as

14    well, correct?

15       A.     That's correct, sir.

16       Q.     And those reports would at least be

17    available for the next inspection that the

18    registrant might have; is that correct?

19       A.     Generally speaking, yes.

20       Q.     And those reports were not given to

21    the registrant, right, after the inspection was

22    over?  That was something that the DEA would just

23    keep in its files, correct?

24       A.     I never provided one to a registrant.

25       Q.     Okay.  But you would have a

Page 76

1    discussion with management, and you would let the

2    registrant know whether, in your view, they were in

3    compliance or not in compliance with all of the

4    applicable DEA regulations, correct?

5           A.     There would definitely be a

6    management meeting.  And depending on the outcome

7    of the investigation, would kind of dictate the

8    kinds of conversation.

9                  I don't -- sometimes -- I would

10   generally be a little more cautious on being too

11   complimentary or two negative.  It's kind of a pass

12   or fail.

13          Q.     Okay.  When you say "pass or fail,"

14   meaning they either were in compliance or they were

15   not in compliance, correct?

16          A.     Sure.  And if they were not in

17   compliance at the time of the management

18   conference, I didn't have the ability to tell them

19   what was going to occur based on my findings that

20   they were not in compliance.

21                 So it wouldn't be a closed

22   conversation at the end because I -- sitting there,

23   I didn't have the ability to tell them.  That's a

24   management decision.

25          Q.     Okay.  So if they weren't in

1   compliance, you wouldn't necessarily tell them

2   immediately.  You would then go back to your

3   superiors at the DEA and discuss what next steps

4   might be?

5          A.     That's a correct statement.  As far

6   as in Detroit, that's how we did that.

7          Q.     Okay.  And, you know, in terms of DEA

8   enforcement efforts, when a registrant is not in

9   compliance with its regulations, what's the first

10  lowest level of enforcement that the DEA might

11  undertake?

12         A.     Well, in some rare instances, there's

13  an actual on-site correction.  So an example would

14  be some minor recordkeeping issue that can be

15  corrected on site, would be listed and would be

16  detailed, but not what -- it would be a corrective

17  action.

18              The next level up -- the next formal

19  level up, or the lowest formal level, would be a

20  letter of admonition.

21         Q.     Okay.  And then would the letter of

22  admonition essentially give the registrant a

23  certain period of time to try to get their act

24  together and get into compliance?

25         A.     It generally gave them thirty days to

1    take corrective action and notify the DEA.

2          Q.    Okay.  Let's just say -- assume you

3    have a really recalcitrant registrant.  If they

4    don't do anything in response to the letter of

5    admonition, what's the next step up the enforcement

6    ladder?

7          A.    You can actually have a divisional

8    hearing.  You can bring the registrant in to have a

9    hearing in front of the diversion program manager.

10   It's not utilized that often, but it does occur.

11   That would be the next level.

12         Q.    Okay.  And, again, just so the jury

13   gets a sense of what all the different enforcement

14   levels are, what's the next step up the ladder?

15         A.    Sometimes there could be a memorandum

16   of agreement or understanding that might result

17   from that hearing at the diversion program manager

18   level.

19               The next level above that would be an

20   order to show cause hearing.

21         Q.    Okay.  And --

22         A.    So just so you're clear on that, that

23   would be something that would be reviewed through

24   management and through headquarters.  It's not

25   something that would be issued by a diversion

1  investigator.

2      Q.     Okay.  Would all these different

3  steps be sort of civil proceedings, as opposed to

4  criminal?

5      A.     They would be administrative

6  proceedings.

7      Q.     Okay.  What if you, as part of your

8  inspection, uncovered criminal misconducted by the

9  registrant, would there be a different -- different

10  steps that would be taken against the registrant?

11          MS. KNIGHT:  Objection to form.

12      A.     Yes.  A criminal investigation would

13  be different, yes, sir.

14      Q.     (BY MR. LIVINGSTON:)  Okay.  Now,

15  would you agree that a registrant should be able to

16  rely on a passing grade from the DEA and in feeling

17  comfortable that their systems are, you know, in

18  compliance with the DEA regulations?

19          MS. KNIGHT:  Objection to form.

20      A.     I'm not in total agreement.  I guess

21  it would depend on the circumstances.  I think

22  there's some levels of registrants' conduct -- most

23  registrants are aware that they can ask for a

24  decision or an opinion from the policy section of

25  DEA headquarters.

1              If it's something that's clearly a

2    simpler issue contained within the regulations,

3    that would be something I think that a registrant

4    could rely on more.  But if it would be more of a

5    complex matter, I -- I would not agree with you.

6         Q.     (BY MR. LIVINGSTON:)  Well, let me

7    just try to break that down.

8              So are you saying that if you inspect

9    my facilities, and I tell you -- I disclose

10   everything.  I say, here's the key to the -- my

11   office.  Take a look at everything I have.  You

12   know, all the documents I have.  I explain to you

13   in great detail how my SOM system operates.  I show

14   you my vault.  I do -- I walk you through

15   everything that you want to, you know, do and see.

16   And at the end of it, you say, Scott, you're good

17   to go, I can't rely on that?

18              MS. KNIGHT:  Objection to the form.

19         A.     I think you can put some reliance on

20   that.  But I don't think that -- that as that DEA

21   investigator leads, I don't think you can put your

22   full faith that everything is perfectly correct.

23              And I say that through my experience

24   in some of the cases I've dealt with.

25   Specifically, there have been issues where previous

Page 81

1    inspections had not identified any issue.

2            Q.    (BY MR. LIVINGSTON:)  And -- yeah,

3    I'm not talking about situations where, you know,

4    the registrant tells you, here's our system, but

5    they don't actually follow their system.  They

6    don't actually operate it the way they tell you.

7                  I'm just talking -- assuming that the

8    registrant actually operates the system in the

9    manner in which they've described it to you.  And

10   you say, sounds good to me, shouldn't the

11   registrant -- and as a matter of all fairness -- be

12   able to rely on that representation that they're

13   fine?

14           MS. KNIGHT:  Objection to form.

15           A.    I don't fully disagree with what

16   you're saying.  But I'd have to say that a

17   registrant is bound to comply with the regulations,

18   and that's not dependent on whether or not an

19   inspection is conducted, and an issue is not found

20   or discovered or detailed by a diversion

21   investigation, it doesn't relinquish the

22   responsibilities to comply with the regulations.

23           Q.    (BY MR. LIVINGSTON:)  Oh, no.  Of

24   course, the law is the law.  The question is

25   whether they can rely, in all fairness, on what

1    you're telling them as an expert.  Right?  These

2    are DEA regulations.  You're a DEA investigator

3    whose job it is to enforce those regulations.

4    Nobody knows those regulations, presumably, when

5    you're on the job, any better than you, and you're

6    coming in to a registrant and you're telling them

7    that they're okay, shouldn't they be able to rely

8    on that?

9                MS. KNIGHT:  Objection to form.

10         A.     As I answered earlier, I generally

11   agree with that.  But there are certain areas that

12   a registrant should -- would seek a higher

13   approval.

14         Q.     (BY MR. LIVINGSTON:)  Let's now --

15   I'd like to just give me a little road map here.

16   Let's now focus on the DEA regulations that you've

17   described in some detail so far this morning.

18                Let's -- to do that, let's --

19                MS. KNIGHT:  Mr. Livingston, if we're

20   switching gears, can we just take a quick

21   five-minute comfort break?  Is this --

22                MR. LIVINGSTON:  Sure.

23                MS. KNIGHT:  Okay.  Real quick.

24                THE VIDEOGRAPHER:  The time is now

25   approximately 9:18 a.m.  We're off the record.

Page 83

1                    (Whereupon, a break was had from 9:18

2                    a.m. until 9:32 a.m. EDT)

3                    THE VIDEOGRAPHER:  The time is now

4      approximately 9:32 a.m.  We're on the record.

5                    Q.    (BY MR. LIVINGSTON:)  Now,

6      Mr. Rafalski, when you were conducting cyclic

7      investigations of -- inspections of distributors

8      back in the day when you were a DEA diversion

9      inspector, you never had a Dr. McCann at your side

10     to use the ARCOS data to run the methodologies that

11     he ran on the registrant, correct?

12                   A.    No.  I would have access to analysts

13     that worked in headquarters in ARCOS.

14                   Q.    And did you ever have them run all

15     these methodologies for a registrant?

16                   A.    No.  You were -- I thought you were

17     speaking in terms of doing a regulatory

18     investigation.

19                   Q.    Yeah.  I'm just asking that -- I know

20     that to test the Defendants' compliance in this

21     case, you used Dr. McCann to assist you in running

22     the data through your methodologies.

23                   Did you ever do that, or something

24     similar to that, when you were a DEA diversion

25     inspector?

Page 84

1         A.     Yes.

2         Q.     What did -- when did you do it and

3    with respect to whom?

4         A.     I think that's going to be another

5    Touhy issue, Mr. Livingston.

6         Q.     Well, you just said that you did it,

7    so I don't think it's a Touhy issue.  We need to

8    know --

9              MS. KNIGHT:  Mr. -- Mr. Livingston,

10   if he invokes Touhy, and believes that that's his

11   obligation under the law, then you can't override

12   that.  You're very familiar with that rule.

13             MR. LIVINGSTON:  I don't agree with

14   your position on it.

15        A.     But I think to acknowledge it was

16   done is different than telling what I did or who I

17   did it with and who I did it for.

18        Q.     (BY MR. LIVINGSTON:)  Well, no.  The

19   question was -- we know what you did because -- so

20   the question is:  Did you ever take the seven

21   methodologies that are in your report and hand it

22   to somebody with a Ph.D. in data analysis to run

23   those methodologies through the registrant's data?

24        A.     To that specific question, I would

25   answer no.  I don't think that's the same question

Page 85

1   you asked me earlier.

2          Q.     So the answer is no?

3          A.     That's correct.  The answer is no.

4          Q.     Okay.  And remember when we were

5   talking before about the various levels of

6   enforcement that were available to you as a DEA

7   inspector, if a registrant was not in compliance

8   with the regulations?  Do you remember when we

9   talked about that a minute ago?

10         A.     Yes.  Available to the agency, not to

11  me specifically.  But, yes, I remember the

12  conversation.

13         Q.     Right.

14                When you inspected distributors while

15  you were with the DEA, how often did you conclude

16  that they were in full compliance with all

17  applicable DEA regulations?  Roughly, percentage,

18  you know, ten percent, sixty percent, a hundred

19  percent, ninety percent, whatever it is.

20                MS. KNIGHT:  Objection to form.

21         A.     Are you -- in regards to your

22  question, was that specific to distributors?

23         Q.     (BY MR. LIVINGSTON:)  Yes.

24         A.     I think generally speaking, off the

25  top of my head, distributors -- there's a large

Page 86

1  volume of regulations.  So I would say that there

2  was generally at least maybe fifty percent, maybe a

3  little less of time where there would be some kind

4  of violation.

5          Q.     Okay.  All right.  Would you turn to

6  Exhibit 6, Page 9?  Giant Eagle Exhibit 6.

7                 (GE Exhibit 6 was marked for

8                 identification.)

9          Q.     (BY MR. LIVINGSTON:)  And the pages

10  are at the top.  See, this is Section 1301.71 of

11  the DEA's Controlled Substance Act regulations?

12                 MS. KNIGHT:  Mr. Livingston, that's

13  not what's behind his tab.

14          A.     6?  You said 6?

15          Q.     (BY MR. LIVINGSTON:)  Yes.

16          A.     Tab 6 I have "Linden Barber" --

17          Q.     Yeah.  No.  It -- yeah, but just go

18  to the Page 9 at the top.  It's a compilation of

19  various -- yeah.  Yeah.  It was a trick question.

20  Sorry about that.

21          A.     No.  I didn't hear the "Page 9."  I'm

22  sorry.

23                 Okay.  I'm there.

24          Q.     Yeah.  You're familiar with this

25  regulation, correct?

Page 87

1          A.     Yes, sir.

2          Q.     Okay.  And when you would inspect

3   registrants, you would try to make sure that they

4   were complying with 1301.71, correct?

5          A.     Among many other regulations, yes.

6          Q.     I didn't mean it to be exclusive.

7   But among -- that you would make sure they were in

8   compliance at least with 1301.71?

9          A.     Yes.

10          Q.     And this regulation says, "All

11   applicants and registrants shall provide effective

12   controls and procedures to guard against theft and

13   diversion of controlled substances."

14               That is one of the regulations that

15   you believe the defendants did not comply with in

16   this case, correct?

17          A.     That's correct.

18          Q.     Now, the next sentence says, "In

19   order to determine whether a registrant has

20   provided effective controls against diversion, the

21   administrator" -- that's really the DEA, right --

22   "shall use the security requirements set forth in

23   Sections 1301.72 through 1301.76," correct?

24          A.     Yes.

25          Q.     Okay.  So if we want to know whether

1   the defendants are complying with this overarching

2   requirement for having effective controls, the DEA

3   says we're supposed to look at the -- all the

4   regulations between 72 and 76, correct?

5              A.     That's what this says, yes, sir.

6              Q.     Yeah.  And that's what you did when

7   you were a DEA investigator, correct?

8              A.     It's one of the things I did, yes,

9   sir.

10             Q.     Okay.  And the SOM regulation is one

11  of the regulations, but just one of the regulations

12  between 1301.72 and 1301.76, correct?

13             A.     That's correct.

14             Q.     And then if we skip down to

15  1301.71(b), it says, "Substantial compliance with

16  the standards set forth in Sections 1301.72 to

17  1301.76 may be deemed sufficient by the

18  administrator after evaluation of the overall

19  security needs -- or system -- overall security

20  system and needs of the applicant or registrant."

21             Do you see that?

22             A.     Yes, sir.

23             Q.     What does "substantial compliance"

24  mean?

25             A.     Well, it -- the word "substantial"

Page 89

1   would mean in compliance, substantial, more than

2   just trying.  It would be substantial in

3   compliance.

4           Q.    Well, doesn't it mean less -- at

5   least less than one hundred percent?

6           A.    That may be your interpretation.  I

7   think "substantial" would mean in compliance.

8           Q.    Well, are you saying that your

9   definition of "substantial" is there has to be

10  perfect compliance?

11          A.    I don't know that I'm saying there's

12  perfect.  But I think you couldn't find any obvious

13  faults.  It would be in compliance.

14          Q.    Well, I mean, let's just assume that

15  you're -- you get -- you're in compliance with nine

16  out of ten or ten out of eleven.  I mean, is that

17  substantial?  Or do you have to have perfect

18  compliance?  You can't be noncompliant with any

19  regulation to be "in substantial compliance with

20  the regulations"?

21                MS. KNIGHT:  Objection to form.

22          A.    I think substantial -- because if we

23  look down at the column of different items to be in

24  compliance with, they're broad and they give

25  various descriptions.  So I think "substantial

1   compliance" would mean you can't find any faults of

2   noncompliance.

3                I'm not sure I would say it has to be

4   perfect.  But if you were to find that there were

5   an obvious failure to be in compliance, that would

6   not be substantial.

7                I think substantial is more than just

8   average or trying.  I think it shows a high level

9   attempt to be in compliance.

10          Q.     (BY MR. LIVINGSTON:)  Now, you're

11  very familiar with the SOM regulation, correct?

12          A.     Yes, sir.

13          Q.     And that regulation says that you

14  have to have a Suspicious Order Monitoring system

15  that's going to identify orders of unusual size,

16  pattern or frequency, correct?

17          A.     Well, in the beginning it says, "You

18  must design and operate."

19          Q.     Yeah.  But the system is supposed to

20  be able to identify unusual orders from a size,

21  pattern and frequency perspective, correct?

22          A.     But I don't -- yeah, it does say

23  that, but I don't believe that's an exclusive

24  statement.  That doesn't say that's the only things

25  that it should identify.  But I would agree it does

1  say that.

2         Q.     Okay.  I mean -- and there's no

3  definition for what the DEA means by "unusual,"

4  correct?

5         A.     There is not, and I think there's a

6  reason for that.

7         Q.     And would you agree that "unusual"

8  essentially means "unexpected," something that's

9  not -- you know, that's out of the norm, that's not

10  expected?

11         A.     I generally would agree with that.  I

12  think it would be something based on what your

13  knowledge of the usual, what you've established as

14  usual.  It would be something you identified that's

15  unusual, that would be correct.

16         Q.     Yeah.  Now, you're familiar,

17  generally, with the fact that the DEA is

18  responsible for quotas, manufacturing quotas for

19  controlled substances, correct?

20         A.     Yes.  I received some training.  I

21  haven't handled quotas, but I'm aware of the quotas

22  in the regulation.

23         Q.     Yeah.  I'm not going to get into the

24  details of the quotas.  But just that, for the

25  jury's benefit, as a general matter, the quotas are

1    prepared by the DEA every year after they

2    investigate to try to determine what the medical

3    and research needs is for any particular drug that

4    they regulate, correct?

5            A.    Mr. Livingston, just so we're clear,

6    there's different kinds of quotas.  The aggregate

7    quota, the manufacturing production quotas.  But,

8    yes, that -- what you said would be a true

9    statement more at the level of the aggregate quota.

10           Q.    Right.  But just -- my point is just

11   that the DEA does its level best to try to

12   determine, in advance, for the next coming year,

13   what the country's legitimate medical and research

14   needs are for each drug?

15                 MS. KNIGHT:  Objection to form.

16           A.    I'd agree with that statement.

17           Q.    (BY MR. LIVINGSTON:)  Yes.  And

18   then -- and that's -- again, based on the DEA's

19   expectation -- expectation of what the medical

20   demand and research demand for that drug will be in

21   the coming year, correct?

22                 MS. KNIGHT:  Objection to form.

23           A.    I think it's a little broader than

24   that.  I think there's input from the manufacturers

25   throughout the country -- I think it's a broader

Page 93

1    base of information that they rely on.  Just --

2    I've never worked in quotas, and I haven't helped

3    set quotas, but that's just my knowledge through

4    training and through working with the DEA.

5            Q.    Yeah.  And pharmacies have no role in

6    setting those quotas, correct?

7            A.    A specific pharmacy, I do not believe

8    so, no, sir.

9            Q.    I mean, the DEA doesn't call up the

10   head of CVS and say, how much do you guys think we

11   should, you know, put in for the quota for

12   oxycodone, stuff like that --

13               MS. KNIGHT:  Objection to form.

14           Q.    (BY MR. LIVINGSTON:) -- right?

15           A.    I don't have any knowledge whether

16   they do or don't, Mr. Livingston.

17           Q.    Well, to your knowledge, based --

18   with respect to the regulations, that's not a

19   source that the DEA consults, right, they don't

20   call up pharmacies?

21               MS. KNIGHT:  Objection to form.

22   Asked and answered.

23           A.    Yeah.  But I don't have any knowledge

24   that maybe CVS is in a consortium or utilizes some

25   entity to -- on their behalf.  I just don't have

1    any -- the knowledge to answer that question,

2    Mr. Livingston.

3           Q.     (BY MR. LIVINGSTON:)   And the DEA

4    quotas are published, right?  They're made publicly

5    known throughout the country, correct?

6           A.     Yes, sir.  In the Code of Federal

7    Regulation -- no, I'm sorry.  In the Federal

8    Register.

9           Q.     So any pharmacy could review those

10   quotas to see what the DEA expects to happen in

11   terms of the manufacturing of any particular

12   controlled substance for the coming year, correct?

13          MS. KNIGHT:  Objection to form.

14          A.     Anyone could go and review that in

15   the Federal Register, and then they could commented

16   on it, including CVS.

17          Q.     (BY MR. LIVINGSTON:)  All right.  So

18   just hypothetically, if the DEA quota for OxyContin

19   for a given year is going to go up twenty-five

20   percent, you would agree, wouldn't you, sir, that a

21   pharmacy would not expect -- or I'm sorry.  The

22   fact that the pharmacy experienced a lesser

23   percentage increase in the -- in the -- in

24   prescriptions for that drug would not be

25   surprising, would not be unusual, would not be

Page 95

1    unexpected?

2                    MS. KNIGHT:  Objection to form.

3          A.     I'm sorry.  That -- I don't

4    understand that question, Mr. Livingston.

5          Q.     (BY MR. LIVINGSTON:)  Yeah.  Let me

6    try it again.

7                    So we know that the pharmacies will

8    know in advance what the quota is going to be.

9    Let's say that the quota for OxyContin is

10   twenty-five percent for the coming year.  So the

11   DEA is expecting doctors to write twenty-five

12   percent more scripts in the coming year.

13                   And then the pharmacy experiences,

14   let's say, a ten percent increase in the

15   dispensing -- or in prescriptions for that drug.

16   You would agree that, from the pharmacy's

17   perspective, that ten percent increase is not

18   unexpected?

19                   MS. KNIGHT:  Objection to form.

20         A.     I don't have a base of knowledge in

21   regards to the quotas that would allow me to either

22   agree or disagree with that statement,

23   Mr. Livingston.

24         Q.     (BY MR. LIVINGSTON:)  I'm not asking

25   you to tell me what the quota -- what the basis of

1    the quota is.  Just that if the -- you've already

2    told me that you know that the quota is supposed to

3    be a forecast of the coming medical and research

4    demand for the drug, correct?

5         A.    Yeah.  But my answer is in regards to

6    your hypothetical, is you said some percentages and

7    some drug types and some expectations at a pharmacy

8    level.  And I just don't have -- that's a pretty

9    broad question, hypothetical question.

10             It's -- the manufacturing is much

11   more complex.  And to make it a specific drug at a

12   specific pharmacy, I just don't -- I don't think

13   that's an accurate hypothetical, and I just don't

14   have the expertise or the knowledge to answer that

15   or agree with that or disagree with that.

16        Q.    Okay.  And when you asked Dr. McCann

17   to run his methodologies, you did not ask him to

18   take into consideration what the annual increases

19   in the DEA quotas were for the drugs that he looked

20   at, correct?

21        A.    That's a correct statement.  I did

22   not do that.

23        Q.    Let's try another hypothetical that's

24   a little -- hopefully a little easier.

25             Let's assume that a pharmacy -- and

```
 1   let's say Giant Eagle.  It's folks at the corporate
 2   headquarters know that a pharmacy across the street
 3   from one of its pharmacies in Lake County is
 4   closing its doors.  Its biggest competitor in the
 5   area is closing its doors.
 6                   And they do an analysis and they say,
 7   we think our prescriptions for controlled
 8   substances are probably going to go up by twenty
 9   percent because of that closure.  And, in fact, the
10   scripts for that drug go up twenty percent or less.
11                   You would agree that, from Giant
12   Eagle's perspective, that that increase was not
13   unexpected, correct?
14                   MS. KNIGHT:  Object to form.
15         A.     That's another complex hypothetical.
16   Generally speaking, that could occur, but -- so
17   what we're talking about there, the essence would
18   be the Suspicious Order Monitoring system and due
19   diligence.
20                   So my expectations is that there
21   would actually be some confirmation of that
22   happening, and some due diligence investigation.
23   But it could happen and I would agree with your
24   hypothetical.
25         Q.     (BY MR. LIVINGSTON:)  And you did not
```

Page 98

1   ask Dr. McCann to take into consideration, when he

2   did his analysis, the closures or any stores, or

3   anything from a market standpoint, that might have

4   affected the demand for drugs at any particular

5   pharmacy that was analyzed, correct?

6           A.    I would agree with that statement,

7   Mr. Livingston.

8           Q.    You were involved in the Dr. Leo

9   Ognen investigation.  He was a bad doctor; is that

10  correct?

11          A.    Dr. Leo Ognen, yes, sir.

12          Q.    Could you go to your report, Exhibit

13  2, at Page 5?  His investigation is one of the ones

14  that you listed in your report.

15          A.    That's correct.

16          Q.    And you also indicated that it was

17  that investigation and resulting criminal

18  conviction that led to the creation of the OARRS

19  database in Ohio; was that correct?

20          A.    No.  I recognized that you could draw

21  that conclusion from that statement.  What I was

22  trying to say in that statement is Dr. Ognen was

23  way pre-OARRS.  So that was one of the first, that

24  I was aware of, where I kind of created my own

25  OARRS, for a better term.

1              So to conduct that investigation,

2    literally had to go to multiple pharmacies in Ohio

3    and obtain prescribing reports and create a --

4    similar to the OARRS.  But I did not design the

5    OARRS.

6                   (GE Exhibit 46 was marked for

7                   identification.)

8         Q.    (BY MR. LIVINGSTON:)  Why don't we

9    look at Exhibit 46, because I want to try to get

10   the timing down right here.

11             This is a 2003 Bill Tracking for

12   the -- what ultimately became the Ohio legislation

13   that created OARRS.

14             And do you see that under "Status" it

15   was first introduced in January of 2004, correct?

16        A.    Yes.

17        Q.    And Dr. Ognen, according to his

18   indictment, he was still engaged in a criminal

19   conspiracy through much of 2004, correct?

20        A.    That's correct.

21             But looking at the bill for Ohio, I

22   think the bill was passed, signed in 2005 by the

23   governor.  But I don't think the actual OARRS

24   became implemented until a much later date.

25        Q.    Right.  But your investigation of

1   Dr. Ognen in no way sparked the interest in Ohio

2   for enacting OARRS, correct?

3           A.     Yes.  As I previously stated, I

4   understand reading that, that you could draw that

5   conclusion, but that wasn't my intent.

6               I -- in doing that investigation, we

7   actually created a prescriber database that would

8   have been similar to OARRS, but it was only

9   specific to Dr. Ognen.

10          Q.     Now, your opinion is that Giant Eagle

11  violated the DEA's SOM regulation, correct?

12          A.     Yes, sir.

13          Q.     And for what period of time do you

14  claim that Giant Eagle violated the DEA SOM

15  regulation?

16          A.     All the way through to 2016.  And I

17  don't know further than 2016 because I didn't do an

18  in-depth review post 2016.  I know that they had

19  some issues that brought them -- looked like they

20  appeared to be coming into compliance.  But

21  definitely from the time frame of 2000 -- prior to

22  2009 all the way to 2016.

23          Q.     Okay.  I am -- yeah.  It wasn't clear

24  to me when I read your report what your time frame

25  is for Giant Eagle's purported noncompliance.  So

Page 101

```
 1   you are saying, you are clarifying that Giant
 2   Eagle's purported noncompliance only was from 2009
 3   when they first started distributing Schedule 3
 4   drugs, you say, through 2016?
 5                   THE REPORTER:  You are getting a
 6   little soft, Mr. Livingston.
 7                   MR. LIVINGSTON:  Okay.  Is that
 8   better?
 9                   THE REPORTER:  Yes, sir.
10                   MR. LIVINGSTON:  Thank you.
11        A.    Well, they -- so there was two
12   facilities.  The first facility stopped
13   distributing this 2014.
14        Q.    (BY MR. LIVINGSTON:)  Right.  When
15   there was a reclassification from hydrocodone from
16   Schedule 3 to 2, correct?
17        A.    Correct.  And then they did not
18   self-distribute for a couple of years, and then
19   they started back self-distributing in 2016.  So my
20   opinion definitely goes from 2009 to 2014 and then
21   when they started to self-distribute again from the
22   GERX DC, I have some information contained in my
23   report, but I did not have enough information to
24   make a definitive opinion on their conduct post
25   2016.
```

1          Q.     All right.  So let's just focus on

2     the gap period between 2014 and '16 when the second

3     facility known as GERX was opened up.  You have no

4     opinion obviously that Giant Eagle was doing

5     anything wrong as a distributor because they were

6     not a distributor, correct?

7          A.     No, I don't agree with that.

8          Q.     So even though they were not a

9     distributor after 2014, you are saying they were

10    still not complying with the SOM regulation?

11         A.     I didn't say the SOM regulation.

12    That wasn't -- I don't believe that was the

13    question you asked.

14         Q.     Yeah, I think you are getting me -- I

15    am starting to chase my tail here or feel like it.

16              So are you saying yes or no that you

17    have an opinion post 2014 about Giant Eagle?

18         A.     I believe the period between 2014 and

19    2016, there's a maintenance of effective controls

20    issue with the distribution from I believe it was

21    McKesson that distributed to them.  But in

22    regards -- if we are just talking specifically

23    SOMs, I do not have an opinion past 2014 on the

24    SOMs issue.

25         Q.     So in the period that you mentioned

Page 103

1    after 2014 with respect to McKesson, Giant Eagle

2    was a customer of McKesson, correct?

3            A.    That's correct.

4            Q.    And you are saying that, as a

5    customer, Giant Eagle had an obligation to have a

6    SOMs system?

7                  MS. KNIGHT:  Objection to form.

8            A.    I don't think the regulation requires

9    that -- requires that.  I think, as a chain

10   pharmacy, I think they still had the responsibility

11   to monitor the purchases of their -- of their

12   pharmacies.

13           Q.    (BY MR. LIVINGSTON:)  And do you have

14   any evidence at all that suggests that Giant

15   Eagle's corporate office did not monitor and did

16   not know what its pharmacies were ordering from

17   McKesson?

18           A.    I think they did monitor that because

19   they obviously were ordering them and making

20   payments.  So I think they were still aware of the

21   levels of drugs that their pharmacies were

22   receiving.  They just weren't distributing.

23           Q.    Right.  And so -- but I thought you

24   mentioned that they were violating the DEA

25   regulations as a customer of McKesson because they

1  were not monitoring what their pharmacies were

2  doing.

3          A.     Well, the issue is that a level of

4  prescribing continued, and maybe even escalated,

5  after they stopped self-distributing.  So the

6  conduct, I don't believe -- I believe that the

7  maintenance of effective controls would require

8  them still to be responsible for what their

9  pharmacies were purchasing from McKesson.

10          Q.     Are you saying that Giant Eagle --

11  well, let me -- did you or did you not examine

12  Giant Eagle's dispensing levels for the drugs in

13  question in this case?

14          A.     Yes, sir.

15          THE REPORTER:  I couldn't understand

16  if you said yes, sir or no, sir.

17          A.     I said yes, sir.

18          Q.     (BY MR. LIVINGSTON:)  Isn't it true

19  that Giant Eagle's dispensing of the drugs in

20  question in this case decreased over time starting

21  in 2012?

22          A.     I would have to go to my report to

23  look at least to the chart or some of the McCann

24  charts.  So off the top of my head, I don't -- I'm

25  not sure on that, just sitting off the top of my

1    head, Mr. Livingston.

2          Q.    Isn't it true that Giant Eagle's

3    dispensing of the drugs in question in this case

4    went down at -- at the same time that the DEA

5    quotas for many of these drugs were actually

6    increasing?

7          A.    Hold on.  Let me look at my report.

8                (Pause.)

9          A.    Looking at the charts in my report, I

10   do not agree with you, Mr. Livingston, on that.

11         Q.    (BY MR. LIVINGSTON:)  What reports --

12   charts are you referring to?

13         A.    Looking at the Lake County on Page

14   152.  I guess there would be a slight decrease.  I

15   wouldn't call it a significant decrease.  And then

16   on Page 151, 150, I would say there may be a slight

17   decrease.

18         Q.    Well, Mr. Rafalski, you realize that

19   these charts that Dr. McCann produced relate to

20   distribution, correct?

21         A.    Yes.

22         Q.    They don't -- these are not

23   dispensing charts, correct?

24         A.    Well, I think if they were

25   distributed to the pharmacies, they were dispensed.

1         Q.     Well, for example, there's nothing in

2    2015 and '16 on these two charts on 152, correct?

3         A.     That's correct.

4         Q.     And that is because Giant Eagle

5    wasn't distributing during that period at all,

6    correct?

7         A.     That's correct.

8         Q.     And there's no indication here as to

9    what was happening with the DEA quotas, correct?

10              MS. KNIGHT:  Mr. Livingston, it is

11   getting hard to hear you.

12        Q.     (BY MR. LIVINGSTON:)  There's no

13   indication on the charts on Page 152 what was

14   happening simultaneously with the DEA quotas for

15   these drugs?

16        A.     I agree.

17        Q.     And that was my previous question

18   was:  Comparing Giant Eagle's dispensing levels

19   year over year to the changes in the DEA quotas,

20   neither you nor Dr. McCann did that analysis,

21   correct?

22        A.     That is correct.  We did not do the

23   analysis and compare it with quotas that were

24   issued.

25        Q.     All right.  Would you go to Page 7 of

1    your report in Exhibit 2?  Do you see this is where

2    you say that the defendants' supposedly

3    noncompliant SOM systems, which you characterize as

4    sort of systemic failures, were a "Substantial

5    cause of the opioid epidemic plaguing the country

6    and specifically in Lake County and Trumbull

7    County"; do you see that?

8           A.     Yes, sir.

9           Q.     That is your opinion, correct?

10          A.     It is.

11          Q.     And what do you mean by substantial?

12          A.     I mean it wasn't a close call.  It

13   was obvious.

14          Q.     Well, what about in comparison to

15   others that contributed to the opioid crisis in

16   these two counties?

17          A.     What others are you speaking of,

18   Mr. Livingston?

19          Q.     Well, we talked about it earlier.

20   You didn't analyze what the big three distributors'

21   contribution, if anything, was to the opioid crisis

22   in these counties, correct?

23          A.     That's correct.

24          Q.     You didn't look at any pill mill

25   doctors who were writing illegal scripts for

Page 108

1    opioids in those two counties, did you?

2           A.     That's correct.

3           Q.     You didn't look at any independent

4    pharmacies who were ultimately shut down for

5    writing illegal scripts in these two counties,

6    correct?

7           A.     That's correct.

8           Q.     You didn't look at what the amount of

9    theft from medicine cabinets or what have you after

10   scripts were filled in -- legitimate scripts were

11   filled in those two counties for opioids, correct;

12   you didn't try to figure that out?

13          A.     That is correct, Mr. Livingston,

14   because I wasn't asked to form an opinion on those

15   things.

16          Q.     And you weren't asked to look at what

17   contribution, if any, manufacturers of opioids made

18   by any conduct that they were responsible for,

19   including their marketing efforts, correct?

20          A.     Not contained within this specific

21   opinion, that is correct.

22          Q.     And in order to contribute to the

23   opioid epidemic in these two counties, the

24   defendant pharmacies had to have had problems at

25   the pharmacy level, correct?

1            MS. KNIGHT:  Objection to form.

2       A.     I do not disagree with that

3    statement.

4       Q.    (BY MR. LIVINGSTON:)  Right.  I mean

5    just, this is, I think, pretty simple logic that

6    your focus was entirely on the defendants' conduct

7    as distributors, correct?

8       A.     In concert with the distribution to

9    their pharmacies, yes.

10      Q.     And even if the defendants were, you

11   know, as you claim, not doing a good job of

12   complying with DEA regulations at the distribution

13   level, if their pharmacies were exemplary

14   pharmacies with respect to controls against

15   diversion, and their pharmacies were doing

16   everything that a good pharmacy should be doing, at

17   the end of the day, there's -- it doesn't matter,

18   because there's not going to be any diversion as a

19   result of what the pharmacies were doing at the

20   distribution level, correct?

21            MS. KNIGHT:  Object to the form.

22      A.     Well, in that hypothetical, because

23   of the failures of the company, and not doing due

24   diligence and not providing me with the information

25   to see that that was actually accurate, there's no

Page 110

1    way that I could use that to formulate my opinion.

2            Q.      (BY MR. LIVINGSTON:)  No, we already

3    know -- we have already covered, you are not

4    offering the jury any opinions about the

5    defendants' conduct as pharmacies; you didn't look

6    at it, and it is not in your report, and you are

7    not going to testify about it.

8                    I am just saying that, as a matter of

9    logic, unless the defendants were doing something

10   wrong at the pharmacy level -- if they were doing

11   everything they were supposed to be doing,

12   exercising their corresponding duty, they had good

13   controls against theft, you know, whatever you want

14   to dream up, come up with your dream pharmacy with

15   respect to anti-diversion measures, if that is the

16   case, then at the end of the day, it doesn't matter

17   what their warehouses are doing with respect to

18   compliance because those drugs are not going to end

19   up being diverted, correct?

20                   MS. KNIGHT:  Objection to form.

21          A.      I don't agree with that hypothetical.

22   That is why the regulations are in place to

23   operate -- I mean to design and operate a SOMs.

24   And that is why there's due diligence in effect.

25   And I don't think -- if I understand your

1    hypothetical, you are saying that essentially, the

2    drugs don't need to be monitored if all of the

3    pharmacies are perfect.

4                    And I don't think that is actually

5    what occurred in this case.  So I just don't agree

6    with that hypothetical.

7            Q.    (BY MR. LIVINGSTON:)  You are

8    fighting my hypothetical.  Let me make it even

9    simpler.

10                    Okay.  I am not suggesting that if

11   the pharmacies aren't complying with the

12   regulations that they are supposed to as

13   distributors, they can't get letters of

14   admonishment, get fined, get in trouble with the

15   DEA.  I'm not saying that.  I am just saying that

16   in terms of contributing to diversion in a

17   particular area, which is your opinion that you

18   have in your report on Page 7, that can't happen

19   and won't happen if, despite their noncompliance as

20   distributors, they are doing everything that a good

21   pharmacy is supposed to do and there is no

22   diversion going on at their pharmacies, correct?

23                    MS. KNIGHT:  Object to form.

24           A.    Well, in regards to that

25   hypothetical, I guess before I comment on it, in a

1    perfect world, I don't think that your hypothetical

2    is possible.  But in listening to your

3    hypothetical, if everything was absolutely perfect

4    with every pharmacy, then it is, hypothetically,

5    potentially it could be true.

6         Q.    (BY MR. LIVINGSTON:)  Now, when you

7    try to analyze whether a distributor is complaining

8    with the SOM regulation, you have to look at the

9    nature of the -- of the distributor's business,

10   correct?  That is right in the regs, you are

11   supposed to take those sorts of things into

12   consideration?

13        A.    Generally I agree with that, yes,

14   sir.

15        Q.    And that is why the DEA -- you know,

16   there's no one-size-fits-all for SOM regulations,

17   correct?

18        A.    I believe we touched on that earlier.

19   I believe that is why the regulation is good as it

20   stands, because it allows the ability for a

21   registrant to design their own system to meet their

22   own needs and their own customer base, and it is

23   fluid and allows them to change it.  I don't think

24   there's a one-size-fits-all that could ever handle

25   the totality of distributor activities in there.

1        Q.      Now, no matter how many times we look

2   at the DEA's some regulation, we won't find any of

3   the seven methodologies that you asked Mr. --

4   Dr. McCann to use when he crunched the data,

5   correct?

6        A.      The DEA regulations never contained a

7   methodology or an algorithm.

8        Q.      Okay.  And, in fact, the DEA doesn't

9   even require that a registrant have an automated

10  threshold system.  They can use a manual system if

11  they desire?

12       A.      If they can -- if it can be designed

13  and operated and identify suspicious orders, yes,

14  sir.

15       Q.      Okay.  When you were inspecting

16  distributors, you know, while you were with the

17  DEA, did you ever recommend to any of them that

18  they use any of the methodologies that you are now

19  embracing in your report?

20       A.      No, sir.  It would have been improper

21  for me to do that.  I think the farthest guidance,

22  probably the only guidance I can recall is there

23  was a period of time when the HDMA had a suspicious

24  order monitoring draft or a guide policy, and I

25  wouldn't direct a registrant to that, especially a

Page 114

1    new registrant.  But I may say that if they did

2    some Google research, they may get some good ideas

3    off the internet.  But I never specifically

4    directed any registrant to any type of a suspicious

5    order monitoring system.

6             Q.    Okay.  Now, the results that

7    Dr. McCann came up varied greatly for each one of

8    the defendants under the methodologies that you

9    gave him to use, correct?

10                  MS. KNIGHT:  Object to form.

11            A.    In your question, are you asking me

12   the results varied greatly?

13            Q.    (BY MR. LIVINGSTON:)  Yes, the

14   results.

15            A.    Yes.

16                  MR. LIVINGSTON:  Let's go to

17   Exhibit -- Giant Eagle Exhibit 24.

18                  (GE Exhibit 24 was marked for

19                  identification.)

20            Q.    (BY MR. LIVINGSTON:)  This is a chart

21   that we had our version of a Dr. McCann put

22   together which is just really taking the results

23   from his report and your report for Giant Eagle.

24   This is a comparison of the methodologies for

25   flagging distribution orders, you know, seven

Page 115

1    methodologies that you use.  And here are the

2    numbers that were flagged for hydrocodone for Giant

3    Eagle's pharmacies in Lake County.

4                    And do you see that, depending on

5    which flavor you pick, the numbers go anywhere from

6    zero percent to a hundred percent, correct?

7            A.     I agree.  I see that.

8            Q.     Yeah.  And that is -- I mean this is

9    an accurate comparison of the results that you

10   relied on, correct?

11           A.     Well, if this is your expert that

12   prepared this --

13           Q.     All they did was cut and paste it

14   from Dr. McCann.  We can go back.  Don't these

15   results look familiar to you?

16           A.     I would have to go to the charts.

17   Not off the top of my head.  I don't memorize them.

18   I'm not disputing you, but if you wanted, I would

19   have to compare them to his results.  These are bar

20   graphs.  I think mine are in actual percents and

21   numbers.

22           Q.     Right.  We wanted to make this a

23   little easier for the jury to see.

24                    You would agree that if these numbers

25   are correct, that the error rate, depending on

1  which methodologies you pick, is a thousand

2  percent, from zero per percent to one hundred

3  percent?

4                MS. KNIGHT:  Objection to form.

5        A.    I don't think there is an error rate.

6        Q.    (BY MR. LIVINGSTON:)  Well, there's a

7  difference of a thousand percent?

8        A.    There's a difference based on the

9  type of methodologies, but I don't think error

10  rate.

11       Q.    And you would agree that after

12  hearing all the evidence if the jury decides that

13  methodologies C and D are the proper methodologies

14  that Giant Eagle should have been employing, then

15  Giant Eagle did not substantially contribute to the

16  opioid crisis because there were no suspicious

17  orders that were flagged, correct?

18       A.    I do not agree with that, and I don't

19  know that it is proper for me to say what the jury

20  or the judge will say.

21             Just so you are clear, as I applied

22  the methodologies to the transaction data, I picked

23  the methodologies based on their uses that I

24  identified through the litigation, and I applied

25  them to the transaction.

1             It is up to the judge or the jury to

2    make a decision upon reviewing the methodologies.

3             Q.    Of course.  And that is why I asked

4    you to, in a hypothetical fashion, assuming at the

5    end of the day that the jury concludes that the C

6    and D methodologies are the gold standard for

7    distributors, you would have to agree, sir, that

8    because no suspicious orders at all are identified

9    under those methodologies, that you would not --

10   that Giant Eagle could not have contributed to the

11   opioid crisis in Lake County?

12            A.    I would not agree because if the jury

13   were to hear me, I would opine on C and D as being

14   highly ineffective in that you would take an

15   average of the usual and multiply it by three times

16   to identify an unusual.  I think I have been

17   consistent in being critical of the two and three

18   times multiplier used on --

19            Q.    Yeah.  So you are fighting the

20   hypothetical, and that is why I think we are

21   struggling to get an answer here.

22                  So the hypothetical is, assume that

23   they reject your view that C and D methodologies,

24   though you included them in your report and

25   Dr. McCann included them, they reject your view

Page 118

1    that apparently these are not very good

2    methodologies.  And they decide that they are not

3    just good but the best methodologies and the ones

4    that the DEA should apply to registrants like Giant

5    Eagle.

6                   In that situation, sir, wouldn't you

7    agree that Giant Eagle would not have substantially

8    contributed to the opioid crisis in Lake County?

9            A.    No.

10                 MS. KNIGHT:  Object to form.

11           A.    I do not agree.

12           Q.    (BY MR. LIVINGSTON:)  Let's just take

13   a look at the next page, just so that we -- I just

14   want to quickly -- this is the same sort of

15   comparison --

16           A.    What page are you speaking of,

17   Mr. Livingston?

18           Q.    Actually, I wanted you to go to

19   Page -- -- the third page, actually, "Flagged

20   Orders of Hydrocodone for Trumbull."

21                 SPECIAL MASTER COHEN:

22   Mr. Livingston?

23                 MR. LIVINGSTON:  Yes.

24                 SPECIAL MASTER COHEN:  I'm sorry to

25   interrupt.  This is David Cohen.  It looks like you

1   are in a conference room, and the microphone is

2   very directional.  So when you are looking down, we

3   barely can hear you.  I just want to make sure that

4   the jury can hear you when this is played.  So if

5   you will kind of think about facing the microphone

6   when you speak, I think it will really help

7   everybody.

8                   MR. LIVINGSTON:  I appreciate that,

9   Special Master Cohen.  I will try to do that.

10          Q.      (BY MR. LIVINGSTON:)  Yeah, do you

11  see that this is a similar comparison for Trumbull

12  County?

13          A.      I do, yes, sir.

14          Q.      And we are not getting anymore

15  consistency here; we still go from zero to a

16  hundred percent, correct?

17                  (Pause.)

18          Q.      (BY MR. LIVINGSTON:)  Correct?

19          A.      I answered yes, sir.

20          Q.      Oh, I'm sorry.  I didn't hear you.

21                  All right.  Now, let's go to Exhibit

22  10.  Giant Eagle, 10.

23                  (GE Exhibit 10 was marked for

24                  identification.)

25          Q.      (BY MR. LIVINGSTON:)  And Exhibit 10

1    is an indexed comparison of growth in hydrocodone

2    product DEA quotas in dispensing -- in comparison

3    to the Giant Eagle dispensing changes for these --

4    for this drug in Lake and Trumbull Counties in MME.

5    Now, again, I know that you just testified that you

6    and Dr. McCann did not do this analysis.  And I

7    understand obviously you have never seen this

8    before.

9                  But assuming that our data

10   consultants knew what they were doing when they put

11   this together, you would agree here that this chart

12   shows a significant decrease over time in Giant

13   Eagle's dispensing of hydrocodone products starting

14   after 2012, as I indicated earlier, correct?

15                  MS. KNIGHT:  Objection to form.

16        A.      That is what this chart would

17   indicate.

18        Q.      (BY MR. LIVINGSTON:)  And in fact,

19   the decreases over time were going down faster than

20   the DEA quotas?

21                  MS. KNIGHT:  Objection to form.

22        A.      If this is accurate, I would agree

23   with that statement.

24        Q.      (BY MR. LIVINGSTON:)  Yeah.  I mean

25   just for example, let's take 2013, the difference

Page 121

1   in 2012, the DEA quota for hydrocodone went up over

2   twenty-five -- roughly twenty-five percent while at

3   the same time, there was a significant decrease in

4   the dispensing of hydrocodone by Giant Eagle's

5   pharmacies in Lake and Trumbull Counties, assuming

6   that this data is correct?

7                 MS. KNIGHT:  Object to form.

8          A.     That is what this chart would

9   illustrate.

10         Q.     (BY MR. LIVINGSTON:)  Yeah, and even

11  if we fast forward to a year a little closer in

12  time, from 2018 to '19, the DEA quota either went

13  up slightly or looks like right about -- stayed

14  right about the same, while at the same time there

15  was again a decrease in the dispensing of this drug

16  by Giant Eagle's pharmacies in these counties,

17  correct?

18         A.     Specific to these counties, that is

19  what this chart would depict, if it is accurate,

20  sir.

21         Q.     And, sir, if you -- you didn't know

22  anything about Giant Eagle, and I showed you this

23  and I said, you know, what do you think this

24  suggests to you, wouldn't you agree that, standing

25  alone, without -- you know, I know there's a lot of

1    other things we have got to look at, but just

2    looking at this chart, this would suggest to you

3    that Giant Eagle's pharmacies are good pharmacies

4    that have proper controls and they are not engaged

5    in massive diversion, correct?

6             A.    I couldn't draw that conclusion from

7    looking at this.

8             Q.    Let me just -- you have examined or

9    you did examine when you were a DEA inspector many

10   pharmacies, correct?

11            A.    I don't know that I would

12   characterize it many, but as part of my job I have

13   done that, yes, sir.

14            Q.    Well, just for example, you examined

15   SafeScript, right?

16            A.    That is correct.

17            Q.    And that turned out to be a bad

18   pharmacy, correct?

19            A.    That's correct.

20            Q.    And when you investigate a

21   potentially a bad pharmacy, there are certain

22   things you look for, certain factors that you

23   consider to try to determine whether you have got a

24   good pharmacy or a bad pharmacy on your hands,

25   correct?

1          A.     Yes.  But I am not sure how you are

2     drawing a correlation to the chart.  But when I

3     look at this chart, just for informational

4     purposes, I do see an escalation of the dispensing

5     of hydrocodone by the Giant Eagle pharmacies,

6     leading up to 2012 when many declines occurred

7     throughout the industry.  So that would be a

8     concern, the years of 2009, '10, 11, exceeding the

9     quota, comparison quota.  So that also would be

10    alarming to me or would be of concern to me.

11         Q.     What factors would you look at --

12    look for to try to determine whether you have a

13    good pharmacy or a bad pharmacy?

14         A.     I would look at ordering patterns and

15    I would look at -- I would review prescribing

16    patterns, prescriber patterns.  That would be a

17    preliminary.

18         Q.     What about, you know, Oxy A, that is

19    a high dose form of oxycodone --

20              MS. KNIGHT:  Let him finish.

21         A.     I wasn't quite finished, sir, I am

22    sorry.

23              I would look at the types of drugs

24    that were dispensed in relation to all drugs.  I

25    would look at all drugs compared to controlled

1    substances.  I would look at cash and noncash

2    payments.  I would look at the volume.  I would

3    look at the geographic area.  I would look at other

4    pharmacies nearby.  I would look at a bunch of

5    different factors in helping to draw a conclusion

6    on that issue we are talking about.

7              Q.    (BY MR. LIVINGSTON:)  Okay.  And I

8    think -- I already know the answer, but you didn't

9    look at any of these factors with respect to any of

10   the pharmacies in this case, correct?

11             A.    I wasn't asked to provide an opinion

12   on pharmacies, so I did not.

13             Q.    Yeah.  No, I don't care why you

14   didn't.  I just want to know whether you did or you

15   didn't.  You did not, correct?

16             A.    I said I did not.

17             MS. KNIGHT:  Asked and answered.

18             A.    I was not asked to.

19             Q.    (BY MR. LIVINGSTON:)  Now, controls,

20   one of the things you suggested was your percentage

21   of controls versus noncontrols, correct?

22             A.    That's correct, sir.

23             Q.    And I think SafeScript, didn't they

24   have like ninety percent controls?

25             A.    Yes.  But I don't know the exact

Page 125

1    number.  But they were heavy on the controls.

2           Q.    I mean they were like almost off the

3    charts, right?  Correct?

4           A.    I don't know if I agree with that.  I

5    think as a business model, they were focusing on

6    dispensing controlled substances.

7           Q.    Well, that was one thing, their high

8    percentage of controls suggested to you that they

9    were a problem pharmacy, correct, when you

10   investigated them?

11          A.    That was an indicator to me that it

12   was a possible problem.  It wasn't definitive --

13                (Reporter clarification.)

14          A.    It wasn't definitive that it was

15   actually problematic until I evaluated it.

16          Q.    (BY MR. LIVINGSTON:)  Okay.  What

17   percentage does the DEA use or did you use

18   personally, if it is different than the DEA, that

19   would cause you to have some concerns about

20   controls?  I mean at what point, what level of

21   controls versus noncontrols did you start to get

22   concerned?

23          A.    Well, it changed over the years.

24   Early -- early in my career, it would probably be

25   somewhere around five to twelve percent of controls

1    versus noncontrols.  And then as time went by, up

2    until 2012, it might get up as close as into the

3    twenties.  And just based on the prescribing and

4    dispensing of controlled substances.  And it

5    wouldn't just be opioids; it would be all controls.

6              But it would generally be around

7    twenty at the height.  Unless there was some kind

8    of a reason that they were a specialty pharmacy,

9    they had contracts or special relationships that

10   were verified to be legitimate, that number could

11   be higher.  We are just talking a general,

12   full-service pharmacy.

13        Q.    Yeah.  So I just want to make sure I

14   understand.  You are saying that roughly around

15   twenty percent, if it was more than twenty percent,

16   you would start to get concerned about the level of

17   controls versus noncontrols?

18        A.    I guess concern could be a good word.

19   It would be something that I might look at a little

20   closer, and that would be at the height.

21        Q.    Well, what was the average level of

22   controls versus noncontrols?  Was that something

23   that you knew when you were a DEA inspector?

24        A.    Yeah, there would be published

25   reports or there would be information available or,

Page 127

1   in talking to -- you know, generally I relied some

2   on the state level Board of Pharmacy director, he

3   would give some levels and standards of what they

4   were seeing.

5                   So -- and it isn't definitive.  It is

6   just kind of a generalization.  Also I looked at

7   many, many questionnaires that -- back when I was

8   employed that distributors received from

9   pharmacies.  And they listed percents there.  So it

10  was an on to job plus publications.

11          Q.    I think Mr. Wright provided testimony

12  on behalf of the DEA in this litigation.  Did you

13  review his testimony?

14          A.    No -- I believe I might have read his

15  transcript.  I don't recall what he testified into

16  this subject.

17          Q.    He said twenty percent.  Does that

18  ring a bell to you?

19                  MR. FULLER:  Counsel, I am just going

20  to note an objection for the record that Mr. Wright

21  didn't provide testimony on behalf of DEA.  I

22  believe he was deposed, but he wasn't a 30(b) for

23  the DEA.

24          Q.    (BY MR. LIVINGSTON:)  In any event,

25  with that objection, do you recall that Mr. Wright

1   testified that twenty percent was sort of the

2   standard that the DEA applied?

3              MS. KNIGHT:  Objection to form.

4        A.    What time frame was that,

5   Mr. Livingston, unless you have the transcript that

6   I can review?

7              Q.    (BY MR. LIVINGSTON:)  Yeah, why don't

8   you go to 17, Giant Eagle 17, Page 260 to 61.

9                    (GE Exhibit 17 was marked for

10                   identification.)

11             Q.    (BY MR. LIVINGSTON:)  Starting on

12  Line 13 on 260, he was asked, "Is it accurate to

13  say that you knew that it was common for legitimate

14  pharmacies to have a ratio of approximately twenty

15  percent of controlled to eighty percent

16  noncontrolled."

17                   "In that area, yes."

18                   "And higher percentages of controlled

19  drugs could be reasonable at times, right?"

20                   "Yes."

21                   "For example, pharmacies located

22  right next to a cancer clinic or something like

23  that?"

24                   And the answer was "correct."

25                   Does that refresh your recollection

1   as to Mr. Wright's testimony on this issue.

2                   MS. KNIGHT:  Objection to form.  He

3   didn't say he didn't remember it.

4           A.      I read the testimony and I don't

5   disagree, but it doesn't contain a time frame.  So

6   I am not aware of what time frame Mr. Wright is

7   speaking to.  I am aware that earlier in my career,

8   2005, '6, '7, these numbers weren't that high, at

9   least in Michigan where I was a diversion

10  investigator.

11          Q.      (BY MR. LIVINGSTON:)  And you know

12  Mr. Rannazzisi, you have heard of him?

13          A.      I have.

14          Q.      And who is Mr. Rannazzisi.

15                  MS. KNIGHT:  Rannazzisi.

16          Q.      (BY MR. LIVINGSTON:)  I'm sorry.  If

17  I mispronounced it, I apologize.  Do you know who

18  he is?

19          A.      Yeah, he was the head of diversion

20  for a period of years.  I don't remember exactly

21  when he started.  2005, I think.  I started in '04.

22  I think it was after I started.  He was -- for the

23  better part of my career, he was the head of the

24  diversion within the DEA.

25          Q.      Yeah.  Do you think he knew what he

Page 130

1  was talking about when he gave testimony relating

2  to DEA regulations and issues?

3             MS. KNIGHT:  Objection to form.

4        A.    I am always cautious about saying

5  what somebody else knew or didn't know.  I mean he

6  is highly educated.  He was in a high level

7  position.  So I don't have any reason to not

8  believe what he said.

9        Q.    (BY MR. LIVINGSTON:)  When you were

10  at the DEA, he was the boss of your bosses,

11  essentially, right?

12        A.    Yes.  The head of diversion within

13  the DEA.

14        Q.    All right.  Why don't we turn to

15  Exhibit 32.

16             (GE Exhibit 32 was marked for

17             identification.)

18        Q.    (BY MR. LIVINGSTON:)  Do you know

19  that he is now an expert, he has provided expert

20  testimony on behalf of the plaintiffs in other

21  opioids cases?  Are you aware of that?

22        A.    I am aware that he has been doing

23  that, yes, sir.

24        Q.    Okay.  So you guys are on the same

25  team, right?

Page 131

1              MS. KNIGHT:  Objection to form.

2         A.     I wouldn't characterize it as that.

3    He does do the same similar work as I do.

4         Q.     (BY MR. LIVINGSTON:)  Well, if you

5    turn to -- this is deposition testimony that he

6    gave in the State of Ohio opioids case.  On Page

7    302, and he says, "And what is the percentage that

8    tells you if someone is diverting?"

9              "Well, it depends.  I would say

10   anything -- it used to be that the standard was a

11   pharmacy generally had between nine and twelve -- I

12   think nine and twelve percent controls versus

13   legend drugs dispensing.  I would say, you know,

14   extend it out maybe thirteen, fourteen percent,

15   maybe fifteen percent, but I wouldn't go any higher

16   than that."

17              So it sounds like he is using fifteen

18   as the cutoff.  Do you think that is a reasonable

19   cutoff?

20        A.     Depending on the time frame, I don't

21   think it is unreasonable and depending on what the

22   geographic location is.

23        Q.     Well, let's not, you know, speculate

24   about the appropriate time frame.  The appropriate

25   time frame for this case apparently is 2006 to the

1    present, correct?

2           A.     Yes.

3           Q.     Okay.  During that time frame, is

4    fifteen percent -- is that a reasonable number to

5    use for when you should start to get concerned

6    about whether there's diversion going on at a

7    pharmacy?

8           A.     I don't think it is unreasonable.

9    Again, I'm just going to say unless there's some

10   kind of other reason for it to be above that level,

11   a justifiable reason.

12          Q.     And then you also mentioned looking

13   at cash transactions, correct?

14          A.     That would be another one of the

15   factors.

16          Q.     What was the percentage, the usual

17   percentage that a good pharmacy would have of cash

18   transactions for controlled substances?

19                 MS. KNIGHT:  Objection to the form.

20          A.     I think it -- and I'm not drawing a

21   direct -- I haven't really dealt with this topic

22   recently.  I believe it would be low -- lower than

23   twenty percent.  Just generally speaking.

24          Q.     (BY MR. LIVINGSTON:)  Okay.  Fair

25   enough.  Would you go to Exhibit, Giant Eagle

Page 133

1  Exhibit 18?

2                    (GE Exhibit 18 was marked for

3                    identification.)

4        Q.    (BY MR. LIVINGSTON:)  All right.  So

5  again we had our version of Dr. McCann prepare this

6  chart which is really just the total prescriptions

7  and the number of controlled prescriptions on a

8  percentage basis for each of Giant Eagle's

9  pharmacies located in Lake and Trumbull Counties

10  from 2006 to -- through November of 2019.

11                    And do you see that the average

12  percentage for all these pharmacies together was

13  only 9.8 percent?  Do you see that?

14        A.    I see that, if it is correct.

15        Q.    Assuming that our data consultants

16  did their math right, you would agree that this

17  would not -- would have not raised any eyebrows for

18  you when you were a DEA diversion investigator?

19        A.    Depending on the distribution of the

20  type and strength of drugs.

21        Q.    Well, I thought we just talked about

22  how, you know, anywhere from fifteen to twenty

23  percent would be where your eyebrows would start to

24  go up, and now we are looking at 9.8 percent.

25  Isn't that less than the cutoff you just testified

1    about?

2                    MS. KNIGHT:  Objection to the form.

3            A.     Yeah.  But I think in the totality of

4    my answer, I think that was one of the factors was

5    the percentage or within the percent of these.  For

6    example, Newton Falls maybe could be all oxycodone

7    thirty milligram tablets.  Just hypothetical.

8                    (Reporter clarification.)

9            A.     So I would agree, looking at the

10   percents, I don't see one here that is alarming,

11   but that is not definitively saying it is a good

12   pharmacy.

13           Q.     (BY MR. LIVINGSTON:)  Well, I think

14   our data consultants might have guessed where you

15   were going with your testimony.  So let's go to

16   Exhibit 20, Giant Eagle Exhibit 20.

17                    (GE Exhibit 20 was marked for

18                    identification.)

19           Q.     (BY MR. LIVINGSTON:)  Do you see this

20   is a market share analysis of Giant Eagle's

21   opioids -- all opioids -- for all opioids at issue

22   in this case versus the Oxy 30s or greaters.  That

23   is what you just mentioned, right, the Oxy 30s;

24   that is a higher dose Oxy?

25           A.     Yes.  But just for clarification,

Page 135

1    that was an example.  I am not saying the

2    application is here in these two counties.  I would

3    look for any unusual dispensing of an opioid when

4    compared to other opioids.  That is a more broader

5    statement than just saying Oxy 30s, oxycodones 30s.

6    Any of the opioids could be abused.

7         Q.    (BY MR. LIVINGSTON:)  Isn't it true,

8    sir, that you, when you were a DEA inspector, would

9    look at higher -- high percentages of higher dose

10   opioids scripts as a potential indicator of

11   diversion?

12        A.    Not necessarily.  I would look for an

13   unusual amount of any type of an opioid.  The

14   diversion tended at certain time frames to go to

15   certain strengths, but that doesn't eliminate the

16   fact that in certain geographic regions there were

17   certain pills that were more desirable.

18        Q.    Right.  Well, isn't it true, sir,

19   that you specifically focused on Oxy 80s with

20   respect to the SafeScript pharmacy when you

21   investigated and ultimately gave testimony against

22   that pharmacy?

23        A.    Yes, but it wasn't just by looking at

24   documents or by that.  It was partly identified

25   through the investigation.

1        Q.     All right.  We will get to SafeScript

2     in some detail a little bit later.

3               But just if you look here, you will

4     see that Giant Eagle's share in Lake and Trumbull

5     County for all opioids at issue was 16.6 percent,

6     but its share for the high dose oxycodone types of

7     solids was only 4.02 percent.  1/4 of its market

8     share for opiates.  Do you see that?

9               MS. KNIGHT:  Objection to the form.

10        Q.    (BY MR. LIVINGSTON:)  Do you see

11     that?

12               MR. FULLER:  Counsel, just so I

13     understand, this is comparing different dosages to

14     the entire market share for the respective counties

15     and not necessarily the pharmacy within itself?

16               MR. LIVINGSTON:  Right.  These are

17     all of Giant Eagle's pharmacies collectively.

18     Nondefendants include all the nondefendant

19     pharmacies, and co-defendants include all the

20     defendants except for Giant Eagle.

21               MR. FULLER:  Got it.  Thank you.

22        A.     I see that is what this chart

23     indicates.

24        Q.    (BY MR. LIVINGSTON:)  And just

25     looking at this chart alone without looking at any

Page 137

1    other factor, you would agree that this suggests

2    that diversion is less likely, not more likely,

3    correct?

4                    MS. KNIGHT:  Object to the form.

5         A.    I couldn't draw that conclusion just

6    from looking at this chart.

7         Q.    (BY MR. LIVINGSTON:)  Well, this

8    wouldn't raise an eyebrow, would it?  You are

9    looking at a company that normally has sixteen

10   percent share of all opioids, and then it only has

11   a four percent share of high dose.  This certainly

12   isn't going to cause you to immediately get on the

13   phone and call your group supervisor up and say we

14   have got a problem on our hands, right?

15        A.    Well, just for clarification,

16   diversion can occur at any percent.  So it is not

17   that you would look at this number and say that

18   diversion is not occurring.  If you are saying that

19   this -- just strictly saying that they are

20   distributing is a lesser amount of a certain type,

21   I agree with what that chart says.

22                    But I don't think this eliminates the

23   ability to say that they are a good company or they

24   are not -- there's no diversion.

25        Q.    Why don't we go to Exhibit 19.

Page 138

1                    (GE Exhibit 19 was marked for

2                    identification.)

3          Q.      (BY MR. LIVINGSTON:)  You see that

4    this is a Declaration of Diversion, Investigator

5    James Rafalski, yourself, under penalty of perjury.

6    You recall do giving this declaration?

7          A.      I do.

8          Q.      And I assume you were as honest as

9    possible when you provided this declaration?

10         A.      Yes, sir.

11         Q.      And this was provided in connection

12   with the SafeScript pharmacy case, correct?

13         A.      Yes, sir.

14         Q.      And this pharmacy was sort of

15   involved in a conspiracy with some bad doctors; is

16   that correct, or a bad doctor?

17         A.      Yes, that is an accurate statement.

18                 MS. KNIGHT:  Can you hear him well?

19         Q.      (BY MR. LIVINGSTON:)  In paragraph 2,

20   you indicate that -- when you describe SafeScript,

21   you say that they were between October 2005 through

22   May 2007, they were "dispensing illicit

23   prescriptions (primarily 80 milligram OxyContin)

24   issued by a physician engaged in illicit conduct

25   outside the scope of professional practice."  Do

Page 139

1    you see that?  Do you see that?

2         A.    Hold on a second.  I am reading it,

3    sir.  Yes, I agree that is what it says.

4         Q.    Okay.  And so the thing you focused

5    on when you were investigating this pharmacy was

6    their 80 milligram Oxy scripts, correct?

7                MS. KNIGHT:  Object to form.

8         A.    That is accurate, Mr. Livingston.

9    But it is because the investigation of the abuse or

10   of the diversion was focused on that specific drug.

11   Also, I believe through recollection there might

12   have been some other Schedule IIs, but this is one

13   of the primary drugs.

14        Q.    (BY MR. LIVINGSTON:)  Okay.  And if

15   you would skip ahead to Page 33 of this document.

16   You have a couple -- a chart on that page and also

17   on Page 5.  Do you see those charts?

18        A.    I do, sir.

19        Q.    And these are charts reflecting Oxy

20   -- the number of Oxy tablets that were dispensed by

21   this pharmacy during these periods of times,

22   correct?

23        A.    Yes, sir.

24        Q.    And there's quite an increase here

25   from January of 2006 to August of 2006 for

                                                    Page 140

1    SafeScript, right?  They go from eighteen hundred
2    tablets to fifty-four hundred.  That is like a
3    triple increase there?
4            A.    Yes, sir.
5            Q.    And then if you go to Page 5, you
6    will see an even more dramatic increase in Oxy
7    scripts from fourteen hundred to sixteen hundred --
8    one thousand six -- I mean sixteen thousand four
9    hundred.  So that is more than a tenfold increase
10   over that relatively short period of time, correct?
11           A.    Yes, sir.
12           Q.    Now, you and Dr. McCann did not
13   analyze Giant Eagle's dispensing of Oxy 80 or Oxy
14   30, the higher dose Oxy scripts; is that correct?
15           A.    The drugs were analyzed in families,
16   so that is correct.  It wasn't specific to any
17   strength.
18           Q.    And haven't you given -- haven't you
19   informed registrants, other distributors, that they
20   should be on the lookout for pharmacies that go
21   over a thousand doses of eighty milligram Oxy in a
22   given month when they start ordering more than
23   that?
24           A.    I don't ever -- I don't have a
25   recollection of ever giving that guidance.

Page 141

1          Q.     Well, didn't you have a buddy from

2     the DEA, Jack Crowley, who was a Purdue employee?

3                    MS. KNIGHT:  Object to form.

4          A.     I don't characterize him as a buddy,

5     but I am aware -- I know who Mr. Crowley is, yes.

6          Q.     (BY MR. LIVINGSTON:)  Well, he was a

7     friend, wasn't he?

8          A.     I would say more of an acquaintance.

9          Q.     Well, did you work with him in the

10    Detroit office?

11         A.     No.  He was -- as far as I knew, I

12    think he was retired when I started working.

13         Q.     Well, why don't we look at Exhibit

14    49.

15                    (GE Exhibit 49 was marked for

16                    identification.)

17         Q.     (BY MR. LIVINGSTON:)  Do you see this

18    is an email from -- well, from you to -- I'm sorry,

19    to Jack Crowley from yourself.  It looks like a

20    personal email, jralph1972@aol.com, dated April 19,

21    2009?

22         A.     That's correct.

23         Q.     Okay.  Was it a matter of practice

24    that you would conduct official DEA business using

25    your personal email account?

1          A.     No.  I think it was very limited.  In

2    fact, I don't recall outside of this ever doing it.

3    I didn't have access to be able to generate emails

4    outside of the office early in my career, and I was

5    following up on something I was asked to do to get

6    some information to Mr. Crowley, and I did it from

7    this personal email.

8          Q.     Okay.  So did you have -- create any

9    other emails or exchange any other emails relating

10   to DEA business from this or any other personal

11   account at any point in time?

12         A.     I don't believe so.  I mean it is a

13   long time ago.  Early -- I know early in my career,

14   there -- they didn't have off-site abilities to do

15   emails.  But generally speaking, no contact with

16   registrants, no guidance, no official business

17   would have been conducted, although I guess this

18   could be considered government business.  I was

19   asked to give him some guidance, and I did this

20   through an email.

21         Q.     Right.  Well, this email is about

22   official government business.  It is not about, you

23   know, getting together for lunch, right?

24         A.     No.  I agree.  I said it was giving

25   him some guidance.

1          Q.      Okay.  And is this email account

2    still active?

3          A.      It is.

4          Q.      And have you destroyed any of your

5    old emails that are on this account that might have

6    involved DEA business?

7          A.      I think it auto deletes now.  So I

8    think the answer to that would be yes.

9          Q.      And can you give us the background

10   really quickly here about why you were

11   corresponding with Mr. Crowley, who was at Purdue?

12         A.      My supervisor asked me -- let me read

13   this one second.  It has been a while since I saw

14   this.

15                 It was my recollection that he was

16   coming to Detroit and he was going to be visiting

17   some pharmacies as a Purdue -- on behalf of Purdue.

18         Q.      What was Mr. Crowley's position at

19   the time with Purdue?

20         A.      I know he was in compliance, but I

21   don't know for sure, sir.

22         Q.      Okay.  And you know that Purdue has

23   pled guilty to doing some pretty nasty things with

24   respect to opioids, correct?

25         A.      I am aware of that, and Mr. Crowley

Page 144

1   was right at the middle of all that.

2        Q.     And in the beginning, you say, "I'm

3   sorry it took so long, but I have been extremely

4   busy at work and have a couple projects going on at

5   home.  I read your proposed questions, and they are

6   very detailed and comprehensive."

7                 Where are those proposed questions?

8   Are they on your email account, or have they been

9   deleted?

10        A.     They wouldn't have been on -- he

11   wouldn't have emailed me at this account.

12        Q.     So you are responding to an email you

13   received from your email account at the DEA?

14        A.     I don't recall even being emailed.

15   It might have went to somebody else and I was given

16   something in writing.

17        Q.     Okay.  And it says, "You definitely

18   haven't lost your skills.  I wish some of my fellow

19   investigators were this thorough."

20                 So, again, it sounds like you knew

21   him pretty well; is that true?

22        A.     We had a couple of conversations.  I

23   met him once in person.  He was in the Detroit

24   office.  But I wouldn't say I knew him well.  We

25   had some phone conversations.

1          Q.     All right.  So essentially,

2    Mr. Crowley is asking you for some advice about

3    when he -- when he investigates a pharmacy, you

4    know, what he should look for as potentially signs

5    that, you know, there's a problem, correct?

6          A.     Yes.

7          Q.     And then you -- you provided him with

8    some guidance, correct?

9          A.     Yes.

10         Q.     And the first thing you say is you

11   would want to observe the pharmacy for a while.

12   You say, "I might also take some time and drive

13   around the surrounding area.  Generally in Detroit

14   most of these problem pharmacies will have illegal

15   sales or transfer of pills from the purchaser to

16   someone outside.  It is a fairly common activity."

17              I mean are you essentially saying you

18   want to be on the lookout for long lines of people

19   who are zombie-like or out-of-state licenses in the

20   parking lot of the pharmacy, that sort of thing?

21         A.     Yeah, generally speaking.  I don't

22   recall the names, but I recall the locations of a

23   couple of the pharmacies, and they were a

24   concerning area to go to in the city of Detroit.

25   So I am just giving him some general guidance about

1  what he might observe in the parking lots.

2       Q.    And neither you nor Dr. McCann did

3  anything like that, neither of you ever went to any

4  of the pharmacies that are owend and operated by

5  the defendants in Lake and Trumbull Counties,

6  correct?

7       A.    That is a correct statement, sir.

8       Q.    And, to your knowledge, nobody --

9  none of the other experts or nobody, to your

10 knowledge, on plaintiffs' side did that, correct?

11           MS. KNIGHT:  Object to form.

12      A.    I do not know, sir.

13      Q.    (BY MR. LIVINGSTON:)  But to your

14 knowledge, you are not aware of anyone, correct?

15           MS. KNIGHT:  Object to form.

16      A.    As I stated, I don't know if anyone

17 did or did not do that.

18      Q.    (BY MR. LIVINGSTON:)  All right.  The

19 next thing you list is "A good visual check of the

20 pharmacy says a lot.  Pills, bottles, records

21 laying all around and disorganization is the norm

22 for most of the bad pharmacies."  Do you see that?

23      A.    Yes.

24      Q.    And again, this is not something that

25 you and Dr. McCann or anyone else on the

Page 147

1  plaintiffs' side, to your knowledge, did with

2  respect to defendants' pharmacies.  Nobody went

3  around and made this kind of visual check and found

4  this kind of evidence, correct?

5                    MS. KNIGHT:  Object to form.  Asked

6  and answered.

7            A.    I did not do this, and I do not

8  believe Dr. McCann did this.  I can't speak for any

9  other experts or consultants that were working for

10  the plaintiffs.  I do not have any knowledge

11  whether they did or didn't.

12            Q.    (BY MR. LIVINGSTON:)  And then if you

13  go further down, the next paragraph says, "If any

14  of the distributor/suppliers have conducted

15  investigations or collected data from the pharmacy,

16  you may want to get more detailed information."

17                    So you are basically suggesting that

18  if the pharmacy is supplied by a distributor, you

19  might want to talk to the distributor to see if

20  they know anything about the pharmacy, correct?

21            A.    Yes.  I took particular interest in

22  this because I was wondering if Mr. Crowley

23  actually did this, what he would do with the

24  information.

25            Q.    Okay.  Number 3 -- well, in this

1    case, if you were to make that inquiry, you would

2    be talking to the corporate office of these

3    pharmacies because they are all -- this is a

4    self-distribution situation where all the

5    pharmacies are owned by the same company, correct?

6            A.    I am speaking about Mr. Crowley and

7    his visit to Detroit.

8            Q.    Right, yeah.  Purdue is a

9    manufacturer, so it is just a completely different

10   situation, right?

11           A.    Well, it is a distribution from a

12   distributor to a pharmacy.  It is not a chain, but

13   it is the same business.  But I will agree with

14   you.

15           Q.    Let's get to the more important

16   paragraph, the next one.  It says, "You may already

17   know this, but a general pharmacy average for

18   ordering the eighty milligram" -- you are referring

19   to Oxy here, right, eighty milligram product?

20           A.    Yes.

21           Q.    -- "is approximately three hundred to

22   one thousand dosages units per month.  If any

23   pharmacy you visit is ordering a larger amount and

24   not proportionate to the OxyContin strengths, then

25   you might want to investigate the totals more in

1   depth to ensure it is legitimate."

2                   Do you see that?

3         A.      Yes.

4         Q.      So basically what you are telling

5   Mr. Crowley to be on the lookout for is, hey, if

6   you see that they are ordering, the pharmacy is

7   ordering more than a thousand doses, you know, it

8   is a red flag for you.  And you might want to do

9   your due diligence to see if there really is

10  something amiss with the pharmacy, correct?

11        A.      Conceptually, that would be a good

12  description of doing due diligence, by looking at

13  the distributions of strengths of drugs, I agree,

14  yes.

15        Q.      Right.  And conversely you are

16  telling Mr. Crowley that if the pharmacy has less

17  than a thousand dosage units per month, and

18  especially substantially less, then that shouldn't

19  raise his eyebrow, that would not be a red flag,

20  and he doesn't need to do any further due

21  diligence?

22                MS. KNIGHT:  Object to form.

23        A.      I don't think it would completely

24  preclude it, but generally speaking if it was much

25  less, a hundred couple dosage units a month, I

1   would tend to agree with that statement.

2          Q.     (BY MR. LIVINGSTON:)  Now I would

3   like you to turn to Exhibit 50.

4                  (GE Exhibit 50 was marked for

5                  identification.)

6          Q.     (BY MR. LIVINGSTON:)  And again, this

7   is something that our data consultants, using the

8   data that has been produced in this case, the OARRS

9   data, performed at our request.  And this is

10  basically the average monthly oxycodone eighty

11  milligram dosage units dispensed by Overholts

12  Pharmacy.  Do you know who Overholts Pharmacy is?

13         A.     It's -- yes, generally speaking.

14         Q.     Who is Overholts?

15         A.     Well, it's an independent pharmacy.

16  I --

17         Q.     And do you know what happened to

18  Overholts?

19                MS. KNIGHT:  Mr. Livingston, you need

20  to let Mr. Rafalski finish his answer.

21                MR. LIVINGSTON:  I'm sorry.  I

22  thought he was finished.  I'm just trying to move

23  it along.

24                MS. KNIGHT:  Well, we've spent all

25  morning talking about areas that he doesn't have

1    opinions on.  You can let him finish his answer.

2           A.     I recall seeing it on one of

3    Dr. McCann's charts, and it's in either Lake or

4    Trumbull County.  I know it was a high dispenser,

5    but other than that, I don't have any other

6    information now with regard to what happened with

7    that pharmacy.

8           Q.     (BY MR. LIVINGSTON:)  Well, Overholts

9    was eventually shut down and its owner sent to jail

10   for, you know, diverting opioids.  But you see

11   there that Overholts is well above your one

12   thousand dosage units cutoff, correct?

13          A.     It does -- the chart does say that.

14   If it's accurate, I agree.

15          Q.     Yeah.  So if you were investigating

16   Overholts, this would have been a red flag for you

17   that they were well above your cutoff, correct?

18          A.     It would have definitely required

19   some scrutiny.

20          Q.     Is okay.  And if you -- do you know

21   who the Franklin Pharmacy is, where that

22   pharmacy --

23          A.     I do not.

24          Q.     Okay.  That's another pharmacy that

25   had some issues; in fact, McKesson cut them off at

1    some point.  And they were also an independent

2    pharmacy.  And you see that they're also more than

3    double above your cutoff; do you see that?

4         A.    I do.  But just -- just for

5    clarification, I think my email to Mr. Crowley was

6    a couple of years earlier.  And I'm not so sure

7    that as time went on, a thousand would have been --

8    a thousand a month would have been accurate, as

9    that use of that drug escalated rapidly, just

10   pointing that out to you.

11        Q.    Well, are you saying that the number

12   would have gone up or down?

13        A.    My number of a thousand would have

14   went up.

15        Q.    Okay.

16        A.    Early guidance that I received first

17   in Detroit would be oxycodone products.  All

18   oxycodone products in the year would have probably

19   been under -- well, under probably ten thousand

20   when I first started.

21        Q.    Okay.  In any event, so are you

22   saying that maybe Franklin wouldn't have raised

23   your eyebrows if you had investigated Franklin

24   because the dosage cutoff was more than a thousand?

25        A.    Just looking at the chart and seeing

Page 153

1   those numbers, it would be outside of the norm, but

2   that doesn't mean that it's diverting or there's

3   some illicit conduct, although if it ranked high

4   compared to all other pharmacies, it bears some

5   scrutiny but there could be an explanation.

6            That's the essence -- interestingly,

7   that's the essence of due diligence is to determine

8   whether or not that the bar graphs like this are

9   legitimate or illegitimate dispensing.

10       Q.     We don't need to talk about

11  nondefendants, but if we skip ahead, there's all

12  defendants and then there's Giant Eagle by its

13  lonesome.  Do you see that all defendants is just a

14  small fraction of the thousand dosage units cutoff

15  that we've been speaking about?

16       A.     Yes, but again, in this chart, we're

17  talking about the eighty milligrams hydrocodone --

18  or oxycodone tablets, so we had some other

19  activities that occurred during the time frame.

20  Had the reformulation of the oxycodone, OxyContin

21  eighty milligram.  That caused a huge shift to the

22  thirty milligram oxycodone.

23            So there's other factors to

24  determine.  Looking at this specific drug over this

25  wide time frame, it's concerning with the data that

1   we see there.

2          Q.      But looking at this -- this metric

3   alone, if you were to have looked at all defendants

4   or Giant Eagles of dispensing of eighty milligram

5   oxy during this time frame, that would not have

6   raised any concerns on your part?

7                  MS. KNIGHT:  Object to the form.

8          A.      I don't know that I would have ever

9   looked at it in this manner.  Again, that's a

10  really wide time frame for the data, so I don't

11  know how the data would change if we looked at each

12  year.

13                 I'm always cautious to just look at a

14  chart and make some kind of assumptions or

15  determinations.  I mean Overholts generally -- I

16  mean, Overholts would be a concern, obviously.  But

17  then I don't know what the time frame of

18  Overholts's conduct is.

19                 So just clarifying, just looking at a

20  chart gives some indications, but it's not the

21  strength that I think you're trying to apply to it

22  in regards to the questions to me.

23          Q.      (BY MR. LIVINGSTON:)  Just turn to

24  the next page on this exhibit, there's another

25  chart, average monthly oxycodone eighty milligram

Page 155

1   dosage units dispensed.  This is for Giant Eagle's

2   pharmacies in these two counties on a pharmacy by

3   pharmacy basis.

4                    And do you see that for the most

5   part, most months for most pharmacies, literally

6   there was -- there was not one dosage of -- dose of

7   eighty milligram oxy that was dispensed and filled?

8   Do you see that?

9           A.     I see that's what these charts show.

10          Q.     And again, just looking at this, if I

11  just put this in front of you, said would this

12  cause you any concern, you know, about this

13  pharmacy, you would say no, this looks exemplary;

14  this looks like this pharmacy is hardly involved in

15  dispensing this drug at all, correct?

16                  MS. KNIGHT:  Object to form.

17          A.     I don't know that I would use that

18  terminology, but if I saw those dispensing numbers

19  I obviously wouldn't rush to take a look at it, if

20  that was your question.

21          Q.     (BY MR. LIVINGSTON:)  That was the

22  question.  Thank you for clarifying.

23                  MS. KNIGHT:  Mr. Livingston, when we

24  get to a good breaking point, let me know.  It

25  would be great.

1              MR. LIVINGSTON:  Okay.  We're almost

2    there.

3         Q.      (BY MR. LIVINGSTON:)  Now, you did

4    make this comparison with respect to Safe Script.

5    You looked at Safe Script's oxy dispensing compared

6    to what other pharmacies were doing, correct?  You

7    specifically looked at that?

8         A.      Yes, sir.

9         Q.      Okay.  That's the exercise we just

10   went through.  We looked at how much some of the

11   independents were dispensing, all defendants,

12   nondefendants, Giant Eagle, right, we just went

13   through that exercise?

14              MS. KNIGHT:  Objection to form.

15        A.      Yes, but again, it's just one

16   specific drug for a broad timeline.  So it's a very

17   limited picture of the activity of the pharmacy.

18        Q.      (BY MR. LIVINGSTON:)  Did you review

19   any of the testimony in this case that was provided

20   under oath by several Ohio Board of Pharmacy agents

21   who were responsible for Lake and Trumbull

22   Counties, did you look at that testimony?

23        A.      No, sir.  I did not.

24        Q.      So you're not aware of the fact that

25   Agent Pavlich testified under oath that

1   Dr. Franklin, who was ultimately -- well, he

2   ultimately was killed by his wife, but before that

3   happened, he got in trouble with the Ohio board for

4   dispensing, writing bad scripts for opioids.

5               You didn't know that Mr. Pavlich

6   testified that Dr. Franklin would write scripts for

7   opioids and he would tell his customers, do not

8   fill at the Giant Eagle and Rite Aids across the

9   street, go to Overholts; you're not aware of that

10  testimony, are you?

11              MS. KNIGHT:  Objection to form.

12        A.    As I stated, I had not read those

13  depositions.

14        Q.    (BY MR. LIVINGSTON:)  And isn't that

15  kind of information the sort of thing, the sort

16  of -- it would be a factor to you that would

17  suggest that those pharmacies were good pharmacies

18  and were not bad pharmacies with respect to the

19  diversion of opioids in these counties?

20              MS. KNIGHT:  Objection to form.

21        A.    I wouldn't draw that conclusion from

22  that.

23        Q.    (BY MR. LIVINGSTON:)  Well, would you

24  draw the conclusion that you should get on your

25  phone and call up the local police and say, you

1   better scope out Giant Eagle and Rite Aid?  It

2   wouldn't cause you to do that, would it?

3                MS. KNIGHT:  Objection to form.

4        A.     That's totally outside of the

5   previous question.  I just wouldn't come to make

6   that conclusion.  It's such a limited amount of

7   facts why a doctor would say, don't fill them

8   across the street.  Obviously maybe something

9   occurred and he directed them somewhere else, or he

10   already had a prearranged agreement with Overholts.

11                So just that broad statement, I can't

12   draw any conclusions from that.

13        Q.     (BY MR. LIVINGSTON:)  Are you aware

14   that the three agents all testified that all of the

15   defendants, to their knowledge and information,

16   were always in compliance with the Ohio Board of

17   Pharmacy regulations, including their many SOM

18   regulation and their corresponding duty

19   obligations, are you aware of that?  Did you factor

20   that into your analysis?

21        A.     I did not read their depositions and

22   I am not aware of that testimony.

23        Q.     So the plaintiffs' attorneys did not

24   suggest to you that you should read those

25   depositions?

1              MS. KNIGHT:  Object to form.

2         A.    They don't suggest what to read or

3    what not to read.  I -- I request documents to draw

4    my opinion.

5              My experience in dealings with boards

6    of pharmacies and the types of inspections they

7    conduct are more at a pharmacy level and typically

8    don't look at the same type of issues that I look

9    at.

10        Q.    (BY MR. LIVINGSTON:)  So are you

11   telling us that you didn't think it was important,

12   before you issued your opinion that these

13   pharmacies substantially contributed to the opioid

14   crisis in these two counties, it wasn't important

15   for you to look at what the Ohio Board of Pharmacy

16   agents had to say about whether those pharmacies

17   were acting lawfully or unlawfully?

18             MS. KNIGHT:  Objection to form.

19        A.    I don't qualify it as important or to

20   be unimportant.  It is just something I didn't look

21   at in formulating my opinion.

22        Q.    (BY MR. LIVINGSTON:)  Well, we know

23   it wasn't important enough to be included on your

24   Schedule I, correct, as something that you

25   reviewed?

1          A.     I did not review those documents,

2    sir.

3                    MR. LIVINGSTON:  I think we can take

4    a break.

5                    MS. KNIGHT:  Thank you.

6                    THE VIDEOGRAPHER:  The time is now

7    11:05 a.m.  We're off the record.

8                    MR. LIVINGSTON:  Ten minutes.

9                    (Whereupon, a break was had from

10                   10:05 a.m. until 11:18 a.m. EDT)

11                   THE VIDEOGRAPHER:  The time is now

12   approximately 11:18 a.m.  We're on the record.

13                   MR. LIVINGSTON:  I have still a

14   number of questions that I would like to ask this

15   witness.  But as a matter of courtesy, I'm going to

16   now turn it over to my colleagues so that they can

17   get their questions in before the end of the day,

18   and then I will reserve my rights when they're

19   done, if there's time left, which I believe there

20   will be, to finish my questioning.

21

22   EXAMINATION BY MS. SWIFT:

23          Q.     Mr. Rafalski, this is Kate Swift.

24   Can you hear me okay?

25          A.     I can hear you, ma'am.

1          Q.     Good morning.  We met once before.

2    It's good to see you again, sir.

3          A.     You too.

4               MS. KNIGHT:  Ms. Swift, exactly which

5    box should we pull?

6               MS. SWIFT:  Can you tell which one is

7    the Walgreens's box?

8               MS. KNIGHT:  I'm so sorry.  Which

9    firm are you with?

10              MS. SWIFT:  No problem.  It's Bartlit

11   Beck.

12              MS. KNIGHT:  Okay.  Got it.

13         Q.     (BY MS. SWIFT:)  I've got some

14   questions before we even get to any documents.

15         A.     Okay.

16         Q.     Mr. Rafalski, you testified earlier

17   today that the suspicious order monitoring

18   regulation does not require pharmacies to have

19   suspicious order monitoring systems when they're

20   acting as customers purchasing medications from

21   other distributors, do you remember that testimony?

22         A.     Yes, I do.

23         Q.     Distributors have their own separate

24   obligations under the Controlled Substances Act

25   that are different from pharmacy obligations; is

1   that a true statement?

2          A.     Yeah, more specifically under the

3   regulations but promulgated by the CSA, yes.

4          Q.     So, for example, if a Walgreens

5   pharmacy orders medication from ABC Distributor,

6   ABC Distributor has an obligation to monitor and

7   report for suspicious orders, correct?

8          A.     That's a correct statement.

9          Q.     But in your report, you also included

10  an analysis identifying flagged orders that you

11  attribute to the pharmacies but that were shipped

12  by other distributors, do I have that right?

13         A.     Are you speaking of Dr. McCann's

14  flagging the charts?

15         Q.     Yes, sir, I am.

16         A.     That's a correct statement.  Yes, I

17  did.

18         Q.     Doing that, including shipments from

19  other distributors in the flagging analysis, makes

20  a really big difference to the results of the

21  flagging analysis, correct, sir?

22         A.     It does do a change of the results,

23  it does.

24         Q.     I would like to just show you one

25  example to make sure we're on the same page.  Do

Page 163

1    you have your report handy, I believe it was marked

2    as Exhibit 2?

3                  MS. KNIGHT:  I just took it away from

4    him, Ms. Swift.  Hang on one second.

5          Q.    (BY MS. SWIFT:)  You might as well

6    keep that out all day, sir.

7                  MS. KNIGHT:  I don't have a box from

8    you, Ms. Swift.

9                  MS. SWIFT:  You don't have a box from

10   Bartlit Beck.

11                 MS. KNIGHT:  None.

12         Q.    (BY MS. SWIFT:)  Mr. Rafalski, do you

13   have a Bartlit Beck box?

14                 MS. KNIGHT:  He only has what I have.

15         A.     They came to me.  We have an

16   envelope, two boxes and --

17                 MS. KNIGHT:  But nothing from her

18   firm.

19         A.     Nothing from your firm.

20                 MS. SWIFT:  Can we get off the record

21   for one second and talk about that just to make

22   sure we can get on the same page about how we're

23   going to deal with it.

24                 MS. KNIGHT:  Sure.

25                 THE VIDEOGRAPHER:  The time now is

Page 164

1    approximately 11:21 a.m.  We're off the record.

2                    (Whereupon, a break was had from

3                    11:21 a.m. until 11:23 a.m.)

4                    THE VIDEOGRAPHER:  The time is now

5    approximately 11:23 a.m.  We're on the record.

6         Q.     (BY MS. SWIFT:)  Mr. Rafalski, do you

7    have your report in the Lake and Trumbull case in

8    front of you, Exhibit 2?

9         A.     I do, Ms. Swift.

10        Q.     I would like to ask you to turn to

11   Page 46, please.

12        A.     Okay.

13        Q.     And do you see there in the first

14   chart for method A, which I believe you like to

15   refer to as the masters method, for CVS, for

16   example, there are no flagged orders for oxycodone.

17   Do you see that?

18        A.     I do.

19        Q.     But then if you turn to Page 51,

20   there's an analysis for the same method A, but this

21   time including shipments from other distributors as

22   well.  Correct?

23        A.     That's correct.

24        Q.     And in that version of method A,

25   you've got ninety-six percent of CVS's orders of

1    oxycodone flagged.  Is that correct?

2          A.     That's a correct statement.

3          Q.     Which of those numbers is the right

4    one, in your view?

5          A.     I think they're both correct.

6          Q.     How can they both be correct?  How

7    can you have zero flagged orders and ninety-six

8    percent of the orders flagged?

9          A.     Well, the first application is just

10   distributions from CVS to CVS Pharmacy.  The second

11   application we talked about, Chart H, is

12   distribution from all distributors to the CVS

13   Pharmacy.  So I think they accurately reflect the

14   data that they analyze.

15         Q.     And my question was a little bit

16   different.  I understand that that's what the data

17   shows when you run the analysis two completely

18   different ways.

19              But in your opinion, as a consultant

20   on DEA rules and regulations relating to suspicious

21   order monitoring, if you're trying to determine

22   what the right number of flagged orders is for CVS

23   under method A, which is the right number?

24              MS. KNIGHT:  Objection to form.

25         A.     I still believe they both are.  The

1    one stands on its own in regards to CVS, and then

2    the second one in all distributions including

3    oxycodone, I still say both.

4            Q.    (BY MS. SWIFT:)  But you're

5    attributing both of those numbers, the zero percent

6    flagged orders on the one hand and the ninety-six

7    percent flagged orders on the other, you're

8    attributing both of those to CVS, correct, sir?

9            A.    That's correct.

10           Q.    All right.  And we know that the

11   distributors who shipped those other orders to CVS,

12   that ninety-six percent, those distributors also

13   had an obligation to monitor and report for

14   suspicious orders, correct, sir?

15           A.    They also had the same obligation as

16   a distributor, that's correct, Ms. Swift.

17           Q.    But you put all of those flagged

18   orders on CVS, correct?

19           A.    In this methodology H on 51, that's

20   correct.

21           Q.    You did the same thing for all five

22   pharmacy defendants in this case, correct?

23           A.    That's correct.

24           Q.    Was it your idea to add this chart

25   that starts on Page 51 of your report that includes

Page 167

1   shipments from other distributors in the flagged

2   order analysis, was that your idea?

3           A.     Yes.

4           Q.     You didn't get that idea from the

5   plaintiffs' lawyers?

6           A.     No.  This would be consistent with my

7   position in, for example, the Mallinckrodt case.

8   My belief is that the registrants being CVS,

9   Walgreens, Rite Aid, Walmart and HBC, while they're

10  distributing to their own pharmacies, they would

11  also be responsible for products that their

12  pharmacies are purchasing from other distributors

13  for the maintenance of effective controls.

14          Q.     Well, it's not an analysis that you

15  conducted in the Summit and Cuyahoga case, correct,

16  sir?

17          A.     That's correct.

18          Q.     And it's also not an analysis you

19  conducted in New York, correct, sir?

20          A.     That's correct.

21          Q.     And, in fact, we asked you about that

22  in New York and you said it wouldn't be an

23  appropriate way to do it.  Do you remember that?

24          A.     I do not.

25          Q.     Okay.  I show you my first exhibit.

1          MS. SWIFT:  It's been a minute since
2    I have done this.  Can somebody remember, what do I
3    do, right click on it -- introduce exhibit.  I
4    figured it out.
5          I'm going to introduce WAG Exhibit 1.
6    It should be popping up in the exhibit share.  I'll
7    share my screen so you can see it, Mr. Rafalski.
8    Just one second, please.
9               (WAG Exhibit 1 was marked for
10              identification.)
11        Q.    (BY MS. SWIFT:)  Tell me if you can
12   see this on your screen, sir.
13        A.    I can.
14        Q.    Have you seen the document that I've
15   put on the screen before which has an SLCG in the
16   top left corner and it says "Opioid Shipments to
17   Pharmacies in Trumbull County, Ohio" across the
18   top?
19        A.    I don't specifically recall this,
20   only because of the SLCG logo.
21        Q.    And you --
22        A.    It --
23        Q.    Sorry.  Go ahead.
24        A.    It may be contained in one of the
25   indexes that I have, but I don't recall

Page 169

1    specifically seeing this before.

2            Q.    Do you understand that SLCG is

3    Dr. McCann's firm?

4            A.    I do.

5            Q.    Do you understand that he created --

6    Dr. McCann created charts like this for really

7    pharmacies all over the country, you can download

8    it and print it from his website?

9            A.    I've heard some conversation about

10   his website, but I have never went there.  So

11   that's maybe why the SLCG shows up on the form.

12              Because it doesn't show up on any of

13   the documents I have reviewed as part of the

14   litigation.

15           Q.    Got it.  I'll represent to you that I

16   got this Trumbull County pharmacy report from his

17   website.

18              Have you seen charts like this in

19   Dr. McCann's reports in these cases over the years?

20           A.    Yes.  Similar reports to this.

21           Q.    The chart that I've got in front of

22   you right now lists on the first two pages of this

23   document all of the pharmacies in Trumbull County.

24   And you can see the first series of them on the

25   first page, correct, sir?

1          A.       Yes.

2          Q.       And you can see at the top of the

3    page that it shows shipments -- opioid shipments to

4    pharmacies in Trumbull County, Ohio from 2006 to

5    2014, correct?

6          A.       Yes.  I think this is the same chart

7    that appears in, I think it's 9-H of my -- of the

8    McCann report or of the McCann analysis.  I believe

9    I've reviewed the very -- if not this exact chart,

10   a very similar chart to this.

11         Q.       Right.  And you can see over on the

12   right-hand side, the pharmacies are ordered by

13   greatest amount of MME to smallest, can you see

14   that in that far right column?

15         A.       I do.

16         Q.       What is MME, if you know?

17         A.       Morphine metric equivalency, I think.

18         Q.       Does morphine milligram equivalent

19   sound right to you?

20         A.       Yes, I'm sorry.

21         Q.       That's a measure of how strong the

22   opioid is as compared to morphine, correct, sir?

23         A.       Yeah.  There's a factor that you

24   utilize to -- a formula to come up with specific

25   drugs.  So it kind of takes the dosage unit out and

1    just broadly gives I guess one way to look at the

2    volume or harm.

3         Q.    And the reason for doing that, as I

4    understand it, is to allow you to compare different

5    opioids in different dosages by potency; is that

6    your understanding as well?

7         A.    Yes, that's a general understanding.

8    It's kind of similar to looking weight and

9    milligram, but it's just a different calculation.

10        Q.    I'll scroll through so you can see

11   that the list of pharmacies in Trumbull County,

12   it's just two pages, and then it gets into more

13   detail about the individual pharmacies.

14             And then my first question for you on

15   the first two pages is going to be, would you agree

16   with me that the largest Walgreens on this chart is

17   this one right here, 804 West Market Street in

18   Warren, Ohio?

19        A.    I would agree.

20        Q.    That Walgreens at 804 West Market

21   received about, I'm going to round up, about

22   forty-eight million MME of opioids between 2006 and

23   2014, correct?

24        A.    Yes.

25        Q.    Would you agree with me that that's

1   well below the top three pharmacies on this list of

2   pharmacies in Trumbull County?

3           A.      In regards to the MME comparison, I

4   do agree.

5           Q.      There are only three pharmacies in

6   the entire county that received more than a hundred

7   million MME of opioids between 2006 and 2014,

8   correct, sir?

9           A.      According to this analysis, yes.

10          Q.      And the number one on the list is

11  Franklin Pharmacy and Health Care, and we've got

12  Overholts Pharmacy, which we talked about a little

13  bit before today, and the third one is Bellevue

14  Medicine Shoppe.  Do you see that, sir?

15          A.      I see that, yes.

16          Q.      The Franklin Pharmacy received two

17  hundred and forty-one million MME of opioids

18  between 2006 and 2014, correct?

19          A.      That's correct.

20          Q.      Overholts received one hundred and

21  seventy-six million MME of opioids?

22          A.      That's what the chart reflects, yes.

23          Q.      And then the next pharmacy on the

24  list after that top three, Franklin, Overholts and

25  Bellevue, drops down to eighty-eight million,

Page 173

 1  right, sir?

 2          A.      That's correct.

 3          Q.      You didn't do any analysis in your

 4  report of the market share for any of the

 5  pharmacies in either Trumbull or Lake County,

 6  correct, sir?

 7          A.      I did not.

 8          Q.      So you're not going to come to trial

 9  and say Walgreens has X market share and so

10  Walgreens is X percent responsible for the opioid

11  crisis or anything like that, right?

12          A.      That's not an opinion that I was

13  requested to provide or that I did any analysis to

14  be able to provide.  That's a correct statement.

15          Q.      And it is not an opinion that you are

16  going to provide, correct, sir?

17          A.      As I sit here today, I would not

18  because I haven't formed an opinion on it.

19          Q.      All right.  If you change your mind,

20  will you let us know?

21          A.      Well, I would probably file something

22  and we would visit again, so, yes, I will let you

23  know.

24          Q.      Well, sitting here today, based on

25  the report that you have submitted and that we've

1   had an opportunity to look at, you can't say

2   whether Walgreens is one percent responsible for

3   the opioids crisis, ninety-nine percent responsible

4   or anything in between, correct?

5            A.    I did not do an analysis that would

6   have quantified or given an amount of each

7   particular defendant in regards to their dispensing

8   or their activity.  I didn't look at it that way.

9   It was just the two opinions that are in my report

10  are the only things that I focused on.

11           Q.    You can't offer any assessment of the

12  level of responsibility that any of the five

13  pharmacies in the case have for any opioids crisis

14  in Lake or Trumbull County, correct?

15                 MS. KNIGHT:  Objection to form.

16           A.    Well, what do you mean by level of

17  responsibility?

18           Q.    (BY MS. SWIFT:)  I mean what I was

19  asking you before, are you going to come in and say

20  Walgreens is one percent responsible for the

21  opioids crisis in Lake and Trumbull Counties?  You

22  are not going to do that, right?

23           A.    Well, I'm not going to put a percent

24  on there.  I mean, my opinions are pretty well

25  stated in my report.  It doesn't provide a percent

Page 175

1    of conduct.  It's just they failed it -- they

2    failed in the suspicious order monitoring system

3    and maintenance of effective controls.

4                  So I have no intentions of coming in

5    and saying they're hypothetically thirty-three

6    percent responsible.

7          Q.     Or any other level of responsibility?

8          A.     Correct.

9          Q.     Quantified?

10         A.     Correct.  It's just a failure as I

11   pointed out in my report.

12         Q.     You're not connecting any failure

13   that you identify in your report to a level of

14   contribution to an opioids crisis in Lake or

15   Trumbull County, correct?

16                MS. KNIGHT:  Object to form.

17         A.     Well, I'm saying there's a

18   contribution.  I am just not putting a figure on

19   it.

20         Q.     (BY MS. SWIFT:)  You can't quantify

21   the contribution; is that fair?

22         A.     I did not try to do that, that's

23   correct.

24         Q.     And you can't do it; is that fair?

25                MS. KNIGHT:  Object to form.

1          A.      Yeah, I think that would be outside

2     of my expertise other than just doing the raw

3     numbers.  That would be a correct statement.

4          Q.      (BY MS. SWIFT:)  Right.  We talked a

5     little bit about the Overholts Pharmacy that

6     received -- well, let's go back to the chart and

7     look at it.  You can see the Overholts Pharmacy

8     received a hundred and seventy-six million MME,

9     compared to that biggest Walgreens on the list, the

10    one at 804 West Market which received about

11    forty-eight million MME, right, sir?

12         A.      So now I'm seeing like a multitude of

13    screens.  Do you --

14              MS. KNIGHT:  Yeah, I think we're

15    seeing your background, Kate.

16              MS. SWIFT:  Got it.

17              MR. FULLER:  But thank you for the

18    realtime, Kate.

19              MS. SWIFT:  Mike, anytime.

20         A.      Appreciate that.

21         Q.      (BY MS. SWIFT:)  I appreciate your

22    letting me know.

23         A.      It's so small --

24              MS. KNIGHT:  I thought it was my

25    screen or I would have spoken up sooner.  I was

```
 1   trying to fix it on my computer.
 2           Q.     (BY MS. SWIFT:)  What can you see
 3   now?
 4           A.     That's better.  Thank you.
 5                  MS. KNIGHT:  That's better.
 6           Q.     (BY MS. SWIFT:)  Would you agree with
 7   me -- this is a little unfair, I'm going to ask you
 8   to do a little bit of math.  Would you agree with
 9   me that the Overholts Pharmacy received roughly a
10   hundred and twenty-eight million more MME of
11   opioids than the biggest Walgreens on the list?
12                  MS. KNIGHT:  Object to form.
13           A.     You said a hundred and --
14           Q.     (BY MS. SWIFT:)  I took a hundred and
15   seventy-six minus forty-eight is what I'm doing.
16   It's more than a hundred million --
17           A.     Overholts, I'm sorry.  I was looking
18   at Franklin.  Yes, generally I would agree with
19   that.
20           Q.     When you were at the DEA,
21   Mr. Rafalski, was it important to you to prevent
22   diversion of controlled substances?
23           A.     Yes.  That was the essential
24   responsibility of my job.
25           Q.     Was it important to you to address
```

1   the opioids crisis?

2          A.     Yes.

3          Q.     Was it important to you, while you

4   were at the DEA, to look at all possible factors

5   contributing to the diversion of opioids?

6                MS. KNIGHT:  Object to form,

7   objection to form.

8          A.     That's a pretty broad statement, but

9   I wouldn't disagree with it.

10         Q.     (BY MS. SWIFT:)  But as a paid expert

11  for the plaintiffs' lawyers in this case, you

12  ignored Overholts Pharmacy all together; is that

13  correct?

14         A.     Well, I don't know that I would have

15  ignored it.  Just like if I was at the DEA and I

16  was conducting an investigation or -- for example,

17  one of the cases I worked, Masters Pharmaceutical,

18  I evaluated some of the customers.  And it's not

19  that I overlooked other customers, it's just that

20  that wasn't -- it wouldn't have been a pharmacy

21  that I would have looked at.

22                So in regards to this, as an expert,

23  I'm given defendants to review, and I'm given a

24  specific area to do a review in, and that's

25  suspicious order monitoring system and maintenance

1  of effective controls.

2          So I wouldn't -- you know, to go out

3  and start reviewing other pharmacies outside of the

4  five defendants, I just wouldn't do that.

5          Q.    So it wasn't your assignment in this

6  case to figure out what the most important

7  contributors to the opioids crisis in Lake and

8  Trumbull County was; is that a fair statement?

9          A.    I don't know if that was the

10  reasoning.  I just was given five defendants to

11  review.

12          Q.    So is it fair to say that the reason

13  that you ignored Overholts Pharmacy in your

14  analysis in this case is because the plaintiffs'

15  lawyers told you only to focus on the five

16  pharmacies that are in the case?

17          MS. KNIGHT:  Objection to form.

18          A.    Yes, when I -- when I agree to give

19  an opinion, it's specific to certain defendants.

20  And I don't stray outside of that.

21          Q.    (BY MS. SWIFT:)  You don't stray

22  outside of that, and, therefore, to the extent that

23  the Overholts Pharmacy was the principal

24  contributor to an opioids crisis in Lake and

25  Trumbull County, you just don't have anything to

Page 180

1  say about it because it wasn't something the

2  plaintiffs' lawyers asked you to do; is that fair,

3  sir?

4              MS. KNIGHT:  Objection to form.

5          A.    Well, it's not something I reviewed

6  or have any information to formulate an opinion on,

7  so I guess it's a correct statement.

8          Q.    (BY MS. SWIFT:)  All right.  The

9  Franklin Pharmacy is actually the biggest one on

10  this list, and that one has got two hundred and

11  forty-one million MME over the time frame that

12  we're talking about, right, sir?

13          A.    That's correct.

14          Q.    If you'll bear with me, I'd like to

15  ask you to do -- this is the last math problem for

16  the day, I think.  I want to count up the Walgreens

17  that are on the list in Trumbull County.  I believe

18  there are six of them.  We've got this one here,

19  804 West Market, right, you see that?

20          A.    Yes.

21          Q.    And we've already said that one has

22  got about forty-eight million, MME, right?

23          A.    Correct.

24          Q.    And the next, the next Walgreens is

25  5027 Youngstown, also in Warren, do you see that?

Page 181

1          A.      Yes.

2          Q.      Also -- you're faster than I am.

3          A.      Ninety-five million will be it.

4          Q.      And then the next Walgreens is the

5     one at 3390 Elm Road, right?

6          A.      Correct.

7          Q.      That one is about forty-six million?

8          A.      One forty.

9          Q.      And the next one is the one at 15

10    South Main Street in Hubbard, do you see that?

11         A.      I do, so it's one eighty now.

12         Q.      Okay.  The next one is this one at

13    600 South Mecca, are you with me?

14         A.      I see it.  So that's thirty -- so

15    we're at two ten.

16         Q.      Then we've got this one at 2249

17    Youngstown-Warren Road in Niles, about 28 million?

18         A.      Yes.  So we're at two thirty-eight.

19    We'll probably round that up just to be two

20    thirty-nine.

21         Q.      And we'll just scroll through to make

22    sure we didn't miss any others at the bottom of the

23    list.

24         A.      I think you only have six in

25    Trumbull.

1          Q.      Yep.  And that's six, right?

2          A.      Yes.

3          Q.      Would you agree with me that all six

4    Walgreens added up together for this time frame

5    received less MME of opioids than the number one

6    pharmacy on the list?

7          A.      Yes.  We kind of rounded down going

8    through, but we're at two thirty-eight and there's

9    two forty-one.  So the math that we did here, I

10   would agree that it's below two forty-one.

11         Q.      Right.  You worked on the Masters

12   Pharmaceutical case when you were at DEA, correct?

13                 (Reporter clarification.)

14         Q.      You worked on the Masters

15   Pharmaceutical case while you were at DEA, correct,

16   sir?

17         A.      I did.

18         Q.      You were the lead investigator in

19   that case?

20         A.      I was.

21         Q.      Three of the flagging methods that

22   you used in this case, you purport to be based, at

23   least in part, on the method that Masters used; is

24   that fair?

25         A.      That would be a fair statement,

Page 183

1   Ms. Swift.

2          Q.      It's methods A, B and G, as in good?

3          A.      Yes.

4          Q.      Masters was a distributor of opioids

5   to pharmacies around the country, correct?

6          A.      Yes, that's an accurate statement.

7          Q.      Did Masters lose its license to

8   distribute opioids as a result of your case?

9          A.      Yes.

10          Q.      Do you know how many oxycodone pills,

11  how many dosage units Masters shipped to its

12  largest pharmacy customer in 2009, just off the top

13  of your head?

14          A.      I do not.

15          Q.      That's not something that you looked

16  at for purposes of your report in Lake and Trumbull

17  County, correct, Masters' shipments to pharmacies?

18          A.      No, it was not.

19          Q.      Are you aware that Masters did ship

20  opioids to pharmacies in Lake and Trumbull

21  Counties?

22          A.      I think I recall seeing and reviewing

23  some charts of Mr. McCann or some of the data.  I

24  believe so.  I don't recall which specific once.

25          Q.      You didn't look at any of Masters'

Page 184

1  shipments to pharmacies in Lake and Trumbull County

2  for purposes of this case, correct?

3          MS. KNIGHT:  You keep sort of dying

4  off in the middle of the sentence.  I didn't get

5  that whole sentence.  Sorry.

6          Q.    (BY MS. SWIFT:)  Mr. Rafalski, you

7  did not look at any of Masters' shipments to

8  pharmacies in Lake and Trumbull County for purposes

9  of this case, correct?

10         A.    That's a correct statement.  I did

11 not.

12         Q.    You have no opinion on whether

13 Masters is more or less responsible for the opioids

14 crisis in Lake and Trumbull County than any other

15 distributor, correct?

16         A.    I don't have an opinion on Masters

17 because I did not review their activity in Trumbull

18 and Lake County.

19         Q.    All right.  Now I'm going to show you

20 another one of Dr. McCann's charts.  Bear with me

21 for a second.  I'm going to mark another exhibit.

22 This will be WAG 2.

23                (WAG Exhibit 2 was marked for

24                identification.)

25         Q.    (BY MS. SWIFT:)  Can you see that on

Page 185

1     the screen, Mr. Rafalski?

2          A.     Yeah, but you have to minimize all

3     your other screens.

4               MS. SWIFT:  I did it again.  Hold on.

5          Q.     (BY MS. SWIFT:)  How's that?

6          A.     That's good, Ms. Swift.  Thank you.

7          Q.     I'll represent to you, but tell me if

8     you disagree that this is what you see on the

9     screen.  This is the same kind of chart we were

10    just looking at from Dr. McCann's website.  This is

11    for Lake County, Ohio, not Trumbull.  Do you see

12    that at the top of the page?

13         A.     I do.

14         Q.     All right.  And you'll recall that

15    the biggest Walgreens in Trumbull County that we

16    looked at was the one at 804 West Market and had

17    about forty-eight million MME for the time period

18    2006 to 2014.  Do you remember that?

19         A.     Yes.

20         Q.     Do you see here, sir, that the

21    biggest Walgreens in Lake County is this one at

22    5881 Som Center Road in Willoughby and it's bigger?

23    It received about fifty-seven million MME over the

24    time period, do you see that?

25         A.     I see it.

1        Q.      Would you agree with me based on

2   these two charts from Dr. McCann that Walgreens at

3   5881 Som Center Road is the biggest Walgreens in

4   the two counties?

5                   MS. KNIGHT:  Objection to form.

6        A.      By MME, yes.

7        Q.      (BY MS. SWIFT:)  Now, I'm going to

8   turn to Page 16 of WAG Exhibit 2, which you can see

9   right here is the page number where the details

10  about that Walgreens at 5881 Som Center Road --

11       A.      Yes, I'm familiar with that.

12       Q.      I'm sorry?

13       A.      Yes, I'm familiar with that.

14  That's --

15       Q.      I get it.

16       A.      This is similar to the production

17  that I talked about.

18       Q.      You're familiar with the way

19  Mr. McCann puts together these charts, is that what

20  you're saying?

21       A.      Yes.

22       Q.      On Page 16, you can see -- let me see

23  if I can show the whole thing.  Can you see the

24  whole screen, Mr. Rafalski?

25       A.      I can see through year 2009 full.

Page 187

1          Q.     Perfect.

2          A.     Okay.

3          Q.     And what we see on this screen is

4    more detail about the shipments received at the

5    Walgreens on Som Center Road between 2006 and 2014,

6    correct?

7          A.     Yes.

8          Q.     And in 2009, I believe you said you

9    could see 2009, Walgreens -- this Walgreens on Som

10   Center Road received three hundred and twenty-five

11   thousand doses of oxycodone.  Do you see that?

12         A.     Yes.

13         Q.     Here?

14         A.     I see it.

15         Q.     In 2010, the Walgreens on Som Center

16   Road received three hundred and sixty-four thousand

17   eight hundred dosage units of oxycodone.  Do you

18   see that?

19         A.     I do.

20         Q.     Then if we flip over to the next page

21   for 2011, you can see it went down just a tiny bit,

22   this Walgreens received three hundred and

23   sixty-four thousand six hundred doses of oxycodone

24   for this entire time period of 2006 to 2014,

25   correct?

1          A.      Two hundred --

2          Q.      Sorry.  I'm sorry.  Strike the

3   question.

4                  In 2011, the Walgreens on Som Center

5   Road received three hundred and sixty-four thousand

6   six hundred dosage units of oxycodone, correct?

7          A.      That's correct.

8          Q.      And then just quickly, you can see

9   from the subsequent years, that it goes down after

10  that?

11         A.      Correct.

12         Q.      I want you to keep that handy.  This

13  is going to be tricky, given that you don't have a

14  hard copy.  Well --

15                 MS. KNIGHT:  I was just going to say,

16  we can't keep anything handy.

17                 MS. SWIFT:  Right.

18         Q.      (BY MS. SWIFT:)  Will you agree with

19  me that the largest year in terms of receipt of

20  oxycodone for this Walgreens on Som Center Road,

21  the biggest year was 2010 with three hundred and

22  sixty-four thousand eight hundred?

23         A.      No, wouldn't it be '11, three

24  sixty-four six hundred?  Yes, you're correct.

25         Q.      It was lightly bigger in 2010.  The

Page 189

1   only point is it never goes above three sixty-five?

2          A.     I agree you moved it up.  It's three

3   sixty-four eight hundred.

4          Q.    Okay.

5          A.     Just for clarification, it's not

6   specific to any particular milligram or pill size.

7   It's just a dosage by family.

8                 THE REPORTER:  Y'all are overlapping

9   a little bit when you're saying the numbers.  You

10  need to wait till each of you finish.  I couldn't

11  hear the end of the numbers.

12                MS. SWIFT:  Do you want us to do them

13  again, Laura?

14                THE REPORTER:  I can figure it out

15  from the chart.

16                MS. SWIFT:  Okay.  I appreciate it.

17  We're not supposed to speak over each other, which

18  both of us know very well and we still do it.  I

19  apologize.

20          Q.    (BY MS. SWIFT:)  All right.  Keeping

21  that roughly three hundred and sixty-five thousand

22  number in your mind, Mr. Rafalski, as the largest

23  number of oxycodone dosage units that this

24  Walgreens ever received in -- you know, on an

25  annual basis in this time frame, I want to move to

Page 190

1   another document.  Are you with me?

2          A.     I'm with you.

3                 MS. SWIFT:  This will be WAG 3.

4                 (WAG Exhibit 3 was marked for

5                 identification.)

6          Q.     (BY MS. SWIFT:)  And just to make

7   sure I'm tracking what I'm showing you, can you see

8   me introducing the exhibit?

9          A.     I can.

10         Q.     Great.  Is that all that you can see?

11         A.     Yes.  So far.

12         Q.     Great.  I've put this exhibit on the

13  screen.  You can see it says "Ohio Prescription

14  Drug Abuse Task Force" on the first page and it

15  says it's a task force report from October 1st of

16  2010, do you see that?

17         A.     I do.  "Task Force Recommendations."

18         Q.     And at the bottom it says "Presented

19  to Governor Ted Strickland and the Ohio General

20  Assembly," correct?

21         A.     I see that, Ms. Strickland --

22  Ms. Swift.

23         Q.     Have you ever seen this document

24  before, Mr. Rafalski?

25         A.     I'm not sure.  Right now I don't

Page 191

1   recall it.

2          Q.     It's not cited in your report.  Is it

3   fair to say you did not rely on this document in

4   forming your opinions in this case?

5          A.     Yes, I do not recall seeing it.

6          Q.     On Page 2, just to give you a sense

7   of what we are looking at here with this Ohio task

8   force report, you can see in the first paragraph of

9   this letter to Governor Strickland that, "The Ohio

10  Prescription Drug Abuse Task Force has completed

11  its work and has developed twenty policy

12  recommendations that we" will -- "we believe will

13  curb Ohio's prescription drug abuse epidemic."  Do

14  you see that?

15         A.     I see that it says that.

16         Q.     All right.  So I am just going to

17  skip to the part that I want to ask you questions

18  about.  And I am happy to show you any part of it

19  that you want.  But I -- in the interest of time, I

20  really just have questions about like a page of it.

21                And where I am going now, for folks

22  following along, is to Page 49, which is Page 39 of

23  the PDF.  And do you see, Mr. Rafalski, at the top

24  of this page, there's the heading, "Regulatory

25  Recommendations"?

Page 192

1          A.      I see this.

2          Q.      And then at the bottom, there's a

3    subheading that says, "Examine the" -- "the

4    Regulation of Prescriber Dispensing of Controlled

5    Substances"; do you see that?

6          A.      I see that.

7          Q.      The -- that first paragraph under

8    that heading says, "Reports have shown some pain

9    clinics essentially operate as 'pill mills' or

10   quasi-pharmacies by dispensing drugs that have the

11   highest potential for abuse and diversion for

12   street use with only cursory or limited medical

13   evaluations."  Did I read all that correctly?

14         A.      You did.

15         Q.      Do you understand from the heading in

16   that first sentence that I have read to you that

17   this section is talking about clinics where doctors

18   dispense drugs directly to patients without having

19   to go to a Walgreens and fill a prescription?

20         A.      Well, I think you can draw the

21   inference that it says that, but my experience with

22   DEA and then as an -- as a expert is the "pill

23   mill" term seem to be pretty -- used pretty broadly

24   now.  And that in -- sometimes even they consider

25   doctors pill -- prescribing doctors pill mills.  So

1  I am always cautious when I see the term "pill

2  mills."  What --

3          Q.    It can have multiple meanings, is

4  that what you are saying?

5          A.    Yes.  Now, pain clinics, for pain

6  clinics, it doesn't -- it -- pain clinics and

7  dispensing would be pursuant to a doctor's

8  registration, if that is what they are speaking

9  about here.  But we may get more direction later in

10  this article.

11          Q.    Okay.  You understand that whether it

12  is referred to as a pill mill or a pain clinic,

13  those are often terms that are used to describe

14  businesses where doctors dispense medications

15  directly to patients?

16          A.    It could, but -- also a pain clinic

17  is sometimes just referred to as a doctor that is

18  writing pain pills.  And then pill mills sometimes

19  are -- doctors are referred to pill mills.  So just

20  so, you know, my -- I don't give an exclusive use

21  to that -- those words.

22          Q.    And I am not asking you to.

23          A.    Okay.

24          Q.    The next sentence in this paragraph

25  says, "This is often done as a direct result of

1   pharmacists refusing to fill prescriptions from

2   suspicious and known intentional overprescribers."

3   Did I read that part correctly?

4           A.     You did.

5           Q.     It goes on to say, "It is also

6   recognized that direct dispensing by prescribers of

7   controlled substances is not submitted to the of

8   Ohio's prescription monitoring system, OARRS."  Did

9   you know that there was ever a period of time where

10  dispensing of controlled substances directly by

11  doctors was not reported in the OARRS system?  Was

12  that something you were aware of?

13          A.     I was not.

14          Q.     But you do know that sometimes

15  doctors dispense directly to patients, right, sir?

16          A.     Practitioners have the ability to

17  dispense as long as they comply with some of the

18  regulations required.  I know that in Michigan they

19  report, just I did not know at least in 2009 that

20  they did not report in Ohio.

21          Q.     The next sentence reads, "In 2009,

22  Ohio prescribers dispensed prescription opioids at

23  a much higher rate than neighboring states."  Did

24  you know that?

25          A.     I did not.

Page 195

1        Q.      And then it refers to Figures 12 and

2   13, and you can see the figures there on the page,

3   right?

4        A.      I can.

5        Q.      Figure 12 shows that in 2009, Ohio

6   prescribers dispensed nine hundred and sixty-nine

7   thousand, three hundred and two dosage units of

8   oxycodone.  Do you see that?

9        A.      I do.

10       Q.      And I am not going to take the time

11  to look at it, but if you look at this -- the

12  footnotes in this report on Page 75 of the PDF, you

13  can see that Footnotes 95 and '6 show that this

14  information comes from ARCOS data, and that is data

15  from the DEA, right, sir?

16       A.      If it says it comes from ARCOS, that

17  would come from the DEA, that's correct.

18       Q.      You recall that the document we were

19  looking at a moment ago, Dr. McCann's chart,

20  regarding the largest Walgreens in both Lake and

21  Trumbull County, the one on SOM Center Road, in

22  2009, that Walgreens received just three hundred

23  and twenty-five thousand doses of oxycodone.  Do

24  you remember that?

25       A.      I do.

1        Q.    Doctors in Ohio dispensed almost

2  three times as much oxycodone as the biggest

3  Walgreens in Lake and Trumbull County, would you

4  agree with that based on what we have seen today?

5              (Reporter clarification.)

6        Q.    (BY MS. SWIFT:)  Based on the

7  documents we have looked at today.

8             MS. KNIGHT:  Objection to form.

9        A.    In -- I -- just that this reflects

10  the entire state of Ohio, that -- this number that

11  is in this report, and you are referring back to

12  the pharmacy that is just located in one county of

13  Ohio.  So just with that caveat, other than that, I

14  would agree.

15        Q.    (BY MS. SWIFT:)  All right.  I am

16  going to make one additional comparison to the --

17  to the -- that Walgreens store on SOM Center Road,

18  and to do that, I got to show you one more

19  document.

20             (WAG Exhibit 4 was marked for

21             identification.)

22             MS. SWIFT:  This will be WAG 4.

23        Q.    (BY MS. SWIFT:)  Can you see that on

24  the screen, sir?

25        A.    I can.

Page 197

1          Q.      And you can see from the first page,

2     this is a document, it is a -- it is a court

3     document from the Southern District of Florida.  Do

4     you see that at the top?

5          A.      I do.

6          Q.      And I will scroll down to the second

7     page, where you can see it is a superseding

8     indictment.  Do you see that?

9          A.      I do.

10          Q.      And the date on it that is stamped on

11     the right-hand side is August 11th, 2011.  Do you

12     see that?

13          A.      Yes.  I am -- I am familiar with many

14     of the names on this.

15          Q.      I was going to ask you, have you seen

16     this -- this superseding indictment from 2011 of --

17     there's a number of doctors listed and other folks.

18     Have you seen this document before?

19          A.      I don't recall specifically the

20     document, but I recall the George brothers, and

21     then there's several doctors on this that I recall

22     from working the Harvard case.

23          Q.      Got it.  All right.  I am just going

24     to ask you a handful of questions about this one.

25     I am going to go to Paragraph Number 1.  Paragraph

Page 198

1   Number 1 of the superseding indictment that I

2   marked as Exhibit 4, WAG Exhibit 4, says that the

3   defendants were members of "a criminal organization

4   that operated principally in Broward and Palm Beach

5   Counties, Florida."

6               Do you understand, Mr. Rafalski, that

7   Florida was home to a large number of pain clinics

8   or pain -- pill mills, whatever you want to call

9   them, in this 2011 time frame?

10          A.    So in Florida, the pain clinic was --

11   would -- in the proper time frame would have

12   been -- doctors would have been dispensing from the

13   pain clinics pursuant to drugs that were purchased

14   through the doctors' DEA registration.  That

15   would --

16          Q.    And you are --

17          A.    And that would be the accurate

18   description at that time period of what a real pain

19   clinic was, until it kind of broadened.

20          Q.    You can see in Paragraph 2 that the

21   Southern District of Florida's superseding

22   indictment described those pain clinics as "a

23   series of 'pill mills.'"  Do you see that?

24          A.    Yes.

25          Q.    Paragraph 2 says that, "Members and

1    associates of the enterprise primarily operated as

2    a series of 'pill mills' where patrons procured

3    prescription narcotics and controlled substances

4    under the guise of medical" -- that is a repeat

5    page, I apologize -- "under the guise of medical

6    necessity," correct?

7          A.    I don't disagree with that statement.

8          Q.    Then we will go to Page 3, which is

9    Page 5 of the PDF, I believe.  And do you see, it

10   starts to list the entities that are involved in

11   this criminal enterprise?

12         A.    I do.

13         Q.    And it includes pain clinics called

14   Hallandale Pain; American Pain, LLC; Executive

15   Pain; and East Coast Pain.  Do you see all of

16   those?

17         A.    I see them.

18         Q.    All right.  Now I am going to go to

19   Page 19.  I want to ask you about some of the

20   doctors in this indictment from Florida.  Do you

21   see the heading, "Defendant Physician Cynthia Cadet

22   and Coconspirator Physicians"?

23         A.    I do.

24         Q.    Then Paragraph 59 is a general

25   paragraph describing the ARCOS database; do you see

Page 200

1   that?

2           A.      I do.

3           Q.      It says, "ARCOS is used to accumulate

4   transactions of controlled substances which are

5   then summarized in reports that federal and state

6   investigators can use to identify diversion into

7   illicit channels of distribution."  Do you agree

8   with all of that?

9           A.      I do.

10          Q.      Now, in the subsequent paragraphs

11  that we will look at, I will scroll over to the

12  next page, starting with Paragraph 60, these

13  paragraphs list amounts of oxycodone that these

14  indicted doctors purchased in this time frame.  And

15  you will see as we go through, it is not the same

16  time frame for every paragraph, but it gives you a

17  general sense, in the 2009 time frame, how much

18  oxycodone these doctors were purchasing.

19          Are you with me so far?

20          A.      I am.

21          Q.      All right.  So in Paragraph 62, do

22  you see that Dr. Cadet ordered eight hundred and

23  eighty-six thousand doses of oxycodone in the

24  course of about fourteen months in the 2009 time

25  frame?

Page 201

1           A.      I do.

2           Q.      And then in Paragraph 64, it says

3    that Dr. Aruta ordered nine hundred and sixteen

4    thousand, three hundred doses of oxycodone in

5    approximately thirteen months in that time frame.

6           A.      I see that also.

7           Q.      Paragraph 66 shows that Dr. Boshers

8    ordered more than a million doses of oxycodone in

9    about eighteen months.  Do you see that?

10          A.      I do.

11          Q.      Dr. Boshers -- maybe I am

12   mispronouncing it.

13          A.      No.  I think that is correct.

14          Q.      Dr. Boshers ordered more than one

15   million doses of oxycodone in about eighteen

16   months, correct?

17          A.      Yeah, that would be a correct

18   statement.

19          Q.      So that one doctor, Dr. Boshers,

20   ordered more oxycodone doses in eighteen months

21   than all of the doctors in Ohio purchased in the

22   year of 2009.  Remember that number for Ohio was

23   just under a million?

24          A.      Yes.  When we were looking at the

25   Ohio report, it is interesting that they failed to

Page 202

1   list the Florida doctors.  I wondered if that was

2   to maybe make Ohio look more significant.

3           Q.     It was an Ohio report.  It was an --

4   a report to the Ohio governor, do you recall that?

5           A.     Yes, but they cited some other states

6   too, West Virginia, and my recollection is they

7   listed some other states to do a comparison.

8           Q.     In any event, you will agree with me

9   that this one doctor in Florida purchased more

10  oxycodone in the 2009 time frame than all of the

11  doctors combined in the state of Ohio?

12          A.     I would not disagree with that

13  statement.

14          Q.     If you look at Paragraph 68, the

15  superseding indictment shows that a Dr. Dreszer

16  ordered eight hundred and forty-nine thousand, six

17  hundred doses of oxycodone in the -- in the 2009

18  time frame, do you see that?

19          A.     I do see that.

20          Q.     And then I am not going to go through

21  them all, but you can see as I scroll that the

22  superseding indictment in the Southern District of

23  Florida goes on from there reciting the amounts of

24  oxycodone that were purchased by additional

25  doctors; do you see that?

1          A.      I do.

2          Q.      Okay.  Now, I will represent to you

3     that we checked the ARCOS data for the doctors who

4     worked at just one of these pain clinics, the

5     American Pain Clinic.  And first of all, have you

6     heard of the American Pain Clinic before today?

7          A.      I have.

8          Q.      What do you know about it?

9          A.      I believe that was owned by the

10    George brothers.  And I think it was maybe the

11    second pain clinic they owned.  I think they owned

12    two.  One closed, and they reopened a second one.

13         Q.      How -- what is the basis of your

14    knowledge about the George brothers and the

15    American Pain Clinic that they ran?

16         A.      It is just some recollection from

17    when I was working at the DEA.

18         Q.      Did you work on this case that we are

19    talking about right now?

20         A.      I worked on the Harvard case, which

21    was distributing to many of the doctors on this

22    list.

23         Q.      Do you know that the George brothers

24    were convicted for their crimes that are outlined

25    in this indictment?

Page 204

1          A.      I know they were convicted.  I don't

2    know if it was specific to this indictment.  I know

3    they were convicted, yes.

4          Q.      Uh-huh.  Do you know that they are in

5    jail to this day?

6          A.      I do not know this -- their status.

7          Q.      Is there anything else that you know

8    about the American Pain Clinic, other than what you

9    have told me already?

10          A.      Other than many of the doctors that I

11    believe were indicted and incarcerated that were

12    working there.

13          Q.      All right.  As I said, we looked at

14    the ARCOS data for these doctors that we just

15    walked through, Dr. Cadet, Dr. Boshers,

16    Dr. Dreszer, and a couple of the other ones.  And I

17    will represent to you -- you don't have to take my

18    word for it, but I will ask you to assume that I am

19    right when I tell you that the DEA's ARCOS data

20    shows that with respect to five doctors who worked

21    at the American Pain Clinic in Florida, those

22    doctors purchased more than 7.6 million dosage

23    units of oxycodone in 2000 -- 2009 alone.  Does

24    that number surprise you, based on what you know

25    about this case?

1                    MS. KNIGHT:  Objection to form.

2          A.     I never -- I never looked at that

3    specific group and that specific number, but I am

4    aware of the large distributions to doctors in

5    South Florida during that time period.

6          Q.     (BY MS. SWIFT:)  You don't dispute

7    that just five doctors at the American Pain Clinic

8    in Florida purchased more than seven million dosage

9    units of oxycodone in 2009?

10                   MS. KNIGHT:  Object to form.

11         A.     No, I do not dispute that.

12         Q.     (BY MS. SWIFT:)  And again, you

13    recall we looked at the numbers for 2009 for all of

14    the doctors in Ohio, and it was under a million

15    dosage units of oxycodone, right?

16         A.     That's correct.

17         Q.     Doctors at this one Florida pain

18    clinic, American Pain, ordered more than seven

19    times as much oxycodone as all Ohio doctors

20    combined.  Did you know that?

21                   MS. KNIGHT:  Objection to form.

22         A.     I -- well, when you said that I know

23    that, are you speaking to the comparison to Ohio I

24    did?

25         Q.     (BY MS. SWIFT:)  Yes.

Page 206

1        A.    No -- well, let me think about that.

2   In my -- I think I did some analysis.  I just don't

3   recall what it was.  But I looked at the

4   distribution to doctors at all of the states during

5   this time period, so I don't have a recollection

6   exactly of the numbers for Florida, but I am sure

7   that at one point I did know it, or at least I --

8   it was part of a list that I looked at.

9        Q.    And again, we looked at the largest

10  Walgreens in all of Lake and Trumbull County and

11  saw that in 2009, that Walgreens received about

12  three hundred and twenty-five thousand dosage units

13  of oxycodone.

14              Did you know that the five doctors at

15  the American Pain Clinic in Florida ordered more

16  than twenty times as much oxycodone as the biggest

17  Walgreens in Lake and Trumbull Counties?

18              MS. KNIGHT:  Objection to form.

19       A.    I didn't have any direct knowledge of

20  that figure.

21       Q.    (BY MS. SWIFT:)  All right.  Now I

22  would like you to look at Paragraph 84 of the

23  indictment relating to the American Pain Clinic in

24  Florida.  It says, "Of the prescriptions filled at

25  American Pain, approximately ninety-six percent

1  were filled for either oxycodone or alprazolam."

2  Did you know that?

3          A.    No, I did not know that specific

4  number.

5          Q.    You didn't do any analysis of what

6  that number would be for any of the pharmacies,

7  stores in Lake and Trumbull County, correct, sir?

8              MS. KNIGHT:  Objection to form.

9  Only -- Ms. Swift, I didn't hear your whole

10  question.  I'm sorry.

11          Q.    (BY MS. SWIFT:)  You didn't conduct

12  any analysis of what that number would be, what the

13  percentage of prescriptions filled that were either

14  oxycodone or alprazolam, you didn't do that

15  analysis for any of the pharmacies in Lake and

16  Trumbull County, right, sir?

17          A.    I did not.

18          Q.    Paragraph 85 of the superseding

19  indictment says that, "The prescriptions filled at

20  American Pain reflect that approximately eighty

21  percent were for individuals who listed an address

22  outside of Florida."  Were you aware of that?

23          A.    I was not.

24          Q.    All right.  Do you have any idea how

25  many of those were for Ohio residents?

Page 208

1         A.      I do not.

2         Q.      Paragraph 6 -- or, sorry, 86, tells

3    us -- you can see the last sentence says, "Patients

4    from Tennessee accounted for approximately 18.4

5    percent."  Do you see that?

6         A.      Do.

7         Q.      And then it says, "Patients from Ohio

8    accounted for approximately 11.5 percent" of the

9    prescriptions we are talking about.  Do you see

10   that?

11        A.      I do.  Now, is that -- is that -- and

12   this is specific for American Pain, correct?

13        Q.      This is specific for American Pain.

14        A.      Okay.

15        Q.      You didn't conduct any analysis of

16   this pain clinic or any other in Florida for

17   purposes of your Lake and Trumbull report, right,

18   sir?

19        A.      I did not.

20        Q.      You haven't conducted any analysis of

21   any Florida pain clinic for any of your reports

22   that you have issued in the opioids litigation,

23   right, sir?

24        A.      I have not provided an opinion or

25   done any analysis in Florida.

1          Q.      You don't have any opinion about the

2     extent to which the doctors and pain clinics

3     described in this federal indictment contributed to

4     the opioids epidemic anywhere in America, correct,

5     sir?

6          A.      Well, I have an opinion that they

7     contributed significantly, but I -- it would just

8     be through my experience of working in the DEA and

9     having knowledge of the migration of the pills.

10              But I didn't -- I did not offer an

11    opinion on that, yeah, an expert opinion on that,

12    I'm sorry.

13         Q.      Do you know how many doctors wrote

14    prescriptions for opioids in Lake and Trumbull

15    County during the relevant time period, from 2006

16    to the present?

17         A.      I do not.

18         Q.      Do you know how many of those

19    prescriptions were illegitimate, meaning they

20    weren't for a legitimate medical purpose?

21         A.      I do not.

22         Q.      You don't have any opinion on how

23    many prescriptions filled by one of the pharmacies

24    in this case were diverted?

25         A.      So a part of -- so in forming my

1    expert opinion, I wasn't asked to review any

2    materials, documents or information related to

3    that, so I don't offer an opinion on that.

4            Q.    You have no idea if any prescriptions

5    filled by a Walgreens pharmacy were diverted; is

6    that fair, because you didn't look?

7            A.    I did not review prescriptions for --

8    specific prescriptions at any Walgreens, so I guess

9    that would be generally a correct statement.

10           Q.    Do you know how many prescriptions

11   filled by any of the other pharmacies in Lake and

12   Trumbull were diverted after they were filled?

13           A.    I do not.

14           Q.    That is true, whether we are talking

15   about somebody taking a prescription bottle from a

16   friend's medicine cabinet or any other form of

17   diversion, you don't have any idea what those

18   numbers are?

19           A.    No.  I wasn't asked to provide an

20   opinion on that, so I don't have any information to

21   form an opinion on that or to --

22           Q.    And you are not --

23           A.    -- or to provide you with any numbers

24   or any direct knowledge of that.

25           Q.    You are not aware of any pills that

Page 211

1   Walgreens shipped to one of its pharmacies that

2   went on to fill a prescription written by a doctor

3   who had prescribed that drug improperly, you

4   haven't done -- haven't done any analysis to match

5   that up; is that fair?

6           A.      That is a fair statement.  I have not

7   looked at the prescribing and matched it with some

8   of the doctors that were engaged in illicit

9   activity.

10          Q.      Are you aware of any prescription

11  dispensed by a Walgreens or any of the other

12  pharmacies in this case where a licensed pharmacist

13  wasn't involved in the dispensing?

14          A.      I haven't done a review to provide an

15  opinion on that, Ms. Swift.

16          Q.      Are you aware, Mr. Rafalski, that the

17  DEA conducts routine investigations of distributors

18  every few years or so?  I think actually you

19  testified a little bit about that earlier today; is

20  that right?

21          A.      Cyclic or work-plan investigations

22  you are speaking of, that would be correct.

23          Q.      And those routine investigations are

24  meant to insure compliance with the DEA's

25  regulations; is that fair?

                                              Page 212

1              A.      That is -- yes, that is one of the

2      aspects.

3              Q.      All right.  You conducted

4      investigations like that when you were a diversion

5      investigator at DEA, right?

6              A.      I did.

7              Q.      I want to ask you a couple of

8      questions about some testimony from the DEA on how

9      the DEA conducts those investigations.  But my

10     first question is, did you read the deposition

11     transcript of Claire Brennan in this case?

12             A.      I did.

13             Q.      Did you read the entire thing?

14             A.      I did.

15             Q.      You understand that Ms. Brennan is a

16     section chief in Diversion Control -- in the

17     Diversion Control Division of the DEA?

18             A.      Yes, I am aware of that.

19             Q.      All right.  I am happy to show you

20     the testimony, but I am going to see if we can do

21     this quicker.

22                     Would you agree with me that DEA

23     investigators can talk to whoever they want to at a

24     company to get their questions answered?

25                     MS. KNIGHT:  Objection to form.

Page 213

1  Ms. Swift, I just want to clarify, are you just

2  asking him questions or are you asking about him

3  about testimony that you are not showing him?

4          MS. SWIFT:  I am just -- well, I am

5  trying to be transparent and let him know -- I am

6  happy to show him this.  I am just asking him

7  questions right now.  If we need to, I will pull up

8  Ms. Brennan's testimony.

9          Q.    (BY MS. SWIFT:)  But let's just

10  forget about Ms. Breannan for now, Mr. Rafalski,

11  and I will just ask you the questions, okay?

12          A.    Okay.

13          Q.    Would you agree that DEA

14  investigators, when they go on site at a

15  distribution center, they can talk to whoever they

16  want to, to get their questions answered?

17          A.    I don't know that I would agree with

18  that.  I have never done one where I demanded to

19  talk to a specific person, so I'm not fully in

20  agreement with that.  That is not saying that it

21  wouldn't occur, but I don't think that is something

22  within the regulation, that I could demand to speak

23  to someone.

24          Q.    Well, you are -- you are entitled to

25  get your questions answered; is that fair?

Page 214

1          A.     I think that is a fair statement, but

2     not that I -- I would demand to do it at a specific

3     person, if I understand your question properly.

4          Q.     If -- well, okay.  I will -- I

5     will -- I will just cut to the chase and show you

6     Ms. Brennan's testimony.  Hold on just a sec.  This

7     will be WAG 5.

8               (WAG Exhibit 5 was marked for

9               identification.)

10         Q.     (BY MS. SWIFT:)  While we are

11    waiting, Mr. Rafalski, would you agree with me that

12    DEA investigators can look at whatever company

13    documents they need to in order to answer their

14    questions during a cyclic investigation?

15              MS. KNIGHT:  Objection to form.

16         A.     I would not agree with that.

17         Q.     (BY MS. SWIFT:)  All right.  Do you

18    see I've got on the screen Ms. Brennan's deposition

19    from November of last year?

20         A.     I do.

21         Q.     Then go to Page 31.  Do you

22    understand that Ms. Brennan testified as a 30(b)(6)

23    witness on behalf of DEA?

24         A.     I do.  Can I make a clarification on

25    that last answer, not "I do," but the one previous,

Page 215

1   about the review of records?

2           Q.      Sure.

3           A.      So during a cyclic investigation or

4   an inspection, registrants sign a Form 82, and that

5   only gives a diversion investigator the right to

6   look at specific required records.  Outside of that

7   you can ask to review those records, but the

8   registrant would not have to comply with that, just

9   so I can clarify my answer.

10          Q.      All right.  I am showing you Page 31

11  of Ms. Brennan's transcript, and I just want to get

12  your take on her answer at Lines 15 to 18.  She

13  says, "Diversion investigators would talk with

14  whoever they needed to, whomever they needed to at

15  the company, to answer specific questions."  That

16  was the DEA's testimony in this 30(b)(6)

17  deposition.  But you disagree with the DEA; is that

18  right?

19          A.      Well, the way that it is worded here,

20  I guess that I would not be in disagreement.  I

21  understood your first question is that I could go

22  in and demand to speak to someone about my specific

23  question.  But typically if you are in there, you

24  can talk to -- to whoever, as long as they are

25  agreeable by the registrant.

Page 216

1          Q.      Then the next question is, "The

2    diversion investigators would also look at

3    documents, whatever documents they needed to, to

4    answer their questions?"

5                       Answer:  "Yes."

6                       Do you agree with the DEA about that?

7          A.      Back to my previous answer, I have

8    been on site at -- and have asked to look at

9    records, and I know that I have the right to look

10   at the required records.

11                      There's some other recordkeeping that

12   I would ask to see and I would be informed that

13   they do not have to produce them, pursuant to a

14   subpoena, but they do produce them and I review

15   them.

16                      So I don't fully disagree with that,

17   but it doesn't allow a diversion investigator to

18   look at, let's say, financial records or certain

19   records that are outside the scope of the

20   requirements in this -- in the Code of Federal

21   Regulations.  So I guess that is kind of a waffling

22   answer, but it's -- I don't specifically agree with

23   this -- literally what she says.

24          Q.      Well, let me ask it this way,

25   Mr. Rafalski.  In your experience as a diversion

1  investigators, do registrants, distribution centers

2  typically agree to show you the documents that you

3  want to look at?

4       A.    Yes.  But generally speaking, I only

5  ask to see documents that I know that they are

6  required to keep pursuant to the Code of Federal

7  Regulations.

8       Q.    Do registrants typically show you the

9  documents that you need in order to do your job as

10 an investigator?

11      A.    Yes.

12      Q.    Okay.  And that is important for

13 DEA's enforcement role, would you agree with me, to

14 ensure that DEA's regulations are being followed,

15 it is important to able to see the documents that

16 you need to see in order to do that?

17      A.    I would agree with that.

18      Q.    Okay.  I want to show you her

19 testimony on Page 20.  Starting at Line 2, I asked

20 Ms. Brennan, "Do you believe that the diversion

21 investigators at the DEA do a careful, thorough job

22 when documenting their findings during

23 investigations?

24            "Answer:  DEA expects that an

25 investigation would be documented."

Page 218

1              Do you agree with that?

2          A.      I do.

3          Q.      And that is important too, right, to

4     document issues if you find them?

5          A.      I agree, that is an -- an important

6     obligation.

7          Q.      Do you agree that DEA does document

8     its investigations and issues that are found during

9     those investigations in investigation reports?

10                 MS. KNIGHT:  Objection to form.

11         A.      I don't know that I am qualified to

12    answer that statement because it is kind of

13    something that the DEA would answer.

14                 Just in regards to my knowledge of my

15    time working in Detroit, I would say generally that

16    is an accurate statement.  But there's always times

17    when you might find a shortcoming in a report now

18    and then when you are reviewing them.

19         Q.      (BY MS. SWIFT:)  You -- so you

20    testified you read Ms. Brennan's deposition, so you

21    understand that Ms. Brennan testified about DEA's

22    investigations of several of Walgreens'

23    distribution centers, right, sir?

24                 MS. KNIGHT:  Objection to form.

25         A.      Yes, generally.  I don't have like a

1    great recollection of it, but I --

2            Q.    (BY MS. SWIFT:)  Understood.

3            A.    -- I recall reading it and what the

4    basis for the deposition was.

5            Q.    DEA allowed us, they gave us a Touhy

6    authorization, to ask Ms. Brennan about more than a

7    dozen of DEA's investigation reports at her

8    deposition.

9            Is that consistent with your

10   recollection, having read the deposition?

11           A.    It is.

12           Q.    All right.  Now I am going to show

13   you Page 242 -- I don't know if I can go right to

14   it, so I am just going to scroll quickly.

15           MS. KNIGHT:  Ms. Swift, if we are

16   going to keep going through Ms. Brennan's

17   testimony, we need some time to go through this

18   deposition so that Mr. Rafalski can put all of this

19   in context.

20           If you want to ask him questions, I

21   have no objection to that, but if we are just going

22   to go through Ms. Brennan's testimony, then we need

23   some time for him to look at that and --

24           MS. SWIFT:  I have got like fewer

25   than ten questions left on just one other issue in

1    this deposition which he had and read before he

2    issued his report and he talks about in his report,

3    so I think he has had the opportunity to give

4    whatever context he wants, and this is my

5    opportunity to cross-examine about -- him about

6    what he said in his report.

7                    MS. KNIGHT:  To be fair, we are

8    working without copies of these exhibits, and you

9    are just picking and choosing out of someone else's

10   testimony.  He testified he read lots of

11   depositions.  And so if you are going to keep going

12   through the deposition testimony, he needs a copy

13   of that deposition in front of him so that he can

14   put it in context.

15                   MS. SWIFT:  You have got a copy of

16   it.  I mean, do you want me to email it to him?  He

17   is -- it is in the Exhibit Share so you can grab

18   it.

19                   MS. KNIGHT:  So --

20                   MS. SWIFT:  I have only got a handful

21   of questions left on this.

22                   MS. KNIGHT:  If you want to take the

23   time that doesn't come off our time, doesn't count

24   towards his deposition, and allow him to review it

25   in context, I'm fine with that.  If you just want

Page 221

1    to ask him questions, that is fine too.  But if we

2    are going to keep going through Ms. Brennan's

3    testimony, he needs a copy in front of him so that

4    he can read it, and he doesn't have a copy in front

5    of him.

6              MS. SWIFT:  I am going to ask him

7    about Page 242, and then I am going to be done.

8         Q.    (BY MS. SWIFT:)  Do you have Page 242

9    in front of you, Mr. Rafalski?

10        A.    I do.

11             MS. KNIGHT:  He has -- he has your

12   screen-share in front of him, is what he has.

13             MS. SWIFT:  And I am happy to -- I --

14   we would be done with the questioning if you would

15   just let me do it.  I mean, I am happy to go to

16   Page 241 and let him what -- read whatever he

17   wants.  It's -- I -- everything else I am going to

18   ask him about is on this page.

19        Q.    (BY MS. SWIFT:)  Starting at Line 9

20   of Page 242, Mr. Rafalski, I was asking her about

21   the investigation reports that you have access to

22   and that she was authorized to testify about on

23   behalf of DEA.  And I asked her, "In all of those

24   investigation reports for those three distribution

25   centers, we didn't see a single violation relating

Page 222

1  to due diligence on suspicious orders, correct?"

2              Answer:  "Again, that that's correct,

3  but it would be how we were trained."

4              Question:  "Often we didn't see

5  anything about Walgreens' due diligence procedures

6  in these reports, correct?"

7              Answer:  "That's correct."

8              My question for you, sir, is whether

9  you read and considered this testimony on behalf of

10  DEA in forming your opinions against Walgreens in

11  this case?

12              MS. KNIGHT:  Same objection.

13        A.    Can I just read a little bit of the

14  next page?

15              MS. KNIGHT:  And she is saying,

16  "Again."

17              (Pause.)

18        A.    Well, I don't have a disagreement

19  that that is what she said in her testimony.

20        Q.    (BY MS. SWIFT:)  My question for you

21  is different, sir.  Did you read and consider this

22  testimony in forming your opinions against

23  Walgreens in this case?

24        A.    I did not.

25        Q.    Did you read --

Page 223

1          A.     I -- well, let me correct that.  I

2    read the deposition, so I guess I took it into

3    consideration.  It was part of what I reviewed in

4    forming my opinions, so it is not that I didn't

5    take it into account.

6          Q.     You disregarded the view of the DEA

7    with respect to its conclusions about Walgreens'

8    due diligence in forming your opinions in this

9    case; is that correct?

10               MS. KNIGHT:  Objection to form.

11          A.     No.  I wouldn't say that is an

12    accurate statement.

13          Q.     (BY MS. SWIFT:)  Well, you said

14    you -- well, do you agree with Ms. Brennan --

15    strike that.  Let me ask this next prefatory

16    question.

17               Did you read any of DEA's

18    investigation reports of Walgreens' distribution

19    centers, the ones that Ms. Brennan was testifying

20    about in her deposition?

21          A.     I believe I did read some of them.

22          Q.     If --

23          A.     I don't recall if I read all of them.

24          Q.     You didn't cite them in your report;

25    would you agree with that?

Page 224

1           A.      Weren't they exhibits to the

2    deposition?

3           Q.      They were exhibits to the deposition.

4    They were not cited in your report, is what I am

5    saying.

6           A.      Okay.  Well --

7                   MR. FULLER:  Well, hold on, let's

8    clarify the record because the deposition is cited

9    in his reliance materials with all exhibits, so

10   they would be recited in his reliance materials,

11   Kate.

12                  MS. SWIFT:  I'm going to object to

13   the speaking objection.  You are feeding

14   Mr. Rafalski testimony, Mike.  I would like to get

15   the witness' answer to my question.

16          Q.      (BY MS. SWIFT:)  My question is

17   simple, Mr. Rafalski.  Did you read DEA's

18   investigation reports of Walgreens' three

19   distribution centers in forming your opinions on --

20   about Walgreens in this case?

21                  MS. KNIGHT:  Asked and answered.

22          A.      I did read them, and they were --

23   they were included as part of the exhibits to the

24   deposition.  I believe they were cited, and I did

25   read -- I don't recall if I read all of the

Page 225

1    reports.  It seemed like there were maybe even more

2    than three.  And I did take that into account when

3    I did my opinion.

4            Q.    (BY MS. SWIFT:)  You just disregarded

5    the DEA's conclusion about Walgreens' performance

6    of due diligence in forming your opinions in this

7    case; is that fair?

8                MS. KNIGHT:  Objection to form.

9            A.    Well, I am not sure that -- if --

10   that the opinions on three reports would be

11   significant enough to take into account when I have

12   reviewed many other records that would be in

13   conflict with that.  So that may be Ms. Brennan's

14   opinion or your opinion based on her review of

15   three reports, but I don't think that provides an

16   overall basis for me to change or modify my

17   opinion.

18           Q.    (BY MS. SWIFT:)  Just to clarify, it

19   was more than a dozen reports on three distribution

20   centers.  Does that change your answer at all?

21           A.    No, it does not.

22           Q.    Okay.  You can't say, sitting here

23   today, whether DEA ever documented problems with

24   Walgreens' due diligence in any of those reports,

25   can you?

1          A.      I don't recall if they did or did

2     not.

3          Q.      So when Ms. Brennan, testifying on

4     behalf of DEA, testified under oath that DEA did

5     not document any due-diligence violations in its

6     more than a dozen reports of investigations of

7     Walgreens distribution centers, you don't have any

8     basis to disagree with that, correct, sir?

9               MS. KNIGHT:  Objection to form.  And

10    if you would like to talk to Mr. Rafalski about the

11    Brennan deposition, you really need to give him a

12    copy.

13         A.      But I just -- I really can't respond

14    to that because I am not sure that those reports,

15    without going back and reviewing them, that they

16    specifically talked about the review of

17    due-diligence records at Walgreens.

18         Q.      (BY MS. SWIFT:)  Understood.  And my

19    only question is, sitting here today, without

20    taking the time to reread a three hundred page

21    deposition transcript, you don't have any basis to

22    disagree with the statement that DEA did not

23    document problems with Walgreens' due diligence,

24    correct, sir?

25         A.      I don't agree or disagree, Ms. Swift.

1          Q.     Understood.  When you were a

2     diversion investigator at DEA, you yourself

3     investigated Walgreens' distribution centers and

4     you didn't document any due-diligence violations

5     there either, correct?

6          A.     I did not.  I cited them for a

7     defective suspicious order monitoring system.

8          Q.     But you didn't document any problems

9     with due diligence, right, sir?

10          A.     I don't recall seeing any due

11     diligence, because my recollection is the personnel

12     onsite at the distribution center was deferring

13     everything to their headquarters.

14          Q.     I understand you have a story you

15     would like to tell now that you have been hired by

16     the plaintiffs' lawyers to offer opinions in this

17     case.  My question was different.  When you were a

18     diversion investigator at DEA, you investigated

19     Walgreens' distribution centers and you never once

20     documented problems with Walgreens' due diligence,

21     correct, sir?

22               MS. KNIGHT:  Objection to form.

23     Asked and answered.

24          A.     I don't -- when I was at the

25     Walgreens -- and I don't know that "Walgreens"

1    would be -- would be would be accurate, I don't

2    have a recollection if I did or did not document

3    due diligence.  I don't have a recollection of

4    doing that, but I can't be certain without seeing

5    the report.

6            Q.    (BY MS. SWIFT:)  You have testified a

7    number of times in this litigation that it is

8    important to document issues relating to suspicious

9    orders, right, sir?

10           A.    I have.

11           Q.    And do you recall that you noted in

12   your report that Walgreens stopped distributing

13   opioids to its Lake and Trumbull County pharmacies

14   in April of 2014?  It is at Page 80 if you want to

15   look at it.  But does that -- does April 2014 sound

16   right to you?

17           A.    I was -- Schedule IIs?

18           Q.    All opioids, Schedule IIs, Schedule

19   IIIs, all of them.

20           A.    I think IIs were March of '13, but --

21   what page again?  I'm sorry.

22           Q.    Page 80.  And you're correct, sir.  I

23   was talking about like the latest possible date

24   Walgreens ever distributed an opioid into Lake and

25   Trumbull County.

Page 229

1          A.     You say it is on Page 80?

2          Q.     Yep.

3          A.     Okay.  I agree.

4          Q.     Walgreens never distributed an opioid

5     to Lake and Trumbull County after April of 2014,

6     correct?

7          A.     I would agree.

8          Q.     Is it your opinion that Walgreens

9     should have retained historical due-diligence

10    documents for shipments it hasn't made in at least

11    seven years, even though it ceased all distribution

12    activities years ago?

13         A.     Yes, I would say they should retain

14    those, because they still -- those pharmacies are

15    still Walgreens pharmacies and they are still

16    engaged in the purchase and dispensing of

17    controlled substances.  So -- and I would believe

18    that they would probably have interactions with the

19    distributors that now handle those pharmacies.  So

20    I would have an expectation they would -- they

21    would -- they would retain those records.

22         Q.     My question is different, sir.  I am

23    talking about due-diligence records relating to

24    Walgreens' distribution of opioids to its own

25    pharmacies, which Walgreens has not done since

1   2014.  Is it your opinion in this case that

2   Walgreens should have retained due-diligence

3   records from the time when it was distributing

4   opioids, which it stopped more than seven years

5   ago, up until the present day?

6                MS. KNIGHT:  Asked and answered.

7        A.     Yes, same answer, because they

8   continue to purchase opioids from a different

9   vendor.  So I think it would be important to retain

10  those records.

11       Q.     (BY MS. SWIFT:)  It would be

12  important when Walgreens is purchasing opioids from

13  a different vendor in 2021 to have due diligence

14  records related to its own distribution to that

15  pharmacy in 2010?

16                MS. KNIGHT:  Asked and answered.

17       A.     Yes, I believe so.

18       Q.     (BY MS. SWIFT:)  What is the basis

19  for that opinion?

20       A.     Because it is a historic record of

21  what actions were taken by Walgreens in regards to

22  one of their pharmacies, and I think it may be of

23  some importance to another vendor who may contact

24  Walgreens, especially if they are distributing to a

25  Walgreens pharmacy, and want to look at the history

Page 231

1    of the conduct of that pharmacy.

2              I just think it is just part of the

3    history, and I think that is always important when

4    you are reviewing.

5         Q.    That explanation that you just

6    provided is not anywhere in your report, correct,

7    sir?

8         A.    I think I have testified to that

9    before.  Specifically to say that Walgreens should

10   have retained documents from back to that time

11   period, I don't think it specifically says that.

12        Q.    Okay.  Do you recall that there was

13   an investigation by DEA of a Walgreens distribution

14   center in Perrysburg, Ohio, in 2013?

15        A.    Let me look at my report.  One

16   second.

17              MS. KNIGHT:  Page 82.

18        Q.    (BY MS. SWIFT:)  Page 82.

19        A.    Yes.

20        Q.    Did you have any personal involvement

21   in that investigation as a diversion investigator

22   at DEA?

23        A.    I did not.

24        Q.    You are not going to come to trial

25   and talk about anything about that investigation

Page 232

1    that is not reflected in your report, correct?

2         A.    No.  I did not participate in this

3    investigation.

4         Q.    Okay.  All right.  On Page 83 of your

5    report, you have a chart labeled --

6              MR. FULLER:  Kate, it is almost

7    12:45.  When do you plan on stopping for lunch?

8              MS. SWIFT:  As soon as I am done,

9    which I am hoping is going to be in the next

10   fifteen minutes.

11             MR. FULLER:  Well, let's plan on

12   breaking for lunch at 12:45.  I mean, it is well

13   after noon.

14        Q.    (BY MS. SWIFT:)  Do you see the chart

15   on 83 labeled "Suspicious Orders Reported In CT3

16   Jurisdictions"?

17        A.    I do.

18        Q.    You in that chart refer to "Rigid

19   Formula Report (Customer Grouping Formula)," and

20   then "Rigid Formula Reports (Chemical Handlers

21   Manual Appendix E-3)."  You don't cite any

22   documents, correct?

23             MS. KNIGHT:  Objection to form.

24        A.    I think contained in my report talks

25   about the SOM system that utilized those, but

Page 233

1   specifically for this chart, I do not.

2           Q.      (BY MS. SWIFT:)  Walgreens doesn't

3   have any documents that you have seen that are

4   called rigid formula reports, right?

5           A.      No, I don't think they have produced

6   any in the litigation.

7           Q.      My question was different, sir.

8   Well, you have never seen a document in -- a

9   Walgreens document that had the title or that was

10  called a rigid formula report, right?

11          A.      Oh, that's correct.

12          Q.      Who came up with that term, "rigid

13  formula report"?

14          A.      I believe I did.

15          Q.      Are you aware that Walgreens produced

16  reports in this litigation called suspicious

17  controlled drug order reports?

18          A.      Not specifically by that title.

19          Q.      Did you know that Walgreens submitted

20  those reports to the DEA for a number of years?

21          A.      I knew they were submitting reports

22  to the DEA.  I did -- I don't recall seeing that

23  specific title on them.

24          Q.      Did you review any of Walgreens'

25  suspicious controlled drug order reports in forming

Page 234

1   your opinions in this case?

2         A.     Right now I don't have a recollection

3   of doing that.

4         Q.     Okay.  If you didn't cite to any in

5   your report, is it fair to say you didn't review

6   them?

7         A.     Ms. Swift, I looked at so many

8   records, right now I'm not having a recollection of

9   reviewing those.

10        Q.     Is it fair to say that you didn't do

11  any comparison of the orders Walgreens reported to

12  DEA on its suspicious controlled drug order reports

13  to the orders that were flagged using your flagging

14  methods?

15        A.     That's a correct statement,

16  Ms. Swift.

17        Q.     So you would have no idea how many --

18  how often orders that you flagged were also

19  included on a -- on a Walgreens suspicious order

20  report that was reported to the DEA?

21              MS. KNIGHT:  Objection to form.

22        A.     I would agree with that statement.

23        Q.     (BY MS. SWIFT:)  All right.  Turn to

24  Page 94 of your report, please.

25        A.     I am there.

1          Q.      There are three paragraphs on Page 94

2     about audits related to Walgreens, and I'm not

3     going to read them into the record, these

4     paragraphs, because they are privileged and we

5     objected to their production on their basis.  And I

6     am going to ask that this portion of the transcript

7     be marked highly confidential, but I do want to ask

8     you a couple of questions about this page of your

9     report.

10                    (The following testimony has been

11                    designated as confidential by

12                    counsel.)

13          Q.      (BY MS. SWIFT:)  Have you reviewed

14     the documents that you are talking about in this

15     section of your report, these audits?

16          A.      Yes, I believe I have.

17          Q.      Who wrote them?

18          A.      I don't recall since it was so long

19     ago.

20          Q.      Do you know what they did to conduct

21     the audits?

22          A.      No, I do not.  That's -- like I said,

23     it -- this has been a long time ago with the --

24          Q.      And that is not -- that is not

25     reflected in your report, right, sir?

Page 236

1          A.      That's correct.

2          Q.      Do you know what documents the people

3   who prepared those audits reviewed?

4          A.      Not without going and looking at

5   the -- at the actual documents, I do not.

6          Q.      And none of that is reflected in your

7   report, right?

8          A.      That I would need to review the

9   documents to --

10                 MS. KNIGHT:  And I'm going to object.

11  To be fair, the documents are cited in his report.

12  I'm not sure what you mean.

13                 MS. SWIFT:  I am going to object

14  again to the speaking objections and the coaching

15  of the witness.  I'm trying to finish this so we

16  can have lunch.

17                 MS. KNIGHT:  I'm not coaching the

18  witness, Ms. Swift.

19                 MS. SWIFT:  You are coaching the

20  witness, but I will ignore it.

21         Q.      (BY MS. SWIFT:)  You don't -- you

22  don't reflect in the narrative of your written

23  report what documents the auditors reviewed or who

24  they talked to, right, sir?

25         A.      My report does not detail that, that

1    is correct.

2         Q.    Your report does not detail whether

3    the managers at the Walgreens' distribution

4    centers, the folks on the ground doing the work day

5    to day agreed or disagreed with these audits,

6    correct, sir?

7         A.    I do not state that in my report,

8    that is correct.

9         Q.    You -- on Page 95, you reference

10   "Perrysburg DC Manager Steve Kneller"; do you see

11   that?

12        A.    I do.

13        Q.    You reference his deposition just a

14   few pages from it.  Did you read the entire

15   deposition transcript or just the parts that you

16   cited?

17        A.    I don't recall.

18        Q.    Did you write this section of your

19   report on Pages 94 and 95 about the Walgreens

20   audits?

21        A.    I did.

22              (Reporter clarification.)

23        Q.    (BY MS. SWIFT:)  On the Walgreens

24   audits?

25        A.    Yes, I did.

1          Q.     Did you write it all by yourself?

2                 MS. KNIGHT:  Counsel, are we really

3     going to get into the work product of working on

4     expert reports?

5                 MS. SWIFT:  I'm not asking anything

6     different than anybody has ever asked in any of

7     these depositions.  I'm not asking for a draft.  I

8     am just asking if he wrote his report.

9                 MS. KNIGHT:  And he has answered yes.

10         A.     I -- it may have went back and forth

11    in draft form a couple times, but this is my report

12    and these are my words.

13         Q.     (BY MS. SWIFT:)  Is all of the

14    supporting material for this section of your report

15    on Pages 94 and 95 cited in the footnotes?

16         A.     I believe it is, yes.

17         Q.     In forming your opinions, you did not

18    review any DEA report of investigation about

19    Walgreens' dispensing of opioids, correct, sir?

20         A.     Could you say that one more time,

21    Ms. Swift?

22         Q.     You did not review any DEA reports

23    about Walgreens' dispensing of opioids in forming

24    your opinion?

25         A.     Dispensing from a pharmacy?

1          Q.     Yes.

2          A.     No, I did not.

3          Q.     Did you ever visit a pharmacy in Lake

4   or Trumbull County for purposes of preparing your

5   report?

6          A.     I did not.

7          Q.     And you never did the kind of

8   investigation you recommended to Mr. Crowley at

9   Purdue, correct?

10         A.     That would be a much earlier time

11  frame, but, no, I did not go and sit and do any

12  observations at a Walgreens, that is a correct

13  statement.

14         Q.     Or any other pharmacy in Lake or

15  Trumbull County, right, sir?

16         A.     That's correct.

17         Q.     You don't have any idea how many of

18  your flagged orders went to fill legitimate

19  prescriptions, right, sir?

20         A.     Well, my flagged orders were flagged

21  for a specific reason.  So it didn't make a

22  determination of what was diverted or what was not

23  diverted, but just my opinion is, based on the lack

24  of the due diligence on the first flagged order,

25  that more likely than not that those flagged orders

Page 240

1  were diverted, but not specific to any specific

2  prescription.

3          Q.    Sir, I would like you to listen to my

4  question.  That wasn't my question at all.

5                My question was whether you have any

6  idea how many of the orders that you flagged in

7  your flagging analysis on the distribution side

8  went to fill legitimate prescriptions?

9                MS. KNIGHT:  Asked and answered.

10         A.    I don't have any specific knowledge

11  to answer that specific question, Ms. Swift.

12         Q.    (BY MS. SWIFT:)  You never made any

13  attempt to connect your flagged orders with any

14  specific prescription?

15         A.    That is a correct statement.  I did

16  not.

17         Q.    All right.

18               MS. KNIGHT:  Are we at a good

19  stopping place?

20               MS. SWIFT:  I have got one more

21  question.  I know that is a dangerous thing for a

22  lawyer to say.

23               MS. KNIGHT:  Okay.

24         Q.    (BY MS. SWIFT:)  I will try to do

25  without pulling up the document to make it go

Page 241

1   faster.  Your lawyers produced to us an invoice for

2   you in this case, and on Page 9, it reflected five

3   hours of work on Walgreens.

4                Is it true that the sum total of time

5   you have spent focusing on Walgreens for purposes

6   of your Lake and Trumbull report was five hours?

7                MS. KNIGHT:  Objection to form.

8       A.    No, I think -- I think later

9   billings, there were a lot of them that were

10  working on the draft report, I think, maybe in

11  that, that was specific to a project or something I

12  was looking at.

13               But I think there's plenty of

14  billings that -- where I was drafting the report or

15  working on finalizing the report that would have

16  been some time spent on Walgreens too.

17      Q.    (BY MS. SWIFT:)  Are you saying that

18  we -- there's other bills out there that we just

19  don't have, or that that is mixed in with other

20  time and it just doesn't -- we can't tell that it

21  is time you spent on Walgreens?

22      A.    The latter.  There is -- I think -- I

23  think later in the drafting, there is a lot of them

24  that just say "drafting report," where I spent a

25  lot of time and I didn't keep track of specific

Page 242

1    what area that I was working on.

2         Q.    Do you disagree with me that as far

3    as I can -- as far as it is possible to tell from

4    your invoice, it only reflects five hours specific

5    to Walgreens?

6              MS. KNIGHT:  Objection to form.

7         A.    My billing may reflect that, but I

8    think there's several areas where I billed that

9    said "drafting report" where I was working on

10   several different areas of my report, especially in

11   the last month or two.

12        Q.    (BY MS. SWIFT:)  What is your best

13   estimate of how much time you spent on Walgreens in

14   forming your opinions for the Lake and Trumbull

15   County report?

16        A.    I really don't have a guess on that,

17   Ms. Swift.

18        Q.    Can you ballpark it for me?

19        A.    No.  I just know my cumulative hours.

20   I know that I already had done a significant amount

21   of work on Walgreens already, so it would be not as

22   many hours as the three defendants that I had not

23   offered an opinion on.  I spent more time with them

24   than Walgreens, but I don't -- I can't give you an

25   exact number, Ms. Swift.

1                    MS. KNIGHT:  Is now a good time?

2                    MS. SWIFT:  I apologize.  One more

3    that I do have to ask.

4            Q.     (BY MS. SWIFT:)  Mr. Rafalski, have

5    you spent any time speaking to Dr. McCann about --

6    leading up to and about the opinions in your Lake

7    and Trumbull County report specifically?

8            A.     Yes.

9            Q.     When did you speak to him and for how

10   long?

11           A.     I don't remember the date, but I

12   spoke to him while I was writing my report, had a

13   telephone conference, I don't want to guess, but at

14   least an hour or more, and then I spoke to him

15   recently about a couple questions after my report

16   was -- and before my testimony.

17           Q.     So am I correct that you had one

18   conversation with Dr. McCann about the Lake and

19   Trumbull County report of about an hour?

20           A.     One that I can recall.  I have had

21   several conversations, but there's one specifically

22   that came up that we had a conversation.  I am not

23   saying there aren't more, but only one I can recall

24   right now sitting here.

25           Q.     What did you discuss with Dr. McCann

1   during that conversation?

2          A.     We discussed the methodologies and

3   specifically we spent some time discussing the new

4   methodology, the thirty-day trailing.  That was one

5   of the areas that we needed to discuss.

6          Q.     What specifically about the

7   thirty-day trailing method did you discuss with

8   Mr. McCann?

9          A.     The -- how the thirty-day was

10  treated.  When you read the Masters policy, it was

11  whether to treat the thirtieth day or the

12  thirty-first day as part of the trailing.  I can

13  explain that further if that doesn't make sense to

14  you.

15         Q.     No, I understand what you are saying.

16  Is there anything else that you discussed with

17  Dr. McCann relating to your Lake and Trumbull

18  County report?

19         A.     I don't recall.  I know we went over,

20  I think, how to utilize some of the data in regards

21  to ARCOS or nonARCOS.  There were several areas,

22  but the one that I remember we spent the most time

23  on was discussing the thirty-day trailing.

24                MS. SWIFT:  Okay.  I don't have

25  anything else right now.  Thanks, Mr. Rafalski.

Page 245

1          A.     You are welcome.

2                 THE VIDEOGRAPHER:  The time is now

3     approximately 12:51 p.m.  We are off the record.

4                 (Whereupon, a break was had from

5                 12:51 p.m. EDT until 1:53 p.m. EDT.)

6                 THE VIDEOGRAPHER:  The time is now

7     1:53 p.m.  We are now on the record in the

8     deposition of James Rafalski.

9

10    EXAMINATION BY MS. MCENROE:

11         Q.     Good afternoon, Mr. Rafalski.  We met

12    just before we came on the record a moment ago.  My

13    name is Elisa McEnroe.  I am an attorney with

14    Morgan, Lewis & Bockius on behalf of Rite Aid.  And

15    we have not met before today, correct?

16         A.     That's correct.  Good afternoon, Ms.

17    McEnroe.

18         Q.     Good afternoon.  I would like to

19    direct your within your report on Track 3 to Page

20    108, if you have that in front of you.

21         A.     Okay.

22         Q.     This is -- there's a section that

23    starts there that says Rite Aid; do you see where

24    that is?

25         A.     I do.

1          Q.      And you discuss Rite Aid throughout

2    this report using the singular.  Do you have an

3    understanding that there are actually a couple of

4    Rite Aid entities that have been sued in this case,

5    there are a couple of Rite Aid defendants?

6          A.      I do not.  I just used Rite Aid

7    throughout my report.

8          Q.      Sure.  So let's talk about it a

9    little bit more specifically.  In your report here,

10   you list distribution center, and then you have two

11   distribution centers listed there, do you see that?

12         A.      Liverpool D.C. in New York and

13   Perryman D.C. in Maryland.

14         Q.      Exactly.  Do you have an

15   understanding that each of those would have their

16   own DEA registration?

17         A.      I do.

18         Q.      And those are each their own

19   entities; is that fair, do you understand that?

20         A.      Yeah, they're separate locations,

21   separate DEA registrations, but they're both Rite

22   Aid distribution centers, correct?

23         Q.      Correct.  I'm not questioning that,

24   yeah.  And do you understand --

25                 MS. MCENROE:  Oh, Ms. Knight, you're

Page 247

1    muted.  I don't know if that was intentional or

2    not.

3                  MS. KNIGHT:  I'm talking through -- I

4    have to talk through Mr. Rafalski's speaker.

5                  MS. MCENROE:  Oh, oh, oh, okay.

6    Great.

7           Q.    (BY MS. MCENROE:)  And so,

8    Mr. Rafalski, you also understand that there are

9    dispensing related claims in this litigation

10   regarding pharmacy dispensing?  I think we talked

11   about that this morning?

12          A.     There are.

13          Q.     And there are Rite Aid entities that

14   own pharmacies?

15          A.     Correct.

16          Q.     You would understand that?  And they

17   would have their own DEA registrations going on,

18   those pharmacies, separate from the DEA

19   registrations of the distribution centers; is that

20   fair?

21          A.     That would be correct.  Every

22   location that handles controlled substances at that

23   registered location at that address would have a

24   DEA registration.

25          Q.     Great.  And for that type of

1  registration as well, right, so a distribution

2  center would have a distribution registration and a

3  pharmacy would have a pharmacy registration; is

4  that fair?

5          A.     They would have a business activity,

6  yes, but they all would be DEA registrations, just

7  different business activities.

8          Q.     You're not accusing Rite Aid of

9  having distributed without the proper DEA

10  registration in this case, are you?

11          A.     No, I am not.

12          Q.     You're not making that allegation

13  against anybody in this case, are you?

14          A.     That's correct.  I'm not aware that

15  any distribution occurred while they were

16  unlicensed.

17                 THE REPORTER:  Unlicensed or on

18  licensed?

19                 THE WITNESS:  Unlicensed.

20                 THE REPORTER:  Thank you.

21          Q.     (BY MS. MCENROE:)  And you don't have

22  any reason to think that Rite Aid's distribution

23  centers did not go through the preregistration

24  investigation you discussed both in your report and

25  today in your deposition, correct?

1          A.      I have not reviewed any records that

2     would definitively tell me that, but it would be

3     highly unusual that they received a registration

4     without a preregistration process.

5          Q.      And you have no reason to think that

6     that happened that way?

7          A.      That's correct.

8          Q.      Correct?

9          A.      I don't have any information to say

10    either way, but if you're asking me to make an

11    assumption, I know not to do that, but I would find

12    it unusual that they would be registered without a

13    preregistration process.

14         Q.      And is that also the same of there

15    having been cyclic investigations of the Rite Aid

16    distribution centers, that you would presume that

17    that had happened as well, being that they were

18    registered?

19              MS. KNIGHT:  Objection to the form.

20         A.      I would be a little bit confident,

21    only because in some areas, locations of the

22    country, depending on how busy they are, sometimes

23    they're put off for some time.  I would say they

24    would have them, but I don't know that they would

25    be as regular as people think they would have

Page 250

1   occurred.

2          Q.      (BY MS. MCENROE:)  Did you look to

3   see?

4          A.      How often there were registration --

5   or cyclics?

6          Q.      About the cyclic investigations?

7          A.      I did not.  I do not have access to

8   DEA records.

9          Q.      And you didn't look at the DEA

10  records that have been produced in this case

11  pertaining to cyclic investigations either?

12         A.      For Rite Aid, I don't recall

13  reviewing any cyclic DEA 6s.

14         Q.      Did you ask if there were any?

15         A.      I didn't specifically ask.  But if

16  there were documents, I should have been provided

17  them.  I -- and maybe they are in my folder.  I

18  don't know if they're in my disclosure, I would

19  have to look.  I just don't recall offhand looking

20  at them, any DEA 6s.

21         Q.      So we were talking just a minute ago

22  about the two distribution entities that are

23  defendants in this case.  And you described them as

24  Liverpool and Perryman.  And those are fine

25  description names for me as well to use.

Page 251

1          And you would agree that they have

2   suspicious order monitoring obligations, those two

3   entities, correct?

4          A.     I do.

5          Q.     Are you advancing opinions that any

6   of Rite Aid's pharmacy registrants, any of those

7   defendants that are pharmacies solely have

8   suspicious order monitoring obligations on them?

9          A.     That's not a regulatory requirement

10  of a pharmacy to have a suspicious order monitoring

11  system, so I am not.

12         Q.     Do you have an understanding that

13  Rite Aid did not distribute Schedule II drugs?

14         A.     Correct.  Only hydrocodone.

15         Q.     And when you say only hydrocodone --

16  go ahead.

17         A.     Part of the litigation, I'm sorry,

18  the one opioid that I looked at in my opinion was

19  the hydrocodone.  They did Schedule III through Vs.

20         Q.     And when you mention the hydrocodone,

21  just so that we're clear on the record and we're

22  mentioning schedule, so hydrocodone during the

23  relevant time period was Schedule III; is that fair

24  to say?

25         A.     Yes, up until it was rescheduled.

Page 252

1          Q.      And do you have an understanding or a

2    recall of when Rite Aid stopped distributing?  And

3    you can take a look if it's helpful to that Page

4    108 where I directed you within your report.  You

5    have listed under transactional data, date range

6    2006 to 2014 ARCOS, do you see that?

7          A.      Yes.  It's just not specific to the

8    date, to the end of the year in 2014, but that

9    would be accurate as far as I'm concerned.

10         Q.      Sure.  Into sometime in '14; is that

11   fair?

12         A.      Yes.  The rescheduling was I think in

13   October of 2014.

14         Q.      And is it correct that oxycodone is

15   Schedule II?

16         A.      It's correct, yes, ma'am.

17         Q.      And fentanyl is Schedule II?

18         A.      Yes, that is Schedule II.

19         Q.      Is it correct that hydrocodone is

20   Schedule II?

21         A.      It is today, yes, ma'am.

22         Q.      Is it correct that hydromorphone is

23   Schedule II?

24         A.      Yes, it is.

25         Q.      And morphine?

Page 253

1          A.      Schedule II.

2          Q.      I'm almost done.  I promise.  Is it

3    true that oxycodone is Schedule II?

4          A.      Yes, that's Schedule II.

5          Q.      And oxymorphone is Schedule II?

6          A.      Also Schedule II.

7          Q.      Tapentadol is Schedule II, if I said

8    that correctly?

9          A.      I would have to look that one up.

10   I'm not sure.

11         Q.      And methadone is Schedule II; is that

12   correct?

13                 THE REPORTER:  I'm sorry.  I didn't

14   hear an answer.

15                 (Record read.)

16         A.      Yes, it is.

17         Q.      (BY MS. MCENROE:)  So you would agree

18   with me that if you have discussions of oxycodone,

19   for example, pertaining to Rite Aid, that would

20   only be about any Rite Aid conduct as a customer,

21   right, because we did not distribute -- Rite Aid

22   did not distribute Schedule IIs?

23         A.      No.  I do not agree with that.

24         Q.      So you think that -- strike that for

25   a second.  Let me just back up.

1          So how do you think Rite Aid's

2    pharmacies got oxycodone?

3          A.    I'm not saying they have oxycodone.

4    If I understood your question, you asked about the

5    obligations, correct?

6          Q.    On the pharmacy entities, correct.

7          A.    Well, I think corporately there's

8    some responsibility for Rite Aid because they're a

9    chain facility, they have chain pharmacies, and

10   they're purchasing Schedule II products from an

11   outside vendor, but they're well aware of what

12   their pharmacies are purchasing.

13          So under the maintenance of effective

14   controls, I believe they have some responsibility

15   to monitor those drugs also.

16          Q.    So let's take a look -- let's break

17   that down a little bit more.  So we're going to go

18   within your report to Page 46.  So we're going

19   to -- I think this is what you're referring to, if

20   I'm not mistaken, as an example.  Tell me when

21   you're there.

22          A.    Talking about the charts?

23          Q.    Yep, talking about the charts.  So

24   let's look at the first one there for Lake County

25   on Page 46, and this is under your methodology A.

Page 255

1              You see for Rite Aid in the flagged

2    orders of oxycodone dosage units, you have NA

3    listed there; is that correct?

4         A.    That's correct.

5         Q.    So then let's sort of keep your eye

6    on that, but let's also flip at the same time to

7    Page 51, 51.  And you have a section starting with

8    H there in the middle.  Do you see that?

9         A.    I do.

10         Q.    That follows a sentence that says,

11    "The following charts provide the results of each

12    methodology applied to orders placed by each

13    distributor's pharmacies to all distributors."  Do

14    you see that?

15         A.    I do.

16         Q.    So this Section H is applying the

17    same methodology as you did in A, except now you're

18    applying it for orders placed by each of the

19    distributors' pharmacies; is that a correct

20    understanding.

21         A.    Yes.  So it would be distributions by

22    all pharmacies -- I mean, excuse me, by all

23    distributors to Rite Aid pharmacies.

24         Q.    And now if we look at that

25    corresponding box in the Lake County chart in

Page 256

1    Section H under oxycodone, you'll see that it says

2    five million six hundred and sixty-four thousand

3    one hundred, and then it says in parentheses,

4    that's 94.7 percent of the total dosage units.  Do

5    you see that?

6              A.     I do.

7              Q.     So if I'm understanding correctly, in

8    your report, in your methodology A, you're saying

9    and acknowledging that Rite Aid did not have

10   distribution centers that distributed any

11   oxycodone, at least that had supporters that

12   flagged there, right, and presumably because we

13   didn't distribute it at all; is that fair to say?

14             A.     I'm sorry.  I thought you were done.

15   So an NA would mean that there was no distribution.

16   A zero would mean it identified no flagged orders,

17   just for clarification.

18             Q.     Sure.  And then in looking in Section

19   H, when we're taking into account the orders that

20   Rite Aid placed with outside vendors, now you're

21   flagging 94.7 percent, correct?

22             A.     That's correct.

23             Q.     Okay.  And are you presuming to say

24   that Rite Aid's pharmacies had a suspicious order

25   monitoring obligation with respect to the oxycodone

Page 257

1   that they were purchasing?

2          A.    No, I'm saying the Rite Aid, the

3   actual entity of Rite Aid, the company, had an

4   obligation to monitor those.

5          Q.    Right.  But I think we talked about a

6   little bit earlier, you have different registered

7   entities that have different licensing situations,

8   right?  So we have the distribution centers are

9   registered with the DEA as distribution centers and

10  they have suspicious order monitoring obligations,

11  right?

12         A.    That's correct.

13         Q.    And we have pharmacies that are

14  registered with the DEA as pharmacy entities,

15  correct?

16         A.    That's correct.

17         Q.    Okay.  So you're not imputing the

18  suspicious order monitoring obligations of the

19  distributors to the pharmacies with respect to

20  things they're purchasing, right; they didn't have

21  to put a suspicious order monitoring system into

22  place at the pharmacy level, correct?

23         A.    I'm placing that responsibility on

24  the Rite Aid corporate or the compliance program of

25  Rite Aid.

1          Q.      On what basis?  What's your statutory

2     basis for doing that?  Because we have statutes

3     that put the suspicious order monitoring obligation

4     on the registrant, right?

5          A.      Regulations, yes, correct.

6          Q.      So then how are you then taking it to

7     a different step?  I just don't understand.

8          A.      Maintenance of effective controls to

9     prevent diversion of controlled substances.

10          Q.      Specifically tell me what you're

11     citing to.

12          A.      The law.  I think it's 823 --

13     21USC823 either (b) or (c), and then it's also

14     contained in the regulations.  It's CFR, I think

15     it's 1301.01, I believe, without having --

16          Q.      And those pertain to DEA registered

17     entities, correct?

18          A.      Yes.

19          Q.      Okay.  They don't pertain to holding

20     companies?

21          A.      Well, I think as a chain pharmacy

22     that manages chain -- and that monitors and

23     controls registered locations that are pharmacies,

24     I believe that obligation also is upon Rite Aid.

25          Q.      On what basis?

Page 259

1          A.      My opinion.

2          Q.      Yeah, but on what statutory code,

3    what basis are you saying that?

4          A.      Maintenance of effective controls to

5    prevent diversion.  My reviewing of records, I see

6    there's some coordination, even after McKesson was

7    a registrant -- I'm sorry, even after Rite Aid was

8    a registrant, there was some coordination with

9    McKesson on distributions and approval of

10   thresholds with four pharmacies with McKesson at

11   the corporate level.

12         Q.      Excuse me, sir.

13              MS. MCENROE:  I move to strike

14   everything after the maintenance of effective

15   controls because there was no question pending to

16   which you were responding.

17         Q.      (BY MS. MCENROE:)  So I just am

18   trying -- so it's just your opinion, so we should

19   just take it as your view that there's an

20   obligation on other corporate entities that are not

21   DEA registrants?

22              MS. KNIGHT:  Object to the form.

23         Q.      (BY MS. MCENROE:)  Because you think

24   that they should have it; is that what you're

25   saying?

Page 260

1          A.     I believe they should under the

2     maintenance of effective controls to prevent

3     diversion, yes.

4          Q.     Did you enforce on anybody on that

5     theory while you were at DEA; have you ever seen

6     that happen?

7          A.     It's not exactly the same but very

8     similar to the Mallinckrodt case where I held them

9     responsible to distributions to their customer's

10    customer.

11              Now, I agree with you or concede that

12    Mallinckrodt was still a registrant, but I held

13    them to conduct where they had no direct dealings

14    with a secondary or a customer's-customer's

15    distribution.

16         Q.     Have you ever while you were with DEA

17    seen a case where a registrant was held to the

18    obligations of a registrant?

19         A.     You mean a --

20         Q.     I'm sorry.  Let me try that again.

21              While you were with DEA, did you ever

22    see a case where a nonregistrant was held to the

23    standards of a registrant?

24         A.     Well, if you're talking about

25    administratively under the rule for registration,

Page 261

1    the answer would be no.  I'm not sure.

2                    I don't directly recall one where

3    there was any kind of an action as far as

4    litigation against a company in the same manner

5    that I'm proposing here.  I just -- I don't know

6    for sure.

7                    Just for clarification, if I can

8    complete my answer, is the company does have

9    numerous registrants, they're just at the pharmacy

10   level.  They're not completely void of having any

11   DEA registrations.

12                   MS. MCENROE:  Again, I move to strike

13   as not responsive to any pending question.

14          Q.    (BY MS. MCENROE:)  So you recently

15   testified in West Virginia, do you remember doing

16   that --

17          A.    I do.

18          Q.    -- at a trial?  And in your

19   testimony, you testified that there's a provision

20   in the Controlled Substances Act that relates to

21   corresponding responsibility.  Do you remember

22   having that testimony?

23          A.    I do.

24          Q.    And in particular, I believe you

25   testified that corresponding responsibility from

1   the CSA is placed on the individual pharmacist who

2   is filling the prescription, not on the pharmacy;

3   is that correct?

4        A.    I recall giving that answer, and so

5   when I answered that question --

6        Q.    Wait.  So that's a yes, then?

7             MS. KNIGHT:  I need --

8        Q.    (BY MS. MCENROE:)  Sir, that was a

9   yes or no question whether you remembered giving

10  that testimony.  I'm going to ask you more

11  questions.  You'll get a chance to talk about it

12  some more.

13            MS. KNIGHT:  No, ma'am.  You need to

14  let him finish his answer.  You don't get to cut

15  him off.

16            MS. MCENROE:  Special Master Cohen,

17  I'm just trying to get some yes or no questions so

18  we can get through this and we're not here until

19  tomorrow at the end of the day.

20            SPECIAL MASTER COHEN:  He's been

21  answering yes or no.  Sometimes it comes after an

22  explanation.  But I think if you give him time,

23  that in my having attended all of this so far, I

24  don't think he's going outside of that line.

25            MS. MCENROE:  Okay.  Can we --

Page 263

1                MR. FULLER:  Go ahead and finish your

2     answer, Mr. Rafalski.

3                MS. MCENROE:  I don't even know what

4     question he's responding to.

5                SPECIAL MASTER COHEN:  Why don't you

6     go ahead and start over.

7          Q.    (BY MS. MCENROE:)  That would be

8     great.  Let's start from the beginning.  So do you

9     remember testifying in West Virginia?

10         A.     I do.

11         Q.     Okay.  Do you remember testifying in

12    West Virginia, yes or no, that the CSA provision

13    related to corresponding responsibility places that

14    responsibility on the individual pharmacist who is

15    filling the prescription, yes or no?

16               MS. KNIGHT:  Object.  Objection to

17    form.

18         A.     So first, it's not the CSA that

19    places the obligation, it's the Code of Federal

20    Regulations, 1306.04.  And my response in that

21    answer that I provided was just directly related to

22    how that code of regulation applies to a

23    pharmacist.

24               But the pharmacist is acting under

25    the DEA registration of the pharmacy.  So it's kind

1   of an encompassing act.

2           Q.    (BY MS. MCENROE:)  So that was a yes,

3   right?  Because my next question I think is exactly

4   where we were going, so if you give me time, we're

5   going to get through this together, okay?

6               So my next question was asking, and I

7   think you had testified, that when there's an

8   administrative action, that would be taken against

9   the registrant regarding that corresponding

10  responsibility having been exercised by the

11  pharmacist, which it would be the corporate entity,

12  the pharmacy, correct?

13          MS. KNIGHT:  Objection to form.

14          A.    That would be a -- that -- I don't

15  recall specifically that's what I said but I'm not

16  disputing what you're saying.  But that would be an

17  accurate statement, that the registrant -- the

18  registration is held by the pharmacy and those

19  actions that occur with the pharmacist is part of

20  the responsibility of that registration, so, yes.

21          Q.    (BY MS. MCENROE:)  Thank you.  And so

22  I just want to understand, in order to have a

23  pharmacy held responsible for the failure to have

24  had a corresponding responsibility applied, the

25  corresponding responsibility had to be exercised by

Page 265

1   a pharmacist down below, right, so it's not just

2   that the pharmacy has the corresponding

3   responsibility?

4                  MS. KNIGHT:  Objection to form.

5          A.     Well, I think the specific act is

6   governed by the CFR.  But I think the conduct of

7   the pharmacist is part of the registration of the

8   pharmacy.  It's not an independent act, it all

9   encompasses the pharmacy, the registration of the

10  pharmacy.

11         Q.     (BY MS. MCENROE:)  So I think we may

12  be talking in circles so I just want to make sure

13  I'm understanding, because I think we're saying the

14  same thing, and I'm just trying to understand.

15                  The actual act of exercising

16  corresponding responsibility in filling a

17  prescription is done by the pharmacist, though the

18  pharmacy may be held accountable for it if the

19  pharmacist does not do it correctly.  Is that fair

20  to say?

21         A.     I would agree with that statement,

22  Ms. McEnroe.

23         Q.     And is it fair to say then that

24  there's not some corresponding responsibility

25  concept that the pharmacy can exercise, absent a

Page 266

1    pharmacist exercising the corresponding

2    responsibility one way or another, whether it's

3    sufficient or not sufficient?

4         A.    Well, I think there's definitely an

5    awareness of the responsibilities for that

6    responsibility by the pharmacy in governing and

7    controlling in regards to the pharmacist's acts

8    there.

9              So I don't know -- I don't think it's

10   just totally independent of the pharmacy, but I

11   just think it's enacted within at least the CFR has

12   described specifically about a pharmacist.

13        Q.    So we agree that the CFR is talking

14   specifically about a pharmacist operating and

15   exercising its corresponding responsibility, that

16   we agree on?

17        A.    Yes, under the authority of the DEA

18   registration of the pharmacy, yes.

19        Q.    So going back to something we were

20   talking about a minute ago, you agree that Rite Aid

21   ceased distribution from its distribution centers

22   all together in 2014 at some point?

23        A.    I do.

24        Q.    Okay.  A couple of other questions,

25   just nuts and bolts about some of the Rite Aid

1    entities and pharmacies you talked about in your

2    report.  Do you know where Rite Aid Store 3151 is

3    located, like physically located?

4              A.    No.  I do not.

5              Q.    Do you know if it's in Lake and

6    Trumbull Counties?

7              A.    I have a list -- not in front of me,

8    but somewhere here I have a list and I can tell

9    you, based on the list, it's I think out of 9 H of

10   Mr. McCann's report, but I don't have those

11   committed to memory, no.

12             Q.    So you talk about 3151 in your

13   report, but you don't know sitting here today where

14   it's located?

15             A.    I know it's in one of the counties,

16   but specifically the address or where it is, no, I

17   do not.

18             Q.    When you say you know it's in one of

19   the counties, which counties are you referring to?

20             A.    I'm not sure unless I went back and

21   looked at that part of Mr. McCann's report.

22             Q.    What I'm just asking is do you know

23   if it's in one of the plaintiffs' counties in this

24   case?

25             MS. KNIGHT:  Asked and answered.

1   Objection.

2           Q.     (BY MS. MCENROE:)   I'm not fully

3   understanding.   I know it's located in a county,

4   which could be anywhere, right, so I'm just trying

5   to understand if it's in a plaintiff county.

6           A.     I believe it's in one of the two

7   counties.

8           Q.     What about for Store 3182, same

9   question, is that located in one of the plaintiff

10  counties?

11          A.     I'm not sure about 3182 without

12  consulting that chart.

13          Q.     And I should have said was it located

14  because I don't want to mislead you.   It closed a

15  couple of years ago but I just wanted -- that's one

16  that you talked about in your report as well.

17              So you don't remember specifically

18  whether it's in a plaintiff county or not or was in

19  a plaintiff county or not?

20          A.     Specifically, no, I do not have that

21  memorized.

22          Q.     Okay.  So in your report you talk a

23  bit about Rite Aid having a five thousand dosage

24  unit threshold.   Is that a concept that you

25  remember?

1          A.     Yes, by NDC, yes, ma'am.

2          Q.     By NDC, yeah.  And you specifically

3   testified previously, but tell me if I'm wrong,

4   that DEA does not prescribe instructions to

5   distributors about how to construct a suspicious

6   order monitoring system; is that fair to say?

7          A.     Could you repeat that one more time,

8   I'm sorry?

9          Q.     Sure.  I'm not trying to do anything

10  tricky here.  So I think you've testified, probably

11  a number of times, now that DEA does not give

12  instructions or rules to the specific distributors

13  about how to design an effective suspicious order

14  monitoring program; is that fair to say?

15              MS. KNIGHT:  Object to form.

16         A.     That's a correct statement as far as

17  what I was directed as when I was a diversion

18  investigator.

19         Q.     (BY MS. MCENROE:)  So there's not

20  like a list somewhere of a set of characteristics

21  of a suspicious order monitoring system that are

22  good or not good or sufficient or not sufficient in

23  and of themselves; is that fair to say?

24         A.     Well, I think there's information

25  available on the internet, but if you're speaking

Page 270

1   about does the DEA give a list to a registrant,

2   because that was kind of a general question, the

3   DEA does not, but I think there's plenty of

4   resources available outside of the DEA.

5           Q.     Sure.  You answered a better question

6   than I asked.  So my question is does the DEA

7   provide a list or a set of criteria, specifically

8   about nuts and bolts how to construct the

9   suspicious order monitoring program that is

10  sufficient from your view?

11              MS. KNIGHT:  Asked and answered.

12          A.     They do not.

13          Q.     (BY MS. MCENROE:)  You discuss in

14  your report, we can take a look at it, Page 113.

15          A.     Okay.

16          Q.     There's a paragraph towards the top

17  that starts "If a Rite Aid store," do you see that?

18          A.     Yes.

19          Q.     Okay.  It says, "If a Rite Aid store

20  wanted more than the five thousand DUs allowed by

21  the company-wide threshold, the store could request

22  a permanent exception or override."  Do you see

23  that?

24          A.     I do.

25          Q.     Where did you get the concept

Page 271

1   permanent there for this report, do you know?

2   There's no citation on that sentence.

3          A.     I'm sorry I didn't cite one.  I

4   believe it's something I reviewed in some of the

5   records.

6          Q.     Do you have any recall that Rite Aid

7   periodically reviewed its exceptions to the five

8   thousand NDC threshold?

9          A.     Not that specifically, but what -- I

10  did not recall -- or I did not see is when you are

11  granting these exceptions and overrides, I didn't

12  see any due diligence conducted or sufficient due

13  diligence conducted.  But I don't specifically

14  remember that.

15         Q.     So you said two things there.  You

16  said we didn't do any due diligence, and then you

17  said we didn't do sufficient due diligence.  I just

18  wanted to be clear.  Which are you saying?

19         A.     I would say sufficient because there

20  could be one out there that maybe I didn't see or I

21  missed, so I don't want to be so definitive, but I

22  didn't see a sufficient number.

23         Q.     Did you look for materials like that?

24         A.     I did.

25         Q.     Did you look for materials like that

Page 272

1    for threshold exceptions in Lake or Trumbull

2    Counties in particular?

3            A.     Yes, I did.

4            Q.     Did you have any understanding of

5    whether there were any exceptions to the five

6    thousand threshold in Lake and Trumbull County --

7    Lake or Trumbull County?

8            A.     I believe I saw some emails that

9    indicated that there could be.  I don't remember

10   specifically of seeing any list or override list,

11   at least right now that I can recall.

12           Q.     So would you agree with me that if

13   there were no exceptions to the five thousand

14   dosage unit threshold for the stores in Lake and

15   Trumbull County, that there would be no due

16   diligence about the threshold exceptions in Lake or

17   Trumbull County that did not exist?

18           A.     If -- that would be an accurate

19   statement, yes.

20           Q.     Let's take a look in the first of the

21   Morgan Lewis binders that I sent you.  I apologize

22   I'm going to have to stand up and get my binders

23   from the back.  I'm in my makeshift office here.

24                  MS. KNIGHT:  What binder?

25                  MS. MCENROE:  So we're going to look

```
                                               Page 273
 1   at Binder Number 1 of 4, and in particular Tab 8.
 2                   (RITE Exhibit 1 was marked for
 3                   identification.)
 4        A.       Hold up.  We're digging them out.
 5                   MS. KNIGHT:  They're wrapped within
 6   the box.
 7                   MS. MCENROE:  Oh, thanks.
 8                   MS. KNIGHT:  One binder that's
 9   Volumes 1 through 4.  Is that right?
10                   MS. MCENROE:  Yeah, whoever labeled
11   them, I apologize, they wrote 1 through 4, 2
12   through 4, 3 through 4, so it's the first number
13   that's governing.
14                   MS. KNIGHT:  This one popped open in
15   travel so we'll put it back together again and
16   he'll have it in just a moment.
17                   MS. MCENROE:  Thank you.
18                   THE WITNESS:  I might put it on the
19   other side.
20                   MS. KNIGHT:  Yeah.
21                   THE WITNESS:  It's probably too big.
22   That's why.
23                   MS. KNIGHT:  Yeah, too much in here.
24                   THE REPORTER:  Ms. McEnroe, if you
25   could slow down a bit, I would appreciate it.
```

1            (Off-the-record discussion.)

2        A.    Okay.  I'm there.

3        Q.    (BY MS. MCENROE:)  Great.  Thank you.

4    You'll see this is an email from Kevin Mitchell.

5    Do you see that?

6        A.    I do.

7        Q.    And he was the senior manager of

8    regulatory compliance for Rite Aid, and that's

9    dated in 2008; do you see that?

10        A.    I do.

11        Q.    And the subject is information

12    needed?

13        A.    I see that.

14        Q.    And they're talking about having a

15    process in place for excessive order monitoring and

16    talking about quantities, and you'll see if you do

17    the quick math that those bottles that they have

18    listed, those add up to five thousand.  Do you see

19    that?

20        A.    I do.

21        Q.    And then he says, "Please identify

22    any and all stores that have attempted to order in

23    excess of these quantities.  I need the store

24    number, item number and description, and date of

25    order.  We are going to run reports for those

1   stores on those items in question to check for

2   'need'."  Do you see that?

3          A.     I do.

4          Q.     And then it goes on, "Also, some of

5   you have stores that have been given exceptions for

6   certain items.  Please provide the store number and

7   item number as well.  We want to reevaluate the

8   need."  Do you see that?

9          A.     I do.

10         Q.     And then the last part I'm going to

11  read is, "We will be reevaluating our current

12  threshold.  Once we run the reports and review, we

13  will send to your D.C. printer for you to file with

14  your controlled drug paperwork."  Do you see that?

15         A.     I do.

16         Q.     And I looked but I didn't see this

17  email on your materials considered.  Have you seen

18  this email before?

19         A.     I don't specifically recall it.

20         Q.     If you had seen it before, would it

21  have been in your materials considered list?

22         A.     It should be.  I can check my

23  materials.

24         Q.     We're a little short on time so I'll

25  represent to you, and I'm comfortable that if you

Page 276

1    look later you'll see, I didn't see it listed

2    there.  Are you confident that you were given all

3    of the documentation relevant to Rite Aid

4    suspicious order monitoring system?

5           A.     I believe I am.

6           Q.     Okay.  So you in your report wrote

7    that there was a permanent exception, and then here

8    we have Mr. Mitchell, the senior manager of

9    regulatory compliance for Rite Aid, sort of the

10   headquarters Rite Aid, talking about reevaluating

11   our current threshold and wanting to reevaluate the

12   need for specific exceptions to the five thousand

13   threshold.  Do you see that?

14          A.     I do.  And this email would indicate

15   to me that they were permanent exceptions that

16   they're reevaluating to make sure they stay.

17                 And as I had talked about earlier, is

18   these were some exceptions that were put into

19   place, and when I was looking through documents, I

20   didn't see these exceptions, any due diligence or

21   any verification that those would be for proper

22   amounts that didn't have the potential for

23   diversion.

24          Q.     So I just want to understand what you

25   think permanent means, because if they're

Page 277

1    reevaluating it, and they reevaluate it and they

2    decide they don't need it anymore, that would not

3    be permanent; is that fair to say?

4            A.    Well, I think that's kind of your

5    interpretation of permanent.  If temporary would

6    mean we'll approve it at one time and then it will

7    revert back or there would be some short duration.

8            Here we're querying throughout the

9    pharmacies to find the ones where there had been an

10   exception granted and then getting back.

11           So the other concerning thing is that

12   it appears maybe Mr. Mitchell doesn't even know

13   which exceptions have been approved.

14           MS. MCENROE:  I'm going to move to

15   strike starting with the other, because that was

16   not responsive to any question; that was just a

17   declaratory statement.

18           Q.    (BY MS. MCENROE:)  Okay.  So we maybe

19   have a disagreement on what the word permanent

20   means.  So I just want to understand also, if you

21   look back at your report at Page 113, a little

22   further down in that paragraph, it starts with the

23   word "There is no formal."  Do you see that?  It

24   says, "There is no formal documentation of a

25   request to increase or override the threshold."  Do

1    you see that?

2             A.      I do.

3             Q.      And what do you -- what do you mean

4    by formal documentation in that instance?

5             A.      Something in writing, something that

6    can be documented that can be reviewed.  Something

7    more than a telephone call.

8             Q.      Would an email suffice?

9             A.      If it was placed in a due diligence

10   file where it could be retrieved or reviewed, I

11   would say yes.

12            Q.      And when you say that, where is the

13   requirement that an email be placed in a due

14   diligence file to be able to be reviewed?

15            A.      Well, I think if a registrant wants

16   to consider it as part of their due diligence, they

17   would put it in a customer file.  So if you were to

18   review the customer file and due diligence, you

19   would see it existed.  To just have it maintained

20   somewhere on a server --

21            Q.      So that's an interesting question.

22   So when you were an investigator and you would go

23   in and do an investigation, if you asked, what's

24   the deal with this particular threshold, it was a

25   problem if the company had to go back and just

Page 279

1    print off an email from their email server as

2    opposed to saying, here, I have it in this folder?

3    That to you would not suffice, it was as if that

4    documentation didn't exist?

5                    MS. KNIGHT:  Objection to the form.

6            A.      I wouldn't look for an email specific

7    to an order.  I would ask first to see the customer

8    file to see if it existed in there.

9                    And how I view that scenario that you

10   describe is if you're in a well-run compliance

11   program and you were going to do a review of a Rite

12   Aid pharmacy, you would not want to have to go

13   gather emails out of servers, you would want all

14   those records brought together in a customer file

15   for that customer.

16           Q.      (BY MS. MCENROE:)  Sure, ideally.

17   But if the company brought them to you but they

18   weren't just in a specific folder called customer

19   file, you would still consider it as part of the

20   investigation if they gave it to you and presented

21   it to you, correct?

22           A.      I may consider they did the

23   investigation, but the fact that it wasn't part of

24   the customer file would be a concern, because I'm

25   not sure a person that would look at the customer

Page 280

1    file would go and search all these other entities

2    to try to find any records related to due

3    diligence.

4            Q.    Does the DEA define what needs to be

5    maintained in the customer file?  Is that something

6    I can go look up in a code somewhere?

7            A.    You cannot.

8            Q.    In your report, you talk about

9    certain enforcement actions against Rite Aid,

10   against other entities and whatnot.  Do you

11   remember having that in your report?

12           A.    They are, enforcement actions are

13   here, yes, ma'am.

14           Q.    Did you do any research to see if

15   there was a factual nexus between the alleged

16   conduct in the enforcement actions that you listed

17   and the allegations against the defendants in this

18   case?

19           A.    I'm not sure I understand that

20   question.

21           Q.    So let me ask it a little

22   differently.  Did you go through and check that

23   each of the enforcement actions you listed, for

24   example, pertained to actual stores in the

25   jurisdictions in this case?

1          A.     Well, I hope they did.  I hope the

2     DEA didn't take action against a store that didn't

3     exist.

4          Q.     I'm sorry.  In this case, in terms of

5     in the plaintiff counties.

6          A.     Oh, I didn't understand your

7     question.  Are you --

8          Q.     Yeah, I don't think they're

9     make-believe stores, I think we can agree on that.

10               So let me start over and see if we

11     can speak the same language.  So my question is:

12     Did you do any research to see if there was a nexus

13     between the alleged conduct and the enforcement

14     actions that are listed in your report and the

15     opinions that you've advanced about the defendants

16     in these counties?

17          A.     So in looking at them, I did review

18     them, but it wasn't important to me whether they

19     were specifically in Lake or Trumbull County,

20     because my opinions are systemic and it's corporate

21     wide.

22               So it's just an indication of

23     failures to be in compliance with DEA regulations

24     that was the importance of putting those actions in

25     my report.

1    Q.    Did you do any research to see if the

2  substances at issue in this alleged conduct

3  pertained to opioids?

4    A.    I recall reading them, some did and

5  some didn't, but again, it was in regards to just

6  compliance with DEA regulations, conduct by

7  company.

8    Q.    Just overall compliance is what

9  you're saying, not specific about opioid-related

10  suspicious order monitoring or the like; is that

11  fair to say?

12    A.    I would agree with that statement,

13  Ms. McEnroe.

14    Q.    Okay.  And in fact, did you even

15  check whether the enforcement actions you have

16  listed are about distribution conduct?

17          MS. KNIGHT:  Objection to form.

18    A.    I remember reviewing them, and off

19  the top of my head, I don't.  I can review them

20  again, but I believe there probably some aren't

21  specific just to distributors.

22    Q.    (BY MS. MCENROE:)  And we spoke a

23  little bit earlier -- I'm sorry.  I didn't mean to

24  cut you off.

25    A.    I'm sure that it's in regards to

```
 1    registrants.  There's -- it's -- all of these
 2    administrative actions are in regards to DEA
 3    registrants and DEA regulations.  Maybe not all
 4    specific to distributors.
 5              Q.    Okay.
 6              MS. KNIGHT:  If you could slow down a
 7    little bit, maybe you wouldn't keep cutting
 8    Mr. Rafalski off.
 9              MS. MCENROE:  I appreciate the tips
10    on my deposition style, thank you.
11              Q.    (BY MS. MCENROE:)  So in terms of the
12    actual enforcement actions you have listed here,
13    some of them come years and years after we even
14    stopped -- Rite Aid even stopped distributing; does
15    that sound right to you?  Do you have any recall on
16    that?
17              A.    Not specifically.  If you want to
18    point --
19              Q.    Yeah, so let's take a look -- let me
20    get my binders straightened out here.  So give me
21    one second.
22              At Page 113 you'll see there's a
23    section that starts "Enforcement Actions" as a
24    header, right, do you see that?
25              A.    My report?
```

1          Q.     Yes, please.

2          A.     Okay.  Sorry.  I'm there.

3          Q.     Yes.  So there's a section that

4     starts "Enforcement Actions," but I'm going to

5     direct you to Page 114, so on the next go.

6          A.     Okay.

7          Q.     And you'll see starting towards the

8     top, each of the paragraphs starts with the date,

9     right, March 2017, January 2018, December 2018.  Do

10    you see that?

11         A.     I do.

12         Q.     And we discussed earlier that Rite

13    Aid stopped distributing sometime in 2014; is that

14    correct?

15         A.     It is.

16         Q.     So that's what I was asking about,

17    about that -- the times just don't connect; is that

18    fair to say?

19              MS. KNIGHT:  Objection to form.

20         A.     Well, it goes back to the corporate

21    entity of Rite Aid and whether or not they are in

22    compliance with regulations of the DEA.

23         Q.     (BY MS. MCENROE:)  Right.  But my

24    question is whether or not the ones you listed here

25    were specific about distribution conduct.  And Rite

1 Aid as a corporate entity was not doing any

2 distribution for years by that time; is that fair

3 to say?

4          A.     Well, yes.  I didn't understand the

5 question.  I just thought you asked why I would

6 post administrative actions not specific to

7 distributors.

8          Q.     Let's take a look at another one of

9 our binders.  And it's going to be the one that

10 says Volume 2 to 4.

11          A.     We probably should unwrap them all.

12          Q.     (BY MS. MCENROE:)  It's like

13 Christmas morning there, getting them out of the

14 bubble wrap.  I apologize.

15          A.     We like the bubble wrap.

16              MS. KNIGHT:  That one is going to pop

17 open too.

18          A.     2 to 4.

19          Q.     (BY MS. MCENROE:)  Great.  I'm sorry?

20 What did you say, sir?

21          A.     What tab?

22          Q.     Perfect.  No problem.  I just wanted

23 to get the binder first to start.

24              So multiple times in your report,

25 Mr. Rafalski, you discuss that Rite Aid reported

Page 286

1    zero suspicious orders to the DEA.  Do you remember

2    that?

3            A.      I do.

4            Q.      So in particular, for example, just

5    to get a good visual, if you look at Page 123 --

6    I'm sorry.  That's the wrong page.  115 I meant,

7    I'm so sorry.

8            A.      Okay.

9            Q.      You have a section there, Section 4,

10   and it says "Suspicious Orders Reported in CT3

11   Jurisdictions," and you have the years 2006 to 2014

12   listed with zeros next to them; is that correct?

13           A.      That's correct.

14           Q.      So let's take a look at Tab 35.

15                   (RITE Exhibit 2 was marked for

16                   identification.)

17           Q.      (BY MS. MCENROE:)  And the next

18   number of documents I'm going to show you,

19   Mr. Rafalski, are all very similar to one another.

20   And I'll give you time to look at them.  They're

21   short, so they're easy to take a look at.

22                   They're each an email from Kimberly

23   Birklin, who is the DEA coordinator at Liverpool,

24   which is one of the two distributions centers we

25   were talking about being Rite Aid distribution

Page 287

1    centers, to Heather White at the DEA.  Do you see

2    that for Tab 35?

3            A.    I do.

4            Q.    Okay.  And it says, "Heather, we did

5    not have any suspicious orders at our Liverpool

6    distribution center during November 2009."  Do you

7    see that?

8            A.    I do.

9            Q.    So now we're going to go to Tab 36.

10                 (RITE Exhibit 3 was marked for

11                 identification.)

12           Q.    (BY MS. MCENROE:)  Very similar

13   email.  This is one is about December 2009.  Do you

14   see that?

15           A.    I do.

16           Q.    We'll go to Tab 37.

17                 (RITE Exhibit 4 was marked for

18                 identification.)

19           Q.    (BY MS. MCENROE:)  Very similar email

20   but this time it's just January 2010, that's the

21   difference.  Do you see that?

22           A.    I do.

23           Q.    The next Tab 38 is the same but for

24   February 2010.  Do you see that?

25                 (RITE Exhibit 5 was marked for

Page 288

1                    identification.)

2          A.      I do.

3          Q.      (BY MS. MCENROE:)   The next Tab 39 is

4      for March 2010?

5                    (RITE Exhibit 6 was marked for

6                    identification.)

7          Q.      (BY MS. MCENROE:)   Do you see that?

8          A.      I do.

9          Q.      Okay.   The one after that, Tab 40, is

10     April 2010.   Do you see that?

11                   (RITE Exhibit 7 was marked for

12                   identification.)

13         A.      I do.

14                   (RITE Exhibit 8 was marked for

15                   identification.)

16         Q.      (BY MS. MCENROE:)   Okay.   Great.   And

17     then Rite Aid 41 is May 2010, do you see that?

18         A.      I do.

19                   (RITE Exhibit 9 was marked for

20                   identification.)

21         Q.      (BY MS. MCENROE:)   Okay.   Then Tab 42

22     is June 2010, do you see that?

23         A.      I do.

24                   (RITE Exhibit 10 was marked for

25                   identification.)

1          Q.     (BY MS. MCENROE)   July 2010 is at
2     Tab 43; do you see that?
3          A.     I do.
4                 (RITE Exhibit 11 was marked for
5                 identification.)
6          Q.     (BY MS. MCENROE:)   Tab 44 is at
7     August 2010, do you see that?
8          A.     I do.
9                 (RITE Exhibit 12 was marked for
10                identification.)
11         Q.     (BY MS. MCENROE:)   Tab 45 is
12    September 2010, do you see that?
13         A.     I do.
14                (RITE Exhibit 13 was marked for
15                identification.)
16         Q.     (BY MS. MCENROE:)   Okay.  Now we're
17    going to go to the other binder that you just had
18    opened.  I apologize for having to jump between
19    binders, and we're going to go to Tab Number 7.
20                THE WITNESS:  Just put it on top.
21                MS. KNIGHT:  All right.
22                MS. MCENROE:  Yeah, that sounds good.
23                MS. KNIGHT:  Well, now I have three
24    binders in front of me.
25                THE WITNESS:  I know.

1           MS. MCENROE:  You should see what my

2    office looks like.  I hear you.

3           A.     Number 7.

4           Q.    (BY MS. MCENROE:)  Yes, sir.  So

5    Number 7, you'll see this is an email, so we're

6    going to read it from the back to start, if that

7    makes sense, at the bottom of the email chain.  And

8    you'll see this is a November 2010 email from

9    Kimberly Birklin to Heather White.

10           MS. KNIGHT:  Just a second.  If

11    you'll just give him a moment so he can read the

12    email.

13           MS. MCENROE:  Absolutely.  I was just

14    going to direct him through it, but that's no

15    problem.

16       A.     So if we're going from the bottom up,

17    we're going on the back page?

18           Q.    (BY MS. MCENROE:)  Yes, sir, exactly.

19    So we're going to go to the back page, and you'll

20    see that Kim Birklin is saying, "Heather, we did

21    not have any suspicious orders for the month of

22    October 2010," do you see that?

23           MS. KNIGHT:  Elisa, please let him

24    read the email.  He'll be right with you.

25           MS. MCENROE:  Sure.  I was going to

Page 291

```
 1   walk him through it.  It's no problem.
 2               (Pause.)
 3        A.    Okay.  Go ahead.  I'm sorry.
 4        Q.    (BY MS. MCENROE:)  Great.  So that
 5   first email we were at the back page of Tab 7 says,
 6   "Heather, we did not have any suspicious orders for
 7   the month of October 2010 at our Liverpool Rite Aid
 8   distribution center," do you see that?
 9        A.    I do.
10        Q.    And that matches the slew of
11   documents we just looked at from the preceding
12   months; is that fair to say?
13        A.    I would agree with that.
14        Q.    And then Ms. White writes back, and
15   you'll see here she has her signature block so we
16   can see she's out of the Albany district office, do
17   you see that?
18        A.    I do.
19        Q.    And she responds, "You don't have to
20   send these anymore, but you do still have to
21   maintain the suspicious order monitoring program
22   and notify me if you do have any issues."  Do you
23   see that?
24        A.    I do.
25        Q.    Okay.  And I looked but I didn't see
```

1    any of these documents in your materials

2    considered.  Have you seen these documents before?

3         A.    I do not believe I have.

4         Q.    Okay.  So looking through your

5    report, Mr. Rafalski, I didn't see any discussion

6    of letters of admonition against Rite Aid relating

7    to its suspicious order monitoring program.  Does

8    that sound right to you?

9         A.    I did not review any records that

10   indicate that there were any issue.

11        Q.    And similarly, I didn't see any

12   discussion in your report of any enforcement

13   actions against Rite Aid relating to its suspicious

14   order monitoring program; does that sound right to

15   you?

16        A.    I don't recall putting that opinion

17   in or that information in my report, so I think

18   that would be an accurate statement.

19        Q.    Thank you.  And, in fact, I didn't

20   see any discussion in the report of any negative

21   feedback whatsoever from the DEA to Rite Aid about

22   its suspicious order monitoring program.  Do you

23   remember seeing any of that?

24              MS. KNIGHT:  You can look at your

25   report if you need to.

Page 293

1          A.     One second.

2          Q.     (BY MS. MCENROE:)  Sure.

3               MS. KNIGHT:  The enforcement action

4     sections starts on Page 113.

5          Q.     (BY MS. MCENROE:)  Right.  So the

6     suspicious order monitoring program, that's what

7     I'm specifically asking about.

8          A.     I don't believe I do, Ms. McEnroe.

9          Q.     (BY MS. MCENROE:)  I also frankly

10    don't see any discussion about positive feedback

11    from the DEA about Rite Aid's suspicious order

12    monitoring program as well.  Does that sound right

13    to you?

14         A.     I believe that's a correct statement.

15         Q.     Okay.  Did you ask for correspondence

16    reflecting any feedback DEA provided to Rite Aid

17    about its suspicious order monitoring program while

18    you were preparing your report?

19         A.     I searched and I asked for assistance

20    in searching anything related to a suspicious order

21    monitoring program.

22         Q.     Okay.  Whether good or bad?

23         A.     Yeah.  It doesn't look at the

24    content, just I think searches documents for

25    certain topics, if it appears in the correct area

Page 294

1    to -- when the search is generated.

2                   For example, all of the emails that

3    we just discussed regards to no suspicious order

4    monitoring, I'm slightly confused because I

5    guess -- I don't know if those documents were

6    produced in discovery.  I don't recall seeing them.

7    That's why I say that.

8         Q.    Okay.  So if we take a look back --

9    now I've messed up my binder, so give me one

10   second -- to the documents we were looking at.  So

11   let's go, for example, to Tab 36.

12        I just picked one of the random ones.  I

13   picked December 2010, do you see that?

14        A.    Yes.

15        Q.    And down at the bottom there's a

16   trailer that was printed on the bottom that says

17   "Confidential Subject to Protective Order," do you

18   see that?

19        A.    Yes.

20        Q.    Then in right-hand bottom corner it

21   says RiteAid_OMDL, that stands for opioids MDL, and

22   then there's a Bates stamp.  Do you see that?

23        A.    Yes.

24        Q.    Do you have any reason to believe

25   that wasn't produced in discovery?

1           MS. KNIGHT:  Object to form.

2           A.    I should have been more specific.  In

3    regards to the suspicious order monitoring

4    interrogatories or the discovery material, whether

5    these were listed specific to that area, I should

6    have been more definitive on my answer.

7           Q.    (BY MS. MCENROE:)  Oh, so you're not

8    saying that they weren't produced in discovery, you

9    mean that they weren't specifically highlighted

10   necessarily in the discovery materials that you

11   looked at?

12          A.    In regards to suspicious orders

13   reporting.  It asked for all suspicious orders

14   reporting.  I don't know if you would -- this would

15   be included because it says reporting none, but it

16   would be -- it would be responsive, I believe, to

17   some of the discovery requests.

18          Q.    Okay.  But plaintiffs didn't show it

19   to you in any event?

20          A.    I don't recall seeing this.

21          Q.    I would like to direct your attention

22   to Tab 5, which is in Binder 1.

23                (RITE Exhibit 14 was marked for

24                identification.)

25          Q.    (BY MS. MCENROE:)  And I'll give you

Page 296

1   a minute to take a look at it if that would be

2   helpful.

3                  MS. KNIGHT:  Right here.  Yes.  If he

4   could have just a minute.

5                  MS. MCENROE:  Of course.  It's both

6   an email and an attachment, just to explain sort of

7   the sequence of the documents there.

8                  MS. KNIGHT:  Thank you.

9          A.    Okay.  I'm ready.

10         Q.    (BY MS. MCENROE:)  Great.  The cover

11  email you'll see is from Keith Frost.  And the

12  subject line is "Please review quote DEA audit July

13  11th."

14                 Do you see that?

15         A.    I do.

16         Q.    And this document is dated July 11th,

17  2012, do you see that?

18         A.    I do.

19         Q.    So this was pretty contemporaneous

20  with the circumstances that he's talking about; is

21  that fair to say?

22                 MS. KNIGHT:  Objection to form.

23         A.    It is.

24         Q.    (BY MS. MCENROE:)  And it says,

25  "Great job everyone for making this audit very

1    successful.  Please share with our associates.

2    Keith."  Do you see that?

3            A.    I do.

4            Q.    Do you have an understanding that the

5    personnel listed here, they work at the Perryman

6    distribution center, or at least they did at the

7    time, do you have any recall one way or the other

8    on that, for example Deborah Chase and Marion Wood,

9    both of whom I think were deposed in this matter?

10           A.    I don't have any specific

11   recollection of them.

12           Q.    Sure.  Well, let's look at the -- the

13   next page is the first page of the attachment.  And

14   it starts with Roman Numeral I, D.C. 10, DEA audit

15   results:  No findings or discrepancies.  One

16   hundred percent accountability.  Do you see that?

17           A.    I do.

18           Q.    What -- Rite Aid sometimes internally

19   refers to the Perryman distribution center as D.C.

20   10.  Is that something you've seen in some

21   documentation?  Is that familiar to you?

22           A.    I recall seeing it, but I'm not sure

23   that I equated it when I read it to the Perryman,

24   but I don't disagree with you or say that I don't

25   accept that.

Page 298

1      Q.     Sure.  So we don't have to go through
2  the entire content, I know you just got a chance to
3  take a look at it.  But there's then Section 2 is a
4  summary of the audit.  Do you see that?
5      A.     I do.
6      Q.     And then there's a Section 3 there at
7  the bottom of that page, and it says, "Shout out.
8  Both DEA inspectors are very impressed and pleased
9  to see that Rite Aid demonstrates its due diligence
10  by having an excellent excessive order monitoring
11  program.  They mentioned that the DEA is taking a
12  harder look at all distributors to ensure that
13  monitoring" -- "that order monitoring processes are
14  in place and effective."  Do you see that?
15      A.     I do.
16      Q.     I looked.  I couldn't find this
17  document in your materials considered either.  Have
18  you seen this before?
19      A.     I'm not sure.  I look at so many
20  documents.  I don't specifically recall it.
21      Q.     You certainly didn't cite it in your
22  report; is that fair to say?
23      A.     I don't believe I did, but let me
24  check something.
25      Q.     And, Mr. Rafalski, since I'm far away

1   from where you are, may I ask what you're taking a

2   look at just so I can follow along?

3          A.     My report.

4          Q.     The actual body of the report or the

5   list of materials considered?

6          A.     List of materials considered.

7          Q.     Okay.

8                 (Off-the-record discussion.)

9          Q.     (BY MS. MCENROE:)  Yeah.  I think if

10  the Bates numbers are sorted in order, it would

11  appear on Page 15 if I'm reading this correctly.

12  But I don't see it there.

13         A.     I don't believe I see it.

14         Q.     So let's take a look at Page 121 of

15  your report.  Let me know when you're there.

16         A.     I am there.

17         Q.     There's a paragraph towards the

18  bottom that starts "Rite Aid was on notice."  Do

19  you see where I am?

20         A.     I do.

21         Q.     It says, "Rite Aid was on notice on

22  multiple occasions that its SOM system was

23  insufficient and not complaint with regulatory

24  standards."  Do you see that?

25         A.     I do.

Page 300

1          Q.      And there's no citation on that

2    sentence, correct?  It's just a yes or no, there's

3    no footnote on that sentence?

4          A.      There is no footnote ton that

5    sentence.

6          Q.      Then your paragraph continues to go

7    on to talk about Dear Registrant letters, correct?

8          A.      Yes.

9          Q.      And in the footnote on the next

10   sentence about the Dear Registrant letters, there's

11   a citation -- let me keep going here to see, that

12   if you keep going you quote from the Dear

13   Registrant letters on the next page, 122, and you

14   have a footnote to the Dear Registrant letters at

15   Footnote 498; is that correct?

16         A.      I believe so, yes.

17         Q.      And that's AmerisourceBergen produced

18   document, correct; that's not a Rite Aid produced

19   document you cited to?

20         A.      Yes.

21         Q.      Did you ask for a copy of Dear

22   Registrant letters that went to Rite Aid in

23   particular?

24         A.      I didn't ask Rite Aid.  I looked

25   through the production materials.

Page 301

1          Q.     Did you see one that was produced

2     specifically about Rite Aid or addressed

3     specifically to Rite Aid?

4          A.     I don't recall specifically seeing

5     one, but my experience with DEA is that every

6     registered entity that was a distributor were

7     mailed those registrant letters.

8          Q.     In your report, you also talk about a

9     concept of distributor briefings, correct?

10         A.     Yes.

11         Q.     And I looked, and you have a list of

12     distributor briefings I saw on Page 18, for

13     example.  I didn't see any reference to any Rite

14     Aid distributor briefings.  Have you seen any

15     evidence of any Rite Aid distributor briefings as

16     you described them in your report?

17         A.     Not in the discovery material, not

18     that I can recall.

19         Q.     So you haven't seen that Rite Aid got

20     the Dear Registrant letters specifically or that

21     there was a distributor briefing for Rite Aid,

22     correct?

23         A.     I don't recall.

24         Q.     Okay.

25         A.     I'm trying to have some recollection

Page 302

1    of Ms. Hart's deposition and whether she responded

2    to that, but if it's not in my report, I don't have

3    time to reread and look at my notes on Hart.

4         Q.    But sitting here today, you don't

5    remember that, correct?

6         A.    I don't have any recollection sitting

7    here right now, that's correct.

8         Q.    Okay.  And if it were anywhere, you

9    think it would be in Janet Hart's deposition.  Is

10   that fair to say?

11        A.    At least a question or a response to

12   whether or not those things -- the company had

13   received those, if she had knowledge of it or a

14   distributor briefing.

15             For sure the letters from Rannazzisi

16   because they consistently get asked in the

17   depositions of the 30(b)s.  I just don't have any

18   direct recollection of Ms. Hart.

19        Q.    So you don't have a direct

20   recollection of either the Dear Registrant letter

21   or the distributor initiative briefings, you're

22   just thinking where you might go to look; is that

23   fair to say?

24             MS. KNIGHT:  Object to form.

25        A.    That's where I would look first,

Page 303

1    that's correct.  I don't have a direct recollection

2    that she answered those specific questions.

3            Q.    Okay.  I think now is a good time for

4    us to go off the record.

5                        THE VIDEOGRAPHER:  This ends Media

6    Unit Number 1 in the deposition of James Rafalski.

7    The time is 2:51 p.m.  We are going off the record.

8                        (Whereupon, a break was had from 2:51

9                        p.m. EDT until 3:09 p.m.)

10                       THE VIDEOGRAPHER:  This begins Media

11   Unit Number 2 in the deposition of James Rafalski.

12   The time is 3:09 p.m.  We are back on the record.

13

14   EXAMINATION BY MS. FUMERTON:

15           Q.    Good afternoon, Mr. Rafalski.  I

16   introduced myself at the beginning of the

17   deposition to you when we were off the record, but

18   just as a reminder, my name is Tara Fumerton, and I

19   represent Walmart in this litigation.

20                       I am going to ask you a series of

21   questions.  It might seem that it is a little

22   scatter shot, but it's just the nature of going at

23   the end of the day or towards the end of the day

24   and I'm trying not to repeat myself.  So I will try

25   to orient you as to what topics my questions are as

Page 304

```
 1    we go through this process.
 2            A.     I understand.
 3            Q.     My first -- my first question for you
 4    is do you have any notes with you today?
 5            A.     I do have a sheet of notes.
 6            Q.     And how many sheets of notes -- could
 7    you hold it up for the camera for me?  Is that
 8    something that is doable?
 9            A.     (Demonstrating).
10            Q.     Okay.  And is that --
11            MS. FUMERTON:  I would like to mark
12    that as an exhibit.  I know we can't do that sort
13    of on the fly in the remote process.  So what I
14    would ask is that we mark that as Walmart Exhibit
15    1.
16                   (Walmart Exhibit 1 was marked for
17                   identification.)
18            A.     Want me to write it on it?
19            Q.     No.  You don't have to write it on
20    it.  We will just ask your counsel or ask Ms.
21    Knight to make a PDF of that and send it to the
22    court reporter during a break, if we can do that.
23            A.     Sure.
24            Q.     Could you explain to us what that
25    series of notes is?  Is it something that you
```

Page 305

1    created, for example?

2          A.    Yes.  It is kind of like cliff notes.

3    Just some points in regards to Walmart that I put

4    down.

5          Q.    Oh, so it is specific to Walmart; is

6    that what I am hearing?

7          A.    It is.

8          Q.    Okay.  Then I definitely am going to

9    want this marked during the break and then I might

10   have some questions for you about that document.

11         Besides that -- you said it is one

12   page, is that right?

13         A.    That's correct.

14         Q.    And you wrote those notes yourself?

15         A.    I did.

16         Q.    Did anybody else give you input on

17   those notes?

18         A.    They did not.

19         Q.    And why did you choose to create

20   notes specific to Walmart?

21         A.    Well, no one has asked.  I have notes

22   one page specific to every entity -- every

23   defendant just to help jog my memory since there's

24   five and I didn't want to cross over and have some

25   confusion between different SOMS or some of the

1    information regarding each of the defendants.

2           Q.     So I guess I may not have asked a

3    clear enough question earlier.

4                  So you have -- in addition to the one

5    page of notes for Walmart, you have four other

6    one-page notes; is that accurate?

7           A.     It is.

8           Q.     Okay.  Actually, we are going to mark

9    that entire set of notes, so I want all of them

10   together as Walmart Exhibit 1.

11          A.     Okay.

12          Q.     So that would be five pages worth of

13   notes; is that right?

14          A.     That is correct.

15          Q.     Okay.  Do you have any other notes

16   with you today?

17          A.     I do not.

18          Q.     Ms. Swift asked you a series of

19   questions about your conversation with Craig

20   McCann.  Do you recall those questions?

21          A.     I do.

22          Q.     Have you talked to any of plaintiffs'

23   other paid experts in connection with your

24   testimony or your expert report for the Track 3

25   case?

Page 307

1          A.     I have not.

2          Q.     Did you speak with Carmen Catizone?

3          A.     I have not.

4          Q.     Do you have your expert report in

5     front of you?  I think it was marked as Giant Eagle

6     Exhibit 2.

7          A.     I do.

8          Q.     And do you have -- that Schedule I is

9     part of your report; is that correct?

10          A.     Yes.

11          Q.     Your materials?  Could you turn to

12     Page 42 of Schedule I?  I just have a simple

13     question for you.

14          A.     Go ahead.

15          Q.     Specifically on Page 42, one of the

16     entries that you listed says "all discovery

17     responses served by defendants included in my

18     report."

19          A.     Hold on.

20          Q.     Do you see that about halfway

21     through?

22          A.     I'm sorry.  When you said 42, I

23     thought you meant Page 42.  I'm sorry.

24          Q.     Yeah, it should be Page 42 of

25     Schedule I, I believe.  We also have it on the

```
 1   screen if you don't want to flip, but take your
 2   time if you want to have the hard copy in front of
 3   you.
 4              MS. KNIGHT:  Do you mind if I just
 5   give him my hard copy.  I'm open to the page.
 6              MS. FUMERTON:  Of course.  That is
 7   fine.
 8        A.    Okay.  I'm sorry.
 9        Q.    (BY MS. FUMERTON:)  Yeah.  So about
10   halfway down on that page, you have written "all
11   discovery responses served by defendants included
12   in my report."  And I am just trying to understand
13   what that refers to.  Could you explain?
14        A.    Yeah.  So when I am preparing my
15   report, I go to the discovery responses that are
16   filed with the court, and I review those for their
17   content.
18        Q.    So you also separately list a whole
19   bunch of discovery responses separately, correct,
20   if you go to just immediately above that?
21        A.    I do.
22        Q.    So is that supposed to capture
23   anything other than the ones that are already cited
24   in your report?
25        A.    Yes, it is.
```

1          Q.     And so is it just the written

2     responses that is served to plaintiffs?

3          A.     Yes, I don't know that there's any

4     other responses other than written.

5          Q.     Well, that is what I am just trying

6     to clarify, what you meant when you wrote "all

7     discovery responses served by defendants included

8     in my report."

9               So I wasn't sure if it was all

10    discovery responses that are included in your

11    report or all discovery responses served by

12    defendants who are included in your report.

13               MS. KNIGHT:  Oh, I see.  Go ahead.

14         A.     All responses served by defendants.

15    I think it is kind of a catchall to make sure I

16    covered all the discovery responses, since there's

17    so many.

18         Q.     (BY MS. FUMERTON:)  Okay.  But you

19    are talking just about the written; you are not

20    talking about all the documents produced in this

21    case, correct?

22         A.     No.  No.  Just the written discovery

23    responses.

24         Q.     Okay.  Thank you.  Switching topics,

25    Walmart's distribution centers that are discussed

1    in your report were registered with the DEA as

2    distributors of controlled substances at all times

3    relevant to your opinions in this case, correct?

4            A.    That's correct.

5            Q.    And the same distribution centers

6    were also licensed with the State of Ohio at all

7    times relevant to your opinions in this case,

8    correct?

9            A.    That's correct.

10           Q.    And you agree that the DEA has had

11   several occasions to review Walmart's distribution

12   practices during the time frame covered in your

13   report, correct?

14           A.    That's a correct statement.  I agree

15   with that.

16           Q.    And that is also true with respect to

17   the Ohio Board of Pharmacy, correct?

18           A.    That they visited the Walmart

19   distributors?

20           Q.    Well, no, that they would have the

21   opportunity to review, if they needed to, correct?

22           A.    I'm not sure they could come to

23   Arkansas and review the Arkansas distributors,

24   unless you are speaking about the pharmacies in

25   Ohio.  I would agree with that.

1       Q.      Okay.  So at least with respect to
2  the pharmacies, you would agree that the Ohio Board
3  of Pharmacy would have the opportunity to invent --
4  to, I'm sorry, inspect Walmart pharmacies, correct?
5       A.      Yes.
6       Q.      Okay.  And the DEA never revoked
7  Walmart's distribution registrations, correct?
8       A.      That would be an accurate statement,
9  yes.
10      Q.      And the Ohio Board of Pharmacy never
11 revoked Walmart's licenses as a distributor,
12 correct?
13      A.      They would not.  I don't know that
14 they would have the authority to do that, but they
15 did not do that.
16      Q.      And the DEA never revoked the
17 registration of any Walmart pharmacy in Lake or
18 Trumbull County, correct?
19      A.      Not that I am aware of.
20      Q.      And the Ohio Board of Pharmacy never
21 revoked the license of any Walmart pharmacy in Lake
22 and Trumbull County, correct?
23      A.      Not that I am aware of.
24      Q.      Your report on Page 18 -- and that is
25 just a reference, you don't have to pull it out

1   now, but if you would like to turn to it, that is

2   fine.  You discussed a DEA distributor briefing

3   initiative, correct?

4           A.    Yes.

5           Q.    And you described that as one of the

6   ways that distributors were informed of the

7   regulatory obligations, correct?

8           A.    Yes.  I think they are informed many

9   more oftentimes than that, but that was one of the

10  things that happened at the distributor briefings,

11  that is correct.  That was a little more specific

12  to internet pharmacies, but also it was also in

13  regards to -- there's -- I recall there being a

14  notification in the presentation that it wasn't

15  specific to internet pharmacies.  But that was the

16  focus.

17          Q.    This -- let me try that over again.

18  Did the DEA hold the distributor briefings as part

19  of this initiative with Walmart?

20          A.    Are you asking me if they held a

21  briefing with Walmart?

22          Q.    Yeah.  You describe these distributor

23  briefing initiative, and you describe a series of

24  meetings with a series of distributors.  What I am

25  asking you is did the DEA, as part of that

Page 313

1    initiative, hold the distributor briefing with

2    Walmart?

3            A.    I don't recall seeing any

4    documentation that that occurred.

5            Q.    Did you ask plaintiffs to provide you

6    with documentation that such a distributor briefing

7    occurred?

8            A.    I am sure I did.  I don't recall

9    seeing it in the discovery responses either.

10           Q.    Okay.  So you aren't aware that the

11   DEA did eventually have a distributor briefing with

12   Walmart in August of 2015; is that right?

13           A.    I don't think I cited it in my

14   report, so, no, I don't think I was aware of that.

15           Q.    Specific to Walmart and on Page 135

16   of your report, you conclude that, "In my opinion,

17   the massive increase in prescription opioids

18   without sufficient due diligence documented is

19   indicative of a failure to maintain effective

20   control."

21                 Is that what you wrote?

22           A.    That is what I wrote, yes.

23           Q.    In your opinion, what is a massive

24   increase?

25           A.    It references the chart directly

1    above.  So it shows within Trumbull and Lake County

2    a steep increase up through 2012.

3           Q.    Right.  So I see the chart, and we

4    are going to talk about those in a second.  What I

5    want to understand is what, in your opinion, is a

6    massive increase.

7           A.    Well, I think it more than doubled

8    within six years, approximately.  I would say that

9    is a massive increase.

10          Q.    Okay.  So can you -- is -- it has to

11   be at least a doubling to be a massive increase?

12   Is that the bare minimum it has to be to be a

13   massive increase, or how would it be in your bounds

14   of what a massive increase is?

15          A.    I don't know that it would have a

16   specific amount in mind like doubling or tripling.

17   This is regards to opioids, so I think part of it

18   would be the type of drugs where the increase

19   occurred, the geographic area.  I think there's

20   several factors.  I think here there's a very sharp

21   increase in the distribution of opioids.

22          Q.    Okay.  And you conclude that with

23   respect to all defendants, right?

24          A.    Yes.  I think they all have very

25   similar increases over that time period.

Page 315

1      Q.     It is your opinion that the

2   defendants all had similar increases in their

3   distribution of opioids; is that accurate?

4      A.     Well, I would have to reference back

5   to each one of my charts.  Some of them may have

6   started out high.  So I -- just right now, the

7   specifics in regards to Walmart, I would say that

8   that holds true, without going through my report.

9      Q.     And does it matter to your opinion at

10  all whether or not the doubling is the doubling of

11  one to two versus a hundred to two hundred, or is

12  it just the fact that it was doubled that that is a

13  massive increase in your mind?

14     A.     Well, when you said one or two, I'm

15  not sure I understand your question, ma'am.

16     Q.     Sure.  So you can have one to two is

17  a doubling, right?

18     A.     Oh, okay.  I'm sorry.  Yes.

19     Q.     A hundred to two hundred is a

20  doubling.  So I guess my point is -- or my question

21  is, does it matter when you say there's a massive

22  increase what the quantity is, or are you just

23  looking at the percentage of increase?

24     A.     Well, if you are saying one pill to

25  two pills, that wouldn't be a massive increase.

1   But I think a hundred -- a hundred and thirty, a

2   hundred and forty thousand up over three hundred

3   thousand, it is more than doubling.  So I think

4   that is a -- that is massive to me.

5         Q.    Okay.  And do you have any -- that is

6   just your opinion?  Were you using any sort of

7   scale at all when you were reaching that

8   conclusion, or is it just something that seemed

9   right to you, based on your hunch?

10         A.    Not a hunch.  That is my opinion.

11         Q.    Okay.  But it is not based on

12   anything other than just you think that's about

13   what a massive increase is; you are not tying it to

14   anything specific?

15         MS. KNIGHT:  Objection to form.

16         Q.    (BY MS. FUMERTON:)  As far as a

17   measure?

18         A.    It is not to scale.  There's no scale

19   I used for this, if that is what you are asking.

20         Q.    Yes, okay.  So let's look at those

21   charts briefly.  And I am not going to ask you to

22   look at them in depth, if you want to just flip

23   through them.  But I just have a question because

24   they all sort of look, to me at least, to have a

25   similar arc and want to see if you agree.

Page 317

1    In looking at these graphs, do you

2  agree that beginning in 2013 and 2014 across the

3  board there was a decrease in the amount of opioids

4  that Walmart was distributing?

5    A.    I do.

6    Q.    And it is your opinion that this

7  decrease was due to Walmart's implementation of

8  effective controls against diversion?

9    A.    I think it was more likely -- my

10  experience would indicate while I was working that

11  it is more likely that it was the industry's

12  response to actions that were being taken by the

13  DEA and some reductions of quota, voluntary

14  reductions of quota by a manufacturer that started

15  the downward trend.

16    MS. FUMERTON:  So move to strike that

17  answer as nonresponsive.

18    Q.    (BY MS. FUMERTON:)  Do you think that

19  the decrease in the amount of opioids that Walmart

20  was distributing was due to Walmart's

21  implementation of effective controls against

22  diversion?

23    MS. KNIGHT:  Objection.  Asked and

24  answered.

25    A.    My previous answer, I do not.

Page 318

1          Q.     (BY MS. FUMERTON:)  Okay.  Do you

2     think it is indicative that a distributor might be

3     implementing effective controls against diversion?

4                    MS. KNIGHT:  Objection to form.

5          A.      In regards to thinking of what SOMS

6     was in place at the time this occurred, I don't

7     think it was the result of the maintenance of

8     effective controls.  I think it was more likely an

9     industry trend.  If we looked at charts, I think

10    many different distributors would have declines

11    starting around 2012, 2013.  Not all.  But I think

12    it would be pretty consistent.

13         Q.     (BY MS. FUMERTON:)  So in your

14    opinion, an increase is indicative of a lack of

15    control.  The inverse is not true, correct?

16         A.      That's correct unless I could tie it

17    to some specific activity, I think the trend -- as

18    I have already answered, I think if you were

19    looking at charting not just in these two counties

20    but throughout the country, I think you would begin

21    to see a decline -- a begin of a decline around the

22    2012, end of 2000 -- mid to end of 2012.

23                    I might add that that wasn't when the

24    opioid epidemic was over, but I think there's a

25    start of a decline of the actual distribution.

Page 319

1        Q.      Your report references seven
2    suspicious order methodologies, some of which were
3    utilized by one or more of the defendants, correct?
4        A.      That is a correct statement.
5        Q.      Walmart did not utilize any of those
6    seven methodologies, right?
7        A.      That is correct.
8        Q.      And you agree that a distributor did
9    not need to use one of those seven methodologies to
10   have a sufficient suspicious order monitoring
11   program, correct?
12       A.      Yeah.  A distributor could have
13   designed one different from one of the
14   methodologies and potentially be effective.
15       Q.      And, in fact, you think it would be
16   wrong for the DEA, for example, to suggest to
17   Walmart that it should have used one of those seven
18   methodologies, correct?
19       A.      As part of my training as a diversion
20   investigator, it would have been wrong for me to
21   advocate the use of any specific system.
22       Q.      Including the seven that you have in
23   your report, correct?
24       A.      That would be any.  That would be
25   correct.  That would be encompassed to any.

1        Q.      Are you familiar with the term "order

2   of interest"?

3        A.      I am.

4        Q.      And are you familiar with how that

5   term was used at Walmart?

6        A.      Not specifically.  I know that that

7   was a term that was used, but not how it was

8   integrated specifically into their SOMS.

9        Q.      Do you understand or have any

10  understanding as to how Walmart reviewed and

11  investigated orders of interest?

12       A.      I don't recall that specific

13  terminology.

14       Q.      Okay.  Well, even if you don't recall

15  that specific terminology, do you recall how

16  Walmart investigated orders that its systems had

17  flagged?

18       A.      Yeah, I recall they didn't hardly do

19  any -- at least not sufficient investigations.

20  They were just cutting orders down below the

21  thresholds.  Generally speaking, I don't -- I don't

22  recall seeing any sufficient due diligence

23  regarding orders that exceeded the threshold.

24       Q.      So that wasn't -- well, you keep

25  throwing in the word "sufficient," so let's back up

Page 321

1   for a second.

2            Do you recall seeing any evidence

3   that Walmart investigated orders of interest?

4        A.    I recall there may have been an

5   occasional or there may have been a few, but it

6   wasn't a system corporate-wide application.  I'm

7   not saying --

8        Q.    So is --

9        A.    I'm not saying they never looked at

10  or reviewed a potential order.  But it didn't occur

11  on a regular and consistent basis in regards to the

12  orders that were cut or the orders that were

13  shipped over the twenty bottles in a consistent

14  basis.

15       Q.    Okay.  And is it your understanding

16  that Walmart's primary order monitoring policy was

17  a twenty-bottle limit?

18       A.    Not at the beginning.  They had a

19  manual review, a distribution pickers review up

20  through, I think, 2011.  And it was sometime later

21  that the over twenty bottle both for oxycodone and

22  over twenty bottle for Schedule 2 started later,

23  later when they started the REDDWERX system.

24       Q.    Okay.  And what about after that?  Do

25  you recall what Walmart did to investigate orders?

Page 322

1          A.     Are you talking the REDDWERX enhanced

2     system?  Or could you me a time frame on your

3     question, please?

4          Q.     Yeah.  Sure.  So any of the orders

5     that were flagged by any of Walmart systems, do you

6     recall what they did to investigate those orders?

7                    MS. KNIGHT:  Objection to form.

8          A.     Yeah, but what date frame are you

9     speaking?

10         Q.     (BY MS. FUMERTON:)  Okay.  Let's just

11    take 2015 forward.

12         A.     Yes, I recall that they -- they had a

13    policy change where they -- there was a potential

14    form that they used, an Order of Interest

15    Evaluation form appeared in a policy, but I don't

16    recall seeing the use of that form.

17                    And then at a later date, they

18    started to document or they indicated they

19    documented orders of interest in the ARCHER system.

20    I remember seeing some communications where there

21    were -- they were -- that they were behind on

22    entries of some information.  But I have not -- I

23    have not been provided any of the -- as far as I

24    know, I have not seen any documentation of that --

25    of that ARCHER entry database with regards to if

Page 323

1   there was any due diligence --

2                   (Reporter clarification.)

3           A.      In regards to the orders in the

4   ARCHER system.

5           Q.      (BY MS. FUMERTON:)  If Walmart had

6   produced its documentation of its orders in the

7   ARCHER system, would you have liked to have

8   reviewed that?

9           A.      I would have.

10          Q.      And you just mentioned that earlier

11  on, during the time period that you reviewed

12  Walmart's policies, it used associates at its

13  distribution center to identify orders of unusual

14  size, frequency and pattern, correct?

15          A.      I believe that was what the testimony

16  of Ms. Hiland was.  I don't recall -- there was

17  never any written SOMS or policies or procedures

18  outlining that.  I think that was something that

19  was part of the 30(b) deposition.  And of --

20          Q.      Okay.

21          A.      -- and of some of the workers.

22          Q.      And you have no basis to disagree

23  with that testimony, correct?

24          A.      Well, I would have liked to have seen

25  something in writing or some proof that that

1   existed.  I am not here saying that I don't believe

2   that it didn't occur.  But to be able to evaluate

3   it, I would have liked to have seen something that

4   would have outlined it, other than somebody saying

5   that occurred.

6                  I recall there was no written

7   policies or procedures, no training.

8        Q.    So if Ms. Hiland had testified that

9   with respect to order monitoring, those associates

10  were trained on how to identify those orders, you

11  missed that testimony; is that right?

12                MS. KNIGHT:  Objection to form.

13       A.    You would have to restate that

14  question.  I'm sorry.

15       Q.    (BY MS. FUMERTON:)  Okay.  Well, you

16  said you recall there was no written policies or

17  procedures and no training, correct?

18       A.    That's correct.

19       Q.    And so are you saying that you didn't

20  see anybody testify about the training that those

21  associates received with respect to order

22  monitoring?

23       A.    No formal training.  I believe there

24  was some comments that it was on-the-job training

25  or kind of learning as you go.  But my statement is

Page 325

1   no formal training.  That would be something

2   generated by the company.

3                    I -- one of the things that was

4   really indicative to me would be Mr. Abernathy's

5   comment about his awareness of the opioid epidemic

6   and his position at the D.C.  That was

7   indicative --

8                    MS. FUMERTON:  I move to strike that.

9           Q.    (BY MS. FUMERTON:)  My question was

10  with respect to training.  And Ms. Hiland, in fact,

11  did testify that those associates received training

12  with respect to order monitoring, correct?

13          A.    I don't recall that in the

14  deposition.  I recall that there was no formal

15  training.

16          Q.    Okay.  And on-the-job training to you

17  is not training?

18          A.    Well, I think anything is training.

19  But just coming in and learning from somebody else

20  and no formal procedures or policies or no formal

21  training, I am not sure that I would agree that

22  would be an effective training.

23          Q.    Okay.  And you agree that the

24  Controlled Substance Act and the regulations

25  promulgated under it don't prohibit registrants

1    from relying on employee experience to fulfill

2    their regulatory obligations, correct?

3          A.    In certain -- in certain

4    circumstances, I believe that it is possible to

5    have a manual system.  Depending on the type of

6    activity and the volume, it may not be sufficient.

7    But at the same time, the regulation requires that

8    you design and operate.  And I'm not sure when you

9    have no policies, no procedures, no documentation,

10   that that is a design, outside of just it appears

11   to me kind of everybody telling everybody what to

12   do.  It is difficult for me to say that that would

13   be in compliance with the regulation.

14              MS. FUMERTON:  I move to strike that

15   as nonresponsive, so I will ask my question again.

16         Q.    (BY MS. FUMERTON:)  The Controlled

17   Substance Act and the regulations promulgated under

18   it do not prohibit registrants from relying on

19   employee experience to fulfill the regulatory

20   obligations, correct?

21              MS. KNIGHT:  You can answer.

22         A.    You will have to repeat that.  That

23   is a different question, I believe.

24         Q.    (BY MS. FUMERTON:)  I read it

25   verbatim, but I will read it again.

1          You agree that the Controlled

2  Substances Act and the regulations promulgated

3  under it do not prohibit registrants from relying

4  on employee experience to fulfill their regulatory

5  obligations, correct?

6          MS. KNIGHT:  Asked and answered.

7      A.    I don't think the regulation speaks

8  specifically to that.  I believe earlier we were

9  discussing a manual system.  That is what I was

10  responding to earlier.

11      Q.    (BY MS. FUMERTON:)  And a manual

12  system is not prohibited either, correct?

13      A.    It is not what?  I'm sorry.

14      Q.    Prohibited, correct?

15      A.    A manual system is not as long as it

16  is sufficient to meet the needs of the registrant.

17      Q.    You also mentioned the twenty bottle

18  limit that Walmart instituted for oxy 30 in 2012;

19  do you recall that?

20      A.    I do.

21      Q.    Sorry.  2012.  I said it right.  Do

22  you know why Walmart implemented that policy?

23      A.    Yeah, I recall seeing an email.  It

24  was in response to concerns about diversion of

25  oxycodone 30 in West Virginia and Florida.

1        Q.      Do you recall testimony that it was

2   in response to suggestions from the DEA that that

3   might be something that they should do?

4        A.      I don't recall that in the

5   depositions I reviewed.  If you -- if you have

6   that, I would be interested to see it.

7        Q.      You also have an opinion that Walmart

8   did not follow its own policies to cut orders of

9   oxycodone 30 to twenty bottles, correct?

10        A.      I --

11        Q.      So Page 138 if you want to look at

12   it.

13        A.      I do, but I am a little confused

14   by -- or not confused, but I'm just not sure about

15   that statement.  I know it appears in my report.

16              I saw some documents where some

17   emails and some databases where the over -- the

18   four-week average would indicate that they had to

19   be shipping over twenty bottles.  So I am not

20   confident whether or not they were complying with

21   that.

22        Q.      You are not confident of your

23   statement in your report that Walmart did not

24   follow its policies limiting oxycodone to 30 -- or

25   oxycodone 30 to twenty bottles, correct?

1          A.      So maybe that wasn't stated.  I

2     wouldn't say confident.  I saw some indications

3     that they weren't, but there wasn't enough

4     information for me to be sure about that.  I don't

5     think I am real definitive in my statement.

6              Based on some of the records I saw an

7     email from, I think, Jimmy Sherrill and a database

8     of over twenty bottle reports that it was an August

9     database.  And I'm not sure -- I think Mr. Sherrill

10    cited in my footnotes, but the one database I am

11    referencing, I don't believe that was cited and

12    that was an oversight.

13         Q.      What database are you referring to?

14         A.      So I think it would be in Footnote

15    593.  I think it would be Footnote that ends with

16    11133.

17         Q.      And I'm sorry.  So what is incorrect

18    about your Footnote?

19         A.      Walmart WMT_MDL_000011133.  It should

20    be over thirty database that starts in July and

21    runs through September or October, maybe even until

22    November.

23         Q.      Okay.  And this is Footnote 593; is

24    that right?

25         A.      Yes.

Page 330

1          Q.      So I am looking at Footnote 593 and I

2     don't see that reference.

3          A.      I just said I should have referenced

4     it and I didn't.  It was an oversight.

5          Q.      Oh, you meant to include that?

6          A.      Yes.  I think I --

7          Q.      When did you realize -- how did you

8     realize, how did you come to the realization you

9     had that oversight?

10         A.      As I began preparing for my

11    deposition, I went through and started reviewing

12    again all of my cites in my report, and I

13    discovered that.

14         Q.      Is there anything else in your report

15    that you discovered was incorrect?

16                 MS. KNIGHT:  Objection to form.

17         A.      Yes.  So if we go to the charts, the

18    methodology charts, the headings in the methodology

19    charts for Walmart say 2006 to 2014, and I believe

20    the methodologies were ran in a longer time period

21    for Walmart, and it should run through -- it would

22    correspond --

23         Q.      (BY MS. FUMERTON:)  What page of the

24    report are you looking at?

25                 MS. KNIGHT:  Page 46.  He is talking

1    about methodologies.

2              A.      Methodologies for Walmart should run

3    and correspond to the charts that is on Page 135.

4    So the ending date for Walmart should be 2018 and

5    not 2014, based on some transaction data that

6    Walmart provided to Dr. McCann.

7              Q.     (BY MS. FUMERTON:)  Any other things

8    that you are incorrect about in your report?

9              A.     No.

10             MS. KNIGHT:  Objection to form.

11             A.     No, I believe that is it.

12             Q.     (BY MS. FUMERTON:)  On Page 36 [sic]

13   you write that "I was not provided any documentary

14   evidence that Walmart had an effective system in

15   place to identify orders of unusual size, pattern

16   or frequency," correct?

17             A.     Page 36?

18             Q.     136.

19             A.     Oh, 136.  Thank you.

20             Q.     Do you see that?

21             A.     Yes.

22             Q.     Okay.  So you are not saying that

23   such evidence does not exist, just that you were

24   not provided it, correct?

25             A.     Well, if I wasn't provided it, I

Page 332

1   guess I don't know that it exists.

2          Q.     Right.  You are not making a claim

3   one way or the another whether or not it exists or

4   not.  You are just saying you weren't provided it,

5   correct?

6          A.     Well, I hope if -- I hope if Walmart

7   had it, they provided it, but I didn't see it.

8          Q.     Well, Walmart has provided thousands

9   and thousands and thousands of documents in this

10  litigation.  You didn't review those thousands and

11  thousands and thousands of documents that Walmart

12  provided, correct?

13         A.     I can't definitively say I reviewed

14  every document, but I reviewed enough documents

15  that I am confident with the opinion I formed.  I

16  think that also the statement I make there is there

17  was no written SOMS policy or procedure all the way

18  through 2014.

19              MS. FUMERTON:  Okay.  I strike that

20  as nonresponsive.

21         Q.     (BY MS. FUMERTON:)  My simple

22  question was Walmart did not provide you with any

23  documents.  Plaintiffs provided you with the

24  documents, correct?

25         A.     Well, not in totality.  I also

                                          Page 333

1    searched for the documents myself.  I have that

2    ability.  But they assist me in providing me with

3    documents, either through me contacting them, being

4    with them, asking for searches.  It is not that I

5    only have access to certain documents.  I can

6    search documents myself also.

7              Q.      Okay.  But again, you are saying that

8    all Walmart's entirety of its production, you

9    looked and you didn't see a single evidence of an

10   effective system to identify orders of unusual

11   size, pattern or frequency?

12             A.      Specifically for pattern and

13   frequency, I don't recall anything that Walmart had

14   in operation that dealt with pattern and frequency.

15             Q.      But you are not changing your earlier

16   testimony that you relied on documents that aren't

17   cited in your opinion, correct?  In your report?

18                  MS. KNIGHT:  Object to the form.

19             A.     I don't think I said that.

20             Q.     (BY MS. FUMERTON:)  I am just

21   asking -- I am just making sure you are not,

22   correct?

23                  MS. KNIGHT:  Objection to form.

24             A.     Can you say that one more time.

25             Q.     (BY MS. FUMERTON:)  Sure.  All the

1  documents that you relied upon in forming your

2  opinions are what is cited in your report, correct?

3         A.    Yes.

4         Q.    On Page 4 [sic] you write that

5  "Walmart also knowingly allowed its pharmacies to

6  order drugs directly from McKesson, thereby

7  exceeding even what Walmart called 'hard limits'

8  imposed and allowing a means of bypassing an

9  already deficient system."  Do you see that?

10         A.    Would you give me the page again,

11  please?

12         Q.    140.

13         A.    I'm sorry.

14              MR. FULLER:  I will have to go to

15  140.

16         A.    In the interest of time -- oh, I see,

17  first paragraph?

18         Q.    (BY MS. FUMERTON:)  Yes.

19         A.    Yes, I did say that.

20         Q.    So it is your understanding that

21  Walmart pharmacies could order Schedule 2

22  substances directly from McKesson, correct?

23         A.    That is correct, based on the

24  testimony of Ms. Hiland and Mr. Abernathy.

25         Q.    In forming your opinions about

Page 335

1    Walmart, did you consider the control and

2    noncontrolled substance dispensing ratio for any of

3    the stores in Lake and Trumbull Counties?

4              A.    I did not.

5              Q.    On Page -- well, on Pages 23 to 33 of

6    your report, you list some of the significant

7    administration -- let me repeat that.

8                    On Page 23 to 33 of your report, you

9    list some of the significant administrative actions

10   against distributors and manufacturers for failing

11   to maintain effective controls against diversion

12   and for failing to identify and/or report

13   suspicious orders, correct?

14             A.    Yes.

15             Q.    And you list almost fifty different

16   actions, correct?

17             A.    That's correct.

18             Q.    And none of them involve Walmart,

19   right?

20             A.    I put the purpose for putting those

21   at the beginning at letter J, but you are correct,

22   it does not involve Walmart.

23             Q.    And on Pages 129 to 130 of your

24   report, you discuss a number of government

25   agreements that Walmart entered into, correct?

1          A.      I do.

2          Q.      And none of those settlements or

3    agreements that are listed there involved Walmart

4    pharmacies in Trumbull and Lake Counties, correct?

5          A.      I don't believe they do.

6          Q.      And none of the allegations in those

7    settlements or agreements involved Walmart's

8    conduct as a distributor, correct?

9          A.      I think in a broad sense when it

10   talks about having an effective compliance program

11   it does but not specific to a specific distributor.

12               (Reporter clarification.)

13         A.      I'm sorry if I'm mumbled.  I will do

14   better.

15         Q.      (BY MS. FUMERTON:)  And then at the

16   end of that section, you comment about -- or you

17   list a DOJ lawsuit that was commenced in December

18   of 2020, correct?

19         A.      I do.

20         Q.      And you understand that the

21   allegations that you recite there are simply that,

22   allegations, correct?

23         A.      I do.  They are just allegations.

24         Q.      Did you consider Walmart's response

25   to any of those allegations in forming your

Page 337

1  opinions?

2          A.     I know they have responded, but I did

3  not.

4          Q.     In reaching your opinions about

5  Walmart in this case, did you assume that those

6  allegations are true?

7          A.     Not until proven, but I think it is

8  indicative of conduct.  So I put it into the

9  report.

10         Q.     So you did not rely on those

11 allegations in reaching your opinion, correct?

12                MS. KNIGHT:  Objection to form.

13         A.     It wouldn't -- it doesn't carry the

14 strength as if it was an allegation that was proven

15 through either an MOA or an administrative hearing

16 in litigation, but it is something to consider

17 because it is targeting the compliance programs.

18         Q.     (BY MS. FUMERTON:)  Well, then

19 Walmart's response should be something you

20 considered too, correct?

21         A.     I think the responses that -- I think

22 they countersued or there was some other

23 litigation.  And I think until it is resolved --

24 that is why I said it doesn't carry the same weight

25 as if there was some kind of litigation or a final

                                              Page 338

1    result.  I think it is just indicative of more

2    issues with compliance.

3          Q.    But if you are trying to be fair, you

4    would consider both the allegations and the

5    response, correct?

6          A.    Yes.

7                MS. FUMERTON:  I have no further

8    questions at this time, subject to any follow-up

9    that somebody -- based on your answers to somebody

10   else.  But I do -- would like to see that one-pager

11   that you have relating to Walmart.  So I also

12   reserve my ability to ask questions about that.  So

13   is that something we quickly -- it is only five

14   pages -- have scanned for us?

15               MS. KNIGHT:  I have the PDFs.  I just

16   need someplace to send them.

17               MS. FUMERTON:  You could send them to

18   me or/and the court reporter.  It is

19   tfumerton@jonesday.com.  Why don't we go off the

20   record while we talk about this.

21               THE VIDEOGRAPHER:  This ends Media

22   Unit Number 2 in the deposition of James Rafalski.

23   The time is 3:53 p.m.  We are going off the record.

24               (Whereupon, a break was had from 3:53

25               p.m. until 4:22 p.m. EDT)

1                THE VIDEOGRAPHER:  This begins Media

2      Unit Number 3 in the deposition of James Rafalski.

3      The time is 4:23 p.m.  We are back on the record.

4

5      EXAMINATION BY MR. RUIZ:

6            Q.     Good afternoon, Mr. Rafalski.

7            A.     Good afternoon.

8            Q.     My name is Anthony Ruiz, and I

9      represent both CVS entities in this case.  I want

10     to just quickly ask you a couple of questions about

11     Walmart Exhibit 1, which are the notes that you

12     brought with you here today.

13           A.     Sure.  Go ahead, sir.

14           Q.     Earlier you testified that you put

15     together the notes relating to Walmart by yourself.

16     Do you recall that?

17           A.     Yes.

18           Q.     Is that true for the notes for the

19     other defendants as well?

20           A.     That's correct.  All five of these I

21     did myself.

22           Q.     Okay.  When did you prepare these

23     notes?

24           A.     Over the last several days.

25           Q.     I want to turn to your report, which

Page 340

1   is Giant Eagle Exhibit 2.  Do you agree that your

2   opinions as they relate to CVS's SOMS system are

3   substantially the same as your opinions in your

4   earlier report in the MDL?

5            A.      In regards to CT1, sir?

6            Q.      Yeah.

7            A.      That is correct.

8            Q.      Do you recall how much time you spent

9   on the CVS portion of your Track 3 report?

10           A.      I do not, sir.  Not as much time as I

11  spent on the three reports.  This would be the

12  first opinion on those three companies.  I spent

13  considerably more, but I didn't keep a running

14  total of the time on CVS.

15           Q.      Do you think it was fewer than ten

16  hours?

17           A.      No.  I would say it was probably a

18  little more than that.  But then you have to take

19  into account that I started working on CVS three

20  years ago, and it has kind of been a continuation

21  during the last three years.

22           Q.      You said earlier that you have spoken

23  with Dr. McCann.  Do you recall that?

24           A.      I have, numerous times.

25           Q.      Have you talked to any other

1   plaintiffs' experts in connection with your report?

2           A.      In regards to CT3, that would be a

3   no.

4           Q.      Have you spoken with any other

5   plaintiffs' experts in regards to CT3 generally?

6           A.      No.

7           Q.      Let's turn to Page 46 of your report,

8   if we could.

9           A.      Okay.

10          Q.      Do you see for Method A for Lake

11  County under CVS, it says that 91.8 percent of the

12  hydrocodone dosage units distributed by CVS are

13  flagged by Method A?

14          A.      I agree with that, sir.

15          Q.      If CVS hadn't distributed those

16  pills, do you know how many cancer patients would

17  have been deprived of their medications?

18          A.      No.  But that doesn't say that they

19  weren't shipped.  That says that those were the

20  orders that were flagged as part of the methodology

21  in applying the assumption.  It is not indicating

22  that those pills were not shipped.

23          Q.      That is not my question.  My question

24  is if CVS had not shipped those pills, do you know

25  how many cancer patients would have been deprived

Page 342

1    of their medication?

2           A.     That is a theoretical question,

3    hypothetical, and I do not.

4           Q.     Do you know how many patients

5    recovering from surgery would not have been able to

6    fill their prescriptions?

7           A.     Same response.  If that is

8    hypothetical, I do not know.

9           Q.     Do you know how many hospice patients

10   would not have been able to fill their

11   prescriptions?

12          A.     No, I do not.

13          Q.     Do you know how many prescriptions

14   written for legitimate medical purposes would not

15   have been filled if those pills were not shipped?

16          A.     No, sir, I do not.

17          Q.     I want to skip to a different part of

18   your report where you talk about the distributor

19   briefing.  I am not going to reference anything

20   specific, so you don't need to flip through unless

21   you want to.

22                 In your report, you mention a number

23   of distributors that received DEA distributor

24   briefings --

25                 THE REPORTER:  I'm sorry.  I couldn't

Page 343

1    understand the initials, the acronym.

2         Q.    (BY MR. RUIZ:)  I said in your

3    report, you mention a number of distributors -- of

4    distributors that received DEA distributor

5    briefings.

6         A.    Yes, sir, I do.

7         Q.    Do you know if CVS received one?

8         A.    I do not recall reviewing a record

9    that indicated they did, or a deposition.

10        Q.    I want to talk about your CVS opinion

11   specifically.  You provide opinions relating to

12   CVS's distribution activities, correct?

13        A.    I do.

14        Q.    In your report, you don't discuss any

15   specific CVS pharmacy in Lake or Trumbull County?

16        A.    In regards to an opinion, I do not.

17        Q.    You are aware that CVS only

18   distributed to its own pharmacy?

19        A.    Yes, I am.  And only hydrocodone.

20        Q.    And you are aware that CVS stopped

21   distributing hydrocodone in 2014 when it was

22   rescheduled to Schedule 2?

23        A.    Yes, I do know that.

24        Q.    So it has been approximately almost

25   seven years since CVS distributed hydrocodone?

1          A.      A little less but approximately, yes.

2          Q.      Would you agree with me that a lot of

3    your opinions relating to CVS's SOMS system are

4    based on the absence of records or documentation?

5                  MS. KNIGHT:  Objection to form.

6          A.      Specifically on the SOMS, I don't

7    totally agree with that.  If it is in regards to

8    the maintenance of effective controls -- that would

9    be a more accurate answer or more accurate

10   question -- I would say I do.

11         Q.      (BY MR. RUIZ:)  Can you parse that

12   out for me?  What do you mean?

13         A.      Well, I think I have a good

14   understanding of the SOMS, how it is designed and

15   how it operated.  So I don't think, in regards to

16   your question, my opinion is not because I don't

17   have sufficient information.  I think the area

18   where I didn't see any sufficient information would

19   have been the due diligence that would have been

20   conducted in a more formal and systematic way.

21         Q.      I understand.  Okay.  So you are

22   basing your opinion relating to due diligence on

23   the lack of documentary evidence today based on

24   events that occurred in 2010, 2011, 2012; is that

25   right?

Page 345

1         A.    Yes.  So just for clarification,
2    documentary -- I am looking for a total -- a total
3    number of things, not just -- not just some pieces
4    of paper and documents.  Policies, procedures, some
5    evidence that due diligence was conducted, how
6    pharmacies were open, all the due diligence that
7    would occur, not just related to a suspicious order
8    but in just conducting the business activity of a
9    distributor in a pharmacy -- with the pharmacy.  I
10   am sorry.
11        Q.    And my question is that you are
12   basing your opinion relating to that due diligence
13   based on the lack of evidence that you see in the
14   paper record on those points?
15        A.    That is a correct statement, sir,
16   yes.  I would agree generally with that.
17        Q.    And you testified earlier that in
18   your opinion, distributors should retain records
19   related to their distribution of hydrocodone, even
20   after -- even years after they have stopped
21   distributing that product, correct?
22        A.    Yes, I did state that earlier, and I
23   do believe that.
24        Q.    So if a pharmacy has been open since
25   the 1980s, is it your opinion that CVS should have

```
 1   kept documentation relating to orders that were

 2   shipped more than thirty years ago?

 3            A.     I don't know if I would be as

 4   definitive thirty years ago.  But even records,

 5   when they stopped distributing, which would be six

 6   and a half or almost seven years ago, I still think

 7   they should retain those records.  Because I could

 8   see a need where, you know, they are now conducting

 9   business using Cardinal, where Cardinal may rely on

10   some of that activity prior to their distribution.

11            So I am not advocating they keep

12   records forever, but I think there's a

13   reasonableness to that also.

14            Q.     What is the -- what is the cutoff for

15   you between six and thirty years?  When can a

16   distributor get rid of records?

17            A.     I think it would be more specific to

18   the type of due diligence.  If it was something

19   severe, some kind of activity involving a pharmacy

20   and some employees and personnel, I think that

21   would be more significant in a longer time period.

22            If it was some due diligence that

23   was, say, for example, some people do site -- not

24   site visits, they do a monitoring where they sit

25   outside and watch for out-of-state license plates.
```

                                                        Page 347

1    If one of those was thirty years old, I am not so

2    sure that would need to be retained.

3                    But it would be up to the distributor

4    to, you know, provide those records that would show

5    what actions they took.

6          Q.    What you just testified to there, has

7    that been provided in any DEA guidance to

8    registrants?

9                    MS. KNIGHT:  Objection to form.

10         A.     That specific guidance, I am not

11   aware that it was ever provided by the DEA.  I

12   think the only guidance that I was aware of is in

13   the distributor briefings.  I attended two of them,

14   and the comment was made, "If it is not written

15   down, it didn't happen."  That would be the exact

16   statement that they say at the distributor

17   briefing.  And I am aware that also is not in the

18   law.

19         Q.    (BY MR. RUIZ:)  And you also don't

20   know whether or when CVS received a distributor

21   briefing, right?

22         A.     I do not, sir.

23         Q.     In your report, you discussed a 2013

24   DEA inspection of CVS's Indiana distribution

25   center.  Do you recall that?

```
                                              Page 348
 1            A.      The page, please?
 2            Q.      62.
 3                    MS. KNIGHT:  What page, Mr. Ruiz?
 4                    MR. RUIZ:  62.
 5            A.      Just trying to save time, sir.  Thank
 6     you.
 7            Q.      (BY MR. RUIZ:)  I understand.
 8            A.      Okay.
 9            Q.      You don't mention any other DEA
10     inspections of CVS facilities in your report,
11     correct?
12            A.      I believe that is a correct
13     statement, yes, sir.
14            Q.      Are you aware of any?
15            A.      Not one that had the kind of
16     interaction between the company and the DEA as
17     this.  I'm sure there was regulatory inspections
18     before and after this one.
19            Q.      So my question was, are you aware of
20     any other DEA inspections, yes or no?
21            A.      I don't recall seeing any records or
22     DEA 6s involves other inspections.
23            Q.      Did you ask to review any?
24            A.      I don't know that I specifically
25     asked.  That would be something that, since I have
```

Page 349

1   been doing this for a few years, three years now,

2   that would be something that would be loaded in,

3   depending on how it was provided, especially in

4   discovery.

5              If it was -- if it was something that

6   was provided in a response to one of the discovery

7   questions, I am fairly certain that I would have

8   reviewed it.  If it wasn't, I don't recall seeing

9   any indications.  I do -- in looking at all the

10  records, sometimes there's an email about a DEA

11  visit.  I saw one earlier from a different company.

12  Those are -- those are sometimes in the records.  I

13  don't have a specific recollection of one of those

14  for CVS.

15         Q.    And if it is not listed in your

16  report or in the materials on Schedule I of your

17  report, that means that you did not rely on it,

18  correct?

19         A.    If it is not in Schedule I, then I

20  did not review it.  That is correct.

21         Q.    Let's turn to Page 77 of your report.

22         A.    Okay.  Go ahead.

23         Q.    In the middle paragraph, the

24  paragraph that starts with "On February 12th,

25  2013" --

1          A.      Yes.

2          Q.      -- the last two sentences of that

3     paragraph, so the second-to-last sentence says, "I

4     have been informed that a random spot-check of the

5     orders flagged for additional review corresponds

6     with the orders shown on the IRR recap."  Do you

7     see that?

8          A.      I do.

9          Q.      Who informed you about that random

10    spot-check?

11         A.      I don't understand the question, sir.

12         Q.      Well, you are not saying that you did

13    the spot-check, right?  Someone else did it?

14         A.      Yeah.  I don't -- I don't recall why

15    that was there.  I think maybe some of this

16    information was provided by one of the plaintiffs'

17    attorneys.  And I reviewed it and reviewed the

18    footnotes attached.

19         Q.      So did you do a random spot-check

20    yourself?

21         A.      Of the -- of the -- I don't know that

22    this was the entirety, but it was brought to my

23    attention by one of the plaintiffs' attorneys.  And

24    I went and reviewed the footnotes and confirmed the

25    content and adapted it into my report.

Page 351

1          Q.     So instead of saying "I have been

2     informed that a random spot-check," it should say

3     "I conducted a random spot-check," because you did

4     it yourself?

5                    MS.  KNIGHT:   Object to the form.

6          A.     I don't know that I would write it

7     like that.   I think the documents could inform me.

8                    But I think there was some

9     collaboration on this particular part of the

10    report.

11         Q.     (BY MR. RUIZ:)   Is that true for the

12    next sentence where you also write, "I have also

13    been informed"?

14         A.     I believe so.   I don't have a direct

15    recollection, but I believe so, sir.

16         Q.     Let's turn to the next page, Page 78.

17    And at the bottom paragraph, the last sentence

18    says, "Additional investigation could include

19    review of patient profiles, such as the age,

20    distance traveled and method of payment, review of

21    ratios" -- do you see where I am reading?

22         A.     No.   I'm sorry.   What page again?

23         Q.     Page 78.

24         A.     Oh, I'm sorry.   Wrong page.

25         Q.     And it is the last paragraph at the

Page 352

1   bottom.

2        A.     I see that.

3        Q.     And it says there that "Additional

4   investigation could include review of," and then it

5   lists a number of things.  Do you see that?

6        A.     I do.

7        Q.     Did you conduct any of these analyses

8   that you list here?

9        A.     No, I did not.  I put these in the

10  report because these are things that would be

11  readily available for CVS to do.  It is not

12  something I did in writing my opinion, preparing my

13  opinion.

14       Q.     Did you ask to review any of this

15  information for any CVS pharmacies in Lake or

16  Trumbull County?

17       A.     I did not.  And I -- and so, in

18  second to that, this would be some of the things

19  that I might expect to see in due diligence records

20  in regards to a review of materials for a pharmacy

21  for a suspicious order for other reasons, and I did

22  not see that.  That is the other purpose for being

23  in the report.

24       Q.     I didn't ask why you included it in

25  your report.  My question is, did you ask to review

Page 353

1   any of this information for any CVS pharmacies in

2   Lake or Trumbull County?

3               And the answer is no, correct?

4        A.    I did not.

5               MS. KNIGHT:  I --

6        Q.    (BY MR. RUIZ:)  Did you do any

7   analysis of the control to noncontrol ratio for any

8   CVS pharmacy in Lake or Trumbull County?

9        A.    I did not.

10       Q.    Did you do any analysis of the

11  geographic area surrounding any CVS pharmacy in

12  Lake or Trumbull County?

13       A.    I did over the course of preparing my

14  report.  I did some Google Maps and placed all the

15  pharmacies surrounding certain -- in certain areas

16  of Lake and Trumbull County.  I did that in regards

17  to a lot of different reasons.

18               But I did do some geographic mapping.

19  I also looked at pharmacies for each of the

20  defendants to see how close they were to each other

21  in regards to their dispensing totals to see any

22  vast differences.

23               So, yes, I did do that.  It is not in

24  my report, but I did do that as I was preparing my

25  report.

1      Q.     So it is not in your report and
2  there's nothing in your -- in your materials
3  considered that tells us what you did, correct?
4      A.     I am not sure how I would put Google
5  Mapping in just looking at geographic locations.
6  So, no, there's no reliance document for that.  It
7  is just something I did.  You asked me the
8  question, sir.  I am just trying to provide you
9  with the answer.
10      Q.     Did you do any analysis of the
11  overall market share that CVS's distribution of
12  hydrocodone combination products accounted for in
13  Lake and Trumbull Counties?
14      A.     I did not.  I think there's some
15  information in Dr. McCann's report that could be
16  indicative of that, but I did not do any analysis.
17      Q.     And you don't say anything about that
18  in your report, correct?
19      A.     I do not.  My opinion isn't based on
20  who has the least or the most market share.  It was
21  just in regards to the two areas I provided an
22  opinion on.
23      Q.     And similarly, you didn't do any
24  analysis of the overall market share of CVS's
25  dispensing of opioids in Lake or Trumbull County,

Page 355

1  correct?

2         A.     That's correct.  I didn't use that in

3  formulating my opinion.

4         Q.     Are you aware of any enforcement

5  action, administrative action or civil proceeding

6  where a pharmacy has been held responsible for

7  shipments made by an outside vendor?

8         A.     Well, I have done cases when I was

9  with the DEA that resulted from purchases from an

10  outside vendor, so I am unsure I understand your

11  question.

12         Q.     Let me try it again.  Are you aware

13  of any enforcement action, administrative action or

14  civil proceeding where a pharmacy was the one held

15  responsible for shipments that were made by an

16  outside vendor?

17         A.     Purchases, not shipments.

18         Q.     What do you mean by -- what do you

19  mean by purchases?

20         A.     So, for example, I had several cases

21  where pharmacies were buying products from a

22  distributor and there was diversion occurring or

23  illicit dispensing.  Those purchases from those

24  distributors were part and parcel of the

25  administrative or criminal actions that went

Page 356

1    against them.  Maybe I still don't understand your

2    question.

3         Q.    I'm not sure if I -- if I understand

4    your answer.  What cases are you thinking of?

5         A.    We talked about one earlier,

6    SafeScript Pharmacy, in my deposition.  That result

7    of that was the action taken, and the conviction

8    was based on the purchases made by the pharmacy of

9    a specific drug from a distributor.  The whole

10   conduct couldn't have occurred without the

11   purchases of the drugs.

12        Q.    Any others?

13        A.    I have done other cases that would

14   have similar circumstances.  I don't know that they

15   are open to public knowledge, so I would have to be

16   probably Touhy -- be careful of discussing those,

17   since they haven't been discussed.  And I'm not

18   aware there's anything public available about it.

19   But, yes, there are.

20        Q.    Have you ever been contacted by

21   plaintiffs' attorneys for the Mobile County Board

22   of Health in Alabama?

23        A.    I have.

24        Q.    I'm sorry?

25        A.    Yes, I have.

1          Q.      Did you agree to be an expert in that

2    case?

3          A.      I did not.

4          Q.      Did you agree to submit an expert

5    report in that case?

6          A.      I did not.

7          Q.      Are you aware that the plaintiffs in

8    that case submitted your MDL Track 1 report in that

9    case?

10         A.      I am.  My recollection is they

11   advised me after they did it.

12             MR. RUIZ:  I don't think I have any

13   other questions.  If we could just take five

14   minutes.

15         A.      Okay.

16             THE VIDEOGRAPHER:  This ends Media

17   Unit Number 3 in the deposition of James Rafalski.

18   The time is 4:49 p.m.  We are going off the record.

19             (Whereupon, a break was had from 4:49

20             p.m. until 4:02 p.m. EDT)

21             THE VIDEOGRAPHER:  This begins Media

22   Unit Number 4 in the deposition of James Rafalski.

23   The time is 5:03 p.m.  We are back on the record.

24         Q.      (BY MR. LIVINGSTON:)  Okay.

25   Mr. Rafalski, can you look at --

1              MR. FULLER:  Waited a minute.  Hold

2     on.  Hold on, Scott.  I'm sorry.  Is Mr. Diaz

3     done -- Ruiz?

4              MR. LIVINGSTON:  I don't know who

5     Diaz is, but Mr. Ruiz is done.

6              MR. FULLER:  Are we done or -- here

7     is where my confusion comes.  I sent the email that

8     we were going seven hours and/or until 5:00.  It is

9     after 5:00.  So if we are not on the verge of being

10    done in the next few minutes --

11             THE REPORTER:  I'm sorry.  You're

12    breaking up --

13             MR. LIVINGSTON:  You are breaking up.

14             THE REPORTER:  I can't hear you.

15             MR. FULLER:  Mr. Rafalski showed up

16    extra early this morning.

17             MS. SWIFT:  Can we go off the record

18    if we are going to fight about something?

19             MR. FULLER:  No, it can be on the

20    record.  We were going to be done by 5:00 --

21             MS. SWIFT:  This is not going to come

22    out of our time.  Please go off the record.  We are

23    trying to be as efficient as possible, Mike.  Let's

24    go off the record.  If you want to talk about this,

25    this's fine.

Page 359

1              THE VIDEOGRAPHER:  This ends Media

2    Unit 4 in the deposition of James Rafalski.  The

3    time is 5:04 p.m.  We are going off the record.

4                   (Whereupon, a break was had from 5:04

5                   p.m. until 5:15 p.m. EDT)

6              THE VIDEOGRAPHER:  This begins Media

7    Unit Number 5 in the deposition of James Rafalski.

8    The time is 5:16 p.m.  We are back on the record.

9              MS. SWIFT:  Plaintiffs have told us

10   they don't want to complete the deposition today.

11   We have about forty plus minutes left of the seven

12   hours that we thought we were going to get today.

13             We have a total of 8.75 hours

14   allotted to us, and Mr. Rafalski has indicated that

15   he is tired and would prefer to start tomorrow

16   morning again.

17             We are putting this statement on the

18   record because we have another expert deposition of

19   Craig McCann starting at 8:00 a.m. tomorrow and we

20   need to finish that in order to keep our schedule,

21   which has already moved once, in light of the

22   Court's orders on our motion to strike.

23             And so we object to stopping now.  It

24   is only 5:17 Eastern Time.  And we would prefer to

25   go at least until the seven-hour mark, which is

Page 360

1    what we thought we were going to get today but

2    plaintiffs have objected to that.  And so, you

3    know, we will start again tomorrow.

4              We are reserving all 8.75 hours that

5    we are entitled to and to the time we are allotted

6    after whatever direct plaintiffs think they are

7    going to do, though I will note for the record also

8    that we object to the notion that plaintiffs are

9    going to do a direct of their expert who has

10   indicated he is coming live to testify at trial.

11             But with that and all of those rights

12   reserved, we will stop today.  Does anybody, any of

13   the other defendants want to make any statement on

14   the record?  Did I leave anything out?

15             MR. LIVINGSTON:  Yes.  I would like

16   to just add a couple of things.  One is I want to

17   make sure we don't leave until we set a starting

18   time for tomorrow and, number two and even more

19   important, ask the witness not to review any

20   exhibits that were sent by the defendants that have

21   not yet been disclosed and used in your deposition

22   pursuant to the deposition protocol.  You are not

23   to get notice of those until they are used actually

24   in the deposition, so --

25             A.    In response to that, they will be

1    left locked in the room.  I don't have access.

2                    MR. LIVINGSTON:  I was assuming you

3    weren't anxious to look at them, but I just wanted

4    to make sure.

5                    MS. MCENROE:  I'm picking up on

6    Mr. Livingston's request as well.  I just want to

7    point out that you are still on cross-examination,

8    so any discussion with plaintiffs' counsel would be

9    improper and highly prejudicial.  So you are not to

10   discuss your testimony whatsoever that you have

11   already given or you intent to give with plaintiffs

12   this evening.

13                   You know, you are still sort of under

14   oath in the time between now and when we return

15   together tomorrow.

16        A.    I understand.

17                   MS. SWIFT:  On the start time, I

18   can't remember if we emailed about that, Mike.  Is

19   8:00 a.m. -- I am going to be deposing Craig

20   McCann, so it is not really my issue but --

21                   MR. FULLER:  Yeah.  The only thing I

22   need to check is if I have any obligations tomorrow

23   morning for the trial that I am in.  I can email

24   you guys probably within an hour.

25                   MS. SWIFT:  And I can't see if

Page 362

1  Page -- oh, there is Page.  Page, we have got the

2  court reporter and everything lined up for 8:00

3  a.m. with Dr. McCann tomorrow morning.

4              MS. POERSCHKE:  Okay.  So we are

5  still planning to start at 8:00, right?

6              MS. SWIFT:  Correct.  That is

7  absolutely right.  Have you received the exhibits,

8  our --

9              MS. POERSCHKE:  I got -- I got your

10  box.  We got your box.  And McCann got your box.

11  And we got an envelope from Walmart.  And that is

12  it.  Does that sound right, everybody?

13              MS. SWIFT:  It does to me.  Thank

14  you.  Anything else?

15              MR. FULLER:  The only thing I would

16  ask Ralph and Kathleen to check on is if Kate's box

17  did make it.  Then I don't know that they have both

18  seen that.

19              MS. SWIFT:  We got confirmation -- my

20  team sent me a note saying who signed for both of

21  the boxes we sent for Mr. Rafalski.  I can't

22  speak -- I can't speak for the one that went to

23  McHugh Fuller, but I am staying at a hotel right

24  now too, and I know it is hard to get stuff from

25  the front desk.

1              MS. KNIGHT:  Yes.  We definitely got

2    everything that was here as of last night that made

3    it to the front desk, so we will check when we get

4    out of here and see if something came in.

5              MS. SWIFT:  We have been in New York

6    all week, and I have had to like cross-examine

7    people to get my own boxes because they end up in

8    different places.  The only reason I'm saying that

9    is I would like you to track them down if, you

10   could, so you could just destroy them.  Because

11   there's -- I don't remember what all is in there.

12   But if you can throw them away in a safe way, that

13   would be great.

14             MS. KNIGHT:  We will definitely --

15   we'll check with the front desk and see what is

16   there.

17             MR. FULLER:  Let me ask on the

18   defense side, are you guys fine starting at 8:00 if

19   I can work on my side?

20             MR. LIVINGSTON:  Actually, I would

21   prefer a more humane start.  But obviously if you

22   guys want to start at 8:00, I'm not going to have a

23   hissy fit about it.

24             MS. FUMERTON:  That's a good way to

25   put it.

1              MS. KNIGHT:  The only thing I suggest

2    is for those that are trying to maybe pop over to

3    the McCann deposition, that starting earlier would

4    be better.

5              MR. FULLER:  Okay.  Let me just check

6    with the trial team here and make sure that works

7    for me.  And I will send an email to everybody,

8    okay?  Or at least those of you that I have your

9    emails.  All right.  Thanks.

10             MS. SWIFT:  That is all.  Thanks,

11   Mike.

12             SPECIAL MASTER COHEN:  This is -- let

13   me -- this is David.  I know that I am coming in at

14   the very end and I have missed quite a bit.  And it

15   appears that you are making arrangements for

16   continuing Rafalski tomorrow.  Let me offer a

17   suggestion.  I think I heard that the defendants

18   think that there's something like forty, forty-five

19   more minutes; is that right?

20             MR. FULLER:  That is just for their

21   seven hours, David, and they may go beyond that to

22   their 8.75.

23             SPECIAL MASTER COHEN:  Well, here is

24   what is likely, right.  It is likely that if

25   defendants were to continue today, they wouldn't

1    take the hour and three-quarters they have left.

2    But if they continue tomorrow, they are much more

3    likely to take the hour and three-quarters they

4    have left, which they are entitled to do.  And I

5    said it was up to Mr. Rafalski.

6              So let me just make this suggestion.

7    Here is another option.  I know you are tired.  I

8    know everyone is tired.  But if you were to take,

9    say, an hour-and-a-half break, have dinner, take a

10   little chill, come back and start -- I'm just

11   making this up as I go -- at 7:00 tonight for

12   forty-five minutes, no longer, then you can finish

13   it tonight, if defendants will agree to that.

14   Forty-five minutes tonight.  Otherwise start early

15   tomorrow and you have got an hour and -- an hour

16   and three-quarters.

17              So I am just trying to figure out a

18   way to make everyone's life easier, including

19   Mr. Rafalski, the defendants and plaintiffs.  You

20   know, maybe that works; maybe it doesn't.  Maybe

21   right away you already know.  I will ask

22   Mr. Rafalski, is that something that you are

23   willing to do?

24        A.     I would like to get done today, but I

25   am not confident that it would be the forty-five

Page 366

1   minutes.

2              SPECIAL MASTER COHEN:  I understand.

3   That is why I say they have to commit to forty-five

4   minutes and it is over.  They may say they are not

5   willing to.

6              MS. KNIGHT:  We have questions.

7              MR. FULLER:  We are going to have

8   some cross, so I don't know that that will

9   necessarily work.  And that was part of the

10  discussion we were having earlier, why I decided to

11  come back in the morning.

12             MS. SWIFT:  We object to that, but I

13  get -- you know, I get --

14             SPECIAL MASTER COHEN:  Everyone has

15  got to agree or it doesn't work, so --

16             MR. FULLER:  But thank you for the

17  suggestion.

18             SPECIAL MASTER COHEN:  All right.

19  So -- and as long as I am on with y'all, so I will

20  be joining you then for the McCann depo and not the

21  continuation of the Rafalski?  Is that how this is

22  going to work?

23             MS. SWIFT:  If you wouldn't mind,

24  David, let us caucus among ourselves, you know, and

25  decide --

Page 367

```
 1                    SPECIAL MASTER COHEN:  That is fine.
 2                    MS. SWIFT:  -- if it is okay with you
 3    where we would like to put you because you might
 4    have to bounce back and forth, if that's okay with
 5    you.
 6                    SPECIAL MASTER COHEN:  I can do that.
 7                    MS. SWIFT:  Okay.  Thank you.
 8                    SPECIAL MASTER COHEN:  Alrighty,
 9    everybody.  Thank you.
10                    MR. LIVINGSTON:  Before we just
11    close, I just want to make sure that the
12    videographer does not include the time we have just
13    had on the record.
14                    MS. SWIFT:  Oh, I actually want it on
15    the record, Scott.
16                    MR. LIVINGSTON:  Well, you have got
17    to put -- you've got to put it on the record, but
18    it is not part of our substantive examination of
19    the witness.  We have got a procedural issue here.
20                    MS. SWIFT:  Understood.  Yes, that is
21    fair.  It shouldn't come out of our time, but it
22    should be on the transcript.
23                    MR. LIVINGSTON:  Yeah.  No, I want it
24    on the transcript.  I'm just saying it shouldn't
25    count against us for the 8.75 hours.
```

Page 368

1                    SPECIAL MASTER COHEN:  That is

2    correct.

3                    MS. SWIFT:  Thank you, Scott.

4                    SPECIAL MASTER COHEN:  Okay.

5                    MR. FULLER:  Thanks everybody.

6                    MS. SWIFT:  Have a good night, guys.

7                    THE VIDEOGRAPHER:  This ends today's

8    deposition of James Rafalski.  The time is 5:25

9    p.m.  We are going off the record.

10                    (Whereupon, the deposition of

11                    James Rafalski was adjourned at

12                    5:25 p.m. EDT on June 10, 2021,

13                    to be reconvened at 8:00 a.m. EDT

14                    on June 11, 2021.)

15

16

17

18

19

20

21

22

23

24

25

Page 369

1                C E R T I F I C A T E

2

3

4    STATE OF ALABAMA

5    JEFFERSON COUNTY

6

7              I hereby certify that the above and

8    foregoing deposition was taken down by me in

9    stenotypy, and the questions and answers thereto

10   were reduced to typewriting under my supervision,

11   and that the foregoing represents a true and

12   correct transcript of the deposition given by said

13   witness upon said hearing, to the best of my

14   ability.

15             I further certify that I am neither

16   of counsel nor of kin to the parties to the action,

17   nor am I in anywise interested in the result of

18   said cause.

19

20

21

22

     LAURA H. NICHOLS

23   Commissioner-Notary Public, State of AL

     ACCR License No. 3, Exp. 9/30/2021

24   GA CCR No. 2714, Exp. 4/1/2022

     TN LCR No. 679, Exp. 6/30/2021

25   Transcript Certified on 6/14/2021

```
                                                        Page 370
 1                       Veritext Legal Solutions
                           1100 Superior Ave
 2                             Suite 1820
                         Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
      June 15, 2021
 5
      To: Kathleen Knight, Esq.
 6
      Case Name: National Prescription Opiate Litigation - Track 3 v.
 7
      Veritext Reference Number: 4629482
 8
      Witness:  James Rafalski      Deposition Date:  6/10/2021
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

Page 371

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS

2

      ASSIGNMENT REFERENCE NO: 4629482
3     CASE NAME: National Prescription Opiate Litigation - Track 3 v.
      DATE OF DEPOSITION: 6/10/2021
4     WITNESS' NAME: James Rafalski
5         In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7         I have made no changes to the testimony
   as transcribed by the court reporter.

8

   _____        _____
9  Date                   James Rafalski
10        Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:

12

          They have read the transcript;
13        They signed the foregoing Sworn
             Statement; and
14        Their execution of this Statement is of
             their free act and deed.

15

          I have affixed my name and official seal
16
   this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

Page 372

1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2

         ASSIGNMENT REFERENCE NO: 4629482
3        CASE NAME: National Prescription Opiate Litigation - Track 3 v.
         DATE OF DEPOSITION: 6/10/2021
4        WITNESS' NAME: James Rafalski
5            In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7            I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9            I request that these changes be entered
     as part of the record of my testimony.
10

             I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____          _____
     Date                       James Rafalski
14

             Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18                in the appended Errata Sheet;
             They signed the foregoing Sworn
19                Statement; and
             Their execution of this Statement is of
20                their free act and deed.
21           I have affixed my name and official seal
22   this _____ day of_____, 20____.
23                     _____
                       Notary Public
24

                       _____
25                     Commission Expiration Date

Page 373

1                          ERRATA SHEET
                VERITEXT LEGAL SOLUTIONS MIDWEST
2                      ASSIGNMENT NO: 4629482
3      PAGE/LINE(S) /          CHANGE          /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____        _____
20     Date                    James Rafalski
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                     _____
                       Notary Public
24

                       _____
25                     Commission Expiration Date

| & |
|---|
| **&** 2:17 3:7,16 6:11 |
| 8:11,19 11:19 |
| 12:9,18 14:13,14 |
| 14:22 245:14 |

| 0 |
|---|
| **00000609** 13:24 |
| **000011133** 329:19 |
| **0016954** 18:7 |
| **0020799** 20:20 |
| **0020801** 20:21 |
| **0068316** 18:12 |
| **0068320** 18:16 |
| **0068321** 18:20 |
| **0068326** 18:24 |
| **0068329** 19:8 |
| **0068331** 19:12 |
| **0068332** 19:16 |
| **0068335** 19:20 |
| **0068337** 19:24 |
| **0068339** 20:8 |
| **0068341** 20:12 |
| **0068346** 20:15 |
| **0068347** 20:16 |
| **00907** 3:19 |
| **04** 129:21 |
| **07068** 11:21 |

| 1 |
|---|
| **1** 14:23 15:11,22 |
| 16:23 17:11 18:4 |
| 21:4 30:4 50:11 |
| 50:13,15,24 51:13 |
| 52:4,11 54:17 |
| 55:7,11 168:5,9 |
| 197:25 198:1 |
| 273:1,2,9,11 |
| 295:22 303:6 |
| 304:15,16 306:10 |
| 339:11 357:8 |

**1/12/2010** 18:15
**1/28/2008** 18:6
**1/4** 136:7
**10** 1:18 14:11
  19:21 23:9 119:22
  119:22,23,25
  123:8 288:24
  297:14,20 368:12
**10/4/2010** 20:11
**100** 4:9
**1000** 7:11
**101** 8:20
**10178-0060** 8:21
**108** 245:20 252:4
**10940** 4:8
**10:05** 160:10
**10th** 23:16
**11** 20:5 123:8
  188:23 289:4
  368:14
**11.5** 208:8
**1100** 370:1
**11133** 329:16
**113** 270:14 277:21
  283:22 293:4
**114** 284:5
**114-18** 15:13
**115** 286:6
**119-23** 14:11
**11:05** 160:7
**11:18** 160:10,12
**11:21** 164:1,3
**11:23** 164:3,5
**11th** 197:11
  296:13,16
**12** 20:9 195:1,5
  289:9
**12/28/2009** 18:11
**121** 299:14
**122** 300:13

**123** 286:5
**128-9** 14:16
**129** 335:23
**12:45** 232:7,12
**12:51** 245:3,5
**12th** 349:24
**13** 17:17 20:13
  54:12 128:12
  195:2 228:20
  289:14
**130** 335:23
**130-16** 15:23
**1301.01** 258:15
**1301.71** 86:10 87:4
  87:8 88:15
**1301.72** 87:23
  88:12,16
**1301.74** 68:19
**1301.76** 87:23
  88:12,17
**1306.04.** 263:20
**1311** 3:17
**133-2** 14:19
**134-17** 15:8
**135** 313:15 331:3
**136** 331:18,19
**138** 328:11
**138-1** 15:4
**14** 20:17 252:10
  295:23
**140** 334:12,15
**141-15** 16:10
**15** 181:9 215:12
  299:11 370:4
**150** 105:16
**150-4** 16:14
**151** 105:16
**152** 105:14 106:2
  106:13
**15219** 6:14 12:12

**15910** 12:19
**16** 14:10 15:25
  102:2 106:2 186:8
  186:22
**16.6** 136:5
**160** 13:6
**1600** 12:20
**168-9** 16:23
**17** 1:6 14:16 63:24
  128:8,8,9
**1701** 8:12
**18** 14:19 16:6
  63:25 133:1,2
  215:12 301:12
  311:24
**18.4** 208:4
**1800** 7:10
**1820** 370:2
**184-23** 17:5
**18409** 369:22
**19** 15:4 121:12
  137:25 138:1
  141:20 199:19
**190-4** 17:8
**19103-2921** 8:13
**196-20** 17:12
**1980s** 345:25
**199-06** 16:8
**1:53** 245:5,7
**1st** 190:15

| 2 |
|---|
| **2** 13:14 17:5 18:9 |
| 30:8,12 31:13,15 |
| 31:20 32:14 38:14 |
| 58:16 63:10,21 |
| 64:17 98:13 |
| 101:16 107:1 |
| 138:19 163:2 |
| 164:8 184:22,23 |
| 186:8 191:6 |
| 198:20,25 217:19 |

273:11 285:10,18
286:15 298:3
303:11 307:6
321:22 334:21
338:22 340:1
343:22
**2/2/2010**   18:19
**20**   14:23 15:8
134:16,16,17
217:19 371:16
372:22 373:22
**200**   5:8
**2000**   100:21
204:23 318:22
**2003**   16:9 99:11
**20036-5807**   7:12
**2004**   59:13 64:21
66:2 72:6 99:15
99:19
**2005**   99:22 129:8
129:21 138:21
**2006**   14:23 16:25
17:7 42:24 131:25
133:10 139:25,25
170:4 171:22
172:7,18 185:18
187:5,24 209:15
252:6 286:11
330:19
**2007**   138:22
**2008**   15:11 16:17
274:9
**2009**   100:22 101:2
101:20 123:8
141:21 183:12
186:25 187:8,9
194:19,21 195:5
195:22 200:17,24
201:22 202:10,17
204:23 205:9,13
206:11 287:6,13

**2010**   17:11 61:16
187:15 188:21,25
190:16 230:15
287:20,24 288:4
288:10,17,22
289:1,7,12 290:8
290:22 291:7
294:13 344:24
**2011**   61:16 187:21
188:4 197:11,16
198:9 321:20
344:24
**2012**   104:21
120:14 121:1
123:6 126:2
296:17 314:2
318:11,22,22
327:18,21 344:24
**2013**   120:25
231:14 317:2
318:11 347:23
349:25
**2014**   16:25 17:7
101:13,20 102:2,9
102:17,18,23
103:1 170:5
171:23 172:7,18
185:18 187:5,24
228:14,15 229:5
230:1 252:6,8,13
266:22 284:13
286:11 317:2
330:19 331:5
332:18 343:21
**2015**   106:2 313:12
322:11
**2016**   100:16,17,18
100:22 101:4,19
101:25 102:19
**2017**   53:8,9 56:6
56:18 59:14 64:21

284:9
**2018**   15:11 16:17
56:20 121:12
284:9,9 331:4
**2019**   14:7,18,23
51:13 133:10
**202**   3:18 7:13
**2020**   15:25 17:17
336:18
**2021**   1:18 14:10
16:7 23:9,17
230:13 368:12,14
370:4
**212**   8:22
**214**   9:11
**214-8**   17:14
**215**   8:14
**216**   2:21 9:20
**216-523-1313**
370:3
**216-9000**   10:10,18
**21usc823**   258:13
**2200**   9:8
**2249**   181:16
**23**   335:5,8
**235-11**   21:12
**24**   13:4,5 15:13
114:17,18
**241**   221:16
**242**   219:13 221:7,8
221:20
**24400**   9:18
**245**   13:7
**24th**   3:9
**25**   14:7 51:13
**25338-3843**   5:9
**26**   16:7 63:25
**260**   128:8,12
**261-2220**   2:11
**2714**   369:24

**273-2**   18:4
**28**   10:8,16 14:18
181:17
**2800**   9:9
**2804**   1:5,6
**286-15**   18:9
**287-10**   18:13
**287-17**   18:17
**287-25**   18:21
**288-11**   19:9
**288-14**   19:13
**288-19**   19:17
**288-24**   19:21
**288-5**   19:5
**289-14**   20:13
**289-4**   20:5
**289-9**   20:9
**2900**   2:18
**293-8244**   3:20
**294644**   10:9,17
**295-23**   20:17
**2nd**   2:19

---

**3**

**3**   17:8 18:13 23:20
24:8,24 25:5
31:21 41:15 50:12
52:14,21 53:2
101:3,16 147:25
190:3,4 199:8
232:21 245:19
273:12 287:10
298:6 306:24
339:2 340:9
357:17 369:23
370:6 371:3 372:3
**3/1/2010**   18:23
**30**   15:19,22 17:16
40:23 57:19,20
127:22 140:14
214:22 215:16
302:17 323:19

327:18,25 328:9
  328:24,25
**300** 9:18
**3011** 3:8
**302** 131:7
**303** 13:8
**304** 5:10
**304-17** 21:4
**309-6000** 8:22
**30s** 134:22,23
  135:5,5
**31** 15:11 214:21
  215:10
**31-15** 13:14
**312** 5:20 7:24
**313** 3:11
**3151** 267:2,12
**316** 4:19
**3182** 268:8,11
**32** 15:23 130:15,16
**32502** 4:20
**33** 139:15 335:5,8
**339** 13:9
**3390** 181:5
**345-0200** 5:10
**35** 286:14 287:2
**3500** 5:18
**35th** 6:13 12:11
**36** 287:9 294:11
  331:12,17
**37** 287:16
**377** 16:9
**38** 287:23
**39** 191:22 288:3
**39402** 2:10
**3:09** 303:9,12

**4**

**4** 17:12 18:17
  196:20,22 198:2,2
  273:1,9,11,12,12
  285:10,18 286:9

287:17 334:4
  357:22 359:2
**4.02** 136:7
**4/06/2010** 19:7
**4/1/2022** 369:24
**40** 288:9
**41** 288:17
**412** 6:15 12:13
**42** 16:5 63:22
  288:21 307:12,15
  307:22,23,24
**43** 289:2
**435-7000** 4:21
**44** 289:6
**44113** 2:20
**44114** 370:2
**44122** 9:19
**45** 289:11
**46** 16:8 99:6,9
  164:11 254:18,25
  330:25 341:7
**4629482** 370:7
  371:2 372:2 373:2
**471-3490** 6:15
  12:13
**48202** 3:10
**49** 16:10 141:14,15
  191:22
**494-4400** 7:24
**498** 300:15
**4:02** 357:20
**4:22** 338:25
**4:23** 339:3

**5**

**5** 11:20 17:14
  18:21 54:12 98:13
  139:17 140:5
  199:9 214:7,8
  287:25 295:22
  359:7

**5/3/2010** 19:11
**50** 16:14 150:3,4
**5027** 180:25
**51** 164:19 166:19
  166:25 255:7,7
**51-7** 14:5
**52-23** 14:8
**526-1836** 10:24
**54** 7:22
**57-20** 15:19
**5881** 185:22 186:3
  186:10
**59** 51:17 199:24
**593** 329:15,23
  330:1
**5:00** 358:8,9,20
**5:03** 357:23
**5:15** 359:5
**5:16** 359:8
**5:17** 359:24

**6**

**6** 13:22 17:16 19:5
  54:13 86:6,6,7,14
  86:14,16 129:8
  195:13 208:2
  214:22 215:16
  288:5
**6/1/2010** 19:15
**6/10/2021** 370:8
  371:3 372:3
**6/14/2021** 369:25
**6/30/2021** 369:24
**60** 200:12
**600** 181:13
**601** 2:11
**60601-1692** 5:19
**60654** 7:23
**61** 128:8
**62** 200:21 348:2,4
**63-22** 16:5

**64** 201:2
**65** 52:21
**659-5200** 4:11
**66** 201:7
**679** 369:24
**68** 52:22 202:14
**69** 51:17
**6s** 250:13,20
  348:22

**7**

**7** 19:9 64:16
  106:25 111:18
  129:8 288:11
  289:19 290:3,5
  291:5
**7.6** 204:22
**7/11/2012** 20:19
**7/6/2010** 19:19
**713** 4:11
**72** 88:4
**740-8000** 9:11
**75** 195:12
**75201** 9:10
**76** 88:4
**77** 5:18 349:21
**77064** 4:10
**778-1800** 7:13
**78** 351:16,23
**781-1111** 2:21
**782-3939** 5:20
**7:00** 365:11

**8**

**8** 14:5 19:13 51:7
  51:10 273:1
  288:14
**8.75** 359:13 360:4
  367:25
**8.75.** 364:22
**8/2/2010** 19:23

**80** 62:7 138:23 139:6 140:13 228:14,22 229:1
**800-4166** 3:11
**804** 171:17,20 176:10 180:19 185:16
**80mg** 16:15
**80s** 135:19
**818** 12:22
**82** 215:4 231:17,18
**823** 258:12
**83** 232:4,15
**831-0001** 9:20
**839-2333** 12:22
**84** 206:22
**843** 10:10,18
**85** 207:18
**850** 4:21
**86** 208:2
**86-7** 13:22
**866** 10:24
**89** 62:7
**8:09** 23:10,17

**9**

**9** 14:8 19:17 42:10 52:20,22,23 86:6 86:18,21 170:7 221:19 241:2 267:9 288:19
**9.8** 133:13,24
**9/30/2021** 369:23
**9/8/2010** 20:7
**91.8** 341:11
**91436** 12:21
**939** 3:20
**94** 234:24 235:1 237:19 238:15
**94.7** 256:4,21
**95** 62:7 195:13 237:9,19 238:15

**963-5076** 8:14
**97** 2:9
**973-994-1700** 11:22
**9:32** 83:2,4

**a**

**a.m.** 23:10,17 82:25 83:2,2,4 160:7,10,10,12 164:1,3,3,5 359:19 361:19 362:3 368:13
**abatement** 33:2
**abc** 162:5,6
**abernathy** 334:24
**abernathy's** 325:4
**abilities** 142:14
**ability** 44:15 60:12 76:18,23 112:20 137:23 194:16 333:2 338:12 369:14
**able** 67:10,16,17 68:14 79:15 81:12 82:7 90:20 142:3 173:14 217:15 278:14 324:2 342:5,10
**absence** 344:4
**absent** 265:25
**absolute** 39:13
**absolutely** 39:1 74:13 112:3 290:13 362:7
**abston** 4:5
**abuse** 17:9 139:9 190:14 191:10,13 192:11
**abused** 135:6
**accept** 297:25

**access** 83:12 142:3 221:21 250:7 333:5 361:1
**account** 33:22,23 141:25 142:11 143:1,5 144:8,11 144:13 223:5 225:2,11 256:19 340:19
**accountability** 297:16
**accountable** 265:18
**accounted** 208:4,8 354:12
**accr** 369:23
**accumulate** 200:3
**accuracy** 32:3
**accurate** 27:4 32:18,20,25 33:8 43:22 47:4,8 48:3 53:14 58:1,5 66:3 67:5 69:5 70:2 96:13 109:25 115:9 120:22 121:19 128:12 138:17 139:8 151:14 152:8 183:6 198:17 218:16 223:12 228:1 252:9 264:17 272:18 292:18 306:6 311:8 315:3 344:9 344:9
**accurately** 165:13
**accusing** 248:8
**acknowledge** 84:15 371:11 372:16

**acknowledging** 256:9
**acquaintance** 141:8
**acronym** 61:12 343:1
**act** 77:23 86:11 161:24 261:20 264:1 265:5,8,15 325:24 326:17 327:2 371:14 372:20
**acted** 41:21 43:11
**acting** 23:4 55:16 56:1 159:17 161:20 263:24
**action** 77:17 78:1 261:3 264:8 281:2 293:3 355:5,5,13 355:13 356:7 369:16
**actions** 230:21 264:19 280:9,12 280:16,23 281:14 281:24 282:15 283:2,12,23 284:4 285:6 292:13 317:12 335:9,16 347:5 355:25
**active** 143:2
**activities** 43:21 44:1 47:1 50:16 50:20 51:3 70:10 112:25 153:19 229:12 248:7 343:12
**activity** 68:7,9 70:17,25 145:16 156:17 174:8 184:17 211:9 248:5 318:17

326:6 345:8
346:10,19
**acts** 266:7
**actual** 44:16 77:13
99:23 115:20
236:5 257:3
265:15 280:24
283:12 299:4
318:25
**adapted** 350:25
**add** 166:24 274:18
318:23 360:16
**added** 182:4
**addition** 306:4
**additional** 196:16
202:24 350:5
351:18 352:3
**address** 177:25
207:21 247:23
267:16 370:15
**addressed** 301:2
**adjourned** 368:11
**administration**
335:7
**administrative**
79:5 264:8 283:2
285:6 335:9
337:15 355:5,13
355:25
**administratively**
260:25
**administrator**
87:21 88:18
**administrator's**
66:6
**admonishment**
111:14
**admonition** 77:20
77:22 78:5 292:6
**advance** 60:4
92:12 95:8

**advanced** 281:15
**advancing** 251:5
**advice** 145:2
**advised** 357:11
**advocacy** 28:24
**advocate** 29:8
319:21
**advocating** 346:11
**affect** 37:17
**affixed** 371:15
372:21
**afternoon** 245:11
245:16,18 303:15
339:6,7
**age** 62:4,14 351:19
**agency** 17:16
85:10
**agent** 60:12 61:5
61:20 62:3,14
66:17 156:25
**agents** 60:9,18,25
61:22 66:14
156:20 158:14
159:16
**aggregate** 92:6,9
**agnello** 11:19
**ago** 85:9 142:13
195:19 229:12
230:5 235:19,23
245:12 250:21
266:20 268:15
340:20 346:2,4,6
**agree** 26:6,19
29:22 34:1,5,14,19
34:23 35:9,18,23
35:25 36:5,8,21
47:13 51:25 53:5
67:12 71:22 79:15
80:5 82:11 84:13
90:25 91:7,11
92:16 94:20 95:16

95:22 96:15 97:11
97:23 98:6 102:7
105:10 106:16
110:21 111:5
112:13 115:7,24
116:11,18 117:7
117:12 118:7,11
120:11,22 121:24
125:4 133:16
134:9 137:1,21
139:3 142:24
148:13 149:13
150:1 151:14
171:15,19,25
172:4 177:6,8,18
179:18 182:3,10
186:1 188:18
189:2 196:4,14
200:7 202:8
212:22 213:13,17
214:11,16 216:6
216:22 217:2,13
217:17 218:1,5,7
223:14,25 226:25
229:3,7 234:22
251:1 253:17,23
260:11 265:21
266:13,16,20
272:12 281:9
282:12 291:13
310:10,14,25
311:2 316:25
317:2 319:8
325:21,23 327:1
340:1 341:14
344:2,7 345:16
357:1,4 365:13
366:15
**agreeable** 215:25
**agreed** 22:2 237:5

**agreement** 31:7
78:16 79:20
158:10 213:20
**agreements**
335:25 336:3,7
**ahead** 29:19
139:15 153:11
168:23 251:16
263:1,6 291:3
307:14 309:13
339:13 349:22
**aid** 8:4,5,5,7 18:1
18:7,12,16,20,24
19:1,8,12,16,20,24
20:1,8,12,15,16,20
20:21 21:6 25:15
50:21 51:21 52:10
53:2 158:1 167:9
245:14,23 246:1,4
246:5,6,22 247:13
248:8 249:15
250:12 251:13
252:2 253:19,20
253:21 254:8
255:1,23 256:9,20
257:2,3,24,25
258:24 259:7
266:20,25 267:2
268:23 270:17,19
271:6 274:8 276:3
276:9,10 279:12
280:9 283:14
284:13,21 285:1
285:25 286:25
288:17 291:7
292:6,13,21
293:16 297:18
298:9 299:18,21
300:18,22,24
301:2,3,14,15,19
301:21

aid's 248:22 251:6 254:1 256:24 293:11
aids 157:8
aj 2:13
al 18:6 20:19 369:23
alabama 23:3,4 356:22 369:4
alarming 123:10 134:10
albany 291:16
alex.abston 4:12
alexandra 4:5
algorithm 113:7
allegation 248:12 337:14
allegations 280:17 336:6,21,22,23,25 337:6,11 338:4
alleged 280:15 281:13 282:2
alliance 7:16
allotted 29:13 359:14 360:5
allow 95:21 171:4 216:17 220:24
allowed 219:5 270:20 334:5
allowing 334:8
allows 112:20,23
alprazolam 207:1 207:14
alrighty 367:8
amanda 10:13
america 209:4
american 199:14 203:5,6,15 204:8 204:21 205:7,18 206:15,23,25 207:20 208:12,13

amerisourceberg... 26:15 300:17
amiss 149:10
amount 33:20 58:13 108:8 135:13 137:20 148:23 158:6 170:13 174:6 242:20 314:16 317:3,19
amounts 35:7 48:11 200:13 202:23 276:22
analyses 352:7
analysis 13:15 42:7 45:25 84:22 97:6 98:2 106:20 106:23 120:6 134:20 158:20 162:10,19,21 164:20 165:17 167:2,14,18 170:8 172:9 173:3,13 174:5 179:14 206:2 207:5,12,15 208:15,20,25 211:4 240:7 353:7 353:10 354:10,16 354:24
analyst 10:6
analysts 83:12
analyze 51:3 107:20 112:7 140:13 165:14
analyzed 98:5 140:15
anna 20:19
annual 96:18 189:25
answer 27:20 28:25 41:5,6

46:18 53:25 54:3 56:9,12,23 74:2,11 84:25 85:2,3 94:1 96:5,14 117:21 124:8 128:24 134:4 143:8 150:20 151:1 214:13,25 215:9 215:12,15 216:4,5 216:7,22 217:24 218:12,13 222:2,7 224:15 225:20 230:7 240:11 253:14 261:1,8 262:4,14 263:2,21 295:6 317:17,25 326:21 344:9 353:3 354:9 356:4
answered 74:9 82:10 93:22 119:19 124:17 147:6 212:24 213:16,25 224:21 227:23 230:6,16 238:9 240:9 262:5 267:25 270:5,11 303:2 317:24 318:18 327:6
answering 39:12 41:10 45:20,23 75:7 262:21
answers 29:3 32:4 41:11 338:9 369:9
anthony 7:7 339:8
anti 110:15
anxious 361:3
anybody 24:15 238:6 248:13 260:4 305:16 324:20 360:12

anymore 119:14 277:2 291:20
anytime 176:19
anywise 369:17
aol.com 141:20
apologize 129:17 189:19 199:5 243:2 272:21 273:11 285:14 289:18
apparently 118:1 131:25
appear 299:11 371:11 372:15
appearance 30:16
appeared 100:20 322:15
appearing 2:2 3:2 4:2 5:2 6:2 7:2 8:2 9:2 10:2 11:2,11 12:1
appears 31:22 51:25 170:7 277:12 293:25 326:10 328:15 364:15
appellate 66:7
appended 372:11 372:18
appendix 42:10 232:21
applicable 46:17 48:21 67:18 72:12 76:4 85:17
applicant 88:20
applicant's 67:15
applicants 87:11
application 135:2 165:9,11 321:6
applied 34:17 35:20 36:2,7,11

37:4 48:10 51:25
60:7 116:21,24
128:2 255:12
264:24
**applies**  263:22
**apply**  36:15 62:2
68:8 70:22 118:4
154:21
**applying**  49:21
67:1 255:16,18
341:21
**appreciate**  119:8
176:20,21 189:16
273:25 283:9
**appropriate**  74:14
74:24 131:24,24
167:23
**approval**  82:13
259:9
**approve**  67:14
277:6
**approved**  36:11
277:13
**approximately**
23:17 82:25 83:4
128:14 148:21
160:12 164:1,5
201:5 206:25
207:20 208:4,8
245:3 314:8
343:24 344:1
**april**  14:10 141:20
228:14,15 229:5
288:10
**arc**  316:25
**archer**  322:19,25
323:4,7
**arcos**  83:10,13
195:14,16 199:25
200:3 203:3
204:14,19 244:21

252:6
**area**  40:5 44:23
63:5 97:5 111:17
124:3 128:17
145:13,24 178:24
242:1 293:25
295:5 314:19
344:17 353:11
**areas**  40:4 64:14
82:11 150:25
242:8,10 244:5,21
249:21 353:15
354:21
**arkansas**  310:23
310:23
**arrangements**
364:15
**arrest**  60:12,14
**arrests**  60:19
**article**  193:10
**aruiz**  7:14
**aruta**  201:3
**asked**  44:14,20
45:23 46:2,5,9
50:23 52:8 58:12
64:2 85:1 93:22
96:16 102:13
108:14,16 113:3
117:3 124:11,17
124:18 128:12
142:5,19 143:12
147:5 167:21
180:2 210:1,19
216:8 217:19
221:23 224:21
227:23 230:6,16
238:6 240:9 254:4
267:25 270:6,11
278:23 285:5
293:19 295:13
302:16 305:21

306:2,18 317:23
327:6 348:25
354:7
**asking**  27:11 33:1
49:5 57:3 59:6
83:19 95:24
114:11 145:2
174:19 193:22
213:2,2,6 221:20
238:5,7,8 249:10
264:6 267:22
284:16 293:7
312:20,25 316:19
333:4,21
**asks**  29:6
**aspect**  68:17
**aspects**  44:18 68:4
212:2
**assembly**  190:20
**assessment**  174:11
**assign**  22:12
**assignment**  63:5
179:5 371:2 372:2
373:2
**assist**  83:21 333:2
**assistance**  37:24
293:19
**associates**  199:1
297:1 323:12
324:9,21 325:11
**assume**  27:21 29:6
78:2 89:14 96:25
117:22 138:8
204:18 337:5
**assuming**  81:7
117:4 120:9 121:5
133:15 361:2
**assumption**  34:2
39:7 249:11
341:21

**assumptions**  29:4
154:14
**atlantic**  8:6
**attached**  38:13
350:18 372:7
**attachment**  20:18
296:6 297:13
**attempt**  29:12
90:9 240:13
**attempted**  274:22
**attended**  262:23
347:13
**attention**  40:19
63:24 295:21
350:23
**attorney**  2:16 3:6
3:15 4:6 5:6 7:8
7:19 8:10,18 9:6
12:17 24:17
245:13
**attorneys**  2:7 4:16
5:16 6:10 11:17
12:8 40:2 54:22
57:1,1 59:10
158:23 350:17,23
356:21
**attribute**  162:11
**attributing**  166:5
166:8
**aubel**  5:5
**audit**  73:6 296:12
296:25 297:14
298:4
**auditors**  236:23
**audits**  235:2,15,21
236:3 237:5,20,24
**august**  139:25
197:11 289:7
313:12 329:8
**aunterreiner**
10:19

**authority** 60:19
61:24 266:17
311:14
**authorization**
219:6
**authorize** 372:11
**authorized** 221:22
**auto** 143:7
**automated** 113:9
**available** 35:4
75:17 85:6,10
126:25 269:25
270:4 352:11
356:18
**ave** 370:1
**avenue** 2:18 8:20
9:8
**average** 16:15
90:8 117:15
126:21 133:11
148:17 150:10
154:25 328:18
**aware** 25:9,14
29:8 30:25 36:6
37:11 47:11 60:8
60:10 64:12 65:16
79:23 91:21 98:24
103:20 129:6,7
130:21,22 141:5
143:25 146:14
156:24 157:9
158:13,19,22
183:19 194:12
205:4 207:22
210:25 211:10,16
212:18 233:15
248:14 254:11
311:19,23 313:10
313:14 343:17,20
347:11,12,17
348:14,19 355:4

355:12 356:18
357:7
**awareness** 266:5
325:5

**b**

**b** 8:5,7 17:16
40:23 68:19 88:15
127:22 183:2
214:22 215:16
258:13 302:17
323:19
**back** 27:1 37:6
52:15,17 62:7
72:3,5 73:19 77:2
83:8 101:19
115:14 127:7
176:6 196:11
216:7 226:15
231:10 238:10
253:25 266:19
267:20 272:23
273:15 277:7,10
277:21 278:25
284:20 290:6,17
290:19 291:5,14
294:8 303:12
315:4 320:25
339:3 357:23
359:8 365:10
366:11 367:4
370:15
**background** 143:9
176:15
**bad** 44:22 60:25
98:9 122:17,21,24
123:13 138:15,16
146:22 157:4,18
293:22
**ballpark** 47:2 57:6
242:18

**bar** 115:19 153:8
**barber** 86:16
**bare** 314:12
**barely** 119:3
**baron** 12:18
**baronbudd.com**
12:23
**barr** 4:18
**bartlit** 7:20 161:10
163:10,13
**bartlitbeck.com**
7:25
**base** 36:22 93:1
95:20 112:22
**based** 29:3,4 34:1
34:2 76:19 91:12
92:18 93:17 116:8
116:23 126:3
173:24 182:22
186:1 196:4,6
204:24 225:14
239:23 267:9
316:9,11 329:6
331:5 334:23
338:9 344:4,23
345:13 354:19
356:8
**basically** 147:17
149:4 150:10
**basing** 344:22
345:12
**basis** 69:22 95:25
133:8 155:3
189:25 203:13
219:4 225:16
226:8,21 230:18
235:5 258:1,2,25
259:3 321:11,14
323:22
**bates** 13:23 14:14
16:11 18:7,11,15

**bar** 115:19 153:8
18:19,23 19:7,11
19:15,19,23 20:7
20:11,14,19
294:22 299:10
**batting** 47:6
**baylen** 4:19
**beach** 198:4
**bear** 58:2 180:14
184:20
**bears** 153:4
**beck** 7:20 161:11
163:10,13
**becker** 11:20
**began** 330:10
**beginning** 13:23
72:3 90:17 144:2
263:8 303:16
317:2 321:18
335:21
**begins** 23:18
303:10 339:1
357:21 359:6
**behalf** 13:19 56:7
57:12 93:25
127:12,21 130:20
143:17 214:23
221:23 222:9
226:4 245:14
**behrens** 11:6
**beisell** 5:15
**belief** 167:8
**believe** 28:13,14
29:3 30:15 37:12
39:4,4,7 41:24
54:6 58:9 66:19
69:25 70:21 87:15
90:23 93:7 102:12
102:18,20 104:6,6
112:18,19 127:14
127:22 130:8
132:22 139:11

142:12 147:8
160:19 163:1
164:14 165:25
170:8 180:17
183:24 187:8
191:12 199:9
203:9 204:11
217:20 223:21
224:24 229:17
230:17 233:14
235:16 238:16
254:14 258:15,24
260:1 261:24
268:6 271:4 272:8
276:5 281:9
282:20 292:3
293:8,14 294:24
295:16 298:23
299:13 300:16
307:25 323:15
324:1,23 326:4,23
327:8 329:11
330:19 331:11
336:5 345:23
348:12 351:14,15
**believes**  84:10
**bell**  127:18
**bellevue**  172:13,25
**bench**  16:6
**benefit**  91:25
**bernard**  6:7
**berris**  2:17
**best**  92:11 118:3
242:12 369:13
**better**  56:16 74:19
82:5 98:25 101:8
129:23 158:1
177:4,5 270:5
336:14 364:4
**beyond**  29:1
364:21

**big**  107:20 162:20
273:21
**bigger**  185:22
188:25
**biggest**  97:4 176:9
177:11 180:9
185:15,21 186:3
188:21 196:2
206:16
**bill**  16:9 59:3,10
99:11,21,22
**billed**  58:21 242:8
**billing**  15:21 242:7
**billings**  58:18
241:9,14
**billion**  33:2,17
**bills**  241:18
**binder**  31:14
272:24 273:1,8
285:23 289:17
294:9 295:22
**binders**  272:21,22
283:20 285:9
289:19,24
**birklin**  18:10,14
18:18,22 19:6,10
19:14,18,22 20:6
20:10 286:23
290:9,20
**birmingham**  23:3
**bit**  34:22 35:13
53:7 71:8 136:2
165:15 172:13
176:5 177:8
187:21 189:9
211:19 222:13
246:9 249:20
254:17 257:6
268:23 273:25
282:23 283:7
364:14

**block**  291:15
**blucero**  18:6
**board**  42:25 43:7
127:2 156:20
157:3 158:16
159:15 310:17
311:2,10,20 317:3
356:21
**boards**  159:5
**bob**  11:6
**bockius**  8:11,19
245:14
**body**  299:4
**bolts**  266:25 270:8
**bonasso**  5:7
**boots**  7:16
**border**  63:8 64:14
**born**  62:24
**boshers**  201:7,11
201:14,19 204:15
**boss**  130:10
**bosses**  130:10
**bottle**  210:15
321:17,21,22
327:17 329:8
**bottles**  146:20
274:17 321:13
328:9,19,25
**bottom**  181:22
190:18 192:2
290:7,16 294:15
294:16,20 298:7
299:18 351:17
352:1
**boulevard**  3:8
9:18 10:8,16
12:19
**bounce**  367:4
**bound**  81:17
**bounds**  314:13

**box**  161:5,7 163:7
163:9,13 255:25
273:6 362:10,10
362:10,16
**boxes**  163:16
362:21 363:7
**break**  80:7 82:21
83:1 160:4,9
164:2 245:4
254:16 303:8
304:22 305:9
338:24 357:19
359:4 365:9
**breaking**  155:24
232:12 358:12,13
**breannan**  213:10
**brennan**  17:17
212:11,15 214:22
217:20 218:21
219:6 223:14,19
226:3,11
**brennan's**  213:8
214:6,18 215:11
218:20 219:16,22
221:2 225:13
**bridgeside**  10:8,16
**briefing**  301:21
302:14 312:2,21
312:23 313:1,6,11
342:19 347:17,21
**briefings**  301:9,12
301:14,15 302:21
312:10,18 342:24
343:5 347:13
**briefly**  316:21
**bring**  78:8
**broad**  37:21 44:14
89:24 96:9 156:16
158:11 178:8
336:9

| | | | |
|---|---|---|---|
| **broadened** 198:19 | **cabinet** 210:16 | **case** 1:6 25:10 | 45:8 46:13 48:1 |
| **broader** 92:23,25 | **cabinets** 108:9 | 26:12 28:6,9,10,16 | 58:20,21 65:12,24 |
| 135:4 | **cadet** 199:21 | 28:17 29:6 30:3,4 | 65:25 66:4 80:24 |
| **broadly** 171:1 | 200:22 204:15 | 30:8,16 31:7 33:1 | 130:21 169:19 |
| 192:23 | **calculation** 171:9 | 33:10,13,14 37:9 | 178:17 355:8,20 |
| **brody** 11:19 | **california** 12:21 | 39:14 41:13 45:10 | 356:4,13 |
| **brothers** 197:20 | **call** 26:22 48:8 | 48:11 50:12 51:13 | **cash** 124:1 132:13 |
| 203:10,14,23 | 68:24 72:18 93:9 | 55:9 57:23 58:12 | 132:17 |
| **brought** 64:11 | 93:20 105:15 | 58:16,16,17 65:12 | **catchall** 309:15 |
| 65:23 100:19 | 107:12 137:13 | 65:13,13,17,17 | **catizone** 307:2 |
| 279:14,17 339:12 | 157:25 198:8 | 71:2 74:7 83:21 | **caucus** 366:24 |
| 350:22 | 278:7 | 87:16 104:13,20 | **cause** 23:11 66:5 |
| **broward** 198:4 | **called** 47:18 61:10 | 105:3 110:16 | 78:20 107:5 |
| **brunner** 9:5 | 66:25 199:13 | 111:5 124:10 | 125:19 137:12 |
| **bubble** 285:14,15 | 233:4,10,16 | 131:6,25 134:22 | 155:12 158:2 |
| **buchanan** 4:18 | 279:18 334:7 | 138:12 148:1 | 369:18 |
| **budd** 12:18 | **camera** 24:20 | 150:8 156:19 | **caused** 153:21 |
| **buddy** 141:1,4 | 304:7 | 164:7 166:22 | **caution** 73:24 |
| **bunch** 124:4 | **cancer** 128:22 | 167:7,15 174:13 | **cautious** 75:6 |
| 308:19 | 341:16,25 | 178:11 179:6,14 | 76:10 130:4 |
| **business** 25:25 | **capacity** 61:24 | 179:16 182:12,15 | 154:13 193:1 |
| 26:2 68:7,9 112:9 | 65:22 | 182:19,22 183:8 | **caveat** 30:23 58:4 |
| 125:5 141:24 | **capitol** 5:8 | 184:2,9 191:4 | 196:13 |
| 142:10,16,18,22 | **capture** 308:22 | 197:22 203:18,20 | **ccr** 369:24 |
| 143:6 148:13 | **cardinal** 26:15 | 204:25 209:24 | **ceased** 229:11 |
| 248:5,7 345:8 | 346:9,9 | 211:12 212:11 | 266:21 |
| 346:9 | **care** 56:4 124:13 | 222:11,23 223:9 | **cecchi** 11:18 |
| **businesses** 25:22 | 172:11 | 224:20 225:7 | **center** 8:6,8 |
| 26:14 193:14 | **career** 62:5,10,15 | 227:17 230:1 | 185:22 186:3,10 |
| **busy** 144:4 249:22 | 125:24 129:7,23 | 234:1 241:2 246:4 | 187:5,10,15 188:4 |
| **buying** 355:21 | 142:4,13 | 248:10,13 250:10 | 188:20 195:21 |
| **bypassing** 334:8 | **careful** 217:21 | 250:23 260:8,17 | 196:17 213:15 |
| **byrne** 11:18 | 356:16 | 260:22 267:24 | 227:12 231:14 |
| | **carella** 11:18 | 280:18,25 281:4 | 246:10 248:2 |
| **c** | **carellabyrne.com** | 306:25 309:21 | 287:6 291:8 297:6 |
| **c** 2:1 3:1 4:1 5:1 | 11:23,24 | 310:3,7 337:5 | 297:19 323:13 |
| 6:1 7:1 8:1 9:1 | **carmen** 307:2 | 339:9 357:2,5,8,9 | 347:25 |
| 10:1 11:1 116:13 | **carolina** 10:9,17 | 370:6 371:3 372:3 | **centers** 217:1 |
| 117:5,13,23 | **carry** 60:18 | **cases** 1:12 24:8 | 218:23 221:25 |
| 258:13 369:1,1 | 337:13,24 | 27:25 28:2 30:19 | 223:19 224:19 |
| **ca** 370:25 | | 30:25 40:18 44:12 | 225:20 226:7 |

227:3,19 237:4
246:11,22 247:19
248:23 249:16
256:10 257:8,9
266:21 286:24
287:1 309:25
310:5
**centre** 6:12 12:10
**certain** 37:23,24
40:2,19,25 44:13
44:18 46:20 48:8
68:16 77:23 82:11
122:21,22 135:14
135:15,16,17
137:20 179:19
216:18 228:4
275:6 280:9
293:25 326:3,3
333:5 349:7
353:15,15
**certainly** 33:16
44:5 57:6 68:13
137:11 298:21
**certificate** 372:11
**certification** 371:1
372:1
**certified** 1:23 22:6
23:1 369:25
**certify** 23:5 369:7
369:15
**cfa** 14:7,10
**cfr** 258:14 265:6
266:11,13
**chagrin** 9:18
**chain** 25:20 34:21
35:1,2,18,20 103:9
148:12 254:9,9
258:21,22 290:7
**chains** 35:13
**chance** 262:11
298:2

**change** 61:15
112:23 154:11
162:22 173:19
225:16,20 322:13
370:13,14 372:8
373:3
**changed** 125:23
**changes** 106:19
120:3 370:12
371:7 372:7,9
**changing** 333:15
**channels** 200:7
**characteristics**
269:20
**characterize** 70:9
107:3 122:12
131:2 141:4
**charleston** 5:9
**chart** 104:23
114:20 120:11,16
121:8,19 122:2
123:2,3 133:6
136:22,25 137:6
137:21 139:16
151:13 152:25
153:16 154:14,20
154:25 164:14
165:11 166:24
169:21 170:6,9,10
171:16 172:22
176:6 185:9
189:15 195:19
232:5,14,18 233:1
255:25 268:12
313:25 314:3
**charting** 318:19
**charts** 104:24
105:9,12,19,23
106:2,13 115:16
125:3 139:17,19
151:3 155:9

162:14 169:6,18
183:23 184:20
186:2,19 254:22
254:23 255:11
315:5 316:21
318:9 330:17,18
330:19 331:3
**chase** 49:18
102:15 214:5
297:8
**check** 71:11,25
72:9 146:19 147:3
275:1,22 280:22
282:15 298:24
350:4,10,13,19
351:2,3 361:22
362:16 363:3,15
364:5
**checked** 203:3
**chemical** 232:20
**chicago** 5:19 7:23
**chief** 212:16
**chill** 365:10
**choose** 305:19
**choosing** 220:9
**christmas** 285:13
**circles** 265:12
**circumstances**
79:21 296:20
326:4 356:14
**citation** 271:2
300:1,11
**cite** 43:15 223:24
232:21 234:4
271:3 298:21
**cited** 191:2 202:5
224:4,8,24 227:6
236:11 237:16
238:15 300:19
308:23 313:13
329:10,11 333:17

334:2
**cites** 330:12
**citing** 258:11
**city** 63:18 145:24
**civil** 23:6 79:3
355:5,14 371:5
372:5
**claim** 70:5 100:14
109:11 332:2
**claims** 247:9
**claire** 17:16
212:11
**clarification** 45:12
125:13 134:8,25
137:15 152:5
182:13 189:5
196:5 214:24
237:22 256:17
261:7 323:2
336:12 345:1
**clarify** 213:1
215:9 224:8
225:18 309:6
**clarifying** 101:1
154:19 155:22
**clear** 33:21 78:22
92:5 100:23
116:21 251:21
271:18 306:3
**clearly** 80:1
**cleveland** 2:20
9:19 370:2
**click** 168:3
**cliff** 305:2
**clinic** 128:22
193:12,16 198:10
198:19 203:5,6,11
203:15 204:8,21
205:7,18 206:15
206:23 208:16,21

clinics 192:9,17
193:5,6,6 198:7,13
198:22 199:13
203:4 209:2
clock 29:12
close 107:12 126:2
353:20 367:11
closed 43:4,6
76:21 203:12
268:14
closely 67:23
closer 74:18
121:11 126:20
closing 97:4,5
closure 97:9
closures 98:2
coaching 29:11
236:14,17,19
coast 199:15
coconspirator
199:22
code 94:6 216:20
217:6 259:2
263:19,22 280:6
cohen 9:15,17
118:21,24,25
119:9 262:16,20
263:5 364:12,23
366:2,14,18 367:1
367:6,8 368:1,4
collaboration
351:9
colleagues 36:2,11
37:4 47:19 160:16
collected 147:15
collectively 136:17
colosimo 74:4
column 89:23
170:14
combination
354:12

combined 202:11
205:20
come 49:11 56:23
61:23 110:14
158:5 170:24
173:8 174:19
195:17 220:23
231:24 283:13
310:22 330:8
358:21 365:10
366:11 367:21
comes 49:7 195:14
195:16 262:21
358:7
comfort 82:21
comfortable 79:17
275:25
coming 82:6 92:12
92:21 94:12 95:10
95:12 96:3 100:20
143:16 175:4
325:19 360:10
364:13
commenced
336:17
commencing 23:9
comment 28:25
33:6 36:19 111:25
325:5 336:16
347:14
commented 94:15
comments 324:24
commission
371:19 372:25
373:25
commissioner
22:5 23:5 369:23
commit 366:3
committed 267:11
common 128:13
145:16

communications
322:20
companies 25:21
27:2 258:20
340:12
company 6:5 12:5
47:21,21 51:21,22
109:23 137:9,23
148:5 212:24
214:12 215:15
257:3 261:4,8
270:21 278:25
279:17 282:7
302:12 325:2
348:16 349:11
compare 106:23
115:19 171:4
compared 123:25
135:4 153:4 156:5
170:22 176:9
comparing 52:17
106:18 136:13
comparison 14:12
15:14 53:1 107:14
114:24 115:9
118:15 119:11
120:1,2 123:9
156:4 172:3
196:16 202:7
205:23 234:11
competitor 97:4
compilation 86:18
complaining 112:7
complaint 299:23
complete 39:23
261:8 359:10
completed 40:15
75:12 191:10
370:15
completely 148:9
149:23 165:17

261:10
completion 38:22
complex 35:14
80:5 96:11 97:15
compliance 13:16
64:22 65:5 68:24
69:2,7 70:11 71:4
76:3,3,14,15,17,20
77:1,9,24 79:18
83:20 85:7,16
87:8 88:15,23
89:1,3,7,10,13,15
89:18,19,24 90:1,5
90:9 100:20
110:18 143:20
158:16 211:24
257:24 274:8
276:9 279:10
281:23 282:6,8
284:22 326:13
336:10 337:17
338:2
complied 48:20
complies 68:7
71:18,20
complimentary
76:11
comply 46:16
47:17 67:10,17,25
68:14 69:19,23,25
70:6 81:17,22
87:15 194:17
215:8
complying 72:14
87:4 88:1 102:10
109:12 111:11
328:20
comprehensive
144:6
comprised 61:21

computer 177:1
concede 260:11
concept 265:25
268:24 270:25
301:9
conceptually
149:11
concern 123:8,10
126:18 154:16
155:12 279:24
concerned 125:22
126:16 132:5
252:9
concerning 145:24
153:25 277:11
concerns 125:19
154:6 327:24
concert 109:8
conclude 85:15
313:16 314:22
concluded 46:15
47:14 69:18
concludes 117:5
conclusion 69:23
98:21 100:5 122:6
124:5 137:5
157:21,24 158:6
225:5 316:8
conclusions 48:19
158:12 223:7
conduct 41:13
45:9,25 46:9
60:13 66:16 70:11
79:22 99:1 101:24
104:6 108:18
109:6 110:5
138:24 141:24
153:3 154:18
159:7 175:1
207:11 208:15
231:1 235:20

253:20 260:13
265:6 280:16
281:13 282:2,6,16
284:25 336:8
337:8 352:7
356:10
conducted 81:19
142:17 147:14
167:15,19 208:20
212:3 271:12,13
344:20 345:5
351:3
conducting 73:3
75:8 83:6 178:16
345:8 346:8
conducts 211:17
212:9
conference 24:12
76:18 119:1
243:13
confident 39:17
249:20 276:2
328:20,22 329:2
332:15 365:25
confidential 1:17
13:25 14:24 15:12
15:18 16:13,17
18:8,12,16,20,24
19:8,12,16,20,24
20:8,12,16,21 21:9
21:12 60:20 235:7
235:11 294:17
confirm 57:24
71:2
confirmation
97:21 362:19
confirmed 350:24
conflict 225:13
confused 294:4
328:13,14

confusion 305:25
358:7
connect 240:13
284:17
connecting 175:12
connection 138:11
306:23 341:1
conservative 59:7
conservatively
58:5
consider 33:16
122:23 192:24
222:21 278:16
279:19,22 335:1
336:24 337:16
338:4
considerably
340:13
consideration 49:7
96:18 98:1 112:12
223:3
considered 142:18
222:9 275:17,21
292:2 298:17
299:5,6 337:20
354:3
consistency
119:15
consistent 117:17
167:6 219:9
318:12 321:11,13
consistently
302:16
consortium 93:24
conspiracy 99:19
138:15
construct 269:5
270:8
consultant 10:21
55:16 56:1 165:19

consultants
120:10 133:15
134:14 147:9
150:7
consulting 10:22
53:7 268:12
consults 93:19
contact 142:15
230:23
contacted 356:20
contacting 333:3
contain 38:20
129:5
contained 42:7,10
43:14 52:5 69:16
80:2 101:22
108:20 113:6
168:24 232:24
258:14
contains 1:17
contemporaneous
296:19
content 293:24
298:2 308:17
350:25
context 219:19
220:4,14,25
continuation
340:20 366:21
continue 230:8
364:25 365:2
continued 104:4
continues 300:6
continuing 3:1,4
4:1,4 5:1 6:1 7:1
8:1 9:1 10:1,4
11:1,4 12:2 14:2
15:2 16:2 17:2
19:2 20:2 364:16
contracts 126:9

**contribute**  108:22
  116:15
**contributed**
  107:15 117:10
  118:8 159:13
  209:3,7
**contributing**
  111:16 178:5
**contribution**
  107:21 108:17
  175:14,18,21
**contributor**
  179:24
**contributors**
  179:7
**control**  14:20
  212:16,17 313:20
  318:15 335:1
  353:7
**controlled**  13:18
  64:24 67:2,11,16
  69:11 86:11 87:13
  91:19 94:12 97:7
  123:25 125:6
  126:4 128:15,18
  132:18 133:7
  161:24 177:22
  192:4 194:7,10
  199:3 200:4
  229:17 233:17,25
  234:12 247:22
  258:9 261:20
  275:14 310:2
  325:24 326:16
  327:1
**controlling**  266:7
**controls**  13:17
  69:10 70:8,15
  71:1 87:12,20
  88:2 102:19 104:7
  109:14 110:13

  122:4 124:19,21
  124:24 125:1,8,20
  125:21,25 126:5
  126:17,22 131:12
  167:13 175:3
  179:1 254:14
  258:8,23 259:4,15
  260:2 317:8,21
  318:3,8 335:11
  344:8
**conversation**  76:8
  76:22 85:12 169:9
  243:18,22 244:1
  306:19
**conversations**
  144:22,25 243:21
**conversely**  149:15
**convicted**  203:24
  204:1,3
**conviction**  98:18
  356:7
**coordination**
  259:6,8
**coordinator**
  286:23
**copies**  220:8
**copy**  188:14
  220:12,15 221:3,4
  226:12 300:21
  308:2,5
**corner**  168:16
  294:20
**corp**  8:5
**corporate**  97:1
  103:15 148:2
  257:24 259:11,20
  264:11 281:20
  284:20 285:1
  321:6
**corporately**  254:7

**corporation**  8:7
**correct**  25:18,24
  26:5,10,14,16,21
  27:3,25 28:3,4,7
  28:11 30:5,8,13,14
  30:17 32:10,15,16
  33:4,10 34:3
  40:20 41:16,17,24
  43:13,21 44:3,8
  45:1,4,10,11,18
  46:10,11,17 47:12
  48:13,21 49:22
  50:2,3,17,21,22
  51:4,23 52:4,14
  53:4,8,13 56:2,3
  58:17,19,21 59:14
  59:18,19,23 60:4
  60:15 61:1,13
  62:19,20 63:3,12
  64:8,13 66:2,12,13
  66:17,18,21 67:4
  67:11,18 68:1,14
  68:20 69:4,13,20
  69:21 70:23 71:13
  72:1,25 73:6,20
  75:14,15,18,23
  76:4,15 77:5
  80:22 83:11 85:3
  86:25 87:4,16,17
  87:23 88:4,7,12,13
  90:11,16,21 91:4
  91:15,19 92:4,21
  93:6 94:5,12 96:4
  96:20,21 97:13
  98:5,10,15,19
  99:15,19,20 100:2
  100:11 101:16,17
  102:6 103:2,3
  105:20,23 106:2,3
  106:6,7,9,21,22
  107:9,22,23 108:2

  108:6,7,11,13,19
  108:21,25 109:7
  109:20 110:19
  111:22 112:10,17
  113:5 114:9 115:6
  115:10,25 116:17
  119:16,18 120:14
  121:6,17 122:5,10
  122:16,18,19,25
  124:10,15,21,22
  125:3,9 128:24
  132:1,13 133:14
  137:3 138:12,16
  139:6,22 140:10
  140:14,16 141:22
  143:24 145:5,8
  146:6,7,10,14
  147:4,20 148:5
  149:10 151:12,17
  155:15 156:6
  159:24 162:7,8,16
  162:21 164:22,23
  165:1,2,5,6 166:8
  166:9,14,16,18,20
  166:22,23 167:15
  167:17,19,20
  169:25 170:5,22
  171:23 172:8,18
  172:19 173:2,6,14
  173:16 174:4,14
  175:8,10,15,23
  176:3 178:13
  180:7,13,23 181:6
  182:12,15 183:5
  183:17 184:2,9,10
  184:15 187:6,25
  188:6,7,11,24
  190:20 195:17
  199:6 201:13,16
  201:17 205:16
  207:7 208:12

| | | | |
|---|---|---|---|
| 209:4 210:9 | 334:23 335:13,16 | **count** 180:16 | 184:1,8,14,18 |
| 211:22 222:1,2,6,7 | 335:17,21,25 | 220:23 367:25 | 185:11,15,21 |
| 223:1,9 226:8,24 | 336:4,8,18,22 | **countersued** | 195:21 196:3,12 |
| 227:5,21 228:22 | 337:11,20 338:5 | 337:22 | 206:10 207:7,16 |
| 229:6 231:6 232:1 | 339:20 340:7 | **counties** 13:20 | 209:15 228:13,25 |
| 232:22 233:11 | 343:12 345:15,21 | 14:14,22 15:10 | 229:5 239:4,15 |
| 234:15 236:1 | 348:11,12 349:18 | 16:17 25:2 41:14 | 242:15 243:7,19 |
| 237:1,6,8 238:19 | 349:20 353:3 | 42:5 63:7,11,13,16 | 244:18 254:24 |
| 239:9,12,16 | 354:3,18 355:1,2 | 64:6,6 107:16,22 | 255:25 268:3,5,18 |
| 240:15 243:17 | 362:6 368:2 | 108:1,5,11,23 | 268:19 272:6,7,15 |
| 245:15,16 246:22 | 369:12 | 120:4 121:5,16,18 | 272:17 281:19 |
| 246:23 247:15,21 | **corrected** 77:15 | 133:9 135:2 | 311:18,22 314:1 |
| 248:14,25 249:7,8 | **correction** 77:13 | 136:14 146:5 | 341:11 343:15 |
| 251:3,14 252:14 | **corrections** 370:12 | 155:2 156:22 | 352:16 353:2,8,12 |
| 252:16,19,22 | 372:17 | 157:19 159:14 | 353:16 354:25 |
| 253:12 254:5,6 | **corrective** 77:16 | 174:21 183:21 | 356:21 369:5 |
| 255:3,4,19 256:21 | 78:1 | 186:4 198:5 | 371:10 372:15 |
| 256:22 257:12,15 | **correctly** 192:13 | 206:17 267:6,15 | **couple** 53:15 |
| 257:16,22 258:5 | 194:3 253:8 256:7 | 267:19,19,23 | 55:18 65:11 |
| 258:17 262:3 | 265:19 299:11 | 268:7,10 272:2 | 101:18 139:16 |
| 264:12 269:16 | **correlation** 123:2 | 281:5,16 318:19 | 144:4,22 145:23 |
| 279:21 284:14 | **correspond** | 335:3 336:4 | 149:25 152:6 |
| 286:12,13 293:14 | 330:22 331:3 | 354:13 | 204:16 212:7 |
| 293:25 300:2,7,15 | **correspondence** | **country** 92:25 | 235:8 238:11 |
| 300:18 301:9,22 | 293:15 | 94:5 107:5 169:7 | 243:15 246:3,5 |
| 302:5,7 303:1 | **corresponding** | 183:5 249:22 | 266:24 268:15 |
| 305:13 306:14 | 110:12 143:11 | 318:20 | 339:10 360:16 |
| 307:9 308:19 | 158:18 255:25 | **country's** 92:13 | **course** 60:22 |
| 309:21 310:3,4,8,9 | 261:21,25 263:13 | **county** 15:18 | 66:12 81:24 117:3 |
| 310:13,14,17,21 | 264:9,24,25 265:2 | 16:25 17:7 25:2,3 | 200:24 296:5 |
| 311:4,7,12,18,22 | 265:16,24 266:1 | 50:10 51:20 63:17 | 308:6 353:13 |
| 312:3,7,11 318:15 | 266:15 | 63:18 97:3 105:13 | **court** 1:1 23:7,22 |
| 318:16 319:3,4,7 | **corresponds** 350:5 | 107:6,7 115:3 | 29:9 30:12 66:7 |
| 319:11,18,23,25 | **costs** 33:2 | 117:11 118:8 | 71:3 197:2 304:22 |
| 323:14,23 324:17 | **counsel** 22:4,9,11 | 119:12 136:5 | 308:16 338:18 |
| 324:18 325:12 | 23:8,21 24:18 | 151:4 168:17 | 362:2 371:7 |
| 326:2,20 327:5,12 | 127:19 136:12 | 169:16,23 170:4 | **court's** 41:5 |
| 327:14 328:9,25 | 235:12 238:2 | 171:11 172:2,6 | 359:22 |
| 331:16,24 332:5 | 304:20 361:8 | 173:5 174:14 | **courtesy** 160:15 |
| 332:12,24 333:17 | 369:16 | 175:15 179:8,25 | **courthouse** 7:21 |
| 333:22 334:2,22 | | 180:17 183:17 | |

courts 28:7
cover 63:6 64:3,5
  296:10
coverage 63:5
covered 110:3
  309:16 310:12
craig 14:6,9
  306:19 359:19
  361:19
create 99:3 142:8
  305:19
created 98:24
  99:13 100:7 169:5
  169:6 305:1
creation 98:18
crimes 203:24
criminal 79:4,8,12
  98:17 99:18 198:3
  199:11 355:25
crisis 47:12 107:15
  107:21 116:16
  117:11 118:8
  159:14 173:11
  174:3,13,21
  175:14 178:1
  179:7,24 184:14
criteria 270:7
critical 117:17
cross 220:5 305:24
  361:7 363:6 366:8
crowley 141:2,5
  141:19 142:6
  143:11,25 145:2
  147:22 148:6
  149:5,16 152:5
  239:8
crowley's 143:18
crunched 113:4
crux 38:3
csa 162:3 262:1
  263:12,18

ct1 54:19,20 340:5
ct3 58:18 232:15
  286:10 341:2,5
cumulative 242:19
curb 191:13
current 65:3 67:4
  275:11 276:11
currently 71:19
cursory 192:12
customer 8:6
  103:2,5,25 112:22
  183:12 232:19
  253:20 260:10
  278:17,18 279:7
  279:14,15,18,24
  279:25 280:5
customer's 260:9
  260:14,14
customers 26:13
  27:3 157:7 161:20
  178:18,19
cut 45:21 49:18
  51:22 115:13
  151:25 214:5
  262:14 282:24
  321:12 328:8
cutoff 62:14
  131:18,19 133:25
  151:12,17 152:3
  152:24 153:14
  346:14
cutting 283:7
  320:20
cuyahoga 51:20
  53:4 167:15
cvs 7:4,4,5,5,6
  21:6 25:16 42:17
  50:16 93:10,24
  94:16 164:15
  165:10,10,12,22
  166:1,8,11,18

167:8 339:9 340:9
  340:14,19 341:11
  341:12,15,24
  343:7,10,15,17,20
  343:25 345:25
  347:20 348:10
  349:14 352:11,15
  353:1,8,11
cvs's 164:25 340:2
  343:12 344:3
  347:24 354:11,24
cyclic 67:3 71:10
  72:10,17 73:13,18
  75:13 83:6 211:21
  214:14 215:3
  249:15 250:6,11
  250:13
cyclics 250:5
cynthia 199:21

### d

d 6:6,7,8 8:5,7
  116:13 117:6,13
  117:23
d.c. 246:12,13
  275:13 297:14,19
  325:6
dallas 9:10
dan 1:7
dangerous 240:21
daniel 2:15
data 16:16 48:11
  49:13,16,22 83:10
  83:22 84:22,23
  113:4 116:22
  120:9 121:6
  133:15 134:14
  147:15 150:7,8,9
  153:25 154:10,11
  165:14,16 183:23
  195:14,14 203:3
  204:14,19 244:20

252:5 331:5
database 98:19
  100:7 199:25
  322:25 329:7,9,10
  329:13,20
databases 328:17
date 23:5,16 99:24
  197:10 228:23
  243:11 252:5,8
  274:24 284:8
  322:8,17 331:4
  370:8 371:3,9,19
  372:3,13,25
  373:20,25
dated 51:13
  141:20 274:9
  296:16
dave 11:15
david 9:15,17,21
  12:7 118:25
  364:13,21 366:24
day 5:17 83:8
  109:17 110:16
  117:5 160:17
  163:6 180:16
  204:5 230:5 237:4
  237:5 244:4,7,9,11
  244:12,23 262:19
  303:23,23 371:16
  372:22 373:22
days 77:25 339:24
  370:18
dc 7:12 101:22
  237:10
de 3:17
dea 14:13 30:22
  34:9,18 35:21
  36:2,10,12 37:4
  46:17 47:17,18
  48:21 53:8,18,21
  55:15 56:1 59:13

59:13,17,21 60:7,9
60:23 61:9,16
62:1,8,18 64:19
65:3,5,23 66:2,10
66:16,24 67:2,4,10
67:18,22,25 71:18
71:20 74:6 75:10
75:11,11,22 76:4
77:3,7,10 78:1
79:16,18,25 80:20
82:2,2,16 83:8,24
85:6,15,17 87:21
88:2,7 91:3,17
92:1,11 93:4,9,19
94:3,10,18 95:11
96:19 100:14
103:24 105:4
106:9,14,19
109:12 111:15
112:15 113:6,8,17
118:4 120:2,20
121:1,12 122:9
125:17,18 126:23
127:12,21,23
128:2 129:24
130:2,10,13
133:18 135:8
141:2,24 142:10
143:6 144:13
165:20 177:20
178:4,15 182:12
182:15 192:22
195:15,17 198:14
203:17 209:8
211:17 212:5,8,9
212:17,22 213:13
214:12,23 215:17
216:6 217:21,24
218:7,13 219:5
221:23 222:10
223:6 225:23

226:4,4,22 227:2
227:18 231:13,22
233:20,22 234:12
234:20 238:18,22
246:16,21 247:17
247:18,24 248:6,9
250:8,9,13,20
257:9,14 258:16
259:21 260:5,16
260:21 261:11
263:25 266:17
269:4,11 270:1,3,4
270:6 280:4 281:2
281:23 282:6
283:2,3 284:22
286:1,23 287:1
292:21 293:11,16
296:12 297:14
298:8,11 301:5
310:1,10 311:6,16
312:2,18,25
313:11 317:13
319:16 328:2
342:23 343:4
347:7,11,24 348:9
348:16,20,22
349:10 355:9
**dea's**  86:11 92:18
100:11 113:2
204:19 211:24
215:16 217:13,14
218:21 219:7
223:17 224:17
225:5
**dea12**  13:24
**deal**  163:23
278:24
**dealing**  44:12
71:12
**dealings**  36:18
159:5 260:13

**dealt**  36:16 80:24
132:21 333:14
**dear**  300:7,10,12
300:14,21 301:20
302:20 370:10
**deborah**  297:8
**december**  15:11
284:9 287:13
294:13 336:17
**decide**  118:2 277:2
366:25
**decided**  366:10
**decides**  116:12
**decision**  76:24
79:24 117:2
**declaration**  15:5
138:4,6,9
**declaratory**
277:17
**decline**  318:21,21
318:25
**declines**  123:6
318:10
**decrease**  105:14
105:15,17 120:12
121:3,15 317:3,7
317:19
**decreased**  104:20
**decreases**  120:19
**deed**  371:14
372:20
**deemed**  88:17
370:19
**defective**  227:7
**defendant**  5:4,13
9:4 13:11 14:1
15:1 16:1,20 17:1
18:1 19:1 20:1
21:1 34:6,15
35:18 36:2 41:15
43:20,25 44:7

45:9 46:8 108:24
174:7 199:21
305:23
**defendant's**  43:10
68:24
**defendants**  6:4 7:4
7:16 8:4 12:4 25:5
25:6,8,10,13 26:11
32:3 37:5 42:1,14
42:24 46:25 47:5
47:15 48:20 50:11
50:13 51:2 52:1,7
52:13 56:25 65:5
69:7,18 70:22
83:20 87:15 88:1
107:2 109:6,10
110:5,9 114:8
136:19,20 146:5
147:2 153:12,13
154:3 156:11
158:15 166:22
178:23 179:4,10
179:19 198:3
242:22 246:5
250:23 251:7
280:17 281:15
306:1 307:17
308:11 309:7,12
309:14 314:23
315:2 319:3
339:19 353:20
360:13,20 364:17
364:25 365:13,19
**defense**  363:18
**deferring**  227:12
**deficient**  334:9
**define**  280:4
**definitely**  76:5
100:21 101:20
144:17 151:18
266:4 305:8 363:1

363:14
definition 89:9
91:3
definitive 101:24
125:12,14 127:5
271:21 295:6
329:5 346:4
definitively
134:11 249:2
332:13
deleted 144:9
deletes 143:7
demand 31:9
92:20,20 96:4
98:4 213:22 214:2
215:22
demanded 213:18
demonstrates
298:9
demonstrating
304:9
department
370:22
depend 79:21
dependent 73:2,12
81:18
depending 68:4,6
76:6 115:4,25
131:20,21 133:19
249:22 326:5
349:3
depends 31:10
131:9
depict 121:19
depo 366:20
deponent 13:4
deposed 28:21
127:22 297:9
deposing 361:19
deposition 1:15
14:17 15:24 17:15

21:5 22:4,13
23:18 24:20 27:7
27:9 28:5,15
29:14,17 30:6,7,9
30:16 32:2 37:2
40:4,7,8,12,16,19
40:23,24,25 41:1,2
41:4 55:8,9 131:5
212:10 214:18
215:17 218:20
219:4,8,10,18
220:1,12,13,24
223:2,20 224:2,3,8
224:24 226:11,21
237:13,15 245:8
248:25 283:10
302:1,9 303:6,11
303:17 323:19
325:14 330:11
338:22 339:2
343:9 356:6
357:17,22 359:2,7
359:10,18 360:21
360:22,24 364:3
368:8,10 369:8,12
370:8,11 371:1,3
372:1,3
depositions 32:5
38:9,11 39:20,21
39:22 40:2,11,13
40:17 48:25 49:15
55:3 157:13
158:21,25 220:11
238:7 302:17
328:5
deprived 341:17
341:25
depth 73:7 100:18
149:1 316:22
describe 138:20
193:13 279:10

312:22,23
described 44:19
81:9 82:17 198:22
209:3 250:23
266:12 301:16
312:5
describing 199:25
description 48:14
149:12 198:18
250:25 274:24
descriptions 89:25
design 90:18 99:4
110:23 112:21
269:13 326:8,10
designated 1:17
21:12 28:22
235:11
designations 21:9
designed 113:12
319:13 344:14
designee 17:16
desirable 135:17
desire 60:5 113:11
desk 362:25 363:3
363:15
despite 111:19
destroy 363:10
destroyed 143:4
detail 71:7 80:13
82:17 136:2
171:13 187:4
236:25 237:2
detailed 68:3
77:16 81:20 144:6
147:16
details 91:24
186:9
determination
239:22
determinations
154:15

determine 87:19
92:2,12 122:23
123:12 153:7,24
165:21
detroit 2:18 3:10
24:13,13,14 34:18
35:21 44:23 61:7
61:17 62:18,20,23
62:25 63:1,6 64:3
77:6 141:10
143:16 144:23
145:13,24 148:7
152:17 218:15
developed 191:11
dgilfillan 11:23
dgoetz 2:22
diaz 358:2,5
dictate 76:7
difference 34:23
60:17 116:7,8
120:25 162:20
287:21
differences 34:25
353:22
different 34:7,16
35:7,8,13,19 36:1
37:3 73:15,16
78:13 79:2,9,9,13
84:16 89:23 92:6
124:5 125:18
136:13 148:9
161:25 165:16,18
171:4,5,9 222:21
227:17 229:22
230:8,13 233:7
238:6 242:10
248:7 257:6,7
258:7 305:25
318:10 319:13
326:23 335:15
342:17 349:11

353:17 363:8
**differently** 280:22
**difficult** 36:20
326:12
**digging** 273:4
**diligence** 70:12,13
70:19 71:4 97:19
97:22 109:24
110:24 149:9,12
149:21 153:7
222:1,5 223:8
225:6,24 226:5,17
226:23 227:4,9,11
227:20 228:3
229:9,23 230:2,13
239:24 271:12,13
271:16,17 272:16
276:20 278:9,14
278:16,18 280:3
298:9 313:18
320:22 323:1
344:19,22 345:5,6
345:12 346:18,22
352:19
**dinner** 365:9
**direct** 29:7 36:18
63:24 113:25
132:21 193:25
194:6 206:19
210:24 245:19
260:13 284:5
290:14 295:21
302:18,19 303:1
351:14 360:6,9
**directed** 40:18
114:4 158:9 252:4
269:17
**direction** 193:9
**directional** 119:2
**directly** 192:18
193:15 194:10,15

261:2 263:21
313:25 334:6,22
**director** 127:2
**disagree** 81:15
95:22 96:15 109:2
129:5 178:9 185:8
199:7 202:12
215:17 216:16
226:8,22,25 242:2
297:24 323:22
**disagreed** 237:5
**disagreement**
215:20 222:18
277:19
**disclose** 80:9
**disclosed** 360:21
**disclosure** 250:18
**discovered** 81:20
330:13,15
**discovery** 37:13
37:17 294:6,25
295:4,8,10,17
301:17 307:16
308:11,15,19
309:7,10,11,16,22
313:9 349:4,6
**discrepancies**
297:15
**discuss** 77:3
243:25 244:5,7
246:1 270:13
285:25 335:24
343:14 361:10
**discussed** 244:2,16
248:24 284:12
294:3 309:25
312:2 347:23
356:17
**discussing** 244:3
244:23 327:9
356:16

**discussion** 31:4
76:1 274:1 292:5
292:12,20 293:10
299:8 361:8
366:10
**discussions** 253:18
**disorganization**
146:21
**dispense** 192:18
193:14 194:15,17
**dispensed** 16:16
105:25 123:24
139:20 150:11
155:1,7 194:22
195:6 196:1
211:11
**dispenser** 151:4
**dispensing** 14:13
95:15 104:12,19
105:3,23 106:18
120:2,3,13 121:4
121:15 123:4
125:6 126:4
131:13 135:3
138:22 140:13
153:9 154:4
155:15,18 156:5
156:11 157:4
174:7 192:4,10
193:7 194:6,10
198:12 211:13
229:16 238:19,23
238:25 247:9,10
335:2 353:21
354:25 355:23
**dispute** 52:16,18
205:6,11
**disputing** 115:18
264:16
**disregarded** 223:6
225:4

**distance** 351:20
**distribute** 26:8,24
101:18,21 183:8
251:13 253:21,22
256:13
**distributed** 26:4
26:13 102:21
105:25 228:25
229:4 248:9
256:10 341:12,15
343:18,25
**distributing** 26:18
101:3,13,19
103:22 104:5
106:5 137:20
167:10 203:21
228:12 230:3,24
252:2 283:14
284:13 317:4,20
343:21 345:21
346:5
**distribution** 7:5
8:7 15:15 43:20
45:4,17 46:25
50:9,16,20 51:3
64:23 65:14
102:20 105:20
109:8,12,20
114:25 133:19
148:4,11 165:12
200:7 206:4
213:15 217:1
218:23 221:24
223:18 224:19
225:19 226:7
227:3,12,19
229:11,24 230:14
231:13 237:3
240:7 246:10,11
246:22 247:19
248:1,2,15,22

249:16 250:22
256:10,15 257:8,9
260:15 266:21,21
282:16 284:25
285:2 286:25
287:6 291:8 297:6
297:19 309:25
310:5,11 311:7
314:21 315:3
318:25 321:19
323:13 343:12
345:19 346:10
347:24 354:11
**distributions**
149:13 165:10
166:2 205:4
255:21 259:9
260:9 286:24
**distributor**   13:16
45:1,16 61:1
71:12 72:19 102:5
102:6,9 112:7,25
147:14,18,19
148:12 162:5,6
166:16 183:4
184:15 301:6,9,12
301:14,15,21
302:14,21 311:11
312:2,10,18,22
313:1,6,11 318:2
319:8,12 336:8,11
342:18,23 343:4
345:9 346:16
347:3,13,16,20
355:22 356:9
**distributor's**
112:9 255:13
**distributors**   25:20
26:12,20,23 27:1
45:5,9 46:4 66:1
83:7 85:14,22,25

107:20 109:7
111:13,20 113:16
117:7 127:8
140:19 161:21,23
162:12,19 164:21
165:12 166:11,12
167:1,12 211:17
229:19 255:13,19
255:23 257:19
269:5,12 282:21
283:4 285:7
298:12 310:2,19
310:23 312:6,24
318:10 335:10
342:23 343:3,4
345:18 355:24
**district**   1:1,2 23:7
197:3 198:21
202:22 291:16
**diversion**   13:18
15:5 34:9,18
35:21 36:23,24
53:19 59:17,21
60:1,11,16,23 61:6
61:10,14,25 62:16
63:6 64:19 66:10
67:19,22 69:11
70:15 71:1,24
72:23 75:11 78:9
78:17,25 81:20
83:8,24 87:13,20
109:15,18 110:15
111:16,22 122:5
129:9,19,24
130:12 132:6
133:18 135:11,14
137:2,16,18,24
138:4 139:10
157:19 177:22
178:5 192:11
200:6 210:17

212:4,16,17 215:5
215:13 216:2,17
216:25 217:20
227:2,18 231:21
258:9 259:5 260:3
269:17 276:23
317:8,22 318:3
319:19 327:24
335:11 355:22
**diverted**   110:19
209:24 210:5,12
239:22,23 240:1
**diverting**   131:8
151:10 153:2
**division**   1:3 51:22
212:17
**divisional**   62:20
63:4 78:7
**doable**   304:8
**doctor**   98:9
138:16 158:7
193:17 201:19
202:9 211:2
**doctor's**   193:7
**doctors**   95:11
107:25 138:15
192:17,25,25
193:14,19 194:11
194:15 196:1
197:17,21 198:12
198:14 199:20
200:14,18 201:21
202:1,11,25 203:3
203:21 204:10,14
204:20,22 205:4,7
205:14,17,19
206:4,14 209:2,13
211:8
**document**   1:11
31:19 39:2,9,11,14
51:24 139:15

168:14 169:23
190:1,23 191:3
195:18 196:19
197:2,3,18,20
218:4,7 226:5,23
227:4,8 228:2,8
233:8,9 240:25
296:16 298:17
300:18,19 305:10
322:18 332:14
354:6
**documentary**
331:13 344:23
345:2
**documentation**
276:3 277:24
278:4 279:4
297:21 313:4,6
322:24 323:6
326:9 344:4 346:1
**documented**
217:25 225:23
227:20 278:6
313:18 322:19
**documenting**
217:22
**documents**   37:23
37:24 38:9,10,17
38:21,25 39:5,16
39:18,19 49:1,10
80:12 135:24
159:3 160:1
161:14 169:13
196:7 210:2
214:13 216:3,3
217:2,5,9,15
229:10 231:10
232:22 233:3
235:14 236:2,5,9
236:11,23 250:16
276:19 286:18

291:11 292:1,2
293:24 294:5,10
296:7 298:20
309:20 328:16
332:9,11,14,23,24
333:1,3,5,6,16
334:1 345:4 351:7
**doing**  39:17 40:22
  55:22 59:9 60:21
  72:16 73:13 83:17
  100:6 102:4 104:2
  109:11,15,16,19
  109:23 110:9,10
  110:11,17 111:20
  120:10 130:22
  142:2 143:23
  149:12 156:6
  162:18 171:3
  176:2 177:15
  228:4 234:3 237:4
  258:2 261:15
  285:1 349:1
**doj**  336:17
**dollar**  58:13
**dollars**  33:2,17
  55:7 57:16
**doors**  97:4,5
**dosage**  16:16
  149:17,25 150:11
  151:12 152:24
  153:14 155:1,6
  170:25 183:11
  187:17 188:6
  189:7,23 195:7
  204:22 205:8,15
  206:12 255:2
  256:4 268:23
  272:14 341:12
**dosages**  136:13
  148:22 171:5

**dose**  123:19
  134:24 135:9
  136:6 137:11
  140:14 155:6
**doses**  140:21
  149:7 187:11,23
  195:23 200:23
  201:4,8,15,20
  202:17
**double**  152:3
**doubled**  314:7
  315:12
**doubling**  314:11
  314:16 315:10,10
  315:17,20 316:3
**download**  169:7
**downtown**  24:13
**downward**  317:15
**dozen**  219:7
  225:19 226:6
**dr**  47:23 48:7,18
  48:24 49:7,10,17
  49:20 50:25 51:6
  51:12,23 52:2,5,11
  52:21 83:9,21
  96:16 98:1,8,11,22
  99:17 100:1,9
  105:19 106:20
  113:4 114:7,21
  115:14 117:25
  120:6 133:5
  140:12 146:2,25
  147:8 151:3 157:1
  157:6 162:13
  169:3,6,19 184:20
  185:10 186:2
  195:19 200:22
  201:3,7,11,14,19
  202:15 204:15,15
  204:16 243:5,18
  243:25 244:17

331:6 340:23
  354:15 362:3
**draft**  113:24 238:7
  238:11 241:10
**drafting**  241:14,23
  241:24 242:9
**dramatic**  140:6
**draw**  73:24 98:20
  100:4 122:6 124:5
  137:5 157:21,24
  158:12 159:3
  192:20
**drawing**  123:2
  132:20
**dream**  110:14,14
**dreszer**  202:15
  204:16
**drew**  11:5
**drill**  37:1
**drive**  145:12
**driven**  48:23,24
**drops**  172:25
**drug**  17:9,15 92:3
  92:14,20 94:24
  95:15 96:4,7,11
  97:10 120:4
  121:15 139:10
  152:9 153:24
  155:15 156:16
  190:14 191:10,13
  211:3 233:17,25
  234:12 275:14
  356:9
**drugs**  26:4,8 96:19
  98:4 101:4 103:21
  104:12,19 105:3,5
  106:15 110:18
  111:2 123:23,24
  123:25 128:19
  131:13 133:20
  139:13 140:15

149:13 170:25
  192:10,18 198:13
  251:13 254:15
  314:18 334:6
  356:11
**due**  70:12,13,19
  71:3 97:18,22
  109:23 110:24
  149:9,12,20 153:7
  222:1,5 223:8
  225:6,24 226:5,17
  226:23 227:4,9,10
  227:20 228:3
  229:9,23 230:2,13
  239:24 271:12,12
  271:16,17 272:15
  276:20 278:9,13
  278:16,18 280:2
  298:9 313:18
  317:7,20 320:22
  323:1 344:19,22
  345:5,6,12 346:18
  346:22 352:19
**duly**  24:2
**duration**  277:7
**dus**  270:20
**duty**  110:12
  158:18
**dying**  184:3

| e |
| --- |

**e**  2:1,1 3:1,1 4:1,1
  5:1,1 6:1,1 7:1,1
  8:1,1 9:1,1,5 10:1
  10:1 11:1,1 13:21
  15:6,21 232:21
  369:1,1
**eagle**  6:4 12:4
  13:11 14:1,13,21
  15:1,17 16:1 21:6
  24:7 25:16 31:13
  42:17 50:21 51:22

52:10 53:2 74:8
86:6 97:1 100:10
100:14 102:4,17
103:1,5 104:10
106:4 114:17,23
116:14,15 117:10
118:5,7 119:22
120:3 121:22
123:5 128:8
132:25 134:16
136:20 153:12
156:12 157:8
158:1 307:5 340:1
**eagle's** 74:5 97:12
100:25 101:2
103:15 104:12,19
105:2 106:18
115:3 120:13
121:4,16 122:3
133:8 134:20
136:4,17 140:13
155:1
**eagles** 154:4
**earlier** 82:10 85:1
107:19 112:18
120:14 129:7
152:6 161:16
211:19 239:10
257:6 276:17
282:23 284:12
306:3 323:10
327:8,10 333:15
339:14 340:4,22
345:17,22 349:11
356:5 364:3
366:10
**early** 41:4 61:16
62:5 125:24,24
142:4,13,13
152:16 358:16
365:14

**earn** 56:6
**earned** 54:17 55:7
55:11
**earning** 55:15
**easier** 55:14 96:24
115:23 365:18
**east** 64:6,13
199:15
**eastern** 1:3 7:17
359:24
**easy** 286:21
**eckerd** 8:6
**edt** 23:10 83:2
160:10 245:5,5
303:9 338:25
357:20 359:5
368:12,13
**educated** 130:6
**eekhoff** 10:5
**effect** 110:24
**effective** 13:17
36:16 46:22 69:10
70:8,15 71:1
87:11,20 88:2
102:19 104:7
167:13 175:3
179:1 254:13
258:8 259:4,14
260:2 269:13
298:14 313:19
317:8,21 318:3,8
319:14 325:22
331:14 333:10
335:11 336:10
344:8
**efficient** 358:23
**efforts** 55:11 56:6
57:12 77:8 108:19
**eight** 32:14 171:22
172:25 176:11
177:10,15 180:22

181:18 182:8
185:17 187:17
188:22 189:3
200:22 202:16
**eighteen** 140:1
201:9,15,20
**eighty** 128:15
140:21 148:18,19
150:10 153:17,21
154:4,25 155:7
172:25 181:11
200:23 207:20
**either** 71:17 76:14
95:21 121:12
151:3 173:5 207:1
207:13 227:5
249:10 250:11
258:13 298:17
302:20 313:9
327:12 333:3
337:15
**eleven** 89:16
**elias** 2:9
**eliminate** 135:15
**eliminates** 137:22
**elisa** 8:9 245:13
290:23
**elisa.mcenroe**
8:15
**elkins** 2:6
**elm** 181:5
**else's** 220:9
**email** 16:11 18:5
18:10,14,18,22
19:6,10,14,18,22
20:6,10,14,18
141:18,20,25
142:7,20,21 143:1
144:8,12,13 152:5
220:16 274:4
275:17,18 276:14

278:8,13 279:1,1,6
286:22 287:13,19
290:5,7,8,12,24
291:5 296:6,11
327:23 329:7
349:10 358:7
361:23 364:7
370:17
**emailed** 144:11,14
361:18
**emails** 142:3,9,9
142:15 143:5
272:8 279:13
294:2 328:17
364:9
**embracing** 113:19
**employed** 127:8
**employee** 66:2
141:2 326:1,19
327:4
**employees** 346:20
**employing** 116:14
**employment** 44:12
45:6 61:3 72:4
**enacted** 266:11
**enacting** 100:2
**encino** 12:21
**enclosed** 370:11
**encompassed**
319:25
**encompasses**
70:17 265:9
**encompassing**
264:1
**ends** 303:5 329:15
338:21 357:16
359:1 368:7
**enforce** 82:3 260:4
**enforcement**
17:16 60:17 62:10
77:8,10 78:5,13

85:6 217:13 280:9
280:12,16,23
281:13 282:15
283:12,23 284:4
292:12 293:3
355:4,13
**engaged** 99:18
122:4 138:24
211:8 229:16
**engineer** 29:13
**enhanced** 322:1
**ensure** 70:18
149:1 217:14
298:12
**enter** 31:6
**entered** 335:25
372:9
**enterprise** 199:1
199:11
**entire** 41:2 62:17
136:14 172:6
187:24 196:10
212:13 237:14
298:2 306:9 371:5
372:5
**entirely** 69:3
109:6
**entirety** 39:21
333:8 350:22
**entities** 25:25
26:25 35:8 199:10
246:4,19 247:13
250:22 251:3
254:6 257:7,14
258:17 259:20
267:1 280:1,10
339:9
**entitled** 213:24
360:5 365:4
**entity** 93:25 257:3
264:11 284:21

285:1 301:6
305:22
**entries** 307:16
322:22
**entry** 322:25
**envelope** 163:16
362:11
**epidemic** 107:5
108:23 191:13
209:4 318:24
325:5
**equated** 297:23
**equivalency**
170:17
**equivalent** 170:18
**errata** 370:13,18
372:7,10,18 373:1
**error** 115:25
116:5,9
**escalated** 104:4
152:9
**escalation** 123:4
**especially** 113:25
149:18 230:24
242:10 349:3
**esq** 370:5
**essence** 97:17
153:6,7
**essential** 71:4
177:23
**essentially** 48:6
67:8 77:22 91:8
111:1 130:11
145:1,17 192:9
**established** 62:10
91:13
**estimate** 57:4
242:13
**et** 18:6 20:19
**evade** 29:7

**evaluate** 324:2
**evaluated** 125:15
178:18
**evaluation** 88:18
322:15
**evaluations**
192:13
**evasive** 29:7
**evasiveness** 29:11
**evening** 361:12
**event** 127:24
152:21 202:8
295:19
**events** 344:24
**eventually** 151:9
313:11
**everybody** 119:7
326:11,11 362:12
364:7 367:9 368:5
**everyone's** 365:18
**evidence** 22:14
29:10 103:14
116:12 147:4
301:15 321:2
331:14,23 333:9
344:23 345:5,13
**exact** 66:22 124:25
170:9 242:25
347:15
**exactly** 54:5,9
75:1,6 129:20
161:4 206:6
246:14 260:7
264:3 290:18
**examination** 13:1
13:5,6,7,8,9 23:11
24:5 160:22
245:10 303:14
339:5 361:7
367:18

**examine** 41:20
47:20 67:23
104:11 122:9
192:3 220:5 363:6
**examined** 24:2
46:16 122:8,14
**example** 26:15
40:23 51:19 77:13
106:1 120:25
122:14 128:21
134:6 135:1 162:4
162:25 164:16
167:7 178:16
253:19 254:20
280:24 286:4
294:2,11 297:8
301:13 305:1
319:16 346:23
355:20
**exceeded** 320:23
**exceeding** 123:8
334:7
**excellent** 298:10
**exception** 42:21
270:22 276:7
277:10
**exceptions** 271:7
271:11 272:1,5,13
272:16 275:5
276:12,15,18,20
277:13
**excess** 274:23
**excessive** 274:15
298:10
**exchange** 142:9
**exclusive** 87:6
90:23 193:20
**exclusively** 68:23
**excuse** 255:22
259:12

executed   372:10
execution   371:14
  372:19
executive   199:14
exemplary   109:13
  155:13
exercise   156:9,13
  265:25
exercised   264:10
  264:25
exercising   110:12
  265:15 266:1,15
exhibit   13:14,22
  14:5,8,11,16,19
  15:4,8,13,19,23
  16:5,8,10,14,23
  17:5,8,12,14 18:4
  18:9,13,17,21 19:5
  19:9,13,17,21 20:5
  20:9,13,17 21:4
  31:13,15,20 32:14
  38:14 51:7,10
  52:20,22,23 57:19
  57:20 63:22 64:17
  86:6,6,7 98:12
  99:6,9 107:1
  114:17,17,18
  119:21,23,25
  128:9 130:15,16
  132:25 133:1,2
  134:16,16,17
  137:25 138:1
  141:13,15 150:3,4
  154:24 163:2
  164:8 167:25
  168:3,5,6,9 184:21
  184:23 186:8
  190:4,8,12 196:20
  198:2,2 214:8
  220:17 273:2
  286:15 287:10,17

287:25 288:5,11
288:14,19,24
289:4,9,14 295:23
304:12,14,16
306:10 307:6
339:11 340:1
exhibits   13:11
  14:1 15:1 16:1,20
  17:1 18:1 19:1
  20:1 21:1 31:13
  220:8 224:1,3,9,23
  360:20 362:7
exist   272:17 279:4
  281:3 331:23
existed   278:19
  279:8 324:1
exists   332:1,3
exp   369:23,24,24
expect   94:21
  352:19
expectation   92:19
  92:19 229:20
expectations   96:7
  97:20
expected   91:10
expecting   95:11
expects   94:10
  217:24
experience   64:20
  65:20 66:8 74:6
  80:23 159:5
  192:21 209:8
  216:25 301:5
  317:10 326:1,19
  327:4
experienced   94:22
experiences   95:13
expert   13:15 14:6
  14:9 28:22,23
  29:2 30:21 31:19
  31:21,23 36:1

37:6,20 44:17
49:19 64:17,22
65:4 68:23 82:1
115:11 130:19,19
178:10,22 192:22
209:11 210:1
238:4 306:24
307:4 357:1,4
359:18 360:9
expertise   44:6,11
  96:14 176:2
experts   28:17
  146:9 147:9
  306:23 341:1,5
expiration   29:13
  371:19 372:25
  373:25
explain   41:11
  80:12 244:13
  296:6 304:24
  308:13
explanation   153:5
  231:5 262:22
extend   131:14
extensive   73:11
extent   48:1,20
  179:22 209:2
extra   358:16
extremely   144:3
eye   255:5
eyebrow   137:8
  149:19
eyebrows   133:17
  133:23 152:23

**f**

f   3:5 10:22 369:1
facilities   74:5 80:9
  101:12 348:10
facility   101:12
  102:3 254:9

facing   119:5
fact   28:5 45:15
  49:5 60:9 69:24
  91:17 94:22 97:9
  113:8 120:18
  135:16 142:2
  151:25 156:24
  167:21 279:23
  282:14 292:19
  315:12 319:15
  325:10
factor   137:1
  157:16 158:19
  170:23
factors   122:22
  123:11 124:5,9
  132:15 134:4
  153:23 178:4
  314:20
facts   29:3,4 34:3
  158:7
factual   280:15
fail   76:12,13
failed   175:1,2
  201:25
failing   335:10,12
failure   70:13 90:5
  175:10,12 264:23
  313:19
failures   107:4
  109:23 281:23
fair   34:14 47:6
  48:2 132:24
  175:21,24 179:8
  179:12 180:2
  182:24,25 191:3
  210:6 211:5,6,25
  213:25 214:1
  220:7 225:7 234:5
  234:10 236:11
  246:19 247:20

248:4 251:23 252:11 256:13 265:19,23 269:6 269:14,23 277:3 282:11 284:18 285:2 291:12 296:21 298:22 302:10,23 338:3 367:21

**fairly** 145:16 349:7

**fairness** 81:11,25

**faith** 80:22

**falduto** 11:16

**fall** 63:16

**falls** 134:6

**familiar** 84:12 86:24 90:11 91:16 115:15 186:11,13 186:18 197:13 297:21 320:1,4

**families** 140:15

**family** 189:7

**far** 46:12 47:5 48:2 65:16 77:5 82:17 141:11 170:14 190:11 200:19 242:2,3 252:9 261:3 262:23 269:16 298:25 316:16 322:23

**farm** 11:20

**farrell** 3:16

**farrellfuller.com** 3:21

**farther** 64:12

**farthest** 113:21

**fashion** 117:4

**fast** 121:11

**faster** 120:19 181:2 241:1

**faults** 89:13 90:1

**feasible** 37:14

**february** 14:18 287:24 349:24

**federal** 23:6 30:12 61:24 64:22 66:6 94:6,7,15 200:5 209:3 216:20 217:6 263:19

**feedback** 292:21 293:10,16

**feeding** 224:13

**feel** 102:15

**feeling** 79:16

**fellow** 144:18

**fentanyl** 252:17

**fewer** 219:24 340:15

**fifteen** 36:3 42:15 42:20 46:25 131:15,17 132:4 133:22 232:10

**fifty** 32:14 40:6 86:2 140:2 185:23 335:15

**fight** 358:18

**fighting** 111:8 117:19

**figure** 108:12 175:18 179:6 189:14 195:5 206:20 365:17

**figured** 168:4

**figures** 195:1,2

**file** 173:21 275:13 278:10,14,17,18 279:8,14,19,24 280:1,5

**filed** 308:16

**files** 75:23

**fill** 157:8 158:7 192:19 194:1 211:2 239:18 240:8 342:6,10

**filled** 14:21 108:10 108:11 155:7 206:24 207:1,13 207:19 209:23 210:5,11,12 342:15

**filling** 41:22 43:1,1 43:7,12 44:1,16 262:2 263:15 265:16

**final** 17:10 37:7,11 337:25

**finalizing** 241:15

**financial** 216:18

**find** 40:5,14 89:12 90:1,4 113:2 218:4,17 249:11 277:9 280:2 298:16 370:11

**findings** 76:19 217:22 297:15

**fine** 81:13 220:25 221:1 250:24 308:7 312:2 358:25 363:18 367:1

**fined** 111:14

**finish** 45:20,22 123:20 150:20 151:1 160:20 189:10 236:15 262:14 263:1 359:20 365:12

**finished** 123:21 150:22

**firm** 4:7 31:10 161:9 163:18,19 169:3

**first** 24:2 27:8 36:6 61:2,3 64:18 65:17 77:9 98:23 99:15 101:3,12 145:10 152:16,20 164:13 165:9 167:25 169:22,24 169:25 171:14,15 190:14 191:8 192:7,16 197:1 203:5 212:10 215:21 239:24 244:12 254:24 263:18 272:20 273:12 279:7 285:23 291:5 297:13 302:25 304:3,3 334:17 340:12

**fit** 363:23

**fits** 112:16,24

**five** 25:6 41:15 42:1,11 50:11 51:1 54:8 58:11 58:11 61:2 62:7 82:21 94:19 95:10 95:11 121:2,2 125:25 166:21 174:12 179:4,10 179:15 181:3 187:10 189:1,21 195:23 204:20 205:7 206:12,14 241:2,6 242:4 256:2 268:23 270:20 271:7 272:5,13 274:18 276:12 305:24

306:12 338:13
339:20 357:13
364:18 365:12,14
365:25 366:3
**fix**  177:1
**flag**  48:12 149:8
149:19 151:16
**flagged**  15:16
51:20 52:9,13
53:4 115:2 116:17
118:19 162:10
164:16 165:1,7,8
165:22 166:6,7,17
167:1 234:13,18
239:18,20,20,24
239:25 240:6,13
255:1 256:12,16
320:17 322:5
341:13,20 350:5
**flagging**  15:15
114:25 162:14,19
162:21 182:21
234:13 240:7
256:21
**flaherty**  5:7
**flahertylegal.com**
5:11
**flavor**  115:5
**flip**  187:20 255:6
308:1 316:22
342:20
**flipping**  58:3
**floor**  2:19 3:9 6:13
12:11
**florida**  4:20 65:15
197:3 198:5,7,10
199:20 202:1,9,23
204:21 205:5,8,17
206:6,15,24
207:22 208:16,21
208:25 327:25

**florida's**  198:21
**fluid**  112:23
**fly**  304:13
**focus**  41:1 68:23
82:16 102:1 109:6
179:15 312:16
**focused**  135:19
139:4,10 174:10
**focusing**  125:5
241:5
**folder**  250:17
279:2,18
**folks**  42:23 97:1
191:21 197:17
237:4
**follow**  24:21 29:22
81:5 299:2 328:8
328:24 338:8
**followed**  217:14
**following**  23:12
142:5 191:22
235:10 255:11
**follows**  24:3
255:10
**footnote**  300:3,4,9
300:14,15 329:14
329:15,18,23
330:1
**footnotes**  195:12
195:13 238:15
329:10 350:18,24
**force**  17:10,10
61:22 62:6 190:14
190:15,17 191:8
191:10
**forecast**  96:3
**foregoing**  23:7
369:8,11 371:13
372:18
**forest**  10:23

**forever**  346:12
**forget**  213:10
**form**  22:10 29:18
29:24 32:11,21
33:11,19 34:10
35:22 36:4,13
37:22 43:12 44:9
47:7 55:12 56:8
56:12 57:8 59:1
68:2 74:12,23
79:11,19 80:18
81:14 82:9 85:20
89:21 92:15,22
93:13,21 94:13
95:2,19 97:14
103:7 108:14
109:1,21 110:20
111:23 114:10
116:4 118:10
120:15,21 121:7
123:19 128:3
129:2 130:3 131:1
132:19 134:2
136:9 137:4 139:7
141:3 146:11,15
147:5 149:22
154:7 155:16
156:14 157:11,20
158:3 159:1,18
165:24 169:11
174:15 175:16,25
177:12 178:6,7
179:17 180:4
186:5 196:8 205:1
205:10,21 206:18
207:8 210:16,21
212:25 214:15
215:4 218:10,24
223:10 225:8
226:9 227:22
232:23 234:21

238:11 241:7
242:6 249:19
259:22 263:17
264:13 265:4
269:15 279:5
282:17 284:19
295:1 296:22
302:24 316:15
318:4 322:7,14,15
322:16 324:12
330:16 331:10
333:18,23 337:12
344:5 347:9 351:5
**formal**  77:18,19
277:23,24 278:4
324:23 325:1,14
325:20,20 344:20
**formed**  49:16
173:18 332:15
**former**  36:2,10
65:3
**forming**  33:22
191:4 209:25
222:10,22 223:4,8
224:19 225:6
233:25 238:17,23
242:14 334:1,25
336:25
**formula**  170:24
232:19,19,20
233:4,10,13
**formulate**  46:1
49:8,11 110:1
180:6
**formulated**  49:13
**formulating**  39:9
159:21 355:3
**forth**  27:1 87:22
88:16 238:10
367:4

**forty** 171:22
172:17 176:11
177:15 180:11,22
181:7,8 182:9,10
185:17 202:16
316:2 359:11
364:18,18 365:12
365:14,25 366:3
**forward** 39:16
121:11 322:11
370:15
**found** 81:19 147:3
218:8
**four** 61:2,4 137:11
140:2,8 187:16,23
188:5,22,24 189:3
256:2 259:10
306:5 328:18
**fourteen** 42:17,20
131:14 140:7
200:24
**fraction** 153:14
**frame** 100:21,24
128:4 129:5,6
131:20,24,25
132:3 153:19,25
154:5,10,17
180:11 182:4
189:25 198:9,11
200:14,16,17,25
201:5 202:10,18
239:11 310:12
322:2,8
**frames** 46:21
135:14
**franklin** 151:21
152:22,23 157:1,6
172:11,16,24
177:18 180:9
**frankly** 293:9

**free** 371:14 372:20
**frequency** 90:16
90:21 323:14
331:16 333:11,13
333:14
**friday** 17:17
**friend** 141:7
**friend's** 210:16
**front** 50:8 78:9
155:11 164:8
169:21 220:13
221:3,4,9,12
245:20 267:7
289:24 307:5
308:2 362:25
363:3,15
**frost** 20:18 296:11
**fulfill** 326:1,19
327:4
**full** 39:5 40:12
64:18 80:22 85:16
126:12 186:25
**fuller** 2:8 3:14,16
127:19 136:12,21
176:17 224:7
232:6,11 263:1
334:14 358:1,6,15
358:19 361:21
362:15,23 363:17
364:5,20 366:7,16
368:5
**fully** 27:10,16
34:19,23 81:15
213:19 216:16
268:2
**fumerton** 5:14
13:8 303:14,18
304:11 308:6,9
309:18 316:16
317:16,18 318:1
318:13 322:10

323:5 324:15
325:8,9 326:14,16
326:24 327:11
330:23 331:7,12
332:19,21 333:20
333:25 334:18
336:15 337:18
338:7,17 363:24
**further** 37:17
100:17 147:13
149:20 244:13
277:22 338:7
369:15

**g**

**g** 15:16 183:2
**ga** 369:24
**gap** 102:2
**gather** 279:13
**ge** 13:14,22 14:5,8
14:11,15,16,19
15:4,8,13,19,23
16:5,8,10,14 31:15
51:7 52:23 57:20
63:22 86:7 99:6
114:18 119:23
128:9 130:16
133:2 134:17
138:1 141:15
150:4
**gears** 82:20
**general** 36:17,17
42:6 67:12 91:25
126:11 145:25
148:17 171:7
190:19 199:24
200:17 270:2
**generalization**
127:6
**generally** 40:6,21
46:18 48:22 57:15
57:18 59:8 61:21

68:6 71:22 75:19
76:10 77:25 82:10
85:24 86:2 91:11
91:17 97:16
112:13 126:6
127:1 131:11
132:23 142:15
145:13,21 149:24
150:13 154:15
177:18 210:9
217:4 218:15,25
320:21 341:5
345:16
**generate** 142:3
**generated** 294:1
325:2
**geographic** 124:3
131:22 135:16
314:19 353:11,18
354:5
**geography** 64:2
**george** 197:20
203:10,14,23
**georgia** 30:17
58:16
**gerx** 101:22 102:3
**getting** 61:11
101:5 102:14
106:11 119:14
142:23 277:10
285:13
**giant** 6:4 12:4
13:11 14:1,13,21
15:1,17 16:1 21:6
24:7 25:15 31:13
42:17 50:20 51:22
52:10 53:2 74:5,8
86:6 97:1,11
100:10,14,25
101:1 102:4,17
103:1,5,14 104:10

104:12,19 105:2
106:4,18 114:17
114:23 115:2
116:14,15 117:10
118:4,7 119:22
120:3,12 121:4,16
121:22 122:3
123:5 128:8
132:25 133:8
134:16,20 136:4
136:17,20 140:13
153:12 154:4
155:1 156:12
157:8 158:1 307:5
340:1
**gilfillan**  11:15
**give**  30:24 32:9
39:13 54:16 58:4
77:22 82:15 89:24
127:3 142:19
143:9 179:18
191:6 193:20
220:3 226:11
242:24 262:22
264:4 269:11
270:1 283:20
286:20 290:11
294:9 295:25
305:16 308:5
334:10 361:11
**given**  27:24 28:17
30:2,3,7 31:25
47:10,14 75:20
94:19 140:18,22
144:15 174:6
178:23,23 179:10
188:13 275:5
276:2 361:11
369:12
**gives**  154:20 171:1
200:16 215:5

**giving**  37:9 138:6
140:25 142:24
145:25 262:4,9
**glanced**  39:6
**go**  27:8 29:19
31:13 40:6 51:10
51:17 52:15,20
57:19 64:16 66:11
66:14 72:25 73:4
77:2 80:17 86:17
94:14,19 97:8,10
98:12 99:2 104:22
106:25 114:16
115:5,14,16
118:18 119:15,21
128:8 131:15
132:25 133:24
134:15 135:14
137:25 140:1,5,20
145:24 147:13
157:9 168:23
176:6 179:2
192:19 197:25
199:8,18 200:15
202:20 213:14
214:21 215:21
219:13,17,22
221:15 239:11
240:25 248:23
251:16 254:17
263:1,6 278:22,25
279:12 280:1,6,22
284:5 287:9,16
289:17,19 290:19
291:3 294:11
298:1 300:6
302:22 303:4
304:1 307:14
308:15,20 309:13
324:25 330:17
334:14 338:19

339:13 349:22
358:17,22,24
359:25 364:21
365:11
**goes**  64:12 101:20
188:9 189:1 194:5
202:23 275:4
284:20
**goetz**  2:15
**going**  28:9 37:6,8
39:13 52:16 53:21
54:15 71:17,17
72:13,19 74:8
75:5 76:19 84:4
90:15 91:23 94:19
95:8 97:8 109:18
110:7,18 111:22
120:19 127:19
132:6,9 134:15
137:12 143:16
144:4 160:15
163:23 168:5
171:15,21 173:8
173:16 174:19,22
174:23 177:7
182:7 184:19,21
186:7 188:13,15
191:16,21 195:10
196:16 197:15,23
197:25 199:18
202:20 212:20
219:12,14,16,16
219:21 220:11,11
221:2,2,6,7,17
224:12 226:15
231:24 232:9
235:3,6 236:4,10
236:13 238:3
247:17 254:17,18
262:10,24 264:4,5
266:19 272:22,25

274:25 275:10
277:14 279:11
284:4 285:9,16
286:18 287:9
289:17,19 290:6
290:14,16,17,19
290:25 300:11,12
303:7,20,22 305:8
306:8 314:4 315:8
316:21 338:23
342:19 357:18
358:8,18,20,21
359:3,12 360:1,7,9
361:19 363:22
366:7,22 368:9
**gold**  117:6
**good**  23:15 24:6,9
24:10 48:14 80:16
81:10 109:11,16
110:12 111:20
112:19 114:2
118:1,3 122:3,24
123:13 126:18
132:17 134:11
137:23 146:19
149:11 155:24
157:17 161:1,2
183:2 185:6
240:18 243:1
245:11,16,18
269:22,22 286:5
289:22 293:22
303:3,15 339:6,7
344:13 363:24
368:6
**google**  114:2
353:14 354:4
**governed**  265:6
**governing**  64:23
266:6 273:13

**government** 142:18,22 335:24

**governor** 99:23 190:19 191:9 202:4

**grab** 220:17

**grade** 54:12 79:16

**grand** 3:8

**granted** 277:10

**granting** 271:11

**graphs** 49:20,24 50:1,7 115:20 153:8 317:1

**great** 80:1 155:25 190:10,12 219:1 247:6,25 263:8 274:3 285:19 288:16 291:4 296:10,25 363:13

**greater** 52:12 63:5

**greaters** 134:22

**greatest** 170:13

**greatly** 114:7,12

**ground** 27:8 237:4

**grounds** 22:12

**group** 2:8 59:22 60:4 137:13 205:3

**grouping** 232:19

**growth** 14:12 120:1

**gs14** 59:23

**gs15** 60:2

**guard** 87:12

**guess** 29:5 33:12 35:12 36:7 37:13 37:14 42:9 56:22 70:8 73:23 79:20 105:14 111:25 126:18 142:17 171:1 180:7 210:8 215:20 216:21

223:2 242:16 243:13 294:5 306:2 315:20 332:1

**guessed** 134:14

**guidance** 113:21 113:22 140:25 142:16,19,25 145:8,25 152:16 347:7,10,12

**guide** 113:24

**guilty** 143:23

**guise** 199:4,5

**guns** 60:18

**guys** 93:10 130:24 361:24 363:18,22 368:6

## h

**h** 1:22 22:5 23:1 42:10 165:11 166:19 170:7 255:8,16 256:1,19 267:9 369:22

**h.b.** 16:9

**half** 346:6 365:9

**halfway** 307:20 308:10

**hallandale** 199:14

**hand** 84:21 166:6 170:12 197:11 294:20

**handful** 197:24 220:20

**handle** 60:19 67:16 112:24 229:19

**handled** 91:21

**handlers** 232:20

**handles** 247:22

**hands** 122:24 137:14

**handy** 163:1 188:12,16

**hang** 163:4

**happen** 94:10 97:23 111:18,19 260:6 347:15

**happened** 150:17 151:6 157:3 249:6 249:17 312:10

**happening** 97:22 106:9,14

**happy** 191:18 212:19 213:6 221:13,15

**hard** 33:7 106:11 188:14 308:2,5 334:7 362:24

**harder** 298:12

**harm** 171:2

**hart** 302:3,18

**hart's** 302:1,9

**harvard** 65:12 197:22 203:20

**hate** 42:9

**hattiesburg** 2:10

**hbc** 6:4 12:4 15:17 51:21 167:9

**hcp** 14:12

**hdma** 113:23

**hdqtrs** 8:5

**he'll** 273:16 290:24

**head** 42:19 55:4 85:25 93:10 104:24 105:1 115:17 129:19,23 130:12 183:13 282:19

**header** 283:24

**heading** 191:24 192:8,15 199:21

**headings** 330:18

**headquarters** 78:24 79:25 83:13 97:2 227:13 276:10

**health** 172:11 356:22

**hear** 27:10 86:21 106:11 117:13 119:3,4,20 138:18 160:24,25 189:11 207:9 253:14 290:2 358:14

**heard** 27:21 56:11 74:22,25 129:12 169:9 203:6 364:17

**hearing** 66:5 78:8 78:9,17,20 116:12 305:6 337:15 369:13

**heather** 18:10,14 18:18,22 19:6,10 19:14,18,22 20:6 20:10 287:1,4 290:9,20 291:6

**heavy** 125:1

**height** 126:7,20

**held** 34:8 71:3 260:8,12,17,22 264:18,23 265:18 312:20 355:6,14

**help** 37:19,21,22 38:4,5,6 119:6 305:23

**helped** 93:2

**helpful** 252:3 296:2

**helping** 124:5

**henry** 9:4

**hey** 72:19 149:5
**high** 33:3,10 90:8
  123:19 125:7
  129:8 130:6 135:9
  136:6 137:11
  151:4 153:3 315:6
**higher** 82:12
  126:11 128:18
  131:15 134:24
  135:9,9 140:14
  194:23
**highest** 192:11
**highlighted** 295:9
**highly** 1:17 117:14
  130:6 235:7 249:3
  361:9
**hiland** 323:16
  324:8 325:10
  334:24
**hills** 10:23
**hired** 227:15
**hissy** 363:23
**historic** 230:20
**historical** 229:9
**history** 230:25
  231:3
**hold** 34:6,15 35:18
  54:15 105:7 139:2
  185:4 214:6 224:7
  273:4 304:7
  307:19 312:18
  313:1 358:1,2
**holders** 67:4
**holding** 70:18
  258:19
**holds** 315:8
**home** 144:5 198:7
**hon** 1:7
**honest** 138:8
**hope** 281:1,1
  332:6,6

**hopefully** 96:24
**hoping** 232:9
**hospice** 342:9
**hotel** 24:13 362:23
**hour** 243:14,19
  359:25 361:24
  365:1,3,9,15,15
**hours** 15:21 58:10
  58:12 241:3,6
  242:4,19,22
  340:16 358:8
  359:12,13 360:4
  364:21 367:25
**houston** 4:8,10
**how's** 185:5
**hubbard** 7:22
  181:10
**huge** 153:21
**huh** 204:4
**humane** 363:21
**humanly** 32:19
**hunch** 316:9,10
**hundred** 32:14
  42:11,11 54:7
  55:7 57:16 85:18
  89:5 115:6 116:2
  119:16 140:1,2,7,7
  140:9 148:21
  149:25 172:6,17
  172:20 176:8
  177:10,13,14,16
  180:10 187:10,16
  187:17,22,23
  188:1,5,6,21,22,24
  189:3,21 195:6,7
  195:22 200:22
  201:3,4 202:16,17
  206:12 226:20
  256:2,3 297:16
  315:11,11,19,19
  316:1,1,2,2

**hundreds** 25:23
  65:24
**hydrocodone**
  15:17 101:15
  115:2 118:20
  120:1,13 121:1,4
  123:5 153:17
  251:14,15,19,20
  251:22 252:19
  341:12 343:19,21
  343:25 345:19
  354:12
**hydromorphone**
  252:22
**hypothetical** 96:6
  96:9,13,23 97:15
  97:24 109:22
  110:21 111:1,6,8
  111:25 112:1,3
  117:4,20,22 134:7
  342:3,8
**hypothetically**
  94:18 112:4 175:5

### i

**i.e.** 44:1
**idea** 42:6 166:24
  167:2,4 207:24
  210:4,17 234:17
  239:17 240:6
**ideally** 279:16
**ideas** 114:2
**identification**
  31:16 51:8 52:24
  57:21 63:23 86:8
  99:7 114:19
  119:24 128:10
  130:17 133:3
  134:18 138:2
  141:16 150:5
  168:10 184:24
  190:5 196:21

  214:9 273:3
  286:16 287:11,18
  288:1,6,12,15,20
  288:25 289:5,10
  289:15 295:24
  304:17
**identified** 23:21
  48:11 52:11 81:1
  91:14 116:24
  117:8 135:24
  256:16
**identify** 43:5
  90:15,20,25
  113:13 117:16
  175:13 200:6
  274:21 323:13
  324:10 331:15
  333:10 335:12
**identifying** 162:10
**ignore** 236:20
**ignored** 178:12,15
  179:13
**ii** 251:13 252:15
  252:17,18,20,23
  253:1,3,4,5,6,7,11
  254:10
**iii** 251:19,23
**iiis** 228:19
**iis** 139:12 228:17
  228:18,20 253:22
**illegal** 43:1 107:25
  108:5 145:14
**illegally** 43:7
**illegitimate** 43:2
  153:9 209:19
**illicit** 138:22,24
  153:3 200:7 211:8
  355:23
**illinois** 5:19 7:23
**illustrate** 121:9

**immediately** 77:2
  137:12 308:20
**imperative** 32:24
**implementation**
  317:7,21
**implemented**
  99:24 327:22
**implementing**
  318:3
**implies** 65:7
**importance**
  230:23 281:24
**important** 33:14
  68:13,16,17
  148:15 159:11,14
  159:19,23 177:21
  177:25 178:3
  179:6 217:12,15
  218:3,5 228:8
  230:9,12 231:3
  281:18 360:19
**imposed** 334:8
**impressed** 298:8
**improper** 113:20
  361:9
**improperly** 211:3
**imputing** 257:17
**inappropriate**
  41:10
**incarcerated**
  204:11
**incidental** 26:2
**include** 50:1 58:15
  61:19 136:18,19
  330:5 351:18
  352:4 367:12
**included** 51:18
  117:24,25 159:23
  162:9 224:23
  234:19 295:15
  307:17 308:11

309:7,10,12
  352:24 370:13
**includes** 166:25
  199:13
**including** 24:8
  32:15 45:9 51:2
  94:16 108:19
  158:17 162:18
  164:21 166:2
  319:22 365:18
**income** 54:10
**incorporated**
  372:12
**incorrect** 329:17
  330:15 331:8
**increase** 50:8
  94:23 95:14,17
  97:12 139:24
  140:3,6,9 277:25
  313:17,24 314:2,6
  314:9,11,13,14,18
  314:21 315:13,22
  315:23,25 316:13
  318:14
**increases** 96:18
  314:25 315:2
**increasing** 105:6
**independent** 34:21
  35:1,5,6,15 108:3
  150:15 152:1
  265:8 266:10
**independents**
  156:11
**index** 13:1,11 14:1
  15:1 16:1,20 17:1
  18:1 19:1 20:1
  21:1,9
**indexed** 14:12
  120:1
**indexes** 168:25

**indiana** 7:4 347:24
**indicate** 120:17
  138:20 276:14
  292:10 317:10
  328:18
**indicated** 98:16
  120:14 272:9
  322:18 343:9
  359:14 360:10
**indicates** 136:23
**indicating** 341:21
  370:13
**indication** 50:6
  106:8,13 281:22
**indications** 154:20
  329:2 349:9
**indicative** 313:19
  318:2,14 325:4,7
  337:8 338:1
  354:16
**indicator** 125:11
  135:10
**indicted** 200:14
  204:11
**indictment** 17:13
  99:18 197:8,16
  198:1,22 199:20
  202:15,22 203:25
  204:2 206:23
  207:19 209:3
**individual** 171:13
  262:1 263:14
**individuals** 207:21
**industry** 123:7
  318:9
**industry's** 317:11
**ineffective** 117:14
**inference** 192:21
**inform** 351:7
**informants** 60:20

**information** 29:1
  35:4,6,7 52:3,3
  56:25 93:1 101:22
  101:23 109:24
  126:25 142:6
  147:16,24 151:6
  157:15 158:15
  180:6 195:14
  210:2,20 249:9
  269:24 274:11
  292:17 306:1
  322:22 329:4
  344:17,18 350:16
  352:15 353:1
  354:15
**informational**
  123:3
**informed** 140:19
  216:12 312:6,8
  350:4,9 351:2,13
**ingredients** 49:6
**initials** 343:1
**initiative** 302:21
  312:3,19,23 313:1
**input** 92:24
  305:16
**inquiry** 148:1
**inspect** 80:8 87:2
  311:4
**inspected** 85:14
**inspecting** 113:15
**inspection** 73:19
  74:7 75:13,17,21
  79:8 81:19 215:4
  347:24
**inspections** 67:7
  73:20 81:1 83:7
  159:6 348:10,17
  348:20,22
**inspector** 83:9,25
  85:7 122:9 126:23

135:8
inspectors 74:5
  75:11 298:8
instance 278:4
instances 77:12
instituted 327:18
instruction 28:19
  28:20 29:16,23
  41:5
instructions 28:16
  269:4,12
insufficient 299:23
insure 211:24
integrated 320:8
intent 100:5
  361:11
intentional 194:2
  247:1
intentions 175:4
interaction 348:16
interactions
  229:18
interest 100:1
  147:21 191:19
  320:2,11 321:3
  322:14,19 334:16
interested 328:6
  369:17
interesting 201:25
  278:21
interestingly
  153:6
internal 49:1
internally 297:18
internet 53:24
  114:3 269:25
  312:12,15
internet.com
  10:25
interpretation
  89:6 277:5

interrogator 29:5
interrogatories
  295:4
interrupt 118:25
introduce 168:3,5
introduced 99:15
  303:16
introducing 190:8
invent 311:3
inventory 73:5
inverse 318:15
investigate 44:22
  92:2 122:20
  148:25 321:25
  322:6
investigated
  125:10 135:21
  152:23 227:3,18
  320:11,16 321:3
investigates 145:3
investigating
  60:25 139:5
  151:15
investigation
  72:17,18 73:3,18
  73:19 75:8 76:7
  79:12 81:21 83:18
  97:22 98:9,13,17
  99:1,25 100:6
  135:25 139:9
  178:16 214:14
  215:3 217:25
  218:9 219:7
  221:21,24 223:18
  224:18 231:13,21
  231:25 232:3
  238:18 239:8
  248:24 278:23
  279:20,23 351:18
  352:4

investigations
  67:1,3 71:9 72:11
  72:24 73:15 83:7
  147:15 211:17,21
  211:23 212:4,9
  217:23 218:8,9,22
  226:6 249:15
  250:6,11 320:19
investigator 15:6
  34:9,18 35:21
  36:24 53:19 59:17
  59:21 60:11,16,24
  61:6 62:16 64:20
  66:11 67:20 71:25
  79:1 80:21 82:2
  88:7 129:10
  133:18 138:4
  182:18 212:5
  215:5 216:17
  217:10 227:2,18
  231:21 269:18
  278:22 319:20
investigators
  36:23 61:25 67:22
  72:23 144:19
  200:6 212:23
  213:14 214:12
  215:13 216:2
  217:1,21
invoice 15:20
  241:1 242:4
invoices 57:23
  58:14
invoke 74:13,23
invokes 84:10
involve 335:18,22
involved 98:8
  138:15 143:6
  155:14 199:10
  211:13 336:3,7

involvement
  231:20
involves 348:22
involving 346:19
irr 350:6
issue 15:9 37:1
  74:11 77:14 80:2
  81:1,19 84:5,7
  102:20,24 104:3
  124:6 129:1
  134:21 136:5
  219:25 282:2
  292:10 361:20
  367:19
issued 78:25
  106:24 138:24
  159:12 208:22
  220:2
issues 80:25
  100:19 130:2
  151:25 159:8
  218:4,8 228:8
  291:22 338:2
item 274:24 275:7
items 89:23 275:1
  275:6

                j

j 2:6 3:14 5:5,15
  14:6,9,18 335:21
jack 141:2,19
jaffe 10:21
jail 151:9 204:5
james 1:16 13:4,21
  15:6,21 22:4
  23:10,18 24:1
  138:5 245:8 303:6
  303:11 338:22
  339:2 357:17,22
  359:2,7 368:8,11
  370:8 371:4,9
  372:4,13 373:20

**janet** 302:9
**january** 14:23
    15:11 99:15
    139:25 284:9
    287:20
**jay** 12:16
**jeff** 11:16
**jefferson** 369:5
**jersey** 11:21
**jfalduto** 11:24
**jimmy** 329:7
**jjaffe** 10:25
**jlichter** 12:23
**jmarcus** 6:18
**jmetts** 4:23
**job** 53:7,7 55:21
    55:24 56:16 82:3
    82:5 109:11
    122:12 127:10
    177:24 217:9,21
    296:25 324:24
    325:16
**jog** 305:23
**joined** 62:1
**joining** 366:20
**jonathan** 6:8
    10:21
**jones** 5:17
**jonesday.com**
    5:21,22
**jonesday.com.**
    338:19
**joseph** 15:25
**jr** 3:14
**jralph1972** 141:20
**juan** 3:19
**judge** 28:16
    116:20 117:1
**judgments** 44:16
**julia** 4:15

**july** 15:25 289:1
    296:12,16 329:20
**jump** 289:18
**june** 1:18 23:9,16
    53:9 59:3 288:22
    368:12,14 370:4
**jurisdictions**
    232:16 280:25
    286:11
**jury** 28:13 36:10
    37:9 54:16 65:2
    78:12 110:4
    115:23 116:12,19
    117:1,5,12 119:4
**jury's** 48:5 91:25
**justifiable** 132:11

## k

**kaitlyn** 10:5
**karn** 20:19
**kate** 160:23
    176:15,18 224:11
    232:6
**kate's** 362:16
**kate.swift** 7:25
**katherine** 7:18
**kathleen** 2:5,12
    24:17 362:16
    370:5
**keekhoff** 10:11
**keep** 41:7 54:23
    75:23 163:6 184:3
    188:12,16 217:6
    219:16 220:11
    221:2 241:25
    255:5 283:7
    300:11,12 320:24
    340:13 346:11
    359:20
**keeping** 189:20
**keith** 20:18 296:11
    297:2

**kennedy** 2:17
**kept** 346:1
**kevin** 18:5 274:4
**key** 80:10
**kill** 51:16
**killed** 157:2
**kim** 290:20
**kimberly** 18:10,14
    18:18,22 19:6,10
    19:14,18,22 20:6
    20:10 286:22
    290:9
**kin** 369:16
**kind** 38:3 41:3
    44:14 61:6 74:25
    76:7,11 86:3
    98:24 119:5 126:7
    127:6 132:10
    147:3,4 154:14
    157:15 170:25
    171:8 182:7 185:9
    198:19 216:21
    218:12 239:7
    261:3 263:25
    270:2 277:4 305:2
    309:15 324:25
    326:11 337:25
    340:20 346:19
    348:15
**kinds** 26:13 76:8
    92:6
**kneller** 237:10
**knew** 120:10
    126:23 128:13
    129:25 130:5
    141:11 144:20,24
    233:21
**knight** 2:5 24:17
    24:21 29:18,24
    32:11,21 33:11,19
    34:10 35:22 36:4

36:13 41:9 44:9
45:14,19 47:7
53:20 54:2 55:12
56:8,11,14 57:8,14
58:2 59:1 68:2
74:12,16,19,21
75:1 79:11,19
80:18 81:14 82:9
82:19,23 84:9
85:20 86:12 89:21
92:15,22 93:13,21
94:13 95:2,19
97:14 103:7
106:10 109:1,21
110:20 111:23
114:10 116:4
118:10 120:15,21
121:7 123:20
124:17 128:3
129:2,15 130:3
131:1 132:19
134:2 136:9 137:4
138:18 139:7
141:3 146:11,15
147:5 149:22
150:19,24 154:7
155:16,23 156:14
157:11,20 158:3
159:1,18 160:5
161:4,8,12 163:3,7
163:11,14,17,24
165:24 174:15
175:16,25 176:14
176:24 177:5,12
178:6 179:17
180:4 184:3 186:5
188:15 196:8
205:1,10,21
206:18 207:8
212:25 214:15
218:10,24 219:15

220:7,19,22
221:11 222:12,15
223:10 224:21
225:8 226:9
227:22 230:6,16
231:17 232:23
234:21 236:10,17
238:2,9 240:9,18
240:23 241:7
242:6 243:1
246:25 247:3
249:19 259:22
262:7,13 263:16
264:13 265:4
267:25 269:15
270:11 272:24
273:5,8,14,20,23
279:5 282:17
283:6 284:19
285:16 289:21,23
290:10,23 292:24
293:3 295:1 296:3
296:8,22 302:24
304:21 308:4
309:13 316:15
317:23 318:4
322:7 324:12
326:21 327:6
330:16,25 331:10
333:18,23 337:12
338:15 344:5
347:9 348:3 351:5
353:5 363:1,14
364:1 366:6 370:5
**know** 24:24 25:4,6
25:7,7,11 26:22
27:12,17 31:24
33:5,7 36:15,16
39:24 40:6,12
42:10,22 43:3,4
47:21,23 49:23

52:6 54:5,5,9,14
54:21 55:10,23
56:17 58:11 61:10
63:15 66:22 67:15
72:4 74:17 76:2
77:7 79:17 80:12
80:15 81:3 83:19
84:8,19 85:18
87:25 89:11 91:9
93:11 95:7,8 96:2
97:2 100:17,18
103:16 109:11
110:3,13 112:15
113:16 114:25
116:19 120:5
121:21,23,25,25
122:11 123:18
124:8,14,25 125:4
127:1 129:11,17
130:5,18 131:13
131:23 133:22
141:5 142:13,23
143:20,21,22
145:4,5 146:12,16
147:20 148:17
149:7 150:12,17
151:4,10,20 154:8
154:11,17 155:12
155:17,24 157:5
159:22 166:10
170:16 173:20,23
176:22 178:14
179:2,9 183:10
189:18,24 193:20
194:9,14,18,19,24
203:8,23 204:1,2,2
204:4,6,7,24
205:20,22 206:7
206:14 207:2,3
209:13,18 210:10
213:5,17 216:9

217:5 218:11
219:13 227:25
233:19 235:20
236:2 240:21
242:19,20 244:19
247:1 249:11,24
250:18 261:5
263:3 266:9 267:2
267:5,13,15,18,22
268:3 271:1
277:12 289:25
294:5 295:14
298:2 299:15
304:12 309:3
311:13 314:15
320:6 322:24
327:22 328:15
332:1 337:2
341:16,24 342:4,8
342:9,13 343:7,23
346:3,8 347:4,20
348:24 350:21
351:6 356:14
358:4 360:3
361:13 362:17,24
364:13 365:7,8,20
365:21 366:8,13
366:24
**knowingly** 67:20
334:5
**knowledge** 36:18
36:22 91:13 93:3
93:15,17,23 94:1
95:20 96:14 146:8
146:10,14 147:1
147:10 158:15
203:14 206:19
209:9 210:24
218:14 240:10
302:13 356:15

**known** 74:1,3 94:5
102:3 194:2
**knows** 82:4
**kyle** 14:18

**l**

**l** 22:1
**labeled** 232:5,15
273:10
**lack** 45:13 70:12
239:23 318:14
344:23 345:13
**ladd** 8:17
**ladder** 78:6,14
**lake** 13:19 14:14
14:22 15:10,18
16:16 25:3 41:14
42:4 50:9 97:3
105:13 107:6
115:3 117:11
118:8 120:4 121:5
133:9 136:4 146:5
151:3 156:21
164:7 173:5
174:14,21 175:14
179:7,24 183:16
183:20 184:1,8,14
184:18 185:11,21
195:20 196:3
206:10,17 207:7
207:15 208:17
209:14 210:11
228:13,24 229:5
239:3,14 241:6
242:14 243:6,18
244:17 254:24
255:25 267:5
272:1,6,7,14,16
281:19 311:17,21
314:1 335:3 336:4
341:10 343:15
352:15 353:2,8,12

353:16 354:13,25
language 281:11
lanier 4:7
lanierlawfirm.com
4:12
large 23:4 85:25
198:7 205:4
larger 148:23
largest 171:16
183:12 188:19
189:22 195:20
206:9
late 61:16 62:7
latest 228:23
laura 1:22 22:5
23:1 189:13
369:22
law 2:7,8,16 3:6
3:15 4:6,7,16 5:6
5:16 6:10 7:8,19
8:10,18 9:6 11:17
12:8,17 31:10
60:16 62:10 81:24
81:24 84:11
258:12 347:18
lawfully 41:21
43:11 159:17
lawsuit 28:23
336:17
lawyer 240:22
lawyers 38:6
40:18 167:5
178:11 179:15
180:2 227:16
241:1
layers 35:3
laying 146:21
lcr 369:24
lead 70:13 182:18
leading 22:10
123:6 243:6

leads 80:21
learning 324:25
325:19
leave 360:14,17
led 98:18
left 53:8 160:19
168:16 219:25
220:21 359:11
361:1 365:1,4
legal 11:8 370:1
373:1
legend 131:13
legislation 99:12
legitimate 92:13
108:10 126:10
128:13 149:1
153:9 209:20
239:18 240:8
342:14
leo 98:8,11
leon 3:17
lesser 94:22
137:20
letter 73:22 77:20
77:21 78:4 191:9
302:20 335:21
370:19
letters 111:13
292:6 300:7,10,13
300:14,22 301:7
301:20 302:15
letting 176:22
level 35:11 44:8,13
46:2 59:20,24
62:11 77:10,18,19
77:19 78:11,18,19
90:8 92:9,11 96:8
104:3 108:25
109:13,20 110:10
125:20 126:16,21
127:2 130:6

132:10 159:7
174:12,16 175:7
175:13 257:22
259:11 261:10
levels 78:14 79:22
85:5 103:21
104:12 106:18
127:3
levin 4:17
levinlaw.com 4:22
4:23
lewis 8:11,19
245:14 272:21
license 67:2,4
183:7 311:21
346:25 369:23
licensed 35:9
211:12 248:18
310:6
licenses 145:19
311:11
licensing 257:7
lichter 12:16
life 365:18
light 31:25 35:16
359:21
lightly 188:25
liked 323:7,24
324:3
limit 321:17
327:18
limited 62:4 69:3
142:1 156:17
158:6 192:12
limiting 328:24
limits 334:7
linden 86:16
line 128:12 217:19
221:19 262:24
296:12 370:13
372:7 373:3

lined 362:2
lines 145:18
215:12
list 146:19 171:11
172:1,10,24 176:9
177:11 180:10,17
181:23 182:6
199:10 200:13
202:1 203:22
206:8 246:10
267:7,8,9 269:20
270:1,7 272:10,10
275:21 299:5,6
301:11 308:18
335:6,9,15 336:17
352:8
listed 38:25 39:19
77:15 98:14 127:9
197:17 202:7
207:21 246:11
252:5 255:3
274:18 276:1
280:16,23 281:14
282:16 283:12
284:24 286:12
295:5 297:5
307:16 336:3
349:15 372:7,17
listen 28:24 240:3
listening 112:2
listing 38:17 372:7
lists 169:22 352:5
literally 27:3
49:19 73:4 99:2
155:5 216:23
litigation 1:9
10:14 23:20 33:3
39:3 53:12 54:24
55:17 56:2 116:24
127:12 169:14
208:22 228:7

233:6,16 247:9
251:17 261:4
303:19 332:10
337:16,23,25
370:6 371:3 372:3
**little** 34:22 37:1
53:6 71:7,7 75:6
76:10 82:15 86:3
92:23 96:24,24
101:6 115:23
121:11 126:19
136:2 165:15
172:12 176:5
177:7,8 189:9
211:19 222:13
246:9 249:20
254:17 257:6
275:24 277:21
280:21 282:23
283:7 303:21
312:11 328:13
340:18 344:1
365:10
**live** 360:10
**liverpool** 8:7
246:12 250:24
286:23 287:5
291:7
**living** 55:15
**livingston** 6:6,16
13:5 24:5,7,9,23
26:7 29:21 30:1
31:18 32:13,23
33:15,25 34:13,20
35:24 36:6,9,25
41:12 44:21 45:15
45:19 46:6 47:10
47:22 48:4 51:9
52:25 53:22,25
54:11 55:13,19
56:17,19 57:10,17

57:22 58:3,6
59:11 65:8 68:10
73:23 75:4,9
79:14 80:6 81:2
81:23 82:14,19,22
83:5 84:5,9,13,18
85:23 86:9,12,15
90:10 92:5,17
93:14,16 94:2,3,17
95:4,5,23,24 97:25
98:7 99:8 101:6,7
101:10,14 103:13
104:18 105:1,10
105:11 106:10,12
107:18 108:13
109:4 110:2 111:7
112:6 114:13,16
114:20 116:6
118:12,17,22,23
119:8,10,18,25
120:18,24 121:10
124:7,19 125:16
127:24 128:5,7,11
129:11,16 130:9
130:18 131:4
132:24 133:4
134:13,19 135:7
136:10,16,24
137:7 138:3,19
139:8,14 141:6,17
146:13,18 147:12
150:2,6,19,21
151:8 154:23
155:21,23 156:1,3
156:18 157:14,23
158:13 159:10,22
160:3,8,13 357:24
358:4,13 360:15
361:2 363:20
367:10,16,23

**livingston's** 361:6
**llc** 5:4 7:5,6,6 10:7
10:15 199:14
**llp** 6:11 8:11,19
9:7 12:9
**loaded** 349:2
**local** 62:11 157:25
**located** 24:11 42:4
128:21 133:9
196:12 267:3,3,14
268:3,9,13
**location** 131:22
247:22,23
**locations** 145:22
246:20 249:21
258:23 354:5
**locke** 9:7
**locked** 361:1
**lockelord.com**
9:12
**logic** 109:5 110:9
**logo** 168:20
**lonesome** 153:13
**long** 142:13 144:3
145:18 194:17
215:24 235:18,23
243:10 327:15
366:19
**longer** 66:19,23
330:20 346:21
365:12
**look** 33:12 39:14
47:20 53:23 73:17
73:19 80:11 88:3
89:23 99:9 104:23
105:7 107:24
108:3,8,16 110:5
112:8 113:1
115:15 118:13
122:1,22 123:3,11
123:12,14,15,23

123:25 124:1,2,3,3
124:4,9 126:19
135:3,9,12 136:3
137:17 141:13
145:4 154:13
155:19 156:22
159:8,8,15,20
171:1 174:1,8
176:7 178:4
183:25 184:7
195:11,11 200:11
202:2,14 206:22
210:6 214:12
215:6 216:2,8,9,18
217:3 219:23
228:15 230:25
231:15 250:2,9,19
252:3 253:9
254:16,24 255:24
270:14 271:23,25
272:20,25 276:1
277:21 279:6,25
280:6 283:19
285:8 286:5,14,20
286:21 292:24
293:23 294:8
296:1 297:12
298:3,12,19 299:2
299:14 302:3,22
302:25 316:20,22
316:24 328:11
357:25 361:3
**looked** 39:4,6
96:19 100:19
127:6 154:3,9,11
156:5,7,10 178:21
183:15 185:16
196:7 204:13
205:2,13 206:3,8,9
211:7 234:7
251:18 267:21

275:16 291:11,25
295:11 298:16
300:24 301:11
318:9 321:9 333:9
353:19
**looking**   37:24
39:15 40:3 42:9
51:24 99:21 105:9
105:13 119:2
122:2,7 132:12
133:24 134:9
135:23 136:25,25
137:6,9 149:12
152:25 153:24
154:2,19 155:10
171:8 177:17
185:10 191:7
195:19 201:24
236:4 241:12
250:19 256:18
276:19 281:17
292:4 294:10
315:23 317:1
318:19 330:1,24
345:2 349:9 354:5
**lookout**   140:20
145:18 149:5
**looks**   118:25
121:13 141:19
155:13,14 290:2
**lord**   9:7
**lose**   183:7
**loss**   70:14
**lost**   144:18
**lot**   35:4 40:14
52:17 62:8 121:25
145:20 146:20
241:9,23,25 344:2
353:17
**lots**   146:1 220:10

**low**   132:22
**lower**   63:7 64:4
132:22
**lowest**   42:16 77:10
77:19
**lpa**   2:17 9:17
**lunch**   142:23
232:7,12 236:16
**luxenberg**   3:7

**m**

**m**   7:7,10,18 68:25
**ma'am**   160:25
252:16,21 262:13
269:1 280:13
315:15
**madam**   370:10
**maddie.brunner**
9:12
**madeleine**   9:5
**mailed**   301:7
**main**   38:3 49:6
181:10
**maintain**   13:17
70:25 291:21
313:19 335:11
**maintained**
278:19 280:5
**maintenance**
69:10 70:7,14,14
102:19 104:7
167:13 175:3
178:25 254:13
258:8 259:4,14
260:2 318:7 344:8
**majority**   63:18
**makeshift**   272:23
**making**   53:18 54:6
103:19 248:12
296:25 332:2
333:21 364:15
365:11

**mallinckrodt**
65:13,17 167:7
260:8,12
**management**   35:3
35:3 60:6 61:15
73:5 76:1,6,17,24
78:24
**manager**   60:1
78:9,17 237:10
274:7 276:8
**managers**   237:3
**manages**   258:22
**manner**   81:9
154:9 261:4
**manual**   71:25 72:3
72:8 113:10
232:21 321:19
326:5 327:9,11,15
**manufacturer**
65:18 148:9
317:14
**manufacturers**
92:24 108:17
335:10
**manufacturing**
91:18 92:7 94:11
96:10
**map**   64:11 82:15
**mapping**   353:18
354:5
**maps**   353:14
**march**   14:7 51:13
228:20 284:9
288:4
**marcus**   6:7,8,11
6:16,17,17,18,19
12:9,14
**marion**   297:8
**mark**   184:21
304:11,14 306:8
359:25

**marked**   31:15
51:7 52:23 57:20
63:22 86:7 99:6
114:18 119:23
128:9 130:16
133:2 134:17
138:1 141:15
150:4 163:1 168:9
184:23 190:4
196:20 198:2
214:8 235:7 273:2
286:15 287:10,17
287:25 288:5,11
288:14,19,24
289:4,9,14 295:23
304:16 305:9
307:5
**market**   8:12 15:9
98:3 134:20 136:7
136:14 171:17,20
173:4,9 176:10
180:19 185:16
354:11,20,24
**marketing**   108:19
**maryland**   8:5
246:13
**massive**   122:5
313:17,23 314:6,9
314:11,13,14
315:13,21,25
316:4,13
**master**   9:16
118:21,24 119:9
262:16,20 263:5
364:12,23 366:2
366:14,18 367:1,6
367:8 368:1,4
**masters**   5:4 65:12
71:2 164:15
178:17 182:11,14
182:23 183:4,7,11

183:17,19,25
184:7,13,16
244:10
**match** 211:4
**matched** 211:7
**matches** 291:10
**material** 37:13,17
238:14 295:4
301:17
**materials** 210:2
224:9,10 271:23
271:25 275:17,21
275:23 292:1
295:10 298:17
299:5,6 300:25
307:11 349:16
352:20 354:2
**math** 133:16 177:8
180:15 182:9
274:17
**mathematical**
48:17
**matter** 23:19 37:5
44:4 80:5 81:11
91:25 109:17
110:8,16 113:1
141:23 160:15
297:9 315:9,21
**matters** 38:18
58:24
**matthew** 6:9 8:17
**matthew.ladd**
8:23
**maximum** 51:19
**mazgaj** 6:9,19
**mccann** 14:6,9
47:23 48:7,18,24
49:2,7,17,20 50:25
51:6,23 52:2,11
83:9,21 96:16
98:1 104:23

105:19 106:20
113:4 114:7,21
115:14 117:25
120:6 133:5
140:12 146:2,25
147:8 169:6 170:8
170:8 183:23
186:2,19 243:5,18
243:25 244:8,17
306:20 331:6
340:23 359:19
361:20 362:3,10
364:3 366:20
**mccann's** 42:7
49:10 51:12 52:5
52:21 151:3
162:13 169:3,19
184:20 185:10
195:19 267:10,21
354:15
**mcenroe** 8:9 13:7
245:10,13,17
246:25 247:5,7
248:21 250:2
253:17 259:13,17
259:23 261:12,14
262:8,16,25 263:3
263:7 264:2,21
265:11,22 268:2
269:19 270:13
272:25 273:7,10
273:17,24 274:3
277:14,18 279:16
282:13,22 283:9
283:11 284:23
285:12,19 286:17
287:12,19 288:3,7
288:16,21 289:1,6
289:11,16,22
290:1,4,13,18,25
291:4 293:2,5,8,9

295:7,25 296:5,10
296:24 299:9
361:5
**mchugh** 2:8
362:23
**mchughfuller.com**
2:12,13
**mckesson** 26:15
102:21 103:1,2,17
103:25 104:9
151:25 259:6,9,10
334:6,22
**md** 1:6
**mdl** 1:5 13:24 30:4
30:8 294:21
329:19 340:4
357:8
**mean** 26:17 32:18
36:23 37:7 55:20
55:22 65:9,20,20
65:23 67:22 68:11
71:24 87:6 88:24
89:1,4,7,14,16
90:1 91:2 93:9
107:11,12 109:4
110:23 115:8
120:24 125:2,20
130:5 140:8
142:12 145:17
153:2 154:15,16
174:16,18,24
220:16 221:15
232:12 236:12
255:22 256:15,16
260:19 277:6
278:3 282:23
295:9 344:12
355:18,19
**meaning** 26:12
76:14 209:19

**meanings** 193:3
**means** 54:15 91:3
91:8 276:25
277:20 334:8
349:17
**meant** 211:24
286:6 307:23
309:6 330:5
**measure** 170:21
316:17
**measures** 110:15
**mecca** 181:13
**media** 303:5,10
338:21 339:1
357:16,21 359:1,6
**medical** 92:2,13
92:19 96:3 192:12
199:4,5 209:20
342:14
**medication** 162:5
342:1
**medications**
161:20 193:14
341:17
**medicine** 108:9
172:14 210:16
**meet** 73:5 112:21
327:16
**meeting** 76:6
**meetings** 312:24
**members** 198:3,25
**memorandum**
13:23 78:15
**memorize** 115:17
**memorized** 268:21
**memory** 267:11
305:23
**mention** 251:20
342:22 343:3
348:9

mentioned 102:25
103:24 132:12
134:23 298:11
323:10 327:17
mentioning
251:22
mere 34:2
messed 294:9
messrs 6:6 11:5,15
met 144:23 161:1
245:11,15
methadone 253:11
method 164:14,15
164:20,24 165:23
182:23 244:7
341:10,13 351:20
methodologies
15:15 48:8,10,13
49:12,21,22 51:1
52:1 83:10,15,22
84:21,23 96:17
113:3,18 114:8,24
115:1 116:1,9,13
116:13,22,23
117:2,6,9,23 118:2
118:3 244:2 319:2
319:6,9,14,18
330:20 331:1,2
methodology
113:7 166:19
244:4 254:25
255:12,17 256:8
330:18,18 341:20
methods 15:16
182:21 183:2
234:14
metric 154:2
170:17
metts 4:15
mexico 31:2,3

michael 3:14
michigan 3:10
24:14 63:2,7,8,17
64:4,5,13,15 129:9
194:18
microphone 74:18
119:1,5
mid 8:6 318:22
middle 144:1
184:4 255:8
349:23
midst 47:11
midwest 370:17
373:1
migration 209:9
mike 3:21 176:19
224:14 358:23
361:18 364:11
mill 107:24 192:23
193:12
milligram 65:15
134:7 138:23
139:6 140:21
148:18,19 150:11
153:21,22 154:4
154:25 155:7
170:18 171:9
189:6
milligrams 153:17
million 171:22
172:7,17,21,25
176:8,11 177:10
177:16 180:11,22
181:3,7,17 185:17
185:23 201:8,15
201:23 204:22
205:8,14 256:2
mills 192:9,25
193:2,18,19 198:8
198:23 199:2

mind 173:19
189:22 308:4
314:16 315:13
366:23
mine 115:20
minimize 185:2
minimum 314:12
minor 77:14
minus 177:15
minute 82:21 85:9
168:1 250:21
266:20 296:1,4
358:1
minutes 160:8
232:10 357:14
358:10 359:11
364:19 365:12,14
366:1,4
misconducted
79:8
mislead 268:14
mispronounced
129:17
mispronouncing
201:12
missed 271:21
324:11 364:14
missing 43:18
mississippi 2:10
misspeak 63:20
mistaken 254:20
mitchell 18:5
274:4 276:8
277:12
mixed 241:19
mme 14:14 120:4
170:13,16 171:22
172:3,7,17,21
176:8,11 177:10
180:11,22 182:5
185:17,23 186:6

moa 337:15
mobile 356:21
model 125:5
modify 225:16
moment 58:3
195:19 245:12
273:16 290:11
money 54:16
monitor 103:11,15
103:18 162:6
166:13 254:15
257:4
monitored 111:2
monitoring 46:15
48:9 68:19 90:14
97:18 104:1
113:24 114:5
161:17,19 165:21
175:2 178:25
194:8 227:7 251:2
251:8,10 256:25
257:10,18,21
258:3 269:6,14,21
270:9 274:15
276:4 282:10
291:21 292:7,14
292:22 293:6,12
293:17,21 294:4
295:3 298:10,13
298:13 319:10
321:16 324:9,22
325:12 346:24
monitors 258:22
month 51:19
53:10 59:3,4
140:22 148:22
149:17,25 152:8
242:11 290:21
291:7
monthly 16:15
150:10 154:25

**months** 53:15
66:20,21 155:5
200:24 201:5,9,16
201:20 291:12
**morgan** 8:11,19
245:14 272:21
**morganlewis.com**
8:15,23
**morning** 23:15
24:6,9,10,11 27:7
29:22 31:1 82:17
150:25 161:1
247:11 285:13
358:16 359:16
361:23 362:3
366:11
**morphine** 170:17
170:18,22 252:25
**motion** 359:22
**motley** 10:7,15
**motleyrice.com**
10:11,19
**mougey** 4:18
**mount** 10:9,17
**move** 150:22
189:25 259:13
261:12 277:14
317:16 325:8
326:14
**moved** 39:16
189:2 359:21
**moving** 41:7
**multiple** 99:2
193:3 285:24
299:22
**multiplier** 117:18
**multiply** 117:15
**multitude** 176:12
**mumbled** 336:13
**muted** 247:1

**n**

**n** 2:1 3:1 4:1 5:1
6:1 7:1 8:1 9:1
10:1 11:1 22:1
**name** 24:6 245:13
303:18 339:8
370:6 371:3,4,15
372:3,4,21
**names** 145:22
197:14 250:25
**naming** 40:24
**narcotics** 199:3
**narrative** 236:22
**nasty** 143:23
**national** 1:9 23:19
370:6 371:3 372:3
**nationwide** 35:5
**nature** 112:9
303:22
**ndc** 269:1,2 271:8
**nearby** 124:4
**nearly** 33:2
**necessarily** 77:1
135:12 136:15
295:10 366:9
**necessary** 22:8
37:14
**necessity** 199:6
**need** 84:7 111:2
149:20 150:19
153:10 189:10
213:7 214:13
217:9,16 219:17
219:22 226:11
236:8 262:7,13
274:23 275:2,8
276:12 277:2
292:25 319:9
338:16 342:20
346:8 347:2
359:20 361:22

**needed** 215:14,14
216:3 244:5
274:12 310:21
**needs** 68:14 88:19
88:20 92:3,14
112:22 220:12
221:3 280:4
327:16
**negative** 76:11
292:20
**negligible** 56:18
56:20
**neighboring**
194:23
**neither** 106:20
146:2,3 369:15
**nevada** 31:4
**never** 44:25 45:16
67:14 75:24 83:9
93:2 113:6 114:3
120:7 169:10
189:1 205:2,2
213:18 227:19
229:4 233:8 239:7
240:12 311:6,10
311:16,20 321:9
323:17
**new** 8:21,21 10:23
11:21 28:6,15
29:16,17 30:3
31:2,3 41:4 58:17
71:15 114:1
167:19,22 244:3
246:12 363:5
**newton** 134:6
**nexus** 280:15
281:12
**nhtsa** 42:14
**nichols** 1:22 22:5
23:1 369:22

**night** 363:2 368:6
**niles** 181:17
**nine** 89:15 131:11
131:12 174:3
181:20 195:6,6
201:3 202:16
**ninety** 85:19
124:24 164:25
165:7 166:6,12
174:3 181:3
206:25
**nonarcos** 244:21
**noncash** 124:1
**noncompliance**
69:8 90:2 100:25
101:2 111:19
**noncompliant**
89:18 107:3
**noncontrol** 353:7
**noncontrolled**
128:16 335:2
**noncontrols**
124:21 125:21
126:1,17,22
**nondefendant**
136:18
**nondefendants**
136:18 153:11
156:12
**nonregistrant**
260:22
**nonresponsive**
317:17 326:15
332:20
**noon** 232:13
**norm** 91:9 146:21
153:1
**normally** 137:9
**north** 4:8
**northeastern**
63:11,16

**northern** 1:2 64:6
**northwest** 7:10
  64:8,14,14
**notarized** 370:14
**notary** 1:25 22:7
  23:3 369:23
  370:25 371:10,18
  372:15,23 373:23
**note** 127:20 360:7
  362:20 370:12
**noted** 228:11
**notes** 21:5 302:3
  304:4,5,6,25 305:2
  305:14,17,20,21
  306:5,6,9,13,15
  339:11,15,18,23
**notice** 299:18,21
  360:23
**notification**
  312:14
**notify** 78:1 291:22
**notion** 360:8
**novak** 3:5
**november** 14:23
  15:22,22 17:17
  133:10 214:19
  287:6 290:8
  329:22
**number** 13:24
  14:15 18:7,11,15
  18:19,23 19:7,11
  19:15,19,23 20:7
  20:11 24:8 27:25
  40:18 43:4 49:20
  52:9,12 53:1
  66:22 125:1
  126:10 132:4
  133:7 137:17
  139:20 147:25
  152:11,13 160:14
  165:22,23 172:10

182:5 186:9
189:22,23 196:10
197:17,25 198:1,7
201:22 204:24
205:3 207:4,6,12
228:7 233:20
242:25 269:11
271:22 273:1,12
274:24,24 275:6,7
286:18 289:19
290:3,5 303:6,11
335:24 338:22
339:2 342:22
343:3 345:3 352:5
357:17,22 359:7
360:18 370:7,13
**numbers** 16:11
20:14,20 56:22
115:2,5,21,24
129:8 153:1
155:18 165:3
166:5 176:3 189:9
189:11 205:13
206:6 210:18,23
299:10 372:7
**numeral** 297:14
**numerous** 261:9
340:24
**nuts** 266:25 270:8

**o**

**o** 22:1 68:25
**o'brien** 4:18
**oarrs** 16:16 98:18
98:23,25 99:4,5,13
99:23 100:2,8
150:8 194:8,11
**oath** 32:4 156:20
156:25 226:4
361:14
**object** 44:9 47:7
55:12 97:14

109:21 111:23
114:10 118:10
121:7 137:4 139:7
141:3 146:11,15
147:5 149:22
154:7 155:16
159:1 175:16,25
177:12 178:6
205:10 224:12
236:10,13 259:22
263:16 269:15
295:1 302:24
333:18 351:5
359:23 360:8
366:12
**objected** 235:5
360:2
**objection** 29:18,24
32:11,21 33:11,19
34:10 35:22 36:4
36:13 56:8,11
57:8,14 59:1 68:2
74:12,22 79:11,19
80:18 81:14 82:9
85:20 89:21 92:15
92:22 93:13,21
94:13 95:2,19
103:7 109:1
110:20 116:4
120:15,21 127:20
127:25 128:3
129:2 130:3 131:1
132:19 134:2
136:9 156:14
157:11,20 158:3
159:18 165:24
174:15 178:7
179:17 180:4
186:5 196:8 205:1
205:21 206:18
207:8 212:25

214:15 218:10,24
219:21 222:12
223:10 224:13
225:8 226:9
227:22 232:23
234:21 241:7
242:6 249:19
263:16 264:13
265:4 268:1 279:5
282:17 284:19
296:22 316:15
317:23 318:4
322:7 324:12
330:16 331:10
333:23 337:12
344:5 347:9
**objections** 22:9,12
236:14
**obligation** 70:21
84:11 103:5 162:6
166:13,15 218:6
256:25 257:4
258:3,24 259:20
263:19
**obligations** 158:19
161:24,25 251:2,8
254:5 257:10,18
260:18 312:7
326:2,20 327:5
361:22
**observations**
239:12
**observe** 145:11
146:1
**obtain** 99:3
**obvious** 89:12
90:5 107:13
**obviously** 30:22
58:14 102:4
103:19 120:7
154:16 155:19

158:8 363:21
occasional 321:5
occasions 299:22
310:11
occur 76:19 78:10
97:16 137:16
213:21 264:19
321:10 324:2
345:7
occurred 111:5
123:6 153:19
158:9 248:15
250:1 313:4,7
314:19 318:6
324:5 344:24
356:10
occurring 137:18
355:22
october 17:11
138:21 190:15
252:13 290:22
291:7 329:21
offer 29:9 41:21
43:9 44:6 64:21
65:4 174:11
209:10 210:3
227:16 364:16
offered 22:13 45:3
45:7 46:13 47:1
242:23
offering 41:25
45:17 110:4
offhand 250:19
office 61:7,17
62:19,21 63:1,4
64:3 80:11 103:15
141:10 142:4
144:24 148:2
272:23 290:2
291:16

officer 60:17 62:6
62:6
officers 61:22,23
official 141:24
142:16,22 371:15
372:21
oftentimes 60:24
312:9
ognen 98:9,11,22
99:17 100:1,9
oh 16:9,25 17:7
69:12 81:23
119:20 233:11
246:25 247:5,5,5
273:7 281:6 295:7
305:5 309:13
315:18 330:5
331:19 334:16
351:24 362:1
367:14
ohio 1:2 2:20 7:6
8:4 9:19 13:20
17:9 25:2 42:25
43:6 63:2,8,11,13
64:6,7,12 98:19
99:2,12,21 100:1
131:6 156:20
157:3 158:16
159:15 168:17
170:4 171:18
185:11 190:13,19
191:7,9 194:20,22
195:5 196:1,10,13
201:21,22,25
202:2,3,4,11
205:14,19,23
207:25 208:7
231:14 310:6,17
310:25 311:2,10
311:20 370:2

ohio's 191:13
194:8
okay 24:18 25:4,9
29:21 30:10,19
31:17,23 32:7,13
38:2,16 41:3
43:24 45:13 47:5
47:10 54:11 57:10
57:17 59:11,20
61:18 62:17 63:1
68:18,22,25 69:12
70:19 75:25 76:13
76:25 77:7,21
78:2,12,21 79:2,7
79:14 82:7,23
85:4 86:5,23 87:2
87:25 88:10 91:2
96:16 100:23
101:7 111:10
113:8,15 114:6
124:7 125:16
130:24 132:3,24
139:4,14 141:23
142:8 143:1,22
144:17 147:25
151:20,24 152:15
152:21 156:1,9
160:24 161:12,15
164:12 167:25
181:12 187:2
189:4,16 193:11
193:23 203:2
208:14 213:11,12
214:4 217:12,18
224:6 225:22
229:3 231:12
232:4 234:4
240:23 244:24
245:21 247:5
256:23 257:17
258:19 262:25

263:11 264:5
266:24 268:22
270:15,19 274:2
276:6 277:18
282:14 283:5
284:2,6 286:8
287:4 288:9,16,21
289:16 291:3,25
292:4 293:15,22
294:8 295:18
296:9 299:7
301:24 302:8
303:3 304:10
305:8 306:8,11,15
308:8 309:18,24
311:1,6 313:10
314:10,22 315:18
316:5,11,20 318:1
320:14 321:15,24
322:10 323:20
324:15 325:16,23
329:23 331:22
332:19 333:7
339:22 341:9
344:21 348:8
349:22 357:15,24
362:4 364:5,8
367:2,4,7 368:4
old 47:19 143:5
347:1
olstein 11:18
omdl 18:7,12,16
18:20,24 19:8,12
19:16,20,24 20:8
20:12,15,16,20,21
294:21
once 144:23 161:1
183:24 227:19
275:12 359:21
ones 53:3 98:13
118:3 204:16

223:19 277:9
284:24 294:12
308:23
**ongoing** 37:13
**onsite** 227:12
**open** 273:14
285:17 308:5
345:6,24 356:15
**opened** 102:3
289:18
**operate** 25:23 81:6
90:18 110:23,23
192:9 326:8
**operated** 42:23
113:13 146:4
198:4 199:1
344:15
**operates** 80:13
81:8
**operating** 43:16
47:16 71:20
266:14
**operation** 70:23
70:24 333:14
**operations** 44:7
**opiate** 1:9 23:20
370:6 371:3 372:3
**opiates** 136:8
**opine** 117:13
**opinion** 25:7 33:23
37:18 41:13,19,25
43:14 45:17,24
46:1,7 48:23
49:11,13,16 50:19
52:8 68:22 79:24
100:10 101:20,24
102:4,17,23 107:9
108:14,21 110:1
111:17 124:11
159:4,12,21
165:19 173:12,15

173:18 179:19
180:6 184:12,16
208:24 209:1,6,11
209:11,22 210:1,3
210:20,21 211:15
225:3,14,14,17
229:8 230:1,19
238:24 239:23
242:23 251:18
259:1,18 292:16
313:16,23 314:5
315:1,9 316:6,10
317:6 318:14
328:7 332:15
333:17 337:11
340:12 343:10,16
344:16,22 345:12
345:18,25 352:12
352:13 354:19,22
355:3
**opinions** 37:8 39:9
41:21 43:10,19
44:6 45:3,8 46:3
46:13 47:1 48:24
49:8 50:16 64:22
65:4 68:22 110:4
151:1 174:9,24
191:4 222:10,22
223:4,8 224:19
225:6,10 227:16
234:1 238:17
242:14 243:6
251:5 281:15,20
310:3,7 334:2,25
337:1,4 340:2,3
343:11 344:3
**opioid** 16:24 17:6
41:22 43:2,7,13
45:8 107:5,15,21
108:23 116:16
117:11 118:8

135:3,13 159:13
168:16 170:3,22
173:10 228:24
229:4 251:18
282:9 318:24
325:5
**opioids** 15:9 24:8
28:2 30:4,20,25
32:1 46:12 47:12
50:9 53:12 55:17
56:2 108:1,11,17
126:5 130:21
131:6 134:21,21
134:21 135:4,6,10
136:5 137:10
143:24 151:10
157:4,7,19 171:5
171:22 172:7,17
172:21 174:3,13
174:21 175:14
177:11 178:1,5
179:7,24 182:5
183:4,8,20 184:13
194:22 208:22
209:4,14 228:13
228:18 229:24
230:4,8,12 238:19
238:23 282:3
294:21 313:17
314:17,21 315:3
317:3,19 354:25
**opportunity** 62:13
174:1 220:3,5
310:21 311:3
**opposed** 66:21
79:3 279:2
**option** 365:7
**oral** 23:11
**order** 32:1 46:15
48:9 59:16 66:4,9
68:18 78:20 87:19

90:14 97:18
108:22 113:24
114:5 161:17,19
165:21 167:2
175:2 178:25
214:13 217:9,16
227:7 233:17,25
234:12,19 239:24
251:2,8,10 256:24
257:10,18,21
258:3 264:22
269:6,13,21 270:9
274:15,22,25
276:4 279:7
282:10 291:21
292:7,14,22 293:6
293:11,17,20
294:3,17 295:3
298:10,13 299:10
319:2,10 320:1
321:10,16 322:14
324:9,21 325:12
334:6,21 345:7
352:21 359:20
**ordered** 170:12
200:22 201:3,8,14
201:20 202:16
205:18 206:15
**ordering** 103:16
103:19 123:14
140:22 148:18,23
149:6,7
**orders** 15:16,16
90:15,20 113:13
114:25 116:17
117:8 118:20
162:5,7,10 164:16
164:25 165:7,8,22
166:6,7,11,14,18
222:1 228:9
232:15 234:11,13

234:18 239:18,20
239:25 240:6,13
255:2,12,18
256:16,19 286:1
286:10 287:5
290:21 291:6
295:12,13 320:11
320:16,20,23
321:3,12,12,25
322:4,6,19 323:3,6
323:13 324:10
328:8 331:15
333:10 335:13
341:20 346:1
350:5,6 359:22
**organization**
35:14 198:3
**orient** 303:25
**outcome** 33:6,24
76:6
**outlined** 203:24
324:4
**outlining** 323:18
**outside** 36:23 42:1
59:3 61:23 62:25
138:25 142:2,4
145:16 153:1
158:4 176:1 179:3
179:20,22 207:22
215:6 216:19
254:11 256:20
262:24 270:4
326:10 346:25
355:7,10,16
**overall** 88:18,19
225:16 282:8
354:11,24
**overarching** 69:13
69:19,24 70:10
88:1

**overholts** 150:11
150:12,14,18
151:8,11,16
154:15,16 157:9
158:10 172:12,20
172:24 176:5,7
177:9,17 178:12
179:13,23
**overholts's** 154:18
**overlapping** 189:8
**overlooked** 178:19
**overprescribers**
194:2
**override** 74:14,24
84:11 270:22
272:10 277:25
**overrides** 271:11
**overseen** 35:3
**oversight** 329:12
330:4,9
**owned** 146:4
148:5 203:9,11,11
**owner** 151:9
**oxford** 6:12 12:10
**oxy** 123:18 134:22
134:23,24 135:5
135:19 139:6,19
139:20 140:6,13
140:13,14,21
148:19 154:5
155:7 156:5
327:18
**oxycodone** 16:15
65:14 93:12
123:19 134:6
136:6 150:10
152:17,18 153:18
153:20,22 154:25
164:16 165:1
166:3 183:10
187:11,17,23

188:6,20 189:23
195:8,23 196:2
200:13,18,23
201:4,8,15,20
202:10,17,24
204:23 205:9,15
205:19 206:13,16
207:1,14 252:14
253:3,18 254:2,3
255:2 256:1,11,25
321:21 327:25
328:9,24,25
**oxycodones** 135:5
**oxycontin** 94:18
95:9 138:23
148:24 153:20
**oxymorphone**
253:5

**p**

**p** 2:1,1,15 3:1,1
4:1,1 5:1,1 6:1,1
7:1,1 8:1,1,9 9:1,1
10:1,1 11:1,1 22:1
**p.a.** 4:18
**p.c.** 3:7 11:19
12:18
**p.m.** 245:3,5,5,7
303:7,9,9,12
338:23,25,25
339:3 357:18,20
357:20,23 359:3,5
359:5,8 368:9,12
**page** 4:14 13:3,13
14:4 15:3 16:4,22
17:4 18:3 19:4
20:4 21:3,11
32:14 64:16 86:6
86:18,21 98:13
105:13,16 106:13
106:25 111:18
118:13,16,19,19

128:8 131:6
139:15,16,17
140:5 154:24
162:25 163:22
164:11,19 166:25
169:25 170:3
185:12 186:8,9,22
187:20 190:14
191:6,20,22,22,24
195:2,12 197:1,7
199:5,8,9,19
200:12 214:21
215:10 217:19
219:13 221:7,8,16
221:18,20 222:14
226:20 228:14,21
228:22 229:1
231:17,18 232:4
234:24 235:1,8
237:9 241:2
245:19 252:3
254:18,25 255:7
270:14 277:21
283:22 284:5
286:5,6 290:17,19
291:5 293:4
297:13,13 298:7
299:11,14 300:13
301:12 305:12,22
306:5,6 307:12,15
307:23,24 308:5
308:10 311:24
313:15 328:11
330:23,25 331:3
331:12,17 334:4
334:10 335:5,8
341:7 348:1,3
349:21 351:16,16
351:22,23,24
362:1,1,1 370:13
370:15 372:7

[page - perfect]                                                                    Page 45

373:3

pager  338:10

pages  40:6 51:17
51:18 52:21 63:24
86:9 169:22
171:12,15 237:14
237:19 238:15
306:12 335:5,23
338:14

paid  54:23 55:25
58:15 178:10
306:23

pain  192:8 193:5,5
193:6,12,16,18
198:7,8,10,13,18
198:22 199:13,14
199:14,15,15
203:4,5,6,11,15
204:8,21 205:7,17
205:18 206:15,23
206:25 207:20
208:12,13,16,21
209:2

pairing  61:7

palm  198:4

papantonio  4:17

paper  345:4,14

paperwork  275:14

paragraph  64:19
138:19 147:13
148:16 191:8
192:7 193:24
197:25,25 198:20
198:25 199:24,25
200:12,16,21
201:2,7 202:14
206:22 207:18
208:2 270:16
277:22 299:17
300:6 334:17
349:23,24 350:3

351:17,25

paragraphs
200:10,13 235:1,4
284:8

paralegal  10:14

parcel  355:24

parentheses  256:3

park  8:20

parking  145:20
146:1

parkway  4:8

parse  344:11

part  26:14 71:4
79:7 122:12
129:23 154:6
155:5 169:13
182:23 191:17,18
194:3 206:8
209:25 223:3
224:23 231:2
244:12 251:17
264:19 265:7
267:21 275:10
278:16 279:19,23
307:9 312:18,25
314:17 319:19
323:19 341:20
342:17 351:9
355:24 366:9
367:18 372:9

participate  232:2

particular  40:10
74:2 92:3 94:11
98:4 111:17
147:21 174:7
189:6 261:24
272:2 273:1
278:24 286:4
300:23 351:9

parties  22:3,11
369:16

partly  135:24

partnered  61:5

parts  237:15

party  26:20,23

pass  76:11,13

passed  99:22

passing  79:16

paste  115:13

patient  351:19

patients  192:18
193:15 194:15
208:3,7 341:16,25
342:4,9

patrick  5:15

patrons  199:2

pattern  90:16,21
323:14 331:15
333:11,12,14

patterns  123:14
123:16,16

paul  3:5

pause  105:8
119:17 222:17
291:2

pavlich  156:25
157:5

payment  351:20

payments  103:20
124:2

pbeisell  5:22

pdf  191:23 195:12
199:9 304:21

pdfs  338:15

penalty  15:7 138:5

pending  28:6
30:16 58:24
259:15 261:13

peninsula  64:4,5

peninsulas  63:7

pennsylvania  6:14
8:13 12:12

penny  54:15

pensacola  4:20

pension  56:5

pensions  55:18,22

people  40:24
60:12,14 145:18
236:2 249:25
346:23 363:7

percent  85:18,18
85:19,19 86:2
89:5 94:20 95:10
95:12,14,17 97:9
97:10 115:6,6
116:2,2,3,7 119:16
121:2 124:24
125:25 126:15,15
127:17 128:1,15
128:15 131:12,14
131:15 132:4,23
133:13,23,24
134:5 136:5,7
137:10,11,16
164:25 165:8
166:5,7,12 173:10
174:2,3,20,23,25
175:6 206:25
207:21 208:5,8
256:4,21 297:16
341:11

percentage  85:17
94:23 124:20
125:8,17 131:7
132:16,17 133:8
133:12 134:5
207:13 315:23

percentages  96:6
128:18 135:9

percents  115:20
127:9 134:10

perfect  89:10,12
89:17 90:4 111:3

112:1,3 187:1
285:22
**perfectly** 80:22
**perform** 73:5
**performance**
225:5
**performed** 66:25
67:3 150:9
**period** 59:17
77:23 100:13
102:2,18,25 106:5
113:23 129:20
140:10 185:17,24
187:24 194:9
198:18 205:5
206:5 209:15
231:11 251:23
314:25 323:11
330:20 346:21
**periodically** 67:3
271:7
**periods** 46:20
139:21
**perjury** 15:7
138:5
**permanent** 270:22
271:1 276:7,15,25
277:3,5,19
**perryman** 246:13
250:24 297:5,19
297:23
**perrysburg**
231:14 237:10
**person** 65:3,21
144:23 213:19
214:3 279:25
**personal** 141:20
141:25 142:7,10
231:20
**personally** 125:18
371:11 372:15

**personnel** 227:11
297:5 346:20
**perspective** 90:21
95:17 97:12
**pertain** 258:16,19
**pertained** 280:24
282:3
**pertaining** 250:11
253:19
**ph.d.** 14:7,10
84:22
**pharmaceutical**
5:4 178:17 182:12
182:15
**pharmacies** 14:22
15:17 16:24 17:6
25:17,20,23 26:5,9
26:18 34:7,8,16,17
34:21,22 35:10,12
35:19,20 36:3
41:14,15,20 42:4
42:12,13,23,23
43:3,15,20,25 44:1
44:7,13,23 45:10
46:8,9 50:12
65:25 93:5,20
95:7 97:3 99:2
103:12,16,21
104:1,9 105:25
108:4,24 109:9,13
109:14,15,19
110:5 111:3,11,22
115:3 121:5,16
122:3,3,10 123:5
124:4,10,12 127:9
128:14,21 133:9
133:12 136:17,19
140:20 143:17
145:14,23 146:4
146:22 147:2
148:3,5 153:4

155:2,5 156:6
157:17,17,18
159:6,13,16
161:18 162:11
167:10,12 168:17
169:7,23 170:4,12
171:11,13 172:1,2
172:5 173:5
174:13 179:3,16
183:5,17,20 184:1
184:8 192:10
207:6,15 209:23
210:11 211:1,12
228:13 229:14,15
229:19,25 230:22
247:14,18 251:7
254:2,9,12 255:13
255:19,22,23
256:24 257:13,19
258:23 259:10
267:1 277:9
310:24 311:2,4
312:12,15 334:5
334:21 336:4
345:6 352:15
353:1,15,19
355:21
**pharmacist** 44:11
44:17 211:12
262:1 263:14,23
263:24 264:11,19
265:1,7,17,19
266:1,12,14
**pharmacist's**
266:7
**pharmacists** 194:1
**pharmacy** 7:4
35:1,1,2,11,15
43:1,6,11 44:7
45:24 46:2,8 51:1
61:1 93:7 94:9,21

94:22 95:13 96:7
96:12,25 97:2
98:5 103:10
108:25 109:16
110:10,14 111:21
112:4 122:18,21
122:24,24 123:13
123:13 125:9
126:8,12 127:2
131:11 132:7,17
134:12 135:20,22
136:15 138:12,14
139:5,21 145:3,11
145:20 146:20
147:15,18,20
148:12,17,23
149:6,10,16
150:12,12,15
151:7,21,22,24
152:2 155:2,3,13
155:14 156:17,20
158:17 159:7,15
161:25 162:5
165:10,13 166:22
169:16 172:11,12
172:16,23 176:5,7
177:9 178:12,20
179:13,23 180:9
182:6 183:12
196:12 210:5
230:15,25 231:1
238:25 239:3,14
247:10 248:3,3
251:6,10 254:6
257:14,22 258:21
261:9 262:2
263:25 264:12,18
264:23 265:2,8,9
265:10,18,25
266:6,10,18
279:12 310:17

311:3,10,17,20,21
343:15,18 345:9,9
345:24 346:19
352:20 353:8,11
355:6,14 356:6,8
**pharmacy's** 95:16
**philadelphia** 8:13
**phone** 137:13
144:25 157:25
370:3
**physically** 24:15
267:3
**physician** 138:24
199:21
**physicians** 199:22
**pick** 115:5 116:1
**picked** 116:22
294:12,13
**pickers** 321:19
**picking** 28:13
220:9 361:5
**picture** 156:17
**pieces** 345:3
**pill** 107:24 189:6
192:9,22,25,25
193:1,12,18,19
198:8,23 199:2
315:24
**pills** 135:17
145:15 146:20
183:10 193:18
209:9 210:25
315:25 341:16,22
341:24 342:15
**pittsburgh** 6:14
12:12
**place** 7:21 110:22
240:19 257:22
274:15 276:19
298:14 318:6
331:15

**placed** 255:12,18
256:20 262:1
278:9,13 353:14
**places** 263:13,19
363:8
**placing** 257:23
**plaguing** 107:5
**plaintiff** 59:10
268:5,9,18,19
281:5
**plaintiffs** 2:4 3:4
4:4 11:13 24:19
24:24 28:22 31:10
33:1 38:6 40:2,18
53:11 54:22 55:16
56:2,7 57:1,13
130:20 146:10
147:1,10 158:23
167:5 178:11
179:14 180:2
227:16 267:23
295:18 306:22
309:2 313:5
332:23 341:1,5
350:16,23 356:21
357:7 359:9 360:2
360:6,8 361:8,11
365:19
**plan** 28:10 30:24
211:21 232:7,11
**planning** 362:5
**plates** 346:25
**played** 119:4
**pleasant** 10:9,17
**please** 23:23 34:12
41:6 164:11 168:8
234:24 274:21
275:6 284:1
290:23 296:12
297:1 322:3
334:11 348:1

**placed** 358:22 370:11,11
**pleased** 298:8
**pled** 143:23
**plenty** 241:13
270:3
**pllc** 5:7
**plus** 127:10
359:11
**pnovak** 3:12
**poerschke** 4:14
362:4,9
**point** 26:3 40:4
46:24 61:8 62:2
69:6 92:10 125:20
142:11 152:1
155:24 189:1
206:7 266:22
283:18 315:20
361:7
**pointed** 175:11
**pointing** 152:10
**points** 305:3
345:14
**police** 61:23 62:5
157:25
**policies** 49:15
323:12,17 324:7
324:16 325:20
326:9 328:8,24
345:4
**policy** 75:10 79:24
113:24 191:11
244:10 321:16
322:13,15 327:22
332:17
**polster** 1:7
**ponce** 3:17
**pop** 285:16 364:2
**popped** 273:14
**popping** 168:6

**portion** 235:6
340:9
**portions** 39:23,24
40:19
**position** 84:14
130:7 143:18
167:7 325:6
**positive** 293:10
**possible** 32:19
41:8 112:2 125:12
138:9 178:4
228:23 242:3
326:4 358:23
**post** 100:18
101:23 102:17
285:6
**potency** 171:5
**potential** 33:6,13
33:24 46:22
135:10 192:11
276:22 321:10
322:13
**potentially** 37:12
37:14 44:18 47:4
58:9 112:5 122:21
145:4 319:14
**pplpc01800027...**
16:12
**pplpc01800027...**
16:12
**ppoerschke** 4:22
**practice** 31:6 72:7
75:10 138:25
141:23
**practices** 29:11
310:12
**practitioners**
194:16
**pre** 98:23
**prearranged**
158:10

preceding 291:11
preclude 29:9
  149:24
prefatory 223:15
prefer 359:15,24
  363:21
prejudicial 361:9
preliminary 37:7
  123:17
preparations 75:5
prepare 57:2,4
  75:11 133:5
  339:22
prepared 13:20
  31:20 33:7 52:4
  56:23 92:1 115:12
  236:3
preparing 37:19
  239:4 293:18
  308:14 330:10
  352:12 353:13,24
preregistration
  66:25 67:8 71:10
  72:10 75:13
  248:23 249:4,13
prescribe 269:4
prescribed 211:3
prescriber 100:7
  123:16 192:4
prescribers 194:6
  194:22 195:6
prescribing 99:3
  104:4 123:15
  126:3 192:25
  211:7
prescription 1:9
  17:9 23:19 190:13
  191:10,13 192:19
  194:8,22 199:3
  210:15 211:2,10
  240:2,14 262:2

263:15 265:17
313:17 370:6
371:3 372:3
prescriptions
  14:20,21 41:23
  43:13 44:2,16
  94:24 95:15 97:7
  133:6,7 138:23
  194:1 206:24
  207:13,19 208:9
  209:14,19,23
  210:4,7,8,10
  239:19 240:8
  342:6,11,13
present 9:14 10:4
  11:4,14 12:6
  24:15 42:25 50:7
  132:1 209:16
  230:5
presentation
  312:14
presented 190:18
  279:20
presumably 82:4
  256:12
presume 249:16
presuming 256:23
pretty 72:24 96:8
  109:5 143:23
  144:21 174:24
  178:8 192:23,23
  296:19 318:12
prevent 45:16
  69:11 70:15 71:1
  177:21 258:9
  259:5 260:2
prevention 13:18
previous 44:12
  55:3 80:25 106:17
  158:5 214:25
  216:7 317:25

previously 49:14
  54:22 100:3 269:3
primarily 63:17
  138:23 199:1
primary 139:13
  321:16
principal 179:23
principally 198:4
print 169:8 279:1
printed 294:16
printer 275:13
prior 22:14 73:20
  75:5,8 100:21
  346:10
priorprod 13:24
privileged 235:4
probably 39:22
  40:11 53:23 58:5
  59:9 61:4 97:8
  113:22 125:24
  152:18,19 173:21
  181:19 229:18
  269:10 273:21
  282:20 285:11
  340:17 356:16
  361:24
problem 125:9,12
  137:14 145:5,14
  161:10 180:15
  278:25 285:22
  290:15 291:1
problematic
  125:15
problems 108:24
  225:23 226:23
  227:8,20
procedural 367:19
procedure 23:6
  332:17 371:5
  372:5

procedures 87:12
  222:5 323:17
  324:7,17 325:20
  326:9 345:4
proceeding 30:4
  355:5,14
proceedings 23:12
  32:1,4 79:3,6
process 249:4,13
  274:15 304:1,13
processes 298:13
proctor 4:17
procured 199:2
produce 216:13,14
produced 49:20
  105:19 150:8
  233:5,15 241:1
  250:10 294:6,25
  295:8 300:17,18
  301:1 309:20
  323:6
product 29:11
  120:2 148:19
  238:3 345:21
production 92:7
  186:16 235:5
  300:25 333:8
  370:15,17,22
products 65:15
  120:13 152:17,18
  167:11 254:10
  354:12 355:21
professional 1:24
  22:7 23:2 138:25
proffer 29:10
profiles 351:19
program 60:1
  70:12 78:9,17
  257:24 269:14
  270:9 279:11
  291:21 292:7,14

292:22 293:6,12
293:17,21 298:11
319:11 336:10
**programs**  337:17
**prohibit**  325:25
326:18 327:3
**prohibited**  327:12
327:14
**project**  241:11
**projects**  144:4
**promise**  27:12,17
253:2
**promulgated**
162:3 325:25
326:17 327:2
**proof**  323:25
**proper**  34:14
116:13,19 122:4
198:11 248:9
276:21
**properly**  214:3
**proportionate**
148:24
**proposed**  67:24
144:5,7
**proposing**  261:5
**protective**  294:17
**protocol**  360:22
**proven**  337:7,14
**provide**  29:2 31:8
45:23 50:19 51:15
52:8 53:12 56:21
73:22 74:7 87:11
124:11 127:21
173:13,14,16
174:25 210:19,23
211:14 255:11
270:7 275:6 313:5
332:22 343:11
347:4 354:8

**provided**  23:6
25:6 38:10 46:3,7
46:19 48:7,17
49:16 50:15,25
52:2,7 54:21
56:25 75:24 87:20
127:11 130:19
138:9,11 145:7
156:19 208:24
231:6 250:16
263:21 293:16
322:23 331:6,13
331:24,25 332:4,7
332:8,12,23 347:7
347:11 349:3,6
350:16 354:21
**provides**  225:15
**providing**  109:24
333:2
**provision**  261:19
263:12
**public**  1:25 22:7
23:4 356:15,18
369:23 371:10,18
372:15,23 373:23
**publications**
127:10
**publicly**  74:1,3
94:4
**published**  94:4
126:24
**puerto**  3:19
**pull**  161:5 213:7
311:25
**pulling**  240:25
**purchase**  229:16
230:8
**purchased**  198:13
200:14 201:21
202:9,24 204:22
205:8

**purchaser**  145:15
**purchases**  103:11
355:9,17,19,23
356:8,11
**purchasing**  104:9
161:20 167:12
200:18 230:12
254:10,12 257:1
257:20
**purdue**  141:2
143:11,17,17,19
143:22 148:8
239:9
**pure**  26:12
**purport**  182:22
**purported**  100:25
101:2
**purpose**  67:7
209:20 335:20
352:22
**purposes**  123:4
183:16 184:2,8
208:17 239:4
241:5 342:14
**pursuant**  193:7
198:13 216:13
217:6 360:22
**push**  61:9
**put**  80:19,21 93:11
114:21 120:10
155:11 166:17
168:15 174:23
190:12 219:18
220:14 249:23
257:21 258:3
273:15,18 276:18
278:17 289:20
305:3 335:20
337:8 339:14
352:9 354:4
363:25 367:3,17

367:17
**puts**  186:19
**putting**  175:18
281:24 292:16
335:20 359:17

**q**

**qualified**  64:21
65:4 218:11
**qualify**  159:19
**quantico**  66:12,15
**quantified**  174:6
175:9
**quantify**  175:20
**quantities**  274:16
274:23
**quantity**  315:22
**quarters**  365:1,3
365:16
**quasi**  192:10
**querying**  277:8
**question**  27:10,13
27:16,22 28:24,25
29:2 34:11 35:17
41:6 43:17 44:13
44:20 49:25 54:1
54:4 56:9,12 59:5
60:8 74:2,9,11
81:24 84:19,20,24
84:25 85:22 86:19
94:1 95:4 96:9,9
102:13 104:13,20
105:3 106:17
114:11 155:20,22
158:5 165:15
171:14 188:3
207:10 212:10
214:3 215:21,23
216:1 222:4,8,20
223:16 224:15,16
226:19 227:17
229:22 233:7

240:4,4,5,11,21
254:4 259:15
261:13 262:5,9
263:4 264:3,6
268:9 270:2,5,6
275:1 277:16
278:21 280:20
281:7,11 284:24
285:5 302:11
304:3 306:3
307:13 315:15,20
316:23 322:3
324:14 325:9
326:15,23 332:22
341:23,23 342:2
344:10,16 345:11
348:19 350:11
352:25 354:8
355:11 356:2

**questioning**
160:20 221:14
246:23

**questionnaires**
127:7

**questions** 22:10,10
27:20 32:8 41:10
45:20 56:23 144:5
144:7 154:22
160:14,17 161:14
191:17,20 197:24
212:8,24 213:2,7
213:11,16,25
214:14 215:15
216:4 219:20,25
220:21 221:1
235:8 243:15
262:11,17 266:24
303:2,21,25
305:10 306:19,20
338:8,12 339:10
349:7 357:13

366:6 369:9

**quick** 47:20 82:20
82:23 274:17

**quicker** 212:21

**quickly** 30:2 41:7
51:11 59:12
118:14 143:10
188:8 219:14
338:13 339:10

**quite** 35:13 64:12
123:21 139:24
364:14

**quota** 14:13 92:7,9
93:11 94:18 95:8
95:9,25 96:1,2
121:1,12 123:9,9
317:13,14

**quotas** 91:18,18
91:21,21,24,25
92:6,7 93:2,3,6
94:4,10 95:21
96:19 105:5 106:9
106:14,19,23
120:2,20

**quote** 296:12
300:12

---

**r**

**r** 2:1 3:1 4:1 5:1
6:1 7:1 8:1,17 9:1
9:15,17 10:1 11:1
369:1

**rafalski** 1:16 13:4
13:21 15:6,21
21:5 22:4 23:10
23:19 24:1,6,19,23
41:3 54:3 56:15
74:13,23 83:6
105:18 138:5
150:20 160:23
161:16 163:12
164:6 168:7

177:21 184:6
185:1 186:24
189:22 190:24
191:23 198:6
211:16 213:10
214:11 216:25
219:18 221:9,20
224:14,17 226:10
243:4 244:25
245:8,11 247:8
263:2 283:8
285:25 286:19
292:5 298:25
303:6,11,15
338:22 339:2,6
357:17,22,25
358:15 359:2,7,14
362:21 364:16
365:5,19,22
366:21 368:8,11
370:8 371:4,9
372:4,13 373:20

**rafalski's** 15:14
247:4

**rafferty** 4:17

**raise** 137:8 149:19

**raised** 62:24
133:17 152:22
154:6

**ralph** 362:16

**ran** 83:11 203:15
330:20

**random** 294:12
350:4,9,19 351:2,3

**range** 54:7 252:5

**ranked** 153:3

**rannazzisi** 15:25
129:12,14,15
302:15

**rapidly** 152:9

**rare** 77:12

**rate** 115:25 116:5
116:10 194:23

**ratio** 128:14 335:2
353:7

**ratios** 351:21

**raw** 176:2

**reach** 48:19

**reaching** 316:7
337:4,11

**read** 28:17,18
29:15 39:23,25
40:7,8,12,13 43:19
100:24 127:14
129:4 143:12
144:5 157:12
158:21,24 159:2,3
192:13,16 194:3
212:10,13 218:20
219:10 220:1,10
221:4,16 222:9,13
222:21,25 223:2
223:17,21,23
224:17,22,25,25
235:3 237:14
244:10 253:15
275:11 290:6,11
290:24 297:23
326:24,25 371:5,6
371:12 372:5,6,17

**readily** 352:11

**reading** 40:23
41:2 59:9 100:4
139:2 219:3 282:4
299:11 351:21
370:19

**reads** 194:21

**ready** 296:9

**real** 51:11 82:23
198:18 329:5

realization 330:8
realize 105:18
  330:7,8
really 33:12 36:21
  54:23 78:3 87:21
  114:22 119:6
  132:21 133:6
  143:10 149:9
  154:10 162:20
  169:6 191:20
  226:11,13 238:2
  242:16 325:4
  361:20
realtime 1:23
  11:11,14 12:1,6
  22:6 23:2 176:18
reask 32:7
reason 27:10,15
  91:6 126:8 130:7
  132:10,11 171:3
  179:12 239:21
  248:22 249:5
  294:24 363:8
  370:14 372:8
  373:3
reasonable 39:7
  128:19 131:18
  132:4
reasonableness
  346:13
reasoning 179:10
reasons 352:21
  353:17
recalcitrant 78:3
recall 39:15 42:16
  50:13 113:22
  127:15,25 138:6
  142:2 144:14
  145:22,22 151:2
  168:19,25 183:22
  183:24 185:14

191:1,5 195:18
197:19,20,21
202:4 205:13
206:3 219:3
223:23 224:25
226:1 227:10
228:11 231:12
233:22 235:18
237:17 243:20,23
244:19 250:12,19
252:2 261:2 262:4
264:15 271:6,10
272:11 275:19
282:4 283:15
292:16 294:6
295:20 297:7,22
298:20 301:4,18
301:23 306:20
312:13 313:3,8
320:12,14,15,18
320:22 321:2,4,25
322:6,12,16
323:16 324:6,16
325:13,14 327:19
327:23 328:1,4
333:13 339:16
340:8,23 343:8
347:25 348:21
349:8 350:14
recap 350:6
receipt 188:19
  370:18
receive 37:19 38:4
received 38:5
  91:20 127:8
  144:13 152:16
  171:21 172:6,16
  172:20 176:6,8,10
  177:9 182:5
  185:23 187:4,10
  187:16,22 188:5

189:24 195:22
206:11 249:3
302:13 324:21
325:11 342:23
343:4,7 347:20
362:7
receiving 103:22
recite 336:21
recited 224:10
reciting 202:23
reclassification
  101:15
recognized 98:20
  194:6
recollection 42:18
  51:5,11 128:25
  139:11 140:25
  143:15 202:6
  203:16 206:5
  219:1,10 227:11
  228:2,3 234:2,8
  297:11 301:25
  302:6,18,20 303:1
  349:13 351:15
  357:10
recommend
  113:17
recommendations
  17:11 190:17
  191:12,25
recommended
  239:8
reconvened
  368:13
record 23:16,22
  43:5 82:25 83:4
  127:20 160:7,12
  163:20 164:1,5
  224:8 230:20
  235:3 245:3,7,12
  251:21 253:15

274:1 299:8 303:4
303:7,12,17
338:20,23 339:3
343:8 345:14
357:18,23 358:17
358:20,22,24
359:3,8,18 360:7
360:14 367:13,15
367:17 368:9
372:9
recordkeeping
  77:14 216:11
records 46:1 48:25
  49:15 146:20
  215:1,6,7 216:9,10
  216:18,19 225:12
  226:17 229:21,23
  230:3,10,14 234:8
  249:1 250:8,10
  259:5 271:5
  279:14 280:2
  292:9 329:6 344:4
  345:18 346:4,7,12
  346:16 347:4
  348:21 349:10,12
  352:19
recovering 342:5
red 149:8,19
  151:16
reddwerx 321:23
  322:1
reduced 369:10
reductions 317:13
  317:14
reevaluate 275:7
  276:11 277:1
reevaluating
  275:11 276:10,16
  277:1
refer 164:15
  232:18

**reference** 21:6
72:5 237:9,13
301:13 311:25
315:4 330:2
342:19 370:7
371:2 372:2
**referenced** 330:3
371:11 372:15
**references** 313:25
319:1
**referencing**
329:11
**referred** 193:12
193:17,19
**referring** 105:12
148:18 196:11
254:19 267:19
329:13
**refers** 195:1
297:19 308:13
**refine** 35:17
**reflect** 165:13
207:20 236:22
242:7
**reflected** 232:1
235:25 236:6
241:2
**reflecting** 139:19
293:16
**reflects** 172:22
196:9 242:4
**reformulation**
153:20
**refresh** 51:10
128:25
**refusing** 194:1
**regard** 151:6
**regarding** 50:20
64:22 65:4,18
195:20 247:10
264:9 306:1

320:23
**regards** 45:24
85:21 95:21 96:5
102:22 111:24
154:22 166:1
172:3 174:7
178:22 218:14
230:21 244:20
266:7 282:5,25
283:2 294:3 295:3
295:12 305:3
312:13 314:17
315:7 318:5
321:11 322:25
323:3 340:5 341:2
341:5 343:16
344:7,15 352:20
353:16,21 354:21
**regions** 135:16
**register** 94:8,15
**registered** 1:24
22:6 23:2 247:23
249:12,18 257:6,9
257:14 258:16,23
301:6 310:1
**registrant** 67:9
68:5,7,13 71:15
72:12,13 73:2,13
75:18,21,24 76:2
77:8,22 78:3,8
79:9,10,15 80:3
81:4,8,11,17 82:6
82:12 83:11,15
85:7 87:19 88:20
112:21 113:9,25
114:1,4 215:8,25
258:4 259:7,8
260:12,17,18,23
264:9,17 270:1
278:15 300:7,10
300:13,14,22

301:7,20 302:20
327:16
**registrant's** 67:24
69:16 84:23
**registrants** 68:16
70:10 73:16 79:22
79:23 87:3,11
118:4 140:19
142:16 167:8
215:4 217:1,8
251:6 259:21
261:9 283:1,3
325:25 326:18
327:3 347:8
**registration** 68:9
70:18 72:15 193:8
198:14 246:16
247:24 248:1,2,3
248:10 249:3
250:4 260:25
263:25 264:18,20
265:7,9 266:18
311:17
**registrations**
246:21 247:17,19
248:6 261:11
311:7
**regs** 112:10
**regular** 249:25
321:11
**regulate** 92:4
**regulation** 68:19
69:3,8,9,13,19,24
70:1,4,5,17,21
71:5 86:25 87:10
88:10 89:19 90:11
90:13 91:22 94:7
100:11,15 102:10
102:11 103:8
112:8,19 113:2
158:18 161:18

192:4 213:22
263:22 326:7,13
327:7
**regulations** 46:17
47:17 48:21 64:23
65:5 66:15 67:10
67:18 68:1,8,12,12
68:13,20 71:7,19
71:21 72:14 76:4
77:9 79:18 80:2
81:17,22 82:2,3,4
82:16 85:8,17
86:1,11 87:5,14
88:4,11,11 89:20
93:18 103:25
109:12 110:22
111:12 112:16
113:6 130:2
158:17 162:3
165:20 194:18
211:25 216:21
217:7,14 258:5,14
263:20 281:23
282:6 283:3
284:22 325:24
326:17 327:2
**regulatory** 13:16
83:17 191:24
251:9 274:8 276:9
299:23 312:7
326:2,19 327:4
348:17
**reject** 117:23,25
**relate** 105:19
340:2
**related** 32:1 46:1
65:14 210:2
230:14 235:2
247:9 263:13,21
280:2 282:9
293:20 345:7,19

relates 1:11
261:20
relating 30:20
43:20,25 67:10
130:1 142:9
165:20 206:23
221:25 228:8
229:23 244:17
292:6,13 338:11
339:15 343:11
344:3,22 345:12
346:1
relation 123:24
relationships
126:9
relatively 140:10
relevancy 40:15
relevant 209:15
251:23 276:3
310:3,7
reliance 80:19
224:9,10 354:6
relied 38:21 39:18
49:4 115:10 127:1
333:16 334:1
relinquish 81:21
rely 32:3 39:8
79:16 80:4,17
81:12,25 82:7
93:1 191:3 337:10
346:9 349:17
relying 326:1,18
327:3
remember 29:15
41:5 57:11 85:4,8
85:11 129:3,20
161:21 167:23
168:2 185:18
195:24 201:22
243:11 244:22
261:15,21 263:9

263:11 268:17,25
271:14 272:9
280:11 282:18
286:1 292:23
302:5 322:20
361:18 363:11
remembered
262:9
reminded 29:8
reminder 303:18
remote 1:15 11:11
11:14 12:1,6
17:15 27:9 304:13
remotely 2:2 3:2
4:2 5:2 6:2 7:2 8:2
9:2 10:2 11:2 23:9
renaissance 24:13
reopened 203:12
repeat 27:12 199:4
269:7 303:24
326:22 335:7
rephrase 27:17
replicate 49:19,24
report 13:15 14:6
14:9 17:10 31:19
31:21,24 32:14,17
32:20,25 33:7
34:1,6,15 36:1
37:6,7,15,20 38:13
38:22 39:18 42:2
43:9,15,19,25 44:4
49:19 50:2 51:13
51:16 52:4,6,16,21
64:17 68:23 69:3
69:6 75:12 84:21
98:12,14 100:24
101:23 104:22
105:7,9 107:1
110:6 111:18
113:19 114:23,23
117:24 162:7,9

163:1 164:7
166:13,25 169:16
170:8 173:4,25
174:9,25 175:11
175:13 183:16
190:15 191:2,8
194:19,20 195:12
196:11 201:25
202:3,4 208:17
218:17 220:2,2,6
223:24 224:4
228:5,12 231:6,15
232:1,5,19,24
233:10,13 234:5
234:20,24 235:9
235:15,25 236:7
236:11,23,25
237:2,7,19 238:8
238:11,14,18
239:5 241:6,10,14
241:15,24 242:9
242:10,15 243:7
243:12,15,19
244:18 245:19
246:2,7,9 248:24
252:4 254:18
256:8 267:2,10,13
267:21 268:16,22
270:14 271:1
276:6 277:21
280:8,11 281:14
281:25 283:25
285:24 292:5,12
292:17,20,25
293:18 298:22
299:3,4,15 301:8
301:16 302:2
306:24 307:4,9,18
308:12,15,24
309:8,11,12 310:1
310:13 311:24

313:14,16 315:8
319:1,23 328:15
328:23 330:12,14
330:24 331:8
333:17 334:2
335:6,8,12,24
337:9 339:25
340:4,9 341:1,7
342:18,22 343:3
343:14 347:23
348:10 349:16,17
349:21 350:25
351:10 352:10,23
352:25 353:14,24
353:25 354:1,15
354:18 357:5,8
reported 1:22
47:18 194:11
232:15 234:11,20
285:25 286:10
reporter 1:23,25
22:6,7 23:2,3,22
56:10 74:16,20,22
75:3 101:5,9
104:15 125:13
134:8 182:13
189:8,14 196:5
237:22 248:17,20
253:13 273:24
304:22 323:2
336:12 338:18
342:25 358:11,14
362:2 371:7
reporting 295:13
295:14,15
reports 39:17 50:7
74:7 75:16,20
99:3 105:11
126:25 169:19,20
192:8 200:5
208:21 218:9

219:7 221:21,24
222:6 223:18
224:18 225:1,10
225:15,19,24
226:6,14 232:20
233:4,16,17,20,21
233:25 234:12
238:4,22 274:25
275:12 329:8
340:11
**represent** 24:7
169:15 185:7
203:2 204:17
275:25 303:19
339:9
**representation**
81:12
**represents** 369:11
**request** 33:17,18
37:23 67:15 74:15
150:9 159:3
270:21 277:25
361:6 372:9,11
**requested** 173:13
**requests** 295:17
**require** 104:7
113:9 161:18
**required** 72:15
151:18 194:18
215:6 216:10
217:6 370:25
**requirement**
70:19 88:2 251:9
278:13
**requirements**
87:22 216:20
**requires** 103:8,9
326:7
**reread** 226:20
302:3

**rescheduled**
251:25 343:22
**rescheduling**
252:12
**research** 10:6
45:25 92:3,13,20
96:3 114:2 280:14
281:12 282:1
**reserve** 160:18
338:12
**reserved** 360:12
**reserving** 360:4
**residents** 207:25
**resolved** 337:23
**resources** 270:4
**respect** 40:17
41:22 43:12 51:23
69:13,15 70:22
84:3 93:18 103:1
109:14 110:15,17
124:9 135:20
143:24 147:2
156:4 157:18
204:20 223:7
256:25 257:19
310:16 311:1
314:23 324:9,21
325:10,12
**respective** 22:3
136:14
**respond** 226:13
**responded** 302:1
337:2
**responding** 144:12
259:16 263:4
327:10
**responds** 291:19
**response** 35:17
78:4 263:20
302:11 317:12
327:24 328:2

336:24 337:19
338:5 342:7 349:6
360:25
**responses** 32:9
307:17 308:11,15
308:19 309:2,4,7
309:10,11,14,16
309:23 313:9
337:21
**responsibilities**
81:22 266:5
**responsibility**
69:16 103:10
174:12,17 175:7
177:24 254:8,14
257:23 261:21,25
263:13,14 264:10
264:20,24,25
265:3,16,24 266:2
266:6,15
**responsible** 63:2
63:10 91:18 104:8
108:18 156:21
167:11 173:10
174:2,3,20 175:6
184:13 260:9
264:23 355:6,15
**responsive** 261:13
277:16 295:16
**restate** 34:11
324:13
**restricted** 60:21
**result** 78:16
109:19 183:8
193:25 318:7
338:1 356:6
369:17
**resulted** 355:9
**resulting** 98:17
**results** 33:13
48:17,17,19,23

49:1,7,10,11,12
50:25 73:20 114:6
114:12,14,22
115:9,15,19
162:20,22 255:11
297:15
**retain** 229:13,21
230:9 345:18
346:7
**retained** 30:24
31:11 53:11 229:9
230:2 231:10
347:2
**retainer** 31:2,5,7
53:16
**retired** 55:15,25
141:12
**retrieved** 278:10
**return** 361:14
**returned** 370:18
**revenue** 56:5
**revert** 277:7
**review** 38:9 39:10
39:20 45:25 48:24
48:25 49:14 52:15
94:9,14 100:18
123:15 127:13
128:6 156:18
160:1 178:23,24
179:11 184:17
210:1,7 211:14
215:1,7 216:14
220:24 225:14
226:16 233:24
234:5 236:8
238:18,22 275:12
278:18 279:11
281:17 282:19
292:9 296:12
308:16 310:11,21
310:23 321:19,19

332:10 348:23
349:20 350:5
351:19,20 352:4
352:14,20,25
360:19 370:12
371:1 372:1
**reviewed** 38:24
39:2 46:21 48:16
78:23 159:25
169:13 170:9
180:5 223:3
225:12 235:13
236:3,23 249:1
271:4,7 278:6,10
278:14 320:10
321:10 323:8,11
328:5 332:13,14
349:8 350:17,17
350:24
**reviewing** 117:2
179:3 183:22
218:18 226:15
231:4 234:9
250:13 259:5
282:18 330:11
343:8
**revoked** 311:6,11
311:16,21
**rice** 10:7,15
**rico** 3:19
**rid** 346:16
**riedman** 11:5
**right** 25:10 30:23
31:12 33:9 36:25
38:12 45:7 53:6
54:25 55:6 56:4
56:19 57:3 58:8
58:10,14,25 62:22
63:16 64:10,16
66:20 67:21 68:10
69:17,22 71:6,24

72:21 73:4 75:9
75:21 82:1 85:13
86:5 87:21 92:10
93:14,19 94:4,17
99:10,25 101:14
102:1 103:23
106:25 109:4
112:10 115:22
119:21 121:13,14
122:15 125:3
128:19,22 130:11
130:14,25 133:4
133:16 134:23
135:18 136:1,16
137:14 140:1
142:21,23 144:1
145:1 146:18
148:8,10,19
149:15 156:12
162:12 165:3,22
165:23 166:10
168:3 169:22
170:11,12,14,19
171:17 173:1,11
173:19 174:22
176:4,11 180:8,12
180:19,22 181:5
182:1,11 184:19
185:14 186:9
188:17 189:20
190:25 191:16
194:15 195:3,15
196:15 197:11,23
199:18 200:21
203:19 204:13,19
205:15 206:21
207:16,24 208:17
208:23 211:20
212:3,5,19 213:7
214:17 215:5,10
215:18 216:9

218:3,23 219:12
219:13 227:9
228:9,16 232:4
233:4,10 234:2,8
234:23 235:25
236:7,24 239:15
239:19 240:17
243:24 244:25
248:1 253:21
256:12 257:5,8,11
257:20 258:4
264:3 265:1 268:4
272:11 273:9
283:15,24 284:9
284:23 289:21
290:24 292:8,14
293:5,12 294:20
296:3 302:7
305:12 306:13
313:12 314:3,23
315:6,17 316:9
319:6 324:11
327:21 329:24
332:2 335:19
344:25 347:21
350:13 362:5,7,12
362:23 364:9,19
364:24 365:21
366:18
**rights** 160:18
360:11
**rigid** 232:18,20
233:4,10,12
**ring** 127:18
**rite** 8:4,4,5,7 18:1
18:4,7,9,12,13,16
18:17,20,21,24
19:1,5,8,9,12,13
19:16,17,20,21,24
20:1,5,8,9,12,13
20:15,16,17,20,21

21:6 25:15 50:21
51:21 52:10 53:2
157:8 158:1 167:9
245:14,23 246:1,4
246:5,6,21 247:13
248:8,22 249:15
250:12 251:6,13
252:2 253:19,20
253:21 254:1,8
255:1,23 256:9,20
256:24 257:2,3,24
257:25 258:24
259:7 266:20,25
267:2 268:23
270:17,19 271:6
273:2 274:8 276:3
276:9,10 279:11
280:9 283:14
284:12,21,25
285:25 286:15,25
287:10,17,25
288:5,11,14,17,19
288:24 289:4,9,14
291:7 292:6,13,21
293:11,16 295:23
297:18 298:9
299:18,21 300:18
300:22,24 301:2,3
301:13,15,19,21
**riteaid** 294:21
**riteaid.com** 18:6
**road** 2:9 11:20
82:15 181:5,17
185:22 186:3,10
187:5,10,16 188:5
188:20 195:21
196:17
**role** 28:23,24 29:2
67:19 93:5 217:13
**roman** 297:14

[room - searched]                                                    Page 56

**room** 24:12 119:1
  361:1
**rose** 66:5
**roseland** 11:21
**ross** 9:8
**roughly** 53:17
  54:14 57:15 85:17
  121:2 126:14
  177:9 189:21
**round** 171:21
  181:19
**rounded** 182:7
**routine** 211:17,23
**ruiz** 7:7 13:9 339:5
  339:8 343:2
  344:11 347:19
  348:3,4,7 351:11
  353:6 357:12
  358:3,5
**rule** 84:12 260:25
**rules** 23:6 24:22
  27:8 165:20
  269:12 371:5
  372:5
**ruling** 66:6 71:2
**run** 29:12 30:2
  83:10,14 84:22
  96:17 165:17
  274:25 275:12
  279:10 330:21
  331:2
**running** 49:12,21
  54:23 83:21
  340:13
**runs** 329:21
**rush** 155:19
**rx** 7:5

**s**

**s** 2:1 3:1 4:1 5:1
  6:1 7:1 8:1 9:1
  10:1 11:1 22:1

68:25 302:17
  370:15 372:8,8
  373:3
**safe** 156:4,5
  363:12
**safescript** 122:15
  124:23 135:20
  136:1 138:12,20
  140:1 356:6
**salary** 53:21
**sales** 145:15
**salesperson** 40:14
**sam** 4:8
**san** 3:19
**save** 348:5
**saw** 43:19 143:13
  155:18 206:11
  272:8 301:12
  328:16 329:2,6
  349:11
**saying** 36:14,15
  38:24 52:19 62:12
  80:8 81:16 89:8
  89:11 101:1 102:9
  102:16 103:4
  104:10 110:8
  111:1,15,15
  126:14 130:4
  134:11 135:1,5
  137:18,19 145:17
  152:11,22 175:5
  175:17 186:20
  189:9 193:4
  213:20 222:15
  224:5 241:17
  243:23 244:15
  254:3 256:8 257:2
  259:3,25 264:16
  265:13 271:18
  279:2 282:9
  290:20 295:8

315:24 321:7,9
  324:1,4,19 331:22
  332:4 333:7
  350:12 351:1
  362:20 363:8
  367:24
**says** 31:19 87:10
  87:18 88:3,5,15
  90:13,17 131:7
  137:21 139:3
  144:17 146:20
  147:13 148:16
  168:16 190:13,15
  190:18 191:15
  192:3,8,21 193:25
  195:16 198:2,25
  200:3 201:2
  206:24 207:19
  208:3,7 215:13
  216:23 231:11
  245:23 255:10
  256:1,3 270:19
  274:21 277:24
  285:10 286:10
  287:4 291:5
  294:16,21 295:15
  296:24 298:7
  299:21 307:16
  341:11,19 350:3
  351:18 352:3
**scale** 316:7,18,18
**scanned** 338:14
**scatter** 303:22
**scenario** 279:9
**schedule** 38:13,16
  38:20 101:3,16
  139:12 159:24
  228:17,18,18
  251:13,19,22,23
  252:15,17,18,20
  252:23 253:1,3,4,5

253:6,7,11,22
  254:10 307:8,12
  307:25 321:22
  334:21 343:22
  349:16,19 359:20
**schedules** 32:15
**schein** 9:4
**scope** 138:25
  158:1 216:19
**scott** 6:6 24:7
  45:14,14 80:16
  358:2 367:15
  368:3
**screen** 168:7,12,15
  176:25 185:1,9
  186:24 187:3
  190:13 196:24
  214:18 221:12
  308:1
**screens** 176:13
  185:3
**script** 156:4
**script's** 156:5
**scripts** 43:2,7
  95:12 97:10
  107:25 108:5,10
  108:10 135:10
  139:6 140:7,14
  157:4,6
**scroll** 171:10
  181:21 197:6
  200:11 202:21
  219:14
**scrutiny** 151:19
  153:5
**seal** 371:15 372:21
**search** 40:22
  60:19 280:1 294:1
  333:6
**searched** 293:19
  333:1

**searches** 37:23,25
38:1 293:24 333:4
**searching** 293:20
**sec** 214:6
**second** 61:4 102:2
139:2 143:13
163:4,21 165:10
166:2 168:8
184:21 197:6
203:11,12 231:16
253:25 283:21
290:10 293:1
294:10 314:4
321:1 350:3
352:18
**secondary** 38:1
260:14
**secret** 53:23
**section** 40:10
42:10 79:24 86:10
192:17 212:16
235:15 237:18
238:14 245:22
255:7,16 256:1,18
283:23 284:3
286:9,9 298:3,6
336:16
**sections** 41:1
87:23 88:16 293:4
**security** 55:19,23
56:5 67:24 68:4
68:12,16,20 69:14
87:22 88:19,19
**see** 31:18 37:2
51:12,14,18 57:22
64:18,25 80:15
86:10 88:21 94:10
99:14 107:1,7
109:25 115:4,7,23
119:11 123:4
133:11,13,14

134:10,19 136:4,8
136:10,22 138:3
139:1,1,17 140:6
141:17 146:22
147:19 149:2,6,9
151:10 152:2,3
153:13 154:1
155:4,8,9 161:2
164:13,17 168:7
168:12 169:24
170:2,11,13
171:10 172:14,15
176:7 177:2
180:19,25 181:10
181:14 184:25
185:8,11,20,24,25
186:8,22,22,23,25
187:3,9,11,14,18
187:21 188:8
190:7,10,13,16,21
191:8,14,15,23
192:1,5,6 193:1
195:2,8,13 196:23
197:1,4,7,8,12
198:20,23 199:9
199:15,17,21,25
200:15,22 201:6,9
202:18,19,21,25
208:3,5,9 212:20
214:18 216:12
217:5,15,16
221:25 222:4
232:14 237:10
245:23 246:11
250:3 252:6 255:1
255:8,14 256:1,5
259:5 260:22
270:17,22 271:10
271:12,20,22
274:4,5,9,13,16,18
275:2,8,14,16

276:1,1,13,20
277:23 278:1,19
279:7,8 280:14
281:10,12 282:1
283:22,24 284:7
284:10 287:1,7,14
287:21,24 288:7
288:10,17,22
289:2,7,12 290:1,5
290:8,20,22 291:8
291:15,16,17,23
291:25 292:5,11
292:20 293:10
294:13,18,22
296:11,14,17
297:2,16 298:4,9
298:14 299:12,13
299:19,24 300:11
301:1,13 307:20
309:13 314:3
316:25 318:21
324:20 328:6
330:2 331:20
332:7 333:9 334:9
334:16 338:10
341:10 344:18
345:13 346:8
350:7 351:21
352:2,5,19,22
353:20,21 361:25
363:4,15
**seeing** 127:4 151:2
152:25 169:1
176:12,15 183:22
191:5 227:10
228:4 233:22
272:10 292:23
294:6 295:20
297:22 301:4
313:3,9 320:22
321:2 322:16,20

327:23 348:21
349:8
**seek** 82:12
**seen** 120:7 168:14
169:18 190:23
196:4 197:15,18
233:3,8 260:5,17
275:17,20 292:2
297:20 298:18
301:14,19 322:24
323:24 324:3
362:18
**self** 26:18 101:18
101:19,21 104:5
148:4
**send** 275:13
291:20 304:21
338:16,17 364:7
**senior** 274:7 276:8
**sensabaugh** 5:7
**sense** 42:3 54:16
58:23 78:13 191:6
200:17 244:13
290:7 336:9
**sent** 151:9 272:21
358:7 360:20
362:20,21
**sentence** 87:18
184:4,5 192:16
193:24 194:21
208:3 255:10
271:2 300:2,3,5,10
350:3 351:12,17
**sentences** 350:2
**separate** 31:7
161:23 246:20,21
247:18
**separately** 308:18
308:19
**september** 289:12
329:21

sequence  296:7
series  169:24
  198:23 199:2
  303:20 304:25
  306:18 312:23,24
serve  60:13
served  307:17
  308:11 309:2,7,11
  309:14
server  278:20
  279:1
servers  279:13
service  6:5 12:5
  51:21 126:12
services  7:5 58:16
set  87:22 88:16
  93:3 269:20 270:7
  306:9 360:17
setting  93:6
settlements  336:2
  336:7
seven  62:5 84:20
  113:3 114:25
  185:23 205:8,18
  229:11 230:4
  319:1,6,9,17,22
  343:25 346:6
  358:8 359:11,25
  364:21
seventy  58:7
  172:21 176:8
  177:15
severe  346:19
shape  43:12
shapira  6:11 12:9
shapira.com  6:16
  6:17,18,19 12:14
share  15:9 134:20
  136:4,6,8,14
  137:10,11 168:6,7
  173:4,9 220:17

221:12 297:1
  354:11,20,24
sharp  29:11 50:8
  314:20
sheet  304:5 370:13
  372:7,10,18 373:1
sheets  304:6
sherrill  329:7,9
shift  62:9 153:21
ship  183:19
shipments  16:24
  17:6 162:18
  164:21 167:1
  168:16 170:3,3
  183:17 184:1,7
  187:4 229:10
  355:7,15,17
shipped  162:11
  166:11 183:11
  211:1 321:13
  341:19,22,24
  342:15 346:2
shipping  328:19
shoppe  172:14
short  68:25 140:10
  275:24 277:7
  286:21
shortcoming
  218:17
shortly  28:10
shot  303:22
shout  298:7
show  66:5 72:20
  78:20 80:13 155:9
  162:24 167:25
  169:12 184:19
  186:23 191:18
  195:13 196:18
  212:19 213:6
  214:5 217:2,8,18
  219:12 286:18

295:18 347:4
showed  121:22
  358:15
showing  190:7
  213:3 215:10
shown  192:8 350:6
  370:16
shows  50:8 90:8
  120:12 165:17
  169:11 170:3
  195:5 201:7
  202:15 204:20
  314:1
shut  42:25 44:22
  45:5 108:4 151:9
sic  331:12 334:4
side  83:9 146:10
  147:1 170:12
  197:11 240:7
  273:19 363:18,19
sign  215:4
signature  291:15
  369:22 370:14
signed  31:5 53:15
  99:22 362:20
  371:13 372:18
significant  65:12
  105:15 120:12
  121:3 202:2
  225:11 242:20
  335:6,9 346:21
significantly  209:7
signing  370:19
signs  145:4
similar  32:9 83:24
  99:4 100:8 119:11
  131:3 169:20
  170:10 171:8
  186:16 260:8
  286:19 287:12,19
  314:25 315:2

316:25 356:14
similarly  292:11
  354:23
simple  53:1 109:5
  224:17 307:12
  332:21
simpler  80:2 111:9
simply  336:21
simultaneously
  106:14
sincerely  370:21
single  43:6 221:25
  333:9
singular  246:2
sir  25:21 26:1 27:5
  27:14,19,23 28:4
  30:6,14,18,21 32:6
  32:12 34:4,24
  35:23 36:8 38:7
  38:22 41:18 43:4
  43:8,17,22 44:3,6
  44:24 47:4,8,13
  48:15 50:3,14,18
  50:22 53:5,9,20
  58:19 59:15,19
  60:5 62:16,24
  66:13,23 67:6
  68:21 71:23 75:15
  79:13 87:1 88:5,9
  88:22 90:12 93:8
  94:6,20 98:11
  100:12 101:9
  104:14,16,16,17
  107:8 112:14
  113:14,20 117:7
  118:6 119:13,19
  121:20,21 122:13
  123:21 124:22
  130:23 135:8,18
  138:10,13 139:3
  139:18,23 140:4

140:11 143:21
146:7,12 156:8,23
160:2 161:2
162:15,21 163:6
166:8,14 167:16
167:19 168:12
169:25 170:22
172:8,14 173:1,6
173:16 176:11
180:3,12 182:16
185:20 194:15
195:15 196:24
207:7,16 208:18
208:23 209:5
218:23 222:8,21
226:8,24 227:9,21
228:9,22 229:22
231:7 233:7
235:25 236:24
237:6 238:19
239:15,19 240:3
259:12 262:8
285:20 290:4,18
339:13 340:5,10
341:14 342:16
343:6 345:15
347:22 348:5,13
350:11 351:15
354:8 370:10
**sit**  173:17 239:11
346:24
**site**  72:25 73:4
75:6 77:13,15
142:14 213:14
216:8 346:23,24
**sitting**  76:22
104:25 173:24
225:22 226:19
243:24 267:13
302:4,6

**situation**  67:9
118:6 148:4,10
**situations**  71:16
81:3 257:7
**six**  42:15,16,21
51:19 63:7,13
64:5,6 66:20
140:8 164:25
165:7 166:6,12
172:21 176:8
177:15 180:18
181:7,24 182:1,3
187:23 188:6,24
200:23 202:16
206:25 256:2
314:8 346:5,15
**sixteen**  137:9
140:7,8 201:3
**sixty**  85:18 187:16
187:23 188:5,22
188:24 189:1,3,21
195:6 256:2
**size**  90:15,20
112:16,24 189:6
323:14 331:15
333:11
**skills**  144:18
**skip**  88:14 139:15
153:11 191:17
342:17
**slcg**  168:15,20
169:2,11
**slew**  291:10
**slight**  105:14,16
**slightly**  121:13
294:4
**slow**  273:25 283:6
**small**  153:14
176:23
**smallest**  170:13

**social**  55:19,23
56:5
**soft**  101:6
**sold**  26:5
**solely**  251:7
**solids**  136:7
**solutions**  11:8
370:1 373:1
**som**  69:2,9,25 70:5
70:23 71:11,18,20
72:1,5,9 80:13
88:10 90:11
100:11,14 102:10
102:11 107:3
112:8,16 158:17
185:22 186:3,10
187:5,9,15 188:4
188:20 195:21
196:17 232:25
299:22
**somebody**  61:19
84:22 130:5
144:15 168:2
210:15 324:4
325:19 338:9,9
**someplace**  338:16
**somewhat**  35:8
**soms**  69:1 70:25
102:23,24 103:6
110:23 305:25
318:5 320:8
323:17 332:17
340:2 344:3,6,14
**soon**  232:8
**sooner**  176:25
**sorry**  38:19 56:10
56:15 73:14 86:20
86:22 94:7,21
95:3 118:24
119:20 123:22
129:16 141:18

144:3 150:21
161:8 168:23
170:20 177:17
184:5 186:12
188:2,2 207:10
208:2 209:12
228:21 251:17
253:13 256:14
259:7 260:20
269:8 271:3 281:4
282:23 284:2
285:19 286:6,7
291:3 307:22,23
308:8 311:4
315:18 324:14
327:13,21 329:17
334:13 336:13
342:25 345:10
351:22,24 356:24
358:2,11
**sort**  60:13 74:21
79:3 107:4 118:14
128:1 138:14
145:20 157:15,15
184:3 255:5 276:9
296:6 304:12
316:6,24 361:13
**sorted**  299:10
**sorts**  112:11
**sought**  29:1
**sound**  58:8 170:19
228:15 283:15
292:8,14 293:12
362:12
**sounds**  81:10
131:17 144:20
289:22
**source**  38:6 93:19
**south**  4:19 10:9,17
181:10,13 205:5

southern 197:3 198:21 202:22
spaeder 7:9
sparked 100:1
speak 37:10 70:20 119:6 147:8 189:17 213:22 215:22 243:9 281:11 307:2 362:22,22
speaker 247:4
speaking 46:18 48:22 56:16 57:16 57:18 68:6 71:15 71:22 75:19 83:17 85:24 97:16 107:17 118:16 129:7 132:23 142:15 145:21 148:6 149:24 150:13 153:15 162:13 193:8 205:23 211:22 217:4 224:13 236:14 243:5 269:25 310:24 320:21 322:9
speaks 327:7
special 9:16 60:9 60:12,18,25 61:5 61:20,22 62:3,13 66:14,17 118:21 118:24 119:9 126:9 262:16,20 263:5 364:12,23 366:2,14,18 367:1 367:6,8 368:1,4
specialmaster.law 9:21
specialty 126:8

specific 36:18 40:3 40:4,22,22 42:14 72:4 75:7 84:24 85:22 93:7 96:11 96:12 100:9 108:20 121:18 139:10 140:16 153:24 156:16 170:24 178:24 179:19 183:24 189:6 204:2 205:3 205:3 207:3 208:12,13 210:8 213:19 214:2 215:6,15,22 233:23 239:21 240:1,1,10,11,14 241:11,25 242:4 252:7 265:5 269:12 276:12 279:6,18 282:9,21 283:4 284:25 285:6 295:2,5 297:10 303:2 305:5,20,22 312:11,15 313:15 314:16 316:14 318:17 319:21 320:12,15 336:11 336:11 342:20 343:15 346:17 347:10 349:13 356:9
specifically 43:15 61:5 70:11,16 72:9 80:25 85:11 102:22 107:6 114:3 135:19 156:7 162:2 168:19 169:1 197:19 216:22

226:16 231:9,11 233:1,18 243:7,21 244:3,6 246:9 250:15 258:10 264:15 266:12,14 267:16 268:17,20 269:2 270:7 271:9 271:13 272:10 275:19 281:19 283:17 293:7 295:9 298:20 301:2,3,4,20 307:15 320:6,8 327:8 333:12 343:11 344:6 348:24
specifics 315:7
speculate 131:23
speculation 34:2
spend 59:9
spent 62:8 63:17 150:24 241:5,16 241:21,24 242:13 242:23 243:5 244:3,22 340:8,11 340:12
spoke 243:12,14 282:22
spoken 176:25 340:22 341:4
spot 350:4,10,13 350:19 351:2,3
squad 61:15
squads 61:11,18
stakes 33:3,10
stamp 294:22
stamped 197:10
stand 272:22
standalone 26:24 35:15

standard 117:6 128:2 131:10
standards 34:7,8 34:16 35:19,25 36:7,11,15 37:3 88:16 127:3 260:23 299:24
standing 121:24
standpoint 98:3
stands 37:15 112:20 166:1 294:21
start 29:16 55:8,8 73:18 125:21 126:16 132:5 133:23 140:22 179:3 263:6,8 281:10 285:23 290:6 318:25 359:15 360:3 361:17 362:5 363:21,22 365:10 365:14
started 28:13 40:13 65:24 72:5 101:3,19,21 129:21,21,22 141:12 152:20 315:6 317:14 321:22,23 322:18 330:11 340:19
starting 102:15 104:20 120:13 128:11 200:12 217:19 221:19 255:7 277:15 284:7 318:11 359:19 360:17 363:18 364:3
starts 166:25 199:10 245:23

270:17 277:22
283:23 284:4,8
293:4 297:14
299:18 329:20
349:24
**state** 23:4 28:6
31:3,4 53:23
127:2 131:6
145:19 196:10
200:5 202:11
237:7 310:6
345:22 346:25
369:4,23 371:10
372:15
**stated** 49:14 100:3
146:16 157:12
174:25 329:1
**statement** 26:10
27:4 34:20,24
35:12 36:5,8
41:17,25 43:23
44:3 45:11 46:11
47:9 48:3 50:4
53:14 60:15 64:25
65:7 66:18 67:5
67:12 69:21 77:5
90:24 92:9,16
95:22 96:21 98:6
98:21,22 109:3
120:23 135:5
138:17 146:7
150:1 158:11
162:1,8,16 165:2
173:14 176:3
178:8 179:8 180:7
182:25 183:6
184:10 199:7
201:18 202:13
210:9 211:6 214:1
218:12,16 223:12
226:22 234:15,22

239:13 240:15
264:17 265:21
269:16 272:19
277:17 282:12
292:18 293:14
310:14 311:8
319:4 324:25
328:15,23 329:5
332:16 345:15
347:16 348:13
359:17 360:13
371:13,14 372:19
372:19
**states** 1:1 23:7
25:24 66:1 194:23
202:5,7 206:4
**status** 99:14 204:6
**statutes** 258:2
**statutory** 258:1
259:2
**stay** 276:16
**stayed** 62:11
121:13
**staying** 362:23
**steep** 314:2
**stenographic**
23:22
**stenotypy** 369:9
**step** 54:12 78:5,14
258:7
**steps** 77:3 79:3,10
**steve** 237:10
**stick** 40:9
**stipulated** 22:2
**stipulation** 23:8
**stop** 360:12
**stopped** 101:12
104:5 228:12
230:4 252:2
283:14,14 284:13
343:20 345:20

346:5
**stopping** 232:7
240:19 359:23
**store** 196:17 267:2
268:8 270:17,19
270:21 274:23
275:6 281:2
**stores** 7:6 43:11
98:2 207:7 272:14
274:22 275:1,5
280:24 281:9
335:3
**story** 227:14
**straightened**
283:20
**stray** 179:20,21
**stream** 11:11,14
12:1,6
**streamline** 32:2
**street** 4:19 5:8
7:10,22 8:12 97:2
157:9 158:8
171:17 181:10
192:12
**strength** 133:20
140:17 154:21
337:14
**strengths** 135:15
148:24 149:13
**strickland** 190:19
190:21 191:9
**strictly** 137:19
**strike** 188:2
223:15 253:24
259:13 261:12
277:15 317:16
325:8 326:14
332:19 359:22
**string** 16:11 20:14
**strong** 170:21

**struggling** 117:21
**studied** 39:5
**stuff** 93:12 362:24
**style** 283:10
**subheading** 192:3
**subject** 127:16
274:11 294:17
296:12 338:8
**submit** 357:4
**submitted** 15:20
37:11 173:25
194:7 233:19
357:8
**submitting** 233:21
**subpoena** 216:14
**subpoenas** 60:13
**subscribed** 371:10
372:14 373:21
**subsequent** 188:9
200:10
**substance** 27:6
67:2 86:11 94:12
325:24 326:17
335:2
**substances** 13:19
64:24 67:11,16
69:11 87:13 91:19
97:8 124:1 125:6
126:4 132:18
161:24 177:22
192:5 194:7,10
199:3 200:4
229:17 247:22
258:9 261:20
282:2 310:2 327:2
334:22
**substantial** 33:18
33:20 88:15,23,25
89:1,2,7,9,17,19
89:22,25 90:6,7
107:4,11

**substantially**
52:12 53:3 116:15
118:7 149:18
159:13 340:3
**substantive**
367:18
**suburbs** 62:25
**successful** 297:1
**sued** 246:4
**suffice** 278:8
279:3
**sufficient** 88:17
266:3,3 269:22,22
270:10 271:12,17
271:19,22 313:18
319:10 320:19,22
320:25 326:6
327:16 344:17,18
**suggest** 68:11
122:2 157:17
158:24 159:2
319:16 364:1
**suggested** 124:20
125:8
**suggesting** 36:10
111:10 147:17
**suggestion** 364:17
365:6 366:17
**suggestions** 328:2
**suggests** 103:14
121:24 137:1
**suite** 3:18 4:9 5:18
7:11 9:9,18 12:20
370:2
**sum** 241:4
**summaries** 38:11
**summarize** 38:8
**summarized** 200:5
**summary** 298:4
**summit** 53:4
167:15

**superior** 370:1
**superiors** 77:3
**superseding** 17:13
197:7,16 198:1,21
202:15,22 207:18
**supervision**
369:10
**supervisor** 59:22
60:4 137:13
143:12
**supplement** 37:15
**supplied** 147:18
**suppliers** 147:14
**support** 8:6
**supporters** 256:11
**supporting** 238:14
**supposed** 71:25
88:3 90:19 96:2
110:11 111:12,21
112:11 189:17
308:22
**supposedly** 107:2
**sure** 32:18,19,25
33:8 34:19 38:23
44:10 55:2 61:11
67:9,25 71:11,14
71:17 72:13 73:9
74:1 76:16 82:22
87:3,7 90:3
104:25 119:3
123:1 126:13
143:21 152:6
162:25 163:22,24
181:22 190:7,25
206:6 215:2 225:9
226:14 236:12
246:8 252:10
253:10 256:18
261:1,6 265:12
267:20 268:11
269:9 270:5

276:16 279:16,25
280:19 282:25
290:25 293:2
297:12,22 298:1
298:19 302:15
304:23 309:9,15
310:22 313:8
315:15,16 322:4
325:21 326:8
328:14 329:4,9
333:21,25 339:13
347:2 348:17
354:4 356:3
360:17 361:4
364:6 367:11
**surgery** 342:5
**surprise** 204:24
**surprising** 94:25
**surrounding**
145:13 353:11,15
**surveillance** 60:13
60:20
**suspected** 46:7
**suspicious** 46:15
48:9 68:18 90:14
97:18 113:13,23
114:4 116:16
117:8 161:17,19
162:7 165:20
166:14 175:2
178:25 194:2
222:1 227:7 228:8
232:15 233:16,25
234:12,19 251:2,8
251:10 256:24
257:10,18,21
258:3 269:5,13,21
270:9 276:4
282:10 286:1,10
287:5 290:21
291:6,21 292:7,13

292:22 293:6,11
293:17,20 294:3
295:3,12,13 319:2
319:10 335:13
345:7 352:21
**swear** 23:23
**swift** 7:18 13:6
160:22,23 161:4,6
161:10,13 163:4,5
163:8,9,12,20
164:6,9 166:4,16
168:1,11 174:18
175:20 176:4,16
176:19,21 177:2,6
177:14 178:10
179:21 180:8
183:1 184:6,25
185:4,5,6 186:7
188:17,18 189:12
189:16,20 190:3,6
190:22 196:6,15
196:22,23 205:6
205:12,25 206:21
207:9,11 211:15
213:1,4,9 214:10
214:17 218:19
219:2,15,24
220:15,20 221:6,8
221:13,19 222:20
223:13 224:12,16
225:4,18 226:18
226:25 228:6
230:11,18 231:18
232:8,14 233:2
234:7,16,23
235:13 236:13,18
236:19,21 237:23
238:5,13,21
240:11,12,20,24
241:17 242:12,17
242:25 243:2,4

244:24 306:18
358:17,21 359:9
361:17,25 362:6
362:13,19 363:5
364:10 366:12,23
367:2,7,14,20
368:3,6
**switch**  59:12
**switching**  82:20
309:24
**sworn**  24:2 371:10
371:13 372:14,18
373:21
**system**  46:16
71:12,18,20 72:1,5
72:9 80:13 81:4,5
81:8 88:19,20
90:14,19 97:18
103:6 112:21
113:10,10 114:5
175:2 178:25
194:8,11 227:7
232:25 251:11
257:21 269:6,21
276:4 299:22
319:21 321:6,23
322:2,19 323:4,7
326:5 327:9,12,15
331:14 333:10
334:9 340:2 344:3
**systematic**  344:20
**systemic**  107:4
281:20
**systems**  46:22,23
47:17 48:9 67:24
67:25 70:23 79:17
107:3 161:19
320:16 322:5

**t**

**t**  22:1,1 369:1,1
**tab**  86:13,16 273:1
285:21 286:14
287:2,9,16,23
288:3,9,21 289:2,6
289:11,19 291:5
294:11 295:22
**tablets**  134:7
139:20 140:2
153:18
**tactical**  61:10,14
**tail**  102:15
**take**  33:21,23
47:20 49:6 52:17
78:1 80:11 82:20
84:20 96:18 98:1
112:11 117:14
118:12 120:25
145:12 155:19
160:3 195:10
204:17 215:12
220:22 223:5
225:2,11 252:3
254:16 259:19
270:14 272:20
281:2 283:19
285:8 286:14,21
294:8 296:1 298:3
299:14 308:1
322:11 340:18
357:13 365:1,3,8,9
**taken**  22:5 79:10
230:21 264:8
317:12 356:7
369:8
**takes**  170:25
**talk**  24:19 53:6,21
69:7 147:19
153:10 163:21
212:23 213:15,19

215:13,24 226:10
231:25 246:8
247:4 262:11
267:12 268:22
280:8 300:7 301:8
314:4 338:20
342:18 343:10
358:24
**talked**  85:9 107:19
133:21 165:11
172:12 176:4
186:17 226:16
236:24 247:10
257:5 267:1
268:16 276:17
306:22 340:25
356:5
**talking**  37:5 46:24
81:3,7 85:5 97:17
102:22 124:6
126:11 127:1
130:1 148:2
150:25 153:17
180:12 192:17
203:19 208:9
210:14 228:23
229:23 235:14
247:3 250:21
254:22,23 260:24
265:12 266:13,20
274:14,16 276:10
286:25 296:20
309:19,20 322:1
330:25
**talks**  220:2 232:24
336:10
**tapentadol**  253:7
**tara**  5:14 303:18
**targeting**  337:17
**task**  17:9,10 61:22
62:6 190:14,15,17

191:7,10
**taught**  66:15
67:23
**team**  130:25
362:20 364:6
**ted**  190:19
**telephone**  243:13
278:7
**tell**  54:17 76:18,23
77:1 80:9 81:6
95:25 157:7 161:6
168:11 185:7
204:19 227:15
241:20 242:3
249:2 254:20
258:10 267:8
269:3
**telling**  65:2 82:1,6
84:16 149:4,16
159:11 326:11
**tells**  81:4 131:8
208:2 354:3
**temporary**  277:5
**ten**  36:3 85:18
89:16,16 95:14,17
152:19 160:8
181:15 219:25
340:15
**tend**  150:1
**tended**  135:14
**tenfold**  140:9
**tennessee**  208:4
**term**  37:21 98:25
192:23 193:1
233:12 320:1,5,7
**terminology**
155:18 320:13,15
**terms**  55:20 77:7
83:17 94:11
111:16 188:19
193:13 281:4

283:11

test 83:20

testified 24:3
30:10,20 48:2
55:3 63:9 74:6,9
120:5 127:15
128:1 133:25
156:25 157:6
158:14 161:16
211:19 214:22
218:20,21 220:10
226:4 228:6 231:8
261:15,19,25
264:7 269:3,10
324:8 339:14
345:17 347:6

testify 28:10 55:6
57:4 65:21 110:7
221:22 324:20
325:11 360:10

testifying 28:12,14
223:19 226:3
263:9,11

testimony 1:17
21:12 27:24 29:10
30:2,3,6,8,24 31:8
31:25 32:5 46:14
46:19 53:12 63:25
64:10 127:11,13
127:21 129:1,4
130:1,20 131:5
134:15 135:21
156:19,22 157:10
158:22 161:21
212:8,20 213:3,8
214:6 215:16
217:19 219:17,22
220:10,12 221:3
222:9,19,22
224:14 235:10
243:16 261:19,22

262:10 306:24
323:15,23 324:11
328:1 333:16
334:24 361:10
371:6,7 372:6,9,12

texas 4:10 9:10

tfumerton 5:21
338:19

thank 75:3 101:10
136:21 155:22
160:5 176:17
177:4 185:6
248:20 264:21
273:17 274:3
283:10 292:19
296:8 309:24
331:19 348:5
362:13 366:16
367:7,9 368:3

thanks 24:22
244:25 273:7
364:9,10 368:5

theft 87:12 108:9
110:13

theoretical 342:2

theory 260:5

thereto 22:14
369:9

thing 41:7 49:4
55:21 60:14 125:7
139:4 145:10,20
146:19 157:15
166:21 186:23
212:13 240:21
265:14 277:11
361:21 362:15
364:1

things 59:9 60:21
66:8 71:10 73:6,8
73:17,23 75:7
88:8 90:24 108:15

112:11 122:1,22
124:20 143:23
174:10 257:20
271:15 302:12
312:10 325:3
331:7 345:3 352:5
352:10,18 360:16

think 34:20,22
35:4,6,8,13,16
42:11,16 44:11,19
46:19 47:3 48:22
53:14,22 54:12
58:10 61:9 63:14
63:14 65:7,19
66:3,7 71:1 73:21
74:10 79:21 80:3
80:19,20,21 84:4,7
84:15,25 85:24
89:7,12,22,25 90:7
90:8 91:5,12
92:23,24,25 93:10
96:12 97:7 99:22
99:23 102:14
103:8,9,10,18,20
105:24 109:5
110:25 111:4
112:1,23 113:21
115:20 116:5,9
117:16,20 119:5,6
121:23 124:8,23
125:5 127:11
129:21,22,25
131:12,18,21
132:8,20 134:3,4
134:13 137:22
141:12 142:1
143:7,8 149:23
152:5 154:21
159:11 160:3
165:5,13 170:6,7
170:17 176:1,14

180:16 181:24
183:22 192:20
201:13 203:10,11
206:1,2 211:18
213:21 214:1
220:3 225:15
228:20 230:9,22
231:2,3,8,11
232:24 233:5
241:8,8,10,13,22
241:23 242:8
244:20 247:10
248:22 249:5,25
252:12 253:24
254:1,7,19 257:5
258:12,14,21
259:23 262:22,24
264:3,7 265:5,6,11
265:13 266:4,9,11
267:9 269:10,24
270:3 276:25
277:4 278:15
281:8,9 292:17
293:24 297:9
299:9 302:9 303:3
307:5 309:15
312:8 313:13,14
314:7,17,19,20,24
316:1,3,12 317:9
317:18 318:2,7,8,9
318:11,17,18,20
318:24 319:15
321:20 323:18
325:18 327:7
329:5,7,9,14,15
330:6 332:16
333:19 336:9
337:7,21,21,23
338:1 340:15
344:13,15,17
346:6,12,17,20

347:12 350:15
351:7,8 354:14
357:12 360:6
364:17,18
**thinking** 64:9,11
302:22 318:5
356:4
**thinks** 74:14
**third** 26:20,23
118:19 172:13
**thirteen** 42:17,20
60:3 64:20 131:14
201:5
**thirtieth** 244:11
**thirty** 58:11 62:5
65:15 74:6 77:25
134:7 153:22
175:5 181:14,18
181:20 182:8
244:4,7,9,12,23
316:1 329:20
346:2,4,15 347:1
370:18
**this's** 358:25
**thorough** 72:25
73:1 144:19
217:21
**thought** 62:9 63:9
67:16 83:16
103:23 133:21
150:22 176:24
256:14 285:5
307:23 359:12
360:1
**thousand** 54:8
55:7 57:16 58:7
116:1,7 140:8,8,21
148:22 149:7,17
151:12 152:7,8,13
152:19,24 153:14
187:11,16,23

188:5,22 189:21
195:7,23 200:23
201:4 202:16
206:12 256:2
268:23 270:20
271:8 272:6,13
274:18 276:12
316:2,3
**thousands** 27:2,3
65:25 332:8,9,9,10
332:11,11
**three** 1:12 33:2,17
39:3,16 51:2
52:13 66:21
107:20 117:15,17
148:21 158:14
172:1,5,24 175:5
182:21 187:10,16
187:22 188:5,21
188:23 189:1,2,21
195:7,22 196:2
201:4 206:12
221:24 224:18
225:2,10,15,19
226:20 235:1
242:22 289:23
316:2 340:11,12
340:19,21 349:1
365:1,3,16
**threshold** 48:8
51:20 113:10
268:24 270:21
271:8 272:1,6,14
272:16 275:12
276:11,13 277:25
278:24 320:23
**thresholds** 259:10
320:21
**throw** 363:12
**throwing** 320:25

**tie** 318:16
**till** 189:10
**time** 22:12,13
23:17 26:3 29:13
46:20,21 52:18
58:21,24 59:2,5,9
61:8 62:8,17
63:18 76:17 77:23
82:24 83:3 86:3
100:13,21,24
104:20 105:4
113:23 120:12,19
121:3,12,14 126:1
128:4 129:5,6
131:20,24,25
132:3 135:14
140:10 142:11,13
143:19 145:12
152:7 153:19,25
154:5,10,17 160:6
160:11,19 163:25
164:4,21 180:11
182:4 185:17,24
187:24 189:25
191:19 194:9
195:10 198:9,11
198:18 200:14,16
200:17,24 201:5
202:10,18 205:5
206:5 209:15
218:15 219:17,23
220:23,23 226:20
230:3 231:10
235:23 238:20
239:10 241:4,16
241:20,21,25
242:13,23 243:1,5
244:3,22 245:2,6
249:23 251:23
255:6 262:22
264:4 269:7

275:24 277:6
285:2 286:20
287:20 297:7
302:3 303:3,7,12
308:2 310:12
314:25 318:6
322:2 323:11
326:7 330:20
333:24 334:16
338:8,23 339:3
340:8,10,14
346:21 348:5
357:18,23 358:22
359:3,8,24 360:5
360:18 361:14,17
367:12,21 368:8
**timeline** 156:16
**times** 40:9 113:1
117:15,18 128:19
139:21 196:2
205:19 206:16
218:16 228:7
238:11 269:11
284:17 285:24
310:2,7 340:24
**timing** 99:10
**tiny** 187:21
**tips** 283:9
**tired** 359:15 365:7
365:8
**title** 233:9,18,23
**titled** 31:19
**tl00000001** 14:15
**tn** 7:5 369:24
**today** 24:20 27:21
28:21 32:2,8 37:2
37:10,11,16 47:16
55:5 56:24 57:2,4
161:17 172:13
173:17,24 196:4,7
203:6 211:19

225:23 226:19
245:15 248:25
252:21 267:13
302:4 304:4
306:16 339:12
344:23 359:10,12
360:1,12 364:25
365:24
**today's** 23:16
368:7
**told** 28:12 96:2
179:15 204:9
359:9
**toledo** 63:19 64:8
**tomorrow** 262:19
359:15,19 360:3
360:18 361:15,22
362:3 364:16
365:2,15
**ton** 300:4
**tonight** 365:11,13
365:14
**top** 42:19 55:4
64:19 85:25 86:10
86:18 104:24,25
115:17 168:16,18
170:2 172:1,24
183:12 185:12
191:23 197:4
270:16 282:19
284:8 289:20
**topic** 40:22 132:21
**topics** 40:3 293:25
303:25 309:24
**total** 14:20 42:12
55:10 58:12 79:20
133:6 241:4 256:4
340:14 345:2,2
359:13
**totaled** 58:6,11

**totality** 112:25
134:3 332:25
**totally** 41:9 158:4
266:10 344:7
**totals** 148:25
353:21
**touched** 112:18
**touhy** 73:22 74:10
74:13,23 84:5,7,10
219:5 356:16
**touhys** 73:25
**track** 1:12 23:20
24:8,24 25:5 30:4
30:8,12 31:21
41:15 50:11,12,13
50:15,24 51:13
52:4,11,14,21 53:2
54:17,23 55:7,11
58:16,19 63:10,21
241:25 245:19
306:24 340:9
357:8 363:9 370:6
371:3 372:3
**tracking** 16:9
99:11 190:7
**trailer** 294:16
**trailing** 51:19
56:11 244:4,7,12
244:23
**trained** 72:23
222:3 324:10
**training** 66:12
91:20 93:4 319:19
324:7,17,20,23,24
325:1,10,11,15,16
325:17,18,21,22
**transaction** 49:13
116:22,25 331:5
**transactional**
252:5

**transactions** 48:12
51:20 52:10,13
53:2 132:13,18
200:4
**transcribed** 371:7
**transcript** 16:6
127:15 128:5
212:11 215:11
226:21 235:6
237:15 367:22,24
369:12,25 370:11
370:12 371:5,12
372:5,11,17
**transfer** 145:15
**transparent** 213:5
**travel** 273:15
**traveled** 351:20
**treat** 244:11
**treated** 36:22,24
244:10
**trees** 51:16
**trend** 317:15
318:9,17
**trial** 16:6 22:12
28:9 30:9,11,12
32:5 33:24 63:10
63:21 173:8
231:24 261:18
360:10 361:23
364:6
**trick** 86:19
**tricky** 188:13
269:10
**tried** 33:7
**triple** 140:3
**tripling** 314:16
**trouble** 74:17
111:14 157:3
**true** 29:6 92:8
104:18 105:2
112:5 135:7,18

144:21 162:1
210:14 241:4
253:3 310:16
315:8 318:15
337:6 339:18
351:11 369:11
**trumbull** 13:19
14:14,22 15:10
16:17,25 17:7
25:2 41:14 42:5
50:9 107:6 118:20
119:11 120:4
121:5 133:9 136:4
146:5 151:4
156:21 164:7
168:17 169:16,23
170:4 171:11
172:2 173:5
174:14,21 175:15
179:8,25 180:17
181:25 183:16,20
184:1,8,14,17
185:11,15 195:21
196:3 206:10,17
207:7,16 208:17
209:14 210:12
228:13,25 229:5
239:4,15 241:6
242:14 243:7,19
244:17 267:6
272:1,6,7,15,17
281:19 311:18,22
314:1 335:3 336:4
343:15 352:16
353:2,8,12,16
354:13,25
**truthfulness** 32:3
**try** 32:1 37:1
51:10 77:23 80:7
87:3 92:2,11 95:6
96:23 99:9 108:12

112:7 119:9
122:23 123:12
175:22 240:24
260:20 280:2
303:24 312:17
355:12
**trying** 89:2 90:8
98:22 150:22
154:21 165:21
177:1 213:5
236:15 259:18
262:17 265:14
268:4 269:9
301:25 303:24
308:12 309:5
338:3 348:5 354:8
358:23 364:2
365:17
**turn** 38:12 86:5
130:14 131:5
150:3 154:23
160:16 164:10,19
186:8 234:23
307:11 312:1
339:25 341:7
349:21 351:16
**turned** 122:17
**twelve** 66:11,19
125:25 131:11,12
**twenties** 126:3
**twenty** 40:6 42:11
42:12 46:25 54:7
54:8 58:11 94:19
95:10,11 97:8,10
121:2,2 126:7,15
126:15 127:17
128:1,14 132:23
133:22 177:10
187:10 191:11
195:23 206:12,16
321:13,17,21,22

327:17 328:9,19
328:25 329:8
**two** 30:11 42:18
51:17 53:10 58:10
58:11 61:25 76:11
101:11 106:2
107:16 108:1,5,11
108:23 117:17
135:2 155:2
159:14 163:16
165:17 169:22
171:12,15 172:16
174:9 180:10
181:15,18,19
182:8,9,10 186:2,4
188:1 195:7
203:12 242:11
246:10 250:22
251:2 268:6
271:15 286:24
315:11,11,14,16
315:19,25 318:19
347:13 350:2
354:21 360:18
**tying** 316:13
**type** 35:6,14 56:23
60:21 68:5 73:2
73:12 114:4 116:9
133:20 135:13
137:20 159:8
247:25 314:18
326:5 346:18
**types** 96:7 123:23
136:6 159:6
**typewriting**
369:10
**typically** 159:7
215:23 217:2,8

**u**

**u** 22:1
**uh** 204:4
**ultimately** 46:14
99:12 108:4
135:21 157:1,2
**umbrella** 70:9
**unannounced**
72:18,21
**unbilled** 58:24
59:2,5
**uncovered** 79:8
**understand** 27:14
27:16,19 32:24
33:9,13 38:23
49:25 95:4 100:4
104:15 110:25
120:7 126:14
136:13 165:16
169:2,5 171:4
192:15 193:11
198:6 212:15
214:3,22 218:21
227:14 244:15
246:19,24 247:8
247:16 258:7
264:22 265:14
268:5 276:24
277:20 280:19
281:6 285:4 304:2
308:12 314:5
315:15 320:9
336:20 343:1
344:21 348:7
350:11 355:10
356:1,3 361:16
366:2
**understanding**
48:6 56:24 74:17
78:16 171:6,7
246:3,15 251:12

252:1 255:20
256:7 265:13
268:3 272:4 297:4
320:10 321:15
334:20 344:14
**understood** 27:22
215:21 219:2
226:18 227:1
254:4 367:20
**undertake** 77:11
**unexpected** 91:8
95:1,18 97:13
**unfair** 177:7
**unimportant**
159:20
**unique** 61:7 66:7
**uniquely** 64:21
65:10
**uniqueness** 34:21
65:19
**unit** 170:25 268:24
272:14 303:6,11
338:22 339:2
357:17,22 359:2,7
**united** 1:1 23:7
25:24 66:1
**units** 16:16 148:22
149:17,25 150:11
151:12 153:14
155:1 183:11
187:17 188:6
189:23 195:7
204:23 205:9,15
206:12 255:2
256:4 341:12
**unlawfully** 41:22
43:11,16 159:17
**unlicensed** 248:16
248:17,19
**unreasonable**
131:21 132:8

unsure 355:10
unterreiner 10:13
unusual 90:15,20
  91:3,7,15 94:25
  117:16 135:3,13
  249:3,12 323:13
  331:15 333:10
unwrap 285:11
upper 63:6 64:4
use 35:25 49:9,9
  68:25 83:10 87:22
  110:1 113:4,10,18
  114:9 115:1
  125:17,17 132:5
  152:9 155:17
  192:12 193:20
  200:6 250:25
  319:9,21 322:16
  355:2
uses 116:23
usual 91:13,14
  117:15 132:16
usually 61:18
utilize 170:24
  244:20 319:5
utilized 49:23 52:7
  78:10 232:25
  319:3
utilizes 93:24

**v**

v 370:6 371:3
  372:3
varied 114:7,12
varies 42:15
various 45:8 47:15
  85:5 86:19 89:25
vast 48:10 353:22
vastly 35:7
vault 80:14
vendor 230:9,13
  230:23 254:11

  355:7,10,16
vendors 256:20
ventura 12:19
verbatim 326:25
verge 358:9
verification
  276:21
verified 126:10
veritext 11:8
  370:1,7 373:1
veritext.com.
  370:17
version 114:21
  133:5 164:24
versus 41:2 124:21
  125:21 126:1,17
  126:22 131:12
  134:22 315:11
video 1:15
videographer
  23:15 82:24 83:3
  160:6,11 163:25
  164:4 245:2,6
  303:5,10 338:21
  339:1 357:16,21
  359:1,6 367:12
  368:7
videographers
  11:7
videotaped 14:17
  15:24 17:15 23:18
view 47:15 69:18
  76:2 117:23,25
  165:4 223:6
  259:19 270:10
  279:9
violated 100:11,14
violating 41:4
  103:24
violation 86:4
  221:25

violations 226:5
  227:4
virginia 5:9 30:13
  66:12 202:6
  261:15 263:9,12
  327:25
virtually 48:1
visit 148:7,23
  173:22 239:3
  349:11
visited 310:18
visiting 143:16
visits 346:24
visual 146:19
  147:3 286:5
void 261:10
volume 1:14 13:11
  14:1,17 15:1,25
  16:1,6,20 17:1
  18:1 19:1 20:1
  21:1,9 86:1 124:2
  171:2 285:10
  326:6
volumes 273:9
voluntary 317:13
vs 251:19

**w**

wacker 5:18
waffling 216:21
wag 16:23 17:5,8
  17:12,14 168:5,9
  184:22,23 186:8
  190:3,4 196:20,22
  198:2 214:7,8
wait 49:10 189:10
  262:6
waited 358:1
waiting 214:11
waived 370:19
walgreen 7:17,17

walgreens 7:16
  16:20 17:1 21:7
  25:15 50:17 162:4
  167:9 171:16,20
  173:9,10 174:2,20
  176:9 177:11
  180:16,24 181:4
  182:4 185:15,21
  186:2,3,10 187:5,9
  187:9,15,22 188:4
  188:20 189:24
  192:19 195:20,22
  196:3,17 206:10
  206:11,17 210:5,8
  211:1,11 218:22
  222:5,10,23 223:7
  223:18 224:18,20
  225:5,24 226:7,17
  226:23 227:3,19
  227:20,25,25
  228:12,24 229:4,8
  229:15,24,25
  230:2,12,21,24,25
  231:9,13 233:2,9
  233:15,19,24
  234:11,19 235:2
  237:3,19,23
  238:19,23 239:12
  241:3,5,16,21
  242:5,13,21,24
walgreens's 161:7
walk 80:14 291:1
walked 204:15
walmart 5:13 21:1
  21:4,7 25:15
  42:16,21 50:21
  51:21 52:10 53:3
  167:9 303:19
  304:14,16 305:3,5
  305:20 306:5,10
  310:18 311:4,17

311:21 312:19,21
313:2,12,15 315:7
317:4,19 319:5,17
320:5,10,16 321:3
321:25 322:5
323:5 327:18,22
328:7,23 329:19
330:19,21 331:2,4
331:6,14 332:6,8
332:11,22 333:13
334:5,7,21 335:1
335:18,22,25
336:3 337:5
338:11 339:11,15
362:11
**walmart's** 309:25
310:11 311:7,11
317:7,20 321:16
323:12 333:8
336:7,24 337:19
**want** 27:7 47:19
51:16 52:17 54:2
80:15 87:25 99:9
110:13 118:14
119:3 124:14
126:13 145:11,18
147:16,19 148:25
149:8 180:16
188:12 189:12,25
191:17,19 198:8
199:19 212:7,23
213:1,16 215:11
217:3,18 219:20
220:16,22,25
228:14 230:25
235:7 243:13
264:22 265:12
268:14 271:21
275:7 276:24
277:20 279:12,13
283:17 304:18

305:9,24 306:9
308:1,2 314:5
316:22,25 328:11
339:9,25 342:17
342:21 343:10
358:24 359:10
360:13,16 361:6
363:22 367:11,14
367:23
**wanted** 115:18,22
118:18 268:15
270:20 271:18
285:22 361:3
**wanting** 276:11
**wants** 220:4
221:17 278:15
**warehouses** 26:4
110:17
**warrants** 60:19
**warren** 171:18
180:25 181:17
**washington** 7:12
**watch** 346:25
**waubel** 5:11
**way** 43:12 44:19
55:14 81:6 98:23
100:1,16,22 110:1
167:23 171:1
174:8 186:18
215:19 216:24
249:6,10 266:2
297:7 332:3,17
344:20 363:12,24
365:18
**ways** 165:18 312:6
**we've** 150:24
153:15 172:11
173:25 180:18,21
181:16
**website** 169:8,10
169:17 185:10

**week** 30:11,18
66:11 72:20
328:18 363:6
**weeks** 66:19,23
**weight** 171:8
337:24
**weisman** 2:17
**weismanlaw.com**
2:22
**weitz** 3:7
**weitzlux.com** 3:12
**welcome** 245:1
**went** 66:4 105:4
121:1,12 126:1
144:15 146:3
147:2 152:7,14
156:10,12 169:10
187:21 211:2
238:10 239:18
240:8 244:19
267:20 300:22
330:11 350:24
355:25 362:22
**west** 3:8 4:8 5:9,18
7:22 30:12 171:17
171:20 176:10
180:19 185:16
202:6 261:15
263:9,12 327:25
**whatnot** 280:10
**whatsoever**
292:21 361:10
**whiddon** 2:9
**white** 18:11,15,19
18:23 19:7,11,15
19:19,23 20:7,11
287:1 290:9
291:14
**wide** 153:25
154:10 270:21
281:21 321:6

**wife** 157:2
**william** 5:5
**willing** 365:23
366:5
**willoughby** 185:22
**wish** 144:18
**witness** 23:10,23
30:22 160:15
214:23 224:15
236:15,18,20
248:19 273:18,21
289:20,25 360:19
367:19 369:13
370:8,11 371:1,4
371:11 372:1,4,15
**witness'** 370:14
**wmt** 329:19
**wondered** 202:1
**wondering** 147:22
**wood** 297:8
**word** 88:25 126:18
204:18 277:19,23
320:25
**worded** 215:19
**words** 193:21
238:12
**work** 33:22 54:17
57:23 60:24 61:23
61:24 131:3 141:9
144:4 191:11
203:18 211:21
237:4 238:3 241:3
242:21 297:5
363:19 366:9,15
366:22
**worked** 47:25
83:13 93:2 178:17
182:11,14 203:4
203:20 204:20
**workers** 323:21

working 39:2
40:21 58:25 93:4
141:12 147:9
197:22 203:17
204:12 209:8
218:15 220:8
238:3 241:10,15
242:1,9 317:10
340:19
works 35:5 364:6
365:20
world 112:1
worth 306:12
wrap 285:14,15
wrapped 273:5
wright 14:18
127:11,20,25
129:6
wright's 129:1
write 95:11 157:6
237:18 238:1
304:18,19 331:13
334:4 351:6,12
writes 291:14
writing 107:25
108:5 144:16
157:4 193:18
243:12 278:5
323:25 352:12
written 211:2
236:22 308:10
309:1,4,19,22
323:17 324:6,16
332:17 342:14
347:14
wrong 61:12 102:5
110:10 269:3
286:6 319:16,20
351:24
wrote 209:13
235:17 238:8

273:11 276:6
305:14 309:6
313:21,22

x

x 173:9,10

y

y 10:22
y'all 189:8 366:19
yeah 30:10 31:22
34:13 41:17 42:6
45:7,11 49:3
51:15 54:20 55:20
63:9 65:23 69:1
70:3 73:10 74:19
81:2 83:19 86:17
86:17,19,19,24
88:6 90:19,22
91:16,23 93:5,23
95:5 96:5 100:23
102:14 115:8
117:19 119:10
120:24 121:10
124:13 126:13,24
128:7 129:19,25
134:3 145:21
148:8 151:15
162:2 170:23
176:1,14 185:2
201:17 209:11
246:20,24 259:2
269:2 273:10,20
273:23 281:8
283:19 289:22
293:23 299:9
307:24 308:9,14
312:22 319:12
320:18 322:4,8
327:23 340:6
350:14 361:21
367:23

year 53:17 54:8
57:11,12 58:21
61:3,4 92:1,12,21
94:12,19 95:10,12
106:19,19 121:11
152:18 154:12
186:25 188:19,21
201:22 214:19
252:8
years 36:3 37:4
39:3,17 54:9 57:5
59:12 60:3,22
61:2,4 62:7 64:20
74:6 101:18 123:8
125:23 129:20
152:6 169:19
188:9 211:18
229:11,12 230:4
233:20 268:15
283:13,13 285:2
286:11 314:8
340:20,21 343:25
345:20 346:2,4,6
346:15 347:1
349:1,1
yep 38:15 182:1
229:2 254:23
york 8:21,21
10:23 28:6,15
29:16,17 30:3
41:5 58:17 167:19
167:22 246:12
363:5
youngstown
180:25 181:17

z

zero 47:6 115:6
116:2 119:15
165:7 166:5
256:16 286:1

zeros 286:12
zombie 145:19
zoom 23:9
zuckerman 7:9
zuckerman.com
7:14
zwier 12:7,14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.