Page 374

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5   MDL NO. 2804

6   CASE NO. 17-md-2804

7   Hon. Dan A. Polster

8

9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11  THIS DOCUMENT RELATES TO:

12  TRACK THREE CASES

13

14                   VOLUME II

15

16           REMOTE VIDEO DEPOSITION OF

17                 JAMES RAFALSKI

18                 June 11, 2021

19

20

21

22  REPORTED BY:  Laura H. Nichols

23                Certified Realtime Reporter,

24                Registered Professional

25                Reporter and Notary Public

Page 375

```
 1               A P P E A R A N C E S
 2             (All Appearing Remotely)
 3
 4   FOR THE PLAINTIFFS:
 5          Ms. Kathleen Knight
 6             and Mr. A. J. Elkins
 7          Attorneys at Law
 8          McHugh Fuller Law Group
 9          97 Elias Whiddon Road
10          Hattiesburg, Mississippi  39402
11          (601) 261-2220
12          kathleen@mchughfuller.com
13          aj@mchughfuller.com
14   -and-
15          Mr. Daniel P. Goetz
16          Attorney at Law
17          Weisman Kennedy & Berris Co., LPA
18          2900 Detroit Avenue
19          2nd Floor
20          Cleveland, Ohio  44113
21          (216) 781-1111
22          dgoetz@weismanlaw.sworn
23
24
25
```

Page 376

```
 1          A P P E A R A N C E S, (CONTINUING)
 2               (All Appearing Remotely)
 3
 4   FOR THE PLAINTIFFS, CONTINUING:
 5          Mr. Michael J. Fuller, Jr.
 6          Attorney at Law
 7          Farrell & Fuller
 8          1311 Ponce De Leon
 9          Suite 202
10          San Juan, Puerto Rico  00907
11          (939) 293-8244
12          mike@farrellfuller.com
13   -and-
14          Ms. Alexandra Abston
15          Attorney at Law
16          The Lanier Law Firm
17          10940 West Sam Houston Parkway North
18          Suite 100
19          Houston, Texas  77064
20          (713) 659-5200
21          alex.abston@lanierlawfirm.com
22
23
24
25
```

Page 377

1          A P P E A R A N C E S, (CONTINUING)

2               (All Appearing Remotely)

3

4   FOR THE PLAINTIFFS, CONTINUING:

5          Mr. Michael Innes

6          Attorneys at Law

7          Carella, Byrne, Cecchi, Olstein,

8             Brody & Agnello, P.C.

9          5 Becker Farm Road

10         Roseland, New Jersey  07068

11         973-994-1700

12         minnes@carellabyrne.com

13

14  FOR THE DEFENDANT MASTERS PHARMACEUTICAL, LLC:

15         Ms. Emily Ford

16         Attorney at Law

17         Flaherty Sensabaugh Bonasso PLLC

18         200 Capitol Street

19         Charleston, West Virginia  25338-3843

20         (304) 345-0200

21         eford@flahertylegal.com

22

23

24

25

Page 378

1            A P P E A R A N C E S, (CONTINUING)

2                 (All Appearing Remotely)

3

4   FOR THE DEFENDANT WALMART, INC.:

5           Mr. Patrick J. Beisell

6           Attorney at Law

7           Jones Day

8           77 West Wacker, Suite 3500

9           Chicago, Illinois  60601-1692

10          (312) 782-3939

11          pbeisell@jonesday.com

12

13  FOR THE DEFENDANTS, GIANT EAGLE, INC. and HBC

14  SERVICE COMPANY:

15          Messrs. Scott D. Livingston

16             and Matthew Mazgaj

17          Attorneys at Law

18          Marcus & Shapira LLP

19          One Oxford Centre

20          35th Floor

21          Pittsburgh, Pennsylvania  15219

22          (412) 471-3490

23          livingston@marcus-shapira.com

24          mazgaj@marcus-shapira.com

25

Page 379

1          A P P E A R A N C E S, (CONTINUING)

2               (All Appearing Remotely)

3

4    FOR DEFENDANTS, CVS PHARMACY, INC.; CVS INDIANA,

5    LLC; CVS RX SERVICES, INC.; CVS TN DISTRIBUTION,

6    LLC and OHIO CVS STORES, LLC:

7          Mr. Anthony M. Ruiz

8          Attorney at Law

9          Zuckerman Spaeder

10         1800 M Street Northwest

11         Suite 1000

12         Washington, DC  20036-5807

13         (202) 778-1800

14         aruiz@zuckerman.com

15

16   FOR THE DEFENDANTS, WALGREENS BOOTS ALLIANCE, INC.;

17   WALGREEN CO.; and WALGREEN EASTERN CO., INC.:

18         Mr. Alex J. Harris

19         Attorney at Law

20         Bartlit Beck

21         1801 Wewatta Street

22         Suite 1200

23         Denver, Colorado  80202

24         (303) 592.3100

25         alex.harris@bartlitbeck.com

1        A P P E A R A N C E S, (CONTINUING)

2            (All Appearing Remotely)

3

4   FOR THE DEFENDANT, RITE AID OF OHIO, INC.; RITE AID

5   HDQTRS. CORP.; RITE AID OF MARYLAND d/b/a

6   MID-ATLANTIC CUSTOMER SUPPORT CENTER; ECKERD

7   CORPORATION d/b/a RITE AID LIVERPOOL DISTRIBUTION

8   CENTER:

9            Ms. Elisa P. McEnroe

10           Attorney at Law

11           Morgan, Lewis & Bockius LLP

12           1701 Market Street

13           Philadelphia, Pennsylvania  19103-2921

14           (215) 963-5076

15           elisa.mcenroe@morganlewis.com

16

17   FOR THE DEFENDANT, HENRY SCHEIN:

18           Ms. Madeleine E. Brunner

19           Attorney at Law

20           Locke Lord LLP

21           2200 Ross Avenue

22           Suite 2800

23           Dallas, Texas  75201

24           (214) 740-8000

25           maddie.brunner@lockelord.com

```
 1          A P P E A R A N C E S, (CONTINUING)
 2               (All Appearing Remotely)
 3
 4    OTHERS PRESENT:
 5          Mr. David R. Cohen
 6          Special Master
 7          David R. Cohen Co. LPA
 8          24400 Chagrin Boulevard, Suite 300
 9          Cleveland, Ohio  44122
10          (216) 831-0001
11          david@specialmaster.law
12
13          Ms. Amanda Unterreiner
14          Litigation Paralegal
15          Motley Rice LLC
16          28 Bridgeside Boulevard
17          Mount Pleasant, South Carolina  294644
18          (843) 216-9000
19          aunterreiner@motleyrice.com
20
21          Mr. Jonathan Jaffe, Consultant
22          i-y-f Consulting
23          Forest Hills, New York
24          (866) 526-1836
25          jjaffe@its-your-internet.com
```

```
 1          A  P  P  E  A  R  A  N  C  E  S,  (CONTINUING)
 2                  (All Appearing Remotely)
 3
 4    OTHERS PRESENT, CONTINUING:
 5            Mr. Justin Bond
 6            Videographer
 7            Veritext Legal Solutions
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 383

1                INDEX OF EXAMINATION, VOLUME II

2

3                                          Page:

4    DEPONENT:  JAMES RAFALSKI, CONT.              386

5    EXAMINATION BY MR. LIVINGSTON, CONT.          386

6    EXAMINATION BY MR. BEISELL                    495

7    REEXAMINATION BY MS. MCENROE                  525

8    REEXAMINATION BY MR. BEISELL                  533

9

10

11        INDEX OF GIANT EAGLE EXHIBITS, MARKED FOR

12               IDENTIFICATION IN VOLUME II

13

14                                          Page:

15   GE Exhibit 15                              399-16

16        Remote videotaped deposition of

17   George P. Pavlich, December 14, 2020

18   GE Exhibit 25                              412-08

19        Ohio State Highway Patrol,

20   Awareness:  Prescription Drug Interdiction,

21   Bates Numbers LAKE003677550 through

22   LAKE003677553 (Confidential)

23   GE Exhibit 26                              426-20

24        Remote Videotaped Deposition of

25   Brian Dombek, February 10, 2021

Page 384

1          INDEX OF GIANT EAGLE EXHIBITS, MARKED FOR

2           IDENTIFICATION IN VOLUME II (Continuing)

3

4                                               Page:

5    GE Exhibit 33                                463-20

6          DEA, Report of Investigation, Bates

7    Numbers US-DEA-00033016 through

8    US-DEA-00030420 (Confidential)

9    GE Exhibit 34                                462-16

10         DEA, Report of Investigation, Bates

11   Numbers DEA-T1BCC-00001833 through

12   DEA-T1BCC-00001845 (Confidential)

13   GE Exhibit 35                                490-10

14         Email string, Bates Number HBC

15   MDL00136952 (Confidential)

16   GE Exhibit 38                                456-09

17         Notes Re HBC Service Company,

18   prepared by counsel for Giant Eagle

19   GE Exhibit 47                                446-11

20         Videotaped Deposition of James

21   Rafalski, February 7, 2020

22   GE Exhibit 53                                393-05

23         Email string, Bates Number HBC

24   MDL00090009 (Confidential)

25

Page 385

1        INDEX OF GIANT EAGLE EXHIBITS, MARKED FOR

2          IDENTIFICATION IN VOLUME II (Continuing)

3

4                                          Page:

5    GE Exhibit 55                                423-15

6          Videotaped Deposition of Damian

7    Blakeley, December 7, 2020

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 386

1            PROCEEDINGS CONTINUING, VOLUME II

2                      June 11, 2021

3                     8:04 a.m. EDT

4

5            THE VIDEOGRAPHER:  Good morning.

6   Today is June 11th, 2021.  We are on the record at

7   8:04 a.m.  Today we will take a videotaped

8   deposition in Case Number 17-md-2804.  This

9   deposition is being held remotely.  Would you

10  please swear the witness?

11

12                  JAMES RAFALSKI,

13  having been previously duly sworn, was examined and

14  testified further as follows:

15

16  EXAMINATION BY MR. LIVINGSTON, CONTINUING:

17        Q.    All right.  Good morning,

18  Mr. Rafalski.  As you know, my name is Scott

19  Livingston.  I started off with the questioning.

20  And I guess I am batting cleanup, although my

21  colleagues may have some additional questions when

22  I am finished.

23            Did you have the opportunity to speak

24  with counsel yesterday at all about your

25  deposition?

Page 387

1          A.     I did not.

2          Q.     Did you speak with anyone about your

3  deposition?

4          A.     I did not, other than my wife asked

5  how it went.

6          Q.     Other than that, no one?

7          A.     No one.

8          Q.     All right.  Do you have the Giant

9  Eagle exhibit binder in front of you?

10         A.     I do.  Before we get started,

11  Mr. Livingston, can I -- there's a couple of things

12  I would like to say.  Before --

13         Q.     Wait, no.  No.  You can save those

14  for when your counsel is asking you questions.

15                I would like to have you turn to your

16  report, which is Exhibit 2.  I think we talked a

17  little bit yesterday about how important it was for

18  you to do your due diligence before you published

19  your report.

20         A.     Yes, sir.

21         Q.     And how it was really important to

22  make sure that it was accurate and thorough.

23         A.     Yes, sir.

24         Q.     And that all of the important things

25  that you needed to look at, it was important for

Page 388

1   you to actually look at those things and identify

2   them in your report, correct?

3           A.     I believe that is an accurate

4   statement, Mr. Livingston.

5           Q.     And one of those things would be

6   Mr. Tsipakis's deposition, correct?

7           A.     Yes, sir.

8           Q.     And who is Mr. Tsipakis?

9           A.     He was the 30(b) witness for Rite

10  Aid -- I mean, I'm sorry, Giant Eagle.  I'm sorry.

11          Q.     Yeah, wrong guess.

12          A.     Not a guess, sir.

13          Q.     He was the 30(b)(6) witness for Giant

14  Eagle in this matter, correct?

15          A.     That's correct.

16          Q.     Which means he was designated by

17  Giant Eagle to speak on behalf of the whole

18  company; is that correct?

19          A.     That is how I understand a 30(b),

20  sir.

21          Q.     And you know from reading his

22  deposition that he is, in fact, in charge of all of

23  Giant Eagle's pharmacy operations, correct?

24          A.     I believe that is what the deposition

25  indicates, yes, sir.

Page 389

1          Q.     Yes.  And you cited his deposition in

2    a number of places in your report; is that correct?

3          A.     That's correct, sir.

4          Q.     Would you turn to your Schedule I,

5    which identifies the documents and things that you

6    reviewed?  And specifically, I would like to direct

7    your attention to Page 42 of your schedule.  Do you

8    see at the bottom there that there are a number of

9    depositions listed that you reviewed?

10         A.     Yes, sir.

11         Q.     And you list Mr. Tsipakis's

12   December 13, 2018, deposition, correct?

13         A.     Yes, sir.

14         Q.     And did you read that deposition

15   thoroughly and entirely?

16         A.     Yes, sir.

17         Q.     You do not list Mr. Tsipakis's

18   30(b)(6) deposition that he gave in this case,

19   correct?

20         A.     I'm confused by that.  I read a 30(b)

21   deposition for Mr. Tsipakis.  I don't recall being

22   30 -- two 30(b)s.

23         Q.     Right.  Maybe that was because your

24   counsel didn't alert you to that.  But do you see

25   the date of this Tsipakis deposition?

Page 390

1            A.      I do.

2            Q.      Okay.   That deposition was given in

3    Track 1, correct?

4            A.      The date would indicate that.

5            Q.      Yes.   And we are now in Track 3,

6    correct?

7            A.      That's correct.

8            Q.      And discovery in Track 3 had not even

9    begun when this December 2018 deposition of

10   Mr. Tsipakis was taken, correct?

11           A.      That's correct.

12           Q.      So can you confirm for me on the

13   record that you did not review Mr. Tsipakis's

14   30(b)(6) deposition that he gave in this case,

15   which is the Lake and Trumbull County case against

16   the pharmacy chain defendants?

17                   MS. KNIGHT:   Objection to form.

18           A.      Mr. Livingston, I don't have any

19   notes here with me from my review of the

20   deposition, so I'm a little hesitant to confirm

21   that without looking at the notes to confirm that

22   date of the deposition I read.

23           Q.      (BY MR. LIVINGSTON:)   Well, actually

24   you do have notes.   Why don't you turn to

25   Walmart Exhibit -- what was marked yesterday as

Page 391

1    Walmart Exhibit 1, which was your cheat sheet for

2    each of the various defendants in this case.

3              A.     Okay.

4              Q.     And you did list Mr. Tsipakis's 30(b)

5    deposition.  You thought it was important enough to

6    actually list that on your cheat sheet, correct?

7              A.     It is on here.  I just do not know

8    the date of the deposition.  That is not listed

9    there, Mr. Livingston.

10             Q.     Well, when we take a break, I am

11   going to ask you to review closely your entire

12   schedule.  Because I know I am getting up in age,

13   but I couldn't see it.  And I have reviewed it

14   several times.  I saw no indication either in the

15   body of your report or in your schedule that you

16   even glanced at Mr. Tsipakis's lengthy two-day

17   deposition in Track 3.  Would you --

18                    MS. KNIGHT:  Object to form.

19             Q.     (BY MR. LIVINGSTON:)  Would you -- I

20   think in your cheat sheet you also indicate, you

21   have written down that Giant Eagle could not block

22   orders.  It is at the bottom of the second heading

23   there.  You see that?  "Did not block orders."  Was

24   that a material fact that you considered when you

25   rendered your opinion that Giant Eagle's SOMS

Page 392

1   system was subpar?

2            MS. KNIGHT:  Mr. Livingston, I'm so

3   sorry.  You were frozen, so we didn't hear anything

4   up until just this moment when you came back.

5            MR. LIVINGSTON:  Okay.

6       Q.    (BY MR. LIVINGSTON:)  Well, let me

7   back up.  So do you see where you indicate in

8   your -- on your cheat sheet that Giant Eagle SOMS

9   system did not block orders?  Do you see that?

10      A.    Yes, sir.

11      Q.    Okay.  Was that fact material to your

12  opinion that Giant Eagle's SOMS system was subpar?

13      A.    During that time period, with that

14  statement, yes, sir, that was part of my opinion.

15      Q.    All right.  Why don't you go to the

16  body of your report, in Exhibit 2, Page 154.  Do

17  you see on the second -- beginning of the second

18  full paragraph, there's a statement, "The threshold

19  system did not block orders."  Did you see that or

20  do you see that?

21      A.    Yes, sir.

22      Q.    Okay.  Is that what you were

23  referring to on your cheat sheet when you said

24  Giant Eagle's system did not block orders?

25            MS. KNIGHT:  Objection to the form.

Page 393

1          A.     Yes, sir.

2          Q.     (BY MR. LIVINGSTON:)  Would you go to

3    Exhibit 53 in Giant Eagle's binder?

4                 MS. KNIGHT:  Exhibit 53.  Okay.

5                 (GE Exhibit 53 was marked for

6                 identification.)

7          A.     I am there, sir.

8          Q.     (BY MR. LIVINGSTON:)  All right.  Do

9    you see that there's an email at the bottom from

10   Brandon Heckman at Giant Eagle to a number of other

11   folks within the company, including a number of

12   folks who are in the pharmacy department?  Do you

13   recognize these names?

14         A.     Some of them, sir.

15         Q.     Okay.  And you see that it is dated

16   July 7, 2014.

17         A.     I do.

18         Q.     Okay.  And do you see that the

19   indication here for importance is high?  Do you see

20   that?

21         A.     Yes, sir.

22         Q.     Okay.  I am going to -- bear with me.

23   I am going to read part of this email.  It says,

24   "Tonight we had a task come across for RX4031 that

25   called for an entire case of item 144535 to be

Page 394

1    picked.  The item is a controlled substance, so we

2    will not be shipping this until it is verified that

3    this is what the store should actually be

4    receiving.

5                      "While the quantity requested of this

6    item may be due to the holiday weekend, we would

7    like this order to be investigated before shipping.

8    I have left the case sitting in the reserve until

9    it is verified that it is okay to ship the item."

10                     Doesn't this email pretty clearly

11   indicate to you that Giant Eagle at this point in

12   time was using a SOMS system that did, in fact,

13   identify potentially suspicious orders and block

14   them before they were shipped?

15           A.    Mr. Livingston, I think this email

16   obviously indicates that that order was held.  I

17   don't know that it indicates to me that it was

18   blocked by the SOMS system.  In regards to the

19   portion of my report that we are discussing, that

20   was based on a statement from Mr. -- the 30(b),

21   Mr. Tsipakis.  This -- I acknowledge that this

22   order is being held, but I don't see that it

23   would -- it is held specific to the SOMS system.

24           Q.    Well, do you think it was -- are you

25   suggesting to the jury that it was just by pure

Page 395

1    accident that this order happened to be identified

2    as an order that should be blocked and investigated

3    before it was shipped?

4            A.    No.  I will acknowledge it is being

5    held bill the company.  But I don't know that it is

6    being specifically blocked by the SOMS system.

7    There could have been many other reasons why

8    something would trigger it to be stopped by the

9    company.

10                I am just stating to you that this

11   doesn't acknowledge to me that this was specific to

12   the SOMS.

13           Q.    But this is a controlled substance,

14   sir.  This is not an order of aspirin, correct?

15           A.    Well, I agree it is a controlled

16   substance order.

17           Q.    Right.  And the controlled substance

18   is being blocked because obviously there's a

19   suggestion here that the order was larger than

20   usual, and the suggestion is perhaps it was due

21   because -- due to the holiday weekend.  But they

22   are not going to assume that.  They are going to

23   investigate it before they let it go, correct?

24           A.    It does say all of those things, sir.

25           Q.    And then if we go to the email at the

Page 396

1    top, in response it says, "Please send the rest of

2    this order.  I called the pharmacy.  They have

3    several owes and need this medication.  They

4    received three bottles in today's order.  Thank

5    you."

6                    So you see that this email chain

7    reveals not only that an order was blocked after

8    being identified as too -- potentially too large,

9    it was investigated and ultimately released.  Do

10   you see that?

11        A.    That is what this email indicates.  I

12   agree with that.  I'm not so sure I agree that it

13   is a sufficient reason to release, but that is not

14   part of your question.

15        Q.    But what troubles me, sir, is I

16   reviewed your entire schedule of documents that you

17   reviewed, and I no know indication that you

18   reviewed this document.  Why not, sir?

19              MS. KNIGHT:  Objection to form.

20        A.    Other than when I was searching,

21   maybe I didn't locate it.  I don't have an

22   explanation, Mr. Livingston.

23        Q.    (BY MR. LIVINGSTON:)  Okay.  You

24   would agree that this is something you should have

25   looked at and considered before you rendered your

Page 397

1  opinion?

2                    MS. KNIGHT:  Objection to form.

3          A.     I think any -- I think any document

4  is relevant, Mr. Livingston.  This particular

5  document wouldn't have changed my statement in my

6  report about the blocking of the orders.

7          Q.    (BY MR. LIVINGSTON:)  You wouldn't

8  have even dropped a footnote and said well, with

9  the exception of one email that, you know, I

10  happened to come across, or would you just tell the

11  jury that there was never, ever an order blocked by

12  Giant Eagle's system --

13                    MS. KNIGHT:  Object to the form.

14          Q.    (BY MR. LIVINGSTON:)  -- despite the

15  fact -- despite the fact -- let me finish my

16  question -- despite the fact that this email makes

17  it perfectly clear that they did block orders?

18                    MS. KNIGHT:  Objection to form.

19          A.     Again, I concede they blocked an

20  order.  This email doesn't -- would be different

21  than the statement made by Mr. Tsipakis.  And

22  secondly, it doesn't indicate to me that it was

23  blocked by the SOMS.

24          Q.    (BY MR. LIVINGSTON:)  Do you have any

25  earthly idea sitting under oath today for your

1  deposition what the basis of this order being

2  blocked was, other than Giant Eagle's SOMS system?

3          MS. KNIGHT:  Objection to form.

4      Q.    (BY MR. LIVINGSTON:)  Are you just

5  going to -- you're going to sit there and just

6  throw out some guesses for us?

7          MS. KNIGHT:  Objection to form.  And

8  that is an entirely inappropriate question.

9          MR. LIVINGSTON:  No, it is not

10  inappropriate because it is clear --

11      Q.    (BY MR. LIVINGSTON:)  Do you have any

12  basis at all for telling the jury that this was not

13  blocked pursuant to Giant Eagle's existing SOMS

14  system back in 2014?

15      A.    I will repeat my answer earlier.  I

16  read the email and acknowledge it is being held by

17  the company.  There's nothing in here that

18  definitively tells me it was blocked by the SOMS

19  system.

20      Q.    Right.  And there's nothing

21  definitively in here that tells you that it was not

22  blocked by the SOMS system, right?

23      A.    That's correct.

24      Q.    While we are on the topic of due

25  diligence in connection with your expert report,

Page 399

1    one of the things that you did not investigate

2    before you rendered your opinion that somehow the

3    defendants contributed substantially to the opioid

4    crisis in Lake and Trumbull County was what impact,

5    if any, bad doctors had on the opioid crisis in

6    those two counties, correct?

7            A.      Generally, that is correct, sir.

8            Q.      And I won't replow old territory from

9    yesterday, but I think you did acknowledge that you

10   did not review any of the Ohio Board witness

11   deposition transcripts, correct?

12           A.      That is a correct statement.  That is

13   what I stated yesterday, sir.

14           Q.      Would you go, turn to Exhibit --

15   Giant Eagle Exhibit 15?

16                   (GE Exhibit 15 was marked for

17                   identification.)

18           Q.      (BY MR. LIVINGSTON:)  And just the

19   first page, just to orient you -- and again, I know

20   that you didn't review this.  You just

21   acknowledged --

22           A.      One second, sir.  One second.

23                   (Pause.)

24           A.      Okay.  I am there.

25           Q.      (BY MR. LIVINGSTON:)  All right.  You

Page 400

1   see on Page 1 here, this is basically we didn't

2   want to kill trees, we didn't provide the whole

3   deposition but just some of the parts that we

4   thought we might want to ask you questions about.

5                    But this was Mr. George Pavlich, who

6   was a long time Ohio Board of Pharmacy agent who

7   worked in Lake and Trumbull Counties.  And his

8   deposition was taken in this matter on December 14,

9   2020.

10                   Could you turn to Page 184 and 185?

11                   At the very bottom of 184,

12  Ms. Pavlich was asked about another Ohio Board

13  agent.  "Was there a problem or an issue about why

14  Agent Bodi did not investigate Dr. Franklin?"  And

15  he responded, "Not everybody is capable of doing an

16  extensive massive doctor investigation.  I just

17  happened to be really good at it.  I had already

18  indicted and convicted probably fifty doctors,

19  including the Mahoning County Coroner."

20                   Did you know that just this one board

21  agent alone had put behind bars fifty bad doctors

22  in these two counties who were writing bad scripts?

23                   MS. KNIGHT:  Objection to form.

24       A.      I acknowledge the fifty.  I don't

25  know that it is the two -- it is Lake and Trumbull

Page 401

1    Counties, sir.

2         Q.    (BY MR. LIVINGSTON:)  You don't know

3    where Mahoning County is?

4         A.    No.  You said the two bad counties,

5    and that wouldn't be Lake or Trumbull.

6         Q.    You know Mahoning County is

7    borders --

8         A.    I do.

9         Q.    You got that geography right.  So it

10   was in that neck of the woods, right?

11             MS. KNIGHT:  Object to the form.

12        A.    Yes.  But in reading this deposition,

13   this two pages, I don't know that that answer is

14   specific to the two counties, but I acknowledge it

15   is fifty doctors.

16        Q.    (BY MR. LIVINGSTON:)  And we -- that

17   is a lot.  I mean do you know what the demographics

18   are for these two counties?  Aren't they pretty

19   small, relatively rural counties?

20        A.    We are talking Trumbull and Lake?

21        Q.    Yes.

22        A.    Lake is small in square miles, but I

23   believe the population is larger than Trumbull.

24        Q.    I mean, when you add them up, aren't

25   they only in the neighborhood of the four hundred

Page 402

1   thousand or so?

2           A.    No, I think they are much higher than

3   that.  I think -- it has been a while since I

4   looked and reviewed, but I think it is more around

5   eight hundred thousand for combined.

6           Q.    You must have a different Google map

7   than I do.  But in any event, let's look at

8   Page 186 and 187 of Mr. Pavlich's deposition.  Did

9   you -- well, let me ask you this:  In preparing

10  your report, did you come across Dr. Franklin's

11  name?

12          A.    I did.

13          Q.    You know he was a bad doctor, right?

14          A.    The Google information I read would

15  indicate that, yes.  If that is the Dr. Franklin

16  that was murdered by his wife, then, yes.

17          Q.    So you did -- did you do any research

18  on Dr. Franklin in connection with preparing your

19  report?

20          A.    Well, yes.  I looked up and I tried

21  to identify some of the -- that there were some

22  doctors in the Lake and Trumbull area, there were

23  bad doctors present through looking through Google

24  and reading some releases by the Ohio Attorney

25  General.

Page 403

1           But I didn't specifically investigate

2     Dr. Franklin's prescribing, if that is the question

3     you are asking.

4           Q.    Okay.  So previously I thought you

5     just told me this morning that you had not tried to

6     investigate to see what the impact of the bad

7     doctors writing bad scripts in Label and Trumbull

8     Counties were on the opioid crisis.  But yet you

9     did do some research on these doctors?  Is that

10    what you are telling us?

11          A.    Only in to identify the existence of

12    some doctors that had been under investigation,

13    indicted or identified through a Google search.

14    That is correct.

15          Q.    But for what purpose?  Why were you

16    trying to identify them?

17          A.    Predominantly, I was looking in the

18    areas of pharmacies that had high prescribing to

19    see if some of these doctors had offices specific

20    to those areas.  Another one -- that would be the

21    general reason.  And just that they existed.

22               There was -- I recall reviewing an

23    Attorney General press release that gave a

24    number -- a number of doctors and pharmacies that

25    had been -- lost their medical license.  So I did

Page 404

1    some further review to see if I could identify any

2    of these doctors.  The document didn't list any

3    names.

4         Q.    Well, you said that you were looking

5    at these doctors in connection with -- to see if

6    they were located near any of the high volume

7    pharmacies; is that correct?

8         A.    Yes, sir.

9         Q.    And when you said "high volume

10   pharmacies," are you referring to any of the

11   pharmacies owned and operated by the defendant

12   pharmacies?

13        A.    Yes, that would be one of the

14   purposes.

15        Q.    Okay.  So you did try to do an

16   analysis to see if a lot of these bad doctors'

17   scripts were being filled by any of the defendant

18   pharmacies; is that correct?

19              MS. KNIGHT:  Object to the form.

20        A.    I did not have the ability to do that

21   in-depth of an analysis because I did not have

22   prescribing records.  My interest or goal was just

23   to see if I could identify some of the doctors that

24   were in those two counties that were engaged with

25   issuing a list of prescriptions.

Page 405

1          Q.     (BY MR. LIVINGSTON:)  All right.  So
2     you did some analysis and you identified at least
3     some doctors.  Why are they not mentioned in your
4     report?
5                    MS. KNIGHT:  Object to the form.
6          A.     Because I didn't have sufficient
7     information in discovery or provided to me to link
8     them to the actual prescriptions at those
9     pharmacies.
10          Q.     (BY MR. LIVINGSTON:)  Well, you know,
11     sir, don't you, that there was a big food fight
12     about whether the defendants would have to produce
13     their prescription data and ultimately they did
14     provide that information and ultimately the OARRS
15     data for these two counties was produced by the
16     Ohio Board of Pharmacy?  Are you aware of those
17     facts?
18                    MS. KNIGHT:  Object to the form.
19          A.     I have heard general conversations on
20     that matter, but I wasn't asked to provide an
21     opinion on the prescribing and dispensing at the
22     pharmacy level.  Mine was just purely interest on
23     just the doctors present in these two counties as
24     just part of just reviewing some materials.
25          Q.     (BY MR. LIVINGSTON:)  My memory is

Page 406

1   not what it used to be, but you just said in

2   response to the earlier, the previous question that

3   the reason why you didn't -- you weren't able to

4   analyze whether these doctors' scripts were being

5   filled by my client and some of the other

6   defendants in this case was because you didn't have

7   the data available.

8           And that is just not true, right?

9   The data, in fact, was available to you.

10          MS. KNIGHT:  Objection to form.

11      A.    It was not provided to me.  It was

12  not available to me.  I was not asked to provide an

13  opinion on that.

14      Q.    (BY MR. LIVINGSTON:)  Did you

15  request, make a request to plaintiffs' counsel that

16  they provide you with that data or with your

17  assistant, Dr. McCann, that they provide that data

18  to Dr. McCann?

19          MS. KNIGHT:  Objection to form.

20      A.    I did not ask for that data, sir.

21      Q.    (BY MR. LIVINGSTON:)  So you just

22  assumed that the data wasn't available?

23          MS. KNIGHT:  Objection to form.

24      A.    No.  Again, I wasn't asked to provide

25  an opinion on the list of prescribing and

Page 407

1    dispensing at the pharmacy level.  I wasn't asked

2    to do an analysis of the pharmacies, so it wasn't

3    data that I requested.  Because I did not need it

4    because I was not doing an opinion on that matter.

5              Q.    (BY MR. LIVINGSTON:)  All right.

6    Would you go to Page 187?

7              A.    I am there.

8              Q.    In the middle of that page, there's a

9    question asked.  "And in your search warrant, on

10   the next paragraph you state that the review

11   confirmed that Dr. Franklin authorized fifteen

12   thousand two hundred ninety-eight controlled

13   substance prescriptions during the period of 4-10

14   of '06 through 6- 4 of '08, so a little more than

15   two years, these fifteen thousand controlled

16   substance prescriptions.  Was that the time window

17   that you had narrowed your investigation down to?"

18              "Yes."

19              So Mr. Pavlich is telling us that

20   this one bad doctor alone during only a two-year

21   period -- remember, this case, the period for this

22   case goes from 2006 to the present.  But this is

23   only two of those years, one bad doctor writing

24   fifteen thousand -- over fifteen thousand bad

25   scripts.  And you didn't factor this into your

Page 408

1    report, did you?

2                    MS. KNIGHT:  Objection to form.

3            A.      I did not.

4            Q.      (BY MR. LIVINGSTON:)  You also didn't

5    factor into your analysis the effect that any

6    internet pharmacies had on the opioid crisis in

7    Lake and Trumbull County, correct?

8            A.      That is correct.

9            Q.      And that is despite the fact that you

10   knew from your time with the DEA that a major

11   contributor to the opioid crisis was internet

12   pharmacies, correct?

13           A.      I am well aware of the effect of the

14   internet pharmacies.  I don't know how it is

15   relevant to Lake and Trumbull County unless you are

16   indicating that maybe some of the residents there

17   were utilizing ordering those prescriptions online.

18   I'm not aware of any internet pharmacies that were

19   located in Lake and Trumbull County during the time

20   period of my review.

21           Q.      Who said an internet pharmacy had to

22   be located physically in the county?  Isn't that

23   the whole point, that you can just order on the

24   internet and have the drugs delivered to you?

25           A.      That is the point.

1      Q.     Okay.

2      A.     So that is why I made that -- that's

3  why I gave that reply, because there would be no

4  way for me to know what residents of those two

5  counties ordered from the internet, other than if

6  there was -- in doing my review, there was never

7  any material that would provide me with that

8  information.

9      Q.     But you are not suggesting that Lake

10  and Trumbull County residents didn't have the

11  internet available to them during the relevant

12  period, are you?

13      A.     No.  I think what I'm indicating,

14  there's no way I would know that they utilized the

15  internet to order internet opioid prescriptions and

16  have it delivered to those specific counties.  That

17  information wouldn't be available to me.

18      Q.     When you were with the Detroit office

19  of the DEA, was Detroit considered a major drug

20  supplier via drug gangs to neighboring states?

21          MS. KNIGHT:  Objection to form.

22      A.     Early in my career, I believe that

23  would be a correct statement.

24      Q.     (BY MR. LIVINGSTON:)  When you say

25  "early in your career," what do you -- what do you

Page 410

1    mean by that?  What time period are you talking

2    about?

3         A.    I would say 2004.  And it would have

4    been declining sometime prior to 2010.  Maybe the

5    first three or four years I think there was quite a

6    bit of migration to a couple of different states.

7         Q.    Well, one of those states was Ohio,

8    correct?

9         A.    Ohio primarily only because it was a

10   bordering.  But the actual illicit distribution in

11   my investigations, what I was aware was

12   predominantly it was mainly to Kentucky and then

13   secondly to Tennessee.

14        Q.    Well, were you aware that a lot of

15   these Detroit-located drug gangs would pay elderly

16   citizens to get opioid scripts filled in -- at

17   Detroit pharmacies right down the street from your

18   office and then travel on Greyhound buses and

19   rented cars to Lake and Trumbull County to sell

20   those drugs there because they could get more per

21   pill than they could in Detroit?  Were you aware of

22   that problem?

23             MS. KNIGHT:  Objection to form.

24        A.    I did not work any cases that

25   involved Lake and Trumbull County, and I did not

Page 411

1    have any discussions from any investigators in that
2    region of the country.  All of my cases had links
3    to, as I stated earlier, Kentucky and Tennessee.
4                    I was aware that there was some
5    bouncing back and forth across the state borders
6    because the maps or the PMP programs didn't link
7    between each state.  But I'm not aware of any case
8    that was worked out of the Detroit office that was
9    specifically tied to those two counties.
10            Q.    (BY MR. LIVINGSTON:)  Well, one thing
11   for sure we know from reading your report is that
12   you did not take into consideration the impact that
13   drug gangs had on selling illegitimately obtained
14   opioid scripts in Lake and Trumbull County,
15   correct?
16            A.    No.  My report, Mr. Livingston,
17   focuses on the distribution from the distributor
18   down to the pharmacy.  My analysis doesn't focus on
19   the illicit conduct outside of that action.
20            Q.    Okay.  And -- well, you also didn't
21   review any of the law enforcement depositions that
22   were taken in this case in which testimony was
23   given that Detroit was a major supplier of
24   illegally obtained opioid pills to Lake and
25   Trumbull County, correct?

                                                Page 412

1              MS. KNIGHT:  Object to the form.

2         A.     I didn't review those reports.  I

3    would be interested to look at one if you have one

4    available or in the binder.

5         Q.     (BY MR. LIVINGSTON:)  You -- I don't

6    want to leave you in anticipation.  Let's go to

7    Exhibit -- Giant Eagle Exhibit 25.

8                   (GE Exhibit 25 was marked for

9                   identification.)

10        Q.     (BY MR. LIVINGSTON:)  This is --

11   Exhibit 25 is Ohio State Highway Patrol, Critical

12   Information and Communications Center, Criminal

13   Intelligence Unit, Issue Date -- and it has

14   "Awareness:  Prescription Drug Interdiction."  And

15   it is dated August 9, 2012.  Do you see that?

16        A.     I do.

17        Q.     Okay.  This is during the relevant

18   time frame upon which your opinion is based,

19   correct?

20        A.     It is.

21        Q.     Okay.  Did you review this document

22   in connection with the preparation of your report?

23        A.     I don't recall looking at this

24   specific document, sir.

25        Q.     Okay.  When you were a DEA agent,

Page 413

1    would you sometimes receive these reports from

2    neighboring law enforcement agencies?

3              A.      I don't recall receiving specific

4    Ohio.  I might receive summaries that the DEA would

5    produce relying on these type of documents.  But I

6    don't recall receiving anything from the Ohio State

7    Patrol or having access to it when I was with the

8    DEA.

9              Q.      All right.  And certainly in August

10   of 2012, you were still in the DEA's Detroit

11   office, correct?

12             A.      I'm sorry.  Could you say that one

13   more time?

14             Q.      Yes.  I said and certainly when

15   the -- the date of this -- on the date of this

16   report, August of 2012, you were still at the DEA's

17   Detroit office, correct?

18             A.      That's correct.

19             Q.      Okay.  Under "Summary," if you skip

20   down a little bit --

21                   MS. KNIGHT:  Mr. Rafalski, do you

22   need time to review that?

23             A.      Could I just have one more minute?  I

24   want to look at this before I respond to some of

25   your questions.  Could I just have a minute to read

```
                                                      Page 414
 1   it, Mr. Livingston?

 2              (Pause.)

 3        A.     Okay.  Go ahead.  I'm sorry.

 4        Q.    (BY MR. LIVINGSTON:)  Okay.  So if we

 5   go down to the summary, it says, "Recently a

 6   multistate meeting was held at Ohio HIDTA to

 7   network and develop plans to help combat the

 8   prescription drug problem most prominently coming

 9   from the Detroit, Michigan area."  Did the DEA --

10              MS. KNIGHT:  Mr. Livingston, I'm

11   sorry.  Which page of the exhibit?

12        A.     First page.

13              MR. LIVINGSTON:  First page, cover

14   page.

15        A.     I see that.

16        Q.    (BY MR. LIVINGSTON:)  Okay.  Did the

17   DEA sometimes participate in these multistate

18   meetings with other law enforcement agencies to

19   deal with these kinds of drug problems?

20        A.     I don't have any personal knowledge

21   of them attending these meetings, but I knew that

22   would be part of -- they had a HIDTA unit,

23   intelligence unit, so I would expect they may.  But

24   I don't have any direct knowledge of whether they

25   did or did not.
```

Page 415

1          Q.     All right.  It says, "The following
2    pieces of intelligence were derived from the
3    discussions:  Greyhound bus lines are being used as
4    a transportation method.  The suspects usually
5    travel late evening or early morning.  Rental cars
6    are often commonly used as a method of
7    transportation.

8                     "In approximately fifty percent of
9    large pill interdiction Ohio State Highway Patrol
10   cases in the last year, suspects were driving
11   rental cars and the suspects were not usually on
12   the rental agreement."

13                   And then it talks about, gets into
14   even more detail about the methods of concealment.
15   "Women often conceal pills in their body cavities
16   via condoms.  Pills are commonly found in potato
17   chip bags, fast food bags and have been found
18   recently concealed in Subway sandwiches."

19                   "Types of narcotics seized."  This is
20   important.  "The Ohio State Highway Patrol most
21   predominately seizes OxyContin, oxycodone and
22   hydrocodone.  However, OPANA?, similar to morphine
23   and codeine, are increasing in frequency."

24                   Now, those opioid drugs that are
25   mentioned here, those are the drugs that your --

Page 416

1    that your report focuses on with respect to the

2    opioid crisis in Lake and Trumbull County, correct?

3              A.     It is.

4              Q.     Would you go to the next page?  Bates

5    number at the bottom, last five digits -- four

6    digits, 7551.

7              A.     I see that.

8              Q.     And there's a big -- in bold it says,

9    "Awareness:  Prescription Drug Interdiction."

10   Under "Marion, Ohio," second bullet point, it says,

11   "Many people originating from Detroit have

12   relocated to Marion, Ohio.  There are several

13   organized crime -- criminal groups from Detroit.

14   Often when drug dealers travel from Detroit to sell

15   drugs, members of the group or family will set up

16   residence in the destination location."

17              And then let's skip down.  We want to

18   look at the section titled "Detroit-Why?"

19              "Detroit's main drug problem is

20   heroin and cocaine.  The drug users do not commonly

21   use prescription drugs in Detroit as part of their

22   drug habit."

23              Did you know that to be the case in

24   this time frame while you were working for the DEA

25   in Detroit, that drug users there were mostly --

Page 417

1    preferred heroin and cocaine to prescription drugs?

2                    MS. KNIGHT:  Object to the form.

3            A.     In my capacity in diversion, I didn't

4    do enforcement activities on heroin and cocaine.  I

5    would acknowledge that heroin and cocaine has

6    generally always been a problem in the Detroit,

7    metro Detroit area.  I don't know that I would call

8    it the preferred.

9                    During this -- during the time period

10   prior to 2012, OxyContin 80 milligram tablets were

11   a large problem in Detroit, not on the date -- this

12   was issued in 2012.  So I don't know that I totally

13   agree with some of the information in here.  I mean

14   I don't have anything to dispute it.

15                   And the other thing I would like to

16   comment on is you kind of passed over quick into

17   Marion, Ohio.  That paragraph --

18           Q.     (BY MR. LIVINGSTON:)  You know, I --

19   you know, that is not -- I haven't asked a question

20   about Marion, Ohio.  Again, if you want to -- you

21   will have plenty of time with your own counsel, and

22   you can run his clock.  I don't want you running my

23   clock.

24           A.     I understand.  But when you make a

25   statement to me, I just want to acknowledge.  Some

Page 418

1    of them I don't accept, and you can just tell me.

2    But if I don't get to comment on them and you just

3    tell me and move on, I understand.

4         Q.    Well, when I ask you about Topic A

5    and you want to comment about Topic B, that is when

6    it becomes a problem.

7              MS. KNIGHT:  Counsel, you asked him,

8    you read to him Marian -- portions of the Marion

9    part.  You just skipped over parts that were

10   inconsistent with your argument.  So --

11             MR. LIVINGSTON:  All right.  Thank

12   you for the speaking objection.

13        Q.    (BY MR. LIVINGSTON:)  So the next

14   question is, when you were with the DEA in Detroit,

15   didn't you guys have team meetings, even though you

16   were focused on pill diversion, where you would

17   hear what was going on with respect to criminal

18   gangs in Detroit?  You guys didn't, you know, talk

19   to each other?

20             MS. KNIGHT:  Objection to form.

21        A.    Only if there was some kind of

22   relationship or it was in conjunction with the

23   distribution of prescription drugs.  I did not

24   interact with agents on illicit drug

25   investigations.

Page 419

1      Q.     (BY MR. LIVINGSTON:)  If you go to

2  the next bullet point under the Detroit section, it

3  says, "The prescription pills come from Detroit,

4  however are not typically sold in Detroit.

5  Prescription pills go for approximately double the

6  amount in Ohio, Kentucky and West Virginia.  The

7  pill traffickers from Detroit commonly pay elderly

8  people to fill prescriptions at pain clinics and

9  also doctor shop."

10             So do you see that this report is

11  indicating that the problem is that these drug

12  gangs are paying people to illegally obtain these

13  drugs from pharmacies in Detroit but rather than

14  sell them in Detroit, they are then being selled --

15  sold, I'm sorry, in Ohio and neighboring states,

16  correct?

17             MS. KNIGHT:  Objection to form.

18      A.     That is what this document says.  But

19  I think if they are linking it to the above

20  paragraph, I think it is maybe specific to some

21  gang activity in some of the certain areas.  I

22  don't know that -- it is a broad stroke to say that

23  this was just a common practice.

24             I am well aware that many of the

25  pills were still being sold and marketed on the

Page 420

1    streets of Detroit and the suburbs, in the general

2    areas around Detroit.  So it is kind of a broad

3    stroke to say that predominantly are leaving

4    Detroit and being sold elsewhere.

5                I do acknowledge that that occurred

6    because there was a larger market or a better price

7    per milligram in some of the areas outside of

8    Detroit.  I acknowledge that.  But I don't know

9    that it was as predominant as stated in this

10   paragraph, through my experience in doing the cases

11   when I was doing them.

12         Q.    (BY MR. LIVINGSTON:)  Of course, Lake

13   and Trumbull Counties are in Ohio, correct?

14         A.    That's correct.

15         Q.    And the reference here to "The pill

16   traffickers from Detroit commonly pay elderly

17   people to fill prescriptions at pain clinics and

18   also doctor shop," that is diversion, correct?

19         A.    That is correct.  It would be a

20   little more than to fill prescriptions.  They would

21   actually -- they would actually enlist people.

22   During this time period, there was a little

23   different type of illicit conduct where they would

24   recruit people and they would have them pose as

25   patients, not even be -- going to an office.  And

Page 421

1    they would write prescriptions in mass and fill

2    them and obtain them.

3              Q.    Right.

4              A.    Not exactly -- and it wasn't just

5    elderly people.  Generally, they focused on people

6    that were on Medicaid.

7              Q.    But in any event, the point here is

8    that these -- if you are paying an elderly person

9    to fill a script for no legitimate medical reason,

10   then that is a form of diversion, correct?

11             A.    Yes.  And indirectly, that would be

12   something that is tied to my investigation.  But it

13   would be you would -- you would see certain drugs

14   increasing in dispensing at some of the pharmacies

15   where this activity was occurring.  In Detroit, I

16   acknowledge, not in Lake and Trumbull County.  But

17   this is the kind of conduct that would fit into the

18   type of review that I do.

19             Q.    And part -- a major part of your job

20   was to prevent this sort of thing from happening,

21   where elderly people would be obtaining

22   prescriptions from pharmacies -- I mean from

23   doctors and getting them filled from pharmacies in

24   Detroit illegally, correct?  That was part of your

25   job, was to prevent that from happening?

Page 422

1          A.     On the first five years of my job or

2     six years of my job, that was the main focus of my

3     employment.

4          Q.     All right.  Go to the next page,

5     Bates 7552, again under "Awareness:  Prescription

6     Drug Interdiction."  It says, "The Ohio State

7     Highway Patrol Criminal Intelligent Unit analyzed

8     large pill seizures since January 2011 to the

9     present time.  One hundred and one cases were

10    analyzed, and it became evident that the majority

11    of the large interdictions were resulting from the

12    origin of Detroit, Michigan."

13               And then there's a pie chart that

14    shows where the drugs were headed.  And do you see

15    that Ohio is one of the major areas of where the

16    drugs were taken?

17         A.     I see that.

18         Q.     And then if you go to the last page,

19    7553, there's a Ohio map where they have indicated

20    where the drug seizures have taken place.  And

21    obviously, there's a number of large drug seizures

22    that took place in northeast Ohio, correct?

23               MS. KNIGHT:  Objection to form.

24         A.     There are.  I can't -- it probably

25    was a color at one time, so I can't tell what type

Page 423

1   of drugs.  But there are -- I don't know --

2   compared to the other areas, I don't know if I

3   would call it large, but there's a significant

4   number there.

5           Q.     (BY MR. LIVINGSTON:)  Right.  And

6   Lake and Trumbull Counties are both in northeast

7   Ohio, correct?

8           A.     Yes.  Some of them -- some of them

9   may be in the bottom you circled.  I don't know

10  that you have the county on there.  I believe some

11  of those might be a little outside of the county.

12  I think that is where the county line is, but there

13  are some in both those counties, yes, sir.

14          Q.     Please turn to Exhibit 55.

15                 (GE Exhibit 55 was marked for

16                 identification.)

17          Q.     (BY MR. LIVINGSTON:)  Do you know who

18  Damian Blakeley is?

19                 MS. KNIGHT:  Do you have 55?

20          A.     Hold on.

21                 MS. KNIGHT:  Our notebook goes

22  through 54.

23          Q.     (BY MR. LIVINGSTON:)  You know, I

24  think we emailed -- this is just a couple of pages

25  of deposition testimony.

```
                                                      Page 424
 1                 MS. KNIGHT:  Hold on, one second,

 2    Mr. Livingston.  We also got a little FedEx pack.

 3                 MR. LIVINGSTON:  That may be in

 4    there.  I'm not positive.

 5                 MS. KNIGHT:  No, it is not.  It says

 6    it is to replace Tab 2 in the binder, which would

 7    have been the --

 8          A.     Report.

 9                 MS. KNIGHT:  -- exhibits to his

10    report, so we don't have a 55.

11          Q.     (BY MR. LIVINGSTON:)  Well, like I

12    said, this is just deposition testimony.  I don't

13    even care if it is marked as an exhibit, to be

14    honest with you.

15                 Have you reviewed Mr. Blakeley's

16    deposition?

17          A.     I do not recall that name, sir.

18          Q.     Did you know that he was a long-time

19    member of the Lake County Narcotics Bureau and that

20    he was on a task force with the DEA for a number of

21    years?

22          A.     I do not recall Mr. Blakeley's name,

23    no, sir.

24          Q.     Let's just go to Page 95 to 99.  Do

25    you see in the middle of the page, he says, "So for
```

Page 425

1   the oxycodone pills, starting with the

2   30-milligram, where did they originate?"

3                 "Like where are they made?"

4                 No.  In terms of -- yeah, that was a

5   bad question.  I apologize... Where did the people

6   who were selling the Oxy 30-milligrams obtain their

7   pills?"

8                 Answer:  "Mostly Detroit, Michigan."

9                 Do you see that?

10        A.     Yeah, could you just go back up.  Can

11  I just read a couple of pages of this, please.

12        Q.     You can take your time to read the

13  whole thing.  I don't have a problem with that.

14                MS. KNIGHT:  Well, we don't have a

15  copy, Mr. Livingston, so if you want him to comment

16  on --

17                MR. LIVINGSTON:  No, I don't want --

18  listen, this is cross examination.  This is what I

19  want him to read.  You guys have available the

20  whole transcript if you want to show it to him at a

21  break or whatever you want to do.

22        A.     Can you scroll it down a little,

23  please.

24                Okay.  I acknowledge that is what the

25  transcript says.

Page 426

1          Q.     (BY MR. LIVINGSTON:)  So it looks
2     like this pipeline of pills, OxyContin, illegally
3     obtained OxyContin pills, you know, from Detroit,
4     you know, also ended up depositing pills in Lake
5     and Trumbull County, correct?
6                    MS. KNIGHT:  Objection to form.
7          A.     I'm not sure it says Lake and
8     Trumbull.  That is why I wanted to look up earlier
9     the -- I think there's a city I am not familiar
10    with.
11         Q.     (BY MR. LIVINGSTON:)  All right.
12    Let's see, maybe we will get lucky and possibly you
13    read Mr. Dombek -- do you know who Mr. Dombek is?
14    He is another narcotics person?
15                    MS. KNIGHT:  Objection to the form.
16         Q.     (BY MR. LIVINGSTON:)  Did you review
17    his deposition?
18         A.     No, sir.
19         Q.     Let's go quickly to Exhibit 26.
20                    (GE Exhibit 26 was marked for
21                    identification.)
22         Q.     (BY MR. LIVINGSTON:)  Page 101 --
23    let's go to 59 first.
24                    MS. KNIGHT:  Give us a moment.
25    Exhibit 26.

```
 1          Q.      (BY MR. LIVINGSTON:)  Exhibit 26,
 2   Line 16, beginning Line 16.
 3                  MS. KNIGHT:  Just a moment,
 4   Mr. Livingston.
 5          A.      What page?  I'm sorry.
 6          Q.      (BY MR. LIVINGSTON:)  59, starting on
 7   Line 16.
 8          A.      I am there.
 9          Q.      Do you see that Mr. Dombek
10   corroborated what we just read from Mr. Blakeley's
11   deposition, and he says, "We have had a lot of
12   activity of pharmaceutical-looking drugs, whether
13   or not they ended up being that, coming from
14   states, Michigan, Detroit...."  Do you see that?
15          A.      I do.
16          Q.      Why don't you go to Page 101.
17          A.      It also --
18                  MS. KNIGHT:  Objection to form.
19          A.      It also says Arizona, and it is
20   interesting because it says "pharmaceutical-looking
21   drugs."  I know this was the time period where they
22   were manufacturing pills to look like
23   pharmaceuticals.
24                  So there's a little more to that
25   statement, but I agree that it does say coming from
```

1    Detroit, states Michigan and Detroit in particular.

2         Q.    (BY MR. LIVINGSTON:)  Why don't we go

3    to Page 101 at the bottom, Line 21.  And Mr. Dombek

4    was being asked about the same Ohio State Highway

5    Patrol report that the two of us just went over.

6    And he is asked, "And the bulletin concerns issues

7    with prescription drugs coming from the Detroit,

8    Michigan area into Ohio.  Do you agree with me?"

9                   "Yeah.  I am just looking for where

10   it says specifically that on the back side."

11                  Go to the middle of Page 102,

12   starting on 11:  "And you mentioned earlier in your

13   deposition testimony that this is an issue that you

14   and your colleagues have seen over the course of

15   time; is that right?"

16                  Answer:  "Yes."

17                  Question:  "Prescription drugs coming

18   from Detroit into Ohio?"

19                  Answer:  "Yes."

20                  "And it looks like the information

21   that was provided to you and your colleagues

22   describes them coming in through Greyhound Bus

23   Lines or rental cars, right?"

24                  "That's correct."

25                  So Mr. Dombek, who is, you know,

Page 429

1   boots on the ground in Lake County with respect to

2   drug enforcement, is testifying under oath that the

3   biggest problem they were facing with respect to

4   drugs in his county was the pipeline of drugs that

5   were being illegally obtained across the street

6   from your DEA office in Detroit and being deposited

7   in Lake and Trumbull County, and you didn't even

8   know about this --

9              MS. KNIGHT:  Objection to the form.

10        Q.    (BY MR. LIVINGSTON:)  -- when you

11   prepared your report?

12              MS. KNIGHT:  Objection to the form.

13   A misrepresentation of the document.

14        Q.    (BY MR. LIVINGSTON:)  You didn't know

15   about this, right?  It is not mentioned anywhere in

16   your report; it is not mentioned in your schedule,

17   correct?  This is news to you.  As you read it here

18   now, this is news to you?

19              MS. KNIGHT:  Counsel, this is

20   argumentative.

21              MR. LIVINGSTON:  No, it is not.  It

22   is cross examination.

23              MS. KNIGHT:  You are allowed to

24   cross.  You are not allowed to argue with the

25   witness.

Page 430

1          A.     This information wouldn't have been

2     essential to rendering my opinion in regards to the

3     distribution of opioids from a distributor down to

4     a pharmacy.

5          Q.     (BY MR. LIVINGSTON:)  Are you

6     familiar with the pharmacist's corresponding duty?

7     Do you know what that is?

8          A.     Corresponding responsibilities?  Yes,

9     sir.

10         Q.     What is it?

11         A.     It is 1306.04 in the regulations, and

12    a pharmacist has the responsibility to determine

13    that the prescription is legitimate and that

14    there's a doctor/patient relationship.  Also

15    requires if there's any anomalies or red flags that

16    they dispel those before issuing the prescription.

17         Q.     You said red flags?

18         A.     Well, they don't say that in the

19    regulation, but they say anything abnormal or

20    anything that was identified out of the unusual,

21    that those are resolved prior to the dispensing of

22    the medication.

23         Q.     Has the DEA offered any guidance

24    about what a red flag is?

25         A.     I think there are plenty of cases

Page 431

1   that have occurred where they are published on the

2   Federal Register or on the DEA website in regards

3   to pharmacies and their corresponding

4   responsibility.  So I think there's plenty of

5   information available.

6                    Have they specifically sent a list

7   out of red flags?  I'm not aware of that.

8         Q.     You didn't do any analysis to

9   determine to what extent the defendant pharmacists

10  in Lake and Trumbull County properly discharged

11  their duty to exercise their corresponding

12  responsibility?

13        A.     I did not.

14        Q.     And you did not endeavor to try to

15  determine whether any suspicious order at the

16  distribution level with respect to any of the

17  defendant pharmacies ultimately was used to fill an

18  illegitimate or not legitimate prescription,

19  correct?

20        A.     That was not part of my analysis, no,

21  sir.

22        Q.     Turn to Exhibit 2, your report,

23  Schedule I.

24                    MS. KNIGHT:  So Mr. Livingston, I

25  believe that is the -- I don't know what was wrong

Page 432

1   with the version that was in the notebook, but that

2   is what was in this other envelope, saying it

3   should replace what is in --

4               MR. LIVINGSTON:  I think we forgot to

5   send the schedule.  I'm not sure.

6               MS. KNIGHT:  Don't worry about it.

7          Q.     (BY MR. LIVINGSTON:)  Mr. Rafalski,

8   do you know who Lewis Colosimo is?

9          A.     I do.

10          Q.     Who is he?

11          A.     Prior to my leaving the DEA or during

12   my employment, I'm aware he is a diversion

13   investigator, I believe, in the Pittsburgh,

14   Pennsylvania office.

15          Q.     Did you have any dealings with

16   Mr. Colosimo when you were with the DEA?

17          A.     I did.

18          Q.     What were those dealings?

19          A.     I know specifically during the

20   Harvard drug investigation he assisted me and maybe

21   took some actions subsequent to my case involving

22   distribution from Harvard into his area.  I believe

23   I had conversations with him about an unrelated

24   case, either before or after Harvard.  I don't

25   remember the specific time on that.

Page 433

1          Q.     Okay.  Did you find him to be, you

2     know, a competent DEA diversion inspector?

3                    MS. KNIGHT:  Objection to form.

4          A.     I am always cautious to draw

5     opinions, but matters that I dealt with him that he

6     assisted me or I assisted him, I -- I was confident

7     in those activities that we shared that he was

8     competent.  To assess his job performance, I don't

9     think I am qualified to do that.

10         Q.     (BY MR. LIVINGSTON:)  Well, did you

11    think he knew what he was doing, based on your

12    interactions with him?

13                    MS. KNIGHT:  Objection to form.

14         A.     Specifically to the matters that we

15    were dealing with each other on, yes.

16         Q.     (BY MR. LIVINGSTON:)  And the matters

17    you were dealing with him on was an investigation

18    of a major drug distributor, correct?

19         A.     No, there was some conduct in his

20    area that got passed on that he took action on.  So

21    he didn't assist me with the Harvard case.  It was

22    just some actions subsequent or discovered through

23    the Harvard case that he followed up and took

24    action on.

25         Q.     Well, when you -- when I asked you

Page 434

1    what your dealings were, you said that in

2    connection with the Harvard drug case, you worked

3    with him, correct; is that not true?

4              MS. KNIGHT:  Asked and answered.

5         A.      That is a broad statement,

6    Mr. Livingston.  He -- he didn't assist me at all

7    with the actual investigation of Harvard.

8    Sometimes in doing an investigation, you will see

9    activities that extend out beyond my geographic

10   area.  And some of it was -- some of the drugs were

11   sent into his geographic area, and he followed up

12   on those distributions.

13              So, in essence, it was linked to the

14   Harvard, but he didn't actually investigate the

15   Harvard case with me.

16        Q.    I understand that.  But he understood

17   what Harvard did wrong, correct, why Harvard got in

18   trouble with the DEA, correct?

19              MS. KNIGHT:  Object to form.

20        A.      I am sure we had a discussion about

21   that.

22        Q.    (BY MR. LIVINGSTON:)  And you knew

23   that he was a long-time DEA diversion inspector,

24   correct?

25              MS. KNIGHT:  Objection to form.

Page 435

1        A.     I don't recall knowing how long he
2   was on the job.  I mean he was -- I believe he was
3   senior to me, but I didn't know how many years
4   specifically.  I don't remember having that
5   conversation.
6        Q.     (BY MR. LIVINGSTON:)  And in your
7   report on Page 45, you indicate that you reviewed
8   his deposition?
9               MS. KNIGHT:  On Page 45 of the
10  report?
11              MR. LIVINGSTON:  Of the schedule, I'm
12  sorry.  I apologize.
13              MS. KNIGHT:  No, that is okay.  Just
14  clarifying.
15       A.     I reviewed some of his deposition.  I
16  don't think I read his deposition from front to
17  back.
18       Q.     (BY MR. LIVINGSTON:)  Well, how did
19  you determine what portions of his deposition you
20  should read?  Did you like do a word search, or how
21  did you figure that out?
22       A.     Sometimes it would be a word search
23  or sometimes I would more skim read it until I got
24  to areas that I found more relevant or interesting.
25  And then I would -- so it wasn't the same type of

Page 436

1  review I would do with other depositions where I

2  would sit and take notes and, you know, formulate

3  like a draft document.  So I did -- I did recall

4  reviewing some of it, but not to the extent I would

5  some of the others.

6          Q.     And you know that he was one of the

7  DEA agents who most often inspected Giant Eagle's

8  distribution centers, correct?

9          A.     I don't recall.  I know he did that.

10 I don't know that he did it most often.  It is a

11 small office, so it is possible.  But I don't have

12 that direct recollection.

13         Q.     Well, you at least knew that he was

14 one of the DEA diversion inspectors from the

15 Pittsburgh office who inspected not only Giant

16 Eagle's original warehouse, the HBC facility but

17 later the GERX facility, correct?

18         A.     I am aware he was doing some of the

19 reviews, yes, sir.

20         Q.     And then you also identify the

21 exhibits to his deposition.  Did you read all of

22 those exhibits or just some of those exhibits?

23         A.     I believe just some of them, sir.

24         Q.     Which ones did you read?

25         A.     I do not have my list here.  Janet

Page 437

1   Hart, Marion Wood --
2           Q.      I'm sorry.  I am asking with respect
3   to Mr. Colosimo's deposition exhibits, which ones
4   of those did you read?
5           A.      I don't recall, sir.
6           Q.      Do you recall a number of inspection,
7   DEA inspection reports for Giant Eagle's facilities
8   were exhibits to his deposition?
9           A.      I believe, yes, sir, I recall that.
10          Q.      Did you review all of them?
11          A.      I don't recall if I did or not.
12          Q.      When you did a word search on
13  Mr. Colosimo's deposition, did you ever search for
14  the words "full compliance"?
15          A.      I don't recall, Mr. Livingston.
16          Q.      Did you ever search for the words "no
17  discrepancies"?
18          A.      I don't recall, Mr. Livingston.
19          Q.      Did you ever search for the words "a
20  case closed"?
21          A.      Just for correction on the earlier
22  statement, they weren't in a Word, so the PDF
23  searches are not quite as reliable as the Word
24  searches.  I did do some searches that method.  I
25  don't recall specifically on the last question

Page 438

1    searching for that exact term either.

2            Q.     Well, do you get these in

3    Min-U-Script form with a word index at the back of

4    the deposition?

5            A.     I believe some I do.  I don't

6    remember specifically if I did with his.

7            Q.     So if you wanted to, when you get

8    those word indexes, you can literally just look up

9    the word "full" and see where it comes up, correct?

10           A.     If it is included with this exhibit.

11   I'm not sure all of them do.

12           Q.     And then further on down on this

13   list, you indicate you reviewed the deposition, the

14   March 5th deposition of Rick Shaheen.  Do you know

15   who Rick Shaheen is?

16           A.     No, I don't recall.

17           Q.     Well, do you know that Rick Shaheen

18   was mentioned by Mr. Colosimo because they worked

19   together when Mr. Shaheen was with the Pennsylvania

20   Attorney General Office Drug -- Antidrug Unit?

21           A.     I don't recall Mr. Shaheen's name,

22   sir.

23           Q.     Okay.  And you know that Mr. Shaheen

24   is in charge of pharmacy security for Giant Eagle

25   and has been since 2013?  Does that ring a bell for

Page 439

1    you?

2         A.    It does not.

3         Q.    It does not ring a bell?  Well, let's

4    just ask it in a hypothetical fashion.  Assuming

5    that Rick Shaheen, with a long-term law enforcement

6    background with respect to drugs, has been hired by

7    Giant Eagle to focus solely on making sure that no

8    diversion occurs at its pharmacies, you would agree

9    that that is a good control for a corporately-owned

10   pharmacy chain to have, correct?

11             MS. KNIGHT:  Objection to form.

12        A.    Generally speaking, any kind of

13   proactive action like that would be a good thing.

14   I'm not specifically -- I am not specifically

15   commenting on the capabilities of Mr. Shaheen.  But

16   the particular act you described would always be a

17   good thing to help to try to prevent diversion and

18   maintain effective controls to prevent it.

19        Q.    (BY MR. LIVINGSTON:)  All right.

20   Now, I think a minute ago you just said that you

21   don't remember which, if any, of the inspection

22   reports you may have reviewed.  But one thing is

23   for sure, nowhere in your 158-page report do you

24   mention the outcome of any of Giant Eagle's

25   inspections by the DEA, correct?

Page 440

1          A.     That's correct.

2                 MS. KNIGHT:  Objection to form.

3          Q.     (BY MR. LIVINGSTON:)  And unlike

4    Mr. Colosimo and the other folks at the DEA

5    Pittsburgh office who inspected Giant Eagle's

6    facilities, you never actually physically inspected

7    either HBC or GERX; is that correct?

8          A.     I never was physically present at

9    either of those locations, sir.

10         Q.     Did you ever ask plaintiffs' counsel

11   for that opportunity?

12         A.     To go there and inspect them?

13         Q.     Yes.

14         A.     I did not.

15         Q.     Did they ever tell you that that was

16   an option, that under the Federal Rules, a party

17   can request and obtain the right to physically

18   inspect the other parties' facilities?

19         A.     They did not tell me that.  I am not

20   aware of that, sir.

21         Q.     Now that you are aware of it, is that

22   something that you wish you had had the opportunity

23   to do before you rendered your opinions in this

24   matter?

25         A.     Well, I think anything that I could

Page 441

1  do to further gain information would be -- not

2  critical but important.  If I had a choice to do

3  anything, I wish I could interview the people

4  myself versus the deposition.  That is what I would

5  wish to do first.  But anything would be important,

6  sir.

7                    If I could go onsite, I'm not sure I

8  could -- it would be relevant as far back as my

9  review is, but I wouldn't preclude doing anything

10  that would gain further information.

11        Q.    Now, to try to set the scene a little

12  bit, were you aware that Giant Eagle, before it

13  opened up its H -- or obtained its license,

14  Schedule 3 license for HBC in 2009, that prior to

15  that, it had a List 1 chemical distribution

16  license?

17        A.    I generally recall seeing something

18  about that in the document review, yes.

19        Q.    And that in order to obtain that

20  license, there's similar requirements, not

21  necessarily identical but somewhat similar to the

22  requirements for -- a distribution license for

23  Schedule 3 drugs, correct?

24                    MS. KNIGHT:  Objection to form.

25        A.    I think a List 1 chemical distributor

Page 442

1   is quite a bit different than a controlled

2   substance distributor.  It is the distribution, and

3   there's some general things that are comparable.

4   But generally speaking, they are much different

5   registrations.

6           Q.    (BY MR. LIVINGSTON:)  Well, there's

7   security requirements for a person who is licensed

8   to distribute List 1 chemicals, correct?

9           A.    Yeah, but they are very general and

10  not as specific as for controlled substances.

11          Q.    Yeah, I didn't say that, but just

12  that they do have security requirements, correct?

13          A.    Yeah, they just have a general

14  statement about it.  They are nowhere -- those are

15  nowhere similar, the securities.

16          Q.    And you know that HBC started

17  distributing List 1 chemicals in 1997, correct?

18          A.    I don't know the specific year, sir.

19          Q.    Well, roughly in that time frame?

20          A.    Yes.  Almost all distributors that

21  are controlled substance distributors do a

22  coincidental activity with List 1 chemicals because

23  of the over-the-counter prescriptions or

24  over-the-counter medications that contain

25  pseudoephedrine and ephedrine.  So that is pretty

Page 443

1  typical a business activity for a distributor.

2          Q.     All right.  Why don't we go to

3  Exhibit 33, Giant Eagle 33.

4               MS. KNIGHT:  Counsel, we have been

5  going a little over an hour.  Are we at a good like

6  five-minute stopping break?

7               MR. LIVINGSTON:  Yeah, that is fine.

8               MS. KNIGHT:  Really, just five

9  minutes should be fine.

10              THE VIDEOGRAPHER:  Okay.  We will go

11  off the record at 9:13.

12              (Whereupon, a break was had from 9:13

13              a.m. until 9:24 a.m. EDT)

14              THE VIDEOGRAPHER:  We are back on the

15  record at 9:24.

16          Q.     (BY MR. LIVINGSTON:)  Mr. Rafalski,

17  can you tell me how many preregistration

18  inspections Giant Eagle's HBC and GERX facilities

19  had?

20          A.     I cannot, sir.

21          Q.     Do you know how many cyclic

22  inspections Giant Eagle's HBC and GERX facilities

23  had during the time frame that we have been talking

24  about for this case?

25          A.     No, sir.  I do not.

Page 444

1          Q.     All right.  Well, let me represent to

2    you that they had three preregistration inspections

3    and eight cyclic inspections between 1997 and 2020.

4                 You would agree that that is a

5    significant number of inspections, right?

6                 MS. KNIGHT:  Objection to the form.

7          A.     Is that specific to the GERX DC or at

8    both facilities?  I'm sorry.

9          Q.     (BY MR. LIVINGSTON:)  I said both

10   facilities.

11         A.     Both.

12         Q.     Collectively.

13         A.     That would be probably an expected

14   amount.

15         Q.     And I think you testified yesterday

16   that typically distributors end up fifty percent of

17   the time when they have their facilities inspected

18   getting at least a letter of admonishment from the

19   DEA, correct?

20         A.     That is the matter I wanted to

21   discuss with you this morning before starting my

22   testimony.

23         Q.     Well, yes or no, you said that under

24   oath yesterday?

25         A.     I did say that.  In rethinking that

Page 445

1   over the night, I'm not comfortable with that

2   answer, mainly because I didn't keep a scorecard.

3   And early in my career, before there was electronic

4   ordering, there was generally record violations.

5   But as time went on, I'm not confident with fifty

6   percent, as that is kind of a guess, and I don't

7   like to guess.

8                So I am not going to stand by the

9   fifty percent.  That is what I wanted to correct

10  this morning.

11       Q.    Well, are you telling me that you are

12  uniquely qualified to give opinions about whether

13  distributors are complying with their DEA

14  regulatory obligations, you were with the DEA for

15  twelve, thirteen years, and you can't even ballpark

16  it for us how often you end up, when you were doing

17  your inspections, how often you ended up, you know,

18  at least sending out a letter of admonishment to

19  the distributor?

20                MS. KNIGHT:  Object to form.

21       A.    I think that is an important

22  question, and I don't want to guess on that,

23  Mr. Livingston.  I don't want to ballpark it.

24       Q.    (BY MR. LIVINGSTON:)  And not only

25  did you tell us yesterday under oath that your best

Page 446

1  estimate was fifty percent, but in another opioids

2  case you also testified under oath that it was

3  fifty percent.

4           MS. KNIGHT:  Objection to form.

5       A.    I don't recall that.  But I am not

6  comfortable, without having the ability to go back

7  and look and give an accurate number, with just

8  using fifty percent.

9           Q.    (BY MR. LIVINGSTON:)  Let's go to

10  Exhibit 47.

11           (GE Exhibit 47 was marked for

12                identification.)

13           Q.    (BY MR. LIVINGSTON:)  Do you see

14  that -- Exhibit 47 is portions of your videotaped

15  deposition transcript from the New York opioids

16  case.

17       A.    I see that.

18       Q.    And it was taken in February of 2020,

19  correct?

20       A.    Yes, sir.

21       Q.    Would you go to Page 849, 850.

22           At the bottom of Page 849, starting

23  on Line 20, you were asked, "What about for

24  distributors?  How common was it that you would

25  issue -- the DEA would issue letters of admonition

Page 447

1    following inspections or audits?"

2                      Answer:  "I think it would be at

3    least fifty percent," correct?

4            A.    Yes.  But that question, I think, is

5    just about inspections, not specific to

6    distributors.

7            Q.    It says "what about for

8    distributors"?

9            A.    Later on it does say fifty cent --

10   fifty percent.  I acknowledge that.

11           Q.    And that was your testimony given

12   under oath in the New York case, correct?

13           A.    That is what I stated, yes.

14           Q.    And you also stated it under oath

15   yesterday?

16           A.    I did.  I said it was -- I believe I

17   said it was a best guess, and I am not comfortable

18   guessing about that.

19           Q.    And so you just woke up in the middle

20   of the night thinking, oh, my gosh, I better change

21   this testimony, or did you have a conversation with

22   any person about this particular issue?

23           A.    I had no conversations.  I did not

24   wake up in the middle of the night.  When I got

25   back after my testimony, I was having dinner by

Page 448

1   myself and thinking about that number and being a

2   guess, and I wasn't comfortable with it.

3            Q.     All right.  Did you ever have trouble

4   after you gave the New York testimony?  Did you

5   ever recant that testimony?

6            A.     I did not.

7                   MS. KNIGHT:  Objection to the form.

8            A.     I did not.

9            Q.     (BY MR. LIVINGSTON:)  Well,

10  regardless of what the exact percentage is or is

11  not for how often the DEA would issue letters of

12  admonition after an inspection to a distributor,

13  you would agree that Giant Eagle's record of all

14  clean inspections for three preregistration

15  inspections and eight cyclic inspections is

16  exemplary, correct?

17                  MS. KNIGHT:  Objection to form.

18           A.     I would say that is expected.

19           Q.     (BY MR. LIVINGSTON:)  Well, you said

20  it was expected, but you also have said that it

21  was -- forget the percentage, that it certainly

22  wasn't uncommon for even a single -- for

23  distributors to get letters of admonition for not

24  being in compliance after an inspection?

25           A.     I did say that.  And doing

Page 449

1    inspections, as I have stated just earlier, there's

2    all kinds of violations.  Typically early in my

3    career, record violations were pretty common,

4    especially related to distribution because they

5    were paper forms.  Later on they became a little

6    more compliant.  There's always the potential.

7                   But in your statement earlier, I'm

8    not aware of what the DEA in a totality, how many

9    LOAs are issued.  Only my experience with my cases

10   and people that I am with in Detroit.

11                  But every time I go in, I hope and

12   expect that there's no violations.  It is not

13   something that is -- I seek to find.  That is -- a

14   good, compliant investigation is good because they

15   are compliant with the regulations.

16       Q.    Well, can you identify, not give us

17   the particular name, but just can you think of any

18   distributor who you inspected that often who -- for

19   whom you found no violations at all?

20       A.    I have never had an inspection as

21   often as what is happening.  If Mr. Colosimo was on

22   each one of those, I have never had that situation

23   in Detroit, so wider geographic area and more

24   investigators.

25                  There have been some that I have had

1    recollection that had no violations.  I don't know

2    that they had them every time.  And there was no

3    registrants that were exclusive to me that I would

4    do every one.  They are generally distributed --

5    they are generally avoided where you don't always

6    go to the same place.  That sometimes happens in

7    offices where there's smaller numbers of

8    investigators.

9          Q.    When -- yeah.  I didn't suggest that

10   Mr. Colosimo was the agent or investigator,

11   inspector who inspected each time.  He just

12   testified about each of those inspections.

13               But let me ask you this:  How many

14   times did you investigate or inspect a distributor

15   more than once?

16         A.    There's a couple I can recall doing

17   more than once.

18         Q.    Which one was the more -- more than

19   twice?

20         A.    I'm not going to guess on that.  And

21   one of the reasons is sometimes I go as the lead,

22   so it is my assignment.  Sometimes I go as a backup

23   or assisting somebody.  So I may have visited and

24   been present but not the lead.  And I am not going

25   to guess on that because I just don't know.  I

Page 451

1    never kept records to be able to accurately answer

2    that, and I don't want to guess.

3            Q.    And did you ever find that a

4    distributor's SOMS system that you inspected was in

5    compliance?

6            A.    I believe there were some, yes.

7            Q.    Okay.  And what kind of threshold

8    system did they have?

9            A.    Without disclosing the registrant,

10   one that I recall, because I had concerns going in,

11   was a manual system.  And I actually found that to

12   be compliant, but it was based on a business

13   activity and the abilities and knowledge of the

14   employees.

15           I can recall a couple of smaller

16   companies that had compliance systems.  I can also

17   recall some that did not.  But off the top of my

18   head, I didn't really keep records or I don't have

19   a recollection specifically of the different

20   companies and what they had and didn't have.

21           Q.    Without disclosing the name of the

22   registrant, the one that was a manual system, can

23   you tell us what was the nature of the business?

24   You said based on business activity.  What did you

25   mean by that?

1          A.      They were unique.  They distributed

2     to dispensing doctors and specific kinds of -- like

3     dentists operating at clinics, and there were some

4     distributions I had concern with, but going onsite

5     and having a discussion with the compliance people

6     and the owner, I was -- I believed that they were

7     compliant in the knowledge of their registrants and

8     what they were dispensing in their business

9     activities.  But it was -- the scope of their

10     business wasn't as large as a distributor like, for

11     example, Giant Eagle.

12          Q.      My next question is, how many

13     customers, different customers, just roughly,

14     fifty, a hundred, a thousand, ten thousand?

15          A.      Not thousands.  I don't specifically

16     recall.  I don't want to guess on that.  I don't

17     believe it was even over a hundred.  I believe it

18     was under a hundred, but I don't remember

19     specifically how many.  It wasn't a large

20     distribution because it was a unique type of

21     business.

22          Q.      Do you know how many pharmacies Giant

23     Eagle has in Ohio?

24          A.      Just in the two counties overall, I

25     have seen a document about that, but I don't recall

Page 453

1    it off the top of my head.

2         Q.    And how did the manual system work?

3    Was there just people who were fairly familiar with

4    the customers who would, you know, identify

5    unusually large orders or suspicious orders of some

6    sort?

7         A.    There was a multitude of things they

8    did.  There was more of an intimate relationship

9    with the sales.  The CEO was in the field a lot and

10   sales.  And they used -- actually used people to

11   evaluate some companies.  They had questioned some

12   outside consultants.  The compliance people had

13   pretty intimate knowledge of who their customers

14   were and what they were ordering.

15              During my interview, I didn't find

16   any areas where they weren't -- didn't have

17   knowledge of the customers that I reviewed or the

18   questions that I had.

19         Q.    So one of the things that gave you

20   comfort was their familiarity that the compliance

21   people had with their customers?

22         A.    Well, it was a multitude of things,

23   but that was one.  You know, they had an

24   onboarding, they had customer files.  They had a

25   knowledge of what they were ordering.  They were

Page 454

1   aware if there were increases.  It was a system

2   that I didn't find any faults with on that

3   particular inspection.  I don't know moving forward

4   if it changed, but --

5           Q.     All right.  So you are aware that

6   Giant Eagle never received a letter of admonition,

7   correct?

8           A.     I believe that is an accurate

9   statement, yes, sir.

10          Q.     There was never any kind of

11  administrative action of any kind ever taken

12  against Giant Eagle for violating any DEA

13  regulations, correct?

14          A.     Not that I am a aware of.

15          Q.     And Giant Eagle never was penalized

16  or entered into any kind of memorandum of

17  understanding for any violation of any DEA

18  regulations, correct?

19          A.     That's correct.

20          Q.     And you at least know -- you would at

21  least acknowledge that Giant Eagle was found to be

22  in full compliance at the conclusion of every

23  inspection that I mentioned to you earlier?

24                 MS. KNIGHT:  Objection to form.

25          A.     I'm not sure that I reviewed every

Page 455

1    inspection, the results, but I'm not going to

2    dispute your comment.  But I don't have personal

3    knowledge of that.

4            Q.    (BY MR. LIVINGSTON:)  Are you saying

5    that, in the preparation of your opinion regarding

6    whether Giant Eagle's SOMS system was complying

7    with DEA regulations, you didn't think it was

8    material for you to consider, at least review and

9    consider the outcome of the inspection report,

10   inspections that were done by your DEA colleagues?

11           MS. KNIGHT:  Objection to form.

12           A.    I wouldn't say it wasn't important,

13   but I didn't put a high value on it only because in

14   my experience with the cases I have worked,

15   generally there would be clean inspections during

16   the time frame where I took action, in regarding,

17   specifically, Masters and Mallinckrodt.

18           Q.    Well, you identify in your report

19   some instances where our co-defendants may have had

20   some minor violations of DEA regulations, correct?

21   You identify those in your report, correct?

22           MS. KNIGHT:  Object to form.

23           A.    Yes, sir.

24           Q.    (BY MR. LIVINGSTON:)  Okay.  But in

25   your report, you don't mention that Giant Eagle had

1    clean inspections; you don't mention that at all,

2    right?

3            A.    No.  But I think when I don't mention

4    they had any adverse actions, I think short of

5    thinking I just didn't put that information in

6    there, I think that is the inference you could

7    take.

8            Q.    Why don't we go to Exhibit 38.

9                  (GE Exhibit 38 was marked for

10                 identification.)

11           Q.    (BY MR. LIVINGSTON:)  This is a cheat

12   sheet that we prepared to avoid the necessity of

13   having to go through every single inspection

14   report.  And, you know, if we have to do that, we

15   certainly have the time, and we will do it.  But I

16   thought we would maybe try to streamline things by

17   looking at this slide that we prepared.

18                 So this is just with respect to HBC.

19   This doesn't include GERX.

20                 We have already talked about

21   Mr. Colosimo.  You would acknowledge that he has

22   thirty-one years' experience as a DEA diversion

23   investigator, correct?

24                 MS. KNIGHT:  Objection to form.

25           A.    I do not know how much time.  I don't

Page 457

1    dispute this or when thirty-one years was, but I

2    don't have any independent knowledge of that.

3            Q.    (BY MR. LIVINGSTON:)  Well, if you

4    reviewed his deposition, you would have that

5    knowledge.  I thought you said you at least

6    reviewed portions of it.

7                  MS. KNIGHT:  Objection to form.

8            A.    I did.  I don't recall seeing that he

9    had thirty-one years on the job.

10           Q.    (BY MR. LIVINGSTON:)  Okay.  And that

11   would be -- about two and a half times the amount

12   of time you had when you were with the DEA; is that

13   correct?

14                 MS. KNIGHT:  Objection to form.

15           A.    I don't know if it was two and a

16   half, but it was considerably more years than I

17   had.

18           Q.    And do you know who Kurt Dittmer is?

19           A.    I don't know him personally.  I know

20   that he is a DEA -- a diversion investigator, but I

21   don't recall much more about that other than his

22   name.

23           Q.    And you see he had over twenty years

24   experience and he was a DEA group supervisor?

25                 MS. KNIGHT:  Objection to form.

Page 458

```
 1          A.      I see that on this chart.
 2          Q.      (BY MR. LIVINGSTON:)  And do you know
 3    who Vincent Tomei is?
 4          A.      Not without seeing it on the chart,
 5    no, sir.
 6          Q.      And Michael Kupchick, Pittsburgh --
 7    another DEA diversion investigator?
 8          A.      I see that on the chart.
 9          Q.      And do you know who -- never heard of
10    John Conlon either, I take it?
11                  MS. KNIGHT:  Object to form.
12          A.      The name not personally, no.
13          Q.      (BY MR. LIVINGSTON:)  Well, did
14    you -- how do you know -- what do you know about
15    him?  You just said you know the name.  How do you
16    know the name?
17          A.      Just through working at the DEA.
18    Might have been present at one time when I met with
19    Colosimo or some other matter.  The name is
20    familiar to me.
21          Q.      And Jeff Sousa, have you ever heard
22    of him?
23          A.      Yes, him too, but probably with
24    dealings through Mr. Colosimo maybe.  The name
25    seems familiar.
```

Page 459

1        Q.     Do you see that we have just sort of
2    highlighted sort of the ultimate conclusion of the
3    reports and which inspections each one of these DEA
4    inspectors was involved with?
5               You see in 2009 when Mr. Colosimo did
6    the preregistration inspection for HBC and he
7    approved HBC's facility for a Schedule 3 license,
8    correct?
9               MS. KNIGHT:  Objection to form.
10       A.     It doesn't give all of those details.
11   And that is what your cheat sheet says, but I would
12   like to read the report where it says deemed
13   adequate, the security system to see specifically
14   what it says.  But I acknowledge that your chart
15   says that.
16       Q.     All right.  Well, like I said, I kind
17   of suspected we probably would have to go back.  We
18   will do that.
19               Just when you get to 2013, Mr. Conlon
20   concludes "no discrepancies with respect to
21   recordkeeping or security.  Both recordkeeping and
22   security are in full compliance with..."
23               And when you do -- when the DEA does
24   these cyclic investigations, one of the major
25   things that they look at is the SOMS system,

Page 460

1  correct, that is part of the security and

2  recordkeeping regulations?

3          A.      Well, it is part of being -- doing

4  the onsite inspection.  I don't know that it is

5  more important than any other section, but it is

6  something that they should review and comment on.

7          Q.      Right.  And Mr. -- I want to ask you,

8  remember we talked yesterday about how the

9  regulation refers to requiring registrants to be in

10  substantial compliance with the security

11  regulations; we went over that?

12          A.      Yes, sir.

13          Q.      And here we have a finding that Giant

14  Eagle was not substantially in compliance but

15  rather in full compliance, correct?

16          A.      If that is what the statement of Mr.

17  Sousa says, then I agree that is what that

18  statement says.

19          Q.      Okay.  And in 2014, Mr. Sousa reaches

20  the same conclusion.  He says "No discrepancies

21  with respect to recordkeeping or security.  Both

22  recordkeeping and security are in full compliance."

23  Do you see that?

24              MS. KNIGHT:  Object to form.

25          A.      I do see that statement.  But to say

Page 461

1  recordkeeping and security are in full compliance,

2  it is a pretty broad statement without looking at

3  the report.

4        Q.    (BY MR. LIVINGSTON:)  Yes.

5        A.    Not that I need to read them all, but

6  I wouldn't disagree that the report may say that.

7  Maybe in summary at the beginning, I am guessing.

8        Q.    And when you go -- and your opinion

9  that is in your report is that from 2009, when HBC

10 first was granted a license for Schedule 3 drugs,

11 until hydrocodone was reclassified in 2014, during

12 that entire period of time, Giant Eagle was not

13 even in substantial compliance; it wasn't in

14 compliance at all, right?

15       A.    In regards to their SOMS system,

16 that's correct.

17       Q.    In other words, you disagree with the

18 conclusions reached by all of these DEA agents,

19 correct?

20             MS. KNIGHT:  Object to the form.

21       A.    Well, that is why I would like to

22 review the documents to ensure that they even

23 inquired about those things in their investigation.

24 It is not a mandate that they be required.  So I

25 would like to see what description they had and

Page 462

1   what awareness they had of the system.  But I am in

2   disagreement if it says full compliance with

3   security, I do not disagree -- I do not agree with

4   that statement.

5           Q.      (BY MR. LIVINGSTON:)  So you publish

6   your report in April, which contains all of your

7   final opinions for this case, and now we are taking

8   your deposition in June.  And you haven't taken the

9   time to review any of these inspection reports,

10  correct?

11              MS. KNIGHT:  Objection to the form.

12          A.      That's correct.

13          Q.      (BY MR. LIVINGSTON:)  Well, I guess

14  now is as good a time as any to finally look at

15  these reports.  Let's go to Exhibit 34.

16              (GE Exhibit 34 was marked for

17              identification.)

18          Q.      (BY MR. LIVINGSTON:)  Page, at the

19  top, we will go to Page 9.

20              MS. KNIGHT:  Just a moment.  Sorry,

21  Mr. Livingston.  He is getting there.

22          A.      Go ahead.

23          Q.      (BY MR. LIVINGSTON:)  Okay.  You see

24  this is a report by Mr. Colosimo regarding the

25  approval of HBC's request for a Schedule 3 license

```
                                             Page 463

 1   in October of '09?

 2              MS. KNIGHT:  So you said Page 9 in

 3   the exhibit; is that right?

 4         A.    I agree it is Mr. Colosimo.

 5              MR. LIVINGSTON:  Page 9 at the top.

 6         A.    Go ahead.

 7              MR. LIVINGSTON:  Matt, you have got

 8   different pages than I have.

 9              MS. KNIGHT:  Yeah, Page 9 doesn't

10   have his name on it.  That is why I was asking.

11         A.    I went back and confirmed it on the

12   first page.

13              MR. LIVINGSTON:  Why don't we go

14   about Bates number, how about Bates Number 33024,

15   USDEA, 33024.

16         A.    I think that must be a different tab

17   than -- I'm sorry.  You are saying Tab 34?

18         Q.    (BY MR. LIVINGSTON:)  33.  33.  Maybe

19   that is the problem.  Let's go to Tab 33.

20              (GE Exhibit 33 was marked for

21              identification.)

22         A.    All right.  And the Bates number

23   again, please.

24         Q.    (BY MR. LIVINGSTON:)  33024 and Page

25   9 at the top.
```

Page 464

1           A.      Okay.  I am there.

2           Q.      So do you see that this is a report

3    by Mr. Kupchick?

4           A.      I do.

5           Q.      And this is a cyclic investigation.

6    Also he was helped by Mr. Tomei.

7           A.      I see that.

8           Q.      And the date of this is May 13th,

9    2011.  And just for the jury's understanding, this

10   form is a form that you used too when you were with

11   the DEA or something very similar to it, correct?

12          A.      Yes.

13          Q.      And it was part of every DEA

14   diversion inspector's job after they inspected a

15   facility to prepare a report on the findings,

16   correct?

17          A.      That is the training and the manual

18   instruction, yes, sir.

19          Q.      And the synopsis at the beginning

20   just kind of quickly gives you sort of a summary of

21   the outcome?

22          A.      Yes, it does.

23          Q.      And it says "Cyclic Investigation and

24   Case Closing."  What does "case closing" mean?

25          A.      Well, that means the onsite

Page 465

1   investigation has been concluded.

2           Q.     Okay.  And that means at that point

3   from the DEA's perspective, the registrant is in

4   compliance, correct?

5           A.     No.  It just means the matter is

6   closed.

7           Q.     Why would you close the matter if the

8   registrant is still not in compliance?  Wouldn't

9   you -- I mean that doesn't sound like the DEA would

10  be doing its job in that situation, right?

11                 MS. KNIGHT:  Objection to form.

12          A.     Well, until -- if there's a pending

13  action with the registrant, it should remain open.

14  And that is the training.  But I don't draw that

15  assumption.  With some -- you know, in my career, I

16  know that some were closed prior to that conclusion

17  and they were supplemented.  But generally speaking

18  when it says "case closed," the matter has had a

19  final resolution.

20          Q.     (BY MR. LIVINGSTON:)  Okay.  Why

21  don't we skip down on to the third paragraph under

22  "Synopsis."  And it says, "This investigation

23  revealed no discrepancies with respect to

24  security."  That is just another way of saying

25  there was no finding of a violation of the DEA

```
                                         Page 466

 1    regulations, correct?

 2                   MS. KNIGHT:  Objection to form and

 3    misrepresentation on the document.

 4         A.     I just think it says what it says,

 5    sir.

 6         Q.     (BY MR. LIVINGSTON:)  Well, you are

 7    an expert.  You are a DEA expert.  You are reading

 8    a DEA report.  Nobody has a better DEA decoder ring

 9    than you.  What does that mean to you?

10                   MS. KNIGHT:  Objection to form.

11         A.     It means this investigation revealed

12    no discrepancies with respect to security.

13         Q.     (BY MR. LIVINGSTON:)  And what does

14    that mean, no discrepancies?

15         A.     I guess no -- nothing that was

16    correctable.  I don't know if that is the language

17    I would use.  Nothing -- no problems.

18         Q.     All right.  Let's go to 33026.  It

19    talks about under "Details" the basis of the

20    investigation.  And it says that this is being done

21    pursuant to an office cyclic work plan.  You had

22    similar cyclic work plans when you were a DEA

23    inspector as well, correct?

24         A.     Yes, I did.

25         Q.     All right.  Under the next paragraph,
```

Page 467

1   the last sentence says, "This investigation was

2   initiated on May 13, 2011, and concluded on May 17,

3   2011, with a meeting with management."  Now, how

4   much time have you spent with respect to the

5   opinion that you have rendered in this matter

6   relating to Giant Eagle?

7                   MS. KNIGHT:  Objection to form.

8           A.    I don't understand the question.  Can

9   you ask that again, please?

10          Q.    (BY MR. LIVINGSTON:)  Yeah.  How much

11  time did you spend on your opinion that Giant Eagle

12  had a subpar SOM system?  How much time?

13          A.    I didn't -- I don't -- I don't recall

14  the exact number of hours.

15          Q.    Well, was it five hours, ten hours,

16  twelve hours?

17          A.    No.  Much more than that.

18          Q.    How many?

19          A.    I'm not sure.  I am not going to

20  guess.

21          Q.    Can't ballpark it?

22          A.    No.

23          Q.    Okay.  Well, if you don't -- if you

24  can't tell us, then I guess nobody can, right?

25          A.    I can just tell you it was a

Page 468

1    substantial amount of time.  I didn't keep a

2    specific amount of time.  I know the total time I

3    wrote -- went -- spent on the report.  I didn't

4    keep specific records for each of the companies.

5    So, no, I am not going to guess or ballpark it.

6          Q.    All right.  And then it says that

7    they had a meeting with management.  You didn't

8    meet with Giant Eagle's management, did you?

9          A.    I did not.

10          Q.    Okay.  Let's go down to the last

11   paragraph on this page.  It says, "HBC was approved

12   as a distributor of List 1 chemicals on August 27,

13   1997, and was assigned DEA Registration Number.

14   The subject firm was the subject of in-depth cyclic

15   investigations in 2002, 2004 and 2008."

16          Now, you see that this report is

17   looking retrospectively at prior inspections of the

18   facility, correct?

19          MS. KNIGHT:  Objection to form.

20          A.    Yes.  And that statement is specific

21   to a List 1 chemical.

22          Q.    (BY MR. LIVINGSTON:)  Right.  Right.

23   Yeah, I wasn't suggesting otherwise.  And that was

24   a common practice for you and other DEA inspectors

25   that in these reports, you would look -- you would

Page 469

1    include what the outcome was of prior inspections,

2    correct?

3         A.    Generally speaking, yes.  I am not

4    sure that it would -- that it would cross over to

5    do other business activities, but that is just the

6    style of this writer.

7         Q.    And then the next sentence says, "No

8    violations were uncovered during these

9    investigations.  HBC was approved as a distributor

10   of controlled substances in October of 2009."  Do

11   you see that?

12        A.    I do.

13        Q.    Okay.  So again this is like probably

14   the, you would agree, the first cyclic inspection

15   of the HBC facility after it obtained, you know,

16   its Schedule 3 license, correct?

17             MS. KNIGHT:  Object to the form.

18        A.    By looking at the date and you

19   producing no other document, yes.

20        Q.    (BY MR. LIVINGSTON:)  All right.

21   Would you go to Page 33028 or Number 13 at the top?

22        A.    Okay.

23        Q.    It says, "After a thorough review and

24   analysis of the required records, it was determined

25   that all of the controlled substances were

Page 470

1    accounted for."  So this was kind of like an

2    inventory check, right?  Correct?

3             A.    It is.

4             Q.    Okay.  And you would agree that a DEA

5    agent should, in fact, make sure that his

6    inspection is thorough, correct?

7             A.    Well, this is stating this in regards

8    to the required records.

9             Q.    And you didn't do any kind of

10   inventory check like these DEA inspectors did, did

11   you?

12            A.    In regards to what, sir?

13            Q.    To Giant Eagle.

14            A.    No, I did not.

15            Q.    All right.  Would you go to Page

16   33034, Page 19 at the top?  You see at the top, it

17   says, "All selections are performed using the

18   Vocollect directed activity."  Do you know what the

19   Vocollect system is?

20            A.    Reading this, it looks like it is the

21   picking system.

22            Q.    Well, before you read this, when you

23   prepared your report, did you know that Giant Eagle

24   during all the relevant period of time employed and

25   used the Vocollect system?

Page 471

1          A.     I don't recall the term "Vocollect"

2      in my review, sir.

3          Q.     Did you know that the Vocollect was a

4      computerized inventory system that kept constant

5      up-to-date count of everything in inventory when

6      you prepared your report?  Were you aware of that?

7          A.     I was aware that they had an internal

8      system that was -- that was keeping track of

9      inventory.  I don't recall it being called the

10     Vocollect.

11         Q.     Do you see that -- DEA then describes

12     the Vocollect system as it "directs users via

13     headset to the location and quantity of each item

14     to select.  As the selector is picking, they can

15     scan the NDC bar code of the item to ensure that

16     the exact item is being selected.  (This is

17     repeated for all items until all total units are

18     selected.)

19              "These tasks are completed one

20     customer at a time.  The controlled substances are

21     placed inside a Number 2 [sic] white paper bag with

22     a pick list attached to the outside of the bag for

23     ease of customer verification upon delivery.  Upon

24     generic -- upon completion of the tasks inside the

25     cage, the tasks are combined with the generic drug

1  tasks and consolidated into the fewest shipping

2  cartons/totes as possible."

3              Now, as described, you would agree

4  that this sounds like a very sound inventory

5  control system, correct?

6              MS. KNIGHT:  Object to the form.

7         A.    I don't know if I would characterize

8  it as sound.  It is an inventory control system.

9         Q.    (BY MR. LIVINGSTON:)  Well, do you

10 think it is a bad system?

11        A.    No.  I just think it is a system.

12        Q.    Well, isn't it better than most of

13 the systems that you found that distributors had

14 when you did your inspections?  How many of them

15 had a computerized system like this that kept an

16 up-to-the-second count of everything in inventory?

17             MS. KNIGHT:  Object to the form.

18        A.    I think most had that capability.

19        Q.    (BY MR. LIVINGSTON:)  And then under

20 "Inventory Controls," Giant Eagle doubles down.  It

21 says, "In addition to the self-scan audit during

22 selection, HBC performs random audits of at least

23 ten percent of the total tasks being completed.

24 After all selections complete, HBC cyclic counts

25 all controlled substances daily as the business is

Page 473

1 run and always prior to selecting a new billing

2 cycle. All discrepancies are researched thoroughly

3 in attempt to find the variance."

4 Now, the DEA regulations only require

5 biannual inventory counts, correct?

6 A. That is the regulatory requirement,

7 yes, sir.

8 Q. Okay. So here we have the DEA

9 regulation says that only every two years you have

10 to do what Giant Eagle does every day, correct?

11 MS. KNIGHT: Object to the form.

12 A. Well, the regulations require that a

13 registrant conduct a biannual inventory, and it has

14 a specific way that it is recorded to the DEA. It

15 doesn't prohibit registrants from doing other

16 audits or inventories. Generally, states require

17 more often. And generally speaking, in my

18 experience, most of the distributors had an almost

19 daily audit or reaudit of their controlled

20 substances. That was pretty common in the

21 industry.

22 Q. (BY MR. LIVINGSTON:) That wasn't my

23 question, sir. I just asked about the DEA

24 regulations. As compared to the DEA regulation,

25 you would agree that Giant Eagle actually far

Page 474

1    exceeded the minimal requirements that are included

2    in the DEA regulations with respect to inventory

3    counts?

4         A.    They conducted inventories more often

5    than biannually, yes, sir.

6         Q.    Would you at least -- maybe at least

7    on inventory, would you give Giant Eagle an A?

8              MS. KNIGHT:  Object to the form.

9         A.    Well, I don't know if I would grade

10   them.  But as I stated, that was pretty common in

11   the industry with electronic systems, that they

12   would do a daily accountability as part of their --

13   I don't know if it was their security program, but

14   it was definitely part of their accountability

15   internally.

16        Q.    (BY MR. LIVINGSTON:)  I would like to

17   go to the last sentence on this paragraph.  It

18   says, "The Pharmacy Merchandizing group notifies

19   all customers to search for any discrepancy with

20   their inbound order."  Did you know that the

21   Pharmacy Merchandising group was at Giant Eagle's

22   corporate headquarters?

23        A.    I don't know if I was aware

24   specifically where they were located.

25        Q.    Well, doesn't this tell you that

Page 475

1   Giant Eagle's corporate offices were overseeing

2   inventory control at the HBC warehouse, that it was

3   another check on what was going on at that

4   warehouse?

5              MS. KNIGHT:  Object to the form.

6        A.    Well, I think it is a little broader

7   than that.  Because once the drugs are received by

8   the pharmacy, it is not just whether or not that

9   they have been properly packaged; it is whether any

10  of them have been lost in transit.  So this is

11  another area that is pretty typical for

12  distributors, to make sure that there's any kind of

13  loss, theft or loss of the product.

14             The next section talks about a third

15  party courier service, so that probably heightens

16  the necessity for that type of review on an order.

17       Q.    (BY MR. LIVINGSTON:)  All right.  I

18  would like to now turn to Page 30485, which is Page

19  40 at the top, if it is easier for you.  And you

20  see that this is another --

21       A.    Hold on one second.

22             MS. KNIGHT:  Just a moment,

23  Mr. Livingston.

24       A.    Okay.  I am there.

25       Q.    (BY MR. LIVINGSTON:)  Okay.  Do you

Page 476

1    see that this is another report of another

2    investigation and this report was prepared in

3    August of 2013?

4              A.     I see that.

5              Q.     And do you see that this report was

6    prepared by a different DEA agent than the prior

7    report that we just looked at, correct?

8              A.     I do.

9              Q.     Okay.  And then we see the same

10   language that the case was closed after the cyclic

11   investigation.  And we had not only Mr. Conlon

12   involved this time, but we have got Mr. Sousa

13   involved.  Do you see that?

14             A.     I do.

15             Q.     If you skip down to the very bottom,

16   I just want to see where the signature line is.

17   There's a signature by Mr. Conlon, and then there's

18   also it says "Approved, Kurt Dittmer."  And GS

19   stands for group supervisor, correct?

20             A.     Yes.

21             Q.     Would it be fair to say that every

22   inspection report had to have a sign-off by the

23   group supervisor?

24             A.     That would be typical.

25             Q.     And what would the group supervisor

Page 477

1    do, if anything, before signing off on an

2    inspection report?

3                    MS. KNIGHT:  Object to the form.

4         A.    I'm not sure I could comment on what

5    Mr. Dittmer was.  Generally speaking, they should

6    review their report.

7         Q.    (BY MR. LIVINGSTON:)  Right.  And

8    would they talk to the agents who were boots on the

9    ground during the inspection?

10                   MS. KNIGHT:  Object to the form.

11        A.    I don't know what Mr. Dittmer did or

12   how he handled his office.

13        Q.    (BY MR. LIVINGSTON:)  I'm not.  I'm

14   asking generally about group supervisors, who I

15   assume you reported to a group supervisor during

16   your tenure at the DEA, correct?

17        A.    I did.

18        Q.    Okay.  So I am talking about group

19   supervisors generally.  Would you sometimes talk to

20   your group supervisor before he or she signed off

21   on your report?

22        A.    Sometimes, but not always, because

23   the report would always go through and be reviewed.

24        Q.    If you look at the highlighted

25   portion here, it says that "This investigation

Page 478

1    revealed no discrepancies with respect to

2    recordkeeping or security.  Therefore, this case is

3    closed."  So you would agree that this is another

4    finding that Giant Eagle is in compliance with the

5    DEA regulations, including the SOM regulation,

6    correct?

7                 MS. KNIGHT:  Object to form.

8          A.    I can't draw that conclusion without

9    looking at the report.  The next page on 2, I

10   looked -- glancing at the enclosures, I don't see a

11   policy or a procedure for the SOMS.  So that is a

12   little concerning.  I would expect to see that.  So

13   I don't know if we are going to get into the

14   content of the report.

15         Q.    Yeah, we are going to.  Let's turn to

16   next page, Page 42.  It says, "Subject Firm's

17   Background."  Do you see in the middle of the first

18   paragraph it says, "The subject firm distributes

19   general merchandise, health and beauty aids,

20   over-the-counter products containing List 1

21   chemicals and Scheduled II to V controlled

22   substances to approximately two hundred twenty

23   Giant Eagle supermarkets located in Pennsylvania,

24   West Virginia and Ohio"?

25                 Now, you see here that these agents

Page 479

1  thought it was, you know, important to know that

2  Giant Eagle wasn't a McKesson type distributor but

3  rather a self-distributor, correct?

4                MS. KNIGHT:  Objection to form.

5        A.     I don't know that's the purpose for

6  the comment.  I think it is just part of preparing

7  a report, to give a base of information about the

8  registrant.

9        Q.     (BY MR. LIVINGSTON:)  But why include

10  that information if it is not important?  Why would

11  you want to know whether they distribute to Giant

12  Eagle supermarkets or maybe Giant Eagle's HBC

13  supplying Rite Aid?  I mean why wouldn't you -- why

14  would you note that if it is not important?

15        A.     Well, I think it is important.  But I

16  believe your statement was it was put on this

17  report to make a comparison to other larger

18  distributors.  I think it is just a good

19  description of the registrant that is being

20  investigated.  Maybe I misunderstood your earlier

21  statement.

22        Q.     Okay.  And let me just ask you,

23  typically, what percentage of a distributor like a

24  McKesson or, you know, I don't know,

25  AmerisourceBergen, Cardinal, what percentage of

Page 480

1   their business involves controlled substances?

2          A.     I am not going to guess on that.  I

3   have some general ideas, but I don't have a direct

4   recollection of a specific number.

5          Q.     Well, just roughly.  I mean you have

6   rendered opinions on those poor folks in a number

7   of different cases, right?

8               MS. KNIGHT:  Objection to form.

9          A.     Under ten percent would be, I

10  believe, a good estimate, but that is just an

11  estimate.

12         Q.     (BY MR. LIVINGSTON:)  Okay.  Well,

13  there's a notation here that HBC had a hundred and

14  fifty-seven million dollars in sales in 2012, of

15  which controlled substances accounted for less than

16  one percent.

17         A.     It does say that.  I just point to

18  your attention that that is of all products, not

19  just controlled substances.

20         Q.     Yeah, right, all products and

21  controlled substances are for less than one

22  percent.  And I asked you the same question with

23  respect to McKesson, and you said less than ten

24  percent, correct?

25         A.     Yeah.  But mine would be in relation

1    to the handling of drugs, noncontrolled and

2    controlled.  I don't know what it would be relative

3    to all products.

4           Q.    Right.  But you would agree that

5    HBC's bread and butter wasn't controlled

6    substances?

7               MS. KNIGHT:  Objection to form.

8           A.    I never looked at the financials to

9    see how profitable it was, so I --

10          Q.    (BY MR. LIVINGSTON:)  But you are

11   seeing it right now.  I'm understand you haven't

12   seen it before, but now you have seen it.  We

13   know -- we have already established that you didn't

14   take the time to review these inspection reports

15   before you rendered your opinion.

16               But you are seeing this right now on

17   the screen that they did a hundred fifty-seven

18   million dollars in business in 2012 but less than

19   one percent of that was controlled substances.  You

20   would agree that that was not how HBC, you know, it

21   wasn't a primary part of its business?

22               MS. KNIGHT:  Objection to form.

23          A.    When I look at that statement, I'm

24   concerned of whether it is one percent of the

25   hundred and fifty-seven million or it is one

Page 482

1   percent of their business.  So I don't know exactly

2   what that statement is trying to say.

3          Q.     (BY MR. LIVINGSTON:)  And just again

4   for the jury's benefit, HBC is just an operating

5   division.  It is not even a legal, separate legal

6   entity from Giant Eagle, right?

7          A.     I believe so, yes.

8          Q.     Okay.  And so -- and HBC, when they

9   were acting as a distributor, would order drugs

10  from, let's say, a manufacturer of opioids.  And

11  those drugs would be -- would be delivered to HBC's

12  warehouse and that -- and that is when title would

13  pass from the manufacturer to Giant Eagle, correct?

14              MS. KNIGHT:  Objection to form.

15         A.     Once they received a shipment, then

16  that is -- in DEA terms, that is when they take

17  title of the controlled substances.

18         Q.     (BY MR. LIVINGSTON:)  Okay.  And

19  because Giant Eagle owns and operates both HBC and

20  its own pharmacies, title to those drugs does not

21  pass when HBC ships those drugs to one of Giant

22  Eagle's pharmacies, correct?

23         A.     Well, so my answer in general to that

24  would be they would still be under control of the

25  corporate HBC.  But in the DEA world -- so I'm not

1   sure exactly your question.  But in the DEA world,

2   once it passes from one registrant to the other

3   registrant and it is accepted at the pharmacy

4   level, then the pharmacy has title of those drugs

5   for the -- only for the concerns of the DEA.

6           Q.     All right.  But legal title, legal

7   ownership of those drugs does not pass when HBC

8   merely ships the drug to one of Giant Eagle's

9   pharmacies?

10              MS. KNIGHT:  Objection to form.

11          A.     I don't know that I can make a --

12   give a legal opinion on that.

13          Q.     (BY MR. LIVINGSTON:)  Well, you have

14   been giving legal opinions all day about whether

15   Giant Eagle was in compliance with the DEA

16   regulations.  But you won't tell me whether or not

17   title passes when Giant Eagle ships its drugs from

18   its own warehouse to its own pharmacies?

19              MS. KNIGHT:  Objection to form and

20   asked and answered.

21          A.     Mr. Livingston, I don't give -- mine

22   isn't a legal opinion.  Mine is an opinion whether

23   there's compliance with the regulations.  It is

24   not -- I am not rendering a legal opinion.

25          Q.     (BY MR. LIVINGSTON:)  But the

Page 484

1    regulations, that is a law, isn't it?

2            A.    It is.  But I'm not saying --

3            Q.    You are saying whether Giant Eagle

4    complied with the law.

5                  MS. KNIGHT:  Mr. Livingston, you need

6    to let him finish his answer.

7            A.    I'm not -- I'm not offering a legal

8    opinion.

9            Q.    (BY MR. LIVINGSTON:)  All right.

10   Would you go to Page 52 at the top, which is 30497

11   at the bottom, the number.  All right.  You see

12   under the heading "Due Diligence:  There's a

13   discussion between the DEA inspectors and the

14   manager of HBC, Matt Rogos.  And he "advised the

15   investigators that, unlike other drug

16   distributorships, HBC has only one customer, Giant

17   Eagle Pharmacies.  All orders for controlled

18   substances are made via dedicated Giant Eagle

19   pharmacy computer systems whereby only pharmacists

20   can place electronic orders for Schedule III

21   through V controlled substances."  Did you know

22   that when you did your report?

23           A.    Yes, sir.

24           Q.    And he goes on to say, "Rogos advised

25   that at the store level, the pharmacist placing the

Page 485

1    order may not be the pharmacist on duty when the

2    order is received.  When orders are received at the

3    pharmacy, it is the responsibility of a pharmacist

4    and a pharmacy technician to enter controlled

5    substances into the pharmacy inventory."

6                    And then Mr. Conlon provided Rogos

7    with the cite to your favorite regulation, the SOM

8    regulation, 1301.74(b).  And then he quotes --

9    which is quoted here.  Do you see that?

10                   MS. KNIGHT:  Objection to form.

11           A.     I do.

12           Q.     (BY MR. LIVINGSTON:)  If you skip

13   down a little bit, it says, "Rogos advised at this

14   time HBC and/or Giant Eagle, Inc., its parent

15   company, has no computerized software system to

16   indicate that an order may be suspicious.  Rogos

17   advised that if a Giant Eagle pharmacy were to

18   receive unusually high orders of controlled

19   substances from HBC, deviating from other stores,

20   it would be noticed at the Giant Eagle headquarters

21   level.

22                   "Rogos stated that he will bring this

23   issue to the attention of Greg Carlson and Kim

24   Remas of Giant Eagle's headquarters Controlled

25   Substance Purchasing Unit."

Page 486

1          So you see that Mr. Rogos is advising

2     and describing to the DEA inspectors that Giant

3     Eagle had a manual system at the time for

4     identifying suspicious orders in compliance with

5     1301.74(b).

6               MS. KNIGHT:  Objection to form.

7          A.     This statement that you highlighted

8     here, I would agree that it is manual and it only

9     identifies orders of unusual high orders.  I don't

10    know what "high" means unless it means by size.  It

11    does not say any compliance with pattern or

12    frequency.  And then the last statement is -- I am

13    concerned by what issue is going to be brought to

14    the attention of Mr. Carlson and Ms. Remas.

15         Q.     (BY MR. LIVINGSTON:)  Yeah, we are

16    going to get there in a second.

17         A.     Okay.

18         Q.     Before we do -- and you yourself have

19    approved or at least found a manual system, a

20    manual SOM system to be in compliance with the SOM

21    regulation, correct?

22         A.     Based on the business activity and

23    the scope of the that registrant, that is a correct

24    statement.

25         Q.     Okay.  Lets go to the next page of

Page 487

1    this document, 30498, Page 53 at the top.  It says

2    "Meeting With Management."  Again, this is

3    something that Investigators Conlon and Sousa were

4    do.  They were able to meet with Mr. Rogos.  That

5    is not something that you did, correct?

6          A.     That's correct.

7          Q.     And it says, "During this meeting,

8    investigators advised Rogos that both recordkeeping

9    and security are in full compliance with the

10   requirements set forth in Title 21 Code of Federal

11   Regulations."  And 21 Code of federal regulations

12   includes the SOM regulation, correct?

13         A.     Yes.

14         Q.     Okay.  And then they said,

15   "Investigator Conlon advised Rogos to develop a

16   better system of due diligence."  Do you see that

17   recommendation that he made to Giant Eagle?

18         A.     I do.  Which kind of contradicts the

19   earlier statement.

20         Q.     Well, why would it contradict it

21   since you just testified under oath a couple of

22   times that a manual system can be in full

23   compliance with the SOM regulation?

24         A.     I did.  But I didn't state in my

25   description that they should do better due

Page 488

1    diligence.  I said they had good documentation of

2    due diligence.  I don't know that a registrant

3    could be in full compliance and at the same time

4    get a corrective statement like that in the report.

5             I guess that may go back to the

6    earlier statement where they -- that I brought up

7    where they are going to notify management.

8        Q.    And you know -- okay.  Just to orient

9    ourselves, the date of this meeting with management

10   or this investigation and report is August of 2013,

11   correct?

12       A.    That's correct.

13       Q.    And isn't it true, sir, that in your

14   own report, you indicate that by the fall, late

15   fall of 2013, Giant Eagle had begun to use an

16   automated computerized threshold system to go along

17   with its manual SOMS system?

18       A.    Yes, sir, mid October.

19       Q.    Okay.  So within two months, Giant

20   Eagle acted on this recommendation that they

21   received from Investigator Conlon, correct?

22            MS. KNIGHT:  Object to the form.

23       A.    I don't know that that was a reaction

24   to this.  I didn't see a criticism of the manual

25   system, just a criticism of the due diligence.

```
                                              Page 489

 1              But also, going to the three times
 2    twelve-month company average didn't answer the
 3    issue I brought up about the unusual frequency or
 4    pattern.  I do not believe that system monitored
 5    that aspect either.
 6         Q.    (BY MR. LIVINGSTON:)  Go back to the
 7    previous page at the very bottom.
 8         A.    Yes.
 9         Q.    At the very bottom, Mr. Rogos says
10    that he will bring this issue to the attention of
11    Greg Carlson and Kim Remas of Giant Eagle's
12    headquarters.
13         A.    Yes.
14         Q.    And then within two months after he
15    brings this issue up, Giant Eagle has for the first
16    time a computerized SOMS system, correct?
17              MS. KNIGHT:  Objection to form.
18         A.    Mr. Livingston, what do you believe
19    "issue" is in that statement?
20         Q.    (BY MR. LIVINGSTON:)  Yes or no that
21    within two months after Mr. Rogos stated that he
22    would bring this issue up to corporate management,
23    Giant Eagle had in place, in operation a
24    computerized threshold SOMS system?
25              MS. KNIGHT:  Object to the form.
```

Page 490

1          A.     If we are just talking about the

2     facts and the date of this inspection, I would

3     agree two months later there was a change to the

4     SOMS.  I don't agree that that statement there is

5     the result or cause -- doesn't -- isn't significant

6     enough to me to say that that was the result of the

7     inspection.

8          Q.     (BY MR. LIVINGSTON:)  Why don't we go

9     to Exhibit 35.

10               (GE Exhibit 35 was marked for

11               identification.)

12          Q.     (BY MR. LIVINGSTON:)  And this

13     exhibit, when you get there --

14          A.     I am there.

15          Q.     Okay.  This was an Exhibit 16 to

16     Mr. Colosimo's deposition.  You did not read this

17     exhibit, correct?

18          A.     I don't recall it, sir.

19          Q.     Okay.  And this is an email, a couple

20     of emails.  If you go to the bottom there, it is an

21     email from Kayla Voelker at Giant Eagle who -- a

22     number of folks within the company who are a part

23     of the pharmacy team.  You know, you have cited

24     Mr. Chunderlik.  And, you know, you are familiar

25     with some of these names and Mr. Carlson and so

Page 491

1   forth, correct?

2          A.     Yeah, I have read some of these

3   depositions, yes, sir.

4          Q.     And do you see that -- again, this is

5   only November of 2013.  She says, "We have had two

6   pharmacies exceed the purchasing thresholds for

7   certain controlled products so far this month."  So

8   certainly by this point in time, which was, you

9   know, early to mid November of 2013, Giant Eagle

10  clearly has a threshold system in place, correct?

11         A.     According to the records, yes, sir.

12         Q.     And then if you go up to the

13  responsive email, it says, "Joe, please respond to

14  these questions in regard to your request for an

15  increase in narcotic order points.  The adjustment

16  in order points will be based on this data."

17                 And then it has a number of criteria.

18  It has, "Has your store experienced an overall

19  increase in prescription volume compared to last

20  year?  If so, what is the percentage increase?  Has

21  your pharmacy had an acquisition within the last

22  year?  Has a new physician practice opened in your

23  geographic location within the last year?

24                 "Do you have a patient or multiple

25  patients that require these drugs?  Is your

Page 492

1   pharmacy located near a hospital or a facility that

2   specializes in these drugs?"  And then sort of a

3   catchall, "Other reasons that may justify raising

4   the monthly ordering controlled substance

5   threshold?"

6                  You would agree that these are very

7   sound and good due diligence questions to ask?

8                  MS. KNIGHT:  Object to form.

9        A.     I think they are some good questions,

10  but the issue at this time period is that these

11  orders have already shipped.  They haven't been

12  held by the system and they had already been

13  shipped.  So this is post-distribution where they

14  are asking these questions.  And I don't see a

15  pharmacy number or what area, but I don't recall

16  seeing a document that responded to these specific

17  questions and whether they were subsequently

18  followed up when the pharmacist responded.

19       Q.     (BY MR. LIVINGSTON:)  Well, let's go

20  back to Exhibit 53.  And Exhibit 53 is the one that

21  you never reviewed, but this is the one that

22  clearly indicates that Giant Eagle was halting

23  shipment of orders until it was able to investigate

24  a potentially suspicious order, correct?

25       A.     Say that one more time, please.

1      Q.      Yeah, does it -- we just went over

2   this.  I am just trying to -- you know, you said

3   that Giant Eagle's system couldn't block orders.

4   But this email suggests otherwise, right?  It says,

5   "This item is a controlled substance, so we will

6   not be shipping this until it is verified" --

7                  MS. KNIGHT:  Object to the form.

8      Q.      (BY MR. LIVINGSTON:)  -- "that this

9   is what the store should actually be receiving,"

10  right?  We just went over this about twenty minutes

11  ago, right?

12     A.      We did.  And the same answer is that

13  I don't know that this has been blocked by the

14  system, but I agree that it has been held for some

15  reason by the company.

16     Q.      You don't know a lot of things.  Yet

17  the one thing you appear to know is for some reason

18  you are certain about your conclusion that Giant

19  Eagle had a subpar SOMS system, right?

20                  MS. KNIGHT:  Objection to form.

21     A.      Yes, I did have an opinion of that.

22     Q.      (BY MR. LIVINGSTON:)  You don't know

23  what you reviewed, you can't remember which

24  depositions, which exhibits, yet you are able to

25  conclude with moral certainty that Giant Eagle's

Page 494

1    SOMS system was deficient, correct?

2              MS. KNIGHT:  Objection to form.

3    Argumentative.

4         A.    Yes.  Based on my review of all the

5    documents and information related to Giant Eagle, I

6    was able to form an opinion that they did not meet

7    the maintenance of effective controls to prevent

8    diversion of controlled substances and did not have

9    a proper Suspicious Order Monitoring System.  That

10   is a correct statement.  That is what my opinion

11   found.

12             Q.    (BY MR. LIVINGSTON:)  And what is

13   also a correct statement is that in rendering that

14   opinion, you didn't even bother to look at the

15   inspection reports over a fifteen-year period for

16   Giant Eagle that your DEA colleagues -- wherein

17   your DEA colleagues concluded that Giant Eagle was

18   in full compliance at all times with the

19   regulations that you now suggest Giant Eagle was

20   not in full compliance with, correct?

21             MS. KNIGHT:  Objection to form.

22   Misrepresentation or mischaracterization of the

23   evidence.

24        A.    I think the last DEA-6 that we

25   reviewed together would show they were not in full

Page 495

1   compliance.

2          Q.     (BY MR. LIVINGSTON:)  That is not

3   what the report says.

4          A.     The reports says that they needed to

5   do a better job at doing their due diligence.  They

6   did come to the conclusion that it was in

7   compliance, but I believe contained within the

8   report it kind of is contradicted by some of the

9   statements.  And whatever the issue is that they

10  are reporting to their headquarters, I would say

11  that there was some obvious issues there.  I don't

12  know that they are clearly stated in the report.

13              MS. KNIGHT:  Counsel, we have been

14  just over an hour.  Is this a good stopping point

15  for a break?

16              MR. LIVINGSTON:  Yes.

17              THE VIDEOGRAPHER:  We will go off the

18  record at 10:27.

19              (Whereupon, a break was had from

20              10:27 a.m. until 10:38 a.m. EDT)

21              THE VIDEOGRAPHER:  We are back on the

22  record at 10:38.

23

24  EXAMINATION BY MR. BEISELL:

25          Q.     Mr. Rafalski, my name is Patrick

Page 496

1   Beisell.  I am with Jones Day.  I represent

2   Walmart.  I will be really quick.  And honestly,

3   I'm sorry to ask these questions.  Just a few

4   cleanup questions for you.

5                 So yesterday you were asked about

6   whether you had any conversations with Dr. McCann

7   about your Track 3 report.  Do you remember that?

8           A.    I did.

9           Q.    And correct me if I am wrong, but you

10  testified yesterday that you had a few

11  conversations but you could only really recall one

12  and it was a telephone conversation.  Does that

13  sound right?

14          A.    Well, I think the question was

15  specific to CT3.

16          Q.    Yes, it was.

17          A.    Okay.  So it would have been one

18  prior to the submission of my report and one after.

19  But I think I also said -- I may have also said

20  over the course of the litigation I have had

21  numerous discussions with him.

22          Q.    Sure.  So to be clear, regarding

23  Track 3, Lake and Trumbull County, you had a few

24  conversations, but you could really only recall one

25  before the submission of your report, correct?

1          A.      Yeah, direct -- I don't -- in regards

2     to that, it is not a few.  It was one prior and one

3     after.

4          Q.      Okay.  Great.  And the one prior to

5     your report was about an hour, and it was a

6     telephone conversation; is that right?

7          A.      At least an hour, yes, sir.  It was a

8     Zoom conference.

9          Q.      Okay.  That was actually where I was

10    going to go.  Because, you know, the pandemic has

11    changed the way that we think about things.  So

12    when you said telephone conversation, I wanted to

13    be clear.  Were there any other kinds of

14    conversations that you had, maybe Zoom conferences

15    or other telephonic conferences with Mr. McCann?

16         A.      No, sir.

17         Q.      It's just the one?

18         A.      Yes, sir.

19         Q.      Okay.  And I believe you talked about

20    the methodology that was the primary focus of the

21    conversation was the thirty-day trailing?

22         A.      That is the one point I remember we

23    discussed the most, but I think there were some

24    other general discussions about some of the charts

25    and some of the data.  But I specifically remember

Page 498

1    the thirty-day trailing was the primary discussion.

2            Q.      Okay.  During that call, did

3    Dr. McCann ever show you a flagged order or give

4    you an example of a flagged order?

5            A.      I don't recall that.

6            Q.      Okay.

7            A.      The triggering, I don't recall him

8    showing me -- I don't recall any kind of

9    demonstratives put on the screen during the

10   discussion.

11           Q.      So other than the thirty-day

12   trailing, do you remember anything else

13   specifically about that hour-or-so Zoom telephone

14   call that you had?

15           A.      I think some of the charting and the

16   time frames confirming the ARCOS time period and

17   nonARCOS data, I remember some general discussions

18   about that.  But specific to the other

19   methodologies, I think there was some discussion

20   on -- no, I am thinking of something different.

21   No, that is generally it.  I mean I'm sure there

22   was something, other things discussed relating to

23   my report, but the things I remember most are what

24   I have already stated.

25           Q.      Good.  Thank you.  Related to

Page 499

1    Dr. McCann and the methodologies, did you ask him

2    by chance to run any other methodologies beyond the

3    seven that appear in your report?

4              A.     No.  I did not.

5                     MR. BEISELL:  Let's see how much time

6    do I have.  Am I doing all right?

7              Q.     (BY MR. BEISELL:)  You mentioned a

8    couple of times today and yesterday that you ran

9    some searches to look for documents.  Do you recall

10   that?

11             A.     Yes, sir.

12             Q.     Okay.  How did you -- well, let me

13   back up.  What database did you use to run these

14   searches, if any?

15             A.     I do some in Relativity, but I am not

16   very good at searches there because I get so many

17   hits it is mind-boggling.

18             Q.     Complicated.

19             A.     Then the documents are dropped into a

20   Google Drive for me, so I can search the documents

21   first easiest by Bates number and then by content

22   in my Google Drive.

23             Q.     So let me make sure that I understand

24   that.  You have access to a Relativity database --

25             A.     I do.

1       Q.      -- that you can -- that you can

2   search on your own anytime you want?

3       A.      Correct.  And to supplement that is I

4   have one of the attorneys primarily when I want to

5   do a search, because my confidence isn't that high

6   with my abilities in Relatively, I would ask him to

7   do searches.  Either generally I would call him or

8   sometimes I am actually in person.  I don't

9   remember if CT3 that occurred, but I would be more

10  reliant on his searches because his ability is much

11  greater than mine.

12      Q.      Who is that person?

13      A.      Mr. Elkins.

14      Q.      Mr. Elkins.  And would you like give

15  Mr. Elkins the search that you wanted to run?

16      A.      Yes.  Some very specific.  So, for

17  example, I could be reviewing a document.  I think

18  in regards to Walmart, I think there was -- one I

19  recall off the top of my head was there was a DEA

20  inspection and there were subsequent questions.  I

21  think it was 2014.

22              And my first search of my documents,

23  I believed there had to be more documents, so I

24  searched.  And then I had Mr. Elkins search, and

25  that uncovered more documents, which then led to

Page 501

1    another search.  So sometimes I just read some

2    documents and it seems like there should be more.

3    And that is how those searches would occur.

4              I don't -- I don't rely a lot on

5    Relativity because I generally get like a quarter

6    million hits every time I do a search.  And I

7    haven't received a lot of training and use on it,

8    and it is a difficult search.

9         Q.    Sure.  I mean I have been doing it

10   for years, and I still struggle with it.  To be

11   clear, would it be fair to say that the majority of

12   the searches then happens not in Relativity by you

13   but in Relativity by Mr. Elkins and/or in the

14   Google database that you mentioned?

15        A.    Yeah.  I do a lot of the Google

16   database searches.  Of course, that is dependent on

17   the documents being in the Google database.  And

18   that sometimes leads me to then secondarily go to

19   Mr. Elkins and ensure that those documents are --

20   have been dropped into my Google Drive.  And I

21   think that's -- I don't want to speak for

22   Mr. Elkins, but that is the process.

23        Q.    Sure.  And the Google Drive is

24   populated by documents that Mr. Elkins puts in

25   there, or who puts in the document?

Page 502

1        A.       Primarily, Mr. Elkins does it.   I

2    don't know who -- how they get to Mr. Elkins, you

3    know, through discovery or whatever.  But he is my

4    primary contact that drops the documents in Google

5    Drive.

6        Q.       Yeah.  And the Google Drive

7    documents, that is just a small selection of

8    documents as compared to the Relativity database,

9    right?

10       A.       Well, yes.  Because like in CT1,

11   there was five million or over documents.  They are

12   not all in my Google Drive.  I don't think it

13   probably has that capability but -- and I don't

14   need to see -- there's a multitude of documents

15   that I don't need to see relative to my opinion.

16              You know, I am basically looking at a

17   certain range or type of documents and not looking

18   at sales data or any -- some of that other

19   information that I don't use in my opinion.

20       Q.       Do you know approximately how many

21   documents are in the Relativity database that you

22   have access to?  Any idea?

23       A.       No.  One time I heard it was over

24   five million.  I know I do searches a lot of times

25   where it is an astronomical number.  But

1    specifically -- and I don't know that my Relativity

2    access has the full access that other people have.

3    I don't know exactly how Relativity works but just

4    generally speaking.

5            Q.     Does the Relativity database include

6    the Track 1 documents that you mentioned as well as

7    this litigation, the Track 3 documents?

8            A.     Track 1 is where I used it the most

9    at the beginning and had the most frustration so --

10   and I get different accesses through different

11   litigations too.  I had a different access through,

12   I believe, the New York case that I worked on.

13           Q.     Sure.  Sure.  Just a couple more

14   questions about the searches that you ran, not that

15   Mr. Elkins ran, but that you ran.

16                  So say, for example, that you wanted

17   to run a search for suspicious orders.  How would

18   you go about running that search?  Walk me through

19   it.  In Relativity.

20           A.     Oh.  Well, I used the drop-downs, and

21   I tried to put in search terms and go specifically

22   by company.  Those were always frustrating because

23   I would get so many hits.  So a search like that, I

24   would rely on Mr. Elkins, confident that his search

25   would be much more comprehensive than I could do.

Page 504

1          I found scrolling through documents

2     after documents not a waste of time, but I just

3     couldn't hit like a very specific search.  I didn't

4     have the ability to do that.

5          Q.     True.  So just to like put a fine

6     point on it, if you were searching for Walmart

7     suspicious orders, if I understand you correctly,

8     you would run a search that says "Walmart" and

9     "suspicious orders."  And then you would get

10    thousands and thousands of documents.  So you would

11    ask Mr. Elkins, "Can you identify for me documents

12    that hit on these terms?"  Or how would that work,

13    that second part?

14         A.     Well, as time went on, in dealing

15    with Mr. Elkins and the plaintiffs' lawyers, they

16    have a pretty good idea of exactly the documents I

17    want.  So they are dropped in there, and some of

18    them now are actually disclosed in discovery, the

19    range of documents.  So it is not -- at the

20    beginning, it was the entire database.  Everything

21    was just dumped in there, and it was like a giant

22    box.  And I was trying to find documents.

23              The discoveries now is providing a

24    much more comprehensive, so it is easier to do

25    searches or for me to look at Bates numbers and be

Page 505

1    confident that I have those documents.  I rely on

2    the discoveries now a lot more and what they are

3    listing.

4                    So but as I am doing searches,

5    there's always times when I will see a document and

6    I will ask for a further search.  You know, there's

7    always a concern I miss a document because there's

8    just so many.

9                    And I believe, in my recollection, I

10   can restrict the searches a little bit more, so I

11   could look for emails for suspicious orders,

12   different types of documents.  Or when I scroll

13   down through Relativity, it tells me what kind of

14   documents they are, whether it is an email or a

15   spreadsheet or something like that.

16        Q.    Got you.  I just want to be clear

17   about the second part because I am not quite sure

18   that I got a good answer on that.  So taking the

19   example of Walmart and suspicious orders, how would

20   you instruct Mr. Elkins to search for you?  Would

21   you give him a specific search or would you just

22   ask him a topic and trust him to search the right

23   way?

24        A.    Both.

25        Q.    Does that make sense?

Page 506

1      A.     Yes.  Both.  Depending on --
2   depending if I see a document that references
3   specifically a date or an act or something.
4   Generally sometimes it is an email.  In my
5   testimony today, there was an email where it talked
6   about do a follow-up.  And so I would think there
7   may be a document that might be subsequent to that
8   email where the follow-up occurred.
9           So I would provide him the Bates
10  number and the date and also the parties on the
11  email.  And I would ask him to do a search to see
12  if there was any kind of a memo or response or
13  document or anything related to that.
14          Most of my searches are subsequent to
15  some of the documents I receive which, of course,
16  are generated originally by Mr. Elkins.
17      Q.     Got it.  And then how confident are
18  you that the Relativity database or even the Google
19  database that you used contains documents other
20  than those produced by the defendants in Track 3?
21  So, for example, do you think that you had access
22  to documents produced by the DEA?
23      A.     In Relativity, I don't recall seeing
24  any, but I don't know whether they -- how they are
25  dropped in there or if they are accessible by me.

1   But I know that they are provided by Mr. Elkins.

2           Q.      What about deposition exhibits, did

3   you have Relativity access to that where you could

4   just search across exhibits?

5           A.      All of those have always been put

6   into Google Drive with the exhibits.

7           Q.      And the Google Drive -- I promise

8   this will be my last question.  And the Google

9   Drive, how do you search in Google Drive?

10          A.      I can search by Bates number.  I can

11  also just search by a key term.

12          Q.      Just control F is what we are talking

13  about?

14          A.      Up at the top of the Google Drive

15  there's a search parameter.  So I will open it up

16  to a specific folder.  I have multiple folders for

17  multiple reports.  So I will go into that specific

18  folder like CT3.  I may narrow it first to the

19  folder for a company, and then I may broaden it

20  just to all the documents in CT3.  And then I may

21  find some documents, or I generally would find

22  documents or, if I don't, then I would do a

23  secondary request through Mr. Elkins.

24                  MR. BEISELL:  Thank you,

25  Mr. Rafalski.  I think that is all I have, unless

Page 508

```
 1   any of my colleagues have anything else.  I think
 2   we have got a few minutes left.
 3                   MS. KNIGHT:  I don't believe that is
 4   true.  Where are we on the time, Justin?
 5                   THE VIDEOGRAPHER:  Been on the record
 6   for just thirteen minutes.
 7                   MS. KNIGHT:  That would be right
 8   about the time.
 9                   MR. BEISELL:  Yeah.  Thank you for
10   your time, Mr. Rafalski.
11          A.      Yeah, thank you.
12                   MS. KNIGHT:  All right.
13   Mr. Rafalski, I have a few questions for you.
14
15   EXAMINATION BY MS. KNIGHT:
16          Q.      You testified yesterday --
17                   MR. BEISELL:  I'm sorry, Kathleen, I
18   didn't mean to interrupt you.  I just wanted to
19   point out while you are doing your direct or cross
20   or whatever it is of Mr. Rafalski, just so that we
21   don't keep running over each other, I think we are
22   going to have Scott do the objections for the
23   entire defense group, if that is all right.
24                   MS. KNIGHT:  I have no objection to
25   that.  Give us one second.  There's some folks in
```

Page 509

1  the hallway.

2          Q.      (BY MS. KNIGHT:)  All right.

3  Mr. Rafalski, you testified yesterday that your

4  opinions in this case were limited to the

5  responsibilities, duties, acts and omissions of the

6  defendants as distributors; is that right?

7          A.      Right.

8                  MR. LIVINGSTON:  Leading.  Objection,

9  leading.

10          Q.      (BY MS. KNIGHT:)  Is that still the

11  case?

12          A.      Yes, it is.

13          Q.      Are your opinions regarding Giant

14  Eagle contained in your report?

15                  MR. LIVINGSTON:  Objection.  Asked

16  and answered.

17          A.      Yes, they are.

18          Q.      (BY MS. KNIGHT:)  And do you stand by

19  your opinions about Giant Eagle as set forth in

20  your report?

21                  MR. LIVINGSTON:  Objection.  Asked

22  and answered.

23          A.      Yes, I do.

24          Q.      (BY MS. KNIGHT:)  Did seeing one

25  email with a held order change your opinions?

```
                                              Page 510

 1                  MR. LIVINGSTON:  Objection, leading.
 2          A.      No, it did not.
 3          Q.      (BY MS. KNIGHT:)  Mr. Rafalski, you
 4  were asked questions yesterday about whether you
 5  had opinions about whether pills had been diverted.
 6  Do you recall being asked a series of questions
 7  about that?
 8          A.      Yes, I do.
 9          Q.      Is your opinion in this case
10  consistent with your prior testimony that if a --
11  if methodology A flags an order as suspicious,
12  given the defendants' lack of adequate due
13  diligence, that those pills are more likely than
14  not diverted?
15                  MR. LIVINGSTON:  Objection.
16  Extremely leading.
17          A.      Yes, I do.
18          Q.      (BY MS. KNIGHT:)  In your report, you
19  have documents cited in footnotes, and you also
20  have documents on your reliance list; is that
21  right?
22          A.      That's correct.
23          Q.      Are the documents on your reliance
24  list also documents that support your opinions?
25          A.      Yes, they are.
```

1        Q.        So the absence of a footnote,

2    including one of those reliance documents, would

3    not indicate that it wasn't supportive of your

4    opinions; is that fair to say?

5                      MR. LIVINGSTON:  Objection, leading.

6        A.        That would be an accurate statement.

7        Q.        (BY MS. KNIGHT:)  Do you recall being

8    asked questions yesterday about some language that

9    said I was informed in your CVS portion of your

10   report?

11       A.        I'm sorry.  Could you say that one

12   more time?  I'm sorry.

13       Q.        Yes, sir.  Do you recall -- I can

14   direct you to it -- being asked questions, it is on

15   Page 77 of your report where there's language that

16   says "I have been informed of the random spot check

17   of the orders flagged for additional review

18   corresponds with orders shown in the IRR recaps."

19   Do you recall those questions --

20       A.        I do recall that question, yes.

21       Q.        I just want to be certain.  Is it

22   your testimony that you reviewed the records,

23   confirmed what was reported to you and did not

24   simply adopt something that was told to you by

25   plaintiffs' counsel?

```
 1                    MR. LIVINGSTON:  Objection, leading.

 2                    MR. RUIZ:  Objection to the form.

 3                    (Off-the-record discussion.)

 4          Q.    (BY MS. KNIGHT:)  You can answer,

 5    Mr. Rafalski?

 6          A.     Mr. Livingston -- I might have cut

 7    off Mr. Livingston if he wants to repeat that.  I'm

 8    sorry.

 9          Q.    (BY MS. KNIGHT:)  She got his

10    objection.  What she didn't get was your answer.

11          A.     Yes, I did.

12          Q.    (BY MS. KNIGHT:)  You were asked

13    questions yesterday and even some today about

14    corresponding duties of pharmacists.  Do you recall

15    that?

16          A.     Yes, I do.

17          Q.     And you were also asked questions

18    about why a corporate office for a pharmacy would

19    be held responsible for the acts of itself and the

20    pharmacy; do you recall that?

21          A.     I do.

22          Q.     Are you familiar with the CVS versus

23    Holiday -- the Holiday case involves CVS?

24          A.     I am.

25          Q.     I am going to share my screen.  Bear
```

Page 513

1    with me.  I apologize.

2                  All right.  Can everybody see Holiday

3    CVS LLC, doing business as CVS Pharmacies?

4          A.     It has not opened.

5          Q.     Oh, sharing is paused.

6                  THE REPORTER:  Sharing is enabled

7    from our end.

8                  MS. KNIGHT:  It says that it is

9    paused.

10                  THE REPORTER:  Videographer, you want

11   to go off the record?

12                  THE VIDEOGRAPHER:  Sure.  We are off

13   the record at 10:57.

14                  (Whereupon, a break was had from

15                  10:57 a.m. until 10:59 a.m. EDT)

16                  THE VIDEOGRAPHER:  We are back on the

17   record at 10:59.

18                  MS. KNIGHT:  Thank you.

19          Q.     (BY MS. KNIGHT:)  Okay.

20   Mr. Rafalski, now can you see the Holiday CVS LLC

21   doing business as CVS Pharmacy?

22          A.     I do.

23          Q.     And this is published in the Federal

24   Register; is that right?

25          A.     That's correct.

Page 514

1          Q.      In your experience, do the

2    registrants monitor the Federal Register for

3    decisions or opinions or for administrative actions

4    by the DEA?

5                  MR. RUIZ:  Objection.  Calls for

6    speculation and leading.

7          A.      I have experience that they routinely

8    review these decisions.  I don't have information

9    if specific registrants did, but it is part of the

10   industry, yes.

11         Q.      And do you see that this decision is

12   from Friday, October 12th, 2012?

13         A.      I do.

14         Q.      And that would have been after you

15   participated in issuing a letter of admonition to

16   Walgreens and in the middle of your investigation

17   of Masters; is that right?

18         A.      That's correct.

19                 MR. RUIZ:  Objection, leading.

20         Q.      (BY MS. KNIGHT:)  This is a very long

21   opinion.  I am going to go down -- okay.  So on

22   Page 25 of 31, can you read the highlighted

23   section?

24         A.      At the end it is going to be blocked

25   by the camera view, so if you move it to the very

Page 515

1   top.  "Agency precedence has consistently held that

2   the registration of a pharmacy may be revoked as a

3   result of an unlawful activity of the pharmacy's

4   owner," and then "majority."  And I cannot see if

5   there's another word there.

6           Q.     "Majority shareholders."

7           A.     "Majority shareholders, officers,

8   managing pharmacist or other key employee."

9           Q.     Okay.  If you will read the next

10  highlighted section?

11          A.     "In short, a pharmacist has a

12  corresponding responsibility under federal law to

13  dispense only lawful prescriptions, Liddy

14  Pharmacies LLC, 76FR48887."

15          Q.     You don't need to read those numbers.

16          A.     "The corresponding responsibility to

17  ensure the dispensing of valid prescriptions

18  extends to the pharmacy itself."

19          Q.     And do you see at the top of the next

20  page that it says this is settled agency precedent?

21          A.     I do.

22                 MR. LIVINGSTON:  I'm going to object

23  to his reading just a decision.  This is not proper

24  questioning.

25          Q.     (BY MS. KNIGHT:)  My question is are

Page 516

1   you familiar with that language?

2          A.     Yes, I am.

3          Q.     Do you agree with it?

4          A.     Yes, I do.

5                 MR. LIVINGSTON:  Objection, leading.

6          Q.     (BY MS. KNIGHT:)  You were asked

7   yesterday whether you knew that Dr. Franklin told

8   his customers not to go to Walgreens or Rite Aid.

9   Do you remember those questions yesterday?

10                MR. LIVINGSTON:  Objection.

11  Mischaracterizes what he was asked about, and it is

12  leading.

13         Q.     (BY MS. KNIGHT:)  Do you remember

14  those questions yesterday?

15         A.     I remember that, yes.

16         Q.     Okay.  That topic?

17         A.     The topic.

18         Q.     All right.  I want you to assume for

19  the sake of discussion that Walgreens and Rite Aid

20  identified Dr. Franklin as a bad doctor, okay?

21         A.     Okay.

22         Q.     And they each decided to stop filling

23  prescriptions that Dr. Franklin had written, okay?

24         A.     Okay.

25         Q.     All right.  And so the next thing

1  that happens is his customers go to an independent

2  pharmacy to fill their prescriptions.  All right?

3  Are you with me?

4          A.    I am.

5          Q.    Now, that independent pharmacy is

6  closed, and those customers go back to Walgreens

7  and Rite Aid, and Walgreens and Rite Aid start

8  filling Dr. Franklin's prescriptions again.  Would

9  that be an acceptable approach to Suspicious Order

10  Monitoring System?

11          A.    It would not be.

12          MR. RUIZ:  Objection to the form of

13  the question.

14          THE REPORTER:  I'm sorry, I didn't

15  hear the whole answer.  I just heard "it would --

16          MS. KNIGHT:  "Not be."

17          A.    It would not be.

18          MS. KNIGHT:  Are you ready,

19  Ms. Nichols?

20          THE REPORTER:  Yes.

21          Q.    (BY MS. KNIGHT:)  If Rite Aid and

22  Walgreens maintained appropriate due diligence,

23  should they be on notice that Dr. Franklin was a

24  bad doctor?

25          MR. LIVINGSTON:  Objection, leading.

Page 518

1          A.     Yes.

2          Q.     (BY MS. KNIGHT:)  Is that an example

3    of why it is important to maintain due diligence

4    files?

5                    MR. LIVINGSTON:  Objection, leading.

6          A.     That would be one of the primary

7    reasons, that is correct.

8          Q.     (BY MS. KNIGHT:)  Okay.  Is it fair

9    to say -- and I think that the term you used

10   yesterday was historical data.  What is the -- why

11   is it important to maintain historical data for due

12   diligence files, in particular?

13         A.     Well, it gives the -- in this case,

14   the distributor to go back and look at the history

15   of activity that occurred at a pharmacy.  That way

16   it is -- it doesn't require employees to just have

17   a general recollection.  And they look at a pattern

18   of activity that may be indicative that there's a

19   problem at the pharmacy.  It just doesn't make

20   sense, in general terms, to not keep any records

21   and treat every investigation or review of a

22   pharmacy as the first, without maintaining any

23   long-term records.

24         Q.     If you didn't maintain long-term

25   records and you hired a new pharmacist at your

1    pharmacy, how is that pharmacist going to know

2    about the problems that had been previously

3    identified, if there's no due diligence file?

4                    MR. LIVINGSTON:  Object to form.

5            A.     Well, they wouldn't.  But secondarily

6    to that and specifically in the chains, they use

7    multiple pharmacists -- I believe there's usually a

8    primary, but there's always a lot of fill-in

9    pharmacies.  So it is easier to track the activity

10   at each of the pharmacies relative to the

11   pharmacist that that chain employs.

12           Q.     Is that another way of saying that

13   the defendants had institutional knowledge?

14                   MR. LIVINGSTON:  Objection to the

15   form.

16           A.     I guess that would be, yes.

17           Q.     (BY MS. KNIGHT:)  Okay.

18           A.     They would have a greater width of

19   knowledge because they are their pharmacies and

20   their pharmacists and their pharmacy managers.  So

21   it definitely gives them a greater ability to

22   maintain more comprehensive records by the nature

23   of it being a chain.

24           Q.     And as we have seen from the Federal

25   Register, your opinions that pharmacies should be

Page 520

1  held to account for the information that they have

2  available to them is not a novel idea, is it?

3          A.    It is not.

4                MR. LIVINGSTON:  Object to form.

5          Q.    (BY MS. KNIGHT:)  You were asked

6  questions yesterday and again today about whether a

7  manual system for flagging suspicious orders could

8  theoretically be an acceptable approach to

9  identifying suspicious orders.  Do you recall those

10  series of questions yesterday and today?

11          A.    I do recall those questions, and

12  specifically it is not prohibited by the DEA to

13  have a manual system.

14          Q.    Would it be appropriate for any one

15  of the five defendants, CVS, Walgreens, Rite Aid,

16  Walmart or Giant Eagle, to use a manual system to

17  identify suspicious orders?

18          A.    No, it would not.

19                MR. LIVINGSTON:  Objection.  Asked

20  and answered.

21          Q.    (BY MS. KNIGHT:)  In your report at

22  Page -- I think it is 137.  Let me just double

23  check.  Yes.  At Page 137 of your report, this is

24  specifically about Walmart.

25                You have that there was -- "the

Page 521

1    distribution center filled orders of controlled

2    substances for more than four thousand pharmacies

3    over a four-day week."

4                   Is there any set of circumstances

5    under which it would be appropriate to have a

6    manual system under those circumstances?

7                   MR. LIVINGSTON:  Object to the form.

8         A.    No.  That would be one of the primary

9    reasons would be the volume of orders that are

10   pulled on a daily basis.

11        Q.    (BY MS. KNIGHT:)  Are all of your

12   opinions regarding the Suspicious Order Monitoring

13   System for Walmart in your report accurate?

14        A.    Yes, they are.

15        Q.    Is there anything about the testimony

16   or questioning yesterday or today that changed your

17   opinions about Walmart?

18                   MR. LIVINGSTON:  Objection to the

19   form.

20        A.    No, there's not.

21        Q.    (BY MS. KNIGHT:)  Same questions

22   about CVS, anything about the questioning or the

23   documents that you saw yesterday or today that

24   changed your opinions about CVS?

25        A.    No, there is not.

Page 522

1                    MR. LIVINGSTON:  Objection to the

2    form.

3           Q.    (BY MS. KNIGHT:)  How about

4    Walgreens, same question?

5                    MR. LIVINGSTON:  Objection to the

6    form.

7           A.    No, it did not.

8           Q.    (BY MS. KNIGHT:)  And last one, Rite

9    Aid, any changes based on the documents that you

10   have seen or the questioning yesterday and today?

11                   MR. LIVINGSTON:  Objection to the

12   form.

13          A.    No, it did not.

14                   MS. KNIGHT:  All right.  I would like

15   a quick five-minute break, and then I will see -- I

16   just want to look through my notes and make sure I

17   don't have any other questions for you.

18                   THE VIDEOGRAPHER:  We will go off the

19   record at 11:09.

20                   (Whereupon, a break was had from

21                   11:09 a.m. until 11:17 a.m. EDT)

22                   THE VIDEOGRAPHER:  We are back on the

23   record at 11:17.

24          Q.    (BY MS. KNIGHT:)  Mr. Rafalski, just

25   a little bit more from me.

Page 523

1              Did you ask to review all of the due

2    diligence that the defendants produced related to

3    Lake and Trumbull County orders?

4         A.    I did.  Yes, I did.

5         Q.    All right.  Specifically, with

6    respect to Walmart, do you recall receiving and

7    reviewing a handful of spreadsheets, Excel

8    spreadsheets?

9              MR. LIVINGSTON:  Objection to the

10   form.

11        A.    I remember reviewing a few.  I'm not

12   sure exactly which ones we are speaking of.

13        Q.    (BY MS. KNIGHT:)  There was some --

14   there was one about Know Your Customer, and there

15   were a couple that had flagged orders identified.

16   Do you recall those?

17        A.    I do.

18        Q.    And do you remember that there were

19   notes next to some of those flagged orders?

20             MR. LIVINGSTON:  Objection, leading.

21        A.    I do.

22        Q.    (BY MS. KNIGHT:)  The spreadsheets

23   that you saw that included flagged orders and

24   explanations about those flagged orders, was that

25   sufficient due diligence in your opinion?

1              MR. LIVINGSTON:  Objection, leading.

2        A.     No, it was not.

3              MS. KNIGHT:  I don't have any other

4   questions for you -- well, let me ask you one more

5   question.

6        Q.     (BY MS. KNIGHT:)  Have all of your

7   opinions that you have expressed been within a

8   reasonable degree of probability or certainty?

9        A.     Certainty, yes.

10        Q.     All right.  Oh, Mr. Rafalski, did you

11   have a concern about testimony a little bit ago --

12   concern is not the right word.  Did you want to

13   clarify something about your testimony about

14   Relativity?

15              MR. LIVINGSTON:  I am going to object

16   to the form of the question.

17              MS. KNIGHT:  I can ask him a better

18   question.

19        Q.     (BY MS. KNIGHT:)  Did you use

20   Relativity to run searches on your own more in the

21   early stages of your investigation in these cases?

22        A.     Yes.  And specifically to that, to

23   the series of questions, I don't have a real direct

24   recollection of doing it for CT3 because of growing

25   frustration.

Page 525

1          I know that I relied predominantly on

2   Mr. Elkins to do the searches, which I believe he

3   did through Relativity.  But I know I was answering

4   questions on how I did searches, and I did do

5   searches, but I don't recall it being specific to

6   CT3 because I had other matters going.  I just

7   wanted to clarify that.

8          MS. KNIGHT:  All right.  I don't have

9   any other questions for you now.  I don't know

10  whether anybody else does.

11         MS. MCENROE:  The defendants are

12  going to take a short break, and then we will be

13  back.

14         THE VIDEOGRAPHER:  We will go off the

15  record at 11:20.

16         (Whereupon, a break was had from

17         11:20 a.m. until 11:31 a.m. EDT)

18         THE VIDEOGRAPHER:  We are back on the

19  record at 11:31.

20

21  REEXAMINATION BY MS. MCENROE:

22      Q.    Good morning, Mr. Rafalski.  We met

23  yesterday.  I am Elisa McEnroe.  I represent Rite

24  Aid.

25         You remember a series of questions

Page 526

```
 1   that I had asked you?

 2         A.     I do.  Good morning.

 3         Q.     You were just previously asked some

 4   questions about plaintiffs' counsel, and there was

 5   a discussion about a term that was used about "bad

 6   doctor."  Do you recall that testimony?

 7         A.     I do.

 8         Q.     And I believe that term was maybe

 9   used yesterday as well from time to time in your

10   testimony.  Is that a defined term under the DEA's

11   regulations, as far as you know?

12         A.     Within the regulations, there is no

13   bad doctor.  It is just a term that is used

14   internally or in description.

15         Q.     Very briefly, what do you mean by

16   that or understand that to mean?

17         A.     A bad doctor would be a doctor

18   prescribing for no legitimate purposes or not

19   having a proper doctor/patient relationship.

20   Illicit prescribing would be a bad doctor.

21         Q.     A bad doctor could still have a DEA

22   license to write prescriptions for controlled

23   substances; is that fair?

24         A.     They would be.

25         Q.     And is it also fair to say that not
```

1  every single prescription written by what you think

2  of as a bad doctor is necessarily an illegitimate

3  prescription?

4          A.      That is kind of a complex question.

5  I think once, depending on the activity and

6  behavior of a doctor, I guess there's always the

7  possibility there's a legitimate prescription in

8  there.  Especially noncontrols.  But it is

9  difficult to make the assumption that once they are

10  engaged in that activity that there's some

11  sprinkled in.  But I will acknowledge and concede

12  it is a possibility.

13          Q.      In fact, you would need to look at

14  every prescription on a

15  prescription-by-prescription basis to make that

16  determination; is that fair?

17          A.      I would probably need to look at more

18  than just a prescription.  If I was doing a case, I

19  would look at the medical records also.

20          Q.      If you were in the DEA's position and

21  able to do that, correct?

22          A.      Yes.  I thought that is what we were

23  speaking about.

24          Q.      Sure.  But a pharmacist looking at it

25  would look at a prescription as it is presented to

Page 528

1   them, prescription by prescription, correct?

2          A.     That is correct.  They could follow

3   up on it by calling the doctor, having a

4   discussion.  But, yes, the preliminary is just

5   reviewing the written document.

6          Q.     You were asked a hypothetical about a

7   Dr. Franklin and a series of circumstances going

8   back and forth between different pharmacies and

9   whatnot by plaintiffs' counsel.  Do you remember

10  that line of questioning?

11         A.     I do.

12         Q.     Do you know if any pharmacies

13  actually tipped off the Ohio Board of Pharmacy with

14  regard to Dr. Franklin and his practices?

15         A.     I do not have direct knowledge, but

16  based on the level of activity, I am sure there was

17  probably something that occurred in regards to a

18  notification.

19         Q.     You are not giving any opinions in

20  this case with regard to pharmacy practice, in any

21  event; is that correct?

22         A.     That is correct.  I was not asked to

23  give an opinion on that specific activity.

24         Q.     Jumping to another line of

25  questioning from plaintiffs' counsel, you were

1    asked a little bit about corresponding

2    responsibility; do you remember that?

3            A.     I do.

4            Q.     Is there anything in your report

5    about who owes a corresponding responsibility?

6            A.     There is none.  But I was asked

7    questions about it, so I think that is why that

8    garnered the questions.  But I didn't provide that

9    information in my report.

10           Q.     Would you agree with me that the

11   question of who owes a corresponding responsibility

12   is a legal question?  In fact, you were shown a

13   legal case to read to talk about that question?

14                  MS. KNIGHT:  Object to form.  It was

15   actually a DEA administrative case.

16           Q.     (BY MS. MCENROE:)  Okay.  I would

17   still think that might be a legal case, but go

18   ahead.

19           A.     Yes.  I wasn't commending on the

20   legal position.  Just within the Federal Register,

21   obviously it extends the activities of a pharmacist

22   to a pharmacy.  I think just that principle.  I

23   mean that is common to my employment because the

24   registrant is always the focus, and the pharmacist

25   is not a registrant.  So it is just part of the

Page 530

1   activity.

2           Q.      Right.  And the registrant is not the

3   one filling the prescription, right, so it is the

4   pharmacist that is filling the prescription?

5           A.      Well, I think the pharmacy,

6   ultimately with the authority of the registration,

7   is filling the prescription.  I think it is relying

8   on the pharmacist to do that.

9           Q.      So you think the pharmacy is

10  exercising the professional duties of a pharmacist;

11  the pharmacy went to pharmacy school, for example?

12              MS. KNIGHT:  Object to form.

13          A.      No.  But I think the actual authority

14  of dispensing controlled substances is under the

15  DEA registration.  If there was no registration,

16  there would be no prescriptions dispensed.

17              I know that is kind of a

18  chicken-or-an-egg kind of explanation.  But it is

19  just the activity first begins because a pharmacy

20  has to have a DEA registration.

21          Q.      (BY MS. MCENROE:)  And in talking

22  about who owes a corresponding responsibility, you

23  are drawing on your understanding of what the law

24  says about who owes the corresponding

25  responsibility, correct?

Page 531

1       A.      Yeah, I think we discussed that

2   before.  You just used the term "corresponding

3   responsibility."  As a DEA investigator, it goes to

4   the regulation, I think it's 1306.04, that

5   specifically talks about that.  That is the crucial

6   regulation which would allow me to take either a

7   generally criminal action against a pharmacist.

8   That is the nexus is the corresponding

9   responsibility.

10      Q.      Jumping to another line of

11  questioning from plaintiffs' counsel just a minute

12  ago, you were asked a little bit about searches

13  that you ran for your CT3 report, do you remember

14  that?

15      A.      I do.

16      Q.      So would it be fair to say that in

17  your opinions for Rite Aid and for Giant Eagle and

18  for Walmart, who you first advanced in CT3, you did

19  not run any searches yourself in Relativity?

20      A.      Yeah, I am drawing a blank on doing

21  that.  I have a lot of frustration with Relativity.

22  I know I have used it again recently, same

23  frustration.  I know that I had a lot of

24  interactions with Mr. Elkins searching for

25  documents for me.  That is actually faster and

Page 532

1    easiest than me trying to do it myself.

2          Q.    Do you know, for example, if a search

3    was conducted for the term "suspicious order" in

4    Rite Aid's production to see what would come out

5    for you to review?

6          A.    I don't know specifically if there

7    would be a search.  But in dealing with -- it has

8    been four years now or three years of actively

9    doing this, a lot of those searches and my needs I

10   think are already well-known with Mr. Elkins.  So

11   most of my conversations now isn't to tell him just

12   do a broad search of suspicious orders; it is more

13   focused based on my review of records.  That is a

14   long answer.

15               I don't know whether or not he did

16   that.  I did not direct him to just go in and do

17   just the term "suspicious orders."

18          Q.    So you remember that line of

19   questioning we talked through yesterday together,

20   Mr. Rafalski, that set of documents, of emails

21   between Rite Aid and from Liverpool Distribution

22   Center and the DEA regarding not having any

23   suspicious orders?  You had mentioned that you had

24   not seen those documents before.

25               Do you know whether those are on your

Page 533

1    Google Drive?

2         A.    I do not.

3              MS. MCENROE:  I am going to pass it

4    to a co-defendant, Patrick.  Are you there,

5    Patrick?  Maybe we should go off the record.

6              MS. KNIGHT:  No.  We need to stay on

7    the record.  We need to get this going.

8              MR. BEISELL:  Absolutely.  I agree,

9    Kathleen.

10

11   REEXAMINATION BY MR. BEISELL:

12        Q.    Hello, again, Mr. Rafalski.  Just a

13   couple of questions for you.

14              So you testified a minute ago that

15   Walmart's manual system wasn't sufficient or

16   appropriate in your opinion because of the volume

17   of orders being shipped.  Is that a fair summary?

18        A.    Yeah, volume would be one reason.

19   The other reason is it doesn't look at pattern and

20   frequency.  It just looks at size on a daily basis.

21   That was not specific to volume, but that would be

22   one of the main reasons.  Volume in the amount of

23   orders they're processing per day.

24        Q.    Got it.  What does manual mean to

25   you?

Page 534

1          A.      That means that the ultimate decision

2     is made by a person in the act of pulling the

3     actual order.

4          Q.      So a human individual decides whether

5     or not this is a suspicious order, that is a manual

6     system?

7          A.      It decides whether or not there's a

8     trigger or there's a reason to stop or to make an

9     alert.  It wouldn't be to make ultimately a

10    decision.  It is just the system is based on a

11    manual review versus a computer stopping or

12    blocking an order.

13         Q.      Got it.  What years did Walmart use

14    the manual system you referred to?

15         A.      I would have to go to my report.  I

16    put away my little --

17         Q.      The notes from yesterday?

18         A.      Yes.  Because each one used them for

19    different time periods, I don't like to guess about

20    that.

21         Q.      Sure.  If you can quickly find your

22    report, go ahead.

23         A.      Let me have my little timeline,

24    instead of reading my report.

25         Q.      Sure.

Page 535

1         A.      I have so many books here, I don't
2    know that I have it.

3               I have some recollection that they
4    used it even into the REDDWERKS system.  It was
5    also a part of their SOMS.  So I don't know that
6    that I have a definitive date when it actually was
7    terminated.  I remember -- I have some recollection
8    that there was a representation that it was
9    occurring much greater than just when the REDDWERKS
10   kicked into place, that it was still ongoing, that
11   they would utilize employees to look at orders as
12   they were processing them.  So I don't know an
13   exact ending date for that.

14        Q.      So based on what you told me, then,
15   it would be fair to say that the manual system
16   wasn't always the only system in place?

17        A.      Correct.  What I am saying is that
18   when the REDDWERKS went into place, which was
19   computer based, they -- I believe that they also
20   were relying on -- still relying on the pickers to
21   manually look at orders.

22        Q.      And those pickers that you just
23   mentioned, do you know how many pickers worked at
24   the DC analyzing those orders on a daily basis?

25        A.      I recall it was discussed in the

Page 536

1   deposition, but I don't recall it off the top of my

2   head.  I believe it was a smaller number.  And just

3   for clarification --

4          Q.     Yeah.

5          A.     -- the manual system there in -- I

6   believe if I remember correctly with Walmart in the

7   deposition, there was also some printing process of

8   orders where I believe they identified some

9   clerical workers, too, as part of the manual

10  process.

11         Q.     Can you explain that process to me a

12  little bit more?

13         A.     Yeah, I think they had a process

14  early on where the orders came to the DC, and there

15  were some clerical people that helped prepare the

16  picking orders or I believe there was some

17  testimony from maybe Mr. Abernathy that he also

18  relied on some clerical people to look at orders.

19         Q.     You mean on preparing the 222 forms?

20         A.     Yes.  It wasn't clear how they

21  actually did that.  He kind of indicated they

22  printed something.  It wasn't specific to an order

23  form, so I don't know if it was a pick order or a

24  customer order.  But there was -- I recall he

25  talked about some employees in the clerical that

Page 537

1    also were part of the process.

2         Q.    Understood.  You said a minute ago

3    when I asked you if you knew how many pickers were

4    working on the manual review, you said a smaller

5    number?

6         A.    Yeah.  I don't remember exactly

7    because most all the defendants used it at one

8    point or time.  It was -- I don't want to guess.

9    But it was an extensive number of employees.

10        Q.    Do you know how big Walmart's

11   Distribution Center 6045 is?

12        A.    Square footage, I do not.

13        Q.    You see 6045 as the one that

14   distributed CT2s, correct?

15        A.    That's correct.

16        Q.    And that is the only one that

17   distributed CT2s?

18        A.    Correct.

19        Q.    You agreed yesterday that DEA had

20   several occasions to review Walmart's distribution

21   practices over the course of the time covered in

22   your report; do you remember that?

23        A.    I would expect that, yes.

24        Q.    So you did testify to that yesterday?

25        A.    Yes.

Page 538

1          Q.      Did you review any of the DEA-6

2    reports reflecting the cyclic audits that DEA

3    conducted of Walmart's DC 6045?

4          A.      I did not.

5          Q.      Do you recall any criticism by the

6    DEA during the relevant time period about Walmart's

7    manual system?

8          A.      Yeah, I believe there was some

9    criticism in 2010, based on an inspection.  And

10    then there was another one in 2014.

11          Q.      And those were not DEA-6 reports, I

12    take it, since you just said you didn't review

13    them?

14          A.      No, I believe they were

15    communications or emails within the company on both

16    occasions.

17          Q.      And those emails, to your

18    recollection, were criticisms by the DEA about the

19    manual system?

20          A.      Oh, I'm sorry.  I didn't understand

21    it to be the manual system.

22          Q.      Yep.

23          A.      I don't remember specifically what

24    they were about.  I know it was issues with the

25    SOMS or the identification of customers or maybe

Page 539

1   even due diligence.  But I just know that there was

2   some preparations for reporting back to the DEA on

3   certain topics and at the time frame.

4                  Specifically in '14, I did a lot of

5   searching for documents to supplement the original

6   email.  I have recollection of both of those.

7          Q.     Understood.  Let me reask my question

8   since we didn't quite meet there.

9                  So you don't recall any criticism by

10  the DEA during the relevant time period covered in

11  your report about Walmart's manual system?

12         A.     I don't believe the two -- I didn't

13  understand your question to be specific to that.  I

14  don't recall anything -- any criticism I reviewed,

15  and I don't recall those emails being in regards to

16  the manual system.

17         Q.     Thanks.  Just a couple more

18  questions.

19                  You mentioned or Ms. Knight asked you

20  about some spreadsheets related to Walmart.  Do you

21  recall that?

22         A.     Yes.

23         Q.     And how many spreadsheets do you

24  think there were, specific to her question?

25         A.     I think there were four.

Page 540

1          Q.     There were four?  Okay.  And in your
2     mind, that is the sum total of Walmart's due
3     diligence records for Track 3?
4                  MS. KNIGHT:  Objection to form.
5          A.     No.  I wouldn't say that is exclusive
6     of their due diligence.  Just through conversation,
7     I am aware that there may be more information in
8     ARCHER.  And I don't know -- I believe those
9     spreadsheets might be a production from ARCHER.
10    But by the content of some of the testimony and
11    documents, it seems like there should be more
12    information in ARCHER, and I just haven't been able
13    to find that.
14         Q.     (BY MR. BEISELL:)  Understood.
15    Several times today, I am sorry for repeating, but
16    several times today you said that you relied -- all
17    of the documents that you relied on for the
18    opinions in your report are contained either in
19    your report or in your reliance materials, right?
20         A.     Yes, sir.
21         Q.     If a document doesn't exist in your
22    reliance materials or in your report, then you
23    didn't rely on it for your opinions, right?
24         A.     That would be a correct assumption,
25    yes, sir.

Page 541

```
 1        Q.      The inverse of the question I just
 2   asked, right?
 3        A.      Yes.
 4        Q.      So bear with me while I do a little
 5   bit of a hypothetical with you since I don't have a
 6   whole lot of time.  So I am going to show you my
 7   screen here.  Can you see my screen, Mr. Rafalski?
 8        A.      I do.
 9        Q.      And this is your Schedule I, your
10   list of reliance materials?
11        A.      It is.
12        Q.      Okay.  Now, hypothetically if one of
13   those spreadsheets, say, the order monitoring data,
14   if one of those spreadsheets had a Bates label of
15   286240, if I put this in, it should appear
16   somewhere in your reliance materials or in your
17   report, right, if you reviewed that document and
18   you relied on it for your opinions?
19        A.      Yeah.
20                MS. KNIGHT:  Objection to the form.
21        A.      Yes, it should.
22        Q.      (BY MR. BEISELL:)  Okay.  So I am
23   just going to click here and see if we can find it.
24   So it is not there, as far as I can tell.
25                And we will try in your report.  Bear
```

Page 542

1    with me.  Also not there.

2              So hypothetically if the Bates number

3    286240, the Walmart-produced document, was one of

4    those spreadsheets and it doesn't appear to be in

5    your report or in your Schedule I, then you didn't

6    rely on it for your opinions; is that fair?

7              MS. KNIGHT:  Objection to the form.

8         A.    That could be one explanation or it

9    just didn't make it onto the reliance sheet.  But I

10   think that is a fair assumption.

11             MR. BEISELL:  I don't have any other

12   questions unless Scott or any of the other -- my

13   other colleagues do.

14             MR. LIVINGSTON:  How much time is

15   left?

16             MS. KNIGHT:  It looks like one

17   minute.

18             MS. MCENROE:  I thought --

19             MS. KNIGHT:  I've used nineteen

20   minutes, and we came back at 11:31.

21             MS. MCENROE:  I did quick, mental

22   math.  I think you are right.  I think you have got

23   one minute.

24             MR. LIVINGSTON:  I don't have any

25   questions.

Page 543

1               MS. MCENROE:  Unless I am wrong, I

2     think that concludes the deposition for today.

3               MS. KNIGHT:  Thank you, all.  I have

4     a question before we go off the record.  We have

5     all of these documents here.  Do you want to send

6     FedEx shipment labels to us to send them back to

7     you, or do you want us to destroy them, or what do

8     you want to do?

9               MS. MCENROE:  Shred them, please.

10              MS. KNIGHT:  Okay.

11              MR. RUIZ:  Destroy.

12              MS. KNIGHT:  You got it.

13              MR. LIVINGSTON:  Kathleen, I am fine

14    with you just destroying those.

15          A.    For Ms. Swift, if you could let her

16    know --

17              MS. KNIGHT:  I told her last night.

18          A.    Okay.  Never mind.

19              MS. MCENROE:  Thank you so much,

20    Mr. Rafalski.  Thank you, everybody.

21              MR. BEISELL:  Thank you, everybody.

22          A.    Thank you very much.

23              THE VIDEOGRAPHER:  We are off the

24    record, 11:50.

25

Page 544

1

2          (Deposition concluded at 11:50 a.m. EDT)

3

4              FURTHER THE DEPONENT SAITH NOT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 545

1                    C E R T I F I C A T E

2

3

4     STATE OF ALABAMA

5     JEFFERSON COUNTY

6

7              I hereby certify that the above and

8     foregoing deposition was taken down by me in

9     stenotypy, and the questions and answers thereto

10    were reduced to typewriting under my supervision,

11    and that the foregoing represents a true and

12    correct transcript of the deposition given by said

13    witness upon said hearing, to the best of my

14    ability.

15              I further certify that I am neither

16    of counsel nor of kin to the parties to the action,

17    nor am I in anywise interested in the result of

18    said cause.

19

20    

21    /s/ LAURA H. NICHOLS

      Commissioner-Notary Public, State of AL

22    ACCR License No. 3, Exp. 9/30/2021

      GA CCR No. 2714, Exp. 4/1/2022

23    TN LCR No. 679, Exp. 6/30/2021

      Transcript Certified on 6/14/2021

24

25

```
                                                       Page 546
 1                       Veritext Legal Solutions
                             1100 Superior Ave
 2                              Suite 1820
                           Cleveland, Ohio 44114
 3                         Phone: 216-523-1313
 4
     June 17, 2021
 5
     To: Kathleen Knight
 6
     Case Name: National Prescription Opiate Litigation - Track 3 v.
 7
     Veritext Reference Number: 4637239
 8
     Witness:  James Rafalski , Vol. II    Deposition Date:  6/11/2021
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
 1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2

     ASSIGNMENT REFERENCE NO: 4637239
 3   CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 6/11/2021
 4   WITNESS' NAME: James Rafalski , Vol. II
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have made no changes to the testimony
     as transcribed by the court reporter.
 8

     _____        _____
 9   Date                    James Rafalski , Vol. II
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25
```

Page 548

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

     ASSIGNMENT REFERENCE NO: 4637239
3    CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 6/11/2021
4    WITNESS' NAME: James Rafalski , Vol. II
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9         I request that these changes be entered
     as part of the record of my testimony.
10

          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                   James Rafalski , Vol. II
14

          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
          Notary Public
24

          _____
25        Commission Expiration Date
```

Page 549

1                          ERRATA SHEET

              VERITEXT LEGAL SOLUTIONS MIDWEST

2                    ASSIGNMENT NO: 4637239

3    PAGE/LINE(S) /          CHANGE          /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

     _____       _____

20   Date                    James Rafalski , Vol. II

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23                   _____

                     Notary Public

24

                     _____

25                   Commission Expiration Date

| & |
| --- |
| **&**  375:17 376:7 377:8 378:18 380:11 |

| 0 |
| --- |
| **00001833**  384:11 |
| **00001845**  384:12 |
| **00030420**  384:8 |
| **00033016**  384:7 |
| **00907**  376:10 |
| **06**  407:14 |
| **07068**  377:10 |
| **08**  407:14 |
| **09**  463:1 |

| 1 |
| --- |
| **1**  390:3 391:1 400:1 441:15,25 442:8,17,22 468:12,21 478:20 503:6,8 |
| **10**  383:25 |
| **100**  376:18 |
| **1000**  379:11 |
| **101**  426:22 427:16 428:3 |
| **102**  428:11 |
| **10940**  376:17 |
| **10:27**  495:18,20 |
| **10:38**  495:20,22 |
| **10:57**  513:13,15 |
| **10:59**  513:15,17 |
| **11**  374:18 386:2 428:12 |
| **1100**  546:1 |
| **11:09**  522:19,21 |
| **11:17**  522:21,23 |
| **11:20**  525:15,17 |
| **11:31**  525:17,19 542:20 |

**11:50**  543:24 544:2
**11th**  386:6
**1200**  379:22
**12th**  514:12
**13**  389:12 467:2 469:21
**1301.74**  485:8 486:5
**1306.04**  430:11 531:4
**1311**  376:8
**137**  520:22,23
**13th**  464:8
**14**  383:17 400:8 539:4
**144535**  393:25
**15**  383:15 399:15 399:16
**15219**  378:21
**154**  392:16
**158**  439:23
**16**  427:2,2,7 490:15
**17**  374:6 386:8 467:2 546:4
**1701**  380:12
**1800**  379:10
**1801**  379:21
**1820**  546:2
**184**  400:10,11
**18409**  545:20
**185**  400:10
**186**  402:8
**187**  402:8 407:6
**19**  470:16
**19103-2921**  380:13
**1997**  442:17 444:3 468:13

| 2 |
| --- |
| **2**  387:16 392:16 424:6 431:22 471:21 478:9 |
| **20**  446:23 547:16 548:22 549:22 |
| **200**  377:18 |
| **2002**  468:15 |
| **20036-5807**  379:12 |
| **2004**  410:3 468:15 |
| **2006**  407:22 |
| **2008**  468:15 |
| **2009**  441:14 459:5 461:9 469:10 |
| **2010**  410:4 538:9 |
| **2011**  422:8 464:9 467:2,3 |
| **2012**  412:15 413:10,16 417:10 417:12 480:14 481:18 514:12 |
| **2013**  438:25 459:19 476:3 488:10,15 491:5,9 |
| **2014**  393:16 398:14 460:19 461:11 500:21 538:10 |
| **2018**  389:12 390:9 |
| **202**  376:9 379:13 |
| **2020**  383:17 384:21 385:7 400:9 444:3 446:18 |
| **2021**  374:18 383:25 386:2,6 546:4 |
| **21**  428:3 487:10,11 |
| **214**  380:24 |

**215**  380:14
**216**  375:21 381:10
**216-523-1313**  546:3
**216-9000**  381:18
**2200**  380:21
**222**  536:19
**24400**  381:8
**25**  383:18 412:7,8 412:11 514:22
**25338-3843**  377:19
**26**  383:23 426:19 426:20,25 427:1
**261-2220**  375:11
**27**  468:12
**2714**  545:22
**28**  381:16
**2800**  380:22
**2804**  374:5,6 386:8
**286240**  541:15 542:3
**2900**  375:18
**293-8244**  376:11
**294644**  381:17
**2nd**  375:19

| 3 |
| --- |
| **3**  390:5,8 391:17 441:14,23 459:7 461:10 462:25 469:16 496:7,23 503:7 506:20 540:3 545:22 546:6 547:3 548:3 |
| **30**  388:9,13,19 389:18,20,22,22 390:14 391:4 394:20 425:2,6 |
| **300**  381:8 |
| **303**  379:24 |

**304**  377:20
**30485**  475:18
**30497**  484:10
**30498**  487:1
**31**  514:22
**312**  378:10
**33**  384:5 443:3,3
463:18,18,19,20
**33024**  463:14,15
463:24
**33026**  466:18
**33028**  469:21
**33034**  470:16
**34**  384:9 462:15,16
463:17
**345-0200**  377:20
**35**  384:13 490:9,10
**3500**  378:8
**35th**  378:20
**38**  384:16 456:8,9
**386**  383:4,5
**393-05**  384:22
**39402**  375:10
**399-16**  383:15

**4**

**4**  407:14
**4-10**  407:13
**4/1/2022**  545:22
**40**  475:19
**412**  378:22
**412-08**  383:18
**42**  389:7 478:16
**423-15**  385:5
**426-20**  383:23
**44113**  375:20
**44114**  546:2
**44122**  381:9
**446-11**  384:19
**45**  435:7,9
**456-09**  384:16

**462-16**  384:9
**463-20**  384:5
**4637239**  546:7
547:2 548:2 549:2
**47**  384:19 446:10
446:11,14
**471-3490**  378:22
**490-10**  384:13
**495**  383:6

**5**

**5**  377:9
**52**  484:10
**525**  383:7
**526-1836**  381:24
**53**  384:22 393:3,4
393:5 487:1
492:20,20
**533**  383:8
**54**  423:22
**55**  385:5 423:14,15
423:19 424:10
**59**  426:23 427:6
**592.3100**  379:24
**5th**  438:14

**6**

**6**  388:13 389:18
390:14 407:14
494:24 538:1,11
**6/11/2021**  546:8
547:3 548:3
**6/14/2021**  545:23
**6/30/2021**  545:23
**601**  375:11
**6045**  537:11,13
538:3
**60601-1692**  378:9
**659-5200**  376:20
**679**  545:23

**7**

**7**  384:21 385:7
393:16
**713**  376:20
**740-8000**  380:24
**75201**  380:23
**7551**  416:6
**7552**  422:5
**7553**  422:19
**76fr48887**  515:14
**77**  378:8 511:15
**77064**  376:19
**778-1800**  379:13
**781-1111**  375:21
**782-3939**  378:10

**8**

**80**  417:10
**80202**  379:23
**831-0001**  381:10
**843**  381:18
**849**  446:21,22
**850**  446:21
**866**  381:24
**8:04**  386:3,7

**9**

**9**  412:15 462:19
463:2,5,9,25
**9/30/2021**  545:22
**939**  376:11
**95**  424:24
**963-5076**  380:14
**97**  375:9
**973-994-1700**
377:11
**99**  424:24
**9:24**  443:13,15

**a**

**a.m.**  386:3,7
443:13,13 495:20
495:20 513:15,15

522:21,21 525:17
525:17 544:2
**abernathy**  536:17
**abilities**  451:13
500:6
**ability**  404:20
446:6 500:10
504:4 519:21
545:14
**able**  406:3 451:1
487:4 492:23
493:24 494:6
527:21 540:12
**abnormal**  430:19
**absence**  511:1
**absolutely**  533:8
**abston**  376:14
**accept**  418:1
**acceptable**  517:9
520:8
**accepted**  483:3
**access**  413:7
499:24 502:22
503:2,2,11 506:21
507:3
**accesses**  503:10
**accessible**  506:25
**accident**  395:1
**account**  520:1
**accountability**
474:12,14
**accounted**  470:1
480:15
**accr**  545:22
**accurate**  387:22
388:3 446:7 454:8
511:6 521:13
**accurately**  451:1
**acknowledge**
394:21 395:4,11
398:16 399:9

400:24 401:14
417:5,25 420:5,8
421:16 425:24
447:10 454:21
456:21 459:14
527:11 547:11
548:16
**acknowledged**
399:21
**acquisition** 491:21
**act** 439:16 506:3
534:2 547:14
548:20
**acted** 488:20
**acting** 482:9
**action** 411:19
433:20,24 439:13
454:11 455:16
465:13 531:7
545:16
**actions** 432:21
433:22 456:4
514:3
**actively** 532:8
**activities** 417:4
433:7 434:9 452:9
469:5 529:21
**activity** 419:21
421:15 427:12
442:22 443:1
451:13,24 470:18
486:22 515:3
518:15,18 519:9
527:5,10 528:16
528:23 530:1,19
**acts** 509:5 512:19
**actual** 405:8
410:10 434:7
530:13 534:3
**add** 401:24

**addition** 472:21
**additional** 386:21
511:17
**address** 546:15
**adequate** 459:13
510:12
**adjustment**
491:15
**administrative**
454:11 514:3
529:15
**admonishment**
444:18 445:18
**admonition**
446:25 448:12,23
454:6 514:15
**adopt** 511:24
**advanced** 531:18
**adverse** 456:4
**advised** 484:14,24
485:13,17 487:8
487:15
**advising** 486:1
**affixed** 547:15
548:21
**age** 391:12
**agencies** 413:2
414:18
**agency** 515:1,20
**agent** 400:6,13,14
400:21 412:25
450:10 470:5
476:6
**agents** 418:24
436:7 461:18
477:8 478:25
**agnello** 377:8
**ago** 439:20 493:11
524:11 531:12
533:14 537:2

**agree** 395:15
396:12,12,24
417:13 427:25
428:8 439:8 444:4
448:13 460:17
462:3 463:4
469:14 470:4
472:3 473:25
478:3 481:4,20
486:8 490:3,4
492:6 493:14
516:3 529:10
533:8
**agreed** 537:19
**agreement** 415:12
**ahead** 414:3
462:22 463:6
529:18 534:22
**aid** 380:4,4,5,7
388:10 479:13
516:8,19 517:7,7
517:21 520:15
522:9 525:24
531:17 532:21
**aid's** 532:4
**aids** 478:19
**aj** 375:13
**al** 545:21
**alabama** 545:4
**alert** 389:24 534:9
**alex** 379:18
**alex.abston**
376:21
**alex.harris** 379:25
**alexandra** 376:14
**alliance** 379:16
**allow** 531:6
**allowed** 429:23,24
**amanda** 381:13
**amerisourceberg...**
479:25

**amount** 419:6
444:14 457:11
468:1,2 533:22
**analysis** 404:16,21
405:2 407:2 408:5
411:18 431:8,20
469:24
**analyze** 406:4
**analyzed** 422:7,10
**analyzing** 535:24
**anomalies** 430:15
**answer** 398:15
401:13 425:8
428:16,19 445:2
447:2 451:1
482:23 484:6
489:2 493:12
505:18 512:4,10
517:15 532:14
**answered** 434:4
483:20 509:16,22
520:20
**answering** 525:3
**answers** 545:9
**anthony** 379:7
**anticipation** 412:6
**antidrug** 438:20
**anybody** 525:10
**anytime** 500:2
**anywise** 545:17
**apologize** 425:5
435:12 513:1
**appear** 493:17
499:3 541:15
542:4 547:11
548:15
**appearing** 375:2
376:2 377:2 378:2
379:2 380:2 381:2
382:2

appended   548:11
548:18
approach   517:9
520:8
appropriate
517:22 520:14
521:5 533:16
approval   462:25
approved   459:7
468:11 469:9
476:18 486:19
approximately
415:8 419:5
478:22 502:20
april   462:6
archer   540:8,9,12
arcos   498:16
area   402:22 414:9
417:7 428:8
432:22 433:20
434:10,11 449:23
475:11 492:15
areas   403:18,20
419:21 420:2,7
422:15 423:2
435:24 453:16
argue   429:24
argument   418:10
argumentative
429:20 494:3
arizona   427:19
aruiz   379:14
asked   387:4
400:12 405:20
406:12,24 407:1,9
417:19 418:7
428:4,6 433:25
434:4 446:23
473:23 480:22
483:20 496:5
509:15,21 510:4,6

511:8,14 512:12
512:17 516:6,11
520:5,19 526:1,3
528:6,22 529:1,6
531:12 537:3
539:19 541:2
asking   387:14
403:3 437:2
463:10 477:14
492:14
aspect   489:5
aspirin   395:14
assess   433:8
assigned   468:13
assignment   450:22
547:2 548:2 549:2
assist   433:21
434:6
assistant   406:17
assisted   432:20
433:6,6
assisting   450:23
assume   395:22
477:15 516:18
assumed   406:22
assuming   439:4
assumption
465:15 527:9
540:24 542:10
astronomical
502:25
atlantic   380:6
attached   471:22
548:7
attempt   473:3
attending   414:21
attention   389:7
480:18 485:23
486:14 489:10
attorney   375:16
376:6,15 377:16

378:6 379:8,19
380:10,19 402:24
403:23 438:20
attorneys   375:7
377:6 378:17
500:4
audit   472:21
473:19
audits   447:1
472:22 473:16
538:2
august   412:15
413:9,16 468:12
476:3 488:10
aunterreiner
381:19
authority   530:6,13
authorize   548:11
authorized   407:11
automated   488:16
available   406:7,9
406:12,22 409:11
409:17 412:4
425:19 431:5
520:2
ave   546:1
avenue   375:18
380:21
average   489:2
avoid   456:12
avoided   450:5
aware   405:16
408:13,18 410:11
410:14,21 411:4,7
419:24 431:7
432:12 436:18
440:20,21 441:12
449:8 454:1,5,14
471:6,7 474:23
540:7

awareness   383:20
412:14 416:9
422:5 462:1

**b**

b   380:5,7 388:9,13
388:19 389:18,20
389:22 390:14
391:4 394:20
418:5 485:8 486:5
back   392:4,7
398:14 411:5
425:10 428:10
435:17 438:3
441:8 443:14
446:6 447:25
459:17 463:11
488:5 489:6
492:20 495:21
499:13 513:16
517:6 518:14
522:22 525:13,18
528:8 539:2
542:20 543:6
546:15
background   439:6
478:17
backup   450:22
bad   399:5 400:21
400:22 401:4
402:13,23 403:6,7
404:16 407:20,23
407:24 425:5
472:10 516:20
517:24 526:5,13
526:17,20,21
527:2
bag   471:21,22
bags   415:17,17
ballpark   445:15
445:23 467:21
468:5

bar  471:15
bars  400:21
bartlit  379:20
bartlitbeck.com
  379:25
base  479:7
based  394:20
  412:18 433:11
  451:12,24 486:22
  491:16 494:4
  522:9 528:16
  532:13 534:10
  535:14,19 538:9
basically  400:1
  502:16
basis  398:1,12
  466:19 521:10
  527:15 533:20
  535:24
bates  383:21 384:6
  384:10,14,23
  416:4 422:5
  463:14,14,22
  499:21 504:25
  506:9 507:10
  541:14 542:2
batting  386:20
bear  393:22
  512:25 541:4,25
beauty  478:19
beck  379:20
becker  377:9
beginning  392:17
  427:2 461:7
  464:19 503:9
  504:20
begins  530:19
begun  390:9
  488:15
behalf  388:17

behavior  527:6
beisell  378:5 383:6
  383:8 495:24
  496:1 499:5,7
  507:24 508:9,17
  533:8,11 540:14
  541:22 542:11
  543:21
believe  388:3,24
  401:23 409:22
  423:10 431:25
  432:13,22 435:2
  436:23 437:9
  438:5 447:16
  451:6 452:17,17
  454:8 479:16
  480:10 482:7
  489:4,18 495:7
  497:19 503:12
  505:9 508:3 519:7
  525:2 526:8
  535:19 536:2,6,8
  536:16 538:8,14
  539:12 540:8
believed  452:6
  500:23
bell  438:25 439:3
benefit  482:4
berris  375:17
best  445:25 447:17
  545:13
better  420:6
  447:20 466:8
  472:12 487:16,25
  495:5 524:17
beyond  434:9
  499:2
biannual  473:5,13
biannually  474:5
big  405:11 416:8
  537:10

biggest  429:3
bill  395:5
billing  473:1
binder  387:9
  393:3 412:4 424:6
bit  387:17 410:6
  413:20 441:12
  442:1 485:13
  505:10 522:25
  524:11 529:1
  531:12 536:12
  541:5
blakeley  385:7
  423:18
blakeley's  424:15
  424:22 427:10
blank  531:20
block  391:21,23
  392:9,19,24
  394:13 397:17
  493:3
blocked  394:18
  395:2,6,18 396:7
  397:11,19,23
  398:2,13,18,22
  493:13 514:24
blocking  397:6
  534:12
board  399:10
  400:6,12,20
  405:16 528:13
bockius  380:11
bodi  400:14
body  391:15
  392:16 415:15
boggling  499:17
bold  416:8
bonasso  377:17
bond  382:5
books  535:1

boots  379:16
  429:1 477:8
bordering  410:10
borders  401:7
  411:5
bother  494:14
bottles  396:4
bottom  389:8
  391:22 393:9
  400:11 416:5
  423:9 428:3
  446:22 476:15
  484:11 489:7,9
  490:20
boulevard  381:8
  381:16
bouncing  411:5
box  504:22
brandon  393:10
bread  481:5
break  391:10
  425:21 443:6,12
  495:15,19 513:14
  522:15,20 525:12
  525:16
brian  383:25
bridgeside  381:16
briefly  526:15
bring  485:22
  489:10,22
brings  489:15
broad  419:22
  420:2 434:5 461:2
  532:12
broaden  507:19
broader  475:6
brody  377:8
brought  486:13
  488:6 489:3
brunner  380:18

**bullet** 416:10
419:2
**bulletin** 428:6
**bureau** 424:19
**bus** 415:3 428:22
**buses** 410:18
**business** 443:1
451:12,23,24
452:8,10,21 469:5
472:25 480:1
481:18,21 482:1
486:22 513:3,21
**butter** 481:5
**byrne** 377:7

**c**

**c** 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
545:1,1
**ca** 546:25
**cage** 471:25
**call** 417:7 423:3
498:2,14 500:7
**called** 393:25
396:2 471:9
**calling** 528:3
**calls** 514:5
**camera** 514:25
**capabilities**
439:15
**capability** 472:18
502:13
**capable** 400:15
**capacity** 417:3
**capitol** 377:18
**cardinal** 479:25
**care** 424:13
**career** 409:22,25
445:3 449:3
465:15

**carella** 377:7
**carellabyrne.com**
377:12
**carlson** 485:23
486:14 489:11
490:25
**carolina** 381:17
**cars** 410:19 415:5
415:11 428:23
**cartons** 472:2
**case** 374:6 386:8
389:18 390:14,15
391:2 393:25
394:8 406:6
407:21,22 411:7
411:22 416:23
432:21,24 433:21
433:23 434:2,15
437:20 443:24
446:2,16 447:12
462:7 464:24,24
465:18 476:10
478:2 503:12
509:4,11 510:9
512:23 518:13
527:18 528:20
529:13,15,17
546:6 547:3 548:3
**cases** 374:12
410:24 411:2
415:10 420:10
422:9 430:25
449:9 455:14
480:7 524:21
**catchall** 492:3
**cause** 490:5
545:18
**cautious** 433:4
**cavities** 415:15
**ccr** 545:22

**cecchi** 377:7
**cent** 447:9
**center** 380:6,8
412:12 521:1
532:22 537:11
**centers** 436:8
**centre** 378:19
**ceo** 453:9
**certain** 419:21
421:13 491:7
493:18 502:17
511:21 539:3
**certainly** 413:9,14
448:21 456:15
491:8
**certainty** 493:25
524:8,9
**certificate** 548:11
**certification** 547:1
548:1
**certified** 374:23
545:23
**certify** 545:7,15
**chagrin** 381:8
**chain** 390:16
396:6 439:10
519:11,23
**chains** 519:6
**chance** 499:2
**change** 447:20
490:3 509:25
546:13,14 548:8
549:3
**changed** 397:5
454:4 497:11
521:16,24
**changes** 522:9
546:12 547:7
548:7,9
**characterize** 472:7

**charge** 388:22
438:24
**charleston** 377:19
**chart** 422:13
458:1,4,8 459:14
**charting** 498:15
**charts** 497:24
**cheat** 391:1,6,20
392:8,23 456:11
459:11
**check** 470:2,10
475:3 511:16
520:23
**chemical** 441:15
441:25 468:21
**chemicals** 442:8
442:17,22 468:12
478:21
**chicago** 378:9
**chicken** 530:18
**chip** 415:17
**choice** 441:2
**chunderlik** 490:24
**circled** 423:9
**circumstances**
521:4,6 528:7
**cite** 485:7
**cited** 389:1 490:23
510:19
**citizens** 410:16
**city** 426:9
**civil** 547:5 548:5
**clarification** 536:3
**clarify** 524:13
525:7
**clarifying** 435:14
**clean** 448:14
455:15 456:1
**cleanup** 386:20
496:4

clear 397:17 398:10 496:22 497:13 501:11 505:16 536:20

clearly 394:10 491:10 492:22 495:12

clerical 536:9,15 536:18,25

cleveland 375:20 381:9 546:2

click 541:23

client 406:5

clinics 419:8 420:17 452:3

clock 417:22,23

close 465:7

closed 437:20 465:6,16,18 476:10 478:3 517:6

closely 391:11

closing 464:24,24

cocaine 416:20 417:1,4,5

code 471:15 487:10,11

codeine 415:23

cohen 381:5,7

coincidental 442:22

colleagues 386:21 428:14,21 455:10 494:16,17 508:1 542:13

collectively 444:12

color 422:25

colorado 379:23

colosimo 432:8,16 438:18 440:4 449:21 450:10

456:21 458:19,24 459:5 462:24 463:4

colosimo's 437:3 437:13 490:16

combat 414:7

combined 402:5 471:25

come 393:24 397:10 402:10 419:3 495:6 532:4

comes 438:9

comfort 453:20

comfortable 445:1 446:6 447:17 448:2

coming 414:8 427:13,25 428:7 428:17,22

commending 529:19

comment 417:16 418:2,5 425:15 455:2 460:6 477:4 479:6

commenting 439:15

commission 547:19 548:25 549:25

commissioner 545:21

common 419:23 446:24 449:3 468:24 473:20 474:10 529:23

commonly 415:6 415:16 416:20 419:7 420:16

communications 412:12 538:15

companies 451:16 451:20 453:11 468:4

company 378:14 384:17 388:18 393:11 395:5,9 398:17 485:15 489:2 490:22 493:15 503:22 507:19 538:15

comparable 442:3

compared 423:2 473:24 491:19 502:8

comparison 479:17

competent 433:2,8

complete 472:24

completed 471:19 472:23 546:15

completion 471:24

complex 527:4

compliance 437:14 448:24 451:5,16 452:5 453:12,20 454:22 459:22 460:10,14 460:15,22 461:1 461:13,14 462:2 465:4,8 478:4 483:15,23 486:4 486:11,20 487:9 487:23 488:3 494:18,20 495:1,7

compliant 449:6 449:14,15 451:12 452:7

complicated 499:18

complied 484:4

complying 445:13 455:6

comprehensive 503:25 504:24 519:22

computer 484:19 534:11 535:19

computerized 471:4 472:15 485:15 488:16 489:16,24

conceal 415:15

concealed 415:18

concealment 415:14

concede 397:19 527:11

concern 452:4 505:7 524:11,12

concerned 481:24 486:13

concerning 478:12

concerns 428:6 451:10 483:5

conclude 493:25

concluded 465:1 467:2 494:17 544:2

concludes 459:20 543:2

conclusion 454:22 459:2 460:20 465:16 478:8 493:18 495:6

conclusions 461:18

condoms 415:16

conduct 411:19 420:23 421:17 433:19 473:13

[conducted - correctly]

conducted   474:4
532:3 538:3
conference   497:8
conferences
497:14,15
confidence   500:5
confident   433:6
445:5 503:24
505:1 506:17
confidential
383:22 384:8,12
384:15,24
confirm   390:12,20
390:21
confirmed   407:11
463:11 511:23
confirming   498:16
confused   389:20
conjunction
418:22
conlon   458:10
459:19 476:11,17
485:6 487:3,15
488:21
connection   398:25
402:18 404:5
412:22 434:2
consider   455:8,9
considerably
457:16
consideration
411:12
considered   391:24
396:25 409:19
consistent   510:10
consistently   515:1
consolidated
472:1
constant   471:4
consultant   381:21

consultants
453:12
consulting   381:22
cont   383:4,5
contact   502:4
contain   442:24
contained   495:7
509:14 540:18
containing   478:20
contains   462:6
506:19
content   478:14
499:21 540:10
continuing   376:1
376:4 377:1,4
378:1 379:1 380:1
381:1 382:1,4
384:2 385:2 386:1
386:16
contradict   487:20
contradicted
495:8
contradicts   487:18
contributed   399:3
contributor
408:11
control   439:9
472:5,8 475:2
482:24 507:12
controlled   394:1
395:13,15,17
407:12,15 442:1
442:10,21 469:10
469:25 471:20
472:25 473:19
478:21 480:1,15
480:19,21 481:2,5
481:19 482:17
484:17,21 485:4
485:18,24 491:7
492:4 493:5 494:8

521:1 526:22
530:14
controls   439:18
472:20 494:7
conversation
435:5 447:21
496:12 497:6,12
497:21 540:6
conversations
405:19 432:23
447:23 496:6,11
496:24 497:14
532:11
convicted   400:18
copy   425:15
coroner   400:19
corp   380:5
corporate   474:22
475:1 482:25
489:22 512:18
corporately   439:9
corporation   380:7
correct   388:2,6,14
388:15,18,23
389:2,3,12,19
390:3,6,7,10,11
391:6 395:14,23
398:23 399:6,7,11
399:12 403:14
404:7,18 408:7,8
408:12 409:23
410:8 411:15,25
412:19 413:11,17
413:18 416:2
419:16 420:13,14
420:18,19 421:10
421:24 422:22
423:7 426:5
428:24 429:17
431:19 433:18
434:3,17,18,24

436:8,17 438:9
439:10,25 440:1,7
441:23 442:8,12
442:17 444:19
445:9 446:19
447:3,12 448:16
454:7,13,18,19
455:20,21 456:23
457:13 459:8
460:1,15 461:16
461:19 462:10,12
464:11,16 465:4
466:1,23 468:18
469:2,16 470:2,6
472:5 473:5,10
476:7,19 477:16
478:6 479:3
480:24 482:13,22
486:21,23 487:5,6
487:12 488:11,12
488:21 489:16
490:17 491:1,10
492:24 494:1,10
494:13,20 496:9
496:25 500:3
510:22 513:25
514:18 518:7
527:21 528:1,2,21
528:22 530:25
535:17 537:14,15
537:18 540:24
545:12
correctable
466:16
correction   437:21
corrections   546:12
548:17
corrective   488:4
correctly   504:7
536:6

**corresponding**
430:6,8 431:3,11
512:14 515:12,16
529:1,5,11 530:22
530:24 531:2,8
**corresponds**
511:18
**corroborated**
427:10
**counsel** 384:18
386:24 387:14
389:24 406:15
417:21 418:7
429:19 440:10
443:4 495:13
511:25 526:4
528:9,25 531:11
545:16
**count** 471:5
472:16
**counter** 442:23,24
478:20
**counties** 399:6
400:7,22 401:1,4
401:14,18,19
403:8 404:24
405:15,23 409:5
409:16 411:9
420:13 423:6,13
452:24
**country** 411:2
**counts** 472:24
473:5 474:3
**county** 390:15
399:4 400:19
401:3,6 408:7,15
408:19,22 409:10
410:19,25 411:14
411:25 416:2
421:16 423:10,11
423:12 424:19

426:5 429:1,4,7
431:10 496:23
523:3 545:5
547:10 548:15
**couple** 387:11
410:6 423:24
425:11 450:16
451:15 487:21
490:19 499:8
503:13 523:15
533:13 539:17
**courier** 475:15
**course** 420:12
428:14 496:20
501:16 506:15
537:21
**court** 374:1 547:7
**cover** 414:13
**covered** 537:21
539:10
**crime** 416:13
**criminal** 412:12
416:13 418:17
422:7 531:7
**crisis** 399:4,5
403:8 408:6,11
416:2
**criteria** 491:17
**critical** 412:11
441:2
**criticism** 488:24
488:25 538:5,9
539:9,14
**criticisms** 538:18
**cross** 425:18
429:22,24 469:4
508:19
**crucial** 531:5
**ct1** 502:10
**ct2s** 537:14,17

**ct3** 496:15 500:9
507:18,20 524:24
525:6 531:13,18
**customer** 380:6
453:24 471:20,23
484:16 523:14
536:24
**customers** 452:13
452:13 453:4,13
453:17,21 474:19
516:8 517:1,6
538:25
**cut** 512:6
**cvs** 379:4,4,5,6
511:9 512:22,23
513:3,3,20,21
520:15 521:22,24
**cycle** 473:2
**cyclic** 443:21
444:3 448:15
459:24 464:5,23
466:21,22 468:14
469:14 472:24
476:10 538:2

| d |
| --- |

**d** 378:15 380:5,7
**daily** 472:25
473:19 474:12
521:10 533:20
535:24
**dallas** 380:23
**damian** 385:6
423:18
**dan** 374:7
**daniel** 375:15
**data** 405:13,15
406:7,9,16,17,20
406:22 407:3
491:16 497:25
498:17 502:18
518:10,11 541:13

**database** 499:13
499:24 501:14,16
501:17 502:8,21
503:5 504:20
506:18,19
**date** 389:25 390:4
390:22 391:8
412:13 413:15,15
417:11 464:8
469:18 471:5
488:9 490:2 506:3
506:10 535:6,13
546:8 547:3,9,19
548:3,13,25
549:20,25
**dated** 393:15
412:15
**david** 381:5,7,11
**day** 378:7 391:16
473:10 483:14
496:1 497:21
498:1,11 521:3
533:23 547:16
548:22 549:22
**days** 546:18
**dc** 379:12 444:7
535:24 536:14
538:3
**de** 376:8
**dea** 384:6,7,8,10
384:11,12 408:10
409:19 412:25
413:4,8 414:9,17
416:24 418:14
424:20 429:6
430:23 431:2
432:11,16 433:2
434:18,23 436:7
436:14 437:7
439:25 440:4
444:19 445:13,14

446:25 448:11
449:8 454:12,17
455:7,10,20
456:22 457:12,20
457:24 458:7,17
459:3,23 461:18
464:11,13 465:9
465:25 466:7,8,8
466:22 468:13,24
470:4,10 471:11
473:4,8,14,23,24
474:2 476:6
477:16 478:5
482:16,25 483:1,5
483:15 484:13
486:2 494:16,17
494:24 500:19
506:22 514:4
520:12 526:21
529:15 530:15,20
531:3 532:22
537:19 538:1,2,6
538:11,18 539:2
539:10
**dea's** 413:10,16
465:3 526:10
527:20
**deal** 414:19
**dealers** 416:14
**dealing** 433:15,17
504:14 532:7
**dealings** 432:15,18
434:1 458:24
**dealt** 433:5
**dear** 546:10
**december** 383:17
385:7 389:12
390:9 400:8
**decided** 516:22
**decides** 534:4,7

**decision** 514:11
515:23 534:1,10
**decisions** 514:3,8
**declining** 410:4
**decoder** 466:8
**dedicated** 484:18
**deed** 547:14
548:20
**deemed** 459:12
546:19
**defendant** 377:14
378:4 380:4,17
404:11,17 431:9
431:17 533:4
**defendants** 378:13
379:4,16 390:16
391:2 399:3
405:12 406:6
455:19 506:20
509:6 510:12
519:13 520:15
523:2 525:11
537:7
**defense** 508:23
**deficient** 494:1
**defined** 526:10
**definitely** 474:14
519:21
**definitive** 535:6
**definitively**
398:18,21
**degree** 524:8
**delivered** 408:24
409:16 482:11
**delivery** 471:23
**demographics**
401:17
**demonstratives**
498:9
**dentists** 452:3

**denver** 379:23
**department**
393:12 546:22
**dependent** 501:16
**depending** 506:1,2
527:5
**deponent** 383:4
544:4
**deposited** 429:6
**depositing** 426:4
**deposition** 374:16
383:16,24 384:20
385:6 386:8,9,25
387:3 388:6,22,24
389:1,12,14,18,21
389:25 390:2,9,14
390:20,22 391:5,8
391:17 398:1
399:11 400:3,8
401:12 402:8
423:25 424:12,16
426:17 427:11
428:13 435:8,15
435:16,19 436:21
437:3,8,13 438:4
438:13,14 441:4
446:15 457:4
462:8 490:16
507:2 536:1,7
543:2 544:2 545:8
545:12 546:8,11
547:1,3 548:1,3
**depositions** 389:9
411:21 436:1
491:3 493:24
**depth** 404:21
468:14
**derived** 415:2
**described** 439:16
472:3

**describes** 428:22
471:11
**describing** 486:2
**description** 461:25
479:19 487:25
526:14
**designated** 388:16
**despite** 397:14,15
397:16 408:9
**destination** 416:16
**destroy** 543:7,11
**destroying** 543:14
**detail** 415:14
**details** 459:10
466:19
**determination**
527:16
**determine** 430:12
431:9,15 435:19
**determined**
469:24
**detroit** 375:18
409:18,19 410:15
410:17,21 411:8
411:23 413:10,17
414:9 416:11,13
416:14,18,21,25
417:6,7,11 418:14
418:18 419:2,3,4,7
419:13,14 420:1,2
420:4,8,16 421:15
421:24 422:12
425:8 426:3
427:14 428:1,1,7
428:18 429:6
449:10,23
**detroit's** 416:19
**develop** 414:7
487:15
**deviating** 485:19

**dgoetz** 375:22

**different** 397:20
402:6 410:6
420:23 442:1,4
451:19 452:13
463:8,16 476:6
480:7 498:20
503:10,10,11
505:12 528:8
534:19

**difficult** 501:8
527:9

**digits** 416:5,6

**diligence** 387:18
398:25 484:12
487:16 488:1,2,25
492:7 495:5
510:13 517:22
518:3,12 519:3
523:2,25 539:1
540:3,6

**dinner** 447:25

**direct** 389:6
414:24 436:12
480:3 497:1
508:19 511:14
524:23 528:15
532:16

**directed** 470:18

**directs** 471:12

**disagree** 461:6,17
462:3

**disagreement**
462:2

**discharged** 431:10

**disclosed** 504:18

**disclosing** 451:9
451:21

**discovered** 433:22

**discoveries** 504:23
505:2

**discovery** 390:8
405:7 502:3
504:18

**discrepancies**
437:17 459:20
460:20 465:23
466:12,14 473:2
478:1

**discrepancy**
474:19

**discuss** 444:21

**discussed** 497:23
498:22 531:1
535:25

**discussing** 394:19

**discussion** 434:20
452:5 484:13
498:1,10,19 512:3
516:19 526:5
528:4

**discussions** 411:1
415:3 496:21
497:24 498:17

**dispel** 430:16

**dispense** 515:13

**dispensed** 530:16

**dispensing** 405:21
407:1 421:14
430:21 452:2,8
515:17 530:14

**dispute** 417:14
455:2 457:1

**distribute** 442:8
479:11

**distributed** 450:4
452:1 537:14,17

**distributes** 478:18

**distributing**
442:17

**distribution** 379:5
380:7 410:10

411:17 418:23
430:3 431:16
432:22 436:8
441:15,22 442:2
449:4 452:20
492:13 521:1
532:21 537:11,20

**distributions**
434:12 452:4

**distributor** 411:17
430:3 433:18
441:25 442:2
443:1 445:19
448:12 449:18
450:14 452:10
468:12 469:9
479:2,3,23 482:9
518:14

**distributor's**
451:4

**distributors**
442:20,21 444:16
445:13 446:24
447:6,8 448:23
472:13 473:18
475:12 479:18
509:6

**distributorships**
484:16

**district** 374:1,2

**dittmer** 457:18
476:18 477:5,11

**diversion** 417:3
418:16 420:18
421:10 432:12
433:2 434:23
436:14 439:8,17
456:22 457:20
458:7 464:14
494:8

**diverted** 510:5,14

**division** 374:3
482:5

**doctor** 400:16
402:13 407:20,23
419:9 420:18
430:14 516:20
517:24 526:6,13
526:17,17,19,20
526:21 527:2,6
528:3

**doctors** 399:5
400:18,21 401:15
402:22,23 403:7,9
403:12,19,24
404:2,5,16,23
405:3,23 406:4
421:23 452:2

**document** 374:11
396:18 397:3,5
404:2 412:21,24
419:18 429:13
436:3 441:18
452:25 466:3
469:19 487:1
492:16 500:17
501:25 505:5,7
506:2,7,13 528:5
540:21 541:17
542:3

**documentation**
488:1

**documents** 389:5
396:16 413:5
461:22 494:5
499:9,19,20
500:22,23,25
501:2,17,19,24
502:4,7,8,11,14,17
502:21 503:6,7
504:1,2,10,11,16

504:19,22 505:1
505:12,14 506:15
506:19,22 507:20
507:21,22 510:19
510:20,23,24
511:2 521:23
522:9 531:25
532:20,24 539:5
540:11,17 543:5
**doing** 400:15
407:4 409:6
420:10,11 433:11
434:8 436:18
441:9 445:16
448:25 450:16
460:3 465:10
473:15 495:5
499:6 501:9 505:4
508:19 513:3,21
524:24 527:18
531:20 532:9
**dollars** 480:14
481:18
**dombek** 383:25
426:13,13 427:9
428:3,25
**double** 419:5
520:22
**doubles** 472:20
**downs** 503:20
**dr** 400:14 402:10
402:15,18 403:2
406:17,18 407:11
496:6 498:3 499:1
516:7,20,23 517:8
517:23 528:7,14
**draft** 436:3
**draw** 433:4 465:14
478:8
**drawing** 530:23
531:20

**drive** 499:20,22
501:20,23 502:5,6
502:12 507:6,7,9,9
507:14 533:1
**driving** 415:10
**drop** 503:20
**dropped** 397:8
499:19 501:20
504:17 506:25
**drops** 502:4
**drug** 383:20
409:19,20 410:15
411:13 412:14
414:8,19 416:9,14
416:19,20,22,25
418:24 419:11
422:6,20,21 429:2
432:20 433:18
434:2 438:20
471:25 483:8
484:15
**drugs** 408:24
410:20 415:24,25
416:15,21 417:1
418:23 419:13
421:13 422:14,16
423:1 427:12,21
428:7,17 429:4,4
434:10 439:6
441:23 461:10
475:7 481:1 482:9
482:11,20,21
483:4,7,17 491:25
492:2
**due** 387:18 394:6
395:20,21 398:24
484:12 487:16,25
488:2,25 492:7
495:5 510:12
517:22 518:3,11
519:3 523:1,25

539:1 540:2,6
**duly** 386:13
**dumped** 504:21
**duties** 509:5
512:14 530:10
**duty** 430:6 431:11
485:1

**e**

**e** 375:1,1 376:1,1
377:1,1 378:1,1
379:1,1 380:1,1,18
381:1,1 382:1,1
545:1,1
**eagle** 378:13
383:11 384:1,18
385:1 387:9
388:10,14,17
391:21 392:8
393:10 394:11
399:15 412:7
438:24 439:7
441:12 443:3
452:11,23 454:6
454:12,15,21
455:25 460:14
461:12 467:6,11
470:13,23 472:20
473:10,25 474:7
478:4,23 479:2,12
482:6,13,19
483:15,17 484:3
484:17,18 485:14
485:17,20 486:3
487:17 488:15,20
489:15,23 490:21
491:9 492:22
493:19 494:5,16
494:17,19 509:14
509:19 520:16
531:17

**eagle's** 388:23
391:25 392:12,24
393:3 397:12
398:2,13 436:7,16
437:7 439:24
440:5 443:18,22
448:13 455:6
468:8 474:21
475:1 479:12
482:22 483:8
485:24 489:11
493:3,25
**earlier** 398:15
406:2 411:3 426:8
428:12 437:21
449:1,7 454:23
479:20 487:19
488:6
**early** 409:22,25
415:5 445:3 449:2
491:9 524:21
536:14
**earthly** 397:25
**ease** 471:23
**easier** 475:19
504:24 519:9
**easiest** 499:21
532:1
**eastern** 374:3
379:17
**eckerd** 380:6
**edt** 386:3 443:13
495:20 513:15
522:21 525:17
544:2
**effect** 408:5,13
**effective** 439:18
494:7
**eford** 377:21
**egg** 530:18

eight 402:5 407:12
444:3 448:15
either 391:14
432:24 438:1
440:7,9 458:10
489:5 500:7 531:6
540:18
elderly 410:15
419:7 420:16
421:5,8,21
electronic 445:3
474:11 484:20
elias 375:9
elisa 380:9 525:23
elisa.mcenroe
380:15
elkins 375:6
500:13,14,15,24
501:13,19,22,24
502:1,2 503:15,24
504:11,15 505:20
506:16 507:1,23
525:2 531:24
532:10
email 384:14,23
393:9,23 394:10
394:15 395:25
396:6,11 397:9,16
397:20 398:16
490:19,21 491:13
493:4 505:14
506:4,5,8,11
509:25 539:6
546:17
emailed 423:24
emails 490:20
505:11 532:20
538:15,17 539:15
emily 377:15
employed 470:24

employee 515:8
employees 451:14
518:16 535:11
536:25 537:9
employment 422:3
432:12 529:23
employs 519:11
enabled 513:6
enclosed 546:11
enclosures 478:10
endeavor 431:14
ended 426:4
427:13 445:17
enforcement
411:21 413:2
414:18 417:4
429:2 439:5
engaged 404:24
527:10
enlist 420:21
ensure 461:22
471:15 501:19
515:17
enter 485:4
entered 454:16
548:9
entire 391:11
393:25 396:16
461:12 504:20
508:23 547:5
548:5
entirely 389:15
398:8
entity 482:6
envelope 432:2
ephedrine 442:25
errata 546:13,18
548:7,10,18 549:1
especially 449:4
527:8

essence 434:13
essential 430:2
established 481:13
estimate 446:1
480:10,11
evaluate 453:11
evening 415:5
event 402:7 421:7
528:21
everybody 400:15
513:2 543:20,21
evidence 494:23
evident 422:10
exact 438:1 448:10
467:14 471:16
535:13
exactly 421:4
482:1 483:1 503:3
504:16 523:12
537:6
examination 383:1
383:5,6 386:16
425:18 429:22
495:24 508:15
examined 386:13
example 452:11
498:4 500:17
503:16 505:19
506:21 518:2
530:11 532:2
exceed 491:6
exceeded 474:1
excel 523:7
exception 397:9
exclusive 450:3
540:5
executed 548:10
execution 547:14
548:19
exemplary 448:16

exercise 431:11
exercising 530:10
exhibit 383:15,18
383:23 384:5,9,13
384:16,19,22
385:5 387:9,16
390:25 391:1
392:16 393:3,4,5
399:14,15,16
412:7,7,8,11
414:11 423:14,15
424:13 426:19,20
426:25 427:1
431:22 438:10
443:3 446:10,11
446:14 456:8,9
462:15,16 463:3
463:20 490:9,10
490:13,15,17
492:20,20
exhibits 383:11
384:1 385:1 424:9
436:21,22,22
437:3,8 493:24
507:2,4,6
exist 540:21
existed 403:21
existence 403:11
existing 398:13
exp 545:22,22,23
expect 414:23
449:12 478:12
537:23
expected 444:13
448:18,20
experience 420:10
449:9 455:14
456:22 457:24
473:18 514:1,7
experienced
491:18

expert 398:25
466:7,7
expiration 547:19
548:25 549:25
explain 536:11
explanation
396:22 530:18
542:8
explanations
523:24
expressed 524:7
extend 434:9
extends 515:18
529:21
extensive 400:16
537:9
extent 431:9 436:4
extremely 510:16

**f**

f 381:22 507:12
545:1
facilities 437:7
440:6,18 443:18
443:22 444:8,10
444:17
facility 436:16,17
459:7 464:15
468:18 469:15
492:1
facing 429:3
fact 388:22 391:24
392:11 394:12
397:15,15,16
406:9 408:9 470:5
527:13 529:12
factor 407:25
408:5
facts 405:17 490:2
fair 476:21 501:11
511:4 518:8
526:23,25 527:16

531:16 533:17
535:15 542:6,10
fairly 453:3
fall 488:14,15
familiar 426:9
430:6 453:3
458:20,25 490:24
512:22 516:1
familiarity 453:20
family 416:15
far 441:8 473:25
491:7 526:11
541:24
farm 377:9
farrell 376:7
farrellfuller.com
376:12
fashion 439:4
fast 415:17
faster 531:25
faults 454:2
favorite 485:7
february 383:25
384:21 446:18
federal 431:2
440:16 487:10,11
513:23 514:2
515:12 519:24
529:20
fedex 424:2 543:6
fewest 472:1
field 453:9
fifteen 407:11,15
407:24,24 494:15
fifty 400:18,21,24
401:15 415:8
444:16 445:5,9
446:1,3,8 447:3,9
447:10 452:14
480:14 481:17,25

fight 405:11
figure 435:21
file 519:3
files 453:24 518:4
518:12
fill 419:8 420:17
420:20 421:1,9
431:17 517:2
519:8
filled 404:17 406:5
410:16 421:23
521:1
filling 516:22
517:8 530:3,4,7
final 462:7 465:19
finally 462:14
financials 481:8
find 433:1 449:13
451:3 453:15
454:2 473:3
504:22 507:21,21
534:21 540:13
541:23 546:11
finding 460:13
465:25 478:4
findings 464:15
fine 443:7,9 504:5
543:13
finish 397:15
484:6
finished 386:22
firm 376:16
468:14 478:18
firm's 478:16
first 399:19 410:5
414:12,13 422:1
426:23 441:5
461:10 463:12
469:14 478:17
489:15 499:21
500:22 507:18

518:22 530:19
531:18
fit 421:17
five 416:5 422:1
443:6,8 467:15
502:11,24 520:15
522:15
flag 430:24
flagged 498:3,4
511:17 523:15,19
523:23,24
flagging 520:7
flags 430:15,17
431:7 510:11
flaherty 377:17
flahertylegal.com
377:21
floor 375:19
378:20
focus 411:18 422:2
439:7 497:20
529:24
focused 418:16
421:5 532:13
focuses 411:17
416:1
folder 507:16,18
507:19
folders 507:16
folks 393:11,12
440:4 480:6
490:22 508:25
follow 506:6,8
528:2
followed 433:23
434:11 492:18
following 415:1
447:1
follows 386:14
food 405:11
415:17

footage 537:12
footnote 397:8
 511:1
footnotes 510:19
force 424:20
ford 377:15
foregoing 545:8
 545:11 547:13
 548:18
forest 381:23
forget 448:21
forgot 432:4
form 390:17
 391:18 392:25
 396:19 397:2,13
 397:18 398:3,7
 400:23 401:11
 404:19 405:5,18
 406:10,19,23
 408:2 409:21
 410:23 412:1
 417:2 418:20
 419:17 421:10
 422:23 426:6,15
 427:18 429:9,12
 433:3,13 434:19
 434:25 438:3
 439:11 440:2
 441:24 444:6
 445:20 446:4
 448:7,17 454:24
 455:11,22 456:24
 457:7,14,25
 458:11 459:9
 460:24 461:20
 462:11 464:10,10
 465:11 466:2,10
 467:7 468:19
 469:17 472:6,17
 473:11 474:8
 475:5 477:3,10

478:7 479:4 480:8
481:7,22 482:14
483:10,19 485:10
486:6 488:22
489:17,25 492:8
493:7,20 494:2,6
494:21 512:2
517:12 519:4,15
520:4 521:7,19
522:2,6,12 523:10
524:16 529:14
530:12 536:23
540:4 541:20
542:7
forms 449:5
 536:19
formulate 436:2
forth 411:5 487:10
 491:1 509:19
 528:8
forward 454:3
 546:15
found 415:16,17
 435:24 449:19
 451:11 454:21
 472:13 486:19
 494:11 504:1
four 401:25 410:5
 416:5 521:2,3
 532:8 539:25
 540:1
frame 412:18
 416:24 442:19
 443:23 455:16
 539:3
frames 498:16
franklin 400:14
 402:15,18 407:11
 516:7,20,23
 517:23 528:7,14

franklin's 402:10
 403:2 517:8
free 547:14 548:20
frequency 415:23
 486:12 489:3
 533:20
friday 514:12
front 387:9 435:16
frozen 392:3
frustrating 503:22
frustration 503:9
 524:25 531:21,23
full 392:18 437:14
 438:9 454:22
 459:22 460:15,22
 461:1 462:2 487:9
 487:22 488:3
 494:18,20,25
 503:2
fuller 375:8 376:5
 376:7
further 386:14
 404:1 438:12
 441:1,10 505:6
 544:4 545:15

## g

ga 545:22
gain 441:1,10
gang 419:21
gangs 409:20
 410:15 411:13
 418:18 419:12
garnered 529:8
ge 383:15,18,23
 384:5,9,13,16,19
 384:22 385:5
 393:5 399:16
 412:8 423:15
 426:20 446:11
 456:9 462:16
 463:20 490:10

general 402:25
 403:21,23 405:19
 420:1 438:20
 442:3,9,13 478:19
 480:3 482:23
 497:24 498:17
 518:17,20
generally 399:7
 417:6 421:5
 439:12 441:17
 442:4 445:4 450:4
 450:5 455:15
 465:17 469:3
 473:16,17 477:5
 477:14,19 498:21
 500:7 501:5 503:4
 506:4 507:21
 531:7
generated 506:16
generic 471:24,25
geographic 434:9
 434:11 449:23
 491:23
geography 401:9
george 383:17
 400:5
gerx 436:17 440:7
 443:18,22 444:7
 456:19
getting 391:12
 421:23 444:18
 462:21
giant 378:13
 383:11 384:1,18
 385:1 387:8
 388:10,13,17,23
 391:21,25 392:8
 392:12,24 393:3
 393:10 394:11
 397:12 398:2,13
 399:15 412:7

436:7,15 437:7
438:24 439:7,24
440:5 441:12
443:3,18,22
448:13 452:11,22
454:6,12,15,21
455:6,25 460:13
461:12 467:6,11
468:8 470:13,23
472:20 473:10,25
474:7,21 475:1
478:4,23 479:2,11
479:12 482:6,13
482:19,21 483:8
483:15,17 484:3
484:16,18 485:14
485:17,20,24
486:2 487:17
488:15,19 489:11
489:15,23 490:21
491:9 492:22
493:3,18,25 494:5
494:16,17,19
504:21 509:13,19
520:16 531:17
**give** 426:24 445:12
446:7 449:16
459:10 474:7
479:7 483:12,21
498:3 500:14
505:21 508:25
528:23
**given** 390:2
411:23 447:11
510:12 545:12
**gives** 464:20
518:13 519:21
**giving** 483:14
528:19
**glanced** 391:16

**glancing** 478:10
**go** 392:15 393:2
395:23,25 399:14
407:6 412:6 414:3
414:5 416:4 419:1
419:5 422:4,18
424:24 425:10
426:19,23 427:16
428:2,11 440:12
441:7 443:2,10
446:6,9,21 449:11
450:6,21,22 456:8
456:13 459:17
461:8 462:15,19
462:22 463:6,13
463:19 466:18
468:10 469:21
470:15 474:17
477:23 484:10
486:25 488:5,16
489:6 490:8,20
491:12 492:19
495:17 497:10
501:18 503:18,21
507:17 513:11
514:21 516:8
517:1,6 518:14
522:18 525:14
529:17 532:16
533:5 534:15,22
543:4
**goal** 404:22
**goes** 407:22
423:21 484:24
531:3
**goetz** 375:15
**going** 391:11
393:22,23 395:22
395:22 398:5,5
418:17 420:25
443:5 445:8

450:20,24 451:10
452:4 455:1
467:19 468:5
475:3 478:13,15
480:2 486:13,16
488:7 489:1
497:10 508:22
512:25 514:21,24
515:22 519:1
524:15 525:6,12
528:7 533:3,7
541:6,23
**good** 386:5,17
400:17 439:9,13
439:17 443:5
449:14,14 462:14
479:18 480:10
488:1 492:7,9
495:14 498:25
499:16 504:16
505:18 525:22
526:2
**google** 402:6,14,23
403:13 499:20,22
501:14,15,17,20
501:23 502:4,6,12
506:18 507:6,7,8,9
507:14 533:1
**gosh** 447:20
**grade** 474:9
**granted** 461:10
**great** 497:4
**greater** 500:11
519:18,21 535:9
**greg** 485:23
489:11
**greyhound** 410:18
415:3 428:22
**ground** 429:1
477:9

**group** 375:8
416:15 457:24
474:18,21 476:19
476:23,25 477:14
477:15,18,20
508:23
**groups** 416:13
**growing** 524:24
**gs** 476:18
**guess** 386:20
388:11,12 445:6,7
445:22 447:17
448:2 450:20,25
451:2 452:16
462:13 466:15
467:20,24 468:5
480:2 488:5
519:16 527:6
534:19 537:8
**guesses** 398:6
**guessing** 447:18
461:7
**guidance** 430:23
**guys** 418:15,18
425:19

| h |
|---|

**h** 374:22 441:13
545:21
**habit** 416:22
**half** 457:11,16
**hallway** 509:1
**halting** 492:22
**handful** 523:7
**handled** 477:12
**handling** 481:1
**happened** 395:1
397:10 400:17
**happening** 421:20
421:25 449:21
**happens** 450:6
501:12 517:1

**harris** 379:18
**hart** 437:1
**harvard** 432:20,22
432:24 433:21,23
434:2,7,14,15,17
434:17
**hattiesburg**
375:10
**hbc** 378:13 384:14
384:17,23 436:16
440:7 441:14
442:16 443:18,22
456:18 459:6
461:9 468:11
469:9,15 472:22
472:24 475:2
479:12 480:13
481:20 482:4,8,19
482:21,25 483:7
484:14,16 485:14
485:19
**hbc's** 459:7 462:25
481:5 482:11
**hdqtrs** 380:5
**head** 451:18 453:1
500:19 536:2
**headed** 422:14
**heading** 391:22
484:12
**headquarters**
474:22 485:20,24
489:12 495:10
**headset** 471:13
**health** 478:19
**hear** 392:3 418:17
517:15
**heard** 405:19
458:9,21 502:23
517:15
**hearing** 545:13

**heckman** 393:10
**heightens** 475:15
**held** 386:9 394:16
394:22,23 395:5
398:16 414:6
492:12 493:14
509:25 512:19
515:1 520:1
**hello** 533:12
**help** 414:7 439:17
**helped** 464:6
536:15
**henry** 380:17
**heroin** 416:20
417:1,4,5
**hesitant** 390:20
**hidta** 414:6,22
**high** 393:19
403:18 404:6,9
455:13 485:18
486:9,10 500:5
**higher** 402:2
**highlighted** 459:2
477:24 486:7
514:22 515:10
**highway** 383:19
412:11 415:9,20
422:7 428:4
**hills** 381:23
**hired** 439:6
518:25
**historical** 518:10
518:11
**history** 518:14
**hit** 504:3,12
**hits** 499:17 501:6
503:23
**hold** 423:20 424:1
475:21
**holiday** 394:6
395:21 512:23,23

513:2,20
**hon** 374:7
**honest** 424:14
**honestly** 496:2
**hope** 449:11
**hospital** 492:1
**hour** 443:5 495:14
497:5,7 498:13
**hours** 467:14,15
467:15,16
**houston** 376:17,19
**human** 534:4
**hundred** 401:25
402:5 407:12
422:9 452:14,17
452:18 478:22
480:13 481:17,25
**hydrocodone**
415:22 461:11
**hypothetical**
439:4 528:6 541:5
**hypothetically**
541:12 542:2

**i**

**idea** 397:25
502:22 504:16
520:2
**ideas** 480:3
**identical** 441:21
**identification**
383:12 384:2
385:2 393:6
399:17 412:9
423:16 426:21
446:12 456:10
462:17 463:21
490:11 538:25
**identified** 395:1
396:8 403:13
405:2 430:20
516:20 519:3

523:15 536:8
**identifies** 389:5
486:9
**identify** 388:1
394:13 402:21
403:11,16 404:1
404:23 436:20
449:16 453:4
455:18,21 504:11
520:17
**identifying** 486:4
520:9
**ii** 374:14 383:1,12
384:2 385:2 386:1
478:21 546:8
547:4,9 548:4,13
549:20
**iii** 484:20
**illegally** 411:24
419:12 421:24
426:2 429:5
**illegitimate** 431:18
527:2
**illegitimately**
411:13
**illicit** 410:10
411:19 418:24
420:23 526:20
**illinois** 378:9
**impact** 399:4
403:6 411:12
**importance**
393:19
**important** 387:17
387:21,24,25
391:5 415:20
441:2,5 445:21
455:12 460:5
479:1,10,14,15
518:3,11

inappropriate
398:8,10
inbound  474:20
include  456:19
469:1 479:9 503:5
included  438:10
474:1 523:23
546:13
includes  487:12
including  393:11
400:19 478:5
511:2
inconsistent
418:10
incorporated
548:12
increase  491:15,19
491:20
increases  454:1
increasing  415:23
421:14
independent  457:2
517:1,5
index  383:1,11
384:1 385:1 438:3
indexes  438:8
indiana  379:4
indicate  390:4
391:20 392:7
394:11 397:22
402:15 435:7
438:13 485:16
488:14 511:3
indicated  422:19
536:21
indicates  388:25
394:16,17 396:11
492:22
indicating  408:16
409:13 419:11
546:13

indication  391:14
393:19 396:17
indicative  518:18
indicted  400:18
403:13
indirectly  421:11
individual  534:4
industry  473:21
474:11 514:10
inference  456:6
information
402:14 405:7,14
409:8,17 412:12
417:13 428:20
430:1 431:5 441:1
441:10 456:5
479:7,10 494:5
502:19 514:8
520:1 529:9 540:7
540:12
informed  511:9,16
initiated  467:2
innes  377:5
inquired  461:23
inside  471:21,24
inspect  440:12,18
450:14
inspected  436:7,15
440:5,6 444:17
449:18 450:11
451:4 464:14
inspection  437:6,7
439:21 448:12,24
449:20 454:3,23
455:1,9 456:13
459:6 460:4 462:9
469:14 470:6
476:22 477:2,9
481:14 490:2,7
494:15 500:20
538:9

inspections  439:25
443:18,22 444:2,3
444:5 445:17
447:1,5 448:14,15
448:15 449:1
450:12 455:10,15
456:1 459:3
468:17 469:1
472:14
inspector  433:2
434:23 450:11
466:23
inspector's  464:14
inspectors  436:14
459:4 468:24
470:10 484:13
486:2
instances  455:19
institutional
519:13
instruct  505:20
instruction  464:18
intelligence
412:13 414:23
415:2
intelligent  422:7
interact  418:24
interactions
433:12 531:24
interdiction
383:20 412:14
415:9 416:9 422:6
interdictions
422:11
interest  404:22
405:22
interested  412:3
545:17
interesting  427:20
435:24

internal  471:7
internally  474:15
526:14
internet  408:6,11
408:14,18,21,24
409:5,11,15,15
internet.com
381:25
interrupt  508:18
interview  441:3
453:15
intimate  453:8,13
inventories  473:16
474:4
inventory  470:2
470:10 471:4,5,9
472:4,8,16,20
473:5,13 474:2,7
475:2 485:5
inverse  541:1
investigate  395:23
399:1 400:14
403:1,6 434:14
450:14 492:23
investigated  394:7
395:2 396:9
479:20
investigation
384:6,10 400:16
403:12 407:17
421:12 432:20
433:17 434:7,8
449:14 461:23
464:5,23 465:1,22
466:11,20 467:1
476:2,11 477:25
488:10 514:16
518:21 524:21
investigations
410:11 418:25
459:24 468:15

469:9
**investigator**
432:13 450:10
456:23 457:20
458:7 487:15
488:21 531:3
**investigators**
411:1 449:24
450:8 484:15
487:3,8
**involved** 410:25
459:4 476:12,13
**involves** 480:1
512:23
**involving** 432:21
**irr** 511:18
**issue** 400:13
412:13 428:13
446:25,25 447:22
448:11 485:23
486:13 489:3,10
489:15,19,22
492:10 495:9
**issued** 417:12
449:9
**issues** 428:6
495:11 538:24
**issuing** 404:25
430:16 514:15
**item** 393:25 394:1
394:6,9 471:13,15
471:16 493:5
**items** 471:17

**j**

**j** 375:6 376:5
378:5 379:18
**jaffe** 381:21
**james** 374:17
383:4 384:20
386:12 546:8
547:4,9 548:4,13

549:20
**janet** 436:25
**january** 422:8
**jeff** 458:21
**jefferson** 545:5
**jersey** 377:10
**jjaffe** 381:25
**job** 421:19,25
422:1,2 433:8
435:2 457:9
464:14 465:10
495:5
**joe** 491:13
**john** 458:10
**jonathan** 381:21
**jones** 378:7 496:1
**jonesday.com**
378:11
**jr** 376:5
**juan** 376:10
**july** 393:16
**jumping** 528:24
531:10
**june** 374:18 386:2
386:6 462:8 546:4
**jury** 394:25
397:11 398:12
**jury's** 464:9 482:4
**justify** 492:3
**justin** 382:5 508:4

**k**

**kathleen** 375:5,12
508:17 533:9
543:13 546:5
**kayla** 490:21
**keep** 445:2 451:18
468:1,4 508:21
518:20
**keeping** 471:8
**kennedy** 375:17

**kentucky** 410:12
411:3 419:6
**kept** 451:1 471:4
472:15
**key** 507:11 515:8
**kicked** 535:10
**kill** 400:2
**kim** 485:23 489:11
**kin** 545:16
**kind** 417:16
418:21 420:2
421:17 439:12
445:6 451:7
454:10,11,16
459:16 464:20
470:1,9 475:12
487:18 495:8
498:8 505:13
506:12 527:4
530:17,18 536:21
**kinds** 414:19
449:2 452:2
497:13
**knew** 408:10
414:21 433:11
434:22 436:13
516:7 537:3
**knight** 375:5
390:17 391:18
392:2,25 393:4
396:19 397:2,13
397:18 398:3,7
400:23 401:11
404:19 405:5,18
406:10,19,23
408:2 409:21
410:23 412:1
413:21 414:10
417:2 418:7,20
419:17 422:23
423:19,21 424:1,5

424:9 425:14
426:6,15,24 427:3
427:18 429:9,12
429:19,23 431:24
432:6 433:3,13
434:4,19,25 435:9
435:13 439:11
440:2 441:24
443:4,8 444:6
445:20 446:4
448:7,17 454:24
455:11,22 456:24
457:7,14,25
458:11 459:9
460:24 461:20
462:11,20 463:2,9
465:11 466:2,10
467:7 468:19
469:17 472:6,17
473:11 474:8
475:5,22 477:3,10
478:7 479:4 480:8
481:7,22 482:14
483:10,19 484:5
485:10 486:6
488:22 489:17,25
492:8 493:7,20
494:2,21 495:13
508:3,7,12,15,24
509:2,10,18,24
510:3,18 511:7
512:4,9,12 513:8
513:18,19 514:20
515:25 516:6,13
517:16,18,21
518:2,8 519:17
520:5,21 521:11
521:21 522:3,8,14
522:24 523:13,22
524:3,6,17,19
525:8 529:14

530:12 533:6
539:19 540:4
541:20 542:7,16
542:19 543:3,10
543:12,17 546:5
**know**  386:18
388:21 391:7,12
394:17 395:5
396:17 397:9
399:19 400:20,25
401:2,6,13,17
402:13 405:10
408:14 409:4,14
411:11 416:23
417:7,12,18,19
418:18 419:22
420:8 423:1,2,9,17
423:23 424:18
426:3,4,13 427:21
428:25 429:8,14
430:7 431:25
432:8,19 433:2
435:3 436:2,6,9,10
438:14,17,23
442:16,18 443:21
445:17 450:1,25
452:22 453:4,23
454:3,20 456:14
456:25 457:15,18
457:19,19 458:2,9
458:14,14,15,16
460:4 465:15,16
466:16 468:2
469:15 470:18,23
471:3 472:7 474:9
474:13,20,23
477:11 478:13
479:1,1,5,11,24,24
481:2,13,20 482:1
483:11 484:21
486:10 488:2,8,23

490:23,24 491:9
493:2,13,16,17,22
495:12 497:10
502:2,3,16,20,24
503:1,3 505:6
506:24 507:1
519:1 523:14
525:1,3,9 526:11
528:12 530:17
531:22,23 532:2,6
532:15,25 535:2,5
535:12,23 536:23
537:10 538:24
539:1 540:8
543:16
**knowing**  435:1
**knowledge**  414:20
414:24 451:13
452:7 453:13,17
453:25 455:3
457:2,5 519:13,19
528:15
**known**  532:10
**kupchick**  458:6
464:3
**kurt**  457:18
476:18

---

**l**

**label**  403:7 541:14
**labels**  543:6
**lack**  510:12
**lake**  390:15 399:4
400:7,25 401:5,20
401:22 402:22
408:7,15,19 409:9
410:19,25 411:14
411:24 416:2
420:12 421:16
423:6 424:19
426:4,7 429:1,7
431:10 496:23

523:3
**lake003677550**
383:21
**lake003677553**
383:22
**language**  466:16
476:10 511:8,15
516:1
**lanier**  376:16
**lanierlawfirm.com**
376:21
**large**  396:8 415:9
417:11 422:8,11
422:21 423:3
452:10,19 453:5
**larger**  395:19
401:23 420:6
479:17
**late**  415:5 488:14
**laura**  374:22
545:21
**law**  375:7,8,16
376:6,15,16 377:6
377:16 378:6,17
379:8,19 380:10
380:19 411:21
413:2 414:18
439:5 484:1,4
515:12 530:23
**lawful**  515:13
**lawyers**  504:15
**lcr**  545:23
**lead**  450:21,24
**leading**  509:8,9
510:1,16 511:5
512:1 514:6,19
516:5,12 517:25
518:5 523:20
524:1
**leads**  501:18

**leave**  412:6
**leaving**  420:3
432:11
**led**  500:25
**left**  394:8 508:2
542:15
**legal**  382:7 482:5,5
483:6,6,12,14,22
483:24 484:7
529:12,13,17,20
546:1 549:1
**legitimate**  421:9
430:13 431:18
526:18 527:7
**lengthy**  391:16
**leon**  376:8
**letter**  444:18
445:18 454:6
514:15 546:19
**letters**  446:25
448:11,23
**level**  405:22 407:1
431:16 483:4
484:25 485:21
528:16
**lewis**  380:11 432:8
**license**  403:25
441:13,14,16,20
441:22 459:7
461:10 462:25
469:16 526:22
545:22
**licensed**  442:7
**liddy**  515:13
**limited**  509:4
**line**  423:12 427:2
427:2,7 428:3
446:23 476:16
528:10,24 531:10
532:18 546:13
548:7 549:3

**lines** 415:3 428:23
**link** 405:7 411:6
**linked** 434:13
**linking** 419:19
**links** 411:2
**list** 389:11,17
391:4,6 404:2,25
406:25 431:6
436:25 438:13
441:15,25 442:8
442:17,22 468:12
468:21 471:22
478:20 510:20,24
541:10
**listed** 389:9 391:8
548:7,17
**listen** 425:18
**listing** 505:3 548:7
**literally** 438:8
**litigation** 374:9
381:14 496:20
503:7 546:6 547:3
548:3
**litigations** 503:11
**little** 387:17
390:20 407:14
413:20 420:20,22
423:11 424:2
425:22 427:24
441:11 443:5
449:5 475:6
478:12 485:13
505:10 522:25
524:11 529:1
531:12 534:16,23
536:12 541:4
**liverpool** 380:7
532:21
**livingston** 378:15
378:23 383:5
386:16,19 387:11

388:4 390:18,23
391:9,19 392:2,5,6
393:2,8 394:15
396:22,23 397:4,7
397:14,24 398:4,9
398:11 399:18,25
401:2,16 405:1,10
405:24 406:14,21
407:5 408:4
409:24 411:10,16
412:5,10 414:1,4
414:10,13,16
417:18 418:11,13
419:1 420:12
423:5,17,23 424:2
424:3,11 425:15
425:17 426:1,11
426:16,22 427:1,4
427:6 428:2
429:10,14,21
430:5 431:24
432:4,7 433:10,16
434:6,22 435:6,11
435:18 437:15,18
439:19 440:3
442:6 443:7,16
444:9 445:23,24
446:9,13 448:9,19
455:4,24 456:11
457:3,10 458:2,13
461:4 462:5,13,18
462:21,23 463:5,7
463:13,18,24
465:20 466:6,13
467:10 468:22
469:20 472:9,19
473:22 474:16
475:17,23,25
477:7,13 479:9
480:12 481:10
482:3,18 483:13

483:21,25 484:5,9
485:12 486:15
489:6,18,20 490:8
490:12 492:19
493:8,22 494:12
495:2,16 509:8,15
509:21 510:1,15
511:5 512:1,6,7
515:22 516:5,10
517:25 518:5
519:4,14 520:4,19
521:7,18 522:1,5
522:11 523:9,20
524:1,15 542:14
542:24 543:13
**llc** 377:14 379:5,6
379:6 381:15
513:3,20 515:14
**llp** 378:18 380:11
380:20
**loas** 449:9
**locate** 396:21
**located** 404:6
408:19,22 410:15
474:24 478:23
492:1
**location** 416:16
471:13 491:23
**locations** 440:9
**locke** 380:20
**lockelord.com**
380:25
**long** 400:6 424:18
434:23 435:1
439:5 514:20
518:23,24 532:14
**look** 387:25 388:1
402:7 412:3
413:24 416:18
426:8 427:22
438:8 446:7

459:25 462:14
468:25 477:24
481:23 494:14
499:9 504:25
505:11 518:14,17
522:16 527:13,17
527:19,25 533:19
535:11,21 536:18
**looked** 396:25
402:4,20 476:7
478:10 481:8
**looking** 390:21
402:23 403:17
404:4 412:23
427:12,20 428:9
456:17 461:2
468:17 469:18
478:9 502:16,17
527:24
**looks** 426:1 428:20
470:20 533:20
542:16
**lord** 380:20
**loss** 475:13,13
**lost** 403:25 475:10
**lot** 401:17 404:16
410:14 427:11
453:9 493:16
501:4,7,15 502:24
505:2 519:8
531:21,23 532:9
539:4 541:6
**lpa** 375:17 381:7
**lucky** 426:12

**m**

**m** 379:7,10
**madam** 546:10
**maddie.brunner**
380:25
**madeleine** 380:18

**mahoning** 400:19
401:3,6
**main** 416:19 422:2
533:22
**maintain** 439:18
518:3,11,24
519:22
**maintained**
517:22
**maintaining**
518:22
**maintenance**
494:7
**major** 408:10
409:19 411:23
421:19 422:15
433:18 459:24
**majority** 422:10
501:11 515:4,6,7
**making** 439:7
**mallinckrodt**
455:17
**management**
467:3 468:7,8
487:2 488:7,9
489:22
**manager** 484:14
**managers** 519:20
**managing** 515:8
**mandate** 461:24
**manual** 451:11,22
453:2 464:17
486:3,8,19,20
487:22 488:17,24
520:7,13,16 521:6
533:15,24 534:5
534:11,14 535:15
536:5,9 537:4
538:7,19,21
539:11,16

**manually** 535:21
**manufacturer**
482:10,13
**manufacturing**
427:22
**map** 402:6 422:19
**maps** 411:6
**march** 438:14
**marcus** 378:18,23
378:24
**marian** 418:8
**marion** 416:10,12
417:17,20 418:8
437:1
**marked** 383:11
384:1 385:1
390:25 393:5
399:16 412:8
423:15 424:13
426:20 446:11
456:9 462:16
463:20 490:10
**market** 380:12
420:6
**marketed** 419:25
**maryland** 380:5
**mass** 421:1
**massive** 400:16
**master** 381:6
**masters** 377:14
455:17 514:17
**material** 391:24
392:11 409:7
455:8
**materials** 405:24
540:19,22 541:10
541:16
**math** 542:22
**matt** 463:7 484:14
**matter** 388:14
400:8 405:20

407:4 440:24
444:20 458:19
465:5,7,18 467:5
**matters** 433:5,14
433:16 525:6
**matthew** 378:16
**mazgaj** 378:16,24
**mccann** 406:17,18
496:6 497:15
498:3 499:1
**mcenroe** 380:9
383:7 525:11,21
525:23 529:16
530:21 533:3
542:18,21 543:1,9
543:19
**mchugh** 375:8
**mchughfuller.com**
375:12,13
**mckesson** 479:2
479:24 480:23
**md** 374:6 386:8
**mdl** 374:5
**mdl00090009**
384:24
**mdl00136952**
384:15
**mean** 388:10
401:17,24 410:1
417:13 421:22
435:2 451:25
464:24 465:9
466:9,14 479:13
480:5 498:21
501:9 508:18
526:15,16 529:23
533:24 536:19
**means** 388:16
464:25 465:2,5
466:11 486:10,10
534:1

**medicaid** 421:6
**medical** 403:25
421:9 527:19
**medication** 396:3
430:22
**medications**
442:24
**meet** 468:8 487:4
494:6 539:8
**meeting** 414:6
467:3 468:7 487:2
487:7 488:9
**meetings** 414:18
414:21 418:15
**member** 424:19
**members** 416:15
**memo** 506:12
**memorandum**
454:16
**memory** 405:25
**mental** 542:21
**mention** 439:24
455:25 456:1,3
**mentioned** 405:3
415:25 428:12
429:15,16 438:18
454:23 499:7
501:14 503:6
532:23 535:23
539:19
**merchandise**
478:19
**merchandising**
474:21
**merchandizing**
474:18
**merely** 483:8
**messrs** 378:15
**met** 458:18 525:22
**method** 415:4,6
437:24

**methodologies**
498:19 499:1,2
**methodology**
497:20 510:11
**methods** 415:14
**metro** 417:7
**michael** 376:5
377:5 458:6
**michigan** 414:9
422:12 425:8
427:14 428:1,8
**mid** 380:6 488:18
491:9
**middle** 407:8
424:25 428:11
447:19,24 478:17
514:16
**midwest** 546:17
549:1
**migration** 410:6
**mike** 376:12
**miles** 401:22
**milligram** 417:10
420:7 425:2
**milligrams** 425:6
**million** 480:14
481:18,25 501:6
502:11,24
**min** 438:3
**mind** 499:17 540:2
543:18
**mine** 405:22
480:25 483:21,22
500:11
**minimal** 474:1
**minnes** 377:12
**minor** 455:20
**minute** 413:23,25
439:20 443:6
522:15 531:11
533:14 537:2

542:17,23
**minutes** 443:9
493:10 508:2,6
542:20
**mischaracterizat...**
494:22
**mischaracterizes**
516:11
**misrepresentation**
429:13 466:3
494:22
**mississippi** 375:10
**misunderstood**
479:20
**moment** 392:4
426:24 427:3
462:20 475:22
**monitor** 514:2
**monitored** 489:4
**monitoring** 494:9
517:10 521:12
541:13
**month** 489:2
491:7
**monthly** 492:4
**months** 488:19
489:14,21 490:3
**moral** 493:25
**morgan** 380:11
**morganlewis.com**
380:15
**morning** 386:5,17
403:5 415:5
444:21 445:10
525:22 526:2
**morphine** 415:22
**motley** 381:15
**motleyrice.com**
381:19
**mount** 381:17

**move** 418:3
514:25
**moving** 454:3
**multiple** 491:24
507:16,17 519:7
**multistate** 414:6
414:17
**multitude** 453:7
453:22 502:14
**murdered** 402:16

**n**

**n** 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
**name** 386:18
402:11 424:17,22
438:21 449:17
451:21 457:22
458:12,15,16,19
458:24 463:10
495:25 546:6
547:3,4,15 548:3,4
548:21
**names** 393:13
404:3 490:25
**narcotic** 491:15
**narcotics** 415:19
424:19 426:14
**narrow** 507:18
**narrowed** 407:17
**national** 374:9
546:6 547:3 548:3
**nature** 451:23
519:22
**ndc** 471:15
**near** 404:6 492:1
**necessarily** 441:21
527:2
**necessity** 456:12
475:16

**neck** 401:10
**need** 396:3 407:3
413:22 461:5
484:5 502:14,15
515:15 527:13,17
533:6,7
**needed** 387:25
495:4
**needs** 532:9
**neighborhood**
401:25
**neighboring**
409:20 413:2
419:15
**neither** 545:15
**network** 414:7
**never** 397:11
409:6 440:6,8
449:20,22 451:1
454:6,10,15 458:9
481:8 492:21
543:18
**new** 377:10 381:23
446:15 447:12
448:4 473:1
491:22 503:12
518:25
**news** 429:17,18
**nexus** 531:8
**nichols** 374:22
517:19 545:21
**night** 445:1 447:20
447:24 543:17
**nineteen** 542:19
**ninety** 407:12
**nonarcos** 498:17
**noncontrolled**
481:1
**noncontrols** 527:8
**north** 376:17

northeast  422:22
   423:6
northern  374:2
northwest  379:10
notarized  546:14
notary  374:25
   545:21 546:25
   547:10,18 548:15
   548:23 549:23
notation  480:13
note  479:14
   546:12
notebook  423:21
   432:1
notes  384:17
   390:19,21,24
   436:2 522:16
   523:19 534:17
notice  517:23
noticed  485:20
notification
   528:18
notifies  474:18
notify  488:7
novel  520:2
november  491:5,9
number  384:14,23
   386:8 389:2,8
   393:10,11 403:24
   403:24 416:5
   422:21 423:4
   424:20 437:6
   444:5 446:7 448:1
   463:14,14,22
   467:14 468:13
   469:21 471:21
   480:4,6 484:11
   490:22 491:17
   492:15 499:21
   502:25 506:10
   507:10 536:2

537:5,9 542:2
   546:7,13
numbers  383:21
   384:7,11 450:7
   504:25 515:15
   548:7
numerous  496:21

**o**

oarrs  405:14
oath  397:25 429:2
   444:24 445:25
   446:2 447:12,14
   487:21
object  391:18
   397:13 401:11
   404:19 405:5,18
   412:1 417:2
   434:19 445:20
   455:22 458:11
   460:24 461:20
   469:17 472:6,17
   473:11 474:8
   475:5 477:3,10
   478:7 488:22
   489:25 492:8
   493:7 515:22
   519:4 520:4 521:7
   524:15 529:14
   530:12
objection  390:17
   392:25 396:19
   397:2,18 398:3,7
   400:23 406:10,19
   406:23 408:2
   409:21 410:23
   418:12,20 419:17
   422:23 426:6,15
   427:18 429:9,12
   433:3,13 434:25
   439:11 440:2
   441:24 444:6

446:4 448:7,17
   454:24 455:11
   456:24 457:7,14
   457:25 459:9
   462:11 465:11
   466:2,10 467:7
   468:19 479:4
   480:8 481:7,22
   482:14 483:10,19
   485:10 486:6
   489:17 493:20
   494:2,21 508:24
   509:8,15,21 510:1
   510:15 511:5
   512:1,2,10 514:5
   514:19 516:5,10
   517:12,25 518:5
   519:14 520:19
   521:18 522:1,5,11
   523:9,20 524:1
   540:4 541:20
   542:7
objections  508:22
obligations  445:14
obtain  419:12
   421:2 425:6
   440:17 441:19
obtained  411:13
   411:24 426:3
   429:5 441:13
   469:15
obtaining  421:21
obvious  495:11
obviously  394:16
   395:18 422:21
   529:21
occasions  537:20
   538:16
occur  501:3
occurred  420:5
   431:1 500:9 506:8

518:15 528:17
occurring  421:15
   535:9
occurs  439:8
october  463:1
   469:10 488:18
   514:12
offered  430:23
offering  484:7
office  409:18
   410:18 411:8
   413:11,17 420:25
   429:6 432:14
   436:11,15 438:20
   440:5 466:21
   477:12 512:18
officers  515:7
offices  403:19
   450:7 475:1
official  547:15
   548:21
oh  447:20 503:20
   513:5 524:10
   538:20
ohio  374:2 375:20
   379:6 380:4 381:9
   383:19 399:10
   400:6,12 402:24
   405:16 410:7,9
   412:11 413:4,6
   414:6 415:9,20
   416:10,12 417:17
   417:20 419:6,15
   420:13 422:6,15
   422:19,22 423:7
   428:4,8,18 452:23
   478:24 528:13
   546:2
okay  390:2 391:3
   392:5,11,22 393:4
   393:15,18,22

[okay - pack]

394:9 396:23
399:24 403:4
404:15 409:1
411:20 412:17,21
412:25 413:19
414:3,4,16 425:24
433:1 435:13
438:23 443:10
451:7 455:24
457:10 460:19
462:23 464:1
465:2,20 467:23
468:10 469:13,22
470:4 473:8
475:24,25 476:9
477:18 479:22
480:12 482:8,18
486:17,25 487:14
488:8,19 490:15
490:19 496:17
497:4,9,19 498:2,6
499:12 513:19
514:21 515:9
516:16,20,21,23
516:24 518:8
519:17 529:16
540:1 541:12,22
543:10,18
**old**  399:8
**olstein**  377:7
**omissions**  509:5
**onboarding**
453:24
**once**  450:15,17
475:7 482:15
483:2 527:5,9
**ones**  436:24 437:3
523:12
**ongoing**  535:10
**online**  408:17

**onsite**  441:7 452:4
460:4 464:25
**opana**  415:22
**open**  465:13
507:15
**opened**  441:13
491:22 513:4
**operated**  404:11
**operates**  482:19
**operating**  452:3
482:4
**operation**  489:23
**operations**  388:23
**opiate**  374:9 546:6
547:3 548:3
**opinion**  391:25
392:12,14 397:1
399:2 405:21
406:13,25 407:4
412:18 430:2
455:5 461:8 467:5
467:11 481:15
483:12,22,22,24
484:8 493:21
494:6,10,14
502:15,19 510:9
514:21 523:25
528:23 533:16
**opinions**  433:5
440:23 445:12
462:7 480:6
483:14 509:4,13
509:19,25 510:5
510:24 511:4
514:3 519:25
521:12,17,24
524:7 528:19
531:17 540:18,23
541:18 542:6
**opioid**  399:3,5
403:8 408:6,11

409:15 410:16
411:14,24 415:24
416:2
**opioids**  430:3
446:1,15 482:10
**opportunity**
386:23 440:11,22
**option**  440:16
**order**  394:7,16,22
395:1,2,14,16,19
396:2,4,7 397:11
397:20 398:1
408:23 409:15
431:15 441:19
474:20 475:16
482:9 485:1,2,16
491:15,16 492:24
494:9 498:3,4
509:25 510:11
517:9 521:12
532:3 534:3,5,12
536:22,23,24
541:13
**ordered**  409:5
**ordering**  408:17
445:4 453:14,25
492:4
**orders**  391:22,23
392:9,19,24
394:13 397:6,17
453:5,5 484:17,20
485:2,18 486:4,9,9
492:11,23 493:3
503:17 504:7,9
505:11,19 511:17
511:18 520:7,9,17
521:1,9 523:3,15
523:19,23,24
532:12,17,23
533:17,23 535:11
535:21,24 536:8

536:14,16,18
**organized**  416:13
**orient**  399:19
488:8
**origin**  422:12
**original**  436:16
539:5
**originally**  506:16
**originate**  425:2
**originating**  416:11
**outcome**  439:24
455:9 464:21
469:1
**outside**  411:19
420:7 423:11
453:12 471:22
**overall**  452:24
491:18
**overseeing**  475:1
**owes**  396:3 529:5
529:11 530:22,24
**owned**  404:11
439:9
**owner**  452:6 515:4
**ownership**  483:7
**owns**  482:19
**oxford**  378:19
**oxy**  425:6
**oxycodone**  415:21
425:1
**oxycontin**  415:21
417:10 426:2,3

| p |
| --- |

**p**  375:1,1,15 376:1
376:1 377:1,1
378:1,1 379:1,1
380:1,1,9 381:1,1
382:1,1 383:17
**p.c.**  377:8
**pack**  424:2

packaged 475:9
page 383:3,14
  384:4 385:4 389:7
  392:16 399:19
  400:1,10 402:8
  407:6,8 414:11,12
  414:13,14 416:4
  422:4,18 424:24
  424:25 426:22
  427:5,16 428:3,11
  435:7,9 439:23
  446:21,22 462:18
  462:19 463:2,5,9
  463:12,24 468:11
  469:21 470:15,16
  475:18,18 478:9
  478:16,16 484:10
  486:25 487:1
  489:7 511:15
  514:22 515:20
  520:22,23 546:13
  546:15 548:7
  549:3
pages 401:13
  423:24 425:11
  463:8
pain 419:8 420:17
pandemic 497:10
paper 449:5
  471:21
paragraph 392:18
  407:10 417:17
  419:20 420:10
  465:21 466:25
  468:11 474:17
  478:18
paralegal 381:14
parameter 507:15
parent 485:14
parkway 376:17

part 392:14
  393:23 396:14
  405:24 414:22
  416:21 418:9
  421:19,19,24
  431:20 460:1,3
  464:13 474:12,14
  479:6 481:21
  490:22 504:13
  505:17 514:9
  529:25 535:5
  536:9 537:1 548:9
participate 414:17
participated
  514:15
particular 397:4
  428:1 439:16
  447:22 449:17
  454:3 518:12
parties 440:18
  506:10 545:16
parts 400:3 418:9
party 440:16
  475:15
pass 482:13,21
  483:7 533:3
passed 417:16
  433:20
passes 483:2,17
patient 430:14
  491:24 526:19
patients 420:25
  491:25
patrick 378:5
  495:25 533:4,5
patrol 383:19
  412:11 413:7
  415:9,20 422:7
  428:5
pattern 486:11
  489:4 518:17

533:19
pause 399:23
  414:2
paused 513:5,9
pavlich 383:17
  400:5,12 407:19
pavlich's 402:8
pay 410:15 419:7
  420:16
paying 419:12
  421:8
pbeisell 378:11
pdf 437:22
penalized 454:15
pending 465:12
pennsylvania
  378:21 380:13
  432:14 438:19
  478:23
people 416:11
  419:8,12 420:17
  420:21,24 421:5,5
  421:21 425:5
  441:3 449:10
  452:5 453:3,10,12
  453:21 503:2
  536:15,18
percent 415:8
  444:16 445:6,9
  446:1,3,8 447:3,10
  472:23 480:9,16
  480:22,24 481:19
  481:24 482:1
percentage 448:10
  448:21 479:23,25
  491:20
perfectly 397:17
performance
  433:8
performed 470:17

performs 472:22
period 392:13
  407:13,21,21
  408:20 409:12
  410:1 417:9
  420:22 427:21
  461:12 470:24
  492:10 494:15
  498:16 538:6
  539:10
periods 534:19
person 421:8
  426:14 442:7
  447:22 500:8,12
  534:2
personal 414:20
  455:2
personally 457:19
  458:12 547:11
  548:15
perspective 465:3
pharmaceutical
  377:14 427:12,20
pharmaceuticals
  427:23
pharmacies
  403:18,24 404:7
  404:10,11,12,18
  405:9 407:2 408:6
  408:12,14,18
  410:17 419:13
  421:14,22,23
  431:3,17 439:8
  452:22 482:20,22
  483:9,18 484:17
  491:6 513:3
  515:14 519:9,10
  519:19,25 521:2
  528:8,12
pharmacist
  430:12 484:25

485:1,3 492:18
515:8,11 518:25
519:1,11 527:24
529:21,24 530:4,8
530:10 531:7
**pharmacist's**
430:6
**pharmacists** 431:9
484:19 512:14
519:7,20
**pharmacy** 379:4
388:23 390:16
393:12 396:2
400:6 405:16,22
407:1 408:21
411:18 430:4
438:24 439:10
474:18,21 475:8
483:3,4 484:19
485:3,4,5,17
490:23 491:21
492:1,15 512:18
512:20 513:21
515:2,18 517:2,5
518:15,19,22
519:1,20 528:13
528:20 529:22
530:5,9,11,11,19
**pharmacy's** 515:3
**philadelphia**
380:13
**phone** 546:3
**physically** 408:22
440:6,8,17
**physician** 491:22
**pick** 471:22
536:23
**picked** 394:1
**pickers** 535:20,22
535:23 537:3

**picking** 470:21
471:14 536:16
**pie** 422:13
**pieces** 415:2
**pill** 410:21 415:9
418:16 419:7
420:15 422:8
**pills** 411:24
415:15,16 419:3,5
419:25 425:1,7
426:2,3,4 427:22
510:5,13
**pipeline** 426:2
429:4
**pittsburgh** 378:21
432:13 436:15
440:5 458:6
**place** 422:20,22
450:6 484:20
489:23 491:10
535:10,16,18
**placed** 471:21
**places** 389:2
**placing** 484:25
**plaintiffs** 375:4
376:4 377:4
406:15 440:10
504:15 511:25
526:4 528:9,25
531:11
**plan** 466:21
**plans** 414:7
466:22
**pleasant** 381:17
**please** 386:10
396:1 423:14
425:11,23 463:23
467:9 491:13
492:25 543:9
546:11,11

**plenty** 417:21
430:25 431:4
**pllc** 377:17
**pmp** 411:6
**point** 394:11
408:23,25 416:10
419:2 421:7 465:2
480:17 491:8
495:14 497:22
504:6 508:19
537:8
**points** 491:15,16
**policy** 478:11
**polster** 374:7
**ponce** 376:8
**poor** 480:6
**populated** 501:24
**population** 401:23
**portion** 394:19
477:25 511:9
**portions** 418:8
435:19 446:14
457:6
**pose** 420:24
**position** 527:20
529:20
**positive** 424:4
**possibility** 527:7
527:12
**possible** 436:11
472:2
**possibly** 426:12
**post** 492:13
**potato** 415:16
**potential** 449:6
**potentially** 394:13
396:8 492:24
**practice** 419:23
468:24 491:22
528:20

**practices** 528:14
537:21
**precedence** 515:1
**precedent** 515:20
**preclude** 441:9
**predominant**
420:9
**predominantly**
403:17 410:12
420:3 525:1
**predominately**
415:21
**preferred** 417:1,8
**preliminary** 528:4
**preparation**
412:22 455:5
**preparations**
539:2
**prepare** 464:15
536:15
**prepared** 384:18
429:11 456:12,17
470:23 471:6
476:2,6
**preparing** 402:9
402:18 479:6
536:19
**preregistration**
443:17 444:2
448:14 459:6
**prescribing** 403:2
403:18 404:22
405:21 406:25
526:18,20
**prescription** 374:9
383:20 405:13
412:14 414:8
416:9,21 417:1
418:23 419:3,5
422:5 428:7,17
430:13,16 431:18

491:19 527:1,3,7
527:14,15,15,18
527:25 528:1,1
530:3,4,7 546:6
547:3 548:3
**prescriptions**
404:25 405:8
407:13,16 408:17
409:15 419:8
420:17,20 421:1
421:22 442:23
515:13,17 516:23
517:2,8 526:22
530:16
**present** 381:4
382:4 402:23
405:23 407:22
422:9 440:8
450:24 458:18
**presented** 527:25
**press** 403:23
**pretty** 394:10
401:18 442:25
449:3 453:13
461:2 473:20
474:10 475:11
504:16
**prevent** 421:20,25
439:17,18 494:7
**previous** 406:2
489:7
**previously** 386:13
403:4 519:2 526:3
**price** 420:6
**primarily** 410:9
500:4 502:1
**primary** 481:21
497:20 498:1
502:4 518:6 519:8
521:8

**principle** 529:22
**printed** 536:22
**printing** 536:7
**prior** 410:4 417:10
430:21 432:11
441:14 465:16
468:17 469:1
473:1 476:6
496:18 497:2,4
510:10
**proactive** 439:13
**probability** 524:8
**probably** 400:18
422:24 444:13
458:23 459:17
469:13 475:15
502:13 527:17
528:17
**problem** 400:13
410:22 414:8
416:19 417:6,11
418:6 419:11
425:13 429:3
463:19 518:19
**problems** 414:19
466:17 519:2
**procedure** 478:11
547:5 548:5
**proceedings** 386:1
**process** 501:22
536:7,10,11,13
537:1
**processing** 533:23
535:12
**produce** 405:12
413:5
**produced** 405:15
506:20,22 523:2
542:3
**producing** 469:19

**product** 475:13
**production** 532:4
540:9 546:15,17
546:22
**products** 478:20
480:18,20 481:3
491:7
**professional**
374:24 530:10
**profitable** 481:9
**program** 474:13
**programs** 411:6
**prohibit** 473:15
**prohibited** 520:12
**prominently** 414:8
**promise** 507:7
**proper** 494:9
515:23 526:19
**properly** 431:10
475:9
**provide** 400:2
405:14,20 406:12
406:16,17,24
409:7 506:9 529:8
**provided** 405:7
406:11 428:21
485:6 507:1
**providing** 504:23
**pseudoephedrine**
442:25
**public** 374:25
545:21 547:10,18
548:15,23 549:23
**publish** 462:5
**published** 387:18
431:1 513:23
**puerto** 376:10
**pulled** 521:10
**pulling** 534:2
**purchasing** 485:25
491:6

**pure** 394:25
**purely** 405:22
**purpose** 403:15
479:5
**purposes** 404:14
526:18
**pursuant** 398:13
466:21
**put** 400:21 455:13
456:5 479:16
498:9 503:21
504:5 507:5
534:16 541:15
**puts** 501:24,25

**q**

**qualified** 433:9
445:12
**quantity** 394:5
471:13
**quarter** 501:5
**question** 396:14
397:16 398:8
403:2 406:2 407:9
417:19 418:14
425:5 428:17
437:25 445:22
447:4 452:12
467:8 473:23
480:22 483:1
496:14 507:8
511:20 515:25
517:13 522:4
524:5,16,18 527:4
529:11,12,13
539:7,13,24 541:1
543:4
**questioned** 453:11
**questioning**
386:19 515:24
521:16,22 522:10
528:10,25 531:11

532:19
questions   386:21
  387:14 400:4
  413:25 453:18
  491:14 492:7,9,14
  492:17 496:3,4
  500:20 503:14
  508:13 510:4,6
  511:8,14,19
  512:13,17 516:9
  516:14 520:6,10
  520:11 521:21
  522:17 524:4,23
  525:4,9,25 526:4
  529:7,8 533:13
  539:18 542:12,25
  545:9
quick   417:16
  496:2 522:15
  542:21
quickly   426:19
  464:20 534:21
quite   410:5 437:23
  442:1 505:17
  539:8
quoted   485:9
quotes   485:8

**r**

r   375:1 376:1
  377:1 378:1 379:1
  380:1 381:1,5,7
  382:1 545:1
rafalski   374:17
  383:4 384:21
  386:12,18 413:21
  432:7 443:16
  495:25 507:25
  508:10,13,20
  509:3 510:3 512:5
  513:20 522:24
  524:10 525:22

532:20 533:12
  541:7 543:20
  546:8 547:4,9
  548:4,13 549:20
raising   492:3
ran   499:8 503:14
  503:15,15 531:13
random   472:22
  511:16
range   502:17
  504:19
reached   461:18
reaches   460:19
reaction   488:23
read   389:14,20
  390:22 393:23
  398:16 402:14
  413:25 418:8
  425:11,12,19
  426:13 427:10
  429:17 435:16,20
  435:23 436:21,24
  437:4 459:12
  461:5 470:22
  490:16 491:2
  501:1 514:22
  515:9,15 529:13
  547:5,6,12 548:5,6
  548:17
reading   388:21
  401:12 402:24
  411:11 466:7
  470:20 515:23
  534:24 546:19
ready   517:18
real   524:23
really   387:21
  400:17 443:8
  451:18 496:2,11
  496:24

realtime   374:23
reask   539:7
reason   396:13
  403:21 406:3
  421:9 493:15,17
  533:18,19 534:8
  546:14 548:8
  549:3
reasonable   524:8
reasons   395:7
  450:21 492:3
  518:7 521:9
  533:22
reaudit   473:19
recall   389:21
  403:22 412:23
  413:3,6 424:17,22
  435:1 436:3,9
  437:5,6,9,11,15,18
  437:25 438:16,21
  441:17 446:5
  450:16 451:10,15
  451:17 452:16,25
  457:8,21 467:13
  471:1,9 490:18
  492:15 496:11,24
  498:5,7,8 499:9
  500:19 506:23
  510:6 511:7,13,19
  511:20 512:14,20
  520:9,11 523:6,16
  525:5 526:6
  535:25 536:1,24
  538:5 539:9,14,15
  539:21
recant   448:5
recaps   511:18
receipt   546:18
receive   413:1,4
  485:18 506:15

received   396:4
  454:6 475:7
  482:15 485:2,2
  488:21 501:7
receiving   394:4
  413:3,6 493:9
  523:6
reclassified   461:11
recognize   393:13
recollection
  436:12 450:1
  451:19 480:4
  505:9 518:17
  524:24 535:3,7
  538:18 539:6
recommendation
  487:17 488:20
record   386:6
  390:13 443:11,15
  445:4 448:13
  449:3 495:18,22
  508:5 512:3
  513:11,13,17
  522:19,23 525:15
  525:19 533:5,7
  543:4,24 548:9
recorded   473:14
recordkeeping
  459:21,24 460:2
  460:21,22 461:1
  478:2 487:8
records   404:22
  451:1,18 468:4
  469:24 470:8
  491:11 511:22
  518:20,23,25
  519:22 527:19
  532:13 540:3
recruit   420:24
red   430:15,17,24
  431:7

reddwerks 535:4
  535:9,18
reduced 545:10
reexamination
  383:7,8 525:21
  533:11
reference 420:15
  546:7 547:2 548:2
referenced 547:11
  548:15
references 506:2
referred 534:14
referring 392:23
  404:10
refers 460:9
reflecting 538:2
regard 491:14
  528:14,20
regarding 455:5
  455:16 462:24
  496:22 509:13
  521:12 532:22
regardless 448:10
regards 394:18
  430:2 431:2
  461:15 470:7,12
  497:1 500:18
  528:17 539:15
region 411:2
register 431:2
  513:24 514:2
  519:25 529:20
registered 374:24
registrant 451:9
  451:22 465:3,8,13
  473:13 479:8,19
  483:2,3 486:23
  488:2 529:24,25
  530:2
registrants 450:3
  452:7 460:9

473:15 514:2,9
registration
  468:13 515:2
  530:6,15,15,20
registrations
  442:5
regulation 430:19
  460:9 473:9,24
  478:5 485:7,8
  486:21 487:12,23
  531:4,6
regulations 430:11
  449:15 454:13,18
  455:7,20 460:2,11
  466:1 473:4,12,24
  474:2 478:5
  483:16,23 484:1
  487:11,11 494:19
  526:11,12
regulatory 445:14
  473:6
related 449:4
  494:5 498:25
  506:13 523:2
  539:20
relates 374:11
relating 467:6
  498:22
relation 480:25
relationship
  418:22 430:14
  453:8 526:19
relative 481:2
  502:15 519:10
relatively 401:19
  500:6
relativity 499:15
  499:24 501:5,12
  501:13 502:8,21
  503:1,3,5,19
  505:13 506:18,23

507:3 524:14,20
  525:3 531:19,21
release 396:13
  403:23
released 396:9
releases 402:24
relevant 397:4
  408:15 409:11
  412:17 435:24
  441:8 470:24
  538:6 539:10
reliable 437:23
reliance 510:20,23
  511:2 540:19,22
  541:10,16 542:9
reliant 500:10
relied 525:1
  536:18 540:16,17
  541:18
relocated 416:12
rely 501:4 503:24
  505:1 540:23
  542:6
relying 413:5
  530:7 535:20,20
remain 465:13
remas 485:24
  486:14 489:11
remember 407:21
  432:25 435:4
  438:6 439:21
  452:18 460:8
  493:23 496:7
  497:22,25 498:12
  498:17,23 500:9
  516:9,13,15
  523:11,18 525:25
  528:9 529:2
  531:13 532:18
  535:7 536:6 537:6
  537:22 538:23

remote 374:16
  383:16,24
remotely 375:2
  376:2 377:2 378:2
  379:2 380:2 381:2
  382:2 386:9
rendered 391:25
  396:25 399:2
  440:23 467:5
  480:6 481:15
rendering 430:2
  483:24 494:13
rental 415:5,11,12
  428:23
rented 410:19
repeat 398:15
  512:7
repeated 471:17
repeating 540:15
replace 424:6
  432:3
replow 399:8
reply 409:3
report 384:6,10
  387:16,19 388:2
  389:2 391:15
  392:16 394:19
  397:6 398:25
  402:10,19 405:4
  408:1 411:11,16
  412:22 413:16
  416:1 419:10
  424:8,10 428:5
  429:11,16 431:22
  435:7,10 439:23
  455:9,18,21,25
  456:14 459:12
  461:3,6,9 462:6,24
  464:2,15 466:8
  468:3,16 470:23
  471:6 476:1,2,5,7

476:22 477:2,6,21
477:23 478:9,14
479:7,17 484:22
488:4,10,14 495:3
495:8,12 496:7,18
496:25 497:5
498:23 499:3
509:14,20 510:18
511:10,15 520:21
520:23 521:13
529:4,9 531:13
534:15,22,24
537:22 539:11
540:18,19,22
541:17,25 542:5
**reported**  374:22
477:15 511:23
**reporter**  374:23
374:25 513:6,10
517:14,20 547:7
**reporting**  495:10
539:2
**reports**  412:2
413:1 437:7
439:22 459:3
462:9,15 468:25
481:14 494:15
495:4 507:17
538:2,11
**represent**  444:1
496:1 525:23
**representation**
535:8
**represents**  545:11
**request**  406:15,15
440:17 462:25
491:14 507:23
548:9,11
**requested**  394:5
407:3

**require**  473:4,12
473:16 491:25
518:16
**required**  461:24
469:24 470:8
546:25
**requirement**
473:6
**requirements**
441:20,22 442:7
442:12 474:1
487:10
**requires**  430:15
**requiring**  460:9
**research**  402:17
403:9
**researched**  473:2
**reserve**  394:8
**residence**  416:16
**residents**  408:16
409:4,10
**resolution**  465:19
**resolved**  430:21
**respect**  416:1
418:17 429:1,3
431:16 437:2
439:6 456:18
459:20 460:21
465:23 466:12
467:4 474:2 478:1
480:23 523:6
**respond**  413:24
491:13
**responded**  400:15
492:16,18
**response**  396:1
406:2 506:12
**responsibilities**
430:8 509:5
**responsibility**
430:12 431:4,12

485:3 515:12,16
529:2,5,11 530:22
530:25 531:3,9
**responsible**
512:19
**responsive**  491:13
**rest**  396:1
**restrict**  505:10
**result**  490:5,6
515:3 545:17
**resulting**  422:11
**results**  455:1
**rethinking**  444:25
**retrospectively**
468:17
**returned**  546:18
**revealed**  465:23
466:11 478:1
**reveals**  396:7
**review**  390:13,19
391:11 399:10,20
404:1 407:10
408:20 409:6
411:21 412:2,21
413:22 421:18
426:16 436:1
437:10 441:9,18
455:8 460:6
461:22 462:9
469:23 471:2
475:16 477:6
481:14 494:4
511:17 514:8
518:21 523:1
532:5,13 534:11
537:4,20 538:1,12
546:12 547:1
548:1
**reviewed**  389:6,9
391:13 396:16,17
396:18 402:4

424:15 435:7,15
438:13 439:22
453:17 454:25
457:4,6 477:23
492:21 493:23
494:25 511:22
539:14 541:17
**reviewing**  403:22
405:24 436:4
500:17 523:7,11
528:5
**reviews**  436:19
**revoked**  515:2
**rice**  381:15
**rick**  438:14,15,17
439:5
**rico**  376:10
**right**  386:17 387:8
389:23 392:15
393:8 395:17
398:20,22 399:25
401:9,10 402:13
405:1 406:8 407:5
410:17 413:9
415:1 418:11
421:3 422:4 423:5
426:11 428:15,23
429:15 439:19
440:17 443:2
444:1,5 448:3
454:5 456:2
459:16 460:7
461:14 463:3,22
465:10 466:18,25
467:24 468:6,22
468:22 469:20
470:2,15 475:17
477:7 480:7,20
481:4,11,16 482:6
483:6 484:9,11
493:4,10,11,19

496:13 497:6
499:6 502:9
505:22 508:7,12
508:23 509:2,6,7
510:21 513:2,24
514:17 516:18,25
517:2 522:14
523:5 524:10,12
525:8 530:2,3
540:19,23 541:2
541:17 542:22

**ring** 438:25 439:3
466:8
**rite** 380:4,4,5,7
388:9 479:13
516:8,19 517:7,7
517:21 520:15
522:8 525:23
531:17 532:4,21
**road** 375:9 377:9
**rogos** 484:14,24
485:6,13,16,22
486:1 487:4,8,15
489:9,21
**roseland** 377:10
**ross** 380:21
**roughly** 442:19
452:13 480:5
**routinely** 514:7
**ruiz** 379:7 512:2
514:5,19 517:12
543:11
**rules** 440:16 547:5
548:5
**run** 417:22 473:1
499:2,13 500:15
503:17 504:8
524:20 531:19
**running** 417:22
503:18 508:21

**rural** 401:19
**rx** 379:5
**rx4031** 393:24

**s**

**s** 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
389:22 545:21
546:15 548:8,8
549:3
**saith** 544:4
**sake** 516:19
**sales** 453:9,10
480:14 502:18
**sam** 376:17
**san** 376:10
**sandwiches**
415:18
**save** 387:13
**saw** 391:14 521:23
523:23
**saying** 432:2 455:4
463:17 465:24
484:2,3 519:12
535:17
**says** 393:23 396:1
414:5 415:1 416:8
416:10 419:3,18
422:6 424:5,25
425:25 426:7
427:11,19,20
428:10 447:7
459:11,12,14,15
460:17,18,20
462:2 464:23
465:18,22 466:4,4
466:20 467:1
468:6,11 469:7,23
470:17 472:21
473:9 474:18
476:18 477:25

478:16,18 485:13
487:1,7 489:9
491:5,13 493:4
495:3,4 504:8
511:16 513:8
515:20 530:24
**scan** 471:15
472:21
**scene** 441:11
**schedule** 389:4,7
391:12,15 396:16
429:16 431:23
432:5 435:11
441:14,23 459:7
461:10 462:25
469:16 484:20
541:9 542:5
**scheduled** 478:21
**schein** 380:17
**school** 530:11
**scope** 452:9
486:23
**scorecard** 445:2
**scott** 378:15
386:18 508:22
542:12
**screen** 481:17
498:9 512:25
541:7,7
**script** 421:9 438:3
**scripts** 400:22
403:7 404:17
406:4 407:25
410:16 411:14
**scroll** 425:22
505:12
**scrolling** 504:1
**seal** 547:15 548:21
**search** 403:13
407:9 435:20,22
437:12,13,16,19

474:19 499:20
500:2,5,15,22,24
501:1,6,8 503:17
503:18,21,23,24
504:3,8 505:6,20
505:21,22 506:11
507:4,9,10,11,15
532:2,7,12
**searched** 500:24
**searches** 437:23
437:24,24 499:9
499:14,16 500:7
500:10 501:3,12
501:16 502:24
503:14 504:25
505:4,10 506:14
524:20 525:2,4,5
531:12,19 532:9
**searching** 396:20
438:1 504:6
531:24 539:5
**second** 391:22
392:17,17 399:22
399:22 416:10
424:1 472:16
475:21 486:16
504:13 505:17
508:25
**secondarily**
501:18 519:5
**secondary** 507:23
**secondly** 397:22
410:13
**section** 416:18
419:2 460:5
475:14 514:23
515:10
**securities** 442:15
**security** 438:24
442:7,12 459:13
459:21,22 460:1

460:10,21,22
461:1 462:3
465:24 466:12
474:13 478:2
487:9
see 389:8,24
391:13,23 392:7,9
392:17,19,20
393:9,15,18,19
394:22 396:6,10
400:1 403:6,19
404:1,5,16,23
412:15 414:15
416:7 419:10
421:13 422:14,17
424:25 425:9
426:12 427:9,14
434:8 438:9
446:13,17 457:23
458:1,8 459:1,5,13
460:23,25 461:25
462:23 464:2,7
468:16 469:11
470:16 471:11
475:20 476:1,4,5,9
476:13,16 478:10
478:12,17,25
481:9 484:11
485:9 486:1
487:16 488:24
491:4 492:14
499:5 502:14,15
505:5 506:2,11
513:2,20 514:11
515:4,19 522:15
532:4 537:13
541:7,23
seeing 441:17
457:8 458:4
481:11,16 492:16
506:23 509:24

seek 449:13
seen 428:14
452:25 481:12,12
519:24 522:10
532:24
seized 415:19
seizes 415:21
seizures 422:8,20
422:21
select 471:14
selected 471:16,18
selecting 473:1
selection 472:22
502:7
selections 470:17
472:24
selector 471:14
self 472:21 479:3
sell 410:19 416:14
419:14
selled 419:14
selling 411:13
425:6
send 396:1 432:5
543:5,6
sending 445:18
senior 435:3
sensabaugh
377:17
sense 505:25
518:20
sent 431:6 434:11
sentence 467:1
469:7 474:17
separate 482:5
series 510:6
520:10 524:23
525:25 528:7
service 378:14
384:17 475:15

services 379:5
set 416:15 441:11
487:10 509:19
521:4 532:20
settled 515:20
seven 480:14
481:17,25 499:3
shaheen 438:14,15
438:17,19,23
439:5,15
shaheen's 438:21
shapira 378:18
shapira.com
378:23,24
share 512:25
shared 433:7
shareholders
515:6,7
sharing 513:5,6
sheet 391:1,6,20
392:8,23 456:12
459:11 542:9
546:13 548:7,10
548:18 549:1
ship 394:9
shipment 482:15
492:23 543:6
shipped 394:14
395:3 492:11,13
533:17
shipping 394:2,7
472:1 493:6
ships 482:21 483:8
483:17
shop 419:9 420:18
short 456:4 515:11
525:12
show 425:20
494:25 498:3
541:6

showing 498:8
shown 511:18
529:12 546:16
shows 422:14
shred 543:9
sic 471:21
side 428:10
sign 476:22
signature 476:16
476:17 545:20
546:14
signed 477:20
547:13 548:18
significant 423:3
444:5 490:5
signing 477:1
546:19
similar 415:22
441:20,21 442:15
464:11 466:22
simply 511:24
sincerely 546:21
single 448:22
456:13 527:1
sir 387:20,23
388:7,12,20,25
389:3,10,13,16
392:10,14,21
393:1,7,14,21
395:14,24 396:15
396:18 399:7,13
399:22 401:1
404:8 405:11
406:20 412:24
423:13 424:17,23
426:18 430:9
431:21 436:19,23
437:5,9 438:22
440:9,20 441:6
442:18 443:20,25
446:20 454:9

455:23 458:5
460:12 464:18
466:5 470:12
471:2 473:7,23
474:5 484:23
488:13,18 490:18
491:3,11 497:7,16
497:18 499:11
511:13 540:20,25
546:10
**sit** 398:5 436:2
**sitting** 394:8
397:25
**situation** 449:22
465:10
**six** 422:2
**size** 486:10 533:20
**skim** 435:23
**skip** 413:19
416:17 465:21
476:15 485:12
**skipped** 418:9
**slide** 456:17
**small** 401:19,22
436:11 502:7
**smaller** 450:7
451:15 536:2
537:4
**software** 485:15
**sold** 419:4,15,25
420:4
**solely** 439:7
**solutions** 382:7
546:1 549:1
**som** 467:12 478:5
485:7 486:20,20
487:12,23
**somebody** 450:23
**somewhat** 441:21
**soms** 391:25 392:8
392:12 394:12,18

394:23 395:6,12
397:23 398:2,13
398:18,22 451:4
455:6 459:25
461:15 478:11
488:17 489:16,24
490:4 493:19
494:1 535:5
538:25
**sorry** 388:10,10
392:3 413:12
414:3,11 419:15
427:5 435:12
437:2 444:8
462:20 463:17
496:3 508:17
511:11,12 512:8
517:14 538:20
540:15
**sort** 421:20 453:6
459:1,2 464:20
492:2
**sound** 465:9 472:4
472:8 492:7
496:13
**sounds** 472:4
**sousa** 458:21
460:17,19 476:12
487:3
**south** 381:17
**spaeder** 379:9
**speak** 386:23
387:2 388:17
501:21
**speaking** 418:12
439:12 442:4
465:17 469:3
473:17 477:5
503:4 523:12
527:23

**special** 381:6
**specializes** 492:2
**specialmaster.law**
381:11
**specific** 394:23
395:11 401:14
403:19 409:16
412:24 413:3
419:20 432:25
442:10,18 444:7
447:5 452:2 468:2
468:4,20 473:14
480:4 492:16
496:15 498:18
500:16 504:3
505:21 507:16,17
514:9 525:5
528:23 533:21
536:22 539:13,24
**specifically** 389:6
395:6 403:1 411:9
428:10 431:6
432:19 433:14
435:4 437:25
438:6 439:14,14
451:19 452:15,19
455:17 459:13
474:24 497:25
498:13 503:1,21
506:3 519:6
520:12,24 523:5
524:22 531:5
532:6 538:23
539:4
**speculation** 514:6
**spend** 467:11
**spent** 467:4 468:3
**spot** 511:16
**spreadsheet**
505:15

**spreadsheets**
523:7,8,22 539:20
539:23 540:9
541:13,14 542:4
**sprinkled** 527:11
**square** 401:22
537:12
**stages** 524:21
**stand** 445:8
509:18
**stands** 476:19
**start** 517:7
**started** 386:19
387:10 442:16
**starting** 425:1
427:6 428:12
444:21 446:22
**state** 383:19
407:10 411:5,7
412:11 413:6
415:9,20 422:6
428:4 487:24
545:4,21 547:10
548:15
**stated** 399:13
411:3 420:9
447:13,14 449:1
474:10 485:22
489:21 495:12
498:24
**statement** 388:4
392:14,18 394:20
397:5,21 399:12
409:23 417:25
427:25 434:5
437:22 442:14
449:7 454:9
460:16,18,25
461:2 462:4
468:20 479:16,21
481:23 482:2

486:7,12,24
487:19 488:4,6
489:19 490:4
494:10,13 511:6
547:13,14 548:19
548:19
**statements** 495:9
**states** 374:1
409:20 410:6,7
419:15 427:14
428:1 473:16
**stating** 395:10
470:7
**stay** 533:6
**stenotypy** 545:9
**stop** 516:22 534:8
**stopped** 395:8
**stopping** 443:6
495:14 534:11
**store** 394:3 484:25
491:18 493:9
**stores** 379:6
485:19
**streamline** 456:16
**street** 377:18
379:10,21 380:12
410:17 429:5
**streets** 420:1
**string** 384:14,23
**stroke** 419:22
420:3
**struggle** 501:10
**style** 469:6
**subject** 468:14,14
478:16,18
**submission** 496:18
496:25
**subpar** 392:1,12
467:12 493:19
**subscribed** 547:10
548:14 549:21

**subsequent** 432:21
433:22 500:20
506:7,14
**subsequently**
492:17
**substance** 394:1
395:13,16,17
407:13,16 442:2
442:21 485:25
492:4 493:5
**substances** 442:10
469:10,25 471:20
472:25 473:20
478:22 480:1,15
480:19,21 481:6
481:19 482:17
484:18,21 485:5
485:19 494:8
521:2 526:23
530:14
**substantial** 460:10
461:13 468:1
**substantially**
399:3 460:14
**suburbs** 420:1
**subway** 415:18
**sufficient** 396:13
405:6 523:25
533:15
**suggest** 450:9
494:19
**suggesting** 394:25
409:9 468:23
**suggestion** 395:19
395:20
**suggests** 493:4
**suite** 376:9,18
378:8 379:11,22
380:22 381:8
546:2

**sum** 540:2
**summaries** 413:4
**summary** 413:19
414:5 461:7
464:20 533:17
**superior** 546:1
**supermarkets**
478:23 479:12
**supervision**
545:10
**supervisor** 457:24
476:19,23,25
477:15,20
**supervisors**
477:14,19
**supplement** 500:3
539:5
**supplemented**
465:17
**supplier** 409:20
411:23
**supplying** 479:13
**support** 380:6
510:24
**supportive** 511:3
**sure** 387:22
396:12 411:11
426:7 432:5
434:20 438:11
439:7,23 441:7
454:25 467:19
469:4 470:5
475:12 477:4
483:1 496:22
498:21 499:23
501:9,23 503:13
503:13 505:17
513:12 522:16
523:12 527:24
528:16 534:21,25

**suspected** 459:17
**suspects** 415:4,10
415:11
**suspicious** 394:13
431:15 453:5
485:16 486:4
492:24 494:9
503:17 504:7,9
505:11,19 510:11
517:9 520:7,9,17
521:12 532:3,12
532:17,23 534:5
**swear** 386:10
**swift** 543:15
**sworn** 386:13
547:10,13 548:14
548:18 549:21
**synopsis** 464:19
465:22
**system** 392:1,9,12
392:19,24 394:12
394:18,23 395:6
397:12 398:2,14
398:19,22 451:4,8
451:11,22 453:2
454:1 455:6
459:13,25 461:15
462:1 467:12
470:19,21,25
471:4,8,12 472:5,8
472:10,11,15
485:15 486:3,19
486:20 487:16,22
488:16,17,25
489:4,16,24
491:10 492:12
493:3,14,19 494:1
494:9 517:10
520:7,13,16 521:6
521:13 533:15
534:6,10,14 535:4

535:15,16 536:5
538:7,19,21
539:11,16
**systems** 451:16
472:13 474:11
484:19

**t**

**t** 545:1,1
**t1bcc** 384:11,12
**tab** 424:6 463:16
463:17,19
**tablets** 417:10
**take** 386:7 391:10
411:12 425:12
436:2 456:7
458:10 481:14
482:16 525:12
531:6 538:12
**taken** 390:10
400:8 411:22
422:16,20 446:18
454:11 462:8
545:8
**talk** 418:18 477:8
477:19 529:13
**talked** 387:16
456:20 460:8
497:19 506:5
532:19 536:25
**talking** 401:20
410:1 443:23
477:18 490:1
507:12 530:21
**talks** 415:13
466:19 475:14
531:5
**task** 393:24
424:20
**tasks** 471:19,24,25
472:1,23

**team** 418:15
490:23
**technician** 485:4
**telephone** 496:12
497:6,12 498:13
**telephonic** 497:15
**tell** 397:10 418:1,3
422:25 440:15,19
443:17 445:25
451:23 467:24,25
474:25 483:16
532:11 541:24
**telling** 398:12
403:10 407:19
445:11
**tells** 398:18,21
505:13
**ten** 452:14 467:15
472:23 480:9,23
**tennessee** 410:13
411:3
**tenure** 477:16
**term** 438:1 439:5
471:1 507:11
518:9,23,24 526:5
526:8,10,13 531:2
532:3,17
**terminated** 535:7
**terms** 425:4
482:16 503:21
504:12 518:20
**territory** 399:8
**testified** 386:14
444:15 446:2
450:12 487:21
496:10 508:16
509:3 533:14
**testify** 537:24
**testifying** 429:2
**testimony** 411:22
423:25 424:12

428:13 444:22
447:11,21,25
448:4,5 506:5
510:10 511:22
521:15 524:11,13
526:6,10 536:17
540:10 547:6,7
548:6,9,12
**texas** 376:19
380:23
**thank** 396:4
418:11 498:25
507:24 508:9,11
513:18 543:3,19
543:20,21,22
**thanks** 539:17
**theft** 475:13
**theoretically**
520:8
**thereto** 545:9
**thing** 411:10
417:15 421:20
425:13 439:13,17
439:22 493:17
516:25
**things** 387:11,24
388:1,5 389:5
395:24 399:1
442:3 453:7,19,22
456:16 459:25
461:23 493:16
497:11 498:22,23
**think** 387:16
391:20 394:15,24
397:3,3 399:9
402:2,3,4 409:13
410:5 419:19,20
423:12,24 426:9
430:25 431:4
432:4 433:9,11
435:16 439:20

440:25 441:25
444:15 445:21
447:2,4 449:17
455:7 456:3,4,6
463:16 466:4
472:10,11,18
475:6 479:6,15,18
492:9 494:24
496:14,19 497:11
497:23 498:15,19
500:17,18,21
501:21 502:12
506:6,21 507:25
508:1,21 518:9
520:22 527:1,5
529:7,17,22 530:5
530:7,9,13 531:1,4
532:10 536:13
539:24,25 542:10
542:22,22 543:2
**thinking** 447:20
448:1 456:5
498:20
**third** 465:21
475:14
**thirteen** 445:15
508:6
**thirty** 456:22
457:1,9 497:21
498:1,11 546:18
**thorough** 387:22
469:23 470:6
**thoroughly** 389:15
473:2
**thought** 391:5
400:4 403:4
456:16 457:5
479:1 527:22
542:18
**thousand** 402:1,5
407:12,15,24,24

452:14,14 521:2
**thousands** 452:15
504:10,10
**three** 374:12 396:4
410:5 444:2
448:14 489:1
532:8
**threshold** 392:18
451:7 488:16
489:24 491:10
492:5
**thresholds** 491:6
**throw** 398:6
**tied** 411:9 421:12
**time** 392:13
394:12 400:6
407:16 408:10,19
410:1 412:18
413:13,22 416:24
417:9,21 420:22
422:9,25 424:18
425:12 427:21
428:15 432:25
434:23 442:19
443:23 444:17
445:5 449:11
450:2,11 455:16
456:15,25 457:12
458:18 461:12
462:9,14 467:4,11
467:12 468:1,2,2
470:24 471:20
476:12 481:14
485:14 486:3
488:3 489:16
491:8 492:10,25
498:16,16 499:5
501:6 502:23
504:2,14 508:4,8
508:10 511:12
526:9,9 534:19

537:8,21 538:6
539:3,10 541:6
542:14
**timeline** 534:23
**times** 391:14
450:14 457:11
487:22 489:1
494:18 499:8
502:24 505:5
540:15,16
**tipped** 528:13
**title** 482:12,17,20
483:4,6,17 487:10
**titled** 416:18
**tn** 379:5 545:23
**today** 386:6,7
397:25 499:8
506:5 512:13
520:6,10 521:16
521:23 522:10
540:15,16 543:2
**today's** 396:4
**told** 403:5 511:24
516:7 535:14
543:17
**tomei** 458:3 464:6
**tonight** 393:24
**top** 396:1 451:17
453:1 462:19
463:5,25 469:21
470:16,16 475:19
484:10 487:1
500:19 507:14
515:1,19 536:1
**topic** 398:24 418:4
418:5 505:22
516:16,17
**topics** 539:3
**total** 468:2 471:17
472:23 540:2

**totality** 449:8
**totally** 417:12
**totes** 472:2
**track** 374:12
390:3,5,8 391:17
471:8 496:7,23
503:6,7,8 506:20
519:9 540:3 546:6
547:3 548:3
**traffickers** 419:7
420:16
**trailing** 497:21
498:1,12
**training** 464:17
465:14 501:7
**transcribed** 547:7
**transcript** 425:20
425:25 446:15
545:12,23 546:11
546:12 547:5,12
548:5,11,17
**transcripts** 399:11
**transit** 475:10
**transportation**
415:4,7
**travel** 410:18
415:5 416:14
**treat** 518:21
**trees** 400:2
**tried** 402:20 403:5
503:21
**trigger** 395:8
534:8
**triggering** 498:7
**trouble** 434:18
448:3
**troubles** 396:15
**true** 406:8 434:3
488:13 504:5
508:4 545:11

**trumbull** 390:15
399:4 400:7,25
401:5,20,23
402:22 403:7
408:7,15,19
409:10 410:19,25
411:14,25 416:2
420:13 421:16
423:6 426:5,8
429:7 431:10
496:23 523:3
**trust** 505:22
**try** 404:15 431:14
439:17 441:11
456:16 541:25
**trying** 403:16
482:2 493:2
504:22 532:1
**tsipakis** 388:8
389:21,25 390:10
394:21 397:21
**tsipakis's** 388:6
389:11,17 390:13
391:4,16
**turn** 387:15 389:4
390:24 399:14
400:10 423:14
431:22 475:18
478:15
**twelve** 445:15
467:16 489:2
**twenty** 457:23
478:22 493:10
**twice** 450:19
**two** 389:22 391:16
399:6 400:22,25
401:4,13,14,18
404:24 405:15,23
407:12,15,20,23
409:4 411:9 428:5
452:24 457:11,15

473:9 478:22
488:19 489:14,21
490:3 491:5
539:12
**type** 413:5 420:23
421:18 422:25
435:25 452:20
475:16 479:2
502:17
**types** 415:19
505:12
**typewriting**
545:10
**typical** 443:1
475:11 476:24
**typically** 419:4
444:16 449:2
479:23

**u**

**u** 438:3
**ultimate** 459:2
534:1
**ultimately** 396:9
405:13,14 431:17
530:6 534:9
**uncommon** 448:22
**uncovered** 469:8
500:25
**understand**
388:19 417:24
418:3 434:16
467:8 481:11
499:23 504:7
526:16 538:20
539:13
**understanding**
454:17 464:9
530:23
**understood**
434:16 537:2
539:7 540:14

**unique** 452:1,20
**uniquely** 445:12
**unit** 412:13 414:22
414:23 422:7
438:20 485:25
**united** 374:1
**units** 471:17
**unlawful** 515:3
**unrelated** 432:23
**unterreiner**
381:13
**unusual** 430:20
486:9 489:3
**unusually** 453:5
485:18
**usdea** 463:15
**use** 416:21 466:17
488:15 499:13
501:7 502:19
519:6 520:16
524:19 534:13
**users** 416:20,25
471:12
**usual** 395:20
**usually** 415:4,11
519:7
**utilize** 535:11
**utilized** 409:14
**utilizing** 408:17

**v**

**v** 478:21 484:21
546:6
**valid** 515:17
**value** 455:13
**variance** 473:3
**various** 391:2
**verification**
471:23
**verified** 394:2,9
493:6

**veritext** 382:7
546:1,7 549:1
**veritext.com.**
546:17
**version** 432:1
**versus** 441:4
512:22 534:11
**video** 374:16
**videographer**
382:6 386:5
443:10,14 495:17
495:21 508:5
513:10,12,16
522:18,22 525:14
525:18 543:23
**videotaped** 383:16
383:24 384:20
385:6 386:7
446:14
**view** 514:25
**vincent** 458:3
**violating** 454:12
**violation** 454:17
465:25
**violations** 445:4
449:2,3,12,19
450:1 455:20
469:8
**virginia** 377:19
419:6 478:24
**visited** 450:23
**vocollect** 470:18
470:19,25 471:1,3
471:10,12
**voelker** 490:21
**vol** 546:8 547:4,9
548:4,13 549:20
**volume** 374:14
383:1,12 384:2
385:2 386:1 404:6
404:9 491:19

521:9 533:16,18
533:21,22

**w**

**wacker** 378:8
**wait** 387:13
**waived** 546:19
**wake** 447:24
**walgreen** 379:17
379:17
**walgreens** 379:16
514:16 516:8,19
517:6,7,22 520:15
522:4
**walk** 503:18
**walmart** 378:4
390:25 391:1
496:2 500:18
504:6,8 505:19
520:16,24 521:13
521:17 523:6
531:18 534:13
536:6 539:20
542:3
**walmart's** 533:15
537:10,20 538:3,6
539:11 540:2
**want** 400:2,4
412:6 413:24
416:17 417:20,22
417:25 418:5
425:15,17,19,20
425:21 445:22,23
451:2 452:16
460:7 476:16
479:11 500:2,4
501:21 504:17
505:16 511:21
513:10 516:18
522:16 524:12
537:8 543:5,7,8

| | | | |
|---|---|---|---|
| **wanted** 426:8 | **wish** 440:22 441:3 | **wrote** 468:3 | 537:19,24 |
| 438:7 444:20 | 441:5 | **y** | **york** 381:23 |
| 445:9 497:12 | **witness** 386:10 | **y** 381:22 | 446:15 447:12 |
| 500:15 503:16 | 388:9,13 399:10 | **yeah** 388:11 425:4 | 448:4 503:12 |
| 508:18 525:7 | 429:25 545:13 | 425:10 428:9 | **z** |
| **wants** 512:7 | 546:8,11 547:1,4 | 442:9,11,13 443:7 | **zoom** 497:8,14 |
| **warehouse** 436:16 | 547:11 548:1,4,15 | 450:9 463:9 | 498:13 |
| 475:2,4 482:12 | **witness'** 546:14 | 467:10 468:23 | **zuckerman** 379:9 |
| 483:18 | **woke** 447:19 | 478:15 480:20,25 | **zuckerman.com** |
| **warrant** 407:9 | **women** 415:15 | 486:15 491:2 | 379:14 |
| **washington** | **wood** 437:1 | 493:1 497:1 | |
| 379:12 | **woods** 401:10 | 501:15 502:6 | |
| **waste** 504:2 | **word** 435:20,22 | 508:9,11 531:1,20 | |
| **way** 409:4,14 | 437:12,22,23 | 533:18 536:4,13 | |
| 465:24 473:14 | 438:3,8,9 515:5 | 537:6 538:8 | |
| 497:11 505:23 | 524:12 | 541:19 | |
| 518:15 519:12 | **words** 437:14,16 | **year** 407:20 | |
| **website** 431:2 | 437:19 461:17 | 415:10 442:18 | |
| **week** 521:3 | **work** 410:24 453:2 | 491:20,22,23 | |
| **weekend** 394:6 | 466:21,22 504:12 | 494:15 | |
| 395:21 | **worked** 400:7 | **years** 407:15,23 | |
| **weisman** 375:17 | 411:8 434:2 | 410:5 422:1,2 | |
| **weismanlaw.sw...** | 438:18 455:14 | 424:21 435:3 | |
| 375:22 | 503:12 535:23 | 445:15 456:22 | |
| **went** 387:5 428:5 | **workers** 536:9 | 457:1,9,16,23 | |
| 445:5 460:11 | **working** 416:24 | 473:9 501:10 | |
| 463:11 468:3 | 458:17 537:4 | 532:8,8 534:13 | |
| 493:1,10 504:14 | **works** 503:3 | **yep** 538:22 | |
| 530:11 535:18 | **world** 482:25 | **yesterday** 386:24 | |
| **west** 376:17 | 483:1 | 387:17 390:25 | |
| 377:19 378:8 | **worry** 432:6 | 399:9,13 444:15 | |
| 419:6 478:24 | **write** 421:1 526:22 | 444:24 445:25 | |
| **wewatta** 379:21 | **writer** 469:6 | 447:15 460:8 | |
| **whatnot** 528:9 | **writing** 400:22 | 496:5,10 499:8 | |
| **whiddon** 375:9 | 403:7 407:23 | 508:16 509:3 | |
| **white** 471:21 | **written** 391:21 | 510:4 511:8 | |
| **wider** 449:23 | 516:23 527:1 | 512:13 516:7,9,14 | |
| **width** 519:18 | 528:5 | 518:10 520:6,10 | |
| **wife** 387:4 402:16 | **wrong** 388:11 | 521:16,23 522:10 | |
| **window** 407:16 | 431:25 434:17 | 525:23 526:9 | |
| | 496:9 543:1 | 532:19 534:17 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.