```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4   IN RE:  NATIONAL PRESCRIPTION :
     OPIATE LITIGATION           :  MDL No. 2804
 5   _____: Case No.
                                 :  1:17-md-2804
 6   THIS DOCUMENT RELATES TO:     :
                                 :
 7   The County of Lake, Ohio v.   :  Hon. Dan A. Polster
     Purdue Pharma, LP, et al.    :
 8   Case No. 18-op-45032          :
                                 :
 9   The County of Trumbull, Ohio  :
     v. Purdue Pharma, LP, et al.  :
10   Case No. 1:18-op-45079        :
                                 :
11   Track 3 Cases                 :
     _____:
12
13        - HIGHLY CONFIDENTIAL -
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
14
                  -  -  -
15
                 March 5, 2021
16
                  -  -  -
17
             Videotaped remote deposition
18   of RICHARD SHAHEEN, taken pursuant to
     notice, was held via Zoom
19   videoconference, beginning at 10:23 a.m.,
     EST, on the above date, before Michelle
20   L. Gray, a Registered Professional
     Reporter, Certified Shorthand Reporter,
21   Certified Realtime Reporter, and Notary
     Public.
22
                  -  -  -
23        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
24           deps@golkow.com
```

```
 1   ZOOM APPEARANCES:
 2

     LEVIN PAPANTONIO RAFFERTY PROCTOR
 3   BUCHANAN, O'BRIEN, BARR, MOUGEY, PA
     BY:  JOSHUA HARRIS, ESQ.
 4        TROY RAFFERTY, ESQ.
          JULIA METTS, ESQ.
 5   316 South Baylen Street, Suite 600
     Pensacola, Florida 32502
 6   (888) 435-7001
     jharris@levinlaw.com
 7   trafferty@levinlaw.com
     jmetts@levinlaw.com
 8   Representing the Plaintiffs
 9

     WAGSTAFF & CARTMELL, LLP
10   BY:  THOMAS W. SIDLINGER, ESQ.
     4740 Grand Avenue, Suite 300
11   Kansas City, Missouri 64112
     (816) 701-7421
12   tsidlinger@wcllp.com
     Representing the Plaintiffs
13
14   MARCUS & SHAPIRA, LLP
     BY:  JOSHUA A. KOBRIN, ESQ.
15   One Oxford Centre, 35th Floor
     Pittsburgh, Pennsylvania 15219
16   (412) 338-3990
     kobrin@marcus-shapira.com
17   Representing the Defendant, HBC
     Service Company
18
19   JONES DAY
     BY:  MEGAN E. RYAN, ESQ.
20   77 West Wacker, Suite 3500
     Chicago, Illinois 60601
21   (312) 269-1560
     Mryan@jonesday.com
22   Representing the Defendant, Walmart
23
24
```

```
 1   ZOOM APPEARANCES:  (Cont'd.)

 2

 3   ALSO PRESENT:

 4

     VIDEOTAPE TECHNICIAN:

 5   Dan Lawlor

 6

     LITIGATION TECHNICIAN:

 7   Joe Wills

 8

     Josh Gay - Legal Investigator

 9   (Levin Papantonio)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -  -  -
 2                  I N D E X
 3                     -  -  -
 4
    Testimony of:
 5
                         RICHARD SHAHEEN
 6
        By Mr. Harris            11, 438
 7
        By Mr. Kobrin           389, 443
 8
 9
10
11                    -  -  -
12               E X H I B I T S
13                    -  -  -
14
15  NO.          DESCRIPTION          PAGE
16  Shaheen-1    Trib Live            35
                 Heroin's Popularity
17               Goes up in Monroeville
                 PGEN-00147
18
    Shaheen-2    Printout of          74
19               Pharmacy Names and
                 Locations
20               P-HBC-01359
21  Shaheen-3    PowerPoint           87
                 Giant Eagle
22               Loss Prevention
                 Department
23               P-HBC-01304
24
```

```
 1                     -  -  -
 2            E X H I B I T S  (Cont'd.)
 3                     -  -  -
 4
 5   NO.            DESCRIPTION              PAGE
 6   Shaheen-4      E-mail Thread           117
                    10/2/14
 7                  Subject, Narcs
                    Found in Tote
 8                  P-HBC-01316
 9   Shaheen-5      E-mail Thread           130
                    7/28/15
10                  Subject, Oxy Limit
                    P-HBC-01332
11
     Shaheen-6      E-mail Thread           160
12                  8/11/15
                    Subject, Procedural
13                  Inconsistency
                    P-HBC-01324
14
     Shaheen-7      E-mail Thread           204
15                  8/17/15
                    Subject, Pharmacy
16                  Team Leader Calls
                    P-HBC-01325
17
     Shaheen-8      Giant Eagle Pharmacy    216
18                  Suspected Controlled
                    Substance Loss
19                  DEA Notification
                    10/20/14
20                  P-HBC-01284
21   Shaheen-9      E-mail Thread           223
                    11/10/14
22                  Subject, 1405 Audit
                    Question
23                  P-HBC-01279
24
```

```
 1                    -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.            DESCRIPTION          PAGE
 6    Shaheen-10   Prescription Pickup   229
                   Signature
 7                 Liberty Township
                   Police Department
 8                 P-HBC-01299
 9    Shaheen-11   E-mail Thread         247
                   11/30/15
10                 Subject, Fraudulent
                   Prescriptions Received
11                 P-HBC-01342
12    Shaheen-12   E-mail Thread         253
                   6/13/17
13                 Subject, Loss
                   P-HBC-01340
14
      Shaheen-13   E-mail Thread         269
15                 12/7/17
                   Subject, 4056
16                 Jamestown Youngstown
                   P-HBC-01300
17
      Shaheen-14   E-mail Thread         272
18                 12/8/17
                   Subject, Brenton
19                 Cornwell Statement
                   P-HBC-01308
20
      Shaheen-15   E-mail Thread         278
21                 6/6/18
                   Subject, LP Pharmacy
22                 Wins FY18
                   P-HBC-01282
23
24
```

```
 1                     -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                     -  -  -
 4
 5   NO.            DESCRIPTION            PAGE
 6   Shaheen-16   E-mail Thread           293
                  8/13/18
 7                Subject, BOLO
                  P-HBC-01285
 8
     Shaheen-17   Pharmacy Hot Sheet      296
 9                8/13/18
                  P-HBC-01298
10
     Shaheen-18   Minutes of the          303
11                November 2-4, 2009
                  Meeting
12                Ohio State Board of
                  Pharmacy
13                P-GEN-00150
14   Shaheen-19   Minutes of the          334
                  December 5-7, 2011
15                Meeting
                  Ohio State Board
16                Of Pharmacy
                  P-GEN-00148
17
     Shaheen-20   Minutes of the          351
18                September 11-12, 2017
                  Meeting
19                Ohio State Board
                  Of Pharmacy
20                P-GEN-00149
21
     Shaheen-21   E-mail Thread           366
22                7/3/19
                  Subject, 2019
23                Accomplishments
                  P-HBC-01296
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -

 2            E X H I B I T S  (Cont'd.)

 3                        -   -   -

 4

 5   NO.             DESCRIPTION              PAGE

 6   Shaheen-22   E-mail Thread              386
                  6/6/19
 7                Subject, Response
                  Requested:  Quarterly
 8                Team Leader Call Topics
                  P-HBC-01281
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    -  -  -
 2           DEPOSITION SUPPORT INDEX
 3                    -  -  -
 4
 5   Direction to Witness Not to Answer
 6   PAGE   LINE  PAGE LINE     PAGE LINE
     None.
 7
 8   Request for Production of Documents
 9   PAGE   LINE  PAGE LINE     PAGE LINE
     None.
10
11   Stipulations
12   PAGE   LINE  PAGE LINE     PAGE LINE
     None.
13
14
     Questions Marked Highly Confidential
15
     PAGE   LINE  PAGE LINE     PAGE LINE
16   None.
17
18
19
20
21
22
23
24
```

```
 1                    -  -  -

 2              THE VIDEOGRAPHER:  We are

 3         now on the record.  My name is Dan

 4         Lawlor.  I'm a videographer

 5         representing Golkow Litigation

 6         Services.

 7              Today's date is March 5th,

 8         2021, and the time is 10:23

 9         eastern.

10              This remote video deposition

11         is being held in the matter of

12         opioid litigation Track 3,

13         Counties of Lake and Trumbull,

14         Ohio, v. Purdue.

15              All parties to this

16         deposition are appearing remotely

17         and have agreed to the witness

18         being sworn in remotely.

19              Due to the nature of remote

20         reporting, please pause briefly

21         before speaking to ensure all

22         parties are heard completely.

23              The deponent is Rick

24         Shaheen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                Counsel will be noted on the

 2         stenographic record.

 3                The court reporter is

 4         Michelle Gray and will now swear

 5         in the witness.

 6                   -  -  -

 7                ... RICHARD SHAHEEN, having

 8         been first duly sworn, was

 9         examined and testified as follows:

10                   -  -  -

11                EXAMINATION

12                   -  -  -

13    BY MR. HARRIS:

14         Q.    Good morning, Mr. Shaheen.

15    We just met a moment ago off the record.

16    But my name is Joshua Harris, and I

17    represent the plaintiffs in this matter,

18    Lake and Trumbull Counties.  How are you

19    doing?

20         A.    I'm doing well.  How about

21    you?

22         Q.    Doing well.  Thank you.

23                So we'll start with your

24    deposition here in a moment, but I want
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to cover a couple things before we do.

 2    It's my understanding that our firm has

 3    mailed you a binder full of exhibits that

 4    we'll use throughout the day.  Do you

 5    have that binder available?

 6         A.    I do.

 7         Q.    Okay.  And I believe it was

 8    either taped or sealed in some manner.

 9    Is it still sealed or taped in the manner

10    you received it?

11         A.    It is.

12         Q.    Okay.  So you haven't looked

13    at anything in there before I tell you to

14    open it this morning or this afternoon,

15    correct?

16         A.    Correct.

17         Q.    Okay.  Perfect.  Thank you.

18               Have you ever been deposed

19    before?

20         A.    I have.

21         Q.    How many times?

22         A.    Only a couple times.

23         Q.    Okay.  Well, just a quick

24    kind of preview.  You know, this is a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   simple question-and-answer thing.  It's

 2   not supposed to be painful like a

 3   trepanation or a root canal or anything

 4   like that.  The only thing I ask is that

 5   you answer the questions honestly.  Are

 6   you okay with that?

 7        A.    I am.

 8        Q.    Okay.  The only other kind

 9   of ground rule I want to establish is

10   that if you do answer a question, I'm

11   going to assume you understood the

12   question.  Does that make sense?

13        A.    It does.

14        Q.    Okay.  Basically if you

15   don't understand what I'm asking, let me

16   know, and I'll see if I can't rephrase

17   it.  Sound good?

18        A.    Okay.

19        Q.    All right.  So let's go

20   ahead and get started.  Will you go ahead

21   and state your full name for the record,

22   please.

23        A.    Richard Shaheen.

24        Q.    Mr. Shaheen, where are you
```

```
 1   currently employed?

 2           A.    Giant Eagle.

 3           Q.    What is your title with

 4   Giant Eagle?

 5           A.    I am the pharmacy security

 6   manager.

 7           Q.    How long have you held that

 8   title?

 9           A.    Since August 2020.

10           Q.    When did you first join

11   Giant Eagle?

12           A.    November 2013.

13           Q.    And just to lay some

14   background, Giant Eagle owns HBC; is that

15   correct?

16           A.    They did.

17           Q.    They did, okay.  And they no

18   longer do, is that correct?

19           A.    No.  They still have HBC.

20   They have a warehouse.

21           Q.    Okay.  All right.  All

22   right.  So what was your position when

23   you started in November of 2013 with

24   Giant Eagle?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I was hired as a pharmacy

 2    investigator.

 3          Q.    What kind of duties or

 4    responsibilities did you have in that

 5    capacity?

 6          A.    We were handling cameras,

 7    meaning video review of cameras,

 8    installing cameras, locks, security.  In

 9    a pharmacy, we were involved with the

10    gates and for security purposes we also

11    handled internal, external

12    investigations.

13                We would assist in other

14    loss prevention needed areas in addition

15    to anything I was doing in a pharmacy

16    area.

17          Q.    Okay.  When you mentioned

18    gates, do you mean gates for -- well, let

19    me back it up.

20                What is Giant Eagle overall?

21          A.    Giant Eagle is a grocery

22    chain.  It also has GetGos, which are

23    convenience stores, and it also has

24    numerous pharmacies within their --
```

1    within their grocery chain.

2         Q.    Are the pharmacies located

3    within the grocery stores or is there

4    standalone buildings as well?

5         A.    I'm sorry.  I missed the

6    first half.

7         Q.    Sure.  Are the pharmacies

8    located within the grocery stores, or are

9    there standalone buildings?

10        A.    No.  They're within.  We

11   have one standalone.

12        Q.    Okay.  And when you

13   mentioned gates earlier for security, is

14   that related to the Giant Eagle store in

15   a whole or just the pharmacy area?

16        A.    The barricades in the

17   pharmacy.

18        Q.    Okay.  You said that you are

19   now currently the pharmacy security

20   manager.  What are your responsibilities

21   in that position?

22             MR. KOBRIN:  Object to form.

23             THE WITNESS:  Well, it's

24        still relatively the same.  We

```
 1          have added two other individuals

 2          who are also working in the

 3          pharmacy department.  I have two

 4          pharmacy investigators currently.

 5  BY MR. HARRIS:

 6          Q.    Are those the two

 7  individuals that you added?

 8          A.    Yes.

 9          Q.    What are their names?

10          A.    Andrew Gaus.

11          Q.    Is that G-A-U-S-E?

12          A.    G-A-U-S.

13          Q.    Okay.  Thank you.  The other

14  one?

15          A.    Sam Muhieddin.

16          Q.    Okay.  What did you do

17  before you joined Giant Eagle?

18          A.    I was with the Pennsylvania

19  Office of the Attorney General.  I was an

20  agent with the office.

21          Q.    Did you do investigations

22  during that role as well?

23          A.    I did.

24          Q.    Did you ever do
```

1    investigations into controlled

2    substances?

3         A.    I did investigations into

4    pharmacies and into doctors.

5         Q.    Can you provide me a little

6    more detail on that?  What was the scope

7    of some of those investigations?

8              MR. KOBRIN:  Object to form.

9              THE WITNESS:  Independent

10         pharmacies were, in general,

11         filling out prescriptions without

12         proper authorization from doctors.

13             Same thing with physicians.

14         Physicians either practicing

15         outside the scope, fraudulently

16         billing Medicare, Medicaid, those

17         types of claims, white collar type

18         of investigations involving

19         practitioners.

20    BY MR. HARRIS:

21         Q.    You mentioned independent

22    pharmacies were in general filling

23    prescriptions without proper

24    authorizations.  Did you ever investigate

Highly Confidential - Subject to Further Confidentiality Review

```
 1   chain pharmacies?

 2        A.    We didn't have that problem

 3   with chain pharmacies.

 4        Q.    Do you believe that problem

 5   exists with chain pharmacies?

 6        A.    Not that I'm aware of.

 7        Q.    Okay.  Have you ever

 8   investigated that issue inside Giant

 9   Eagle in your time working for them?

10        A.    No.

11              MR. KOBRIN:  Object to form.

12   BY MR. HARRIS:

13        Q.    I'm sorry.  It cut out a

14   little bit.  Can you repeat that?

15              MR. KOBRIN:  Yeah, just --

16        Rick, just make sure that you give

17        me a moment to object just in

18        case.

19   BY MR. HARRIS:

20        Q.    Do you want me to repeat my

21   question, Mr. Shaheen?

22        A.    Please.

23        Q.    Okay.  Have you ever

24   investigated that issue, meaning filling
```

```
 1   prescriptions without the proper

 2   authorization inside Giant Eagle in your

 3   time working for them?

 4               MR. KOBRIN:  Object to form.

 5               THE WITNESS:  I didn't hear

 6        you.  I didn't hear you.

 7               MR. KOBRIN:  I just said

 8        object to form.  You can -- you

 9        can still answer the question.

10               THE WITNESS:  Oh, okay.

11               Yes, I did investigate --

12        I'm just referring back to a case,

13        yes.

14   BY MR. HARRIS:

15        Q.    Okay.  Can you provide me a

16   little bit of detail on that

17   investigation?

18        A.    Patient was fraudulently

19   making up and filling -- making up their

20   own prescriptions.  I was alerted by our

21   pharmacist, and we then subsequently

22   contacted the appropriate law enforcement

23   agency, and an arrest was made.

24        Q.    During the course of your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    investigation into that patient, did you

 2    ever learn if any of their fraudulent

 3    scripts were filled?

 4         A.    I would have to look on the

 5    documents.  I do believe -- I do believe

 6    a couple of the scripts were filled

 7    though.

 8         Q.    Those would have been filled

 9    by Giant Eagle pharmacists?

10         A.    It would have been filled by

11    Giant Eagle pharmacists.  But once

12    they -- once they realized a prescription

13    through their due diligence, they

14    contacted me immediately and then we

15    began our case investigation.

16         Q.    Okay.  After they filled the

17    fraudulent prescriptions?

18         A.    I'm sorry?

19         Q.    They contacted you after

20    they filled several fraudulent

21    prescriptions?

22              MR. KOBRIN:  Object to form.

23              Facts not in evidence.

24    BY MR. HARRIS:
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    You can go ahead and answer,

2  Mr. Shaheen.

3     A.    I don't know that.

4  Sometimes what happens is if a pharmacy

5  down the street or another pharmacy has

6  said, "Hey, there's individuals going

7  around attempting to pass scripts," then

8  I would be notified by our people, and

9  they would at that point, if they tried

10  to attempt to pass a script at our

11  pharmacy, we would -- we would certainly

12  try to get these individuals arrested or

13  contact law enforcement.

14     Q.    Okay.  Well, this is a

15  preview.  We'll be talking about some

16  investigations throughout the day.  So

17  we'll table this for now.  But I may

18  refer back to it later on.  Sound good?

19     A.    Yep.

20     Q.    Okay.  Let me ask you some

21  baseline questions before we dig in much

22  deeper.  Do you agree that addiction can

23  start with prescription substances?

24          MR. KOBRIN:  Object to form.

```
 1              No foundation.

 2                   You can answer, Rick.

 3                   THE WITNESS:  Repeat the

 4         question, please.

 5    BY MR. HARRIS:

 6         Q.    Sure.  Do you agree that

 7    addiction can start with prescription

 8    substances?

 9                   MR. KOBRIN:  Same objection.

10                   THE WITNESS:  I am not a

11         licensed pharmacist or a

12         physician.  I don't think I'm

13         adequately able to answer that

14         question.

15    BY MR. HARRIS:

16         Q.    Okay.  How long were you an

17    investigator for the Pennsylvania AG's

18    office?

19         A.    26 years.

20         Q.    I'm not going to ask you for

21    an exact number.  But roughly how many

22    pharmacies or doctors did you investigate

23    in that 26-year period?

24         A.    I don't have an exact
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    number.  But I've investigated them.
 2          Q.    Would you say it's a
 3    significant amount?
 4          A.    What do you mean by
 5    significant?  I mean, what do you mean by
 6    significant amount?
 7          Q.    Sure.  Let's say more than
 8    50.
 9          A.    No.
10          Q.    Less than 50?
11          A.    Oh, yeah.
12          Q.    Okay.  More or less than 25?
13          A.    Not sure.
14          Q.    Okay.  Did you ever do any
15    independent research when you were
16    investigating these pharmacies to see
17    what the affect of prescription drugs may
18    be on people who are illegally obtaining
19    them?
20          A.    No.  That information was
21    provided -- any type of that information
22    would have been done by a practitioner,
23    whether it be a pharmacist or a doctor.
24          Q.    So during your 26 years of
```

```
 1    investigating, you never did any

 2    independent research into these

 3    pharmacies?

 4              MR. KOBRIN:  Object to form.

 5              THE WITNESS:  No.

 6    BY MR. HARRIS:

 7         Q.   Do you believe prescription

 8    drugs can be dangerous?

 9         A.   I think any drug can be

10    dangerous if it's not taken in the

11    prescribed manner.

12         Q.    Including prescription

13    drugs?

14         A.    Any drug.

15         Q.    Okay.  I appreciate that,

16    but my question is more narrow.

17              For prescription drugs, they

18    can be dangerous, correct?

19              MR. KOBRIN:  Objection.

20              THE WITNESS:  Any drug can

21         be dangerous.

22    BY MR. HARRIS:

23         Q.    Including prescription

24    drugs?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Any drug taken outside the

 2     normal course can be dangerous to an

 3     individual.

 4          Q.    Outside the normal course of

 5     what?

 6          A.    The directions.

 7          Q.    Okay.  So Vicodin can be

 8     dangerous?

 9          A.    Any drug taken outside that

10     normal course or how it's prescribed can

11     be dangerous.

12          Q.    So the answer to my question

13     is yes?

14              MR. KOBRIN:  Object to form.

15              THE WITNESS:  Yes.

16     BY MR. HARRIS:

17          Q.    Okay.  Oxycodone can be

18     dangerous?

19          A.    Once again, any -- any drug

20     taken outside the normal course or how it

21     is prescribed can be dangerous.

22          Q.    Okay.  Mr. Shaheen, I sense

23     there is a question that you're really

24     wanting to answer.  So let me ask it for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you.
 2                Can any drug taken outside
 3   the normal course of how it is
 4   prescribed, can that be dangerous?
 5                MR. KOBRIN:  Object to form.
 6                THE WITNESS:  Okay.  Please
 7        repeat again.
 8   BY MR. HARRIS:
 9        Q.    Absolutely.  Can any drug
10   taken outside the normal course of how it
11   is prescribed be dangerous?
12        A.    It can be.
13        Q.    Okay.  Great.  Now that
14   we've established that, I appreciate your
15   clarity, but we may not need to repeat it
16   after every time.
17                So going back to my
18   question, is oxycodone, can that be
19   dangerous?
20                MR. KOBRIN:  Object to form.
21                THE WITNESS:  If taken
22        outside that normal course.
23   BY MR. HARRIS:
24        Q.    If taken outside the normal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    course, then yes.

 2           A.    It can be.

 3           Q.    Okay.  Can hydrocodone be

 4    dangerous?

 5           A.    If that drug is taken

 6    outside the normal course of how it's

 7    prescribed, it can be.

 8           Q.    What about alprazolam?

 9           A.    If any drug taken outside

10    the normal course, it can be dangerous.

11           Q.    Okay.  Would you also agree

12    that prescription drugs are the drug type

13    most abused by middle school children?

14                 MR. KOBRIN:  Object to form.

15                 THE WITNESS:  Yes.  Middle

16           school kids can abuse -- middle

17           school kids can abuse medications.

18    BY MR. HARRIS:

19           Q.    Again, that wasn't exactly

20    my question.  So I'm going to repeat it.

21    I'm going to ask that you listen closely.

22    Okay?

23                 My question was, do you

24    agree that prescription drugs are the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   drug type most abused by middle school

 2   children?

 3           A.    Well, I, again, have to look

 4   at statistics.  Had it been that way?

 5   Yes, it could have been that way during

 6   time periods.

 7           Q.    Okay.  Do you agree that

 8   prescription drugs are abused by middle

 9   school children more so than marijuana?

10           MR. KOBRIN:  Object to form.

11           Foundation.

12           THE WITNESS:  It is -- it is

13           possible, yes.

14   BY MR. HARRIS:

15           Q.    How would you confirm that

16   fact?

17           MR. KOBRIN:  Object to form.

18           You asked him if he agreed.

19           MR. HARRIS:  Well, then

20           he -- then he said it was

21           possible.  So I'm now asking him,

22           if it is possible, how would he

23           confirm that.

24           MR. KOBRIN:  I object to
```

```
 1          form.  I don't think that

 2          correlates.  The witness said

 3          something is certainly possible

 4          that  you're --

 5               MR. HARRIS:  Okay.

 6  BY MR. HARRIS:

 7          Q.    All right.  Mr. Shaheen, do

 8  you understand my question?

 9               MR. KOBRIN:  I just want to

10          finish.

11               But he would have knowledge

12          or understand how to confirm

13          something that he had conceded was

14          possible.

15               MR. HARRIS:  Okay.  You've

16          stated your objection.  We

17          appreciate it.

18  BY MR. HARRIS:

19          Q.    Mr. Shaheen, do you

20  understand my question?

21          A.    Yes.

22          Q.    Okay.  How would you find

23  out if middle school children abused

24  prescription drugs more than they do
```

1    marijuana?

2              MR. KOBRIN:  Object to form.

3         Facts not in evidence.

4              THE WITNESS:  Again, from --

5         from things that you read or

6         visiting a school where you have

7         been told information is shared

8         like that.  So those are some of

9         the sources.

10   BY MR. HARRIS:

11        Q.    When we first started I

12   mentioned that binder that our firm had

13   shipped to you.

14              If you can go ahead and grab

15   that.  I think the protocol requires that

16   you open that seal on camera.  So do you

17   have something that you're able to open

18   it with handy?

19        A.    Yeah, I have some scissors.

20        Q.    Okay.  Great.  If you'll go

21   ahead and open that binder for me, but if

22   you'll show me the seal first before you

23   cut it open, I'd appreciate that.

24        A.    Okay.  I mean, it's sealed

```
 1   by tape.  So --

 2           Q.    Okay.  That is very -- I

 3   don't know who sealed that.  But they did

 4   a very good job.  Okay.  Well, if you

 5   need to take a moment to get that

 6   unsealed, I understand if you want to go

 7   ahead and do that real fast.

 8                 MR. KOBRIN:  Hey, Josh.

 9                 MR. HARRIS:  Yes, sir.

10                 MR. KOBRIN:  I have two

11           boxes.  I just opened the

12           Chunderlik one.  I'm going to open

13           the other one now, Just so you

14           know.

15                 MR. HARRIS:  Yeah, we can

16           address how to handle that.  We'll

17           e-mail about it later.

18                 MR. KOBRIN:  Yeah, I'm going

19           to seal it up again.  It says

20           Chunderlik.  There's a piece of

21           paper that just says Chunderlik on

22           it.

23                 MR. HARRIS:  Okay.

24                 MR. KOBRIN:  Well, it says
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            "Do not open until Monday

 2            9:00 a.m."  But it doesn't say

 3            Chunderlik on the outside.

 4                 MR. HARRIS:  Okay.  Well --

 5            but he's set for Monday.  Okay.

 6            Well, I trust with your

 7            representation that you won't look

 8            at it before Monday.

 9                 MR. KOBRIN:  I'm just

10            letting you know.  I have two

11            boxes that look exactly the same.

12                 MR. HARRIS:  Understood.

13            Understood.

14   BY MR. HARRIS:

15        Q.   Mr. Shaheen, we'll  -- okay.

16   There's the binder with the seal.  You

17   can go ahead and cut that.  What I will

18   ask, though, is that you will not open up

19   a tab until I refer or direct you to that

20   tab.  Okay?

21        A.    Okay.

22                 MR. KOBRIN:  You sealed them

23            in here too.  Slick.

24                 Can I open the binder?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. HARRIS:  Yeah,
 2         absolutely.  That's going to be
 3         useful today.
 4              MR. KOBRIN:  Yeah, so that's
 5         probably sealed on the other one
 6         too.
 7              MR. HARRIS:  I imagine so.
 8         So I doubt it will be a problem on
 9         Monday.
10    BY MR. HARRIS:
11         Q.   Mr. Shaheen, throughout the
12    day if you need a restroom break or water
13    break at any time, please let me know.
14    You know, we're entitled to seven hours
15    on the record.  My hope is to not take
16    that full time, so we're not in any rush
17    at all.  So just let me know.  Okay?
18         A.   Very good.  Thank you.
19              MR. HARRIS:  And then, Josh,
20         whenever you've got your box
21         unsealed, let me know.
22              MR. KOBRIN:  I have it.
23              There's only one binder?
24              MR. HARRIS:  Yes, only one
```

```
 1              binder for Mr. Shaheen.
 2    BY MR. HARRIS:
 3         Q.    All right.  Mr. Shaheen, if
 4    you'll go ahead and open your binder to
 5    Tab 1.  We're going to introduce this as
 6    the first exhibit.
 7                 (Document marked for
 8                 identification as Exhibit
 9                 Shaheen-1.)
10                 MR. HARRIS:  This is going
11                 to be Shaheen-1.  And this was
12                 produced with a stamp P-GEN-00147.
13    BY MR. HARRIS:
14         Q.    Let me know when you get to
15    that tab.
16         A.    Okay.
17         Q.    All right.  Do you see the
18    top left -- and I believe it'll be on
19    your screen as well, if it's easier to
20    refer to it in that form.
21                 Up on the top left, it says
22    "Trib Live."
23                 Do you see that?
24         A.    I do.
```

```
 1          Q.    Okay.  Are you familiar with

 2   this publication?

 3          A.    I -- yes, I am familiar with

 4   it.

 5          Q.    Okay.  Is it a publication

 6   that's in Pennsylvania?

 7          A.    Yes.

 8          Q.    And then if we look at the

 9   title of this, it says, "Heroin's

10   popularity goes up in Monroeville."  And

11   it's dated Wednesday, November 28, 2012.

12               Do you see that?

13          A.    I do.

14          Q.    All right.  Where is

15   Monroeville, if you know?

16          A.    It's outside of Pittsburgh,

17   ten miles or so.

18          Q.    All right.  And

19   November 28th, 2012, that would have been

20   when you were investigator for -- excuse

21   me, an agent for the Philadelphia AG's

22   office, correct?

23          A.    No.

24          Q.    Okay.  What were you doing
```

```
 1    November 2012?

 2         A.    No, I wasn't with the

 3    Philadelphia AG's office.  That's --

 4         Q.    Oh, I'm sorry.  The

 5    Pennsylvania AG's office.

 6         A.    Yes.

 7         Q.    I apologize.  Let me re-ask

 8    that.

 9              So as of November 28th,

10    2012, you were employed as an agent by

11    the Pennsylvania Attorney General's

12    office?

13         A.    Correct.

14         Q.    Okay, great.  Do you

15    remember this article being published by

16    any chance?

17         A.    I do remember this article

18    being published.

19         Q.    Okay.  Let's look at this

20    picture they have here printed on the

21    first page.

22         A.    Mm-hmm.

23         Q.    Do you see what's on that

24    table?
```

```
 1          A.    I do.

 2          Q.    Okay.  Would you agree

 3   that's bricks of heroin?

 4          A.    This -- this picture was --

 5   was not where -- I was going around and

 6   doing presentations at schools.  So I

 7   don't know where this picture is or was,

 8   okay.  Yeah, I don't know the picture.

 9          Q.    Okay.  Let's read the

10   caption under it then.  It says,

11   "Monroeville detectives and other local,

12   state, and federal agencies ceased 2,000

13   bricks of heroin, which represent a

14   street value of $550,000 to $700,000

15   through a joint investigation in 2009 and

16   2010."

17                Did I read that properly?

18          A.    Yes.

19          Q.    Okay.  So based on the

20   description, you can agree that it's

21   bricks of heroin, right?

22                MR. KOBRIN:  Object to form.

23          You can agree to what the caption

24          says.  I'm not going to let him
```

```
 1           agree to what --

 2                MR. HARRIS:  Okay.  Well,

 3           Josh, I'm going to ask that you

 4           object to form and not instruct

 5           the witness in between questions.

 6                MR. KOBRIN:  I'm not

 7           instructing the witness.  I'm

 8           telling you what I'll allow him to

 9           agree.

10                THE WITNESS:  That -- yeah.

11  BY MR. HARRIS:

12      Q.    So, Mr. Shaheen, you agree?

13      A.    The -- yeah, to the wording

14  and what the picture -- yes.

15      Q.    Okay.  And heroin is a type

16  of opioid; is that correct?

17      A.    Yes.

18      Q.    Okay.  Let's go ahead and

19  read the first sentence, just to get kind

20  of familiarized with this article.

21                It says, "As heroin

22  becomes" -- excuse me.

23                It reads, "As heroin has

24  become more potent and more accessible in
```

```
 1    the Pittsburgh area, paramedics and

 2    police in Monroeville have found

 3    themselves increasingly dealing with

 4    overdoses and crimes related to the

 5    opiate."

 6              Did I read that correctly?

 7              MR. KOBRIN:  Object to form.

 8              THE WITNESS:  Yes.

 9    BY MR. HARRIS:

10         Q.    Let's read the next

11    sentence.  "Heroin-related deaths in

12    Allegheny County increased from 62 in

13    2008 to 95 in 2011, according to the

14    Office of Allegheny County Medical

15    Examiner," correct?

16         A.    Yes.

17         Q.    Let's go ahead and turn to

18    Page 2.  If you go about three-quarters

19    of the way down, there's a sentence that

20    says, "Heroin addiction takes hold

21    quickly."

22              Do you see that?

23         A.    I do.

24         Q.    Okay.  Right after that, it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    says, "'It's easily addictive after a

 2    couple doses,' said Dr. Tim Muchnok,

 3    staff physician in the emergency room at

 4    Forbes Regional Hospital in Monroeville."

 5              Do you see that?

 6         A.    I do.

 7         Q.    All right.  And the last

 8    part, "'Heroin is one of the most

 9    addictive medications out there,'"

10    correct?

11              MR. KOBRIN:  Object to form.

12    BY MR. HARRIS:

13         Q.    Is that what that says,

14    Mr. Shaheen?

15         A.    That's what -- that's what

16    that says.

17         Q.    Okay.  Were you aware of

18    this information when you were an agent

19    with the Pennsylvania AG's office?

20         A.    I didn't do any heroin or

21    investigations with any illicit drugs,

22    okay.

23         Q.    Okay.  My question was, if

24    you were aware that heroin was addictive.
```

```
 1              A.    And -- well, yeah, that's --
 2    I was -- and based on -- based on
 3    investigations, yes.  Do I -- have I
 4    heard or have knowledge that heroin is
 5    addictive?  Yes.
 6              Q.    Let's turn to the third page
 7    of this article, the section that starts
 8    off saying, "Gateway Rx."
 9              A.    Okay.
10              Q.    Were you able to find that
11    spot?
12              A.    Yes.
13              Q.    Do you understand Rx to mean
14    prescription?
15              A.    We use it synonymously.  We
16    use it as pharmacy.  We use it as
17    prescription.
18              Q.    Okay.  So prescription is at
19    least one of the ways that you would read
20    Rx?
21              A.    Yes.
22              Q.    All right.  Let's go ahead
23    and read this first sentence.  "For many,
24    the addiction starts with prescription
```

Highly Confidential - Subject to Further Confidentiality Review

1    drugs, such as Vicodin and OxyContin,

2    that contain the same narcotic found in

3    heroin, said Richard Shaheen, senior

4    supervisory special agent for the

5    Pennsylvania Attorney General."

6              Do you see where it says

7    that?

8         A.    I do.

9         Q.    And is that Richard Shaheen,

10   is that you?

11        A.    That's me.

12        Q.    Okay.  So do you agree that

13   addiction starts with prescription drugs

14   for many people?

15        A.    It is possible that -- yes,

16   to your question, it is possible.

17        Q.    Well, you didn't say it's

18   possible in this interview in 2012; is

19   that correct?

20              MR. KOBRIN:  Object to form.

21        This isn't a quotation here.

22              THE WITNESS:  I am saying it

23        is possible.

24   BY MR. HARRIS:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Let's go ahead and

2    continue.

3              "Prescription drugs have

4    overtaken marijuana as the drug type most

5    often abused by middle school students,

6    said Shaheen, who specializes in

7    community outreach programs aimed at

8    middle school and high school students."

9              Did I read that correctly?

10    A.    You did read that, yes.

11    Q.    Okay.  Do you agree that

12    prescription drugs at that time had

13    overtaken marijuana as the drug type most

14    often abused by middle school students?

15    A.    Based on information that we

16    have received during that time period in

17    question that you're referring to, that

18    was the information we would have

19    received when we go out to schools to

20    share information with parents.

21    Q.    So the simple answer to my

22    question is yes?

23              MR. KOBRIN:  Object to form.

24              THE WITNESS:  When I did

Highly Confidential - Subject to Further Confidentiality Review

```
 1            outreach, oftentimes when I got

 2            called into schools, parents, law

 3            enforcement, and whoever we were

 4            meeting with at the time would

 5            share that information, provide

 6            that information, and we would

 7            share that information to the

 8            group who we were addressing.

 9    BY MR. HARRIS:

10            Q.    You wouldn't share

11    information you believed to be wrong; is

12    that right?

13            A.    I would not share

14    information that I believed to be wrong.

15            Q.    Okay.  So based on the

16    information that you would have received

17    in 2012, do you agree that prescription

18    drugs at that time had overtaken

19    marijuana as the drug type most often

20    abused by middle school students?

21            A.    Oftentimes is -- like I

22    said, if I went to a school and I was

23    provided information, what is happening

24    in that particular area, I would share
```

1    that information that is provided to me.

2            So in Monroeville or that

3    general area, if I was given that

4    information, that's the information that

5    I would share.

6        Q.    Would that be the same

7    information that you believed?

8        A.    If it's -- if it's provided

9    to me in an accurate manner -- if it was

10   provided to me in an accurate manner.

11       Q.    If it was provided to you in

12   an accurate manner then, yes, it would be

13   information that you believe?

14       A.    It's what I believed from

15   law enforcement, from parents in that

16   community who was sharing that

17   information to me.

18       Q.    So if it was provided to you

19   by law enforcement, that would lend it

20   some more credibility?

21            MR. KOBRIN:  Object to form.

22            THE WITNESS:  I don't

23       believe law enforcement would

24       provide me with false information,

Highly Confidential - Subject to Further Confidentiality Review

```
 1              nor would I think the parents

 2              provide me with the false

 3              information.

 4    BY MR. HARRIS:

 5         Q.    Okay.  Let's continue down a

 6    little bit further.  Do you see the

 7    sentence that starts with, "Once someone

 8    begins"?

 9              It says, "Once someone

10    begins using prescription opiates, the

11    jump to heroin simply is a matter of

12    economics, some experts say."  Then the

13    line after that says, "Penn Hills Police

14    Chief Howard Burton said the demand for

15    heroin is fueled by the fact it's cheaper

16    than prescription drugs."

17              Do you see where it says

18    that?

19         A.    I do.

20         Q.    So you don't believe Penn

21    Hills Police Chief Howard Burton would

22    provide false information, right?

23              MR. KOBRIN:  Object to form.

24              THE WITNESS:  I don't
```

```
 1          believe he would --

 2   BY MR. HARRIS:

 3          Q.    You can go ahead,

 4   Mr. Shaheen.

 5          A.    I don't believe that he

 6   would provide false information.

 7          Q.    All right.

 8               MR. HARRIS:  You can close

 9          that section of the binder.  We've

10          got some other topics that we'll

11          cover.

12   BY MR. HARRIS:

13          Q.    So when you left the

14   Pennsylvania AG's office in 2013, how did

15   you come to be employed by Giant Eagle?

16          A.    Yes.  I left in -- in 2013.

17   My office was located near a Giant Eagle

18   pharmacy.  We got a call from Giant Eagle

19   pharmacist who started to identify a

20   problem with a particular physician.  And

21   they contacted me and the diversion unit.

22   I believe they also contacted DEA.

23               We started an investigation,

24   subsequently arrested the doctor.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   And they asked for my

 2    resumé, and I gave them my resumé.  And

 3    they sent it over to the director of loss

 4    prevention and he called me up, and we

 5    started to talk about a possible position

 6    with Giant Eagle.  And I subsequently got

 7    hired maybe a year later in 2013.

 8         Q.    In 2013, when you were

 9    hired, was there any training for your

10    position that you received?

11         A.    Yes.

12         Q.    Do you remember what that

13    training entailed?

14         A.    I -- somewhat.  I worked

15    with pharmacy district leaders.  They

16    would take me out, and, you know, we

17    would go into the pharmacies.  They would

18    explain things, how it was, you know, how

19    pharmacy progression was moving.

20                   I also went with the loss

21    prevention representatives, started to

22    get educated on the cameras, started to

23    get educated on the locks, who do we call

24    about things.  You know, panic alarms,
```

1    that was another thing is, you know,

2    working on the panic alarms, showing me

3    where they were located, how we utilize

4    things like that.

5              And then I also met with

6    some people that were in the, you know,

7    pharmacy, the background workers, if you

8    will, and show me some of the software

9    programs and things that they were using.

10             And then started to forge my

11   own path to do what I do.

12        Q.   Did you kind of create your

13   position, or did it exist before you got

14   there?

15        A.   It did not exist before I

16   got there.

17        Q.   If I'm not mistaken, and

18   please correct me if I am, when you were

19   first hired, what was -- what was the

20   title when you were first hired?

21        A.   Pharmacy investigator.

22        Q.   Okay.  So there were no

23   pharmacy investigators pre-2013 that

24   you're aware of hired by Giant Eagle?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Not by title.  Now, they did

 2   have the loss prevention representative

 3   who would go into the stores and help

 4   wherever was needed, whether it was

 5   grocery, whether it was pharmacy, or

 6   whether it was our GetGos.

 7        Q.    So loss prevention in that

 8   fashion, is that more related to making

 9   sure that the Giant Eagle company doesn't

10   lose money based on loss?

11             MR. KOBRIN:  Object to form.

12             THE WITNESS:  Yeah, can you

13        repeat that?

14   BY MR. HARRIS:

15        Q.    Sure.  You mentioned that

16   there were loss prevention

17   representatives, correct?

18        A.    Yes.

19        Q.    But that wasn't solely just

20   for the pharmacies, rather it was for the

21   entire Giant Eagle store as a whole,

22   right?

23        A.    Yes.  But it included

24   pharmacy.
```

```
 1            Q.    Okay.  Fair enough.  It

 2    includes pharmacies.  Was their primary

 3    goal to prevent loss so that the company

 4    would not lose money?

 5                  MR. KOBRIN:  Object to form.

 6                  THE WITNESS:  Well, there is

 7            a lot of goals.  I mean, they were

 8            doing safety.  You know, like I

 9            told you, when I talk about

10            safety, you know, you're talking

11            about, you know, camera coverage,

12            you are talking about the alarms,

13            you are talking about checking

14            valves and everything that's

15            functional in a store, making sure

16            that -- you know, and keeping up

17            to date with state and federal

18            regulations.

19                  You know, if there was an

20            issue that there was some type of

21            loss, they would investigate that

22            loss, whether it was pharmacy,

23            whether it was grocery side,

24            whether it was cash, whether it
```

Highly Confidential - Subject to Further Confidentiality Review

1          was product.

2     BY MR. HARRIS:

3          Q.    Okay.  You mentioned that

4     part of the training would detail state

5     and federal regulations.  When you were

6     being trained as a pharmacy investigator,

7     were you made aware of any state or

8     federal regulation that would apply to

9     what you were investigating?

10         A.    Well, you know I didn't --

11    that's kind of -- to me that's a vague

12    question.  So if I'm doing an

13    investigation, can you be maybe more

14    specific, and I can answer that question

15    more directly?  That was kind of vague to

16    me.

17         Q.    Absolutely.  I would love

18    the right answers.

19              When you were trained at

20    Giant Eagle, were there any statutes,

21    either state or federal, that you were

22    made aware of that would apply to your

23    investigations of pharmacies?

24         A.    They had all kind of

Highly Confidential - Subject to Further Confidentiality Review

```
 1   statutes and litigations.  There was

 2   procedures, policies, you know, that we

 3   had to adhere to no matter what we were

 4   doing, whether it was me doing an

 5   investigation, or our pharmacies, you

 6   know, providing medications and, you

 7   know, receiving, shipping, dispensing.

 8   Yes.

 9        Q.    Are you familiar with the

10   Controlled Substances Act?

11        A.    Yes, I'm familiar.

12        Q.    What's your level of

13   familiarity with the Controlled

14   Substances Act?

15             MR. KOBRIN:  Object to form.

16             THE WITNESS:  Again, I need

17        you to be more specific to that.

18   BY MR. HARRIS:

19        Q.    Sure.  Well, you just said

20   that you had to know statutes that were

21   related to your pharmacies providing

22   medications, receiving, shipping and

23   dispensing those, yes.

24             Are you referring to the
```

Highly Confidential - Subject to Further Confidentiality Review

1  Controlled Substance Act when you

2  mentioned those elements?

3         A.    Well, that's -- mostly I'm

4  mentioning to the procedures that we had

5  in place.

6         Q.    Okay.  Do you understand the

7  Controlled Substance Act is the law that

8  regulates the legitimate distribution

9  chain of controlled substances?

10        A.    I'm not familiar --

11        Q.    With what?

12        A.    -- with the last portion of

13 your question.

14        Q.    Okay.  Do you know -- do you

15 know what the legitimate distribution

16 chain of controlled substances is?

17        A.    I don't -- no, I would

18 need -- no, I don't.

19        Q.    Okay.  Let's walk through it

20 then.

21              Giant Eagle does not make

22 their controlled substances, do they?

23        A.    No.

24        Q.    All right.  Are you familiar

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with the term "manufacturers"?

 2         A.    Yes.

 3         Q.    Okay.  And you know, since

 4    this case is revolving around opioids, my

 5    questions are going to be primarily about

 6    opioid products.  There may be some

 7    documents we look at that have non-opioid

 8    products.  But just so you know, that's

 9    kind of what I'm focusing on.  Does that

10    make sense?

11         A.    Yes.

12         Q.    Okay.  All right.  So opioid

13    manufacturers would be companies like

14    Purdue or Johnson & Johnson or Allergan.

15              Are you familiar with those

16    companies?

17         A.    Yes.

18         Q.    Okay.  And you understand

19    those companies to make opioids, correct?

20         A.    They -- yes.

21         Q.    All right.  And once those

22    are made, they often go to what's called

23    a distributor.  Have you ever heard the

24    term distributor?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Okay.  Those would be

3   companies like McKesson and

4   AmerisourceBergen and Cardinal Health,

5   and there's companies like Anda.  Are you

6   familiar with those companies?

7        A.    Yes.

8        Q.    All right.  What a

9   distributor often does is, once they get

10  the pills, the opioids, from the

11  manufacturers, they will distribute them

12  to chain pharmacies, wholesale

13  pharmacies, retail pharmacies, and the

14  like.  Are you familiar with that

15  process?

16       A.    Yes.

17       Q.    Okay.  And in that chain --

18  excuse me, in that way, as a pharmacy,

19  you would agree that Giant Eagle is a

20  wholesaler, correct?

21            MR. KOBRIN:  Object to the

22       form.

23            THE WITNESS:  We only -- we

24       only provide for our own stores.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HARRIS:
 2        Q.    Okay.  Fair enough.  So you
 3   only provide -- so you only get pills for
 4   your own pharmacies; is that right?
 5        A.    Correct.
 6        Q.    Do you get your pills
 7   directly from the distributors?
 8             MR. KOBRIN:  Are we using
 9        pills now to include all opioids
10        or --
11             MR. HARRIS:  Okay.  Fair
12        enough.
13   BY MR. HARRIS:
14        Q.    Let me re-ask that question.
15        A.    Yeah.
16        Q.    Do you receive all of your
17   opioids from distributors?
18        A.    When you're referring to --
19   what are you referring to as
20   distributors?
21        Q.    The companies that I just
22   mentioned.  You indicated that you
23   understood so far where we were in the
24   legitimate distribution chain.
```

1  Distributors would be companies such as

2  McKesson and Anda.  Do you know if Giant

3  Eagle received opioids from companies

4  like McKesson and Anda?

5       A.    Yes, we received some of

6  them from them.

7       Q.    Okay.  You said some.  Where

8  do you receive the rest of your opioids

9  from?

10      A.    Giant Eagle has a vault in

11 our warehouse, in one of our warehouses.

12      Q.    Okay.  But once you receive

13 the opioids from either your vault or the

14 distributors, and then it goes to the

15 Giant Eagle pharmacies; is that correct?

16      A.    Correct.

17      Q.    From the Giant Eagle

18 pharmacies, that's where customers come

19 in, provide their prescription, and get

20 it filled by the Giant Eagle pharmacist,

21 correct?

22      A.    Correct.

23      Q.    All right.  So going back to

24 the Controlled Substance Act -- and I may

```
 1   refer to it as CSA, but if you need me to

 2   clarify what I mean by that, let me know.

 3              So going back to the

 4   Controlled Substance Act, do you now

 5   understand that that is the law that

 6   regulates the legitimate distribution

 7   chain of controlled substances, including

 8   opioids?

 9              MR. KOBRIN:  Object to form.

10              THE WITNESS:  I do

11        understand.

12   BY MR. HARRIS:

13        Q.    Okay.  All right.  Are you

14   familiar with the term "closed system of

15   distribution"?

16        A.    No.

17        Q.    Okay.  A closed system of

18   distribution is when opioids are

19   distributed within the lawful parameters,

20   meaning -- of the Controlled Substance,

21   Act, meaning it goes from manufacturer to

22   distributor to pharmacy to customer.

23              Does that make sense?

24              MR. KOBRIN:  Object to form.
```

```
 1                THE WITNESS:  Yes.
 2   BY MR. HARRIS:
 3        Q.    So with that understanding
 4   of what a closed system is, do you agree
 5   that a closed system should reduce --
 6   well, let me -- let me strike that.
 7                Do you -- have you ever
 8   heard of the term "diversion"?
 9        A.    In what term?  I don't know
10   what you're referring to, so no.
11        Q.    Okay.  Related to the
12   Controlled Substance Act, have you ever
13   heard diversion of controlled substances?
14        A.    Oh, I'm sorry.  I
15   misunderstood.
16                Diversion?  Have I ever
17   heard the term "diversion"?
18        Q.    Yes, sir.  What do you --
19        A.    Yes.
20        Q.    Sorry.  What do you
21   understand diversion to mean?
22        A.    Well, if you're referring to
23   medications not going to a -- from a
24   warehouse to a pharmacy, that medication
```

Highly Confidential - Subject to Confidentiality Review

```
1    ended up somewhere else.

2              So if that's what -- because

3    that's a broad stroke what you're asking.

4    Diversion can be, you know, other things.

5              But, you know, in general,

6    if you're talking about a warehouse that

7    didn't deliver the medications and

8    allegedly they sent it, and it didn't

9    make it there.

10        Q.    Okay.  That's one example of

11   diversion.  Let's talk about diversion

12   with pharmacies.  You agree that theft of

13   controlled substances can contribute to

14   diversion, correct?

15        A.    Did you say theft?

16        Q.    Yes, sir, I did.

17        A.    Yes, it can.

18        Q.    You agree selling controlled

19   substances without a valid prescription

20   would contribute to diversion, correct?

21        A.    Yes.  That can happen, yes.

22        Q.    Okay.  And in your time

23   investigating with the Pennsylvania AG's

24   office and in your time as a pharmacy
```

1    investigator with Giant Eagle, do you

2    believe it's a good thing to prevent

3    diversion?

4         A.    I think we do a great job at

5    preventing -- at Giant Eagle at

6    preventing any type of diversion.  I'm

7    very confident in our -- in what we do.

8         Q.    Okay.  I'm glad to hear

9    that, but that wasn't my exact question.

10   So let me go ahead and re-ask it for you.

11             Do you, Richard Shaheen,

12   believe it's a good thing to prevent

13   diversion?

14        A.    And that's what I'm saying..

15   I think we do.

16        Q.    Mr. Shaheen, that's not my

17   question.  So today is going to go a lot

18   more smoothly if you listen to my

19   question and answer my question.  Okay?

20             I'm going to ask it one more

21   time?

22             Do you believe it's a good

23   thing to prevent diversion?

24        A.    I think we do that very well

```
1    at Giant Eagle.  That's my answer to you.
2         Q.   We are going to go through
3    what Giant Eagle does throughout today.
4    So I assure you that you'll have more
5    opportunities to ask that.  I'm not
6    asking you what Giant Eagle does or does
7    not do related to diversion.
8              I'm asking you, do you
9    believe it is good and important to
10   prevent diversion?
11        A.   We have --
12        Q.   It's a simple yes or no
13   question, Mr. Shaheen.  Is it good to
14   prevent diversion?
15        A.   I believe what we have and
16   what we put in place and what we have at
17   Giant Eagle is exactly that, that we
18   have -- we have those procedures and
19   whatnot in place.  We do a very good job
20   at that.
21             MR. HARRIS:  Okay.  I'm
22        going to move to strike that
23        answer as nonresponsive.
24   BY MR. HARRIS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Mr. Shaheen, listen to my

 2   question very closely, okay?

 3               My question to you is very

 4   simple.  It is a yes/no question.

 5               Do you believe it is

 6   important to reduce diversion?

 7               MR. KOBRIN:  Object to form.

 8        It's not necessarily asking a

 9        question, but you can answer the

10        question.

11               THE WITNESS:  Do I

12        believe -- any type of laws like

13        that, I believe it's important.

14   BY MR. HARRIS:

15          Q.   It is important.  And it's

16   important so that these middle school

17   children that we read about in that

18   article don't get their hand on

19   prescription drugs, including opioids;

20   isn't that right?

21               MR. KOBRIN:  Object to form.

22               THE WITNESS:  And that's why

23        when we talk to parents, we give

24        them the ability to understand how
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              maybe their kids will get it.

 2                   MR. KOBRIN:  Did you finish,

 3              Rick?  You cut out there for a

 4              second.  I didn't hear the end of

 5              that.  I didn't know if you were

 6              finished.

 7   BY MR. HARRIS:

 8         Q.   Was there any more to your

 9   answer, Mr. Shaheen?

10         A.   No.  I gave you my answer.

11         Q.   Okay.  Are you okay with

12   middle school children having their hands

13   on prescription drugs?

14         A.   I don't --

15                   MR. KOBRIN:  Objection to

16              form.  I'd ask that you rephrase

17              that, Mr. Harris.

18                   MR. HARRIS:  I'm not going

19              to.

20   BY MR. HARRIS:

21         Q.   Mr. Shaheen, are you okay

22   with middle school children having their

23   hands on prescription drugs?

24                   MR. KOBRIN:  Object to form.
```

```
 1          Argumentative.  Inappropriate.

 2              You can answer if you can,

 3       Rick.  It's a pretty clear answer.

 4              THE WITNESS:  No, I'm not

 5       okay.

 6  BY MR. HARRIS:

 7       Q.    Okay.  Great.  So it's

 8  important to reduce diversion to make

 9  sure the number of pills out on the

10  streets for kids is lessened; isn't that

11  right?

12       A.    And that's what I said.

13  We're doing that on a daily basis at

14  Giant Eagle.  I don't -- you want me to

15  answer something that I'm telling you

16  what we do.

17       Q.    I want you to answer yes or

18  no.  It's a very simple question,

19  Mr. Shaheen.  It's important to make sure

20  that prescription drugs stay within the

21  lawful course of where they need to be

22  and do not fall outside a system of

23  closed distribution; isn't that right?

24       A.    Every prescription drug.
```

```
 1          Q.    Perfect.  Great.  Thank you.

 2                Okay.  Do you agree that

 3     even one pill falling outside the lawful

 4     area where it should be is an example of

 5     diversion?

 6          A.    It could be.

 7                MR. KOBRIN:  Object to form.

 8     BY MR. HARRIS:

 9          Q.    Okay.  So -- so even if one

10     opioid were to not be delivered to a

11     pharmacy or be stolen from a pharmacy or

12     be prescribed without a valid

13     prescription, that can be an example of

14     diversion, right?

15                MR. KOBRIN:  Object to form.

16                THE WITNESS:  Well, you'd

17           have to -- you'd have to do that

18           investigation and see where it

19           ended up.  Was it a broken pill?

20           Did it get thrown in the garbage?

21           Did something happen to it?  You'd

22           have to look into that.

23                Depending on what happened,

24           that would be the answer.
```

```
 1   BY MR. HARRIS:

 2        Q.    Okay.  Do you believe there

 3   is an opioid epidemic in this country?

 4             MR. KOBRIN:  Object to form.

 5             THE WITNESS:  I think the

 6        problem with opioids have --

 7        have -- are being addressed, have

 8        gotten better.

 9             Did we have -- you know, did

10        we have people that were taking

11        opioids or being prescribed

12        opioids by doctors?  Yes to all

13        that.

14             To a -- I wouldn't say

15        epidemic.  Did we have somewhat of

16        a problem with opioids, yeah we

17        were -- we were not only in the

18        law enforcement world but in the

19        other communities, I think

20        everybody now has gotten together

21        and understands the problem a lot

22        better.

23   BY MR. HARRIS:

24        Q.    So just to be clear, your
```

1   testimony for this jury is no, you do not

2   believe there was an epidemic, but you

3   would say that we had somewhat of a

4   problem with opioids; is that correct?

5           MR. KOBRIN:  Object to form.

6       Misrepresents his testimony.

7           THE WITNESS:  Yes, we did

8       have -- we did have a problem.

9       And it's still being addressed.

10  BY MR. HARRIS:

11      Q.   Do you believe that

12  diversion of opioids has contributed to

13  that problem with opioids in this

14  country?

15      A.   Please repeat.

16          MR. KOBRIN:  Object to form.

17  BY MR. HARRIS:

18      Q.   Absolutely.  Do you believe

19  that diversion of opioids has contributed

20  to the problem with opioids in this

21  country?

22          MR. KOBRIN:  Object to form.

23          THE WITNESS:  Yes, if -- if

24      medication is prescribed -- and it

Highly Confidential - Subject to Further Confidentiality Review

```
 1              goes back to the beginning too.
 2              If it's not taken appropriately or
 3              used not appropriately, it could
 4              add to that.
 5    BY MR. HARRIS:
 6              Q.    If they're stolen, it can
 7    add to that as well, the problem?
 8              A.    If stolen, it could add to
 9    that problem.
10              Q.    Okay.  If there -- strike
11    that.
12                    If prescriptions are filled
13    without valid prescriptions, can that
14    contribute to the problem?
15                    MR. KOBRIN:  Object to form.
16                    THE WITNESS:  Again, yes, if
17              it's not written accordingly and
18              taken appropriately.
19    BY MR. HARRIS:
20              Q.    Okay.  Well, I'm asking you
21    about fraudulent prescriptions.
22                    So if an order for opioids
23    is filled with a fraudulent prescription,
24    that's not taken appropriately, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    If a prescription was not
 2  written appropriately by a doctor.
 3         Q.    Meaning if it was forged?
 4         A.    Correct.
 5         Q.    Or fraudulent?
 6         A.    Yes.
 7         Q.    Okay.  So a forged or
 8  fraudulent prescription is not an
 9  appropriate use of opioids, correct?
10              MR. KOBRIN:  Object to form.
11              THE WITNESS:  Right.  It's
12         not the proper way, obviously, of
13         attaining medication.
14  BY MR. HARRIS:
15         Q.    Okay.  And then fraudulent
16  prescriptions should not be filled,
17  correct?
18         A.    If a fraudulent prescription
19  is determined, they won't be filled.  If
20  you -- if you determine a prescription is
21  fraudulent, you know, there's not a
22  pharmacist out there, I believe, that
23  would fill that.
24         Q.    That wasn't exactly my
```

```
 1   question.  So if you'll please listen

 2   again.  A fraudulent prescription should

 3   not be filled, correct?

 4             I'm not asking whether it's

 5   identified or who's identifying it.  I'm

 6   just asking the simple question.

 7             A fraudulent prescription

 8   should not be filled.  We can agree to

 9   that, right?

10        A.   If you know it's fraudulent,

11   I agree with you.

12        Q.   Okay.  Now, Giant Eagle is

13   not a national chain; is that right?

14        A.   Correct.

15        Q.   As far as -- my

16   understanding is they cover five states,

17   Ohio, Pennsylvania, West Virginia,

18   Maryland, and I believe they have a

19   couple stores in Indiana; is that

20   correct?

21        A.   Correct.

22        Q.   Okay.  If you want to go

23   ahead and pull that binder out that I

24   gave you.  We're going to look at another
```

```
 1   document now.   It's going to be, I

 2   believe, the last tab, Tab 73.

 3              (Document marked for

 4         identification as Exhibit

 5         Shaheen-2.)

 6              MR. HARRIS:  For the record,

 7         this was produced as P-HBC-01359.

 8         And we can label this as

 9         Shaheen-2.

10              MR. KOBRIN:  We're skipping

11         2 through 72, right, Josh.

12              MR. HARRIS:  Yeah.  Going

13         straight to 73.  And I'll tell you

14         why I'm pointing that out.

15              That is -- we're going

16         straight to 73.  If y'all want to

17         pull that out from the binder,

18         we'll discuss it with the witness.

19              But this is a pharmacy and

20         store list that lists out the

21         stores.  So we'll be referring to

22         it throughout the day.

23              So if you want to take it

24         out for ease of access, so you
```

```
 1            don't have to flip through that

 2            entire binder all day, I'm okay

 3            with that.

 4    BY MR. HARRIS:

 5            Q.    Does that make sense,

 6    Mr. Shaheen?

 7            A.    It does.

 8            Q.    Okay.  So whenever you have

 9    that pulled out and you're able to look

10    at the first page.  Realistically, I only

11    plan on referring to the first five

12    pages, if that makes it even easier.

13                 MR. KOBRIN:  This is going

14            to be Exhibit 2 then?

15                 MR. HARRIS:  Yes.  This will

16            be Shaheen-2.

17                 THE WITNESS:  How many pages

18            did you say?

19    BY MR. HARRIS:

20            Q.    Well, the whole document

21    covers approximately 24.  But if you

22    look, the first six -- I apologize -- and

23    they're labeled at the bottom, are the

24    ones that I'm going to be referring to
```

Highly Confidential - Subject to Further Confidentiality Review

1    throughout the day.  But let's go ahead

2    and start with Page 1, okay, Mr. Shaheen?

3    You got that document in front of you?

4         A.    Yes.

5              MR. KOBRIN:  If you have a

6         binder clip, I think you might

7         want to -- I'm going to clip the

8         whole thing, just because it is a

9         lot of pages.  I don't want it to

10        get loose.

11             MR. HARRIS:  Yeah, that's

12        fine.  I only intend to refer to

13        the first six pages.  So if you

14        want to put the other 20 off to

15        the side, however y'all want to do

16        it.

17             MR. KOBRIN:  Are the other

18        20 related, or do you know what

19        they are?

20             MR. HARRIS:  Yeah, I know

21        what they are, but I don't need

22        them though.

23             MR. KOBRIN:  Okay.  I just

24        want to make sure that we don't

Highly Confidential - Subject to Further Confidentiality Review

```
 1              throw them aside and ignore them

 2              if they're relevant at all.

 3                   MR. HARRIS:  Yeah, if I

 4              refer to anything on those, I'll

 5              let y'all know so you can grab

 6              them again.

 7    BY MR. HARRIS:

 8         Q.    All right.  Mr. Shaheen,

 9    let's look at the top of Page 1 here.  Do

10    you see the blue bar on HBC-1359, labeled

11    as Shaheen-2 now?

12         A.    Yes.

13         Q.    All right.  So this is --

14    this is a list of the pharmacies and the

15    stores that Giant Eagle owns.  Is that

16    fair to say?

17         A.    I'm just looking at all the

18    pages to make sure.

19         Q.    Absolutely.

20                   MR. KOBRIN:  I don't know if

21              you got my objection.  Object to

22              form.  Lack of foundation.

23                   THE WITNESS:  Okay.

24    BY MR. HARRIS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    All right.  So would you
 2   agree that this is a list of Giant Eagle
 3   stores and pharmacies?
 4          A.    Yes.
 5          Q.    All right.  Let's look at
 6   that top blue bar now.   If we see, the
 7   first column says "Pharm No.," standing
 8   for pharmacy number.
 9               Do you see where it says
10   that?
11          A.    I do.
12          Q.    Then it says "Store No.,"
13   standing for store number, "Short Name,"
14   and it gives the physical location,
15   including the territory.
16               Do you see all those?
17          A.    I do.
18          Q.    All right.  So what I intend
19   to do today is we're going to be looking
20   at report from pharmacies.  I'd like to
21   you keep this ready so that way we can
22   see where these pharmacies are located.
23   Okay?
24          A.    Okay.
```

```
 1          Q.   All right.  You can set that
 2   off to the side for now.   Let's go ahead
 3   and go through this.
 4               You would agree that in
 5   these pharmacies that are on this list,
 6   Giant Eagle dispenses controlled
 7   substances; is that right?
 8          A.   Yes.
 9          Q.   Okay.  And because you are
10   dispensing controlled substances, Giant
11   Eagle is required to follow the
12   Controlled Substance Act.  Do you agree
13   with that?
14               MR. KOBRIN:  Object to form.
15          It is a legal conclusion.
16               THE WITNESS:  Yes.
17   BY MR. HARRIS:
18          Q.   Okay.  Have you ever heard
19   of a suspicious order monitoring system?
20          A.   Yes.
21          Q.   What is your understanding
22   of what a suspicious order monitoring
23   system, or SOMS for short, is?
24          A.   Limited.  But it is
```

```
 1   basically orders from a warehouse to a

 2   pharmacy.

 3           Q.    When you were first employed

 4   by Giant Eagle, did they have a

 5   suspicious order monitoring system in

 6   place?

 7           A.    I'm not sure.

 8           Q.    Okay.  Do you know if they

 9   have one in place today?

10           A.    I believe they do.

11           Q.    Okay.  Reporting suspicious

12   orders, is that a requirement under the

13   Controlled Substance Act?

14              MR. KOBRIN:  Object to form.

15           Seeks a legal conclusion.  Do you

16           want to show him the CSA or --

17              THE WITNESS:  I don't know.

18           I'd have to -- I'd have to see it.

19              Is it under the DEA?   Is

20           it -- what do you -- do you have a

21           document for me to see so I can

22           acknowledge that?

23   BY MR. HARRIS:

24           Q.    No, sir.  I'm just asking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you, based upon your understanding of the

 2   Controlled Substance Act, is reporting

 3   suspicious orders required?

 4             MR. KOBRIN:  Object to form.

 5             THE WITNESS:  I'm not sure.

 6             MR. KOBRIN:  I think he's

 7        already said that his knowledge of

 8        the Controlled Substance Act is

 9        limited.

10             MR. HARRIS:  Thanks for

11        that.  Thank you, Counsel.

12   BY MR. HARRIS:

13        Q.   Drawing --

14             MR. KOBRIN:  Mr. Harris, I'm

15        not going to be obstructionist.

16        And I think my objections have

17        been pretty reasonable.  But if

18        you do interrupt them, we are

19        going to burn a lot of time on

20        that because that, I'm not going

21        to -- I'm not going to condone.

22             So just let me get my

23        objection out.  And I'll let you

24        move on.  I'll allow you ask the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         question.  I'll allow him to

 2         answer it.

 3              But don't try and cut my

 4         objections short.  I'd appreciate

 5         that.

 6              MR. HARRIS:  Well, assuming

 7         they state objection to form, then

 8         we should not have issues

 9         throughout the day.

10              MR. KOBRIN:  Mr. Harris, I

11         haven't met you in the case.  So

12         you may not know, there is

13         actually an order on that in this

14         case from the Special Master that

15         says we're allowed to explain our

16         objections in short form.

17              I'm not going to waste a lot

18         of time.  I'm not looking to be

19         obstructionist.  I'm not trying to

20         give you a hard time here.  But I

21         am going to get my objection on

22         the record.

23              And my objection was he said

24         he had limited knowledge of the
```

```
 1          SOMS and the Controlled Substance
 2          Act.
 3               So I object to form about
 4          getting into detail on these
 5          issues.
 6               MR. HARRIS:  Anything else?
 7          Or am I good to ask a question?
 8               MR. KOBRIN:  You're good.
 9          Thank you.
10  BY MR. HARRIS:
11          Q.   Mr. Shaheen, Giant Eagle did
12  not have a SOMS policy until August 2014;
13  is that correct?
14               MR. KOBRIN:  Object to form.
15               THE WITNESS:  A what?
16  BY MR. HARRIS:
17          Q.   A SOMS, suspicious order
18  monitoring system?
19          A.   I don't know that.
20               MR. KOBRIN:  Object to form.
21          Facts not in evidence.
22  BY MR. HARRIS:
23          Q.   Okay.  And the chain of
24  distribution and dispensing, do you agree
```

1    that Giant Eagle relies heavily on their

2    pharmacists as a last line of defense?

3                MR. KOBRIN:  Object to form.

4                THE WITNESS:  Medication

5          cannot leave a pharmacy unless a

6          pharmacist fills that medication.

7                We have other systems in

8          place leading up to that with the

9          end result of a pharmacist either

10         dispensing and then it being sold

11         out.  That's the protocol that we

12         follow.

13   BY MR. HARRIS:

14         Q.   Okay.  And you rely upon

15   your pharmacists to properly dispense

16   those controlled substances, including

17   opioids, correct?

18               MR. KOBRIN:  Object to form.

19         Mr. Shaheen relies upon them?

20         Giant Eagle does?

21               You can answer it.

22               THE WITNESS:  I was --

23         repeat.  I thought he was going to

24         say something.  Repeat.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KOBRIN:  I did too.
 2  BY MR. HARRIS:
 3       Q.    Okay.  Giant Eagle relies
 4  upon its pharmacists to properly dispense
 5  controlled substances, including opioids,
 6  correct?
 7       A.    Yes.
 8       Q.    Okay.  They play a key role
 9  in -- excuse me.  Strike that.
10              Pharmacists play a key role
11  by exercising their professional judgment
12  filling legitimate prescriptions,
13  correct?
14       A.    That is one of the things
15  they utilize.
16       Q.    Okay.  What are the other
17  things they utilize?
18       A.    Due diligence.
19       Q.    What does that term mean to
20  you?
21       A.    Again, it's a -- it's a
22  judgment term that pharmacists exercise
23  through their professional education.
24       Q.    Okay.  Are the pharmacists
```

```
 1    required to conduct due diligence?

 2          A.    Yes.

 3          Q.    By whom?

 4          A.    Themselves.

 5          Q.    Okay.  Are there any federal

 6    or state statutes that you're aware of

 7    that also impose that obligation?

 8          A.    I would have to look for

 9    that.  I'm not familiar.

10          Q.    Okay.  Now, your role within

11    the company is to train pharmacists to

12    keep tight control over the controlled

13    substances they dispense, correct?

14                MR. KOBRIN:  Object to form.

15                THE WITNESS:  No, I'm not

16          training pharmacists.  Do I work

17          with pharmacists to help them?

18          That's what I do.  I'm not

19          training them.

20    BY MR. HARRIS:

21          Q.    Okay.  Let's go ahead and go

22    to Tab 33.  This is going to be

23    P-HBC-01304.

24          A.    Tab what?
```

```
 1              Q.    33. Three-three.  Let me
 2     know when you get that.
 3              (Document marked for
 4              identification as Exhibit
 5              Shaheen-3.)
 6              MR. HARRIS:  While you're
 7              pulling that up, Mr. Shaheen, I'm
 8              just going to state for the record
 9              that the cover sheet on this
10              document indicated that this
11              was -- this presentation comes
12              from January 15th, 2015.
13              I don't believe there's a
14              date on this slide, so I want to
15              go ahead and put that out there
16              for the record.
17     BY MR. HARRIS:
18              Q.    Do you recognize this
19     presentation, Mr. Shaheen?
20              A.    I do.
21              Q.    Okay.  And we see here that
22     it has the Giant Eagle logo on the left.
23              Then it says, "Loss
24     prevention department."
```

```
 1                    Do you see that?

 2          A.    I do.

 3          Q.    And it has your name,

 4  Richard Shaheen, and your title, pharmacy

 5  investigator, right?

 6          A.    Yes.

 7          Q.    Is it safe to say this was a

 8  presentation that you created?

 9          A.    Yes.

10          Q.    Was this a presentation that

11  you would have presented to a group of

12  Giant Eagle employees, including

13  pharmacists and pharmacist techs?

14          A.    No.

15          Q.    Okay.  Who would you have

16  presented this to?

17          A.    Pharmacists.

18          Q.    So just the pharmacists, not

19  the techs.

20          A.    Correct.

21          Q.    Okay.  Thank you for that

22  clarification.  All right.  Let's go

23  ahead and go through this slide.  The

24  first slide -- or I guess the second
```

```
 1    technically after the cover page, starts

 2    with "Pharmacy/Loss Prevention Guide For

 3    the Master Trainer."

 4              Do you see that?

 5         A.    I do.

 6         Q.    And it lists the topics that

 7    are covered in this presentation,

 8    starting with drug diversion, right?

 9         A.    Yes.

10         Q.    And then it says, "Signs of

11    drug abuse within the pharmacy," correct?

12         A.    Correct.

13         Q.    And then it says

14    "Overprescribers"?

15         A.    Yes.

16         Q.    "Theft within the pharmacy"?

17         A.    Yes.

18         Q.    And continues on.

19              So let's go ahead and go

20    through this.  The next slide is titled

21    "What is Drug Diversion?"

22         A.    Mm-hmm.

23         Q.    It says, just for the

24    record -- was that mm-hmm, that was a
```

```
 1   yes, correct?

 2          A.    I'm sorry.  I'm sorry.

 3          Q.    That's okay.

 4                It says, "NADDI," N-A-D-D-I,

 5   "defines drug diversion as 'any criminal

 6   act involving a prescription drug.'"

 7                Do you see that?

 8          A.    Yes.

 9          Q.    So since you created this

10   PowerPoint, where did you get that

11   information from?

12          A.    NADDI.

13          Q.    Okay.  What is NADDI, for

14   the jury?

15          A.    National Association of Drug

16   Diversion Investigators.

17          Q.    Is that a professional

18   organization?

19          A.    I believe so.

20          Q.    Are you a member of NADDI?

21          A.    No longer.

22          Q.    So it sounds like you

23   previously were?

24          A.    Yes.  And not -- not during
```

1  the time period this was created.  But

2  when I was an agent I was a member, and

3  then one year at Giant Eagle, I think it

4  was.

5        Q.    Why did you leave?

6        A.    Oh, I didn't leave.  I just

7  never renewed.

8        Q.    Okay.  Why did you not

9  review?

10       A.    I just -- I just never

11  reviewed.  That's all.  Their meetings

12  are in Columbus, and I'm in Pittsburgh.

13       Q.    Okay.

14       A.    Yeah.

15       Q.    All right.  Let's go ahead

16  and go to the next page then.

17             It says, "Consequences

18  video."  And we see here, this is an

19  officer arresting what appears to be a

20  younger male; is that correct?

21       A.    Yes.

22       Q.    All right.  The next page is

23  titled, "Signs of abuse."  Excuse me, it

24  says, "Signs of drug abuse," right?

```
1          A.    Yes.

2          Q.    Now, is this related to

3    signs of drug abuse of Giant Eagle

4    employees?

5          A.    No, this -- this could be

6    anybody.

7          Q.    Okay.  Let's go through some

8    of these then.  The first signs of drug

9    abuse for what you say to be anybody, is

10   frequent breaks, right?

11         A.    Right.  Well, let me

12   clarify.  A portion of what is said is

13   for anybody.  But like, the breaks and

14   work station and call offs, that's

15   relevant to Giant Eagle.

16         Q.    Okay.  And this was

17   presented to Giant Eagle pharmacists,

18   correct?

19         A.    Correct.

20         Q.    Okay.  So this presentation

21   says that frequent breaks, leaving work

22   station, late for work/call offs, are

23   signs for drug abuse, right?

24         A.    Yes, it could be.  Mm-hmm.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    So you put the -- strike

 2    that.

 3                  Let's go to the next one,

 4    "Overprescribers."

 5                  Do you see this slide?

 6            A.    Yes.

 7            Q.    It says, "Follow the

 8    controlled substance dispensing

 9    guidelines."

10                  Do you see that?  What are

11    those?

12            A.    The -- there's a procedure

13    within Giant Eagle that is provided to

14    the pharmacists.

15            Q.    Okay.  What does that

16    procedure say?

17            A.    I would have to pull it out.

18    You'd have to show me.  There's several

19    things on it.

20            Q.    So even though you're

21    providing training on this, and you don't

22    have specific bullet points, you're not

23    aware of, sitting here today, what's

24    contained within the controlled substance
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   dispensing guidelines?

 2            MR. KOBRIN:  Object to form.

 3        That misrepresents his testimony.

 4        He actually included -- in his

 5        words, he said there's a lot in

 6        it.

 7   BY MR. HARRIS:

 8        Q.    You can go ahead and answer,

 9   Mr. Shaheen.

10        A.    They receive, they have

11   the -- the pharmacists have it.  Like I

12   said, you know, my training -- you could

13   call it training.  I mean, I'm -- it's a

14   familiarization.  Hey, don't forget, look

15   at your controlled substance dispensing

16   guidelines.  They have those.

17        Q.    Okay.  So you don't --

18        A.    No bullet points were

19   needed.  That's my emphasis.

20            MR. KOBRIN:  Hey, Josh,

21        before you ask another question,

22        can we take a break sometime soon?

23        We've been going for about an hour

24        and 20 minutes.
```

```
 1              MR. HARRIS:  Yeah, let me

 2         see.  Let's get through this

 3         document, and then we can take a

 4         break.

 5              MR. KOBRIN:  Are you okay

 6         with that, Mr. Shaheen?

 7              THE WITNESS:  Yeah.  The

 8         coffee is starting to work on me,

 9         but...

10    BY MR. HARRIS:

11         Q.   All right. Well, we'll move

12    through it.  It says, "Utilize

13    'corresponding responsibility.'"  And

14    corresponding responsibility in quotes.

15              Do you see that?

16         A.   Yes.

17         Q.   All right.  What is

18    corresponding responsibility?

19         A.   Well, it's -- a

20    corresponding responsibility, you know,

21    is to -- the doctor provides the

22    prescription.  It is then the

23    responsibility that the pharmacist has to

24    use their professional judgment for the
```

Highly Confidential - Subject to Further Confidentiality Review

1   validity of that prescription that the

2   physician wrote.

3        Q.    Okay.  Let go to the next

4   slide titled "Theft Within the Pharmacy."

5             Do you see this slide?

6        A.    Yes.

7        Q.    First bullet point says,

8   "Contact PI if theft is suspected."

9             Do you see where it says

10  that?

11       A.    Yes.

12       Q.    What is PI?

13       A.    Pharmacy investigator.

14       Q.    Okay.  And back in 2015,

15  that's what your role was?

16       A.    Yes.

17       Q.    Were there any other

18  pharmacy investigators employed by Giant

19  Eagle at that time?

20       A.    I'm not sure if Andrew was

21  hired at that point.

22       Q.    Other -- so understanding

23  your answer about Andrew, other than him

24  were there any others -- any other

```
 1   pharmacy investigators?

 2        A.    No.

 3        Q.    So at this point it was

 4   either just you or just you and Andrew?

 5        A.    Correct.

 6        Q.    All right.  Let's go to the

 7   next slide.  It says, "Best investment in

 8   America."

 9              The first bullet point says,

10   "180 oxycodone 30-milligram tablets."

11              Do you see where it says

12   that?

13        A.    Yes.

14        Q.    Underneath it, it says,

15   "$1 - street value $5,400."

16              What does that mean?

17        A.    This was provided to me by a

18   narcotic -- a narcotic agent

19   investigator, utilized to show what was

20   street value based on any type of sale

21   for that particular product or that drug.

22        Q.    Okay.  So oxycodone has a

23   high street value.  Would you agree?

24              MR. KOBRIN:  Object to form.
```

```
 1                  THE WITNESS:  Yes.

 2   BY MR. HARRIS:

 3        Q.    Okay.  The next one we see,

 4   "90 alprazolam, 2-milligram tablets,"

 5   with the same kind of sub-bullet point.

 6                  Do you see where it says

 7   that?

 8        A.    Alprazolam, yes.

 9        Q.    Okay.  And is that

10   representing the street value for

11   alprazolam?

12        A.    That was the information

13   that was provided to me, yes.

14        Q.    Let's go to -- I apologize.

15   These don't have page numbers on them.

16   But the page titled "Perpetual Log" at

17   the top.  Let me know when you get there,

18   Mr. Shaheen.

19        A.    Okay.

20        Q.    Okay.  It says, "Perpetual

21   log, tool used to keep an accurate count

22   of medications."

23                  Do you see where it says

24   that?
```

```
 1        A.    Yes.

 2        Q.    Was this a tool employed by

 3   your pharmacists to make sure that they

 4   could in fact keep an accurate count of

 5   medications?

 6        A.    I'm sorry.  Half of you

 7   broke up.  Would you please repeat?

 8        Q.    Absolutely.  The perpetual

 9   log, was that a tool actually used by

10   your pharmacists to keep an accurate

11   account of medications?

12        A.    Yes.  But they also had --

13   we also had -- the perpetual log is one

14   thing.  One of -- one of a couple of

15   things.  They had technology or software

16   programs also, but yes.

17        Q.    Okay.  The next bullet point

18   says, "Full back counts are mandatory."

19             Do you see that?

20        A.    Yes.

21        Q.    What is a full back count?

22        A.    Count the remaining product

23   in a bottle if you didn't use the stock

24   bottle up.  And then also count your
```

1   inventory in the safe.

2          Q.    Okay.  And the purpose

3   behind the perpetual log was to make sure

4   that your pharmacist could keep track of

5   prescription drugs, right?

6          A.    Yes, it was an aid for that,

7   mm-hmm.

8          Q.    Okay.  And it's important to

9   keep track of prescription drugs such as

10  opioids to make sure they don't go into

11  the chain of diversion, right?

12         A.    It was -- it was important

13  to maintain because any type of shortages

14  we were obligated to report to the DEA

15  and the Ohio Board, and any other state

16  that we had to.  So if we were missing

17  medication, this was a system to identify

18  that.

19         Q.    Okay.  And it's important to

20  know where they are so they aren't

21  diverted and fall into the hands of

22  people who should not have prescription

23  drugs, correct?

24         A.    This is -- this was a

1    reporting system to make sure that we had

2    accountability that there were no losses,

3    whether it was by delivery or dispensing.

4    It was utilized in that manner.

5              MR. KOBRIN:  Really quick, I

6         made a couple of objections that

7         didn't show up on the record.  I

8         want to make sure it's not --

9         because it's not -- it might be on

10        my end that it's not picking up my

11        microphone.  Should it be showing

12        up on the realtime or will it get

13        added later, do you think?

14             THE COURT REPORTER:  No, if

15        I don't hear you, I don't -- I did

16        not hear an objection for the last

17        few questions.

18             MR. KOBRIN:  That's fine.

19        The last two, if you can end --

20        object to form, but it's fine.

21        You can proceed.

22    BY MR. HARRIS:

23        Q.   Mr. Shaheen, your last

24    answer was, "This was a reporting system

```
 1   to make sure we had accountability that

 2   there were no losses, whether it was by

 3   delivery or dispensing."

 4            Do you remember saying that?

 5       A.   Yes.

 6       Q.   Why is it important to have

 7   accountability so there are no losses?

 8       A.   Well, you have

 9   accountability on all medications.

10            I mean, you know, it's not

11   like -- it's not like this is, you know,

12   we receive product and you turn your back

13   on it.  You know, we're obligated by

14   state and federal regulations.  We follow

15   those regulations.  You know, we go above

16   and beyond.  And this was one of the

17   additional platforms that Giant Eagle

18   does to go above and beyond what is

19   required by -- you know, what's lawfully

20   required by us.

21       Q.   So your testimony for this

22   jury today is that Giant Eagle goes above

23   and beyond what's lawfully required

24   related to their prescription drugs and
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   dispensing?
2               MR. KOBRIN:  Object to form.
3               THE WITNESS:  Yes.  I am
4        saying that we have a lot of
5        systems in place, and this was one
6        of them.
7   BY MR. HARRIS:
8        Q.    Okay.  It says -- third
9   bullet point, "Enter data in log
10  immediately after final verification,"
11  right?
12       A.    Yes.
13       Q.    Mr. Shaheen, I think --
14  sorry.  I believe the first part of your
15  answer got cut off.  So let me re-ask my
16  question, okay?
17              The third bullet point, it
18  says, "Enter data in log immediately
19  after final verification," correct?
20       A.    Yes.
21       Q.    Okay.  What does the word
22  "immediately" mean to you?
23       A.    After they -- after a
24  pharmacist does the check on the product,
```

1    the product will be placed back into a

2    safe or secured area.

3         Q.    Okay.  I understand that,

4    but my question was, what does the word

5    "immediately" mean to you?  It says,

6    "Enter data in log immediately after

7    final verification."

8              What does "immediately"

9    mean?

10        A.    After they finish their

11   verification, the pharmacists are

12   supposed to put the medication back into

13   the safe.  Now, that's my answer.

14        Q.    Okay.  Right after they're

15   done, correct?

16             MR. KOBRIN:  You're freezing

17        on me.  I'm not sure why.  I think

18        it's okay now.

19             I can see on the realtime

20        what you said.  But I didn't catch

21        the end of that response.

22             THE WITNESS:  My response?

23             MR. KOBRIN:  Yeah.  You said

24        the pharmacists are supposed to

```
 1          put the medication back in the

 2          safe?

 3              THE WITNESS:  Yes.  Or

 4          secure it, you know, in the

 5          drawer.  They have a locked drawer

 6          and a locked safe, you know.

 7   BY MR. HARRIS:

 8      Q.   Okay.  Well, Mr. -- let me

 9   go ahead and stop you, Mr. Shaheen.

10   Mr. Kobrin may have an opportunity later

11   today to ask you questions.  But right

12   now --

13              MR. KOBRIN:  I'm not doing

14          redirect.  I apologize.  I just --

15          you all froze on me for a second.

16   BY MR. HARRIS:

17      Q.   Okay.  Then let's go ahead

18   and clear it this way then.

19              Mr. Shaheen, when it says,

20   "Enter data in log immediately after

21   final verification," how soon after the

22   final verification must the pharmacist

23   log the data?

24      A.   The pharmacist -- the
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacist will complete their final

2    verification.  They will bag the

3    medication up, you know, back count the

4    bottle, if that was the time period, and

5    then subsequently take the bottle and

6    place it into a safe or a secured area,

7    which is either a drawer or a safe that

8    we have by the pharmacist's feet.

9         Q.    What does that have to do

10   with logging data immediately?

11        A.    Well, you're asking about

12   the perpetual log.  You know, we keep an

13   accurate account, and we have to do our

14   back counts, and then at times too,

15   sometimes the pharmacists have another

16   prescription that is right after that for

17   that same drug, and they can provide that

18   to the technician.

19        Q.    And let me ask you this.  It

20   doesn't say on here, "Enter data two

21   weeks after final verification," does it?

22             MR. KOBRIN:  Object to form.

23             THE WITNESS:  No.

24   BY MR. HARRIS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    It doesn't say, "Enter data

 2   in log one month after final

 3   verification," does it?

 4               MR. KOBRIN:  Object to form.

 5               THE WITNESS:  No.

 6   BY MR. HARRIS:

 7          Q.    It says immediately, doesn't

 8   it?

 9          A.    It says immediately.

10          Q.    And that means right after,

11   correct?

12          A.    As I told you, sometimes

13   what happens too is these pharmacists

14   will get another prescription, and

15   they'll take that same bottle and hand it

16   over to a technician.

17               MR. KOBRIN:  We've been

18        going --

19               MR. HARRIS:  Motion to

20        strike as nonresponsive.

21   BY MR. HARRIS:

22          Q.    My question to you,

23   Mr. Shaheen, was, it says immediately,

24   which -- this is your presentation, and
```

```
 1    I'm asking you, when you put this in your

 2    presentation, what did you mean by

 3    immediately?

 4              That is my question.  Do you

 5    understand my question?

 6        A.    Follow -- yes, I understand

 7    your question.

 8        Q.    Okay.  Then could you please

 9    answer my question?  What does

10    immediately mean as it appears in this

11    slide?

12        A.    Following -- following final

13    verification, okay, they verify the

14    product.  They back count the product.

15    And then the product will be placed

16    inside the safe and/or the locked area.

17              MR. KOBRIN:  All right.

18        We've been going for almost

19        15 minutes since we --

20              MR. HARRIS:  No, we're going

21        to get an answer to this question

22        because he is avoiding it.  We

23        have -- we are getting an answer

24        to this question.
```

```
 1              MR. KOBRIN:  We can --
 2         excuse me, Josh.  I waited until
 3         that answer was complete.  I was
 4         hopeful that that would be the
 5         answer that you wanted.
 6              If you want to do a
 7         follow-up, I'm okay with that.
 8         But I think we need to take a
 9         break already.
10              MR. HARRIS:  Well, let's get
11         through this slide, and then we
12         will.
13              So if your witness wants to
14         answer my question, then we can
15         take a break even sooner.
16    BY MR. HARRIS:
17         Q.   So Mr. Shaheen, when you say
18    immediately, give me, in a sense of time,
19    how quickly that must happen.
20              MR. KOBRIN:  Object to form.
21         Asked and answered.
22              THE WITNESS:  It -- it even
23         states that they enter the data
24         into the log, okay, immediately
```

```
 1            after final verification.  So

 2            that's the process.  The

 3            medication comes down.  They pull

 4            it out of the basket.  They count

 5            the pills.  And then they enter

 6            the data into the system, and

 7            then -- then they place the

 8            bottles into the safe or locked

 9            drawer.

10    BY MR. HARRIS:

11            Q.    Okay.  At the bottom, "It

12    says all pharmacist must comply,"

13    correct?

14            A.    Correct.

15            Q.    It does not say "may

16    comply," correct?

17                  MR. KOBRIN:  We're going to

18            take a break, Josh.  This is

19            getting a little ridiculous.  I've

20            been completely cooperative with

21            you on finishing getting through

22            this.  But we've been working on

23            it for 15 minutes.

24                  MR. HARRIS:  Sure.  Maybe
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          during the break, you can speak to

 2          your witness about answering

 3          questions as well.  But that's

 4          fine.  We can go off the record.

 5               MR. KOBRIN:  Yeah, I object

 6          to that statement.  I think you've

 7          gotten what you need on this

 8          issue.  I don't want to cut off

 9          your colloquy, but I do want to

10          give the witness an opportunity to

11          take a break.  He said that the

12          coffee was working its way through

13          him.  So I don't want him to be

14          uncomfortable during the

15          deposition.

16               MR. HARRIS:  I'm happy to

17          take a break.

18               MR. KOBRIN:  Ten-minute

19          break.

20               THE VIDEOGRAPHER:  Going off

21          record.  The time is 11:55.

22               (Short break.)

23               THE VIDEOGRAPHER:  We are

24          going back on record.  The time is
```

```
 1          12:11.
 2    BY MR. HARRIS:
 3          Q.    All right.  Mr. Shaheen,
 4    we're back from our break.  Do you
 5    understand that you're still under oath?
 6          A.    I do.
 7          Q.    Okay.  I'll go ahead and say
 8    this.  I certainly don't mind taking
 9    breaks throughout the day.  And I
10    anticipate we'll take one for lunch.  But
11    the future breaks, let's make sure that
12    we finish questions or documents we're
13    discussing before we take a break.  Is
14    that okay, Mr. Shaheen?
15               MR. KOBRIN:  Object to form.
16          Or objection, rather.  Not to
17          form.  I think we were really
18          considerate on that front.  And
19          I'm not going to let him agree to
20          that.  If we're going to take a
21          long time going through a
22          document, for you to say let's
23          finish up this document after
24          we've been going for an hour and
```

```
1              20 -- I think we went for an hour

2         and 40 minutes there.

3              And so if he needs to take a

4         break before a document is done, I

5         don't think that's inappropriate

6         if he needs to take a quick break.

7              MR. HARRIS:  Okay.  Well,

8         we're not going to take a break

9         while I have a question pending.

10  BY MR. HARRIS:

11         Q.   So let's move on,

12  Mr. Shaheen.  Looking at where --

13              MR. KOBRIN:  Josh, I think

14         that's fair.  I just -- I'm

15         concerned about agreeing to not

16         take a break before a document is

17         done, when we could be on a

18         document for an hour or two.

19  BY MR. HARRIS:

20         Q.   All right.  Mr. Shaheen, do

21  you have this document pulled up in front

22  of you?  I forget what tab it is.  I

23  apologize.  It's Tab 33.

24         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  We're on the page
 2   "Perpetual Log."  Do you remember talking
 3   about this page?
 4          A.    Yes.
 5          Q.    Okay.  The question that I
 6   had pending before we took our break was
 7   at the bottom, it says, "All pharmacists
 8   must comply with the perpetual log
 9   protocol."
10                Do you see that?
11          A.    I do.
12          Q.    Okay.  And you agree must
13   means must, not may, correct?
14          A.    Yes.
15          Q.    Okay.  Let's go a couple
16   pages back where the title of the slide
17   is, "Floater pharmacists and techs."
18                Let me know when you get to
19   that slide.  I'm sorry.  Towards --
20   towards the end of the document.  Do you
21   see it, Mr. Shaheen?
22          A.    Yes.
23          Q.    All right.  What is a
24   floater pharmacist?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    They don't go to one store.
 2  They'll go to multiple.
 3          Q.    Okay.  The sentence -- the
 4  bullet point, rather, I should say says,
 5  "These TMs" -- what does TM stand for?
 6          A.    Team members.
 7          Q.    Okay.  "These team members
 8  must comply with policy and procedure the
 9  same as each permanent team member.
10              Is that what it says?
11          A.    Yes.
12          Q.    Is that what you meant when
13  you put it in this slide?
14          A.    Yes.
15          Q.    All right.  We are now done
16  with that document.
17              Now, one thing that's
18  important in these training materials is
19  to make sure that your pharmacists work
20  closely with the DEA; is that right?
21              MR. KOBRIN:  Object to form.
22              THE WITNESS:  Yes, they will
23          work closely with the DEA.  It's
24          not, like, on a daily basis, but
```

```
1           yes, they will at times work

2           closely with the DEA.

3    BY MR. HARRIS:

4           Q.    Okay.  Is it important to be

5    honest with the DEA when your Giant Eagle

6    pharmacists are working with them?

7           A.    I'm sorry.  You -- I missed

8    that.  I'm sorry.

9           Q.    Sure. Let me repeat my

10   question.

11              Is it important for Giant

12   Eagle pharmacists to be honest with the

13   DEA when working with them?

14          A.    Yes.

15          Q.    Why?

16          A.    Well, whatever they're

17   working with, meaning whatever that

18   problem is, if that's the situation, if

19   the DEA is coming in to request

20   information, we provide that information

21   accurately.

22              If we are contacting the

23   DEA, then, you know, the information that

24   we provide shall be accurate.
```

```
 1          Q.    Is the same true for a State

 2   Board of Pharmacy?

 3          A.    Yes.

 4          Q.    All right.  Let's go ahead

 5   and turn to -- I believe this is going to

 6   be Tab 45 in your binder.  This is

 7   P-HBC-1316.

 8               (Document marked for

 9          identification as Exhibit

10          Shaheen-4.)

11               MR. KOBRIN:  Really quick

12          Josh, you said the last one, Tab

13          33, was that Exhibit 3?

14               MR. HARRIS:  Tab 33 was the

15          slide deck?

16               MR. KOBRIN:  Yeah.

17               MR. HARRIS:  Yes.

18               MR. KOBRIN:  Three?

19               MR. HARRIS:  Yes, that's

20          correct.

21               THE WITNESS:  What number is

22          this tab?

23   BY MR. HARRIS:

24          Q.    The tab that we are now
```

```
 1   turning to is going to be Tab 45, Tab

 2   4-5, and this will be Shaheen-4, for the

 3   record.

 4         A.    Got it.

 5         Q.    Okay.  Mr. Shaheen, this was

 6   an e-mail chain that was produced to us.

 7   I'd like to start at the bottom e-mail,

 8   which is the earliest e-mail in time.  So

 9   do you see at the bottom where it says

10   from Mike Bianco Junior?

11         A.    Yes.

12         Q.    Okay.  This was to

13   STR_Pharmacy_PDLS.  I'm assuming that's a

14   Listserv, correct?

15         A.    Yes, that's to a varied

16   list, yes.

17         Q.    Okay.  And then it has

18   carbon copied Joseph Millward, Donna

19   Matty, you, Richard Shaheen, and Greg

20   Carlson.

21               Do you see where it says

22   that?

23         A.    I do.

24         Q.    And this was an e-mail from
```

```
 1    September 25th, 2014.

 2                Do you see where it says

 3    that?

 4         A.    I do.

 5         Q.    All right.  Mr. Bianco

 6    Junior writes, "Hi, PDLs."  What does PDL

 7    stand for?

 8         A.    Pharmacy district leader.

 9                MR. KOBRIN:  Hey, Josh, I

10         don't want to interrupt you after

11         you start getting into the meat of

12         that document.

13                But to the extent that you

14         need to, Rick, feel free read over

15         the document before you answer any

16         questions about it.

17    BY MR. HARRIS:

18         Q.    Okay.  Mr. Shaheen, it says,

19    "We had a narcotic tote returned to the

20    HBC warehouse today with no identifying

21    marks on or in the tote, so we are unable

22    to determine the pharmacy these came

23    from."

24                Do you see where it says
```

1    that?

2         A.    I do.

3         Q.    All right.  It says, "Please

4    let me know if any of your pharmacies

5    have reported these missing items."  And

6    then it has a list below it.

7              Do you see that?

8              MR. KOBRIN:  Object to form.

9         Misstates the document.

10             THE WITNESS:  Yes, I see it.

11   BY MR. HARRIS:

12        Q.    Okay.  On that list of

13   items, the first item says, "Two units,"

14   and it has an item number, "of

15   hydroco/APAP."

16             Do you understand that to

17   mean two units of hydrocodone?

18        A.    Yes.

19        Q.    All right.  Then if we go

20   down about four more, it says, "One

21   unit," item number, hydrocodone with a

22   different strength.

23             Do you see that?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And then right beneath that
 2    we see one more unit hydrocodone with a
 3    different strength.
 4                Do you see that?
 5          A.    Yes.
 6          Q.    All right.  Great.  Let's go
 7    ahead and go back to the first page of
 8    this e-mail.
 9                The next e-mail in the
10    chain -- and I will acknowledge that
11    you're not on this.  Have you seen this
12    document before, Mr. Shaheen?
13                MR. KOBRIN:  Object to form.
14          With regard to any of these
15          documents, Rick, I just don't want
16          to you talk about any documents
17          that we might have gone over in
18          our preparation.
19                But generally, if you've
20          seen this document in the course
21          of your work, feel free to answer.
22                THE WITNESS:  Let me -- let
23          me -- let me read this.
24    BY MR. HARRIS:
```

```
 1          Q.    We're going to read through

 2    some of it together.  My question is more

 3    general.  Have you seen this document

 4    before, Mr. Shaheen?

 5                MR. KOBRIN:  Same

 6          instruction.

 7                THE WITNESS:  Yes, I've seen

 8          this document.

 9    BY MR. HARRIS:

10          Q.    This e-mail -- the next

11    e-mail in the chain is still from

12    Mr. Bianco, October 1st, 2014, right?

13          A.    October --

14          Q.    October 1st, 2014.

15          A.    Yes.

16          Q.    All right.  Mr. Bianco

17    writes to Joseph Millward.  "Hi, Joe.  As

18    you likely know, the DEA was in for an

19    inspection of the warehouse today

20    specifically asking about

21    hydrocodone-containing products.  At that

22    time" -- excuse me.  "At the time, the

23    warehouse reported having no

24    hydrocodone-containing products on hand."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you see where it says

 2   that?

 3        A.    I do.

 4        Q.    The very next sentence says,

 5   "Currently we have one case of

 6   hydrocodone/APAP 5/325 that was intended

 7   for 6510 which is being shipped out

 8   tonight after discussion with Tracy

 9   Patel."

10              Do you see where it says

11   that?

12        A.    I do.

13        Q.    Okay.  So here Mr. Bianco

14   writes the DEA was asking if this

15   warehouse had any hydrocodone products,

16   right?

17              MR. KOBRIN:  Object to form.

18        The document speaks for itself.

19   BY MR. HARRIS:

20        Q.    You can go ahead and answer,

21   Mr. Shaheen.

22        A.    Okay.  I'm just finished

23   reading it, unless you want me to wait

24   for you.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    I'm finished my question.

 2   I'm happy to repeat it though.

 3          A.    Please.

 4                MR. KOBRIN:  Have you

 5          finished reading it, Rick?

 6                THE WITNESS:  I'm on the

 7          last line.

 8                MR. KOBRIN:  Why don't we

 9          read the exhibit, and when you're

10          ready.

11                MR. HARRIS:  We're going to

12          go through it -- to be time

13          efficient, Mr. Shaheen --

14                MR. KOBRIN:  No, I'd like --

15          Mr. Shaheen has stated that he

16          wanted to finish reading it.  And

17          so I'd like him to have the

18          opportunity to read the document.

19                MR. HARRIS:  Sure.

20          Absolutely.  Read it all he wants.

21                THE WITNESS:  Okay.

22   BY MR. HARRIS:

23          Q.    Have you had enough time,

24   Mr. Shaheen?
```

```
1          A.    I read that October 1st

2    portion.

3          Q.    Okay.  Do you agree in this

4    document, Mr. Bianco is stating that the

5    DEA was asking if this specific warehouse

6    had any hydrocodone-containing products

7    on hand?

8          A.    Yes.

9          Q.    And you agree the warehouse

10   reported having no hydrocodone products

11   on hand, correct?

12              MR. KOBRIN:  Object to form.

13         He wasn't there.  He's not even on

14         this e-mail.  I don't now he can

15         possibly agree what they did then.

16   BY MR. HARRIS:

17         Q.    Okay.  Mr. Shaheen, you

18   agree that this e-mail says, "At the time

19   the warehouse reported having no

20   hydrocodone-containing products on hand,"

21   correct?

22         A.    Yes, but I -- I wasn't

23   involved nor did any investigation to

24   this.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              So I don't -- I don't know

 2   where the product was.  I can't tell you,

 3   you know, was it in the warehouse.

 4              I see what it says, but I

 5   don't know that.

 6        Q.    Okay.  Do you know

 7   Mr. Bianco?

 8        A.    Yes, I do.

 9        Q.    Okay.  Who is he?

10        A.    He's a pharmacist, but he

11   works in the corporate side.  He's behind

12   the scenes.  He's not a pharmacist in our

13   stores.

14        Q.    Okay.  Do you believe him to

15   be someone who may misrepresent

16   information to the DEA?

17        A.    No.

18        Q.    Okay.  So when he says,

19   "Currently, we have one case of

20   hydrocodone," do you believe that to be

21   true?

22        A.    Yes.

23        Q.    So based on Mr. Bianco's

24   e-mail, what was told to the DEA appears
```

1   to be different than what the actual

2   situation was.  Is that fair to say?

3               MR. KOBRIN:  Object to form.

4         Again, we're in the same situation

5         where you're asking him to look at

6         an e-mail and tell you what he

7         thinks it means when he didn't

8         receive the e-mail and didn't

9         experience -- was not present at

10        any of the events related to the

11        e-mail.

12  BY MR. HARRIS:

13        Q.   You can go ahead and answer,

14  Mr. Shaheen.

15        A.   Again, you know, I didn't

16  look into this.  I don't know where the

17  products would have been or were they

18  there or not there.

19             You know, yeah, I believe

20  Mike.  But I don't know where these

21  products were.  So I can't --

22        Q.   Okay.

23        A.   I'm not comfortable in

24  answering that.

```
1          Q.    Sure.  All right.  Well,

2   let's go ahead and let's highlight this

3   portion.

4                It says, "At the time the

5   warehouse reported having no

6   hydrocodone-containing products on hand."

7                Do you see where it says

8   that very clearly?

9          A.    Yes.

10         Q.    Okay.  The very next

11  portion, of the very next sentence says,

12  "Currently, we have one case of

13  hydrocodone."

14               Do you see part of that

15  sentence?

16         A.    I do.

17         Q.    So saying no hydrocodone is

18  different than saying one case of

19  hydrocodone.  Can you agree with that

20  principle?

21               MR. KOBRIN:  Object to form.

22               THE WITNESS:  Yes, but at

23          the time the warehouse reported

24          no -- again, I don't -- I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          know why they would have reported

 2          that.  I didn't investigate that.

 3  BY MR. HARRIS:

 4          Q.    Yeah, I don't know either.

 5  But my question is, no means zero,

 6  correct, in this context at least?

 7               MR. KOBRIN:  Object to form.

 8          I don't know that he can even

 9          answer that.  He's not -- for the

10          record, he's not there.  He didn't

11          receive the e-mail.  He didn't

12          know anything about this

13          situation.

14  BY MR. HARRIS:

15          Q.    You can answer, Mr. Shaheen.

16          A.    I truly don't know.  I

17  didn't look into this.  I don't know

18  where the product was.  I don't have an

19  answer for that.  I don't know.

20          Q.    During your time as a

21  pharmacy investigator, were you ever made

22  aware of potential, what may be called

23  red flags when looking at prescribing and

24  dispensing habits?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   Yes.

 2      Q.   Let's go ahead and turn to

 3 Tab 61 of your folder.  This is going to

 4 be P-HBC-1332.  And we'll label this as

 5 Shaheen-4 -- Shaheen-5.  Excuse me.

 6           (Document marked for

 7           identification as Exhibit

 8           Shaheen-5.)

 9 BY MR. HARRIS:

10      Q.   Were you able to look at

11 this document, Mr. Shaheen?

12      A.   Yes, I found it.

13      Q.   Okay.  Let's go ahead and

14 turn to the very last page of this

15 document.

16           And down here, this is the

17 earliest e-mail in time on this chain.  I

18 guess let me step back.

19           Do you understand in

20 reviewing these, at least for e-mail

21 documents, that it puts the first e-mail

22 kind of at the bottom, and then we have

23 to work our way up?  Does that make sense

24 to you?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    I'm seeing that, yeah.

2          Q.    Okay.  It's a bit confusing.

3    If you need me to point out where I'm

4    referring to, I'm happy to do that.

5          A.    Thank you.

6          Q.    Not a problem.  So this is

7    from 0019, Pharmacy Team Leader.

8                Do you see where it says

9    that on the "from" line?

10         A.    Yes.

11         Q.    Okay.  Now, 0019.  Is that

12   your understanding that it's referring to

13   the pharmacy number for a Giant Eagle

14   pharmacy?

15         A.    Yes.

16         Q.    Okay.  So if we look at that

17   pharmacy list that I had you pull out

18   earlier, if we look at Page 1, under

19   Pharmacy Number 19, we see that this is

20   the Broad Street pharmacy in Cambria

21   County, Pennsylvania.

22         A.    Yes.

23         Q.    Okay, great.  So this was

24   another e-mail that was to Joseph
```

1    Millward, July 7th -- or excuse me,

2    July 27, 2015, that reads, "Hi, Joe.

3    I've reached my limit on oxycodone for

4    the month already, so I am in need of an

5    increase to keep my business.  Is there

6    any way this can be done?"

7              Do you see where it says

8    that?

9         A.    Yes.

10         Q.    He says, "I know in the past

11    it was just a quick e-mail, but currently

12    I was told that there was a bunch of

13    questions we had to answer."

14              Do you see where it says

15    that?

16         A.    Yes.

17         Q.    All right.  So let's go to

18    the next e-mail in the chain.  The next

19    e-mail on the chain is from Joseph

20    Millward back to Pharmacy 19.

21              Do you see where it says

22    that?

23         A.    Yes.

24         Q.    All right.  This is the same

1    day, July 27, 2015.  He writes, "Scott,

2    please answer the following questions to

3    ensure the increase in threshold is

4    justified by legitimate prescriptions."

5              Do you see where it says

6    that?

7         A.    I do.

8         Q.    And then down at the bottom,

9    it has a list of 11 -- let me make

10   sure -- yeah, 11 questions that the

11   pharmacists are supposed to answer in

12   order to get an increase; is that

13   correct?

14        A.    Can you give me a second to

15   go over them?  Or are you going to cover

16   them?

17        Q.    We're going to cover most of

18   them, but -- so I'm going to start with

19   Number 1.  So let's start there.  And if

20   I indicate I'm going to skip one, then

21   I'll let you know, and you can read that

22   one.

23              So one of the things the

24   pharmacist has to answer is, an over --

```
 1    "Has the store experienced an overall

 2    increase in prescription volume compared

 3    to last year?"

 4              Do you see that?

 5         A.    Yes.

 6         Q.    Okay.  Would you agree that

 7    a large increase in prescription volume

 8    compared to last year or certain other

 9    checkpoints is a potential red flag?

10              MR. KOBRIN:  Object to form.

11         Facts not in evidence.

12         Misrepresents the exhibit, and

13         Mr. Shaheen was not on this e-mail

14         either.

15              But you can discuss it if

16         you can, Rick.

17              THE WITNESS:  You know,

18         again, you know, red flags, you

19         know, is, you know, for me in law

20         enforcement, former law

21         enforcement, you know, used a

22         little bit more loosely than maybe

23         a pharmacist would.

24              But, you know, I'm sure
```

1          that, you know, in their eyes it's

2          a professional judgment.

3               So, you know, that question

4          from -- from Millward to him.  And

5          why I'm saying maybe a judgment, I

6          don't know what had changed in

7          that pharmacy, meaning are there

8          doctor offices that have opened up

9          and so on and so forth.

10              So I think that's maybe why

11         he's asking that question.  You

12         know, has your store experienced

13         an overall increase in

14         prescription volume compared to

15         last year?

16              Well, there could be a very

17         good reason for that.  So...

18    BY MR. HARRIS:

19         Q.    All right.  Thank you.  My

20    question was simply, is it a potential

21    red flag?

22         A.    It could be.

23         Q.    Okay.  Thank you.  Let's go

24    to Number 6.  I'm happy for you to read

```
1   two through five before you get there.

2   Actually, let's go to 4.  Sorry. I just

3   glossed this one over.

4               Number 4, "Who are the

5   prescribers with unusual prescribing

6   patterns?"

7               Do you see where it says

8   that?

9               MR. KOBRIN:  Rick, take the

10          time to read what you need to

11          read.

12              THE WITNESS:  Okay.  Give me

13          one second, please.

14  BY MR. HARRIS:

15      Q.   Sure.  There's ten words.

16  So it shouldn't take terribly long.

17      A.   I was looking at two and

18  three, but...

19              Okay.

20      Q.   Okay.  Number 4 says, "Who

21  are the prescribers with unusual

22  prescribing patterns?"   Correct?

23      A.   Yes.

24      Q.   Okay.  Are unusual
```

1    prescribing patterns potential red flags?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  It could be.

4    BY MR. HARRIS:

5         Q.    Okay.  I'm going to skip

6    five, so feel free to read it over.

7              Number 6, it says, "Is there

8    a pattern of prescribing that does not

9    indicate individual patient dosing for

10   the lowest effective dose?"

11             Do you see where it says

12   that?

13        A.    Yes.

14        Q.    Okay.  Are high-dosage

15   prescriptions potential red flags?

16             MR. KOBRIN:  Object to form.

17             THE WITNESS:  Again, that --

18        that would be relying on a

19        pharmacist to more or less make

20        that -- as I said, in my loosely

21        pattern, in law enforcement, for

22        me it could be.  For a pharmacist,

23        it may not be.

24   BY MR. HARRIS:

```
 1          Q.    Okay.  So let's take a step

 2   back then.

 3               So this -- the dosage on a

 4   prescription would be the scenario where

 5   a pharmacist would need to use that

 6   corresponding responsibility we talked

 7   about, right?

 8               MR. KOBRIN:  Object to form.

 9               THE WITNESS:  Their due

10          diligence.

11   BY MR. HARRIS:

12          Q.    As well as corresponding

13   responsibility, correct?

14               MR. KOBRIN:  Object to form.

15               THE WITNESS:  They do

16          utilize that.

17   BY MR. HARRIS:

18          Q.    Okay.  Because potential --

19   excuse me.  They utilize corresponding

20   responsibility and due diligence because

21   high dosage prescriptions could

22   potentially be red flags, correct?

23               MR. KOBRIN:  Object to form.

24          I don't know what it means
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1            "utilize corresponding

 2            responsibility."

 3                 Corresponding responsibility

 4            is a legal term that is in a

 5            regulation.  They have a

 6            corresponding responsibility.

 7                 I'm not sure I understand,

 8            and my objection to form is I'm

 9            not sure what it means to utilize

10            a corresponding responsibility.

11    BY MR. HARRIS:

12            Q.    Mr. Shaheen, do you

13    understand my question?

14            A.    If you -- I would appreciate

15    it if you could break that down more.  I

16    mean, I'm -- a court -- pharmacists are

17    using due diligence.  So they're looking

18    at a prescription, and based on -- on

19    their training, you know, based on

20    knowing, you know, the physician.

21                 And that's -- I guess that's

22    why.  I mean, I can't assume.  But he's

23    asking is there a pattern of prescribing.

24                 So I'm sure the pharmacist
```

1    is looking into that to answer that

2    question.

3          Q.    Well, you don't know that

4    for sure, though, correct?  You agree

5    that's what they're supposed to be doing,

6    but you can't confirm that for sure,

7    correct?

8          A.    No, I cannot confirm it.

9          Q.    Okay.  But that's what they

10   are supposed to do, correct?

11             MR. KOBRIN:  Object to form.

12   BY MR. HARRIS:

13         Q.    Do their due diligence?

14             MR. KOBRIN:  Object to form.

15             Misrepresents the evidence.  This

16             is someone in corporate asking

17             follow-up questions to a team

18             leader.

19             MR. HARRIS:  Josh, I

20             understand your position on being

21             able to object and state the

22             reason.  I believe that means that

23             you can say objection, misstates

24             the document.

```
 1              However, please limit your

 2         objections.  This is getting a bit

 3         out of hand.  Thank you.

 4              MR. KOBRIN:  Well, I'm not

 5         going to allow to you mislead the

 6         witness.  He's not on this e-mail.

 7              MR. HARRIS:  Okay.  Well,

 8         let's go ahead and address that

 9         issue then.

10   BY MR. HARRIS:

11         Q.   Mr. Shaheen, will you flip

12   to the very first page of this e-mail,

13   please.

14              MR. KOBRIN:  You interrupted

15         me again, Mr. Harris.  He's not on

16         this particular e-mail.  I

17         understand that this whole thread

18         is eventually forwarded to him.  I

19         saw that when I opened the binder.

20              That doesn't mean that he

21         knows what's going on.  And I am

22         uncomfortable with you

23         misrepresenting this

24         correspondence which he was not
```

Highly Confidential - Subject to Further Confidentiality Review

1          involved in personally.

2                  And so I'm going to clarify

3          the record if there's a

4          misrepresentation.

5                  MR. HARRIS:  Okay.  Well,

6          you're welcome to ask any

7          questions you want on redirect.

8    BY MR. HARRIS:

9          Q.    Mr. Shaheen, my question to

10   you was, pharmacists are supposed to

11   conduct due diligence when it comes to

12   prescribing controlled substances such as

13   opioids, correct?

14         A.    Yes.  They utilize their due

15   diligence not just with opioids, but with

16   every drug.  Mm-hmm.

17         Q.    Okay.  And that's because

18   high dosage prescriptions are potential

19   red flags for diversion, correct?

20                 MR. KOBRIN:  Object to form.

21                 THE WITNESS:  It is a

22         potential.

23   BY MR. HARRIS:

24         Q.    Thank you.  Let's move to

```
 1    Number 7.  It says, "Is there a pattern

 2    of drug combinations?"  And then in

 3    parentheses it says, "Opiate,

 4    benzodiazapine, muscle relaxant."

 5              Do you see that?

 6         A.    I do.

 7         Q.    Are you familiar with this

 8    combination of those three categories of

 9    drugs?

10         A.    Yes, I have seen that.

11         Q.    Okay.  Have you ever heard

12    those referred to as the trinity drugs or

13    Holy Trinity maybe?

14         A.    Yes.

15         Q.    Have you ever heard those

16    referred to as a drug cocktail?

17         A.    Yes.

18         Q.    Okay.  Would you agree that

19    when a patient is prescribed these three

20    categories of controlled substance --

21    well, excuse me.  Let me strike that.

22              Would you agree that when a

23    customer is prescribed these three groups

24    of drugs, that could potentially be a red
```

```
 1   flag for diversion?

 2        A.    Potentially.

 3        Q.    Okay.  Thank you.

 4              Okay.  Are there any other

 5   potential indicate -- excuse me.

 6              Are there any other

 7   potential red flags that would be

 8   indicators of diversion to you on this

 9   list that we have not covered?

10              MR. KOBRIN:  Take your time

11         to read it, Rick.

12              THE WITNESS:  There may be,

13         but nothing comes to mind right

14         now.

15   BY MR. HARRIS:

16        Q.    Fair enough.  All right.

17   Let's go to the next e-mail in line.

18              We see that July 27, 2015,

19   Pharmacy 19 responds.  And it appears

20   that they answer the questions, correct,

21   the 11 categories of questions that were

22   asked?  We're going to work through some

23   of these as well.

24        A.    Yes.
```

 1          Q.    Okay.  So if you recall,

 2    Question Number 1 --

 3                MR. HARRIS:  I don't know if

 4          there's a way to do a side-by-side

 5          of the list of questions, with the

 6          answers maybe next to them.  That

 7          may be the easiest way to do this,

 8          so Mr. Shaheen doesn't have to --

 9          oh, it may be too small.

10    BY MR. HARRIS:

11          Q.    We usually have pretty good

12    techs, Mr. Shaheen.  Let's see if we

13    can't --

14                MR. KOBRIN:  How big is your

15          screen?

16                MR. HARRIS:  Oh, that's

17          true.

18    BY MR. HARRIS:

19          Q.    Are you on a laptop,

20    Mr. Shaheen, or an iPad?

21          A.    No, I'm on a laptop.

22          Q.    Okay.  Well, this may be

23    easier then.  I don't know if your papers

24    are stapled.  But if you want to remove

1    this first page from the binder so we can

2    kind of do a side-by-side, that may be

3    the easiest way for to you refer to it,

4    Mr. Shaheen.  That's what I'm going to

5    do.

6              Let me know when you've got

7    this sorted out Mr. Shaheen, and I'll ask

8    my next questions.

9         A.    I have that page up.

10        Q.    Okay.  So Question Number 1,

11   "Has your store experienced an overall

12   increase in prescription volume compared

13   to last year?"  Here we see Pharmacy 19

14   responded, "Yes."

15             Do you see that?

16        A.    I do.

17        Q.    And do you agree in certain

18   situations, that could potentially be a

19   red flag for diversion, right?

20        A.    Potentially, yes.

21        Q.    Okay.  Number 4, "Who are

22   the prescribers with unusual prescribing

23   patterns?"  Here Pharmacy 19 answers, "We

24   are particular" -- excuse me.  "We are

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pretty meticulous in screening our

 2    narcotic," and then, here, "Rxs," what do

 3    you understand that to mean?  I know you

 4    said earlier it may have different

 5    meanings?

 6         A.    Are you talking about the

 7    response from 19 on Number 4?  Is that

 8    what you're asking?

 9         Q.    Yes, sir.  So the response

10    from 19 -- from Pharmacy 19 to question

11    Number 4 is, "We are pretty meticulous in

12    screening our narcotic Rxs."

13               How do you read that

14    sentence?

15         A.    I mean it's vague what he's

16    saying.  He's screening Dr. Green.  I

17    mean, it's vague.  "We are pretty

18    meticulous in screening our narcotic

19    Rxs."

20         Q.    Okay.  But I think earlier

21    you said Rxs could be prescribers?

22         A.    Prescriptions.

23         Q.    Prescriptions.

24         A.    In this case, I don't know
```

1   how he's using it.  It could be, you

2   know, it could be a prescription.

3          Q.    Okay.  Fair enough.  I was

4   just making sure there wasn't some

5   corporate lingo I was missing.

6                So the full answer to the

7   question, any prescribers with unusual

8   patterns, "We are pretty meticulous in

9   screening our narcotic Rxs."  But then he

10  indicates, "Dr. Green, if any."

11               Do you see where it says

12  that?

13         A.    Yes.

14         Q.    Okay.  And unusual

15  prescribing patterns could potentially be

16  red flags for diversion, right?

17               MR. KOBRIN:  Object to form.

18               THE WITNESS:  Potentially.

19  BY MR. HARRIS:

20         Q.    7, "Is there a pattern of

21  drug combinations (opiate,

22  benzodiazapine, muscle relaxant)?"

23               And the answer to 7 from

24  Pharmacy 19, "Many pain" -- excuse me.

```
 1    "Many pain clinics will do this but does
 2    not seem excessive."
 3              Do you see where it says
 4    that?
 5         A.    I do.
 6         Q.    Okay.  Let's -- let's go
 7    ahead and go back to the very first page
 8    of this e-mail.  And at the very top, we
 9    have a group e-mail from Joseph Millward
10    on July 28th, 2015, right?
11         A.    Yes.
12         Q.    He writes -- and you are on
13    this e-mail.  Do you see where you are on
14    the carbon copy line?  It says Gregory
15    Carlson, Richard Shaheen?
16         A.    Yes.
17         Q.    All right.  He writes --
18    Mr. Millward writes, "Darren, 12 of the
19    15 oxycodone 30-milligram tablets were
20    for quantities of 120 or greater."
21              Do you see that?
22         A.    I do.
23              MR. KOBRIN:  Object to form.
24         You skipped an intervening e-mail.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So there's some context that's

 2              going to be missing there.  So I

 3              think we either need to go through

 4              it or you need to give the witness

 5              a chance to read it.

 6    BY MR. HARRIS:

 7         Q.    Is -- Mr. Shaheen, if you

 8    need to read it, feel free.  I'm just

 9    asking you what the top e-mail says.

10              All right, Mr. Shaheen.  So

11    the top e-mail says, "Darren, 12 of the

12    15 oxycodone 30-milligram tablets were

13    for quantities of 120 or greater."

14              Do you see where it says

15    that?

16         A.    I do.

17         Q.    Okay.  And these were

18    oxycodone scripts that were being filled

19    by Pharmacy 19, right?

20              MR. KOBRIN:  Object to form.

21         Not making -- he read this e-mail.

22         I don't think he knows from

23         experience or knowledge what this

24         means.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HARRIS:

 2        Q.    You can go ahead,

 3   Mr. Shaheen.

 4        A.    I don't know if they were

 5   dispensed.  I mean, it's not saying

 6   dispensed.  It's just saying those

 7   quantities.  So I don't know if they

 8   turned those down.

 9        Q.    Okay.  Then in the middle of

10   that paragraph, it says, "Also check to

11   see if there are any prescribing patterns

12   with any of the docs that would indicate

13   a lack of dose personalization (every

14   patient gets the same prescription)."

15              Do you see that?

16        A.    I do.

17        Q.    Okay.  If there's a lack of

18   dose personalization, is that a potential

19   red flag for diversion?

20        A.    Again, that would -- I don't

21   know -- I don't know if I would use that

22   as a red flag.  Maybe -- maybe a

23   pharmacist -- I don't know about that

24   being a red flag.
```

1     Q.   Okay.

2     A.   I can't answer that one..

3  I'm sorry.

4     Q.   Sure.  It's okay.

5          The next paragraph says,

6  "Under Number 7, Scott indicates that

7  many of the patients present with the

8  trinity drugs.  This is a concerning

9  pattern."

10         Do you see where it says

11  that?

12    A.   You said Number 7?

13    Q.   Yes, sir.

14         MR. KOBRIN:  You're reading

15      from the first page though, right?

16         THE WITNESS:  Oh, I'm sorry.

17      Yeah.  Yes.

18  BY MR. HARRIS:

19    Q.   So, yeah, sorry.  The line

20  that I quoted is from the e-mail on the

21  first page from Joseph Millward referring

22  back to Number 7 answer from Scott from

23  Pharmacy 19.

24    A.   Okay.

```
 1          Q.    Okay.  So it says, "Under

 2   Number 7, Scott indicates that many of

 3   the patients present with the trinity

 4   drugs.  This is a concerning pattern."

 5              Do you see that?

 6          A.    I do.

 7          Q.    Okay.  Was this a concerning

 8   pattern to you?

 9              MR. KOBRIN:  Object to form.

10              THE WITNESS:  You know,

11          if -- the document is sent to

12          Darren.  If whatever came out of

13          it, if it was then sent to me,

14          then I would -- I would either

15          begin an investigation or refer

16          it, or if they felt that there was

17          enough due diligence to dispense,

18          again, relying on the pharmacist.

19              I don't recall if any of

20          this led to any type of

21          investigation with me or my unit.

22          So I -- I don't know.  I don't

23          know where this was left.

24              Is there -- do you have more
```

1          documentation?  I don't know where

2          this was left.

3    BY MR. HARRIS:

4          Q.    Okay.  Well, my question

5    isn't necessarily in this context.  My

6    question was more broad.

7               If a pharmacy was telling

8    that you many patients present with

9    trinity drugs in their prescriptions, in

10   their written prescriptions, is that a

11   concerning pattern to you?

12              MR. KOBRIN:  Object to form.

13         Hypothetical.

14              THE WITNESS:  You know,

15         that -- again, you know, I'm

16         not -- I'm not a pharmacist.  I'm

17         not a doctor.

18              Yes, you know, potentially

19         trinity drugs could be a red flag.

20         But again -- but again, if -- if

21         -- I don't know how many patients

22         were prescribed this and in what

23         manner.  So I can't answer that

24         portion of it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              It -- as I said to you
 2         previously, trinity drugs,
 3         potentially.  But to this, I
 4         don't -- I don't know what was
 5         done.  I don't think it was sent
 6         anywhere.  I don't have an answer
 7         as to what happened with -- and
 8         how this case was left, which
 9         would provide me with a better
10         answer to provide you.
11              MR. HARRIS:  Motion to
12         strike everything after, "Yes, you
13         know, potentially trinity drugs
14         could be a red flag."
15    BY MR. HARRIS:
16         Q.   All right.  Mr. Shaheen, we
17    can put that document away.
18              MR. KOBRIN:  Object to the
19         motion of striking a portion of
20         the response.
21    BY MR. HARRIS:
22         Q.   Okay.  So your role as a
23    pharmacy investigator, did you ever have
24    to train pharmacists or pharmacist techs?
```

1          A.     No, I didn't train them.

2          Q.     Okay.  Did you ever provide

3     information on loss prevention to

4     pharmacists or pharmacist techs?

5          A.     I did.

6          Q.     Okay.  Did you train them on

7     that topic?

8          A.     No.  It's -- it's a -- did I

9     provide information to them?  Yes.  You

10     know, we provided information to techs

11     and pharmacists.

12          Q.     Okay.  The information that

13     you provided, did you want to make sure

14     that it was accurate?

15          A.     Yes.

16          Q.     Okay.  Did you want to make

17     sure they had all the information the

18     techs or the pharmacist may need?

19          A.     As much as I could supply,

20     yes.

21          Q.     Had they ever followed up

22     with you and asked you for additional

23     information, what would you have done to

24     get that for them?

```
 1          A.    Well, it depends on what

 2    they would ask for.

 3          Q.    Okay.

 4                MR. KOBRIN:  Object to form.

 5    BY MR. HARRIS:

 6          Q.    How many people were

 7    providing training regarding

 8    corresponding responsibility and due

 9    diligence?

10          A.    I'm sorry.  I missed that.

11    I'm sorry.

12          Q.    Okay.  Well, let me strike

13    that then.

14                Would you also provide

15    training on corresponding responsibility

16    and due diligence?

17                MR. KOBRIN:  Object to form.

18          He didn't -- he's already stated

19          that he --

20                THE WITNESS:  I provided

21          information --

22                MR. KOBRIN:  Rick, hold on.

23          Hold on.  Let me finish my

24          objection.  All right?
```

```
 1              THE WITNESS:  Okay.  Sorry.
 2              MR. KOBRIN:  Object to form.
 3         He's already stated that he
 4         didn't -- he didn't classify what
 5         he did as training for the
 6         pharmacists and techs.
 7    BY MR. HARRIS:
 8         Q.    You can go ahead and answer,
 9    Mr. Shaheen.
10         A.    As I said, I -- I didn't
11    train.  I provided information to them.
12         Q.    Okay.  Did you provide
13    information regarding corresponding
14    responsibility and due diligence to
15    pharmacists?
16         A.    Well, not corresponding
17    responsibility.  They -- we have -- we
18    have a box in a pharmacy, and that
19    documentation is contained within.
20              You know, there -- there is
21    times where, you know, maybe you
22    reference the corresponding
23    responsibility to them.  That's that
24    portion.
```

```
 1                And what was the second half
 2    of your question?
 3         Q.    Information regarding due
 4    diligence.
 5         A.    You know, the due diligence
 6    portion would be, you know, if a
 7    discussion of, you know -- and oftentimes
 8    it would just be a referral to their --
 9    you know, utilize your judgment, whatever
10    that may be.  And you know, looking for
11    them to assess if it's a prescription or
12    the doctor or a patient situation.
13         Q.    So yes, you would provide
14    information on due diligence?
15         A.    I wouldn't -- I wouldn't
16    provide it.  They would provide
17    information.  And if it warranted to go
18    to the next level, they would give me
19    that information.  And, you know, if they
20    were -- you know, generally to request
21    them, to utilize their due diligence,
22    that was a common -- you know, that was a
23    common, without breaking it down, just
24    utilize your due diligence, which means
```

Highly Confidential - Subject to Further Confidentiality Review

1    use your professional judgment.

2         Q.    Was there anyone else

3    providing this information when you first

4    started at Giant Eagle?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  I don't know.

7              MR. HARRIS:  Okay.  Let's go

8         ahead and go to Tab 53.  This is

9         P-HBC-1324.  And this is going to

10        be Shaheen Exhibit 6.

11             (Document marked for

12        identification as Exhibit

13        Shaheen-6.)

14   BY MR. HARRIS:

15        Q.    Mr. Shaheen, same thing for

16   these e-mails.  We're going to start at

17   the most bottom one.  This one is from

18   you, August 11th, 2015.

19             Do you see where it says

20   that?  This is on the first page.

21        A.    What exhibit number?  53.

22        Q.    53, yes, sir.  Sorry?

23        A.    53, okay.

24             MR. KOBRIN:  Tab 53, Rick.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          It's going to be Exhibit 6.

 2               MR. HARRIS:  Or, yeah,

 3          excuse me.  That's correct.  Tab

 4          53.  Exhibit Shaheen-6.  I

 5          apologize.  Thank you, Josh.

 6  BY MR. HARRIS:

 7          Q.    All right.  Do you see where

 8  this is an e-mail from you, Mr. Shaheen?

 9          A.    Yes.

10          Q.    Okay.  August 11th, 2015, to

11  Gregory Carlson, Joseph Millward, George

12  Chunderlik, and Reid Fleming, right?

13          A.    Yes.

14          Q.    And it says "Subject:

15  Procedural inconsistency."

16               Do you see where it says all

17  that?

18          A.    Yes.

19          Q.    Let's go ahead and start

20  reading this.  "On July 30th, I received

21  a DEA fax notification from Pharmacy 1417

22  Geneva, Ohio (attached).  I spoke with

23  the PDL regarding the missing 100-count

24  bottle of oxycodone 10 milligrams."
```

```
1                Do you see where it says

2     that?

3          A.    I do.

4                MR. HARRIS:  Let's go ahead

5          and highlight, "missing 100 count

6          bottle of oxycodone, 10

7          milligrams."  All right.

8     BY MR. HARRIS:

9          Q.    The next sentence, will you

10    go ahead and read the next sentence out

11    loud for me, Mr. Shaheen?

12         A.    "I was informed that not all

13    of the Ohio stores are doing full back

14    counts of oxycodone products with their

15    perpetual log."

16         Q.    Okay.  Was that a problem to

17    you?

18               MR. KOBRIN:  Again,

19         Mr. Shaheen, if you want to read

20         the whole exhibit before you

21         answer, please take the time.

22               THE WITNESS:  Okay.  Can you

23         give me a minute, please?

24    BY MR. HARRIS:
```

1          Q.    Yeah.  Yeah.

2                Now, let me tell you this,

3     Mr. Shaheen.  We're going to go through

4     more of this document.  So let's focus on

5     my part right now.

6                The sentence you just read,

7     "I was informed that not all of the Ohio

8     stores are doing full back counts of

9     oxycodone products with their perpetual

10    log," was that a problem for you?

11         A.    Utilizing a perpetual log

12    minimized the amount of video that I

13    would have to review.  So that was a tool

14    and an aid that I utilized to help me

15    review if there was a loss.

16         Q.    Okay.  And we'll get to, you

17    know, how busy in the scope of your

18    investigations.

19                But my question is, is it

20    problematic that Giant Eagle employees

21    are not following Giant Eagle policy?  Is

22    that a problem for you?

23                MR. KOBRIN:  Object to form.

24                THE WITNESS:  Well --

```
 1            MR. KOBRIN:  Asked and

 2      answered.

 3            MR. HARRIS:  I don't believe

 4      it was answered.

 5            THE WITNESS:  This --

 6            MR. KOBRIN:  It's giving you

 7      more --

 8            THE WITNESS:  I mean, as

 9      they're receiving product and

10      dispensing product, like I said,

11      it made it -- it made it easier

12      for me to minimize looking at

13      video and trying to make a

14      determination what if, in fact,

15      happened to this bottle, if it got

16      thrown away.

17            You know, we -- we would use

18      that tool as a part of an

19      investigative assist, if you will.

20            So having it, utilizing it

21      did minimize the time in what we

22      had to look for.

23   BY MR. HARRIS:

24      Q.    Okay.  Do you remember the
```

Highly Confidential - Subject to Further Confidentiality Review

1    presentation that you did in 2015 that

2    we've already gone over?

3              MR. KOBRIN:  Objection.

4              THE WITNESS:  Yes.  You mean

5         with the -- yeah.

6    BY MR. HARRIS:

7         Q.    It was Shaheen Exhibit 3,

8    and I believe it's Tab 33, the one that

9    says "Perpetual Log" on it.  You may not

10   be able to see this one.  But you

11   remember this page.  We talked about it.

12        A.    Yes.

13        Q.    And it says at the bottom,

14   "All pharmacists must comply," correct?

15   That's what it said at the bottom.

16             Feel free to flip back to

17   it.  I don't want you to guess on this.

18             MR. KOBRIN:  Is it Tab 33?

19             MR. HARRIS:  It's Tab 33,

20        that's correct.  It's about the

21        fifth -- it's almost in the

22        middle.  I'm not sure.  It's not

23        page numbered.

24             So can we pull this one back

Highly Confidential - Subject to Further Confidentiality Review

```
 1              up and pull it up for Mr. Shaheen?

 2              We're going to come back to this

 3              e-mail a little, but I want to

 4              make sure -- here we go.

 5   BY MR. HARRIS:

 6         Q.   Right here, Mr. Shaheen.

 7   Perpetual log.

 8              Right here at the bottom,

 9   "All pharmacists must comply."

10              Do you remember seeing that?

11         A.   Yes.

12         Q.   Okay.  And remember you

13   agreed that it was not an option, it was

14   a must?

15              MR. KOBRIN:  Object to form.

16   BY MR. HARRIS:

17         Q.   I believe earlier you

18   testified that it does not say may, it

19   says must; is that right?

20         A.   Right.

21         Q.   All right.  Let's go back to

22   that e-mail.

23         A.   Okay.

24         Q.   Here we go.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. HARRIS:  And that

 2            sentence, if we can highlight it.

 3    BY MR. HARRIS:

 4            Q.    "I was informed that not all

 5    of the Ohio stores are doing full back

 6    counts of oxycodone products with their

 7    perpetual log."

 8                    You see that, right?

 9            A.    Yes.

10            Q.    So based on what Giant Eagle

11    required that all pharmacists must

12    comply, that was not happening at all

13    Ohio stores in August of 2015, correct?

14                    MR. KOBRIN:  Object to form.

15            Misstates.  Facts not in evidence.

16                    THE WITNESS:  There -- there

17            were -- there were some stores

18            that did not do full back counts.

19    BY MR. HARRIS:

20            Q.    And they were required to,

21    right?

22                    MR. KOBRIN:  Object to form.

23            States facts not in evidence.

24    BY MR. HARRIS:
```

```
 1          Q.    I mean, that's what your

 2    position said, isn't it, Mr. Shaheen?

 3    "All pharmacists must comply."  They were

 4    required to do these back counts with

 5    their perpetual logs, weren't they?

 6                MR. KOBRIN:  Object to form.

 7                THE WITNESS:  Well, yes,

 8          that's what it said.  They must

 9          comply.

10    BY MR. HARRIS:

11          Q.    Okay.  And here you're

12    indicating that not all of the Ohio

13    stores are complying, correct?

14                MR. KOBRIN:  Object to form.

15                Mr. Shaheen, have you had a

16          chance to read the whole e-mail?

17                THE WITNESS:  I'm looking at

18          it right now.  Give me a second.

19                You know, again, you know --

20    BY MR. HARRIS:

21          Q.    My question is very simple,

22    Mr. Shaheen.

23          A.    Paragraph -- well, no, no,

24    this comes into play.
```

1    I mean, Paragraph 3 here.

2    POD, which is Pennsylvania, our

3    pharmacists were utilizing it and not

4    everybody in Ohio.  And again, I'm not

5    quite sure, but I don't know when it was

6    applied in Ohio, because we started in

7    one little section that tested in

8    Pennsylvania, and then it migrated.

9    So I don't know at that time

10   if that was the case, and this could have

11   been an e-mail to push it that way.  I

12   don't know when it hit Ohio.

13   So I can't say.  I stated

14   here that, "Not all Ohio stores are doing

15   a full back count of the oxycodone

16   product.  Therefore, the loss" -- and

17   then if you read subsequent to that,

18   that's what I'm indicating.

19   Q.   Okay.  Thank you.  Let's go

20   to the third paragraph, the second

21   sentence.  It says, "My concerns" -- this

22   is an e-mail that you wrote. This says,

23   "My concerns are that a regulatory agency

24   may find fault with the lack of our

1    consistency or not being proactive in

2    other regions for the same type of

3    losses."

4              Do you see that?

5         A.   I do.

6         Q.   So this was a potential

7    issue for Giant Eagle, not being able to

8    keep track of their products, right?

9              MR. KOBRIN:  Object to form.

10             THE WITNESS:  No.  I -- no.

11             What that's referring to is

12        making sure that we are consistent

13        throughout the chain.  I don't

14        want one section to do it and not

15        the other.  That's -- that's

16        what -- that's what that

17        indicates.

18   BY MR. HARRIS:

19        Q.   Well, it also indicates that

20   your concerns are that a regulatory

21   agency -- let's stop there.

22             A regulatory agency, an

23   example of one would be the Ohio Board of

24   Pharmacy, correct?

```
 1              A.    They are a regulatory

 2   agency, correct.

 3              Q.    Another example of a

 4   regulatory agency would be the Drug

 5   Enforcement Administration, correct?

 6              A.    Correct.

 7              Q.    Okay.  So here, you write

 8   explicitly, "My concerns are that a

 9   regulatory agency may find fault with the

10   lack of our consistency or not being

11   proactive in other regions for the same

12   types of losses."

13              Do you see where it says

14   that?

15              A.    Yes.

16              Q.    Okay.  And the type of loss

17   that we're discussing here is a missing

18   100-count bottle of oxycodone

19   10-milligram pills; is that right?

20              A.    Yes.

21              Q.    So it is a potential problem

22   for Giant Eagle that they are not able to

23   keep up with their prescription drugs,

24   mainly, in this e-mail, oxycodone,
```

```
 1   correct?

 2               MR. KOBRIN:  Object to form.

 3         Misstates the evidence.

 4               THE WITNESS:  Yeah, I

 5         don't -- I don't agree with that.

 6   BY MR. HARRIS:

 7         Q.   So you're okay with Giant

 8   Eagle losing 100-count bottles of

 9   oxycodone?

10               MR. KOBRIN:  Object to form.

11               THE WITNESS:  No, no.

12               MR. KOBRIN:  Misstates his

13         testimony.

14               Give me a chance to make an

15         objection.

16               THE WITNESS:  Sorry.

17   BY MR. HARRIS:

18         Q.   Okay.  So what are your

19   concerns?

20               MR. KOBRIN:  Object to the

21         form.  Asked and answered.

22               THE WITNESS:  My concern, as

23         I told you before, I needed -- I

24         needed a time frame.  And if that
```

```
 1          wasn't being utilized, then I

 2          would have to look at a lot more

 3          video to try to make a

 4          determination where the loss, if

 5          it was a loss, or whatever the

 6          case may be, of what occurred.

 7   BY MR. HARRIS:

 8          Q.    Okay.  You had a broad range

 9   of pharmacies that you had to cover,

10   right?

11          A.    A what now?

12          Q.    You had a broad range of

13   pharmacies that you were responsible for

14   covering in your potential

15   investigations, right?

16          A.    I did.

17          Q.    Okay.  But it says it down

18   here, Please also consider the tools I

19   need to conduct my investigations in an

20   efficient manner.

21               Do you see where it says

22   that?

23               MR. KOBRIN:  Object to form.

24               THE WITNESS:  Excuse me.  I
```

```
 1            see that.
 2    BY MR. HARRIS:
 3            Q.    Okay.  And one of the tools
 4    is if they fill out the perpetual log
 5    immediately after doing their data entry,
 6    right?
 7                    MR. KOBRIN:  Object to form.
 8                    Are you referring to this
 9            exhibit still or are you referring
10            to the prior?
11                    MR. HARRIS:  I'm just asking
12            the question.
13                    THE WITNESS:  Yeah, please
14            ask that question again.  I don't
15            know where -- what you're
16            referring to.
17    BY MR. HARRIS:
18            Q.    Okay.  You write, Please
19    consider the tools I need to conduct my
20    investigations in an efficient manner,
21    correct?
22            A.    Effective manner.
23                    MR. KOBRIN:  Object to form.
24            You keep saying efficient.  It
```

```
 1              says effective.

 2                   MR. HARRIS:  Effective.  I

 3              apologize.  So let me -- all

 4              right.  Strike that.

 5    BY MR. HARRIS:

 6         Q.    Mr. Shaheen, it says,

 7    "Please also consider the tools I need to

 8    conduct my investigations in an effective

 9    manner," correct?

10         A.    Correct.

11         Q.    Okay.  And one of the tools

12    that you rely upon are the perpetual

13    logs; is that true?

14         A.    Correct.

15         Q.    Okay.  And if those

16    perpetual logs are filled out immediately

17    after, if the data is entered immediately

18    after a prescription, that makes it more

19    effective, correct?

20                   MR. KOBRIN:  Object to form.

21                   THE WITNESS:  The -- I'm

22              sorry.

23    BY MR. HARRIS:

24         Q.    I was going to say that I'm
```

1  not referring to anything on the document

2  at this point.  I'm just asking you, if

3  having an accurate and updated perpetual

4  log, that's updated immediately after

5  prescribing, is that a tool to help you

6  investigate in an effective manner?

7       A.    Having -- having that log

8  being utilized is an effective tool for

9  me, yes.

10       Q.    And one of your concerns was

11  the amount of time that it was taking to

12  investigate all of these issues that were

13  popping up; is that true?

14            MR. KOBRIN:  Object to form.

15            THE WITNESS:  You know, it

16       does take time if I don't know a

17       start and an end, yes.

18  BY MR. HARRIS:

19       Q.    So the next sentence in that

20  e-mail says, "With me having the

21  responsibility of approximately 220

22  pharmacies, minimizing video review time

23  is very important."

24            Do you see where it says

Highly Confidential – Subject to Further Confidentiality Review

1   that?

2          A.    I do.

3          Q.    So at this time, August 11,

4   2015, you alone were responsible for

5   investigating 220 Giant Eagle pharmacies;

6   is that true?

7          A.    If Andrew wasn't hired at

8   that point, it's true.

9          Q.    Okay.  Well, we can agree

10  that Andrew -- and I think you said his

11  last name was Gaus?  I'm not sure if I'm

12  saying it properly.

13         A.    Gaus, mm-hmm.

14         Q.    Gaus.  Okay.  Andrew Gaus is

15  not on this e-mail, correct, in the "to"

16  or "cc" chain?

17         A.    That is correct.

18         Q.    Okay.  And you don't

19  reference -- you don't say, "Andrew and

20  me have the responsibility of 220

21  pharmacies," correct?

22         A.    Yes, that's correct.  But he

23  could have been hired by them.  That's --

24         Q.    I'm --

```
 1          A.    Yeah.

 2          Q.    Sorry.  I didn't mean to cut

 3   you off.

 4          A.    No, no, I mean not every

 5   e-mail I'm on that Andrew is on and vice

 6   versa.

 7          Q.    No, I understand that.  But

 8   at least here in this e-mail, we don't --

 9   we don't have any, you know, clear

10   evidence that Mr. Gaus was helping you

11   with these 220 pharmacies and the

12   investigations pertaining to those,

13   right?

14          A.    Correct.

15          Q.    Okay.  All right.

16   Mr. Shaheen I'm done with that document.

17              MR. HARRIS:  I'll tell you

18          what, we've been going -- and I

19          know you're east coast; is that

20          correct, Mr. Shaheen.

21              THE WITNESS:  Pittsburgh.

22              MR. HARRIS:  Pittsburgh.

23          Okay.  We've been going for about

24          an hour since our last break.  So
```

```
 1          I propose that we take another

 2     break.  We can go off the record

 3     and discuss how long and if we

 4     want to have this be our a lunch

 5     break, since we're midday and

 6     about 1 o'clock for the east coast

 7     folks.  So if everyone is okay,

 8     then we'll go off the record.

 9          MR. KOBRIN:  That sounds

10     fine to me.  Thank you.

11          THE VIDEOGRAPHER:  Going off

12     the record.  The time is 1:09.

13               -  -  -

14          (Whereupon, a luncheon

15     recess was taken.)

16               -  -  -

17   A F T E R N O O N   S E S S I O N

18               -  -  -

19          THE VIDEOGRAPHER:  We're

20     going back on record.  The time is

21     1:42.

22          MR. HARRIS:  Okay.  Before

23     continuing, I want to address an

24     issue raised by defense counsel.
```

```
 1              Earlier in the deposition,

 2         defense counsel raised that he was

 3         entitled to make speaking

 4         objections.

 5              During lunch, I checked the

 6         order establishing deposition

 7         protocol established for this MDL

 8         litigation.  Page 8 of that

 9         deposition protocol does indicate,

10         and I quote, "Counsel shall

11         refrain from engaging in colloquy

12         during a deposition.  No speaking

13         objections are allowed, and

14         professionalism is to be

15         maintained by all counsel at all

16         times.  Counsel shall not be make

17         objections or statements that

18         might suggest an answer to a

19         witness."

20              Mr. Kobrin indicated there

21         was an order that was effectively

22         to the opposite extent, entitling

23         him to speak and then put his

24         objections on the record.
```

```
 1              So I would ask before we

 2         proceed, Mr. Kobrin, if you have

 3         such an order, I would love to see

 4         it before we -- before we move on.

 5              MR. KOBRIN:  You just read

 6         from an order.  What is that

 7         order?  Give me the document.

 8              MR. HARRIS:  Excuse me, sir?

 9              MR. KOBRIN:  What are you

10         reading from?

11              MR. HARRIS:  This is from

12         "Order Establishing Deposition

13         Protocol" from MDL 2804 Docket

14         Number 643.

15              MR. KOBRIN:  Is that a code

16         order?

17              MR. HARRIS:  It looks like

18         it is signed by -- I apologize.

19         Judge Polster.

20              MR. KOBRIN:  I actually

21         appreciate this.  I remember

22         something from a long time ago

23         where this issue came up, and I

24         recall that there being a little
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        bit of latitude beyond "object to

 2        form."

 3             If that's not the case then

 4        --

 5             MR. HARRIS:  I think a

 6        little bit of latitude is far

 7        surpassing what you've been doing,

 8        so I'd love to see what you --

 9             MR. KOBRIN:  I don't agree

10        with that.  I don't agree with

11        that.  I don't think I

12        misrepresented anything.

13             This is from 2018.  There is

14        an order on this particular issue

15        that follows this order,

16        Mr. Harris, where this was raised

17        with the special master and the

18        special master issued an opinion

19        on this particular issue.

20             I do not want to represent

21        it from memory because it was

22        about two years ago.  If you want

23        to take a break now --

24             MR. HARRIS:  Absolutely.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        do.
2              MR. KOBRIN:  -- I can try to
3        find it.  The only concern I have
4        is how late are we going to go?
5              MR. HARRIS:  Well, that
6        depends on how many speaking
7        objections you intend to make and
8        how long your witness intends to
9        make his answers.
10             So let's go ahead and take a
11       break.  I think if we can solve
12       the speaking objection issue here
13       pretty quick, it will definitely
14       cut down on the amount of time
15       that I have.
16             MR. KOBRIN:  I don't consent
17       to a break right now. I don't
18       consent to a break right now.
19       We're not taking a break.
20             MR. HARRIS:  Well, I didn't
21       consent to a break either, and
22       then we still went on a break.  So
23       here we have some issues that
24       you're saying that you can do
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          things that you're not entitled

 2          to.

 3                MR. KOBRIN:  Stop.  When did

 4          you not consent to a break?

 5                MR. HARRIS:  When we were in

 6          the middle of an exhibit when I

 7          was examining your witness and he

 8          was refusing to answer my

 9          question, and you said you were

10          going to go off the record.

11                MR. KOBRIN:  My witness had

12          gone for over an hour and a half.

13          And you said that you were going

14          to finish an exhibit.  And then we

15          waited 15 minutes.  And you did

16          consent to the break.  If you

17          don't consent to a break in the

18          future, please make that clear on

19          the record.

20                MR. HARRIS:  I promise you I

21          will.

22                MR. KOBRIN:  We would not

23          have taken that break if you

24          clearly said you didn't consent.
```

```
 1          We would have proceeded, but I
 2          would have potentially taken that
 3          up with the special master because
 4          I think not consenting to a break
 5          after that long a period of
 6          questioning on one exhibit and
 7          during the first period of the
 8          morning would have been completely
 9          unacceptable.
10               MR. HARRIS:  Well, let's
11          see.  Do you have any colleagues
12          on?
13               MR. KOBRIN:  If you would
14          like me to find -- you have dug up
15          an order from June of 2018.  I
16          recall there being an opinion on
17          this particular issue from Special
18          Master Cohen.
19               I do not want to state it
20          verbatim.  And I do not want to
21          pretend that I remember it
22          perfectly.
23               I'm willing to search for
24          that order.  I am not willing to
```

```
 1          waste more time during the day.

 2          If you can give me a hard stop

 3          time, I'll go off the record.

 4               MR. HARRIS:  I'm not going

 5          to give you a hard stop time

 6          because of your speaking

 7          objections.  I see at least one of

 8          your colleagues on.  What if they

 9          find it and they can e-mail it

10          once they have an opportunity to

11          do it since they're not

12          participating.

13               MR. KOBRIN:  Who's my

14          colleague?  Who's my colleague?

15               MR. HARRIS:  Is Thomas

16          Sidlinger from your firm?

17               MR. KOBRIN:  He's from

18          plaintiffs' firm.  I believe he is

19          from one of the plaintiffs' firms.

20          I don't think that matters.  None

21          of my colleagues from my law firm

22          who represent Giant Eagle, to my

23          knowledge are --

24               MR. HARRIS:  Well, here's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          what we're going to do.  Since I

 2          have the only order on this record

 3          right now that indicates no

 4          speaking objections, that's what

 5          we're going to do until you can

 6          show me differently on the record.

 7               So that's how we're going to

 8          do it.  So now we -- hold on.

 9          Hold on.  No, no, no.

10               MR. KOBRIN:  You guys think

11          you --

12               (Simultaneous speaking.)

13               MR. HARRIS:  I have an order

14          showing that there are no speaking

15          objections allowed.

16               Since you do not have an

17          opposing order to show me on

18          record right now, that's what

19          we're going to do.

20               MR. KOBRIN:  This is an

21          ambush.

22               MR. HARRIS:  So I suggest

23          you keep your objections --

24               MR. KOBRIN:  This is an
```

```
1          ambush, Mr. Harris.  It's

2          inappropriate.  It's

3          unprofessional.  If you had an

4          issue with this, we've had two

5          breaks you could have raised this

6          with me.  You raised this only

7          when we went back on the record.

8               I have stated to you that an

9          order from Special Master Cohen on

10         this particular issue was

11         litigated.  If you're not aware of

12         that order, that's your problem,

13         not mine.  This is your

14         deposition.  You can proceed

15         however you please.

16              I am going to keep making

17         objections that I feel are

18         appropriate and are allowed.

19              Now, if you want me to try

20         and find that order quickly, I can

21         do that.

22              MR. HARRIS:  That's exactly

23         what I would like.  Thank you.

24              MR. KOBRIN:  Okay.  Let's
```

```
1        stay on the record.  Give me a

2        moment.  I'm going to mute my

3        phone for a minute.  I'm going to

4        see if I can find someone to do it

5        so that I don't continue to waste

6        part record time on this.  All

7        right?

8            (Brief pause.)

9            MR. KOBRIN:  I'm back.  I

10       spoke to somebody who's going to

11       look into it.  They recall that it

12       might have been during a

13       deposition where the Special

14       Master attended, and this issue

15       was litigated live on the record

16       similar to how it is now, and that

17       there was a speaking order from

18       Special Master Cohen, but they're

19       going to look for that or any

20       subsequent order that he may have

21       issued.

22           MR. HARRIS:  Okay.  Well,

23       how about we come to a gentlemen's

24       agreement?
```

```
 1              If you want to limit it to

 2         objection to form and the basis

 3         without a colloquy until we can

 4         sort it out, I'm okay with that.

 5              But other than that, I think

 6         that it goes beyond the order that

 7         we do have currently.

 8              MR. KOBRIN:  Can you tell me

 9         really quickly what is your

10         concern?

11              MR. HARRIS:  My concern is

12         that you're coaching your witness

13         how to answer these questions,

14         which is the exact concern that

15         Judge Polster raises in this

16         order.

17              Your speaking objections are

18         indicating to this witness how he

19         should answer.

20              MR. KOBRIN:  I will refrain

21         from speaking objections to

22         indicate the witness how they

23         should answer.  But I'm not going

24         to refrain from objections where
```

Highly Confidential - Subject to Further Confidentiality Review

1        you're misleading the witness.

2               MR. HARRIS:  Well, if you

3        want to say objection to form,

4        misleading the witness, fine by

5        me.  I'm okay with that.

6               Anything further, I will

7        object.

8               MR. KOBRIN:  I'm going to

9        explain the objection.  I'm going

10       to explain the objection.  I don't

11       think that's how we have ever

12       been --

13              MR. HARRIS:  Okay.  Well,

14       this isn't going to get resolved

15       until we see that order.

16              So how about this?  If it

17       comes to that point, I'll have to

18       get Special Master Cohen on the

19       phone.

20              MR. KOBRIN:  If you want to

21       do that, that's your decision.

22       I'm going to try and dig up that

23       order for you.  This doesn't end

24       your deposition.  I don't think

```
 1            I've been unreasonable in any way.
 2                 MR. HARRIS:  Yeah, I do.  I
 3            disagree.  I do.
 4                 So all right.
 5                 Mr. Shaheen, sorry --
 6                 MR. KOBRIN:  Have you
 7            attended -- Mr. Harris, have you
 8            defended or taken depositions in
 9            this case?
10                 MR. HARRIS:  Yes, I have.
11  BY MR. HARRIS:
12            Q.   So Mr. Shaheen, are you
13  prepared to continue?
14                 MR. KOBRIN:  Can you tell me
15            the last deposition you took in
16            this case, Josh?
17  BY MR. HARRIS:
18            Q.   Mr. Shaheen, are you ready
19  to continue?
20                 MR. KOBRIN:  Josh, I'm just
21            curious, did you take a deposition
22            in this Track 3 case?
23                 MR. HARRIS:  If you want to
24            discuss, we can go off the record.
```

```
 1          We're not going to do this on my
 2          record time.  Thank you.
 3              MR. KOBRIN:  I don't want
 4          to -- this is a complete ambush,
 5          Josh.  You could have raised it at
 6          any time --
 7              MR. HARRIS:  This is not an
 8          ambush.  This is not an ambush.
 9          This is an objection to your
10          improper continued objections.
11              So, okay, you object how you
12          feel is appropriate, and I'll
13          address it as I feel is
14          appropriate.
15              We're not going to waste any
16          more of my record time for it.
17              MR. KOBRIN:  You ambushed
18          me.  You didn't raise this to me
19          at any point on or off the record,
20          and you pulled up an order from
21          June of 2018, which I think was
22          resolved in later litigation.
23              So I think we can proceed,
24          and I'm fine with that.  You said
```

```
1          that you might call the Special

2          Master.  I told you that I would

3          have somebody look into it.

4              I told you I didn't want to

5          inadvertently misrepresent

6          anything, so I would try find the

7          source for my belief that I'm

8          allowed to say more than object to

9          form.

10             And I will try and keep my

11         objections to a minimum, which I

12         think I've done throughout this

13         deposition.

14             I'm not going to agree to a

15         gentlemen's agreement that's going

16         to limit me or that's going to

17         trap me going forward from

18         defending my witness.

19             MR. HARRIS:  Okay.  Well,

20         I'll proceed.  And then on the

21         next break, we will solve this

22         before going back on the record.

23         All right?

24   BY MR. HARRIS:
```

```
 1          Q.    Mr. Shaheen, are you ready

 2    to continue?

 3                THE COURT REPORTER:  You're

 4          on mute.

 5    BY MR. HARRIS:

 6          Q.    I think you're muted.

 7          A.    There.  I was -- sorry.

 8          Q.    All right.  Great.

 9                All right.  So we left off

10    the deposition -- I want to -- I want to

11    go back and cover a few things.

12                You mentioned that Giant

13    Eagle, in regards to, you know,

14    protecting against diversion, goes above

15    and beyond, correct?

16          A.    I did.

17          Q.    Okay.  Do you still believe

18    that after our lunch break?

19          A.    I still believe that.

20          Q.    Okay.  I also asked you

21    earlier if you had an opportunity to ever

22    investigate Giant Eagle pharmacies.  And

23    I believe your answer was no; is that

24    correct?
```

```
 1          A.    As an agent, I -- I don't
 2   remember ever investigating Giant Eagle
 3   pharmacy.
 4          Q.    And when you say agent,
 5   you're referring to your time as an agent
 6   for the Pennsylvania AG's office?
 7          A.    During that time period from
 8   2000 until my retirement in 2013, I don't
 9   recall that, yes.
10          Q.    Sure.  Understood.  What
11   about since being hired by Giant Eagle?
12   Have you ever investigated Giant Eagle
13   pharmacies for evidence of diversion?
14          A.    I don't recall.
15          Q.    Okay.  So let me ask you
16   this.  Have you ever found evidence of
17   Giant Eagle diverting controlled
18   substances, particularly opioids?
19              MR. KOBRIN:  Object to form.
20          Vague.
21              THE WITNESS:  What are you
22          referring to?  The time period
23          that I was an agent or the time
24          period that I'm employed here?
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1   BY MR. HARRIS:

 2        Q.    Let me make it a little bit

 3   more narrow with the time.

 4             So during your time employed

 5   with Giant Eagle, have you ever found

 6   evidence that Giant Eagle committed

 7   diversion of their opioids?

 8        A.    That, to me, is somewhat

 9   misleading.  Reason being is I don't -- I

10   don't see Giant Eagle committing

11   diversion.

12             Your question is like an

13   intentional act, and I don't see that as

14   something that we did.

15        Q.    Okay.  So you're saying that

16   Giant -- no Giant Eagle employee has ever

17   committed an intentional act of

18   diversion?  I want to make sure I get

19   that right.

20        A.    No, I'm not -- no, you

21   didn't say -- you didn't say an employee.

22   Now you said employee.

23             Yes.  Have I had cases where

24   an employee had taken controlled
```

```
1   substances?  Yes.

2          Q.    Okay.  A Giant Eagle

3   employee, right?

4          A.    Correct.

5          Q.    Okay.  And they acted on

6   behalf of and to the benefit for Giant

7   Eagle; is that correct?

8                MR. KOBRIN:  Objection to

9          form.

10               THE WITNESS:  If they were

11         employed at Giant Eagle.

12  BY MR. HARRIS:

13         Q.    Correct.  Giant Eagle

14  employees, that's what I'm referring to,

15  right?

16         A.    Yes, that's correct.  Yes.

17         Q.    Okay.  And diversion can

18  appear in many forms.  Would you agree to

19  that?

20               MR. KOBRIN:  Object to form.

21         Vague.

22               THE WITNESS:  It can appear

23         differently.

24               Do you have -- is there
```

1          something specific that you're

2          referring to that I can answer yes

3          and no for you to that?

4     BY MR. HARRIS:

5          Q.   Sure.  Okay.  Let me give

6     you some examples of what could

7     potentially be diversion.  Theft of

8     prescription drugs, including opioids,

9     can be an example of diversion, right?

10          A.   Potentially.

11          Q.   Is there ever a scenario

12     where theft of prescription drugs,

13     including opioids, is not diversion?  Is

14     there a scenario in your mind you can

15     think of that it's okay for a Giant Eagle

16     to steal prescription drugs, including

17     opioids?

18          A.   No.  It's not okay.

19          Q.   Because it's diversion,

20     correct?

21          A.   Potentially diversion.

22          Q.   Okay.  When is it not

23     potentially diversion?  When is it okay

24     to steal prescription drugs, including

```
 1   opioids?

 2           MR. KOBRIN:  Object to form.

 3       Misrepresents prior testimony.

 4           THE WITNESS:  Yeah,

 5       that's -- yeah, if somebody,

 6       whether inside or outside, steals

 7       opioids, it could potentially be

 8       used as or coined to phrase

 9       diversion.  Yes, it can be

10       diverted.

11   BY MR. HARRIS:

12       Q.   The actual theft of the

13   opioids is evidence of diversion, though,

14   isn't it, Mr. Shaheen?

15       A.   Yes.

16       Q.   The filling of invalid

17   prescriptions can be an example of

18   diversion, can't it, Mr. Shaheen?

19           MR. KOBRIN:  Object to form.

20           THE WITNESS:  It could be,

21       yes.

22   BY MR. HARRIS:

23       Q.   Not conducting proper due

24   diligence and losing prescription drugs,
```

```
 1   including opioids can be diversion, can't
 2   it, Mr. Shaheen?
 3              MR. KOBRIN:  Object to form.
 4              THE WITNESS:  You said
 5        several things there again.
 6   BY MR. HARRIS:
 7        Q.   I can break it up if that
 8   makes it easier for you.
 9        A.   Please repeat it.
10        Q.   Absolutely.  Well, let me do
11   this.  Let me break it up into, you know,
12   smaller bits.
13              Not conducting due diligence
14   regarding prescription drugs can be
15   diversion, correct?
16        A.   It potentially could be --
17   potentially be diversion.
18        Q.   Okay.  So when is a scenario
19   that it's okay to not use due
20   diligence -- or conduct due diligence,
21   excuse me, regarding prescription drugs
22   including opioids?
23              MR. KOBRIN:  Object to form.
24        Misrepresents prior testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Because --
 2   BY MR. HARRIS:
 3        Q.    Go ahead, Mr. Shaheen.
 4        A.    If -- if a prescription is
 5   filled and they conducted due diligence,
 6   and it's filled on a legitimate basis,
 7   it's not diversion.
 8        Q.    I tend to agree with you for
 9   once.  My question was different, though.
10   My question was the lack of due diligence
11   and then filling a prescription, is an
12   incident of diversion, isn't it?
13                MR. KOBRIN:  Object to form.
14                THE WITNESS:  No, not
15           necessarily.
16   BY MR. HARRIS:
17        Q.    When is it okay to not
18   conduct due diligence?
19                MR. KOBRIN:  Object to form.
20                THE WITNESS:  The times our
21           pharmacists will know a patient,
22           know the doctor, and based on that
23           knowledge, I mean, that's a form
24           of due diligence, and may fill
```

1          that prescription.

2    BY MR. HARRIS:

3          Q.    Do your pharmacists know

4    their coworkers?

5               MR. KOBRIN:  Object to form.

6               THE WITNESS:  Yes.

7    BY MR. HARRIS:

8          Q.    You would agree that losing

9    pills can potentially be an example of

10   diversion, pills including opioids?

11              MR. KOBRIN:  Object to form.

12              THE WITNESS:  Yes,

13         potentially.  Yes.

14   BY MR. HARRIS:

15         Q.    Okay.  All right.  Let's

16   move on now to -- back to our folder.  Do

17   you still have that handy?

18         A.    I do.

19         Q.    Okay.  Let's look at -- I

20   apologize, I need to find my tab.  This

21   is going to be Tab 54 in your folder.

22              MR. HARRIS:  This is going

23         to be P-HBC-1325.  And I believe

24         this is going to be Shaheen-7, for

1          the record.

2               (Document marked for

3          identification as Exhibit

4          Shaheen-7.)

5     BY MR. HARRIS:

6          Q.    Mr. Shaheen, when you get

7     there, please let me know, and we'll go

8     ahead and address it.

9          A.    Tab 54, I'm there.

10         Q.    Okay.  This is not a

11    terribly long e-mail, so we're going to

12    cover most of it, so if you want to read

13    along with me.  It says from Gregory

14    Carlson at the top.

15              Do you see that?

16         A.    I do.

17         Q.    All right.  This was sent

18    Monday August 17th, 2015 to a group of

19    people, including yourself.  You see your

20    name on there, Richard Shaheen, the

21    second line?

22         A.    I do.

23         Q.    Okay.  The subject was,

24    "Pharmacy team leader calls."  There's an

1    attachment.  And the importance says

2    high.

3              Do you see where it says all

4    that?

5         A.    Yes.

6         Q.    Okay, great.  Mr. Carlson

7    writes, "Team, the team leader calls are

8    set for this week, Tuesday, Wednesday and

9    Thursday.  One PDL will be in charge of

10   dialing in as the chairperson for each

11   call."

12             Do you see where it says

13   that?

14        A.    I do.

15        Q.    Okay.  Skipping the next

16   sentence.  You can read it over if you

17   want.  "Each speaker can introduce the

18   next speaker when they are done (I

19   introduce Adrienne, Adrienne introduces

20   Joe, et cetera)."

21             Do you see that?

22        A.    I do.

23        Q.    The next line says, "See

24   your times below.  We have packed the

```
1   whole hour, so please make sure not to

2   exceed your allotted time," right?

3        A.   Yes.

4             MR. HARRIS:  Okay.  Let's go

5        ahead and pull up and zoom in

6        on --

7   BY MR. HARRIS:

8        Q.   Well, you're happy to look

9   over the first page, if you want.  But

10  I'm going to direct your attention to the

11  second page.  Since you were on this

12  e-mail, you were actually making a

13  presentation; isn't that right?

14            MR. KOBRIN:  And feel free

15       to read what you need to, Rick.

16            THE WITNESS:  Yeah, yeah,

17       no, I see it.

18  BY MR. HARRIS:

19       Q.   Okay.  So then it says,

20  "Loss prevention, Rick Shaheen, five

21  minutes," correct?

22       A.   Yes.

23       Q.   Okay.  Did you ask for more

24  time to present on this subject?
```

1     A.     I don't recall.

2     Q.     And then under yours, we

3    have some sub-points.  It says, "A,

4    return of C-IIs to locked cabinet safe

5    after final verification."

6             Do you see that?

7     A.     Yes.

8     Q.     And C-II refers to

9    Schedule II controlled substances, right?

10    A.     Yes.

11    Q.     "B, properly completing

12   Oxycodone full back counts, enter data

13   into perpetual log."

14             You see where it says that,

15   right?

16    A.     Yes.

17    Q.     So at this point, this

18   e-mail was from August 2015.  You're

19   still having to remind Giant Eagle

20   employees to complete the full back

21   counts and enter the data into a

22   perpetual log, right?

23             MR. KOBRIN:  Object to form.

24   Facts not in evidence.

```
 1         Misrepresents the document.
 2    BY MR. HARRIS:
 3         Q.    You can go ahead,
 4    Mr. Shaheen.
 5         A.    Stores were using paper -- a
 6    paper log.
 7         Q.    Okay.  I don't believe that
 8    was my question.  So let's look at this
 9    bullet point again.
10         A.    Go ahead.
11         Q.    It says, "Properly
12    completing Oxycodone full back
13    counts/enter data into perpetual log."
14              Is that what it says there?
15         A.    Yes.
16         Q.    You would agree this was a
17    topic that you were going to cover in
18    your five-minute presentation?
19         A.    Yes.
20         Q.    Okay.  So let's take a step
21    back.
22              Did Gregory Carlson create
23    this agenda, or did you add the three
24    sub-points to your presentation?
```

1        A.    I believe I would have added

2   those points.

3        Q.    Okay.  Why would you have

4   added Point B to this presentation?

5        A.    I wanted to ensure that they

6   were utilizing the document correctly and

7   following through to enter the data into

8   the perpetual log.

9        Q.    Okay.  And they were

10  required to enter the data immediately,

11  correct?

12            MR. KOBRIN:  Object to form.

13            THE WITNESS:  They would

14       enter the data as soon as they

15       could.

16  BY MR. HARRIS:

17       Q.    Well, hold on, Mr. Shaheen.

18  That's not what that document that we

19  looked at said earlier.  I'm happy to

20  pull it back up if you want.

21            Do you remember what I'm

22  referring to, your presentation from

23  2015?  I believe it was Tab 33.

24            Would you like to look at it

1    again with me?

2           A.    Okay.

3           Q.    Do you remember this one,

4    the document that says perpetual log on

5    it?  Here we go.

6                 It says, "Enter data in log

7    immediately after final verification."

8                 That's what you put in this

9    presentation, correct?

10          A.    Yes.

11          Q.    Okay.  So is that different

12   than the message that you gave on this

13   August 17th, 2015 pharmacy team leader

14   meeting?

15          A.    Well, as I explained --

16                MR. KOBRIN:  Object to form.

17          Object to form.  Sorry.

18   BY MR. HARRIS:

19          Q.    Go ahead, Mr. Shaheen.

20   Sorry.

21          A.    Sorry.

22          Q.    No, you're okay.

23          A.    The properly -- properly

24   completing Oxycodone full back

Highly Confidential - Subject to Further Confidentiality Review

1  counts/enter data into perpetual log, you

2  know, it was a reminder to them to enter

3  the data into the perpetual log when they

4  finished.  That's what that was.

5      Q.    Okay.  But really, in

6  conjunction with this other presentation,

7  they have to enter the data in the log

8  immediately after a final verification.

9  That's what this says, right?

10     A.    Yes.

11     Q.    And it also, on this

12 perpetual log slide at the bottom, it

13 says, "All pharmacists must comply."

14         Do you remember reading that

15 as well?

16     A.    Yes.

17     Q.    Okay.  And then finally on

18 the new document, the agenda.  It says

19 C -- "Double count C-T" -- excuse me

20 "C-II prescriptions," right?

21     A.    Correct.

22     Q.    Okay.  Do you recall if this

23 quarterly team leader call ever happened?

24     A.    I -- yes, I believe it

1    happened, yes.

2          Q.    Okay.  And if you turn to

3    the third page, I'm really just looking

4    at the title.  It looks like this was the

5    attachment to the e-mail, "Quarterly team

6    leader call."  Do you recall Giant Eagle

7    having these quarterly team meetings?

8          A.    Yes.

9          Q.    Do they still have those

10   quarterly team meetings?

11         A.    Yes.

12         Q.    Okay.  All right.  So we're

13   done with that one.  Let's go ahead and

14   move on.

15               I'd like to turn your

16   attention to -- let me ask you this.

17               Where do you live,

18   Mr. Shaheen?

19         A.    I'm sorry.  I didn't hear

20   you.

21         Q.    Where do you live?  Just the

22   city is fine.  I don't need the whole

23   address.  I know we have it somewhere.

24         A.    Greensburg, PA.

```
1          Q.   Okay.  Have you ever been to

2     Lake County, Ohio?

3          A.   Yes.

4          Q.   Have you ever been to

5     Trumbull County, Ohio?

6          A.   Yes.

7          Q.   Okay.  Were you in those

8     counties investigating Giant Eagle

9     pharmacies or issues related to Giant

10    Eagle pharmacies?

11         A.   I was there for Giant Eagle

12    business, yes.

13         Q.   Okay.  Let's go ahead and

14    turn to some documents that relate to

15    these two counties.  We're going to go

16    skip ahead to -- before we get there, you

17    said that you were doing Giant Eagle

18    business.

19              Did you ever find evidence

20    of diversion from Giant Eagle or Giant

21    Eagle employees in Lake County?

22              MR. KOBRIN:  Hold on one

23         second.  Can you repeat that?

24         It's not coming through on my
```

```
 1          feed, and I didn't hear you.  It

 2          froze up.

 3               MR. HARRIS:  I've got it on

 4          mine.  I'm not sure.

 5               MR. KOBRIN:  It says, "Did

 6          you ever find" -- okay.  "Did you

 7          ever find evidence of diversion

 8          from Giant Eagle or Giant Eagle

 9          employees in Lake County?"

10               MR. HARRIS:  Yes.

11     BY MR. HARRIS:

12          Q.   Mr. Shaheen, do you need me

13     to repeat it?

14          A.   No.

15          Q.   You know what?  Let's

16     just -- just to make sure that I have a

17     clean record, I actually would prefer to

18     repeat it.  So let me re-ask the

19     question.

20               Mr. Shaheen, did you ever

21     find evidence of diversion from Giant

22     Eagle or Giant Eagle employees in Lake

23     County, Ohio?

24          A.   I -- I don't exactly know
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   every city that's in Lake County.  So I

 2   can't answer verbatim there.

 3               If one of the stores that I

 4   investigated had diversion and it was in

 5   Lake County, then yes, I would have.

 6        Q.    Did you ever find evidence

 7   of diversion from Giant Eagle or Giant

 8   Eagle employees in Trumbull County, Ohio?

 9        A.    In -- you know, it's kind of

10   the same answer.  I don't know every city

11   that's in those counties or the store

12   that's in a county like I do in

13   Pennsylvania, just because of my

14   familiarity with this state versus Ohio.

15               So if I was there in Ohio

16   and diversion occurred in our pharmacy, I

17   would say -- if it was in that county, I

18   would say yes.

19        Q.    You agree that diversion has

20   contributed to what you identified as the

21   opioid problem in this country?

22               MR. KOBRIN:  Object to form.

23               THE WITNESS:  I would agree

24        that opioids have been a problem
```

1          in this country.

2     BY MR. HARRIS:

3          Q.   Okay.  Thank you for that.

4               Do you agree that the

5     diversion of opioids has contributed to

6     enhance that problem in this country?

7               MR. KOBRIN:  Object to form.

8               THE WITNESS:  Yes.  I would

9          say that that is true.

10    BY MR. HARRIS:

11         Q.   Okay.  Let's turn to Tab 16

12    in your folder.

13              MR. HARRIS:  This is

14         P-HBC-1284, and I believe this is

15         going to be Shaheen-8 for the

16         record.

17              (Document marked for

18         identification as Exhibit

19         Shaheen-8.)

20              THE WITNESS:  16?

21              MR. HARRIS:  Tab 16, yes,

22         sir.

23    BY MR. HARRIS:

24         Q.   Okay.  Are you familiar with

Highly Confidential - Subject to Further Confidentiality Review

```
 1   these forms, Mr. Shaheen?

 2          A.    I am.

 3          Q.    All right.  Let's get

 4   oriented.  We're going to look at a few

 5   of these.  I'd like to take a little time

 6   on the first one to let the jury know

 7   what we're looking at.  This is the Giant

 8   Eagle pharmacy suspected controlled

 9   substance loss DEA notification form,

10   correct?

11          A.    Correct.

12          Q.    Okay.  And these are used in

13   scenarios where, like it says in the

14   title, there's a suspected loss of a

15   controlled substance, right?

16          A.    Correct.

17          Q.    You indicated that losing

18   controlled substances, including opioids,

19   can potentially increase diversion,

20   right?

21               MR. KOBRIN:  Object to form.

22               THE WITNESS:  Correct.

23   BY MR. HARRIS:

24          Q.    So this form is dated
```

1    10/20/2014.

2              Do you see that?

3        A.    Yes.

4        Q.    It says, "Dear Agent in

5    Charge."  Is that referring to the DEA

6    agent?  I know -- I know you may not know

7    specifically, but generally, is that

8    referring to the DEA agent?

9              MR. KOBRIN:  Josh, really

10        quick, is this a standalone

11        document, do you know?  Or is it

12        part of a family?

13             MR. HARRIS:  As far as I

14        know, this was the form that was

15        produced.  During the break, I can

16        see about having someone check.

17        But I believe we got it as a

18        standalone.

19             MR. KOBRIN:  Got it.  Thank

20        you.

21             MR. HARRIS:  Yep.

22   BY MR. HARRIS:

23        Q.    Let me re-ask my question

24   Mr. Shaheen.

Highly Confidential - Subject to Further Confidentiality Review

```
1              So these are submitted to

2    the DEA, right?

3         A.    Yes.

4         Q.    So where it says, "Dear

5    Agent in Charge," that's referring to the

6    DEA agent, correct?

7         A.    Yes.

8         Q.    Okay.  That's not referring

9    to you or later when he joined Austin,

10   right?

11        A.    Correct.

12        Q.    Okay.  Thank you.  Then

13   there's a paragraph.  Then under the

14   paragraph, it says details and date of

15   suspected loss.

16             Do you see that?

17        A.    I do.

18        Q.    Okay.  Let's go ahead and

19   look at this one.  Let's highlight the

20   reason.  It says, "Monthly narcotic audit

21   performed on 10/19 showed

22   hydrocodone/APAP 10/325-milligram tabs

23   missing."

24             Do you see where it says
```

1    that?

2            A.    Yes.

3            Q.    Okay.  Then it says

4    afterwards, "After research, expected to

5    have lost 2,044 tablets."

6                  Do you see where it says

7    that?

8            A.    I do.

9            Q.    Okay.  And it says Giant

10   Eagle Pharmacy Number 1405, right?

11           A.    Correct.

12           Q.    Okay.  If you go back to

13   that sheet that you referred to earlier,

14   what I'm referring to is one of the

15   exhibits, P-HBC-1359, that was marked in

16   your deposition.

17                 This is the pharmacy list.

18   Do you remember looking at this earlier?

19           A.    Yes.

20           Q.    Okay.  So if we go to find

21   out 1405, which is on Page 3, I think

22   it's about the eighth one down, Pharmacy

23   1405, we can see that this pharmacy is

24   located in Trumbull County, correct?

```
 1          A.    Yes.

 2          Q.    Okay.  So a pharmacy in

 3   Trumbull County has lost -- has expected

 4   to have lost 2,044 tablets of

 5   hydrocodone, correct?

 6          A.    Yes.

 7          Q.    Okay.  And we see down here,

 8   pharmacy address 48 Vienna Avenue, Niles,

 9   Ohio, 44446.

10                That's the address, right?

11          A.    Yes.

12          Q.    Okay.  All right.  Now, you

13   say Giant Eagle goes above and beyond to

14   prevent diversion.  Is this an evidence

15   of Giant Eagle going above and beyond to

16   prevent diversion?

17                MR. KOBRIN:  Object to form.

18                THE WITNESS:  When things

19          like this are reported, we

20          immediately go -- contact the

21          board.  We immediately start what

22          we call covert counts to identify

23          if it is a problem internally or

24          if it's a problem with our data.
```

```
 1                 And it is also provided to

 2            our data people so we can do the

 3            research to see if this is an

 4            appropriate loss or if, in fact,

 5            it was data, because sadly

 6            sometimes data does affect these.

 7                 And instead of not reporting

 8            it, we would report this -- these

 9            kind of scenarios.

10  BY MR. HARRIS:

11       Q.    How many other times has

12  data reflected a loss of 2,044

13  hydrocodone tablets in the time you've

14  been employed by Giant Eagle?

15       A.    I don't -- I can't tell you

16  the quantities.  But we've had data that

17  has shown that if something is double

18  ordered, and that product never was

19  received, it would throw off the number;

20  therefore, until we found out what had

21  happened with that product, then, you

22  know, we would fill out a DEA 106 and

23  then make an amendment if we found it or

24  you know, try to look at video and do
```

Highly Confidential - Subject to Further Confidentiality Review

1    these counts, like I said, and, you know,

2    report the information to the Ohio Board.

3            Q.    Okay.  Thank you.  And then

4    we saw -- just to make sure before we

5    move on, this is October 20th, 2014.  Do

6    you see that at the top, the date?

7            A.    Correct.

8            Q.    Okay.  Let's go ahead and

9    turn to another exhibit.

10                 This is going to be Tab 11,

11   11 in your binder.

12                 MR. HARRIS:  This is

13           P-HBC-1279, and we'll mark as

14           Shaheen-9.

15                 (Document marked for

16           identification as Exhibit

17           Shaheen-9.)

18   BY MR. HARRIS:

19           Q.    Let me know when you get to

20   that one, Mr. Shaheen.  And this one

21   might be weird because I think it was

22   printed out in landscape versus portrait.

23           A.    Tab 11?

24           Q.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KOBRIN:  This is what

 2         exhibit again, Josh?  This is 9?

 3              MR. HARRIS:  This is

 4         Shaheen-9.  Yes, that's correct.

 5              THE WITNESS:  Okay.

 6              MR. HARRIS:  If I'm wrong, I

 7         hope someone stops me before the

 8         whole numbering is off.

 9  BY MR. HARRIS:

10         Q.   Do you see this exhibit,

11  Mr. Shaheen?

12         A.   Yes.

13         Q.   Okay.  This is an e-mail

14  from Nicole Deluco.

15              Do you see that at the top?

16         A.   Yes.

17         Q.   On Monday, November 10,

18  2014, so less than 30 days from the DEA

19  form that we just looked at, right?

20         A.   Okay.

21         Q.   Okay.  That's correct?  This

22  is less than 30 days from the last form

23  we looked at?

24         A.   I -- sorry, I've lost that
```

1   page.

2         Q.    No problem.  I can tell you.

3   It was Tab 16, so not too far, and it was

4   October 20th, 2014, right?

5         A.    Yeah, I found it.  Yep.

6         Q.    Okay.  So less than 30 days,

7   we have this e-mail from Nicole Deluco.

8   You're cc'd on here.  And it says "1405

9   Audit Question" is the subject.

10             Do you see that?

11        A.    Yes.

12        Q.    And do you understand 1405

13  to refer to the pharmacy number in this

14  scenario?

15        A.    Yes.

16        Q.    Which is the same pharmacy

17  that we looked at on Exhibit Shaheen-8?

18        A.    Yes.

19        Q.    Also in Trumbull County?

20        A.    Yes.

21        Q.    Okay.  Let's read the e-mail

22  together.

23             It says, "Hey, Donna.  Last

24  night I was doing an audit in Niles,

```
 1   1405, and I came across a discrepancy

 2   with hydrocodone/APAP 10/30" -- or excuse

 3   me -- "10/325 that I can't figure out.

 4   I'm wondering if it's possibly a data

 5   issue."

 6               Do you see where it says

 7   that?

 8        A.    Yes.

 9        Q.    Okay.  We're going to go

10   down to the paragraph that starts,

11   "Here's where it gets odd."  Let me know

12   when you find that paragraph.  Feel free

13   to browse over the others too.

14        A.    Okay.

15        Q.    All right.  It says, "Here's

16   where it gets odd.  I ran a controlled

17   drug report.  It's showing that five

18   scripts for a total of 465 tabs were

19   dispensed under that NDC on 11/7/14."

20               Do you see that?

21        A.    I do.

22        Q.    It goes on to say, "I show

23   no purchases for it after reviewing their

24   C-II invoices, and my audit isn't
```

1    reflecting 465 being dispensed under that

2    NDC."

3              Do you see that?

4        A.    I do.

5        Q.    Okay.  She asked, "Could

6    this be a data issue?"   Right?

7        A.    Yes.

8        Q.    Okay.  So in less than

9    30 days -- hold on one second.  Okay.  In

10   less than 30 days, this one pharmacy in

11   Trumbull County has reported 2,509

12   hydrocodone potentially missing; is that

13   right?

14             MR. KOBRIN:  Object to form.

15   BY MR. HARRIS:

16       Q.    The other one was 2,044.

17   This one is 465.  I mean, feel free to

18   stop and do the math if you want.

19       A.    Yeah, I did.

20       Q.    Okay.  So in less than

21   30 days, this one pharmacy has reported

22   2,509 pills potentially missing; is that

23   right?

24       A.    That's correct.

```
 1            Q.    Okay.  Is this another
 2    example of Giant Eagle going above and
 3    beyond to prevent diversion?
 4                  MR. KOBRIN:  Object to form.
 5                  THE WITNESS:  We -- in cases
 6            like this, as I said, if -- if
 7            behind the scenes data was being
 8            examined to try to determine this,
 9            we were -- I can't remember if I
10            did counts or Chris did counts.
11                  I know the Ohio Board was
12            contacted.  You know, so obviously
13            with these reports, it just didn't
14            sit.
15                  Giant Eagle did, like I
16            said, the cold audits, which is
17            taking out technology.
18                  And our results from those
19            audits showed that nothing was
20            missing during a particular time
21            period.
22    BY MR. HARRIS:
23            Q.    Okay.  Anything else?  I
24    just want to make sure that I didn't cut
```

Highly Confidential - Subject to Further Confidentiality Review

1   you off.

2         A.    No, no.  You didn't cut me

3   off.

4         Q.    Okay.  All right.  Let's go

5   ahead and look at the next exhibit.  This

6   is going to be Tab 28, Tab 28 in your

7   folder.

8              MR. HARRIS:  And it's

9         P-HBC-1299.  This will be Shaheen

10        Exhibit 10, for the record.

11             (Document marked for

12        identification as Exhibit

13        Shaheen-10.)

14             THE WITNESS:  28?

15             MR. HARRIS:  Yes.  Yes, sir.

16        28.  Shaheen-10.

17   BY MR. HARRIS:

18        Q.    Now, Mr. Shaheen, I'll

19   represent to you and counsel that this is

20   the form this document was produced in.

21   I'd like to walk through it with you,

22   Mr. Shaheen.  I believe these are two

23   separate instances from the same store,

24   but I am hoping that you can confirm that

```
 1   for me, candidly.

 2              So if you have any questions

 3   as we're looking through this, let me

 4   know, okay?

 5              So we're looking at Exhibit

 6   Shaheen-10.

 7              This is the front page.  At

 8   the top, we see it's labeled

 9   "Prescription Pickup Signature."

10              Do you see that on this

11   form?

12        A.    Yes.

13        Q.    Okay.  And then we can also

14   tell that there's some handwriting around

15   here on this document in its entirety.

16              Do you see that?

17        A.    I do.

18        Q.    Okay.  Do you recognize any

19   of that handwriting to be yours by

20   chance?

21        A.    Yes.  The top right in that

22   little box.  I'll read it.  400 -- I

23   don't know if that's an eight or a two --

24   "Ohio, on Rx filled by our pharm."
```

1           And below that, I don't know

2   what "1213 drop-off," that's not me.

3   "Video given to police in September by me

4   and Andrew."

5           So again, I don't know if I

6   gave it or Andrew, but one of us gave the

7   police video.

8       Q.    Okay.  And just to be clear,

9   it says RAS.  I'm assuming those are your

10  initials?

11      A.    Yes, they are.

12      Q.    Okay, perfect.  Okay.

13  Great.  Well, if you look at the

14  customer -- or excuse me, the pharmacy

15  list I provided, it indicates that 4002

16  is the Church Hill Commons pharmacy, also

17  in Trumbull County.  That's on Page 4.

18  Feel free to go back and confirm that if

19  you'd like.

20      A.    Okay.

21      Q.    Just so the record is clear,

22  the customer list is Shaheen-2, and that

23  was Tab 37 in your binder.  But I think

24  you pulled it out for ease of access.

```
 1          A.    Okay.

 2          Q.    Were you able to confirm

 3     that store -- or that Pharmacy 4002 is a

 4     pharmacy in Trumbull County, Ohio?

 5          A.    It -- yes, it is in

 6     Trumbull.

 7          Q.    Okay.  Great.  So here, as

 8     you just testified, you wrote, "Stolen

 9     prescription filled by our pharm," right?

10          A.    Yes.

11          Q.    And does pharm stand for

12     pharmacist?

13          A.    Pharm stands for pharmacy.

14          Q.    Pharmacy.  Okay.  So the

15     pharmacy in whole as opposed to versus

16     one pharmacy?

17          A.    Yes.

18          Q.    Okay.  Thank you.

19                And then this was -- it

20     looks like the prescription pickup

21     signature, is that the documentation that

22     you provided to the police?

23                MR. KOBRIN:  Object to form.

24                THE WITNESS:  I -- at this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            point, I don't know if this was

 2            provided by me or -- because the

 3            writing on it may be at that time

 4            the pharmacist documented that,

 5            and then put stuff over top.  And

 6            then I got what she gave the

 7            police officer, and then I

 8            subsequently wrote over it.

 9   BY MR. HARRIS:

10         Q.    I understand.  Let me re-ask

11   my question.

12            So the part that we can

13   confirm you wrote was, "Stolen

14   prescription filled by our pharmacy,"

15   right?

16         A.    That's mine.

17         Q.    Okay.  So someone from,

18   presumably, Giant Eagle provided law

19   enforcement, police, with additional

20   information about this stolen

21   prescription that was filled by your

22   pharmacy, right?

23         A.    Correct.

24         Q.    Okay.  And we see under the
```

1    prescription pickup signature, it says,

2    "Date filled, September 3rd, 2016."

3              Do you see where it says

4    that?

5         A.    Date filled, yes.

6         Q.    Okay.  And then two below

7    that, it says, "Acquiring store, 4002,"

8    which we've established is a pharmacy in

9    Trumbull County, Ohio, correct?

10        A.    Correct.

11        Q.    Okay.  And you agreed

12   earlier that filling a stolen

13   prescription -- well, strike that.

14             Do you agree that a stolen

15   prescription is not a valid prescription,

16   right?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  A stolen

19        prescription, well, again -- a

20        stolen prescription is not a

21        valid -- you know, two ways to

22        look at it, but it's not a valid

23        prescription.

24   BY MR. HARRIS:

1       Q.   Okay.  What's the other way

2   to look at it?  When is a stolen

3   prescription okay?

4       A.   Well, I'm just saying if a

5   prescription was written, the -- if the

6   prescription was written legitimately for

7   somebody, okay -- and maybe I'm just

8   misinterpreting what you're saying.  But

9   if it's written, and then that

10  prescription is taken by somebody else,

11  at that point, the script is actually

12  legitimate, but the person that took it

13  makes it that theft that you're talking

14  about.

15      Q.   Okay.  So attempting to get

16  prescription drugs including opioids with

17  a prescription, not prescribed to you,

18  that's fraudulent, correct?

19      A.   Correct.

20      Q.   Okay.  And you agree that

21  filling fraudulent prescriptions can

22  contribute to diversion, correct?

23      A.   It can, correct.

24      Q.   Okay.  Let's go ahead and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   turn to the second page.  And this is

 2   where this document gets a little weird.

 3   If you look at the top, this is another

 4   DEA notification form that we discussed

 5   already, but this one is dated June 12,

 6   2015.

 7              Do you see where it says

 8   that?

 9        A.   I do.

10        Q.   Okay.  And certainly the

11   last one that we looked at was about a

12   year -- a year and three months,

13   approximately, in time.  So do you agree

14   with me that these look like they're

15   discussing two separate instances?

16              And take your time to review

17   it.  We're going to have some more

18   questions on it.  But that's my take on

19   it, two instances from the same store.

20              I'll come back to that

21   question.

22              Let's look at this one a

23   little bit more together, and then we can

24   ask that one.
```

1          Let's go -- details and date

2    of suspected loss.  It says 5/30, May

3    30th, presumably 2015.

4          Would you agree with that?

5          A.    Yes.

6          Q.    Okay.  It says,

7    "Prescription for morphine IR

8    30-milligram was filled.  Quantity 60 on

9    review of video.  Two bottles were pulled

10   from safe.  Only one returned.  Possibly

11   thrown out."

12          Do you see where it says

13   that?

14          A.    Yes.

15          Q.    Okay.  So from what we're

16   reading, it's unclear where that other

17   bottle went, correct?

18          MR. KOBRIN:  Object to form.

19          THE WITNESS:  Correct.

20   BY MR. HARRIS:

21          Q.    And you may know or you may

22   not.  Do you know how many pills -- how

23   many tablets or pills, whatever you want

24   to refer to them as -- are in a bottle of

Highly Confidential - Subject to Further Confidentiality Review

1    morphine 30 milligrams?

2         A.    I'm not sure.

3         Q.    Okay.  But we saw in your

4    presentation earlier that a lot of these

5    prescription opioids have high street

6    values.  Is that -- do you remember

7    looking at that?

8         A.    Yes.

9         Q.    Okay.  So I mean, a bottle

10   of morphine, I'm not going to ask you

11   what you think the street value is.

12              Actually, yeah, I am.  You

13   were an agent for Pennsylvania AG.  Did

14   you ever become aware of a street value

15   of a bottle of morphine?

16        A.    I didn't -- I didn't

17   investigate street drugs.  Illicit.

18              Mine was Medicaid fraud.

19   That's what we did.  We did pharmacies.

20   We did doctors.  We didn't do, you know,

21   street --

22        Q.    Sure.

23        A.    -- purchases.

24              And you know what?  I mean,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   I'm -- only a portion of this was -- was

 2   there -- do you have more documentation

 3   than this?

 4        Q.    This is how this document

 5   was produced to us, Mr. Shaheen.  So I'm

 6   trying to figure it out as much as you.

 7        A.    Well, no, I mean, it says

 8   possibly thrown away.  I'm just

 9   thinking --

10        Q.    Oh, well, here, let's go to

11   the next page.  Maybe this is what you're

12   looking for.  Page 3, original notes.

13        A.    Okay.

14        Q.    All right.  Is this your

15   handwriting?

16        A.    Yes.

17        Q.    Okay.  So 4002, that's that

18   pharmacy in Trumbull County.  May 30th,

19   '15.  Then we see, "MS IR 30 MG, 100

20   missing."

21              Do you see that?

22        A.    Yes, I do.

23        Q.    MS IR stands for that

24   morphine that we were just discussing?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  Before we go on, when

3  destroying prescription drugs, including

4  opioids, isn't there a procedure that

5  needs to be followed to do that properly?

6              MR. KOBRIN:  Object to form,

7         foundation.

8              THE WITNESS:  Yes.

9  BY MR. HARRIS:

10    Q.    Okay.  Do you know what that

11  procedure is?

12    A.    Well, I can only say in --

13  generally what we do is, if something is

14  going -- excuse me -- our out dates and

15  whatnot, we return those to a company,

16  and get credit for it.  That's generally

17  what we do.

18    Q.    Okay.  So it's not a Giant

19  Eagle practice to take a bottle out and

20  throw it in a dumpster?

21    A.    Right.

22              MR. KOBRIN:  Object to form.

23              THE WITNESS:  Sorry.

24  BY MR. HARRIS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Go ahead, Mr. Shaheen.  You

 2   can answer.

 3          A.    No, it's not our practice to

 4   throw it in a dumpster.

 5          Q.    So we see here -- and the

 6   date and time on the left, is this one of

 7   your video file reviews?

 8          A.    Yes.

 9          Q.    Okay.  So are those maybe

10   timestamps on the video?

11          A.    Yes.

12          Q.    So if we see the timestamp

13   12:30:53, it says, "Bottle thrown out,"

14   correct?

15          A.    Correct.

16          Q.    Okay.  "3:41 garbage out to

17   compactor," is what I believe is what

18   that says, right?

19          A.    Correct.

20          Q.    So this is not -- this is

21   outside the ordinary Giant Eagle practice

22   in destroying prescription drugs,

23   correct?

24                MR. KOBRIN:  Object to form.
```

```
 1                THE WITNESS:  Correct.  But

 2          you know, they didn't know that it

 3          went in the garbage.  So it's not

 4          part of their practice.

 5     BY MR. HARRIS:

 6          Q.    Oh, okay.  Where does it say

 7     they didn't know it went in the garbage?

 8          A.    My video review.

 9          Q.    Okay.  Where does it say

10     that on this document, though?

11          A.    It doesn't say it on the

12     document.  I'm telling you based on my

13     video review, you know, if you read here,

14     the bottle was thrown out.  And then what

15     I did was I followed the video all the

16     way to make sure that this bottle didn't

17     end up, you know -- by anybody taking it,

18     and you're able to follow the garbage.

19     And the garbage was then sent to the

20     compactor, and it was destroyed there.

21          Q.    Outside the course of Giant

22     Eagle's normal practice for destruction

23     of opioids, right?

24                MR. KOBRIN:  Object to form.
```

```
 1                  THE WITNESS:  Yes.  If we
 2         were going to destroy it, this
 3         product would have went back to
 4         Anda or --
 5  BY MR. HARRIS:
 6         Q.    McKesson?
 7         A.    Whatever company, yes.
 8         Q.    Okay.  Let me ask you this.
 9  Going back to this exhibit as a whole,
10  the first page dealt with a stolen
11  prescription.  And then the second page
12  deals with an improperly disposed of
13  bottle of morphine, correct?
14         A.    Correct.
15         Q.    One from 2016, one from
16  2015, right?
17         A.    Yes.
18         Q.    So these are two separate
19  instances that happened to be combined in
20  one exhibit, right?
21                And listen, I'm not asking
22  this as a -- as a trick or anything.
23  It's just generally, from your review, do
24  these appear to be two separate
```

```
 1   incidents?

 2        A.    These appear to be, based on

 3   dates, two separate incidents.

 4        Q.    Okay.  The incident dated --

 5            MR. KOBRIN:  In your

 6         question, you said combined into

 7         one exhibit.  Did you mean that

 8         you guys combined it or the

 9         production?  I just didn't -- I

10         don't want there to be a

11         misrepresentation on the record

12         that we somehow -- that we created

13         this exhibit for this purpose.

14            MR. HARRIS:  I believe this

15         is how it was produced.  I mean,

16         the Bates numbers are certainly

17         sequential.  But -- and I'm not

18         necessarily --

19            MR. KOBRIN:  I can --

20            MR. HARRIS:  I'm not

21         necessarily, you know, raising an

22         issue of how it was produced.  I'm

23         just trying to confirm for the

24         record that these are not intended
```

Highly Confidential - Subject to Further Confidentiality Review

1          to be attached.

2                  If we inadvertently

3          attached, then that's on me.

4          But --

5                  MR. KOBRIN:  I think that --

6          Josh, I think that is right.  But

7          I think if you look at these

8          documents -- and again, I haven't

9          got all of our production

10         memorized, but if you look at

11         these documents via hardcopy

12         scans, they're not -- these are

13         not ESI production.

14                 MR. HARRIS:  Okay.  Yeah,

15         that's fair.  That's fair.  I'm

16         not challenging the validity of

17         them.  I'm just -- I'm just trying

18         to establish that they are two

19         separate and not linked in any

20         way, which I believe he's

21         testified to, so...

22     BY MR. HARRIS:

23         Q.   All right, Mr. Shaheen.  The

24     incident September 6, 2016 with filling

Highly Confidential - Subject to Further Confidentiality Review

```
1    the stolen prescription, is that another

2    example of Giant Eagle going above and

3    beyond to prevent diversion?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  The minute

6         that this -- this was happened, we

7         were alerted to it.  Contacted the

8         police and then provided the

9         necessary information to the

10        police so maybe they could conduct

11        their investigation with our video

12        and then information that they

13        gathered.

14   BY MR. HARRIS:

15        Q.    Okay.  Thank you.

16              And then the incident from

17   June 2015 where an employee improperly

18   disposed of a bottle of morphine.  Is

19   that another example of Giant Eagle going

20   above and beyond to prevent diversion?

21              MR. KOBRIN:  Object to form.

22              THE WITNESS:  Once this

23        happened, I got called.  I know

24        they probably started mini counts.
```

```
 1          Then I come in to review video.
 2               Once I was able to determine
 3          that the product got thrown into
 4          the garbage, you know, the
 5          information was provided to the
 6          Ohio Board and the DEA.
 7    BY MR. HARRIS:
 8          Q.    Okay.  All right.  I'll tell
 9    you what, Mr. Shaheen, I have one more
10    document that's fairly short.  Let's go
11    over that.  Then we've been going for
12    about another hour, so we'll take another
13    break.  Does that sound good to you?
14          A.    Thank you.
15          Q.    Let's go ahead and to turn
16    to Tab 71, Tab 7-1 in your folder.
17               (Document marked for
18          identification as Exhibit
19          Shaheen-11.)
20               MR. HARRIS:  This is going
21          to be Shaheen-11.  And for the
22          record, this was produced
23          P-HBC-1342, Shaheen-11.
24    BY MR. HARRIS:
```

```
 1            Q.    Let me know when you get a

 2    chance to flip through that one,

 3    Mr. Shaheen, and we'll discuss it

 4    together.

 5            A.    Okay.  I'm there.

 6            Q.    Okay.  Now, this is an

 7    e-mail.  I'll acknowledge that you are

 8    not on the initial e-mail, but it looks

 9    like you were later copied.  Is that

10    fair?  Or it was later forwarded to you,

11    I should say, rather.

12            A.    Yes.

13            Q.    Okay.  It's forwarded to you

14    from Chris Miller on November 30th, 2015,

15    the same day the original e-mail was

16    sent, right?

17            A.    Yes.

18            Q.    Okay.  And this is related

19    to Pharmacy 1435, as we can see from both

20    the from line and the start of the

21    initial e-mail.

22                  Do you see where it says

23    that?

24            A.    I do.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And on Shaheen-2, our

2    pharmacy list, if you go to Page 2, it

3    indicates Pharmacy 1435, also in Trumbull

4    County, Ohio, correct?

5    A.    Correct.

6    Q.    All right, great.  So let's

7    go ahead and read the e-mail.  It says,

8    "Subject:  Fraudulent prescriptions

9    received."

10          Do you see where it says

11   that?

12   A.    I do.

13   Q.    It says, "Hi, Chris.  This

14   is Mike from Number 1435.  I received a

15   call today from CNP Laura Dejulia who

16   works for Meridian Community Care."

17          Do you see where it says

18   that?

19   A.    I do.

20   Q.    Okay.  It says they fired a

21   nurse today who has been writing

22   fraudulent prescriptions under three

23   different names, right?

24   A.    Yes.

```
1          Q.    Mike from Pharmacy 1435

2   says, "Most prescriptions were filled at

3   Walgreens on Meridian Road; however, two

4   prescriptions were filled at our store

5   and several at Giant Eagle on Belmont

6   Avenue."

7                Do you see where it says

8   that?

9          A.    I do.

10         Q.    It says "We," all capital,

11  right?  "We filled a fraudulent Percocet

12  prescription in June of 2014 and a

13  fraudulent Norco prescription in April

14  of 2015."

15               Do you see that?

16         A.    I do.

17         Q.    Okay.  And you agree filling

18  fraudulent prescriptions can contribute

19  to the diversion of opioids, right?

20               MR. KOBRIN:  Object to form.

21         Complete misrepresentation of the

22         document.

23               THE WITNESS:  Yes, and it

24         looks like -- go ahead.
```

1    BY MR. HARRIS:

2         Q.    Is this another example of

3    Giant Eagle going above and beyond to

4    prevent the diversion of opioids?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  In response to

7         this, again, whether it was

8         myself, Chris Miller, or anyone

9         else, would have contacted Mike

10        and spoke with Mike.  Obviously

11        provide and work with law

12        enforcement to help out with this

13        particular case, prosecute this

14        individual, and maybe even the

15        Ohio Board.  Mm-hmm.

16   BY MR. HARRIS:

17        Q.    Okay.  Well, but we already

18   have two prescriptions that were filled

19   at two separate Giant Eagle stores

20   indicated by this e-mail, right?  Two

21   fraudulent prescriptions I should say.

22        A.    From -- from what is -- from

23   what is reported by the pharmacist.

24   Mm-hmm, yes.

```
 1          Q.   Okay.  So filling fraudulent

 2    prescriptions, is that an example of

 3    Giant Eagle going above and beyond to

 4    prevent the diversion of opioids?

 5              MR. KOBRIN:  Object to form.

 6              THE WITNESS:  We exercise

 7         our due diligence.  We -- we

 8         exercise all precautions to try to

 9         prevent these kind of things from

10         happening.  Okay.

11              And then plus, anything that

12         we have on top of it, whether it's

13         electronic, or paper, to utilize

14         to help prevent these things from

15         happening.

16              MR. HARRIS:  All right.  I

17         told you that I was going to go

18         through that one document real

19         quick because it was short.  So

20         why don't we go ahead and take a

21         ten-minute break.

22              Good for everyone?

23              MR. KOBRIN:  Works for me.

24         Thank you, Josh.
```

```
 1              MR. HARRIS:  All right.

 2          We'll go ahead and go off the

 3          record if that's all right with

 4          everybody.

 5              THE VIDEOGRAPHER:   Going

 6          off the record.  The time is 2:44.

 7              (Short break.)

 8              THE VIDEOGRAPHER:   We are

 9          going back on record.  The time is

10          3:05.

11   BY MR. HARRIS:

12          Q.   All right, Mr. Shaheen.

13   We're back from our break.  Do you

14   understand that you're still under oath?

15          A.   I do.

16          Q.   Okay.  Let us -- let's turn

17   together to Tab 29, 2-9, of your folder.

18              (Document marked for

19          identification as Exhibit

20          Shaheen-12.)

21              MR. HARRIS:  This is going

22          to be -- let me double-check.  I

23          think I have a typo on my -- well,

24          yeah, Joe will pull it up.
```

```
1              No, I don't think that's it.

2         Oh, it's Tab 69.  I'm sorry.  This

3         is the next exhibit.  So it's Tab

4         6-9.  I apologize, Mr. Shaheen.  I

5         went too far on the page.  We'll

6         look that one in a minute.

7              Okay.  Here we go.  So let's

8         make this clear for the record.

9         We're looking at what's been

10        produced as P-HBC-1340.

11             This is Tab 69 in the folder

12        produced to Mr. Shaheen.

13             This is going to be marked

14        as Shaheen-11 -- or excuse me, 12

15        for the depo transcript.

16   BY MR. HARRIS:

17        Q.   All right, Mr. Shaheen.

18   Just kind of briefly orienting ourselves.

19   We have a cover e-mail.  And then

20   attached to it we have another giant

21   e-mail DEA notification; is that right?

22        A.   Yes.

23        Q.   Okay.  Let's go ahead.  This

24   is a short e-mail.  Let's just go ahead
```

1    and peak at it real fast.  This is an

2    e-mail from Angela Garofalo on June 13th,

3    2017, to a couple folks, and you're on

4    the "cc" line.

5              Do you see that?

6        A.    I do.

7        Q.    It says "Subject:  Loss."

8    And then there's an attachment, which

9    we'll get to next, right?

10       A.    Yes.

11       Q.     And it says, "Rolling,"

12   which I believe was intending to be

13   Rollin.  "Rolling, store was investigated

14   and cannot determine what happened.  Can

15   you send me a report showing all

16   purchases and dispensing since May 1st?

17   We did the annual control inventory then

18   and everything looked good."

19              Is that right?

20       A.    Yes.

21       Q.    Okay.  And I believe you

22   testified earlier that when a store did

23   suffer a loss, what they would do is look

24   at the data to determine if they could

1   identify where that loss occurred

2   potentially?

3        A.    Yes.

4        Q.    Okay.  But here,

5   Mr. Garofalo is indicating, "Store has

6   investigated and cannot determine what

7   happened."

8              Do you see where it says

9   that?

10       A.    Yes.

11       Q.    Okay.  So let's go ahead and

12  go to the attachment to get a little more

13  information.  This is also dated -- gosh,

14  I think that -- I believe that's

15  6/2/2017.  It's a little chicken scratch.

16             Okay.  So we see, "Details

17  and date of suspected loss."  It says,

18  "120 hydrocodone, May 30, 2017."  And

19  underneath that, "40 amphetamine, May 30,

20  2017."

21             Do you see where it says

22  that?

23       A.    Yes.

24       Q.    Okay.  And if we look at our

1    pharmacy list from Exhibit Shaheen-2, we

2    see the Giant Eagle pharmacy number is

3    6381, which is the Willoughby store in

4    Lake County, Ohio, correct?

5        A.    Yes.

6        Q.    And you testified earlier

7    that you had been to Lake County to

8    conduct Giant Eagle business?

9        A.    Correct.

10        Q.    Okay.  Do you have any

11    independent recollection of being at this

12    store, the Willoughby store, or pharmacy,

13    I should say, in Lake County?

14        A.    I could have been at the

15    store.  I don't recall.

16        Q.    Okay.  So let me ask you

17    this.  The data that's pulled by

18    pharmacists when inspecting loss is also

19    entered by Giant Eagle pharmacists; is

20    that correct?

21        A.    Please repeat.

22        Q.    Sure.  Let me ask it a

23    different way.  That wasn't a very good

24    question.

1         A.     Yeah.

2         Q.     We talked about the

3    perpetual logs earlier.  Do you remember

4    looking at those?

5         A.     Mm-hmm.  Yes.

6         Q.     And you also indicated that

7    there's also electronic forms of data

8    reporting, if you will?

9         A.     Yes.

10        Q.     Is it the Giant Eagle

11   pharmacists that input that information

12   to either the log or the electronic

13   database?

14        A.     Yes.  Giant Eagle

15   pharmacists and/or IT people on the back

16   side.

17        Q.     Okay.  Fair enough.  So

18   you're relying on those pharmacists -- or

19   in scenarios, the IT people -- you rely

20   on those pharmacists to put accurate

21   information in those logs, correct?

22        A.     Yes.

23        Q.     Because you need accurate

24   information to determine what happened

1   with a potential loss, right?

2                MR. KOBRIN:  Object to form.

3                THE WITNESS:  Yes.  That

4        would be -- that would be used in

5        an attempt to determine a loss.

6   BY MR. HARRIS:

7        Q.    Okay.  And as we discussed,

8   a loss of prescription drugs, including

9   opioids, is potentially increasing the

10  risk of diversion, correct?

11       A.    Potentially.

12       Q.    Okay.  Now, this loss of

13  opioids in June 2017 at a Lake County

14  pharmacy, is this another example of

15  Giant Eagle employees going above and

16  beyond to prevent the diversion of

17  opioids?

18                MR. KOBRIN:  Object to form.

19        Misrepresents this document.

20                THE WITNESS:  Utilizing the

21        data and what they have, not only

22        at the store level, but then

23        through corporate, they've

24        identified a loss here.

```
 1              Subsequent to that loss,
 2         they filled out a DEA 106.  And
 3         again, I don't remember if I
 4         looked at it or Andrew looked at
 5         it to review video.  Those are
 6         some of the things that we do to
 7         become proactive.
 8              Probably -- I don't have --
 9         I don't see anything else.  But I
10         know as a form, we always contact
11         the board and then we start a
12         covert count.
13  BY MR. HARRIS:
14         Q.   Okay.  Thank you.  I want to
15  address something that you mentioned.
16  You said those are some things that we do
17  to become proactive.  But let's take a
18  step back.
19              You weren't aware of this
20  loss until it was reported to you by the
21  pharmacist, Angela Garofalo, correct?
22              MR. KOBRIN:  Object to form.
23              THE WITNESS:  Yes, correct.
24  BY MR. HARRIS:
```

```
 1        Q.   Okay.  So whenever you found

 2   out, you were actually reactive to the

 3   situation, not proactive, correct?

 4        A.   Reactive to that, but then

 5   moving proactive by starting our mini

 6   counts, reviewing video and whatnot, to

 7   try to determine that loss.

 8        Q.   Okay.  Fair enough.

 9             But in terms of the loss

10   itself, your investigation was reactive

11   to the loss as opposed to being proactive

12   to the loss, right?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  We

15        responded --

16             MR. KOBRIN:  The question is

17        whether he wasn't proactive to

18        something that hadn't happened

19        yet?

20   BY MR. HARRIS:

21        Q.   Mr. Shaheen, do you

22   understand my question?

23        A.   Please repeat.

24        Q.   Okay.  Sure.  So you were
```

1  not proactive to this loss of 120

2  hydrocodone and 40 amphetamine, correct?

3       A.    I didn't know of this loss

4  until Angela reported, and then we became

5  reactive to it.  And why I'm saying

6  proactive on our counts, the board -- I

7  don't wait for the board to tell us to

8  please start the mini counts.  We start

9  that automatically.  So that's what I'm

10 saying about being proactive.

11      Q.    Okay.  And I understand, and

12 I appreciate that.  But I'm asking in

13 regard to the actual loss itself.  That's

14 a reactive investigation, not a proactive

15 investigation, right?

16      A.    I didn't know about this

17 loss until Angela contacted me.

18      Q.    Okay.  Thank you.  Would you

19 agree that most of your investigations,

20 you only become aware of when a

21 pharmacist or a team leader or another

22 Giant Eagle employee notify you?

23      A.    It could be, yes.  And

24 remember I said before, background

Highly Confidential - Subject to Further Confidentiality Review

```
 1   workers, IT people. Okay.  We put in --

 2         Q.    Sure.  Those would be Giant

 3   Eagle employees, right?

 4         A.    Yes.  Mm-hmm.

 5         Q.    Okay.  And so a majority, if

 6   not all, of your investigations into the

 7   potential issues that could lead to

 8   diversion are reactive once you're

 9   notified by Giant Eagle employees,

10   correct?

11               MR. KOBRIN:  Object to form.

12               THE WITNESS:  A lot of

13         times, what we have done is we

14         utilize some of the protocols that

15         are already built in, and anything

16         that we add.

17               So if a product does go

18         missing, okay, we have the ability

19         to react to, okay, you know,

20         this -- this particular NDC is

21         missing.

22               And, you know, in most cases

23         I would be notified by a

24         pharmacist.  But in some cases, if
```

1          it is from, you know, a background

2          worker, then we can start

3          utilizing our data that we have to

4          begin our research and start our

5          camera review and video and

6          whatnot.

7    BY MR. HARRIS:

8          Q.    Okay.  Sorry.

9          A.    That's it.  I'm sorry.

10         Q.    Okay.  So you mentioned that

11   you utilize protocols that are built in.

12   Is -- perpetual logs are one of those

13   protocols, correct?

14         A.    One of them.

15         Q.    Okay.  But again, that

16   relies on accurate information being put

17   into that log, right?

18               MR. KOBRIN:  Object to form.

19               THE WITNESS:  Correct.

20   BY MR. HARRIS:

21         Q.    Okay.  Same with the

22   electronic data collection, that requires

23   accurate information to be stored in it,

24   correct?

```
 1        A.    Correct.

 2        Q.    Okay.  To be proactive it

 3   requires that your pharmacist conduct due

 4   diligence before filling prescriptions,

 5   correct?

 6              MR. KOBRIN:  Object to form.

 7              THE WITNESS:  Please repeat

 8        that question.

 9   BY MR. HARRIS:

10        Q.    Absolutely.  To be

11   proactive, it requires that your

12   pharmacist conduct due diligence before

13   filling prescriptions, correct?

14              MR. KOBRIN:  Object to form.

15        I just don't want to have a

16        confusion here.  You shifted from

17        loss to dispense.

18              MR. HARRIS:  Right.  I'm

19        covering a couple different

20        topics.  I'm more so in the big

21        bucket of proactive versus

22        reactive.

23              So let me ask that again,

24        Mr. Shaheen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. HARRIS:

 2        Q.   One way to be proactive --

 3   I'll phrase it that way.  One way to be

 4   proactive would be to require your

 5   pharmacist to conduct due diligence

 6   before filling prescriptions, correct?

 7        A.   And I believe, yes, they do.

 8        Q.   Okay.  So why did we see

 9   examples of fraudulent scripts being

10   filled earlier today?

11             MR. KOBRIN:  Object to form.

12        Argumentative.

13             Argumentative.

14             Go ahead, Rick.

15             THE WITNESS:  Okay.  I

16        was -- I didn't know if you had

17        something else.

18             MR. KOBRIN:  I was making

19        sure it was heard.  I'm sorry.

20             THE WITNESS:  You know,

21        Mr. Harris, the pharmacists are

22        conducting due diligence.

23        Sometimes a prescription may -- a

24        fraudulent prescription may get
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           filled, and in some of the cases

 2           that we talked about, it happened.

 3                But at no point in time are

 4           any of our pharmacists filling a

 5           prescription knowingly or

 6           willingly to, you know, satisfy

 7           somebody's, you know, desire to

 8           commit a criminal act and obtain

 9           those -- those products.

10                It -- they don't operate

11           that way.

12                So, yes, due diligence is a

13           requirement for every pharmacist

14           when they -- when they exercise

15           utilizing their due diligence and

16           what they've learned in their

17           training.

18   BY MR. HARRIS:

19        Q.   Okay.  Is it your testimony

20   that at no point in time are any of your

21   pharmacists having a desire to commit a

22   criminal act to obtain these products,

23   referencing opioids?

24                MR. KOBRIN:  Object to form.
```

```
 1              THE WITNESS:  Unless
 2         somebody has done -- unless one of
 3         our pharmacists or team members
 4         has absolutely stolen that
 5         product, okay, I don't -- I can't
 6         tell you if and when that's going
 7         to happen again, okay.
 8              So if it happens, we're
 9         going to react to it.
10              If it happens, we're going
11         to contact the board.  We're going
12         to, you know, follow through on
13         our policies and procedures.
14              You know, it has happened,
15         and that's what we did in the
16         past, and we'll continue to do
17         that in the future.
18    BY MR. HARRIS:
19         Q.   All right.  Let's move on to
20    the next exhibit, Mr. Shaheen.  Now we go
21    to Tab 29.  This is the one that I messed
22    up earlier, Tab 29.
23              MR. HARRIS:  This is
24         P-HBC-1300. And this will be
```

1          Shaheen-13 for the record.

2               (Document marked for

3          identification as Exhibit

4          Shaheen-13.)

5     BY MR. HARRIS:

6          Q.    This is another short

7     e-mail.  So let me know when you get to

8     it, and we'll walk through it together.

9          A.    I'm there.

10         Q.    Okay.  We see this is an

11    e-mail from Todd Roahrig.  I hope I'm not

12    messing his name up too badly.

13         A.    You're right.

14         Q.    Okay.  Sent December 7, 2017

15    to you Andrew Gaus, and himself

16    apparently.  "Subject:  4056 Jamestown

17    Youngstown."

18              Do you see that?

19         A.    Yes.

20         Q.    Okay.  If we look at our

21    chart from Shaheen-2, Pharmacy 4056, we

22    see that is actually the Jamestown

23    pharmacy in Trumbull County Ohio.  It's

24    Page 4, almost dead in the middle.

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    All right.  So we've got

3    another Trumbull County pharmacy.

4                Let's go ahead and read

5    this.  A Norco 10 was filed Tuesday

6    evening by leader Sarah, and yesterday

7    Brent RPh believed they were about 30" --

8    or "they were short 30, reviewed video

9    and believes we dispensed 120 instead of

10   90.

11               Did I read that right?

12         A.    Yes, except it was filled.

13   You said filed.

14         Q.    Okay.  Well, let's strike

15   that.  Let me read it again.

16               And before we move on to

17   that, actually, let me ask this question

18   first.  Where it says Brent RPh, is that

19   registered pharmacist?

20         A.    Correct.

21         Q.    Okay.  So if I read it like

22   that, would you agree that's an accurate

23   reading?

24         A.    Yes.
```

1        Q.    So this e-mail reads, "A

2    Norco 10 was filled Tuesday evening by

3    leader Sarah, and yesterday Brent,

4    registered pharmacist, believed they were

5    short 30, reviewed video and believes we

6    dispensed 120 instead of 90."

7             Do you see that it says

8    that?

9        A.    Yes.

10       Q.    "But comments from leader

11   Sarah concerning proper follow-up and

12   integrity may be due to her error, are

13   concerning..."

14            Right?

15       A.    Yes.

16       Q.    Okay.  There is more

17   documents that go with this.  But I

18   wanted to go ahead and start with that

19   one.  So we're -- well, let me -- let me

20   ask you this.

21            Is it -- is it something

22   that would flag Giant Eagle to

23   investigate if 120 pills were dispensed

24   instead of what appears to be the

1    appropriate 90?

2         A.    Yes.

3         Q.    Is -- is overfilling

4    prescriptions a potential risk of

5    diversion?

6         A.    It's a potential risk.

7         Q.    Okay.  We're going to go

8    ahead.  We're done with that document if

9    you want to put it to the side.  We're

10   going to turn next to Tab 37.

11              MR. HARRIS:  This is

12        P-HBC-1308.

13              (Document marked for

14        identification as Exhibit

15        Shaheen-14.)

16              MR. HARRIS:  And this is

17        Shaheen-14 for the record.

18              THE WITNESS:  Okay.

19              MR. KOBRIN:  The tab again

20        for 14, Josh?

21              MR. HARRIS:  Tab 37, 3-7.

22              MR. KOBRIN:  Thank you.

23              MR. HARRIS:  And it's

24        Bates-stamped P-HBC-1308,

1          Shaheen-14.

2    BY MR. HARRIS:

3          Q.    All right.  Mr. Shaheen,

4    we'll go through this a little bit

5    together.  I want to cover this first

6    e-mail.  As you'll see, the third and

7    fourth pages of this exhibit appear to be

8    duplicative.  They have different stamp

9    numbers, but it's just a copy of the same

10   e-mail.

11         So let's -- let's go through

12   the first copy first, and then we'll look

13   at the documents after the duplicate.

14   Does that make sense?

15         A.    Yes.

16         Q.    All right.  So at the top of

17   this e-mail, we have from Lori Phillips

18   to you, Andrew, the subject, "Brenton

19   Cornwell Statement," right?

20         A.    Yes.

21         Q.    Okay.  It looks like Lori

22   forwarded you an e-mail from Brenton from

23   that same day, December 8th at 4:08 p.m.

24   And it says, "Question about statement,"

```
 1   correct?

 2        A.    Correct.

 3        Q.    All right.  Let's read this

 4   e-mail together.

 5              It says, "On December 6th at

 6   approximately 2:03 p.m., I was checking a

 7   prescription for generic Norco 10/325."

 8              Do you see where it says

 9   that?

10        A.    Yes.

11        Q.    "Upon performing a back

12   count" --

13              MR. HARRIS:  Let's highlight

14        this part, please.

15   BY MR. HARRIS:

16        Q.    "Upon performing a back

17   count, I discovered a shortage of 30

18   tablets.  I immediately alerted Sarah,

19   the manager."

20              Did I read that properly?

21        A.    Yes.

22        Q.    Okay.  It goes on to say

23   that they did research, and then the

24   following sentence says, "I noticed on
```

1    the back count listed on the open bottle

2    we were using that the count didn't make

3    sense."

4              Right?

5       A.    Yes.

6       Q.    And from that presentation

7    you gave, Giant Eagle pharmacists are

8    required to do back counts, correct?

9       A.    Correct.

10      Q.    Okay.  And you actually had

11   concerns that they weren't being done

12   consistently, and then a regulation -- or

13   excuse me, a regulatory agency may take

14   problem with that.

15             Do you remember saying that

16   in an e-mail?

17      A.    Yes.

18      Q.    Okay.  Let's keep going.

19   "The top number was 81, which was a back

20   count I performed on Monday and was

21   verified in the narcotic log.  The next

22   number was 61."

23             Do you see that?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    And then he explains, "That

2    number would indicate a quantity of 120

3    being dispensed, not 90, on the previous

4    that was counted by Sarah, the previous

5    day," right?

6            A.    Correct.

7            Q.    Okay.  "I asked Sarah" --

8    which -- and doesn't say it here, but

9    Sarah is the manager for this pharmacy?

10   At least that's what's indicated?

11           A.    I believe she was.

12           Q.    Okay.  "I asked Sarah if she

13   wanted to review tape to confirm, contact

14   the patient, or contact Todd, and she

15   said no to each suggestion."

16                 Do you see where it says

17   that?

18           A.    Yes.

19           Q.    "She did update the narcotic

20   log several minutes later to indicate the

21   suspected loss without researching."

22                 Do you see where it says

23   that?

24           A.    Yes.
```

1       Q.    Now, I'll just ask the

2    question.  Is this an example of Giant

3    Eagle employees and pharmacists going

4    above and beyond to prevent diversion of

5    prescription drugs, including opioids?

6              MR. KOBRIN:  Object to form.

7              THE WITNESS:  I can't speak

8         for Sarah.  I see that Brendon --

9         Brenton actually responded.

10             So, you know, the procedure

11        in place was correct.

12             Why she did what she did, I

13        can't explain.

14   BY MR. HARRIS:

15      Q.    Okay.  Would you agree that

16   her actions increased the risk of

17   diversion of opioids?

18             MR. KOBRIN:  Object to form.

19             THE WITNESS:  If in fact,

20        the 120 and not 90 was provided to

21        a patient, then yes, that's

22        possible.

23   BY MR. HARRIS:

24      Q.    Thank you.

 1              Okay.  Let's go ahead and

 2    look at -- let's look at Tab 14 in your

 3    binder, Tab 14.

 4              (Document marked for

 5         identification as Exhibit

 6         Shaheen-15.)

 7              MR. HARRIS:  This is going

 8         to be Bates stamp P-HBC-1282.

 9    BY MR. HARRIS:

10         Q.    This is an e-mail from you.

11    We're going to cover most of this.  But

12    certainly at any point if you need to

13    stop, please let me know.

14         A.    Okay.

15         Q.    All right.  So for the

16    record, we're going to label this

17    Shaheen-15.  Let's go ahead and look at

18    Shaheen-15 together.

19              Up at the top, this is an

20    e-mail from you on June 6, 2018 to Mike

21    Leighlitner and Andrew Gaus, right?

22         A.    Correct.

23         Q.    This was a forward of LP --

24    does that mean loss prevention?

1          A.     Correct.

2          Q.     All right.  A forward of

3    loss prevention pharmacy wins FY, fiscal

4    year, '18, right?

5          A.     Correct.

6          Q.     You write, "Sorry, Mike.

7    This was sent to you sooner.  Please feel

8    free to take what you think is

9    significant."

10              I want to go through.  This

11   is -- did you draft the original e-mail,

12   the LP pharmacy wins e-mail?  Is that

13   something you typically do?

14         A.     I believe -- not typically.

15   But I think what happened is he may have

16   needed some information for some of the

17   executives.  So maybe I threw something

18   like this together.

19         Q.     Okay.  That makes sense.

20              Okay.  Well, let's look at

21   what you put together.  Let's start with

22   the second paragraph.

23              Starting, "We worked in

24   conjunction with the pharmacy department

Highly Confidential - Subject to Further Confidentiality Review

```
1    to implement at our pharmacies the

2    electronic perpetual C-II log that helps

3    identify when those drugs are missing or

4    short," right?

5         A.    Correct.

6         Q.    And again, that electronic

7    perpetual log is only as good as the

8    information put into it?

9         A.    Correct.

10             MR. KOBRIN:  Object to form.

11   BY MR. HARRIS:

12        Q.    And information should be

13   investigated before loading it into a

14   log?

15             MR. KOBRIN:  Object to form

16        vague.

17             MR. HARRIS:  I can rephrase

18        it.

19   BY MR. HARRIS:

20        Q.    Mr. Shaheen, would you agree

21   that you want accurate information to go

22   into these logs?

23        A.    Yes.

24        Q.    And sometimes that requires
```

Highly Confidential - Subject to Further Confidentiality Review

1    investigating the scenario to get that

2    information?

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  Well, in -- if

5         something did come up missing in

6         the course of an investigation,

7         that would be looked at, plus then

8         anything following that to when it

9         is alleged that there was a

10        problem.

11   BY MR. HARRIS:

12        Q.    Okay.  Let's go two

13   paragraphs down.  "The pharmacy

14   department helped us paying" -- excuse

15   me.  "The pharmacy department helped us

16   by paying for the upgrade and camera

17   equipment at eight of our pharmacies.  It

18   has already paid off in identifying theft

19   or loss of cash and medication at most of

20   those stores."

21              Right?

22        A.    Correct.

23        Q.    Okay.  Let's go down one

24   more.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    It says, "Our newest case
 2     involves two nurses that falsified over
 3     200 prescriptions causing thousands of
 4     hydrocodone, a C-II, to be dispensed
 5     illegally."
 6                    Do you see that?
 7          A.    I do.
 8          Q.    And you agreed earlier that
 9     illegally dispensing opioids is --
10     contributes to diversion, right?
11          A.    I did.
12          Q.    Okay.  Let's go down to the
13     section that says, "Loss prevention
14     pharmacy wins FY '18."  I want to make
15     sure we are on the same page.
16                    Do you understand fiscal
17     year '18 to be July 2018 to June 30th,
18     2019?
19          A.    Yes.
20          Q.    Okay.  So that's the time
21     frame that we're looking at.
22                    So in that year period you
23     list that there were 19 internal thefts,
24     right?
```

1      A.   Yes.

2      Q.   Internal refers to Giant

3   Eagle employees?

4      A.   Yes.

5      Q.   Okay.  And you agreed

6   earlier that theft of prescription drugs

7   including opioids can lead to diversion,

8   right?

9           MR. KOBRIN:  Object to form.

10          Misrepresents the evidence.

11          THE WITNESS:  Yes.  But 19

12          internal thefts that year -- on

13          any year, you could say -- it's

14          not just drugs.  It could be cash.

15          It could be product from the

16          supermarket.  It could be theft of

17          time.

18   BY MR. HARRIS:

19      Q.   Okay.  Well, I hear you.

20   Let's go ahead and look at the other

21   categories and see if we may be talking

22   cash, or if we may be talking drugs; is

23   that okay?

24      A.   All right.

1      Q.    All right.  The next one
2   says, "80 fake prescription cases."
3            Do you see where it says
4   that?
5      A.    Yes.
6      Q.    That's not talking about
7   cash, right?
8      A.    No.
9      Q.    That's talking about
10  prescription drugs, right?
11     A.    Yes.
12     Q.    Which can include opioids?
13     A.    It could.
14     Q.    Okay.  And again, filling
15  fake or fraudulent prescriptions can lead
16  to diversion, correct?
17           MR. KOBRIN:  Object to form.
18      Misrepresents the document.
19           THE WITNESS:  It could.
20  BY MR. HARRIS:
21     Q.    Okay.  Let's go down two
22  bullet points.  "327 investigations this
23  year," right?
24     A.    Correct.

1    Q.   Now, would you have

2  conducted all of these investigations, in

3  addition to Andrew Gaus, or at this point

4  in 2018 were there more people on your

5  team?

6    A.   No.  This would have just

7  been Andrew and myself.

8    Q.   Okay.  Let's go to the last

9  bullet point right here.  It says, "Loss

10  prevention pharmacy wins, fiscal year

11  '18.

12        "Keeping drugs out of our

13  communities and out of the hands of our

14  children."

15        Mr. Shaheen, would you agree

16  that is a good thing?

17    A.   That's a great thing.

18    Q.   That is a -- I absolutely

19  agree.

20        This kind of relates back to

21  the article that you gave comment on in

22  2012 when you were an agent for the

23  Pennsylvania Attorney General.

24        Do you remember that?

```
 1          A.    I do.

 2          Q.    Okay.  So even about six

 3    years, roughly 6 to 7 years later,

 4    keeping drugs out of the community and

 5    out of the hands of our children should

 6    be a priority for yourself, right?

 7          A.    Yes.

 8          Q.    And it should be a priority

 9    for Giant Eagle as well, correct?

10          A.    Yes, it is.

11          Q.    Okay.  So despite all of the

12    evidence that we've looked at that may

13    lead to diversion, it is a priority, is

14    your testimony?

15                MR. KOBRIN:  Object to form.

16          Argumentative.

17                THE WITNESS:  You know, we

18          didn't talk about the 80 fake

19          prescriptions and the results of

20          what we did when we worked with

21          the DEA, AG, FBI and the Ohio

22          Board.

23                But maybe I'll address that

24          later.
```

1    BY MR. HARRIS:

2         Q.    Okay.  All right.  Let's go

3    to the second page.  Well, hold on.

4    Sorry, before we go there, it says, "Top

5    cases, fiscal year '18."

6              Let's go ahead to the second

7    page.  It says, "Store Number 6377."  If

8    you look at Shaheen-2, Page 5, we can see

9    that Store 6377 is, in fact, the

10   Painesville pharmacy in Lake County.

11             Do you agree?

12        A.    Yes.

13        Q.    Okay.  "Painesville, we

14   caught and interviewed a pharmacy

15   technician that admitted to stealing over

16   $6,000 worth of controlled substances."

17             That's what it says?

18        A.    That's what it says.

19        Q.    Let's go to the next one.

20   Store 12 -- or excuse me, store 2416.  If

21   you go to our Page 3 of Shaheen-2, we

22   identified Store 2416 as the McDonald

23   pharmacy in Washington County,

24   Pennsylvania, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Correct.

2        Q.    Okay.  It says, "2416,

3   McDonald, pharmacy technician stealing

4   money.  We got the tech to admit to

5   stealing $500."

6              Do you see that?

7        A.    Yes.

8        Q.    Okay.  Store 4093, Yorktown

9   Centre.  If we go to Shaheen-2, we can

10  identify Yorktown being in Erie County,

11  Pennsylvania.

12             Do you agree?  That's on

13  Page 4, a little under halfway.

14       A.    Yes.

15       Q.    Okay.  "Store 4093, Erie

16  County, Pennsylvania.  Store 4093,

17  Yorktown Centre, two technicians abusing

18  the extra miles coupon, new extra mile

19  program implemented."

20             You see that, right?

21       A.    Yes.

22       Q.    All right.  Store 4051,

23  Howland.  If we go back to Page 4 of

24  Shaheen-2, we see Howland is another
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy in Trumbull County?

2         A.    4051, yes.

3         Q.    Okay.  "Three pharmacy

4    technicians stealing."

5              MR. HARRIS:  And let's go in

6         and highlight these next ones in

7         red, please.

8    BY MR. HARRIS:

9         Q.    "One stole product.  One

10   stole money.  Another was selling meth

11   out of our store."

12              Is that what that says,

13   Mr. Shaheen?

14        A.    Yes.

15        Q.    Store Number 47.  If we go

16   to Page 1 of Exhibit Shaheen-2, it's

17   Robinson County -- or excuse me, Robinson

18   pharmacy, Allegheny County, Pennsylvania.

19              Do you agree?

20        A.    I agree.

21        Q.    "Store 47, Robinson.  On

22   pharmacy" -- excuse me -- "On pharmacy

23   tech caught stealing controlled

24   substances and another pharmacy tech

Highly Confidential - Subject to Further Confidentiality Review

1    abusing GEAC."

2            Is that what that says,

3    Mr. Shaheen?

4        A.    Yes.

5        Q.    Are these examples of Giant

6    Eagle employees going above and beyond to

7    prevent diversion of opioids,

8    Mr. Shaheen?

9            MR. KOBRIN:  Object to form.

10           Misrepresents the document.

11           Misrepresents his testimony.

12           THE WITNESS:  If you're

13           talking -- you know, like 2416

14           stealing money, well, each one of

15           these cases they were terminated

16           and/or either prosecuted in each

17           occasion.

18           Store 47, Robinson, the

19           pharmacy tech got caught stealing,

20           was his first day as an employee.

21           And so he was terminated while he

22           was on the bench, and immediately

23           when he made his count on that

24           drug when it went to the

Highly Confidential - Subject to Further Confidentiality Review

```
 1          pharmacist, he identified it right

 2          away because of the back count.

 3               Howland, you know, we have

 4          one -- one stole product.  Like I

 5          said, sometimes that happens, that

 6          they'll steel product from the

 7          store, whether it was food or

 8          whatever.

 9               One stole money.  Again,

10          that's over a span, maybe in that

11          year's time period.

12               An individual was selling

13          meth.  No knowledge of that

14          individual doing it.  And when we

15          caught wind of it, then the task

16          force ended up arresting that

17          individual.

18               You know, because of the

19          Painesville, we caught and

20          interviewed a pharmacy technician

21          that admitted to stealing over

22          $6,000 worth of controlled

23          substance.  Yes, she was -- I

24          worked with the Board on that.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         believe that was my case, not

 2         Andrew's.  But she was

 3         subsequently arrested by the Ohio

 4         Board.

 5              So, you know, just to give

 6         you a background on each one of

 7         those.

 8  BY MR. HARRIS:

 9         Q.   Sir, are you testifying that

10  each one of those is an example of Giant

11  Eagle employees going above and beyond?

12         A.   No.  I'm saying what I'm

13  referring --

14              MR. KOBRIN:  Object to form.

15         Object to form.  Give me a chance,

16         Rick.

17  BY MR. HARRIS:

18         Q.   You can go ahead,

19  Mr. Shaheen.

20         A.   What I'm referring to is --

21  is when we do identify it, that we do

22  take action immediately.  We don't rest

23  on anything.  These things are moved

24  either to myself or to law enforcement or
```

1    to Andrew.

2           Q.    Okay.  But these were all

3    reactive investigations, right?

4                MR. KOBRIN:  Object to form.

5           Misrepresents the testimony and

6           the document.

7                THE WITNESS:  We were -- we

8           were notified by either the

9           pharmacy manager or one of the

10          pharmacists in some of these.

11               And in some cases, we had to

12          put up hidden cameras.  So, again,

13          that's why I say at times we are

14          proactive in how we react to

15          things.

16   BY MR. HARRIS:

17          Q.    All right.  Let's go ahead

18   and go to the next one, Mr. Shaheen.

19   This is Tab 17, 1-7.

20               (Document marked for

21          identification as Exhibit

22          Sheehan-16.)

23               MR. HARRIS:  This is

24          P-HBC-1285.  This will be Shaheen

```
 1          Exhibit 16 for the record.

 2    BY MR. HARRIS:

 3          Q.    Let me know when you have

 4    that open.

 5          A.    I -- you said 17.  I have

 6    it.

 7          Q.    What we may want to do --

 8    well, you got the folder.  Let's start

 9    with Shaheen-16.  So this is Document

10    Shaheen 16.  This is an e-mail from you,

11    Monday August 13th, 2018, correct?

12          A.    Yes.

13          Q.    It looks like you attached a

14    picture to it, right?

15          A.    Yes.

16          Q.    Okay.  Let's read the text

17    of your e-mail, if we can highlight this.

18               "Please see the attached

19    forged prescription.  This ring is having

20    success passing this forgery."

21               Is that what that says?

22          A.    That's what it says.

23          Q.    It then continues on to say,

24    "As always please use due diligence and
```

```
 1    look for red flags."  Right?

 2         A.    Correct.

 3         Q.    And it indicates what's a

 4    potential red flag below.  Would you

 5    agree?

 6         A.    Yes.

 7         Q.    Okay.  So a script being

 8    passed near closing is a potential red

 9    flag, right?

10              MR. KOBRIN:  Object to form.

11         Asked and answered.

12              THE WITNESS:  Well, the

13         information that I would have

14         obtained from law enforcement or

15         if another pharmacist contacted

16         us, law enforcement would have

17         said that these scripts were being

18         passed at late night.

19              So to help evaluate for the

20         pharmacist, then once this was

21         uncovered by law enforcement, we

22         shared that information.

23    BY MR. HARRIS:

24         Q.    Okay.  So from what this
```

1  document says though, "This ring is

2  having success passing this forgery."

3          That's what that document

4  says right there, right?

5      A.    Yes, they have success.

6      Q.    Okay.  And then "this

7  forgery," is that referring to the

8  picture attached behind this e-mail?

9      A.    Yes.  I don't know.  I mean,

10 there's nothing that indicates -- I sent

11 out a BOLO to look, but nothing indicates

12 that we did fill that prescription.

13     Q.    Okay.  I'm glad you

14 mentioned that.  Let's go ahead and turn

15 to Tab 27, please.  And we may refer back

16 to Tab 17.  But let's go to 27 for now.

17     A.    Okay.

18          (Document marked for

19          identification as Exhibit

20          Shaheen-17.)

21          MR. HARRIS:  This is going

22          to be Shaheen-17 for the record.

23          This is -- or excuse me,

24          P-HBC-1298.

```
 1   BY MR. HARRIS:

 2        Q.    This is a pharmacy hot

 3   sheet.  Do you see where it says that?

 4        A.    I do.

 5        Q.    This is for Store 4002.

 6              Do you see where it says

 7   that at the top right?

 8        A.    I do.

 9        Q.    And if we look at Shaheen-2,

10   this is the Churchhill Commons store in

11   Trumbull County; is that right?

12        A.    Correct.

13        Q.    Okay.  And was this filled

14   out by you?

15        A.    Yes, it was.

16        Q.    Okay.  And we see on here it

17   says, "Investigator," and Rick Shaheen is

18   checked off, correct?

19        A.    Yes.

20        Q.    All right.  The type of

21   incident checked off, fraudulent script,

22   right?

23        A.    Yes.

24        Q.    It says, "BOLO sent out on
```

1    8/13/18."  Is that what you were just

2    referring to?  You sent out a BOLO, you

3    mentioned?

4           A.    Hold on.  I have to look

5    back.  August 13th.  Yes.

6           Q.    Description of event.  Let's

7    read this closely, because I believe you

8    said there's no indication that this was

9    filled, right?  Is that what you

10   mentioned.  Let's go ahead and read this

11   together.

12              MR. KOBRIN:  Object to form.

13         He said there was no indication in

14         the e-mail that this was filled at

15         a Giant Eagle.

16              THE WITNESS:  Yes.  That's

17         what I said.  There was no

18         indication in the e-mail that it

19         was passed.

20   BY MR. HARRIS:

21         Q.    Okay.  Let's look at this

22   indication.  It says, "Description of

23   event:  Cleveland Clinic script passed at

24   two of our pharmacies in Ohio."

Highly Confidential - Subject to Further Confidentiality Review

1          Did I read that correctly,

2   Mr. Shaheen?

3          A.   Yes.  I don't know that it

4   was filled.  That's what I'm saying to

5   you.  They can drop a prescription.  But

6   that doesn't mean that we filled the

7   prescription.  I would have to look to

8   see.  If you want the right answer, I'd

9   have to look and see if on that day we

10  filled it.

11         You know, they could have

12  been alerting me based on receiving it

13  saying, Hey, I got this, Rick.  They

14  tried to pass it at our script.

15         So I'm not being tough.  I'm

16  telling you, I need something to say yes,

17  we filled it, or no, we didn't.  But it

18  could have been that we just -- they just

19  dropped this script, and we refused it.

20         MR. HARRIS:  Okay.  Motion

21     to strike as nonresponsive.

22  BY MR. HARRIS:

23         Q.   I'm going to re-ask my

24  question, Mr. Shaheen.  I'm going to ask

1    you to listen to me.  Okay?

2              Under description of event,

3    it says, "Cleveland Clinic script passed

4    at two of our pharmacies in Ohio."

5              Did I read that correctly?

6         A.    Yes.  That's what it says.

7              MR. KOBRIN:  Asked and

8         answered.

9    BY MR. HARRIS:

10        Q.    Okay.  And then on the

11   second page attached to this pharmacy hot

12   sheet is another copy of the script from

13   the Cleveland Clinic, correct?

14        A.    I'm just comparing it.  Yes.

15        Q.    Okay.  Is this another

16   example of Giant Eagle employees going

17   above and beyond to prevent diversion?

18              MR. KOBRIN:  Object to form.

19              THE WITNESS:  It is if we

20        didn't fill it.  And that's what I

21        don't --

22   BY MR. HARRIS:

23        Q.    And if you did fill it, does

24   that mean that it's not?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    That's what I'm saying to

2    you, I don't know if they filled this

3    prescription or not.  I don't have that

4    to back it up.

5        Q.    All right.  Mr. Shaheen --

6              MR. HARRIS:  Josh, I'm going

7          to move into another section.  I

8          don't know if you want to take a

9          break.  Up to you.  We can keep

10         pushing through or we can take a

11         break, depending on how you and

12         Mr. Shaheen feel.

13             MR. KOBRIN:  How do you

14         feel, Rick?  Do you want to take a

15         quick break?

16             THE WITNESS:  Yeah, quick

17         break.

18             MR. HARRIS:  If everyone is

19         comfortable pushing on, I'm fine

20         going forward a little bit more.

21         I can try to breeze through this,

22         and then I'm going to hit the spot

23         where I need to, you know, stop

24         and check my notes.  So y'all's

```
1        call.
2             Madam Court Reporter, are
3        you okay?
4             MR. KOBRIN:  Why don't we
5        take a three-minute break just to
6        so we give you a chance to go to
7        the restroom if you want to.
8             MR. HARRIS:  Yeah, that's
9        fine.  We'll come back in about
10       five minutes.
11            MR. KOBRIN:  I just want to
12       make sure that the witness is
13       okay.
14            It's hard to read each other
15       through Zoom.  But I don't want
16       to -- if he says he'd like to take
17       a break, I hear you.  I'm fine
18       taking one.  Let's just take a
19       very fast one.  Five minutes?
20            MR. HARRIS:  Yep.
21            MR. KOBRIN:  Thanks.
22            THE VIDEOGRAPHER:  Going off
23       the record.  The time is 3:47.
24            (Short break.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We are

 2         going back on record.  The time is

 3         3:56.

 4   BY MR. HARRIS:

 5         Q.    Okay.  Mr. Shaheen, we're

 6   back from our break.  You understand that

 7   you're still under oath?

 8         A.    Yes, I do.

 9         Q.    Okay.  Fantastic.

10              I'd like to turn in your

11   binder Tab 4, up in the front.  I'm going

12   to introduce what I believe is going to

13   be Shaheen-18.

14              (Document marked for

15         identification as Exhibit

16         Shaheen-18.)

17              MR. HARRIS:  And this has a

18         Bates stamp P-GEN-150.  I guess

19         it's actually P-GEN-00150.

20   BY MR. HARRIS:

21         Q.    Let me know when you have

22   this up in front of you, Mr. Shaheen?

23         A.    I have it.

24         Q.    I understand this is a
```

1  larger document.  I have a very narrow

2  focus that I'm going to review in that

3  portion that I intend to review.  If you

4  need to read, you know, a little bit

5  forward or back, please let me know.  I'm

6  happy to give you the time to do that.

7                Let's go ahead and start up

8  here at the top.  It says, "Minutes of

9  the November 2nd through 4th, 2009

10  meeting of the Ohio State Board of

11  Pharmacy."

12                Do you see that?

13       A.    I do.

14       Q.    Okay.  Have you ever read

15  meeting minutes of the Ohio State Board

16  of Pharmacy?

17       A.    No.

18       Q.    Okay.  The Ohio State Board

19  of Pharmacy, that's a regulatory agency

20  that you often work with in the course of

21  your job?

22       A.    Correct.

23       Q.    And one of the functions

24  they do, in addition to providing advice,

```
 1   is they often sometimes punish

 2   pharmacists who act inappropriately or

 3   illegally; is that correct?

 4         A.    That's correct.

 5         Q.    Okay.  Again, if there's

 6   anything that you'd like to review on the

 7   front, I'm happy to allow you time to do

 8   so.  But what I would like you to do is,

 9   if you notice in the bottom right corner

10   there's a series of numbers.

11               And if you turn, you'll see

12   there is a decimal.  So the .001, on that

13   page that ends in .0010, if that makes

14   sense?

15         A.    Yes.

16         Q.    Okay.  So do you see an

17   entry almost at the bottom that says

18   1:32 p.m.?

19               Yeah.  So let's see, I want

20   to make sure that I've got you on the

21   right page.

22         A.    I'm not on the right page or

23   it's not here.

24         Q.    So it should be -- it should
```

1  be the one -- the page --

2           MR. HARRIS:  Maybe if we can

3       highlight it for Mr. Shaheen, the

4       bottom right corner.

5  BY MR. HARRIS:

6       Q.    Do you see on the screen,

7  Mr. Shaheen, where it shows -- do you see

8  where it says .0010.

9       A.    Yes.

10      Q.    That's kind of the page

11 number that I'm referring to on the

12 bottom right.  Unfortunately that's the

13 only way that I can refer to it.

14      A.    Okay.  How many -- how many

15 pages in on this is it?

16      Q.    I imagine that's ten pages

17 in, 10 or 11.

18      A.    All right.  Okay.  Yep.

19      Q.    Okay.  Are you with me now?

20 Do you see the 1:32 p.m. entry?

21      A.    Yes.

22      Q.    Okay.  All right.  I'm just

23 going to ask a foundational question so

24 our record is a bit cleaner.  So we're

1    looking at Shaheen-18, on the page ending

2    in .0010.

3                    The bottom entry at

4    1:32 p.m.  Do you see that, Mr. Shaheen?

5            A.    I do see that.

6            Q.    Okay.  It says, "The board

7    reconvened in Room East B."  Then it

8    follows up, "The board was joined by

9    assistant Attorney General Tracy Greuel

10   to conduct an adjudication hearing in

11   accordance with the Ohio revised code

12   Chapters 119 and 4729 in the matter of

13   Justin Allan Bracken, registered

14   pharmacist" -- a number -- "Canton,

15   Ohio."

16                   Do you see where it says

17   that?

18           A.    I do.

19           Q.    Okay.  Let's go to the next

20   page if you will.

21                   All right.  Here, we see the

22   underlined section in the middle.  It

23   says, "Order of the State Board of

24   Pharmacy."

```
 1              Do you see where we're

 2    looking at that?

 3         A.    Yes.

 4         Q.    Okay.  Then it says the

 5    docket number, "In the matter of Justin

 6    Allan Bracken, registered pharmacist."

 7              Do you see that.

 8         A.    I --

 9         Q.    Sorry.  It cut out.

10         A.    Yes, I do.

11         Q.    Okay.  Thank you.  Okay.

12    Then we see a little bit further down, it

13    says, "Summary of evidence."  Lists a few

14    items.  Feel free to browse those over if

15    you'd like.  And then it goes on to the

16    next page.  And that's what I would like

17    to refer to.

18              MR. KOBRIN:  While you are

19         getting organized Josh, a standing

20         objection.  I may be wrong.  I

21         don't see how that is at all

22         relevant to the Track 3

23         litigation.

24              MR. HARRIS:  Okay.  I hope
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              to show that.  So --
 2                  MR. KOBRIN:  I'll give you
 3              the chance.  I just want to get
 4              that upfront, rather than having
 5              some late-breaking, "Wait a
 6              minute, hold on."
 7                  But I'm sure you'll make --
 8              you'll try to make a case that it
 9              is.
10     BY MR. HARRIS:
11          Q.   All right.  Mr. Shaheen,
12     let's look at Number 35 on this list,
13     okay?
14          A.   Okay.
15          Q.   So going 35 down and
16     continue on to the next page.  This is
17     drug accountability statement at Giant
18     Eagle pharmacy 4152.
19              Do you see that?
20          A.   I do.
21          Q.   Okay.  If we go to
22     Shaheen-2, Page 4, almost at the bottom,
23     we see 4152 is a pharmacy in Stark
24     County, Ohio; is that right?
```

1    A.    Yes.

2    Q.    Do you know how far Stark

3    County, Ohio, is from Lake and Trumbull

4    County?

5    A.    I don't.

6    Q.    Okay.  Have you ever, in

7    your time as either an agent for the

8    Pennsylvania Attorney General's office,

9    or in your time as a pharmacy

10   investigator for Giant Eagle, heard of

11   the term "migration" or "pill migration"?

12   A.    No.  We've never used -- we

13   didn't use it.

14   Q.    All right.  Understood.  But

15   are you familiar with that term?

16   A.    No.

17   Q.    Okay.  Have you ever heard

18   of what's called "The Oxy Express"?

19   MR. KOBRIN:  Object to form.

20   THE WITNESS:  No.

21   BY MR. HARRIS:

22   Q.    Okay.  Would you agree with

23   me that people can transport prescription

24   drugs across county lines?

1          A.     Yes.

2          Q.     In fact, is that a potential

3    red flag when people get prescriptions

4    filled in different counties?

5          A.     We have people -- no.  No, I

6    don't -- I mean, I don't see that as a

7    red flag, as a coverall to a red flag.

8    No, I don't agree with that.

9          Q.     Well, I'm not asking for a

10   coverall.  I'm asking if it's a potential

11   red flag, people getting pills and

12   prescriptions filled in other counties?

13              MR. KOBRIN:  Object to form.

14              THE WITNESS:  It could be

15         potential.

16   BY MR. HARRIS:

17         Q.     Okay.  Thank you.

18              Okay.  So we've established

19   this is a pharmacy in Stark County, Ohio.

20              The -- 35 is an

21   accountability statement for temazepam.

22   So is 36.

23              MR. KOBRIN:  Are you using

24         paragraph numbers?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. HARRIS:  Yeah.

 2   BY MR. HARRIS:

 3        Q.    So right here on the screen,

 4   we have drug accountability statement.

 5   Number 35 is drug accountability

 6   statement at Giant Eagle pharmacy 4152

 7   for temazepam 15 milligrams, right?

 8        A.    Yes.

 9        Q.    The next one is a statement

10   for temazepam 30 milligrams, correct?

11        A.    Correct.

12        Q.    And then we have clonazepam,

13   right?

14        A.    Correct.

15        Q.    Lorazepam?

16        A.    Correct.

17        Q.    39, alprazolam -- well, 39,

18   40, 41, and 42 are all alprazolam,

19   correct, different strengths?

20        A.    Different strengths,

21   correct.

22        Q.    All right.  Let's go to the

23   next page, continuing on.  We have 43 and

24   44, different strength of clonazepam
```

```
 1    statements, right?

 2         A.    Correct.

 3         Q.    45 and 46 we have different

 4    strength Lorazepam statements?

 5         A.    Correct.

 6         Q.    And 47, 48 we have different

 7    strength hydrocodone statements, right?

 8         A.    Correct.

 9         Q.    Okay.  We can zoom out of

10    that.  Let's go to the findings of fact a

11    little bit further down on this page.

12    Okay?

13         A.    Okay.

14         Q.    It says, "After having heard

15    the testimony, observed the demeanor of

16    the witnesses, considered the evidence,

17    and weighed the credibility of each, the

18    State Board of Pharmacy finds the

19    following to be fact."

20               Do you see where I'm reading

21    that?

22         A.    I see that.

23         Q.    Okay.  Number 1, "Records of

24    the board of pharmacy indicate that
```

```
 1   Justin Allan Bracken was originally

 2   licensed in the State of Ohio on

 3   June 22nd, 2004, pursuant to examination

 4   and his license to practice pharmacy in

 5   Ohio was summarily suspended on

 6   October 6, 2009."

 7             Do you see that?

 8        A.    I see that.

 9        Q.    Okay.  And Mr. Bracken was a

10   pharmacist at Giant Eagle Pharmacy 4152

11   correct?

12        A.    Did it say that anywhere?  I

13   didn't see that.  I don't know him.

14             MR. KOBRIN:  Yeah, objection

15        as to relevance.  This all

16        precedes Mr. Shaheen's employment

17        with Giant Eagle.

18             THE WITNESS:  This is -- I

19        was there -- this is 2009.

20   BY MR. HARRIS:

21        Q.    Okay.  So let me ask it this

22   way.  You don't actually know Justin

23   Allan Bracken, correct?

24        A.    Correct.
```

```
 1          Q.   Okay.  But from the

 2   indications, the drug accountability

 3   statements at Giant Eagle Pharmacy 4152,

 4   does that lead you to believe that he was

 5   a pharmacist at that store?

 6               MR. KOBRIN:  Where is that,

 7          Josh, real quick again?

 8               MR. HARRIS:  What was that?

 9          I'm sorry.

10               MR. KOBRIN:  Where is the

11          4152 in here?

12               MR. HARRIS:  Oh, so all the

13          drug accountability statements we

14          looked at, they're all drug

15          accountability statements at Giant

16          Eagle Pharmacy 4152.  And if we

17          look at Shaheen-2, the Pharmacy

18          4152 is the Massillon pharmacy in

19          Stark County, Ohio.

20               MR. KOBRIN:  Okay.  I

21          just -- I'm not trying to be

22          difficult.

23               You know, I thought it was

24          somewhere where it said he worked
```

1    there.

2  BY MR. HARRIS:

3    Q.   If you'll give me a little

4  leeway, Mr. Shaheen, we'll get to that

5  point.  Okay.  I'm happy to skip ahead if

6  you feel more comfortable, but let's read

7  these in order and we'll hit that point.

8  All right?

9    A.   Okay.

10    Q.   So Number one we read.

11  Let's look at Number 2.  "Justin Allan

12  Bracken" --

13         MR. HARRIS:  And let's

14      underline this part, please.

15  BY MR. HARRIS:

16    Q.   -- "is addicted to or

17  abusing drugs and/or impaired physically

18  or mentally to such a degree as to render

19  him unfit to practice pharmacy."

20         Do you see where I read

21  that, Mr. Shaheen?

22    A.   I do.

23    Q.   It goes on to say, "To wit:

24  Justin Allan Bracken is addicted to the

1    use of controlled substances, and Justin

2    Allan Bracken has stolen drugs from his

3    employer to supply his addiction."

4            Do you see where I've read

5    that?

6        A.    I do.

7        Q.    Okay.  "Justin Allan Bracken

8    was, on or about May 20, 2009, observed

9    passed out in a vehicle in front of a

10   liquor store and observed acting impaired

11   once aroused."  Correct?

12       A.    Yes.

13       Q.    Okay.  Let's turn to the

14   next page, please.  This is still under

15   the findings of fact.  We're going to go

16   to Paragraph 8.

17           It says, "8.  Justin Allan

18   Bracken did from April 30th, 2007, to

19   May 20th, 2009, with purpose to deprive,

20   knowingly obtain or exert control over

21   dangerous drugs, the property of Giant

22   Eagle Pharmacy 4152 beyond the express or

23   implied consent of the owner.

24           "To wit: Justin Allan

```
 1   Bracken possessed a stock container of

 2   temazepam 15 milligrams from his

 3   employer."

 4              Do you see that?

 5        A.   Yes.

 6        Q.   Okay.  So he took controlled

 7   substances from Giant Eagle Pharmacy 4152

 8   is what it says, right?

 9        A.   Yes.

10        Q.   And then they refer to that

11   as his employer, correct?

12        A.   Correct.

13        Q.   So based on the information

14   provided -- and I understood that you

15   were not employed by Giant Eagle at the

16   time.  Based on the information provided

17   under the findings of fact by the Ohio

18   Board of Pharmacy, would you agree that

19   Justin Allan Bracken was a Giant Eagle

20   pharmacist?

21              MR. KOBRIN:  Object to form.

22         He can only agree to -- that

23         that's what it says here.

24              MR. HARRIS:  Okay.
```

1    BY MR. HARRIS:

2         Q.    Can you agree that's what it

3    says here then, Mr. Shaheen?

4              MR. HARRIS:  That's fair

5         enough, Josh.

6              THE WITNESS:  Yes.

7    BY MR. HARRIS:

8         Q.    Okay.  Thank you.  Let's go

9    down to Number 9.  It says, "Justin Allan

10   Bracken as the responsible person between

11   April 30, 2007 and May 20, 2009, failed

12   to provide supervision and control and

13   adequate safeguards over the listed Giant

14   Eagle 4152 dangerous drug stocks.

15             "To wit:  The following

16   dangerous drugs were diverted without

17   detection."

18             Do you see that?

19        A.    I do.

20        Q.    Okay.  Next it says,

21   "Alprazolam, 25" -- or ".25 milligrams,

22   199 quantity."

23             Do you see where it says

24   that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I do.

2        Q.    "Alprazolam .5 milligrams,

3   143 quantity."

4              Do you see that?

5        A.    Yes, I do.

6        Q.    "Alprazolam, 1 milligram, 74

7   quantity."

8              Do you see that?

9        A.    Yes.

10       Q.    "Alprazolam, 2 milligrams,

11  57 quantity."

12             Do you see that?

13       A.    Yes.

14       Q.    Do you agree that alprazolam

15  falls into the category of those cocktail

16  drugs we talked about earlier?

17             MR. KOBRIN:  Object to form.

18       No foundation.

19  BY MR. HARRIS:

20       Q.    Mr. Shaheen, do you know

21  what a cocktail drug is?

22       A.    I've heard of that term

23  before.  I know that alprazolam is one of

24  the benzodiazapines.

1          Q.    Okay.  Well, I apologize.

2    Let me ask it this way.

3              Earlier we referred to

4    trinity drugs or the Holy Trinity.  Do

5    you remember that conversation?

6          A.    Yes.

7          Q.    Okay.  And you indicated

8    that if these three types of drugs are

9    prescribed together, it could be a

10   potential sign of diversion, correct?

11   And those drugs were opioids,

12   benzodiazapine, and muscle relaxants,

13   right?

14         A.    Correct.

15         Q.    Alprazolam is a

16   benzodiazapine, correct?

17         A.    Correct.

18         Q.    So it's one drug that could

19   be a potential red flag for diversion,

20   right?

21              MR. KOBRIN:  Object to form.

22              THE WITNESS:  Yes.  It's

23         possible.

24   BY MR. HARRIS:

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  In fact, the Ohio

2   Board of Pharmacy labeled it as a

3   dangerous drug right there in Paragraph

4   9, didn't they?

5              MR. KOBRIN:  Object to form.

6         He can only say what's there.

7              MR. HARRIS:  Yeah.  That's

8         what I'm asking.

9   BY MR. HARRIS:

10             Q.    Right here, the Ohio Board

11  of Pharmacy says Mr. Bracken did not have

12  the -- did not provide supervision and

13  control and adequate safeguards over the

14  listed Giant Eagle 4152 dangerous drug

15  stocks.  Right, Mr. Shaheen?  That's what

16  it says right there, dangerous drug

17  stocks?

18             A.    Yes.  That's what it says.

19             Q.    Okay.  Let's keep going.

20  Clonazepam, half a milligram, 701

21  quantity.

22                  Do you see that?

23             A.    Yes.

24             Q.    Clonazepam, 1 milligram, 214
```

```
1    quantity.

2              Do you see that?

3        A.   Yes.

4        Q.   Clonazepam, 2 milligrams, 61

5    quantity.

6              Do you see that that one?

7        A.   I do.

8        Q.   Lorazepam, half a milligram,

9    335 quantity.

10             Do you see that?

11       A.   Yes.

12       Q.   Lorazepam, 1 milligram, 10

13   quantity.

14             Do you see that?

15       A.   Yes.

16       Q.   Lorazepam, 2 milligram, 115

17   quantity.

18             Do you see that?

19       A.   Yes.

20       Q.   Let's go to the next page.

21   Up at the top, we start, temazepam,

22   15 milligrams, 113 quantity.

23             Do you see that?

24       A.   I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Temazepam, 30 milligrams, 67

 2    quantity.

 3                Do you see that?

 4          A.    Yes.

 5          Q.    Hydrocodone,

 6    5/500 milligrams, 513 quantity.

 7                Do you see that?

 8          A.    I do.

 9          Q.    Hydrocodone,

10    7.5/750 milligrams, 706 quantity.

11                Do you see that?

12          A.    I do.

13          Q.    Okay.  And I hate to do this

14    to you.  We're going to flip to the last

15    page.  This is under the findings of fact

16    where Ohio Board of Pharmacy said, "The

17    following dangerous drug" -- the list

18    that we just went over -- "The following

19    dangerous drugs were diverted without

20    detection."

21                MR. HARRIS:  Let's go ahead

22          and highlight that and underline

23          it in red for Mr. Shaheen, please.

24    BY MR. HARRIS:
```

1        Q.    "The following dangerous

2   drugs were diverted without detection."

3   And it goes through that whole list you

4   and I just walked through.

5            Is that what that says,

6   Mr. Shaheen?

7            MR. KOBRIN:  Show me where

8        you are again.  I'm not sure where

9        you jumped to now.

10           MR. HARRIS:  We went back

11       one page to Paragraph 9, before

12       the list of all the drugs that

13       were diverted without detection

14       started.

15  BY MR. HARRIS:

16       Q.    Do you see where I am,

17  Mr. Shaheen?

18       A.    Yes.

19       Q.    Okay.  And you agree with

20  me, the Ohio Board of Pharmacy found that

21  from Giant Eagle 4152 dangerous drug

22  stock, the following dangerous drugs were

23  diverted without detection.

24           Is that what that says right

1    there?

2              MR. KOBRIN:  Object to form.

3         That is a little mixed.

4              He can read this to you.

5         You can read it.  Anyone can read

6         it.  He can't say what the Board

7         of Pharmacy found, concluded, or

8         anything like that.

9              MR. HARRIS:  I'm not asking

10        him to.  I'm asking him, in their

11        minutes, the Board of Pharmacy put

12        this.  So I'm asking him to say

13        what the Board of Pharmacy put in

14        their findings of fact.

15   BY MR. HARRIS:

16        Q.   So I'll repeat it again,

17   Mr. Shaheen.  And I'll put that caveat so

18   it's good for your attorney.

19              Under the Ohio Board -- Ohio

20   State Board of Pharmacy findings of fact,

21   Paragraph 9, they put, "Giant Eagle 4152

22   dangerous drug stocks.  To wit:  The

23   following dangerous drugs were diverted

24   without detection."

```
 1              That's what that says,

 2   doesn't it, Mr. Shaheen?

 3        A.    Yes.

 4        Q.    Is this an example of Giant

 5   Eagle pharmacists going above and beyond

 6   to prevent the diversion of prescription

 7   drugs, including opioids?

 8              MR. KOBRIN:  Object to form.

 9              THE WITNESS:  I don't know

10        anything about this case.  This is

11        the first I heard of it.  I don't

12        know who did what.  I don't know

13        who investigated it.  I don't know

14        how it got to this point.  I would

15        like to know more facts about it.

16              I see what you're saying,

17        and you heard my responses to your

18        questions.

19              But I -- I can't -- I can't

20        say what anybody did prior to that

21        and how this was even uncovered.

22   BY MR. HARRIS:

23        Q.    Is that because it went

24   diverted without detection?
```

```
1                MR. KOBRIN:  Object to form.

2        It was obviously detected.

3                THE WITNESS:  Yeah, how is

4        it detected?  Who found it out?

5   BY MR. HARRIS:

6        Q.    That's a great question.

7   Apparently not a Giant Eagle though,

8   looking at this, correct?

9                MR. KOBRIN:  Object to form.

10       That -- Mr. Harris, to be fair if

11       you're going to tell him that it

12       wasn't at Giant Eagle, why don't

13       you show him how it was found out.

14       Because it's probably in this

15       report.  If it's not, it's

16       somewhere else in the record.

17             If you're going to present

18       this finding about Mr. Bracken who

19       you allege worked for Giant Eagle

20       over a decade ago, I think you

21       should probably tell us what

22       happened here and how we

23       discovered it.

24                MR. HARRIS:  Sure.
```

```
 1   BY MR. HARRIS:
 2          Q.    All of these -- Mr. Shaheen,
 3   all of those drug accountability
 4   statement forms that I looked at with
 5   you, all those we went over, those were
 6   provided to the Ohio Board of Pharmacy so
 7   they can find their findings of fact.
 8               Do you recall going through
 9   that list of drug accountability
10   statement forms?
11               MR. KOBRIN:  Who provided
12          those, Josh?
13   BY MR. HARRIS:
14          Q.    Do you remember going over
15   those, Mr. Shaheen?
16          A.    I need to see it.  Which one
17   was it?
18          Q.    Let's flip back.  The page
19   that ends in .0012.  And it starts Number
20   35, "Drug accountability statement at
21   Giant Eagle Pharmacy 4115."
22               And it goes through and
23   delineates on this page seven categories
24   of drugs, and on the next page about
```

1    another --

2         A.    Okay.

3         Q.    -- six more, right?  And

4    those are the drugs that we just talked

5    about, right?

6         A.    Right.

7         Q.    Okay.  So if we go back to

8    Page 14 -- and I'm happy to stop and let

9    you do the math.

10              The Ohio Board of Pharmacy

11   found that Giant Eagle 4152 had the

12   following dangerous drugs that were

13   diverted without detection.  There are

14   3,310 different pills, quantities, that

15   were diverted without detection.  That's

16   what this says, right, Mr. Shaheen?

17              MR. KOBRIN:  Object to form.

18         You're mixing up a lot of things

19         and you're saying Giant Eagle did

20         stuff.  There's nothing here about

21         Giant Eagle doing anything.

22              MR. HARRIS:  I think that's

23         partially the point.  But my --

24         I'll rephrase my question.  And

```
 1              I'll put it very simply.

 2   BY MR. HARRIS:

 3        Q.    And, Mr. Shaheen, I'm happy

 4   to stop and let you do the math on it.  I

 5   just used my phone calculator to figure

 6   it out.

 7              It says, "Justin Allan

 8   Bracken, as the responsible person" --

 9   who we've already established was a Giant

10   Eagle employee -- "between April 30,

11   2007, and May 20, 2009, failed to provide

12   supervision and control and adequate

13   safeguards over the listed Giant Eagle

14   4152 dangerous drug stocks.  To wit:  The

15   following dangerous drugs were diverted

16   without detection."

17              And then it lists out 3,310

18   dangerous drugs that were diverted

19   without detection.

20              Is that what this says,

21   Mr. Shaheen?

22              MR. KOBRIN:  Object to form.

23              You don't need to do the

24        math, Mr. Shaheen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              He can only state what he's

 2         already stated.  This has been

 3         asked and answered.  He can say

 4         that's what it says.

 5              That's all he can do.  I'm

 6         not sure where we're going with

 7         this over and over again.  He

 8         neither worked for the company

 9         then, nor does he know anything

10         about this case.

11              Go ahead, Rick.

12              THE WITNESS:  I have no

13         knowledge about this case.  I

14         would like to look into it.  I see

15         what it says in the paragraph.

16              But I don't know what

17         happened with this person, other

18         than, you know, the Ohio Board

19         sanctioned him or took actions

20         against him.

21    BY MR. HARRIS:

22         Q.   Is this an example of Giant

23    Eagle pharmacists going above and beyond

24    to prevent diversion of opioids?
```

```
1               MR. KOBRIN:  Object to form.
2         Asked and answered.
3               THE WITNESS:  Once again, I
4         don't know how this was detected.
5         I don't know who investigated it.
6               If they were proactive in
7         their investigation, that
8         eventually they ended up, you
9         know -- whether they were using
10        cameras or did controlled counts,
11        whether the Board was involved, I
12        don't know what they did.
13              So I can't give you -- I
14        can't give you another answer.  I
15        don't know what happened in this
16        case, other than these clips that
17        we just reviewed.
18    BY MR. HARRIS:
19        Q.   All right.  Let's go to Tab
20    2 in your binder.  This is another
21    minutes of the December 5th through 7th,
22    2011, meeting of the Ohio State Board of
23    Pharmacy.
24              Do you see that?
```

1          MR. HARRIS:  Well, sorry,

2     let me do this first, Mr. Shaheen.

3          (Document marked for

4     identification as Exhibit

5     Shaheen-19.)

6          MR. HARRIS:  This will be

7     Shaheen-19 for the deposition.

8     And this was produced P-GEN-00148.

9  BY MR. HARRIS:

10     Q.   Do you see at the top where

11  it says, "Minutes of the December 5th

12  through 7th, 2011, meeting of the Ohio

13  State Board of Pharmacy"?

14     A.   Yes.

15     Q.   Okay.  Again, there's more

16  in here that we don't need to refer to

17  it.  But if you want to turn about four

18  pages in, in the middle, it says

19  R2012-102.  Let me know when you get to

20  this page.

21     A.   Okay.

22     Q.   Okay.  It says, "Settlement

23  agreement with the State Board of

24  Pharmacy," docket number, "in the matter

```
 1    of Giant Eagle 4098, courtesy of Kelly

 2    Ann Chappell, registered pharmacist."

 3                    Do you see that?

 4                    MR. KOBRIN:  Object to form.

 5                    THE WITNESS:  Yes.

 6    BY MR. HARRIS:

 7         Q.    Okay.  Then it says -- if we

 8    go to Shaheen-2, Pharmacy 4098 is the

 9    Chardon store in Geauga County.

10                    Do you know where Chardon

11    is, Mr. Shaheen?

12         A.    I know it's in Ohio.  I

13    don't have an exact location.  I believe

14    I was there at the store.

15         Q.    Okay.  I'll represent to you

16    that it's less than ten miles from Lake

17    County and less than ten miles from

18    Trumbull, almost in the middle.

19                    Does that sound about right?

20         A.    I don't -- I don't know.  I

21    know it's over that way.  That's all I

22    can tell you.

23         Q.    Okay.  That's okay.  All

24    right.
```

```
 1              This says -- the first
 2   paragraph, "This settlement agreement is
 3   entered into by and between Giant Eagle
 4   4098 and the Ohio State Board of
 5   Pharmacy."
 6              Do you see where it says
 7   that?
 8        A.    Yes.
 9        Q.    Okay.  Let's go ahead and
10   turn to the next page.  Sorry, if we can
11   go back one more.  I skipped a section.
12   I do apologize.
13              Second paragraph starts off.
14   "Giant Eagle 4098 enters into this
15   agreement being fully informed of its
16   rights afforded under Chapter 119."
17              Do you see where it says
18   that?
19        A.    Yes.
20        Q.    Okay.  So this is -- this is
21   a settlement agreement, as its labeled at
22   the top, between Giant Eagle 4098 and the
23   Ohio Board of Pharmacy, correct?
24        A.    Yes.  That's what it says.
```

```
 1              Q.    Okay.  Let's turn to the

 2      next page.  The second full paragraph

 3      starts, "Whereas, on or about July 14th,

 4      2011, pursuant to Chapter 119 of the Ohio

 5      Revised Code, Giant Eagle 4098 was

 6      notified of the allegations or charges

 7      against it, its right to a hearing, its

 8      right in such hearing, and its right to

 9      submit contentions in writing.

10              "Further, a hearing was

11      scheduled and continued by the board.

12      The July 14, 2011 notice of opportunity

13      for hearing contains the following

14      allegations or charges."

15              Do you see that?

16      A.    Yes.

17              Q.    Okay.  Number 1, "Records of

18      the Board of Pharmacy indicate that Giant

19      Eagle 4098 is licensed with the State

20      Board of Pharmacy as a terminal

21      distributor of dangerous drugs."

22              Do you see where it says

23      that?

24      A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    "Records further reflect

 2     during the relevant time period stated

 3     herein, Kelly Ann Chappell was the

 4     responsible pharmacist pursuant to" --

 5     and it provides a rule for the Ohio

 6     Administrative Code.

 7                 Do you see where it says

 8     that?

 9          A.    I do.

10                 MR. KOBRIN:  I'll just ask

11            for another standing objection as

12            to the relevance of this.

13                 It's outside of the Track 3

14            counties.  I don't think there's

15            any relationship, and the witness

16            did not work at the company when

17            these proceedings took place.

18                 MR. HARRIS:  Okay.  Well,

19            I'll -- I'll establish -- well,

20            I'll represent that this is --

21                 MR. KOBRIN:  Standing

22            objection.  It's fine.  As long as

23            you're okay with it, I'll just put

24            a standing objection there so I
```

1          don't have to interrupt you.

2                    MR. HARRIS:   Okay.   That

3          works.   Thanks, Josh.

4     BY MR. HARRIS:

5          Q.    "Number 2, Giant Eagle

6     pharmacy 4098 did, from May 1st, 2009

7     through January 21st, 2011, fail to

8     provide effective and approved controls

9     and procedures to deter and detect theft

10    and diversion of dangerous drugs."

11                   Do you see where it says

12    that?

13         A.    Yes.

14         Q.    Okay.   I believe earlier you

15    testified you're not aware of when Giant

16    Eagle implemented it's SOMS program; is

17    that correct?

18         A.    It's what program?

19         Q.    Its suspicious order

20    monitoring system.

21         A.    Yeah, no, I'm not aware.

22         Q.    Okay.   Let's reads the last

23    sentence here.   It says -- well, we'll

24    finish this one.   "To wit:   The following

1    controlled substances and dangerous drugs

2    were stolen from the pharmacy, yet

3    internal control procedures failed to

4    deter or detect the theft."

5              Do you see where it says

6    that?

7         A.   Yes.

8         Q.   "The drugs were stolen by an

9    inadequately supervised technician who

10   admitted to a Board agent that the drugs

11   were diverted to her addicted husband and

12   also sold to another individual."

13             Do you see where it says

14   that?

15        A.   I do.

16        Q.   Okay.  Paragraph 3, Giant

17   Eagle Pharmacy 4098 did, from May 1st,

18   2009 to January 21st, 2011, failed to

19   provide effective and approved controls

20   and procedures to deter her and detect

21   theft and diversion of dangerous drugs."

22             Do you see where it says

23   that?

24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Let's go on.  "To wit:  The

 2   following controlled substances and

 3   dangerous drugs were stolen from the

 4   pharmacy, yet internal control procedures

 5   failed to deter or detect the theft.  The

 6   drugs were stolen by an inadequately

 7   supervised technician, who admitted to

 8   the board agent that the" -- let's go to

 9   the next page -- "drugs were diverted to

10   her addicted husband and also sold to

11   another individual."

12            Right?

13       A.    Yes.

14       Q.    And then we list out the

15   drugs that were -- the allegations say

16   were stolen.  Let's go through this list.

17            It says, "Drug, hydrocodone.

18   Shortage, 1,321."

19            Do you see that?

20       A.    I do.

21       Q.    Next, two down, "Drug,

22   hydrocodone.  Shortage, 5,237."

23            Do you see that?

24       A.    I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Next, "Hydrocodone," and

 2    this is another strength.  "Shortage,

 3    6,161."

 4                Do you see that?

 5          A.    I do.

 6          Q.    "Hydrocodone," next down,

 7    "shortage, 30,566."

 8                Do you see that?

 9          A.    I do.

10          Q.    "Hydrocodone.  Shortage,

11    5,282."

12                Do you see that?

13          A.    Yes.

14          Q.    "Hydrocodone.  Shortage,

15    14,586."

16                Do you see that?

17          A.    Yes.

18          Q.    "Hydrocodone.  Shortage,

19    5,523."

20                Do you see that?

21          A.    Yes.

22          Q.    "Hydrocodone.  Shortage,

23    17,512."

24                Do you see that?
```

1        A.     Yes.

2        Q.     Hydrocodone, 1,057 shortage.

3               Do you see that?

4        A.     Yes.

5        Q.     Okay.  Let's go down --

6   well, let's go -- so you agree the Ohio

7   Board of Pharmacy settled with Giant

8   Eagle Pharmacy 4098 based on the

9   allegations that this pharmacist diverted

10  tens of thousands of pills to her

11  addicted husband and sold some to another

12  individual?  That's what this document

13  says?

14               MR. KOBRIN:  Object to form.

15               THE WITNESS:  No.

16               MR. KOBRIN:  He can't agree

17         to anything in this document.

18               THE WITNESS:  No.

19               MR. HARRIS:  I'm not asking

20         him to agree to the substance of

21         it.  I'm asking him to agree that

22         that's what the document says.

23               MR. KOBRIN:  Any of us can

24         read it.  I don't understand why

Highly Confidential - Subject to Further Confidentiality Review

```
 1          you're wasting your time with this

 2          with him.  He has no knowledge of

 3          this.  He has no relationship with

 4          the company at the time that these

 5          events happened.  He's not a

 6          30(b)(6).

 7               I mean, this has nothing to

 8          do with him at all.  I mean, he

 9          can read it, yes.  But you're

10          getting testimony that he can read

11          that on the page?  I guess I'll

12          allow that.  But it seems like a

13          tremendous waste of time.

14   BY MR. HARRIS:

15        Q.    Okay.  Mr. Shaheen, let me

16   repeat my question for you, since your

17   counsel let you answer it.

18               The question was:  So you

19   agree that the Ohio Board of Pharmacy

20   settled with Giant Eagle Pharmacy 4098

21   based on the allegations that this

22   pharmacist diverted tens of thousands of

23   pills to her addicted husband and sold

24   some to another, is what this document
```

```
 1   says, correct?
 2             MR. KOBRIN:  He has no basis
 3        on which to agree that there was
 4        an action, which is what you asked
 5        for, that there was a settlement.
 6             He has no knowledge of any
 7        of this.  He can say that's what
 8        he read.  I'll allow him to
 9        testify that's what the page that
10        you put in front of him says.
11             We did not produce this.
12        You've presented it to him in a
13        deposition, and he can read it.
14        And he can say that those are the
15        words.
16             MR. HARRIS:  Okay.
17   BY MR. HARRIS:
18        Q.   Mr. Shaheen, do you need me
19   to repeat my question, or do you agree
20   that's what the document says?
21        A.   Well, there was -- you're
22   saying a pharmacist.  Where did it say in
23   this document that it was a pharmacist
24   that diverted?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Absolutely.  Let's go back.

 2   Let me ask that question.

 3          A.    Did I miss that?

 4          Q.    Yes, so, you may have.

 5   Let's go back one page, Paragraph 1.  You

 6   follow me?

 7          A.    Yes.

 8                MR. HARRIS:  Let's highlight

 9          that.

10   BY MR. HARRIS:

11          Q.    And it says, the second

12   sentence, I believe, "Records further

13   reflect during the relevant time periods

14   stated herein, Kelly Ann Chappell was the

15   responsible pharmacist pursuant to" -- a

16   rule of Ohio Administrative Code.

17                Do you see that?

18          A.    Yes.

19          Q.    Okay.  And then let's go

20   down to Number 3.

21          A.    Okay.

22          Q.    So Kelly Ann was the

23   pharmacist.  And then the last sentence

24   says, "The drugs were stolen by an
```

1    inadequately supervised technician who

2    admitted to a Board agent that the drugs

3    were diverted to her addicted husband and

4    also sold to another individual."

5            Do you see that?

6        A.    I see that.

7        Q.    Okay.

8        A.    So my answer to you -- and

9    maybe you misspoke.  You claimed it was a

10   pharmacist diverted.  And that's not what

11   it says.

12       Q.    Okay.  Thank you for that

13   clarification.  I'm happy to re-ask my

14   question.

15           Based on your review of this

16   document, this document, and what you've

17   read in this document, this states that

18   the Ohio Board of Pharmacy settled with

19   Giant Eagle Pharmacy 4098 based on the

20   allegations that a Giant Eagle technician

21   diverted tens of thousands of pills to

22   her addicted husband and sold some to

23   another individual; is that correct?

24       A.    Without me reading it, it

Highly Confidential - Subject to Further Confidentiality Review

1    looks like it is some type of agreement,

2    settlement, based on the title, with

3    Giant Eagle.  Mm-hmm.  Yeah.

4         Q.    So you agree that this

5    document states that it's a settlement

6    agreement with the allegations being that

7    a technician diverted tens of thousands

8    of pills to her addicted husband and sold

9    to another individual, correct?

10        A.    Correct.

11        Q.    That's what this document

12   states, correct?

13        A.    Yes, sir.  I have no

14   knowledge of this, but you are correct.

15        Q.    Understood.  Is diverting

16   tens of thousands of hydrocodone an

17   example of Giant Eagle pharmacies and

18   Giant Eagle technicians going above and

19   beyond to prevent the diversion of

20   opioids?

21             MR. KOBRIN:  Object to form.

22             THE WITNESS:  Obviously, you

23        know, somebody -- again, I don't

24        know who investigated, how they

```
 1          determined.  Obviously somebody

 2          got arrested in this particular

 3          case.

 4               I don't know what was

 5          happening in 2009 or '10 or '11 or

 6          whatever year this was.

 7               You know, I started in 2013,

 8          the end of the year.

 9               So I don't know anything

10          about -- about this case.

11               And actually, this is the

12          first time I saw anything about

13          this.

14  BY MR. HARRIS:

15      Q.   Okay.  So I understand.  I

16  appreciate that answer.  But I guess my

17  question is a bit more simple, yes or no.

18               Is the allegations contained

19  in here, if true, is that -- strike that.

20               A simple yes or no.  Is this

21  an example of Giant Eagle employees going

22  above and beyond to prevent diversion?

23      A.   I don't know how this was

24  uncovered --
```

1          MR. KOBRIN:  Object to form.

2     Object to form.

3          Give me a beat.

4          THE WITNESS:  Okay.  I don't

5     know how this was uncovered.  I

6     don't know how this all developed.

7          To give you that proper

8     answer, I would have to know the

9     history and take a look.

10         I see the end result.  But I

11    don't know how it got there.

12  BY MR. HARRIS:

13    Q.   Okay.  All right.  Let's go

14  to Tab 3.  We'll go through this one real

15  quick, and I think I'll be at a point

16  where I can take a break to start closing

17  up.

18         So let's go through this one

19  Mr. Shaheen, and then we'll take a quick

20  pause.  Okay?

21    A.   Yes, sir.

22         MR. HARRIS:  Tab 3.  We're

23    going to label this Shaheen-20 for

24    the record.

```
 1              (Document marked for

 2         identification as Exhibit

 3         Shaheen-20.)

 4              MR. HARRIS:   This is

 5         P-GEN-00149.   Okay.

 6  BY MR. HARRIS:

 7         Q.    At the top it says, "Minutes

 8  of the September 11th through 12th, 2017

 9  meeting of the State of Ohio Board of

10  Pharmacy."

11              Do you see where it says

12  that?

13         A.    Yes.

14         Q.    And then you certainly were

15  employed by Giant Eagle in September of

16  2017, right?

17         A.    Correct.

18         Q.    Okay.  Let's go ahead -- and

19  I apologize again.  There's -- oh,

20  actually, this one is going to be a touch

21  easier.  If you see at the top right, if

22  you go in the next page, we actually have

23  page numbers on this one.

24              So if you go to, the top
```

Highly Confidential - Subject to Further Confidentiality Review

1    right, Page 87.  That's a lot easier than

2    these decimal numbers.

3         A.    Yes.  Okay.

4         Q.    Okay.  If we go to the very

5    bottom.  It's R-2018-0086.  "Ms. Marchal

6    announced the following settlement

7    agreement has been signed by all parties

8    and is now effective."  And it starts,

9    "In the matter of," and it goes to the

10   next page, right?

11              And it says, "In the matter

12   of Giant Eagle Pharmacy 6501 and Shawna

13   Ricker, registered pharmacist."

14              Do you see where it says

15   those names?

16        A.    Okay.

17        Q.    Okay.  If we look at

18   Shaheen-2, we can see that Giant Eagle

19   Pharmacy 6501 is the Gahanna pharmacy in

20   Franklin County, Ohio.

21              Do you know where Franklin

22   County, Ohio is?

23        A.    I know it's near Columbus.

24        Q.    Okay.  Fair enough.  Do you

1  know about how far drivingwise Columbus

2  is from Lake County, roughly?

3        A.    No.  No.  Maybe two, two and

4  a half hours.  I don't know.

5        Q.    Okay.  Do you know from

6  maybe Columbus to Cleveland?

7        A.    Two, two and a half.  I'm

8  guessing.  I don't know.

9        Q.    No worries.  I'm not going

10  to hold you to that.

11            Let's read this paragraph.

12  "Settlement agreement with the State of

13  Ohio Board of Pharmacy."

14            It says, "This settlement

15  agreement is entered into by the state of

16  Ohio Board of Pharmacy, Board, and Giant

17  Eagle Pharmacy 6501 and Shawna Ricker for

18  the purpose of resolving all issues

19  between the parties relating to the Board

20  investigation of the failure to report

21  significant drug losses to the Board."

22            Do you see that?

23  A.    Yes.

24            MR. KOBRIN:  I'm going to

```
 1          ask to have another standing

 2          objection.  This is outside of the

 3          Track 3 jurisdiction.  I don't see

 4          how it's relevant in this

 5          particular track of the case.  So

 6          I would like a standing objection

 7          on that issue.

 8               MR. HARRIS:  Okay.  Sure.

 9   BY MR. HARRIS:

10      Q.    Let's go down to the fact

11   section at the bottom of this page.  It

12   says, "Facts.  1.  On or about March 9th,

13   2016, the Board initiated an

14   investigation of Giant Eagle Pharmacy

15   6501, terminal distributor of dangerous

16   drugs license number" -- provides their

17   license number -- and Shawna Ricker's

18   license number, and then provides her

19   license number -- "related to the Giant

20   Eagle Pharmacy 6501 and Shawna Ricker's

21   failure to report significant drug losses

22   to the Board."

23               Do you see where it says

24   that?
```

```
 1          A.    I do.

 2          Q.    Okay.  Let's go to the next

 3   page.  Under terms, Number 2, it says,

 4   "Giant Eagle Pharmacy 6501 and Shawna

 5   Ricker neither admit nor deny the

 6   allegations stated in the notice of

 7   opportunity for hearing letter dated

 8   May 30th, 2017; however, the Board has

 9   evidence sufficient to sustain

10   allegations, finds them to violate Ohio's

11   pharmacy law as set forth in the notice,

12   and hereby adjudicates the same."

13                Do you see where it says

14   that?

15          A.    I do.

16          Q.    Okay.  Number 3 says, "Giant

17   Eagle Pharmacy 6501 agrees to pay the

18   Board a monetary penalty in the amount of

19   $2,500 by means of a cashier's check."

20                Do you see where it says

21   that?

22          A.    Yes.

23          Q.    "4.  Giant Eagle Pharmacy

24   agrees to" -- excuse me -- "Giant Eagle
```

```
 1    Pharmacy 6501 agrees to" -- and then we

 2    have a couple factors listed out.

 3              Do you see that?

 4         A.    Yes.

 5         Q.    "A.  Continue training staff

 6    in best practices, quarterly education

 7    meetings, and training pharmacy staff in

 8    loss prevention measures, including

 9    inventory recordkeeping and security of

10    controlled substances."  Right?

11         A.    Yes.

12         Q.    "B.  Continue training

13    pharmacy staff on the company's

14    controlled substance dispensing

15    guidelines and other policies and

16    procedures for the filing and dispensing

17    of prescriptions for controlled

18    substances and to periodically review" --

19    "and to the periodically review" --

20    excuse me -- "and revise such policies as

21    appropriate."

22              Do you see where it says

23    that?

24         A.    Yes.
```

 1          Q.    Okay.  "C.  Continue to

 2     evaluate and monitor the pharmacy's

 3     physical theft/loss prevention measures

 4     which include but are not limited to..."

 5               Do you see that?

 6          A.    Yes.

 7          Q.    And then it provides out a

 8     list of measures that can be taken to

 9     prevent loss, right?

10          A.    Yes.

11          Q.    Okay.  Let's go to the next

12     page, Paragraph D.

13               It says, "Require Giant

14     Eagle Pharmacy 6501 pharmacists to

15     complete and/or repeat DEA continuing

16     education on controlled substances,"

17     right?

18          A.    Yes.

19          Q.    And, finally, "E.  Continue

20     to perform regular internal audits on

21     controlled substance compliance with

22     federal and state laws and regulations as

23     well as compliance with company policies

24     and procedures."  Right?

1      A.    Yes.

2      Q.    Okay.  So here, the Ohio

3  Board of Pharmacy in this settlement,

4  states -- and this is back at Paragraph 2

5  on Page 89.

6           The Ohio Board of Pharmacy

7  states, "The board has sufficient

8  evidence to sustain the allegations,

9  finds them to violate Ohio's pharmacy law

10  as set forth in the notice and hereby

11  adjudicates the same."  Right?

12      A.    Yes.

13      Q.    Mr. Shaheen, is this an

14  example of Giant Eagle pharmacists and

15  Giant Eagle itself going above and beyond

16  to prevent the diversion of controlled

17  substances which include opioids?

18           MR. KOBRIN:  Object to form.

19           Objection.  Relevance for this

20           document.

21           THE WITNESS:  Once again, as

22           I previously stated, the fact that

23           it was detected and information

24           was provided to the Ohio Board,

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the Ohio Board agents, again,

 2          counts were being conducted, video

 3          was reviewed, and obviously here,

 4          the Board had -- there was some

 5          type of agreement -- again, the

 6          first time I'm seeing this

 7          document.

 8               MR. KOBRIN:  I don't want

 9          you to speculate on anything,

10          Rick.  If this is the first time

11          that you're seeing this document,

12          I don't think you can really speak

13          to anything about this document

14          unless you've got personal

15          knowledge about the events.

16               MR. HARRIS:  I'll object to

17          instructing the witness

18          mid-answer.

19     BY MR. HARRIS:

20          Q.   But, Mr. Shaheen, you can

21     continue if you have an answer after

22     that.

23               MR. KOBRIN:  Sorry.

24               THE WITNESS:  Yeah, that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              no, that --  I mean, you know,

2              it's what I've said previously.

3                   I think -- you know, I think

4              that what we do, this happened,

5              and then you know, to try to

6              prevent it, those are some of the

7              things that we did and tried to

8              determine what the losses were at

9              that store, working with the

10             Board.

11                  And you know, that's

12             where -- that's where, you know,

13             we end up, is always working with

14             the Board, always trying to

15             improve on policies and procedures

16             that we have in effect at our

17             stores.

18   BY MR. HARRIS:

19        Q.   And in fact, that's what

20   Giant Eagle had to agree to, especially

21   this specific store, 6501.  Giant Eagle

22   had to agree to improve their systems and

23   continue training their pharmacists;

24   isn't that right?
```

```
 1              MR. KOBRIN:  Object to form.

 2         Misrepresents the document.  It

 3         doesn't say anything about Giant

 4         Eagle having to agree to anything.

 5         Giant Eagle decided and

 6         voluntarily agreed to this.

 7              MR. HARRIS:  Okay.  I'll

 8         rephrase my question.

 9    BY MR. HARRIS:

10         Q.    Mr. Shaheen, this documents

11    states that Giant Eagle agreed to the

12    Board of Pharmacy saying that they need

13    improve their training, correct?

14              MR. KOBRIN:  Object to form.

15         It doesn't say anything that they

16         need to do anything.

17              THE COURT REPORTER:  If you

18         could keep your voice up, Josh.

19              MR. KOBRIN:  Sorry.  Object

20         to form.  It doesn't say anything

21         that they need to do anything.

22              THE WITNESS:  I don't -- I

23         don't see that.

24    BY MR. HARRIS:
```

1      Q.   This document, Paragraph 4,

2  this is an agreement by Giant Eagle in

3  which Giant Eagle agrees to continue

4  training staff, correct?  4A, "Continue

5  training staff in best practices,"

6  correct?

7      A.   4A, yes.

8      Q.   4B, continue training

9  pharmacy staff on the company's

10  controlled substance dispensing

11  guidelines, correct?

12      A.   Correct.

13          MR. KOBRIN:  Objection to

14      form.

15          THE WITNESS:  Yeah, it

16      says -- yeah.

17  BY MR. HARRIS:

18      Q.   4C, "Continue to evaluate

19  and monitor the pharmacy's physical

20  theft/loss prevention measures," correct?

21      A.   Yes.

22      Q.   4D, "Giant Eagle agreed to

23  require Giant Eagle Pharmacy 6501

24  pharmacists to complete and/or repeat DEA

```
 1   continuing education on controlled

 2   substances," correct?

 3        A.    Correct.

 4        Q.    Okay.  Now, Giant Eagle,

 5   their reporting policies, their

 6   monitoring policies, these proactive

 7   investigations that you've talked about,

 8   were those consistent throughout the

 9   Giant Eagle pharmacies, or did they vary

10   by pharmacy?

11             MR. KOBRIN:  Object to form.

12        Vague.

13             THE WITNESS:  No.

14        Consistent throughout.

15   BY MR. HARRIS:

16        Q.    And that's not necessarily

17   consistent throughout all the Ohio

18   pharmacies, but consistent throughout all

19   the Giant Eagle pharmacies across the

20   states we discussed earlier?

21             MR. KOBRIN:  Object to form.

22        Vague.

23             THE WITNESS:  Consistent

24        throughout all the states.
```

```
1    BY MR. HARRIS:

2        Q.    Okay.  Are there any

3    policies that are either state or store

4    specific that Giant Eagle implements that

5    you can think of sitting here today?

6        A.    Can you explain a little

7    more, please?

8        Q.    Sure.  There's different

9    policies for completing -- strike that.

10            There's a policy for

11   completing the perpetual log immediately

12   after a prescriber, correct?

13       A.    Correct.

14       Q.    Okay.  There's a policy that

15   all pharmacists must comply with the

16   perpetual log instructions, correct?  Do

17   you remember looking at that?

18       A.    Yes.

19       Q.    Okay.  Policies such as

20   those, are those store-specific, or do

21   they apply to every Giant Eagle pharmacy?

22            MR. KOBRIN:  Object to form.

23            THE WITNESS:  If it's a

24        policy, it would apply to all
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              stores.
 2                   MR. HARRIS:  Thank you.
 3                   I think this is a good spot
 4              to stop and take a quick break if
 5              you'd like to.  Is that okay with
 6              you, Mr. Shaheen?
 7                   THE WITNESS:  Yes.
 8                   MR. KOBRIN:  How much time
 9              do you have left about, Josh?  Do
10              you have a sense?
11                   MR. HARRIS:  I want to check
12              my notes.  So let me give you an
13              answer off the record before we
14              come back, but I don't suspect
15              long.
16                   MR. KOBRIN:  That's
17              understandable.  Ten minutes?
18              Five minutes?  What do you want?
19                   MR. HARRIS:  I'd probably do
20              five unless people need more.  So
21              I'm inclined to keep moving if we
22              can, but happy to -- happy to
23              accommodate anyone.
24                   MR. KOBRIN:  I just don't
```

```
 1         think we'll do five.

 2              MR. HARRIS:  Okay.  Let's

 3         call it ten.  Let's shoot for ten.

 4         So we'll go off the record.

 5              MR. KOBRIN:  Thank you.

 6              THE VIDEOGRAPHER:  Going off

 7         record.  The time is 4:47.

 8              (Short break.)

 9              THE VIDEOGRAPHER:  We are

10         going back on record.  The time is

11         5:08.

12    BY MR. HARRIS:

13         Q.    Okay.  Mr. Shaheen, we're

14    back from our break.  Do you understand

15    that you're still under oath?

16         A.    Yes, I do.

17         Q.    Okay.  Thank you, sir.

18              Let's go ahead and turn to

19    Tab 25 of the binder we provided you.

20              MR. HARRIS:  This is going

21         to be P-HBC-1296.  And I believe

22         this is going to be Shaheen-21.

23              (Document marked for

24         identification as Exhibit
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Shaheen-21.)

 2   BY MR. HARRIS:

 3          Q.    This is an e-mail from you.

 4   We'll go through parts of it.

 5                Were you able to find it,

 6   Mr. Shaheen?

 7          A.    Yes.

 8          Q.    All right.  Let's start at

 9   the top and get oriented.  This is an

10   e-mail from you, Richard Shaheen,

11   July 3rd, 2019, right?

12          A.    Yes.

13          Q.    To Reid Fleming, Mike

14   Leighlitner, and Andrew Gaus, correct?

15          A.    Yes.

16          Q.    Subject, 2019

17   accomplishments.  And then it starts off

18   reading, "As per your request, here are

19   some of our high points directly

20   affecting Giant Eagle for 2019."

21                Is that right?

22          A.    Yes.

23          Q.    Now, from -- cutting that

24   first sentence into two, was this
```

1    directed towards Reid Fleming?

2         A.    Yes.

3         Q.    Okay.  Who is Reid Fleming?

4         A.    He was our former director

5    of loss prevention.

6         Q.    You said former.  He is no

7    longer with the company?

8         A.    He retired.

9         Q.    Okay.  Congratulations to

10   him.

11              All right.  Let's look at

12   the second paragraph.  Sorry, third

13   paragraph.  "15,000 pharmacy tech cash

14   theft case.  Agreement made with tech and

15   she paid back $8,000."

16              Do you see that?

17        A.    Yes.

18        Q.    Let's go down to the next

19   paragraph.  "We are continuing to work

20   with and assist the joint state and

21   federal case involving the fraudulent

22   promethazine with codeine prescriptions.

23   Numerous arrests were made as a result of

24   our pharmacy teams that were coached on

1    how to exercise their due diligence."

2              Correct?

3         A.    Correct.

4         Q.    Okay.  So you obviously

5    included that because you believe it's a

6    plus?

7         A.    Yes.

8         Q.    Okay.  Let's go down to the

9    second-to-last paragraph.  This says, "A

10   drug ring involving multiple individuals

11   were arrested in our parking lot for

12   selling their Percocet.  They would

13   purchase the medication at our pharmacy

14   and the" -- it says the, but I believe it

15   means then -- meet up with others to sell

16   their pills."

17             Did I read that properly?

18        A.    Yes.

19        Q.    So this is acknowledging

20   that a drug ring was able to establish

21   themselves outside a parking lot for one

22   of Giant Eagle's pharmacies; is that

23   right?

24             MR. KOBRIN:  Object to form.

```
 1                THE WITNESS:  I believe it
 2         was three -- three or four family
 3         members.
 4  BY MR. HARRIS:
 5         Q.    What do you mean by family
 6  members?
 7         A.    The -- when you're referring
 8  to the ring.  That was a 70-year-old
 9  female and her family that was involved
10  with that.
11         Q.    Okay.  But just to be clear,
12  when you say "when they refer to the
13  ring," it's actually when you refer to
14  the ring, right?  You typed this e-mail?
15         A.    Yes, I did.  That's me.
16  Mm-hmm.
17         Q.    Okay.  And you referred to
18  it as, "A drug ring involving multiple
19  individuals were arrested in our parking
20  lot for selling their Percocet."
21                That's what that says right
22  there, right?
23         A.    Yes.
24         Q.    Okay.  Can you tell the jury
```

```
 1    how long that had been going on before
 2    Giant Eagle noticed it?
 3         A.    I don't know how long that
 4    went on.  I don't have those records.
 5              When we did discover this
 6    was happening, we contacted the Grain --
 7    Grainage police department down there,
 8    and their drug task force took over the
 9    case.
10         Q.    Mr. Shaheen, is the fact
11    that a drug ring was able to establish
12    themself outside of a Giant Eagle
13    pharmacy another instance of Giant Eagle
14    going above and beyond to prevent the
15    diversion of opioids?
16              MR. KOBRIN:  Object to form.
17         And just for the sake of time,
18         there's nothing about a drug ring
19         establishing itself there.  It
20         just says that they were involved
21         and they would use the parking
22         lot.
23    BY MR. HARRIS:
24         Q.    Mr. Shaheen, do you
```

 1   understand my question?

 2         A.    Yes.  They -- they --

 3   exactly.  That's what these

 4   individuals -- this individual was doing.

 5               I'm sorry.  That's my dog.

 6               The individual would

 7   purchase the medication and then go out

 8   into the parking lot.  And what I said to

 9   you earlier was family members, so she

10   was driven by either a daughter and/or

11   her son.  That's what would happen out in

12   the parking lot.

13               And the minute we discovered

14   that, we went ahead and contacted the

15   local police who, with the sheriff and

16   others, started their investigation.  And

17   that's what ended up happening.  We

18   stopped the action.  She was arrested.

19         Q.    So you had a reactive

20   investigation to finding out there were

21   as a drug ring involving multiple

22   individuals who were selling their

23   Percocet in a Giant Eagle pharmacy

24   parking lot?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. KOBRIN:  Object to form.

2              THE WITNESS:  I don't

3         remember how this case ended up

4         starting.  I don't know if it was

5         alerted to us by one of our

6         pharmacists, which I believe it

7         was.  And then at that point

8         that's when we took over the case

9         and, you know, started to spin

10        some camera -- video that is, and

11        then got law enforcement

12        involvement.

13              So that's the proactive

14        portion.

15   BY MR. HARRIS:

16        Q.    Now, Mr. Shaheen, today

17   we've gone through a bunch of examples.

18   Some from Trumbull and Lake County, Ohio.

19   Do you remember going through those

20   documents earlier today?

21        A.    Yes.  We went through some

22   of those county documents.

23        Q.    Okay.  Then we looked at

24   some from counties outside Trumbull and

```
 1    Lake County, some of the Board of

 2    Pharmacy documents.

 3              Do you remember looking at

 4    those?

 5         A.    Correct.

 6         Q.    Okay.  And you also

 7    testified that, you know, there's certain

 8    indicators that could indicate potential

 9    diversion.  Remember testifying to that?

10         A.    Yes.

11         Q.    Those would be theft of

12    controlled substances, right?

13         A.    Yes.

14         Q.    And we saw some documents

15    where pharmacists and pharmacist techs

16    did in fact steal controlled substances;

17    am I right?

18         A.    Yes.

19         Q.    Okay.  You testified that

20    overprescribing opioids could be a

21    potential indicator of diversion.

22              Do you remember that?

23         A.    Potential, yes.  Mm-hmm.

24         Q.    Do you remember that we
```

Highly Confidential - Subject to Further Confidentiality Review

1    looked at documents that indicated that

2    there were -- excuse me, that there were

3    controlled substances that were

4    overprescribed?  Do you remember looking

5    at those?

6              MR. KOBRIN:  Object to form.

7              THE WITNESS:  Yes.

8    BY MR. HARRIS:

9         Q.    Okay.  And those were

10   overprescribed by Giant Eagle

11   pharmacists, correct?

12             MR. KOBRIN:  Can you tell me

13        what documents you are talking

14        about, Josh?

15             MR. HARRIS:  If you look at

16        Shaheen-13, Tab 29.

17             MR. KOBRIN:  Objection.  I

18        think that misrepresents the

19        evidence.

20   BY MR. HARRIS:

21        Q.    It says here, "Norco 10 was

22   filled Tuesday evening by leader Sarah,

23   and yesterday Brent, registered

24   pharmacist, believed they were short 30.

1    Reviewed video and believes we dispensed

2    120 instead of 90."

3              Do you see where it says

4    that?

5         A.    Yes.

6         Q.    Okay.  So do you remember

7    talking earlier today about at least a

8    claim, at bare minimum, of a Giant Eagle

9    pharmacist overprescribing, based on this

10   document?

11             MR. KOBRIN:  Object to form.

12        There's nothing about

13        overprescribing.

14             THE WITNESS:  No, nothing

15        about -- yeah.

16   BY MR. HARRIS:

17        Q.    Okay.  So you're saying this

18   is not indicative of overprescribing?

19        A.    No.  She doesn't prescribe.

20        Q.    Okay.  Excuse me.  Okay.  I

21   understand.  I'm using the improper

22   terminology.  Let me -- let me back it up

23   and I'll strike the last question.

24   You're right.  I appreciate that.

Highly Confidential - Subject to Further Confidentiality Review

1            MR. KOBRIN:  The last five

2        questions -- because I actually --

3        you know, I'm not sure if I

4        objected to all of them.  But I

5        wasn't sure what you were talking

6        with overprescribing.

7            MR. HARRIS:  That is -- that

8        is fair.  The pharmacists here

9        were not the ones technically

10        prescribing.  So let me -- I

11        forget what questions they are.  I

12        don't -- I want to strike any of

13        those.

14    BY MR. HARRIS:

15        Q.   Let me ask -- let me ask it

16    this way, Mr. Shaheen.

17            Is overfilling -- do you

18    remember testifying earlier and agreeing

19    that overfilling prescriptions is a

20    potential for diversion, correct?

21        A.   Correct.

22        Q.   Okay.  And you remember

23    looking at documents that indicate a

24    potential overfilling of prescriptions?

```
 1          A.    Yes.

 2          Q.    And if you recall, Pharmacy

 3   4056 was in Trumbull County.

 4                Do you remember that?

 5          A.    Yes.

 6                MR. HARRIS:  Okay.  We can

 7          take that one down.  Thank you.

 8          And I apologize for that

 9          confusion.

10   BY MR. HARRIS:

11          Q.    Do you remember talking

12   about not conducting proper due diligence

13   is a potential for diversion, correct?

14                MR. KOBRIN:  Object to form.

15                THE WITNESS:  Potential,

16          yes.

17   BY MR. HARRIS:

18          Q.    Okay.  Do you remember

19   looking at documents saying that logs

20   were not being filled out or audits were

21   not being complete in the counties we've

22   looked at today by Giant Eagle

23   pharmacists?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  Do you remember -- do

 2   you remember testifying that losing

 3   controlled substances, including opioids,

 4   can potentially lead to diversion?

 5          A.    Potentially.

 6          Q.    Okay.  Do you remember

 7   looking at documents where there were

 8   lost controlled substances, including

 9   opioids, today?

10          MR. KOBRIN:  Object to form

11        as to "lost."

12          THE WITNESS:  Yes.

13   BY MR. HARRIS:

14          Q.    Giant Eagle, it should be a

15   priority to prevent the diversion of

16   opioids.  Do you agree with that

17   statement, Mr. Shaheen?

18          A.    Yes.

19          Q.    And, in fact, they're

20   legally required to as a prescriber of

21   opioids, aren't they?

22          MR. KOBRIN:  Object to form.

23        Seeks a legal conclusion.  It

24        misrepresents the facts in
```

```
 1          evidence.
 2               THE WITNESS:  Can you please
 3          state it again?
 4   BY MR. HARRIS:
 5          Q.   Sure.  Do you agree that
 6   Giant Eagle, under federal and state law,
 7   is required to prevent the diversion of
 8   opioids?
 9               MR. KOBRIN:  Object to form.
10          Legal conclusion.
11               THE WITNESS:  We have an
12          obligation, yes.
13   BY MR. HARRIS:
14          Q.   Do you agree that's an
15   important obligation?
16               MR. KOBRIN:  Same objection.
17               THE WITNESS:  Yes.
18   BY MR. HARRIS:
19          Q.   Okay.  Do you agree it's
20   important to keep prescription drugs,
21   including opioids, out of our
22   communities, correct?
23          A.   Correct.
24          Q.   Do you believe it's
```

```
 1    important to keep prescription drugs,

 2    including opioids, out of the hands of

 3    our children; isn't that correct?

 4              MR. KOBRIN:  Object to form.

 5         Is there medications -- I don't

 6         know that you want to --

 7              THE COURT REPORTER:  I

 8         can't --

 9    BY MR. HARRIS:

10         Q.   Let me ask the question, Mr.

11    Shaheen.

12              THE COURT REPORTER:  I can't

13         hear you.

14    BY MR. HARRIS:

15         Q.   You would agree it's

16    important to prevent diversion of

17    prescription drugs, including opioids, to

18    our communities, correct?

19         A.   Correct.

20         Q.   You would agree it's

21    important to prevent the diversion of

22    prescription drugs, including opioids, to

23    our children in our communities; isn't

24    that correct?
```

1          A.     Correct.

2          Q.     Because as we looked at

3    earlier, children are getting their hands

4    on prescription drugs; isn't that right?

5               MR. KOBRIN:  Object to form.

6          Lacks foundation.

7    BY MR. HARRIS:

8          Q.     That's what you said in

9    2012, right, Mr. Shaheen, that children

10   were able to get their hands on

11   prescription drugs, including opioids,

12   right?

13         A.     Correct.

14         Q.     Do you agree that opioids

15   specifically are highly addictive?

16              MR. KOBRIN:  Object to form.

17         Seeks expert testimony.

18              THE WITNESS:  Opioids can be

19         addictive.

20   BY MR. HARRIS:

21         Q.     And do you agree that opioid

22   prescription -- prescription opioid --

23   strike that.

24              Do you agree that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   prescription opioid use can lead to

 2   illicit heroin use?

 3             MR. KOBRIN:  Object to form.

 4             THE WITNESS:  It's possible,

 5        yes.

 6   BY MR. HARRIS:

 7        Q.    So for a company like Giant

 8   Eagle who both distributes and dispenses

 9   prescription drugs, including the opioids

10   that we've been discussing today,

11   wouldn't you agree that it's important to

12   spend some time on the policies and

13   procedures to help prevent the diversion

14   of opioids?

15        A.    Spend some time, are you --

16   I guess --

17        Q.    I can rephrase it if you'd

18   like.

19        A.    Yes.  Could you, please?

20        Q.    Yes, absolutely.

21             So for a company like Giant

22   Eagle who both distributes and dispenses

23   prescription drugs, including opioids,

24   that we've been discussing here today,
```

```
 1    wouldn't you agree that it's important to

 2    spend some time training and educating

 3    Giant Eagle employees on policies and

 4    procedures that can be used to prevent

 5    the diversion of prescription drugs and

 6    opioids?

 7              MR. KOBRIN:  Object to form.

 8              THE WITNESS:  Giant Eagle

 9         has policies and procedures in

10         place in addition to the

11         pharmacists doing constant

12         training as required by the law

13         for, you know, continuing

14         education.

15              So I believe that is already

16         actively happening.

17    BY MR. HARRIS:

18         Q.   Well, the continuing

19    education requirement as you just

20    mentioned is imposed by law, correct?

21         A.   Is what?

22         Q.   Is imposed by law, I believe

23    is what you said, or required by law?

24         A.   Yes.
```

1        Q.    Okay.  So Giant Eagle is not

2    the law.  They're not the ones requiring

3    those continuing education, correct?

4        A.    Correct.

5        Q.    You said they have policies

6    and procedures in place, Giant Eagle

7    does, but you don't remember when the

8    suspicious order monitoring system was

9    activated, correct?

10        A.    I don't know that.

11        Q.    Okay.  But my question to

12    you -- and I acknowledge that your

13    testimony is that they do have policies

14    and procedures.

15            My question is, don't you

16    agree for a company like Giant Eagle,

17    isn't it important to spend time

18    educating and training people on those

19    policies and procedures?

20            MR. KOBRIN:  Objection.

21        Asked and answered.

22            THE WITNESS:  I -- we have

23        those policies and procedures.

24        And that's what it's utilized for.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. HARRIS:

 2         Q.    Okay.  Let's look at one

 3    final document, Mr. Shaheen.  Let's go

 4    ahead and flip to Tab 13.

 5              MR. HARRIS:  This is going

 6         to be P-HBC-1281.

 7              (Document marked for

 8         identification as Exhibit

 9         Shaheen-22.)

10    BY MR. HARRIS:

11         Q.    All right.  The top one is

12    an e-mail from you.  But let's go ahead

13    and look at the bottom e-mail.  It's

14    fairly short, so we'll just go through it

15    together if that's okay with you, sir.

16         A.    Yes.

17         Q.    Okay.  It's from Sara

18    Dannhardt.  It's dated June 6, 2019, so

19    more recent than some of the documents

20    that we've looked at.

21              It says, "Subject:  Response

22    requested:  Quarterly team leader call

23    topics."

24              Do you see that in the
```

Highly Confidential - Subject to Further Confidentiality Review

1    bottom?

2         A.    Yes.

3         Q.    You see about maybe middle

4    of the way, that you're on this e-mail,

5    Richard Shaheen.

6              Do you see your name?

7         A.    Yes.

8         Q.    All right.  Ms. Dannhardt

9    writes, "Good morning.  The quarterly

10   team leader call has been scheduled for

11   Monday, June 17th from 8:00 a.m. to

12   9:00 a.m.  Please provide the topics

13   you'd like to present on by" -- excuse

14   me.  "Please present the topics that you

15   would like to present by end of day

16   tomorrow, if possible."

17             Do you see that?

18        A.    Yes.

19        Q.    All right.  Let's go to the

20   top.  Let's see what you responded with.

21   After everything that we've talked about,

22   your e-mail from Richard Shaheen June 6,

23   2019.

24             Do you see that date?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I do.

 2                MR. HARRIS:  All right.

 3          Let's highlight this, please.

 4     BY MR. HARRIS:

 5          Q.    It says, "Hi, Sara.  I would

 6     like to speak about corresponding

 7     responsibility and due diligence."

 8                Do you see that?

 9          A.    I do.

10          Q.    The next line says, "I only

11     need five minutes for my segment."

12                Do you see that?

13          A.    Mm-hmm.

14          Q.    That's a yes?

15          A.    Yes.  I'm sorry.

16          Q.    Okay.  So in 2019, after

17     having been with the company for about

18     six years, you wrote in this e-mail -- it

19     states, "I only need five minutes for my

20     segment," that segment being

21     corresponding responsibility and due

22     diligence; is that correct?

23          A.    Correct.

24                MR. HARRIS:  Thank you.
```

```
 1          Mr. Shaheen, that concludes my

 2          questions.  I'm not sure if your

 3          counsel has any.

 4               You know, I may have some

 5          follow-up if he does.  But I

 6          appreciate your time and your

 7          patience today.

 8               In the event that he

 9          doesn't, you know, thank you for

10          taking the time to answer my

11          questions today.

12               THE WITNESS:  Thank you,

13          Mr. Harris.

14               MR. HARRIS:  Absolutely.

15                    -  -  -

16               EXAMINATION

17                    -  -  -

18     BY MR. KOBRIN:

19          Q.    How are you doing, Rick?  I

20     do have some questions.  Do you want to

21     take a break, Rick, or do you want to --

22          A.    No.

23          Q.    I know you have a headache.

24     You sure you're okay?
```

```
 1          A.    They're painting and

 2   plastering in the house.  And the smell

 3   is just -- it gets to you.

 4          Q.    That's it.  Do you want to

 5   take a break and get some water or an

 6   aspirin or anything?

 7          A.    No, I'm good.  I've got a

 8   little bit of water.  I'm good.  Let's

 9   roll.

10          Q.    All right.  Let's do this.

11                So we're going to do this a

12   little strangely orderwise.  Bear with

13   me, Rick -- Mr. Shaheen, if you will.

14                We're going to do this in a

15   totally different order because they are

16   all bound in the binder.  So I'm going to

17   try to go to the tabs and I'm going give

18   the exhibit numbers for the record.  But

19   I think it's probably easier if I

20   identify documents by tabs.  Is that all

21   right, Mr. Shaheen?

22          A.    That's good.

23          Q.    All right.  So let's start

24   off.  The first one that I'd like to talk
```

1    about is Tab 2, which is Exhibit 19.

2    This is the document, the minutes from

3    the December 5th through 7th, 2011

4    meeting of the Ohio State Board of

5    Pharmacy.

6              Do you see that?

7         A.    Yes.

8         Q.    Okay.  And plaintiffs'

9    counsel asked you about this settlement

10   agreement that is on Page 4, labeled .003

11   of that document, right?

12        A.    Yes.

13        Q.    Have you ever seen these

14   minutes from Monday, December 5, 2011

15   before today?

16        A.    No.

17        Q.    You never reviewed this for

18   any of your work at Giant Eagle?

19        A.    No.

20        Q.    Did you ever -- did you work

21   at Giant Eagle back in 2011?

22        A.    No, I didn't.

23        Q.    Do you know anything about

24   this case at all regarding Giant Eagle

```
 1    Store 4098?
 2              MR. HARRIS:  Objection to
 3         form.
 4              MR. KOBRIN:  What's the
 5         objection?
 6              MR. HARRIS:  To form.
 7              MR. KOBRIN:  What's the form
 8         objection?
 9              MR. HARRIS:  It's vague.
10    BY MR. KOBRIN:
11         Q.   Okay.  Do you know anything
12    about this settlement agreement with
13    store 4098 and the Ohio Board of
14    Pharmacy?
15         A.   No.
16         Q.   Do you have any basis of
17    knowledge about this settlement
18    agreement, anything at all?
19         A.   No.
20         Q.   All right.  Thank you.
21              Let's go to Tab Number 3,
22    which is Exhibit 20.
23              Hold on one second.
24              MR. HARRIS:  I think you're
```

```
1              going the other way, Josh.  I
2              think it's Tab 4.
3                   MR. KOBRIN:  Actually, I was
4              going to change to Tab 4.  I was
5              at Tab 3.  But strike that.  Let's
6              go to Tab 4.  You are correct.
7              Lawyers think alike, regardless of
8              whether plaintiffs or defendants.
9    BY MR. KOBRIN:
10        Q.    Do you recall plaintiffs'
11   counsel asking you about this
12   November 2nd to 4th, 2009 meeting of the
13   Ohio State Board of Pharmacy?
14        A.    Yes.
15        Q.    All right.  And I believe
16   plaintiffs' counsel asked you about the
17   section regarding Justin Allan Bracken,
18   which is on the 12th page of the
19   document, labeled 0011.
20              Do you recall that?
21        A.    Yes.
22        Q.    Have you ever seen this
23   document in whole or in part before
24   today?
```

```
 1          A.    No.
 2          Q.    All right.  Do you know
 3    anything about this order regarding
 4    Justin Allan Bracken?
 5          A.    No.
 6          Q.    Did you work at Giant Eagle
 7    in November of 2009 when this order came
 8    down?
 9          A.    No.
10          Q.    Did you do any work related
11    to this order at that time or any time
12    after?
13          A.    No.
14          Q.    Do you have any basis
15    whatsoever for any knowledge regarding
16    this order of the Ohio State Board of
17    Pharmacy?
18               MR. HARRIS:  Objection to
19          form.
20               THE WITNESS:  No.
21    BY MR. KOBRIN:
22          Q.    Now, let's go back to Tab 3,
23    which is Exhibit Number 20.
24               Do you recall plaintiffs'
```

1    counsel asking you about these minutes of

2    the September 11th and 12th, 2017,

3    meeting of the State of Ohio Board of

4    Pharmacy?

5           A.    Yes.

6           Q.    All right.  Plaintiffs'

7    counsel, I believe, asked you about the

8    16th page.  It actually starts on the

9    15th page, but the real substance begins

10   on the 16th page, which is labeled .0015

11   at the bottom; is that correct?

12          A.    Yes.

13          Q.    And this is a settlement

14   agreement with the Ohio State Board of

15   Pharmacy, correct?

16          A.    Yes.

17          Q.    Mr. Harris asked you about

18   lots of different sentences and whether

19   those sentences were what was written on

20   this page of the settlement agreement.

21                Did he direct you to or ask

22   you anything about related to the drugs

23   at issue in this settlement agreement?

24          A.    Not that I recall, no.

1        Q.    Do you see anything in this

2    settlement agreement which is -- looks

3    like it's a little over three pages.

4              Do you see anything about

5    the drugs at issue in this settlement

6    agreement?

7        A.    Can I have a second to look?

8        Q.    Sure.

9        A.    No.

10       Q.    If you could look with me on

11   the page marked at the bottom 0016.  Do

12   you see under the terms, there's a

13   paragraph, numbered Paragraph 3.

14             Do you see that paragraph?

15       A.    Yep.  I'm there.

16       Q.    I want to ask you a separate

17   question.  You've worked in law

18   enforcement at the AG's office and you've

19   collaborated with lots of -- worked with

20   and cooperated and assisted law

21   enforcement agencies during your time at

22   Giant Eagle; is that accurate?

23       A.    Yes.

24             Q.    And during that time, did

Highly Confidential - Subject to Further Confidentiality Review

```
1    you have the opportunity to work with

2    lots of different regulatory and law

3    enforcement agencies?

4         A.    Yes.

5         Q.    During that time, did you --

6    were you able to get a sense of the

7    penalties, monetary and otherwise, that

8    those law enforcement or regulatory

9    agencies impose on organizations or

10   people who in any way, whether

11   purposefully or not, violate regulations

12   or laws?

13        A.    Yes.

14        Q.    If you see in Paragraph 3,

15   it says that Giant Eagle and the Board

16   agree to monetary penalty in the amount

17   of $2,500.

18             Do you see that?

19        A.    I do.

20        Q.    Based on your knowledge of

21   monetary penalties that are imposed by

22   regulatory and law enforcement agencies,

23   do you regard that as a large penalty or

24   small penalty?
```

```
 1                  MR. HARRIS:  Objection to
 2          form.  Improper opinion.  Facts
 3          not in -- assumes facts not in
 4          evidence.  Misstates the document.
 5   BY MR. KOBRIN:
 6          Q.   Do you have any opinion --
 7   strike that.
 8                  Do you have any opinion
 9   based on your experience with law
10   enforcement or regulatory agencies about
11   the monetary penalty of $2,500?
12                  MR. HARRIS:  Objection to
13          form.  Calls for an improper
14          opinion.
15                  THE WITNESS:  That's a small
16          amount.
17   BY MR. KOBRIN:
18          Q.   And your belief -- do you
19   have a belief that's a small amount?  Is
20   that what you believe based your
21   experience working with regulatory
22   agencies and law enforcement agencies?
23                  MR. HARRIS:  Objection to
24          form.  Calls for an improper
```

```
 1          opinion.

 2               THE WITNESS:  I'm basing it

 3          on my previous experience mostly,

 4          and current experience.

 5  BY MR. KOBRIN:

 6          Q.   What does that $2,500

 7  penalty tell you about how the Board of

 8  Pharmacy regards the violation for which

 9  it imposed that penalty?

10               MR. HARRIS:  Objection to

11          form.  Calls for speculation.

12               He's not on the board and

13          cannot testify to their state of

14          mind.

15  BY MR. KOBRIN:

16          Q.   I'm asking you, what does

17  that tell you, Mr. Shaheen?  What

18  conclusions do you draw, Mr. Shaheen,

19  from that $2,500 penalty from the State

20  Board of Pharmacy?

21               MR. HARRIS:  Same objection.

22               THE WITNESS:  Minor or not a

23          severe penalty.

24  BY MR. KOBRIN:
```

1      Q.   All right.  Given that you

2   have that belief about a $2,500 penalty,

3   would you have the same belief about

4   $1,000 penalty?

5           MR. HARRIS:  Objection to

6       form.  Improper question.

7           THE WITNESS:  I would have

8       the same opinion on $1,000.  It's

9       not a severe penalty.  It's

10      actually -- I wouldn't consider

11      that the board has taken high

12      regard to that case.

13   BY MR. KOBRIN:

14      Q.   Moving on to Paragraph 4.

15   You may recall that plaintiffs' counsel

16   had you read that Giant Eagle Pharmacy

17   6501 agreed to do the things that are

18   listed there under A, B, C, D, and E

19   under Paragraph 4.

20           Do you see that?

21      A.   Yes.

22      Q.   Do you see that first

23   sentence of several of those paragraphs,

24   continue training, continue training,

```
 1    continue to evaluate?  Do you see that at

 2    the bottom of Page 0016?

 3         A.    Yes.

 4         Q.    Does it say 'continue' there

 5    because Giant Eagle was already doing

 6    these things?

 7              MR. HARRIS:  Objection to

 8         form.  Calls for speculation.

 9    BY MR. KOBRIN:

10         Q.    If you know, Mr. Shaheen.

11    Do you know whether it says continue

12    there because Giant Eagle was already

13    doing those things?

14              MR. HARRIS:  Object to form.

15         Calls for speculation as to why

16         the Board put that language in

17         there.  You restricted me from

18         asking questions because he's not

19         part of the Board and had never

20         seen those.  Now, you're

21         attempting to do the same.

22              But go ahead, Mr. Shaheen.

23              MR. KOBRIN:  I'm asking

24         whether he knows --
```

```
 1              THE WITNESS:  Yes.

 2              MR. KOBRIN:  Did Giant Eagle

 3         continue --

 4              MR. HARRIS:  If he knows

 5         what the Board of Pharmacy was

 6         thinking?

 7              Same objection.  Go ahead.

 8  BY MR. KOBRIN:

 9         Q.   I don't know.  Mr. Shaheen,

10  do you know -- it says continue -- in

11  Paragraph 4, if you look under Paragraph

12  4 it says that Giant Eagle agreed to

13  continue training, continue training,

14  continue to evaluate.

15              They all say continue.  Do

16  you know if Giant Eagle was already doing

17  those things?

18         A.   Yes, we are.

19         Q.   So they were already

20  training staff in best practices; is that

21  right?

22         A.   Yes, they were.

23         Q.   Were they already

24  continuing -- were they already -- excuse
```

```
 1    me -- training pharmacy staff on the

 2    company's controlled substance dispensing

 3    guidelines and other policies and

 4    procedures for the filling and dispensing

 5    of prescriptions for controlled

 6    substances and to the potential --

 7    periodically review and revise such

 8    policies as appropriate?

 9         A.    Yes.

10              MR. HARRIS:  Objection to

11         form.  Vague.

12    BY MR. KOBRIN:

13         Q.    And were they already

14    continuing to do the evaluation and

15    monitoring that is listed under

16    Subparagraph C there?

17         A.    Yes.

18         Q.    In fact, you were deeply

19    involved in Giant Eagle's efforts to

20    evaluate and monitor the pharmacies'

21    physical theft and loss prevention

22    measures, weren't you?

23              MR. HARRIS:  Object to form.

24    BY MR. KOBRIN:
```

1    Q.    Were you -- were you

2  intimately involved in the company's

3  efforts to evaluate and monitor the

4  pharmacies' physical theft and loss

5  prevention measures?

6            MR. HARRIS:  Same objection.

7            THE WITNESS:  Yes, I am.

8  BY MR. KOBRIN:

9    Q.    You are.

10           And you know from your

11  personal experience -- rather, strike

12  that.

13           Do you know from your

14  personal experience that they were

15  already evaluating and monitoring

16  physical theft and loss prevention

17  measures?

18    A.    Yes, we were.

19    Q.    If you turn to Tab 14, which

20  is Exhibit 15.  This is an e-mail,

21  Mr. Shaheen, that plaintiffs' counsel

22  asked you about with the subject "LP

23  pharmacy wins fiscal year '18"; is that

24  correct?

```
 1          A.    Correct.

 2          Q.    Do you recall plaintiffs'

 3   counsel asking you questions and having

 4   you read bullet points from this e-mail

 5   that you sent to Mr. Leighlitner?

 6          A.    Yes.

 7                MR. HARRIS:  Objection.

 8                THE WITNESS:  Yes.

 9   BY MR. KOBRIN:

10          Q.    One of the bullets he had

11   you read was, "80 fake prescription

12   cases."

13                Do you see that?

14          A.    Yes.

15          Q.    Those 80 fake prescription

16   cases that you classified as pharmacy

17   wins in fiscal year '18, were those

18   prescriptions -- were those fake

19   prescriptions filled?

20                MR. HARRIS:  Objection to

21          form.

22   BY MR. KOBRIN:

23          Q.    If you know.  Were those

24   fake prescriptions filled?
```

```
 1                   Strike that.  Let me

 2    rephrase.

 3                   Those 80 fake prescription

 4    cases listed in the second bullet, do you

 5    recall listing that as a pharmacy win in

 6    this e-mail?

 7          A.    Yes.

 8          Q.    When you listed that, do you

 9    recall the generalities of those 80 fake

10    prescription cases?

11          A.    Yes.

12          Q.    Were those 80 fake

13    prescription cases, cases where the

14    prescriptions or the drugs for those

15    prescriptions, those fake prescriptions,

16    were dispensed?

17                   MR. HARRIS:  Objection to

18          form.

19                   THE WITNESS:  No.  In many

20          of those cases we ended up

21          stopping these individuals from

22          filling these prescriptions,

23          having these individuals get

24          arrested.
```

```
 1                    In addition to that, the
 2             success that we had from the BOLOs
 3             and whatnot, that a lot of those
 4             prescriptions were not passed
 5             because a pharmacist would shut
 6             them down at the counter.
 7                    So they weren't always
 8             arrested.  But it was either
 9             people were shut down or they
10             ended up getting arrested as we
11             contacted law enforcement.
12    BY MR. KOBRIN:
13        Q.    Moving down these bullets,
14    plaintiffs' counsel skipped one of the
15    bullets.  So I'd like you to read it if
16    you could.  It is the -- one, two, three,
17    four, five -- the sixth bullet is the one
18    plaintiff skipped.
19                    Could you read that for me?
20        A.    "Continued working
21    partnership with the DEA, AG, FBI, Ohio
22    Board of Pharmacy, local and state
23    police.  U.S. attorney and FBI
24    acknowledge our efforts in drug diversion
```

```
 1    cases."
 2          Q.    Can you provide any further
 3    information on any of those partnerships
 4    or that acknowledgment?
 5                MR. HARRIS:  Objection to
 6          form.  Vague.  Calls for a
 7          narrative.
 8    BY MR. KOBRIN:
 9          Q.    Can you, Mr. Shaheen?
10          A.    Yes, I can.
11          Q.    Would you provide us more
12    information then about the partnerships.
13                MR. HARRIS:  Same objection.
14                THE WITNESS:  Constantly
15          working hand in hand with the --
16          all three of those agencies that
17          are listed.
18                As we start to develop cases
19          from information that we receive
20          from our pharmacies, we provide
21          that information to the DEA, the
22          AG, FBI, et cetera, Ohio Board.
23                And it's early boots on the
24          ground.  So we're very proactive
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            with that.
 2                 Local municipalities, state
 3            police, from time to time we work
 4            with them, depending on who has
 5            jurisdiction.
 6                 The U.S. attorney's office,
 7            of which I'm a member on this task
 8            force that they have, we have
 9            worked hand in hand with the FBI.
10            And one of the main cases we did,
11            was out of the Pittsburgh area.
12                 The FBI had modeled what we
13            did and provided that to various
14            FBI offices throughout --
15            throughout the country.
16                 It was a very successful
17            program that we did with the FBI
18            that led to multiple arrests in
19            that case.
20                 So, you know, we got
21            acknowledged by them and the U.S.
22            attorney's office for that effort.
23    BY MR. KOBRIN:
24            Q.   When you say the FBI modeled
```

1   what we did, who is the "we" there?

2           MR. HARRIS:   Objection to

3       form.

4           THE WITNESS:   Giant Eagle

5       pharmacy investigator, Andrew and

6       myself.

7   BY MR. KOBRIN:

8       Q.    What is the -- I believe you

9   said you're a task force for the U.S.

10  attorney's office; is that correct?

11      A.    Yes.  We're part of that

12  civil healthcare task force.

13      Q.    Is that something that you

14  do individually is or is that something

15  that the Giant Eagle is a partner of,

16  with the U.S. attorney's office?

17      A.    No.  That's -- it is -- I

18  got invited because of my former work as

19  an agent.  And you know, there's

20  various -- it's all healthcare

21  investigators from various federal

22  agencies, plus insurance -- insurance --

23  SIU individuals who do investigations on

24  insurance fraud, and then of course the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   DEA is there.
 2            And that's, you know, a good
 3   arena for us to share information with
 4   them, both what they're giving us and
 5   what we give them.
 6        Q.   So you serve on that task
 7   force along with -- as a representative,
 8   rather, of Giant Eagle?
 9        A.   Yes.
10            MR. HARRIS:  Objection to
11        form.
12   BY MR. KOBRIN:
13        Q.   Do you serve on that that
14   task force as a representative of Giant
15   Eagle or in an individual capacity?
16        A.   Yes, on behalf of Giant
17   Eagle.
18        Q.   If you could flip to Tab 16,
19   which is Exhibit 8.  I believe you saw a
20   couple of these Giant Eagle pharmacies
21   suspected controlled substance loss DEA
22   notification documents.
23            Do you recall looking at
24   these with plaintiffs' counsel?
```

1        A.     Yes.

2        Q.     What is a suspected control

3    loss DEA notification?

4        A.     We submit these documents to

5    the DEA, Ohio Board, and then our

6    corporate office acknowledging that a

7    product, a controlled substance is either

8    suspected lost, missing, generally at

9    that point.

10              And that is alerting them to

11   the fact that, you know, we've discovered

12   that a product is missing.

13       Q.     When do you send this loss

14   notification?

15              MR. HARRIS:  Objection to

16       form.

17              THE WITNESS:  Generally,

18       it's sent when they discover it.

19       So as soon -- as soon as they

20       realize that it's a suspected

21       loss.

22   BY MR. KOBRIN:

23       Q.     At this point, have you even

24   had the chance to investigate the loss,

```
 1    or is this just when you suspect a loss

 2    then?

 3              MR. HARRIS:  Objection to

 4         form.

 5              THE WITNESS:  No.  Generally

 6         if -- if I receive a phone call or

 7         an e-mail, they weren't sure about

 8         this, we'll take a quick drive if

 9         it's close by.

10              Or if it's wherever, one,

11         either myself, Sam, or Angie will

12         go out and start looking.  And at

13         that point in time, by the end of

14         the day, this document goes out

15         within the appropriate time

16         period, if we can't uncover it

17         initially.  And then we'll start

18         looking.

19              We'll then also, as I said

20         before, be proactive, start our

21         counts to see if in fact it is

22         diversion or is it a data

23         situation.  We'll reach back to

24         our IT people, provide them with
```

```
 1            that information, look to see what

 2            we received, what we dispensed,

 3            what we have on hand, try to make

 4            that determination if it is data.

 5                 And then obviously

 6            contact -- in this case, it was a

 7            board agent, and then contact the

 8            board agent and explain to them

 9            everything that we're doing.

10  BY MR. KOBRIN:

11       Q.   So even after this loss

12  notification has gone out, you continue

13  to work to resolve any missing controlled

14  substances?

15                 MR. HARRIS:  Objection to

16            form.

17  BY MR. KOBRIN:

18       Q.   Even -- strike that.

19                 After this loss notification

20  goes out, you continue to research in

21  order to resolve any issues of missing

22  controlled substances; is that right?

23       A.   That's correct.

24       Q.   And this is Exhibit 16.
```

```
 1                 MR. KOBRIN:  Can I just hold
 2          on for one second and step away
 3          from the computer.  Is that okay
 4          with you, Josh?
 5                 MR. HARRIS:  Yeah.
 6                 MR. KOBRIN:  I have a noise
 7          issue.  I don't know if it's
 8          affecting you guys or not.
 9                 MR. HARRIS:  I mean, I'm not
10          hearing anything, but you can
11          handle it.
12     BY MR. KOBRIN:
13          Q.    Are you on Tab 17?
14          A.    Yes.  I am now.
15          Q.    And if you can at the same
16     time look at Tab 25, which I believe --
17     is it 25?
18                 MR. HARRIS:  That was
19          Shaheen-21, Josh.  At least that's
20          what I noted.
21                 MR. KOBRIN:  Tab 25 is
22          Shaheen-21?
23                 MR. HARRIS:  Correct, yeah.
24                 THE WITNESS:  Which one am I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            on?  20 -- 17 and what?

 2   BY MR. KOBRIN:

 3            Q.    17, which is Exhibit 16, and

 4   Tab 25, which is Exhibit 21.

 5            A.    Okay.

 6            Q.    I actually think we want to

 7   look at, I believe, Tab 27, Exhibit 17.

 8   Looking at Tab 17 which is Exhibit 16 and

 9   Tab 27, which is Exhibit 17.

10            If we look at Exhibit 16, do

11   you remember answering questions about

12   this BOLO at Exhibit 16?

13            A.    You're talking Tab 17

14   though?  That's what I --

15            Q.    Exactly.  And thank you very

16   much.  They put them both up side by

17   side.  I'm not sure if you can see that

18   well enough on your screen.  But you can

19   at least know which one we're looking at.

20   We're looking at the one on the left,

21   which is the BOLO.

22            What does BOLO stand for?

23            A.    Being on the lookout.

24            Q.    And you send these out when
```

1    you get a lead from a pharmacy?  What

2    makes you send this out?

3         A.    Exactly that.  When a

4    pharmacist -- if a pharmacist contacts me

5    or if we get something via law

6    enforcement, I will immediately put out a

7    BOLO to alert.  Sometimes it's just a

8    local with this -- you know, if we hear

9    that it's happening in Cleveland, I'll

10   send it to those three PDLs in that area

11   which encompasses -- you know, I don't

12   know, 90, 100 stores in that greater

13   Cleveland area.

14        Q.    When you said in this BOLO,

15   "This ring is having success passing this

16   forgery," did you mean that they were

17   having success passing the forgery and

18   getting it dispensed at Giant Eagle

19   pharmacies?

20        A.    No.

21             MR. HARRIS:  Object to form.

22             THE WITNESS:  No.  No, I

23        didn't -- no, I didn't mean that.

24        They were having success

```
 1          throughout their area wherever
 2          they were -- wherever they were
 3          going.  The information came to
 4          us, and I kicked out this BOLO.
 5   BY MR. KOBRIN:
 6          Q.    Okay.  Now, if we can look
 7   at Exhibit 17, which plaintiffs' counsel
 8   asked you about, which is behind Tab 27.
 9   It's Exhibit 17.  This is the pharmacy
10   hot sheet.
11          A.    Yes.
12          Q.    It says, "Cleveland Clinic
13   script passed at two of our pharmacies in
14   Ohio."  And I think you explained this a
15   little bit to plaintiffs' counsel.  But
16   he -- he moved to strike some of it.
17              What does it mean when you
18   say a Cleveland Clinic script is passed
19   at two of our pharmacies?  Does that mean
20   that it was dispensed?
21          A.    No, it doesn't mean that it
22   was dispensed.
23              As I said before, if a
24   script comes in and it gets dropped, and
```

1    then they do their due diligence, then

2    the script would get either -- sometimes

3    kept by the pharmacy, but if the

4    individual demands the script back, they

5    would give the script back.

6         Q.   Can you turn to Tab 28 which

7    is Exhibit 10?

8              Can you turn to the third

9    page here, where you have your original

10   notes.

11        A.   Okay.

12        Q.   What did you have to do to

13   fill out these notes?  What is this?

14             MR. HARRIS:  Objection to

15        form.

16             THE WITNESS:  Can you ask it

17        again, please?

18   BY MR. KOBRIN:

19        Q.   What are these notes

20   memorializing?  What are you doing here?

21             MR. HARRIS:  Objection to

22        form.

23   BY MR. KOBRIN:

24        Q.   What are you recording?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I went to the store and I
 2    started the spin cam review camera trying
 3    to follow what had transpired with this
 4    bottle.  And the times would be set up
 5    here so that I knew when I put it on the
 6    disc or whatever I retained it to,
 7    whether it was a flash drive, that I had
 8    the times that I can incorporate either
 9    on a CD or a flash drive, and then the
10    events, how they happened, like a
11    timestamp.
12              Q.    You would just sit and watch
13    the video?  Is that what this is
14    representing -- or strike that.
15                    Is this representing you
16    watching the video and what you saw?
17              A.    Yes.
18              Q.    You say -- it looks like you
19    started watching the video -- sorry.  Go
20    ahead.  Finish.
21              A.    You know, you see at 12:30,
22    bottle thrown out.
23                    And then I had to go all the
24    way -- all the way down from 12:30 to
```

1  3:41, and then because the garbage was

2  getting filled.  And then I saw either --

3  generally it's a technician -- but a

4  technician take the garbage out to the

5  compactor, and then it was discarded --

6  it was discarded at that point in time.

7        Q.    After you saw that the

8  bottle wasn't stolen, wasn't, you know,

9  abused by a team member, wasn't hidden or

10  something, after you saw that it was

11  thrown out inadvertently, why did you

12  continue to follow the video until it

13  went out to the compactor?

14           MR. HARRIS:  Objection to

15        form.

16           THE WITNESS:  Well, I -- I

17        tried to follow as far as we can.

18        If, our cameras from the pharmacy

19        into the grocery, if we can do a

20        path of travel, then that way, if

21        I get questioned or we get

22        questioned by the Ohio Board or

23        the DEA as to, you know, what was

24        the final outcome, we try to

```
 1              follow it all the way to make sure

 2              that it was not diverted.

 3    BY MR. KOBRIN:

 4         Q.   So this way you can make

 5    sure that nobody abused the drugs that

 6    were inadvertently thrown out at 12:30?

 7              MR. HARRIS:  Objection to

 8         form.

 9    BY MR. KOBRIN:

10         Q.   Is this so that you can

11    confirm that no one abused or had the

12    opportunity to abuse the drugs that were

13    inadvertently thrown out at 12:30?

14              MR. HARRIS:  Objection to

15         form.

16              THE WITNESS:  Correct.

17    BY MR. KOBRIN:

18         Q.   Correct what?

19         A.   Yeah.  No -- there was --

20    the bottle was not diverted.  The bottle

21    was inadvertently thrown out, and it went

22    into the garbage, then into the

23    compactor.

24         Q.   So what are you trying to
```

Highly Confidential - Subject to Further Confidentiality Review

1    confirm by tracing the bottle all the way

2    to the compactor?

3                 MR. HARRIS:  Objection to

4         form.

5                 THE WITNESS:  I'm confirming

6         that there was no diversion

7         involved.  There was no intent to

8         steal any product from Giant

9         Eagle.

10                And the bottle, in fact --

11        so when we completed our DEA 106,

12        that -- that we have a record on

13        what happened and we're -- because

14        we're accountable for these

15        medications -- what happened to

16        that bottle that day.

17   BY MR. KOBRIN:

18        Q.   Go to Tab 29 for me, which

19   is Exhibit 13.  Actually, no, let's skip

20   that one for now.

21                Let's go to tab -- strike

22   that.

23                Let's go to Tab 33.

24        A.   33, you said?

1        Q.    33.  Which is Exhibit 3, so

2    this is from this morning.

3        A.    Okay.

4        Q.    Do you recall plaintiffs'

5    counsel asking you about -- asking you

6    questions about this presentation,

7    Mr. Shaheen?

8        A.    Yes.

9        Q.    And plaintiffs' counsel

10   represented to you that the date of this

11   presentation was around January of 2015;

12   is that right?

13       A.    Yes.

14       Q.    Could you turn to the page

15   in the presentation with the header

16   "Perpetual Log."

17            Based on this page and the

18   time of the presentation, do you have a

19   sense to whom you were presenting this

20   PowerPoint presentation in 2015?

21       A.    This PowerPoint was

22   presented to pharmacists who were looking

23   to become pharmacy leaders.  In other

24   words, from a staff pharmacist to a

```
 1    manager.

 2         Q.    Were they in any particular

 3    region or were they all pharmacists who

 4    were looking to become team leaders?

 5         A.    I think -- one day I

 6    think -- I don't know exactly where all

 7    the pharmacists were from.

 8              But, you know, I think I did

 9    it twice.  There was two small groups of

10    pharmacists.

11         Q.    All right.  So this wasn't a

12    companywide presentation?

13              MR. HARRIS:  Objection to

14         form.  Assumes facts not in

15         evidence.

16    BY MR. KOBRIN:

17         Q.    Was it a companywide

18    presentation or was this a presentation

19    made to a small group?

20         A.    This was a --

21              MR. HARRIS:  Objection to

22         form.

23    BY MR. KOBRIN:

24         Q.    Go ahead.
```

```
 1         A.    This was a presentation for

 2   a small group.

 3         Q.    You later testified about

 4   why you liked the perpetual log.  Do you

 5   recall that, Mr. Shaheen?

 6         A.    Yes.

 7         Q.    And you were encouraging

 8   them to expand the perpetual log from

 9   what you termed as POD to the Ohio

10   pharmacies.  Do you recall testifying

11   about that?

12         A.    Yes.

13         Q.    Okay.  And what is the POD?

14         A.    That's the Pittsburgh region

15   of Giant Eagle.  So it's like

16   Pennsylvania, Erie, down to Pittsburgh,

17   across to Altoona.

18         Q.    And you encouraged them to

19   do the perpetual log for consistency in

20   Ohio because it was already being enacted

21   as a procedure in western PA.

22               Do you recall that

23   testimony?

24               MR. HARRIS:  Objection to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          form.  Misstates testimony and

 2          documents.

 3  BY MR. KOBRIN:

 4          Q.   Do you recall encouraging

 5  people within the company to expand the

 6  perpetual log procedure to Ohio?

 7              MR. HARRIS:  Same objection.

 8          Apologize.  Same objection.

 9              THE WITNESS:  Yes, I do

10          recall.

11  BY MR. KOBRIN:

12          Q.   Can you explain what the

13  perpetual log was?

14          A.   The perpetual log was -- you

15  have an NDC for a particular drug.  You

16  listed how many you had on it, meaning

17  the quantity that you currently had.  You

18  did a fill -- so if you had 500, and now

19  you have a prescription for 100, it's a

20  calculation to be used when you take your

21  100 out of the 400, now you have 300.

22              And it's an ongoing

23  representation that lists the

24  prescription number and the quantity
```

```
 1   dispensed and so on and so forth, that --
 2   what would give us more of a lifetime --
 3   if there was something that happened
 4   between fills, it would minimize that
 5   time that I had to look at video in
 6   addition to keep an accurate depiction of
 7   what they had in the safe for that
 8   particular product.
 9        Q.    Were there other safeguards
10   in addition to the perpetual log at Giant
11   Eagle pharmacies to keep track of
12   inventory?
13             MR. HARRIS:  Objection to
14        form.
15             THE WITNESS:  Yes.  We
16        had -- we have a monthly narcotic
17        audit that we do.  And that's
18        hands down across the chain.  It
19        was in existence before I came.  I
20        don't know when they started that.
21             We had that.  Of course, the
22        perpetual log.
23             And even before -- even
24        before a lot of the Ohio stores --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          and again, I don't know definites,

 2          but Ohio stores, some of them

 3          had -- when I visited the stores,

 4          and I can remember Columbus.  But

 5          when I visited the stores, they

 6          had a perpetual log already -- it

 7          wasn't my doing -- that they

 8          initiated, whether they came from

 9          a different chain or not.

10               Some of the pharmacies

11          already had something like that in

12          place.

13   BY MR. KOBRIN:

14          Q.   Were there other audit

15   controls at all?  Other than you

16   mentioned a monthly audit and a perpetual

17   log, were there other controls in place

18   to keep a tab on inventory, particularly

19   controlled substances?

20               MR. HARRIS:  Objection to

21          form.

22               THE WITNESS:  You know,

23          we -- PDLs conducted audits.  I'm

24          trying to think of the other --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         the electronic perpetual log that

 2         we have, and it's a live basis

 3         right now.  In other words, you

 4         don't have to use pen and paper

 5         anymore.

 6              The minute that you start --

 7         it interacts with our filling

 8         program, EPS, PDX, it interacts

 9         with that, that when a

10         prescription is filled for a

11         particular controlled substance,

12         Schedule IIs, it will -- it will

13         automatically have that number

14         that posts when they do their back

15         count.

16              And so the pharmacist then

17         will complete their back count, go

18         into the safe, look to see what

19         else they have in the safe, and

20         match that number with the live

21         number that's on the software

22         program.

23    BY MR. KOBRIN:

24         Q.   Do me a favor and turn to
```

1    Tab 71, which is Exhibit 11.

2          A.    Okay.

3          Q.    Do you remember reading this

4    e-mail from Christopher Miller to you

5    during plaintiffs' counsel's examination?

6          A.    Yes.

7          Q.    And this is about

8    notification that a nurse had been fired

9    who worked at a community care center and

10   was able to write fraudulent

11   prescriptions; is that correct?

12               MR. HARRIS:  Objection to

13         form.

14               THE WITNESS:  Correct.

15   BY MR. KOBRIN:

16         Q.    Plaintiffs' counsel had you

17   read several portions of the e-mail, but

18   he skipped the last sentence of the first

19   paragraph.  Could you read that into the

20   record as well?

21         A.    "Laura Dejulia said the" --

22         Q.    No, no, no.  The last

23   sentence of the first paragraph,

24   Mr. Shaheen.  He had you read everything

```
 1   about the call from the community care

 2   center.  He had you read about the nurse

 3   who had been writing fraudulent

 4   prescriptions, correct?

 5        A.    Correct.

 6        Q.    Do you remember that?

 7        A.    Yes.

 8        Q.    He didn't have you read the

 9   last sentence of that first paragraph.

10   And that's what I'd like you to add in

11   order to complete the record regarding

12   this e-mail.

13        A.    Okay.  "Prescriptions" --

14              MR. HARRIS:  I'm sorry,

15        Mr. Shaheen.  Objection to form.

16              Go ahead.

17              MR. KOBRIN:  What's the

18        objection?

19              MR. HARRIS:  Misstates the

20        record.  The record is complete

21        because this document is in it.

22        And as you stated with many, it

23        can speak for itself.

24              So, go ahead, Mr. Shaheen.
```

1   BY MR. KOBRIN:

2        Q.   I'm going to restate my

3   question real quick.

4             Plaintiffs' counsel had you

5   read over this document.  Do you remember

6   that, Mr. Shaheen?

7        A.   Yes.  Yes.

8        Q.   Plaintiffs' counsel didn't

9   have you read the last sentence of the

10  first paragraph; is that correct?

11       A.   Correct.

12       Q.   Okay.  Could you read the

13  last sentence of the first paragraph into

14  the record in order to have that full

15  paragraph in the record, testimony on

16  record?

17            MR. HARRIS:  Objection to

18       form.

19            THE WITNESS:  Okay.

20       "Prescriptions had all the

21       pertinent information on them

22       because the nurse worked at the

23       facility."

24  BY MR. KOBRIN:

```
 1          Q.    What does that mean to you?
 2               MR. HARRIS:  Objection to
 3          form.  Sorry.
 4               Go ahead, Mr. Shaheen.
 5               THE WITNESS:  A completed
 6          prescription, written
 7          appropriately.  All the
 8          requirements were met.
 9   BY MR. KOBRIN:
10          Q.    Was this a hard to detect
11   fraud?
12               MR. HARRIS:  Objection to
13          form.
14               THE WITNESS:  Yes, it would
15          be.
16   BY MR. KOBRIN:
17          Q.    How does it make you feel as
18   somebody who worked in law enforcement
19   and now works in loss prevention trying
20   to prevent diversion?  How does a story
21   like this make you feel?
22               MR. HARRIS:  Objection to
23          form.  Outside the scope.  Not
24          relevant to anything discussed
```

```
 1          today or in this litigation.
 2              Go ahead, Mr. Shaheen.
 3              THE WITNESS:  I'm happy to
 4          be in the position that I'm in.
 5          This is -- it's very upsetting to
 6          see people abuse their positions
 7          like this.  It just -- it keeps
 8          driving us.
 9              That's why I'm working at it
10          because I understand it from my
11          previous life.  I have boots on
12          the ground now.  I know I can make
13          a difference.  And these are why
14          we put these BOLOs out and we go
15          after these individuals, to
16          prevent -- and hopefully prevent,
17          help make a dent into these
18          individuals who are creating
19          problems, not only for, you know,
20          the doctors, but the pharmacists,
21          because you've got a nurse
22          there -- and sadly now, any
23          prescription that's fraudulent is
24          basically going against the doctor
```

```
 1          as if he wrote it.
 2  BY MR. KOBRIN:
 3          Q.    You visit these pharmacies
 4  sometimes when these events happen --
 5  strike that.
 6              Mr. Shaheen, do you
 7  sometimes visit these pharmacies and have
 8  the opportunity to talk to the
 9  pharmacists involved in these events when
10  these e-mails about fraudulent
11  prescriptions that people attempt to pass
12  at Giant Eagle pharmacies, do you have a
13  chance to meet with these pharmacists?
14          A.    Yes, almost always.
15          Q.    Do you get a sense from
16  those meetings as to how those
17  pharmacists feel about those events?
18              MR. HARRIS:  Objection to
19          form.  Calls for speculation.
20          Absolutely not relevant.
21              THE WITNESS:  I can tell you
22          that, you know, they're obviously
23          very, very concerned.  They
24          express that concerned to me.
```

```
1              You know, they -- they
2          obviously work with law
3          enforcement very well when it
4          comes to these types of things
5          because law enforcement will show
6          up.
7              You know, it really -- it
8          really affects a lot of these
9          pharmacists to the point where,
10         you know, they're very agitated
11         that somebody could have gotten a
12         prescription and actually
13         committed a fraudulent
14         prescription and possibly in some
15         cases medication -- received
16         medication when in fact these
17         people were not entitled to it.
18             MR. KOBRIN:  Thank you so
19         much for your time today.  I
20         appreciate it, Mr. Shaheen.
21             I pass the witness.
22             MR. HARRIS:  Thank you,
23         Mr. Kobrin.
24                  -  -  -
```

```
 1                      EXAMINATION

 2                        -  -  -

 3   BY MR. HARRIS:

 4          Q.    Mr. Shaheen, I have just

 5   what I would believe to be a short

 6   section of follow-up questions.  Let's go

 7   ahead and address those.

 8                In light of everything that

 9   you and I talked about today, all the

10   documents you and I looked at and we

11   discussed, do you still believe that

12   Giant Eagle, Giant Eagle pharmacists, and

13   Giant Eagle pharmacist tech -- pharmacy

14   techs, excuse me, go above and beyond to

15   prevent the diversion of opioids?

16          A.    Yes, I do believe that.

17          Q.    Okay.  I do want to follow

18   up on one quick point that you spoke to

19   your attorney about.

20                Remember you were discussing

21   the Board of Pharmacy agreement amount?

22          A.    Yes.

23          Q.    Okay.  You said $2,500 was

24   not a large amount.  Do you remember
```

```
 1    saying that?
 2              MR. KOBRIN:  Objection.
 3         Misrepresents his testimony.
 4    BY MR. HARRIS:
 5         Q.    Hold on.  I certainly don't
 6    want to do that.  Give me a second.  I
 7    will pull it up.
 8              Okay, Mr. Shaheen.  Are you
 9    ready?
10         A.    Yes, sir.
11         Q.    Do you remember when your
12    attorney asked you if you had any opinion
13    on the monetary penalty of $2,500 -- do
14    you remember when he asked you that?
15         A.    Yes.
16         Q.    And you said that's a small
17    amount, didn't you?
18              MR. KOBRIN:  Object to form.
19              Why don't you just read his
20         testimony if you want to refer
21         back.
22              MR. HARRIS:  That's not how
23         I'm going to do this.
24    BY MR. HARRIS:
```

1    Q.   You said $2,500 was a small

2  amount, didn't you, Mr. Shaheen?

3            MR. KOBRIN:  I think he was

4        talking about it being a small

5        amount relative to monetary

6        penalties based on his experience.

7            MR. HARRIS:  Mr. Kobrin,

8        please do not instruct your

9        witness while I'm doing my

10       examination.  You do not know what

11       he was speaking of.  I am asking

12       him.

13           MR. KOBRIN:  You're

14       misrepresenting.

15  BY MR. HARRIS:

16      Q.   Mr. Shaheen, let me ask my

17  question.

18           When you were asked, "Do you

19  have any opinion based on your experience

20  with law enforcement or regulatory

21  agencies about the monetary penalty of

22  $2,500?"  Your answer was, "That's a

23  small amount," wasn't it?

24           MR. KOBRIN:  Objection.

```
 1                  THE WITNESS:  That was my

 2           answer.  But in law enforcement

 3           and what I did in the

 4           Commonwealth, we always used

 5           treble punitive damages.  And

 6           those amounts far superseded that

 7           $2,500.  And that's what I'm

 8           saying.

 9                I'm saying that those

10           amounts were a lot more than

11           $2,500.

12                MR. HARRIS:  Motion to

13           strike as nonresponsive to

14           everything after "Yes, that was my

15           answer."

16     BY MR. HARRIS:

17           Q.   Mr. Shaheen, when asked

18     about -- when your attorney asked you,

19     "Given that you have that belief" --

20     meaning it was a small amount -- "about a

21     $2,500 penalty, would you have the same

22     belief about $1,000 penalty," you said,

23     "I would have the same opinion on $1,000.

24     It's not a severe penalty.  It's
```

1    actually -- I wouldn't consider that --

2    that the Board has taken high regard to

3    that case."

4              Do you remember saying that,

5    Mr. Shaheen?  Simple yes or no.

6         A.    Yes.

7         Q.    Okay.  My question to you

8    is, since you think $1,000 and $2,500 are

9    small amounts and that the Board hasn't

10   taken high regard to that case, based on

11   your answers, is it fair to say that it

12   would take a significantly higher number

13   for you to consider it a severe penalty?

14              MR. KOBRIN:  Object to form.

15              THE WITNESS:  I would say

16        yes.  I would say that a higher

17        dollar -- yes, yes.

18              MR. HARRIS:  Thank you.  I

19        don't have any more questions.

20              MR. KOBRIN:  Do you want to

21        take a break, Rick, are you okay?

22        Can you go for like a couple --

23        three more minutes?

24              THE WITNESS:  Yeah, I'm

```
 1        good.

 2                     -  -  -

 3                  EXAMINATION

 4                     -  -  -

 5   BY MR. KOBRIN:

 6        Q.   You talked about the

 7   penalties amounts being $2,500 and

 8   $1,000.  Were you referring to those

 9   being small amounts generally or only

10   with regard to the way -- a regulatory

11   monetary penalty imposed by a government

12   agency?

13             MR. HARRIS:  Objection to

14        form.  Counsel testifying.

15        Outside the scope of redirect.

16        Leading the witness.  Improper

17        question.

18             Go ahead, Mr. Shaheen.  He

19        already told you what to say.

20             MR. KOBRIN:  I'm very

21        impressed with your ability to

22        make objections, and with ardor.

23             But we're good.

24             MR. HARRIS:  Thank you, sir.
```

```
 1          Go ahead.
 2    BY MR. KOBRIN:
 3          Q.     Mr. Shaheen --
 4          A.     Okay. Go ahead.
 5          Q.     Go ahead.  I've got all day.
 6                 When you were discussing the
 7    $2,500 penalty, did you regard it as
 8    small generally, or were you regarding it
 9    as small in relationship -- strike that.
10                 When you were discussing the
11    monetary penalties that the Ohio Board of
12    Pharmacy imposed on Giant Eagle, and you
13    said that you regarded them as small,
14    that was based on your experience, or was
15    that based on a general sense of monetary
16    amounts?
17          A.     That was --
18                 MR. HARRIS:  Objection to
19          form.
20                 Excuse me, Mr. Shaheen.
21          Objection to form.  Outside the
22          scope.  Leading.  Counsel
23          testifying.
24                 Go ahead.
```

```
 1                THE WITNESS:  That's based

 2        on my experience.

 3   BY MR. KOBRIN:

 4        Q.    And that experience is with

 5   law enforcement and regulatory agencies;

 6   is that accurate?

 7                MR. HARRIS:  Same

 8        objections.

 9   BY MR. KOBRIN:

10        Q.    Is that experience with law

11   enforcement, Mr. Shaheen?

12        A.    I'm sorry.  Could you

13   please --

14                MR. HARRIS:  Same objection.

15   BY MR. KOBRIN:

16        Q.    Is that experience on which

17   you base that assessment based on your

18   experience with law enforcement

19   penalties?

20        A.    Yes.

21                MR. HARRIS:  Objection.

22        Outside the scope.

23   BY MR. KOBRIN:

24        Q.    And is that experience based
```

```
 1   on your -- is that assessment -- strike

 2   that.

 3              Is that assessment based on

 4   your experience with regulatory agency

 5   penalties?

 6              MR. HARRIS:  Objection.

 7        Outside the scope.

 8   BY MR. KOBRIN:

 9        Q.   I think he stepped on your

10   answer there, Mr. Shaheen.  Could you

11   answer that part again?

12              MR. HARRIS:  I didn't step.

13        I was objecting.  Thank you.

14              THE WITNESS:  Yes.

15   BY MR. KOBRIN:

16        Q.   And those are penalties that

17   are imposed by the government in those

18   cases; is that correct?

19              MR. HARRIS:  Objection to

20        form.  Outside the scope.

21   BY MR. KOBRIN:

22        Q.   Strike that.

23              Is your experience with

24   these penalties related to penalties
```

1    imposed by the government?

2              MR. HARRIS:  Objection to

3         form.  Still outside the scope.

4              THE WITNESS:  Yes.

5    BY MR. KOBRIN:

6         Q.    Do you have any experience

7    with civil litigation penalties at all?

8              MR. HARRIS:  Objection to

9         form.  Outside the scope.

10        Relevance.

11   BY MR. KOBRIN:

12        Q.    Strike that.

13             Mr. Shaheen, there was a lot

14   of discussion today about whether Giant

15   Eagle goes above and beyond in its

16   efforts to prevent diversion.

17             Do you recall that?

18        A.    Yes.

19        Q.    In fact, you were just asked

20   by plaintiffs' counsel whether you still

21   believe Giant Eagle goes above and

22   beyond.  Do you remember that?

23        A.    Yes.

24        Q.    And we've reviewed the

```
 1   documents today.  Do they make you

 2   believe that Giant Eagle goes above and

 3   beyond --

 4              MR. HARRIS:  Object to form.

 5   BY MR. KOBRIN:

 6        Q.    -- in its effort to prevent

 7   diversion?  Do they support your belief

 8   that Giant Eagle truly goes above and

 9   beyond in its efforts to prevent

10   diversion?

11        A.    I believe Giant Eagle goes

12   above and beyond to prevent diversion.

13        Q.    Do you believe that the

14   documents today showed that Giant Eagle

15   goes above and beyond in its efforts to

16   catch diverters?

17              MR. HARRIS:  Objection to

18        form.

19              THE WITNESS:  Yes.

20   BY MR. KOBRIN:

21        Q.    Do you believe that the

22   documents that you saw today show that

23   Giant Eagle goes above and beyond in its

24   efforts to catch diverters?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Do you believe that the

3     documents that you reviewed today showed

4     that Giant Eagle cares deeply about

5     preventing diversion in the communities

6     it serves, including Lake County and

7     Trumbull County, Ohio?

8                 MR. HARRIS:  Objection to

9          form.

10                THE WITNESS:  Yes.

11                MR. KOBRIN:  Thank you,

12         Mr. Shaheen.

13                MR. HARRIS:  Mr. Shaheen, my

14         final question is, are you ready

15         to be done with this depo?

16                THE WITNESS:  Yes.

17                MR. HARRIS:  I have no more

18         questions for you, sir.

19                THE WITNESS:  Thank you,

20         Mr. Harris.

21                MR. HARRIS:  Thank you,

22         Mr. Shaheen.  I appreciate your

23         time today.

24                Mr. Kobrin, I appreciate you

Highly Confidential - Subject to Further Confidentiality Review

1    being here as well.  I'm glad we

2    worked through it together.

3         Madam Court Reporter,

4    videographer, and techs, thank you

5    everyone so much.  We truly

6    appreciate y'all's work today.

7         MR. KOBRIN:  Second that.

8    Thank you.

9         Pleasure working with you,

10   Josh.

11        THE VIDEOGRAPHER:  All

12   right.  This concludes today's

13   deposition.  We're going off

14   record.  The time is 6:21.

15        (Excused.)

16        (Deposition concluded at

17   approximately 6:21 p.m.)

18

19

20

21

22

23

24

```
 1
 2                    CERTIFICATE
 3
 4
 5           I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
             It was requested before
 8   completion of the deposition that the
     witness, RICHARD SHAHEEN, have the
 9   opportunity to read and sign the
     deposition transcript.
10
11
12   _Michelle L Gray_____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  March 12, 2021
16
17
18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4   over carefully and make any necessary

 5   corrections.  You should state the reason

 6   in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8              After doing so, please sign

 9   the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

```
 1                  -  -  -  -  -  -

                   E R R A T A

 2                  -  -  -  -  -  -

 3

 4    PAGE  LINE   CHANGE

 5    _____ _____  _____

 6        REASON:  _____

 7    _____ _____  _____

 8        REASON:  _____

 9    _____ _____  _____

10        REASON:  _____

11    _____ _____  _____

12        REASON:  _____

13    _____ _____  _____

14        REASON:  _____

15    _____ _____  _____

16        REASON:  _____

17    _____ _____  _____

18        REASON:  _____

19    _____ _____  _____

20        REASON:  _____

21    _____ _____  _____

22        REASON:  _____

23    _____ _____  _____

24        REASON:  _____
```

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5   hereby certify that I have read the

 6   foregoing pages, 1 - 455, and that the

 7   same is a correct transcription of the

 8   answers given by me to the questions

 9   therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    RICHARD SHAHEEN                    DATE

17

18

19   Subscribed and sworn

     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22


     _____

23   Notary Public

24
```

1                        LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____  _____

4      _____  _____  _____

5      _____  _____  _____

6      _____  _____  _____

7      _____  _____  _____

8      _____  _____  _____

9      _____  _____  _____

10     _____  _____  _____

11     _____  _____  _____

12     _____  _____  _____

13     _____  _____  _____

14     _____  _____  _____

15     _____  _____  _____

16     _____  _____  _____

17     _____  _____  _____

18     _____  _____  _____

19     _____  _____  _____

20     _____  _____  _____

21     _____  _____  _____

22     _____  _____  _____

23     _____  _____  _____

24     _____  _____  _____