```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                EASTERN DIVISION

 3

      *************************

 4

    IN RE:  NATIONAL
 5  PRESCRIPTION OPIATE        Case No.
    LITIGATION                 1:17-md-2804

 6

    THIS DOCUMENT RELATES
 7  TO:                        Hon. Dan A. Polster

 8  Track Three Cases

 9   *************************

10           - HIGHLY CONFIDENTIAL -
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12

13           Videotaped Remote Deposition of

14   JAMES G. TSIPAKIS, held via Zoom

15   videoconference, commencing at 1:07 CST, on

16   the 17th of March, 2021, before Maureen

17   O'Connor Pollard, Registered Diplomate

18   Reporter, Realtime Systems Administrator,

19   Certified Shorthand Reporter.

20                    - - -

21

            GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com

23

24
```

```
 1    ZOOM APPEARANCES:
 2
      LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY &
 3    PROCTOR, PA
 4    BY:   PETER MOUGEY, ESQ.
            LAURA DUNNING, ESQ.
 5          PAGE POERSCHKE, ESQ.
            JOSH GAY, ESQ.
 6          JULIA METTS, ESQ.
            316 S. Baylen Street
 7          Pensacola, Florida 32502
            850-435-7054
 8          pmougey@levinlaw.com
            ldunning@levinlaw.com
 9          ppoerschke@levinlaw.com
            jmetts@levinlaw.com
10          jgay@levinlaw.com
            Representing the Plaintiffs
11
12    MARCUS & SHAPIRA LLP
13    BY:   ROBERT BARNES, ESQ.
            JOSHUA A. KOBRIN, ESQ.
14          One Oxford Centre, 35th Floor
            301 Grant Street
15          Pittsburgh, Pennsylvania 15219-6401
            412-338-4690
16          barnes@marcus-shapira.com
            kobrin@marcus-shapira.com
17          Representing the Defendants Giant
            Eagle, Inc. and HBC Service Company,
18          and the Deponent
19
      JONES DAY
20
      BY:   NIA M. MACK, ESQ.
21          77 West Wacker
            Chicago, Illinois 60601
22          312-782-3939
            nmack@jonesday.com
23          Representing Walmart
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (continued):

 2

      ZUCKERMAN SPAEDER LLP

 3

      BY:    PAUL B. HYNES, JR., ESQ.

 4           1800 M Street NW, Suite 1000

             Washington, DC 20036-5807

 5           202-778-1800

             phynes@zuckerman.com

 6           representing the CVS Defendants

 7

 8    Videographer:  Chris Ritona

 9

10    Trial Technician:  Corey Smith

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                     INDEX
 2   EXAMINATION                              PAGE
 3   JAMES G. TSIPAKIS
 4   BY MR. MOUGEY                             7
 5
 6
 7          E X H I B I T S
 8    NO.          DESCRIPTION                PAGE
 9   Tsipakis-1   Controlled Substance
                  Dispensing Guideline, Bates
10                HBC_MDL00191292 through
                  HBC_MDL00191295.............   37
11
     Tsipakis-2   Giant Eagle Pharmacy
12                Controlled Substances
                  Manual, Bates
13                HBC_MDL00032653 through
                  32699......................   153
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                     -   -   -

              DEPOSITION SUPPORT INDEX
 2                     -   -   -

 3

    Direction to Witness Not to Answer
 4  PAGE   LINE

 5   20       23

     22        1
 6

 7

 8  Request for Production of Documents
    PAGE   LINE
 9  None.

10

11

    Stipulations
12  PAGE   LINE
    None.
13

14

    Questions Marked Highly Confidential
15  PAGE   LINE
    None.
16

17

18

19

20

21

22

23

24
```

```
 1                  P R O C E E D I N G S

 2

 3               THE VIDEOGRAPHER:  We are now

 4       on the record.  My name is Chris

 5       Ritona.  I'm the videographer for

 6       Golkow Litigation Services.

 7               Today's date is March 17th,

 8       2021, and the time is approximately

 9       1:07 p.m. Central.

10               This remote video deposition is

11       being held in the matter of the

12       National Prescription Opiate

13       Litigation in the United States

14       District Court for the Northern

15       District of Ohio, Eastern Division,

16       Case Number 1:17-md-2804.

17               The deponent today is Jim

18       Tsipakis.

19               All parties to this deposition

20       are appearing remotely and have agreed

21       to the witness being sworn in

22       remotely.

23               Due to the nature of remote

24       reporting, please pause briefly before
```

```
 1            speaking to ensure all parties are

 2            heard completely.

 3                 Will counsel please identify

 4            themselves for the record.

 5                 MR. MOUGEY:  This is Peter

 6            Mougey with Levin Papantonio

 7            representing the plaintiffs.

 8                 MR. BARNES:  Robert Barnes with

 9            Marcus & Shapira representing Giant

10            Eagle and the witness, Jim Tsipakis.

11                 THE VIDEOGRAPHER:  Thank you.

12                 The court reporter today is

13            Maureen Pollard, and she will now

14            please swear in the witness.

15

16                 JAMES G. TSIPAKIS,

17       having been duly remotely sworn, was examined

18       and testified as follows:

19                      EXAMINATION

20       BY MR. MOUGEY:

21            Q.    Good afternoon, Mr. Tsipakis.

22       This is Peter Mougey.  How are you doing

23       today?

24            A.    Good.  Good, thank you.  How
```

Highly Confidential - Subject to Further Confidentiality Review

1    are you?

2           Q.      I'm doing well.

3                   With a last name like Mougey, I

4    think you and I can both sympathize with each

5    other.  Am I pronouncing it correctly,

6    Tsipakis?

7           A.      Tsipakis, yes.

8           Q.      Tsipakis.  Thank you.

9                   Mr. Tsipakis, today you are

10   appearing on behalf of Giant Eagle, correct,

11   sir?

12          A.      Correct.

13          Q.      And HBC Service Company is a

14   subsidiary of Giant Eagle, correct, sir?

15          A.      Correct.

16          Q.      So today when we use Giant

17   Eagle I'm going to be referring to both Giant

18   Eagle and HBC, unless you tell me that's

19   improper or we should make a distinction

20   between the two.  Okay?

21          A.      Yes.

22          Q.      And, sir, you understand when

23   you are responding to questions today that

24   you are answering as if you were speaking for

1   Giant Eagle the corporation, correct?

2        A.      Correct.

3        Q.      And that's rather than you

4   testifying on your own -- in your own

5   personal capacity, correct?

6        A.      Correct.

7        Q.      And, Mr. Tsipakis, you've

8   testified on behalf of Giant Eagle in this

9   national opiate prescription litigation prior

10  to today, correct?

11       A.      Correct.

12       Q.      So you're familiar with the

13  process of testifying on behalf of the

14  corporation, correct?

15       A.      Correct, with the added remote,

16  the added nuance of remote.  The last time

17  was in person.

18       Q.      Yes, sir, we're all still

19  getting used to that.  One good thing is we

20  all get to sleep in our own bed tonight, I

21  guess, right?

22              All right.  Mr. Tsipakis, I'd

23  like to start off with just you and I

24  agreeing on some vernacular or some

1    terminology.  Okay, sir?

2          A.     Yes.

3          Q.     Now, if I ask you the term "red

4    flag," have you heard of the term red flag in

5    the context of dispensing controlled

6    substances?

7          A.     Yes.

8                MR. BARNES:  I just -- Peter, I

9          just caution the witness, don't

10         include in your answers anything

11         between attorney/client meetings and

12         things of that nature.  It would be

13         excluding any privileged meetings or

14         communications with counsel.

15   BY MR. MOUGEY:

16         Q.     So red flags, do you understand

17   what red flag is in the context of dispensing

18   controlled substances?

19         A.     Yes.

20         Q.     And what is your understanding

21   of the term red flag in the context of

22   dispensing controlled substances?

23         A.     Red flags are, as I would

24   consider them, flags in general.  Flags are

1    pieces of information to use when dispensing

2    a -- assessing to dispense a particular

3    medication.

4         Q.    So when you say "pieces of

5    information," explain to the jury a little

6    more when we use the term red flag, what do

7    you mean by pieces of information?

8         A.    Well, they're screening tools,

9    pieces of information, situational.  It's

10   basically information that is aware at the

11   time of dispensing to be able to assess the

12   prescription and dispense it appropriately.

13        Q.    And when Giant Eagle is faced

14   with a red flag at the time of a prescription

15   being presented for controlled substances, is

16   it appropriate for Giant Eagle to fill that

17   prescription?

18        A.    The prescription is filled by

19   our registered and licensed pharmacists, so

20   the pharmacist uses their professional

21   judgment to fill -- or to fill or not fill a

22   prescription.

23        Q.    Yes, sir.

24              And in that professional

1    judgment, does -- with the pharmacist, does

2    Giant Eagle have to answer any, I think your

3    term was screening information prior to the

4    controlled substance being dispensed?

5        A.    Can you repeat that, please?

6        Q.    Yes, sir.

7              Does any questions presented by

8    a red flag need to be addressed and answered

9    prior to a controlled substance, for example

10   opiates, being dispensed at Giant Eagle?

11       A.    Giant Eagle trusts the

12   professional judgment of their pharmacists to

13   use the information in front of them to

14   determine whether to fill a prescription or

15   not fill a prescription.

16       Q.    Yes, sir.  And I'm simply

17   asking, is the obligation of Giant Eagle and

18   its employees to be able to dispel any

19   concern associated with a red flag before a

20   controlled substance like opiates are

21   dispensed?

22              MR. BARNES:  I'm going to

23          object for the record.  Ask for

24          clarification.

Highly Confidential - Subject to Further Confidentiality Review

1          Are you talking about the

2          pharmacist, or somebody else?

3     BY MR. MOUGEY:

4          Q.     Go ahead and answer,

5     Mr. Tsipakis.

6          A.     From a Giant Eagle perspective,

7     we provide the tools necessary for our

8     pharmacists to be able to use their

9     professional judgment.

10         Q.     And, sir, when you say we

11    provide tools necessary, you mean Giant

12    Eagle, correct, sir?

13         A.     Correct.

14         Q.     So you'd agree that the

15    pharmacists rely on the tools that Giant

16    Eagle provides to be able to discharge their

17    responsibility to dispel any questions

18    associated with a red flag before dispensing

19    controlled substances like opiates, correct?

20              MR. BARNES:  Objection to form.

21         A.     They're not exclusive.  So

22    Giant Eagle provides tools, for example a

23    computer system for them to use, access to

24    the internet so they can access screening

Highly Confidential - Subject to Further Confidentiality Review

1   tools like prescription drug monitoring

2   programs, the OARRS program, for example, in

3   Ohio.  So we provide access for tools that

4   they use, that they may need, to be able to

5   use their professional judgment to fill or

6   not fill prescriptions.

7   BY MR. MOUGEY:

8        Q.    Let's go back to the initial

9   question I asked, which is relatively simple,

10  I think.

11            Is it the responsibility of a

12  Giant Eagle pharmacist to answer any

13  questions presented by a red flag before

14  filling a prescription for opiates or any

15  other controlled substance?

16       A.    It's the pharmacist's

17  professional judgment on whether to fill or

18  not fill a prescription, and they need to

19  assess the information that they have in

20  front of them at the time of dispensing, and

21  clear anything that they need to clear before

22  they fill that prescription.

23       Q.    And by "clear," you mean answer

24  any questions presented by a potential red --

1    or a red flag, correct?

2           A.     That they deem -- that they

3    deem appropriate and necessary, yes.

4           Q.     So the simple answer to my

5    question is yes, Giant Eagle pharmacists have

6    to clear red flags before dispensing opiates,

7    correct?

8                  MR. BARNES:  Objection.

9           Misstates his answer.

10          A.     Giant Eagle pharmacists use

11   their professional judgment, including

12   whatever screening tools and information they

13   need, to fill or not fill prescriptions, to

14   choose to fill or not fill a prescription,

15   including opiates.

16   BY MR. MOUGEY:

17          Q.     I understand that Giant Eagle

18   pharmacists use their professional judgment,

19   and I understand that they use whatever

20   screening tools Giant Eagle provides.

21                 What I'm asking you for about

22   the fifth or sixth time is, simply, is it

23   incumbent upon a Giant Eagle pharmacist to

24   answer red flags prior to filling a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prescription for opiates?
 2              MR. BARNES:  Objection.  Asked
 3         and answered the fifth or sixth
 4         time -- five or six times.
 5    BY MR. MOUGEY:
 6         Q.    Yes or no.
 7         A.    Red flags are not inclusive or
 8    exclusive on sole pieces of information that
 9    pharmacists need to fill or not fill a
10    prescription.  So pharmacists use their
11    professional judgment, and if any questions
12    come up that they feel are necessary to have
13    answered, they do that with their
14    professional judgment.
15         Q.    And they have to do that, which
16    is answer any questions they have regarding
17    an opioid prescription prior to fill,
18    correct, sir?
19         A.    If a pharmacist has a question
20    about a prescription, it is incumbent on them
21    to answer their questions that they have
22    prior to filling a prescription in their
23    judgment.
24         Q.    Mr. Tsipakis, as you testified
```

1    previously as we got started today, you have

2    appeared in the corporate capacity on behalf

3    of Giant Eagle before, correct?

4         A.     Correct.

5         Q.     And the prior testimony on

6    behalf of Giant Eagle was in regard to

7    suspicious order monitoring, correct, sir?

8         A.     One of the topics, yes.

9         Q.     Yes, sir.

10              And that Giant Eagle, at least

11   for periods of time, was a distributor of

12   opiates to its own pharmacies, correct, sir,

13   amongst other drugs?

14        A.     Giant Eagle -- well, let me --

15   so Giant Eagle, which class of opiates?  Are

16   you considering C2 opiates?

17        Q.     I'm not asking anything

18   specific.  I did that on purpose to make it

19   really nice and easy for you to answer.

20              So Giant Eagle distributed

21   opiates of any kind to its pharmacies for a

22   period of time, correct?

23              MR. BARNES:  Peter, I'm going

24         to interject now.  I think some

Highly Confidential - Subject to Further Confidentiality Review

```
 1            limited question is okay here, but the

 2            Court's ruling and documents numbers

 3            3329 and 3595 instruct that these

 4            depositions are not supposed to be

 5            repetitive or duplicative of prior

 6            30(b)(6) depositions.

 7                 And you're correct, he was

 8            previously deposed in case track 1

 9            extensively on distribution, so I hope

10            we're not going into repetitive

11            testimony.

12                 MR. MOUGEY:  I promise my

13            questions will take a lot longer than

14            your speech.  So I'm just asking some

15            preliminary questions.

16       BY MR. MOUGEY:

17            Q.    Giant Eagle distributed opiates

18       to its own pharmacies for at least periods of

19       time, correct, sir?

20            A.    Certain classes of drugs were

21       by us and certain by McKesson.

22            Q.    Thank you.

23                 And Giant Eagle distributed

24       Class 3 through 5 opiates or controlled
```

Highly Confidential – Subject to Further Confidentiality Review

1    substances to its own pharmacies from -- up

2    until 2014, correct?

3         A.    Correct.

4         Q.    And then in 2000 -- is it late

5    2015 or early 2016, Giant Eagle began to

6    distribute Class 2 through 5 controlled

7    substances to its own pharmacies, correct?

8         A.    Correct.

9         Q.    There was a period in '14 and

10   '15 of a year, year and a half, two years

11   where Giant Eagle did not distribute any

12   controlled substances to its pharmacies,

13   correct, sir?

14        A.    That is not correct.

15        Q.    All right.  So did Giant Eagle

16   continue to distribute Class 3 through 5 in

17   '14 and '15 and the beginning of '16 to its

18   own pharmacies?

19        A.    Yes.  Correct.

20        Q.    So in late 2015, early 2016

21   Giant Eagle began to include Class 2, like

22   OxyContin, and at that point hydrocodone

23   combination products to its own pharmacies,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Which year did you say, please?

 2            Q.     Late '15, early '16.

 3            A.     I believe that's correct.

 4            Q.     Okay.  Now, if I use -- let me

 5     give you two terms and see if you and I can

 6     continue down kind of defining some

 7     vernacular between the two of us.

 8                   If I use the term total system

 9     or multiple layers in regard to HBC's duty to

10     monitor dispensing of controlled substances,

11     are you familiar with those terms?

12            A.     Yes.

13            Q.     And if you and I use the terms

14     total system or multiple layers, explain to

15     the jury what you mean by those terms.

16                   MR. BARNES:  Object to the

17            question as being violative of Court's

18            instructions to not repeat prior

19            deposition testimony.

20                   The witness was extensively

21            deposed for seven hours on

22            distribution out of Giant Eagle's

23            warehouses, and I will instruct the

24            witness not to answer questions that
```

1          go into distribution type issues for

2          which he's already been deposed.

3    BY MR. MOUGEY:

4          Q.     So what do you mean by multiple

5    layers or total system, Mr. Tsipakis?

6          A.     So if I can ask a question, am

7    I answering the question or --

8               MR. BARNES:  Peter, you need to

9          clarify.  If this relates to

10         distribution, he's not answering.

11              MR. MOUGEY:  Robert, I'm asking

12         a couple preliminary questions to draw

13         some distinction between distribution

14         and dispensing, and I'm asking him if

15         we use the terms total system and

16         multiple layers what he's referencing.

17         It's just a preliminary question,

18         Robert.  You've spoken more than I

19         have at this point.

20   BY MR. MOUGEY:

21         Q.     I'd ask, Mr. Tsipakis, that you

22   please answer the question.

23              MR. BARNES:  If it relates to

24         distribution, I'm instructing the

1    witness not to answer.  He's already

2    been deposed.

BY MR. MOUGEY:

4    Q.    What do you mean by the terms

5    total system and multiple layers?

6         MR. BARNES:  Jim, to the extent

7         that this relates only to dispensing,

8         you can answer the question.  But if

9         it relates to distribution for which

10        you've already been deposed, do not

11        answer.

12   BY MR. MOUGEY:

13   Q.    Why don't you just answer just

14   in regard to dispensing when you're talking

15   about total system and multiple layers as

16   Mr. Barnes suggests.  Just tell us what part

17   of the system is just dispensing when you

18   mean total system and multiple layers?

19   A.    So Giant Eagle, as you

20   mentioned, we have our warehouse and we have

21   our stores, so we have -- from a dispensing

22   side we have different layers of controls,

23   and pieces that we have in place to comply

24   with the laws, but also to comply with a

1    system of security and safety and making sure

2    our prescriptions are adequately dispensed

3    and appropriately dispensed.

4         Q.     Please explain to the jury when

5    you say "different layers," what different

6    layers in regard to dispensing are you

7    referring to?

8         A.     From a dispensing, I would say

9    we have different controls and different

10   levels of -- actually, I would say from a

11   dispensing perspective we have different

12   controls in place to ensure our prescriptions

13   are adequately dispensed.

14        Q.     And that's what I'm asking,

15   sir.  Would you please explain to the jury,

16   of the total system and the multiple layers,

17   what specific controls do you have in place

18   to comply with the Controlled Substance Act

19   in relation to opiates?

20        A.     From a dispensing perspective,

21   we have different controls.  We have physical

22   security controls, we have pharmacist

23   controls, for example, we have audit

24   controls, and etcetera.  So those are the

Highly Confidential - Subject to Further Confidentiality Review

1   different controls that we have.  We have

2   reporting controls.  So all those controls

3   together are used to monitor, certainly, and

4   help us in dispensing our prescriptions.

5       Q.    Now, you said "etcetera."  I've

6   got physical security, pharmacist controls,

7   audit controls, and reporting controls.  Any

8   other controls as part of this total system

9   or multiple layers as it relates to just

10  dispensing?

11      A.    Well, those are the main

12  controls.

13      Q.    All right.  Let's go through --

14  when you say "main ones," I'd like a list so

15  I know what we're doing, no etceteras,

16  etceteras, or no these are the main ones.

17          What are our list of the

18  controls that encompass the total system or

19  multiple layers other than the four you just

20  mentioned?

21      A.    Can you repeat the question?

22  What would you like me to say specially?

23  What would you like me to answer

24  specifically?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     I'd like to know the different

 2   categories or components of the total system

 3   or the multiple layers as it relates to

 4   dispensing with Giant Eagle fulfilling its

 5   obligations under the Controlled Substance

 6   Act?

 7          A.     So I believe I've answered

 8   there is the physical -- do you want me to go

 9   through each of the controls?  Is that what

10   you're asking me?

11          Q.     I just want a list of the

12   general categories.  You said "etcetera," and

13   I just want to have a complete list.

14          A.     Sure.  So there's the physical

15   controls and security we talked about.

16   There's the pharmacist controls.

17          Q.     Got it.

18          A.     There's the audit controls.

19          Q.     Okay.

20          A.     There's the reporting controls.

21          Q.     All right.

22          A.     There's controls from --

23   externally from Board of Pharmacy, DEA,

24   McKesson at this time, or Cardinal, our
```

1    current distributors, so those are all the

2    various controls that are in place.

3         Q.    Okay.  Let's go through each

4    one of those, if we can.

5              Now, physical security, would

6    you explain what you mean by physical

7    security to the jury as it relates to

8    dispensing and Giant Eagle's obligations

9    under the Controlled Substance Act?

10        A.    Sure.  Physical controls, all

11   of our pharmacies have alarm systems,

12   monitoring, camera monitoring controls.

13             There is lockable cabinets and

14   safes in our stores to secure controlled

15   substances.

16             There's policies as well for

17   control on access to the pharmacy and making

18   sure the physical standards of security for

19   the pharmacy.

20             So those are the physical

21   controls.

22        Q.    All right.  How about the

23   pharmacist controls?

24        A.    So our main control is our

1    pharmacist, our pharmacists using their

2    professional judgment and their training and

3    their experience to be able to properly

4    assess and dispense -- and appropriately

5    assess and screen prescriptions for opiates,

6    and decide whether to fill those or not, or

7    that they're a legitimate prescription and

8    whether they should be filled or they should

9    not be filled.

10        Q.    Now, what tools did Giant Eagle

11   make available to pharmacists prior to 2013

12   to assist a pharmacist in making the decision

13   to fill or not to fill a controlled

14   substance, more specifically an opiate?

15        A.    So Giant Eagle provided access

16   to the internet for them to be able to do

17   whatever research they needed to do plugging

18   into the PDMP systems.

19             Pharmacists were given

20   guidelines, again using their professional

21   judgment, but guidelines and any information,

22   whether it was continuing education or other

23   programs, etcetera, to help them.  But

24   ultimately they're using their professional

Highly Confidential - Subject to Further Confidentiality Review

1    judgment and their training.

2              And then anything that required

3    an external or some sort of -- for example,

4    the internet, then we made sure that they had

5    access to that, or whether it was a module or

6    screening pieces, etcetera, they had access

7    to that.

8         Q.    Now, did Giant Eagle have

9    guidelines for the pharmacist in relation to

10   their obligations under the Controlled

11   Substance Act in relation to opiates prior to

12   2013?

13        A.    Yes.

14        Q.    And where would I find those?

15        A.    So those guidelines, I believe,

16   were provided for what we had.  The

17   guidelines, they were multiply reinforced

18   over the years, and certainly they're not

19   new, the guidelines are not new, they all

20   basically follow the Controlled Substance Act

21   and the requirements of the Controlled

22   Substance Act.

23        Q.    Now, you reviewed documents in

24   preparation for today, correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Correct.
 2              Q.      In fact, your counsel has
 3      provided a list of 200-plus documents that
 4      you reviewed in preparation for today,
 5      correct?
 6              A.      Correct.
 7              Q.      And you understand, sir, that
 8      part of your responsibility appearing as a
 9      corporate representative today is that you
10      educate yourself, correct, sir?
11              A.      Correct.
12              Q.      And that includes, obviously,
13      looking at documents, correct?
14              A.      Correct.
15              Q.      And then speaking or
16      potentially interviewing other folks within
17      Giant Eagle, correct?
18              A.      Correct.
19              Q.      Did you interview any other
20      individuals at Giant Eagle in preparation for
21      today?
22              A.      Yes.
23              Q.      And who were those individuals?
24              A.      So I spoke to my -- various
```

1    folks.  Do you need the exact names of the

2    folks that I spoke to?

3         Q.     Please, and their titles.

4         A.     Okay.  So in preparation George

5    Chunderlik, who was part of our compliance

6    team; Mike Chapel, who was part of our

7    pharmacy operations team; Bob McClune.

8         Q.     What department was Mr. McClune

9    in?

10        A.     At the time he was in

11   analytics.

12        Q.     Is he still employed with Giant

13   Eagle?

14        A.     In a different capacity, but

15   yes.

16        Q.     Okay.  Anyone else?

17        A.     No.

18        Q.     So let's go back to the

19   guidelines.  Can you point me to a document

20   that Giant Eagle had in writing, the

21   guidelines for its pharmacist employees?

22        A.     No.

23        Q.     So when you're telling this

24   jury that there were formal guidelines, what

Highly Confidential - Subject to Further Confidentiality Review

1    are you referencing, prior to '13?

2          A.     So what I'm referencing is from

3    what I've spoken to my colleagues and others

4    within the company, there was multiple cases

5    at meetings, during conference calls, and

6    things that were done across our stores

7    across the years, and all of these guidelines

8    were continually, nothing new, continually

9    reinforced and discussed.

10         Q.     Now, does Giant Eagle have a

11   firm intranet?

12         A.     Do we have an intranet?  Yes.

13         Q.     And by "intranet," I mean where

14   only employees of Giant Eagle can access like

15   a website that's only available for Giant

16   Eagle information, correct?  Are we saying

17   the same thing?

18         A.     Yes.

19         Q.     All right.  And so would Giant

20   Eagle post important information like

21   guidelines for controlled substances or

22   opiates on its firm intranet?

23         A.     On occasion, yes.

24         Q.     And you couldn't find any

1  evidence of any formal written guidelines in

2  relation to a pharmacist's obligations under

3  the Controlled Substance Act in Giant Eagle's

4  system?

5      A.    No, but there's no requirement

6  to do so.

7      Q.    You couldn't find any

8  presentation with those guidelines written

9  down that were used to communicate Giant

10  Eagle's obligations under the Controlled

11  Substance Act regarding pharmacist employees?

12          MR. BARNES:  Object to failure

13      to state time period.

14  BY MR. MOUGEY:

15      Q.    Prior to 2013.

16      A.    No.

17      Q.    And you reviewed e-mails in

18  preparation for today, correct?

19      A.    Yes.

20      Q.    You couldn't find any

21  guidelines in relation to Giant Eagle's

22  obligations under the Controlled Substance

23  Act regarding dispensing in the e-mail

24  tracking?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARNES:  Same objection.
 2       Time frame.
 3              MR. MOUGEY:  Prior to '13.
 4       A.      There was e-mails I saw that
 5   certainly we had board inspections, DEA
 6   inspections during the time, and there was no
 7   issues flagged by any of the regulatory
 8   bodies during that time.
 9   BY MR. MOUGEY:
10       Q.      Right.  But what I asked you
11   was a little different.  I'm asking you about
12   written guidelines.
13              You didn't find any written
14   guidelines in the e-mail traffic that you
15   reviewed prior to 2013, correct,
16   Mr. Tsipakis?
17       A.      Not specific guidelines, but
18   definite due diligence from corporate stores
19   and vice-versa on different aspects of
20   controlled substances.  And certainly --
21       Q.      You told me -- I'm sorry.  Go
22   ahead, Mr. Tsipakis, I didn't mean to
23   interrupt you.
24       A.      Go ahead.
```

1          Q.     So you've pointed to DEA,

2     you've pointed to audits, you've pointed

3     to -- but you couldn't find any written

4     guidelines for Giant Eagle communicating to

5     its employees about their responsibilities

6     under the Controlled Substance Act in

7     relation to dispensing opiates, correct, sir?

8          A.     Reissuing -- the guidelines

9     that we issued in 2013 and beyond are

10    basically the same guidelines from the

11    Controlled Substance Act.  Every pharmacist

12    is aware of the Controlled Substance Act and

13    the provisions within the Controlled

14    Substance Act, and that's part of their

15    professional judgment.

16         Q.     So the answer is no, you

17    couldn't find anything in e-mails, firm

18    intranet, filing cabinets, anywhere at Giant

19    Eagle any written guidelines regarding

20    pharmacy employees' obligations under the

21    Controlled Substance Act when dispensing

22    opiates, correct?

23         A.     The guidelines that you -- I'm

24    sorry, could you repeat the question as far

 1    as -- the guidelines are the guidelines from

 2    the Controlled Substance Act from the DEA, so

 3    certainly in 2013 we formalized some

 4    documents and certainly put them on an

 5    intranet, etcetera.  But the guidelines

 6    hadn't changed.  The guidelines are still the

 7    same.

 8         Q.    So prior to 2013, simply

 9    pharmacists and the pharmacy employees when

10    discharging their obligations under the

11    Controlled Substance Act in relation to

12    opiates, Giant Eagle directed them to read

13    the actual regulations for the Act itself?

14         A.    That's not what I'm saying.

15    What I'm saying is that a pharmacist's

16    professional judgment and obligation is to

17    abide by all laws and statutes, and certainly

18    the Controlled Substance Act was one of those

19    pieces that they followed.

20         Q.    So you and I are on the same

21    page when talking to this jury today that

22    Giant Eagle did not have any internal written

23    guidelines regarding pharmacy employees'

24    Controlled Substance Act obligations

1    regarding opiates prior to 2013, correct?

2              MR. BARNES:  Object to form.

3         A.    I guess I'm confused with your

4    question as far as the guidelines don't come

5    from Giant Eagle.  The guidelines come from

6    the Controlled Substance Act, and our

7    obligations of our pharmacists who are

8    professionals who are licensed.

9    BY MR. MOUGEY:

10        Q.    Mr. Tsipakis, Giant Eagle

11   created guidelines in 2013, correct, sir?

12        A.    The guidelines --

13             MR. BARNES:  Object to form.

14        Misstates his testimony.

15             Go ahead.

16        A.    The guidelines that you're

17   referring to and the guidelines we published

18   in 2013 are solely taken from the Controlled

19   Substance Act.  They're not our guidelines.

20   BY MR. MOUGEY:

21        Q.    Sir, would you please pull out

22   folder 28?  We're going to mark this

23   Exhibit 1.

24             ///

```
 1              (Whereupon, Tsipakis Exhibit
 2        Number 1 was marked for
 3        identification.)
 4              TRIAL TECHNICIAN:  Counsel, can
 5        I get the document number?
 6              MR. MOUGEY:  The Bates number,
 7        or the P-HBC-28 number?
 8              TRIAL TECHNICIAN:  The P-HBC
 9        number.
10              MR. BARNES:  Can you help
11        orient me as far as the numbers,
12        because these folders are all --
13        A.    What I'm looking for?  It would
14   says 28 on it?  Or I have a lot of things
15   that say P-HBC.
16   BY MR. MOUGEY:
17        Q.    P-HBC-28.  It's on the tab of
18   the folder, since we're confused about the
19   guidelines.  It's up on the screen if you'd
20   like to reference it.
21        A.    I'll be happy to reference
22   what's on the screen.
23        Q.    That would be fantastic.  Thank
24   you, Mr. Tsipakis.
```

1          Do you see in front of you,

2   sir, which we're going to mark as Exhibit 1,

3   Giant Eagle's Controlled Substance Dispensing

4   Guideline.

5          Do you see that, sir?

6   A.      Yes.

7   Q.      And the first paragraph under

8   "Purpose" says, "To provide guidelines for

9   the proper dispensing of controlled

10  substances that support the 'corresponding

11  responsibility' mandate placed upon

12  pharmacists to exercise due diligence in

13  their decision to fill or not to fill a

14  controlled substance prescription."  Correct,

15  sir?

16  A.      Correct.

17  Q.      And as we -- if you would turn

18  the page and go through the next page or two,

19  sir, this document lists and identifies a

20  number of red flags in relation to dispensing

21  of controlled substances or opiates, correct,

22  sir?

23  A.      The document describes

24  situations and things to look for, sure.

1    Yes.

2        Q.    Right.  And these are helpful

3    for the Giant Eagle pharmacies when

4    discharging -- pharmacists when discharging

5    their responsibilities under the Controlled

6    Substance Act, correct, sir?

7        A.    They're not exclusive, but

8    certainly things to look for, yes.

9        Q.    I didn't ask if they were

10   exclusive.  Just hear me, Mr. Tsipakis, and

11   the question I asked.  I just asked you if

12   they were helpful.

13       A.    Helpful in relation to --

14   you're asking me to say if they're helpful

15   for the pharmacist.

16       Q.    Right.

17       A.    These are things that they know

18   and practice and do every day.

19       Q.    That's right.  So let's go back

20   to Purpose again on the first page.  So the

21   guideline appears in the title, correct?

22       A.    Yes.

23       Q.    And underneath the Purpose, the

24   word guideline is used again, "To provide

1    guidelines for the proper dispensing of

2    controlled substances," correct?

3         A.    Correct.

4         Q.    Now, was there a document

5    similar to this guideline that you could find

6    after talking with -- interviewing four

7    different individuals, reviewing e-mails,

8    reviewing the firm intranet, coming up with a

9    200-plus document reliance list today, could

10   you identify any guidelines similar to this

11   that Giant Eagle created to help their

12   pharmacy employees discharge their

13   obligations under the Controlled Substance

14   Act?

15        A.    No.

16        Q.    And that's because it didn't

17   exist, correct, sir?

18        A.    I can't tell you whether it did

19   or didn't.  I just didn't see it, or find it.

20        Q.    Kind of like Bigfoot?  I mean,

21   do you believe that in all -- did you have

22   anyone tell you that guidelines existed prior

23   to 2013?

24        A.    What I know is there was --

1    from what I saw and in talking to folks,

2    certainly the pieces of these provisions were

3    not only being followed, but certainly

4    investigations, etcetera -- I know you don't

5    like me to use etcetera.  But there was

6    investigations and e-mail traffic and

7    conversations that had these materials being

8    discussed.

9        Q.    Yes, sir.  But there was no

10   formal guidelines similar to this written

11   down in four pages to assist the pharmacy

12   employees at Giant Eagle to discharge their

13   obligations under the Controlled Substance

14   Act prior to 2013, correct?

15       A.    There was no document as what

16   you're showing in front of me that I saw or

17   found.

18       Q.    Okay.  Thank you, Mr. Tsipakis.

19             So we were going through the

20   five different categories of controls for

21   Giant Eagle employees to discharge their

22   responsibilities under the Controlled

23   Substance Act, and we covered 1, physical

24   security, we covered 2, the pharmacist

Highly Confidential - Subject to Further Confidentiality Review

1    controls that you listed as professional

2    judgment, their training, assessment,

3    screening.

4           Is there anything else under

5    category 2 that you believe Giant Eagle

6    pharmacists used to fulfill their obligations

7    under the Controlled Substance Act?

8    A.     Well, in addition, the

9    pharmacist is the control, is that --

10   Q.     Okay.  The pharmacist is the

11   last line of defense, so to speak, before the

12   controlled substance or opiate is dispensed

13   to that patient, correct?

14          MR. BARNES:  Object to form.

15   A.     I don't understand your

16   question, "the last line of defense."

17   BY MR. MOUGEY:

18   Q.     What does last line of defense

19   mean to you, Mr. Tsipakis?

20   A.     The pharmacist is the person

21   that's dispensing the prescription.  But the

22   pharmacist assesses the prescription, screens

23   the prescription, makes sure it's

24   appropriate, and then dispenses the

1    prescription.

2         Q.    Yes, sir.  And that's the last

3    gatekeeper, so to speak, before the opiate is

4    dispensed to the patient and the patient

5    leaves the store with a bottle or a sheet or

6    a liquid of opiates, correct?

7              MR. BARNES:  Object to form.

8         A.    The pharmacist is the last

9    person that the patient sees before they pick

10   up a prescription.  I guess I'm trying to

11   understand your question.

12             The pharmacist gets a

13   prescription, reviews that prescription,

14   whatever diligence they need to do with that

15   prescription, they counsel the patient, and

16   then they give that prescription to the

17   patient.

18   BY MR. MOUGEY:

19        Q.    And that's the last

20   professional, meaning the pharmacist, between

21   the patient and receiving that prescription

22   of opioids, correct?

23        A.    I guess I'm still --

24        Q.    It's the last healthcare

1    professional between the patient and the

2    patient receiving the prescription of opiates

3    or controlled substances, correct?

4         A.    You're asking it's the last

5    healthcare professional.  Yes, that is

6    correct.

7         Q.    I'm going to come back to

8    pharmacist control in a minute, unless you

9    have anything else to add at this point, the

10   tools available to a pharmacist other than

11   intranet, the guidelines, continuing

12   education, professional judgment.  That's

13   what I have listed.  Did I get that right?

14        A.    Yes.

15        Q.    Okay.  Audit control.  Could

16   you explain to the jury what you meant by

17   audit controls as part of the total system?

18        A.    Sure.  Pharmacists have audit

19   controls where they do regular counts of

20   controlled substances, monthly, yearly.

21   Certainly at any given time they can run any

22   reports that they would like that would

23   verify on hand counts, etcetera, also what

24   orders are coming and what orders are leaving

Highly Confidential - Subject to Further Confidentiality Review

1    and dispensing.  So they have all that in

2    front of them at their disposal.

3         Q.    When you say reports regarding

4    orders coming and going, what do you mean?

5         A.    So orders, they know when --

6    they know what comes into the pharmacy,

7    meaning from an order, regardless of where it

8    came from, and certainly what they dispensed,

9    what prescriptions they dispensed.

10        Q.    When you say "an order," what

11   do you mean?

12        A.    A prescription.  When I say

13   order, I'm sorry, order -- an order for -- an

14   order for any prescription drug, whether it's

15   from the wholesaler, whether it's from our

16   warehouse, they get their drug order, which

17   is the ins, if you will, the prescriptions

18   that come into the pharmacy, right, and then

19   they know the prescriptions that leave the

20   pharmacy, dispensed.

21        Q.    Now I'm confused.  Maybe

22   Mr. Barnes will object to me, but I'm

23   confused whether or not we're talking about

24   orders or prescriptions at this point.

1          So when you just testified that

2    a pharmacist has access to orders coming and

3    going, are you talking about prescriptions,

4    or orders through the distribution center?

5          A.     You asked me about a control,

6    an audit control.  And what I'm testifying is

7    that in order to do an audit of control you

8    need to understand where your physical

9    inventory started and where your physical

10   inventory ended, so they have that

11   information that they can use and they can

12   audit and verify.

13         Q.     Okay.  So we're talking about

14   an inventory control, meaning how many pills

15   were total, and how many pills after they

16   were filled -- prescriptions were filled, how

17   many were left to ensure that the count is

18   right.  Am I saying that accurately?

19         A.     It's an inventory control, but

20   it's also an audit control, yes.

21         Q.     To make sure that there's not

22   thefts within the pharmacy might be one

23   protection, correct?

24         A.     Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  But you're not

2  suggesting to the jury that a pharmacist is

3  watching orders, monitoring those orders for

4  anything suspicious or red flags in relation

5  to the distribution center, correct?

6    A.    What I'm saying is pharmacists

7  are filling legitimate prescriptions from

8  legitimate prescribers, and then ordering

9  from our warehouse, which is only our

10  warehouse, or certainly from the wholesaler,

11  so there shouldn't be any suspicious orders.

12    Q.    Is there an assumption at Giant

13  Eagle that all prescriptions coming from

14  prescribers are legitimate?

15    A.    There is no assumption.  Each

16  prescription is screened and verified by our

17  pharmacist and filled, assuming that they're

18  valid and legitimate, yes.

19    Q.    All right.  So we just hit the

20  audit controls.

21        And we have reporting controls.

22  What did you mean by reporting controls?

23    A.    So there's reports that the

24  pharmacist can run at store level, there's

Highly Confidential - Subject to Further Confidentiality Review

1  reports that certainly we run regularly at

2  corporate, and those are the different

3  reporting controls.

4       Q.     Why don't you explain to the

5  jury what reports were available under the

6  reporting controls at the store level.

7       A.     So at the store level they run

8  their regular narcotic audits as far as what

9  their on-hand should be, their counting that

10 they do, that they're required to do and

11 document.

12      Q.     Anything else?

13      A.     So the main reports that they

14 have is their on-hands and their counts that

15 they do, and certainly the on-hands.  So the

16 on-hand reporting, and again, that all comes

17 out of the computer system.  And if they want

18 to run ad hoc reports, they can do that as

19 well.

20      Q.     And what type of ad hoc reports

21 are available?

22      A.     At any given time they can run

23 a usage report on a particular product, or

24 what was dispensed and what should be left,

```
 1    etcetera, which is the basis of our inventory

 2    narcotic audits.

 3         Q.    So the two reports that we

 4    just -- the narcotic audit and the ad hoc are

 5    both inventory control reports?

 6         A.    Yes.

 7         Q.    All right.  Any other reports

 8    at the store level that are available for

 9    Giant Eagle employees to discharge their

10    responsibilities under the Controlled

11    Substance Act with regard to opiates?

12         A.    Those are the main reports.

13         Q.    All right.  To me that kind of

14    feels a little bit like etcetera, so I'm

15    sorry, I'm just trying to get a complete

16    list.

17              So when you say "main reports,"

18    are there any kind of subreports, you know,

19    other than those two that you're identifying

20    here?

21         A.    Well, it's not so much

22    subreports.  Out of the computer system,

23    there's a wealth of knowledge in the computer

24    system, and they can pull reports for various
```

Highly Confidential - Subject to Further Confidentiality Review

1    things.

2         Q.     That's what I'm trying to get

3    to.  What are those various things, the

4    etcetera?  What's the various reports that

5    can be pulled at the store level?

6         A.     Oh, there's -- I mean, they can

7    run reports on how many prescriptions they

8    filled, they can run reports on -- so they

9    can run inventory reports, they can run

10   dispensing reports, they can run doctor

11   reports, they can run a lot of different -- I

12   mean, it's not an endless scenario, but they

13   can certainly run reports based on the

14   activities of the pharmacy.

15        Q.     What's a doctor report?

16        A.     They can run a report on

17   prescriptions by a physician if they wanted

18   to.

19        Q.     Is that at the store level, or

20   is that across all Giant Eagle?

21        A.     It's an individualized report

22   that they can run at the store level.

23        Q.     So meaning no, they can't run

24   it across all Giant Eagles?

1          A.     At the store level, no.

2          Q.     So that's -- there's more than

3     200 Giant Eagles during this entire time

4     frame, or approximately 200, correct?

5          A.     Correct.

6          Q.     So when you said a doctor

7     report, that's information just at that one

8     Giant Eagle store that can be pulled out of

9     the 200, correct?

10         A.     For that store, correct.

11         Q.     Yes, sir.

12                I think, I can't read my own

13    handwriting, but after the doctor report I

14    think I wrote dispensing reports.  Did I get

15    that right?

16         A.     Correct.

17         Q.     And what do you mean when you

18    list dispensing reports at the store level

19    for one of the reporting controls?

20         A.     They can run what prescriptions

21    were filled for a period of time, a day, a

22    week, a month.  It's basically activity for

23    what was dispensed, control, noncontrol.

24    They can run all of the dispensings for the

1    pharmacy.

2         Q.    Is the control versus

3    noncontrolled, is that always available at

4    the store level?

5         A.    For that store, yes.

6         Q.    Is that a complete list of the

7    reports that were available at the store

8    level under reporting controls?

9         A.    Those are the main controls.

10   Certainly they can run a financial report on

11   what the sales were for the pharmacy, what

12   the margin was for the pharmacy, where they

13   are according to budget.

14             So when I say there's a lot of

15   reports, there's a lot of reports that the

16   system can generate, and those are the

17   different types of reports they can run.

18        Q.    Any type of reports at the

19   store level that can be run to access

20   prescriber information across all of the

21   Giant Eagle pharmacies?

22        A.    At the store level, no.

23        Q.    So if a pharmacist at any point

24   in time at Giant Eagle wanted to analyze

Highly Confidential - Subject to Further Confidentiality Review

1   pattern prescribing by a prescriber in

2   relation to opiates, they couldn't be done at

3   the store level, correct?

4        A.    They would have information for

5   their store.

6        Q.    Across Giant Eagle, a

7   pharmacist couldn't analyze pattern

8   prescribing for a physician across all Giant

9   Eagle stores, correct?

10       A.    Correct.  But there's multiple

11  instances that I reviewed that pharmacists,

12  if they had a question, they would bubble it

13  up to corporate or to their district leader,

14  and then the appropriate reports or

15  investigation were done, numerous reports of

16  that, what I saw.

17       Q.    What I'm simply asking is if

18  they wanted to run a report at the -- in the

19  regular course at the store to analyze a

20  pattern prescribing of a physician with

21  regard to opiate, it couldn't be done,

22  correct?

23       A.    At the store level, no.

24       Q.    A pharmacist could not analyze

1    the patterns of a prescriber in relation to

2    opiate cocktails across all Giant Eagle

3    stores, correct?

4         A.     An individual store couldn't

5    run a report like that.  If they would have

6    concerns, they would flag that to their

7    supervisor, and then that would be

8    appropriately -- so it was both sides.  It's

9    stores bringing concerns, and then certainly

10   from our diligence corporately on concerns

11   that we had as well.

12        Q.     We're just talking right now

13   about the pharmacists discharging their

14   corresponding responsibility prior to fill.

15   They could not review a prescriber's

16   potential pattern of cocktails, correct?

17        A.     The pharmacist would be using

18   their professional judgment for each

19   prescription, which is individualized for

20   each individualized patient and each

21   individualized circumstance.  So they would

22   be using --

23        Q.     Go ahead, Mr. Tsipakis.

24        A.     So they would be using that

1    information to discharge their duty on that

2    prescription.

3         Q.    Right.  But there's blinders on

4    for a pharmacist when trying to review a

5    prescriber pattern or potential pattern of

6    prescribing cocktails across all Giant Eagle

7    stores at the store level, correct?

8              MR. BARNES:  Object to the form

9         of the question.  Misstates his

10        testimony.

11        A.    That's why the pharmacists have

12   access to the OARRS system and the

13   prescription drug monitoring system, so they

14   don't need to run a report, they have that

15   tool that they can go in which will show all

16   controlled substance prescribing across

17   multiple states and multiple jurisdictions.

18   So they have everything in front of them from

19   that.  They don't need to run other reports

20   if that's what they're looking for.

21        Q.    Let's address that next.

22              What I'm just asking you, sir,

23   is a simple question.  Can a pharmacist or

24   any pharmacy employee at Giant Eagle run a

Highly Confidential - Subject to Further Confidentiality Review

1    report at the store level to look at a

2    prescriber's pattern of prescribing cocktails

3    to patients across all Giant Eagle stores?

4         A.    At the store level they cannot.

5    And again, well, using the PDMP, the

6    prescription drug monitoring program, is a

7    better tool because then they could see

8    across not only our stores, but all stores,

9    all parts of the state, all parts of the

10   region, etcetera.  So it's a much more

11   inclusive tool.

12        Q.    Is it your testimony to this

13   jury that a pharmacy employee at Giant Eagle

14   can search OARRS and organize the data by

15   prescriber to pick up patterns?

16        A.    My testimony is that a

17   pharmacist gets a prescription that's

18   individualized per patient, and they use

19   their professional judgment to fill that

20   prescription, including using the OARRS

21   program if they feel that it's necessary.

22        Q.    That's not what I asked.

23             Can a pharmacist run a report

24   on OARRS, sort it by prescriber so that

1    pharmacist can determine whether or not

2    there's a pattern of a specific doctor

3    prescribing cocktails?

4         A.    I'm not familiar with how the

5    OARRS reports are and how they can be sorted,

6    so I cannot answer that.

7         Q.    So when you're telling this

8    jury that it can happen at the store level

9    and you've pointed to OARRS, you have no

10   independent knowledge whether or not OARRS

11   can be sorted by prescriber, correct, sir?

12        A.    I don't have any knowledge if

13   it can be sorted by prescriber, but I do know

14   that information on controlled substances

15   prescribed by prescriber would be in OARRS.

16        Q.    But you don't know if a

17   prescriber can be searched to look at all of

18   his or her prescriptions to determine if

19   there's patterns with relation to cocktails,

20   correct?

21             MR. BARNES:  I'm going to

22        interject an objection.

23             You've already taken the

24        30(b)(6) of Chris Miller who testified

1        extensively about Giant Eagle's data,

2        data fields, documents, things of --

3        notes fields, things of that nature,

4        so you keep pressing him on things

5        that I think were already covered by

6        the Miller deposition.  So I'm going

7        to object on those grounds.

8    BY MR. MOUGEY:

9        Q.     One of the reports that you've

10   identified to this jury that a pharmacist can

11   access is OARRS in relation to its dispensing

12   obligations under the Controlled Substance

13   Act, correct?

14       A.     Correct.

15       Q.     And you have no understanding,

16   sitting here today, of whether or not a

17   pharmacist employee, pharmacy employee, can

18   sort the data in OARRS by prescriber to pick

19   up patterns, correct?

20       A.     I do not know if they can --

21   how the information can or cannot be sorted,

22   but I do know all the information that is

23   needed and necessary is in OARRS.

24       Q.     You agree that pattern

1    prescribing is a red flag, correct, sir?

2         A.    I agree that pattern

3    prescribing is something to look at, yes.

4    It's not necessarily a red flag.

5         Q.    Something to look at, that's a

6    red flag, right, that requires a little bit

7    more attention?  Correct?

8         A.    Yes.

9         Q.    And you'd agree that pattern

10   prescribing is a red flag, correct?

11        A.    It's a screening piece of

12   information you need to consider, yes.

13        Q.    Screening piece of information

14   to consider another question, correct?

15        A.    Correct.

16        Q.    Part of the due diligence

17   process, correct?

18        A.    That's correct.

19        Q.    And can you explain to this

20   jury any tools available to a pharmacist at

21   the store level where a pharmacy -- Giant

22   Eagle pharmacy employee can sort data by

23   prescriber to pick up patterns?

24        A.    As I've previously said, at the

1    store level they can't run a global report

2    for multiple prescribers or multiple stores.

3              By logging into the OARRS

4    system, they have all the information they

5    need, not only including Giant Eagle, but any

6    pharmacy on any opioid prescription that was

7    prescribed by any -- dispensed or filled at

8    any pharmacy.

9         Q.    Explain to this jury, then, how

10   a pharmacist or pharmacy employee at Giant

11   Eagle can use OARRS to identify patterns from

12   a specific prescriber.

13        A.    So if I was a pharmacist and I

14   was given a prescription, and I had some

15   questions about that prescription, I could

16   log into the OARRS system and see what

17   controlled substances, all of them, any of

18   them, that were prescribed for that patient.

19        Q.    Sir, we're not talking about

20   the patient.  We're talking about sorting by

21   prescriber.

22             Explain to the jury how a Giant

23   Eagle pharmacy employee can access OARRS to

24   analyze pattern prescribing for a specific

1    physician.

2         A.     What I'm testifying is that

3    there's no way at the store to create some

4    sorted report as you mentioned.  I'm telling

5    you that they would go into OARRS to see what

6    prescriptions were prescribed.

7              Again, I believe your question

8    is how a pharmacist exercises their duty, and

9    what I'm testifying is to tell you they get a

10   prescription, they screen that prescription

11   for all the things that they screen the

12   prescription for.  If there is a question

13   that arises that they feel they need to look

14   into using their professional judgment, they

15   can log into the OARRS system and obtain

16   information that they need to screen and

17   process that prescription.

18        Q.     That's a lot of words,

19   Mr. Tsipakis.

20             What I want you to explain to

21   this jury is how can a Giant Eagle pharmacy

22   employee access OARRS to look at pattern

23   prescribing by a specific physician?

24             MR. BARNES:  I'm going to

1       object and move to strike the

2       unnecessary characterization of his

3       answer.

4               This is also getting

5       repetitive, and also assumes that the

6       pharmacist has any obligation to look

7       for pattern prescribing under either

8       Ohio law or federal law.

9               MR. MOUGEY:  Thank you for that

10      speaking objection, Mr. Barnes.

11 BY MR. MOUGEY:

12      Q.    Now, Mr. Tsipakis, let's go

13 back to the question at hand.

14              Explain to this jury how a

15 Giant Eagle pharmacy employee can review

16 OARRS for potential pattern prescribing by a

17 specific physician.

18              MR. BARNES:  Same objection.

19      A.    I apologize, I must not be

20 understanding your question.  What I believe

21 you're asking me is what tool does a

22 pharmacist use to screen for a prescription,

23 and I've said to you that they would use

24 OARRS as a tool to do that.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MOUGEY:

2        Q.    That's not what I asked.  You

3    understand -- what's pattern prescribing mean

4    to you, Mr. Tsipakis, in relation to opiates

5    or controlled substances?

6        A.    A particular medication regimen

7    that's prescribed by a prescriber.

8        Q.    So in relation to an opiate,

9    would a pattern prescriber potentially write

10   prescriptions for the same drug or drug

11   strength over and over and over again

12   regardless of diagnosis?

13       A.    Is it possible?  Yes, it's

14   certainly possible.

15       Q.    And how does a pharmacist or

16   pharmacy employee at Giant Eagle review OARRS

17   to review prescriber patterns for prescribing

18   drugs repetitively, like OxyContin or

19   hydrocodone?

20           MR. BARNES:  Same objection as

21       previously stated.  I think we've gone

22       over this three times, Peter.

23           But you can answer one more

24       time, Jim.

1      A.     So I'm trying to understand

2   your question.  But, for example, if it's a

3   pain clinic doctor that sees pain patients,

4   it's not unlikely that they would have

5   similar drugs that they dispense to treat

6   patients.

7             So what I'm testifying is a

8   pharmacist would use individual factors for

9   that prescription that is presented for that

10  patient, and if there's any questions and

11  diagnosis needed or things that they would

12  need, they would contact the prescriber, they

13  would use OARRS, they would find the

14  information in front of them to be able to

15  discharge their professional -- using their

16  professional judgment to fill or not fill

17  that prescription.

18  BY MR. MOUGEY:

19      Q.     I'm not asking about the

20  individual prescription.  I'm not asking

21  about the likelihood of a pain clinic doc.

22             I'm asking about, you've told

23  this jury that one of the ways for a Giant

24  Eagle pharmacist to review any concerns

1    regarding potential pattern prescribing

2    history from a specific doctor was to go to

3    OARRS.  Could you please explain to the jury

4    how a Giant Eagle pharmacist or one of its

5    employees is supposed to use OARRS to look

6    for pattern prescribing on behalf of a

7    specific physician.

8              MR. BARNES:  Same objection.

9         Asked and answered four times now.

10        It's getting pretty close to

11        instructing him not to answer.

12             One more time, Jim.

13   BY MR. MOUGEY:

14        Q.    How about just answer it this

15   time, the exact question I asked.

16        A.    What I don't understand is,

17   you're asking me to say that a pharmacist

18   would need to look under a certain -- again,

19   it's a professional judgment that they need

20   to fill that prescription.

21             So you're asking me on why a

22   pharmacist would look for patterns or look at

23   different things, and I'm telling you that

24   they would look for that prescription that's

Highly Confidential - Subject to Further Confidentiality Review

1   in front of them, and if they had questions

2   they could talk to the physician's office,

3   they could call corporate for something if

4   they needed or if they had questions, in

5   addition to looking at OARRS.

6           I apologize if I'm not

7   understanding your question, but --

8       Q.      I think you understand it.

9   What I'm asking is you keep pointing to

10  OARRS, and I'm asking -- I'm not asking you

11  why they would look to OARRS.

12          You understand what pattern

13  prescribing is, correct?

14      A.      Yes.

15      Q.      And how does a pharmacist use

16  OARRS to answer any questions about pattern

17  prescribing?

18      A.      What I'm confused about your

19  question is pattern prescribing may or may

20  not matter to that particular prescription.

21  So like I said, I tried to give an example,

22  if a patient comes from a pain clinic, and

23  that pain clinic sees pain patients, you

24  would see very similar prescriptions,

1    different doses, different quantities.  So I

2    guess, I apologize, I don't understand your

3    question.

4         Q.    How is OARRS used to identify

5    or provide an answer to a Giant Eagle

6    pharmacist regarding pattern prescribing?

7    I'm not asking about why.  How?  How is OARRS

8    used?

9         A.    OARRS would be used to get

10   information on what controlled substances, if

11   any, were filled by another pharmacy for that

12   patient.  So that pharmacist can use that

13   information to discharge their professional

14   judgment to fill or not fill a prescription.

15        Q.    The simple answer is OARRS

16   can't be sorted by prescriber to look at

17   patterns, correct, Mr. Tsipakis?

18        A.    Again, not having used OARRS, I

19   can't tell you how it's sorted or not sorted.

20        Q.    All right.  So we're on the

21   reporting controls, and we've gone through

22   the store level reports.

23             What reports are available at

24   Giant Eagle to ensure that its pharmacies are

1    discharging their obligations under the

2    Controlled Substance Act in relation to

3    opiates?

4         A.    Sure.  So in preparing for this

5    testimony I saw numerous examples of a

6    corporate team member running reports

7    globally to look for any patterns or any

8    types of prescriptions that they had question

9    on, and then they would follow up with the

10   appropriate district leader, team leader.  So

11   numerous examples of inquiries, e-mails back

12   and forth, calls back and forth between our

13   analytics team, compliance team, operations

14   team, to look for different drugs or

15   different patterns or different physicians.

16        Q.    What type of systematic reports

17   are being run at Giant Eagle to monitor

18   dispensing of controlled substances, but more

19   specifically opiates?

20        A.    Reports are run on the

21   analysts -- again, from what I saw from the

22   information I saw, analysts are running

23   different reports and using the modules that

24   we have to look for potential areas of

1    concern.

2         Q.    And what are those reports that

3    are being -- you're testifying to this jury

4    that those are being run systematically,

5    meaning on a regular basis?

6         A.    There is reports that run

7    regularly, yes.

8         Q.    Okay.  And what are those

9    regular reports?

10        A.    So again, of the ones that I

11   saw, it was reports run on quantities,

12   certain drugs, certain -- you know, which

13   stores these drugs are being filled at,

14   etcetera.  And where there's questions that

15   come up, those are being discussed with the

16   folks that need to be involved in those

17   discussions.

18        Q.    When you say quantities of

19   certain drugs, what do you mean,

20   Mr. Tsipakis?

21        A.    So what I saw as part of my

22   research, there was a question where I saw a

23   few e-mail traffic where one of the analysts

24   saw a number of pills at a particular store

1    on a certain controlled substance that was

2    dispensed, and there was definitive

3    discussion between corporate, the store

4    leader, and a district manager on what are

5    these prescriptions, who is prescribing them,

6    etcetera.  In other words, a utilization

7    report, I guess maybe is a good way to

8    characterize it.

9         Q.    And your testimony to this jury

10   is that those reports were being run on a

11   regular basis with Giant Eagle discharging

12   its responsibilities under the Controlled

13   Substance Act?

14        A.    So what I'm telling you is that

15   I saw numerous reports and inquiries run

16   across all the --

17        Q.    Go ahead.

18             You saw examples in e-mail

19   traffic, correct, sir?

20        A.    Correct.

21        Q.    What I'm asking you to explain

22   to this jury is what reports were run on a

23   regular basis to identify potential red flags

24   in relation to dispensing of opiates.  Just

1    name one, let's start there.  On a regular

2    basis.

3                MR. BARNES:  Object to form.

4        A.    The reports -- so the reports

5    are generated based on if there's a threshold

6    or something that triggers that basically

7    brings up a flag or brings up a question, to

8    your earlier point, a question that comes up,

9    and then there's followup to that question,

10   or that -- something that flags, if you will.

11   BY MR. MOUGEY:

12       Q.    All right.  So we've identified

13   one report.  That's a threshold.

14                Explain to the jury what a

15   threshold report is.

16       A.    So a threshold report is where

17   you would have -- and again, it's generalized

18   across the chain, so if there's a certain

19   threshold of a particular controlled

20   substance that's dispensed, it will flag that

21   there was a utilization over that threshold,

22   and then it would kick off an investigation

23   or a conversation.

24       Q.    Any other regular reports that

1    were being run other than threshold reports?

2         A.    I saw ad hoc reports in

3    response to questions from the field or

4    questions around from, for example, from our

5    loss prevention department.  If they had some

6    information about a particular doctor or a

7    particular patient, you know, those reports

8    would be run to substantiate whatever

9    information they were looking for.

10        Q.    So the question I asked was any

11   other regular reports that were being run

12   other than threshold, and your answer was I

13   saw ad hocs.  Let's go back to my question.

14             Regular reports, other than the

15   threshold, and part of your investigation for

16   today covering a period of 15, 20 years, have

17   you been able to find any other regular

18   reports run at the corporate level evidencing

19   Giant Eagle's discharging its

20   responsibilities under the Controlled

21   Substance Act?

22             MR. BARNES:  Object to form of

23        question.  He's already testified to

24        two different reports, Peter.

```
 1           A.     Actually more.

 2                  MR. MOUGEY:  Any more of these

 3           kind of speaking objections and your

 4           insertion of his testimony, I'm going

 5           to have you sworn in next and I'm

 6           going to put you on the stand, okay,

 7           Bob?  Why don't we just get

 8           Mr. Tsipakis' testimony rather than

 9           yours.

10    BY MR. MOUGEY:

11           Q.     Any other reports that you've

12    identified already regularly run,

13    Mr. Tsipakis?

14           A.     As I mentioned, it's the

15    threshold reports that I mentioned.

16           Q.     Yes.

17           A.     And those -- to your point and

18    my point, as far as regular reports, if

19    there's an ad hoc report that turns into a

20    regular report, could be a month, could be a

21    week, could be -- those are all different

22    reports that are run.

23                  So the main reports -- so going

24    back to your question, the main report that's
```

1    run regularly is that, the threshold reports

2    on dispensing, on what is dispensed.

3          Q.     So just make sure you and I are

4    saying the same thing.  What's ad hoc mean to

5    you?

6          A.     It's reports that are either

7    from our analyst side, either from an LP.  So

8    basically there is some piece of information

9    that triggers a request for a report, so it

10   could be -- so that's why I call it ad hoc.

11          So it could be at the direction

12   of our loss prevention department, it could

13   be at the loss prevention, it could be to

14   follow up on an internal investigation, it

15   could be a followup on a particular thing we

16   want to look at, so there's various reports.

17          Q.     So ad hoc, I just looked it up

18   to make sure you and I are doing the same

19   thing.  "Ad hoc.  For a particular purpose,

20   as necessary," meaning it's kind of a one-off

21   report, correct?

22          MR. BARNES:  Object to form.

23          A.     It could be a particular

24   purpose, but then that purpose, it can

Highly Confidential - Subject to Further Confidentiality Review

1    continue, so...

2    BY MR. MOUGEY:

3         Q.    Right.

4              You can't identify any other

5    regular report run during this 15 or 20 years

6    other than the threshold reports, correct?

7         A.    That's the report that runs

8    regularly, yes.

9         Q.    Yes, sir.  That's the only one

10   you can identify, correct?

11             MR. BARNES:  Objection.

12        Misstates his prior testimony.

13             You can answer.

14        A.    That is the main report, as I

15   mentioned.  But then there's reports we run,

16   as we said, for the audits that we run, and

17   there's lots of reports that run.

18             The threshold report runs, or

19   the reviewing of those threshold reports run

20   regularly and consistently.

21   BY MR. MOUGEY:

22        Q.    Now, explain to this jury on

23   the threshold reports what year those

24   started.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     The exact year, I don't
 2    remember.  It was for sure covered during my
 3    first deposition at length on when those
 4    reports started and didn't start.
 5          Q.     I think I know.  How about you
 6    tell me if I'm right.  2013 is when the
 7    threshold report started.
 8                 MR. BARNES:  How about we not
 9          duplicate his prior deposition?
10          You've gone pretty far into it, Peter,
11          and I think it's unfair.  And the
12          witness is not being produced today to
13          regurgitate his first deposition, and
14          the Court has ordered that it not be
15          regurgitated, so...
16                 MR. MOUGEY:  We're just talking
17          about dispensing, and Mr. Tsipakis has
18          identified the threshold reports as a
19          report regularly run for Giant Eagle
20          to discharge its obligations on the
21          pharmacist's side, so I'm simply
22          asking Mr. Tsipakis when did that
23          report begin to be run.
24                 ///
```

1    BY MR. MOUGEY:

2        Q.    Does 2013 sound about right?

3        A.    I don't believe that's correct.

4    I believe it definitely was done before 2013.

5    The exact, I couldn't tell you, I don't

6    remember.  But it was definitely covered in

7    my deposition.

8        Q.    Is it your testimony today that

9    the -- to this jury that threshold reports

10   were not used by Giant Eagle to discharge its

11   obligations under the Controlled Substance

12   Act as a dispenser?

13       A.    What I'm saying is the Giant

14   Eagle pharmacists have their -- so the Giant

15   Eagle pharmacists have a responsibility to

16   fill their prescriptions, to check their

17   prescriptions, to use the tools they have

18   available to them.

19             Our obligation is to make sure

20   that our pharmacists have the tools that they

21   need to be able to do their job.

22       Q.    Yes, sir.  And that's what

23   we're talking about right now, we're talking

24   about the reporting controls which is one of

1    the five tools available to Giant Eagle

2    employees at the pharmacy level to discharge

3    its obligation.

4              What I'm asking you, sir, is,

5    did Giant Eagle pharmacies use the threshold

6    report to discharge its obligations as a

7    dispenser?

8         A.    What I'm saying is there was no

9    requirement for us to have any such report or

10   to document such report.

11             What I am testifying is that we

12   had that screening and that tool as an

13   additional screening tool for us as a

14   corporation, in addition to what the stores

15   and the pharmacists are looking at and doing

16   as well.

17        Q.    And is it your testimony to

18   this jury that the threshold reports were

19   used as a screening tool by Giant Eagle as a

20   dispenser?

21             MR. BARNES:  Object to form.  I

22        think it's covered in his prior

23        deposition.

24             I think, Peter, you've gone to

1          little bit -- way beyond, so I'm going

2          to instruct the witness not to answer.

3                    MR. MOUGEY:  We're going to

4          take --

5                    MR. BARNES:  Pardon me?

6     BY MR. MOUGEY:

7          Q.    Was Giant Eagle using the

8     threshold report as a dispenser, as its

9     dispensing obligations?

10                   MR. BARNES:  Same objection.

11                   Jim, is it is it your

12         recollection this was covered in your

13         prior deposition?

14                   THE WITNESS:  Yes.

15                   MR. BARNES:  All right.  So no

16         need to answer.

17                   MR. MOUGEY:  Let's go ahead and

18         go off the record.  I'm going to

19         contact Special Master Cohen.  I think

20         I'm entitled to ask that question.

21         I'm specifically asking about

22         dispensing.

23                   I'd like to go off the record,

24         and we'll contact Special Master Cohen

Highly Confidential - Subject to Further Confidentiality Review

1    and try to get an answer to that

2    question.

3              THE VIDEOGRAPHER:  2:30.  We

4    are off the video record.

5              (Whereupon, a recess was

6    taken.)

7              THE VIDEOGRAPHER:  3:03, we are

8    on the video record.

9    BY MR. MOUGEY:

10        Q.    Mr. Tsipakis, did Giant Eagle

11   use the threshold report to discharge its

12   obligations under the Controlled Substance

13   Act as a dispenser?

14        A.    The obligations as a dispenser

15   fall on our professional responsibility of

16   our pharmacists.  We use the reports as

17   another tool and another aspect of that.  But

18   the pharmacists at the store with their

19   judgment on whether to fill a prescription or

20   not fill a prescription.

21        Q.    Right.  But what I asked you

22   was, did Giant Eagle use the threshold report

23   to discharge its obligations as a dispenser

24   under the Controlled Substance Act?

1          A.     The dispenser -- the pharmacist

2     is the one that's dispensing the

3     prescriptions.

4          Q.     So in no shape, form, or

5     fashion did Giant Eagle use the threshold

6     report to discharge its obligations, even in

7     part, under the Controlled Substance Act as a

8     dispenser?

9          A.     That's not what I'm saying.

10     What I'm saying is that we used the threshold

11     reports in addition to the information that

12     the stores had to work as that system that we

13     talked about earlier to make sure we're

14     filling prescriptions appropriately and

15     accurately.

16          Q.     So is the answer to my question

17     yes, that Giant Eagle at least in part used

18     the threshold report to discharge its

19     obligations as a dispenser?

20          A.     We used those reports as part

21     of our system, yes.

22          Q.     As part of the system -- part

23     of the dispensing system is what I'm asking.

24          A.     The dispenser is the store, so

Highly Confidential - Subject to Further Confidentiality Review

1    yes, the store.

2         Q.    Okay.  Now, let me just see if

3    I can tie that all back together.

4              So the threshold reports were

5    used at least in part by Giant Eagle at the

6    store level regarding dispensing to fulfill

7    its obligations under the Controlled

8    Substance Act?

9         A.    The reports were run and used

10   corporately to help support and, I guess --

11   so from a perspective on the responsibility

12   on whether to fill a prescription or not fill

13   a prescription, that's the professional

14   judgment of the pharmacy.  And we were using

15   those reports to identify areas that either

16   we would like to look at or have concerns

17   about or have flags about.  So they all

18   worked together.

19        Q.    On the dispensing side is what

20   I'm asking.

21        A.    On the dispensing side, yes.

22        Q.    How often were the threshold

23   reports run and used on the dispensing side

24   at Giant Eagle?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Daily.

2      Q.      And which department was in

3  charge of running the threshold reports for

4  review on the dispensing side?

5      A.      So the IT side supported

6  setting up those reports and maintaining the

7  systems that generated those reports, but

8  then those reports were used by various

9  groups, but primarily the compliance

10  department, pharmacy compliance department.

11  And then based on those reports, if they

12  needed to bring another group in, they

13  certainly could do that.

14      Q.      So were the reports run -- were

15  they automated, that they just ran daily?

16      A.      Yes.

17      Q.      And then were they disseminated

18  to individuals that were responsible for

19  reviewing those reports with regard to

20  dispensing?

21      A.      Those reports would

22  auto-generate, and anything that showed up on

23  those reports would go to the appropriate

24  department, for example the compliance

Highly Confidential - Subject to Further Confidentiality Review

1  department, the folks in the compliance

2  department.

3         Q.     I just want to make sure that

4  we're saying the same thing.

5                The threshold reports that

6  we're discussing, those are one in the same

7  with the threshold reports that were used on

8  the suspicious order side as a distributor,

9  correct?

10        A.     Correct.

11        Q.     Which department made the

12 determination whether there needed to be

13 followup on the dispensing side from the

14 threshold reports?

15        A.     The pharmacy compliance

16 department.

17        Q.     Do you have a specific name of

18 who that individual was or is within the

19 pharmacy compliance department that was

20 responsible for reviewing the threshold

21 reports for dispensing?

22        A.     It varied over time, but George

23 Chunderlik was one of the folks that reviewed

24 those reports.  Joe Millward was another

1    person that would look at those reports.  For

2    example, two individuals that got those

3    reports and reviewed those reports.

4         Q.    Was there a trigger, so to

5    speak, with a threshold report that would

6    generate an investigation or a followup on

7    the dispensing side?

8              MR. BARNES:  Objection.

9         Duplicative of track 1 testimony.

10             I don't think that -- Peter,

11        I'm recalling now that you didn't do

12        that track 1 deposition.

13             MR. MOUGEY:  I read it, though.

14             MR. BARNES:  Okay.  This is

15        clearly stuff that was covered in

16        track 1, so I'm going to object to

17        continued questioning.

18             I'm going to let you keep

19        asking them, but I'm noting for the

20        record that this is duplicative and

21        repetitive as prohibited by the Case

22        Management Order 3329 and 3595.

23             MR. MOUGEY:  Thank you.

24             ///

1    BY MR. MOUGEY:

2         Q.    So, Mr. Tsipakis, what I asked

3    was, is there a trigger on the dispensing

4    side of when there needed to be followup to

5    look at individual prescriptions?

6         A.    So the threshold reports

7    basically show movement of product, and then

8    if there was a certain threshold that was

9    met, those would show up on a report, and

10   then that report, depending on the

11   information and the stores involved,

12   etcetera, there would be followup.

13              So it wouldn't be unlikely for

14   the operations folks, loss prevention folks,

15   analytics folks to be together to figure out

16   the next course.

17        Q.    There wasn't any specific

18   triggers or flags on the dispensing side that

19   were different than the distribution side?

20        A.    It's one in the same.

21        Q.    We started down this line an

22   hour, hour and a half ago talking about the

23   total system or the multiple layers, and

24   we've identified the physical security, the

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacist controls, audit controls,

2    reporting controls, which is where I think we

3    are now.  And we've talked about the store

4    level reports and we've talked about the

5    corporate level reports.

6                    And I believe that the

7    corporate level reports, yeah, the corporate

8    level reports included the threshold reports.

9                    Have I captured that

10   accurately?

11        A.    Correct.

12        Q.    You also identified some ad hoc

13   reports, correct?

14        A.    Yes.

15        Q.    Anything under the reporting

16   controls that we haven't identified yet?

17        A.    No.

18        Q.    Now, do you believe that the

19   threshold report -- I'll tell you what.  Give

20   me a second.

21                    Mr. Tsipakis, would reviewing

22   your prior testimony from 2018 help you with

23   refreshing your recollection as to when the

24   threshold program began?

1      A.      Sure.

2      Q.      I'm going to put up -- it's

3   page 117 of your transcript.  Let me see if

4   this refreshes your recollection from your --

5   Mr. Gaddy asked, "When did HBC first start

6   utilizing a threshold program?"

7               And I believe you responded, "A

8   threshold program with some IT enhancements

9   were put into place roughly in 2013."

10              Mr. Gaddy asked, "Do you know

11   what month in 2013 or season?"

12              And you just said you don't

13   recall exactly.

14              Does that refresh your memory,

15   sir, that the threshold report began in --

16   sometime in 2013?

17      A.      Yes.

18      Q.      And that's the same threshold

19   report we're talking about now in regard to

20   dispensing, right?

21      A.      For that one, yes.

22      Q.      Yes, sir.

23              Okay.  So under the reporting

24   controls component that we've been walking

Highly Confidential - Subject to Further Confidentiality Review

1   through for the last half an hour or so, do

2   you recall, outside of the threshold report,

3   any other regular reporting being used for

4   Giant Eagle -- by Giant Eagle to discharge

5   its obligations as a dispenser?

6          MR. BARNES:  Objection to form.

7      Vague definition.

8      A.     Certainly prior to 2013, to

9   your point about reports, we had systems like

10  the SupplyLogic system and other systems that

11  folks regularly ran reports or looked through

12  those systems for things to look for, or

13  patterns that they needed to look at,

14  etcetera.

15          So the threshold report, as you

16  mentioned, they're from 2013, but reporting

17  didn't start just in 2013, there was other

18  tools as well before that.

19  BY MR. MOUGEY:

20     Q.     Explain to the jury what those

21  SupplyLogic system is.

22     A.     SupplyLogics is a tool that

23  basically looks at the utilization of

24  prescriptions, for example number of tablets

1    or dosage units entering the pharmacy, how

2    many are being dispensed, and it would flag

3    any type of discrepancy, or a flag of

4    overutilization, for example.

5             It also would -- if you wanted

6    to look at a certain class of drugs or

7    stores, etcetera, I mean, it allows you to

8    look at all that.

9        Q.    Would you consider SupplyLogic

10   to be an inventory control or inventory

11   management system?

12       A.    It's an inventory control, but

13   certainly we also use that as -- to

14   understand where prescriptions, what

15   prescriptions, and in what frequency, and in

16   what quantities were being dispensed.

17       Q.    Can you point this jury to any

18   regular reports being run at either store or

19   corporate level using SupplyLogics?

20       A.    I know folks used it daily,

21   weekly, monthly as part of their duties.

22       Q.    But there's 200 --

23   approximately 200 pharmacies at Giant Eagle,

24   correct?

1         A.      Correct.

2         Q.      Some of the stores receive as

3    many as 6,000 prescriptions a week, correct?

4         A.      Correct.

5         Q.      I think I saw a figure there's

6    over 30,000 employees, correct?

7         A.      Total employees, not pharmacy

8    employees, but yes.

9         Q.      You can't point this jury,

10   however, to any specific reports that were

11   automated like the threshold report prior to

12   2013?

13        A.      What can I point the jury to is

14   that there was the compliance department, and

15   within the compliance department they had

16   duties that they ran, again monthly, weekly,

17   that they discharged their duties, and as

18   part of those duties they ran reports and

19   they looked at trends, and they looked at

20   areas, if there was any areas of concern.

21        Q.      And what were the reports that

22   compliance ran regularly?

23        A.      The specific names I don't

24   recall, but I definitely saw, through the

1    things that I saw, information where

2    something flagged.  So it was both ways.

3              So it could be that a store

4    requested more information, or if something

5    from a local level bubbled up that they ran

6    reports, and then they continued to run those

7    reports, etcetera.

8        Q.    Would you refer to those as

9    ad hoc reports?

10       A.    Well, ad hoc from the

11   perspective of the same individuals ran those

12   reports all the time, so in my mind those are

13   regular reports, not ad hoc reports.

14       Q.    I'm a little confused, so why

15   don't you help me out here.

16             You're referencing regular

17   reports, but you can't describe with any

18   specificity what those are, correct?

19             MR. BARNES:  Object to form.

20       A.    What I know is the systems

21   auto-generated reports, and there was

22   auto-queries that ran within that, and those

23   folks within the compliance group regularly

24   reviewed those reports, and then regular

Highly Confidential - Subject to Further Confidentiality Review

```
 1   actions came out of those reports.
 2   BY MR. MOUGEY:
 3        Q.     Okay.  So auto-generated
 4   reports, what auto-generated reports from
 5   SupplyLogic?
 6        A.     So we have the threshold
 7   reports, and then prior to -- again, it's the
 8   nomenclature, but basically there were
 9   reports that ran and could be run and queries
10   that could be run for any criteria that the
11   compliance team set, for example.
12        Q.     Right.  I'm asking you what
13   specifically types of reports were run on a
14   regular basis?
15        A.     So utilization of -- it could
16   be everything from particular prescribers,
17   so, for example, if loss prevention got
18   information on a particular physician, they
19   could run a report and a regular report on
20   activity of that prescriber.
21             If there was a -- for example,
22   I saw a lot of reports run on Suboxone or
23   buprenorphine, those kind of things, on what
24   was being prescribed, where, and those type
```

Highly Confidential - Subject to Further Confidentiality Review

1    of things.

2              So they ran all these reports

3    within the tools that they had, SupplyLogic

4    being one of those tools that they had.

5    Q.    We're talking about regular

6    reports, and you used the word "could be" in

7    your answer.

8              I'm asking, can you identify

9    for this jury any reports that were run on a

10   regular basis out of SupplyLogic?

11   A.    The reports all basically are a

12   threshold type report where there is

13   something that triggers, and then that

14   follows up with an action.

15   Q.    So what was the something that

16   triggered in the SupplyLogic?

17   A.    Overutilization.

18   Overutilization.

19   Q.    Explain what overutilization

20   is.

21   A.    So based on -- again, these all

22   are based on thresholds and figures to see is

23   there an area or a store or a particular

24   prescription that -- a particular class of

1    prescriptions, for example, that are being

2    dispensed, and then our team would

3    investigate that and ask questions about it.

4         Q.    So was the SupplyLogic just a

5    different name for the threshold report?

6         A.    It's a tool.  I mean, it's a

7    tool.

8         Q.    So what was the threshold that

9    triggered the report?

10        A.    I couldn't tell you the exact

11   number of the threshold, but I know they were

12   looking -- the tool helps us identify

13   patterns or things to look at, things of

14   concern.  It's not indicative of an issue,

15   it's things to look at or to check.

16        Q.    I need you to help me be more

17   specific.  You're using a lot of words like

18   that reports are being run, the specific

19   examples, our team would investigate and ask

20   questions, or you just testified that they're

21   tools to help us identify patterns.

22             So I need you to get a little

23   bit more specific and explain to the jury,

24   outside of that threshold report, what types

Highly Confidential - Subject to Further Confidentiality Review

1    of information were being run on a regular

2    basis at Giant Eagle to discharge its

3    obligations under the Controlled Substance

4    Act as a dispenser?

5            MR. BARNES:  Asked and answered

6        a couple times already.

7            But go ahead.

8        A.    Reports, for examples of the

9    reports there was certain drugs that they

10   could run and they would run.  Method of

11   payment that was run.  The prescribers, which

12   prescribers were prescribing in a certain

13   area or geography or stores.  So all those

14   things were things that they regularly looked

15   at.  And when there was something that

16   flagged, they would investigate and get the

17   appropriate folks involved.

18            Or if they got information from

19   the field or from LP or someone else, they

20   would add that to their -- the things that

21   they ran.  I mean, these were folks in the

22   compliance department that did regular

23   activities week to week, day to day.

24        Q.    Certain drugs, what specific

Highly Confidential - Subject to Further Confidentiality Review

1    reports at Giant Eagle were run analyzing

2    what you described as certain drugs?

3         A.    So there was reports run on

4    hydrocodone usage.  There was drugs, Suboxone

5    as I just mentioned.  Cash prescriptions for

6    some of those drugs.

7         Q.    What about them?  You'd just

8    run the number of pills, you'd run the number

9    of prescriptions, you'd run the number of

10   transactions?  What were the reports?

11        A.    As I mentioned, you'd run those

12   reports to look for patterns of

13   overutilization.

14        Q.    What kind of patterns?

15        A.    As I just mentioned,

16   overutilization, meaning this store is

17   different than this store, this prescriber is

18   different than this prescriber.  So

19   utilization is usage, usage.

20        Q.    And where are examples of all

21   of these reports being run through

22   SupplyLogic?

23        A.    So the examples are they use

24   those tools.

```
 1              I think we're getting -- we
 2    might be getting confused from a reporting
 3    perspective.  They ran -- they use different
 4    tools, Supply Logics being one of them, to
 5    run reports, regular reports in areas that
 6    they wanted to look at, with threshold being
 7    the main one of a threshold.
 8              They all basically tie back to
 9    a threshold.  There's a certain number that
10    triggers a number, that triggers a pattern
11    that our folks would investigate as a tool.
12        Q.    When you say a threshold or a
13    pattern, that there would be a number of
14    pills for a specific NDC code, and when
15    they've exceeded that NDC code there would be
16    a trigger?
17        A.    Difference than the average, or
18    difference than the chain or something,
19    correct.
20        Q.    So it was aggregate volume for
21    a specific NDC code?
22        A.    By store, by area, yes.
23        Q.    On the prescriber side, what
24    regular reports were run by Giant Eagle?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     On the prescriber side, there

2   was physicians that, for whatever information

3   we had that, either from the store level,

4   from LP, they would run reports on activity

5   from those prescribers.  And a lot of those

6   reports would generate from, again, from the

7   prescription side.

8           So if there was utilization on

9   the prescription side, they would tie it back

10  to a particular prescriber, and then you run

11  those prescribers, and then you would see

12  they're part of what practice or what area,

13  etcetera.

14     Q.     Let me see if I get this right.

15          The higher than in the average

16  would trigger a report on certain drugs.  Did

17  I get that right?

18     A.     The compliance folks would run

19  those reports, and when there was a pattern,

20  the tool identified a pattern for them to

21  look into, they would look into that, and

22  then the appropriate investigation would

23  happen.

24     Q.     Let's just focus on just what I

Highly Confidential - Subject to Further Confidentiality Review

1    asked.  We're going to do this in steps.

2           A.     Okay.

3           Q.     So the certain drug report was

4    a report that was based on a threshold, and

5    when exceeded it would cause a flag, is that

6    fair?

7           A.     Yes.

8           Q.     Okay.  Once that flag was

9    raised, then Giant Eagle had the ability to

10   run a report and drill down to see what

11   caused that flag, is that fair?

12          A.     Yes.

13          Q.     And sometimes that flag would

14   necessitate looking at specific prescribers,

15   is that fair?

16          A.     Yes.

17          Q.     And those prescriber reports

18   may shed light on pattern prescribing

19   activity, correct?

20          A.     Sure.  Yes.

21          Q.     Now, outside -- but that was

22   all caused by the trigger from the threshold

23   report, correct?

24          A.     Threshold report, or again,

Highly Confidential - Subject to Further Confidentiality Review

1    there's some piece of information that caused

2    us to run those, or regularly run those.  But

3    yes, the threshold.

4         Q.    Now, if I use the word coding

5    or software code, are you familiar with that?

6         A.    Yes.

7         Q.    Was there any software code at

8    Giant Eagle that would analyze prescribing

9    habits of physicians to spot red flags with

10   patterns outside of that threshold report you

11   just identified?

12        A.    We would use the third-party

13   tools like SupplyLogics to do that, and those

14   systems have coding or algorithms built in to

15   do the analysis.

16        Q.    But that's triggered by the

17   threshold report or some other information,

18   correct?

19        A.    For example, the SupplyLogics

20   module, the tool, has its own algorithms and

21   has its own triggers and has its own

22   monitoring pieces to it, and raises things to

23   look at.

24        Q.    Is it your testimony today that

Highly Confidential - Subject to Further Confidentiality Review

1    SupplyLogic was -- had code that was

2    analyzing physician prescriptions looking for

3    pattern prescribing activity?

4         A.     What I'm testifying is that

5    SupplyLogics was a tool, one of the tools

6    that we had that was able to look at trends

7    to then give our folks things to -- clues of

8    things that they should look at, or would

9    like to look at, or need to look at.

10        Q.     I want to get our lingo down so

11   we're saying same thing.

12             When you say "trends," you're

13   talking about thresholds, correct?

14        A.     Well, for example, in the

15   SupplyLogics system it will show you one

16   store versus another, or a trend, right, so

17   you could see one store, for example, that

18   sells more of one drug than another.

19        Q.     That's aggregate volume,

20   correct?

21        A.     It's per the store.  I mean,

22   it's aggregate, but also you could look at

23   store level, too.

24        Q.     Right.  That's aggregate volume

Highly Confidential - Subject to Further Confidentiality Review

1    per store, correct?

2         A.      And also versus the chain,

3    correct.

4         Q.      Sure.

5         A.      Yeah.

6         Q.      But we're talking about

7    prescribers, and what I'm asking, is there

8    any systematic coding at Giant Eagle that was

9    analyzing physician prescription writing

10   looking for patterns?

11        A.      So as we just discussed, the

12   system that we're talking about, when it's

13   aggregating the prescription volume, it would

14   then hone into store, and then when you hone

15   into the store you could see what prescribers

16   are generating those prescriptions.

17        Q.      You're talking about the

18   trigger being the threshold which would then

19   cause further investigation, correct?

20        A.      Yes.

21        Q.      That's not what I'm discussing.

22   That's not what I'm asking.

23             What I'm asking you is,

24   independent of those thresholds, is there any

Highly Confidential - Subject to Further Confidentiality Review

1    coding or any computer algorithm at Giant

2    Eagle that would analyze physician

3    prescriptions looking for patterns?

4         A.    Specific to the prescribers,

5    no.

6         Q.    Same question on method of

7    payment.  Any systematic algorithm or

8    software coding that was analyzing method of

9    payment under system logic?

10        A.    We would regularly run reports,

11   and I've seen examples of reports where we

12   ran method of a payment, for example, across,

13   for example, hydrocodone product, so you

14   would see method of payment, cash, insurance,

15   and you could see that and analyze that.

16        Q.    So in preparation for today,

17   you've reviewed materials that date back 10

18   to 15 years, is that fair?

19        A.    Since 2006 or so, yeah.

20        Q.    So your counsel has identified

21   about 200, 200 or so documents that you

22   relied on for today.

23              Does that sound about right?

24        A.    Yes.

1     Q.     Out of those 200 or so

2    documents, is it fair to say that there's

3    about 10 to 15 e-mails with reports as

4    attachments evidencing these types of ad hoc

5    reports that you are referencing?

6     A.     There's -- the answer is, well,

7    yes, but there's the investigations that

8    follow with it.  There's e-mail strings,

9    there's the cause and effect, and there's all

10   the, again, the snippets of those pieces.

11   But it shows the pattern of some things

12   flagging, communication from corporate to

13   store and vice-versa with LP, all together

14   working towards identifying and researching

15   and clearing.

16     Q.     And I'm just simply asking you,

17   based on the actual evidence, the e-mails,

18   Giant Eagle has been able to identify 10 to

19   15 examples of ad hoc reports being run that

20   you just mentioned, correct?

21          MR. BARNES:  Object to the form

22      of the question.  Assumes facts not in

23      evidence.  Well, I'll leave it at

24      that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     What I reviewed was examples of

 2    what was an ongoing process.  I saw 10 or 15

 3    examples of that, but that is not -- it was

 4    not only 10 or 15 times these things were

 5    happening, they were happening regularly and

 6    being executed regularly and daily, weekly,

 7    monthly.  I just saw examples of those

 8    showing the breadth of those controls and the

 9    inquiries and the investigations and the

10    followup and the documentation.

11         Q.     And all of those examples, the

12    followup, the documentation, for purposes of

13    today you've been able to identify 10 to 15

14    examples, correct?

15         A.     Of what I saw.  But then in

16    talking with folks that were here during

17    those times, they -- again, corroborates

18    those examples that they had those controls

19    in place, and the constant communication

20    between corporate and stores, and then

21    working together as a team on if there was

22    concerns or questions or things they wanted

23    more information, that they would work

24    together to get that information, to provide
```

1    that information, to follow up on that

2    information.  There was examples that law

3    enforcement used that information from us,

4    vice-versa.

5         Q.    I appreciate all that

6    extraneous information, and I'm confident

7    when Mr. Barnes asked you questions you can

8    have the ability to explain all of that just

9    like you did right there.  But what I'd like

10   an answer to is my specific question.

11             And my specific question is, in

12   preparation for today you were able to

13   identify, you meaning Giant Eagle, 10 to 15

14   examples in e-mails of all of these reports,

15   correct?

16        A.    Of what I saw, correct.

17        Q.    Yes, sir.

18             Now, was SupplyLogic available

19   at the store level?

20        A.    I'm not sure of the exact

21   pieces that they used or didn't use.  I know

22   it was -- there was pieces of SupplyLogics

23   that helped them with their order points and

24   creating orders, and then there was the

```
1    functions that the corporate team used as
2    well.
3         Q.    These examples you just gave of
4    certain drugs and prescriber searches and
5    methods of payment searches for SupplyLogic,
6    were those available as tools to the pharmacy
7    employees at Giant Eagle?
8         A.    Certainly if they had a
9    concern, they would -- I saw examples if
10   there was a concern, they would raise a
11   concern, and then the appropriate reports or
12   information was researched and followed up
13   on.
14        Q.    At the time of fill, if the
15   pharmacist wanted to run some of the queries
16   you just identified prior to filling the
17   prescription, that couldn't be done, correct?
18        A.    At the time of fill the
19   pharmacist would use the tools available for
20   them, whether it's utilizing OARRS, whether
21   it's utilizing another pharmacy looking at
22   the profile, looking at a profile from
23   another store, talking to the physician
24   themselves or the prescriber.
```

1        Q.     Right.  We're going to get to

2   all that, but that's not what I asked you.

3   What I asked you was specifically about

4   system logic.

5              At the time of fill, could the

6   pharmacist run the queries you just

7   identified prior to the prescription and the

8   patient walking out the door?

9        A.     Those global reports, no.

10       Q.     I'd like to go back to the only

11  document we marked, Exhibit 1, Mr. Tsipakis.

12  Controlled Substance Dispensing Guideline.

13             MR. BARNES:  Is it a folder

14       marked HBC-00028?

15             MR. MOUGEY:  Yes.

16             MR. BARNES:  Are you calling it

17       Exhibit 28, or Exhibit 1?

18             MR. MOUGEY:  Exhibit 1.

19             Mr. Barnes, are you there?

20             MR. BARNES:  I'm still here.

21             MR. MOUGEY:  I mean, have you

22       got the doc?  Okay.

23  BY MR. MOUGEY:

24       Q.     So, Mr. Tsipakis, let's start

 1    with, would you explain to the jury what,

 2    your understanding as a Giant Eagle

 3    representative, corresponding responsibility

 4    means?

 5         A.    The responsibility of our

 6    pharmacist to ensure that the prescriptions

 7    are valid and issued pursuant to a proper

 8    medical purpose, and all of the rest of the

 9    things that go with the proper prescription,

10    proper dosing, proper therapeutic, and the

11    analysis that goes through that.

12               But in particular for the

13    controlled substances, to make sure that

14    those prescriptions are valid, and valid

15    being that they're being issued as a proper

16    medical purpose, and appropriate dosing,

17    etcetera.

18         Q.    When we say -- when the term --

19    when Giant Eagle in this document, Exhibit 1,

20    uses the word "corresponding," corresponding

21    to who?

22         A.    Corresponding to the

23    pharmacist.

24         Q.    And who is the pharmacist's

1  responsibility corresponding with?  Who is on

2  the other side?

3      A.    The prescriber.

4      Q.    So would you think it's fair to

5  say that the pharmacist's responsibility goes

6  hand-in-hand with the physician to ensure

7  that a prescription is valid and issued for

8  legitimate medical purposes, especially in

9  the context of opiates?

10     MR. BARNES:  Objection to form

11     of the question.

12     A.    I would say that there is

13  responsibility on both sides.  The physician

14  is responsible making sure that the

15  prescription they issue is for a bona fide

16  patient/prescriber relationship, it is

17  appropriate therapy for that patient, and all

18  of the diagnostic pieces that they're trained

19  to do in issuing a proper prescription.

20         On our side we have the

21  corresponding responsibility to ensure all of

22  the things the pharmacists look for,

23  therapeutic duplication, utilization, drug

24  interactions, OTC, Rx, and including if the

Highly Confidential - Subject to Further Confidentiality Review

1  prescription is valid, and it's got all of

2  the information that we need to it, need to

3  have on it, but also issued with a legitimate

4  medical purpose.

5      Q.    Can you turn to Bates number

6  93, which is the next page, page 2 of this

7  document, under the section titled

8  "Appropriateness of Controlled Substance

9  Prescriptions," and it has in quotes "Red

10  Flags."

11          Do you see that?

12      A.    Yes, sir.

13      Q.    Would you explain to the jury

14  what Giant Eagle means when it uses the term

15  red flags internally?

16      A.    So this document is dispensing

17  guidelines, that's basically a formal summary

18  of information that's already available.

19          So, for example, these red

20  flags are practices or screenings that were

21  common, but also used by the DEA as examples.

22          And what we have listed here is

23  the same information, just neatly organized

24  for the pharmacist to -- they know this, but

Highly Confidential - Subject to Further Confidentiality Review

1   certainly to have this in front of them as

2   well.

3          Q.    It's nice to have it all neat

4   and organized right in front of the

5   pharmacist, right?

6          A.    It is.  But again, this is

7   things they already know, and this is part of

8   what's in the pharmacist manual, the DEA

9   pharmacist manual.  Also there's state law

10  that covers some of these things on top of

11  what the DEA regulations are.  But these are

12  just things to keep in mind when filling a

13  prescription, and things to look for or,

14  again, using your pharmacist professional

15  judgment, and also these other things here to

16  look for as well as you're doing your

17  diligence.

18         Q.    All right.  I'd like to stay on

19  page 2, but, Mr. Tsipakis, if you'd look on

20  the paper version, that there are ten red

21  flags on page 2 and page 3, correct?

22         A.    Correct.

23         Q.    And it's your testimony to this

24  jury on behalf of Giant Eagle that these red

1  flags are not new to Giant Eagle as of 2013,

2  correct?

3       A.    Correct, nor are they

4  exclusive.

5       Q.    Yes, sir.  These aren't

6  necessarily an exhaustive list, is that what

7  you mean?

8       A.    Correct.

9             And also, these flags may or

10  may not be the same red flags depending on

11  the patient and the prescription.

12       Q.    These are examples, correct?

13       A.    Things to look for, yes.

14       Q.    Yes, sir.  You talked -- you

15  testified earlier about the fifth kind of

16  external control, you mentioned the DEA as

17  one of those external controls, correct?

18       A.    Yes.

19       Q.    And you're aware that the DEA

20  has a website specifically devoted to

21  diversion of controlled substances, correct?

22       A.    Yes.  With information on it,

23  yes.

24       Q.    Yes, sir.

1          And Giant Eagle would agree

2   that that website was a good source of

3   information about red flags, correct?

4       A.     It's a source, yes.

5       Q.     Yes, sir.

6          And it's one of the five

7   controls you mentioned earlier, the external,

8   the DEA's information, correct?

9       A.     Of course, yes.

10      Q.     And if we look through these

11   ten, let's start off with number 1.

12          Now, you and I talked a little

13   bit about a cocktail earlier.  Why don't you

14   explain to the jury what a cocktail is.

15      A.     Well, a cocktail in -- what

16   it's being listed here is a particular series

17   of drugs put together, in this case being an

18   opiate, benzodiazapine, and a muscle

19   relaxant, so the cocktail being those three

20   drugs, those three classes of drugs being

21   prescribed together.

22      Q.     Now, you would agree that Giant

23   Eagle believes that those three drugs used in

24   combination are a red flag?

1          A.     They're something to look at.

2     It doesn't necessarily mean there's something

3     wrong with the prescription or the patient.

4     It's just something to look at.

5          Q.     Sure.  That's what a red flag

6     means, right, that you've just got to follow

7     up, correct?

8          A.     Correct.

9          Q.     Now, explain to the jury why

10    these three drugs, this cocktail, why are

11    those a red flag when used together?

12         A.     Are you asking for the clinical

13    reason they're used together, or from a

14    pattern why they're used together?

15         Q.     What is -- why are they -- why

16    is that a red flag when these three are used

17    together?  That's the potential -- what's the

18    potential issue or problem?

19         A.     There's a potential that these

20    drugs used in this combination are for

21    patients that may not be using these for a

22    legitimate purpose or for the appropriate

23    therapy.

24         Q.     And why is that?

1          A.     It's a characterization, but

2    there is prescriptions that -- a lot of the

3    abuse that's made on these particular

4    prescriptions, they include these three

5    components together.

6          Q.     So is another way of saying

7    that it's indicia or indicative of

8    pill-seeking behavior from a patient?

9          A.     It's potential, but then there

10   is absolute legitimate reasons to use these

11   together as well.

12         Q.     What is the risk, the health

13   risk of taking these three drugs together, if

14   any?

15              MR. BARNES:  Objection to form.

16        He's not a doctor.

17         A.     I could tell you what these

18   three drugs do as far as clinically what they

19   do and what they have.  Is that your

20   question?

21   BY MR. MOUGEY:

22         Q.     Yes, sir.  Please explain.

23         A.     Okay.  So the oxycodone is the

24   opiate for pain; the benzodiazapine is for

```
 1    anxiety, or basically a tranquilizer; and

 2    then the muscle relaxant is a potentiator as

 3    listed here.

 4         Q.    And those drugs used in

 5    combination, what impact, if any, does that

 6    have on the probability of respiratory

 7    failure of a patient?

 8              MR. BARNES:  Object.  Asking

 9         for a medical judgment.

10         A.    Again, it depends on the

11    patient and the conditions certainly, but

12    they could cause respiratory issues.

13              But as far as --

14    BY MR. MOUGEY:

15         Q.    How would you define

16    "respiratory issues"?

17         A.    Well, certainly it could -- so

18    this combination could cause someone to be

19    unconscious or have trouble breathing, or

20    potentially --

21         Q.    Die?

22         A.    -- die, yeah.

23         Q.    So that's kind of the reason

24    why it's a red flag in combination, correct?
```

1      A.      Well, a lot has to do with

2   dosing and frequency, and so it's not an

3   absolute.  But certainly these three things

4   together would be something to look for, yes.

5      Q.      Does Giant Eagle have an

6   understanding of whether the DEA believes

7   that those drugs prescribed to the same

8   patient are a major red flag?

9      A.      I believe the DEA, as any

10  pharmacist from their professional judgment,

11  would look at this -- would look at any drug

12  in a profile, that's part of the DUR process,

13  as is required and necessary for a pharmacist

14  to look at all drugs on a profile, how they

15  work together, how they interact together,

16  what potential side effects they could cause,

17  interactions they could cause.

18          So yes, this is drugs that are

19  used together, but certainly you're looking

20  at the whole profile with all the drugs

21  included.

22      Q.      Does Giant Eagle have a warning

23  system, automated, for a pharmacist alerting

24  it of these three drugs being prescribed to

Highly Confidential - Subject to Further Confidentiality Review

1    the same patient, say, within 30 days?

2         A.     So the pharmacy system that we

3    employ is connected with the, in this case,

4    the OARRS system which would show -- so

5    there's two things.

6              There's the patient profile

7    which would flag these concurrent medications

8    together, but also it would trigger an OARRS

9    review as part of the workflow process which

10   would show any drugs that are not on our

11   profile as well.

12        Q.     What you just described, I

13   believe, tell me if it's fair to say, that's

14   a manual search, right?

15        A.     No, it comes up at the review,

16   the pharmacist review system, in the system.

17   So the system would flag drugs on the

18   concurrent profile within Giant Eagle, but

19   then the OARRS process would show anything

20   outside of Giant Eagle for that patient.

21        Q.     What I'm trying to understand

22   is the first part.  Let's separate OARRS out

23   for a second.

24              What I asked was, was there an

1  automated flag that would alert a pharmacist

2  within Giant Eagle that those three drugs had

3  been prescribed to the same patient within

4  30 days of each other?

5      A.    Sure.  The system software

6  would flag this concurrent and overlapping

7  drugs and therapy, yes.

8      Q.    How would it flag it?

9      A.    So in the DUR review screen, as

10  pharmacists would check a prescription, it

11  would show that these drugs were -- when they

12  were filled, and what quantities were filled,

13  and that they overlap.

14      Q.    Okay.  I want to make sure you

15  and I are on the same thing.

16          I understand that from a review

17  of the history a pharmacist would be able to

18  manually ascertain that.  But what I'm asking

19  is, was there a flag that highlighted or

20  identified the fact automatically that these

21  three had been prescribed together?

22          MR. BARNES:  Objection.  Asked

23      and answered at least twice.

24          But you can answer again.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     The pharmacy system would flag

2   these drugs together as therapy, right.  So

3   when you do your drug utilization review,

4   anything pertinent to that drug that you're

5   filling would show up.  So it would show up

6   for the pharmacist, and then they could drill

7   down further if they wanted, but it would

8   show concurrent therapy or overlapping

9   therapy, and then they would be able to make

10  a decision on what they needed to do from

11  there.

12      Q.     I'm not trying to be difficult,

13  but when you say that it shows, are you

14  saying that there's an automated system that

15  highlights the fact that all three of these

16  were prescribed to the same patient?

17      A.     Again, what I'm testifying is

18  that the pharmacist as part of their drug

19  utilization review would review and know that

20  these drugs --

21      Q.     Right.

22      A.     -- are in the profile, and

23  again, they would see what's being used, not

24  used, when it was used, but they would have

Highly Confidential - Subject to Further Confidentiality Review

1    that information.

2            Q.    Let's -- I'm still not -- my

3    confusion is still not answered here.

4            So what I'm trying to

5    distinguish is the pharmacist manually

6    reviewing patient profile history to manually

7    identify those three drugs, or is there a --

8    during the utilization review, is there a

9    flag that's automatically populated

10   highlighting the fact that these three drugs

11   were prescribed to the same patient within a

12   specific amount of time?

13           MR. BARNES:  Objection.  Asked

14       and answered three times.  I don't

15       know how many times you need to do it.

16           MR. MOUGEY:  Until I

17       understand.

18           A.    Again, the pharmacist as part

19   of the DUR process would know that these

20   drugs were concurrently either being used or

21   had been used or in the profile.  Each time a

22   DUR is done it's looking at all the drugs

23   within the profile.

24               ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. MOUGEY:

 2          Q.     I'm asking a simple question

 3     here, I think.

 4                 Is it a manual search that the

 5     pharmacist uses to identify those three drugs

 6     to the same patient, or is there an automated

 7     process at Giant Eagle to identify the

 8     combination of these three drugs?

 9                 MR. BARNES:  Same objection.

10          A.     So as far as where on the

11     screen it shows up or how it shows up, I

12     don't know how it shows up.

13                 But as part of the DUR, the

14     pharmacist would know these drugs are part of

15     the patient's --

16     BY MR. MOUGEY:

17          Q.     So there's no automated process

18     that identifies the combination of these

19     three drugs, it's a manual search, correct?

20                 MR. BARNES:  Objection.

21          Misstates prior testimony.  He said at

22          least times that it flags in the DUR

23          review.

24                 MR. MOUGEY:  I'm going to put
```

1          you on the stand, Bob.

2     BY MR. MOUGEY:

3          Q.    So is it a manual process?

4               MR. BARNES:  Keep asking the

5          question over and over again, I will

6          take the stand.

7               MR. MOUGEY:  Maybe we'll get a

8          cleaner answer.  If you want me to

9          read back some of the testimony, I'll

10         be more than happy to.

11    BY MR. MOUGEY:

12         Q.    So is there a flag, or is it a

13    manual review?

14         A.    Again, as far as how it shows

15    up in the system and where it shows exactly

16    in the system, in the DUR process this would

17    show up.  Where in the screen, how in the

18    screen, or how the pharmacist would access

19    that screen --

20         Q.    How would it show up?

21         A.    It would show up as a

22    therapeutic -- however it's characterized,

23    these drugs would show up in the DUR review.

24         Q.    Sure.  They'd also show up in

1    the patient profile, correct?

2         A.    Would these drugs show up.

3    Yes, they would be in the profile, yes.

4         Q.    And it would take a manual

5    review in the patient profile for the

6    pharmacist to identify these drugs being

7    prescribed together, correct?

8         A.    I apologize, maybe this is

9    where I'm confused.  As far as to do a proper

10   DUR, you would need to look at all the drugs

11   on the profile, whether it pops up on the

12   left screen, the right screen or on the

13   bottom, they would know that these drugs are

14   on the profile and would use their

15   professional judgment on whatever they're

16   filling.

17        Q.    It takes the pharmacist to go

18   back and review all of the drugs being

19   prescribed and perform a manual review of the

20   patient history, the prescription history, to

21   identify these three drugs prescribed in

22   conjunction with each other, correct?

23        A.    I apologize.  This manual, you

24   keep saying "manual," I don't understand.

1      Q.     You don't understand the word

2    manual?

3      A.     I certainly understand the word

4    manual.  I just don't understand --

5      Q.     What do you think manual means?

6      A.     So in the pharmacy system these

7    drugs would show, you would conduct your DUR

8    however you conduct your DUR, which is

9    required, and you would proceed from there.

10     Q.     Explain to the jury when you

11   say "conduct a DUR," what do you mean?

12     A.     So when I'm filling a

13   prescription, the system would flag any type

14   of drug interactions, underutilization,

15   overutilization, dosing, and then you look at

16   all that information and you conduct your

17   DUR, and then proceed from there.

18     Q.     Number 2, lack of

19   individualized dosing.  "Best practice:

20   individualized according to the patient need

21   using the lowest possible beneficial dose."

22            Did I read that right?

23     A.     Yes.

24     Q.     What does "individualization of

Highly Confidential - Subject to Further Confidentiality Review

1    dosing" mean to you?

2         A.    Dosing that is specific to that

3    patient.

4         Q.    And how would the pharmacist at

5    Giant Eagle identify whether that dosing is

6    specific to that patient?

7         A.    Sure.  If prescriptions were

8    coming, irrespective of the patient, patient

9    weight, gender, all those things, if the

10   prescriptions were coming exactly the same

11   without -- because weight is a determinant on

12   dosing frequency, so this is are you seeing

13   the same -- are you seeing the same dose and

14   drug irrespective of patient characteristics.

15        Q.    Well, that makes sense to me,

16   except how is the pharmacist supposed to

17   compare all of the different prescriptions

18   for all the different patients from the same

19   prescriber?

20        A.    The pharmacists, using their

21   professional judgment, know their

22   prescribers, know their patients, and if you

23   see -- we know our patients, and we know the

24   prescriptions that we fill, and if there was

1    something that was regularly and the same,

2    the pharmacist would be able to identify

3    that.

4          Q.     I'm sorry.  Go ahead,

5    Mr. Tsipakis.

6          A.     And there's examples of things

7    where -- that I know that I've seen where

8    there's lack of this individualization, which

9    then prompts a further review, or a further

10   screening.

11         Q.     Are some of Giant Eagle's

12   pharmacies open 24 hours?

13         A.     No, they are not.

14         Q.     They're all -- Giant Eagle

15   pharmacies are open, what's the -- 12 hours,

16   15 hours?

17         A.     Basically anywhere from 10 to

18   12 hours, from morning to night.

19         Q.     Seven days a week?

20         A.     On the weekends it's only -- it

21   varies, but for the most part we have 8 to 10

22   stores during the week, 8 to 10, 8 to 8, 9 to

23   9.

24                And then on the weekends,

Highly Confidential - Subject to Further Confidentiality Review

1    Sunday hours being shorter, but an eight-hour

2    shift, like a 9 to 5 on Saturdays, 10 to 4,

3    10 to 5 on Sundays.

4            It varies by area, but shorter

5    on the weekends, longer during the week.

6        Q.    So some of busier stores can

7    have 5 to 600 prescriptions in an hour?

8        A.    Per hour?

9        Q.    I'm sorry, per day.

10       A.    Sure.

11       Q.    And let me redo my math there.

12           So you testified earlier some

13   of the busier stores do approximately 6,000

14   prescriptions a week, correct?

15       A.    We have some stores that are

16   that busy, yes.

17       Q.    So that's approximately 8 or

18   900 prescriptions per day, correct?

19       A.    Roughly, yes.

20       Q.    So again, roughly, 60, 70, 80

21   prescriptions in an hour at the busiest

22   stores, correct?

23       A.    Correct.

24       Q.    So it's your testimony to this

Highly Confidential - Subject to Further Confidentiality Review

1    jury that the pharmacist was going to be able

2    to connect the dots and recall dosage,

3    weight, frequency across prescribers for

4    opiates when some of the busier stores are

5    filling prescriptions to the tune of about

6    one a minute?

7                    MR. BARNES:  Object to form.

8                    This is beyond the topics the

9            parties had agreed to.  This is --

10           you're now into topics -- performance

11           metrics topics 9 and 10 which were not

12           supposed to be the subject of this

13           witness's testimony today.

14   BY MR. MOUGEY:

15        Q.    The system in place,

16   Mr. Tsipakis, is the manual review and

17   recollection of the pharmacist, correct, to

18   identify lack of individualization of dosing,

19   right?

20        A.    So each prescription is

21   individualized -- is screened individually

22   per patient.  So when a prescription comes

23   in, the pharmacists use their professional

24   judgment based on that patient, based on

Highly Confidential - Subject to Further Confidentiality Review

1    information they have, date of birth, gender,

2    weight.  If they need more information, they

3    can contact the physician.  So they look at

4    each prescription separately.

5         Q.    Yes, sir.  The system in place

6    at Giant Eagle, is your testimony to this

7    jury when looking at individual dosing, is

8    that the pharmacist is supposed to have

9    recall of other prescriptions in the store

10   coming through that from that prescriber to

11   compare weight and frequency over as many as

12   60, 70, 80 prescriptions an hour, correct?

13        A.    No, not correct.  I can tell

14   you --

15        Q.    Go ahead.

16        A.    If there's a pattern that's the

17   same pattern over and over and over again,

18   it's very quickly figured out from the same

19   prescriber.

20        Q.    What's the difference between

21   what I said and what you just said, that the

22   system in place at Giant Eagle is a manual

23   recollection by the pharmacist of the

24   different prescriber prescriptions and the

1    pharmacist's ability to compare against

2    frequency and size over the course of a

3    period of time, correct?

4              MR. BARNES:  Objection.

5         Misstates his testimony.

6         A.     The pharmacist each and every

7    time look at the prescription that's in front

8    them, based on the patient that's in front of

9    them, based on what other information they

10   have in front of them, which includes OARRS,

11   and then they're able to decide whether they

12   should proceed with this prescription or not,

13   or ask for more clarification or different

14   information that's needed.  So...

15   BY MR. MOUGEY:

16        Q.     It's not just based on

17   prescription in front of them, sir, it's a

18   comparison of other opiate prescriptions

19   coming in across patients to determine if the

20   dosing is individualized, correct?

21        A.     The fact that a prescriber is

22   prescribing -- again, as it's listed here,

23   these are potential red flags and things for

24   the pharmacist to look at.

Highly Confidential - Subject to Further Confidentiality Review

1              After the pharmacist gets that

2      prescription and exercises their professional

3      judgment, they would decide whether it's

4      appropriate in the course of -- whether it

5      was appropriate, not appropriate, more

6      information needed, or whether to fill that

7      prescription or not.

8          Q.     I understand.  A little

9      different.  The question I asked you was that

10     in order to determine if a physician is

11     issuing the same prescriptions with the same

12     dosing, irrespective of the weight of the

13     patient, Giant Eagle relies on the memory of

14     the pharmacist, correct?

15         A.     That's not correct.  You're

16     characterizes as a broad brush the same thing

17     for everybody, and this is -- every

18     prescription is unique to that individual.

19         Q.     We're not talking about

20     prescriptions that are unique to that

21     individual.  We're talking about pattern

22     prescribing.

23              Tell me the tools that Giant

24     Eagle has at the point of fill that the

1  pharmacist can use to determine if a

2  prescriber is writing the same prescription

3  over and over and over again.

4       A.     And as I just testified, this

5  is a flag for the pharmacist to look at, and

6  then in their professional judgment decide

7  for that patient, for that profile, whether

8  they should fill this prescription or not.

9       Q.     I'm asking about the tools, the

10  tools that Giant Eagle has at the point of

11  fill for a pharmacist to determine if a

12  physician is writing the same prescription

13  for, for example, OxyContin 30 over and over

14  and over again.  What tools are available?

15       A.     So if a prescriber was

16  prescribing the same exact medication for

17  every patient, and there was a frequency of

18  those patients, the pharmacist would know

19  that.

20       Q.     And what tools are available to

21  assist the pharmacist identifying that

22  pattern of Oxy 30, for example, over and over

23  and over again?

24       A.     The tools that they have in

Highly Confidential - Subject to Further Confidentiality Review

1   front of them is using the computer system

2   and the profiles that they have in front of

3   them, they can use OARRS, they can use -- and

4   again, with their training and experience at

5   their store, they know the prescriptions that

6   come in, they know the prescribers that are

7   in the area, they know what the prescribing

8   habits are for those areas.  I mean, they use

9   their professional judgment.

10          Q.     There's no computer search to

11   determine if a prescriber, at the store

12   level, if a prescriber is writing scripts for

13   Oxy 30s over and over again, correct?

14          A.     I'm sorry, can you repeat that,

15   please?

16          Q.     There's no tool, computer tool,

17   at Giant Eagle at the pharmacy level for the

18   pharmacist or staff to identify whether a

19   physician is writing the same script, for

20   example Oxy 30, over and over and over again,

21   correct?

22          A.     Not correct.  If the pharmacist

23   wanted to run a utilization report on a

24   physician, they could put that physician --

Highly Confidential - Subject to Further Confidentiality Review

1    they could pull up that physician and look at

2    the history of dispenses for that prescriber.

3         Q.    At the store level?

4         A.    Correct.

5         Q.    Using Giant Eagle system at the

6    store level, your testimony to this jury is

7    that a pharmacist or pharmacist staff can

8    organize a physician's prescriptions?

9         A.    What I'm testifying is if a

10   pharmacist wanted to see what prescriptions

11   they had filled from a particular prescriber,

12   they could run a report which would show all

13   the fills for that prescriber.

14        Q.    That's not what I'm asking.

15        A.    You asked me what report was

16   available, and I answered to you, sir, that

17   that's the report that they can --

18        Q.    All they can look at is at the

19   store level, correct, meaning no other Giant

20   Eagle stores, correct?

21        A.    That's a utilization report for

22   their store.

23        Q.    That's right.

24             So the answer to my question,

1   Mr. Tsipakis, is yes, that all they can look

2   at is at the store level, not across all 200

3   Giant Eagle stores, to determine if the same

4   physician is writing prescriptions for Oxy

5   30s over and over and over, correct?

6       A.    Well, they could use the

7   profiles and dial in to other stores, but the

8   utilization report that they would run would

9   be for their store.

10      Q.    And the dialing in would be

11   store by store, correct, sir?

12      A.    Correct.

13      Q.    So there is not a tool at Giant

14   Eagle for a pharmacist to use to pick up on

15   whether a prescriber is writing Oxy 30s,

16   irrespective of weight, over and over and

17   over again across the Giant Eagle system,

18   correct?

19        MR. BARNES:  Object to form.

20     Misstates his testimony, and asked and

21     answered.

22      A.    You had asked me whether a

23   pharmacist could detect or identify a

24   prescriber writing the same prescription over

1    and over again.  They would know that and see

2    that at their store.

3    BY MR. MOUGEY:

4         Q.    I didn't ask you whether they

5    would know it by just smoke signals or just

6    remembering the 6,000 prescriptions a week.

7    We'll let the jury decide whether or not a

8    pharmacist can remember 6,000 prescriptions.

9    Focus on the question that I ask.

10             What I asked you was, sir, is

11   there a tool, computer tool, for a pharmacist

12   to use that would identify if a prescriber is

13   writing, for example, Oxy 30s over and over

14   and over again across all of the Giant Eagle

15   pharmacies?

16        A.    What the pharmacist would do in

17   that situation if they had a concern is bring

18   that concern -- which I didn't see as part of

19   my prep for this deposition, they would have

20   a concern, they would raise that concern, and

21   then we could run global utilization from the

22   chain level.

23        Q.    I'm not asking if they went to

24   the corporate level, if they picked up on the

Highly Confidential - Subject to Further Confidentiality Review

1    pattern of the 6,000.  Okay?

2         A.     And again --

3         Q.     No, no, no, no, no.  Answer my

4    question, sir.  Was there -- no, Bob.

5               Was there a tool, was there a

6    computer-generated tool that would flag if a

7    physician was writing the same prescription,

8    for example Oxy 30, over and over again that

9    covered all the Giant Eagle stores?

10              MR. BARNES:  Objection.

11   BY MR. MOUGEY:

12        Q.     Other than memory.

13              MR. BARNES:  You cut off the

14        witness's prior answer.

15              Mr. Tsipakis, if you have more

16        to say in answer to the prior

17        question, please --

18   BY MR. MOUGEY:

19        Q.     Answer my question, sir.

20        A.     I will do both.

21              You characterized the stores as

22   6,000.  The 6,000 a week stores that we have,

23   there's a handful of stores that are 6,000.

24   Our average store volume is 2,300 per week.

Highly Confidential - Subject to Further Confidentiality Review

1    So the characterization that there's -- is

2    incorrect.

3              To answer your question, the

4    second part about what the stores have access

5    to, what the stores have access to is the

6    tools that we've discussed, whether it's

7    OAARS, whether it's the profile, whether it's

8    dialing into other stores.

9              If they have a concern past

10   that, the stores can request more information

11   from the corporate side, and we can run

12   reports, or whatever other information, or

13   getting LP involved, or getting local law

14   enforcement and DEA involved in other pieces.

15             So they have multiple layers

16   and tools they can look at.  And again, using

17   their professional judgment, they decide

18   whether to fill that prescription or not.

19             MR. MOUGEY:  This is getting --

20        let's take a break.

21             THE VIDEOGRAPHER:  4:17.  We

22        are off the video record.

23             (Whereupon, a recess was

24        taken.)

```
 1                    THE VIDEOGRAPHER:  4:28, we are

 2         on the video record.

 3    BY MR. MOUGEY:

 4         Q.     Mr. Tsipakis, this document

 5    continues 4, 5, 6, 7, 8, 9, 10 identifying

 6    other examples of red flags, correct, sir?

 7         A.     Correct.

 8         Q.     And the next section on Bates

 9    number 94, "Other Red Flags That Should Be

10    Considered Include," and it lists another

11    seven, correct?

12         A.     Page -- I'm sorry.

13                Yes.  Correct.

14         Q.     The section entitled

15    "Documentation."  "The pharmacist must

16    document the steps they have taken to verify

17    questionable prescriptions, including any

18    calls to the prescriber, conversations with

19    the patient, medication history review, and

20    notate on the prescription itself or in the

21    computer system utilizing appropriate note

22    fields."

23                Did I read that correctly?

24         A.     Yes, you did.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Why is it important that the

2    pharmacist document the information that's

3    identified in this section on Bates number

4    94?

5    A.    The pharmacists in their

6    judgment would document these interactions

7    that they felt was relevant for themselves,

8    or another pharmacist perhaps if they were

9    going to look at it, so -- and just to have,

10   where necessary, to have a documentation of

11   what occurred or what action was taken.

12   Q.    And why is that important?

13   A.    I mean, it depends.  So if a

14   physician was called because the dose was

15   changed, the reason for the change, so you'd

16   want someone to know that, or for the next

17   pharmacist that came and saw it, they would

18   understand what happened.

19   Q.    So the documentation helps

20   facilitate communication amongst different

21   pharmacists within Giant Eagle?

22   A.    Sure.  Yes.

23   Q.    And would you explain to the

24   jury the different tools available for --

Highly Confidential - Subject to Further Confidentiality Review

1    that's a wrong word.  Let me do that again.

2              Would you explain to the jury

3    the different ways a pharmacist can document

4    the information that's listed here on 94, and

5    any other information that you think is

6    relevant or important?

7         A.    Sure.  The pharmacists have

8    different places they can document.  They can

9    document on the prescription, they can

10   document under the patient record, under the

11   general notes field, or certainly on the

12   prescription hard copy itself.

13        Q.    When you say "document on the

14   prescription," what do you mean?

15        A.    If they wanted to document

16   something, they could pull the hard copy and

17   actually make a prescription -- document

18   something on the actual prescription.  They

19   could document it on the digital copy of the

20   prescription in the system under the notes

21   field as well.

22        Q.    So if a pharmacist made a

23   notation on a hard copy of a -- of the

24   prescription, how would that be seen or used

1     by a pharmacist at other Giant Eagle stores?

2          A.     If it was notated on the hard

3     copy and it was scanned, the physical

4     prescription is scanned, so that would be on

5     the hard copy.  Excuse me.

6                 If something is notated on the

7     hard copy, then it's scanned into the system.

8     It's digitally shown in the computer.

9          Q.     It's your testimony that the

10    prescriptions, if there's notations, were

11    scanned in and stored on Giant Eagle's

12    system?

13         A.     What I'm testifying to an

14    example, and to what I just said, if a

15    pharmacist notated something on a

16    prescription, and then scanned that

17    prescription into the system, it would be in

18    the system.

19         Q.     Oh, "if."  I missed the word

20    if.  It's kind of like etcetera.

21                So let's -- is it required at

22    Giant Eagle that a prescription with notes on

23    it is scanned in?

24         A.     So, I'm sorry.  For billing

Highly Confidential - Subject to Further Confidentiality Review

1    purposes -- so I'll give you an example.

2              For billing purposes, the

3    insurance companies need the hard copy, the

4    notes on the hard copy.  For example, if it's

5    a diabetic test strip prescription, it comes

6    in as as directed, and you ask the patient

7    how many times they test, you would notate

8    that on the prescription, and then scan it

9    into the system, so then that record would be

10   there.

11        Q.    I understand.  But what I asked

12   you was a little different.

13             I said, does Giant Eagle

14   require that notes on the back of

15   prescriptions be scanned into the system?

16        A.    If the pharmacist felt

17   something was relevant that they needed to

18   put into the system, they would put it into

19   the system.  There's a lot of billing things

20   we do on the back of the prescription that,

21   like as I just mentioned, is for billing

22   purposes.

23        Q.    So the answer to my question is

24   no, it's not required, it's up to the

1    pharmacist to decide whether to scan it in?

2         A.    There's discretion there, yes.

3         Q.    That wasn't that hard, was it?

4               Do you know how many -- let's

5    do it this way.

6               There's multiple notes fields,

7    correct?

8         A.    To my understanding, yes.

9         Q.    And do you know how many

10   characters the notes fields can maintain,

11   like what's the max?

12        A.    I do not know.

13        Q.    Who would know?  Mr. Miller

14   didn't know last week, or in his testimony

15   either.

16        A.    There would be someone from our

17   pharmacy IT department that runs our systems

18   that could most likely get that information.

19        Q.    Do you know anyone in

20   particular that would know that information?

21        A.    Well, there could be Joe Lazaro

22   on our team.  If we don't know, our software

23   vendor, certainly someone at our software

24   vendor could be -- that could be discussed

1  with our software vendor, they would know.

2        Q.      You understand that at least

3  some of the note fields can be deleted at the

4  store level, correct?

5              MR. BARNES:  Peter, I'm going

6        to object to this line of questioning.

7        It was covered in the document data

8        30(b)(6) with Mr. Miller.

9              And this witness has not been

10        prepared and is not to testify to

11        those topics.

12  BY MR. MOUGEY:

13        Q.      Well, aren't the notes fields

14  an important part of the system of

15  documenting red flags, Mr. Tsipakis?

16        A.      The notes fields are used for a

17  lot of different things, not just red flags.

18        Q.      I didn't ask if they were used

19  for a lot of things.  Mr. Tsipakis, please,

20  hear what I'm asking.

21              I said, the notes fields are an

22  important part of documenting due diligence

23  on red flags, correct?

24        A.      Correct.  But I'm also saying

Highly Confidential - Subject to Further Confidentiality Review

1  it's not exclusively only used for that.

2      Q.    I didn't ask you if it was

3  exclusive.  I didn't suggest it was.  I just

4  said it was part.  Did you hear the word

5  "part"?

6      A.    Yes, sir, I did.

7      Q.    Okay.  So the notes fields are

8  the primary place that the pharmacist can

9  record their due diligence on red flags,

10  correct?

11      A.    It's a place they could

12  document that.

13      Q.    Well, we have the notes fields

14  and we have the back of a prescription,

15  right, the hard copy prescription, correct,

16  sir?

17      A.    Not all red flags require

18  documentation or for it to be written out.

19      Q.    Didn't ask you if it did.  I

20  asked you where.

21          So we have the notes fields and

22  the back of a prescription.  Where else can

23  due diligence be recorded on a red flag at

24  Giant Eagle?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Due diligence could be also an

2    e-mail to their supervisor about a concern,

3    to the compliance department.  There's --

4    there's a lot of different places they could

5    document a concern.

6          Q.     Well, where else could it be?

7    So we have e-mails, we have notes, we have

8    back of a hard copy prescription.  Where else

9    can due diligence be recorded on red flags?

10         A.     You said the e-mails, because

11   there's certainly e-mails back and forth with

12   our LP department.

13              So e-mails, the notes field,

14   and the back of a prescription, those would

15   be the primary.  Also notes to other

16   pharmacists or how they communicate between

17   each other, sometimes they can leave notes as

18   well outside of the system.

19              And there's no law that

20   requires where they put their notes or their

21   documentation.  I mean, the whole point of

22   the notes is to communicate pertinent

23   information if necessary.

24         Q.     So let's go back to the

1    document in front of you, sir.

2          Do you see under

3    "Documentation" it says, "The pharmacist must

4    document" -- correct?

5          A.    Correct.

6          Q.    -- "steps they have taken to

7    verify questionable prescriptions," correct?

8          A.    Correct.

9          Q.    And then the paragraph goes on

10   to give specific examples, correct?

11         A.    Yes.  Correct.

12         Q.    It says there's two places to

13   record the documentation, one is on the back

14   of the prescription itself, correct?

15         A.    Yes.

16         Q.    And the second is the computer

17   system utilizing appropriate note fields,

18   correct?

19         A.    Correct.

20         Q.    So Giant Eagle's own guidelines

21   give note fields and notations on the hard

22   copy prescription, correct?

23         A.    Correct.

24         Q.    And the reason for documenting

```
 1    the, quote unquote, due diligence is at least
 2    in part to help communicate information
 3    amongst pharmacists at Giant Eagle, correct?
 4         A.    Correct.
 5         Q.    Now, let's go back to the
 6    question I asked a few minutes ago.
 7               Did Giant Eagle at any point in
 8    time have issues with the size of the note
 9    fields and pharmacist notes having to be
10    deleted because the field was filled up?
11               MR. BARNES:  Objection.
12               This was covered in a separate
13          deposition.  This is not a topic for
14          this witness.
15         A.    I'm not aware about the
16    limitation or deleting of any notes.  Not
17    aware of that.
18    BY MR. MOUGEY:
19         Q.    You would agree that if, in
20    fact, the notes fields were limited, that
21    that would adversely impact Giant Eagle's
22    ability to maintain its system on red flags?
23               MR. BARNES:  Objection.  Calls
24          for a hypothetical.  There's no
```

1          foundation.  He said he's not aware of

2          limitations or deletions.

3          A.     As far as what information, the

4     note fields are there, you use the note

5     fields as they're designed, and again, I

6     don't -- I'm not privy to the limitations or

7     character limits on those, or if they were

8     deleted, or what impact that would or

9     wouldn't have.

10    BY MR. MOUGEY:

11         Q.     Mr. Tsipakis, if you could

12    please open up the folder that I've marked as

13    1348.

14             MR. BARNES:  HBC-1348?

15             MR. MOUGEY:  HBC, yes, 1348.

16             (Whereupon, Tsipakis Exhibit

17         Number 2 was marked for

18         identification.)

19    BY MR. MOUGEY:

20         Q.     Let me know when you have it,

21    sir.

22         A.     Does it begin with Giant Eagle

23    Pharmacy Controlled Substances Manual?

24         Q.     Yes, sir.

1          A.      Okay.  I have it.

2          Q.      Okay.  Great.

3                  Does Giant Eagle repeatedly

4    advise its pharmacists and staff that they

5    need to perform due diligence on red flags?

6          A.      We reinforce it, yes.

7          Q.      When you say "reinforce it,"

8    you reinforce the importance of performing

9    due diligence on red flags, correct?

10         A.      Well, all due diligence, but

11   certainly including red flags, yes, of

12   course.

13         Q.      And other than taking a note on

14   the back of a hard copy prescription that the

15   pharmacist has discretion whether to scan or

16   not, the only other place to record that due

17   diligence is in the notes fields, correct,

18   sir?

19         A.      That's not correct.  The

20   pharmacist, and also what I saw in preparing

21   for this testimony, there was numerous

22   pharmacists that would have a concern or a

23   diligence question that would be an e-mail

24   to -- whether it's to loss prevention, the

1    compliance team, to their direct supervisor,

2    so those, in essence, are communicative --

3    modes of communication as well.

4         Q.    And in your preparation for

5    today, how many examples of recording due

6    diligence did you see in e-mail traffic?  Ten

7    or less?

8         A.    I'm not sure of the exact, but

9    somewhere there.

10        Q.    So over a period of

11   approximately 15 years, you've seen ten or

12   less examples of due diligence being recorded

13   in e-mails, correct?

14             MR. BARNES:  Objection.

15             You've asked a misleading

16        question.

17        A.    What I said is I saw snippets

18   of those examples that are not exclusive of

19   all the information that's there or exists.

20   It's the ones that I had personally seen.

21   BY MR. MOUGEY:

22        Q.    So what is your definition,

23   Mr. Tsipakis, of what due diligence is?

24        A.    Due diligence is -- it

1    relates -- in relation to filling a

2    prescription?

3         Q.    Red flags, yes, sir, for opiate

4    prescriptions which is what I think we're

5    talking about.

6         A.    So the due diligence would be

7    to, as you're assessing a prescription and

8    you're going through all of the normal

9    procedures to validate a prescription, in

10    addition to doing your due diligence on

11    therapy, drug interactions, the drug, the

12    dosing, the quantity, the patient, the

13    characteristics of the patient, so you take

14    all those things into consideration.

15              And if there is any red

16    flags -- again, not exclusive, but if a red

17    flag, and one red flag to one pharmacist may

18    not be the same red flags to another, based

19    on experience or knowledge of the patient or

20    the prescriber, you would exercise caution of

21    care for all those things.  And then if you

22    were satisfied with your professional

23    judgment, you would fill that prescription.

24         Q.    And the fact that red flags to

1    one pharmacist to another may be different

2    things are reasons why Giant Eagle puts

3    together guidelines and manuals to help

4    educate the pharmacists and staff, correct?

5         A.    It helps reinforce to their

6    staff.  Pharmacists, again, have a

7    responsibility to do their due diligence in

8    their professional judgment.  These are --

9    these guidelines are help to make aware, to

10   reinforce good practice.

11        Q.    And Giant Eagle provides the

12   tools, the reinforcement on these guidelines

13   and manuals to help educate it's pharmacists

14   and staff, correct?

15        A.    It's not only through these.

16   Pharmacists have continuing education, they

17   have -- what we do here is we help put things

18   together in a nice, neat place.  But again,

19   it's not exclusive of all the information and

20   training that our pharmacists have and

21   continue to get from a continuous

22   perspective.

23        Q.    Let's turn to Bates number 55,

24   which is the third page in under "Statement

Highly Confidential - Subject to Further Confidentiality Review

1    of Purpose."

2         A.    655, so the last digits?

3         Q.    Yes.

4              MR. BARNES:  I'm going to

5         interject an objection here, Peter.

6         There's no foundation that this

7         document was actually used as a Giant

8         Eagle manual.  In fact, I think the

9         testimony from others is to the

10        contrary.

11   BY MR. MOUGEY:

12        Q.    That would be great to know.

13   Well, let's do it this way.

14             So is Mr. Barnes' testimony

15   accurate that this manual was not used at

16   Giant Eagle?

17        A.    I don't know when and how this

18   was used at Giant Eagle.

19        Q.    Do you know whether it was

20   used?  Let's start there.

21        A.    I do not.

22        Q.    So today, in preparation for

23   your testimony about the systems in place at

24   Giant Eagle to identify red flags, conduct

Highly Confidential - Subject to Further Confidentiality Review

1    due diligence, you don't know whether or not

2    this document, which we'll mark as Exhibit 2,

3    was enforced at Giant Eagle?

4         A.    What I'm testifying is I

5    haven't seen this document.  Doesn't mean

6    that it was or wasn't used at Giant Eagle.

7         Q.    I think I can -- Mr. Barnes, I

8    can accept your representation that this

9    document was not used at Giant Eagle?

10             MR. BARNES:  I interpose an

11        objection, Pete.  There's no

12        foundation to ask questions related to

13        this document because there is no

14        foundation that it was actually used.

15        I mean --

16             MR. MOUGEY:  You brought a

17        witness today that's going to testify

18        about systems at Giant Eagle and red

19        flags in regards to opiates, and I'm

20        sitting here looking at a controlled

21        substance manual, was this used at

22        Giant Eagle or wasn't it?

23             I think you're kind of in

24        Hobson's choice here, either the

```
 1          witness isn't prepared to answer the

 2          question and you need to go back and

 3          do a little homework, or --

 4               MR. BARNES:  I think there's

 5          maybe a reason why he wasn't shown it,

 6          and it's because, if you read the

 7          George Chunderlik deposition from

 8          track 1, that that's what I'm getting

 9          at.

10               If you want to take a break for

11          a minute, I can verify one way or the

12          other.

13               MR. MOUGEY:  That will be

14          great.  That will save us a little

15          time.  That will be great.

16               MR. BARNES:  Let's go off the

17          record for a second.

18               THE VIDEOGRAPHER:  4:49.  We're

19          off the video record.

20               (Whereupon, a recess was

21          taken.)

22               THE VIDEOGRAPHER:  5:03.  We

23          are on the video record.

24               ///
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MOUGEY:

2        Q.    Mr. Tsipakis, we have Exhibit 2

3    in front of you, sir, entitled "Giant Eagle

4    Pharmacy Controlled Substances Manual."

5            Have you seen this document

6    before, sir?

7        A.    Prior to today I had not seen

8    it, no, but...

9        Q.    And what do you know about this

10   document, sir?

11       A.    So what I was able to ascertain

12   was this document was an internal draft that

13   our compliance department was working on that

14   never got published or distributed outside of

15   the compliance department.  It was a draft

16   that they were working on.  That basically

17   the Controlled Substance Guidelines document

18   is what was published and used for the

19   stores, not this.

20       Q.    So the Exhibit 1, the three to

21   four-page document, was the document that was

22   used at Giant Eagle to educate their pharmacy

23   staff to address red flags and due diligence,

24   correct?

1    A.    It was not the only.  Help

2    educate, it's not the primary -- it wasn't

3    the only thing, but it was one of the things,

4    yes.

5    Q.    And this, I believe, 40-plus

6    page document that you have in front of you

7    marked as Exhibit 2 was drafted by compliance

8    but not used?

9    A.    That is correct.  That is my

10   understanding, yes.

11   Q.    So, sir, if you'd turn to Bates

12   number 58 of this document.  All of the

13   detail about due diligence on Bates number 58

14   was never used to help educate the pharmacist

15   and pharmacist staff related to controlled

16   substance and opiates?

17   A.    Give me a second to just look

18   at it.

19        This is information pulled out

20   of the pharmacist manual, the DEA pharmacist

21   manual, but this wasn't used in this form,

22   no.

23   Q.    So as you flip through this

24   document, for example on page 62 titled --

1    Bates number 62, "Filling Prescriptions for

2    Controlled Substances - Due Diligence," you

3    can see the next several pages are all about

4    red flags and due diligence, this was never

5    used to help educate Giant Eagle's

6    pharmacists and staff regarding controlled

7    substances and opiates?

8         A.    My understanding is this was a

9    draft that wasn't used or disseminated to our

10   pharmacists.

11        Q.    If you turn to page 64,

12   compliance at Giant Eagle took the time to

13   break out the red flags into different

14   segments of the prescription fill process,

15   correct?

16        A.    I'm sorry, page -- you said 64?

17        Q.    Yes, sir.

18        A.    Okay.  Page 64, I've read it.

19        Q.    Yes, sir.

20             For example, page 64, "Red

21   Flags for Drop-Off," none of this educational

22   material was ever used at Giant Eagle,

23   correct?

24        A.    In this exact form, no.  The

1    concepts here have been used, but not this

2    exact document.

3         Q.    Bates number 67, "Red Flags For

4    Data Entry," all of this information was

5    never used to educate the pharmacists,

6    correct, sir?

7         A.    I'm just reading it.

8               Again, this is information from

9    multiple sources that were listed here, but

10   in this form was not used.

11        Q.    Yes, sir.  It's almost 40-plus

12   pages, and this page specifically, Bates 67,

13   were red flags specifically just for the data

14   entry piece of the filling a prescription for

15   controlled substances, correct?

16        A.    As it's written, it says, "Red

17   Flags For Data Entry."  That's what it says.

18        Q.    Bates number 68 is another

19   section written by compliance, "Red Flags For

20   Fill" related to controlled substances,

21   correct?

22        A.    "Red flags For Fill," that is

23   the title, yes.

24        Q.    And you can see under each one

Highly Confidential - Subject to Further Confidentiality Review

1    of these titles, if you want to flip back on

2    the next couple pages, compliance is

3    stressing the importance of due diligence,

4    correct, sir?

5            MR. BARNES:  Object to form.

6            The witness has already

7        testified this document was not -- was

8        in draft form and was not effectuated.

9    BY MR. MOUGEY:

10       Q.    Bates number 68, compliance is

11   stressing due diligence, correct?

12           MR. BARNES:  Same objection.

13   BY MR. MOUGEY:

14       Q.    Right underneath the "Red Flags

15   For Fill," correct, sir, "additional due

16   diligence may be necessary"?

17       A.    That is what it says, correct.

18       Q.    Number, Bates number 69,

19   there's an entire section with examples of

20   due diligence that could be used to determine

21   all of the different red flags, correct, sir?

22           MR. BARNES:  Same objection.

23       A.    It lists -- I'm sorry, it lists

24   due diligence and examples of such.

1   BY MR. MOUGEY:

2       Q.      On Bates number 70, "Red Flags

3   For Final Verification," another stage in the

4   prescription fill process, correct?

5       A.      Correct.

6       Q.      And underneath the title,

7   compliance is again pointing out about

8   different kinds of due diligence, correct?

9               MR. BARNES:  Same objection.

10          Move to strike all of this line of

11          questioning.  Asking about a document

12          that was never finalized.  It's a

13          draft document, and your questions

14          assume otherwise falsely.

15  BY MR. MOUGEY:

16      Q.      Correct, Mr. Tsipakis?

17      A.      I'm sorry, can you repeat the

18  question, please, sir?

19      Q.      Yes, sir.

20              Underneath the title,

21  compliance is again pointing out different

22  kinds of due diligence in the document,

23  correct, sir?

24              MR. BARNES:  Same objection.

1          Same motion.

2          A.     It lists that, yes.

3     BY MR. MOUGEY:

4          Q.     Bates number 71, more "Red

5     Flags For Will Call," correct?

6          A.     Examples listed, yes.

7          Q.     And again, examples of due

8     diligence compliance thought was important,

9     correct?

10         A.     Examples of things to look for,

11    yes.

12         Q.     Do you know why the document

13    that compliance took time to draft that's

14    over 40 pages long about red flags,

15    controlled substances, opiates, due

16    diligence, why this was never published to

17    Giant Eagle employees?

18         A.     I do not.

19         Q.     If you look at Bates number 55

20    under "Statement of Purpose" in the very

21    beginning of the doc, do you agree with

22    compliance in this document that it drafted

23    "The abuse of prescription drugs is epidemic

24    in the United States"?  Does Giant Eagle

1    agree with that?

2              MR. BARNES:  Object to form.

3         Move to strike.  Same bases.

4         A.    As far as the statement of

5    purpose, there is certainly -- I can't say

6    that it's an epidemic or a pandemic.  There's

7    certainly concern.

8    BY MR. MOUGEY:

9         Q.    Giant Eagle doesn't agree with

10   its compliance department in the draft of

11   this document that prescription drugs is an

12   epidemic in the United States?

13             MR. BARNES:  Hold on.  Object.

14             Pete, what topic are you

15        covering right now?  You're asking him

16        about whether he agrees with

17        compliance department in a draft

18        document that was never finalized

19        about the opioid epidemic.  I don't

20        even see that topic on here.  Let

21        alone, the lack of foundation for any

22        of these questions from a document

23        that was never finalized and utilized

24        and which you received in Word form

Highly Confidential - Subject to Further Confidentiality Review

1          knowing that it's a draft.

2                  So we object to this whole line

3          of questioning.

4                  MR. MOUGEY:   I understand.

5     BY MR. MOUGEY:

6          Q.      Mr. Tsipakis, does Giant Eagle

7     agree with this document that was drafted by

8     compliance that "The abuse of prescription

9     drugs is epidemic in the United States"?

10                 MR. BARNES:   Objection.

11         Outside the topics, lack of

12         foundation.

13         A.      Again, not knowing who drafted

14    this or how they drafted this, certainly it

15    was put together.  If you're asking me that's

16    what it says, yes, that's what it says.

17    BY MR. MOUGEY:

18         Q.      No, what I'm asking you, does

19    Giant Eagle agree or disagree that

20    prescription drugs are an epidemic in the

21    United States?

22                 MR. BARNES:   Same objection.

23         Outside topics, lack of foundation.

24         A.      Giant Eagle agrees that

1    prescription abuse is certainly a concern.

2    BY MR. MOUGEY:

3         Q.    A concern, but doesn't rise to

4    the level of an epidemic, sir?

5              MR. BARNES:  Same objection.

6         A.    Again, that's what it says,

7    Giant Eagle agrees that it's a concern.

8    BY MR. MOUGEY:

9         Q.    But Giant Eagle doesn't agree

10   that it's an epidemic in the United States

11   for prescription drug use, opiates?

12             MR. BARNES:  Same objection.

13        A.    As far as whether it's an

14   epidemic or -- I'm not an epidemiologist, I

15   can't tell you whether that is or it isn't.

16   BY MR. MOUGEY:

17        Q.    I mean, I have a concern that

18   my son stayed out last night past his curfew,

19   I mean, that's not the same as an epidemic.

20             Sir, does Giant Eagle believe

21   that there is an epidemic in the United

22   States associated with prescription drugs,

23   and more specifically opiates?

24             MR. BARNES:  Objection.

1          Outside the topics, lack of

2          foundation.

3      A.     Again, Giant Eagle's position

4  is there's a concern, there's a concern,

5  certainly.

6  BY MR. MOUGEY:

7      Q.     A concern like my son staying

8  out past his curfew, or a concern that

9  "Deaths from prescription drug overdoses

10 exceed deaths from auto accidents," as in the

11 third sentence of this document drafted by

12 compliance?

13          MR. BARNES:  Same objection.

14 BY MR. MOUGEY:

15     Q.     Does Giant Eagle agree and

16 understand that deaths from prescription drug

17 overdoses exceed deaths from auto accidents?

18          MR. BARNES:  Same objection.

19     A.     That is what it says.  I don't

20 have any way to substantiate whether that's

21 true or not true.

22 BY MR. MOUGEY:

23     Q.     If that is true, wouldn't this

24 have been good information for pharmacists

Highly Confidential - Subject to Further Confidentiality Review

1    and pharmacy staff to have, as you call it

2    tools, to make sure that pharmacists

3    understood the severity of overdose deaths in

4    the United States?

5         A.    I believe pharmacists

6    understand that very clearly.

7         Q.    But you're not, on behalf of

8    Giant Eagle, willing to agree that

9    prescription drug abuse is epidemic in the

10   United States?

11             MR. BARNES:  Same objection.

12        A.    Giant Eagle agrees that it's a

13   concern, and things to be vigilant against,

14   yes.

15   BY MR. MOUGEY:

16        Q.    In the last sentence in that

17   paragraph, "Over 20 percent of Americans

18   admit to abusing prescription drugs and they

19   are now the recognized 'gateway' drugs to

20   heroin and other illegal drug abuse."

21             Sir, do you think it's

22   important in the education process of your

23   pharmacists and staff that they understand

24   that prescription opiates are gateway drugs

1    to heroin and other illegal drug abuse?

2              MR. BARNES:  Object to the form

3         of the question.  It's outside the

4         30(b)(6) topics, and there's lack of

5         foundation with respect to this

6         document.

7         A.    I can't substantiate the

8    numbers that are listed there, whether it is

9    or isn't.

10   BY MR. MOUGEY:

11        Q.    But if it was accurate,

12   somebody from compliance had put the time in

13   to draft this 40, 45-page document, wouldn't

14   you believe that that would be important

15   information for your pharmacists to know,

16   that prescription drugs are recognized as

17   gateway to heroin and other illegal drug

18   abuse?

19             MR. BARNES:  Same objection.

20        Outside the 30(b)(6) topics, lack of

21        foundation, asking the witness to

22        speculate as to what's in a draft

23        document about something that he

24        clearly has no knowledge about.

1          A.     I can't speculate on the

2    accuracy of that statement or not.  I know

3    what it says, but I certainly cannot take a

4    position on it.

5    BY MR. MOUGEY:

6          Q.     I'm just simply asking you,

7    sir, if that is an accurate fact as drafted,

8    put together by your compliance department,

9    that wouldn't the fact that prescription

10   drugs recognized -- are recognized as gateway

11   drugs to heroin be important for your staff

12   people to know at Giant Eagle?

13               MR. BARNES:  Objection.

14          Outside the 30(b)(6) topics, lack of

15          foundation.  You don't even know where

16          the source of this information is.

17          A.     Again, I know what it says

18   there.  But recognized, recognized by whom,

19   is just a very -- there's no way to

20   substantiate where this came from, whether

21   it's accurate.

22   BY MR. MOUGEY:

23          Q.     I'm not asking you -- I asked

24   you, sir, to assume this fact as accurate,

1    would this be important for your pharmacists

2    and staff to know that prescription opiates

3    are recognized as gateway drugs to heroin and

4    other illegal drug abuse?

5              MR. BARNES:  Objection.

6         Outside the scope of the 30(b)(6)

7         topics, asking the witness to

8         speculate, lack of foundation with

9         respect to this document.

10        A.     Only if our pharmacists

11   understand what the abuse of prescription

12   drugs are, the importance of it, the role

13   that they play in preventing it, and

14   certainly helping our patients get the

15   medication they need, the legitimate patients

16   and legitimate prescriptions for pain

17   management or any other condition.

18   BY MR. MOUGEY:

19        Q.     In 2013 when this document was

20   drafted, doesn't Giant Eagle believe it was

21   important to arm its pharmacist and their

22   staff with as much information as possible to

23   recognize red flags?

24              MR. BARNES:  Same objection.

1          Lack of foundation, including the

2          allegation concerning the date of

3          preparation.  I don't think there's

4          any foundation related to that.  It's

5          outside the 30(b)(6) topics.

6                    MR. MOUGEY:  Check your

7          metadata.

8     BY MR. MOUGEY:

9          Q.     Go ahead, Mr. Tsipakis.

10         A.     I was going to ask you that.  I

11    don't know when the date of this was as well.

12    I was going to say that.

13              Certainly the information

14    that's listed here is already in many of our

15    other documents, including our Controlled

16    Substance Dispensing Guidelines and the DEA

17    manual that our stores have, as well as

18    continuing education that the pharmacists

19    receive, and other things that they would be

20    exposed to.  And also topics covered at staff

21    meetings, quarterly meetings, LP meetings

22    that we have with our staff.  So many of this

23    information is included in those activities.

24         Q.     Doesn't Giant Eagle believe

Highly Confidential - Subject to Further Confidentiality Review

1    it's important to consolidate information

2    from various sources, including them in one

3    easy to review piece that's accessible

4    internally to help combat prescription drug

5    abuse issues within their community?  You

6    don't think that would be helpful?

7         A.     Certainly when you consolidate

8    and put things together in one place it's

9    helpful, but also would give you the false

10   security that this is the only document and

11   this is the only thing you should be looking

12   at.

13              So I believe it's helpful, it's

14   not exclusive.  And certainly, the

15   pharmacists with their knowledge, their

16   training, their continuing education, which

17   these topics are continually covered, and in

18   many cases in many states continuing

19   education required on these topics.

20        Q.     So Giant Eagle, instead of

21   developing a system in one place with the

22   concern that there would be a false security,

23   decided to parcel out information in a three

24   to four-page guideline, a couple pages of

Highly Confidential - Subject to Further Confidentiality Review

1    continuing education and some e-mails and

2    some meetings, and parcel it out to combat

3    against the false security of having it all

4    in one place?

5              MR. BARNES:  Object to form.

6    BY MR. MOUGEY:

7         Q.     That's your testimony to this

8    jury?

9              MR. BARNES:  Object to form.

10        Misstates his testimony.

11        A.     Again, as I just testified, I

12   don't know the purpose, or where this draft,

13   or what it was used for, or what it was put

14   together for.  All I can tell you is that it

15   was not used.  A draft was put together, time

16   was put into it certainly, but it was not

17   distributed or used with our pharmacists.

18   BY MR. MOUGEY:

19        Q.     Doesn't that make you wonder

20   why this wasn't used, Mr. Tsipakis, that this

21   was put together?  Was it a handy

22   consolidation of 40-plus pages of red flags

23   and due diligence information, and then it

24   wasn't published?

1      A.    Again, I can't speculate why it

2  was not used.  I can tell you by leafing

3  through this document that I hadn't seen up

4  until today, a lot of this information -- all

5  of this information is absolutely covered in

6  different places, and on our intranet, and in

7  the training and continuing education that

8  our pharmacists receive externally and

9  internally.

10     Q.    Do you know who Nancy Springer

11  is?

12     A.    I do not.

13     Q.    You agree that Giant Eagle was

14  obligated to have a system in place to

15  prevent against diversion, correct?

16     A.    Giant Eagle is obligated to

17  have safeguards to help prevent diversion,

18  yes.

19     Q.    And part of the system is

20  ensuring that its 30,000 plus employees that

21  are -- whichever portion are involved in

22  dispensing, are well educated, correct, sir?

23     A.    The pharmacists receive

24  professional training, are licensed by the

Highly Confidential - Subject to Further Confidentiality Review

1    Board of Pharmacy, and have continuing

2    education requirements, and use their

3    professional judgment, and are continually

4    getting educated from external sources,

5    internal meetings and calls, and things that

6    we provide.

7              But it's a continual process.

8    It's not a once and done.  They're constantly

9    getting different things from different

10   sources, all in the aspects of making sure

11   that they have everything that they need and

12   the tools available.  In addition to us

13   continually over the years providing

14   information, integration, to allow them to be

15   able to do their job effectively and

16   efficiently.

17        Q.    Sir, can you point me to any

18   document in preparation for today that comes

19   anywhere near Exhibit Number 2 with all of

20   the substantive information about red flags

21   and dispensing information -- I'm sorry, red

22   flags and due diligence related to controlled

23   substances, more specifically opiates?

24              MR. BARNES:  Objection.  Asked

1          and answered multiple times.

2          A.     There's not one document that

3     we have.  All this information that's listed

4     here is all available on a different portion,

5     including our pharmacy intranet where

6     pharmacists have all this information that

7     they can go look up and look at.

8                 For example, there's here is

9     how to do an order, there is here is how to

10    fill out a DEA 222 Form, all of that

11    information is available and organized on our

12    pharmacy intranet.

13    BY MR. MOUGEY:

14         Q.     All this information about red

15    flags and due diligence at specific points of

16    time in the fill process of an opiate

17    prescription, your testimony to this jury is

18    that that's available at other places at

19    Giant Eagle?

20         A.     That's not what I said.  What I

21    said is --

22         Q.     No, that's not what you said,

23    and that's exactly why I asked, sir.  I'm not

24    asking about form -- 222 Forms.

1        I'm asking you, sir, is

2   information about due diligence and red flags

3   filling opiate prescriptions in any place in

4   Giant Eagle's system all combined in one

5   document like it is here?

6        A.     The document that we have is in

7   our controlled substance dispensing

8   guidelines.

9        Q.     And that's three, four pages,

10   correct, sir?

11        A.     I'm not sure the exact number

12   of pages, but that sounds about right.

13        Q.     Less than five?  Are you

14   comfortable with that?

15        A.     Yes, sir.

16             MR. MOUGEY:  I don't have any

17        further questions, other than the

18        45 minutes that we've reserved.  Thank

19        you.

20             MR. BARNES:  Okay.  Pete, we'll

21        get back with you on the 45-minute

22        followup.

23             MR. MOUGEY:  Sounds good.

24        Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BARNES:  Okay.

2          THE VIDEOGRAPHER:  5:27 p.m.

3     We are off the video record for today.

4          (Whereupon, the deposition was

5     adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                     CERTIFICATE
2

3               I, MAUREEN O'CONNOR
        POLLARD, Registered Diplomate
        Reporter, Realtime Systems
4       Administrator, and Certified Shorthand
        Reporter, do hereby certify that prior
5       to the commencement of the
        examination, JAMES G. TSIPAKIS, was
6       remotely duly identified and sworn by
        me to testify to the truth, the whole
7       truth, and nothing but the truth.
8               I DO FURTHER CERTIFY that
        the foregoing is a verbatim transcript
9       of the testimony as taken
        stenographically by and before me at
10      the time, place, and on the date
        hereinbefore set forth, to the best of
11      my ability.
12              I DO FURTHER CERTIFY that
        I am neither a relative nor employee
13      nor attorney nor counsel of any of the
        parties to this action, and that I am
14      neither a relative nor employee of
        such attorney or counsel, and that I
15      am not financially interested in the
        action.
16

17
                _Maureen O Pollard_____
18
        MAUREEN O'CONNOR POLLARD
19      NCRA Registered Diplomate Reporter
        Realtime Systems Administrator
20      Certified Shorthand Reporter
        Notary Public
21
        Dated:  March 22, 2021
22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  It will be

10    attached to your deposition.

11              It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt

14    of the deposition transcript by you.  If you

15    fail to do so, the deposition transcript may

16    be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

```
1                    - - - - - -

                    E R R A T A

2                    - - - - - -

3     PAGE   LINE   CHANGE

4     _____  _____  _____

5          REASON:  _____

6     _____  _____  _____

7          REASON:  _____

8     _____  _____  _____

9          REASON:  _____

10    _____  _____  _____

11         REASON:  _____

12    _____  _____  _____

13         REASON:  _____

14    _____  _____  _____

15         REASON:  _____

16    _____  _____  _____

17         REASON:  _____

18    _____  _____  _____

19         REASON:  _____

20    _____  _____  _____

21         REASON:  _____

22    _____  _____  _____

23

24
```

1
2                ACKNOWLEDGMENT OF DEPONENT
3
4        I, _____, do
   Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9

   _____
10 JAMES G. TSIPAKIS                    DATE
11
12
13
14
15
16

   Subscribed and sworn
17 To before me this
   _____ day of _____, 20____.
18
   My commission expires: _____
19
20 _____
   Notary Public
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```