```
  1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
  2                    EASTERN DIVISION
  3                       - - -
  4   IN RE:  NATIONAL PRESCRIPTION :
      OPIATE LITIGATION              :  MDL No. 2804
  5   _____:  Case No.
                                     :  1:17-md-2804
  6   THIS DOCUMENT RELATES TO:      :
                                     :
  7   THIS DOCUMENT RELATES TO:      :  Hon. Dan A. Polster
      TRACK THREE CASES              :
  8                                  :
                                     :
  9   _____:
 10
                Wednesday May 5, 2021
 11
                  HIGHLY CONFIDENTIAL
 12      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 13
             Remote videotaped deposition of
 14
      JAMES TSIPAKIS, conducted at the location of the
 15
      witness in Naperville, Illinois, commencing at
 16
      10:09 a.m., on the above date, before Carol A. Kirk,
 17
      Registered Merit Reporter, Certified Shorthand
 18
      Reporter, and Notary Public.
 19
 20
 21
 22            GOLKOW LITIGATION SERVICES
 23       877.370.3377 ph | 917.591.5672 fax
 24              deps@golkow.com
```

```
 1          R E M O T E   A P P E A R A N C E S
 2                        - - -
 3   On behalf of the Plaintiffs:
 4          LEVIN PAPANTONIO THOMAS MITCHELL
            RAFFERTY & PROCTOR P.A.
 5          BY:  JEFF GADDY, ESQUIRE
                  jgaddy@levinlaw.com
 6          316 South Baylen Street, Suite 600
            Pensacola, Florida  32591
 7          205-435-7000
 8
     On behalf of HBC Service Company:
 9
            MARCUS & SHAPIRA LLP
10          BY:  ROBERT M. BARNES, ESQUIRE
                  rbarnes@marcus-shapira.com
11                JOSHUA A. KOBRIN, ESQUIRE
                  kobrin@marcus-shapira.com
12          One Oxford Center, 35th Floor
            301 Grant Street
13          Pittsburgh, Pennsylvania  15219-6401
            412-471-3490
14
15   On behalf of the Defendant, Walmart:
16          JONES DAY
            BY:  NIA MACK, ESQUIRE
17                nmack@jonesday.com
            77 West Wacker Drive
18          Chicago, Illinois  60601
            312-269-4289
19
20   ALSO PRESENT:
21          Joe Wills, Document Tech
            Jacklyn Duran, Videographer
22
23
24                        - - -
```

```
 1                  INDEX TO EXAMINATION

 2   WITNESS                                          PAGE

 3   JAMES TSIPAKIS

 4        CROSS-EXAMINATION (CONT'D.) BY MR. GADDY      11

          REDIRECT EXAMINATION BY MR. BARNES            57

 5        RECROSS-EXAMINATION BY MR. GADDY             206

          FURTHER REDIRECT EXAMINATION BY MR. BARNES   265

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                     INDEX TO EXHIBITS
 2   TSIPAKIS          DESCRIPTION                    PAGE
 3   Exhibit 3         E-mail string ending with       12
                       an e-mail to Mr. Bianco from
 4                     Mr. Carlson, dated 11/11/2013,
                       Bates-stamped HBC_MDL00136771
 5                     through 136772
 6   Exhibit 4         E-mail string ending with       19
                       an e-mail to Mr. Millward from
 7                     Mr. Mullen, dated 12/17/2015,
                       Bates-stamped HBC_MDL00080562
 8
     Exhibit 5         E-mail string ending with an    32
 9                     e-mail to Mr. Chunderlik from
                       Mr. Millward, dated 11/15/2016,
10                     Bates-stamped HBC_MDL00057875
                       through 57877
11
     Exhibit 6         E-mail string ending with an    45
12                     e-mail to Messrs. Mullen and
                       Evans from Mr. Millward, dated
13                     1/15/2016, Bates-stamped
                       HBC_MDL00057872 through 57874
14
     Exhibit 7         PowerPoint titled "Controlled  112
15                     Records Box," Bates-stamped
                       GE_TL00012826
16
     Exhibit 8         PowerPoint titled "Controlled  116
17                     Drug Records Box Instructions,"
                       Bates-stamped GE_TL00011473
18
     Exhibit 9         Pharmacist's Manual,           117
19                     Bates-stamped HBC_MDL00126694
                       through 126779
20
     Exhibit 10        E-mail string ending with an   117
21                     e-mail to STR_Pharmacy_PDLS
                       from Mr. Millward, dated
22                     12/9/2011, Bates-stamped
                       HBC_MDL00181739 through 181744
23
24
```

```
1                  INDEX TO EXHIBITS (CONT'D)
2    TSIPAKIS           DESCRIPTION                      PAGE
3    Exhibit 11         E-mail string ending with an     132
                        e-mail to 2408, Pharmacy Team
4                       Leader (0616) from Mr. Shaheen,
                        dated 11/28/2014, Bates-stamped
5                       HBC_MDL00171028
6    Exhibit 12         E-mail string ending with an     135
                        e-mail to Mr. Millward and
7                       others from Mr. Lucot, dated
                        1/22/2015, Bates-stamped
8                       HBC_MDL00133377 and 133378
9    Exhibit 13         E-mail string ending with and    136
                        e-mail to Mr. Millward from
10                      Mr. Miller, dated 9/28/2015,
                        Bates-stamped GE_TL00008103
11
     Exhibit 14         E-mail string ending with        138
12                      an e-mail to Mr. Miller from
                        Mr. Millward, dated 10/6/2015,
13                      Bates-stamped GE_TL00008108
14   Exhibit 15         E-mail string ending with        138
                        an e-mail to Mr. Miller from
15                      Mr. Millward, dated 11/16/2015,
                        Bates-stamped GE_TL00002209
16
     Exhibit 16         E-mail to Mr. Millward from      139
17                      Mr. Mullen, dated 11/24/2015,
                        Bates-stamped GE_TL00004427
18                      through 4429
19   Exhibit 17         E-mail string ending with        140
                        an e-mail to Mr. Evans from
20                      Mr. Millward, dated 1/15/2016,
                        Bates-stamped HBC_MDL00091954
21                      through 1957
22   Exhibit 18         HBC Service Company Suspicious    142
                        Order Notification, 1/21/16,
23                      Bates-stamped HBC_MDL00074072
                        through 74073
24
```

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    TSIPAKIS        DESCRIPTION                    PAGE
 3    Exhibit 19      E-mail string ending with an   143
                      e-mail to Messrs. Amadio and
 4                    Miller from Mr. Millward, dated
                      3/1/2016, Bates-stamped
 5                    GE_TL00001068 through 1070
 6    Exhibit 20      E-mail to Mr. Chunderlik from  144
                      Mr. Mullen, dated 3/24/2016,
 7                    Bates-stamped HBC_MDL00125405
                      through 125407
 8
      Exhibit 21      E-mail string ending with an   147
 9                    e-mail to 6381, Pharmacy Team
                      Leader from Mr. Chunderlik,
10                    dated 4/12/2016, Bates-stamped
                      GE_TL00001263 and 1264
11
      Exhibit 22      E-mail to Mr. Chunderlik from  148
12                    Mr. Muller, dated 5/4/2016,
                      Bates-stamped HBC_MDL00008155
13
      Exhibit 23      E-mail string ending with an   151
14                    e-mail to Mr. Chunderlik from
                      Mr. Mullen, dated 5/5/2016,
15                    Bates-stamped HBC_MDL00059786
16    Exhibit 24      E-mail string ending with an   152
                      e-mail to Mr. Chunderlik from
17                    Mr. Mullen, dated 5/5/2016,
                      Bates-stamped HBC_MDL00061271
18
      Exhibit 25      E-mail string ending with an   153
19                    e-mail to Mr. Chunderlik from
                      Mr. Mullen, dated 5/26/2016,
20                    Bates-stamped HBC_MDL000047357
                      through 47359
21
      Exhibit 26      E-mail string ending with       154
22                    an e-mail to Ms. Hurley from
                      Ms. Krasnow, dated 6/15/2016,
23                    Bates-stamped HBC_MDL00060918
                      and 60919
24
```

```
 1                    INDEX TO EXHIBITS
 2   TSIPAKIS          DESCRIPTION                    PAGE
 3   Exhibit 27        E-mail to Mr. Chunderlik from  156
                       Mr. Mullen, dated 6/17/2016,
 4                     Bates-stamped HBC_MDL00008340
                       through 8343
 5
     Exhibit 28        E-mail string ending with an   157
 6                     e-mail to Mr. Chunderlik from
                       Mr. Mullen, dated 6/30/2016,
 7                     Bates-stamped HBC_MDL00008207
                       and 8208
 8
     Exhibit 29        E-mail string ending with an   158
 9                     e-mail to Mr. Chunderlik from
                       Mr. Mullen, dated 7/7/2016,
10                     Bates-stamped HBC_MDL00029892
11   Exhibit 30        E-mail string ending with an   159
                       e-mail to Mr. Chunderlik from
12                     Mr. Mullen, dated 7/22/2016,
                       Bates-stamped HBC_MDL00115934
13                     and 115935
14   Exhibit 31        E-mail from Mr. Shaheen, dated  160
                       8/24/2016, Bates-stamped
15                     HBC_MDL00060356 and 60357
16   Exhibit 32        E-mail to Messrs. Bertucci and  161
                       Raub from Mr. Chunderlik, dated
17                     8/26/2016, Bates-stamped
                       HBC_MDL00059779 through 59781
18
     Exhibit 33        E-mail to Messrs. Gaus and      163
19                     Shaheen from Mr. Mullen, dated
                       10/25/2016, Bates-stamped
20                     HBC_MDL00070224 through 70228
21   Exhibit 34        E-mail string ending with an    164
                       e-mail to Mr. Chunderlik from
22                     Mr. Mullen, dated 10/28/2016,
                       Bates-stamped HBC_MDL00059626
23                     through 59628
24
```

| 1 | | INDEX TO EXHIBITS | |
| 2 | TSIPAKIS | DESCRIPTION | PAGE |
| 3 | Exhibit 35 | E-mail string ending with an e-mail to Mr. Roahrig from | 165 |
| 4 | | Mr. Chunderlik, dated 4/25/2017, Bates-stamped | |
| 5 | | GL-TL00002060 and 2061 | |
| 6 | Exhibit 36 | E-mail from Mr. Shaheen, dated 4/26/2017, Bates-stamped | 167 |
| 7 | | GE_TL00002064 and 2065 | |
| 8 | Exhibit 37 | E-mail string ending with an e-mail to Mr. Garofalo from | 168 |
| 9 | | 1225, Pharmacy Team Leader, Bates-stamped GE_TL00001883 | |
| 10 | | and 1884 | |
| 11 | Exhibit 38 | E-mail to 4056, Pharmacy Team Leader from Mr. Roahrig, dated | 173 |
| 12 | | 10/15/2017, Bates-stamped GE_TL00007589 | |
| 13 | | | |
| | Exhibit 39 | Documents Bates-stamped | 175 |
| 14 | | GE_TL00008352 through 8357 | |
| 15 | Exhibit 40 | E-mail string ending with an e-mail to 4002, Pharmacy Team | 178 |
| 16 | | Leader from Mr. Shaheen, dated 1/14/2018, Bates-stamped | |
| 17 | | GE_TL00008093 and 8094 | |
| 18 | Exhibit 41 | E-mail from Mr. Shaheen, dated 1/15/2018, Bates-stamped | 179 |
| 19 | | GE_TL00008090 through 8092 | |
| 20 | Exhibit 42 | E-mail to Mr.Tsipakis and others from Mr. Shaheen, dated | 179 |
| 21 | | 2/14/2018, Bates-stamped HBC_MDL00126617 | |
| 22 | | | |
| | Exhibit 43 | E-mail to Mr. Leighlitner from | 181 |
| 23 | | Mr. Shaheen, dated 6/6/2018, Bates-stamped GE_TL_00006072 | |
| 24 | | and 6073 | |

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)

 2    TSIPAKIS        DESCRIPTION                    PAGE

 3    Exhibit 44      E-mail to Mr. Chappell from    183
                      Ms. Chappell, dated 8/17/2018,
 4                    Bates-stamped GE_TL00002048

 5    Exhibit 45      E-mail string ending with an   185
                      e-mail to Shaheen and Patel
 6                    from 6531, Pharmacy Team
                      Leader, dated 10/16/2018,
 7                    Bates-stamped GE_TL00002739

 8    Exhibit 46      E-mail to Mr. Fleming from     188
                      Mr. Shaheen, dated 7/3/2019,
 9                    Bates-stamped GE_TL00006070

10    Exhibit 47      E-mail string ending with an   191
                      e-mail to 4387, Pharmacy Team
11                    Leader from Mr. Shaheen, dated
                      11/12/2019, Bates-stamped
12                    HBC_MDL00195807 and 195808

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                      -  -  -

 2              P R O C E E D I N G S

 3                      -  -  -

 4              THE VIDEOGRAPHER:  We are now on

 5       the record.

 6              My name is Jaclyn Duran.  I am a

 7       videographer on behalf of Golkow

 8       Litigation Services.

 9              Today's date is May 5, 2021 and

10       the time is 10:09 a.m.  This videotaped

11       deposition is being held via remote Zoom

12       in the matter of National Prescription

13       Opiate Litigation.  The deponent today

14       is James Tsipakis.

15              All parties to the deposition are

16       appearing remotely and have agreed to

17       the witness being sworn in remotely.

18       All parties are noted on the

19       stenographic record.

20              The witness has been previously

21       sworn in.

22              Counsel, you may proceed.

23                      -  -  -

24              JAMES TSIPAKIS
```

1   being by me previously duly sworn, as hereinafter

2   certified, deposes and says as follows:

3           CROSS-EXAMINATION (CONT'D.)

4   BY MR. GADDY:

5           Q.   Good morning, Mr. Tsipakis.  How

6   are you doing?

7           A.   Good morning.  How are you?

8           Q.   I'm doing good.  Thanks.

9                As I told you a minute ago, Peter

10  is in trial in West Virginia.  So I'm going to

11  finish up the last 45 minutes or so of your

12  deposition this morning, okay?

13          A.   Sure.

14          Q.   I did have the opportunity to read

15  the first part of your deposition from March.  I

16  don't intend to repeat any of that material, but

17  I might refer to some of the things you said

18  just to reorient us, okay?

19          A.   Okay.

20          Q.   Where I want to start is, one of

21  the things that you told us in March was that

22  threshold reports were one tool that Giant Eagle

23  uses to monitor dispensing of controlled

24  substances.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Do you recall that generally?

 2          A.    Yes.

 3          Q.    And you told us that your memory

 4   was that the threshold reports began to be

 5   utilized by Giant Eagle in 2013, but you

 6   couldn't remember precisely when within 2013; is

 7   that fair?

 8          A.    Yes.

 9                       - - -

10      (Tsipakis Deposition Exhibit 3 marked.)

11                       - - -

12   BY MR. GADDY:

13          Q.    Okay.  I want to see if we can

14   drill down into that just a little bit.

15                Let me show you what we'll mark as

16   Tsipakis 3, which is P-HBC-1174, and it's going

17   to be tab 8 in your binder.

18          A.    So this binder, the black binder,

19   you sent, tab 8?

20          Q.    Yes, sir.

21          A.    Okay.

22                MR. KOBRIN:  I just -- while we're

23          on the record, I don't think we received

24          this prior to the first portion of this
```

```
 1              deposition.  There are some of the ones

 2              in your list, Jeff, that we did receive.

 3              I'm not saying they're all missing.  But

 4              the first two, 1174, and the second one

 5              you identified, 1115, I don't have in my

 6              boxes.

 7                   And I don't think we also,

 8              therefore, received it even timely if

 9              the deadline would have been for this

10              portion of the deposition, which I don't

11              think it was.

12                   I think it would have needed to be

13              provided to us 48 hours before the first

14              half of this depo, but we didn't even

15              receive it 48 hours before this second

16              half of the depo.  But it's I think

17              disputable pursuant to the protocol.

18   BY MR. GADDY:

19         Q.    Are you with me, Mr. Tsipakis?

20         A.    Yes, sir.

21         Q.    Okay.  You see the top of this

22   page -- this is a one-page.  It looks like it's

23   a meeting invite.

24                   You see at the very top of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   page it's an invite from Greg Carlson?

 2         A.    Yes.

 3         Q.    And it looks like this is dated

 4   November 11, 2013.

 5               Do you see that?

 6         A.    Yes.

 7         Q.    And if we go down and look at the

 8   original message and we see the folks who were

 9   invited to this meeting, it looks like it was

10   George Chunderlik, Nathan Hughes,

11   Joseph Millward, Anthony Mollica, Shawn Voyten,

12   and Greg Carlson.

13               Do you see that?

14         A.    Yes.

15         Q.    A couple of times in your

16   deposition, you've referred to the compliance

17   department or the compliance team.

18               Would these folks listed here in

19   that invite be members of that compliance team

20   or compliance department?

21         A.    Some of them, yes.

22         Q.    Okay.  Are there additional folks

23   who you would say are members of the compliance

24   department or compliance team that we don't see
```

1   on here?

2          A.    I believe these are the main --

3   the main folks.

4          Q.    Okay.  I know at some point in

5   time, Jason Mullen joined the company?

6          A.    Yes.

7          Q.    Does that sound familiar?

8          A.    Yes.

9          Q.    Okay.  I don't -- you can tell me

10  if I'm wrong.  I don't think he was with the

11  company in 2013.  But at some point, he joined

12  the company and became a part of the compliance

13  team; is that accurate?

14         A.    Yes, I believe that is accurate.

15         Q.    Okay.  But since he wasn't with

16  the company yet, these would be the main folks

17  on the compliance team back in 2013, right?

18         A.    To the best of my understanding,

19  yes.

20         Q.    Okay.  And it looks like there

21  were two meeting topics listed here.  The first

22  was the "Discussion of the process that has been

23  developed for identifying pharmacies ordering

24  excessive controlled substances."

```
 1              Do you see that?

 2        A.    Yes.

 3        Q.    And do you recognize what he's

 4   talking about there or what they're intending to

 5   discuss here in November of 2013 regarding the

 6   "ordering of excessive controlled substances"

 7   would be the threshold report that you talked to

 8   us about earlier?

 9              MR. KOBRIN:  Hey, Jeff.  I'm going

10         to interpose an objection.  This

11         distribution was covered in the

12         December 13, 2018 deposition.  And

13         pursuant to the Court's orders, these

14         depositions in Track 3 were not to be

15         duplicative, and this is duplicative of

16         the distribution deposition in December

17         of '18.

18              So we would ask you to move on

19         beyond distribution and interpose this

20         objection to this line of questioning.

21   BY MR. GADDY:

22        Q.    Go ahead, Mr. Tsipakis.

23        A.    Obviously, I wasn't there.  I can

24   only tell you what I'm reading, and certainly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    what you have up on the screen is what it says.
 2    So I'm not sure what they were going to talk
 3    about or not, but I can only identify what's
 4    written.
 5          Q.    And my question is whether or not
 6    it looks like they're discussing this threshold
 7    report that you told us is used by Giant Eagle
 8    to monitor controlled substance dispensing.
 9                Do you agree that that's what
10    they're discussing?
11          A.    Yeah, I follow your question, but
12    I don't see anything listed here about a
13    threshold report or any -- there's no topic that
14    says "threshold report."
15                It just says "pharmacies ordering
16    excessive controlled substances" is what it
17    says, so ...
18          Q.    Okay.  Are you aware of any other
19    processes that Giant Eagle utilized in this time
20    period for identifying pharmacies ordering
21    excessive controlled substances other than the
22    threshold report?
23          A.    As I mentioned before, we did have
24    a system called Supplylogix that we used as
```

```
 1   well, so ...

 2          Q.    Do you think they're talking about

 3   a Supplylogix program here, or ...

 4          A.    I couldn't tell you.  I don't

 5   know.

 6          Q.    Okay.  The next item says the

 7   "Discussion of the monitoring and steps to be

 8   taken when a pharmacy appears on the above

 9   list."

10          Do you see that?

11          A.    Yes.

12          Q.    Okay.  Now, do you have any

13   understanding of the threshold report that Giant

14   Eagle used to monitor controlled substances --

15   controlled substance dispensing being utilized

16   before November of 2013?

17          A.    I don't know the exact dates of

18   when it was -- it was an automated report and an

19   automated process that was put in place.  I

20   don't know the exact start of it, but I don't

21   have the exact time -- the exact date that that

22   started.

23          Q.    Okay.  But we see here they're

24   meeting about it in November of 2013 to talk
```

```
 1   about the process that's been developed and the

 2   steps to take when a pharmacy appears on a list.

 3             Do you have any reason to believe

 4   that they'd be talking about anything other than

 5   threshold report here in this November 2013

 6   meeting?

 7        A.    I don't have -- I don't have any

 8   basis to say it is or it is not the threshold

 9   report.

10        Q.    Okay.  But your understanding of

11   the threshold report that Giant Eagle uses to

12   monitor controlled substance dispensing is that

13   it generates a list of pharmacies like is being

14   referred to in item number 2 there, correct?

15        A.    The threshold report does list

16   pharmacies of -- pharmacies to look at or orders

17   to look at, yes.

18                       - - -

19     (Tsipakis Deposition Exhibit 4 marked.)

20                       - - -

21   BY MR. GADDY:

22        Q.    Okay.  I want to look at a couple

23   of examples of how Giant Eagle would react to

24   pharmacies appearing on the threshold report as
```

```
 1    it relates to their controlled substance

 2    dispensing.

 3                 We're going to go to what we'll

 4    mark as Tsipakis Number 4, which is P-HBC-1115,

 5    which is in your tab number 6, Mr. Tsipakis.

 6                 MR. KOBRIN:  Again, I just want to

 7            insert an objection.  I don't think we

 8            received this prior to the deposition

 9            pursuant to the protocols in the remote

10            deposition, a protocol that was entered

11            by the Court and to which the parties

12            agreed.  So I think it's excludable

13            pursuant to that protocol.

14            Q.    Let me know when you have it,

15    please, Mr. Tsipakis.

16            A.    I'm sorry, Mr. Gaddy?

17            Q.    I said let me know when you have

18    it.

19            A.    Oh, yes.  Yes, sir, I have it.

20            Q.    Okay.  This looks like a one-page

21    e-mail chain.  And what we'll do is we'll start

22    at the bottom of the page so we can read this

23    chronologically, okay?

24            A.    Okay.
```

```
 1          Q.    You see it starts down there with

 2   an e-mail from Robert McClune on December 17th

 3   of 2015.

 4                Do you see that?

 5          A.    Yes.

 6          Q.    And I think you told us before

 7   that Bob McClune was in analytics?

 8          A.    Procurement analytics, correct,

 9   uh-huh.

10          Q.    Okay.  And the subject of this

11   e-mail is the "Daily HBC Suspicious Purchasing

12   Report."  And then it has the date that it looks

13   like that report was run.

14                Do you see that?

15          A.    Yes.

16          Q.    Okay.  And this e-mail came out,

17   it looks like, at 7:30 the following morning

18   after the report was run.

19                Do you see that, 7:32 a.m.?

20          A.    Yes.

21          Q.    And it says in the body, "We have

22   had three pharmacies exceed the purchasing

23   thresholds for certain controlled products so

24   far this month."
```

```
 1              And the folks that received this

 2   e-mail looks like a lot of the same people we

 3   saw on the last meeting invite; Mr. Hughes,

 4   Mr. Carlson, Mr. Millward, and Mr. Chunderlik.

 5              Do you see that?

 6      A.    Yes.

 7      Q.    And you recognize all those folks

 8   from the last meeting where they were talking

 9   about these types of reports that would list

10   pharmacies that had ordered excessive amounts of

11   controlled substances?

12      A.    Yes.

13      Q.    Now, a minute ago when we were

14   looking at the last document, you said that the

15   threshold report was an automated report.

16              Is it your understanding that that

17   report would be run every day?

18      A.    Yes, I believe every day.  So on

19   the weekends when they printed it, if it printed

20   Saturday or Sunday, I'm not sure, but it was

21   automated.

22      Q.    Okay.  Was it something that the

23   computer ran on its own, or was it something

24   that an analyst like Bob McClune would have to
```

```
1    go in and run?
2            A.    There would be instances of both,
3    but there was a standing daily report that would
4    run on its own.  It was programmed to run.
5            Q.    Okay.  Okay.  Great.
6                  So let me ask -- let me ask you
7    this question:  Outside of the threshold report,
8    were there any other standing daily reports that
9    were run within Giant Eagle for the purpose of
10   monitoring controlled substance dispensing?
11           A.    I'm sorry.  Your question is
12   automated reports or --
13           Q.    Correct.
14           A.    So automated reports would be --
15   would be this one that's listed, unless there
16   was some reason either from loss prevention or a
17   store if they wanted us to run something
18   different, that would be programmed as well, but
19   from what is listed here, it's the main -- the
20   main report that was run every day.
21                 I mean, there's other automated
22   reports too, but those could be -- those
23   weren't -- this is the regular report that ran.
24           Q.    I think we're saying the same
```

1    thing, but I just want to make sure.  And I

2    understand that there's ad hoc reports and

3    there's other places that you can pull different

4    types of information.

5              But my question is, are there any

6    other automated reports, meaning they run every

7    day regardless of whether somebody asked you to

8    or not, outside of the daily threshold report?

9         A.    So this is the main report, yes.

10   But then there would be additions to the report,

11   so if there's different drugs they wanted to be

12   added to it or classes, et cetera.  So it's the

13   main vehicle, but it doesn't mean it just stayed

14   static.

15             They could add things to it or

16   subtract things to it as well.  So if there was

17   another drug they wanted to add, right, to show

18   up on the report or a different class or

19   parameters, certainly that was adjusted over

20   time.

21        Q.    But it was all in the context of

22   the daily threshold report, right?

23        A.    Right.

24        Q.    Okay.  Were there any other

Highly Confidential - Subject to Further Confidentiality Review

```
 1   automated reports that ran on different

 2   frequencies, maybe weekly, monthly, quarterly,

 3   outside of the threshold report?

 4         A.    The compliance department and

 5   analysts certainly had the autonomy to run the

 6   reporting on things they wanted to look at.  And

 7   I've seen examples of if they wanted to run

 8   reports on cash prescriptions or if they wanted

 9   to run reports on, you know, maybe a

10   non-controlled drug that they wanted to look at

11   or a controlled drug, et cetera.

12               So that's where tools like

13   Supplylogix and also just other analytical

14   queries would run, and those could run for a

15   period of time as well, or something that was

16   someone's job to look at that every week or

17   every month or every quarter, so ...

18         Q.    Okay.  And, again, I understand

19   the ad hoc reports and the reports that you can

20   pull upon request or if you wanted to look into

21   any particular thing.  And we'll look in a

22   minute at some of the different items that folks

23   like Jason Mullen would look into, but my

24   question is a little bit different.
```

```
 1                 Anything that was automated, a no

 2    questions asked, it's going to show up in your

 3    inbox no matter what every week, every month,

 4    every quarter, anything like that outside of

 5    this daily threshold report?

 6          A.    So let me try to -- so the answer

 7    is this one is the main one that ran its own,

 8    but as I mentioned, the analyst or someone that

 9    wanted to run a regular report could schedule

10    something for their -- you know, in their inbox

11    to run every quarter or every month, or those

12    kind of things.

13                 I believe we're saying the same

14    thing, but this is not -- this is the main

15    report, but people could add to it --

16          Q.    Okay.

17          A.    -- for themselves, for their own

18    use, right, for their job description or the

19    things that they needed, the things that they

20    were looking at.

21                 Like, for example, as you

22    mentioned, the Jason Mullen, there was reports

23    he ran and things that he had created on a

24    cadence.
```

```
 1           Q.    Okay.  So I understand that maybe
 2    an individual could design something to be sent
 3    to them if they wanted to for their particular
 4    duties, but anything at the corporate level that
 5    was designed to run -- be an automated report
 6    other than the threshold report?
 7           A.    This would be the one.  Yes.
 8           Q.    Okay.  So back to the e-mail, it
 9    says, "Three pharmacies exceeded the purchasing
10    threshold for certain controlled products so far
11    this month."
12                 When we're talking about exceeding
13    the threshold, is the analysis -- the threshold
14    that is triggered here, is it the same threshold
15    when Giant Eagle is evaluating controlled
16    substance dispensing as it is when they're
17    evaluating controlled substance distribution as
18    you testified about in 2018?
19           A.    I'm sorry.
20           Q.    Does that make sense?
21           A.    I'm sorry.  Could you repeat that
22    just to make sure I understand exactly the
23    question, please.
24           Q.    Sure.  What I'm trying to do is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   make sure that we're talking about the same
 2   threshold.
 3               So in 2018, you told us that the
 4   trigger would be when a pharmacy orders more
 5   than three times the average over the previous
 6   12 months, that that would cause a pharmacy to
 7   trigger and appear on the threshold report for
 8   evaluation of distribution related issues.
 9               What I'm asking you here is, is
10   that same three times the average formula the
11   same when Giant Eagle is looking at pharmacies
12   on this report for controlled substance
13   dispensing issues?
14               MR. BARNES:  Objection to the
15          extent it misstates his December 2018
16          testimony.
17               Further object as repetitive of
18          his December 2018 testimony, and,
19          therefore, move to strike it.
20          A.   So the threshold that's used, if
21   you're asking if there's a separate threshold,
22   it's the one that's cast over the dispensing,
23   but it's -- as we've mentioned before in my
24   previous testimony, orders from the warehouse to
```

Case: 1:17-md-02804-DAP Doc #: 4217-31 Filed: 12/29/21 29 of 283. PageID #: 567239

```
 1    the stores are pursuant on prescriptions for

 2    those items.

 3              So from a logical flow

 4    perspective, the thresholds would carry through.

 5    So I'm not sure if that answers your question,

 6    but ...

 7         Q.   Maybe.  And I'm cognizant of Bob's

 8    issues, and I promise I'm trying not to

 9    re-litigate the same stuff that I asked you

10    about two or three years ago, but I'm just

11    trying to make sure that we have a clean record

12    that the three times threshold -- and again,

13    that's general.  We can look back at the old

14    deposition to get the details.

15              But the three times threshold that

16    we talked about in 2018 relating to distribution

17    is the same three times threshold that Giant

18    Eagle is looking at as it relates to dispensing

19    issues; is that correct?

20              MR. BARNES:  Objection to the

21         extent you're misstating his December

22         '18 testimony, and, further, that it's

23         repetitive and duplicative, which you're

24         not supposed to do in these Track 3
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              depositions.

 2         A.    The exact number of the threshold

 3   and what the algorithm is set at, I don't

 4   remember.  I don't recall the exact number.  But

 5   certainly the threshold is set at the corporate

 6   level -- at the chain level, and that's what

 7   this report flags as far as anything that would

 8   bump against that threshold, which doesn't

 9   necessarily say there's an issue, but it

10   definitely tells us things to look at and to

11   clear before those orders -- or before those

12   orders go to the stores, and certainly if

13   there's things that we want to look at from a

14   corporate perspective and from a resource

15   perspective.

16         Q.    The threshold that you told us

17   about in your distribution deposition is the

18   same threshold that we're talking about here for

19   dispensing; is that right?

20         A.    I'm not -- again, I don't know

21   what the exact number I mentioned or didn't

22   mention, but it would be one and the same as far

23   as the threshold.

24         Q.    Okay.  If we go back -- if we look
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    up at the next e-mail in the chain, it looks

 2    like Mr. Millward responds -- he writes to

 3    Darren Evans.  He says, "What's going on with

 4    Store 71 and buprenorphine?"

 5              Are you familiar with that

 6    product?

 7         A.   Yes.

 8         Q.   And that's an opioid, but it's

 9    actually an opioid that's often prescribed in

10    the treatment context, correct?

11         A.   Treatment -- I'm sorry?  Treatment

12    context?  Can you --

13         Q.   In the treatment context.

14         A.   All drugs are for treatment.

15    Treatment of -- are you saying for detox or

16    what -- I just want to make sure I'm clear on --

17         Q.   Yeah.  Thanks.  Good

18    clarification.

19              It's a drug that's prescribed to

20    treat individuals who are addicted to opioids.

21         A.   Yes.

22         Q.   Okay.  It says, "They are way

23    above the average for the company."

24              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And that goes to what you just

 3   said a moment ago that the threshold was built

 4   on a chain-wide average, not a store-specific

 5   average, correct?

 6          A.    Correct.

 7                      - - -

 8      (Tsipakis Deposition Exhibit 5 marked.)

 9                      - - -

10   BY MR. GADDY:

11          Q.    Okay.  Let's turn and look,

12   Mr. Tsipakis, now to what we'll mark as Exhibit

13   Number 5, P-HBC-1018, which is going to be your

14   tab number 5.

15          A.    Okay.

16          Q.    When you get there, if you would,

17   turn to the back page so we can read this

18   chronologically.

19          A.    Okay.

20          Q.    You see here it looks like we have

21   another one of these automated type e-mails

22   again from Bob McClune.  Again, it goes to this

23   group of folks from the compliance department.

24   It's on January 15th, and it says, "We have one
```

```
 1   pharmacy exceeding the purchase threshold for

 2   certain controlled substance products so far

 3   this month."

 4             Do you see that?

 5        A.    Yes.

 6        Q.    And the -- in order -- the

 7   threshold that Giant Eagle is looking at is

 8   pharmacies that exceed for controlled substance

 9   dispensing purposes, it sets over at the

10   beginning of every month, correct?

11        A.    The exact mechanics, as I

12   testified before, would be how the mechanics

13   work.  But, yes, I think it resets for the

14   following month.  The exact date and how that

15   does it, I'm not -- I'm not familiar with it at

16   this moment, but it does reset.

17        Q.    Okay.  But on the 15th is when

18   this report goes out.

19             Let's turn the page and look at

20   the response from Mr. Millward.

21             And he says, "Store 54 and, to a

22   lesser extent, 2402 are increasing in

23   buprenorphine products on a daily basis.  Jason

24   was able to pull some data together that is
```

```
 1   potentially concerning."
 2               Do you see that?
 3        A.    Yes.
 4        Q.    Again, we're seeing this is
 5   related to buprenorphine products, which we know
 6   is an opioid, but is one that is often
 7   prescribed to folks being treated for OUD, or
 8   opioid use disorder, correct?
 9        A.    One of these is, yes.
10        Q.    It goes on to say, "The store did
11   not exceed the purchase threshold last month.
12   This is a new trend at the Somerset stores.  I
13   need you to intercede with the store to find out
14   what they perceive to be the trend."
15               Do you see that?
16        A.    Yes.
17        Q.    In the next paragraph, he says,
18   "Some research shows that the Rx" -- the
19   scripts -- "are coming from prescribers who are
20   being investigated based on news articles."
21               Do you see that?
22        A.    Yes.
23        Q.    How does -- if at all, how does
24   Giant Eagle communicate to its pharmacists that
```

```
 1   they may be filling prescriptions for doctors

 2   who are being investigated?

 3         A.    Well, certainly, as I've testified

 4   before, we have a very robust loss prevention

 5   department.  And certainly our head of our loss

 6   prevention is very well established with local

 7   law enforcement, DEA, FBI as well.

 8               So, certainly, we have a really

 9   good program where there's information that is

10   shared amongst the agencies on ongoing

11   investigations.  There are certainly things for

12   us to look at and things we help them with.

13               So from reading -- all I can tell

14   is from what I'm reading here is what

15   Joseph Millward has said something about news

16   articles.  But as far as what investigations or

17   what he's using to base that, I couldn't tell

18   you, but I'm just reading what it says.

19         Q.    Okay.  Well, the compliance

20   department, it looks like, has looked into this

21   and determined that this pharmacy, this Giant

22   Eagle pharmacy, is filling prescriptions for

23   opioids for prescribers who are being

24   investigated.
```

```
 1              That's what they've determined

 2   here so far, right?

 3        A.    That's what it says, yes.

 4        Q.    Okay.  You agree that that's a red

 5   flag, that pharmacists should be on the lookout

 6   for a prescriber who's being investigated?

 7        A.    Certainly it's a data point to

 8   consider, sure.

 9        Q.    It goes on to say -- it says, "The

10   Rxs are coming from prescribers who are being

11   investigated, based on news article, and plastic

12   surgeons."

13              Do you see that?

14        A.    Yes.

15        Q.    Okay.  While a plastic surgeon may

16   prescribe an opioid after a medical procedure,

17   do you agree that it would be a red flag for a

18   plastic surgeon to be prescribing opioid use

19   disorder treatment drugs?

20              MR. BARNES:  Objection; calls for

21         a medical opinion.  He's not here as an

22         expert, in any event.

23              But go ahead and answer, Jim.

24        A.    Certainly a plastic surgeon is a
```

```
 1    fully authorized physician, M.D., that can --

 2    that has legal rights to write for

 3    prescriptions.  And certainly if they have a DEA

 4    license for that drug that they're dispensing in

 5    that particular class, they have authority to

 6    prescribe those medications as they see being

 7    fit in their professional judgment.

 8         Q.    My question is a little bit

 9    different.

10              Do you agree that it would be a

11    red flag for a plastic surgeon to be writing

12    prescriptions for opioid treatment drugs?

13         A.    It would be something to consider,

14    yes.

15         Q.    Okay.  And then it goes on to say,

16    "for other prescribers who may be outside of

17    their normal course of professional practice."

18              Do you see that?

19         A.    Yes.

20         Q.    Then it says, "Some of the

21    prescribers are from outside of the normal

22    service area for the stores."

23              Do you see that?

24         A.    Yes.
```

```
1             Q.    Do you agree that that is also a

2    red flag, filling prescriptions for doctors who

3    are outside of the normal service area of the

4    store?

5             A.    It's a data point to consider,

6    yes.

7             Q.    But despite all these red flags,

8    you agree that these prescriptions were getting

9    filled?

10            A.    I can't ascertain if they got

11   filled or didn't fill.  Certainly I can read the

12   dialogue here that is stating that they were

13   filled and certainly the correspondence between

14   the individuals on this e-mail string, but

15   that's what they're suggesting, yes.

16            Q.    Okay.  Well, what we know is that

17   they were at least using enough of this product

18   that they were flagging on Giant Eagle's three

19   times threshold report by the 15th of the month,

20   correct?

21            A.    What I ascertain from this string

22   is that there was -- the month before, these

23   drugs did not show up on a flag for these

24   stores.  The following month they did, which
```

1  would mean that there was a change in

2  prescribing habits, which changed dispensing

3  habits from our side, which then shows us

4  picking that up and investigating that trend.

5      Q.   And Mr. Millward goes on to say,

6  "I suggest that we shut off the buprenorphine

7  products to the two stores," and he underlines

8  that.

9          Do you see that?

10     A.   Yes.

11     Q.   And what's happening here is the

12  compliance department -- based on these

13  prescriptions being filled with the red flags

14  the compliance department saw, that they made

15  the decision that they wouldn't even ship any

16  more of this product to the store, correct?

17     A.    What I see is they suggest that

18  they stop shipping this product to the stores

19  until they have a chance to look at it further

20  and investigate further.

21     Q.   Okay.  Well, he doesn't really say

22  "investigate."  He says, "Until you have a

23  chance to visit, investigate, and retrain the

24  team members on the controlled substance

```
 1    dispensing guidelines and red flags."

 2              Do you see that?

 3         A.    Yes.

 4         Q.    And if you look up at the next --

 5    well, sorry.  Let's read the next sentence.

 6              He says, "We'll then evaluate your

 7    findings and determine if the pattern is

 8    suspicious and if the DEA should be notified."

 9              Do you see that?

10         A.    Yes.

11         Q.    Do you know whether or not the DEA

12    was notified about this?

13         A.    I do not.

14         Q.    Okay.  If we go up to the next

15    e-mail in the chain, it looks like two minutes

16    later, from 12:53 from the one we were just

17    looking at to 12:55, Mr. Millward then sends an

18    e-mail blocking buprenorphine products from

19    those pharmacies.

20              Do you see that?

21         A.    I do, yes.

22         Q.    If you go to the first page of the

23    document and start at the bottom.  It looks like

24    here Mr. Evans forwards this e-mail chain to the
```

```
 1   pharmacist at Stores 54 and 2402.

 2              Do you see that?

 3        A.    Yes.

 4        Q.    Okay.

 5              MR. BARNES:  Hey, Jeff.  I'm going

 6        to interpose an objection.  I don't see

 7        any evidence that this has anything to

 8        do with any of the drugs at issue in the

 9        case or Lake and Trumbull County.

10              Can you clarify that?

11   BY MR. GADDY:

12        Q.    Go up to the next e-mail, please,

13   Mr. Tsipakis.  And you see that one of the

14   pharmacists writes back, and he says, "Hi,

15   Darren.  We are now getting all of Medicine

16   Shoppe's scripts.  Just got off the phone to

17   confirm that they are no longer stocking at all.

18   We've had so many calls on this product."

19              Do you see that?

20              MR. BARNES:  Same objection;

21        irrelevant, outside the jurisdictions at

22        issue, and does not involve any of the

23        drugs at issue in the case.

24        Q.    Do you see that, Mr. Tsipakis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I'm sorry.  Can you just -- yes, I

 2    see that.  Yep.

 3              Q.    Okay.  And if we go up to the next

 4    e-mail in the chain, it looks like Mr. Millward

 5    again writes -- and takes off the pharmacist,

 6    but just writes to his compliance team.

 7                    Do you see that in the "to" line,

 8    in the "CC" line?

 9                    MR. BARNES:  Same objections.

10              A.    The compliance team and the loss

11    prevention team.

12              Q.    Correct.  He says, "Darren, why is

13    the Medicine Shoppe refusing to fill these

14    prescriptions?  Do they believe the

15    prescriptions are not legitimate to fill?  What

16    is the store documenting on the image notes or

17    hard copies as evidence of their due diligence

18    on the legitimacy of the prescriptions?"

19                    Do you see that?

20              A.    Yes.

21              Q.    He then goes on to say, "They seem

22    to be laced with red flags."

23                    Right?

24              A.    Yes.
```

1          Q.    And we've already looked at some

2    of those flags.  Doctors being investigated,

3    correct?

4          A.    What was written before, yes.

5          Q.    Filling for doctors without a

6    specialty that was relevant to the treatment

7    drugs being dispensed?

8                MR. BARNES:  Same objections.

9          Q.    Correct, Mr. Tsipakis?

10         A.    Certainly I can see what was

11   written on -- what was written in the e-mail,

12   yes.  As far as -- I'm not the pharmacist there

13   that was filling the prescriptions, so I can't

14   comment on what they were looking at and what

15   they were filling and what information they had.

16         Q.    And they were also filling for

17   doctors outside of the area according to this,

18   correct?

19                MR. BARNES:  Same objections.

20          Same objections.

21         A.    Whether they filled there or

22   didn't fill, I don't have -- I can't answer

23   that.  I can only answer what's in this e-mail

24   string.

```
 1              Q.    Okay.  Well, Mr. Tsipakis, you

 2     agree it would not be a good thing for

 3     Giant Eagle pharmacists to be filling controlled

 4     substance prescriptions that are laced with red

 5     flags?

 6              MR. BARNES:  Same objection.

 7              A.    A pharmacist, if they're -- if

 8     they're confronted with prescriptions that have

 9     red flags, they have a duty and a corresponding

10     responsibility to clear those red flags and to

11     be comfortable with those red flags, and either

12     they'll make a decision to proceed or not

13     proceed on filling those prescriptions.  It's

14     what they do every day.

15              Q.    Okay.  But if they're filling

16     prescriptions that are laced with red flags,

17     you'll agree that's not a good thing?

18              MR. BARNES:  Objection; misstates

19          not only his testimony but this

20          document.

21              A.    The pharmacists in their

22     professional judgment would get a prescription,

23     do their diligence on that prescription, and if

24     there's anything that they feel is a red flag
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    concerning that prescription, they would proceed

 2    accordingly to their professional judgment.

 3           Q.    Yes or no, Mr. Tsipakis.  Should

 4    they be filling prescriptions laced with red

 5    flags or not?

 6                 MR. BARNES:  Objection; asked and

 7           answered twice.

 8                 You can try it one more time, Jim.

 9           If your answer is the same, you can just

10           say it's the same answer.

11           A.    So if a pharmacist has a

12    prescription and they determine there's a red

13    flag, if they filled the prescription, there

14    would be no more red flag.  They would have

15    cleared the red flag.  Otherwise, they wouldn't

16    have filled the prescription.

17                        - - -

18       (Tsipakis Deposition Exhibit 6 marked.)

19                        - - -

20    BY MR. GADDY:

21           Q.    Let's look at what we'll mark as

22    Exhibit Number 6, P-HBC-1017.  It's going to be

23    tab number 4 in your binder.

24                 And this is going to be the
```

```
 1   same -- not the same, but similar e-mail chain.

 2              If we go to the bottom of the

 3   second page, you'll see the e-mail from Millward

 4   that we already looked.  And I just want to show

 5   you Jason's response.

 6              So look at the bottom of page --

 7        A.    Is that the bottom --

 8        Q.    I'm sorry?

 9        A.    I'm sorry.  Tab 4, right?  Tab 4.

10        Q.    Correct.  And then look at the

11   bottom of page 2, and you'll see the Millward

12   e-mail that we looked at just a moment ago.

13              I just want you to orient yourself

14   real quick.

15        A.    Yeah.  Thank you.  Just give me

16   one minute just to read from the back here just

17   so I get my chronological order here, so ...

18              Okay.  I'm sorry.  Page -- the

19   second page bottom was the same e-mail.  Okay.

20   I see that.

21        Q.    Okay.  Now, let's flip to the

22   first page and look at Jason's response and his

23   analysis, okay?

24        A.    I'm sorry.  First page, right?
```

```
 1            Q.    Yep.  Middle of the page, the

 2    e-mail from Jason Mullen.

 3                  Do you see that?

 4            A.    On Friday, January 15th?

 5            Q.    Yes, sir.

 6            A.    Okay.  Yep, I have it.  Let me

 7    just read that.

 8                  That's what you want me to read,

 9    correct?

10            Q.    We're going to read it together.

11            A.    Oh, okay.

12            Q.    He says, "I apologize for the

13    lengthy e-mail.  Below is my analysis and the

14    attached spreadsheet goes in more depth on the

15    actual data."  He says, "14 docs have prescribed

16    since the beginning of December, and three of

17    the doctors, Clark, El-Attrache and Harika,

18    previously had their medical license sanctioned

19    by the state."

20                  Do you see that?

21            A.    Yes.

22            Q.    You agree that would be a red flag

23    for the pharmacist to look into, correct?

24                  MR. BARNES:  Objection.  We are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              continuing on with an incident involving

 2              none of the drugs at issue, involving

 3              neither jurisdiction at issue.  So we

 4              object and move to strike any testimony

 5              related to this.

 6         Q.    Go ahead, Mr. Tsipakis.

 7         A.    Could you repeat your question?

 8         Q.    You'll agree the fact that three

 9    of the doctors that these pharmacies were

10    filling prescriptions for, the fact that they

11    had their medical license sanctioned by the

12    state should be a red flag that the pharmacist

13    should look into a little bit further?

14         A.    If they're aware of those, yes.

15         Q.    Well, it's something that they

16    should have the ability to become aware of,

17    right, when they're filling controlled substance

18    prescriptions?

19         A.    Well, I guess I'm trying to

20    understand the question.

21              So if someone is sanctioned,

22    depending on what they got sanctioned for, I

23    mean, they're still a legally authorized

24    practitioner to prescribe medication.  If there
```

1    was -- if they were sanctioned for something

2    egregious involving their ability to prescribe

3    prescriptions, they wouldn't be able to

4    prescribe prescriptions.

5         Q.    Well, Mr. Tsipakis, it was

6    important enough that Giant Eagle's compliance

7    department made a note of it when they were

8    investigating these prescriptions that caused

9    these pharmacies to pop on the threshold report,

10   right?

11        A.    All I can read here is that

12   certainly from Mr. Mullen, he mentions that they

13   were previously sanctioned.  I don't know what

14   they were sanctioned for.  I can't make the

15   determination of the materiality of their

16   sanction.  All I know is what he has stated

17   here, the "previously had their medical license

18   sanctioned."

19        Q.    Okay.  So you'll agree that's why

20   it would be a red flag that you would want your

21   pharmacist to look into a little bit further

22   before just filling this prescription for a

23   controlled substance, right?

24             MR. BARNES:  Objection; asked and

```
 1          answered already.

 2          Q.    Right, Mr. Tsipakis?

 3          A.    Sure.

 4                MR. BARNES:  Same objection.

 5          Q.    Okay.  It says, "The other doctor,

 6   Teet, is being criminally prosecuted for witness

 7   tampering and falsification of records in a DEA

 8   investigation about his buprenorphine

 9   prescribing habits."

10                Do you see that?

11          A.    Yes.

12          Q.    Okay.  I would assume that's a

13   little bit easier for you.  That's definitely a

14   red flag, right?

15                MR. BARNES:  Same objections.

16          A.    Yeah.

17          Q.    Mr. Tsipakis?

18          A.    Yes.  It's certainly a data point

19   to consider, yes.

20          Q.    Okay.  It goes on to say that this

21   Dr. Teet is predominantly practicing as a

22   plastic surgeon.  And you already told us that

23   that would be a red flag to look into, the fact

24   that a plastic surgeon is writing prescriptions
```

1    for drugs used to treat opioid use disorder?

2                    MR. BARNES:  Objection; misstates

3            his prior testimony.  That's not what he

4            said.

5            Q.    Is that right, Mr. Tsipakis?

6            A.    Again, what I'm reading here, it's

7    saying Dr. Teet is predominantly practicing as a

8    plastic surgeon.  This is from Jason Mullen.

9                    Again, he's a medical physician

10   with sanctioned authority to treat patients and

11   to prescribe medication, and -- I guess I don't

12   understand the particular question.

13           Q.    I'm asking you whether or not it

14   should be a red flag that you have a plastic

15   surgeon writing prescriptions for drugs that are

16   used to treat people with opioid use disorders,

17   whether or not that's something that you would

18   want your pharmacists at Giant Eagle to look

19   into a little bit further?

20                   MR. BARNES:  Objection; asked and

21           answered.

22           A.    Sure.  It's a data point they

23   should look at and consider.  If they're

24   presented with it and they have it, of course,

```
 1    sure.

 2          Q.    Okay.  Below that, Jason notes,

 3    "Additional findings of note."

 4                On the second bullet point there,

 5    he says, "Several patients reside at the same

 6    address."

 7                Do you see that?

 8          A.    I'm sorry.  I was under the line,

 9    "The analysis with a date range to present" --

10    I'm sorry.  Are you further down or -- oh, okay.

11          Q.    It's highlighted on the screen in

12    front you, too, if you want to look at that.

13          A.    Oh, okay.  Yep.  Thank you.  So

14    it's the paragraph below.  Okay.  "Additional

15    findings of note."

16          Q.    You see, "Several patients reside

17    at the same address"?

18          A.    Yes.

19          Q.    Okay.  You'll agree that that's a

20    red flag that a pharmacist should look into

21    further?

22          A.    Yes.

23          Q.    And then it says, "Three

24    practitioners."  And it lists them there --
```

```
 1    represent almost 60 percent of the buprenorphine

 2    business at the one pharmacy.

 3                 Do you see that?

 4         A.    Yes.

 5         Q.    Do you agree that when you have

 6    doctors writing such a high volume of controlled

 7    substances, that that's a red flag that you

 8    would want your pharmacists to look into a

 9    little further?

10                 MR. BARNES:  Same objections.

11         A.    I mean, they would become familiar

12    and you would know that.  But, sure, yes, it's a

13    data point to consider.

14         Q.    If you go to the last section, it

15    says, "Based off analysis for Store 54."

16                 Do you see that?

17         A.    Yes.

18         Q.    Do you see it's looking at the

19    types of payment?

20                 And it says in the first bullet

21    point, "24 patients have paid cash."  And the

22    second bullet point, "22 patients have used

23    third-party payments or insurance."

24                 Do you see that?
```

```
 1            A.    Yes.

 2            Q.    And do you agree the fact that

 3    over half of the prescriptions are being paid

 4    for in cash is yet another red flag that you

 5    would want your pharmacists to look out for and

 6    do a little bit more investigation before

 7    filling these prescriptions for opioids that are

 8    being paid for in cash?

 9                  MR. BARNES:  Same objections.

10            A.    Certainly a data point to

11    consider, yes.

12            Q.    If we turn to the next page, they

13    talk a little bit about the distance.  And they

14    show that as far as the distance between the

15    pharmacy and the doctor, it's as high as

16    82 miles away and an average distance of about

17    45 miles away.

18                  Do you see that?

19            A.    Yes.

20            Q.    Again, do you agree those are red

21    flags that you would want your pharmacists to

22    look into and investigate a little bit further

23    before they fill these prescriptions?

24                  MR. BARNES:  Same objections.
```

```
 1              Q.    I'm sorry.  Mr. Tsipakis, if you
 2      answered -- y'all are speaking over each other.
 3              A.    Yes.
 4              Q.    Okay.
 5              A.    A data point to consider.  Yes.
 6              Q.    Okay.  And then in the next two
 7      blocks, you see the distance between the patient
 8      and the pharmacy was as high as 30 miles,
 9      average of 13.5, and distance from the patient
10      to the doctor is as high as 81 miles, an average
11      of almost 50 miles.
12                    You'll agree that those are also
13      red flags that you would want your pharmacists
14      to look into before filling these prescriptions?
15                    MR. BARNES:  Same objections.
16              A.    Certainly data points to consider.
17              Q.    Now, when Mr. Millward said in the
18      last e-mail that these prescriptions looked like
19      they were laced with red flags, that was before
20      he had a lot of this additional information
21      about the percentage of cash payments and the
22      specific distances that patients were traveling
23      to see these doctors and to get to these
24      pharmacists, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    I'm sorry.  The question was, was

2     this e-mail after his e-mail before?  Yes.  It

3     was exact -- I'm just trying to see the time if

4     it's the same day or next day, but ...

5               I believe it was after, yes.

6          Q.    Now, where is Jason able to pull

7     this type of information from?

8               MR. BARNES:  Jeff, I'm showing the

9          45 minutes have lapsed.

10              Can we get a confirmation of that

11         from the videographer?

12              THE VIDEOGRAPHER:  Yeah, it just

13         started, 45 minutes.

14              MR. BARNES:  He just hit it?

15         Okay.

16              We have a redirect examination I'd

17         like to move into.

18              MR. KOBRIN:  Bob?

19              MR. BARNES:  Yeah?

20              MR. KOBRIN:  Hold on one sec.  I

21         just want to -- we don't need to take a

22         break or anything, but I do want to just

23         quickly -- I'm just going to give you a

24         call, if I can, about documents we might
```

```
 1          want.

 2                  We can all stay on if we want.

 3          I'm just going to leave my office for a

 4          second.

 5                  MR. BARNES:  Let's take a

 6          five-minute break in between the end of

 7          the direct and my cross, okay?

 8                  Off the record for five minutes.

 9                  THE VIDEOGRAPHER:  The time is

10          10:55 a.m.

11                  Off the record.

12                  (Recess taken.)

13                  THE VIDEOGRAPHER:  The time is

14          11:10 a.m.

15                  Back on the record.

16                         - - -

17                  REDIRECT EXAMINATION

18     BY MR. BARNES:

19          Q.    Good afternoon, Mr. Tsipakis.

20          A.    Good afternoon.

21          Q.    As you know, I'm Robert Barnes.  I

22     represent Giant Eagle.

23                  You were deposed by Peter Mougey

24     back on March 17th of 2021 and today by Jeff
```

Highly Confidential - Subject to Further Confidentiality Review

1    Gaddy.

2            I have some follow-up questions

3    from both depositions since we didn't have an

4    opportunity to question you back in March.  So

5    some of the stuff, we haven't heard today, but

6    since this is a continuance of March, it's fair

7    game to go into.

8            Do you recall being asked a lot of

9    questions about Giant Eagle's controlled

10   substance dispensing guidelines which was

11   Exhibit 1 to your prior deposition?

12       A.    Yes.

13       Q.    And do you have those exhibits

14   nearby from the prior deposition?  There were

15   only two exhibits.  One was the dispensing

16   guidelines, and one was an unpublished

17   controlled substance manual.

18            Do you remember those?

19       A.    Yes.  I have them.

20       Q.    Okay.  Now, with respect to the

21   guidelines, one portion of the guidelines that

22   was not covered in your last deposition was on

23   page 4 called "Giant Eagle's Promise of

24   Support."  And it begins, "Giant Eagle supports

```
 1    the professional judgment of each pharmacy team

 2    member."

 3              Do you see that?

 4         A.   Yes.

 5         Q.   What is the significance of that

 6    portion of the guidelines?

 7         A.   The significance is that

 8    Giant Eagle as a corporation stands behind the

 9    professional judgment of our pharmacists, and we

10    act ready to give them not only the support but

11    whatever resources they need to do their job.

12         Q.   It says, "Giant Eagle will support

13    the decision of the pharmacist."

14              Whatever -- does that mean that

15    Giant Eagle will support whatever decision the

16    pharmacist comes to after they exercise whatever

17    due diligence they deem appropriate and decide

18    to fill or not fill the prescription?

19         A.   Yes.

20              MR. GADDY:  Objection to form.

21         Q.   So either way, Giant Eagle is

22    going to support the professional judgment of

23    the pharmacists, fill or not fill?

24         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    And are you aware of circumstances
 2    in which Giant Eagle pharmacists have refused to
 3    fill prescriptions?
 4           A.    Yes, absolutely.
 5           Q.    Does that happen on a regular
 6    basis?
 7                 MR. GADDY:  Objection to form.
 8           A.    It happens, yes.
 9           Q.    Okay.  But why would a pharmacist
10    care if the company that employs him or her is
11    going to be supportive of their decision?
12                 I mean, why care one way or the
13    other?
14           A.    It's important --
15                 MR. GADDY:  Objection to form.
16           A.    It's important for the pharmacist
17    to know that they're allowed to practice and to
18    make decisions based on their professional
19    judgment and they'll have support from their
20    company.  And if they don't feel comfortable
21    filling a prescription, then the company will
22    support that decision and not force them to fill
23    a prescription or to coerce them to fill a
24    prescription.  It's 100 percent support of their
```

```
 1    judgment.

 2         Q.    And you're a professional

 3    pharmacist; is that correct?

 4         A.    Yes.

 5         Q.    And you actually have experience

 6    filling prescriptions in stores?

 7         A.    Many years.  Yes.

 8         Q.    Okay.  And can you tell us, in

 9    terms of looking at a prescription in hindsight,

10    is it possible to look at the data only and

11    determine whether the pharmacist made a good or

12    bad judgment?

13         A.    It's impossible to do that

14    retrospectively.  When you're the pharmacist at

15    the counter, you're using your judgment.  You

16    have the data points and circumstances in front

17    of you.  You have the patient in front you.  You

18    have the physician interactions.  There's a

19    whole plethora of data points that are used to

20    either fill or not fill a prescription.

21              And just by looking at the data,

22    it would be impossible to second-guess or come

23    to a conclusion one way or the other if you

24    weren't there.
```

1            Q.    Okay.  And are you aware of any

2    organization, say, for example, PDMP programs,

3    including OARRS, suggesting or requiring that

4    pharmacies identify and apply red flags to

5    prescriptions?

6            A.    Requiring, no.

7            Q.    Okay.  Now, you were asked a lot

8    of questions in both your prior March deposition

9    and today about red flags.

10                Can you clarify for the record

11   what in your experience as a professional

12   pharmacist -- what does the term "red flag" mean

13   to you?

14                And more specifically, what does

15   it mean in terms of whether or not it is any

16   indication of whether or not a prescription is

17   legitimate or not legitimate?

18           A.    Sure.  A red flag is certainly

19   something to consider when you're filling a

20   prescription.  A red flag could be a lot of the

21   things that we discussed, but certainly a red

22   flag could be dosage that's out of the ordinary.

23   A patient's age contraindication, an OTC

24   indication.  A red flag is not only about

```
 1   suspicious activity, it's also about a clinical

 2   red flag.

 3              So a red flag to me is a piece of

 4   information that's important, when you're about

 5   to fill a prescription and counsel a patient on

 6   a particular medication and therapy, to take all

 7   that into consideration and then come to a

 8   conclusion on either to fill a prescription or

 9   how to counsel a patient or how to watch a

10   patient for continual support in therapy, et

11   cetera.

12         Q.    All right.  Is the filling of a

13   prescription -- is that -- do you consider that

14   a health care decision?

15              MR. GADDY:  Objection to form.

16         A.    Could you either repeat the

17   question or -- it would help, please.

18         Q.    Sure, sure.  Do you consider your

19   role as a professional pharmacist to be part of

20   a health care -- part of our health care system?

21   Are you a health care professional?

22         A.    Yes, absolutely.

23              MR. GADDY:  Form.

24         Q.    And so when filling a
```

 1  prescription, is it in your mind part of the --

 2  is it a health care determination as to whether

 3  or not this patient should get this medication

 4  at this point in time?

 5            MR. GADDY:  Objection to form.

 6       A.    So from a pharmacist's perspective

 7  and a pharmacy perspective, we're not

 8  diagnosticians.  We don't have the education or

 9  training to diagnose.  So our role is not to

10  second-guess whether a prescription is the

11  proper medical prescription for a patient or

12  not.

13            Our role is to make sure the --

14  from a therapy that has been prescribed by a

15  licensed practitioner, to be checking for drug

16  interactions, to be checking for the DURs that

17  we do, to check for legitimacy of a prescription

18  being issued by a licensed and authorized

19  prescriber, and then also helping the patient,

20  counseling the patient on how to use that

21  medication, side effects of the medication.

22            So the fact that our training and

23  also limited information that we have at the

24  pharmacy counter, we're not diagnosticians and

Highly Confidential - Subject to Further Confidentiality Review

1  doing anything with the diagnosis of the

2  patient.  That's the physician's primary -- or

3  whoever the practitioner is who treated the

4  patient's responsibility.

5          Q.    Is the pharmacist supposed to make

6  any medical judgment in filling a prescription?

7                MR. GADDY:  Objection to form.

8          A.    Medical judgment, no.

9          Q.    And is that because you have no

10  medical training in terms of medical school,

11  residencies, all the things that doctors do?

12          A.    Yes.  We're not equipped to make

13  those type of decisions, and not authorized to

14  prescribe either.

15          Q.    I see.  But doctors, they're

16  licensed to prescribe medications for their

17  patients; is that correct?

18          A.    Correct.  And trained to as well,

19  yes.

20          Q.    And you were asked some questions

21  earlier by Mr. Gaddy about doctors being

22  suspended or investigated.

23                Have you ever been trained or

24  advised that the fact that a doctor is being

```
 1    investigated means that he cannot issue a

 2    prescription?

 3            A.    No, just because they're being

 4    investigated -- unless their -- unless their

 5    prescribing powers or ability to prescribe

 6    medications either from the medical board or

 7    from the DEA are taken away, they are authorized

 8    to write prescriptions and to effectuate

 9    prescriptions.

10            Q.    Does the pharmacist or the

11    pharmacy have any ability to revoke or suspend a

12    doctor's license to prescribe?

13            A.    Absolutely not.

14            Q.    Getting back to this whole idea of

15    red flags, are you aware of any state

16    regulations that list or require the application

17    of red flags in the dispensing process?

18            A.    No.

19            Q.    To your knowledge, has the Ohio

20    Board of Pharmacy ever issued regulations that

21    said, "Here are the red flags that you must

22    follow when filling a prescription"?

23            A.    No.

24            Q.    Why do pharmacists even use the
```

```
 1    term "red flags" if it's not in state

 2    regulations or in DEA regulations?

 3          A.    They're used as things to look

 4    for, data points.  Certainly through

 5    pharmacists' training, continuing education, et

 6    cetera, there's things that come up that are

 7    good to know and certainly to reinforce from a

 8    practical and a training perspective.  But,

 9    again, it comes to the pharmacist's professional

10    judgment on the prescription dispensing process.

11          Q.    And do pharmacists in the exercise

12    of their professional judgment in filling

13    prescriptions sometimes dispense medications

14    even if there had been a red flag?

15          A.    Absolutely.  Yes.

16          Q.    And why is that?  Why wouldn't a

17    pharmacist just say, "I'm not filling your

18    prescription because, for example, you drove

19    36 miles, and I think that's too far"?

20          A.    It would be irresponsible and

21    dangerous for pharmacists to just blanket not

22    fill prescriptions.  Obviously they were issued

23    from a medical practitioner that in their

24    judgment believed that this patient needs this
```

```
 1    medication for treatment and therapy.
 2                 And for us to just make a blanket
 3    determination, that would be very dangerous to
 4    the patient and certainly to the care of that
 5    patient.
 6                 Instead, our -- the expectation
 7    will be for the pharmacist to have whatever they
 8    need to look at for that particular
 9    prescription, any red flag, whether it be
10    distance or something else, to clear those red
11    flags or to understand those red flags or
12    discuss any concerns with the prescriber or
13    patient or certainly a family member, whatever
14    needs to happen before they dispense that
15    prescription to make it not a red flag anymore
16    for that -- for that prescription or certainly
17    that pharmacist.
18         Q.    Can you tell whether or not in
19    hindsight by looking at data if a prescription
20    is legitimate or not?
21                 MR. GADDY:  Asked and answered.
22         A.    No.
23         Q.    With respect to how pharmacists go
24    about clearing red flags and specifically with
```

1    respect to documenting what they did with red

2    flags, are you aware of any requirement either

3    in the state or the federal regulations that

4    requires a pharmacist to write anything down

5    when filling a prescription and clearing red

6    flags?

7         A.    There is no such requirement.  No.

8         Q.    Why do pharmacists sometimes write

9    things down then?

10        A.    It's the pharmacist's discretion

11   on whether they need to document, whether they

12   need to communicate to another pharmacist,

13   whether they need to put something on the

14   prescription for insurance purposes or other

15   reasons, so certainly it depends.

16             Pharmacists have that discretion

17   and judgment on when they would need to document

18   something or if it wasn't important to document

19   or needed to be documented.

20        Q.    To your knowledge, has the DEA or

21   the Ohio Board of Pharmacy ever advised

22   Giant Eagle that it had to write anything down

23   with respect to its pharmacists' due diligence?

24        A.    No, never.

```
1              Q.    And are Giant Eagle pharmacists

2     and their stores in regular and constant contact

3     with the Board of Pharmacy and their

4     investigators and agents?

5              A.    Yes.

6                    MR. GADDY:  Objection to form.

7              A.    Yes, often.

8              Q.    In what way?  Can you describe the

9     ways in which Giant Eagle and its employees and

10    pharmacists are in such contact, constant

11    contact, with the Board of Pharmacy.

12             A.    Sure.  Absolutely.

13                   We have regular inspections that

14    the state and certainly the DEA do with our

15    stores; some announced, some unannounced.  We

16    also have Ohio regulations on if there's

17    concerns around a controlled substance or loss

18    of a controlled substance, we need to notify the

19    board.

20                   As part of investigations, folks

21    from the board or DEA may come in to get

22    information from us or ask us questions.

23                   Also, as mentioned earlier and

24    testified earlier, we have a very robust loss
```

1  prevention department lead by Rick Shaheen, who

2  has long-standing relationships with the

3  Attorney General, DEA, FBI from his previous

4  employ.

5           So there's a lot of conversations

6  between him and the Board of Pharmacy, him and

7  our stores.  So it's a constant open

8  communication amongst law enforcement, our

9  pharmacists, and our corporate resources.

10      Q.    All right.  Going back to the

11  Giant Eagle dispensing guidelines, these were

12  issued I believe in 2013 I think was your prior

13  testimony.

14           Do you recall that?

15      A.    Yes, that's correct.

16      Q.    The fact that they were issued --

17  there's a date on the bottom.  This is

18  Exhibit 1, "Created 7/22/2013."  Would I be

19  correct or incorrect if I read that to mean that

20  Giant Eagle had no dispensing guidelines before

21  these written guidelines were issued in July of

22  '13?

23      A.    That would be incorrect.

24      Q.    What did Giant Eagle have before

1   these 2013 guidelines were issued, either

2   written or unwritten?

3          A.    Certainly the pharmacies had

4   things that we had on our intranet portal of

5   our -- where the resources are.  They had the

6   pharmacist manual at each pharmacy from the DEA,

7   various Board of Pharmacy rules and regs, and

8   certainly any things -- education, training, or

9   things that were provided from the board or

10  other sources.

11              So there was a multitude of things

12  that were available and certainly disseminated

13  to the stores.

14         Q.    You mentioned the DEA pharmacist's

15  manual in your answer.  Is that a manual used in

16  the industry by pharmacists in their day-to-day

17  practice?

18         A.    Yes.  Absolutely.

19         Q.    In fact, do you have experience as

20  a professional pharmacist using the DEA

21  pharmacist's manual in your dispensing

22  experience?

23         A.    Yes.

24         Q.    And is that manual -- is it your

1    testimony that that manual was always available

2    to Giant Eagle pharmacists during the time

3    period we're talking about, which is basically

4    2006 to 2019?

5         A.    Yes.

6         Q.    Okay.  Now, the dispensing

7    guidelines for Giant Eagle have several sections

8    called "Appropriateness of Controlled Substance

9    Prescriptions (red flags)."

10             Why issue this to your pharmacists

11   and pharmacies if they already have the DEA

12   pharmacist manual?  What's the purpose of

13   sending this out and calling these guidelines

14   and telling your pharmacies and pharmacists

15   about these red flags?

16        A.    So it's important to continue as

17   part of any licensed practitioner, and certainly

18   in the pharmacist perspective, there's

19   continuing education, there's training, there's

20   things that change in the marketplace and things

21   to be aware of.

22             What was important here is around

23   this time, the DEA was more vocal about red

24   flags and things to consider based on the

```
 1   prescribing by practitioners and things that was

 2   in the marketplace.

 3              So it was just a good idea to make

 4   sure that all these things continue to be top of

 5   mind for our pharmacists, which already were,

 6   certainly, but adding it -- adding it for them

 7   to consider, which they already consider these

 8   things as well, but, again, continuing to

 9   reinforce information.

10        Q.    Now, are red flags -- do they

11   apply across the board to every patient, or are

12   they individualized by patient?

13        A.    They're individualized by patient.

14   There is no one size fits all red flag.

15        Q.    Okay.  Now, in your last

16   deposition in March, you were asked a lot of

17   questions about so-called physical security

18   controls.

19              Do you recall that line of

20   questioning?

21        A.    Yes.

22        Q.    I want to follow up a little bit

23   with that.

24              Are all Giant Eagle pharmacies
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    located inside Giant Eagle grocery stores?

 2         A.    Yes.

 3         Q.    And does that have anything to do

 4    with security in a good way or a bad way or any

 5    way?

 6         A.    Certainly from a security

 7    perspective, we're inside of a bigger, larger

 8    business.  Many of our stores have -- all of our

 9    stores have security and loss prevention.  Some

10    have armed security, local police departments

11    and armed security, depending on the store and

12    location and volume of the stores.

13                There's more management staff.

14    There's more employees in the stores.  Certainly

15    being in a location in the store usually

16    typically to the back or to the side,

17    certainly -- we're within a larger business.

18         Q.    Okay.  And wherever the pharmacy

19    is in the grocery stores, are there physical

20    segregations or security systems that prevent

21    just grocery customers from accessing the

22    pharmacy or even grocery employees, for example?

23         A.    Yes, absolutely.  The pharmacy is

24    a separate department with barriers and
```

```
 1    barricades.  And certainly after hours, all that

 2    is locked up and secured.

 3              All of the pharmacies have

 4    state-of-art monitoring systems, camera systems,

 5    alarm systems that monitor all the activity of

 6    the pharmacy, both from the employee level on

 7    the interior of the pharmacy or anyone outside

 8    of the pharmacy, including any of the back areas

 9    that are adjacent to the pharmacy.

10         Q.    Can grocery employees or grocery

11    customers gain access to the pharmacy?

12         A.    They cannot.

13         Q.    Is the access to the pharmacy

14    limited in some way?

15         A.    The access to the pharmacy is

16    absolutely limited to the employees of the

17    store -- of the pharmacy rather, and limited

18    access for members of management only when a

19    pharmacist is present and has allowed them to

20    enter.

21         Q.    Now, with respect to how the

22    pharmacies handle controlled substances,

23    including opioids, are there special procedures

24    and policies that Giant Eagle has implemented
```

1  and follows to specially handle controlled

2  substances?

3        A.   Yes.  Absolutely.  We follow all

4  of the policy and procedures certainly in

5  regards to controlled substances that the DEA

6  has set forth.

7             And we go above and beyond with

8  our own policy and procedures on how we handle

9  controlled substances, how they're received, how

10  they're unpacked, how they're stored, who has

11  access to keys to access the locked safes and

12  cabinets that the controlled substances are in.

13  All that is documented and all of that is under

14  surveillance at all times.

15        Q.   You mentioned how controlled

16  substances are received.  Let's take it a step

17  back.

18             When a pharmacist enters an order

19  for a controlled substance, that either goes to

20  the Giant Eagle distribution warehouse or to

21  either McKesson -- McKesson at the time; is that

22  right?

23        A.   At the time it was McKesson.

24  Currently it's Cardinal, yes.

 1          Q.    It's currently Cardinal.

 2               And when a pharmacist enters an

 3    order for a controlled substance, is there --

 4    are there controls and oversight over that

 5    process?  Can a pharmacist, for example, order,

 6    you know, 100 bottles of OxyContin willy-nilly

 7    without any oversight?

 8          A.    They cannot.  An order can be

 9    placed, but that order is scrutinized for

10    validity and for volume and from a threshold

11    perspective, that if they order more than we --

12    more than a threshold allows, that order will be

13    kicked out and not effectively filled.

14          Q.    Okay.  That threshold system you

15    mentioned, I think you testified that that began

16    in 2013; is that right?

17          A.    The automated threshold system,

18    yes.

19          Q.    Okay.  Was there some other

20    non-automated threshold system before then?

21          A.    Certainly there was folks in the

22    compliance department and employees whose sole

23    job was to monitor activities at the store,

24    orders.  Our own warehouse, too, monitoring

 1   orders that left the warehouse for the stores,

 2   folks from corporate certainly on the same

 3   orders and certainly the prescriptions that were

 4   dispensed.  So there was always supervision.

 5          Q.    Now, did the DEA approve and

 6   inspect prior to opening and after opening both

 7   of Giant Eagle's drug warehouses, the HBC and

 8   the GERx facilities?

 9          A.    Yes.

10          Q.    Now, HBC and GERx never operated

11   simultaneously with respect to controlled

12   substances; is that correct?

13          A.    That is correct.

14          Q.    And, in fact, Giant Eagle didn't

15   even distribute any controlled substances until

16   November of 2009; is that right?

17          A.    That is correct.

18          Q.    And then the license that it had

19   for the HBC warehouse was a Schedule III, IV, V

20   license; is that right?

21          A.    That is correct.

22          Q.    And HBC never had a Schedule II

23   license; is that right?

24          A.    Correct.

```
 1            Q.    And some of the most prominent

 2    drugs in this case are Schedule II opioids; is

 3    that right?

 4                  MR. GADDY:  Objection to form.

 5            A.    There were Schedule III opioids

 6    that were reclassed to Schedule II in October of

 7    2016.

 8            Q.    Right.  But you're aware that in

 9    this case, the focus is on Schedule II opioids;

10    is that right?

11                  MR. GADDY:  Objection; form.

12            A.    Yes.

13            Q.    And my point is that HBC's license

14    never permitted it to distribute any Schedule II

15    opioids; is that correct?

16            A.    That is correct.

17            Q.    Okay.  But with respect to the HBC

18    warehouse, in order to be licensed, it had to

19    apply and be approved and be inspected by the

20    DEA; is that right?

21            A.    Yes.

22            Q.    And in order to maintain its

23    license, it had to go through random inspections

24    where the DEA agents would show up and demand to
```

```
 1   see records and inspect the warehouse and things

 2   of that nature, correct?

 3          A.    Correct.

 4                MR. GADDY:  Object to form.

 5                Bob, you objected all throughout

 6          my questioning about distribution

 7          related issues, and you're asking him

 8          about a warehouse being licensed.  This

 9          has nothing to do with dispensing.

10          Q.   Are you familiar with that,

11   Mr. Tsipakis?

12          A.    Yes.

13          Q.   Okay.  The inspections prior to

14   2013 of the Giant Eagle HBC facility, were you

15   aware that the DEA looked at Giant Eagle's

16   operations, including its SOM system, suspicious

17   order monitoring system, prior to 2013?

18                MR. GADDY:  Form and scope.  This

19          is not included in any of the topics of

20          the 30(b)(6) notice that deals with

21          dispensing issues.

22          Q.   You can answer, Jim.

23          A.    Yes.

24          Q.   All right.  And are you aware in
```

1    2013 of the DEA -- well, 2009 through 2013, the

2    DEA inspections all concluded full compliance

3    with Giant Eagle's and full compliance with all

4    DEA regulations?

5         A.    Yes.

6              MR. GADDY:  Form, scope, misstates

7         the evidence.

8         Q.    Was that a yes, Mr. Tsipakis?

9         A.    Yes.

10             MR. GADDY:  Same objections.

11        Q.    Now, in 2013, are you aware that

12   the DEA as part of its inspection in 2013 made a

13   recommendation that Giant Eagle add an automated

14   system -- a threshold system to all of its other

15   internal controls as a recommendation to improve

16   their controls?

17             MR. GADDY:  Form, scope,

18        misstates.

19        A.    Yes.

20        Q.    Okay.  And to your understanding,

21   is that -- was that the trigger for the creation

22   of the threshold report in 2013, the automated

23   report?

24             MR. GADDY:  Form, scope.

```
 1          A.    Yes.

 2          Q.    Okay.  And even without the

 3    automated threshold report, was it your

 4    understanding or is it your understanding that

 5    the DEA had concluded Giant Eagle was in full

 6    compliance with all DEA regulations, including

 7    SOM regulations, even without an automated

 8    threshold report?

 9               MR. GADDY:  Form; scope;

10          misstates.  Colosimo said they were not

11          in full compliance.

12               MR. BARNES:  Actually, your

13          objection misstates, if anything.

14          A.    The answer is yes.

15          Q.    Okay.  So was the automated

16    threshold report an add-on control to an already

17    fully compliant system at the HBC warehouse?

18               MR. GADDY:  Form, scope,

19          misstates.

20          A.    Yes.  It was our intent of

21    continual improvement, continuous improvement.

22          Q.    Okay.  So getting back to at the

23    pharmacy level.  So a pharmacist enters an order

24    for a controlled substance, and it either goes
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to HBC at the time -- which couldn't take any

 2    Schedule II orders, so it would have to go to

 3    McKesson, correct?

 4          A.    Correct.

 5          Q.    But then later for GERx, the GERx

 6    facility had a Schedule II license, right,

 7    beginning in about March of 2016?

 8          A.    That is correct.

 9          Q.    Okay.  And that facility also had

10    to go through DEA application, pre-open

11    inspection, post-open inspections, et cetera,

12    correct?

13                MR. GADDY:  Form, scope.

14          A.    Yes.  Absolutely.

15          Q.    And is it your understanding that

16    the DEA had similarly concluded that the GERx

17    facility met all the requirements, including the

18    SOM regulations?

19                MR. GADDY:  Form, scope,

20          misstates.

21          A.    Yes.  And actually even on the

22    controlled substance vault, the C-II vault that

23    we had, they commented on how well that was put

24    together and actually even above what was
```

```
 1    required, so yes.

 2            Q.    Okay.  So getting back to the

 3    placement of an order.

 4                  So a pharmacist decides to fill in

 5    his professional judgment a controlled substance

 6    prescription, and if it's during the HBC time,

 7    if it's a Schedule II, that has to go to --

 8    excuse me -- it has to go to McKesson, correct?

 9            A.    Correct.

10            Q.    If it's Schedule III, IV, V, it

11    could go to HBC, correct?

12            A.    Correct.

13            Q.    All right.  And are you aware of

14    any controls at those facilities on the order?

15                  Let's first -- let's pretend it's

16    a Schedule II and it has to go to McKesson.

17                  To your knowledge, did McKesson

18    implement and enforce controls on Giant Eagle

19    pharmacy orders going to McKesson?

20            A.    Yes.

21                  MR. GADDY:  Form, scope.

22            Q.    Now, with respect to the -- if it

23    went to the HBC facility because it wasn't a

24    Schedule II -- and, therefore, had nothing to do
```

Highly Confidential - Subject to Further Confidentiality Review

1    with this case -- let's say, if it was for some

2    product, say, an opioid Schedule III, were there

3    controls at the warehouse over that order that

4    would make sure that the pharmacist was entering

5    a legitimate order?

6           A.    Yes.

7                 MR. GADDY:  Form, scope.

8           A.    Yes.  Absolutely.

9           Q.    Okay.  And you already covered in

10   your 2018 deposition all the controls at the

11   warehouse.  And I don't want to repeat any of

12   that other than to say, did you generally

13   describe all of those controls in your

14   December 2018 deposition?

15          A.    Yes, I did.

16          Q.    Okay.  So what controls occur --

17   once an order goes in and it goes through either

18   a McKesson review or an HBC review, are there

19   corporate level controls over those orders in

20   addition to those two levels of control?

21                MR. GADDY:  Objection to form.

22          Objection to scope.  This is supposed to

23          be a dispensing deposition, not talking

24          about distribution related controls.

```
 1              Q.    Go ahead, Jim.

 2              A.    Yes.

 3              Q.    Okay.  And what are some of the

 4    corporate level controls over those orders in

 5    addition to the warehouse or McKesson level

 6    controls?

 7                    MR. GADDY:  Can I get a standing

 8              objection to all the questions regarding

 9              distribution and warehouses and controls

10              on ordering of controlled substances as

11              opposed to dispensing?

12                    MR. BARNES:  You asked a lot about

13              threshold reports.

14                    MR. GADDY:  I'm just asking if I

15              can get a standing objection so I don't

16              have to interrupt you every time.

17                    MR. BARNES:  Yep.

18                    MR. GADDY:  Thank you.

19    BY MR. BARNES:

20              Q.    So, Jim, go ahead.  Corporate-type

21    controls over orders.

22                    What did some of those controls

23    include?

24              A.    Sure.  So we had corporate
```

1    compliance individuals who were monitoring those

2    orders.  We had internal auditors that if there

3    were concerns about orders, we could dispatch.

4    We had our pharmacy district managers who were

5    dispatched if there were things that we wanted

6    them to look at.  Reports that were regularly

7    run on things that we wanted to keep an eye on

8    and abreast of.

9               We also had an open dialogue on a

10   communication of things, whether from a loss

11   prevention side on things for us to keep an eye

12   on, or external things that were happening at

13   other chains or other places that we would get

14   information on that we would act on, and

15   proactively prepare for and screen for.

16              So, really, it was a system of

17   multiple touch points all working for the same

18   purpose, to make sure that all of our orders

19   were scrutinized and being handled in the

20   appropriate fashion.

21         Q.    All right.  And when the

22   controlled substances arrived at the pharmacy,

23   were there controls over those incoming

24   controlled substances such that they were

Highly Confidential - Subject to Further Confidentiality Review

1  maintained differently than other stock, for

2  example?

3          A.    Yes.   Absolutely.   They would come

4  in different identifiable totes.   Pharmacists

5  only would be allowed to open those totes.   They

6  would be required to check in those products for

7  any shortages or any -- making sure that the

8  product arrived intact.

9                And it was their responsibility if

10 there was any discrepancies, to immediately flag

11 those discrepancies, saving those invoices,

12 signing off on those invoices, and then properly

13 putting that inventory into stock and updating

14 any on-hand quantities related to those drugs.

15         Q.    And where were, say, Schedule II

16 controlled substances kept?   Were they kept with

17 the regular stock, or were they segregated?

18         A.    They were segregated in a locked

19 safe.   And the products would come in on a

20 secured tote.   Pharmacists only would be allowed

21 to open that tote, would check in the product,

22 and then immediately put that product into the

23 safe adding it to the current inventory on hand.

24         Q.    Meanwhile, you testified back in

1    December of '18 about the inventory management

2    system that the warehouse had.

3              Was the inventory management

4    system used at Giant Eagle, was it monitoring

5    the flow of product from the warehouse to the

6    pharmacies?

7         A.    Yes.

8         Q.    And so not only was there a

9    physical check-in process, was the computerized

10   inventory system updating itself to show the

11   arrival of the product at the pharmacies?

12        A.    Yes.

13        Q.    Now, when the controlled

14   substances were put in the safes, what was the

15   next movement of that product?  Was it a filling

16   of a prescription?

17        A.    That product would not come out of

18   the safe unless it was pursuant to a

19   prescription that needed to be dispensed or

20   counted during our monthly narc audits.

21        Q.    Now, is a monthly narc audit -- by

22   "narc," do you mean a Schedule II controlled

23   substance, on is it broader than that?

24        A.    Schedule II product, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  Does the DEA or the Ohio

 2    Board of Pharmacy require a monthly narc audit?

 3              A.    They do not.

 4              Q.    Why does Giant Eagle do it every

 5    month?

 6              A.    It's important for us to make sure

 7    that we have a proper control -- actually,

 8    better than required control on our controlled

 9    substances to make sure that with everything --

10    with the dispensing and with the pharmacists,

11    that the counts are reflective to what we say we

12    have on hand.

13              Q.    And that occurred on a monthly

14    basis throughout this entire time period?

15              A.    Correct.

16              Q.    Now, did there come a point in

17    time when the controlled substances went on a

18    perpetual inventory system?

19              A.    Yes.

20              Q.    Such that product was updated

21    constantly every time it was moved, the

22    inventory was updated?

23              A.    Yes.

24              Q.    Do you know when approximately
```

1    that occurred?

2         A.    I think it -- I believe it started

3    somewhere about 2015, I believe.

4         Q.    Is that something that the DEA or

5    the Ohio Board of Pharmacy required, a perpetual

6    controlled substance inventory?

7         A.    No.  That was us in our quest for

8    continual improvement and continual progress

9    that we chose to do that.

10        Q.    So once you went perpetual, were

11   you able to track on a second-by-second basis

12   the flow of controlled substances through your

13   pharmacies?

14        A.    In realtime, yes.

15        Q.    In realtime.  And the legal

16   requirement, as you understood it from the DEA,

17   is just count it once every two years?

18        A.    During the biennial inventory,

19   which is the only requirement, yes, from the

20   DEA.

21        Q.    So rather than wait every two

22   years, you were counting it in realtime?

23        A.    Correct.  For Schedule IIs, yes.

24   Correct.

```
 1            Q.    Okay.  And so the -- what about

 2    the movement?  If a pharmacist then gets a

 3    prescription for a controlled substance, say,

 4    for 30 pills of some opioid, let's say Vicodin,

 5    would they have to then -- he or she have to

 6    access that safe -- what types of controls would

 7    govern that process of filling that Vicodin

 8    prescription?

 9            A.    Per our policy, only pharmacists

10    have access and keys to the safe.  Keys are not

11    left out.  The pharmacist on his or her person

12    have those keys to that safe for their shift,

13    and only they have ability to go into that safe,

14    remove the product that they need to fill

15    pursuant to that prescription.

16            Q.    Is there any special handling of

17    that product while it's outside of the safe in

18    terms of taking the 30 pills out for that fill

19    and counting -- making sure that the counts are

20    correct?

21            A.    It's in complete control of the

22    pharmacist at all times, and it's also double

23    counted and notated that it's been double

24    counted.
```

```
 1            Q.    What do you mean by "double
 2    counting"?  What does that mean?
 3            A.    So, say, it's a prescription for
 4    30, the pharmacist will count it the first time,
 5    the 30 pills, and then they'll make sure again
 6    that it's 30 pills.
 7            Q.    What about any counting of what's
 8    left in the bigger bottle from where the 30 came
 9    from?
10            A.    Yeah.  It's our process of
11    backcounting as we call it.  So for -- as an
12    illustrative example, let's say there's a bottle
13    of 100 pills of an opiate, let's say Vicodin in
14    a bottle, we dispense 30 of it.  The pharmacist
15    is counting the original 30 for the
16    prescription.  And then the 30 minus 100, there
17    should be 70 left in the original stock bottle,
18    so counting to make sure there's 70 left in that
19    bottle before it goes back into the safe.
20            Q.    Is that something that's required
21    by the DEA or the Ohio Board of Pharmacy?
22            A.    It is not.
23            Q.    Well, why do it?
24            A.    It's -- it was an improvement
```

1    for -- as a chain and for us as a continual

2    double check to make sure that all product -- we

3    were aware where the product was, what the

4    on-hands were, and an ability for us to identify

5    any discrepancies in realtime.

6          Q.    Okay.  You mentioned a pharmacy

7    loss prevention department with Rick Shaheen

8    several times in the last deposition and today.

9          Why does Giant Eagle have a

10   separate pharmacy loss prevention department?

11         A.    It's important for us to have a

12   separate resource, a dedicated resource that's

13   not just another department where they're

14   checking on the whole store and this is just an

15   added -- we felt very strongly that it was

16   important to have an independent, fully

17   resourced department to help assist and have

18   oversight of our pharmacies from a physical

19   security, a drug security, and certainly

20   controlled substance security.

21         Q.    Rick Shaheen -- is he in charge of

22   that department?

23         A.    He is.

24         Q.    And is he experienced in pharmacy

1    diversion?

2                    MR. GADDY:  Objection to form.

3            A.    Extremely experienced.  His

4    pedigree is many years at the attorney general's

5    office working with the DEA as well, and

6    certainly as a prosecutor helping in the

7    attorney general's office in a prosecution of

8    cases exactly on diversion and criminal

9    activity.

10           Q.    Okay.  You were asked some

11   questions about the tools that Giant Eagle

12   provides for its pharmacists.

13                    One of the tools I wanted to ask

14   you about is what type of dispensing software

15   does Giant Eagle use in its pharmacies or has it

16   used going all the way back to 2006?

17           A.    Giant Eagle pharmacies utilize a

18   pharmacy dispensing software from the PDX --

19   it's PDX Corporation.  And it's one of the gold

20   standard, state-of-the-art system, that's

21   available on the market and still is available

22   on the market.

23           Q.    All right.  And are there things

24   that the pharmacist is forced to go through when

```
 1    filling a prescription when using that PDX

 2    dispensing software?

 3          A.    There's a certain workflow that

 4    they need to go through, yes.

 5          Q.    Does this software include things

 6    like patient profiles and drug utilization

 7    reviews?

 8          A.    Yes.  Absolutely.

 9          Q.    The software dispensing system

10    that Giant Eagle used, was it subjected to

11    repeated Ohio Board of Pharmacy inspections and

12    audits?

13          A.    Yes.  Absolutely.  Continual

14    check-ins on it.  And certainly as we rolled out

15    new modules or improvements on the system, that

16    was -- at the next inspection, was highlighted

17    or looked at from the board, certainly.

18          Q.    To your knowledge, did the Board

19    of Pharmacy ever criticize or suggest to Giant

20    Eagle that it should -- it needed better

21    dispensing software than what it was using?

22          A.    Never.

23          Q.    Are you familiar with something

24    called rx.com?
```

```
 1            A.    Yes.

 2            Q.    What is it?

 3            A.    Rx.com is basically the central

 4   database that the pharmacy software in the

 5   stores use to communicate with each other.

 6   Basically the central prescriber database, if

 7   you will, or where the data resides.

 8            Q.    Is that something that's required

 9   by either the DEA or the Ohio Board of Pharmacy?

10            A.    No.

11            Q.    But is it something that

12   Giant Eagle added onto its software system to

13   provide more information to its pharmacists?

14            A.    Yes.

15            Q.    And so using the PDX software with

16   the rx.com, were Giant Eagle pharmacists able to

17   view a patient's prescription history across the

18   entire chain?

19            A.    Yes.

20            Q.    And was that something that would

21   come up as part of the workflow modules in the

22   PDX dispensing software?

23            A.    It would be part of the DUR

24   process, yes.
```

```
 1          Q.    Okay.   The -- we mentioned the

 2   OARRS database.  Were Giant Eagle pharmacists

 3   provided access to the OARRS database from the

 4   time it was created through the time period at

 5   issue?

 6          A.    Yes.

 7          Q.    And did there come a point in time

 8   that OARRS was embedded in the software

 9   dispensing system?

10          A.    Yes.

11          Q.    And why -- why did Giant Eagle go

12   through that process of embedding the OARRS

13   access right in the software system?

14          A.    As was -- as our history, we were

15   trying to make things easier for our

16   pharmacists, and certainly instead of them

17   having to leave the screen that they were on to

18   log in to a separate window or a separate

19   website, we embedded it within the workflow

20   process to make it that much easier for them to

21   be able to get the information efficiently and

22   effectively versus having to -- basically like a

23   single sign-on versus them requiring to spend a

24   lot of time digging, hunting, and pecking for
```

1    the information right at their fingertips.

2           Q.    And when approximately was the

3    OARRS access embedded in the software as opposed

4    to being an independently accessible database?

5           A.    The exact date I can't remember,

6    but I believe it was somewhere around 2016,

7    2017, the beginnings of it.

8           Q.    What is your understanding of what

9    the OARRS database provides to the pharmacists

10   at the point of dispensing?  What kind of

11   information does it provide?

12                MR. GADDY:  Objection to form.

13          A.    It provides information on a

14   particular patient, controlled substances and

15   medications that have been filled across any

16   store or any provider.

17          Q.    In your experience as a

18   pharmacist, are these PDM programs helpful

19   pieces of information in making a professional

20   judgment to fill or not fill a prescription?

21          A.    Yes, absolutely helpful data

22   point.

23          Q.    Does OARRS restrict the

24   pharmacist's access in any way?  In other words,

1    can a pharmacist go in and just roam around the

2    OARRS database and see what he or she feels

3    like?

4          A.    The OARRS database is a restricted

5    database.  There's only certain views the

6    pharmacist can see and are allowed access to.

7          Q.    And is it primarily this

8    patient -- the activity of this patient in front

9    of him?

10         A.    Yes.  It's that particular patient

11   with that date of birth and activity related to

12   that patient in the query or the search.  Yes.

13         Q.    And are you familiar that OARRS is

14   a branch of the Ohio Board of Pharmacy?

15         A.    Yes, I am.

16         Q.    And do you know that OARRS takes

17   in information from every pharmacy in the state,

18   every prescription filled by every pharmacy in

19   the state on a daily basis?

20         A.    Yes.

21         Q.    Now, Giant Eagle certainly doesn't

22   have the access to that kind of information; is

23   that correct?

24         A.    To the OARRS information?  No.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Right.  And my point is that Giant

2     Eagle knows what its pharmacies are doing, but

3     it doesn't know what all the other pharmacies

4     are doing; is that right?

5          A.    Correct.  Yes.

6          Q.    All right.  And then do you know

7     whether OARRS -- besides taking in the

8     information, whether or not OARRS has

9     investigators and agents and analysts that

10    analyze that information?

11         A.    OARRS is a multi-faceted tool.

12    There's the face of the tool that the

13    pharmacists access for the information that was

14    just described on a particular patient and

15    medication history across any store in the

16    state.  But certainly loss prevention, DEA,

17    others use the back end of that to do their

18    queries and investigative searches.  They have

19    more ability to access other information that we

20    do not.

21         Q.    Do you know, for example, does

22    OARRS -- when taking in every pharmacist's

23    prescription activity, do they look for things

24    like doctor shoppers and, you know, patients

Highly Confidential - Subject to Further Confidentiality Review

1  moving from doctor to doctor or abusing the

2  system, drug seeking --

3           MR. GADDY:  Objection.

4       Q.    -- drug seeking behavior?

5           MR. GADDY:  Objection to form.

6       A.    My understanding is that the OARRS

7  database, the back end of that, the Board of

8  Pharmacy and law enforcement use that to

9  identify patterns or places that they want to

10  investigate or things that they want to

11  investigate.

12           That is information that they

13  typically use -- for example, it's not uncommon

14  for a law enforcement to show up on our

15  pharmacy, and say, "I need these prescriptions"

16  or "I need information on this patient."

17           And where they get that

18  information is from an OARRS type database that

19  gives them the ability to look for things they

20  want to look at.  And then they follow up

21  accordingly to where they want to look at.

22           So traditionally that's how they

23  would end up at our pharmacy for a prescription

24  or more information.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. GADDY:  Bob, I'm sorry to

 2           interrupt.  I didn't -- I made a mistake

 3           and didn't assume you were going to go

 4           this long.  If you've got more than five

 5           or ten minutes, do you mind if we take a

 6           quick bathroom break?

 7                    MR. BARNES:  You want to take a

 8           bathroom break now or five or ten

 9           minutes from now?

10                    MR. GADDY:  If you're going to be

11           done in five or ten minutes, I can

12           probably make it, but if you've got more

13           than that then ...

14                    MR. BARNES:  No, no.  We better

15           take a break then.

16                    MR. GADDY:  Okay.  Thanks.

17                    MR. BARNES:  Okay.

18                    THE VIDEOGRAPHER:  The time is

19           12:00 p.m.  Off the record.

20                    (Recess taken.)

21                    THE VIDEOGRAPHER:  The time is

22           12:10 p.m.  Back on the record.

23    BY MR. BARNES:

24           Q.   Mr. Tsipakis, we were talking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   about how -- the tools provided for pharmacists

 2   by Giant Eagle.  We talked about the pharmacy

 3   dispensing system, rx.com and/OARRS.

 4              Is there a method for Giant Eagle

 5   pharmacists to check on the status of a doctor's

 6   license before they issue a prescription or fill

 7   a prescription?

 8        A.   Yes.  That's integrated into the

 9   pharmacy software.  Yes.

10        Q.   And is that updated on a continual

11   basis by a third-party vendor?

12        A.   Yes.

13        Q.   So if a doctor's license is

14   revoked, is it your experience that the software

15   will pick that up pretty quickly?

16              MR. GADDY:  Objection to form.

17        A.   Yeah.  I don't even know the

18   exact, but it's hours.  It would pick it up in

19   hours, yes.

20        Q.   And what about if a doctor is

21   suspended, in the industry, is any notation made

22   that the doctor's license has been suspended in

23   some way?

24        A.   No.
```

1          Q.     Okay.   Is that something that you

2    have to find out indirectly?

3          A.     Usually if it's similar, like, to

4    how even pharmacy -- they'll show a notation on

5    the website that says "sanctioned" or "fined" or

6    something, but it won't tell you why or any of

7    the details behind that action.

8          Q.     Did the DEA or the Ohio Board of

9    Pharmacy ever advise Giant Eagle that it needed

10   to do anything more than check the status of the

11   doctor's license as part of its software

12   dispensing system?

13         A.     Never.

14         Q.     Are you familiar with something

15   called a BOLO, B-O-L-O?

16         A.     Yes.   Be on the lookout, yes.

17         Q.     What is that exactly?

18         A.     So that is a moniker that our --

19   Rick Shaheen in our loss prevention use.   BOLO

20   short for "be on the lookout."

21         Q.     And did Giant Eagle corporate,

22   including its loss prevention personnel, advise

23   pharmacies, Giant Eagle pharmacies, chain-wide

24   to be on the lookout for certain things like

 1    drug rings or forgery rings or bad doctors,

 2    things of that nature?

 3            MR. GADDY:  Objection to form.

 4        A.    Yes.  Absolutely.  Either if there

 5    was information that our stores themselves had

 6    information, loss prevention, or corporate had

 7    from whatever source that came in, whether it

 8    was from an investigative source, FBI, DEA,

 9    Board of Pharmacy, there would be an e-mail

10    communication sent out to all stores.  And the

11    stores check their e-mails often, and they would

12    be flagged that there was a message.  Then they

13    would read that message and disseminate that

14    information.

15        Q.    And did the Giant Eagle

16    pharmacists go through regular training and have

17    regular meetings with other pharmacists in the

18    chain?

19            MR. GADDY:  Objection; form.

20        A.    Yes.

21        Q.    What kind of training?  What kind

22    of meetings did they go through?

23        A.    So pharmacists are required to go

24    through a continuing education process, and

Highly Confidential - Subject to Further Confidentiality Review

1    certainly as a corporation, we had a continuous

2    quality improvement process, so there's

3    quarterly meetings we do.  There's calls that we

4    do with the districts.

5              There's annual meetings that we

6    have where we bring all the pharmacists together

7    pre-COVID, and there's multiple touch points

8    with our pharmacists and our management from our

9    management down to our pharmacists and our

10   technicians.

11             Q.    And does Giant Eagle employ

12   district leaders called pharmacy district

13   leaders or PDLs?

14             A.    We do, yes.

15             Q.    And are they responsible for

16   multiple stores in a region, and do they travel

17   from store to store?

18             A.    Yes.  We have the pharmacy

19   district leader that's in place to support a

20   number of stores that they're responsible for to

21   help them lead and practice the profession of

22   pharmacy, support the pharmacy, and make sure

23   that they have everything that they need, and

24   also follow up with anything we need them to

1    follow up on.

2          Q.    And do the PDLs do quality audits

3    when they visit the pharmacies?

4          A.    Regularly, yes.

5                MR. GADDY:  Object to form.

6          Q.    Does that include making sure that

7    the pharmacists are following Giant Eagle

8    policies and procedures?

9          A.    Yes.  Absolutely.  They have a

10   checklist of things that they look for, and that

11   is definitely one of the top things that they

12   look for on that checklist.

13         Q.    And how about the pharmacy loss

14   prevention personnel, Rick Shaheen and others

15   that work under him, are they in the stores a

16   lot?

17               MR. GADDY:  Objection to form.

18         A.    They're in the stores doing audits

19   regularly, and then certainly they come in

20   unannounced, or certainly if we have a concern

21   that we would -- either a concern from store

22   level or a concern from corporate level, we

23   dispatch them to follow up, yes.

24         Q.    And at the corporate level, does

1    Giant Eagle monitor its pharmacies to look for

2    things like high volumes of controlled

3    substances being dispensed, things of that

4    nature?

5            A.    Yes.

6            Q.    Are you aware of any Giant Eagle

7    pharmacy throughout the entire chain dispensing

8    excessive amounts of controlled substances?

9            A.    We're dispensing prescriptions

10   that were pursuant to a legally authorized

11   prescription that was presented to us.

12           Q.    Right.  But are you familiar with

13   so-called pill mills and things of that nature

14   where there's large amounts of, if not

15   exclusively, controlled substances being

16   dispensed, things of that nature?

17           A.    No.

18           Q.    You're not familiar with that?

19   Okay.

20               But my question, Mr. Tsipakis, is,

21   does Giant Eagle watch its pharmacies to ensure

22   that there are not large amounts of -- unusual

23   amounts of controlled substances being

24   dispensed?

 1              MR. GADDY:  Objection to form.

 2        A.    We absolutely monitor, and if

 3   there's a concern or something we want to

 4   investigate in further detail, we absolutely do

 5   that.

 6        Q.    Does Giant Eagle watch to make

 7   sure that what's going into the stores is going

 8   out properly through prescription filling?

 9        A.    Yes.  Absolutely.  And we monitor

10   what comes into the pharmacy, what leaves the

11   pharmacy, and what should be left on the

12   pharmacy counter.

13        Q.    Okay.  Are you familiar with the

14   term "controlled records box, controlled

15   substance records box" at Giant Eagle?

16        A.    Yes.

17        Q.    What is it?

18        A.    It's a box similar to a banker's

19   box or a file folder box where it's basically

20   one place that all the information around

21   controlled substances can be neatly organized

22   and kept, which includes the pharmacist

23   manual -- the DEA pharmacist manual was in

24   there, any Board of Pharmacy regulations, all

Highly Confidential - Subject to Further Confidentiality Review

```
 1   our controlled substance invoices, our 222 forms

 2   are kept in there.

 3             Everything is in a nice organized

 4   place that -- whether it's for our own employees

 5   or certainly during inspections, routine

 6   inspections that DEA, law enforcement, et

 7   cetera, it's nice and neatly organized and

 8   accessible.

 9        Q.   Would you look at the file folder

10   that has these manila folders numbered 1 through

11   43.

12             MR. BARNES:  Jeff, these were sent

13        to you separately.

14             MR. GADDY:  Thanks, Bob.

15                    - - -

16     (Tsipakis Deposition Exhibit 7 marked.)

17                    - - -

18   BY MR. BARNES:

19        Q.   And I want to have you pull out

20   41, 42 and 43.

21             And for file 40, we'll mark this

22   Tsipakis Exhibit 7.

23             Can you identify Exhibit 7,

24   Mr. Tsipakis.
```

1          A.     Sure.   It's entitled "Controlled

2     Records Box."

3          Q.     And is this a Giant Eagle business

4     record?

5                 MR. GADDY:   Object to form.

6          A.     Yes.

7          Q.     The second page on the flip side

8     appears to be a photograph of a 2011 pharmacy

9     controlled drug records box; is that correct?

10         A.     Correct.

11         Q.     Is this what the controlled record

12    box looks like at the pharmacies?

13         A.     Yes.

14         Q.     And does this documentation show

15    what's in these controlled records boxes -- I'll

16    just flip through it.

17                Section 1 is C-III through V

18    invoices; is that right?

19         A.     Correct.

20         Q.     Section 2 is the C-II invoices and

21    executed DEA Form 222s.

22                Do you see that?

23         A.     Correct.   Yes.

24         Q.     And these are the DEA ordering

```
 1    forms for Schedule II controlled substances; is

 2    that right?

 3           A.    Correct.

 4           Q.    And then Section 3 is the

 5    unexecuted 222s?

 6           A.    Correct.

 7           Q.    Section 4 is outdated controlled

 8    drug return documentation?

 9           A.    Correct.

10           Q.    Section 5, power of attorney

11    forms.

12                 MR. GADDY:  Bob, is this a

13           document that you've produced?  Mine

14           doesn't have a Bates number on it.

15                 MR. BARNES:  I believe so, yeah.

16                 MR. GADDY:  Do you have the Bates

17           number for this document?

18                 MR. BARNES:  It's at the front.

19                 MR. KOBRIN:  It's Bates number

20           it's the native -- it's a PowerPoint.

21           So the Bates number is GE_TL00012826.

22                 MR. BARNES:  It's on the front

23           page, Jim.

24                 MR. GADDY:  Okay.  Thank you.
```

```
 1   BY MR. BARNES:

 2            Q.    Section 5, power of attorney;

 3   Section 6, biannual controlled drug inventory.

 4                  Do you see that, Mr. Tsipakis?

 5            A.    Yes.

 6            Q.    Is that Section 6 -- is that the

 7   every two-year inventory that the DEA requires

 8   that you previously testified to?

 9            A.    The DEA requires every two years.

10   We do it annually on top of our others, yes.

11            Q.    But this Section 6 is for the one

12   that the DEA requires, not for the monthly or

13   perpetuals?

14            A.    Correct.

15            Q.    Okay.  Section 7 are the

16   technician protocols.

17                  Does Giant Eagle have protocols

18   that its pharmacy technicians must follow in its

19   pharmacies?

20            A.    Yes.

21            Q.    And are they overseen by

22   pharmacists?

23            A.    They are, yes.

24            Q.    Section 8 is past inspection
```

1    reports.  This would be Ohio Board of Pharmacy

2    type inspections of that pharmacy; is that

3    right?

4              A.    Correct.  And DEA.  Sure.  Yes.

5              Q.    And finally, Section 9 is pharmacy

6    regular regulatory materials.  Would that

7    include the DEA manual that you testified

8    earlier to?

9              A.    Yes.

10                        - - -

11      (Tsipakis Deposition Exhibit 8 marked.)

12                        - - -

13   BY MR. BARNES:

14             Q.    All right.  Go to file 41.  We'll

15   call this Tsipakis Exhibit 8.

16                   Can you identify Exhibit 8, sir?

17             A.    Exhibit 8 starts with -- it looks

18   like a presentation -- "Controlled Drug Records

19   Box Instructions."

20             Q.    Is this a business record of Giant

21   Eagle?

22                   MR. GADDY:  Objection to form.

23             A.    Yes, it is.

24             Q.    And does this show what the

1    contents of the controlled record box should be

2    as of 2019?

3           A.    Yes.

4           Q.    And does that include in

5    Section 13 pharmacy regulatory materials

6    including the DEA pharmacy manual?

7           A.    Yes.

8                       - - -

9      (Tsipakis Deposition Exhibit 9 marked.)

10                      - - -

11   BY MR. BARNES:

12          Q.    All right.  Go to file 42, sir.

13   We'll call this Exhibit 9.

14          A.    This is the pharmacist manual, the

15   DEA manual.

16          Q.    Is this the manual that was

17   available to and accessible to the Giant Eagle

18   pharmacies at all times?

19          A.    Yes.

20                      - - -

21     (Tsipakis Deposition Exhibit 10 marked.)

22                      - - -

23   BY MR. BARNES:

24          Q.    And, lastly, Exhibit 10 will be

```
 1    from file 43.  It's captioned "Controlled Drug

 2    Box Memo 2012."  It appears to have contents for

 3    the controlled substance box or similar to the

 4    last two exhibits; is that correct?

 5         A.    That is correct.

 6         Q.    Is this another business record of

 7    Giant Eagle?

 8         A.    Yes, it is.

 9         Q.    Okay.  You were asked by

10    Mr. Mougey back in March some questions about

11    the pharmacists being the so-called last line of

12    defense.

13            Do you recall that questioning?

14         A.    Yes, I do.

15         Q.    With respect to the role of --

16    let's start with the doctor.

17            What is your understanding of how

18    the term "last line of defense" interplays with

19    the role of the doctor?

20            MR. GADDY:  Objection to form.

21         A.    Certainly from a health care --

22    from a patient's treatment and care, there's a

23    team of folks that are all working together for

24    the treatment and the care of that patient.
```

1            It all starts in the primary

2    individual and the practitioner -- the physician

3    or nurse practitioner or physician's assistant.

4    So it could be an M.D., or it could be a

5    different level provider.

6            But, regardless, it's the main --

7    the main interaction is with a caregiver who has

8    the patient's diagnosis, medical condition,

9    labs, all the other information that they have

10   to care for that patient and treat that patient.

11   Certainly there could be some other mid-level

12   providers involved in that interaction.

13            If that interaction requires a

14   prescription to be issued, then that

15   prescription will either come to us

16   electronically or by the patient themselves, and

17   that will present itself to our pharmacy

18   counter.  Our pharmacy, I should say.

19        Q.   Stop right there, because I'll

20   break that next step down.

21            But a doctor or nurse practitioner

22   or physician's assistant, are these folks that

23   have prescribing authority; is that correct?

24        A.   Yes.  Correct.

```
 1              Q.    Under their doctor's license or

 2    nurse practitioner license or PA license; is

 3    that right?

 4              A.    Correct.  Yes.

 5              Q.    And is it -- at the point of

 6    issuing the prescription, is that where the

 7    medical judgment comes in?  There's a medical

 8    judgment made by the doctor or these other

 9    licensed personnel?

10              A.    Yes.

11              Q.    Is that right?

12              A.    Correct.

13              Q.    And are these -- I'll call them

14    doctors, but I mean all prescribers, but I'll

15    use the term "doctors."

16                    The doctors, before they issue a

17    prescription, are they supposed to check for red

18    flags?

19              A.    Yes.

20              Q.    In fact, the doctors are the ones

21    that have the physician-patient relationship; is

22    that correct?

23              A.    That is correct.

24              Q.    And it's the doctors that know the
```

1    medical history of the patient and do the

2    examinations and make the diagnoses and come up

3    with a treatment plan; is that correct?

4                    MR. GADDY:  Objection; form.

5          A.    Correct.

6          Q.    Okay.  And is it the doctor then

7    that makes the risk-benefit type determination

8    for, say, an opioid prescription after doing

9    those exams and making those medical judgments;

10   is that correct?

11                   MR. GADDY:  Objection to form.

12         A.    Yes, that is correct.

13         Q.    All right.  So by the time the

14   patient leaves their doctor's office with their

15   prescription, a medical judgment and evaluation

16   has been made and red flags have been analyzed.

17                   Is that your understanding as a

18   pharmacist?

19                   MR. GADDY:  Objection to form.

20         A.    And they're required to look at

21   the same OARRS system that our pharmacists look

22   at as well, yes.

23         Q.    All right.  So by the time the

24   patient brings it in or it's electronically sent

Highly Confidential - Subject to Further Confidentiality Review

1    to the pharmacist, is it your understanding as a

2    pharmacist that those medical judgments and

3    risk-benefits and examinations and evaluations

4    have already been made?

5                    MR. GADDY:  Objection to form.

6           A.    Yes.

7           Q.    And is it your role as the

8    pharmacist to reevaluate, reexamine,

9    reinterpret, or second-guess the medical

10   judgment of the issuing prescribers?

11                   MR. GADDY:  Objection to form.

12          A.    No, it is not.

13          Q.    Are you supposed to rereview the

14   medical history of the patient at the time of

15   dispensing?

16          A.    No.  We're not qualified -- I

17   don't have the medical training or experience to

18   do that, no.  We wouldn't do that.  We wouldn't

19   have that ability as a pharmacist.

20          Q.    Okay.  And in your experience,

21   have you found that most doctors issue their

22   prescriptions in good faith intending to provide

23   legitimate treatment for a legitimate patient?

24          A.    Yes.

```
 1              MR. GADDY:  Objection to form.

 2        Q.    Pardon me?

 3        A.    Yes.

 4        Q.    So then now let's focus in.  With

 5   all those parameters, now you're the pharmacist

 6   and all these medical judgments have been made

 7   and all these things have been weighed, you're

 8   presented with a prescription.  What's your

 9   role?

10              MR. GADDY:  Objection to form.

11        A.    So our role is to take in that

12   prescription, certainly have the information we

13   need about the patient's, you know, gender,

14   weight, medical -- the medical history was done

15   from the physician's office, but for our

16   purpose, we know looking at what prescriptions

17   they are currently on, what OTCs they take, so

18   from our perspective, we're looking for the drug

19   that was prescribed, if there's any

20   contraindications and dosing of that particular

21   prescription, anything that it counteracts with,

22   anything that they're currently taking from a

23   disease state perspective.

24              We're also doing a DUR -- and that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   all is part of the DUR process, drug utilization

 2   review.

 3              We're also looking for the

 4   legitimacy of that prescription in the case of a

 5   controlled substance, was it issued by a doctor

 6   or a practitioner that is authorized to write

 7   for that prescription.  So we're assessing all

 8   those pieces of information.

 9              And then if there's any concern in

10   follow-up we need from the physician's office,

11   let's say, we would do all that, if there's any

12   more information that we need.

13              And then finally it gets to the

14   point of dispensing that particular prescription

15   and going over the prescription with the patient

16   so that they understand how to use that

17   medication, what are the important things for

18   them to know about the medication, side effects,

19   potential side effects, about the prescription,

20   and basically counseling the patient on how to

21   use that medication to be part of their care

22   plan.

23         Q.    Okay.  Does the pharmacy's role

24   include looking for forgeries and, you know,
```

Highly Confidential - Subject to Further Confidentiality Review

1  that type of alter -- or other alterations of a

2  prescription?

3       A.    Sure.  That's part of the

4  legitimacy of the prescription.  But, yes, we're

5  looking to make sure that the prescription was

6  authorized by an authorized practitioner, it has

7  not been altered or changed, or if it's a forged

8  prescription, yes.

9       Q.    And are you familiar with state

10  regulations such as the Ohio Board of Pharmacy

11  issuing regulations for how a prescription is

12  supposed to be filled?

13       A.    Yes.

14       Q.    And does Giant Eagle make sure

15  that when it's filling prescriptions, it's in

16  compliance with those regulations?

17            MR. GADDY:  Objection to form.

18       A.    Yes.

19       Q.    And the Ohio regulations, the

20  so-called manner of processing prescriptions, do

21  they include things like having a patient

22  profile?

23       A.    Yes.

24       Q.    And does Giant Eagle have a

Highly Confidential - Subject to Further Confidentiality Review

```
 1   patient profile in its software system?

 2           A.    Absolutely.  Yes.

 3           Q.    And does it include doing a drug

 4   utilization review?

 5           A.    Yes.

 6           Q.    And does Giant Eagle software

 7   system include a drug utilization review?

 8           A.    Yes.

 9           Q.    And does that include, when

10   necessary or appropriate, checking the OARRS

11   database as prescribed in the regulations or

12   when to check the OARRS database?

13           A.    Yes.

14           Q.    And do the manner of processing

15   regulations for Ohio, do they further provide --

16   besides the patient profile and a DUR, do they

17   provide for labeling the prescription properly?

18           A.    Yes.

19           Q.    And does Giant Eagle have a system

20   for making sure its filled prescriptions are

21   properly labeled?

22           A.    Yes, we do.

23           Q.    And, further, do those manner of

24   processing regulations have a fourth step, which
```

1    is provide counseling, at least a counseling

2    opportunity, to the patient?

3         A.    Yes.

4         Q.    And does Giant Eagle provide such

5    counseling or an opportunity for counseling?

6         A.    Yes.  Absolutely.

7         Q.    And the final -- the fifth step of

8    the manner of processing regulations include

9    proper recordkeeping, keeping the hard copy of

10   the prescription or the electronic prescription

11   available for certain periods of time.

12             Are you familiar with that?

13        A.    Yes.

14        Q.    And does Giant Eagle follow those

15   regulations in terms of keeping those

16   prescriptions, hard copy or electronic copy, as

17   appropriate?

18        A.    Yes, we do.

19        Q.    Now, once the prescription is --

20   I'm sorry.

21             Are you aware of any other step to

22   the Ohio regulations for filling a regulation

23   besides -- or filling a prescription besides

24   those five steps?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No.

 2          Q.    To your knowledge, do they include

 3   anything about certain types of red flags and

 4   stopping the prescription and not filling the

 5   prescription if any one or more of the red flags

 6   are present?

 7          A.    They do not, no.

 8          Q.    Do they require the documentation

 9   of any due diligence by the pharmacist?

10          A.    No, they do not.

11          Q.    Okay.  Now, what about -- besides

12   the doctor's role and the pharmacist's role,

13   what about the patient's role?  Does the patient

14   have any role in preventing diversion of a

15   prescription given to them at a pharmacy?

16          A.    Yes, they do.  Ultimately the

17   prescription is dispensed to the patient.  The

18   patient then would use that medication, would

19   need to store that medication and make sure that

20   it's issued.  And right on the bottle of a

21   controlled substance, it federally says

22   there's -- right on there that this is intended

23   for the person that it's prescribed for, not to

24   be given or transferred to anyone else.
```

Highly Confidential - Subject to Further Confidentiality Review

1          So the obligation and certainly

2    the expectation is for us to dispense that

3    prescription to a patient and for only that

4    patient to use that prescription and provide

5    that prescription as well.

6          Q.    Does the pharmacist or the

7    pharmacy have any role in tracking the patients

8    to make sure that they're safeguarding their

9    medications and using them for only their

10   intended purpose?

11         A.    No.

12         Q.    Has the Board of Pharmacy or the

13   DEA ever suggested that Giant Eagle have any

14   role in making sure patients safeguard their

15   medications after they've been dispensed to

16   them?

17         A.    No.

18         Q.    You were asked in your last

19   deposition some questions about audit controls,

20   and you mentioned inventory and audit controls.

21   I wanted to follow up just a little bit on that.

22         And I think you mentioned a few

23   minutes ago that Giant Eagle has an internal

24   audit department where they have internal

Highly Confidential - Subject to Further Confidentiality Review

1    auditors that conduct audits at the pharmacies;

2    is that right?

3           A.    Yes, that's correct.

4           Q.    Okay.  Is that another layer of

5    controls that Giant Eagle has at the pharmacies?

6           A.    Yes, it is.

7           Q.    And you also mentioned the PDL

8    quality control audits.  Is that another form of

9    corporate control of the pharmacies?

10          A.    Yes, it is.

11          Q.    Are you aware of the Board of

12   Pharmacy or the DEA ever asking Giant Eagle or

13   requiring Giant Eagle to provide data to its

14   pharmacists across the chain, for example, the

15   board -- has the board ever suggested that store

16   number 1 needs to know what store number 2 is

17   doing above and beyond what's already in the

18   Giant Eagle software system?

19          A.    No, they have not.

20          Q.    But is somebody doing that if

21   Giant Eagle is not doing that?  Is there another

22   agency that's looking at these prescriptions and

23   analyzing the data and looking for things like

24   pattern prescribing and doctor shopping?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.  Certainly behind the scenes,

2   there's agencies and certainly within that use

3   the OARRS data similar to the CSOS data that the

4   DEA uses.

5             So there's absolute -- the

6   agencies have the data and use that data however

7   they use it to come up with their investigative

8   directives.

9        Q.    Okay.  With respect to what the

10  Giant Eagle pharmacist can see through its

11  software system, including rx.com, can a

12  Giant Eagle pharmacist see what the patient in

13  front of him or her has filled at all Giant

14  Eagle stores in the chain at the point of

15  dispensing?

16       A.    Yes.

17       Q.    To your knowledge, do the Ohio or

18  the federal regulations require Giant Eagle

19  pharmacists to investigate or look for pattern

20  prescribing or doctor shopping or things of that

21  nature?

22            MR. GADDY:  Objection to form.

23       Q.    Go ahead, Jim.

24       A.    No, they do not.

```
 1                        - - -

 2        (Tsipakis Deposition Exhibit 11 marked.)

 3                        - - -

 4   BY MR. BARNES:

 5        Q.    You were asked a lot of questions

 6   by Mr. Mougey in your last deposition about

 7   examples of corporate level type controls.  And

 8   if you go back to the file we sent you, the

 9   files 1 through 39.  I'm going to start with

10   exhibit -- file number 2.  And this will be

11   Exhibit 11.

12        A.    Okay.

13        Q.    Do you recognize this as a

14   business record of Giant Eagle?

15              MR. GADDY:  Objection; form.

16        A.    Yes, I do.

17        Q.    And can you tell us in summary

18   what this business record reflects in terms of

19   Giant Eagle anti-diversion controls?

20        A.    This is a communication between

21   one of our stores to Rick Shaheen, head of our

22   loss prevention department, basically following

23   up on a phone call.  This looks like this was a

24   documentation to a phone call that had happened,
```

1    a written follow up to a phone call that

2    happened on a bad prescription or a fake

3    prescription that was attempted to be presented

4    at one of our pharmacies.

5              And the details are listed about

6    the individual involved, the prescriptions

7    involved, the police being contacted, and

8    basically also leading to the arrest and

9    apprehension of the suspect that actually tried

10   to pass the phoney prescription to us.

11             And then the follow up from Rick

12   basically complimenting the store and telling

13   them they did a great job on the diligence that

14   they provided, and also that he was going to

15   follow up with in this case the Brentwood Police

16   Department on any follow ups from that case.

17        Q.   Is this an example of something

18   that occurs at the Giant Eagle pharmacies from

19   time to time in terms of pharmacists exercising

20   due diligence with respect to prescriptions

21   attempting to be passed for drugs like oxycodone

22   here.  This is oxycodone 15, number 90;

23   oxycodone, 30 milligrams, number 90; and

24   Klonopin.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Those are opioids, correct?

 2                   MR. GADDY:  Objection to form,

 3         scope.

 4         A.    Yes.  The oxycodone is an opiate,

 5   yes.

 6         Q.    All right.  So is this an example

 7   of a Giant Eagle pharmacist detecting a forgery

 8   and refusing to fill an oxycodone prescription?

 9                   MR. GADDY:  Same objections.

10         A.    Yes, it is.

11         Q.    Are there other -- to your

12   knowledge, has this occurred on multiple

13   occasions and this is an example of it

14   occurring?

15                   MR. BARNES:  Same objections.

16         A.    Yes.

17         Q.    All right.  In that type of a

18   circumstance, are you familiar with the term of

19   "refusal to fill" situation where a pharmacist

20   is presented a prescription, goes through this

21   process and says, "I'm not filling it"?

22         A.    Yes, I'm familiar with that.  Yes.

23         Q.    Does Giant Eagle refuse to fill

24   opioid prescriptions?  Has that happened?
```

```
 1                    MR. GADDY:  Objection to form.

 2          A.    Yes, we do.

 3          Q.    And this is an example of that?

 4          A.    Yes, it is.

 5                         - - -

 6      (Tsipakis Deposition Exhibit 12 marked.)

 7                         - - -

 8   BY MR. BARNES:

 9          Q.    Go to file 3, which will be

10   Exhibit 12.

11                    Can you identify Exhibit 12 as a

12   business record of Giant Eagle?

13                    MR. GADDY:  Objection to form.

14          A.    Yes, it is.

15          Q.    And can you tell us in sum and

16   substance what this is showing in terms of --

17   it's labeled "Forged Prescription."  Is this an

18   example of a Giant Eagle pharmacist detecting a

19   forged prescription from a so-called

20   Philadelphia prescription ring?

21                    MR. BARNES:  Form and scope.

22          A.    Yes.  It's a -- it's a -- yes.

23          Q.    And in this circumstance, did the

24   Giant Eagle pharmacist bring in law enforcement
```

```
 1   and refuse to fill this oxycodone prescription?

 2                MR. BARNES:  Same objections.

 3        A.    Yes.  It was information that our

 4   pharmacist used that was successful in combating

 5   a forged prescription, which then led to an

 6   arrest of 22 people involved in this forgery

 7   ring, so a pretty significant -- a pretty

 8   significant apprehension of suspects in the ring

 9   from Philadelphia.  And our pharmacist was

10   involved in helping apprehend these suspects.

11        Q.    The end of the e-mail at the

12   bottom references due diligence and following

13   the controlled substance dispensing guidelines.

14                Do you see that?

15        A.    Yes.

16        Q.    Is this an example of the

17   Giant Eagle pharmacies following the guidelines

18   and exercising due diligence in combating

19   criminal diversion of opioids?

20        A.    Yes, it does.

21                    - - -

22      (Tsipakis Deposition Exhibit 13 marked.)

23                    - - -

24
```

1    BY MR. BARNES:

2          Q.    Go to the next file, number 4.

3    We're going to call it Exhibit 13.

4                Is this a business record of

5    Giant Eagle?

6                MR. GADDY:  Form.

7          A.    Yes, it is.

8          Q.    And does it show the operation of

9    corporate controls over the pharmacies?

10               MR. GADDY:  Object to form, scope.

11         A.    Yes, it does.

12         Q.    And what type of controls are

13   being exercised here, and what is the corporate

14   headquarters looking at in this example?

15         A.    So in this example, we have a

16   pharmacy, one of our pharmacies, contacting the

17   PDL in this case.  We're following up with the

18   compliance department about a concern on a

19   physician and basically alerting corporate on

20   what they're seeing at store level, and then

21   also a validation from corporate that they're

22   monitoring this particular doctor, and

23   validating the monitoring for scripts from this

24   doctor.

```
 1                    - - -

 2        (Tsipakis Deposition Exhibit 14 marked.)

 3                    - - -

 4   BY MR. BARNES:

 5        Q.    Okay.  Go to file number 5, which

 6   we'll call Exhibit 14.

 7             Do you recognize this as a

 8   business record of Giant Eagle?

 9        A.    Yes.

10        Q.    This looks very similar to the

11   last Exhibit 13; is that correct?

12        A.    It is.

13        Q.    Just more in the chain of the

14   corporate monitoring of this Dr. Veres,

15   V-e-r-e-s?

16        A.    Yes.  It's a continuation of the

17   previous e-mail string, and then more

18   information being passed between the store and

19   corporate in follow up.

20                    - - -

21        (Tsipakis Deposition Exhibit 15 marked.)

22                    - - -

23   BY MR. BARNES:

24        Q.    Okay.  Go to file 6, which we'll
```

1    mark as Exhibit 15.

2            Do you recognize Exhibit 15 as a

3    business record of Giant Eagle?

4        A.    Yes.

5        Q.    And does it show the exercise of

6    corporate controls over prescriptions being

7    issued by a Dr. Veres?

8            MR. GADDY:  Objection to form,

9        scope.

10       A.    Yes, it does.

11       Q.    Is this something that the

12   corporate compliance department looked at in

13   terms of monitoring doctors and their

14   prescription habits?

15       A.    Yes.  It's an example -- yes,

16   absolute example.

17                  - - -

18    (Tsipakis Deposition Exhibit 16 marked.)

19                  - - -

20   BY MR. BARNES:

21       Q.    Go to file 7.  We'll call it

22   Exhibit 16.

23            Do you recognize Exhibit 16 as a

24   corporate business record of Giant Eagle?

```
 1          A.    Yes.

 2          Q.    And does it represent or show the

 3   corporate oversight of the narc audits going on

 4   at the pharmacies?

 5          A.    Yes.

 6                MR. GADDY:  Objection to form.

 7          Q.    And in this circumstance, this was

 8   for Vicodin prescriptions across multiple stores

 9   in the chain, monitoring those types of

10   prescriptions?

11          A.    Correct.  Yes.

12          Q.    Is this something the corporate

13   compliance did on a regular basis in terms of

14   monitoring opioid prescriptions across the

15   entire chain?

16                MR. GADDY:  Object to form.

17          A.    Yes.

18                      - - -

19      (Tsipakis Deposition Exhibit 17 marked.)

20                      - - -

21   BY MR. BARNES:

22          Q.    Go to file 8, which we'll mark

23   Exhibit 17.  I think we've seen this earlier

24   this morning.  Mr. Gaddy asked you some
```

1    questions about this.

2                   Is this a business record of Giant

3    Eagle, Exhibit 16 -- or I'm sorry -- Exhibit 17?

4           A.     Yes, it is.

5           Q.     And this involved buprenorphine at

6    store number 54.

7                   Do you know that store number 54

8    is located in Pennsylvania?

9           A.     Yes, I do.

10          Q.     And buprenorphine, is that a

11   Schedule II or some other schedule opioid?

12          A.     A Schedule III.

13          Q.     A Schedule III.  And it's an

14   opioid treatment, correct?  It's not a -- it's

15   something you take to try and get off opioids;

16   is that right?

17          A.     Correct.

18          Q.     All right.  And in this

19   circumstance, is this an example of the

20   corporate level threshold report triggering an

21   investigation in Pennsylvania for this

22   Schedule III buprenorphine, including looking at

23   things like distances and where are these

24   prescriptions coming from?  Is that right?

```
 1              A.    Yes, that's correct.

 2              Q.    Do you know whether this activity

 3    resulted in the reporting of a suspicious order

 4    to the DEA involving this matter?

 5              A.    This interaction and this

 6    investigation did result in a suspicious order

 7    identification and letter to the DEA.

 8                         - - -

 9       (Tsipakis Deposition Exhibit 18 marked.)

10                         - - -

11    BY MR. BARNES:

12              Q.    And I'm going to mark -- it's one

13    of the documents sent to you by e-mail.  It's

14    marked -- it's HBC -- the last five numbers are

15    74072.

16                    Do you have that, Mr. Tsipakis?

17              A.    Yes, I have it.

18              Q.    And is this the suspicious order

19    you just testified to that came out of this

20    investigation of these Schedule III

21    buprenorphine prescriptions in Pennsylvania?

22              A.    Yes.  It was sent to the DEA.

23    Yes.  The suspicious order was flagged to the

24    DEA.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              Q.    And do you know if the DEA did

 2      anything with the suspicious order after it was

 3      sent to them on 1/21 of '16?

 4              A.    They never responded.

 5              Q.    All right.  I meant to mark that

 6      Exhibit 18, that suspicious order report to the

 7      DEA dated 1/21 of '16.  So if you could just put

 8      an 18 on there.

 9                    And is this a corporate business

10      record of Giant Eagle, this Exhibit 18?

11                    MR. GADDY:  Objection; form.

12              A.    Yes, it is.

13              Q.    Was Giant Eagle -- did Giant Eagle

14      view this as an example of controls working or

15      not working?

16                    MR. BARNES:  Objection; form.

17              A.    Controls working.

18                         - - -

19         (Tsipakis Deposition Exhibit 19 marked.)

20                         - - -

21      BY MR. BARNES:

22              Q.    Okay.  Go to file 9, which we'll

23      mark as Exhibit 19.

24                    Do you recognize Exhibit 19 as a
```

```
 1    corporate business record of Giant Eagle?

 2            A.    Yes.

 3                  MR. GADDY:  Object to form.

 4            Q.    And can you tell us what this is

 5    an example of or shows in terms of corporate

 6    controls?

 7                  MR. GADDY:  Objection to form,

 8          scope.

 9            A.    This shows an interaction between

10    pharmacists on a prescription and showing

11    that -- utilizing the OARRS system and getting

12    the information from the OARRS system and a

13    prescription that was filled at another pharmacy

14    and using the determination on ultimately

15    whether to fill or not fill a prescription.

16            Q.    Okay.  Is this an example of the

17    type of activity that occurred at the pharmacies

18    with these types of prescriptions?

19            A.    Yes.

20                  MR. GADDY:  Form, scope.

21                        - - -

22         (Tsipakis Deposition Exhibit 20 marked.)

23                        - - -

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. BARNES:

 2        Q.   Go to file 10, which we'll mark as

 3   Exhibit 20.

 4             Do you recognize Exhibit 20 as a

 5   business record of Giant Eagle, Mr. Tsipakis?

 6        A.   Yes.

 7        Q.   Is this -- this relates to

 8   oxycodone being dispensed at certain stores.  Is

 9   this a corporate type oversight or control

10   occurring involving this type of drug at

11   Giant Eagle corporate headquarters?

12             MR. GADDY:  Object to form, scope.

13        A.   Yes.

14        Q.   Is this a comparison of what the

15   store ordered in terms of oxycodone versus what

16   it dispensed?

17        A.   Yes.

18        Q.   And why even look at that?  Why

19   exercise that kind of a control?

20        A.   It's an effective control to

21   understand that based on the prescriptions that

22   are being prescribed at that store, there's an

23   amount of product that is being needed to fill

24   those prescriptions and then what is being
```

1    ordered.

2              So if there's a pattern where

3    there's more product being requested than is

4    being required of demand from the prescriptions

5    authorized by prescribers, then it would show a

6    potential concern of the ins and outs being --

7    for lack of a better term, the ins and outs not

8    matching or being close.  They should -- they

9    should be within -- within reason.

10        Q.    There's references to McKesson

11   being involved in this investigation here.

12             Do you see that on the bottom of

13   page 1 --

14        A.    Yes.

15        Q.    -- McKesson.

16             Was this triggered by McKesson

17   exercising controls over these oxycodone orders?

18        A.    Yes.  This was -- it originated

19   from a concern from McKesson shutting off --

20   basically requesting more information on the

21   amount of product being shipped to the store.

22        Q.    Okay.  And when McKesson would

23   exercise its oversight over its order

24   fulfillment to Giant Eagle pharmacies, would

Highly Confidential - Subject to Further Confidentiality Review

```
 1   corporate headquarters at Giant Eagle get

 2   involved?

 3           A.    Yes.  We would -- we would be

 4   notified immediately from McKesson, which would

 5   kick off an investigation and a review on the

 6   facts involved, why is there an increase being

 7   asked for.

 8           Q.    All right.  And is this an example

 9   of that, Giant Eagle corporate employees

10   investigating a McKesson threshold being tripped

11   and making sure that it was appropriate?

12           A.    Yes, it is.

13                      - - -

14      (Tsipakis Deposition Exhibit 21 marked.)

15                      - - -

16   BY MR. BARNES:

17           Q.    Go to file 11, which we'll call

18   Exhibit 21.

19              Do you recognize Exhibit 21 as a

20   corporate business record of Giant Eagle?

21              MR. GADDY:  Form.

22           A.    Yes, I do.

23           Q.    And there's a reference to a red

24   flag video being circulated by
```

```
 1   George Chunderlik; is that correct?

 2          A.    Yes, that is correct.

 3          Q.    Was this part of his corporate

 4   compliance, pharmacy compliance duties?

 5          A.    Yes, it was.

 6          Q.    And was he asking all of the

 7   pharmacy members to rewatch a video relating to

 8   drug diversion?

 9          A.    Yes.  It's an e-mail string asking

10   if they should watch the video again, and George

11   affirmatively saying yes, they're going to watch

12   the video again.

13          Q.    All right.  Was that something

14   that the Giant Eagle compliance department

15   typically did get information out to the

16   pharmacy team, things like videos from the Board

17   of pharmacy, things of that nature?

18                MR. GADDY:  Object to form.

19          A.    Yes.

20                      - - -

21      (Tsipakis Deposition Exhibit 22 marked.)

22                      - - -

23   BY MR. BARNES:

24          Q.    Go to file 12, which we'll mark
```

1    Exhibit 22.

2              Do you recognize 22 as a corporate

3    business record of Giant Eagle?

4              MR. GADDY:  Form.

5         A.    Yes.

6         Q.    There's a reference to this

7    Supplylogix.  You've referenced that a couple

8    times in your deposition.  Is that a

9    computerized software system that manages and

10   provides information about orders?

11        A.    Yes.  It's a -- it's a tool that

12   helps us manage our orders and our order points

13   and also a tool we can use to drill into

14   information that we want to look at on the

15   prescriber basis or on the -- the prescriber

16   basis or the store basis or dispensing basis.

17        Q.    Now, is Supplylogix -- does it

18   provide routinely written reports, or is it more

19   of a dashboard -- electronic dashboard type

20   system?

21        A.    It's more of a dashboard and a

22   querying system.

23        Q.    So does it have the capacity to

24   analyze orders in different ways for different

1   purposes?

2               MR. GADDY:  Objection; form.

3       A.     Yes.

4       Q.     Okay.  And in this example, it

5   says, "Supplylogix is starting to raise flags

6   into the dispensing of oxymorphone,

7   hydrochloride at Store 4008."

8               Is this an example of Giant Eagle

9   corporate headquarters using the Supplylogix

10  tool to identify and investigate opioid

11  prescriptions?

12      A.     Yes, it is.

13      Q.     And in this circumstance, in the

14  middle paragraph, it says, "Supplylogix is

15  indicating that 59.38 percent of the

16  prescriptions are coming from a pain clinic ran

17  by Ashraf Razzak."

18              Is this an example of what the

19  corporate compliance team would look at using

20  Supplylogix?

21      A.     Yes.

22      Q.     Okay.  Did you find Supplylogix to

23  be a valuable tool at the corporate level in

24  terms of looking at orders and making sure that

1   orders and dispensing were appropriate?

2        A.   Yes.

3                   - - -

4     (Tsipakis Deposition Exhibit 23 marked.)

5                   - - -

6   BY MR. BARNES:

7        Q.   Go to file 13.  We'll call it

8   Exhibit 23.

9             Do you recognize Exhibit 23 as a

10  corporate business record of Giant Eagle?

11            MR. GADDY:  Form.

12       A.   Yes.

13       Q.   Now, is this an example of Giant

14  Eagle's corporate headquarters looking at orders

15  of buprenorphine for a specific store?

16       A.   Yes, it is.

17       Q.   And does that analysis include

18  looking at where the prescriptions were coming

19  from, where the patients were coming from, and

20  distances and things -- use of cash, things like

21  that?

22       A.   Yes, it is.

23       Q.   Now, is that something that the

24  corporate compliance department would do in its

1   investigations when drilling down into orders

2   for whatever purpose, they had the capacity and

3   the ability to look at the location where the

4   patients were coming from, how they were paying,

5   in cash or insurance, things of that nature?

6           A.   Yes.

7           Q.   And is this an example of that,

8   how the corporate compliance team would review

9   at a corporate level opioid prescriptions at

10  specific stores?

11          A.   Yes, it is.

12                   - - -

13     (Tsipakis Deposition Exhibit 24 marked.)

14                   - - -

15  BY MR. BARNES:

16          Q.   Go to file 14, which we'll mark as

17  Exhibit 24.

18               Do you recognize Exhibit 24 as a

19  corporate business record of Giant Eagle?

20               MR. GADDY:   Form.

21          A.   Yes.

22          Q.   And it's similar to the last

23  exhibit.  Is this an example of corporate

24  exercising oversight and control over

Highly Confidential - Subject to Further Confidentiality Review

```
 1    buprenorphine prescriptions at a specific store?

 2              MR. GADDY:  Objection; form.

 3         A.    Yes, it is.

 4         Q.    And did these types of things

 5    occur on a regular basis at Giant Eagle in terms

 6    of corporate oversight in monitoring opioid

 7    prescriptions at the stores?

 8              MR. GADDY:  Object to form.

 9         A.    Yes.

10                   - - -

11      (Tsipakis Deposition Exhibit 25 marked.)

12                   - - -

13   BY MR. BARNES:

14         Q.    Go to file 16, which we're going

15    to mark as Exhibit 25.

16         A.    Okay.

17         Q.    Do recognize Exhibit 25 as a

18    corporate business record of Giant Eagle?

19              MR. GADDY:  Object to form.

20         A.    Yes, I do.

21         Q.    And can you tell us what this

22    communication is about?  It's captioned

23    "Meeting, Script Ring."

24              MR. GADDY:  Form, scope.
```

1        A.    So this is a communication with

2   our head of our loss prevention department,

3   Rick Shaheen, and the FBI, so local special

4   agent Robert Warner of the Pittsburgh FBI

5   office.  And it involves meeting to discuss a

6   ring of forgeries in the area.

7        Q.    It indicates in the middle

8   paragraph that "Six UPMC physicians were being

9   victimized by this forgery ring involving

10  oxycodone forgeries."

11             Is that right?

12             MR. GADDY:  Scope.

13        A.    Yes, that is correct.

14        Q.    And you mentioned earlier that

15  Rick Shaheen and the pharmacy loss prevention

16  often worked with agencies like the FBI and the

17  DEA.

18             Is this an example of

19  Giant Eagle's personnel working closely with the

20  FBI to prosecute opioid criminals?

21        A.    Yes, it is.

22                   - - -

23     (Tsipakis Deposition Exhibit 26 marked.)

24                   - - -

```
 1   BY MR. BARNES:

 2         Q.    Go to file 17, Exhibit 26.

 3               Do you recognize 26, sir, as a

 4   corporate business record of Giant Eagle?

 5               MR. GADDY:  Form.

 6         A.    Yes, I do.

 7         Q.    And can you tell us if this

 8   represents or shows more corporate oversight of

 9   opioid dispensing, including focusing on

10   specific doctors and locations?

11         A.    Yes, it is.

12         Q.    The bottom paragraph on the first

13   page references methadone being prescribed for

14   sleep and not being appropriate and the

15   pharmacist reaching out to the prescribing

16   physician on numerous occasions to get the

17   dosage changed for the oxymorphone, and the

18   office doesn't want to change it.

19               Is this an example of Giant Eagle

20   pharmacists testing the legitimacy of opioid

21   prescriptions?

22         A.    Yes, it is.

23               MR. GADDY:  Form.

24         Q.    And does this further show that
```

1    the Giant Eagle pharmacist reached out to

2    corporate headquarters for assistance with how

3    to respond to these types of prescriptions and

4    what to do?

5              MR. GADDY:  Object to form.

6        A.    Yes, it is.

7        Q.    And does this reference -- does

8    this evidence Giant Eagle advising the

9    pharmacist to exercise their professional

10   judgment and don't fill the prescription if they

11   think it's inappropriate?

12             MR. GADDY:  Form.

13       A.    Yes, it does.

14                  - - -

15     (Tsipakis Deposition Exhibit 27 marked.)

16                  - - -

17   BY MR. BARNES:

18       Q.    Go to file 18, Exhibit 27.

19             Do you recognize this as a

20   corporate business record of Giant Eagle?

21       A.    Yes, I do.

22             MR. GADDY:  Form.

23       Q.    And is this another example of

24   Giant Eagle corporate headquarters analyzing the

```
 1    prescribing habits of a specific doctor for

 2    specific controlled substances?

 3              MR. GADDY:  Form, scope.

 4         A.    Yes, it is.

 5         Q.    Is this something that corporate

 6    headquarters did on a routine basis in terms of

 7    looking at doctors who were sending patients to

 8    Giant Eagle pharmacies?

 9              MR. GADDY:  Objection; form.

10         A.    Yes.

11                   - - -

12      (Tsipakis Deposition Exhibit 28 marked.)

13                   - - -

14    BY MR. BARNES:

15         Q.    Go to file 19, Exhibit 28.

16              Do you recognize Exhibit 28 as a

17    corporate business record of Giant Eagle?

18         A.    Yes, I do.

19         Q.    Is this an example of what we've

20    seen before, which is Giant Eagle corporate

21    headquarters looking at purchases by specific

22    stores and dispensing by specific stores?

23              Do you see that?

24              MR. GADDY:  Form and scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1            A.    Yes, it is.

  2            Q.    Okay.  In this circumstance, this

  3   is for oxycodone; is that correct?

  4            A.    Yes, that is correct.

  5                        - - -

  6      (Tsipakis Deposition Exhibit 29 marked.)

  7                        - - -

  8   BY MR. BARNES:

  9            Q.    Go to file 20, Exhibit 29.

 10            Do you recognize Exhibit 29 as a

 11   business record of Giant Eagle?

 12            MR. GADDY:  Form.

 13            A.    Yes, I do.

 14            Q.    And is this an example of

 15   Giant Eagle corporate headquarters looking at

 16   certain types of dispensing activity for

 17   controlled substances, including the use of cash

 18   or discount card payments for certain time

 19   periods for opioid prescriptions?

 20            A.    Yes, it is.

 21            Q.    Is this the type of -- another

 22   example of the type of oversight for opioid

 23   prescriptions Giant Eagle headquarters exercised

 24   over its pharmacies?
```

1          MR. GADDY:  Objection to form.

2       Q.    Did you answer that, Mr. Tsipakis?

3       A.    Yes.  The answer is yes.

4                    - - -

5       (Tsipakis Deposition Exhibit 30 marked.)

6                    - - -

7    BY MR. BARNES:

8       Q.    Okay.  Go to file 21, Exhibit 30.

9             Do you recognize Exhibit 30 as a

10   business record of Giant Eagle?

11            MR. GADDY:  Form.

12      A.    Yes, it is.

13      Q.    And is this an example of

14   corporate oversight looking at specific stores

15   and how they compare to the dispensing numbers

16   for other stores in the chain?

17      A.    File 30 you said, right,

18   Mr. Barnes?

19      Q.    No.  File 21, Exhibit 30.  Sorry.

20      A.    Okay.  Sorry.  Wrong one.  Excuse

21   me.

22      Q.    I should have used the term

23   "file."  File 21 is going to be Exhibit 30.

24      A.    Yeah, I have it.  I have it.

1          Q.     Is this a business record of

2     Giant Eagle?

3          A.     Yes, it is.

4          Q.     And is this an example of the type

5     of corporate oversight that occurred, including

6     looking at specific stores dispensing versus

7     other stores in the chain?

8          A.     Yes, it is.  Comparing stores,

9     uh-huh.

10                        - - -

11       (Tsipakis Deposition Exhibit 31 marked.)

12                        - - -

13    BY MR. BARNES:

14         Q.     Go to file 22.  We'll call it

15    Exhibit 31.

16                Do you recognize Exhibit 31 as a

17    business record of Giant Eagle?

18                MR. GADDY:  Form.

19         A.     Yes.

20         Q.     You mentioned earlier the term

21    "BOLO," be on the lookout.  Is this a BOLO?

22         A.     It is.  It's communication from

23    our loss prevention department to all our

24    stores.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And does it reference a forged

2     oxycodone prescription?

3          A.     Yes, it does.

4          Q.     And was this forgery detected by

5     somebody -- I guess this is a communication from

6     the FBI and the DEA about a forgery?

7               MR. GADDY:  Object to form.

8          A.     This is an example of information

9     we received that we passed on to our stores to

10    keep a lookout for it, yes.

11         Q.     Okay.  What I was getting at is

12    whether or not the forgery was detected at a

13    Giant Eagle store or not, and that's why I was

14    confused.

15         A.     It says in there, "I provided the

16    FBI and DEA valuable information based on the

17    assistance from stores" -- which would be our

18    stores -- "to help get some of these people

19    arrested."

20               - - -

21      (Tsipakis Deposition Exhibit 32 marked.)

22               - - -

23    BY MR. BARNES:

24         Q.     Okay.  All right.  Go to file 23.

1    It will be Exhibit 32.

2              Is this a business record --

3    Exhibit 32, is it a business record of

4    Giant Eagle?

5         A.   Yes, it is.

6         Q.   There's a reference to "Controlled

7    Substance Research," and the first paragraph

8    mentions "General outline of the research that

9    Jason does when a pharmacy is flagged in the HBC

10   threshold report."

11             Do you see that?

12        A.   Yes, I do.

13        Q.   And the next couple of pages are

14   an outline of steps taken once the flag occurs.

15             Do you see that?

16        A.   Yes, I do.

17        Q.   And looking over these steps, is

18   that your understanding of what Giant Eagle

19   corporate compliance did in response to a

20   threshold being triggered either in the

21   Giant Eagle system or in the McKesson system?

22        A.   Yes, it is.

23        Q.   There's a reference to multiple

24   tools being available on the second page of this

Highly Confidential - Subject to Further Confidentiality Review

1   document.  Supplylogix certainly is one of them,

2   monthly purchasing and dispensing information in

3   number 4)a, narc audits in 4)a.i, on-hand

4   changes, reports, things of that nature.

5              Are these all tools that corporate

6   compliance used once the threshold had been

7   triggered?

8         A.   Yes, they are.

9                   - - -

10    (Tsipakis Deposition Exhibit 33 marked.)

11                  - - -

12  BY MR. BARNES:

13        Q.   Okay.  Go to file 24, which would

14  be Exhibit 33.

15             Do you recognize Exhibit 33 as a

16  corporate business record of Giant Eagle?

17        A.   Yes, it is.

18        Q.   And is this an example of

19  corporate looking at the prescribing habits of a

20  Dr. Joseph Joseph?

21        A.   Yes, it is.

22        Q.   All right.  And the first page

23  lists various factors that the corporate

24  compliance looked at, including the distances

Highly Confidential - Subject to Further Confidentiality Review

1  for when the scripts were filled, patients

2  coming from West Virginia, patients traveling

3  together.  Was this something corporate

4  compliance would evaluate when looking at the

5  doctor prescribing habits?

6          MR. GADDY:  Objection; form.

7       A.    Yes, it is.

8       Q.    And is this an example of -- just

9  an example of these types of investigations run

10  by Giant Eagle corporate?

11       A.    Yes, it is.

12                 - - -

13     (Tsipakis Deposition Exhibit 34 marked.)

14                 - - -

15  BY MR. BARNES:

16       Q.    Go to file 25, Exhibit 34.

17          Do you recognize Exhibit 34 as a

18  business record of Giant Eagle?

19       A.    Yes, I do.

20       Q.    And there's a reference on the

21  bottom of page 1 to theft of a prescription pad.

22          Is that a problem that pharmacies

23  confront from time to time, that criminals steal

24  doctors' prescription pads?

```
 1            A.    Yes, it is.

 2            Q.    And is this an example of

 3    Giant Eagle corporate compliance looking into a

 4    theft of a prescription pad for certain doctors,

 5    Dr. Sheldon Stryker and Dr. Matthew Paulson?

 6            A.    Yes, it is.  It was information we

 7    received from a dental office telling us about

 8    the theft of the prescription pad and then us

 9    reacting to that and searching in our systems

10    for those doctors, and then the information

11    being passed to the stores, yes.

12            Q.    Kind of a -- almost like a

13    BOLO-type report, be on the lookout for these

14    types of things?

15            A.    Yes.

16                       - - -

17       (Tsipakis Deposition Exhibit 35 marked.)

18                       - - -

19    BY MR. BARNES:

20            Q.    Go to file 26, which we'll call

21    Exhibit 35.

22                  Is 35 a business record of

23    Giant Eagle?

24                  MR. GADDY:  Form.
```

```
 1            A.    Yes, it is.

 2            Q.    Is this an example of Giant Eagle

 3   corporate compliance getting involved with

 4   pharmacists who are triggering further

 5   investigation for customers coming from out of

 6   town locations?

 7            A.    Yes, it is.

 8            Q.    And in this example, this is

 9   triggered by a pharmacy team leader saying,

10   "Rick, I had two customers come in tonight with

11   Youngstown, Ohio addresses, both new customers

12   with tramadol prescriptions from this

13   podiatrist.

14              "I called 1435, and they ran an

15   OARRS for me.  Both had history of lots of

16   tramadol.  My tech called Belmont Avenue, and

17   they verified he is someone we don't want to

18   fill prescriptions from.  Just wanted to let you

19   know."

20              Is this an example of a

21   Giant Eagle pharmacist refusing to fill

22   prescriptions by people coming from unusual

23   locations asking for opioids?

24            A.    What this shows is a pharmacist
```

1  getting a data point or a flag, and even with a

2  system limitation of not being able to look at a

3  PDMP, asking another store to get the

4  information they needed to follow up and not

5  fill a prescription.  Yes.

6          Q.    Okay.

7                        - - -

8      (Tsipakis Deposition Exhibit 36 marked.)

9                        - - -

10  BY MR. BARNES:

11          Q.    All right.  Go to file 27,

12  Exhibit 36.

13                Do you recognize Exhibit 36 as a

14  business record of Giant Eagle?

15          A.    Yes, I do.

16          Q.    Is this another BOLO being issued,

17  this time about two Ohio stores and a certain

18  type of drug?

19          A.    Yes, it is.

20          Q.    Again, more communication across

21  the chain regarding things to look for, be on

22  the lookout?

23          A.    Yes, it is.

24                        - - -

```
 1          (Tsipakis Deposition Exhibit 37 marked.)

 2                        - - -

 3   BY MR. BARNES:

 4          Q.    Go to file 28, Exhibit 37.

 5               Do you recognize Exhibit 37 as a

 6   business record of Giant Eagle?

 7          A.    Yes.

 8          Q.    If you look at the bottom of this

 9   e-mail chain, it appears that it was triggered

10   by some inquiries by a Giant Eagle pharmacist

11   concerning a prescription for Percocet or

12   generic Percocet.  It begins, "Hi, Angela."

13               Was Angela the pharmacy team

14   leader's PDL?

15          A.    It's our pharmacy district manager

16   for the store, correct.  Yes.

17          Q.    It says, "I spoke with a doctor

18   regarding a patient who has continually

19   exhibited red flags regarding prescriptions.

20   One of the flags that the patient exhibits, and

21   I explained to the doctor, was he in the past

22   asked for 512 brand of generic Percocet.  The

23   doctor asked that we do not dispense the 512

24   brand which is our preferred brand of generic
```

Highly Confidential - Subject to Further Confidentiality Review

1   Percocet.

2               "During my conversation, the

3   doctor -- she stated that he had asked for brand

4   name Percocet from her, and she felt as though

5   the patient was diverting the medication and

6   asked that we change the quantity from 30 to 20

7   tabs, which I did document on the Rx mainly

8   because the doctor did not want the patient to

9   return to the office to pick up another hard

10  copy.

11              "The patient became very upset

12  when I explained this to him and wanted the

13  prescription back, which I was not comfortable

14  doing since we documented the changes on the Rx

15  and note to not dispense the 512 brand.

16              "Knowing that the doctor feels as

17  though the patient is diverting their

18  medication, I am not comfortable at all

19  dispensing the prescription with another

20  manufacturer from the 512 brand.

21              "Unfortunately, in this situation,

22  the patient has been restricted to Giant Eagle

23  pharmacy by the Ohio Medicaid Pharmacy

24  Coordinated Service Program Information for

```
 1    Pharmacies.

 2                 "Are we able to completely refuse

 3    to fill a prescription even with a different

 4    manufacturer and hand the prescription back to

 5    the patient even with the documented changes?

 6                 "Is it possible to contact the

 7    state and opt out of the program for being the

 8    preferred pharmacy knowing that he may be

 9    diverting controlled substances."

10                 Does this strike you as an unusual

11    circumstance --

12         A.    Yes.

13         Q.    -- in any way, Mr. Tsipakis?

14               How so?

15         A.    It's unusual from a standpoint of

16    the pharmacist identifies a red flag, is

17    uncomfortable about the red flag, discusses it

18    with the physician.  The physician agrees with

19    the concern that the pharmacist has, but still

20    authorizes the prescription or still is okay

21    with the prescription being filled and putting

22    the pharmacist in a difficult position of what's

23    described there, and then the follow up with --

24    above it with our district manager and
```

Highly Confidential - Subject to Further Confidentiality Review

1    conferring with our loss prevention department

2    on next steps.

3           Q.    And what did the PDL, Angela

4    Garofalo tell this pharmacist who was put in

5    this position with a doctor saying, "I issued

6    the prescription, but I think the patient is

7    diverting?"  She asks around, and what is she

8    told by Giant Eagle higher-ups?

9           A.    She's told, "Regarding the Ohio

10   State Board of Pharmacy rules, you can deny

11   filling a prescription for a patient," and

12   basically tells her to use her judgment.  She

13   absolutely can refuse to fill this prescription.

14          Q.    Okay.  And then up above, it says,

15   "After speaking with Rick Shaheen, we have

16   determined that we have a responsibility to

17   reach out to the State Board of Pharmacy agent

18   and provide him with all of this information.

19             "My concern is that if the M.D.

20   feels the patient may be diverting meds, why are

21   they still writing them scripts?  Please contact

22   your local board agent, Trey Edwards."

23             And then up above, it says, "The

24   doctor did mention this would be the final

Highly Confidential - Subject to Further Confidentiality Review

```
 1   prescription, but I was a little weary that she

 2   was still allowing this one filled."

 3              So in this circumstance, the

 4   doctor is saying, "I've issued the script all

 5   right, but the patient is diverting it, but

 6   please go ahead and fill it."

 7              Why does that put the pharmacist

 8   in a bad position?

 9        A.    It puts the pharmacist in a bad

10   position because for the -- we have no evidence

11   that they're diverting or not diverting, and

12   also drastically cutting someone off of an

13   opiate, it poses a safety concern to the

14   patient, which my assumption is why the

15   physician is trying to give them one more

16   prescription in their medical judgment.

17              But it puts us in the position of

18   not having an aligned front between us and the

19   prescribing physician and then having to

20   basically go to a higher level to report this.

21   And basically it's the pharmacist reporting the

22   physician, which obviously creates an

23   uncomfortable situation.

24        Q.    And so in this circumstance, it
```

```
 1    appears that Ohio -- or I'm sorry -- Giant Eagle

 2    contacted the Ohio Board of Pharmacy agent Trey

 3    Edwards?

 4          A.    Yes.

 5          Q.    Do you know how this was resolved

 6    after this?

 7          A.    I do not.

 8          Q.    You don't?  Okay.

 9                      - - -

10       (Tsipakis Deposition Exhibit 38 marked.)

11                      - - -

12    BY MR. BARNES:

13          Q.    Go to file 29, Exhibit -- we'll

14    call it Exhibit 38.

15                Is this a business record of Giant

16    Eagle?

17                MR. GADDY:  Object to form.

18          A.    Yes.

19          Q.    And does this evidence an incident

20    in which a Giant Eagle pharmacist detected a

21    prescription that was written for a deceased

22    patient?

23          A.    Yes, it is.

24          Q.    There's a reference in the second
```

1  paragraph to the third party rejected.  Is that

2  the insurance rejection?

3          A.    Yes.  That's my assumption.  Yes.

4          Q.    Do the insurance companies have a

5  role in the dispensing process in terms of

6  exercising control on their own independent of

7  anybody else?

8              MR. GADDY:  Form, scope.

9          A.    It's an added control.  It's

10 certainly an added data point.  If that

11 prescription had -- if a prescription for the

12 same item has been filled somewhere else, the

13 insurance would reject paying twice for the same

14 medication.  So it would reject.

15         Q.    Okay.  So here the insurance

16 rejected, and the e-mail appears to be

17 summarizing what the pharmacist did in terms of

18 insisting upon identification, calling a

19 Rite Aid pharmacy, letting them know the

20 situation and then calling the Warren police?

21         A.    Yes, that is correct.

22         Q.    Okay.  Is this an example of a

23 pharmacist exercising due diligence on a

24 prescription and refusing to fill it?

```
 1          A.    Yes, it is.

 2                      - - -

 3      (Tsipakis Deposition Exhibit 39 marked.)

 4                      - - -

 5   BY MR. BARNES:

 6          Q.    Go to file 30, which we'll call

 7   Exhibit 39.

 8          A.    30.  Okay.

 9          Q.    This is Exhibit 39.  Is this a

10   business record of Giant Eagle?

11               MR. BARNES:  Object to form.

12          A.    Yes, it is.

13          Q.    And is this a --

14               MR. KOBRIN:  This is the one we

15          wanted to supplement, Jim, an e-mail

16          from earlier with additional

17          information.  So this is the other

18          e-mail document I sent you, Jeff.  Does

19          that make sense?

20               MR. GADDY:  Okay.

21               MR. BARNES:  Just to be sure, this

22          is a three-page document with writing on

23          all pages except the last one,

24          double-sided, beginning with Bates stamp
```

1          GE00835 on all three pages.

2                    MR. GADDY:  Mine is a five-page.

3                    THE WITNESS:  Yeah, mine is too.

4          It starts with pharmacy hot sheet,

5          Giant Eagle pharmacy hot sheet.

6                    MR. GADDY:  The first page of mine

7          is an e-mail from a pharmacy team lead

8          to Rick Shaheen, "Subject:  Fake

9          Prescriptions."

10                   MR. BARNES:  Right, right.

11  BY MR. BARNES:

12         Q.    Jim, your pharmacy hot sheet is my

13  last page.  Do you have other pages?

14         A.    Yeah, it might be jumbled on how

15  it was printed, so I apologize.

16                   MR. KOBRIN:  I'm not sure we all

17         have the same page order in the same

18         document.

19                   MR. BARNES:  Page 1 is going to be

20         the e-mail from 1405 pharmacy team

21         leader, 10:41, to Rick Shaheen,

22         "Subject:  Fake Prescriptions."

23                   MR. KOBRIN:  Let's take like a

24         two-minute break and make sure we have

 1          this right.  Is that all right?

 2               MR. GADDY:  It should just be in

 3          the order of the Bates numbers on the

 4          bottom right-hand corner; 53, 54, 55,

 5          56, 57, if that makes sense.

 6               THE WITNESS:  Yes.  I mean, I have

 7          the -- I have it.  It's just -- mine is

 8          cut off in the corner, and I can't see

 9          the Bates, the last digits.

10  BY MR. BARNES:

11          Q.    Jim, so the cover of Exhibit 39

12  will be this e-mail.

13          A.    Yep, I have it.  I have it.

14          Q.    The second page is two

15  prescription copies.

16          A.    Yep.

17          Q.    The third page is a fax cover

18  sheet.  The fourth and fifth pages are a

19  prescription cover and then a pharmacy hot

20  sheet.

21          A.    Yes, I have it.

22          Q.    All right.  All together, those

23  are -- that's Exhibit 30.

24               Do you recognize these as

Highly Confidential - Subject to Further Confidentiality Review

```
 1   corporate business records of Giant Eagle?

 2          A.    Yes, I do.

 3          Q.    And does this reference

 4   Rick Shaheen and a pharmacy team leader

 5   communicating about a fake prescription?

 6                MR. GADDY:  Object to form.

 7          A.    Yes, it is.

 8          Q.    And is this an example of a

 9   Giant Eagle pharmacist exercising due diligence

10   spotting a fake prescription and calling

11   Rick Shaheen and the local police?

12          A.    Yes, it is.

13          Q.    That's all I have on Exhibit 39.

14                      - - -

15     (Tsipakis Deposition Exhibit 40 marked.)

16                      - - -

17   BY MR. BARNES:

18          Q.    File 31, Exhibit 40.

19                Do you recognize Exhibit 40 as a

20   corporate business record of Giant Eagle?

21          A.    Yes, it is.

22          Q.    Is this another example of a be on

23   the lookout fraudulent promethazine with codeine

24   scripts?
```

```
 1          A.    Yes, it is.

 2                      - - -

 3      (Tsipakis Deposition Exhibit 41 marked.)

 4                      - - -

 5  BY MR. BARNES:

 6          Q.    Okay.  Go to file 32, Exhibit 41.

 7                Is this a business record of Giant

 8  Eagle?

 9                MR. GADDY:  Form.

10          A.    Yes, it is.

11          Q.    Another example of a be on the

12  lookout, Phenergan with codeine forged

13  prescriptions in the area, be on the lookout?

14          A.    Yes, it is.

15                MR. GADDY:  Scope.

16                      - - -

17      (Tsipakis Deposition Exhibit 42 marked.)

18                      - - -

19  BY MR. BARNES:

20          Q.    File 33, Exhibit 42.

21                Do you recognize Exhibit 42 as a

22  business record of Giant Eagle?

23                MR. GADDY:  Form.

24          A.    Yeah, I do.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              Q.    And what does this Exhibit 42

 2    reference, Mr. Tsipakis?

 3              MR. GADDY:  Form, scope.

 4              A.    So this shows an e-mail

 5    communication actually following up on a case

 6    that we had provided information.  So it's a

 7    link to the case that we gave information to the

 8    DEA and FBI over a year ago, and basically

 9    applauding the efforts of our teams for the

10    BOLOs that we put out and utilizing our due

11    diligence in resulting in getting this

12    individual or individuals arrested.

13              A large supplier of oxycodone,

14    this person named Barry Dorsey, that was the

15    head of an oxycodone ring in our Pittsburgh

16    area, and basically congratulating our efforts

17    in leading to those arrests and getting him and

18    those drugs off the street.

19         Q.    It references Giant Eagle

20    providing video to the federal agents as part of

21    this prosecution; is that correct?

22              MR. GADDY:  Scope.

23         A.    It does, yes.

24         Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Basically it all started with us

2    getting a call from the store about a bad script

3    that led all the way up to -- for over a year,

4    to the prosecution of these actors.

5                      - - -

6       (Tsipakis Deposition Exhibit 43 marked.)

7                      - - -

8    BY MR. BARNES:

9          Q.    Okay.  Go to file 34, which we'll

10   call Exhibit 43?

11               Is Exhibit 43 a business record of

12   Giant Eagle?

13               MR. GADDY:  Form.

14         A.    Yes, it is.

15         Q.    Does this reference the summary of

16   the efforts of the pharmacy loss prevention

17   department for fiscal year 2018?

18         A.    Yes, it does.

19         Q.    Down below it says, "Loss

20   Prevention Wins."  Second to last bullet point,

21   "Continued working partnership with the DEA, AG,

22   FBI, Ohio Pharmacy Board, local and state

23   police, U.S. attorney, and FBI acknowledge our

24   efforts in drug diversion cases."

```
 1                      Is that your understanding, that

 2     Giant Eagle's pharmacy loss prevention

 3     department worked with all of those law

 4     enforcement agencies on a continual basis to

 5     combat diversion, including diversion of

 6     opioids?

 7                      MR. GADDY:  Objection to scope.

 8            A.    Yes.  We have a strong

 9     collaboration with all those agencies and

10     continue to have strong collaboration with them

11     today.

12            Q.    Up above in the second paragraph,

13     there's a reference to electronic perpetual

14     controlled substance II logs that helps identify

15     when those drugs are missing or short.

16                      Is that another type of control

17     that Giant Eagle had, electronic perpetual

18     inventories for controlled substances,

19     Schedule IIs, to constantly monitor those

20     products?

21                      MR. GADDY:  Objection to form.

22            A.    Yes.  That's part of our

23     continuing -- our continuous improvement

24     process.  And not what's required.  This is
```

1    above and beyond what is required.  But our

2    efforts to simplify things for our pharmacies

3    and certainly continue to keep a pulse on our

4    controlled substances, so an effort to continue

5    improving the diligence.

6                      - - -

7       (Tsipakis Deposition Exhibit 44 marked.)

8                      - - -

9    BY MR. BARNES:

10          Q.    All right.  Go to file 36, which

11    we'll call Exhibit 44.

12                Do you recognize this as a

13    corporate business record of Giant Eagle?

14                MR. GADDY:  Objection to form.

15          A.    Yes, I do.

16          Q.    And what does this record -- this

17    business record evidence?

18                MR. GADDY:  Form, scope.

19          A.    It summarizes an interaction

20    between one of our pharmacy team leaders and the

21    DEA investigator.  It memorializes the

22    conversation that was had.

23          Q.    Is that an important event for

24    Giant Eagle when one of its pharmacists meets

1   with a DEA investigator?

2                MR. GADDY:   Form and scope.

3        A.    Yes, it is.

4        Q.    And in this circumstance on the

5   bottom of page 1, there's a reference to

6   "Doctors were upset that the pharmacies, Giant

7   Eagle, CVS, Rite Aid mentioned, and that

8   pharmacists were refusing to fill

9   prescriptions."

10               Is that something that Giant Eagle

11   experienced when it refused to fill

12   prescriptions, people would complain, like

13   doctors and patients?

14               MR. GADDY:   Form and scope.

15       A.    Yes.  Certain doctors would get

16   very upset with us questioning and asking for

17   more information, and in some cases would file a

18   complaint, which it appears to be this is

19   pursuant to a complaint that the doctor filed

20   against Giant Eagle and its pharmacists.

21       Q.    And at the very end of this

22   summary of this meeting with this DEA agent,

23   what does this memorialize the DEA agent advised

24   the Giant Eagle pharmacist to do?

```
 1                    MR. GADDY:  Form and scope.
 2          A.    It basically says that -- in
 3    reading this and summarizing this, he did his
 4    investigation pursuant to what he needed to do.
 5    He said that "Things take many months to happen
 6    and that facts on this particular case may be
 7    something that will proceed to court and to keep
 8    doing what you're doing.  Keep fighting the good
 9    fight."
10          Q.    And what was Giant Eagle's
11    response to that when a DEA agent says, "Keep
12    doing what you're doing"?  What did Giant Eagle
13    take that to mean?
14                    MR. GADDY:  Objection to form and
15            scope.
16          A.    We took this as this was a
17    positive meeting reinforcing that our efforts
18    and how our pharmacists are acting and
19    continuing in our safeguards and controls and --
20    are working, and, in essence, being applauded by
21    the investigators in question.
22                          - - -
23        (Tsipakis Deposition Exhibit 45 marked.)
24                          - - -
```

```
 1   BY MR. BARNES:

 2           Q.    Okay.  Go to file 37, Exhibit 45.

 3                 Is this a business record of Giant

 4   Eagle, Exhibit 45?

 5           A.    Yes, it is.

 6           Q.    And does it reference a Giant

 7   Eagle pharmacy detecting what it believed were

 8   fraudulent prescriptions for promethazine and

 9   Norco?

10           A.    Yes, it is.

11           Q.    Down at the bottom, there's an

12   indication that the pharmacist detected that the

13   address and phone numbers for the alleged

14   prescriber were not on the hard copy.  The

15   correct phone number is as indicated, but a

16   different number was on the script, and further

17   recognizing that this was an OB-GYN for out of

18   town doctors.

19                 Is this an example of Giant Eagle

20   pharmacists exercising due diligence to detect

21   fraudulent prescriptions?

22                 MR. GADDY:  Form and scope.

23           A.    Yes.

24           Q.    Now, is it your experience,
```

 1    Mr. Tsipakis, that the mere fact that a

 2    pharmacist may detect and think that there's a

 3    red flag, but it actually turns out that there's

 4    not a red flag, that the prescription is

 5    actually legitimate?

 6          A.    Yes, that does happen.

 7                MR. BARNES:  Object to form.

 8          Q.    In fact, that's exactly what

 9    happened here, right?  Up above it says that

10    local police were contacted.  They did an

11    investigation.  It turned out it wasn't a

12    forgery, correct?

13          A.    That is correct.

14          Q.    So this is an example of a red

15    flag being totally wrong.  It was actually a

16    legitimate prescription.

17                Correct?

18          A.    This was a legitimate

19    prescription.  After all the diligence was done

20    and all the investigation, it was found to be,

21    yes, the prescriber actually did write this

22    prescription.

23          Q.    Is that something that the

24    pharmacist has to take into account that what he

1    may think is a red flag is actually not a red

2    flag and it's actually a totally legitimate

3    prescription?

4            A.    It's a consideration, yes.

5                        - - -

6        (Tsipakis Deposition Exhibit 46 marked.)

7                        - - -

8    BY MR. BARNES:

9            Q.    Go to file 38, which we'll call

10   Exhibit 46.

11           A.    Sorry.  Which number, Mr. Barnes?

12           Q.    File 38.  We're going to call it

13   Exhibit 46.

14           A.    Okay.

15           Q.    Is this a corporate business

16   record of Giant Eagle?

17           A.    Yes, it is.

18           Q.    And is this another example of the

19   pharmacy loss prevention department summarizing

20   its activities for 2019?

21               MR. GADDY:  Objection to form,

22           scope.

23           A.    Yes, it is.

24           Q.    Again, emphasizing they're working

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with multiple law enforcement agencies, various

 2   task force, constant communications with the

 3   Board of Pharmacy, and the Attorney General

 4   offices.

 5              Am I reading these correctly?

 6              MR. GADDY:  Same objections.

 7        A.    Yes.  You are reading them

 8   correctly.  And of note -- and I remember in

 9   particular near the bottom, it talks about

10   individuals being arrested in our parking lot

11   for selling their Percocet to other individuals.

12   So an example, as we testified earlier, of

13   prescriptions being dispensed and then patients

14   diverting those and then getting arrested.

15        Q.    Was that an investigation and were

16   those arrests the result of Giant Eagle calling

17   in law enforcement?

18        A.    Yes, it was.

19              MR. GADDY:  Form.

20        A.     It was a multi-month, if not

21   years, of investigation that led to an arrest.

22        Q.     There's references to Giant Eagle

23   working on providing information to the federal

24   drug task force investigating cases regarding
```

1    the opioid crises.

2              Do you see that?

3        A.    Yes.

4        Q.    It says, "As a result, several

5    licensed medical practitioners have been

6    arrested for either overprescribing or medically

7    unnecessary controlled substances."

8              So does that indicate that

9    Giant Eagle's loss prevention department was

10   actively working with the federal drug task

11   force investigating the opioid crisis?

12             MR. GADDY:  Objection; form and

13        scope.

14       A.    Yes, we were actively involved.

15       Q.    And do you know, Mr. Tsipakis, at

16   any time Giant Eagle was working on a federal

17   drug task force investigating the opioid crisis

18   whether anybody on that task force or any other

19   law enforcement agency challenged Giant Eagle's

20   participation and said, "Well, you guys don't

21   deserve to participate because you're doing

22   something wrong at your own pharmacies"?

23             MR. GADDY:  Objection to form and

24        scope.

```
1            A.    No, never.

2            Q.    And for that matter, in all of the

3    contacts with law enforcement and Board of

4    Pharmacy, police that we've seen, did anybody

5    from Lake or Trumbull County law enforcement or

6    otherwise ever complain about Giant Eagle's

7    dispensing practices?

8                  MR. GADDY:  Form and scope.

9            A.    No, never.

10                        - - -

11      (Tsipakis Deposition Exhibit 47 marked.)

12                        - - -

13   BY MR. BARNES:

14           Q.    Go to file 39, which we'll call

15   Exhibit 47.

16                  Is this a business record of

17   Giant Eagle?

18           A.    Yes, it is.

19           Q.    Is this another example of the be

20   on the lookout notification sent out by

21   Rick Shaheen, Giant Eagle's pharmacy loss

22   prevention department, and in this example, fake

23   prescriptions attempting to being passed in a

24   certain area?
```

```
 1                    MR. GADDY:  Form, scope.

 2          A.    Yes, it is.

 3          Q.    Okay.  Now, Mr. Tsipakis, in

 4   Giant Eagle's circumstance, it has control over

 5   both the distribution from its own warehouses

 6   and dispensing from its own pharmacies; is that

 7   correct?

 8                    MR. GADDY:  Objection to form,

 9          scope.

10          A.    Yes.

11          Q.    Was that a yes, Mr. Tsipakis?

12          A.    Yes, that is correct.

13          Q.    Okay.  And so product that came

14   out of the Giant Eagle warehouses were in

15   constant control of Giant Eagle even when they

16   arrived at the pharmacy and all the way to the

17   point of dispensing; is that correct?

18          A.    Yes, that is correct.

19          Q.    And, Mr. Tsipakis, I think you

20   testified a little bit about this, but the Ohio

21   Board of Pharmacy inspected the Giant Eagle

22   pharmacies in Ohio hundreds of times.

23                    Are you aware of that?

24                    MR. GADDY:  Form and scope.
```

```
 1              A.    Yes, I am aware of that.

 2              Q.    And was Giant Eagle ever

 3     suspended -- was its license ever suspended or

 4     revoked for any alleged violation of the Ohio or

 5     federal drug laws?

 6                    MR. GADDY:  Same.

 7              A.    No.

 8              Q.    As a result of those inspections

 9     or otherwise?

10                    MR. GADDY:  Same objections.

11              A.    No, never.

12              Q.    You were asked some questions in

13     your last deposition about so-called cocktail

14     drugs.

15                    Do you remember that,

16     Mr. Tsipakis?

17              A.    Yes.

18              Q.    In your experience, are cocktail

19     drugs written for legitimate medical reasons by

20     doctors?

21                    MR. GADDY:  Objection; form.

22              A.    Yes.

23              Q.    Are those types of prescriptions

24     evaluated as part of the DUR process?
```

1          A.    Yes.  Absolutely.

2          Q.    You were asked some questions in

3    your last deposition about how busy are

4    Giant Eagle stores.  Mr. Mougey asked you, for

5    example, did Giant Eagle stores do approximately

6    6,000 prescriptions a week.

7               Do you remember that line of

8    questioning?

9          A.    Yes, I do.

10         Q.    And what's the actual average

11   number of prescriptions filled by Giant Eagle

12   stores?

13         A.    Our average prescriptions per

14   store is roughly 23-, 2400, and that's for total

15   prescriptions.  Controlled substance

16   prescriptions, all schedules, are less than

17   9 percent of that number.

18         Q.    And is that a -- does that

19   percentage mean anything to you in terms of how

20   big or small or right on where it should be?

21   What does that mean, 9 percent?  Less than

22   9 percent of Giant Eagle's total prescriptions

23   were controlled substances.

24               MR. GADDY:  Objection; form,

1        scope.

2            A.    From the DEA view and from

3    experience, a typical pharmacy on controlled

4    substances is roughly 20 percent.  So this would

5    indicate that we're half of -- roughly less than

6    half of the normal average that the DEA states

7    is average across registrants.

8            Q.    Which is an indication of what to

9    you?

10           MR. GADDY:  Object to form.

11           A.    That we don't fill -- that we

12   don't fill as many controlled substances as

13   other -- as other pharmacies, and that people

14   that are trying to pass prescriptions as was

15   described, forged prescriptions or other

16   prescriptions, they just don't come to us.

17           Q.    All right.  But getting back to --

18   so 23- to 2400 average, less than 9 percent are

19   controlleds.  Do your stores -- how many -- how

20   many on average pharmacists does a typical

21   Giant Eagle pharmacy have on -- under employment

22   working at a pharmacy?

23           A.    So at a particular pharmacy,

24   depending on the volume, we could have anywhere

1  from three to six pharmacists on during a day

2  shift.

3         Q.    So that workload of 2300 to 2400

4  prescriptions, less than 9 percent are

5  controlled substances, that would be spread out

6  between three to six pharmacists working

7  throughout the day?

8         A.    Yes, that's correct.  A little

9  less during the weekends, but during the week,

10  full hours, yes.

11         Q.    And the other 81 [sic] percent of

12  the prescriptions, besides the 9 percent or so

13  that are controlleds, are these just regular

14  prescriptions like amoxicillin and the

15  run-of-the-mill-type prescriptions?

16         A.    They're non-controlled or

17  scheduled drugs.

18         Q.    Do controlled prescriptions

19  usually require more time for the pharmacists

20  when they come in -- even if it's only 9 percent

21  or so of their workload, do pharmacists tend to

22  spend more time on controlled substance

23  prescriptions?

24         A.    Yes.

```
 1                    MR. GADDY:  Form, scope.
 2           Q.    Is a lot of due diligence
 3   performed by Giant Eagle pharmacists not written
 4   down?
 5                    MR. GADDY:  Objection to form.
 6           A.    Yes.
 7           Q.    And why is that?  Why wouldn't
 8   Giant Eagle require pharmacists to write down
 9   each and every thing they consider as part of
10   the due diligence process?
11           A.    There's no requirement to document
12   such interactions or documentation, but also
13   it's the professional judgment and the
14   discretion of the pharmacists on if they need to
15   or if they need to communicate something or if
16   they need to -- for example, an insurance reason
17   need to put something in the computer or put
18   something on the hard copy.
19           Q.    Do pharmacists have -- as they
20   gain experience, especially at a pharmacy, do
21   they develop relationships with the patients
22   such that they would know what their past
23   history is of prescriptions at the pharmacy and
24   what the condition being treated is?
```

```
 1                MR. GADDY:  Objection to form.

 2         A.    Yes.

 3         Q.    And is that something that

 4  pharmacists typically write down every time, or

 5  is that something they carry in their head and

 6  based upon the patient relationship, they

 7  already know it and they will fill the

 8  prescription knowing that it's appropriate

 9  already?

10                MR. GADDY:  Same objections.

11         A.    Certainly a pharmacist that's at a

12  store, a regular -- you get to know your

13  clientele and your patients, and as a pharmacist

14  myself, you know those patients and you know

15  their history and you know their disease states.

16         Q.    You were asked some questions at

17  the last deposition about a so-called manual.

18  This was Exhibit 2 of your first deposition.

19                Do you remember this manual?

20         A.    Yes.

21         Q.    All right.  And I just had some

22  follow-up questions.

23                You've already told us that the

24  DEA manual was used by Giant Eagle throughout
```

```
 1    this time period in those controlled substance

 2    boxes that we went over.

 3                 This Exhibit 2 I think you

 4    testified was never passed or effectuated as a

 5    policy at Giant Eagle.  Was that due in part to

 6    the fact that you were already following the DEA

 7    manual?

 8                 MR. GADDY:  Objection to form.

 9        A.    Yes.

10        Q.    And are some or all of the

11    portions of this Exhibit 2 -- were they already

12    in place in other locations at the Giant Eagle

13    pharmacies in other policies, for example, and

14    in the guidelines, things of that nature?

15        A.    Yes, they were.

16        Q.    Okay.  Does it concern you at all

17    that there was a draft of a manual on

18    Giant Eagle's computer system that was never

19    effectuated, or is that something that you've

20    seen before?

21                 MR. GADDY:  Objection to form.

22        A.    No, not concerned and I've

23    definitely seen drafts of things that we

24    started, created, or were not published.
```

1        Q.    Did the DEA or the Ohio Board of

2    Pharmacy ever require that Giant Eagle adopt

3    this manual as its own manual at any time?

4              MR. GADDY:  Form.

5        A.    No, never.

6        Q.    In fact, did they require

7    Giant Eagle to adopt any specific manual at any

8    time?

9        A.    No, never.

10             MR. KOBRIN:  Bob, can we take a

11        break wherever it's convenient?

12             MR. BARNES:  Yeah, we can take a

13        ten-minute break.

14             I probably only have about ten

15        more minutes, Jeff.

16             MR. GADDY:  Okay.  Thanks.

17             THE VIDEOGRAPHER:  Stand by.  The

18        time is 1:50 p.m.  Off the record.

19             (Recess taken.)

20             THE VIDEOGRAPHER:  The time is

21        2:03 p.m.  Back on the record.

22    BY MR. BARNES:

23        Q.    Mr. Tsipakis, you were asked some

24    questions about a series of exhibits, and I

```
 1   tended to ask you if they were a business record

 2   of Giant Eagle.

 3              Do you remember all multiple times

 4   I asked you those questions?

 5        A.    Yes, I do.

 6        Q.    In that regard, I want to break

 7   that down.  Were the records that you testified

 8   to as being business records, were they made at

 9   or near the time that they were transmitted by

10   somebody with knowledge of the information

11   contained therein?

12        A.    Yes, they were.

13              MR. GADDY:  Object to form.

14              Bob, I can't imagine we're going

15         to have a dispute about this.  I just --

16              MR. BARNES:  Oh, you're not?

17         Okay.

18              MR. GADDY:  I don't think we will.

19         I just -- half the time I hadn't gotten

20         the folder open before he was answering

21         the question.

22              MR. BARNES:  Well, I'm going to

23         finish.

24
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BARNES:

2          Q.    And, Mr. Tsipakis, when you

3    testified that those documents, those exhibits,

4    were business records, were they -- did you mean

5    that these records were kept in the ordinary

6    course of business by Giant Eagle pursuant to

7    regularly conducted business activity of

8    Giant Eagle?

9                MR. GADDY:  Object to form.

10         A.    Yes, they were.

11         Q.    And was it a regular practice of

12   Giant Eagle to keep those records?

13               MR. GADDY:  Objection; form.

14         A.    Yes, it was.

15         Q.    And was that what you meant when

16   you said that they were business records of

17   Giant Eagle?

18               MR. GADDY:  Same.

19         A.    Yes, it is.

20         Q.    You testified in your first

21   deposition about the corresponding obligation of

22   Giant Eagle pharmacists.

23               To your understanding, is that an

24   obligation of the pharmacist or the pharmacy?

```
 1              MR. GADDY:  Object to form.

 2         A.    The pharmacist.

 3         Q.    And then you also testified

 4   regarding the sometimes scanning of hard copy

 5   prescriptions.

 6              Do you recall that testimony?

 7         A.    Yes, I do.

 8         Q.    In what circumstance would a hard

 9   copy prescription be scanned or not scanned?

10   What determined those scanning parameters?

11              MR. GADDY:  Object to form.

12         A.    All the prescriptions, hard

13   copies, are scanned into the computer system.

14         Q.    Has that always been the case, or

15   did it start at a certain point in time?

16         A.    I'm not sure exactly when it was

17   started.  Certainly it was after an enhancement

18   in the pharmacy computer dispensing software

19   allowing images to be stored electronically in

20   the computer.

21         Q.    Okay.  And I think you said

22   insurers require hard copy scanning for

23   reimbursement; is that correct?

24         A.    Yes.  I believe what I said is
```

1  there's certain insurance -- from an audit

2  perspective on insurance, notes need to be

3  physically on the hard copy.  It doesn't matter

4  if they're in the computer system.  They have to

5  be on the hard copy.  So there's occasions that

6  we need to pull the hard copy and document.

7            I believe the example I used on

8  testing strips.  So for Medicare, Medicaid, the

9  directions of use, if we get a prescription that

10 says use as directed and we quantify what that

11 means, testing once a day, twice a day, three

12 times a day, that needs to be, in essence, put

13 on the prescription, hard copy.

14       Q.    Okay.  In these 30 or 40 examples,

15 these exhibits we went over -- I'll call them

16 corporate controls and pharmacy due diligence --

17 was it a regular practice of the Giant Eagle

18 corporate compliance department to respond to

19 pharmacists' inquiries when they had concerns

20 about potentially bad scripts and to do

21 investigations and to help the pharmacies and

22 the pharmacists resolve them?

23            MR. GADDY:  Objection to form.

24       A.    Yes.  Absolutely.  These were

Highly Confidential - Subject to Further Confidentiality Review

1   examples of an ongoing and continual even to

2   this day process, that basically the

3   interactions between corporate resources, the

4   stores, loss prevention and a regular course and

5   normal course of business and oversight.

6          Q.    Okay.  And over the years, have

7   various personnel been involved in these

8   activities, some of whom are no longer employed

9   by the company?

10         A.    Yes, that is correct.

11         Q.    And Giant Eagle's record retention

12  policies, would some of those records likely

13  have been destroyed after people left and a

14  number of years had passed since their leaving?

15              MR. GADDY:  Form, scope.

16         A.    Yes.  There's -- the servers

17  automatically -- for example, Outlook will

18  delete after so many days for space reasons and

19  other things.  So there is -- there is normal

20  processes that happen that eliminate

21  documentation over the -- especially if the time

22  has lapsed, yes.

23         Q.    Okay.  And you were asked earlier

24  this morning by Mr. Gaddy of what other controls

1   were there over dispensing besides the threshold

2   reports.

3              Do you remember that line of

4   questioning?

5        A.    Yes, I do.

6        Q.    And have we covered, to your

7   recollection, the numerous other controls over

8   dispensing that exist at the Giant Eagle

9   pharmacies and existed at these pharmacies

10  throughout the time period, such as inventory

11  controls and software controls and audit

12  controls, and all those other types of controls?

13             MR. GADDY:  Objection to form.

14       A.    Yes, we have.

15             MR. BARNES:  I've got nothing

16        further.

17                   - - -

18             RECROSS-EXAMINATION

19  BY MR. GADDY:

20       Q.    Mr. Tsipakis, you were asked some

21  questions earlier by Mr. Barnes about the job or

22  the duty of the pharmacist, and he would talk

23  about the job or the duty of the pharmacist in

24  comparison to maybe other medical professionals,

Highly Confidential - Subject to Further Confidentiality Review

1    like the doctor.

2              Do you recall that generally?

3         A.    Yes, I do.

4         Q.    You don't dispute the fact that

5    the pharmacy and the pharmacist have a

6    corresponding responsibility, correct?

7         A.    The pharmacist has a

8    corresponding --

9              MR. BARNES:  Object to form.

10        A.    -- responsibility.

11        Q.    Let's look at Exhibit Number 1,

12   which is P-HBC-28, which is the controlled

13   substance dispensing guidelines.

14             Let me know when you have those,

15   Mr. Tsipakis.

16        A.    I have it.

17        Q.    And you see at the top of the

18   first page -- this is a Giant Eagle policy,

19   right?

20        A.    Yes, it is.

21        Q.    Okay.  And the very first section

22   of this document, it states the purpose,

23   correct?

24        A.    Yes.

1        Q.    And it says, "The purpose of this

2   document is to provide the guidelines for the

3   proper dispensing of controlled substances that

4   support the corresponding responsibility mandate

5   placed upon pharmacists to exercise due

6   diligence in the decision to fill or not to fill

7   a controlled substance prescription."

8        Correct?

9        A.    Correct.

10        Q.    And you'll agree that that is an

11   obligation in the decision that the pharmacist

12   has to make every time they're presented with a

13   prescription, correct?

14        MR. BARNES:  Object to form.

15        A.    Yes.  Pharmacists use their due

16   diligence and professional judgment to fill --

17   to decide whether to fill or not fill a

18   prescription.

19        Q.    Right.  But every time they fill a

20   prescription, they have to make that independent

21   decision of whether or not that prescription

22   should be filled or should not be filled,

23   correct?

24        A.    Yes.  Correct.

1      Q.      When you were talking about the

2  job and the duty of the pharmacist and

3  differentiating it from the doctor, you weren't

4  trying to run away from this corresponding

5  responsibility that the Giant Eagle pharmacists

6  have, were you?

7      A.      Absolutely not.

8      Q.      That's an obligation and a duty

9  that they have today and that they've had since

10  the time that you first started filling

11  prescriptions as a pharmacist, correct?

12              MR. BARNES:  Object to form.

13      A.      Yes, that's correct.

14      Q.      And as outlined in this Giant

15  Eagle policy, the pharmacist must exercise due

16  diligence in making that decision, correct?

17      A.      Due diligence and their

18  professional judgment, yes, correct.

19      Q.      Now, Mr. Barnes also asked you

20  some questions about red flags and where some of

21  that language comes from, and he asked you about

22  Ohio regulations and those types of things.

23              Do you recall that generally?

24      A.      Yes.

```
 1              Q.    Do you recall that the DEA has

 2    made clear that pharmacists are supposed to be

 3    on the lookout for red flags?

 4                    MR. BARNES:  Object to form.

 5              A.    The DEA has not changed any of

 6    their rules according to -- in relation to red

 7    flags.  They've published certain memos or

 8    putting things on their website.  The rules are

 9    the same, but certainly they have given -- it's

10    not guidance.  It's basically giving information

11    on things to look out for or data points to be

12    aware of.

13              Q.    Mr. Tsipakis, do you agree that

14    the DEA has told pharmacies, like Giant Eagle,

15    that there are certain red flags that must be

16    considered as part of due diligence?

17                    MR. BARNES:  Object to form.

18              A.    The DEA has provided certainly

19    examples of red flags to be considered when

20    filling prescriptions, yes.

21              Q.    More than just guidance.  They've

22    given a list of red flags that must be

23    considered by the pharmacists when filling

24    prescriptions, correct?
```

```
 1                 MR. BARNES:  Object to form.  He
 2        already said it wasn't guidance.
 3        A.    There is no -- there is no DEA
 4   rule that I am aware of that prescribes these
 5   red flags and this is what you need to do with
 6   these red flags and this is how you need to
 7   clear those red flags.
 8        Q.    Mr. Tsipakis, do you agree that
 9   the DEA has told pharmacies like Giant Eagle
10   that there are red flags that must be considered
11   as part of the due diligence process?
12                 MR. BARNES:  Objection; asking him
13        to speculate about what the DEA might
14        have told other pharmacies.
15        A.    Again, the red -- the DEA has put
16   information out on things it considers red flags
17   and things to consider when filling a controlled
18   substance prescription.
19        Q.    And you'll agree that pharmacists
20   should be on the lookout for red flags when
21   filling controlled substance prescriptions,
22   correct?
23        A.    Pharmacists should be on the
24   lookout of all red flags for all prescriptions,
```

```
 1   not just controlled substance prescriptions, but
 2   for all prescriptions.
 3           Q.    And, in fact, on the second page
 4   of this controlled substance dispensing
 5   guideline that Giant Eagle put out in 2013,
 6   about two-thirds of the way down the page, Giant
 7   Eagle outlines these red flags.
 8                Do you see that, where it says
 9   "Appropriateness of Controlled Substance
10   Prescriptions"?
11           A.    Yes.
12           Q.    And it says there in that first
13   line, it says, "The DEA in a written opinion
14   suspending a licensed pharmacy for failure to
15   exercise the appropriate follow-up with regards
16   to the dispensing of controlled substances
17   identified ten red flags that must be considered
18   as part of the due diligence by the pharmacist
19   in evaluating whether to fill a prescription."
20                Do you see that?
21           A.    Yes, I do.
22           Q.    And do you agree with that
23   statement that Giant Eagle chose to include in
24   their dispensing guidelines in 2013?
```

 1          A.    Yes.  We included them.

 2          Q.    And you're not running away from

 3   the fact that there are red flags that

 4   pharmacists should be on the lookout for and

 5   should consider and should dispel before filling

 6   prescriptions for controlled substances,

 7   correct?

 8          A.    Correct.  I'm not running away

 9   from anything.

10          Q.    Okay.  Now, pharmacists are also

11   required to document any due diligence that they

12   perform in order to dispel red flags, correct?

13                MR. BARNES:  Object to form.

14          A.    There is no legal requirement that

15   requires a pharmacist to document any due

16   diligence around red flags.

17          Q.    Are Giant Eagle pharmacists

18   required to document any due diligence that they

19   perform to dispel red flags?

20                MR. BARNES:  Objection; asked and

21          answered.  I also object to form.

22          A.    Our pharmacists use their

23   professional judgment and discretion on when

24   they need to document things that they need to

1    document, and they do so.

2         Q.    Mr. Tsipakis, if we look at the

3    third page of the controlled substance

4    dispensing policy about two-thirds of the way

5    down the page, there's a section entitled

6    "Documentation."

7              Do you see that?

8         A.    I'm sorry.  Which page?

9         Q.    Page 3 of the guidelines.

10        A.    Yes, I see it.

11        Q.    And do you see there it says, "The

12   pharmacists must document the steps they have

13   taken to verify questionable prescriptions,

14   including any calls to the prescriber,

15   conversations with the patient, medication

16   history review, and notate on the prescription

17   itself or in the computer system utilizing the

18   appropriate notes field."

19             Do you see that?

20        A.    Yes.

21        Q.    This guideline that Giant Eagle

22   sent to its pharmacists back in July of 2013

23   doesn't say "Use your judgment about whether or

24   not to document your due diligence."  It says

```
 1   they must document the steps.

 2              Correct?

 3       A.     That is what it says here, but

 4   certainly --

 5       Q.     And if you have a pharmacist who

 6   is --

 7              MR. BARNES:  Hold on.  Hold on.

 8         He didn't finish his answer.

 9       Q.     I'm sorry, Mr. Tsipakis.  I didn't

10   mean to interrupt you.  Were you still --

11       A.     So if you're saying that's what it

12   says on the line, what's implied here is for the

13   pharmacist to document in the areas that we've

14   provided them, whether it's in the computer

15   system, on the hard copy, the items that they

16   deem in their discretion that they need to

17   document, because a red flag -- there is no --

18   there is no -- there's no one size fits all.

19              So certainly a red flag to one

20   pharmacist may not be a red flag to another

21   pharmacist, because I know the patient or I know

22   where they live or I know where they're coming

23   from.  I know what the situation is.

24              So there is -- that's where the
```

Highly Confidential - Subject to Further Confidentiality Review

1    discretion comes in on what pharmacists need to

2    document or not, depending on the red flag or

3    the situation.

4         Q.    Can you point me to where in the

5    documentation section it tells pharmacists they

6    can use their discretion on whether or not to

7    document the steps that they took to verify a

8    prescription.

9         A.    In the practice of pharmacy,

10   documentation is a discretion.  There's a

11   discretion on where I document things I need for

12   insurance purposes, things I need for refills,

13   things I need to follow up with physicians.  So

14   there's discretion that is used.

15        Q.    Is there anywhere on this policy

16   where Giant Eagle is telling their pharmacies

17   that it's up to them whether or not they

18   document the steps that they take to verify a

19   prescription, or does this document tell them

20   that they must do that?

21        A.    This document simply outlines

22   dispensing guidelines, best practices, and

23   things they should be aware of when filling a

24   prescription for a controlled substance.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                This does not -- this does not

 2      override their professional judgment.  This does

 3      not override their training.  This does not

 4      override any of that.

 5                This is just certainly a guideline

 6      to help them, to point things out, and certainly

 7      from a documentation process, they have

 8      abilities to document in multiple places within

 9      the computer system, the hard copy, dispensing

10      record, et cetera.

11           Q.    I'm just a little confused,

12      Mr. Tsipakis.

13                Does it or does it not say that

14      the pharmacist must document the steps they've

15      taken?  Does it say that?

16                MR. BARNES:  Objection; asked and

17           answered.

18           A.    If you're asking me to read what

19      the line on page 3 says, yes, it says, "The

20      pharmacist must document the steps they have

21      taken to verify questionable prescriptions."

22           Q.    Okay.  And then in the bullet

23      points below, it gives some additional

24      information that it says must be included.  It
```

1   says, "This documentation must include," and it

2   gives some additional information that must be

3   included when they document the steps they've

4   taken.

5            Do you see that?  Are we on the

6   same page there?

7        A.   Yes.  This is no different when we

8   take a new prescription over the phone on who

9   the prescriber was, who the nurse was who called

10   it in, what time did they call it in, what date

11   did they call it in.

12            So this is all very common on what

13   a pharmacist is aware of to document or when not

14   to document.

15            MR. GADDY:  Move to strike as

16      nonresponsive.

17   BY MR. GADDY:

18        Q.   Now, we see at the bottom of every

19   page the date that this was created, July 22,

20   2013, correct?

21        A.   Correct.

22        Q.   And you agree there was no written

23   Giant Eagle controlled substance dispensing

24   guideline prior to July 22, 2013, correct?

```
1              MR. BARNES:  Objection; asked and
2         answered.
3         A.    The information in this guideline
4    and other information was already available
5    either at the pharmacy on the Internet portal
6    that we have.  It was information that was
7    already available.
8         Q.    So the answer is no, it was never
9    in written form in a guideline from Giant Eagle
10   prior to January of '13, right?
11             MR. BARNES:  Objection; misstates
12        his testimony.
13        A.    If you're asking me if there is a
14   document, a four-page document, that -- I
15   guess -- I'm sorry.  I'm trying to understand
16   your question.
17             This is a guideline that was
18   provided on 2013 that's information that was --
19   same information that the stores had, were
20   using, and put in a guideline, in a document.
21        Q.    This is Version 1, correct?
22        A.    I'm not aware of another document
23   that looks like -- if you're asking me -- like
24   this --
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    -- before.

3      Q.    Has this version ever been

4   supplemented or edited at any time since July of

5   2013?

6      A.    I am not -- I'm not aware of that,

7   yes or no.

8      Q.    If all of this information was

9   already available somewhere else, can you

10  explain to us why Giant Eagle took the time and

11  spent the money to put together a formal

12  controlled substance dispensing guideline if it

13  was information that the pharmacist already had?

14     A.    It's our attempt as a continuous

15  improvement process and continually top of mind.

16  As was mentioned in my testimony before, we

17  continually talked to our pharmacists through

18  education, through training, and this is an

19  evolution of that continual keeping things top

20  of mind and reminding and supporting our

21  pharmacists, so ...

22     Q.    Okay.  So this was the first time

23  that you had decided to create a top of mind

24  document regarding dispensing guidelines for

1    controlled substance, July 2013, fair?

2                 MR. BARNES:  Object to form,

3         misstates testimony.

4         A.    This was a document that was put

5    together of information that's already out

6    there.  You had mentioned about DEA information

7    that was out there, Board of Pharmacy

8    information.  So someone decided and thought it

9    would be a good idea to put some information

10   together and to push it out to the stores.  And

11   that's what they did.

12        Q.    And you don't know whether or not

13   people have continued to update these guidelines

14   over time as additional information has come out

15   over the last eight years?

16        A.    Well, I am sure they have.  I just

17   don't know what revisions -- I don't know what

18   revisions, if any, have happened.  There's

19   certainly a lot of different training documents

20   and other things that we have that go through

21   regular revisions.

22                 So if you're asking me if this is

23   a static document, nothing is static in our --

24   again, it's a continual process of improvement.

1    Every week, every month, every year, there's

2    things that we respond to and help support our

3    pharmacy.

4         Q.    Is there an updated version of

5    this document?  The only one I have is dated

6    7/22/13, and you're telling me it's continually

7    being updated.  I don't have an updated version.

8              Are you telling me there is one?

9         A.    You asked me if I know if this has

10   been revised, and I'm testifying that I don't

11   know if it's been revised.

12        Q.    You have no knowledge that it has

13   been?

14        A.    I have no knowledge that it has

15   been or it has not been.

16        Q.    You were asked some questions

17   about the controlled substance manual, the one

18   that I think George Chunderlik put together but

19   was never actually rolled out to the pharmacies.

20             Do you remember that generally?

21        A.    Was that the exhibit -- the second

22   exhibit --

23        Q.    It was.

24        A.    Okay.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Do you remember that generally?

 2            A.    Yes.

 3            Q.    Okay.  And Mr. Barnes a few

 4   minutes ago asked you why, after Giant Eagle

 5   took the time and spent the money to put that

 6   together, wouldn't it have been rolled out to

 7   the stores.  And you said something to the

 8   effect of because the stores already had the DEA

 9   pharmacy manual.

10            Do you remember that generally?

11            A.    I said that the pharmacists have

12   the DEA pharmacist manual and other information

13   that they have.  The DEA pharmacist manual is

14   one of different pieces of information that they

15   have.  And a lot of what's covered in this

16   document is really covering information that

17   they already have, or it's already -- they

18   already have access to or already did have

19   access to or in another form already there.

20            Q.    What is the other source of

21   information -- and I'm telling you because I'm

22   looking -- I've flipped through the DEA

23   pharmacist manual, and I'll represent to you

24   it's not in there.  You can look, if you like.
```

1        But what is the other source of

2   information that you're telling us the

3   pharmacists had to see the extensive list of red

4   flags that were outlined in Exhibit Number 2,

5   the controlled substance manual?

6        MR. BARNES:  Object to form.

7        A.    So I don't have an exact date when

8   this was created or how it was created.  What I

9   do know is the data, as you mentioned on the

10  controlled substance guideline that we have, so

11  the pharmacist have had access to that, right,

12  since it was put together.

13        Pharmacists through continuing

14  education, through the red flags videos we

15  talked about earlier from the Ohio Board of

16  Pharmacy -- there's different pieces of

17  information covering red flags and top of mind

18  of red flags that has been discussed with our

19  pharmacists and certainly reinforced with our

20  pharmacists.

21        Q.    Is there any -- we'll talk about

22  the video in just a second.  But anything other

23  than the dispensing guidelines, which we've

24  already looked at, the video, any other

Highly Confidential - Subject to Further Confidentiality Review

1   document, any other piece of paper or policy

2   that you can point me to that the pharmacists

3   had access to that had everything in it that

4   that Exhibit Number 2, the controlled substance

5   manual -- I don't want to go back through it

6   again.  You went over it in March.  But all the

7   different flags that it has for prescribers and

8   for patients and for pharmacists and for stores.

9   I think we counted over 40 red flags that that

10  one listed.

11                What other document or piece of

12  paper can you point me to that the pharmacist

13  had access to that gave you the comfort to not

14  publish Exhibit Number 2, the controlled

15  substance manual?

16          A.    So in regards to red flags, I know

17  the discussion of red flags was covered

18  extensively at the different meetings and the

19  continuing education portions of our pharmacists

20  that we had, whether it was at cluster meetings

21  we had, whether it was at our annual meetings

22  that we had.  Certainly all of that was top of

23  mind.

24                As far as a written document, this

Highly Confidential - Subject to Further Confidentiality Review

1   is the written document that we have, that we

2   had put together in 2013.

3            Q.    Okay.  You're talking about the

4   guidelines?

5            A.    Guidelines.

6            Q.    Okay.  So we have the four-page

7   guidelines, and we have the video, and then we

8   have meetings and training?

9            A.    No.  You're -- again, you're

10  taking my testimony as there's little snippets

11  or one thing.  This was a continuous process of

12  all the responsibility from the pharmacists,

13  certainly the reinforcing of support for our

14  pharmacists.  And as the conversations around

15  red flags and propagation of things -- or data

16  points and things to watch out and changes in

17  prescribing habits, all those things were

18  continually discussed and shared and top of mind

19  with our corporate teams, our pharmacy teams,

20  our loss prevention teams.

21                 So whether it was in a document or

22  not, it was covered extensively throughout the

23  years.

24            Q.    Okay.  So meetings, discussions,

1    continuing education, the controlled substance

2    dispensing guidelines, the four-pager, and the

3    video?

4         A.    Loss prevention audits.  When LP

5    would go audit the stores, certainly these are

6    conversations they had, the pharmacy district

7    managers reinforcing expectations of practice.

8    So, yes, all of that.

9         Q.    And all of that is the reason that

10   Giant Eagle kept the 40-page controlled

11   substance manual sitting on the shelf that had

12   all these red flags listed in there; it's

13   because of all those meetings and discussions

14   that Giant Eagle decided they didn't need to

15   give the manual to the pharmacists?

16        A.    No, that is not what I'm saying.

17             Up until my testimony in March, I

18   had never seen this manual, Exhibit 1348.  It

19   was on one individual's hard drive and have no

20   background on how it was created, the reason it

21   was created, the reason -- I just -- I don't

22   have any background on it.

23        Q.    Okay.  Well, you understand you're

24   here today as the corporate representative of

```
 1   Giant Eagle, correct?

 2           A.    Yes.  Correct.

 3           Q.    Okay.  Did you learn in your

 4   preparation that George Chunderlik was the one

 5   who was charged with drafting the controlled

 6   substance manual?

 7           A.    My understanding is he is not --

 8   he did not draft this document.

 9           Q.    Okay.  Did you happen to look at

10   any of the portions of his deposition that he

11   gave earlier and any of the performance

12   evaluations where he talked about drafting or

13   putting together the controlled substance

14   manual?

15           A.    Are you talking about the

16   dispensing guideline or this manual?

17           Q.    No, the manual.  He did both of

18   them.

19           A.    My understanding in talking to

20   George is this is not a manual that he

21   created --

22           Q.    Okay.

23           A.    -- speaking with him.

24           Q.    And as the corporate
```

1  representative of Giant Eagle, you don't have

2  any information that you can provide for why

3  Giant Eagle spent the time, money, and effort to

4  put that 40-plus page controlled substance

5  manual together that went through 30, 40 red

6  flags and then didn't give it to anybody?  You

7  don't know why that is?

8          MR. BARNES:  Object; misstates the

9      record.

10      A.   I can tell you my understanding in

11  talking with George, that there was a pharmacist

12  that was helping out in the training department

13  that put this particular document together.  And

14  from there, whatever the discussion was at the

15  time, et cetera, that it was never effectuated.

16  So past that, I can't -- I can't speculate on

17  the reasons why it wasn't used or not.

18      Q.   So you know you had it.  You know

19  it was put together.  And you know it wasn't

20  used.

21          Is that all fair?

22          MR. BARNES:  Object to form.

23      A.   I know that it exists and it was

24  worked on by an individual pharmacist.  Past

 1   that, correct, I don't know anything else about

 2   it.

 3        Q.    Well, you know it exists.  You

 4   know it was worked on.  And you know it wasn't

 5   shared with the pharmacists at Giant Eagle

 6   stores.

 7             Correct?

 8        A.    I know that it was never

 9   effectuated or distributed to our pharmacists,

10   yes.

11        Q.    You talked a little bit about

12   Rick Shaheen in the loss prevention department

13   and the role that they played, and you made some

14   comments along the lines of that because you

15   had -- I think you called it a robust loss

16   prevention department, that that would help

17   prevent diversion.

18             Do you remember that generally?

19        A.    Yes.

20        Q.    Okay.  I want to look at

21   P-HBC-1419, which is going to be tab 16 in your

22   binder.

23             MR. BARNES:  Jeff, was this a

24        document that was previously provided?

```
 1              MR. GADDY:  Yeah, everything that

 2        I've used was sent -- I made my list

 3        from last time's list.

 4              MR. BARNES:  Your list from what

 5        list?  I'm sorry.  I didn't hear that.

 6              MR. GADDY:  I made my list for

 7        today from the list of what Peter sent

 8        you in March.

 9              MR. KOBRIN:  Exhibit 1614,

10        P-HBC --

11              MR. GADDY:  1419.

12              MR. KOBRIN:  Thank you.

13              THE WITNESS:  And, Mr. Gaddy, I'm

14        sorry.  Which tab in your binder?

15              MR. GADDY:  16.

16              THE WITNESS:  Thank you.

17              MR. KOBRIN:  This is not -- this

18        is not in my box from the last time.

19        1419 is not there, just like the first

20        two that you used this morning are not

21        there.

22              I have 1404 -- P-HBC-1404, and

23        then it goes to PODWAG.  That's one set.

24        You guys sent two sets.
```

1    BY MR. GADDY:

2           Q.    Mr. Tsipakis, are you -- did you

3    find it?

4                 MR. BARNES:  Hold on, Jeff.  I'm

5           not going to permit questioning if this

6           wasn't previously provided.

7                 MR. KOBRIN:  I don't --

8                 MR. GADDY:  You're looking at it.

9                 MR. KOBRIN:  I go from P-HBC-1387

10          TO P-HBC-5017.  I don't know if they're

11          not in order.  I'm willing to flip

12          through and look for it and continue to

13          look for it, but it's not in my set of

14          documents which were retained from the

15          first half of the deposition.

16                MR. GADDY:  That's fine, Josh.

17          Bob's got a binder in front of him with

18          the document in it.

19                MR. KOBRIN:  Which were sent in a

20          completely untimely manner.  They were

21          sent weeks after the deposition opened

22          and not even timely for this second half

23          of the deposition.

24                I mean, proceed if you want to,

Highly Confidential - Subject to Further Confidentiality Review

```
 1              but I think it's completely excludable

 2              as being a complete violation of the

 3              protocol.

 4                   MR. GADDY:  I appreciate your

 5              thoughts.

 6                   MR. BARNES:  Well, wait a minute.

 7                   MR. KOBRIN:  I don't think they're

 8              thoughts.  I mean, Bob -- if Bob says is

 9              you're not going on about it, you're not

10              going on about it.  I think it's --

11                   MR. GADDY:  Well, then we'll come

12              back and do it again.  It's a document

13              that Bob's got in front of him.  This is

14              the silliest thing I've ever heard.

15                   (Cross-talk.)

16                   (Court reporter admonishment.)

17                   MR. BARNES:  Jeff, hold on.  The

18              only reason we're here for a 45-minute

19              follow up was Peter was so upset about

20              not getting documents in the -- pursuant

21              to the protocol, and so we fought it out

22              with Special Master Cohen, and he said

23              you get 45 minutes, but that wasn't the

24              45 minutes to redo your exhibits.  It
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        was 45 minutes to go over the documents

2        that were produced.  This is not a

3        second bite at the apple.

4            MR. GADDY:  And I don't think it

5        is, Bob.  I told you I made my list from

6        what he sent last time.  I can't help it

7        that Josh doesn't have his stuff in

8        order.

9            (Cross-talk.)

10           (Court reporter admonishment.)

11           I sent you a cull-down list to

12       make this easier for everybody.  And why

13       y'all are trying to make it more

14       difficult, I can't fathom.

15           If you want to object about it and

16       you want to raise this later if this

17       ever tries to get used, you're more than

18       welcome to.

19           MR. BARNES:  Why don't we talk to

20       the special master, Jeff.

21           (Cross-talk.)

22           (Court reporter admonishment.)

23           MR. GADDY:  Josh, stop

24       interrupting.
```

```
 1              If you want to make an objection

 2        and maintain your objection, you're more

 3        than welcome to do so.

 4              The only reason I'm going to this

 5        document, Bob, is because of the

 6        questions you asked him on your

 7        redirect, so I would have pulled this

 8        out anyway new and used it even if it

 9        hadn't been sent before, even though it

10        was.

11              But I really don't understand.

12        You've made your record.  It's

13        preserved.  I got a couple questions

14        about it, and we'll move on and be done.

15              MR. BARNES:  Well, Josh, just

16        interpose your objection if you believe

17        it wasn't previously produced, and we'll

18        move to strike it as appropriate,

19        because this is not -- especially after,

20        Jeff, you and Peter, Peter especially,

21        objected so vociferously about not

22        following the protocol.

23              So we're going to insist that the

24        protocol be followed for you just like
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              you insisted that we follow it.

 2                   So if this wasn't produced, we're

 3              going to move to strike it, and that's

 4              the objection.

 5                   MR. KOBRIN:  I have a complete set

 6              of the documents from the prior

 7              deposition which we received.  Actually,

 8              I have two complete sets which were

 9              received in two packages.

10                   I've looked in both packages.

11              This document and this file are not in

12              either of the boxes that we received

13              prior to the first half of the

14              deposition.

15                   MR. BARNES:  And so, Jeff, why are

16              you representing that this is from

17              there?  I'm a little bit confused.  Why

18              would you say that it was already

19              previously sent if it wasn't previously

20              sent?

21                   MR. GADDY:  What I did was I

22              pulled a list that was purported to me

23              as having everything that was sent the

24              first time, and I went through that and
```

```
 1          culled it down to about 17, 18 documents
 2          to try to make it easier for everybody.
 3              Bob, I think you've got it sitting
 4          in front of you.  So, again, I'm at a
 5          loss for what the prejudice is here.
 6              Secondly, this is only coming up
 7          because of questions that you just asked
 8          him about Rick Shaheen and what he did.
 9          So I would have gone to the well and
10          pulled this document out anyway.
11              MR. BARNES:  Don't give me the
12          stuff about it's in front of me.  All
13          200 of our exhibits were in front of
14          Peter the last time, and he threw a
15          hissy fit about it wasn't received by
16          noon the day before, so ...
17              MR. GADDY:  Well, that's because
18          there was a ruling that we were supposed
19          to see what the deponent was relying on
20          in preparation for his deposition 24
21          hours in advance.
22              MR. BARNES:  Right.  And if this
23          is brand new, that's our --
24              (Cross-talk.)
```

```
 1                (Court reporter admonishment.)

 2                MR. GADDY:  So that we could look

 3          at them to ask our -- to know what to

 4          ask the witness questions about.

 5                MR. KOBRIN:  You had your time.

 6          This is a form over substance situation.

 7          You're claiming substance now and we're

 8          claiming form.  You previously claimed

 9          form and we claimed substance.

10                Peter admitted he went through all

11          the documents before.  You still got

12          your additional 45 minutes.

13                MR. GADDY:  Look, guys, we've been

14          here for four and a half hours for a

15          45-minute depo.  Can I please just ask

16          him five questions about this?  You've

17          made your record.  Can we all just move

18          on?  I promise Jim would be a lot

19          happier if we can just go ahead and get

20          this over with.  He has no interest in

21          listening to you arguing about this.

22                MR. BARNES:  What we're going to

23          do is interpose the objection.  You can

24          ask him Jim the questions but over our
```

```
 1            objection to the extent it wasn't

 2            previously produced pursuant to the

 3            protocol which you guys insisted be

 4            followed meticulously.

 5                 So that's the objection to your

 6            tab 16, but go ahead and ask some

 7            questions, but we are going to move to

 8            strike your use of any exhibit and your

 9            elicitation of any testimony for

10            documents you did not previously

11            provide.

12    BY MR. GADDY:

13         Q.    Mr. Tsipakis, do you have tab 16

14    open?

15         A.    Yes.

16         Q.    I want to start at the bottom of

17    the page and do this chronologically.

18                 Do you see it's an e-mail from

19    May 5, 2016?

20         A.    Yes.

21         Q.    And, again, we're asking -- I'm

22    showing you this document in context to some of

23    the responses that you gave to Mr. Barnes'

24    questioning regarding Rick Shaheen and the loss
```

1    prevention department and how they played a role

2    in diversion prevention when it came to

3    Giant Eagle pharmacies, but you see this is

4    another HBC suspicious purchasing report.

5             Do you see that?

6        A.    Yes.

7        Q.    And it says, "One pharmacy

8    exceeding the threshold"?

9        A.    Yes.

10       Q.    And if we go back up to the next

11   e-mail, it says, "George" -- and this is from

12   Jason Mullen.  It says, "George, do you want me

13   to look into 6512's numbers for buprenorphine?

14   I think they're having similar prescriber issues

15   that was hitting the Lancaster store."

16            Do you see that?

17       A.    Yes.

18       Q.    It goes to say, "This is the

19   fourth straight month that that store has blown

20   through their threshold rather early in the

21   month, although the threshold may be too low."

22            Do you see that?

23       A.    Yes.

24       Q.    Okay.

```
 1              MR. KOBRIN:  Object to form.

 2         Q.    Now, let's go up to the top

 3    e-mail, Mr. Tsipakis.

 4         A.    Yeah.  I'm just reading the --

 5    okay.

 6         Q.    You see we've got another follow

 7    up here from Jason Mullen to Mr. Chunderlik?

 8         A.    I'm sorry.  The top of the page?

 9         Q.    Yes, sir.

10         A.    I'm just going to read it one

11    second.  I see it.  I'm reading it.

12         Q.    We can read it together.

13         A.    Okay.

14         Q.    It says, "I'm still going through

15    the data, but I wanted to give you a heads up

16    there were a couple of flags."

17              Do you see that?

18         A.    Yes.

19         Q.    It says, "They seem to be getting

20    a lot of the scripts from the health and

21    wellness center.  This is the same place that is

22    hitting a lot of other Columbus stores,

23    including Lancaster, that Rick Shaheen went to

24    the DEA about."
```

 1              Do you see that?

 2       A.    Yes.

 3       Q.    So what happened in this situation

 4  was that Rick Shaheen with Giant Eagle loss

 5  prevention had identified a problem prescriber

 6  or prescribers and had actually contacted the

 7  DEA about them.

 8              Do you gather that?

 9       A.    From what I read there, yes.

10       Q.    But despite the fact that he had

11  done that, other stores within the Giant Eagle

12  chain were still filling a lot of scripts from

13  those same prescribers.

14              Do you see that?

15       A.    Whether they were filled, it says

16  here "hitting a lot of other Columbus stores."

17  So from what I'm reading here, these

18  prescriptions were showing up at other of our

19  stores.

20       Q.    Okay.  So even though loss

21  prevention had gone to the DEA complaining about

22  a prescriber or prescribers, these scripts

23  continued to make their way into Giant Eagle

24  stores and to the extent that this particular

Highly Confidential - Subject to Further Confidentiality Review

1   store blew through their threshold for the

2   fourth straight month, correct?

3         A.    So the store -- again, not having

4   any other data or any other data points, I think

5   if you recall in the testimony you and I had a

6   few years ago, the threshold -- the thresholds

7   that are set, there are certain stores that

8   could get caught in that threshold where they

9   were too low.

10              And this is an example of perhaps

11  a store that they're -- based on the chain

12  level, this is the threshold that's set, a

13  particular store based on their volume.  It may

14  not be appropriate for that particular store and

15  they hit the threshold.  And that's the

16  conversation I gathered that was done in this

17  e-mail string.

18              As far as the Rick Shaheen to the

19  DEA, this is not uncommon for us to talk to the

20  DEA about -- which is part of the collaboration

21  of things we're seeing, things we're concerned

22  about, things that we want to bring to their

23  attention.

24              But at the end of the day, these

Highly Confidential - Subject to Further Confidentiality Review

1   are lawful prescriptions coming from prescribers

2   that are authorized to prescribe these

3   particular medications.  And, again, each of

4   these prescriptions would have been cleared by a

5   pharmacist in their discretion, in their due

6   diligence.

7           Q.   So I want to break that down into

8   two pieces, Mr. Tsipakis.

9                The first you said is the

10  threshold might have been too low because of the

11  volume of this store, right?

12          A.   I'm only implying that from what

13  is written.  I don't know.

14          Q.   Sure.  Sure.  That's one

15  possibility, right?

16          A.   Uh-huh.

17          Q.   I'm sorry.  I didn't hear you.

18          A.   Yes.

19          Q.   Okay.  And that's one of the

20  problems with having a chain-wide threshold,

21  right?

22          A.   From a mathematical perspective,

23  that is -- certainly that is something that can

24  happen, yes.

1      Q.    You're going to have some stores

2  that maybe trip the threshold maybe more than

3  they should because they're high volume stores,

4  and then you're going to have other thresholds

5  that are maybe never going to trip the threshold

6  because they're such low volume stores; is that

7  fair?

8      A.    I think it depends on where you

9  set the thresholds.  If you set the thresholds

10  for the lowest common denominator, then other

11  stores -- again, it's a mathematical equation

12  how that works.

13          But in theory, you could have

14  stores on either side of that, but in our case,

15  it's the more conservative, using the smaller

16  number, so I think it would be stores with

17  higher volumes hitting the net more often than

18  the other way around.

19      Q.    Well, what you've told us is

20  Giant Eagle uses a chain-wide average, right?

21      A.    Correct.

22      Q.    Okay.  And, again, mathematical

23  problems, some stores are going to flip -- are

24  going to pop more easily than others are just

1   because of the populations that they service,

2   correct?

3          A.     The prescription mix, correct.

4   Yes.

5          Q.     And that's one of the flaws with

6   having a chain-wide average instead of a

7   store-specific average, correct?

8                 MR. BARNES:  Object to form.

9          A.     This is why we don't just rely on

10  a threshold report or just thresholds.  This is

11  one tool of many tools as we've testified -- as

12  we've gone through today in testimony and other

13  testimony, this is one -- one tool.  And, again,

14  a tool that's not required by a threshold that's

15  not a required tool by the DEA, but one

16  certainly from a recommendation or at least a

17  good practice we implemented and continued to

18  improve upon it.

19         Q.     Okay.  Well, it's one that the DEA

20  actually advised you to implement, correct?

21         A.     Yes.  As it was testified earlier,

22  that was a suggestion, not a requirement.  A

23  suggestion.  We took that internally.  We talked

24  to the stakeholders, thought that was a good

1    idea, and put it into practice.

2         Q.    Now, before I get off track, I

3    said I wanted to break this into two parts, and

4    we covered the threshold part.

5              The second part is that -- relates

6    to Rick Shaheen and his conversation with the

7    DEA.  So I want to come back to that, okay?

8         A.    Okay.

9         Q.    So Mr. Shaheen had had

10   conversations with the DEA about this prescriber

11   or prescribers, but despite the fact that

12   Giant Eagle loss prevention had notified -- or

13   excuse me -- had identified an issue with the

14   prescriber or prescribers, this particular store

15   and other stores throughout Columbus continued

16   to receive and fill prescription from those

17   individuals, correct?

18             MR. BARNES:  Objection; misstates

19        the document.

20        A.    I don't understand how you're

21   linking the two together.  As far as if you're

22   asking did we continue to receive prescriptions

23   from this prescriber, yes, we did, as did every

24   other pharmacy, certainly, I'm sure in the area.

```
 1            Q.    But would you agree with me that

 2     if your loss prevention department has developed

 3     such serious concerns about a prescriber or

 4     prescribers that they've decided to go to the

 5     DEA about them, that maybe that's information

 6     that should be passed along to all the

 7     pharmacists in the field so that they can

 8     evaluate that information as part of their due

 9     diligence in making the determination about

10     whether or not to fill a prescription from that

11     prescriber?

12            A.    I have no information that says he

13     did or did not pass that information along or

14     what was given or what wasn't.  I'm only reading

15     with you this e-mail string.

16            Q.    I hear you, and that will be my

17     next question.  But my first question is, don't

18     you think he should have or Giant Eagle should

19     have communicated that information to the

20     pharmacists that, "Hey, our loss prevention

21     department has determined that this prescriber

22     or these prescribers at the health and wellness

23     center are so concerning that we went to the DEA

24     about them."
```

1          Don't you believe that that

2    information should be communicated to the

3    Giant Eagle pharmacists in the field so that

4    they can have that as an arrow in their quiver

5    when they're making a determination about

6    whether or not to fill a prescription?

7               MR. BARNES:  Object to form.

8          A.   Again, whether that information

9    was or was not communicated, I don't have -- I

10   can't answer that.  But from experiences that I

11   have seen in how Rick Shaheen and our loss

12   prevention department and how our corporate

13   department is set up and works, I most assuredly

14   think that information was considered and

15   disseminated in whatever fashion that it was.  I

16   have no reason to believe it wouldn't be.

17              MR. GADDY:  Okay.  Well, I'll move

18        to strike your speculation.

19   BY MR. GADDY:

20        Q.   But maybe you just answered my

21   first question towards the end there by

22   implication.

23              But you'll agree that that

24   information should have been passed on to

```
 1    Giant Eagle pharmacists, right?

 2              MR. BARNES:  Object to form.

 3         A.    You had asked me if that's

 4    information -- again, I'm going back to the

 5    question you asked me about Rick Shaheen and the

 6    DEA, and I wasn't privy to the conversation

 7    between Rick Shaheen and the DEA and what

 8    information he did or didn't share.

 9              Certainly information around this

10    instance and the stores that are involved, I

11    most assuredly believe that the store and the

12    PDLs and the loss prevention folks involved with

13    Store 6512 would have had conversation.

14              MR. GADDY:  Okay.  Well, object

15         and move to strike.

16    BY MR. GADDY:

17         Q.    You're guessing, Mr. Tsipakis.

18              My question -- I'm going to ask

19    two questions.  The first is going to be whether

20    or not it should have been communicated, and the

21    second was whether or not it was.

22              And you've already told me you

23    don't know if it was or not.  But I'm still

24    trying to get an answer to my first question.
```

```
 1                 Should this information, should it
 2   have been communicated to the Giant Eagle
 3   pharmacists that Giant Eagle loss prevention had
 4   made a determination that there were concerns
 5   about these prescribers, that they went to the
 6   DEA.  Should that information have been sent to
 7   the Giant Eagle pharmacists, yes or no?
 8                 MR. BARNES:  Objection; asked and
 9            answered multiple times.
10                 MR. GADDY:  But not answered yet.
11            Been asked, but not answered.
12   BY MR. GADDY:
13            Q.    Should that information have been
14   provided to the Giant Eagle pharmacists?
15                 MR. BARNES:  You don't like the
16            answer, so you keep hounding him with
17            the same question over and over and over
18            again.
19                 One more time, Mr. Tsipakis.
20            A.    So information, certainly data
21   points as described here, information again on
22   this particular topic, what was shared or wasn't
23   shared or would it be helpful, it's a red flag.
24   It's a data point.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    But, again, each pharmacist

2      individually needs to use their judgment and the

3      information that they have whether to fill or

4      not fill a prescription.

5                    And, again, these prescriptions

6      that are coming in are coming from a licensed

7      authorized individual to prescribe medication.

8                    If the DEA had a concern, an

9      imminent threat to the community and to the

10     counties involved, they would have pulled this

11     person's DEA license.

12                   MR. GADDY:  Move to strike as

13              nonresponsive.

14     BY MR. GADDY:

15         Q.    Should this information have been

16     provided to the pharmacists?

17                   MR. BARNES:  I think this is about

18              the fifth time you've asked him the same

19              question.

20                   MR. GADDY:  He hasn't answered it

21              yet, Bob.  He's telling me that it might

22              or it might not have been, but he

23              thinks --

24                   MR. BARNES:  You don't like the
```

```
 1          answer.

 2                    MR. GADDY:  I'm asking should it

 3          have been provided.

 4                    MR. BARNES:  Let's move on.  Let's

 5          move on.  You've asked him five times.

 6                    MR. GADDY:  No, I'm not moving on

 7          until I get an answer.

 8   BY MR. GADDY:

 9          Q.    Mr. Tsipakis, should this

10   information have been provided to the

11   pharmacists?

12                    MR. BARNES:  Objection; asked and

13          answered at least five times.

14          A.    Without having been there and

15   understanding what the conversations were,

16   you're asking me to speculate whether this

17   information would have been helpful or not to

18   other pharmacies.  The same speculation you just

19   asked me about is the same thing you're asking

20   me to do.

21                    I wasn't there.  I wasn't part of

22   that conversation.  I'm only reading an e-mail

23   conversation in a chain.

24          Q.    So your answer is, you don't have
```

Highly Confidential - Subject to Further Confidentiality Review

1    enough information to tell us whether or not the

2    fact that Rick Shaheen had gone to the DEA about

3    this prescriber or prescribers should have been

4    communicated to the pharmacists; is that fair?

5              MR. BARNES:  Object to form,

6         misstates the testimony.

7         A.    What I'm saying is you're asking

8    me if this was data useful or not, and without

9    having the full -- I don't know.  I don't know

10   if it would have been helpful or not.

11        Q.    Okay.  Thank you.  You don't know.

12             Do you know definitively, not you

13   think or you guessed, but do you know whether or

14   not this information was given to the

15   pharmacists?

16             MR. BARNES:  Object to form.

17        A.    I do not.

18        Q.    Thank you.

19             Before we went down that trail, we

20   were talking a little bit about the DEA looking

21   at distribution centers.  Mr. Barnes asked you

22   about that, and you referenced that they'd made,

23   I think you said, a suggestion about

24   implementing a threshold program.

```
 1                    Do you recall that generally?

 2          A.    Yes.

 3          Q.    Okay.  Did you review the

 4  deposition of Agent Colosimo that was taken in

 5  this case?

 6          A.    I did not.

 7          Q.    Okay.  Were you aware -- because

 8  you provided some testimony about DEA said that

 9  Giant Eagle was in compliance or full compliance

10  or some terms like that.

11                    Were you aware that Agent Colosimo

12  indicated that the DEA had expressed concerns

13  regarding Giant Eagle's suspicious order

14  monitoring program?

15                    MR. BARNES:  Object to form.

16          A.    No, I'm not aware of that.

17          Q.    Did you review any of the reports

18  of the DEA inspections of HBC or Giant Eagle

19  facilities in preparation for your testimony

20  today?

21          A.    I believe those I had reviewed in

22  the first track, in the first -- from the HBC

23  that --

24          Q.    We didn't have them then, so -- we
```

1    got them after 2018.  So we got them from the

2    DEA at some point in time after 2018.

3              A.    Okay.

4              Q.    So you wouldn't have had them to

5    review before that deposition.

6              A.    What I did review is our version,

7    right, the -- our inspection report is what I'm

8    saying.

9              Q.    Okay.  Thanks.  That's a good

10   clarification.

11                   You haven't reviewed any

12   DEA-authored reports about inspections of the

13   HBC or Giant Eagle distribution facility?

14             A.    Correct.

15             Q.    Okay.  I want to ask a quick

16   question about OARRS to follow up on some

17   questioning that Mr. Barnes had.

18                   At your deposition in March, when

19   I read it, I got the impression that you were

20   testifying that a pharmacist could go into OARRS

21   and run a report on a doctor.  And then today

22   when you testified, I thought you made it pretty

23   clear that a pharmacist could only run a report

24   on a patient.

```
 1                   Do you agree that a pharmacist can

 2      only run a report on a patient within OARRS and

 3      that they cannot go into OARRS and pull a report

 4      on a doctor?

 5           A.    So -- thank you.  Let me clarify.

 6                   So I believe that was in response

 7      to Mr. Mougey's questions about pattern

 8      prescribing or using OARRS.

 9                   From a pharmacy perspective,

10      there's a very limited use case on how you can

11      use OARRS.  So by going in and putting a patient

12      and a date of birth, I can get who the

13      prescriptions -- who filled those

14      prescriptions -- what pharmacy filled those

15      prescriptions, the quantity of those

16      prescriptions, and who the doctor that

17      authorized those prescriptions.

18                   So from a doctor information, that

19      is what's available and that's what I would

20      have -- that's what I meant.  You can't run a

21      doctor report showing me all the prescriptions

22      by Dr. XYZ.  That's not a functionality of OARRS

23      or the ability of OARRS.  It's an individualized

24      inquiry or query based on a patient level
```

1    inquiry.

2         Q.    Okay.  So if a patient came into a

3    Giant Eagle pharmacy and presented a

4    prescription from Dr. Doe and the pharmacist at

5    Giant Eagle wanted to do research on Dr. Doe,

6    based on what you just told me, they cannot go

7    into OARRS, type in Dr. Doe and get a list of

8    every script Dr. Doe has filled; is that

9    correct?

10         A.    That is my understanding.

11         Q.    Okay.  And I think what you also

12    told us last time is that that is something that

13    a pharmacist could do within the dispensing

14    system and get information just for their store

15    for Dr. Doe; is that correct?

16         A.    So I believe what you're referring

17    to is the conversation around reports that are

18    available at the store.

19         Q.    Yes, sir.

20         A.    The store can run a utilization

21    report that shows what prescriptions they

22    filled, what drugs they want to look at, which

23    there is a prescriber report that they can run

24    at store level, yes.

1     Q.    Okay.  And so at the store level,

2   not the whole chain, but at the store level, a

3   pharmacist could run a report for Dr. Doe and

4   see all the prescriptions that he or she filled

5   or had filled at that store, but not at all the

6   other Giant Eagles, correct?

7     A.    Correct.  If they had something

8   that they wanted to see broader, they could --

9   they would talk to their PDL, or they would talk

10  to the compliance department.  And I think a lot

11  of the reports and the testimony we saw earlier

12  today show examples of corporate running reports

13  across the chain.

14          So if stores had a concern or a

15  question, they would escalate that question,

16  whether it would be to loss prevention, whether

17  it would be to the compliance department,

18  whether it would be to their PDL, and they would

19  get assistance or someone to help them or walk

20  them through whatever they needed.

21    Q.    Okay.  The last thing I want to

22  ask you about relates to the volume issues that

23  you talked about with Mr. Barnes towards the end

24  of your testimony.

```
 1              You said that the average volume

 2   is 2,300 scripts per week per store?

 3         A.    23-, 2400 unequivocalized, yes.

 4         Q.    Okay.  How many -- so if we were

 5   to -- so if we were to just take 2300, we could

 6   multiply that by 52 to get the average number of

 7   scripts per year per store; would that be fair?

 8         A.    Yes.

 9         Q.    Okay.  So I did that and got about

10   120,000.  Does that sound about right?

11         A.    Sure.  Yes.  I didn't do the math,

12   but I'm trusting your math.

13         Q.    Well, I pulled my calculator on my

14   phone with a calculator.  I got 119,600, but

15   I'll round it up to 120,000.

16         A.    Okay.

17         Q.    How many Giant Eagle stores are

18   there?

19         A.    Pharmacies?

20         Q.    Yes, sir.

21         A.    As of today, 215.

22         Q.    So if we multiply the 120,000

23   scripts per year times the 215 stores, I get

24   25.8 million prescriptions filled.
```

```
 1                    Does that sound about right?

 2          A.    Yes.

 3          Q.    And that would be per year?

 4          A.    Correct.

 5          Q.    Okay.  Is that fairly consistent

 6     if we keep going back in time the last couple of

 7     years, or is it going to go down by a

 8     substantial number?

 9          A.    I couldn't answer definitively.

10     Certainly we've been growing -- or the years

11     that I've been here personally and certainly

12     we've grown year on year.  I'd have to go back

13     and look at what our -- I mean, I couldn't

14     definitively tell you if it's materially

15     different than that number or not.  I can tell

16     you firsthand in the last four years I've been

17     here that it's pretty consistent.

18          Q.    Okay.

19                MR. BARNES:  Jeff, I'm going to

20          just interpose an agreement.  We had

21          agreed that the witness would be

22          presented on topics 1 through 7.

23                You're now getting into other

24          topics that we had agreed would be
```

```
 1            provided in writing, including

 2            performance metrics, pay, compensation,

 3            staffing, promise times, fill times.  Is

 4            that what you're getting into?  I don't

 5            understand what this questioning would

 6            be about, and it seems to be straying

 7            from the agreed topics.

 8                  MR. GADDY:  I'm just following up

 9            directly on questions that you asked

10            him, Bob.

11                  MR. BARNES:  Yeah, I didn't ask

12            him about how many prescriptions the

13            entire chain filled or anything like

14            that.

15                  So I'll see where it's going, but

16            I think you're right on the line of

17            going beyond the topics.

18                  MR. GADDY:  Okay.

19    BY MR. GADDY:

20            Q.   Okay, Mr. Tsipakis.  So we had

21    about 25.8 million per year for Giant Eagle, and

22    you said that roughly 9 percent of those are

23    typically controlled substances?

24            A.   To my knowledge, that's what I
```

Highly Confidential - Subject to Further Confidentiality Review

1    believe, yes.

2         Q.    Okay.  And so I multiplied the

3    25.8 million times 9 percent and I got

4    2,322,000.

5              Does that sound about right for

6    the number of controlled substances that

7    Giant Eagle would have filled last year?

8         A.    25 million, yes.

9         Q.    And, again, same answer that you

10   just gave as far as how consistent that would

11   have been going back the last couple of years,

12   you've grown, so it would have been a little

13   lower the last few years looking backwards?

14        A.    I mean, I think the numbers are

15   going to be less, because prescribing habits and

16   opiate prescriptions and controlled

17   prescriptions are down year on year.  So

18   depending on the class of drug that you're

19   looking at, I expect it actually would be less

20   year on year.

21        Q.    Well, if they're less year on

22   year, that means they'd be more as we went

23   backwards, right?

24        A.    Potentially, yes.

```
 1              Q.    Okay.  So 2.3 million last year,

 2    maybe about that, maybe a little bit more, maybe

 3    a little bit less, depending, but ballpark-wise,

 4    you don't have an issue with the 2.3 million

 5    controlled substance prescriptions filled on an

 6    annual basis?

 7              A.    No.  Again, assuming the numbers

 8    that I have looked at, the 10 percent controlled

 9    versus total, then that would line up.

10              Q.    Okay.  And on every one of those

11    2.3 million prescriptions for controlled

12    substances every year, the pharmacist that fills

13    those prescriptions has a corresponding

14    obligation to do their due diligence and make

15    sure that those prescriptions should actually be

16    filled, correct?

17              A.    Yes.

18              Q.    And they have an obligation to be

19    on the lookout for red flags and to conduct

20    their due diligence to dispel any and all red

21    flags before they fill those prescriptions,

22    right?

23              MR. BARNES:  Object to form.

24          Object to form.
```

1    A.    It's not only on controlled

2  substances.  I mean, all prescriptions.  But,

3  yes, the corresponding responsibility is on the

4  controlled substances.

5    Q.    Yeah.  And they have an obligation

6  to look out for the red flags and dispel any and

7  all red flags before they make a decision to

8  fill those prescriptions, correct?

9           MR. BARNES:  Object to form.

10    A.    Correct, in their professional --

11  using their professional judgment and training

12  and patient information, yes, all of that.

13           MR. GADDY:  Okay.  Thank you,

14       Mr. Tsipakis.  That's all I have for

15       you.

16           MR. BARNES:  I have a few

17       follow-up questions, Mr. Tsipakis.

18                - - -

19       FURTHER REDIRECT EXAMINATION

20  BY MR. BARNES:

21    Q.    I think you told us earlier --

22  going backwards from what you just finished on,

23  you told us earlier that the DEA has said about

24  20 percent controlled substance versus

```
 1   non-controlled substance prescriptions is a

 2   normal operating pharmacy; is that correct?

 3              MR. GADDY:  Objection to form.

 4       A.    Yes, that is correct.

 5       Q.    So applying the DEA's math,

 6   Giant Eagle should have as an operating --

 7   normal operating pharmacy filled about 5 million

 8   prescriptions; is that right?

 9              MR. GADDY:  Objection to form.

10       Q.    For controlled substances last

11   year using Jeff's math and the DEA?

12              MR. GADDY:  Objection to form.

13       A.    Yes.

14       Q.    And instead, they're not only

15   less -- they're less than half of that; is that

16   right?

17              MR. GADDY:  Form.

18       A.    Yes.

19       Q.    Now, when you just answered the

20   question about corresponding obligation and red

21   flags, am I correct that as far as you know,

22   neither the DEA or the Ohio Board of Pharmacy

23   has ever advised Giant Eagle that it had to

24   follow any red flags at any time?
```

1          MR. GADDY:  Objection to form.

2      A.    That is correct.

3      Q.    In the hundreds of inspections by

4  the Ohio Board of Pharmacy and the multiple

5  inspections by the DEA of the warehouses, did

6  they ever at any time suggest or state that

7  there were red flags that had to be followed by

8  the pharmacists when filling prescriptions?

9          MR. GADDY:  Form, asked and

10         answered.

11     A.    No.

12     Q.    And we went through many examples

13  today of Giant Eagle's corporate headquarters

14  sharing information across the chain with

15  pharmacies, including BOLOs and e-mails and

16  looking at specific doctors.

17         Do you remember all those things

18  we went through?

19     A.    Yes, I do.

20     Q.    Okay.  So is it a fair statement

21  that the Giant Eagle's pharmacy compliance

22  department oversaw all the pharmacies and

23  communicated regularly with all the pharmacies

24  out in the field?

```
1              MR. GADDY:  Objection to form.
2         A.   Yes.  In conjunction with the
3    operations team and the loss prevention team,
4    yes.
5         Q.   Okay.  With respect to OARRS, is
6    it your testimony that OARRS precludes
7    pharmacists to investigate doctors, to go into
8    their database and say, "I just want to see what
9    Dr. Smith has been up to in the last year.  I
10   want to see what prescriptions he's been
11   authorizing for all of his patients."
12              You can't do that, can you?
13        A.   That is not a functionality
14   allowed for the pharmacist on our side of the
15   OARRS platform.
16        Q.   Right.  But on the OARRS side of
17   the platform, they can certainly see it and do
18   it and, in fact, that's the function of OARRS,
19   right, to analyze that data and to look for bad
20   prescribers and bad patients and doctor shoppers
21   and drug abusers?  That's what they do with that
22   data; am I correct?
23        A.   Yes, that is my understanding.
24        Q.   Now, when you say that -- you were
```

1    asked some questions about whether Rick Shaheen

2    passed on information about a DEA -- contacting

3    the DEA, was it to your understanding Rick

4    Shaheen's normal practice and habit to

5    communicate that type of information to other

6    pharmacies when he had information about bad

7    doctors or bad patients?

8            A.    Yes.

9                  MR. GADDY:  Objection to form.

10           A.    Absolutely.

11           Q.    Now, you have experience yourself,

12   Mr. Tsipakis, of undergoing State Board of

13   Pharmacy inspections of pharmacies where you

14   were a pharmacist?

15           A.    Yes, I do.

16           Q.    And have you had the experience

17   from time to time of having information about a

18   potentially bad doctor and communicating that to

19   the board agent and being told what to do or not

20   to do with that information?

21                 MR. GADDY:  Object to form.

22                 Is this individual testimony, Bob,

23         or 30(b)(6)?

24                 MR. BARNES:  It's 30(b)(6).  It's

```
 1              just following up on what you elicited.

 2              MR. GADDY:  All right.  I'll

 3         object then.

 4         A.    I'm sorry, Mr. Barnes.  Can you

 5    repeat the question for me, please?

 6         Q.    Yeah.  I'll say it in a better

 7    way.

 8              Do you have knowledge about board

 9    agents advising pharmacies to not stop filling

10    prescriptions for doctors under investigation

11    because that's -- the doctor was simply under

12    investigation and hadn't been found guilty of

13    anything?

14              MR. GADDY:  Objection to form.

15         A.    No, never.

16         Q.    Okay.  Do doctors in your

17    experience, Mr. Tsipakis, who end up being

18    convicted and having their license stripped

19    away, do they still, nevertheless, have good

20    patients who need good prescriptions filled?

21              MR. GADDY:  Objection; form.

22         A.    Yes.  Absolutely.

23         Q.    Do you recall you were asked

24    questions about Giant Eagle's chain-wide
```

1    threshold system?  Do you understand that that

2    threshold system was looked at by the DEA after

3    it was implemented and found to be in compliance

4    with the SOM regulations?

5            MR. GADDY:  Objection to form.

6        A.    Yes, I am aware of that.

7        Q.    In fact, are you aware that the

8    DEA doesn't really provide much guidance, if

9    any, about how to run a threshold system and

10   what formulas to use because it's a

11   facility-by-facility specific factor?

12           MR. GADDY:  Object to form, scope.

13       A.    Yes, that is correct.  The DEA

14   does not provide explicit guidance or

15   suggestions on how to implement or what numbers

16   to use or not.  Correct.

17       Q.    It's up to the facility to do it

18   based upon what they feel they need to do; is

19   that correct?

20       A.    Yes, that is correct.

21       Q.    And, to your knowledge, did the

22   DEA ever advise Giant Eagle's warehouses that

23   they're using the wrong formula or should use a

24   different formula?

```
 1            A.    No, never.

 2            Q.    Were guidelines ever required by

 3    either the DEA or the Ohio Board of Pharmacy?

 4    Did you ever even need to have guidelines?

 5                 MR. GADDY:  Objection; form.

 6            A.    No.  They were never required

 7    or -- never required of us.

 8            Q.    So why even have them?  Why even

 9    issue anything?

10                 MR. GADDY:  Objection; form, asked

11            and answered.

12            A.    Again, in the continuous process

13    of keeping things combined, supporting our

14    pharmacists information and using them as

15    talking points for all of our continuing

16    education, our meetings, et cetera, it was

17    decided to put it together in a guideline.

18            Q.    Okay.  But that's not something

19    required by the regulations or the statutes, as

20    far as you know?

21                 MR. GADDY:  Objection; form.

22            A.    No, it is not.

23            Q.    Mr. Gaddy represented to you in

24    some questioning that red flags are not in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   DEA manual.  Do you remember him representing

 2   that to you?

 3         A.    He did say that, yes.

 4         Q.    And assuming that to be true, what

 5   is the significance of the fact that the DEA's

 6   own pharmacy manual doesn't require any red

 7   flags?

 8              MR. GADDY:  Objection to form, the

 9         scope.

10         A.    Again, red flags -- red flags can

11   be different.  There is no list of explicit

12   things you have to look out for.  It's

13   individualized based on patient and situation

14   and prescription.

15              So certainly these are things

16   for -- data points for pharmacists to use in

17   their professional judgment and discretion on

18   whether to fill or not fill a prescription.

19              But, again, there is no statute or

20   requirement of here's a list of -- either for

21   the Board of Pharmacy or DEA.  It's more of a

22   best practice or things to look for or things

23   that are top of mind, a guideline or suggestion

24   only.
```

1    Q.    Right.  So if the DEA had felt it

2  was important enough for pharmacies and

3  pharmacists to know about red flags, do you

4  think they would have put it in their own

5  pharmacist manual?

6         MR. GADDY:  Objection to form.

7    That's not what that is, but go ahead.

8    A.    Yes, I do.

9    Q.    The questions you were asked by

10 Mr. Gaddy about the dispensing guidelines,

11 specifically the documentation, these

12 guidelines, under the documentation section, it

13 says, "The pharmacist must document the steps

14 they have taken to verify questionable

15 prescriptions."

16         Do you know what a questionable

17 prescription is?

18    A.    Yes.

19    Q.    What is it?

20    A.    A questionable prescription is

21 when a pharmacist has a concern about either

22 legitimacy of a prescription or a dose on a

23 prescription.  I mean, there's many things on a

24 questionable prescription on whether it should

1    be filled or not.

2         Q.    All right.  But if a pharmacist

3    satisfies his concern, it's no longer a

4    questionable prescription; is that correct?

5         A.    Correct.  They've cleared the

6    prescription, yes.

7         Q.    And, therefore, no need to

8    document anything?

9         A.    That's correct.

10        Q.    Is it -- from a pharmacist's

11   perspective, and specifically Giant Eagle's

12   perspective, which is more important for

13   Giant Eagle, that pharmacists do their due

14   diligence or they document it because somebody

15   some day might challenge their professional

16   judgment?

17             MR. GADDY:  Objection; form,

18        scope.

19        A.    For the pharmacist to use their

20   due diligence to take care of the patients.

21             MR. BARNES:  I've got nothing

22        further.

23             MR. GADDY:  I don't have any more

24        questions for Mr. Tsipakis.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I did want to note that we looked
 2         into these documents, particularly the
 3         one that you were raising an issue with,
 4         and apparently that was one that you
 5         identified and provided to us late that
 6         was the subject of the redeposition.
 7              So that document came from the
 8         e-mail that -- Josh, I assume it was you
 9         e-mailed over the night before the
10         deposition.  So that's where that one
11         came from.
12              Mr. Tsipakis, I don't have any
13         more questions for you.
14              MR. KOBRIN:  Let me just put on
15         the record real quick.  Was that -- when
16         you entered that document -- that's
17         neither here nor there, because you've
18         been -- within the guidelines, you
19         wouldn't have been able to pull the
20         document from the documents we disclosed
21         to you, which we did disclose to you
22         within a timely fashion and keeping the
23         protocols, because you would have had to
24         get the document to us in 48 hours
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          before the deposition, and we disclosed

 2          the documents to you the day before the

 3          deposition.  So I don't know why that

 4          has any relevance.

 5              Did you mark that as an exhibit or

 6          no?

 7              MR. BARNES:  I don't think he did.

 8              MR. GADDY:  Yeah, I meant to.

 9          Let's mark it.  I don't know what number

10          we're on, Bob.

11              MR. BARNES:  Why don't you just

12          mark it Exhibit 23, since that's what it

13          already is, so let's have the record

14          reflect that it's Exhibit 23.

15              MR. GADDY:  I'm sorry?

16              MR. KOBRIN:  It's Exhibit 23.

17              MR. GADDY:  There already is a 23.

18              MR. KOBRIN:  Yeah, I believe

19          that's your exhibit.

20              MR. GADDY:  Oh, the document that

21          you used?

22              MR. KOBRIN:  I think so.  And I

23          raise this now because that's the one

24          that we're going to replace.  So just so
```

```
1            you're on notice, we're going to replace
2            that version of it with version that
3            says "Confidential Protected Health
4            Information" at the bottom, so we're
5            going to request that you swap out any
6            others, and we will send a version with
7            CPHI to the court reporter.
8                 MR. BARNES:  Okay.  We can go off
9            the record.
10                MR. GADDY:  Hold on.  I'm still
11           not following.
12                MR. KOBRIN:  With a CPHI legend
13           I'm going to ask the court reporter.  We
14           can do this off the record, but I do
15           want the court reporter to know that
16           I'll replace 23.  When I send it to her,
17           I will send her a version that has
18           "Confidential Protected Health
19           Information" at the bottom.
20                Okay.  We're off.
21                THE VIDEOGRAPHER:  Off the video
22           record.  Stand by.  The time is
23           3:20 p.m.  Off the record.
24                (Signature reserved.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2              Thereupon, at 3:20 p.m., on Wednesday,

 3    May 5, 2021, the deposition was concluded.

 4                    -  -  -

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                    CERTIFICATION

2

3         I, Carol A. Kirk, Registered Merit Reporter and

4    Certified Shorthand Reporter, do hereby certify that

5    prior to the commencement of the examination,

6    JAMES TSIPAKIS was duly remotely sworn by me to

7    testify to the truth, the whole truth, and nothing but

8    the truth.

9         I DO FURTHER CERTIFY that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place, and on the

12   date hereinbefore set forth, to the best of my

13   ability.

14        I DO FURTHER CERTIFY that I am neither a

15   relative nor an employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney or

18   counsel, and that I am not financially interested in

19   the action.

20

21

22   _Carol A Kirk_

     Carol A. Kirk, RMR, CSR

23   Notary Public

     Dated:  May 10, 2021

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2

 3

 4   Case Caption:  National Prescription Opiate Litigation

 5

 6

 7        DECLARATION UNDER PENALTY OF PERJURY

 8

 9             I declare under penalty of perjury that I

10   have read the entire transcript of my deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                    _____

                      JAMES TSIPAKIS

19

20   SUBSCRIBED AND SWORN TO

21   before me this _____ day

22   of _____, A.D. 20____

23

                 _____

24               Notary Public
```

```
1              DEPOSITION ERRATA SHEET

2    Page No._____Line No.____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No.____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No.____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No.____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No.____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No.____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No.____Change to:_____

21   _____

22   Reason for change:_____

23

     SIGNATURE_____DATE:_____

24         JAMES TSIPAKIS
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No.____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No.____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No.____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No.____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No.____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No.____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No.____Change to:_____

21   _____

22   Reason for change:_____

23

     SIGNATURE_____DATE:_____

24        JAMES TSIPAKIS
```