**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>*Track Three Cases* | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
***IN LIMINE* TO PRECLUDE EVIDENCE OR ARGUMENT ABOUT**
**ALLEGED MISCONDUCT AFTER 2010 [DKT. #3843]**
**AND MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ................................................................................................ 0

I.  THE PHARMACIES' MOTION IS A DISGUISED MOTION FOR
    SUMMARY JUDGMENT AND SHOULD BE DENIED ON THAT BASIS .................. 1

II. PLAINTIFFS HAVE EXTENSIVE EVIDENCE LINKING POST-2010
    MISCONDUCT TO THE COUNTIES' HARMS ............................................................. 2

    A.  Plaintiffs' Evidence About the Shipment of Suspicious Orders
        and the Dispensing of "Red Flag" Prescriptions Is Sufficient to
        Support an Inference of Causation with Respect to Both Pre-2010
        Misconduct and Post-2010 Misconduct .................................................................. 3

    B.  Plaintiffs Offer Other Expert Evidence of Causation ............................................. 7

III. THE PHARMACIES' 403 ARGUMENT ABOUT DISAGGREGATION
     IS BASED ON A FUNDAMENTAL MISCHARACTERIZATION OF
     THE LAW AND FACTS ............................................................................................... 11

IV. RULE 611 DOES NOT PERMIT THE PHARMACIES TO EXCLUDE
    OTHERWISE ADMISSIBLE EVIDENCE. .................................................................. 12

CONCLUSION ............................................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Audio Technica U.S., Inc. v. United States*,
963 F.3d 569 (6th Cir. 2020) .................................................................................................... 3

*BCS Services, Inc. v. Heartwood 88, LLC*,
637 F.3d 750 (7th Cir. 2011) .................................................................................................... 5

*City and County of San Francisco v. Purdue Pharma, L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. 2020) ...................................................................................... 6

*Dent v. NFL*,
902 F.3d 1109 (9th Cir. 2018) .................................................................................................. 6

*Direct Sales Company v. United States*,
319 U.S. 703 (1943) .................................................................................................................. 6

*Dortch v. Fowler*,
588 F.3d 396 (6th Cir. 2009) .................................................................................................... 4

*Gonzalez v. Raich*,
545 U.S. 1 (2005) ...................................................................................................................... 6

*Indiana Insurance Company v. General Electric Company*,
326 F. Supp. 2d 844 (N.D. Ohio 2004) .................................................................................... 4

*Louzon v. Ford Motor Company*,
718 F.3d 556 (6th Cir. 2013) .................................................................................................... 3

*Robinson v. Runyon*,
149 F.3d 507 (6th Cir. 1998) .................................................................................................... 4

*United States v. Moore*,
423 U.S. 122 (1975) .................................................................................................................. 6

*United States v. Sumlin*,
956 F.3d 879 (6th Cir. 2020) .................................................................................................... 4

**Statutes**

21 U.S.C. § 801(2) ......................................................................................................................... 6

**Rules**

Federal Rule of Civil Procedure 56 ............................................................................................... 1

Federal Rule of Evidence 401 ............................................................................................................. 4

**Other Authorities**

Wright & Miller, 28 Federal Practice & Procedure Evid. § 6163 (2d ed.) ................................... 13

House of Representatives Report No. 91-1444 ................................................................................ 6

Senate Report No. 91-613. ................................................................................................................. 6

The Pharmacies' motion to preclude all argument and evidence concerning their post-2010 conduct (Doc. #3844) should be denied in its entirety.[1]

## SUMMARY OF ARGUMENT

At the outset, Plaintiffs note that the Pharmacies' motion is not a true evidentiary motion, but rather a summary judgment motion in disguise. Simply put, Defendants ask this Court to rule on the sufficiency of Plaintiffs' causation evidence with respect to their post-2010 misconduct. The Pharmacies chose not to file a summary judgment motion; they cannot now obtain the same relief simply by styling their motion as an evidentiary one and depriving Plaintiffs of the procedural safeguards associated with motions brought pursuant to Fed. R. Civ. P. 56.

Even on its own terms, the Pharmacies' motion lacks merit.  The Pharmacies focus on the analyses offered by one of Plaintiffs' experts, Dr. David Cutler, who shows how the Pharmacies' failure to prevent diversion with respect to massive shipments of prescription opioids had a devastating impact on Lake and Trumbull Counties, including more than 175 deaths from 1996-2019. The Pharmacies contend that because Dr. Cutler does not expressly link post-2010 misconduct to these harms,[2] any evidence of such conduct is irrelevant and should be excluded. But their motion ignores the wealth of *other* evidence of the causal connection between the Pharmacies' post-2010 misconduct and the devastating nuisance in Plaintiffs' communities.

The Pharmacies contend that only expert testimony can establish a causal link between their conduct and the harms Plaintiffs have suffered.  But this Court has repeatedly found that the combination of "massive increases in the supply of prescription opioids" with "a complete failure

---

[1]  The applicable legal standard for motions *in limine* is set forth in Plaintiffs' Opposition to Certain Defendants' Motion *in Limine* To Exclude Evidence of Remote Shipments and Prescriptions and Memorandum in Support, filed contemporaneously with this motion.  Plaintiffs incorporate this legal standard by reference.

[2]  Plaintiffs do not agree with the Pharmacies' characterization of Dr. Cutler's opinions, but even accepting that characterization, Defendants' arguments have no merit.

by the … Pharmacies to maintain effective controls against diversion" supports an inference of causation of harm to communities such that a jury can make that connection. *See* Doc. #2561 at 9 (CT1: Denying Defendants' Summary Judgment Motion on Causation) & Doc. #3099 at 4 (CT1B: Denying CVS's Motion for Summary Judgment); and Doc. #3102 at 4 (CT1B: Denying Walmart's Motion for Summary Judgment). The Pharmacies ignore these rulings, which the Court also adhered to in denying Giant Eagle's motion for summary judgment. Doc. #3913 at 7-8. The Pharmacies also wrongly claim Plaintiffs have no other expert evidence of causation. Dr. Lembke, Mr. Catizone, and Dr. Keyes each opine on the connections between failure to control diversion and addiction, overdose deaths, and other aspects of the epidemic.

Significantly, the Pharmacies do not dispute that the Plaintiffs have evidence of their post-2010 misconduct—including evidence of their continued failure to implement adequate policies and procedures to control diversion. Their motion to exclude such evidence necessarily concedes its existence. Indeed, the fact and expert evidence tell a consistent story. The Pharmacies failed to adequately prevent diversion. And that diversion led to addiction, opioid use disorder, overdose deaths and other harms to Plaintiffs' communities. The Pharmacies do not and cannot seriously argue that those facts suddenly became untrue in 2010. Nor can they immunize or keep the facts of their post-2010 misconduct from the jury simply because a single expert opined that his analysis was sufficiently supported by the Pharmacies' pre-2010 misconduct that he did not need to consider separately the additional impacts of their post-2010 misconduct.

The Pharmacies' motion should be denied.

**I.  THE PHARMACIES' MOTION IS A DISGUISED MOTION FOR SUMMARY JUDGMENT AND SHOULD BE DENIED ON THAT BASIS**

A motion *in limine* is a way to resolve evidentiary disputes before trial. *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). Parties that want to "resolve non-evidentiary matters

1

prior to trial" have a different tool to do that: "the summary-judgment motion." *Id.* A dispute about the sufficiency of the evidence as a matter of law "requires a summary-judgment analysis" and cannot be resolved through a motion *in limine*. *Id.* at 562. To do otherwise would "deprive[] [the opposing party] of the procedural protections that attach at summary judgment." *Id.* at 561. This is true regardless of whether the party filing a motion *in limine* based on the sufficiency of the evidence "attempts to infuse into [the] motion an evidentiary matter" by making relevance arguments. *Id.* at 562-3. "[I]f these tactics were sufficient, a litigant could raise any matter in limine, as long as he included the duplicative argument that the evidence relating to the matter at issue is irrelevant." *Id.* at 563. "Where, as here, the motion in limine is no more than a rephrased summary judgment motion, the motion should not be considered." *Id.*

The Pharmacies' motion asks the Court to weigh the sufficiency of the evidence on causation for misconduct occurring after 2010. Specifically, the Pharmacies argue their motion should be granted because "expert testimony is necessary to draw a valid causal link between Defendants' post-2010 distribution and dispensing and Plaintiffs' alleged harms, and Plaintiffs' causation expert has offered no such testimony." Doc. #3844 at 4. This is a sufficiency of the evidence argument. "Such non-evidentiary legal issues must be decided in the context of a motion for summary judgment," not a motion *in limine*. *Audio Technica U.S., Inc. v. U.S.*, 963 F.3d 569, 575 (6th Cir. 2020).

The Court can and should deny the motion on this basis alone.

## II. PLAINTIFFS HAVE EXTENSIVE EVIDENCE LINKING POST-2010 MISCONDUCT TO THE COUNTIES' HARMS

The Pharmacies' motion proceeds from a fundamentally flawed premise, that their post-2010 misconduct is irrelevant because Plaintiffs have no evidence linking that misconduct to their

2

harms. This is simply not true. A wealth of evidence, both expert and not, supports the causal connection and shows the Pharmacies' post-2010 misconduct is highly relevant to this case.[3]

### A. Plaintiffs' Evidence About the Shipment of Suspicious Orders and the Dispensing of "Red Flag" Prescriptions Is Sufficient to Support an Inference of Causation with Respect to Both Pre-2010 Misconduct and Post-2010 Misconduct

Even without expert testimony going directly to causation, Plaintiffs have sufficient evidence of the causal link between the Pharmacies' distribution and dispensing practices and the Plaintiffs' harms. The analysis reflected in the expert reports of Mr. Rafalski and Dr. McCann demonstrate that, as distributors, the Pharmacies shipped massive numbers of "suspicious orders" into Lake and Trumbull Counties without due diligence to establish that diversion was not likely. The analysis reflected in the expert reports of Mr. Catizone and Dr. McCann similarly demonstrates that the Pharmacies dispensed massive quantities of opioids in Lake and Trumbull County pursuant to prescriptions with "red flags" suggestive of diversion, again without due diligence to establish that diversion was unlikely. This evidence shows that the shipment of suspicious orders and the dispensing of red-flag prescriptions continued well beyond 2010.

---

[3] Plaintiffs' evidentiary burden here is slight. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401 (emphasis added). This is an "extremely liberal" standard. *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009). "Neither the appellate nor the district court is permitted to consider the weight or sufficiency of the evidence in determining relevancy and even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has even the slightest probative worth." *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998). Parties are "permitted to build an incremental case"—not every piece of evidence needs to speak to every disputed issue simultaneously. *United States v. Sumlin*, 956 F.3d 879, 889 (6th Cir. 2020). Relevance often depends on what evidence is presented at trial, "[t]he court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds." *Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). In this context, it is important to note that it is not necessary that the factfinder accept as true Plaintiffs' causation evidence. Because Plaintiffs will offer testimony to link the Pharmacies' post-2010 misconduct to the harms at issue in this case, the relevance of that misconduct is beyond question. Any other result would require a plaintiff to prevail on its claims before it could offer evidence of them.

No further expert analysis is required. This Court repeatedly recognized in CT1 and CT1B that the combination of massive shipments of prescription opioids into a community (which McCann, Rafalski, and Catizone each speak to) and the Pharmacies' failure to control diversion as distributors, as well as dispensers (which Rafalski and Catizone also speak to) gives rise to a natural inference from which a jury can find a causal connection to harm to the communities, like Lake and Trumbull Counties, into which the prescription opioids were shipped/dispensed. *See* Doc. #2561 at 9 (CT1: Denying Defendants' Summary Judgment Motion on Causation) & Doc. #3099 at 4 (CT1B: Denying CVS's Motion for Summary Judgment); and Doc. #3102 at 4 (CT1B: Denying Walmart's Motion for Summary Judgment). Indeed, the Court reaffirmed this holding just days ago in denying Giant Eagle's motion for summary judgment. *See* Doc. #3913 at 7-8 (CT3: Denying Giant Eagle's Motion for Summary Judgment).

Those rulings rested on a common sense, well-established principle (applied by this Court in denying summary judgement on causation in CT1) that causation may be inferred where particular misconduct (including violation of a statute) might be expected to cause a particular result. Doc. #2561 at 9 ("[b]ecause Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have done enough to withstand summary judgment on this issue." (citing *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011)). Here, this foreseeability is demonstrated in the Controlled Substances Act (CSA) itself, which sets forth Congress's finding that the "illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2). The Supreme Court also has recognized that, in enacting the CSA, "Congress was particularly concerned with the diversion of drugs from

legitimate to illegitimate channels." *U.S. v. Moore*, 423 U.S. 122, 135 (1975) (citing H.R. Rep. No. 91-1444, p. 6; S. Rep. No. 91-613, pp. 4; 116 Cong. Rec. 996 (1970)).[4]

The Pharmacies' duty to maintain effective controls and procedures to guard against theft and diversion of controlled substances, arises out of this inherent capacity to cause public health and safety harms. This is precisely why this Court and others addressing public nuisance claims against opioid distributors and manufacturers based upon breaches of CSA duties have held that the foreseeability element of proximate causation is evident in the duty and breach themselves. As Judge Breyer explained in the *City and County of San Francisco* case:

> The very existence of the duties to maintain effective controls supports the notion that opioid misuse is foreseeable. "A lack of reasonable care in the handling, distribution, and administration of controlled substances can foreseeably harm the individuals who take them. That's why they're 'controlled' in the first place—overuse or misuse can lead to addictions and long-term health problems."

491 F. Supp. 3d 610 at 680 (quoting *Dent v. NFL*, 902 F.3d 1109, 1119 (9th Cir. 2018)).

The Pharmacies' internal documents likewise show they clearly understood the link between their conduct and the opioid epidemic. To cite just one post-2010 example, in 2018, Walmart gave the following presentation to its pharmacists in which it clearly acknowledged the link between oversupply of opioids and overdose deaths:

---

[4] *See also Gonzalez v. Raich*, 545 U.S. 1, 12-13 (2005) ("Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.") (citing *Moore*, 423 U.S. 122.). In *Direct Sales Co. v. U.S.*, the Supreme Court recognized in addressing the CSA's predecessor statute, the Harrison Act, that "[t]he difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, aris[es] from the latters' inherent capacity for harm and from the very fact that they are restricted." 319 U.S. 703, 711 (1943).



WMT_MDL_000466679. Around the same time in 2018, Walmart also implemented a system that assigned each opioid prescription the company dispensed an overdose risk score based on factors like the MME level of the prescription, the number of doctors visited in the past year, the number of pharmacies visited in the past year, and the presence of overlapping prescriptions that might indicated drug cocktails or non-medical use.[5] WMT_MDL_000385342; WMT_MDL_000385343. These factors are highly similar to the ones Mr. Catizone identifies as "red flags" the Pharmacies should have, but failed, to use to stop diversion at their pharmacy counters. Catizone Rpt. (Apr. 16, 2021) Doc. #3852-2 at 33-43. The implementation of this system clearly shows Walmart's

---

[5] Prior to the development of this system, Walmart recognized that its "[p]harmacists lack visibility to prescription monitoring program (PMP) information that is needed to properly execute their 'corresponding responsibility' as required by the Controlled Substances Act." WMT_MDL_000508830. However, the implementation of this system has not solved the problem—as recently as 2020, a senior Walmart compliance executive drafted a document noting that "potential red flags are not consistently understood or reviewed for [and] systems and processes do not consistently support the identification and resolving [sic] of potential red flags." WMT_MDL_000500661. The Pharmacies seek to exclude this and other damning, post-2010 evidence.

6

understanding that these factors/red flags are linked to concrete harms, including a higher risk of overdose.

Thus, Plaintiffs are entitled, but not <u>required</u>, to use experts to show a jury the predictable results of the Pharmacies' failure to control the massive volumes of prescription opioids shipped into and dispensed in Lake and Trumbull Counties. And the evidence from which the jury can draw this inference relates as much to the period after 2010 as to period preceding it.

### B. Plaintiffs Offer Other Expert Evidence of Causation

Even if expert testimony on causation were required (which it is not), Dr. Cutler is not the only expert who offers opinions on the causal connection between the Pharmacies' misconduct and the opioid epidemic. Dr. Anna Lembke, Mr. Carmen Catizone, and Dr. Katherine Keyes each offer opinions on causation in this case, none of which are limited to pre-2010 misconduct.

**Dr. Lembke**: Dr. Anna Lembke provides an extensive analysis of each of the Pharmacies' policies, procedures and conduct that fostered, encouraged and promoted diversion of prescription opioids, both before and after 2010, including their (a) failure to make it mandatory for pharmacists to consult OARRS before deciding to dispense Rx opioid prescriptions, despite evidence that OARRS was the best available source of information on doctor shopping, inappropriate drug cocktail prescribing, and other evidence of potential diversion; (b) failure to provide their pharmacists with the Defendant chain pharmacies' own internal data on physician prescribing that would have allowed the pharmacists to identify high volume/pill mill doctors; (c) imposition of performance metrics that prioritized speed of prescription fills over diligence in investigating red flags; and (d) incentivizing high prescribing rather than refusals to fill, by including Rx opioids in the totals of prescriptions for which monetary bonuses were issued to pharmacists. These topics

7

are addressed at length for each of the Pharmacies, beginning at page 99 of Dr. Lembke's CT3 report. Lembke Rpt. (Apr. 16, 2021), Doc. #3852-8.

Specific examples of the Pharmacies' post-2010 conduct that Dr. Lembke observes contributed to the opioid epidemic include: a 2019 Tata consultants' review for Walgreens, which documented Walgreens pharmacists' complaints of overstress and insufficient time to process prescriptions, resulting in "skirting of procedures" and erroneous fills/dispensing; DEA enforcement actions against Walgreens post-2010, including a 2013 Memorandum of Agreement; a 2015 Walgreens internal audit that found inadequate compliance with procedures that were supposed to have been implemented to comply with the MOA (Lembke Rpt. at 139-149); Walgreens' implementation of a 2013 program that omitted hydrocodone and other potent prescription opioids from heightened investigative scrutiny, despite ample evidence of diversion and abuse of such drugs; Walmart's internal email in 2013 stating that Walmart is "starting to become a 'funnel' with C-II's due to more liberal policies on dispensing pain meds" (*id.* at 115); and the Defendants' collective participation with drug manufacturers in the National Association of Chain Drug Stores (NACDS), in its efforts to disseminate pro-opioid messages through the "Pain Care Forum" and other avenues, and to resist more restrictive scheduling of hydrocodone, extending to at least 2014 (*id.* at 95-97). Dr. Lembke's report also documents the ongoing collaboration between Purdue and Pharmacy Defendants to assure a large supply of OxyContin at their stores, and to provide "educational services" about opioids, in cooperation with Purdue and Endo, between 1997-2017. *Id.* at 76-96.

Drawing on published studies and reports, Dr. Lembke explains that opioid use disorder "is caused by repeated exposure to opioids" and that "diversion is a key contributor to increased exposure to prescription opioids." *Id.* at 17-18. Dr. Lembke then draws on multiple reports linking

pharmacy failure to prevent diversion to the "Tsunami" of prescription opioids that flooded U.S. communities. *Id.* (quoting 2017 NASEM report finding that "[p[rescription drugs are diverted to nonmedical use in several ways," including "<u>diversion via the filling of a prescription</u> (e.g. pursuant to doctor shopping and high-frequency prescribers, etc.)[.]") (emphasis added) and *id.* at 231 (quoting 2013 CDC report finding that "[t]here are instances where pharmacies are dispensing large quantities of opioids as part of an illegal distribution scheme as well as pharmacists who fail to meet their obligation to determine that a prescription was issued for a legitimate medical purpose."). Dr. Lembke also lays out how "[t]he increased supply of prescription opioids through licit and illicit sources resulted in a prescription opioid epidemic in the United States" ( *id.* at 232) that led to "high rates of addiction and death in young people in the prime of their lives; (ii) high rates of pregnant women being exposed to opioids and giving birth to babies dependent on opioids, who in turn suffer long term cognitive consequences; (iii) the tragic disruption to families and communities due to loss of parental caregivers, requiring substantial resources for foster care; and (iv) exodus from the work force as a result of opioid dependence and addiction." *Id.* at 235-36.

**Mr. Catizone**: Carmen Catizone details how each of the Pharmacies failed to put in place policies and procedures pre- and post-2010 to adequately monitor for and address "red flags" of diversion and, as a result, failed to "flag" and investigate an enormous number of suspect prescriptions that were dispensed in the Counties throughout this entire period. Catizone Rpt. (Apr. 16, 2021) Doc. #3852-2 at 30-43. Mr. Catizone similarly concludes that the Pharmacies were dispensing excessive quantities of prescription opioids and "dangerously high doses" from 2006 to 2019. *Id.* at 43-45.

Mr. Catizone explains that many of the red flags the Pharmacies ignored are specifically linked to an increased the likelihood of diversion, abuse and overdoses. For example, Mr. Catizone

9

points out that "[t]he Defendants' data included prescriptions issued and dispensed for drug cocktails,"—combinations of opioids and benzodiazepines, sometimes with a muscle relaxant—that "intensif[y] the risk of overdose and death" (*id.* at 37) and are recognized as 'a deadly, potentially, deadly combination.'" *Id.* at 39-40. These cocktails have been found to account for more than 30% of overdoses. *Id*. at 39. Mr. Catizone observes that the Pharmacies dispensed tens of thousands of these deadly drug cocktails into Lake and Trumbull Counties, including post-2010. *Id.* at 38-39.

**Dr. Keyes**: Plaintiffs also have proffered the expert opinions of Dr. Katherine Keyes, who this Court observed in CT1 was well-qualified to testify to "factors that play a role in producing opioid-related harm." Doc. #2549 at 20. Here, based on an exhaustive epidemiological analysis on the extensive literature on opioid related harms, Dr. Keyes opines that "[a] substantial portion of the opioid crisis has arisen due to the diversion of prescription opioids from medical to non-medical uses." Apr. 16, 2021 Keyes Report (Doc #3852-7) ("Keyes Rpt.") at 27. The three three streams that Dr. Keyes finds fed diversion dovetail exactly with the distribution and dispensing control failures that by Mr. Rafalski and Mr. Catizone have opined occurred both pre- and post-2010. April 16, 2021 Rafalski Report (Doc. #3852-13) at 40-158; Catizone Rpt. at 30-103. Those three streams are: (1) "the vast availability of opioids in American homes due to oversupply and over-prescription, from which opioids were traded, given, or sold within social networks[;]" (2) "individuals who sought multiple prescriptions in order to use non-medically and/or sell[;]" and (3) "high-volume prescribers who did not prescribe based on legitimate medical need." Keyes Rpt. at 27. Dr. Keyes then explains, in detail, how a robust scientific literature shows a causal link between non-medical use of opioids and heroin and synthetic opioid use. *Id.* at 35-41.

Dr. Keyes specifically examines the crisis in Lake and Trumbull Counties, opining that, although "[p]rescribing has since declined from 2012 levels," it "nevertheless remains extraordinarily high." *Id.* at 45. Dr. Keyes observe the numerous harms that the oversupply has caused, explaining that, "[i]n addition to fatal overdose, other consequences to Lake and Trumbull effected by opioid oversupply include emergency department visits for overdose, increased burden in the treatment and chemical dependency provider system, opioid use disorder and opioid use among both adults and adolescents, and neonatal abstinence syndrome (NAS)." *Id.*

Although an expert is not required to establish a causal connection between the Pharmacies failure to prevent diversion of controlled substances and the harms to Plaintiffs' communities, each of these experts provides an ample basis for a jury to draw a causal link between the Pharmacies' misconduct—enabling diversion of prescription opioids—and the opioid epidemic. And none of these experts cabin their analysis to misconduct occurring prior to 2010. Opioids did not stop being addictive in 2010. The Pharmacies did not stop enabling diversion in 2010. And the use of opioids did not stop causing overdoses and myriad other harms in 2010. The chain of causation is clear.

### III.  THE PHARMACIES' 403 ARGUMENT ABOUT DISAGGREGATION IS BASED ON A FUNDAMENTAL MISCHARACTERIZATION OF THE LAW AND FACTS

The Pharmacies also spend an inordinate amount of time talking about the role of control variables in causal analysis. That argument builds to the following assertion:

> [A]dmitting evidence of any Defendant's alleged misconduct after 2010 would be unduly prejudicial, allowing the jury to draw unwarranted causal inferences based on volume alone without the aid of expert testimony. No lay person—witness or juror—can reliably disaggregate distribution and dispensing by Defendants from distribution and dispensing by non-party distributors and dispensers, much less account for the myriad of economic and demographic variables that Dr. Cutler attempted to identify and control for in his direct analysis of shipments.

Doc. #3844 at 5.

11

But the jury does not have to disaggregate the causes of the opioid epidemic in this case in the way the Pharmacies suggest. As the Court's jury instructions explain, "[t]here may be multiple causes of a public nuisance. The fact that some other cause or causes combined with Defendant's conduct in creating the public nuisance does not relieve that Defendant from liability if the Plaintiff can prove that the conduct the Defendant engaged in was a <u>substantial factor</u> in creating the public nuisance." Ex. X, CT3 Jury Instructions; Ex. A at 24, CT3 Jury Instructions; *see also* Doc. #3913 at 7-8. Thus, the jury is not tasked with the macabre exercise of attempting to figure out precisely how many people are dead because of the Pharmacies' conduct and Dr. Cutler's analysis actually <u>exceeds</u> the Counties' burden. And the evidence from Dr. Lembke, Mr. Catizone, Dr. Keyes, and from the Pharmacies' own documents also is more than sufficient for the Counties to prove that the Pharmacies pre- <u>and</u> post-2010 misconduct was at least a "substantial factor" in creatig the public nuisance that harmed Lake and Trumbull Counties.[6]

## IV. RULE 611 DOES NOT PERMIT THE PHARMACIES TO EXCLUDE OTHERWISE ADMISSIBLE EVIDENCE.

The Pharmacies also argue post-2010 evidence should be excluded under Rule 611. Not so: "Rule 611 provides no basis for excluding what is otherwise admissible evidence." Wright & Miller, 28 Fed. Prac. & Proc. Evid. § 6163 (2d ed.).

## CONCLUSION

For all of the foregoing reasons, Lake and Trumbull Counties respectfully submit that the Pharmacies' motion should be denied.

---

[6] This is particularly true for the "economic and demographic variables" the Pharmacies cite, which include the racial makeup, income levels, and education levels of the relevant community. Doc. #3844. It is hardly a defense for the Pharmacies that the demographics of Lake and Trumbull Counties made those places particularly vulnerable to the effects of drug diversion. Indeed, if anything, that fact makes the Pharmacies more culpable, because it should have put them on notice of a heightened need to protect against diversion— which they manifestly failed to do.

Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304)654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
THE LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Suite 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Trial Counsel*

*/s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

13

        Frank L. Gallucci
        PLEVIN & GALLUCCI CO., L.P.A.
        55 Public Square, Suite 222
        Cleveland, OH 44113 (216)
        861-0804
        (216) 861-5322 (Fax)
        FGallucci@pglawyer.com

        Hunter J. Shkolnik
        NAPOLI SHKOLNIK
        270 Munoz Rivera Avenue, Suite 201
        Hato Rey, Puerto Rico 00918
        hunter@napolilaw.com
        (347) 379-1688

        *Counsel for Plaintiffs Lake County and*
        *Trumbull County, Ohio*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 2, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

        */s/Peter H. Weinberger*
        Peter H. Weinberger