**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track Three Cases | |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR
JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B) (DKT. #4202,
#4203, #4206, #4207) AND MEMORANDUM OF LAW IN SUPPORT**

January 20, 2022

# TABLE OF CONTENTS

*Table of Contents* .................................................................................................... i

*Table of Authorities* .............................................................................................. iii

*Introduction* ............................................................................................................ 1

*Legal Standard* ....................................................................................................... 1

*Argument* ................................................................................................................ 2

**I.    There is Legally Sufficient Evidence in the Record on Which the Jury Could Have Reasonably Relied in Finding Each Defendant Liable for Public Nuisance.** ............................ 2

    **A.    The Evidence Demonstrated that the Oversupply of Legal Prescription Opioids, and Diversion of those Opioids into the Illicit Market Outside of Appropriate Medical Channels, Constitutes an Ongoing Public Nuisance in Lake and Trumbull Counties.** ...... 3

    **B.    The Evidence Demonstrated that Defendants Unlawfully and/or Intentionally Dispensed Massive Amounts of Prescription Opioids into Lake and Trumbull Counties….** ................................................................................................................ 13

        1.    Walgreens unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties. ........................................................................ 19

        2.    CVS unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties. ........................................................................ 44

        3.    Walmart unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties. ........................................................................ 64

    **C.    The Evidence Demonstrated that Defendants' Intentional and Unlawful Conduct Proximately Caused the Public Nuisance in Lake and Trumbull Counties.** .................. 82

        1.    Walgreens proximately caused the ongoing public nuisance in the Counties. .......... 84

        2.    CVS proximately caused the ongoing public nuisance in the Counties. .................... 90

        3.    Walmart proximately caused the ongoing public nuisance in the Counties. .............. 92

        4.    Defendants' causation arguments should be rejected. ............................................... 94

    **D.    Defendants Are Not Entitled to "Safe Harbor" Immunity.** ...................................... 97

**II.    There Is No Legal Bar to Judgment on Plaintiffs' Nuisance Claim.** ................................ 99

    **A.    Ohio Statutory Law Does Not Preclude Plaintiffs' Common-Law Nuisance Claims….** .............................................................................................................. 100

        1.    The Ohio Product Liability Act does not expressly bar Plaintiffs' nuisance claims. . 100

        2.    Plaintiffs' nuisance claims are not precluded by Ohio Rev. Code Ann. § 4729.35.... 101

    **B.    Ohio Common Law Does Not Preclude Plaintiffs' Public Nuisance Suit.** .............. 101

        1.    Plaintiffs have shown a violation of a public right. .................................................. 102

        2.    Plaintiffs have shown that Defendants' dispensing conduct constitutes a nuisance... 104

        3.    Defendants have control over the prescription opioids at the time of the alleged nuisance.................................................................................................................... 104

i

4. The CSA and its Ohio analog are predicate "safety statutes."................................... 105
5. Plaintiffs do not seek an unprecedented expansion of nuisance contrary to public policy............................................................................................................................. 106

**C. Defendants Owe a Duty to Plaintiffs for their Dispensing Conduct. ...................... 108**
1. Plaintiffs properly base their nuisance claims on corporate-level dispensing duties.. 108
2. Penalizing Defendants for dispensing conduct that does not violate the CSA would not stand as an obstacle to Congress's objectives and is not preempted. ................................. 108
3. Plaintiffs do not seek to enforce statutory duties. ..................................................... 109
4. Plaintiffs' claims are not barred by the primary jurisdiction doctrine. ...................... 109

**D. Plaintiffs' Nuisance Claims Do Not Fail for Additional Legal Reasons. ................. 112**
1. Plaintiffs have standing............................................................................................... 112
2. The economic loss doctrine does not bar Plaintiffs' claims. ...................................... 113
3. Plaintiffs' claims are not barred or preempted by the statewide concern doctrine. .... 114
4. The municipal cost recovery doctrine does not bar Plaintiffs' claims........................ 114
5. Plaintiffs' public nuisance claims are not barred by the statute of limitations. .......... 115
6. There is an ongoing public nuisance caused by Defendants' improper dispensing of prescription opioids which requires abatement.................................................................. 115
7. There has not been improper admission of expert testimony. .................................... 116

***Conclusion***..................................................................................................................... ***117***

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Becker v. Shaull*,
    584 N.E.2d 684 (Ohio 1992) ..............................................................................106

*Chabner v. United of Omaha Life Ins. Co.*,
    225 F.3d 1042 (9th Cir.2000) ..............................................................................111

*Chambers v. St. Mary's Sch.*,
    697 N.E.2d 198 (Ohio 1998) ..............................................................................106

*Chaney v. Dreyfus Serv. Corp.*,
    595 F.3d 219 (5th Cir. 2010) ..........................................................................17, 18

*Charvat v. EchoStar Satellite, LLC*,
    630 F.3d 459 (6th Cir. 2010) ..............................................................................110

*Cincinnati v. Beretta, U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ................................................................................2

*Cincinnati v. Deutsche Bank Nat'l Trust Co.*,
    863 F.3d 474 (6th Cir. 2017) ..................................................................................3

*City and County of San Francisco v. Purdue Pharma L.P.*,
    491 F. Supp. 3d 610 (N.D. Cal. Sept. 30, 2020) ................................................102

*City of Bos. v. Purdue Pharma, LP*,
    No. 1884CV02860, 2020 WL 416406 (Mass. Super. Jan. 3, 2020) ....................103

*City of Boston v. Purdue Pharma, L.P.*,
    No. 1884CV02860, 2020 WL 977056 (Mass. Super. Ct. Jan. 31, 2020) .............107

*City of Chicago v. Beretta U.S.A. Corp.*,
    213 Ill.2d 351, 821 N.E.2d 1099 (2004) ............................................................114

*City of Chicago v. Purdue Pharma L.P.*,
    211 F. Supp. 3d 1058 (N.D. Ill. 2016) ...............................................................110

*City of Chicago v. Purdue Pharma L.P.*,
    No. 14 C 4361, 2015 WL 2208423 (N.D. Ill. May 8, 2015) ...............................111

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
    621 F. Supp. 2d 513 (N.D. Ohio 2009)...............................................................98

*City of Cleveland v. JP Morgan Chase Bank, N.A.*,
    2013-Ohio-1035, 2013 WL 1183332 (Ohio Ct. App. March 21, 2013)...................2

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
    801 N.E.2d 1222 (Ind. 2003) ................................................................107

*City of New Haven v. Purdue Pharma, L.P.*,
    No. X07HHDCV176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) .............107

*City of Wyoming v. Procter & Gamble Co.*,
    210 F. Supp. 3d 1137 (D. Minn. 2016) ................................................107

*Com. v. Endo Health Solutions Inc.*,
    No. 17-CI-1147, 2018 WL 3635765 (Ky.Cir.Ct. July 10, 2018) ..................102, 103

*Commonwealth v. Purdue Pharma, L.P.*,
    No. 1884CV01808BLS2, 2019 WL 5495866 (Mass. Super. Sept. 17, 2019) .....................103

*Crown Prop. Dev., Inc. v. Omega Oil Co.*,
    113 Ohio App. 3d 647, 681 N.E.2d 1343 (1996) ..............................................116

*Dartron Corp. v. Uniroyal Chem. Co.*,
    893 F. Supp. 730 (N.D. Ohio 1995) ................................................116

*Delaney v. Deere and Co.*,
    999 P.2d 930 (Kan. 2000) ................................................114

*State, ex rel. Dewine v. Purdue Pharma L.P.*,
    No. 17 CI 261, 2018 WL 4080052 (Ohio Com.Pl. Aug. 22, 2018) ........................103

*Direct Sales Co. v. United States*,
    319 U.S. 703 (1943) ................................................86

*ECIMOS, LLC v. Carrier Corp.*,
    971 F.3d 616 (6th Cir. 2020) ................................................1, 2

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ................................................109

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
    690 F. Supp. 256 (S.D.N.Y. 1988), *aff'd*, 869 F.2d 175 (2d Cir. 1989) ................19

*Fuhr v. Sch. Dist. of City of Hazel Park*,
    364 F.3d 753 (6th Cir. 2004) ................................................1

*In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*,
    MDL No. 1909, 2013 WL 593993 (N.D. Ohio Feb. 15, 2013) ................................82

*Glob. Crossing Bandwith, Inc. v. OLS, Inc.*,
    No. 05-CV-6423L, 2009 WL 763483 (W.D.N.Y. Mar. 19, 2009) ........................111

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ................................................................................15, 16, 19

*Gov't of U.S. Virgin Islands v. Takata Corp.*,
   No. ST-16-CV-286, 2017 WL 3390594 (V.I. Super. Ct. June 19, 2017) ...........................107

*Hager v. Waste Technologies Industries*,
   No. 2000-CO-45, 2002 WL 1483913 (Ohio App. 7 Dist. June 27, 2002).............................98

*Jones Total Health Care Pharm., LLC*,
   881 F.3d 823 (11th Cir. 2018) .........................................................................15

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   497 F. Supp. 3d 552 (N.D. Cal. 2020) ......................................................110, 111

*Kramer v. Angel's Path, L.L.C.*,
   882 N.E.2d 46 (Ohio Ct. App. 2007).................................................................105

*Krueger v. Experian Info. Sols., Inc.*,
   No. 20-2060, 2021 WL 4145565 (6th Cir. Sept. 13, 2021) ....................................112

*Martin v. Cincinnati Gas & Elec. Co.*,
   561 F.3d 439 (6th Cir. 2009) ...........................................................................84

*Masters Pharm., Inc. v. Drug Enf't Admin.*,
   861 F.3d 206 (D.C. Cir. 2017)..........................................................................86

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) ........................................................................18

*Moreland v. Oak Creek OB/GYN, Inc.*,
   970 N.E.2d 455 (Ohio Ct. App. 2005)...............................................................106

*Morsey v. Chevron USA, Inc.*,
   779 F. Supp. 150 (D.Kan.1991) .......................................................................111

*People ex rel. Gallo v. Acuna*,
   929 P.2d 596 (Cal. 1997) ...............................................................................107

*In re Nat'l Prescription Opiate Litig.*,
   No. 18-OP-45332, 2020 WL 1986589 (N.D. Ohio Apr. 27, 2020) ...........................102

*In re Nat'l Prescription Opiate Litig.* (West Boca Medical Center),
   452 F. Supp. 3d 745 (N.D. Ohio 2020)..............................................................102

*Nottke v. Norfolk S. Ry. Co.*,
   264 F. Supp.3d 859 (N.D. Ohio 2017)................................................................13

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ..................................................................17

*In re Opioid Litigation*,
    No. 400000/2017, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018) ........................103, 107

*In re Opioid Litigation*,
    No. 4000002017, 2018 WL 4760685 (N.Y. Sup. Ct. Mar. 14, 2018) .................................111

*Pang v. Minch*,
    559 N.E.2d 1313 (Ohio 1990) ..................................................................83

*Paroline v. United States*,
    572 U.S. 434 (2014).........................................................................82

*People v. ConAgra Grocery Prods. Co.*,
    227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017) .....................................................107

*People v. Purdue Pharma L.P.*,
    No. 30201400725287CUBTCX, 2021 WL 5227329 (Cal.Super. Nov. 01, 2021).......... *passim*

*Potter v. Chicago Pneumatic Tool Co.*,
    694 A.2d 1319 (Conn. 1997) ...................................................................114

*S.E.C. v. Delphi Corp.*,
    508 F. App'x 527 (6th Cir. 2012) ..............................................................19

*Schwartz v. Honeywell Int'l, Inc.*,
    102 N.E.3d 477 (Ohio 2018) ...................................................................84

*Smith v. Hickenlooper*,
    164 F. Supp. 3d 1286 (D. Colo. 2016) .........................................................106

*Smrtka v. Boote*,
    88 N.E.3d 465 (Ohio Ct. App. 2017) ..........................................................106

*Speers v. Univ. of Akron*,
    196 F. Supp. 2d 551 (N.D. Ohio 2002)........................................................1, 2

*State ex rel. Hunter v. Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021)................................................................103, 105

*State ex rel. Jennings v. Purdue Pharma L.P.*,
    No. CVN18C01223MMJCCLD, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) .............107

*State of Maryland v. Exxon Mobil Corp.*,
    406 F. Supp. 3d 420 (D. Md. 2019) ...........................................................107

*State of South Dakota v. Purdue Pharma, L.P.*,
No. 32CIV18-000065, 2021 WL 6102727 (S.D.Cir. Mar. 29, 2021)...................................107

*State v. Purdue Pharma Inc.*,
No. 217-2017-CV-00402, 2018 WL 4566129 (N.H.Super. Sep. 18, 2018) .........................103

*State v. Purdue Pharma L.P.*,
No. 1-173-18, 2019 WL 2331282 (Tenn.Cir.Ct. Feb. 22, 2019) ...........................................103

*State v. Purdue Pharma L.P.*,
No. 17-2-25505-0 SEA, 2018 WL 7892618 (Wash.Super. May 14, 2018) .........................103

*State v. Purdue Pharma L.P.*,
No. 3AN-17-09966CI, 2018 WL 4468439 (Alaska Super. July 12, 2018) ...........................102

*State v. Purdue Pharma L.P.*,
No. CV2018002018, 2019 WL 1590064 (Ark.Cir. Apr. 05, 2019).....................................102

*State v. Purdue Pharma L.P.*,
No. PC-2018-4555, 2019 WL 3991963 (R.I.Super. Aug. 16, 2019).....................................103

*State v. United Parcel Serv., Inc.*,
253 F. Supp. 3d 583 (S.D.N.Y. 2017), *aff'd*, 942 F.3d 554 (2d Cir. 2019) ......................16, 19

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011).............................................................................................................17

*State Ex Rel. Stenehjem v. Purdue Pharma L.P.*,
No. 08-2018-CV-01300, 2019 WL 2245743 (N.D.Dist. May 10, 2019) .............................107

*Supreme Council Am. Legion of Honor v. Orcutt*,
119 F. 682 (6th Cir. 1903) .................................................................................................16

*Taylor v. City of Cincinnati*,
55 N.E.2d 724 (Ohio 1944) ..........................................................................................13, 83

*Tincher v. Omega Flex, Inc.*,
104 A.3d 328 (Pa. 2014)...................................................................................................114

*TransUnion LLC v. Ramirez*,
—— U.S. ——, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021)....................................................112

*Uland v. S.E. Johnson Companies*,
WM-97-005, 1998 WL 123086 (Ohio Ct. App. Mar. 13, 1998) .........................................106

*United States v. Sci. Applications Int'l Corp.*,
626 F.3d 1257 (D.C. Cir. 2010)..........................................................................................18

*Woodmont, Inc. v. Daniels*,
    274 F.2d 132 (10th Cir. 1959) ........................................................18

*Yates v. United States*,
    354 U.S. 298 (1957)...........................................................................99

*Zieman v. City of Detroit*,
    81 F.3d 162, 1996 WL 140328 (6th Cir. 1996) .....................................1

**STATUTES**

21 U.S.C. § 801.......................................................................................105

21 U.S.C. § 812...........................................................................................4

21 U.S.C. § 824.........................................................................................21

21 U.S.C. § 827.........................................................................................21

21 U.S.C. § 841.........................................................................................21

OHIO REV. CODE § 2305.09....................................................................115

OHIO REV. CODE § 2305.10....................................................................115

OHIO REV. CODE § 2307.71....................................................................100

OHIO REV. CODE § 2307.72....................................................................100

OHIO REV. CODE § 4729.35..............................................................101, 105

R.C. § 3767.13.........................................................................................106

**OTHER AUTHORITIES**

21 C.F.R. § 1301.71........................................................................14, 21, 23

21 C.F.R. § 1306.03...................................................................................21

21 C.F.R. § 1306.04........................................................................14, 15, 21

21 C.F.R. § 1306.06...................................................................................21

*Alabama v. Purdue Pharma L.P.*,
    03-CV-2019-901174.00, slip op. (Cir. Ct. Nov. 13, 2019).................102

*Alaska v. McKesson Corp.*,
    No. 3AN-18-10023CI, slip op. (Super. Ct. Aug. 28, 2019).................102

*Brooke Cty. Comm'n v. Purdue Pharma L.P.*,
No. 17-C248, slip op. (Cir. Ct. Dec. 28, 2018), *writ denied*, *State ex rel. Cardinal Health, Inc. v. Hummel*, No. 19-0210 (W. Va. June 4, 2019)..................................103

*California ex rel. Korb v. Purdue Pharma L.P.*,
No. 30-2014-00725287, slip op. (Super. Ct. Mar. 12, 2021)..................................102

*City of Surprise v. Allergan PLC*,
No. CV2019-003439, slip op. (Super. Ct. Oct. 28, 2020) ..................................102

*County of Delaware v. Purdu.e Pharma, L.P.*,
CV- 2017008095, slip ops. (Ct. C.P., March 13, 2020, Dec. 4, 2019, and Oct. 25, 2019) ..................................103

*East Main Street Pharmacy; Affirmance of Suspension Order*,
75 FR 66149-01, 2010 WL 4218766 (D.E.A. Oct. 27, 2010) ..........................................13, 15

FED. R. CIV. P. 50 ..................................1

*Florida v. Purdue Pharma L.P.*,
No. 2018-CA-001438, slip order (Cir. Ct. Apr. 11, 2019) ..................................102

*Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*,
77 FR 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012) ..........................................13, 14

H.R. Rep. 91-1444, 4574 (1970)..................................105

*Kentucky ex rel. Beshear* v. *Cardinal Health*,
No. 18-CI00I013, slip op. (Cir. Ct. Sept. 12, 2019)..................................102

*Kentucky ex rel. Beshear v. Walgreens Boots Alliance, Inc.*,
No. 18-CI-00846, slip op. (Cir. Ct. July 18, 2019) ..................................102

*Medic-Aid Pharmacy*,
75 Fed. Reg. 30043-01, 1990 WL 328750 (July 24, 1990) ..................................15

*Michigan ex rel. Kessel v. Cardinal Health, Inc.*,
No. 19016896-NZ, slip op. (Cir. Ct. Mar. 24, 2021) ..................................103

*Masters Pharmaceuticals, Inc.*; Decision and Order,
80 FR 55418-01, 55475 (D.E.A. Sept. 15, 2015) ..................................86

*Mississippi v. Cardinal Health, Inc.*,
No. 25Cll:18-cv00692, slip op. (Cir. Ct. Apr. 5, 2021) ..................................103

*Missouri ex rel. Schmitt v. Purdue Pharma, L.P.*,
No. 1722-CC10626, slip op. (Cir. Ct. Apr. 6, 2020) ..................................103

*Nevada v. McKesson Corp.*,
 No. A-19-796755-B, slip order (Dist. Ct. Jan. 3, 2020) ........................................................103

*New Mexico ex rel. Balderas v. Purdue Pharma L.P.*,
 No. D-101-CV-2017-02541 slip op. (Dist. Ct. Dec. 17, 2020)...........................................103

OHIO ADMIN. CODE § 4729-5-20 ...............................................................................................21

*Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy; Revocation of Registration*,
 55 FR 4729-01, 1990 WL 352775 (Feb. 9, 1990) .................................................................15

RESTATEMENT (SECOND) OF TORTS § 431 ...............................................................................83

RESTATEMENT (SECOND) OF TORTS § 433 ...............................................................................83

RESTATEMENT (SECOND) OF TORTS § 821B.......................................................................*passim*

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM, Introduction ...................................114

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8...............................................113

*South Carolina v. Purdue Pharma L.P.*,
 No. 2017-CP40-04872, slip order (Ct. C.P. Apr. 12, 2018) .................................................103

*State of Oklahoma ex rel. Hunter v. Purdue L.P.*,
 No. CJ-2017-816 (Okla. Dist. Ct. Dec. 6, 2017) .................................................................111

*Tennessee ex rel. Slatery v. AmerisourceBergen Drug Corp.*,
 No. 1345-19, slip op. (Cir. Ct. July 14, 2020) .....................................................................103

*In re Texas Opioid Litigation* (*County of Dallas*),
 No. 2018-77098, slip op. (Dist. Ct. June 9, 2019) ...............................................................103

*Vermont v. Cardinal Health, Inc.*,
 No. 279-3-19 Cncv, slip op. (Super. Ct. May 12, 2020).......................................................103

*Vermont v. Purdue Pharma L.P.*,
 No. 757-9-18 Cncv, slip op. (Super. Ct. Mar. 19, 2019) ......................................................103

## INTRODUCTION

This trial lasted six weeks and included the testimony of thirty-four witnesses and the admission of hundreds of exhibits.  The jury carefully and thoughtfully deliberated for one week and unanimously returned a verdict for Plaintiffs.  Defendants have now filed renewed motions for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, arguing there was insufficient evidence on which the jury could have reasonably relied to reach its verdict, and re-asserting a litany of their prior failed legal arguments.  Defendants' motions should be denied.  There is ample evidence in the record on which the jury could have reasonably relied in reaching their verdict.  Viewing the evidence in the light most favorable to Plaintiffs and granting all reasonable inferences in Plaintiffs' favor, as the Court must, it is clear that Defendants are not entitled to judgment as a matter of law on the basis of insufficient evidence  Defendants' legal arguments should also be rejected.  The Court's prior rulings on these legal issues were correct and Defendants offer no new authority justifying any change in these rulings.

## LEGAL STANDARD

Where a party files a motion for judgment as a matter of law before a case is submitted to the jury which is not granted, that party is permitted to renew the denied motion after trial on the same grounds asserted in the earlier motion.  FED. R. CIV. P. 50(b).  When considering a motion for judgment as a matter of law, a court "neither weighs the evidence, evaluates the credibility of witnesses, nor substitutes its judgment for that of the jury."  *Speers v. Univ. of Akron*, 196 F. Supp. 2d 551, 555 (N.D. Ohio 2002); *see also Fuhr v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 759 (6th Cir. 2004) ("'[T]he weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'") (citation omitted); *Zieman v. City of Detroit*, 81 F.3d 162, 1996 WL 140328, at *2 (6th Cir. 1996).  The court "'must view the evidence in the light most favorable to the nonmovant,' and must grant all reasonable inferences in the nonmovant's favor."  *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 627 (6th Cir. 2020) (citation omitted); *see also Fuhr*, 364 F.3d at 759 ("[W]e must disregard all evidence favorable to the moving party that the jury is not required to believe."); *Zieman*, 1996 WL 140328, at *2; *Speers*,

1

196 F. Supp. at 555.  "Evidence is sufficient to submit to a jury unless, 'when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or not controverted issues of fact upon which reasonable persons could differ.'" *Speers*, 196 F. Supp. 2d at 555 (citation omitted).  The motion should not be granted unless "reasonable minds could not come to a conclusion other than one favoring the movant." *ECIMOS*, 971 F.3d at 627 (citation and internal quotation marks omitted).

## ARGUMENT

### I.    THERE IS LEGALLY SUFFICIENT EVIDENCE IN THE RECORD ON WHICH THE JURY COULD HAVE REASONABLY RELIED IN FINDING EACH DEFENDANT LIABLE FOR PUBLIC NUISANCE.

The issues decided by the jury in this case were (1) whether the oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels, is a public nuisance in Lake and Trumbull Counties, and, if so, (2) whether Defendants (Walgreens, CVS, Walmart,) proximately caused the public nuisance in Lake and Trumbull Counties.  Dkt. #4153 (11/15/21 Trial Tr.) at 7070:23 – 7079:10, 7329:1 – 7330:2. Under Ohio law, "[t]o prove an absolute public nuisance cause of action, [the] evidence must establish: (1) intentional or unlawful conduct or omission by the defendant; (2) that unreasonably interferes with a right common to the general public; and (3) a causal relationship between a defendant's conduct and a plaintiff's injury."  Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at pp. 2-3 (citing *Cincinnati v. Beretta, U.S.A. Corp.,* 768 N.E.2d 1136, 1141-44 (Ohio 2002) and *City of Cleveland v. JP Morgan Chase Bank, N.A.,* 2013-Ohio-1035, 2013 WL 1183332, at *3-4 (Ohio Ct. App. March 21, 2013)); *see also* RESTATEMENT (SECOND) OF TORTS § 821B.  As set forth below, the testimony and documentary evidence admitted in this case plainly provide a rational basis to support the jury's conclusion that a public nuisance in fact presently exists in the Counties, and that the conduct of Defendants proximately caused that nuisance.[1]

---

[1]  Rather than address each and every factual assertion or characterization of the evidence made by Defendants in their four motions, Plaintiffs set forth in this response ample evidence from the record supporting each element of their claims and the jury's verdict.  As noted above, the Court must view (footnote continues on next page)

**A.  The Evidence Demonstrated that the Oversupply of Legal Prescription Opioids, and Diversion of those Opioids into the Illicit Market Outside of Appropriate Medical Channels, Constitutes an Ongoing Public Nuisance in Lake and Trumbull Counties.**

"A public nuisance is an unreasonable interference with a right common to the general public."  RESTATEMENT (SECOND) OF TORTS § 821B.  The Ohio Supreme Court has explained:

> "Unreasonable interference" *includes* those acts that significantly interfere with public health, safety, peace, comfort, or convenience, conduct that is contrary to a statute, ordinance, or regulation, or conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware.

*Beretta,* 768 N.E.2d at 1142 (emphasis added).  *See also* RESTATEMENT (SECOND) OF TORTS § 821B(2); *Cincinnati v. Deutsche Bank Nat'l Trust Co.,* 863 F.3d 474, 477 (6th Cir. 2017); Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 2.  The entire community need not "be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large."  RESTATEMENT (SECOND) OF TORTS § 821B(1) cmt. g.  A public nuisance can be something that "affect[s] the health of so many persons so as to involve the interests of the public at large."  *Id*.

The evidence adduced at trial demonstrated that there is an ongoing opioid epidemic in Lake and Trumbull Counties and that this opioid epidemic constitutes an unreasonable and significant interference with public health and public safety which has significantly harmed, and continues to significantly harm, Plaintiffs.  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- During the relevant time period, prescription opioids were regulated as Schedule II or Schedule III controlled substances under the CSA.  Under the CSA, Schedule II drugs are those with a high potential for abuse, which "may lead to severe psychological or physical dependence[,]" and Schedule III drugs are those with some potential for abuse, which "may lead to moderate or low physical dependence or high psychological dependence."  *See, e.g.,*

the evidence in the light most favorable to Plaintiffs and grant all reasonable inferences in Plaintiffs' favor.  *Supra* at pp. 1-2.  To the extent Plaintiffs do not specifically address a particular factual or evidentiary assertion of Defendants, this is not, and should not be construed as, a concession that Defendants have characterized the facts or evidence accurately.

3

21 U.S.C. § 812(b)(2)-(3); Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 335:13 – 336:1; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1164:5 – 1165:12; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5403:1.

- <u>Prescription opioid drugs and heroin have a nearly identical molecular structure and interact identically with, and are received by the human brain as indistinguishable from, one another.</u> *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 544:9 – 545:8, 653:13-19 ("Q: And does heroin work in the brain in the same way that the opioids themselves did in terms of your explanation of hijacking the brain and that dopamine-learning loop? A: Yeah. So opioids all work similarly in the brain's reward pathway."); Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3473:11 – 3474:5, 3475:21-22; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3652:7-13.

- <u>Due to their dangerous and addictive nature, prescription opioids are highly susceptible to diversion and abuse.</u> *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 507:17 – 508:2, 514:22 – 515:2, 517:23 – 518:2; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5403:16 ("Q: Right. And controlled substance have a particular danger because they can be addictive, right? A: Correct. Q: And addiction can – and they can – a patient can become dependent on them, right? A: Correct. Q: And as a result of becoming addicted or dependent, they can become drug seekers, right? A: Correct. Q: And the risk of addiction and dependence resulting in drug seeking can often lead to diversion, right? A: Correct. Q: And the whole reason for the state regulations and the federal regulations is – on controlled substances is because it is out of a recognition that these drugs are dangerous, can be addictive, and can lead to diversion, right? A: Correct").[2]

- <u>There is an opioid epidemic in this country that has been going on since the late 1990s/early 2000s.</u> *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 630:18-23 ("By the year 2005, the prescription opioid epidemic was several years into its evolution, having begun in the mid-to-late 1990s."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:10-14 ("Q: And is it fair to say that this opioid epidemic, from your knowledge at the DEA, had been going on since early 2000s. The answer is yes; right? A: It's fair to say that, yes.").[3]

---

[2]    *See also, e.g,* Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1550:5-13, 1560:1-8; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1838:6 – 1844:23, 1845:13 – 1848:23; Dkt. #4106 (10/28/21 Trial Tr.) [*Wailes*] at 4703:22 – 4704:1, 4705:12, 4716:8-24; Dkt. #4118 (11/4/21 Trial Tr.) [*Murphy*] at 6033:10-11 (noting that "Ohio has had relative high rates of opioid use disorder"); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-20808.

[3]    *See also, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1560:1-8; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:24 – 1663:1, 1798:11-17; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3664:24 – 3665:24, 3666:13 – 3669:10; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4245:14-20; Dkt. #4093 (footnote continues on next page)

- The abuse of prescription opioids can lead to, *inter alia*, dependence, addiction, overdoses, and death.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 517:23 – 518:2, 518:16-22, 519:22 – 520:4, 534:16 – 536:21, 558:18 – 562:8, 590:2 – 591:2, 647:6-10, 648:15 – 649:22, 656:24 – 662:14, 662:15 – 663:1 ("So when we're considering the harms to our communities as a result of the opioid epidemic, we have to consider people who have become addicted, we have to consider people who have died, but we also, importantly, need to consider the very large numbers of patients who have become physically dependent and who are now suffering the harms of being on opioids and struggling to get off of opioids, or at least go to a lower safer dose."), 664:16 – 665:6, 672:22 – 674:17, 708:20-25.[4]

---

(10/27/21 Trial Tr.) [*Toiga*] at 4444:17-24 ("Q:…. Why don't you tell the court and jury what you understand the opioid epidemic to be. A: What I understand it to be is the concerns about the misuse, overdose, and deaths associated with the use of opioids, and, so, I mean, that's the specifics related from an FDA perspective, but the impact of the misuse and abuse of opioids from a public health – as a public health concern for the American public."), 4445:3-10 ("Q: Something happened in the 1990s and thereafter that developed into an opioid epidemic. Is that a fair statement? A: From an FDA perspective, we – I mean, we began receiving reports of concerns about opioids in the – in the '90s, I believe. Q: The latter part of the '90s. Would that be a fair statement? A: Yes."); Dkt. #4107 (10/29/21 Trial Tr.) [*Wailes*] at 4831:23 – 4832:2 ("Q: Do you believe there has been a prescription opioid epidemic in the United States of America at in [sic] point in time since the year 2000? A: I believe that has been described as an opioid epidemic, yes."); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5405:2-14, 5406:10 – 5408:17; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6377:1-2 ("Q: Okay. In your opinion, is there an opioid epidemic? A: Yes."), 6377:8-9 ("In February of 2011, the CDC publicly stated that the United States was in the grips of an opioid epidemic."), 6377:14-16, 6449:22-24 ("Q: Were you aware of the Congressional hearings about the opioid crisis back in 2002 and 2003? A: I'm vaguely aware of it . . ."), 6450:7-11 ("Q: And so we can see in scientific literature or the jury has heard through testimony about different phases that go back to the early 2000s. You're not fussing that we've had a problem that long are you? A: Oh, no, I'm not fussing that at all."); P-04568; P-20809 at 014-024.

[4]    *See also, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1838:6 – 1844:23, 1845:13 – 1848:23; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3646:4-19, 3649:10-13, 3650:5-9, 3651:24 – 3652:1, 3661:11-20; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3460:5-18, 3537:6-11; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4083:7-13, 4111:24 – 4112:3, 4169:13 – 4170:7, 4171:2-19, 4172:16 – 4173:18, 4180:19-24; Dkt. #4106 (10/28/21 Trial Tr.) [*Wailes*] at 4701:11-24, 4718:7-17, 4186:1 – 4188:3; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5404:14, 5405:2-14 ("Q: And here you write, 'Prescription opioids are associated with more fatal overdoses than any other prescription or illegal drug, including cocaine, heroin, and marijuana combined.' Have I read that correctly? A: Yes."), 5406:10 – 5407:7, 5407:8 – 5408:9 ("Q: So what you were depicting here is that in our country in 2018, there were 14,800 prescription painkiller deaths. Right? A: Yes. Q: And for every one of those deaths there were 10 treatment admissions for abuse, right? A: Yes. Q: And for every one of those deaths there were 32 emergency department visits for misuse or abuse? A: Yes. Q: So if you wanted to know the total number, you would multiply 14,800, which were deaths, times 32, and you would get the total number of emergency room visits, right? A: Right. Q: And for every death there were 130 people who abuse or are dependent, right? A: Correct. Q: So again, you could multiply the two, and we don't have the time to do that right now. And then there were, of – for each death, there

(footnote continues on next page)

5

- Diversion, misuse, and addiction of prescription opioids pose a significant risk to public health and safety.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 522:5 – 536:21, 537:18 – 540:7, 541:24 – 542:17, 662:7-14, 674:12-17; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3460:5-18; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1560:1-8; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:24 – 1663:1; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4169:13 – 4170:7; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5404:4, 5405:2-14, 5406:10 – 5408:17; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6623:25 – 6624:9 ("Q: Addiction, misuse, and diversion of opioid prescriptions pose a significant risk to the health and safety of our communities across the nation.  Do you agree with that?  A: I agree with that.  Q: Diversion of opioid prescriptions is a danger to the health and welfare of our cities and counties across the country.  Do you agree with that?  A: I agree with that."), 6626:1-9 ("Q: And I think we've already – I think you already agree with me that diversion is dangerous to the health and safety of our neighborhoods; correct?  A: That's correct. Q: And diversion burdens our court systems, our law enforcement community, and the social fabric of our communities.  Agreed?  Do you agree with that?  A: Yes, I agree."); P-20809 at 006-011, 014-024.

- The abuse of prescription opioids can also be a gateway to the abuse of illegally manufactured or obtained drugs, such as heroin and fentanyl.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 648:19 – 652:9, 653:7-12, 727:2-4, 728:17; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 832:25 – 833:11; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3473:15 – 3475:17; Dkt. #4065 (10/22/21) Trial Tr. [*Keyes*] 3642:9-25 ("In every study that's been conducted, using prescription opioids, both medically and nonmedically, is associated with an increased risk of transition to heroin use."), 3648:22-25, 3649:7-22 ("And for prescription opioid use, for example, there's a really strong association between increased use of prescription opioids and subsequent experiences of addiction and transition to heroin use."), 3650:5-9, 3652:3-13, 3653:6-22, 3656:13 – 3657:17; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4178:19 – 4179:10, 4203:2-16.[5]

---

were 825 nonmedical users, right?  A: Right.  Q: And many of those nonmedical users ended up using because of diversion, right?  A: Well, I don't know.  I mean, I would – if they were a nonmedical user and weren't prescribed the medication, then, yes, there was diversion."); Dkt. #4118 (11/4/21 Trial Tr.) [*Murphy*] at 6020:4 – 6021:5 (discussing article on The Implications of County-Level Variation in the U.S. Opioid Distribution; "Q: And their results that they found from their study is 'In adjusted models, a one-pill increase in per capita pill volume was associated with a .2 percent increase in opioid-related deaths per 100,000 in the population.'  Do you see that?  A: I do.  Q: They say, 'Our findings validate the relationship between per capita pill volume and opioid-related deaths.'  Do you see that?  A: I do."); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6518:20 – 6519:5, 6561:17-19; P-20808; P-20809 at 014-024.

[5]  *See also, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 914:9-14; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1847:15-24 ("Q: And prescription pill opioids increases the likelihood that the user of those opioids might end up using illegal or illicit drugs, right?  A: Yeah."), 1848:5-13 ("Q: Sure.  We're (footnote continues on next page)

6

- When the costs or difficulties of obtaining prescription drugs increase, addicted persons often seek out cheaper or more easily available alternatives like heroin.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 632:11-19, 648:15 – 649:22, 676:25 – 677:24; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 914:9-14; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2796:14-20; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3656:8 – 3657:17; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4112:4-12, 4162:20 – 4164:2; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4267:7-12.

- Many users of heroin and illegally manufactured fentanyl initially started with prescription opioids.  In fact, prescription opioid use is the strongest risk factor for future heroin use—stronger than using marijuana, age, gender, medical conditions, or socioeconomic conditions.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 648:15 – 652:9, 676:25 – 677:24, 727:2-4; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 832:25 – 833:11; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2793:5 – 2794:5, 2796:14-20; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3473:15 – 3475:25; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3642:9-25, 3653:6-22 ("Not only do we see [an association between prescription opioid use and heroin], when you compare all of the different risk factors for heroin use, prescription opioid use is the strongest risk factor.  It's a much stronger risk factor than using marijuana, for example, or age or gender or other medical conditions. . . .  It's a much stronger risk factor for heroin use than socioeconomic conditions."); Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4116:18-22 ("Q: So you've – I don't think you've given a number, but you've said, I think, a number of different times and different ways, that many people who use heroin have in some point in the past used a prescription opioid; correct?  A: About 75 percent, yes."), 4117:9-11, 4118:17 – 4119:3 ("The risk factor studies that have been done that show that prescription opioid use is a strong risk factor for heroin use."), 4119:21 – 4120:9, 4128:5-9, 4131:5-11, 4178:19 – 4179:10 ("Of all the risk factors that we study for heroin use, prescription opioid use is the strongest risk factor."), 4191:13 – 4192:8.

---

talking about the gateway effect that the jury has heard in this case, and this bullet point is intended to communicate that opioid prescription pills, using them, increases the likelihood of the use of other drugs, including illicit drugs.  Right?  A: Sure, but, you know, I don't think any of them are any more dangerous than opioids.  Opioids are bad for sure."); Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2793:5 – 2794:5, 2796:14-20; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4384:19-24 ("Q: Okay.  And focusing on just heroin for a moment, the heroin part – and I understand there's multiple parts – but the heroin part of the opioid crisis in Lake County, those date back a long way as well; correct?  A: The epidemic as I observed it began with the prescriptions and then progressed into illicit opioids."), 4391:9-15, 4395:17-21 ("Q:….  One last question, Ms. Fraser.  You did provide some testimony on the potential transition, you've already testified to this, of patients from prescription opioids to illegal opioids; correct?  A: That has – we have seen that transition, yes."), 4395:22 – 4396:3; Dkt. #4118 (11/4/21 Trial Tr.) [*Murphy*] at 6048:24 – 6049:2; P-20808 at 014.

- Around 2010, there was an increase in prescription opioid deaths that involved heroin as well as an increased transition to heroin use among people who used prescription opioids.  *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3644:11-19, 3644:20 – 3645:4 (noting another shift happened in 2014/2015, where people were transitioning to fentanyl).  *See also* Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4114:13-15 ("I estimate that about 36,000 people in Ohio developed heroin use after having used prescription opioids.  And so if we scale that down to the proportion of people who live in Ohio who are in Lake and Trumbull County, you know, it's quite a substantial proportion of the people with opioid use disorder.").

- Another harm that can result from opioid abuse is babies being born with neonatal abstinence syndrome ("NAS").  Babies born with NAS often need ongoing care and continue thereafter to suffer from developmental delays and require special services.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 669:11 – 670:16; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:12 – 3472:2; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3639:1-23, 3672:20 – 3673:21, 3677:10-20, 3678:8-18.

- Even babies who are not diagnosed with NAS but are exposed to opioids in utero are often born sick, suffer from withdrawals, and require treatment in neonatal intensive care units.  They can also suffer from long-term cognitive and emotional delays that are significant and not seen in babies who are not exposed to opioids.  Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 660:12-17, 669:11 – 670:16.

- Children whose parents have opioid use disorder experience adverse childhood events that increase the risk for psychiatric disorders, learning disabilities, and other struggles.  Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3677:21 – 3678:3.

- The opioid epidemic's harms also include disruption and separation of families and children.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 662:7-11, 665:18 – 666:6; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3459:7, 3471:12 – 3472:2, 3472:21-23; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4259:1-5, 4262:11 – 4263:5; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:8-25.

- Oversupply and diversion of opioids can also lead to increases in crime.  *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3675:11 – 3676:5.

- There is an opioid epidemic in Lake and Trumbull Counties that continues to persist today.  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2730:9 – 2731:19; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:7 – 3460:1; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3665:25 – 3666:5, 3670:8 – 3671:20; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4239:24 – 4240:8 ("Q: And is opioid addiction a problem in Trumbull County?  A: Yes, it is.  Q: And how long has it been a problem?  A: Probably, you know, at least 20 years.  We've been watching it mount, watching it grow.  Our worst year was 2017, but this year's probably

8

going to be worse than then."), 4242:21 – 4244:2, 4244:3-9 ("Q: Worse.  Why would this year be – not why.  How will this year be worse, ma'am?  A: Based on the number of overdoses we've had so far, deaths, we're on track to be higher than the 135 [overdose deaths that occurred in 2017]."); Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4363:7-11, 4385:10-19.  *See also* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1848:24 – 1849:14.

- In 2019, an estimated 5,668 people in Lake County, and 7,221 people in Trumbull County, were addicted to opioids.  Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:2-10, 3472:11-20.  *See also* Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4172:16 – 4173:5 ("I actually estimated that in my report, and I estimated that the prevalence of opioid use disorder in Lake County – well, the number of people in 2019 with opioid use disorder that I estimated in Lake County was about 6,000.  About 6,000 people with opioid use disorder in Lake County, and about 7,500 people in Trumbull County.  And that, given the population size of Lake and Trumbull, is going to translate into about 3 to 4 percent of the population of Lake and Trumbull County who have opioid use disorder.  And that's fairly slightly higher, but fairly consistent with the U.S. as a whole, but we have – about – estimate 3 to 4 percent.").

- In Trumbull County, 4-5% of adults report nonmedical opioid use within the past year.  Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3459:8-14.

- Prescription opioids are an ongoing and significant cause of drug overdose deaths in the Counties.  A majority of opioid deaths in the Counties are at least partially attributable to prescription opioids.  *See, e.g.,* Dkt. #4065 (Trial Tr. 10/22/21) [*Keyes*] at 3679:9 – 3680:17; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:7-20, 3466:24 – 3470:10, 3535:23 – 3536:4, 3536:21-24; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4171:2-11.

- Between 1999 and 2019, the number of opioid overdose deaths in the Counties increased exponentially.  Dkt. #4065 (Trial Tr. 10/22/21) [*Keyes*] at 3641:6-25.  *See also* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 804:2-7; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:12-24 ("[R]ates of overdose death, for example, that have increased from, say, 12 to 15 in Lake and Trumbull Counties, you know, 15 years ago, plus or minus, to as high as, in Trumbull County, 100 to 120 overdoses a year, and in Lake County, 80 to 90 overdoses a year"), 3468:21 – 3469:7, 3469:16 – 3470:10; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4243:15-16 ("[i]n 2017 we had 135 overdose deaths and we had 1,250 overdoses[.]"); Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4400:20-24 ("Q: And then the other one is, in what year – and obviously this is if you know – in what year did Lake County experience the most opioid-related overdoses?  A: Our peak was in 2017.  We've lost over 400 people in the last 5 years, but the peak was in 2017.").

9

- Lake and Trumbull Counties have suffered an increase in children born with NAS, which requires ongoing care and is associated with learning disabilities and other developmental delays.  *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:12 – 3472:15, 3472:21-23; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3672:20–3673:21, 3677:6-20, 3678:8-18.

- In 2019, 28 babies in Lake County, and in 2018, 55 babies in Trumbull County were born with NAS. *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:12-25, 3472:21-23.

- Trumbull County ranks as one of the lowest counties in Ohio for overall length and quality of life. Among the most influential attributing factors is the county's heavy opiate abuse. Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2821:10 – 2822:3.

- Lake County now has more children than ever who live in foster care, residential treatment facilities, or with grandparents because their parents have been impacted by opioids and are unable to take care of them. Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:8-25 ("Q: Let's start with public Children's Services.  How has the epidemic affected your county such that they're involved?  A: We have more children in foster care because their parents, their caregivers have been impacted by opioids and are unable to take care of their kids.  We have nearly a hundred grandparents raising their grandchildren because the family member, because the parent is not able to care for their children.  We have more children today than ever in residential treatment, which is paid for by Children's Services by the ADAMHS board, by local levy dollars, because the children have such acute symptoms as a result of their trauma that they're pulled out of their homes and placed into residential treatment.  We have programs specific to caring for babies who are born in withdrawal because of the paternal opiate use disorder.  It's a huge, huge impact on our community because of what's happening with these children and these babies.").

- Trumbull County experienced a 40% increase of children who were placed in foster care, and a 65% increase of children going into kinship care, as a result of the opioid use of one or both parents.  Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4262:11 – 4263:5 ("So we knew the need because we had a 40 percent increase of children ending up in foster care in our community as a result of their parents' opiate issues.  Sometimes it was a death.  Sometimes it was just long-term use and they became a dependent child.  We had a 65 percent increase of our children going into kinship care, mostly being raised by grandparents, sometimes by, you know, an aunt, uncle or somebody else.").

- Childhood trauma resulting from placement into the foster care system requires special services to address the effect of displacement and for the child not to be defined by their parents' addiction. *See, e.g.*, Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4262:11 – 4263:5; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:8-21, 4367:11-16, 4377:9-14.

- Having a parent or household member with an opioid abuse disorder is a significant risk factor for a child to develop psychiatric disorders and learning disabilities. *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3677:21–3678:7.

- The opioid epidemic has increased crime rates and adversely affected neighborhoods throughout the Counties. *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:17-19; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3672:20-25, 3675:14 – 3676:5; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4261:8-21; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4369:17-23, 4375:7-16; P-04598 at 00015.

- Opioid-related harms affect generations of communities, posing an ongoing issue for Plaintiffs' communities. *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3678:16 – 3679:8; *see also, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1849:1-14.

- Abuse of diverted prescription opioids has exacted, and continues to exact, tragic costs from Plaintiffs' communities, overburdening law enforcement, crowding the Counties' jails and treatment facilities, undermining the employability of the workforce, and devastating families. *See, e.g.*, Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 670:17 – 672:20; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2795:7–2796:20; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3549:7, 3470:11 – 3472:23; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3663:10 – 3664:19, 3672:20 – 3675:4; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4171:2-11.[6]

---

[6]  *See also, e.g.,* Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4237:3-17, 4243:9 – 4244:9, 4246:1-22, 4247:1-13 ("We were so inundated in our county with deaths that we had to buy autopsies from the coroner's office.  For the first time in history, my board gave our coroner's office $70,000 to help pay for those kinds of things.  It was like we were hit with tsunami, and we were just pulling the bodies out of the water.  We were doing everything that we could think of and that we read in the research to make an impact and to stop the epidemic in our community, and this was just one more thing.  But it was sounding the alarm, saying, we are struggling and we need help on every level."), 4253:17 – 4254:2, 4262:11 – 4263:5, 4263:17 – 4264:5 ("So again, in 2017 we were averaging three overdose deaths a day – or in most, thank God, were brought back with naloxone.  But our first responders were just, you know, day in and day out.  And we're talking police, fire, EMTs, the hospital staff. . . .  And we also made sure that they all knew where they could get free confidential help if they themselves were, you know, experiencing burnout because of what they had been witnessing day in and day out.  And a lot of them took us up on that."), 4290:24 – 4291:8 ("Q:….  Are other programs being negatively affected financially by the opioid crisis?  A: That's a good question, and that's a broad question.  So many people can't hire people because they can't pass the drug test.  We know that our suicide rates have
(footnote continues on next page)

- Plaintiffs have used, and continue to use, human power, resources, and time to fight the opioid epidemic, which adversely affects both the Counties' budgets and their ability to address other matters. *See, e.g.*, Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4228:9-24, 4237:3-17, 4239:19 – 4240:4, 4243:9 – 4245:13, 4246:1-22, 4247:3 – 4249:16, 4250:3-18, 4251:6 – 4261:7, 4262:11 – 4263:5, 4263:13 – 4264:17, 4289:24 – 4290:3, 4290:24 – 4291:25; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4360:1-6 ("Q: And as the executive director, have you had hands-on experience with how the county has been affected by the opioid epidemic?  A: Absolutely.  And [sic] enormous amount of my job in the last decade has had to do with the impact of opioids on our community."), 4361:9 – 4362:6, 4365:8-25, 4367:18-24, 4368:18 – 4369:23, 4374:11 – 4378:19, 4379:8 – 4380:4, 4383:2-7 ("Q: All right.  Ms. Fraser, your job involves opioid-related issues.  Can you give us an idea of how much of your time and your efforts are suspended – are encapsulated in dealing with the opioid epidemic in Lake and – Lake County?  A: Over the last decade I would say fully 75 percent of my job has been related to the opiate epidemic."), 4394:3-4.[7]

- The sharp increase in opioid abuse led to a rise in emergency department visits and first responders being called to scenes of overdoses. *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2755:5-7; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3459:7, 3470:11 – 3471:1, 3472:3-18; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3672:20-25, 3674:6-17; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4254:8-11, 4263:17-20; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4374:11-23; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5407:3-21.

- The increased need to respond to overdose emergencies also means that first responders are less able to address other needs in the community. *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2795:20–2796:12; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3468:21 – 3471:1; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4254:8-10.

- Additionally, repeated exposure to traumatic experiences, such as multiple overdoses and overdose-related deaths among young people, impact emergency responders emotionally, behaviorally, interpersonally, and physically, resulting in increased personnel turnover and

---

gone up in direct correlation and people graduating, that's been affected, people getting into other, you know, long-term vocational things. We know that our jail is full.  Our other mental health and addiction, you know, treatment programs are full with wait lists.  So yeah, it's affected across the community."); Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:18-25, 4369:3-23, 4374:11 – 4378:19, 4382:25 – 4383:1, 4385:10-19; P-04511; P-04598.

[7]  *See also, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:10-19, 2750:18–2752:22, 2753:4–2755:25, 2762:3-5, 2795:7–2797:3; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3460:1; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3676:6 – 3677:2, 3678:8 – 3679:8; P-04511; P-04568; P-04598.

decreased personal empathy.  *See, e.g.,* Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4263:13 – 4264:5.

Moreover, the unreasonableness of the interference is further supported by evidence demonstrating that (i) Defendants' conduct violated various statutes and regulations (*infra* at § I.B), (ii) was of a continuing nature (*infra* at § I.B-C), and (iii) produced a long-lasting effect upon public health and safety (*supra* at § I.A), an effect of which Defendants were aware or should have been aware (*infra* at §§ I.B-C).

### B. The Evidence Demonstrated that Defendants Unlawfully and/or Intentionally Dispensed Massive Amounts of Prescription Opioids into Lake and Trumbull Counties.

For Defendants to be held liable for public nuisance, their dispensing conduct[8] must have been intentional and/or unlawful.  In this context, "intentional" "means not that a wrong or the existence of a nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance."  *Nottke v. Norfolk S. Ry. Co.,* 264 F. Supp.3d 859, 863 (N.D. Ohio 2017) (citing *Angerman v. Burick,* 2003-Ohio-1469, 2003 WL 1524505, at *2 (Ohio Ct. App. March 26, 2003)).  *See also* Dkt. #3403 (CT3 MTD Order) at p. 28.  In other words, "'[w]here the harm and resulting damage are the necessary consequence of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, . . . the rule of absolute liability applies.'"  Dkt. #3403 (CT3 MTD Order) at p. 28 (quoting *Taylor v. City of Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944)).

Defendants' conduct is unlawful if it violates applicable statutes or regulations governing the dispensing of prescription opioids.  The legal obligations on dispensers of opioids under the CSA and its implementing regulations have been clearly delineated by this Court in prior rulings.[9]

---

[8]  For purposes of this response, "conduct" includes omissions.

[9]  In addition to the plain language of the statute and implementing regulations, the DEA has published on the Federal Register numerous decisions, opinions, and administrative actions that describe the obligations of dispensers under the CSA at length.  *See, e.g., East Main Street Pharmacy*; *Affirmance of Suspension Order*, 75 FR 66149-01, 66163, 2010 WL 4218766 (D.E.A. Oct. 27, 2010); *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*, 77 FR 62316-01, 62341, (footnote continues on next page)

To begin with, *all* registrants must "'provide effective controls and procedures to guard against [i] theft *and* [ii] diversion of controlled substances.'"  Dkt. #3403 (CT3 MTD Order) at p. 15 (emphasis in original) (quoting 21 C.F.R. § 1301.71(a)).

Regarding dispensers of opioids, the Court has explained that: (1) both the individual pharmacists *and* the pharmacy registrant bear the responsibility to guard against invalid prescriptions[;] (2) dispensers of controlled substances must "check for and conclusively resolve red flags of possible diversion prior to dispensing those substances[;]" (3) pharmacies must collect and retain specific data-points that would inarguably be useful to the pharmacy (or the DEA) in identifying suspicious prescribing and dispensing activity" in order to "guard against diversion[;]"[10] and (4) "a pharmacy may not fill a prescription that it knows or has reason to know is invalid and may not remain deliberately ignorant or willfully blind of the prescription information it has (including computerized reports it generates)."  Dkt. #3403 (CT3 MTD Order) at pp. 14-22, 25; Dkt. #3499 (CT3 Reconsideration Order) at p. 7.

As to this last point, the Court recognized that the corresponding responsibility duty imposed by 21 C.F.R. §1306.04(a) requires a pharmacist to refuse to fill a prescription when "a red flag was *or should have been recognized* at or before the time the controlled substance was dispensed." Dkt. #3403 (CT3 MTD Order) at p. 22 & n.25 (emphasis added) (citing *Holiday CVS*, 77 FR. 62316-01, at 62341); *see also id.* at n.25 ("[T]he DEA 'has consistently interpreted [section

---

2012 WL 4832770 (D.E.A. Oct. 12, 2012).

[10]  Defendants claim that the Court "ruled that the CSA does not require any data to be shared among a chain's individual pharmacists, explaining that 'there is no absolute requirement . . . that a pharmacy must conduct a computerized [] analysis of each prescription before filling it.'" Dkt. #4202 (Ds' JMOL) (quoting Dkt. #3499 (CT3 Reconsideration Order) at p.7); *see also* Dkt. #4203 (WMT JMOL) at p. 11; Dkt. #4206 (WAG JMOL) at p. 6. But importantly the Court also emphasized that, despite the CSA not containing an "explicit" requirement as to the use of data to prevent diversion: "It remains true, however, that a pharmacy may not fill a prescription that it knows or has reason to know is invalid and *may not remain deliberately ignorant or willfully blind of the prescription information it has (including computerized reports it generates). To repeat: pharmacies may not 'do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled.'*" Dkt. #3499 (CT3 Reconsideration Order) at p.7 (internal citations omitted) (emphasis added).

1306.04(a)] as prohibiting a pharmacist from filling a prescription for a controlled substance when he either knows or has reason to know that the prescription was not written for a legitimate medical purpose.'") (quoting *E. Main St. Pharmacy*, 75 FR 66149-01, at 66163).

In their motions (Dkt. #4202 (Ds' JMOL at p. 4; Dkt. #4203 (WMT JMOL) at pp. 3-5), Defendants cherry-pick phrases from the Court's opinion and the applicable precedent in an effort to minimize their obligation to "check for and conclusively resolve red flags of possible diversion prior to dispensing [controlled] substances."   Dkt. #3403 (CT3 MTD Order) at p. 22.  Plaintiffs incorporate their prior briefing on the applicable standard.  Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 20-26.  As noted therein, the DEA recognizes that pharmacists and pharmacies will be deemed willfully blind if they ignore high volumes of red-flagged prescriptions or other dispensing irregularities plainly present in their data.  *See, e.g., Medic-Aid Pharmacy*, 75 Fed. Reg. 30043-01, 30043-44, 1990 WL 328750 (July 24, 1990); *Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy; Revocation of Registration*, 55 FR 4729-01, 1990 WL 352775 (Feb. 9, 1990); *Jones Total Health Care Pharm., LLC,* 881 F.3d 823, 832 (11th Cir. 2018); *E. Main St. Pharmacy*, 75 Fed. Reg. 66149-01, 2010 WL 4218766.   When the red flags are present, there is a duty to investigate prior to dispensing.  *Medic-Aid Pharmacy*, 75 Fed. Reg. at 30043-44 ("there is no question that a conscientious pharmacist would have been suspicious of these prescriptions and would have refused to fill them"); *Ralph J. Bertolino*, 55 FR at 4729-01 ("the sheer quantity and frequency of prescriptions for Preludin, a highly abused Schedule II controlled substance . . . should have prompted Mr. Bertolino to question their legitimacy and ultimately decide not to fill them").  And, the failure to attempt to do so is sufficient to constitute a violation of 21 C.F.R. § 1306.04(a).  *See Jones Total Health*, 881 F.3d at 830 (violation of section 1306.04(a) established by evidence that pharmacy filled over one-hundred prescriptions that had at least one red flag that pharmacy did not attempt to resolve and that could not have been resolved).

Defendants, citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011), argue that "Plaintiffs were required to present evidence that each Defendant (1) subjectively believed its pharmacists were violating the CSA and (2) intentionally took actions to avoid learning

15

about it."    Dkt. #4202 (Ds' JMOL) at p. 4; *see also* Dkt. #4203 (WMT JMOL) at pp. 3-4; Dkt. #4207 (CVS JMOL) at pp. 3-4.  That is not the correct standard.  As the Supreme Court explained in *Global-Tech*, the standard for willful blindness requires that "there is a high probability that *a fact* exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  563 U.S. at 769 (emphasis added).  Defendants contend that the "fact" whose existence they must have been aware of is that their pharmacists were violating the CSA.  But pharmacists who lack the information to identify red flags may be dispensing invalid prescriptions without themselves being aware of it or violating the CSA.  Thus, it is sufficient for Plaintiffs to show that each Defendant believed that invalid opioid prescriptions were being filled at its pharmacies, that prescriptions filled at their pharmacies were being diverted, or even that the information in their own database would enable them and their pharmacists to identify invalid prescriptions -- and took actions to avoid learning about or preventing it.  Defendants can be shown to have been willfully blind based on what *they* knew or believed, regardless of whether their pharmacists knew or were willfully blind, regardless of whether the pharmacists' conduct would satisfy each element to establish a violation of the CSA.

Moreover, in this context, the corporate Defendants here are presumed to have the knowledge of their employees.  *See Supreme Council Am. Legion of Honor v. Orcutt*, 119 F. 682, 687 (6th Cir. 1903) ("Since a corporation can only act by its agents, we think it should be imputed to the corporation, after so long a period, that it had knowledge of the course of business pursued by them."); *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 669 (S.D.N.Y. 2017), *aff'd*, 942 F.3d 554 (2d Cir. 2019) ("Knowledge that an agent acquires during the course of performing his or her job responsibilities may be imputed to an employer. . . .  In addition, the presumption of corporate knowledge is conclusive, even if the corporate employee never communicated the information to her superiors.") (citing cases; internal quotations omitted).  In this case, as set forth below, there was ample evidence in the record that individual employees of Defendants knew or subjectively believed that there was a high probability that Defendants' pharmacists were

dispensing illegitimate opioid prescriptions that were likely to be diverted and took actions to avoid learning about it or preventing it. *Infra* at § I.B.1-3.

For this and other reasons, the cases cited by Walmart and CVS (Dkt. #4203 (WMT JMOL) at pp. 4-5; Dkt. #4207 (CVS JMOL) at pp. 6-7 & n.3) are inapposite. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 413, 418-19, 422 (2011) (holding, in employment discrimination action, "that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [Uniformed Services Employment and Reemployment Rights Act]") (internal footnote omitted) (emphasis in original);[11] *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461, 476-77, 483-84 (6th Cir. 2014) (dismissing plaintiff's securities fraud claim because complaint failed to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind" as required under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995; finding that the state of mind of only certain specified agents of corporation are probative of the corporate scienter required for a securities fraud action under the Securities Exchange Act); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 239-42 (5th Cir. 2010) (in RICO action based on alleged violation of the federal money laundering statute, plaintiffs failed to present sufficient evidence

---

[11]  In its motion (Dkt. #4207 (CVS JMOL) at pp. 6-7), CVS cherry-picks certain language from this case without providing the full context:  "Here, however, Staub is seeking to hold liable not [his supervisor or his supervisor's supervisor], but their employer.  Perhaps, therefore, the discriminatory motive of one of the employer's agents . . . can be aggregated with the act of another agent ([the HR official who fired him]) to impose liability on [the corporate employer].  Again we consult general principles of law, agency law, which form the background against which federal tort laws are enacted.  *Here, however, the answer is not so clear*.  *The Restatement of Agency suggests* that the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable for a tort that requires both.  Some of the cases involving federal torts apply that rule.  *But another case involving a federal tort, and one involving a federal crime, hold to the contrary*.  *Ultimately, we think it unnecessary in this case to decide what the background rule of agency law may be, since the former line of authority is suggested by the governing text [of the USERRA]*, which requires that discrimination be 'a motivating factor' *in the adverse action*.  When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the decision; but it seems to us a considerable stretch to call it 'a motivating factor.'"  *Staub*, 562 U.S. at 418-19 (internal citations omitted) (emphasis added).

that defendant knew, or could be charged with knowledge, of alleged co-conspirator's money laundering; plaintiffs appeared to concede that no employee of defendant "actually knew that money laundering was ongoing" and there was no evidence "that any individual at [defendant] was subjectively aware of a high probability that [the co-conspirator] was engaged in money laundering[,]" as required to establish deliberate ignorance);[12] *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1275-76 (D.C. Cir. 2010) (new trial warranted in False Claims Act case based on erroneous "collective knowledge" jury instruction because it "allowed the jury to find that SAIC knowingly submitted false claims for payment even if the jury also concluded (1) that no individual at SAIC was simultaneously aware (or was recklessly unaware) of the company's NRC contract and its relationships with other companies involved in the recycling of radioactive materials, and (2) that SAIC, acting on the basis of the knowledge of its individual employees, took reasonable steps to identify potential conflicts");[13] *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008) (dismissing complaint where allegations insufficient to support strong inference that individual corporate officers named as defendants either orchestrated improper chargeback scheme, or knew of or were severely reckless in not discovering this scheme and in failing to advise potential investors of its effect on earnings, as required to satisfy heightened pleading standards of PSLRA); *Woodmont, Inc. v. Daniels*, 274 F.2d 132, 136–37 (10th Cir. 1959) (in case involving claim for fraudulent inducement of a contract, the court noted it would not hold corporation constructively responsible where the representations of the corporation's field representatives were made in good faith and there was no evidence that corporation's directors actually knew contractors were relying on field representative's representations as a basis for their

---

[12] Notably, although the plaintiffs failed to provide sufficient evidence in that case, the court acknowledged that "[c]ertainly, failing to ask questions in the face of highly suspicious activity may be enough, in some situations, to satisfy the purposeful contrivance prong of the test." *Chaney*, 595 F.3d at 241.

[13] Notably, the court also stated: "Under the FCA, if a plaintiff can prove that a government contractor's structure prevented it from learning facts that made its claims for payment false, then the plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims." *Id.*

misapprehension; however, court ultimately affirmed judgment in favor of contractor because the evidence demonstrated that both vice president and field agent of the corporation made "positive representations of material facts" that they actually believed to be untrue); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 259-60 (S.D.N.Y. 1988) (dismissing fraud claim alleging that Standard & Poor's published description of corporation's convertible bonds with reckless disregard as to its falsity, finding that plaintiffs' "attempt to demonstrate recklessness by pointing out alleged inconsistencies in the understandings held by various people at Standard & Poor's" did not show "that Standard & Poor's published the description of the bonds with serious doubt as to its truth"), *aff'd,* 869 F.2d 175 (2d Cir. 1989).

Finally, "[w]hile *Global–Tech* requires proof of deliberate actions, the standard does not require proof of an identifiable affirmative act." *United Parcel Serv.*, 253 F. Supp. 3d at 667 (internal quotations omitted). Indeed, choosing to proceed in the presence of "[r]ed flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *S.E.C. v. Delphi Corp.*, 508 F. App'x 527, 532 (6th Cir. 2012) (quoting *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011)); *United Parcel Serv.*, 253 F. Supp. 3d at 667 (same).

### 1. Walgreens unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties.

The evidence adduced at trial demonstrates that Walgreens dispensed massive amounts of prescription opioids into the Counties without providing effective controls against diversion.[14] Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- There are seven WAG pharmacies in Lake County and six WAG pharmacies in Trumbull County. Dkt. #4111 (11/2/21 Trial Tr.) [*Brunner*] at 5494:15-23.

- From January 2006 through December 2019, Walgreens pharmacies dispensed **25,346,069** dosage units of prescription opioids into Lake County and **27,969,541** dosage units of

---

[14]   Between 2006 and 2018, Lake County had an average population of 229,550 people and Trumbull County had an average population of 210,118 people. *See, e.g.,* P-26322-A; Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2126:9-17.

prescription opioids into Trumbull County.  P-26321 at 001; Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2129:17-19, 2132:13 – 2134:6, 2135:16 – 2136:19; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2885:10-22.  *See also* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2027:1 – 2028:4.

- Hydrocodone and oxycodone are the two most abused opioids in the United States; hydrocodone is also the most prescribed drug in the United States.[15]

- Of the total dosage units of prescription opioids, Walgreens dispensed **9,118,612** dosage units of hydrocodone and **13,055,332** dosage units of oxycodone from its pharmacies in Lake County from January 2006 through December 2019.  P-26321 at 001.

- During that time period, Walgreens dispensed an average of 6.86 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Lake County.  At its peak in 2011, Walgreens dispensed an average of 9.64 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Lake County.  P-26321 at 003; Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2133:7 – 2134:6.

- Of the total dosage units of prescription opioids, Walgreens dispensed **15,130,246** dosage units of hydrocodone and **11,000,425** dosage units of oxycodone from its pharmacies in Trumbull County from January 2006 through December 2019.  P-26321 at 001.

- During that time period, Walgreens dispensed an average of 8.83 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Trumbull County.  At its peak in 2015, Walgreens dispensed an average of 13.02 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Trumbull County.  P-26321 at 003. *See also* Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2133:20 – 2134:6.

- During the relevant time period, Walgreens dispensed a total of 1,007,556 *prescriptions*[16] for opioids, benzos, and muscle relaxers into the Counties, of which **806,193** were opioid prescriptions.  Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2139:17-20, 2139:24 – 2140:18; Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2230:12-19, 2238:12-19, 2298:18-20.

---

[15]  *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1515:23 – 1516:4; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1663:16-17, 1665:6 – 1666:4; Dkt. #4118 (11/4/21 Trial Tr.) [*Choi*] at 6185:8 – 6186:11.

[16]  As Dr. McCann explained, "dosage unit" refers to the number of pills, while "prescription" typically involves packaging of more than a single dosage unit (*e.g.*, 30 or 90 pills).  Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2139:24 – 2140:15; Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2304:6-11.

The evidence adduced at trial demonstrates that Walgreens' dispensing of opioids into the Counties was unlawful. Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- The practice of pharmacy is governed by well-defined laws and regulations, both at the national and state-wide levels, and subject to established and well-known standards of care, including requirements for the careful evaluation of prescriptions and efforts to guard against the diversion of medications into non-medical or illegitimate use.[17]

- The CSA creates a closed system of controlled substances distribution and dispensing, which cannot work unless all members within the closed system comply with their obligations.[18]

- The purpose of the Controlled Substances Act is to prevent the misuse and diversion of controlled substances.[19]

---

[17]  Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 934:21 – 954:8; *see also, e.g.,* 21 U.S.C. §§ 824(d), 827(a), 841; 21 C.F.R. §§ 1301.71(a), 1306.03, 1306.04, 1306.06; OHIO ADMIN. CODE § 4729-5-20; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:11 – 5404:4; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6950:13-18 ("Q: And you know you have a legal obligation to follow the standard of care, don't you? A: Correct.  A: And you're not telling the jury the standard of care is less than the policies, are you? A: No, of course not."), 6951:4-10.

[18]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 374:13-19; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 562:25 – 563:17; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 935:19 – 936:13, 936:21 – 938:5, 954:10-22, 955:7-14, 986:9 – 987:6, 1041:13 – 1042:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1386:22 – 1387:4, 1471:8-22, 1490:24 – 1491:7, 1493:24 – 1494:6; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1544:7-23, 1551:3 – 1552:7, 1553:17-24, 1563:22 – 1564:10, 1565:15 – 1566:13; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:17-25.

[19]  Dkt. #4107 (10/12/21 Trial Tr.) at 1563:22 – 1564:10 ("[T]he architecture for the Controlled Substances Act was a system that would prevent drug diversion, prevent – help prevent addiction, these drugs getting out into the market – into the illegitimate market, the illegal market, and hurting people.  So that was the basis of that.  Congress created the infrastructure for the Controlled Substances Act and the closed system."); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:11 – 5404:4 ("Q: And the whole reason for the state regulations and the federal regulations is – on controlled substances is because it is out of a recognition that these drugs are dangerous, can be addictive, and can lead to diversion, right? A: Correct.  Q: And that's why this is a highly-regulated industry.  In order for the pharmacies in this case to have the ability to dispense drugs, they are required as part of the closed system to follow all of the regulations, right?  A: Correct.  Q: That's important to patient safety, right?  A: Yes.  Q: It's important to public safety, right?  A: Yes.  Q: It's important for our communities, to protect our communities, against the bad things that happens as a result of diversion, right?  A: Sure, yes."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6623:18-24 ("Q: And, frankly, that's why the Controlled Substances Act was enacted.  It was – its purpose was to set up a closed system where drug companies, including the defendant pharmacies, were required to follow the rules to minimize the risk of misuse and diversion of drugs, like opioid prescriptions; correct?  A: Correct.").

- Federal and Ohio controlled substances laws and regulations require Walgreens to maintain effective controls and procedures to guard against the diversion of controlled substances.[20]

- Pharmacies and pharmacists are the last line of defense to protect against diversion.[21]

- The fact that a particular Walgreens pharmacy in the Counties was inspected by the Ohio Board of Pharmacy, or was not sanctioned by the Board, does not establish that the pharmacy was dispensing opioids in compliance with the law because, *inter alia*: (i) those inspections are cursory and represent only a brief snapshot in time; (ii) the Board has historically been understaffed and overworked, often inspecting any given pharmacy only once every couple of years; (iii) the inspectors did not review corporate policies or more than a handful of actual prescriptions during the inspection.[22]  *See also, e.g.,* Dkt. #4106 (10/28/21 Trial Tr.)

---

[20]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 562:25 – 563:17, 573:18 – 574:18, 626:2-7, 701:25 – 702:5; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 937:22 – 938:25, 954:10 – 958:22, 968:22 – 969:2, 975:4-10, 986:9 – 987:2; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1229:2 – 1231:20, 1233:2-7, 1234:9-19; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1388:8-24, 1470:7-20, 1471:3 – 1472:11, 1473:6-19, 1490:24 – 1491:7, 1493:10 – 1494:6, 1497:23 – 1498:5, 1499:18 – 1500:11, 1508:20-23, Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1551:3-8, 1553:17-24 ("[A]ll registrants, regardless of where they are in the chain, they all must maintain effective controls against diversion . . . that protects the drugs that they're dealing with, the drugs that they're transferring, that protects them from being moved out into the illegitimate or illegal stream."), 1576:13 – 1580:12; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:1-22, 1671:17 – 1673:15; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:11-21, 5472:5-15; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:7-21 ("Q:…. Based upon your knowledge and experience at the DEA, is it true that these defendants, Walgreens, CVS, Walmart . . . are required to, quote, provide effective controls and procedures to guard against the theft and diversion of controlled substances, end quote?  A: Yes, that's correct."), 6625:6-25, 6626:21 – 6628:2; P-14750 at 001.

[21]  *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 925:18 – 926:9, 926:20 – 927:23, 930:14-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1203:18 – 1204:14; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:14-22, 1673:7-15; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2894:19-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1833:20 – 1834:5; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6476:23 – 6477:1 ("Q:…. When the pharmacist is dispensing the drug, in that event the pharmacist is the last line of defense. Can we agree on that?  A: We can agree."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6628:3-25; P-15962-A at 009; P-19827 at 002.

[22]  Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4516:21 – 4517:2, 4518:21 – 4519:1, 4519:25 – 4520:11, 4540:16-24, 4547:18 – 4548:3, 4552:15-21, 4596:19 – 4597:6, 4597:17-25, 4598:1-19, 4599:8-13, 4599:14 – 4600:9 (characterizing inspection as 2.5 – 3 hour snapshot of the conditions at that pharmacy, done every 1-2 years), 4601:11-21, 4606:2-5 (no review of pharmacy's written dispensing policies for controlled substances during inspections), 4606:15-18 (no review of pharmacist training programs during inspections), 4612:18 – 4613:3, 4613:9-15, 4615:2-23, 4619:3-9, 4619:17-19, 4619:23 – 4620:18, 4631:3-7, 4642:14-22, 4643:3-12, 4644:8-19, 4644:20 – 4645:5, 4646:13-25, 4652:5-17 ("Q: And so you didn't look at [the pharmacy's dispensing] policies to determine whether or not they confirmed with your understanding of either the federal [CSA] or the state regulations; right?  A: I don't recall looking at those policies."), 4652:20-24; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at (footnote continues on next page)

[*Pavlich*] at 4548:18 – 4549:2, 4621:8-22, 4650:20-24; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5351:5-17, 5354:22 – 5355:5, 5360:20 – 5361:21, 5365:14-19, 5415:8-19, 5416:3-11 ("Q: And your inspection does not check for documentation of red flag resolution other than this checklist, right?  A: Correct.  Q: So we'll say 'other than Walgreens TD GFD.'  Okay?  A: Yes.  And that's not something we would ask for, that good faith dispensing policy.  Like, that's – I mean, we would look at it if it was available, but it's – there was no file of good faith dispensing checklists that we would look through.").

- Walgreens, through the control it exerts over its pharmacies, pharmacists, and pharmacy employees, is responsible for ensuring all dispensing of controlled substances is carried out in accordance with applicable laws and regulations.[23]

- Corporate oversight includes established practices of pharmacies that should incorporate top-down compliance programs using data readily available to Walgreens to guard against

---

5343:10-12, 5343:15-19, 5344:9-11, 5345:11-25, 5346:10-24, 5347:15 – 5348:3, 5348:7-9, 5348:10-13 ("Q: As a Board of Pharmacy agent, what did you view . . . as the purpose of your inspections?  A: It was to maintain accountability for the pharmacies and, you know, also maybe like a PR visit[.]"), 5363:16-17, 5411:14-17, 5412:2-7, 5412:8-19 ("Q: And so it's not intended to be a comprehensive repeated view from the Ohio Board of Pharmacy's standpoint of what is actually going on in the pharmacy, right?  A: It's what's going on at that particular time frame that I'm in the pharmacy."), 5412:20 – 5413:8 (no review of corporate dispensing policies during inspections), 5413:9-18 (no review of corporate training of pharmacists or comparison of controlled/non-controlled pill volumes during inspection), 5414:9-13, 5414:14-24, 5415:8 – 5416:5 (Edwards would have no idea if pharmacist was presented with red flag, nor does he check for documentation of red flag resolution), 5417:9-13, 5443:23 – 5444:4, 5445:1-13, 5468:24 – 5469:3.

23    *See, e.g.*, Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 626:1-18; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 925:11 – 926:9, 935:19 – 936:5, 953:15 – 954:8, 960:20 – 962:12, 968:22 – 969:2, 969:11 – 971:2, 974:16 – 975:12, 976:6-10, 980:5-18, 982:2-7, 996:6-16, 1001:20 – 1002:2, 1046:1-8, 1047:1 – 1048:10; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1149:9 – 1150:3; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1473:6-16, 1510:25 – 1511:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannaazzisi*] at 1578:22-25, 1579:8-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1710:3 – 1711:8, 1808:10-20; Dkt. #4107 (10/29/21 Trial Tr.) [*Wailes*] at 4950:14-17, 4953:18-25; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5472:5-21; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6473:25 – 6474:3, 6474:17-22; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6625:6-20 ("Q: Well, as part of their obligation under a 1301.71 to provide effective controls to guard against theft and diversion, would you agree that these defendant pharmacies corporately have an obligation to develop policies to train pharmacists to comply with the regulations?  A: Yeah, I agree – as part of that process, yes.  Q: Would you agree that the defendants are required to develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations?  A: Yes.  Q: Would you agree that the defendants' pharmacist training and the tools that they provide must be designed to provide effective controls and procedures to prevent the theft and diversion of opioids?  A: Yeah, I believe that's an obligation."), 6625:21-25, 6626:21 – 6627:1, 6627:2-7, 6627:8 – 6628:2, 6632:4-9 ("Q: Ms. Ashley, we talked about the fact that these pharmacy defendants have a duty to provide tools to their pharmacists to prevent diversion, generally speaking, under 1301.71; correct?  Do you agree with that?  A: Yes."), 6632:10 – 6633:2; P-00021.

diversion.[24]

- Corporate oversight also should support, and not impede, pharmacists in complying with laws and regulations related to the dispensing of controlled substances.[25]

- Walgreens is expected to become and remain aware of its obligations regarding the dispensing of controlled substances and the risks associated with same.[26]

- Walgreens' dispensing policies were created and implemented by its corporate department and applied nationally to all its pharmacies. *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1963:24 – 1964:3; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2860:12-20, 2910:16-19, 2926:11-12, 2934:17 – 2935:17, 2937:6-15; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3016:12-21, 3017:19-24, 3076:2-5, 3291:19 – 3292:2; Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6776:1-15, 6934:3-21; P-14746 at 003; P-17254; P-19616; P-19927-A; P-20639 at 025; *see also* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 854:3-12.[27]

- Walgreens failed to implement and maintain effective controls against diversion in its dispensing of prescription opioids.[28]

---

[24] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 858:18 – 859:9, 860:3-4, 868:16-25; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 926:10 – 928:2, 958:23 – 966:1; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4179:11-20; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5419:11-16 ("Q: Now, from your own knowledge, isn't it true that that these pharmacies have their own databases of prescription data? A: Yes. Q: And that dispensing data, in your mind, could also help pharmacists identify and resolve red flags, right? A: Sure."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6627:8 – 6628:2.

[25] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 926:10 – 928:2, 966:2 – 971:2, 972:1 – 975:10, 976:5-10, 980:3 – 985:18; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6625:6-20, 6627:2-7, 6632:4 – 6633:2 (pharmacies should not impose "strict and unreasonable time limits to fill prescriptions so that they cannot have enough time to investigate red flags" or require "quotas on prescriptions filled" and must provide "adequate staffing of the pharmacy to allow enough pharmacists at these stores to fulfill their corresponding responsibility").

[26] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 986:2 – 993:16; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17, 6626:21 – 6627:7.

[27] For this reason, evidence of Defendants' extraterritorial dispensing misconduct is relevant to determining whether they acted unlawfully and/or intentionally in this case. *See, e.g.,* Dkt. #3058 (CT1A Evidentiary Order) at p. 8.

[28] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-41, 701:10-19; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 830:13-16, 891:14 – 892:2; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6, 2021:9-25, 2022:6 – 2023:18, 2029:24 – 2030:5, 2030:10 – 2032:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2737:17 – 2738:2, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8 – 2749:5, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:8-12; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2882:18-24,

(footnote continues on next page)

- <u>Walgreens failed to timely implement and apply necessary controlled substance policies across its pharmacy stores.</u>  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 631:4-15, 694:14-21, 701:10-19; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 891:14 – 892:2; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:17 – 994:19, 995:5-8, 996:4-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1204:16 – 1205:19; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2905:15-25 (WAG did not roll out targeted drug good faith dispensing program until April 2013); Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3351:20 – 3352:13, 3357:9-21 ("Q: So IntercomPlus, is this the same system that the president wouldn't let you use for electronic refusals to fill entries for seven years?  A: Yes."), 3383:25 – 3384:9, 3393:5 – 3394:20; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6930:23 – 6931:14, 6932:12-18, 6932:24 – 6933:2, 6936:12-18, 6937:13 – 6938:11, 6939:12-22 ("Q: Yeah.  Today there's some really helpful tools that you guys have; right?  A: Sure.  Yes.  Q: But those tools didn't always exist in Walgreens pharmacies, as the jury's heard through other witnesses.  Fair?  A: Right, that's fair."), 6941:17 – 6942:13 (WAG policy was to "delete older comments or refusals from the patient profiles to keep the notes current and accurate"), 6943:2 – 6944:3, 6951:24 – 6952:4 ("Q: The DUR alerts, even those have changed over the decades, haven't they?  A: I'm sure they have.  Q: Yeah.  They've got information in them now that they didn't used to have, right?  A: I'm sure."), 6999:7-9 ("Q:… This Target Drug checklist came into use in around 2013; is that right?  A: Yeah – thereabouts, yes.").[29]

2886:20 – 2887:20, 2905:15-22, 2906:17 – 2907:20, 2916:9-16, 2917:2-6, 2917:10-17, 2923:15-25, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3019:2 – 3020:13, 3026:10-16, 3027:4 – 3028:20, 3029:5-7, 3029:21 – 3030:5, 3031:7-12, 3031:16-17, 3034:23 – 3036:17, 3037:20-24, 3039:18 – 3040:5, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3050:14-19, 3051:8-17, 3051:22 – 3055:24, 3058:4-13, 3062:12 – 3064:14, 3064:19 – 3066:12, 3066:25 – 3067:9, 3067:17 – 3069:3, 3070:17-20, 3071:6-18, 3071:19 – 3073:20, 3073:21 – 3079:24, 3080:5 – 3090:12, 3091:1-21, 3092:11 – 3093:9, 3265:22 – 3267:10, 3270:9- - 3721:5, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3287:23 – 3290:5, 3293:16-25; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3343:12-25, 3344:24 – 3345:21, 3346:1-21, 3351:20 – 3352:13, 3357:9-21, 3359:11-16, 3366:22 – 3367:4, 3391:19 – 3392:14, 3393:5 – 3394:14, 3394:15-20 ("[W]e do not blanketly refuse all prescribers' prescriptions."), 3397:13 – 3399:7, 3399:18 – 3405:2; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6930:23 – 6931:14, 6932:12-18, 6932:24 – 6933:2, 6937:13 – 6938:11, 6941:17 – 6942:13, 6943:2 – 6944:3, 6955:4-21, 6981:15-17, 6991:23 – 6992:11, 7006:12 – 7007:6, 7007:16 – 7008:6, 7013:2-20; P-04600-A; P-14746 at 010-011; P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-15085 at 006-011; P-17156; P-17177; P-17254; P-17260; P-19566; P-19574; P-19607; P-20639 at 009, 011-012; P-20795; P-20803; P-23678; P-24039; P-25492 at 015-017, 020-025; P-25621; *see also infra* § I.B.1.

[29]  *See also, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2021:9-25, 2022:6 – 2023:6, 2029:24 – 2030:5, 2030:10 – 2031:19 – 2032:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2850:9 – 2851:7, 2851:21 – 2852:3, 2882:18-24, 2886:20 – 2887:20, 2906:17 – 2907:20, 2916:9-16, 2917:2-6, 2917:14-17, 2923:15-25, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – (footnote continues on next page)

- Even once certain controlled substances diversion policies were developed, Walgreens failed to monitor and enforce the policies across its pharmacy stores. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 998:7 – 1000:8; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3320:22 – 3321:20 (from 2009-2020, the twelve WAG pharmacies in the Counties only refused to fill only ~646 prescriptions, which is approximately 54 per store over the 11-year period), 3326:7 – 3327:25, 3328:25 – 3329:2 ("Q: So it's possible that that prescription [that was refused to fill at one Walgreens store] was taken to another Walgreens store and filled then? A: It is possible."), 3329:9 – 3330:9 (nothing on the refusal to fill documentation that explains why it wasn't filled), 3330:23 – 3331:6 ("A. There's nothing on here that I can see from these papers that will tell you why this prescription was refused.  Q: And one thing we do know is Walgreens sure did fill a lot of prescriptions for this person over the years, right? A: If you look at the dates, they were filled on a monthly cadence, and there were multiple prescriptions filled."), 3331:7 – 3332:16, 3343:12-25, 3344:24 – 3345:21, 3346:1-22, 3354:8-17, 3358:12-21, 3359:2-16, 3366:22 – 3367:4, 3393:5 – 3394:20, 3397:13 – 3405:2; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6947:17 – 6948:12 (despite WAG policy stating it was "imperative" for pharmacists to document all efforts used to validate Good Faith Dispensing, Ms. Stossel insists that this just means documentation is "important" and that "[i]t's not vital to document 100 percent of the time"), 6950:4-5, 6955:14-21 ("You are able to put a little note in [the DUR field], but you don't necessarily, in working practice, say I found a red flag and this is what the red flag was and this is how I resolved the red flag.  It's not common practice to do that. . . .  It's not common practice do [sic] that at my store.").[30]

- Walgreens also implemented employment evaluation policies and performance metrics that impeded its pharmacists' efforts to comply with laws and regulations and meet standards of

---

3015:9, 3019:2 – 3020:13, 3028:5-20, 3029:5-7, 3029:21 – 3030:5, 3031:11-12, 3031:16-17, 3042:19 – 3043:10, 3043:20 – 3044:24, 3045:6 – 3047:15, 3058:4-13, 3064:19 – 3066:12, 3066:25 – 3067:9, 3067:17 – 3069:3, 3070:17-25, 3071:6-18, 3071:19 – 3073:20, 3073:21 – 3079:24, 3080:5 – 3090:12, 3265:22 – 3267:10, 3270:9-25, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3293:16-25; P-14746 at 010-011; P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-15085 at 006-011; P-17177; P-17254; P-19566; P-19574; P-19607; P-20639 at 009, 011-012; P-20795; P-20803; P-23678; P-24039; P-25492 at 015-017, 020-025; P-25621.

[30] *See also, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2030:10 – 2032:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3026:10-16, 3027:4-23, 3028:5-20, 3029:5-7, 3029:21 – 3030:5, 3034:23 – 3036:17, 3037:20-24, 3039:18 – 3040:5, 3042:19 – 3043:10, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3050:14-19, 3051:8-17, 3051:21 – 3055:18, 3055:19-24 (Tasha Polster: "It's not my job to ensure whether or not the pharmacists are doing their due diligence."), 3059:20 – 3060:1 (Polster later conceded that "it is part of [her] job, yes"), 3062:12 – 3064:14, 3071:19 – 3073:20, 3091:1-7, 3265:22 – 3267:11, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3290:18-23; P-15068 at 009-012; P-15085 at 006-011; P-15314 at 028; P-17156; P-17254; P-20803; P-22946; P-23678; P-24039; P-25492 at 015-017, 020-025.

care. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:17 – 933:21, 966:2 – 967:12, 1000:10 – 1004:18, 1005:5 – 1006:17; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:5 – 1115:7, 1115:8 – 1117:3; P-19827 at 002 ("Hearing complaints from pharmacists that they don't have time to check all these prescriptions for good faith. Wants to make sure chains aren't inhibiting this by pressuring their pharmacists to fill fast or not providing adequate labor."; "Believes that compensation (bonus) should not be tied to prescription volume of controlled substances."), 003 ("Bonus parameters are a concern."); Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2051:19 – 2053:14, 2055:24 – 2057:7, 2059:11 – 2061:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2830:23 – 2832:5, 2852:22 – 2855:12, 2856:2-14, 2864:5-14, 2866:5 – 2867:13, 2868:4-17, 2869:1-18, 2892:10 – 2893:16, 2896:15-24, 2897:4-10, 2939:1-12, 2941:2-25, 2944:21 – 2948:1, 2950:16 – 2951:11, 2954:3 – 2955:16, 2957:3-7, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3037:25 – 3038:7, 3061:14-18; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3361:20 – 3362:12, 3363:8 – 3364:1, 3365:3-16; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; P-17254; P-19529; P-19607; P-19821; P-24019; P-25492 at 020-021.

- Walgreens and its pharmacists have a corresponding responsibility to only fill prescriptions for controlled substances that are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her/his professional practice.[31]  *See also, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1831:15 – 1832:13, 1833:20 – 1834:19, 1912:5-9; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2838:16 – 2839:1, 2844:5-13, 2844:18-21 ("Q: Because the company has been held accountable when pharmacists fail to exercise their

---

[31]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 573:18 – 574:18, 619:23 – 620:1, 626:2-7, 626:15-18; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 913:2-21 (corresponding responsibility is "one of the key responsibilities of pharmacists and pharmacies"), 922:7 – 923:20, 925:11 – 926:9 ("So the pharmacist has to take responsibility for that patient's medications and make sure the patient receives the right medication.  The pharmacy is to support the pharmacist in that regard, provide them with the tools that are necessary, provide them with the staffing that is necessary, provide them with information and information systems that allow the pharmacists to meet that responsibility and actually take care of the patients and serve as that last defense."), 928:4 – 929:14, 960:20 – 962:12, 968:22 – 969:2, 970:2 – 971:2, 974:16 – 975:10, 976:5-10, 980:5 – 982:7, 986:9-19, 1043:10 – 1044:20, 1045:3-13; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1229:8-13, 1232:22 – 1233:15, 1234:12 – 1235:4, 1256:16-22; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1324:15-19, 1327:25 – 1328:18, 1339:13-20, 1388:8-24, 1395:9 – 1397:3, 1471:3-22, 1509:13 – 1511:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1576:13 – 1580:12, 1582:20-23, 1586:13 – 1588:6; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:1-22, 1671:17 – 1673:15, 1674:8 – 1678:19, 1795:8-19; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4521:12-17; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6468:25 – 6470:4; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6604:4-19, 6628:3-9 ("Q: Is it your understanding, based upon your years of experience, that a pharmacy and its pharmacists have a corresponding responsibility, in addition to the prescriber's responsibility, to fill only opioid prescriptions that are issued for a legitimate medical purpose?  A: That is my understanding."); P-08954 at 002; P-15068 at 002; P-15314 at 026; P-15962-A at 003, 008-014; P-17177; P-20639 at 005; P-20639 at 009, 024.

corresponding responsibility, true?  A: True."), 2910:10-13.

- The determination of whether a prescription issued for a controlled substance is valid and legitimate requires systems and actions to recognize, investigate, and resolve signs of a prescription's invalidity (*i.e.*, red flags). These red flags are warning signs and can also indicate activities are occurring outside the usual and customary scope of pharmacy practice, activities that are more than likely to include abuse, diversion, and fraudulent acts.[32]

- Walgreens knew and understood that there are certain red flags associated with opioid prescriptions that are indicative of potential diversion. *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1975:5-17, 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2858:8 – 2859:17, 2880:2-3, 2893:24 – 2894:2, 2894:21 – 2896:2; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3070:17-25, 3071:6-18, 3078:13-18, 3096:4-11, 3127:2-8, 3129:5 – 3130:19, 3131:13-20, 3132:1-14, 3134:7 – 3135:3, 3135:15 – 3136:14, 3136:22 – 3137:1, 3138:10-20, 3290:14-23; Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6767:11-13, 6767:21 – 6768:2, 6789:22 – 6790:6, 6792:20 – 6793:3; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6889:21-24, 6890:17-22, 6892:17-24, 6901:14-16, 6902:6-10, 6902:13 – 6903:2 (acknowledging that if you cannot resolve the red flag, you cannot fill the prescription), 6924:23 – 6925:13, 6925:21 – 6926:5, 6926:11 – 6927:2, 6927:16-19, 6929:21 – 6930:2 ("As far as red flags are concerned, those red flags have not changed in the 25 years that I've worked at Walgreens."), 6930:23 – 6931:14, 6932:24 – 6933:2, 6985:20-23, 6991:23 – 6992:16.[33]

---

[32]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 569:10 – 574:18, 625:19 – 629:19, 701:10-19, 706:9-23, 707:9-13; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 922:2 – 923:20, 1007:8 – 1016:14, 1018:22 – 1024:22, 1029:5 – 1041:10, 1042:11-14, 1042:25 – 1044:1, 1045:3-25, 1046:15 – 1048:10, 1055:5 – 1057:9; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1469:12-19, 1470:7 – 1472:11, 1484:22 – 1485:9, 1486:7 – 1489:16, 1490:14 – 1491:7; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1582:12 – 1584:20, 1585:5-9, 1586:13-22; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1691:23 – 1692:23; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4530:14-19 ("Q: And if a prescription, like the one I described, is presented to a pharmacist and the pharmacist has concerns or thinks it's a red flag, the pharmacist should do something to try to address those concerns or that red flag.  Is that fair?  A: Yes, that's fair."), 4607:21 – 4608:2; Dkt. #4107 (10/29/21 Trial Tr.) [*Wailes*] at 4817:9-12, 4921:23 – 4922:1, 4934:22-25, 4940:25 – 4941:3 ("We're all in agreement that red flags are appropriate and good and they're very important prompts to look at prescribing, and that's important, we agree on that."), 4954:23 – 4955:6, 4961:5 – 4963:7, 4963:14 – 4966:25, 4967:10-13, 4969:21-24, 5014:18 – 5015:4; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5414:3-8; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6468:25 – 6471:15; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6627:12 – 6628:2, 6629:20-23; P-00021; P-42147-A.

[33]  *See also, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 625:19 – 629:19, 701:10-19, 702:13-17; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1482:16 – 1489:16, 1490:14 – 1491:7; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1584:17-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1774:10-12; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1829:21 – 1830:4, 1901:2-23, 1902:10 – 1903:22, 1904:1-18, 1907:2 – 1909:2; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4530:20 – 4531:11; (footnote continues on next page)

- To effectively guard against diversion, Walgreens and its pharmacists must, prior to dispensing a prescription opioid: (i) accurately identify and document all red flags raised by the prescription, patient, and prescriber; (ii) reasonably collect complete, relevant, and accurate information concerning each red flag; (iii) independently evaluate the collected information to determine whether the evidence is reliable and whether, as a whole, the evidence adequately resolves each red flag; and (iv) clearly and explicitly document their evaluation of the evidence and their reasoning supporting their judgment to dispense the prescription.[34]

- Documenting the resolution of red-flagged prescriptions, in a clear and understandable

---

Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6428:18 – 6429:3, 6430:1 – 6431:5, 6450:23 – 6453:23, 6454:5 – 6455:16, 6456:9-14; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6610:14 – 6611:3; P-08439; P-15068 at 003-005; P-15314 at 026-028; P-15317 at 002; P-15962-A at 010-012; P-17254; P-19566 at 003; P-19616 at 013-015, 041-043; P-19827 at 002; P-20811; P-26403 at 027-087.

[34] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 572:18 – 573:11, 573:18 – 574:18, 619:23 – 620:1, 626:2-7 ("[A]ccording to the Controlled Substances Act, pharmacies not only have a responsibility to identify red flags and investigate them before dispensing, but pharmacies have a responsibility to create a system that will effectively detect red flags and support their pharmacists in doing so."), 626:15-18, 701:10-19; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 922:7 – 923:20, 925:11 – 926:9, 943:2-8, 986:12-19, 1007:1 – 1024:22, 1025:25 – 1042:14, 1042:25 – 1044:20, 1045:3 – 1048:16, 1055:5 – 1057:23; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1209:6-9, 1209:18-25, 1210:14 – 1211:16, 1212:15-16, 1234:12 – 1235:25, 1256:16-22; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1327:25 – 1328:18, 1339:13-20, 1470:2 – 1472:11, 1473:20 – 1474:10, 1482:16 – 1489:16, 1490:14 – 1491:7, 1509:13 – 1511:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1576:13 – 1577:22, 1582:20-23, 1586:13 – 1588:6; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1674:8 – 1678:19, 1709:15-19; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3139:14 – 3140:11, 3290:18-23; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3555:8-14, 3565:24 – 3566:6, 3580:14-21 ("So one might have a prescriber that's consistently prescribing a single type of opioid. I mean, it raises a flag, and the point is is that the flag then needs to be reviewed and evaluated and a decision needs to be made by the pharmacist, and it should be documented."); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5416:12 – 5417:8 ("Q: All right. Now, would you agree with me, sir, that in general, if a pharmacist is confronted with red flag and resolves it, there should be documentation of that? A: They should document it in the notes of the – the patient profile notes, or maybe handwritten on the prescription. Q: And isn't it true that you regularly advise pharmacists that if you don't write it down, it didn't happen? A: That's common, yes. Q: And that's not just, you know, a general rule of thumb. I mean, that's important for patient safety, isn't it? A: Correct. Q: So that when a pharmacist is about to fill a prescription for a patient who's had a prior opioid prescription filled, documentation of what happened in that first prescription, if there were red flags, is extremely important for patient safety, isn't it? A: Sure, yes. Q: And it's important for public safety, isn't it? A: Yes."), 5467:11-23; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6627:8 – 6628:2; P-08439; P-15962-A at 010-013; P-26403 at 027-055, 056 ("When suspicion is aroused as reasonable professionals, either by ambiguities in the prescription or sheer volume, pharmacists must refuse to dispense[.]"), 058-060, 061-062 ("'When prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes . . .'"; "Verification by prescriber does not allow pharmacists to ignore evidence that gives 'reason to believe' prescription was not issued for a legitimate medical purpose."), 063-087; P-42147-A.

manner, is a critical component of implementing effective controls against diversion, and is otherwise required by law.[35]

- Despite recognizing the importance of doing so,[36] Walgreens consistently failed to document

---

[35] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 941:16 – 944:13 ("It's critical for a number of reasons. One, if another pharmacist treats that patient who's not familiar with that patient and doesn't know what the prior pharmacist did, that's dangerous to the patient. . . . It's critical so that when a Board of Pharmacy does an inspection or when the DEA conducts an inspection, that they realize that those patients were being treated legitimately and the red flags were resolved and that there wasn't a problem with the system not being closed and diversion occurring. . . . It's a very important tool to identify [theft and diversion], to stop it in most cases, and to send the message to others that this pharmacy's doing everything it can to prevent that diversion so it discourages other people from trying to divert drugs from there as well."), 944:17 – 945:19, 985:15-18, 986:12-19, 1010:16 – 1011:5, 1016:3-14, 1017:25 – 1018:21, 1021:20-25 ("[A]nd again the key to everything, as we keep coming back to, is the pharmacist documenting that circumstance. So the next pharmacist knows that it's not abuse, and that the patient's not at risk; that this is what's really prescribed, and it's being monitored for that patient."), 1022:19 – 1023:4, 1026:10 – 1027:1, 1039:23 – 1040:3, 1045:3-25 ("And again, as we've talked about that, information must be clear and understandable for someone else looking at that patient record. To simply write something that the pharmacist may know, like I checked with a doctor or facts from his office, doesn't explain that that red flag has been resolved for somebody else that's looking at a prescription that needs to know why that was resolved."), 1048:1-10, 1054:18 – 1057:23; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1171:1-13, 1210:10 – 1211:16, 1212:24 – 1213:1, 1213:16-20, 1214:3-5, 1214:25 – 1215:2, 1228:15 – 1235:25; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1325:1-7, 1327:14-17, 1327:25 – 1328:18, 1352:9-14, 1353:7-18, 1388:6-13, 1398:6-13, 1471:23 – 1472:11, 1491:23 – 1494:6, 1497:22 – 1498:5, 1499:18 – 1500:14; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1589:21 – 1591:13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1773:1-7, 1813:5 – 1814:14; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:24 – 3566:6; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5416:12 – 5417:8.

[36] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1953:3-15, 1975:18 – 1976:19, 1981:25 – 1982:11, 2093:1-11 ("Q: Right. But there are a number of red flags that are important and are critical to prevent diversion, right? A: Lots of them. I-- Q: Yeah. Right. And the resolution of those red flags and the documentation of that has an important effect on the ability to prevent diversion. True? A: Sure."); Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2879:13 -2880:9 ("It's an obligation of the pharmacists to document resolutions of red flags on prescriptions"), 2881:21-23, 2952:19-22; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3002:9-15, 3009:12-20, 3041:4-6, 3088:13-19, 3089:3-11, 3089:22 – 3090:1, 3091:9-21, 3290:14-20; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4535:10-13 ("My quote to pharmacists was, your prescription is your Bible. If you've got something you want to bring to my attention regarding a prescription, write it on the prescription"); Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6794:2-12; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6947:17-20, 6947:23 – 6948:6, 6948:13 – 6949:2, 6949:9-17, 6949:18-24, 6950:4-18, 6951:4-10; P-15068 at 005 ("It is imperative that pharmacists document all efforts used to validate good faith dispensing."); P-15085 at 010 ("The decision to dispense a prescription is ultimately up to the pharmacist, however, proper documentation to support the decision is needed. It's important that pharmacists document all actions taken during the Good Faith Dispensing process."); P-15314 at 007-008, 028; P-19616 at 038 ("[P]roper documentation document to support the decision is needed. It is important that pharmacists document all actions taken during GFD process."); P-20795; P-25631 at 007 ("Document all efforts used to validate good faith dispensing."), 008.

its resolution of red flags. *See, e.g.,* Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3046:24 –
3047:15, 3051:8-17, 3052:11-25, 3056:14-23, 3088:13-22, 3091:1-7; Dkt. #4064 (10/21/21
Trial Tr.) [*Polster*] at 3329:9 – 3330:9, 3330:23 – 3331:6; Dkt. #4111 (11/2/21 Trial Tr.)
[*Brunner*] at 5599:20-25; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6887:15-17, 7011:23 –
7012:5 (not surprised that "out of a totally random 2,000 sample notes for Walgreens, in the
relevant notes field, 1,237 were blank across all these comment fields, representing about 61
percent of the sample"); P-15085 at 007-008; *see also infra* at fns.41-42.

- Walgreens pharmacist, Amy Stossel, testified that she chooses to consult with patients
  instead of documenting red flag resolution, indicating she does not have time to do both.
  Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6888:3-12 ("I could take the time to document for
  her every single time she comes in about, you know, the red flags with her prescription, or
  I could take a few minutes at the counter with her and make sure that she gets what she needs;
  that she's not in pain, that everything is going okay for her, or does she need a couple things
  from the front of the store one of us could help her get.  It's kind of like a judgment call,
  I guess. . . .  What I need to do with my time."), 6987:16-23 ("I'm trying to spend a couple
  extra minutes talking with them about their health instead of spending five minutes
  documenting something in the computer system.  I really have a very short window of time
  that that person is in front of me.  I know you guys have been to the pharmacy and it's a very
  short window of time that you have there with the person."), 6988:14-20, 6988:21 – 6989:2
  ("And so I know it sounds – I know it sounds like I'm just being a little nonchalant about not
  documenting everything, but when pressed for time, I'd much rather spend that time with
  my patient than taking that – that time to put something else in the computer system that
  I already know and that the other pharmacists in my store already know."), 7008:10-20
  ("Q: And you were saying, 'If I've got a choice between documenting or discussing it, it's
  so much more important I spent my time discussing.'  Do you remember that example?
  A: Yes.  Q: Did it ever occur to you to do both?  A: Of course it occurs to me to do both.
  Q: You could have that full-on counseling session and still make the necessary documentary
  notes in the system.  True?  A: I'm sure that I could if I had ample time to do so."), 7010:20
  – 7011:1 ("Q:….  Why are you pressed for time?  A: My pharmacy is in a very busy location.
  We see a lot of patients during the day.  Pharmacies are busy.  Q: But don't you have enough
  people working – you said you never have two pharmacists on shift at the same time.  That's
  not your decision.  Right?  A: Correct.").

- Walgreens failed to provide its pharmacists with the data, training, guidance, resources, and
  tools necessary to assist the pharmacists in fulfilling their corresponding responsibility
  duties, including but not limited to, utilizing dispensing data to identify patterns, trends, and
  practitioners possibly involved in diversion as well to recognize and resolve red flags. *See,
  e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-21, 701:10-19; Dkt. #4005 (10/7/21
  Trial Tr.) [*Catizone*] at 1048:23 – 1050:14; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at
  3351:20 – 3352:13 (hard copies in refusal to fill folders "are not posted anywhere or shared

electronically"), 3391:19 – 3392:14 (pharmacist did not know whether pharmacy still had good faith dispensing refusal folder), 3393:5 – 3394:20 (pharmacist advised they could not blanketly refuse to fill prescriptions for Dr. Veres despite knowing he "has been a problem for a long time"); Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6922:23-25 ("Q:…. [D]oes Walgreens not tell you how many prescriptions y'all are filling for [Dr. Demangone]? A: I would not get that information from Walgreens, no."), 6933:11-14 ("Q: You didn't know about the settlement agreements your company entered into with the DEA while you were practicing at the company? A: No."), 6934:9-11 ("I don't have information at the store level about company policies or when they make them or – or what they're doing with company policies."), 6941:17 – 6942:13 (WAG policy was to "delete older comments or refusals from the patient profiles to keep the notes current and accurate"), 6965:20-21 (acknowledging "[t]here is a character limit" in the notes section), 6991:23-24 ("There's never really two pharmacists working on the same shift in the same store."), 6995:4-18 (acknowledging at least one of the questions on the target drug checklist is worded in a confusing manner), 6998:7-20 (reiterating that the question on the checklist about the patient's intoxication is "[e]xtremely poorly worded"), 7006:25 – 7007:6 ("Q: So if a prescription is refused, it's not company policy to take a picture, log it into the system, and explain why it's refused? There's no policy on that? A: There's no policy to log it into the system, take a picture, and explain why it was refused, no. Q: That might be a good thing to do, don't you think? A: It's not part of our policy."), 7010:20 – 7011:1 ("Q:…. Why are you pressed for time? A: My pharmacy is in a very busy location. We see a lot of patients during the day. Pharmacies are busy."); P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-19566 at 001 (acknowledging that no "periodic training of all Walgreens retail employees for dispensing controlled substances . . . . exists today"), 002; P-20795 (did not provide electronic access to GFD checklists to pharmacists until 2019).[37]

---

[37] *See also, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1827:20 – 1828:9, 1878:4 – 1879:6, 1880:2-7, 1896:15-18; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1947:13 – 1948:12, 1964:23 – 1965:15, 2007:6 – 2009:3, 2015:15 – 2016:9, 2017:3 – 2018:4, 2021:9-25, 2022:6 – 2023:6, 2029:24 – 2030:5, 2030:10 – 2032:2, 2035:23 – 2036:10; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2847:1-10, 2850:9 – 2851:7, 2851:21 – 2852:3, 2863:9-17, 2883:7 – 2884:17, 2886:20 – 2887:20, 2915:17-22, 2916:9-16, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3019:2 – 3020:13, 3062:12 – 3064:14, 3070:17-25, 3071:6-18, 3071:19 – 3073:20, 3073:21 – 3079:24, 3080:5 – 3090:12, 3092:11 – 3093:9, 3263:19 – 3264:8, 3265:2 – 3266:6, 3266:24 – 3267:3, 3270:9-25, 3279:11 – 3281:14, 3283:3 – 3284:11, 3287:23 – 3290:5; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3329:9 – 3330:9, 3330:23 – 3331:6, 3354:8-17, 3357:9-21, 3358:12-21, 3359:2-16, 3366:22 – 3367:4, 3383:25 – 3384:9, 3393:5 – 3394:20; Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6771:23 – 6772:8; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6888:3-12, 6922:1-3, 6930:23 – 6931:14, 6932:12-18, 6932:24 – 6933:2, 6933:22 – 6934:2, 6941:17 – 6942:13 6943:2 – 6944:3, 6958:6-8, 6959:21 – 6960:7, 6992:1-11, 7007:16 – 7008:6, 7013:2-20; P-14746 at 010-011; P-17156; P-17254; P-(footnote continues on next page)

32

- As just one example, Walgreens pharmacist Stossel appears not to fully understand Walgreens' target drug good faith dispensing checklist. Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6995:24 – 6996:1 ("In my experience in filling out one of these, you really didn't want to have any of those boxes marked yes. That would really raise some big questions."), 6996:20-22 ("[T]he whole point of the sheet, I think, was so that you would end up with not a lot of boxes marked yes or no."), 6997:13-21 (indicating that she would be more comfortable if a pharmacist answered yes to certain questions on the checklist), 7004:11 – 7005:3 ("Q:…. Now, you used to have to fill [the Target Drug Good Faith Dispensing checklist] out year after year after year for every controlled substance – well, for three of the controlled substances, right? A: Correct. Q: I would think you'd know this pretty good after all those years, wouldn't you? A: Correct. Q: But when you were asked about it, one of the jurors asked you about Question Number 6 and whether or not it's poorly worded, and your response was, 'In my experience in filling out one of these, you really didn't want to have any of those boxes marked yes. That would raise some – really raise some big questions.' Do you see that? A: Sure. Q: In fact, you're wrong, aren't you? A: Yeah, that was – that was incorrect. It's been a couple years since I've looked at this to be frank."), 7005:4-16 ("Q: Yeah. Because you want all of them yes and if there's a no, there's a problem; correct? A: That's correct. Yeah, I realized that after I said it. Q: Well, when you said – when you realized it was wrong, you added something else. You said, I think – the whole point of the sheet I think was that you would end up with not a lot of boxes marked yes or no. Well, that's not the point either. The point is that they're all yes, and if you've got a no, there's a problem; correct? A: Right. Sure."), 7005:17 – 7006:8 ("Q: And so theoretically, you were supposed to be filling one of these out with just about every controlled substance you did; correct? A: Well, with three – with three of the controlled substances. Q: And when you say it's been a couple of years since I've filled one of these out, is that because it's now electronic? A: It's electronic, correct. Q: So y'all don't use that form anymore? A: The paper form we do not use anymore. Q: But you still use it on the computer? A: Yes, we use it on the computer, but it's in a different format. It's not the same. Q: But you're still being asked the same questions, aren't you? A: Some of the questions are exactly the same.").

- Walgreens also collected data that would be useful for it and its pharmacists in identifying suspicious prescribing and dispensing activity in order to guard against diversion, but for at least some period of time failed to provide such data, or make it easily accessible, to its

17260; P-19607; P-20639 at 009, 011-012, 014-015; P-20803; P-24039; P-25492 at 017, 025; P-25621 (2014 internal email; "I wanted to reach out to you about your thoughts on the GFD comments. The comments section is getting full for many patients and requiring the deletion of comments (not just GFD but other comments as well). Especially in the Florida area where the TD-GFD has been going on so long, is it OK to give direction around purging of old GFD comments?"; "I think that's probably a good idea. TDGFD comments are only supposed to be for one script each time, so technically other than ID info that may be in the comments, other info could be purged.").

pharmacists. *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-21, 701:10-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1878:4 – 1879:6, 1880:2-7; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1953:16-21, 1954:5-15, 2007:6 – 2009:3, 2015:15 – 2016:9, 2017:3 – 2018:4; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2927:19 – 2928:7, 2946:6 – 2947:9, 2948:7-15, 2950:19-21, 2951:19-25; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3073:21 – 3079:24; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5419:11-16 ("Q: Now, from your own knowledge, isn't it true that these pharmacies have their own databases of prescription data? A: Yes. Q: And that dispensing data, in your mind, could also help pharmacists identify and resolve red flags, right? A: Sure."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6627:8 – 6628:2; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6921:21-25; P-15068; P-15314 at 022-025; P-17254; P-19607; P-20639 at 014-015.

- Additionally, state PDMPs, such as OARRS in Ohio, contain helpful data that pharmacists can use to identify and resolve red flags.[38]

- OARRS started in 2006; in October 2011, Ohio law changed to mandate that pharmacists check OARRS under certain specified circumstances.[39]

---

[38] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 569:24 – 572:17 (PDMP information is "very useful and I would even say essential for determining which patients are misusing and/or getting addicted to and/or diverting opioids"; "And it's why it's so critical for pharmacists to check the PDMP before dispensing a highly addictive and potentially lethal drug like an opioid. It's absolutely fundamental."), 663:24 – 664:14; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 858:13-17 (checking PDMP "is one of the best objective ways to determine the presence of red flags"); Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1015:18 – 1016:2; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1159:16 – 1160:19; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1324:20 – 1325:7, 1444:18-24; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1691:23 – 1692:7; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3553:17-21; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4623:2-10 ("Q: You found [OARRS] to be an enlightening experience; right? A: Very much so. Q: Best tool you ever had? A: I would say it was the best tool I had for purposes of doctor shopping and profile reconstruction, yes. Q: Profile reconstruction not only with respect to the doctor's profile and prescribing patterns, but also with respect to the patient's profile and behavior; right? A: Yeah, that is."), 4624:2-6, 4627:10-13; Dkt. #4106 (10/28/21 Trial Tr.) [*Wailes*] at 4741:24 – 4742:1; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5417:14 – 5418:4 ("Q: So you have found in your experience that OARRS is really an incredible investigation tool, right? A: Correct. Q: And it's not only for law enforcement that it's an incredible tool. It really is an incredible tool, if used properly and timely, for pharmacists, right? A: Correct. Q:…. At the Ohio Board of Pharmacy department, it has been demonstrated to you and the other field agents that the timely and appropriate use of OARRS can reduce diversion, correct? A: Correct. Q: And so it is an important tool to protect patient and public safety, correct? A: Correct."); Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6785:22 – 6786:1.

[39] *See, e.g.,* Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4066:22 – 4067:4; Dkt. #4106 (10/28/21 Trial Tr.) [*Wailes*] at 4741:16-18; Dkt. #4107 (10/29/21 Trial Tr.) [*Wailes*] at 4991:3-4; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5408:25 – 5409:22, 5418:5-6, 5418:14-21, 5418:22 – 5419:10; Dkt. #4115 (footnote continues on next page)

- Despite recognizing the usefulness of PDMPs, during at least some portion of the relevant time period, Walgreens failed to mandate that its pharmacists check the applicable PDMP whenever filling an opioid prescription. *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1875:23 – 1876:4 ("Q: Right.  And you're aware of the fact that after OARRS came into existence in Ohio, there was evidence to – published by the Ohio Board of Pharmacy that it was effective in reducing diversion, the use of OARRS was effective in reducing diversion. True?  A:  Sure.  And I would agree with that."), 1897:23 – 1898:19, 1904:19-24, 1905:8-25; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1946:3 – 1947:12, 1958:22 – 1959:3; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2882:18-24; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5472:22 – 5473:1 ("Q: And if a corporate office takes four or five years after a PDMP comes onboard to issue a policy encouraging, indeed mandating, that the pharmacists register for OARRS, that would be a problem, right?  A: Potentially it could be a problem."); Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6784:13-14 (Stossel did not get access to OARRS until May 2009), 6786:2-6 ("Prior to having OARRS, that information was not directly available within one screen on a computer.  There was a lot more leg work that needed to be done in order to obtain that information prior to filling a prescription.  So to have all of that on one screen was kind of exciting."), 6786:7 – 6787:8 (explaining how OARRS saved the pharmacist time); P-19616 at 040.

- Walgreens' pharmacies in the Counties filled thousands of opioid prescriptions presenting red flags without evidence of resolving those red flags. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1006:19-25, 1057:25 – 1058:18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1137:1-5, 1148:3 – 1149:8, 1179:17 – 1188:2, 1202:4 – 1203:17.

- Specifically, of the 806,193 opioid prescriptions dispensed by Walgreens into the Counties, **175,609** had one or more red flags associated with them.  Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2238:16-19, 2245:8-22, 2246:11, 2247:8-9.[40]

- From the random sampling of 2000 red-flagged Walgreens prescriptions in the Counties, only 160 prescriptions contained some writing in the DUR comment field regardless of the DUR alert and even for those 160 prescriptions, the comments were often just pharmacist

---

(11/3/21 Trial Tr.) [*Harrington*] at 5681:15.

[40] And this is a conservative estimate, based on Catizone's sixteen red flags.  But as Defendants' own experts concede, there are a number of red flags that may have been present that could not be determined from the data available.  Dkt. #4124 (11/5/21 Trial Tr.) [*Glickman*] at 6345:13 – 6346:19 ("A: Yeah, there's – the data set is not going to characterize every nuance of what people's behaviors are in prescription --  Q: Data set won't characterize, based on the way you reviewed the data set at least, if three people come together in the same car with the same prescription.  It's not going to be in the data set, is it?  A: No, it's not.  Q: Okay.  So there are potential red flags that aren't picked up by anybody's analysis, the false negatives, fair?  A: Yes, that's – I think that's accurate.") (internal objection omitted).

initials, notes about reviewing patient history, general patient consult, and speaking to the doctor.  Of the 2000 prescriptions, 1,237 were blank across all Walgreens' relevant notes fields (61% of the sample), and of those 1,237, there were 940 prescriptions that also had nothing written on the hard copy prescription (47% of the total sample).  And even of the hard copy prescriptions with notes, they were often notations that the patient was waiting, or pharmacist initials, or "check with M.D."  "There wasn't any relevant notes regarding red flags and the resolution of red flags on any of those hard copies that [Mr. Catizone] reviewed."[41]

- Plaintiffs' expert, Mr. Catizone testified that, based on the random sampling of prescription notes fields produced, over 90% of the red flag opioid prescriptions dispensed by Walgreens into the Counties did not contain adequate documentation demonstrating that the red flags were resolved prior to dispensing.[42]

- Dr. McCann testified that Mr. Catizone's 90% of red-flagged prescriptions in the random sampling can be extrapolated over all the red-flagged prescriptions.[43]

The evidence adduced at trial further demonstrates that Walgreens' dispensing of opioids into Lake and Trumbull Counties was intentional.  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- Walgreens knew and understood its obligations under the CSA and Ohio law related to the dispensing of prescription opioids.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 701:13-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1830:12-17, 1832:8-13, 1865:24 – 1866:11, 1866:16 – 1867:17; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1939:11 – 1942:6, 1943:12 – 1945:2, 1950:17 – 1951:17; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at

---

[41]  *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1180:2 – 1190:15, 1193:18-22, 1202:4 – 1203:17, 1241:15-21, 1243:9-13; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1338:2-5, 1357:8-11, 1362:14-23, 1372:21 – 1373:14, 1499:12-17, 1501:1 – 1503:9; Dkt. #4111 (11/2/21 Trial Tr.) [*Brunner*] at 5599:20-25; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6954:1 – 6955:3.

[42]  *See* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 923:21 – 925:4, 998:18-20, 999:3-21; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1202:23 – 1203:3 ("So when I looked at all these prescriptions which had red flags, the overwhelming majority, and in my report I said based upon my best educated experienced guess, it looks like 90 percent of those prescriptions did not have adequate documentation, but I couldn't really tell on the others as well."), 1203:4-11, 1203:12-14 ("But overwhelmingly, in my overwhelming opinion, about 90 percent of what I looked at didn't meet that level of documentation that was required.").

[43]  Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2167:11 – 2168:23 (explaining what a confidence interval is), 2168:24 – 2170:17 (explaining how he extrapolated the confidence interval in this case); Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2302:23 – 2303:3.

2857:24 – 2858:7, 2879:18 – 2880:9, 2881:21 – 2882:2, 2891:9 – 2892:20, 2894:14 – 2896:2, 2907:2-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6624:10 – 6625:5, 6629:7-16; P-14746 at 014; P-14750; P-15314 at 007; P-15317; P-15962-A; P-17177; P-19566; P-19827; P-20639 at 005, 009; P-20810; P-25631 at 007; P-26403 at 027-086.

- Walgreens knew that the prescription opioids it was dispensing had a high potential for abuse that could lead to severe psychological or physical dependence, and thus knew that the diversion of opioids would create a public health hazard. *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were fueling the opioid epidemic in these counties, right?  A: Mr. Weinberger, without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"), 1912:20-24 ("Q: Well, diversion of opioids is very dangerous to the health and safety of our communities, right?  A: Without question.  Q: And diversion is dangerous to individuals, right?  A: It's terrible."); Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6777:15-18 ("Q: Since the day you left pharmacy school, have you always known that controlled substances come with the risk of addiction and abuse?  A: Yes."), 6778:20-23 ("Q: Is it – has there ever been a time when you weren't concerned about the diversion of controlled substances or opioids in the community where you're raising your kids?  A: No, not at all."); P-19566 at 003 ("The abuse of prescription drugs—especially controlled substances—is a serious social and health problem in the United States today.").[44]

- Walgreens knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids were substantially certain to occur. *See, e.g.,* P-19566 at 003 ("The abuse of prescription drugs—especially controlled substances—is a serious social and health problem in the United States today.  As a healthcare professional, you share responsibility for solving the prescription drug abuse and diversion problem."); P-20639 at 009 ("[W]e also understand our role in helping reduce the inappropriate use of controlled substances in the communities we serve."), 024.[45]

---

[44] *See also, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1848:24 – 1849:14, 1845:13 – 1850:20; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2888:2-13, 2907:21 – 2911:16; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3251:5 – 3252:3, 3252:8-14; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-14746 at 003, 005-006; P-15314 at 022; P-15962-A at 003-008; P-17254; P-19827 at 002; P-20639 at 002, 004, 024; P-20808; P-23267 at 006-007; P-26403 at 025.

[45] *See also, e.g., See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1662:18 – 1663:1; Dkt. #4023 (footnote continues on next page)

- Walgreens knew and understood its dispensing policies and procedures, and its implementation of same, did not comply with its legal obligation. *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2862:2 – 2863:24, 2907:2-20, 2916:9-16, 2923:15-25, 2925:2-6, 2937:6-15, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3028:5-20, 3029:5-7, 3029:21 – 3030:5, 3031:11-12, 3031:16-17, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3050:14-19, 3051:8-17, 3051:21 – 3055:24, 3058:4-13, 3062:12 – 3064:14, 3091:1-7, 3265:22 – 3267:10, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3290:24 – 3291:5; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3366:22 – 3367:4; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6624:10 – 6625:5; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6937:13 – 6938:11, P-15085 at 006-011; P-15317; P-17177; P-17254; P-20639 at 009, 011-012; P-20803; P-25492 at 015-017, 020-025.

- Walgreens knew that it was not providing its pharmacists with the necessary training, guidance, tools, resources, and data to allow them to successfully exercise their corresponding responsibility. *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3351:20 – 3352:13, 3357:9-21 ("Q: So IntercomPlus, is this the same system that the president wouldn't let you use for electronic refusals to fill entries for seven years?  A: Yes."), 3358:12-21, 3359:2-16, 3366:22 – 3367:4, 3391:19 – 3392:14, 3393:5 – 3394:20; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6933:11-14, 6933:22 – 6934:2, 6941:17 – 6942:13 (WAG knew pharmacists were running out of room for comments in the patient profiles, but just told them to "delete older comments or refusals from the patient profiles to keep the notes current and accurate"), 6943:2 – 6944:3 (same), 6991:23-24; P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-19566 at 001 (acknowledging that no "periodic training of all Walgreens retail employees for dispensing controlled substances . . . . exists today"), 002; P-20795 (did not provide electronic access to GFD checklists to pharmacists until 2019); P-25621 (2014 internal email; "I wanted to reach out to you about your thoughts on the GFD comments.  The comments section is getting full for many patients and requiring the deletion of comments (not just GFD but other comments as well).  Especially in the Florida area where the TD-GFD has been going on so long, is it OK to give direction around purging of old GFD comments?"; "I think that's probably a good idea.  TDGFD comments are only supposed to be for one script each time, so technically

---

(10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6, 3094:12-20; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6777:19-22 ("Q: Since the day you left pharmacy school, have you always known that controlled substances raise concerns about diversion?  A: Yes."); P-14746 at 005, 014; P-15314 at 022; P-15962-A; P-19827 at 001-002; P-26403.

other than ID info that may be in the comments, other info could be purged.").[46]

- Walgreens deliberately implemented dispensing and compensation policies and procedures that discouraged or hindered its pharmacists from performing due diligence on suspicious prescriptions. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 932:11 – 934:7; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:11 – 1117:3, 1291:14-20; P-19827 at 002-003 (WAG knew DEA's position was that "compensation (bonus) should not be tied to prescription volume of controlled substances"); P-25621 (2014 internal email; "I wanted to reach out to you about your thoughts on the GFD comments. The comments section is getting full for many patients and requiring the deletion of comments (not just GFD but other comments as well). Especially in the Florida area where the TD-GFD has been going on so long, is it OK to give direction around purging of old GFD comments?"; "I think that's probably a good idea. TDGFD comments are only supposed to be for one script each time, so technically other than ID info that may be in the comments, other info could be purged.").[47]

- Walgreens systematically ignored red flags and other dispensing irregularities plainly present in its data and continued to fill suspicious prescriptions. *Supra* at pp. 35-36; *see also, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2737:17 – 2738:2, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8 – 2749:5, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:8-12; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2925:2-6; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3343:8-25, 3344:24 – 3345:21, 3346:1-21, 3370:6-19, 3370:22 – 3373:20, 3397:13 – 3405:2; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6952:6-19 ("Q:… And based on the way you've talked about [the DUR alerts], would you agree with me that you could never accidentally fill the trinity because it's

---

[46] *See also, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1964:23 – 1965:15, 2021:9-25, 2022:6 – 2023:6, 2029:24 – 2030:5, 2035:23 – 2036:10; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2850:9 – 2851:7, 2851:21 – 2852:3, 2863:9-24, 2883:7 – 2884:17, 2886:20 – 2887:20, 2915:17-22, 2916:9-16, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3019:2 – 3020:13, 3062:12 – 3064:14, 3073:21 – 3079:24, 3080:5 – 3090:12, 3092:11 – 3093:9, 3265:2 – 3266:6, 3265:22 – 3267:10, 3279:11 – 3281:14, 3283:3 – 3284:11, 3287:23 – 3290:5; P-17156; P-17254; P-17260; P-20803; P-24039; P-25492 at 015-017, 020-025.

[47] *See also, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2051:19 – 2053:14, 2055:24 – 2057:7, 2059:11 – 2061:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2830:23 – 2832:5, 2852:22 – 2855:12, 2856:2-14, 2864:5-14, 2866:5 – 2869:18, 2892:10 – 2893:16, 2896:15-24, 2897:4-10, 2939:1-12, 2941:2-25, 2944:21 – 2948:1, 2950:16 – 2951:11, 2954:3 – 2955:16, 2956:11 – 2957:7, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3037:25 – 3038:7, 3061:14-18; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3361:20 – 3362:12, 3363:8 – 3364:1, 3365:3-16; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; P-17254; P-19529; P-19607; P-19821; P-24019; P-25492 at 020-021.

going to show, hey, you're filling a trinity, right? . . . . And you can't ever accidentally fill that. Fair? A: Sure."), 6953:4-20 ("Q: Correct, but for those that do – A: Okay. Q: -- the limited red flags that will show up at a DUR, like you and Mr. Stoffelmayr showed the jury, those limited ones that do show up – A: Okay. Q: -- you can't accidentally ignore those. If you ignore them, it's something you've done knowingly. True? A: Well, you can't ignore them because you can't go past them. Q: Exactly. So the way the process is set up right now. If you hit resolve or just strick your initials in a note and then hit resolve, it's something you're doing knowingly. Fair? A: Sure."); P-04600-A; P-17254; P-20639 at 011-012; P-23678 (Walgreens pharmacy in Trumbull County dispensed opioid that should not have been dispensed according to GFD checklist); P-24039.

- Walgreens lobbied or pushed back against measures that would have helped prevent diversion. *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1910:16 – 1914:8, 1916:4-8; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1939:1-10; P-08442; P-20639 at 025; P-20811; P-23267 at 013.

- Walgreens knew of problematic prescribers and pill mills in or around the Counties from which it continued to allow or encourage its pharmacists to fill opioid prescriptions. *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:17, 2002:18-19 ("We know what's going on with Dr. Veres. He's been like this for 25 years."), 2003:20 – 2004:2 ("Every pharmacist in Trumbull and Mahoning County knows Dr. Veres, you got to be careful."); Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3393:5 – 3394:20 (pharmacist not permitted to blanket refuse to fill prescriptions for Dr. Veres, despite knowing he "has been a problem for a long time" and that other chain pharmacies had stopped filling prescriptions for him), 3395:13-16, 3397:13 – 3405:2 (Walgreens filling prescriptions for Dr. Veres); Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4570:25 – 4572:7 (Dr. Peter Franklin "was heavily prescribing controlled substances to a number of patients"; "His prescribing didn't even come close to legitimate medical purpose. He was prescribing exorbitant amounts, numbers I have never seen in my life, to patients controlled substances."), 4585:9-16 (Dr. Franklin was set to be indicted, but was murdered before it happened), 4595:21-23 ("Q: Well, did you ever investigate Dr. Veres? A: I believe myself and another specialist went to his office a number of times yes."); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5433:13-23, 54349-11 ("Q: And there were 780 Dr. Franklin prescriptions filled at a Walgreens, right? A: Yes."), 5473:4-13 ("Q:…. Part of the issue with Dr. Franklin is he had an office in Middlefield in Geauga County, and what was beginning to be noticed by the Board of Pharmacy and others is that his – that the patients that he was seeing were traveling outside of Geauga County to get their prescriptions filled, right? A: Correct. Q: And that includes pharmacies in Trumbull County and in Lake County owned by CVS and Walgreens, right? A: Correct"); Dkt. #4111 (11/2/21 Trial Tr.) [*Brunner*] at 5595:19 – 5596:6 ("Q:…. Did you look to see how many prescriptions Walgreens filled for Dr. Frank Veres? A: I did. Q: How did you do that? What data did you use? A: We used the OARRS

data.  Q: How many prescriptions did Walgreens fill for Dr. Frank Veres at all 13 of the Walgreens stores in Lake and Trumbull Counties?  A: 15,435.  Q: From what time period to what time period?  A: That covers OARRS, so it's 2008 through 2018.  Q: 2008 to 2018, did I hear that correctly?  A: Yes."), 5598:1-5, 5598:15-19, 5598:20 – 5599:5 ("Q: Did you run the numbers for Dr. Demangone?  A: Yes.  Q: What were those?  A: For Walgreens was 13,663.  Q: Uh-huh.  What about for Champion's and Overholt's combined?  A: 6.  Q: 6 what.  A: 6.  Q: 6 what?  6 prescriptions?  A: 6 prescriptions, yes."); Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6906:18-23 ("Q:….  Have you filled prescriptions for patients of Dr. Demangone?  A: Yeah.  Q: Have you refused prescriptions for patients of Dr. Demangone?  A: Yeah, I'm sure I have."), 6920:14-17 ("Q:….  Y'all at Walgreens are the funnel for the prescriptions of Dr. Demangone, aren't you?  A: So we fill prescriptions for a lot of different doctors; Dr. Demangone being one of them.").[48]

- Prescription opioids were migrating into Ohio from other states, including Florida.  *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1404:22 – 1405:4; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1667:3 – 1670:15; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6454:18 – 6455:3; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6629:24 – 6630:17.

- Walgreens knew that prescription opioids were migrating into Ohio from other states, including Florida.  *See, e.g.,* P-15962-A at 005-006; P-19827 at 002; P-42147-A at 003, 007; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 887:18-25; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1404:22 – 1405:4; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1667:3 – 1670:15, 1697:12 – 1698:11; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6454:5-9, 6454:18 – 6455:6.

- Walgreens was subject to investigations and enforcement actions, and parties to settlements with the DEA, in which it was informed of diversion or sanctioned for its failures to prevent diversion.  *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 811:2-16, 816:15-22; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1695:2 – 1697:11, 1698:12-25, 1703:13-20,

---

[48] *See also, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1196:13-23; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3230:2 – 3232:2; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4581:9-13, 4583:4-7; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6895:8-13, 6895:14-17, 6898:4-20, 6906:11-12 ("Q: Are you familiar with a doctor David Demangone?  A: Yes."), 6920:18 – 6921:5 ("Q: Um-hmm.  And I say that because we saw an exhibit that was entered into evidence the other day that Dr. Demangone keeps his picture in his window these days.  It's CVS 4243.  'Until further notice, do not fill prescriptions at CVS and Walmart.'  Did you know that's in his window?  A: I've never been to his office.  I didn't know that's in his window.  Q: But it's okay to go fill them at Walgreens because you personally will fill them, won't you?  A: I have filled prescriptions for Dr. Demangone at my store."), 6921:12-15 ("Q: Would you be surprised to find out that you have personally filled over 25,000 dosage units for Dr. Demangone?  A: No, I probably wouldn't."), 6921:21 – 6922:3; P-24039.

1704:8-17, 1708:24 – 1710:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2847:21 – 2850:21, 2856:16 – 2860:20, 2862:2 – 2863:24 ("Clearly, the DEA didn't feel that we had compliance to what they wanted."), 2911:17 – 2912:9, 2919:8-19, 2933:18 – 2936:1, 2937:6 – 2938:14; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3020:18-22, 3021:5-13, 3030:20 – 3031:18, 3257:17 – 3258:24, 3272:10 – 3273:4, 3290:24 – 3291:5; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6630:2-22, 6631:14 – 6632:3, 6641:15 – 6642:8; P-00015; P-14750; P-15317; P-19566; P-20639 at 007.

- In one Memorandum of Understanding resolving one of the DEA's enforcement actions, Walgreens admitted to violations of the CSA from both its Jupiter Florida distribution center and several Florida pharmacies. *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2936:6-14, 2937:6-11; P-00015 at 002 ("Walgreens acknowledges that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA . . . and its implementing regulations . . ."); P-14750 at 002.

- Despite these repeated warnings and sanctions, Walgreens made little to no effort to substantively change its dispensing policies and procedures until contractually obligated to do so under its settlements with the DEA. *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1115:8 – 1117:3; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1703:13-20, 1704:8-17, 1708:24 – 1710:2; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1970:18-23; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2832:17 – 2833:22, 2849:1 – 2851:7, 2851:21 – 2852:3, 2857:19 – 2860:20, 2862:2 – 2863:24, 2869:19 – 2870:1, 2873:17 – 2876:7, 2886:20 – 2887:20, 2919:8-19, 2924:19 – 2925:1, 2937:20 – 2938:14; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3020:18-22, 3021:5-13, 3024:12 -3026:1, 3030:3 – 3031:18, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:20 – 3049:10, 3058:4-13, 3257:17 – 3258:24, 3265:22 – 3267:10, 3270:9-25, 3272:10 – 3273:4, 3273:18 – 3274:13, 3284:15 – 3287:13, 3293:16-25; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3366:22 – 3367:4 ("Q:… Did you have a policy change after the incident with pharmacist Yaeger where you said businesspeople should not, should not be doing the things you instructed them to do years before?  A: I didn't make any policy changes."); Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6999:7-9; P-00015; P-14750 at 005-009, 011-013; P-15085; P-15314 at 004, 010, 014; P-15317 at 002-004; P-17254; P-19566; P-20639 at 007-010; P-25492 at 020-024; P-25631 at 004 ("Due to recent action taken by the DEA, select policies and procedures have been updated to ensure our pharmacists and stores are compliant when dispensing controlled substances."), 010, 014 ("We will be developing additional tools to assist in our compliance efforts.  These include: . . . Controlled Substance investigation process . . .").

- Despite these repeated warnings and sanctions, Walgreens continued to facilitate and encourage the oversupply and diversion of its opioids. *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1810:23 – 1811:1, 1811:7-11; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at

1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6, 2021:9-25, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2892:10 – 2893:16, 2911:17 – 2912:9, 2919:8-19, 2921:21 – 2922:3, 2939:1-12, 2941:2-25, 2942:4-22, 2944:6 – 2948:1, 2954:3 – 2955:16, 2956:11 – 2957:7, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3019:2 – 3020:13, 3030:3 – 3031:18, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3051:21 – 3055:24, 3058:4-13, 3071:19 – 3073:20, 3265:22 – 3267:10, 3272:10 – 3273:4; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3343:8-25, 3344:24 – 3345:21, 3346:1-21, 3361:20 – 3362:12, 3363:8 – 3364:1, 3365:3-16, 3366:22 – 3367:4, 3393:5 – 3394:20, 3397:13 – 3405:2; P-15068 at 009-012 (failing to include hydrocodone on target drug good faith dispensing checklist); P-15085 at 006-011; P-17254; P-19607; P-23678 (according to good faith dispensing checklist, WAG pharmacy in Trumbull County dispensed prescription to patient that appeared visibly intoxicated or under the influence of illicit drugs); P-24039.

- Walgreens committed the failures described above (*supra* at § I.B.1) despite its awareness of rising concerns over the abuse of diverted prescription pills in Ohio and the rest of the country. *See, e.g.*, Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were fueling the opioid epidemic in these counties, right?  A: Mr. Weinberger, without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"), 1912:20-24; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2860:22 – 2861:4, 2887:10 – 2888:13, 2891:9-13, 2907:21 – 2911:16, 2919:1-7 ("The opioid crisis was absolutely on a roll."), 2919:8-19, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6, 3071:19 – 3073:20, 3094:12-20, 3095:16-19, 3251:5 – 3252:3, 3252:8-14; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:16-20 ("Q: And is it fair to say that any registrant, including these five defendants, from your experience, knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on?  A: I believe they knew or should have known."); P-14746 at 003, 005-006; P-15314 at 022 ("Prescription drug abuse is the nation's fastest growing drug problem."); P-15962-A; P-19566 at 003; P-19827 at 001-002; P-20639 at 002, 004, 006, 024; P-20808; P-26403 at 011.

- Walgreens worked in concert with opioid manufacturers in spreading the manufacturers' false messaging surrounding the treatment of pain and the true addictive nature of opioids in an effort to increase opioid sales and profits. *See, e.g.*, Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 552:15-21, 557:4-13, 557:18-20, 564:14-18, 565:13-17, 585:8 – 588:21, 594:4 – 597:20, 598:2-23, 614:1 – 618:7; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 768:24 – 769:9, 772:12-23, 809:11-14, 810:2-8, 814:18 – 815:12, 825:23 – 826:12, 827:11-17, 829:5-8, 888:4 – 890:3; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2956:11-24; P-25984.

2. ***CVS unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties.***

The evidence adduced at trial demonstrates that CVS dispensed massive amounts of prescription opioids into the Counties without providing effective controls against diversion. *Supra* at fn.14. Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- There are fourteen CVS pharmacies in the Counties. P-26319-A; Dkt. #3995 (10/5/21 Trial Tr.) at 193:2-9.

- From January 2006 through November 2019, CVS pharmacies dispensed a total of **25,528,782** dosage units of prescription opioids into Lake County and **15,977,215** dosage units of prescription opioids into Trumbull County. *See, e.g.,* P-26319-A; Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2125:16 – 2126:8, 2128:23 – 2129:16, 2135:16 – 2136:19.

- Hydrocodone and oxycodone are the two most abused opioids in the United States; hydrocodone is also the most prescribed drug in the United States. *Supra* at fn.15.

- Of the total dosage units of prescription opioids, CVS dispensed **10,497,738** dosage units of hydrocodone and **13,007,492** dosage units of oxycodone from its pharmacies in Lake County from January 2006 through November 2019. P-26319-A.

- During that time period, CVS dispensed an average of 7.36 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Lake County. At its peak in 2012, CVS dispensed an average of 10.92 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Lake County. P-26319-A; Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2126:18 – 2127:13, 2128:1-17.

- Of the total dosage units of prescription opioids, CVS dispensed **10,701,691** dosage units of hydrocodone and **4,832,952** dosage units of oxycodone from its pharmacies in Trumbull County from January 2006 through November 2019. P-26319-A.

- During that time period, CVS dispensed an average of 5.31 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Trumbull County. At its peak in 2010, CVS dispensed an average of 6.42 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Trumbull County. P-26319-A. *See also* Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2126:18-23, 2127:14-25, 2128:1-10.

- During the relevant time period, CVS dispensed a total of 851,198 *prescriptions* [49] for opioids, benzos, and muscle relaxers into the Counties, of which **701,467** were opioid prescriptions. Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2139:9-13, 2139:24 – 2140:18; Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2228:11-18, 2230:2-5, 2230:12-22, 2298:11-13.

The evidence adduced at trial demonstrates that CVS's dispensing of opioids into the Counties was unlawful.  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- The practice of pharmacy is governed by well-defined laws and regulations, both at the national and state-wide levels, and subject to established and well-known standards of care, including requirements for the careful evaluation of prescriptions and efforts to guard against the diversion of medications into non-medical or illegitimate use.  *Supra* at fn.17.

- The CSA creates a closed system of controlled substances distribution and dispensing, which cannot work unless all members within the closed system comply with their obligations.  *Supra* at fn.18.

- The purpose of the Controlled Substances Act is to prevent the misuse and diversion of controlled substances.  *Supra* at fn.19.

- Federal and Ohio controlled substances laws and regulations require CVS to maintain effective controls and procedures to guard against the diversion of controlled substances.  *Supra* at fn.20; *see also, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 381:1-19, 383:4-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3964:10-13.

- Pharmacies and pharmacists are the last line of defense to protect against diversion.  *Supra* at fn.21; *see also, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 374:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3966:25 – 3967:3; Dkt. #4107 (10/29/21 Trial Tr.) [*Wailes*] at 4946:18-22; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5646:23 – 5647:4, 5666:6-12 ("Q: What's the most basic common tool that CVS has to try to identify illegitimate prescriptions?  A: We have 30,000 pharmacists that work across our 10,000 stores.  Q: Okay.  Would it be correct to say that the first filter on illegitimate prescriptions are the pharmacists?  A: Yes, I think that's fair to say.").

- The fact that a particular CVS pharmacy in the Counties was inspected by the Ohio Board of

---

[49]  *Supra* at fn.16.

Pharmacy, or that it was not sanctioned by the Board, does not establish that the pharmacy was dispensing opioids in compliance with the law because, *inter alia*: (i) those inspections are cursory and represent only a brief snapshot in time; (ii) the Board has historically been understaffed and overworked, often inspecting any given pharmacy only once every couple of years; (iii) the inspectors did not review corporate policies or more than a handful of actual prescriptions during the inspection. *Supra* at fn.22.

- CVS, through the control it exerts over its pharmacies, pharmacists, and pharmacy employees, is responsible for ensuring all dispensing of controlled substances is carried out in accordance with applicable laws and regulations. *Supra* at fn.23; *see also* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 383:4-12; Dkt. #4107 (10/29/21 Trial Tr.) [*Wailes*] at 4953:1-25; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6474:4-16 ("Q: All right.  And the responsibility for tools I was taking from the CVS comments on page 62323, where the official for CVS testified that 'CVS takes its responsibility seriously.'  And in that regard they said, 'We understand it's our responsibility to provide our stores the tools and information that they need to do their jobs on a day-to-day basis and in compliance with state, federal, and local legislation and requirements.'  They're talking about some actions they've taken that they think help them do that.  Do you see that?  A: Yes."); P-00021 (in 2013 article in New England Journal of Medicine by CVS: "Pharmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular. . . .  Chain pharmacies . . . have the advantage of aggregated information on all prescriptions filled at the chain.  At CVS, we recently instituted a program on analysis and actions to limit inappropriate prescribing."); P-42147-A.

- Corporate oversight includes established practices of pharmacies that should incorporate top-down compliance programs using data readily available to CVS to guard against diversion. *Supra* at fn.24.

- Corporate oversight also should support, and not impede, pharmacists in complying with laws and regulations related to the dispensing of controlled substances. *Supra* at fn.25.

- CVS is expected to become and remain aware of its obligations regarding the dispensing of controlled substances and the risks associated with same. *Supra* at fn.26.

- CVS's dispensing policies were created and implemented by its corporate department and applied nationally to all its pharmacies. *See, e.g.*, Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5659:18-23 ("Q: Okay.  Your responsibilities, am I right, are programmatic and they span the whole chain?  A: That is correct.  Q: Okay.  And you're here to testify about the programs and policies that span the whole chain, correct?  A: That is correct."), 5875:22-24 ("Q: Because the policies that applied in Florida are the same policies that apply in Ohio, aren't they?  A: That is true . . ."), 5876:14-25 ("Q: And the policies and the training

that applied in Florida applied all over the U.S., didn't it?  A: It did.  Q: The policies and training that applied in Texas applied in Ohio, didn't it?  A: It did.  Q: The policies and training that applied in Maryland applied in Ohio, didn't it?  A: It did.  Q: The policies and training that applied in Rhode Island applied in Ohio, didn't it?  A: It did.");[50] *supra* at fn.27.

- CVS failed to implement and maintain effective controls against diversion in its dispensing of prescription opioids.[51]

---

[50] *See also, e.g.*, Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 370:19-20; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 719:16-18; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 854:3-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3958:4-9, 3960:20 – 3962:6, 3974:1 – 3976:15, 3976:25 – 3977:22, 3981:18-21, 3984:22-23, 3990:7-21, 3998:1 – 3999:11, 4008:15 – 4010:15, 4011:13 – 4015:2; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4055:18 – 4057:2, 4059:3-15; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5652:13 – 5653:5, 5655:10-14, 5656:12-15, 5656:23-25, 5658:7-9 (CVS operates roughly 10,000 pharmacies across the country), 5658:23 – 5659:1, 5663:11-18, 5667:9-13, 5668:3 – 5671:5, 5687:17-25, 5690:4-24, 5718:13 – 5720:2, 5721:18 – 5723:12, 5750:13-16; P-00459; P-06325; P-06566; P-06595; P-06620; P-08378; P-08397; P-08407; P-15843.

[51] *See, e.g.*, Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25, 356:6-7; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-21, 700:17 – 701:4, 701:10-19, 717:23 – 718:1, 718:19-21, 719:2-4, 720:9-12; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 891:14 – 892:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-25, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:7-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3958:4-23, 3960:20 – 3962:6, 3963:16 – 3964:9, 3969:24 – 3971:17, 3977:23 – 3984:17, 3988:2 – 3996:20, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24, 4077:3 – 4081:9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5654:11-16, 5661:10-13, 5663:3-13, 5755:12-16, 5768:8 – 5769:19, 5784:4 – 5786:3, 5793:25 – 5794:12, 5796:25 – 5797:24, 5800:11-16, 5810:19 – 5813:1, 5819:15 – 5826:16, 5838:8-13, 5838:22 – 5839:4, 5842:6-14, 5888:5-11, 5888:19-23, 5889:10-12; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6564:9 – 6567:4 (CVS Store 3326 in Mentor, Ohio, had poor recordkeeping related to narcotics in 2014; "Q: Some narcotics were also not logged at all when ordered.  Is that a good thing or a bad thing?  A: In terms of recordkeeping, that is not a good thing, no."), 6567:14 – 6568:20 (220 oxycodone pills estimated to be lost at CVS Store 3326), 6568:24-25, 6569:5-15 ("Q: Is that a good thing or a bad thing?  A: Well, as I stated before, yeah, the recordkeeping, not a good thing.  Q: Well, not only recordkeeping, you don't know whether these are stolen or whether they're lost, whether they were over-dispensed, whether somebody put too many in, whether somebody took some out.  You don't have a clue, do you?  A: Well, no, sir, and that's why at the time, both Dan and I obviously were freaking out a little bit, for lack of a better word."), 6570:9 – 6571:18 (another 101 oxycodone tablets estimated to be lost or stolen at CVS Store 3326), 6572:12-15, 6572:20 – 6573:4, 6573:5-11 (Cook dealt with other drug losses at his CVS stores), 6573:14 – 6574:17 (CVS store where Cook worked also lost 93 units of percocet in 2017; "I can agree with you that I have obviously seen issues with the inventory of opioids, yes.  100 percent."); P-00459 at 008 ("When I started to really understand the tremendous growth of the misuse of prescription drugs I realized I may have been naive to believe we were doing everything we could to reduce the growth of this tragic problem in the U.S."); P-04600-A; P-06272; P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-06620; P-08378; P-08397; P-08402; P-08405; P-08406; P-08408; P-08409; P-08439; P-15601 at 1202; P-15733; P-15843; P-21936 (CVS Store 3326 in Mentor, Ohio, had poor recordkeeping related to narcotics in 2014); P- (footnote continues on next page)

- CVS failed to timely implement and apply necessary controlled substance policies across its pharmacy stores. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 376:5-9 ("Q: And so the pharmacists of today has much better resources than the pharmacists of 10 years ago when it comes to trying to determine and resolve red flags.  True?  A: In certain respects, that would be true."); Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 631:4-15, 694:14-21, 700:17 – 701:4 ("Q: Okay.  And your understanding is that that [prescriber monitoring] program was not implemented at CVS until 2015?  A: That is my understanding, yes. Q: How early do you think it should have been implemented?  A: I think it should have been implemented really, from the early 2000s, you know, as people started dying, I would say by, somewhere between 2005 and 2010.  CVS should have used their own data to figure out where these pills were coming from and where they were going."), 701:10-19, 717:23 – 718:1, 718:19-21 ("[E]ven in 2004, CVS was not allowing pharmacists to have blanket refusals for known pill-mill doctors."), 719:2-4; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 891:14 – 892:2; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:17 – 994:19, 995:5-8, 996:4-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1204:16 – 1205:19; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4057:17 – 4058:6 ("Q: So the program was going to alert pharmacists when there's a red flag and stop them from filling the prescription until they document the resolution of that flag; correct?  A: Yes.  It was designed to alert them when certain characteristics, potential red flags, were present, to allow them to review those characteristics.  Q: And to document the resolution of those characteristics prior to filling the prescription; correct?  A: Yes.  At the time, that was the requirement.  Q: Okay.  And at that time, that was in 2020, so just – just last year, in August; correct?  A: This is August.  Yes. Q: So as of August of 2020, this still was – had not been implemented at CVS; correct? A: Correct."), 4063:10-12 ("Q: CVS's first policy related to the prescription monitoring program was in April of 2012; is that right?  A: Yes."); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5705:4-6 ("Q: When was the early fill alert put in place?  A: It was put in place in 2014, to the best of my recollection."), 5706:25 – 5707:12 (CVS implemented an Opioid Risk Module, that had "specific alerts around combinations of medications that were more enhanced, providing more direction to the pharmacists on actions to take[,]" in 2018), 5709:2-10 ("Q: When did this forgery, when did you begin to unroll and implement the forgery program?  A: And again, this has been an evolution in these different parameters. I think the prescriber alert was first.  And to the best of my recollection, '17, '16, somewhere in there, we had to build the patient-level alert, so that came shortly after that.  And then the realtime alerts based on the analytics for certain subsets of our algorithm I believe was 2020."), 5721:4-11 (CVS put store monitoring system into place around 2012), 5724:10-13 (MAQ program "implemented across the country for oxy and hydro in 2014"), 5755:21 –

---

21937 (providing further details regarding poor recordkeeping regarding opioids at CVS Store 3326 in 2014); P-21938 (CVS store where Cook worked also lost 93 units of percocet in 2017; "It seems these occurred as dispensing errors where patients got too much."); P-23330; *see also infra* § I.B.2.

5756:7 (today CVS allows blanket refusals to fill), 5788:16-21 ("Q:…. So if we try to find red flags in the manual in 2004, I'm not seeing it anywhere. Am I missing it? A: I'm not sure. I don't believe it was in policies in 2004? Q: You're not – you don't believe it was in policies? A: No."), 5793:25 – 5794:12 ("Q: And for the first time, in 2010 y'all start talking about red flags are warning signs and listing them. True? A: True."), 5796:25 – 5797:24, 5800:11-16 ("Q:…. But let me just get you to at least agree that during this Phase II time, after Holiday, that's when you're company started sending out documents like you and Mr. Delinsky talked about, DEA & Pharmacy Regulatory Training; true? A: Yes."), 5811:12-25 ("Q: Right. So, for example, when Mr. Delinsky puts CVS-MDL-00945, this Policy and Procedure on Red Flags – do you remember this one? A: I do. Q: I wrote down here 10/2014. That was the date of this, wasn't it? A: Correct. Q: And not only was it the date of it, but if you look at the back, this was a brand new policy, wasn't it? A: It was. Q: And this is a policy that Mr. Delinsky talked about having red flags listed, patient red flags, prescriber red flags. Remember those? A: Yup."), 5812:8 – 5813:1 ("Q:…. There's no reason your company couldn't have told the pharmacists and trained the pharmacists about these red flags in 2000, is there? A: We could have used this specific language historically if we had it, I guess. Q: Well, ma'am, you had people pay in cash for prescriptions back then, didn't you? A: Yes. Q: You had people where the patient or the prescriber's not located within the store's geographic area, didn't you? A: Yes. . . . I as a pharmacist during that time was looking for those things. . . . Q: Then if you were looking for those things back then, your company could have trained and put a policy in place on those things back then, true? A: Potentially."), 5842:6-14 (documentation of red flag resolution did not become a requirement in CVS policy until 2012/2013), 5880:7-11 ("Q: Yes, phase II was 2012, but this MAQ program, the forgery program, NarxCare, the 2016 guidelines, the training, all of that kind of stuff, that was phase III, right? A: It was."); P-08415 (holy trinity alert, which would provide "Real time identification of controlled substance cocktail fill[,]" set as a proposed project to be deployed in the first quarter of 2019; projected sources of value include "Improve documentation in RxConnect for cocktail fills[,]" "Increase Rx Team awareness of combination fills[," "Reduction of wrongful death suits and damage to CVS branding[,]" and "Improve patient safety"); P-15601 at 1202 (2004 CVS policy states: "*Blanket decisions based on a practitioner's prescribing habits or a customer's appearance are unprofessional and may be illegal*.").[52]

---

[52] *See also, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 321:7-11, 322:3-7, 339:21 – 340:2, 340:16-25, 342:4 – 343:11, 354:17-21, 390:21 – 391:6, 420:12-23; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3960:20 – 3961:19, 3977:23 – 3980:24, 3990:22 – 3995:10, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4057:16, 4058:7 – 4060:16, 4060:23 – 4062:20, 4063:13 – 4066:1, 4066:10 – 4069:24, 4077:3 – 4079:8, 4079:23 – 4080:21, 4081:4-9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5654:11-18, 5663:3-13, 5685:23 – 5686:20, 5687:17-22, 5689:3-8, 5692:18-21, 5695:5-8, 5711:8-11, 5727:15 – 5728:5, 5729:21 –
(footnote continues on next page)

- Even once certain controlled substances diversion policies were developed, CVS failed to monitor and enforce the policies across its pharmacy stores. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 998:7 – 1000:8; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3981:22 – 3984:17, 3988:2 – 3990:1, 3990:14 – 3995:10, 4001:21 – 4008:10, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4047:14, 4052:5-17 ("Q:…. Was it required to document a refusal to fill at CVS? A: Not to my knowledge. Q: Was there a requirement that they inform CVS corporate headquarters of a refusal to fill? A: Not to my knowledge."), 4052:18 – 4053:2, 4053:8-11 ("Q: Ms. Travassos, this program, this pilot program that we were discussing in 2018, that was not implemented at CVS; correct? A: The pilot program was not implemented chain-wide."), 4053:12-17, 4053:19 – 4056:6, 4063:10 – 4066:1, 4066:10 – 4069:24, 4079:23 – 4080:21, 4081:4-9; P-06329; P-06457; P-06566; P-08378; P-08397; P-08402; P-08405; P-08408; P-15733; P-15843.

- CVS also implemented employment evaluation policies and performance metrics that impeded its pharmacists' efforts to comply with laws and regulations and meet standards of care. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 357:21 – 358:19, 361:15 – 362:17, 364:1-7, 366:19-24; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:17 – 934:7, 966:2 – 967:12, 1000:10 – 1004:18, 1005:5 – 1006:17; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:11 – 1115:7, 1121:5 – 1128:5, 1291:14-20; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1434:3-13; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5743:9-24 (controlled substances were included in CVS bonus calculations until 2013); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6558:12-16, 6559:3-19, 6587:3-6 ("What is evaluated? So again, -- and it's changed over the years, it's evolved. What's not evaluated *anymore* is like work flow scores, how efficiently we're processing prescriptions.") (emphasis added); P-06672 at 002-003 ("[W]e must ask ourselves the right questions and make tough decisions to understand if displaying red flags via WaVe is the most appropriate use of red flag identification. We may come to realize that a high volume of red flags may create too large an impact on workflow . . ."); P-15604; P-19827 at 002 ("Hearing complaints from pharmacists that they don't have time to check all these prescriptions for good faith. Wants to make sure chains aren't inhibiting this by pressuring their pharmacists to fill fast or not providing adequate labor."; "Believes that compensation (bonus) should not be tied to prescription volume of controlled substances."), 003 ("Bonus

---

5730:8, 5731:11 – 5732:1, 5755:12-16, 5777:6-11, 5784:4-7, 5784:11 – 5786:3, 5788:22 – 5789:14, 5790:17 – 5791:11, 5796:25 – 5797:24, 5811:2-11, 5818:19 – 5825:1, 5825:25 – 5826:16, 5836:11-14, 5887:18-20, 5888:5-11, 5888:19-23, 5889:10-12, 5892:21 – 5893:3; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6577:13-19, 6577:20-25 ("Q: Would you agree with me that Rx Connect has modified over the years or decades since it first came out? A: Yes. Q: And when you were speaking about it, you're speaking about it in today's incarnation. Fair? A: That is a fair assessment."); P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-06620; P-06672 at 002-003; P-08378; P-08397; P-08402; P-08405; P-08408; P-08439; P-15733; P-15843; P-23305; P-23330.

parameters are a concern."); P-20695; P-21927 (Cook: "At times, I had to really coach my partner who would have real challenges with the blue chips, like . . . wait times for narcotics specifically, but I was able to hold the team together throughout all this and make sure we did not go off track from the CVS mission statement.").

- CVS and its pharmacists have a corresponding responsibility to only fill prescriptions for controlled substances that are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her/his professional practice. *Supra* at fn.31; *see also* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 300:25 – 301:9, 303:19-22, 348:13 – 349:5, 362:9-15, 374:10-14, 376:15-24, 379:5-12, 380:1-8, 395:2-21; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3979:15-23, 3992:21-23; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4081:22 – 4082:1 ("Q: But the head of your department, Nicole Harrington, if we look back at MR937, under Item 2, wrote, broaden our ability to exercise corporate corresponding responsibility to further support our stores; correct?  A: That's what this document says."); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5642:18-21, 5644:20-22, 5645:10-14, 5754:21 – 5755:1, 5881:20 – 5882:2; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6537:18-22 ("Corresponding responsibility . . . to me it starts with a definition is when a patient presents a prescription for a controlled substance, you know, resolving any red flags that are discovered prior to that medication ultimately reaching the hands of the public."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6631:9-11; P-00459 at 015-016 ("Pharmacists fail to satisfy this legal requirement when they knew or should have known that a prescription was not issued for a legitimate medical purpose.  Pharmacists cannot be willfully blind."); P-08954 at 002 (in 2015 settlement with DEA, CVS "acknowledge[d] that *it* has a corresponding responsibility . . .") (emphasis added); P-15656 at 002.

- The determination of whether a prescription issued for a controlled substance is valid and legitimate requires systems and actions to recognize, investigate, and resolve signs of a prescription's invalidity (*i.e.*, red flags). These red flags are warning signs and can also indicate activities are occurring outside the usual and customary scope of pharmacy practice, activities that are more than likely to include abuse, diversion, and fraudulent acts. *Supra* at fn.32.

- CVS knew and understood that there are certain red flags associated with opioid prescriptions that are indicative of potential diversion. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 297:1-13, 299:16 – 301:9, 305:17 – 306:8, 309:12-18, 310:14-19, 376:10 – 379:12, 380:1-8, 384:1 – 387:21, 388:3-5, 395:22 – 396:1, 396:2-14, 397:6 – 398:10, 399:11-16; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 625:3 – 629:19, 701:10-19, 702:13-17; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1584:17-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1774:10-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3982:10 – 3984:17, 3999:18 – 4001:6; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:21-24, 4061:6-24; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4530:20 – 4531:11; Dkt. #4115 (11/3/21 Trial Tr.)

[*Harrington*] at 5661:20-22, 5669:19 – 5671:5, 5672:3-9, 5678:6 – 5679:3, 5735:16 – 5736:10, 5737:16 – 5738:23, 5740:7-8, 5752:6-9, 5757:13-21, 5758:4-15, 5760:14-18, 5761:10-12, 5763:5 – 5764:13, 5773:7 – 5774:6, 5774:23 – 5775:3, 5794:10-12, 5795:4-5, 5801:25 – 5802:7, 5802:12-15, 5819:17 – 5826:16; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6537:18-25, 6538:10 – 6539:14, 6544:12-22; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6428:18 – 6429:3, 6430:1 – 6431:5, 6450:23 – 6453:23, 6454:5 – 6455:16, 6456:9-14; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6610:14 – 6611:3; P-00459 at 018; P-06672 at 002-003; P-08415; P-08439; P-15656; P-15962-A at 010-012; P-19827 at 001-002; P-20699; P-26403 at 027-087; CVS-MDL-00266; CVS-MDL-00906; CVS-MDL-00945 at 010-011.

- <u>To effectively guard against diversion, CVS and its pharmacists must, prior to dispensing a prescription opioid: (i) accurately identify and document all red flags raised by the prescription, patient, and prescriber; (ii) reasonably collect complete, relevant, and accurate information concerning each red flag; (iii) independently evaluate the collected information to determine whether the evidence is reliable and whether, as a whole, the evidence adequately resolves each red flag; and (iv) clearly and explicitly document their evaluation of the evidence and their reasoning supporting their judgment to dispense the prescription.</u> *Supra* at fn.34; *see also, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 362:3-15, 376:10 – 379:12, 380:1-8, 396:2-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3983:5-8; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:16-24 ("Q: Well, every red flag that a pharmacist identifies with a prescription must be resolved before the pharmacist can fill the prescriptions; correct? A: Yes."); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5742:24 – 5743:1, 5848:8-15 ("Q: 'We've heard basically that pharmacists shouldn't really interfere or second guess doctors'/prescribers' decisions of what they are prescribing. What is your opinion?' A: As a pharmacist, we have to ask questions about the prescriptions that we're receiving. We have to understand more about why the medication is being prescribed for us to evaluate if it's appropriate."); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6537:18-22 ("Corresponding responsibility . . . to me it starts with a definition is when a patient presents a prescription for a controlled substance, you know, resolving any red flags that are discovered prior to that medication ultimately reaching the hands of the public."), 6544:12-22.

- <u>Documenting the resolution of red-flagged prescriptions, in a clear and understandable manner, is a critical component of implementing effective controls against diversion, and is otherwise required by law.</u> *Supra* at fn.35.

- <u>Despite recognizing the importance of doing so, CVS consistently failed to document their resolution of red flags.</u> *See, e.g., infra* at fns.56-57; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5741:18-20 ("Q: Okay. Does CVS call on its pharmacists in its policies to document the resolution of red flags? A: We do.") 5741:25 – 5742:2 ("It's good information to have at certain points in time. We've looked it back at that information for different

purposes."), 5742:16-19 ("Q: In your experience, is it common for pharmacists to do the hard work of resolving a red flag but not to write down everything they did? A: Yes."), 5803:12 – 5804:24, 5894:25 – 5895:3 ("Q: Company policy on documentation: Resolve red flags but don't worry about documenting it? That's not the policy, is it? A: That's not the policy."), 5895:17-19 ("Q:…. That policy is 'document all steps,' isn't it? A: That's how the policy reads."); Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6480:11-19 ("Q: All right. I'm showing you, Mr. Hill, a question that has been put to you by the jury. 'Does CVS require their pharmacists to document the resolution of red flags?' As a matter of policy. A: From the documents that I reviewed, yes. Q: Okay. And let's just follow up on that. You are absolutely right, CVS requires documentation, correct? A: Correct."); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6566:7-10 ("Q: Well, recordkeeping isn't simply something to do for grins; you're taught back in school recordkeeping is extremely important; correct? A: We are taught the importance of recordkeeping, yes."), 6570:1-6, 6582:6-16, 6583:20-25 ("Q: As a CVS pharmacist, do you have to document resolutions of red flags? If so, where do you document resolutions? A: Yes. So, yeah, CVS, part of their policy is, and part of my training was to document the resolution of a red flag."), 6584:10 – 6585:9 ("Q:…. If a CVS pharmacist decides to refuse to fill a prescription, what is the process of that? Are there certain documents that have to be filled out? A:…. Documents that have to be filled out, not to my knowledge. There are circumstances if the prescription is deemed to be fraudulent, then we are required to notify Board of Pharmacy as well as local law enforcement. But assuming it's not a fraudulent prescription, there is no – to my knowledge, there's no legal requirement for a refusal to fill documentation.").[53]

- CVS failed to provide its pharmacists with the data, training, guidance, resources, and tools necessary to assist the pharmacists in fulfilling their corresponding responsibility duties, including but not limited to, utilizing dispensing data to identify patterns, trends, and practitioners possibly involved in diversion as well to recognize and resolve red flags. *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-21, 717:23 – 718:1, 718:19-21, 719:2-4; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1048:23 – 1050:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4053:2 (piloting various programs that would have assisted pharmacists but suspending or failing to implement them), 4053:19-23 ("Q: So there was nothing at CVS like this one-page form which we just looked at which captured in one place all of the information to resolve red flags related to a particular prescription; correct? A: To my knowledge, that is correct."), 4060:23 – 4061:5 ("Q: In 2013, you were in favor of including the documentation, created a program – a controlled substance review program in 2018 requiring documentation, in fact, put stars next to where it should be

---

[53] *See also, e.g.,* Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4535:10-13 ("My quote to pharmacists was, your prescription is your Bible. If you've got something you want to bring to my attention regarding a prescription, write it on the prescription"); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5742:6-7, 5843:6-13; P-15656 at 006; CVS-MDL-854 at 002-003.

documented, and in the initial draft of the WaVe 2.0 program that you were working on, you suggested documentation. But in the pilot program today it's not included; correct? A: Correct."), 4061:6 – 4062:20 ("Q: The 27 red flags, is there a list of each of those red flags? A: There is a list of the 27 flags as originally designed in 2020. Q: Okay. And are all 27 of those flags included in the pilot program to release soon? A: No. Q: How many flags are included in the pilot program? A: We are piloting with three. . . . Q: So one of the concerns about having 27 red flags that were originally developed for the WaVe 2.0 program was that it might have too large of an impact on pharmacy work flow; correct? A: There was the potential for that."), 4063:10 – 4064:19 (first policy related to PMPs issued in April 2012 and did not instruct CVS pharmacists to use the PMP unless required by state law), 4064:20 – 4066:1 (revised CVS policy on PMPs issued in September 2015 only required pharmacists to access PMPs when there are red flags or when required by state law), 4067:5-9 ("Q: Okay. So at the time that Ohio developed its prescriber monitoring program, CVS did not have a policy for its pharmacists related to a prescriber monitoring program; correct? A: They didn't have a written policy."), 4069:20-24 ("Q: So at the time that the communication went out, the instruction to CVS pharmacists is that you could only access the OARRS report when one of these six listed scenarios occurs; correct? A: That's what it says here."); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5784:4-7 ("Q: Ma'am, even as of 2017, y'all didn't have an alert for the trinity cocktail in place, did you? A: Not specifically to the trinity with the directions that we provide on how pharmacists handle it."), 5838:22 – 5839:4 ("Q: 'Are copies of refusals to fill prescriptions kept? For how long and where?' A: So I'm not sure if this is referring to, like, a hard copy. Typically, if we refuse to fill a prescription, we actually will provide that back to the patient. We don't typically take copies at CVS. Pharmacists have an opportunity, if they wanted to, to put a note in the system, but we don't keep copies as per normal practice."), 5887:18-20 ("Q: But Ms. Harrington, in 2000, y'all didn't even have a red flag policy, did you? A: Not in 2000."), 5888:5-11 ("Q: Are you trying to tell us that RxConnect would identify pattern prescribing by doctors? A: No, but a pharmacist would see that in the course of their dispensing working in a pharmacy day in and day out. Q: Wait. Some of these pharmacies dispense 500-plus prescriptions a day, don't they? A: Potentially, yes."), 5888:19-23 ("Q: Then you don't need all these algorithms y'all have spent all this money on, you just need pharmacists who are practicing? A: The algorithms can make it easier. It can support pharmacists."), 5889:10-12 ("Q:…. RxConnect doesn't identify pattern prescribing, does it? Yes or no? A: It does not."), 5890:13-21 ("Q: The truth of the matter is, it's a little bit more. CVS doesn't even communicate to their registered pharmacists routinely when the home office is investigating a doctor, true? A: It depends on how the information comes to us when we're investigating a pharmacist. Some come from pharmacies, some come from conversations with them. Others of them when they're coming from the algorithm aren't proactively communicated until we do our investigation."); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6578:1-9 (Cook was not trained on, nor is he familiar with, the *East Main* case or the *Holiday CVS* case), 6578:13-25 (even

in today's iteration, RxConnect does not provide "information about CVS's investigations into suspicious prescribers[,]" information "about CVS's analysis of store dispensing habits[,]" "information about whether prescribers are top volume prescribers for hydrocodone or oxycodone"), 6579:7-15 (even in today's iteration, RxConnect does not provide information regarding whether a doctor is a top prescriber for a share of controlled drugs versus non-controlled drugs); P-23305 (2008 CVS policy on Schedule II drugs contains no list of red flags and states: "Blanket decisions based on a practitioners prescribing habits or a customers appearance are either unprofessional or illegal.").[54]

- <u>For example, CVS collected data that would be useful for it and its pharmacists in identifying suspicious prescribing and dispensing activity in order to guard against diversion, but for at least some period of time failed to provide such data, or make it easily accessible, to its pharmacists.</u> *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 431:2-11 ("Q: And have you ever – have you provided reports of information regarding those store monitoring reports to your store managers in Lake and Trumbull Counties? A: So not every store gets a report, sir."); Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4048:2 – 4049:3 ("Q: So if a pharmacist wanted to see if anyone had a particular concern or resolved a particular red flag related to a prior prescription that a patient received, and those notes were only contained on the back of the prescription, how would that pharmacist access that information, if at all? A: They would need to refer to the hard copy. . . . Q: If you wanted to see if a particular patient's prescription in the past had a red flag concern resolved related to it, you would need to go back and try to locate that prescription by prescription number in the notebooks, if there was not any documentation in RxConnect; is that right? A: That's correct. Q: So if there was information that was only contained on the back of a prescription, there would be no electronic system in place at CVS to retrieve that information; correct? A: Not that I'm aware of."), 4053:24 – 4060:16, 4060:23 – 4062:20; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5688:4 – 5691:15 (discussing data used for prescriber monitoring system), 5718:13 – 5719:13 (discussing data used for store monitoring system), 5888:19-23 ("Q: Then you don't need all these algorithms y'all have spent all this money on, you just need pharmacists who are practicing? A: The algorithms can make it easier. It can support pharmacists."), 5889:22-

---

[54] *See also, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 354:6-15, 376:5-9, 390:21 – 391:6, 420:12-23, 429:10-18, 431:2-11; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3969:24 – 3971:17, 3977:23 – 3981:21, 3984:18 – 3985:14, 3986:9 – 3990:1, 3990:22 – 3996:20, 3998:1 – 3999:11, 4008:15 – 4009:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4053:24 – 4060:16, 4666:10 – 4067:4, 4067:10 – 4069:16, 4077:3 – 4079:20, 4079:23 – 4080:21, 4081:4-9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5755:12-16, 5774:7-22, 5775:4-16, 5784:20 – 5786:3, 5787:9 – 5789:14, 5793:25 – 5794:12, 5796:25 – 5797:24, 5800:11-16, 5811:2-25, 5812:8 – 5813:1, 5818:19 – 5826:16, 5886:25 – 5887:14, 5890:22 – 5891:24; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6527:11-19 (CVS utilized floater pharmacists that moved from one store to another), 6574:22-25 (same), 6580:10-14; P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-06672 at 002-003; P-08378; P-08397; P-08402; P-08408; P-08409; P-08415; P-08439; P-15601 at 1202; P-15733; P-15843.

25, 5890:13-21 ("Q: The truth of the matter is, it's a little bit more.  CVS doesn't even communicate to their registered pharmacists routinely when the home office is investigating a doctor, true?  A: It depends on how the information comes to us when we're investigating a pharmacist.  Some come from pharmacies, some come from conversations with them. Others of them when they're coming from the algorithm aren't proactively communicated until we do our investigation.").[55]

- CVS did, however, sell this dispensing data to IMS for profit.  Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 374:20-24; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5780:8 – 5781:8.

- Additionally, state PDMPs, such as OARRS in Ohio, contain helpful data that pharmacists can use to identify and resolve red flags.  *Supra* at fn.38; *see also, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 400:13 – 401:10, 403:23 – 404:11; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6542:21 – 6543:10; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5679:21-24 ("PMP is the prescription monitoring program.  It's a tool that's provided by the state that takes all of the dispensing information from all of the pharmacies, for controlled substances, and puts it in one place."), 5680:5-14.

- OARRS started in 2006; in October 2011, Ohio law changed to mandate that pharmacists check OARRS under certain specified circumstances.  *Supra* at fn.39.

- Despite recognizing the usefulness of PDMPs, during at least some portion of the relevant time period, CVS failed to mandate that its pharmacists check the applicable PDMP whenever filling an opioid prescription.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 390:21 – 391:6; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4062:21 – 4063:9 ("Q: Ms. Travassos, would you agree with me that checking a State's PMP is an invaluable tool for pharmacists to prevent controlled substance from being diverted? A: It is a great tool for pharmacists to use to provide more context around filling controlled substance. . . . Q: Ms. Travassos, if you'd look at the second sentence in the overview, would you agree

---

[55] *See also, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25, 312:18 – 313:7, 315:5 – 318:7, 357:8-13, 371:11-17, 371:21 – 372:5, 374:20 – 376:9, 416:4-9, 418:4 – 419:3, 419:11 – 420:23, 426:13 – 427:20, 429:10-18; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-21, 701:10-19, 717:23 – 718:1, 718:19-21, 719:2-4; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3969:24 – 3971:17, 3974:1 – 3976:15, 3976:25 – 3985:14, 3986:1 – 3990:13, 3990:22 – 3996:20, 3999:12 – 4008:10, 4011:13 – 4017:14, 4050:1-14; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5419:11-16 ("Q: Now, from your own knowledge, isn't it true that these pharmacies have their own databases of prescription data?  A: Yes. Q: And that dispensing data, in your mind, could also help pharmacists identify and resolve red flags, right?  A: Sure."); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5721:22 – 5723:12, 5724:20 – 5725:18, 5808:2-9, 5889:22-25, 5890:22 – 5891:24; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6575:19 – 6576:7, 6591:23 – 6592:13; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6627:8 – 6628:2; P-06325; P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-08402; P-08405; P-08406; P-08407; P-08408; P-08409; P-15733; P-23330.

with me that it reads, the PMP is an invaluable tool for pharmacists to prevent controlled substance from being diverted?  A: It does say that, yes."), 4063:10 – 4064:6 (under CVS's first policy regarding PMPs, issued in April 2012, pharmacists were instructed that they were only required to check the PMP if required under state law), 4064:20 – 4066:1 (under CVS's revised policy regarding PMPs, issued in September 2015, pharmacists were instructed that they were only required to check the PMP if there were red flags or if required under state law), 4069:16-24 ("Q:….  Under important notes, it reads, you may only access the OARRS report when one of these six listed scenarios occurs.  Do you see that?  A: I do.  Q: So at the time that the communication went out, the instruction to CVS pharmacists is that you could only access the OARRS report when one of these six listed scenarios occurs; correct?  A: That's what it says here."); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5472:22 – 5473:1 ("Q: And if a corporate office takes four or five years after a PDMP comes onboard to issue a policy encouraging, indeed mandating, that the pharmacists register for OARRS, that would be a problem, right?  A: Potentially it could be a problem."); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6542:21 – 6543:10 (describing OARRS as "[d]efinitely one of the more important tools" he uses when filling controlled substance prescriptions; "It tells me information not only on the drug name, the quantity, the day's supply, it goes so far as to tell me the doctor who prescribed it, where that medication was filled and even like the insurance that was applied when they filled that medication."); P-06325 at 002; P-08378;P-08397 at 023 ("You may only access the OARRS report when one of the six listed scenarios occurs."); P-15843 at 001 ("The PMP is an invaluable tool for Pharmacists to prevent controlled substances from being diverted or dispensed for non-medical purposes . . ."); P-15843 at 002.

- CVS's pharmacies in the Counties filled thousands of opioid prescriptions presenting red flags without evidence of resolving those red flags.  *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1006:19-25, 1057:25 – 1058:18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1136:23 – 1138:14, 1144:9 – 1164:7, 1165:14 – 1168:3, 1169:9 – 1171:13, 1202:4 – 1203:17.

- Specifically, of the 701,467 opioid prescriptions dispensed by CVS into the Counties, **141,651** had one or more red flags associated with them.  *See, e.g.,* Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2231:17 – 2232:5, 2233:17-20, 2245:4; *supra* at fn.40.

- From the random sampling of 2000 red-flagged CVS prescriptions that were dispensed in the Counties, 950 contained no information across all relevant due diligence notes fields.  Of those 950, 686 also had nothing documented on the hard copy prescriptions.  Of the 1050 red-flagged prescriptions that had notes, "in the overwhelming majority of cases," the notes were unacceptable/insufficient.[56]

---

[56]   *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1150:11 – 1154:18, 1155:11-19 (""Q:….  Are you saying that all of the 1,050 that did have notes were inadequate, or give us a feel for what was and (footnote continues on next page)

- <u>Plaintiffs' expert, Mr. Catizone testified that, based on the random sampling of prescription notes fields produced, over 90% of the red flag opioid prescriptions dispensed by CVS into the Counties did not contain adequate documentation demonstrating that the red flags were resolved prior to dispensing.</u>[57]

- <u>Dr. McCann testified that Mr. Catizone's 90% of red-flagged prescriptions in the random sampling can be extrapolated over all the red-flagged prescriptions.</u>  *Supra* at fn.43.

The evidence adduced at trial further demonstrates that CVS's dispensing of opioids into Lake and Trumbull Counties was intentional.  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- <u>CVS knew and understood its obligations under the CSA and Ohio law related to the dispensing of prescription opioids.</u>  *See, e.g.*, Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 299:16 – 301:9, 339:21 – 340:2, 340:16-21, 348:13 – 349:5, 362:3-15, 365:22 – 366:2, 376:10 – 379:12, 379:20-22, 380:1-8, 381:1-19, 384:1 – 387:21, 394:12-18, 395:2-21, 396:2-14; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5650:9-10, 5653:9-11, 5653:21-23, 5654:3-8, 5661:20-22 ("Q:….  Do you know about the *Holiday* action?  A: I do.  It happened before I took on this role, but I'm very well aware of it."), 5662:9-12, 5667:22 – 5668:2, 5737:16 – 5738:1, 5772:9-14, 5773:10-15, 5773:25 – 5774:6, 5774:23 – 5775:3, 5794:17-19, 5820:18 – 5825:1, 5827:1-17, 5883:6-20; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6525:11-13, 6526:16-18; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6624:10 – 6625:5, 6629:7-16; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5634:11-22, 5754:21 – 5755:1; P-00021; P-00459 at 015-016; P-08954; P-08955; P-10212; P-10213; P-10214; P-15601; P-15656; P-15962-A; P-19827 at 001-002; P-26403 at 027-087; P-42147-A; CVS-MDL-00945.

---

was not, what was your experience reading through it based on your opinion?  A: My experience was that the overwhelming majority of those 1,050 notes approximately did not appropriately document the existence of red flags and the resolution of that red flag as required by standards of care and requirements."), 1155:20 – 1164:7, 1165:15 – 1166:13, 1167:4 – 1168:3, 1169:9 – 1171:13, 1180:2-8, 1202:4 -1203:17, 1241:15-21, 1243:9-13; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1451:22-24, 1455:17-23, 1499:12-17.

[57]  *See* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 923:21 – 925:4, 998:18-20, 999:3-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1202:23 – 1203:3 ("So when I looked at all these prescriptions which had red flags, the overwhelming majority, and in my report I said based upon my best educated experienced guess, it looks like 90 percent of those prescriptions did not have adequate documentation, but I couldn't really tell on the others as well."), 1203:4-11, 1203:12-14 ("But overwhelmingly, in my overwhelming opinion, about 90 percent of what I looked at didn't meet that level of documentation that was required.").

- CVS knew that the prescription opioids it was dispensing had a high potential for abuse that could lead to severe psychological or physical dependence, and thus knew that the diversion of opioids would create a public health hazard.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 335:13 – 336:7 ("Q: And so to speak of Oxycodone or Hydrodone as safe and effective, it would be important to recognize that it's of limited medical use and it has a high potential for abuse and addiction.  Right?  A: Yes."), 395:2-21; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2454:22 – 2455:8; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:24, 3967:12 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5650:9-10 ("Controlled substances are scheduled by the DEA, and it's based on the level of addiction potential."), 5651:13-17, 5737:16 – 5738:1, 5749:12-19, 5768:13 – 5769:19; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6518:22 – 6519:5, 6538:2-5 ("[E]very controlled medication that's handed to me, you know, has that risk of abuse, has that risk of, you know, if it's in the wrong hands, you know, it's not a good situation."), 6554:2-4, 6561:17-19 ("Q: And would you agree with me that opioids are highly addictive?  A: Absolutely, I would."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-00459 at 007-009, 012, 014, 045 ("I am frustrated when I think of all of the time and energy we must spend to keep our prescription drugs in the right hands, and I am sad for the hurt and pain this issue has caused so many people!!"); P-00021; P-08403; P-15656 at 003; P-15962-A at 003-008; P-19827 at 001-002; P-26403 at 025.

- CVS knew that the purpose of the CSA is to prevent the abuse and diversion of controlled substances.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 381:1-19; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5663:3-13, 5737:16 – 5738:1; P-00459 at 014; P-15656 at 003; P-15962-A.

- CVS knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 340:16-25, 345:25 – 346:4, 379:20-22, 394:12-18, 396:2-14; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1662:18 – 1663:1; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:19; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5737:9 – 5738:1, 5754:21 – 5755:1, 5768:23 – 5769:19, 5820:18 – 5821:12; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-00021; P-08494; P-15601 at 1202 (2004 internal policy recognizing that "[t]he exercising of corresponding responsibility is especially important with regard to 'questionable' prescriptions for controlled drugs"); P-15656 at 003 ("Ensuring that Pharmacists exercise corresponding responsibility is a key focus of federal, state and local law enforcement as part of their effort to curb drug abuse."); P-15962-A; P-19827 at 001-002; P-00459 at 007-009, 014, 045 ("I am frustrated when I think of all of the time and energy we must spend to keep our prescription drugs in the right hands, and I am sad for the hurt and pain this issue has caused so many people!!").

- CVS knew and understood its dispensing policies and procedures, and its implementation of same, did not comply with its legal obligation. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25, 339:21 – 340:2, 340:16-25, 342:4 – 343:11, 348:13 – 349:5, 394:12-18; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2453:11 – 2454:16; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4058:7 – 4060:16, 4060:23 – 4062:20, 4079:23 – 4080:21, 4081:4-9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5662:9-12; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6624:10 – 6625:5; P-06612; P-08954; P-08955.

- CVS knew that it was not providing its pharmacists with the necessary training, guidance, tools, resources, and data to allow them to successfully exercise their corresponding responsibility. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25, 390:21 – 391:6, 420:12-23; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3969:24 – 3971:17, 3977:23 – 3980:24, 3984:18 – 3985:14, 3986:9 – 3990:1, 3990:22 – 3996:20, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4053:2, 4053:8 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24, 4077:3 – 4079:8, 4079:23 – 4080:21, 4081:4-9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5663:3 – 5664:23, 5755:12-16, 5768:13 – 5769:19, 5784:19 – 5786:3, 5787:5-8, 5788:16 – 5789:14, 5812:8 – 5813:1, 5819:2 – 5826:16, 5890:13-21 ("Q: The truth of the matter is, it's a little bit more. CVS doesn't even communicate to their registered pharmacists routinely when the home office is investigating a doctor, true? A: It depends on how the information comes to us when we're investigating a pharmacist. Some come from pharmacies, some come from conversations with them. Others of them when they're coming from the algorithm aren't proactively communicated until we do our investigation."), 5890:22 – 5891:24; P-00459 at 008; P-06329; P-06457; P-06510; P-06566; P-06612; P-06620; P-06672 at 002-003; P-08378; P-08415; P-08397; P-08402; P-08405; P-08408; P-08409; P-08439; P-15733; P-15843.

- CVS deliberately implemented dispensing and compensation policies and procedures that discouraged or hindered its pharmacists from performing due diligence on suspicious prescriptions. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 357:21 – 358:19, 361:15 – 362:17, 364:1-7, 366:19-24; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 932:11 – 934:7; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:11 – 1115:7, 1121:5 – 1128:5, 1291:14-20; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1434:3-13; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4049:22 – 4052:4, 4053:8-17, 4053:24 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5743:9-24 (controlled substances were included in CVS bonus calculations until 2013); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6558:12-16, 6559:3-19, 6587:3-6 ("What is evaluated? So again, -- and it's changed over the years, it's evolved. What's not evaluated *anymore* is like work flow scores, how efficiently we're processing prescriptions.") (emphasis added); P-06612; P-06672 at 002-003 ("[W]e must ask ourselves the right questions and make tough decisions to understand

if displaying red flags via WaVe is the most appropriate use of red flag identification.  We may come to realize that a high volume of red flags may create too large an impact on workflow . . ."); P-08378; P-08397;  P-15604; P-15843; P-19827 at 001-003; P-20695; P-21927 (Cook: "At times, I had to really coach my partner who would have real challenges with the blue chips, like . . . wait times for narcotics specifically, but I was able to hold the team together throughout all this and make sure we did not go off track from the CVS mission statement.").

- CVS systematically ignored red flags and other dispensing irregularities plainly present in its data and continued to fill suspicious prescriptions.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 301:10 – 302:12 ("Q: And so then if all of a sudden the amount of prescriptions that your pharmacies were filling increased dramatically because you all were now filling the Overholt's Pharmacy prescriptions, that should ring a bell with someone in corporate. Shouldn't it?  A: Well, in our pharmacy stores, leaders would certainly be very aware. . . . Q: By the same token, they would be aware not only of that, but aware of why that store closed, if it were something as dramatic as losing a license.  Fair?  A: Well, again, as I said, yes, I'm sure they would know. . . .  That news would get around."), 303:8 – 306:25, 315:5 – 318:7, 420:12-23; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-25, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:7-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3981:22 – 3984:17, 3988:2 – 3990:1, 3990:22 – 3996:20, 3999:12 – 4008:10, 4011:13 – 4015:2, 4015:6 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4056:8 – 4060:16, 4060:23 – 4062:20, 4079:23 – 4080:21, 4081:4-9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5838:8-13, 5890:9-12, 5890:13-21 ("Q: The truth of the matter is, it's a little bit more. CVS doesn't even communicate to their registered pharmacists routinely when the home office is investigating a doctor, true?  A: It depends on how the information comes to us when we're investigating a pharmacist.  Some come from pharmacies, some come from conversations with them.  Others of them when they're coming from the algorithm aren't proactively communicated until we do our investigation."), 5890:22 – 5891:24; P-04600-A; P-06329; P-06566; P-08405; P-08406; P-08408; P-08409; P-08480; P-08494; P-15733; P-23330; *supra* at pp. 57-58.

- CVS lobbied or pushed back against measures that would have helped prevent diversion. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 405:19 – 407:22, 408:10-15, 412:14-21, 413:19-22; P-08442; P-23267 at 013.

- CVS knew of problematic prescribers and pill mills in or around the Counties from which it continued to allow or encourage its pharmacists to fill opioid prescriptions.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 301:10 – 302:12 (aware of Overholt's), 303:8 –

306:25 (Dr. Veres), 312:11-16, 313:17 – 314:14, 315:5 – 319:6 (Dr. Veres), 324:5-14, 326:7 – 327:5, 328:12-18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1196:13-23; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3990:22 – 3994:14, 3995:11 – 3996:20, 3998:1-22, 3999:12 – 4008:10, 4011:13 – 4017:14; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4570:25 – 4572:7 (Dr. Peter Franklin "was heavily prescribing controlled substances to a number of patients"; "His prescribing didn't even come close to legitimate medical purpose.  He was prescribing exorbitant amounts, numbers I have never seen in my life, to patients controlled substances."), 4581:9-13, 4585:9-16 (Dr. Franklin was set to be indicted, but was murdered before it happened), 4595:21-23 ("Q: Well, did you ever investigate Dr. Veres?  A: I believe myself and another specialist went to his office a number of times yes."); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5433:13- 5434:8 (as part of his investigation into Dr. Franklin and Overholtz, Edwards determined that there were 1,418 Dr. Franklin prescriptions that were dispensed at CVS), 5473:4-13 ("Q:…. Part of the issue with Dr. Franklin is he had an office in Middlefield in Geauga County, and what was beginning to be noticed by the Board of Pharmacy and others is that his – that the patients that he was seeing were traveling outside of Geauga County to get their prescriptions filled, right?  A: Correct.  Q: And that includes pharmacies in Trumbull County and in Lake County owned by CVS and Walgreens, right?  A: Correct"); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5779:16-19, 5805:1-7, 5807:12-14, 5808:10 – 5809:18; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6576:8-18 ("Q: Dr. Demangone?  A: Yes, I am familiar with that doctor.  Q: And you know about the issues with his opiates; correct?  A: Yes, I'm aware of.  Q: And are you aware of whether or not you filled any of his prescriptions?  A: I can speak to the fact that earlier on in my career working in Lake County, I did.  At some point, to the best of my knowledge in 2014, maybe early '15, I stopped, to the best of my knowledge."); P-06566; P-08405; P-08406 (knowledgeable and concerned about Drs. Frank and Zachary Veres and Dr. Jose Torres prescribing cocktails and high volumes of opioids; "Possible concern with two doctor's officers that fill the bulk of the scripts for Oxycodone and Hydrocodone and evidence of cocktail scripts written by these doctors."); P-08408; P-08480 (CVS knew of suspicious activity by Dr. Veres); P-08494 (same); P-15733; P-23330.

- Prescription opioids were migrating into Ohio from other states, including Florida. Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1404:22 – 1405:4; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1667:3 – 1670:15; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6454:18 – 6455:3; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6629:24 – 6630:17.

- CVS knew that prescription opioids were migrating into Ohio from other states, including Florida.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 329:13 – 330:3, 334:10-17, 370:5-9; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1404:22 – 1405:4; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1667:3 – 1670:15; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5661:18-22, 5737:16 – 5738:1; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at

887:18-25; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6454:5-9, 6454:18 – 6455:6; P-15962-A at 005-006; P-19827 at 001-002; P-42147-A at 003, 007.

- CVS was subject to investigations and enforcement actions, and parties to settlements with the DEA, in which it was informed of diversion or sanctioned for its failures to prevent diversion.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 339:21 – 340:2, 340:16-25, 342:4 – 346:4, 347:5 – 350:18, 351:22-24, 352:5 – 353:8, 392:7 – 393:8; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 625:3-18; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1685:16 – 1686:2; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2453:9 – 2454:16; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3963:9-15, 3964:10-22; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5661:18 – 5662:12, 5663:3-24, 5728:24 – 5729:2, 5791:17 – 5793:24, 5794:23 – 5796:13, 5799:10-18, 5884:3-6 ("Q: Here's my question.  When CVS is under investigation, an order to show cause is issued, investigations show major problems, do you think that's a good thing?  A: No."), 5885:22 – 5886:2; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6630:2 – 6631:11; P-08954; P-08955; P-10212; P-10213; P-10214; P-42147-A.

- In two settlements, CVS admitted to violations of the CSA from certain pharmacies in Florida and Maryland.  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 339:21 – 340:2, 340:16-25, 342:4 – 343:11; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3963:9-15; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5662:9-12; P-08954 at 003; P-08955 at 002.

- Despite these repeated warnings and sanctions, CVS made little to no effort to substantively change its dispensing policies and procedures until contractually obligated to do so under its settlements with the DEA.  *See, e.g.,* Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5663:3-18, 5688:4-7 ("Q: Was this prescriber monitoring program, doctor monitoring program, was this one of the programs that CVS put in place in the wake of the *Holiday* case in Florida? A: Yes, it was."), 5721:4-11 ("Q: Okay.  Is the store monitoring program another program like the prescriber monitoring program that CVS implemented after the *Holiday* events? A: Yes."), 5731:11 – 5732:1, 5793:25 – 5794:12, 5797:25 – 5798:7, 5800:11-16 ("Q:…  But let me just get you to at least agree that during this Phase II time, after Holiday, that's when you're company started sending out documents like you and Mr. Delinsky talked about, DEA & Pharmacy Regulatory Training; true?  A: Yes."), 5878:19 – 5879:5, 5892:21 – 5893:3; P-15843.

- Despite these repeated warnings and sanctions, CVS continued to facilitate and encourage the oversupply and diversion of its opioids.  *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1810:23 – 1811:1, 1811:12-15; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3990:22 – 3996:20, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4052:5 – 4056:7, 4063:10 – 4066:1, 4066:10 – 4069:24, 4079:23 – 4080:21, 4081:4-9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5791:1 – 5793:24; P-06329; P-06457; P-06566; P-06620; P-08397; P-08402; P-08405; P-08408; P-

15733; P-15843; P-23330.

- CVS committed the failures described above (*supra* at § I.B.2) despite its awareness of rising concerns over the abuse of diverted prescription pills in Ohio and the rest of the country. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 373:19 – 374:2 ("Q:…. There is an opioid epidemic in America and in Ohio.  Fair?  A: Sir, I would say yes.  I've used that term in the past and I know our company has used it in many circumstances and, yes, I know that opioid abuse and addiction is a devastating issue. . . .  It plagues our country."); Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3967:23 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5651:13-17, 5737:16 – 5738:1, 5768:13 – 5769:19, 5794:17-19, 5820:18 – 5821:12; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:16-20 ("Q: And is it fair to say that any registrant, including these five defendants, from your experience, knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on?  A: I believe they knew or should have known."); P-00459 at 007-009, 012, 014 ("Prescription drug abuse is an epidemic in our country."), 045; P-08403; P-15656 at 003 ("Prescription drug abuse is the nation's fastest-growing drug problem."); P-15962-A; P-26403 at 011.

- CVS worked in concert with opioid manufacturers in spreading the manufacturers' false messaging surrounding the treatment of pain and the true addictive nature of opioids in an effort to increase opioid sales and profits. *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 553:15-21, 557:4-15, 564:14-18, 565:13-17, 581:4 – 584:18, 597:13-20, 598:2-23, 604:18 – 610:11, 611:7 – 613:25, 641:9 – 644:11, 712:15 – 713:3, 721:22 – 722:3; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 756:15-25, 759:4-18, 760:1-21, 761:2-3, 762:1-25, 763:5-8, 768:24 – 769:9, 772:12-23, 860:5 – 862:25.

### 3. *Walmart unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties.*

The evidence adduced at trial demonstrates that Walmart dispensed massive amounts of prescription opioids into the Counties without providing effective controls against diversion. *Supra* at fn.14.  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- There are five Walmart pharmacies in the Counties.  Dkt. #4124 (11/5/21 Trial Tr.) [*Glickman*] at 6231:19-22.

- From January 2006 through April 2018, Walmart pharmacies dispensed **9,890,771 dosage units** of prescription opioids into Lake County and **5,228,488 dosage units** of prescription

opioids into Trumbull County.  P-26322-A.  *See also* Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2129:17-19, 2134:16 – 2136:19.

- Hydrocodone and oxycodone are the two most abused opioids in the United States; hydrocodone is also the most prescribed drug in the United States.  *Supra* at fn.15.

- Of the total dosage units of prescription opioids, Walmart dispensed **3,813,525** dosage units of hydrocodone and **5,210,503** dosage units of oxycodone from its pharmacies in Lake County from January 2006 through April 2018.  P-26322-A.

- During that time period, Walmart dispensed an average of 3.19 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Lake County.  At its peak in 2011, Walmart dispensed an average of 4.09 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Lake County.  P-26322-A.

- Of the total dosage units of prescription opioids, Walmart dispensed **3,457,264** dosage units of hydrocodone and **1,636,754** dosage units of oxycodone from its pharmacies in Trumbull County from January 2006 through April 2018.  P-26322-A.

- During that time period, Walmart dispensed an average of 1.97 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Trumbull County.  At its peak in 2016, Walmart dispensed an average of 3.32 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Trumbull County.  P-26322-A.  *See also* Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2135:5-12.

- During the relevant time period, Walmart dispensed a total of 275,700 *prescriptions* [58] for opioids, benzos, and muscle relaxers into the Counties, of which **229,006** were opioid prescriptions.  Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2139:21 – 2140:18; Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2230:12-19, 2239:8-22, 2299:21 – 2299:1; Dkt. #4124 (11/5/21 Trial Tr.) [*Glickman*] at 6329:11 – 6330:6 (85,087 of those prescriptions were for oxycodone).

The evidence adduced at trial demonstrates that Walmart's dispensing of opioids into the Counties was unlawful.  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- The practice of pharmacy is governed by well-defined laws and regulations, both at the national and state-wide levels, and subject to established and well-known standards of care,

---

[58]  *Supra* at fn.16.

including requirements for the careful evaluation of prescriptions and efforts to guard against the diversion of medications into non-medical or illegitimate use. *Supra* at fn.17.

- The CSA creates a closed system of controlled substances distribution and dispensing, which cannot work unless all members within the closed system comply with their obligations. *Supra* at fn.18.

- The purpose of the Controlled Substances Act is to prevent the misuse and diversion of controlled substances. *Supra* at fn.19.

- Federal and Ohio controlled substances laws and regulations require Walmart to maintain effective controls and procedures to guard against the diversion of controlled substances. *Supra* at fn.20; *see also* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2435:23 – 2436:21, 2437:13 – 2438:23; WMT-MDL-01155.

- Pharmacies and pharmacists are the last line of defense to protect against diversion. *Supra* at fn.21; *see also* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2459:22 – 2460:9.

- The fact that a particular Walmart pharmacy in the Counties was inspected by the Ohio Board of Pharmacy, or that it was not sanctioned by the Board, does not establish that the pharmacy was dispensing opioids in compliance with the law because, *inter alia*: (i) those inspections are cursory and represent only a brief snapshot in time; (ii) the Board has historically been understaffed and overworked, often inspecting any given pharmacy only once every couple of years; (iii) the inspectors did not review corporate policies or more than a handful of actual prescriptions during the inspection. *Supra* at fn.22.

- Walmart, through the control it exerts over its pharmacies, pharmacists, and pharmacy employees, is responsible for ensuring all dispensing of controlled substances is carried out in accordance with applicable laws and regulations. *Supra* at fn.23; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1691:4-13, 1693:4-25.

- Corporate oversight includes established practices of pharmacies that should incorporate top-down compliance programs using data readily available to Walmart to guard against diversion. *Supra* at fn.24.

- Corporate oversight also should support, and not impede, pharmacists in complying with laws and regulations related to the dispensing of controlled substances. *Supra* at fn.25.

- Walmart is expected to become and remain aware of its obligations regarding the dispensing of controlled substances and the risks associated with same. *Supra* at fn.26.

- Walmart's dispensing policies were created and implemented by its corporate department and applied nationally to all its pharmacies. *See, e.g.*, Dkt. #4078 (10/25/21 Trial Tr.)

[*Nelson*] at 3862:21-25, 3863:8-14; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5069:11 – 5070:2 ("[T]he approach that [the Practice Compliance team] took over time really was to find out what the highest standard was, and then we would set our policy to that to make sure that we didn't, you know, across multiple states have any gap in the way that we were executing those programs."), 5070:3 – 5071:5, 5073:20 – 5074:16 ("[F]rom the home office perspective, our role really is to make sure that the programs and the resources for the associates in the field, so the pharmacists and technicians, are appropriate, and then to be a resource for them."), 5074:17 – 5075:1, 5105:9 – 5106:23, 5108:4 – 5110:6, 5120:3-19, 5122:14-22, 5132:7-17, 5144:23 – 5145:7, 5157:23 – 5158:19, 5194:2-13, 5248:16 – 5249:2, 5250:8-14; Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6672:10-19 (refusal to fill forms submitted to home office); P-07846; P-26697; P-26705; P-26882; P-26892; WMT-MDL-01155; WMT-MDL-00134. *See also supra* at fn.27; *see also* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 854:3-12; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1693:20-25.

- <u>Walmart failed to implement and maintain effective controls against diversion in its dispensing of prescription opioids.</u>[59]

- <u>Walmart failed to timely implement and apply necessary controlled substance policies across</u>

---

[59] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 636:3 – 637:3, 694:14-21, 701:10-19, 774:1-13; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 891:14 – 892:2; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2486:1-5, 2493:22 – 2502:24, 2504:16 – 2513:24, 2525:9 – 2535:10, 2535:24 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2738:3-5, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2799:20-21; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3853:24 – 3854:12, 3856:2-25, 3857:2 – 3858:24, 3859:2 – 3863:17, 3864:1-21, 3865:7 – 3867:17, 3868:1 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3882:1 – 3883:5, 3883:12 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3913:12-14, 3916:16 – 3917:22, 3931:21 – 3932:2; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5100:13-22, 5101:10 – 5102:7, 5140:14 – 5141:6, 5144:23 – 5145:1, 5154:13-22, 5189:19 – 5190:9, 5193:15 – 5194:1, 5196:19 – 5198:22, 5199:16 – 5200:19, 5205:24 – 5206:2, 5206:15 – 5209:3, 5211:8 – 5215:15, 5215:22 – 5216:17, 5225:11 – 5226:24, 5227:24 – 5228:11, 5229:16 – 5230:11, 5230:18-20, 5231:8 – 5240:4, 5247:12-20, 5248:6-10, 5248:16 – 5249:2, 5251:24 – 5252:3, 5278:16 – 5279:12, 5280:20 – 5281:8; Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6723:7 – 6724:2, 6725:12-25, 6726:7-9, 6726:11-20, 6732:8-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Mack*] at 6750:25 – 6751:5, 6754:13-18; P-04600-A; P-07381; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08048; P-08068; P-08069; P-14223 at 004; P-14442; P-14450; P-14540; P-14552; P-14585 at 009-013; P-14643; P-14645; P-14662; P-17527; P-20824; P-20829 at 001 ("I spent part of yesterday with an inspector and he wanted to give me a heads-up that the inspectors collectively feel Walmart is Starting to become a 'funnel' with C-II's due to more liberal policies on dispensing pain medicines. I.e. King Soopers, Walgreens, Safeway, and Target all have algorithms that determines whether or not they dispense a c-II. Walgreens and Kings are required to check PMP on all oxy's and hydromorphone med. Target is restricting the quantity each month they can order."); P-20850; P-20852; P-21228 at 003; P-21884; P-26671 at 001; P-26681; P-26697; P-26705; P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892; WMT-MDL-01194; *see also infra* § I.B.3.

its pharmacy stores. *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 631:4-15, 632:20 – 633:2, 636:3 – 637:3, 694:14-21, 701:10-19; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 891:14 – 892:2; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:17 – 994:19, 995:5-8, 996:4-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1204:16 – 1205:19; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5096:23-25 ("Q:….  When was Archer available to a pharmacist through the Tools function in Connexus?  A: We started to use Archer in 2015 for refusal to fills."), 5120:3 – 5122:13 (did not publish red flags document for pharmacists on The Wire until November 2013), 5132:2-19 (POM 1311, which provides policy on corresponding responsibility, not developed until 2009), 5140:14 – 5141:6 (prohibited blanket refusals to fill until 2015), 5154:13-22 (did not allow corporate blocks until January 2017), 5157:23 – 5158:9 (POM 1316, regarding use of PDMPs, not created until 2010), 5159:23 – 5160:3 (Walmart did not issue guidance to pharmacists on use of OARRS until 2011), 5160:5-20 (Walmart did not issue POM 1317, regarding prescriptions written by out-of-state prescribers, until March 2011), 5210:14-16 ("Q:….  You're not saying that Archer was readable by Connexus in 2002, are you?  A: No.  I testified that Archer became available in 2015."), 5214:7 – 5215:15 (did not provide access to OARRS until at least late 2009), 5224:14-10 ("Q:….  You've never heard, talked to, smelled, seen, or remotely come upon anything in Ohio that says a company cannot issue a blanket refusal to fill of a controlled substance, true?  A: No, I've not seen a policy from Ohio.") (internal objection omitted), 5247:11-20 (blanket refusals to fill were prohibited until July 2015), 5248:6-10 ("Q:….  The first one: 'What year was the corporate block instituted in the Walmart policy?'  A: So in the policy, the first policy, it appeared in January of 2017.  We had previously blocked – instituted a block in late 2016, but the policy reflected it in 2017."); Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6661:7-9 ("Q: How long have you been able to access OARRS from your computer?  A: I would say a good 10 years."), 6672:25 – 6673:3 (Archer not implemented until 2015), 6673:4-14 ("Q: So prior to that, how would pharmacists, how did you as a pharmacist at the Walmart pharmacy learn information about refusals to fill before the computer system had it?  A: Well, at that time, we didn't necessarily have a specific name for them, but we would talk between pharmacists, both Walmart pharmacists and also pharmacies that maybe were in our area, the, you know, pharmacy down the street or surrounding us within a two-mile radius.  We'd kind of give them a call and feel out if they had any experience with that prescriber or patient or whatever that might be."), 6723:7 – 6724:2; Dkt. #4132 (11/8/21 Trial Tr.) [*Mack*] at 6750:25 – 6751:5 ("Q: Ms. Mack, I'm just asking whether pharmacists at Walmart, in 2012, were permitted to impose a blanket refusal to fill on a prescriber without looking at each prescription individually.  A: At that time, I would say no, they needed to look at every prescription."), 6754:13-18 ("Q: At what point did Walmart permit its pharmacists to refuse to fill all prescriptions from a prescriber without looking at each prescription individually?  A: I would say the first time that the policy changed somewhat to take out the blanket refusal.  I think that might have been somewhere around 2015."), 6756:6-8 ("Q: And did you ever have any conversations with the Ohio Board

of Pharmacy regarding blanket refusals to fill?  A: I don't think so."), 6760:16-18 ("Q: What is the basis for Walmart's prohibition on blanket refusals to fill for pharmacists in Ohio? A: I don't have the answer to that."); P-07036 (1/2/14 Walmart PPT) at 008 (as of 1/14, Walmart was estimating that it would "[e]stablish a process for the analysis of refusal to fill data and reporting problematic prescribers or patients internally" by the first quarter of 2015), 030 (noting it had not yet determined "where to house the data[,]" "what program to use to analyze the data[,]" or "how to disseminate refusal to fill decisions and/or problematic prescribers and patients within the same trade area or to the entire corporate entity[,]" or "[e]ngage[d] key stakeholders to determine if pharmacists may exercise their discretion to impose blanket refusals"), 036; P-26681 (as of February 2018: "Currently, there is no feed established between Archer (where RTFs are stored) and Connexus."); WMT-MDL-01027 (did not publish red flag document for pharmacists on The Wire until November 2013).[60]

- The testimony of Walmart employees that they were told by certain state boards of pharmacy that blanket refusals to fill were prohibited or discouraged was not credible evidence that any state board of pharmacy had such a policy, as the testimony was based on hearsay and Walmart did not offer any written official policy from any state board of pharmacy expressing such a prohibition.[61]

---

[60]  See also, e.g., Dkt. #4041 (10/18/21 Trial Tr.) [Nelson] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2486:1-5, 2493:22 – 2502:24, 2504:16 – 2513:24, 2525:9 – 2527:9, 2534:2 – 2535:10, 2535:24 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [Nelson] at 3856:2-25, 3857:2 – 3858:24, 3859:2 – 3863:17, 3864:1-21, 3865:7 – 3867:17, 3868:1 – 3869:5, 3876:2 – 3879:12, 3879:16 – 3881:8, 3882:1 – 3883:5, 3883:12 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3913:12-14, 3916:16 – 3917:22, 3931:21 – 3932:2, 3942:14 – 3944:24, 3946:20 – 3950:9; Dkt. #4109 (11/1/21 Trial Tr.) [Hiland] at 5095:9 – 5096:10, 5100:13-22, 5101:10 – 5102:7, 5144:23 – 5145:1, 5189:19 – 5190:9, 5193:15 – 5194:1, 5196:1-4, 5196:19 – 5198:22, 5199:16 – 5200:19, 5205:24 – 5206:2, 5206:15 – 5209:3, 5215:22 – 5216:25, 5225:11 – 5226:24, 5229:18 – 5230:11, 5230:18-20, 5235:25 – 5240:4, 5248:16 – 5249:2, 5249:16-22, 5250:8-14, 5277:5-16, 5278:16 – 5279:12, 5280:20 – 5281:8; P-07381; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08048; P-08068; P-08069; P-14223 at 004; P-14450; P-14540; P-14552; P-14585 at 009-0013; P-14643; P-14645; P-14662; P-20824; P-20829 at 001; P-20850; P-20852; P-21090; P-21228 at 003; P-21884; P-26671 at 001; P-26697; P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892; WMT-MDL-01194; WMT-MDL-00134 (2017 version of POM 1311 which finally allows corporate blocks) at 992-993; WMT-MDL-00568 (POM 1316, regarding use of PDMPs, created in February 2010); WMT-MDL-00575 (POM 1317, regarding considerations and responsibilities for prescriptions written by out-of-state prescribers; created March 2011).

[61]  In its motion, Walmart argues that it "offered uncontroverted evidence that the reason it did not allow blanket refusals-to-fill at the time was that it was following the direction of state boards of pharmacy." Dkt. #4203 (WMT JMOL) at pp. 9-10 (citing to testimony of Mack and Hiland regarding their conversations with certain state board of pharmacies).  But as the Court held (and instructed the jury), this testimony constituted hearsay that was not offered and could

(footnote continues on next page)

- Even once certain controlled substances diversion policies were developed, Walmart failed to monitor and enforce the policies across its pharmacy stores. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 998:7 – 1000:8; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1292:2-13; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3856:20-25, 3885:9 – 3889:16, 3891:21 – 3893:25, 3896:17 – 3899:5, 3900:19 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3913:12-14; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5196:19 – 5198:22, 5199:16-23; P-08037 at 001-004; P-08069; P-14540; P-14552; P-14645; P-20852; P-26671 at 001; P-26732; P-26736; P-26737.

- Walmart also implemented employment evaluation policies and performance metrics that impeded its pharmacists' efforts to comply with laws and regulations and meet standards of care. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:17 – 934:7, 966:2 – 967:12, 1000:10 – 1004:18, 1005:5 – 1006:17; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:11 – 1115:7, 1117:5 – 1121:4, 1291:14-20; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2572:1 – 2573:10, 2579:15-17; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6651:6-10, 6651:19-23 (typically one pharmacist in the store at any given time); Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:5 – 1115:7, 1117:5 – 1121:4; P-19827 at 002 ("Hearing complaints from pharmacists that they don't have time to check all these prescriptions for good faith. Wants to make sure chains aren't

---

not be considered for the truth of the matter asserted (*i.e.*, that any board of pharmacy had such a policy). Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5137:16-23 ("[S]he can't give the content. . . . The communication itself, the contents of the communication, would be hearsay."), 5138:12-13 ("She can't relate the contents of it. That's hearsay."), 5138:24 – 5139:7, 5139:8-12 (Ms. Fumerton: "And Your Honor, obviously the statements – and I think you're in the right direction on this – *are not being offered for the truth of the matter asserted*, but it does explain why Walmart had a policy and why Walmart policies evolved.") (emphasis added), 5140:2-4, 5173:22-23, 5178:3-5; Dkt. #4153 (11/15/21 Trial Tr.) at 7073:19 – 7074:1 (Court instructed jury: "You have heard testimony from one or more of the defendants' employees about conversations they testified they had with officials from State Boards of Pharmacy. This evidence has been admitted for a limited purpose. You may consider their recollections of those conversations as evidence of the defendants' own knowledge or intent. *You may not consider the testimony as evidence of any official policy of any Board of Pharmacy*.") (emphasis added). The jury could have reasonably concluded that this testimony from Walmart's employees was not credible, especially since Defendants were unable to produce any document from any state board of pharmacy stating that its policy was to prohibit blanket refusals to fill. *See, e.g.,* Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5135:17-18, 5148:15-19 (Ms. Fumerton: "I certainly know that with respect to the boards of pharmacy communications, those were done orally. . . . They were not documents."), 5223:23 – 5224:3 ("Q:… [W]as there every anything in Texas that substantiated in writing that required that corporate policy, that said, a corporation is not allowed to issue a blanket refusal to fill? A: No. . . ."), 5224:14-20 ("Q:…. You've never heard, talked to, smelled, seen, or remotely come upon anything in Ohio that says a company cannot issue a blanket refusal to fill of a controlled substance, true? A: No, I've not seen a policy from Ohio.") (internal objection omitted); Dkt. #4132 (11/8/21 Trial Tr.) [*Mack*] at 6752:16-20 ("Q: And these discussions that you had over the years with the Texas Board of Pharmacy, are they memorialized anywhere? A: No, not – I don't think they're memorialized anywhere that's available or – they're just – they were verbal conversations every time.").

70

inhibiting this by pressuring their pharmacists to fill fast or not providing adequate labor.";
"Believes that compensation (bonus) should not be tied to prescription volume of controlled
substances."), 003 ("Bonus parameters are a concern."); P-21572.

- Walmart and its pharmacists have a corresponding responsibility to only fill prescriptions for controlled substances that are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her/his professional practice. *Supra* at fn.31; *see also* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2450:1 – 2451:19, 2457:12 – 2458:13, 2527:14 – 2530:8, 2533:5 – 2534:1, 2574:15 – 2575:24 (acknowledging awareness of case where DEA indicated corresponding responsibility extended to pharmacy); Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6665:3 – 6666:4; P-08439 at 001-002; WMT-MDL-01155.

- The determination of whether a prescription issued for a controlled substance is valid and legitimate requires systems and actions to recognize, investigate, and resolve signs of a prescription's invalidity (*i.e.*, red flags). These red flags are warning signs and can also indicate activities are occurring outside the usual and customary scope of pharmacy practice, activities that are more than likely to include abuse, diversion, and fraudulent acts. *Supra* at fn.32.

- Walmart knew and understood that there are certain red flags associated with opioid prescriptions that are indicative of potential diversion. *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 625:19 – 629:19, 701:10-19, 702:13-17; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2443:18 – 2445:15, 2447:1-23, 2455:9 – 2457:11, 2466:22 – 2467:14, 2477:23 – 2479:22, 2480:7 – 2481:5, 2484:19 – 2487:15, 2487:23 – 2488:3, 2489:15 – 2491:18, 2527:10 – 2530:24, 2560:9-14; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1584:17-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1774:10-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3895:7-16, 3923:1-8; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4530:20 – 4531:11; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5113:8-10, 5120:3 – 5122:13, 5123:3-16, 5124:1-23, 5189:19 – 5190:5, 5202:12 – 5203:12, 5206:15-23, 5208:8 – 5209:3, 5258:6-12; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6428:18 – 6429:3, 6430:1 – 6431:5, 6450:23 – 6453:23, 6454:5 – 6455:16, 6456:9-14; Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6667:7-17; P-07381; P-07799; P-08439; P-14662; P-15962-A at 010-013; P-19827 at 001-002; P-21228; WMT-MDL-01155; WMT-MDL-01027; WMT-MDL-00299.

- To effectively guard against diversion, Walmart and its pharmacists must, prior to dispensing a prescription opioid: (i) accurately identify and document all red flags raised by the prescription, patient, and prescriber; (ii) reasonably collect complete, relevant, and accurate information concerning each red flag; (iii) independently evaluate the collected information to determine whether the evidence is reliable and whether, as a whole, the evidence

adequately resolves each red flag; and (iv) clearly and explicitly document their evaluation of the evidence and their reasoning supporting their judgment to dispense the prescription. *Supra* at fn.34; *see also* Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5113:8-10, 5123:3-16, 5133:13-18, 5201:15-23 ("[O]ur policies do tell our pharmacists that if they identify a red flag, they should resolve the red flag before dispensing the medication."); Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6667:16-17 (acknowledging red flags "need[ ] to be resolved before you fill the prescription"), 6668:1-2 (same); WMT-MDL-01155; WMT-MDL-01027; WMT-MDL-00134.

- Documenting the resolution of red-flagged prescriptions, in a clear and understandable manner, is a critical component of implementing effective controls against diversion, and is otherwise required by law.  *Supra* at fn.35.

- Despite recognizing the importance of doing so, Walmart consistently failed to document their resolution of red flags.  *See, e.g., infra* at fns.64-65; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3944:13-18; Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4535:10-13 ("My quote to pharmacists was, your prescription is your Bible.  If you've got something you want to bring to my attention regarding a prescription, write it on the prescription"); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5393:3-4; P-21090; WMT-MDL-00134 at 989.

- Walmart failed to provide its pharmacists with the data, training, guidance, resources, and tools necessary to assist the pharmacists in fulfilling their corresponding responsibility duties, including but not limited to, utilizing dispensing data to identify patterns, trends, and practitioners possibly involved in diversion as well to recognize and resolve red flags.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-21; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 768:9-15, 768:24 – 770:7, 771:13-16; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1048:23 – 1050:14; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5120:3 – 5122:13 (did not provide its red flag document for pharmacists on The Wire until November 2013), 5251:24 – 5252:3 ("Q: 'How was it known to other pharmacists/pharmacies the patient had a refusal to fill?'  A: So from a patient perspective, there wasn't a clear transfer of information.  There is some information that can be gathered within Archer, but it would be conversations."), 5269:11-14 ("Q:….  My question was, they don't have easy access to the information, and the information need to be readily available, and we need to do this as soon as we can.  True?  A: That's all reflected in this document."); Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6661:7-9 ("Q: How long have you been able to access OARRS from your computer?  A: I would say a good 10 years."), 6672:25 – 6673:3 (Archer not implemented until 2015), 6673:4-14 ("Q: So prior to that, how would pharmacists, how did you as a pharmacist at the Walmart pharmacy learn information about refusals to fill before the computer system had it?  A: Well, at that time, we didn't necessarily have a specific name for them, but we would talk between pharmacists, both Walmart pharmacists and also pharmacies that maybe were in our area, the, you know, pharmacy down the street or surrounding us within a two-mile

radius.  We'd kind of give them a call and feel out if they had any experience with that prescriber or patient or whatever that might be."), 6704:1-5 ("Q: Okay.  So when we talk about knowing the doctors and the patients, would it be fair to say that there are some you do know, but there are many you do not know.  Fait?  A: Over the course of those years, yeah, that's fair."), 6704:6-23, 6704:24 – 6705:12 ("Q: Yeah.  In your deposition, when asked how many different Walmart pharmacies have you worked in, your answer was I couldn't give you an accurate account because I've worked at various pharmacies that need extra help or floated out to pharmacies, and not just in Northeast Ohio, but all over the State of Ohio; right?  A: Correct.  Q: And so not only might you not know all of the doctors and patients in your store, but as you, or others float around, you're going to be hit with patients and doctors you've never heard of before.  Fair?  A: Yes."), 6706:9 – 6708:2 (in her deposition, however, Militello testified that she primarily only talked to other pharmacists during transfers of prescriptions), 6708:3 – 6709:13 (Militello acknowledged she does not talk to other pharmacists about prescribers today and, though she claims to have done so in the past, she could not recall any specific conversations), 6709:24 – 6710:2, 6723:7 – 6724:2 ("Q: So if you wanted to go check a hard script, you would have to leave the pharmacy, go to another part of the store, unlock the cabinet, pull out the hard prescription to look at it, and then return back to the pharmacy?  A: I would pull it up on Connexus where I would be able to look at the hard copy of the prescription.  Q: If there is a copy now in Connexus, but you've been doing this for a long time.  They haven't always been on Connexus, have they?  A: They have not.  Q: And so if we go back 10 years, you've got to go back there and you've got to go find it; right?  A: If it's a case of needing to see the prescription, yes, we would have to look at the filed prescription."), 6724:12-15 (Militello did not know there was a problem with people abusing opioids until the past couple of years), 6725:5-7 (same), 6733:2-11; Dkt. #4132 (11/8/21 Trial Tr.) [*Mack*] at 6750:25 – 6751:5 ("Q: Ms. Mack, I'm just asking whether pharmacists at Walmart, in 2012, were permitted to impose a blanket refusal to fill on a prescriber without looking at each prescription individually.  A: At that time, I would say no, they needed to look at every prescription."); P-20829 at 001 ("I spent part of yesterday with an inspector and he wanted to give me a heads-up that the inspectors collectively feel Walmart is Starting to become a 'funnel' with C-II's due to more liberal policies on dispensing pain medicines.  I.e. King Soopers, Walgreens, Safeway, and Target all have algorithms that determines whether or not they dispense a c-II.  Walgreens and Kings are required to check PMP on all oxy's and hydromorphone med.  Target is restricting the quantity each month they can order."); P-26681 (as of February 2018: "Currently, there is no feed established between Archer (where RTFs are stored) and Connexus."); P-26705 ("[Refusal to fill] forms are collected and stored in Archer.  However, pharmacists do not have easy access to this information, especially if the pharmacist is from another store.  This information could be used to clear red flags, or identify red flags that may indicate that the prescription was not issued for a legitimate medical reason. . . .  Currently, pharmacists do

not have easy access to this information to utilize in their professional judgment.").[62]

- <u>For example, Walmart collected data that would be useful for it and its pharmacists in identifying suspicious prescribing and dispensing activity in order to guard against diversion, but for at least some period of time failed to provide such data, or make it easily accessible, to its pharmacists.</u>  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 694:14-21, 701:10-19; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2549:19 – 2553:7, 2581:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3900:7-18, 3912:20 – 3913:2, 3932:3-19; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5095:9 – 5096:10, 5096:23-25, 5122:14-22, 5196:19 – 5918:13, 5238:15 – 5240:4, 5240:12-18, 5248:16 – 5249:2 ("In the 2011 time frame we did provide aggregate reporting [regarding refusals to fill] to the leadership, but we didn't push that down to the stores."), 5250:8-14, 5251:24 – 5252:3, 5265:18 – 5268:11, 5269:11-14; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5419:11-16 ("Q: Now, from your own knowledge, isn't it true that these pharmacies have their own databases of prescription data? A: Yes.  Q: And that dispensing data, in your mind, could also help pharmacists identify and resolve red flags, right?  A: Sure."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6627:8 – 6628:2; Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6673:4-14; P-07966; P-14585 at 009; P-14645; P-20849; P-20852; P-20852; P-26681 (as of February 2018: "Currently, there is no feed established between Archer (where RTFs are stored) and Connexus."); P-26705; P-26882; P-26882.

- <u>Additionally, state PDMPs, such as OARRS in Ohio, contain helpful data that pharmacists can use to identify and resolve red flags.</u>  *Supra* at fn.38.  *See also* Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6661:10-13 ("Q: What did you think about OARRS when it first became

---

[62] *See also, e.g,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2468:18 – 2469:15, 2480:7 – 2481:5, 2482:13 – 2484:18, 2487:10-12, 2493:22 – 2502:24, 2504:16 – 2507:19, 2509:16 – 2510:19, 2511:5 – 2513:24, 2525:9 – 2527:9, 2532:21 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3856:20-25, 3857:2 – 3858:24, 3859:2 – 3863:17, 3864:1-21, 3868:1 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3883:12 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3913:12-14, 3916:16 – 3917:22, 3931:21 – 3932:2, 3938:11-17, 3940:2 – 3941:11, 3942:8-11; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5095:9 – 5096:10, 5096:23-25, 5100:13-22, 5101:10 – 5102:7, 5140:14 – 5141:6, 5144:23 – 5145:1, 5154:13-22, 5189:19 – 5190:9, 5193:15 – 5194:1, 5196:19 – 5198:22, 5199:16 – 5200:19, 5205:24 – 5206:2, 5206:15 – 5209:3, 5210:14-16, 5211:8 – 5215:15, 5215:22 – 5216:17, 5229:16 – 5230:11, 5230:18-20, 5231:8 – 5238:13, 5240:12-18, 5247:11-20, 5248:6-10, 5248:16 – 5249:2, 5251:24 – 5252:3 5265:18 – 5266:1, 5266:5 – 5268:11, 5277:5-15, 5278:16 -5279:12, 5280:20 – 5281:8; P-07381; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08048; P-08068; P-08069; P-14442; P-14450; P-14552; P-14643; P-14645; P-14662; P-17527; P-20824; P-20849; P-20850; P-21228 at 003; P-21884; P-26671 at 001; P-26697; P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892; WMT-MDL-01194; WMT-MDL-01027.

74

available?  A: I thought it was a great program and I was happy to see it implemented.").

- OARRS started in 2006; in October 2011, Ohio law changed to mandate that pharmacists check OARRS under certain specified circumstances. *Supra* at fn.39.

- Despite recognizing the usefulness of PDMPs, during at least some portion of the relevant time period, Walmart failed to provide access to OARRS for years and also failed to mandate that its pharmacists check the applicable PDMP whenever filling any opioid prescription. *See, e.g.,* Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5100:13-22 (made policies regarding PDMPs available to pharmacists around 2010), 5101:10 – 5102:7 (Walmart did not require its pharmacists to check OARRS, or even have access to OARRS, until late 2011 when regulations changed requiring Ohio pharmacists to check OARRS under certain circumstances), 5214:12 – 5215:9 (Walmart still had not granted its pharmacists access to PDMPs as of June 2009), 5280:20 – 5281:8 (access to OARRS not available to Walmart pharmacists until 2010 time frame); Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5389:23 – 5391:20 (in 1-31-11 inspection of Walmart in Madison, Ohio, Edwards noted: "'Walmart pharmacists now able to access OARRS,' exclamation point."; "They used to have to, in the old days, have to get on their phone, you know, and access – or go, you know, somewhere else to access OARRS on their own.  So this is telling me that they now had the ability to do it within the dispensing software at Walmart."), 5472:22 – 5473:1 ("Q: And if a corporate office takes four or five years after a PDMP comes onboard to issue a policy encouraging, indeed mandating, that the pharmacists register for OARRS, that would be a problem, right? A: Potentially it could be a problem."); Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6661:7-9 ("Q: How long have you been able to access OARRS from your computer?  A: I would say a good 10 years."), 6661:10-13, 6728:3-6 ("Q:….  If you'd have had that tool available earlier, though, I assume, like everything else, you would have used it.  Fair?  A: Fair."); P-21884 (Walmart still had not granted its pharmacists access to PDMPs as of June 2009); P-26671 at 001 (discussing proposed rule change by Ohio Board of Pharmacy that would require pharmacists to check OARRS under certain circumstances: "I believe this will present a significant burden and liability to our pharmacists and an unjustified delay to our patients."); P-26697 (2007 e-mail: "Our pharmacists cannot utilize this [OARRS] system unless they can access the OARS [sic] web-site from the Connexus computer system."; "Shannon, There are several states that allow access to the monitoring program information. We met with several operators, including Ron last summer, and it was decided we would get a Legal determination of whether or not to provide or allow this access in our stores – this includes in Ohio. *The opinion has been that we will not grant access to these databases.*  So far there are no programs that require a pharmacist to check the information before dispensing a prescription, and we have not identified any penalties or onus on the pharmacist in any case for not utilizing the information.") (emphasis added); WMT-MDL-01194 (in late 2011, Walmart finally started requiring its pharmacists to check OARRS under certain circumstances in accordance with new OARRS regulations); WMT-MDL-00568 (policy

75

regarding use of PDMPs, ceased in 2010, states that pharmacists "may" access PDMPs).[63]

- Walmart's pharmacies in the Counties filled thousands of opioid prescriptions presenting red flags without evidence of resolving those red flags. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1006:19-25, 1057:25 – 1058:18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1144:9 – 1150:10, 1169:9 – 1170:6, 1171:14 – 1180:8, 1202:4 – 1203:17; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1477:25 – 1479:19.

- Specifically, of the 229,006 opioid prescriptions dispensed by Walmart into the Counties, **37,379** had one or more red flags associated with them. *See, e.g.,* Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2245:16-22, 2246:12-13, 2247:10-11; *supra* at fn.40.

- From the random sampling of 1,800 red-flagged Walmart prescriptions in the Counties, only two "contained no information across all relevant comment fields" but "the majority of the information contained in these comment fields would not qualify as adequate or even relevant due diligence."  The hard copies for these prescriptions also did not reflect adequate due diligence for resolution.  Of the 1,800 prescriptions, 1,639 contained no information in the "MISC info field," 1,400 contained no information in the "prescription order detail comment fields," 19 contained no information in the "patient comment field," and 300 contained no information in the "patient comment field."[64]

- Plaintiffs' expert, Mr. Catizone testified that, based on the random sampling of prescription notes fields produced, over 90% of the red flag opioid prescriptions dispensed by Walmart into the Counties did not contain adequate documentation demonstrating that the red flags were resolved prior to dispensing.[65]

- Dr. McCann testified that Mr. Catizone's 90% of red-flagged prescriptions in the random

---

[63]  *See also, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2447:14-23, 2509:16 – 2511:4; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3860:1-12; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5157:23 – 5158:19, 5159:2 – 5160:3, 5211:19 – 5213:15, 5278:16 – 5279:7; P-07846 at 042; P-14643 at 004.

[64]  *See* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1171:14 –1180:8, 1202:4 – 1203:17, 1241:15-21, 1243:9-13, 1256:11-22, 1267:12-23, 1268:23 – 1269:4, 1270:10-15, 1286:20-23, 1289:4 – 1290:7; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1499:12-17.

[65]  *See* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 923:21 – 925:4, 998:18 – 999:16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1202:23 – 1203:3 ("So when I looked at all these prescriptions which had red flags, the overwhelming majority, and in my report I said based upon my best educated experienced guess, it looks like 90 percent of those prescriptions did not have adequate documentation, but I couldn't really tell on the others as well."), 1203:4-11, 1203:12-14 ("But overwhelmingly, in my overwhelming opinion, about 90 percent of what I looked at didn't meet that level of documentation that was required.").

sampling can be extrapolated over all the red-flagged prescriptions. *Supra* at fn.43.

The evidence adduced at trial further demonstrates that Walmart's dispensing of opioids into Lake and Trumbull Counties was intentional. Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- Walmart knew and understood its obligations under the CSA and Ohio law related to the dispensing of prescription opioids. *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2435:7 – 2436:21, 2437:10 – 2439:15, 2440:9 – 2448:25, 2450:1 – 2452:23, 2453:9 – 2459:8, 2459:18-21, 2463:9-16, 2470:11 – 2471:1, 2477:15 – 2479:22, 2484:19 – 2487:15, 2487:23 – 2488:3, 2489:15 – 2491:18, 2527:10 – 2530:24, 2533:5 – 2534:1; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3854:15 – 3855:2, 3855:14 – 3856:1; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5062:22 – 5063:3, 5204:10 – 5205:7; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6624:10 – 6625:5, 6629:7-16; P-07799; P-14711; P-15962-A at 007-013; P-19827 at 001-002; WMT-MDL-01155 at 933 (in leadership message to pharmacists: "[Y]ou and all of us at Walmart and Sam's Club have an obligation to prevent diversion and misuse of controlled substances."), 934 (acknowledging "our serious obligation to prevent the diversion of medication outside legitimate medical channels).

- Walmart knew that the prescription opioids it was dispensing had a high potential for abuse that could lead to severe psychological or physical dependence, and thus knew that the diversion of opioids would create a public health hazard. *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2454:22 – 2455:8, 2458:14-19, 2471:22 – 2473:5; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5110:20 – 5111:9, 5112:3-10; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-15962-A at 003-008; P-19827 at 001-002; P-20829 at 002; WMT-MDL-01155; WMT-MDL-00575.

- Walmart knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur. *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2465:6-10, 2466:15 – 2467:1, 2471:22 – 2473:5, 2477:2-6, 2477:19-22; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5110:20 – 5111:9, 5112:3-10; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-14585 at 009; P-19827 at 001-002; P-20829 at 002; P-26737; WMT-MDL-01155 at 933 (in leadership message to pharmacists: "[Y]ou and all of us at Walmart and Sam's Club have an obligation to prevent diversion and misuse of controlled substances."), 934 (acknowledging "our serious obligation to prevent the diversion of medication outside legitimate medical channels); WMT-MDL-00299 at 001; *see*

*also* Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1662:18 – 1663:1.

- Walmart knew and understood its dispensing policies and procedures, and its implementation of same, did not comply with its legal obligation. *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2530:12-24, 2534:2 – 2539:20; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5206:15 – 5207:10, 5208:5 – 5209:3, 5229:18 – 5230:11, 5230:18-20, 5235:25 – 5240:4; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6624:10 – 6625:5; P-07381; P-07846; P-07966; P-14585 at 009-013; P-20829 at 001 ("I spent part of yesterday with an inspector and he wanted to give me a heads-up that the inspectors collectively feel Walmart is Starting to become a 'funnel' with C-II's due to more liberal policies on dispensing pain medicines.  I.e. King Soopers, Walgreens, Safeway, and Target all have algorithms that determines whether or not they dispense a c-II.  Walgreens and Kings are required to check PMP on all oxy's and hydromorphone med.  Target is restricting the quantity each month they can order.").

- Walmart knew that it was not providing its pharmacists with the necessary training, guidance, tools, resources, and data to allow them to successfully exercise their corresponding responsibility.  *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2491:15 – 2492:9, 2498:1-16, 2525:9 – 2527:9, 2530:12-24, 2532:21 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14, 2582:8 – 2583:7; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3869:6 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3883:12 – 3885:5, 3885:9 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3916:16 – 3917:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5095:9 – 5096:10, 5096:23-25, 5100:13-22, 5101:10 – 5102:7, 5140:14 – 5141:6, 5144:23 – 5145:7, 5154:13-22, 5189:19 – 5190:9, 5193:15 – 5194:1, 5196:19 – 5198:22, 5199:16-23, 5206:15 – 5209:3, 5211:8 – 5215:15, 5215:22 – 5216:13, 5229:18 – 5230:20, 5231:8 – 5238:13, 5240:12-18, 5247:11-20, 5248:6-10, 5248:16 – 5249:2, 5251:24 – 5252:3, 5265:18 – 5268:11, 5269:11-14, 5278:16 – 5279:12, 5280:20 – 5281:8; P-07381; P-07799; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08068; P-08069; P-14442; P-14450; P-14540; P-14552; P-14585 at 009-013; P-14645; P-14662; P-17527; P-20824; P-20829 at 001; P-20849; P-20850; P-21884; P-26671 at 001; P-26681; P-26697; P-26705 ("[Refusal to fill] forms are collected and stored in Archer.  However, pharmacists do not have easy access to this information, especially if the pharmacist is from another store.  This information could be used to clear red flags, or identify red flags that may indicate that the prescription was not issued for a legitimate medical reason. . . .  Currently, pharmacists do not have easy access to this information to utilize in their professional judgment."); P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892.

- Walmart deliberately implemented dispensing and compensation policies and procedures that discouraged or hindered its pharmacists from performing due diligence on suspicious

prescriptions. *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2572:1 – 2573:10, 2579:15-17; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5211:8 – 5213:15, 5214:10 – 5215:9; P-19827 at 001-002 (Walmart knew DEA said not to do this). *See also* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 932:11 – 934:7; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:11 – 1115:7, 1117:5 – 1121:4, 1291:14-20; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; P-21572; P-21884; P-26697 (2007 e-mail: "Our pharmacists cannot utilize this [OARRS] system unless they can access the OARS [sic] web-site from the Connexus computer system."; "Shannon, There are several states that allow access to the monitoring program information. We met with several operators, including Ron last summer, and it was decided we would get a Legal determination of whether or not to provide or allow this access in our stores – this includes in Ohio. *The opinion has been that we will not grant access to these databases.* So far there are no programs that require a pharmacist to check the information before dispensing a prescription, and we have not identified any penalties or onus on the pharmacist in any case for not utilizing the information.") (emphasis added); P-26671 at 001.

- Walmart systematically ignored red flags and other dispensing irregularities plainly present in its data and continued to fill suspicious prescriptions. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 774:1-13; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2505:2 – 2506:12, 2507:20 – 2509:25, 2534:2 – 2539:20, 2539:22 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2738:3-5, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2799:20-21; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3869:6 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3885:9 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:19 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3916:16 – 3917:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5196:19 – 5198:22, 5199:16-23, 5229:18 – 5230:11, 5230:18-20; Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6710:7 – 6711:23 (Eastlake store knew of problematic prescriber, Dr. Trevor Levin, prescribing large quantities of cocktails and being confrontational when asked questions, in 2018), 6711:25 – 6720:8 (Walmart filled numerous red-flagged opioid and cocktail prescriptions by Dr. Levin), 6743:19 – 6744:11 (discussing prior issues with Dr. Levin); P-04600-A; P-07908; P-07966; P-08037 at 001-004; P-08068 (in 2014, Walmart knew Dr. Randall Wade's prescriptions were being blocked by other chain pharmacies and was "telling his patients to go to Wal-Mart because they will fill them" and there was a concern "that we as a company will start to accumulate this 'suspect' clientele"; in a follow-up email in 2016: "I'm forwarding this to you because this discussion was had about Dr. Randall Wade a couple of years ago. He's still under investigation by the DEA and I just found out today that CVS is no longer filling his controls per corporate orders. Kroger stopped filling them a couple years ago. . . . My question is should we stop filling his controls too?"); P-14540; P-14552; P-14645; P-14662; P-17572 (in 2018, Eastlake store knew of problematic prescriber,

Dr. Trevor Levin, prescribing large quantities of cocktails and being confrontational when asked questions);P-20889 (indicating Eastlake store was one of Walmart's highest volume oxy stores in the country in September 2012); P-20829 at 001; P-21391 (OARRS report attached to refusal to fill prescription of Dr. Levin showing numerous red-flagged prescriptions being filled in 2016/2107); P-26732; P-26736; P-26737; P-26767 (aware of prior issues with Dr. Levin prescriptions in 2014); P-26874; P-26882; P-26890; P-26892; *supra* at pp. 76-77.

- Walmart lobbied or pushed back against measures that would have helped prevent diversion. *See, e.g.,* P-21884; P-23267; P-26671 at 001 (discussing proposed rule change by Ohio Board of Pharmacy that would require pharmacists to check OARRS under certain circumstances: "I believe this will present a significant burden and liability to our pharmacists and an unjustified delay to our patients."); P-26697; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5211:8 – 5213:15.

- Walmart knew of problematic prescribers, pill mills, and patients in or around the Counties from which it continued to allow or encourage its pharmacists to fill opioid prescriptions. *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3916:16 – 3917:22 (knew of problematic prescriber in Cleveland); Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6710:7 – 6711:23 (Eastlake store knew of problematic prescriber, Dr. Trevor Levin, prescribing large quantities of cocktails and being confrontational when asked questions, in 2018), 6711:25 – 6720:4 (Walmart filled numerous red-flagged opioid and cocktail prescriptions by Dr. Levin), 6720:5-8 ("Q: Now, Dr. Levin eventually becomes a doctor that you quit filling for. True? A: That is correct."), 6743:5-16, 6743:19 – 6744:11 (discussing prior issues with Dr. Levin); P-17572 (in 2018, Eastlake store knew of problematic prescriber, Dr. Trevor Levin, prescribing large quantities of cocktails and being confrontational when asked questions); P-21391 (OARRS report attached to refusal to fill prescription of Dr. Levin showing numerous red-flagged prescriptions being filled by Walmart pharmacies in 2016/2107); P-26767 (aware of prior issues with Dr. Levin prescriptions in 2014; Lori Militello stated: "The patient has had questionable tendencies in the past. The morphine equiv for the patient is 350. The md has no interest in deally [sic] with the pharmacy professionally."); P-26890 (knew of problematic prescriber in Cleveland); *see also* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1196:13-23.

- Prescription opioids were migrating into Ohio from other states, including Florida. *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1404:22 – 1405:4; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1667:3 – 1670:15; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6454:18 – 6455:3; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6629:24 – 6630:17.

- Walmart knew that prescription opioids were migrating into Ohio from other states, including Florida. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 887:18-25;

Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1404:22 – 1405:4; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1667:3 – 1670:15; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5205:5-7 (Hiland read the *Holiday* case); Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6454:5-9, 6454:18 – 6455:6; P-15962-A at 005-006; P-19827 at 001-002; P-42147-A at 003, 007.

- Walmart was subject to investigations and enforcement actions, and parties to settlements with the DEA, in which it was informed of diversion or sanctioned for its failures to prevent diversion. *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1686:16 – 1694:18, 1732:16-24; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2461:17 – 2469:15, 2470:11 – 2471:21, 2474:10-19, 2475:20 – 2479:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5187:22 – 5188:12, 5229:1-9, 5256:3-12, 5270:20 – 5271:21; P-07846 at 003, 006-010, 020-021; P-14711; P-21113.

- Despite these repeated warnings and sanctions, Walmart made little to no effort to substantively change its dispensing policies and procedures until contractually obligated to do so under its settlements with the DEA. *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1690:16 – 1694:18; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2465:21 – 2469:15, 2470:11 – 2471:21, 2533:5 – 2534:1, 2550:4 – 2553:7; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3951:12 – 3952:23; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5187:14 – 5188:22, 5189:11 – 5190:9, 5192:6 – 5193:8, 5193:15 – 5194:13, 5194:20 – 5195:3, 5196:1-4, 5199:24 – 5200:7, 5200:11-19, 5206:15 – 5207:10, 5208:23 – 5209:3, 5225:11 – 5226:17, 5226:18-24 ("Q: Ma'am, you wrote specific new policies because of this, didn't you?  A: We had some policies that were new in the time frame of the MOA.  Q: In other words, the answer's yes, we wrote specific new policies because of the agreement, correct?  A: Yes."), 5231:8 – 5238:13, 5248:25 – 5249:2; P-07036 (1/2/14 Walmart PPT) at 031; P-07846; P-14442; P-14711 at 002-004; P-20852 ("The MOA that requires the reporting of the Refusal to fill expires in 30 days.  We have not invested a great amount of effort in doing analysis on the data since the agreement is virtually over.  Driving sales and patient awareness is a far better use of our Market Directors and Market manager's time.").

- Despite these repeated warnings and sanctions, Walmart continued to facilitate and encourage the oversupply and diversion of its opioids. *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 774:1-13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1810:23 – 1811:6; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2507:20 – 2509:6, 2534:2 – 2542:3, 2542:14 – 2548:18, 2570:11-21, 2572:1 – 2573:10; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3859:2 – 3863:17, 3869:6 – 3875:13, 3879:16 – 3881:8, 3885:9 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:19 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3916:16 – 3917:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5196:19 – 5198:22, 5199:16-23, 5229:16 – 5230:11, 5230:18-20; Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6710:7 – 6720:8; P-07908; P-07966; P-08037 at 001-004; P-08068; P-08069; P-14540; P-14552; P-14643; P-14645; P-17572; P-20829 at 001 (Walmart informed by Colorado BOP

81

that its "inspectors collectively feel Walmart is Starting to become a 'funnel' with C-II's due to more liberal policies on dispensing pain meds . . ."); P-20850; P-20852; P-20889 (indicating Eastlake store was one of Walmart's highest volume oxy stores in the country in September 2012); P-21391; P-26732; P-26736; P-26737; P-26767; P-26874; P-26882; P-26890; P-26892.

- Walmart committed the failures described above (*supra* at § I.B.3) despite its awareness of rising concerns over the abuse of diverted prescription pills in Ohio and the rest of the country.  *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 774:1-13; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2471:22 – 2473:5; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3902:24 – 3908:10; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5110:20 – 5111:9, 5112:10; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:16-20 ("Q: And is it fair to say that any registrant, including these five defendants, from your experience, knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on?  A: I believe they knew or should have known."); P-19827 at 001-002; P-20829 at 002; P-26737 at 002; WMT-MDL-01155 at 932 (in 2013 presentation to its pharmacists, Walmart recognized "the sad fact that the abuse of controlled substances in the U.S. has increased significantly and at a concerning rate over the past ten years"); WMT-MDL-00575 (in 2011, Walmart internally acknowledged "[t]he growing problem of prescription drug abuse . . .").

- Walmart worked in concert with opioid manufacturers in spreading the manufacturers' false messaging surrounding the treatment of pain and the true addictive nature of opioids in an effort to increase opioid sales and profits.  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 551:15-21, 557:4-13, 557:16-17, 564:14-18, 565:13-17, 588:22 – 589:17, 592:25 – 594:3, 597:13-20, 598:2-23, 615:22 – 616:3, 616:12-15, 618:9 – 619:7; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 768:24 – 769:9, 769:17 – 770:7, 771:13-16, 772:12-23, 775:3-9, 845:10-14, 885:3-24.

### C. The Evidence Demonstrated that Defendants' Intentional and Unlawful Conduct Proximately Caused the Public Nuisance in Lake and Trumbull Counties.

Under Ohio law, Plaintiffs must show that each Defendant's wrongful conduct was a cause—*i.e.*, both a cause-in-fact and a legal/proximate cause—of harm to Plaintiffs.  *In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.,* MDL No. 1909, 2013 WL 593993, at *3 (N.D. Ohio Feb. 15, 2013).  Courts often use the phrase "proximate cause" to mean both cause-in-fact and legal/proximate cause.  *Paroline v. United States*, 572 U.S. 434, 444 (2014).  Where, as here, multiple wrongdoers contribute to a combined harm, Plaintiffs must show that each

82

Defendant's conduct was a substantial factor in producing the harm. *See Pang v. Minch*, 559 N.E.2d 1313, 1324 (Ohio 1990).

The threshold inquiry is whether a Defendant's wrongful conduct had "a substantial as distinguished from a merely negligible effect . . ." RESTATEMENT (SECOND) OF TORTS § 431, cmt. b (1965). Moreover, "[i]f a particular act might be expected to cause a particular result and, if that result has in fact followed, the conclusion may be justified that the causal relation exists." *Id.* at § 433B, cmt. b; *see also Taylor,* 55 N.E.2d at 727 ("Where the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, . . . the rule of absolute liability applies."); Dkt. #2561 (CT1 Causation MSJ Order) at p. 6 ("Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have made a sufficient showing to withstand summary judgment on this issue."); Dkt. #3403 (CT3 MTD Order) at p. 28.

This Court has previously held that "massive increases in the supply of prescription opioids into" the Counties, "combined with evidence that suggests a complete failure by [Defendants] to maintain effective controls against diversion," provides sufficient evidence from which a jury "could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs." Dkt. #2561 (CT1 Causation MSJ Order) at p. 9; *see also* Dkt. #3913 (CT3 GE MSJ Order) at p. 8. Moreover, "even a very small proportional contribution by one of numerous [D]efendants could equate with a rather large and substantial absolute quantity, both in monetary terms and in terms of the consequent harms." Dkt. #2559 (CT1 *De Minimis* MSJ Order) at p. 5; *see also, e.g.,* Dkt. #3102 (CT1 WMT MSJ Order) at pp. 4-5; Dkt. #3099 (CT1 CVS MSJ

Order) at pp. 4-5.[66]  This Court has also previously held that Plaintiffs may demonstrate causation through aggregate proof.  Dkt. #2561 (CT1 Causation MSJ Order) at p. 8.[67]

### 1. Walgreens proximately caused the ongoing public nuisance in the Counties.

The evidence adduced at trial demonstrates that Walgreens' conduct discussed above (*supra* at § I.B.1) was a substantial factor in producing the public nuisance in the Counties and Plaintiffs' related harms (*supra* at § I.A; *infra* at § I.C.1).  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- An increased volume of prescription opioids, such as that brought about by a failure of a pharmacy to maintain adequate or effective controls against diversion, is a substantial contributing factor to diversion into the illicit market.[68]

---

[66]  Defendants' cited cases are distinguishable.  *See Schwartz v. Honeywell Int'l, Inc.*, 102 N.E.3d 477, 478, 481-84 (Ohio 2018) (in action alleging decedent developed mesothelioma and died as a result of asbestos exposure by virtue of her father's repair work in the garage of the family home during her childhood, evidence was insufficient to prove exposure was a substantial factor causing decedent's harm; court rejected "cumulative-exposure theory" of causation, "which postulates that every nonminimal exposure to asbestos is a substantial factor in causing mesothelioma"); *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443–44 (6th Cir. 2009) (in asbestos exposure case, plaintiff failed to establish that defendant's products contained asbestos and provided no "evidence that supports a reasonable inference of exposure from [defendant's] products, much less that [defendant's] products were a substantial factor in causing Mr. Martin's mesothelioma").

[67]  Defendants' citation to *People v. Purdue Pharma L.P.*, No. 30201400725287CUBTCX, 2021 WL 5227329 (Cal.Super. Nov. 01, 2021), is inapt, for reasons discussed below.  *Infra* at pp. 95, 98-99, 107.

[68]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 499:7-10, 520:8 – 521:22, 542:18-25, 544:7-8, 590:2 – 591:2, 632:11-19 ("[T]hat paradigm shift is really at the heart of what caused the current opioid epidemic.  That paradigm shift in prescribing and dispensing led to the oversupply, which led to all kinds of different people having easy access to opioids, which led to people getting addicted and dying, which led to people turning then to heroin, illicit Fentanyl, as it became harder to get opioids, all of which are problems which we continue to deal with today."), 640:23 – 641:8, 648:23 – 650:14, 666:9 –669:10, 676:2-17 ("Q:….  There is no doubt a cause and effect relationship exists between the oversupply of prescription opioids and the opioid epidemic.  Is that your opinion?  A: Yes.  Q: What is the basis for that opinion?  A: As opioid prescribing increased four fold [sic] between 1999 and 2012, opioid-related overdose deaths increased four-fold and opioid-related addiction increased four-fold.  And it is my opinion that it is the expansion of that supply that led to overdose deaths and addiction, that led overdose deaths and addiction to rise."), 676:18 – 677:24; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 859:16-20; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1050:15-25, 1054:12-17 ("Q:…. Do you believe that these failures of dispensing red flag [prescriptions], without conducting adequate investigation or due diligence, is likely to lead to diversion?  A: Yes, sir."); Dkt. #4023 (footnote continues on next page)

- Walgreens dispensed thousands of opioid pills into the Counties that were likely to be diverted to illicit, non-medical use due to its systematic failures to maintain adequate and effective controls against diversion.[69]

- The oversupply and diversion of prescription opioids causes an increase in opioid-related public health and safety harms.[70]

---

(10/13/21 Trial Tr.) [*Rannazzisi*] at 1745:25 – 1746:3, 1748:22 – 1749:7, 1809:24 – 1810:22; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3460:19 – 3461:16, 3486:2-8, 3554:4 – 3555:14, 3558:10-12, 3559:6-13, 3560:16 – 3561:13, 3563:12 – 3564:2; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3634:25 – 3636:5, 3654:25 – 3659:23, 3661:11-20, 3683:22 – 3684:5; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4165:21 – 4166:18, 4174:10-17 ("Q:…. The pharmacies have been called by people inside pharma as well as the government the last line of defense. How does that integrate with your pump analogy? A: Yes. I think that that's absolutely right. Certainly the pharmacies would be part who could turn off the pump exactly right. At the end of the pump where the spout is there, there is that potential to reduce the harm associated with opioid use, and in my opinion the pharmacies did not do that."), 4183:3 – 4184:3, 4186:1 – 4188:3, 4195:3-9; Dkt. #4118 (11/4/21 Trial Tr.) [*Murphy*] at 6020:4 – 6021:5 (discussing article on The Implications of County-Level Variation in the U.S. Opioid Distribution; "Q: And their results that they found from their study is 'In adjusted models, a one-pill increase in per capita pill volume was associated with a .2 percent increase in opioid-related deaths per 100,000 in the population.' Do you see that? A: I do. Q: They say, 'Our findings validate the relationship between per capita pill volume and opioid-related deaths.' Do you see that? A: I do.").

[69] *Supra* at § I.B.1 & fn.68; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 629:21 – 630:2; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6; P-24039.

[70] *See, e.g., supra* at § I.A; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 520:8 – 521:22, 542:18-25, 544:7-8, 546:23 – 547:5, 549:7 – 550:8, 619:19-22, 632:11-19, 640:23 – 641:8, 648:23 – 653:12, 656:24 – 658:2, 661:1-6, 668:6 – 669:10, 676:2 – 677:24; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 859:16-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1893:10-12 ("Q: Would you agree, Mr. Joyce, that an oversupply of opioid pills in a community can lead to diversion? A: Sure."), 1893:15-18 ("Q: And would you agree that diversion can lead to an unreasonable interference with the public health and safety? A: Without question."); Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3460:5 – 3465:22, 3486:2-8; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3637:16 – 3639:23, 3641:6-25, 3646:4-19, 3650:5-9, 3664:10-19 ("Q: And are you able based on your expertise and the Bradford Hill criteria to correlate in Lake and Trumbull Counties these increased opium-related harms to the oversupply of prescription opioids in those counties? A: Yes, I examined the supply of prescription opioids to Lake and Trumbull County, just like many communities in the United Sates, increased in concert with the increase in the supply of prescription opioids. That still remains high in Lake and Trumbull."), 3665:25 – 3671:20, 3672:20 – 3674:5, 3675:22 – 3676:1, 3677:6 – 3679:8, 3683:22 – 3684:5; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4088:13 – 4089:12, 4097:2-8, 4180:19-24, 4181:15 – 4182:15, 4183:3 – 4184:3, 4186:1 – 4188:3, 4203:2-16; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5404:4, 5405:2-14, 5406:10 – 5408:17, 5471:15-19 ("Q: Mr. Edwards, even a small percentage of the doctors, if they're bad, and if the pharmacists do not exercise corresponding responsibility, can cause a lot of harm to individuals in a community, right? A: Yes."); Dkt. #4118 (11/4/21 Trial Tr.) [*Murphy*] at 6020:4 – 6021:5 (discussing article on The Implications of County-Level Variation in the U.S. Opioid Distribution; "Q: And their results that they found from their study is 'In adjusted models, a one-pill

(footnote continues on next page)

- <u>Walgreens' failure to maintain adequate and effective controls against diversion with respect to the thousands of prescription opioids it dispensed into Lake and Trumbull Counties substantially contributed to the opioid epidemic in those Counties and the related harms suffered by Plaintiffs.</u>  *Supra* at fns.69-70; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 678:9 – 679:1, 679:5-6, 679:9-16, 679:20-21; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3064:29 – 3066:12, 3066:25 – 3067:9, 3067:17 – 3069:3; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4174:13-17.

Additionally, it was entirely foreseeable that the influx of red-flagged opioid prescriptions into the Counties, as a result of Walgreens' lax (or non-existent) anti-diversion policies and procedures, would lead to diversion and the related harms associated with same.  Indeed, this result is exactly what the CSA and its implementing regulations were created to prevent.[71]  Moreover, it was not simply foreseeable; it was *actually foreseen* by Walgreens.  The evidence adduced at trial demonstrates that Walgreens knew that failing to employ sufficient dispensing practices would cause significant diversion, leading to opioid abuse and related harms.  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- <u>The purpose of federal drug control laws is to make sure controlled substances are confined to legitimate medical channels.</u>[72]

---

increase in per capita pill volume was associated with a .2 percent increase in opioid-related deaths per 100,000 in the population.' Do you see that?  A: I do.  Q: They say, 'Our findings validate the relationship between per capita pill volume and opioid-related deaths.'  Do you see that?  A: I do."), 6051:1-3 ("Q: And you don't think oversupply and overdispensing is part of the story?  A: I'm saying it's part of the story."); Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:1-14; P-15962-A at 004; P-20809 at 006-011, 014-024.

[71]  *See supra* at fn.19; *see, e.g., Masters Pharmaceuticals, Inc.*; Decision and Order, 80 FR 55418-01, 55475 (D.E.A. Sept. 15, 2015), *aff'd by Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017) (CSA's "core purposes" is to "prevent prescription drug abuse and the diversion of drugs to persons who seek to abuse them.").  The Supreme Court has long recognized the inherent causal relationship between diversion of opioids and harm to the public.  *See Direct Sales Co. v. United States*, 319 U.S. 703, 710-11 (1943) ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, aris[es] from the latters' inherent capacity for harm and from the very fact they are restricted . . . .").

[72]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 573:18 – 574:18, 668:5-24; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 772:20-23; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 955:7-14, 1043:10 – (footnote continues on next page)

- <u>Diversion is foreseeable if registrants fail to comply with federal and state law governing the dispensing of prescription opioids.</u>[73]

- <u>The DEA recognizes that a CSA registrant's failure to comply with federal law enables more diversion.</u>[74]

---

1044:20; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1234:12 – 1235:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1395:9 – 1396:6, Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1564:2-7, 1574:18 – 1575:13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1673:4-15, 1717:3-7; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:11-21; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6623:18-24 ("Q: And, frankly, that's why the Controlled Substances Act was enacted. It was – its purpose was to set up a closed system where drug companies, including the defendant pharmacies, were required to follow the rules to minimize the risk of misuse and diversion of drugs, like opioid prescriptions; correct?  A: Correct."); P-15962-A.

[73] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 701:10-19, 702:13-17; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 986:9 – 987:19, 988:3-12, 989:15-22, 992:5 – 994:16, 995:5-8, 996:6-21, 999:22 – 1000:8, 1007:8 – 1009:9, 1018:6-21, 1020:22 – 1021:1, 1040:9 – 1042:4 ("Q:….[B]ased upon your experience and expertise, is it foreseeable that if these red flags exist and are not resolved and documented, is it foreseeable that it would lead to abuse, diversion, and fraudulent acts?  A: Yes, sir. Q: Is it foreseeable to a pharmacy as well as a pharmacist that unresolved red flags like you've discussed with dispensing can lead to diversion and would lead to diversion?  A: Yes, sir."), 1042:25 – 1044:10, 1054:13-17; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1131:8-13, 1209:18-25; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1336:2-22, 1340:2-14, 1388:8-24, 1400:15-25, 1471:3 – 1472:11, 1490:24 – 1491:7, 1494:2-6; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1565:15 – 1566:13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:1-22, 1671:17 – 1673:15, 1676:6-11, 1693:4-19, 1808:10-20; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2896:4-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; P-20639 at 009; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3556:22 – 3557:6; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3675:15 – 3676:1; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5404:4, 5471:15-19; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6623:18-24, 6625:21-25 ("Q: Because if the training and the tools used by the defendant corporations are not adequate, we run the risk of opioid pills getting into the wrong hands and leading to diversion; correct?  A: That's correct."); Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6777:19-22, 6778:20-23; P-00035 at 002 ("[A]ll registrants— manufacturers, distributors, *pharmacies*, and practitioners—share responsibility for maintaining appropriate safeguards against diversion.") (emphasis added); P-10101 at 002 (same); P-15962-A; P-19827 at 001-002.

[74] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:7-16, 994:3-16, 1016:16-20, 1020:23 – 1021:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-10, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1565:19 – 1566:13 ("If they're all doing what they're required to do, then it would minimize diversion considerably.  But if one person breaks down in that system, you have diversion.  And depending on how quickly it could be discovered, you can have a lot of diversion, a great amount of diversion."), 1603:1 – 1605:14, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1660:4 – 1661:22, 1666:11-17, 1671:17 – 1673:15, 1674:8 – 1678:19, 1693:4-19, 1697:24 – 1698:11, 1808:10-20, 1809:24 – 1810:22; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2896:4-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*]

(footnote continues on next page)

- Walgreens' failures to control the supply chain for the dangerous opioids it was dispensing inevitably and predictably led to diversion.[75] *See also, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 557:18-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1893:10-12 ("Q: Would you agree, Mr. Joyce, that an oversupply of opioid pills in a community can lead to diversion?  A: Sure."), 1893:15-18 ("Q: And would you agree that diversion can lead to an unreasonable interference with the public health and safety? A: Without question."); Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2093:1-11; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6777:15-22; P-19827 at 001-002; P-20639 at 009, 024.

- Walgreens knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.  *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-19, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1565:21 – 1566:13, 1602:10-11, 1603:1 – 1605:14, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1650:1 – 1651:24, 1658:17 – 1659:6, 1660:4 – 1661:22, 1666:11-17, 1671:17 – 1673:15, 1674:8 – 1678:19, 1697:24 – 1698:11, 1808:10-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15, 1893:10-12 ("Q: Would you agree, Mr. Joyce, that an oversupply of opioid pills in a community can lead to diversion?  A: Sure."), 1893:15-18 ("Q: And would

---

at 6623:18-24, 6625:21-25; P-15962-A; P-19827 at 001-002.

[75]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 507:17 – 508:2, 550:9 – 551:17, 557:4-13, 557:23 – 558:2, 562:12 – 563:17, 563:9-17, 589:18 – 591:2, 605:23 – 606:3, 619:11 – 620:11, 625:19 –630:2, 631:4-15, 632:11-19, 640:23 – 641:8, 666:9-25, 668:25 – 669:10, 679:12-16, 679:20-21; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 988:3-12, 989:13 – 994:19, 995:5-8, 996:6-21, 998:7-20, 999:3 – 1000:15, 1001:22-23, 1006:21-25, 1007:8-20, 1025:20 –1027:1, 1040:9 – 1042:4, 1048:23 – 1050:2, 1050:16-25 ("Q: All right.  Opinion 13 continues.  'The subsequent result of the failure to provide such data, information, and tools likely led to the diversion of quantities of controlled substances, particularly opioids, outside of the closed distribution and dispensing system for controlled substances.'  Is that your opinion? A: Yes, sir.  Q: And is it based upon reasonable probability of your expertise? A: Yes, sir."), 1054:13-17 ("Q:….  Do you believe that these failures of dispensing red flag [pr]escriptions, without conducting adequate investigation or due diligence, is likely to lead to diversion?  A: Yes, sir."), 1058:2-18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1114:1 – 1115:4, 1119:12 – 1121:4, 1123:16 – 1124:14, 1124:19 – 1127:5, 1127:14 – 1128:5, 1129:2 – 1130:20, 1131:8-13, 1151:12 – 1154:18, 1155:11-19, 1156:3 – 1158:4, 1158:16 – 1159:12, 1161:7 – 1162:10, 1162:25 – 1164:4, 1167:7 – 1168:3, 1170:11 – 1171:13, 1172:8-10, 1172:18 – 1173:1, 1173:15 – 1174:6, 1175:2 – 1179:16, 1179:22 – 1180:8, 1180:13 – 1188:2, 1193:18-22, 1202:4 – 1203:14, 1204:5-14, 1205:8-19; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1338:2-5, 1373:1-10, 1386:22 – 1387:7, 1471:3 – 1472:11, 1490:24 – 1491:7; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1565:21 – 1566:13, 1662:18 – 1663:1, 1666:11-17, 1809:24 – 1810:22; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3563:12 – 3564:2; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3675:15 – 3676:1; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5404:4; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:24, 6625:21-25, 6626:21 – 6627:7; P-20809 at 006-011, 014-024.

you agree that diversion can lead to an unreasonable interference with the public health and safety?  A: Without question."), 1912:20-24; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2891:9-13, 2896:4-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6, 3094:12-20; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; Dkt. #4132 (11/8/21 Trial Tr.) [*Stossel*] at 6777:15-22; P-14746 at 005, 014; P-15314 at 022; P-15962-A; P-19566 at 003 ("The abuse of prescription drugs—especially controlled substances—is a serious social and health problem in the United States today.  As a healthcare professional, you share responsibility for solving the prescription drug abuse and diversion problem."); P-19827 at 001-002; P-20639 at 009, 024 ("[W]e continue to believe that addressing prescription drug abuse will require all parties—including . . . pharmacies . . .—to play a role in finding practical solutions to combatting abuse . . .").

- Walgreens knew that there was an ever-worsening opioid epidemic in this country during the time that it engaged in its unlawful and intentional dispensing conduct.  *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1836:2-5 ("Q: And Trumbull County and this region have seen the effects of the opioid pill diversion directly.  True?  A: I would say so."), 1836:6-13, 1836:14-18 ("Q: So would you agree that any pharmacist working at Walgreens in your district should be well-aware of the problems associated with opioid pill--  A: Every pharmacist in the State of Ohio is aware of the opioid problem."), 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were fueling the opioid epidemic in these counties, right?  A: Mr. Weinberger, without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"); Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2888:2-13, 2896:4-14, 2907:17-20, 2907:21 – 2911:16, 2919:1-7; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3251:5 – 3252:3, 3252:8-14; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:16-20 ("Q: And is it fair to say that any registrant, including these five defendants, from your experience, knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on?  A: I believe they knew or should have known."); P-14746 at 003, 005-006; P-15314 at 022; P-15962-A; P-19566 at 003; P-20639 at 002, 004, 006, 024; P-20808; P-26403 at 011.

- The public health and safety harms associated with the opioid epidemic were known by Walgreens during the time it engaged in its unlawful and intentional dispensing conduct.  *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12-19, 1835:5-23, 1836:2-18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were fueling the opioid epidemic in these counties, right?  A: Mr. Weinberger, without question, every

pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"), 1912:20-24; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6- 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2888:2-13, 2891:9-13, 2907:17-20, 2907:21 – 2911:16; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3251:5 – 3252:3, 3252:8-14; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; P-14746 at 003, 005-006; P-15314 at 022; P-15962-A; P-19566 at 003; P-19827 at 001-002; P-20639 at 002, 004, 024; P-20808; P-26403 at 011, 025.

## 2. *CVS proximately caused the ongoing public nuisance in the Counties.*

The evidence adduced at trial demonstrates that CVS's conduct discussed above (*supra* at § I.B.2) was a substantial factor in producing the public nuisance in the Counties and Plaintiffs' related harms (*supra* at § I.A; *infra* at § I.C.2).  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- An increased volume of prescription opioids, such as that brought about by a failure of a pharmacy to maintain adequate or effective controls against diversion, is a substantial contributing factor to diversion into the illicit market.  *Supra* at fn.68.

- CVS dispensed thousands of opioid pills into the Counties that were likely to be diverted to illicit, non-medical use due to its systematic failures to maintain adequate and effective controls against diversion.[76]

- The oversupply and diversion of prescription opioids causes an increase in opioid-related public health and safety harms.  *Supra* at fn.70.

- CVS's failure to maintain adequate and effective controls against diversion with respect to the thousands of prescription opioids it dispensed into Lake and Trumbull Counties substantially contributed to the opioid epidemic in those Counties and the related harms suffered by Plaintiffs.  *Supra* at fns.74, 76.  *See also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 678:24 – 679:1, 679:7-8, 679:12-16, 679:22-23; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4174:13-17.

Additionally, it was entirely foreseeable that the influx of red-flagged opioid prescriptions into the Counties, as a result of CVS's lax (or non-existent) anti-diversion policies and procedures, would lead to diversion and the related harms associated with same.  Indeed, this result is exactly

---

[76] *Supra* at § I.B.2 & fn.68; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 629:21 – 620:2; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3981:22 – 3984:17, 3988:2 – 3990:1; P-08409.

what the CSA and its implementing regulations were created to prevent. *Supra* at fn.71. Moreover, it was not simply foreseeable; it was *actually foreseen* by CVS. The evidence adduced at trial demonstrates that CVS knew that failing to employ sufficient dispensing practices would cause significant diversion, leading to opioid abuse and related harms. Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- The purpose of federal drug control laws is to make sure controlled substances are confined to legitimate medical channels. *Supra* at fn.72.

- Diversion is foreseeable if registrants fail to comply with federal and state law governing the dispensing of prescription opioids. *Supra* at fn.73.

- The DEA recognizes that a CSA registrant's failure to comply with federal law enables more diversion. *Supra* at fn.74.

- CVS's failures to control the supply chain for the dangerous opioids it was dispensing inevitably and predictably led to diversion. *Supra* at fn.75.

- CVS knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 379:20-22, 381:1-19, 394:12-18, 396:2-14; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-19, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1565:21 – 1566:13, 1602:10-11, 1603:1 – 1605:14, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1650:1 – 1651:24, 1658:17 – 1659:6, 1660:4 – 1661:22, 1666:11-17, 1671:17 – 1673:15, 1674:8 – 1678:19, 1697:24 – 1698:11, 1808:10-20; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:19; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5737:9 – 5738:1, 5768:13 – 5769:19, 5820:18 – 5821:12; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-00459 at 007-009, 045 ("I am frustrated when I think of all of the time and energy we must spend to keep our prescription drugs in the right hands, and I am sad for the hurt and pain this issue has caused so many people!!"); P-00021; P-15656 at 003 ("Ensuring that Pharmacists exercise corresponding responsibility is a key focus of federal, state and local law enforcement as part of their effort to curb drug abuse."); P-15962-A; P-19827 at 001-002.

- CVS knew that there was an ever-worsening opioid epidemic in this country during the time that it engaged in its unlawful and intentional dispensing conduct. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 373:19 – 374:2; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at

3967:23 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5651:13-21, 5768:13 – 5769:19, 5820:18 – 5821:12; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:16-20 ("Q: And is it fair to say that any registrant, including these five defendants, from your experience, knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on? A: I believe they knew or should have known."); P-00021; P-00459 at 007-009, 012, 014 ("Prescription drug abuse is an epidemic in our country.  Deaths from drug overdose have been rising steadily over the past two decades and have become a leading cause of injury and death in the United States."), 045; P-08403; P-15656 at 003; P-15962-A; P-26403 at 011.

- The public health and safety harms associated with the opioid epidemic were known by CVS during the time it engaged in its unlawful and intentional dispensing conduct. *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 373:19 – 374:2 ("I know that opioid abuse and addiction is a devastating issue. . . .  It plagues our country."), 379:20-22, 394:12-18; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:24, 3967:18-22, 3968:18 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5768:13 – 5769:19, 5820:18 – 5821:12; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6736:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:16-20 ("Q: And is it fair to say that any registrant, including these five defendants, from your experience, knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on?  A: I believe they knew or should have known."); P-00021; P-00459 at 007-009, 012, 014, 045; P-08403; P-15656 at 003; P-15962-A; P-19827 at 001-002; P-26403 at 011, 025.

### 3. *Walmart proximately caused the ongoing public nuisance in the Counties.*

The evidence adduced at trial demonstrates that Walmart's conduct discussed above (*supra* at § I.B.3) was a substantial factor in producing the public nuisance in the Counties and Plaintiffs' related harms (*supra* at § I.A; *infra* at § I.C.3).  Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- An increased volume of prescription opioids, such as that brought about by a failure of a pharmacy to maintain adequate or effective controls against diversion, is a substantial contributing factor to diversion into the illicit market. *Supra* at fn.68.

- Walmart dispensed thousands of opioid pills into the Counties that were likely to be diverted to illicit, non-medical use due to its systematic failures to maintain adequate and effective controls against diversion.[77]

---

[77]  *Supra* at § I.B.3 & fn.68.  *See also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 629:21 – 630:2.

- The oversupply and diversion of prescription opioids causes an increase in opioid-related public health and safety harms. *Supra* at fn.70.

- Walmart's failure to maintain adequate and effective controls against diversion with respect to the thousands of prescription opioids it dispensed into Lake and Trumbull Counties substantially contributed to the opioid epidemic in those Counties and the related harms suffered by Plaintiffs. *Supra* at fns.70, 77; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 636:3 – 637:3, 678:24 – 679:2, 679:12-17; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4174:13-17.

Additionally, it was entirely foreseeable that the influx of red-flagged opioid prescriptions into the Counties, as a result of Walmart's lax (or non-existent) anti-diversion policies and procedures, would lead to diversion and the related harms associated with same. Indeed, this result is exactly what the CSA and its implementing regulations were created to prevent. *Supra* at fn.71. Moreover, it was not simply foreseeable; it was *actually foreseen* by Walmart. The evidence adduced at trial demonstrates that Walmart knew that failing to employ sufficient dispensing practices would cause significant diversion, leading to opioid abuse and related harms. Specifically, there was more than sufficient evidence on which the jury could have reasonably relied to conclude the following:

- The purpose of federal drug control laws is to make sure controlled substances are confined to legitimate medical channels. *Supra* at fn.72.

- Diversion is foreseeable if registrants fail to comply with federal and state law governing the dispensing of prescription opioids. *Supra* at fn.73.

- The DEA recognizes that a CSA registrant's failure to comply with federal law enables more diversion. *Supra* at fn.74.

- Walmart's failures to control the supply chain for the dangerous opioids it was dispensing inevitably and predictably led to diversion. *Supra* at fn.75.

- Walmart knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur. *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-19, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1565:21 – 1566:13, 1602:10-11, 1603:1 – 1605:14, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1650:1 – 1651:24, 1658:17 – 1659:6, 1660:4 – 1661:22,

1666:11-17, 1671:17 – 1673:15, 1674:8 – 1678:19, 1690:19 – 1693:19, 1694:12-18, 1697:24 – 1698:11, 1808:10-20; ; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5110:20 – 5111:9, 5112:3-10; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-25, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:17; P-14585 at 009; P-15962-A; P-19827 at 001-002; P-20829 at 002; P-26737 at 002; WMT-MDL-01155 at 933 (in leadership message to pharmacists: "[Y]ou and all of us at Walmart and Sam's Club have an obligation to prevent diversion and misuse of controlled substances."), 934 (acknowledging "our serious obligation to prevent the diversion of medication outside legitimate medical channels); WMT-MDL-00299 at 001.

- Walmart knew that there was an ever-worsening opioid epidemic in this country during the time that it engaged in its unlawful and intentional dispensing conduct. *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5112:1-10; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6626:16-20 ("Q: And is it fair to say that any registrant, including these five defendants, from your experience, knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on?  A: I believe they knew or should have known."); P-15962-A; P-20829 at 002; P-26737 at 002; WMT-MDL-01155 at 932.

- The public health and safety harms associated with the opioid epidemic were known by Walmart during the time it engaged in its unlawful and intentional dispensing conduct. *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5110:20 – 5111:9, 5112:3-10; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6375:5-15, 6376:23-25; P-15962-A; P-19827 at 001-002; P-20829 at 002; P-26737 at 002; WMT-MDL-01155 at 932.

### 4. Defendants' causation arguments should be rejected.

Throughout their Motions, Defendants repeat the same arguments regarding causation that have previously been considered and rejected by this Court.  Dkt. #4202 (Ds' JMOL) at pp. 15-24 (no individualized evidence/aggregate proof insufficient; not enough market share to be substantial factor; remoteness; intervening/superseding causes), p. 44-45 (expert opinions on causation inadmissible); Dkt. #4203 (WMT JMOL) at pp. 2, 12-15 (same); Dkt. #4206 (WAG JMOL) at pp. 1, 7-12 (same; no evidence conduct caused ongoing nuisance); Dkt. #4207 (CVS JMOL) at pp. 13-17 (same).  These arguments should be rejected again for the reasons set forth in the Court's prior rulings and Plaintiffs' (and the CT1 plaintiffs') prior briefing, which are incorporated as if

set forth herein. *See, e.g.,* Dkt. #2561 (CT1 Causation MSJ Order); Dkt. #3403 (CT3 MTD Order) at pp. 30-32; Dkt. #3913 (CT3 GE MSJ Order) at pp. 7-8; Dkt. #3102 (CT1 Walmart MSJ Order) at pp. 4-5; Dkt. #3099 (CT1 CVS MSJ Order) at pp. 2-5; Dkt. #3002-1 (CT1 Ps' Opp. to Causation MSJ); Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 31-36; Dkt. #4216 (CT3 Ps' Lembke *Daubert* Opp.); Dkt. #3953 (CT3 Lembke *Daubert* Order); Dkt. #4226 (CT3 Keyes *Daubert* Opp.); Dkt. #3946 (CT3 Keyes *Daubert* Order); Dkt. #4227 (CT3 Ps' Alexander *Daubert* Opp.); Dkt. #3948 (CT3 Ps' Alexander *Daubert* Order); Dkt. #4210 (CT3 Ps' Catizone *Daubert* Opp.); Dkt. #3947 (CT3 Ps' Catizone *Daubert* Order); Dkt. #4229 (McCann *Daubert* Opp.); Dkt. #3949 (McCann *Daubert* Order); Dkt. #4230-1 (CT3 Ps' Opp. to MIL re: Post-2010 Misconduct); Dkt. #3977 (CT3 Evidentiary Order) at pp. 21-23; Dkt. #4218 (CT3 Ps' Opp. to GE MSJ) at pp. 44-51; *see also supra* at §§ I.A, I.C.1-3.

Defendants also claim that the recent decision by the California Superior Court in *People v. Purdue Pharma L.P.*, 2021 WL 5227329, supports their argument that evidence of individualized prescriptions is required to establish causation in a public nuisance action. Dkt. #4202 (Ds' JMOL) at p. 16. But that case does nothing of the sort. In that case, the State of California sued various opioid manufacturers for, *inter alia*, causing a public nuisance by engaging "in an aggressive false and/or misleading marketing scheme designed to increase, and which succeeded in increasing, the writing of prescriptions for Defendants' opioid medications" which has "caused or contributed to" the opioid crisis in California. *Id*. at *1. Notably, in California, the legislature had enacted two statutes the purpose of which were to ensure "that health care practitioners could, in appropriate circumstances, prescribe opioid medications without risk of discipline" and "that pain patients would have access to opioid medications where that was medically appropriate." *Id*. at *5. After a bench trial, the court (in a tentative ruling) rendered judgment in favor of the defendants because the plaintiff had provided *no evidence whatsoever* of medically inappropriate opioid prescriptions caused by the defendants' allegedly false or misleading marketing and promotion:

Plaintiffs proffered *no* evidence that the allegedly false or misleading marketing by Defendants caused the writing of medically inappropriate prescriptions. Instead, Plaintiffs ask the Court to infer that the rise in prescriptions generally must logically also have resulted in the rise of medically inappropriate prescriptions. But there is no evidence, other than the rise itself, from which this Court can reasonably draw such an inference. And even if the Court could reasonably infer that false or misleading marketing must have caused *some* medically inappropriate prescriptions to be written, no evidence before the Court enables it to conclude, without rank speculation, whether the number or volume of such medically inappropriate prescriptions contributed to the alleged public nuisance, and if so, to what extent. . . . While Plaintiffs are not required to prove the exact contribution of each of the[ ] contributing actors, including of each Defendant, they must nevertheless prove that the contribution of each Defendant was more than "negligible or theoretical."

Here, with no evidence to identify the existence or volume of medically inappropriate opioid prescriptions caused by Defendants' allegedly improper marketing, determining whether such cause was "negligible or theoretical" (insufficient to establish causation), or minor (sufficient to establish causation) in relation to the overall opioid crisis, would require wholly unsupported speculation.

*Id.* at *7-8, *10. The court did not hold that aggregate proof could not be sufficient, but rather that the form of aggregate proof *presented in that case* was not. *Id.* at *9.[78] In this case, on the other hand, Plaintiffs have presented ample evidence that Defendants dispensed thousands of red-flagged opioid prescriptions that were likely to be diverted into the Counties without any evidence that they resolved those red flags prior to dispensing. *Supra* at § I.B, § I.C.1-3.

Finally, with respect to Defendants' arguments that the conduct of others (including criminals, problematic prescribers, and opioid manufacturers) breaks the chain of causation, there was ample evidence in the record on which the jury could have reasonably relied to conclude that the conduct of these third parties was (i) foreseeable,[79] and, (ii) not independent of Defendants'

---

[78] The court noted: "Plaintiffs could have shown, or at least attempted to show, that Defendants' marketing caused health care providers to write medically inappropriate prescriptions. Plaintiffs could have shown, or at least attempted to show, singly *or in the aggregate* how many medically inappropriate opioid prescriptions were written, and the correlation between those numbers, and/or the increase in those numbers, and Defendants' marketing efforts. The Court will not opine on all the ways in Plaintiffs could have sought to discharge their burden, but Plaintiffs sought to introduce no such evidence." *Id.* (emphasis added).

[79] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 297:1-13, 299:16 – 302:12, 305:17 – 306:8, 329:13 (footnote continues on next page)

misconduct.[80]

### D. Defendants Are Not Entitled to "Safe Harbor" Immunity.

As this Court has repeatedly stated, "under Ohio law, ''safe harbor' immunity from absolute nuisance liability is available *only* to those who perform in accordance with their applicable licensing regulatory obligations.'" Dkt. #3403 (CT3 MTD Order) at pp. 29-30 (quoting Dkt. #3177 (Cleveland Bakers MTD Order) at pp. 45-47 (emphasis added). As set forth above, Defendants did not dispense prescription opioids in accordance with applicable statutes and regulations. *Supra* at § I.B.

Defendants also claim that they cannot be held liable for public nuisance based on intentional *lawful* conduct because they are authorized to dispense opioids under the CSA.

---

– 330:3, 396:2-14; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 550:9 – 551:17, 628:22 – 629:19, 666:17 – 667:4, 701:10-19, 702:13-17; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1040:9 – 1042:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1576:13 – 1577:22; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1669:7 – 1670:15; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2891:9-13, 2908:24-25, 2909:11-20, 2920:25 – 2921:4, 2921:11-14; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4179:11-20; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6622:22 – 6623:24; P-00459 at 016; P-14585 at 009; P-14746 at 003, 006; P-15314 at 022; P-15962-A; P-17254; P-19827; P-20639 at 003-004, 006, 009; P-26737 at 002.

[80] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 299:16 – 302:12, 305:17 – 306:8, 396:2-14; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 551:18 – 552:21, 554:4 – 555:3, 555:12 – 558:2, 562:12 – 564:18, 569:10 – 571:5, 578:9 – 579:11, 580:12-17, 581:4 – 584:18, 585:6 – 592:4, 592:25 – 598:23, 604:18 – 610:11, 611:7 – 619:7, 641:9 – 644:11, 678:9 – 679:23, 687:12 – 688:7, 721:22 – 722:3; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 756:15-25, 759:4-18, 760:1-21, 761:2-3, 762:1-25, 763:5-8, 769:2-9, 769:17 – 770:7, 771:13-16, 772:12-23 ("My testimony really hinges on the fact that Walmart and other defendants actively collaborated with Purdue and its not necessarily important whether or not at that – at that time in the late 1990s or in 2001 they fully understood the degree to which Purdue was manipulating the opioids paradigm shift. It's that they were collaborators. They were business partners. They took money. They exchanged data. And at the same time, they did not uphold their corresponding responsibility to make sure that the opioids that they were dispensing were being used for legitimate medical purposes."), 775:3-9, 787:3-12, 788:4-13, 809:11-14, 810:2-8, 814:18 – 815:12, 825:23 – 826:12, 827:11-17, 829:5-8, 859:7-20, 860:5 – 862:25, 885:3-24, 890:14 – 891:11; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:9-16; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1565:13 – 1566:13, 1576:13 – 1577:22, 1587:3 – 1588:8, Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1677:11-16; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4176:17 – 4177:4, 4179:11-20, 4195:3-9, 4197:3 – 4199:2, 4210:2-16, 4211:3-23; P-00459 at 016; P-14585 at 009; P-14746 at 003, 006; P-15314 at 022 ("Prescription drug abuse is the nation's fastest growing drug problem. . . . Community pharmacy has become a target for individuals seeking these drugs."); P-15962-A; P-17254; P-19827; P-20639 at 009; P-26737 at 002; *see also supra* at pp. 4, 6-8 (discussing strong association with prescription opioid use and later use of heroin or illegally manufactured fentanyl).

Dkt. #4202 (Ds' JMOL) at pp. 13-14; Dkt. #4207 (CVS JMOL) at p. 12 n.7. Not so.  For immunity to apply, the conduct must be "fully authorized" by statute or regulation.  *See City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 621 F. Supp. 2d 513, 526 (N.D. Ohio 2009) ("[C]onduct which is *fully authorized* by statute or administrative regulation is not an actionable tort.") (emphasis added); *Hager v. Waste Technologies Industries*, No. 2000-CO-45, 2002 WL 1483913, at *10 (Ohio App. 7 Dist. June 27, 2002) (same); RESTATEMENT (SECOND) OF TORTS § 821B cmt. f (same).  Certain conduct may not be "fully authorized" under a statute even if it is not explicitly prohibited.  As just one example, there is evidence that Defendants intentionally implemented certain compensation and dispensing policies that discouraged or hindered its pharmacists from performing due diligence on suspicious prescriptions, such as 15-minute wait time goals and bonuses based in part on sales from filling opioid prescriptions.  *Supra* at pp. 27, 39, 50-51, 60-61, 70-71, 79.  These policies may not be expressly prohibited under the CSA. But neither are they "fully authorized" by that statute or consistent with the statute's purpose.  Thus, to the extent Defendants deliberately implemented such policies for the purpose of selling more drugs (including opioids), while being aware of the ever-worsening opioid epidemic and knowing that these policies resulted in their pharmacists spending less time to do the due diligence on red-flagged prescriptions necessary to prevent diversion, such intentional conduct can form the basis of a public nuisance claim.  Another example also illustrates the point.  Plaintiffs clearly dispute Defendants' argument that documentation of red flag resolution is not required under applicable federal and state statutes and regulations.  However, assuming, *arguendo*, that Defendants are correct, then they can still be held liable for public nuisance based on their intentional conduct related to their failure to document.  Specifically, Defendants deliberately implemented policies and procedures that hindered or discouraged their pharmacists from documenting red flag resolution, while being aware of the ever-worsening opioid epidemic and knowing the importance of such documentation to allow their pharmacists to exercise their corresponding responsibility and prevent diversion.  *Supra* at § I.B.

Again, Defendants' citation to *People v. Purdue Pharma L.P.*, is inapt.  Dkt. #4202

(Ds' JMOL) at p. 14.  The court did *not* hold that the false advertising of prescription opioids could *never* form the basis for a public nuisance claim under California law; rather, it held that the plaintiffs in that particular case had failed to offer any evidence to establish essential elements of their claims.  2021 WL 5227329 at *7-11 ("Nothing stated herein is intended to suggest that false or misleading marketing and promotion that results in medically inappropriate prescriptions being written may not constitute an actionable public nuisance.  But that is not the evidence before this Court.").

As both unlawful conduct and intentional lawful conduct (that is not fully authorized by statute or regulation) are appropriate bases for a public nuisance claim,[81] the fact that the verdict form did not separate the two is irrelevant.  *Compare Yates v. United States*, 354 U.S. 298, 311-12 (1957) (where charge of conspiring to organize Communist Party of United States with intent to causing overthrow of government was barred by statute of limitations, but it was submitted to jury along with charge of conspiring to advocate violent overthrow of government, convictions could not be supported on basis that jury found defendants guilty of conspiring to advocate, when it could not be determined on which charge defendants had been convicted).

## II.    THERE IS NO LEGAL BAR TO JUDGMENT ON PLAINTIFFS' NUISANCE CLAIM.

Defendants correctly note that this Court has rejected each of the following Defendants' arguments and reasons offered in support of their contention that Plaintiffs' claims are legally deficient.  Dkt. #4202 (Ds' JMOL) at p. 24 (citing Dkt. #1032 (CT1B MTD Order) and Dkt. #3403 (CT3 MTD Order)).  Since Defendants restated these issues to preserve them for appeal, in order to ensure a complete record for appellate purposes, Plaintiffs incorporate by reference their own and other plaintiffs' prior briefing and the Court's rulings on these same issues, including but not limited to: Dkt. #654 (CT1 Ps' MTD Opp.); Dkt. #2171 (CT1 Ps' Opp. to Preemption MSJ); Dkt. #2179 (CT1 Ps' Opp. to SOL MSJ); Dkt. #3002-1 (CT1 Ps' Opp. to Causation MSJ);

---

[81]    *See also, e.g.,* Plaintiffs' Omnibus Opposition to Defendants' Motions for New Trial, filed contemporaneously herewith and incorporated as if fully set forth herein, at § II.L.

Dkt. #3004-1 (Ps' Opp. to SOL MSJ); Dkt. #3366 (CT3 Ps' Opp. to MTD).[82]  Moreover, to the extent any of Defendants' legal arguments rely on a purported lack of evidence, Plaintiffs' incorporate fully the evidence cited above.  *Supra* at § I.  Plaintiffs further respond as follows.[83]

### A.   Ohio Statutory Law Does Not Preclude Plaintiffs' Common-Law Nuisance Claims.

#### 1.   *The Ohio Product Liability Act does not expressly bar Plaintiffs' nuisance claims.*

Contrary to Defendants' claims, this Court did not err by concluding that Plaintiffs with similar claims in Track One were asserting a non-abrogated claim for equitable relief.  Dkt. #4204 (Ds' Motion) at p. 25. Plaintiffs incorporate by reference their opposition brief on this issue. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 18-21. This Court rejected Defendants' arguments and correctly found that the common law public nuisance claims were not abrogated by the OPLA at least insofar as it does not seek compensatory damages for harm.[84]  Dkt. #1203 (CT1 Opinion and

---

[82]  *See also, e.g.,* Dkt. #1025 (CT1 R&R on MTDs); Dkt. #1203 (CT1 Order Adopting R&R); Dkt. #3403 (CT3 MTD Order); Dkt. #208 (CT1 Ps' MTD Opp.); Dkt. #2170 (CT1 Ps' Nuisance MSJ Opp.); Dkt. #2561 (CT1 Causation MSJ Order); Dkt. #2578 (CT1 Order on Ds' Nuisance MSJ); Dkt. #3012 (CT1 Ps' Nuisance MSJ); Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ); Dkt. #3099 (CT1 CVS MSJ Order); Dkt. #3102 (CT1 Walmart MSJ Order); Dkt. #3403 (CT3 MTD Order); Dkt. #3499 (CT3 Reconsideration Order); Dkt. #3883 (CT3 Ps' Trial Brief); Dkt. #3913 (CT3 GE MSJ Order); Dkt. #3946 (CT3 Keyes *Daubert* Order); Dkt. #3947 (CT3 Ps' Catizone *Daubert* Order); Dkt. #3948 (CT3 Ps' Alexander *Daubert* Order); Dkt. #3949 (McCann *Daubert* Order); Dkt. #3953 (CT3 Lembke *Daubert* Order); Dkt. #4210 (CT3 Ps' Catizone *Daubert* Opp.); Dkt. #4216 (CT3 Ps' Lembke *Daubert* Opp.); Dkt. #4218 (CT3 Ps' Opp. to GE MSJ); Dkt. #4226 (CT3 Keyes *Daubert* Opp.); Dkt. #4227 (CT3 Ps' Alexander *Daubert* Opp.); Dkt. #4229 (McCann *Daubert* Opp.).

[83]  To the extent Defendants are effectively seeking reconsideration of the Court's rulings, they do not even attempt to meet the applicable test for reconsideration which requires a showing of "manifest injustice" or "clear error."  *See* Dkt. #3499 (CT3 Reconsideration Order) at p. 2 (citation omitted).

[84]  "'Harm' means death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question.  Economic loss is not 'harm.'"  OHIO REV. CODE § 2307.71(A)(2).  Dkt. #1203 (CT1 Opinion and Order, adopting in part and rejecting in part Dkt. #1025 (R&R)) at p. 28 n.14.  This Court further rejected Defendants' assertion that section 2307.72(D)(1) which expressing carved out abatement relief for contamination of the environment as an indication that OPLA supersedes all other forms of equitable relief.  Concluding that "a far more natural reading on this section is the carving out of all forms of relief for pollution of the environment from preemption by federal environmental protection laws and regulations.  *Id*. at p. 26 n.12.

Order, adopting in part and rejecting in part Dkt. #1025 (R&R)) at pp. 23-28. The Court properly found that a claim seeking only equitable relief is not abrogated by the OPLA. *Id*. at p. 26.

> **2.    *Plaintiffs' nuisance claims are not precluded by Ohio Rev. Code Ann. § 4729.35.***

Defendants argue that § 4729.35 permits only injunctive relief and that Ohio law does not permit a plaintiff to bring a common-law claim where the Ohio Legislature has comprehensively regulated the field and provided specific remedies that conflict with the common-law cause of action. Dkt. #4202 (Ds' JMOL) at p. 25. Plaintiffs incorporate by reference their opposition brief on this issue. Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 5-10  This Court rejected Defendants' insistence that the Plaintiffs "can bring their claim under the appropriate statute, OHIO REV. CODE ("O.R.C") § 4729.35, or not at all." Dkt. #3403 (CT3 MTD Order) at pp. 3-4. After a thorough analysis, this Court concluded:

> Under the approach urged by Defendants, pharmacists, pharmacies, and "other person[s]" who violate a state or federal law or regulation governing controlled substances would be subject only to an order enjoining the misconduct. This reading would immunize an entity from common law liability for the consequences of this conduct, even if it causes a dire nuisance by unreasonably interfering with the public's right to health and safety. To find the General Assembly intended this outcome strains credulity and would contradict its fundamental instruction that, "[i]n enacting a statute, it is presumed that …[a] just and reasonable result is intended." O.R.C. § 1.47 (C).

> In sum, the Court perceives nothing in § 4729.35 expressly stating or necessarily implying abrogation of common law public nuisance claims.

Dkt. #3403 (CT3 MTD Order) at pp. 12-13. (internal footnotes omitted).

Similarly, this Court correctly rejected Defendants' motion for reconsideration or certification on this issue. Dkt. #3499 (CT3 Reconsideration Order) at pp. 3-4.

## B.    Ohio Common Law Does Not Preclude Plaintiffs' Public Nuisance Suit.

Contrary to Defendants' contentions, Plaintiffs public nuisance suit is viable, and Defendants owe a duty to Plaintiffs for their dispensing conduct under Ohio nuisance law.

### 1. *Plaintiffs have shown a violation of a public right.*

Defendant incorrectly claims that Plaintiffs cannot base their public-nuisance claim on the private misuse of opioid medications and are thus unable to prove the invasion of a public right. Dkt. #4202 (Ds' JMOL) at pp. 27-28; Dkt. #4207 (CVS JMOL) at p. 19. Plaintiffs incorporate by reference the Track One plaintiffs' prior briefing on this issue. *See* Dkt. #654 (CT1 Ps' MTD Opp.); *see also* Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 36-37. As noted below, this Court has consistently rejected this argument. Defendants offer the Court no legitimate reason to revisit its prior rulings.

Defendants did not seek reconsideration of this issue in their Motion to Dismiss the Second Amended Complaint and only asked that the issue be preserved for appeal. Dkt. #3340 (CT3 Ds' MTD) at pp. 30-31. Thus, the Court did not reconsider its prior rulings, (Dkt. #3403 (CT3 MTD Order) at pp. 32-33), and should not do so now. Instead, this Court should follow its previous orders, which have analyzed this issue and rejected Defendants' arguments that: (i) Plaintiffs' claims rely on an aggregation of individual rights, as opposed to rights commonly held by the public, and (ii) none of the allegedly interfered-with rights constitute public rights. *See* Dkt. #2578 (CT1 Order on Mfr. MSJ) at pp. 3-4; Dkt. #1680 at pp. 18-19 (Muscogee and Blackfeet Order adopting in part and rejecting in part Dkt. #1499 at pp. 58-61 (Muscogee R&R) and Dkt. #1500 at pp. 28-34 (Blackfeet R&R). Finally, courts in a multitude of states have rejected Defendants' claim that no public rights are at issue in opioid cases.[85] Defendants' reliance on *State*

---

[85] *Alabama v. Purdue Pharma L.P.*, 03-CV-2019-901174.00, slip op. at 11-12 (Cir. Ct. Nov. 13, 2019); *Alaska v. McKesson Corp.*, No. 3AN-18-10023CI, slip op. at 7 (Super. Ct. Aug. 28, 2019); *State v. Purdue Pharma L.P.*, No. 3AN-17-09966CI, 2018 WL 4468439 (Alaska Super. July 12, 2018); *City of Surprise v. Allergan PLC,* No. CV2019-003439, slip op. at 35-36 (Super. Ct. Oct. 28, 2020); *State v. Purdue Pharma L.P.*, No. CV2018002018, 2019 WL 1590064 (Ark.Cir. Apr. 05, 2019); *California ex rel. Korb v. Purdue Pharma L.P.*, No. 30-2014-00725287, slip op. at 16-17 (Super. Ct. Mar. 12, 2021); *City and County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 669 (N.D. Cal. Sept. 30, 2020) (Bryer); *In re Nat'l Prescription Opiate Litig.*, No. 18-OP-45332, 2020 WL 1986589 (N.D. Ohio Apr. 27, 2020); *In re Nat'l Prescription Opiate Litig.* (West Boca Medical Center), 452 F. Supp. 3d 745 (N.D. Ohio 2020); *see also Florida v. Purdue Pharma L.P.*, No. 2018-CA-001438, slip order (Cir. Ct. Apr. 11, 2019); *Kentucky ex rel. Beshear* v. *Cardinal Health,* No. 18-CI00I013, slip op. (Cir. Ct. Sept. 12, 2019); *Kentucky ex rel. Beshear v. Walgreens Boots Alliance, Inc.,* No. 18-CI-00846, slip op. (Cir. Ct. July 18, 2019); *Com. v. Endo Health Solutions Inc.*, No. 17-CI-1147, 2018 WL 3635765 (footnote continues on next page)

*ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021), an Oklahoma case applying Oklahoma nuisance law, is misplaced and should be rejected.[86]

---

(Ky.Cir.Ct. July 10, 2018); *City of Bos. v. Purdue Pharma, LP*, No. 1884CV02860, 2020 WL 416406 (Mass. Super. Jan. 3, 2020); *Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808BLS2, 2019 WL 5495866 (Mass. Super. Sept. 17, 2019); *Michigan ex rel. Kessel v. Cardinal Health, Inc.*, No. 19016896-NZ, slip op., at 2 (Cir. Ct. Mar. 24, 2021), *reversing on reconsideration* slip. op. (Cir. Ct. Nov. 17, 2020); *Mississippi v. Cardinal Health, Inc.*, No. 25Cll:18-cv00692, slip op. (Cir. Ct. Apr. 5, 2021); *Missouri ex rel. Schmitt v. Purdue Pharma, L.P.*, No. 1722-CC10626, slip op., *7-8 (Cir. Ct. Apr. 6, 2020); *Nevada v. McKesson Corp.*, No. A-19-796755-B, slip order (Dist. Ct. Jan. 3, 2020); *State v. Purdue Pharma Inc.*, No. 217-2017-CV-00402, 2018 WL 4566129 (N.H.Super. Sep. 18, 2018); *New Mexico ex rel. Balderas v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541 slip op. (Dist. Ct. Dec. 17, 2020); slip op. (Dist. Ct. Sept. 10, 2019); *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018); *State, ex rel. Dewine v. Purdue Pharma L.P.*, No. 17 CI 261, 2018 WL 4080052 (Ohio Com.Pl. Aug. 22, 2018); *County of Delaware v. Purdu.e Pharma, L.P.*, CV-2017008095, slip ops. (Ct. C.P., March 13, 2020, Dec. 4, 2019, and Oct. 25, 2019); *State v. Purdue Pharma L.P.*, No. PC-2018-4555, 2019 WL 3991963, at *9 (R.I.Super. Aug. 16, 2019); *South Carolina v. Purdue Pharma L.P.*, No. 2017-CP40-04872, slip order (Ct. C.P. Apr. 12, 2018); *State v. Purdue Pharma L.P.*, No. 1-173-18, 2019 WL 2331282, at *5 (Tenn.Cir.Ct. Feb. 22, 2019); *Tennessee ex rel. Slatery v. AmerisourceBergen Drug Corp.*, No. 1345-19, slip op. (Cir. Ct. July 14, 2020); *In re Texas Opioid Litigation* (*County of Dallas*), No. 2018-77098, slip op. (Dist. Ct. June 9, 2019); *Vermont v. Purdue Pharma L.P.*, No. 757-9-18 Cncv, slip op. at *6 (Super. Ct. Mar. 19, 2019); *Vermont v. Cardinal Health, Inc.*, No. 279-3-19 Cncv, slip op. (Super. Ct. May 12, 2020); *State v. Purdue Pharma L.P.*, No. 17-2-25505-0 SEA, 2018 WL 7892618 (Wash.Super. May 14, 2018); *Brooke Cty. Comm'n v. Purdue Pharma L.P.*, No. 17-C248, slip op. (Cir. Ct. Dec. 28, 2018), *writ denied*, *State ex rel. Cardinal Health, Inc. v. Hummel*, No. 19-0210 (W. Va. June 4, 2019).

[86]  In *Hunter*, the Oklahoma Supreme Court held that an opioid manufacturer could not be held liable for public nuisance, under Oklahoma's nuisance statute, based on its failure "to warn of the dangers associated with opioid abuse and addiction in promoting and marketing its opioid products." 499 P.3d at 720, 725 ("This Court relies on Oklahoma precedent, and the limitations set by Oklahoma case law guide our consideration of whether J&J's conduct created a public nuisance."). The court noted that "[f]or the past 100 years, our Court, applying Oklahoma's nuisance statutes, has limited Oklahoma public nuisance liability to defendants (1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive activity that rendered the property uninhabitable." *Id.* at 724; *see also id.* at 725 ("The Court applies the nuisance statutes to unlawful conduct that annoys, injures, or endangers the comfort, repose, health, or safety of others.  But that conduct has been criminal or property-based conflict.").  Although Plaintiffs do not believe *Hunter* was correctly decided, it certainly is of no consequence in this case which is based on *Ohio* nuisance law and brought against *chain pharmacies* for their unlawful and intentional *dispensing* conduct.  *Compare id.* at 727 (rejecting State's characterization of its suit as "an interference with the public right of health[,]" citing *Oklahoma* precedent for the proposition that "[t]his case does not involve a comparable incident to those in which we have anticipated that an injury to the public health would occur, e.g., diseased animals, pollution in drinking water, or the discharge of sewer on property"; "[A]s the manufacture and distribution of products *rarely* cause a violation of a public right, we refuse to expand public nuisance to claims *against a product manufacturer*.") (emphasis added).

### 2. *Plaintiffs have shown that Defendants' dispensing conduct constitutes a nuisance.*

Defendants contend the Plaintiffs cannot base their nuisance claim on Defendants' highly regulated dispensing conduct as an "absolute nuisance ordinarily involves an inherently dangerous activity." Dkt. #4202 (Ds' JMOL) at pp. 28-29. Plaintiffs incorporate their opposition brief on this issue. Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 26-31. This Court previously rejected all of Defendants' arguments, including the claim that an absolute nuisance theory could not apply because their dispensing conduct was licensed, authorized, and regulated under the CSA, and found that an "absolute" nuisance can be based on culpable and intentional or unlawful conduct by the defendant resulting in harm. Dkt. #3403 (CT3 MTD Order) at pp. 26-30. This Court further concluded Plaintiffs had sufficiently stated common law claims for absolute public nuisance based on Defendants' alleged dispensing activities. *Id.* at p. 30.

### 3. *Defendants have control over the prescription opioids at the time of the alleged nuisance.*

Defendants assert that a "defendant is not liable for public nuisance unless it exercises control over the instrumentality that caused the nuisance *at the time of the nuisance*," thus claiming that Plaintiffs cannot show Defendants controlled the opioids at the time of the alleged nuisance "i.e. when third parties diverted the opioids and used them illegally." Dkt. #4202 (Ds' JMOL) at pp. 29-30; *see also* Dkt. #4207 (CVS JMOL) at p. 23. Plaintiffs incorporate by reference their briefing on this issue in CT1. Dkt. #2170 (CT1 Ps' Opp. to Nuisance MSJ). This Court has previously rejected this argument noting that it "is premised on a misconception of Plaintiffs' theory of nuisance liability." Dkt. #2578 (CT1 Order on Mfr. MSJ) at pp. 4-5; *see also* Dkt. #1680 at pp. 19-20 adopting the analyses set forth in Dkt. #1499 at p. 57 (Muscogee), Dkt. #1500 at p. 31 (Blackfeet)). This Court recognized, "[p]laintiffs do not allege the claimed nuisance is the consequence of use or misuse of the opioid medication itself, but rather is the result of Defendants' business conduct: 'Defendants had control over the instrumentality of the nuisance by virtue of

their control over their own opioid marketing, distribution, or *dispensing practices*.'" *Id.* (emphasis added).  These rulings were correct and should be followed here.[87]

### 4.      The CSA and its Ohio analog are predicate "safety statutes."

Defendants argue that Plaintiffs cannot prove the violation of a "safety statute," which they claim is "required to prove liability under the 'unlawful' prong of absolute nuisance."  Dkt. #4202 (Ds' JMOL) at pp. 30-31.  Even assuming that this is a requirement under current Ohio public nuisance law, which Plaintiffs do not concede,[88] it is beyond dispute that the CSA (and its Ohio analog) sets forth specific legal requirements for the protection of others.  *See, e.g.,* 21 U.S.C. § 801(2) (1970) ("The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.");[89] *cf.* OHIO REV. CODE ANN. § 4729.35 ("The violation by a pharmacist or other person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse as defined in section 3719.011 of the Revised Code or the commission of any act set forth in division (A) of section 4729.16 of the Revised Code, is hereby declared to be inimical, harmful, and adverse to the public welfare of the citizens of Ohio and to constitute a public nuisance.").[90]

---

[87]   Defendants' reliance on *Hunter*, 499 P.3d 719, is misplaced, for the reasons discussed above.  *Supra* at fn.86; *see also* 499 P.3d at 728 (finding that "[e]ven with its influential marketing, J&J ultimately could not control[, *inter alia*,]: . . . how pharmacies dispersed its products . . .").

[88]   *See, e.g., Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 53 (Ohio Ct. App. 2007) ("Strict liability also attaches when there is 'the violation of law resulting in a civil wrong or harm," *especially* when a safety statute is violated.") (citation omitted) (emphasis added).

[89]   Moreover, the legislative history of the CSA shows that one of the fundamental purposes of the statute is to protect society from the dangers that controlled substances pose to the safety of communities.  H.R. Rep. 91-1444, 4574, 4601-02 (1970).

[90]   Plaintiffs are not asserting an action for statutory public nuisance in this case, but the fact that the Ohio legislature has deemed violations of controlled substance laws as a public nuisance demonstrates that these laws are meant to protect the public.

Notably, Defendants do not actually dispute this.  Instead they argue that these statutes are not "safety statutes" because they contain no private right of action.[91]  But Plaintiffs are not seeking to enforce the CSA or its Ohio analog; instead Plaintiffs have brought a common law public nuisance action to protect the public from Defendants' unreasonable interference with public rights.  One way to demonstrate that Defendants' interference was unreasonable is by showing that their "conduct is proscribed by a statute, ordinance or administrative regulation." RESTATEMENT (SECOND) OF TORTS § 821B.

The cases cited by Defendants in support of their argument are not applicable.  Dkt. #4202 (Ds' JMOL) at pp. 30-31.  Most do not involve a nuisance claim at all and are otherwise inapposite.[92]  And *Uland v. S.E. Johnson Companies*, WM-97-005, 1998 WL 123086, at *15-16, n.15 (Ohio Ct. App. Mar. 13, 1998), does not support Defendants' assertions.  *Uland* involved claims by landowners based upon the contamination of the lake that abuts their properties.  *Id.* at *3.  The court granted summary judgment as to the plaintiff's nuisance claim to the extent it was premised on some state and federal statutes and regulations, but denied summary judgment to the extent the claim was premised on R.C. § 3767.13(B), which recognizes that a violation of that particular section "damage[s] or prejudice[s]…the public."[93]

### 5.     *Plaintiffs do not seek an unprecedented expansion of nuisance contrary to public policy.*

Defendants claim that Plaintiffs' product-based nuisance theory must be rejected on public-policy grounds and as an illegitimate expansion of Ohio common law. Dkt. #4202 (Ds' JMOL) at

---

[91]   They also argue that violations of CSA regulations cannot establish *per se* liability.  Dkt. #4202 (Ds' JMOL) at p. 31.  They are incorrect for the reasons discussed in the Track One plaintiffs' prior briefing. *See, e.g.,* Dkt. #3017-1 (CT1 Ps' SOMs B MSJ Reply) at pp.71-72 & n.149.

[92]   *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 202–03 (Ohio 1998); *Becker v. Shaull*, 584 N.E.2d 684, 685–87 (Ohio 1992); *Smrtka v. Boote*, 88 N.E.3d 465, 474 (Ohio Ct. App. 2017); *Moreland v. Oak Creek OB/GYN, Inc.*, 970 N.E.2d 455, 462 (Ohio Ct. App. 2005); *Smith v. Hickenlooper*, 164 F. Supp. 3d 1286, 1290–91 (D. Colo. 2016).

[93]   *Uland*, 1998 WL 123086, at *15–16 ("R.C. 3767.13(B) reads as follows: '(B) No person shall cause or *allow* offal, filth, of noisome substances to be collected or *remain* in any place *to the damage or prejudice of others or of the public*.'" (emphasis added)).

pp. 26-27.  This argument ignores the actions of the Ohio's Supreme Court and Legislature.  The Ohio Supreme Court expressly approved similar product-based nuisance claims.[94]  *Beretta*, 768 N.E.2d 1136.  While *Beretta's* holding has been limited by OPLA, this Court has already determined that Plaintiffs' claims are not barred by OPLA (*see supra* § II.A.1) and should defer to the Ohio Legislature's preservation of Plaintiffs' claims here.

Defendants also point to the recent decision by the Oklahoma Supreme Court rejecting public nuisance claims against opioid manufacturers for falsely marketing opioids.  That case is inapplicable here, where the issue is whether the unlawful and intentional dispensing conduct of chain pharmacies caused a public nuisance under Ohio common law.  *Supra* at fn.86.  The other non-Ohio cases cited by Defendants are similarly inapt.[95]

---

[94]  Likewise, other Courts addressing governmental public nuisance claims have rejected this argument in opioid litigation and other cases involving products. *See, e.g., City of Boston v. Purdue Pharma, L.P.*, No. 1884CV02860, 2020 WL 977056 (Mass. Super. Ct. Jan. 31, 2020); *Opioid Litig.*, 2018 WL 3115102 (opioids); *see also City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1229-33 (Ind. 2003) (handguns); *People ex rel. Gallo v. Acuna*, 929 P.2d 596 (Cal. 1997) (handguns); *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 546 (Cal. Ct. App. 2017) (lead paint); *City of Wyoming v. Procter & Gamble Co.*, 210 F. Supp. 3d 1137, 1162 (D. Minn. 2016) ("flushable" wipes); *State of Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420 (D. Md. 2019) (MTBE); *Gov't of U.S. Virgin Islands v. Takata Corp.*, No. ST-16-CV-286, 2017 WL 3390594, at *40-44 (V.I. Super. Ct. June 19, 2017) (airbags).

[95]  *See, e.g., People v. Purdue Pharma L.P.*, 2021 WL 5227329, at *7 ("Nothing stated herein is intended to suggest that false or misleading marketing and promotion that results in medically inappropriate prescriptions being written may not constitute an actionable public nuisance.  But that is not the evidence before this Court."); *State of South Dakota v. Purdue Pharma, L.P.*, No. 32CIV18-000065, 2021 WL 6102727, at *1 (S.D.Cir. Mar. 29, 2021) (providing no explanation as to why it dismissed public nuisance claim); *State Ex Rel. Stenehjem v. Purdue Pharma L.P.*, No. 08-2018-CV-01300, 2019 WL 2245743, at *11-13 (N.D.Dist. May 10, 2019) (dismissing statutory public nuisance claim against opioid manufacturer because North Dakota courts have not extended to statute to cases involving the sale of goods); *State ex rel. Jennings v. Purdue Pharma L.P.*, No. CVN18C01223MMJCCLD, 2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019) (dismissing public nuisance claims where, under Delaware law, public nuisance traditionally limited to claims involving land use and has not been recognized for claims involving products; notably, court distinguished Delaware law from Ohio law on this issue); *City of New Haven v. Purdue Pharma, L.P.*, No. X07HHDCV176086134S, 2019 WL 423990, at *1-8 (Conn. Super. Ct. Jan. 8, 2019) (dismissing cities' public nuisance claims on standing grounds based on controlling Connecticut precedent), *judgment entered,* (Conn. Super. Ct. 2019).

### C.     Defendants Owe a Duty to Plaintiffs for their Dispensing Conduct.

#### 1.      *Plaintiffs properly base their nuisance claims on corporate-level dispensing duties.*

Defendants claim that "Plaintiffs' public-nuisance claim fails as to dispensing" because the Plaintiffs "cannot point to any provision of the CSA or its related regulations that Defendants violated." Dkt. #4202 (Ds' JMOL) at pp. 32-34.   Plaintiffs incorporate by reference their opposition brief on this issue.  Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 10-11, 15-20.  This Court has correctly concluded that the CSA imposes obligations on the pharmacists and pharmacies as dispensers.  Dkt. #3403 (CT3 MTD Order) at pp. 17-18.[96]  This Court further found the "CSA makes clear that any ***person***, which includes a pharmacy itself, who knowingly fills or allows to be filled an illegitimate prescription is in violation of the Act."  *Id*. at p. 21 (emphasis in original).  The Court rejected Defendants' reading of the CSA, finding it antithetical to its very purpose, and concluded that Defendants have failed to meet their burden of demonstrating there is no corporate-level obligation to design and implement systems, policies, or procedures to identify red flag prescriptions.  *Id.* at pp. 21-25.  These holdings are correct and should not be reconsidered.

#### 2.      *Penalizing Defendants for dispensing conduct that does not violate the CSA would not stand as an obstacle to Congress's objectives and is not preempted.*

Defendants contend that any theory of the case that seeks to penalize Defendants for dispensing conduct that does not violate the CSA would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and be preempted by federal law. Dkt. #4202 (Ds' JMOL) at pp. 34-36.  Defendants also contend that Plaintiffs' claims are preempted because "[i]n contravention of the Supremacy Clause, Plaintiffs seek to use Ohio nuisance law to override Congress and FDA's determination that opioid medications may be lawfully prescribed."  *Id*. at p. 6.[97]  Plaintiffs incorporate by reference plaintiffs' prior briefing on

---

[96]    CVS has acknowledged it owes this obligation.  P-08954 at 002 (in 2015 settlement with DEA, CVS "acknowledge[d] that *it* has a corresponding responsibility . . .") (emphasis added).

[97]    In addition to being legally correct, Defendants' argument is based on an erroneous factual assumption. (footnote continues on next page)

these issues.  Dkt. #2171 (CT1 Ps' Opp. to Preemption MSJ); Dkt. #3464 (CT1B Ps' MIL Opp.) at pp. 15-16.  This Court has rejected Defendants' previous contention that the imposition of state liability would stand as an obstacle to the DEA's ability to regulate and enforce the CSA. Dkt. #2565 (Opinion and Order Re: Preemption) at p. 22; Dkt. #3546 (CT1B Evidentiary Order) at pp. 25-26.  This Court should follow its previous holdings and reject this argument.

### 3. Plaintiffs do not seek to enforce statutory duties.

Defendant contends the DEA's enforcement authority is exclusive, precluding private suits.  Dkt. #4202 (Ds' JMOL) at pp. 36-37.  Plaintiffs incorporate by reference plaintiffs' previous briefing on this issue which explains that Plaintiffs do not seek to enforce the Defendants' statutory and regulatory duties.  Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 74-78.  This Court correctly rejected this argument in CT1, Dkt. #1025 (R&R) at pp. 76-79, *report and recommendation adopted in relevant part*, Dkt. #1203; *see also* Dkt. #1499 at p. 43, Muscogee *report and recommendation adopted in relevant part*, Dkt. #1680 ("As the court explained in *Summit County* and herein . . . the negligence, nuisance, and unjust enrichment claims do not rest upon an in actionable private right of action under these statutes."), and should do so again here.

### 4. Plaintiffs' claims are not barred by the primary jurisdiction doctrine.

Defendants contend that Plaintiffs' claims are barred by the primary jurisdiction doctrine which permits federal courts to refrain from adjudicating claims that require resolution of issues within the "special competence" of a federal agency.  Dkt. #4202 (Ds' JMOL) at p. 37. Defendant's cursory invocation of the doctrine for the first time in the middle of a jury trial (and reasserted now) amounted to far too little, far too late.

---

Plaintiffs have not sought to hold Defendants liable simply for dispensing large volumes of opioids. Rather, they dispensed large volumes of opioids presenting one or more red flags without sufficiently resolving those red flags prior to dispensing, making it likely that large numbers of those opioids were diverted.  The case cited by Defendants in support of this proposition is entirely distinguishable.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-59 (1982) (Federal Home Loan Bank Board regulation permitting "due-on-sale" clauses in federal savings and loan association mortgage contracts preempts conflicting state prohibitions on such clauses).

First, the doctrine is a discretionary one.  *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1065 (N.D. Ill. 2016) ("Primary jurisdiction is a permissive doctrine…").  The doctrine is also limited:

> However, not every case that implicates the expertise of federal agencies warrants invocation of primary jurisdiction. Rather, the doctrine is reserved for a limited set of circumstances that requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency.

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 579 (N.D. Cal. 2020) (internal quotations omitted).  Defendants identify no specific issues for DEA determination that are ones of first impression or are particularly complicated.  The primary issues here have been subject to numerous DEA administrative proceedings which have been cited and applied by this Court.  *See* Dkt. #3403 at pp. 21-23; Dkt. #3499 (CT3 Reconsideration Order) at pp. 5-7.

Defendants suggest that the DEA can resolve "the question of whether Defendants have complied with the CSA."  Dkt. #4202 (Ds' JMOL) at p. 37.  *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010), upon which Defendants rely, is distinguishable.  There the FCC filed a brief at the invitation of the Court of Appeals and identified specific questions of law on which it could offer an interpretation if there was a primary jurisdiction referral and agreed to issue a prompt decision.  *Id.* at 466-67.  The question of whether Defendants complied with the CSA is too general of a question for a primary jurisdiction referral.  Consideration of the *Charvat* factors is impossible on such a general level.

Moreover, unlike *Charvat,* here the DEA has participated extensively in these proceedings from their beginning, providing data, documents, and witnesses.  The agency, however, has made no request for a primary jurisdiction referral. Indeed, Plaintiffs are not aware of any previous attempts in the opioid litigation to make a primary jurisdiction referral to the DEA by any party or

court.  Requests to refer marketing questions in claims against the opioid manufacturers have been denied.[98]

Finally, in exercising its discretion, this Court should give significant weight to the status of this litigation and the fact that this request was not previously made.  As the Court in *JUUL* noted: "Courts must also consider whether invoking primary jurisdiction would needlessly delay the resolution of claims, and . . . efficiency is the deciding factor in whether to invoke primary jurisdiction."  497 F. Supp. 3d at 580 (internal quotations omitted).  Here, the trial is over and this Court has already ruled on the legal issues raised by Defendants.  A primary jurisdiction referral now cannot be deemed efficient in any sense of the word.  *See  Chabner v. United of Omaha Life Ins. Co.,* 225 F.3d 1042, 1051 & n.8 (9th Cir.2000) (noting it was "important to note that [appellant] did not seek application of the primary jurisdiction doctrine until after the district court had already" granted appellee summary judgment, and adding that "[s]taying the proceedings at that late date, much less now, would hardly have enhanced the district court's efficiency, nor would it have taken advantage of the [relevant agency]'s expertise, given that the district court had already decided" the relevant issue).  A referral would be particularly inefficient here because it could require restarting the jury trial anew after the DEA provided answers to whatever questions the Court referred to it.

A number of courts have held that the doctrine of primary jurisdiction is subject to waiver or forfeiture.  *See Glob. Crossing Bandwith, Inc. v. OLS, Inc.,* No. 05-CV-6423L, 2009 WL 763483, at *3 (W.D.N.Y. Mar. 19, 2009) (citing numerous cases).  This Court should join them and find that Defendants' delay in making the request constitutes waiver.  *Morsey v. Chevron USA, Inc.,* 779 F. Supp. 150, 153 (D.Kan.1991) (stating that "[c]ourts may weigh the timeliness of the assertion of the defense in making their discretionary decision to invoke the primary jurisdiction

---

[98]   *See, e.g., City of Chicago v. Purdue Pharma L.P.,* No. 14 C 4361, 2015 WL 2208423, at *4 (N.D. Ill. May 8, 2015) (denying primary jurisdiction referral of deceptive opioid marketing claim to Food and Drug Administration); *State of Oklahoma ex rel. Hunter v. Purdue L.P.,* No. CJ-2017-816, p. 3 (Okla. Dist. Ct. Dec. 6, 2017) (same); *In re Opioid Litigation*, No. 4000002017, 2018 WL 4760685 (N.Y. Sup. Ct. Mar. 14, 2018).

doctrine," and denying defendant's motion for a stay where defendant "waited nearly two years from the time it removed this action to assert primary jurisdiction").

### D. Plaintiffs' Nuisance Claims Do Not Fail for Additional Legal Reasons.

#### 1. Plaintiffs have standing.

Defendants assert that Plaintiffs lack standing – both Article III and "prudential (public nuisance)." Dkt. #4202 (Ds' JMOL) at p. 38; Dkt. #4207 (CVS JMOL) at p. 19. Plaintiffs incorporate by reference their previous briefing on this issue. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 38-45, 106-109. This Court has previously rejected Defendants' contention that the Track One Plaintiffs lack Article III standing finding that plaintiffs plausibly pled an injury-in-fact that is fairly traceable to the Defendants' alleged actions and is likely to be redressed by the requested relief.[99] Dkt. #1025 (R&R) at pp. 100-102, *report and recommendation adopted in relevant part,* Dkt. #1203 at p. 2; *see also City & Cty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 632 (N.D. Cal. 2020) (finding standing noting "the City's allegations demonstrate that, at the very least, Walgreens' oversupply of opioids and failure to report suspicious orders caused third parties to act in a way that injured the City").

Defendants' argument that Plaintiffs lack prudential standing is premised on the claim that plaintiffs' alleged injuries are wholly derivative of harm suffered by third parties. Dkt. #4202 (Ds' JMOL) at p. 38. This premise is not true, and the argument was previously rejected by the Court. Dkt. #1025 (R&R) at pp. 28-33, *report and recommendation adopted in relevant part*, Dkt. #1203 at p. 10. And this Court has separately found that Defendants' alleged misconduct and Plaintiffs' direct consequential injuries constitute direct injuries. Dkt. #1499, *report and*

---

[99] Defendants' reliance on *TransUnion LLC v. Ramirez*, ––– U.S. –––, 141 S. Ct. 2190, 2203, 210 L.Ed.2d 568 (2021) (Dkt. #4098 at p. 36) is unpersuasive. *Ramirez* merely held that pure regulatory violations detached from any concrete harm is insufficient to confer Article III standing. *Id.* at 2211. When, as here, a plaintiff pleads and proves concrete harm, the standing requirement is met. *Cf. Krueger v. Experian Info. Sols., Inc.*, No. 20-2060, 2021 WL 4145565, at *2 (6th Cir. Sept. 13, 2021) (plaintiff established injury in fact under *Ramirez* in his Fair Credit Reporting Act claim by showing that inaccurate reports about a mortgage loan's status prevented him from replacing his vehicle).

*recommendation adopted in relevant part*, Dkt. #1680.  These conclusions are correct and are sufficient to defeat Defendants' prudential standing challenge.

### 2.  The economic loss doctrine does not bar Plaintiffs' claims.

Defendants incorrectly claim the economic loss doctrine bars Plaintiffs' claim.  Dkt. #4202 (Ds' JMOL) at p. 38 (citing Dkt. #491-1 (CT1 Distr. Ds' MTD) at pp. 56-57, Dkt. #3340-1 (CT3 Ds' MTD) at p. 36); Dkt. #4207 (CVS JMOL) at p. 22.  Plaintiffs incorporate by reference plaintiffs' previous briefing on this issue.  Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 21-23. This Court has rejected application of the economic loss doctrine to the Plaintiffs' absolute public nuisance claim on the grounds that the "doctrine applies only to negligence" noting that this restriction of the doctrine "is replete in the case law."  Dkt. #3177 (*Cleveland Bakers* Opinion & Order) at pp. 58-59 (quoting *ODW Logistics, Inc. v. Karmaloop, Inc.*, 2014 WL 293816, at *4 (S.D. Ohio Jan. 27, 2014)); *see also id*. at n.33 (citing cases applying Ohio law); *id.* at 55-57 (contrary Ohio case law applies "to bar only qualified (negligence-based) public nuisance claims").  Defendants cite no cases holding that the doctrine applies to Plaintiffs' intent-based absolute public nuisance claim.

Finally, Defendants' citation to the RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 (2020), (Dkt. #4202 (Ds' JMOL) at p. 39), is unpersuasive.  By its express terms, Section 8 of the Third Restatement does not apply to the Plaintiffs' abatement claim here as the provision applies only to claims for economic loss by a private party who has suffered an injury "distinct in kind from those suffered by members of the affected community in general."  RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM, § 8.  The comment to Section 8 makes clear that the provision is not intended to apply to public nuisance actions brought by public officials.  *Id.*, § 8 cmt. a ("In addition to the common-law claims recognized here, public officials may bring civil or criminal actions against a defendant who creates a public nuisance. . .. The definition of 'public nuisance' for those purposes is widely a matter of statute and tends to be considerably broader than the common-law definition recognized by this Section as a basis for a private suit.").  Defendants

have not provided any examples of an Ohio court citing this section.[100]  No state's highest court has adopted Section 8, and this Court should be reluctant to presume that Ohio would do so if presented with the question.

### 3. Plaintiffs' claims are not barred or preempted by the statewide concern doctrine.

Defendants wrongly claim the statewide concern doctrine bars the Plaintiffs' claims. Dkt. #4202 (Ds' JMOL) at pp. 39-40.  Plaintiffs incorporate by reference their previous briefing on this issue.  Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 109-114.  This Court has correctly concluded the statewide concern doctrine does not bar the Plaintiffs' claims.  Dkt. #1025 (R&R) at pp. 98-100, and Defendants' offer no new arguments supporting reconsideration of that conclusion.

### 4. The municipal cost recovery doctrine does not bar Plaintiffs' claims.

Defendants assert the municipal cost recovery doctrine (also known as the free public services doctrine) bars Plaintiffs' claims.  Dkt. #4202 (Ds' JMOL) at p. 40.  The doctrine does not apply to Plaintiffs' claims. Plaintiffs incorporate by reference the previous briefing on this issue. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 21-23.  This Court rejected the application of the doctrine in Track One.  Dkt. #1025 (R&R) at pp. 17-22 (citing favorably *Beretta,* 768 N.E.2d at 1149-50 and rejecting *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 821 N.E.2d 1099 (2004)), *report and recommendation adopted in relevant part*, Dkt. #1203; *see also* Dkt. #1680 at pp. 13-14 (finding "the current trend among state court judges ruling in opioid-related cases around the

---

[100]  Generally, the Third Restatement has been viewed as a radical departure from the settled standards of tort law.  *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM, Introduction, Pg. 3 ("This Restatement is, therefore, an almost total overhaul of Restatement Second as it concerns the liability of commercial sellers of products.").  Unlike its predecessor, the Third Restatement has not been widely adopted by the states.  *See, e.g.*, *Delaney v. Deere and Co.*, 999 P.2d 930, 946 (Kan. 2000) (stating that the (Third) Restatement "goes beyond the law" and is "contrary to the law in Kansas"); *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 415 (Pa. 2014) (declining to adopt a product liability portion of the Third Restatement and discussing other courts across the country that have done the same); *Potter v. Chicago Pneumatic Tool Co.*, 694 A.2d 1319, 1331 (Conn. 1997) (observing that a provision of the Draft Restatement (Third) "has been a source of substantial controversy among commentators" and stating that rule promulgated in the Draft Restatement (Third) was inconsistent with the court's "independent review of the prevailing common law").

country is that the municipal cost recovery rule does not apply when, as alleged here, an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonable anticipated as part of its normal operating budget for municipal, county, or in this case, tribal services").

### 5. *Plaintiffs' public nuisance claims are not barred by the statute of limitations.*

Defendants contend that Plaintiffs' public nuisance claim is barred by either the two-year Ohio Product Liability Act ("OPLA") statute of limitations, OHIO REV. CODE § 2305.10, or the more general four-year statute of limitations for tort suits "[f]or an injury to the rights of the plaintiff not arising on contract," OHIO REV. CODE ANN. § 2305.09.  Dkt. #4202 (Ds' JMOL) at pp. 40-43; Dkt. #4207 (CVS JMOL) at pp. 20-21; Dkt. #4206 (WAG JMOL) at p. 12.  Plaintiffs incorporate by reference plaintiffs' prior briefing on this issue which sets forth that their public nuisance claims are not barred by the statute of limitations as there are no statute of limitations for public nuisance claims. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 122-128; Dkt. #2179 (CT1 Ps' Opp. to SOL MSJ) at pp. 17-19. This Court previously found that there is "no period of limitations applicable to Plaintiffs' claims of common law absolute public nuisance."  Dkt. #2568 (MSJ Order on SOL) at pp. 3-6.  Defendants do not even acknowledge the Court's prior ruling let alone try to explain why it is in error.

### 6. *There is an ongoing public nuisance caused by Defendants' improper dispensing of prescription opioids which requires abatement.*

Defendants contend that Plaintiffs have failed to show an ongoing public nuisance. Dkt. #4202 (Ds' JMOL) at p. 43; Dkt. #4207 (CVS JMOL) at pp. 21-22; Dkt. #4206 (WAG JMOL) at pp. 11-12.  Not so.  *Supra* at § I.A.  Defendants claim that Plaintiffs' arguments that "Defendants engaged in misconduct with respect to those prescription medications" and that Plaintiffs "continue to incur damages as a result of that misconduct" "is different from saying that a prescription opioid nuisance is ongoing" and that "Plaintiffs have not made that showing."

Dkt. #4202 (Ds' JMOL) at p. 43.[101]  Defendants cite no authority for their argument that such a showing of continuing conduct is independently required.  Courts commonly find nuisances based on conditions that remain after the nuisance causing activity has ceased.  *See Dartron Corp. v. Uniroyal Chem. Co.*, 893 F. Supp. 730, 741 (N.D. Ohio 1995) (denying summary judgment on claim that activities on adjacent properties resulting in contamination that spread to plaintiffs' property created a nuisance in spite of fact that activities ceased in 1975); *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 113 Ohio App. 3d 647, 660–61, 681 N.E.2d 1343, 1352 (1996) (denying summary judgement where evidence showed that contamination on the property from storage tanks that had been removed had spread onto adjoining properties); *see also* RESTATEMENT (SECOND) OF TORTS § 821B(2)(c) (1979) (noting that "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include . . . whether the conduct is of a continuing nature *or* has produced a permanent or long-lasting effect") (emphasis added).

### 7.    *There has not been improper admission of expert testimony.*

Defendants claim that without the expert testimony they sought to preclude (Dr. Caleb Alexander, Carmen Catizone, Dr. Katherine Keyes, Dr. Anna Lembke, and Dr. Craig McCann), Plaintiffs' case is legally insufficient and fails as a matter of law, and reassert their *Daubert* arguments against each expert witness.  Dkt. #4202 (Ds' JMOL) at pp. 44-45.  As an initial matter, Plaintiffs dispute that expert testimony was legally required to prove Plaintiffs' case for the reasons discussed in their prior briefing and by the Court itself.  *See, e.g.,* Dkt. #3967 (CT3 Evidentiary Order) at pp. 22-23 & n. 28 ("[T]he Notes of the Advisory Committee on Federal Rule of Evidence 702 seem to refute [Defendants' argument that expert testimony is required to show causation]."; "Although there is a medical angle to the question of whether the increased supply of prescription opioids caused the alleged harms to Plaintiffs stemming from the opioid crisis, the Court is not convinced it is a purely medical question such that it requires medical expert testimony.");

---

[101]  Contrary to Defendants' assertions, in this phase of these bifurcated proceedings, Plaintiffs have presented ample evidence of the continuing interference with the public's rights to health, safety, comfort, and convenience caused by Defendants' conduct.  *Supra* at § I.A.

Dkt. #3102 (CT1 Order on Walmart MSJ) at p. 4 n.12 ("[T]he Court notes the record evidence suggests obvious deficiencies that a layperson could plainly recognize. Accordingly, a lack of expert testimony is not fatal to Plaintiffs' claim."); Dkt. #3017-1 (CT1 Ps' SOM MSJ Reply) at pp. 81-83.

Regardless, the testimony of each of Plaintiffs' experts was properly admissible for the reasons set forth in Plaintiffs' prior briefing, which is incorporated by reference as if fully set forth herein. Dkt. #4210 (CT3 Ps' Catizone *Daubert* Opp.); Dkt. #4229 (McCann *Daubert* Opp.); Dkt. #4227 (CT3 Ps' Alexander *Daubert* Opp.); Dkt. #4226 (CT3 Keyes *Daubert* Opp.); Dkt. #4216 (CT3 Ps' Lembke *Daubert* Opp.). This Court has correctly ruled that the expert testimony presented at trial was admissible. Dkt. #3947 (CT3 Ps' Catizone *Daubert* Order); Dkt. #3949 (McCann *Daubert* Order); Dkt. #3948 (CT3 Ps' Alexander *Daubert* Order); Dkt. #3946 (CT3 Keyes *Daubert* Order); Dkt. #3953 (CT3 Lembke *Daubert* Order). Defendants offer no basis to reconsider these decisions, only a restatement of their prior arguments.

## CONCLUSION

For the foregoing reasons, Defendants' Motions for Judgment as a Matter of Law Under Rule 50(b) should be denied in their entirety.

Dated: January 20, 2022

Respectfully submitted,

*/s/ Jayne Conroy*
Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

117

*/s/ Joseph F. Rice*
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR 00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX 77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com
mca@lanierlawfirm.com

*Trial Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222

118

Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger