**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| **Track Three Cases** | |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS'**
**MOTIONS FOR NEW TRIAL (DKTS. #4204, #4207)**
**AND MEMORANDUM OF LAW IN SUPPORT**

January 20, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................... 1

LEGAL STANDARD ............................................................................. 1

ARGUMENT ......................................................................................... 3

I.   THE JURY'S VERDICT WAS NOT AGAINST THE GREAT WEIGHT OF THE EVIDENCE .......... 3

II.  THE TRIAL WAS NOT UNFAIR OR PREJUDICIAL TO DEFENDANTS. ................... 3

A.   The Court properly denied Defendants' mistrial motion based on juror misconduct, and a new trial is not warranted ......................................................... 3

B.   The Court properly excluded the three unvaccinated potential jurors. ........................... 9

C.   A new trial is not warranted based on Plaintiffs' counsel's closing arguments. .............. 14

D.   The Court properly admitted evidence of DEA settlements and administrative actions.. 25

E.   Defendants' complaints regarding the Court's hearsay rulings are unpersuasive. ........... 43

F.   Plaintiffs' counsel's questions on cross-examination were not improper and do not warrant a new trial. ......................................................................... 51

G.   Defendants are not entitled to a new trial as the Court did not delegate defining the law to DEA and other witnesses. ............................................................. 55

     1.   Definition of "diversion" ........................................................ 56

     2.   Definition of "knowingly" ...................................................... 59

     3.   Documentation requirement .................................................... 60

     4.   Definition of "Responsible Persons" under the CSA ............................. 60

H.   Catizone's testimony regarding his understanding of the CSA's obligations and about red flags was not prejudicial and does not warrant a new trial. .................................... 61

     1.   Mr. Catizone's testimony about the CSA did not usurp the role of the Court and was not irrelevant. ................................................................. 61

     2.   Mr. Catizone's testimony about the consequences of filling "red flag" prescriptions did not violate Daubert or this Court's Daubert ruling. ............................. 62

I.   Brad Nelson's live testimony by remote transmission was proper and does not warrant a new trial. ...................................................................................... 64

J.   The Court appropriately permitted reference to the DOJ Complaint because Walmart opened the door despite the Court's clear warnings. ........................................... 76

i

K.    The admission of extraterritorial evidence was proper and does not warrant a new trial. 84

L.    The Court's jury instructions fairly and adequately submitted the issues and applicable law to the jury. ................................................................................................................... 94

M.    The extraordinary remedy of a new trial based on cumulative error is not warranted. .... 98

**CONCLUSION** .................................................................................................................. **103**

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*In re: 3M Combat Arms Earplug Prod. Liab. Litig.*,
  No. 3:19-MD-2885, 2021 WL 2605957 (N.D. Fla. May 28, 2021) ................................ *passim*

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
  No. 12-CV-00064, 2014 WL 107153 (W.D. La. Jan. 8, 2014) ...................................... *passim*

*In re Air Crash Disaster*,
  86 F.3d 498 (6th Cir. 1996) ......................................................................................14

*Altman v. Bobcat Co.*,
  349 Fed. Appx. 758 (3rd Cir. 2009)..........................................................................6

*Aoki v. Gilbert*,
  No. 211CV02797TLNCKD, 2019 WL 1243719 (E.D. Cal. Mar. 18, 2019) ...................68, 71

*Arban v. West Pub. Corp.*,
  345 F.3d 390 (6th Cir. 2003) ................................................................................2, 3

*Argonaut Ins. Co. v. Manetta Enterprises, Inc.*,
  No. 19CV00482PKCRLM, 2020 WL 3104033 (E.D.N.Y. June 11, 2020) ..........................72

*Atwood v. UC Health*,
  No. 1:16CV593, 2019 WL 6877643 (S.D. Ohio Dec. 17, 2019)...........................................17

*Authentic Apparel Grp., LLC v. United States*,
  134 Fed. Cl. 78 (2017) ............................................................................................102

*Babcock Power, Inc. v. Kapsalis*,
  854 F. App'x 1 (6th Cir. 2021) ...............................................................................44

*Barnes v. District of Columbia*,
  924 F. Supp.2d 74 (D.D.C. 2013) .......................................................................34, 35

*Barnes v. Owens-Corning Fiberglas Corp.*,
  201 F.3d 815 (6th Cir. 2000) ...................................................................................2

*Barnette v. Grizzly Processing, LLC*,
  No. CIV. 10-77-ART, 2012 WL 1067076 (E.D. Ky. Mar. 28, 2012) ......................................6

*Baskin v. Pepsi MidAmerica Co.*,
  No. 5:13-CV-00030-TBR, 2015 WL 363906 (W.D. Ky. Jan. 27, 2015) ..............................78

*Beck v. Haik*,
  377 F.3d 624 (6th Cir. 2004) ..................................................................................82

*Benaron v. Simic*,
19-CV-1653 (D. Or. 2021), Opinion and Order, Dkt. 54 .......................................................9

*In re Beverly Hills Fire Litig.*,
695 F.2d 207 (6th Cir. 1982) .............................................................................................7, 8

*Boyle v. United States*,
556 U.S. 938 (2009)...............................................................................................................59

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*,
585 F.3d 267 (6th Cir. 2009) ............................................................................................2, 3

*Brinkley v. Houk*,
866 F. Supp. 2d 747 (N.D. Ohio 2011), *amended in part*, No. 4:06 CV 0110, 2012
WL 1537661 (N.D. Ohio Apr. 30, 2012), *and aff'd,* 831 F.3d 356 (6th Cir. 2016)...............53

*C.P. Ints., Inc. v. California Pools, Inc.*,
238 F.3d 690 (5th Cir. 2001) ...............................................................................................37

*Caudle v. D.C.*,
707 F.3d 354 (D.C. Cir. 2013) .............................................................................................18

*Cawley v. Eastman Outdoors, Inc.*,
No. 1:14-CV-00310, 2014 WL 4656381 (N.D. Ohio Sept. 16, 2014)...................................67

*Chapman v. Tristar Prod., Inc.*,
No. 1:16-CV-1114, 2017 WL 7048986 (N.D. Ohio July 6, 2017) ............................71, 73, 74

*Chernyak v. Bricker*,
No. 2:11-CV-449, 2012 WL 1940646 (S.D. Ohio May 29, 2012) ........................................42

*Chiaverini, Inc. v. Frenchie's Frine Jewelry, Coins, Stamps, Inc.*,
2008 WL 408415 (E.D. Mich. 2008) ...................................................................................100

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015)...................................................................................................87

*Cincinnati v. Beretta, U.S.A. Corp.*,
768 N.E2d 1136 (Ohio 2002) ...............................................................................................35

*City of Cleveland v. Peter Kiewit Sons' Co.*,
624 F.2d 749 (6th Cir. 1980) .............................................................................14, 15, 19, 25

*Clark v. Chrysler Corp.*,
436 F.3d 594 (6th Cir. 2006) ................................................................................................23

*Conner v. Larose*,
    No. 1:15 CV 2722, 2017 WL 4155352 (N.D. Ohio May 31, 2017), *report and recommendation adopted*, No. 1:15CV2722, 2017 WL 4150891 (N.D. Ohio Sept. 18, 2017) ..................................................................................................99, 100

*Conte v. Gen. Housewares Corp.*,
    215 F.3d 628 (6th Cir. 2000) ...................................................................................1, 2

*Cousins v. Bray*,
    No. 2:03-CV-1071, 2005 WL 8161508 (S.D. Ohio Feb. 28, 2005) ....................................7, 23

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579 (1993)..................................................................................................45, 63

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*,
    No. 3:11-MD-2244-K, 2016 WL 9776572 (N.D. Tex. Sept. 20, 2016) .........................71, 73

*Doe v. Dordoni*,
    No. 116CV00074DJHHBB, 2021 WL 6196709 (W.D. Ky. Mar. 22, 2021), *report and recommendation adopted*, No. 1:16-CV-74-DJH-HBB, 2021 WL 5035123 (W.D. Ky. Apr. 13, 2021) ..............................................................................................48

*Donahoo v. Ohio Dep't of Youth Servs.*,
    211 F.R.D. 303 (N.D. Ohio 2002) .........................................................................67

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974)...............................................................................................14

*Draper v. Rosario*,
    836 F.3d 1072 (9th Cir. 2016) ...............................................................................22

*Duren v. Missouri*,
    439 U.S. 357 (1979)...................................................................................11, 12, 13

*Eagan v. CSX Transp., Inc.*,
    271 F. Supp. 2d 993 (E.D. Mich. 2003)................................................................23

*Eagan v. CSX Transp., Inc.*,
    294 F. Supp. 2d 911 (E.D. Mich. 2003)................................................................24

*EB-Bran Prods. v. Warner*,
    242 F. App'x 311 (6th Cir. 2007) ......................................................................25, 85

*Engebretsen v. Fairchild Aircraft Corp.*,
    21 F.3d 721 (6th Cir. 1994) .................................................................................44, 48

*F.T.C. v. Swedish Match N. Am., Inc.*,
    197 F.R.D. 1 (D.D.C. 2000)................................................................................68

v

*Factory Mut. Ins. Co. v. Alon USA L.P.*,
   705 F.3d 518 (5th Cir. 2013) ............................................................47

*Fathera v. Smyrna Police Dep't*,
   646 F. App'x 395 (6th Cir. 2016) .......................................................77

*First Tenn. Bank Nat'l Ass'n v. Barreto*,
   268 F.3d 319 (6th Cir. 2001) ............................................................63

*Ford v. Seabold*,
   841 F.2d 677 (6th Cir. 1988) ............................................................12

*Fryman v. Fed. Crop Ins. Corp.*,
   936 F.2d 244 (6th Cir. 1991) ............................................................99

*Fuhr v. Sch. Dist. of City of Hazel Park*,
   364 F.3d 753 (6th Cir. 2004) ............................................................23

*Gilster v. Primebank*,
   747 F.3d 1007 (8th Cir. 2014) ..........................................................22

*Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n*,
   470 F. Supp. 3d 735 (E.D. Mich. 2020)..............................67, 68, 72

*Greig v. Botros*,
   525 F. App'x 781 (10th Cir. 2013) ...................................................103

*Gritton v. Disponett*,
   No. CIV.A. 3:05-75-JMH, 2007 WL 3407459 (E.D. Ky. Nov. 14, 2007) ............................83

*Hamm v. Jabe*,
   706 F.2d 765 (6th Cir. 1983) ........................................................4, 14

*Helfrich v. Lakeside Park Police Dep't*,
   497 F. App'x 500 (6th Cir. 2012) ................................................77, 81

*Hetzer-Young v. Elano Corp.*,
   2016-Ohio-3356, 66 N.E.3d 234.....................................................102

*Hickman v. Bradshaw*,
   No. 5:16 CV 1077, 2017 WL 10901962 (N.D. Ohio Nov. 30, 2017), *report and recommendation adopted*, No. 5:16-CV-1077, 2019 WL 1040846 (N.D. Ohio Mar. 5, 2019) ............................................................7, 8

*Hickson Corp. v. Norfolk S. Ry. Co.*,
   124 F. App'x 336 (6th Cir. 2005) ............................................78, 81, 82

*Hodge v. Hurley*,
   426 F.3d 368 (6th Cir. 2005) ............................................................................................19

*Holmes v. City of Massillon, Ohio*,
   78 F.3d 1041 (6th Cir. 1996) ..................................................................... *passim*

*House v. Players' Dugout, Inc.*,
   No. 3:16-CV-00594-RGJ, 2021 WL 4898071 (W.D. Ky. Oct. 20, 2021)............................72

*Hunt v. Warden, Lebanon Corr. Inst.*,
   No. 17-3253, 2018 WL 1363807 (6th Cir. Jan. 22, 2018)......................................................55

*Int'l Seaway Trading Corp. v. Target Corp.*,
   No. 020MC00086NEBKMM, 2021 WL 672990 (D. Minn. Feb. 22, 2021) ...................69, 70

*Ives v. Lyon*,
   No. AP 18-3076-PCM, 2020 WL 1456479 (Bankr. D. Or. Mar. 20, 2020) ..........................69

*Jimkoski v. State Farm Mut. Auto. Ins. Co.*,
   247 F. App'x 654 (6th Cir. 2007) ..............................................................................6, 15

*Joffe v. King & Spalding LLP*,
   No. 17-CV-3392 (VEC), ––– F.Supp.3d –––––, 2021 WL 5864427 (S.D.N.Y. Dec. 10,
   2021) ..................................................................................................... *passim*

*Jones v. Federated Fin. Rsrv. Corp.*,
   144 F.3d 961 (6th Cir. 1998) ..................................................................................98, 99

*Jones v. Sandusky Cty., Ohio*,
   96 F. Supp. 3d 711 (N.D. Ohio 2015), *aff'd*, 652 F. App'x 348 (6th Cir. 2016)....................23

*Kaltrider v. Young Men's Christian Ass'n of Cleveland, Ohio*,
   457 F.2d 768 (6th Cir. 1972) ..............................................................................................6

*Kim Laube & Co., Inc. v. Wahl Clipper Corp.*,
   No. LACV0900914JAKJCX, 2013 WL 12085166 (C.D. Cal. Aug. 19, 2013) ....................85

*Kingsley Assocs., Inc. v. Del-Met, Inc.*,
   918 F.2d 1277 (6th Cir. 1990) .........................................................................................44

*Kokesh v. Am. S.S. Co.*,
   747 F.2d 1092 (6th Cir. 1984) ..............................................................................19, 23, 24

*Krueger v. Otis Elevator Co.*,
   925 F.2d 1464, 1991 WL 21981 (6th Cir. 1991) (unpublished) .............................................15

*Leavitt v. Scott*,
   338 F.2d 749 (10th Cir. 1964) .........................................................................................54

*Lockhart v. McCree*,
476 U.S. 162 (1986)........................................................................................................12

*Lucio v. Levy Env't Servs. Co.*,
173 F. Supp. 3d 558 (N.D. Ohio), *aff'd*, 670 F. App'x 889 (6th Cir. 2016)............................44

*McPherson v. Kelsey*,
125 F.3d 989 (6th Cir. 1997) ..................................................................................25

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*,
725 F.3d 571 (6th Cir. 2013) ..................................................................................98

*Mich. First Credit Union v. Cumis Ins. Soc., Inc.*,
641 F.3d 240 (6th Cir. 2011) .......................................................................100, 103

*Miller v. Borg*,
899 F.2d 19, 1990 WL 35218 (9th Cir. 1990) (unpublished) ..................................11

*Momeni-Kuric v. Metro. Prop. & Cas. Ins. Co.*,
No. 3:18-CV-00197-RGJ, 2019 WL 3416677 (W.D. Ky. July 29, 2019)...............................44

*Moore v. Commonwealth*,
No. 2018-CA-001653-MR, 2019 WL 6817587 (Ky. Ct. App. Dec. 13, 2019) ......................20

*Mullins v. Ethicon, Inc.*,
No. 2:12-CV-02952, 2015 WL 8275744 (S.D.W. Va. Dec. 7, 2015) .........................71, 73, 74

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-MD-2804, 2020 WL 425965 (N.D. Ohio Jan. 27, 2020) ........................................85

*New York Cent. R. Co. v. Johnson*,
279 U.S. 310 (1929)...........................................................................................................54

*In re Newbrook Shipping Corp.*,
498 F. Supp. 3d 807 (D. Md. 2020) ..................................................................68, 69

*Nolan v. Memphis City Sch.*,
589 F.3d 257 (6th Cir. 2009) ....................................................................................2

*Novovic v. Greyhound Lines, Inc.*,
No. 2:09-CV-00753, 2012 WL 252124 (S.D. Ohio Jan. 26, 2012)..................................67, 68

*Off. Comm. of Unsecured Creditors v. Calpers Corp. Partners LLC*,
No. 1:18-CV-68-NT, 2021 WL 3081880 (D. Me. July 20, 2021)....................................69, 75

*Park W. Galleries, Inc. v. Hochman*,
692 F.3d 539 (6th Cir. 2012) ..................................................................................24

*In re Petition of Boehringer Ingelheim Pharms., Inc., & Boehringer Ingelheim Int'l GmbH, in Pradaxa (Dabigatran Etexilate) Prod. Liab. Litig.*,
745 F.3d 216 (7th Cir. 2014) ............................................................................77

*Pingatore v. Montgomery Ward & Co.*,
419 F.2d 1138 (6th Cir. 1969) ....................................................................53, 54

*Polek v. Grand River Nav.*,
872 F. Supp. 2d 582 (E.D. Mich. 2012)..............................................................24

*Prasol v. Cattron-Theimeg, Inc.*,
No. 09-10248, 2011 WL 2669619 (E.D. Mich. July 8, 2011) ................................8

*In re RFC & ResCap Liquidating Tr. Action*,
444 F. Supp. 3d 967 (D. Minn. 2020)..................................................................72

*Richardson v. Marsh*,
481 U.S. 200 (1987)............................................................................................6

*Richardson v. Time Mfg. Co.*,
No. 5:04-CV-27, 2005 WL 2180482 (W.D. Mich. Sept. 9, 2005) ........................42

*Risher v. United States*,
2011 WL 1626776 (W.D. Tenn. 2011)...............................................................100

*Rush v. Illinois Cent. R. Co.*,
399 F.3d 705 (6th Cir. 2005) .............................................................................51

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*,
No. 1:06CV2781, 2009 WL 10689369 (N.D. Ohio Oct. 23, 2009)........................47

*In re San Juan Dupont Plaza Hotel Fire Litig.*,
129 F.R.D. 424 (D.P.R. 1989) ...............................................................69, 70, 71

*Schnipke v. Safe-Turf Installation Group, L.L.C.*,
940 N.E.2d 993 (Ohio Ct. App. 2010).................................................................59

*Scottsdale Ins. Co. v. Flowers*,
513 F.3d 546 (6th Cir. 2008) .............................................................................85

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) .............................................................................48

*Skogen v. Dow Chem. Co.*,
375 F.2d 692 (8th Cir. 1967) .............................................................................54

*Smith v. Highland Park Ruritan Club*,
No. 3:06-CV-351, 2008 WL 11342641 (E.D. Tenn. Oct. 21, 2008) ......................25

ix

*Smith v. Justarr, Inc.*,
    657 N.E.2d 542 (Ohio Ct. App. 1995) ..................................................................................56

*Smith v. McQuiggin*,
    No. 2:09-CV-215, 2011 WL 4824492 (W.D. Mich. Oct. 11, 2011) .........................................99

*Smith v. Travelers Ins. Co*.,
    438 F.2d 373 (6th Cir. 1971) ...............................................................................................17

*Sparks v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am., UAW*,
    99 F.3d 1140, 1996 WL 487252 (6th Cir. 1996) (unpublished) ........................................6, 17

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) .......................................................................................................17, 18

*State v. Green*,
    609 N.E.2d 1253 (Ohio 1993) ..............................................................................................51

*State v. Jones*,
    2015-Ohio-4116, 43 N.E.3d 833 (2d Dist.) ........................................................................102

*States v. Valencia*,
    600 F.3d 389 (5th Cir. 2010) ..............................................................................................102

*Stern v. Shouldice*,
    706 F.2d 742 (6th Cir. 1983) ...........................................................................................93, 94

*Stockman v. Oakcrest Dental Ctr., P.C.*,
    480 F.3d 791 (6th Cir. 2007) ...........................................................................................33, 84

*Stone Tech. (HK) Co. v. GlobalGeeks, Inc.*,
    No. 20-CV-23251, 2021 WL 2940256 (S.D. Fla. July 13, 2021) ....................................75, 76

*Strickland v. Owens Corning*,
    142 F.3d 353 (6th Cir. 1998) .............................................................................................2, 23

*Tamraz v. Lincoln Elec. Co.*,
    2007 WL 4287620 (N.D. Ohio Dec. 4, 2007) .......................................................................14

*In re Taxotere (Docetaxel) Prod. Liab. Litig.*,
    No. 16-17039, 2021 WL 6202422 (E.D. La. July 26, 2021) ...................................................69

*Taylor v. TECO Barge Line, Inc*.,
    517 F.3d 372 (6th Cir. 2008) ...............................................................................................2, 3

*Thompson v. Grida*,
    No. 1:08 CV 271, 2013 WL 12228991 (N.D. Ohio Dec. 31, 2013) ...........................6, 17, 100

*Timmel v. Phillips*,
    799 F.2d 1083 (5th Cir. 1986) ...........................................................................11

*Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*,
    682 F.3d 292 (4th Cir. 2012) ........................................................................97, 98

*Tompkin v. Philip Morris USA, Inc.*,
    362 F.3d 882 (6th Cir. 2004) ...............................................................................2

*Toth v. Ford Motor Co.*,
    No. 1:08-CV-00391-JG, 2008 WL 11380224 (N.D. Ohio Sept. 18, 2008)...........................85

*Toth v. Grand Trunk R.R.*,
    306 F.3d 335 (6th Cir. 2002) .............................................................................81

*Trepel v. Roadway Exp., Inc.*,
    194 F.3d 708 (6th Cir. 1999) .............................................................................48

*Twachtman v. Connelly*,
    106 F.2d 501 (6th Cir. 1939) .............................................................................51

*U.S. Salt, Inc. v. Broken Arrow, Inc.*,
    563 F.3d 687 (8th Cir. 2009) ............................................................................102

*United States v. $110,000 in United States Currency*,
    No. 21 C 981, 2021 WL 2376019 (N.D. Ill. June 10, 2021) .....................................69, 70, 72

*United States v. Acosta*,
    924 F.3d 288 (6th Cir. 2019) .........................................................................20, 21

*United States v. Adams*,
    722 F.3d 788 (6th Cir. 2013) ....................................................................50, 81, 103

*United States v. Alkufi*,
    636 F. App'x 323 (6th Cir. 2016) ........................................................................32

*United States v. Allen*,
    160 F.3d 1096 (6th Cir. 1998) ...........................................................................11

*United States v. Armsbury*,
    408 F. Supp. 1130 (D. Or. 1976) ........................................................................12

*United States v. Bender*,
    265 F.3d 464 (6th Cir. 2001) .............................................................................77

*United States v. Boyd*,
    640 F.3d 657 (6th Cir. 2011) .............................................................................21

*United States v. Brawner*,
   173 F.3d 966 (6th Cir. 1999) ................................................................36, 87

*United States v. Buford*,
   106 F. App'x 400 (6th Cir. 2004) ...............................................................99

*United States v. Copeland*,
   51 F.3d 611 (6th Cir. 1995) .....................................................................4, 8

*United States v. Dabish*,
   708 F.2d 240 (6th Cir. 1983) ......................................................................32

*United States v. Elder*,
   No. 18-CR-92 (WFK), 2021 WL 4137532 (E.D.N.Y. Sept. 2, 2021) .......................9

*United States v. Emuegbunam*,
   268 F.3d 377 (6th Cir. 2001) ................................................................19, 55

*United States v. Ford*,
   761 F.3d 641 (6th Cir. 2014) ......................................................................45

*United States v. Frost*,
   914 F.2d 756 (6th Cir. 1990) ......................................................................82

*United States v. Guild*,
   No. 1:07CR404 (JCC), 2008 WL 191184 (E.D. Va. Jan. 17, 2008) .....................71

*United States v. Johnson*,
   No. 1:21CR123, 2021 WL 3167883 (N.D. Ohio July 27, 2021) ...............78, 82, 83

*United States v. Kerley*,
   784 F.3d 327 (6th Cir. 2015) .....................................................................102

*United States v. Khan*,
   993 F2d 1368 (9th Cir. 1993) ......................................................................37

*United States v. King*,
   378 F.2d 359 (6th Cir. 1967) .................................................................82, 83

*United States v. Knox*,
   17 F. App'x 353 (6th Cir. 2001) ................................................................103

*United States v. Kojayan*,
   8 F.3d 1315 (9th Cir. 1993) ........................................................................21

*United States v. Lundergan*,
   No. 5:18-CR-00106-GFVT, 2019 WL 4248971 (E.D. Ky. Sept. 6, 2019)...............7

*United States v. McGuire*,
  744 F.2d 1197 (6th Cir. 1984) ............................................................83

*United States v. Medel*,
  592 F.2d 1305 (5th Cir. 1979) ............................................................54

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008)................................................................47

*United States v. Moses*,
  No. 19-CR-6074, —— F.Supp.3d ——, 2021 WL 4739789 (W.D.N.Y. Oct. 12, 2021) ....9, 11,
  12

*United States v. Nixon*,
  694 F.3d 623 (6th Cir. 2012) ..............................................................36

*United States v. Pamatmat*,
  No. 11-20551-18, 2017 WL 2262975 (E.D. Mich. May 23, 2017), *aff'd*, 756 F. App'x
  537 (6th Cir. 2018)..............................................................................99

*United States v. Paulus*,
  894 F.3d 267 (6th Cir. 2018) ..............................................................2

*United States v. Payne*,
  2 F.3d 706 (6th Cir. 1993) ..................................................................53

*United States v. Phibbs*,
  999 F.2d 1053 (6th Cir. 1993) .........................................................6, 23

*United States v. Poulsen*,
  655 F.3d 492 (6th Cir. 2011) ..............................................................36

*United States v. Richmond*,
  884 F.2d 581, 1989 WL 103334 (6th Cir. 1989) (unpublished) ................8

*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007)..............................................................102

*United States v. Rios*,
  830 F.3d 403 (6th Cir. 2016) ..............................................................47

*United States v. Rivera-Santiago*,
  872 F.2d 1073 (1st Cir. 1989)..............................................................37

*United States v. Rugiero*,
  20 F.3d 1387 (6th Cir. 1994) ..............................................................8

*United States v. Schaffner*,
   780 F.2d 1024 (6th Cir. 1985) ...........................................................................51

*United States v. Schulte*,
   17-CR-548, 2021 WL 1146094 (S.D.N.Y. Mar. 24, 2021) ...................................11

*United States v. Scott*,
   716 F. App'x 477 (6th Cir. 2017) ........................................................................47

*United States v. Segines*,
   17 F.3d 847 (6th Cir. 1994) ...........................................................................77, 84

*United States v. Smith*,
   500 F.2d 293 (6th Cir. 1974) ..............................................................................22

*United States v. Smith*,
   928 F.3d 1215 (11th Cir. 2019) ..........................................................................99

*United States v. Solivan*,
   937 F.2d 1146 (6th Cir. 1991) .......................................................................18, 19

*United States v. Stuckey*,
   253 F. App'x 468 (6th Cir. 2007) ........................................................................54

*United States v. Sypher*,
   684 F.3d 622 (6th Cir. 2012) ..............................................................................99

*United States v. Trujillo*,
   376 F.3d 593 (6th Cir. 2004) ..............................................................................99

*United States v. United Techs. Corp.*,
   No. 3:99-CV-093, 2005 WL 6199561 (S.D. Ohio Feb. 2, 2005) ...........................44

*United States v. Wheaton*,
   517 F.3d 350 (6th Cir. 2008) ................................................................................8

*United States v. Yarbrough*,
   352 F.2d 491 (6th Cir. 1965) ..............................................................................83

*United States v. Young*,
   470 U.S. 1 (1985).........................................................................................19, 20

*United States v. Zidell*,
   323 F.3d 412 (6th Cir. 2003) ..............................................................................52

*United States v. Zipkin*,
   729 F.2d 384 (6th Cir. 1984) ..............................................................................62

*Valadez v. Watkins Motor Lines, Inc.*,
    758 F.3d 975 (8th Cir. 2014) ............................................... 84

*In re Vioxx Prod. Liab. Litig.*,
    439 F. Supp. 2d 640 (E.D. La. 2006) ............................. *passim*

*Walker v. Bain*,
    257 F.3d 660 (6th Cir. 2001) ............................................ 100

*Walker v. Engle*,
    703 F.2d 959 (6th Cir. 1983) ............................................ 103

*Warren v. Thompson*,
    224 F.R.D. 236 (D.D.C. 2004), *aff'd sub nom. Warren v. Leavitt*, 264 F. App'x 9
    (D.C. Cir. 2008) ............................................................... 85

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    No. MDL NO. 551, 1988 WL 525314 (W.D. Wash. Aug. 9, 1988) ................ 70, 71, 72

*White Mule Co. v. ATC Leasing Co. LLC*,
    No. 3:07CV00057, 2008 WL 2680273 (N.D. Ohio June 25, 2008) ............. 67

*Williams v. Illinois*,
    567 U.S. 50 (2012) ............................................................ 44

*Wilson ex rel. Wilson v. Merrell Dow Pharm. Inc.*,
    893 F.2d 1149 (10th Cir. 1990) ........................................ 45

*In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*,
    No. MDL 2592, 2017 WL 2311719 (E.D. La. May 26, 2017) ................ 69, 71, 73

*Zieman v. City of Detroit*,
    81 F.3d 162, 1996 WL 140328 (6th Cir. 1996) (unpublished) ............. 77

**STATUTES**

21 U.S.C. § 829 ...................................................................... 59

21 U.S.C. § 823 ................................................................. 58, 59

28 U.S.C. § 1866 .................................................................... 10

28 U.S.C. § 1869 .................................................................... 11

**OTHER AUTHORITIES**

21 C.F.R. § 1306.04 ................................................................ 59

C. Wright and A. Miller, Federal Practice and Procedure: Civil § 2472 .......................................23

FED. R. CIV. P. 7 ...............................................................................................................101

FED. R. CIV. P. 43 .......................................................................................................... *passim*

FED. R. CIV. P. 45 .......................................................................................................... *passim*

FED. R. CIV. P. 47 ................................................................................................................11

FED. R. CIV. P. 49 ................................................................................................................97

FED. R. CIV. P. 59 ..................................................................................................................1

FED. R. CIV. P. 61 .............................................................................................................100

FED. R. EVID. 103 ...............................................................................................................36

FED. R. EVID. 105 ...............................................................................................................51

FED. R. EVID. 402 ........................................................................................................37, 102

FED. R. EVID. 403 ........................................................................................................37, 102

FED. R. EVID. 404 ...............................................................................................................43

FED. R. EVID. 405 ...................................................................................................78, 82, 83

FED. R. EVID. 408 .................................................................................25, 33, 34, 37, 84

FED. R. EVID. 602 ........................................................................................................45, 50

FED. R. EVID. 701 .............................................................................................................102

FED. R. EVID. 702 ...............................................................................................................63

FED. R. EVID. 703 ........................................................................................................44, 45

FED. R. EVID. 801 ........................................................................................................46, 83

FED. R. EVID. 802 ...............................................................................................................43

FED. R. EVID. 803 ...............................................................................................................46

*Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order,
77 FR 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012) ...........................................90, 91

## INTRODUCTION

Not one of Defendants' litany of purported errors has any merit.  Many of Defendants' arguments are based upon perceived errors to which they failed to timely object at trial.  Many are bald statements without adequate legal support or support in the trial record.  They are also incorrect as a substantive matter.  Specifically, contrary to Defendants' assertions: (1) the great weight of the evidence supports the jury's verdict; (2) the Court properly denied Defendants' mistrial motions related to juror misconduct and closing arguments; (3) the Court properly excluded the three unvaccinated potential jurors; (4) the Court properly admitted evidence of settlements and administrative actions; (5) the Court's hearsay rulings were not one-sided and do not warrant a new trial; (6) Plaintiffs' counsel's cross-examination questions were proper and do not warrant a new trial; (7) the Court did not delegate defining the law to DEA and other witnesses; (8) the testimony of Plaintiffs' expert, Carmen Catizone, regarding CSA obligations and red flags was appropriate and not prejudicial; (9) Brad Nelson's live testimony by remote transmission was warranted and proper under the Federal Rules of Civil Procedure; (10) the Court appropriately permitted a brief reference to the Department of Justice complaint against Walmart based on Walmart opening the door to the matter; (11) extraterritorial evidence was directly relevant to Plaintiffs' claims and its admission was proper; (12) the Court's final jury instructions and Verdict Form fairly and adequately submitted the issues and applicable law to the jury; and (13) the extraordinary remedy of a new trial based on cumulative error is not warranted.  Defendants' motion for new trial should be denied in its entirety.

## LEGAL STANDARD

Under Rule 59 of the Federal Rules of Civil Procedure, the Court "may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FED. R. CIV. P. 59(a)(1)(A).  Courts have interpreted this language to mean that a new trial is warranted "if the verdict is against the weight of the evidence, . . . or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party."  *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637

1

(6th Cir. 2000).  *See also Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045–46 (6th Cir. 1996).  A district court's decision on a motion for a new trial is reviewed for an abuse of discretion. *United States v. Paulus*, 894 F.3d 267, 278 (6th Cir. 2018). *See also Nolan v. Memphis City Sch*., 589 F.3d 257, 264 (6th Cir. 2009) (reversal only warranted if appellate court has a "definite and firm conviction that the trial court committed a clear error of judgment").

Where the movant seeks a new trial on the basis that the verdict is against the clear weight of the evidence, a court cannot grant the motion unless the verdict was unreasonable.  *Nolan*, 589 F.3d at 264; *Taylor v. TECO Barge Line, Inc*., 517 F.3d 372, 383 (6th Cir. 2008); *Holmes*, 78 F.3d at 1047.  Therefore, "if a reasonable juror could reach the challenged verdict, a new trial is improper."  *Barnes v. Owens-Corning Fiberglas Corp.,* 201 F.3d 815, 821 (6th Cir. 2000).  *See also Conte*, 215 F.3d at 637.  A verdict is not unreasonable merely because other inferences or conclusions could have been drawn or because other results are more reasonable.  *Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir. 1998).

Where the movant claims that the trial was influenced by prejudice or unfairness, it is the movant's burden to prove it suffered harmful prejudice.  *See Tompkin v. Philip Morris USA, Inc*., 362 F.3d 882, 891 (6th Cir. 2004).  "'Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial.'"  *Id.* (citation omitted).  District courts are granted broad discretion "in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overturned." *Id.* at 897.  "Although prejudice that affects the fairness of a proceeding can certainly be grounds for a new trial, when 'such prejudice is cured by instructions of the court, the motion for a new trial should be denied.'"  *Holmes*, 78 F.3d at 1046–47 (citation omitted); *see also id.* at 1047 (finding "it error to infer that the jury did not or could not follow the judge's clear instructions in this regard").

Finally, a new trial is not required based on flaws in the jury instructions "unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Arban v. West Pub. Corp*., 345 F.3d 390, 404 (6th Cir. 2003).  *See also Bridgeport Music, Inc. v.*

*UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) ("Reversal of a jury verdict based on incorrect jury instructions is warranted only when the instructions, 'viewed as a whole, [are] confusing, misleading, and prejudicial.' As a result, we will not set aside a jury verdict on the basis of a technically faulty jury instruction when the error is harmless.") (internal citations omitted). The court must consider the jury instructions as a whole "to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *Arban*, 345 F.3d at 404. A court's refusal to give a jury instruction is reviewed under an abuse of discretion standard. *Taylor*, 517 F.3d at 387.

## ARGUMENT

### I. THE JURY'S VERDICT WAS NOT AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

As set forth in great detail in Plaintiffs' Omnibus Opposition to Defendants' Rule 50(b) Motions (Plaintiffs' Rule 50(b) Opp.), filed contemporaneously herewith and incorporated by reference as if fully set forth herein, the great weight of the evidence clearly supports the jury's verdict. Plaintiffs' Rule 50(b) Opp. at § I; *see also* Dkt. #4131 (Ps' Rule 50(a) Opp.) at pp. 2-57. Defendants' arguments to the contrary are simply a rehash of the same arguments they make in their Rule 50 motions. Dkt. #4204 (Ds' MNT) at pp. 2-6; Dkt. #4207 (CVS MNT) at pp. 23-24.[1] Those arguments should be rejected for the same reasons set forth in Plaintiffs' Rule 50(b) Opposition. Plaintiffs' Rule 50(b) Opp.; *see also* Dkt. #4131 (Ps' Rule 50(a) Opp.).

### II. THE TRIAL WAS NOT UNFAIR OR PREJUDICIAL TO DEFENDANTS.

#### A. The Court properly denied Defendants' mistrial motion based on juror misconduct, and a new trial is not warranted.

Defendants complain that Juror 4's introduction of extraneous information concerning Narcan/naloxone, which occurred nearly one month before the close of trial, requires a new trial.

---

[1] For reasons that are not entirely clear, Defendants also point to the fact that Plaintiffs "ultimately abandoned their distribution theory entirely." Dkt. #4204 (Ds' MNT) at pp. 2-3. Defendants do not explain how Plaintiffs' decision not to pursue its distribution theory in this particular trial, which was a strategic decision based on time constraints and *not* on the substantive merits of that theory (Dkt. #4204-1), has any bearing on whether the jury's public nuisance verdict was against the great weight of the evidence.

Dkt. #4204 (Ds' MNT) at p. 7.  Not so.  Declaring a mistrial is a remedy of last resort: "trial courts should, whenever possible, pursue alternatives less drastic than declaration of a mistrial."  *Hamm v. Jabe*, 706 F.2d 765, 768 (6th Cir. 1983) (citing *Harris v. Young*, 607 F.2d 1081, 1085 (4th Cir. 1979)); *see also infra* at fn.15.  "The trial judge is in the best position to determine the nature of the alleged jury misconduct," and thus his or her decision to deny a mistrial is reviewed under the abuse of discretion standard.  *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995).  This Court correctly denied Defendants' mistrial motions on this issue, and should likewise reject their complaints here.

To briefly recap, on October 21, then-Juror 4 brought in one-page printouts from home about a community program called Project DAWN that provides Narcan/naloxone to individuals for free.  Dkt. #4069 (Ps' 1st Mistrial Opp.) at p. 2.[2]  *See also* Dkt. #4065 (10/22/21 Trial Tr.) at 3718 – 3721; Dkt. #4067-1 (Juror Printout).  She provided a copy of the printout to each juror in the jury room and told them that Narcan is free and available in Northeast Ohio through Project DAWN; the topic was not discussed further.  Juror 4's research likely stemmed from a juror question the previous day to a Walgreens witness concerning the cost of naloxone, which led to a line of questioning from Plaintiffs' counsel lasting approximately two minutes.  *See id.*; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3291 – 3293.

When Juror 4's actions were brought to the Court's attention the following day, the Court thoroughly questioned Juror 4, dismissed her from the jury, and then questioned each juror individually in the presence of counsel, asking if they knew of the printout, what they knew about it, what was said about the printout, whether there had been any other instances of jurors bringing in outside information, and admonished the importance of obeying the Court's rule against conducting any outside research or discussing the case with anyone during the trial.  *See* Dkt. #4069 (Ps' 1st Mistrial Opp.) at pp. 2-3; Dkt. #4065 (10/22/21 Trial Tr.) at 3715, 3722 –

---

[2]   Plaintiffs incorporate the entirety of their Opposition to Defendants' Motion for Mistrial Due To Juror Misconduct (Dkt. #4068) and Defendants HBC Service Company and Giant Eagle, Inc.'s Motion for Mistrial (Dkt. #4067) by reference as if fully set forth herein.  Dkt. #4069 (Ps' 1st Mistrial Opp.).

4

3723, 3727 – 3762.  Based on their responses, it was clear that the jurors had largely ignored Juror 4's extrinsic research.  *See* Dkt. #4069 (Ps' 1st Mistrial Opp.) at pp. 3-4.  *See also, e.g.*, Dkt. #4065 (10/22/21 Trial Tr.) at 3730 (juror "didn't even look at [the printout]" and "really didn't pay that much attention to it"), 3734 (juror stating "maybe one or two people picked [the printout] up, but no one really looked at it"), 3744 ("And pretty much the stack of papers she was attempting to hand them out, but then we're like, ah, we don't want that, and she kind of -- she sat down."), 3750 (juror stating he did not read printout or recall what it said), 3756 (juror stating he did not take a printout or read it), 3761 (juror stating he did not look at the printout and ignored Juror 4's explanation).

After considering the Parties' mistrial arguments and the relevant law, the Court thoroughly explained its decision to deny a mistrial:

> This case is not going to be decided on Narcan or naloxone. . . . I don't think any of the defendants are even going to mention it in final argument.  It's extraneous and it's irrelevant as to whether or not the plaintiffs can prove their public nuisance claims against any or all of the defendants.  And I'm confident from the answers of the jurors that most of them ignored it, what this juror -- ex-Juror No. 4 said. So it's clear from the case law a mistrial in the middle of a trial is the very last resort, and if there are any measures short of mistrial that the judge feels can address the issue, that's what the judge should do.  And so that's what I'm going to do.

Dkt. #4078 (10/25/21 Trial Tr.) at 3786:4-21.  The Court also reasoned that the preservation of judicial resources weighed against a mistrial, particularly given the hardships of conducting a jury trial amidst the Covid-19 pandemic.  *See id.* at 3786:24 – 3787:11.

The Court then addressed each juror individually, admonishing that:

(1) I am instructing you that you are to completely disregard anything that former Juror 4 showed to you or said to you.  One, it was obviously improper that she did it, and two, it has no relevance to the case. So can you follow that instruction?

(2) Second, is there anything about what former Juror No. 4 showed you or said to you that casts any doubt in your mind as to whether you can continue to be a fair and impartial juror in this case?

(3) And just to be safe, is there anything else that has occurred in the roughly one month since I gave you the oath and swore you in with your fellow jurors that

> casts any doubt in your mind as to whether you can continue to be fair and
> impartial in this case?

*See id.* at 3797 – 3808. Each juror readily indicated full compliance. *See id.* Accordingly, the

Court reasoned:

> Well, based on each juror's answer, I am confident that each juror can follow my
> instruction to completely disregard what former Juror No. 4 said and did and that
> each juror doesn't feel that whatever they remember or recall will affect their ability
> to be fair and impartial or anything else that's occurred in the last month would do
> so. So I'm going to go forward.

*Id.* at 3809:2-8. Given the Court's curative instructions and well-reasoned conclusion that each

juror could remain impartial and disregard Juror 4's statements and actions,[3] the Court correctly

denied Defendants' mistrial motion.[4]

---

[3] There is a presumption that jurors follow the instructions they are given. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (recognizing "the almost invariable assumption of the law that jurors follow their instructions"); *Holmes*, 78 F.3d at 1046–47 ("We find it error to infer that the jury did not or could not follow the judge's clear instructions in this regard."); *Sparks v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am., UAW*, 99 F.3d 1140, 1996 WL 487252, *5 (6th Cir. 1996) (unpublished) ("[W]e presume that a jury will understand and adhere to curative instructions."); *Thompson v. Grida*, No. 1:08 CV 271, 2013 WL 12228991, *7 (N.D. Ohio Dec. 31, 2013) ("The court presumes the jury heeded the court's clear charge to disregard any of Defendants' counsel's statements which exceeded the jury instructions."); *Barnette v. Grizzly Processing, LLC*, No. CIV. 10-77-ART, 2012 WL 1067076, *3 (E.D. Ky. Mar. 28, 2012) ("The American jury system . . . is based on the assumption that jurors will follow the Court's instructions when discharging their duties. The Court must not and will not 'assume that a jury ignored explicit instructions.' Rather, the Court presumes that 'jurors follow their instructions.' Without that presumption, there would be little reason to entrust fact-finding to a jury in the first place.") (quoting *Jacobs v. Sherman*, 301 F. App'x 463, 468 (6th Cir. 2008)).

[4] *See, e.g.*, *Altman v. Bobcat Co.*, 349 Fed. Appx. 758 (3rd Cir. 2009) (affirming district court's judgment denying defendant's motion for a mistrial when the Court discovered juror misconduct before receiving a verdict and gave the jury cautionary instructions); *cf. Holmes*, 78 F.3d at 1046-47 ("Although prejudice that affects the fairness of a proceeding can certainly be grounds for a new trial, when 'such prejudice is cured by instructions of the court, the motion for a new trial should be denied.'") (citation omitted); *United States v. Phibbs*, 999 F.2d 1053, 1068 (6th Cir. 1993) ("The trial judge cautioned the jury to disregard the testimony, and we believe that he cured any harm to defendants in doing so."); *Kaltrider v. Young Men's Christian Ass'n of Cleveland, Ohio*, 457 F.2d 768, 770 (6th Cir. 1972) ("We are unable to say that the single mention of insurance would be sufficient to require that a mistrial be declared. The case was tried by a skilled trial judge who gave a cautionary instruction after the word 'insurance' had been presented in the presence of the jury. After reviewing the entire record we find no error."); *Jimkoski v. State Farm Mut. Auto. Ins. Co.*, 247 F. App'x 654, 662 (6th Cir. 2007) (two improper remarks made by defense counsel during opening statements were "insufficient for us to hold (footnote continues on next page)

In arguing for a new trial, Defendants entirely ignore the lengths the Court took to cure Juror 4's misconduct.  Defendants instead focus extensively on Plaintiffs' counsel's initial concerns regarding the impact of Juror 4's conduct on the jury.  That argument is unpersuasive.  "The trial judge is in the best position to determine the nature of the alleged jury misconduct and the appropriate remedies for a demonstrated misconduct."  *Hickman v. Bradshaw*, No. 5:16 CV 1077, 2017 WL 10901962, *9 (N.D. Ohio Nov. 30, 2017), *report and recommendation adopted*, No. 5:16-CV-1077, 2019 WL 1040846 (N.D. Ohio Mar. 5, 2019).  And, as Plaintiffs' counsel made explicitly clear:

> Your Honor, for the record I put this into writing in front of the Court, but in the midst of trying to figure this all out and the immediate reaction, *having now a chance to research Sixth Circuit law*, I speak on behalf of the plaintiffs saying that this is not an incurable situation, and we believe if you polled the jury, as you're saying, as long as the jury commits that they can be fair and independent, then we are absolutely fine proceeding.  And I don't want anything I said on Friday to misdirect the Court or any appellate court in that regard.

Dkt. #4078 (10/25/21 Trial Tr.) at 3789:5-14 (emphasis added).  The Court confirmed "that's the way to make a decision of this -- of consequence to take some time to reflect on it. And that's what everyone's done and I appreciate that." *Id.* at 3789:15-22.

Further, this Court has already correctly distinguished Defendants' cited authority on the grounds that those cases involved jurors injecting extraneous information *at the end of trial*, disallowing any opportunity for a curative instruction.[5]  Dkt. #4078 (10/25/21 Trial Tr.) at 3785:20 – 3786:3.  In contrast, the incident here was promptly discovered, Juror 4 was dismissed, the Court

---

that the district court abused its discretion in not declaring a mistrial, particularly where the district court presented the jury with a specific curative instruction directing the jury to disregard [defendant's] improper statements and to ignore attorney remarks not supported by the evidence") (internal citation omitted); *Cousins v. Bray*, No. 2:03-CV-1071, 2005 WL 8161508, *3 (S.D. Ohio Feb. 28, 2005) ("[P]rejudice can be cured by instructions from the court."); *United States v. Lundergan*, No. 5:18-CR-00106-GFVT, 2019 WL 4248971, *1 (E.D. Ky. Sept. 6, 2019) ("If a curative instruction will relieve prejudice to the defendant, it is not an abuse of discretion to deny a motion for a mistrial.").

[5]     *See* Dkt. #4204 (Ds' MNT) at p. 9 (citing *In re Beverly Hills Fire Litig.*, 695 F.2d 207 (6th Cir. 1982); *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746 (6th Cir. 2021); *Stiles v. Lawrie*, 211 F.2d 188 (6th Cir. 1954)).

conducted a thorough *voir dire* of the remaining jurors, and instructed them to disregard the extraneous information.  Courts within the Sixth Circuit have distinguished *Beverly Hills* on this very ground.  *See, e.g.*, *Prasol v. Cattron-Theimeg, Inc.*, No. 09-10248, 2011 WL 2669619, *4-5 (E.D. Mich. July 8, 2011) ("[U]nlike the court in *In re Beverly Hills*, this Court received notice of the juror's misconduct prior to receiving a verdict.  After receiving the note from Mr. McClain, the Court took a number of corrective measures, including dismissing Mr. Denomy as a juror, and giving cautionary instructions to the remaining jurors on three separate occasions.").  In fact, one court in this District found that a trial court did not abuse its discretion in denying a mistrial based on a juror's extraneous internet research that was discovered even after the jury rendered its verdict, reasoning that the trial court deliberately inquired to determine the extent of the misconduct and the effect it may have had on the jury; engaged in an independent examination of each juror; and each juror confirmed the website search had no impact on their decision.  *See Hickman*, 2017 WL 10901962, at *7-*9 (applying Ohio law).

Moreover, Defendants' cited cases involved the insertion of extraneous information that went to the heart of the case, which is not the situation here.  *See* Dkt. #4078 (10/25/21 Trial Tr.) at 3786:17-21.  "[T]he single most important factor in [deciding a mistrial motion] is the extent to which the defendant has been prejudiced."  *United States v. Richmond*, 884 F.2d 581, 1989 WL 103334, *3 (6th Cir. 1989) (unpublished).  As movants, Defendants must prove *actual* prejudice occurred here. *United States v. Wheaton*, 517 F.3d 350, 362 (6th Cir. 2008).  A "serious suspicion" will not suffice, and prejudice may never be presumed by the Court.  *See id.*; *United States v. Rugiero*, 20 F.3d 1387, 1390 (6th Cir. 1994) (recognizing when a juror is exposed to outside information regarding a case, "[w]e do not presume prejudice has occurred").  Once the Court determines that no prejudice has occurred—or that any potential prejudice is curable—its decision will be upheld absent a clear abuse of discretion.  *Copeland*, 51 F.3d at 613.

Not only was there no presumption of prejudice in this instance, Defendants cannot actually identify any prejudice.  There was no mention of Narcan/naloxone or Project DAWN in closing arguments.  *Accord* Dkt. #4153 (11/15/21 Trial Tr.).  Moreover, following Juror 4's misconduct,

8

the jury heard information about the availability of Narcan in the community through Project DAWN from Plaintiffs' County witness, Kim Fraser.  Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4368:24 – 4369:2 ("Our county health department also operates Project DAWN, which is the program that dispenses Narcan in our community. So another important role in addressing consequences of the opioid epidemic.").  It is now even more evident that there was simply no prejudice resulting from Juror 4's independent research.  Defendants' motion should be denied on this ground.

### B.      The Court properly excluded the three unvaccinated potential jurors.

Defendants' argument that the Court erred by excluding three unvaccinated potential jurors should be rejected.  Indeed, numerous federal courts have rejected this exact argument.  *See, e.g.*, *Joffe v. King & Spalding LLP*, No. 17-CV-3392 (VEC), —— F.Supp.3d ——, 2021 WL 5864427, *4 (S.D.N.Y. Dec. 10, 2021); *United States v. Moses*, No. 19-CR-6074, —— F.Supp.3d ——, 2021 WL 4739789, *4–5 (W.D.N.Y. Oct. 12, 2021); *United States v. Elder*, No. 18-CR-92 (WFK), 2021 WL 4137532, *1 (E.D.N.Y. Sept. 2, 2021).[6]  And Defendants cite no caselaw holding otherwise.

The Court's decision to exclude these three unvaccinated potential jurors was well reasoned and supported by the events that unfolded in the week before trial.  Contrary to Defendants' assertion that the Court automatically excluded unvaccinated potential jurors, Dkt. #4204 (Ds' MNT) at p. 10, the Court carefully considered Defendants' initial arguments against excluding unvaccinated individuals.[7]  *See* Dkt. #3981 (9/28/21 Pre-trial Tr.) at 4–33.

---

[6]    *See also Benaron v. Simic*, 19-CV-1653 (D. Or. 2021), Opinion and Order, Dkt. 54 at 39 n.13 ("The Court intends to require that everyone who appears in the courtroom for trial (including parties, witnesses, counsel, and jurors) are fully vaccinated against COVID-19 at the time of trial (and will allow any unvaccinated witnesses to testify via video), which the Court understands may impact the trial date.").

[7]    Defendants' initial argument was that the exclusion of unvaccinated individuals could reduce minorities' participation in the jury pool.  *See* Dkt. #3981 (9/28/21 Pre-trial Tr.) at 4.  The Court observed that the "overwhelming number" of unvaccinated potential jurors were Caucasian, "so excusing them certainly won't skew the pool against minorities."  *Id.* at 6.  Defendants then argued that (footnote continues on next page)

During the pre-trial proceedings, the Court had to remove an unvaccinated potential juror that contracted Covid-19.  *See id.* at 5.  Though the Court expressed its inclination to exclude unvaccinated jurors given "the safety of the trial and the likelihood that it will conclude[,]" the Court still declined to automatically exclude unvaccinated jurors at that time, and *voir dire* proceeded with the entire potential jury pool (vaccinated and unvaccinated).  *See id.* at 7.  Just days later, before the completion of *voir dire*, another unvaccinated potential juror was excused after his wife contracted Covid-19.  *See* Dkt. #3986 (9/30/21 Voir Dire Tr.) at 311.

At the conclusion of *voir dire*, the Court observed that, even without the three unvaccinated potential jurors—who were all Caucasian—the jury was "far more diverse" than its normal experience in federal court.  *Id.* at 467.  The Court thus determined "we can seat a fair and impartial jury without any unvaccinated people."  *Id.*  It further reasoned:

> In the course of this week, we have had to excuse two unvaccinated [potential] jurors: One who got COVID himself or herself, and one whose wife got COVID just today.  And I think it would be the height of foolishness to proceed with unvaccinated jurors, given that they're going to be sitting close together, they will be, albeit masked, on breaks, they'll be in my jury room, which is relatively small, and it doesn't make sense.

*Id.* at 467:15-24.  *See also id.* at 320 – 321.

The Court correctly excluded the three unvaccinated potential jurors on the basis of both safety concerns and to prevent inevitable disruptions in the trial proceedings.  Pursuant to the Jury Selection and Service Act:

> any person summoned for jury service may be (1) excused by the court, or by the clerk under supervision of the court if the court's jury selection plan so authorizes, upon a showing of *undue hardship or extreme inconvenience* . . . or (2) excluded by the court on the ground that such person may be unable to render impartial jury service *or that his service as a juror would be likely to disrupt the proceedings* . . .

28 U.S.C. § 1866(c) (emphasis added).[8]  Other courts have likewise excluded unvaccinated

---

unvaccinated people tend to be politically conservative, which is not a suspect class.  *See id.* at 7-11. Defendants advised the Court that they would file a brief on the matter, but never did.  *See id.* at 5.

[8]  "Undue hardship or extreme inconvenience" is defined as "great distance, either in miles or travel time, from the place of holding court, grave illness in the family or any other emergency which outweighs in (footnote continues on next page)

potential jurors for the reason that including unvaccinated persons on the jury would likely disrupt the proceedings.  *See, e.g.*, *Joffe*, 2021 WL 5864427, at *5 (concluding that "[h]aving unvaccinated individuals on the jury would pose a considerable and unnecessary risk of disruption of the proceedings"); *Moses*, 2021 WL 4739789, at *4-5 (same).

Further, Defendants simply cannot, and do not, meet the burden of establishing that there was not a fair cross-section of the community represented in the jury panel.[9]  The Court permitted unvaccinated potential jurors to participate in *voir dire*, and only made the decision to exclude them upon determining there was a diverse, fair, and impartial jury without the unvaccinated potential jurors.  Defendants' argument fails by force of logic.  Moreover, even crediting the argument, it fails.  The Court's decision was well-supported by safety and logistical concerns, as demonstrated by the necessary exclusion of two other potential jurors before *voir dire* concluded due to Covid-19 exposure.  As one court noted:

> It does not violate [the fair-cross-section] requirement, we said, to disqualify a group for a reason that is related to the ability of members of the group to serve as jurors in a particular case.  The representativeness constitutionally required at the venire stage can be disrupted at the jury panel stage, to serve a State's legitimate interest.

*Miller v. Borg*, 899 F.2d 19, 1990 WL 35218, *2 (9th Cir. 1990) (unpublished) (citation and internal quotation marks omitted).

---

immediacy and urgency the obligation to serve as a juror when summoned, *or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror . . . .*"  28 U.S.C. § 1869(j) (emphasis added).  *See also* FED. R. CIV. P. 47, Advisory Committee Notes, 1991 Amendment (noting "sickness" is an "appropriate ground[ ] for excusing a juror").

[9]   The movant for a fair cross-section challenge must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the group's representation in the source from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation results from systematic exclusion of the group in the jury-selection process."  *Duren v. Missouri*, 439 U.S. 357, 364 (1979).  *See United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998) (adopting test identical to *Duren*); *Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986) (applying *Duren* to fair cross-section challenge in a civil action); *United States v. Schulte*, 17-CR-548, 2021 WL 1146094, *2-3 (S.D.N.Y. Mar. 24, 2021) (citing *United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986)) (applying the *Duren* test to cross-section challenges brought under the JSSA).

As this Court has correctly recognized, unvaccinated jurors do not constitute a "cognizable group" that should not be excluded from the jury pool. *Cf. United States v. Armsbury*, 408 F. Supp. 1130, 1137 n.5 (D. Or. 1976) ("Certain groups which the defendant contends are underrepresented have not been analyzed because they are not cognizable. They are the unemployed, the retired, the student, the uninformed, the politically dormant, the poor, the lazy, the young, the apathetic, the disillusioned, the selfish, and the uneducated."). *See also* Dkt. #3968 (9/30/21 Voir Dire Tr.) at 312. The Sixth Circuit applies a three-part test for determining whether a certain group is "distinctive" under *Duren*, considering whether: (1) the group is defined by a limiting quality (*i.e.*, the group has a definite composition such as race or sex); (2) a common thread or basic similarity in attitude, idea, or experience runs through the group; *and* (3) a community of interests exists among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process. *See Ford v. Seabold*, 841 F.2d 677, 682-83 (6th Cir. 1988). Defendants' argument fails each prong. First, unvaccinated jurors do not have a "definite composition" such as race or sex—a person's unvaccinated status may change at any point. *See Moses*, 2021 WL 4739789, at *3 (finding unvaccinated individuals were not a "distinctive group" and observing that "membership in the unvaccinated group changes on a daily basis"). Put simply, unvaccinated individuals are not a distinctive group identifiable "on the basis of some immutable characteristic." *Lockhart v. McCree*, 476 U.S. 162, 175 (1986). Rather, it is an attribute "within the individual's control[,]" thus weighing against a "distinctive" classification. *Id.* at 175-76.

So too, "[b]ecause there are a multitude of reasons why an individual might be unvaccinated, the group lacks a basic similarity in attitudes or ideas or experience that defines and limits the group." *Joffe*, 2021 WL 5864427, at *6 (internal quotations omitted). *See also Moses*, 2021 WL 4739789, at *3 ("There are myriad reasons why an individual might not to be vaccinated. There will thus be vast variations in attitudes, viewpoints, and experiences within the relevant

group.") (internal quotations omitted).[10]  *Cf. Seabold*, 841 F.2d at 683 (holding young adults and college students were not a cognizable group under *Duren*, given "the differing attitudes and ideas of those attending college[;]" that most student bodies are "comprised of students of differing races, nationalities, and socio-economic backgrounds[;]" and that college students are not "the type of group the Supreme Court has traditionally attempted to protect").  Defendants' contention that all of the potential unvaccinated jurors here shared similar attitudes, ideas, or experiences is pure speculation.[11]  For the same reason, Defendants cannot show that a community of interests exists among unvaccinated potential jurors such that their interest cannot be adequately represented if the group is excluded from the jury selection process.  *Seabold*, 841 F.2d at 683.

Nor can Defendants show that excluding unvaccinated people rendered the jury pool unrepresentative of the community.  While Defendants complain that the unvaccinated potential jurors all had non-professional jobs and were under the age of 50, and that two of them were men, there were other vaccinated potential jurors with non-professional jobs,[12] as well as other

---

[10]  *See generally Joffe*, 2021 WL 5864427, at *6 n.23 ("Based on anecdotal experience, press reports and litigation in this and other Courts, among the reasons people have given for not being vaccinated are: religious objections; fear of medical allergies or side effects; concern that the vaccine may affect fertility; concern that the vaccine may have unknown adverse side effects in the future; uncertainty about the location of available vaccine clinics; procrastination; fear of needles; suspicion of Big Pharma; and concern that the side effects may cause the person to miss work and not be paid.").

[11]  *See, e.g.*, Dkt. #3985 (9/29/21 Voir Dire Tr.) at 66:11-12 ("I'm not against vaccinations, but I just haven't."); *id.* at 133:18-23 (potential juror indicating "no reason" for being unvaccinated); *id.* at 167:3 – 168:6 (unvaccinated potential juror indicating hesitation "at first" because the vaccines happened quickly, and stating he was not a libertarian); *id.* at 182:12-20 (unvaccinated potential juror sharing personal belief that vaccinated people spread the virus easier); *id.* at 214:11-23 (unvaccinated potential juror indicating she had "decided to go ahead and get vaccinated"); Dkt. #3986 (9/30/21 Voir Dire Tr.) at 436:17-25 (unvaccinated potential juror stating she was "just not ready for it").

[12]  *See, e.g.*, Dkt. #3985 (9/29/21 Voir Dire Tr.) at 122 (vaccinated woman with non-professional job); *id.* at 145 (vaccinated man with non-professional job); *id.* at 199 (vaccinated man with non-professional job); Dkt. #3986 (9/30/21 Voir Dire Tr.) at 355 (vaccinated man with nonprofessional job).

vaccinated potential jurors under the age of 50.[13]  There were also numerous vaccinated men.[14]  In sum, the exclusion of unvaccinated persons does not violate the statutory requirement that civil juries comprise a cross-section of the community.  *See Joffe*, 2021 WL 5864427, at *6.  Defendants' argument should be rejected.

> **C.  A new trial is not warranted based on Plaintiffs' counsel's closing arguments.**

This Court correctly denied Defendants' joint mistrial motion concerning Plaintiffs' counsel's statements in closing argument.[15]  A party faces a "heavy burden of showing that it deserves a new trial based on a few words in a long closing argument."  *In re Air Crash Disaster*, 86 F.3d 498, 526 (6th Cir. 1996).  Defendants do not and cannot meet that burden here.  Dkt. #4204 (Ds' MNT) at pp. 12-16.[16]

Errors in closing statements are common—closing arguments "are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974).  For

---

[13]  *See, e.g.*, Dkt. #3985 (9/29/21 Voir Dire Tr.) at 86 (vaccinated woman presumably under 50 years of age, as she has toddlers); *id.* at 203 (vaccinated man under 50 years of age); *id.* at 255 (vaccinated woman presumably under 50 years of age, as she has small children including an 8-month-old infant); Dkt. #3986 (9/30/21 Voir Dire Tr.) at 465 (vaccinated woman under 50 years of age).

[14]  *See, e.g.*, Dkt. #3985 (9/29/21 Voir Dire Tr.) at 128 – 129, 143, 196, 229 – 230, 242 – 243, 277; Dkt. #3986 (9/30/21 Voir Dire Tr.) at 354, 369, 424.

[15]  "Declaration of a mistrial is one of the most 'drastic' alternatives available to a trial court, a remedy of 'last resort.'"  *Tamraz v. Lincoln Elec. Co.*, 2007 WL 4287620, *4 (N.D. Ohio Dec. 4, 2007) (citations omitted).  "[W]hether misconduct in a trial of a cause of action is of such a nature that a fair or impartial verdict cannot be reached is in the first instance for the trial court's determination."  *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980).  "The decision to order a mistrial rests in the trial judge's discretion."  *Hamm*, 706 F.2d at 767.  And the Sixth Circuit has recognized that "[t]he trial court is, of necessity, clothed with a great deal of discretion in determining whether an objectionable question is so prejudicial as to require a retrial . . . . The trial court is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the cold record."  *City of Cleveland*, 624 F.2d at 756 (quoting *Harris v. Zurich Insurance Co.*, 527 F.2d 528, 531 (8th Cir. 1975)).

[16]  In addition to their arguments set forth herein, Plaintiffs incorporate by reference the entirety of their Opposition to Defendants' Joint Motion for Mistrial Based on Closing Arguments (Dkt. #4158) as if fully set forth herein.

that reason, it is "[o]nly where the comments alleged to be prejudicial evidence a studied purpose to inflame or prejudice the jury will [the Sixth Circuit] reverse the jury's ultimate verdict." *Krueger v. Otis Elevator Co.*, 925 F.2d 1464, 1991 WL 21981, *3 (6th Cir. 1991) (unpublished). Thus, it is unsurprising that the Sixth Circuit repeatedly finds that inappropriate remarks by counsel made during opening or closing arguments were insufficient to justify the drastic remedy of a mistrial; rather, only impermissible statements that "consistently permeate[] the entire trial from beginning to end" warrant declaring a mistrial, especially where the trial court promptly provides curative instructions. *Jimkoski*, 247 F. App'x at 662 (quoting *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997)).[17]

As this Court correctly noted in denying Defendants' joint mistrial motion, the comments Defendants challenge here "comprised only a small portion of [Mr. Lanier's] three-hour closing argument – which was, of course, only a small portion of the six-week trial." Dkt. #4172 (Mistrial Order) at pp. 3-4. Moreover, the Court instructed the jury throughout the trial—including in both the preliminary and final instructions—that lawyer's statements were not evidence and that the case could *only* be decided on the evidence.[18]  And the Court issued curative instructions following

---

[17]  *Compare City of Cleveland*, 624 F.2d at 756 (finding the defendant did not receive a fair trial because, in part, "objections to the misconduct were repeatedly made and sustained and the court continually admonished and finally reprimanded counsel but he paid no attention to the admonitions or reprimand and made prejudicial remarks in his closing argument to the jury").

[18]  *See, e.g.,* Dkt. #3991 (10/4/21 Trial Tr.) at 7:25 – 8:7, 13:16-21 ("Statements, arguments and questions by the lawyers are not evidence. The answers of the witnesses are the evidence. The questions are not. Objections to questions are not evidence."), 15:19-21, 26:21-22 ("Opening statements are neither evidence, nor arguments."); Dkt. #4008 (10/8/21 Trial Tr.) at 1307:10-12 ("Well, remember, ladies and gentlemen, I said that the opening statements are not evidence, nor are questions."); Dkt. #4153 (11/15/21 Trial Tr.) at 7060:23 – 7061:7, 7063:3-8, 7063:14 – 7064:15 ("The lawyers' statements and arguments are not evidence. If you remember the facts differently from the way the attorneys have stated them, you should base your decision on what you remember. The lawyers' questions and objections are not evidence"), 7065:21-22, 7070:2-4, 7182:24-25 ("Counsel's views of their own witnesses, paid or unpaid, or of the other side's witnesses, are not evidence."); *see also id.* at 7050:12-14 (Court noting during sidebar: "I made it clear [to the jury]. Whether -- whether it's a lawyer question or a juror question, they're not evidence."), 7205:19-22 (Mr. Swanson to jury: "But what the plaintiffs' lawyers say isn't evidence. What I say isn't evidence. What any of us say isn't evidence. It's testimony and documents and facts that are evidence.").

two of Mr. Lanier's statements in closing arguments. *See* Dkt. #4153 (11/15/21 Trial Tr.) at 7130:18-24, 7182:20-25. In short, there was ample support for the Court's conclusion that "whatever prejudice may have been introduced by his comments was quickly and effectively dealt with by the Court and not repeated by Mr. Lanier." Dkt. #4172 (Mistrial Order) at p. 4.

In their motion, Defendants first argue that the Court's curative instructions did not adequately cure any alleged prejudice. The Court's first curative instruction addressed Mr. Lanier's comment concerning national ramifications, which Defendants objected to during the morning intermission (about an hour after it was made). Dkt. #4153 (11/15/21 Trial Tr.) at 7121:5-15. As soon as the jury returned, the Court instructed:

> Before – before Mr. Lanier proceeds, I want to remind you that your job as jurors is to decide the issues presented in this case only. It is not to decide anything about any future case or any other case in the country.
>
> You will decide only whether each plaintiff, Lake County and Trumbull County, has proved its case against each of the three defendants.

Dkt. #4153 (11/15/21 Trial Tr.) at 7130:18-24. As this Court observed, that instruction "was so clearly opposite to what Mr. Lanier said, that it was tantamount to a rebuke." Dkt. #4172 (Mistrial Order) at pp. 4-5. Further, Plaintiffs' counsel also re-emphasized this point later in his argument:

> *And I want to be really clear when I said that this is a case that I believe has national ramifications, that's not your concern either.* In answering the judge's questions, your concern is these two counties and the actions of these defendants as it has affected these two counties. *What happens after that is not your concern. All you've got to do is focus on that. And that's what the judge is telling you here.*

Dkt. #4153 (11/15/21 Trial Tr.) at 7171:3-10 (emphasis added).

Additionally, Defendants' contention that "Plaintiffs' counsel repeated his improper theme . . . repeating his belief that this case 'has national ramifications'" even after the Court's curative instruction is patently false. Dkt. #2402 (Ds' MNT) at p. 13 (quoting Dkt. #4153 at 7323). In his final words to the jury, Mr. Lanier said: "My job was to give you evidence and get to the truth. My job was to do it within the rules and to do it fairly and try to keep you from getting too bored along the way. And I don't know if I've done anything that's offensive, just set that aside

16

because this is about something much bigger than me." Dkt. #4153 (11/15/21 Trial Tr.) at 7323:4-8.  When viewed in context, this statement plainly had nothing to do with national ramifications.

Where, as here, a curative instruction was given, a mistrial is not warranted.  *Supra* at fn.4. So too, when alleged "prejudice is cured by instructions of the court, [a] motion for a new trial should be denied."  *Holmes*, 78 F.3d at 1046-47.[19]  And it is well established that jurors are presumed to follow the instructions they are given.  *Supra* at fn.3.  Thus, any concern Defendants may have had that the jury would take into consideration the potential national ramifications of this case when determining Defendants' liability for public nuisance was alleviated when the jury was explicitly instructed not to do so.  Defendants' argument that the Court's curative instructions did not cure any alleged prejudice should be rejected.  Dkt. #4204 (Ds' MNT) at p. 13.

Moreover, the cases Defendants cite are factually distinguishable and do not support granting a new trial here.  First, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 420 (2003), involved the reversal of an excessive punitive damages award—not a motion for new trial—for the reason that a state does not have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the state's jurisdiction.  Thus, the fact that "[f]rom their opening statements onward the Campbells framed this case as a chance to rebuke State Farm for its nationwide activities" was notable because the Supreme Court found that the state courts erroneously "awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm."  *Id.* at 420, 422.  In short, *Campbell* does not support Defendants' contention that Plaintiffs' counsel's reference to national ramifications mandates a new trial here.

---

[19]  *See also, e.g.*, *Smith v. Travelers Ins. Co*., 438 F.2d 373, 375 (6th Cir. 1971) (holding that in light of the curative instructions given by the district court and the context of the entire record, the improper comments of the plaintiff's attorney were not so prejudicial as to warrant a new trial); *Atwood v. UC Health*, No. 1:16CV593, 2019 WL 6877643, *3 (S.D. Ohio Dec. 17, 2019) ("Because the instructions cured any prejudice, Defendants are not entitled to a new trial on this basis."); *Grida*, 2013 WL 12228991, at *7 (holding "any alleged prejudice that could have been caused by the remarks made in Defendants' counsel's closing arguments was completely cured by the court's instructions to the jury"); *Sparks*, 1996 WL 487252, at *5 (affirming denial of new trial where the trial court "responded immediately to the improper questions posed by counsel and made clear to the jury that they were to be disregarded").

Defendants' additional authorities are also unpersuasive on this point.  For instance, in the criminal case, *United States v. Solivan*, 937 F.2d 1146, 1153-55 (6th Cir. 1991), a new trial was ordered where the prosecutor's statements during closing arguments were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jury's emotions.  Critically, however, the Sixth Circuit expressly recognized the higher standard a prosecutor must meet as a representative of a sovereign government, noting a prosecutor's duty "encompasses concerns beyond mere advocacy" and "improper insinuations or suggestions [by a prosecutor] are apt to carry more weight against a defendant" because "the jury will normally place great confidence in the faithful execution of the obligations of a prosecuting attorney[.]"  *Id.* at 1150-51.  *See also id.* at 1150 (recognizing that a prosecutor's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done") (quoting *Berger v. United States*, 295 U.S. 78, 85 (1935)).  Moreover, the Sixth Circuit noted that, even in a criminal case, instances where a single misstep could mandate reversal of a verdict are "rare."  *Id.* at 1150.[20]

This Court correctly concluded that Plaintiffs' counsel's comment "was not so inflammatory or prejudicial that it destroyed Defendants' right to a fair trial."  Dkt. #4172 (Mistrial Order) at p. 6.  And, unlike the immediate objection made to the improper comments in *Solivan*, 937 F.2d at 1148, Defendants waited nearly an hour to object here.  *See Kokesh v. Am. S.S. Co.*, 747 F.2d 1092, 1095 (6th Cir. 1984) ("[W]hile some of the remarks made by plaintiff's counsel

---

[20]  Defendants' reliance on *Caudle v. D.C.*, 707 F.3d 354, 363 (D.C. Cir. 2013) is also unavailing.  *See id.* ("This is not a case in which counsel made a *single* misstatement and ceased further misstatements after the district court sustained an objection.  Instead, the appellees' counsel made *four* impermissible statements—each escalating from the last—three of which came after the district court had sustained the District's objections. . . .  Nor do we agree that the district court's general jury instruction—to decide the case without prejudice, sympathy, fear, favor or public opinion—eliminated the unfair prejudice to the District caused by the appellees' counsel.  This instruction is given in virtually every trial; it was not in any way directed at her argument.  As the conduct of the appellees' counsel in this case was egregious, we conclude that the generic instruction did not sufficiently counter the prejudice.") (internal citations omitted).  Notably, in *Caudle*, the court acknowledged that counsel's "send the message" argument, though inappropriate, would normally not "alone . . . be grounds for reversal," but noted that in that case such argument was made after the court had already sustained three objections to improper "golden rule" arguments made by that same counsel.  *Id.* at 361.

during closing argument were inappropriate, they were not so egregious as to require a new trial when defense counsel did not make a contemporaneous objection.").[21]  Finally, the Court immediately issued a curative instruction after Defendants requested it, which Mr. Lanier echoed immediately.  *See City of Cleveland*, 624 F.2d at 756 (noting one of the factors a court should weigh when considering mistrial is "the manner in which the parties and the court treated [counsel's] comments").

The Court's second curative instruction also defeats Defendants' argument concerning any alleged improper bolstering of Dr. Anna Lembke.  Dkt. #4204 (Ds' MNT) at p. 14.  The Sixth Circuit has recognized that the appropriate remedy for improper arguments by counsel is a limiting instruction that lawyers' arguments are not evidence.  *See, e.g.*, *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001) (an instruction by the Court that lawyer arguments are not evidence "generally cure[s] any improprieties in a closing argument").  The Court delivered precisely that instruction here:

> Ladies and gentleman, before we have the final arguments of each of the defendants, I want to remind you that it is up to you, the jury, to decide the credibility of the witnesses you've observed at trial. Counsel's views of their own witnesses, paid or unpaid, or of the other side's witnesses, are not evidence.

Dkt. #4153 (11/15/21 Trial Tr.) at 7182:20-25;[22] *see also id.* at 7066:2-6 ("Another part of your

---

[21]  Defendants cite *Hodge v. Hurley*, 426 F.3d 368, 386 n.25 (6th Cir. 2005) and *United States v. Young*, 470 U.S. 1, 13 (1985), for the proposition that an attorney need not interrupt a closing argument to object, as "it is perfectly proper" to request a bench conference at the conclusion of the opposing argument.  Dkt. #4204 (Ds' MNT) at pp. 14-15.  But those cases make clear that requesting a bench conference at the close of opposing arguments is the "minimum" an attorney should do.  *Hodge*, 426 F.3d at 386 n.25.  Further, the fact that "interruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously," *Young*, 470 U.S. at 13, "does not mean that no objection should ever be made."  *Hodge*, 426 F.3d at 386 n.25.  As noted below, Defendants failed to object to some of their complaints here altogether.

[22]  Walmart's counsel originally proposed the following curative instruction: "It is up to you, the jury, to decide the credibility of the witnesses you have observed at trial.  Counsel views of their own witnesses, paid or unpaid, or of the other side's witnesses are not evidence <u>and are irrelevant.  You should not consider them in any way when rendering your verdict or making your own determination regarding a witness' credibility</u>."  Dkt. #4153 (11/15/21 Trial Tr.) at 7181:7-23 (additional language underlined). The Court agreed to read the first part, noting the underlined language was "surplusage."  *Id.* at 7181:24 – 7182:17.  Walmart's counsel did not object to this modification; he simply said: "Thank you, Your Honor."  *Id.* at 7182:6.

job as jurors is to decide how credible, or believable, each witness was.  This is your job, not mine. It is up to you to decide if a witness's testimony was believable and how much weight you think it deserves."), 7068:25 – 7069:1 ("Remember that you alone decide how much of a witness's testimony to believe, and how much weight it deserves."); *supra* at fn.18.[23]  And, because the Court issued the instruction immediately after receiving defense counsel's suggested language— which, again, followed a belated objection during a break[24]—the Court correctly concluded that the bolstering issue was not "even remotely . . . a basis for a mistrial."  Dkt. #4172 (Mistrial Order) at p. 8.

Defendants cite *United States v. Acosta*, 924 F.3d 288, 299-300 (6th Cir. 2019), a criminal case in which the Sixth Circuit took issue with a prosecutor bolstering the testimony of a State witness.  However, as one court observed in distinguishing that case, "*Acosta*'s ruling was fact specific and hinged on the interplay between the prosecutor's statements about the witnesses on both sides."  *Moore v. Commonwealth*, No. 2018-CA-001653-MR, 2019 WL 6817587, *5 (Ky. Ct. App. Dec. 13, 2019).  Indeed, the *Acosta* court noted that:

> We do not mean to suggest that every favorable comment on a government witness constitutes prosecutorial misconduct, but in each case, the effect of such comments must be considered in the context of the prosecutor's other statements, the defense arguments, and the evidence presented at trial.  *See United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("[E]ach case necessarily turns on its own facts."  (citation omitted)).  *Here, the positive description of Bowles strikingly differed from the prosecutor's negative portrayals of the defense witnesses, as detailed later.*

924 F.3d at 300 (emphasis added).

Again, this is not a criminal case.  The unique considerations about the prosecutor's role that make the anti-vouching rule such a serious concern in criminal cases are not present here.

---

[23]  *See also* Dkt. #4124 (11/5/21 Trial Tr.) at 6320 – 6321 (defense counsel arguing against a limiting instruction Plaintiffs requested, stating that "if the Court has a general instruction of the jury should not try to – should not take my rulings one way or the other on evidentiary issues and should only pay attention to the evidence that's been submitted and to not pay attention to those you're specifically instructed, that's all there should be").

[24]  *See* Dkt. #4153 (11/15/21 Trial Tr.) at 7124.

Defendants do not cite any Sixth Circuit Court of Appeals decisions that have granted a mistrial based on improper vouching in a civil case. This is unsurprising—"[p]rosecutors are subject to constraints and responsibilities that don't apply to other lawyers," particularly in closing arguments. *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). But even under the heightened standard in criminal cases, "[i]t is not improper for a prosecutor to attempt to explain why, based on the facts, a witness's testimony is honest after the same has been attacked by the defense." *United States v. Boyd*, 640 F.3d 657, 671 (6th Cir. 2011).

The very first thing the defense did in their cross of Lembke was attack her credentials. *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 682:23-25. In light of this attack, Plaintiffs' counsel explained in closing that Lembke's credentials are impressive. There is an ample evidentiary record to support that argument. The jury heard testimony that Lembke is a board-certified psychiatrist and neurologist, Stanford professor, sits on the editorial board for numerous peer-reviewed medical journals, and that she has received numerous awards for her academic work. *See id.* at 486 – 499. Additionally, the jury heard testimony that she has extensive practical experience treating patients with addiction and substance use disorders. *See id.* Viewed in context, Plaintiffs' counsel's remarks are clearly linked to and unequivocally supported by the record evidence—not a demand that the jury believe the expert simply on a lawyer's say-so.[25] In short, Defendants do not and cannot show that the Court's instruction was insufficient to cure any prejudice resulting from this error.[26] It is implausible that a few short sentences in a multi-hour

---

[25] It is worth noting that counsel for each Defendant made arguments that would raise serious anti-vouching concerns under the strict standard they now advocate. Counsel for Walgreens proclaimed that a witness was "not some rough pharmacist who cares more about filling scripts than she does about the community where she's raising her kids . . . And [the witness] is not unique. She's a typical Walgreens pharmacist." Dkt. #4153 (11/15/21 Trial Tr.) at 7195:10-17. Counsel for CVS announced that a witness was "who CVS is" and that the witness "for nine years has been devoted to enhancing CVS's program, working so hard to try to fight a very difficult problem. . . . Isn't that exactly who we want in her position? Isn't that who we want?" *Id.* at 7236:4-15. And counsel for Walmart declared a witness was an "excellent pharmacist." *Id.* at 7294:2. Defendants can hardly claim that Plaintiffs' counsel's remarks were improper vouching while simultaneously making similar arguments to support their own witnesses.

[26] Defendants' cited authority is easily distinguishable. Dkt. #4204 (Ds' MNT) at 14. *Compare United* (footnote continues on next page)

closing argument, following a six-week trial, could so influence the jury as to justify a new trial on this record.[27]

Next, Defendants contend that "the Court cannot avoid its obligation to review . . . arguments" for which Defendants failed to contemporaneously object at trial. *See* Dkt. #4204 (Ds' MNT) at pp. 14-15.  But the Court's Order makes clear that the Court did in fact review Defendants' arguments—including immediately issuing a curative instruction after Defendants requested it.  *See, e.g.*, Dkt. #4172 (Mistrial Order) at pp. 6, 8.  In any event, "[w]here

*States v. Smith*, 500 F.2d 293, 298 (6th Cir. 1974) (holding curative instruction that did not specifically instruct that no adverse inference could be drawn from defendants' silence concerning meaning of certain intercepted telephone conversations was insufficient to cure prejudice from prosecutor's statements to the effect that jurors should demand that defendants show that some interpretation of the phone conversations, inconsistent with prosecutor's interpretation, was reasonable; "The prosecutor's improper argument to the jury was the attempt to abrogate the presumption of appellants' innocence and the jury was invited to draw inferences supporting guilt unless the appellants offered proofs of innocence."); *Gilster v. Primebank*, 747 F.3d 1007, 1012-13 (8th Cir. 2014) (finding general instruction that counsels' arguments were not evidence was insufficient to cure prejudice because the trial court overruled defense counsel's timely objection to improper closing argument, "which told the jury they could appropriately consider the argument in the deliberations they were about to begin"; holding that "the timing and emotional nature of counsel's improper and repeated personal vouching for her client, using direct references to facts not in evidence, combined with the critical importance of Gilster's credibility to issues of both liability and damages, made the improper comments unfairly prejudicial and require that we remand for a new trial"); *Draper v. Rosario*, 836 F.3d 1072, 1084 (9th Cir. 2016) (involving improper vouching based on evidence outside of the record during closing argument, including defense counsel's argument that the correctional officer witnesses were more credible because they had "no reason to commit perjury" and that they had more to lose by lying on the stand than the inmate witnesses).

[27] Defendants also contend—without any new argument or supporting authority—that Plaintiffs' counsel "misleadingly suggested to the jury that the litigation would not carry financial consequences for Defendants; suggested without evidence that Defendants are the subject of multiple ongoing investigations in Lake and Trumbull Counties;" and "'joking[ly]' encouraged jurors to 'beat up' any juror who did not agree with Plaintiffs."  Dkt. #4204 (Ds' MNT) at pp. 12-13.  *But see* Dkt. #4153 (11/15/21 Trial Tr.) at 7321:25 – 7322:7 (Plaintiffs' counsel stating: "if there's some that don't see it that way, please, those of you who do, I want you to *not* beat them up, but really go after them.  No, I'm joking.  You've got to debate this, though.  You've got to come up with the right answer, and it takes all of you to do it.  And if you don't agree with me on this stuff, that's fine, you voice your opinion and y'all will figure it out.") (emphasis added).  As fully explained in Plaintiffs' response to Defendants' Joint Mistrial Motion, and as this Court correctly concluded, none of these arguments warranted a mistrial.  *See* Dkt. #4172 (Mistrial Order) at pp. 6-8; Dkt. #4158 (Ps' 2nd Mistrial Opp.) at pp. 6-8, 15.  Moreover, Defendants did not object to any of these statements at trial.  Dkt. #4158 (Ps' 2nd Mistrial Opp.) at pp. 7, 8, 15.

a motion for a new trial is grounded in opposing counsel's misconduct, a contemporaneous objection to the conduct or remark preserves the objecting party's right to move for a new trial." *Cousins*, 2005 WL 8161508, at *2.  *See also Kokesh*, 747 F.2d at 1095 (requiring objection to preserve appeal in most cases).[28]  Though the Sixth Circuit also permits a new trial even where the movant fails to object at trial if opposing counsel's conduct was outrageous enough to warrant such a drastic remedy, *Strickland*, 142 F.3d at 358-59, this exception to the norm is only triggered if the reviewing court finds that counsel's misconduct constituted plain error. *Id.* at 359 ("While the failure to make timely objection does not preclude appellate review, such failure does limit our review to review for plain error.").[29]  Moreover, "failure to object at trial to closing arguments does raise the degree of prejudice which must be demonstrated in order to get a new trial on

---

[28]   *See also Fuhr v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004) ("Hazel Park, furthermore, failed even to object to the statements when they were made.  We have applied a high standard of review [for motions for new trial] under such circumstances."); *Phibbs*, 999 F.2d at 1066–67 (finding it significant that "defendants did not make a contemporaneous objection to the remarks on grounds of prejudice, or on any other grounds" when determining whether trial court abused its discretion in denying defendants' mistrial motion); C. Wright and A. Miller, Federal Practice and Procedure: Civil § 2472 (explaining that in the vast majority of situations a party must make a contemporaneous objection to the comments of counsel if the party would like a court to take note of the errors on appeal or on a motion for new trial).

[29]   *See also Cousins*, 2005 WL 8161508, at *2 n.3; *Jones v. Sandusky Cty., Ohio*, 96 F. Supp. 3d 711, 724 (N.D. Ohio 2015), *aff'd*, 652 F. App'x 348 (6th Cir. 2016) (holding that, where the plaintiff failed to object to the defendant's closing argument, "Plaintiff must show that defense counsel engaged in misconduct which 'was so outrageous as to warrant reversal of the verdict and a new trial, despite counsel's failure to object'") (quoting *Strickland*, 142 F.3d at 358); *Eagan v. CSX Transp., Inc*., 271 F. Supp. 2d 993, 995 (E.D. Mich. 2003) (noting the heightened standard requires the movant to show plain error).  *Cf. Clark v. Chrysler Corp*., 436 F.3d 594, 609, 609 n.19, 610 (6th Cir. 2006) (noting that failure to object to the plaintiff's closing arguments at trial raised the degree of prejudice required to get a new trial, and holding that the plaintiff's closing arguments did not warrant a new trial on punitive damages because although plaintiff's counsel asked the jury to "send Chrysler a message" that changes were necessary, "this comment was appropriately aimed at deterring Chrysler's use of a defective door latch system in the future"); *Park W. Galleries, Inc. v. Hochman*, 692 F.3d 539, 548 n.5 (6th Cir. 2012) (noting the Sixth Circuit has "in certain circumstances" declined to impose an objection requirement on penalty of waiving the right to relief in the form of a new trial, but noting "the degree of prejudice required to obtain a new trial on appeal is higher in the absence of objections at trial").

appeal." *Id.* at 358.[30]  Thus, as noted above, the Court correctly considered Defendants' failure to appropriately object at trial.

Finally, Defendants contend that the Court applied the incorrect standard in concluding a mistrial was unwarranted because Plaintiffs' counsel's statements did not "permeate the entire trial from the beginning to the end[,]" instead of determining whether there was "a reasonable probability that the verdict of the jury [was] influenced" by an improper statement.  Dkt. #4204 (Ds' MNT) at pp. 15-16.  Not so.[31]  The Court's Order makes clear that the Court properly considered Mr. Lanier's statements, both individually and as a whole:

> Ultimately, none of Mr. Lanier's statements individually rise to the level of destroying Defendants' right to a fair trial.  And even taken together, considering "the totality of the circumstances," the Court concludes Mr. Lanier's statements did not "permeate[] the entire trial from the beginning to the end" and did not produce prejudice so substantial as to preclude the jury from deliberating without taint and reaching a fair and impartial verdict.  *City of Cleveland*, 624 F.2d at 756, 755.

Dkt. #4172 (Mistrial Order) at pp. 8-9.  Thus, the Court correctly concluded that "it is highly unlikely that any jury, but in particular this jury – which has proved to be remarkably attentive and engaged throughout the entire trial – would be prejudicially influenced by Mr. Lanier's statements

---

[30]   *See id.* at 359 ("Although there was an 'us-against-the-powerful-corporation' flavor to Plaintiff's closing remarks, as quoted above, we believe those remarks were not so prejudicial as to mandate a new trial, especially where no objection was raised at the first trial."); *Kokesh*, 747 F.2d at 1095 ("[W]hile some of the remarks made by plaintiff's counsel during closing argument were inappropriate, they were not so egregious as to require a new trial when defense counsel did not make a contemporaneous objection."); *Polek v. Grand River Nav.*, 872 F. Supp. 2d 582, 586 (E.D. Mich. 2012) ("Defendant did not lodge an objection or seek any curative instruction from the Court during Plaintiff's closing argument. As a result, the degree of prejudice which Defendant must demonstrate in order to obtain a new trial is raised substantially."); *Eagan v. CSX Transp., Inc.*, 294 F. Supp. 2d 911, 915 (E.D. Mich. 2003) ("'[F]ailure to object at trial to closing arguments does raise the degree of prejudice which must be demonstrated to get a new trial on appeal.'") (citation omitted).

[31]   *See, e.g.*, Dkt. #4172 (Mistrial Order) at p. 2 ("When comment or argument by counsel is inappropriate, a mistrial may be required where there is a reasonable probability that the verdict of a jury has been influenced by such conduct." . . . "In determining whether 'there is a reasonable probability that the verdict of a jury has been influenced' by improper conduct, warranting that the verdict be set aside . . ."), *id.* at p. 3 (observing there are examples where a single misstep by counsel have required a mistrial), *id.* at p. 5 (same).

made in closing argument." *Id.* at p. 9 (footnote omitted).  Defendants' motion for a new trial should be denied on this ground.

     **D.**    **The Court properly admitted evidence of DEA settlements and administrative actions.**

     Defendants argue that the Court erred in permitting Plaintiffs to introduce evidence of enforcement actions and settlements with the DEA at trial.  Dkt. #4204 (Ds' MNT) at pp. 16-17.  Defendants' arguments are without merit and should be rejected as they have been so many times before.

     First, Defendants state, in conclusory fashion, that "[a]dmitting evidence about the settlements violated Federal Rule of Evidence 408."  Dkt. #4204 (Ds' MNT) at p. 16.  They cite no additional legal authority for this proposition, nor do they even reference any of their prior briefing on this issue.  Dkt. #4204 (Ds' MNT) at p. 16.[32]  Even assuming, *arguendo*, that this issue was adequately briefed, Defendants' Rule 408 arguments are without merit and should be rejected for the same reasons set forth in prior briefing and the Court's previous rulings.[33]

     The Court was clear that it was admitting these settlements and enforcement actions to show knowledge/notice, intent, and, in particular, the actions taken (or not taken) by Defendants

---

[32]   *See, e.g., McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'"); *EB-Bran Prods. v. Warner*, 242 F. App'x 311, 313 (6th Cir. 2007) (deeming "woefully underdeveloped" arguments to be waived); *Smith v. Highland Park Ruritan Club*, No. 3:06-CV-351, 2008 WL 11342641, at *3 (E.D. Tenn. Oct. 21, 2008) (denying motion for new trial; "Defendant does not factually or legally develop these arguments so as to provide the court with a basis to analyze its exceptions.  The court cannot consider and respond to what is not provided.") (citing *McPherson*, 125 F.3d at 995-96).

[33]   *See, e.g.,* Dkt. #2815 (CT1A Ps' MIL Opp.) at pp. 53-55, 84-85; Dkt. #3058 (CT1A Evidentiary Order) at pp. 12-15; Dkt. #3464 (CT1B Ps' MIL Opp.) at pp. 28-30; Dkt. #3546 (CT1B Evidentiary Order) at pp. 29-32; Dkt. #3978 (Ps' Opp. to Ds' Motions for Reconsideration re: Settlements); Dkt. #3990 (Order Regarding Admissibility of Prior Settlement Agreements); Dkt. #4012 (Ps' Opp. to Ds' M to Limit Joe Rannazzisi Testimony); **Ex. A** (Ps' 10/1/21 Letter Opp. to WAG Letter re: Settlements); **Ex. B** (Ps' 10/1/21 Letter Opp. to CVS Letter re: Settlements); **Ex. C** (10/2021 E-mail Chain) at pp. 1-2.

in response to these settlements and actions.[34]  Defendants claim that the settlement evidence was not actually used for these purposes, citing a single example from Plaintiffs' counsel's closing argument:

> How can they have policy – oh, look, we had all of those wonderful policies.  As Mr. Delinsky said, are we – with all of these policies, are we the kind of company that would ever do something so egregious?  And look, yes.  *Holiday*.  That was your company.  Maryland.  That was your company.  Walgreens in San Diego, that was your company.  Walmart, that was your company.  They've entered into settlement after settlement in spite of all of these wonderful policies they tell you they've got.  They still – you know, you can take every one of those wonderful screens . . . .  You can take all of these wonderful tools and it didn't stop *Holiday*.

Dkt. #4153 (11/15/21 Trial Tr.) at 7315:10-24.  First, this language is entirely consistent with the permissible purpose for which the settlement evidence was admitted.  Despite Defendants' touting of their policies, the settlements demonstrate that they were on notice that the DEA did not consider these policies to be sufficient.  Moreover, some of these "wonderful" policies were only put in

---

[34]  *See, e.g.,* Dkt. #3981 (9/28/21 Pretrial Hearing Tr.) at 40:15-19 ("Because again, they're not – they can't be offered for the truth of the matter asserted. . . . It may be relevant for notice, notice, notice and intent, and depending on how the questions go."), 41:12-19 ("A permissible use, I mean it seems to me you can question an executive about a settlement and whether, whether that influenced the company's policies going forward in any way, shape or form.  And if so, fine.  If not, why.  I mean, I think that's – you know, settlement is a fact and it's really what the defendants did or – did or didn't do as a result."); Dkt. #3990 (Order Regarding Admissibility of Prior Settlement Agreements) at p. 2 (holding that three of the settlements containing admissions (P-08954; P-08956; P-00015) "are admissible to show notice of potential national-level policy failures equally applicable to all locations, including Lake and Trumbull counties"); Dkt. #3995 (10/5/21 Trial Tr.) at 185:14 – 186:2, 187:3-21 ("[I]t's direct evidence that the Government didn't think that that defendant was complying with its obligations under the CSA.  Settlement after settlement after settlement."), 187:22-25 ("And what's relevant is what the company did or didn't do in response to what the Government was doing."); Dkt. #4005 (10/7/21 Trial Tr.) at 878:17 – 879:3, 880:6 – 881:9, 881:14-22; Dkt. #4023 (10/13/21 Trial Tr.) at 1633:19-24 (*Holiday* relevant to CVS's intent), 1635:11-24 (same), 1637:10-11 (*Holiday* relevant to intent and notice), 1644:22 – 1645:2 ("That's – that crystallizes why these settlements are relevant.  Yeah, there's notice, but to me what is particularly probative on, on whether or not the plaintiff can prove its case, is what the defendants did or didn't do after these settlements."), 1645:4-16, 1645:19-23 ("THE COURT: All right.  So what they did or didn't do, and that, to me, that is far more important than the fact that there were a few settlements.  MR. STOFFELMAYR: We agree completely, Your Honor."); Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2489:3-6; Dkt. #4050 (10/19/21 Trial Tr.) at 2982:12-20; Dkt. #4057 (10/20/21 Trial Tr.) at 3296:13-17, 3296:19-22; Dkt. #4153 (11/15/21 Trial Tr.) at 7073:10-14 (instructing the jury that it "may consider these settlements only to the extent you believe they bear on what notice or knowledge the defendant received as a result of the settlements, or to the extent you believe they bear on the defendants' intent").

place because Defendants were obligated to do so under the terms of various settlement agreements

with the DEA.  *See, e.g.,* Plaintiffs' Rule 50(b) Opp. at pp. 42, 63, 81.  Second, Defendants did not

contemporaneously object to these statements by Plaintiffs' counsel.  Dkt. #4153 (11/15/21 Trial

Tr.) at 7315:10 – 7324:1; *see also infra* at pp. 36-37.  Finally, as Defendants are well aware, the

comments and questions of attorneys are not evidence, and the jury was repeatedly so instructed.

*Supra* at fn.18.

The jury was also specifically instructed as to the limited purpose for which it could

consider the settlement evidence:

> You have heard testimony about settlements that certain defendants entered into
> with the DEA, the Drug Enforcement Administration.  This settlement evidence
> has been admitted for a limited purpose.  You may consider these settlements only
> to the extent you believe they bear on what notice of knowledge the defendant
> received as a result of the settlements, or to the extent you believe they bear on the
> defendants' intent.  You may not infer liability or draw any conclusions about a
> defendant's potential liability in this case based upon the fact that it entered into
> those settlements.

Dkt. #4153 (11/15/21 Trial Tr.) at 7073:6-17.[35]  Juries are presumed to follow the instructions

given to them.  *Supra* at fn.3.  Thus, even if Plaintiffs' counsel's statements were improper (they

were not), any potential prejudice was cured by these instructions and the statements do not warrant

a new trial.  *See Holmes*, 78 F.3d at 1046–47 ("Although prejudice that affects the fairness of a

proceeding can certainly be grounds for a new trial, when 'such prejudice is cured by instructions

of the court, the motion for a new trial should be denied.'") (citation omitted).

Notably, Defendants do not raise any issue regarding the language of the instruction itself.

---

[35]  This instruction was further reinforced by Plaintiffs' counsel during closing arguments.  Dkt. #4153
(11/15/21 Trial Tr.) at 7172:9-23 (Mr. Lanier: "You know, we were allowed to bring settlement
agreements, some settlement agreements to you and show them to you.  There were provisions that
we're not allowed to tell you about in those agreements.  Rightfully so.  Because the agreements
themselves are not proof that something wrong was done by these defendants in these counties.  But
what they are is notice to the defendants of what's going on in their pharmacies.  And it's also relevant
to use to see how they've affected national policy because some of the settlements we were allowed to
show you where it required some changes by these defendants on a national basis.").  Additionally, the
Court emphasized to the jury: "If you're instructed that some item of evidence is received for a limited
purpose only, you must follow that instruction."  Dkt. #3991 (10/4/21 Trial Tr.) at 14:10-12.

Instead, they claim such instruction "was inconsistent with how the Court permitted the evidence to be used, came long after Plaintiffs had introduced (and repeated) the evidence during their case-in-chief, and was simply too late and ineffective to undo the prejudice caused to Defendants." Dkt. #4204 (Ds' MNT) at p. 16. Again, as previously noted, the instruction was entirely consistent with how the Court permitted the settlement evidence to be used. *Supra* at fn.34.

Moreover, any delay in giving the instruction was entirely a problem of Defendants' own making. Plaintiffs first referenced settlements in front of the jury on October 4, during opening statements. Dkt. #3991 (10/4/21 Trial Tr.) at 74:12 – 76:17.[36] The next day Plaintiffs' counsel extensively questioned the first witness, CVS's Tom Davis, regarding several CVS settlements; defense counsel objected but did not request a limiting instruction during that questioning, nor did they do so at the next break. Dkt. #3995 (10/5/21 Trial Tr.) at 338:3 – 354:5, 368:16 – 369:8. It was not until the end of that day (October 5) that defense counsel first requested a limiting instruction:

> MR. DELINSKY: Your Honor, we'd request a limiting instruction on all the settlements.
>
> THE COURT: Well, if you want to propose one and work it out with the plaintiffs, I'll certainly give it. You can do it overnight and you agree on something, I agree it comes – well, see what you can come up with.
>
> MR. DELINSKY: Thank you, Your Honor.

Dkt. #3995 (10/5/21 Trial Tr.) at 436:12-19.

For over one week, defense counsel did not raise the issue again, despite ample opportunity to do so.[37] Finally, on the morning of October 13, CVS's counsel raised the issue, but still had no

---

[36] Despite being aware Plaintiffs intended to reference settlements in their opening statement, Defendants did not mention any limiting instruction in their motions for reconsideration regarding settlements or during the pre-trial hearing on the morning the trial began. Dkt. #3972 (CVS M for Reconsideration); Dkt. #3973 (WMT Joinder to CVS M to Reconsider); Dkt. #3974 (WAG M for Reconsideration); Dkt. #3992 (10/4/21 Pre-Trial Hearing Tr.). Nor did they raise the issue immediately after Plaintiffs' counsel's opening statement, or even the next morning, despite a lengthy discussion regarding settlement evidence outside the presence of the jury. Dkt. #3991 (10/4/21 Trial Tr.) at 173:4 – 179:10; Dkt. #3995 (10/5/21 Trial Tr.) at 183:2 – 190:14.

[37] *See, e.g.*, Dkt. #4000 (10/6/21 Trial Tr.) at 458:2 – 483:18, 540:20-22, 576:2 – 577:2, 654:5 – 656:13, (footnote continues on next page)

proposed language for the Court and portrayed no sense of urgency as to the instruction being read immediately:

> MR. DELINSKY: Your Honor, very briefly, and this is more by way of housekeeping related to this issue. We do need a limiting instruction, we've talked about this before on the settlements.

> THE COURT: Have you provided – have you worked something out? If you've worked something out I'll give it.

> MR. DELINSKY: We've provided one to plaintiffs. We're just awaiting comments. Pete had identified an issue.

> MR. LANIER: We will get it to you.

> THE COURT: As soon as you come up with it, Mr. Delinsky, I'll give it. I think, you know, if the parties agree on the language, I'll give it.

> MR. DELINSKY: What we did, Your Honor, is we based it on the limiting instruction that Judge Sargus gave in the *DuPont* ruling, which is one of the cases Your Honor relied on. So it's largely modeled after that, but we will endeavor to get that.

Dkt. #4023 (10/13/21 Trial Tr.) at 1646:4-22. For another five days the issue was not raised to the Court again, despite numerous opportunities to do so.[38]

On the evening of October 18, Defendants finally provided the Court with their proposed language for the limiting instruction. Dkt. #4043 (Ds' Corrected Proposal for Instructions on CSA and Settlements). Notably, in their submission, Defendants did not request that the instruction be given immediately, nor did they request that the Court rule on an expedited basis. *Id.*[39] Nor did

---

729:19 – 745:21; Dkt. #4005 (10/7/21 Trial Tr.) at 751:2 – 752:25, 817:23 – 823:17, 871:15 – 884:13, 971:10-12, 1060:5 – 1091:2; Dkt. #4008 (10/8/21 Trial Tr.) at 1096:2 – 1112:13, 1139:4-6, 1218:20 – 1227:13, 1312:1-8; Dkt. #4017 (10/12/21 Trial Tr.) at 1317:2-5, 1406:10-12, 1494:20 – 1497:2, 1612:14 – 1616:17.

[38] *See, e.g.*, Dkt. #4023 (10/13/21 Trial Tr.) at 1705:4 – 1707:25, 1755:11 – 1759:2, 1819:19-21, 1917:22 – 1921:24; Dkt. #4026 (10/14/21 Trial Tr.) at 1927:2 – 1938:7, 2005:7-12, 2050:25 – 2051:2, 2094:22-24, 2191:3 – 2192:25; Dkt. #4032 (10/15/21 Trial Tr.) at 2198:2 – 2223:18, 2267:18-20, 2307:25 – 2310:2, 2389:16 – 2400:17; Dkt. #4041 (10/18/21 Trial Tr.) at 2407:2 – 2413:23, 2469:24-25, 2488:7 – 2489:14, 2514:10 – 2525:3, 2583:18 – 2585:1, 2671:17 – 2699:20.

[39] Plaintiffs submitted their counterproposal regarding the settlement limiting instruction on October 21. Dkt. #4062 (Ps' Proposed Instruction on Settlements).

29

they raise the issue the following morning with the Court (or over the next couple days).[40]  Indeed, on October 21, at the end of the trial day, the Court itself raised the issue of the limiting instruction and *specifically asked when defense counsel would like the instruction read*; defense counsel had no answer at that time:

> THE COURT:…. [F]irst, both sides have submitted a proposed instruction or limiting instruction about these settlements.  And there are some differences.  I would greatly appreciate if you can agree on one version.  If not, I'm have to come up with one.  *Are you contemplating me giving this during the trial or at some particular point or in the final instructions?  It was unclear.*
>
> MR. DELINKSY:  Your Honor, I think it's the defense request.  Two things on the table.  Number one, we will, now that we have their competing instruction, we will confer with them and see if we can find common ground.
>
> THE COURT:  Okay.
>
> MR. DELINSKY:  Okay, I can identify the concept that they want introduced in it, I understand it, so we will try.
>
> THE COURT:  Okay.
>
> MR. DELINSKY:  *Number two, you raise a very good caution, and I'd like to reserve on that and come back to it.*
>
> THE COURT:  All right.  *Well, as I said, I can do both.*
>
> MR. DELINSKY:  Right.
>
> THE COURT:  I mean, they're not mutually exclusive, Mr. Delinsky.
>
> MR. DELINSKY:  Right.
>
> THE COURT:  There have been times where I've said something during the trial, some instruction, which I repeat in the final instructions.  I don't have a problem doing both.  *I just want to know what you're suggesting.*
>
> MR. DELINSKY:  I think that's where we'll end up, *but I certainly want to confer with my codefendants.*
>
> THE COURT:  All right.  That's fine.  You can continue to work on that.

Dkt. #4064 (10/21/21 Trial Tr.) at 3584:23 – 3586:6 (emphasis added).

---

[40]  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) at 2705:1 – 2720:15, 2775:13 – 2776:25, 2818:13 – 2820:2, 2881:3-4, 2969:14 – 2985:11; Dkt. #4057 (10/20/21 Trial Tr.) at 2990:1 – 2999:22, 3059:23, 3112:2 – 3117:25, 3191:20-21, 3294:17 – 3302:13; Dkt. #4064 (10/21/21 Trial Tr.) at 3307:1 – 3320:4, 3381:15-16, 3431:10 – 3439:20, 3515:22-23.

On October 25, defense counsel e-mailed Plaintiffs' counsel and Special Master Cohen with their objections to Plaintiffs' proposed language for the limiting instruction. **Ex. C** (10/2021 E-mail Chain) at p. 4.  Defendants did not request in that e-mail that the instruction be given immediately.  *Id.*  The following day, Special Master Cohen e-mailed the parties with the Court's proposed language and asked that any objections be made by the end of the day.  *Id.* at p. 3.  In their response, defense counsel objected to the proposed language, citing legal authority in support of their arguments.  *Id.* at pp. 2-3.  But again, they made no request that the instruction be given immediately.  *Id.*  Indeed, despite having ample opportunity to do so after October 21 (when the Court first raised the issue of timing),[41] defense counsel did not ask the Court to immediately give the instruction until the morning of November 8, *the second to last day of testimony in the trial*:

> MR. DELINSKY:  All right.  Thank you, Your Honor.  The one other issue is in all the back and forth on the limiting instructions, there hasn't been a reading yet of the limiting instruction on the settlements.  That did come in briefly on Friday and extensively – not extensively but with Ms. Harrington on Wednesday.  I would request this morning that the settlement instruction be read.  I know it will be read

---

[41] *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) at 3600:1 – 3612:10, 3672:6-7; Dkt. #4078 (10/25/21 Trial Tr.) at 3796:3-14 (no request made despite topic of limiting instruction being brought up by Court: "THE COURT: A stipulation or instruction on settlement agreements.  MR. WEINBERGER: Right. We submitted a response.  We haven't had a chance to discuss our response with the other side . . . . THE COURT: All right.  Well, I want you to keep working on it. . . .  Use Special Master Cohen to assist you.  If the parties can't agree, obviously I'll decide it."), 3849:6-8, 3890:8 – 3891:5, 3955:4-7, 4018:5 – 4028:5; Dkt. #4090 (10/26/21 Trial Tr.) at 4033:1 – 4046:10, 4102:14-16, 4147:1 – 4148:4, 4217:24 – 4221:25, 4294:6 – 4330:4; Dkt. #4093 (10/27/21 Trial Tr.) at 4335:1 – 4347:17, 4381:18 – 4382:3, 4401:21 – 4419:5, 4457:6 – 4487:13; Dkt. #4106 (10/28/21 Trial Tr.) at 4492:1 – 4505:16, 4561:7-10, 4608:22 – 4610:22, 4687:19-22, 4760:20 – 4764:18; Dkt. #4107 (10/29/21 Trial Tr.) at 4769:1 – 4781:24, 4855:7-12, 4898:10 – 4899:4, 4939:23 – 4940:1, 4977:6 – 4982:20, 5043:16 – 5048:8; Dkt. #4109 (11/1/21 Trial Tr.) at 5053:2 – 5059:21, 5187:22 – 5190:16, 5190:18 – 5192:2, 5192:6 – 5195:3, 5195:4-11, 5200:4 – 5201:1, 5206:15 – 5207:3, 5224:24 – 5226:24, 5231:8-17, 5236:3 – 5238:13, 5241:16 – 5246:12, 5270:20 – 5271:21, 5320:18 – 5326:7; Dkt. #4111 (11/2/21 Trial Tr.) at 5331:1 – 5340:15, 5410:9-23, 5456:6 – 5457:3, 5550:4-5, 5605:10 – 5608:13; Dkt. #4115 (11/3/21 Trial Tr.) at 5613:1 – 5621:22, 5687:7-8, 5734:10 – 5735:3, 5772:9-14, 5775:4-10, 5790:20-24, 5791:17 – 5792:5, 5792:13 – 5793:19, 5793:25 – 5794:22, 5795:4-5, 5795:2-24, 5796:9-19, 5797:25 – 5798:7, 5798:15-18, 5799:10-18, 5800:11-16, 5802:4-7, 5817:15-16, 5875:4-6, 5875:14-24, 5876:6-25, 5878:6 – 5879:5, 5883:21 – 5884:6, 5884:16 – 5885:10, 5885:22 – 5886:8, 5893:2-3, 5896:13 – 5899:9; Dkt. #4118 (11/4/21 Trial Tr.) at 5904:1 – 5914:13, 5976:6-7, 6028:3 – 6029:15, 6112:10-11, 6188:25 – 6193:4; Dkt. #4124 (11/5/21 Trial Tr.) at 6198:1 – 6212:24, 6269:4-5, 6318:21 – 6325:6, 6402:2 – 6417:2, 6466:22 – 6470:19, 6471:2-21, 6472:1 – 6474:22, 6487:21 – 6490:15.

31

on Monday, one week from today as well, but I would make that request, Your Honor.

MR. WEINBERGER:  We would object to that.  We believe it's adequate –

THE COURT: Well, I think at this point, since I haven't read it, I'm going to do it in the final instructions.  I think that's the key point, so I'll do it then.

Dkt. #4132 (11/8/21 Trial Tr.) at 6510:17 – 6511:6.[42]  There was no further discussion of the matter at that time.

Defendants cannot establish, nor have they even attempted to do so, that they were unfairly prejudiced by the Court giving the limiting instruction on November 15 (in its final instructions) instead of on November 8;[43] thus, no new trial is warranted on these grounds.  *See, e.g., United States v. Dabish*, 708 F.2d 240, 243 (6th Cir. 1983) ("Finally, we reject Dabish's argument that the district court's refusal to give a contemporaneous limiting instruction was reversible error. As we observed earlier, the judge did give the limiting instruction later in the trial, in the course of his general charge to the jury. We believe the timing of such an instruction is best left to the trial judge's discretion."); *United States v. Alkufi*, 636 F. App'x 323, 333 (6th Cir. 2016) ("[W]e have previously held that a district court did not err where it did not provide a contemporaneous limiting instruction for 404(b) evidence, but later did so during the jury charge.") (citing cases).  Notably, when it came to an analogous limiting instruction requested by Plaintiffs, related to certain hearsay statements by Boards of Pharmacy that could only be considered for a limited purpose, Defendants were insistent that if the instruction be given it all, it should be given in the final instructions. Dkt. #4124 (11/5/21 Trial Tr.) at 6320:16 – 6322:18, 6322:19-23 (Mr. Majoras: "[A]nd part of my issue, Your Honor, is if there should be a discussion about what hearsay may or may not be, it should be at the end of the case, if at all, because these hearsay rulings have applied to virtually every witness in the case."), 6322:24 – 6323:2, 6323:19 – 6324:25.

---

[42]   Neither Walgreens' counsel nor Walmart's counsel indicated on the record at that time that they were joining Mr. Delinsky's request.  *Id*.

[43]   Testimony in the case ended on November 9 and the jury was excused for the rest of that week. Dkt. #4133 (11/9/21 Trial Tr.) at 7014:13-25.

*Stockman v. Oakcrest Dental Ctr., P.C.*, is inapposite.  480 F.3d 791 (6th Cir. 2007).  In that employment discrimination case, the trial court allowed the plaintiff to introduce evidence of the defendants' offer to reinstate the plaintiff's employment after the lawsuit had been filed, along with evidence of the plaintiff's rejection and counteroffer, reasoning that they were admissible under Rule 408's "another purpose" exception to rebut the defendants' argument that the plaintiff failed to mitigate his damages.  *Id* at 795-97.  The Sixth Circuit rejected the idea that this was a proper "purpose" under Rule 408:

> The goal of mitigation is the prevention of unnecessary economic loss, and therefore mitigation necessarily goes to the amount of a claim.  Because disproving mitigation cannot both be a purpose for excluding evidence under Rule 408—*i.e.*, for "the amount" of the claim—and at the same time be admissible as "another purpose," [the plaintiff's] position is implausible.

*Id*. at 798 (internal citation omitted).  The court further held that the evidence was sufficiently prejudicial to warrant a new trial because: (i) the probative value of the offer "was nearly non-existent[;]"[44] (ii) the evidence was "inherently prejudicial because a jury could easily have misunderstood that the offer, made on the eve of trial, was an implicit admission of liability or a sign that Defendants thought they might lose at trial[;]" (iii) "[t]he evidence of trial was too insubstantial to overcome the Letters' prejudicial effect[,]" and, thus, their admission was substantially likely to have affected the verdict; and (iv) the trial court failed to issue a contemporaneous instruction, despite "both parties agree[ing] that a limiting instruction was appropriate at the time[,]" and instead delayed doing so until the charge.  *Id*. at 797, 799-800, 804.

---

[44]  The court reasoned: "The offer was made just before trial, two years after termination, and was contingent on settling the case, whereas Defendants' evidence established that Dr. Stockman sought, received, and rejected offers of equivalent employment in the months following his termination.  Thus, the Letters were irrelevant to all issues of mitigation except for future pay."  *Id*. at 799.  The court further noted that "this mere scintilla of probative value was further reduced by Defendants' offer to concede the issue[,]" since *they* had the burden of proving failure to mitigate.  *Id*. ("Even though a party cannot offer to concede an element of the case against his so as to preclude certain prejudicial evidence, here, the burden of proving a failure to mitigate future pay rested with Defendants[.]") (internal citation omitted).

33

The circumstances in the present case are entirely different.  As discussed above, the settlement evidence was not precluded by Rule 408 because it was properly offered for another purpose (*i.e.*, notice/knowledge and intent).  The evidence did not involve an offer to compromise the dispute between Plaintiffs and Defendants in this case, but rather involved executed settlements between the DEA and Defendants related to various enforcement actions under the CSA.  *See, e.g.,* P-08954; P-08955; P-10212; P-10213; P-10214; P-00015; P-14750; P-15317; P-14711; P-21113.  Thus, there was no risk that the jury would construe this evidence as an admission of their nuisance liability in this case, especially when coupled with the limiting instruction provided.  *See Holmes*, 78 F.3d at 1046–47 ("Although prejudice that affects the fairness of a proceeding can certainly be grounds for a new trial, when 'such prejudice is cured by instructions of the court, the motion for a new trial should be denied.'"; "We find it error to infer that the jury did not or could not follow the judge's clear instructions in this regard.") (citation omitted).  Moreover, there was ample evidence of Defendants' liability offered at trial.  *See, e.g.,* Plaintiffs' Rule 50(b) Opp. at § I.  Finally, this Court was entirely willing to offer the limiting instruction during the trial; Defendants were responsible for the delay.  *Supra* at pp. 28-33.

Defendants' next complaint is that the settlement evidence was unnecessarily cumulative, citing a District of Columbia District court case for the proposition that "when settlement and related evidence is admitted, 'the evidence . . . [must] be presented as briefly as possible' in order to 'guard against the risk of prejudice or confusion[.]'"  Dkt. #4204 (Ds' MNT) at p. 16 (quoting *Barnes v. District of Columbia,* 924 F. Supp.2d 74, 90 (D.D.C. 2013)).  But the *Barnes* court was not stating a general rule; rather, it held that under the circumstances of *that particular case*, evidence of a settlement of a related class action, which contained no admissions and was offered to show notice, should be presented as briefly as possible.  924 F. Supp.2d at 85-86, 90-91.[45]

---

[45]  Notably, the *Barnes* court also acknowledged: "A defendant should not be able to use a settlement as a shield if it continues to engage in the same unlawful conduct, and new plaintiffs would need to look at the history of the defendant's knowledge and conduct to make their case. . . .  In cases where notice and past practice are key elements, the District cannot simply ask everyone to ignore the prospective obligations it undertook as part of the *Bynum* settlement."  *Id.* at 90.

The circumstances in the present case are different from those in *Barnes*. First, the settlements at issue relate not to private litigation but rather to DEA enforcement actions alleging violations of the CSA. Moreover, three of the settlements contain admissions of liability by CVS or Walgreens. P-08954; P-08956; P-00015. And while the settlements were certainly probative of knowledge/notice, that was not the sole basis for their admission. *Supra* at fn.34. The fact that Defendants had such knowledge, yet repeatedly failed to change their dispensing policies or procedures (except when they were contractually obligated to do so under the settlement agreements), demonstrates that their conduct was intentional and that the interference caused by their conduct was unreasonable. *See, e.g., Cincinnati v. Beretta, U.S.A. Corp.*, 768 N.E2d 1136, 1142 (Ohio 2002) ("'Unreasonable interference' includes . . . conduct that is of a continuing nature or one which has produced a . . . long-lasting effect upon the public right, an effect of which the actor is aware or should be aware."). The Court acknowledged as much.[46] Additionally, many of the anti-diversion dispensing policies that Defendants touted to the jury were only put in place because they were required under the terms of certain settlement agreements. *See, e.g.,* Plaintiffs'

---

[46] Dkt. #3981 (9/28/21 Pretrial Hearing Tr.) at 41:19 – 42:1 ("And so there's an argument that, you know, no Court's admitted ten settlements. I mean, candidly, ten settlements against a company in a five-year period could be far more probative that one. I mean, one is one. But if you have ten, you've – and they are similar and similar to the conduct here, well, it looks like the company just blew them off."); Dkt. #3995 (10/5/21 Trial Tr.) at 185:14 – 186:2 ("Well, here's my ruling. If there are substantial number of settlements in a relatively short period of time, and they all relate to the subject matter of this case, you can – and the witness is responsible enough that he or she would have taken some action or should have taken some action, I'll allow it in. Okay. If not, it doesn't come in. If it's one or two over a long period, it's not relevant to anything. It's more prejudicial than probative. If you've got five or six or seven against – we'll just use, you know, CVS, and this is a witness who had a position of responsibility to do something and didn't, well you can cross-examine him on it or examine him on it."), 187:3-25 ("I said if you've got four or five, some substantial number in a reasonable period of time and the time frame we're talking about and it relates to the subject matter of this case, and you've got a witness who's a responsible witness, well, it's fair to ask him, well, I mean, here's the Government over and over again telling you that you're not fulfilling your responsibilities under the CSA. What, if anything, did you do? That's a fair question. Okay? And I'll allow that. Whether it was, you know – because, again, it's direct evidence that the Government didn't think that that defendant was complying with its obligations under the CSA. Settlement after settlement after settlement. At some point, you would think the company would seriously consider changing what they're doing. And if you've got a witness on there who's got some responsibility, that's a fair question. And what's relevant is what the company did or didn't do in response to what the Government was doing. So that's why it's relevant.").

Rule 50(b) Opp. at pp. 42, 63, 81.  And, on a number of occasions Plaintiffs' counsel raised the issue of settlements in order to rebut or clarify testimony from Defendants' own witnesses elicited by defense counsel on direct (or redirect) examination.[47]

Moreover, Defendants failed to preserve their objections to the "cumulative" nature of the settlement evidence with respect to the vast majority of the settlement evidence elicited at trial. Federal Rule of Evidence 103 allows a party to "claim error in a ruling to admit . . . evidence only if the error affects a substantial right of the party and: (1) if the ruling admits evidence, a party, on the record: (A) *timely* objects or moves to strike; and (B) *states the specific ground*, unless it was apparent from the context."  FED. R. EVID. 103(a) (emphasis added).  "Once the court rules *definitively* on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal."  FED. R. EVID. 103(b) (emphasis added). However, if the court's ruling "'is in any way qualified or conditional, the burden is on counsel to [again] raise objection to preserve [the] error.'"  *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012) (quoting *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)).  *See also United States v. Poulsen*, 655 F.3d 492, 510 (6th Cir. 2011) (counsel must renew objection at time evidence is offered unless "'the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is conditioned upon any other circumstance or evidence'") (quoting *Brawner*, 173 F.3d at 970).  Moreover, counsel must request permission from the court for any "running" or "continuing" objection, and the record should reflect the court's consent.  *See, e.g., United States v. Khan*, 993 F2d 1368, 1377 (9th Cir. 1993); *United States v. Rivera-Santiago*, 872 F.2d 1073, 1083 (1st Cir. 1989) ("Although the judge's ruling was emphatic and indicated that future objections would be fruitless, defense

---

[47] *See, e.g.*, Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5108:8 – 5116:3, 5120:4 – 5123:19, 5187:14 – 5188:5, 5188:6-22, 5189:11 – 5190:1, 5190:2-9, 5192:6 – 5193:8, 5193:15 – 5194:13, 5194:20 – 5195:3, 5199:24 – 5200:7, 5200:11-19, 5225:11 – 5226:21, 5226:22-24, 5231:8-17; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5650:25 – 5651:5, 5661:18 – 5663:18, 5663:19 – 5664:23, 5687:17 – 5697:17, 5718:13 – 5721:17, 5728:24 – 5729:2, 5732:2-15, 5772:9-14, 5775:4-10, 5790:17-24, 5791:1 – 5799:24, 5800:11-16, 5802:4-7, 5862:6 – 5864:4, 5871:23 – 5874:18, 5875:4 – 5876:25, 5883:21 – 5884:6, 5884:16 – 5886:8, 5886:19-22, 5892:21 – 5893:3.

counsel, absent the grant of a continuing objection, could preserve an "error of law" issue only by continuing to object when the testimony warranted it as the trial progressed."); *C.P. Ints., Inc. v. California Pools, Inc.*, 238 F.3d 690, 696 (5th Cir. 2001) (holding counsel's failure to object to four out of six questions on the grounds that the answer might have called for a legal conclusion failed to satisfy Rule 103 and did not preserve error for appeal).

Here, a "cumulative" objection as to settlement evidence was raised only a handful of times during the trial (and always on CVS's initiation). CVS initially raised an objection to cumulative settlements being offered to prove notice in a two-sentence section, citing no legal authority other than Rules 402, 403, and 408, in its Motion for Reconsideration Regarding Settlements, filed just before trial began. Dkt. #3972 (CVS M for Reconsideration) at p. 9. Walmart and Walgreens joined in CVS's motion. Dkt. #3973 (WMT Joinder to CVS M to Reconsider); Dkt. #3974 (WAG M for Reconsideration).[48] The Court ruled that Plaintiffs were permitted to reference the three settlements containing admissions during opening statements, but expressly "decline[d] to rule on the remaining prior settlement agreements now, in the abstract[,]" and instead would "review each settlement agreement carefully and be prepared to make proper rulings on the admissibility of each agreement in the context in which it arises at trial." Dkt. #3990 (Order Regarding Admissibility of Prior Settlement Agreements) at p. 3.

On October 7, CVS's counsel raised an objection with the Court, arguing that CVS's settlements should no longer be discussed, at least with expert and non-CVS witnesses, because "[t]he purpose for which you have allowed them to come in, notice, is now established." Dkt. #4005 (10/7/21 Trial Tr.) at 876:17 – 877:25, 878:1-8 ("So I think at this point in time, especially with expert witnesses and nonCVS [*sic*] witnesses, *we can address further CVS fact witnesses down the road*, it needs to stop.") (emphasis added). Although the Court agreed that notice had been established, it determined that the settlement evidence was still relevant as to other

---

[48] Plaintiffs incorporate by reference, as if fully set forth herein, their prior briefing on these issues. *See, e.g.*, Dkt. #3978 (Ps' Opp. to Ds' Motions for Reconsideration re: Settlements) at pp. 14-16; Dkt. #4012 (Ps' Opp. to Ds' M to Limit Joe Rannazzisi Testimony) at pp. 6-7.

37

issues.[49]  On October 13, CVS's counsel again mentioned his objection to the cumulative nature

of the CVS settlement evidence generally as part of his separate objection to certain *Holiday*

evidence being used with Joe Rannazzisi.[50]  The Court's ruling at that time pertained only to the

specific *Holiday* evidence being discussed; it did not discuss CVS's "cumulative" objection to the

CVS settlements.  Dkt. #4023 (10/13/21 Trial Tr.) at 1635:11-24, 1637:7 – 1639:16.

On October 18, in the middle of Brad Nelson's deposition being played at trial, CVS's

counsel interjected an objection to certain of the deposition testimony that referenced *Holiday* as

"gratuitous;" the Court overruled the objection as an untimely objection to deposition designations

and also noted the relevance of the evidence as to that particular witness.[51]  Later that day, CVS

---

[49]  Dkt. #4005 (10/7/21 Trial Tr.) at 878:17 – 879:3 ("You've got it in for notice.  Seems to me for the fact witness, the only way it's relevant is if you have someone in responsibility, and the issue is you asked him, I mean, did you do anything as a result of it.  And then that's different.  It's not notice.  It goes to . . . what the witness did or didn't do to change practices, and that's different.  And so the focus there is not the settlement agreement; it's the – what the witness did or didn't do in a position of responsibility."), 880:6 – 881:9 ("[T]hat's the significance of these agreements.  There's no admission but certainly it puts the company on notice that DEA had a problem.  And so the key result really is, you know, did the company do anything as a result.  And that – and witnesses who are in a position to know that can be asked that."), 881:14-22 ("I'm speaking in general, Ms. Fumerton, about settlement agreements in general.  The focus in this case is over a long period of time, all right?  And no one – you know, what you did or didn't do in 2001, all right, there may be an explanation for it, but that explanation may not be very convincing in 2015.  So that's what – that's what these are about.").

[50]  Dkt. #4023 (10/13/21 Trial Tr.) at 1629:1 – 1636:12, 1636:14 – 1637:6 (Mr. Delinsky: "Your Honor, the one other thing I would add is, look, in candor, Your Honor, you know, we think the admission of this evidence, coupled with the admission of what, I think four or five other CVS settlements, is in the land of very significant error, but each time we get another witness being questioned about these facts, that potential error and the prejudice that results from it is magnified.  There already has been testimony in this case about it.  Over our objection, Your Honor has determined that it's relevant, but to the extent that it's relevant it's not Ohio relevant.  And there has to be an end game here.  If it comes piling on on pharmacies, two pharmacies that are not – that are hundreds of miles away from where the case is, so there has to be some limiting factors on how often this can be raised in this trial.").

[51]  Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2488:11 – 2489:13 ("MR. DELINSKY: Your Honor, I understand the Court has admitted aspects of the *Holiday* case and CVS settlements over our objections, but this is getting gratuitous.  THE COURT: I thought all this was agreed to, these depositions?  MR. LANIER: It was, Your Honor, and Special Master Cohen ruled on this, and the time for appealing his rulings is long gone.  MR. DELINSKY: This is gratuitous.  We're now looking at newspaper articles, we're looking at press releases.  THE COURT: Wait a minute.  First of all, this – I hear your objection, Mr. Delinsky, okay, it's way, way too late.  This has all been dealt with, these deposition excerpts, okay?  You knew these were coming in a long time ago.  So it's untimely, and, you know, there's been a lot of discussion about this, and it's fair game anyway because of this witness's position

(footnote continues on next page)

filed a 1.5 page motion seeking to preclude any further evidence of the *Holiday* decision and CVS's settlements with the DEA.  Dkt. #4044 (CVS MIL re: Further *Holiday*/Settlement Evidence). Neither Walgreens nor Walmart joined in CVS's motion.  The following morning, the Court denied the motion on the record, but *only* referenced *Holiday* in its ruling; there was no mention whatsoever of settlement evidence:

> All right.  CVS filed a motion to exclude future references to *Holiday*.  That's denied.  But I am going to limit it.  At this point, it's only relevant if the plaintiffs can – are seeking to elicit testimony from a witness either from CVS or from another company that knew about it and either did or didn't take any action as a result.  And so that's all I'm going to allow. . . .  You don't have to read a whole lot about it, just say did you hear about *Holiday*, yes, if so, did you do anything, yes or no, Bingo, move on. . . .  So that's it.

Dkt. #4050 (10/19/21 Trial Tr.) at 2982:9-22.  CVS's counsel made no attempt to clarify with the Court as to whether its ruling also included settlement evidence.  *Id*. at 2982:9 – 2985:8.

None of the Court's rulings were explicit, definitive, and unconditional rulings that the settlement evidence could never be considered cumulative.  *See* Dkt. #3990 (Order Regarding Admissibility of Prior Settlement Agreements) at p. 3 (aside from allowing reference to three settlements in opening statements, the Court declined to rule on admissibility of settlements in the abstract and deferred issue to trial);[52] Dkt. #4005 (10/7/21 Trial Tr.) at 878:17 – 879:3 (rejecting CVS's argument that further CVS settlement evidence would be cumulative due solely to notice having already been established because the evidence was relevant to issues besides notice under certain circumstances), 880:6 – 881:9, 881:14-22; Dkt. #4023 (10/13/21 Trial Tr.) at 1637:7 – 1639:16 (ruling pertained solely to use of specific *Holiday* evidence with Rannazzisi and did not reference "cumulative" objection to settlement evidence); Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*]

---

and what he knew about it and what he did or didn't do with respect to Walmart.  So it's overruled because it's untimely, and even if it were timely, I think I'd overrule it.  MR. DELINSKY: Well, Your Honor, we believe we did assert objections to this, but we just wanted it noted for the record.  THE COURT:  Well, it's noted.  I've overruled it for two reasons.").

[52] This pre-trial objection is the only "cumulative" objection expressly joined by Walmart and Walgreens and the only "cumulative" objection that can arguably be considered to encompass Walmart's and Walgreens' settlements.

at 2488:11 – 2489:13 (rejecting CVS's objection as to the "gratuitous" nature of certain *Holiday* evidence used in particular witness's deposition; no ruling on cumulative settlement evidence); Dkt. #4050 (10/19/21 Trial Tr.) at 2982:9-22 (ruling on CVS's motion only expressly referenced *Holiday* decision, not cumulative settlement evidence). As such, Defendants' five "cumulative" objections were not sufficient to excuse defense counsel from having to contemporaneously object to the purportedly cumulative nature of settlement evidence at the time such evidence was introduced.

Notably, the Court repeatedly emphasized to the parties the necessity of making contemporaneous objections at trial. Dkt. #4000 (10/6/21 Trial Tr.) at 475:10-16 ("And from now on, if either side thinks that my evidentiary rulings are incorrect, everyone knows you've got to make a contemporaneous objection and give the Court the opportunity to reconsider it."); Dkt. #4090 (10/26/21 Trial Tr.) at 4219:22 – 4220:3 ("THE COURT: All right. Mr. Delinsky, if you think – if you think a question should be objected to, object. Okay? MR. DELINSKY: Okay. THE COURT: I mean, I – *that's your obligation* and right and I'm not going to hold it against you.") (emphasis added).[53] Yet throughout the trial defense counsel failed to contemporaneously object *at all* to many of Plaintiffs' counsel's questions related to settlements.[54] They also had

---

[53] *See also* Dkt. #4000 (10/6/21 Trial Tr.) at 461:16-22 ("And again, if you thought, if you thought – the time to do this was requesting a side-bar at the time. All right? If you think that my rulings are wrong, unfair, or I have a different strike zone for one side or the other, *it's appropriate to raise that contemporaneously* while the witness is there.") (emphasis added), 467:11 – 468:2 ("Look, as I said, you can put anything on the record now. It's untimely and ineffective and candidly of no value for you to say it now. The time to have raised some of this would have been contemporaneously if you felt that my rulings were incorrect or unfair, all right? I might have reconsidered something. . . . I mean, everyone knows how to do that. Your raising this [the following day] doesn't help anyone. All right?"), 740:14-15; Dkt. #4005 (10/7/21 Trial Tr.) at 1051:17-25 ("Ms. Sullivan, that was mighty late. . . . I'd caution counsel that, you know, it's your job to object; not mine."); Dkt. #4057 (10/20/21 Trial Tr.) at 2994:16-17 ("If you think the witness is venturing into an area that's objectionable, obviously you should object.").

[54] *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) at 1111:15 – 1112:4 (Plaintiffs' counsel raised issue of using Walgreens settlement agreement with Catizone, and Walgreens' counsel responded: "We, as long as numbers are redacted as we've talked about many times, we don't have any objection to using that document with Mr. Catizone."), 1115:8 – 1116:22; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1687:12 – 1693:25, 1694:10-18, 1695:2 – 1697:11, 1698:12 – 1700:1, 1700:22 – 1704:17, 1708:7 – (footnote continues on next page)

numerous other opportunities throughout the trial day to lodge objections to the cumulative nature of the settlement evidence, but failed to do so.[55]  And even when defense counsel did object to questioning regarding settlements, the objection was often either based on other grounds or the basis was not identified at all and it was not apparent from the context that it was a "cumulative" objection.[56]  *See, e.g., Chernyak v. Bricker*, No. 2:11-CV-449, 2012 WL 1940646, at *4-8 (S.D.

<hr/>

[55]  1711:8, 1801:10 – 1802:2, 1808:10-20; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1963:4-19, 1964:23 – 1965:15, 2016:2 – 2018:4, 2038:25 – 2039:6, 2040:2-12, 2044:2-18; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2845:10-14, 2848:21 – 2850:21, 2856:16 – 2860:20, 2862:2 – 2863:8, 2873:17-22, 2886:20 – 2887:20, 2933:18 – 2934:1, 2934:17 – 2936:14, 2937:6 – 2938:17; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3020:18 – 3021:13, 3022:10-12, 3030:20 – 3031:6, 3045:6-16, 3048:20 – 3049:1, 3050:21 – 3051:3, 3257:17 – 3258:24, 3265:22 – 3266:17, 3267:12 – 3268:14, 3271:24 – 3272:3, 3272:10-23, 3273:5 – 3274:13, 3276:8-12, 3280:24 – 3281:14, 3282:15-21, 3283:3-11, 3284:23 – 3285:10, 3287:11-13, 3291:2-5, 3291:19-24; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3951:20 – 2952:12; Dkt. #4107 (10/29/21 Trial Tr.) [*Wailes*] at 4939:23 – 4940:1; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5187:22 – 5190:16, 5192:6 – 5195:3, 5200:4 – 5201:1, 5206:15 – 5207:3, 5224:24 – 5226:24, 5231:8-17, 5236:3 – 5238:13; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5772:9-14, 5775:4-10, 5790:20-24, 5791:17 – 5792:5, 5792:13 – 5793:19, 5793:25 – 5794:22, 5795:4-5, 5795:2-24, 5796:9-19, 5797:25 – 5798:7, 5798:15-18, 5799:10-18, 5800:11-16, 5802:4-7, 5875:4-6, 5875:14-24, 5876:6-25, 5878:6 – 5879:5, 5883:21 – 5884:6, 5884:16 – 5885:10, 5885:22 – 5886:8, 5893:2-3, 5896:13 – 5899:9; Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6466:22 – 6470:19, 6471:2-21, 6472:1 – 6474:22; Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6578:5-9; Dkt. #4133 (11/9/21 Trial Tr.) [*Stossel*] at 6933:11-14.

[56]  *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) at 1755:11 – 1759:2, 1819:19-21, 1917:22 – 1921:24; Dkt. #4026 (10/14/21 Trial Tr.) at 2005:7-12, 2050:15 – 2051:2, 2094:22-24, 2191:3 – 2192:25; Dkt. #4032 (10/15/21 Trial Tr.) at 2198:2 – 2223:18, 2267:18-20, 2307:25 – 2310:2, 2389:16 – 2400:17; Dkt. #4041 (10/18/21 Trial Tr.) at 2407:2 – 2413:23, 2469:24-25; Dkt. #4050 (10/19/21 Trial Tr.) at 2881:3-4; Dkt. #4057 (10/20/21 Trial Tr.) at 2990:1 – 2999:22, 3059:2-3, 3112:2 – 3117:25, 3191:20-21, 3294:17 – 3302:13; Dkt. #4064 (10/21/21 Trial Tr.) at 3307:1 – 3320:4, 3381:15-16, 3431:10 – 3439:20, 3515:22-23, 3582:21 – 3595:7; Dkt. #4065 (10/22/21 Trial Tr.) at 3600:1 – 3612:10, 3672:6-7; Dkt. #4078 (10/25/21 Trial Tr.) at 3790:2 – 3796:23, 3849:6-8, 3890:8 – 3891:5, 3955:4-7, 4018:5 – 4028:5; Dkt. #4090 (10/26/21 Trial Tr.) at 4102:14-16, 4147:1 – 4148:4, 4217:24 – 4221:25, 4294:6 – 4330:4; Dkt. #4093 (10/27/21 Trial Tr.) at 4335:1 – 4347:17, 4381:18 – 4382:3, 4401:21 – 4419:5, 4457:6 – 4487:13; Dkt. #4106 (10/28/21 Trial Tr.) at 4492:1 – 4505:16, 4561:7-10, 4608:22 – 4610:22, 4687:19-22, 4760:20 – 4764:18; Dkt. #4107 (10/29/21 Trial Tr.) at 4769:1 – 4781:24, 4855:7-12, 4898:10 – 4899:4, 4977:6 – 4982:20, 5043:16 – 5048:8; Dkt. #4109 (11/1/21 Trial Tr.) at 5053:2 – 5059:21, 5241:16 – 5246:12, 5320:18 – 5326:7; Dkt. #4111 (11/2/21 Trial Tr.) at 5331:1 – 5340:15, 5410:9-23, 5456:6 – 5457:3, 5550:4-5, 5605:10 – 5608:13; Dkt. #4115 (11/3/21 Trial Tr.) at 5613:1 – 5621:22, 5687:7-8, 5734:10 – 5735:3, 5817:15-16, 5896:13 – 5899:9; Dkt. #4118 (11/4/21 Trial Tr.) at 5904:1 – 5914:13, 5976:6-7, 6028:3 – 6029:15, 6112:10-11, 6188:25 – 6193:4; Dkt. #4124 (11/5/21 Trial Tr.) at 6198:1 – 6212:24, 6269:4-5, 6318:21 – 6325:6, 6402:2 – 6417:2, 6487:21 – 6490:15.

[57]  *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1116:23 – 1117:3 (no basis identified); Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1687:2-3 (same), 1694:1-7 (objecting on basis that witness was offering opinion testimony), 1694:19-25 (no basis identified), 1700:2-7 (same); Dkt. #4026 (footnote continues on next page)

41

Ohio May 29, 2012) ("Without some elaboration by plaintiff as to the basis of her objection, the Court cannot conclude that her challenge is meritorious."); *Richardson v. Time Mfg. Co.*, No. 5:04-CV-27, 2005 WL 2180482, at *3 (W.D. Mich. Sept. 9, 2005) (counsel must cite to the specific evidentiary rules which form the basis for the objections). *See also* Dkt. #4064 (10/21/21 Trial Tr.) at 3312:7-11 ("In the future if you're objecting to something, you've got to be very specific to what you're objecting to, a specific question and answer or examination on a specific document and here it is and why."). As much of the settlement evidence was adduced at trial without contemporaneous objection to its "cumulative" nature, a new trial is certainly not warranted on these grounds.

Finally, Defendants argue, in conclusory fashion, that the evidence of settlements and administrative actions was not admissible because it involved extraterritorial conduct, was irrelevant under Rule 402, was unfairly prejudicial, and was inadmissible under Rule 404(b), Rule 602, and Rule 802. Dkt. #4204 (Ds' MNT) at p. 17. Yet again, aside from the rules themselves, Defendants cite no authority to support their arguments, nor do they even refer back to any of their

_____

(10/14/21 Trial Tr.) [*Joyce*] at 1964:9-17 (objecting to specific notes made on demonstrative), 2039:7-13 (objecting to lack of personal knowledge); Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3272:24 – 3273:3 (no basis identified), 3282:22-25 (same); Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5190:18 – 5192:2 (objecting to the references to the allegations in MOA), 5192:6 – 5195:3, 5195:4-11 (objecting to Mr. Lanier's characterization of Nelson's testimony related to agreement), 5200:4 – 5201:1, 5206:15 – 5207:3, 5224:24 – 5226:24, 5231:8-17, 5236:3 – 5238:13, 5270:20 – 5271:21 (objecting as to scope); Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5791:12-16 (no basis identified), 5792:6-11 (no basis identified), 5793:20-24 (no basis identified), 5794:23 – 5795:3 ("Q: And the *Holiday* case is marked Plaintiffs' Exhibit 42147-A. You are familiar with the *Holiday* case, aren't you? MR. DELINSKY: Objection, Your Honor. We've already discussed this exhibit, it shouldn't be displayed. THE COURT: Well, overruled."), 5795:6-18 (no basis identified), 5796:4-8 (same), 5796:20-23 (same), 5798:8-14 (objection to *Holiday*-related question based on the action only involving two pharmacies), 5798:19 – 5799:8 (same), 5799:19-24 (no basis identified), 5875:7-11 ( no basis identified), 5875:25 – 5876:2 (no basis identified), 5884:7-14 (no basis identified for original objection, but then added objection regarding "difference in timing"), 5885:11-20 ("Q: And you say it's a good thing that the company sent out policies after being in trouble -- MR. DELINSKY: Objection, Your Honor. The chronology just doesn't work. It's not accurate. MR. LANIER: This was his question. MR. DELINSKY: It's 'trouble.' THE COURT: Overruled. MR. LANIER: I'll take out the word 'trouble' if that's a problem, Your Honor. THE COURT: Yeah, that's the problem."), 5893:12-16 (objection stating "[t]hat's not the testimony"); Dkt. #4124 (11/5/21 Trial Tr.) [*Hill*] at 6456:18 – 6457:1 ("Objection, Your Honor. That goes straight to the *Touhy* regulation."), 6470:20-25 ("Objection, Your Honor. This is an ALJ ruling, not the DEA."), 6471:22-25 (no basis identified).

42

prior briefing.  These arguments are inadequately briefed (*supra* at fn.32), and even if they were not, they are entirely without merit for the reasons set forth in prior briefing and the Court's previous rulings.  *Supra* at fn.33; *see also, e.g.,* Dkt. #2815 (CT1A Ps' MIL Opp.) at pp. 31-34, 55-59, 79, 84—85, 97-98, 106-109; Dkt. #3058 (CT1A Evidentiary Order) at pp. 8-11; Dkt. #3464 (CT1B Ps' MIL Opp.) at pp. 29-44; Dkt. #3546 (CT1B Evidentiary Order) at pp. 32-33.

## E. Defendants' complaints regarding the Court's hearsay rulings are unpersuasive.

Defendants next complain that the Court's "one-sided" hearsay errors warrant a new trial. Dkt. #4204 (Ds' MNT) at p. 17.  This argument fails.  As a preliminary matter, the Court made numerous hearsay rulings that cut against Plaintiffs and were conceivably more detrimental than the rulings against Defendants.  *See, e.g.*, Dkt. #4008 (10/8/21 Trial Tr.) at 1102 – 1110 (prohibiting Plaintiffs from using the Ohio Workforce Survey with Carmen Catizone, even though he relied on it in preparing his report); Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4355 – 4357, 4371 – 4374, 4380 – 4381, 4382 (sustaining hearsay objections to the testimony of Plaintiffs' witness, Kim Fraser); Dkt. #4124 (11/5/21 Trial Tr.) at 6206 – 6212; Dkt. #4132 (11/8/21 Trial Tr.) [*Mack*] at 6754 – 6755, 6758, 6761 (allowing Defendants to play video deposition of Deborah Mack over Plaintiffs' hearsay objections).[57]  Regardless, Defendants' comparison between the Court's limitations on the testimony of Lembke and that of Walmart's non-expert witness, Susanne Hiland, can be quickly dismissed.

___

[57]  As defense counsel noted, "Ms. Mack goes into detail about all the 17 different boards of pharmacy that she had conversations with . . . ."  Dkt. #4109 (11/1/21 Trial Tr.) at 5147:11-14.  And, while the Court purported to restrict hearsay from Mack's testimony, it is clear that the jury was permitted to hear it.  *Compare* Dkt. #4132 (11/8/21 Trial Tr.) at 6207 (the Court stating Mack "can relate that on such-and-such a date or approximately such-and-such and I spoke to so-and-so from the State Board of Pharmacy, and as -- I mean, I don't think she can relate the detail, the exact words, but she can say, as a result of that, I did X, Y, and Z . . . .") *with id.* at 6755 (Mack stating: "So I went up and talked to her afterwards and she said, yes, if a pharmacist has already decided they can't fill for Dr. Smith, they could blanket refuse that. And that was the first time I had ever heard a Board that actually said do this without looking at every prescription.").  *Compare also id.* at 6210 (the Court stating: "I'm not going to – I'm not going to allow her to talk about what someone else at Walmart related to her") *with id.* at 6758 (Mack relaying what "pharmacists would say").

Rule 703 allows an expert witness like Lembke to rely on materials, including inadmissible hearsay, in forming the basis of her opinion if other experts in that field would reasonably rely on that kind of evidence. FED. R. EVID. 703. *See Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 8 (6th Cir. 2021); *Kingsley Assocs., Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1286-87 (6th Cir. 1990) (holding that expert testimony based on hearsay, which included the expert's research into the automobile industry and confidential documents from General Motors, was admissible). Here, Defendants do not attempt to argue that experts such as Lembke do not reasonably rely on corporate documents in forming their opinions.

And "[i]t is well-settled that an expert can relate the basis for his opinion even if that basis is not itself admissible." *Lucio v. Levy Env't Servs. Co*., 173 F. Supp. 3d 558, 565 n.5 (N.D. Ohio), *aff'd*, 670 F. App'x 889 (6th Cir. 2016). Thus, an expert witness may explain the facts underlying his or her opinion, even if not independently admissible. *See Williams v. Illinois*, 567 U.S. 50, 58 (2012) ("Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth . . . ."); *Engebretsen v. Fairchild Aircraft Corp.,* 21 F.3d 721, 728-29 (6th Cir. 1994) (recognizing an expert may use inadmissible materials to "explain the basis of the expert's opinion").[58] Of course, the same is not true for a non-expert witness like Walmart's Susanne Hiland. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness . . . , an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge

---

[58] *See also Momeni-Kuric v. Metro. Prop. & Cas. Ins. Co*., No. 3:18-CV-00197-RGJ, 2019 WL 3416677, \*10 (W.D. Ky. July 29, 2019) (same); *United States v. United Techs. Corp*., No. 3:99-CV-093, 2005 WL 6199561, \*3 (S.D. Ohio Feb. 2, 2005) (noting Rule 703 permits hearsay, or other inadmissible evidence, upon which an expert properly relies to be admitted to explain the basis of the expert's opinion); *Wilson ex rel. Wilson v. Merrell Dow Pharm. Inc*., 893 F.2d 1149, 1153 (10th Cir. 1990) ("We have interpreted Rule 703 as allowing an expert to reveal the basis of his testimony during direct examination, even if this basis is hearsay, provided that the facts or data underlying his conclusions are of a type reasonably relied upon by others in his field of expertise. . . . The hearsay is admitted for the limited purpose of informing the jury of the basis of the expert's opinion and not for proving the truth of the matter asserted.") (internal citations omitted).

or observation.") (internal citation omitted).  Federal Rule of Evidence 602 plainly makes the distinction:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony.  *This rule does not apply to a witness's expert testimony under Rule 703.*

FED. R. EVID. 602 (emphasis added).

Here, Defendants specifically complain about Lembke's testimony concerning certain Purdue documents.[59]  These are documents discussed at length in her report and on which she properly relied to form her opinions in this case.  These documents were not hearsay because they contained statements, offered against Defendants, made by Defendants' co-conspirators (*i.e.*, opioid manufacturers) during and in furtherance of a conspiracy to increase opioid sales through the use of misinformation regarding the safety and efficacy of prescription opioids. FED. R. EVID. 801(d)(2)(E).  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 552 – 557, 565, 581 – 589, 591

---

[59]  Most of the Purdue-related documents were not offered into evidence, but rather just discussed by Lembke in relation to her opinions.  Two of Plaintiffs' Purdue-related exhibits were admitted into evidence with Lembke: (i) a CVS brochure entitled *How to Stop Diversion and Protect Your Pharmacy* (P-17322a), which was admitted as a party admission; and (ii) a December 21, 1998 letter from Purdue to Walgreen's pharmacy supervisor (P-25984), which was admitted without objection. *See* Dkt. #4005 (10/7/21 Trial Tr.) at 1079, 1083, 1090.  Defense counsel quoted from and questioned Lembke about the brochure extensively on cross-examination. *See* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 714:17 – 719:9; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 753:25 – 754:19.  It is unclear from Defendants' motion whether they are challenging these two exhibits in addition to the other Purdue-related documents discussed by Lembke.  Regardless, even assuming the Purdue-related documents were inadmissible hearsay (and they are not), their probative value substantially outweighed any unfair prejudice.  FED. R. EVID. 703.  Indeed, the documents are highly probative to demonstrate, *inter alia*, that Defendants' dispensing of opioids into the Counties was intentional, since Defendants worked in concert with opioid manufacturers in spreading the manufacturers' false messaging surrounding the treatment of pain and the true addictive nature of opioids in an effort to increase opioid sales and profits. *See, e.g.,* Plaintiffs' Rule 50(b) Opp. at pp. 43-44, 64, 82.  "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis."  *United States v. Ford*, 761 F.3d 641, 648 (6th Cir. 2014) (internal quotation marks omitted).  Moreover, Defendants also introduced their own evidence to rebut any implication that they worked in concert with Purdue. *See, e.g.,* Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5386:18 – 5388:10.

– 594, 597 – 598, 605 – 619; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 759 – 760, 860 – 862, 888-890. Some of this evidence would also be admissible as admissions by a party opponent, which is not hearsay, FED. R. EVID. 801(d)(2),[60] or under the ancient document or business record hearsay exceptions. *See* FED. R. EVID. 803(16) ("A statement in a document that was prepared before January 1, 1998, and whose authenticity is established.");[61] FED. R. EVID. 803(6) (permitting certified records of regularly conducted activity of a business).[62]

At trial, Lembke confirmed that she relied upon Purdue documents in forming her opinion that CVS spread misinformation about the safety and efficacy of opioids. Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 604:18 – 605:5. Lembke then described in detail why the language in the documents was important in forming the basis of her opinion. *See id.* at 605:13 – 619:7. Far from "simply parrot[ing] another individual's out-of-court statement[,]" Dkt. #4204 (Ds' MNT) at p. 18, Lembke's testimony is replete with factual explanatory information derived from her own expertise. Indeed, Lembke's references to the language in the Purdue documents were incidental—the majority of her testimony involved her factual explanation to the jury, based on her specific expertise,[63] of why the documents were important in forming the basis of her opinion. *See, e.g.*, Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 607:22 – 610:3, 612:20 – 613:12. *See also id.* at 552 – 557, 565, 581 – 589, 591 – 594, 596 – 598.[64] Defendants offer no support for their

---

[60] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 595:9 – 596:15 (discussing e-mail chain between Purdue and Walgreens containing statements by Walgreens employee), 606:4-20 (memorandum containing statements by CVS's Director of Quality Improvement), 607:11-23; Dkt. #4005 (10/7/21 Trial Tr.) at 760:7-21 (discussing CVS letter sent to Purdue in 2001), 862:9-25.

[61] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 595:1-19 (discussing February 1997 e-mail chain between Walgreens and Purdue); *see also id.* at 477:7-8 (defense counsel acknowledging that "[t]hese documents, many of them are very old, from 20 years ago").

[62] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) at 478:22 – 479:3, 601:24 – 602:4 (explaining that Plaintiffs produced certification from Purdue that document was a business record kept in the ordinary course of business).

[63] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 760:1-3 ("I mean, all of my opinion is based on documents that I have reviewed in addition to my knowledge, experience, and training.").

[64] Defendants' cited authority (Dkt. #4204 (Ds' MNT) at p. 19) does not support excluding Lembke's (footnote continues on next page)

baseless assertion that Lembke merely "read out loud the entire content" of inadmissible documents.  Dkt. #4204 (Ds' MNT) at p. 18.  And, while defense counsel objected to Plaintiffs' counsel's use of one Purdue document with Lembke, Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 599 – 604, Defense counsel never objected to Lembke referencing any other Purdue-related documents.  *See id.* at 595 – 597, 604 – 619; *see also id.* at 482:3-6.

It is clear that Lembke is "a true expert whose considered opinion sheds light on some specialized factual situation[,]" not a mere conduit for hearsay.  *United States v. Rios*, 830 F.3d 403, 417 (6th Cir. 2016).[65]  *See generally* Dkt. #3953 (Lembke *Daubert* Order) at p. 12 ("Dr. Lembke's review of discovery produced in this MDL regarding the Pharmacy Defendants' policies and procedures is refracted through the lens of an expert in opioid medication, addiction, and treatment – she is certainly not simply a 'lay person who read [up]' on the subject."); Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 754:12-14 ("Well, this document itself is what I relied on, *but it's how the document was used by CVS in its partnership with Purdue*.") (emphasis added).

---

opinions.  *Cf. United States v. Mejia*, 545 F.3d 179, 197-98 (2d Cir. 2008) (holding that some of government's expert witness's testimony ran afoul of Rule 703 because he had merely repeated information gathered from other sources without articulating how he applied his expertise to the underlying information being relayed; "When asked how he learned particular facts, [the expert] did not explain how he had pieced together bits of information from different sources and reached a studied conclusion that he then gave to the jury"); *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 52-25 (5th Cir. 2013) (concluding district court did not abuse its discretion in rejecting Rule 703 challenge to expert appraiser's testimony because expert "did more than just repeat information gleaned from external sources" and demonstrated his familiarity with the appraisal of heavy industrial plants broadly); *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, No. 1:06CV2781, 2009 WL 10689369, *3 (N.D. Ohio Oct. 23, 2009) (declining to rule, on a motion *in limine*, that expert's reliance materials were of the type typically relied on by experts in the field, particularly because it was unclear that information expert relied upon was properly disclosed during discovery).

[65]  *Cf. Rios*, 830 F.3d at 417 (recognizing, in criminal cases, that Rule 703 and the Confrontation Clause of the Sixth Amendment—which bars admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination—can be reconciled if the expert exercises "independent judgment" in assessing and using the hearsay (and other sources) to reach an expert opinion) (quotations and citations omitted); *United States v. Scott*, 716 F. App'x 477, 485 (6th Cir. 2017) (rejecting argument that expert law enforcement agent with 40 years of experience and extensive drug-investigation training was used as a mere conduit for hearsay because the expert "provided an independent judgment about the statements made to shed light on what the jury may have witnessed on the pole-camera video").

As such, it is entirely proper for Lembke to rely on even inadmissible evidence in forming her opinion, and for her to explain why that evidence was important in deriving her opinion.[66] Moreover, Defendants cross-examined Lembke extensively regarding her reliance on the Purdue documents—the appropriate method to explore alleged weaknesses in the factual basis of an expert's testimony. *See, e.g.*, Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 753:25 – 763:8, 769:10 – 775:9, 806:18 – 817:10, 828:20 – 830:21.[67] Defendants' hearsay challenge to the testimony of Plaintiffs' expert, Carmen Catizone, is similarly flawed. *See* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1343 – 1344 (relaying factual basis to support his expert opinion that a physician or prescriber should never write a trinity prescription); *id.* at 1468 (providing factual basis for Catizone's expert opinion, based on his experience as a pharmacist, regarding inappropriate inquiries by pharmacists).[68]

---

[66] *See Engebretsen*, 21 F.3d at 729 ("Rules 702 and 703 carve out a narrow exception to the rule against the admission of hearsay. Heaslip and Morgan were entitled to testify as to their opinion, and rely on inadmissible evidence.") (emphasis omitted). *Cf. Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 717 (6th Cir. 1999) (holding district court abused its discretion by prohibiting expert art appraisers from mentioning an artist's tape-recorded conversation detailing the worth of a carving similar to the one at issue; experts in the field of appraising African art frequently relied upon evidence of comparable sales, so the district court should have permitted the experts "to testify regarding the basis of their opinions" under Rule 703).

[67] *See also In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 530 (6th Cir. 2008) (observing that mere "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility") (citation omitted); *Doe v. Dordoni*, No. 116CV00074DJHHBB, 2021 WL 6196709, *4 (W.D. Ky. Mar. 22, 2021), *report and recommendation adopted*, No. 1:16-CV-74-DJH-HBB, 2021 WL 5035123 (W.D. Ky. Apr. 13, 2021) ("Where there is at least some basic, reliable evidentiary foundation for an opinion, an expert is permitted to view the facts and resolve inferences in a party's favor. Thereafter, the opposition is free to challenge the expert's factual take on cross or via contrary evidence.").

[68] To support their contention that the Court's hearsay rulings were unfair, Defendants also cite Dkt. #4132 (11/8/21 Trial Tr.) at 6498, but the transcript actually demonstrates that the Court's rulings were not one-sided. The Court first permitted an article to be admitted with defense expert, Dr. Kevin Murphy, reasoning that "this was an article that he cited and relied upon and he was cross-examined on it." *Id.* at 6498:16-25. But the Court disallowed Plaintiffs' next exhibit, which Defendants argued was hearsay and that "Dr. Murphy repeatedly denied knowing anything about the document[.]" *Id.* at 6499:1-19. Finally, Defendants complain that the Court permitted hearsay testimony from Plaintiffs' witness, Kim Fraser. However, the trial transcript reflects that the Court considerably restricted Plaintiffs' counsel's line of questioning on the basis of hearsay, including sustaining defense counsel's (footnote continues on next page)

The same is not true for Walmart's non-expert witness, Susanne Hiland, belying Defendants' argument that the Court's rulings were unfair. Defendants specifically complain that Hiland was prevented from testifying about how some state Boards of Pharmacies disallowed blanket refusals to fill, which Defendants contend was permissible to show Walmart's notice or state of mind. Dkt. #4204 (Ds' MNT) at pp. 19-20. But the record makes clear that Hiland did not personally communicate with Boards of Pharmacies, nor was any board's feedback tied to actions she personally took. *See* Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5150:9-17, 5153:6-25, 5223:22 – 5224:20. Further, there was no document to support Hiland's testimony that Defendants contend "mattered most,"—which concerned a pharmacist that was allegedly disciplined by the Indiana Board of Pharmacy. *See id.* at 5145:25 – 5148:15, 5151:3-22, 5169:16 – 5170:22, 5172:11-25.[69] Accordingly, the few hearsay objections that the Court sustained on the matter— when Hiland sought to recount conversations that members of her team (and not her personally) had with Boards of Pharmacy—were plainly correct. *See id.* at 5151:13-22 ("Q: And just so that the record is clear, what did Mr. Koch convey to you?" . . . "Q What did you learn that informed the basis for you including the blanket refusal to fill prohibition from Mr. Koch?"). *See also id.* at 5153:6 – 5154:6, 5173:6 – 5178:16, 5264:20 – 5265:1.[70]

Moreover, the Court did overrule the majority of Plaintiffs' counsel's objections on the matter. *See, e.g.*, *id.* at 5145:10-14, 5150:20-21, 5152:2-3, 5153:10-11. Indeed, contrary to

---

objections on numerous occasions. *See, e.g.*, Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4371:1 – 4374:8, 4380:10 – 4381:6, 4382:14-23.

[69]  While Walmart produced documents from the Wisconsin Examining Board and the Idaho Board of Pharmacy, there was no document concerning the Indiana Board of Pharmacy's disciplinary action against a pharmacist. *See* Dkt. #4109 (11/1/21 Trial Tr.) at 5166. Nor was there a document from the Texas Board of Pharmacy indicating that blanket refusals to fill were prohibited. *See id.* at 5223:22 – 5224:20.

[70]  The Court made this personal knowledge distinction with lay witnesses throughout trial. *See, e.g.*, Dkt. #4017 (10/12/21 Trial Tr.) at 1495:1-11 (regarding Joe Rannassizi: "And as a fact witness, I intend to apply the rules that apply to all fact witnesses, which he can't -- he can only testify to matters, statements, whatever, within his personal, personal knowledge and experience."). *See also* FED. R. EVID. 602.

Defendants' contention that the Court prohibited Hiland from saying "two words" on the subject, Hiland's testimony on the matter spans several pages of the trial transcript. *See, e.g.*, Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5149:13 – 5154:8, 5173:11-14, 5262:8 – 5264:14. Defendants were also allowed to play the deposition testimony of lay witness Deborah Mack, which, as noted above, contained plentiful testimony (including hearsay) about her personal conversations with Boards of Pharmacy. *See, e.g.*, Dkt. #4132 (11/8/21 Trial Tr.) [*Mack*] at 6751:12 – 6757:9, 6760:23 – 6761:18; Dkt. #4124 (11/5/21 Trial Tr.) at 6206:17 – 6212:15 (Plaintiffs objecting).

Finally, Defendants' complaint regarding the Court's "Employee Conversations" jury instruction falls flat. Dkt. #4204 (Ds' MNT) at p. 20. Far from being "one-sided," this instruction was consistent with the Court's instruction regarding settlement agreements. *See* Dkt. #4153 (11/15/21 Trial Tr.) at 7073:6 – 7074:1.[71] Moreover, it is entirely appropriate for a Court, when requested by a party as Plaintiffs did here, to issue a limiting instruction regarding the purpose for which the jury may consider particular hearsay evidence. *See* Dkt. #4124 (11/5/21 Trial Tr.) at 6211:5-7, 6212:11-15, 6319:22-24, 6324:10-15; *see also* FED. R. EVID. 105 ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."); *Rush v. Illinois Cent. R. Co.*, 399 F.3d 705, 721 (6th Cir. 2005) (noting that a court may give an instruction regarding the proper scope of evidence which is admissible for one purpose, but not admissible for another purpose, at the same time the jury is exposed to the evidence or during final instructions). Defendants' motion for a new trial should be denied on this ground.

---

[71] This case is nothing like Defendants' cited authority, *United States v. Adams*, 722 F.3d 788, 833 (6th Cir. 2013), a criminal case in which the defendants were charged with a conspiracy involving a vote-buying scheme. The Court's conclusion that "the government was able to paint an unfair picture of defendants" was based on six different errors the district court committed that cumulatively rendered the defendants' trial fundamentally unfair, including the district court's unprompted substantive changes to the government's proposed transcripts of audio recordings, admitting evidence of acts of witness intimidation that were not connected to defendants, and admitting unfairly prejudicial evidence of voter complaints about vote buying. *See id.*

### F. Plaintiffs' counsel's questions on cross-examination were not improper and do not warrant a new trial.

Defendants next argue that Plaintiffs' counsel's questions of adverse witnesses that pertained to facts not in evidence require a new trial. Dkt. #4204 (Ds' MNT) at p. 20.[72] The "extent of cross-examination is within the discretion of the trial judge." *United States v. Schaffner*, 780 F.2d 1024 (6th Cir. 1985). *See also Twachtman v. Connelly*, 106 F.2d 501, 507 (6th Cir. 1939) ("The course to be pursued in cross-examination is largely within the discretion of the trial court."); *State v. Green*, 609 N.E.2d 1253, 1259 (Ohio 1993). As support, Defendants cite numerous instances to which they never objected at trial, as well as one instance where Plaintiffs' counsel unintentionally misspoke and immediately corrected his error for the record. As shown fully below, these examples certainly do not amount to "prejudicial misconduct." Dkt. #4204 (Ds' MNT) at p. 23. And any alleged prejudice was sufficiently cured by the Court's instructions that lawyers' arguments are not evidence. *Supra* at fn.18. Defendants' argument should be rejected.

As a preliminary matter, Defendants failed to object to numerous examples cited to support their complaint regarding Plaintiffs' counsel's questions about Ohio doctors. Dkt. #4204 (Ds' MNT) at p. 21.[73] Nor did Defendants object to Plaintiffs' counsel's question concerning one of Walmart's stores being a top volume store for oxy in the nation. Dkt. #4204 (Ds' MNT) at

---

[72] Defendants also complain of Plaintiffs' counsel's question to Captain Villanueva, a non-adverse witness, but the question was plainly supported by the document Captain Villanueva was reviewing, and Defendants failed to object nonetheless. Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2739 – 2740; P-04600-A.

[73] *See, e.g.*, Dkt. 3995 (10/5/21 Trial Tr.) [*Davis*] at 355-56, 372, 421; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3916 – 3918, 3939; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3991:9 – 3992:7, 3996:1 – 3998:5, 4006:4-25, 4012:18 – 4013:7, 4013:13 – 4014:13, 4015:3 – 4016:1, 4016:9 – 4017:1, 4017:5-10 (this testimony was not originally objected to during Travassos' deposition); Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4533, 4595; Dkt. #4111 (11/2/21 Trial Tr.) [*Brunner*] at 5582, 5598; Dkt. #4115 [*Harrington*] at 5800 (11/3/21 Trial Tr.). What is more, Defendants cite examples of Plaintiffs' counsels' statements that are actually cites to direct examination by their own counsel, *see, e.g.*, Dkt. #4106 (10/28/21 Trial Tr.) [*Pavlich*] at 4533, 4569 – 4586 (direct examination by Swanson), as well as to discussions between Plaintiffs' counsel and the Court outside of the jury's presence. *See* Dkt. #4000 (10/6/21 Trial Tr.) at 458 – 470.

p. 22.[74]  Additionally, Defendants failed to object to one of their examples of counsel "sp[eaking] as if counsel were the ultimate authority[.]"  Dkt. #4204 (Ds' MNT) at p. 22.[75]  *See generally United States v. Zidell*, 323 F.3d 412, 426 (6th Cir. 2003) ("Although the courts have required that there be a 'good faith basis' for cross-examination under Rule 608(b), Defendant's lack of objection at trial deprived the District Court of any opportunity to determine whether such a basis existed, and hence precludes any meaningful consideration of this question by this Court.").  *See also supra* at pp. 36-37.

Nevertheless, Defendants challenge only a handful of statements from a robust trial transcript encompassing six weeks of testimony.  And the few objections Defendants did raise do not support their contention that Plaintiffs' counsel's questions were improper.[76]  For example, Defendants contend that Plaintiffs' counsel "falsely assert[ed]" that Walmart was four to five years late in allowing access to OARRS, when, in fact, that is plainly apparent from the record. Dkt. #4204 (Ds' MNT) at p. 22 (citing Dkt. #4132 (11/8/21 Trial Tr.) at 6727).  *See, e.g.*, Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1876 (confirming that OARRS was created in 2006); Dkt. #4106 (10/28/21 Trial Tr.) [*Wailes*] at 4741, 4991 (same); Dkt. #4109 [*Hiland*] (11/1/21 Trial Tr.) at 5211 – 5216, 5278 – 5280 (Walmart's Susanne Hiland confirmed that Walmart policy did not allow pharmacist-access to OARRS until at least 2010); P-26671. Defendants also assert that "Plaintiffs never introduced evidence of any such bad prescribers—not in Lake or Trumbull Counties, not anywhere[,]" Dkt. #4204 (Ds' MNT) at p. 21, but that is not true.  *See, e.g.*, P-06566, P-04600-A.  *See also* Plaintiffs' Rule 50(b) Opp. at pp. 40-41, 62, 80.

---

[74]  Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6722:17-25.

[75]  Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5280.

[76]  For instance, Defendants cite to Walgreen's opening statement, Dkt. #3991 (10/4/21 Trial Tr.) at 162, 165, in which Mr. Stoffelmayer informed the jury about "a well known pill mill doctor in the area[,]" Dr. Peter Franklin.  *See id.* at 163:2-8.  Defendants then cite Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 296 – 299, where Mr. Delinsky objected to Mr. Lanier's "reading opening statements into the record" when Mr. Lanier inquired about Mr. Stoffelmayer's comments concerning Franklin. *See id.* at 296:20 – 298:21.

Far from inserting facts that did not exist, Plaintiffs' counsel had a good faith basis for inquiring as he did.  *See, e.g.*, Dkt. #4000 (10/6/21 Trial Tr.) at 458:22 – 459:17; Dkt. #4140 (11/10/21 Trial Tr.) at 7036:9-23.  "A cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists[.]" *Brinkley v. Houk*, 866 F. Supp. 2d 747, 794 (N.D. Ohio 2011), *amended in part*, No. 4:06 CV 0110, 2012 WL 1537661 (N.D. Ohio Apr. 30, 2012), *and aff'd*, 831 F.3d 356 (6th Cir. 2016) (citing *State v. Gillard*, 533 N.E.2d 272 (Ohio 1988)).  *See also* Roger Park & Tom Lininger, The New Wigmore: A Treatise on Evidence: Impeachment and Rehabilitation § 2.3 (1st ed. Supp. 2020) ("Inadmissible evidence [can] provide the good-faith basis for cross-examination.").

Defendants' cited authority is inapt.  The prosecutor's statements in *United States v. Payne*, 2 F.3d 706, 715 (6th Cir. 1993), were found to be deliberate and "part of a calculated effort used to evoke strong sympathetic emotions[,]" that went "beyond anything in the evidence or anything invited by the defense."  The court noted that the comments rose to the level of misconduct "especially" because "a United States Attorney is held to a heightened standard." *Id.*  And, unlike here, the prosecutorial misconduct in *Payne* "permeated the whole trial and prejudiced the defendant." *Id.  Compare also Pingatore v. Montgomery Ward & Co*., 419 F.2d 1138, 1142 (6th Cir. 1969) (holding that plaintiff's counsel's intemperate argument, which included cursing, shouting, and tearing up papers used by opposing counsel, were "calculated to prejudice the minds of the jury" and required a new trial); *New York Cent. R. Co. v. Johnson*, 279 U.S. 310, 316-18 (1929) (ordering new trial where, during closing arguments, plaintiff's counsel for the first time and without evidence made a "bitter and passionate attack . . . tending to stir the resentment and arouse the prejudice of the jury" by repeatedly accusing the defendant of raising the defense that syphilis had caused the plaintiff's condition; given that, at the close of the case, "it was apparent that the attempted or suggested defense that [the plaintiff's] condition was due to syphilis was without substance, and it was formally abandoned by [defense] counsel in his address to the

jury[,]" plaintiff's counsels' "repeated statements" that syphilis was the defense coupled with "vituperative language" was not "fair comment on the evidence or justified by the record").[77]

That is far from the case here.  For example, what Defendants claim was a "false assertion" by Plaintiffs' counsel that the data from McCann's report came from OARRS (when McCann actually used ARCOS data) was, in fact, an unintentional mistake.  *See* Dkt. #4204 (Ds' MNT) at p. 22.  And Plaintiffs' counsel swiftly corrected his mistake on the record. *See* Dkt. #4124 (11/5/21 Trial Tr.) [*Glickman*] at 6348:25 – 6350:23 ("I had been under the understanding that this was prepared by McCann himself and in his report.  It's my understanding this was pulled from the OARRS data.  And so I want the record to reflect that it is evidently not from McCann's report but straight from the OARRS data.").  It is clear that Plaintiffs' counsel was not attempting to communicate improper information to the jury. *See generally United States v. Stuckey*, 253 F. App'x 468, 489 (6th Cir. 2007) ("There is, however, nothing in the transcript from which one could draw a conclusion that the AUSA was attempting to use the leading questions to improperly communicate information to the jury.  Therefore, the AUSA's questioning was not improper.").

Nor was Mr. Lanier's question to Walmart's pharmacy witness, Lori Militello, regarding whether she was aware that she filled over 900 "trinity" prescriptions, improper.  Dkt. #4204 (Ds' MNT) at p. 22.  Rather, Plaintiffs' counsel's questions were proper to impeach Militello's testimony on direct examination suggesting she had properly filled trinity prescriptions for a patient whose morphine equivalent was 465 (among other notable red flags), despite documents showing that, a few years prior, Militello had refused to fill a prescription for a patient with a

---

[77] Defendants' cited cases from outside this Circuit are also unpersuasive, and, if anything, underscore this Court's broad discretion in ruling on the extent of Plaintiffs' counsel's cross-examination here. Dkt. #4204 (Ds' MNT) at p. 20. *Cf. Leavitt v. Scott*, 338 F.2d 749, 751–52 (10th Cir. 1964) (holding trial court did not abuse its discretion in limiting cross-examination where, except for some testimony that plaintiff was quiet and withdrawn man both before and after collision, there was no evidence or offer of evidence that his mental perplexity after collision of trucks pre-existed collision); *Skogen v. Dow Chem. Co.*, 375 F.2d 692, 704 (8th Cir. 1967) (holding trial court did not abuse its "broad" discretion in limiting extent of cross-examination); *United States v. Medel*, 592 F.2d 1305, 1314 (5th Cir. 1979) (same).

54

morphine equivalent of 350 on the basis that she "felt very uncomfortable."  *See* Dkt. #4132 (11/8/21 Trial Tr.) [*Militello*] at 6733 – 6737, 6744 – 6745; P-26767-A.  Here too, there is no indication that Plaintiffs' counsel lacked a good faith basis for his question.  *Cf. Hunt v. Warden, Lebanon Corr. Inst.*, No. 17-3253, 2018 WL 1363807, *5 (6th Cir. Jan. 22, 2018) (finding no prosecutorial misconduct where the movant failed to demonstrate that the prosecutor lacked a good-faith belief that a factual predicate for his questions existed).

Moreover, even if Defendants could establish that Plaintiffs' counsel's questions were improper, the Sixth Circuit has recognized that the appropriate remedy for improper arguments by counsel is a limiting instruction that lawyers' arguments are not evidence.  *See, e.g.*, *Emuegbunam*, 268 F.3d at 406 (an instruction by the Court that lawyer arguments are not evidence "generally cure[s] any improprieties in a closing argument"); *see also supra* at fn.19.  And it is well established that jurors are presumed to follow the instructions they are given.  *Supra* at fn.3.  Here, the Court instructed the jury throughout the trial—including in both its preliminary and final instructions—that lawyer's statements were not evidence.  *Supra* at fn.18.  Thus, any alleged prejudice that could have resulted from the comments that Defendants actually objected to was sufficiently remediated.  Defendants' motion for a new trial should be denied on this ground.

### G.     Defendants are not entitled to a new trial as the Court did not delegate defining the law to DEA and other witnesses.

The Court did not delegate defining the law to the DEA and other witnesses.  Defendants' argument that the Court delegated its duties in defining the law for the jury to witnesses (Dkt. #4204 (Ds' MNT) at p. 24) completely ignores the Court's instructions and the Verdict Forms – which, as set forth below, did not leave key legal terms undefined.

The Court identified the controlled substances laws and regulations as the statutes at issue in its jury instructions.  Dkt. #7042 (11/15/21 Trial Tr.) at 7059:21 – 7079:13.  The goal of any discussion of legal requirements in jury instructions must be, as the Ohio courts have opined, "to prevent the jury from being misled or confused about how to apply the statute to the evidence presented in the case."  *See Smith v. Justarr, Inc.*, 657 N.E.2d 542, 545 (Ohio Ct. App. 1995).

55

Only "if the statute contains words or phrases of doubtful or ambiguous meaning" would further instruction be appropriate. *Id.* Even then, any explanation would have to be "calculated to prevent the jury from being misled or confused about how to apply the statute to the evidence presented in the case." *Id*.

This Court has previously held that while a witness "may not express his own opinions as to what the law requires" that they can "refer to the law as instructed by the Court." *See* Dkt. #2494 (CT1 Rafalski and McCann *Daubert* Order) at p. 8. Catizone's and Rannazzisi's testimony at issue in the Defendants' motion is similar to that of Rafalski's proposed testimony in CT1, wherein this Court held:

> based on his experience as a DEA Investigator, Rafalski may express opinions as to particular characteristics in SOMS and due diligence procedures that he finds are effective in preventing diversion; however, he may not express an opinion regarding an ultimate legal conclusion on whether a Defendants' conduct violated the law. (*See, e.g., Woods v. Lecureux,* 110 F.3d 1215, 1221 (6th Cir. 1997) (expert testimony that attempts to tell the jury what result to reach can hardly be viewed as being helpful to the jury).

Dkt. #2494 (CT1 Rafalski and McCann *Daubert* Order) at pp. 8-9.[78]

### 1. Definition of "diversion"

In regard to diversion, the Court advised the jury that "each plaintiff claims that each defendant substantially contributed to an oversupply of legal prescription opioids and to *diversion of those opioids into the illicit market outside of appropriate medial channels*, thereby endangering public health or safety." Dkt. #4153 (11/15/21 Trial Tr.) at 7071:2-7 (emphasis added). The Court instructed the jury:

> Under both Federal and Ohio laws and regulations, entities that are authorized to dispense controlled substances are required to provide effective controls and procedures to guard against theft and diversion.

---

[78] Similarly, this Court found that Rafalski could opine "about what components he believes an effective SOMS should contain …" and "the need for documentation to maintain effective control" with the same limitation that he could "not state what the law requires in this regard." Dkt. #2494 (CT1 Rafalski and McCann *Daubert* Order) at pp. 9-10.

> A prescription for a controlled substance must be issued for a legitimate medical purpose by a doctor, or other registered prescriber, acting in the usual course of his or her professional practice. The Federal and Ohio Controlled Substances Acts and their accompanying regulations also provide that the pharmacist who fills the prescription has a corresponding responsibility for proper dispensing of controlled substances for a legitimate medical purpose. The corresponding responsibility for proper dispensing of valid prescription extends to the pharmacy itself.

*Id*. at 7075:12 – 7076:1. During the Court's explanation of the Verdict Form questions, the Court read question one: "Did Lake County prove, by the greater weight of the evidence, that oversupply of legal prescription opioids and *diversion of these – those opioids into the illicit market outside of appropriate medical channels* is a public nuisance in Lake County?" *Id*. at 7329:6-10 (emphasis added).

The portion of Catizone's testimony Defendants cite as evidence that the Court delegated the definition of law was merely him confirming his opinion that "the federal and Ohio State controlled substance laws and regulations require each defendant to maintain effective controls for a closed system of distribution and dispensing of opioids that guards against diversion." Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 954:10-16. This testimony does not purport to define diversion and is functionally identical to the Court's instruction quoted above. Moreover, Defendants did not object to this testimony during trial. *See supra* at pp. 36-37.

Defendants also cite to Rannazzisi being allowed to testify that he defined diversion as "the illegal movement of pharmaceuticals from the legitimate stream of commerce into the illegitimate market" and "[t]he movement of pharmaceuticals, legitimate pharmaceuticals and chemicals from the normal legitimate stream of commerce into the illicit market." Dkt. #4017 (10/21/21 Trial Tr.) [*Rannazzisi*] at 1530:1-6, 1535:24 – 1536:5. Defendants further cite to Rannazzisi's agreeing with Plaintiffs' counsel's definition of "moving pharmaceuticals from legal to illicit market." *Id*. at 1536:3-5. Yet again, Defendants did not object to this testimony. *See supra* at pp. 36-37.

Rannazzisi's definition of diversion is entirely consistent with the instructions and Verdict Form question read to the jury, which refers to the diversion of opioids "into the illicit market outside of appropriate medical channels." Dkt. #4153 (11/15/21 Trial Tr.) at 7071:5-7, 7329:6-

57

10.  Defendants cannot establish that they were prejudiced by the witness correctly summarizing his understanding of the applicable law, based on his experience as a former DEA official, as a prelude to his other opinions.  Defendants also criticize the Court for instructing the jury that it could not answer the jury's question requesting "the DEA definition of diversion" and telling them to "rely upon your collective memory of the testimony and the documents."  Dkt. #4204 (Ds' MNT) at p. 25.  But during the parties' discussion with the Court about the jury's question, Walgreens' counsel acknowledged that he did not "think there is such a thing as an official definition [of diversion] by DEA in any event."  Dkt. #4157 (11/16/21 Trial Tr.) at 7341:25 – 7342:1.  CVS's counsel agreed and conceded that Defendants' proposed instruction "doesn't purport to be the DEA definition."  *Id.* at 7342:3-6.  Despite their proposed instruction admittedly not being "the DEA definition" of diversion, Defendants still complain that the Court declined to give it.  Dkt. #4204 (Ds' MNT) at p. 25.  Yet Defendants cite no testimony consistent with their definition of diversion.  As such, it would have been improper to answer the jury's question concerning the DEA's definition with the Defendants' definition.

Defendants' proposed definition was also properly refused as a substantive matter.  Their definition of diversion, which appears to be an amalgamation of language from 21 U.S.C. § 823(b)(1)[79] and 21 C.F.R. § 1306.04(a),[80] contained argumentative and superfluous language

---

[79]  This statutory provision provides that in determining whether approval of a CSA registration is in the public interest, a factor to be considered is "maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels[.]" 21 U.S.C. § 823(b)(1).  Notably this language, in and of itself, is entirely consistent with Rannazzisi's definition and the verdict question provided to the jury in this case.

[80]  This regulatory provision, *which does not refer to diversion at all*, states: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R. § 1306.04(a).  Notably, this language is nearly identical to the instructions provided to the jury. Dkt. #4153 (11/15/21 Trial Tr.) at 7075:12-15.

that purported to cast Defendants as part of "legitimate channels" and commented, incorrectly, on circumstances specific to this case, rather than neutrally setting forth a standard. Accordingly, the Court rightly denied the use of Defendants' definition of diversion. *See, e.g., Boyle v. United States*, 556 U.S. 938, 946 (2009) ("A trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed."); *Schnipke v. Safe-Turf Installation Group, L.L.C.*, 940 N.E.2d 993, 1002 (Ohio Ct. App. 2010) ("A trial court has no obligation to give jury instructions in the language proposed by the parties," but rather "has the discretion to use its own language to communicate the same legal principles.").

### 2.    Definition of "knowingly"

Defendants also complain that the Court improperly delegated the definition of "knowingly" to Rannazzisi. This argument willfully ignores the Court's instruction to the jury on the definition of "knowingly":

> A violation of the corresponding responsibility occurs when a person knowingly fills or allows to be filled an illegitimate prescription. In this context, knowingly includes when a person acts with deliberate ignorance or willful blindness to information in their possession.

Dkt. #4153 (11/15/21 Trial Tr.) at 7076:2-6.

Rannazzisi's testimony in question was in regard to how he applied the language of "knowing" during his time at the DEA: "when you're presented with red flags, you can't turn a blind eye to those red flags. You have to analyze the prescription, look at the red flags, and resolve them. You can't just take a blind eye and say, 'I don't see anything' and send the prescription out." Dkt. #4017 (10/21/21 Trial Tr.) [*Rannazzisi*] at 1581:20-25. His testimony was based on his experience as a DEA investigator and was not expressing an opinion regarding an ultimate legal conclusion. Moreover, there was no objection to this answer.[81] *See supra* at pp. 36-37. It

---

[81] Defendants objected to a previous line of questioning regarding the definition of "knowing" which the Court sustained and then directed Plaintiffs' counsel to rephrase the question to address how Rannazzisi applied the language during his leadership roles at the DEA. *Id*. at 1580:21 – 1582:8. Plaintiffs' counsel rephrased the question and there were no further objections. *Id.* at 1582:10 – 1583:7.

is of note that Rannazzisi's personal definition of "knowingly" that he utilized during his time at the DEA is not substantially different from the definition provided by the Court.  Thus, there was no delegation of the definition of "knowingly."

### 3.    Documentation requirement

Defendants further assert the Court erred by permitting Rannazzisi to testify about documentation requirements, which Defendants claim was improper testimony about the law. Dkt. #4204 (Ds' MNT) at p. 24.  This argument can be quickly dismissed, as Rannazzisi clearly testified about his understanding of the documentation requirement based on his experience both as a licensed pharmacist and his work for the DEA (which included giving lectures on documentation). Dkt. #4017 (10/21/21 Trial Tr.) [*Rannazzisi*] at 1588:9 – 1591:13.  Rannazzisi testified that he was taught—and when he practiced—documentation was "a professional practice standard[,]" explaining that "notation on the prescription for what you did, especially when you called a doctor, was imperative, it was important."  *Id*. at 1590:14, 1591:9-13.

### 4.    Definition of "Responsible Persons" under the CSA

Finally, Defendants assert that the Court erred by permitting Catizone to testify as to the definition of a "Responsible Person" under the CSA.  Dkt. #4204 (Ds' MNT) at p. 24.  Catizone testified that as a pharmacist and as the ex-head of the National Association of Boards of Pharmacies, he operated under the premise that chain pharmacies and their agents were responsible persons under the CSA.  Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 968:22 – 969:2.  Catizone also testified that the model regulations of the NABP that were provided to states "just defined persons, pharmacies and pharmacists as the same entity."  *Id*. at 969:5-6.  When Defendants initially objected on the basis that the question called for a legal conclusion, the Court limited the testimony to "his understanding as a pharmacist."  *Id*. at 968:6-20.  There was no further objection.

Catizone's testimony was proper as it was limited to his personal knowledge and experience.  His testimony did not amount to usurping the Court's authority in regard to defining the law to the jury.

**H.      Carmen Catizone's testimony regarding his understanding of the CSA's obligations and about red flags was not prejudicial and does not warrant a new trial.**

Defendants are simply wrong in claiming that Catizone's testimony about the customs and standards of care imposed on chain pharmacies by the CSA and about the consequences of filling "red flag" prescriptions was improper and prejudicial.  Dkt. #4204 (Ds' MNT) at p. 26.

**1.      Catizone's testimony about the CSA did not usurp the role of the Court and was not irrelevant.**

As discussed above, Catizone's testimony about the CSA did not usurp the role of the Court and was not irrelevant.  Plaintiffs incorporate their arguments set forth *supra* at § II.G, as if fully restated herein.

The Court did not delegate the question of unlawful conduct.  Defendants cite only to a limited portion of the Court's instruction,[82] but the full instruction belies their argument:

> Unlawful conduct can occur either by acting in a certain way that is prohibited by law, or by failing to act in a certain way that is required by law.  Specifically, unlawful conduct occurs when a person engaged in conduct that is prohibited by a statute, ordinance, or regulation that controls safety.  And unlawful conduct also occurs when a statute, ordinance, or regulation that controls safety requires a person to engage in certain conduct, but the person fails to do so.  The person does not need to know their conduct is unlawful for an unlawful act to occur.

Dkt. #4153 (11/15/21 Trial Tr.) at 7074:2-13.[83]

The Court also did not err by allowing Catizone to testify as to his understanding, as a practicing pharmacist for 20 years, that the CSA did not place unilateral responsibility on the pharmacist and that understanding comported with both his practice with his employer and how he wrote the NABP model legislation.  Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 976:4 –

---

[82]    Dkt. #4204 (Ds' MNT) at p. 27 (citing Dkt. #4153 (11/15/21 Trial Tr.) at 7074:6-8).

[83]    Defendants claim, in conclusory fashion, that these instructions were erroneous, but fail to explain how so.  Dkt. #4204 (Ds' MNT) at p. 27.  Instead, they cite to the entirety of their objections to the final jury instructions (Dkt. #4146) as well as the section in their motion (§ II.L) discussing jury instructions, which itself, for the most part, refers back to the entirety of their previously filed objections. Dkt. #4204 (Ds' MNT) at pp. 38-39.  Defendants' arguments are insufficiently briefed (*supra* at fn.32) and without merit, as discussed below.  *See infra* at § II.L.

981:15.[84]  And, contrary to Defendants' claims, Catizone's trial testimony relating to the CSA did not "instruct the jury on a hotly contested legal interpretation of the CSA: whether pharmacies could interfere with pharmacists' corresponding responsibility under the CSA."  Dkt. #4204 (Ds' MNT) at p. 27.[85]  Rather, his testimony merely recounted his understanding and experience during 20 years of practice.  In fact, the Court directly asked Catizone "is that how you practiced it when you were a practicing pharmacist for 20 years?" and then directed him to testify on that basis.  Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 980:15-20.  Catizone's testimony did not "instruct the jury" on the legal interpretation of the CSA.[86]

> ### 2. *Catizone's testimony about the consequences of filling "red flag" prescriptions did not violate Daubert or this Court's Daubert ruling.*

Catizone's testimony about the consequences of filling "red flag" prescriptions did not violate *Daubert* or this Court's *Daubert* ruling.  The Court found "the record amply demonstrates Catizone has specialized experience and expertise to reliably state how, in his opinion, Defendants' pharmacy practices, procedures, and standards of care resulted in systematic failures to guard against diversion."  Dkt. #3947 (Catizone *Daubert* Order) at p. 11.  The Court further concluded that "this expertise also qualifies him to express opinions regarding the *likely* consequences of

---

[84]  The case cited by Defendants for the proposition that "expert witness testimony about the law is superfluous" is distinguishable.  *United States v. Zipkin*, 729 F.2d 384, 386 (6th Cir. 1984) involved testimony from a bankruptcy judge on provisions in the Bankruptcy Act and legal interpretation of an order.  Catizone's testimony pertained to his understanding and practice during his time as a practicing pharmacist.

[85]  Moreover, though Defendants might "hotly contest" it, this Court has already ruled on the issue of a pharmacy's legal obligations under the CSA (*see, e.g.,* Dkt. #3403 (CT3 MTD Order) at pp. 14-22, 25; Dkt. #3499 (CT3 Reconsideration Order) at p. 7) and instructed the jury accordingly: "Under both Federal and Ohio laws and regulations, entities that are authorized to dispense controlled substances are required to provide effective controls and procedures to guard against theft and diversion. . . .  The corresponding responsibility for proper dispensing of valid prescription extends to the pharmacy itself."  Dkt. #4153 (11/15/21 Trial Tr.) at 7075:12 – 7076:1.  Thus, the Court did not delegate to Catizone its role to define the law.

[86]  Furthermore, Defendants had the opportunity to cross-examine Catizone about his understanding and experience as it pertained to the CSA, documentation of red flags, and corresponding responsibility.  *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1229:2 – 1234:19.

Defendants' alleged conduct – that is, that dispensing 'red flag' prescriptions without conducting adequate investigation or due diligence is likely to lead to diversion."  *Id*.  *See also id.* at p. 12; , *First Tenn. Bank Nat'l Ass'n v. Barreto,* 268 F.3d 319, 335 (6th Cir. 2001) (recognizing that, where non-scientific expert testimony is involved, the relevant reliability concerns may focus on personal knowledge or experience) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 1450 (1999)).  The Court properly applied the legal standards of Federal Rule of Evidence 702 and *Daubert* (as set forth in detail by this Court in Dkt. #2495 (CT1 Rosenthal *Daubert* Order) at pp. 1-3) in finding Catizone was qualified to offer the opinions expressed at trial.

Specifically, Defendants cite to Catizone's testimony in which he agreed that it was foreseeable to a pharmacy as well as a pharmacist that unresolved red flags can lead to diversion, noting that "when the closed system is breached by the things we just talked about, those drugs leave the closed system and get outside of that system and get into the hands of people that shouldn't be talking the medication."  Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1041:13 – 1042:7.  This testimony does not violate *Daubert* or the Court's *Daubert* ruling as it clearly falls into the permitted category of "opinions regarding the *likely* consequences" of Defendants' conduct.  Dkt. #3947 (Catizone *Daubert* Order) at pp. 11-12.  Catizone's testimony was not that of a statistician or an epidemiologist as precluded by this Court's *Daubert* ruling.  *See id.* at p. 11. His testimony did not attempt to provide "a statistical link or causal correlation between the number of 'red-flagged' prescriptions and actual diversion of opioids, or that 'red-flagged" prescriptions, *in fact*, were diverted at a higher rate than other prescription opioids."  *Id.*  He merely discussed the foreseeability or likelihood of diversion.

Nor does this testimony prejudice Defendants by "leaving the jury with the impression that if an unresolved 'red flag' prescription was dispensed, it was in fact diverted."  Dkt. #4204 (Ds' MNT) at p. 29.  In fact, Defendants' argument of prejudice is belied by their own briefing setting forth a compilation of testimony from their cross-examination of Catizone, during which he agreed that just because a prescription has red flags and was dispensed does not mean it was diverted.  *See id*. at p. 29 n.4.

63

In sum, Catizone's testimony did not violate *Daubert*, was not prejudicial, and does not constitute prejudicial error.  A new trial is not warranted.

### I. Brad Nelson's live testimony by remote transmission was proper and does not warrant a new trial.

Defendants claim that the Court "exceeded its authority by coercing the remote testimony from *former* Walmart employee Brad Nelson—a witness who is outside the Court's subpoena power and who testified only because the Court ordered him to."  Dkt. #4204 (Ds' MNT) at p. 29. Defendants' arguments are without merit and should be rejected because, *inter alia*, Walmart does not have any standing to object to a former employee being ordered to provide live testimony through remote transmission and, regardless, the Court's order fully comported with the Federal Rules.

Brad Nelson was Walmart's Senior Manager of Controlled Substances for Health and Wellness, and later a Director of Practice Compliance.  Dkt. #4035 (Ps' M for Sanctions) at p. 3. Plaintiffs deposed him on March 23, 2021.  *Id*.  However, in the months leading up to trial (and even during the trial), well after Nelson's deposition, Walmart continued to produce relevant documents, including, but not limited to, thousands of documents from Nelson's custodial file. Dkt. #4035 (Ps' M for Sanctions); Dkt. #4041 (10/18/21 Trial Tr.) at 2411:5-24, 2515:1-17, 2517:13 – 2520:14.  As a result, Plaintiffs filed a motion for sanctions against Walmart, seeking the imposition of one or more of the following sanctions: (i) a default judgment; (ii) a mistrial as to Walmart; (iii) permission to call Nelson to testify live by remote testimony, in addition to playing his deposition;[87] and (iv) permission to question Susanne Hiland regarding these documents, regardless of whether she had personal knowledge of the documents.  Dkt. #4035 (Ps' M for Sanctions) at p. 3.  Walmart opposed Plaintiffs' motion.  Dkt. #4038 (WMT Sanction Opp.).

After considering the parties' arguments, the Court determined that to remedy the situation, it would allow Plaintiffs to call Nelson to testify live by remote testimony regarding these newly

---

[87] Plaintiffs played portions of Nelson's deposition at trial on October 18.  Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2414:19 – 2583:10.

produced documents[88] and additionally, as a sanction, the total time of his live testimony would be allocated to Walmart.[89]  Notably, although Walmart's counsel verbally objected to the Court's ruling,[90] Nelson (who was represented by his own independent counsel)[91] never filed or asserted any objection on the record to having to appear live by remote transmission.

Nelson's live testimony occurred on October 25.  Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3850:7 – 3954:23.  During his testimony, Plaintiffs' counsel questioned Nelson regarding eighteen exhibits.  *Id.*  Six of these exhibits were produced after Nelson's deposition (P-14643; P-26892; P-26882; P-26874; P-26890; P-21393),[92] and another five, although produced before Nelson's deposition, were foundational documents needed to provide context for the late-produced documents or were used to rebut Nelson's testimony (P-07174; P-08037; P-14223; P-20852; P-21090).[93]  The remaining seven exhibits, which Plaintiffs' counsel had not initially realized were

---

[88]  The Court limited Plaintiffs to two hours of questioning.  Dkt. #4041 (10/18/21 Trial Tr.) at 2523:2-3, 2523:8-9.

[89]  Dkt. #4041 (10/18/21 Trial Tr.) at 2409:4-9 ("My hope is not to have to consider draconian sanctions.  And it's clear that the Court's supposed to before imposing sanctions see if I can remedy whatever harm through ordinary means, and the most logical one is to have Mr. Nelson testify so he can be examined on these documents."), 2410:1-5 ("And if the testimony, the examination with the documents I think is sufficient, then that's what we'll do.  I won't have to consider anything else.  And that's my intent.  And I can deal with the time, charge the time accordingly.  That's relatively minor."), 2412:17-22, 2520:18, 2521:4-5, 2522:18-25 ("I'm putting off, quite frankly, putting off any consideration of sanctions.  The only sanction will be what I – you know, how we deal with the time.  And I will charge it all to Walmart.  But I'm not – at the moment, I'm not imposing any additional sanctions.  I want to see how this goes.  All right?  So that's what a Court's supposed to do, to see if we can remedy it."), 2523:24 – 2524:19; Dkt. #4047 (Nelson Order).

[90]  Dkt. #4041 (10/18/21 Trial Tr.) at 2408:24 – 2409:1 (Mr. Majoras: "Your Honor, for the record, we object to this.  He has counsel.  His counsel will presumably respond."), 2524:15-16.

[91]  Dkt. #4032 (10/15/21 Trial Tr.) at 2398:4-6 (Mr. Majoras: "Mr. Nelson is not an employee.  He has been retired.  He's not controlled by Walmart.  He has his own counsel."); Dkt. #4041 (10/18/21 Trial Tr.) at 2408:25 – 2409:1, 25:23:10-12; Dkt. #4065 (10/22/21 Trial Tr.) at 3775:11-13; Dkt. #4078 (10/25/21 Trial Tr.) at 3849:15-16.

[92]  *See, e.g.,* Dkt. #4035 (Ps' M for Sanctions) at pp. 7-9, 11-12; Dkt. #4078 (10/25/21 Trial Tr.) at 4025:23-25; Dkt. #4078 (10/25/21 Trial Tr.) at 5046:22.  Although Plaintiffs' counsel questioned Nelson regarding P-21393, it was ultimately not offered into evidence.  Dkt. #4090 (10/26/21 Trial Tr.) at 4299:9-14.

[93]  Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3853:2 – 3855:9, 3881:14 – 3883:5, 3908:11 – 3910:23, (footnote continues on next page)

produced prior to Nelson's deposition,[94] were used to show a repeated pattern of behavior regarding Walmart's refusal to allow blanket refusals to fill (P-14450; P-14540; P-14552; P-14662; P-26732; P-26736; P-26737).[95]  Upon determining that those particular documents had not been late-produced, Plaintiffs reached an agreement with Walmart to reallocate a proportionate amount of Nelson's live testimony time back to Plaintiffs.  Dkt. #4109 (11/1/21 Trial Tr.) at 5058:13-17 (Mr. Majoras: "Over the weekend I reached an agreement with Mr. Lanier and Mr. Weinberger about the timing of Mr. Nelson's time on the stand, and we have agreed that an hour of that time will be attributed to plaintiffs, and the remaining hour and 45 total will stay with the defense side.").

Defendants argue that the Court lacked any authority to compel Nelson to testify because he is a former employee of Walmart who is outside of the Court's subpoena power to appear in court.  Dkt. #4204 (Ds' MNT) at pp. 29-30.  Not so.

As a preliminary matter, because Nelson is a former employee of Walmart, Walmart does not have any standing to object to him being ordered to provide live testimony through remote transmission.  *See Novovic v. Greyhound Lines, Inc.*, No. 2:09-CV-00753, 2012 WL 252124, at *8 (S.D. Ohio Jan. 26, 2012) (holding defendant could not challenge or move to quash subpoenas of its former employees).  *See also Donahoo v. Ohio Dep't of Youth Servs.*, 211 F.R.D. 303, 306 (N.D. Ohio 2002); *Cawley v. Eastman Outdoors, Inc.*, No. 1:14-CV-00310, 2014 WL 4656381, at *2 (N.D. Ohio Sept. 16, 2014); *White Mule Co. v. ATC Leasing Co. LLC*, No. 3:07CV00057, 2008 WL 2680273, at *4 (N.D. Ohio June 25, 2008).[96]  It was Nelson's obligation to object if he felt it necessary, and he did not do so.

---

3942:13 – 3944:24, 3951:12 – 3952:22; Dkt. #4107 (10/29/21 Trial Tr.) at 5046:16-21.

[94]  Dkt. #4078 (10/25/21 Trial Tr.) at 4026:3-14; Dkt. #4078 (10/25/21 Trial Tr.) at 5046:23 – 5047:8.

[95]  Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3883:6 – 3889:16, 3891:21 – 3898:17, 3900:19 – 3908:10, 3910:14-23.

[96]  To the extent Walmart attempts to argue that it has standing because it was the party sanctioned, that argument should be rejected.  The Court made it clear that the *only* sanction it was imposing on Walmart related to the allocation of time.  *Supra* at fn.89.

Regardless, Nelson's remote testimony was entirely proper under Federal Rules of Civil Procedure 43(a) and 45(c).  Pursuant to Rule 43(a), "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."  FED. R. CIV. P. 43(a).  *See In re Vioxx Prod. Liab. Litig.*, 439 F. Supp. 2d 640, 643 (E.D. La. 2006); *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2014 WL 107153, at *1 (W.D. La. Jan. 8, 2014).[97]  "'Appropriate safeguards exist where the opposing party's ability to conduct cross-examination is not impaired, the witness testifies under oath in open court, and the witness's credibility can be assessed adequately.'"  *In re: 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2021 WL 2605957, at *5 (N.D. Fla. May 28, 2021) (citation omitted).  *See also F.T.C. v. Swedish Match N. Am., Inc.*, 197 F.R.D. 1, 2 (D.D.C. 2000); *Aoki v. Gilbert*, No. 211CV02797TLNCKD, 2019 WL 1243719, at *1 (E.D. Cal. Mar. 18, 2019).  "Determining whether good cause and compelling circumstances exist is a matter left to the court's discretion."  *Gould*, 470 F. Supp. 3d at 740.  *See also 3M*, 2021 WL 2605957, at *2; *Aoki*, 2019 WL 1243719, at *1.  "This discretion is further supplemented by the court's wide latitude in determining the manner in which evidence is to be presented under the Federal Rules of Evidence."  *Gould*, 470 F. Supp. 3d at 740 (citations and internal quotation marks omitted).  *See also 3M*, 2021 WL 2605957, at *4 (same).

"When an order under Rule 43(a) authorizes testimony from a remote location, the witness can be commanded to testify *from any place described in Rule 45(c)(1)*."  FED. R. CIV. P. 45, Advisory Committee Notes, 2013 Amendments (emphasis added).  *See also 3M*, 2021 WL 2605957, at *2 (same).  Under Rule 45(c)(1), a person may be commanded "to attend a trial" "within 100 miles of where the person resides, is employed, or regularly transacts business in

---

[97]  Since Rule 43 was amended in 1996 to allow for the use of testimony by contemporaneous transmission, "there has been an increasing trend by federal courts allowing and by legal commentators advocating for the use of contemporaneous transmission of trial testimony."  *Vioxx*, 439 F. Supp. 2d at 642.  *See also Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n*, 470 F. Supp. 3d 735, 739 (E.D. Mich. 2020) (noting the 1996 amendment to Rule 43(a) "reflects an acknowledgement that advances in technology render it possible for remote testimony to nevertheless take place in open court").

person[,]" or "within the state where the person resides, is employed, or regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense."  FED. R. CIV. P. 45(c)(1).

Defendants argue that "Nelson is outside the reach of this Court's subpoena power—and thus Rule 43(a) does not permit the Court to compel his testimony."  Dkt. #4204 (Ds' MNT) at p. 31.  But Defendants' "narrow reading of the pertinent rules is not consistent with the view of most federal courts."  *3M*, 2021 WL 2605957, at *3 (noting that "an overwhelming consensus of federal courts, including MDL courts, have held that Rules 43(a) and 45 should be read in tandem").[98]

---

[98] *See, e.g., Novovic*, 2012 WL 252124, at *7 (finding that Rule 45(c)(3), which protects witnesses "'from undue burden or expense,'" would "not be offended by utilizing th[e] more reasonable alternative" of having witnesses who resided more than 100 miles from the courthouse testify by live simulcast from courthouses that are within the 100-mile radius of each witness's home); *In re Newbrook Shipping Corp.*, 498 F. Supp. 3d 807, 815 (D. Md. 2020) (deposition notice for remote deposition "no longer requires GMS or Sharma to travel more than 100 miles (or at all) to comply, so the Court declines to address GMS' argument that the subpoena compels GMS to comply outside of the geographic bounds of Rule 45(c)"); *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 16-17039, 2021 WL 6202422, at *3 (E.D. La. July 26, 2021) ("[T]his Court joins another section of this Court and at least two additional courts within the Fifth Circuit in holding that, for good cause and compelling circumstances and with the appropriate safeguards, Rule 45 is satisfied so long as the witness is not compelled to testify at a location beyond 100 miles from the witness's residence."); *Off. Comm. of Unsecured Creditors v. Calpers Corp. Partners LLC*, No. 1:18-CV-68-NT, 2021 WL 3081880, at *2–3 (D. Me. July 20, 2021) (court inclined to agree with those courts that "have held that a party may be able to use Rules 43(a) and 45(c) to compel a witness to testify remotely from a location within 100 miles of her residence but only upon a showing of good cause in compelling circumstances"; "I do not believe that Rule 43(a) should function as an automatic run-around to Rule 45(c). . . .  But the Rules also suggest that, where there is good cause in compelling circumstances, a court can authorize a witness to testify via contemporaneous video transmission and can then subsequently compel the witness to give the testimony from a location within 100 miles of his residence."); *United States v. $110,000 in United States Currency*, No. 21 C 981, 2021 WL 2376019, at *3 (N.D. Ill. June 10, 2021) ("Rule 45(c) does not limit the reach of a subpoena to only those residing within 100 miles of the pending litigation."); *Int'l Seaway Trading Corp. v. Target Corp.*, No. 020MC00086NEBKMM, 2021 WL 672990, at *5 (D. Minn. Feb. 22, 2021) (arbitrator's subpoena commanding witness to appear for deposition taken by "virtual means" allows the witness to comply "from his home or anywhere else he chooses that is within 100 miles of his residence[,]" and thus "is consistent with the plain language of Rule 45(c)(1)(A) because he has been commanded to attend the deposition within 100 miles of where he resides"; Given the plain language of Rule 45(c), a remote deposition subpoena requiring Mr. Satz's compliance in St. Louis does not run afoul of the Rule simply because it was issued by an arbitrator in Minneapolis.") (internal citations omitted); *In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 2311719, at *4 (E.D. La. May 26, 2017) (subpoena commanding witness to testify at trial by live video

(footnote continues on next page)

As one court recently explained:

[A] party may use a Rule 45 subpoena to compel remote testimony by a witness from anywhere so long as the place of compliance (where the testimony will be given by the witness *and not where the trial will take place*) is within the geographic limitations of Rule 45(c).  This is because "the 100-mile limitation now found in Rule 45(c) has to do with the place of *compliance*; not the location of the court from which the subpoena issued."[99]

*3M*, 2021 WL 2605957, at *4 (first emphasis added) (quoting *Int'l Seaway*, 2021 WL 672990, at *5).[100]  This is because "the geographic limitations of Rule 45(c) are a shield for witnesses and not a sword wielded by a litigant."  *3M*, 2021 WL 2605957, at *4 ("Just as there is no presumptive burden for a witness to travel less than 100 miles to testify at trial in the courtroom, there is no

---

transmission from a location within 100 miles of his home and place of business "is within the bounds of [Rule 45(c)(1)(A)]"); *Actos*, 2014 WL 107153, at *10 ("[T]his Court finds the Federal Rules of Civil Procedure specifically authorize a court to issue an order permitting contemporaneous transmission of live witness testimony as well as the issuance of a subpoena to compel such appearance by a witness (within the location limits and under the conditions defined by Rule 45) for the purpose of the transmission of his or her contemporaneous testimony at trial, if the requirements included within both rules are heeded."); *Ives v. Lyon*, No. AP 18-3076-PCM, 2020 WL 1456479, at *5 (Bankr. D. Or. Mar. 20, 2020) (permitting "'witnesses that cannot otherwise be compelled to attend pursuant to FRCP 45(c)' . . . to testify by telephone"); *cf. In re San Juan Dupont Plaza Hotel Fire Litig.*, 129 F.R.D. 424, 426 (D.P.R. 1989).

99  "Unlike the prior [version of the] rule, place of service is not critical to place of compliance."  FED. R. CIV. P. 45, Advisory Committee Notes, 2013 Amendments.  *See also Int'l Seaway*, 2021 WL 672990, at *4-5 (same; "In its current version, Rule 45 provides that a subpoena 'may be served at any place within the United States.'  Prior to the 2013 amendments, a subpoena could not be served so broadly, but could only be served: at any place within the district of the court that issued it; any place outside the issuing district, but within 100 miles of the place of the deposition; any place within the state where a state stature or rule of court allowed service of a subpoena issued by a state court sitting in the place of the deposition; or any place where the court authorizes service based on a motion and a showing of good cause.") (internal citation omitted).

100  *See also Actos*, 2014 WL 107153, at *9 ("It is certainly true that Rule 45 makes no mention of transmission of testimony *via* video to a courtroom, either to approve the issuance of subpoenas for such a purpose, nor to disapprove them; instead, *Rule 43* allows for appearance 'in open court' by such contemporaneous transmission, and Rule 45 provides the mechanism to secure such appearance. Nothing in Rule 45, itself, indicated the Rule must be read in the vacuum Defendants argue; to the contrary, Rule 45 must be read *in tandem with* Rule 43 and as a part of harmonious whole that is the Federal Rules of Civil Procedure.  Rule 43 defines an appearance 'at trial' in 'open court,' as including 'testimony in open court by contemporaneous transmission from a different location;' Rule 45 grants the mechanism to assure that appearance 'in open court' by way of video transmission.") (internal footnote omitted).

presumptive burden for a witness to travel less than 100 miles to testify at trial by contemporaneous transmission.").[101]

Defendants cite a number of cases in which district courts have gone the other way on this issue. Dkt. #4204 (Ds' MNT) at pp. 31-32. Plaintiffs respectfully contend that these cases were wrongly decided for the reasons discussed above.

Defendants next assert that even if the Court had the power to order Nelson's remote testimony, there was no "good cause" or "compelling circumstances" to do so. Dkt. #4204 (Ds' MNT) at p. 32. But this Court expressly (and properly) found the opposite:

> The Court finds there is good cause and compelling circumstances for Mr. Nelson's testimony. Mr. Nelson has information pertinent to this case, as demonstrated during the playing of his deposition at trial on October 18. Further, Plaintiffs have pointed to highly relevant documents produced in discovery after Mr. Nelson was deposed. The Court concludes it is necessary and important for the jury to hear from Mr. Nelson regarding these documents. Additionally, given that Mr. Nelson resides in Arkansas, there also exist good cause and compelling circumstances for Mr. Nelson to testify by video, rather than in person.

Dkt. #4047 (Nelson Order) at p. 1.[102] The following factors that are typically considered by courts when determining whether good cause and compelling circumstances exist to warrant remote testimony provide further support to the Court's decision:

---

[101] *See also San Juan*, 129 F.R.D. at 426 (addressing earlier version on Rule 45; "Speaking to the scope of Rule 45(e)(1), Judge Browning correctly asserted that the Rule simply 'restricts the reach of subpoenas to prevent undue inconvenience to witnesses *not* to confer advantages on parties.'") (citation omitted); *$110,000 in United States Currency*, 2021 WL 2376019, at *3 ("Rule 45(c)'s geographic limits were crafted to protect third parties from the undue burden of traveling more than 100 miles to provide testimony or produce documents in a proceeding to which they are not a party."); *Int'l Seaway*, 2021 WL 672990, at *6 (the potential burden "imposed by requiring a non-party witness to travel an excessive distance to provide testimony" is not present where the witness has been subpoenaed for a remote deposition that does not require him to travel); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, No. MDL NO. 551, 1988 WL 525314, at *2 (W.D. Wash. Aug. 9, 1988) (Rule 45 "restricts the reach of subpoenas to prevent undue inconvenience to witnesses *not* to confer advantage on parties").

[102] Defendants claim the "only" compelling circumstance the Court offered to justify Nelson's remote testimony was the fact that he lived in Arkansas, which is allegedly insufficient. Dkt. #4204 (Ds' MNT) at p. 32. Clearly that is not the case, as shown in the Court's language quoted above. Moreover, contrary to Defendants' assertions, courts have held that geographical distance can provide good cause and compelling circumstances. *See, e.g., Aoki*, 2019 WL 1243719, at *2 ("[C]ourts have nonetheless found that geographical distance may indeed provide good cause and compelling circumstances to
(footnote continues on next page)

"(1) the control exerted over the witness by the defendant; (2) the complex, multi-party, multi-state nature of the litigation; (3) the apparent tactical advantage, as opposed to any real inconvenience to the witness, that the defendant is seeking by not producing the witness voluntarily; (4) the lack of any true prejudice to the defendant; and (5) the flexibility needed to manage a complex multi-district litigation."

*Chapman v. Tristar Prod., Inc.*, No. 1:16-CV-1114, 2017 WL 7048986, at *1 (N.D. Ohio July 6, 2017) (quoting *Vioxx*, 439 F. Supp. 2d at 643).[103]

With regard to the first factor, although Nelson is no longer employed by Walmart, he is still under Walmart's control.  When he resigned in 2017, Nelson entered into a Confidential General Release and Separation Agreement with Walmart.  P-08075; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2568:19 – 2570:1.  Pursuant to that agreement, Nelson is required to "provide reasonable assistance to, and will cooperate with, Walmart in connection with any government investigation, litigation, arbitration, judicial, non-judicial, or administrative proceedings that may exist or may arise regarding events about which [he] has knowledge."  P-08075 at 005.  *See also* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2569:5 – 2570:1.  Courts have found sufficient control

---

[103]  *See also San Juan*, 129 F.R.D. at 426; *3M*, 2021 WL 2605957, at *4; *Xarelto*, 2017 WL 2311719, at *3; *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, No. 3:11-MD-2244-K, 2016 WL 9776572, at *1 (N.D. Tex. Sept. 20, 2016); *Mullins v. Ethicon, Inc.*, No. 2:12-CV-02952, 2015 WL 8275744, at *1 (S.D.W. Va. Dec. 7, 2015); *Actos*, 2014 WL 107153, at *7 n.17; *Washington Pub.*, 1988 WL 525314, at *2-3.  Additionally, in recent years, courts have found good cause and compelling circumstances to warrant testimony by remote transmission given the health and safety concerns associated with the ongoing Covid-19 pandemic, which provides even further support for the use of remote testimony in this case.  *See, e.g., Gould*, 470 F. Supp. 3d at 740-42; *House v. Players' Dugout, Inc.*, No. 3:16-CV-00594-RGJ, 2021 WL 4898071, at *13 (W.D. Ky. Oct. 20, 2021) ("Courts have also held the Covid-19 pandemic has presented a compelling impact on witnesses' ability to appear in-person justifying appearing by video under Rule 43. . . . Courts have held the distant location of witnesses and the challenges of travel during the global Covid-19 pandemic combined to present good cause in compelling circumstances for remote testimony.") (citing cases); *In re RFC & ResCap Liquidating Tr. Action*, 444 F. Supp. 3d 967, 971–72 (D. Minn. 2020); *$110,000 in United States Currency*, 2021 WL 2376019, at *3; *Argonaut Ins. Co. v. Manetta Enterprises, Inc.*, No. 19CV00482PKCRLM, 2020 WL 3104033, at *2 (E.D.N.Y. June 11, 2020).

under analogous circumstances.  *See, e.g.*, *3M*, 2021 WL 2605957, at *5 (witness under defendants' control where he "has an (indirect) consulting contract with [one of the defendants]").

The second factor (the complex, multi-party, multi-state nature of the litigation) and the fifth factor (the flexibility needed to manage a complex multi-district litigation) are related and often considered together.  *See Vioxx*, 439 F. Supp. 2d at 643-44 (noting that "the fifth factor is essentially an extension of the second factor").  Here, both factors weigh in favor of Nelson's remote trial testimony by contemporaneous transmission.  The trial at issue was a bellwether trial in the federal Opioid MDL, one of the largest and most complex MDLs in the country.  Consolidated within this MDL are thousands of cases from across the country brought by a variety of plaintiffs (including local governments like Plaintiffs) against a variety of defendants (including chain pharmacies like Defendants).  The trial involved two separate plaintiffs and multiple defendants.  Flexibility is certainly necessary to manage this complex MDL and these specific bellwether cases.  *See, e.g., Chapman*, 2017 WL 7048986, at *1 (finding these factors weigh in favor of remote testimony where the "lawsuit spans three states, includes thousands of class members, and involves millions of dollars"); *Vioxx*, 439 F. Supp. 2d at 643-44 (holding that second and fifth factors weighed in favor of allowing witness's trial testimony by contemporaneous transmission because although the case "involves only a single plaintiff, a single defendant, and the law of a single jurisdiction, it is a bellwether trial for a MDL involving thousands of lawsuits over the damage allegedly caused by a drug prescribed to millions of patients in every state of the nation").[104]

---

[104] *See also 3M*, 2021 WL 2605957, at *5 ("These bellwether trials are complex—the complexity of these cases mirrors the undisputed fact that this is the largest MDL in American history."); *Xarelto*, 2017 WL 2311719, at *4 ("One of the purposes of bellwether cases is to inform the parties on the future course of this entire litigation.  Mr. Jalota is a company executive who was at one time in charge of interfacing with the FDA with regards to Xarelto.  This factor as well as the objective of bellwether trials tilts the balance, albeit slight, in favor of allowing live deposition of Mr. Jalota inn this case."); *DePuy*, 2016 WL 9776572, at *2 ("[A]n MDL case by its very nature is complex, and flexibility is required to manage a nationwide docket consisting of over 8,000 cases."); *Mullins*, 2015 WL 8275744, at *2 ("[T]his consolidated case, in and of itself, involves complex issues and multiple parties.  This small compilation of West Virginia cases also represents a much larger collection of cases that involve parties from across the several states.  As a result, this small sampling of cases will bear on many more cases beyond the (footnote continues on next page)

Regarding the third factor, there is no indication that Walmart's refusal to produce Nelson voluntarily (which it could have done pursuant to the terms of its contractual agreement with Nelson) had anything to do with any real inconvenience to Nelson.[105]  *Cf. Vioxx*, 439 F. Supp. 2d at 643 ("[C]onsidering that the PSC has offered to pay Mr. Anstice's travel expenses and the Court would mandate such an arrangement, the Court finds that Merck's refusal to voluntarily produce Mr. Anstice is for a purely tactical advantage.  The Court is quite conscious that Mr. Anstice possesses information highly-relevant to the plaintiff's claims.  This information may be damaging to Merck's position.  As such, the Court assumes that Merck would like to eliminate any unpredictability and limit Mr. Anstice's trial testimony to his 'canned' deposition testimony—a purely tactical reason.  The Court cannot surmise any other legitimate reason why Merck would protest to Mr. Anstice's personal appearance.  Thus, the Court finds Merck's apparent motive in refusing to produce Mr. Anstice is purely tactical.").[106]  Presumably if Nelson felt inconvenienced by the order, he would have objected himself.  He did not.

Finally, Walmart did not suffer any true prejudice by Nelson having to testify remotely, and it has failed to offer any legitimate evidence or argument otherwise.  *See, e.g., Mullins*, 2015 WL 8275744, at *2 (where defendants did "not claim they w[ould] be prejudiced by live video

---

bounds of this consolidated trial. . . .  [T]he management of complex multi-district litigation of this variety requires flexibility.  This consolidated case may impact hundreds and thousands of cases in this MDL, so it is important to ensure a coherent presentation of the evidence."); *Actos*, 2014 WL 107153, at *8 ("As this Court has already acknowledged, the remaining two factors—the fact that this is a complex, multi-state, multidistrict litigation that requires flexible management—clearly weigh as heavily in favor of granting the Plaintiffs' motion as they did in both *Vioxx* and *Washington Public*.").

[105]   *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) at 1223:4-13 (Walmart's counsel complaining that Walmart has no control over him as a former employee and "it would be unfair to require us to go through" the process involved in having him testify remotely); Dkt. #4023 (10/13/21 Trial Tr.) at 1756:24 – 1757:8, 1758:4-14; Dkt. #4032 (10/15/21 Trial Tr.) at 2398:4-6; Dkt. #4041 (10/18/21 Trial Tr.) at 2523:10-12.

[106]   *See also Mullins*, 2015 WL 8275744, at *2 ("Here, aside from the offer to pay travel expenses, the court is presented with the same circumstances [as in *Vioxx*]: the witnesses are relatively important and knowledgeable employees of the defendants, the defendants refuse to make these witnesses available, and the defendants want to limit the testimony of these witnesses to deposition testimony.  The court agrees with the *Vioxx* court's assessment and finds these circumstances show the defendants' refusal is purely tactical.").

73

transmission of the witnesses' testimony[,]" the court would "not conjure up potential prejudices to support the defendants' position"); *Actos*, 2014 WL 107153, at *7 n.18 ("Defendants have not pointed this Court to any evidence that they will be harmed (other than perhaps tactically) by having their employees and former employees appear live by videoconference rather than by videotaped deposition."). Nelson is a former employee who has been previously deposed; thus, the substance of his testimony should have come to no surprise to Walmart. *See, e.g., Chapman*, 2017 WL 7048986, at *1 (finding this factor weighs in favor of remote testimony: "Fisher is Tristar's COO and Plaintiffs have already deposed him. Tristar should not be surprised by, or unprepared for, Fisher's answers."); *Vioxx*, 439 F. Supp. 2d at 643-44 ("[T]he Court finds that Merck would not suffer any true prejudice in having Mr. Anstice testify by contemporaneous videoconferencing. Mr. Anstice has already testified at numerous depositions and at another Vioxx trial. Furthermore, Mr. Anstice is employed by Merck. Thus, Merck should not be surprised at all by Mr. Anstice's testimony, regardless of whether it is from a deposition or via contemporaneous transmission.").

Defendants claim that the circumstances justifying remote testimony *must* be something unexpected (*i.e.*, not reasonably foreseen). Dkt. #4204 (Ds' MNT) at p. 32. That is not an accurate statement of the law,[107] but regardless, the circumstances with regard to Nelson were in fact unexpected. Plaintiffs did not expect that Walmart would continue to produce responsive discovery related to Nelson through the time of trial, which should have been produced within the discovery deadline and before his deposition. Dkt. #4035 (Ps' M for Sanctions). Certain of these documents were not available during Nelson's deposition, making his deposition testimony an

---

[107] Indeed, one of the cases cited by Defendants acknowledges as much. *See Stone Tech. (HK) Co. v. GlobalGeeks, Inc.*, No. 20-CV-23251, 2021 WL 2940256, *2 (S.D. Fla. July 13, 2021) (recognizing that although "'[t]he most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons,'" there can be "'[o]ther possible justifications for remote transmission[,]'" which simply "'must be approached cautiously'") (quoting FED. R. CIV. P. 43, Advisory Committee Notes, 1996 Amendments). *See also, e.g., Actos*, 2014 WL 107153, at *10 ("[T]he Advisory Committee Notes are not intended to be, nor does this Court interpret them as providing, an *exclusive* list of the 'compelling circumstances' under which contemporaneous transmission of live testimony may be permitted.").

insufficient substitute, and the Walmart witness that Plaintiffs intended to call live, Susanne Hiland, would not have had personal knowledge of all these documents.[108]  The Advisory Committee Notes on the 1996 Amendments to Rule 43 explicitly state: "An unforeseen need for the testimony of a remote witness that arises during trial . . . may establish good cause and compelling circumstances."  FED. R. CIV. P. 43, Advisory Committee Notes, 1996 Amendments.[109]

Finally, Defendants' argument that it was inappropriate for the Court "to exceed its subpoena authority" as a discovery sanction is without merit.  First, the Court clearly stated that the *only* "sanction" it was imposing related to the allocation of time.  *Supra* at fn.89.  Moreover, their conclusory arguments that there was no basis for any sanction because "there were no discovery failures by Walmart" (Dkt. #4204 (Ds' MNT) at p. 33) are insufficiently briefed (*supra* at fn.32) and not supported by the evidence.[110]  Regardless, as discussed above, the Court did not

---

[108]  The cases cited by Defendants are factually distinguishable.  *See Calpers*, 2021 WL 3081880, at *3-4 & n.4 (refusing to compel trial testimony of non-party by remote transmission because defendant failed to show "the necessary 'good cause in compelling circumstance'"; "[The non-party] is not under the control of the Plaintiffs, this is not a multi-state or multidistrict case, the witness's own asserted hardship and inconvenience is the moving factor behind its motion (not any tactical advantage to the Plaintiff), and the Plaintiff would be prejudiced because it has already worked to designate [the non-party's] depositions."; "[The non-party] is not unavailable for unexpected reasons.  Rather, [the defendant] knew that [he] resided outside the 100-mile radius of Bangor when it issued a deposition subpoena to him in 2019.  Similarly, [the defendant] has identified no new issues or asserted that another witness is unexpectedly unavailable."); *Stone Tech.*, 2021 WL 2940256, *1-2 (rejecting plaintiff's request to have two of its own corporate representatives, who live in China, appear virtually at trial based solely on the inconvenience of having to travel to the United States with certain Covid-19 restrictions in place; the court reasoned that this inconvenience was "entirely foreseeable" and not unexpected since the trial had been scheduled since August 2020, almost a year prior and during the Covid-19 pandemic, and the plaintiff, "in bringing this action, is responsible for bearing the burdens and costs of litigating its case, including costs and restrictions associated with securing travel and lodging").

[109]  *See also Stone Tech.*, 2021 WL 2940256, *2 (same); *Actos*, 2014 WL 107153, at *8 ("[A] trial, itself, is a dynamic, ever evolving process and the use of contemporaneous transmission of live testimony better allows for the witness and counsel to be responsive to the inevitable, unexpected developments and shifts that always occur during trial.  In so doing, the jury is better and not less served as the witnesses—with the employment of Rules 43 and 45—will be able to contemporaneously and most relevantly comment on the newest developments in real time and unedited watching and judging the witnesses as the trial unfolds—a possibility unavailable with previously recorded testimony or earlier more limited technology.").

[110]  *See, e.g.,* Dkt. #4035 (Ps' M for Sanctions).  They claim, for example that the newly-produced (footnote continues on next page)

exceed its subpoena authority by ordering Nelson to testify remotely.  For this reason, *In re Petition of Boehringer Ingelheim Pharms., Inc., & Boehringer Ingelheim Int'l GmbH, in Pradaxa (Dabigatran Etexilate) Prod. Liab. Litig.*, is inapposite.  745 F.3d 216, 218-20 (7th Cir. 2014) (trial court erred in ordering defendant, as a discovery sanction, to produce employees for deposition at a location outside of subpoena range; the employees all lived in Germany and the trial court ordered them to appear for deposition in the United States, despite the parties having previously agreed to conduct all the depositions in Amsterdam).

> **J.    The Court appropriately permitted reference to the DOJ Complaint because Walmart opened the door despite the Court's clear warnings.**

The Court correctly permitted Plaintiffs' counsel to reference the DOJ Complaint in cross-examining Walmart's witness, Susanne Hiland.  Walmart not only opened the door to that question, *twice*; it was *warned by the Court* not to promote its general corporate integrity and then blatantly proceeded to open the door anyway.  Even after the Court both admonished Walmart and instructed the jury to disregard a question and answer, Walmart again opened the door.  It was only then that the Court permitted Plaintiffs to reference the DOJ Complaint in a limited manner.  As fully explained below, that was entirely appropriate.

It is well established in the Sixth Circuit that when a party opens up a subject at trial, that party cannot complain "if the opposing party introduces evidence on the same subject."  *United*

---

documents were "substantially identical" to documents Walmart produced prior to Nelson's deposition and that "[o]nly thirty Nelson documents were produced after trial began, and nearly all of those were duplicates of documents produced before Nelson's deposition."  Dkt. #4204 (Ds' MNT) at pp. 29, 33.  Defendants provide no evidence supporting these conclusory and inaccurate assertions in their motion.  First, their disingenuous focus on Nelson-related documents produced after trial commenced ignores the fact that tens of thousands of Nelson-related documents were produced between the time of his deposition and trial, and also that many thousands of material documents related to other Walmart witnesses were produced late as well.  Dkt. #4035 (Ps' M for Sanctions).  Moreover, although some of the newly-produced documents were duplicates, there were plenty that were not.  *See, e.g.,* P-14643; P-17681; P-26892; P-26882; P-26874; P-26890; P-21393.  And even where some of the Nelson-related documents were similar to previously-produced documents, they show a repeated pattern of Nelson getting notice of serious problems with dispensing and illegitimate prescriptions all over the country.  Dkt. #4035 (Ps' M for Sanctions).  P-26890, an e-mail to Nelson regarding a problematic prescriber in Cleveland, Ohio, which Walmart originally withheld on the claim that it *lacked geographic relevance to CT3*, is just one example of how Walmart was improperly playing games with discovery.  Dkt. #4035 (Ps' M for Sanctions).

*States v. Bender*, 265 F.3d 464, 471 (6th Cir. 2001).  *See also Fathera v. Smyrna Police Dep't*, 646 F. App'x 395, 401 (6th Cir. 2016); *Zieman v. City of Detroit*, 81 F.3d 162, 1996 WL 140328, *4 (6th Cir. 1996) (unpublished).  In particular, when a party "opens the door" on an issue, by eliciting prejudicial or inadmissible evidence, the opposing party, in the court's discretion, may "introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission."  *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) (citations omitted).  *See also Hickson Corp. v. Norfolk S. Ry. Co.*, 124 F. App'x 336, 341-42 (6th Cir. 2005); *Zieman*, 1996 WL 140328, at *4.  A party may "open the door to rebuttal evidence through statements made during his or her oral argument."  *Helfrich v. Lakeside Park Police Dep't*, 497 F. App'x 500, 509 (6th Cir. 2012). Even "evidence whose probative value might not be thought to outweigh its prejudicial effect if offered on direct examination may well be admitted during redirect examination" for these purposes.  *Segines*, 17 F.3d at 856 (citation omitted).  For example, "once a party 'opens the door' to reputation or character evidence on direct examination, inquiry is allowed into 'relevant specific instances of conduct' that rebut or impeach that evidence." *Hickson*, 124 F. App'x at 343 (citing FED. R. EVID. 405).[111]

Here, Plaintiffs' counsel requested a side bar immediately after Walmart's counsel elicited testimony from Hiland regarding Walmart's business culture, indicating Plaintiffs' belief that "the door is opening to the Department of Justice complaint that was filed in Texas that you have excluded from this case, because that bears directly on the issue of their corporate culture and whether or not they in fact have a foundation of integrity."  Dkt. #4109 (11/1/21 Trial Tr.) at 5077:18 – 5078:21.  The Court then issued a clear warning to Walmart:

> THE COURT: Well, why did you ask that last question and elicit that answer, Ms. Fumerton?

---

[111] *See also United States v. Johnson*, No. 1:21CR123, 2021 WL 3167883, *1 (N.D. Ohio July 27, 2021) ("[O]nce the general positive reputation of the defendant has been testified to by a witness, 'the court may allow an inquiry into relevant specific instances of the person's conduct.'") (quoting FED. R. EVID. 405(a)) (emphasis omitted); *Baskin v. Pepsi MidAmerica Co.*, No. 5:13-CV-00030-TBR, 2015 WL 363906, *1 (W.D. Ky. Jan. 27, 2015) ("Should Baskin attempt to establish his good character through testimony and argument, he will thus open the door to rebuttal character evidence.").

MS. FUMERTON: Well, I asked just about what the corporate culture was at Walmart, and they have various values that are within –

THE COURT: That's the whole point.  I thought that both sides were going to pretty much stay away from that.  You want to put your corporate culture and integrity in play, then I'll let the plaintiffs bring out whatever they want.

MS. FUMERTON: Well, again, Your Honor, I think that the prejudice that would be –

THE COURT: Well, you started it, all right?  Everyone knew what was out there and everyone was -- I thought everyone agreed to stay away from either the defendants sort of promoting their general corporate integrity or the plaintiffs just firing away gratuitous shots at it, because it's not relevant, but you've now put this in through this witness.

*Id.* at 5078:24 – 5079:18.

The Court further admonished that "this is a lot more than foundational background. . . . [B]ringing out that Walmart's, you know, policy is customer service, that's fine, but this went beyond that."  *Id.* at 5079:22 – 5080:3.  The Court then instructed the jury to disregard Hiland's last answer.  *See id.* at 5080:6-7, 5081:5-7 ("Ladies and gentlemen, I'm going to direct you to completely disregard the witness's last answer.").  And the Court *again* warned Defendants:

THE COURT: All right. And *I don't want anything touching this, all right?*

MS. FUMERTON: I understand.

THE COURT: For any of the defendants.  You start -- you want to just, you know, put in and promote your company's general culture or general integrity, that's fine, you can do it, *but I'll let the plaintiffs bring out whatever they want on the other side.*  Is that clear to everyone?

MS. FUMERTON: Yes, Your Honor.

THE COURT: Is it clear to the other defendants? . . . *Be very careful about the questions.*

*Id.* at 5080:9 – 5081:2 (emphasis added).

Despite the Court's clear warnings, Walmart's counsel proceeded to broach the topic, asking Hiland: "If someone were to suggest to you that Walmart puts profits over safety, how would you respond?"  *Id.* at 5115:14-17.  When Hiland responded: "That's just not true[,]" Walmart's counsel prodded further: "Why do you say that?"  *Id.*  Walmart's counsel then asked: "Are the expectations that were being communicated to Walmart pharmacists in this video

78

new? . . . How long have you heard them?" *Id.* at 5116:4-7. Plaintiffs' counsel immediately requested a sidebar, stating "this is back to corporate culture regarding their integrity. The door is wide open. We can't unring this bell." *Id.* at 5116:19-21. The Court aptly agreed:

> THE COURT: I think that's true, all right? Ms. Fumerton, *I told you not to go there, and you went back there.* So I think I want to figure out, Mr. Weinberger, and Mr. Lanier, you need to advise me how you plan to use that DOJ once it's cross-examination.
>
> ***
>
> But then you went farther and had her express her opinion about how Walmart has always put, you know, patient safety above profit for 30-plus years. *I warned you,* so I'm going to allow the plaintiffs to -- I think to use that DOJ lawsuit in a limited way, and she can say whatever she wants to say about it. She can say the Department of Justice is a hundred percent wrong in her opinion, that's fine. She can say whatever she says, and I'm not going to allow any more back and forth on it.
>
> ***
>
> *I warned you, okay?* And I went through it. *And I could have done it the first time that the door was opened, but I decided to be cautious, and I just had the jury disregard the answer, and I went through, and every defendant understood. And you went back at it, so this is the consequence.* The record's very clear. All right?

*Id.* at 5116:22 – 5119:1 (emphasis added).

Moreover, the Court limited Plaintiffs' counsel to asking a single, narrow question regarding the DOJ Complaint. *See, e.g.*, *id.* at 5183:15-21 ("Mr. Lanier, when you ask the question, make it clear it's Walmart only, all right? . . . So it's clear that it has nothing to do with Walgreens and zero to do with CVS.").[112] Again, the propriety of the Court's decision is clear:

> THE COURT: Well, I mean, I've made the record. *I gave Ms. Fumerton the benefit of the doubt the first time* and simply sustained the objection and asked the jury to disregard the witness's answer, *and I made it crystal clear to all lawyers*, and they

---

[112] Plaintiffs' counsel also assured the Court that he would only use the DOJ Complaint within the limitations of the opened door. *See id.* at 5117:4-13 ("I want to be very careful how I use it. I don't want to go too far into it in any way that pushes anything beyond the open door. So what I'd like to do is probably look at the language carefully during the break, but my question likely be something like, 'Ma'am, that is your opinion as you sit here as a Walmart employee, but you know currently the Department of Justice is pursuing an action against Walmart, making allegations that are entirely opposite,' and I'd probably try and limit it to something like that.").

all acknowledged they understood what I was saying, that no one was to get into general corporate character testimony.

MR. MAJORAS: I don't think this did, Your Honor.  I don't think it opened the door.

THE COURT: Trust me, it did, Mr. Majoras, it did.  So I will allow a very limited question from Mr. Lanier.  It's not going to go into any details or any specific allegations, but it's essentially basically saying that the Department of Justice filed a complaint alleging the opposite, that Walmart put corporate profit over safety; are you aware of it; Bingo.  And if she says -- whatever she says, yes, no, that's the end of it.  I'm not going to allow a follow-up question, just one question, and that's it.

*** 

THE COURT: Well, it's going to be done *because you've opened the door twice, and I gave you the benefit of the doubt once.*

*Id.* at 5179:22 – 5180:22 (emphasis added).  Plaintiffs' counsel then proceeded to ask *a single question* regarding the DOJ Complaint.  *See id.* at 5229:1-10 ("Q: I'm referencing you know for a fact that the Department of Justice right now has a 160-page complaint on file against Walmart alleging that the Compliance unit chose not to give its pharmacists the information and authority it knew they needed to comply with the rules.  You know that's out there right now, don't you? A: I know that there is a DOJ complaint.  I don't know the specifics.") (internal objection omitted).  Notably, although Walmart's counsel contemporaneously objected to the question, she did not request that any limiting instruction be given.  *Id.*

The Court did not err in permitting Plaintiffs' counsel to ask one limited question concerning the DOJ Complaint.[113]  That question directly addressed the false impression defense

---

[113] Plaintiffs' limited reference to the DOJ Complaint contrasts starkly to the evidence challenged in *Adams*, 722 F.3d at 831, which Defendants cite as support.  Dkt. #4204 (Ds' MNT) at p. 34.  In *Adams*, a criminal case involving a charge of a vote-buying conspiracy, the Court held it was error to admit over 900 pages of state-election records containing complaints that were hearsay.  722 F.3d at 827-28.  The Sixth Circuit held that the records should have been excluded under Rule 403 because "the complaints go even further than propensity evidence, reaching one of the most important findings that the jury was required to make: whether defendants engaged in vote buying from 2002 to 2006.  *E.g.*, A.A. at 509 (Anonymous complaint dated 05/28/2002: 'Jennings White/Stanley Bowling/Kennon White $75.00 a vote—payed by Bart Morris behind Super America.')."  *Id.* at 831.  Of course, those concerns are nonexistent here; the DOJ Complaint was never admitted into evidence, and its contents were never disclosed.

80

counsel elicited on direct examination that Walmart does and has historically put patients' safety over profits.  *See, e.g.*, *id.* at 5115:14 – 5116:11.  It is well established "that a party may not complain on appeal of errors that he himself invited or provoked the court . . . to commit."  *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 354 (6th Cir. 2002).[114]

Additionally, under Federal Rule of Evidence 405, once a party "opens the door" to reputation or character evidence on direct examination, inquiry is allowed into "relevant specific instances of conduct" that rebut or impeach that evidence.  *See* FED. R. EVID. 405; *Hickson*, 124 F. App'x at 343; *Johnson*, 2021 WL 3167883, at *1.  Indeed, the Advisory Committee on the Federal Rules of Evidence has commented on the theory of allowing such cross-examination:

> According to the great majority of cases, on cross-examination inquiry is allowable as to whether the reputation witness has heard of particular instances of conduct pertinent to the trait in question.  The theory is that, since the reputation witness relates what he has heard, the inquiry tends to shed light on the accuracy of his hearing and reporting.

FED. R. EVID. 405 (Advisory Comm. Notes) (internal citation omitted).  *See also United States v. Frost*, 914 F.2d 756, 772 (6th Cir. 1990) ("Allowing the government to ask defendants' reputation character witnesses if they had heard of specific acts of conduct was not an abuse of discretion by the district court and, indeed, was a textbook application of Fed. R. Evid. 405(a).").

The Sixth Circuit has applied both the invited error doctrine and Rule 405 to permit the introduction of rebuttal evidence against a corporation in a civil case.  *See Hickson*, 124 F. App'x at 341-42, 343 (declining to decide applicability of Federal Rule of Evidence 609 to a testifying

---

[114]  *See Helfrich*, 497 F. App'x at 509 ("By seeking to establish his good character through testimony and argument, Helfrich opened the door to being cross-examined regarding his prior arrests."); *Hickson*, 124 F. App'x at 343 ("But, because Norfolk Southern opened the door to evidence concerning its environmental record, we agree with the district court that Hickson was entitled to rebut evidence introduced by Norfolk Southern that it had an unblemished corporate record on environmental matters. To not admit evidence of the felony conviction would have left the jury with only part of the picture concerning Norfolk Southern's safety and environmental record.  Like the situation with the Hall letter, the 'invited error' doctrine applies to allow evidence of the conviction before the jury.  Any error in admitting the prior felony conviction was invited by Norfolk Southern's own actions in introducing evidence to imply an unblemished environmental record.").

81

corporate witness since "any admission [of the corporation's prior conviction] under Rule 609 was harmless because the evidence could have come in alternatively under Federal Rule of Evidence 405"). And, contrary to Defendants' argument here, the fact that a civil complaint contains unproven allegations does not make Plaintiffs' counsel's inquiry impermissible. Dkt. #4204 (Ds' MNT) at p. 36.[115] Both the Sixth Circuit and this District have permitted inquiry into unproven allegations where the inquiry rebuts a character implication created on direct examination (*i.e.*, an open door). *See, e.g.*, *United States v. McGuire*, 744 F.2d 1197, 1204-05 (6th Cir. 1984) (affirming district court's decision to allow the prosecution to test the defendant's character witnesses by inquiring into their knowledge of a pending civil suit against the defendant, reasoning that, "[o]nce the defendant has 'opened the door' by offering evidence as to his good character, the prosecution may rebut that evidence"); *Johnson*, 2021 WL 3167883, at *1 (holding that, under Rule 405(a), the government permissibly inquired on cross-examination about relevant specific instances of conduct that were alleged in an indictment against the defendant to rebut assertions that the defendant had a reputation for being trustworthy and honest). Nor did the

---

[115] Defendants' cited authority for this point is inapposite. In *Beck v. Haik*, 377 F.3d 624, 642 (6th Cir. 2004), the Court found questioning about uncharged and unproven accusations of child molestation were inappropriate because the door had not been opened to such accusations, and unrelated evidence of sexual crimes or deviancy risks "cater[ing] to the passions of the jury" and "prejudic[ing] [a party's] chance for a fair trial." *Id. Cf. also United States v. King*, 378 F.2d 359, 360 (6th Cir. 1967) (holding questions about how many times the defendant had been arrested were improper because "at the time this line of questioning was commenced the defendant's character had not been placed in question"); *United States v. Yarbrough*, 352 F.2d 491, 493 (6th Cir. 1965) (holding, in a criminal case, that the government could not generally attempt to impeach a witness through evidence of an indictment on a prior, unrelated charge); *Gritton v. Disponett*, No. CIV.A. 3:05-75-JMH, 2007 WL 3407459, *9 (E.D. Ky. Nov. 14, 2007) (holding indictments could not be considered on a motion for summary judgment because they were inadmissible hearsay). Additionally, Defendants' contention that "[t]his Court repeatedly and rightly recognized that allowing the DOJ Complaint against Walmart to come in would be improper and unduly prejudicial" is unsupported by the Court's preliminary rulings they cite. Dkt. #4204 (Ds' MNT) at p. 34. *Cf., e.g.*, Dkt. #3546 (CT1B Evidentiary Order) at p. 11 (declining to blanket-exclude criminal investigations and indictments), pp. 25–27 (declining to blanket-exclude civil investigations or evidence of other lawsuits); Dkt. #3058 (CT1A Evidentiary Order) at pp. 11–13 (noting the Court would generally admit evidence relating to governmental action or inaction), pp. 15–17 (citing FED. R. EVID. 803(22) and noting a criminal indictment not resulting in a conviction is generally inadmissible).

question concerning the DOJ Complaint violate the rule against hearsay; no evidence was offered, and the question went solely to Hiland's credibility, not to proving the truth of the matter asserted. *See* FED. R. EVID. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

As shown, the Court's decision to allow limited reference to the DOJ Complaint was careful and made only after the Court had already issued clear warnings and instructed the jury once to disregard testimony.  And Defendants knew the topic of general corporate culture was off limits.  As the Court noted, "this was in these *motions in limine*, that the case was not going to be tried on whether any of these corporations had good cultures or bad cultures."  Dkt. #4109 (11/1/21 Trial Tr.) at 5183:21 – 5184:2.[116]  The Court also scrupulously considered the wording of Plaintiffs' counsel's question outside of the jury's presence before permitting it, including to ensure it was "clear that it has nothing to do with Walgreens and zero to do with CVS." *See* Dkt. #4109 (11/1/21 Trial Tr.) at 5181:4 – 5182:4, 5183:15-21.  And when Plaintiffs' counsel asked about the DOJ Complaint, he moved on immediately after she answered.  *See id.* at 5229:1-10.[117]  Given the Court's repeated admonitions to Defendants and careful consideration of

---

[116] *See, e.g.,* Dkt. #3058 (CT1A Evidentiary Order) at pp. 68-69 ("Each Defendant may introduce and describe itself accurately to the jury and explain how many people it employs and the work they do to ensure the safe manufacture and delivery of necessary medication to the people living in the Track One counties.  In contrast, evidence that the parties and/or their employees are 'good citizens' and do good deeds such as providing scholarships, community service, or charitable contributions is not relevant to the issues in this case (unless another party offers evidence to the contrary)."); Dkt. #3829 (CT3 *In Limine* Evidentiary Stipulations) at p. 1 (parties stipulated that they would not offer "[a]ny comment or inference that bolsters the unchallenged character (*e.g.,* honest) or traits (*e.g.,* generous) of any party's current or former employees, managers, consultants, witnesses, experts, agents or fiduciaries preemptively (*e.g., 'Do you know Mr. X? Yes, he is a good person of impeccable integrity.* ')"); Dkt. #3988 (CT3 Evidentiary Order re: Previously Asserted MILs) (adopting and incorporating prior CT1 evidentiary rulings).

[117] *Compare Valadez v. Watkins Motor Lines, Inc*., 758 F.3d 975, 981-82 (8th Cir. 2014) (ordering new trial where defense counsel's questioning regarding an accident report, which was allowed under the open door doctrine, "went too far" beyond remedying any false implication created during direct examination, and defense counsel emphasized the evidence in closing argument, reminding the jury "of what the 'official highway report' concluded—that [the plaintiff] was at fault and that [the defendant] was not at fault").

Plaintiffs' question before allowing the jury to hear it, Defendants' argument that any prejudice resulting from the question greatly outweighed its probative value should be rejected.[118] Dkt. #4204 (Ds' MNT) at p. 36. *See Segines*, 17 F.3d at 856.

### K.  The admission of extraterritorial evidence was proper and does not warrant a new trial.

Defendants argue that a new trial is warranted because certain extraterritorial evidence was admitted at trial that had no evidentiary nexus to Plaintiffs' claims, and thus was irrelevant, unfairly prejudicial, and was inadmissible "other bad acts" evidence.  Dkt. #4204 (Ds' MNT) at p. 37. Their arguments should be rejected.

As a preliminary matter, although Defendants assert that "an extensive amount" of extraterritorial evidence was admitted at trial, they identify only *three* exhibits in their motion: P-42147-A; P-14540; P-08182.  Dkt. #4204 (Ds' MNT) at pp. 37-38.  The CT3 trial lasted 28 days, producing a trial transcript of well over 7,000 pages.  Hundreds of exhibits were admitted during the trial.  The admissibility of any particular piece of extraterritorial evidence is necessarily dependent on the evidence itself, the purpose for which it was offered, and the relevant context in which it arose at trial.  *See, e.g.,* Dkt. #3464 (CT1B Ps' MIL Opp.) at pp. 32-44; Dkt. #3546 (CT1B Evidentiary Order) at p. 33.  Defendants cannot expect the Court (or Plaintiffs) to parse through the entire record searching for all the extraterritorial evidence that they could not be bothered to identify in their motion, nor should they be permitted to identify this evidence for the first time in

---

[118] Here too, Defendants' reliance on *Stockman*, 480 F.3d at 798-99, is unpersuasive. Dkt. #4204 (Ds' MNT) at pp. 36-37.  First, the settlement letters there were *admitted* and implicated the amount of the disputed claim, in violation of Rule 408.  The DOJ Complaint was never admitted.  Additionally, the potential for jury prejudice in *Stockman* turned on the fact that the "jury could easily have misunderstood that the offer, made on the eve of trial, was an implicit admission of liability or a sign that Defendants thought they might lose at trial." *Id.* at 799.  By contrast, the jury was unlikely to construe Hiland's mere acknowledgment that she was aware of a DOJ Complaint against Walmart as an admission of Defendants' nuisance liability in the Counties.  And the Court's instruction that lawyer's statements are not evidence further mitigated any potential prejudice. *Supra* at fn.18.

a reply brief.[119]   Thus, Defendants should be deemed to have waived their objections on "extraterritorial" grounds to all evidence except the three exhibits identified in their motion.

To the extent Defendants are arguing that all extraterritorial evidence was *per se* inadmissible (*i.e.*, that the Court erred in not granting its motions *in limine* on this issue), these arguments should be rejected for the same reasons set forth in prior briefing and the Court's prior rulings.   *See, e.g.,* Dkt. #3058 (CT1A Evidentiary Order) at pp. 8-11; Dkt. #3546 (CT1B Evidentiary Order) at pp. 31-33; Dkt. #2815 (CT1A Ps' MIL Opp.) at pp. 31-34, 58, 79, 84—85, 97-98, 106-109; Dkt. #3464 (CT1B Ps' MIL Opp.) at pp. 32-44.[120]   Moreover, there was ample evidence adduced at trial of Defendants' national dispensing policies,[121] making extraterritorial evidence related to those policies directly relevant.[122]   And although not itself on

---

[119]  *See, e.g., Warren v. Thompson*, 224 F.R.D. 236, 240 n.7 (D.D.C. 2004) ("A trial court is not required to 'parse through transcripts' in an effort to identify the grounds of a post-trial motion."), *aff'd sub nom. Warren v. Leavitt*, 264 F. App'x 9 (D.C. Cir. 2008); *Kim Laube & Co., Inc. v. Wahl Clipper Corp.*, No. LACV0900914JAKJCX, 2013 WL 12085166, at *2 (C.D. Cal. Aug. 19, 2013) (same).  *See also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("'Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.'") (citation omitted); *EB-Bran*, 242 F. App'x at 313 (declining to consider arguments "raised for the first time in the reply brief"); *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2020 WL 425965, at *2 n.12 (N.D. Ohio Jan. 27, 2020) (same); *Toth v. Ford Motor Co.*, No. 1:08-CV-00391-JG, 2008 WL 11380224, at *2 (N.D. Ohio Sept. 18, 2008) (refusing to address arguments "advanced [by movant] for the first time in a reply brief").

[120]  The arguments and authorities set forth in this prior briefing, and the Court's prior rulings, also support Plaintiffs' arguments below that the three specific exhibits identified by Defendants in their motion were admissible.  *Id.*

[121]  *See, e.g.*, Plaintiffs' Rule 50(b) Opp. at pp. 24, 46-47, 67; Dkt. #4041 (10/18/21 Trial Tr.) at 2413:9-10.  Defense counsel were certainly quick to point to Defendants' national policies when in their interest to do so during arguments to the Court.  Dkt. #4124 (11/5/21 Trial Tr.) at 6208:15-19 (Mr. Majoras: "It's a national policy, Your Honor.  Plaintiffs spent I don't know how many hours now talking to Mr. Nelson about the national policies and why Walmart had them.  This has been ruled on many times already.").

[122]  *See, e.g.,* Dkt. #3058 (CT1A Evidentiary Order) at pp. 8-10; Dkt. #3546 (CT1B Evidentiary Order) at pp. 31-33; Dkt. #3464 (CT1B Ps' MIL Opp.) at pp. 32-44; Dkt. #4023 (10/13/21 Trial Tr.) at 1636:6-12 ("THE COURT: Because, Mr. Delinsky, all the evidence has been clear, all these defendants had national policies, okay?  They had national policies as to what pharmacists were to do and not to do.
(footnote continues on next page)

trial, the "national scope of the opioid crisis" was certainly relevant to various issues in the case, including, but not limited to, the expert testimony of Drs. Lembke, Alexander, and Keyes.[123] [124]

Turning to the three exhibits Defendants identified in their motion, each is (or was) directly relevant to issues in this case[125] and Defendants' objections to each should be rejected.

**P-08182**.  As a preliminary matter, Defendants have waived any objections they may have had to this document by *not objecting when it was offered for admission*.  Dkt. #4041 (10/18/21 Trial Tr.) at 2675:17-19 ("THE COURT: The last one is 08182, high quantity stores. MR. SWANSON: *No objection on that one*.") (emphasis added).[126]  Regardless, their

And so something that happens in Florida in the time period is directly relevant.  So I've overruled that and I'll continue to overrule objections."); Dkt. #4041 (10/18/21 Trial Tr.) at 2413:9-10; Dkt. #4064 (10/21/21 Trial Tr.) at 3436:20-25.

[123]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 507:1-8, 547:17 – 550:8, 553:23 – 554:3, 558:3-6, 565:13-17, 651:10 – 652:9, 668:25 – 669:10, 719:10-18, 720:9-12; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 802:8-19, 854:3-12, 887:15-25; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3436:10-25, 3453:13 – 3454:19, 3455:14 – 3456:12, 3458:21-24, 3460:19 – 3463:23, 3464:8 – 3465:12, 3466:10 – 3468:18, 3564:4-14; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3640:14-17, 3641:6-25, 3643:9 – 3645:4, 3664:10-19, 3665:4-24, 3666:6-12, 3669:19 – 3671:20; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4088:13-22, 4165:21 – 4166:18, 4171:12 – 4172:14, 4197:14 – 4198:1, 4203:2-16, 4211:3-10.

[124]  Defendants point again to certain statements made by Plaintiffs' counsel during closing arguments regarding the national scope of these issues.  Dkt. #4204 (Ds' MNT) at pp. 36-37.  As previously noted (*supra* at § II.C), these statements were minimal, the Court issued a limiting instruction curing any potential prejudice, and Plaintiffs' counsel himself corrected his statements to the jury.  *See, e.g.,* Dkt. #4153 (11/15/21 Trial Tr.) at 7130:16-24, 7131:1-9 (Mr. Lanier: "And that's exactly right.  You'll – in fact, the judge has tailored his questions to exactly what you'll find.  And you'll read those.  He read you his instructions, but ultimately he'll also give you – I think it's four, Your Honor.  – but he's got a set of questions that he'll ask you, and that narrows down the focus of what this whole case is about in front of you today."), 7171:3-10.  *See also Holmes*, 78 F.3d at 1046–47.

[125]  For this reason, *In re Chocolate Confectionary Antitrust Litig.*, is distinguishable.  801 F.3d 383, 402-04 (3d Cir. 2015) (in an antitrust case, the court concluded that plaintiffs had 'not adequately linked the Canadian conspiracy to the purported U.S. conspiracy to justify using the former to support an inference of the latter").

[126]  To the extent Defendants attempt to argue that their objections to any particular piece of extraterritorial evidence were preserved by their motions *in limine*, this argument should be rejected.  The Sixth Circuit expressly states that a motion *in limine* ruling only preserves error, such that counsel need not renew the objection at the time the evidence is offered, if it is "an explicit and definitive ruling on the record of the evidentiary issues to be decided" and does not indicate that it is "conditioned upon any other circumstances or evidence[.]"  *Brawner*, 173 F.3d at 970.  If the ruling "is in any way qualified or conditional, the burden is on counsel to raise objection to preserve error."  *Id.*  The Court's evidentiary (footnote continues on next page)

86

"extraterritorial" objection to this document fails for substantive reasons as well. P-08182 is a January 2011 e-mail chain between Barbara Martin and Kristine Atwell, the CII Function Manager at Walgreens' Jupiter distribution center in in Florida. P-08182; Dkt. #4032 (10/15/21 Trial Tr.) [*Martin*] at 2373:1-6. Martin worked at Walgreens corporate on matters related to *distribution* and her testimony was offered in support of Plaintiffs' *distribution* theory of liability (before Plaintiffs agreed to drop that theory for purposes of this particular trial).[127] This exhibit was introduced during the play of Martin's deposition at trial, and was discussed for approximately eleven minutes.[128] In the e-mail, Atwell informed Martin that several Walgreens stores in Florida have been ordering "huge quantities" of controlled substances and asked Martin for her thoughts about whether the stores should be justifying the large quantities. P-08182 at 005-006; Dkt. #4032 (10/15/21 Trial Tr.) [*Martin*] at 2373:7-25. Martin acknowledged the large orders, but foisted the

orders denying motions *in limine* related to extraterritorial evidence in this litigation were in no way "explicit and definitive" rulings that no evidence could ever be excluded on extraterritorial grounds. Dkt. #3546 (CT1B Evidentiary Order) at p. 33 ("The Court is not persuaded that there is any reason to revisit its prior ruling on the issues of extraterritoriality, but it offers these clarifying comments. The context of the Court's prior rulings were made with broad-scope aggregate evidence in mind. What that means is, where evidence tends to show nation-wide trends and shipments, national policies and procedures, or systematic failures that are national in scope and become clear in the aggregate, the Court will *generally* permit such evidence—so long as it is otherwise admissible under the Federal Rules. Additionally, the Court will also *generally* allow specific extraterritorial evidence that has some demonstrable nexus to the Plaintiff Counties. . . . On the other hand, evidence that is specific in nature and does not have a nexus to the Plaintiff Counties, without more, will *generally* not be permitted."). *See also id.* at p. 31 ("Similarly [as in CT1A], the Court here declines to enter a blanket ruling excluding evidence of settlements involving conduct that occurred outside the Track One Counties and instead will address this issue when it arises in the context of trial."), p. 38; Dkt. #3967 (CT3 Evidentiary Order) at pp. 24-25.

[127] Dkt. #4032 (10/15/21 Trial Tr.) [*Martin*] at 2332:17-19, 2336:8 – 2337:7 (discussing her involvement in suspicious order monitoring at Walgreens), 2339:19 – 2341:8 (same), 2343:8 – 2345:3 (same), 2347:12 – 2350:13 (same), 2354:21 – 2355:2 ("I would have to assume that my responsibility would probably be on the analysis side, making sure that we're doing the right thing to make sure that Walgreens isn't generating or fulfilling suspicious orders, but that we're doing a right balance between making sure that our stores have the product they need to service their patients."), 2358:20 – 2359:7 (Martin was one of the Walgreens employees that did due diligence on flagged orders); P-08182.

[128] Dkt. #4032 (10/15/21 Trial Tr.) [*Martin*] at 2372:25 – 2377:18, 2378:8 – 2379:12, 2380:17 – 2383:9. P-08182 was Exhibit No. 30 to Barb Martin's deposition. Dkt. #4032 (10/15/21 Trial Tr.) [*Martin*] at 2372:25.

responsibility of conducting due diligence back onto Atwell.  P-08182 at 001-004; Dkt. #4032 (10/15/21 Trial Tr.) [*Martin*] at 2374:1 – 2377:10, 2380:17 – 2383:9.  Notably, one of these same Walgreens stores was the subject of the 2013 settlement agreement between Walgreens and the DEA.  Dkt. #4032 (10/15/21 Trial Tr.) [*Martin*] at 2377:11 – 2379:12.  The exhibit was relevant because it demonstrated that Walgreens' corporate office was not implementing effective controls against diversion as it relates to suspicious order monitoring.  Moreover, its admission could not have prejudiced Defendants, given that it was only discussed for eleven minutes out of a six week trial and it related to Plaintiffs' distribution theory of liability, which they dropped well before the jury began deliberations.  Accordingly, the admission of this exhibit was proper and does not warrant a new trial.

**P-14540**.  This document is an internal Walmart e-mail chain dated November 11, 2015.  P-14540.  As a preliminary matter, Plaintiffs' counsel questioned Brad Nelson regarding this document for approximately eight minutes, during which time defense counsel *did not object once*.  Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3885:9 – 3889:16.  It was not until the following day, when the document was formally offered into evidence, that Walmart's counsel objected to its admission based solely on geographic scope.[129]  Accordingly, Defendants should be deemed to have waived their objection to this document by failing to timely assert it.  *Supra* at pp. 36-37.  Regardless, Defendants' objection is substantively without merit as the document is directly material to issues in this case.  In P-14540, a Walmart pharmacy manager initially e-mailed Walmart Health and Wellness Director, Mickey Boles, to inform him that, going forward, Walmart Pharmacy #20 (in Missouri) would no longer be filling prescriptions for a particularly problematic prescriber who had been "prescribing numerous C-II prescriptions for patients that we do not believe have a medical need for them."  P-14540 at 002.  *See also* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3885:13 – 3887:24.  Significantly, although Walmart had previously prohibited blanket

---

[129]  Dkt. #4090 (10/26/21 Trial Tr.) at 4302:15-16 ("MS. FUMERTON: We have objection [*sic*] to the geographic scope, but over objection it can come in.").

refusals to fill, five months *prior* to this e-mail being sent *Walmart changed their policy to no longer prohibit blanket refusals*.[130]  Yet when forwarded this e-mail by Boles, Brad Nelson responded that the pharmacy should *not* be implementing blanket refusals to fill.[131]  This evidence is highly relevant, as it demonstrates that Walmart's corporate office was not providing accurate guidance to its pharmacists and was in fact encouraging them to continue filling prescriptions for prescribers that the pharmacists knew to be problematic and that appeared likely to be diverted. P-14540.  The fact that the advice was given to a Missouri pharmacist is immaterial, as the relevant policies applied equally to all Walmart pharmacies,[132] and Nelson (and others) consistently gave this same inappropriate guidance to Walmart pharmacists across the country (including in Ohio). *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3863:1-14, 3868:1-6, 3872:9 – 3873:3, 3879:2-10, 3881:1-5, 3892:3 – 3893:25, 3896:17 – 3898:17, 3900:19 – 3902:20, 3903:17 – 3907:3, 3907:25 – 3908:10, 3916:16 – 3917:22; P-26890.  Moreover, its admission could not have prejudiced Defendants, given that it was only discussed for eight minutes out of a six-week trial. Accordingly, the admission of this exhibit was proper and does not warrant a new trial.

**P-42147-A**.  This exhibit is the *Holiday* decision and order.[133]  This administrative decision by the DEA includes a finding by the Chief Administrative Law Judge that two CVS pharmacies

---

[130]  *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3883:19 – 3884:5, 3885:13-17 ("Q: Okay.  This is one where Micah Charles has sent an e-mail out on refusal to fill, and this is November 11th.  So we're five months after that e-mail about the POM no longer prohibits blanket refusals; right?  A: It is after that date.").

[131]  P-14540 at 001 ("The communication from Micah indicates that they are blank refusing to fill prescriptions for a specific prescriber.  Understand that this is not a best practice and boards of pharmacy grant professional judgment for individual prescriptions and not for prescribers. . . .  RX's must be evaluated on an individual basis and red flags identified. . . .  [N]o blanket refusals are allowed by Boards of Pharmacy."); Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3887:25 – 3888:25, 3889:1-4 ("Q: And in your cut and paste section you e-mail, 'No blanket refusals are allowed by the boards of pharmacy.'  You're still saying that, aren't you?  A: Yes, sir.").

[132]  *See, e.g.,* Plaintiffs' Rule 50(b) Opp. at p. 67.

[133]  Defendants refer to this document as an "out-of-state settlement[,]" but the *Holiday* decision is not actually a settlement; it is an administrative decision by the DEA.  *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012).  There is a settlement associated with the conduct at issue in *Holiday*, but that is a (footnote continues on next page)

in Florida violated the CSA in their dispensing of controlled substances, including opioids, to such an extent that it was necessary to revoke their registration.  P-42147-A; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 625:3-18.  Given that CVS had national dispensing policies that applied to all their pharmacies,[134] this decision demonstrates that CVS was on notice that the federal government did not consider these policies to be adequate.  It is also relevant because CVS created a number of new national policies and procedures (and updated others) in direct response to that decision (and the related settlement).[135]  There was also evidence adduced at trial that not all CVS pharmacists were aware of the *Holiday* decision,[136] supporting Plaintiffs' argument that CVS was not providing adequate guidance and training to its pharmacists.  *See, e.g.*, Plaintiffs' Rule 50(b) Opp. at pp. 31-33, 38, 53055, 60, 72-74, 78.

Moreover, the relevance of the *Holiday* decision is not limited to CVS.  This was a decision published on the Federal Register, which was available to all CSA registrants.  *Holiday CVS*, 77

---

different exhibit.

[134]  *See, e.g.,* Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5876:14-16 ("Q: And the policies and the training that applied in Florida applied all over the U.S., didn't it?  A: It did."); *see also* Plaintiffs' Rule 50(b) Opp. at pp. 46-47).

[135]  *See, e.g.,* Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5663:6-18 ("Q: Okay.  Did your group work on any response to that?  A: Yes.  Our store monitoring program, our Prescriber program, a number of the things that we do were built partly in response to that.  We took that even seriously.  Q: Okay.  Let me step back.  Your group did your group develop new programs in response to that incident?  A: Yes.  Q: Did those programs – and you mentioned store monitoring and prescriber monitoring.  We'll get into those.  Did they apply only to Florida, only to one town in Florida, or did they apply to all of CVS's pharmacies?  A: We applied them to all of CVS's pharmacies."), 5668:4-7, 5721:8-11, 5732:12-15 ("[W]e learned from the *Holiday* case.  And we took that information to be able to use it to be able to create programs, to be able to try to make sure that it didn't happen again."), 5797:25 – 5798:7 ("Q: And then in 2012 is when the decision finally is coming out on *Holiday*, correct?  A: Correct.  Q: And that decision, as Mr. Delinksy said, was a big deal within the company, wasn't it?  A: It was.  Q: Got you your new job position, didn't it?  A: Yes."), 5800:11-16 ("Q: Well, we'll get to more of that in a moment.  But let me just get you to at least agree that during this phase II time, after *Holiday*, that's when your company started sending out documents like you and Mr. Delinsky talked about, DEA & Pharmacy Regulatory Training; true?  A: Yes."), 5892:19 – 5893:3; *see also* Plaintiffs' Rule 50(b) Opp. at p. 63).

[136]  *See, e.g.,* Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6578:5-9 ("Q: Did they cover the Holiday CVS case?  A: No, sir.  That doesn't ring a bell to my knowledge.  Q: And it doesn't ring a bell even with you today, does it?  A: No, sir.").

FR 62316-01, 2012 WL 4832770.  The evidence adduced at trial demonstrates that Defendants were well aware of this order.[137]  In the decision, the DEA extensively discussed red flags in the context of controlled substance prescriptions.  P-42147-A.  Thus, it was relevant to show that Defendants knew that they were obligated to identify and resolve red flags associated with opioid prescriptions.[138]  This was particularly relevant in this case, since Defendants repeatedly emphasized to the jury that the concept of "red flags" is not explicitly referenced in the CSA.[139]

---

[137]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 394:12-16 ("Q:…. Sir, you read this case, didn't you?  A: I read – yes, sir.  Q: And you read this case because it's important to your policies, isn't it?  A: Yes."), 399:11-16; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5205:5-7 ("Q: Well, not just from your experience, ma'am.  I'm sure you've read the *Holiday* case, haven't you?  A: Yes, I have."); Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2486:18 – 2487:1; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3855:19 – 3856:1; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5661:18-21 ("Q: Okay.  We've heard a lot in the case about the *Holiday* action in Florida?  Do you know about the *Holiday* action?  A: I do.  It happened before I took on this role, but I'm very well aware of it."), 5794:17-19 ("Q: Well, I know you weren't in your role at that time, but you have read the *Holiday* case very carefully, right?  A: Yes."), 5795:4-5.

[138]  *See, e.g.*, Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 395:22 – 398:5; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 945:5-19, 946:3 – 947:3, 947:22 – 948:3, 987:12-14; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1340:7-14; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1697:12 – 1689:11 ("Q: But when *Holiday* happens, is that done confidentially, or is that something people in the business would know about?  A: Oh, no, it was in the news, and people would understand.  Plus the final order is a record of an agency decision and an agency – what the agency believed was the violation.  So the final order in and of itself is notice.  We also provided notice through the media.  The Department of Justice, I believe, and DEA both put out press releases on it to tell the world this is what happened and this is why it happened."), 1774:10-12; Dkt. #4132 (11/8/21 Trial Tr.) [*Ashley*] at 6624:10-14 ("Q: So with respect to your personal knowledge over all the years that you worked at the DEA, would you agree that the DEA helps the defendants know the law and regulations associated with dispensing opioid products?  A: Yes, I agree."), 6624:21 – 6625:5 ("Q: The DEA publishes, in the Federal Register, the results of enforcement actions brought against companies that violate the dispensing regulations of the DEA – of the Controlled Substances Act?  A: Yes, that's true.  Q: With respect to dispensing enforcement actions that have been brought against CVS and Walgreens and Walmart and Rite Aid, isn't it true that the DEA publishes adjudications, information about these enforcement actions?  A: In my personal recollection, yes.").

[139]  *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1228:3-14 (Ms. Fumerton: "Q: And so I want to spend some time talking really specifically about where in those well-defined laws and regulation it refers to red flags and documentation and so I'm just setting the stage, sir, of the sort of questions that are going to come up.  Nowhere in the Controlled Substances Act do the words 'red flags' appear, correct?  A: Correct.  Q: And nowhere in the Controlled Substances Act does it list your 16 red flags that you described to the jury, correct?  A: Correct."); Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1340:7-14 (Mr. Swanson: "Q: And the red flags that you created for this litigation are different than the criteria that the DEA has identified in its *Pharmacist's Manual*, true?  A: No, sir, because the DEA
(footnote continues on next page)

Additionally, Defendants failed to timely object to P-42147-A at trial on the specific ground that it involved extraterritorial conduct.  During the October 4 pre-trial hearing, Defendants raised an objection to P-42147-A, but only on hearsay grounds.[140]  Special Master Cohen overruled that objection, agreeing the *Holiday* decision "goes to notice."  Dkt. #3992 (10/4/21 Pre-Trial Hearing Tr.) at 27:5-7.  Plaintiffs then proceeded to question multiple witnesses over several days regarding *Holiday*; defense counsel did not contemporaneously object to most of these questions, and the objections they did make were not specifically as to its extraterritorial nature.[141]  CVS's counsel finally objected to *Holiday* on extraterritorial grounds on the morning of October 13, which the Court then overruled.[142]  Because Defendants did not assert this specific objection in a timely manner, it should be deemed waived.  *Supra* at pp. 36-37.  For all these reasons, P-42147-A was properly admitted and does not warrant a new trial.

---

clarified the pharmacy manual by the Court actions it took in the *Holiday*, the *Hills*, the *East Main Street* pharmacies, and so the red flags I identified were identical to what the DEA has said, sir.").

[140] Dkt. #3992 (10/4/21 Pre-Trial Hearing Tr.) at 25:11-23 (Mr. Hynes: "Our other objection is to P-42147, and it's the Holiday decision.  We would have objections, hearsay objections to certain of that. . . .  We have hearsay objections to certain parts of that ruling.  We recognize that some parts may satisfy the public records exception, but the parts of that ruling that just state or describe what the law is don't apply the law to the facts, we don't think meet the exception and we don't think plaintiffs can use that ruling to displace the role of Judge Polster to instruct the jurors on what the applicable law is.").

[141] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 379:17-22, 392:7 – 393:8, 393:9-18 (objecting as to "no foundation here for personal knowledge of the underlying facts"), 393:25 – 398:5, 398:6-12 (objecting that Plaintiffs' counsel was "just quoting now an expert witness from another case"), 398:24 – 399:3 (no basis for objection identified), 399:7-16, 399:17-20 (no basis for objection identified), 399:25 – 400:6; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 625:3 – 626:7, 626:9-10 (objecting as "outside the scope of both her opinion and her expertise"), 626:15 – 627:5; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1488:9-24 (no basis for objection identified), 1489:2-20 (same), 1490:14 – 1491:7.

[142] Dkt. #4023 (10/13/21 Trial Tr.) at 1634:14-17 (Mr. Delinsky: "But, Your Honor, there are 402 issues here and 403 issues.  This case is not about two pharmacies in Florida; it's about the pharmacies here."), 1635:20-22 (Mr. Delinsky: "Your Honor, we object to any of this coming in under 402 and 403 in that it's Florida, but --"), 1635:23-24 ("Well, that's overruled, but it's very relevant."), 1636:1-12 ("MR. DELINSKY: If the testimony is limited to that line that you said, that resolves another layer of our objections; not our global objection as to why we're talking about Florida in a case about 14 pharmacies in two counties in Ohio.  THE COURT: Because, Mr. Delinsky, all the evidence has been clear, all these defendants had national policies, okay?  They had national policies as to what pharmacists were to do and not to do.  And so something that happens in Florida in the time period is directly relevant.  So I've overruled that and I'll continue to overrule objections."), 1636:23 – 1637:3.

Finally, even if these three exhibits were improperly admitted (which they were not), Defendants certainly have not demonstrated that the exclusion of those exhibits, or of any of the extraterritorial evidence, would have caused a different outcome at trial.  They simply state, in conclusory fashion, that it inflamed and confused the jury, leading the jury to believe "it could, or even *should*, hold Defendants liable for what they did anywhere in the country . . ."  Dkt. #4204 (Ds' MNT) at p. 38.  Defendants entirely fail to substantiate these assertions.  *Id.*[143]  *See supra* at fn.32.  This is not surprising, as the record clearly demonstrates the jury was neither inflamed nor confused.  Throughout the entire trial, the jury paid close attention to the testimony and asked witnesses detailed, insightful questions.[144]  It deliberated for almost a week before reaching its unanimous verdict.  It was also made clear to the jury that Defendants could only be held liable for the harm their conduct caused in the Counties.[145]  Defendants have utterly failed to satisfy their

---

[143]  The case Defendants cite to support this conclusory proposition is inapposite.  *See Stern v. Shouldice*, 706 F.2d 742, 750 (6th Cir. 1983) (in professor's suit against college based on professor's termination that allegedly resulted from professor's advice that student seek legal counsel about his suspension, trial court did not abuse its discretion in excluding evidence that marijuana was found in the car the student took from college during the episode which gave rise to the student's suspension on ground that it would inflame or confuse the jury).

[144]  *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) at 3582:5-10 ("Ladies and gentlemen, first I want to compliment you all on those excellent questions.  You know, I have this practice, but I've done it in other trials.  I've never had such probing questions, and it shows each of you has really been paying attention to some very complex testimony."); Dkt. #4078 (10/25/21 Trial Tr.) at 3787:5-10 ("I have no idea what they're going to do at the end, but I know it's going to be based on attention and detail and doing the right thing.  Because they're paying attention all the time.  Every time I look at them, they are focused.  All right?  They're not daydreaming.  They're not wandering.  They're not dozing."); Dkt. #4118 (11/4/21 Trial Tr.) at 5912:10-15 ("[C]andidly, the jurors have had terrific questions. . . .  It really shows they're following.  I mean, some pretty detailed questions that you only have if you're really, really focused.").

[145]  Dkt. #4153 (11/15/21 Trial Tr.) at 7329:1-24; Dkt. #3991 (10/4/21 Trial Tr.) at 22:1-4 ("The counties allege these suspicious shipments and illegitimate prescriptions caused a public nuisance, which is defined as an ongoing substantial interference with the public health *in their counties*.") (emphasis added); *see also* Dkt. #4153 (11/15/21 Trial Tr.) at 7143:16-18 (Mr. Lanier: "Because one of the things the judge has us – we're required to prove is that there is an epidemic that has caused a public nuisance in each of these counties."), 7171:5-7 (Mr. Lanier: "In answering the judge's questions, your concern is these two counties and the actions of these defendants as it has affected these two counties."), 7213:8-12 (Mr. Swanson: "As you've heard from the jury instructions, and as I mentioned a bit earlier, in order to prevail, plaintiffs have to prove that Walgreens was a substantial, a substantial factor in causing the opioid epidemic in Lake County and in Trumbull County."), 7217:4-6 (Mr. Swanson: "Plaintiffs have (footnote continues on next page)

heavy burden in demonstrating a new trial is warranted due to the admission of extraterritorial evidence. *Supra* at p. 2.

L. **The Court's jury instructions fairly and adequately submitted the issues and applicable law to the jury.**

Defendants claim a new trial is a warranted based on the instructions given to the jury because the Court (i) "left out case-specific instructions it should have given," (ii) "gave specific instructions it should not have given," and (iii) "erred in the instructions that all agree were necessary." Dkt. #4204 (Ds' MNT) at p. 38. Defendants appear to request a new trial based on every one of their prior objections and rejected proposed instructions. Dkt. #4204 (Ds' MNT) at p. 38 (citing the entirety of their 34-page proposed instructions and verdict form (Dkt. #4146-1) to support their argument that the Court "left out case-specific instructions it should have given" and citing the entirety of their 37-page objections to the Court's final jury instructions and verdict forms (Dkt. #4146-2) to support their argument that the Court "gave specific instructions it should not have given"). But Defendants only specifically identify and discuss a few of the purportedly improper instructions and verdict form questions in their motion. Aside from these few examples (which are addressed below), Defendants fail to sufficiently identify their specific objections to the Court's jury instructions in their motion and should be deemed to have waived such objections. *Supra* at fns.32, 119. Even assuming, *arguendo*, that their non-specified objections have not been waived, they are entirely without merit for the reasons set forth in prior briefing and the Court's previous rulings.[146]

---

to show that our conduct was a substantial factor in what's going on in the counties today.").

[146] *See, e.g.,* Dkt. #3449 (CT1B Joint Submission re: Instructions/Verdict Form) at pp. 2-5, 17, 19, 21, 23, 25, 28, 32, 35, 41-42, 44-45, 52-127; Dkt. #3548 (CT3 Ps' Response re: Statutes/Regs in Instructions); Dkt. #3550-2 (Ex. B to CVS Response); Dkt. #3793 (CT3 Joint Submission re: Instructions/Verdict Form) at pp. 1-4, 11-20, 23-48; Dkt. #4127 (CT3 Ps' Response to Ds' Objection to Final Instructions); Dkt. #4148 (Ps' Response to Ds' 11/12/21 Submission re: Instructions/Verdict Form); Dkt. #2715 (CT1A Joint Submission re: Instructions/Verdict Form) (including all exhibits); **Ex. D** (CT1B Ps' 4/29/20 Letter Response; Dkt. #3615 (CT3 Ps' Obj. to Ds' Response); **Ex. C** (10/2021 E-mail Chain) at pp. 1-2; Dkt. #4062 (Ps' Proposed Instruction on Settlements); Dkt. #3913 (CT3 GE MSJ Order); Dkt. #3403 (CT3 MTD Order); Dkt. #3499 (CT3 Reconsideration Order); Dkt. #3883 (CT3 Ps' Trial Brief); Dkt. #4218 (Ps' Opp. to GE MSJ) at pp. 22-24, 44-46, 49-51; Dkt. #3366 (CT3 Ps' MTD Opp.); (footnote continues on next page)

The few objections they discuss in their motion are also without merit.  Defendants first argue that the Court improperly instructed the jury regarding unlawful dispensing, intentional conduct, and causation.  Dkt. #4204 (Ds' MNT) at p. 38.  They do not explain in the motion itself *how* these instructions were improper, inaccurate, confusing, misleading, or prejudicial.  Instead, for the unlawful dispensing and causation instructions, Defendants simply cite to the respective page in their objections that shows their redline of each proposed instruction.  *Id*. at p. 38 (citing Dkt. #4146-2 at pp. 21, 24).[147]  And they provide no citation whatsoever to support their argument that the Court's instruction on intentional conduct was improper.  Even assuming these issues have been adequately briefed in the motion (they have not, *supra* fn.32), their previously-asserted objections regarding each of these instructions are without merit, for the reasons set forth in prior briefing and the Court's previous rulings.[148]

Defendants also offer the following vague criticisms related to the Verdict Form questions:

[T]he first question on the verdict form asked only if there was a nuisance caused by "oversupply" and "diversion" of opioids in Plaintiff counties.  Of course, large amounts of opioid medications prescribed for medical use and dispensed in compliance with the CSA can hardly form the basis of nuisance liability.  Dkt. 4146-2 at 35.  Nor did the Court separate out whether the jury found that Defendants (1) unlawfully and/or intentionally and culpably caused any such nuisance.  The causation question on the verdict form was similarly flawed, as was

---

Dkt. #654 (CT1 Ps' MTD Opp.); Dkt. #2171 (CT1 Ps' Opp. to Preemption MSJ); Dkt. #2179 (CT1 Ps' Opp. to SOL MSJ); Dkt. #3002-1 (CT1 Ps' Opp. to Causation MSJ); Dkt. #3004-1 (Ps' Opp. to SOL MSJ); Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ); Dkt. #2170 (CT1 Ps' Opp. to Nuisance MSJ); Dkt. #2578 (CT1 Order on Ds' Nuisance MSJ); Dkt. #208 (CT1 Ps' MTD Opp.); Dkt. #1025 (CT1 R&R on MTDs); Dkt. #1203 (CT1 Order Adopting R&R); Dkt. #2561 (CT1 Causation MSJ Order); Dkt. #3012 (CT1 Ps' Nuisance MSJ); Dkt. #2170 (CT1 Ps' Opp. to Ds' Nuisance MSJ).

[147] Defendants do not even cite to the pages of their objections that contain the majority of their arguments supporting their objections to those specific instructions.  *See* Dkt. #4146-2 at pp. 22-23 (unlawful dispensing), pp. 25-31 (causation)).

[148] *See, e.g.,* Dkt. #3793 (CT3 Joint Submission re: Instructions/Verdict Form) at pp. 26, 28-37, 41-42; Dkt. #3449 (CT1B Joint Submission re: Instructions/Verdict Form) at pp. 28 & n.8, 32, 35, 67, 76, 78, 93-96; Dkt. #3548 (CT3 Ps' Response re: Statutes/Regs in Instructions); Dkt. #3550-2 (Ex. B to CVS Response); Dkt. #4127 (CT3 Ps' Response to Ds' Objection to Final Instructions) at pp. 1-4; Dkt. #3615 (CT3 Ps' Obj. to Ds' Response) at pp. 3-6; Dkt. #2715-2 (Ex. 2 to CT1A Joint Submission) at pp. 10-11, 17; Dkt. #2715-3 (Ex. 3 to CT1A Joint Submission) at pp. 80, 84-87, 89-91, 94-99, 102-103; **Ex. D** (CT1B Ps' 4/29/20 Letter Response) at pp. 3-6, 11, 13.  *See also supra* at fn.146.

95

the fact that the Court allowed the jury to find Defendants liable based on intentional conduct that was lawful under the CSA.  *See, e.g., id.* at 36-37.

Dkt. #4204 (Ds' MNT) at p. 39.  As to the first issue, Defendants cite to their previously asserted objection, in which they argued that the "jurors could easily be confused and believe that they can find a Pharmacy Defendant liable merely because that Defendant was a substantial factor in a 'oversupply' of prescription opioids—regardless of any wrongful conduct or any contribution to actual diversion."  Dkt. #4146-2 (CT3 Ds' Objections to Final Instructions/Verdict Form) at p. 35.  Their objection makes no sense.  The Verdict Forms clearly asked whether the Counties proved that the oversupply of legal prescription opioids *and* the diversion of those legal prescription opioids into the illicit market constituted a public nuisance.  *Id.*; Dkt. #4153 (11/15/21 Trial Tr.) at 7329:6-10, 7329:23-24.  In other words, the jury could not answer yes to that question if they determined there was oversupply but no diversion.  Moreover, the second question then asked whether the Counties proved that any of Defendants "engaged in *intentional and/or illegal conduct* which was a substantial factor in producing *the public nuisance that you found exists in Question 1*[.]"  Dkt. #4146-2 (CT3 Ds' Objections to Final Instructions/Verdict Form) at p. 36 (emphasis added); Dkt. #4153 (11/15/21 Trial Tr.) at 7329:12-17, 7329:23-24.  Thus, it was clear to the jury that not only must there be oversupply *and* diversion to constitute a nuisance, but that the defendant needed to have engaged in unlawful or intentional conduct that was a substantial factor in causing that specific nuisance.  Defendants' objection to the first question should be rejected.[149]

Defendants' complaints about the second question are also without merit.  They argue that it (i) should have required separate findings as to unlawful and intentional conduct that caused the nuisance, and (ii) improperly allowed the jury to find Defendants liable for intentional lawful conduct.  Dkt. #4204 (Ds' MNT) at p. 39.  Defendants provide no additional argument in their motion, but instead merely cite to their previously-asserted objection.  *Id.*; Dkt. #4146-2 (CT3 Ds'

---

[149]  *See also, e.g.,* Dkt. #3793 (CT3 Joint Submission re: Instructions/Verdict Form) at pp. 18-20, 23-25, 47-48; Dkt. #3449 (CT1B Joint Submission re: Instructions/Verdict Form) at pp. 126-127.

Objections to Final Instructions/Verdict Form) at pp. 36-37; *supra* at fn.32.  But the only legal authority they cite in those objections to support their position is Federal Rule of Civil Procedure 49, which simply gives courts the discretion to offer separate questions to the jury, and a Fourth Circuit case that is inapposite.  *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 313-14 (4th Cir. 2012) (general verdict on damages could be upheld, even after court reversed jury's verdict on some claims, since jury had completed special verdict form as to liability, claims were predicated on same conduct and maximum recovery for each claim was the same, and remaining claim offered most generous relief).  As discussed in prior briefing and the Court's previous rulings, under Ohio law a public nuisance can be based on either unlawful *or* intentional conduct (even if the intentional conduct is lawful).[150]  Moreover, the jury was specifically instructed: "Conduct that is fully authorized by a statute, ordinance, or regulation cannot create a public nuisance because it is lawful conduct.  But if a person's conduct does not comply with what is authorized by law, then that conduct may be unlawful conduct."  Dkt. #4153 (11/15/21 Trial Tr.) at 7074:19-23.  Thus, the jury could not have found Defendants liable for nuisance to the extent it determined that Defendants' conduct was "fully authorized" by federal or Ohio statute or regulation.  *Supra* at fn.3.  However, intentional conduct that is technically lawful, but not "fully authorized" by statute or regulation, is an appropriate basis on which to find public nuisance liability.  *Supra* at fn.150.

The jury instructions and Verdict Form questions provided by the Court were not erroneous, confusing, misleading, or prejudicial.  Thus, the cases cited by Defendants are distinguishable.  *See Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 579-80 (6th Cir. 2013) (jury instruction that it was permissible for advertisement to focus on suitability of apartment for renter was legally erroneous and prejudicial enough to warrant new trial, following

---

[150]  *See, e.g.,* Plaintiffs' Rule 50(b) Opp. at pp. 97-99; Dkt. #3449 (CT1B Joint Submission re: Instructions/Verdict Form) at pp. 126-127; Dkt. #3793 (CT3 Joint Submission re: Instructions/Verdict Form) at pp. 18-20; Dkt. #4127 (CT3 Ps' Response to Ds' Objection to Final Instructions) at pp. 2-3.  *See also supra* at fn.146.

verdict that Fair Housing Act was not violated by landlord's ad describing apartment as "great bachelor pad for any single man looking to hook up"; instruction would allow ads to indicate preferences that were forbidden by the FHA, essentially leaving jury with no option but to find for landlord because ad clearly focused on suitability of apartment for a single man); *Jones v. Federated Fin. Rsrv. Corp.*, 144 F.3d 961, 966-67 (6th Cir. 1998) (trial court "erred by refusing to include an apparent authority jury instruction" in action alleging negligent violation of Fair Credit Reporting Act); *Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 250 (6th Cir. 1991) (jury instruction that allowed finding of liability in insureds' action against insurance agents based on oral contract, without clearly requiring that jury find that oral contract was supported by consideration or detrimental reliance separate and apart from premiums on existing written contract, was prejudicial error, where only basis for liability against agents was alleged oral contract, which was not supported by consideration).

**M.  The extraordinary remedy of a new trial based on cumulative error is not warranted.**

"To justify the extraordinary remedy of a new trial based on cumulative error,"[151] Defendants must show that show that the aggregate effect of "individually harmless errors was so prejudicial as to render [the] trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). Further, to warrant a new trial, the cumulative effect of the errors must have "deprived [Defendants] of a trial consistent with constitutional guarantees of due process." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012). Defendants cannot make that showing here. *See* Dkt. #4204 (Ds' MNT) at pp. 39-40.

As shown above, the "errors" Defendants identify do not constitute errors in the first place. The Sixth Circuit has held that a "cumulative-error analysis should evaluate only the effect of matter[s] determined to be in error, not the cumulative effect of non-errors." *United States v.*

---

[151] *United States v. Pamatmat*, No. 11-20551-18, 2017 WL 2262975, *5 (E.D. Mich. May 23, 2017), *aff'd*, 756 F. App'x 537 (6th Cir. 2018). *See also Smith v. McQuiggin*, No. 2:09-CV-215, 2011 WL 4824492, *6 (W.D. Mich. Oct. 11, 2011) ("Smith has not met his burden of showing that the instant case is an exceptional or extraordinary one where the 'cumulative error' principle may be invoked.").

*Buford*, 106 F. App'x 400, 405 (6th Cir. 2004).[152]  "The mere addition of numerous insubstantial complaints of trial error will not lead to a successful 'cumulative error' argument."  *McQuiggin*, 2011 WL 4824492, at *6 (citing *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)).  And even assuming, *arguendo*, that the Court did err, any errors were minor and occurred against both sides.  *See Mich. First Credit Union v. Cumis Ins. Soc., Inc*., 641 F.3d 240, 251 (6th Cir. 2011) ("[M]ost of the purported errors identified by CUMIS do not constitute error in the first instance, and the relatively minor errors that did occur do not warrant reversal, even when considered cumulatively. While the trial in this case 'may not have been perfect, . . . it was fair.'") (quoting *United States v. Ashworth*, 836 F.2d 260, 268 (6th Cir. 1988)).

Indeed, the showing of an error is not automatically grounds for a new trial.  *Grida*, 2013 WL 12228991, *3; *Chiaverini, Inc. v. Frenchie's Frine Jewelry, Coins, Stamps, Inc*., 2008 WL 408415, *1 (E.D. Mich. 2008).  The Sixth Circuit has stated that, "[t]o constitute grounds for granting a new trial, an error, defect or other act must affect the substantial rights of the parties."  *Walker v. Bain*, 257 F.3d 660, 670 (6th Cir. 2001) (citing FED. R. CIV. P. 61).  *See also Risher v. United States*, 2011 WL 1626776, *1 (W.D. Tenn. 2011) (citing 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, 2805 (2d ed. 2010)) ("Thus it is only those errors that have caused substantial harm to the losing party that justify a new trial.  Those errors that are not prejudicial do not call for relief under Rule 59.").  A court must "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

---

[152]  *See also Trujillo*, 376 F.3d at 614 (holding defendant was not entitled to new trial based upon cumulative errors; only error was admission of hearsay statements, which was determined to be harmless error, so that there was no showing that defendant was denied a fundamentally fair trial); *Sypher*, 684 F.3d at 628 ("Where, as here, no individual ruling has been shown to be erroneous, there is no "error" to consider, and the cumulative error doctrine does not warrant reversal."); *United States v. Smith*, 928 F.3d 1215, 1233 (11th Cir. 2019) ("But where there is no error or only a single error, there can be no cumulative error."); *Conner v. Larose*, No. 1:15 CV 2722, 2017 WL 4155352, *11 (N.D. Ohio May 31, 2017), *report and recommendation adopted*, No. 1:15CV2722, 2017 WL 4150891 (N.D. Ohio Sept. 18, 2017) ("[T]he doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent.") (applying Ohio law).

FED. R. CIV. P. 61; *see also Risher*, 2011 WL 1626776, at *1 ("[A] trial court should be most reluctant to set aside that which has previously been decided unless convinced that it was based on a mistake of fact or clear error of law, or that refusal to revisit the earlier decision would work a manifest injustice."); *Grida*, 2013 WL 12228991, at *3.

Defendants claim that the errors at issue are not only the ones they identify and discuss at length in their motion, but "also include the many errors before and during the trial: the motions in limine the Court denied; the objections the Court overruled throughout trial; and the misconduct the Court let Plaintiffs' counsel get away with." Dkt. #4204 (Ds' MNT) at p. 40. Notably, aside from a single example (discussed *infra*), Defendants fail to: (i) provide any citations to the record or even identify the specific rulings to which they object;[153] or (ii) provide any legal authority or argument (not even citations to their own prior briefing) explaining why these unidentified rulings were incorrect. Dkt. #4204 (Ds' MNT) at p. 40. Thus, any complaint about such "errors" should be deemed waived as inadequately briefed. *Supra* at fn.32.[154]

Defendants offer only one example of these "many errors[,]" which was not actually an error at all. They complain that Plaintiffs' witness, Joe Rannazzisi, was allowed on re-direct to give "improper and undisclosed expert opinion" that Defendants were "rogue pharmacies." Dkt. #4204 (Ds' MNT) at p. 40. But during cross-examination, defense counsel specifically questioned Rannazzisi about that subject. *See* Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1731 – 1732, 1741, 1779. Moreover, Rannazzisi's testimony that Defendants challenge was based directly on his DEA experience; it was not an expert opinion. *See id.* at 1811 ("Q: *Based on your tenure and experience . . .*") (emphasis added). *See also* Dkt. #4017 (10/12/21 Trial Tr.) at 1495

---

[153] Defendants appear to be arguing that every ruling the Court ever issued against them constitutes an error. But neither the Court nor Plaintiffs should be expected to parse through not only the entire historical record of these CT3 cases, but also the various prior rulings from the MDL generally that applied to these CT3 cases, to determine what additional "errors" exist. *Supra* at fn.119.

[154] It is one thing for the parties to refer back to and incorporate by reference legal arguments from prior briefing and rulings, but Defendants bear the burden on a motion for new trial and they must identify with specificity each ground on which they assert a new trial is warranted. *See, e.g., supra* at pp. 1-3; FED. R. CIV. P. 7(b)(1)(B) (motions must "state with particularity the grounds for seeking the order").

(Court stating with regard to Rannazzisi that, "as a fact witness, I intend to apply the rules that apply to all fact witnesses, which he can't -- he can only testify to matters, statements, whatever, within his personal, personal knowledge and experience. . . . He can testify since he was a DEA official, he can testify to his understanding of what the DEA's position was at that time."). Numerous courts, including in the Sixth Circuit, have held that perceptions based on industry experience are a sufficient foundation for lay opinion testimony under Rule 701. *See, e.g.*, *United States v. Kerley*, 784 F.3d 327, 338 (6th Cir. 2015).[155]  Ohio state courts have similarly permitted lay witness testimony based on personal knowledge gained by virtue of the witness' employment.[156]  Rannazzisi's testimony was proper non-expert opinion.  Moreover, Defendants' Rule 402 and 403 arguments, based on Rannazzisi relying on extraterritorial enforcement actions to support his lay opinion, are unpersuasive for the reasons discussed in §§ II.D, K herein.

In short, Defendants fail to establish that the trial was fundamentally unfair.  This is unsurprising as the record clearly demonstrates the opposite: a fair and balanced trial that was adeptly handled by this Court.  The Court carefully considered each and every objection to evidence, giving each side ample time to address every issue.  *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) at 1609:7 – 1616:13; Dkt. #4023 (10/13/21 Trial Tr.) at 1622:2 – 1647:25, 1870:13 – 1875:14, Dkt. #4109 (11/1/21 Trial Tr.) at 5135:2 – 5140:9, 5141:19 – 5144:16, 5145:17 – 5149:9, 5153:19 – 5154:9, 5165:4  - 5184:2; Dkt. #4124  (11/7/21 Trial Tr.) at 6206:17 – 6212:21.  The Court issued extensive and timely rulings on *Daubert* motions and motions *in limine*.  *See* Dkt. #3929 (Rafalski *Daubert* Order); Dkt. #3946 (Keyes *Daubert* Order); Dkt. #3947

---

[155]  *See also States v. Valencia*, 600 F.3d 389 (5th Cir. 2010); *U.S. Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009); *United States v. Rigas*, 490 F.3d 208, 222-24 (2d Cir. 2007); *Authentic Apparel Grp., LLC v. United States*, 134 Fed. Cl. 78, 83 (2017) ("Courts have admitted opinion testimony from lay witnesses even when based on the witnesses' experience or knowledge obtained in their profession, rather than on their own observations and personal perceptions respecting the incident in question . . . .").

[156]  *See, e.g.*, *Hetzer-Young v. Elano Corp*., 2016-Ohio-3356, ¶ 59, 66 N.E.3d 234, 249 (permitting lay witness testimony from flight instructor about airplane engine "based on the knowledge and experience [the witness] had accumulated over many years around airplanes"); *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 107 (2d Dist.) (police detective could testify about typical behavior of children in child abuse cases based on his training and experience in such cases).

(Catizone *Daubert* Order); Dkt. #3948 (Alexander *Daubert* Order); Dkt. #3949 (McCann *Daubert* Order); Dkt. #3953 (Lembke *Daubert* Order); Dkt. #3967 (CT3 Evidentiary Order).  The Court was also ready to address every filing during trial promptly, even those filed early that same morning or late on the night before.  *See, e.g.,* Dkt. #4032 (10/15/21 Trial Tr.) at 2198:3 – 2205:7; Dkt. #4050 (10/19/21 Trial Tr.) at 2705:2 – 2720:11; Dkt. #4093 (10/27/21 Trial Tr.) at 4335:10 – 4336:3.  To now claim that "Defendants did not get a fair shake" is simply just not consistent with reality.  Dkt. #4204 (Ds' MNT) at p. 40.

"[A] finding of cumulative error in a civil case is rare[,]"[157] and Defendants cite no civil case from the Sixth Circuit in which a new trial has been granted based on a finding of cumulative error.  *Compare United States v. Knox*, 17 F. App'x 353, 358 (6th Cir. 2001) (finding no abuse of discretion where new trial was granted in criminal case based on prejudicial errors that "may have precluded the defendant [from] having the benefit of the presumption of innocence"); *Walker v. Engle*, 703 F.2d 959, 968-69 (6th Cir. 1983) (affirming grant of a writ of habeas corpus based on cumulative effect of six trial errors; not only was it "clear that the cumulative effect of the conduct of the state was to arouse prejudice against the defendant to such an extent that he was denied fundamental fairness[,]" but the court also found that the methods utilized by the state to obtain a conviction offended a sense of justice); *Adams*, 722 F.3d at 832 (in a criminal case, granting a new trial based on six separate errors, including the erroneous admission of evidence that "caused great prejudice to defendants"); *see also supra* at fns.71, 81 (further distinguishing *Adams*). Moreover, the civil case Defendants cite from this Circuit, *Mich. First*, 641 F.3d at 249-51, supports denial of Defendants' motion here.  In *Mich. First*, the Sixth Circuit held that the plaintiff's counsel's inappropriate "golden rule" argument made in closing statements, as well as plaintiff's counsel's reference of certain "checklists" during opening statement that were not later entered into evidence, were minor errors that did not warrant reversal—particularly since the court's jury

---

[157] *Greig v. Botros*, 525 F. App'x 781, 795 (10th Cir. 2013).

instructions cured any prejudice—even when considered cumulatively. *See id.* Defendants' motion for a new trial should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Joint Motion for New Trial Under Rule 59 should be denied in its entirety.

Dated: January 20, 2022

Respectfully submitted,

*/s/ Jayne Conroy*
Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

*/s/ Joseph F. Rice*
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

103

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com
mca@lanierlawfirm.com

*Trial Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 20, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

/s/*Peter H. Weinberger*
Peter H. Weinberger