# EXHIBIT A

PETER H. WEINBERGER, OF COUNSEL
WILLIAM HAWAL
PETER J. BRODHEAD, OF COUNSEL
DENNIS R. LANSDOWNE
STUART E. SCOTT
NICHOLAS A. DICELLO
JEREMY A. TOR, LICENSED IN NY, OH
DUSTIN B. HERMAN
MICHAEL P. LEWIS, LICENSED IN CA, OH
KEVIN C. HULICK
EMILY DAVIS

CRAIG SPANGENBERG
(1914-1998)

NORMAN W. SHIBLEY
(1921-1992)

JOHN D. LIBER
(1938-2013)

October 1, 2021

**Sent via email at dan_polster@ohnd.uscourts.gov**
The Honorable Dan Aaron Polster
United States District Court, Northern District of Ohio
Carl B. Stokes United States Court House
801 West Superior Avenue, Courtroom 18B
Cleveland, OH 44113-1837

**RE:** *In re: National Prescription Opiate Litigation*, Case No. 1:17-md-02804, Response to Sept. 30, 2021 WAG Letter

Dear Judge Polster:

Plaintiffs write in response to Alex Harris's 9/30/21 letter to the Court, on behalf of Walgreens, objecting again to the admissibility of its 2011 and 2013 settlement agreements with the DEA and further objecting to any mention of the 2013 settlement agreement in Plaintiffs' opening statement. Walgreens' arguments are without merit and should be rejected.

Walgreens first states that it "does not agree with plaintiffs' suggestion that all of the highlighted portions of plaintiffs' hard-copy submission to the Court reflect legal admissions." It fails to identify which specific language does not constitute an admission. Nor does it provide any legal authority to support its argument. Walgreens also claims that "several of the purported admissions require clarification" and that "any mischaracterization in openings would constitute substantial (and incurable) prejudice." But Plaintiffs do not intend to mischaracterize any evidence at trial (in opening statements or otherwise). Walgreens' assertions are speculative and baseless.

Walgreens also notes that the 2013 settlement was not executed until years after the alleged conduct (which occurred primarily in 2010-2011). Plaintiffs are unclear as to the point Walgreens is trying to make. It is entirely unsurprising that a settlement would be executed after the wrongful conduct occurred. The DEA needed to first discover the conduct, then investigate it, then initiate an administrative action. That takes time. Walgreens fails to explain how this makes the settlement any less relevant. Moreover, the conduct at issue in the 2013 settlement took place within the time period relevant to Plaintiffs' claims. Dkt. #3967 (CT3 Evidentiary Order) at p. 21 ("In the upcoming trial, evidence of alleged misconduct after 2010 is obviously relevant to the existence of a

Judge Polster
Page 2 of 3
October 1, 2021

public nuisance in the Plaintiff Counties today. The Pharmacy Defendants' conduct, throughout the entirety of the relevant time period, is at the very heart of Plaintiffs' case.") (internal citation omitted); *see also id.* at p. 19 ("There is simply no question that evidence of alleged misconduct . . . before 2015 is relevant to the existence of a public nuisance in the Plaintiff Counties today.").

Walgreens next claims that the release provisions in the 2013 settlement are significantly broader than the allegations. But the broad nature of the releases Walgreens agreed to in no way negate the relevance of the settlement. In that agreement, Walgreens admitted that:

(i) "suspicious order reporting for distribution to certain pharmacies did not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007 and December 27, 2007[;]" and

(ii) "certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA . . . and §§ 801 et seq.) and its implementing regulations (21 C.F.R. Part 1300 et seq.)."

P-15 at pp. 2-3. The fact that Walgreens admitted that this distribution center and its pharmacies in Florida violated the CSA when distributing and dispensing controlled substances is entirely relevant to this case, where there is evidence that (i) Walgreens implemented its distribution and dispensing policies nationwide,[1] (ii) its Jupiter, Florida distribution center distributed opioids to pharmacies in the Track 3 Counties,[2] and (iii) opioids improperly distributed and dispensed in Florida migrated to other states, including Ohio (a phenomenon Walgreens was well aware of).[3] Dkt. #3058 (CT1A Evidentiary Order) at pp. 8-9, 12-15; Dkt. #3546 (CT1B Evidentiary Order) at p. 31.

---

[1] For example, in finding Walgreens violated its suspicious order reporting obligations under the CSA, the DEA noted that its practice of sending "a monthly report labeled 'Suspicious Control Drug Orders[,]'" violated the requirement that "suspicious orders are to be reported *as discovered*, not in a collection of monthly completed transactions." P-15 at 031 ("[Walgreens'] reports, consisting of nothing more than an aggregate of completed transactions, did not comply with the requirement to report suspicious orders as discovered, despite the title [Walgreens] attached to these reports."). This practice of using Suspicious Control Drug Order reports to "report" suspicious orders to the DEA was a nationwide practice. *See, e.g.,* Dkt. #1971-2 (Stahmann Tr.) at 288:10 – 289:4. Similarly, Walgreens' dispensing policies were implemented nationwide. Under its 2011 settlement agreement, Walgreens was required "to maintain a compliance program to detect and prevent diversion of controlled substances as required under the [CSA] and applicable DEA regulations" that "appl[ied] to all current and future Walgreens walk-in, retail pharmacies registered with the DEA in the United States and its territories and possessions." P-15317 at p. 2, ¶ 4(a). This included, *inter alia*, "policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations." *Id.* at p. 2, ¶ 4(c).

[2] *See, e.g.,* **Ex. A** (3/5/21 WAG ROG Responses) at p. 6.

[3] *See, e.g.,* **Ex. B** (P-19738) at 017-023 (in March 2009, Ohio BOP send email to all Ohio pharmacists regarding "a significant volume of prescriptions from physicians in Florida" who were "prescribing for patients from Ohio and Kentucky"); *see also* Dkt. #2815 (CT1A Ps' Omnibus MIL Opp.) at pp. 32-33, 84-85.

Judge Polster
Page 3 of 3
October 1, 2021

Walgreens argues that the conduct at issue in the 2013 settlement involved "very unusual fact patterns specific to circumstances in Florida" and that there is no suggestion that the dispensing violations at issue reflected national policies and procedures.  But the specific conduct the DEA found problematic in Walgreens' Florida pharmacies is the same type of conduct alleged to have occurred in this case,[4] including: (i) filling opioid prescriptions despite the presence of red flags that had not been resolved before dispensing; and (ii) implementing a "bonus program, combined with a concerted, corporate directed effort to increase oxycodone sales," which "served as an incentive for pharmacists and pharmacy technicians to ignore the 'red flags' of diversion presented by these prescriptions."  P-15 at 033, 035-36, 084-87, 091-93, 097-100, 105-112, 115-117, 121-125.

Walgreens also speculates that Plaintiffs may "suggest that [it] did not have certain 'compliance measures' in place nationwide because it agreed to implement such measures as part of the settlement[,]" despite the fact that it agreed to implement such measures to the extent they were not already in place.  Notably, Walgreens does not identify which compliance measures were already in place at the time the settlement was executed.  Regardless, exclusion is not warranted based on some hypothetical argument Plaintiffs may or may not make.  As previously mentioned, Plaintiffs have no intention of mischaracterizing any evidence.  If Walgreens believe Plaintiffs have done so, it can object at that time.

Finally, Walgreens notes that it "anticipates raising trial objections to the use of these settlements with particular witnesses, including based on a lack of personal knowledge."  But the mere fact that a party "might" object to a particular piece of evidence at trial is not a sufficient basis for preventing it from ever being offered at all.  Moreover, Walgreens does not explain which of the witnesses identified by Plaintiffs would not have personal knowledge of the settlements.  Walgreens' vague and speculative argument should be rejected.

Walgreens has provided no legitimate basis for precluding Plaintiffs' opening statement from detailing evidence of its 2011 and 2013 settlement agreements.  For this reason, its request for their exclusion should be denied.

Respectfully,

*s/W. Mark Lanier*

W. Mark Lanier
wml@lanierlawfirm.com

*s/Peter H. Weinberger*

Peter H. Weinberger
pweinberger@spanglaw.com

WML/PHW/ss
Enclosure
cc:   ext-track3defendants@groups.jonesday.com

---

[4]   See, e.g., Dkt. #3883 (CT3 Ps' Trial Brief) at pp. 3-7.