# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*County of Lake, Ohio v. Purdue Pharma L.P., et al.*,<br>    Case No. 18-op-45032 (N.D. Ohio)<br><br>*County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,<br>    Case No. 18-op-45079 (N.D. Ohio)<br><br>"Track 3 Cases" | **MDL No. 2804**<br>**Case No. 17-md-2804**<br>**Judge Dan Aaron Polster** |

# WALMART INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS
# MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii
INTRODUCTION .................................................................................................................... 1
ARGUMENT............................................................................................................................. 2
I.    NO REASONABLE JUROR COULD HAVE FOUND THAT WALMART ENGAGED IN UNLAWFUL OR INTENTIONAL, CULPABLE CONDUCT THAT CAUSED A PUBLIC NUISANCE................................................................................ 2
    A.    No Reasonable Juror Could Have Found That Walmart Engaged in Unlawful Dispensing Conduct ................................................................................ 2
    B.    No Reasonable Juror Could Have Found That Walmart's Dispensing Conduct Caused the Alleged Harm ........................................................................ 8
CONCLUSION......................................................................................................................... 10

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Barnett v. Carr ex rel. Est. of Carr*,
   No. CA2000-11-219, 2001 WL 1078980 (Ohio Ct. App. Sept. 17, 2001)............................2, 8

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982)...................................................................................................................4

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
   690 F. Supp. 256 (S.D.N.Y. 1988)............................................................................................3

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011).............................................................................................................3, 7

*Kramer v. Angel's Path, L.L.C.*,
   882 N.E.2d 46 (Ohio Ct. App. 2007)........................................................................................2

*Martin v. Cincinnati Gas & Elec. Co.*,
   561 F.3d 439 (6th Cir. 2009) ....................................................................................................8

*Metzger v. Pa., Ohio & Detroit R.R. Co.*,
   66 N.E.2d 203 (Ohio 1946) ......................................................................................................2

*Schwartz v. Honeywell Int'l, Inc.*,
   102 N.E.3d 477 (Ohio 2018) ....................................................................................................8

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 834 (1979).................................................................................8

G. Williams, Criminal Law § 57 (2d ed. 1961) .............................................................................3

**INTRODUCTION**

Walmart is entitled to judgment as a matter of law under Rule 50(b) for all the reasons offered in Defendants' Joint Brief as well as Walmart's individual Rule 50(b) brief. Plaintiffs' opposition brief offers little to respond to those arguments. Nothing in Plaintiffs' opposition demonstrates that they succeeded at trial in proving Walmart caused a public nuisance in Lake or Trumbull counties through unlawful or intentional conduct. In some places, Plaintiffs' response falters on the law, relying on preempted or otherwise invalid theories of liability. In others, Plaintiffs' response suffers factually, positing conclusory, disconnected statements without actual trial evidence to support it. Because Plaintiffs' case ultimately falls short on each element of their nuisance claim, the Court should enter judgment for Walmart.

*First*, no reasonable juror could have found that Walmart engaged in unlawful dispensing conduct that caused a public nuisance in Plaintiffs' Counties. The crux of Plaintiffs' case, repeated in their opposition brief, is that Walmart should be held liable for (1) a policy that required its pharmacists to evaluate each prescription on a prescription-by-prescription basis and (2) not creating and adopting a computer system in which its pharmacies shared refusal-to-fill data with one another. But neither the Controlled Substances Act nor its regulations require any such policy or system. In any event, the evidence shows that Walmart *did* have a policy for not filling illegitimate prescriptions (as determined by the pharmacist's professional judgment) and a system (computer-based Archer and informal store-to-store communication) for sharing refusal-to-fill information.

*Second*, no reasonable juror could have found that Walmart "intentionally and culpably" caused a public nuisance. At trial, Plaintiffs' sole argument was that Defendants intentionally dispensed opioid medications. Plaintiffs' opposition brief—once stripped of bare conclusory statements—asserts the same thesis. But because Walmart's dispensing conduct complied with

1

the CSA, Plaintiffs' intentional conduct theory is both preempted under federal law and not cognizable under Ohio nuisance law.

*Third*, no reasonable juror could have found that Walmart's five pharmacies were a substantial factor in causing a public nuisance in the Plaintiff Counties. Walmart dispensed only 3.15% of prescription opioids in Lake and Trumbull Counties from 2006 until 2014—and even Plaintiffs concede that the vast majority of those prescriptions were legitimately written to fulfill genuine medical need. Plaintiffs also did not "identify any specific prescription that was filled by any of the [Walmart] pharmacists in Lake or Trumbull County that was, in fact, diverted," or any specific individual at Walmart who did anything wrong. Dkt. 4005 at 804 (Oct. 7 trial tr., vol. 4). Plaintiffs' opposition brief focuses on the number of opioids Walmart dispensed, but it is uncontroverted that Defendants only ever dispensed opioid medications approved by FDA pursuant to the CSA, and Walmart cannot be held liable just for doing business as a pharmacy.

## ARGUMENT

**I.  NO REASONABLE JUROR COULD HAVE FOUND THAT WALMART ENGAGED IN UNLAWFUL OR INTENTIONAL, CULPABLE CONDUCT THAT CAUSED A PUBLIC NUISANCE.**

No reasonable juror could have found that Walmart engaged in either unlawful or intentional, culpable conduct. *See, e.g.*, *Barnett v. Carr ex rel. Est. of Carr*, No. CA2000-11-219, 2001 WL 1078980, at *10–11 (Ohio Ct. App. Sept. 17, 2001); *Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, ¶ 19 (Ohio Ct. App. 2007) (citing *Metzger v. Pa., Ohio & Detroit R.R. Co.*, 66 N.E.2d 203 (Ohio 1946)). Nor could they find that Walmart's conduct caused a public nuisance.

### A.  No Reasonable Juror Could Have Found That Walmart Engaged in Unlawful Dispensing Conduct.

Any dispensing duties imposed on Walmart must derive from the CSA's text or its regulations. At the motion-to-dismiss stage, however, this Court held that Walmart is subject to

additional dispensing-related duties at the corporate level, including "an affirmative obligation to protect not only against diversion via theft but also other forms of diversion more broadly." *See* Dkt. 3403 at 25; Dkt. 3499 at 5.  Walmart continues to disagree with that ruling.  *See, e.g.*, Dkt. 3439.  Even if the law imposes those additional requirements, however, no reasonable juror could have found that Walmart violated them.

As the Court has recognized, Plaintiffs face a steep hurdle in showing a breach of dispensing-related duty: They must show that Walmart acted with "deliberate[] ignoran[ce]" or "willful[] blind[ness]," not merely recklessly or negligently.  Dkt. 3499 at 7.  To meet the high threshold of willful blindness, a defendant must have taken "deliberate actions to avoid confirming a high probability of wrongdoing."  *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (citing G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961)).  Plaintiffs thus had to present evidence that Walmart (1) believed its pharmacists were violating the CSA and (2) intentionally took actions to avoid learning about it.  *See id.*

Because "[a] corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual," *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988), Plaintiffs cannot carry that steep burden through a theory of "aggregate knowledge" across all Walmart employees.  Plaintiffs thus had to produce evidence that *individual Walmart employees* were willfully blind to diversion, not that they would have been willfully blind if they knew what every other Walmart employee knew at a given moment in time.  *See* Dkt. 4256 at 7–8 (Defendants' Joint Reply Brief).  But Plaintiffs cannot and did not produce that evidence.  Instead, the evidence at trial established that Walmart always acted to ensure proper dispensing and has worked tirelessly to help its pharmacists carry out their corresponding responsibility—ensuring that Walmart pharmacists were not willfully blind.

3

Plaintiffs' response brief just offers a series of conclusory bullet points followed by long string-cites of trial testimony of unexplained significance.  Plaintiffs begin by arguing that Walmart has violated the CSA merely by dispensing "massive amounts of prescription opioids into the Counties" and then quantifying that assertion in different ways.  Opp. 64.  But it is uncontroverted that Walmart only ever dispensed opioid medications approved by FDA.  *See, e.g.*, Dkt. 4005 at 796 (Lembke testimony, Oct. 7 trial tr., vol. 4); Dkt. 4023 at 1723 (Rannazzisi testimony, Oct. 13 trial tr., vol. 7); Dkt. 4090 at 4153 (Dr. Keyes testimony, Oct. 26 trial tr., vol. 16).  Walmart could not have violated the CSA merely by dispensing a drug that FDA has authorized *pursuant to authority granted by the CSA* and dispensed in quantities that DEA has expressly considered and authorized.  Plaintiffs' attempt to use Ohio nuisance law to override Congress, FDA, and DEA's determination that opioid medications may be lawfully prescribed and dispensed is a straightforward violation of the Supremacy Clause.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Plaintiffs next state in a conclusory bullet point that Walmart "failed to implement and maintain effective controls against diversion in its dispensing of prescription opioids."  Opp. 67.  But Plaintiffs do not even attempt to explain the facts underlying this legal conclusion, aside from a string cite to off-point trial testimony.  For example, Plaintiffs cite an email in which a Walmart pharmacist was told they were "granted the ability to exercise their professional judgment and choose to refuse to fill any prescription if they feel the prescription was written for other than a legitimate purpose."  Dkt. 4041 at 2493–2502 (Oct. 18 trial tr., vol. 10).  Plaintiffs argued at trial that this message revealed a CSA violation because Walmart "allowed" its pharmacists to exercise their professional judgment rather than "instructing" them to do so.  *See* Dkt. 4041 at 2495 (Oct. 18 trial tr., vol. 10) ("Did you give them the ability to drive it below the speed limit, or did you

4

instruct them to drive it below the speed limit?"). But Plaintiffs' semantic nitpick does not show that Walmart's policies were inadequate, especially given the copious amount of trial testimony showing that Walmart pharmacists were not just *allowed* or *instructed* to exercise their professional judgment, but also *required* to do so. Dkt. 4109 at 5112–13 (Nov. 1 trial tr., vol. 20) ("[W]e expect you to never fill a prescription that you believe in the exercise of your professional judgment is either not in the best interest of the patient or has not been issued for a legitimate medical purpose.").

To take another example, Plaintiffs cite testimony that some measures Walmart implemented in their 2013 Pharmacy Operating Manuals were also required by a Memorandum of Agreement that Walmart had entered into with DEA. Opp. 67 n.59 (citing Dkt. 4109 at 5199–5200 (Nov. 1 trial tr., vol. 20)). But as Susanne Hiland, a senior director for Walmart's patient safety organization, explained, "[T]hat didn't necessarily mean [it was] different than what we were doing before . . . It meant [we met] the obligations that were within the MOA." Dkt. 4109 at 5200 (Nov. 1 trial tr., vol. 20). That Walmart's policies complied with the MOA says nothing about what Walmart's policies were before the MOA or whether Walmart's procedures—before or after the MOA—were adequate.

Plaintiffs' other citations are no different. None even remotely proves that Walmart's dispensing policies actually led to diversion in Plaintiffs' counties. In short, if Plaintiffs believe they have shown that actual diversion resulted from a lack of controls, they fail to explain how.

Plaintiffs' undeveloped, scattered citations seem to imply that Walmart should be held liable for: (1) an early policy that required its pharmacists to evaluate each prescription on a prescription-by-prescription basis, and exercise their professional judgment to determine whether they should fill each prescription, rather than deciding in advance that they did not wish to fill any

5

prescription for a particular prescriber (in other words not allowing a "blanket refusal-to-fill"); and (2) not creating and adopting a computer system in which its pharmacies shared refusal-to-fill data with one another.

Those arguments lack basis in both law and fact. The CSA and its regulations do not mandate any particular system for handling refusal-to-fills. Susanne Hiland, a senior director for Walmart's patient safety organization, testified that Walmart required its pharmacists to exercise their professional judgment using all the information available to them and not to fill any prescription they believed was not issued for a legitimate medical purpose or was not in the best interest of the patient. *Id.* at 5112–13. At all times, pharmacists could refuse to fill every controlled substance prescription—even every single one from a particular prescriber— if their professional judgment so dictated. *Id.* at 5152. Walmart pharmacist Lori Militello confirmed that she felt comfortable refusing every prescription from a given provider if necessary. *Id.* at 6699. The mere fact that for a time, Walmart used a different procedure than the one Plaintiffs think was best is no evidence of willful blindness.

Walmart also offered uncontroverted evidence that the reason it did not allow advance blanket refusals-to-fill at the time was because state boards of pharmacy had suggested that such refusals would be unlawful practice of medicine by a pharmacist. Mack testified that she spoke with the executive director of the Texas Board of Pharmacy around 2007 or 2008, and the director instructed that pharmacists must consider each prescription on an individual basis. Dkt. 4132 at 6752 (Nov. 8 trial tr., vol. 25). Mack recalled having similar conversations with the Boards of Pharmacy of California, Idaho, Kansas, Nevada, New Mexico, Oklahoma, and Oregon. *Id.* at 6753, 6756.

6

Plaintiffs' opposition insists that such testimony is inadmissible hearsay. While the Court did not admit the testimony for the truth of the matter asserted (the boards' policies in fact), it did admit it "as evidence of [Walmart's] own knowledge or intent." Dkt. 4153 at 7073 (Nov. 15 trial tr., vol. 28). Under the Court's interpretation of Walmart's CSA duties, Walmart's own "knowledge or intent"—namely, whether Walmart acted with willful blindness—is not only relevant, it is case-dispositive. Seeking out and adhering to the instructions of state pharmacy boards is just the opposite of taking "deliberate actions to avoid confirming a high probability of wrongdoing." *Glob.-Tech Appliances, Inc.*, 563 U.S. at 769.

As for aggregating data, this Court has expressly disavowed the claim that the CSA requires computerized data-sharing, at least as a general matter. *See* Dkt. 3499 at 7 ("[T]here is no absolute requirement, for example, that a pharmacy must conduct a computerized red-flag analysis of each prescription before filling it."). Even so, Walmart *did* share such information from one pharmacy to another. To take a few examples, Walmart provided its pharmacists with access to OARRS (Dkt. 4109 at 5100 (Nov. 1 trial tr., vol. 20)); provided its pharmacists with access to Archer and NarxCare (*id.* at 5096, 5102); and maintained a practice whereby Walmart pharmacists would routinely contact other Walmart pharmacists in the area to relay their concerns to one another and ask each other for guidance on a particular prescriber or patient (Dkt. 4132 at 6673 (Nov. 8 trial tr., vol. 25)).

Tacitly conceding that certain of Walmart's systems were effective, Plaintiffs next argue that Walmart did not "timely implement" those systems. Opp. 67. But Plaintiffs have no proof that Walmart avoided implementing those systems so that it could fill illegitimate prescriptions. So even if Plaintiffs are right that Walmart should have acted earlier (a proposition Walmart

7

disputes), Plaintiffs have shown, at most, *negligence*.[1] And under Ohio law, proof of mere negligence does not suffice on a claim of absolute nuisance. *See, e.g.*, *Barnett*, 2001 WL 1078980, at *10–11.

> **B. No Reasonable Juror Could Have Found That Walmart's Dispensing Conduct Caused the Alleged Harm.**

Even if Plaintiffs could establish that Walmart's dispensing conduct violated the CSA, or that Walmart engaged in intentional and culpable conduct, their case would still fail because they did not establish causation. To begin, Plaintiffs failed to show that Walmart substantially interfered with the public health and safety or that Walmart was a substantial factor in causing Plaintiffs' alleged injuries. The uncontradicted testimony of Walmart's expert witness, Dr. Mark Glickman, established that Walmart's dispensing conduct accounted for only 3.15% of prescription opioids in Lake and Trumbull Counties from 2006 until 2014 by MME. *See* Dkt. 4124 at 6236 (Nov. 5 trial tr., vol. 24). By comparison, the three largest independent pharmacies in Plaintiffs' Counties accounted for five times that: 16.5% of prescription opioids by MME. *Id.* at 6243. And even Plaintiffs acknowledge that the vast majority of opioid medications that Walmart dispensed were for legitimate medical purposes. Walmart's dispensing conduct was thus not nearly material enough to have a "substantial impact" on opioid diversion in the Plaintiff Counties. *Schwartz v. Honeywell Int'l, Inc.*, 102 N.E.3d 477, 482 (Ohio 2018); *see Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009); Restatement (Second) of Torts § 834 cmt. d (1979).

---

[1] Walmart repeatedly took voluntary prophylactic steps to guard against diversion. For instance, Walmart gave its pharmacists access to OARRS in 2010, before the State of Ohio required it to do so. Dkt. 4109 at 5100 (Nov. 1 trial tr., vol. 20); Dkt 4111 at 5390 (Nov. 2 trial tr., vol. 21) (describing inspection report from January 31, 2011, and noting that "Walmart pharmacists [were] now able to access OARRS"). The claim that Walmart failed in regard to "timely" action is thus both legally irrelevant and unsupported by the record.

That is particularly true where Plaintiffs introduced no evidence of any particular illegitimate prescription—and no evidence, at any rate, of what would have happened if Walmart had investigated and attempted to resolve "red flags" for any particular prescription flagged by Plaintiffs' experts. Even if they had evidence of suspicious prescriptions that Walmart theoretically could have detected, Plaintiffs did not introduce evidence that any of those prescriptions were in fact diverted, a key link in Plaintiffs' alleged causal chain. Whatever is true of the other pharmacies, Plaintiffs cannot show even a single instance of actual diversion from a Walmart pharmacy.

These omissions are especially glaring given the trial evidence about independent causes of the overdose burden in Lake and Trumbull Counties. For example, Dr. Katherine Keyes, Plaintiffs' own expert, testified that illicit opioids, including heroin, fentanyl, and counterfeit pills (largely trafficked into the United States from China and Mexico) independently contributed to the burden in Lake and Trumbull Counties. *See, e.g.*, Dkt. 4065 at 3684–88 (Oct. 22 trial tr., vol. 14). Plaintiffs' expert, Dr. Caleb Alexander, for his part, agreed that he had testified that "the origins of the epidemic are multiple [] including unsubstantiated claims about the safety and effectiveness of opioids, multifaceted campaigns by pharmaceutical companies, and the failure of the FDA and DEA." Dkt. 4064 at 3505 (Oct. 21 trial tr., vol. 13). These confounding factors simply underscore the importance of establishing a specific causal link between Walmart's conduct and Plaintiffs' alleged harm.

Plaintiffs' response to Walmart's causation arguments is extremely cursory, consisting of less than two pages—far shorter than the space devoted to Walmart's co-defendants—and positing almost nothing of substance. Opp. 92–94. First, Plaintiffs repeat their refrain that "Walmart dispensed thousands of opioid pills into the Counties." *Id.* at 92. But again Plaintiffs must point

9

to something beyond the mere fact that Defendants dispensed FDA-approved medications, well within DEA-set quotas, pursuant to legitimate prescriptions written by doctors—no matter how big or how small Defendants' overall volume of dispensing might be.  Second, Plaintiffs once again repeat the conclusion that "Walmart knew that failing to employ sufficient dispensing practices would cause significant diversion" and that Walmart was "substantially certain" that "abuse and diversion" of opioids were to occur.  *Id.* at 93.  But as already explained, Plaintiffs fail to explain this conclusion and provide no evidentiary support from trial that supports it.  In sum, no reasonable juror could have found that Walmart's conduct proximately caused a public nuisance in Plaintiffs' Counties.  *See, e.g.*, Dkt. 4090 at 4089 (Oct. 26 trial tr., vol. 16) (Dr. Keyes agreeing that her opinions are "about pharmacies generally and not about any specific pharmacy").

## CONCLUSION

For these reasons, the Court should grant judgment as a matter of law in favor of Walmart.

Dated:  January 31, 2022

Respectfully submitted,

*/s/  John M. Majoras*
John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

11

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's ECF system on all counsel of record on January 31, 2022.

*/s/ John M. Majoras*
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*
