**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

      *County of Lake, Ohio v. Purdue*
      *Pharma L.P., et al.*,
        Case No. 18-op-45032 (N.D. Ohio)

      *County of Trumbull, Ohio v. Purdue*
      *Pharma, L.P., et al.*,
        Case No. 18-op-45079 (N.D. Ohio)

"Track 3 Cases"

**MDL No. 2804**
**Case No. 17-md-2804**
**Judge Dan Aaron Polster**

**REPLY BRIEF IN SUPPORT OF**
**<u>DEFENDANTS' JOINT MOTION FOR NEW TRIAL UNDER RULE 59</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

I.  DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE .................... 1

II. THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE TRIAL WAS FUNDAMENTALLY UNFAIR AND PREJUDICIAL TO DEFENDANTS .................... 3

    A.  Defendants Are Entitled To A New Trial Because Of The Introduction Of Extraneous Evidence By Juror Misconduct.......................................... 3

    B.  The Court Erred by Excluding All Unvaccinated Jurors ............................. 5

    C.  Plaintiffs' Counsel's Misconduct During Closing Arguments Warranted a Mistrial and Also Warrants a New Trial ................................................. 7

    D.  The Court Improperly Admitted Evidence of DEA Settlements and Administrative Actions ............................................................................... 11

    E.  The Court's One-Sided Hearsay Errors Warrant a New Trial .................... 14

    F.  Plaintiffs' Counsel's References to "Facts" Not in Evidence Warrants a New Trial ................................................................................................... 17

    G.  Defendants Are Entitled to a New Trial Because of the Court's Delegation to DEA and Other Witnesses to Define the Law...................... 18

    H.  Permitting Catizone to Testify About His Understanding of the CSA's Obligations and About Red Flags Was Prejudicial and Warrants a New Trial ................................................................................ 20

    I.  The Court Exceeded Its Authority By Forcing Walmart to Get Brad Nelson to Testify ...................................................................................... 22

    J.  Permitting Plaintiffs to Reference the DOJ Complaint Against Walmart Was Error Warranting a New Trial .......................................................... 26

    K.  The Court Should Order A New Trial That Excludes Extraterritorial Evidence .................................................................................................... 28

    L.  The Court Should Order a New Trial Because the Jury Instructions It Gave (and Refused to Give) Tainted the Jury's Verdict............................. 29

    M.  The Court's Many Errors Combined To Make This Trial Fundamentally Unfair ............................................................................... 30

CONCLUSION.......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adkins v. Wolever*,
554 F.3d 650 (6th Cir. 2009) ............................................................27

*Aoki v. Gilbert*,
No. 11-cv-02797, 2019 WL 1243719 (E.D. Cal. Mar. 18, 2019).........25

*Barnes v. District of Columbia*,
924 F. Supp. 2d 74 (D.D.C. 2013) .....................................................12

*Beck v. Haik*,
377 F.3d 624 (6th Cir. 2004) ............................................................27

*Benaron v. Simic*,
No. 19-CV-1653, 2021 WL 4464176 (D. Or. Sept. 29, 2021) ...............6

*Black Card LLC v. Visa USA Inc.*,
No. 15-CV-27, 2020 WL 9812009 (D. Wyo. Dec. 2, 2020) ..................24

*Caudle v. District of Columbia*,
707 F.3d 354 (D.C. Cir. 2013) ............................................8, 9, 10, 18

*Chapman v. Tristar Prods., Inc.*,
No. 16-cv-1114, 2017 WL 7048986 (N.D. Ohio July 6, 2017)............26

*City of Cleveland v. Peter Kiewit Sons' Co.*,
624 F.2d 749 (6th Cir. 1980) ...........................................................8, 9

*Clark v. Chrysler Corp.*,
436 F.3d 594 (6th Cir. 2006) ............................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).....................................................................21, 22

*Douglas v. Alabama*,
380 U.S. 415 (1965)..........................................................................17

*Draper v. Rosario*,
836 F.3d 1072 (9th Cir. 2016) .............................................................9

*Ford v. Seabold*,
841 F.2d 677 (6th Cir. 1988) ...............................................................6

*Frye v. CSX Transp., Inc.*,
933 F.3d 591 (6th Cir. 2019) ............................................................30

*Gilster v. Primebank*,
747 F.3d 1007 (8th Cir. 2014) .............................................................9

*Hodge v. Hurley*,
426 F.3d 368 (6th Cir. 2005) ............................................................10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Beverly Hills Fire Litig.*,
  695 F.2d 207 (6th Cir. 1982) ...................................................................3, 4, 5

*In re Chocolate Confectionary Antitrust Litig.*,
  801 F.3d 383 (3d Cir. 2015)..........................................................................28

*Joffe v. King & Spalding LLP*,
  No. 17-CV-3392, 2021 WL 5864427 (S.D.N.Y. Dec. 10, 2021) ...................7

*Krause v. Rhodes*,
  535 F. Supp. 338 (N.D. Ohio 1979)..............................................................23

*Lea v. Wyeth LLC*,
  No. 03-CV-1339, 2011 WL 13195950 (E.D. Tex. Nov. 22, 2011) ................24

*Leavitt v. Scott*,
  338 F.2d 749 (10th Cir. 1964) .......................................................................17

*Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*,
  9 F.3d 422 (6th Cir. 1993) .............................................................................29

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................................23

*Montgomery Ward & Co. v. Duncan*,
  311 U.S. 243 (1940)......................................................................................1, 3

*Nian v. Warden, N. Cent. Corr. Inst.*,
  994 F.3d 746 (6th Cir. 2021) ........................................................................3, 4

*Off. Comm. of Unsecured Creditors v. Calpers Corp. Partners LLC*,
  No. 18-cv-68, 2021 WL 3081880 (D. Me. July 20, 2021) ............................26

*Park W. Galleries, Inc. v. Hochman*,
  692 F.3d 539 (6th Cir. 2012) .........................................................................10

*Prasol v. Cattron-Theimeg, Inc.*,
  No. 09-10248, 2011 WL 2669619 (E.D. Mich. July 8, 2011) .........................4

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*,
  No. 06-cv-2781, 2009 WL 10689369 (N.D. Ohio Oct. 23, 2009)..................15

*Salmi v. Sec'y of Health & Human Servs.*,
  774 F.2d 685 (6th Cir. 1985) ...........................................................................4

*Skogen v. Dow Chem. Co.*,
  375 F.2d 692 (8th Cir. 1967) .........................................................................17

*Smith v. Justarr, Inc.*,
  657 N.E.2d 542 (Ohio Ct. App. 1995)...........................................................19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ................................................................................................................9

*Stern v. Shouldice*,
706 F.2d 742 (6th Cir. 1983) ...............................................................................................29

*Stiles v. Lawrie*,
211 F.2d 188 (6th Cir. 1954) .............................................................................................3, 5

*Stockman v. Oakcrest Dental Ctr., P.C.*,
480 F.3d 791 (6th Cir. 2007) ................................................................................11, 12, 28

*Stone Tech. (HK) Co. v. GlobalGeeks, Inc.*,
No. 20-cv-23251, 2021 WL 2940256 (S.D. Fla. July 13, 2021) ......................................25

*Strickland v. Owens Corning*,
142 F.3d 353 (6th Cir. 1998) ...............................................................................................10

*United States v. Acosta*,
924 F.3d 288 (6th Cir. 2019) .................................................................................................8

*United States v. Adams*,
722 F.3d 788 (6th Cir. 2013) ...............................................................................................17

*United States v. Brawner*,
173 F.3d 966 (6th Cir. 1999) .........................................................................................14, 17

*United States v. Chen*,
No. 17-CR-00603, 2021 WL 2662116 (N.D. Cal. June 29, 2021) ......................................6

*United States v. Elbe*,
774 F.3d 885 (6th Cir. 2014) .................................................................................................4

*United States v. Ford*,
761 F.3d 641 (6th Cir. 2014) .........................................................................................14, 17

*United States v. Johns*,
759 F. App'x 367 (6th Cir. 2018) .......................................................................................17

*United States v. Kennedy*,
578 F. App'x 582 (6th Cir. 2014) .......................................................................................17

*United States v. King*,
378 F.2d 359 (6th Cir. 1967) ...............................................................................................27

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) ................................................................................................15

*United States v. Payne*,
2 F.3d 706 (6th Cir. 1993) ...................................................................................................18

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Rios*,
830 F.3d 403 (6th Cir. 2016) ...................................................................................15

*United States v. Rugiero*,
20 F.3d 1387 (6th Cir. 1994) ....................................................................................4

*United States v. Scott*,
716 F. App'x 477 (6th Cir. 2017) ............................................................................15

*United States v. Smith*,
500 F.2d 293 (6th Cir. 1974) .............................................................................10, 18

*United States v. Solivan*,
937 F.2d 1146 (6th Cir. 1991) ...............................................................................8, 9

*United States v. Thompson*,
No. 19-CR-1610, 2021 WL 2402203 (D.N.M. June 11, 2021) ..................................6

*United States v. Wheaton*,
517 F.3d 350 (6th Cir. 2008) ....................................................................................4

*United States v. Yarbrough*,
352 F.2d 491 (6th Cir. 1965) ..................................................................................27

*United States v. Young*,
470 U.S. 1 (1985) ...................................................................................................10

*Valadez v. Watkins Motor Lines, Inc.*,
758 F.3d 975 (8th Cir. 2014) ..................................................................................27

*Walker v. Engle*,
703 F.2d 959 (6th Cir. 1983) ..................................................................................30

*Williams v. Illinois*,
567 U.S. 50 (2012) ..................................................................................................15

**STATUTES**

28 U.S.C. § 1866 ........................................................................................................5

**OTHER AUTHORITIES**

Am. Gen. Order No. 2020-08-8 (June 7, 2021) ..........................................................6

Fed. R. Civ. P. 43 ................................................................................................24, 25

Fed. R. Civ. P. 45 ....................................................................................................24

Fed. R. Civ. P. 50 ....................................................................................................18

Fed. R. Civ. P. 51 ....................................................................................................29

Fed. R. Civ. P. 59 ...............................................................................................1, 11

Fed. R. Evid. 103 ....................................................................................................18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Fed. R. Evid. 401 ................................................................................................28

Fed. R. Evid. 402 ..........................................................................................13, 28

Fed. R. Evid. 403 .............................................................................12, 13, 27, 28

Fed. R. Evid. 404 ................................................................................................28

Fed. R. Evid. 405 ................................................................................................27

Fed. R. Evid. 408 ..........................................................................................11, 13

Fed. R. Evid. 703 ................................................................................................15

William A. Galston, *For COVID-19 vaccinations, party affiliation matters more than race and ethnicity*, Brookings (Oct. 1, 2021) ..........................................7

Jennifer Kates et al., *The Red/Blue Divide in COVID-19 Vaccination Rates*, Kaiser Family Foundation (Sept. 14, 2021) ..................................................7

1 McCormick On Evid. § 7 (8th ed. Jan. 2020 update) ....................................17

29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6273 (2d ed. Apr. 2021 update) ........................15

The trial in this case was riddled with errors, many of which, individually and collectively, weakened Defendants' case and strengthened Plaintiffs'.  Indeed, Plaintiffs do not even attempt to defend the Court's decisions on most of the issues raised in Defendants' motion.  Instead, they seek to downplay their significance, or (wrongly) argue that the Court can ignore them because they were somehow "waived."  But the fundamental flaws that permeated this trial from jury selection through jury instructions and closings cannot be so easily set aside.  Many of the Court's errors are enough to warrant a new trial in their own right; in the aggregate, there is no question that they so skewed the evidence that Defendants were denied a fair trial.  Fundamental fairness and Rule 59 both require that the Court grant Defendants' motion.

In short, this Court should grant a new trial both because the "verdict is against the weight of the evidence" and because "the trial was not fair to the party moving."  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see* Fed. R. Civ. P. 59(a)(1)(A); Dkt. 4242 (Pls.' Rule 59 Opp., hereinafter "Opp.") at 1–3 (agreeing with this legal standard).

## I.   DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

Defendants' opening brief explained why, even if the Court does not grant judgment as a matter of law in favor of Defendants, a new trial is warranted because "the verdict is against the weight of evidence."  *Duncan*, 311 U.S. at 251.  In particular, Defendants pointed out how Plaintiffs—after abandoning their distribution theory—failed to adduce sufficient evidence for at least three of the four critical showings necessary to prove their dispensing theory.  Dkt. 4204 (Defendants' Motion for New Trial, hereinafter "Mot.") at 2–4.  And against Plaintiffs' failures of proof, Defendants explained how the evidence at trial showed, among other things, that Defendants' pharmacists are highly trained healthcare professionals who care deeply about their patients and about the communities where they live and work, that the real regulators on the ground in Ohio

never saw Defendants as a source of diverted controlled substances, and that Defendants and their pharmacists in Lake and Trumbull Counties have always been strong allies of local regulators and law enforcement. *Id.* at 4–6.

Plaintiffs offer no response to any of these arguments, pointing instead to their omnibus opposition to Defendants' motions for judgment as law. But that brief does not directly respond to Defendants' arguments either, and it certainly does not identify evidence to fill in the gaps Defendants identified in Plaintiffs' dispensing theory. Instead, that opposition brief merely confirms what Defendants said at the outset: "Plaintiffs devoted great energy to introducing evidence . . . that was supposed to support the first of these four showings—that pharmacists employed by each of the Defendants dispensed opioid prescriptions despite 'red flags' . . . . But they adduced no evidence sufficient to make showings (2)–(4)," which include "(2) that the Defendants' pharmacists knew of, or were willfully blind to, these 'red flags' and did not resolve them before dispensing; (3) that these 'red flag' prescriptions were *in fact* illegitimate, sham prescriptions written by corrupt doctors and/or presented by criminals masquerading as patients; and (4) that the pharmacists employed by each of the Defendants knowingly filled enough of these bad prescriptions to support a conclusion that medications dispensed by that Defendant's pharmacies pursuant to sham prescription . . . played a substantial role in a current and ongoing public nuisance of prescription opioid medications." Mot. at 3–4.

For these and the litany of other reasons explained in Defendants' opening brief, Plaintiffs' theory of liability against Defendants never made sense and the weight of the evidence cuts sharply against it. Because Plaintiffs offer no rebuttal, the Court should grant a new trial.

## II.      THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE TRIAL WAS FUNDAMENTALLY UNFAIR AND PREJUDICIAL TO DEFENDANTS.

This Court should also order a new trial for the independent reason that the "substantial errors" in, among other things, "admission or rejection of evidence" and "instructions to the jury" made this trial fundamentally unfair to Defendants.  *Duncan*, 311 U.S. at 251.

### A.      Defendants Are Entitled To A New Trial Because Of The Introduction Of Extraneous Evidence By Juror Misconduct.

When juror misconduct has "injected extraneous information into the trial," circuit precedent could not be clearer:  The Sixth Circuit "has not hesitated to declare mistrials" in such cases, "requir[ing] that the verdict be set aside, unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict."  *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 213–15 (6th Cir. 1982) (quoting *Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir. 1954)).  More than that, the Sixth Circuit has emphasized that "a juror introducing extraneous information into deliberations 'can rarely be viewed as harmless.'"  *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 758 (6th Cir. 2021) (quoting *Beverly Hills*, 695 F.2d at 215).

Plaintiffs go to great lengths to try to distinguish the facts of these Sixth Circuit decisions, but they cannot escape the rule:  Under binding circuit authority, where extraneous information is introduced into a trial through juror misconduct—a factual predicate that no one disputes has been met in this case—a mistrial is "require[d]" unless the verdict is "entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict."  *Beverly Hills*, 695 F.2d at 215 (quoting *Stiles*, 211 F.2d at 190).  Noticeably absent from Plaintiffs' opposition brief is even one Sixth Circuit decision retreating from *Beverly Hills*.  In fact, the only relevant authority Plaintiffs muster is a single unpublished Eastern District of Michigan decision that, like Plaintiffs, distinguishes *Beverly Hills* purely on its facts, ignores its rule of decision, and

instead relies on cases from the Third, Eighth, and Ninth Circuits. *See Prasol v. Cattron-Theimeg, Inc.*, No. 09-10248, 2011 WL 2669619, at *4–5 (E.D. Mich. July 8, 2011).[1]

Even if factual distinctions were the relevant inquiry, that would not help Plaintiffs, who cannot dispute the one fact that makes this case completely unlike all of the unpublished, non-binding, or out-of-circuit examples they might cite: Lead trial counsel for Plaintiffs immediately recognized the prejudice to Defendants from the juror misconduct and ***agreed*** there should be a mistrial. Dkt. 4068 at 5. Plaintiffs' effort to pass this concession off as mere "initial concerns," Opp. at 7, ignores the facts. Counsel for Plaintiffs—a lawyer with over 37 years of trial experience—repeatedly assured the Court that his position that a mistrial was warranted was not "anything I say lightly," a "snap decision," or a decision "I just made . . . in a vacuum freewheeling," but rather the product of "dialogue" with co-counsel and "candor to the tribunal which I owe under my ethical obligation." Dkt. 4065 at 3769–72. And counsel said all of this ***after*** the Court had

---

[1] Plaintiffs cite two Sixth Circuit decisions that applied different rules to juror misconduct and which, unlike *Beverly Hills*, placed the burden of proving actual juror bias on the moving party. In *United States v. Rugiero*, 20 F.3d 1387 (6th Cir. 1994), the panel affirmed the denial of a mistrial where the jury was exposed to a television report about the criminal defendant's trial counsel. In *United States v. Wheaton*, 517 F.3d 350 (6th Cir. 2008), the panel affirmed the denial of a mistrial where a juror used a laptop during deliberations to view a map showing the relative distance between towns. Both cases applied separate lines of circuit precedent governing "extraneous" or "unauthorized contact" with jurors and "juror misconduct" in general—such as a juror sleeping through trial, commenting on a witness's earring, or discussing post-deliberation plans with a spouse. *See Rugiero*, 20 F.3d at 1389–91; *Wheaton*, 517 F.3d at 360–62. Neither case so much as cites the binding prior precedent of *Beverly Hills* nor applied its rule for the specific circumstances at issue here: juror misconduct that injects extraneous information into the jury room. Of course, a later panel cannot overturn binding precedent, implicitly or otherwise. *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014) ("A panel of this court may not overturn binding precedent because a published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'") (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). Far from overruling *Beverly Hills*, the Sixth Circuit recently reaffirmed it. *Nian*, 994 F.3d at 758 ("[A] juror introducing extraneous information into deliberations 'can rarely be viewed as harmless.'") (quoting *Beverly Hills*, 695 F.2d at 215).

conducted *voir dire* of each member of the jury and instructed them to disregard the extraneous information, stating that "I think that it affects this jury, I think it affects everybody ***whether they recognize it or not***." *Id.* at 3769 (emphasis added). While Plaintiffs' counsel later had a change of heart after consulting with his clients, nothing about his reversal reflected a different judgment on the fact that the extraneous information introduced by juror misconduct was prejudicial to Defendants. *Id.* at 3722–23. Rather, it was a strategic calculation, based on a misreading of "Sixth Circuit law," that the prejudice was not "incurable." Dkt. 4078 at 3789.

Under binding Sixth Circuit authority, the verdict must be set aside "unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict." *Beverly Hills*, 695 F.2d at 215 (quoting *Stiles*, 211 F.2d at 190). In a case in which Plaintiffs have conceded prejudice to Defendants from the juror misconduct—no matter how much they might wish to take it back—the only appropriate outcome is to grant a mistrial, or now a new trial.

### B. The Court Erred by Excluding All Unvaccinated Jurors.

Plaintiffs do not dispute that the Court prohibited three prospective jurors from serving on the jury solely because they did not receive COVID-19 vaccinations. Plaintiffs contend that the automatic exclusion of these prospective jurors was proper under the Jury Selection and Service Act, 28 U.S.C. § 1866(c), to address safety concerns and to prevent disruptions to the trial. But jurors were the *only* participants in the trial who were required to be vaccinated. Attorneys, witnesses, court personnel, spectators, and so on—most of the people in the courtroom—did not have to be vaccinated. If any of those participants had contracted the virus during the trial, they also could have infected other participants and disrupted the trial proceedings. Indeed, attorneys and witnesses posed a *greater* risk of spreading the virus than jurors because, under the Northern District of Ohio's COVID-19 General Order, they were permitted to (and did) remove their masks

when speaking.  *See* Am. Gen. Order No. 2020-08-8 at 2 (June 7, 2021).  Jurors, on the other hand, did not speak during the trial and were not permitted to remove their masks.

Plaintiffs note that four other courts have excluded unvaccinated jurors for similar reasons. But at least one of those courts required all participants—not just jurors—to be vaccinated. *Benaron v. Simic*, No. 19-CV-1653, 2021 WL 4464176, at *19 n.13 (D. Or. Sept. 29, 2021).  And Plaintiffs ignore that many other courts conducted trials in 2021 without requiring jurors to be vaccinated, *e.g.*, *United States v. Chen*, No. 17-CR-00603, 2021 WL 2662116, at *9 (N.D. Cal. June 29, 2021) ("[U]nvaccinated jurors and witnesses will be required to wear masks."); *United States v. Thompson*, No. 19-CR-1610, 2021 WL 2402203, at *4 (D.N.M. June 11, 2021) ("The Court will not be inquiring about the vaccination status of potential jurors and witnesses, but it will inform them that if they are fully vaccinated then they are not required to wear a face mask.")—with at least one court precluding questions about jurors' COVID-19 vaccination status out of fear that it "could be used as a proxy to tease out racial groups or political groups who may be more reluctant to get vaccinated."  Dkt. 79 at 7–8, *United States v. Pea*, No. 19-CR-00294 (W.D. La. Apr. 23, 2021).

Plaintiffs additionally contend that unvaccinated jurors are not a cognizable group and that their exclusion did not cause the jury pool to be unrepresentative of a fair cross-section of the community.  Opp. at 12.  But studies have shown that adults who have not received a COVID-19 vaccine share a "common thread or basic similarity in attitude, ideas or experience."  *See Ford v. Seabold*, 841 F.2d 677, 683 (6th Cir. 1988).  They are largely conservatives, libertarians, and government skeptics, and they include a disproportionate percentage of nonprofessionals and lower-wage workers.  Mot. at 11; *see, e.g.*, Dkt. 79 at 7–8, *Pea*, *supra* (questions about COVID-19 vaccination "could be used as a proxy to tease out racial groups or political groups who may be

more reluctant to get vaccinated"). Plaintiffs call this "pure speculation," Opp. at 13, but these were analyses conducted before the trial, not mere speculation afterward.[2]

Nor do Plaintiffs cite any studies or analyses to the contrary. Instead, they cite a case that does not help them. *See Joffe v. King & Spalding LLP*, No. 17-CV-3392, 2021 WL 5864427 (S.D.N.Y. Dec. 10, 2021). That court indicated that it would not have excluded unvaccinated jurors if "the issue on trial . . . somehow implicated issues as to which there could be sharp differences of opinion between the class of persons who, in the face of a pandemic and highly effective vaccines chooses not to be vaccinated, and the class of persons who have become vaccinated." *Id.* at *6 n.24. Here, the trial *did* involve issues where there could be sharp differences of opinion between vaccinated and unvaccinated adults, including issues of public health, the role of government regulators, the role of healthcare providers, issues of personal responsibility, and how to balance the risks and benefits of prescription opioids.

By excluding prospective jurors who were not vaccinated, therefore, the Court excluded a distinctive group who share common attitudes, and their exclusion resulted in a jury that was not a fair cross-section of the community. The Court should order a new trial on this basis.

## C.  Plaintiffs' Counsel's Misconduct During Closing Arguments Warranted a Mistrial and Also Warrants a New Trial.

Plaintiffs do not dispute that their counsel made multiple improper statements during closing argument, including by pushing the "national ramifications" of this case on the jury. Opp. at 17; *see also, e.g.*, Dkt. 4172 (Order Denying Mot. for Mistrial) at 3–4 (finding that "some of the

---

[2] *See, e.g.*, William A. Galston, *For COVID-19 vaccinations, party affiliation matters more than race and ethnicity*, Brookings (Oct. 1, 2021), https://www.brookings.edu/blog/fixgov/2021/10/01/for-covid-19-vaccinations-party-affiliation-matters-more-than-race-and-ethnicity/; Jennifer Kates et al., *The Red/Blue Divide in COVID-19 Vaccination Rates*, Kaiser Family Foundation (Sept. 14, 2021), https://www.kff.org/policy-watch/the-red-blue-divide-in-covid-19-vaccination-rates/.

statements Mr. Lanier made during his closing arguments were improper"). Plaintiffs try to downplay this conduct—calling it "imperfect" "syntax"; "less than crystal clear" prose; mere "inappropriate remarks"; and behavior "common" in closings. Opp. at 14–15. They advance a standard under which even the most egregious "impermissible statements" in closing arguments do not lead to a new civil trial, because those prejudicial statements did not "permeate[] the entire trial from beginning to end." *Id.* at 15. This Court similarly suggested that a mistrial was unwarranted because Plaintiffs' counsel's comments during closing did not "permeate[] the entire trial. Dkt. 4172 (Order Denying Mot. for Mistrial) at 8. But that is not the correct standard. Under the correct one, no amount of downplaying counsel's statements can avoid a new trial.

A verdict "should be set aside," and a new civil trial ordered, if improper statements made during closing create "a reasonable probability that the verdict of a jury has been influenced" by the statements—regardless whether the statements were made for the first time during closing. *See City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980). All parties agree that it is the "rare" case in which prejudicial statements made during closing argument will warrant a new trial. *Id.* at 18. But "rare" does not mean *nonexistent*, as Plaintiffs seem to think. *See id.* Courts of appeals have ordered new trials based on improper statements made *only* during closing arguments. *See, e.g.*, *United States v. Acosta*, 924 F.3d 288, 299–300 (6th Cir. 2019); *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991); *Caudle v. District of Columbia*, 707 F.3d 354, 363 (D.C. Cir. 2013). The same is true here, especially given counsel's other errors throughout trial. *See, e.g.*, *City of Cleveland*, 624 F.2d at 756.

Plaintiffs try to factually distinguish these cases as ones in which counsel's statements during closing were "designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jury's emotions." Opp. at 18. But that is precisely what happened here. Plaintiffs'

counsel intended to inflame the jury's emotions—including by telling them that they could set "the standards by which these chain pharmacies . . . must act," and that their verdict would be a "seminal" decision with "national ramifications." Dkt. 4153 at 7082–83 (Nov. 15 trial tr., vol. 28). These inflammatory comments also focused on a topic about which jurors already would be extremely passionate: the opioid crisis. *Cf. Solivan*, 937 F.2d at 1153 (War on Drugs). Counsel implied that the jury could and should hold Defendants "accountable for what [they are] doing across the country." *Cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). These "send a message" comments, on this contentious, emotional topic, created a "reasonable probability that the verdict" was influenced by improper considerations. *City of Cleveland*, 624 F.2d at 756.

Nor were these prejudicial comments the only improper comments counsel made. Just as in *Caudle*—a civil case—Plaintiffs' counsel made other improper comments during trial, indeed comments this Court already found improper. *See generally* Dkt. 4172 (Order Denying Mot. for Mistrial). Counsel, for example, misleadingly suggested to the jury that the verdict would not carry financial consequences for Defendants; said without evidence that Defendants are the subject of multiple ongoing investigations in Lake and Trumbull Counties; improperly vouched for Plaintiffs' expert witness Dr. Anna Lembke; and "joking[ly]" encouraged jurors to "beat up" any juror who did not agree with Plaintiffs during deliberations. *See* Dkt. 4156 at 5–13. These comments are improper and prejudicial in any context, contrary to Plaintiffs' argument. *See, e.g.*, *Draper v. Rosario*, 836 F.3d 1072, 1084 (9th Cir. 2016) ("[T]he prohibition on improper vouching based on evidence outside the record extends to civil trials."); *Gilster v. Primebank*, 747 F.3d 1007, 1011 (8th Cir. 2014) (similar); *see also Caudle*, 707 F.3d at 363 (ordering new civil trial).

Plaintiffs next argue that when "a curative instruction [is] given, a mistrial is not warranted." Opp. at 17.  But that is belied by the cases ordering a new trial despite curative instructions.  *See, e.g.*, *United States v. Smith*, 500 F.2d 293, 296 (6th Cir. 1974); *Caudle*, 707 F.3d at 363. Defendants already showed the error in the Court's rationale that "its two 'curative instructions' blunted the prejudice from Plaintiffs' counsel's misconduct."  Mot. at 13; *see id.* at 13–14. Plaintiffs add nothing to overcome that argument.

Finally, Plaintiffs half-heartedly contend that Defendants waived these objections because they "waited nearly an hour to object."  Opp. at 18.  But the law is clear:  "[A]n attorney who believes that opposing counsel has made improper closing arguments" need not interrupt a closing argument to preserve an objection.  *Hodge v. Hurley*, 426 F.3d 368, 386 n.25 (6th Cir. 2005); *see also United States v. Young*, 470 U.S. 1, 13 (1985).  Plaintiffs concede that Defendants, by "requesting a bench conference at the close of opposing arguments," did the "minimum" needed to preserve their objections.  Opp. at 19 n.21.  Of course, Defendants also moved for a mistrial based on all of counsel's improper comments.  Dkt. 4156.  In any event, Plaintiffs agree that "the Sixth Circuit also permits a new trial even where the movant fails to object" *at all*, *id.* at 23—when the comments are "egregious," *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998). In short, because counsel's conduct at closing argument and earlier was improper, and because "'there is a reasonable probability that the verdict of [the] jury [was] influenced by such conduct, it should be set aside,' even if opposing counsel failed to object."  *Clark v. Chrysler Corp.*, 436 F.3d 594, 609 n.19 (6th Cir. 2006); *see Park W. Galleries, Inc. v. Hochman*, 692 F.3d 539, 548 (6th Cir. 2012); *Smith*, 500 F.2d at 296.

### D.    The Court Improperly Admitted Evidence of DEA Settlements and Administrative Actions.

Plaintiffs contend that the Court did not err by permitting Plaintiffs to introduce evidence of DEA settlements and enforcement actions.  Opp. at 42.  They first assert that Defendants did not adequately brief their argument that admitting the settlements violated Federal Rule of Evidence 408, *id.*, but that is nonsense.  Defendants explained repeatedly and at length, in pleadings filed with the Court and in objections made during trial, why the admission of DEA settlements violates Rule 408.  *See, e.g.*, Dkt. 3420; Dkt. 3972; Dkt. 3973; Dkt. 3974; Dkt. 4044; Dkt. 3995 at 184-88 (Oct. 5 trial tr., vol. 2).  This issue was thoroughly briefed and discussed before and during the trial, and then repeated in the Rule 59 post-trial brief.

Plaintiffs next contend that the settlements were not precluded by Rule 408 because they were offered to establish notice, knowledge, or intent.  Opp. at 42–43.   But that is not the correct standard or how Plaintiffs used the settlements at trial.  *See, e.g.*, Dkt. 4153 at 7315 (Nov. 15 trial tr., vol. 28) (closing argument).  To the contrary, Plaintiffs' counsel argued directly to the jury during closing arguments that Defendants "entered into settlement after settlement in spite of all of these wonderful policies they tell you they've got. . . . You can take all of those wonderful tools and it didn't stop *Holiday*." *Id.*  Counsel was not arguing that Defendants were put on notice that DEA did not consider their policies to be sufficient and took no action in response, as Plaintiffs now contend.   He was arguing that "settlement after settlement" with DEA showed that Defendants' policies were ineffective—an improper use of the settlements that could not be cured by a limiting instruction.  *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 805 (6th Cir. 2007) ("Prejudicial evidence can overwhelm the efficacy of palliative jury instructions.").

Plaintiffs do not dispute that there was a delay in giving the limiting instruction.  Instead, they spend pages of their opposition recounting colloquies surrounding a limiting instruction in an

11

effort to show that any delay in giving the limiting instruction was Defendants' fault.  Opp. at 45.  In reality, Defendants requested a limiting instruction the very first day that settlement evidence was offered at trial (October 5), Dkt. 3995 at 436:12–13 (Oct. 5 trial tr., vol. 2), proposed a limiting instruction to Plaintiffs during the first week of trial, followed up with Plaintiffs after they failed to respond, and then submitted their proposed limiting instruction to the Court after Plaintiffs rejected it.  Ex. A; Dkt. 4042.  When the Special Master circulated the Court's proposed limiting instruction, Defendants responded that same day with comments.  Ex. B.  Defendants did enough—they could not force Plaintiffs to agree to a limiting instruction, nor could they force the Court to give one.  The Sixth Circuit has concluded that a court's failure to read certain limiting instructions until it gives a final jury charge may contribute to reversible error.  *Stockman*, 480 F.3d at 805.  That is true here.

Plaintiffs also argue that the settlement evidence offered at trial was not unnecessarily cumulative.  Plaintiffs attempt to distinguish *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 90 (D.D.C. 2013), which held that settlement evidence must "be presented as briefly as possible" to "guard against the risk of prejudice or confusion," by arguing that the private settlement there is different than the DEA settlements here.  But Plaintiffs offer no reason why that has any substantive impact on the *Barnes* court's analysis.  Plaintiffs also mischaracterize the DEA settlements as requiring Defendants to make changes to their anti-diversion policies.  In fact, most of the settlements admitted into evidence did no such thing.  *E.g.*, P-08954; P-08955; P-10212; P-10214.  Even setting aside *Barnes*, moreover, Rule 403 requires courts to balance the "probative value" of evidence against, among other things, "unfair prejudice" and "needlessly presenting cumulative evidence."  Each additional time the Court permitted Plaintiffs to offer evidence of the settlements it tipped the scales toward the dangers contemplated by Rule 403.

Plaintiffs next contend that Defendants somehow failed to preserve their objections to the cumulative introduction of the settlements.[3]  This too ignores the record.  In reality, Defendants filed numerous pretrial objections and motions related to the settlements.  *See* Dkt. 3420, Dkt. 3421, Dkt. 3507, Dkt. 3972, Dkt. 3973, Dkt. 3974, Dkt. 4010, Dkt. 4044.  One set of motions, filed on September 23, 2021, argued that "[i]f the Court allows an exception to Rule 408 for notice, the very first settlement it admits establishes it, and the subsequent settlements not only are needlessly cumulative in violation of Rule 403, they are irrelevant to notice and therefore are inadmissible under both Rule 402 and 408."  Dkt. 3972 at 10; Dkt. 3973; Dkt. 3974.  The Court denied those motions in part, permitting the introduction of multiple settlements and not placing any restrictions on the number of times they could be referenced.  Dkt. 3990.  Defendants then objected throughout trial to the admission of the settlements.  *See, e.g.*, Trial Tr. 7027:2-12; Tr. 337:3-10; Tr. 341:10-15; Tr. 435:25-436:-24; Tr. 876:20-882:25; Tr. 5875:7-10.  CVS even filed another motion to exclude further testimony related to CVS settlements and DEA's decision in the *Holiday* matter based on the "cumulative nature of the evidence," Dkt. 4044, and the Court denied the motion the following day.  Tr. 2982:9–10.[4]

The Sixth Circuit has made clear that counsel "need not renew [an] objection at the time the evidence is offered . . . in order to preserve the error for appeal" "if the trial court has made an

---

[3] Plaintiffs do not argue (nor could they) that Defendants failed to preserve their objections to the introduction of the settlement evidence more generally.  Indeed, the Court agreed during the trial that Defendants were preserved on the issue.  Dkt. 3995 at 188:8-10, 436:21-24 (Oct. 5 trial tr., vol. 2).

[4] In denying the motion, the Court stated:  "CVS filed a motion to exclude further references to Holiday.  That's denied."  Tr. 2982:9-10.  Plaintiffs contend that Defendants should have attempted to confirm that this ruling included settlement evidence.  Opp. at 56.  That the Court only mentioned the *Holiday* matter did not transform the Court's unequivocal "denial" of the motion into a "denial in part."  If the Court denied the motion in part, the Court would have stated so.  No confirmation was necessary.

explicit and definitive ruling on the record of the evidentiary issues to be decided." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999).  "This rule recognizes that the efficiency goals of requiring contemporaneous objections are not furthered if the court has already definitively ruled on the evidence at issue." *United States v. Ford*, 761 F.3d 641, 653 (6th Cir. 2014).  Defendants made their objections, and there was no reason them to repeat their objections throughout trial.

Finally, Plaintiffs argue that Defendants did not adequately brief their arguments that the Court erred by admitting the settlements because they involved conduct that occurred outside Ohio. *Id.* at 59.  Plaintiffs are wrong again.  Defendants briefed this issue at length and repeatedly. *See* Dkt. 3420; Dkt. 3421; Dkt. 3972; Dkt. 4044.  This is further evidenced by the fact that, in responding to this argument, Plaintiffs merely incorporate their prior briefs opposing Defendants' arguments on this score and the Court's prior rulings on Defendants' arguments.  Opp. at 60.  The Court erred by admitting settlements which did not concern conduct in Ohio, let alone Defendants' pharmacies in Lake and Trumbull Counties.

## E.     The Court's One-Sided Hearsay Errors Warrant a New Trial.

The Court rendered this trial further fundamentally unfair to Defendants by admitting prejudicial hearsay that helped Plaintiffs but prohibiting critical defense testimony that Plaintiffs said was hearsay, even though it was not. *See* Mot. at 17–20.

Plaintiffs cite four instances—over the course of a seven-week trial—of the Court making hearsay rulings that went against them, asserting that these rulings were "conceivably more detrimental than the rulings against Defendants."  Opp. at 43.  But Plaintiffs make no effort to develop this "conceivabl[e]" argument as a matter of substance, precisely because these rulings were not prejudicial.

Plaintiffs then distort Defendants' arguments regarding Dr. Anna Lembke.  The Court's error with regard to Dr. Lembke was "freely allow[ing] [her] to act as a conduit for hearsay," rather

14

than "screen[ing] out" the parts of her testimony that served as such a conduit. Mot. at 17–18 (citing *Williams v. Illinois*, 567 U.S. 50, 80–81 (2012)). Instead of engaging this argument, Plaintiffs retreat to the general rule under Rule 703 that "it is entirely proper for Lembke to rely on even inadmissible evidence in forming her opinion, and for her to explain why that evidence was important in deriving her opinion." Opp. at 48. That is true, but it is not what actually happened at this trial. There is a difference between offering expert opinion that "only incidentally discloses" inadmissible hearsay relied on by the expert (which all agree is permissible) and offering expert "opinion" that "simply parrots" an out-of-court statement "for its substantive truth" (which is impermissible). *United States v. Rios*, 830 F.3d 403, 418 (6th Cir. 2016); *see Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, No. 06-cv-2781, 2009 WL 10689369, at *2 n.1 (N.D. Ohio Oct. 23, 2009).

Lembke's testimony clearly fell in the impermissible category. For starters, this Court erroneously believed that Lembke could "testify [about] whatever she was given," "anything she was shown," and anything she "reviewed." Dkt. 4000 at 477–78, 480–81, 600. Plaintiffs do not even attempt to defend that reasoning, implicitly conceding error. Under the proper standard, Lembke is on the "merely parroting" hearsay side of the scale. She simply read the contents of certain Purdue documents into the record, without adding any analysis to those out-of-court statements admitted for their truth. *See United States v. Mejia*, 545 F.3d 179, 197–98 (2d Cir. 2008). That is precisely what the Federal Rules prohibit. *Rios*, 830 F.3d at 418; *see, e.g.*, *United States v. Scott*, 716 F. App'x 477, 485 (6th Cir. 2017); *see also* 29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6273 (2d ed. Apr. 2021 update). And nothing allowed this Court to compound this error by admitting the hearsay documents *themselves* into evidence; Plaintiffs do not rebut that the

law in the Sixth Circuit is that you cannot use an expert to get an inadmissible document into evidence. *See* Dkt. 4000 at 477, 592, 599, 600 621.

Against this weight of authority, Plaintiffs fall back to arguing, in cursory fashion, that these Purdue statements were not hearsay, including because they were statements by "co-conspirators." Opp. at 45–46. This is preposterous. There was no showing, indeed not even a proffer, of any conspiracy at this trial. The other exceptions Plaintiffs mention do not apply either (no one testified to the authenticity of the documents, for example, or to the requirements of, say, the business-records exception). Nor, more to the point, were any of these exceptions offered at trial as a reason the hearsay statements could be admitted; they are nothing more than post hoc rationalizations to justify allowing Lembke to "testify [about] whatever she was given" and "anything she was shown." Dkt. 4000 at 477–78, 480–81, 600.

After defending Lembke's ability to testify about whatever she wanted, Plaintiffs then try to defend this Court's decision to *bar* Susanne Hiland from testifying about how some state Boards of Pharmacy refused to permit blanket refusals to fill—a fact that undercuts Plaintiffs' theory of the case. If this Court followed its earlier rulings, which allowed *Plaintiffs* to elicit evidence about Defendants' settlements because they went to notice or state of mind, the Court would have allowed *Defendants* to elicit this kind of "notice" evidence too. *See* Dkt. 4109 at 5138 (Nov. 1 trial tr., vol. 20). But the Court barred this evidence when Defendants presented it. Plaintiffs' defense—that "Hiland did not personally communicate with Boards of Pharmacies," Opp. at 49—does not rebut the fact that the evidence goes to corporate "notice."

The Court compounded this error by *sua sponte* adding a pro-Plaintiff jury instruction on this issue, even though the Court had admitted next to nothing on what the Boards of Pharmacy said. Trial Tr. at 7073. Plaintiffs say that a court may "issue a limiting instruction regarding the

purpose for which the jury may consider particular hearsay evidence."  Opp. at 50  This is true.
But to do so *only* on certain issues, and *only* when they helped Plaintiffs, makes the rulings one-
sided and improper—not to mention heavily implying that the Court believes the jury should
discount the disfavored evidence.  Because here and elsewhere the Court's rulings "paint[ed] an
unfair picture of defendants," the Court should order a new trial.  *United States v. Adams*, 722 F.3d
788, 833 (6th Cir. 2013).

**F.**    **Plaintiffs' Counsel's References to "Facts" Not in Evidence Warrants a New Trial.**

Plaintiffs' counsel's practice of improperly asserting or assuming facts not in the evidence
caused prejudice and misled the jury, which warrants a new trial.  *See* Mot. at 20–23.

In response, Plaintiffs first emphasize that counsel has discretion in cross-examination,
Opp. at 51, but this discretion undisputedly "does not include . . . the insertion of suggested facts
that do not exist."  *Leavitt v. Scott*, 338 F.2d 749, 751–52 (10th Cir. 1964); *see, e.g.*, *Skogen v.
Dow Chem. Co.*, 375 F.2d 692, 704 (8th Cir. 1967); *see also* 1 McCormick On Evid. § 7 (8th ed.
Jan. 2020 update).  That makes this argument a distraction.

Plaintiffs next argue that Defendants "failed to object" contemporaneously to some
examples cited in the opening brief.  Opp. at 51.  But Plaintiffs rightly concede that Defendants
*did* contemporaneously object to numerous *other* instances of this same problem—and, as already
explained, once a party "ha[s] an objection in" on an issue, "further objection to the [issue] [i]s
unnecessary" to preserve the objection.  *Douglas v. Alabama*, 380 U.S. 415, 421–22 (1965); *see,
e.g.*, *United States v. Johns*, 759 F. App'x 367, 371 (6th Cir. 2018); *United States v. Kennedy*, 578
F. App'x 582, 588–89 (6th Cir. 2014); *Brawner*, 173 F.3d at 970.  "This rule recognizes that the
efficiency goals of requiring contemporaneous objections are not furthered if the court has already
definitively ruled on the [topic] at issue."  *Ford*, 761 F.3d at 653.  This rule is also grounded in the

Federal Rules:  "Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error."  Fed. R. Evid. 103(b).

On the merits, Plaintiffs agree that the propriety of counsel's questions turns on whether his "comments rose to the level" of a "deliberate" and "calculated effort used to evoke strong sympathetic emotions."  Opp. at 53.  Plaintiffs insist they did not, but the substance, context, and ubiquity of the questions tell a different story.  *See* Mot. at 20–23 (detailing and collecting these comments).  Indeed, Plaintiffs explicitly rely on one of these improper questions as "evidence" supporting the verdict in their Rule 50 opposition brief.  *See* Dkt. 4241 at 41 n.48 ("Q: Would you be surprised to find out that you have personally filled over 25,000 dosage units for Dr. Demangone?  A: No, I probably wouldn't.").

Plaintiffs also argue that "any alleged prejudice was sufficiently cured by the Court's instructions that lawyers' arguments are not evidence."  Opp. at 51; *see id.* at 55.  But this generic instruction does not blunt the prejudice from counsel's specific, repeated misconduct:  The Sixth Circuit has held that even curative instructions that "statements, questions, etc[.] of lawyers are not evidence" cannot overcome the prejudice.  *E.g.*, *United States v. Payne*, 2 F.3d 706, 714 (6th Cir. 1993); *see also, e.g.*, *Smith*, 500 F.2d at 296; *Caudle*, 707 F.3d at 363.  Plus, a curative instruction about lawyer "argument" does not even pretend to cure the prejudice from what actually happened here:  Counsel was not *arguing*, he was baking falsehoods into questions as if they were *evidence*.

### G.     Defendants Are Entitled to a New Trial Because of the Court's Delegation to DEA and Other Witnesses to Define the Law.

Plaintiffs do not deny that it is the sole province of the Court to define the law, that Defendants repeatedly and consistently objected to the Court's failure to do so, or that Plaintiffs' witnesses repeatedly "defined" key legal terms for the jury, including perhaps the most important

term in the entire case: "diversion."  Opp. at 57; *see also* Mot. at 23–24.  Instead, Plaintiffs seek refuge in the Court's earlier order regarding James Rafalski, an expert who did not even testify at trial.  That order, which correctly forbade Rafalski (or any other expert) from "express[ing] opinions as to what the law requires," Dkt. 2494 at 8, does not help Plaintiffs.  Defendants do not take issue with any witness "refer[ring] to the law as instructed by this Court," *id.*, but that is not what Plaintiffs' witnesses did.  Defendants object to precisely what the Court already ruled is improper:  A witness "express[ing] his own opinions as to what the law requires."  *Id.*

Indeed, Plaintiffs expressly admit that Carmen Catizone was ***not*** referring to the Court's instructions when he opined about Defendants' diversion-related obligations, but was instead was "confirming his [own] ***opinion***" about what "the federal and Ohio State controlled substance laws and regulations ***require***."  Opp. at 57 (quoting Dkt. 4005 at 954) (emphasis added).  That is *exactly* what the Court ruled that an expert witness *cannot* do.  Dkt. 2494 at 8.

As for Joe Rannazzisi's definition of "diversion," Plaintiffs try to argue that it was "consistent with the instructions and Verdict Form question."  Opp. at 57.  But this ignores the fact that—as this Court itself observed—there was no definition of "diversion" in the jury instructions or verdict form.  Dkt. 4157 at 7340 (Nov. 16 trial tr., vol. 29).  Plaintiffs next suggest that there can be no prejudice to Defendants because further instruction on legal terms in a statute is only necessary "if the statute contains words or phrases of doubtful or ambiguous meaning."  Opp. at 56 (quoting *Smith v. Justarr, Inc.*, 657 N.E.2d 542, 545 (Ohio Ct. App. 1995)).  But there is no question that the word "diversion" was of doubtful or ambiguous meaning ***to the jury***, whose only substantive question in a week of deliberations sought a definition of that very term.

Finally, Plaintiffs thoroughly mischaracterize Defendants' argument by faulting them for not objecting to every instance of a Plaintiffs' witness providing improper legal testimony and

claiming that "Defendants . . . complain that the Court declined" to give "their proposed instruction" in response to the jury's question, even though it "admittedly [was] not being 'the DEA definition' of diversion." Opp. at 58. As Defendants explained, the Court's refusal—over Defendants' objection and proposed instruction—to provide an instruction defining "diversion" was error in the first instance. Mot. at 24–25. The prejudice of that error was highlighted by the jury's request for "the DEA definition" because they had no definition from the Court while hearing legal opinion testimony from witnesses like Rannazzisi. That the sole definition of what is possibly the most important legal term in the case came not from the Court—or even from an expert witness—but from a fact witness, is facially improper and prejudiced Defendants. That improper delegation of the Court's role, and resulting prejudice, requires a new trial.

### H.    Permitting Catizone to Testify About His Understanding of the CSA's Obligations and About Red Flags Was Prejudicial and Warrants a New Trial.

Relatedly, the Court erred by allowing Catizone to offer irrelevant (and inaccurate) testimony about (1) the supposed customs and standards of care imposed on chain pharmacies by the CSA and (2) the consequences of filling "red flag" prescriptions. *See* Mot. at 26–29.

*First*, after correctly recognizing that Catizone could not tell the jury "what's legally right" about what the CSA requires—and sustaining an objection on that ground—the Court reversed itself and allowed such testimony. *See, e.g.*, Dkt. 4005 at 976 (trial tr., Oct. 7, vol. 4). The Court was open about this, explaining that Catizone "could properly testify as to his understanding of the law as it applies to pharmacies and pharmacists." *Id.* at 977.

Plaintiffs somehow claim that this line of questioning—which the Court expressly tied to "the legal responsibility of what a pharmacist is," *id.* at 978—did not amount to "'instruct[ing] the jury' on the legal interpretation of the CSA." Opp. at 62. But they concede that Catizone testified that "the CSA did not place unilateral responsibility on the pharmacist." *Id.* at 61. And Catizone

said far more about his "understanding of the legal obligation[s]"—also testifying that "[t]he pharmacy has to provide the tools and the support that a pharmacist needs to practice" and implement "controls . . . for the closed system for controlled substances"; that pharmacists must "identify[] red flags, resolv[e] red flags, and then document[] the resolution of those red flags before a prescription is dispensed"; and that this "documentation was important [and] necessary." Dkt. 4005 at 980–86 (trial tr., Oct. 7, vol. 4).  Then Catizone testified explicitly that these "requirements are in the laws, in the rules, in the regulations because the opioid epidemic has been so tragic." *Id.* at 987.  This cannot be anything but Catizone's statutory interpretation on critical and disputed legal issues meant solely for the Court to decide.

*Second*, the Court erred by allowing Catizone to testify about the supposed consequences of filling red-flag prescriptions.  This Court correctly held in its *Daubert* ruling that "Plaintiffs have not shown Catizone is qualified to offer expert opinions regarding a statistical link or causal correlation between the number of 'red-flagged' prescriptions and actual diversion of opioids, or that 'red-flagged' prescriptions, *in fact*, were diverted at a higher rate than other prescription opioids." Dkt. No. 3947 (Catizone *Daubert* Order) at 11.  Yet, the Court allowed precisely this testimony at trial:  that the dispensing of a "red flag" prescription *would* lead to diversion.  Dkt. 4005 at 1041–42 (trial tr., Oct. 7, vol. 4).  Plaintiffs admit that Catizone testified about "the consequences of filling 'red flag' prescriptions." Opp. at 62.  They just couch it as the "*likely* consequences." *Id.* at 63.  But Catizone did more than say what *could* happen; he testified that filling these prescriptions "can lead to diversion *and would lead to diversion*." Dkt. 4005 at 1041 (trial tr., Oct. 7, vol. 4); *see also, e.g.*, *id.* ("foreseeable that [red-flagged prescriptions] *would* lead to abuse, diversion, and fraudulent acts") (emphasis added)).  Not only that, but Catizone also testified that "those drugs leave the closed system and get outside of that system and get into the

hands of people that shouldn't be taking that medication." *Id.* at 1042. That is not speaking about what hypothetically *could* happen or even about what was foreseeably likely to happen; it is speaking about what *would* and *does* happen—exactly what this Court already had ruled was outside of Catizone's expertise and therefore out of bounds under *Daubert*.

Plaintiffs do not dispute that Catizone's testimony can be "both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). Nor do they dispute that these comments prejudiced Defendants, as they went to the very heart of the case: whether unresolved "red flag" prescriptions were in fact diverted. Accordingly, the Court should order a new trial without these prejudicial errors.

### I.     The Court Exceeded Its Authority By Forcing Walmart to Get Brad Nelson to Testify.

Defendants demonstrated that the Court exceeded its authority by coercing remote testimony from Brad Nelson—a witness who was outside the Court's subpoena power and who testified only because the Court ordered it. *See* Dkt. 4047 (Order Regarding Testimony of Brad Nelson). Plaintiffs do not dispute that the Court "ordered" Nelson to testify. Opp. at 64. Nor could they: At trial, the Court made clear it was "order[ing]" Nelson to testify (or else Walmart would face "draconian sanctions," Trial Tr. at 2409); and, by separate decision, the Court expressly "ORDERED [Nelson] to testify via live video" and "ORDERED [Walmart] to ensure timely service of this order upon Mr. Nelson" and "to make the necessary arrangements for []his testimony," Dkt. 4047 (Nelson Order) at 2.

Instead, Plaintiffs newly contend that Walmart lacks "standing to object" because Nelson is "a former employee"; and, second, argue that "the Court's order fully comported with the Federal Rules." Opp. at 64. They are wrong on each point.

**1.**  On "standing," the Court issued its order directly to Walmart.  *See id.* at 64–65.  The Court "ORDERED" Walmart to "ensure timely service of this order upon Mr. Nelson" and "to make the necessary arrangements for []his testimony," Dkt. 4047 (Nelson Order) at 2.  Or, to use Plaintiffs' formulation, the Court "compel[led] Nelson to testify" to avoid "draconian sanctions" *against Walmart*.  Opp. at 65 n.89, 66.  As Walmart itself was directly affected by this Court's order, it has "standing" to object.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see, e.g.*, *Krause v. Rhodes*, 535 F. Supp. 338, 344 (N.D. Ohio 1979), *aff'd*, 671 F.2d 212 (6th Cir. 1982) (party has standing to object to discovery order when its interests are adversely affected).  Walmart, in other words, is not raising Nelson's interests but its *own*.  The cases Plaintiff cite, which are about who has standing to move to quash subpoenas directed at third parties, Opp. at 66, are therefore inapposite.  Plus, this Court entirely skirted the subpoena process by coercing Nelson's testimony without a subpoena—Plaintiffs never subpoenaed Nelson, so no one had the chance to move to quash the subpoena (as Nelson would have).

Plaintiffs also imply that Walmart acquiesced in Nelson's testimony, but that suggestion defies the record.  After the Court ordered Walmart to make the arrangements on the threat of "draconian sanctions," Walmart objected multiple times, on the record and in writing.  *See, e.g.*, Trial Tr. 2408–09, 2524.  Nelson did not want to testify live, and Walmart did not want that either—thus the repeated objections.  But the testimony was ordered over those objections.  Walmart did nothing to waive its right to object to that order.

**2.**  Walmart's objections should have been sustained, because the Federal Rules do not give trial courts the sweeping authority to compel live testimony from nonparties anywhere in the country for no reason other than that the witness lives far away.  *Contra* Dkt. 4047 (Nelson Order) at 1.  In fact, the Federal Rules do the exact opposite.  They constrain courts by ensuring that

nonparty witnesses may be ordered to "attend a trial" only "within 100 miles of where the person resides," and they generally require that "the witnesses' testimony must be taken in open court" where the trial takes place.  Fed. R. Civ. P. 43(a), 45(c)(1)(A).

There is a narrow exception to this in-person-testimony requirement, under which "the court may permit testimony . . . by contemporaneous transmission from a different location" "[f]or good cause in compelling circumstances."  Fed. R. Civ. P. 43(a).  This exception does not apply for at least two reasons, however.

*First*, the exception applies only to a witness within "the reach of [the court's] subpoena power"—here, within 100 miles of Cleveland.  *Lea v. Wyeth LLC*, No. 03-CV-1339, 2011 WL 13195950, at *1 (E.D. Tex. Nov. 22, 2011).  Plaintiffs do not dispute that Nelson was outside this Court's subpoena power; the Court could not order him to testify in Cleveland.  This alone is enough to end this debate, as court after court has held.  *See* Mot. at 31–32 (collecting cases).  While some other courts have disagreed, the language of the Rules, and the Advisory Committee Notes accompanying them, shows that "live video testimony under Rule 43 [is] subject to the same geographic limits as a trial subpoena under Rule 45."  *Black Card LLC v. Visa USA Inc.*, No. 15-CV-27, 2020 WL 9812009, at *3 (D. Wyo. Dec. 2, 2020).  Rule 43 nowhere allows a court to do what this Court did—against objection, order the live testimony of someone halfway across the country.  All it does is "permit" the court, *if* the court otherwise has power over the witness, to allow remote rather than in-person live testimony for good cause and in compelling circumstances.  Fed. R. Civ. P. 43(a).  Because this Court lacked power over the witness—and did not "permit" the remote testimony but *ordered* it—this Court transgressed the Rules, regardless of any supposedly compelling circumstances.

*Second*, even if Plaintiffs' cited cases were right, this Court still had no ability to order Nelson to testify remotely because its order was not supported by "good cause in compelling circumstances." *Id.* All this Court said about the "good cause and compelling circumstances" for Nelson's remote testimony was the following: "Mr. Nelson resides in Arkansas." Dkt. 4047 (Nelson Order) at 1. That is it. And the true reason—to punish Walmart—of course could never constitute "good case."

Plaintiffs point to some reasons the Court offered for wanting to hear from Nelson—he would testify about supposedly "relevant documents," Opp. at 70—but that goes to the reason for Nelson to testify *at all*, in person or remotely, not to the compelling reason he needed to testify *remotely*. And Rule 43 requires there to be "good cause in compelling circumstances" for "testimony . . . by contemporaneous transmission from a different location"—that is, compelling circumstances requiring *remote testimony*, not just testimony in general. Fed. R. Civ. P. 43(a).

Residing far away is not "good cause and compelling circumstances." *Contra* Dkt. 4047 (Nelson Order) at 1. Plaintiffs barely try to defend the Court's reasoning on that score. In a footnote, they claim that "geographical distance" alone "can provide [this] good cause." Opp. at 70 n.102. But if that were right, the exception would swallow the rule. Witnesses who "live more than 100 miles from the courthouse" could *always* be compelled to testify remotely, and witnesses who live within 100 miles of the courthouse could *always* be compelled to testify in person. *Aoki v. Gilbert*, No. 11-cv-02797, 2019 WL 1243719, at *2 (E.D. Cal. Mar. 18, 2019). Plaintiffs' reading would give courts the power to compel testimony of *any* witness, *anywhere* in the country. Even Plaintiffs' cases recognize that this result contravenes the Advisory Committee Notes, *e.g.*, *id.*, which require the good cause for remote testimony to be something "unexpected," such as when a witness is set to testify in person but comes down with an illness. *Stone Tech. (HK) Co. v.*

*GlobalGeeks, Inc.*, No. 20-cv-23251, 2021 WL 2940256, at *2 (S.D. Fla. July 13, 2021). When, instead, the party "could reasonably foresee the circumstances offered to justify transmission of testimony" remotely—as when a witness lives far away—courts may not permit such testimony. *See, e.g.*, *Off. Comm. of Unsecured Creditors v. Calpers Corp. Partners LLC*, No. 18-cv-68, 2021 WL 3081880, at *4 (D. Me. July 20, 2021).

After half-heartedly trying to defend this Court's actual reasoning—that good cause existed merely because "Nelson resides in Arkansas," Dkt. 4047 (Nelson Order) at 1—Plaintiffs attempt to inject after-the-fact reasoning and factors from their line of cases. But it is too late for that. And, in any event, the five factors Plaintiffs belatedly try to insert into the case do not apply (and favor Defendants) when, as here with Walmart's *former* employee, the defendant lacks any "control . . . over the witness" and cannot "produc[e] the witness voluntarily." *See Chapman v. Tristar Prods., Inc.*, No. 16-cv-1114, 2017 WL 7048986, at *1 (N.D. Ohio July 6, 2017). This Court accordingly lacked the authority to order the live, remote testimony of Nelson.

### J. Permitting Plaintiffs to Reference the DOJ Complaint Against Walmart Was Error Warranting a New Trial.

Plaintiffs do not dispute that the DOJ Complaint against Walmart is inadmissible hearsay, lacks probative value, and is prejudicial. Opp. at 76–84. Nor could they. *See* Mot. at 34 (collecting authorities). Plaintiffs also never dispute this Court's initial ruling that they could not reference the complaint at trial. Yet, Plaintiffs *did* discuss the complaint—and they attempt to defend this solely on the grounds that Walmart supposedly "opened the door" to this inadmissible and prejudicial evidence. Opp. at 76. But the "open door" rule did not support the admission of this evidence.

For one thing, Walmart's questioning did not open the door to unproven allegations of CSA violations. If any door were open, it would be a door with a small crack for Plaintiffs to rebut

26

Walmart's "business culture" and "corporate culture" as focused on serving customers.  Dkt. 4109 at 5077, 5079, 5116 (Nov. 1 trial tr., vol. 20).  Yet, this Court acted as though the door were wide open to "whatever [Plaintiffs] want."  *Id.* at 5079.  Plaintiffs understandably chose the most damaging thing to Walmart:  the fact that the DOJ had sued it, alleging many of the same things as Plaintiffs here.  *Id.* at 5079.  A DOJ lawsuit, though, did not fit within the narrow door Walmart had arguably opened; it blew open an entirely new door.

Of course, even if general references to Walmart's corporate culture somehow opened the door for CSA violations from other cases, a *mere complaint* still would not fit through that door. The DOJ Complaint contains only "unproven[] accusations," which are "simply . . . not relevant to [an open-door] subject."  *Beck v. Haik*, 377 F.3d 624, 642–43 (6th Cir. 2004), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (ordering a new trial in large part because of this "significant" error).  Plaintiffs' cases about a corporate party opening the door to "the corporation's prior *conviction[s]*" are thus irrelevant.  Opp. at 82 (emphasis added). Plaintiffs cite only two cases that deal with unproven allegations, and each addresses impeaching a third-party "character witness" who testified about someone else's reputation under Rule 405. By expanding these outlier cases into a rule that allows questions relating to the allegations at the heart of the case, Plaintiffs subvert the other Sixth Circuit authority on this issue, *see, e.g.*, *see United States v. King*, 378 F.2d 359, 360 (6th Cir. 1967); *United States v. Yarbrough*, 352 F.2d 491, 493 (6th Cir. 1965), and "subvert[] the doctrine of opening the door 'into a rule for injection of prejudice,'" *Valadez v. Watkins Motor Lines, Inc.*, 758 F.3d 975, 982 (8th Cir. 2014).

Finally, even if unproven allegations were allowed, the prejudice from *these* unproven allegations—by the Department of Justice and related to the same underlying conduct at issue— outweighs any probative value to rebut general testimony about Walmart's corporate culture.  Fed.

R. Evid. 403; *see, e.g.*, *Stockman*, 480 F.3d at 798–99 (for this reason, concluding that "the district court erred in finding that Defendants 'opened the door' to the inclusion of the settlement evidence").

**K.  The Court Should Order A New Trial That Excludes Extraterritorial Evidence.**

This Court prejudicially erred by admitting extensive evidence "concerning alleged conduct that occurred outside of [Plaintiff] Counties" without an established "foundation showing a specific nexus connecting th[e] extraterritorial conduct to harm suffered by one of the Counties and a specific Defendant's" conduct. Dkt. 3421 at 1.  This evidence was "irrelevant to the facts at issue in this trial, *see* Fed. R. Evid. 401, 402, inadmissible 'other bad acts,' *see* Fed. R. Evid. 404(b), and unfairly prejudicial, *see* Fed. R. Evid. 403." *Id.*; *see id.* at 1–5.

Plaintiffs first try to downplay the *amount* of the impermissible extraterritorial evidence, claiming that Defendants did not "identify" enough examples.  Opp. at 84–85.  But the examples cited in Defendants' motion were just that:  representative examples (complete with "*e.g.*" signals) of extraterritorial evidence.  Other examples abound:  P-00015, P-08954, P-08955, P-10212, P-10213, P-10214, P-14711, P-14750, P-21113 (out-of-state settlements); P-08068, P-26732, P-26736, P-26737 (blanket refusal decisions for out-of-state physicians); and P-19720, P-19724 (suspicious controlled substance orders placed by non-County stores); *see also, e.g.*, Dkts. 3420, 3421, 3972, 4044 (more on extraterritorial settlement evidence).

When Plaintiffs do make a show of attempting to defend this Court's decisions on the merits, they do nothing more than cross-reference their earlier briefing and spend seven pages breaking down the three examples Defendants gave.  Opp. at 86–92.  Plaintiffs badly miss the forest for the trees.  Ultimately, they never address Defendants' broader point:  that national evidence should not have come in *without a specific nexus to the Counties*.  *See, e.g.*, *In re*

*Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402–03 (3d Cir. 2015).  To take just one example, Plaintiffs maintain it is "highly relevant" that a Walmart pharmacy manager emailed about how a store *in Missouri* would no longer fill prescriptions for a specific prescriber, and received a response from Brad Nelson that Plaintiffs consider unsatisfactory.  Opp. at 89.  But other than a cursory assertion about how Nelson would give similar advice elsewhere—but not in Plaintiff Counties—Plaintiffs never even attempt to connect what happened *in Missouri* to Lake or Trumbull Counties.  This admitted "extraterritorial evidence," *id.* at 94, with no specific link to Plaintiff Counties, made the jury think that what happened in Missouri, for example, mattered in Northeast Ohio.  *See Stern v. Shouldice*, 706 F.2d 742, 750 (6th Cir. 1983).  But as a matter of law, it did not.  This Court should thus order a new trial in which Plaintiffs are prohibited from back-dooring their way to a verdict for Plaintiff Counties using evidence from hundreds of miles away and with no connection to the Counties.

L.  **The Court Should Order a New Trial Because the Jury Instructions It Gave (and Refused to Give) Tainted the Jury's Verdict.**

The jury instructions considered as a whole were erroneous, prejudicial to Defendants, and confusing and misleading to the jury.  *See, e.g.*, Dkt. 4146; Mot. at 38–39.

The parties have joined issue on these instructions many times before.  *See, e.g.*, Dkt. 4146; Mot. at 38–39.  Plaintiffs here offer only one new (specious) argument.  Even though "Defendants objected to the Court's erroneous jury instructions and verdict form every chance they had," and despite "formally object[ing] again" in the new-trial motion, Mot. at 38, Plaintiffs insist that Defendants "have waived such objections," because Defendants cross-referenced their previous objections rather than repeating those 71 pages of objections in the new-trial motion.  Opp. at 94.  Plaintiffs cite no case law to support this argument, and there is none.  *See* Fed. R. Civ. P. 51(c).  Defendants preserved these objections over and over again.  *See Libbey-Owens-Ford Co. v. Ins.*

*Co. of N. Am.*, 9 F.3d 422, 427 (6th Cir. 1993); *see also Frye v. CSX Transp., Inc.*, 933 F.3d 591, 602 (6th Cir. 2019). Indeed, this Court *ordered* Defendants to cross-reference previous arguments rather to repeat every single one again and again. *See, e.g.*, Dkt. 3758 at 7; *see also, e.g.*, No. 17-md-2804, Dkt. 3325 at 1 n.2. By objecting yet another time for "the reasons detailed in Defendants' previous filings," Mot. at 38, Defendants preserved their jury-instruction arguments many times over. The Court's errors with the jury instructions warrant a new trial.

### M.    The Court's Many Errors Combined To Make This Trial Fundamentally Unfair.

To the dozen-plus errors outlined above, Plaintiffs argue that each is "individually harmless." Opp. at 98. That is not true for the reasons explained. Even if it were true, however, the *collective* harm from those numerous errors would warrant a new trial. *See Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).

Plaintiffs argue that "any errors were minor and occurred against both sides," Opp. at 99, but that is demonstrably untrue. As Defendants illustrated in their opening brief, the Court's errors were substantial and "not inconspicuously cut[] *against* Defendants." *E.g.*, Mot. at 40. Defendants did not get a fair shake. The Court should order a new trial, if for no other reason than because the cumulative effect of the Court's errors—well documented and well briefed here and elsewhere, *contra* Opp. at 100—made the trial fundamentally unfair for Defendants. No remedy will cure these errors except a new trial.

### CONCLUSION

For these reasons, if the Court does not grant judgment as a matter of law in favor of Defendants, it should order a new trial.

Dated:  January 31, 2022

Respectfully submitted,

/s/  John M. Majoras
John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

*/s/ Eric R. Delinsky*

Eric R. Delinsky
Alexandra W. Miller
Graeme W. Bush
Paul B. Hynes, Jr.
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC  20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com
E-mail: gbush@zucerkman.com
E-mail: phynes@zuckerman.com

Counsel for CVS Pharmacy, Inc., Ohio
CVS Stores, L.L.C., CVS TN Distribution,
L.L.C., CVS Rx Services, Inc., and CVS
Indiana, L.L.C.

*/s/ Kaspar J. Stoffelmayr*

Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Bartlit Beck LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,
Walgreen Co., and Walgreen Eastern Co., Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system on all counsel of record on January 31, 2022.


*/s/  John M. Majoras*
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*