# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) |
| | ) **MDL 2804** |
| THIS DOCUMENT RELATES TO: | ) **Case No. 1:17-md-2804** |
| | ) |
| *Track Three Cases:* | ) **Judge Dan Aaron Polster** |
| | ) |
| *County of Lake, Ohio v.* | ) **OPINION AND ORDER** |
| *Purdue Pharma, L.P., et al.,* | ) |
| *Case No. 18-op-45032* | ) |
| | ) |
| *County of Trumbull, Ohio v.* | ) |
| *Purdue Pharma, L.P., et al.,* | ) |
| *Case No. 18-op-45079* | ) |

Before the Court is Pharmacy Defendants' Joint Motion for New Trial (Doc. #: 4204).

Plaintiffs filed a response in opposition (Doc. #: 4242) and Defendants filed a reply (Doc. #: 4258).

For the reasons stated below, the Pharmacy Defendants motion is **DENIED**.

### Legal Standard

Under Federal Rule of Civil Procedure 59, the Court, "may, on motion, grant a new trial

on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new

trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).

The Sixth Circuit has interpreted Rule 59 as permitting a new trial "if the verdict is against the

weight of the evidence, . . . or if the trial was influenced by prejudice or bias, or otherwise unfair

to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). A trial

court is invested with broad discretion to determine whether the moving party has identified

sufficient grounds to obtain a new trial. *See Cummins v. BIC USA, Inc.,* 727 F.3d 506, 509 (6th

Cir. 2013).

In their motion, the Pharmacy Defendants argue they are entitled to new trial both because the jury verdict was against the weight of the evidence and because the trial was unfair to them. The Court addresses both grounds in turn below.

### Argument I: Verdict Against the Weight of the Evidence

In this first branch of the Pharmacy Defendants' motion, Defendants assert the jury verdict was against the great weight of the evidence.

A court may grant a motion for a new trial under Rule 59 only when the verdict is clearly against the weight of the evidence. *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (citing *J. C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991)). Thus, a new trial will not be granted if the jury's verdict is "one which reasonably could have been reached." *Id.* (citing *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). While Rule 59 permits the reconsideration of rulings, it is not a mechanism for the losing party to re-argue their case or otherwise obtain a "do-over." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 826 (6th Cir. 2013). Rather, Rule 59 does nothing more than preserve the trial judge's authority to "prevent a miscarriage of justice" in those rare instances when a jury's verdict was against the clear weight of the evidence. *Waldo*, 726 F.3d at 826 (6th Cir. 2013).

The Pharmacy Defendants assert the great weight of the evidence at trial showed that: (1) "their pharmacists are highly trained healthcare professionals who care deeply about their patients and about the communities where they live and work, and who are supported by some of the best resources in the business," Motion at 4 (Doc. #: 4204); (2) "their pharmacists in Lake and Trumbull Counties have always been strong allies, not adversaries, to local regulators and law enforcement in the fight against drug diversion," *id.* at 4–5; (3) their "pharmacists are not trained as doctors and

do not make prescribing decisions," *id.* at 5; and (4) "there was nothing to tie any [criminal] wrongdoing to Defendants' pharmacies located in the two counties." *Id.* at 6.

Even if all of these assertions are true, however, other evidence adduced at trial amply supports the jury's conclusion that actions taken and not taken by each Defendant were a substantial factor in causing a public nuisance.

Each of the Defendants' assertions is addressed, directly or indirectly, in the Court's ruling on the Pharmacy Defendants' Rule 50 motions for judgment as a matter of law, which the Court incorporates herein by reference. In that order, the Court concluded the jury had a reasonable basis, well supported by the evidence, to reach its verdict. *See generally* JMOL Order at 3-29 (Doc. #: 4295). Because the jury's verdict could reasonably have been reached and was supported by the evidence, the Pharmacy Defendants are not entitled to a new trial on this ground.

## Argument II: Trial was Unfair

In the second branch of their motion, the Pharmacy Defendants claim they are entitled to a new trial because the trial was unfair. To support this argument, Defendants identify thirteen categories of alleged errors.

To obtain a new trial based on the grounds of unfairness, the moving party must identify errors that impacted the parties' substantial rights. *Walker v. Bain*, 257 F.3d 660, 670 (6th Cir. 2001) (citing Fed. R. Civ. P. 59, 61). Stated differently, the identified errors must have been so prejudicial that a refusal to grant a new trial is "inconsistent with substantial justice." *Burks v. O'Connor, Kenny Partners, Inc.*, 33 F. App'x 781, 783 (6th Cir. 2002) (internal citations omitted); *see also Verhoff v. Time Warner Cable, Inc.*, 3:05-cv-7277, 2007 WL 2815215, at *4 (N.D. Ohio Sept. 26, 2007) ("[A]ny failure to have had a perfect  trial, where all rulings were completely

3

correct and irrefutable, and [the judge's] performance was infallible, is not, without a showing of prejudice, a basis for trying once again at a new trial.").

Moreover, when a claimed error relates to evidence admitted at trial, the moving party must demonstrate that the claimed error was not harmless. *Cummins*, 727 F.3d at 510. This is because "[t]he district court has broad discretion to determine questions of admissibility; an evidentiary ruling is not to be lightly overturned." *Id.* Thus, even if there was an error in an evidentiary ruling, "a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Tompkin v. Philip Morris USA, In re*, 362 F.3d 882, 891 (6th Cir. 2004).

Below, the Court examines each of the Defendants' alleged errors in light of this standard. At the outset, the Court notes that, despite the Pharmacy Defendants' vigorous assertions of prejudice, they did very little to identify any creditable reason to believe the jury might have decided anything differently and reached a defense verdict. This is likely because, as will be explained in more detail below, the Court, at all times, went to great lengths to ensure the trial was conducted fairly.

### A. Juror Misconduct

Defendants begin by rearguing they are entitled to a new trial due to juror misconduct. During the trial, one of the jurors, Juror No. 4, decided on her own to print copies of a document regarding the availability of free Narcan (or Naloxone) and distribute them to other jurors.[1] It is not entirely clear why she did this or exactly where she obtained this information. What *is* clear is that her misconduct had no impact on the other jurors, and Defendants suffered no prejudice as a

---

[1] Defendants speculate this information may have been beneficial to Plaintiffs' case, but that is not at all clear. As noted by Defendants, Plaintiffs' counsel initially said he believed a mistrial was appropriate, which suggests he may have believed the juror misconduct was harmful to *Plaintiffs'* case.

result. As is further explained below, the case law cited by Defendants is inapposite. Also irrelevant is Plaintiffs' counsel's initial response to the juror misconduct. Because Defendants have failed to show prejudice as a result of juror misconduct, they are not entitled to a new trial on that basis.

Rule 59 of the Federal Rules of Civil Procedure permits the Court to "grant a new jury trial on all or some of the issues—and to any party—for any reason for which a new trial has heretofore been granted in an action at law in federal court." "The decision whether to grant a new trial is left to the sound discretion of the district court, and [a reviewing court] will not reverse absent a clear abuse of discretion." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). The appellate court applies an abuse-of-discretion standard in jury-misconduct cases precisely because "[t]he trial judge is in the best position to determine the nature of the alleged jury misconduct, and . . . to determine appropriate remedies for any demonstrated misconduct." *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir. 1995).

When an allegation of juror misconduct arises, a district court is required to investigate the claim in order to determine whether the misconduct tainted the trial. *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006). Here, in accord with *United States v. Wheaton,* 517 F.3d 350, 360-361 (6th Cir. 2008), the Court promptly undertook an investigation of Juror No. 4's misconduct. Specifically, immediately upon learning of Juror No. 4's actions – after another juror informed the Court's clerk what had occurred – the Court called Juror No. 4 in to open court and questioned her on the record. Then, the Court individually questioned each of the other jurors, also on the record and in open court. The Court specifically and carefully asked the other jurors whether they had read the document Juror No. 4 had set down at each of their places at the jury room table that morning, and whether the document had influenced them in any way, or had affected their ability to reach a fair and impartial verdict. Each juror responded in the negative; many had not even read

the document, and/or purposefully ignored it because the Court had previously, repeatedly admonished them not to consider any evidence outside of what was admitted in the courtroom. During this colloquy, the Court purposefully used open-ended questions and elicited conversation to ensure each juror was honest and candid regarding any effect Juror No. 4's document might have had. After the Court finished questioning each juror, the Court gave counsel an opportunity to ask their own questions, both of Juror No. 4, *see* 10/22/21 Trial Tr. at 3724:25–25:3, and of the other jurors, individually. *See, e.g., id.* at 3729:14. In the end, the Court concluded the juror misconduct had had little, if any, impact on all of the other jurors.

As in *Wheaton,* the Court took further steps to remedy the juror's misconduct by again admonishing the jury to avoid independent investigation and reminding them the verdict must be based solely on the evidence presented at trial. *See United States v. Copeland*, 51 F.3d 611, 613-614 (6th Cir. 1995) (concluding the district court did not abuse its discretion in dealing with allegations of juror misconduct where it "investigated the merits of the charge and rendered the appropriate cautionary instructions"). And the Court's admonition was further emphasized when, despite her plea to remain on the jury, Juror No. 4 was disqualified from continuing her service, and the Court explained the reason for her dismissal to the remaining jurors.

To prevail on their motion for a new trial, Defendants must show they were prejudiced by Juror No 4's misconduct. *See United States v. Sherrill,* 388 F.3d 535, 537 (6th Cir. 2004) (denying a Sixth Amendment claim based on juror misconduct where the defendant "provided no evidence . . . that [the alleged misconduct] had a prejudicial effect on his defense"); *see also Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation."). Defendants have not met this burden.

6

Defendants' only arguments that prejudice exists are: (1) the Court was surprised at Juror No. 4's disregard of the clear jury instructions; and (2) Plaintiffs' counsel initially expressed his acquiescence to the declaration of a mistrial. Motion at 15–16 (Doc. #: 4204). But the Court's and/or counsel's reactions are irrelevant to showing prejudice. The simple fact is that every other juror stated **believably**, after direct questioning by the Court, that Juror No. 4's misconduct had no impact on their ability to render a fair and impartial verdict.[2] Juror No. 4 was disqualified, and the remaining jurors were admonished. Defendants have failed to show any prejudice resulting from juror misconduct in this case.

Defendants also contend that they have "been unable to identify a single case in which counsel for both sides agreed that a mistrial was warranted and the Court nonetheless refused to grant a mistrial." Motion at 17 (Doc. #: 4204). Perhaps Defendants should have looked harder, because the Court reviewed two such cases, each with more egregious misconduct than occurred in this case, before denying Defendants' motion for a mistrial. *See Hawkins v. State,* No. 12-11-00114-CR, 2012 Tex. App. LEXIS 5229 (Tex. App. June 29, 2012) (court reporter sent "inappropriate" texts to a female prospective juror in a criminal trial); *Jones v. State*, 126 N.E.3d 45 (Ind. Ct. App. 2019) (member of criminal defendant's family whispered to juror during trial about "self-defense," and juror mentioned it to other jurors). Moreover, because Plaintiffs quickly withdrew their initial, oral support for a mistrial, and then formally opposed Defendants' mistrial

---

[2] As noted, it was one of the other jurors who brought Juror No. 4's misconduct to the Court's attention. This further suggests the jurors were troubled, not influenced, by her misconduct, a theme several jurors echoed during colloquy with the Court.

7

motion in writing, the "joint position" was rendered moot before the Court even ruled on Defendants' motion. *See* Pls Opposition to Motion for Mistrial (Doc. #: 4069).[3]

Defendants rely on *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 213-14 (6th Cir. 1982), and *Nian v. Warden N. Cent. Corr. Inst.,* 994 F.3d 746, 758 (6th Cir. 2021). *See* Motion at 14 (Doc. #: 4204). But in both of these cases, the trial court did not become aware of juror misconduct until after the jury had rendered a verdict. *Beverly Hills,* 695 F.2d at 212; *Nian,* 994 F.3d at 750. Obviously, in those cases, the Court was unable to investigate the extent of any juror taint or to remedy the misconduct before jury deliberations. Defendants argue the Sixth Circuit has "never limited the principles in *Beverly Hills* or *Nian* to juror misconduct discovered after a verdict, or declined to order a mistrial because the injection of extraneous information was 'cured' by a limiting instruction." Motion at 16 (Doc. #: 4204). This argument is inaccurate.

---

[3] The Pharmacy Defendants also pull a small handful of the Court's statements out of context to insinuate the Court pressured Plaintiffs to change their mind about joining the request for a mistrial. *See* Motion at 8 (Doc. #: 4204). A review of the entire record, however, easily dispels this implication. Rather, the Court worked methodically through the juror misconduct problem, *see* 10/22/21 Trial Tr. at 3723:16–17 (Doc. #: 4065) ("Well, let's take this one step at a time") and presented the parties with the facts as the Court viewed them, including that the enormous resources all parties had spent getting to trial would be wasted and that scheduling a new trial would be difficult. Accordingly, the Court encouraged counsel to discuss the matter with their clients, consider the effects a mistrial would have, and not rush a decision. *See id.* at 3770:4–7 ("[W]hat I'm going to suggest is that defendants take the rest of the day and the weekend to confer with their clients and decide if they want to join in the motion [for mistrial]."); *id.* at 3766:8–11 ("You can move for mistrial at any point. I mean, I'm not – I'm denying it at this point, but you can all – you can renew it, and you don't have to make a snap decision."). The Court wanted to use the weekend to allow it and all parties to reflect on whether the dramatic and expensive choice of a mistrial was truly necessary. The Court's measured, methodical approach merely suggested a thoughtful response to an otherwise tense situation – a completely reasonable position with which at least one Defendant agreed. *See id.* at 3765:21–66:8 (counsel for Walmart requesting time to discuss with his client and co-defendants). The Court also made several other statements trying to take pressure *off of* the parties. *See id.* at 3767:11–17 (offering to give a curing instruction); *id.* at 3744:8–10 ("[I]f you really think that this jury will not be able to decide this case fairly based on the evidence, then you ought to move for a mistrial.").

The Sixth Circuit may not have expressly limited *Beverly Hills* or *Nian* to post-verdict discovery of juror misconduct. However, the Sixth Circuit *has* declined to order a mistrial when juror misconduct was cured by a limiting instruction and no prejudice was shown. For example, in *Wheaton,* one of the jurors used his laptop during deliberations to replay audio and video recordings and to answer the jurors' questions regarding the distance between Youngstown and two other towns in Ohio. The misconduct was discovered prior to the jury rendering its verdict, yet the district court did not order a mistrial. Rather, it privately admonished the juror and reminded all of the jurors they were not allowed to do independent research. *Wheaton,* 517 F.3d at 359. The Sixth Circuit affirmed because the defendant did not demonstrate any prejudice from the juror's misconduct. *Id.* at 361. Thus, contrary to Defendants' argument, the Sixth Circuit *has* declined to order a mistrial when no prejudice was shown as a result of a juror improperly providing extraneous information to other jurors. The present case is far more akin to *Wheaton* than to the cases cited by Defendants. Because Defendants have failed to demonstrate any prejudice resulting from juror misconduct, they are not entitled to a new trial on that basis.

### B. Unvaccinated Jurors

Defendants next argue they are entitled to a new trial because the Court erred when it excluded three unvaccinated individuals from the venire after those individuals had been cleared for cause during voir dire. According to Defendants, the decision to exclude these potential jurors based on their COVID-19 vaccination status deprived Defendants of their right to select jurors from a fair cross section of the community. Motion at 10–11 (Doc. #: 4204). Yet Defendants neither address the potentially disruptive effect unvaccinated jurors would have had on the trial,

9

nor explain how the unvaccinated population is a distinctive group.[4] Because Defendants do not

show that exclusion of the three unvaccinated venire-persons was an error, they cannot show any

prejudice and are not entitled to a new trial on this basis.

### 1. The Court's Power to Exclude Venire-persons

The Jury Selection and Service Act (the "JSSA") authorizes district courts to exclude from

jury service any venire-person who is "likely to disrupt the proceedings." 28 U.S.C. § 1866(c).

District courts are afforded broad discretion to exercise this power. *See also United States v.*

*Gibson*, 480 F. Supp. 339, 343 (S.D. Ohio 1979) (recognizing that the JSSA provides district courts

with broad discretion to exclude venire-persons).

Other district courts have recently relied on this provision of the JSSA to exclude

unvaccinated individuals from the venire, because those individuals were likely to disrupt the

proceedings if seated on the jury. *E.g., United States v. Cole*, 20-cr-424, 2022 WL 332083, at *5

(N.D. Ohio Feb. 3, 2022).[5] Those courts concluded that unvaccinated individuals are substantially

---

[4] Defendants' argument also overlooks the procedural history leading up to the Court's decision. The Court's early inclination was to preclude unvaccinated jurors from serving on the jury.  On June 2, 2021, the Court requested input from the parties on whether it should allow only vaccinated individuals to serve.  After considering the responses it received (defendants did not respond), the Court ruled it would only allow vaccinated individuals to serve as jurors. *See* CT3 Trial Order at 3 (Doc. #: 3758). Defendants moved for reconsideration, *see* Motion for Reconsideration (Doc. #: 3763), and Plaintiffs did not oppose that motion. (Doc. #: 3764). Finding that Defendants made "good points," the Court granted the motion for reconsideration and stated that unvaccinated individuals would not automatically be disqualified. *See* Order Granting Motion for Reconsideration at 1–2 (Doc. #: 3766).

The Court then went through the normal voir dire process, with the parties, of clearing for cause both vaccinated and unvaccinated juror candidates. Several unvaccinated candidates survived the for-cause challenges.  As described further below, however, COVID-19 had already begun to disrupt the Court's pre-trial proceedings: one unvaccinated venire-person had to be excused when he contracted COVID-19 just days before jury selection began; and another unvaccinated venire-person was excused for cause during voir dire, because his wife contracted COVID-19.  It was only at this juncture that the Court concluded exclusion of the three unvaccinated potential jurors who had been cleared for cause was necessary to minimize the risk of mistrial.

[5] *See also United States v. Elias*, 18-CR-33, 2022 WL 125721, at *4 (E.D.N.Y. Jan. 13, 2022*); Joffe v. King & Spaulding LLP*, --- F. Supp. 3d ---, 2021 WL 5864427, at *4 (S.D.N.Y. Dec. 10, 2021); *United States v. Moses*, --- F. Supp. 3d ---, 2021 WL 4739789, at *3 (W.D.N.Y. Oct. 12, 2021); *accord United States v. O'Lear*, 19-cr-349, 2022 WL 419947, at *3 (N.D. Ohio Feb. 11, 2022) (Polster, J.).

likely to cause disruption because they are considerably more likely to contract and spread COVID-19, which would delay or even suspend the proceedings while jurors isolate. *Joffe* 2021 WL 5864427 at *4.

Thus, this Court is plainly empowered to exclude any venire-person who was likely to disrupt the trial.  The Court properly exercised its discretion in excluding three unvaccinated venire-persons after voir dire was complete. The Court need only to look to the pre-trial proceedings to support the conclusion that unvaccinated potential jurors were likely to be disruptive—one unvaccinated venire-person had to be excused when he contracted COVID-19 just days before jury selection began, and another unvaccinated venire-person was excused after he was cleared for cause during voir dire because his wife contracted COVID-19. Final Pretrial Tr. at 5 (Doc. #: 3981); Voir Dire Tr. at 311 (Doc. #: 3986). Had either of these individuals been seated on the jury when their COVID-19 exposure occurred, there is no doubt that trial would have been disrupted to allow all the jurors to isolate. Indeed, even Defendants are tellingly silent on the issue of potential disruption.

Still, Defendants accuse the Court of acting arbitrarily by requiring only the jurors to be vaccinated, while every other person in the courtroom was not subjected to the same requirement. Defendants maintain that the attorneys and witnesses were at a greater risk of spreading COVID-19 because they removed their masks to speak, which also could have disrupted the proceedings, and they present this as evidence that the Court acted improperly. Reply at 5–6 (Doc. #: 4258). *Id.*[6]

---

[6] To bolster their argument, Defendants point to several courts that declined to institute any vaccination requirement, but the Court finds these other cases to be of no utility whatsoever. Even if a different district court exercised its discretion to seat unvaccinated jurors, that does not mean this Court abused its discretion in taking a different approach. Discretion, by definition, allows each district court to operate its courtroom in a manner that is most suitable for the cases before it.

The Court, however, excluded the unvaccinated potential jurors to minimize the risk of a mistrial.  Defendants' whataboutism argument fails because it does not account for the rules governing jury participation. Pursuant to Rule 48 of the Federal Rules of Civil Procedure, a civil trial cannot proceed with fewer than six jurors unless the parties stipulate to a smaller jury. *See also* Fed. R. Civ. P. 48(b), Advisory Committee Notes (explaining that a mistrial is the appropriate remedy if there are fewer than six jurors).[7] Here, seating any unvaccinated jurors would have created a substantial risk that the total number of jurors could fall below the six-person minimum, because unvaccinated individuals are more likely to contract COVID-19 and induce isolation periods after exposing others to the virus.[8] The Court, therefore, minimized the risk of a juror-shortage mistrial by exercising its power under the JSSA to exclude the unvaccinated potential jurors, and Defendants' contention that the Court acted arbitrarily by imposing safety measures for some and none for others is simply incorrect.

### 2. Fair Cross Section of the Community

Defendants' main argument in this section of their Rule 59 Motion is that the Court's post-voir dire exclusion of the three unvaccinated venire-persons violated their right to select a jury from a fair cross section of the community. Defendants are correct that the JSSA protects this right. Motion at 10 (Doc. #: 4204); *accord* 28 U.S.C. § 1861.

The Supreme Court has articulated a three-part test to assess claimed violations of the JSSA's fair cross-section requirement, which requires the movant to show:

---

[7] Given the contentious nature of the litigation and the importance of this bellwether trial within this sprawling MDL, the Court finds it extremely unlikely that the parties would have stipulated to a jury of less than six.

[8] Around the time of jury selection, unvaccinated individuals were five times more likely to contract COVID-19. CDC, *Laboratory-Confirmed COVID-19 Among Adults Hospitalized with COVID-19–Like Illness with Infection-Induced or mRNA Vaccine-Induced SARS-CoV-2 Immunity — Nine States, January–September 2021*, Morbidity and Mortality Weekly Report (Nov. 5, 2021).

(1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; ***and*** (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979) (providing the framework for assessing the fair cross-section violations); *see generally Omotosho v. Giant Eagle, Inc.*, 997 F. Supp. 2d 792 (N.D. Ohio 2014) (applying *Duren* in a civil case).  Defendants fail to prove any one of these three prongs.

### a. Distinctive Group

Under the first *Duren* element, a group is not "distinctive" simply because they have "shared attitudes" about a particular issue. *Lockhart v. McCree*, 476 U.S. 162, 175 (1986) (holding that people who are opposed to the death penalty are not a "distinctive group" and may be excluded from the venire in capital cases because viewpoints are subject to change). Rather, to find that a group is distinctive, the Sixth Circuit requires that the group shares: (1) an immutable quality, such as race or sex, that has historically been protected from underrepresentation; (2) a common thread or basic similarity in attitude, ideas, or experience that runs through the group, suggesting some level of homogeneity; and (3) a community of interest such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. *Ford v. Seabold*, 841 F.2d 677, 681-88 (6th Cir. 1988).

The Court easily concludes the unvaccinated population is not a distinctive group for the purposes of the *Duren* analysis. Indeed, the other district courts that have addressed exclusion of unvaccinated venire-persons have all concluded that the unvaccinated population is not a distinctive group within the meaning of *Duren*, because the unvaccinated population's shared

attitude about the COVID-19 vaccines is insufficient to create a distinctive group under *Lockhart*.[9] The Court agrees with its sister courts because the following application of the Sixth Circuit's *Ford* framework confirms the conclusion.

The first *Ford* element is plainly not met because the unvaccinated population does not share an immutable characteristic that has historically been protected from under-representation. Rather, an individual's vaccination status is within that individual's control, and the status can change in an instant, when the vaccine is taken. Defendants do not contend otherwise, as they neglected to address the immutable characteristic portion of this analysis.[10]

Under the second *Ford* factor, the unvaccinated population lacks the necessary common attitude, idea, or experience to be considered a distinctive group because there is a "myriad of reasons" why someone may decline the vaccine. *See Moses*, 2021 WL 4739789 at *3. For instance, vaccine refusal can be attributed to a preexisting health issue, a fear of unknown side effects, a preference for individual autonomy over public health, a general distrust of the government and pharmaceutical companies, or allegiance to persons espousing anti-vaccine dogma. Yet, Defendants do not address the diversity of experience or opinion within the unvaccinated population.

---

[9] *See United States v. Cole*, 20-cr-424, 2022 WL 332083, at *3 (N.D. Ohio Feb. 3, 2022); *Elias*, 2022 WL 125721 at *4 (citing *Lockhart*, 476 U.S. at 175); *see also Moses*, 2021 WL 4739789 at *3 (commenting on the "vast variations in attitudes, viewpoints, and experiences" within the unvaccinated population); *Joffe*, 2021 WL 5864427 at *6 (commenting on the lack of unifying definition or limits of the vaccinated population as a group).

[10] In making their fair cross-section argument, Defendants again cherry-pick case language from *Ford* to create the misleading impression that it supports their position. Specifically, Defendants cite to *Ford* for the proposition that a distinctive group need *only* share a "common thread or basic similarity in attitude, ideas or experiences." Motion at 11 (Doc. #: 4204). However, the full *Ford* opinion clearly states that a distinctive group shares an immutable quality and homogeneity. 841 F.2d at 681-88. It is bad form for Defendants to omit this portion of *Ford* simply because it does not support their argument.

14

Defendants argue only that the unvaccinated population shares a common viewpoint because there is a statistical prevalence of "conservatives, libertarians, and government skeptics" and of "nonprofessionals and lower-wage workers" within the group. Motion at 9 (Doc. #: 4204). Without explanation, Defendants summarily conclude these political identities and job characteristics alone define the unvaccinated population's viewpoint. *Id.*

The Court refuses to adopt Defendants' statistics-based approach for defining a *Duren* group, however, because it is overly simplistic and unsupported by law. While Defendants are correct that the unvaccinated population largely consists of political conservatives, their own statistics indicate that 8% of self-identified Democrats and 32% of self-identified Independents, were unvaccinated around the time of trial.[11] Thus, the unvaccinated population has a heterogenous mix of beliefs, even if left-leaning or independent individuals are a statistical minority within the group. In turn, the second *Ford* factor is not satisfied because it requires a substantial amount of homogeneity, and even the slightest critical look at Defendants' statistic-based definition of the unvaccinated population indicates that the group is diverse.

Finally, the third *Ford* element is not satisfied because there is no basis to conclude the unvaccinated population's viewpoint would be excluded from the jury. Defendants use vaccination status as a proxy for individuals with right-leaning politics and/or low-paying jobs, but there is no evidence that the exclusion of three unvaccinated individuals stripped the venire of either conservatives or low-wage, nonprofessional workers.[12] Rather, Defendants' own statistics

---

[11] Defendants cite to a single Gallup poll for their information, but there are other polls and studies that provide differing numbers regarding the political persuasion of vaccinated and unvaccinated persons.

[12] Defendants base their proxy argument on an unpublished minutes order from the Western District of Louisiana, but the Court does not find the order to be relevant or persuasive to resolve this issue. More specifically, Defendants highlight a portion of a pre-trial minutes order in which the Louisiana district court observed that vaccination status questions during voir dire "*could* be used as a proxy to tease out racial groups or political groups who may be more

15

establish that nearly 60% of self-identified Republicans and roughly 50% of nonprofessional workers were fully vaccinated around the time of trial, which means it is quite likely that the venire included at least some vaccinated individuals who were politically conservative and/or nonprofessional workers.[13] Thus, even after the post-voir dire exclusion of three unvaccinated potential jurors, the venire still included individuals with the viewpoint and experiences that Defendants now claim was missing.

In sum, application of each of the *Ford* factors demonstrates that the unvaccinated population is heterogenous. Therefore, the unvaccinated population cannot be deemed a distinctive group within the meaning of *Duren*, and Defendants cannot establish that their fair cross-section right was violated.

### b. Systemic Exclusion

Even if the unvaccinated population were a distinctive group, Defendants' argument would still fail the third *Duren* element because the exclusion of three unvaccinated potential jurors is not an inherent flaw in the jury selection process. Rather, COVID-19 is an external force the courts have been forced to handle. *Elia*s, 2022 WL 125721 at *5. "The COVID-19 pandemic and the effects that it has had on in-person proceedings are external forces for the purposes of *Duren*." *Joffe*, 2021 WL 5864427 at *6.

---

reluctant to get vaccinated." Reply at 6 (Doc. #: 4258) (citing Minutes Order, Apr. 23, 202, Doc. #: 79, *United States v. Pea*, No. 19-CR-0029 (W.D. La.)). But, the procedural posture of that case renders the minutes order inapposite: there, the Louisiana district court made its ruling during a pre-trial conference, whereas, here, this Court made its ruling to exclude the unvaccinated venire-persons only after voir dire concluded and twenty-two other venire-persons were cleared for cause. Thus, while the Louisiana district court concluded that questions about vaccination status *could* be used to discriminate against particular racial or political groups, such discrimination did not occur here.

[13] *See* Reply at 6–7 (Doc. #: 4258) (citing William A. Galston, *For COVID-19 vaccinations, party affiliation matters more than race and ethnicity*, Brookings Inst. (Oct. 1, 2021), https://www.brookings.edu/blog/fixgov/2021/10/01/for-covid-19-vaccinations-party-affiliation-matters-more-than-race-andethnicity/; Jennifer Kates et al., *The Red/Blue Divide in COVID-19 Vaccination Rates*, Kaiser Family Fnd. (Sept. 14, 2021), https://www.kff.org/policy-watch/the-red-blue-divide-incovid-19-vaccination-rates/).

*****

Therefore, there was no error when the Court excluded the three unvaccinated potential jurors. Instead, the Court properly exercised its power under the JSSA, and Defendants' fair cross-section argument fails under *Duren*. Without any error, there is no need to consider whether Defendants were prejudiced; Defendants are not entitled to a new trial on this basis.

## C. Closing Arguments

Defendants next argue they are entitled to a new trial both because Plaintiffs' counsel committed misconduct during closing arguments and because the Court erred in denying Defendants' earlier mistrial motion, made on the same basis. The Court already addressed Defendants' arguments when it denied the mistrial motion, and Defendants' new assertions do not merit a different outcome. Defendants have failed again to show any error or resultant prejudice, and the Court declines to order a new trial.

As in their mistrial motion, Defendants again take issue with two portions of Plaintiffs' counsel's three-hour closing argument: (1) counsel's reference to the national ramifications and importance of the jury's verdict (the "national ramification statements"); and (2) counsel's bolstering of Plaintiffs' expert witness, Dr. Anna Lembke (the "bolstering statements"). Motion at 12–16 (Doc. #: 4204); *see also* Motion for Mistrial (Doc. #: 4156).[14] The Court agreed with

---

[14] In their mistrial motion, Defendants also challenged other portions of Plaintiffs' counsel's closing arguments, namely: (i) a suggestion to the jury that the verdict would not carry financial consequences for Defendants; (ii) a statement suggesting that Defendants are the subject of multiple ongoing investigations in Lake and Trumbull Counties; improperly vouched for; and (iii) a bad joke encouraging jurors to "beat up" any juror who did not agree with Plaintiffs during deliberations. Motion for Mistrial at 5–13 (Doc. #: 4156). The Court earlier examined these arguments carefully and determined none of the statements warranted a mistrial. Order Denying Mistrial at 6–8 (Doc. #: 4172). While Defendants mention these statements again in their reply brief, they do not make any new arguments about why these comments entitle them to a new trial. *See* Reply at 9 (Doc. #: 4258). The Court will therefore not revisit its prior ruling on these statements.

Defendants that these comments were improper but denied the mistrial motion, both because the comments at issue were a small fraction of the six-week trial and because any prejudicial effect was cabined quickly and carefully by the Court's curative instructions. Order Denying Mistrial at 4–6, 8 (Doc. #: 4172).

Now, Defendants attempt to achieve a different outcome by identifying three perceived errors in the Court's order denying their mistrial motion: (1) the Court's curative instructions did not "blunt" the prejudicial effect of Plaintiffs' counsel's comments; (2) the Court improperly faulted Defendants for not objecting contemporaneously to Plaintiffs' counsel's misconduct and instead waiting until the trial breaks to object; and (3) the Court applied the wrong standard when ruling on the mistrial motion. Motion at 12–16 (Doc. #: 4204). As discussed below, none of these arguments entitle Defendants to a new trial because Defendants still have not shown any error.

Much of Defendants' first argument about the Court's curative instructions is spent relitigating the same issues that were raised and rejected in their mistrial motion, and the Court will not revisit its prior ruling (Order Denying Mistrial (Doc. #: 4172)).[15] The Court has already explained why its curative instructions were appropriate, and Defendants have not provided the Court with any reason to reconsider.

---

[15] Defendants did cite a new case to support their argument that the national ramification statements were prejudicial enough to warrant a new trial, but the Court is not persuaded. Namely, Defendants rely on *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 420-21 (2003), in which the Supreme Court reversed a punitive damages award because the plaintiff's attorney made comments about the jury's ability to award punitive damages as a means to hold the defendant accountable for its "nationwide practice." As Plaintiffs correctly point out, *State Farm* is inapposite because the holding is about a punitive damages award; an issue that was not even before this jury. *Id.* at 429. Moreover, *State Farm* is further distinguishable because the plaintiff's attorney made the offending statements "throughout the litigation," *id.* at 421, whereas Plaintiffs' counsel's improper remarks in this case were made only during closing argument. Thus, even if the offending language in *State Farm* is "eerily similar" to Plaintiffs' counsel's national ramification statements, as Defendants say (Motion at 10 (Doc. #: 4204)), what occurred in this case still does not mandate a new trial.

The only new portion of the Defendants' curative instruction argument is their assertion that Plaintiffs' counsel persisted in making national ramification statements after the Court issued its curative instruction to the jury. Motion at 13–14 (Doc. #: 4204). Defendants now claim that, even if the curative instructions did *initially* purge the prejudice of the national ramification statements, Plaintiffs' counsel "rang the bell again in rebuttal" by stating that the trial was "'about something much bigger than [him].'" *Id.* Defendants cite to *Caudle v. District of Columbia*, 707 F.3d 354, 363 (D.C. Cir. 2013), to support this argument. Motion at 13–14 (Doc. #: 4204).

Yet, as Plaintiffs correctly point out, this argument is based on a fractured reading of the trial transcript. While Defendants quote only a portion of Plaintiffs' counsel's rebuttal statement to support their argument, the full statement makes clear that Plaintiffs' counsel was not flouting the Court's earlier curative instruction and rebuke:

> My job was to give you evidence and get to the truth. My job was to do it within the rules and to do it fairly and try to keep you from getting too bored along the way. And I don't know if I've done anything that's offensive, just set that aside because this is about something much bigger than me.

11/15/21 Trial Tr. at 7323:4-8 (Doc. #: 4153). The content of this statement has no relationship to Plaintiffs' counsel's earlier commentary on the national ramifications of the jury's verdict; he was instead asking the jury not to let their personal feelings about him get in the way of their assessment of Plaintiffs' case. Plus, Plaintiffs' counsel national ramification statements and his "bigger than me" statement were made roughly eight hours apart (the first being at the beginning of his closing and the second coming in rebuttal). It is highly unlikely the jury would connect Plaintiffs' counsel's rebuttal statement to the earlier send-a-message statements at all, let alone do so after hearing nearly seven hours of closing arguments from four different lawyers. Finally, Defendants' reliance on *Caudle* is misplaced, because there, the trial court did not issue a curative instruction until after three improper comments were made.  707 F.3d at 358. Here, the Court gave a curative instruction

19

immediately after Defendants made their break-time objection, meaning that *Caudle* is inapposite. Defendants have not articulated any error in the Court's handling of the curative instructions and are not entitled to a new trial on this basis.

Turning to Defendants' second argument, the Court finds no merit in the contention that the Court improperly penalized them for not making contemporaneous objections to Plaintiffs' counsel's improper comments. Quite frankly, the Court does not understand how Defendants can credibly claim the Court "avoid[ed] its obligation to review [Defendants' misconduct] arguments." Motion at 15 (Doc. #: 4204). The record is clear that the Court *repeatedly* addressed these issues, despite the lack of contemporaneous objection: the Court sustained some of Defendants' objections when they were made during the break, issued two curative instructions as a result of these objections, and assessed the merits of each argument again in Defendants' mistrial motion. Defendants have not articulated what else the Court should have done, and the Court can find no error on this basis.

Finally, for their third argument, Defendants now claim the Court failed to apply the proper standard for assessing misconduct during closing argument. Motion at 13 (Doc. #: 4204); Reply at 8 (Doc. #: 4258). Defendants assert that the "correct standard" is: "[A] verdict 'should be set aside' if an improper statement—even a single one—creates 'a reasonable probability that the verdict of a jury has been influenced' by that statement." Motion at 15 (Doc. #: 4204) (quoting *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980). And Defendants further argue the Court deviated from this standard by implying that a mistrial is warranted only when misconduct permeates the entire trial. *Id.*

Again, however, Defendants' argument is based on selective quotation of both the Court's mistrial order and the *City of Cleveland* opinion. The Court previously articulated—and now

reiterates again—that "a mistrial may be required 'where there is a reasonable probability that the verdict of a jury has been influenced by such conduct.'" Order Denying Mistrial at 2 (Doc. #: 4172) (quoting *City of Cleveland*, 624 F.2d at 756). And the Court went on to quote the next paragraph of the *City of Cleveland* opinion, which Defendants conveniently omitted from their argument:

> In determining whether "there is a reasonable probability that the verdict of a jury has been influenced" by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, ***the totality of the circumstances***, including the nature of the comments, ***their frequency***, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself.

*Id.* (emphasis added). The Court further explained the Sixth Circuit has treated the extent to which the impermissible statements "consistently permeated the entire trial from beginning to end" as a factor to consider when faced with a mistrial motion. *Id.* (quoting *Jimkoski v. State Farm Mut. Auto. Ins. Co.*, 247 F. App'x 654, 662 (6th Cir. 2007)). Therefore, Defendants' argument that the Court applied the wrong standard is false. Rather, the Court correctly considered the frequency of Plaintiffs' counsel's improper comments throughout the trial as one factor in deciding whether the closing argument warranted a new trial. And, without such evidence of permeation, the Court concluded the improper comments in closing argument alone were insufficient to warrant a mistrial.

Overall, Defendants' new misconduct arguments have not identified any errors in the Court's handling of Plaintiffs' counsel's closing arguments. Without such errors, Defendants are not entitled to a new trial.

### D. DEA Settlements and Administrative Actions

The Pharmacy Defendants next assert the Court erred by: (1) "permitting the Plaintiffs to introduce evidence related to DEA settlements and administrative actions;" (2) allowing Plaintiffs to do so in a cumulative and needlessly repetitive way; and (3) not issuing a limiting instruction until it was "simply too late and ineffective." Motion at 16 (Doc. #: 4204).

The evidentiary use of DEA settlements and other administrative actions, including in particular the *Holiday* decision,[16] has been a hotly contested issue dating back to Track One. As a result, the Court has had the opportunity to think carefully and extensively about how to narrowly tailor Plaintiffs' use of prior DEA settlement and administrative actions (collectively "Settlements") during the trial. *See, e.g.*, CT1 Evidentiary Order (Doc. #: 3058); CT1-B Evidentiary Order (Doc. #: 3546); CT3 Evidentiary Order (Doc. #: 3967) (applying and clarifying prior evidentiary rulings to Track Three); 9.22.21 Email Order from SM Cohen to E. Delinsky (Doc. #: 3978-1, Ex. 1); Order re Admissibility of Prior Settlement Agreements (Doc. #: 3990) (affirming and clarifying the SM's Email Order). The Court consistently concluded the Settlements could properly be used for the limited purpose of showing notice, knowledge, or intent, but not for the veracity of the allegations asserted by the government.

The Pharmacy Defendants first cursorily argue, again, that the Court should not have allowed Plaintiffs to use the Settlements at all.  But the Court has always been clear and consistent

---

[16] The "*Holiday* decision" refers to *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012). The evidence showed that the *Holiday* decision was widely discussed by all Pharmacy Defendants – indeed, the entire industry – when it was issued. It obviously goes to notice.  It is a Drug Enforcement Agency decision, published on the Federal Register to provide notice to the public. The decision pertains to two CVS pharmacies in Florida that were found to be an imminent danger to the public safety by failing to maintain effective controls against diversion of opioids. As a result, both pharmacies had their DEA registrations revoked. In the decision, the DEA extensively discusses pharmacy responsibilities in the face of "red flags" that may indicate diversion.

that the Settlements could properly be used for a limited purpose. For example, one way for Plaintiffs to prove their public nuisance claim under Ohio law was to show that each Defendant engaged in "intentional conduct that caused a significant and ongoing interference with a public right to health or safety." 11/15/21 Trial Tr. at 7071:22–24 (Doc. #: 4153) (instructing the jury). The Court went on to instruct that one way to prove intentional conduct is "when a person somehow indicates their intent by their conduct." *Id.* at 7072:19–20. Specifically, the Court instructed that, "If a person learns that circumstances resulting from their conduct interfere with public health or public safety, and the person continues that conduct, then the subsequent conduct is intentional." *Id.* at 7073:2–5. The law is clear that intent can be demonstrated by examining a Defendants' conduct ***after*** they learn that their conduct is interfering with public health or safety.

In that regard, several times during the trial, the Court made clear it would allow corporate witnesses in positions of responsibility to be questioned about the Defendants' conduct ***after*** being made aware of the *Holiday* decision and other Settlements. *See, e.g.,* 10/7/21 Trial Tr. at 878:22–879:3 (Doc. #: 4005) ("It goes to . . . what the witness did or didn't do to change practices, and that's different. And so the focus there is not the settlement agreement; it's the—what the witness did or didn't do in a position of responsibility."); *see also* Opposition at 38 n.49 (Doc. #: 4242) (collecting instances). In other words, the Court allowed counsel to question Defendants' corporate representatives about the Settlements—and in particular the *Holiday* decision—for the purpose of showing how Defendants responded after learning of these legal developments. This evidence was only admitted for the limited purpose of showing notice and each Defendants' intent, and then only as briefly as possible. Plaintiffs could not conceivably ask about a Defendants' conduct following notice of a settlement without, at least briefly, referring to that settlement.

23

Second, the Pharmacy Defendants assert the Plaintiffs' use of the Settlements was needlessly repetitive. The Pharmacy Defendants cite *Barnes v. D.C.*, 924 F. Supp. 2d 74, 90 (D.D.C. 2013), for the proposition that "settlement evidence must 'be presented as briefly as possible' to 'guard against the risk of prejudice or confusion.'" Reply at 12 (Doc. #: 4258). This Court agrees and followed the *Barnes* court's lead by "guard[ing] against the risk of prejudice or confusion by ***issuing a limiting instruction to the jury***, and 'insist[ing] that the evidence pertaining to the settlement be presented ***as briefly as possible***.'" *Barnes*, 924 F. Supp. at 90 (quoting *C & E Services, Inc. v. Ashland Inc.*, 539 F.Supp.2d 316 (D.D.C.2008)) (emphasis added).

It is true that the Settlements, and the *Holiday* decision in particular, were introduced to and discussed with more than one witness. However, "as briefly as possible" does ***not*** mean "only once," and some amount of repetition does ***not*** mean "needlessly repetitive." There were multiple corporate representatives called on behalf of each Defendant; and each of those representatives bore some responsibility for the conduct of the corporation after receiving notice of the Settlements. As described above, those questions—which showed, not that the allegations in the Settlements were true, but what the Defendants did with their knowledge of them—could not have been asked had reference to the Settlements not been made. The record reflects that the Court carefully considered each instance where the Settlements were raised and never allowed those references to become gratuitous. *See, e.g.*, 10/19/21 Trial Tr. at 2982:18–20 (Doc. #: 4050) ("You don't have to read a whole lot about it, just say did you hear about *Holiday*, yes, if so, did you do anything, yes or no, Bingo, move on."). This was, in the Court's carefully considered opinion, as briefly as these Settlements could possibly have been presented.

The Court further agrees with additional reasoning the *Barnes* Court used when it allowed the settlement in that case to be admitted:

> A defendant should not be able use a settlement as a shield if it continues to engage in the same unlawful conduct, and new plaintiffs would need to look at the history of the defendant's knowledge and conduct to make their case. In fact, if Rule 408 operated to curtail the ability of plaintiffs to bring new suits if the defendant continues to injure them in the same way, then this could discourage plaintiffs from settling. In cases where notice and past practice are key elements, [defendant] cannot simply ask everyone to ignore the prospective obligations it undertook as part of [a prior] settlement.

*Id.* That reasoning applies with equal force to this case.

Finally, the Pharmacy Defendants assert the Court erred by issuing instructions to the jury too late for them to be effective. Plaintiffs' brief provides a more fulsome account of the events leading up to the instruction being read by the Court. *See* Opposition at 28–32 (Doc. #: 4242). Most notably, the Pharmacy Defendants first raised the issue of a limiting instruction for settlements on October 5, 2021 (the second day of trial),[17] *see* 10/5/21 Trial Tr. at 436:12–13 (Doc. #: 3995), but did not ask for it to be read to the jury until November 8, 2021 (***34 days later***) at the end of the day on the second-to-last day of trial testimony.[18] *See* 11/8/21 Trial Tr. at 6510:22–25 (Doc. #: 4132). The Pharmacy Defendants offer no excuse for this delay except to blame Plaintiffs for it. The Defendants assert "they could not force Plaintiffs to agree to a limiting instruction, nor could they force the Court to give one." Reply at 12 (Doc. #: 4258). Of course, they did not have to force the Court to give an instruction had they been able to agree to one;[19] the Court, in addition

---

[17] The Court immediately agreed that a limiting instruction was appropriate, and that it would give one once the parties reached an agreement on the instruction. 10/5/21 Trial Tr. at 436: 14–16 (Doc. #: 3995) ("Well, if you want to propose [a limiting instruction] and work it out with the plaintiffs, I'll certainly give it.").

[18] Due to Veterans' Day, trial testimony concluded on November 9, and the jury was excused for the rest of that week. *See* 11/9/21 Trial Tr. at 6987:22–24 (Doc. #: 4133).

[19] The parties never reached an agreement on the limiting instruction. *Cf.* Opposition, Ex. C (Doc. #: 4242-3) (email chain providing parties' disagreements and arguments to the Special Master as late as October 27, 2021). Ultimately, the Court crafted the following instruction from language offered by both parties:

> Settlement agreements. You have heard testimony about settlements that certain defendants entered into with the DEA, the Drug Enforcement Administration.  This settlement evidence has been admitted for a limited purpose.  You may consider these settlements only to the extent you believe they bear on what

25

to working to help the parties reach an agreement, offered to give the instruction multiple times. *See* 10/13/21 Trial Tr. at 1646:9–10 (Doc. #: 4023) ("If you've worked something out I'll give it."); 10/21/21 Trial Tr. at 3585:3–4 (Doc. #:4064) ("There have been times where I've said something during the trial, some instruction, which I repeat in the final instructions. I don't have a problem doing both."). Further, at the end of the trial day on October 21, 2021, the Court expressly asked Defendants on the record **when** they would like the instruction read, and even then, the Defendants deferred their decision for later. *See* 10/21/21 Trial Tr. at 3585:3–86:2 (Doc. #:4064). When the Pharmacy Defendants finally did ask the Court to read the instruction, there was one day of testimony remaining and by then the final instructions would be read to the jury the following trial day.

The Pharmacy Defendants have not shown that the Court erred by allowing Plaintiffs to use the Settlements, which, as defined above, include the *Holiday* decision, for the limited purpose of showing notice, knowledge, or intent. Absent any error, the Court need not consider whether any prejudice resulted from the its rulings. A new trial is not warranted on these grounds.

### E. Hearsay Rulings

The Pharmacy Defendants assert the Court's hearsay rulings were one-sided in favor of Plaintiffs. *See* Motion at 17 (Doc. #: 4204). Their Motion provides the Court with a very small sample of purportedly exemplar instances where hearsay rulings did not go in their favor. They then assert, in a conclusory manner, that the evidence presented by Plaintiffs in those examples

---

notice or knowledge the defendant received as a result of the settlements, or to the extent you believe they bear on the defendants' intent.  You may not infer liability or draw any conclusions about a defendant's potential liability in this case based upon the fact that it entered into those settlements.

11/15/21 Trial Tr. at 7073:6–17.

was hearsay and conclude from that the Court's ruling were improper. After a careful review of the examples provided by Defendants, the Court does not believe any of the cited rulings were incorrect; and in any event, none constitute an abuse of discretion.

In their Reply, the Pharmacy Defendants highlight the fact that Plaintiffs' opposition cites only "four instances—over the course of a seven-week trial—of the Court making hearsay rulings that went against them." Reply at 14 (Doc. #: 4258). The Pharmacy Defendants, themselves, however, cite no more than five or six such rulings that went against them. This fact alone tends to undermine the credibility of their argument. Moreover, even if the Pharmacy Defendants had demonstrated there was some substantial disparity in the *number* of hearsay rulings between Defendants and Plaintiffs, rulings against a party, even a large number of rulings, cannot prejudice that party when the rulings are correct. *Cf. Gridley v. United States*, 44 F.2d 716, 735 (6th Cir. 1930) (explaining that "[w]hether [the great number of rulings against appellants] was a manifestation of adverse attitude towards appellants depends on whether the rulings were proper.").[20] Even accepting *arguendo* that a great number of evidentiary rulings went against the Defendants, this would simply indicate the Pharmacy Defendants made more hearsay objections that were not well-taken, or they attempted more often to introduce hearsay to which the Plaintiffs properly objected.

To highlight the Court's alleged improper rulings, the Pharmacy Defendants attempt to contrast two situations in which rulings went against them: (1) the hearsay objections they made against Dr. Anna Lembke, ***an expert witness*** for the Plaintiffs, and (2) the hearsay objections

---

[20] Even if *some* of the Court's hearsay rulings were shown to be improper, the Pharmacy Defendants still have the burden to prove that those few improper rulings made the trial unfair and would have secured a different outcome had they come out the other way. Defendants do not even attempt to do so.

Plaintiffs made against Susanne Hiland, *a fact witness* for Defendants. This comparison is clearly inapt, because the Federal Rules treat fact and expert witnesses differently. For example, the Federal Rules of Evidence expressly allow experts to rely on inadmissible evidence. *Compare* Fed. R. Evid. 703 *with* Fed. R. Evid. 602. The Pharmacy Defendants do not dispute this. *See* Reply at 15 (Doc. #: 4258). Instead, the Pharmacy Defendants assert Dr. Lembke "simply read the contents of certain Purdue documents into the record, without adding any analysis to those out-of-court statements admitted for their truth." *Id.* But the record does not support this assertion at all. *See* 10/6/21 Trial Tr. at 604:17–19:7 (Doc. #: 4000) (Dr. Lembke responding to several questions by analyzing and explaining in detail *why* she relied on specific language in certain inadmissible documents in forming her opinions). Dr. Lembke's testimony was proper, as were the Court's rulings on Defendants' objections to it.

By contrast, fact witness testimony is treated differently under the Federal Rules and the Court expressly made that distinction clear to the parties. *See* 10/12/21 Trial Tr. at 1495:3–11 (Doc. #: 4017) (regarding *Plaintiffs'* witness, Mr. Rannazzisi—who had been an expert witness in other opioid cases—being called as a fact witness in this case: "[A]s a fact witness, I intend to apply the rules that apply to all fact witnesses, which he can't—he can only testify to matters, statements, whatever, within his personal, personal knowledge and experience. So, if there are objections based on hearsay or outside his personal knowledge, defendants can object, and I'll have to rule on them on a question-by-question basis.").

Later, using that reasoning, the Court properly refused to let Susan Hiland (a fact witness) testify about what one of her employees told her about what someone at the Ohio Board of Pharmacy might have told them. *See* 11/1/21 Trial Tr. at 5139:20–40:4 (Doc. #: 4109). The Court also took time at sidebar to draw the distinction between the fact that such a conversation may

have taken place (which would be allowed) and the contents of such a conversation (which would not). *See* 11/1/21 Trial Tr. at 5137:9–13 (Doc. #: 4109) ("[A] knowledgeable corporate witness can testify why she or the corporation created a policy or changed a policy. And if it was based on something that someone else said or did, she can say that. She can't relate the communication. That's hearsay."). To support their argument, the Pharmacy Defendants selectively choose Court statements which, taken out of context, do not accurately reflect the complete record. On nearly every objection, the Court permitted a dialogue, hearing from all parties wishing to be heard, and then reached the appropriate conclusion.

Finally, the Pharmacy Defendants also assert the Court "*sua sponte*—added a pro-Plaintiffs jury instruction on this issue." Motion at 20 (Doc. #: 4204). This is simply wrong, and the record does not support this assertion either. The impetus for the "Employee Conversations" instruction came when Plaintiffs **requested** a limiting instruction; it was not *sua sponte*. 11/5/21 Trial Tr. at 6211:5–7 (Doc. #: 4124). The Court then drafted an instruction and shared it with the parties. *See* 11/8/21 Trial Tr. at 6505:5–21 (Doc. #: 4132). Defendants objected, *id.* at 6505:22–07:16, and offered suggestions, which the Court stated it would consider. *Id.* at 6809:5–18. Then, a short time later, the Court engaged Walmart's counsel in a discussion about the proposed changes, eventually rejecting some and accepting others. *Id.* at 6810:17–12:13. Defendants do not address any of this procedural history, so it is not clear where they believe the error lies.

Further, far from "singl[ing] out this important evidence (*not any of Plaintiffs' evidence*) for further limitation," Motion at 20 (Doc. #: 4204) (parenthetical in original but emphasis added), as Defendants suggest, the Court added the instruction immediately following its instruction on settlement agreements (discussed, *supra* at Section D), which properly limited Plaintiffs' evidence. *See* 11/8/21 Trial Tr. at 6505:19–21 (discussing where the instruction would be read); 11/15/21

29

Trial Tr. at 7073 (Doc. #: 4153) (giving both instructions).  Defendants' argument takes umbrage at being treated "differently" than Plaintiffs by being singled out, but what actually occurred as the Court crafted its Jury Instructions reveals a different story.

Although the Pharmacy Defendants vehemently insist they were prejudiced by events and errors, a careful review of the record reveals those errors simply did not happen. The Pharmacy Defendants did lose both hearsay objections they cite as examples in their motion, but they did not show that either of those hearsay rulings were improper (nor any other hearsay rulings). Further, that Defendants are forced to cherry-pick from the record and present an incomplete and slanted history of what occurred to support their argument shows their position is barren. They are not entitled to a new trial on this ground.

### F. Plaintiffs' Counsel's Questions

Defendants next argue they are entitled to a new trial because Plaintiffs' counsel repeatedly relied on facts not in evidence when cross-examining defense witnesses. Motion at 20–23 (Doc. #: 4204). According to Defendants, this practice resulted in "extreme prejudice" because Plaintiffs' counsel made it seem that particular facts were in evidence when they were not. *Id.* at 20. Yet, Defendants ignore the principle that every question in cross-examination need not be based on evidence already in trial. Likewise, Defendants failed to object to the vast majority of the comments about which they now complain, and the Court can no longer ascertain whether Plaintiffs' counsel had a good faith basis for asking these questions. Ultimately, the Court must presume the jury followed its instruction that the lawyer's questions are not evidence, so Defendants have therefore not shown any prejudice.

30

A district Court has "wide latitude and discretion in determining the scope of cross-examination." *Black v. Penn Central Co.*, 507 F.2d 269, 271 (6th Cir. 1974). Indeed, an attorney need only have a good faith basis to ask a question on cross-examination, and there is no requirement that the factual predicate for the question be in evidence. *See Jerkins v. Lincoln Elec. Co.*, 1:04–CV–18810, 2011 WL 2621357, at *1 (N.D. Ohio July 5, 2011) (citing *Oostendorp v. Khanna*, 937 F.2d 1177, 1181 (7th Cir.1991) ("Cross-examiners must have a good faith basis for their questions, but do not have an affirmative duty to introduce the factual predicate for impeachment."). Certainly, a cross-examiner may neither misrepresent the evidence nor ask any question that lacks a good faith basis. *Id.* Thus, an opposing party must lodge a contemporaneous objection to an inappropriate cross-examination question, so the trial court may probe whether there is a good faith basis for the question. *United States v. Zidell*, 323 F.3d 412, 426 (6th Cir. 2003).

Under this standard, the Court is unable to assess many of Defendants' claimed errors, because Defendants did not raise contemporaneous objections to Plaintiffs' counsel's supposedly prejudicial questioning.[21] The Court cannot now determine whether Plaintiffs' counsel's questions lacked a good faith basis because the trial has ended.  That said, the Court was generally sensitive to the issue Defendants raise during the entirety of trial and with regard to all questioning of all witnesses, and the Court did not have any concern during trial that *any* attorney was regularly employing improper questions during cross-examintion.

---

[21] Defendants cite the following instances in which they claim Plaintiffs' counsel asked questions based on facts not in evidence, but Defendants did not object: Doc. #: #3995 at 355-56, 372, 421; Doc. #: #4050 at 2739; Doc. #: #4078 at 3916-18, 3939, 3395, 3991-4006, 4012-17; Doc. #: # #4106 at 4595; Doc. #: #4111 at 5582, 5598; Doc. #: #4115 at 5800; and Doc. #: #4124 at 6299-6300, 6311-12. The Court also observes that Defendants' list of errors included irrelevant transcript cites: Doc. #: #3991 at 163, 165 (Walgreen's opening statement); Doc. #: #4000 at 458-70 (does not include any questioning by Plaintiffs' counsel); and Doc. #: #4106 at 4533, 4569-72, 4572-86, 4580-81.

31

Defendants' argument that they did not need to object to every improper question does not change the Court's conclusion. Defendants maintain they needed to lodge only one objection to Plaintiffs' counsel's question because further objection on the same issue is unnecessary. Reply at 17–18 (Doc. #: 4258) (citing *United States v. Ford*, 761 F.3d 641, 653 (6th Cir. 2014)). While the Court agrees with Defendants' position as a general matter, that rule does not hold true here. Each of the allegedly erroneous questions Defendants' cite involve different facts that were purportedly being improperly inserted into the trial; this means the Court would have had to conduct a specific analysis of each question to determine whether there was a good faith basis to raise the question, or instead Plaintiffs' counsel was inserting misinformation. Moreover, in the instances when Defendants did lodge objections, none of those objections were made based on Plaintiffs' counsel's purported reliance of facts not in evidence.[22] Thus, even if these objections did address the same topic or factual predicate, the objections were insufficient to alert the Court to the particular prejudice Defendants now claim to have suffered.

To the extent Plaintiffs' counsel's questions *were* improperly based on evidence outside the record, the Court concludes the limiting instruction that lawyers' arguments are not evidence was sufficient to cure any prejudice. *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001). As Plaintiffs' correctly point out, juries are presumed to follow the court's instruction. Opposition at 49 (Doc. #: 4242) (citing *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). Ultimately, Defendants have not identified any reasons for the Court to presume otherwise, as the Court has not found any evidence to support Defendants' argument that Plaintiffs' counsel "was baking falsehoods into questions as if they were evidence." Reply at 14 (Doc. #: 4258).

---

[22] The instances when Defendants object are: Doc. #: # 3995 at 296-99 (reading opening statements into the record), 302-27 (speculation); and Doc. #: #4106 at 4587-91 (lack of foundation).

32

In sum, Defendants have not shown any prejudice. Therefore, they are not entitled to a new trial on this section of the Motion.

### G. Delegation to Witnesses to Define the Law

The Pharmacy Defendants next assert the Court failed to define key legal terms for the jury. Primarily, they assert the Court did not provide a definition of the word "diversion."[23]

Defendants are incorrect.[24] The instructions do provide the jury with language sufficient for them to understand that diversion is the movement of prescription opioids "into the illicit market outside of appropriate medical channels." 11/15/21 Trial Tr. at 7071:5–6 (Doc. #: 4153) (instructing the jury). This instruction adequately and clearly expresses "the substance of the relevant point." *Boyle v. United States*, 556 U.S. 938, 946 (2009) ("A trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed.").

The various examples provided by the Pharmacy Defendants purporting to show that Plaintiffs' witnesses defined diversion for the jury merely show Plaintiffs' witnesses echoing the exact same substance underlying the Court's instruction: that diversion is the movement of prescription opioids from legitimate medical channels into illegitimate markets. *See* 10/12/21 Trial

---

[23] The Pharmacy Defendants also assert, solely as examples, that the Court also permitted various witnesses to define the terms "knowingly," "reasonable person" and "documentation requirements." Motion at 24 (Doc. #: 4204). However, their primary objection is with the term "diversion," which they describe as "perhaps the most important term in the entire case," Reply at 18–19 (Doc. #: 4258), and they do not develop any argument regarding the other terms. Because of the Pharmacy Defendants' emphasis on the term "diversion" and because the Court's reasoning applies just as strongly to those other terms, "diversion" is the only term addressed below.

[24] The Court also notes the Pharmacy Defendants seem to have changed their minds about this issue in order to file the present motion. *See* Defendants Jury Instruction Proposal at 1 (Doc. #: 4043) (filed 10/18/21) (observing that "***the Court has correctly precluded witnesses at trial from testifying about what the law requires***," and asserting "the jury must be instructed on the law in order to determine whether any Defendant engaged in 'unlawful' conduct") (emphasis added).  In this regard, the Court did just what the Defendants asked.

33

Tr. at 1530:4–6 (Rannazzisi: "Diversion is the illegal movement of pharmaceuticals from the legitimate stream of commerce into the illegitimate market."); 1535:25–36:2 (Rannazzisi: "The movement of pharmaceuticals, legitimate pharmaceuticals and chemicals from the normal legitimate stream of commerce into the illicit market.").

In fact, aside from being unnecessarily verbose and more confusing, the Pharmacy Defendants' proposed definition of diversion – "***The transfer of a controlled substance from legitimate 'medical***, scientific, research, or industrial ***channels'*** (such as prescriptions written by a licensed medical prescriber for a legitimate medical purpose and in the usual course of the prescriber's professional practice), ***to an illegal channel***," *see* Motion at 24–25 (Doc. #: 4204) ((citing 21 U.S.C.  823(b)(1) and 21 C.F.R. 1306.04(a)) (emphasis added) – does not differ appreciably in substance from the Court's definition.

Finally, as with many of their asserted justifications for a new trial, the Pharmacy Defendants do not adequately describe ***how*** they may have been prejudiced, let alone unfairly. In their motion, the Pharmacy Defendants assert the purported "delegation of the Court's role to define the law for the jury . . . prejudiced Defendants (***as evidenced by the jury's question***)." Motion at 25 (Doc. #: 4204) (emphasis added). The jury, during deliberations, asked "Can we please have the ***DEA definition*** of diversion?" 11/16/21 Trial Tr. at 7340 (Doc. #: 4157) (emphasis added). It is not at all clear how or even if the jury's question evidences unfair prejudice to the Pharmacy Defendants, and the Defendants do nothing to explain their reasoning for believing it does. More to the point, when the Court discussed the jury's question with counsel, Defendants agreed there ***is no*** "DEA definition" of diversion.  *See* 11/16/21 Trial Tr. at 7341:25–42:1 (after conferring with co-defendants, counsel for Walgreens stated: "I don't think there is such a thing

34

as an official definition [of diversion] by DEA in any event.")  There can be no prejudice where the Court "failed" to give an additional instruction about something that does not exist.

Because the Court's instruction adequately expressed the substance and meaning of "diversion" and other key legal terms, there is no error. Therefore, the Pharmacy Defendants have not shown any prejudice and cannot carry their burden to demonstrate the necessity for a new trial.

### H. Catizone's Understanding of the CSA's Obligations and About Red Flags

Defendants contend the Court erred in two ways when ruling on objections to Carmen Catizone's trial testimony. First, Defendants argue the Court erred by permitting Catizone to testify about his understanding of the Controlled Substances Act's ("CSA") requirements for pharmacies and pharmacists. Defendants argue this prejudiced them because the Court permitted Catizone to "instruct the jury on a hotly contested legal interpretation of the CSA: whether pharmacies could interfere with pharmacists' corresponding responsibility under the CSA." Motion at 34 (Doc. #: 4204). The record does not support this argument.

The relevant testimony was:

Q.      And in this regard, I want to ask you specifically about some chain pharmacies. Are chain pharmacies and their agents responsible persons under the Controlled Substances Act?

MR. MAJORAS: Objection. Legal conclusion.

MR. LANIER: From a pharmacy perspective only, Your Honor, do they consider themselves that; not is that the law.

MR. MAJORAS: Not an appropriate question for a pharmacist.

MR. LANIER: Which he is.

THE COURT: He can answer that from his understanding as a pharmacist.

BY MR. LANIER:

Q.     Yeah. From your understanding as a pharmacist and as the ex-head of the National Association of Boards of Pharmacies [sic], did you operate under the premise that chain pharmacies and their agents are responsible persons under the Controlled Substances Act?

A.     Yes, I did. * * *

10/7/21 Trial Tr. at 968-969 (Doc. #: 4005). Later, the Court again clarified that Catizone's

testimony was **based on his experience as a pharmacist**.

A     My understanding is that the CSA does not place unilateral responsibility on the pharmacist. Responsibility also rests with the pharmacy.

Q     And is that –

THE COURT: Is that -- sir, is that how you practiced it when you were a practicing pharmacist for 20 years?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. I'd like you to testify on that basis then.

*Id.* at 980. The transcript shows the Court limited Catizone's answer to his own understanding as

a pharmacist. He wasn't permitted to testify that his understanding was, in fact, the law. And the

Court's rulings at trial were consistent with its *Daubert* opinion. *See Daubert* Order re Catizone

(Doc. #: 3947). Catizone's testimony was limited to his understanding as a pharmacist; he was not

permitted to explain the actual law to the jurors. *Id.*

Toward the end of trial, the Court provided a thorough instruction on "unlawful conduct"

to the jury:

Unlawful conduct can occur either by acting in a certain way that is prohibited by law, or by failing to act in a certain way that is required by law. Specifically, unlawful conduct occurs when a person engages in conduct that is prohibited by a statute, ordinance, or regulation that controls safety. And unlawful conduct also occurs when a statute, ordinance, or regulation that controls safety requires a person to engage in certain conduct, but the person fails to do so. The person does not need to know their conduct is unlawful for an unlawful act to occur.

36

> A law controls safety if it imposes specific legal requirements for the protection of the health, safety, or welfare of others. The Federal and Ohio Controlled Substances Acts and their accompanying regulations are laws that control safety.

> Conduct that is fully authorized by a statute, ordinance, or regulation cannot create a public nuisance because it is lawful conduct. But if a person's conduct does not comply with what is authorized by law, then that conduct may be unlawful conduct.

11/15/21 Trial Tr. at 7074 (Doc. #: 4153).

In sum, as shown by the transcript, the Court carefully limited Catizone's testimony to his own understanding of the requirements of the CSA. The Court later instructed the jury on the actual law.[25]

In support of their argument that the Court erred in allowing Catizone's testimony, Defendants rely upon *United States v. Zipkin*, 729 F.2d 384 (6th Cir. 1984).  But the case is inapposite. *Zipkin* involved a bankruptcy judge interpreting his own order for the benefit of a jury. The Sixth Circuit found it was error for the trial judge to permit the bankruptcy judge to testify as to the meaning of his order; his order should have spoken for itself. *Zipkin*, 729 F.2d at 389, *citing Blue Mountain Iron and Steel Co. v. Portner*, 131 F.57 (4th Cir.), *cert. denied*, 195 U.S. 636, 49 L. Ed. 355, 25 S. Ct. 793 (1904). In the instant case, Catizone did not explain the law to the jury;

---

[25] The Court instructed the jury:

> Under both Federal and Ohio laws and regulations, entities that are authorized to dispense controlled substances are required to provide effective controls and procedures to guard against theft and diversion. A prescription for a controlled substance must be issued for a legitimate medical purpose by a doctor, or other registered prescriber, acting in the usual course of his or her professional practice. The Federal and Ohio Controlled Substances Acts and their accompanying regulations also provide that the pharmacist who fills the prescription has a corresponding responsibility for proper dispensing of controlled substances for a legitimate medical purpose. The corresponding responsibility for proper dispensing of valid prescription extends to the pharmacy itself.

> A violation of the corresponding responsibility occurs when a person knowingly fills or allows to be filled an illegitimate prescription. In this context, knowingly includes when a person acts with deliberate ignorance or willful blindness to information in their possession.

11/15/21 Trial Tr. at 7075:16–76:6 (Doc. #: 4153).

37

he testified as to his own understanding of the CSA's requirements when he was practicing as a pharmacist.

Federal Rule of Evidence 704 permits a witness to testify in the form of an opinion or inference to an "ultimate issue to be decided by the trier of fact." However, "it is not for the witnesses to instruct the jury as to applicable principles of law, but for the judge." *Marx & Co., Inc. v. Diner's Club*, 550 F.2d 505, 509-510 (2d Cir.), *cert. denied*, 434 U.S. 861, 54 L. Ed. 2d 134, 98 S. Ct. 188 (1977). Here, the Court carefully maintained these parameters. Catizone was permitted to explain his understanding of the pharmacists' and pharmacies' obligations based on twenty years of experience as a pharmacist. The Court instructed the jury on the actual law. Defendants have failed to show any error in the Court's rulings on Catizone's testimony of his understanding of the CSA.

Secondly, Defendants argue the Court erred when it permitted Catizone to testify that it was "foreseeable that the dispensing of a medication with an unresolved red flag could and would lead to diversion." Motion at 28 (Doc. #: 4204) (citing 10/7/21 Trial Tr. at 1041 (Doc. #: 4005)). Defendants contend this testimony prejudiced them by leaving the jury with the impression "that if an unresolved 'red flag' prescription was dispensed, it was in fact diverted—a fact that lied at the heart of this case." Motion at 36 (Doc. #: 4024). Again, this argument is not supported by the transcript.

Catizone didn't testify that dispensing a red flag prescription would necessarily lead to diversion. He testified it was *foreseeable* it could lead to diversion. This distinction is significant. The definition of foreseeable is "able to be foreseen or predicted," and it is common knowledge that predictions aren't always accurate. Thus, Catizone's actual statement was fundamentally different than Defendants' rendition of it. If Defendants' assumption is correct—that the jury was

38

left with the impression that dispensing a red flag necessarily meant it was diverted—that impression was not based on Catizone's actual trial testimony.

By largely omitting the "foreseeable" part of Catizone's testimony from their motion and reply, Defendants have built their argument on a false foundation. They claim Catizone said dispensing red flag prescriptions *would* lead to diversion, but what he actually said was that it was *foreseeable* they could and would lead to diversion. When Catizone's testimony is reviewed in its entirety, it is evident the Court did not permit him to testify on subjects outside his experience or expertise. Defendants have failed to show any error in permitting Catizone to testify as to the foreseeable consequences of dispensing unresolved 'red flag' prescriptions. Because Defendants have failed to demonstrate any error,[26] they are not entitled to a new trial based on the testimony of Carmen Catizone.

### I. Brad Nelson Testimony

Defendants argue the Court exceeded its authority by ordering Brad Nelson to testify via live video at trial. Motion at 36 (Doc. #: 4204). Defendant's argument is deficient in several ways: (1) it downplays Defendants' own role in creating the circumstances leading to the order that Nelson testify at trial via live video; (2) it relies on a mechanical application of Fed. R. Civ. P. 43(a), as though that were the *only* procedural rule governing Nelson's live testimony; (3) it fails to explain how Nelson's live testimony prejudiced Defendants or altered the trial outcome; and (4) Defendants may not even have standing to challenge Nelson's live testimony. Each of the deficiencies is addressed below.

---

[26] Because Defendants have not shown any error, it is unnecessary to consider whether the Court's rulings were prejudicial.

On October 18, 2021, more than two weeks after the trial commenced, Plaintiffs filed a motion for sanctions against Walmart for its failure to comply with discovery obligations and the Court's order. *See* Sanctions Motion (Doc. #: 4035); Opposition to Sanctions Motion at 2 (Doc. #: 4038). Plaintiffs claimed Walmart had produced hundreds of thousands of documents in the three months leading up to trial and 1,102 documents during trial, after discovery had closed. Plaintiffs further claimed the documents were produced "in bulk with no identifiers reflecting [to which document request they responded.]" Walmart did not really deny Plaintiffs' claims.[27] Rather, it argued Plaintiffs hadn't been prejudiced by Walmart's discovery violation – and specifically the late document production hadn't affected the previously-recorded trial deposition of Walmart witness Brad Nelson – because "[o]nly 30 Brad Nelson documents have been produced since trial started, and only three of those are highlighted in Plaintiffs' motion." Opposition to Sanctions Motion (Doc. #: 4038). Walmart also claimed Plaintiffs hadn't been prejudiced because the new documents were similar to other documents, and Plaintiffs had already questioned Nelson regarding "numerous documents with a similar theme." *Id.* at 4. The parties strongly debated whether Walmart's producing thousands of documents in the months leading up to and during trial had prejudiced Plaintiffs. What became clear was that Walmart had failed to produce discovery in accordance with a Court order, and some of the discovery was relevant to the previously recorded trial testimony of Brad Nelson.

Pursuant to Fed. R. Civ. P. 37(b)(2)(A)(i), (ii), and (vi), Plaintiffs requested the following sanctions against Walmart: (i) enter a default judgment against it; (ii) declare a mistrial as to Walmart only; (iii) admit all the documents listed in the sanctions motion into evidence at trial,

---

[27] Technically, Walmart argued it hadn't violated any discovery order, but it also argued its late production documents were "similar" to ones it had already produced.

without requiring Plaintiffs to do so through a witness, and deem any objections against admissibility to be forfeited or overruled; (iv) allow Plaintiffs to call Brad Nelson to testify live at trial by remote testimony (in addition to and not in lieu of playing his deposition), with all trial time used for his remote testimony charged to, and all associated costs paid by, Walmart; and/or (v) allow Plaintiffs to question Susanne Hiland, the only Walmart witness still scheduled to testify live in Plaintiffs' case-in-chief, about any of the documents listed in their motion, regardless of whether she has personal knowledge of the document, and with all trial time associated with such questioning to be charged to Walmart. *See* Sanctions Motion (Doc. #: 4035).

Fed. R. Civ. P. 37(c) grants the Court broad authority to order sanctions when a party has failed to timely disclose or supplement its discovery responses:

> * * * the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

Fed R. Civ. P. Rule 37(c)(1)(A)–(C). The Court considered the various sanctions requested by Plaintiffs and determined the most appropriate one was to permit Plaintiffs to question Mr. Nelson live on the recently-produced documents. *See* Order re Nelson Testimony (Doc. #: 4047). The Court noted: "Plaintiffs have pointed to highly relevant documents produced in discovery after Mr. Nelson was deposed," and it was "necessary and important for the jury to hear from Mr. Nelson regarding these documents." Fed. R. Civ. P. 37(c)(1) expressly authorized the Court to impose sanctions on a party for a refusal to obey a discovery order. *See Youn v. Track, Inc.,* 324 F.3d 409, 420 (6th Cir. 2003). In fact, given this broad authority to impose "appropriate sanctions," the Court

could have ordered Brad Nelson to appear and testify in open court, rather than via live video.[28] And the exercise of such authority would have been reviewed only for an abuse of discretion. *Toth v. Grand Trunk R.R.,* 306 F.3d 335, 343 (6th Cir. 2002).

The Court's order expressly considered Fed. R. Civ. P. 43(a), mostly for the benefit of Mr. Nelson. The Court recognized that requiring Mr. Nelson to travel to Cleveland during the pandemic would be more difficult than requiring him to appear at a more convenient location. Fed. R. Civ. P. 43(a) provides:

> (a) In Open Court. At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

Fed. R. Civ. P. 43(a). Because Mr. Nelson resided in Arkansas, the Court found "there also exist good cause and compelling circumstances for Mr. Nelson to testify by video, rather than in person." No one objected to such an accommodation for Mr. Nelson. And, until now, none of the Defendants argued Mr. Nelson should have been required to travel to Cleveland to testify.

Defendants contend the Court was not authorized, under Fed. R. Civ. P. 43(a), to require Mr. Nelson's testimony by transmission from a different location. But this argument ignores the reason for Nelson's live video testimony—Walmart producing thousands of documents after Plaintiffs had secured Nelson's pre-recorded trial deposition. Indeed, Defendants rely on an application of Rule 43(a) entirely disconnected from the facts of this case. During trial, Walmart adamantly objected to Mr. Nelson being required to appear in Cleveland to testify. But now, for purposes of gaining a new trial, Defendants are forced to argue two seemingly contradictory points.

---

[28] The Court recognizes that Mr. Nelson may have been able to challenge such an order, but that is not what happened.

They argue Nelson was *required* to appear in Cleveland to testify; but they also contend the Court had no authority to require his appearance. Even if Walmart is correct that Mr. Nelson was not subject to the Court's subpoena power, this point was rendered moot after Nelson testified via live video. The order's explicit reference to Fed. R. Civ. P. 43(a) did not deprive the Court of the authority afforded by the other rules. Defendants' insistence to the contrary has no support in the law or facts.

Moreover, completely absent from Defendants' motion is any explanation of the alleged prejudice that resulted to Defendants as a result of Nelson's live video testimony. Even if Defendants *could* show that the Court exceeded its authority in requiring Nelson to testify via live video, to obtain a new trial they still need to show prejudice and that the outcome would have been different. They have not done so. "[A] motion for a new trial will not be granted unless the moving party suffered prejudice," and "[e]ven if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Tompkin v. Philip Morris USA, In re,* 362 F.3d 882, 891 (6th Cir. 2004). The burden of demonstrating the requisite prejudice falls upon the party seeking a new trial. *Id*. In other words, a movant "must show that he was prejudiced and that failure to grant a new trial is inconsistent with substantial justice." *Id.* (quoting *Erskine v. Consol. Rail Corp.,* 814 F.2d 266, 272 (6th Cir. 1987)). Defendants haven't even attempted to meet this burden. Because Defendants have failed to show that the Court erred by ordering Nelson's live testimony or that they were prejudiced as a result, they are not entitled to a new trial on that basis.

Finally, Plaintiffs contend Defendants lack standing to dispute the Court's authority to require Nelson to testify. Defendants respond that the Court "issued its order directly to Walmart" by requiring Walmart to "ensure timely service of this order upon Mr. Nelson." Opposition at 30

(Doc. #: 4258). While it is true the Court ordered Walmart to ensure timely service, it is not true that the Court issued the order directly to Walmart. Walmart certainly had standing to challenge the service part of the order. But otherwise, the order clearly requires Nelson (not Defendants) to testify via live video. Order re Nelson Testimony at 2 (Doc. #: 4047). Even now, it is not Mr. Nelson who is challenging the Court's authority to require *him* to testify. Plaintiff's standing argument is compelling. However, it is unnecessary for the Court to decide this issue because, even if Defendants have standing, they have not met the burden of showing the Court erred, they suffered prejudice, or that the trial outcome would have been different. Defendants are not entitled to a new trial because Mr. Nelson testified via video at trial.

### J. DOJ Complaint Against Walmart

Defendants argue the Court erred by permitting Plaintiffs to cross-examine Walmart's witness regarding the DOJ's investigation into Walmart's practice of dispensing controlled substances. Obtaining a new trial on this basis is particularly difficult because both the denial of a new trial and the evidentiary ruling will be reviewed for abuse of discretion. *See Jones v. Wiseman,* 838 F. App'x 942, 945-946 (6th Cir. 2020*)* "The district court's denial of [a] plaintiff's motion for new trial is reviewed for abuse of discretion." *Cummins v. BIC USA, Inc.,* 727 F.3d 506, 509 (6th Cir. 2013). "To the extent the motion for new trial was based on an erroneous evidentiary ruling, the evidentiary ruling, too, is evaluated under the abuse-of-discretion standard." *Id.*; *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ("[A]buse of discretion is the proper standard of review of a district court's evidentiary rulings."). Because "[t]he district court has broad discretion to determine questions of admissibility; an evidentiary ruling is not to be lightly overturned." *Cummins*, 727 F.3d at 510. The Sixth Circuit will only find

44

an abuse of discretion if it is left with a "definite and firm conviction that the trial court has committed a clear error of judgment." *United States v. Thompson*, 501 F. App'x 347, 363 (6th Cir. 2012) (citation omitted). And "[a]n erroneous evidentiary ruling amounts to reversible error, justifying a new trial, only if it was not harmless; that is, only if it affected the outcome of the trial." *Cummins*, 727 F.3d at 510. Here, Defendants cannot show the Court erred. But even if they could, they cannot show that the Court "committed a clear error of judgment" and/or that the error was not harmless.

In prior orders, the Court indicated to counsel it would exclude evidence related to investigations and indictments not resulting in convictions. *See* CT1 Evidentiary Order at 16–17 (Doc. #: 3058). As the parties were well aware, the Court's prior orders would have likely precluded evidence of the DOJ complaint. However, the prior orders also acknowledged that evidence of investigations would possibly become relevant in some circumstances. For example, the Court had previously stated:

> This Court has previously informed the parties that it: "intends to have 'a very wide strike zone' for evidence about what the federal government, the DEA, and the Food and Drug Administration ('FDA') did or did not do in connection with opioid regulation, as this information is an essential part of the story regarding the claims and defenses in this case." Depending on how the evidence unfolds at trial, this evidence may very well include civil investigations conducted by governmental agencies. Accordingly, the Court declines to make a blanket ruling at this time.

CT1-B Evidentiary Order at 28 (Doc. #: 3546) (internal citations omitted). Consequently, counsel was clearly made aware before trial of the possibility of opening the door to evidence related to investigations against Defendants.

This is exactly what occurred.  During trial, Walmart's counsel asked its own witness, Suzanne Hiland, about Walmart's business culture. 11/1/21 Trial Tr. at 5077 (Doc. #: 4109). Ms. Hiland responded:

45

A        So from the very first time that I joined, the culture for Walmart has been based in what we refer to as our basic beliefs. And those are service to the customer, respect for the individual, and striving for excellence; all of that based in a foundation of integrity.

And for me, that was important. I always wanted to find somewhere to work, and I think it's why I've been with Walmart as long as I have, because those values are very clear. When you're part of Walmart, you know that those are basic beliefs, and they are talked about, they are lived at the corporate office, and it's part of how we communicate to all of our associates.

So I think that's an important part of how we've approached business, is based on the culture that's been there.

*Id.* at 5077–78.

After this testimony, Plaintiffs' counsel requested a side bar and argued Walmart had opened the door to the DOJ's complaint by presenting evidence about its corporate culture of integrity. *Id*. at 5078. The Court agreed Walmart had cracked the door open, but the Court did not allow Plaintiffs to question Hiland about the DOJ complaint; instead, the Court instructed the jury to disregard Ms. Hiland's answer. The Court also strictly warned Defendants not to "promote your company's general culture or general integrity," and that doing so again would result in Plaintiffs being permitted to ask specific questions related to that integrity or culture. *See id*. at 5080. Defendants were directly warned to avoid this line of questioning because the Court viewed it as opening the door to questioning about the DOJ Complaint. *Id.*

Despite this direct warning, Walmart's counsel later returned to Hiland's opinion about Walmart's business reputation.

Q        If someone were to suggest to you that Walmart puts profits over safety, how would you respond?

A        That's just not true.

Q        Why do you say that?

46

A      That's not my experience. Everything that I have ever experienced at Walmart from the time that I was hired was around serving the patient and putting the patient's needs and safety above any business metric or -- and the reason for that is, it was mentioned earlier in this, is if we take care of the patient in a way that is quality and safe, if we do it in a compliant way, then that will build a sustainable business.

And so that's the approach that I was always taught and that we always, in my experience, have always communicated.

*Id.* at 5115-5116. These questions and responses were directly related to Walmart's business reputation, which the Court had already warned Walmart to avoid. It would not have been fair to permit Walmart to continue to offer this "good reputation" evidence while denying rebuttal evidence from Plaintiffs.[29] Thus, in response to Ms. Hiland testifying again about Walmart's integrity and "putting the customer's needs and safety above any business metric," the Court permitted Plaintiff's counsel to ask a single question about the DOJ complaint. *See id.* at 5116–19. The Court did not err in allowing that question.

The Court properly applied Fed. R. Evid. 405 when it permitted one question about Ms. Hiland's knowledge of the DOJ complaint. In fact, it was a textbook application. "When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct." Fed. R. Evid. 405. Here, Defendants asked Ms. Hiland about her opinion of Walmart's corporate culture. On cross-examination, defense counsel was permitted to ask one question about

---

[29] The Court was confounded as to why Walmart repeatedly elicited these statements from Ms. Hiland. Walmart was on trial for contributing to the opioid epidemic. Ms. Hiland's opinion of Walmart's business culture valuing the patient over business metrics was irrelevant. At its core, this opinion was a character reference for Walmart—it was related to Walmart's good business reputation. But when a party offers an opinion about good character, the opposing party is permitted to cite specific evidence suggesting the party may *not* have such good character. That is why Plaintiffs were permitted to inquire about the DOJ complaint—it suggested that Walmart may not have as good of a business reputation as opined by Ms. Hiland.

47

a specific investigation against Walmart. No additional questions were asked about the DOJ complaint.

The Court also established strict guidelines for questioning Ms. Hiland about the DOJ complaint, and Plaintiffs' counsel complied with the Court's guidelines. Plaintiffs' counsel asked:

> Q     Well, you were asked, Does Walmart ever put profits over safety, and you said, Walmart doesn't put profits over safety ever.
>
> Do you remember that?
>
> A     I don't know if I said "ever," but I don't believe in my experience that that's what Walmart has done. That's not the way that we approach business.
>
> Q     But you know even today Walmart is under close examination for this, right?
>
> A     I mean, in this trial? I don't –
>
> Q     I'm referencing you know for a fact that the Department of Justice right now has a 160-page complaint on file against Walmart alleging that the Compliance unit chose not to give its pharmacists the information and authority it knew they needed to comply with the rules.
>
> You know that's out there right now, don't you?
>
> MS. FUMERTON: Objection.
>
> THE COURT: Overruled.
>
> A     I know that there's a DOJ complaint. I don't know the specifics.

11/1/21 Trial Tr. at 5228-5229 (Doc. #: 4109). Plaintiffs' counsel did not ask any further questions about the DOJ complaint.

The Court did not err in permitting a question about the DOJ complaint. But, even if this had been an error, Defendants cannot complain because they invited it. "[A] party may not complain on appeal of errors that he himself invited or provoked the court . . . to commit." *Hickson Corp. v. Norfolk S. Ry*., 124 F. App'x 336 (6th Cir. 2005); *Toth v. Grand Trunk R.R.,* 306 F.3d 335, 354 (6th Cir. 2002); *Harvis v. Roadway Express, Inc*., 923 F.2d 59, 60 (6th Cir. 1991). At

trial, Defendants' counsel was warned to stay away from the topic of Walmart's "corporate culture" or reputation. Despite this warning, Walmart's business reputation was raised a second time. And because Ms. Hiland testified that Walmart "put patient's needs and safety above any business metric," it was fair for Plaintiffs' counsel to ask if she was aware of the DOJ's complaint suggesting otherwise. Defendants cannot show the Court abused its discretion when they invited this rebuttal question about the DOJ complaint.

Finally, Defendants have failed to show that the question about the DOJ complaint was not harmless. During the six-week trial, Plaintiffs' counsel asked one rebuttal question about the DOJ complaint. The question was directly related to Ms. Hiland's opinion about Walmart's culture and approach to patient safety. Defendants haven't explained how this single question changed the entire outcome of the trial. Nor can they. It is questionable whether it had *any* impact on the trial. Walmart's witness testified she knew little about the DOJ complaint, and Plaintiffs' counsel didn't ask any follow-up questions. Because Defendants have failed to show that: (1) the Court erred in permitting a rebuttal question about the DOJ complaint: (2) the Court abused its discretion in allowing this question; and/or (3) the alleged error was not harmless, they are not entitled to a new trial on this basis.

### K. Extraterritorial Evidence

The Pharmacy Defendants assert the Court erred by admitting extraterritorial evidence that did not bear a specific nexus to Plaintiff Counties. *See* Motion at 37–38 (Doc. #: 4204).

The Court spent a great deal of time carefully considering the extent to which so-called extraterritorial evidence would be permitted to play a role in the MDL broadly, and in the Track Three trial in particular. *See, e.g.*, CT3 Evidentiary Order (Doc. #: 3967); CT1-B Evidentiary

Order at 33 (Doc. #: 3546); Order Sustaining-in-part and Overruling-in-part Objections to 2d Discovery Ruling re Geographic Scope of Discovery (Doc. #: 3437); 2d Discovery Ruling re Geographic Scope of Discovery (Doc. #: 3410); Order re Geographic Scope of Discovery at 2 (Doc. #: 3389); Order re Nationwide Dispensing Data at 3 (Doc. #: 3341); Order re Discovery Ruling No. 22 at 4 n.7 (Doc. #: 3333); CT1 Evidentiary Order at 8–11 (Doc. #: 3058); Discovery Ruling No. 3 at 3–4 (Doc. #: 762).[30]

Specifically, in its Track One-B evidentiary order, the Court summarized and clarified that, "where evidence tends to show nation-wide trends and shipments, national policies and procedures, or systemic failures that are national in scope and become clear in the aggregate, the Court will generally permit such evidence—so long as it is otherwise admissible under the Federal Rules." CT1-B Evidentiary Order at 33 (Doc. #: 3546); *see also* CT3 Evidentiary Order (Doc. #: 3967) (applying prior evidentiary rulings to Track Three). In each of the examples provided by the Pharmacy Defendants, the record reflects that Plaintiffs elicited testimony showing the policy to which the evidence related applied to all the Defendants' stores nationally, including those in Lake and Trumbull Counties.

The Pharmacy Defendants cite only three examples to support their assertion that "the extraterritorial evidence the Court admitted was not limited to national policies also in place in Lake and Trumbull Counties:" (1) the *Holiday* decision (discussed *supra*, Section D), (2) an internal Walmart email regarding its blanket-refusal-to-fill policy, and (3) an internal Walgreens email regarding whose responsibility it is to conduct due diligence on suspicious orders. Motion

---

[30] The Court recognizes that, although several of these rulings and orders relate to discovery, their analysis of the relevance and applicability of extraterritorial evidence is sound and applicable to the inquiry regarding the existence of a nexus to the Plaintiff counties.

at 38 (Doc. #: 4204). First, the *Holiday* decision was put on the Federal Register to provide national notice, not just to CVS, but to all pharmacies nationwide, including to those in Lake and Trumbull Counties. *See, generally*, 5 U.S.C. § 552 (Administrative Procedures Act describing what must be published in the Federal Register "for the guidance of the public," including administrative law opinions). Additionally, Plaintiffs elicited testimony showing that the *Holiday* decision was seminal and widely-read within the industry; and as a direct result of *Holiday*, CVS, Walgreens, and Walmart made changes to their respective national dispensing policies, which of course applied to their stores in Plaintiffs' counties. The evidence showed a clear nexus between *Holiday* and Defendants' stores in the counties.

Second, and similarly, regarding the two internal emails, what a corporate compliance officer told the stores he or she was responsible for about the company's blanket-refusal-to-fill policy or suspicious-order-due-diligence policy reflects the company's understanding and implementation of its own national policies and procedures. Because the policies described in those emails were national, they naturally applied to stores in Lake and Trumbull County, in precisely the same way as they did to stores in Missouri and Florida, as well as everywhere else Walmart and Walgreens operate respectively. The national character of the policies discussed in these documents establishes a sufficient nexus to the Plaintiff counties.

The Pharmacy Defendants assert that "the extraterritorial evidence the Court admitted was not limited to national policies also in place in Lake and Trumbull Counties." Motion at 38 (Doc. #: 4204). Yet, beyond this conclusory assertion, the Defendants never even attempt to argue or explain why the policies discussed in those emails (*i.e.*, Walmart's blanket-refusal-to-fill policy and Walgreens' suspicious-order-due-diligence policy) were either (i) not national in scope and applied only to those stores the emails were discussing, or (ii) national in scope but for some reason

did not apply in Lake or Trumbull County. The Pharmacy Defendants simply provide no support for either position.

The Court concluded that national policy evidence would generally be permitted *because* those policies would be in effect in Lake and Trumbull County. Plaintiffs' evidence tended to show that those national policies were ineffective at preventing diversion. The Court consistently ruled that Plaintiffs were entitled to show the ineffectiveness of the policies in effect in Lake and Trumbull County by eliciting evidence and testimony about national policies and procedures that applied in the Counties. The national character of the policies described in the Pharmacy Defendants' examples is what provides the nexus to the counties. The Pharmacy Defendants have not shown that the Court erred in admitting this evidence. Therefore, they are not entitled to a new trial on this ground.

### L. Jury Instructions

The Pharmacy Defendants assert that the Court's jury instructions and verdict forms "tainted the jury's verdict." Motion at 38 (Doc. #: 4204). As plagues most of their motion, the Pharmacy Defendants never attempt to explain ***how*** they may have been prejudiced by the Court's instructions. As described in this section, the Court's instructions were correct. However, even if there were some minor errors, absent a showing of prejudice – which the Pharmacy Defendants have not made – they are not entitled to a new trial. *See Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009).

### 1. Legal Standard

The legal correctness of a trial court's jury instructions is a question of law that is reviewed *de novo*. *See id. at* 273–74. Jury instructions are reviewed "as a whole 'to determine whether they

adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision.'" *Id.* at 273 (quoting *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365 (6th Cir.2005). The Sixth Circuit will not reverse a jury verdict due to incorrect jury instructions unless "the instructions, 'viewed as a whole, [are] confusing, misleading, and prejudicial.'" *Id.* at 274 (quoting *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 641 (6th Cir.2005). "[A] technically faulty jury instruction [will not be set aside] when the error is harmless" *Id.* (citing *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir.2000)).

### 2. Introduction

In the words of Professor Robert Keeton: "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word nuisance." Prosser & Keeton, The Law of Torts (5 Ed.1984) 616, § 86.

In an attempt to chart a course through this "jungle," the Court worked assiduously on its jury instructions and verdict forms for over two years, repeatedly sending updated versions to the parties for comment. At all times, the Court carefully considered each of the Pharmacy Defendants' proposed instructions and their objections to the Court's proposed instructions (as well as the same submissions from Plaintiffs and other Defendants). The Court adopted many of the Pharmacy Defendants' suggestions over the years. It also rejected many proposals and overruled all remaining objections, including those put forward here. The Court now formally overrules those objections once again. In this section, the Court will not necessarily readdress each objection item-by-item. Rather, the Court takes this opportunity to provide context regarding how it drafted its public nuisance jury instructions and verdict forms and to explain the most important decisions it made in crafting them.

### 3. Procedural History

On October 4, 2019, the Track One parties submitted their first proposed jury instructions. *See* CT1 Joint Submission re Jury Instructions (Doc. #: 2715). Both before and after that time, the Court issued many opinions that should have guided the parties' efforts to reach consensus on jury instructions.[31] Despite this, however, the parties never reached agreement on the substance of Ohio public nuisance law.[32] Thus, the Court endeavored to craft instructions that were legally correct, neutral, understandable to a lay jury, and fair to all parties.

### 4. Analysis

That the Pharmacy Defendants continue, to this day, to object to the Court's jury instructions does not make the instructions erroneous, as the Defendants continue to insist. Neither is the Court required to use the Pharmacy Defendants' proposed language (which was, itself, flawed in many ways).[33] *See Schnipke v. Safe-Turf Installation Group, L.L.C.*, 940 N.E.2d 993, 1002 (Ohio Ct. App. 2010); *see also cf., Bridgeport Music*, 585 F.3d at 274 ("The refusal of a district court to give a particular instruction . . . is reviewed for abuse of discretion."). "A trial judge has **considerable discretion** in choosing the language of an instruction, so long as the

---

[31] *See, e.g.*, CT1 MTD Order (Doc. #: 1203); Cleveland Bakers MTD Order (Doc. #: 3177); CSA MSJ Order (Doc. #: 2483); Causation MSJ Order (Doc. #: 2561); Pls Nuisance MSJ Order (Doc. #: 2572); Defs Nuisance MSJ Order (Doc. #: 2578); CT3 MTD Order (Doc. #: 3403); Reconsideration Order re CT3 MTD (Doc. #: 3499); Giant Eagle CT3 MSJ Order (Doc. #: 3913).

[32] In their final pre-verdict objection to the Court's jury instructions (incorporated into their present Motion by reference), the Pharmacy Defendants succinctly summarize the procedural history that led to the Court's final charge. *See* Defendants' Objection to Jury Charge at 2 (Doc. #: 4146) ("the procedural history of the Court's final jury instructions and verdict form in this case is extensive, dating back years, cutting across Tracks One, One-B, and Three, and involving different plaintiffs and defendants, many of whom are not parties to this trial."). That document, which includes both filed and informal email briefing, is over 400 pages long.

[33] Often, the Defendants' proposed language was verbose and confusing, making it a challenge for even the Court to follow; let alone a lay jury. Their apparent attempts to cherry pick favorable language and exclude unfavorable language led to proposed instructions that were unnecessarily redundant, internally inconsistent, or simply wrong on the law.

54

substance of the relevant point is ***adequately*** expressed." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (emphasis added). The Court particularly notes that the Supreme Court in *Boyle* requires only that the substance of the relevant point be expressed ***adequately***, not ***perfectly***; and in any event, need not be exactly as proposed by either party. *Accord Bridgeport*, 585 F.3d at 273.

As it pertains to the law of public nuisance, Ohio follows the Restatement (Second) of Torts (1979) (hereinafter "Restatement"). In March 2002, the Ohio Judicial Conference updated Ohio's model jury instructions, drawing from the Restatement. *See, e.g.*, 1 CV OJI 621.05, Cmt. [Rev. 3-18-02] (citing Restatement of Law 2d, Torts (1965), § 826). Three months later, in June 2002, the Ohio Supreme Court issued its opinion in *Cincinnati v. Beretta*. *See Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002) (citing Restatement of the Law 2d, Torts (1965)).

The Restatement, itself, is less than clear on public nuisances. The chapter on nuisance predominantly applies to private nuisances, which are different. *See* Restatement, Div. 10, Ch. 40 (Nuisance), Topic 2 (Private Nuisance).[34] Many sections, including those related to the most hotly contested issues, such as intentionality (§ 825), unreasonableness (§ 826), gravity of harm (§ 827), utility of conduct (§ 828), and severe harm (§ 829A), expressly apply to private nuisances. Each section does contain language in the comments, however, indicating the language "also applies, *when it is pertinent*, to conduct resulting in a public nuisance," or that the "rules *may be, and commonly are*, applied to conduct that results in a public nuisance." Restatement § 825, cmt. (1979) (emphasis added); *id.* at § 828, cmt. (emphasis added). Using those sections and others, the

---

[34] There is no Topic for "Public Nuisance."

Court determined whether *it was pertinent* to apply the Restatement's language, and if so, how and to what extent each section *may* apply to common law public nuisance.

### 5. Verdict Form

In the Restatement, the treatise begins by commenting on the multiple uses of the word "nuisance" common in legal discourse. It first describes three legally significant "senses" of the word,[35] and then states:

> In this Chapter as well as throughout the Restatement the word is used in the second sense stated above. ***That is to say, that for a nuisance to exist there must be harm to another or the invasion of an interest, but there need not be liability for it.*** If the conduct of the defendant is not of a kind that subjects him to liability (see § 822), the nuisance exists, but he is not liable for it.

Restatement § 821A, cmt. c. (1979) (emphasis added). This bears repeating: The Restatement is ***clear*** that a nuisance can exist in the absence of liability. *Id.* ("[F]or a nuisance to exist there must be harm to another or the invasion of an interest, ***but there need not be liability for it***."). Thus, the Court presented two questions on its verdict form:

> Did Trumbull County prove, by the greater weight of the evidence, that oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels, is a public nuisance in Trumbull County?

> Did Trumbull County prove, by the greater weight of the evidence, that any of the following Defendants engaged in intentional and/or illegal conduct which was a substantial factor in producing the public nuisance that you found exists in Question 1?

Verdict Form (Doc. #: 4176).[36] Put more simply: "Does a nuisance exist?," and "If so, are the Defendants liable for it?" This is the same structure that the Restatement's use of the word

---

[35] The Restatement provides that, at various times, the word "nuisance" has been used to denote (1) "human activity or a physical condition that is harmful or annoying to others," (2) "the harm caused by the human conduct or physical condition described in the first meaning," or (3) "both the conduct or condition and the resulting harm with the addition of the legal liability that arises from the combination of the two." Restatement § 821A, cmt. b.

[36] The questions for Lake County were identical except for the county name.

"nuisance" supports. The Pharmacy Defendants object to the two-question structure of the verdict form; however, the Court's verdict form clearly and correctly reflects the Restatement's use of the word nuisance. There is no error in the Court's verdict form.

### 6. Jury Instruction

Turning to the instructions the Court gave the jury, the Court introduced the substantive law section of its instruction as follows:

> A public nuisance is an unreasonable inference with a right held by the public in common that is ongoing today.[37] A public nuisance includes an unreasonable interference with public health or public safety.[38]
>
> A right common to the general public is a right or an interest that belongs to the community at large.[39] It is a right that is collective in nature. A public right is different from an individual right that everyone has, like the right not to be assaulted or defrauded.[40]

11/15/21 Trial Tr. at 7071:9–17 (Doc. #: 4153).

The first sentence of the instruction above offered a definition of public nuisance: "A public nuisance is an unreasonable inference with a right held by the public in common that is ongoing today." *Id.* at 7071:9–11 (Doc. #: 4153). This mirrors the restatement's definition of a public nuisance: "A public nuisance is an unreasonable interference with a right common to the general

---

[37] *See* Restatement § 821B(1) ("A public nuisance is an unreasonable interference with a right common to the general public.").

[38] *See* Restatement § 821B, cmt. b ("Thus, public nuisances included interference with the public health . . .; with the public safety. . .; and with a wide variety of other miscellaneous public rights of a similar kind."); *see also Cincinnati v. Beretta*, 768 N.E.2d at 1142 ("[A]lthough we have often applied public nuisance law to actions connected to real property or to statutory or regulatory violations involving public health or safety, we have never held that public nuisance law is strictly limited to these types of actions.").

[39] *See* Restatement § 821B, cmt. b ("At common law public nuisance came to cover a large, miscellaneous and diversified group of minor criminal offenses, all of which involved some interference with the interests of the community at large—interests that were recognized as rights of the general public entitled to protection.").

[40] *See* Restatement § 821B, cmt. g ("It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured.").

57

public." Restatement § 821B(1). Upon the Pharmacy Defendants' unrelenting insistence, the Court added the phrase "that is ongoing today." The phrase reflects prior Court rulings that the remedy sought by Plaintiffs is forward looking (abatement) rather than backward looking (damages). *See* Pls Nuisance MSJ Order at 5 (Doc. #: 2572); *see also Daubert* Order re Abatement Experts at 2 (Doc. #: 2519) (explaining the distinction). The phrase was unnecessary for the liability phase of this trial and only applies, if at all, to the remedy phase ("Phase 2"). In other words, since Defendants have been found liable for causing a public nuisance, if that nuisance no longer exists (a potential factual question for Phase 2), then nothing remains for the Court to abate. Despite that, the Court concluded the addition was not legally incorrect and acquiesced to the Defendants request.[41]

The Court continued:

> For a defendant to be held liable for creating a public nuisance, a plaintiff must show, by the greater weight of the evidence, that the defendant did one or both of the following two things:
>
> First, the defendant engaged in ***intentional conduct*** that caused a significant and ongoing interference with a public right to health or safety;
>
> Or two, the defendant engaged in ***unlawful conduct*** that caused a significant and ongoing interference with a public right to health or safety.

11/15/21 Trial Tr. at 7071:18–72:2 (Doc. #: 4153) (emphasis added).

Here, the Court instructed the jury that Plaintiffs could prove a public nuisance by showing *either* intentional *or* unlawful conduct (or both). Although the Restatement does not use this exact phrasing, other courts have, including the Ohio Supreme Court. *See Cincinnati v. Beretta*, 768

---

[41] The Court also notes Plaintiffs objected to this addition. *See* Joint Submission re CT1-B Jury Instructions at 66–67 (Doc. #: 3449). Although the Pharmacy Defendants vehemently assert that the jury instructions "tilted one way only," Motion at 39 (Doc. #: 4204), the Court made several concessions—like the one described here—that, if anything, were Defendant-friendly.

N.E.2d at 1143, n.4; *Metzger v. Pennsylvania, O. & D. R. Co.*, 66 N.E.2d 203, 203 (Ohio 1946); *Cleveland v. JP Morgan Chase Bank*, N.A., 2013 WL 1183332, at *3–*4 (Ohio Ct. App. March 21, 2013). And as a result, this Court has ruled that the disjunctive formulation is proper. *See* Pls Nuisance MSJ Order at 2 (Doc. #: 2572).

In further support of the Court's phrasing, Section 821B(1) of the Restatement provides: "A public nuisance is an ***unreasonable interference*** with a right common to the general public." Restatement § 821B(1) (emphasis added). It further explains:

> Circumstances that may sustain a holding that an ***interference*** with a public right is ***unreasonable*** include the following:
>
> (a) Whether the conduct involves a ***significant interference*** with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>
> (b) whether the conduct is ***proscribed by a statute, ordinance or administrative regulation***, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement § 821B(2) (emphasis added); *see also Cincinnati v. Beretta*, 768 N.E.2d at 1142 (citing the Restatement). The Court interpreted these circumstances as follows: First, interference with a public right may be unreasonable if the interference is significant. Second, interference with a public right may be unreasonable if the conduct creating the interference was unlawful.

Although couched in terms of conduct, the Restatement is clear that the nuisance is ***the harm caused*** by human activity ***or*** physical condition. *See* Restatement § 821A, cmt. b (describing nuisance as "the harm caused by the human conduct ***or*** physical condition [that is harmful or annoying to others]") (emphasis added). Thus, it is important to understand that a nuisance can exist when ***either*** the ***activity, itself,*** is the harm (*e.g.*, emitting a loud ceaseless noise) ***or*** when the

*condition resulting from the activity* is the harm (*e.g.*, felling a tree in such a way that it falls across a public road, blocking traffic). *See* Restatement § 834, cmt. e ("if the activity has resulted in the creation of a physical condition that is of itself harmful after the activity that created it has ceased, a person who carried on the activity that created the condition or who participated to a substantial extent in the activity is subject to the liability for a nuisance, for the continuing harm.").

Thus, in the latter example, the act of cutting down a tree, itself, is neither harmful nor annoying, but the condition resulting from the act (a blocked public right of way) is (and continues to be) despite the cessation of the conduct leading to the condition. In other words, the conduct itself (*i.e.*, the human activity) may, but need not necessarily, be the interference. Per the Restatement, the physical condition resulting from the activity can also be the interference. *See also* CT3 MTD Order at 28 (Doc. #: 3403) ("Stated otherwise, '[w]here the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, the law of negligence has no application and the rule of absolute liability applies.'") (quoting *Taylor v. Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944).

The Court deviated from the Restatement by not including the third circumstance in its instruction. Because it is written with its own internal disjunctive ("whether the conduct is of a continuing nature **_or_** has produced a permanent or long-lasting effect"), the Court concluded it was unnecessarily confusing. Further, as the comments to § 821B explain, the third circumstance was included to limit "the potentially widespread *damage* liability for a public nuisance" in the event "the defendant was not aware of the injurious character of his conduct." Restatement § 821B, cmt. e (emphasis added). In this case, Plaintiffs are not seeking damages, so the third circumstance is only of limited applicability. Due to the confusing nature of circumstance (c) and its limited

applicability, the Court elected not to instruct the jury on this circumstance. This was not error. The Restatement expressly states the circumstances listed in § 821B(2) were not intended to be exclusive or conclusive. *See* Restatement § 821B, cmt. e. (The three sets of circumstances listed in § 821B(2) "are not conclusive tests controlling the determination of whether an interference with a public right is unreasonable. They are listed in the disjunctive; any one may warrant a holding of unreasonableness. They also do not purport to be exclusive.").[42] Ultimately, the Court concluded the language describing the third circumstance was murky and unnecessary and did not apply cleanly to the facts of the case.

### 7. Intentional Conduct

The instructions next describe intentional conduct – one of the most contentious issues in the instructions. The Court instructed:

> For you to find that a person engaged in intentional conduct, it is enough that the person intended to act and knew, or was substantially certain, that the circumstances resulting from that act would interfere with public health or public safety.[43] It is not necessary for you to find that the person intended to cause a public nuisance.[44]

---

[42] Once again, the Court's decision not to include circumstance (c), if anything, amounts to a Defendant-friendly change from the Restatement, as it excluded from the jury's consideration a third category of circumstances that might have been used as a basis for liability.

[43] *See* Restatement § 825 (An "interference with the public right, is intentional if the actor . . . knows that it is resulting or is substantially certain to result from his conduct."); *see also id.* at § 8A.

[44] Defendants consistently objected to this language, but it is clearly appropriate under Ohio law. *See Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 859, 863 (N.D. Ohio 2017) ("An absolute nuisance requires intentional conduct. Intentional, in this context, means not that a wrong or the existence of a nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance.") (quoting *Angerman v. Burick*, 2003-Ohio-1469, ¶ 10, 2003 WL 1524505 (Ohio App.)).

> If a person learns that circumstances resulting from their conduct interfere with public health or public safety, and the person continues that conduct, then the subsequent conduct is intentional.[45]

11/15/21 Trial Tr. at 7072:12–73:5 (Doc. #: 4153).

Ohio public nuisance law requires that both the interference and the conduct be unreasonable. *See* 1 CV OJI 621.05 ¶ 4 (plaintiff must prove "defendant's conduct was intentional and also that the conduct was unreasonable"). The Court concluded that adding the word "unreasonable" to ***this*** portion of the instruction, which explains the meaning of "intentional," made the instructions unnecessarily confusing. Instead, due to the importance of the word and to make the concept as clear as possible for the jury, the Court gave the word "unreasonable" its own section (described below).

The reason "unreasonableness of conduct" is a challenging concept in public nuisance law is because it is context-dependent. Some conduct in one situation may create a nuisance, while the same conduct in another situation may not. The Restatement helps to clarify this point: "It may sometimes be reasonable to operate an important activity if payment is made for the harm it is causing, but unreasonable to continue it without paying." Restatement § 828, cmt. on clause (b). Furthermore, in public nuisance law, "unreasonableness" requires a balancing of the gravity of the interference with a public right against the utility of the Defendants' conduct. *See* Restatement § 826; 1 CV OJI 621.05 ¶ 4.

The Court concluded these two overlapping concepts—(1) that "gravity of interference" must outweigh "utility of conduct," while (2) the reasonableness of conduct, itself, varies based

---

[45] *See* Restatement § 825, cmt. d ("In [continuing or recurrent] cases the first invasion resulting from the actor's conduct may be either intentional or unintentional; but when the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional.").

on compensation—would be difficult for the jury to understand using only the "gravity versus utility" phrasing suggested by the Restatement and model instruction.[46] This is especially true considering the jury was not being asked to determine what remedy, if any, was appropriate.[47]

Instead, the Court provided a separate instruction specifically defining the terms "significant" and "unreasonable." *See* 11/15/21 Trial Tr. at 7077:22–78:13 (Doc. #: 4153). In it, the Court instructed the jury that:

> An interference with a public right may range from a petty annoyance to serious harm. An interference with a public right is not significant or unreasonable if it causes only a relatively slight amount of inconvenience.[48]

> An interference with a public right is significant or unreasonable if it causes greater harm than the public should be required to bear, considering all the circumstances.[49]

> When you consider whether an interference with a public right is significant or unreasonable, some of the factors you may consider include the nature, extent, and duration of the interference, and the social value of the defendant's conduct.[50]

11/15/21 Trial Tr. at 7078:2–78:13. This instruction draws its language directly from the Restatement and adequately instructs the jury to weigh the ***gravity*** of the harm (*i.e.*, more than petty annoyance or than the public should be required to bear) with the ***utility*** (*i.e.*, social value)

---

[46] The Court notes for completeness that the Pharmacy Defendants did propose the use of specific "gravity versus utility" language in their instruction. As described below, the Court rejected that proposal in lieu of the clearer language it used to convey the same concept.

[47] That task was left for the Court in Phase 2 of this trial. *See* Public Nuisance Adjudication Order (Doc. #: 2629).

[48] *See* Restatement § 821F, cmt. c ("significant harm is . . . harm of importance, involving more than slight inconvenience or petty annoyance.").

[49] *See* Restatement § 829A, cmt. a ("[I]n determining whether the gravity of the interference with the public right outweighs the utility of the actor's conduct, the fact that the harm resulting from the interference is severe and greater than the other should be required to bear without compensation will normally be sufficient to make the interference unreasonable.") (internal references omitted).

[50] *See* Restatement § 828 ("In determining the utility of conduct that causes an intentional invasion . . . , the following factors are important: (a) the social value that the law attaches to the primary purpose of the conduct."). Although there are other factors the Restatement indicates are important, they pertain to the private use and enjoyment of land and were omitted from the Court's public nuisance instruction. Recall that these sections apply to private nuisances and only "may" apply to public nuisances "when pertinent." *See supra*, p.52 (quoting Restatement §§ 825; 828).

of the defendants' conduct, considering all the circumstances. The Pharmacy Defendants take exception with the manner the Court presented this instruction, but it clearly and correctly conveys the substance of the law. This too, does not constitute legal error.

### 8. Unlawful Conduct

Section 821B(2)(b) of the Restatement provides that the "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include . . . whether the conduct is proscribed by a statute, ordinance or administrative regulation." Restatement § 821B(2)(b). Unlawful conduct is, therefore, essentially by definition, unreasonable. Thus, the Court instructed the jury on the unlawful conduct prong as follows:

> [U]nlawful conduct occurs when a person engages in conduct that is prohibited by a statute, ordinance, or regulation that controls safety. And unlawful conduct also occurs when a statute, ordinance, or regulation that controls safety requires a person to engage in certain conduct, but the person fails to do so. The person does not need to know their conduct is unlawful for an unlawful act to occur.

> A law controls safety if it imposes specific legal requirements for the protection of the health, safety, or welfare of others.[51] The Federal and Ohio Controlled Substances Acts and their accompanying regulations are laws that control safety.[52]

> Conduct that is fully authorized by a statute, ordinance, or regulation cannot create a public nuisance because it is lawful conduct.[53] But if a person's conduct does not comply with what is authorized by law, then that conduct may be unlawful conduct.

11/15/21 Trial Tr. at 7074:19–23 (Doc. #: 4153). The Court has repeatedly ruled that "safe harbor immunity is available ***only*** to those who perform in accordance with their regulatory obligations."

---

[51] *See* 1 CV OJI § 621.01, cmt. ("The violation of a safety statute creates absolute liability if it is determined that the statute establishes a specific legal requirement for the protection of others.").

[52] *Cf.* 21 U.S.C. § 801(2) (Congress recognized in enacting the CSA that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.").

[53] *See* Restatement § 821B, cmt. f ("conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability.").

Giant Eagle CT3 MSJ Order at 4 (Doc. #: 3913) (emphasis in original); (citing Cleveland Bakers MTD Order at 47 (Doc. #: 3177); *see also* CT3 MTD Order 29–30 (Doc. #: 3403) (same). Thus, the Court instructed the jury that "if a person's conduct does not comply with what is authorized by law, then that conduct may be unlawful conduct." 11/15/21 Trial Tr. at 7074:21–23 (Doc. #: 4153). Use of the word "may" clearly implies that not all conduct that "does not comply with what is authorized by law," is unlawful conduct. To make this point even more clear to the jury, however, the Court went further. It also instructed the jury that:

> The Federal and Ohio Controlled Substances Acts and their accompanying regulations do not require strict or perfect compliance. Only substantial compliance is required. In other words, not every act that is in violation of the law can be a public nuisance. Only unlawful conduct that causes a significant interference with a public right to health or safety can be a public nuisance.

*Id.* at 7075:5–11. These additional instructions make it clear that full legal compliance does not require perfect compliance.

While the Court was finalizing its unlawful conduct instruction, the Pharmacy Defendants correctly pointed out that "the jury must be instructed on the law in order to determine whether any Defendant engaged in 'unlawful' conduct.'" Defendants Jury Instruction Proposal at 1 (Doc. #: 4043). The Court agreed and reviewed proposals from both Plaintiffs and Defendants, but again the parties could not reach agreement. The Court then drafted and, upon receiving additional feedback from the parties, gave the following instruction regarding the CSA, taken from the statutes, regulations, and administrative interpretations by the DEA:

> Under both Federal and Ohio laws and regulations, entities that are authorized to dispense controlled substances are required to provide effective controls and procedures to guard against theft and diversion.[54] A prescription for a controlled

---

[54] *See* 21 C.F.R. 1301.7 l(a) ("All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances."); Ohio Admin. Code §§ 4729 5-3-14 and 4729: 6-3-05 ("[ a]ll licensees and registrants shall provide effective and approved controls and procedures to deter and detect theft and

substance must be issued for a legitimate medical purpose by a doctor, or other registered prescriber, acting in the usual course of his or her professional practice.[55] The Federal and Ohio Controlled Substances Acts and their accompanying regulations also provide that the pharmacist who fills the prescription has a corresponding responsibility for proper dispensing of controlled substances for a legitimate medical purpose.[56] The corresponding responsibility for proper dispensing of valid prescription extends to the pharmacy itself.[57]

A violation of the corresponding responsibility occurs when a person knowingly fills or allows to be filled an illegitimate prescription.[58] In this context, knowingly includes when a person acts with deliberate ignorance or willful blindness to information in their possession.[59]

11/15/21 Trial Tr. at 7075:16–76:6 (Doc. #: 4153). As is clear from the citations above, every single statement in this instruction is well supported and much of it draws from the language of the regulations verbatim. Although the Pharmacy Defendants continue to object to virtually every word of this instruction, their objections, still, are not well taken.

---

diversion of dangerous drugs."); *see also* CT3 MTD Order at 4–5, 25 (Doc. #: 3403) (citing 21 C.F.R. 1301.7 l(a)); Reconsideration Order re CT3 MTD at 5 (Doc. #: 3499) (same).

[55] *See* 21 C.F.R. 1306.04(a) ("A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.").

[56] *See* 21 C.F.R. 1306.04(a) ("The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.").

[57] Defendants vehemently and repeatedly argued that the CSA imposes duties only on *pharmacists*, and not the pharmacy-employer, but the Court rejected this argument as simply incorrect.  On this point, *see* JMOL Order at 40-44 (Doc. #4295).  *See also Top RX Pharmacy; Decision and Order*, 78 FR 26069-01, 26082 (DEA May 3, 2013) ("The corresponding responsibility to ensure the dispensing of valid prescriptions extends to the pharmacy itself."); CT3 MTD Order at 18, (Doc. #: 3403) (citing *Top RX Pharmacy* and *United States v. Appalachian Reg 'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1189–90 (E.D. Ky. 2017)); *accord id.* at 18 n.20 (collecting agency decisions and issued guidance).

[58] *See* 21 C.F.R. 1306.04(a) ("the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.").

[59] *See* Reconsideration Order re CT3 MTD at 5–6 (Doc. #: 3499) ("a pharmacy cannot be deliberately ignorant or willfully blind regarding its own prescription information."); *JM Pharmacy Group, Inc., d/b/a Farmacia Nueva and Best Pharma Corp; Decision and Order*, 80 FR 28667-01, 28670 (May 19, 2015) (a pharmacist may not engage in "deliberate ignorance or willful blindness" when assessing whether a prescription is illegitimate); id at 28685 ("Settled [DEA] precedent . . . prohibit[s] the filling of a prescription where the pharmacist or pharmacy 'knows or has reason to know' that the prescription is invalid.").

### 9. Causation

Finally, the Court instructed the jury on causation:

You may find a defendant liable only if you conclude the defendant was a proximate cause of a public nuisance. A public nuisance may be proximately caused by a defendant's act or failure to act. A defendant's conduct proximately caused a public nuisance if the circumstances that constitute the nuisance are the natural and foreseeable result of that conduct.[60]

There may be more than one proximate cause of a public nuisance, but causes that are merely incidental are not proximate causes. To be a proximate cause, the acts or omissions of a defendant must be a substantial factor in producing circumstances that unreasonably interfere with a public right to health or safety.

An individual defendant's conduct need not be independently capable, all by itself, of causing the public nuisance. There may be multiple causes of a public nuisance. The fact that some other cause or causes combined with the defendant's conduct in creating the public nuisance does not relieve that defendant from liability if the plaintiff can prove that the conduct the defendant engaged in was a substantial factor in creating the public nuisance. [61]

A defendant's conduct is substantial if a reasonable person would regard that conduct as the cause, or one of the material, meaningful, or considerable causes, of the nuisance.[62] If you find that the conduct of any defendant proximately caused a public nuisance, it is not a defense to liability that some other entity may also be to blame.

In addition, the plaintiff must show by the greater weight of the evidence that the conduct a defendant engaged in could reasonably be expected to cause an

---

[60] *See* 1 CV OJI 405.01 ¶ 2 ("'Proximate cause' is an act or failure to act that in the natural and continuous sequence directly produced the [nuisance]."); 1 CV OJI 405.03 ¶ 2 ("A cause is remote [(*i.e.*, not a proximate cause)] when the result could not have been reasonably foreseen or anticipated.").

[61] *See* 1 CV OJI 405.01 ¶ 3(B) ("There may be more than one proximate cause of the [nuisance]. The fact that some other cause combined with the negligence of a defendant in producing the [nuisance] does not relieve a defendant from liability so long as the plaintiff proves that the conduct of the defendant was a ***substantial factor*** in producing the harm.") (emphasis added); *Taylor v. Webster*, 231 N.E.2d 870, 873 (Ohio 1967) ("There may be more than one proximate cause of an injury.").

[62] *See* Restatement § 431("The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause.").

interference with public health or safety. A defendant does not, however, need to foresee that their conduct would lead to the specific nuisance that occurred.[63]

11/15/21 Trial Tr. at 7076:8–77:21 (Doc. #: 4153).

From the outset, it has been readily apparent that the opioid crisis was caused by a confluence of failures by virtually everyone: from federal, state, and local governments to the litany of named defendants in the thousands of MDL cases; and many, many others in between.[64] Where, as here, a plaintiff has alleged the conduct of multiple defendants has resulted in a single injury, Ohio has adopted the Restatement's "substantial factor" test to determine whether the plaintiff has met her burden. *See Pang v. Minch*, 559 N.E.2d 1313, 1324 (Ohio 1990) ("where a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm."); *see also* Causation MSJ Order at 5 (Doc. #: 2561) (same).

The substantial factor test, provided in section 432(2) of the Restatement, provides that:

If [multiple] forces are actively operating, one because of the actor's negligence, [65] the other[s] not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a ***substantial factor*** in bringing it about.[66]

Restatement § 432 (emphasis added); *see also* 1 CV OJI 405.01 ¶ 3(B). The substantial factor test replaces the but-for causation test because normal operation of the but-for test would allow a

---

[63] *See* Restatement § 435(1) ("If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.").

[64] The Court offers no observations whether liability does or should attach to these failures, only that they occurred.

[65] Although this is not a negligence action, § 822 of the Restatement (General Rule for nuisance liability) states that "[t]he principles and problems involved in determining when conduct is the legal cause of harm are dealt with at length in the division of this Restatement dealing with liability for negligent conduct (§§ 430–453)." Restatement § 822, cmt. e.

[66] Comment d to this subsection further provides that "Subsection (2) applies not only when the second force which is operating simultaneously with the force set in motion by the defendant's negligence is generated by the negligent

proven wrongdoer to escape liability based on the tortious conduct of other wrongdoers.[67] *See Paroline v. United States*, 572 U.S. 434, 451 (2014) ("[C]ourts have departed from the but-for standard where circumstances warrant, especially where the combined conduct of multiple wrongdoers produces a bad outcome.") (citing *Burrage v. United States*, 571 U.S. 204 (2014)). In other words, the substantial factor test permits the factfinder to conclude that a defendant is liable for a public nuisance which would have occurred even in the absence of the defendant's wrongful conduct, so long as that defendant's conduct was a substantial factor in bringing about the nuisance. This is precisely what the Court instructed the jury.

The Pharmacy Defendants, over the past few years, have objected to virtually all the language in the Court's instructions. The above explanation and citations demonstrate that the Court thought very carefully about every aspect of its instructions – indeed, literally every word and every order of presentation – and adhered closely to relevant authority. The Court's instructions, viewed as a whole, were not confusing, misleading, unfair, or prejudicial in any way, and were more than adequate to express the substance of public nuisance law. Because the Court's jury instructions and verdict forms are not erroneous, the Pharmacy Defendants are not entitled to a new trial based on the Court's jury instructions or verdict forms.

---

conduct of a third person, but also when it is generated by an innocent act of a third person or when its origin is unknown." Restatement § 432. Thus, plaintiffs did not need to identify all potential defendants.

[67] The but-for causation test is used when there is a single defendant causing a single harm. It provides that "where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which *would not have taken place without the act*, proximate cause is established." *Clinger v. Duncan*, 141 N.E.2d 156, 162 (Ohio 1957) (emphasis added). When there are multiple wrongdoers, each could argue that the result would have occurred without their actions, defeating the but-for causation test.

### M. The Trial was Fair

Defendants' final argument is that the "cumulative effect" of the twelve above-identified errors also entitles Defendants to a new trial. Defendants' reliance on the cumulative error doctrine is misplaced, however, because Defendants have not identified any errors at all. And, even if Defendants identified harmless errors, Defendants still have not articulated any prejudice to their substantial rights. Therefore, as discussed below, Defendants are not entitled to a new trial based on cumulative error.

In assessing Defendants' cumulative-error argument, the Court begins with the maxim that there "can be no such thing as an error-free, perfect trial[.]" *United States v. Hastings*, 461 U.S. 499, 508-09 (1983); *accord McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 458, 553 (1984) (applying the same maxim to a civil trial). Litigants are, therefore, entitled only to a fair trial, which may include harmless errors as a weeks-long trial unfolds. *McDonough*, 464 U.S. at 553. Thus, to obtain a new trial based on cumulative errors, a litigant must show that the identified errors affected the litigant's substantial rights. *Walker v. Bain*, 257 F.3d 660, 670 (6th Cir. 2001) (citing Fed. R. Civ. P. 59, 61).

In a cumulative-error analysis, then, the moving litigant must first show that each challenged ruling was erroneous: "Where [] no individual ruling has been shown to be erroneous, there is no 'error' to consider, and the cumulative error doctrine does not warrant reversal." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012); *see also Jaiyeola v. Toyota Motor N. Am., Inc.*, 19-1918, 2021 WL 518155, at *6 (6th Cir. Feb. 1, 2021) (applying cumulative-error doctrine in a civil case). If the non-moving party can show the individual rulings were harmless errors, the moving party must further establish "that the combined effect of individually harmless errors was so prejudicial as to render the trial fundamentally unfair." *See In re Du Pont de Nemours & Co.*

*C-8 Personal Injury Litig.*, 13-md-2433, 13-cv-170, 2016 WL 659112, at *68 (S.D. Ohio Feb. 17, 2016) (internal alterations omitted) (citing *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004)).

Here, Defendants' argument fails at the first step of the cumulative-error analysis because they have not shown any of the challenged rulings were error, harmless or otherwise. As discussed in the preceding sections, each of the twelve previously-discussed rulings were made with ample legal support and were within the Court's discretion. Defendants, therefore, cannot rely on the cumulative error doctrine to obtain a new trial. *See Jaiyeola., Inc.*, 2021 WL 518155, at *6.

Even assuming *arguendo* that Defendants showed some of the challenged rulings were harmless errors, a new trial would still not be warranted because Defendants were not deprived a fair trial. Defendants summarily conclude they are entitled to a new trial by combining the twelve challenged rulings, discussed *supra*, with the additional argument that the Court committed harmless error in allowing the admission of Joseph Rannazzisi's lay opinion testimony. Motion at 39–40 (Doc. #: 4204).[68] Defendants also pepper in nonspecific and uncited rulings on their motions *in limine*, objections at trial, and misconduct by Plaintiffs' counsel, to support their conclusion that the Court was continually making errors "before and during the trial." *Id.* at 40. Yet, to obtain a new trial, Defendants must do more than simply string together perceived errors; Defendants bear

---

[68] The Court is unpersuaded that the admission of Mr. Rannazzisi's testimony on "rogue pharmacies" was an error at all. As Plaintiffs correctly state, a fact witness may provide lay opinion testimony when that witness has industry experience, and Mr. Rannazzisi's testimony on the pharmacies falls within this category because of his extensive experience while employed with the DEA. *See United States v. Kerley*, 784 F.3d 327, 338 (6th Cir. 2015) (*citing Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004–05 (8th Cir.1986) ("Personal knowledge or perception . . . based on industry experience, is a sufficient foundation for lay opinion testimony.")). Furthermore, Defendants' argument that the "rogue pharmacy" testimony was irrelevant and prejudicial is belied by their cross-examination of Mr. Rannazzisi on that topic. *See, e.g.*, 10/13/21 Trial Tr. at 1731:24-1732:4 ("Are you familiar with the term "Rogue" pharmacies?"). Accordingly, the ruling to admit this testimony—whether alone or combined with Defendants' other challenged rulings—does not entitle Defendants to a new trial.

the burden of demonstrating how any *actual* errors deprived them of their substantial rights. Here, however, Defendants have failed to articulate which of their substantial rights were impacted by the cumulation of errors, and the Court is unable to discern how Defendants claim to have been prejudiced. Thus, Defendants have failed to carry their burden to establish how they were deprived of a fair trial.

Nor is the Court persuaded by Defendants' argument that they were deprived of a fair trial because every purportedly erroneous ruling cut against Defendants and benefitted Plaintiffs. Motion at 39–40 (Doc. #: 4204). As discussed above, Defendants' contention first fails because they have not specifically identified any erroneous rulings and, instead, seemingly take umbrage with every ruling the Court issued against Defendants as a general matter. And Defendants' argument is further faulty because it unsupported by the record. Throughout these proceedings, the Court also made rulings that cut against Plaintiffs; three obvious ones are: (1) rulings on the motions *in limine*, where (among other things) the Court denied Plaintiffs' request to exclude reference to prescription opioids as "legal" drugs, and granted Defendants' request to exclude newspaper articles (*see* CT3 Evidentiary Order at 4–5, 9–12 (Doc. #: 3967)); (2) various trial rulings, where the Court denied objections by Plaintiffs' counsel and sustained others by Defendants' counsel (*see, e.g.*, 10/13/21 Trial Tr. at 1622:2–1647:25 (Doc. #: 4023)); and (3) the ruling on Defendants' objections during closing arguments, where the Court sustained Defendants' objections to those portions of Plaintiff's counsel's statements that were out of bounds and provided a curative instruction (11/15/21 Trial Tr. At 7130:18–24, 7182:20–25 (Doc. #: 4153)).[69]

---

[69] The Court selected these three rulings because they are obvious, record-based examples that belie Defendants' contention. These examples are by no means a comprehensive inventory of every ruling beneficial to Defendants; the Court has neither the time nor the resources to comb the record and tally each of its rulings as "pro-Plaintiffs" or "pro-Defendants."

Defendants conveniently omit any reference to rulings in their favor because, otherwise, they could not argue that the Court was biased and favored Plaintiffs in its rulings. The Court, however, will not ignore the entirety of the record, which firmly demonstrates that arguments by both sides were considered fairly and decided in accordance with the law and consistently with its own prior rulings.

In sum, Defendants' cumulative error argument fails because they neither identify necessary errors under the first prong of the analysis nor articulate how the cumulative effect of the purported errors prejudiced their substantial rights. Accordingly, Defendants are not entitled to a new trial based on cumulative error.

### Conclusion

Accordingly, for the reasons described above, Pharmacy Defendants' Joint Motion for New Trial (Doc. #: 4204) is **DENIED**.

**IT IS SO ORDERED.**

 **/s/ Dan Aaron Polster  March 7, 2022**  
**DAN AARON POLSTER**  
**UNITED STATES DISTRICT JUDGE**