**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | |
| This document relates to: | |
| *County of Lake, Ohio v. Purdue Pharma L.P., et al.*, Case No. 18-op-45032 (N.D. Ohio) | **MDL No. 2804** **Case No. 17-md-2804** **Judge Dan Aaron Polster** |
| *County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*, Case No. 18-op-45079 (N.D. Ohio) | |
| "Track 3 Cases" | |

**DEFENDANTS' JOINT BRIEF REGARDING**
<u>**SELECT LEGAL ISSUES FOR REMEDIES PHASE**</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.  ANY RELIEF AWARDED DURING PHASE 2 MUST BE LIMITED TO
STREAMLINE THE PARTIES' PRESENTATIONS AT TRIAL AND
PREVENT REVERSIBLE LEGAL ERROR ................................................................ 2

   A.  Costs of Programs and Services to Address the Health, Societal, and Other
Downstream Effects of a Nuisance Are Not Recoverable as Abatement .................. 3

   B.  Plaintiffs' "Abatement" Plan Is Not Tailored To the Nuisance That the Jury
Found and Thus Violates the Seventh Amendment and Rule 42 .............................. 8

   C.  Plaintiffs' Abatement Plan Targets Conduct Unconnected to Defendants'
Dispensing and Is Thus Unprecedented and Stunningly Overbroad ......................... 9

II.  JOINT-AND-SEVERAL LIABILITY IS NOT AVAILABLE, AND ANY
AWARD MUST BE APPORTIONED AMONG ALL TORTFEASORS ........................ 12

   A.  Under Ohio Common Law and the Restatement, Each Defendant Should
Be Liable Only for Its Share of Abatement Costs, and Plaintiffs Should
Bear The Burden of Proving That Share ................................................................. 13

   B.  Defendants Maintain Their Objection That Ohio's Joint-and-Several-
Liability Statute Precludes Joint Liability Here ...................................................... 17

III.  THE CONSTITUTION REQUIRES A JURY TO DECIDE THE REMEDY ................. 19

   A.  The Seventh Amendment Requires a Jury to Decide the Remedy ........................... 20

   B.  If the Seventh Amendment Does Not Apply, a Different Judge Must
Decide the Remedy ................................................................................................ 22

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Sheppard*,
856 F.2d 741 (6th Cir. 1988) ........................................................................22, 23

*Bowes v. City of Aberdeen*,
109 P. 369 (Wash. 1910)...............................................................................10, 12

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009)...........................................................................................23

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
615 F.3d 496 (6th Cir. 2010) .............................................................................12

*City of Cleveland v. Lewis*,
96 N.E.3d 990 (Ohio Ct. App. 2017).................................................................6

*Cleveland v. JP Morgan Chase Bank, N.A.*,
No. 98656, 2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ..........................13

*Dairy Queen, Inc. v. Wood*,
369 U.S. 469 (1962)...........................................................................................22

*Davidson v. Bradford*,
212 N.W. 476 (Iowa 1927) .................................................................................10

*Edmonds v. Compagnie Generale Transatlantique*,
443 U.S. 256 (1979)...........................................................................................13

*Freeman v. Grain Processing Corp.*,
848 N.W.2d 58 (Iowa 2014) ...............................................................................21

*Fried v. Sungard Recovery Servs., Inc.*,
925 F. Supp. 372 (E.D. Pa. 1996) ......................................................................21

*Gen. Cas. Co. of Wis. v. Hills*,
561 N.W.2d 718 (Wis. 1997) ..............................................................................21

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989).............................................................................................21

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002)...........................................................................................21

*In re Cordis Corp. Pacemaker Prod. Liab. Litig.*,
No. C-3-86-543, 1992 WL 754061 (S.D. Ohio Dec. 23, 1992)............................22

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993)..............................................................................8

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
643 F. Supp. 2d 461 (S.D.N.Y. 2009)................................................................14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
379 F. Supp. 2d 348 (S.D.N.Y. 2005).....................................................................................14

*In re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018)..........................................11

*In re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804, 2019 WL 4194272 (N.D. Ohio Sept. 4, 2019)....................................12, 18

*In re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804, 2019 WL 4621690 (N.D. Ohio Sept. 24, 2019).........................................20

*In re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804, 2020 WL 7330956 (N.D. Ohio Dec. 9, 2020)............................................18

*Jaffee v. United States*,
592 F.2d 712 (3d Cir. 1979)..................................................................................................21

*Kidis v. Reid*,
976 F.3d 708 (6th Cir. 2020) ...............................................................................................16

*Longbottom v. Mercy Hosp. Clermont*,
998 N.E.2d 419 (Ohio 2013) ..................................................................................................3

*Manganiello v. Agostini*,
No. 07 Civ. 3644, 2009 WL 151724 (S.D.N.Y. Jan. 21, 2009)............................................13

*Nithiananthan v. Toirac*,
Nos. CA2014-02-021, CA2014-02-028, CA2014-08-114,
2015 WL 1619097 (Ohio Ct. App. Apr. 13, 2015)..............................................................5, 8

*Off. of Scioto Twp. Zoning Inspector v. Puckett*,
31 N.E.3d 1254 (Ohio Ct. App. 2015).....................................................................................7

*Olivia v. Airbus Ams., Inc.*,
No. 19 CV 1701, 2021 WL 1195968 (N.D. Ohio Mar. 30, 2021).........................................17

*Pang v. Minch*,
559 N.E.2d 1313 (Ohio 1990) ...................................................................................... *passim*

*People v. Atl. Richfield Co.*,
No. 100CV788657, 2014 WL 1385821 (Cal. Super. Ct. Mar. 26, 2014)................................4

*People v. ConAgra Grocery Prods. Co.*,
227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017)....................................................................4, 5, 10

*Redmond v. State ex rel. Att'y Gen.*,
118 So. 360 (Miss. 1928).......................................................................................................20

*State ex rel. Brown v. Base Wayandotte Corp.*,
Nos. 33533, 33545, 33549, 1975 WL 182459
(Ohio Ct. App. Apr. 24, 1975) (per curiam) ...................................................................10, 11

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*State ex rel. Hunter v. Johnson & Johnson*,
499 P.3d 719 (Okla. 2021) ................................................................................1

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ........................................................................................16

*Thompson v. City of Brook Park*,
No. 84068, 2004 WL 2340071 (Ohio Ct. App. Sept. 23, 2004) ............................5

*Weeks v. Chaboudy*,
984 F.2d 185 (6th Cir. 1993) ...........................................................................13

*Williams v. Pennsylvania*,
579 U.S. 1 (2016) ............................................................................................22

**STATUTES**

Ohio Rev. Code § 2307.011 ........................................................................18, 19

Ohio Rev. Code § 2307.22 .................................................................................18

Ohio Rev. Code § 2307.23 ........................................................................18, 19

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009) .................................................................7

66 C.J.S. Nuisances § 131 (Mar. 2022 update) ..................................................20

1 Dobbs, Law of Remedies § 5.7 (2d ed. 1993) ....................................................4

Fed. R. Civ. P. 42 ........................................................................................8, 9

Restatement (Second) of Torts (1965) .....................................................2, 13, 14

Restatement (Second) of Torts (1979) .................................................................4

## INTRODUCTION

Plaintiffs' abatement plan identifies a series of actions that would address a broad array of social ills in their communities, all under the umbrella of the "opioid crisis."  Plaintiffs demand that these Defendants—a small subset of the parties this Court and Plaintiffs recognize are responsible for the crisis—pay all projected costs to take those actions.  But the jury did not find that Defendants were responsible for the opioid crisis, and the relief sought by Plaintiffs therefore is outside the scope of the abatement remedy.  Instead, abatement requires going-forward solutions tailored to remediate the nuisance the jury actually found—that is, the oversupply and diversion of *legal prescription opioids*.  Insofar as Plaintiffs' abatement plan tries to remediate any problems in their communities that they allege are somehow related to opioids, it goes too far.

The Supreme Court of Oklahoma recently rejected a similar "abatement" plan in a prescription opioid case:

> The State's Abatement Plan is not an abatement in that it ***does not stop the act or omission that constitutes a nuisance***.  The abatement [awarded by the district court] is not the opioids themselves.  Neither is it an injunction to halt the promoting and marketing of opioids as J&J has not promoted opioids for several years.  It is instead an award to the State to fund multiple governmental programs for medical treatment and preventive services for opioid abuse, investigatory and regulatory activities, and prosecutions for violations of Oklahoma law regarding opioid distribution and use—activities. . . . ***Our Court, over the past 100 years in deciding nuisance cases, has never allowed the State to collect a cash payment from a defendant that the district court line-item apportioned to address social, health, and criminal issues arising from conduct alleged to be a nuisance***.  We therefore reject the district court's remedy in this case as it does not abate the alleged nuisance; it does not abate the opioid epidemic, any act or omission of J&J, or any act or omission of other opioid manufacturers.

*State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 729 (Okla. 2021) (emphasis added).  The Oklahoma court's reasoning applies with equal force here.  Defendants are unaware of any case in Ohio—or any other jurisdiction—granting sweeping abatement relief of the sort Plaintiffs have

requested.  The Court should narrow the categories of relief Plaintiffs can seek now, so that the parties can adjust their trial plans to focus on only relief that can actually be awarded as abatement.

Moreover, the Court should reconsider its stated intention to apportion damages using the burden-shifting framework set forth in *Pang v. Minch*, 559 N.E.2d 1313 (Ohio 1990).  In light of the evidence admitted at the merits trial, including Plaintiffs' own evidence, joint and several liability is not appropriate here.  Restatement (Second) of Torts § 433B cmt. e (1965), which the *Pang* court adopted as the law of Ohio, cautions against assuming joint liability when, as here, many actors played a role in the asserted nuisance.  Moreover, Plaintiffs' high-level "aggregate proof" did not establish indivisible harm.  Thus, apportionment and several liability should be the default.

This brief focuses only on foundational issues that can streamline the parties' presentations during the remedies phase or avoid legal error.  It is not an exhaustive list of all the legal issues likely to arise during the remedies phase, and by filing this brief, Defendants expressly reserve and do not waive their right to raise additional legal issues before, during, or after trial.

## ARGUMENT

**I.    ANY RELIEF AWARDED DURING PHASE 2 MUST BE LIMITED TO STREAMLINE THE PARTIES' PRESENTATIONS AT TRIAL AND PREVENT REVERSIBLE LEGAL ERROR.**

Plaintiffs' remedies must directly abate the specific public nuisance that the jury found at trial: the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels."  Dkt. 4176 at 2, 6.  Much of the abatement evidence Plaintiffs propose, however, fails to address that nuisance, and instead tries to cure broad, multidimensional social ills that were not the subject of a jury finding and are not abatable under Ohio law.  That is not abatement relief; it is an attempt to demonstrate non-equitable future damages—a form of relief Plaintiffs have nominally forfeited for the public nuisance claim, in part

to argue that Defendants have no Seventh Amendment jury right. *See, e.g.*, Dkt. 2175 at 8 ("[U]nder their public nuisance claim, Plaintiffs do not seek damages for themselves but rather to have the Court create and supervise a trust . . . that would be used to abate the nuisance."); Dkt. 2601 at 1 ("[T]here is no right to a jury trial on a public nuisance claim for abatement."). The evidence during the remedies phase of trial must focus only on the abatement of the oversupply and diversion of prescription opioids at issue in the jury's verdict.

### A. Costs of Programs and Services to Address the Health, Societal, and Other Downstream Effects of a Nuisance Are Not Recoverable as Abatement.

The only relief available in Phase 2 is abatement—*not* any past or future damages. *See* Dkt. 2519 at 2 (distinguishing abatement from damages). Yet the plan Plaintiffs propose, although styled as "abatement," has little or nothing to do with abating the oversupply and diversion of legal prescription opioids that the jury found. *See* Dkt. 4176 (verdict form). The vast majority of their plan targets asserted health, societal, and other downstream effects from the oversupply nuisance, or from illicit opioid abuse, and consists almost entirely of programs to remediate personal injuries that could be an effect of the nuisance. Plaintiffs' plan thus highlights what Defendants have been saying all along: that Plaintiffs are seeking compensatory damages, not abatement. *See* Dkt. 2535 at 4–5; Dkt. 2163 at 10–12. Compensatory relief for personal injury and related expenses that have not yet been incurred is not "abatement"; it is future damages. *See, e.g.*, *Longbottom v. Mercy Hosp. Clermont*, 998 N.E.2d 419, 421 (Ohio 2013) (identifying "anticipated medical expenses" as future damages). And future damages, like past damages, must be determined by a jury. *See, e.g.*, Dkt. 2599 at 5–6 & n.6. The Court accordingly should hold that funding for programs to remediate community members' personal injuries is not equitable abatement and is not recoverable in the upcoming Phase 2 bench trial.

The purpose of the abatement remedy is to eliminate the condition that constitutes the nuisance or the conduct that caused it.  As a leading treatise explains, in a section titled "The Remedial Options in Nuisance Cases," an "injunction abating the nuisance" is designed to make the plaintiff "free from the activity in question."  1 Dobbs, Law of Remedies § 5.7(3) (2d ed. 1993); *see also id.* ("The injunction might compel complete abatement of the offending condition" or "some adjustment in operating conditions."); Restatement (Second) of Torts § 821B cmt. i (1979) (in an action for abatement, "the question is whether the activity itself is so unreasonable that it must be stopped").  The costs of addressing medical injuries and other harms that result from a nuisance are recoverable as damages, not as abatement.  As the Dobbs treatise referenced above explains, "[d]amages" in a nuisance case "might be based on . . . the cost of eliminating the nuisance effects."  1 Dobbs, Law of Remedies § 5.7(3).

The lead paint lawsuits brought by California municipalities are illustrative.  Just as Plaintiffs claim to do here, those municipalities sought only abatement, not damages.  *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 560 (Cal. Ct. App. 2017).  The municipalities alleged that the presence of lead paint in homes was a public nuisance, and the paint manufacturers found liable for creating that nuisance were ordered to pay into an abatement fund to be used for lead inspections for homes, removal of lead paint from homes, and education for families and homeowners about hazards from lead-based paint currently in homes.  *Id.* at 525, 568–69.[1]  It did *not* cover medical treatment or other programs or services to address the individual harms or other societal harms resulting from lead poisoning in children.  *Id.* at 569.[2]  On appeal, the abatement

---

[1] The plan is available at *People v. Atlantic Richfield Co.*, No. 100CV788657, 2014 WL 1385821 (Cal. Super. Ct. Mar. 26, 2014).

[2] The plaintiffs presented evidence at trial that lead poisoning caused developmental and health defects in children, including brain damage, decreased academic achievement, attention-related behavioral problems, antisocial behaviors, cardiovascular disease, and reproductive effects.

fund was upheld as true abatement—and not a "'thinly-disguised' damages award"—precisely because it "would be utilized *not to recompense anyone for accrued harm* but solely to pay for the *prospective removal of the hazards* defendants had created," *i.e.*, the removal of the lead paint from homes.  *Id.* (emphasis added).  The "sole purpose" and actual effect of the equitable remedy of abatement was "to eliminate the hazard that is causing prospective harm to the plaintiff."  *Id.*

Ohio law also distinguishes between abatement and damages, treating an award to address the *health, societal, and other downstream effects* of a nuisance (as opposed to the nuisance itself) as damages and not as abatement.  In *Nithiananthan v. Toirac*, Nos. CA2014-02-021, CA2014-02-028, CA2014-08-114, 2015 WL 1619097 (Ohio Ct. App. Apr. 13, 2015), the defendants caused a nuisance by directing security cameras and lights toward their neighbors' property.  *Id.* at *2.  To "abate the nuisance," the court issued an injunction to stop the offensive use of the lights and cameras.  *Id.*  The court also awarded $5,000 to cover the costs of landscaping the neighbors had installed to block the cameras, but the court made clear that those amounts were awarded as "damages" to "combat the *effects* of the . . . nuisance."  *Id.* at *10 (emphasis added).  There was no award for "costs associated with psychological or medical treatment," but the court indicated that such an award also would also have been "damages," because it likewise would have been awarded to "combat the effects of the . . . nuisance."  *Id.*; *see also Thompson v. City of Brook Park*, No. 84068, 2004 WL 2340071, at *1 (Ohio Ct. App. Sept. 23, 2004) (an award to a motorcyclist for personal injuries he suffered as a result of an accident caused by a nuisance—a tire in the road that the city failed to timely discover and remove—was "damages").[3]

---

*ConAgra*, 227 Cal. Rptr. 3d at 514–16.  The abatement order did not include treatment for any of these effects.

[3] This paradigm is also reflected in the common scenario where a municipality demolishes, repairs, or cleans up property that has become a public nuisance and then sues to recover its costs.  In that situation, the costs are properly construed as "abatement" because they relate to stopping or

Here, the nuisance the jury found was an alleged oversupply and diversion of legal prescription opioids. Yet Plaintiffs' so-called "abatement" plan has almost nothing to do with eliminating that nuisance. Only the tiniest fraction of the plan addresses the oversupply of prescription opioids in Plaintiffs' counties—$1.7 million of the $2.9 billion plan (or 0.06 percent) would pay for safe storage and drug disposal programs to reduce any oversupply in Plaintiffs' communities. *See* Dr. Rosen Summary Abatement Cost Tables ("Safe Storage and Drug Disposal" line item); Dkt. 4219-1 at 22–23 (accompanying section in Dr. Alexander's abatement plan).[4] The rest of Plaintiffs' plan targets claimed *health, societal, and other downstream effects* of the oversupply rather than the oversupply itself. Indeed, of the plan's $2.9 billion price tag, $1.9 billion (66 percent) is for treatment of individuals with opioid use disorder, or OUD. *See* Dr. Rosen Summary Abatement Cost Tables ("Treatment for Opioid Use Disorder" line item); Dkt. 4219-1 at 35–39 (accompanying section in Dr. Alexander's abatement plan).[5] That is not the only treatment of claimed effects contemplated by the plan. Another $185 million would fund screening and treatment for HIV, hepatitis C, and endocarditis, conditions for which injection drug use is a primary risk factor according to Plaintiffs. *See* Dr. Rosen Summary Abatement Cost Tables ("Managing Complications Attributable to the Endemic" line item); Dkt. 4219-1 at 40–42 (accompanying section in Dr. Alexander's abatement plan). In addition, over $250 million is for programs and services for families and children of individuals with OUD (including the costs of

---

removing the prospectively hazardous activity or condition. *See, e.g.*, *City of Cleveland v. Lewis*, 96 N.E.3d 990, 998–99 (Ohio Ct. App. 2017) (city could recover its "abatement costs" from demolishing property in disrepair).

[4] Should the Court wish to review the report, Plaintiffs delivered Dr. Rosen's expert report to the Court on January 18. *See* Dkt. 4232.

[5] Dr. Alexander's "Treatment for Opioid Use Disorder" line item includes inpatient treatment, residential treatment, outpatient treatment, various types of medication-assisted treatment, and the services of various professionals, including psychiatrists, nurses, addiction counselors, peer recovery coaches, and social workers. Dkt. 4219-1 at 35–39.

foster care and various types of counseling, psychological, and support services for families and children).  *See* Dr. Rosen Summary Abatement Cost Tables ("Families and Children" line item); Dkt. 4219-1 at 62–63 (accompanying section in Dr. Alexander's abatement plan).  And over $150 million is for job placement and training for individuals with OUD.  *See* Dr. Rosen Summary Abatement Cost Tables ("Vocational Training, Education, and Job Placement" line item); Dkt. 4219-1 at 51–53 (accompanying section in Dr. Alexander's abatement plan).

Plaintiffs' focus on treating the health, societal, and downstream effects of the oversupply nuisance, or illicit opioid abuse, instead of the nuisance itself reveals another flaw in Plaintiffs' abatement plan.  As this Court has recognized—and all parties agree—one of the core elements Plaintiffs must prove in Phase 2 is that the public nuisance is "abatable."  *See* Dkt. 4064 at 3476:3–3478:8 (Oct. 21 trial tr., vol. 13).  Under Ohio law, an "abatable nuisance" is "[a] nuisance that reasonable persons would regard as being removable by reasonable means."  *Off. of Scioto Twp. Zoning Inspector v. Puckett*, 31 N.E.3d 1254, 1264 (Ohio Ct. App. 2015) (quoting Black's Law Dictionary (9th ed. 2009)).  An oversupply of prescription opioids, and diversion of those opioids into the illicit market, is not a nuisance "removable by reasonable means."  Perhaps as a result, Plaintiffs' proposed plan does not meaningfully attempt to remove either oversupply or diversion of prescription or illicit opioids.  Plaintiffs' proposed abatement plan therefore underscores why the nuisance they argued at trial is not abatable.

In sum, the Court should not allow Plaintiffs to recover costs for the health, societal, and downstream effects of the nuisance the jury found during Phase 1 of trial under the guise of an "abatement" plan.  To do so would be reversible error.

**B.**     **Plaintiffs' "Abatement" Plan Is Not Tailored To the Nuisance That the Jury Found and Thus Violates the Seventh Amendment and Rule 42.**

An abatement award must be limited to remediating the nuisance that was found to exist. *See also Nithiananthan*, 2015 WL 1619097, at *8 (affirming trial court's refusal to award an abatement remedy that extended beyond the nuisance actually found).  As the Court has previously determined, a jury trial on nuisance liability was warranted because "historically, nuisance actions had a legal component."  Dkt. 2629 at 4.  In ordering bifurcation of the liability and remedy phases, the Court expressly recognized that it would be "bound by the jury's findings of relevant facts" in fashioning an equitable remedy for any nuisance liability.  *Id.* at 10.  Thus, consistent with the Seventh Amendment, the Federal Rules of Civil Procedure, and its own prior orders, the Court cannot award abatement for a nuisance that is any broader than or different from the one the jury found.  *See* Fed. R. Civ. P. 42(b) ("When ordering a separate trial, the court must preserve any federal right to a jury trial."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1181–85 (3d Cir. 1993) (second jury's award of only nominal damages, in damages phase of antitrust trial, violated Seventh Amendment because it was not keyed to the first jury's finding of liability).

Yet Plaintiffs ask the Court to do exactly that.  Their "abatement" plan is not remotely tailored to the nuisance that the jury actually found.  The jury did not find that the nuisance was the "opioid epidemic," the "opioid crisis," or even opioid addiction and abuse.  Instead, the jury found only that the nuisance was the "oversupply of legal prescription opioids, and the diversion of those opioids into the illicit market outside of appropriate medical channels" in each County. Dkt. 4176 at 2, 6.

Plaintiffs' "abatement" plan goes far beyond any oversupply of legal prescription opioids. For example, it does not distinguish between legal prescription opioids and illicit opioids such as

heroin.  The $1.9 billion allocated for OUD treatment in Plaintiffs' plan would include funding for treatment of individuals who never took a single prescription opioid.  *See* Ex. A, Deposition of Caleb Alexander at 67:18–22 (Feb. 11, 2022) ("Q. . . . Your abatement plan would provide treatment services to those individuals who never took a prescription opioid but became addicted to illicit opioids, correct?  A. Yes.").  Other components of Plaintiffs' plan totaling over $200 million would fund treatment and other services for "opioid injection drug users"—*i.e.*, illicit opioid users. [6] *See* Dr. Rosen Summary Abatement Cost Tables ("Harm Reduction" and "Managing Complications Attributable to the Epidemic" line items); Dr. Rosen's Category 1E and 2C Schedules; Dkt. 4219-1 at 26–28, 40–42 (accompanying sections in Dr. Alexander's abatement plan).

Plaintiffs' abatement plan assumes that all illicit opioid use in their counties somehow traces back to an oversupply of prescription opioids.  But the jury found no such thing.  Awarding an abatement remedy that addresses the supply, abuse, and effects of illicit opioids would expand the jury's finding of nuisance liability and violate the Seventh Amendment, Rule 42(b), and the Court's prior orders.[7]

## C. Plaintiffs' Abatement Plan Targets Conduct Unconnected to Defendants' Dispensing and Is Thus Unprecedented and Stunningly Overbroad.

Plaintiffs' abatement plan's focus on remediating "the opioid crisis" generally—and not the oversupply of legal prescription opioids that the jury found—creates another fatal flaw: the plan necessarily does not target oversupply *caused by Defendants' allegedly wrongful dispensing*. Indeed, even Plaintiffs agree that there are many causes of the opioid crisis unrelated to

---

[6] None of the prescription opioid medications at issue in this litigation are injectable.

[7] Even if an individual's opioid use disorder (as opposed to all OUD in the counties) could be traced to *prescription* opioids, rather than *illicit* opioids, associated medical treatment is not an appropriate abatement cost.  *See supra* Section 1.A.

Defendants' dispensing conduct.  Portions of Plaintiffs' proposed abatement plan transparently target costs created by those unrelated causes exclusively.  This is not only legally impermissible but also unprecedented.  In no reported case of which Defendants are aware, state or federal, has a single group of defendants been ordered to abate a complex and multidimensional social ill, much less when those defendants are but a small subset of those that the plaintiffs accuse of causing the problem.

A viable "abatement" plan must be limited to the specific nuisance that the jury found (the oversupply and diversion of prescription opioids in Plaintiffs' counties) and must address only the portion *of that nuisance* that is reasonably attributable to Defendants' dispensing conduct.  *See, e.g.*, *State ex rel. Brown v. Base Wayandotte Corp.*, Nos. 33533, 33545, 33549, 1975 WL 182459 (Ohio Ct. App. Apr. 24, 1975) (per curiam) (in nuisance action for pollution to Lake Erie, because "the deteriorated condition of Lake Erie . . . was caused by innumerable contributors over hundreds of years," "if the damages caused by [other tortfeasors] cannot, in some rational way, be severed from damages done by other types of pollution, money damages cannot be recovered from the defendants.").[8]

Almost all of the harms addressed by the categories of purported "abatement" in Dr. Alexander's report stem from causes completely untethered to Defendants' dispensing practices.  For example, drug manufacturers (Purdue, Cephalon, Janssen, Endo, Mallinckrodt, and others) allegedly misrepresented the dangers and effectiveness of opioids, thereby leading DEA-registered and board-of-medicine licensed doctors, with encouragement from the government, to prescribe

---

[8] *See also ConAgra*, 227 Cal. Rptr. 3d at 569 (concluding that abatement is proper to specifically address a "hazard created by [the] defendants" that was "continuing to cause harm" which "could be prevented only by removing the hazard"); *Bowes v. City of Aberdeen*, 109 P. 369, 377 (Wash. 1910) ("[T]o charge [the defendant] with the abatement of a nuisance" not caused by him "thereby violates every principle of justice."); *Davidson v. Bradford*, 212 N.W. 476, 478–79 (Iowa 1927) ("[O]rder of abatement [was] void" where it was directed at "a tenant who had no connection with the [demonstrated] nuisance.").  Plaintiffs' plan is not tailored in either respect.

in unreasonable numbers.  *See In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2018 WL 6628898, at *5 (N.D. Ohio Dec. 19, 2018).  Those opioid medications were approved by FDA, their production levels were set annually by DEA, and they were distributed to dozens of non-Defendant pharmacies making up the majority of the market in the Plaintiffs' counties by yet another set of actors.  That is to name just a few confounding factors that have nothing to do with Defendants' conduct.

There are even more independent factors causing the broad "opioid crisis" for which Plaintiffs now seek abatement that have nothing to do with prescription opioids at all.  Plaintiffs' own expert, Dr. Keyes, for example, testified that illicit opioids, including heroin, fentanyl, and counterfeit pills (largely trafficked into the United States from China and Mexico) independently caused harm in Lake and Trumbull Counties.  *See, e.g.*, Dkt. 4065 at 3684–88 (Oct. 22 trial tr., vol. 14).

Despite this host of independent actors, unconnected to these pharmacies, Plaintiffs' plan requires *Pharmacy Defendants* to pay for *all* opioid-related remediation, even those measures that address wrongs transparently unrelated to Defendants' dispensing conduct (or associated diversion).  Plaintiffs, for example, seek funds for a training program for police officers to reduce opioids-related stigma, even though the Pharmacy Defendants have never played any role in training law enforcement.  Dkt. 4219-1 at 47.  Plaintiffs' plan also calls for an expansion of pretrial diversion and specialized drug courts, yet Defendants' dispensing conduct has never affected Plaintiffs' exercise of their own prosecutorial or adjudicatory discretion.  *Id.* at 47, 49.  And so on. The jury verdict against these three pharmacies does not entitle Plaintiffs to "abate" wrongs unrelated to these Defendants' improper dispensing conduct, and the Court should limit Plaintiffs' abatement plan accordingly.  *See Base Wayandotte Corp.*, 1975 WL 182459, at *5 ("These

defendants cannot be singled out and held solely responsible for the deteriorated condition of Lake Erie which was caused by innumerable contributors over hundreds of years."); *Bowes*, 109 P. at 377 (it "violates every principle of justice" to require a defendant to abate a nuisance he did not cause).

As the Sixth Circuit cautioned in *Ameriquest*, a "'complex assessment' [is] needed to determine which municipal expenditures increased . . . because of the ills caused by [Defendants' actions] rather than[] [the actions and circumstances] not related to [Defendants' actions]." *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 504–06 (6th Cir. 2010).  There, the Court dismissed the lawsuit entirely because of the attenuated causal chain at issue.  Although this case has reached the remedies phase, the Sixth Circuit's instruction is no less binding.  Plaintiffs' abatement plan abdicates their burden to conduct a "complex assessment" of causation and tie their remedy to Defendants' dispensing conduct.  The plan is a backdoor attempt to collect damages for a far broader societal ill, which was not the subject of the verdict form, and which the jury therefore did not find were attributable to Defendants' dispensing conduct.  It should therefore be rejected.

## II.   JOINT-AND-SEVERAL LIABILITY IS NOT AVAILABLE, AND ANY AWARD MUST BE APPORTIONED AMONG ALL TORTFEASORS.

Although the Court previously indicated that it views the apportionment framework from *Pang v. Minsch*, 559 N.E.2d 1313 (Ohio 1990), as a "useful procedural guide" for determining apportionment during Phase 2 of trial, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4194272, at *4 (N.D. Ohio Sept. 4, 2019) (Dkt. 2572), that framework should not apply here.  Instead, the Court should impose several liability only, and Plaintiffs should bear the burden to show which portion of the abatement plan each Defendant should be responsible for and which portion should be apportioned to non-Defendants.  Defendants also maintain their objection that Ohio's joint-and-several liability statute precludes any imposition of joint liability in this lawsuit.

**A.**     **Under Ohio Common Law and the Restatement, Each Defendant Should Be Liable Only for Its Share of Abatement Costs, and Plaintiffs Should Bear The Burden of Proving That Share.**

This Court has indicated its intent to determine the percentage of the abatement plan each Defendant should pay by following the framework set out in *Pang v. Minch*, 559 N.E.2d 1313 (Ohio 1990).  In that case, an injured driver had been in three separate car accidents and suffered an irreparable spinal injury.  *Id.* at 1317.  Expressly relying on Section 433(B) of the Restatement (Second) of Torts,[9] the Ohio Supreme Court determined that "where a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm." *Id.* at 1324.  Once a plaintiff has done so, "the burden of persuasion shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment." *Id.*

As a threshold matter, joint-and-several liability is not available, and the *Pang* framework is inapplicable when the harm is divisible.  *Weeks v. Chaboudy*, 984 F.2d 185, 189 (6th Cir. 1993) (joint-and-several liability does not apply where the harm is "divisible and the causation of each part can be separately assigned to each tortfeasor") (citing *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260–61 & n.8 (1979)); *Manganiello v. Agostini*, No. 07 Civ. 3644, 2009 WL 151724, at *2 (S.D.N.Y. Jan. 21, 2009) ("where the injury is divisible and separate causation is attributable to each tortfeasor, joint and several liability will not apply."). An injury is divisible when it is "capable of division upon a reasonable and rational basis[.]" Restatement (Second) of Torts § 433A cmt. d (1965).  The primary harm that Plaintiffs seek to

---

[9] The *Pang* court's reliance on the Restatement is hardly an outlier.  As this Court has observed, Ohio law on public nuisance follows the common law rules set forth in the Restatement.  Dkt. 2572 at 1; *see also, e.g.*, *Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *3 (Ohio Ct. App. Mar. 21, 2013).

remedy—opioid used disorder suffered by their residents—is divisible in important ways.  If the Plaintiffs identified residents needing treatment for OUD, for example, a factual determination could be made regarding whether a Defendant's allegedly unlawful dispensing was a substantial factor in that person developing OUD.  The fact that Plaintiffs have elected not to produce that information does not make the harm they seek to remediate indivisible.

Even if joint-and-several liability is available, *Pang* still should not apply.  *Pang* involved three allegedly contributing tortfeasors, while this case involves dozens upon dozens.  As comment e to the section of the Restatement that *Pang* expressly adopted, Section 433B, explains: "there may be so large a number of actors, each of whom contributes a relatively small and insignificant part to the total harm," that placing the burden of proof for apportionment on the defendant "may cause disproportionate hardship to defendants."  *See* Restatement (Second) of Torts § 433B cmt. e; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 643 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2009) (explaining that if 10 manufactures had an equal share in a spill, then there would be too many tortfeasors to permit joint and several liability).  For these reasons, the Restatement notes, the cases (like *Pang*) that have put the burden on a defendant to prove allocability generally "have involved a small number of tortfeasors, such as two or three."  *See* Restatement (Second) of Torts § 433B(2) cmt. e; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 372 n.69 (S.D.N.Y. 2005) (collecting cases).

This case is exactly the sort for which placing the of apportionment on Defendants would create "disproportionate hardship."  Restatement (Second) of Torts § 433B cmt. e.  As Plaintiffs themselves acknowledged throughout the trial, there are numerous contributors to the oversupply and diversion of prescription opioids, not to mention the opioid crisis for which Plaintiffs now seek abatement.  Plaintiffs' own expert witness, Caleb Alexander, opined at trial that there are

14

"[m]any, many, many causes" of the amount of prescription opioids in Plaintiffs' counties.  Dkt. 4064 at 3558 (Oct. 21 trial tr., vol. 13).  He testified that, among others, manufacturers, distributors, doctors, drug cartels, the FDA, DEA, doctor shoppers, and state medical boards were causes.  *Id.* at 3558–59.  During closing arguments, Plaintiffs' counsel agreed: "I blame the doctors, I blame drug cartels, I blame the DEA, I blame the FDA, I blame the Ohio Board of Pharmacy.  I blame a lot of different people.  I certainly blame the manufacturers.  I have no trouble and my witnesses have no trouble saying there's a host of people to blame."  Dkt. 4153 at 7177 (Nov. 15 trial tr., vol. 28).  Plaintiffs' expert Katherine Keyes testified that illicit fentanyl from China and Mexico, counterfeit pills, doctor shoppers, high-volume prescribers, individuals who engage in medicine cabinet theft and diversion, FDA, DEA, state medical boards, drug distributors, and drug manufacturers all were causes of the effects that Plaintiffs now ask to be abated in the Plaintiff counties.  Dkt. 4065 at 3688–99 (Oct. 22 trial tr., vol. 14).  This Court itself has recognized that "the opioid crisis was caused by a confluence of failures by virtually everyone: from federal, state, and local governments to the litany of named defendants in the thousands of MDL cases; and many, many others in between."  Dkt. 4296 at 68 (denying motion for new trial).  Under these circumstances, joint liability for either the narrower (oversupply) or broader (opioid crisis) nuisance is not available.  The remedy must be apportioned among all tortfeasors, and it is Plaintiffs' burden to show what portion Defendants should be required to bear.

To proceed otherwise would violate not only the Restatement, which itself forms the basis of the relevant Ohio common law, but also due process.  As the Supreme Court has explained, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor" and "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property."

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416–17 (2003); *see also Kidis v. Reid*, 976 F.3d 708, 715 (6th Cir. 2020).  It would be arbitrary and unfair to expose a pharmacy to liability to remediate an entire public health epidemic and to shift the burden to the pharmacy to prove how abatement costs should be apportioned when *Plaintiffs' own expert* testified not only that there are "many, many causes," but that the "*major causes* of the opioid epidemic" were *other* actors—drug manufacturers, FDA, and DEA.  Dkt. 4064 at 3532:24–3533:4 (Oct. 21 trial tr., vol. 13) (emphasis added).

Indeed, in this case it would be particularly unfair to place the burden of showing allocability on each Defendant.  Over Defendants' repeated objections, Plaintiffs were permitted to prove their case in the aggregate.  They repeatedly blocked the sort of individualized discovery that would allow a detailed proof of allocation.  Plaintiffs intentionally omitted from trial obvious bases for apportionment.  Indeed, Plaintiffs' proof was so general that it could not prove the sort of indivisible harm needed to impose joint and several liability in the first place.

To put a finer point on this, while Plaintiffs seek money to treat individuals suffering from opioid abuse, over Defendants' repeated objections, they chose to prove their case at trial without addressing the circumstances of any of the persons around whom their abatement requests now are centered.  Their proof—which they termed "aggregate proof"—instead consisted of statistics on the number of prescriptions each Defendant filled and expert opinions on the general correlation in certain epidemiologic studies between this asserted oversupply and opioid abuse.  Having elected to present their case in such a high-level, statistical fashion, Plaintiffs cannot now shift the burden to Defendants to come forward with more granular proof that is not within their possession and that Plaintiffs themselves deliberately sought to avoid.  There can be no joint and several liability, nor any burden shifting, in such circumstances.

16

The discovery process has only enhanced the undue prejudice that would result from burden shifting, as Plaintiffs continue to withhold the evidence bearing on allocability that they intentionally omitted from trial.  Plaintiffs refused to respond to discovery requests for information on the individuals suffering from opioid abuse whom they seek to treat under their abatement plan, and the Court sustained their position.  *See, e.g.*, Dkt. 4275 (ruling that Defendants are not "entitle[d] . . . to extensive personal information about every individual contemplated by Plaintiffs' abatement plan").  Without this discovery, Defendants cannot determine, for example, which of these individuals took prescription opioids (versus illegal opioids) and, of that subset, which individuals obtained them from a CVS, Walgreens, or Walmart pharmacy (or, far more likely, given the evidence on Defendants' market share as well as the conduct of certain non-defendants, from some other pharmacy, from a friend's medicine cabinet, or somewhere else).  Plaintiffs cannot, on the one hand, argue that the burden should be shifted to Defendants to prove apportionment but, on the other hand, block discovery that could be used to prove apportionment.

For these reasons, the Court should not apply joint and several liability and *Pang*'s burden shifting framework to this case.  Defendants should not be held jointly liable with the dozens of wrongdoers even Plaintiffs would have admitted contributed to the nuisance in their counties. Instead, they should be held severally liable, and Plaintiffs should bear the burden of proving what portion, if any, of the abatement costs they now seek should be attributed to each Defendant.

**B.  Defendants Maintain Their Objection That Ohio's Joint-and-Several-Liability Statute Precludes Joint Liability Here.**

Defendants maintain their objection that Ohio statutory law bars joint liability in this litigation.  Under Ohio law, a tort defendant "may be held jointly and severally liable" only if the plaintiff proves that "the defendant was more than fifty percent at fault"; "if [the] defendant is fifty percent or less at fault, they are only liable for their proportionate share of the damages."  *Olivia*

17

*v. Airbus Ams., Inc.*, No. 19 CV 1701, 2021 WL 1195968, at *11 (N.D. Ohio Mar. 30, 2021); *see* Ohio Rev. Code § 2307.22(A)(1), (B), (C).  In other words, if the "percentage of [the defendant's] tortious conduct" is 50% or less, *id.* § 2307.23, then the defendant owes only that proportional share of the plaintiff's recovery.  Plaintiffs failed to prove that Defendants were 50% or more at fault at trial and thus are barred from holding any Defendant jointly liable now.

This Court held that this statutory scheme did not apply to Plaintiffs' "claim to abate a nuisance" because Plaintiffs do not "seek[] compensatory damages."  *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4194272, at *3; *see In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2020 WL 7330956, at *1 (N.D. Ohio Dec. 9, 2020) (Dkt. 3579) (reiterating this holding in Track Three).  The statutory provision, however, does not draw distinctions based on the label Plaintiffs place on a request for money—but instead applies to "economic loss" more generally.

The statute defines what constitutes apportionable economic loss and it plainly covers the relief Plaintiffs seek, regardless of what they label it.  Ohio Rev. Code § 2307.22(A)(2) (apportionment for "compensatory damages *that represent economic loss*" (emphasis added)); *see id.* § 2307.011(C).  The statute defines it broadly to include:  "[a]ll expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations incurred as a result of an injury, death, or loss to person that is a subject of a tort action, including expenditures for those purposes that were incurred as of the date of a judgment and expenditures for those purposes that, in the determination of the trier of fact, will be incurred in the future because of the injury," *id.* § 2307.011(C)(2)—as well as "[a]ny other expenditures incurred as a result of an injury, death, or loss to person or property that is a subject of a tort action," *id.* § 2307.011(C)(4).  As discussed above, Plaintiffs' "abatement" request—at least to the extent that it is not severely limited by the Court—is a request for compensatory damages.  *See supra*

Section 1.A.  Plaintiffs' request is for "medical" and "other care" expenses—or, at least, for "other expenditures"—that they say will be "incurred as a result" of the opioid crisis.  Ohio Rev. Code § 2307.011(C).  It does not matter that the expenses will be "incurred in the future because of [Plaintiffs' alleged] injury"; those "expenditures," too, are expressly covered by the statutory text no less than past expenditures.  *Id.* (covering "expenditures . . . that, in the determination of the trier of fact, will be incurred in the future because of the injury").  By statute, therefore, any money award, for past or future costs, must be apportioned among all tortfeasors.  *See id.*; *see also id.* § 2307.23.

By its terms and through its purpose, the statute sweeps in *all* forms of money relief for "economic loss," both past and future.  Whether under an "abatement" label or something else, that is precisely what Plaintiffs seek:  in the words of their Complaint, "economic damages" for Defendants' supposed nuisance.  *E.g.*, Dkt. 3327 at 197 ¶ 640.  This Court should have applied the statute and required the jury to make fault-apportionment findings, as Defendants requested before trial.  Because it did not, no jury has ever found any Defendant more than 50% liable for any nuisance, and Plaintiffs should be precluded from seeking joint liability during the remedies phase of trial.

## III.   THE CONSTITUTION REQUIRES A JURY TO DECIDE THE REMEDY.

The Seventh Amendment requires a jury, not a judge, to determine the facts relating to the relief Plaintiffs seek.  Even if the Seventh Amendment allowed a judge to sit as factfinder, the Due Process Clause would require it to be a different judge than this Court, which has been significantly involved in settlement discussions, including as a settlement master.  Either way, this Court should not serve as factfinder for Phase 2.

### A.    The Seventh Amendment Requires a Jury to Decide the Remedy.

As this Court has correctly noted, "historically, nuisance actions had a legal component" and were tried to a jury.  *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4621690, at *2 (N.D. Ohio Sept. 24, 2019).  Thus, the parties "tr[ied] nuisance liability to the jury." *Id.* at *3.  But the Court has held that it, and not a jury, will decide what the Court and Plaintiffs now call the "abatement remedies" stage of the case.  *Id.* at *1; *see also, e.g.*, Dkt. 2519 at 3 (the Court will "craft a remedy that will require defendants . . . to pay the prospective costs that will allow [plaintiffs] to abate the opioid crisis").[10]  This holding was error.  In a case like this one, in which Plaintiffs seek the payment of economic damages as part of a traditionally legal claim, the Seventh Amendment requires trial by jury.  *See, e.g.*, Dkt. 2599 at 5–6 & n.6.

The Seventh Amendment requires a jury both because the case would have been tried to a jury in 1791 and because of the legal nature of the relief sought.  As to the first point, the Court's holding depends on the assumption that so long as the relief awarded is limited to "abatement," the claim is historically equitable and a jury is not required or appropriate for the remedies portion. *See* 2019 WL 4621690, at *1–3.  That assumption is incorrect.  "At common law, actions *to abate* nuisances were maintained in the common-law courts of original jurisdiction," rather than courts of equity.  66 C.J.S. Nuisances § 131 (Mar. 2022 update) (emphasis added); *see Redmond v. State ex rel. Att'y Gen.*, 118 So. 360, 361 (Miss. 1928) ("At common law, actions to abate nuisances were maintained in the common-law courts of original jurisdiction; consequently there was a legal remedy to abate nuisances, which lay in the common-law court.").

Moreover, and independently, the "abatement" label simply does not describe what Plaintiffs are seeking here.  *See, e.g.*, Dkt. 2599 at 5–6 & n.6.  A suit seeking "to compel the

---

[10] Again, the jury was not asked to (and did not) not make findings related to the "opioid crisis" generally.

defendant to pay a sum of money to the plaintiff" is "[a]lmost invariably" a suit "for money 'damages,'" the classic form of legal relief requiring a jury. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).  As set forth above, *supra* Section 1.A, virtually all of Plaintiffs' "abatement" plan seeks payment of claimed costs to be incurred due to the health, societal, and downstream effects of the nuisance, not to abate the jury-found nuisance condition itself.  That Plaintiffs now use the misleading "abatement" label for their massive monetary request does not affect the Seventh Amendment analysis.  Plaintiffs themselves acknowledge in their Complaint that they seek "economic damages" for their nuisance claim.  *E.g.*, Dkt. 3327 at 197 ¶ 640.  Plaintiffs seek over a billion dollars each to compensate them for their alleged costs associated with the opioid crisis.  Courts from around the country recognize that the "creation of a common law fund for compensation or restoration" is a "common law"—that is, *legal*—remedy.  *E.g.*, *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 70 (Iowa 2014); *see also, e.g.*, *Gen. Cas. Co. of Wis. v. Hills*, 561 N.W.2d 718, 724 (Wis. 1997) ("[T]he cost of repairing and restoring damaged property and water to its original condition is a proper measure of compensatory damages."); *Fried v. Sungard Recovery Servs., Inc.*, 925 F. Supp. 372, 374 (E.D. Pa. 1996) ("Plaintiffs' claim for medical monitoring is a claim for legal damages in the form of future medical payments."); *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979) (request for "medical care and necessary treatment" is "a claim for money damages"); *see also* Dkt. 2535 at 4–5; Dkt. 2163 at 10–12.

Distinctions between "damages" and "monetary relief under a different label" are often, as here, "purely semantic, with no relevance to the adjudication of [a] Seventh Amendment claim." *E.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 49 n.7 (1989).  After all, "the constitutional right to trial by jury cannot be made to depend upon the choice of words used" by the plaintiffs.

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78 (1962).  Plaintiffs cannot "recast" their claim "for monetary relief" as equitable simply by applying a new label to the relief.  For example, requesting a "mandatory injunction" "ordering the payment of money" does not transform a suit at law into a suit in equity.  *E.g.*, *In re Cordis Corp. Pacemaker Prod. Liab. Litig.*, No. C-3-86-543, 1992 WL 754061, at *9 (S.D. Ohio Dec. 23, 1992) (request for supposedly equitable relief "requiring the funding of the removal of defective pacemakers" was in reality "a claim for monetary damages").  The same is true of Plaintiffs' attempt to label as "abatement" what has always been a request for "economic damages" (Dkt. 3327 at 197 ¶ 640) to compensate for future harm allegedly caused by Defendants' conduct.  Labels aside, the Constitution requires trial by jury—and the same jury must determine liability, the economic remedies Plaintiffs seek, and apportionment.

### B.  If the Seventh Amendment Does Not Apply, a Different Judge Must Decide the Remedy.

If a judge, rather than a jury, will serve as a factfinder for the remedies phase, it cannot be a judge who has been heavily involved in settlement discussions in this MDL.[11]  The Due Process Clause requires the "absence of even the appearance of judicial bias."  *Anderson v. Sheppard*, 856 F.2d 741, 746–47 (6th Cir. 1988).  This guarantee is violated when a judge's "significant, personal involvement" in a case creates a "risk of actual bias."  *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).  Here, the Court's earlier "significant, personal involvement" as settlement master satisfies this standard.  *Id.*  This Court served as settlement master, working with the same lawyers representing Plaintiffs to fashion broad settlements with two different sets of settling defendants.  To be sure, those settlements did not involve the current Defendants.  But they concerned the same

---

[11] CVS does not join in this section of the brief and rests on its previous objections on this subject.

alleged nuisance at issue in this case and will benefit, among others, the same Plaintiffs whose claim this Court will decide.   And this Court presumably heard substantial extra-record information during *ex parte* communications with Plaintiffs' counsel about the same fact issues that will be central to the remedies phase of this trial.  That creates the impermissible risk of the appearance of bias.  *Cf. Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009); *see also Anderson*, 856 F.2d at 747.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court: (1) limit the relief available to Plaintiffs to abatement of the nuisance condition the jury found, and programs reasonably connected to the Defendants' conduct in creating that very nuisance; (2) rule that Plaintiffs bear the burden on apportionment in this case between each Defendant as well as others who contributed to the nuisance; (3) order a jury trial that protects Defendants' Seventh Amendment rights (including the right to have the same jury decide liability and remedies); or, in the alternative, (4) transfer Phase 2 of this Track 3 trial to a different judge who has not been involved in settlement discussions in this MDL.

23

Dated:  March 9, 2022                    Respectfully submitted,

                                         /s/  John M. Majoras
                                         John M. Majoras
                                         Benjamin C. Mizer
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, DC 20001
                                         Phone: (202) 879-3939
                                         Fax: (202) 626-1700
                                         E-mail: jmmajoras@jonesday.com
                                         E-mail: bmizer@jonesday.com

                                         Tina M. Tabacchi
                                         Tara A. Fumerton
                                         JONES DAY
                                         77 West Wacker
                                         Chicago, IL 60601
                                         Phone: (312) 269-4335
                                         Fax: (312) 782-8585
                                         E-mail: tmtabacchi@jonesday.com
                                         E-mail: tfumerton@jonesday.com

                                         *Counsel for Walmart Inc.*

                                         /s/ Eric R. Delinsky
                                         Eric R. Delinsky
                                         Alexandra W. Miller
                                         Graeme W. Bush
                                         Paul B. Hynes, Jr.
                                         ZUCKERMAN SPAEDER LLP
                                         1800 M Street NW, Suite 1000
                                         Washington, DC  20036
                                         Tel: (202) 778-1800
                                         E-mail: edelinsky@zuckerman.com
                                         E-mail: smiller@zuckerman.com
                                         E-mail: gbush@zucerkman.com
                                         E-mail: phynes@zuckerman.com

                                         *Counsel for CVS Pharmacy, Inc., Ohio
                                         CVS Stores, L.L.C., CVS TN Distribution,
                                         L.L.C., CVS Rx Services, Inc., and CVS
                                         Indiana, L.L.C.*

                                         24

*/s/ Kaspar J. Stoffelmayr*
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sten Jernudd
Bartlit Beck LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,
Walgreen Co., and Walgreen Eastern Co., Inc.*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system on all counsel of record on March 9, 2022.

/s/  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*