APPENDIX B

## JANSSEN SETTLEMENT AGREEMENT

This settlement agreement dated as of July 21, 2021 (the "*Agreement*") sets forth the terms of settlement between and among the Settling States, Participating Subdivisions, and Janssen (as those terms are defined below). Upon satisfaction of the conditions set forth in Sections II and VIII, this Agreement will be binding on the Settling States, Janssen, and Participating Subdivisions. This Agreement will then be filed as part of Consent Judgments in the respective courts of each of the Settling States, pursuant to the terms set forth in Section VIII.

## I.     Definitions

Unless otherwise specified, the following definitions apply:

1.  "*Abatement Accounts Fund*" means a component of the Settlement Fund described in subsection VI.E.

2.  "*Additional Restitution Amount*" means the amount available to Settling States listed in Exhibit N of $67,307,692.

3.  "*Agreement*" means this agreement as set forth above, inclusive of all exhibits.

4.  "*Alleged Harms*" means the alleged past, present, and future financial, societal, and related expenditures arising out of the alleged misuse and abuse of opioid products, non-exclusive examples of which are described in the documents listed on Exhibit A, that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by Janssen.

5.  "*Allocation Statute*" means a state law that governs allocation, distribution, and/or use of some or all of the Settlement Fund amounts allocated to that State and/or its Subdivisions. In addition to modifying the allocation, as set forth in subsection VI.D.2, an Allocation Statute may, without limitation, contain a Statutory Trust, further restrict expenditure of funds, form an advisory committee, establish oversight and reporting requirements, or address other default provisions and other matters related to the funds. An Allocation Statute is not required to address all three (3) types of funds comprising the Settlement Fund or all default provisions.

6.  "*Annual Payment*" means the total amount payable to the Settlement Fund by Janssen on the Payment Date each year in 2023 and onward, as calculated by the Settlement Fund Administrator pursuant to Section V. For the avoidance of doubt, this term does not include the Additional Restitution Amount or amounts paid pursuant to Section XI.

7.  "*Appropriate Official*" means the official defined in subsection XIII.E.

*revised July 30, 2021*

8.     "*Attorney Fee Fund*" means an account consisting of funds allocated to pay attorneys' fees and costs pursuant to the agreement on attorneys' fees and costs attached as Exhibit R.

9.     "*Bar*" means either (1) a ruling by the highest court of the State or the intermediate court of appeals when not subject to further review by the highest court of the State in a State with a single intermediate court of appeals setting forth the general principle that no Subdivisions or Special Districts in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law barring Subdivisions and Special Districts in the State from maintaining or asserting Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (3) a Settlement Class Resolution in the State with full force and effect. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement) shall not constitute a Bar.

10.    "*Case-Specific Resolution*" means either (1) a law barring specified Subdivisions or Special Districts from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); (2) a ruling by a court of competent jurisdiction over a particular Subdivision or Special District that has the legal effect of barring the Subdivision or Special District from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) in the case of a Special District, a release consistent with Section IV below. For the avoidance of doubt, a law, ruling, or release that is conditioned or predicated upon a post-Effective Date payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it) shall not constitute a Case-Specific Resolution.

11.    "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert

2

*revised July 30, 2021*

fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

12. "*Claim Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

13. "*Compensatory Restitution Amount*" means the aggregate amount of payments by Janssen hereunder other than amounts paid as attorneys' fees and costs or identified pursuant to subsection VI.B.2 as being used to pay attorneys' fees and investigation costs or litigation costs.

14. "*Consent Judgment*" means a state-specific consent judgment in a form to be agreed upon by the Settling States, Participating Subdivisions, and Janssen prior to the Initial Participation Date that, among other things, (1) approves this Agreement and (2) provides for the release set forth in Section IV, including the dismissal with prejudice of any Released Claims that the Settling State has brought against Released Entities.

15. "*Court*" means the respective court for each Settling State to which the Agreement and the Consent Judgment are presented for approval and/or entry as to that Settling State, or the Northern District of Ohio for purposes of administering the Attorney Fee Fund and any related fee and cost agreements.

16. "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Reference Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (a) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished

3

*revised July 30, 2021*

active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

17.  "*Designated State*" means New York.

18.  "*Effective Date*" means the date sixty (60) days after the Reference Date.

19.  "*Enforcement Committee*" means a committee consisting of representatives of the Settling States and of the Participating Subdivisions. Exhibit B contains the organizational bylaws of the Enforcement Committee. Notice pursuant to subsection XIII.O shall be provided when there are changes in membership or contact information.

20.  "*Global Settlement Abatement Amount*" means the abatement amount of $4,534,615,385.

21.  "*Global Settlement Amount*" means $5 billion, which shall be divided into the Global Settlement Abatement Amount, the Additional Restitution Amount, and the Global Settlement Attorney Fee Amount.

22.  "*Global Settlement Attorney Fee Amount*" means the attorney fee amount of $398,076,923.

23.  "*Incentive A*" means the incentive payment described in subsection V.E.4.

24.  "*Incentive B*" means the incentive payment described in subsection V.E.5.

25.  "*Incentive C*" means the incentive payment described in subsection V.E.6.

26.  "*Incentive D*" means the incentive payment described in subsection V.E.7.

27.  "*Incentive Payment Final Eligibility Date*" means, with respect to a Settling State, the date that is the earliest of (1) three years after the Effective Date; (2) the date of completion of opening statements in a trial of any action brought by a Subdivision in that State that includes a Released Claim against a Released Entity when such date is more than two (2) years after the Effective Date; or (3) two (2) years after the Effective Date in the event a trial of an action brought by a Subdivision in that State that includes a Released Claim against a Released Entity began after the Initial Participation Date but before two (2) years after the Effective Date.

28.  "*Initial Participating Subdivision*" means a Subdivision that meets the requirements set forth in subsection VII.D.

29.  "*Initial Participation Date*" means the date one hundred twenty (120) days after the Preliminary Agreement Date, unless it is extended by written agreement of Janssen and the Enforcement Committee.

*revised July 30, 2021*

30. "*Initial Year Payment*" means the total amount payable to the Settlement Fund by Janssen on each of the two Payment Dates in 2022, as calculated by the Settlement Fund Administrator pursuant to Section V. For the avoidance of doubt, this term does not include the Additional Restitution Amount or amounts paid pursuant to Section XI.

31. "*Injunctive Relief Terms*" means the terms described in Section III and set forth in Exhibit P.

32. "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.

33. "*Later Litigating Special District*" means a Special District (or Special District official asserting the right of or for the Special District to recover for alleged harms to the Special District and/or the people thereof) that is not a Litigating Special District and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Preliminary Agreement Date. It may also include a Litigating Special District whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Special District takes any affirmative step in its lawsuit other than seeking a stay or removal.

34. "*Later Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that is not a Litigating Subdivision and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Trigger Date. It may also include a Litigating Subdivision whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Subdivision takes any affirmative step in its lawsuit other than seeking a stay or removal.

35. "*Later Participating Subdivision*" means a Participating Subdivision that meets the requirements of subsection VII.E but is not an Initial Participating Subdivision.

36. "*Litigating Special District*" means a Special District (or Special District official) that brought any Released Claims against any Released Entities on or before the Preliminary Agreement Date that were not separately resolved prior to that date. A list of Litigating Special Districts will be agreed to by the parties and attached hereto as of the Preliminary Agreement Date.

37. "*Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that brought any Released Claim against any Released Entity prior to the Trigger Date that were not separately resolved prior to that

*revised July 30, 2021*

Trigger Date. A Prior Litigating Subdivision shall not be considered a Litigating Subdivision. Exhibit C is an agreed list of the Litigating Subdivisions. Exhibit C will be updated (including with any corrections) periodically, and a final version of Exhibit C will be attached hereto as of the Reference Date.

38. "*National Arbitration Panel*" means the panel described in subsection XII.F.

39. "*National Disputes*" means the disputes described in subsection XII.F.

40. "*Non-Litigating Special District"* means a Special District that is neither a Litigating Special District nor a Later Litigating Special District.

41. "*Non-Litigating Subdivision*" means a Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

42. "*Non-Participating Subdivision*" means a Subdivision that is not a Participating Subdivision.

43. "*Non-Party Covered Conduct Claim*" means a Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

44. "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

45. "*Non-Released Entity*" means an entity that is not a Released Entity.

46. "*Non-Settling State*" means a State that is not a Settling State.

47. "*Opioid Remediation*" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of the opioid abuse crisis, including on those injured as a result of the opioid abuse crisis. Exhibit E provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.

48. "*Overall Allocation Percentage*" means a Settling State's percentage as set forth in Exhibit F. The aggregate Overall Allocation Percentages of all States (including Settling States and Non-Settling States) shall equal 100%.

49. "*Participating Special District*" means a Special District that executes a release consistent with Section IV below and meets the requirements for becoming a Participating Special District under Section VII.

6

50. "*Participating Subdivision*" means a Subdivision that meets the requirements for becoming a Participating Subdivision under Section VII. Participating Subdivisions include both Initial Participating Subdivisions and Later Participating Subdivisions. Subdivisions eligible to become Participating Subdivisions are listed in Exhibit G. A Settling State may add additional Subdivisions to Exhibit G at any time prior to the Initial Participation Date.

51. "*Participation Tier*" means the level of participation in this Agreement as determined pursuant to subsection VIII.C using the criteria set forth in Exhibit H.

52. "*Parties*" means Janssen and the Settling States (each, a "*Party*").

53. "*Payment Date*" means the date on which Janssen makes its payments pursuant to Section V and Exhibit M.

54. "*Payment Year*" means the calendar year during which the applicable Initial Year Payments or Annual Payments are due pursuant to subsection V.B. Payment Year 1 is 2022, Payment Year 2 is 2023 and so forth. References to payment "for a Payment Year" mean the Initial Year Payments or Annual Payment due during that year. References to eligibility "for a Payment Year" mean eligibility in connection with the Initial Year Payments or Annual Payment due during that year.

55. "*Preliminary Agreement Date*" means the date on which Janssen gives notice to the Settling States and MDL PEC of its determination that a sufficient number of States have agreed to be Settling States. This date shall be no more than fourteen (14) days after the end of the notice period to States, unless it is extended by written agreement of Janssen and the Enforcement Committee.

56. "*Primary Subdivision*" means a Subdivision that has a population of 30,000 or more. A list of Primary Subdivisions in each State is provided in Exhibit I.

57. "*Prior Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that brought any Released Claim against any Released Entity prior to the Trigger Date and all such Released Claims were separately settled or finally adjudicated prior to the Trigger Date; *provided, however*, that if the final adjudication was pursuant to a Bar, such Subdivision shall not be considered a Prior Litigating Subdivision. Notwithstanding the prior sentence, Janssen and the State of the relevant Subdivision may agree in writing that such Subdivision shall not be considered a Prior Litigating Subdivision.

58. "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination or

*revised July 30, 2021*

"cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the avoidance of doubt, "Product" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. "Product" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

59.     "*Reference Date*" means the date on which Janssen is to inform the Settling States and MDL PEC of its determination whether there is sufficient resolution of claims and potential claims at the Subdivision level to go forward with the settlement. The Reference Date shall be thirty (30) days after the Initial Participation Date, unless it is extended by written agreement of Janssen and the Enforcement Committee.

60.     "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Reference Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by any Settling State or any of its Litigating Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a State, any of its Subdivisions or Special Districts, or any Releasors (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought by a Later Litigating Subdivision or other non-party Subdivision or Special District that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

61.     "*Released Entities*" means Janssen and (1) all of Janssen's past and present direct or indirect parents, subsidiaries, divisions, predecessors, successors, assigns, including Noramco, Inc. and Tasmanian Alkaloids PTY. LTD.; (2) the past and present direct or indirect subsidiaries, divisions, and joint ventures, of any of the foregoing; (3) all of Janssen's insurers (solely in their role as insurers with respect

8

*revised July 30, 2021*

to the Released Claims); (4) all of Janssen's, or of any entity described in subsection (1), past and present joint ventures; and (5) the respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, agents, and employees of any of the foregoing (for actions that occurred during and related to their work for, or employment with, Janssen). Any person or entity described in subsections (3)-(5) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity. For the avoidance of doubt, the entities listed in Exhibit Q are not Released Entities; *and provided further* that any joint venture partner of Janssen or Janssen's subsidiary is not a Released Entity unless it falls within subsections (1)-(5) above. A list of Janssen's present subsidiaries and affiliates can be found at https://johnsonandjohnson.gcs-web.com/static-files/f61ae5f3-ff03-46c1-bfc9-174947884db2. Janssen's predecessor entities include but are not limited to those entities listed on Exhibit J. For the avoidance of doubt, any entity acquired, or joint venture entered into, by Janssen after the Reference Date is not a Released Entity.

62.  "*Releasors*" means (1) each Settling State; (2) each Participating Subdivision; and (3) without limitation and to the maximum extent of the power of each Settling State's Attorney General and/or Participating Subdivision to release Claims, (a) the Settling State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in a Settling State, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Subdivision Settlement Participation Form or the Election and Release Form referenced in Section VII providing for a release to the fullest extent of the Participating Subdivision's authority, which shall be attached as an exhibit to the Agreement. Each Settling State's Attorney General represents that he or she has or has obtained (or will obtain no later than the Initial Participation Date) the authority set forth in the Representation and Warranty subsection of Section IV.

63.  "*Revocation Event*" means with respect to a Bar, Settlement Class Resolution, or Case-Specific Resolution, a legislative amendment or a revocation, rescission, reversal, overruling, or interpretation that in any way limits the effect of such Bar,

*revised July 30, 2021*

Settlement Class Resolution, or Case-Specific Resolution on Released Claims or any other action or event that otherwise deprives the Bar, Settlement Class Resolution or Case-Specific Resolution of force or effect in any material respect.

64.  "*Settlement Class Resolution*" means a class action resolution in a court of competent jurisdiction in a Settling State with respect to a class of Subdivisions and Special Districts in that State that (1) conforms with that Settling State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in that State and has become final as defined in "State-Specific Finality"; (3) is binding on all Non-Participating Subdivisions and Special Districts in that State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions or Special Districts may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Janssen other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable state law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing more than 1% of the total population of all of that State's Subdivisions listed in Exhibit G opt out. In seeking certification of any Settlement Class, the applicable State and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

65.  "*Settlement Fund*" means the interest-bearing fund established under the Agreement into which all payments by Janssen are made other than amounts paid as attorneys' fees and costs or identified pursuant to subsection VI.B.2 as being used to pay attorneys' fees and costs. The Settlement Fund comprises the Abatement Accounts Fund, State Fund, and Subdivision Fund.

66.  "*Settlement Fund Administrator*" means the entity that determines the Annual Payments (including calculating Incentive Payments pursuant to Section V) and any amounts subject to suspension or offset pursuant to Sections V and IX), determines the Participation Tier, and administers and distributes amounts into the Settlement Fund. The duties of the Settlement Fund Administrator shall be governed by this Agreement. Prior to the Initial Participation Date, the Parties shall agree to selection and removal processes for and a detailed description of the Settlement Fund Administrator's duties, including a detailed mechanism for paying the Settlement Fund Administrator's fees and costs, all of which shall be appended to the Agreement as Exhibit L.

*revised July 30, 2021*

67.     "*Settlement Fund Escrow*" means the interest-bearing escrow fund established pursuant to this Agreement to hold disputed or suspended payments made under this Agreement.

68.     "*Settlement Payment Schedule*" means the schedule of payments attached to this Agreement as Exhibit M. A revised Settlement Payment Schedule will be substituted for Exhibit M after any offsets, reductions, or suspensions under Sections V and IX are determined.

69.     "*Settling State*" means any State that has entered the Agreement.

70.     "*Special District*" means a formal and legally recognized sub-entity of a State that is authorized by State law to provide one or a limited number of designated functions, including but not limited to school districts, fire districts, healthcare & hospital districts, and emergency services districts. Special Districts do not include sub-entities of a State that provide general governance for a defined area that would qualify as a Subdivision.

71.     "*State*" means any state of the United States of America, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands. Additionally, the use of non-capitalized "state" to describe something (e.g., "state court") shall also be read to include parallel entities in commonwealths, territories, and the District of Columbia (e.g., "territorial court").

72.     "*State Fund*" means a component of the Settlement Fund described in subsection VI.C.

73.     "*State-Specific Finality*" means, with respect to the Settling State in question:

a.      the Agreement and the Consent Judgment have been approved and entered by the Court as to Janssen, including the release of all Released Claims against Released Entities as provided in this Agreement;

b.      for all lawsuits brought by the Settling State against Released Entities for Released Claims, either previously filed or filed as part of the entry of the Consent Judgment, the Court has stated in the Consent Judgment or otherwise entered an order finding that all Released Claims against Released Entities asserted in the lawsuit have been resolved by agreement; and

c.      (1) the time for appeal or to seek review of or permission to appeal from the approval and entry as described in subsection (a) hereof and entry of such order described in subsection (b) hereof has expired; or (2) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described in (a) hereof and the order described in subsection (b) hereof have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no

*revised July 30, 2021*

longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

74.   "*State-Subdivision Agreement*" means an agreement that a Settling State reaches with the Subdivisions in that State regarding the allocation, distribution, and/or use of funds allocated to that State and to Participating Subdivisions in that State. A State-Subdivision Agreement shall be effective if approved pursuant to the provisions of Exhibit O or if adopted by statute. Preexisting agreements addressing funds other than those allocated pursuant to this Agreement shall qualify if the approval requirements of Exhibit O are met. A State and its Subdivisions may revise, supplement, or refine a State-Subdivision Agreement if approved pursuant to the provisions of Exhibit O or if adopted by statute.

75.   "*Statutory Trust*" means a trust fund established by state law to receive funds allocated to a State's Abatement Accounts Fund and restrict their expenditure to Opioid Remediation purposes subject to reasonable administrative expenses. A State may give a Statutory Trust authority to allocate one or more of the three Settlement Funds, but this is not required.

76.   "*Subdivision*" means a formal and legally recognized sub-entity of a State that provides general governance for a defined area, including a county, parish, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and parishes and other functional levels of sub-entities of a State that provide general governance for a defined area. Historic, non-functioning sub-entities of a State (such as Connecticut counties) are not Subdivisions, unless the entity has filed a Released Claim against a Released Entity in a direct, parens patriae, or any other capacity. For purposes of this Agreement, the term Subdivision does not include Special Districts. A list of Subdivisions by state will be agreed to prior to any Subdivision sign-on period.

77.   "*Subdivision Allocation Percentage*" means for Subdivisions in a Settling State that are eligible to receive an allocation from the Subdivision Fund pursuant to subsection VI.C or subsection VI.D, the percentage as set forth in Exhibit G. The aggregate Subdivision Allocation Percentage of all Subdivisions receiving a Subdivision Allocation Percentage in each State shall equal 100%. Immediately upon the effectiveness of any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3) that addresses allocation from the Subdivision Fund, or upon any, whether before or after the Initial Participation Date, Exhibit G will automatically be amended to reflect the allocation from the Subdivision Fund pursuant to the State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3. The Subdivision Allocation Percentages contained in Exhibit G may not change once notice is distributed pursuant to subsection VII.A, except upon the effectiveness of any State-

*revised July 30, 2021*

Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3) that addresses allocation from the Subdivision Fund. For the avoidance of doubt, no Subdivision not listed on Exhibit G shall receive an allocation from the Subdivision Fund and no provision of this Agreement shall be interpreted to create such an entitlement.

78. "*Subdivision Fund*" means a component of the Settlement Fund described in subsection VI.C.

79. "*Subdivision Settlement Participation Form*" means the form attached as Exhibit K that Participating Subdivisions must execute and return to the Settlement Fund Administrator, and which shall (1) make such Participating Subdivisions signatories to this Agreement, (2) include a full and complete release of any and of such Subdivision's claims, and (3) require the prompt dismissal with prejudice of any Released Claims that have been filed by any such Participating Subdivision.

80. "*Threshold Motion*" means a motion to dismiss or equivalent dispositive motion made at the outset of litigation under applicable procedure. A Threshold Motion must include as potential grounds for dismissal, any applicable Bar or the relevant release by a Settling State or Participating Subdivision provided under this Agreement and, where appropriate under applicable law, any applicable limitations defense.

81. "*Trigger Date*" means, in the case of a Primary Subdivision, the Reference Date, or, in the case of all other Subdivisions, the Preliminary Agreement Date.

## II.     Participation by States and Condition to Preliminary Agreement

A. *Notice to States*. On July 22, 2021 this Agreement shall be distributed to all States. The States' Attorneys General shall then have a period of thirty (30) days to decide whether to become Settling States. States that determine to become Settling States shall so notify the National Association of Attorneys General and Janssen and shall further commit to obtaining any necessary additional State releases prior to the Reference Date. This notice period may be extended by written agreement of Janssen and the Enforcement Committee.

B. *Condition to Preliminary Agreement*. Following the notice period set forth in subsection II.A above, Janssen shall determine on or before the Preliminary Agreement Date whether, in its sole discretion, enough States have agreed to become Settling States to proceed with notice to Subdivisions as set forth in Section VII below. If Janssen determines that this condition has been satisfied, and that notice to the Litigating Subdivisions should proceed, it will so notify the Settling States by providing notice to the Enforcement Committee and Settlement Fund Administrator on the Preliminary Agreement Date. If Janssen determines that this condition has not been satisfied, it will so

13

*revised July 30, 2021*

notify the Settling States by providing notice to the Enforcement Committee and Settlement Fund Administrator, and this Agreement will have no further effect and all releases and other commitments or obligations contained herein will be void.

C. *Later Joinder by States*. After the Preliminary Agreement Date, a State may only become a Settling State with the consent of Janssen, in its sole discretion. If a State becomes a Settling State more than sixty (60) days after the Preliminary Agreement Date, but on or before January 1, 2022, the Subdivisions and Special Districts in that State that become Participating Subdivisions and Participating Special Districts within ninety (90) days of the State becoming a Settling State shall be considered Initial Participating Subdivisions or Initial Participating Special Districts. A State may not become a Settling State after January 1, 2022.

### III. Injunctive Relief

A. *Entry of Injunctive Relief*. As part of the Consent Judgment, the Parties agree to the injunctive relief terms attached as Exhibit P.

### IV. Release

A. *Scope.* As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. Each Settling State (for itself and its Releasors) and Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Settling State and its Attorney General to release claims. The Release shall be a complete bar to any Released Claim.

B. *Claim Over and Non-Party Settlement*.

   1. *Statement of Intent.* It is the intent of the Parties that:

      a. Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Settlement Agreement;

      b. the payments made under this Settlement Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

      c. Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

*revised July 30, 2021*

d.    the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

e.    The provisions of this subsection IV.B are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2.    *Contribution/Indemnity Prohibited*. No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3.    *Non-Party Settlement*. To the extent that, on or after the Reference Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Janssen in subsection IV.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4.    *Claim-Over*. In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection IV.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection IV.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, that Releasor and Janssen shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Settlement Agreement by Janssen:

a.    Janssen shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Settlement Agreement, whichever is later;

b.    Janssen and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that it is not required to pay

15

*revised July 30, 2021*

more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement;

c.     That Releasor and Janssen shall take steps sufficient and permissible under the law of the State of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement. Such steps may include, where permissible:

(1)     Filing of motions to dismiss or such other appropriate motion by Janssen or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

(2)     Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(3)     Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(4)     Return of monies paid by Janssen to that Releasor under this Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(5)     Payment of monies to Janssen by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(6)     Credit to Janssen under this Settlement Agreement to reduce the overall amounts to be paid under the Settlement Agreement such that it is held harmless from the Claim-Over; and

(7)     Such other actions as that Releasor and Janssen may devise to hold Janssen harmless from the Claim Over.

d.     The actions of that Releasor and Janssen taken pursuant to paragraph (c) must, in combination, ensure Janssen is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement.

e.     In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Janssen may seek review by

16

*revised July 30, 2021*

the National Arbitration Panel, provided that, if the parties agree, such dispute may be heard by the state court where the relevant Consent Judgment was filed. The National Arbitration Panel shall have authority to require Releasors to implement a remedy that includes one or more of the actions specified in paragraph (c) sufficient to hold Released Entities fully harmless. In the event that the panel's actions do not result in Released Entities being held fully harmless, Janssen shall have a claim for breach of this Settlement Agreement by Releasors, with the remedy being payment of sufficient funds to hold Janssen harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Janssen may have.

5.   To the extent that the Claim-Over is based on a contractual indemnity, the obligations under subsection IV.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Janssen shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

C.   *General Release*. In connection with the releases provided for in the Agreement, each Settling State (for itself and its Releasors) and Participating Subdivision expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Settling State (for itself and its Releasors) and Participating Subdivision hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Settling States' decision to enter into the Agreement or the Participating Subdivisions' decision to participate in the Agreement.

D.   *Res Judicata*. Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement,

*revised July 30, 2021*

and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

E.  *Representation and Warranty.* The signatories hereto on behalf of their respective Settling States and its Participating Subdivisions expressly represent and warrant that they will obtain on or before the Effective Date (or have obtained) the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) their respective Settling States; (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts; (3) any of their respective Settling State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license; and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from a State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

F.  *Effectiveness.* The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Settlement Fund or any portion thereof.

G.  *Cooperation.* Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.

H.  *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under the Agreement for enforcement of the Agreement.

## V.  <u>Monetary Relief and Payments</u>

A.  **Structure of Payments**

1.  All payments under this Section V shall be made into the Settlement Fund, except that where specified, they shall be made into the Settlement Fund Escrow. The Settlement Fund shall be allocated and used only as specified in Section VI.

2.  Janssen shall pay into the Settlement Fund the sum of Four Billion, Five Hundred Thirty-Four Million, Six Hundred Fifteen Thousand, Three Hundred Eighty-Five

*revised July 30, 2021*

Dollars ($4,534,615,385) minus (1) the offsets and credits specified in subsection V.C below, (2) any unearned incentive payments under subsection V.E below, and (3) any adjustments under Section IX below.

3. The payments to the Settlement Fund shall be divided into base and incentive payments as provided in subsections V.D and V.E below.

B. **Payment Process**

1. Except as otherwise provided in this Agreement, Janssen shall make two Initial Year Payments and nine (9) Annual Payments. The Initial Year Payments will consist of base payments. The first Annual Payment shall consist of incentive payments and subsequent Annual Payments shall each consist of base and incentive payments. The amount of all Initial Year Payments and Annual Payments shall be determined by the Settlement Fund Administrator applying Section V and Exhibit M. The Payment Date for the first Initial Year Payment shall be no later than ninety (90) days after the Effective Date. The Payment Date for the second Initial Year Payment shall be no later than July 15, 2022. The Payment Date for the first Annual Payment shall be no later than one year and sixty days following the Effective Date; the Payment Date for the second Annual Payment shall be no later than two years and sixty days following the Effective Date, and so forth, until all Annual Payments are made.

2. All data relevant to the determination of each such payment shall be submitted to the Settlement Fund Administrator sixty (60) days prior to the Payment Date for each payment. Prior to the Initial Participation Date, the Parties will include an exhibit to the Agreement setting forth in detail the process for submitting such data to the Settlement Fund Administrator prior to each Payment Date. The Settlement Fund Administrator shall then determine the Initial Year Payment or Annual Payment and the amount to be paid to each Settling State and its Participating Subdivisions, consistent with the provisions in Exhibit L, by:

a. determining, for each Settling State, the amount of base and incentive payments to which the State is entitled by applying the criteria in this Section;

b. applying any reductions, suspensions, or offsets required by Sections V and IX; and

c. determining the total amount owed by Janssen to all Settling States and Participating Subdivisions.

3. The Settlement Fund Administrator shall then allocate the Initial Year Payment or Annual Payment pursuant to Section VI among the Settling States, among the separate types of funds for each Settling State (if applicable), and among the Participating Subdivisions.

*revised July 30, 2021*

4.      As soon as possible, but no later than fifty (50) days prior to the Payment Date for each payment and following the determination described in subsection V.B.2, the Settlement Fund Administrator shall give notice to Janssen, the Settling States, and the Enforcement Committee of the amount of the Initial Year Payment or Annual Payment, the amount to be received by each Settling State, the amount to be received by the separate types of funds for each Settling State (if applicable), and the amount to be received by each Settling State's Participating Subdivisions.

5.      Within twenty-one (21) days of the notice provided by the Settlement Fund Administrator, any party may dispute, in writing, the calculation of the Initial Year Payment or Annual Payment, or the amount to be received by a Settling State and/or its Participating Subdivisions. Such disputing party must provide a written notice of dispute to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and Janssen identifying the nature of the dispute, the amount of money that is disputed, and the Settling State(s) affected.

6.      Within twenty-one (21) days of the sending of a written notice of dispute, any affected party may submit a response, in writing, to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and Janssen identifying the basis for disagreement with the notice of dispute.

7.      If no response is filed, the Settlement Fund Administrator shall adjust the amount calculated consistent with the written notice of dispute, and Janssen shall pay the adjusted amount as the Initial Year Payment or Annual Payment on the Payment Date. If a written response to the written notice of dispute is timely sent to the Settlement Fund Administrator, the Settlement Fund Administrator shall notify Janssen of the preliminary amount to be paid, which shall be the greater of the amount originally calculated by the Settlement Fund Administrator or the amount that would be consistent with the notice of dispute, *provided*, *however* that in no circumstances shall the preliminary amount to be paid be higher than the maximum amount of base and incentive payments for that payment as set forth in Exhibit M. For the avoidance of doubt, a transfer of suspended payments from the Settlement Fund Escrow does not count toward determining whether the amount to be paid is higher than the maximum amount of base and incentive payments for that payment as set forth in Exhibit M.

8.      The Settlement Fund Administrator shall place any disputed amount of the preliminary amount paid by Janssen into the Settlement Fund Escrow and shall disburse any undisputed amount to each Settling State and its Participating Subdivisions receiving direct allocations within fifteen (15) days of the Payment Date or at such later time as directed by each Settling State.

9.      Disputes described in this subsection (other than those for which no response is filed under subsection V.B.6) shall be resolved in accordance with the terms of Section XII.

*revised July 30, 2021*

10. The process described in this subsection V.B shall also apply to accelerated payments made pursuant to Incentive A under subsection V.E.4.

11. For the avoidance of doubt, Subdivisions not listed on Exhibit G shall not receive an allocation from the Subdivision Fund.

## C. Offsets for Non-Settling States and Credits

1. An offset equal to Four Billion, Five Hundred Thirty-Four Million, Six Hundred Fifteen Thousand, Three Hundred Eighty-Five Dollars ($4,534,615,385) times the percentage allocation assigned to each Non-Settling State in Exhibit F shall be deducted from the total amount to be paid by Janssen to the Settlement Fund under subsection V.A.2 above.

2. In addition to the offset, a credit of Two Hundred and Seventy Million Dollars ($270,000,000) shall be deducted from the maximum Settlement Fund amount to be paid by Janssen under subsection V.A.2 above and applied to the payment amounts as specified by Exhibit M. For the avoidance of doubt, the base payments and maximum incentive payment amounts shown on Exhibit M already reflect the deduction of the offset.

3. Notwithstanding any other provision of this Agreement or any other agreement, in the event that: (1) Janssen enters into an agreement with any Settling State that resolves with finality such Settling State's Claims consistent with Section IV of this Agreement and such agreement has an effective date prior to the Effective Date of this Agreement (such agreement, a "State-Specific Agreement") and (2) pursuant to the terms of the State-Specific Agreement, any payments, or any portion thereof, made by Janssen thereunder are made in lieu of any payments (for the avoidance of doubt, including the Additional Restitution Amount), or any portion thereof, to be made under this Agreement and Janssen makes such a payment pursuant to the State-Specific Agreement, then Janssen will reduce any payments allocable to such Settling State (whether made to the Settlement Fund Escrow or the Settlement Fund) made pursuant to this Agreement to the extent such amount was already paid pursuant to the terms of the State-Specific Agreement. This provision includes but is not limited to any corresponding amounts already paid to the Qualified Settlement Fund established under the Agreement between Janssen and the State of New York dated June 25, 2021.

4. Non-Settling States shall not be eligible for any payments or have any rights in connection with this Agreement. Accordingly, the stated maximum dollar amounts of the payments specified in Exhibit M are reduced by the aggregate Overall Allocation Percentage of Non-Settling States as set forth in Exhibit F.

## D. Base Payments

1. Janssen shall make base payments into the Settlement Fund totaling One Billion, Nine Hundred Forty-Two Million, Three Hundred Forty-Six Thousand, One Hundred Fifty-Five Dollars ($1,942,346,155) minus the offsets and credits

*revised July 30, 2021*

specified in subsection V.C above. The base payments will be paid in accordance with the payment schedule specified by Exhibit M, subject to potential acceleration and potential deductions as provided herein.

2.      The base payments will be allocated by Settling State proportionate to each Settling State's assigned percentages in Exhibit F, adjusted for any Non-Settling States.

3.      If a State qualifies for Incentive A (described below), Janssen will accelerate the base payment schedule so that the State receives its Payment Year 1-4 base payment allocations and full Payment Year 1-4 Incentive A payment amounts within ninety (90) days of notice, on or after the Effective Date, of the Bar's implementation. Payment Year 5-10 payments are made annually and cannot be accelerated.

4.      The exemplar payment schedule in Exhibit M does not account for deductions for offsets or unearned incentives, which will be separately calculated for each payment.

E.      **Incentive Payments**

1.      Janssen shall make incentive payments into the Settlement Fund potentially totaling up to Two Billion, Three Hundred Twenty-Two Million, Two Hundred Sixty-Nine Thousand, Two Hundred Thirty Dollars ($2,322,269,230), consisting of $2,109,038,461 for Incentive A (or, alternatively up to $2,109,038,461 for combined Incentives B and C if Incentive A is not achieved) and $213,230,769 for Incentive D, prior to being adjusted for credits if every State is a Settling State and were to satisfy the requirements specified below to earn its maximum incentive amount. The incentive payments will be paid in accordance with the payment schedule in Exhibit M, subject to potential acceleration and potential deductions as provided herein.

2.      The maximum incentive amount for any Settling State shall be $2,322,269,230 times the percentage allocation assigned that Settling State in Exhibit F.

3.      A Settling State may qualify to receive incentive payments in addition to base payments if, as of the Incentive Payment Final Eligibility Date, it meets the incentive eligibility requirements specified below. Settling States may qualify for incentive payments in four ways. If a Settling State qualifies for "Incentive A," it will become entitled to receive the maximum Incentive A payment allocable to the State as stated in subsection V.E.1. If a Settling State does not qualify for Incentive A, it can alternatively qualify for "Incentive B" and/or "Incentive C." A Settling State can qualify for "Incentive D" regardless of whether it qualifies for another incentive payment. The Incentive Payment Final Eligibility Date is not relevant to Incentive D.

*revised July 30, 2021*

4.      *Incentive A: Accelerated Incentive Payment for Full Participation.*

a.      A Settling State shall receive an accelerated Incentive A payment allocable to the State for full participation as described in subsection V.E.4.b.

b.      A State qualifies for Incentive A by: (1) complete participation in the form of releases consistent with Section IV above from all Litigating Subdivisions and Litigating Special Districts, Non-Litigating Subdivisions with population over 10,000, and Non-Litigating Covered Special Districts (as defined in subsection V.E.7.e); (2) a Bar; or (3) a combination of approaches in clauses (1)-(2) that achieves the same level of resolution of Subdivision and Special District claims (e.g., a law barring future litigation combined with full joinder by Litigating Subdivisions and Litigating Special Districts). For purposes of Incentive A, a Subdivision or Special District is considered a "Litigating Subdivision" or "Litigating Special District" if it has brought Released Claims against Released Entities on or before the Reference Date; all other Subdivisions and Special Districts are considered "Non-Litigating." For purposes of Incentive A, Non-Litigating Special Districts shall not include a Special District with any of the following words or phrases in its name: mosquito, pest, insect, spray, vector, animal, air quality, air pollution, clean air, coastal water, tuberculosis, and sanitary.

c.      Qualification for Incentive A entitles the qualifying Settling State to expedited payment of base payments and incentive payments for Payment Years 1-4, which Janssen shall pay into the Settlement Fund within ninety (90) days after receiving notice from the Settlement Fund Administrator that a State has qualified for Incentive A, but in no event less than ninety (90) days from the Effective Date. Base and incentive payments for Payment Years 5-10 will not be expedited.

d.      If a Settling State qualifies for Incentive A after receiving an incentive payment under Incentives B or C, described below, the Settling State's payments under Incentive A will equal the remainder of its total Incentive A payments less any payments previously received under Incentives B or C. A Settling State that receives all of its maximum incentive allocation under Incentive A shall not receive additional incentive payments under Incentives B or C.

e.      A Settling State that is not eligible for Incentive A as of the Incentive Payment Final Eligibility Date shall not be eligible for Incentive A for that Payment Year or any subsequent Payment Years.

23

*revised July 30, 2021*

5.   *Incentive B: Early Participation or Released Claims by Litigating Subdivisions and Litigating Special Districts.*

a.   If a Settling State does not qualify for Incentive A, it may still qualify to receive up to 60% of its total potential Incentive A payment allocation under Incentive B.

b.   A Settling State can qualify for an Incentive B payment if Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the Settling's litigating population are either Participating Subdivisions or have their claims resolved through Case-Specific Resolutions.

(1)   A Settling State's litigating population is the sum of the population of all Litigating Subdivisions and Litigating Special Districts. A Settling State's litigating population shall include all Litigating Subdivisions and Litigating Special Districts whose populations overlap in whole or in part with other Litigating Subdivisions and Litigating Special Districts, for instance in the case of a Litigating Special District, city, or township contained within a county.

(2)   For example, if a Litigating Special District and a city that is a Litigating Subdivision are located within a county that is a Litigating Subdivision, then each of their individual populations would be added together to determine the total litigating population. Special District populations shall be counted in the manner set forth in subsection XIII.B. If each qualifies as a Litigating Subdivision or Litigating Special District and the county has a population of 10, the City has a population of 8, and the Special District has a population of 1, the total litigating population would be 19.

c.   The following time periods apply to Incentive B payments:

(1)   Period 1: Zero to two hundred ten (210) days after the Effective Date.

(2)   Period 2: Two hundred eleven (211) days to one year after the Effective Date.

(3)   Period 3: One year and one day to two years after the Effective Date.

d.   Within Period 1: If Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of a Settling State's litigating population are Participating Subdivisions or have their claims resolved through Case-Specific Resolutions during Period 1, a sliding scale will determine the share of the funds available under Incentive B, with a

24

*revised July 30, 2021*

maximum of 60% of the Settling State's total potential incentive payment allocation available. Under that sliding scale, if Litigating Subdivisions and Litigating Special Districts collectively representing 75% of a Settling State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 1, a Settling State will receive 50% of the total amount available to it under Incentive B. If more Litigating Subdivisions and Litigating Special Districts become Participating Subdivisions or achieve Case-Specific Resolution status, the Settling State shall receive an increased percentage of the total amount available to it under Incentive B as shown in the table below.

| Participation or Case-Specific Resolution Levels (As percentage of litigating population) | Incentive B Award (As percentage of total amount available to State under Incentive B) |
|---|---|
| 75% | 50% |
| 76% | 52% |
| 77% | 54% |
| 78% | 56% |
| 79% | 58% |
| 80% | 60% |
| 85% | 70% |
| 90% | 80% |
| 95% | 90% |
| 100% | 100% |

e.  <u>Within Period 2</u>: If a Settling State did not qualify for an Incentive B payment in Period 1, but Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the Settling State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 2, then the Settling State qualifies for 75% of the Incentive B payment it would have qualified for in Period 1.

f.  <u>Within Period 3</u>: If a Settling State did not qualify for an Incentive B payment in Periods 1 or 2, but Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the Settling State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 3, then the Settling State qualifies for 50% of the Incentive B payment it would have qualified for in Period 1.

g.  A Settling State that receives the Incentive B payment for Periods 1 and/or 2 can receive additional payments if it secures participation from additional Litigating Subdivisions and Litigating Special Districts (or Case-Specific Resolutions of their claims) during Periods 2 and/or 3.

*revised July 30, 2021*

Those additional payments would equal 75% (for additional participation or Case-Specific Resolutions during Period 2) and 50% (for additional participation or Case-Specific Resolutions during Period 3) of the amount by which the increased litigating population levels would have increased the Settling State's Incentive B payment if they had been achieved in Period 1.

h.     If Litigating Subdivisions and Litigating Special Districts that have become Participating Subdivisions or achieved Case-Specific Resolution status collectively represent less than 75% of a Settling State's litigating population by the end of Period 3, the Settling State shall not receive any Incentive B payment.

i.     If there are no Litigating Subdivisions or Litigating Special Districts in a Settling State, and that Settling State is otherwise eligible for Incentive B, that Settling State will receive its full allocable share of Incentive B.

j.     Incentives earned under Incentive B shall accrue after each of Periods 1, 2, and 3. After each period, the Settlement Fund Administrator shall conduct a look-back to assess which Settling States vested an Incentive B payment in the preceding period. Based on the look-back, the Settlement Fund Administrator will calculate the incentives accrued under Incentive B for the period; *provided* that the percentage of Incentive B for which a Settling State is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

6.     *Incentive C: Early Participation of Subdivisions*

a.     If a Settling State does not qualify for Incentive A, it may still qualify to receive up to 40% of its total potential Incentive A payment allocation under Incentive C, which has two parts.

(1)     Part 1: Under Incentive C, Part 1, a Settling State can receive up to 75% of its Incentive C allocation. A Settling State can qualify for a payment under Incentive C, Part 1 only if Primary Subdivisions (whether Litigating Primary Subdivisions or Non-Litigating Primary Subdivisions as of the Reference Date) representing at least 60% of the Settling State's Primary Subdivision population become Participating Subdivisions or achieve Case-Specific Resolution status.

(2)     A Settling State's Primary Subdivision population is the sum of the population of all Primary Subdivisions (whether Litigating Primary Subdivisions or Non-Litigating Primary Subdivisions as of the Reference Date). Because Subdivisions include Subdivisions whose populations overlap in whole or in part with other

*revised July 30, 2021*

Subdivisions, for instance in the case of a city or township contained within a county, the Settling State's Primary Subdivision population is greater than Settling State's total population. (Special Districts are not relevant for purposes of Incentive C calculations.)

(3)     A sliding scale will determine the share of the funds available under Incentive C, Part 1 to Settling States meeting the minimum 60% threshold. Under that sliding scale, if a Settling State secures participation or Case-Specific Resolutions from Primary Subdivisions representing 60% of its total Primary Subdivision population, it will receive 40% of the total amount potentially available to it under Incentive C, Part 1. If a Settling State secures participation or Case-Specific Resolutions from Primary Subdivisions representing more than 60% of its Primary Subdivision population, the Settling State shall be entitled to receive a higher percentage of the total amount potentially available to it under Incentive C, Part 1, on the scale shown in the table below. If there are no Primary Subdivisions, and that Settling State is otherwise eligible for Incentive C, that Settling State will receive its full allocable share of Incentive C, Part 1.

| Participation or Case-Specific Resolution Levels (As percentage of total Primary Subdivision population) | Incentive C Award (As percentage of total amount available to State under Incentive C, Part 1) |
|---|---|
| 60% | 40% |
| 70% | 45% |
| 80% | 50% |
| 85% | 55% |
| 90% | 60% |
| 91% | 65% |
| 92% | 70% |
| 93% | 80% |
| 94% | 90% |
| 95% | 100% |

b.     <u>Part 2</u>:  If a Settling State qualifies to receive an incentive under Incentive C, Part 1, the State can also qualify to receive an additional incentive amount equal to 25% of its total potential Incentive C allocation by securing 100% participation of the ten (10) largest Subdivisions by population in the Settling State. (Special Districts are not relevant for purposes of this calculation.) If a Settling State does not qualify for any amount under Incentive C, Part 1, it cannot qualify for Incentive C, Part 2.

c.     Incentives earned under Incentive C shall accrue on an annual basis up to three years after the Effective Date. At one, two, and three years after the

*revised July 30, 2021*

Effective Date, the Settlement Fund Administrator will conduct a look-back to assess which Subdivisions had agreed to participate or had their claim resolved through a Case-Specific Resolution that year. Based on the look-back, the Settlement Fund Administrator will calculate the incentives accrued under Incentive C for the year; *provided* that the percentage of Incentive C for which a Settling State is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

7. *Incentive D: Release of Payments if No Qualifying Special District Litigation.*

   a. $213,230,769 shall be available for potential Incentive D payments according to the terms specified in this subsection V.E.7.

   b. If, within five years of the Reference Date, a Covered Special District files litigation against any Released Entity, Janssen shall, within thirty (30) days of Janssen being served, provide notice of the litigation to the Settling State in which the Covered Special District sits, which shall file a motion to intervene in the litigation and use its best efforts to obtain either dismissal of the litigation in cooperation with Janssen, or a release consistent with Section IV of the Special District's Claims.

   c. A Settling State shall receive its allocation of the Incentive D payment if, within five years after the Effective Date (the "look-back date"), no Covered Special District within the Settling State has filed litigation which has survived a Threshold Motion and remains pending as of the look-back date, unless the dismissal after the litigation survived the Threshold Motion is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it).

   d. Prior to the look-back date, a Released Entity shall not enter into a settlement with a Covered Special District unless the State in which the Covered Special District sits consents to such a settlement or unreasonably withholds consent of such a settlement.

   e. "*Covered Special Districts*" are school districts, healthcare/hospital districts, and fire districts, subject to the following population thresholds:

      (1) For school districts, the K-12 student enrollment must be 25,000 or 0.12% of a State's population, whichever is greater;

      (2) For fire districts, the district must cover a population of 25,000, or 0.20% of a State's population if a State's population is greater than 18 million. If not easily calculable from state data sources and agreed to between the State and Janssen, a fire district's population is calculated by dividing the population of the county or counties a

28

*revised July 30, 2021*

> fire district serves by the number of fire districts in the county or counties.

(3)  For healthcare/hospital districts, the district must have at least 125 hospital beds in one or more hospitals rendering services in that district.

## VI.  Allocation and Use of Settlement Funds

A.  *Components of Settlement Fund*. The Settlement Fund shall be comprised of an Abatement Accounts Fund, a State Fund, and a Subdivision Fund for each Settling State. The payments under Section V into the Settlement Fund shall be initially allocated among those three (3) sub-funds and distributed and used as provided below or as provided for by a State-Subdivision Agreement (or other State-specific allocation of funds). Unless otherwise specified herein, payments placed into the Settlement Fund do not revert back to Janssen.

B.  *Use of Settlement Payments*.

1.  It is the intent of the Parties that the payments disbursed from the Settlement Fund to Settling States and Participating Subdivisions listed in Exhibit G be for Opioid Remediation, subject to limited exceptions that must be documented in accordance with subsection VI.B.2. In no event may less than 86.5% of Janssen's maximum amount of payments pursuant to Sections V, X, and XI over the entirety of all Payment Years (but not any single Payment Year) be spent on Opioid Remediation.

2.  While disfavored by the Parties, a Settling State or Participating Subdivision listed on Exhibit G may use monies from the Settlement Fund (that have not been restricted by this Agreement solely to future Opioid Remediation) for purposes that do not qualify as Opioid Remediation. If, at any time, a Settling State or a Participating Subdivision listed on Exhibit G uses any monies from the Settlement Fund for a purpose that does not qualify as Opioid Remediation, such Settling State or Participating Subdivision shall identify such amounts and report to the Settlement Fund Administrator and Janssen how such funds were used, including if used to pay attorneys' fees, investigation costs, litigation costs, or costs related to the operation and enforcement of this Agreement, respectively. It is the intent of the Parties that the reporting under this subsection VI.B.2 shall be available to the public. For the avoidance of doubt, (a) any amounts not identified under this subsection VI.B.2 as used to pay attorneys' fees, investigation costs, or litigation costs shall be included in the "Compensatory Restitution Amount" for purposes of subsection VI.F and (b) Participating Subdivisions not listed on Exhibit G or Participating Special Districts that receive monies from the Settlement Fund indirectly may only use such monies from the Settlement Fund for purposes that qualify as Opioid Remediation.

*revised July 30, 2021*

C.  *Allocation of Settlement Fund.* The allocation of the Settlement Fund allows for different approaches to be taken in different states, such as through a State-Subdivision Agreement. Given the uniqueness of States and their Subdivisions, Settling States and Participating Subdivisions are encouraged to enter into State-Subdivision Agreements in order to direct the allocation of their portion of the Settlement Fund. As set out below, the Settlement Fund Administrator will make an initial allocation to three (3) state-level sub-funds. The Settlement Fund Administrator will then, for each Settling State and its Participating Subdivisions listed on Exhibit G, apply the terms of this Agreement and any relevant State-Subdivision Agreement, Statutory Trust, Allocation Statute, or voluntary redistribution of funds as set out below before disbursing the funds.

1.  <u>Base Payments</u>. The Settlement Fund Administrator will allocate base payments under subsection V.D among the Settling States in proportion to their respective Overall Allocation Percentages. Base payments for each Settling State will then be allocated 15% to its State Fund, 70% to its Abatement Accounts Fund, and 15% to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in subsection VI.D.

2.  <u>Incentive Payments</u>. The Settlement Fund Administrator will treat incentive payments under subsection V.E on a State-specific basis. Incentive payments for which a Settling State is eligible under subsection V.E will be allocated 15% to its State Fund, 70% to its Abatement Accounts Fund, and 15% to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in subsection VI.D.

3.  <u>Application of Adjustments</u>. If a reduction, offset, or suspension under Section IX applies with respect to a Settling State, the reduction, offset, or suspension shall be applied proportionally to all amounts that would otherwise be apportioned and distributed to the State Fund, the Abatement Accounts Fund, and the Subdivision Fund for that State.

4.  <u>Settlement Fund Administrator</u>. Prior to the Initial Participation Date, Janssen and the Enforcement Committee will agree to a detailed mechanism consistent with the foregoing for the Settlement Fund Administrator to follow in allocating, apportioning, and distributing payments, which shall be appended hereto as Exhibit L.

5.  <u>Settlement Fund Administrator Costs</u>. Any costs and fees associated with or arising out of the duties of the Settlement Fund Administrator as described in Exhibit L with regard to Janssen's payments to the Settlement Fund shall be paid out of interest accrued on the Settlement Fund and from the Settlement Fund should such interest prove insufficient.

D.  *Settlement Fund Reallocation and Distribution*. As set forth below, within a particular Settling State's account, amounts contained in the Settlement Fund sub-funds may be reallocated and distributed per a State-Subdivision Agreement or other means. If the

30

*revised July 30, 2021*

apportionment of amounts is not addressed and controlled under subsections VI.D.1-2, then the default provisions of subsection VI.D.4 apply. It is not necessary that a State-Subdivision Agreement or other means of allocating funds pursuant to subsections VI.D.1-2 address all of the Settlement Fund sub-funds. For example, a Statutory Trust might only address disbursements from a Settling State's Abatement Accounts Fund.

1.  Distribution by State-Subdivision Agreement. If a Settling State has a State-Subdivision Agreement, amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under subsection VI.C shall be reallocated and distributed as provided by that agreement. Any State-Subdivision Agreement entered into after the Preliminary Agreement Date shall be applied only if it requires: (1) that all amounts be used for Opioid Remediation, except as allowed by subsection VI.B.2, and (2) that at least 70% of amounts be used solely for future Opioid Remediation (references to "future Opioid Remediation" include amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms). For a State-Subdivision Agreement to be applied to the relevant portion of an Initial Year Payment or an Annual Payment, notice must be provided to Janssen and the Settlement Fund Administrator at least sixty (60) days prior to the Payment Date.

2.  Distribution by Allocation Statute. If a Settling State has an Allocation Statute and/or a Statutory Trust that addresses allocation or distribution of amounts apportioned to such State's State Fund, Abatement Accounts Fund, and/or Subdivision Fund and that, to the extent any or all such sub-funds are addressed, requires (1) all amounts to be used for Opioid Remediation, except as allowed by subsection VI.B.2, and (2) at least 70% of all amounts to be used solely for future Opioid Remediation, then, to the extent allocation or distribution is addressed, the amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under subsection VI.C shall be allocated and distributed as addressed and provided by the applicable Allocation Statute or Statutory Trust. For the avoidance of doubt, an Allocation Statute or Statutory Trust need not address all three (3) sub-funds that comprise the Settlement Fund, and if the applicable Allocation Statute or Statutory Trust does not address distribution of all or some of these three (3) sub-funds, the applicable Allocation Statute or Statutory Trust does not replace the default provisions in subsection VI.D.4 of any such unaddressed fund. For example, if an Allocation Statute or Statutory Trust that meets the requirements of this subsection VI.D.2 only addresses funds restricted to abatement, then the default provisions in this Agreement concerning allocation among the three (3) sub-funds comprising the Settlement Fund and the distribution of the State Fund and Subdivision Fund for that State would still apply, while the distribution of the applicable State's Abatement Accounts Fund would be governed by the qualifying Allocation Statute or Statutory Trust.

3.  Voluntary Redistribution. A Settling State may choose to reallocate all or a portion of its State Fund to its Abatement Accounts Fund. A Participating Subdivision listed on Exhibit G may choose to reallocate all or a portion of its

*revised July 30, 2021*

allocation from the Subdivision Fund to the State's Abatement Accounts Fund or to another Participating Subdivision or Participating Special District. For a voluntary redistribution to be applied to the relevant portion of an Initial Year Payment or an Annual Payment, notice must be provided to the Settling Distributors and the Settlement Fund Administrator at least sixty (60) days prior to the Payment Date.

4. <u>Distribution in the Absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust</u>. If subsections VI.D.1-2 do not apply, amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under subsection VI.C shall be distributed as follows:

   a. Amounts apportioned to that State's State Fund shall be distributed to that State.

   b. Amounts apportioned to that State's Abatement Accounts Fund shall be distributed consistent with subsection VI.E. Each Settling State shall submit to the Settlement Fund Administrator a designation of a lead state agency or other entity to serve as the single point of contact for that Settling State's funding requests from the Abatement Accounts Fund and other communications with the Settlement Fund Administrator. The designation of an individual entity is for administrative purposes only and such designation shall not limit funding to such entity or even require that such entity receive funds from this Agreement. The designated entity shall be the only entity authorized to request funds from the Settlement Fund Administrator to be disbursed from that Settling State's Abatement Accounts Fund. If a Settling State has established a Statutory Trust then that Settling State's single point of contact may direct the Settlement Fund Administrator to release the State's Abatement Accounts Fund to the Statutory Trust.

   c. Amounts apportioned to that State's Subdivision Fund shall be distributed to Participating Subdivisions in that State listed on Exhibit G per the Subdivision Allocation Percentage listed in Exhibit G. Subsection VII.I shall govern amounts that would otherwise be distributed to Non-Participating Subdivisions listed in Exhibit G.

   d. Special Districts shall not be allocated funds from the Subdivision Fund, except through a voluntary redistribution allowed by subsection VI.D.3. A Settling State may allocate funds from its State Fund or Abatement Accounts Fund for Special Districts.

5. <u>Restrictions on Distribution</u>. No amounts may be distributed from the Subdivision Fund contrary to Section VII, *i.e.*, no amounts may be distributed directly to Non-Participating Subdivisions or to Later Participating Subdivisions in excess of what is permissible under subsection VII.E. Amounts allocated to the Subdivision Fund that cannot be distributed by virtue of the preceding sentence shall be distributed

32

*revised July 30, 2021*

into the sub-account in the Abatement Accounts Fund for the Settling State in which the Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement described in subsection VI.D.1 or by an Allocation Statute or a Statutory Trust described in subsection VI.D.2.

E.    *Provisions Regarding Abatement Accounts Fund.*

1.    <u>State-Subdivision Agreement, Allocation Statute, and Statutory Trust Fund Provisions</u>. A State-Subdivision Agreement, Allocation Statute, or Statutory Trust may govern the operation and use of amounts in that State's Abatement Accounts Fund so long as it complies with the requirements of subsection VI.D.1 or VI.D.2 as applicable, and all direct payments to Subdivisions comply with subsections VII.E-H.

2.    <u>Absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust</u>. In the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust that addresses distribution, the Abatement Accounts Fund will be used solely for future Opioid Remediation and the following shall apply with respect to a Settling State:

a.    *Regional Remediation.*

(1)    At least 50% of distributions for remediation from a State's Abatement Accounts Fund shall be annually allocated and tracked to the regional level. A Settling State may allow the Advisory Committee established pursuant to subsection VI.E.2.d to define its regions and assign regional allocations percentages. Otherwise, a Settling State shall (1) define its initial regions, which shall consist of one (1) or more Subdivisions and which shall be designated by the State agency with primary responsibility for substance abuse disorder services employing, to the maximum extent practical, existing regions established in that State for opioid abuse treatment or other public health purposes; and (2) assign initial regional allocation percentages to the regions based on the Subdivision Allocation Percentages in Exhibit G and an assumption that all Subdivisions listed on Exhibit G will become Participating Subdivisions.

(2)    This minimum regional expenditure percentage is calculated on the Settling State's initial Abatement Accounts Fund allocation and does not include any additional amounts a Settling State has directed to its Abatement Accounts Fund from its State Fund, or any other amounts directed to the fund. A Settling State may dedicate more than 50% of its Abatement Accounts Fund to the regional expenditure and may annually adjust the percentage of its Abatement Accounts Fund dedicated to regional expenditures as long as the percentage remains above the minimum amount.

33

*revised July 30, 2021*

(3)     The Settling State (1) has the authority to adjust the definition of the regions, and (2) may annually revise the percentages allocated to each region to reflect the number of Subdivisions in each region that are Non-Participating Subdivisions.

b.      *Subdivision Block Grants*. Certain Subdivisions listed on Exhibit G shall be eligible to receive regional allocation funds in the form of a block grant for future Opioid Remediation. A Participating Subdivision listed on Exhibit G eligible for block grants is a county or parish (or in the case of States that do not have counties or parishes that function as political subdivisions, a city) that (1) does not contain a Litigating Subdivision or a Later Litigating Subdivision for which it has the authority to end the litigation through a release, bar, or other action; (2) either (i) has a population of 400,000 or more or (ii) in the case of California has a population of 750,000 or more; and (3) has funded or otherwise managed an established health care or treatment infrastructure (e.g., health department or similar agency). Each Subdivision listed on Exhibit G eligible to receive block grants shall be assigned its own region.

c.      *Small States*. Notwithstanding the provisions of subsection VI.E.2.a, Settling States with populations under four (4) million that do not have existing regions described in subsection VI.E.2.a shall not be required to establish regions. However, such a Settling State that contains one (1) or more Subdivisions listed on Exhibit G eligible for block grants under subsection VI.E.2.b shall be divided regionally so that each block-grant eligible Subdivision listed on Exhibit G is a region and the remainder of the state is a region.

d.      *Advisory Committee*. The Settling State shall designate an Opioid Settlement Remediation Advisory Committee (the "*Advisory Committee*") to provide input and recommendations regarding remediation spending from that Settling State's Abatement Accounts Fund. A Settling State may elect to use an existing advisory committee or similar entity (created outside of a State-Subdivision Agreement or Allocation Statute); provided, however, the Advisory Committee or similar entity shall meet the following requirements:

(1)     Written guidelines that establish the formation and composition of the Advisory Committee, terms of service for members, contingency for removal or resignation of members, a schedule of meetings, and any other administrative details;

(2)     Composition that includes at least an equal number of local representatives as state representatives;

(3)     A process for receiving input from Subdivisions and other communities regarding how the opioid crisis is affecting their

*revised July 30, 2021*

communities, their abatement needs, and proposals for abatement strategies and responses; and

    (4)    A process by which Advisory Committee recommendations for expenditures for Opioid Remediation will be made to and considered by the appropriate state agencies.

3.    <u>Abatement Accounts Fund Reporting</u>. The Settlement Fund Administrator shall track and assist in the report of remediation disbursements as agreed to among the Parties.

F.    *Nature of Payment.* Janssen, the Settling States, the Participating Subdivisions, and the Participating Special Districts, acknowledge and agree that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

1.    Janssen has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

2.    The Settling States, the Participating Subdivisions, and the Participating Special Districts sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions;

3.    By executing this Agreement the Settling States, the Participating Subdivisions, and the Participating Special Districts certify that: (a) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions; and (b) the portion of the Compensatory Restitution Amount received by each Settling State or Participating Subdivision is no greater than the amount of the Alleged Harms allegedly suffered by such Settling State or Participating Subdivision;

4.    The payment of the Compensatory Restitution Amount by Janssen constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by Janssen;

5.    The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, the Settling States and Participating Subdivisions to the same position or condition that they would be in had the Settling States and Participating Subdivisions not suffered the Alleged Harms;

6.    For the avoidance of doubt: (a) no portion of the Compensatory Restitution Amount represents reimbursement to any Settling State, Participating Subdivision, Participating Special District, or other person or entity for the costs of any investigation or litigation, (b) the entire Compensatory Restitution Amount

*revised July 30, 2021*

is properly characterized as described in subsection VI.F, and (c) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, other punitive assessments, or attorneys' fees; and

7.  New York, on behalf of all Settling States, Participating Subdivisions, and Participating Special Districts (the "Form 1098-F Filer") shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering this Agreement becomes binding. On the Form 1098-F, the Form 1098-F Filer shall identify the entire Compensatory Restitution Amount received by the Form 1098-F Filer as remediation/restitution. The Form 1098-F Filer shall also, on or before January 31 of the year following the calendar year in which the order entering this Agreement becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Janssen.

## VII.  Participation by Subdivisions and Special Districts

A.  *Notice.* No later than fifteen (15) days after the Preliminary Agreement Date, the Settling States, with the cooperation of Janssen, shall send individual written notice of the opportunity to participate in this Agreement and the requirements of participation to all Subdivisions in the Settling States of this Agreement that are (1) Litigating Subdivisions or (2) Non-Litigating Subdivisions listed on Exhibit G as eligible to become Participating Subdivisions. Janssen's share of costs of the written notice to such Subdivisions shall be advanced by Janssen and deducted from its initial settlement payment. Notice shall also be provided simultaneously to counsel of record for Litigating Subdivisions and Non-Litigating Subdivisions listed on Exhibit G as eligible to become Participating Subdivisions. The Settling States, with the cooperation of Janssen, will also provide general notice reasonably calculated to alert Non-Litigating Subdivisions listed on Exhibit G in the Settling States to this Agreement, the opportunity to participate in it and the requirements for participation. Such notice may include publication and other standard forms of notification, as well as notice to national state and county organizations such as the National Association of Counties and the National League of Cities. The notice will include that the deadline for becoming an Initial Participating Subdivision is the Initial Participation Date. Nothing contained herein shall preclude a Settling State from providing further notice to or otherwise contacting any of its Subdivisions about becoming a Participating Subdivision, including beginning any of the activities described in this paragraph prior to the Preliminary Agreement Date.

B.  *Requirements for Becoming a Participating Subdivision: Non-Litigating Subdivisions.* A Non-Litigating Subdivision in a Settling State that is listed on Exhibit G may become a Participating Subdivision by returning an executed Subdivision Settlement Participation Form specifying (1) that the Subdivision agrees to the terms of this Agreement pertaining to Subdivisions, (2) that the Subdivision releases all Released Claims against all Released Entities, (3) that the Subdivision agrees to use monies it receives, if any, from the Settlement Fund pursuant to the applicable requirements of Section VI, and (4) that the Subdivision submits to the jurisdiction of the court where the Consent Judgment is filed

*revised July 30, 2021*

for purposes limited to that court's role under the Agreement. The required Subdivision Settlement Participation Form is attached as Exhibit K.

C.   *Requirements for Becoming a Participating Subdivision: Litigating Subdivisions/Later Litigating Subdivisions*. A Litigating Subdivision or Later Litigating Subdivision in a Settling State may become a Participating Subdivision by returning an executed Subdivision Settlement Participation Form to the Settlement Fund Administrator and upon prompt dismissal of its legal action. A Settling State may require each Litigating Subdivision in that State to specify on the Subdivision Settlement Participation Form whether its counsel has waived any contingency fee contract with that Participating Subdivision and intends to seek fees according to Exhibit R. The Settlement Fund Administrator shall provide quarterly reports of this information to the parties organized by Settling State. Except for trials begun before the Initial Participation Date, a Litigating Subdivision or a Later Litigating Subdivision may not become a Participating Subdivision after the completion of opening statements in a trial of a legal action it brought that includes a Released Claim against a Released Entity.

D.   *Initial Participating Subdivisions.* A Subdivision qualifies as an Initial Participating Subdivision if it meets the applicable requirements for becoming a Participating Subdivision set forth in subsections VII.B or VII.C by the Initial Participation Date. Provided however, all Subdivision Settlement Participation Forms shall be held by the Settlement Fund Administrator until Janssen provides the notice in subsection VIII.B that it intends to proceed with the settlement, at which time the obligations created by such forms become effective.

E.   *Later Participating Subdivisions.* A Subdivision that is not an Initial Participating Subdivision may become a Later Participating Subdivision by meeting the applicable requirements for becoming a Participating Subdivision after the Initial Participation Date and agreeing to be subject to the terms of a State-Subdivision Agreement (if any) or any other structure adopted or applicable pursuant to subsections VI.D or VI.E. The following provisions govern what a Later Participating Subdivision can receive (but do not apply to Initial Participating Subdivisions):

1.   A Later Participating Subdivision shall not receive any share of any base or incentive payments paid to the Subdivision Fund that were due before it became a Participating Subdivision.

2.   A Later Participating Subdivision that becomes a Participating Subdivision after July 15, 2022 shall receive 75% of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision before that date (unless the Later Participating Subdivision is subject to subsections VII.E.3 or VII.E.4 below).

3.   A Later Participating Subdivision that, after the Initial Participation Date, maintains a lawsuit for a Released Claim(s) against a Released Entity and has judgment entered against it on every such Claim before it became a Participating Subdivision (other than a consensual dismissal with prejudice) shall receive 50%

*revised July 30, 2021*

of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision prior to such judgment; *provided, however*, that if the Subdivision appeals the judgment and the judgment is affirmed with finality before the Subdivision becomes a Participating Subdivision, the Subdivision shall not receive any share of any base payment or incentive payment.

4.      A Later Participating Subdivision that becomes a Participating Subdivision while a Bar or Case-Specific Resolution involving a different Subdivision exists in its State shall receive 25% of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision without such Bar or Case-Specific Resolution.

F.      *No Increase in Payments*. Amounts to be received by Later Participating Subdivisions shall not increase the payments due from Janssen.

G.      *Ineligible Subdivisions.* Subdivisions in Non-Settling States and Prior Litigating Subdivisions are not eligible to be Participating Subdivisions.

H.      *Non-Participating Subdivisions*. Non-Participating Subdivisions shall not directly receive any portion of any base or incentive payments, including from the State Fund and direct distributions from the Abatement Accounts Fund; however, a Settling State may choose to fund future Opioid Remediation that indirectly benefits Non-Participating Subdivisions.

I.      *Unpaid Allocations to Later Participating and Non-Participating Subdivisions*. Any base payment and incentive payments allocated pursuant to subsection VI.D to a Later Participating or Non-Participating Subdivision that cannot be paid pursuant to this Section VII, will be allocated to the Abatement Accounts Fund for the Settling State in which the Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement or by a Statutory Trust.

J.      *Requirements for Becoming a Participating Special District: Non-Litigating Special Districts*. A Non-Litigating Special District may become a Participating Special District by either executing a release consistent with Section IV or by having its claims extinguished by operation of law or released by a Settling State.

K.      *Requirements for Becoming a Participating Special District: Litigating Special Districts/Later Litigating Special Districts.* A Litigating Special District or Later Litigating Special District in a Settling State may become a Participating Special District by either executing a release consistent with Section IV and upon prompt dismissal of its legal action or by having its claims extinguished by operation of law or released by a Settling State.

L.      *Initial Participating Special Districts*. A Special District qualifies as an Initial Participating Special District if it meets the applicable requirements for becoming a Participating Special District by the Initial Participation Date.

*revised July 30, 2021*

M. *Later Participating Special Districts.* A Special District that is not an Initial Participating Special District may become a Later Participating Special District by meeting the applicable requirements for becoming a Participating Special District after the Initial Participation Date and agreeing to be subject to the terms of any agreement reached by the applicable Settling State with Initial Participating Special Districts. A Later Participating Special District shall not receive any share of any base or incentive payments paid to the Settlement Fund that were due before it became a Participating Special District.

## VIII.  <u>Condition to Effectiveness of Agreement and Filing of Consent Judgment</u>

A. *Determination to Proceed With Settlement.* Janssen will determine on or before the Reference Date whether there has been a sufficient resolution of the Claims of the Litigating Subdivisions in the Settling States (through participation under Section VII, Case-Specific Resolution(s), and Bar(s)) to proceed with this Agreement. The determination shall be in the sole discretion of Janssen and may be based on any criteria or factors deemed relevant by Janssen.

B. *Notice by Janssen.* On or before the Reference Date, Janssen shall inform the Settling States and MDL PEC of its determination pursuant to subsection VIII.A. If Janssen determines to proceed, the Parties will proceed to file the Consent Judgments. If Janssen determines not to proceed, this Agreement will have no further effect and all releases (including those given by Participating Subdivisions) and other commitments or obligations contained herein will be void.

C. *Determination of the Participation Tier.*

   1. On the Reference Date, provided that Janssen determines to proceed with this Agreement, the Settlement Fund Administrator shall determine the Participation Tier. The criteria used to determine the Participation Tier are set forth in Exhibit H. Any disputes as to the determination of the Participation Tier shall be decided by the National Arbitration Panel.

   2. The Participation Tier shall be redetermined by the Settlement Fund Administrator annually as of the Payment Date, beginning with Payment Year 1, pursuant to the criteria set forth in Exhibit H.

   3. After Payment Year 3, the Participation Tier cannot move higher, unless this restriction is waived by Janssen.

   4. In the event that a Participation Tier redetermination moves the Participation Tier higher, and that change is in whole or in part as a result of the post-Reference Date enactment of a Bar and there is later a Revocation Event with respect to that Bar, then on the next Payment Date that is at least one hundred eighty (180) days after the Revocation Event, the Participation Tier shall move down to the Participation Tier that would have applied had the Bar never been enacted, unless the Bar is reinstated or all Subdivisions affected by the Revocation Event become Participating Subdivisions within one hundred eighty (180) days of the

*revised July 30, 2021*

Revocation Event. This is the sole circumstance in which, on a nationwide basis, the Participation Tier can move down.

5.   In the event that there is a post-Reference Date Revocation Event with respect to a Bar that was enacted in a Settling State prior to the Reference Date, then, on the next Payment Date that is at least one hundred eighty (180) days after the Revocation Event, unless the Bar is reinstated or all Subdivisions affected by the Revocation Event become Participating Subdivisions within one hundred eighty (180) days of the Revocation Event, the Participation Tier shall decrease – solely for the State in which the Revocation Event occurred – to the Participation Tier commensurate with the percentage of Litigating Subdivisions in that State that are Participating Subdivisions and the percentage of Non-Litigating Subdivisions that are both Primary Subdivisions and Participating Subdivisions, according to the criteria set forth in Exhibit H, except that the calculations shall be performed as to that State alone. For the avoidance of doubt and solely for the calculation in this subparagraph, the Settling States Column of Exhibit H shall play no role. This is the sole circumstance in which one Settling State will have a different Participation Tier than other Settling States.

6.   The redetermination of the Participation Tier under subsection VIII.C.2 shall not affect payments already made or suspensions or offsets already applied.

## IX.   Potential Payment Adjustments

A.   *Later Litigating Subdivisions.*

1.   If a Later Litigating Subdivision in a Settling State with a population above 10,000 brings a lawsuit or other legal proceeding against Released Entities asserting Released Claims, Janssen shall, within thirty (30) days of the lawsuit or other legal proceeding being served on Janssen, provide notice of the lawsuit or other legal proceeding to the Settlement Fund Administrator and the Settling State in which the Later Litigating Subdivision sits and provide the Settling State an opportunity to intervene in the lawsuit or other legal proceeding. A Released Entity shall not enter into a settlement with a Later Litigating Subdivision unless the State in which the Later Litigating Subdivision sits consents to such a settlement or unreasonably withholds consent to such a settlement.

2.   If no Participation Tier applies and the Later Litigating Subdivision's lawsuit or other legal proceeding survives a Threshold Motion before Janssen makes its last settlement payment to the Settling State, the following shall apply:

a.   Janssen will, from the date of the entry of the order denying the Threshold Motion and so long as the lawsuit or other legal proceeding is pending, be entitled to a suspension of the following payments it would otherwise owe the Settling State in which the Later Litigating Subdivision is located: (1) all remaining incentive payments to the relevant state; and (2) the last two scheduled base payments, if not already paid (the "Suspended Payments").

*revised July 30, 2021*

b.    For each Payment Year that Janssen is entitled to a suspension of payments, the Settlement Fund Administrator shall calculate the Suspended Payments applicable to the next Payment due from Janssen. The Suspended Payments shall be paid into the Settlement Fund Escrow account.

3.    If a Participation Tier applies at the time the Threshold Motion is denied, Janssen will be entitled to a suspension of the following percentages of Suspended Payments depending on the applicable Tier—75% for Tier 1, 50% for Tier 2, 35% for Tier 3, and 25% for Tier 4. Otherwise, the requirements of subsection IX.A.2 apply.

4.    If the Released Claim is resolved with finality without requirement of payment by a Released Entity, the placement of any remaining balance of the Suspended Payments into the Settlement Fund Escrow shall cease and the Settlement Fund Administrator shall immediately transfer amounts in the Settlement Fund Escrow on account of the suspension to the Settling State at issue and its Participating Subdivisions listed on Exhibit G. The lawsuit will not cause further suspensions unless the Released Claim is reinstated upon further review, legislative action, or otherwise.

5.    If the Released Claim is resolved with finality on terms requiring payment by a Released Entity (*e.g.*, if the lawsuit in which the Released Claim is asserted results in a judgment against Janssen or a settlement with Janssen), the Settlement Fund Administrator will transfer the amounts in the Settlement Fund Escrow on account of the suspension to Janssen necessary to satisfy 75% of the payment obligation of the Released Entity to the relevant Later Litigating Subdivision. The Settlement Fund Administrator shall immediately transfer any remaining balance in the Settlement Fund Escrow on account of the suspension to the Settling State at issue and its Participating Subdivisions listed on Exhibit G. If the amount to be transferred to Janssen exceeds the amounts in the Settlement Fund Escrow on account of the suspension, Janssen shall receive a dollar-for-dollar offset for the excess amount against its obligation to pay any remaining payments that would be apportioned to the Settling State at issue and to its Participating Subdivisions listed on Exhibit G.

B.    *Settlement Class Resolution Opt Outs.* If a Settling State is eligible for Incentive A on the basis of a Settlement Class Resolution, and a Primary Subdivision that opted out of the Settlement Class Resolution maintains a lawsuit asserting a Released Claim against a Released Entity, the following shall apply. If the lawsuit asserting a Released Claim either survives a Threshold Motion or has an unresolved Threshold Motion fewer than sixty (60) days prior to the scheduled start of a trial involving a Released Claim, and is resolved with finality on terms requiring payment by the Released Entity, Janssen shall receive a dollar-for-dollar offset for the amount paid against its obligation to make remaining Incentive A payments that would be apportioned to that State or Participating Subdivisions listed on Exhibit G. For the avoidance of doubt, an offset shall not be

*revised July 30, 2021*

applicable under this subsection if it is applicable under subsection IX.A with respect to the Subdivision at issue.

C.    *Revoked Bar, Settlement Class Resolution, or Case-Specific Resolution.*

    1.    If Janssen made a payment as a result of the existence of a Bar, Settlement Class Resolution, or Case-Specific Resolution in a Settling State, and that Bar, Settlement Class Resolution, or Case-Specific Resolution is subject to a Revocation Event, Janssen shall receive a dollar-for-dollar offset against its obligation to make remaining payments that would be apportioned to that State or Participating Subdivisions listed on Exhibit G. This offset will be calculated as the dollar amount difference between (1) the total amount of incentive payments paid by Janssen during the time the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event was in effect, and (2) the total amount of Incentive Payments that would have been due from Janssen during that time without the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event being in effect. The amount of incentive payments that would have been due, referenced in (2) above, will be calculated based on considering any Subdivision that provides a release within one hundred eighty (180) days after the Revocation Event as having been a Participating Subdivision (in addition to all other Participating Subdivisions) during the time that the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event was in effect. If a Revocation Event causes a Settling State to no longer qualify for Incentive D, the Settling State shall return to Janssen all payments made under Incentive D.

    2.    Notwithstanding anything to the contrary in paragraph 1 above, if a Bar or Case-Specific Resolution is reinstated by the Settling State, either through the same or different means as the initial Bar or Case-Specific Resolution, Janssen's right to an offset is extinguished and any amounts withheld to offset amounts paid on account of the revoked, rescinded, reversed, or overruled Bar or Case-Specific Resolution shall be returned to the Settling State, less and except any incentive payments that would have been paid during the period in which the Bar or Case-Specific Resolution was revoked, rescinded, reversed, or overruled.

## X.    Additional Restitution Amount

A.    *Additional Restitution Amount.* Pursuant to the schedule set forth below and subject to the reduction specified in subsection X.B below, Janssen shall pay an Additional Restitution Amount to the Settling States listed in Exhibit N. Such funds shall be paid on the schedule set forth on Exhibit M on the Payment Date for each relevant Payment Year to such Settling States as allocated by the Settlement Fund Administrator pursuant to Exhibit N.

        Payment Year 1    $15,384,615.38

        Payment Year 2    $26,923,076.92

*revised July 30, 2021*

Payment Year 3          $25,000,000.00

B.   *Reduction of Additional Restitution Amount*. In the event that any Non-Settling State appears on Exhibit N, the amounts owed by Janssen pursuant to this Section X shall be reduced by the allocation set forth on Exhibit N for any such Non-Settling States.

C.   *Use of Funds*. All funds paid as an Additional Restitution Amount shall be part of the Compensatory Restitution Amount, shall be used for Opioid Remediation, except as allowed by subsection VI.B.2, and shall be governed by the same requirements as specified in subsection VI.F.

## XI.    Plaintiffs' Attorneys' Fees and Costs

A.   The Agreement on Attorneys' Fees, Expenses and Costs is set forth in Exhibit R and incorporated herein by reference. The Agreement on the State Outside Counsel Fee Fund and Agreement on the State Cost Fund Administration are set forth in Exhibit U and Exhibit S, respectively, and are incorporated herein by reference.

## XII.    Enforcement and Dispute Resolution

A.   *Enforceability*. The terms of the Agreement and Consent Judgment applicable to or in a Settling State will be enforceable solely by that Settling State and Janssen. Settling States or Participating Subdivisions shall not have enforcement rights with respect either to the terms of this Agreement that apply only to or in other States or to any Consent Judgment entered into by another Settling State. Participating Subdivisions shall not have enforcement rights against Janssen with respect to the Agreement or any Consent Judgment except as to payments that would be allocated to the Subdivision Fund or Abatement Accounts Fund pursuant to Section VI; *provided, however*, that each Settling State shall allow Participating Subdivisions in that State to notify it of any perceived violations of the Agreement or Consent Judgment.

B.   *Jurisdiction*. Janssen consents to the jurisdiction of the court in which the Consent Judgment is filed, limited to resolution of disputes identified in subsection XII.F.2 for resolution in the court in which the Consent Judgment is filed.

C.   *Specific Terms Dispute Resolution.*

1.    Any dispute that is addressed by the provisions set forth in the Injunctive Relief terms in Exhibit P shall be resolved as provided therein.

2.    In the event Janssen believes the 86.5% threshold established in subsection VI.B.1 is not being satisfied, any Party may request that Janssen and the Enforcement Committee meet and confer regarding the use of funds under subsection VI.B.1. The completion of such meet-and-confer process is a precondition to further action regarding any such dispute. Further action concerning subsection VI.B.1 shall: (i) be limited to Janssen seeking to reduce its Annual Payments by no more than 5% of the difference between the actual amount of Opioid Remediation and the 86.5% threshold established in subsection VI.B.1; (ii) only reduce Annual

43

*revised July 30, 2021*

Payments to those Settling States and its Participating Subdivisions that are below the 86.5% threshold established in subsection VI.B.1; and (iii) not reduce Annual Payments restricted to future Opioid Remediation.

D.   *State-Subdivision Enforcement.*

1.   A Participating Subdivision shall not have enforcement rights against a Settling State in which it is located with respect to the Agreement or any Consent Judgment except: (1) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust with respect to intrastate allocation; or (2) in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust, as to allegations that: (a) the Settling State's use of Abatement Accounts Fund monies were not used for uses similar to or in the nature of those uses contained in Exhibit E; or (b) a Settling State failed to pay funds directly from the Abatement Accounts Fund to a Participating Subdivision eligible to receive a block grant pursuant to subsection VI.E.2.b.

2.   A Settling State shall have enforcement rights against a Participating Subdivision located in its territory: (1) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust; or (2) in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust, as to allegations that the uses of Abatement Accounts Fund monies by Participating Subdivisions listed on Exhibit G were not for uses similar to or in the nature of those uses contained in Exhibit E.

3.   As between Settling States and Participating Subdivisions, the above rights are contractual in nature and nothing herein is intended to limit, restrict, change, or alter any other existing rights under law.

E.   *Subdivision Payment Enforcement.* A Participating Subdivision shall have the same right as a Settling State pursuant to subsection XII.F.a(4) to seek resolution of any failure by Janssen to make its required base and/or incentive payments in a Payment Year.

F.   *Other Dispute Resolution Terms.*

1.   Except as provided in subsection XII.C, the parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this subsection XII.F to resolve the dispute.

2.   Except as provided in subsections XII.C and XII.F.4, disputes not resolved informally shall be resolved in either the court that entered the relevant Consent Judgment or, if no Consent Judgment was entered, a state or territorial court with jurisdiction located wherever the seat of state government is located. State court proceedings shall be governed by the rules and procedures of the forum. For the avoidance of doubt, disputes to be resolved in state court include, but are not limited to, the following:

*revised July 30, 2021*

a.  disputes concerning whether expenditures qualify for Opioid Remediation;

b.  disputes between a Settling State and Participating Subdivisions located in such Settling State as provided by subsection XII.D, except to the extent the State-Subdivision Agreement provides for other dispute resolution mechanisms. For the avoidance of doubt, disputes between a Settling State and any Participating Subdivision shall not be considered National Disputes;

c.  whether this Agreement and relevant Consent Judgment are binding under state law;

d.  the extent of the Attorney General's or other participating entity's authority under state law, including the extent of the authority to release claims;

e.  whether the requirements of a Bar, a Case-Specific Resolution, State-Specific Finality, Later Litigating Subdivision, Litigating Subdivision, or a Threshold Motion have been met; and

f.  all other disputes not specifically identified in subsections XII.C and XII.F.4.

3.  Any Party may request that the National Arbitration Panel provide an interpretation of any provision of the settlement that is relevant to the state court determination, and the National Arbitration Panel shall make reasonable best efforts to supply such interpretation within the earlier of thirty (30) days or the time period required by the state court proceedings. Any Party may submit that interpretation to the state court to the extent permitted by, and for such weight provided by, the state court's rules and procedures. If requested by a Party, the National Arbitration Panel shall request that its interpretation be accepted in the form of an amicus curiae brief, and any attorneys' fees and costs for preparing any such filing shall be paid for by the requesting Party.

4.  National Disputes involving a Settling State, Participating Subdivision, and/or Janssen shall be resolved by a National Arbitration Panel.

a.  "*National Disputes*" are disputes that are exceptions to subsection XII.F.2's presumption of resolution in state courts because they involve issues of interpretation of Agreement terms applicable to all Settling States without reference to a particular State's law. Disputes between a State and any Participating Subdivisions shall not be considered National Disputes. National Disputes are limited to the following:

(1)  the amount of offset and/or credit attributable to Non-Settling States and Tribes;

(2)  issues involving the scope and definition of "Product";

45

(3)     interpretation and application of the terms "Covered Conduct" and "Released Entities";

(4)     disputes over a given year's payment or the payment of the Additional Restitution Amount to all Settling States (for the avoidance of doubt, disputes between a Settling State and Janssen over the amounts owed to only that State shall not be considered National Disputes);

(5)     questions regarding the performance and/or removal of the Settlement Fund Administrator;

(6)     disputes involving liability of successor entities;

(7)     disputes that require a determination of sufficient Subdivision and Special District participation to qualify for Incentives A, B, C, or D, as well as disputes over qualification for Participation Tiers;

(8)     disputes that require interpretation of Agreement terms (i) that concretely affect four (4) or more Settling States; and (ii) do not turn on unique definitions and interpretations under State law; and

(9)     any dispute subject to resolution under subsection XII.F.2 but for which all parties to the dispute agree to arbitration before the National Arbitration Panel under the provisions of this subsection XII.F.4.

b.     The "*National Arbitration Panel*" shall be comprised of three (3) neutral arbitrators. One (1) arbitrator shall be chosen by Janssen, one (1) arbitrator shall be chosen by the Enforcement Committee with due input from Participating Subdivisions, and the third arbitrator shall be agreed upon by the first two (2) arbitrators. The membership of the National Arbitration Panel is intended to remain constant throughout the term of this Agreement, but in the event that replacements are required, the retiring arbitrator shall be replaced by the party that selected him/her.

(1)     The National Arbitration Panel shall make reasonable best efforts to decide all matters within one hundred eighty (180) days of filing, and in no event shall it take longer than one (1) year.

(2)     The National Arbitration Panel shall conduct all proceedings in a reasonably streamlined process consistent with an opportunity for the parties to be heard. Issues shall be resolved without the need for live witnesses where feasible, and with a presumption in favor of remote participation to minimize the burdens on the parties.

(3)     To the extent allowed under state law, a Settling State, Participating Subdivision, and (at any party's request) the National

*revised July 30, 2021*

Arbitration Panel may certify to an appropriate state court any question of state law. The National Arbitration Panel shall be bound by a final state court determination of such a certified question. The time period for the arbitration shall be tolled during the course of the certification process.

(4)     The arbitrators will give due deference to any authoritative interpretation of state law, including any declaratory judgment or similar relief obtained by a Settling State, Participating Subdivision, or Janssen on a state law issue.

(5)     The decisions of the National Arbitration Panel shall be binding on Settling States, Participating Subdivisions, Janssen, and the Settlement Fund Administrator. In any proceeding before the National Arbitration Panel involving a dispute between a Settling State and Janssen whose resolution could prejudice the rights of a Participating Subdivision(s) or Participating Special District(s) in that Settling State, such Participating Subdivision(s) or Participating Special District(s) shall be allowed to file a statement of view in the proceeding.

c.     Nothing herein shall be construed so as to limit or otherwise restrict a State from seeking injunctive or other equitable relief in state court to protect the health, safety, or welfare of its citizens.

d.     Each party shall bear its own costs in any arbitration or court proceeding arising under this subsection XII.F. The costs for the arbitrators on the National Arbitration Panel shall be divided and paid equally by the disputing sides for each individual dispute, *e.g.*, a dispute between Janssen and Setting States/Participating Subdivisions shall be split 50% by Janssen and 50% by the Settling States/Participating Subdivisions that are parties to the dispute; a dispute between a Settling State and a Participating Subdivision shall be split 50% by the Settling State and 50% by any Participating Subdivisions that are party to the dispute.

5.     Prior to initiating an action to enforce pursuant to this subsection XII.F, the complaining party must:

a.     Provide written notice to the Enforcement Committee of its complaint, including the provision of the Consent Judgment and/or Agreement that the practice appears to violate, as well as the basis for its interpretation of the disputed provision. The Enforcement Committee shall establish a reasonable process and timeline for obtaining additional information from the involved parties; *provided, however*, that the date the Enforcement Committee establishes for obtaining additional information from the parties shall not be more than forty-five (45) days following the notice.

*revised July 30, 2021*

The Enforcement Committee may advise the involved parties of its views on the complaint and/or seek to resolve the complaint informally.

b.   Wait to commence any enforcement action until thirty (30) days after the date that the Enforcement Committee establishes for obtaining additional information from the involved parties.

6.   If the parties to a dispute cannot agree on the proper forum for resolution of the dispute under the provisions of subsections XII.F.2 or XII.F.4, a committee comprising the Enforcement Committee and sufficient representatives of Janssen such that the members of the Enforcement Committee have a majority of one (1) member will determine the forum where the dispute will be initiated within twenty-eight (28) days of receiving notification of the dispute relating to the proper forum. The forum identified by such committee shall be the sole forum for determining where the dispute shall be heard, and the committee's identification of such forum shall not be entitled to deference by the forum selected.

G.   *No Effect*. Nothing in this Agreement shall be interpreted to limit the Settling State's Civil Investigative Demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable state law and the CID or investigative subpoena is issued pursuant to such authority, and Janssen reserves all of its rights in connection with a CID or investigative subpoena issued pursuant to such authority.

## XIII.   Miscellaneous

A.   *No Admission*. Janssen does not admit liability or wrongdoing. Neither this Agreement nor the Consent Judgments shall be considered, construed, or represented to be (1) an admission, concession, or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to Janssen.

B.   *Population of Subdivisions*. The population figures for Subdivisions shall be the published U.S. Census Bureau's population estimates for July 1, 2019, released May 2020. These population figures shall remain unchanged during the term of this Agreement.

C.   *Population of Special Districts*. For any purpose in this Agreement in which the population of a Special District is used, other than the use of "Covered Special District": (a) School Districts' population will be measured by the number of students enrolled who are eligible under the Individuals with Disabilities Education Act ("*IDEA*") or Section 504 of the Rehabilitation Act of 1973; (b) Health Districts' and Hospital Districts' population will be measured at 25% of discharges; and (c) all other Special Districts' (including Fire Districts' and Library Districts') population will be measured at 10% of the population served.

D.   *Population Associated with Sheriffs*. For any purpose in this Agreement in which the population associated with a lawsuit by a sheriff is used, the population will be measured at 20% of the capacity of the jail(s) operated by the sheriff.

48

*revised July 30, 2021*

E.   *Tax Reporting and Cooperation*.

  1.   Upon request by Janssen, the Settling States, Participating Subdivisions, and Participating Special Districts agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for Janssen to establish the statements set forth in subsection VI.E.3 to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

  2.   Without limiting the generality of subsection VI.C.1, each Settling State, Participating Subdivision, and Participating Special District shall cooperate in good faith with Janssen with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

  3.   The Designated State, on behalf of all Settling States, Participating Subdivisions, and Participating Special Districts, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "Appropriate Official").

  4.   For the avoidance of doubt, neither Janssen nor the Settling States, Participating Subdivisions, and Participating Special Districts make any warranty or representation to any Settling jurisdiction or Releasor as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

F.   *No Third-Party Beneficiaries.* Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State or Released Entity. No Settling State may assign or otherwise convey any right to enforce any provision of this Agreement.

G.   *Calculation*. Any figure or percentage referred to in this Agreement shall be carried to seven decimal places.

H.   *Construction*. None of the Parties and no Participating Subdivision shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

I.   *Cooperation*. Each Party and each Participating Subdivision agrees to use its best efforts and to cooperate with the other Parties and Participating Subdivisions to cause this Agreement and the Consent Judgments to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party and each Participating Subdivision agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement or any Consent Judgment

*revised July 30, 2021*

by any other person, and will support the integrity and enforcement of the terms of this Agreement and the Consent Judgments.

J.      *Entire Agreement*. This Agreement, its exhibits and any other attachments, including the attorneys' fees and cost agreement in Exhibit R, embodies the entire agreement and understanding between and among the Parties and Participating Subdivisions relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

K.      *Execution*. This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement. One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart hereof. One or more counterparts of this Agreement may be signed by electronic signature.

L.      *Good Faith and Voluntary Entry*. Each Party warrants and represents that it negotiated the terms of this Agreement in good faith. Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion. The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

M.      *No Prevailing Party.* The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement. The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

N.      *Non-Admissibility.* The settlement negotiations resulting in this Agreement have been undertaken by the Parties and by certain representatives of the Participating Subdivisions in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose. This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement.

O.      *Notices.* All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

*revised July 30, 2021*

1.      For the Attorney(s) General:

Ashley Moody,
Attorney General
State of Florida
The Capitol,
PL-01
Tallahassee, FL 32399

Josh Stein, Attorney General
North Carolina Department of Justice
Attn: Daniel Mosteller
PO Box 629
Raleigh, NC 27602
Dmosteller@ncdoj.gov

2.      For the Plaintiffs' Executive Committee:

Paul F. Farrell
Farrell Law
P.O. Box 1180
Huntington, WV 25714-1180

Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Avenue, 7th Floor
New York, NY 10016-7416
JConroy@simmonsfirm.com

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
jrice@motleyrice.com

Peter Mougey
Levin Papantonio Rafferty
316 South Baylen St.
Pensacola, FL 32502
pmougey@levinlaw.com

Paul J. Geller
Robbins Geller Rudman & Dowd LLP
120 East Palmetto Park Road
Boca Raton, FL 33432
PGeller@rgrdlaw.com

*revised July 30, 2021*

3.    For Janssen:

Charles C. Lifland
O'Melveny & Myers LLP
400 South Hope Street, 18th Floor Los Angeles, CA 90071
Phone: (213) 430-6000
clifland@omm.com

Daniel R. Suvor
O'Melveny & Myers LLP
400 South Hope Street, 18th Floor Los Angeles, CA 90071
Phone: (213) 430-6000
dsuvor@omm.com

Any Party or the Plaintiffs' Executive Committee may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this subsection.

P.    *No Waiver.* The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties. The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

Q.    *Preservation of Privilege.* Nothing contained in this Agreement or any Consent Judgment, and no act required to be performed pursuant to this Agreement or any Consent Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

R.    *Successors.* This Agreement shall be binding upon, and inure to the benefit of, Janssen and its respective successors and assigns. Janssen shall not sell the majority of its voting stock or substantially all its assets without obtaining the acquiror's agreement that it will constitute a successor with respect to Janssen's obligations under this Agreement.

S.    *Modification, Amendment, Alteration.* After the Reference Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by Janssen along with the signatures of at least thirty-seven (37) of those then-serving Attorneys General of the Settling States along with a representation from each Attorney General that either: (1) the advisory committee or similar entity established or recognized by that Settling State (either pursuant to subsection VI.E.2, by a State-Subdivision Agreement, or by statute) voted in favor of the modification, amendment, or alteration of this Agreement including at least one Participating Subdivision-appointed member; or (2) in States without any advisory committee, that 50.1% of the Participating Subdivisions by population expressed approval of the modification, amendment, or alteration of this Agreement in writing.

*revised July 30, 2021*

Provided, however, in the event the modification, amendment, or alteration relates to injunctive relief, interstate allocation between the Settling States, intrastate allocation in a particular Settling State, or fees or costs of Settling States and Participating Subdivisions, then every Settling State and each Participating Subdivision affected by that modification, amendment, or alteration must assent in writing. Provided further that, in the event the modification, amendment, or alteration relates to injunctive relief, then such amendment, modification, or alteration of injunctive relief against Janssen will not be effective unless and until any Consent Judgment is modified by a court of competent jurisdiction, except as otherwise provided by the Injunctive Terms.

T.  *Termination.*

    1.  Unless otherwise agreed to by Janssen and the Settling State in question, this Agreement and all of its terms (except subsection XIII.N and any other non-admissibility provisions, which shall continue in full force and effect) shall be canceled and terminated with respect to the Settling State, and the Agreement and all orders issued by the courts in the Settling State pursuant to the Agreement shall become null and void and of no effect if one or more of the following conditions applies:

        a.  A Consent Judgment approving this Agreement without modification of any of the Agreement's terms has not been entered as to the Settling State by a court of competent jurisdiction on or before one hundred eighty (180) days after the Effective Date; or

        b.  This Agreement or the Consent Judgment as to that Settling State has been disapproved by a court of competent jurisdiction to which it was presented for approval and/or entry (or, in the event of an appeal from or review of a decision of such a court to approve this Agreement and the Consent Judgment, by the court hearing such appeal or conducting such review), and the time to appeal from such disapproval has expired, or, in the event of an appeal from such disapproval, the appeal has been dismissed or the disapproval has been affirmed by the court of last resort to which such appeal has been taken and such dismissal or disapproval has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

    2.  If this Agreement is terminated with respect to a Settling State and its Participating Subdivisions for whatever reason pursuant to subsection XIII.T.1, then:

        a.  An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date the Settling State signed this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that Janssen and the Settling State in question shall be in the same

*revised July 30, 2021*

position with respect to the statute of limitation as they were at the time the Settling State filed its action; and

b.  Janssen and the Settling State and its Participating Subdivisions in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that Janssen and the Settling State and its Participating Subdivisions in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

3.  Unless Janssen and the Enforcement Committee agree otherwise, this Agreement, with the exception of the Injunctive Relief Terms that have their own provisions on duration, shall terminate as to all Parties as of the Payment Date for Payment Year 9, *provided* that Janssen has performed its payment obligations under the Agreement as of that date. Notwithstanding any other provision in this Agreement, all releases under this Agreement will remain effective despite any termination under this paragraph.

U.  *Governing Law.* Except (1) as otherwise provided in the Agreement or (2) as necessary, in the sole judgment of the National Arbitration Panel, to promote uniformity of interpretation for matters within the scope of the National Arbitration Panel's authority, this Agreement shall be governed by and interpreted in accordance with the respective laws of the Settling State, without regard to the conflict of law rules of such Settling State, that is seeking to enforce the Agreement against Janssen or against which Janssen is seeking enforcement. Notwithstanding any other provision in this subsection on governing law, any disputes relating to the Settlement Fund Escrow shall be governed by and interpreted in accordance with the law of the state where the escrow agent has its primary place of business.

*revised July 30, 2021*

## EXHIBIT A

## Alleged Harms

The following export reports that were filed in connection with the case captioned *In re National Prescription Opiate Litigation*, No. 1-17-md-02804 (N.D. Ohio):

1. Expert report of Professor David Cutler, dated March 25, 2019.

2. Expert report of Dr. Jeffrey B. Liebman, dated March 25, 2019.

3. Expert report of Professor Thomas McGuire regarding damages to Bellwethers, dated March 25, 2019.

4. Report of Professor Thomas McGuire regarding public nuisance, dated March 25, 2019.

*revised July 30, 2021*

## EXHIBIT B

## Enforcement Committee Organization Bylaws

## ARTICLE I

These bylaws constitute the code of rules adopted by the Settling States and Participating Subdivisions for the creation of an Enforcement Committee (the "Committee") to exist and operate during the term of the Agreement in connection with Janssen and shall control the regulation and management of the Committee's affairs.

## ARTICLE II
## Purpose

The Committee is organized for the sole purpose of evaluating and taking such action as deemed reasonable, necessary, and appropriate by the members of the Committee on the matters delegated to the Committee under that certain Settlement Agreement between the Settling States and Janssen dated July 21, 2021.

## ARTICLE III
## Members of the Committee

**(1)    Number of Members**
The Committee will consist of seventeen (17) members (the "Members"). Upon majority resolution of the Committee, the number of Members may be increased or decreased from time to time, but in no event shall a decrease have the effect of decreasing the total number of Members to less than seven Members.

**(2)    Initial Members**
The Committee initially will consist of eleven Settling State Members and six Participating Subdivision Members; three of the Participating Subdivisions shall be counties and three shall be municipalities. The initial Settling State Members are representatives from: Connecticut, Delaware, Florida, Georgia, Massachusetts, New York, North Carolina, Ohio, Pennsylvania, Tennessee, and Texas. The initial Participating Subdivision Members are: (a) Bexar County, Texas; (b) Broward County, Florida; (c) Chicago, Illinois; (d) Cincinnati, Ohio; (e) Nashville, Tennessee; and (f) Nassau County, New York. Until the Reference Date contained in the Settlement Agreement, the Participating Subdivisions may designate their outside counsel to serve as their representative. After the Reference Date, an employee or official of the Participating Subdivision must be the designated as the representative of the Participating Subdivision.

**(3)    Term of Members**
The term of office for Members of the Committee will be until the end of the term of the Settlement Agreement, nine (9) years, unless and until a Member withdraws or resigns from the Committee.

*revised July 30, 2021*

**(4)    Resignation**

Any Member may resign at any time by delivering written notice to the Chairperson of the Committee. Such resignation shall take effect upon receipt or, if later, at the time specified in the notice.

**(5)    Removal**

(a) Any Member may be removed without cause, at any time, by a majority of the entire Committee, at a Regular or Special Meeting called for that purpose. Any Member under consideration of removal must first be notified about the consideration by written notice at least five days prior to the meeting at which the vote takes place.

(b)  In the event that any Member is not a Settling State or a Participating Subdivision or the Member subsequently becomes a Later Litigating Subdivision, the Member shall be removed immediately without notice or vote of the Committee.

**(6)    Vacancies**

In the event of a vacancy, the Members of the same type (Settling State or Participating Subdivision) shall select another Settling State or Participating Subdivision to fill that Member's position.

**(7)    Compensation**

Members shall not receive any salaries or other compensation for their services, but, by resolution of the Committee, may be reimbursed for any actual expenses incurred in the performance of their duties for the Committee, as long as a majority of disinterested Members approve the reimbursement. Any reimbursement shall be sought from the Settlement Fund Administrator.

### ARTICLE IV
### Conflicts of Interest and Code of Ethics

If a Member, agent, or employee of the Committee has a conflict of interest, he or she may not participate in a vote, discussion, or decision about the matter. Each Member shall follow any applicable state or local law with respect to conflicts, gifts, and ethics.

### ARTICLE V
### Committee Meetings

**(1)    Place of Meetings**

Meetings of the Committee will be held at any place that the Chairperson may designate, including by telephonic or electronic means.

**(2)    Regular Meetings**

Regular meetings of the Committee shall be held as deemed necessary by the Chairperson or any three members.

*revised July 30, 2021*

**(3)** **Notice of Meetings**

Written notice of the date, time, place and subject of each meeting must be provided to the Members at least 72 hours before the scheduled time of the meeting, except when there is an emergency or urgent public necessity.

**(4)** **Quorum**

A majority of the incumbent Members (not counting vacancies) shall constitute a quorum for the purposes of convening a meeting or conducting business.

**(5)** **Voting and Proxy**

When it is necessary to vote on any matter before the Committee, Members may vote by electronic means as provided in these Bylaws. Proxy voting is permitted. In order for a matter to pass, the matter must have a majority vote of Members present and must have at least one vote from a Settling State Member and a Participating Subdivision Member. In the event that there is a Quorum, but no Settling State or Participating Subdivision Member is present, then a matter may pass with a simple majority vote.

**(6)** **Minutes**

The Committee shall prepare and keep minutes. The minutes must state the subject of each deliberation and indicate each vote, order, decision, or other action taken.

**ARTICLE VI**
**Officers**

**(1)** **Roster of Officers**

The Committee shall have a Chairperson, a Vice Chairperson, and a Secretary. The Committee may have at its discretion, such other officers as may be appointed by the Members of the Committee. One person may hold two or more offices, except those serving as Chairperson.

**(2)** **Election and Removal of Officers**

All officers shall serve two-year terms. The election shall be conducted at the first meeting of the fiscal year. Officers shall remain in office until their successors have been selected. Officers may serve consecutive terms without limit. The election of officers shall be by majority vote of the Members of the Committee attending the meeting.

**(3)** **Vacancies**

If a vacancy occurs during the term of office for any elected officer, the Members of the Committee shall elect a new officer to fill the remainder of the term as soon as practical, by majority vote of Members present.

**(4)** **Chairperson**

The Chairperson will supervise and control the affairs of the Committee and shall exercise such supervisory powers as may be given him/her by the Members of the Committee. The Chairperson will perform all duties incident to such office and such other duties as may be provided in these bylaws or as may be prescribed from time to time by the Committee. The

*revised July 30, 2021*

Chairperson shall preside at all meetings and shall exercise parliamentary control in accordance with Robert's Rules of Order.

**(5)** **Vice Chairperson**
The Vice Chairperson shall act in place of the Chairperson in the event of the Chairperson's absence, inability, or refusal to act, and shall exercise and discharge such other duties as may be required by the Committee. The Vice Chairperson shall serve as the parliamentarian and interpret any ambiguities of the bylaws.

**(6)** **Secretary**
The Secretary will keep and maintain all records related to the Committee and take minutes of all meetings.

**(7)** **Records**
All elected officers and committee chairpersons shall relinquish their records to the Chairperson immediately upon the completion of their term of office or completion of a project.

**(8)** **Resignation**
An officer may resign the office while not resigning membership from the Committee, by submitting a letter to the Chairperson. Vacancies occurring in any office shall be appointed for the remainder of the term.

**ARTICLE VII**
**Duties**

**(1)** **Prior to the Reference Date**
The Committee shall be responsible for any additional negotiations with Janssen, including, but not limited to, negotiating extensions of any periods created by the Settlement Agreement.

**(2)** **After the Enforcement Date**
The Committee shall establish procedures for the receipt of notices that a dispute exists concerning the Agreement and review of such disputes, pursuant to Section XII of the Agreement. Members may engage with Janssen, Settling States, and Participating Subdivisions attempting to resolve any dispute without further action by the Committee. The Committee may request additional information from Janssen, Settling States, and Participating Subdivisions to the extent the Committee believes such information is necessary to understand, resolve, or provide advice related to a dispute. The Committee shall endeavor to provide advice relative to the dispute no later than 60 days after receipt of notice.

*revised July 30, 2021*

## ARTICLE VIII
### Rules of Procedure

The proceedings and business of the Committee shall be governed by Robert's Rules of Order unless otherwise waived by the Committee.

## ARTICLE IX
### Operations

**(1)** **Records**
The Committee will keep correct and complete records and will also keep minutes of the proceedings of the Committee meetings and Committees. The Committee will keep such records at its principal place of business at a place designated by the Chairperson**.**

All elected officers and committee chairpersons shall relinquish their records to the Chairperson, immediately upon the completion of their term of office.

**(2)** **Inspection of Books and Records**
The minutes of a meeting are public records and shall be available for public inspection and copying on request to the Committee's Chairperson or the Chairperson's designee.

**(3)** **Amendments**
The bylaws may be amended at any time by a vote of a majority of Members present and must have at least one vote from a Settling State Member and a Participating Subdivision Member. In the event that there is a Quorum, but no Settling State or Participating Subdivision Member is present, then a matter may pass with a simple majority vote.

*revised July 30, 2021*

**EXHIBIT C**

**Litigating Subdivision and Special District List[1]**

1. Abbeville (AL), City of, Alabama
2. Albertville (AL), City of, Alabama
3. Alexander City (AL), City of, Alabama
4. Anniston (AL), City of, Alabama
5. Arab (AL), City of, Alabama
6. Argo (AL), City of, Alabama
7. Ashland (AL), City of, Alabama
8. Ashville (AL), City of, Alabama
9. Athens (AL), City of, Alabama
10. Attalla (AL), City of, Alabama
11. Attentus Mouton, LLC d/b/a Lawrence Medical Center (AL), Alabama
12. Auburn (AL), City of, Alabama
13. Autauga (AL), County of, Alabama
14. Baldwin (AL), County of, Alabama
15. Barbour (AL), County of, Alabama
16. Berry (AL), Town of, Alabama
17. Bibb (AL), County of, Alabama
18. Bibb County Healthcare Authority (AL), Alabama
19. Birmingham (AL), City of, Alabama
20. Blount (AL), County of, Alabama
21. Boaz (AL), City of, Alabama
22. Brent (AL), City of, Alabama
23. Bridgeport (AL), City of, Alabama
24. Brookwood (AL), Town of, Alabama
25. Brundidge (AL), City of, Alabama
26. Bullock (AL), County of, Alabama
27. Butler (AL), County of, Alabama
28. Butler (AL), Town of, Alabama
29. Calera (AL), City of, Alabama
30. Calhoun (AL), County of, Alabama
31. Camp Hill (AL), Town of, Alabama
32. Carbon Hill (AL), City of, Alabama
33. Cedar Bluff (AL), Town of, Alabama
34. Center Point (AL), City of, Alabama
35. Centre (AL), City of, Alabama
36. Centreville (AL), City of, Alabama
37. Chambers (AL), County of, Alabama
38. Cherokee (AL), County of, Alabama
39. Cherokee (AL), Town of, Alabama
40. Chickasaw (AL), City of, Alabama
41. Chilton (AL), County of, Alabama
42. Choctaw (AL), County of, Alabama
43. Clanton (AL), City of, Alabama
44. Clarke (AL), County of, Alabama
45. Clay (AL), County of, Alabama
46. Cleburne (AL), County of, Alabama
47. Cleveland (AL), Town of, Alabama
48. Coffee (AL), County of, Alabama
49. Colbert (AL), County of, Alabama
50. Conecuh (AL), County of, Alabama
51. Coosa (AL), County of, Alabama
52. Cordova (AL), City of, Alabama
53. Covington (AL), County of, Alabama
54. Crenshaw (AL), County of, Alabama
55. Cullman (AL), City of, Alabama
56. Cullman (AL), County of, Alabama
57. Cullman County Health Care Authority (AL), Alabama
58. Dadeville (AL), City of, Alabama
59. Dale (AL), County of, Alabama
60. Dale County Healthcare Authority (AL), Alabama
61. Daleville (AL), City of, Alabama
62. Dallas (AL), County of, Alabama

---

[1] For purposes of calculating the percentage of Litigating Subdivisions and Litigating Special Districts pursuant to Section V.E.5 and Exhibit H, an individual Litigating Subdivision or Litigating Special District shall not be included more than once in the numerator, and shall not be included more than once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit; provided, however, that for the avoidance of doubt, no Litigating Subdivision or Litigating Special District will be excluded from the numerator or denominator under this sentence unless a Litigating Subdivision or Litigating Special District otherwise counted in the denominator has the authority to release the Claims (consistent with Section IV) of the Litigating Subdivision or Litigating Special District to be excluded.

63. Daphne (AL), City of, Alabama
64. Dauphin Island (AL), Town of, Alabama
65. DCH Health Care Authority (AL), Alabama
66. Decatur (AL), City of, Alabama
67. DeKalb (AL), County of, Alabama
68. Demopolis (AL), City of, Alabama
69. Dora (AL), City of, Alabama
70. Dothan (AL), City of, Alabama
71. Double Springs (AL), Town of, Alabama
72. Douglas (AL), Town of, Alabama
73. Enterprise (AL), City of, Alabama
74. Escambia (AL), County of, Alabama
75. Etowah (AL), County of (Sheriff), Alabama
76. Etowah (AL), County of, Alabama
77. Eufaula (AL), City of, Alabama
78. Evergreen (AL), City of, Alabama
79. Fairfield (AL), City of, Alabama
80. Faunsdale (AL), Town of, Alabama
81. Fayette (AL), County of (Sheriff), Alabama
82. Fayette (AL), City of, Alabama
83. Fayette (AL), County of, Alabama
84. Florence (AL), City of, Alabama
85. Foley (AL), City of, Alabama
86. Fort Deposit (AL), Town of, Alabama
87. Fort Payne (AL), City of, Alabama
88. Franklin (AL), County of, Alabama
89. Fultondale (AL), City of, Alabama
90. Gadsden (AL), City of, Alabama
91. Geneva (AL), City of, Alabama
92. Geneva (AL), County of, Alabama
93. Geneva County Health Care Authority (AL), Alabama
94. Georgiana (AL), City of, Alabama
95. Geraldine (AL), Town of, Alabama
96. Gilbertown (AL), Town of, Alabama
97. Grant (AL), Town of, Alabama
98. Graysville (AL), City of, Alabama
99. Greene (AL), County of, Alabama
100. Greene County Hospital Board (AL), Alabama
101. Greensboro (AL), City of, Alabama
102. Greenville (AL), City of, Alabama
103. Guin (AL), City of, Alabama
104. Guntersville (AL), City of, Alabama
105. Gurley (AL), Town of, Alabama
106. Hale (AL), County of, Alabama
107. Haleyville (AL), City of, Alabama
108. Hamilton (AL), City of, Alabama
109. Hammondville (AL), Town of, Alabama
110. Hartselle (AL), City of, Alabama
111. Headland (AL), City of, Alabama
112. Healthcare Authority for Baptist Health (AL), Alabama
113. Health Care Authority of Clarke County (AL), Alabama
114. Health Care Authority of Morgan County – City of Decatur (AL), Alabama
115. Health Care Authority of the City of Huntsville d/b/a HH Health System, et al. (AL), Alabama
116. Health Care Authority of the City of Huntsville d/b/a Hunstville Hospital (AL), Alabama
117. Health Care Authority of the City of Huntsville d/b/a Huntsville Hospital for Women and Children (AL), Alabama
118. Health Care Authority of the City of Huntsville d/b/a Madison Hospital (AL), Alabama
119. Henagar (AL), City of, Alabama
120. Henry (AL), County of, Alabama
121. HH Health System - Athens Limestone, LLC d/b/a Athens Limestone Hospital (AL), Alabama
122. HH Health System - Morgan, LLC d/b/a Decatur Morgan Hospital - Decatur and Decatur Morgan Hospital - Parkway (AL), Alabama
123. HH Health System - Shoals, LLC d/b/a Helen Keller Hospital and Red Bay Hospital (AL), Alabama
124. Homewood (AL), City of, Alabama
125. Hoover (AL), City of, Alabama
126. Houston (AL), County of, Alabama
127. Hueytown (AL), City of, Alabama
128. Huntsville (AL), City of, Alabama
129. J. Paul Jones Hospital (AL), Alabama
130. Jackson (AL), County of, Alabama
131. Jackson County Health Care Authority (AL), Alabama
132. Jacksonville (AL), City of, Alabama
133. Jasper (AL), City of, Alabama
134. Jefferson (AL), County of (Sheriff), Alabama
135. Jefferson (AL), County of, Alabama
136. Killen (AL), City of, Alabama

137. Lamar (AL), County of (Sheriff), Alabama
138. Lamar (AL), County of, Alabama
139. Lanett (AL), City of, Alabama
140. Lauderdale (AL), County of, Alabama
141. Lawrence (AL), County of, Alabama
142. Leeds (AL), City of, Alabama
143. Leesburg (AL), City of, Alabama
144. Leighton (AL), Town of, Alabama
145. Level Plains (AL), City of, Alabama
146. Limestone (AL), County of, Alabama
147. Lincoln (AL), City of, Alabama
148. Linden (AL), City of, Alabama
149. Locust Fork (AL), Town of, Alabama
150. Louisville (AL), City of, Alabama
151. Lowndes (AL), County of, Alabama
152. Luverne (AL), City of, Alabama
153. Macon (AL), County of, Alabama
154. Madison (AL), City of, Alabama
155. Madison (AL), County of, Alabama
156. Marengo (AL), County of, Alabama
157. Marion (AL), City of, Alabama
158. Marion (AL), County of, Alabama
159. Marshall (AL), County of, Alabama
160. Marshall County Health Care Authority (AL), Alabama
161. McKenzie (AL), Town of, Alabama
162. Medical West Hospital Authority (AL), Alabama
163. Midfield (AL), City of, Alabama
164. Mobile (AL), City of, Alabama
165. Mobile (AL), County of, Alabama
166. Mobile County Board of Health and Family Oriented Primary Health Care Clinic (AL), Alabama
167. Mobile County Emergency Medical Services System Rescue Squad (AL), Alabama
168. Monroe (AL), County of, Alabama
169. Monroe County Health Care Authority (AL), Alabama
170. Monroeville (AL), City of, Alabama
171. Montgomery (AL), City of, Alabama
172. Montgomery (AL), County of, Alabama
173. Moody (AL), City of, Alabama
174. Morgan (AL), County of, Alabama
175. Moulton (AL), City of, Alabama
176. Mountain Brook (AL), City of, Alabama
177. Munford (AL), Town of, Alabama
178. Muscle Shoals (AL), City of, Alabama
179. Nauvoo (AL), City of, Alabama
180. New Hope (AL), City of, Alabama
181. Northport (AL), City of, Alabama
182. Oakman (AL), Town of, Alabama
183. Oneonta (AL), City of, Alabama
184. Opelika (AL), City of, Alabama
185. Opp (AL), City of, Alabama
186. Orange Beach (AL), City of, Alabama
187. Oxford (AL), City of, Alabama
188. Ozark (AL), City of, Alabama
189. Parrish (AL), City of, Alabama
190. Pell City (AL), City of, Alabama
191. Perry (AL), County of, Alabama
192. Phenix City (AL), City of, Alabama
193. Pickens (AL), County of, Alabama
194. Piedmont (AL), City of, Alabama
195. Pike (AL), County of, Alabama
196. Pleasant Grove (AL), City of, Alabama
197. Powell (AL), Town of, Alabama
198. Prattville (AL), City of, Alabama
199. Priceville (AL), Town of, Alabama
200. Prichard (AL), City of, Alabama
201. Ragland (AL), City of, Alabama
202. Rainbow City (AL), City of, Alabama
203. Rainsville (AL), City of, Alabama
204. Red Bay (AL), City of, Alabama
205. Robertsdale (AL), City of, Alabama
206. Rockford (AL), Town of, Alabama
207. Russell (AL), County of, Alabama
208. Russellville (AL), City of, Alabama
209. Satsuma (AL), City of, Alabama
210. Scottsboro (AL), City of, Alabama
211. Selma (AL), City of, Alabama
212. Sheffield (AL), City of, Alabama
213. Shelby (AL), County of, Alabama
214. Sipsey (AL), City of, Alabama
215. Slocomb (AL), City of, Alabama
216. Spanish Fort (AL), City of, Alabama
217. Springville (AL), City of, Alabama
218. St. Clair (AL), County of, Alabama
219. Sumiton (AL), City of, Alabama
220. Sumter (AL), County of, Alabama
221. Sweet Water (AL), Town of, Alabama
222. Sylacauga (AL), City of, Alabama
223. Sylacauga Health Care Authority (AL), Alabama

224. Talladega (AL), City of, Alabama
225. Talladega (AL), County of, Alabama
226. Tallapoosa (AL), County of, Alabama
227. Tarrant (AL), City of, Alabama
228. Thomasville (AL), City of, Alabama
229. Tombigbee Health Care Authority (AL), Alabama
230. Troy (AL), City of, Alabama
231. Trussville (AL), City of, Alabama
232. Tuscaloosa (AL), City of, Alabama
233. Tuscaloosa (AL), County of, Alabama
234. Tuscumbia (AL), City of, Alabama
235. Tuskegee (AL), City of, Alabama
236. Union Springs (AL), City of, Alabama
237. Uniontown (AL), City of, Alabama
238. Vance (AL), Town of, Alabama
239. Vernon (AL), City of, Alabama
240. Vestavia Hills (AL), City of, Alabama
241. Walker (AL), County of, Alabama
242. Washington (AL), County of, Alabama
243. Weaver (AL), City of, Alabama
244. West Blocton (AL), Town of, Alabama
245. Wilcox (AL), County of, Alabama
246. Winfield (AL), City of, Alabama
247. Woodville (AL), Town of, Alabama
248. Yellow Bluff (AL), Town of, Alabama
249. Apache (AZ), County of, Arizona
250. Bullhead City (AZ), City of, Arizona
251. Cochise (AZ), County of, Arizona
252. Glendale (AZ), City of, Arizona
253. Kingman (AZ), City of, Arizona
254. La Paz (AZ), County of, Arizona
255. Maricopa (AZ), County of, Arizona
256. Mohave (AZ), County of, Arizona
257. Navajo (AZ), County of, Arizona
258. Phoenix (AZ), City of, Arizona
259. Pima (AZ), County of, Arizona
260. Pinal (AZ), County of, Arizona
261. Prescott (AZ), City of, Arizona
262. Surprise (AZ), City of, Arizona
263. Tucson (AZ), City of, Arizona
264. Yuma (AZ), County of, Arizona
265. Adona (AR), City of, Arkansas
266. Alexander (AR), City of, Arkansas
267. Alicia (AR), City of, Arkansas
268. Allport (AR), City of, Arkansas
269. Alma (AR), City of, Arkansas
270. Almyra (AR), City of, Arkansas
271. Alpena (AR), City of, Arkansas
272. Altheimer (AR), City of, Arkansas
273. Altus (AR), City of, Arkansas
274. Amagon (AR), City of, Arkansas
275. Amity (AR), City of, Arkansas
276. Anthonyville (AR), City of, Arkansas
277. Antoine (AR), City of, Arkansas
278. Arkadelphia (AR), City of, Arkansas
279. Arkansas (AR), County of, Arkansas
280. Arkansas City (AR), City of, Arkansas
281. Ash Flat (AR), City of, Arkansas
282. Ashdown (AR), City of, Arkansas
283. Ashley (AR), County of, Arkansas
284. Atkins (AR), City of, Arkansas
285. Aubrey (AR), City of, Arkansas
286. Augusta (AR), City of, Arkansas
287. Austin (AR), City of, Arkansas
288. Avoca (AR), City of, Arkansas
289. Bald Knob (AR), City of, Arkansas
290. Banks (AR), City of, Arkansas
291. Barling (AR), City of, Arkansas
292. Bassett (AR), City of, Arkansas
293. Batesville (AR), City of, Arkansas
294. Bauxite (AR), City of, Arkansas
295. Baxter (AR), County of, Arkansas
296. Bay (AR), City of, Arkansas
297. Bearden (AR), City of, Arkansas
298. Beaver (AR), City of, Arkansas
299. Beebe (AR), City of, Arkansas
300. Beedeville (AR), City of, Arkansas
301. Bella Vista (AR), City of, Arkansas
302. Bellefonte (AR), City of, Arkansas
303. Belleville (AR), City of, Arkansas
304. Ben Lomond (AR), City of, Arkansas
305. Benton (AR), County of, Arkansas
306. Benton (AR), City of, Arkansas
307. Bentonville (AR), City of, Arkansas
308. Bergman (AR), City of, Arkansas
309. Berryville (AR), City of, Arkansas
310. Bethel Heights (AR), City of, Arkansas
311. Big Flat (AR), City of, Arkansas
312. Bigelow (AR), City of, Arkansas
313. Biggers (AR), City of, Arkansas
314. Birdsong (AR), City of, Arkansas
315. Biscoe (AR), City of, Arkansas

316. Black Oak (AR), City of, Arkansas
317. Black Rock (AR), City of, Arkansas
318. Black Springs (AR), City of, Arkansas
319. Blevins (AR), City of, Arkansas
320. Blue Eye (AR), City of, Arkansas
321. Blue Mountain (AR), City of, Arkansas
322. Bluff City (AR), City of, Arkansas
323. Blytheville (AR), City of, Arkansas
324. Bodcaw (AR), City of, Arkansas
325. Bonanza (AR), City of, Arkansas
326. Bono (AR), City of, Arkansas
327. Boone (AR), County of, Arkansas
328. Booneville (AR), City of, Arkansas
329. Bradford (AR), City of, Arkansas
330. Bradley (AR), County of, Arkansas
331. Bradley (AR), City of, Arkansas
332. Branch (AR), City of, Arkansas
333. Briarcliff (AR), City of, Arkansas
334. Brinkley (AR), City of, Arkansas
335. Brookland (AR), City of, Arkansas
336. Bryant (AR), City of, Arkansas
337. Buckner (AR), City of, Arkansas
338. Bull Shoals (AR), City of, Arkansas
339. Burdette (AR), City of, Arkansas
340. Cabot (AR), City of, Arkansas
341. Caddo Valley (AR), City of, Arkansas
342. Caldwell (AR), City of, Arkansas
343. Cale (AR), City of, Arkansas
344. Calhoun (AR), County of, Arkansas
345. Calico Rock (AR), City of, Arkansas
346. Calion (AR), City of, Arkansas
347. Camden (AR), City of, Arkansas
348. Cammack Village (AR), City of, Arkansas
349. Campbell Station (AR), City of, Arkansas
350. Caraway (AR), City of, Arkansas
351. Carlisle (AR), City of, Arkansas
352. Carroll (AR), County of, Arkansas
353. Carthage (AR), City of, Arkansas
354. Casa (AR), City of, Arkansas
355. Cash (AR), City of, Arkansas
356. Caulksville (AR), City of, Arkansas
357. Cave City (AR), City of, Arkansas
358. Cave Springs (AR), City of, Arkansas
359. Cedarville (AR), City of, Arkansas
360. Centerton (AR), City of, Arkansas
361. Central City (AR), City of, Arkansas

362. Charleston (AR), City of, Arkansas
363. Cherokee Village (AR), City of, Arkansas
364. Cherry Valley (AR), City of, Arkansas
365. Chester (AR), City of, Arkansas
366. Chicot (AR), County of, Arkansas
367. Chidester (AR), City of, Arkansas
368. Clarendon (AR), City of, Arkansas
369. Clark (AR), County of, Arkansas
370. Clarksville (AR), City of, Arkansas
371. Clay (AR), County of, Arkansas
372. Cleburne (AR), County of, Arkansas
373. Cleveland (AR), County of, Arkansas
374. Clinton (AR), City of, Arkansas
375. Coal Hill (AR), City of, Arkansas
376. Colt (AR), City of, Arkansas
377. Columbia (AR), County of, Arkansas
378. Concord (AR), City of, Arkansas
379. Conway (AR), County of, Arkansas
380. Conway (AR), City of, Arkansas
381. Corning (AR), City of, Arkansas
382. Cotter (AR), City of, Arkansas
383. Cotton Plant (AR), City of, Arkansas
384. Cove (AR), City of, Arkansas
385. Coy (AR), City of, Arkansas
386. Craighead (AR), County of, Arkansas
387. Crawford (AR), County of, Arkansas
388. Crawfordsville (AR), City of, Arkansas
389. Crittenden (AR), County of, Arkansas
390. Cross (AR), County of, Arkansas
391. Crossett (AR), City of, Arkansas
392. Cushman (AR), City of, Arkansas
393. Daisy (AR), City of, Arkansas
394. Dallas (AR), County of, Arkansas
395. Damascus (AR), City of, Arkansas
396. Danville (AR), City of, Arkansas
397. Dardanelle (AR), City of, Arkansas
398. Datto (AR), City of, Arkansas
399. De Queen (AR), City of, Arkansas
400. Decatur (AR), City of, Arkansas
401. Delaplaine (AR), City of, Arkansas
402. Delight (AR), City of, Arkansas
403. Dell (AR), City of, Arkansas
404. Denning (AR), City of, Arkansas
405. Dermott (AR), City of, Arkansas
406. Des Arc (AR), City of, Arkansas
407. Desha (AR), County of, Arkansas

408. DeValls Bluff (AR), City of, Arkansas
409. Dewitt (AR), City of, Arkansas
410. Diamond City (AR), City of, Arkansas
411. Diaz (AR), City of, Arkansas
412. Dierks (AR), City of, Arkansas
413. Donaldson (AR), City of, Arkansas
414. Dover (AR), City of, Arkansas
415. Dumas (AR), City of, Arkansas
416. Dyer (AR), City of, Arkansas
417. Dyess (AR), City of, Arkansas
418. Earle (AR), City of, Arkansas
419. East Camden (AR), City of, Arkansas
420. Edmondson (AR), City of, Arkansas
421. Egypt (AR), City of, Arkansas
422. El Dorado (AR), City of, Arkansas
423. Elaine (AR), City of, Arkansas
424. Elkins (AR), City of, Arkansas
425. Elm Springs (AR), City of, Arkansas
426. Emerson (AR), City of, Arkansas
427. Emmet (AR), City of, Arkansas
428. England (AR), City of, Arkansas
429. Enola (AR), City of, Arkansas
430. Etowah (AR), City of, Arkansas
431. Eudora (AR), City of, Arkansas
432. Eureka Springs (AR), City of, Arkansas
433. Evening Shade (AR), City of, Arkansas
434. Everton (AR), City of, Arkansas
435. Fairfield Bay (AR), City of, Arkansas
436. Fargo (AR), City of, Arkansas
437. Farmington (AR), City of, Arkansas
438. Faulkner (AR), County of, Arkansas
439. Felsenthal (AR), City of, Arkansas
440. Fifty-Six (AR), City of, Arkansas
441. Fisher (AR), City of, Arkansas
442. Flippin (AR), City of, Arkansas
443. Fordyce (AR), City of, Arkansas
444. Foreman (AR), City of, Arkansas
445. Forrest City (AR), City of, Arkansas
446. Fort Smith (AR), City of, Arkansas
447. Fouke (AR), City of, Arkansas
448. Fountain Hill (AR), City of, Arkansas
449. Fountain Lake (AR), City of, Arkansas
450. Fourche (AR), City of, Arkansas
451. Franklin (AR), County of, Arkansas
452. Franklin (AR), City of, Arkansas
453. Friendship (AR), City of, Arkansas
454. Fulton (AR), County of, Arkansas
455. Fulton (AR), City of, Arkansas
456. Garfield (AR), City of, Arkansas
457. Garland (AR), County of, Arkansas
458. Garland (AR), City of, Arkansas
459. Garner (AR), City of, Arkansas
460. Gassville (AR), City of, Arkansas
461. Gateway (AR), City of, Arkansas
462. Gentry (AR), City of, Arkansas
463. Georgetown (AR), City of, Arkansas
464. Gilbert (AR), City of, Arkansas
465. Gillett (AR), City of, Arkansas
466. Gillham (AR), City of, Arkansas
467. Gilmore (AR), City of, Arkansas
468. Glenwood (AR), City of, Arkansas
469. Goshen (AR), City of, Arkansas
470. Gosnell (AR), City of, Arkansas
471. Gould (AR), City of, Arkansas
472. Grady (AR), City of, Arkansas
473. Grannis (AR), City of, Arkansas
474. Grant (AR), County of, Arkansas
475. Gravette (AR), City of, Arkansas
476. Green Forest (AR), City of, Arkansas
477. Greenbrier (AR), City of, Arkansas
478. Greene (AR), County of, Arkansas
479. Greenland (AR), City of, Arkansas
480. Greenway (AR), City of, Arkansas
481. Greenwood (AR), City of, Arkansas
482. Greers Ferry (AR), City of, Arkansas
483. Griffithville (AR), City of, Arkansas
484. Grubbs (AR), City of, Arkansas
485. Guion (AR), City of, Arkansas
486. Gum Springs (AR), City of, Arkansas
487. Gurdon (AR), City of, Arkansas
488. Guy (AR), City of, Arkansas
489. Hackett (AR), City of, Arkansas
490. Hamburg (AR), City of, Arkansas
491. Hampton (AR), City of, Arkansas
492. Hardy (AR), City of, Arkansas
493. Harrell (AR), City of, Arkansas
494. Harrisburg (AR), City of, Arkansas
495. Harrison (AR), City of, Arkansas
496. Hartford (AR), City of, Arkansas
497. Hartman (AR), City of, Arkansas
498. Haskell (AR), City of, Arkansas
499. Hatfield (AR), City of, Arkansas

500. Havana (AR), City of, Arkansas
501. Haynes (AR), City of, Arkansas
502. Hazen (AR), City of, Arkansas
503. Heber Springs (AR), City of, Arkansas
504. Hector (AR), City of, Arkansas
505. Helena - West Helena (AR), City of, Arkansas
506. Hempstead (AR), County of, Arkansas
507. Hermitage (AR), City of, Arkansas
508. Hickory Ridge (AR), City of, Arkansas
509. Higden (AR), City of, Arkansas
510. Higginson (AR), City of, Arkansas
511. Highfill (AR), City of, Arkansas
512. Highland (AR), City of, Arkansas
513. Hindsville (AR), City of, Arkansas
514. Holland (AR), City of, Arkansas
515. Holly Grove (AR), City of, Arkansas
516. Hope (AR), City of, Arkansas
517. Horatio (AR), City of, Arkansas
518. Horseshoe Bend (AR), City of, Arkansas
519. Horseshoe Lake (AR), City of, Arkansas
520. Hot Spring (AR), County of, Arkansas
521. Hot Springs (AR), City of, Arkansas
522. Houston (AR), City of, Arkansas
523. Howard (AR), County of, Arkansas
524. Hoxie (AR), City of, Arkansas
525. Hughes (AR), City of, Arkansas
526. Humnoke (AR), City of, Arkansas
527. Humphrey (AR), City of, Arkansas
528. Hunter (AR), City of, Arkansas
529. Huntington (AR), City of, Arkansas
530. Huntsville (AR), City of, Arkansas
531. Huttig (AR), City of, Arkansas
532. Imboden (AR), City of, Arkansas
533. Independence (AR), County of, Arkansas
534. Izard (AR), County of, Arkansas
535. Jackson (AR), County of, Arkansas
536. Jacksonport (AR), City of, Arkansas
537. Jacksonville (AR), City of, Arkansas
538. Jasper (AR), City of, Arkansas
539. Jennette (AR), City of, Arkansas
540. Jericho (AR), City of, Arkansas
541. Jerome (AR), City of, Arkansas
542. Johnson (AR), County of, Arkansas
543. Johnson (AR), City of, Arkansas
544. Joiner (AR), City of, Arkansas
545. Jonesboro (AR), City of, Arkansas
546. Judsonia (AR), City of, Arkansas
547. Junction City (AR), City of, Arkansas
548. Keiser (AR), City of, Arkansas
549. Kensett (AR), City of, Arkansas
550. Keo (AR), City of, Arkansas
551. Kibler (AR), City of, Arkansas
552. Kingsland (AR), City of, Arkansas
553. Knobel (AR), City of, Arkansas
554. Knoxville (AR), City of, Arkansas
555. La Grange (AR), City of, Arkansas
556. Lafayette (AR), County of, Arkansas
557. Lafe (AR), City of, Arkansas
558. Lake City (AR), City of, Arkansas
559. Lake View (AR), City of, Arkansas
560. Lake Village (AR), City of, Arkansas
561. Lakeview (AR), City of, Arkansas
562. Lamar (AR), City of, Arkansas
563. Lavaca (AR), City of, Arkansas
564. Lawrence (AR), County of, Arkansas
565. Leachville (AR), City of, Arkansas
566. Lead Hill (AR), City of, Arkansas
567. Lee (AR), County of, Arkansas
568. Leola (AR), City of, Arkansas
569. Lepanto (AR), City of, Arkansas
570. Leslie (AR), City of, Arkansas
571. Letona (AR), City of, Arkansas
572. Lewisville (AR), City of, Arkansas
573. Lexa (AR), City of, Arkansas
574. Lincoln (AR), County of, Arkansas
575. Lincoln (AR), City of, Arkansas
576. Little Flock (AR), City of, Arkansas
577. Little River (AR), County of, Arkansas
578. Little Rock (AR), City of, Arkansas
579. Lockesburg (AR), City of, Arkansas
580. Logan (AR), County of, Arkansas
581. London (AR), City of, Arkansas
582. Lonoke (AR), County of, Arkansas
583. Lonoke (AR), City of, Arkansas
584. Lonsdale (AR), City of, Arkansas
585. Louann (AR), City of, Arkansas
586. Lowell (AR), City of, Arkansas
587. Luxora (AR), City of, Arkansas
588. Lynn (AR), City of, Arkansas
589. Madison (AR), County of, Arkansas
590. Madison (AR), City of, Arkansas
591. Magazine (AR), City of, Arkansas

592. Magness (AR), City of, Arkansas
593. Magnolia (AR), City of, Arkansas
594. Malvern (AR), City of, Arkansas
595. Mammoth Spring (AR), City of, Arkansas
596. Manila (AR), City of, Arkansas
597. Mansfield (AR), City of, Arkansas
598. Marianna (AR), City of, Arkansas
599. Marie (AR), City of, Arkansas
600. Marion (AR), County of, Arkansas
601. Marion (AR), City of, Arkansas
602. Marked Tree (AR), City of, Arkansas
603. Marmaduke (AR), City of, Arkansas
604. Marshall (AR), City of, Arkansas
605. Marvell (AR), City of, Arkansas
606. Maumelle (AR), City of, Arkansas
607. Mayflower (AR), City of, Arkansas
608. Maynard (AR), City of, Arkansas
609. McCaskill (AR), City of, Arkansas
610. McCrory (AR), City of, Arkansas
611. McDougal (AR), City of, Arkansas
612. McGehee (AR), City of, Arkansas
613. McNab (AR), City of, Arkansas
614. McNeil (AR), City of, Arkansas
615. McRae (AR), City of, Arkansas
616. Melbourne (AR), City of, Arkansas
617. Mena (AR), City of, Arkansas
618. Menifee (AR), City of, Arkansas
619. Midland (AR), City of, Arkansas
620. Miller (AR), County of, Arkansas
621. Mineral Springs (AR), City of, Arkansas
622. Minturn (AR), City of, Arkansas
623. Mississippi (AR), County of, Arkansas
624. Mitchellville (AR), City of, Arkansas
625. Monette (AR), City of, Arkansas
626. Monroe (AR), County of, Arkansas
627. Montgomery (AR), County of, Arkansas
628. Monticello (AR), City of, Arkansas
629. Montrose (AR), City of, Arkansas
630. Moorefield (AR), City of, Arkansas
631. Moro (AR), City of, Arkansas
632. Morrilton (AR), City of, Arkansas
633. Morrison Bluff (AR), City of, Arkansas
634. Mount Ida (AR), City of, Arkansas
635. Mount Pleasant (AR), City of, Arkansas
636. Mount Vernon (AR), City of, Arkansas
637. Mountain Home (AR), City of, Arkansas

638. Mountain Pine (AR), City of, Arkansas
639. Mountain View (AR), City of, Arkansas
640. Mountainburg (AR), City of, Arkansas
641. Mulberry (AR), City of, Arkansas
642. Murfreesboro (AR), City of, Arkansas
643. Nashville (AR), City of, Arkansas
644. Nevada (AR), County of, Arkansas
645. Newark (AR), City of, Arkansas
646. Newport (AR), City of, Arkansas
647. Newton (AR), County of, Arkansas
648. Nimmons (AR), City of, Arkansas
649. Norfork (AR), City of, Arkansas
650. Norman (AR), City of, Arkansas
651. Norphlet (AR), City of, Arkansas
652. North Little Rock (AR), City of, Arkansas
653. Oak Grove (AR), City of, Arkansas
654. Oak Grove Heights (AR), City of, Arkansas
655. Oakhaven (AR), City of, Arkansas
656. Oden (AR), City of, Arkansas
657. Ogden (AR), City of, Arkansas
658. Oil Trough (AR), City of, Arkansas
659. O'Kean (AR), City of, Arkansas
660. Okolona (AR), City of, Arkansas
661. Ola (AR), City of, Arkansas
662. Omaha (AR), City of, Arkansas
663. Oppelo (AR), City of, Arkansas
664. Osceola (AR), City of, Arkansas
665. Ouachita (AR), County of, Arkansas
666. Oxford (AR), City of, Arkansas
667. Ozan (AR), City of, Arkansas
668. Ozark (AR), City of, Arkansas
669. Palestine (AR), City of, Arkansas
670. Pangburn (AR), City of, Arkansas
671. Paragould (AR), City of, Arkansas
672. Paris (AR), City of, Arkansas
673. Parkdale (AR), City of, Arkansas
674. Parkin (AR), City of, Arkansas
675. Patmos (AR), City of, Arkansas
676. Patterson (AR), City of, Arkansas
677. Pea Ridge (AR), City of, Arkansas
678. Peach Orchard (AR), City of, Arkansas
679. Perla (AR), City of, Arkansas
680. Perry (AR), County of, Arkansas
681. Perry (AR), City of, Arkansas
682. Perrytown (AR), City of, Arkansas
683. Perryville (AR), City of, Arkansas

684. Phillips (AR), County of, Arkansas
685. Piggott (AR), City of, Arkansas
686. Pike (AR), County of, Arkansas
687. Pindall (AR), City of, Arkansas
688. Pine Bluff (AR), City of, Arkansas
689. Pineville (AR), City of, Arkansas
690. Plainview (AR), City of, Arkansas
691. Pleasant Plains (AR), City of, Arkansas
692. Plumerville (AR), City of, Arkansas
693. Pocahontas (AR), City of, Arkansas
694. Poinsett (AR), County of, Arkansas
695. Polk (AR), County of, Arkansas
696. Pollard (AR), City of, Arkansas
697. Pope (AR), County of, Arkansas
698. Portia (AR), City of, Arkansas
699. Portland (AR), City of, Arkansas
700. Pottsville (AR), City of, Arkansas
701. Powhatan (AR), City of, Arkansas
702. Poyen (AR), City of, Arkansas
703. Prairie (AR), County of, Arkansas
704. Prairie Grove (AR), City of, Arkansas
705. Prattsville (AR), City of, Arkansas
706. Prescott (AR), City of, Arkansas
707. Pyatt (AR), City of, Arkansas
708. Quitman (AR), City of, Arkansas
709. Randolph (AR), County of, Arkansas
710. Ratcliff (AR), City of, Arkansas
711. Ravenden (AR), City of, Arkansas
712. Ravenden Springs (AR), City of, Arkansas
713. Rector (AR), City of, Arkansas
714. Redfield (AR), City of, Arkansas
715. Reed (AR), City of, Arkansas
716. Reyno (AR), City of, Arkansas
717. Rison (AR), City of, Arkansas
718. Rockport (AR), City of, Arkansas
719. Roe (AR), City of, Arkansas
720. Rogers (AR), City of, Arkansas
721. Rondo (AR), City of, Arkansas
722. Rose Bud (AR), City of, Arkansas
723. Rosston (AR), City of, Arkansas
724. Rudy (AR), City of, Arkansas
725. Russell (AR), City of, Arkansas
726. Russellville (AR), City of, Arkansas
727. Salem (AR), City of, Arkansas
728. Salesville (AR), City of, Arkansas
729. Saline (AR), County of, Arkansas

730. Scott (AR), County of, Arkansas
731. Scranton (AR), City of, Arkansas
732. Searcy (AR), County of, Arkansas
733. Searcy (AR), City of, Arkansas
734. Sebastian (AR), County of, Arkansas
735. Sedgwick (AR), City of, Arkansas
736. Sevier (AR), County of, Arkansas
737. Shannon Hills (AR), City of, Arkansas
738. Sharp (AR), County of, Arkansas
739. Sheridan (AR), City of, Arkansas
740. Sherrill (AR), City of, Arkansas
741. Sherwood (AR), City of, Arkansas
742. Shirley (AR), City of, Arkansas
743. Sidney (AR), City of, Arkansas
744. Siloam Springs (AR), City of, Arkansas
745. Smackover (AR), City of, Arkansas
746. Smithville (AR), City of, Arkansas
747. South Lead Hill (AR), City of, Arkansas
748. Sparkman (AR), City of, Arkansas
749. Springdale (AR), City of, Arkansas
750. Springtown (AR), City of, Arkansas
751. St. Charles (AR), City of, Arkansas
752. St. Francis (AR), County of, Arkansas
753. St. Francis (AR), City of, Arkansas
754. St. Joe (AR), City of, Arkansas
755. St. Paul (AR), City of, Arkansas
756. Stamps (AR), City of, Arkansas
757. Star City (AR), City of, Arkansas
758. Stephens (AR), City of, Arkansas
759. Stone (AR), County of, Arkansas
760. Strawberry (AR), City of, Arkansas
761. Strong (AR), City of, Arkansas
762. Stuttgart (AR), City of, Arkansas
763. Subiaco (AR), City of, Arkansas
764. Success (AR), City of, Arkansas
765. Sulphur Rock (AR), City of, Arkansas
766. Sulphur Springs (AR), City of, Arkansas
767. Summit (AR), City of, Arkansas
768. Sunset (AR), City of, Arkansas
769. Swifton (AR), City of, Arkansas
770. Taylor (AR), City of, Arkansas
771. Texarkana (AR), City of, Arkansas
772. Thornton (AR), City of, Arkansas
773. Tillar (AR), City of, Arkansas
774. Tinsman (AR), City of, Arkansas
775. Tollette (AR), City of, Arkansas

776. Tontitown (AR), City of, Arkansas
777. Traskwood (AR), City of, Arkansas
778. Trumann (AR), City of, Arkansas
779. Tuckerman (AR), City of, Arkansas
780. Tull (AR), City of, Arkansas
781. Tupelo (AR), City of, Arkansas
782. Turrell (AR), City of, Arkansas
783. Twin Groves (AR), City of, Arkansas
784. Tyronza (AR), City of, Arkansas
785. Ulm (AR), City of, Arkansas
786. Union (AR), County of, Arkansas
787. Valley Springs (AR), City of, Arkansas
788. Van Buren (AR), County of, Arkansas
789. Van Buren (AR), City of, Arkansas
790. Vandervoort (AR), City of, Arkansas
791. Victoria (AR), City of, Arkansas
792. Vilonia (AR), City of, Arkansas
793. Viola (AR), City of, Arkansas
794. Wabbaseka (AR), City of, Arkansas
795. Waldenburg (AR), City of, Arkansas
796. Waldo (AR), City of, Arkansas
797. Waldron (AR), City of, Arkansas
798. Walnut Ridge (AR), City of, Arkansas
799. Ward (AR), City of, Arkansas
800. Warren (AR), City of, Arkansas
801. Washington (AR), County of, Arkansas
802. Washington (AR), City of, Arkansas
803. Watson (AR), City of, Arkansas
804. Weiner (AR), City of, Arkansas
805. Weldon (AR), City of, Arkansas
806. West Fork (AR), City of, Arkansas
807. West Memphis (AR), City of, Arkansas
808. West Point (AR), City of, Arkansas
809. Western Grove (AR), City of, Arkansas
810. Wheatley (AR), City of, Arkansas
811. Whelen Springs (AR), City of, Arkansas
812. White (AR), County of, Arkansas
813. White Hall (AR), City of, Arkansas
814. Wickes (AR), City of, Arkansas
815. Widener (AR), City of, Arkansas
816. Wiederkehr Village (AR), City of, Arkansas
817. Williford (AR), City of, Arkansas
818. Willisville (AR), City of, Arkansas
819. Wilmar (AR), City of, Arkansas
820. Wilmot (AR), City of, Arkansas
821. Wilson (AR), City of, Arkansas
822. Wilton (AR), City of, Arkansas
823. Winchester (AR), City of, Arkansas
824. Winslow (AR), City of, Arkansas
825. Winthrop (AR), City of, Arkansas
826. Woodruff (AR), County of, Arkansas
827. Wooster (AR), City of, Arkansas
828. Wrightsville (AR), City of, Arkansas
829. Wynne (AR), City of, Arkansas
830. Yell (AR), County of, Arkansas
831. Yellville (AR), City of, Arkansas
832. Zinc (AR), City of, Arkansas
833. Alameda (CA), County of, California
834. Amador (CA), County of, California
835. Anaheim (CA), City of, California
836. Butte (CA), County of, California
837. Calaveras (CA), County of, California
838. Central California Alliance for Health (CA), California
839. Chico (CA), City of, California
840. Chula Vista (CA), City of, California
841. Clearlake (CA), City of, California
842. Commission On Medical Care d/b/a Partnership HealthPlan of California (CA), California
843. Contra Costa (CA), County of, California
844. Costa Mesa (CA), City of, California
845. Del Norte (CA), County of, California
846. Downey Unified School District (CA), California
847. Dublin. (CA), City of, California
848. El Dorado (CA), County of, California
849. El Monte (CA), City of, California
850. Elk Grove Unified School District (CA), California
851. Encinitas (CA), City of, California
852. Eureka (CA), City of, California
853. Fresno (CA), County of, California
854. Fullerton (CA), City of, California
855. Glenn (CA), County of, California
856. Health Plan of San Joaquin (CA), California
857. Humboldt (CA), County of, California
858. Huntington Beach (CA), City of, California
859. Imperial (CA), County of, California
860. Inland Empire Health Plan (CA), California

861. Inyo (CA), County of, California
862. Irvine (CA), City of, California
863. Kern (CA), County of, California
864. Kern High School District (CA), California
865. La Habra (CA), City of, California
866. La Mesa (CA), City of, California
867. Laguna Beach (CA), City of, California
868. Lakeport (CA), City of, California
869. Lassen (CA), County of, California
870. Local Initiative Health Authority For Los Angeles County (CA), California
871. Los Angeles (CA), City of, California
872. Los Angeles (CA), County of, California
873. Madera (CA), County of, California
874. Marin (CA), County of, California
875. Mariposa (CA), County of, California
876. Mendocino (CA), County of, California
877. Merced (CA), County of, California
878. Modoc (CA), County of, California
879. Mono (CA), County of, California
880. Monterey (CA), County of, California
881. Montezuma Fire Protection District (CA), California
882. Murrieta (CA), City of, California
883. Napa (CA), County of, California
884. Nevada (CA), County of, California
885. Oakland (CA), City of, California
886. Orange (CA), County of, California
887. Oxnard (CA), City of, California
888. Placentia (CA), City of, California
889. Placer (CA), County of, California
890. Plumas (CA), County of, California
891. Riverside (CA), County of, California
892. Sacramento (CA), City of, California
893. Sacramento (CA), County of, California
894. San Benito (CA), County of, California
895. San Bernardino (CA), County of, California
896. San Clemente (CA), City of, California
897. San Diego (CA), City of, California
898. San Diego (CA), County of, California
899. San Francisco (CA), County of, California
900. San Joaquin (CA), County of, California
901. San Jose (CA), City of, California
902. San Luis Obispo (CA), County of, California
903. San Mateo (CA), County of, California
904. Santa Ana (CA), City of, California
905. Santa Barbara (CA), County of, California
906. Santa Barbara San Luis Obispo Regional Health Authority (CA), California
907. Santa Clara (CA), County of, California
908. Santa Cruz (CA), County of, California
909. Shasta (CA), County of, California
910. Siskiyou (CA), County of, California
911. Sonoma (CA), County of, California
912. Stockton (CA), City of, California
913. Sutter (CA), County of, California
914. Tehama (CA), County of, California
915. Trinity (CA), County of, California
916. Tulare (CA), County of, California
917. Tuolumne (CA), County of, California
918. Ventura (CA), County of, California
919. Ventura County Medi-Cal Managed Care Commission d/b/a Gold Coast Health Plan (CA), California
920. Westminster (CA), City of, California
921. Yolo (CA), County of, California
922. Yuba (CA), County of, California
923. Adams (CO), County of, Colorado
924. Alamosa (CO), City of, Colorado
925. Alamosa (CO), County of, Colorado
926. Arapahoe (CO), County of, Colorado
927. Aurora (CO), City of, Colorado
928. Black Hawk (CO), City of, Colorado
929. Boulder (CO), County of, Colorado
930. Brighton (CO), City of, Colorado
931. Broomfield (CO), County of, Colorado
932. Chaffee (CO), County of, Colorado
933. Commerce City (CO), City of, Colorado
934. Conejos (CO), County of, Colorado
935. Crowley (CO), County of, Colorado
936. Denver (CO), County of, Colorado
937. Federal Heights (CO), City of, Colorado
938. Fremont (CO), County of, Colorado
939. Greeley (CO), City of, Colorado
940. Hudson (CO), Town of, Colorado
941. Huerfano (CO), County of, Colorado
942. Jefferson (CO), County of, Colorado
943. Lakewood (CO), City of, Colorado
944. Larimer (CO), County of, Colorado
945. Las Animas (CO), County of, Colorado
946. Mesa (CO), County of, Colorado

947. Mesa County Valley School District 51 (CO), Colorado
948. Northglenn (CO), City of, Colorado
949. Otero (CO), County of, Colorado
950. Pueblo (CO), County of, Colorado
951. Sheridan (CO), City of, Colorado
952. Teller (CO), County of, Colorado
953. Thornton (CO), City of, Colorado
954. Tri-County Health Department (CO), Colorado
955. Westminster (CO), City of, Colorado
956. Wheat Ridge (CO), City of, Colorado
957. Ansonia (CT), City of, Connecticut
958. Beacon Falls (CT), Town of, Connecticut
959. Berlin (CT), Town of, Connecticut
960. Bethlehem (CT), Town of, Connecticut
961. Bridgeport (CT), City of, Connecticut
962. Bristol (CT), City of, Connecticut
963. Coventry (CT), Town of, Connecticut
964. Danbury (CT), City of, Connecticut
965. Derby (CT), City of, Connecticut
966. East Hartford (CT), Town of, Connecticut
967. Enfield (CT), Town of, Connecticut
968. Fairfield (CT), Town of, Connecticut
969. Middlebury (CT), Town of, Connecticut
970. Middletown (CT), City of, Connecticut
971. Milford (CT), City of, Connecticut
972. Monroe (CT), Town of, Connecticut
973. Naugatuck (CT), Borough of, Connecticut
974. New Britain (CT), City of, Connecticut
975. New Haven (CT), City of, Connecticut
976. New London (CT), City of, Connecticut
977. New Milford (CT), Town of, Connecticut
978. Newtown (CT), Town of, Connecticut
979. North Haven (CT), Town of, Connecticut
980. Norwalk (CT), City of, Connecticut
981. Norwich (CT), City of, Connecticut
982. Oxford (CT), Town of, Connecticut
983. Prospect (CT), Town of, Connecticut
984. Roxbury (CT), Town of, Connecticut
985. Seymour (CT), Town of, Connecticut
986. Shelton (CT), City of, Connecticut
987. Southbury (CT), Town of, Connecticut
988. Southington (CT), Town of, Connecticut
989. Stratford (CT), Town of, Connecticut
990. Thomaston (CT), Town of, Connecticut
991. Tolland (CT), Town of, Connecticut

992. Torrington (CT), City of, Connecticut
993. Wallingford (CT), Town of, Connecticut
994. Waterbury (CT), City of, Connecticut
995. West Haven (CT), City of, Connecticut
996. Wethersfield (CT), Town of, Connecticut
997. Windham (CT), Town of, Connecticut
998. Wolcott (CT), Town of, Connecticut
999. Woodbury (CT), Town of, Connecticut
1000. Dover (DE), City of, Delaware
1001. Kent (DE), County of, Delaware
1002. Seaford (DE), City of, Delaware
1003. Sussex (DE), County of, Delaware
1004. Alachua (FL), County of, Florida
1005. Apopka (FL), City of, Florida
1006. Bay (FL), County of, Florida
1007. Bradenton (FL), City of, Florida
1008. Bradford (FL), County of, Florida
1009. Brevard (FL), County of, Florida
1010. Broward (FL), County of, Florida
1011. Calhoun (FL), County of, Florida
1012. Clay (FL), County of, Florida
1013. Clearwater (FL), City of, Florida
1014. Coconut Creek (FL), City of, Florida
1015. Coral Gables (FL), City of, Florida
1016. Coral Springs (FL), City of, Florida
1017. Daytona Beach (FL), City of, Florida
1018. Daytona Beach Shores (FL), City of, Florida
1019. Deerfield Beach (FL), City of, Florida
1020. Delray Beach (FL), City of, Florida
1021. Deltona (FL), City of, Florida
1022. Dixie (FL), County of, Florida
1023. Eatonville (FL), Town of, Florida
1024. Escambia (FL), County of, Florida
1025. Florida City (FL), City of, Florida
1026. Fort Lauderdale (FL), City of, Florida
1027. Fort Pierce (FL), City of, Florida
1028. Gilchrist (FL), County of, Florida
1029. Gulf (FL), County of, Florida
1030. Halifax Hospital Medical Center (FL), Florida
1031. Hallandale Beach (FL), City of, Florida
1032. Hamilton (FL), County of, Florida
1033. Hernando (FL), County of, Florida
1034. Hillsborough (FL), County of, Florida
1035. Holmes (FL), County of, Florida
1036. Homestead (FL), City of, Florida

1037. Jackson (FL), County of, Florida
1038. Jacksonville (FL), City of, Florida
1039. Lake (FL), County of, Florida
1040. Lauderhill (FL), City of, Florida
1041. Lee (FL), County of, Florida
1042. Lee Memorial Health System d/b/a Lee Health (FL), Florida
1043. Leon (FL), County of, Florida
1044. Levy (FL), County of, Florida
1045. Lynn Haven (FL), City of, Florida
1046. Manatee (FL), County of, Florida
1047. Marion (FL), County of, Florida
1048. Miami (FL), City of, Florida
1049. Miami Gardens (FL), City of, Florida
1050. Miami-Dade (FL), County of, Florida
1051. Miami-Dade County School Board (FL), Florida
1052. Miramar (FL), City of, Florida
1053. Monroe (FL), County of, Florida
1054. New Port Richey (FL), City of, Florida
1055. Niceville (FL), City of, Florida
1056. North Broward Hospital District (FL), Florida
1057. North Miami (FL), City of, Florida
1058. Ocala (FL), City of, Florida
1059. Ocoee (FL), City of, Florida
1060. Okaloosa (FL), County of, Florida
1061. Orange (FL), County of, Florida
1062. Orlando (FL), City of, Florida
1063. Ormond Beach (FL), City of, Florida
1064. Osceola (FL), County of, Florida
1065. Oviedo (FL), City of, Florida
1066. Palatka (FL), City of, Florida
1067. Palm Bay (FL), City of, Florida
1068. Palm Beach (FL), County of, Florida
1069. Palmetto (FL), City of, Florida
1070. Panama City (FL), City of, Florida
1071. Pasco (FL), County of, Florida
1072. Pembroke Pines (FL), City of, Florida
1073. Pensacola (FL), City of, Florida
1074. Pinellas (FL), County of, Florida
1075. Pinellas Park (FL), City of, Florida
1076. Polk (FL), County of, Florida
1077. Pompano Beach (FL), City of, Florida
1078. Port St. Lucie (FL), City of, Florida
1079. Putnam (FL), County of, Florida
1080. Sanford (FL), City of, Florida

1081. Santa Rosa (FL), County of, Florida
1082. Sarasota (FL), City of, Florida
1083. Sarasota (FL), County of, Florida
1084. Sarasota County Public Hospital District (FL), Florida
1085. Seminole (FL), County of, Florida
1086. South Florida Behavioral Health Network (FL), Florida
1087. St. Augustine (FL), City of, Florida
1088. St. Johns (FL), County of, Florida
1089. St. Lucie (FL), County of, Florida
1090. St. Petersburg (FL), City of, Florida
1091. Stuart (FL), City of, Florida
1092. Suwannee (FL), County of, Florida
1093. Sweetwater (FL), City of, Florida
1094. Tallahassee (FL), City of, Florida
1095. Tampa (FL), City of, Florida
1096. Taylor (FL), County of, Florida
1097. Union (FL), County of, Florida
1098. Volusia (FL), County of, Florida
1099. Walton (FL), County of, Florida
1100. Washington (FL), County of, Florida
1101. West Volusia Hospital Authority (FL), Florida
1102. Adel (GA), City of, Georgia
1103. Albany (GA), City of, Georgia
1104. Alma (GA), City of, Georgia
1105. Appling (GA), County of (Sheriff), Georgia
1106. Appling (GA), County of, Georgia
1107. Arlington (GA), City of, Georgia
1108. Athens-Clarke (GA), County of, Georgia
1109. Atkinson (GA), County of, Georgia
1110. Atlanta (GA), City of, Georgia
1111. Augusta (GA), City of, Georgia
1112. Bacon (GA), County of, Georgia
1113. Bacon County Hospital Foundation (GA), Georgia
1114. Bainbridge (GA), City of, Georgia
1115. Baldwin (GA), County of (Sheriff), Georgia
1116. Banks (GA), County of, Georgia
1117. Bartow (GA), County of, Georgia
1118. Ben Hill (GA), County of, Georgia
1119. Berrien (GA), County of, Georgia
1120. Bibb (GA), County of (Sheriff), Georgia

1121. Bibb County School District (GA), Georgia
1122. Blackshear (GA), City of, Georgia
1123. Blakely (GA), City of, Georgia
1124. Brantley (GA), County of, Georgia
1125. Brooks (GA), County of, Georgia
1126. Brunswick (GA), City of, Georgia
1127. Bulloch (GA), County of, Georgia
1128. Burke (GA), County of, Georgia
1129. Butts (GA), County of, Georgia
1130. Camden (GA), County of, Georgia
1131. Candler (GA), County of, Georgia
1132. Candler County Hospital Authority (GA), Georgia
1133. Carroll (GA), County of, Georgia
1134. Cartersville (GA), City of, Georgia
1135. Catoosa (GA), County of, Georgia
1136. Charlton (GA), County of, Georgia
1137. Chatham (GA), County of, Georgia
1138. Chatham County Hospital Authority (GA), Georgia
1139. Chattooga (GA), County of, Georgia
1140. Cherokee (GA), County of, Georgia
1141. Clay (GA), County of, Georgia
1142. Clayton (GA), County of, Georgia
1143. Clinch (GA), County of, Georgia
1144. Clinch County Hospital Authority (GA), Georgia
1145. Cobb (GA), County of, Georgia
1146. Coffee (GA), County of (Sheriff), Georgia
1147. Columbia (GA), County of, Georgia
1148. Columbus (GA), City of, Georgia
1149. Cook (GA), County of, Georgia
1150. Crawford (GA), County of (Sheriff), Georgia
1151. Crisp (GA), County of (Sheriff), Georgia
1152. Crisp (GA), County of, Georgia
1153. Dade (GA), County of, Georgia
1154. Damascus (GA), City of, Georgia
1155. Dawson (GA), City of, Georgia
1156. Dawson (GA), County of, Georgia
1157. Decatur (GA), County of, Georgia
1158. DeKalb (GA), County of, Georgia
1159. Demorest (GA), City of, Georgia
1160. Dodge County Hospital Authority (GA), Georgia

1161. Dooly (GA), County of, Georgia
1162. Doraville (GA), City of, Georgia
1163. Dougherty (GA), County of, Georgia
1164. Douglas (GA), County of, Georgia
1165. Dunwoody (GA), City of, Georgia
1166. Early (GA), County of, Georgia
1167. Echols (GA), County of, Georgia
1168. Effingham (GA), County of, Georgia
1169. Elbert (GA), County of, Georgia
1170. Emanuel (GA), County of, Georgia
1171. Evans (GA), County of, Georgia
1172. Evans Memorial Hospital, Inc. (GA), Georgia
1173. Fannin (GA), County of, Georgia
1174. Fayette (GA), County of, Georgia
1175. Fitzgerald (GA), City of, Georgia
1176. Floyd (GA), County of, Georgia
1177. Forsyth (GA), County of, Georgia
1178. Fulton (GA), County of, Georgia
1179. Gainesville (GA), City of, Georgia
1180. Glascock (GA), County of, Georgia
1181. Glynn (GA), County of (Sheriff), Georgia
1182. Glynn (GA), County of, Georgia
1183. Grady (GA), County of, Georgia
1184. Greene (GA), County of, Georgia
1185. Gwinnett (GA), County of, Georgia
1186. Habersham (GA), County of, Georgia
1187. Habersham County Medical Center (GA), Georgia
1188. Hall (GA), County of, Georgia
1189. Hancock (GA), County of, Georgia
1190. Harris (GA), County of (Sheriff), Georgia
1191. Heard (GA), County of, Georgia
1192. Henry (GA), County of, Georgia
1193. Hospital Authority of Bainbridge and Decatur County (GA), Georgia
1194. Hospital Authority of Baxley and Appling County (GA), Georgia
1195. Hospital Authority of Bleckley County (GA), Georgia
1196. Hospital Authority of Valdosta and Lowndes County (GA), Georgia
1197. Hospital Authority of Wayne County (GA), Georgia

1198. Houston (GA), County of (Sheriff), Georgia
1199. Houston (GA), County of, Georgia
1200. Irwin (GA), County of, Georgia
1201. Jackson (GA), County of, Georgia
1202. Jasper (GA), County of, Georgia
1203. Jeff Davis (GA), County of (Sheriff), Georgia
1204. Jeff Davis (GA), County of, Georgia
1205. Jefferson (GA), County of, Georgia
1206. Johnson (GA), County of, Georgia
1207. Jones (GA), County of (Sheriff), Georgia
1208. Jones (GA), County of, Georgia
1209. Lakeland (GA), City of, Georgia
1210. Lanier (GA), County of, Georgia
1211. Laurens (GA), County of (Sheriff), Georgia
1212. Laurens (GA), County of, Georgia
1213. Lee (GA), County of, Georgia
1214. Liberty (GA), County of, Georgia
1215. Lincoln (GA), County of, Georgia
1216. Long (GA), County of, Georgia
1217. Lowndes (GA), County of, Georgia
1218. Lumpkin (GA), County of, Georgia
1219. Macon (GA), County of, Georgia
1220. Macon-Bibb (GA), County of, Georgia
1221. Madison (GA), County of, Georgia
1222. McDuffie (GA), County of, Georgia
1223. McIntosh (GA), County of, Georgia
1224. Meriwether (GA), County of (Sheriff), Georgia
1225. Meriwether (GA), County of, Georgia
1226. Milledgeville (GA), City of, Georgia
1227. Monroe (GA), County of, Georgia
1228. Montgomery (GA), County of, Georgia
1229. Murray (GA), County of (Sheriff), Georgia
1230. Nashville (GA), City of, Georgia
1231. Newton (GA), County of, Georgia
1232. Oconee (GA), County of (Sheriff), Georgia
1233. Oconee (GA), County of, Georgia
1234. Oglethorpe (GA), County of, Georgia
1235. Peach (GA), County of (Sheriff), Georgia
1236. Peach (GA), County of, Georgia

1237. Pierce (GA), County of (Sheriff), Georgia
1238. Pierce (GA), County of, Georgia
1239. Pike (GA), County of, Georgia
1240. Polk (GA), County of, Georgia
1241. Pooler (GA), City of, Georgia
1242. Pulaski (GA), County of, Georgia
1243. Rabun (GA), County of, Georgia
1244. Randolph (GA), County of, Georgia
1245. Richmond Hill (GA), City of, Georgia
1246. Rockdale (GA), County of, Georgia
1247. Rome (GA), City of, Georgia
1248. Sandy Springs (GA), City of, Georgia
1249. Savannah (GA), City of, Georgia
1250. Schley (GA), County of, Georgia
1251. Screven (GA), County of (Sheriff), Georgia
1252. Screven (GA), County of, Georgia
1253. Seminole (GA), County of, Georgia
1254. Spalding (GA), County of, Georgia
1255. Springfield (GA), City of, Georgia
1256. Stephens (GA), County of, Georgia
1257. Sumter (GA), County of, Georgia
1258. Taliaferro (GA), County of, Georgia
1259. Tattnall (GA), County of, Georgia
1260. Telfair (GA), County of (Sheriff), Georgia
1261. Tift (GA), County of (Sheriff), Georgia
1262. Tifton (GA), City of, Georgia
1263. Toombs (GA), County of, Georgia
1264. Towns (GA), County of, Georgia
1265. Troup (GA), County of, Georgia
1266. Twiggs (GA), County of, Georgia
1267. Union (GA), County of, Georgia
1268. Walton (GA), County of, Georgia
1269. Ware (GA), County of (Sheriff), Georgia
1270. Warren (GA), County of, Georgia
1271. Warwick (GA), City of, Georgia
1272. Washington (GA), County of, Georgia
1273. Wayne (GA), County of (Sheriff), Georgia
1274. Wayne (GA), County of, Georgia
1275. Whitfield (GA), County of, Georgia
1276. Wilcox (GA), County of, Georgia
1277. Wilkes (GA), County of, Georgia
1278. Wilkinson (GA), County of, Georgia
1279. Woodbury (GA), City of, Georgia

1280. Worth (GA), County of, Georgia
1281. Hawai'i (HI), County of, Hawai'i
1282. Kaua'i (HI), County of, Hawai'i
1283. Ada (ID), County of, Idaho
1284. Adams (ID), County of, Idaho
1285. Bannock (ID), County of, Idaho
1286. Bingham (ID), County of, Idaho
1287. Blaine (ID), County of, Idaho
1288. Boise (ID), City of, Idaho
1289. Boise (ID), County of, Idaho
1290. Bonneville (ID), County of, Idaho
1291. Camas (ID), County of, Idaho
1292. Canyon (ID), County of, Idaho
1293. Caribou (ID), County of, Idaho
1294. Cassia (ID), County of, Idaho
1295. Chubbuck (ID), City of, Idaho
1296. Elmore (ID), County of, Idaho
1297. Gooding (ID), County of, Idaho
1298. Latah (ID), County of, Idaho
1299. Minidoka (ID), County of, Idaho
1300. Owyhee (ID), County of, Idaho
1301. Payette (ID), County of, Idaho
1302. Pocatello (ID), City of, Idaho
1303. Preston (ID), City of, Idaho
1304. Twin Falls (ID), City of, Idaho
1305. Twin Falls (ID), County of, Idaho
1306. Addison (IL), Village of, Illinois
1307. Alexander (IL), County of, Illinois
1308. Anna (IL), City of, Illinois
1309. Bedford Park (IL), Village of, Illinois
1310. Bellwood (IL), Village of, Illinois
1311. Bensenville (IL), Village of, Illinois
1312. Benton (IL), City of, Illinois
1313. Berkeley (IL), Village of, Illinois
1314. Berwyn (IL), City of, Illinois
1315. Board of Education of East Aurora, School District 131 (IL), Illinois
1316. Board of Education of Joliet Township High School, District 204 (IL), Illinois
1317. Board of Education of Thornton Fractional Township High Schools, District 215 (IL), Illinois
1318. Board of Education of Thornton Township High Schools, District 205 (IL), Illinois
1319. Bolingbrook (IL), Village of, Illinois
1320. Bond (IL), County of, Illinois

1321. Boone (IL), County of, Illinois
1322. Bridgeview (IL), Village of, Illinois
1323. Broadview (IL), Village of, Illinois
1324. Burbank (IL), City of, Illinois
1325. Bureau (IL), County of, Illinois
1326. Calhoun (IL), County of, Illinois
1327. Carbondale (IL), City of, Illinois
1328. Champaign (IL), County of, Illinois
1329. Chicago (IL), City of, Illinois
1330. Chicago Board of Education District No. 299 (IL), Illinois
1331. Chicago Heights (IL), City of, Illinois
1332. Chicago Ridge (IL), Village of, Illinois
1333. Christian (IL), County of, Illinois
1334. Coles (IL), County of, Illinois
1335. Cook (IL), County of, Illinois
1336. Countryside (IL), City of, Illinois
1337. DeKalb (IL), County of, Illinois
1338. Dolton (IL), Village of, Illinois
1339. DuPage (IL), County of, Illinois
1340. Edwards (IL), County of, Illinois
1341. Effingham (IL), County of, Illinois
1342. Evergreen Park (IL), Village of, Illinois
1343. Forest Park (IL), Village of, Illinois
1344. Franklin (IL), County of, Illinois
1345. Franklin Park (IL), Village of, Illinois
1346. Gallatin (IL), County of, Illinois
1347. Granite City (IL), City of, Illinois
1348. Hamilton (IL), County of, Illinois
1349. Hardin (IL), County of, Illinois
1350. Harrisburg (IL), City of, Illinois
1351. Harvey (IL), City of, Illinois
1352. Harwood Heights (IL), Village of, Illinois
1353. Henry (IL), County of, Illinois
1354. Herrin (IL), City of, Illinois
1355. Hillside (IL), Village of, Illinois
1356. Hodgkins (IL), Village of, Illinois
1357. Hoffman Estates (IL), Village of, Illinois
1358. Jasper (IL), County of, Illinois
1359. Jefferson (IL), County of, Illinois
1360. Jersey (IL), County of, Illinois
1361. Johnson (IL), County of, Illinois
1362. Kane (IL), County of, Illinois
1363. Kankakee (IL), City of, Illinois
1364. Kankakee (IL), County of, Illinois
1365. Kendall (IL), County of, Illinois

1366. La Grange Park (IL), Village of, Illinois
1367. Lake (IL), County of (Sheriff), Illinois
1368. Lake (IL), County of, Illinois
1369. LaSalle (IL), County of, Illinois
1370. Lawrence (IL), County of, Illinois
1371. Lee (IL), County of, Illinois
1372. Livingston (IL), County of, Illinois
1373. Lyons (IL), Township of, Illinois
1374. Lyons (IL), Village of, Illinois
1375. Macon (IL), County of, Illinois
1376. Macoupin (IL), County of, Illinois
1377. Marion (IL), City of, Illinois
1378. Marion (IL), County of, Illinois
1379. Massac (IL), County of, Illinois
1380. Maywood (IL), Village of, Illinois
1381. McCook (IL), Village of, Illinois
1382. McHenry (IL), County of, Illinois
1383. McLean (IL), County of, Illinois
1384. Melrose Park (IL), Village of, Illinois
1385. Merrionette Park (IL), Village of, Illinois
1386. Metropolis (IL), City of, Illinois
1387. North Riverside (IL), Village of, Illinois
1388. Northlake (IL), City of, Illinois
1389. Oak Lawn (IL), Village of, Illinois
1390. Oak Park (IL), Village of, Illinois
1391. Orland Fire Protection District (IL), Illinois
1392. Orland Park (IL), Village of, Illinois
1393. Palos Heights (IL), City of, Illinois
1394. Palos Hills (IL), City of, Illinois
1395. Pekin (IL), City of, Illinois
1396. Peoria (IL), City of, Illinois
1397. Piatt (IL), County of, Illinois
1398. Posen (IL), Village of, Illinois
1399. Princeton (IL), City of, Illinois
1400. Pulaski (IL), County of, Illinois
1401. River Forest (IL), Village of, Illinois
1402. River Grove (IL), Village of, Illinois
1403. Riverside (IL), Village of, Illinois
1404. Rockford (IL), City of, Illinois
1405. Saline (IL), County of, Illinois
1406. Sangamon (IL), County of, Illinois
1407. Schiller Park (IL), Village of, Illinois
1408. Schuyler (IL), County of, Illinois
1409. Sesser (IL), City of, Illinois
1410. Shelby (IL), County of, Illinois
1411. St. Clair (IL), County of, Illinois

1412. Stone Park (IL), Village of, Illinois
1413. Streator (IL), City of, Illinois
1414. Summit (IL), Village of, Illinois
1415. Tinley Park (IL), Village of, Illinois
1416. Union (IL), County of, Illinois
1417. Wabash (IL), County of, Illinois
1418. Washington (IL), County of, Illinois
1419. Waukegan Community Unit School District (IL), Illinois
1420. West Frankfort (IL), City of, Illinois
1421. West Franklin (IL), County of (Central Dispatch), Illinois
1422. White (IL), County of, Illinois
1423. Will (IL), County of, Illinois
1424. Williamson (IL), County of, Illinois
1425. Winnebago (IL), County of, Illinois
1426. Alexandria (IN), City of, Indiana
1427. Allen (IN), County of, Indiana
1428. Austin (IN), City of, Indiana
1429. Beech Grove (IN), City of, Indiana
1430. Benton (IN), County of, Indiana
1431. Blackford (IN), County of, Indiana
1432. Bloomington (IN), City of, Indiana
1433. Brownstown (IN), Town of, Indiana
1434. Chandler (IN), Town of, Indiana
1435. Connersville (IN), City of, Indiana
1436. Danville (IN), Town of, Indiana
1437. Delaware (IN), County of, Indiana
1438. Elwood (IN), City of, Indiana
1439. Evansville (IN), City of, Indiana
1440. Fayette (IN), County of, Indiana
1441. Fishers (IN), City of, Indiana
1442. Fort Wayne Community Schools (IN), Indiana
1443. Franklin (IN), City of, Indiana
1444. Franklin (IN), County of, Indiana
1445. Gary (IN), City of, Indiana
1446. Greenwood (IN), City of, Indiana
1447. Hammond (IN), City of, Indiana
1448. Hartford City (IN), City of, Indiana
1449. Howard (IN), County of, Indiana
1450. Huntington (IN), City of, Indiana
1451. Indianapolis (IN), City of, Indiana
1452. Jackson (IN), County of, Indiana
1453. Jasper (IN), City of, Indiana
1454. Jay (IN), County of, Indiana
1455. Jeffersonville (IN), City of, Indiana

1456. Jennings (IN), County of, Indiana
1457. Kokomo (IN), City of, Indiana
1458. Lafayette (IN), City of, Indiana
1459. Lake (IN), County of, Indiana
1460. LaPorte (IN), County of, Indiana
1461. Lawrence (IN), City of, Indiana
1462. Lawrence (IN), County of, Indiana
1463. Logansport (IN), City of, Indiana
1464. Madison (IN), City of, Indiana
1465. Madison (IN), County of, Indiana
1466. Marion (IN), County of, Indiana
1467. Marshall (IN), County of, Indiana
1468. Martinsville (IN), City of, Indiana
1469. Mishawaka (IN), City of, Indiana
1470. Monroe (IN), County of, Indiana
1471. Montpelier (IN), City of, Indiana
1472. Mooresville (IN), Town of, Indiana
1473. Morgan (IN), County of, Indiana
1474. New Albany (IN), City of, Indiana
1475. New Castle (IN), City of, Indiana
1476. Noblesville (IN), City of, Indiana
1477. Orange (IN), County of, Indiana
1478. Pendleton (IN), Town of, Indiana
1479. Penn-Harris-Madison School
Corporation (IN), Indiana
1480. Peru (IN), City of, Indiana
1481. Plainfield (IN), Town of, Indiana
1482. Porter (IN), County of, Indiana
1483. Portland (IN), City of, Indiana
1484. Pulaski (IN), County of, Indiana
1485. Richmond (IN), City of, Indiana
1486. Ripley (IN), County of, Indiana
1487. School City of Mishawaka (IN), Indiana
1488. Scott (IN), County of, Indiana
1489. Seymour (IN), City of, Indiana
1490. Shelbyville (IN), City of, Indiana
1491. Sheridan (IN), Town of, Indiana
1492. Smith-Green Community Schools (IN),
Indiana
1493. South Bend (IN), City of, Indiana
1494. South Bend Community School
Corporation (IN), Indiana
1495. St. Joseph (IN), County of, Indiana
1496. Starke (IN), County of, Indiana
1497. Tippecanoe (IN), County of, Indiana
1498. Upland (IN), Town of, Indiana
1499. Vanderburgh (IN), County of, Indiana

1500. Vigo (IN), County of, Indiana
1501. West Lafayette (IN), City of, Indiana
1502. Westfield (IN), City of, Indiana
1503. Zionsville (IN), Town of, Indiana
1504. Adair (IA), County of, Iowa
1505. Adams (IA), County of, Iowa
1506. Allamakee (IA), County of, Iowa
1507. Appanoose (IA), County of, Iowa
1508. Audubon (IA), County of, Iowa
1509. Benton (IA), County of, Iowa
1510. Black Hawk (IA), County of, Iowa
1511. Bremer (IA), County of, Iowa
1512. Buchanan (IA), County of, Iowa
1513. Buena Vista (IA), County of, Iowa
1514. Calhoun (IA), County of, Iowa
1515. Carroll (IA), County of, Iowa
1516. Cedar (IA), County of, Iowa
1517. Cerro Gordo (IA), County of, Iowa
1518. Cherokee (IA), County of, Iowa
1519. Chickasaw (IA), County of, Iowa
1520. Clay (IA), County of, Iowa
1521. Clayton (IA), County of, Iowa
1522. Clinton (IA), County of, Iowa
1523. Dallas (IA), County of, Iowa
1524. Delaware (IA), County of, Iowa
1525. Des Moines (IA), County of, Iowa
1526. Emmet (IA), County of, Iowa
1527. Fayette (IA), County of, Iowa
1528. Fremont (IA), County of, Iowa
1529. Hamilton (IA), County of, Iowa
1530. Hancock (IA), County of, Iowa
1531. Hardin (IA), County of, Iowa
1532. Harrison (IA), County of, Iowa
1533. Henry (IA), County of, Iowa
1534. Howard (IA), County of, Iowa
1535. Humboldt (IA), County of, Iowa
1536. Ida (IA), County of, Iowa
1537. Jasper (IA), County of, Iowa
1538. Johnson (IA), County of, Iowa
1539. Jones (IA), County of, Iowa
1540. Keokuk (IA), County of, Iowa
1541. Lee (IA), County of, Iowa
1542. Lyon (IA), County of, Iowa
1543. Madison (IA), County of, Iowa
1544. Mahaska (IA), County of, Iowa
1545. Marion (IA), County of, Iowa

1546. Mills (IA), County of, Iowa
1547. Mitchell (IA), County of, Iowa
1548. Monroe (IA), County of, Iowa
1549. Montgomery (IA), County of, Iowa
1550. Muscatine (IA), County of, Iowa
1551. O'Brien (IA), County of, Iowa
1552. Osceola (IA), County of, Iowa
1553. Plymouth (IA), County of, Iowa
1554. Pocahontas (IA), County of, Iowa
1555. Polk (IA), County of, Iowa
1556. Pottawattamie (IA), County of, Iowa
1557. Poweshiek (IA), County of, Iowa
1558. Sac (IA), County of, Iowa
1559. Scott (IA), County of, Iowa
1560. Shelby (IA), County of, Iowa
1561. Sioux (IA), County of, Iowa
1562. Tama (IA), County of, Iowa
1563. Taylor (IA), County of, Iowa
1564. Union (IA), County of, Iowa
1565. Webster (IA), County of, Iowa
1566. Winnebago (IA), County of, Iowa
1567. Winneshiek (IA), County of, Iowa
1568. Worth (IA), County of, Iowa
1569. Wright (IA), County of, Iowa
1570. Allen (KS), County of, Kansas
1571. Barber (KS), County of, Kansas
1572. Bourbon (KS), County of, Kansas
1573. Cherokee (KS), County of, Kansas
1574. Cowley (KS), County of, Kansas
1575. Crawford (KS), County of, Kansas
1576. Dickinson (KS), County of, Kansas
1577. Elk (KS), County of, Kansas
1578. Elkhart (KS), City of, Kansas
1579. Finney (KS), County of, Kansas
1580. Ford (KS), County of, Kansas
1581. Grant (KS), County of, Kansas
1582. Greenwood (KS), County of, Kansas
1583. Harvey (KS), County of, Kansas
1584. Johnson (KS), County of, Kansas
1585. Leavenworth (KS), County of, Kansas
1586. Manter (KS), City of, Kansas
1587. Meade (KS), County of, Kansas
1588. Montgomery (KS), County of, Kansas
1589. Morton (KS), County of, Kansas
1590. Neosho (KS), County of, Kansas
1591. Overland Park (KS), City of, Kansas

1592. Pratt (KS), County of, Kansas
1593. Reno (KS), County of, Kansas
1594. Sedgwick (KS), County of, Kansas
1595. Seward (KS), County of, Kansas
1596. Shawnee (KS), County of, Kansas
1597. Stanton (KS), County of, Kansas
1598. Ulysses (KS), City of, Kansas
1599. Wabaunsee (KS), County of, Kansas
1600. Wichita (KS), City of, Kansas
1601. Wyandotte County/Kansas City (KS), Unified Government of, Kansas
1602. Adair (KY), County of (Fiscal Court), Kentucky
1603. Allen (KY), County of, Kentucky
1604. Anderson (KY), County of (Fiscal Court), Kentucky
1605. Ballard (KY), County of, Kentucky
1606. Bath (KY), County of (Fiscal Court), Kentucky
1607. Bell (KY), County of (Fiscal Court), Kentucky
1608. Bellefonte (KY), City of, Kentucky
1609. Benham (KY), City of, Kentucky
1610. Board of Education of Breathitt County Public Schools (KY), Kentucky
1611. Board of Education of Bullitt County Public Schools (KY), Kentucky
1612. Board of Education of Estill County Public Schools (KY), Kentucky
1613. Board of Education of Fayette County Public Schools (KY), Kentucky
1614. Board of Education of Harrison County Public Schools (KY), Kentucky
1615. Board of Education of Hart County Public Schools (KY), Kentucky
1616. Board of Education of Jefferson County Public Schools (KY), Kentucky
1617. Board of Education of Johnson County Public School District (KY), Kentucky
1618. Board of Education of LaRue County Public Schools (KY), Kentucky
1619. Board of Education of Lawrence County Public Schools (KY), Kentucky
1620. Board of Education of Martin County Public Schools (KY), Kentucky
1621. Board of Education of Menifee County Public Schools (KY), Kentucky

1622. Board of Education of Owsley County Public Schools (KY), Kentucky

1623. Board of Education of Wolfe County Public Schools (KY), Kentucky

1624. Boone (KY), County of (Fiscal Court), Kentucky

1625. Bourbon (KY), County of (Fiscal Court), Kentucky

1626. Boyd (KY), County of (Fiscal Court), Kentucky

1627. Boyle (KY), County of (Fiscal Court), Kentucky

1628. Bracken (KY), County of (Fiscal Court), Kentucky

1629. Breathitt (KY), County of (Fiscal Court), Kentucky

1630. Breckinridge (KY), County of, Kentucky

1631. Buckhorn (KY), City of, Kentucky

1632. Bullitt (KY), County of (Fiscal Court), Kentucky

1633. Caldwell (KY), County of (Fiscal Court), Kentucky

1634. Calloway (KY), County of (Fiscal Court), Kentucky

1635. Campbell (KY), County of (Fiscal Court), Kentucky

1636. Campbellsville (KY), City of, Kentucky

1637. Carlisle (KY), County of (Fiscal Court), Kentucky

1638. Carter (KY), County of (Fiscal Court), Kentucky

1639. Casey (KY), County of (Fiscal Court), Kentucky

1640. Christian (KY), County of (Fiscal Court), Kentucky

1641. Clark (KY), County of (Fiscal Court), Kentucky

1642. Clay (KY), County of (Fiscal Court), Kentucky

1643. Clinton (KY), County of (Fiscal Court), Kentucky

1644. Columbia (KY), City of, Kentucky

1645. Covington (KY), City of, Kentucky

1646. Cumberland (KY), County of (Fiscal Court), Kentucky

1647. Daviess (KY), County of (Fiscal Court), Kentucky

1648. Edmonson (KY), County of (Fiscal Court), Kentucky

1649. Elliott (KY), County of (Fiscal Court), Kentucky

1650. Estill (KY), County of (Fiscal Court), Kentucky

1651. Estill County Emergency Medical Services (KY), Kentucky

1652. Fleming (KY), County of (Fiscal Court), Kentucky

1653. Florence (KY), City of, Kentucky

1654. Floyd (KY), County of, Kentucky

1655. Franklin (KY), County of (Fiscal Court), Kentucky

1656. Fulton (KY), County of (Fiscal Court), Kentucky

1657. Gallatin (KY), County of (Fiscal Court), Kentucky

1658. Garrard (KY), County of (Fiscal Court), Kentucky

1659. Grant (KY), County of (Fiscal Court), Kentucky

1660. Grayson (KY), City of, Kentucky

1661. Green (KY), County of (Fiscal Court), Kentucky

1662. Greenup (KY), County of (Fiscal Court), Kentucky

1663. Greenup (KY), City of, Kentucky

1664. Hancock (KY), County of (Fiscal Court), Kentucky

1665. Hardin (KY), County of (Fiscal Court), Kentucky

1666. Harlan (KY), County of (Fiscal Court), Kentucky

1667. Harlan (KY), City of, Kentucky

1668. Harrison (KY), County of (Fiscal Court), Kentucky

1669. Hart (KY), County of (Fiscal Court), Kentucky

1670. Henderson (KY), County of (Fiscal Court), Kentucky

1671. Henderson (KY), City of, Kentucky

1672. Henry (KY), County of (Fiscal Court), Kentucky

1673. Hickman (KY), County of (Fiscal Court), Kentucky

1674. Hillview (KY), City of, Kentucky

1675. Hopkins (KY), County of (Fiscal Court), Kentucky

1676. Hyden (KY), City of, Kentucky

1677. Inez (KY), City of, Kentucky

1678. Jamestown (KY), City of, Kentucky

1679. Jenkins (KY), City of, Kentucky

1680. Jessamine (KY), County of (Fiscal Court), Kentucky

1681. Kenton (KY), County of (Fiscal Court), Kentucky

1682. Kentucky River District Health Department (KY), Kentucky

1683. Knott (KY), County of, Kentucky

1684. Knox (KY), County of (Fiscal Court), Kentucky

1685. Larue (KY), County of (Fiscal Court), Kentucky

1686. Laurel (KY), County of (Fiscal Court), Kentucky

1687. Lawrence (KY), County of, Kentucky

1688. Lee (KY), County of (Fiscal Court), Kentucky

1689. Leslie (KY), County of (Fiscal Court), Kentucky

1690. Letcher (KY), County of (Fiscal Court), Kentucky

1691. Lewis (KY), County of (Fiscal Court), Kentucky

1692. Lexington-Fayette Urban (KY), County of, Kentucky

1693. Lincoln (KY), County of (Fiscal Court), Kentucky

1694. Logan (KY), County of (Fiscal Court), Kentucky

1695. London (KY), City of, Kentucky

1696. Louisville-Jefferson (KY), County of, Kentucky

1697. Loyall (KY), City of, Kentucky

1698. Lynch (KY), City of, Kentucky

1699. Madison (KY), County of (Fiscal Court), Kentucky

1700. Manchester (KY), City of, Kentucky

1701. Marshall (KY), County of (Fiscal Court), Kentucky

1702. Martin (KY), County of (Fiscal Court), Kentucky

1703. Mason (KY), County of (Fiscal Court), Kentucky

1704. McCracken (KY), County of, Kentucky

1705. McLean (KY), County of (Fiscal Court), Kentucky

1706. Meade (KY), County of (Fiscal Court), Kentucky

1707. Mercer (KY), County of (Fiscal Court), Kentucky

1708. Monroe (KY), County of (Fiscal Court), Kentucky

1709. Montgomery (KY), County of (Fiscal Court), Kentucky

1710. Morehead (KY), City of, Kentucky

1711. Morgan (KY), County of (Fiscal Court), Kentucky

1712. Morganfield (KY), City of, Kentucky

1713. Mt. Washington (KY), City of, Kentucky

1714. Muhlenberg (KY), County of (Fiscal Court), Kentucky

1715. Murray (KY), City of, Kentucky

1716. Nicholas (KY), County of (Fiscal Court), Kentucky

1717. Ohio (KY), County of (Fiscal Court), Kentucky

1718. Oldham (KY), County of (Fiscal Court), Kentucky

1719. Owen (KY), County of (Fiscal Court), Kentucky

1720. Owensboro (KY), City of, Kentucky

1721. Owsley (KY), County of (Fiscal Court), Kentucky

1722. Paducah (KY), City of, Kentucky

1723. Paintsville (KY), City of, Kentucky

1724. Pendleton (KY), County of (Fiscal Court), Kentucky

1725. Perry (KY), County of (Fiscal Court), Kentucky

1726. Pike (KY), County of, Kentucky

1727. Pineville (KY), City of, Kentucky

1728. Pippa Passes (KY), City of, Kentucky

1729. Powell (KY), County of (Fiscal Court), Kentucky

1730. Prestonsburg (KY), City of, Kentucky

1731. Pulaski (KY), County of (Fiscal Court), Kentucky

1732. Rowan (KY), County of (Fiscal Court), Kentucky

1733. Russell (KY), County of (Fiscal Court), Kentucky

1734. Russell (KY), City of, Kentucky
1735. Russell Springs (KY), City of, Kentucky
1736. Scott (KY), County of (Fiscal Court), Kentucky
1737. Shelby (KY), County of (Fiscal Court), Kentucky
1738. Shepherdsville (KY), City of, Kentucky
1739. South Shore (KY), City of, Kentucky
1740. Spencer (KY), County of (Fiscal Court), Kentucky
1741. Taylor (KY), County of (Fiscal Court), Kentucky
1742. Taylor County Hospital District Health Facilities Corporation (KY), Kentucky
1743. Todd (KY), County of (Fiscal Court), Kentucky
1744. Union (KY), County of (Fiscal Court), Kentucky
1745. Vanceburg (KY), City of, Kentucky
1746. Warfield (KY), City of, Kentucky
1747. Warren (KY), County of, Kentucky
1748. Wayne (KY), County of (Fiscal Court), Kentucky
1749. Webster (KY), County of (Fiscal Court), Kentucky
1750. West Liberty (KY), City of, Kentucky
1751. Whitesburg (KY), City of, Kentucky
1752. Whitley (KY), County of (Fiscal Court), Kentucky
1753. Winchester (KY), City of, Kentucky
1754. Wolfe (KY), County of (Fiscal Court), Kentucky
1755. Woodford (KY), County of (Fiscal Court), Kentucky
1756. Worthington (KY), City of, Kentucky
1757. Abita Springs (LA), Town of, Louisiana
1758. Acadia-St. Landry Hospital Service District (LA), Louisiana
1759. Alexandria (LA), City of, Louisiana
1760. Allen (LA), Parish of (Sheriff), Louisiana
1761. Ascension (LA), Parish of (Sheriff), Louisiana
1762. Ascension (LA), Parish of, Louisiana
1763. Ascension Parish School Board (LA), Louisiana
1764. Assumption (LA), Parish of (Sheriff), Louisiana
1765. Assumption (LA), Parish of, Louisiana
1766. Avoyelles (LA), Parish of (Sheriff), Louisiana
1767. Avoyelles (LA), Parish of, Louisiana
1768. Baldwin (LA), Town of, Louisiana
1769. Bastrop (LA), City of, Louisiana
1770. Baton Rouge (LA), City of, Louisiana
1771. Beauregard (LA), Parish of, Louisiana
1772. Benton Fire Protection District No. 4 (LA), Louisiana
1773. Berwick (LA), Town of, Louisiana
1774. Bienville (LA), Parish of (Sheriff), Louisiana
1775. Bogalusa (LA), City of, Louisiana
1776. Bossier (LA), Parish of, Louisiana
1777. Bossier City (LA), City of, Louisiana
1778. Bossier Parish Emergency Medical Services Ambulance District (LA), Louisiana
1779. Caddo (LA), Parish of, Louisiana
1780. Caddo Fire Protection District No. 1 (LA), Louisiana
1781. Calcasieu (LA), Parish of (Sheriff), Louisiana
1782. Calcasieu (LA), Parish of, Louisiana
1783. Caldwell (LA), Parish of, Louisiana
1784. Cameron (LA), Parish of, Louisiana
1785. Catahoula (LA), Parish of (Sheriff), Louisiana
1786. Catahoula (LA), Parish of, Louisiana
1787. Claiborne (LA), Parish of, Louisiana
1788. Concordia (LA), Parish of (Sheriff), Louisiana
1789. Concordia (LA), Parish of, Louisiana
1790. Covington (LA), City of, Louisiana
1791. Delhi (LA), Town of, Louisiana
1792. DeSoto (LA), Parish of, Louisiana
1793. DeSoto Fire Protection District No. 8 (LA), Louisiana
1794. Donaldsonville (LA), City of, Louisiana
1795. East Baton Rouge (LA), Parish of (Sheriff), Louisiana
1796. East Baton Rouge (LA), Parish of, Louisiana
1797. East Carroll (LA), Parish of (Sheriff), Louisiana
1798. East Carroll (LA), Parish of, Louisiana
1799. Eunice (LA), City of, Louisiana

1800. Evangeline (LA), Parish of (Sheriff), Louisiana
1801. Evangeline (LA), Parish of, Louisiana
1802. Ferriday (LA), Town of, Louisiana
1803. Franklin (LA), Parish of, Louisiana
1804. Franklin (LA), City of, Louisiana
1805. Gramercy (LA), Town of, Louisiana
1806. Grant (LA), Parish of (Sheriff), Louisiana
1807. Grant (LA), Parish of, Louisiana
1808. Gretna (LA), City of, Louisiana
1809. Hospital Service District No. 1 of the Parish of Avoyelles (LA), Louisiana
1810. Hospital Service District No. 1 of the Parish of LaSalle (LA), Louisiana
1811. Iberia (LA), Parish of (Sheriff), Louisiana
1812. Iberia (LA), Parish of, Louisiana
1813. Iberia Parish School Board (LA), Louisiana
1814. Iberville (LA), Parish of, Louisiana
1815. Jackson (LA), Parish of (Sheriff), Louisiana
1816. Jackson (LA), Parish of, Louisiana
1817. Jean Lafitte (LA), Town of, Louisiana
1818. Jefferson (LA), Parish of (Sheriff), Louisiana
1819. Jefferson (LA), Parish of, Louisiana
1820. Jefferson Davis (LA), Parish of (Sheriff), Louisiana
1821. Jefferson Davis (LA), Parish of, Louisiana
1822. Jefferson Parish Coroner's Office (LA), Louisiana
1823. Jefferson Parish Hospital Service District No. 1 (LA), Louisiana
1824. Jefferson Parish Hospital Service District No. 2 (LA), Louisiana
1825. Kenner (LA), City of, Louisiana
1826. Lafayette (LA), Parish of (Sheriff), Louisiana
1827. Lafourche (LA), Parish of, Louisiana
1828. Lafourche Parish School Board (LA), Louisiana
1829. Lake Charles (LA), City of, Louisiana
1830. Lake Providence (LA), Town of, Louisiana
1831. LaSalle (LA), Parish of, Louisiana
1832. Lincoln (LA), Parish of (Sheriff), Louisiana
1833. Livingston (LA), Parish of (Sheriff), Louisiana
1834. Livingston (LA), Parish of, Louisiana
1835. Lutcher (LA), Town of, Louisiana
1836. Madisonville (LA), Town of, Louisiana
1837. Mandeville (LA), City of, Louisiana
1838. Monroe (LA), City of, Louisiana
1839. Morehouse (LA), Parish of (Sheriff), Louisiana
1840. Morehouse (LA), Parish of, Louisiana
1841. Morgan City (LA), City of, Louisiana
1842. Natchitoches (LA), City of, Louisiana
1843. Natchitoches (LA), Parish of (Parish Council), Louisiana
1844. New Iberia (LA), City of, Louisiana
1845. New Orleans (LA), City of, Louisiana
1846. New Roads (LA), City of, Louisiana
1847. North Caddo Hospital Service District (LA), Louisiana
1848. Opelousas (LA), City of, Louisiana
1849. Opelousas General Hospital Authority (LA), Louisiana
1850. Orleans (LA), Parish of (DA), Louisiana
1851. Orleans (LA), Parish of (Sheriff), Louisiana
1852. Orleans Parish Hospital Service Dist. – District A (LA), Louisiana
1853. Ouachita (LA), Parish of (Sheriff), Louisiana
1854. Ouachita (LA), Parish of, Louisiana
1855. Patterson (LA), City of, Louisiana
1856. Pearl River (LA), Town of, Louisiana
1857. Pineville (LA), City of, Louisiana
1858. Pointe Coupee (LA), Parish of, Louisiana
1859. Pointe Coupee Parish Health Services District Number 1 (LA), Louisiana
1860. Rapides (LA), Parish of (Sheriff), Louisiana
1861. Rapides (LA), Parish of (DA), Louisiana
1862. Rapides (LA), Parish of, Louisiana
1863. Red River (LA), Parish of, Louisiana
1864. Red River Fire Protection District (LA), Louisiana
1865. Richland (LA), Parish of (Sheriff), Louisiana
1866. Richland (LA), Parish of, Louisiana

1867. Richwood (LA), Town of, Louisiana
1868. Sabine (LA), Parish of (Sheriff), Louisiana
1869. Sabine (LA), Parish of, Louisiana
1870. Saint Martinville (LA), City of, Louisiana
1871. Shreveport (LA), City of, Louisiana
1872. Slidell (LA), City of, Louisiana
1873. St. Bernard (LA), Parish of (Sheriff), Louisiana
1874. St. Bernard (LA), Parish of, Louisiana
1875. St. Bernard Parish Coroner's Office (LA), Louisiana
1876. St. Bernard Parish School Board (LA), Louisiana
1877. St. Charles (LA), Parish of (Sheriff), Louisiana
1878. St. Charles (LA), Parish of, Louisiana
1879. St. James (LA), Parish of, Louisiana
1880. St. James Parish School Board (LA), Louisiana
1881. St. John the Baptist (LA), Parish of, Louisiana
1882. St. Landry (LA), Parish of (Sheriff), Louisiana
1883. St. Landry (LA), Parish of, Louisiana
1884. St. Martin (LA), Parish of, Louisiana
1885. St. Mary (LA), Parish of (Sheriff), Louisiana
1886. St. Mary (LA), Parish of, Louisiana
1887. St. Mary Parish School Board (LA), Louisiana
1888. St. Tammany (LA), Parish of (Sheriff), Louisiana
1889. St. Tammany (LA), Parish of, Louisiana
1890. St. Tammany (LA), Parish of (DA), Louisiana
1891. St. Tammany Fire Protection District No. 1 (LA), Louisiana
1892. St. Tammany Fire Protection District No. 12 (LA), Louisiana
1893. St. Tammany Fire Protection District No. 13 (LA), Louisiana
1894. St. Tammany Fire Protection District No. 2 (LA), Louisiana
1895. St. Tammany Fire Protection District No. 3 (LA), Louisiana
1896. St. Tammany Fire Protection District No. 4 (LA), Louisiana
1897. St. Tammany Fire Protection District No. 5 (LA), Louisiana
1898. St. Tammany Parish Coroner's Office (LA), Louisiana
1899. Tensas (LA), Parish of (Sheriff), Louisiana
1900. Terrebonne (LA), Parish of (Sheriff), Louisiana
1901. Terrebonne (LA), Parish of, Louisiana
1902. Union (LA), Parish of (Sheriff), Louisiana
1903. Union (LA), Parish of, Louisiana
1904. Vermilion (LA), Parish of, Louisiana
1905. Vernon (LA), Parish of (Sheriff), Louisiana
1906. Vernon (LA), Parish of, Louisiana
1907. Washington (LA), Parish of (Sheriff), Louisiana
1908. Washington (LA), Parish of, Louisiana
1909. Washington (LA), Parish of (DA), Louisiana
1910. Webster (LA), Parish of, Louisiana
1911. West Ascension Parish Hospital Service District (LA), Louisiana
1912. West Baton Rouge (LA), Parish of, Louisiana
1913. West Baton Rouge Fire Protection District No. 1 (LA), Louisiana
1914. West Carroll (LA), Parish of (Sheriff), Louisiana
1915. West Carroll (LA), Parish of, Louisiana
1916. West Monroe (LA), City of, Louisiana
1917. Westwego (LA), City of, Louisiana
1918. Winn (LA), Parish of (DA), Louisiana
1919. Winn (LA), Parish of, Louisiana
1920. Androscoggin (ME), County of, Maine
1921. Aroostook (ME), County of, Maine
1922. Auburn (ME), City of, Maine
1923. Augusta (ME), City of, Maine
1924. Bangor (ME), City of, Maine
1925. Biddeford (ME), City of, Maine
1926. Board of Education of Bangor School Department (ME), Maine
1927. Board of Education of Cape Elizabeth School Department (ME), Maine

1928. Board of Education of Ellsworth School Department (ME), Maine

1929. Board of Education of Maine Regional School Unit ("RSU") 9 (ME), Maine

1930. Board of Education of Maine RSU 10 (ME), Maine

1931. Board of Education of Maine RSU 13 (ME), Maine

1932. Board of Education of Maine RSU 25 (ME), Maine

1933. Board of Education of Maine RSU 26 (ME), Maine

1934. Board of Education of Maine RSU 29 (ME), Maine

1935. Board of Education of Maine RSU 34 (ME), Maine

1936. Board of Education of Maine RSU 40 (ME), Maine

1937. Board of Education of Maine RSU 50 (ME), Maine

1938. Board of Education of Maine RSU 57 (ME), Maine

1939. Board of Education of Maine RSU 60 (ME), Maine

1940. Board of Education of Maine RSU 71 (ME), Maine

1941. Board of Education of Maine School Administrative District ("SAD") 6 (ME), Maine

1942. Board of Education of Maine SAD 11 (ME), Maine

1943. Board of Education of Maine SAD 15 (ME), Maine

1944. Board of Education of Maine SAD 28/Five Town Central School District (ME), Maine

1945. Board of Education of Maine SAD 35 (ME), Maine

1946. Board of Education of Maine SAD 44 (ME), Maine

1947. Board of Education of Maine SAD 53 (ME), Maine

1948. Board of Education of Maine SAD 55 (ME), Maine

1949. Board of Education of Maine SAD 61 (ME), Maine

1950. Board of Education of Maine SAD 72 (ME), Maine

1951. Board of Education of Portland School Department (ME), Maine

1952. Board of Education of Scarborough School Department (ME), Maine

1953. Board of Education of South Portland School Department (ME), Maine

1954. Board of Education of St George Municipal School District (ME), Maine

1955. Board of Education of Waterville School Department (ME), Maine

1956. Calais (ME), City of, Maine

1957. Cumberland (ME), County of, Maine

1958. Kennebec (ME), County of, Maine

1959. Knox (ME), County of, Maine

1960. Lewiston (ME), City of, Maine

1961. Lincoln (ME), County of, Maine

1962. Penobscot (ME), County of, Maine

1963. Portland (ME), City of, Maine

1964. Rockland (ME), City of, Maine

1965. Saco (ME), City of, Maine

1966. Sagadahoc (ME), County of, Maine

1967. Sanford (ME), City of, Maine

1968. Somerset (ME), County of, Maine

1969. Waldo (ME), County of, Maine

1970. Washington (ME), County of, Maine

1971. Waterville (ME), City of, Maine

1972. York (ME), County of, Maine

1973. Aberdeen (MD), City of, Maryland

1974. Allegany (MD), County of, Maryland

1975. Annapolis (MD), City of, Maryland

1976. Anne Arundel (MD), County of, Maryland

1977. Baltimore (MD), City of, Maryland

1978. Baltimore (MD), County of, Maryland

1979. Baltimore City Board of School Commissioners (MD), Maryland

1980. Bel Air (MD), City of, Maryland

1981. Berlin (MD), City of, Maryland

1982. Bowie (MD), City of, Maryland

1983. Calvert (MD), County of, Maryland

1984. Cambridge (MD), City of, Maryland

1985. Caroline (MD), County of, Maryland

1986. Carroll (MD), County of, Maryland

1987. Cecil (MD), County of, Maryland

1988. Charles (MD), County of, Maryland

1989. Charlestown (MD), City of, Maryland

1990. Cottage City (MD), Town of, Maryland

1991. Cumberland (MD), City of, Maryland

1992. Dorchester (MD), County of, Maryland

1993. Forest Heights (MD), Town of, Maryland
1994. Frederick (MD), City of, Maryland
1995. Frederick (MD), County of, Maryland
1996. Frostburg (MD), City of, Maryland
1997. Garrett (MD), County of, Maryland
1998. Grantsville (MD), City of, Maryland
1999. Hagerstown (MD), City of, Maryland
2000. Harford (MD), County of, Maryland
2001. Havre De Grace (MD), City of, Maryland
2002. Howard (MD), County of, Maryland
2003. Laurel (MD), City of, Maryland
2004. Montgomery (MD), County of, Maryland
2005. Mountain Lake Park (MD), City of, Maryland
2006. North Brentwood (MD), Town of, Maryland
2007. North East (MD), City of, Maryland
2008. Oakland (MD), City of, Maryland
2009. Perryville (MD), City of, Maryland
2010. Prince George's (MD), County of, Maryland
2011. Rockville (MD), City of (Mayor and Common Council), Maryland
2012. Seat Pleasant (MD), City of, Maryland
2013. Somerset (MD), County of, Maryland
2014. St. Mary's (MD), County of, Maryland
2015. Talbot (MD), County of, Maryland
2016. Upper Marlboro (MD), Town of, Maryland
2017. Vienna (MD), City of, Maryland
2018. Washington (MD), County of, Maryland
2019. Westminster (MD), City of (Mayor and Common Council), Maryland
2020. Wicomico (MD), County of, Maryland
2021. Acushnet (MA), Town of, Massachusetts
2022. Agawam (MA), Town of, Massachusetts
2023. Amesbury (MA), City of, Massachusetts
2024. Andover (MA), Town of, Massachusetts
2025. Aquinnah (MA), Town of, Massachusetts
2026. Athol (MA), Town of, Massachusetts
2027. Auburn (MA), Town of, Massachusetts
2028. Ayer (MA), Town of, Massachusetts

2029. Barnstable (MA), Town of, Massachusetts
2030. Belchertown (MA), Town of, Massachusetts
2031. Beverly (MA), City of, Massachusetts
2032. Billerica (MA), Town of, Massachusetts
2033. Boston (MA), City of, Massachusetts
2034. Boston Housing Authority (MA), Massachusetts
2035. Boston Public Health Commission (MA), Massachusetts
2036. Braintree (MA), Town of, Massachusetts
2037. Brewster (MA), Town of, Massachusetts
2038. Bridgewater (MA), Town of, Massachusetts
2039. Brockton (MA), City of, Massachusetts
2040. Brookline (MA), Town of, Massachusetts
2041. Cambridge (MA), City of, Massachusetts
2042. Canton (MA), Town of, Massachusetts
2043. Carver (MA), Town of, Massachusetts
2044. Charlton (MA), Town of, Massachusetts
2045. Chelmsford (MA), Town of, Massachusetts
2046. Chelsea (MA), City of, Massachusetts
2047. Chicopee (MA), City of, Massachusetts
2048. Clarksburg (MA), Town of, Massachusetts
2049. Clinton (MA), Town of, Massachusetts
2050. Danvers (MA), Town of, Massachusetts
2051. Dedham (MA), Town of, Massachusetts
2052. Dennis (MA), Town of, Massachusetts
2053. Douglas (MA), Town of, Massachusetts
2054. Dudley (MA), Town of, Massachusetts
2055. East Bridgewater (MA), Town of, Massachusetts
2056. Eastham (MA), Town of, Massachusetts
2057. Easthampton (MA), City of, Massachusetts
2058. Easton (MA), Town of, Massachusetts
2059. Everett (MA), City of, Massachusetts
2060. Fairhaven (MA), Town of, Massachusetts
2061. Fall River (MA), City of, Massachusetts
2062. Falmouth (MA), Town of, Massachusetts
2063. Fitchburg (MA), City of, Massachusetts

2064. Framingham (MA), City of, Massachusetts
2065. Freetown (MA), Town of, Massachusetts
2066. Georgetown (MA), Town of, Massachusetts
2067. Gloucester (MA), City of, Massachusetts
2068. Grafton (MA), Town of, Massachusetts
2069. Greenfield (MA), City of, Massachusetts
2070. Hanson (MA), Town of, Massachusetts
2071. Haverhill (MA), City of, Massachusetts
2072. Holliston (MA), Town of, Massachusetts
2073. Holyoke (MA), City of, Massachusetts
2074. Hopedale (MA), Town of, Massachusetts
2075. Hull (MA), Town of, Massachusetts
2076. Kingston (MA), Town of, Massachusetts
2077. Lakeville (MA), Town of, Massachusetts
2078. Leicester (MA), Town of, Massachusetts
2079. Leominster (MA), City of, Massachusetts
2080. Leverett (MA), Town of, Massachusetts
2081. Longmeadow (MA), Town of, Massachusetts
2082. Lowell (MA), City of, Massachusetts
2083. Ludlow (MA), Town of, Massachusetts
2084. Lunenburg (MA), Town of, Massachusetts
2085. Lynn (MA), City of, Massachusetts
2086. Lynnfield (MA), Town of, Massachusetts
2087. Malden (MA), City of, Massachusetts
2088. Marblehead (MA), Town of, Massachusetts
2089. Marshfield (MA), Town of, Massachusetts
2090. Mashpee (MA), Town of, Massachusetts
2091. Mattapoisett (MA), Town of, Massachusetts
2092. Medford (MA), City of, Massachusetts
2093. Melrose (MA), City of, Massachusetts
2094. Methuen (MA), City of, Massachusetts
2095. Middleborough (MA), Town of, Massachusetts
2096. Milford (MA), Town of, Massachusetts
2097. Millbury (MA), Town of, Massachusetts
2098. Millis (MA), Town of, Massachusetts
2099. Nantucket (MA), Town of, Massachusetts

2100. Natick (MA), Town of, Massachusetts
2101. New Bedford (MA), City of, Massachusetts
2102. Newburyport (MA), City of, Massachusetts
2103. North Adams (MA), City of, Massachusetts
2104. North Andover (MA), Town of, Massachusetts
2105. North Attleborough (MA), Town of, Massachusetts
2106. North Reading (MA), Town of, Massachusetts
2107. Northampton (MA), City of, Massachusetts
2108. Northbridge (MA), Town of, Massachusetts
2109. Norton (MA), Town of, Massachusetts
2110. Norwell (MA), Town of, Massachusetts
2111. Norwood (MA), Town of, Massachusetts
2112. Orange (MA), Town of, Massachusetts
2113. Oxford (MA), Town of, Massachusetts
2114. Palmer (MA), Town of, Massachusetts
2115. Peabody (MA), City of, Massachusetts
2116. Pembroke (MA), Town of, Massachusetts
2117. Pittsfield (MA), City of, Massachusetts
2118. Plainville (MA), Town of, Massachusetts
2119. Plymouth (MA), Town of, Massachusetts
2120. Provincetown (MA), Town of, Massachusetts
2121. Quincy (MA), City of, Massachusetts
2122. Randolph (MA), Town of, Massachusetts
2123. Rehoboth (MA), Town of, Massachusetts
2124. Revere (MA), City of, Massachusetts
2125. Rockland (MA), Town of, Massachusetts
2126. Salem (MA), City of, Massachusetts
2127. Salisbury (MA), Town of, Massachusetts
2128. Sandwich (MA), Town of, Massachusetts
2129. Scituate (MA), Town of, Massachusetts
2130. Seekonk (MA), Town of, Massachusetts
2131. Sheffield (MA), Town of, Massachusetts
2132. Shirley (MA), Town of, Massachusetts
2133. Somerset (MA), Town of, Massachusetts
2134. Somerville (MA), City of, Massachusetts

2135. South Hadley (MA), Town of, Massachusetts
2136. Southbridge (MA), Town of, Massachusetts
2137. Spencer (MA), Town of, Massachusetts
2138. Springfield (MA), City of, Massachusetts
2139. Stoneham (MA), Town of, Massachusetts
2140. Stoughton (MA), Town of, Massachusetts
2141. Sturbridge (MA), Town of, Massachusetts
2142. Sudbury (MA), Town of, Massachusetts
2143. Sutton (MA), Town of, Massachusetts
2144. Swampscott (MA), Town of, Massachusetts
2145. Templeton (MA), Town of, Massachusetts
2146. Tewksbury (MA), Town of, Massachusetts
2147. Truro (MA), Town of, Massachusetts
2148. Tyngsborough (MA), Town of, Massachusetts
2149. Upton (MA), Town of, Massachusetts
2150. Wakefield (MA), Town of, Massachusetts
2151. Walpole (MA), Town of, Massachusetts
2152. Ware (MA), Town of, Massachusetts
2153. Warren (MA), Town of, Massachusetts
2154. Watertown (MA), Town of, Massachusetts
2155. Wellfleet (MA), Town of, Massachusetts
2156. West Boylston (MA), Town of, Massachusetts
2157. West Bridgewater (MA), Town of, Massachusetts
2158. West Springfield (MA), Town of, Massachusetts
2159. West Tisbury (MA), Town of, Massachusetts
2160. Westborough (MA), Town of, Massachusetts
2161. Westford (MA), Town of, Massachusetts
2162. Weymouth (MA), Town of, Massachusetts
2163. Williamsburg (MA), Town of, Massachusetts

2164. Wilmington (MA), Town of, Massachusetts
2165. Winchendon (MA), Town of, Massachusetts
2166. Winthrop (MA), Town of, Massachusetts
2167. Woburn (MA), City of, Massachusetts
2168. Worcester (MA), City of, Massachusetts
2169. Alcona (MI), County of, Michigan
2170. Alger (MI), County of, Michigan
2171. Alpena (MI), County of, Michigan
2172. Antrim (MI), County of, Michigan
2173. Arenac (MI), County of, Michigan
2174. Baraga (MI), County of, Michigan
2175. Bay (MI), County of, Michigan
2176. Benzie (MI), County of, Michigan
2177. Berrien (MI), County of, Michigan
2178. Branch (MI), County of, Michigan
2179. Calhoun (MI), County of, Michigan
2180. Canton (MI), Charter Township of, Michigan
2181. Cass (MI), County of, Michigan
2182. Charlevoix (MI), County of, Michigan
2183. Cheboygan (MI), County of, Michigan
2184. Chippewa (MI), County of, Michigan
2185. Clinton (MI), County of, Michigan
2186. Clinton (MI), Charter Township of, Michigan
2187. Crawford (MI), County of, Michigan
2188. Delta (MI), County of, Michigan
2189. Detroit (MI), City of, Michigan
2190. Detroit Wayne Mental Health Authority (MI), Michigan
2191. Dickinson (MI), County of, Michigan
2192. East Lansing (MI), City of, Michigan
2193. Eaton (MI), County of, Michigan
2194. Escanaba (MI), City of, Michigan
2195. Flint (MI), City of, Michigan
2196. Genesee (MI), County of, Michigan
2197. Grand Rapids (MI), City of, Michigan
2198. Grand Traverse (MI), County of, Michigan
2199. Gratiot (MI), County of, Michigan
2200. Harrison (MI), Charter Township of, Michigan
2201. Hillsdale (MI), County of, Michigan
2202. Houghton (MI), County of, Michigan

2203. Huron (MI), Charter Township of, Michigan
2204. Ingham (MI), County of, Michigan
2205. Ionia (MI), County of, Michigan
2206. Iosco (MI), County of, Michigan
2207. Iron (MI), County of, Michigan
2208. Iron Mountain (MI), City of, Michigan
2209. Isabella (MI), County of, Michigan
2210. Jackson (MI), City of, Michigan
2211. Kalamazoo (MI), County of, Michigan
2212. Kent (MI), County of, Michigan
2213. Lake (MI), County of, Michigan
2214. Lansing (MI), City of, Michigan
2215. Leelanau (MI), County of, Michigan
2216. Lenawee (MI), County of, Michigan
2217. Livingston (MI), County of, Michigan
2218. Livonia (MI), City of, Michigan
2219. Luce (MI), County of, Michigan
2220. Macomb (MI), County of, Michigan
2221. Manistee (MI), County of, Michigan
2222. Marquette (MI), County of, Michigan
2223. Mason (MI), County of, Michigan
2224. Monroe (MI), County of, Michigan
2225. Montcalm (MI), County of, Michigan
2226. Montmorency (MI), County of, Michigan
2227. Muskegon (MI), County of, Michigan
2228. Newaygo (MI), County of, Michigan
2229. Northville (MI), Charter Township of, Michigan
2230. Oakland (MI), County of, Michigan
2231. Oceana (MI), County of, Michigan
2232. Ogemaw (MI), County of, Michigan
2233. Ontonagon (MI), County of, Michigan
2234. Osceola (MI), County of, Michigan
2235. Otsego (MI), County of, Michigan
2236. Pittsfield (MI), Charter Township of, Michigan
2237. Pontiac (MI), City of, Michigan
2238. Presque Isle (MI), County of, Michigan
2239. Romulus (MI), City of, Michigan
2240. Roscommon (MI), County of, Michigan
2241. Saginaw (MI), County of, Michigan
2242. Sanilac (MI), County of, Michigan
2243. Sault Ste. Marie (MI), City of, Michigan
2244. Shiawassee (MI), County of, Michigan
2245. St. Clair (MI), County of, Michigan
2246. Sterling Heights (MI), City of, Michigan
2247. Traverse City (MI), City of, Michigan
2248. Tuscola (MI), County of, Michigan
2249. Van Buren (MI), Charter Township of, Michigan
2250. Warren (MI), City of, Michigan
2251. Washtenaw (MI), County of, Michigan
2252. Wayne (MI), City of, Michigan
2253. Wayne (MI), County of, Michigan
2254. Westland (MI), City of, Michigan
2255. Wexford (MI), County of, Michigan
2256. Anoka (MN), County of, Minnesota
2257. Beltrami (MN), County of, Minnesota
2258. Big Stone (MN), County of, Minnesota
2259. Board of Education of Minnetonka School District No. 276 (MN), Minnesota
2260. Carlton (MN), County of, Minnesota
2261. Carver (MN), County of, Minnesota
2262. Coon Rapids (MN), City of, Minnesota
2263. Dakota (MN), County of, Minnesota
2264. Douglas (MN), County of, Minnesota
2265. Duluth (MN), City of, Minnesota
2266. Freeborn (MN), County of, Minnesota
2267. Hennepin (MN), County of, Minnesota
2268. Itasca (MN), County of, Minnesota
2269. McLeod (MN), County of, Minnesota
2270. Meeker (MN), County of, Minnesota
2271. Minneapolis (MN), City of, Minnesota
2272. Minnesota Prairie Health Alliance (MN), Minnesota
2273. Morrison (MN), County of, Minnesota
2274. Mower (MN), County of, Minnesota
2275. North St. Paul (MN), City of, Minnesota
2276. Olmsted (MN), County of, Minnesota
2277. Pine (MN), County of, Minnesota
2278. Proctor (MN), City of, Minnesota
2279. Ramsey (MN), County of, Minnesota
2280. Rochester (MN), City of, Minnesota
2281. Roseau (MN), County of, Minnesota
2282. Saint Paul (MN), City of, Minnesota
2283. Sibley (MN), County of, Minnesota
2284. St. Louis (MN), County of, Minnesota
2285. Steele (MN), County of, Minnesota
2286. Waseca (MN), County of, Minnesota
2287. Washington (MN), County of, Minnesota
2288. Winona (MN), County of, Minnesota
2289. Wright (MN), County of, Minnesota

2290. Yellow Medicine (MN), County of, Minnesota
2291. Adams (MS), County of, Mississippi
2292. Amite (MS), County of, Mississippi
2293. Amory (MS), City of, Mississippi
2294. Arcola (MS), Town of, Mississippi
2295. Attala (MS), County of, Mississippi
2296. Benton (MS), County of, Mississippi
2297. Bolivar (MS), County of, Mississippi
2298. Brookhaven (MS), City of, Mississippi
2299. Caledonia (MS), Town of, Mississippi
2300. Carroll (MS), County of, Mississippi
2301. Charleston (MS), City of, Mississippi
2302. Chickasaw (MS), County of, Mississippi
2303. Claiborne (MS), County of, Mississippi
2304. Clarke (MS), County of, Mississippi
2305. Clarksdale (MS), City of, Mississippi
2306. Cleveland (MS), City of, Mississippi
2307. Columbia (MS), City of, Mississippi
2308. Columbus (MS), City of, Mississippi
2309. Copiah (MS), County of, Mississippi
2310. Covington (MS), County of, Mississippi
2311. DeSoto (MS), County of, Mississippi
2312. Diamondhead (MS), City of, Mississippi
2313. Forrest (MS), County of, Mississippi
2314. Franklin (MS), County of, Mississippi
2315. Gautier (MS), City of, Mississippi
2316. George (MS), County of, Mississippi
2317. Greene (MS), County of, Mississippi
2318. Greenwood (MS), City of, Mississippi
2319. Grenada (MS), City of, Mississippi
2320. Grenada (MS), County of, Mississippi
2321. Gulfport (MS), City of, Mississippi
2322. Hancock (MS), County of, Mississippi
2323. Harrison (MS), County of, Mississippi
2324. Hattiesburg (MS), City of, Mississippi
2325. Hinds (MS), County of, Mississippi
2326. Holly Springs (MS), City of, Mississippi
2327. Holmes (MS), County of, Mississippi
2328. Humphreys (MS), County of, Mississippi
2329. Indianola (MS), City of, Mississippi
2330. Issaquena (MS), County of, Mississippi
2331. Itawamba (MS), County of, Mississippi
2332. Iuka (MS), City of, Mississippi
2333. Jackson (MS), City of, Mississippi
2334. Jackson (MS), County of, Mississippi
2335. Jefferson (MS), County of, Mississippi
2336. Jefferson Davis (MS), County of, Mississippi
2337. Jones (MS), County of, Mississippi
2338. Jonestown (MS), City of, Mississippi
2339. Kemper (MS), County of, Mississippi
2340. Kosciusko (MS), City of, Mississippi
2341. Lafayette (MS), County of, Mississippi
2342. Lauderdale (MS), County of, Mississippi
2343. Laurel (MS), City of, Mississippi
2344. Lawrence (MS), County of, Mississippi
2345. Leakesville (MS), Town of, Mississippi
2346. Lee (MS), County of, Mississippi
2347. Leflore (MS), County of, Mississippi
2348. Lincoln (MS), County of, Mississippi
2349. Long Beach (MS), City of, Mississippi
2350. Lumberton (MS), City of, Mississippi
2351. Madison (MS), County of, Mississippi
2352. Marion (MS), County of, Mississippi
2353. Marshall (MS), County of, Mississippi
2354. McLain (MS), Town of, Mississippi
2355. Memorial Hospital at Gulfport (MS), Mississippi
2356. Meridian (MS), City of, Mississippi
2357. Monroe (MS), County of, Mississippi
2358. Morton (MS), City of, Mississippi
2359. Moss Point (MS), City of, Mississippi
2360. Mound Bayou (MS), City of, Mississippi
2361. Neshoba (MS), County of, Mississippi
2362. Nettleton (MS), City of, Mississippi
2363. New Albany (MS), City of, Mississippi
2364. Ocean Springs (MS), City of, Mississippi
2365. Panola (MS), County of, Mississippi
2366. Pascagoula (MS), City of, Mississippi
2367. Pearl River (MS), County of, Mississippi
2368. Pearl River County Hospital (MS), Mississippi
2369. Perry (MS), County of, Mississippi
2370. Philadelphia (MS), City of, Mississippi
2371. Prentiss (MS), County of, Mississippi
2372. Quitman (MS), City of, Mississippi
2373. Scott (MS), County of, Mississippi
2374. Shannon (MS), City of, Mississippi
2375. Sharkey-Issaquena Community Hospital (MS), Mississippi
2376. Shubuta (MS), Town of, Mississippi
2377. South Central Regional Medical Center (MS), Mississippi

2378. Southwest Mississippi Regional Medical Center (MS), Mississippi
2379. Starkville (MS), City of, Mississippi
2380. Stone (MS), County of, Mississippi
2381. Summit (MS), Town of, Mississippi
2382. Sunflower (MS), County of, Mississippi
2383. Tallahatchie (MS), County of, Mississippi
2384. Tate (MS), County of, Mississippi
2385. Tippah (MS), County of, Mississippi
2386. Tishomingo (MS), County of, Mississippi
2387. Tunica (MS), County of, Mississippi
2388. Tupelo (MS), City of, Mississippi
2389. Union (MS), County of, Mississippi
2390. Verona (MS), City of, Mississippi
2391. Vicksburg (MS), City of, Mississippi
2392. Walthall (MS), County of, Mississippi
2393. Washington (MS), County of, Mississippi
2394. Wayne (MS), County of, Mississippi
2395. Waynesboro (MS), City of, Mississippi
2396. Webb (MS), City of, Mississippi
2397. Wiggins (MS), City of, Mississippi
2398. Yalobusha (MS), County of, Mississippi
2399. Adair (MO), County of, Missouri
2400. Andrew (MO), County of, Missouri
2401. Atchison (MO), County of, Missouri
2402. Audrain (MO), County of, Missouri
2403. Barry (MO), County of, Missouri
2404. Barton (MO), County of, Missouri
2405. Boone (MO), County of, Missouri
2406. Buchanan (MO), County of, Missouri
2407. Butler (MO), County of, Missouri
2408. Callaway (MO), County of, Missouri
2409. Camden (MO), County of, Missouri
2410. Cape Girardeau (MO), County of, Missouri
2411. Cass (MO), County of, Missouri
2412. Chariton (MO), County of, Missouri
2413. Christian (MO), County of, Missouri
2414. Clinton (MO), County of, Missouri
2415. Cole (MO), County of, Missouri
2416. Crawford (MO), County of, Missouri
2417. Dade (MO), County of, Missouri
2418. DeKalb (MO), County of, Missouri
2419. Dent (MO), County of, Missouri
2420. Douglas (MO), County of, Missouri
2421. Dunklin (MO), County of, Missouri
2422. Franklin (MO), County of, Missouri
2423. Gasconade (MO), County of, Missouri
2424. Greene (MO), County of, Missouri
2425. Grundy (MO), County of, Missouri
2426. Harrisonville (MO), City of, Missouri
2427. Henry (MO), County of, Missouri
2428. Hickory (MO), County of, Missouri
2429. Howell (MO), County of, Missouri
2430. Independence (MO), City of, Missouri
2431. Iron (MO), County of, Missouri
2432. Jackson (MO), County of, Missouri
2433. Jasper (MO), County of, Missouri
2434. Jefferson (MO), County of, Missouri
2435. Johnson (MO), County of, Missouri
2436. Joplin (MO), City of, Missouri
2437. Kansas City (MO), City of, Missouri
2438. Kinloch Fire Protection District of St. Louis County (MO), Missouri
2439. Knox (MO), County of, Missouri
2440. Lafayette (MO), County of, Missouri
2441. Lawrence (MO), County of, Missouri
2442. Lewis (MO), County of, Missouri
2443. Lincoln (MO), County of, Missouri
2444. Livingston (MO), County of, Missouri
2445. Madison (MO), County of, Missouri
2446. Maries (MO), County of, Missouri
2447. McDonald (MO), County of, Missouri
2448. Miller (MO), County of, Missouri
2449. Moniteau (MO), County of, Missouri
2450. Montgomery (MO), County of, Missouri
2451. Morgan (MO), County of, Missouri
2452. New Madrid (MO), County of, Missouri
2453. Nodaway (MO), County of, Missouri
2454. Northeast Ambulance and Fire Protection District of St. Louis County (MO), Missouri
2455. Osage (MO), County of, Missouri
2456. Ozark (MO), County of, Missouri
2457. Pemiscot (MO), County of, Missouri
2458. Perry (MO), County of, Missouri
2459. Pettis (MO), County of, Missouri
2460. Phelps (MO), County of, Missouri
2461. Pike (MO), County of, Missouri
2462. Polk (MO), County of, Missouri
2463. Pulaski (MO), County of, Missouri

2464. Ralls (MO), County of, Missouri
2465. Randolph (MO), County of, Missouri
2466. Ray (MO), County of, Missouri
2467. Reynolds (MO), County of, Missouri
2468. Ripley (MO), County of, Missouri
2469. Saint Joseph (MO), City of, Missouri
2470. Schuyler (MO), County of, Missouri
2471. Scott (MO), County of, Missouri
2472. Sedalia (MO), City of, Missouri
2473. Shannon (MO), County of, Missouri
2474. Shelby (MO), County of, Missouri
2475. Springfield (MO), City of, Missouri
2476. St. Charles (MO), County of, Missouri
2477. St. Clair (MO), County of, Missouri
2478. St. Francois (MO), County of, Missouri
2479. St. Louis (MO), City of, Missouri
2480. St. Louis (MO), County of, Missouri
2481. Ste. Genevieve (MO), County of, Missouri
2482. Stone (MO), County of, Missouri
2483. Taney (MO), County of, Missouri
2484. Texas (MO), County of, Missouri
2485. Vernon (MO), County of, Missouri
2486. Warren (MO), County of, Missouri
2487. Washington (MO), County of, Missouri
2488. Webster (MO), County of, Missouri
2489. Worth (MO), County of, Missouri
2490. Wright (MO), County of, Missouri
2491. Anaconda-Deer Lodge (MT), County of, Montana
2492. Cascade (MT), County of, Montana
2493. Gallatin (MT), County of, Montana
2494. Great Falls (MT), City of, Montana
2495. Lake (MT), County of, Montana
2496. Missoula (MT), City of, Montana
2497. Missoula (MT), County of, Montana
2498. Douglas (NE), County of, Nebraska
2499. Keith (NE), County of, Nebraska
2500. Knox (NE), County of, Nebraska
2501. Lincoln (NE), County of, Nebraska
2502. Sarpy (NE), County of, Nebraska
2503. South Sioux City (NE), City of, Nebraska
2504. Boulder City (NV), City of, Nevada
2505. Carson City (NV), City of, Nevada
2506. Central Lyon County Fire Protection District (NV), Nevada

2507. Churchill (NV), County of, Nevada
2508. Douglas (NV), County of, Nevada
2509. Ely (NV), City of, Nevada
2510. Fernley (NV), City of, Nevada
2511. Henderson (NV), City of, Nevada
2512. Humboldt (NV), County of, Nevada
2513. Las Vegas (NV), City of, Nevada
2514. Lincoln (NV), County of, Nevada
2515. Lyon (NV), County of, Nevada
2516. Mesquite (NV), City of, Nevada
2517. North Las Vegas (NV), City of, Nevada
2518. North Lyon County Fire Protection District (NV), Nevada
2519. Nye (NV), County of, Nevada
2520. Reno (NV), City of, Nevada
2521. Sparks (NV), City of, Nevada
2522. Washoe (NV), County of, Nevada
2523. West Wendover (NV), City of, Nevada
2524. White Pine (NV), County of, Nevada
2525. Belknap (NH), County of, New Hampshire
2526. Belmont (NH), City of, New Hampshire
2527. Berlin (NH), City of, New Hampshire
2528. Board of Education of Goshen School District (NH), New Hampshire
2529. Board of Education of Kearsarge RSU-School Administrative Unit 65 (NH), New Hampshire
2530. Board of Education of Lebanon School District (NH), New Hampshire
2531. Board of Education of Pittsfield School District (NH), New Hampshire
2532. Board of Education of Tamworth School District (NH), New Hampshire
2533. Carroll (NH), County of, New Hampshire
2534. Cheshire (NH), County of, New Hampshire
2535. Claremont (NH), City of, New Hampshire
2536. Concord (NH), City of, New Hampshire
2537. Coos (NH), County of, New Hampshire
2538. Derry (NH), Town of, New Hampshire
2539. Dover (NH), City of, New Hampshire
2540. Franklin (NH), City of, New Hampshire
2541. Grafton (NH), County of, New Hampshire

2542. Hillsborough (NH), County of, New Hampshire
2543. Keene (NH), City of, New Hampshire
2544. Laconia (NH), City of, New Hampshire
2545. Londonderry (NH), Town of, New Hampshire
2546. Manchester (NH), City of, New Hampshire
2547. Merrimack (NH), County of, New Hampshire
2548. Nashua (NH), City of, New Hampshire
2549. Rochester (NH), City of, New Hampshire
2550. Rockingham (NH), County of, New Hampshire
2551. Strafford (NH), County of, New Hampshire
2552. Sullivan (NH), County of, New Hampshire
2553. Atlantic (NJ), County of, New Jersey
2554. Barnegat (NJ), Township of, New Jersey
2555. Bayonne (NJ), City of, New Jersey
2556. Bergen (NJ), County of, New Jersey
2557. Bloomfield (NJ), Township of, New Jersey
2558. Brick (NJ), Township of, New Jersey
2559. Burlington (NJ), County of, New Jersey
2560. Camden (NJ), County of, New Jersey
2561. Cape May (NJ), County of, New Jersey
2562. Clifton (NJ), City of, New Jersey
2563. Clinton (NJ), Town of, New Jersey
2564. Cumberland (NJ), County of, New Jersey
2565. Elizabeth (NJ), City of, New Jersey
2566. Essex (NJ), County of, New Jersey
2567. Hudson (NJ), County of, New Jersey
2568. Irvington (NJ), Township of, New Jersey
2569. Jersey City (NJ), City of, New Jersey
2570. Monmouth (NJ), County of, New Jersey
2571. Newark (NJ), City of, New Jersey
2572. Ocean (NJ), County of, New Jersey
2573. Paramus (NJ), Borough of, New Jersey
2574. Passaic (NJ), County of, New Jersey
2575. Paterson (NJ), City of, New Jersey
2576. Ridgefield (NJ), Borough of, New Jersey
2577. Saddle Brook (NJ), Township of, New Jersey
2578. Sussex (NJ), County of, New Jersey

2579. Trenton (NJ), City of, New Jersey
2580. Union (NJ), County of, New Jersey
2581. Alamogordo (NM), City of, New Mexico
2582. Albuquerque (NM), City of, New Mexico
2583. Bernalillo (NM), County of, New Mexico
2584. Catron (NM), County of, New Mexico
2585. Cibola (NM), County of, New Mexico
2586. Colfax (NM), County of, New Mexico
2587. Curry (NM), County of, New Mexico
2588. Dona Ana (NM), County of, New Mexico
2589. Española (NM), City of, New Mexico
2590. Grant (NM), County of, New Mexico
2591. Hidalgo (NM), County of, New Mexico
2592. Hobbs (NM), City of, New Mexico
2593. Las Cruces (NM), City of, New Mexico
2594. Lea (NM), County of, New Mexico
2595. Lincoln (NM), County of, New Mexico
2596. Luna (NM), County of, New Mexico
2597. McKinley (NM), County of, New Mexico
2598. Mora (NM), County of, New Mexico
2599. Otero (NM), County of, New Mexico
2600. Rio Arriba (NM), County of, New Mexico
2601. Roosevelt (NM), County of, New Mexico
2602. San Juan (NM), County of, New Mexico
2603. San Miguel (NM), County of, New Mexico
2604. Sandoval (NM), County of, New Mexico
2605. Santa Fe (NM), City of, New Mexico
2606. Santa Fe (NM), County of, New Mexico
2607. Sierra (NM), County of, New Mexico
2608. Socorro (NM), County of, New Mexico
2609. Taos (NM), County of, New Mexico
2610. Union (NM), County of, New Mexico
2611. Valencia (NM), County of, New Mexico
2612. Albany (NY), City of, New York
2613. Albany (NY), County of, New York
2614. Allegany (NY), County of, New York
2615. Amherst (NY), Town of, New York
2616. Amityville (NY), Village of, New York
2617. Amsterdam (NY), City of, New York
2618. Auburn (NY), City of, New York

2619. Babylon (NY), Incorporated Village of, New York
2620. Babylon (NY), Town of, New York
2621. Bellmore Fire District (NY), New York
2622. Bellport (NY), Village of, New York
2623. Board of Education of Rochester City School District (NY), New York
2624. Brookhaven (NY), Town of, New York
2625. Broome (NY), County of, New York
2626. Buffalo (NY), City of, New York
2627. Cattaraugus (NY), County of, New York
2628. Cayuga (NY), County of, New York
2629. Centereach Fire District (NY), New York
2630. Centerport Fire District (NY), New York
2631. Chautauqua (NY), County of, New York
2632. Cheektowaga (NY), Town of, New York
2633. Chemung (NY), County of, New York
2634. Chenango (NY), County of, New York
2635. Clarkstown (NY), Town of, New York
2636. Clinton (NY), County of, New York
2637. Columbia (NY), County of, New York
2638. Cortland (NY), County of, New York
2639. Dutchess (NY), County of, New York
2640. East Hampton (NY), Village of, New York
2641. East Rockaway (NY), Incorporated Village of, New York
2642. Erie (NY), County of, New York
2643. Essex (NY), County of, New York
2644. Farmingdale (NY), Incorporated Village of, New York
2645. Floral Park (NY), Incorporated Village of, New York
2646. Franklin (NY), County of, New York
2647. Fulton (NY), County of, New York
2648. Garden City (NY), Incorporated Village of, New York
2649. Genesee (NY), County of, New York
2650. Geneva (NY), City of, New York
2651. Great Neck (NY), Village of, New York
2652. Greene (NY), County of, New York
2653. Greenport (NY), Village of, New York
2654. Hamilton (NY), County of, New York
2655. Hauppauge Fire District (NY), New York
2656. Haverstraw (NY), Town of, New York
2657. Hempstead (NY), Incorporated Village of, New York
2658. Hempstead (NY), Town of, New York
2659. Herkimer (NY), Village of, New York
2660. Herkimer (NY), County of, New York
2661. Hicksville Water District (NY), New York
2662. Huntington (NY), Town of, New York
2663. Island Park (NY), Incorporated Village of, New York
2664. Islandia (NY), Incorporated Village of, New York
2665. Islip (NY), Town of, New York
2666. Islip Terrace Fire District (NY), New York
2667. Ithaca (NY), City of, New York
2668. Jefferson (NY), County of, New York
2669. Kingston (NY), City of, New York
2670. Lackawanna (NY), City of, New York
2671. Lake Grove (NY), Incorporated Village of, New York
2672. Lancaster (NY), Town of, New York
2673. Lawrence (NY), Incorporated Village of, New York
2674. Levittown Fire District (NY), New York
2675. Lewis (NY), County of, New York
2676. Lindenhurst (NY), Incorporated Village of, New York
2677. Livingston (NY), County of, New York
2678. Lloyd Harbor (NY), Incorporated Village of, New York
2679. Long Beach (NY), City of, New York
2680. Lynbrook (NY), Incorporated Village of, New York
2681. Madison (NY), County of, New York
2682. Massapequa Park (NY), Incorporated Village of, New York
2683. Melville Fire District (NY), New York
2684. Merrick Library (NY), New York
2685. Mill Neck (NY), Incorporated Village of, New York
2686. Miller Place Fire District (NY), New York
2687. Millerton (NY), Village of, New York
2688. Monroe (NY), County of, New York
2689. Montgomery (NY), County of, New York

2690. Mount Sinai Fire District (NY), New York
2691. Mount Vernon (NY), City of, New York
2692. Nassau (NY), County of, New York
2693. Nassau University Medical Center (NY), New York
2694. Nesconset Fire District (NY), New York
2695. New Hyde Park (NY), Incorporated Village of, New York
2696. New York (NY), City of, New York
2697. Niagara (NY), County of, New York
2698. Nissequogue (NY), Incorporated Village of, New York
2699. North Hempstead (NY), Town of, New York
2700. North Merrick Fire District (NY), New York
2701. North Patchogue Fire District (NY), New York
2702. Northport (NY), Incorporated Village of, New York
2703. Ogdensburg (NY), City of, New York
2704. Old Westbury (NY), Incorporated Village of, New York
2705. Oneida (NY), County of, New York
2706. Onondaga (NY), County of, New York
2707. Ontario (NY), County of, New York
2708. Orange (NY), County of, New York
2709. Orangetown (NY), Town of, New York
2710. Orleans (NY), County of, New York
2711. Oswego (NY), County of, New York
2712. Otsego (NY), County of, New York
2713. Oyster Bay (NY), Town of, New York
2714. Patchogue (NY), Incorporated Village of, New York
2715. Plainview - Old Bethpage Public Library (NY), New York
2716. Plattsburgh (NY), City of, New York
2717. Poquott (NY), Incorporated Village of, New York
2718. Port Washington North (NY), Village of, New York
2719. Port Washington Water District (NY), New York
2720. Poughkeepsie (NY), City of, New York
2721. Poughkeepsie (NY), Town of, New York
2722. Putnam (NY), County of, New York
2723. Ramapo (NY), Town of, New York
2724. Rensselaer (NY), County of, New York
2725. Ridge Fire District (NY), New York
2726. Riverhead (NY), Town of, New York
2727. Rochester (NY), City of, New York
2728. Rockland (NY), County of, New York
2729. Rockville Centre Public Library (NY), New York
2730. Rome (NY), City of, New York
2731. Rosalyn Water District (NY), New York
2732. Saltaire (NY), Village of, New York
2733. Saratoga (NY), County of, New York
2734. Saratoga Springs (NY), City of, New York
2735. Schenectady (NY), City of, New York
2736. Schenectady (NY), County of, New York
2737. Schoharie (NY), County of, New York
2738. Schuyler (NY), County of, New York
2739. Seneca (NY), County of, New York
2740. Smithtown (NY), Town of, New York
2741. Smithtown Fire District (NY), New York
2742. South Farmingdale Fire District (NY), New York
2743. Southampton (NY), Town of, New York
2744. Southold (NY), Town of, New York
2745. St. James Fire District (NY), New York
2746. St. Lawrence (NY), County of, New York
2747. Steuben (NY), County of, New York
2748. Stewart Manor (NY), Village of, New York
2749. Stony Brook Fire District (NY), New York
2750. Stony Point (NY), Town of, New York
2751. Suffern (NY), Village of, New York
2752. Suffolk (NY), County of, New York
2753. Sullivan (NY), County of, New York
2754. Syracuse (NY), City of, New York
2755. The Branch (NY), Village of, New York
2756. Tioga (NY), County of, New York
2757. Tompkins (NY), County of, New York
2758. Tonawanda (NY), Town of, New York
2759. Troy (NY), City of, New York
2760. Ulster (NY), County of, New York
2761. Uniondale Fire District (NY), New York
2762. Utica (NY), City of, New York
2763. Valley Stream (NY), Incorporated Village of, New York

2764. Wappinger (NY), Town of, New York
2765. Wappingers Falls (NY), Village of, New York
2766. Wappingers Falls (NY), City of, New York
2767. Wappingers Falls (NY), Town of, New York
2768. Warren (NY), County of, New York
2769. Washington (NY), County of, New York
2770. West Hampton Dunes (NY), Incorporated Village of, New York
2771. West Haverstraw (NY), Village of, New York
2772. West Hempstead Public Library (NY), New York
2773. Westbury (NY), Incorporated Village of, New York
2774. Westchester (NY), County of, New York
2775. Wyoming (NY), County of, New York
2776. Yates (NY), County of, New York
2777. Yonkers (NY), City of, New York
2778. Alamance (NC), County of, North Carolina
2779. Alexander (NC), County of, North Carolina
2780. Alleghany (NC), County of, North Carolina
2781. Anson (NC), County of, North Carolina
2782. Ashe (NC), County of, North Carolina
2783. Beaufort (NC), County of, North Carolina
2784. Bertie (NC), County of, North Carolina
2785. Bladen (NC), County of, North Carolina
2786. Brunswick (NC), County of, North Carolina
2787. Buncombe (NC), County of, North Carolina
2788. Burke (NC), County of, North Carolina
2789. Cabarrus (NC), County of, North Carolina
2790. Caldwell (NC), County of, North Carolina
2791. Camden (NC), County of, North Carolina
2792. Canton (NC), City of, North Carolina
2793. Carteret (NC), County of, North Carolina
2794. Caswell (NC), County of, North Carolina
2795. Catawba (NC), County of, North Carolina
2796. Chatham (NC), County of, North Carolina
2797. Cherokee (NC), County of, North Carolina
2798. Chowan (NC), County of, North Carolina
2799. Cleveland (NC), County of, North Carolina
2800. Columbus (NC), County of, North Carolina
2801. Craven (NC), County of, North Carolina
2802. Cumberland (NC), County of, North Carolina
2803. Currituck (NC), County of, North Carolina
2804. Dare (NC), County of, North Carolina
2805. Davidson (NC), County of, North Carolina
2806. Davie (NC), County of, North Carolina
2807. Duplin (NC), County of, North Carolina
2808. Durham (NC), County of, North Carolina
2809. Fayetteville (NC), City of, North Carolina
2810. Forsyth (NC), County of, North Carolina
2811. Franklin (NC), County of, North Carolina
2812. Gaston (NC), County of, North Carolina
2813. Granville (NC), County of, North Carolina
2814. Greene (NC), County of, North Carolina
2815. Greensboro (NC), City of, North Carolina
2816. Guilford (NC), County of, North Carolina
2817. Halifax (NC), County of, North Carolina
2818. Haywood (NC), County of, North Carolina
2819. Henderson (NC), City of, North Carolina
2820. Hickory (NC), City of, North Carolina
2821. Iredell (NC), County of, North Carolina
2822. Jacksonville (NC), City of, North Carolina
2823. Jones (NC), County of, North Carolina
2824. Lee (NC), County of, North Carolina
2825. Lenoir (NC), County of, North Carolina
2826. Lincoln (NC), County of, North Carolina

2827. Madison (NC), County of, North Carolina
2828. Martin (NC), County of, North Carolina
2829. McDowell (NC), County of, North Carolina
2830. Mecklenburg (NC), County of, North Carolina
2831. Mitchell (NC), County of, North Carolina
2832. Moore (NC), County of, North Carolina
2833. New Hanover (NC), County of, North Carolina
2834. Onslow (NC), County of, North Carolina
2835. Orange (NC), County of, North Carolina
2836. Pamlico (NC), County of, North Carolina
2837. Pasquotank (NC), County of, North Carolina
2838. Person (NC), County of, North Carolina
2839. Pitt (NC), County of, North Carolina
2840. Polk (NC), County of, North Carolina
2841. Randolph (NC), County of, North Carolina
2842. Richmond (NC), County of, North Carolina
2843. Robeson (NC), County of, North Carolina
2844. Rockingham (NC), County of, North Carolina
2845. Rowan (NC), County of, North Carolina
2846. Rutherford (NC), County of, North Carolina
2847. Sampson (NC), County of, North Carolina
2848. Scotland (NC), County of, North Carolina
2849. Stokes (NC), County of, North Carolina
2850. Surry (NC), County of, North Carolina
2851. Tyrrell (NC), County of, North Carolina
2852. Vance (NC), County of, North Carolina
2853. Warren (NC), County of, North Carolina
2854. Washington (NC), County of, North Carolina
2855. Watauga (NC), County of, North Carolina
2856. Wayne (NC), County of, North Carolina
2857. Wilkes (NC), County of, North Carolina
2858. Wilmington (NC), City of, North Carolina
2859. Winston-Salem (NC), City of, North Carolina
2860. Yadkin (NC), County of, North Carolina
2861. Yancey (NC), County of, North Carolina
2862. Barnes (ND), County of, North Dakota
2863. Benson (ND), County of, North Dakota
2864. Bismarck (ND), City of, North Dakota
2865. Burleigh (ND), County of, North Dakota
2866. Cass (ND), County of, North Dakota
2867. Devils Lake (ND), City of, North Dakota
2868. Dickey (ND), County of, North Dakota
2869. Dunn (ND), County of, North Dakota
2870. Eddy (ND), County of, North Dakota
2871. Fargo (ND), City of, North Dakota
2872. Foster (ND), County of, North Dakota
2873. Grand Forks (ND), City of, North Dakota
2874. Grand Forks (ND), County of, North Dakota
2875. Lamoure (ND), County of, North Dakota
2876. Lisbon (ND), City of, North Dakota
2877. McKenzie (ND), County of, North Dakota
2878. McLean (ND), County of, North Dakota
2879. Mercer (ND), County of, North Dakota
2880. Mountrail (ND), County of, North Dakota
2881. Pembina (ND), County of, North Dakota
2882. Pierce (ND), County of, North Dakota
2883. Ramsey (ND), County of, North Dakota
2884. Ransom (ND), County of, North Dakota
2885. Richland (ND), County of, North Dakota
2886. Rolette (ND), County of, North Dakota
2887. Sargent (ND), County of, North Dakota
2888. Stark (ND), County of, North Dakota
2889. Towner (ND), County of, North Dakota
2890. Walsh (ND), County of, North Dakota
2891. Ward (ND), County of, North Dakota
2892. Wells (ND), County of, North Dakota
2893. Williams (ND), County of, North Dakota
2894. Adams (OH), County of, Ohio
2895. Akron, (OH), City of, Ohio
2896. Allen (OH), County of, Ohio
2897. Ashland (OH), City of, Ohio
2898. Ashland (OH), County of, Ohio
2899. Ashtabula (OH), County of, Ohio
2900. Athens (OH), County of, Ohio

2901. Auglaize (OH), County of, Ohio
2902. Aurora (OH), City of, Ohio
2903. Barberton (OH), City of, Ohio
2904. Belmont (OH), County of, Ohio
2905. Boston (OH), Township of, Ohio
2906. Boston Heights (OH), Village of, Ohio
2907. Broadview Heights (OH), City of, Ohio
2908. Brooklyn Heights (OH), Village of, Ohio
2909. Brown (OH), County of, Ohio
2910. Brunswick (OH), City of, Ohio
2911. Butler (OH), County of, Ohio
2912. Carroll (OH), County of, Ohio
2913. Champaign (OH), County of, Ohio
2914. Cincinnati (OH), City of, Ohio
2915. Clermont (OH), County of, Ohio
2916. Cleveland (OH), City of, Ohio
2917. Clinton (OH), Village of, Ohio
2918. Clinton (OH), County of, Ohio
2919. Columbiana (OH), County of, Ohio
2920. Columbus (OH), City of, Ohio
2921. Copley (OH), Township of, Ohio
2922. Coshocton (OH), County of, Ohio
2923. Coventry (OH), Township of, Ohio
2924. Crawford (OH), County of, Ohio
2925. Cuyahoga Falls (OH), City of, Ohio
2926. Darke (OH), County of, Ohio
2927. Dayton (OH), City of, Ohio
2928. Delaware (OH), County of, Ohio
2929. East Cleveland (OH), City of, Ohio
2930. Elyria (OH), City of, Ohio
2931. Erie (OH), County of, Ohio
2932. Euclid (OH), City of, Ohio
2933. Fairfield (OH), City of, Ohio
2934. Fairfield (OH), County of, Ohio
2935. Fairlawn (OH), City of, Ohio
2936. Fayette (OH), County of, Ohio
2937. Findlay (OH), City of, Ohio
2938. Fostoria (OH), City of, Ohio
2939. Four County Board of Alcohol, Drug Addiction and Mental Health Services (OH), Ohio
2940. Franklin (OH), County of, Ohio
2941. Fulton (OH), County of, Ohio
2942. Gallia (OH), County of, Ohio
2943. Garfield Heights (OH), City of, Ohio
2944. Geauga (OH), County of, Ohio
2945. Green (OH), City of, Ohio

2946. Guernsey (OH), County of, Ohio
2947. Hamilton (OH), City of, Ohio
2948. Hamilton (OH), County of, Ohio
2949. Hancock (OH), County of, Ohio
2950. Harrison (OH), County of, Ohio
2951. Hocking (OH), County of, Ohio
2952. Huron (OH), City of, Ohio
2953. Huron (OH), County of, Ohio
2954. Ironton (OH), City of, Ohio
2955. Jackson (OH), County of, Ohio
2956. Jefferson (OH), County of, Ohio
2957. Kent (OH), City of, Ohio
2958. Knox (OH), County of, Ohio
2959. Lake (OH), County of, Ohio
2960. Lakemore (OH), Village of, Ohio
2961. Lakewood (OH), City of, Ohio
2962. Lawrence (OH), County of, Ohio
2963. Lebanon (OH), City of, Ohio
2964. Licking (OH), County of, Ohio
2965. Lima (OH), City of, Ohio
2966. Logan (OH), County of, Ohio
2967. Lorain (OH), City of, Ohio
2968. Lorain (OH), County of, Ohio
2969. Lucas (OH), County of, Ohio
2970. Lucas County Children Services Board of Trustees (OH), Ohio
2971. Lyndhurst (OH), City of, Ohio
2972. Macedonia (OH), City of, Ohio
2973. Mansfield (OH), City of, Ohio
2974. Marietta (OH), City of, Ohio
2975. Marion (OH), County of, Ohio
2976. Mayfield Heights (OH), City of, Ohio
2977. Medina (OH), County of, Ohio
2978. Meigs (OH), County of, Ohio
2979. Mental Health & Recovery Services Board of Allen, Auglaize, and Hardin Counties (OH), Ohio
2980. Mental Health & Recovery Services Board of Lucas County (OH), Ohio
2981. Mercer (OH), County of, Ohio
2982. Miami (OH), County of, Ohio
2983. Middletown (OH), City of, Ohio
2984. Mogadore (OH), Village of, Ohio
2985. Monroe (OH), County of, Ohio
2986. Montgomery (OH), County of, Ohio
2987. Morrow (OH), County of, Ohio
2988. Munroe Falls (OH), City of, Ohio

2989. Muskingum (OH), County of, Ohio
2990. New Franklin (OH), City of, Ohio
2991. Newburgh Heights (OH), Village of, Ohio
2992. Noble (OH), County of, Ohio
2993. North Olmsted (OH), City of, Ohio
2994. North Ridgeville (OH), City of, Ohio
2995. North Royalton (OH), City of, Ohio
2996. Norton (OH), City of, Ohio
2997. Norwalk (OH), City of, Ohio
2998. Olmsted Falls (OH), City of, Ohio
2999. Ottawa (OH), County of, Ohio
3000. Painesville (OH), Township of, Ohio
3001. Parma (OH), City of, Ohio
3002. Parma Heights (OH), City of, Ohio
3003. Peninsula (OH), Village of, Ohio
3004. Perry (OH), County of, Ohio
3005. Pike (OH), County of, Ohio
3006. Portage (OH), County of, Ohio
3007. Portsmouth (OH), City of, Ohio
3008. Ravenna (OH), City of, Ohio
3009. Richfield (OH), Village of, Ohio
3010. Richland County Children's Services (OH), Ohio
3011. Ross (OH), County of, Ohio
3012. Sandusky (OH), City of, Ohio
3013. Sandusky (OH), County of, Ohio
3014. Scioto (OH), County of, Ohio
3015. Seneca (OH), County of, Ohio
3016. Seven Hills (OH), City of, Ohio
3017. Shelby (OH), County of, Ohio
3018. Silver Lake (OH), Village of, Ohio
3019. Springfield (OH), Township of, Ohio
3020. St. Marys (OH), City of, Ohio
3021. Stark (OH), County of, Ohio
3022. Stow (OH), City of, Ohio
3023. Strongsville (OH), City of, Ohio
3024. Tallmadge (OH), City of, Ohio
3025. Toledo (OH), City of, Ohio
3026. Trumbull (OH), County of, Ohio
3027. Tuscarawas (OH), County of, Ohio
3028. Valley Fire District (OH), Ohio
3029. Van Wert (OH), City of, Ohio
3030. Van Wert (OH), County of, Ohio
3031. Vinton (OH), County of, Ohio
3032. Warren (OH), City of, Ohio

3033. Warrensville Heights (OH), City of, Ohio
3034. Washington (OH), County of, Ohio
3035. Wayne (OH), County of, Ohio
3036. Wickliffe (OH), City of, Ohio
3037. Williams (OH), County of, Ohio
3038. Wyandot (OH), County of, Ohio
3039. Youngstown (OH), City of, Ohio
3040. Ada (OK), City of, Oklahoma
3041. Altus (OK), City of, Oklahoma
3042. Anadarko (OK), City of, Oklahoma
3043. Atoka (OK), County of, Oklahoma
3044. Beckham (OK), County of, Oklahoma
3045. Bethany (OK), City of, Oklahoma
3046. Broken Arrow (OK), City of, Oklahoma
3047. Burns Flat (OK), Town of, Oklahoma
3048. Caddo (OK), County of, Oklahoma
3049. Choctaw (OK), County of, Oklahoma
3050. Cimarron (OK), County of, Oklahoma
3051. Cleveland (OK), County of, Oklahoma
3052. Coal (OK), County of, Oklahoma
3053. Comanche (OK), County of, Oklahoma
3054. Craig (OK), County of, Oklahoma
3055. Creek (OK), County of, Oklahoma
3056. Custer (OK), County of, Oklahoma
3057. Delaware (OK), County of, Oklahoma
3058. Dewey (OK), County of, Oklahoma
3059. Edmond (OK), City of, Oklahoma
3060. El Reno (OK), City of, Oklahoma
3061. Elk City (OK), City of, Oklahoma
3062. Enid (OK), City of, Oklahoma
3063. Fort Cobb (OK), Town of, Oklahoma
3064. Garvin (OK), County of, Oklahoma
3065. Grady (OK), County of, Oklahoma
3066. Greer (OK), County of, Oklahoma
3067. Guthrie (OK), City of, Oklahoma
3068. Harmon (OK), County of, Oklahoma
3069. Harper (OK), County of, Oklahoma
3070. Haskell (OK), County of, Oklahoma
3071. Hughes (OK), County of, Oklahoma
3072. Jackson (OK), County of, Oklahoma
3073. Jefferson (OK), County of, Oklahoma
3074. Jenks (OK), City of, Oklahoma
3075. Johnston (OK), County of, Oklahoma
3076. Kay (OK), County of, Oklahoma
3077. Kiowa (OK), County of, Oklahoma
3078. Latimer (OK), County of, Oklahoma

3079. Lawton (OK), City of, Oklahoma
3080. Le Flore (OK), County of, Oklahoma
3081. Lincoln (OK), County of, Oklahoma
3082. Logan (OK), County of, Oklahoma
3083. Love (OK), County of, Oklahoma
3084. Major (OK), County of, Oklahoma
3085. Mayes (OK), County of, Oklahoma
3086. McClain (OK), County of, Oklahoma
3087. McCurtain (OK), County of, Oklahoma
3088. Midwest City (OK), City of, Oklahoma
3089. Muskogee (OK), City of, Oklahoma
3090. Muskogee (OK), County of, Oklahoma
3091. Mustang (OK), City of, Oklahoma
3092. Noble (OK), County of, Oklahoma
3093. Nowata (OK), County of, Oklahoma
3094. Okfuskee (OK), County of, Oklahoma
3095. Oklahoma (OK), County of, Oklahoma
3096. Oklahoma City (OK), City of, Oklahoma
3097. Okmulgee (OK), County of, Oklahoma
3098. Osage (OK), County of, Oklahoma
3099. Ottawa (OK), County of, Oklahoma
3100. Owasso (OK), City of, Oklahoma
3101. Pawnee (OK), County of, Oklahoma
3102. Payne (OK), County of, Oklahoma
3103. Pittsburg (OK), County of, Oklahoma
3104. Ponca City (OK), City of, Oklahoma
3105. Pottawatomie (OK), County of, Oklahoma
3106. Roger Mills (OK), County of, Oklahoma
3107. Rogers (OK), County of, Oklahoma
3108. Seminole (OK), City of, Oklahoma
3109. Seminole (OK), County of, Oklahoma
3110. Shawnee (OK), City of, Oklahoma
3111. Stephens (OK), County of, Oklahoma
3112. Stillwater (OK), City of, Oklahoma
3113. Texas (OK), County of, Oklahoma
3114. Tillman (OK), County of, Oklahoma
3115. Tulsa (OK), City of, Oklahoma
3116. Tulsa (OK), County of, Oklahoma
3117. Washington (OK), County of, Oklahoma
3118. Woods (OK), County of, Oklahoma
3119. Woodward (OK), County of, Oklahoma
3120. Yukon (OK), City of, Oklahoma
3121. Clackamas (OR), County of, Oregon
3122. Clatsop (OR), County of, Oregon
3123. Columbia (OR), County of, Oregon
3124. Coos (OR), County of, Oregon

3125. Curry (OR), County of, Oregon
3126. Jackson (OR), County of, Oregon
3127. Josephine (OR), County of, Oregon
3128. Lane (OR), County of, Oregon
3129. Multnomah (OR), County of, Oregon
3130. Portland (OR), City of, Oregon
3131. Washington (OR), County of, Oregon
3132. Yamhill (OR), County of, Oregon
3133. Adams (PA), County of, Pennsylvania
3134. Aliquippa (PA), City of, Pennsylvania
3135. Allegheny (PA), County of, Pennsylvania
3136. Armstrong (PA), County of, Pennsylvania
3137. Beaver (PA), County of, Pennsylvania
3138. Bedford (PA), County of, Pennsylvania
3139. Bensalem (PA), Township of, Pennsylvania
3140. Berks (PA), County of (DA), Pennsylvania
3141. Bradford (PA), County of, Pennsylvania
3142. Bristol (PA), Township of, Pennsylvania
3143. Bucks (PA), County of, Pennsylvania
3144. Cambria (PA), County of, Pennsylvania
3145. Carbon (PA), County of, Pennsylvania
3146. Chester (PA), County of, Pennsylvania
3147. Clarion (PA), County of, Pennsylvania
3148. Clearfield (PA), County of, Pennsylvania
3149. Clinton (PA), County of, Pennsylvania
3150. Coatesville (PA), City of, Pennsylvania
3151. Columbia (PA), County of, Pennsylvania
3152. Cumberland (PA), County of, Pennsylvania
3153. Dauphin (PA), County of, Pennsylvania
3154. Delaware (PA), County of, Pennsylvania
3155. Edwardsville (PA), Borough of, Pennsylvania
3156. Erie (PA), County of, Pennsylvania
3157. Exeter (PA), Borough of, Pennsylvania
3158. Fairview (PA), Township of, Pennsylvania
3159. Fayette (PA), County of, Pennsylvania
3160. Forty Fort (PA), Borough of, Pennsylvania
3161. Franklin (PA), County of, Pennsylvania
3162. Greene (PA), County of, Pennsylvania

3163. Hanover (PA), Township of, Pennsylvania

3164. Hazleton (PA), City of, Pennsylvania

3165. Huntingdon (PA), County of, Pennsylvania

3166. Indiana (PA), County of, Pennsylvania

3167. Kingston (PA), Borough of, Pennsylvania

3168. Lackawanna (PA), County of, Pennsylvania

3169. Lawrence (PA), County of, Pennsylvania

3170. Lehigh (PA), County of (DA), Pennsylvania

3171. Lock Haven (PA), City of, Pennsylvania

3172. Lower Makefield (PA), Township of, Pennsylvania

3173. Lower Southampton (PA), Township of, Pennsylvania

3174. Luzerne (PA), County of, Pennsylvania

3175. Lycoming (PA), County of, Pennsylvania

3176. Mahoning (PA), Township of (Lawrence County), Pennsylvania

3177. Mercer (PA), County of, Pennsylvania

3178. Middletown (PA), Township of, Pennsylvania

3179. Monroe (PA), County of, Pennsylvania

3180. Morrisville (PA), Borough of, Pennsylvania

3181. Nanticoke (PA), City of, Pennsylvania

3182. New Castle (PA), City of, Pennsylvania

3183. Newtown (PA), Township of, Pennsylvania

3184. Norristown (PA), Municipality of, Pennsylvania

3185. Northampton (PA), County of, Pennsylvania

3186. Northumberland (PA), County of, Pennsylvania

3187. Philadelphia (PA), City of, Pennsylvania

3188. Pike (PA), County of, Pennsylvania

3189. Pittsburgh (PA), City of, Pennsylvania

3190. Plains (PA), Township of, Pennsylvania

3191. Schuylkill (PA), County of, Pennsylvania

3192. Sugar Notch (PA), Borough of, Pennsylvania

3193. Tioga (PA), County of, Pennsylvania

3194. Union (PA), Township of, Pennsylvania

3195. Wampum (PA), Borough of, Pennsylvania

3196. Warminster (PA), Township of, Pennsylvania

3197. Warrington (PA), Township of, Pennsylvania

3198. Washington (PA), County of, Pennsylvania

3199. West Norriton (PA), Township of, Pennsylvania

3200. West Pittston (PA), Borough of, Pennsylvania

3201. Westmoreland (PA), County of, Pennsylvania

3202. Wilkes-Barre (PA), Township of, Pennsylvania

3203. Wilkes-Barre (PA), City of, Pennsylvania

3204. Wright (PA), Township of, Pennsylvania

3205. Wyoming (PA), Borough of, Pennsylvania

3206. Wyoming (PA), County of, Pennsylvania

3207. York (PA), County of, Pennsylvania

3208. Adjuntas (PR), Municipality of, Puerto Rico

3209. Arroyo (PR), Municipality of, Puerto Rico

3210. Barceloneta (PR), Municipality of, Puerto Rico

3211. Bayamon (PR), Municipality of, Puerto Rico

3212. Caguas (PR), Municipality of, Puerto Rico

3213. Canóvanas (PR), Municipality of, Puerto Rico

3214. Catano (PR), Municipality of, Puerto Rico

3215. Cayey (PR), Municipality of, Puerto Rico

3216. Ceiba (PR), Municipality of, Puerto Rico

3217. Cidra (PR), Municipality of, Puerto Rico

3218. Coamo (PR), Municipality of, Puerto Rico

3219. Guayanilla (PR), Municipality of, Puerto Rico

3220. Isla De Vieques (PR), Municipality of, Puerto Rico

3221. Juncos (PR), Municipality of, Puerto Rico
3222. Loiza (PR), Municipality of, Puerto Rico
3223. Rio Grande (PR), Municipality of, Puerto Rico
3224. Sabana Grande (PR), Municipality of, Puerto Rico
3225. San Juan (PR), Municipality of, Puerto Rico
3226. Vega Alta (PR), Municipality of, Puerto Rico
3227. Villalba (PR), Municipality of, Puerto Rico
3228. Yabucoa (PR), Municipality of, Puerto Rico
3229. Barrington (RI), Town of, Rhode Island
3230. Bristol (RI), Town of, Rhode Island
3231. Burrillville (RI), Town of, Rhode Island
3232. Central Falls (RI), City of, Rhode Island
3233. Charlestown (RI), Town of, Rhode Island
3234. Coventry (RI), Town of, Rhode Island
3235. Cranston (RI), City of, Rhode Island
3236. Cumberland (RI), Town of, Rhode Island
3237. East Greenwich (RI), Town of, Rhode Island
3238. East Providence (RI), City of, Rhode Island
3239. Foster (RI), Town of, Rhode Island
3240. Glocester (RI), Town of, Rhode Island
3241. Hopkinton (RI), Town of, Rhode Island
3242. Jamestown (RI), Town of, Rhode Island
3243. Johnston (RI), Town of, Rhode Island
3244. Middletown (RI), Town of, Rhode Island
3245. Narragansett (RI), Town of, Rhode Island
3246. Newport (RI), City of, Rhode Island
3247. North Kingstown (RI), Town of, Rhode Island
3248. North Providence (RI), Town of, Rhode Island
3249. Pawtucket (RI), City of, Rhode Island
3250. Portsmouth (RI), Town of, Rhode Island
3251. Providence (RI), City of, Rhode Island
3252. Richmond (RI), Town of, Rhode Island
3253. Scituate (RI), Town of, Rhode Island
3254. Smithfield (RI), Town of, Rhode Island

3255. South Kingstown (RI), Town of, Rhode Island
3256. Warren (RI), Town of, Rhode Island
3257. Warwick (RI), City of, Rhode Island
3258. West Greenwich (RI), Town of, Rhode Island
3259. West Warwick (RI), Town of, Rhode Island
3260. Westerly (RI), Town of, Rhode Island
3261. Woonsocket (RI), City of, Rhode Island
3262. Abbeville (SC), County of, South Carolina
3263. Aiken (SC), County of, South Carolina
3264. Allendale (SC), County of, South Carolina
3265. Anderson (SC), County of, South Carolina
3266. Bamberg (SC), County of, South Carolina
3267. Barnwell (SC), County of, South Carolina
3268. Beaufort (SC), County of, South Carolina
3269. Berkeley (SC), County of, South Carolina
3270. Calhoun (SC), County of, South Carolina
3271. Charleston (SC), City of, South Carolina
3272. Charleston (SC), County of, South Carolina
3273. Cherokee (SC), County of, South Carolina
3274. Chester (SC), City of, South Carolina
3275. Chester (SC), County of, South Carolina
3276. Chesterfield (SC), County of, South Carolina
3277. Clarendon (SC), County of, South Carolina
3278. Colleton (SC), County of, South Carolina
3279. Columbia (SC), City of, South Carolina
3280. Dillon (SC), County of, South Carolina
3281. Dorchester (SC), County of, South Carolina
3282. Edgefield (SC), County of, South Carolina
3283. Fairfield (SC), County of, South Carolina
3284. Florence (SC), County of, South Carolina

3285. Georgetown (SC), County of, South Carolina
3286. Georgetown City (SC), City of, South Carolina
3287. Greenville (SC), County of, South Carolina
3288. Greenwood (SC), County of, South Carolina
3289. Hampton (SC), County of, South Carolina
3290. Horry (SC), County of, South Carolina
3291. Jasper (SC), County of, South Carolina
3292. Kershaw (SC), County of, South Carolina
3293. Kershaw County Hospital Board (SC), South Carolina
3294. Lancaster (SC), County of, South Carolina
3295. Laurens (SC), County of, South Carolina
3296. Lee (SC), County of, South Carolina
3297. Lexington (SC), County of, South Carolina
3298. Marion (SC), County of, South Carolina
3299. Marlboro (SC), County of, South Carolina
3300. McCormick (SC), County of, South Carolina
3301. Mount Pleasant (SC), Town of, South Carolina
3302. Myrtle Beach (SC), City of, South Carolina
3303. Newberry (SC), County of, South Carolina
3304. North Charleston (SC), City of, South Carolina
3305. Oconee (SC), County of, South Carolina
3306. Orangeburg (SC), City of, South Carolina
3307. Orangeburg (SC), County of, South Carolina
3308. Pickens (SC), County of, South Carolina
3309. Richland (SC), County of, South Carolina
3310. Saluda (SC), County of, South Carolina
3311. Spartanburg (SC), County of, South Carolina
3312. Summerville (SC), Town of, South Carolina
3313. Sumter (SC), County of, South Carolina
3314. Union (SC), County of, South Carolina
3315. Williamsburg (SC), County of, South Carolina
3316. York (SC), County of, South Carolina
3317. Pennington (SD), County of, South Dakota
3318. Arlington (TN), Town of, Tennessee
3319. Blount (TN), County of, Tennessee
3320. Campbell (TN), County of, Tennessee
3321. Cannon (TN), County of, Tennessee
3322. Centerville (TN), Town of, Tennessee
3323. Claiborne (TN), County of, Tennessee
3324. Clarksville (TN), City of, Tennessee
3325. Crockett (TN), County of, Tennessee
3326. Dandridge (TN), Town of, Tennessee
3327. Decatur (TN), County of, Tennessee
3328. Decatur (TN), Town of, Tennessee
3329. Fentress (TN), County of, Tennessee
3330. Gatlinburg (TN), City of, Tennessee
3331. Germantown (TN), City of, Tennessee
3332. Greene (TN), County of, Tennessee
3333. Hamilton (TN), County of, Tennessee
3334. Hancock (TN), County of, Tennessee
3335. Hawkins (TN), County of, Tennessee
3336. Haywood (TN), County of, Tennessee
3337. Henderson (TN), County of, Tennessee
3338. Jefferson (TN), County of, Tennessee
3339. Johnson (TN), County of, Tennessee
3340. Lauderdale (TN), County of, Tennessee
3341. Lexington (TN), City of, Tennessee
3342. Madison (TN), County of, Tennessee
3343. Maryville (TN), City of, Tennessee
3344. Memphis (TN), City of, Tennessee
3345. Millington (TN), City of, Tennessee
3346. Montgomery (TN), County of, Tennessee
3347. Morgan (TN), County of, Tennessee
3348. Nashville & Davidson (TN), City of/County of, Tennessee
3349. Obion (TN), County of, Tennessee
3350. Overton (TN), County of, Tennessee
3351. Pickett (TN), County of, Tennessee
3352. Pigeon Forge (TN), City of, Tennessee
3353. Ripley (TN), City of, Tennessee
3354. Rutherford (TN), County of, Tennessee
3355. Scott (TN), County of, Tennessee

3356. Shelby (TN), County of, Tennessee
3357. Smith (TN), County of, Tennessee
3358. Sumner (TN), County of, Tennessee
3359. Washington (TN), County of, Tennessee
3360. Williamson (TN), County of, Tennessee
3361. Angelina (TX), County of, Texas
3362. Bailey (TX), County of, Texas
3363. Bastrop (TX), County of, Texas
3364. Bee (TX), County of, Texas
3365. Bexar (TX), County of, Texas
3366. Bexar County Hospital District (TX), Texas
3367. Blanco (TX), County of, Texas
3368. Bowie (TX), County of, Texas
3369. Brazos (TX), County of, Texas
3370. Brooks (TX), County of, Texas
3371. Burleson (TX), County of, Texas
3372. Burnet (TX), County of, Texas
3373. Caldwell (TX), County of, Texas
3374. Calhoun (TX), County of, Texas
3375. Cameron (TX), County of, Texas
3376. Camp (TX), County of, Texas
3377. Cass (TX), County of, Texas
3378. Castro (TX), County of, Texas
3379. Cherokee (TX), County of, Texas
3380. Childress (TX), County of, Texas
3381. Clay (TX), County of, Texas
3382. Colorado (TX), County of, Texas
3383. Cooke (TX), County of, Texas
3384. Coryell (TX), County of, Texas
3385. Dallas (TX), County of, Texas
3386. Dallas County Hospital District (TX), Texas
3387. Delta (TX), County of, Texas
3388. Dimmit (TX), County of, Texas
3389. Duval (TX), County of, Texas
3390. Eagle Pass (TX), City of, Texas
3391. Ector (TX), County of, Texas
3392. El Paso (TX), County of, Texas
3393. Ellis (TX), County of, Texas
3394. Falls (TX), County of, Texas
3395. Fannin (TX), County of, Texas
3396. Fort Bend (TX), County of, Texas
3397. Franklin (TX), County of, Texas
3398. Freestone (TX), County of, Texas
3399. Galveston (TX), County of, Texas
3400. Grayson (TX), County of, Texas
3401. Guadalupe (TX), County of, Texas
3402. Guadalupe Valley Hospital (TX), Texas
3403. Hardin (TX), County of, Texas
3404. Harris (TX), County of, Texas
3405. Harris County Hospital District (TX), Texas
3406. Harrison (TX), County of, Texas
3407. Haskell (TX), County of, Texas
3408. Hays (TX), County of, Texas
3409. Henderson (TX), County of, Texas
3410. Hidalgo (TX), County of, Texas
3411. Hopkins (TX), County of, Texas
3412. Houston (TX), City of, Texas
3413. Houston (TX), County of, Texas
3414. Irving Independent School District (TX), Texas
3415. Jasper (TX), County of, Texas
3416. Jefferson (TX), County of, Texas
3417. Jim Hogg (TX), County of, Texas
3418. Jim Wells (TX), County of, Texas
3419. Johnson (TX), County of, Texas
3420. Jones (TX), County of, Texas
3421. Kaufman (TX), County of, Texas
3422. Kendall (TX), County of, Texas
3423. Kerr (TX), County of, Texas
3424. Kinney (TX), County of, Texas
3425. Kleberg (TX), County of, Texas
3426. Lamar (TX), County of, Texas
3427. Laredo (TX), City of, Texas
3428. LaSalle (TX), County of, Texas
3429. Leon (TX), County of, Texas
3430. Leon Valley (TX), City of, Texas
3431. Liberty (TX), County of, Texas
3432. Limestone (TX), County of, Texas
3433. Lubbock (TX), County of, Texas
3434. Madison (TX), County of, Texas
3435. Marion (TX), County of, Texas
3436. Maverick (TX), County of, Texas
3437. McLennan (TX), County of, Texas
3438. McMullen (TX), County of, Texas
3439. Milam (TX), County of, Texas
3440. Mitchell (TX), County of, Texas
3441. Montgomery (TX), County of, Texas
3442. Morris (TX), County of, Texas
3443. Nacogdoches (TX), County of, Texas
3444. Newton (TX), County of, Texas
3445. Nolan (TX), County of, Texas

3446. Nueces (TX), County of, Texas
3447. Nueces County Hospital District (TX), Texas
3448. Ochiltree County Hospital District (TX), Texas
3449. Orange (TX), County of, Texas
3450. Palo Pinto County Hospital District (TX), Texas
3451. Panola (TX), County of, Texas
3452. Parker (TX), County of, Texas
3453. Polk (TX), County of, Texas
3454. Potter (TX), County of, Texas
3455. Red River (TX), County of, Texas
3456. Roberts (TX), County of, Texas
3457. Robertson (TX), County of, Texas
3458. Rockwall (TX), County of, Texas
3459. Rusk (TX), County of, Texas
3460. San Antonio (TX), City of, Texas
3461. San Patricio (TX), County of, Texas
3462. San Saba (TX), County of, Texas
3463. Shackelford (TX), County of, Texas
3464. Shelby (TX), County of, Texas
3465. Smith (TX), County of, Texas
3466. Socorro Independent School District (TX), Texas
3467. Stephens (TX), County of, Texas
3468. Tarrant (TX), County of, Texas
3469. Tarrant County Hospital District (TX), Texas
3470. Terrell (TX), County of, Texas
3471. Texarkana Independent School District (TX), Texas
3472. Throckmorton (TX), County of, Texas
3473. Titus (TX), County of, Texas
3474. Travis (TX), County of, Texas
3475. Trinity (TX), County of, Texas
3476. Upshur (TX), County of, Texas
3477. Uvalde (TX), County of, Texas
3478. Van Zandt (TX), County of, Texas
3479. Walker (TX), County of, Texas
3480. Waller (TX), County of, Texas
3481. Webb (TX), County of, Texas
3482. West Wharton County Hospital District (TX), Texas
3483. Wichita (TX), County of, Texas
3484. Williamson (TX), County of, Texas
3485. Wilson (TX), County of, Texas
3486. Wilson County Memorial Hospital District (TX), Texas
3487. Wood (TX), County of, Texas
3488. Zavala (TX), County of, Texas
3489. Beaver (UT), County of, Utah
3490. Cache (UT), County of, Utah
3491. Carbon (UT), County of, Utah
3492. Daggett (UT), County of, Utah
3493. Davis (UT), County of, Utah
3494. Duchesne (UT), County of, Utah
3495. Emery (UT), County of, Utah
3496. Garfield (UT), County of, Utah
3497. Grand (UT), County of, Utah
3498. Iron (UT), County of, Utah
3499. Juab (UT), County of, Utah
3500. Kane (UT), County of, Utah
3501. Millard (UT), County of, Utah
3502. Piute (UT), County of, Utah
3503. Rich (UT), County of, Utah
3504. Salt Lake (UT), County of, Utah
3505. San Juan (UT), County of, Utah
3506. Sanpete (UT), County of, Utah
3507. Sevier (UT), County of, Utah
3508. Summit (UT), County of, Utah
3509. Tooele (UT), County of, Utah
3510. Tri-County Health Department (UT), Utah
3511. Uintah (UT), County of, Utah
3512. Utah (UT), County of, Utah
3513. Wasatch (UT), County of, Utah
3514. Washington (UT), County of, Utah
3515. Wayne (UT), County of, Utah
3516. Weber (UT), County of, Utah
3517. Bennington (VT), Town of, Vermont
3518. Brattleboro (VT), Town of, Vermont
3519. Sharon (VT), Town of, Vermont
3520. St. Albans (VT), City of, Vermont
3521. Accomack (VA), County of, Virginia
3522. Alexandria (VA), City of, Virginia
3523. Alleghany (VA), County of, Virginia
3524. Amherst (VA), County of, Virginia
3525. Arlington (VA), County of, Virginia
3526. Bland (VA), County of, Virginia
3527. Botetourt (VA), County of, Virginia
3528. Bristol (VA), City of, Virginia
3529. Buchanan (VA), County of, Virginia
3530. Buena Vista (VA), City of, Virginia

3531. Carroll (VA), County of, Virginia
3532. Charlotte (VA), County of, Virginia
3533. Chesapeake (VA), City of, Virginia
3534. Chesterfield (VA), County of, Virginia
3535. Covington (VA), City of, Virginia
3536. Culpeper (VA), County of, Virginia
3537. Cumberland (VA), County of, Virginia
3538. Danville (VA), City of, Virginia
3539. Dickenson (VA), County of, Virginia
3540. Dinwiddie (VA), County of, Virginia
3541. Emporia (VA), City of, Virginia
3542. Fairfax (VA), City of, Virginia
3543. Fairfax (VA), County of, Virginia
3544. Fauquier (VA), County of, Virginia
3545. Floyd (VA), County of, Virginia
3546. Franklin (VA), County of, Virginia
3547. Frederick (VA), County of, Virginia
3548. Fredericksburg (VA), City of, Virginia
3549. Galax (VA), City of, Virginia
3550. Giles (VA), County of, Virginia
3551. Goochland (VA), County of, Virginia
3552. Grayson (VA), County of, Virginia
3553. Greensville (VA), County of, Virginia
3554. Halifax (VA), County of, Virginia
3555. Henrico (VA), County of, Virginia
3556. Henry (VA), County of, Virginia
3557. Hopewell (VA), City of, Virginia
3558. Isle of Wight (VA), County of, Virginia
3559. King and Queen (VA), County of, Virginia
3560. Lee (VA), County of, Virginia
3561. Lexington (VA), City of, Virginia
3562. Loudoun (VA), County of, Virginia
3563. Louisa (VA), County of, Virginia
3564. Madison (VA), County of, Virginia
3565. Martinsville (VA), City of, Virginia
3566. Mecklenburg (VA), County of, Virginia
3567. Montgomery (VA), County of, Virginia
3568. Norfolk (VA), City of, Virginia
3569. Northampton (VA), County of, Virginia
3570. Northumberland (VA), County of, Virginia
3571. Norton (VA), City of, Virginia
3572. Page (VA), County of, Virginia
3573. Patrick (VA), County of, Virginia
3574. Pittsylvania (VA), County of, Virginia
3575. Portsmouth (VA), City of, Virginia
3576. Prince George (VA), County of, Virginia
3577. Prince William (VA), County of, Virginia
3578. Pulaski (VA), County of, Virginia
3579. Radford (VA), City of, Virginia
3580. Richlands (VA), Town of, Virginia
3581. Richmond (VA), City of, Virginia
3582. Richmond (VA), County of, Virginia
3583. Roanoke (VA), City of, Virginia
3584. Roanoke (VA), County of, Virginia
3585. Rockbridge (VA), County of, Virginia
3586. Russell (VA), County of, Virginia
3587. Salem (VA), City of, Virginia
3588. Scott (VA), County of, Virginia
3589. Shenandoah (VA), County of, Virginia
3590. Smyth (VA), County of, Virginia
3591. Stafford (VA), County of, Virginia
3592. Tazewell (VA), County of, Virginia
3593. Virginia Beach (VA), City of (Sheriff), Virginia
3594. Virginia Beach (VA), City of, Virginia
3595. Warren (VA), County of, Virginia
3596. Washington (VA), County of, Virginia
3597. Waynesboro (VA), City of, Virginia
3598. Westmoreland (VA), County of, Virginia
3599. Winchester (VA), City of, Virginia
3600. Wise (VA), County of, Virginia
3601. Wythe (VA), County of, Virginia
3602. Anacortes (WA), City of, Washington
3603. Bainbridge Island (WA), City of, Washington
3604. Burlington (WA), City of, Washington
3605. Chelan (WA), County of, Washington
3606. Clallam (WA), County of, Washington
3607. Clark (WA), County of, Washington
3608. Everett (WA), City of, Washington
3609. Franklin (WA), County of, Washington
3610. Island (WA), County of, Washington
3611. Jefferson (WA), County of, Washington
3612. Kent (WA), City of, Washington
3613. King (WA), County of, Washington
3614. Kirkland (WA), City of, Washington
3615. Kitsap (WA), County of, Washington
3616. Kittitas (WA), County of, Washington
3617. La Conner School District (WA), Washington
3618. Lakewood (WA), City of, Washington

3619. Lewis (WA), County of, Washington
3620. Lincoln (WA), County of, Washington
3621. Mount Vernon (WA), City of, Washington
3622. Mount Vernon School District (WA), Washington
3623. Olympia (WA), City of, Washington
3624. Pierce (WA), County of, Washington
3625. San Juan (WA), County of, Washington
3626. Seattle (WA), City of, Washington
3627. Sedro-Woolley (WA), City of, Washington
3628. Sedro-Woolley School District (WA), Washington
3629. Skagit (WA), County of, Washington
3630. Snohomish (WA), County of, Washington
3631. Spokane (WA), City of, Washington
3632. Spokane (WA), County of, Washington
3633. Tacoma (WA), City of, Washington
3634. Thurston (WA), County of, Washington
3635. Vancouver (WA), City of, Washington
3636. Walla Walla (WA), County of, Washington
3637. Whatcom (WA), County of, Washington
3638. Whitman (WA), County of, Washington
3639. Addison (a/k/a) Webster Springs (WV), Town of, West Virginia
3640. Barbour (WV), County of, West Virginia
3641. Barboursville (WV), Village of, West Virginia
3642. Beckley (WV), City of, West Virginia
3643. Belington (WV), City of, West Virginia
3644. Belle (WV), Town of, West Virginia
3645. Berkeley (WV), County of, West Virginia
3646. Bluefield (WV), City of, West Virginia
3647. Board of Education of Mason County Public Schools (WV), West Virginia
3648. Boone (WV), County of, West Virginia
3649. Braxton (WV), County of, West Virginia
3650. Brooke (WV), County of, West Virginia
3651. Buckhannon (WV), City of, West Virginia
3652. Cabell (WV), County of, West Virginia
3653. Calhoun (WV), County of, West Virginia
3654. Ceredo (WV), Town of, West Virginia

3655. Charles Town (WV), City of, West Virginia
3656. Chesapeake (WV), Town of, West Virginia
3657. Clarksburg (WV), City of, West Virginia
3658. Clay (WV), County of, West Virginia
3659. Clendenin (WV), Town of, West Virginia
3660. Delbarton (WV), Town of, West Virginia
3661. Doddridge (WV), County of, West Virginia
3662. Dunbar (WV), City of, West Virginia
3663. Eleanor (WV), Town of, West Virginia
3664. Elizabeth (WV), Town of, West Virginia
3665. Fairmont (WV), City of, West Virginia
3666. Fayette (WV), County of, West Virginia
3667. Fort Gay (WV), Town of, West Virginia
3668. Gauley Bridge (WV), Town of, West Virginia
3669. Gilmer (WV), County of, West Virginia
3670. Glenville (WV), Town of, West Virginia
3671. Grafton (WV), City of, West Virginia
3672. Grant (WV), County of, West Virginia
3673. Granville (WV), Town of, West Virginia
3674. Greenbrier (WV), County of, West Virginia
3675. Hamlin (WV), Town of, West Virginia
3676. Hancock (WV), County of, West Virginia
3677. Hardy (WV), County of, West Virginia
3678. Harrison (WV), County of, West Virginia
3679. Harrisville (WV), Town of, West Virginia
3680. Huntington (WV), City of, West Virginia
3681. Hurricane (WV), City of, West Virginia
3682. Jackson (WV), County of, West Virginia
3683. Jefferson (WV), County of, West Virginia
3684. Junior (WV), Town of, West Virginia
3685. Kanawha (WV), County of, West Virginia
3686. Kenova (WV), City of, West Virginia
3687. Lewis (WV), County of, West Virginia
3688. Logan (WV), City of, West Virginia
3689. Logan (WV), County of, West Virginia
3690. Madison (WV), Town of, West Virginia

3691. Man (WV), Town of, West Virginia
3692. Marion (WV), County of, West Virginia
3693. Marshall (WV), County of, West Virginia
3694. Mason (WV), County of, West Virginia
3695. Matewan (WV), Town of, West Virginia
3696. McDowell (WV), County of, West Virginia
3697. Milton (WV), City of, West Virginia
3698. Mineral (WV), County of, West Virginia
3699. Mingo (WV), County of, West Virginia
3700. Monongalia (WV), County of, West Virginia
3701. Monroe (WV), County of, West Virginia
3702. Montgomery (WV), City of, West Virginia
3703. Morgan (WV), County of, West Virginia
3704. Moundsville (WV), City of, West Virginia
3705. Mullens (WV), City of, West Virginia
3706. Nicholas (WV), County of, West Virginia
3707. Nitro (WV), City of, West Virginia
3708. Oceana (WV), Town of, West Virginia
3709. Ohio (WV), County of, West Virginia
3710. Parkersburg (WV), City of, West Virginia
3711. Pendleton (WV), County of, West Virginia
3712. Philippi (WV), City of, West Virginia
3713. Pleasants (WV), County of, West Virginia
3714. Pocahontas (WV), County of, West Virginia
3715. Point Pleasant (WV), City of, West Virginia
3716. Preston (WV), County of, West Virginia
3717. Princeton (WV), City of, West Virginia
3718. Putnam (WV), County of, West Virginia
3719. Quinwood (WV), Town of, West Virginia
3720. Rainelle (WV), Town of, West Virginia
3721. Randolph (WV), County of, West Virginia
3722. Ravenswood (WV), Town of, West Virginia
3723. Richwood (WV), City of, West Virginia
3724. Ripley (WV), City of, West Virginia
3725. Ritchie (WV), County of, West Virginia
3726. Roane (WV), County of, West Virginia
3727. Romney (WV), Town of, West Virginia
3728. Rupert (WV), Town of, West Virginia
3729. Saint Albans (WV), City of, West Virginia
3730. Smithers (WV), City of, West Virginia
3731. Sophia (WV), Town of, West Virginia
3732. South Charleston (WV), City of, West Virginia
3733. Spencer (WV), City of, West Virginia
3734. St. Marys (WV), City of, West Virginia
3735. Star City (WV), Town of, West Virginia
3736. Summers (WV), County of, West Virginia
3737. Summersville (WV), City of, West Virginia
3738. Sutton (WV), Town of, West Virginia
3739. Taylor (WV), County of, West Virginia
3740. Tucker (WV), County of, West Virginia
3741. Tyler (WV), County of, West Virginia
3742. Upshur (WV), County of, West Virginia
3743. Vienna (WV), City of, West Virginia
3744. Wayne (WV), County of, West Virginia
3745. Webster (WV), County of, West Virginia
3746. Weirton (WV), City of, West Virginia
3747. West Hamlin (WV), Town of, West Virginia
3748. Wetzel (WV), County of, West Virginia
3749. White Sulphur Springs (WV), City of, West Virginia
3750. Whitesville (WV), Town of, West Virginia
3751. Williamstown (WV), City of, West Virginia
3752. Winfield (WV), City of, West Virginia
3753. Wirt (WV), County of, West Virginia
3754. Wood (WV), County of, West Virginia
3755. Adams (WI), County of, Wisconsin
3756. Ashland (WI), County of, Wisconsin
3757. Barron (WI), County of, Wisconsin
3758. Bayfield (WI), County of, Wisconsin
3759. Brown (WI), County of, Wisconsin
3760. Buffalo (WI), County of, Wisconsin
3761. Burnett (WI), County of, Wisconsin
3762. Calumet (WI), County of, Wisconsin
3763. Chippewa (WI), County of, Wisconsin

3764. Clark (WI), County of, Wisconsin
3765. Columbia (WI), County of, Wisconsin
3766. Crawford (WI), County of, Wisconsin
3767. Cudahy (WI), City of, Wisconsin
3768. Dane (WI), County of, Wisconsin
3769. Dodge (WI), County of, Wisconsin
3770. Door (WI), County of, Wisconsin
3771. Douglas (WI), County of, Wisconsin
3772. Dunn (WI), County of, Wisconsin
3773. Eau Claire (WI), County of, Wisconsin
3774. Florence (WI), County of, Wisconsin
3775. Fond du Lac (WI), County of, Wisconsin
3776. Forest (WI), County of, Wisconsin
3777. Franklin (WI), City of, Wisconsin
3778. Grant (WI), County of, Wisconsin
3779. Green (WI), County of, Wisconsin
3780. Green Lake (WI), County of, Wisconsin
3781. Greenfield (WI), City of, Wisconsin
3782. Iowa (WI), County of, Wisconsin
3783. Iron (WI), County of, Wisconsin
3784. Jackson (WI), County of, Wisconsin
3785. Janesville (WI), City of, Wisconsin
3786. Jefferson (WI), County of, Wisconsin
3787. Juneau (WI), County of, Wisconsin
3788. Kenosha (WI), City of, Wisconsin
3789. Kenosha (WI), County of, Wisconsin
3790. Kewaunee (WI), County of, Wisconsin
3791. La Crosse (WI), County of, Wisconsin
3792. Lafayette (WI), County of, Wisconsin
3793. Langlade (WI), County of, Wisconsin
3794. Lincoln (WI), County of, Wisconsin
3795. Manitowoc (WI), County of, Wisconsin
3796. Marathon (WI), County of, Wisconsin
3797. Marinette (WI), City of, Wisconsin
3798. Marinette (WI), County of, Wisconsin
3799. Marquette (WI), County of, Wisconsin
3800. Menominee (WI), County of, Wisconsin
3801. Milwaukee (WI), City of, Wisconsin
3802. Milwaukee (WI), County of, Wisconsin
3803. Monroe (WI), County of, Wisconsin
3804. Mount Pleasant (WI), Village of, Wisconsin
3805. Oak Creek (WI), City of, Wisconsin
3806. Oconto (WI), County of, Wisconsin
3807. Oneida (WI), County of, Wisconsin
3808. Outagamie (WI), County of, Wisconsin
3809. Ozaukee (WI), County of, Wisconsin

3810. Pepin (WI), County of, Wisconsin
3811. Pierce (WI), County of, Wisconsin
3812. Pleasant Prairie (WI), Village of, Wisconsin
3813. Portage (WI), County of, Wisconsin
3814. Price (WI), County of, Wisconsin
3815. Racine (WI), County of, Wisconsin
3816. Richland (WI), County of, Wisconsin
3817. Rock (WI), County of, Wisconsin
3818. Rusk (WI), County of, Wisconsin
3819. Sauk (WI), County of, Wisconsin
3820. Sawyer (WI), County of, Wisconsin
3821. Shawano (WI), County of, Wisconsin
3822. Sheboygan (WI), County of, Wisconsin
3823. South Milwaukee (WI), City of, Wisconsin
3824. St. Croix (WI), County of, Wisconsin
3825. Sturtevant (WI), Village of, Wisconsin
3826. Superior (WI), City of, Wisconsin
3827. Taylor (WI), County of, Wisconsin
3828. Trempealeau (WI), County of, Wisconsin
3829. Union Grove (WI), Village of, Wisconsin
3830. Vernon (WI), County of, Wisconsin
3831. Vilas (WI), County of, Wisconsin
3832. Walworth (WI), County of, Wisconsin
3833. Washburn (WI), County of, Wisconsin
3834. Washington (WI), County of, Wisconsin
3835. Waukesha (WI), County of, Wisconsin
3836. Waupaca (WI), County of, Wisconsin
3837. Waushara (WI), County of, Wisconsin
3838. Wauwatosa (WI), City of, Wisconsin
3839. West Allis (WI), City of, Wisconsin
3840. Winnebago (WI), County of, Wisconsin
3841. Wood (WI), County of, Wisconsin
3842. Yorkville (WI), Village of, Wisconsin
3843. Carbon (WY), County of, Wyoming
3844. Casper (WY), City of, Wyoming
3845. Cheyenne (WY), City of, Wyoming
3846. Green River (WY), City of, Wyoming
3847. Riverton (WY), City of, Wyoming
3848. Rock Springs (WY), City of, Wyoming
3849. Sweetwater (WY), County of, Wyoming

DRAFT – SUBJECT TO CHANGE FOR QUALITY CONTROL PURPOSES

3850. Charles Town (WV), City of, West Virginia
3851. Chesapeake (WV), Town of, West Virginia
3852. Clarksburg (WV), City of, West Virginia
3853. Clay (WV), County of, West Virginia
3854. Clendenin (WV), Town of, West Virginia
3855. Delbarton (WV), Town of, West Virginia
3856. Doddridge (WV), County of, West Virginia
3857. Dunbar (WV), City of, West Virginia
3858. Eleanor (WV), Town of, West Virginia
3859. Elizabeth (WV), Town of, West Virginia
3860. Fairmont (WV), City of, West Virginia
3861. Fayette (WV), County of, West Virginia
3862. Fort Gay (WV), Town of, West Virginia
3863. Gauley Bridge (WV), Town of, West Virginia
3864. Gilmer (WV), County of, West Virginia
3865. Glenville (WV), Town of, West Virginia
3866. Grafton (WV), City of, West Virginia
3867. Grant (WV), County of, West Virginia
3868. Granville (WV), Town of, West Virginia
3869. Greenbrier (WV), County of, West Virginia
3870. Hamlin (WV), Town of, West Virginia
3871. Hancock (WV), County of, West Virginia
3872. Hardy (WV), County of, West Virginia
3873. Harrison (WV), County of, West Virginia
3874. Harrisville (WV), Town of, West Virginia
3875. Huntington (WV), City of, West Virginia
3876. Hurricane (WV), City of, West Virginia
3877. Jackson (WV), County of, West Virginia
3878. Jefferson (WV), County of, West Virginia
3879. Junior (WV), Town of, West Virginia
3880. Kanawha (WV), County of, West Virginia
3881. Kenova (WV), City of, West Virginia
3882. Lewis (WV), County of, West Virginia
3883. Logan (WV), City of, West Virginia
3884. Logan (WV), County of, West Virginia
3885. Madison (WV), Town of, West Virginia

3886. Man (WV), Town of, West Virginia
3887. Marion (WV), County of, West Virginia
3888. Marshall (WV), County of, West Virginia
3889. Mason (WV), County of, West Virginia
3890. Matewan (WV), Town of, West Virginia
3891. McDowell (WV), County of, West Virginia
3892. Milton (WV), City of, West Virginia
3893. Mineral (WV), County of, West Virginia
3894. Mingo (WV), County of, West Virginia
3895. Monongalia (WV), County of, West Virginia
3896. Monroe (WV), County of, West Virginia
3897. Montgomery (WV), City of, West Virginia
3898. Morgan (WV), County of, West Virginia
3899. Moundsville (WV), City of, West Virginia
3900. Mullens (WV), City of, West Virginia
3901. Nicholas (WV), County of, West Virginia
3902. Nitro (WV), City of, West Virginia
3903. Oceana (WV), Town of, West Virginia
3904. Ohio (WV), County of, West Virginia
3905. Parkersburg (WV), City of, West Virginia
3906. Pendleton (WV), County of, West Virginia
3907. Philippi (WV), City of, West Virginia
3908. Pleasants (WV), County of, West Virginia
3909. Pocahontas (WV), County of, West Virginia
3910. Point Pleasant (WV), City of, West Virginia
3911. Preston (WV), County of, West Virginia
3912. Princeton (WV), City of, West Virginia
3913. Putnam (WV), County of, West Virginia
3914. Quinwood (WV), Town of, West Virginia
3915. Rainelle (WV), Town of, West Virginia
3916. Randolph (WV), County of, West Virginia
3917. Ravenswood (WV), Town of, West Virginia
3918. Richwood (WV), City of, West Virginia
3919. Ripley (WV), City of, West Virginia

DRAFT – SUBJECT TO CHANGE FOR QUALITY CONTROL PURPOSES

3920. Ritchie (WV), County of, West Virginia
3921. Roane (WV), County of, West Virginia
3922. Romney (WV), Town of, West Virginia
3923. Rupert (WV), Town of, West Virginia
3924. Saint Albans (WV), City of, West Virginia
3925. Smithers (WV), City of, West Virginia
3926. Sophia (WV), Town of, West Virginia
3927. South Charleston (WV), City of, West Virginia
3928. Spencer (WV), City of, West Virginia
3929. St. Marys (WV), City of, West Virginia
3930. Star City (WV), Town of, West Virginia
3931. Summers (WV), County of, West Virginia
3932. Summersville (WV), City of, West Virginia
3933. Sutton (WV), Town of, West Virginia
3934. Taylor (WV), County of, West Virginia
3935. Tucker (WV), County of, West Virginia
3936. Tyler (WV), County of, West Virginia
3937. Upshur (WV), County of, West Virginia
3938. Vienna (WV), City of, West Virginia
3939. Wayne (WV), County of, West Virginia
3940. Webster (WV), County of, West Virginia
3941. Weirton (WV), City of, West Virginia
3942. West Hamlin (WV), Town of, West Virginia
3943. Wetzel (WV), County of, West Virginia
3944. White Sulphur Springs (WV), City of, West Virginia
3945. Whitesville (WV), Town of, West Virginia
3946. Williamstown (WV), City of, West Virginia
3947. Winfield (WV), City of, West Virginia
3948. Wirt (WV), County of, West Virginia
3949. Wood (WV), County of, West Virginia
3950. Adams (WI), County of, Wisconsin
3951. Ashland (WI), County of, Wisconsin
3952. Barron (WI), County of, Wisconsin
3953. Bayfield (WI), County of, Wisconsin
3954. Brown (WI), County of, Wisconsin
3955. Buffalo (WI), County of, Wisconsin
3956. Burnett (WI), County of, Wisconsin
3957. Calumet (WI), County of, Wisconsin
3958. Chippewa (WI), County of, Wisconsin
3959. Clark (WI), County of, Wisconsin
3960. Columbia (WI), County of, Wisconsin
3961. Crawford (WI), County of, Wisconsin
3962. Cudahy (WI), City of, Wisconsin
3963. Dane (WI), County of, Wisconsin
3964. Dodge (WI), County of, Wisconsin
3965. Door (WI), County of, Wisconsin
3966. Douglas (WI), County of, Wisconsin
3967. Dunn (WI), County of, Wisconsin
3968. Eau Claire (WI), County of, Wisconsin
3969. Florence (WI), County of, Wisconsin
3970. Fond du Lac (WI), County of, Wisconsin
3971. Forest (WI), County of, Wisconsin
3972. Franklin (WI), City of, Wisconsin
3973. Grant (WI), County of, Wisconsin
3974. Green (WI), County of, Wisconsin
3975. Green Lake (WI), County of, Wisconsin
3976. Greenfield (WI), City of, Wisconsin
3977. Iowa (WI), County of, Wisconsin
3978. Iron (WI), County of, Wisconsin
3979. Jackson (WI), County of, Wisconsin
3980. Janesville (WI), City of, Wisconsin
3981. Jefferson (WI), County of, Wisconsin
3982. Juneau (WI), County of, Wisconsin
3983. Kenosha (WI), City of, Wisconsin
3984. Kenosha (WI), County of, Wisconsin
3985. Kewaunee (WI), County of, Wisconsin
3986. La Crosse (WI), County of, Wisconsin
3987. Lafayette (WI), County of, Wisconsin
3988. Langlade (WI), County of, Wisconsin
3989. Lincoln (WI), County of, Wisconsin
3990. Manitowoc (WI), County of, Wisconsin
3991. Marathon (WI), County of, Wisconsin
3992. Marinette (WI), City of, Wisconsin
3993. Marinette (WI), County of, Wisconsin
3994. Marquette (WI), County of, Wisconsin
3995. Menominee (WI), County of, Wisconsin
3996. Milwaukee (WI), City of, Wisconsin
3997. Milwaukee (WI), County of, Wisconsin
3998. Monroe (WI), County of, Wisconsin
3999. Mount Pleasant (WI), Village of, Wisconsin
4000. Oak Creek (WI), City of, Wisconsin
4001. Oconto (WI), County of, Wisconsin
4002. Oneida (WI), County of, Wisconsin
4003. Outagamie (WI), County of, Wisconsin
4004. Ozaukee (WI), County of, Wisconsin

DRAFT – SUBJECT TO CHANGE FOR QUALITY CONTROL PURPOSES

4005. Pepin (WI), County of, Wisconsin
4006. Pierce (WI), County of, Wisconsin
4007. Pleasant Prairie (WI), Village of, Wisconsin
4008. Portage (WI), County of, Wisconsin
4009. Price (WI), County of, Wisconsin
4010. Racine (WI), County of, Wisconsin
4011. Richland (WI), County of, Wisconsin
4012. Rock (WI), County of, Wisconsin
4013. Rusk (WI), County of, Wisconsin
4014. Sauk (WI), County of, Wisconsin
4015. Sawyer (WI), County of, Wisconsin
4016. Shawano (WI), County of, Wisconsin
4017. Sheboygan (WI), County of, Wisconsin
4018. South Milwaukee (WI), City of, Wisconsin
4019. St. Croix (WI), County of, Wisconsin
4020. Sturtevant (WI), Village of, Wisconsin
4021. Superior (WI), City of, Wisconsin
4022. Taylor (WI), County of, Wisconsin
4023. Trempealeau (WI), County of, Wisconsin
4024. Union Grove (WI), Village of, Wisconsin
4025. Vernon (WI), County of, Wisconsin
4026. Vilas (WI), County of, Wisconsin
4027. Walworth (WI), County of, Wisconsin
4028. Washburn (WI), County of, Wisconsin
4029. Washington (WI), County of, Wisconsin
4030. Waukesha (WI), County of, Wisconsin
4031. Waupaca (WI), County of, Wisconsin
4032. Waushara (WI), County of, Wisconsin
4033. Wauwatosa (WI), City of, Wisconsin
4034. West Allis (WI), City of, Wisconsin
4035. Winnebago (WI), County of, Wisconsin
4036. Wood (WI), County of, Wisconsin
4037. Yorkville (WI), Village of, Wisconsin
4038. Carbon (WY), County of, Wyoming
4039. Casper (WY), City of, Wyoming
4040. Cheyenne (WY), City of, Wyoming
4041. Green River (WY), City of, Wyoming
4042. Riverton (WY), City of, Wyoming
4043. Rock Springs (WY), City of, Wyoming
4044. Sweetwater (WY), County of, Wyoming

**<u>EXHIBIT D</u>**

**<u>[Intentionally Omitted]</u>**

*revised July 30, 2021*

**EXHIBIT E**

**List of Opioid Remediation Uses**

**Schedule A**
**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("*Core Strategies*").[1]

**A.     NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

    1.     Expand training for first responders, schools, community support groups and families; and

    2.     Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

**B.     MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

    1.     Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

    2.     Provide education to school-based and youth-focused programs that discourage or prevent misuse;

    3.     Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

    4.     Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

*revised July 30, 2021*

C. **PREGNANT & POSTPARTUM WOMEN**

1. Expand Screening, Brief Intervention, and Referral to Treatment ("*SBIRT*") services to non-Medicaid eligible or uninsured pregnant women;

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3. Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

D. **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

1. Expand comprehensive evidence-based and recovery support for NAS babies;

2. Expand services for better continuum of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E. **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4. Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansions above.

*revised July 30, 2021*

**F.**   **TREATMENT FOR INCARCERATED POPULATION**

1.    Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.    Increase funding for jails to provide treatment to inmates with OUD.

**G.**   **PREVENTION PROGRAMS**

1.   Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.   Funding for evidence-based prevention programs in schools;

3.   Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.   Funding for community drug disposal programs; and

5.   Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

**H.**   **EXPANDING SYRINGE SERVICE PROGRAMS**

1.    Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

**I.**   **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE**

*revised July 30, 2021*

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE:  TREATMENT |
|---|

### A. __TREAT OPIOID USE DISORDER (OUD)__

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:[2]

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions.

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

*revised July 30, 2021*

8. Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including, but not limited to, training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Disseminate web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14. Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

**B. <u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

*revised July 30, 2021*

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

*revised July 30, 2021*

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

*revised July 30, 2021*

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D. ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

    2. Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

    3. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4. Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

    5. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

70

5. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

### E. ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

71

*revised July 30, 2021*

6. Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including, but not limited to, parent skills training.

10. Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

> PART TWO:  PREVENTION

## F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including, but not limited to, improvements that:

    1. Increase the number of prescribers using PDMPs;

    2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

72

    3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increasing electronic prescribing to prevent diversion or forgery.

8. Educating dispensers on appropriate opioid dispensing.

## G. <u>PREVENT MISUSE OF OPIOIDS</u>

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Funding media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Funding community anti-drug coalitions that engage in drug prevention efforts.

6. Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7. Engaging non-profits and faith-based communities as systems to support prevention.

8. Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

*revised July 30, 2021*

10. Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H. PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

*revised July 30, 2021*

10. Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Supporting screening for fentanyl in routine clinical toxicology testing.

---

| PART THREE:  OTHER STRATEGIES |
| --- |

## I. <u>FIRST RESPONDERS</u>

In addition to items in section C, D and H relating to first responders, support the following:

1. Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J. <u>LEADERSHIP, PLANNING AND COORDINATION</u>

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing

*revised July 30, 2021*

overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K.  TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

## L.  RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

*revised July 30, 2021*

7. Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("*ADAM*") system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

*revised July 30, 2021*

## EXHIBIT F

## List of States and Overall Allocation Percentages

| | |
|---|---|
| Alabama | 1.6491291250% |
| Alaska | 0.2619596435% |
| American Samoa | 0.0174609943% |
| Arizona | 2.3755949882% |
| Arkansas | 0.9713856799% |
| California | 9.9213830698% |
| Colorado | 1.6616291219% |
| Connecticut | 1.3399918096% |
| Delaware | 0.4951498892% |
| District of Columbia | 0.2078293111% |
| Florida | 7.0259134409% |
| Georgia | 2.7882080114% |
| Guam | 0.0513089852% |
| Hawaii | 0.3443244815% |
| Idaho | 0.5297889112% |
| Illinois | 3.3263363702% |
| Indiana | 2.2168933059% |
| Iowa | 0.7611448951% |
| Kansas | 0.8077259480% |
| Kentucky | 2.1047890943% |
| Louisiana | 1.5229786769% |
| Maine | 0.5651006743% |
| Maryland | 2.1106090494% |
| Massachusetts | 2.3035761083% |
| Michigan | 3.4020234989% |
| Minnesota | 1.2972597706% |
| Mississippi | 0.8942157086% |
| Missouri | 2.0056475170% |
| Montana | 0.3457758645% |
| N. Mariana Islands | 0.0188110001% |
| Nebraska | 0.4313919963% |
| Nevada | 1.2547155559% |
| New Hampshire | 0.6311550689% |
| New Jersey | 2.7551354545% |
| New Mexico | 0.8623532836% |
| New York | 5.3903813405% |

78

*revised July 30, 2021*

| | |
|---|---|
| **North Carolina** | 3.2502525994% |
| **North Dakota** | 0.1878951417% |
| **Ohio** | 4.3567051408% |
| **Oklahoma** | 0.3053135060% |
| **Oregon** | 1.4309172888% |
| **Pennsylvania** | 4.5882419559% |
| **Puerto Rico** | 0.7295764154% |
| **Rhode Island** | 0.4942737092% |
| **South Carolina** | 1.5905629933% |
| **South Dakota** | 0.2193860923% |
| **Tennessee** | 2.6881474977% |
| **Texas** | 6.2932157196% |
| **Utah** | 1.1945774957% |
| **Vermont** | 0.2876050633% |
| **Virgin Islands** | 0.0343504215% |
| **Virginia** | 2.2801150757% |
| **Washington** | 2.3189040182% |
| **West Virginia** | 1.1438786260% |
| **Wisconsin** | 1.7582560561% |
| **Wyoming** | 0.1987475390% |

*revised July 30, 2021*

## EXHIBIT G

## Subdivisions Eligible to become Participating Subdivisions and Default Subdivision Fund Allocation Percentages

The Subdivisions set forth on this Exhibit G are eligible to become Participating Subdivisions. By default, the Subdivisions set forth on this Exhibit G shall include: (1) all Litigating Subdivisions; (2) all counties and parishes in States with functional counties or parishes; (3) all Subdivisions that are the highest level of general purpose government in States without functional counties or parishes; and (4) all other Subdivisions with a population of 10,000 or greater. A State may elect to add any additional Subdivisions to this Exhibit G at any time prior to the Initial Participation Date.

Immediately upon the effectiveness of any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3) that addresses allocation from the Subdivision Fund, whether before or after the Initial Participation Date, this Exhibit G will automatically be amended to reflect the allocation from the Subdivision Fund pursuant to the State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3.

For the avoidance of doubt, inclusion on this Exhibit G shall not create any claim for any amount of the Settlement Fund, and no such amounts shall be allocated or distributed to any Subdivision included herein if such Subdivision does not otherwise meet all requirements to receive any such funds pursuant to the Agreement.

The Parties recognize the benefits of remediation funds reaching all communities, including through direct payments from the Subdivision Fund. However, to promote efficiency in the use of such funds and avoid administratively-burdensome disbursements that would be too small to add a meaningful abatement response, certain Subdivisions do not receive a direct allocation from the Subdivision Fund. However, such Subdivisions will benefit from Opioid Remediation in their community, and are eligible to receive direct benefits from the Abatement Accounts Fund in their State. All settlement funds, whether allocated to a Settling State, an Abatement Accounts Fund or a Subdivision listed on this Exhibit G can be used for Opioid Remediation in communities not listed herein.

As provided by subsection VI.D.4.c, the Allocation Percentages shown below apply to distribution of each Settling State's Subdivision Fund in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust. The allocation that would have otherwise gone to Subdivisions not listed below as receiving a direct allocation shall be (1) directed to the county or parish in which such Subdivision is located in Settling States with functional counties or parishes if the relevant county or parish is a Participating Subdivision or (2) to the highest-level general purpose government in which such Subdivision is located in Settling States without functional counties or parishes if the relevant highest-level general purpose government is a Participating Subdivision. Where the relevant county, parish or highest-level General Purpose Government is not a Participating Subdivision, allocations of General Purpose Subdivisions not

*revised July 30, 2021*

listed below as eligible to become Participating Subdivisions shall be allocated pursuant to subsection VII.I. The redirecting of funds described in this paragraph is intended to promote the efficient use of Opioid Remediation funds while keeping, where possible, local control of the distribution of those funds.

This Exhibit G will be updated with Subdivisions eligible to become Participating Subdivisions pursuant to subsection I.77.

*revised July 30, 2021*

**EXHIBIT H**

**Participation Tier Determination\***

| Participation Tier | Settling States as of the Payment Date (beginning in Payment Year 1) | Percentage of Litigating Subdivisions that Are Participating Subdivisions and/or Subdivisions Subject to a Bar, Case-Specific Resolution, or Settlement Class Resolution in effect as of the Payment Date (beginning in Payment Year 1) | Percentage of Non-Litigating Subdivisions with Populations over 10,000 that Are Participating Subdivisions and/or Subdivisions Subject to a Bar, Case-Specific Resolution, or Settlement Class resolution in effect as of the Payment Date (beginning in Payment Year 1) |
|---|---|---|---|
| 1 | 44 | 95% | 90% |
| 2 | 45 | 96% | 96% |
| 3 | 46 | 97% | 97% |
| 4 | 48 | 98% | 97% |

\* The following conditions apply to the determination of Participation Tiers:

1. For the sole purpose of the Participation Tier determination under this Exhibit, the States used to calculate each criterion (including the percentages of Litigating and Non-Litigating Subdivisions in Settling States that are Participating Subdivisions) will include each of the 50 states in the United States, excluding the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands.

2. Assessment of Subdivision participation percentage will be national in scope.

3. For purposes of determining Participation Tiers, "Litigating Subdivisions" includes Special Districts that have brought any Released Claims against any Released Entities. Special Districts shall have their population measured as set forth in subsection XIII.C.

4. The percentage of Litigating Subdivisions and percentage of Non-Litigating Subdivisions with populations over 10,000 will be calculated as follows: Each Litigating Subdivision and each Non-Litigating Subdivision with a population over 10,000 in the States used to calculate the Participation Tier will be assigned a metric reflecting both population and severity (the "Population-Severity Metric"). The Population-Severity Metric shall be the Subdivision's population plus the Subdivision's population multiplied by the severity factor for the State of the Subdivision (the severity factors for each State are attached as Exhibit T hereto) and then divided in two, thus giving 50% weight to each of population and population multiplied by the severity factor. The denominator for each percentage shall be the sum total of the Population-Severity Metric for all the Subdivisions in the

*revised July 30, 2021*

relevant category (Litigating Subdivisions or Non-Litigating Subdivisions with populations over 10,000) in the Settling States, notwithstanding that persons may be included within the population (and therefore the Population-Severity Metric) of more than one Subdivision. The numerator will be the sum total of the Population-Severity Metrics of all Subdivisions in the relevant category of Subdivision (*i.e.*, Litigating Subdivisions or Non-Litigating Subdivisions with populations over 10,000) in the Settling States that are either Participating Subdivisions or are subject to a Bar, Case-Specific Resolution, or Settlement Class Resolution, notwithstanding that persons may be included within the population of more than one Subdivision. For the avoidance of doubt, Subdivisions in Non-Settling States are excluded from both the denominator and numerator of the calculations for the percentage of Litigating Subdivisions and percentage of Non-Litigating Subdivisions with populations over 10,000.

5.   When the Participation Tier is redetermined annually, Later Participating Subdivisions described in Section VII.E.3 or Section VII.E.4 shall not be included as Participating Subdivisions, and for Subdivisions subject to a Bar, Case-Specific Resolution, or Settlement Class Resolution to be included, the Bar, Case-Specific Resolution, or Settlement Class Resolution must have been in effect both as of the relevant Payment Date and for the entire period since the prior Payment Date.

6.   Subdivisions with populations over 10,000 are listed on Exhibit I.

*revised July 30, 2021*

## EXHIBIT I

### Primary Subdivisions and Subdivisions over 10,000

[Distributor Agreement Exhibit I to be inserted]

*revised July 30, 2021*

## EXHIBIT J

### Janssen Predecessors and Former Affiliates

The following includes a non-exclusive list of Janssen's predecessors and former affiliates:

1. Janssen Pharmaceutica, Inc.
2. Janssen Pharmaceutica N.V.
3. Janssen-Cilag Manufacturing, LLC
4. Janssen Global Services, LLC
5. Janssen Ortho LLC
6. Janssen Products, LP
7. Janssen Research & Development, LLC
8. Janssen Supply Group, LLC
9. Janssen Scientific Affairs, LLC
10. JOM Pharmaceutical Services, Inc.
11. OMJ Pharmaceuticals, Inc.
12. Ortho-McNeil Finance Co.
13. Ortho-McNeil Pharmaceutical
14. Ortho-McNeil-Janssen Pharmaceuticals
15. Ortho-McNeil Pharmaceutical Services Division
16. Ortho-McNeil Neurologic
17. Patriot Pharmaceuticals, LLC
18. Pricara, Ortho-McNeil-Janssen Pharmaceuticals
19. Alza Corp.
20. Alza Development Corp.
21. Janssen Supply Chain, Alza Corp.
22. Noramco, Inc.
23. Tasmanian Alkaloids PTY LTD.

*revised July 30, 2021*

**EXHIBIT K**

**Settlement Participation Form**

| Governmental Entity: | State: |
|---|---|
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

The governmental entity identified above ("Governmental Entity"), in order to obtain and in consideration for the benefits provided to the Governmental Entity pursuant to the Settlement Agreement dated July 21, 2021 ("Janssen Settlement"), and acting through the undersigned authorized official, hereby elects to participate in the Janssen Settlement, release all Released Claims against all Released Entities, and agrees as follows.

1. The Governmental Entity is aware of and has reviewed the Janssen Settlement, understands that all terms in this Election and Release have the meanings defined therein, and agrees that by this Election, the Governmental Entity elects to participate in the Janssen Settlement and become a Participating Subdivision as provided therein.

2. The Governmental Entity shall, within 14 days of the Reference Date and prior to the filing of the Consent Judgment, dismiss with prejudice any Released Claims that it has filed.

3. The Governmental Entity agrees to the terms of the Janssen Settlement pertaining to Subdivisions as defined therein.

4. By agreeing to the terms of the Janssen Settlement and becoming a Releasor, the Governmental Entity is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date.

5. The Governmental Entity agrees to use any monies it receives through the Janssen Settlement solely for the purposes provided therein.

6. The Governmental Entity submits to the jurisdiction of the court in the Governmental Entity's state where the Consent Judgment is filed for purposes limited to that court's role as provided in, and for resolving disputes to the extent provided in, the Janssen Settlement.

7. The Governmental Entity has the right to enforce the Janssen Settlement as provided therein.

*revised July 30, 2021*

8. The Governmental Entity, as a Participating Subdivision, hereby becomes a Releasor for all purposes in the Janssen Settlement, including but not limited to all provisions of Section IV (Release), and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority. As a Releasor, the Governmental Entity hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Janssen Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Governmental Entity to release claims. The Janssen Settlement shall be a complete bar to any Released Claim.

9. In connection with the releases provided for in the Janssen Settlement, each Governmental Entity expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Governmental Entity hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Governmental Entities' decision to participate in the Janssen Settlement.

10. Nothing herein is intended to modify in any way the terms of the Janssen Settlement, to which Governmental Entity hereby agrees. To the extent this Election and Release is interpreted differently from the Janssen Settlement in any respect, the Janssen Settlement controls.

*revised July 30, 2021*

I have all necessary power and authorization to execute this Election and Release on behalf of the Governmental Entity.

Signature: _____

Name: _____

Title: _____

Date: _____



88

## **EXHIBIT L**

## **Settlement Fund Administrator**

This Exhibit L will be appended to the Agreement prior to the Initial Participation Date pursuant to subsection I.66.

*revised July 30, 2021*

**EXHIBIT M**

**Settlement Payment Schedule**

| Payment # /Year | Suspension Applies to: | Atty Fee, Costs & Additional Restitution Amount | Base | Incentives A, B & C (maximum) | Incentive D (Lookback Payment) | Credit | Total |
|---|---|---|---|---|---|---|---|
| Payment 1 ED+90 days | None | $103,244,576 | $282,175,271 | --- | --- | $14,580,153 | $400,000,000 |
| Payment 2 July 2022 | None | --- | $658,320,615 | --- | --- | --- | $658,320,615 |
| Payment 3 July 2023 | Bonus | $93,629,192 | --- | $526,905,161 | --- | $71,145,032 | $691,679,385 |
| Payment 4 July 2024 | Bonus | $93,629,191 | $259,273,971 | $549,768,597 | --- | $47,328,241 | $950,000,000 |
| Payment 5 July 2025 | Bonus | $43,720,414 | $262,463,219 | $634,274,384 | --- | $59,541,983 | $1,000,000,000 |
| Payment 6 July 2026 | Bonus | $43,720,414 | $105,720,216 | $54,325,273 | --- | $12,900,764 | $216,666,667 |
| Payment 7 July 2027 | Bonus & lookback | $43,720,414 | $63,074,061 | $54,325,273 | $42,646,154 | $12,900,765 | $216,666,667 |
| Payment 8 July 2028 | Bonus & lookback | $43,720,414 | $63,074,060 | $54,325,272 | $42,646,154 | $12,900,766 | $216,666,666 |
| Payment 9 July 2029 | Bonus & lookback | --- | $82,748,246 | $78,371,501 | $42,646,154 | $12,900,766 | $216,666,667 |
| Payment 10 July 2030 | Base, bonus & lookback | --- | $82,748,248 | $78,371,500 | $42,646,154 | $12,900,765 | $216,666,667 |
| Payment 11 July 2031 | Base, bonus & lookback | --- | $82,748,248 | $78,371,500 | $42,646,153 | $12,900,765 | $216,666,666 |
| **Total** | | **$465,384,615** | **$1,942,346,155** | **$2,109,038,461** | **$213,230,769** | **$270,000,000** | **$5,000,000,000** |

**NOTES**:

1. Any adjustments to attorneys' fees and costs will be addressed in the separate attorneys' fees and costs agreement.

90

*revised July 30, 2021*

2. The attorneys' fees and costs included in the schedule include the Additional Restitution Amount, which will be paid in lieu of attorneys' fees to Settling States listed on Exhibit N.

3. Any offsets under Section V would also be deducted from the base, Incentive B & C maximum, and Incentive D lookback payments and applied proportionately to all payments.

4. Accelerated payments for Incentive A would adjust figures for base and Incentive B & C payments.

5. The dates of payments shown on the schedule are approximate, and will be determined by subsection V.B.1.

*revised July 30, 2021*

## EXHIBIT N

## Additional Restitution Amount Allocation

| | |
|---|---|
| Alabama | 2.1169269268% |
| Alaska | 0.3443798454% |
| American Samoa | 0.0219613287% |
| Arizona | 2.9452135100% |
| California | 13.1510781360% |
| Colorado | 2.1897380150% |
| Connecticut | 1.7275419499% |
| Delaware | 0.6508743856% |
| District of Columbia | 0.2811929384% |
| Georgia | 3.7040606512% |
| Guam | 0.0665280480% |
| Hawaii | 0.4710748102% |
| Illinois | 4.3924998997% |
| Indiana | 2.7750263890% |
| Iowa | 1.0610119129% |
| Kansas | 1.0960862986% |
| Louisiana | 2.0857625133% |
| Maine | 0.7470015721% |
| Maryland | 2.6658205590% |
| Massachusetts | 2.9180077435% |
| Michigan | 4.3144215263% |
| Minnesota | 1.7616910858% |
| Missouri | 2.5748706956% |
| Montana | 0.4612247807% |
| N. Mariana Islands | 0.0240110183% |
| Nebraska | 0.5931074216% |
| New York | 8.4314865530% |
| North Carolina | 4.1880762974% |
| North Dakota | 0.2646479540% |
| Oregon | 1.8098698760% |
| Pennsylvania | 5.6817646992% |
| Rhode Island | 0.6444665757% |
| South Carolina | 2.0610356358% |
| Tennessee | 3.3570652958% |
| Texas | 10.8573789344% |
| Utah | 1.5481963920% |

*revised July 30, 2021*

| | |
|---|---|
| **Vermont** | 0.3893298238% |
| **Virgin Islands** | 0.0453295506% |
| **Virginia** | 3.0182689455% |
| **Wisconsin** | 2.2927931680% |
| **Wyoming** | 0.2691763371% |

*revised July 30, 2021*

# EXHIBIT O

## Adoption of a State-Subdivision Agreement

A State-Subdivision Agreement shall be applied if it meets the requirements of Section VI and is approved by the State and by the State's Subdivisions as follows:

1. *Requirements for Approval*. A State-Subdivision Agreement shall be deemed as agreed to when it has been approved by the State and either (a) Subdivisions whose aggregate "Population Percentages," determined as set forth below, total more than sixty percent (60%), or (b) Subdivisions whose aggregate Population Percentages total more than fifty percent (50%) provided that these Participating Subdivisions also represent fifteen percent (15%) or more of the State's counties or parishes (or, in the case of Settling States whose counties and parishes do not function as local governments, 15% of or more of the Settling State's non-county Subdivisions), by number.

2. *Approval Authority*. Approval by the State shall be by the Attorney General. Approval by a Subdivision shall be by the appropriate official or legislative body pursuant to the required procedures for that Subdivision to agree to a legally binding settlement.

3. *Population Percentage Calculation*. For purposes of this Exhibit O only, Population Percentages shall be determined as follows: For States with functional counties or parishes[3], the Population Percentage of each county or parish shall be deemed to be equal to (a) (1) 200% of the population of such county or parish, minus (2) the aggregate population of all Primary Incorporated Municipalities located in such county or parish, divided by (b) 200% of the State's population. A "Primary Incorporated Municipality" means a city, town, village or other municipality incorporated under applicable state law with a population of at least 25,000 that is not located within another incorporated municipality. The Population Percentage of each Primary Incorporated Municipality shall be equal to its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population; *provided* that the Population Percentage of a Primary Incorporated Municipality that is not located within a county shall be equal to 200% of its population (including the population of any incorporated or unincorporated municipality located therein) divided by 200% of the State's population. For all States that do not have functional counties or parishes, the Population Percentage of each non-county Subdivision (including any incorporated or unincorporated municipality located therein), shall be equal to its population divided by the State's population.

4. *Preexisting Agreements and Statutory Provisions*. A State may include with the notice to its Subdivisions an existing agreement, a proposed agreement, or statutory provisions regarding the distribution and use of settlement funds and have the acceptance of such an agreement or statutory provision be part of the requirements to be an Initial Participating Subdivision.

---

[3] Certain states do not have counties or parishes that have functional governments, including: Alaska, Connecticut, Massachusetts, Rhode Island, and Vermont.

*revised July 30, 2021*

5.  *Revised Agreements*. A State-Subdivision Agreement that has been revised, supplemented, or refined shall be applied if it meets the requirements of Section VI and is approved by the State and by the State's Subdivisions pursuant to the terms above.

*revised July 30, 2021*

## EXHIBIT P

### Injunctive Relief

A. **Definitions Specific to this Exhibit**

1. "*Cancer-Related Pain Care*" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

2. "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen"), including all of their subsidiaries, predecessors, successors, current officers, directors, employees, representatives, agents, affiliates, parents, and assigns acting on behalf of Janssen in the United States.

3. "*End-of-Life Care*" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

4. "*Health Care Provider*" means any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, practice, hospital, clinic, or pharmacy.

5. "*In-Kind Support*" means payment or assistance in the form of goods, commodities, services, or anything else of value.

6. "*Lobby*" and "*Lobbying*" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

7. "*Opioid(s)*" means all naturally occurring, synthetic, or semisynthetic substances that interact with opioid receptors and act like opium. For the avoidance of doubt, the term "Opioid(s)" does not include Imodium.

8. "*Opioid Product(s)*" means all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Products(s)" shall not include (i) methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients (APIs) used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or

*revised July 30, 2021*

APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

9.    "*OUD*" means opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

10.   "*Product(s) for the Treatment of Opioid-Induced Side Effects*" means any over-the-counter or prescription remedy used to treat those side effects identified on the FDA label for any Opioid Product, except that, for purposes of the Agreement, Product(s) for the Treatment of Opioid-Induced Side Effects shall not include products that treat OUD or respiratory depression.

11.   "*Promote*," "*Promoting*," "*Promotion*," and "*Promotional*" means dissemination of information or other practices intended or reasonably anticipated to increase sales, prescriptions, or that attempts to influence prescribing practices in the United States. These terms shall not include the provision of scientific information or data in response to unsolicited requests from Health Care Providers or payors as allowed in subsection C.2.e-h.

12.   "*Third Party(ies)*" means any person or entity other than Janssen or a government entity.

13.   "*Treatment of Pain*" means the provision of therapeutic modalities to alleviate or reduce pain.

14.   "*Unbranded Information*" means any information that does not identify a specific branded or generic product.

## B.    Ban on Selling and Manufacturing Opioids

1.    Janssen shall not manufacture or sell any Opioids or Opioid Products for distribution in the United States. Janssen represents that prior to the Effective Date, it de-listed all of its Opioid Products and no longer ships any of them to or within the United States. Janssen shall provide notice to the Settling States when the last of the inventory Janssen has shipped has expired.

2.    Notwithstanding subsection B.1, above, Janssen may continue to manufacture Nucynta and Nucynta ER (collectively "Nucynta") in accordance with the terms of its April 2, 2015 contract with Depomed, Inc., rights to which were assigned to Collegium Pharmaceutical, Inc. ("Collegium") on February 13, 2020, so long as Janssen is not Promoting Nucynta, or selling Nucynta to anyone other than Collegium. Janssen shall not extend, amend, or otherwise alter the terms of its April 2, 2015 contract or enter into any similar agreement related to Nucynta or any other Opioid or Opioid Product. For the term of its April 2, 2015 contract, or until the expiration of subsection B.1, whichever is shorter, Janssen shall make an annual report to the Settling States showing the amount of Nucynta manufactured in accordance with the April 2, 2015 contract.

*revised July 30, 2021*

C.      **Ban on Promotion**

1.      Janssen shall not engage in Promotion of Opioids or Opioid Products including but not limited to, by:

      a.      Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients, or to persons involved in determining the Opioid Products included in formularies;

      b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

      c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs for Promotion of Opioids or Opioid Products;

      d.      Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

      e.      Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

      f.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

      g.      Engaging in internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet.

2.      Notwithstanding subsection C.1 directly above, Janssen may:

      a.      Maintain a corporate website;

      b.      Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

*revised July 30, 2021*

c.     Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in [State];

d.     Provide the following by mail, electronic mail, on or through Janssen's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in [State];

e.     Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

f.     Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.     Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h.     Provide information relating solely to the pricing of any Opioid Product;

i.     Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy (REMS) program or other federal or state law or regulation applicable in [State] through an independent Third Party, which shall be responsible for the program's content without the participation of Janssen; and

*revised July 30, 2021*

j.      Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Janssen as the source of the information.

3.      Janssen shall not engage in the Promotion of Products for the Treatment of Opioid-Induced Side Effects, including but not limited to:

      a.      Employing or contracting with sales representatives or other persons to Promote Products for the Treatment of Opioid-Induced Side Effects to Health Care Providers or patients;

      b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote Products for the Treatment of Opioid-Induced Side Effects;

      c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote Products for the Treatment of Opioid-Induced Side Effects;

      d.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Products for the Treatment of Opioid-Induced Side Effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4.      Notwithstanding subsection C.3 directly above, Janssen may Promote Products for the Treatment of Opioid-Induced Side Effects so long as such Promotion does not associate the product with Opioids or Opioid Products.

5.      Treatment of Pain

      a.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the Treatment of Pain, except that Janssen may continue to Promote the Treatment of Pain with branded non-Opioids, including Tylenol and Motrin.

      b.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the concept that pain is undertreated, except in connection with Promoting the use of branded non-Opioids, including Tylenol and Motrin, for the Treatment of Pain.

      c.      Janssen shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or that otherwise Promotes Opioids or Opioid Products.

*revised July 30, 2021*

6.     Notwithstanding subsection C.5 above:

    a.     Janssen may Promote or provide educational information about the Treatment of Pain with non-Opioids or therapies such as acetaminophen or non-steroidal anti-inflammatory drugs (NSAIDs), including Promoting or providing educational information about such non-Opioids or therapies as alternatives to Opioid use, or as part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

    b.     Janssen may provide educational information about the Treatment of Pain related to medical procedures involving devices manufactured or sold by Janssen, including educational information about Opioids or Opioid Products, so long as such information does not Promote Opioids or Opioid Products.

7.     The Promotional conduct prohibited in subsection C is not prohibited insofar as it relates to the Promotion of Opioids or Opioid Products for Cancer-Related Pain Care or End-of-Life Care only, and so long as Janssen is identified as the sponsor or source of such Promotional conduct.

## D.    **No Financial Reward or Discipline Based on Volume of Opioid Sales**

1.     Janssen shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products;

2.     Janssen shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to any person in return for the prescribing, sale, use, or distribution of an Opioid Product; and

3.     Janssen's compensation policies and procedures shall ensure compliance with the Agreement.

## E.    **Ban on Funding/Grants to Third Parties**

1.     Janssen shall not directly or indirectly provide financial support or In-Kind Support to any Third Party that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects (subject to subsections C.2, C.4, and C.6), including educational programs or websites that Promote Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects, excluding financial support otherwise required by the Agreement, a court order, or by a federal or state agency.

2.     Janssen shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects.

*revised July 30, 2021*

3.      Janssen shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects (subject to subsections C.2, C.4, and C.6).

4.      Janssen shall not use, assist, or employ any Third Party to engage in any activity that Janssen itself would be prohibited from engaging in pursuant to the Agreement. To the extent Janssen supports trade groups engaged in Lobbying, Janssen shall stipulate that such support not be used for any purpose prohibited by the Agreement.

5.      Janssen shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      Janssen shall not compensate or support Health Care Providers or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payors, i.e., any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers.

7.      No officer or management-level employee of Janssen may concurrently serve as a director, board member, employee, agent, or officer of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or management-level employee of Janssen from concurrently serving on the board of a hospital.

8.      Janssen shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects. For the avoidance of doubt, nothing in this paragraph shall prohibit Janssen from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or Board member at any such entity.

F.   **Lobbying Restrictions**

1.      Janssen shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

   a.      Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

   b.      Has the effect of limiting access to any non-Opioid alternative pain treatments; or

*revised July 30, 2021*

     c.      Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.    Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

     a.      The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

     b.      The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

     c.      The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

     d.      The limitation of initial prescriptions of Opioids to treat acute pain;

     e.      The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

     f.      The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

     g.      Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

     h.      The implementation or use of Opioid drug disposal systems.

3.    Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of PDMPs, including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4.    Notwithstanding the foregoing restrictions in subsections F.1-3, the following conduct is not restricted:

     a.      Challenging the enforcement of or suing for declaratory or injunctive relief with respect to legislation, rules, or regulations referred to in subsection F.1;

     b.      Communications made by Janssen in response to a statute, rule, regulation, or order requiring such communication;

*revised July 30, 2021*

c.      Communications by a Janssen representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

d.      Responding, in a manner consistent with the Agreement, to an unsolicited request for input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to Janssen from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation; or

e.      Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections F.1-3, so long as the company does not support specific portions of such legislation or regulation covered by subsection F.1 or oppose specific portions of such legislation or regulation covered by subsections F.2-3.

5.      Janssen shall provide notice of the prohibitions in subsection F to all employees engaged in Lobbying; shall incorporate the prohibitions in subsection F into trainings provided to Janssen employees engaged in Lobbying; and shall certify to the Settling States that it has provided such notice and trainings to Janssen employees engaged in Lobbying.

## G.      Ban on Prescription Savings Programs

1.      Janssen shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

2.      Janssen shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

3.      Janssen shall not directly or indirectly assist patients, Health Care Providers, or pharmacies with the claims and/or prior authorization process required for third-party payors to approve payment for any Opioid Product.

## H.      General Terms

1.      Janssen shall not make any written or oral statement about Opioids or any Opioid Product that is unfair, false, misleading, or deceptive as defined under the law of [State]. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

*revised July 30, 2021*

2.      Janssen shall not represent that Opioids or any Opioid Product(s) have approvals, characteristics, uses, benefits, or qualities that they do not have. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

3.      For the avoidance of doubt, the Agreement shall not be construed or used as a waiver or limitation of any defense otherwise available to Janssen in any action, and nothing in the Agreement is intended to or shall be construed to prohibit Janssen in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in defense of litigation or other legal proceedings.

4.      Upon the request of the [State] Attorney General, Janssen shall provide the [State] Attorney General with copies of the following, within thirty (30) calendar days of the request:

      a.      Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Janssen's Opioid Product(s); and

      b.      Warning or untitled letters issued by the FDA regarding Janssen's Opioid Product(s) and all correspondence between Janssen and the FDA related to such letters.

5.      The Agreement applies to conduct that results in the Promotion of Opioids or Opioid Products, or the Treatment of Pain inside the United States.

6.      Janssen will enter into the Agreement solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of the Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. The Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

7.      Nothing in the Agreement shall be construed to limit or impair Janssen's ability to:

      a.      Communicate its positions and respond to media inquiries concerning litigation, investigations, reports or other documents or proceedings relating to Janssen or its Opioid Products.

      b.      Maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products, including the website, www.factsaboutourprescriptionopioids.com.

*revised July 30, 2021*

I. **Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1. Janssen shall comply with all applicable state laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids or Opioid Products, including conduct permitted by subsection B.2, provided that nothing in this paragraph requires Janssen to violate federal law or regulations, including but not limited to:

    a. [State] Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

    b. [State] Consumer Protection Laws;

    c. [State] laws, regulations, and guidelines related to opioid prescribing, distribution, and disposal; and

    d. [State Specific Laws].

J. **Clinical Data Transparency**

1. Janssen agrees to continue sharing clinical trial data under the Yale University Open Data Access (YODA) Project to allow researchers qualified under the program to access the company's proprietary data under the terms of the project.

2. In the event Yale University discontinues or withdraws from the YODA Project agreement with Janssen, Janssen shall make its clinical research data regarding Opioids and Opioid Products, and any additional clinical research data that Janssen sponsors and controls regarding Opioids and Opioid Products, available to an independent entity that is the functional equivalent of the YODA Project under functionally equivalent terms.

K. **Enforcement**

1. For the purposes of resolving disputes with respect to compliance with this Exhibit, should any of the Settling States have a reasonable basis to believe that Janssen has engaged in a practice that violates a provision of this Exhibit subsequent to the Effective Date, such Settling State shall notify Janssen in writing of the specific objection, identify with particularity the provision of the Agreement that the practice appears to violate, and give Janssen thirty (30) days to respond in writing to the notification; provided, however, that a Settling State may take any action if the Settling State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

2. Upon receipt of written notice, Janssen shall provide a good faith written response to the Settling State's notification, containing either a statement explaining why Janssen believes it is in compliance with this Exhibit of the Agreement, or a detailed explanation of how the alleged violation occurred and a statement

106

explaining how Janssen intends to remedy the alleged breach. Nothing in this section shall be interpreted to limit the [State's] civil investigative demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable law, and Janssen reserves all of its rights in responding to a CID or investigative subpoena issued pursuant to such authority. If Janssen notifies the Settling States in writing that two or more Settling States have notified Janssen of alleged violations, the Settling States that provided notice of alleged violations shall work in good faith to collectively resolve the alleged violation with Janssen before taking any enforcement action(s).

3.    The Settling States may agree, in writing, to provide Janssen with additional time beyond thirty (30) days to respond to a notice provided under subsection K.1, above, without Court approval.

4.    Upon giving Janssen thirty (30) days to respond to the notification described above, the Settling State shall also be permitted reasonable access to inspect and copy relevant, non-privileged, non-work product records and documents in possession, custody, or control of Janssen that relate to Janssen's compliance with each provision of the Agreement pursuant to that Settling State's CID or investigative subpoena authority.

5.    The Settling State may assert any claim that Janssen has violated the Agreement in a separate civil action to enforce compliance with the Agreement, or may seek any other relief afforded by law for violations of the Agreement, but only after providing Janssen an opportunity to respond to the notification described in subsection K.1, above; provided, however, the Settling State may take any action if the Settling State believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

6.    In the event of a conflict between the requirements of the Agreement and any other law, regulation, or requirement such that Janssen cannot comply with the law without violating the terms of the Agreement or being subject to adverse action, including fines and penalties, Janssen shall document such conflicts and notify the Settling State of the extent to which it will comply with the Agreement in order to eliminate the conflict within thirty (30) days of Janssen's discovery of the conflict. Janssen shall comply with the terms of the Agreement to the fullest extent possible without violating the law.

7.    Janssen or any Settling State may request that Janssen and any Settling State meet and confer regarding the resolution of an actual or potential conflict between the Agreement and any other law, or between interpretations of the Agreement by different courts. Nothing herein is intended to modify or extend the jurisdiction of any single judicial authority as provided by law.

L.    **Compliance Duration**

1.    Subsections B-J shall be effective for 10 years from the Effective Date.

*revised July 30, 2021*

2.      Nothing in this Agreement shall relieve Janssen of its independent obligation to fully comply with the laws of [State] after expiration of the 10-year period specified in this subsection.

**M.      Compliance Deadlines**

1.      Janssen must be in full compliance with the provisions included this Agreement by the Effective Date. Nothing herein shall be construed as permitting Janssen to avoid existing legal obligations.

108

## EXHIBIT Q

### Non-Released Entities

The following includes a non-exclusive list of non-Released Entities:

1. Actavis LLC
2. Actavis Pharma, Inc.
3. Allergan PLC
4. Allergan Finance, LLC
5. AmerisourceBergen Corporation
6. AmerisourceBergen Drug Corporation
7. Anda, Inc.
8. Cardinal Health, Inc.
9. Cephalon, Inc.
10. Collegium Pharmaceuticals
11. CVS Health Corp.
12. CVS Pharmacy, Inc.
13. Endo Pharmaceuticals Inc.
14. Endo Health Solutions Inc.
15. Mallinckrodt LLC
16. McKesson Corporation
17. McKinsey & Company Inc.
18. Par Pharmaceutical, Inc.
19. Par Pharmaceutical Companies, Inc.
20. Purdue Pharma L.P.
21. Purdue Pharma Inc.
22. SpecGx LLC
23. Teva Pharmaceuticals USA, Inc.
24. The Purdue Frederick Company
25. Walgreen Co.
26. Walgreens Boots Alliance, Inc.
27. Walmart Inc.
28. Watson Laboratories, Inc.

*revised July 30, 2021*

<u>**EXHIBIT R**</u>

<u>**Agreement on Attorneys' Fees, Costs, and Expenses**</u>

This Agreement on Attorneys' Fees, Expenses and Costs ("Fee Agreement"), is entered between Janssen and the Plaintiffs' Executive Committee appointed in the multidistrict litigation in the Northern District of Ohio, *In re National Prescription Opiate Litigation*, No. 1:17-MD-2804 ("MDL PEC"), in connection with the Janssen Master Settlement Agreement ("Janssen Agreement").  This Fee Agreement becomes effective on the Effective Date of the Janssen Agreement or the date that the Consent Judgments anticipated under the Janssen Agreement become final in 25 Settling States (whichever is later).  However, the costs specified in paragraphs II.I.1 and II.I.4 of this Fee Agreement that are to be funded pre-Effective Date by Janssen are effective upon agreement in writing with Janssen.

**I.**     **Definitions**

A.     This Fee Agreement incorporates all defined terms in the Janssen Agreement, unless otherwise defined herein, and shall be interpreted in a manner consistent with the Janssen Agreement.

B.     "*Attorney*."  Any of the following retained through a legal contract: a solo practitioner, multi-attorney law firm, or other legal representative of a Participating Subdivision.

C.     "*Attorney Fee Fund*."  An account consisting of funds allocated to pay attorneys' fees approved pursuant to Section II of this Fee Agreement established by Order of and under the ongoing jurisdiction of the MDL Court, as provided below.

D.     "*Common Benefit Fund*."  The sub fund of the Attorney Fee Fund described in Section II.C.

E.     "*Contingency Fee Fund*."  The sub fund of the Attorney Fee Fund described in Section II.D.

F.     "*Cost and Expense Fund Administrator*."  The administrator appointed by the MDL Court to administer the MDL Expense Fund and Litigating Subdivision Cost Fund as provided in the Fee Agreement.

G.     "*Cost Funds*."  Collectively, the MDL Expense Fund and Litigating Subdivision Cost Fund.

H.     "*Fee Entitlement*."  Any right, entitlement or expectation, including but not limited to a fee contract, contingent fee contract, agreement, referral arrangement, co-counsel arrangement, State Back-Stop agreement, or any other arrangement by which counsel could receive compensation or other consideration.  For the avoidance of doubt, the scope of Fee Entitlement under paragraph II.G.3.a does not include any Attorneys' fees associated with representation of a State.

I.      "*Fee Panel*."  The three-person panel appointed by the MDL Court to administer the Attorney Fee Fund and its sub funds as provided in the Fee Agreement.

J.      "*Litigating Subdivision Cost Fund*."  The cost fund described in Section II.E herein.

K.      "*MDL Court*."  United States District Court for the Northern District of Ohio Eastern Division, Case No. 1:17-md-2804, Judge Dan Aaron Polster.

L.      "*MDL Expense Fund*."  The cost fund described in Section II.F below.

M.      "*MDL PEC*."  The Plaintiffs' Executive Committee appointed by the MDL Court.

N.      "*Non-Participating Litigating Subdivision*."  A Litigating Subdivision that is not a Participating Subdivision.

O.      "*Participating Litigating Subdivision*."  A Litigating Subdivision that is also a Participating Subdivision.

P.      "*Participation Agreement*."  An agreement executed by an Attorney that acknowledges the obligation to pay an appropriate MDL Common Benefit Assessment.

Q.      "*Qualifying Representation*."  Legal services provided for representation of a Participating Litigating Subdivision regarding Released Claims against Released Entities.

R.      "*State Back-Stop Agreement*."  Any agreement by a Settling State and private counsel for Participating Subdivisions in that State (or legislation enacted in that State) to provide, adjust, or guarantee attorneys' fees and costs, whether from the Attorney Fee Fund or any other source recognized in the agreement or legislation.

## II.     Fees and Costs

A.      *Total Attorneys' Fees and Costs*.

1.  Total attorneys' fees and costs to be paid by Janssen to Attorneys in each of the relevant Payment Years under this Agreement shall be up to the following amounts, subject to the provisions set forth below, including with respect to the division of the Attorney Fee Fund into its sub funds:

*revised July 30, 2021*

| | Attorney Fee Fund (Contingency Fee Fund and Common Benefit Fund) | MDL Expense Fund | Litigating Subdivision Cost Fund |
|---|---|---|---|
| Payment Year 1 | $32,391,518.74 | $9,615,384.61 | $10,000,000.00 |
| Payment Year 2 | $35,936,883.63 | | $10,000,000.00 |
| Payment Year 3 | $64,482,248.52 | | $10,000,000.00 |
| Payment Year 4 | $43,720,414.21 | | |
| Payment Year 5 | $43,720,414.21 | | |
| Payment Year 6 | $43,720,414.21 | | |
| Payment Year 7 | $43,720,414.21 | | |

2. The sub funds within the Attorney Fee Fund shall include the Common Benefit Fund and the Contingency Fee Fund.  The Cost Funds shall include the MDL Expense Fund, and the Litigating Subdivision Cost Fund.  The State Counsel Fee Fund and the State Cost Fund shall be separate funds under the control of the Settling States.

3. The Contingency Fee Fund and the Common Benefit Fund shall be administered by a Fee Panel to be appointed by the MDL Court that will be governed by the provisions of this Fee Agreement and shall design the process and procedures for the allocation of fees pursuant to this Fee Agreement and the MDL Court's Order.  The Cost Funds shall be administered by the Cost and Expense Fund Administrator to be appointed by the MDL Court who will be governed by the provisions of this Fee Agreement and shall design the process and procedures for the allocation of costs pursuant to this Agreement and the MDL Court's Order.

4. The fees and costs to be paid under this Fee Agreement are available for Attorneys engaged in Qualifying Representations only.  Fees and costs to be paid under this Fee Agreement are not available prior to the Effective Date of the Janssen Agreement or if the Janssen Agreement does not proceed past Janssen's determination in Section VIII.A of the Janssen Agreement.  Fees and costs to be paid under this Fee Agreement are not available for representation of Non-Participating Subdivisions or Non-Litigating Subdivisions and are not available for representation of private hospitals, third-party payors, NAS claimants, personal injury/wrongful death claimants, or any entity other than Participating Litigating Subdivisions.  In addition, fees and costs under this Fee Agreement are not available for representation of

*revised July 30, 2021*

any individual or entity in matters other than those claims against Released Entities, but may include a reasonable share of representations that involve development of facts for pursuit of opioid-related claims against multiple defendants in the pharmacy, manufacturing, and distribution chain.

B.    *Attorney Fee Fund and Sub Funds*

1.  There shall be a split of the Attorney Fee Fund into the Contingency Fee Fund and the Common Benefit Fund.  The split shall be 40% to the Contingency Fee Fund and 60% to the Common Benefit Fund.

2.  In no event shall Janssen be required to pay more into the Attorney Fee Fund in any Payment Year than the maximum amount specified for that Payment Year in paragraph II.A.1, which amounts are reflected in Exhibit M to the Janssen Agreement.  The amounts allocated to the Contingency Fee Fund and the Common Benefit Fund set by the Fee Panel shall be subject to the reductions and offsets set forth below.

3.  Awards of fees from the Contingency Fee Fund shall be available to Attorneys with Qualifying Representations of Participating Litigating Subdivisions eligible to receive an allocation under the Janssen Agreement, as set forth in Exhibit G to the Janssen Agreement, and shall be made applying the Mathematical Model attached as Exhibit "A" to this Fee Agreement.  The collection of the data and calculations for the Mathematical Model has been a cooperative effort among private counsel for a large number of Litigating Subdivisions.  The analysis has been spearheaded by Joseph Tann and Andrew Arnold.  The Fee Panel is encouraged to continue working with those counsel in application of the Model.  The Fee Panel shall oversee the application of the Model and resolve any questions or disputes concerning the eligibility of a Counsel to participate as required in Section II.G.  The Panel is empowered to hear disputes concerning and ensure the accuracy of the mathematical calculation.

4.  As to awards from the Contingency Fee Fund, there shall be no right of appeal.

5.  Any appeal of an award of the Fee Panel from the Common Benefit Fund will be made to the MDL Court and be reviewed under an abuse of discretion standard.

C.    *Common Benefit Fund* (60% of the Attorney Fee Fund.)

1.  Funds in the Attorney Fee Fund shall be allocated to the Common Benefit Fund according to the schedule set forth below, subject to the adjustments described in paragraph II.C.5.  The payments are to be made on the following yearly schedule, subject to the adjustments set forth below:

113

*revised July 30, 2021*

| Payment Year 1 | $19,434,911.24 |
| Payment Year 2 | $21,562,130.18 |
| Payment Year 3 | $38,689,349.11 |
| Payment Year 4 | $26,232,248.53 |
| Payment Year 5 | $26,232,248.53 |
| Payment Year 6 | $26,232,248.53 |
| Payment Year 7 | $26,232,248.53 |
| Total: | **$184,615,384.64** |

2. The Common Benefit Fund shall be available to compensate Attorneys engaged in Qualifying Representations of Participating Litigating Subdivisions who:

    a. have performed work for the common benefit of all subdivisions pursuant to the guidelines established by Judge Polster set forth in MDL 2804 and the Order dated June 19, 2018, under docket number 636, which is included herein by reference; and

    b. satisfy the eligibility criteria set forth in Section II.G.

    For purposes of Common Benefit Fund distribution, notwithstanding paragraph II.A.4, Attorneys representing Tribal Nations litigating against Janssen that have reached a settlement for Released Claims with Janssen and/or Released Entities and meet the eligibility criteria in Section II.G shall be eligible.

3. The Common Benefit Fund shall be overseen by the Fee Panel, which shall determine the allocation of funds to eligible Attorneys consistent with this Fee Agreement and the June 19, 2018 Order;

4. In assessing the benefits that an Attorney has conferred to Participating Subdivisions (including non-Litigating Subdivisions) and/or Tribes for purposes of any compensation decision, the Fee Panel shall give significant weight to the extent to which (i) the Attorney and his or her clients have contributed to increasing (or reducing) the Initial Participation Tier achieved through participation in the Janssen Agreement, (ii) the Attorney and his or her clients have contributed to increasing (or reducing) the amounts achieved under Incentive Payments A-D through participation in the Janssen Agreement, and (iii) the Attorney and his or her clients have contributed to the potential triggering of any suspension, reduction, or offset of Settlement payment amounts under the Janssen Agreement.   The panel may also consider additional fee recoveries the Attorney may potentially obtain, including, but not limited to, from State Back-Stop Agreements, representations of States or Tribal Nations, representations of other clients in opioids-related matters, or through the representation of Subdivision clients,

*revised July 30, 2021*

whether they participated in the Janssen Agreement or not.  It is the intent of this provision to recognize that the goal of the Janssen Agreement is to provide for maximum participation by the Subdivisions, maximum abatement funding for all Subdivisions nationally, and the maximum peace for Released Entities.  Therefore, representing a Non-Participating Subdivision does not further the goal of the Janssen Agreement, and should not be considered Common Benefit because it does not increase funds available to Participating Subdivisions' abatement programs.  Representing Later Litigating Subdivisions is antithetical to the Janssen Settlement, detracts from Common Benefit, and is addressed by the ethics opinion discussed in paragraph II.I.4.  The Fee Panel shall consider this concept of "common detriment" set forth in this paragraph in all of its decision making with respect to the allocation of the Attorney Fee Fund among Attorneys, as well as, in its discretion, any offsets provided to Janssen as set forth in paragraph II.C.6 and Section II.H.  The Fee Panel shall consider the totality of the Attorney's Participating Litigating Subdivisions as compared to the Attorney's Non-Participating Litigating Subdivisions; the Parties recognize that, although the goal is for 100% participation, Attorneys with a higher number of clients have a higher probability of having one or more non-Participating Litigating Subdivision.  As used in this paragraph II.C.4, "client" or "representing" a Subdivision shall include any Litigating Subdivision as to which the Attorney has a Fee Entitlement.

5. As set forth in paragraph II.C.6 and Section II.H, the Fee Panel must consider the factors described in paragraph II.C.4 to determine how and whether to reduce the amounts to be paid by Janssen under this Fee Agreement and to determine how to allocate funds among Attorneys.  They may also, at their discretion, consider other factors.  Any reduction in payment obligation or credit to be given Janssen in this Fee Agreement shall be applied against Payment Year 7 and working backwards.  Any reduction to an Attorney not credited to Janssen shall be allocated to attorneys whose Litigating Subdivision clients participated in the settlement by the Initial Participation Date.

6. The amounts to be provided as a credit or offset to Janssen from the Common Benefit Fund shall depend on the relevant Participation Tier achieved, set forth in Exhibit H of the Janssen Agreement, as follows:

   a. At Participation Tier 1 or below, the Common Benefit Fund payments to be paid by Janssen shall be reduced as follows:

      i. With respect to any Attorney seeking payment from the Common Benefit Fund, the Fee Panel shall compare the aggregate allocation that Participating Litigating Subdivisions with which the Attorney has a Fee Entitlement would receive using the negotiating class allocation metrics with the aggregate amount that all Litigating Subdivisions (Participating and Non-Participating) with which the Attorney has a

115

*revised July 30, 2021*

Fee Entitlement would receive using the negotiating class allocation metrics, provided that only Litigating Subdivisions in Settling States shall be considered for this ratio.  The Fee Panel will multiply the amount to be paid to that Attorney from the Common Benefit Fund by that ratio, reduce the Attorney's award by a maximum reduction of 15%, and the dollar amount of such reduction shall be deducted, dollar-for-dollar, from the amount owed by Janssen to the Common Benefit Fund of the Attorney Fee Fund.

ii. In the event that any Non-Participating Subdivision that is (a) under the jurisdiction of the MDL Court or (b) represented by an Attorney that is obligated to pay into the MDL Common Benefit Fund pursuant to a Participation Agreement, an order of the MDL Court, or any other arrangement settles with or wins a judgment against a Released Entity separate from the Janssen Agreement, and such settlement or judgment results in a common benefit fee assessment or fee payment into the MDL Common Benefit Fund during the time of Janssen's obligation to pay fees under this Fee Agreement, Janssen's obligation to pay into the Common Benefit Fund shall be reduced dollar-for-dollar for any amount of such fee assessments or payments (in the aggregate based on all reductions in this subparagraph II.C.6.a.ii) that exceed the reductions in subparagraph II.C.6.a.i.

iii. For the avoidance of doubt, in Tier 1 for each settlement or judgment with Janssen that results in an assessment or payment to the MDL Common Benefit Fund, that payment shall result in an offset for Janssen, unless the assessment or payment occurs after the Payment Date for Year 7.

b. At Participation Tier 2, the Common Benefit Fund payments to be made by Janssen shall be reduced only as follows:

i. Reduction by the Fee Panel.  With respect to all Attorneys making an application that seeks payment from the Common Benefit Fund, the Fee Panel shall, following a determination that an Attorney is eligible under Section II.G, apply the criteria specified in paragraph II.C.4 in determining whether the lack of participation by Subdivisions with which an Attorney has a Fee Entitlement has resulted in a reduction in the Participation Tier achieved, reduction in benefit to Participating Subdivisions as a result of reductions in Incentives A-D, and/or potential triggering of a suspension, reduction, or offset under the Janssen Agreement.  If the Fee Panel concludes that such a reduction has occurred, it must consider (1) the relative size of the Non-Participating Subdivision, as adjusted by the severity measures reflected in Exhibit H (governing the Participation Tiers) of the Janssen Agreement, and the impact of its non-participation on the

116

*revised July 30, 2021*

Janssen Agreement as a whole (including amounts of Incentive Payments and triggering of suspensions, reductions, or offsets); (2) whether and by how much the payment to the Attorney from the Common Benefit Fund should be reduced as a result of the impact of such non-participation on Participating Subdivisions; and (3) whether some or all of said reduction should revert to Janssen due to the reduction in peace obtained from the Janssen Agreement. Consideration of the factors discussed in this subparagraph and paragraph II.C.4 is mandatory.  The decision whether to (and by how much) to reduce payments by Janssen or to reduce the payment to any Attorney based on the factors in paragraph II.C.4 shall be in the sole discretion of the Fee Panel.

ii.  Offsets.

(1) In the event that any Non-Participating Subdivision that is (a) under the jurisdiction of the MDL Court or (b) represented by an Attorney that is obligated to pay into the MDL Common Benefit Fund pursuant to a Participation Agreement, an order of the MDL Court, or any other arrangement settles with or wins a judgment against a Released Entity separate from the Janssen Agreement, and such settlement or judgment results in a common benefit fee assessment or fee payment into the MDL Common Benefit Fund during the time of Janssen's obligation to pay Common Benefit Fees under this Fee Agreement, Janssen's obligation to pay into the Common Benefit Fund shall be reduced dollar-for-dollar up to the amount of the fee assessment or payment, except that such amount shall be capped at 7.5% of the amount of the settlement or judgment.  Such reduction shall be taken first from Payment Year 7 of Janssen's payments to the Common Benefit Fund of the Attorney Fee Fund up to the full amount of Janssen's payment obligation in Payment Year 7, then from Payment Year 6, and so on.

(2) For the avoidance of doubt, for each settlement or judgment with Janssen that results in an assessment or payment to the MDL Common Benefit Fund, that payment shall result in an offset for Janssen, unless the assessment or payment occurs after the Payment Date for Payment Year 7.

c.  At Participation Tier 3, the reductions to the Attorney Fee Fund shall be the same as set forth in subparagraph II.C.6.b, except that the cap on each offset shall be 5% of the amount of such settlement or judgment.

d.  At Participation Tier 4, there shall be no reductions to Janssen's obligations to make payment into the Common Benefit Fund, but the principles set forth in paragraph II.C.4 shall continue to apply.

*revised July 30, 2021*

D. *Contingency Fee Fund.*  (40% of the Attorney Fee Fund.)

1. Funds from the Attorney Fee Fund shall be allocated to the Contingency Fee Fund on the following yearly schedule, subject to the adjustments set forth below:

| | |
|---|---|
| Payment Year 1 | $12,956,607.50 |
| Payment Year 2 | $14,374,753.45 |
| Payment Year 3 | $25,792,899.41 |
| Payment Year 4 | $17,488,165.68 |
| Payment Year 5 | $17,488,165.68 |
| Payment Year 6 | $17,488,165.68 |
| Payment Year 7 | $17,488,165.68 |
| Total: | **$123,076,923.09** |

2. The Contingency Fee Fund shall be available to compensate Attorneys engaged in Qualifying Representations of Participating Litigating Subdivisions that meet the criteria set forth in Section II.G.

3. The Contingency Fee Fund shall be available to Attorneys who

   a. represent Litigating Subdivisions that are Participating Subdivisions, whether their actions are filed in state or federal court, and

   b. meet the eligibility criteria of Section II.G.

   c. Participation in the Contingency Fee Fund by counsel that have a case that is not subject to the jurisdiction of the MDL Court shall not create, provide, or waive jurisdiction of the MDL Court over that Litigating Subdivision, that case or Attorneys, other than to oversee the fairness of the distribution process, and enforcement of this Fee Agreement.

4. The amounts owed by Janssen to the Contingency Fee Fund shall depend on the relevant Participation Tier set forth in Exhibit H of the Janssen Agreement as follows:

   a. At Participation Tiers 1, 2 and 3, the Contingency Fee Fund payments shall be reduced as follows:

      i. For Non-Settling States, the Contingency Fee Fund payments shall first be reduced by the amounts identified by the Fee Panel, pursuant to paragraph II.H.6, that would have been owed to counsel for Litigating Subdivisions in Non-Settling States, had those States and those Litigating Subdivisions been Settling States and Participating Subdivisions.

118

*revised July 30, 2021*

      ii.  Following the calculation in subparagraph II.D.4.a.i, the Contingency Fee Fund payments shall be reduced to reflect the non-joinder of Litigating Subdivisions in Settling States by subtracting the amounts identified by the Fee Panel, pursuant to paragraph II.H.6, that would have been owed to counsel for Non-Participating Litigating Subdivisions in Settling States had such Litigating Subdivisions been Participating Subdivisions.

    b.  At Participation Tier 4, there shall be no reductions in the Contingency Fee Fund.

    c.  In the event that Janssen, prior to the Effective Date of the Janssen Agreement, settles with any Litigating Subdivision and, under such settlement agreement pays attorneys' fees, the Fee Panel shall treat those Litigating Subdivisions as Participating Litigating Subdivisions and, applying the same criteria applicable to all Attorneys for Participating Litigating Subdivisions, determine what amount they would have been paid from the Contingency Fee Fund if they had become Participating Subdivisions under the Janssen Agreement without such prior settlement. That sum, rather than being paid to the Attorney for the previously settling Litigating Subdivision, shall be credited and/or returned to Janssen as if determined under (a)(ii) above, except that such credit shall not be greater than the amount to the Attorneys paid under the Litigating Subdivision's prior settlement agreement.

E.    *Litigating Subdivision Cost Fund.*

    1.  Janssen shall pay $30,000,000.00 into the Litigating Subdivision Cost Fund, according to the schedule set forth below:

| | |
|---|---|
| Payment Year 1 | $10,000,000.00 |
| Payment Year 2 | $10,000,000.00 |
| Payment Year 3 | $10,000,000.00 |
| **Total** | **$30,000,000.00** |

    2.  The Litigating Subdivision Cost Fund shall be available to compensate Attorneys for costs and expenses arising out of representation of Participating Litigating Subdivisions or to compensate Participating Litigating Subdivisions for direct in-house costs for expenditures related to their litigation against Janssen including the cost of in-house employees.  No funds in the Litigating Subdivision Cost Fund may be used to compensate the costs incurred by Non-Participating Subdivisions or Non-Litigating Subdivisions or costs and expenses arising out of representation of any such Subdivision.  In allocating the Litigating Subdivision Cost Fund, the Administrator shall not allocate any funds for costs incurred after July 21, 2021.

*revised July 30, 2021*

3. During the period between July 21, 2021, and the Effective Date, the MDL PEC, as well as Litigating Subdivisions eligible to claim costs from the Litigating Subdivision Cost Fund, shall make best efforts to cease litigation activity against Janssen, including by jointly seeking stays or severance of claims against Janssen, where feasible, or postponements if a motion to stay or sever is not feasible or is denied, so long as such actions are not otherwise detrimental to the Litigating Subdivision.

4. In the event that Janssen, prior to the Effective Date of the Janssen Agreement, settles with any Litigating Subdivision and, under such settlement agreement pay costs to the Litigating Subdivision or its Attorney, the MDL Cost and Expense Fund Administrator shall treat those Litigating Subdivisions as Participating Litigating Subdivisions and, using the same criteria applicable to all applicants to the Litigating Subdivision Cost Fund, determine what amount in costs the Litigating Subdivision or its Attorney would have been paid from the Subdivision Cost Fund if they had settled under the Janssen Agreement. That sum, rather than being paid to the Attorney or the previously settling Litigating Subdivision, shall be credited and/or returned to Janssen, except that such sum shall not be greater than the amount paid under the previously settled Litigating Subdivision's settlement agreement.

5. The MDL Court shall appoint a Cost and Expense Fund Administrator, who shall develop a process and criteria, with input from participating counsel, by which to a) determine the distribution of amounts from the MDL Expense Fund in pursuit of the claims against Janssen; and b) receive and evaluate applications from Participating Litigating Subdivisions, whether filed in Federal Court or State Court, to seek reimbursement from the Litigating Subdivision Cost Fund for eligible costs under Section II.E.2 in pursuit of the claims against Janssen.  The Cost and Expense Fund Administrator shall require transparency from all applicants as to any other sources for compensating Attorneys for Litigating Subdivisions for costs incurred.  The Cost and Expense Fund Administrator shall be compensated from the Fund.

6. In the event that the total amount of reimbursements from the Litigating Subdivision Cost Fund approved as reasonable by the Cost and Expense Administrator is less than the $30,000,000.00, any remaining funds shall revert to Janssen.

F. *MDL Expense Fund.*

1. In Payment Year 1 of the Janssen Settlement, Janssen shall pay the following amount into the MDL Expense Fund:

| MDL Expense Fund | $9,615,384.61 |
|---|---|

*revised July 30, 2021*

2. The MDL Expense Fund shall be released following the Effective Date of this Fee Agreement without any delay to reimburse the MDL Counsel for an agreed-to portion of the expenses incurred, as approved by the Cost and Expense Fund Administrator.  The MDL Expense Fund will be paid directly to the MDL Cost Account, set up by MDL Order and will be administered under the ongoing jurisdiction of the MDL Court, as provided below.  No funds may be used to compensate the costs incurred by Non-Participating Subdivisions or to compensate any Attorney for costs incurred in representing one or more Non-Participating Subdivisions.

3. In allocating the MDL Expense Fund, the Administrator shall not allocate any funds for costs incurred after July 21, 2021, unless the Administrator determines that there are sufficient funds to cover all subdivision costs incurred prior to July 21, 2021 and that special circumstances exist to justify costs incurred following the public announcement of the Janssen Agreement.

G. *Eligibility*.

1. It is the intention of all parties participating in the Fee Panel process that there should be total transparency to the Fee Panel and to all fund participants.  In connection with the process to be developed by the Fee Panel, any and all monies in attorney's fees, including referral fees, expenses paid, promises for payment, or any other Fee Entitlement, to any applicant in any opioid litigation shall be disclosed to the Fee Panel as a condition of participating in the Attorney Fee Fund and prior to an award from the Fee Panel.  Any payment, expectation of payment or perceived entitlement to participate in a State Back-Stop Agreement or any other agreement reached with a Settling State or any Subdivision or any other source regarding payment of fees must be disclosed to the Fee Panel.  Similarly, any right to payment from any other fund, for example a fund for payment to lawyers representing Settling States or Tribal Nations or Subdivisions shall be disclosed to the Fee Panel.  Because it is anticipated that there will be multiple firms listed on contingent fee agreements with Litigating Subdivisions, the Fee Panel shall establish procedures, with input from Attorneys for Participating Litigating Subdivisions, for who should petition for fees from such groups and to whom the fee shall be paid and thereafter distributed to co-counsel in accordance with applicable agreements.  For the avoidance of doubt, all Attorneys that are part of such groups must meet the eligibility criteria in paragraph II.G.3, must be subject to the criteria set forth in paragraph II.C.4, and must be disclosed to the Fee Panel.

2. An Attorney may apply for and recover attorneys' fees from the Common Benefit Fund, the Contingency Fee Fund, and the Litigating Subdivision Cost Fund and any fund created by a past or future State Back-Stop Agreement, provided the Attorney satisfies the requirements relevant to each such fund and requirements for disclosure to the Fee Panel.

121

*revised July 30, 2021*

3.  An Attorney may not receive any payment from the Attorney Fee Fund (which includes both the Contingency Fee Fund and the Common Benefit Fund) unless the following eligibility criteria are met and annually certified by the Attorney:

    a.  The Attorney must expressly waive the enforcement against the Litigating Subdivision client of all Fee Entitlements (other than under State Back-Stop Agreements) arising out of or related to any or all Qualifying Representations of any Participating Litigating Subdivision prior to applying for attorneys' fees from the Attorney Fee Fund or costs from the Cost Funds.  All applications for attorneys' fees or costs under this Fee Agreement shall include an affirmation by the Attorney of such waiver and notice to the client(s) of such waiver.  Such waiver shall not preclude the Attorney from submitting such Fee Entitlements to the Fee Panel as a factor for consideration in allocating payments from the Attorney Fee Fund or in connection with a State Back-Stop Agreement.  For the avoidance of doubt, no Attorney may recover fees or costs under this Fee Agreement unless the Attorney expressly agrees not to enforce Fee Entitlements as to each and every Participating Litigating Subdivision represented by that Attorney, but such Attorneys may participate in and receive funds from a State Back-Stop Agreement.

    b.  The Attorney must represent that s/he has no present intent to represent or participate in the representation of any Later Litigating Subdivision or any Releasor with respect to Released Claims against Released Entities.

    c.  The Attorney must represent that s/he has not and will not engage in any advertising or solicitation related to Released Claims against Released Entities where such advertising or solicitation relates to a representation that the Attorney could not undertake consistent with the ethics opinion referenced in paragraph II.I.4.

    d.  The Attorney must represent s/he will not charge or accept any referral fees for any Released Claims brought against Released Entities by Later Litigating Subdivisions.  For the avoidance of doubt, this representation shall not prohibit Attorneys from receiving allocated shares of any future common benefit assessments arising out of settlements or judgments with Later Litigating Subdivisions represented by other Attorneys that are the result of the MDL Court's Common Benefit order.

    e.  The Attorney may not have and must represent that s/he does not have a Fee Entitlement related to a Later Litigating Subdivision.

*revised July 30, 2021*

f.  The Attorney must certify that s/he has reviewed the ethics opinion referenced in paragraph II.I.4 and will act in conformity with such opinion.

g.  The Attorney must fully disclose the participation, or the anticipation of participation, in any agreement with a Settling State or Participating Subdivision concerning fees arising out of or related to the Janssen Agreement, including any fees paid or anticipated to be paid or any State Back-Stop Agreement.

h.  The Attorney must identify for the Fee Panel whether s/he utilized state litigation work product or MDL work product, including but not limited to ARCOS data, document repositories, experts developed in the MDL, and deposition transcripts.  The Attorney must identify whether s/he signed the MDL Participation Agreement, and for which case(s) it was signed.

i.  Any Attorney who applies for fees from one or both Funds must represent that, having exercised his/her independent judgment, s/he believes the Janssen Agreement to be fair and will make or has made best efforts to recommend the Janssen Agreement to his or her Subdivision clients in Settling States.  For avoidance of doubt, each Attorney is expected to exercise his or her independent judgment in the best interest of each client individually before determining whether to recommend joining the settlement.  All applications for attorneys' fees or costs under this section shall include an affirmation by the Attorney in compliance with this Subsection.

4.  No Attorney receiving fees under this Fee Agreement may apply for or recover from the Attorney Fee Fund fees arising from representing a Non-Settling State or a Non-Participating Subdivision.  All applications for attorneys' fees under this Section shall include an affirmation by the Attorney of compliance with this Section.

5.  An Attorney who has filed an application under this section and received an award of attorneys' fees shall provide a certification of compliance with the Sections of this Fee Agreement annually during the years upon which they are still entitled to receive attorneys' fee payments.

6.  If, at any time, the Attorney is unable to make the representations set forth in this Section, such representations become untrue, or the Attorney falsely represents compliance with the eligibility criteria, the Attorney shall cease to be eligible to receive funds from the Attorney Fee Fund until further review by the Fee Panel of the Attorney's eligibility under and compliance with this Section II.

*revised July 30, 2021*

7.  If an Attorney has a Fee Entitlement with a Later Litigating Subdivision or otherwise becomes unable to reaffirm compliance with the eligibility criteria set forth above, the Attorney shall notify Janssen and the Fee Panel. For the avoidance of doubt, any Attorney who undertakes any new representation of, or has a Fee Entitlement with, a Later Litigating Subdivision shall be prohibited from receiving any future funds from the Attorney Fee Fund. If an Attorney fails to notify Janssen and the Fee Panel of such Fee Entitlement with a Later Litigating Subdivision, the Attorney shall be required to refund amounts previously paid.

8.  In the event that an Attorney is deemed ineligible by the Fee Panel (whether based on its initial application or subsequent recertification), the Fee Panel shall provide notice to the Attorney and give the Attorney 30 days to provide additional information such that the Fee Panel could re-consider the Attorney's eligibility.

9.  To the extent that an Attorney has a Fee Entitlement with a Participating Subdivision and is authorized to bring Released Claims against Released Entities, but such authorization is, in scope, less broad than the category of Released Claims set forth in the Janssen Agreement, such Attorney may participate fully in both the Contingency Fee Fund and the Common Benefit Fund, without any reduction imposed by the Fee Panel due to the scope of the authorization, so long as the Participating Subdivision fully releases all Released Claims against Released Entities.

10. Attorneys applying to the Attorney Fee Fund knowingly and expressly agree to be bound by the decisions of the Fee Panel, subject to the limited appeal rights set forth in this Fee Agreement, and waive the ability to assert the lack of enforceability of the allocation reached through the arbitration procedures outlined herein.

H.  *Calculation of Amounts Due.*

1.  The Fee Panel shall be solely responsible for determining the amount of fees to be paid to each Attorney and each Participating Subdivision that applies under this Section. None of the Released Entities shall have any responsibility, obligation, or liability of any kind whatsoever with respect to how attorneys' fees are calculated under this Section, except that the Fee Panel may receive information from Janssen as to (a) the identity of Participating, Non-Participating, Litigating, Later Litigating, and Non-Litigating Subdivisions; (b) the impact of non-participation by a Litigating Subdivision as is relevant to the Fee Panel's determination in paragraph II.C.4; and (c) such other information as Janssen may voluntarily elect to provide.

*revised July 30, 2021*

2. The Fee Panel shall establish procedures for the arbitration process consistent with this Fee Agreement and orders of the MDL Court.  Such procedures may include submission of documentary and/or other evidence, interviews with applicants and/or other counsel (including counsel for Janssen) that the Fee Panel deems appropriate, and/or other means of creating a record upon which fee awards will be based.

3. In making determinations under this Fee Agreement, the Fee Panel must apply the eligibility criteria set forth in Section II.G of this Fee Agreement and the criteria set forth in Section II.  In addition, the Fee Panel will give consideration in regard to Common Benefit awards to the *Johnson* factors, as well as the following factors (which factors may be applied and given relative weight in the Fee Panel's discretion):

   a. The Attorney's contemporaneously recorded time and labor dedicated to Qualifying Representations along with the Attorney's financial commitment to such Qualifying Representations.  Claimed "time" will not be automatically accepted by the Fee Panel but will be critically reviewed and given substantially more weight and consideration if such time was subject to the audit process described in any Pretrial Order(s) governing the collection of common benefit time;

   b. The novelty, time, and complexity of the Qualifying Representations;

   c. The skill requisite to perform legal services properly and undesirability of the case;

   d. The preclusion of other employment by the Attorney due to time dedicated to Qualifying Representations;

   e. The "common benefit," if any, alleged to have been conferred by the Attorney and whether such common benefit work product by that Attorney was used by others in parallel litigations against Released Entities whether within or outside the MDL, provided that any Attorney claiming that s/he substantially benefited cases other than those in which s/he entered an appearance as counsel must substantiate such claims by proffering factual support, such as proper supporting affidavits or other documents as determined by the Fee Panel with input from Attorneys for Participating Litigating Subdivisions;

   f. Any "common detriment," as set forth in paragraph II.C.4.

   g. Any contingent fee agreement or other Fee Entitlement with Participating Subdivisions, enforcement of which, except for State Back-Stop Agreements, are waived in conjunction with the application, the nature and extent of any work for those Participating Subdivisions, whether such

*revised July 30, 2021*

Participating Subdivisions actively litigated and, if so, the nature and procedural history of such case(s);

h.  The experience, reputation, and ability of the Attorney;

i.  Whether the Attorney's clients brought Released Claims against Released Entities;

j.  The status of discovery in cases primarily handled by the Attorney;

k.  The nature of any work by the Attorney on "bellwether" cases or cases that were similarly active in litigation;

l.  Any pressure points successfully asserted by the Attorney in cases against Janssen or any risk for Janssen created by the Attorney in cases against them;

m.  Any risk for defendants created by applicants in cases against Janssen;

n.  Successful and unsuccessful motion practice in cases worked on by the Attorney;

o.  The date of filing of any cases filed by the Attorney;

p.  Obtaining consolidation of the litigation in the Attorney's jurisdiction;

q.  The number and population of entities represented by the Attorney and the fees that would have been awarded under extinguished contingent fee arrangements;

r.  Whether the Attorney's clients brought claims against Janssen;

s.  Whether the Attorney has had a leadership role in the litigation, whether in state or federal court;

t.  Whether the Attorney has had a leadership role in any negotiations aimed at resolving the litigation;

u.  Whether the Attorney's cases have survived motions to dismiss;

v.  The extent to which the Attorney contributed to the work product used for the common benefit of opioids litigants, including, without limitation, work on ARCOS data, Prescription Data Monitoring Programs, IQVIA data, depositions, document production and analysis experts, motions, briefs and pleadings, trial preparations, and trials;

126

*revised July 30, 2021*

w.  The extent to which litigation was done prior to and contributed to completion of settlement negotiations, as distinct from litigation that was done litigating after the announcement of the Janssen Agreement, such latter litigation both being of less value and potentially resulting a common detriment to the settlement process; and

x.  Any other factors that the Fee Panel finds to be appropriate to consider after input from applicants to the Attorney Fee Fund.

4.  The Fee Panel shall develop procedures for receiving a single application, which may be updated or amended based on new information (such as participation by additional Litigating Subdivisions) from each Attorney seeking compensation from the Attorney Fee Fund pursuant to processes and procedures developed by the Fee Panel, which shall not be inconsistent with this Fee Agreement.  Any request for attorneys' fees not included on the single application or through the updating/amendment process designed by the Fee Panel shall be deemed waived.  For purposes of transparency and to permit the Fee Panel to conduct its work, the application from each Attorney shall, at a minimum, require each Attorney to

a.  Identify all Litigating Subdivisions for which s/he is seeking payment from the Attorney Fee Fund;

b.  Identify all Subdivisions in both Settling and Non-Settling States (and, where applicable, Tribal Nations) with respect to which s/he has a Fee Entitlement with respect to Relevant Claims against Released Entities, and identify all co-counsel in such cases;

c.  Identify which of those Subdivisions are Participating Subdivisions and which are not (with similar information for Tribal Nations, where applicable);

d.  Specify the specific fund or funds within the Attorney Fee Fund from which the Attorney is seeking compensation;

e.  Demonstrate his or her eligibility for compensation from the relevant sub funds within the Attorney Fee Fund pursuant to the criteria set forth for the relevant sub fund;

f.  Identify any and all Fee Entitlements from representations of States, Tribal Nations, or other plaintiffs related to Released Claims against Released Entities or in opioids-related matters;

g.  Notwithstanding "a-f" above, the Panel may consider a supplemental application if the Attorney shows good cause why circumstances exist that will lead to consideration for additional Common Benefit award.

*revised July 30, 2021*

Examples would include, but are not limited to, an Attorney having Non-Participating Litigating Subdivision clients that subsequently become Participating Subdivisions, a Bar Date passes that increases participation or the Participation Tier, or an Allocation Agreement is reached.

5. With respect to the Common Benefit Fund, the Fee Panel shall (subject to any applicable MDL Court Order):

   a. Review the applications of all Attorneys seeking compensation from the Common Benefit Fund, including determining eligibility for each Attorney as set forth in Section II.G.

   b. Reduce, on an annual basis, Janssen's payment obligations, as set forth in paragraph II.C.5. The Panel shall inform Janssen and the MDL PEC of all such amounts and adjust Janssen's payment obligations accordingly.

   c. Using criteria set forth in Sections II.C and II.I, allocate amounts from the Common Benefit Fund to eligible Attorneys, including payment amounts for each Payment Year. In making such allocations (regardless of the Participation Tier achieved), the Panel shall apply the principles set forth in paragraph II.C.4 and shall allocate any reduction in the payments of Janssen specified in paragraph II.C.5 to the amounts paid to Attorneys with a Fee Entitlement to Litigating Subdivisions that are not Participating Subdivisions.

6. With respect to the Contingency Fee Fund, the Fee Panel shall:

   a. Review the applications of all Attorneys seeking compensation from the Litigating Subdivision Fee Fund, including determining eligibility for each Attorney as set forth in Section II.G.

   b. Apply the Mathematical Model in Exhibit A.

   c. Use such allocations to reduce payments, on an annual basis, the payment obligations of Janssen to the Attorney Fee Fund as set forth in paragraph II.D.4, and distributions therefrom, and inform Janssen and the MDL PEC of all such adjustments.

7. To the extent that there is a dispute about the calculations of the Fee Panel related to the amounts that Janssen is required to pay (including application of any reductions or offsets under this Fee Agreement), such disputes shall be presented to the Fee Panel and any disputed funds be paid into/held in escrow. The Fee Panel shall resolve such disputes expeditiously, with either Party having the right to seek review from the MDL Court.

*revised July 30, 2021*

8. For purposes of determination of fee or cost awards, allocations, reductions, and possible reversions under this Fee Agreement, unless specified otherwise a Subdivision will be considered a Non-Participating Subdivision if it is not a Participating Subdivision as of the deadline for the application for the fee or cost award at issue (or, if the determination does not involve a specific application, the date on which the record for such determination closes).

9. In the event that the Fee Panel, through the use of the Mathematical Model set forth in Exhibit A, allocates funds from the Contingency Fee Fund for an Attorney based on a Qualifying Representation of a Participating Litigating Subdivision or allocates cost to such Participating Litigating Subdivision and that Subdivision is in a Settling State in which the Consent Judgment has not been approved, such funds shall be placed into escrow until the Consent Judgment is approved, after which time they shall be released.

I.  *Miscellaneous*.

1. The costs associated with the Fee Panel prior to the Effective Date of the Attorney Fee Agreement shall be funded by Janssen.  The Fee Panel shall charge an hourly rate that previously has been approved by a federal or state court and shall provide a budget and a cap for such work prior to the Effective Date, which shall be approved by Janssen and such approval shall not be unreasonably withheld.  Janssen shall receive a refund for any such payment of pre-Effective Date costs from interest that accrues on the monies in the Attorney Fee Fund (including interest that accrues during such time as the Attorney Fee Fund monies are in escrow prior to the Effective Date of the Janssen Agreement), up to the amount of such costs.  Post-Effective Date, the cost of the Fee Panel shall be charged against the applicable Fee Fund based on allocation by the Fee Panel and shall not be otherwise funded by Janssen. The costs associated with the Cost and Expense Fund Administrator shall be paid from funds in the MDL Expense Fund and the Litigating Subdivision Cost Fund and shall not be otherwise funded by Janssen.

2. The MDL PEC will seek, and the Attorneys General for Settling States and Janssen will not oppose, a Common Benefit Fee Order requiring an assessment of 7.5% on the gross recovery (by judgment or settlement) of any Non-Participating Subdivision that is subject to the federal court jurisdiction, represented by a MDL PEC firm, represented by any Attorney receiving fees from the Common Benefit Fund, represented by any Attorney that signed a Participation Agreement or paid in a case otherwise under the jurisdiction of the MDL Court.

3. The MDL PEC shall provide to Janssen information they have that identifies Attorneys who represent Litigating Subdivisions who are not Participating Subdivisions and who have an obligation to pay a common benefit assessment, either due to the MDL Court's orders or having signed a Participation Agreement.

*revised July 30, 2021*

4. The MDL PEC shall retain ethics counsel of its choice to provide an opinion that addresses the compliance of its ethical obligations, as it relates to the Janssen Agreement.  Such opinion shall address the issue of the potential conflict of interest for an Attorney that had represented a Participating Subdivision also representing a Later Litigating Subdivision as defined in the Janssen Agreement.  This Subsection shall be enforceable to the extent permitted by the equivalent to Rules 1.16 and 5.6 of the ABA Model Rules of Professional Conduct in the relevant jurisdictions.  The opinion shall be provided to Janssen as soon as it is completed and, in any event, prior to July 31, 2021 and shall be disseminated to counsel eligible to apply to the Attorney Fee Fund within 30 days of the announcement of the Janssen Agreement.  The MDL PEC represents that it will comply with this opinion until the Reference Date and thereafter if the Janssen Agreement proceeds.

5. Participating Subdivisions agree to instruct their counsel to treat information, work product and expert materials as secret under Rule 1.6 of the ABA Model Rules of Professional Conduct.  Accordingly, an Attorney shall not share information or work product with, or experts or materials to, non-participants (other than the Attorney's own current clients or their lawyers, consultants, experts or other representatives or agents).  However, nothing herein shall prevent MDL Leadership or PEC Counsel from fulfilling their obligations in any MDL and the MDL Court Order.

## III.  Miscellaneous

A.  *Termination*.  If the Janssen Agreement does not proceed past the Reference Date, whether because Janssen does not determine to proceed or for any other reason, this Fee Agreement shall be null and void, Janssen shall have no obligation to make any payments under this Fee Agreement, and Janssen and the PEC shall take such steps as are necessary to restore the *status quo ante*.

B.  *MDL Court Consideration*.  This Fee Agreement shall be attached as an exhibit to the Janssen Agreement. This Fee Agreement shall also be submitted by Janssen and the MDL PEC to the MDL Court for approval pursuant to the motion and order that shall be attached, prior to the Preliminary Agreement Date of the Janssen Agreement, as Exhibit B.

1. In the event that the MDL Court, through an order, makes any change to the amounts potentially to be paid by Janssen under this Fee Agreement, makes any change to the Fee Panel's consideration of the factors set forth in paragraph II.C.4, or any other material change to the draft Order attached as part of Exhibit B or the terms of this Fee Agreement, Janssen and the MDL PEC shall meet and confer concerning such changes.

2. If Janssen and the MDL PEC are unable to reach agreement and revisions to this Fee Agreement in the event discussed in paragraph III.B.1, this Fee

*revised July 30, 2021*

Agreement shall be null and void, Janssen shall have no obligation to make any payments under this Fee Agreement, and Janssen and the MDL PEC shall take such steps as are necessary to restore the *status quo ante*.

C.      *Amendment*.  Once the MDL Court has entered an order implementing this Fee Agreement, this Fee Agreement can only be amended by (1) written agreement of Janssen and the MDL PEC and (2) approval by the MDL Court.

D.      *Jurisdiction and Enforcement*.  The MDL Court shall have exclusive and ongoing jurisdiction over the enforcement and implementation of this Fee Agreement as set forth herein. The MDL PEC shall be the Authorized Party to enforce this Fee Agreement, as to the payment obligations of Janssen as set forth in this section, and as to Attorneys making application to the Funds under this Fee Agreement.  Solely for purposes of assessing or allocating common benefit fees, the MDL Court will continue to have jurisdiction over the work product developed in the MDL Court by and under the direction of the MDL PEC with respect to claims against Janssen, including data and documents, depositions, expert reports, briefs and pleadings; and the MDL Court's protective orders, management orders, and other decisions regarding such discovery and other work product, including but not limited to, conditions on its use, will continue in full force and effect.  Nothing in this paragraph authorizes the MDL Court to act contrary to this Agreement or to share any of the work product, or provides the MDL Court with jurisdiction over the Janssen Agreement.

*revised July 30, 2021*

## EXHIBIT S

## Agreement on the State Cost Fund Administration

1.  **Creation of a State Cost Fund.**  Janssen and the Settling States agree to the creation of a state cost fund to pay litigation costs and expenses associated with litigation and investigation related to the opioid litigation (hereinafter the "State Cost Fund"). This agreement is a material part of the Settlement Agreement. The State Cost Fund shall be administered separately from the Common Benefit Fund, the Contingency Fee Fund, the State Counsel Fee Fund, Subdivision Costs Fund, and the MDL Expense Fund. No funds may be released from the State Cost Fund to Non-Settling States.

2.  **State Cost Fund Amount.**  In Payment 1 of the Settlement, Janssen shall pay into the State Cost Fund $13,461,539 (the "State Cost Fund Amount"). Janssen's State Cost Fund payment shall be a component of its Global Settlement Attorney Fee Amount payable to the Attorney Fee Fund, for Payment 1.

3.  **State Cost Fund Committee.**  A committee of Attorneys General from Settling States or their designated representatives (hereinafter the "State Cost Fund Committee") shall oversee the State Cost Fund. The committee shall initially consist of the following states: (a) Delaware; (b) Florida; (c) Georgia; (d) New York; (e) North Carolina; (f) Ohio; (g) Tennessee; and (h) Texas. The Settling State Attorneys General may by majority vote add or change the composition of the State Cost Fund Committee, including replacing any above State, if that State is not a Settling State.

4.  **State Cost Fund Administrator.**  The State Cost Fund Committee shall select an administrator (the "State Cost Fund Administrator"). The State Cost Fund Administrator may be different from the Settlement Administrator under the Settlement Agreement. The State Cost Fund Administrator shall be responsible for administering the State Cost Fund and making payments to Settling States.

5.  **State Cost Fund Guidelines.**  Monies in the State Cost Fund shall be released without any delay to reimburse Settling States for documented opioid litigation and investigation costs incurred or paid. In allocating the State Cost Fund, no funds shall be allocated for costs incurred after July 21, 2021. The State Cost Fund Committee shall establish guidelines for the submission and approval of expenses eligible for reimbursement from the State Cost Fund. The State Cost Fund Administrator shall, in accordance with such guidelines, receive from Settling States records sufficient to demonstrate the incurrence and/or payment of each expense attributable to investigation or litigation related to the opioid litigation, including any outstanding National Association of Attorneys General grant.

6.  **State Cost Fund Payment Priorities and Residual.**  To the extent that that the aggregate eligible submissions of costs and expenses from Settling States exceed the State Cost Fund Amount, payments to Settling States shall be paid in the following order until the State

*revised July 30, 2021*

Cost Fund is exhausted. If the State Cost Fund is unable to fully pay costs at any of the following levels, then Settling States with costs at that level shall be paid on a proportional basis. All expenses with a lesser priority from the level where the State Cost Fund is exhausted will not be reimbursed from the State Cost Fund. Costs shall be paid in the following order: (a) the reasonable costs of the State Cost Fund Administrator, if any; (b) repayment of the National Association of Attorneys General grants connected to opioid litigation; (c) costs incurred or paid by outside counsel for a Settling State litigating against Janssen apart from any fee owed; (d) litigation-related costs attributable to the Janssen case incurred or paid by a Settling State litigating against Janssen; (e) pre-suit investigation-related costs attributable to a Janssen investigation incurred or paid by either a Settling State outside counsel (not including any amount of fees or any costs which have already been reimbursed pursuant to clause (c), above) or a Settling State investigating Janssen; (f) costs incurred or paid by a Settling State or outside counsel litigating against another opioid defendant other than a cost share entered into by a Settling State, which costs have not yet been paid under a preceding clause of this paragraph; (g) the amounts paid by a Settling State as part of cost share related to the filing of a proof of claim in the Purdue Pharma, L.P. bankruptcy; and (h) the amounts paid by a Settling State as part of any other cost share, including, but not limited to the cost share entered into by the Non-Consenting States in the Purdue Pharma, L.P. bankruptcy. If the State Cost Fund has additional monies after payment of the State Cost Fund Administrator's and all Settling States' submitted costs, then the remaining funds will be provided to the National Association of Attorneys General to be placed in the Financial Services Fund for the purpose of funding grants for consumer protection or healthcare-related enforcement or training activities. In determining what costs are attributable to Janssen, the State Fund Committee shall develop a guideline that ensures that all Settling States are treated equitably.

*revised July 30, 2021*

**EXHIBIT T**

**Severity Factors**

| State | Severity Factor |
|---|---|
| Alabama | 108.5243% |
| Alaska | 107.8614% |
| American Samoa | 102.7639% |
| Arizona | 107.7129% |
| Arkansas | 103.2818% |
| California | 82.8688% |
| Colorado | 95.2263% |
| Connecticut | 121.0971% |
| Delaware | 155.5946% |
| District of Columbia | 88.3270% |
| Florida | 107.9604% |
| Georgia | 86.6675% |
| Guam | 96.8019% |
| Hawaii | 77.1051% |
| Idaho | 93.0570% |
| Illinois | 86.6318% |
| Indiana | 108.6768% |
| Iowa | 78.2056% |
| Kansas | 89.6374% |
| Kentucky | 150.0126% |
| Louisiana | 105.2878% |
| Maine | 132.7534% |
| Maryland | 115.2160% |
| Massachusetts | 110.3001% |
| Michigan | 112.4239% |
| Minnesota | 75.9148% |
| Mississippi | 96.7243% |
| Missouri | 107.8496% |
| Montana | 99.7815% |
| N. Mariana Islands | 100.2421% |
| Nebraska | 71.9045% |
| Nevada | 130.5519% |
| New Hampshire | 144.4997% |
| New Jersey | 102.3701% |
| New Mexico | 128.9295% |
| New York | 91.4472% |

*revised July 30, 2021*

| | |
|---|---|
| North Carolina | 102.2754% |
| North Dakota | 76.0864% |
| Ohio | 123.0063% |
| Oklahoma | 129.3047% |
| Oregon | 108.9094% |
| Pennsylvania | 118.2821% |
| Puerto Rico | 73.9803% |
| Rhode Island | 143.8802% |
| South Carolina | 99.6801% |
| South Dakota | 76.4482% |
| Tennessee | 129.9078% |
| Texas | 71.6286% |
| Utah | 119.5878% |
| Vermont | 140.2239% |
| Virgin Islands | 100.4396% |
| Virginia | 88.1611% |
| Washington | 100.5007% |
| Wisconsin | 99.6616% |
| Wyoming | 100.9659% |

*revised July 30, 2021*

## EXHIBIT U

### Agreement on the State Outside Counsel Fee Fund

1. **Creation of a State Outside Counsel Fee Fund.** Janssen and the Settling States agree to the creation of a state outside counsel fee fund to pay reasonable attorney's fees of Settling States with outside counsel in connection with litigation against Janssen (the "State Outside Counsel Fee Fund"). This agreement is a material part of the Settlement Agreement. All terms utilized in this Agreement shall have the same meaning as in the Settlement Agreement unless otherwise indicated.

2. **State Outside Counsel Fee Fund Administration.** The State Outside Counsel Fee Fund shall be administered separately from the Common Benefit Fund, the Contingency Fee Fund, the State Cost Fund, and the MDL Expense Fund. A committee of Attorneys General shall oversee the State Outside Counsel Fee Fund ("Fee Fund Committee"). The Fee Fund Committee shall initially consist of the following: (a) Arkansas; (b) Florida; (c) New Jersey; and (d) Puerto Rico. The Fee Fund Committee shall select a settlement fund administrator (who may or may not be different from the Settlement Administrator under the Distributor Agreement) (the "Fee Fund Administrator") who shall administer the State Outside Counsel Fee Fund according to the guidelines and directives of the Fee Fund Committee.

3. **State Outside Counsel Fee Eligibility.** To participate in the State Outside Counsel Fee Fund, an outside counsel for a Settling State must have filed and be maintaining an action in the name of a Settling State or its attorney general against Janssen in a state or federal court as of June 1, 2021. No Settling State can draw attorney's fees from both the State Outside Counsel Fee Fund and the similarly sized fund to reimburse Settling State's without outside counsel.

4. **State Outside Counsel Fee Fund Amount.** Janssen shall pay funds in the State Outside Counsel Fee Fund according to the schedule set forth below, as part of its annual Global Settlement Attorney Fee Amount payable to the Attorney Fee Fund, subject to the adjustments described below:

   Payment Year 1     $32,391,518.74

   Payment Year 2     $30,769,230.77

   Payment Year 3     $ 4,146,942.80

5. **State Outside Counsel Fee Fund Availability and Calculation of Amount.**

   a. The State Outside Counsel Fee Fund shall be available to compensate private counsel for State Attorneys General for approved fees arising out of representation of the State pursuant to the schedule developed by the Fee Fund Committee and provided to Janssen.

136

*revised July 30, 2021*

b.  Fees shall be calculated by adding two components: (a) a fixed amount consisting of fifty (50%) of the amount allocated to a State utilizing the allocation percentage in the Settlement Agreement multiplied times 4.5%; and (b) a proportional percentage of the remaining fee due under that Settling State's contract assuming that fifty (50%) of the State's recovery is allocable to a Settling State (versus allocable to the Settling State's Subdivisions) so that the fees of all Settling States (minus the base amount that would have been due to any of Non-Settling States) exhausts the State Outside Counsel Fee Fund. The proportional share percentage will be the same for each Settling State included in the State Outside Counsel Fee Fund. All amounts paid will be less any costs or fees of the Fee Fund Administrator.

6.  **Payment by the Fee Fund Administrator**.

a.  If a Settling State and a Settling State's outside counsel agree that the amount calculated in paragraph 5 above satisfies in full amounts owed to all Settling State outside counsel, then upon written notice of that agreement and counsel waiving in writing any entitlement to any additional fee, the Fee Fund Administrator shall pay that Settling State's outside counsel pursuant to the calculation and any schedule created by the Fee Fund Committee.

b.  If a Settling State's outside counsel does not agree that the amount calculated in Paragraph 5 above satisfies in full amounts owed by the Settling State, then the Settling State's share shall be placed in an interest bearing escrow account (less reasonable expenses of the Fee Fund Administrator) and held unless and until the Settling State and its outside counsel agree in a signed writing to a resolution of the amount outstanding or there is a final judgment entered that is no longer appealable.

c.  Upon being provided a signed, written agreement or the final non-appealable judgment, the Fee Fund Administrator shall release monies from the State Outside Counsel Fee Fund in either the amount held by the Fee Fund Administrator, if the amount of the agreement or judgment is equal to or more than the amount held, or the amount indicated in the agreement or in the final judgment, if the amount in the agreement or judgment is less than the amount held.

d.  Nothing herein, including the amounts listed in paragraph 5 above, shall prevent a Settling State from arguing in any proceeding with its outside counsel that (a) its recovery was less than fifty (50%) percent of the recovery in the Settlement Agreement down to and including fifteen (15%) percent of the total recovery; (b) any payment should be discounted by an appropriate discount rate commensurate to the risk of the Settlement Agreement and the timeline that the Settling State is receiving its payments; (c) the settlement amount should be lower because a Settling State's amounts were reduced because a Settling State's outside counsel failed to obtain joinder from a Settling State's Subdivision(s) who(m) the outside counsel also represented;

*revised July 30, 2021*

or (d) any limitation placed by Janssen bars payment of a higher fee to outside counsel.

e. In the event the amount due to the Settling State's outside counsel from an escrow account is less than the total amount of funds escrowed on the account of the Settling State, the balance shall be paid to the Settling State. In no event, other than a State not being a Settling State, shall funds revert to Janssen.

f. Amounts owed by Janssen to the State Outside Counsel Fee Fund shall be reduced and/or credited to Janssen by the amount specified in paragraph 7, below, for any Non-Settling outside counsel States.

7. **Reversion or Reduction of Amounts owed to Non-Settling States.** Amounts owed by Janssen to the State Outside Counsel Fee Fund shall be reduced on account of Non-Settling States as follows:

a. If the State of Washington does not become a Participating State and eleven (11) of the other outside counsel States in the table below become Participating States, then the amount Janssen owes under paragraph 4 will be reduced by the State of Washington's Fixed Amount in the table below.

b. If ten (10) outside counsel States in the table below become Participating States, then the amount Janssen owes under paragraph 4 will be reduced by the allocated Fixed Amount in the table below for each Non-Settling State.

c. If nine (9) or fewer of the outside counsel States in the table below become Participating States, then the amount Janssen owes under paragraph 4 will be reduced by each Non-Settling State's allocated Fixed Amount plus half the difference between the Non-Settling State's full share of the "Fee Amount if all OC States Join" and the Fixed Amount for each Non-Settling State.

| | JJ Allocation % | JJ Payment Amount | State Share | Contract Rate | Full Contract Amount | Fixed Amount | Fee Amount if all OC States Join |
|---|---|---|---|---|---|---|---|
| Arkansas | 0.9663486633% | $44,048,604.48 | $22,024,302.24 | TIPAC | $4,452,430.22 | **$991,093.60** | $3,608,210.22 |
| Florida | 7.0259134409% | $318,598,151.79 | $159,299,075.89 | TIPAC | $11,464,953.79 | **$7,168,458.42** | $10,417,038.57 |
| Idaho | 0.5254331620% | $24,023,889.47 | $12,011,944.74 | 10% | $1,201,194.47 | **$540,537.51** | $1,040,060.24 |
| Kentucky | 2.0929730531% | $95,444,090.08 | $47,722,045.04 | TIPAC | $4,636,102.25 | **$2,147,492.03** | $4,029,130.22 |
| Mississippi | 0.8898883053% | $40,549,243.09 | $20,274,621.55 | TIPAC | $4,277,462.16 | **$912,357.97** | $3,456,713.24 |
| Nevada | 1.2486754235% | $56,896,524.63 | $28,448,262.31 | 19% | $5,405,169.84 | **$1,280,171.80** | $4,399,082.82 |
| New Hampshire | 0.6258752503% | $28,620,454.86 | $14,310,277.43 | 27% | $3,863,761.41 | **$643,960.23** | $3,078,451.90 |
| New Jersey | 2.7551354545% | $124,934,796.18 | $62,467,398.09 | 33% | $20,614,241.37 | **$2,811,032.91** | $16,272,038.83 |
| New Mexico | 0.8557238713% | $39,104,404.67 | $19,552,202.33 | 24 | $ 4,692,528.56 | **$879,849.11** | $3,762,616.04 |
| Ohio | 4.3567051408% | $197,559,821.57 | $98,779,910.78 | TIPAC | $8,438,995.54 | **$4,445,095.99** | $7,464,883.44 |
| Puerto Rico | 0.7263201134% | $33,083,484.37 | $16,541,742.19 | 25% | $4,135,435.55 | **$744,378.40** | $3,308,356.71 |
| South Dakota | 0.2169945907% | $9,948,315.49 | $4,974,157.75 | 12% | $596,898.93 | **$233,837.10** | $505,909.15 |
| Washington | 2.3189040182% | $105,153,378.36 | $52,576,689.18 | 13.5% | $7,097,853.04 | **$2,365,951.01** | 5,943,742.14 |

*revised July 30, 2021*

8.    In the event that the Fee Fund Administrator has received from Janssen part or all of the amount that Janssen is entitled to offset under paragraph 7 above, the Fee Fund Administrator shall return to Janssen the amount so received.

*revised July 30, 2021*