<div align="center">

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

</div>

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION** | **MDL 2804** |
| **OPIATE LITIGATION** | **Case No. 17-md-2804** |
| *This document relates to:* | **Hon. Dan Aaron Polster** |
| **Track Three Cases** | |

<div align="center">

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT BRIEF REGARDING SELECT LEGAL ISSUES FOR REMEDIES PHASE

</div>

March 23, 2022

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

**Introduction** ............................................................................................................ 1

**Argument** ................................................................................................................ 1

**I.      Defendants' Brief Should Be Denied To the Extent It Seeks Reconsideration of Legal Issues this Court Has Already Resolved** ............................................... 1

**II.     Defendants' Proposed Limitations on the Abatement Award Are Improper and Unwarranted.** ................................................................................................ 3

   A.   Defendants fundamentally misunderstand the scope of the nuisance found by the jury. ... 3

   B.   Plaintiffs' abatement plan consists of costs recoverable as abatement that are appropriately tailored to the public nuisance found by the jury. ....................... 6

   C.   Plaintiffs' abatement plan is not overbroad. ................................................. 16

**III.    Under Ohio Law, Wrongdoers Have the Burden of Apportioning Harm to Avoid Joint and Several Liability.** .......................................................................... 24

   A.   Defendants bear the burden of proof for their divisibility defense. ................... 25

   B.   As the Court previously ruled, Ohio's Joint-and-Several-Liability Statute, O.R.C. § 2307.22, does not apply to an action for equitable abatement. ...................... 28

**IV.     Defendants' Constitutional Arguments Have No Merit and Should Be Rejected.** ... 29

   A.   The remedy of abatement of a public nuisance is an equitable claim which does not invoke the right to a jury trial under the Seventh Amendment. ........................ 29

      1.   *The request for an abatement fund is equitable* ........................................ 29

      2.   *The remedy of abatement was historically equitable* ................................. 34

   B.   The request by Walmart and Walgreens for the assignment of a new judge for the remedies phase is both untimely and unwarranted. ....................................... 35

      1.   *Background* ....................................................................................... 36

      2.   *Defendants' request is procedurally barred.* ........................................... 37

      3.   *There are no substantive grounds for the assignment of a new judge* ......... 39

**Conclusion** ............................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Sheppard*,
    856 F.2d 741 (6th Cir. 1988) .................................................................................40

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
    430 U.S. 442 (1977) ....................................................................................31, 32

*Ayers v. Jackson Township*,
    525 A.2d 287 (N.J. 1987) ...............................................................................34

*Balch v. State ex rel. Grigsby, Cnty. Atty.*,
    65 Okla. 146, 164 Pac. 776 (Okla. 1917) ..........................................................31

*Barth v. Firestone Tire & Rubber Co.*,
    661 F. Supp. 193 (N.D. Cal. 1987) ....................................................................33

*Matter of Bell Petroleum Servs., Inc.*,
    3 F.3d 889 (5th Cir. 1993) .................................................................................26

*Bennis v. Michigan*,
    516 U.S. 442 (1996) ..........................................................................................30

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ..........................................................................................32

*Bowes v. City of Aberdeen*,
    109 P. 369 (Wash. 1910) ...................................................................................22

*State ex rel. Brown v. Base Wayandotte Corp.*,
    Nos. 33533, 33545, 33549, 1975 WL 182459 (Ohio App. 8th Dist. Apr. 24, 1975) ........20, 21

*Burlington Northern & Santa Fe Ry. Co. v. United States*,
    556 U.S. 599 (2009) ..........................................................................................25

*Burns v. Jaquays Min. Corp.*,
    752 P.2d 28 (Ariz. App. 2d Div. 1987) ..............................................................34

*Caperton v. A.T. Massey Coal Co.*,
    556 U.S. 868 (2009) ...................................................................................39, 40

*Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ................................................................4, 19, 20

*Citizens for Alternatives to Radioactive Dumping v. CAST Transp., Inc.*,
    No. CV 99-321 MCA/ACT, 2004 WL 7338006 (D.N.M. Sept. 30, 2004) ...........................31

*City of Cleveland v. Ameriquest Mort. Securities, Inc.*,
   615 F.3d 496 (6th Cir. 2010) .........................................................................19, 20

*City of Cleveland v. Lewis*,
   96 N.E.3d 990 (Ohio App. 8th Dist. 2017) ...............................................................13

*Commonwealth v. Dietz*,
   132 A. 572 (Pa. 1926) ...............................................................................................31

*Commonwealth v. United Food Corp.*,
   374 N.E.2d 1331 (Mass. 1978) ................................................................................31

*Conner v. City of Santa Ana*,
   897 F.2d 1487 (9th Cir. 1990) ..................................................................................30

*Control Data Corp. v. S.C.S.C. Corp.*,
   53 F.3d 930 (8th Cir. 1995) ......................................................................................26

*Cook v. Rockwell Int'l Corp.*,
   778 F. Supp. 512 (D. Colo. 1991) ............................................................................33

*In re Copley Pharm., Inc.*,
   161 F.R.D. 456 (D. Wyo. 1995) ...............................................................................33

*Corvello v. New England Gas Co.*,
   532 F. Supp. 2d 396 (D.R.I. 2008) ...........................................................................34

*Craft v. Vanderbilt Univ.*,
   174 F.R.D. 396 (M.D. Tenn. 1996) ..........................................................................33

*Davidson v. Bradford*,
   212 N.W. 476 (Iowa 1927) ...............................................................................22, 23

*Day v. NLO*,
   144 F.R.D. 330 (S.D. Ohio 1992) ............................................................................33

*In re Debs*,
   158 U.S. 564 (1895) .................................................................................................35

*Dodge v. Cotter Corp.*,
   203 F.3d 1190 (10th Cir. 2000) .................................................................................4

*Donovan v. Philip Morris USA, Inc.*,
   268 F.R.D. 1 (D. Mass. 2010) ..................................................................................33

*Englewood v. Turner*,
   897 N.E.2d 213 (Ohio App. 2d Dist. 2008) ...............................................................5

*Hamilton v. Ebbing*,
No. CA2011-01-001, 2012 WL 1825268 (Ohio Ct. App. May 12, 2012) .............................28

*Hickson Corp. v. Norfolk S. Ry. Co.*,
260 F.3d 559 (6th Cir. 2001) ......................................................................................................4

*State ex rel. Hunter v. Johnson & Johnson*,
499 P.3d 719 (Okla. 2021) ...............................................................................................11, 12

*King v. Commonwealth*,
238 S.W. 373 (Ky. 1922) ...........................................................................................................31

*Longbottom v. Mercy Hosp. Clermont*,
998 N.E.2d 419 (Ohio 2013) ....................................................................................................14

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) ...................................................................................................16

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
643 F. Supp. 2d 461 (S.D.N.Y. 2009) ......................................................................................27

*Michigan v. U.S. Army Corps of Engineers*,
667 F.3d 765 (7th Cir. 2011) ...................................................................................................30

*State ex rel. Miller v. Anthony*,
647 N.E.2d 1368 (Ohio 1995) ..................................................................................................31

*Moody v. U.S.*,
958 F.3d 485 (6th Cir. 2020) ......................................................................................................3

*Mugler v. Kansas*,
123 U.S. 623 (1887) ..................................................................................................................35

*Nat'l Ass'n for Advancement of Colored People (NAACP) v. Acusport Corp.*,
226 F. Supp. 2d 391 (E.D.N.Y. 2002) ......................................................................................30

*In re Nat'l Prescription Opiate Litig.*,
19-3935, 2019 WL 7482137 (6th Cir. Oct. 10, 2019) ............................................2, 36, 37, 39

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-MD-2804, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020) .........................................3

*New York v. W. Side Corp.*,
790 F. Supp. 2d 13 (E.D.N.Y. 2011) ........................................................................................30

*Nithiananthan v. Toirac*,
Nos. CA2014-02-021, CA2014-02-028, CA2014-08-114, 2015 WL 1619097 (Ohio
Ct. App. Apr. 13, 2015) .................................................................................................12, 13, 14

iv

*In re NLO, Inc.*,
　　5 F.3d 154 (6th Cir. 1993) .....................................................................................33

*In re: Opioid Litigation*,
　　Circuit Court of Kanawha County, West Virginia, Civil Action No. 19-C-9000 ..............9, 12

*Orange Cty. Water Dist. v. Unocal Corp.*,
　　No. SACV0301742CJCANX, 2016 WL 11201024 (C.D. Cal. Nov. 3, 2016).......................30

*Pakootas v. Teck Cominco Metals, Ltd.*,
　　905 F.3d 565 (9th Cir. 2018) ................................................................................26

*Pang v. Minch*,
　　559 N.E.2d 1313 (Ohio 1990)..................................................................... *passim*

*Pennsylvania v. The Wheeling and Belmont Bridge Co.*,
　　54 U.S. 518 (1851).............................................................................................35

*People v. ConAgra Grocery Products Co.*,
　　227 Cal. Rptr. 3d 499 (Cal. App. 6th Dist. 2017) ............................................ *passim*

*Redmond v. State ex rel. Att'y Gen.*,
　　118 So. 360 (Miss. 1928).....................................................................................34

*San Diego Unified Port Dist. v. Monsanto Co.*,
　　No. 15CV578-WQH-JLB, 2018 WL 4185428 (S.D. Cal. Aug. 30, 2018)............................30

*Schindler v. Standard Oil Co.*,
　　143 N.E.2d 133 (Ohio 1957)..................................................................................24

*Scioto Twp. Zoning Inspector v. Puckett*,
　　31 N.E.3d 1254 (Ohio App. 4th Dist. 2015)............................................................10

*State ex rel. State Bd. of Milk Control v. Newark Milk Co.*,
　　179 A. 116 (N.J. 1935).........................................................................................31

*Tackett v. Village of Carey, Ohio*,
　　306 CV 7014, 2007 WL 1500892 (N.D. Ohio May 18, 2007) .................................5

*Thompson v. City of Brook Park*,
　　No. 84068, 2004 WL 2340071 (Ohio App. 8th Dist. Sept. 23, 2004) .............................13, 14

*Tull v. United States*,
　　481 U.S. 412 (1987)..........................................................................................30, 34

*U.S. Bank Nat. Ass'n v. U.S. E.P.A.*,
　　563 F.3d 199 (6th Cir. 2009) ................................................................................26

v

*U.S. v. Price*,
 688 F.2d 204 (3d Cir. 1982)................................................................................12, 34

*United States v. Alcan Aluminum Corp.*,
 964 F.2d 252 (3d Cir. 1992)........................................................................................27

*United States v. Hercules, Inc.*,
 247 F.3d 706 (8th Cir. 2001) ......................................................................................26

*United States v. NCR Corp.*,
 688 F.3d 833 (7th Cir. 2012) ......................................................................................26

*United States v. Twp. of Brighton*,
 153 F.3d 307 (6th Cir. 1998) .................................................................................26, 27

*United States v. Wade*,
 653 F. Supp. 11 (E.D. Pa. 1984) ................................................................................31

*Veda, Inc. v. U.S. Dep't of the Air Force*,
 111 F.3d 37 (6th Cir. 1997) ........................................................................................28

*W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*,
 208 F. Supp. 3d 1227 (N.D. Ala. 2016) .....................................................................30

*Wedel v. United States*,
 2 F.2d 462 (9th Cir. 1924) ..........................................................................................35

*State ex rel. Wilcox v. Ryder*,
 147 N.W. 953 (Minn. 1914)........................................................................................31

*Williams v. Pennsylvania*,
 579 U.S. 1 (2016)........................................................................................................40

*Yslava v. Hughes Aircraft Co.*,
 845 F. Supp. 705 (D. Ariz. 1993) ...............................................................................33

**STATUTES**

O.R.C. § 2307.22 ...............................................................................................................28

**OTHER AUTHORITIES**

1 Dobbs, Law of Remedies § 5.7(3) (2d ed. 1993)........................................................8, 9

2 Joseph Story, Commentaries on Equity Jurisprudence (5th ed. 1849).........................34

2 Joseph Story, Commentaries on Equity Jurisprudence, as Administered in England and
 America (1st ed. 1836).................................................................................................34

vi

66 C.J.S. NUISANCES § 131 ..................................................................................34

66 C.J.S. NUISANCES § 142 ..................................................................................35

FED. R. CIV. PROC. 42 ...........................................................................................15

Horace G. Wood, A Practical Treatise on the Law of Nuisances in their Various Forms
    (1st ed. 1875) ..................................................................................................34

Merriam-Webster, https://www.merriam-webster.com/dictionary/nullify .....................6

RESTATEMENT (SECOND) OF TORTS § 433A (1965)..............................................2, 25

RESTATEMENT (SECOND) OF TORTS § 433B (1965)..............................24, 25, 26, 27

RESTATEMENT (SECOND) OF TORTS § 434 (1965)..................................................25, 26

RESTATEMENT (SECOND) OF TORTS § 821B (1979) ..................................................9

RESTATEMENT (SECOND) OF TORTS § 840E (1979) ................................................25

RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIAB. § 26. ..............................26

## INTRODUCTION

In its schedule for the remedy phase of the Track Three case, the Court set a deadline "for motions raising additional legal issues[,]" which would apply "should any of the parties determine to file such a motion and should the Court decide it is appropriate to entertain such a motion." Dkt. #4188 (CT3 Scheduling Order) at p. 2. Defendants then filed their Joint Brief Regarding Select Legal Issues for Remedies Phase ("Brief"), which does not actually address any "additional legal" issues. Instead, Defendants primarily seek to re-litigate legal issues that have already been decided by the Court. Their remaining arguments relate to factual issues that must be determined at trial (*e.g.*, whether the nuisance is abatable, whether the harm is reasonably apportionable, the appropriateness of particular abatement costs, etc.).

Regardless, to the extent the Court still deems it appropriate to consider Defendants' Brief, the arguments contained therein are substantively without merit. Specifically: (i) Defendants' unreasonably narrow characterization of the jury's verdict is not supported by the trial record or Ohio nuisance law; (ii) Plaintiffs' abatement plan seeks costs tailored to the nuisance the jury found that are appropriately recoverable as abatement; (iii) Defendants are jointly and severally liable for any abatement awarded unless *they* demonstrate at trial that the award can be reasonably apportioned; (iv) Ohio's joint-and-several-liability statute does not preclude joint liability in this case; (v) Defendants are not entitled to a jury trial on abatement because it constitutes equitable relief; and (vi) Walmart's and Walgreens' request for a different judge to oversee the remedy phase is both untimely and unwarranted. All relief requested in Defendants' Brief should be denied.

## ARGUMENT

### I. DEFENDANTS' BRIEF SHOULD BE DENIED TO THE EXTENT IT SEEKS RECONSIDERATION OF LEGAL ISSUES THIS COURT HAS ALREADY RESOLVED.

Many of the legal issues raised in Defendants' Brief have already been resolved by this Court. Specifically, this Court has previously held: (i) the relief sought by Plaintiffs is equitable

1

abatement, not compensatory damages;[1] (ii) Defendants are not entitled to a jury trial on equitable abatement;[2] (iii) once Plaintiffs establish that Defendants' conduct was a substantial factor in causing the nuisance, the burden shifts to Defendants to demonstrate the harm produced by their conduct is capable of apportionment and, if they fail to satisfy that burden, joint and several liability is warranted;[3] (iv) Ohio's joint-and-several-liability statute does not preclude joint liability in this case;[4] and (v) Judge Polster's involvement in settlement discussions in this MDL does require his disqualification.[5]

---

[1]  *See, e.g.,* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at p. 31 & n.97; Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 5 ("[T]he fact that 'nuisance' is sometimes characterized as a variety of 'tort' does not change the fact that an equitable claim to abate a nuisance is not a tort claim seeking compensatory damages.  Defendants also argue that what Plaintiffs' label as a claim for 'abatement costs' is in fact a 'claim for damages.'  This point is not well-taken for the reasons explained in the Court's recent Order denying Defendants' motion to exclude Plaintiffs' abatement experts.  Unlike tort damages that compensate an injured party for past harm, abatement is equitable in nature and provides a prospective remedy that compensates a plaintiff for the costs of rectifying the nuisance.") (internal citation and footnote omitted); Dkt. #2519 (CT1 Order on Abatement *Daubert* Motion) at pp. 2-3.

[2]  *See, e.g.,* Dkt. #3579 (CT3 Order on Apportionability and Apportionment) at pp. 2-5 ("[I]t is clear that questions related to equitable abatement, including divisibility and apportionment of the costs of abatement, may be and should be determined by the Court."); Dkt. #2629 (CT1 Opinion & Order Regarding Adjudication of Plaintiffs' Public Nuisance Claims); *see also* Minute Order, Sept. 17, 2019; Dkt. #2940 (CT1B CMO) at p. 5; Dkt. #2676 (Order on Motion to Disqualify) at p. 10 n.9.

[3]  *See, e.g.,* Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 7 ("The framework articulated in *Pang v. Minch*, cited by Defendants, provides a useful procedural guide: 'where a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm. . . . Once this burden has been met, a prima facie evidentiary foundation has been established supporting joint and several judgments against the defendants.  Thereafter, the burden of persuasion shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment.'  559 N.E.2d 1313, 1323-1324 (Ohio 1990); *see also* Restatement § 433A, cmt. i[.]").

[4]  *See, e.g.,* Dkt. #3579 (CT3 Order on Apportionability and Apportionment) at p. 1; Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at pp. 4-6 ("[T]he Court finds that O.R.C. § 2703.22 does not bar joint and several liability for abatement of a nuisance.  Put differently, there is nothing in this statute that precludes application of the doctrine of joint and several liability on Defendants.").

[5]  *See* Dkt. #2676 (Order on Motion to Disqualify).  Notably, numerous defendants (including CVS, Walgreens, and Walmart) filed a petition for writ of mandamus on this issue, which the Sixth Circuit denied.  *See In re Nat'l Prescription Opiate Litig.*, 19-3935, 2019 WL 7482137 (6th Cir. Oct. 10, 2019).

To the extent Defendants are seeking reconsideration of these prior legal rulings, they do not even come close to satisfying the applicable standard for reconsideration.  As this Court has previously stated:

> "Motions for reconsideration are disfavored, and a motion for reconsideration is unfounded unless it either calls . . . attention to an argument or controlling authority that was overlooked or disregarded in the original ruling, presents evidence or argument that could not previously have been submitted, or successfully points out a manifest error of fact or law."

*In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2020 WL 5642173, at *1 (N.D. Ohio Sept. 22, 2020) (citation omitted).  Defendants do not raise any new arguments nor cite any new controlling precedent that was not (or could not have been) offered when these legal issues were originally briefed.  Defendants "may disagree with the Court's decision, but that is an issue for appeal, not reconsideration."  *Id.* (citation omitted).

## II.  DEFENDANTS' PROPOSED LIMITATIONS ON THE ABATEMENT AWARD ARE IMPROPER AND UNWARRANTED.

### A.  Defendants fundamentally misunderstand the scope of the nuisance found by the jury.

Defendants argue that the "vast majority" of Plaintiffs' abatement plan should be rejected because it does not "directly abate the specific public nuisance that the jury found at trial: the 'oversupply of legal prescription opioids, and diversion of those opioids in the illicit market outside of appropriate medical channels.'"  Brief at p. 2-3 (quoting Dkt. #4176 (Verdict Forms) at pp. 2, 6).  In other words, according to Defendants, if a particular cost sought by Plaintiffs does not directly address either the "oversupply" or "diversion" of legal prescription opioids, but instead addresses the effects of that oversupply or diversion, it is not recoverable as abatement.

Defendants' narrow reading of the jury's findings is unwarranted.  Defendants focus solely on the language in the verdict forms.  But the verdict forms cannot be viewed in isolation; rather, they must be considered in conjunction with the jury instructions given by the Court, which defined the issues that were presented to the jury.  *See, e.g., Moody v. U.S.*, 958 F.3d 485, 491 (6th Cir. 2020) ("[T]he verdict form didn't stand alone.  It came with a user's manual: the jury instructions.

3

So we evaluate the verdict form in the context of the instructions as a whole (the same way we evaluate individual statements in the instructions).”); *Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 568 (6th Cir. 2001) (“The instructions and the verdict form should be considered together to determine whether they presented the issues to the jury in a clear and fair manner.”); *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000) (referring to the “jury instructions” as its “blueprint for determining the parameters of the first jury’s verdict”).

Here, the Court instructed the jury that “[a] public nuisance is an unreasonable inference [sic] with a right held by the public in common that is ongoing today[,]” which “includes an unreasonable interference with public health or public safety.” Dkt. #4153 (11/15/21 Trial Tr.) at 7071:8-12.[6] Indeed, the Court repeatedly emphasized to the jury that “an interference with public health or safety” was a necessary component to determining the existence of a public nuisance in this case. Dkt. #4153 (11/15/21 Trial Tr.) at 7071:18 – 7072:2 (“For a defendant to be held liable for creating a public nuisance, a plaintiff must show, by the greater weight of the evidence, that the defendant did one or both of the following two things: First, the defendant engaged in intentional conduct that caused a significant and ongoing *interference with a public right to health or safety*; Or two, the defendant engaged in unlawful conduct that caused a significant and ongoing *interference with a public right to health or safety*.”) (emphasis added), 7072:21-25 (“For you to find that a person engaged in intentional conduct, it is enough that the person intended to act and knew, or was substantially certain, that the circumstances resulting from that act would *interfere with public health or public safety*.”) (emphasis added), 7075:9-11 (“Only unlawful conduct that causes a significant *interference with a public right to health or safety* can be a public nuisance.”) (emphasis added), 7076:8-13 (“Under either of the two ways of proving public nuisance; that is, showing intentional conduct or unlawful conduct, a plaintiff must prove by the greater weight of the evidence that a defendant’s conduct caused *an interference with a right to public health or*

---

[6] This is entirely consistent with how “public nuisance” is defined under Ohio law. *See Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002).

*safety* that is ongoing today.") (emphasis added), 7076:23 – 7077:1 ("To be a proximate cause, the acts or omissions of a defendant must be a substantial factor in producing circumstances that unreasonably *interfere with a public right to health or safety*.") (emphasis added).[7]

Given these clear instructions, the jury could not have found that "oversupply" and "diversion" of prescription opioids constituted a public nuisance unless it *also* found that such oversupply and diversion interfered with public health or safety. Thus, the consequential effects of the oversupply and diversion (*i.e.*, the interference with public health or safety) are an inextricable component of the nuisance itself. Notably, this Court has already rejected Defendants' argument that they "are not responsible for the subsequent consequences of the oversupply and diversion of legal prescription opioids into illegitimate markets." Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at p. 54 (noting the argument was "not well taken"); *see also id.* at p. 55 ("This authority confirms that, even if, as Defendants assert, they discontinued the conduct that led to the existence of the nuisance, they are still subject to liability for abatement of any ongoing consequential effects of the nuisance.").

The entire purpose for abating a public nuisance is to eliminate (or at least significantly reduce) the effects of the unreasonable interference with public health and safety. *See, e.g., Englewood v. Turner*, 897 N.E.2d 213, 221 (Ohio App. 2d Dist. 2008) ("To 'abate' means 'to put

---

[7]  *See also id.* at 7070:25 – 7071:7 ("Each plaintiff alleges that each defendant dispensed opioid products in a manner *that endangered public health or safety*, thereby creating a public nuisance. Specifically, each plaintiff claims that each defendant substantially contributed to an oversupply of legal prescription opioids and to diversion of those opioids into the illicit market outside of appropriate medical channels, *thereby endangering public health or safety*.") (emphasis added), 7073:2-5 ("If a person learns that circumstances resulting from their conduct *interfere with public health or public safety*, and the person continues that conduct, then the subsequent conduct is intentional.") (emphasis added), 7077:22 – 7078:13 ("I have instructed you that a public nuisance is an unreasonable interference with a right held by the public in common, and I have used the phrase, significant *interference with a public right to health or safety*. Let me define the terms 'significant' and 'unreasonable.'. . . An interference with a public right is significant or unreasonable if it causes greater *harm* than the public should be required to bear, considering all the circumstances. When you consider whether an interference with a public right is significant or unreasonable, some of the factors you may consider include the nature, extent, and duration of the interference, and the social value of the defendant's conduct.") (emphasis added).

an end to, to nullify or to become void.'") (citation omitted);[8] *Tackett v. Village of Carey, Ohio*, 306 CV 7014, 2007 WL 1500892, at *6 (N.D. Ohio May 18, 2007) (noting that "the purpose of nuisance abatement is to promote the health of the community . . .").  Stopping future wrongful conduct is insufficient if there remains an ongoing interference with public health and safety caused by Defendants' past conduct.

Here, the oversupply and diversion of prescription opioids has created (and continues to create and affect) a significant population of addicted individuals, many of whom have moved on to stronger drugs like heroin or illegally-manufactured fentanyl.  *See, e.g.,* Dkt. #4241 (Ps' Opp. to Ds' Rule 50(b) Motions) at pp. 3-13, 84-94.  Even if, hypothetically, one were to remove all prescription opioids from the Counties and cease any further supply, the threats to, and effect on, public health and safety associated with this already-existing addicted population would continue if not addressed.  And, of course, it is not realistic to remove prescription opioids from society entirely.  Rather, Defendants and others will continue to dispense prescription opioids into the Counties.  For these reasons, the ongoing interference with public health and safety caused by Defendants' past and continuing conduct cannot be fully eliminated (or even significantly minimized) without the implementation of programs and services related to, *inter alia*, the prevention, treatment, and recovery of opioid abuse and addiction.

### B.     Plaintiffs' abatement plan consists of costs recoverable as abatement that are appropriately tailored to the public nuisance found by the jury.

Plaintiffs' abatement plan includes several categories of prospective measures specifically tailored to abate the public nuisance found by the jury.  Dkt. #4219-1 (Abatement Plan); **Ex. 1** (Rosen Rep. Excerpts) at pp. 6-13.  There are prevention measures (*e.g.*, education of the public and providers; safe storage and drug disposal; community prevention and resiliency; harm reduction; and surveillance, evaluation, and leadership) geared towards "reduc[ing] the widespread

---

[8]     Merriam-Webster's Dictionary defines "nullify" to mean: (1) "to make null[;]" or (2) "to make of no value *or consequence*[.]"    Merriam-Webster,  https://www.merriam-webster.com/dictionary/nullify (emphasis added).

oversupply of prescription opioids in the Communities so as to decrease injuries and deaths from these products."  Dkt. #4219-1 (Abatement Plan) at pp. 14-30.  There are treatment measures (*e.g.*, connecting individuals to care; treatment for opioid use disorder; managing complications attributable to the epidemic; workforce expansion and resiliency; naloxone distribution and training) geared towards "better identify[ing] individuals with OUD in the Communities" and "remov[ing] clinical, economic, and social barriers diminishing their access to comprehensive, coordinated high-quality care."  *Id.* at pp. 31-46.  There are recovery measures geared towards enhancing public safety and reintegration (*e.g.*, law enforcement training; pretrial diversion programs; OUD treatment for incarcerated individuals; expanded drug courts; reentry programs; vocational training, education, and job placement; mental health counseling and grief support).  *Id.* at pp. 47-56.  Finally, there are measures intended to specifically address the needs of special populations who have been uniquely affected by the opioid epidemic (*e.g.*, pregnant women, new mothers, and infants; adolescents and young adults; families and children; homeless and housing insecure individuals; individuals with opioid misuse).  *Id.* at pp. 57-67.[9]

These measures directly address the interference with public health and safety in the Counties resulting from the oversupply and diversion of prescription opioids.  *See, e.g.,* Dkt. #4241 (Ps' Opp. to Ds' Rule 50(b) Motions) at pp. 3-13, 84-94; Dkt. #4219-1 (Abatement Plan) at pp. 8-70.  As Plaintiffs have previously explained:

> [T]he abatement plan mirrors many of the governmental and epidemiological reports and literature which predicts that abating the nuisance requires long term solutions.  This is true due to the pervasiveness of the opioid epidemic and the rate of recidivism of Opiate Use Disorder in this population and that only a robust and continuous plan with periodic measurements of success followed by reaction and modification of the remedies can really work.

---

[9]   These measures include: prenatal screening; MAT treatment for pregnant women with OUD; neonatal care; residential transition programs and psychosocial support for pregnant women and new mothers; school-based and family-based prevention programs for children, adolescents, and young adults; resources for children and adolescents in child protective services, or who have lost one or both parents, as a result of opioid use; treatment and housing programs for homeless or housing insecure individuals with OUD; measures to identify and address individuals who misuse opioids.  *Id.*

Dkt. #4232 (Ps' Abatement Plan Submissions) at pp. 1-2. *See also* Dkt. #4219-1 (Abatement Plan) at pp. 6-7, 12-13; **Ex. 2** (2/11/22 Alexander Tr. Excerpts) at 63:12-18 ("[M]y effort was to develop a comprehensive set of programs and services that, if implemented and implemented in a coordinated fashion and well governed, over time could lead to significant reductions and, frankly, decrease by half rates of opioid use disorder and associated morbidity and mortality in the county.").

Defendants argue that: (i) an abatement remedy cannot address the "effects" of the oversupply and diversion of prescription opioids; and (ii) the costs Plaintiffs seek in their abatement plan are actually "damages," not abatement. Brief at pp. 3-9. Defendants are wrong on both counts.

Defendants state that "[t]he purpose of the abatement remedy is to eliminate the condition that constitutes the nuisance or the conduct that caused it." Brief at p. 4. But as discussed above (*supra* at § II.A), the "condition that constitutes the nuisance" necessarily includes the interference to public health and safety resulting from the oversupply and diversion of prescription opioids. Defendants cherry-pick language from a thirty-year-old treatise and a comment to the Restatement (Second) of Torts to argue that any abatement remedy can *only* address the oversupply or diversion of prescription opioids itself and nothing else. Brief at p. 4. Neither authority stands for this limited proposition. The language they quote from the 1993 edition of Dan Dobb's Law of Remedies treatise (Brief at p. 4 (quoting 1 Dobbs, Law of Remedies § 5.7(3) (2d ed. 1993)) is taken out of context.[10] Defendants also quote certain language from Restatement (Second) of Torts

---

[10]  The statement that "an 'injunction abating the nuisance' is designed to make the plaintiff 'free from the activity in question" was made in the context of describing the "three basic remedial choices" that "a chancellor faced with a claim of nuisance" might have had *prior to 1973*. **Ex. 3** (Law of Remedies Excerpts) at p. 522. Defendants also quote several other passages from Dobb's Law of Remedies, but when viewed in their full context it is clear that the treatise was emphasizing the wide scope and flexible nature of remedial relief available at that time: "In more complex or difficult cases, however, it may be necessary to invest considerable effort in the exploration of the remedial options. As already indicated, the chancellor may issue either an injunction, or damages, or possibly both. *But these are not the only choices, because each remedy presents its own spectrum of measurement or scope*. Damages *might* be based on diminished market value, on the cost of eliminating the nuisance effects, or on the subjective, personal elements such as illness or diminished enjoyment of the property. *Injunctions also may range* (footnote continues on next page)

8

§ 821B cmt. i to argue that abatement is meant to stop the conduct that causes the nuisance.  Brief at p. 4.  But that comment references "abatement" and "injunction" as separate terms, and the particular language referenced by Defendants specifically pertained to injunctions:

> There are numerous differences between an action for tort damages and an action for an injunction *or* abatement, and precedents for the two are no means interchangeable. . . .  In an action *for injunction* the question is whether the activity itself is so unreasonable that it must be stopped. . . .

> To maintain a damage action for a public nuisance, one must have suffered damage different in kind from that suffered by the general public; this is not necessarily true in a suit for abatement *or* injunction.

RESTATEMENT (SECOND) OF TORTS § 821B cmt. i (1979) (emphasis added).  A prohibitory injunction is simply one of many ways to potentially address a public nuisance; remedial abatement is another.  *See, e.g., People v. ConAgra Grocery Products Co.*, 227 Cal. Rptr. 3d 499, 562 (Cal. App. 6th Dist. 2017) ("[An] injunction [that bars potentially beneficial activity] differs dramatically from a remedial abatement order.  When the government seeks a remedial abatement order, the nuisance is not contingent, and the remedy does not bar some prospective activity.  Abatement is restricted to undoing already accomplished harmful conditions.").[11]

---

*widely in their scope*.  The injunction *might* compel complete abatement of the offending condition, but equally it *might* only compel some adjustment in operating conditions.  Often a balance of the hardships and equities leads to the conclusion that the defendant may continue the activity, but only for limited periods during the day or only on certain days of the week, *or only when specified steps have been taken to ameliorate the harm that it does*.  *Intractable cases may call for continued experiment, perhaps under court supervision, in an effort to find a way to minimize the harm*."  *Id.* at pp. 524-25 (internal footnotes omitted) (emphasis added).  Notably, this particular edition of the treatise did not include the text of all the footnotes cited therein including, for example, the footnote cited for the proposition that "damages" may be based on "the cost of eliminating the nuisance effects."  Thus, it is unclear whether it was including payment for *future* abatement costs in its definition of damages, or whether it was referring only to compensation for *past* abatement costs, which Plaintiffs do not dispute would constitute damages.

[11]  *See also* **Ex. 4** (Order Regarding Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault, *In re: Opioid Litigation*, Circuit Court of Kanawha County, West Virginia, Civil Action No. 19-C-9000, Transaction ID 65807300 (7-29-20)) at pp. 9-10 ("Although injunction is one remedy historically available in an abatement action, there is no prohibition against other forms of equitable relief, such as the necessary costs to abate the nuisance.  The essence of equity is flexibility. . . .  Numerous courts, acting in the exercise of their equitable powers, have allowed for abatement costs regardless of whether the plaintiff sought injunctive relief.").

Defendants next claim that an "abatable nuisance" is "[a] nuisance that reasonable persons would regard as being removable by reasonable means[,]" and that the oversupply and diversion of prescription opioids "is not a nuisance 'removable by reasonable means.'" Brief at p. 7 (quoting *Scioto Twp. Zoning Inspector v. Puckett*, 31 N.E.3d 1254, 1265 (Ohio App. 4th Dist. 2015) (quoting BLACK'S LAW DICTIONARY, 9th ed. 2009)). The case they cite in support of this proposition involved the defendants' use of their own real property to operate a commercial pay lake without a zoning permit. *Scioto*, 31 N.E.3d at 1256. This conduct was determined to be a nuisance because it violated township zoning resolutions, and "violations of zoning ordinances are public nuisances." *Id.* at 1264. The court further determined that the nuisance was abatable, and ordered the defendants to permanently cease all activities associated with the operation of a pay pond. *Id.* at 1257, 1265. Notably, the nuisance in *Scioto* did not involve any interference with public health or safety. Once the conduct causing the nuisance stopped, there was nothing else to remediate.

The circumstances in this case are different. The nuisance is the unreasonable interference with public health and safety resulting from the oversupply and diversion of legal prescription opioids. Simply stopping future oversupply and diversion is not enough to remove this nuisance from the Counties. The nuisance will not be fully (or even partially) abated until the ongoing hazards to public health and safety caused by Defendants' conduct are remediated. The programs and services proposed in Plaintiffs' abatement plan constitute "reasonable means" to remove these hazards.

Defendants criticize Plaintiffs' abatement plan for "not distinguish[ing] between legal prescription opioids and illicit opioids such as heroin." Brief at pp. 8-9. But Plaintiffs adduced extensive evidence in the liability trial demonstrating that the oversupply and diversion of legal prescription opioids in the Counties led to an increase in the abuse of illegally manufactured or obtained drugs, such as heroin and fentanyl, and the associated harms related thereto. *See, e.g.,* Dkt. #4241 (Ps' Opp. to Ds' Rule 50(b) Motions) at pp. 4, 6-8, 84 n.68. *See also* Dkt. #4219-1 (Abatement Plan) at pp. 8-10, 40. Thus, it is critical for any abatement plan to include measures

10

to reduce the harms associated with both legal prescription opioids and illegally manufactured/obtained opioids, such as heroin and fentanyl. Defendants make much of the fact that the programs and services related to OUD treatment funded by the abatement plan may also end up benefitting some individuals with OUD that never took any legal prescription opioids. Brief at p. 9. But as Dr. Caleb Alexander explained, to effectively abate the opioid epidemic, it is necessary to address all opioids. **Ex. 2** (2/11/22 Alexander Tr. Excerpts) at 67:22 – 68:9 ("I mean, there's no other way to abate the opioid epidemic. I've never seen an abatement plan that said we're just going to treat people that are using heroin and have prior prescription opioid use, but we're not going to treat people that just have prescription opioid use. So, of course, there's some people that are using illicit opioids that have never used prescription opioids but wouldn't be using illicit opioids but for the historic oversupply of prescription opioids in Lake and Trumbull counties."), 68:16-19 ("My plan would treat – would provide services for anybody with opioid use disorder because, to my knowledge, that's the only way to abate the opioid epidemic.").

Defendants point to the Oklahoma Supreme Court's decision in *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021), to support their argument that Plaintiffs' abatement plan is not appropriate. This Court has previously distinguished *Hunter*, noting that the claim in that case was brought under *Oklahoma's* public nuisance statute and has no bearing on a common-law public nuisance claim under Ohio law. Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 35-37. For example, one of the reasons the *Hunter* court rejected the public nuisance claim in that case was because it found that the defendant, an opioid manufacturer, "did not control the instrumentality alleged to constitute the nuisance at the time it occurred." 499 P.3d at 728. The *Hunter* court considered the *prescription opioids* to be the instrumentality constituting the nuisance. *Id*. at 729. Importantly, this Court has rejected that characterization in the present case. *See, e.g.,* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 38-39 ("Plaintiffs' claims do not stem from the products themselves, but from the manner in which Defendants *dispensed* the products, *i.e.* Defendants' failure to provide effective controls to detect red flags and prevent diversion.") (cleaned up); Dkt. #2578 (CT1 Order on Manufacturers' Nuisance MSJ).

11

The *Hunter* court further determined that "[w]ithout control, a manufacturer also cannot remove or abate the nuisance—which is the remedy the State seeks from J&J in this case." *Hunter*, 499 P.3d at 728 (Okla. 2021); *see also id.* at 729 (noting that the programs and services to be funded in the proposed abatement plan were "activities over which J&J has no control").  Regardless of the *Hunter* court's views of abatement under Oklahoma law, Defendants point to no Ohio authority stating that a defendant must have control over the abatement itself to be liable for costs related to abating a public nuisance it caused.

Defendants also continue to insist that the costs Plaintiffs seek in their abatement plan are actually damages, not abatement.  And they continue to be wrong.  *See, e.g., supra* at fn.1; *infra* at §§ III.B, IV.A.[12]  Defendants claim, for example, that Ohio law "distinguishes between abatement and damages, treating an award to address the *health, societal, and other downstream effects* of a nuisance (as opposed to the nuisance itself) as damages and not as abatement."  Brief at p. 5.  But the cases they rely on say no such thing.

In *Nithiananthan v. Toirac*, the plaintiffs brought a private nuisance action against their neighbors complaining about the neighbors' "use of lights and security cameras, encroachment of

---

[12]  *See also, e.g.,* **Ex. 4** (Order Regarding Plaintiffs' Motion to Strike Defendants' Notices of Non-Party Fault, *In re: Opioid Litigation*, Circuit Court of Kanawha County, West Virginia, Civil Action No. 19-C-9000, Transaction ID 65807300 (7-29-20)) at p. 9 ("Damages, whether future or past, are focused on compensation for an injury or loss to make the injured party whole.  Abatement is to rectify the nuisance itself.  For example, the cost of providing opioid education programs or treatment centers might be part of the equitable relief to abate Plaintiffs' alleged public nuisance—the opioid crisis—while compensation for injuries or losses, such as an individual's reduced future earnings due to opioid addiction or death, would be future compensatory damages.  The Court concludes and holds that such costs are in the nature of equitable relief, not past damages.  The Court further concludes that prospective costs for addiction treatment and services may be sought as part of the necessary measures to abate or remediate the alleged public nuisance of the opioid epidemic.") (internal citation omitted); *cf. U.S. v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) ("Damages are awarded as a form of substitutional redress.  They are intended to compensate a party for an injury suffered or other loss.  A request for funds for a diagnostic study of the public health threat posed by the continuing contamination and its abatement is not, in any sense, a traditional form of damages.  The funding of a diagnostic study in the present case, though it would require monetary payments, would be preventive rather than compensatory.  The study is intended to be the first step in the remedial process of abating an existing but growing toxic hazard which, if left unchecked, will result in even graver future injury, i.e., the contamination of Atlantic City's water supply.").

[their] landscaping, and [their] abusive behavior toward [the plaintiffs]." Nos. CA2014-02-021, CA2014-02-028, CA2014-08-114, 2015 WL 1619097, at *2 (Ohio Ct. App. Apr. 13, 2015). At trial the court determined that *only* the defendants' use of cameras and lighting constituted a nuisance. *Id*. The court "granted a permanent injunction to abate the nuisance" which ordered the defendants "to not direct their outdoor lighting toward the [plaintiffs'] house, to direct their security cameras at their own home or property immediately surrounding their home, and to not capture on video the [plaintiffs'] property." *Id*. The court further ordered the defendants to pay $5,000 in damages to the plaintiffs to cover costs the plaintiffs *had already paid* to install landscaping to block the view of the defendants' security camera. *Id*. at *2, *10. In other words, the damages awarded compensated the plaintiffs for their *past* losses. Defendants also point out that the court entered no award for "costs associated with psychological or medical treatment[,]" but "indicated that such an award . . . would also have been 'damages,' because it likewise would have been awarded to 'combat the effects of the . . . nuisance.'" Brief at p. 5. In actuality, the appellate court found no abuse of discretion in awarding only $5,000 in damages because the plaintiffs "did not present any evidence in regards to the shades or drapery, nor did they contend that they *incurred* any other costs to combat the effects of the [defendants'] nuisance, such as costs associated with psychological or medical treatment." *Id*. at *10 (emphasis added). Again, it is clear from the court's statement that *past* costs incurred to combat the effects of a nuisance constitute damages. In the present case, Plaintiffs do not seek to recover any past costs incurred to combat the effects of the public nuisance caused by Defendants.

The other two nuisance cases cited by Defendants also deal with the recovery of past costs. In *City of Cleveland v. Lewis*, the city demolished a structure that it deemed to be a public nuisance and sued the owner of the structure to recovery its demolition costs. 96 N.E.3d 990, 992, 998 (Ohio App. 8th Dist. 2017) ("[T]he city *incurred* costs to have the structure demolished. Appellant is liable to the city for the abatement costs the city *incurred*") (emphasis added). And in *Thompson v. City of Brook Park*, a motorcycle driver asserted a nuisance claim seeking damages against the city for personal injuries he suffered after his motorcycle hit an abandoned tire on the highway.

13

No. 84068, 2004 WL 2340071, at *1 (Ohio App. 8th Dist. Sept. 23, 2004).  Only past damages were at issue in the case, as the trial court had excluded any testimony "relating to the possibility of future medical expenses" because the plaintiff had offered no evidence indicating that he intended to seek further medical treatment.  *Id*. at *4-5.

Defendants also rely on *Longbottom v. Mercy Hosp. Clermont*, 998 N.E.2d 419 (Ohio 2013), a non-nuisance case that is wholly inapposite.  *Longbottom* involved a personal injury action against a physician alleging medical malpractice and loss of consortium.  *Id*. at 420-21.  At trial, the jury found for the plaintiffs and awarded over $2 million in damages, a portion of which "represented future damages for [the injured plaintiff's] anticipated medical expenses, pain and suffering, loss of ability to perform usual functions, and loss of future earning capacity."  *Id*. at 421.  *Longbottom* was not a nuisance action and did not involve an abatement remedy.  Moreover, in that case the plaintiff sought future damages for *his own* medical expenses.  In the present case, Plaintiffs have suffered no personal injuries and do not seek any compensation related thereto.  Rather, they seek funding for measures that are necessary to abate the public nuisance in the Counties caused by Defendants.

Defendants make much of the fact that the abatement fund awarded in *ConAgra*, 227 Cal. Rptr. 3d 499, a public nuisance case involving lead paint, did not include the costs of medical treatment or related programs or services meant to address the individual or societal harms resulting from lead poisoning in children.[13]  But the circumstances in that case are distinguishable. In *ConAgra*, the hazard at issue was "deteriorated interior lead paint, lead paint on friction surfaces, and lead-contaminated soil at residences" in ten specific jurisdictions, which the trial court held "pose[d] an immediate threat to the health of children and must be abated as a public nuisance." *Id*. at 554.  The defendants were ordered to pay money "into an abatement fund that would pay for lead inspections, education about lead hazards, and remediation of particular lead hazards inside

---

[13]   As a preliminary matter, it is not at all clear that the plaintiffs in *ConAgra* ever requested that the abatement plan cover such costs.

residences in the 10 jurisdictions." *Id.* at 525, 569. The appellate court agreed "that the trial court's abatement order w[ould] reduce the risk of further harm to children in the [ten] jurisdictions from lead paint." *Id.* at 556. Importantly, once the lead paint hazards at issue were remediated or removed, they no longer posed an ongoing health threat. *Id.* at 569 ("An abatement order is an equitable remedy . . . . [the] sole purpose [of which] is to eliminate the hazard that is causing prospective harm to the plaintiff. . . . Here, the plaintiff sought the equitable remedy of abatement for the nuisance because the hazard created by defendants *was continuing to cause harm* to children, and that harm could be prevented only by removing the hazard.") (emphasis added). Certainly individuals exposed to excessive lead before the hazard was removed or remediated suffered their own negative health consequences, but they themselves posed no ongoing threat to *public* health or safety. In this case, on the other hand, the oversupply and diversion of prescription opioids has created (and continues to create) a significant population of addicted individuals. If not directly addressed, the threats to public health and safety associated with this addicted population would continue (even if no more prescription opioids were ever sold). Moreover, unlike with lead paint, which has been banned in the United States since 1978 (*ConAgra*, 227 Cal. Rptr. 3d at 520), in this case Defendants and others will continue to dispense prescription opioids into the Counties. For these reasons, the ongoing interference with public health and safety caused by Defendants' conduct cannot be fully eliminated (or at least substantially minimized) without the implementation of programs and services related to, *inter alia*, the prevention, treatment, and recovery of opioid abuse and addiction.

As Plaintiffs' abatement plan does not seek damages, but rather equitable abatement that is specifically tailored to the public nuisance found by the jury,[14] it neither violates Federal Rule

---

[14] Although the Court chose to have a jury decide nuisance liability in this case, it was not required to do so. *See* Dkt. #2629 (CT1 Opinion & Order Regarding Adjudication of Plaintiffs' Public Nuisance Claims) at p. 3 ("The decision to have the jury decide nuisance liability, generally considered an equitable issue, does not implicate the Seventh Amendment right."); Dkt. #3579 (CT3 Order on Apportionability and Apportionment) at pp. 4-5 ("Notably, the Court's conclusion that a jury will decide public nuisance liability was based at least in part on the fact that, in Track One-A, the Court was originally going to try both equitable and legal claims together[.] . . . In Track Three, the Court (footnote continues on next page)

of Civil Procedure 42(b) nor the Seventh Amendment.  *Infra* at § IV.A.[15]

>        **C.      Plaintiffs' abatement plan is not overbroad.**

Defendants claim that Plaintiffs' abatement plan is overbroad because it "does not target oversupply *caused by Defendants' allegedly wrongful dispensing*."  Brief at p. 9 (emphasis in original).  They argue that "[a] viable 'abatement' plan must be limited to the specific nuisance that the jury found (the oversupply and diversion of prescription opioids in Plaintiffs' counties) and must address only the portion *of that nuisance* that is reasonably attributable to Defendants' dispensing conduct."  *Id*. at p. 10 (emphasis in original).  Defendants are wrong on both counts.  As explained above, the public nuisance found by the jury is not as narrow as Defendants imply.  *Supra* at § II.A.  And, as explained in greater detail below, because the jury found that Defendants' conduct was a substantial factor in causing the public nuisance, it is now *Defendants'* burden to demonstrate that the harm can be reasonably apportioned; if they fail to meet that burden, they are jointly and severally liable for the entire harm.  *Infra* at § III.A.  This is a factual inquiry that must be determined at trial.  *See, e.g.,* Dkt. #3579 (CT3 Order on Apportionability and Apportionment) at pp. 1-2; Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at pp. 6-7.

---

will be trying only an equitable claim (public nuisance), so it may not be strictly necessary to use a jury at all.  Indeed, at least two other courts trying only public nuisance claims in opioid cases are not using a jury.  And courts in similar public nuisance cases have also tried questions of liability, abatement, and apportionment only to the bench.") (internal citation and footnote omitted).

[15]  For these reasons *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993), is entirely distinguishable.  That case involved an antitrust action in which the trial was bifurcated into liability and damages phases.  *Id.* at 1151.  There was no question that the parties were entitled to a jury trial for both phases of the trial.  After the first jury reached its verdict against the defendant, a different jury was empaneled to decide the damages.  *Id.*  The second jury awarded only nominal damages to one group of plaintiffs, despite the fact that the first jury found in favor of those plaintiffs as to liability.  *Id.* at 1156.  The plaintiffs appealed, arguing that the trial court improperly allowed the second jury to reexamine certain causation issues in violation of the Seventh Amendment.  *Id.*  The appellate court noted that the second jury's role was *only* to determine the amount of damages incurred by the plaintiffs.  *Id.* at 1183.  However, the trial court (i) allowed the defendant to offer evidence during the second phase in support of its liability defense that any damages incurred by the plaintiffs were caused by something other than the antitrust conspiracy, and (ii) provided confusing instructions to the jury indicating that it was to consider causation, an issue that had already been decided in phase one.  *Id.* at 1183-84.  The appellate court held that this was a violation of the Seventh Amendment.  *Id.* at 1185 (a "retrial of causation issues in a damages trial" is a "clear violation of the Seventh Amendment").

Defendants repeatedly emphasize that other third parties and independent factors also contributed to the public nuisance. Brief at pp. 9-12. They made similar arguments during the liability trial and yet the jury still determined that Defendants' conduct was a substantial factor in causing the public nuisance in the Counties. Dkt. #4176 (Verdict Forms) at pp. 3-4, 7-8.[16] This Court confirmed that the jury's findings were supported by the law and the evidence adduced at trial:

> Defendants contend many independent and intervening factors contributed to the nuisance, making Defendants' role "far too remote for liability." Defendants point to other potentially contributing causes, including opioid manufacturers, opioid distributors, governmental entities, prescribing doctors, illicit opioids, and criminal acts. However, none of these potential causes shifts Defendants' independent responsibility to take effective measures to prevent diversion, or otherwise mandates a verdict for Defendants as a matter of law. In other words, as a matter of law and a matter of fact, the existence of other possible causation factors did not preclude the jury from determining that the conduct of each Defendant played a substantial role in creating the nuisance. For these reasons, the trial evidence sufficiently supports the jury's causation findings.

Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 28-29 (internal citations and footnote omitted).

Defendants offer two examples of costs in Plaintiffs' abatement plan that they claim have nothing to do with their dispensing conduct. Brief at pp. 11-12. Specifically, they criticize Plaintiffs for seeking "funds for a training program for police officers to reduce opioids-related stigma" and "an expansion of pretrial diversion and specialized drug courts" because Defendants "have never played any role in training law enforcement" and their "dispensing conduct has never affected Plaintiffs' exercise of their own prosecutorial or adjudicatory discretion." Brief at p. 11. Defendants are missing the point entirely. Their improper dispensing conduct created a significant population of opioid-addicted individuals, exacting tragic costs from Plaintiffs' communities including, *inter alia*, by increasing opioid overdoses and crime and, in turn, overburdening law

---

[16] Defendants also claim that these other causes are "unrelated" and "completely untethered" to Defendants' dispensing conduct. Brief at pp. 9-11. The evidence adduced at trial demonstrates otherwise. *See, e.g.,* Dkt. #4241 (Ps' Opp. to Ds' Rule 50(b) Motions) at pp. 6-8, 96-97 n.80.

17

enforcement and the court system.  *See, e.g.,* Dkt. #4241 (Ps' Opp. to Ds' Rule 50(b) Motions) at pp. 5-13, 84-86, 88, 90, 92-93.

In his abatement plan, Dr. Alexander explains the key role law enforcement plays in abating the public nuisance and why additional training and pretrial diversion is needed to allow them to do so effectively:

> Law enforcement officers are in a key position to help reverse the opioid epidemic in the Communities as they respond to overdoses and engage in public health oriented policing interventions.  Despite this, police departments, as with other local agencies, have been stretched thin because of the demands of the opioid epidemic, diminishing their ability to address other public safety needs.  The abatement interventions proposed in this report, combined with the expansion of social workers and mental health personnel in the Communities, will address or prevent many of the calls that police and other first responders currently have to respond to. . . .

> Since law enforcement officers are often the first responders to an overdose, it is important to support law enforcement within Lake and Trumbull Counties to have the training and confidence to appropriately respond. . . .  Such training, which should be repeated at regular intervals, may reduce stigma by law enforcement towards people with OUD, increase the likelihood that individuals will call 911 for help, and improve referrals for services and/or treatment.

> Pretrial diversion, sometimes referred to as Law Enforcement Assisted Diversion (LEAD), offers eligible individuals who would otherwise be arrested for drug-related charges the opportunity to instead access community-based services and/or treatment.  These programs are unique in that they occur pre-booking so that if an individual who qualifies for the program chooses to enroll, they do not have an arrest on their record if they complete program requirements. . . .  Thus, in contrast to drug courts, LEAD participants never enter the criminal justice system and they are enrolled in the program instead of being charged with a crime. . . .  LEAD pretrial jail diversion programs are designed to expedite treatment for individuals with substance use disorders while reducing strain on the criminal justice system.

Dkt. #4219-1 (Abatement Plan) at p. 47 (internal footnotes omitted).[17]  Dr. Alexander also explains

---

[17]  *See also id.* (noting that prior stigma training conducted in police departments in the Counties, although not specifically focused on opioid overdoses, has "been effective at improving officers' attitudes toward individuals with mental health issues and self-efficacy in handling those calls[,]" "reduced arrests and use of force, and increased referrals for services during a mental or behavioral crisis") (internal footnotes omitted), pp. 47-48 (noting that LEAD programs instituted in other jurisdictions have shown "improved outcomes for participants including housing, employment, and reduced recidivism").

the important role played by the criminal justice system, and drugs courts in particular, in combatting the opioid epidemic:

> The criminal justice system is a major thoroughfare for individuals with opioid addiction and represents an opportunity to identify and link those individuals to treatment, reducing their risk of overdose and recidivism while improving their societal reintegration. . . .
>
> There is substantial evidence regarding the role that drug courts can play in diverting non-violent offenders from the criminal justice system to the treatment system, where their needs can be more effectively addressed.  These programs represent special court dockets that provide judicially-supervised substance use treatment in lieu of incarcerating individuals with drug-related offenses.

*Id*. at p. 49 (internal footnotes omitted); *see also id.* at pp. 49-50 ("A study conducted by the U.S. Department of Justice found that drug court participants reported less drug use, lower rates of positive drug tests, and fewer rearrests than comparable offenders who did not participate in drug courts.").  Thus, contrary to Defendants' assertions, the proposed costs included in Plaintiffs' abatement plan directly address the public nuisance caused by Defendants' dispensing conduct.

Finally, none of the cases cited by Defendants support their assertion that Plaintiffs' abatement plan is overbroad.  *City of Cleveland v. Ameriquest Mort. Securities, Inc.*, 615 F.3d 496 (6th Cir. 2010), addressed nuisance causation, not the scope of an abatement remedy, and is factually distinguishable.  In that case, the city sued twenty-two financial entities for damages (not abatement), alleging that their "financing of subprime mortgages, the alleged public nuisance, led to a foreclosure crisis in Cleveland that devastated its neighborhoods and economy."  *Id*. at 498-99.  The court dismissed the suit for a number of reasons, including that the plaintiff had not adequately pled the causation element of its claim because there was not a sufficiently direct relationship between the injuries asserted (*e.g.*, eyesores, fires, drug deals, and looting) and the tortious conduct alleged (*i.e.*, financing subprime mortgages).  *Id*. at 502-06.[18]  In this case, the

---

[18]  Significantly, the Sixth Circuit distinguished the facts before it from those in *Beretta,* 768 N.E.2d 1136, a public nuisance action against handgun manufacturers: "[I]n *Beretta*, the plaintiffs accused the defendants of creating and supplying an illegal firearms market in Cincinnati through their marketing, distribution, and selling of firearms.  By contrast, the complaint concedes that, for the most part, the Defendants did not directly make subprime loans to the homeowners of Cleveland.  The Defendants (footnote continues on next page)

jury has already found that Defendants' conduct was a substantial factor in causing the public nuisance, and the Court has affirmed this finding. Dkt. #4176 (Verdict Forms) at pp. 3-4, 7-8; Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 25-29.

The only other Ohio case on which Defendants rely is a 47-year-old, unpublished opinion that has never been cited by another court. *See State ex rel. Brown v. Base Wayandotte Corp.*, Nos. 33533, 33545, 33549, 1975 WL 182459 (Ohio App. 8th Dist. Apr. 24, 1975). *Brown* involved a suit by the State of Ohio against three chemical companies alleging the companies polluted Lake Erie with mercury. *Id*. at *1. The trial court entered summary judgment in which it dismissed one defendant, permanently enjoined the remaining two defendants from further discharging mercury into the lake and related waterways, and denied all other relief requested by the plaintiff. *Id*. at *1-2. Among other things, the trial court found that the defendants had produced an indivisible injury and that the damages resulting from the defendants' conduct were impossible to apportion. *Id*. at *2. On appeal, the plaintiff argued that the trial court erred by (i) holding "that Ohio law requires apportionment of damages as between two tort-feasors whose acts concur to produce an indivisible injury to plaintiff[,]" and (ii) "prematurely appl[ying] the wrong standard in determining that apportionment in this case could not be accomplished." *Id*. at *4. The appellate court found "[t]his assignment of error [to be] well taken in that the ruling as to apportionment of damages is necessarily based upon findings of fact prematurely rendered." *Id*.

The appellate court first described the applicable standards:

This state recognizes, as a rule of damages, that tort-feasors generally will not be held jointly and severally liable where their independent, concurring acts have caused distinct and separate injuries to the plaintiff, or where there is some reasonable means of apportioning damages.

---

are instead accused of financing a legal market for these loans. Thus, for *Beretta* to be analogous to the instant case, the Ohio Supreme Court would have had to allow a suit against the banks that provided financing to the gun manufacturers that allegedly created the illegal secondary market." The court further noted that "[t]he complaint in *Beretta* accused the defendants of financing an *illegal* market for guns, whereas, here, the Defendants allegedly financed a *legal* subprime mortgage market." *Id*. at 505-06. The present case is comparable to *Beretta*: Defendants' wrongful conduct directly contributed to an illegal opioid market.

20

> Only where apportionment of damages is totally impossible will independent tort-feasors be held jointly and severally liable for an indivisible injury caused by their independent acts.
>
> In an action alleging damages caused by water pollution, damages may be apportioned among the independent polluters based upon the relative amounts of contaminants that each polluter deposited into the subject waterway.

*Id*. at \*5 (internal citations omitted).  Significantly, *the plaintiff* argued that the damages were "apportionable, based upon the relative amounts of mercury deposited by the defendants."  *Id*.  The appellate court agreed that this could potentially be a "legally permissible" way to apportion damages.  *Id*.  Because the parties had not been given the opportunity to offer evidence regarding the feasibility of apportionment, the trial court's determination that apportionment was impossible was premature.  *Id*.  Notably, the specific language from *Brown* that Defendants quote in their Brief (pp. 10-12) was taken from the court's discussion of whether the defendants could be held liable for damages related to other *non-mercury* pollutants in the lake:

> In no instance may the defendants in this lawsuit be held responsible for damages to Lake Erie *caused by pollutants other than mercury and/or its derivative compounds*.  These defendants cannot be singled out and held solely responsible for the deteriorated condition of Lake Erie which was caused by innumerable contributors over hundreds of years.  It follows that, if the damages caused by the mercury pollutants cannot, in some rational way, be severed from damages done by *other types of pollution*, money damages cannot be recovered from the defendants.

1975 WL 182459, at \*5 (emphasis added).[19]

The remaining non-Ohio cases cited by Defendants also do not support their arguments.  In *ConAgra*, the California appellate court actually *rejected* the defendants' argument that they should not be held jointly and severally liable for the abatement remedy because "many people were involved in the creation of the nuisance."  227 Cal. Rptr. 3d at 556-57 ("Since defendants

---

[19]  The court did separately state that "in no instance may defendants be held jointly and severally liable for all the mercury pollution damage done to Lake Erie."  *Id*. at \*5.  But again, in that case, the *plaintiff affirmatively argued* that the damages caused by mercury pollution were "apportionable, based upon the relative amounts of mercury deposited by the defendants."  *Id*.  Here, Plaintiffs assert that the harm is indivisible and it is Defendants' burden to demonstrate apportionability.  *Infra* at § III.A.  Notably, *Brown* also pre-dates the Ohio Supreme Court's decision in *Pang v. Minch*, 559 N.E.2d 1313 (Ohio 1990).

failed to show that the public nuisance was divisible, we uphold the trial court's imposition of joint and several liability for the nuisance created by defendants' conduct."). The court noted: "Principles of equitable indemnity would enable these defendants to sort out their respective liabilities. It does not affect the right of a plaintiff to recover the entire judgment from any one of them." *Id*. at 557.

Defendants quote *Bowes v. City of Aberdeen*, 109 P. 369 (Wash. 1910), for the following proposition: "'[T]o charge [the defendant] with the abatement of a nuisance' not caused by him 'thereby violates every principle of justice.'" Brief at p. 10 n.8 (quoting *Bowes*, 109 P. at 377). What Defendants fail to mention in their Brief is that this language came from *the dissent* in that case. 109 P. at 377 (Fullerton, J., dissenting). Moreover, the facts in *Bowes* are entirely distinguishable. In that case the relevant issue was whether it was a permissible exercise of the city's police power to (i) fill or raise the elevation of certain lands (including privately-owned land) to abate the flooding caused by a nearby river during high tides, and (ii) levy assessments on private property owners to cover some of the associated costs of abatement. *Id*. at 369-74. The court held that this was permissible. *Id*. at 374. Judge Fullerton dissented, arguing that private property owners who had absolutely nothing to do with causing the nuisance should not be charged with the costs of abatement. *Id*. at 377.[20] In the present case, to the contrary, a jury has already decided that Defendants' conduct was a substantial factor in causing the public nuisance. Dkt. #4176 (Verdict Forms) at pp. 3-4, 7-8; Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 25-29.

---

[20]  Judge Fullerton reasoned: "That the nuisance sought to be abated in the present case *was not caused by the appellant* cannot be gainsaid. As long as the tides of the sea were permitted to ebb and flow over it as they were wont to do in a state of nature the land was wholesome. It became to the contrary only when the embankments by the railroads and by the public for highways were constructed, which cut off this flow. *These were not of the appellant's construction*, and to charge him with the abatement of a nuisance caused thereby violates every principle of justice. I have found no adjudicated case where a municipality has attempted under its police powers to abate a nuisance in the public streets at the expense of the abutting and adjoining property, *where the owners of the property were not the creators of the nuisance*." *Id*. (emphasis added).

22

*Davidson v. Bradford*, 212 N.W. 476 (Iowa 1927), is similarly distinguishable.  In that case, the appellant's son-in-law pled guilty to maintaining a liquor nuisance in a particular building located on a 460-acre tract of land owned by the appellant.  *Id*. at 477.  As part of the judgment entered against the son-in-law, the court ordered that the "described premises be closed and abated, and all persons on said premises be excluded therefrom, and that all buildings thereon be closed, barred, or nailed up" for a period of one year.  *Id*.  At issue was whether this abatement order applied to the entirety of the appellant's 460-acre property.  *Id*.  Specifically, there was a small portion of the property that "was physically separate from that where the nuisance was maintained by a public road" and "its use was entirely disassociated therefrom by the fact that it was rented to, and occupied by, a tenant who had *no connection* whatever with the nuisance."  *Id*. at 478 (emphasis added).  The court held that the abatement order was void as to that particular portion of the property.  *Id*. at 478-79 ("It is sufficient for the present purpose to say that it had no jurisdiction to so include, merely because it belonged to the same owner, land and other buildings not covered by the indictment, which were in the possession of a tenant *who had no connection with the nuisance, and which were not so used*; and that, to that extent, at least, the order of abatement was void.") (emphasis added).

Contrary to Defendants' assertions, Plaintiffs' abatement plan seeks abatement costs appropriately tailored to the public nuisance the jury found was caused by Defendants' dispensing conduct.  Whether any particular abatement cost is recoverable is a factual issue to be determined at trial.  Similarly, to the extent Defendants contend they should not be held liable for the entire abatement award, it is their burden to demonstrate at trial that the award is reasonably apportionable.  *Infra* at § III.A.  Accordingly, Defendants' request that the Court preemptively limit the abatement relief available to Plaintiffs before the Phase II trial even begins should be rejected.

III.   **UNDER OHIO LAW, WRONGDOERS HAVE THE BURDEN OF APPORTIONING HARM TO AVOID JOINT AND SEVERAL LIABILITY.**

Defendants are proven wrongdoers.  That is, Plaintiffs have already met their burden of proving "that the conduct of each defendant was a substantial factor in producing the harm."  *Pang*, 559 N.E.2d at 1324.  "Once this burden has been met, *a prima facie evidentiary foundation has been established supporting joint and several judgments against the defendants*.  Thereafter, the burden of persuasion shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment."  *Id*. (emphasis added).

Nevertheless, Defendants argue that "Plaintiffs should bear the burden to show which portion of the abatement plan each Defendant should be responsible for and which portion should be apportioned to non-Defendants."  Brief at p. 12.  This, however, is Defendants' burden.

The Ohio Supreme Court, quoting Restatement § 433B, has explained why Ohio has placed the burden of apportionment upon a "proved wrongdoer who has in fact caused harm" instead of an innocent plaintiff:

> "The reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a *proved wrongdoer who has in fact caused harm* to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned.  In such a case *the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility*.  As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former."

*Pang*, 559 N.E.2d at 1324 (quoting RESTATEMENT (SECOND) OF TORTS §433B cmt. d (1965)) (emphasis added and original emphasis removed).[21]

Thus, under Ohio law, based upon the findings-of-fact made by the jury in the Phase I trial, Plaintiffs have met their *prima facie* burden of establishing joint and several liability against the

---

[21]   This Court, in quoting *Pang* and § 433B, noted that, "[t]he same rationale applies here, i.e. Defendants should not be allowed to avoid responsibility for the alleged misconduct merely because it is difficult or impossible to trace individual harms to the conduct of individual Defendants." Dkt. #2561 (CT1 Order on Ds' Causation MSJs) at p. 6 n.5.

Defendants for abating the nuisance Defendants caused.[22]  "Once this burden has been met, it is the responsibility of the defendants to apportion the harm if joint and several liability is to be avoided." *Pang*, 559 N.E.2d at 1325.

In the Phase II trial, the question of "whether the harm to the plaintiff is *capable of apportionment* among two or more causes is a question of law" for the court to decide, and the "*actual apportionment*" among the various causes is a question of fact to be decided by the finder of fact. RESTATEMENT (SECOND) OF TORTS § 434 cmt. d (1965) (emphasis added). Thus, to avoid joint and several liability, Defendants will have the burden at trial of proving to this Court, by a preponderance of the evidence, that a reasonable basis for apportioning the abatement plan among Defendants and non-Defendants exists; and pursuant to § 433A, apportionment can only be made among "causes" that have "been a substantial factor in producing the harm, as stated in §§ 431 and 433." RESTATEMENT (SECOND) OF TORTS § 433A cmt. a.

### A.    Defendants bear the burden of proof for their divisibility defense.

Defendants first argue that, "joint-and-several liability is not available . . . when the harm is divisible." Brief at p. 13.  This is of course true, but it begs the question.  Defendants must first *prove* the harm from the nuisance is divisible (*i.e.*, capable of apportionment) to avoid joint and several liability.  *See Pang*, 559 N.E.2d at 1324; RESTATEMENT § 433B; *ConAgra*, 227 Cal. Rptr.

---

[22]  The Ohio Supreme Court has held joint and several liability applies in public nuisance actions where the harm cannot be apportioned.  *Schindler v. Standard Oil Co.*, 143 N.E.2d 133, 134 (Ohio 1957) (holding where the acts of multiple persons combine to create a public nuisance and it is "impossible to measure or ascertain the amount of damage created by any one of the persons, such persons, as jointly and severally liable, may be joined as defendants").

Likewise, Restatement § 840E cmt. c expressly provides for joint and several liability for abating a nuisance.  RESTATEMENT (SECOND) OF TORTS § 840E, cmt. c, (1979) ("*Entire liability.* There are other cases in which *the harm resulting from a nuisance is not capable of apportionment* to the several contributors upon any reasonable or rational basis. This is true when, for example, oil discharged upon the surface of a stream by a number of defendants catches fire and the fire spreads to the plaintiff's barn and destroys it. It is no less true when plaintiff's cattle drink from the stream and are poisoned. When the apportionment cannot be made or *when the defendant does not sustain his burden of proof as to the extent of his own contribution (see § 433B), he is held liable for the entire harm.* As in other cases of multiple causes bringing about a single indivisible result, the fact that other persons have caused the harm and are liable for it does not relieve the defendant of liability.") (emphasis added).

3d at 557 ("Since defendants failed to show that the public nuisance was divisible, we uphold the trial court's imposition of joint and several liability for the nuisance created by defendants' conduct."); *see also Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) (applying Restatement § 433B and holding that "CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists"); *U.S. Bank Nat. Ass'n v. U.S. E.P.A.*, 563 F.3d 199, 207 (6th Cir. 2009) ("The ultimate burden of proving divisibility is on the party invoking the doctrine.") (citing *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir.1989); *United States v. Twp. of Brighton*, 153 F.3d 307, 319 (6th Cir. 1998) ("[A] defendant can avoid joint and several liability if it can prove divisibility in the district court, and we review the district court's determination for clear error"); RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIAB. § 26, cmt. *g* (2000) ("Unless sufficient evidence permits the factfinder to determine that damages are divisible, they are indivisible.").

> The divisibility analysis involves two steps:
>
> First, we must determine whether the harm at issue is theoretically capable of apportionment.  The Restatement instructs that this is "a question of law, and is for the decision of the court in all cases."  Restatement (Second) of Torts § 434, cmt. d. . . .  Second, if the harm is capable of apportionment, the fact-finder must determine how actually to apportion the damages, which is "a question of fact."  At all times, the *burden remains on the party seeking apportionment*—here NCR—to 'prove[ ] that a reasonable basis for apportionment exists."  *Burlington Northern,* 556 U.S. at 614, 129 S.Ct. 1870.

*United States v. NCR Corp.,* 688 F.3d 833, 838 (7th Cir. 2012) (emphasis added); *accord Pakootas v. Teck Cominco Metals, Ltd.,* 905 F.3d 565, 589 (9th Cir. 2018) ("At both steps, the defendant asserting the divisibility defense bears the burden of proof."); *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 896 (5th Cir. 1993).

The divisibility defense is also a demanding defense and must be proved by a preponderance of the evidence.  *Pakootas,* 905 F.3d at 589 ("This burden is substantial because the divisibility analysis is intensely factual. . . . [T]he defendant must show by a preponderance of the evidence—including all logical inferences, assumptions, and approximations—that there is a

reasonable basis on which to apportion the liability for a divisible harm."); *United States v. Hercules, Inc.,* 247 F.3d 706, 718 (8th Cir. 2001) ("Evidence supporting divisibility must be concrete and specific."); *Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 934 (8th Cir. 1995) ("[D]efendants are jointly and severally liable, unless a particular defendant can establish that his harm is divisible, a very difficult proposition."); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir. 1992) ("[Defendant's] burden in attempting to prove the divisibility of harm to the Susquehanna River is substantial, and the analysis will be factually complex.").

> Unlike comparative negligence, divisibility analysis is not an invitation to courts to attempt to 'split the difference.'  If they are in doubt, district courts should not settle on a compromise amount that they think best approximates the relative responsibility of the parties.  Rather, if they are in doubt, they should impose joint and several liability.  Only if they have a reasonable basis for dividing causation should they actually apportion the damages.

*Brighton*, 153 F.3d at 319 (6th Cir. 1998).

Defendants also argue they should not bear the burden of proving apportionment because there are too many causes of the nuisance.  Brief at p. 14 (citing Restatement § 433B, cmt. d).  But § 433B, cmt. d, addresses situations in which each actor "contributes a relatively small and insignificant part to the total harm."  The example provided in that comment is that of "a hundred factories each contribut[ing] a small, but still uncertain, amount of pollution to a stream."  *Id*.  Here, however, the jury found each Defendant's conduct to be a *substantial factor* in causing the public nuisance.

Likewise, *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 643 F. Supp. 2d 461 (S.D.N.Y. 2009), does not support Defendants' position.  There, the court applied a "comingled product theory" of liability, and stated: "[T]he defining feature of the commingled product theory is that *plaintiffs need not show that each defendant's conduct was a substantial factor* in the harm.  Rather, the City need only show that each defendant *contributed* to the commingled mass that caused the harm."  *Id*. at 469 (emphasis added).  Even then the *MTBE* court placed the burden of proving apportionment on the defendant.  *Id*. at 471 ("The burden of

production and persuasion concerning apportionment rests on Exxon, which must establish a reasonable basis for such apportionment.").

Defendants have not pointed to a single case which supports their position that the burden of proving apportionment should fall on Plaintiffs rather than on the proven wrongdoers.

**B.      As the Court previously ruled, Ohio's Joint-and-Several-Liability Statute, O.R.C. § 2307.22, does not apply to an action for equitable abatement.**

Defendants again argue that Ohio's joint-and-several-liability statute, O.R.C. § 2307.22, should apply here because Plaintiffs' claim for equitable abatement is just a disguised claim for compensatory damages. The Court has twice rejected this argument and should do so again here.[23] *See also Hamilton v. Ebbing*, No. CA2011-01-001, 2012 WL 1825268, at \*4 (Ohio Ct. App. May 12, 2012) ("Both the United States Supreme Court and the Supreme Court of Ohio have found that an abatement action is not a common law action, but rather a suit in equity.") (citing *Cameron v. United States*, 148 U.S. 301, 304 (1893) and *State ex rel. Miller v. Anthony*, 647 N.E.2d 1368 (Ohio 1995)); *Veda, Inc. v. U.S. Dep't of the Air Force*, 111 F.3d 37, 40 (6th Cir. 1997) ("The fact that a judicial remedy may require one party to pay money to another is not sufficient reason to characterize the relief as 'money damages.'") (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988)).

---

[23]    *See* Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 6 ("[T]he fact that abatement relief may encompass medical care does not alter the fact that the only recovery limited by the apportionment statute is 'compensatory damages,' and that is not what Plaintiffs are seeking. . . . Accordingly, the Court finds that O.R.C. § 2703.22 does not bar joint and several liability for abatement of a nuisance. Put differently, there is nothing in this statute that precludes application of the doctrine of joint and several liability on Defendants."); Dkt. #2519 (CT1 Order on Abatement *Daubert* Motion) at pp. 2-3 ("Defendants begin their Abatement Motion with their interpretation of 'abatement law' in Ohio. In the very first paragraph, however, they appear to confuse the forward-looking, equitable remedy of abatement and the rearward-looking remedy of damages. In a traditional public nuisance case, a municipal entity who is harmed by the maintenance of a nuisance will give notice to and ask the offending party to abate the nuisance. If the offending party is unable or unwilling to abate, the harmed party can, when appropriate, abate the nuisance themselves or ask the court for the right to do so, and then seek compensation for the costs of abating the nuisance. This compensation is equitable in nature. The goal is not to compensate the harmed party for harms already caused by the nuisance. This would be an award of damages. Instead, an abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance, going forward.").

Based upon the findings of fact from the Phase I trial, Plaintiffs have met their *prima facie* burden of establishing joint and several liability against the Defendants for abating the nuisance. In the Phase II trial, to avoid joint and several liability, Defendants bear the responsibility of proving apportionment.

## IV.    DEFENDANTS' CONSTITUTIONAL ARGUMENTS HAVE NO MERIT AND SHOULD BE REJECTED.

### A.    The remedy of abatement of a public nuisance is an equitable claim which does not invoke the right to a jury trial under the Seventh Amendment.

This Court has repeatedly rejected the argument that the Seventh Amendment requires the Court to conduct a jury trial on the remedy phase of a public nuisance abatement action. Defendants offer nothing new to justify reconsideration of these determinations.  Indeed, Defendants, without citation of any authority, argue that they are entitled to have the same jury determine liability, remedy, and apportionment.  Brief at p. 22.  This Court should view this attempt for what it is – after losing the jury trial on liability, Defendants attempt to resurrect their Seventh Amendment arguments in a transparent ploy for a second bite at the liability apple.  This Court correctly rejected the argument that the Seventh Amendment requires the Court to conduct a jury trial on the remedy phase of a public nuisance abatement action, and Defendants' request for a do-over should be rejected.

### 1.    The request for an abatement fund is equitable.

On several occasions, this Court has explained that claims for abatement differ in kind from claims for damages:

> [T]he fact that "nuisance" is sometimes characterized as a variety of "tort" does not change the fact that an equitable claim to abate a nuisance is not a tort claim seeking compensatory damages.  Defendants also argue that what Plaintiffs' label as a claim for "abatement costs" is in fact a "claim for damages." . . .  Unlike tort damages that compensate an injured party for past harm, abatement is equitable in nature and provides a prospective remedy that compensates a plaintiff for the costs of rectifying the nuisance.

Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 5 (internal citation and footnote omitted); *see also supra* at fn.1.  As such, like all equitable determinations, the determination of the remedy of

abatement is one for the Court, not a jury.  Dkt. #2676 (Order on Motion to Disqualify) at p. 9 ("[I]t is settled law that, if a defendant is found liable for creating a public nuisance, the decision of whether to impose an abatement remedy (and if so, what that remedy should be) is one that must be decided by the Court, not the jury"); Dkt. #2519 (CT1 Order on Abatement *Daubert* Motion) at p. 2 ("[T]he harmed party can, when appropriate, abate the nuisance themselves or ask the court for the right to do so, and then seek compensation for the costs of abating the nuisance.  This compensation is equitable in nature.  The goal is not to compensate the harmed party for harms already caused by the nuisance.  This would be an award of damages.  Instead, an abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance, going forward.").

This is not a controversial proposition.[24]  These holdings are in accord with the Supreme Court's ruling in *Tull v. United States*, 481 U.S. 412 (1987).  In deciding whether the Seventh Amendment guaranteed a jury trial for a government action seeking civil penalties and injunctive relief under the Clean Water Act, the Supreme Court characterized injunctive relief provided to abate a public nuisance as equitable and not subject to the right to a trial by jury.  *Id.* at 423 ("A public nuisance action was a classic example of the kind of suit that relied on the injunctive relief provided by courts in equity.").  A number of federal courts applying the Seventh Amendment have concluded that a public nuisance abatement action is an equitable action that

---

[24]  *See Bennis v. Michigan*, 516 U.S. 442, 446 (1996) (noting that state court "confirmed the trial court's description of the nuisance abatement proceeding as an 'equitable action'"); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 781 (7th Cir. 2011) ("A court may grant equitable relief to abate a public nuisance that is occurring or to stop a threatened nuisance from arising."); *San Diego Unified Port Dist. v. Monsanto Co.*, No. 15CV578-WQH-JLB, 2018 WL 4185428, at *5 (S.D. Cal. Aug. 30, 2018) ("An abatement of a nuisance is accomplished by a court of equity by means of an injunction proper and suitable to the facts of each case."); *Orange Cty. Water Dist. v. Unocal Corp.*, No. SACV0301742CJCANX, 2016 WL 11201024, at *5 (C.D. Cal. Nov. 3, 2016) ("Abatement is rooted in equitable, injunctive relief."); *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1234 (N.D. Ala. 2016) (As defendants state, plaintiffs' claim for 'abatement of nuisance' is actually a request for equitable relief. . ."); *New York v. W. Side Corp.*, 790 F. Supp. 2d 13, 29 (E.D.N.Y. 2011) ("This goes back to the original theory of nuisance under which 'if abatement by judicial process was desired, [a] resort to equity was required.'") (citation omitted).

does not implicate the right to a jury trial.[25]  Similarly, in the course of interpreting similar state constitutional provisions, numerous state courts (including the Ohio Supreme Court) have refused to find a right to a jury trial in public nuisance actions seeking abatement.[26]

With respect to the scope of the Seventh Amendment, the Supreme Court in *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n* distinguished cases where, as here, the government is seeking to enforce public rights from cases involving wholly private tort, contract, and property claims.  430 U.S. 442, 450 (1977).  In *Atlas Roofing,* the Supreme Court held that the

---

[25]  *See, e.g., Conner v. City of Santa Ana*, 897 F.2d 1487, 1493 (9th Cir. 1990) ("The City was proceeding to abate a nuisance; it was not proceeding under a criminal forfeiture statute.  Therefore, a jury was not required to determine whether the Conners' automobiles constituted a nuisance. . . ."); *Nat'l Ass'n for Advancement of Colored People (NAACP) v. Acusport Corp.*, 226 F. Supp. 2d 391, 397 (E.D.N.Y. 2002) (noting public nuisance actions challenging proliferation of firearm sales and seeking "recovery of costs incurred in abatement are equitable" and therefore do not require trial by jury) (citing authorities); *United States v. Wade*, 653 F. Supp. 11, 13 (E.D. Pa. 1984) ("[T]he Commonwealth has elected to seek recovery only of its costs incurred in abating the nuisance . . . relief [that] is in the nature of equitable restitution.  The non-generator defendants therefore have no right to a trial by jury of the issues presented in the nuisance count."); *Citizens for Alternatives to Radioactive Dumping v. CAST Transp., Inc.*, No. CV 99-321 MCA/ACT, 2004 WL 7338006, at *15 (D.N.M. Sept. 30, 2004) (court in public nuisance abatement action concluding "both the nature of the cause of action and the remedy sought here compel the conclusion that this action is one in equity to which no constitutional right to a jury trial attaches").

[26]  *See, e.g., Miller*, 647 N.E.2d at 1369 ("[T]he Ohio Constitution did not preserve the right to a jury trial in nuisance abatement actions."); *Commonwealth v. United Food Corp.*, 374 N.E.2d 1331, 1342 (Mass. 1978) ("[A]n injunction against the future maintenance of a public nuisance may properly be entered without the involvement of a jury."); *State ex rel. State Bd. of Milk Control v. Newark Milk Co.*, 179 A. 116, 121 (N.J. 1935) (statute authorizing state milk control board to sue in chancery in name of state, on relation of board, for injunction to prohibit habitual violations of Milk Control Act or of orders or rules issued by board held not invalid as violating constitutional guaranty of jury trial in criminal prosecutions and holding that equity has inherent power to restrain threatened nuisances dangerous to health of whole community); *Commonwealth v. Dietz*, 132 A. 572, 574 (Pa. 1926) (finding "courts of equity may be given jurisdiction to abate a common nuisance which affects the public health" and noting "this has long been a subject within the sphere of equitable relief at the complaint of those entitled to act for the public"); *King v. Commonwealth*, 238 S.W. 373, 375 (Ky. 1922) ("As the defendant was not anciently entitled to trial by jury in cases where the relief sought was purely equitable, as in this case, the seventh constitutional provision relied upon has no application."); *Balch v. State ex rel. Grigsby, Cnty. Atty.*, 65 Okla. 146, 164 Pac. 776 (Okla. 1917) ("In an action by the state to abate a public nuisance, the defendant is not entitled to a trial by jury."); *State ex rel. Wilcox v. Ryder*, 147 N.W. 953, 957 (Minn. 1914) ("As to their claim of right to jury trial, even if the action be held civil in all its details, it is sufficient to say that in its main features the proceeding is unquestionably equitable, and that when a court of equity properly assumes jurisdiction of a cause for one purpose it acquires it for all and grants full relief.").

31

Occupational Safety and Health Act of 1970, which permits the federal government to (i) obtain abatement orders requiring employers to correct unsafe working conditions, and (ii) to impose civil penalties on any employer maintaining any unsafe working condition, did not violate employers' Seventh Amendment rights.  *Id.* at 445, 460–61.  Simply put, there is no Seventh Amendment right to jury trial "in cases in which 'public rights' are being litigated *e.g.,* cases in which the Government sues in its sovereign capacity to enforce public rights."  *Id.* at 450–61.

Contrary to Defendants' arguments, a decree requiring the payment of money does not automatically transform an equitable claim for abatement into a legal claim for money damages. As the Supreme Court has explained, an action at law for damages is distinguished by its focus on compensation; where the remedy is for specific relief, it is equitable:

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for "the recovery of specific property *or monies*, ejectment from land, or injunction either directing or restraining the defendant officer's actions." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949) (emphasis added). The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages."

*Bowen*, 487 U.S. at 893.

Finally, Defendants' recently-filed Joint Submission Concerning Plaintiffs' Abatement Plan further emphasizes the equitable nature of the abatement remedy.  Defendants contend that any abatement award should not be paid directly to Plaintiffs; instead, Defendants contend that the "Court should retain jurisdiction over the [abatement] plan and exercise judicial oversight over its administration" with the day-to-day administration of the abatement fund conducted by a court-appointed administrator.  Dkt. #4315 (CT3 Ds' Joint Submission on Ps' Abatement Plan) at pp. 3-4.  Under Defendants' proposal, the Court would supervise the administrator by approving procedures for disbursement of funds to assure that the expenditures were consistent with the abatement plan.  *Id.* at p. 3.  The Court's administrator would be required to report to the Court on

a quarterly basis, and Defendants contend that unused funds at the end of the plan period should revert to Defendants.  *Id.* at pp. 3-4.  Such an abatement plan proposed by Defendants is a classic court-supervised equitable fund – not economic damages to which a right to trial by jury attaches.[27]

Courts in this Circuit and across the country have found that a federal court order creating a court-supervised fund is a proper exercise of equitable jurisdiction rather than a claim for damages.   A seminal case arose in this circuit where the court in *Day v. NLO*, *Inc.* explained the distinction in the context of a medical monitoring fund:

> [A] court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced is utilized for group studies.  In this situation, a defendant, of course, would finance the program as well as being required by the Court to address issues as they develop during the program administration.  *Under these circumstances, the relief constitutes injunctive relief . . . .*

144 F.R.D. 330, 335-36 (S.D. Ohio 1992) (emphasis added).[28]  The Sixth Circuit refused to disturb this conclusion, finding the cases relied upon by the district court "generally support the proposition that such relief is injunctive in nature."   *In re NLO, Inc.*, 5 F.3d 154, 159 (6th Cir. 1993) (denying writ in *Day*).  There are many other examples,[29] and these holdings are not limited

---

[27]    While Plaintiffs believe that the Court should supervise the abatement fund, they do not agree with the entirety of Defendants' proposal on the administration of the fund, particularly Defendants' suggestion that abatement plan services be limited to those persons to whom the defendants dispensed prescription opioids.  *Id.* at p. 3.  Plaintiffs will separately respond to this recent filing in due course.

[28]    *See also Craft v. Vanderbilt Univ.*, 174 F.R.D. 396, 406 (M.D. Tenn. 1996) ("Sixth Circuit district court precedent has held that a medical monitoring program could constitute injunctive relief.").

[29]    *See, e.g., Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993) ("Here, plaintiffs do not merely seek money from Hughes. Plaintiffs seek to implement a court-supervised program requiring ongoing, elaborate medical monitoring.  Accordingly, plaintiffs' relief qualifies as injunctive relief. . . ."); *Barth v. Firestone Tire & Rubber Co.*, 661 F. Supp. 193, 204 (N.D. Cal. 1987) (finding equitable claim for establishment and maintenance of a monitoring program which will pool and share knowledge about the results of the alleged exposure and will provide for diagnosis and preventive medical advice); *see also Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 23 (D. Mass. 2010); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 469 (D. Wyo. 1995) ("During the course of the trial, the Court will also consider evidence relevant to the Plaintiffs' request for the equitable remedy of medical monitoring. . . [B]ecause of the equitable nature of medical monitoring, this issue should not be submitted to the jury."); *Cook v. Rockwell Int'l Corp.*, 778 F. Supp. 512, 515 (D. Colo. 1991) (footnote continues on next page)

33

to medical monitoring cases.[30]

This Court's prior determination that Plaintiffs' abatement remedy is equitable was correct and should not be disturbed.

### 2. *The remedy of abatement was historically equitable.*

As the Supreme Court noted in *Tull*, "[a] public nuisance action was a *classic example of the kind of suit that relied on the injunctive relief provided by courts in equity*." 481 U.S. at 423 (emphasis added). As historical commentators noted well over a century ago, governmental actions to abate a public nuisance by injunction were historically recognized as actions in equity. 2 Joseph Story, Commentaries on Equity Jurisprudence §§ 923-924 (5th ed. 1849); Horace G. Wood, A Practical Treatise on the Law of Nuisances in their Various Forms § 769, p. 812 (1st ed. 1875).

This Court previously held that "historically, nuisance actions had a legal component." Dkt. #2629 (CT1 Opinion & Order Regarding Adjudication of Plaintiffs' Public Nuisance Claims) at p. 4. But that legal component, the determination of "the question of nuisance or not in cases of doubt" is what was appropriate for a jury trial. *Id*. (quoting 2 Joseph Story, Commentaries on Equity Jurisprudence, as Administered in England and America, § 923, p. 203 (1st ed. 1836)). The authority cited by Defendants is consistent with this distinction.[31] And as the court in *ConAgra*

---

("Rockwell argues that dismissal is appropriate because a medical monitoring claim is not cognizable as "injunctive relief." I conclude that dismissal of this claim is not appropriate."). There are also many examples of state courts so holding. *See, e.g., Ayers v. Jackson Township*, 525 A.2d 287, 314 (N.J. 1987) ("[T]he use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases ... is a highly appropriate exercise of the Court's equitable powers."); *Burns v. Jaquays Min. Corp.*, 752 P.2d 28, 34 (Ariz. App. 2d Div. 1987) (holding that court-supervised medical surveillance fund is exercise of court's equitable powers).

30  *See, e.g., Price*, 688 F.2d at 212 ("A request for funds for a diagnostic study of the public health threat posed by the continuing contamination and its abatement is not, in any sense, a traditional form of damages."); *Corvello v. New England Gas Co.*, 532 F. Supp. 2d 396, 398–99 (D.R.I. 2008) (refusing to dismiss claim for injunctive relief where plaintiffs brought public nuisance claims seeking compensatory damages and an injunction requiring defendant to "pay money into a fund sufficient to clean and remediate the contamination").

31  *See Redmond v. State ex rel. Att'y Gen.*, 118 So. 360, 361 (Miss. 1928) ("Generally a court of equity (footnote continues on next page)

noted, the historical precedent distinguished between prohibitory injunctions, which were sometimes heard at law, and abatement orders, which were cognizable in equity.  227 Cal. Rptr. 3d at 565 (discussing precedent relied on by Story).  Indeed, a number of early United States decisions also confirm that government-brought public nuisance actions were thought to be equitable.[32]

The jury in this case has now decided that these Defendants are responsible for creating a public nuisance; the remaining issue is the scope of the equitable relief to be awarded.  This is clearly a claim sounding in equity to which no right to a jury trial attaches.

### B.  The request by Walmart and Walgreens for the assignment of a new judge for the remedies phase is both untimely and unwarranted.

In their final argument, two of the three remaining Track Three defendants seek the assignment of a new judge to serve as factfinder for the upcoming remedies phase.  Their argument is based solely on the Court serving as a factfinder after participation in settlement discussions with other defendants.  This Court and the Sixth Circuit previously rejected similar arguments almost two and one-half years ago in 2019.  Procedurally, the basis for Defendants' request has been available since before 2019, and Defendants offer no justification for seeking this relief on

---

will refuse relief in the case of a nuisance until the complainant has established at law the existence of the nuisance, and will not act if its right is controverted, or not clear."); 66 C.J.S. NUISANCES § 131 (remedies for public nuisance include "a suit in equity for the abatement of or an injunction against the nuisance"); *see also* 66 C.J.S. NUISANCES § 142 ("A nuisance abatement action is an equitable action arising from the state's police power in which injunctive relief is sought, and it is governed by the same equitable principles that apply to injunctive actions, generally.  Likewise, the granting of an injunction to abate a nuisance is an equitable remedy.").

[32]  *See e.g., Pennsylvania v. The Wheeling and Belmont Bridge Co.*, 54 U.S. 518, 522 (1851) (exercising original jurisdiction as court of equity over public nuisance action for abatement); *see also In re Debs*, 158 U.S. 564, 592 (1895) ("Indeed, it may be affirmed that in no well-considered [sic] case has the power of a court of equity to interfere by injunction in cases of public nuisance been denied"); *Mugler v. Kansas*, 123 U.S. 623, 673 (1887) (recognizing that courts of equity have jurisdiction over public nuisance cases and that a jury trial "is not required in suits in equity brought to abate a public nuisance"); *Wedel v. United States*, 2 F.2d 462, 462 (9th Cir. 1924) (recognizing that courts of equity had jurisdiction over public nuisances "to give a more speedy, effectual, and permanent remedy than can be had at law" and therefore rejecting a right to jury trial for a suit to abate a public nuisance).

the eve of the remedies phase of this case.  Substantively, the only change since 2019 is that the Court, at Defendants' request, stopped settlement activities with respect to claims against these Defendants – a fact that weakens Defendants' arguments.  This Court should find the request both substantively lacking and procedurally barred.

### 1.    *Background*

On September 14, 2019, Walmart and Walgreens joined fourteen other Track One defendants and filed a motion seeking that this Court to recuse itself five weeks before the start of the CT1 trial.  Dkt. #2603 (Motion to Disqualify).  One basis for that motion was the Court's supposed "significant involvement in attempting to settle the litigation."  *Id.* at pp. 32-35.  In the 2019 motion, these Defendants noted that this Court would serve as factfinder for the remedies phase and explicitly argued that "the Court's deep and detailed involvement in settlement— personally and through the Special Master—precludes his being a factfinder."  *Id.* at p. 33; *see also id.* at pp. 35 ("Accordingly, the Court must recuse itself from determining what equitable relief is appropriate, should Plaintiffs prove their nuisance claim.").

This Court denied the recusal motion, rejecting these Defendants' arguments that the Court's activities regarding settlement provided any basis for recusal.  Dkt. #2676 (Order on Motion to Disqualify) at p. 6.  This Court also specifically rejected these Defendants' argument that the Court's decision to be the factfinder for the remedy phase constituted grounds for the two-year delay in bringing the motion to recuse on the grounds that the Court's decision was based on "settled law" that "everyone in this case has understood [] from the start."  *Id.* at p. 9.[33]

Thereafter, these Defendants sought a writ of mandamus from the Sixth Circuit challenging the Court's decision on recusal.  The Sixth Circuit refused the writ on the merits.  *Nat'l Prescription*

---

[33]  *See also* Dkt. #2519 (CT1 Order on Abatement *Daubert* Motion) at p. 3 (entered Aug. 26, 2019) (Court intends to "exercis[e] its equitable powers" in order "to craft a remedy that will require defendants ... to pay the prospective costs that will allow plaintiffs to abate the opioid crisis"); Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 5 (entered Sept. 4, 2019) ("Unlike tort damages that compensate an injured party for past harm, abatement is equitable in nature and provides a prospective remedy that compensates a plaintiff for the costs of rectifying the nuisance.").

*Opiate Litig.*, 2019 WL 7482137. With respect to Defendants' timing in bringing the motion, the Court of Appeals noted: "Recusal motions should normally be made 'at the earliest possible moment after obtaining knowledge of the facts demonstrating the basis for such a claim.'" *Id.* at *1 (citation omitted). While the Court of Appeals decided to *assume* that the 2019 motion was timely, it did not think much of Defendants' attempts to excuse their delay:

> Here, the timing of Petitioners' recusal motion doesn't help them. The bulk of the facts Petitioners cite to support recusal were known to them well before they sought recusal. . . . [Judge Polster] has been involved in settlement discussions since the beginning of the litigation. The settlement and abatement issues have been pending for months.

*Id.* at * 2. On the merits of the recusal claim, the Court of Appeals found this Court's activities with respect to settlement were appropriate, particularly for an MDL judge, and did not "evidence prejudicial attitudes on the merits that would require [Judge Polster] to recuse himself." *Id.* at *3.

Following the settlement of the Track One trial, the Pharmacy Defendants expressed their desire that the Court not be involved in settlement negotiations. Dkt. #2963 (Pharmacy Ds' Motion to Prohibit Ex Parte Communications) at p. 4**.** Since then, as Defendants concede, the Court's settlement activities "[t]o be sure, . . . did not involve the current Defendants." Brief at p. 22. In their current Brief, Defendants identify nothing new that would procedurally or substantively support the assignment of a new judge now.

### 2. *Defendants' request is procedurally barred.*

Procedurally, the arguments supporting recusal at this stage are even weaker than they were when these Defendants first made their untimely 2019 motion. As noted above, the decision to have the Court serve as the factfinder for the remedy phase with respect to public nuisance claims was known well before these cases were set for trial. *Supra* at § IV.B.1. Likewise, the settlement activities involving the other defendants, which had continued since 2019, were very public and culminated in signed settlement agreements that were announced ten months ago on July 21, 2021. Dkt. #3795 (CMO for Cases of Non-Participating Subdivisions Asserting Claims Against Settling Defendants).

The parties have already conducted the liability phase trial beginning on October 4, 2021, and culminating with a November 23, 2021 jury verdict for Plaintiffs.  Immediately following the verdict, the Court began discussions on the timing of the remedy phase bench trial.  Dkt. #4175 (11/23/21 Trial Tr.) at 7368:7 – 7369:13.  On December 10, 2021, the Court adopted the parties' proposed a schedule for the abatement phase of the Track Three which would culminate with the May 10, 2022 bench trial.  Dkt. #4188 (CT3 Scheduling Order).  At no time did Defendants offer any objection to this Court serving as the factfinder for the remedy phase based on the continued participation in national settlement discussions with other MDL defendants.

Defendants do not even try to explain why they are only making this motion now.  Granting the request would be both inefficient for both the Court and parties and would prejudice Plaintiffs.  Bringing in a new judge at this stage would require the parties to educate a new judge about the case.  Even apart from this Court's background gained presiding over the MDL, this Court has had the advantage of hearing specific testimony regarding these parties and these claims – evidence that would likely have to be repeated if a new judicial officer was appointed.  A new judge might also necessitate the reconsideration of evidentiary motions already decided by this Court.  All of this is likely why these same Defendants (in 2019) correctly argued that *"[t]he judge who determines the remedy. . . should be the same judge who heard the evidence of liability."*  Doc. #2603-1 (Brief Supporting Motion to Disqualify) at p. 35 (emphasis added).  Finally, the trial currently set for May 10, 2022 (just over six weeks away) would have to be continued to an unknown date when the new judge, the parties and their witnesses would be available causing prejudicing the plaintiffs through delay.[34]

> As our Court of Appeals made clear to these Defendants in their prior attempt at recusal:
>
> A prompt [recusal] application affords the district judge an opportunity to assess the merits of the application before taking any further steps that may be inappropriate for the judge to take.  It also avoids the risk that a party is holding

---

[34]  At least one of Plaintiffs' experts, Dr. Alexander will be unavailable for at least a year beginning approximately mid-August 2022 as he will be on sabbatical in Germany.

back a recusal application as a fall-back position in the event of adverse rulings on pending matters.

*Nat'l Prescription Opiate Litig.*, 2019 WL 7482137, at *2 (internal quotations omitted). Here, these Defendants, with no explanation, have permitted discovery, pretrial rulings, an entire liability trial, and significant proceedings leading up to the remedy phase which is weeks away. Whether they were just delinquent or are using recusal as a fall-back position for rulings they do not like, Defendants certainly failed to make this request "at the earliest possible moment after obtaining knowledge of the facts demonstrating the basis for such a claim." *Id.* at *1.

### 3. There are no substantive grounds for the assignment of a new judge.

Substantively, the request fares no better. Both this Court and the Court of Appeals have rejected the idea that this Court acted improperly in participating in settlement discussions. *See Nat'l Prescription Opiate Litig.*, 2019 WL 7482137, at *3; Dkt. #2676 (Order on Motion to Disqualify) at p. 14. Defendants do not explain how the culmination of the two national settlements last year involved anything new that would require a new judge now. Instead, Defendants offer only conclusory speculation that "this Court *presumably* heard *substantial* extra-record information during ex parte communications with Plaintiffs' counsel *about the same fact issues* that will be *central to the remedies phase* of this trial." Brief at p. 23 (emphasis added). The upcoming trial, however, will involve abating the specific nuisances in Lake County and Trumbull County. Defendants point to no specific information regarding these two plaintiffs that was somehow at issue in the concluded national settlement talks. "It suffices to say that the burden to sustain a motion to disqualify a judge is exceedingly high, and the moving defendants have not met it." Dkt. #2676 (Order on Motion to Disqualify) at p. 6.

Finally, the authorities relied upon by Defendants do not support the assignment of a new judge for the remedy phase. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), involved a due process challenge to a state appellate judge sitting on a case involving an appeal of a $50 million verdict rendered against a defendant who, while the appeal was pending, had contributed $3 million to the Justice's election to the state supreme court – an amount that was $1 million

39

greater than all the other contributions to both candidates combined. *Id.* at 884. The Supreme Court noted that application of the *Caperton* rule would "be confined to rare instances." *Id.* at 890. Unlike *Caperton,* here there is no personal connection between this Court and any of the parties let alone the multimillion dollar personal financial connection at issue in that case.

Defendants fare no better with the other cases they cite which both involve facts far afield from a trial judge participating in run-of-the-mill settlement discussions. In *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016), the Supreme Court held that a state supreme court justice, who as district attorney had given approval to seek death penalty against inmate, violated due process by not recusing himself and participating in decision to reinstate death sentence. In *Anderson v. Sheppard*, 856 F.2d 741, 747 (6th Cir. 1988), the Sixth Circuit found that the trial judge's comments to a pro se litigant evidenced open hostility and bias. The finding was based in part on the judge's involvement in settlement negotiations where he was openly critical of the *pro se* plaintiff for not accepting the terms offered by the defendant. *Id.* This Court's participation in the resolution of national settlements by other defendants does not evidence the hostility and bias condemned in *Anderson.*

The request by Walmart and Walgreens for a new judge for the remedy phase is both too little and too late and should be rejected.

## CONCLUSION

For the foregoing reasons, the relief requested in Defendants' Joint Brief Regarding Select Legal Issues for Remedies Phase should be denied in its entirety.

Dated: March 23, 2022

<div style="margin-left:40%">

Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

</div>

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com
mca@lanierlawfirm.com

*Trial Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

41

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
Salvatore C. Badala
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com
sbadala@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger