# EXHIBIT 1

**United States District Court**
**The Northern District of Ohio Eastern Division**

| | |
|---|---|
| **Plaintiffs,** | **MDL No. 2804** |
|  | **Case No. 1:17-md-2804** |
| **County of Lake, Ohio** | |
| **Case No. 18-op-45032** | **Judge Dan Aaron Polster** |
| | |
| **and** | |
| | |
| **County of Trumbull, Ohio** | |
| **Case No. 18-op-45079** | |
| | |
| **vs.** | |
| | |
| **Purdue Pharma, L.P. et al,** | |
| | |
| **Defendants.** | |

**Expert Report of Harvey S. Rosen, Ph.D.**
**Burke Rosen & Associates**
**April 16, 2021**

I have been retained by counsel for Plaintiffs to provide expert opinions as to the costs necessary today to fund an abatement program for Lake County, Ohio and Trumbull County, Ohio. Lake County, Ohio is east of Cleveland and is statistically part of the Cleveland Metropolitan Statistical Area (MSA). Trumbull County, Ohio is located southeast of Cleveland and west of Youngstown and is part of the Youngstown MSA. The abatement plan for each county is proposed by Caleb Alexander, MD, who is both a physician and a pharmaco-epidemiologist specializing in the opioid epidemic. Dr. Alexander's detailed and comprehensive report contains the different abatement modalities, their change in need over time and current costs of certain components of the proposed abatement programs. Dr. Alexander recommends interventions roughly grouped into four categories as described below and in detail in his reports. He expects that the implementation of the Plans will reduce the epidemic's impact in the two counties over time. Dr. Alexander's Abatement Plan ("the Plan") consists of four major categories which he describes as:

- *Prevention- Reducing Opioid Over Supply and Improving Safe Opioid Use;*
- *Treatment- Supporting Individuals Affected by the Epidemic;*
- *Recovery- Enhancing Public Safety and Reintegration;* and
- *Addressing Needs of Special Populations*

**I.     Materials Reviewed in Connection with this Report**

1. In preparing my opinions for this matter, I have reviewed or relied on the following materials:

    - The Abatement Plan for Addressing the Opioid Crisis in Lake County and Trumbull County, prepared by Caleb Alexander, MD ("Alexander Report");

    - Department of Labor, Bureau of Labor Statistics, Occupational Employment Data, for Cleveland and Youngstown Metropolitan Statistical Areas, May 2019;

    - United States Treasury, Office of Domestic Treasury Office of Domestic Finance. https://www.treasury.gov.;

    - Department of Labor, Bureau of Labor Statistics, Employment Cost Index, various Occupations, 2009-2019;

    - Department of Labor, Bureau of Labor Statistics, Consumer Price Index, various components, 2009-2019.

    - Other sources reviewed or relied upon are footnoted in detail within this report.

II. **Qualifications**

2. I have spent more than 50 years in the field of economics, including as many years performing and teaching economics and forecasting techniques.

3. I have a Bachelor's Degree, Master's Degree, and a Ph.D. in economics from Case Western University which I received in 1969.  As part of my graduate education and Ph.D. work, I also studied a year at the University of California at Berkeley.

4. I have 31 years of service to the State of Ohio as an Associate Professor at Cleveland State University, where I currently hold the rank of emeritus.  In addition, I have taught for 22 years as an adjunct professor at John Carroll University teaching classes in banking, finance, and macroeconomics.  During my academic career, I have taught students the generally accepted methods used by other economists and financial analysts of valuing all types of economic losses.  It is these same methodologies that I have employed in arriving at my opinions in this matter.

5. I have published and spoken extensively concerning applying economic principles to valuation constructs and calculation of damages.  A list of my publications and some of my speaking engagements is contained in Exhibit 2, which is attached to this report.

III. **Litigation Expert Experience**

6. I have supplied expert reports and testimony in hundreds of cases, many utilizing similar economic analyses and valuation techniques as used in this action.  I have previously been qualified as an expert on damages by various state and federal courts, including the Federal Bankruptcy Court. I have lectured to other professional groups of economists and continuing legal education forums for attorneys including the Potter Stewart Inn of the Court, in Cincinnati Ohio in 1996.  In 1998, I offered invited testimony to the United States Senate Commerce Committee in hearings on the Global Tobacco Settlement.

7. I have been retained as an expert in cases involving forecasts and testimony dealing with the valuation and determination of economic damages due to shortfalls and liquidations of mortgage-backed securities in actions against Countrywide (BOA), Morgan Stanley, Credit Suisse, and Goldman Sachs.

8. I have been a Court appointed economist by a state or federal court on nine occasions. Most of these appointments dealt with large scale class action litigation. On two of those occasions, I was appointed as a Special Master, both in Hamilton County, Ohio (A&D building litigation by visiting Judge George Elliot in 1997, and Bengal's stadium litigation by Judge Ruehlman in 2001). In 2002, I was appointed as the class economist by the Franklin County, Ohio, Common Pleas Court (Georgia Pacific litigation). The first federal court appointment was in 1980 by Judge Rubin in the Southern District of Ohio in the matter of the Beverly Hills Supper Club Fire. I was simultaneously appointed by the State Court of Kentucky for the same event. The second federal court appointment, also in the Southern District of Ohio, was by Judge Spiegel in 1994 in the Pfizer heart valve litigation. In 1992, I was appointed by Judge Ruehlman in Hamilton County, Ohio, in the matter of the BASF Plant Explosion, and in 1991 I was appointed in Montgomery County, Ohio, by Judge Kessler in the matter of the CSX train derailment at Miamisburg, Ohio. In November 2015, I was appointed by Judge Martin in Hamilton County, as a settlement administrator involving the Indian Hill School District.

9. In most of these appointments I was engaged to determine economic damages as it related to individuals, businesses, and property damage. Many of these assignments employed variants of the profit and discounted cash flow analysis. In the Pfizer litigation, for example, I was a co-chairman of a committee consisting of attorneys from several foreign countries and the United States. It was our responsibility to develop a damage formula for the Federal Court to compensate individuals around the world and in the United States who had suffered death or injury from a batch of improperly manufactured heart valves. In 1992, I was appointed by a Special Master of the Federal Bankruptcy Court, with Federal Court approval, to forecast the likelihood of financial bankruptcy of a Cincinnati company, the Eagle-Picher Corporation.

   After the company filed for bankruptcy, we were asked by the Court and the Special Master to prepare an econometric forecast of the present value of all future claims, unknown at the time of the bankruptcy filing.

10. I have also been involved in cases which included medical monitoring and abatement programs, like the Plan proposed in this matter.   In 1987, we provided damage evidence in the Fernald uranium class action litigation.  Following the settlement reached with the plant's contractor and the Department of Energy (DOE), a medical monitoring program was established for approximately 10,000 residents who resided in the area and who were exposed to radioactive material.  The fund operated from December 1990 through 2008.  the Fernald Medical Monitoring Program provided health screening to persons who resided within close proximity to the uranium processing plant at Fernald, Ohio.  A second monitoring program Fernald II, which is still in operation, provides screening services to former employees who worked at the Fernald facility.

11. In 2003, I was retained in the Louisiana Smokers Cessation class action litigation (Scott v American Tobacco Company), and calculated and testified to the costs necessary to fund a proposed smokers cessation monitoring and abatement program, covering more than 200,000 smokers. The monitoring program was funded in 2011 and is still in operation today.

12. In 2020, I was retained to determine the funds necessary to fund a proposed medical monitoring program for children born of opioid addicted mothers to screen children for Neonatal Abstinence Syndrome (NAS).

13. My Curriculum Vitae is attached as Exhibit 2, as well as a list of my testimonies in the last 48 months, as Exhibit 3.

**IV. Methodology/Data**

14. The following analysis, attached as <u>Exhibit 1</u>[1], was performed in conformity with methodology and practices used by other economists and practitioners in the field.

15. The Alexander Plan outlines four distinct categories of abatement.  Within each category there was a multitude of sub-modalities.  In most instances, the medical assessments as to population, medications, specific equipment, types of professional personnel, etc. were provided.  As an economist, wherever cost data was not provided within the Plan, it was necessary to determine the current or "base year" cost of each item[2].

16. The categories and their subcomponents of the Plan are:[3]

    Category 1: Prevention - Reducing Opioid Oversupply and Improving Safe Opioid Use
       1A. Health Professional Education
       1B. Patient and Public Education
       1C. Safe Storage and Drug Disposal
       1D. Community Prevention and Resiliency
       1E. Harm Reduction
       1F. Surveillance, Evaluation, and Leadership

    Category 2: Treatment - Supporting Individuals Affected by the Epidemic
       2A. Connecting Individuals to Care
       2B. Treating Opioid Use Disorder
       2C. Managing Complications Attributable to the Epidemic
       2D. Workforce Expansion and Resiliency
       2E. Distributing Naloxone and Providing Training

    Category 3: Recovery - Enhancing Public Safety and Reintegration
       3A. Public Safety
       3B. Criminal Justice System
       3C. Vocational Training and Job Placement
       3D. Reengineering the Workplace
       3E. Mental Health Counseling and Grief Support

    Category 4: Addressing Needs of Special Populations
       4A. Pregnant Women, New Mothers, and Infants
       4B. Adolescents and Young Adults

---

[1] Exhibit 1 consists of two volumes.  Volume I is for Lake County and Volume II is for Trumbull County.
[2] Some cost data was provided by Dr. Nancy Young for some components of Category 4.
[3] Alexander Report.

    4C. Families and Children
    4D. Homeless and Housing Insecure Individuals
    4E. Individuals with Opioid Misuse

17. Both Plans propose abatement over a 15-year period from 2021 to 2035 for both counties. To provide sufficient funds to cover the entire period, it was necessary to incorporate future inflationary increases for each modality.  Historical data from the Bureau of Labor Statistics (BLS) was analyzed to determine the likely inflationary growth rates of medical care costs. It was determined that the cost of those items, which are medical in nature, can be expected to increase at a rate of 2 to 5 percent, depending on the modality proposed.  Historically for many decades in the United States, medical care costs have exceeded the average rate of non-medical price inflation by approximately 1.5 percent per annum, the real rate of increase.[4]  Even though there has been some improvement in this spread in recent years, there is no expectation that the spread will diminish, as this differential has persisted in the United States for many decades, even after the many changes in our economy for delivering health care.

18. This report provides two estimates of the costs to fund the Plan.  The first estimate is on a year-by-year, pay as you go, basis (nominal estimate)[5]; whereas, the second estimate is based on a single lump sum, up front payment (present value estimate).  The present value estimate assumed a discount rate based upon a portfolio of different maturity United States Treasury Securities.[6] The choice of U.S. Government backed Treasury securities minimizes the risk of financial losses to the abatement fund.

**VII. Findings**

19. Lake Summary Table 1 delineates the costs of abatement by each of the four Categories.  It is my opinion that it would require $1.48 billion with annual payments to fund the proposed medical

---

[4] Bureau of Labor Statistics, at www.bls.gov. and Exhibit 1-5.  The "real rate" is any statistic that has been adjusted for inflation.
[5] "Nominal rates" are stated amounts and include future inflation.
[6] See Treasury Office of Domestic Finance. https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=realyield.  Exhibit 1-6.

abatement program for fifteen years; or $1.29 billion with a lump sum payment at present value.  Lake Summary Table 2 presents the same information on a year-by-year basis.

20. Trumbull Summary Table 3 delineates the costs by each of the four Categories.  It is my opinion that it would require $1.85 billion with annual payments to fund the proposed medical abatement program for fifteen years; or $1.60 billion with a lump sum payment at present value.  Trumbull Summary Table 4 presents the same information on a year-by-year basis.

21. I am being compensated at a rate of $495 per hour for my time and $295 per hour for my associate's time, working under my supervision.  If trial testimony or deposition testimony is required, my rate is $1,200 per hour for the first two hours and $495 per hour thereafter, plus travel time and expenses.

22. I hold all the above opinions to a reasonable degree of economic certainty.  The opinions are based on the information I currently have.  I reserve the right to revise my opinions if additional information become available in the future.

**Summary Table 1:**

### Lake County
### Summary by Category

| | Total Cost | Present Value |
|---|---:|---:|
| **Category 1: Prevention - Reducing Opioid Oversupply and Improving Safe Opioid Use** | | |
| 1A. Health Professional Education | $3,873,072 | $3,399,097 |
| 1B. Patient and Public Education | $1,141,271 | $1,007,289 |
| 1C. Safe Storage and Drug Disposal | $77,826 | $69,981 |
| 1D. Community Prevention and Resiliency | $4,710,827 | $4,288,703 |
| 1E. Harm Reduction | $12,231,319 | $10,676,498 |
| 1F. Surveillance, Evaluation, and Leadership | $6,532,784 | $5,726,686 |
| | $28,567,098 | $25,168,255 |
| **Category 2: Treatment - Supporting Individuals Affected by the Epidemic** | | |
| 2A. Connecting Individuals to Care | $18,054,195 | $15,836,613 |
| 2B. Treating Opioid Use Disorder | $964,492,318 | $826,913,976 |
| 2C. Managing Complications Attributable to the Epidemic | $71,969,454 | $66,000,725 |
| 2D. Workforce Expansion and Resiliency | $27,938,928 | $24,654,063 |
| 2E. Distributing Naloxone and Providing Training | $8,164,559 | $7,138,265 |
| | $1,090,619,453 | $940,543,642 |
| **Category 3: Recovery - Enhancing Public Safety and Reintegration** | | |
| 3A. Public Safety | $5,643,598 | $4,991,725 |
| 3B. Criminal Justice System | $58,511,302 | $49,635,838 |
| 3C. Vocational Training and Job Placement | $109,059,681 | $96,430,637 |
| 3D. Mental Health Counseling and Grief Support | $6,686,855 | $5,872,306 |
| | $179,901,435 | $156,930,506 |
| **Category 4: Addressing Needs of Special Populations** | | |
| 4A. Pregnant Women, New Mothers, and Infants | $37,047,838 | $32,380,027 |
| 4B. Adolescents and Young Adults | $15,305,113 | $13,768,375 |
| 4C. Families and Children | $125,737,321 | $113,118,511 |
| 4D. Homeless and Housing Insecure Individuals | $4,325,199 | $3,868,112 |
| | $182,415,470 | $163,135,025 |
| **Total Abatement Cost** | $1,481,503,457 | $1,285,777,429 |

Source: Volume I Exhibits 1-1, 1-2, 1-3 and 1-4

**Summary Table 2:**

## Lake County
## Summary by Year

| Year | Total Cost | Present Value |
|---|---|---|
| 2021 | $ 70,774,366 | $ 70,774,366 |
| 2022 | $ 74,265,899 | $ 74,021,627 |
| 2023 | $ 78,785,275 | $ 78,267,855 |
| 2024 | $ 83,102,003 | $ 82,284,693 |
| 2025 | $ 87,524,540 | $ 86,378,685 |
| 2026 | $ 87,506,734 | $ 81,710,909 |
| 2027 | $ 91,813,699 | $ 84,565,606 |
| 2028 | $ 96,213,496 | $ 87,411,784 |
| 2029 | $ 100,806,329 | $ 90,337,799 |
| 2030 | $ 105,597,553 | $ 93,343,326 |
| 2031 | $ 110,481,962 | $ 87,496,082 |
| 2032 | $ 115,571,553 | $ 89,416,548 |
| 2033 | $ 120,874,512 | $ 91,363,222 |
| 2034 | $ 126,278,031 | $ 93,246,856 |
| 2035 | $ 131,907,507 | $ 95,158,071 |
| **Total Abatement Cost** | **$ 1,481,503,457** | **$1,285,777,429** |

**Source: Volume I Exhibits 1-1, 1-2, 1-3, 1-4 and 1-8.**

**Summary Table 3:**

## Trumbull County
## Summary by Category

| | Total Cost | Present Value |
|---|---:|---:|
| **Category 1: Prevention - Reducing Opioid Oversupply and Improving Safe Opioid Use** | | |
| 1A. Health Professional Education | $1,849,985 | $1,627,191 |
| 1B. Patient and Public Education | $968,185 | $854,523 |
| 1C. Safe Storage and Drug Disposal | $64,226 | $57,753 |
| 1D. Community Prevention and Resiliency | $32,298,646 | $28,223,084 |
| 1E. Harm Reduction | $12,411,974 | $10,833,062 |
| 1F. Surveillance, Evaluation, and Leadership | $5,358,451 | $4,697,305 |
| | $52,951,467 | $46,292,918 |
| **Category 2: Treatment - Supporting Individuals Affected by the Epidemic** | | |
| 2A. Connecting Individuals to Care | $24,696,613 | $21,661,969 |
| 2B. Treating Opioid Use Disorder | $1,228,437,314 | $1,053,198,494 |
| 2C. Managing Complications Attributable to the Epidemic | $129,961,307 | $119,122,597 |
| 2D. Workforce Expansion and Resiliency | $19,847,534 | $17,548,402 |
| 2E. Distributing Naloxone and Providing Training | $8,537,389 | $7,449,582 |
| | $1,411,480,156 | $1,218,981,044 |
| **Category 3: Recovery - Enhancing Public Safety and Reintegration** | | |
| 3A. Public Safety | $5,378,545 | $4,758,386 |
| 3B. Criminal Justice System | $53,210,439 | $45,223,289 |
| 3C. Vocational Training and Job Placement | $67,943,409 | $60,075,604 |
| 3D. Mental Health Counseling and Grief Support | $5,149,395 | $4,522,738 |
| | $131,681,788 | $114,580,018 |
| **Category 4: Addressing Needs of Special Populations** | | |
| 4A. Pregnant Women, New Mothers, and Infants | $72,105,688 | $63,022,470 |
| 4B. Adolescents and Young Adults | $18,173,645 | $16,340,235 |
| 4C. Families and Children | $156,603,692 | $140,882,073 |
| 4D. Homeless and Housing Insecure Individuals | $4,650,751 | $4,159,260 |
| | $251,533,776 | $224,404,038 |
| **Total Abatement Cost** | $1,847,647,188 | $1,604,258,018 |

Source: Volume II- Exhibits 1-1, 1-2, 1-3 and 1-4

**Summary Table 4:**

### Trumbell County
### Summary by Year

| Year | Total Cost | Present Value |
|---|---|---|
| 2021 | $ 88,353,046 | $ 88,353,046 |
| 2022 | $ 93,214,364 | $ 92,907,768 |
| 2023 | $ 99,141,247 | $ 98,490,139 |
| 2024 | $ 104,948,130 | $ 103,915,963 |
| 2025 | $ 110,908,577 | $ 109,456,583 |
| 2026 | $ 108,554,810 | $ 101,364,909 |
| 2027 | $ 113,968,320 | $ 104,971,264 |
| 2028 | $ 119,515,247 | $ 108,581,867 |
| 2029 | $ 125,280,787 | $ 112,270,635 |
| 2030 | $ 131,269,083 | $ 116,035,765 |
| 2031 | $ 137,389,808 | $ 108,805,724 |
| 2032 | $ 143,738,164 | $ 111,208,772 |
| 2033 | $ 150,320,678 | $ 113,620,161 |
| 2034 | $ 157,040,530 | $ 115,962,654 |
| 2035 | $ 164,004,397 | $ 118,312,767 |
| **Total Abatement Cost** | **$ 1,847,647,188** | **$1,604,258,018** |

**Source: Volume II- Exhibits 1-1, 1-2, 1-3 and 1-4**

23. My findings are detailed in <u>Exhibit 1</u>.

*Harvey S. Rosen, Ph.D.*

Harvey S. Rosen, Ph.D.
For Burke Rosen & Associates