## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

    *County of Lake, Ohio v. Purdue*
    *Pharma L.P., et al.*,
      Case No. 18-op-45032 (N.D. Ohio)

    *County of Trumbull, Ohio v. Purdue*
    *Pharma, L.P., et al.*,
      Case No. 18-op-45079 (N.D. Ohio)

"Track 3 Cases"

**MDL No. 2804**
**Case No. 17-md-2804**
**Judge Dan Aaron Polster**

### TRACK 3 DEFENDANTS' ABATEMENT PLAN

The Track 3 Defendants ("Defendants") submit this abatement plan pursuant to the Court's March 21, 2022, Order (Dkt. 4319). This supplements Defendants' March 18, 2022, abatement submission (Dkt. 4315), which incorporated the reports of Defendants' remedy-phase expert witnesses—the same approach Plaintiffs followed in their January 18, 2022, abatement plan submission (Dkt. 4232). Pursuant to the Court's recent order, Defendants provide more specific information as set forth below.

## I.    ABATEMENT SHOULD BE LIMITED TO DRUG DISPOSAL PROGRAMS[1]

Abatement must be tailored to the nuisance the jury found. That nuisance was the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market

---

[1] For the reasons set forth in Defendants' post-trial motions after the liability-phase trial and March 9, 2022 brief regarding select legal issues for the remedies phase, Plaintiffs are not entitled to abatement or any other remedy from these Defendants. *See* Dkt. 4202, 4203, 4205, 4206, 4207, 4299.

1

outside of appropriate medical channels." *See* Dkt. 4176 (verdict form). The only element of Plaintiffs' abatement plan (Dkt. 4232) ("Plaintiffs' Plan") that addresses this nuisance is the drug disposal element.

If the Court awards this form of relief, the appropriate abatement would be for Defendants to operate drug disposal programs in their pharmacies in the two Plaintiff counties. Only law enforcement and DEA registrants who are authorized by DEA to engage in drug takeback may operate drug disposal programs. 21 C.F.R. § 1317.30(a). Plaintiffs' expert witness Dr. Alexander acknowledges, moreover, that the use of pharmacies for drug disposal "has many efficiencies." Dkt. 4219-1 at 22.

Defendants operate drug disposal programs. They have drug takeback kiosks or make safe disposal packets available in many of their pharmacies. If the Court orders Defendants to conduct additional takeback programs or to fund takeback programs operated by law enforcement in the Plaintiff counties, those additional programs should be limited to one year.[2] The nuisance the jury found is the current oversupply of prescription opioid medications, and one year provides a sufficient period for expanded takeback and disposal programs to abate that current oversupply.

## II.     ABATEMENT SHOULD NOT INCLUDE ELEMENTS THAT ADDRESS ATTENUATED, DOWNSTREAM EFFECTS OF THE NUISANCE; IF IT DOES, IT SHOULD BE LIMITED IN SEVERAL WAYS

Most elements of Plaintiffs' Plan would not address the oversupply of prescription opioids found by the jury. Instead, they would address claimed health, societal, and other downstream effects of the nuisance. For example, Plaintiffs seek funds to treat individuals with opioid use disorder ("OUD"), to care for families and children of those with OUD, and to screen for and treat

---

[2] Any order concerning drug disposal should make clear that the Court does not intend to impose obligations on the Defendants that are inconsistent with or not permitted by DEA regulations.

HIV, hepatitis C, and endocarditis. For the reasons set forth in Defendants' brief regarding select legal issues (Dkt. 4299), those elements are not appropriate measures to abate the nuisance the jury found and are not part of Defendants' plan. *See People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 569 (Cal. Ct. App. 2017) (affirming abatement remedy requiring defendants to fund lead paint removal from homes, but not medical treatment or other services to address individual or societal harms resulting from lead poisoning, because the "sole purpose" of the abatement plan was "to eliminate the hazard that is causing prospective harm to the plaintiff").

If the Court, over Defendants' objections, nonetheless orders funding of programs to address any health, societal, or other downstream effects of the nuisance, that abatement should be limited to the effects that are the least indirectly related to Defendants' past dispensing conduct. Most elements of Plaintiffs' Plan are disconnected or far remote from Defendants' dispensing, separated by numerous intervening and superseding acts. Those elements include, among others, Categories 1D (Community Prevention and Resiliency), 1E (Harm Reduction), 1F (Surveillance, Evaluation, and Leadership), 2A (Connecting Individuals to Services and Care), 2C (Managing Complications Attributable to the Epidemic), 2D (Workforce Expansion and Resiliency), and all of Category 3 (Recovery – Enhancing Public Safety and Reintegration) and Category 4 (Addressing Needs of Special Populations) of Dr. Alexander's abatement plan. Among other things, these programs would provide access to syringes and injection equipment for individuals who inject illicit drugs; screening and healthcare services for individuals with HIV and hepatitis C; provide for the hiring of medical social workers and the creation of programs to address "burnout/compassion" fatigue; pay for training to reduce stigma related to "behavioral health crises"; and provide job training and placement services for county residents. These proposed programs are far too remote from

3

Defendants' past dispensing conduct, and Defendants should not be ordered to fund such programs under the guise of "abatement."

Treatment of those with OUD addresses the effects of the nuisance, not the nuisance itself, and also should not be part of an abatement remedy. If the Court nonetheless requires Defendants to fund such programs, however, the treatment should be limited to individuals who: (1) currently have OUD, (2) currently are residents of Lake or Trumbull County; (3) do not have government or private insurance that would pay for OUD treatment; and (4) filled opioid prescriptions to a sufficient degree at Defendants' Lake or Trumbull County pharmacies.

The jury's verdict found the existence of a nuisance based on the present conditions in the counties. Defendants should not be ordered to fund treatment for individuals who develop OUD, or become residents of one of the Plaintiff counties, in the future. Nor should Defendants be required to fund treatment for individuals who have government or private insurance that covers the treatment, because the counties would incur no out-of-pocket expense for those individuals' treatment. Defendants also should not be required to fund treatment for individuals who did not fill opioid prescriptions at Defendants' Lake or Trumbull County pharmacies to a sufficient degree because of the lack of Defendants' connection to that individual's OUD.

Any treatment funding ordered by the Court should be overseen by a neutral third party (the "Administrator") as set out in Section V below. The Administrator should be required to perform a screening process—similar to the screening process in the *Conagra* abatement plan to identify homes eligible for lead-paint remediation—to identify individuals who meet the eligibility criteria for treatment. The Administrator would determine whether an individual seeking treatment had OUD and resided in Lake or Trumbull County as of the date of the Court's abatement order, and whether the individual lacks government and private insurance. If an individual met those

4

threshold requirements, then the Administrator would permit each Defendant to determine by review of its dispensing data (with methods that would protect privacy) the degree to which its Lake or Trumbull County pharmacies filled opioid prescriptions for that person. If a Defendant did not dispense prescription opioids for that individual to a sufficient degree, then no portion of the expense to treat that individual would be allocated to that Defendant.

Any treatment elements of an abatement plan should extend for no more than one year. Plaintiffs' expert Dr. Alexander relies on data from the State of Ohio showing that, on average, OUD treatment lasts less than six months. *See* Expert Report of Dan Kessler ¶¶37- 42. Thus, treatment of county residents who currently have OUD reasonably could be completed within one year.

## III.   IF THE COURT ORDERS DEFENDANTS TO FUND CERTAIN ELEMENTS OF PLAINTIFFS' PLAN, THE ELEMENTS AND THEIR COSTS SHOULD BE ADJUSTED AS DETAILED IN DEFENDANTS' EXPERT REPORTS

If the Court requires Defendants to fund additional programs beyond drug disposal, the Court should adjust the elements and costs of such programs as set forth in the expert reports of Daniel Kessler and Matthew Bialecki. As detailed in those reports, the elements and costs of Plaintiffs' Plan are based on flawed assumptions about projected treatment participation rates and costs, existing and available treatment and support programs, and the contribution of illicit opioids to the need for interventions. Plaintiffs' Plan also overstates cost projections, includes mathematical errors, and disregards existing funding sources.

In his expert report, Dr. Kessler accepts, for purposes of his cost analysis, the scope of the elements of Plaintiffs' Plan as set forth in Dr. Alexander's report, but corrects for flawed assumptions and other errors without opining on whether those elements are proper abatement. Among other things, he corrects for cost overestimates that result from Plaintiffs' overstatements of (1) the number of people with OUD; (2) the number of those with OUD who will receive

treatment; (3) the length of treatment they will receive; and (4) the number of heroin users. Correcting these errors and a mathematical error in Plaintiffs' Plan reduces the costs of their plan for the first five years by more than 50%. Dr. Kessler also corrects for other cost overstatements in Plaintiffs' Plan, including by removing costs already covered by existing funding sources. These additional corrections reduce the costs of Plaintiffs' Plan by more than 60%, to a total abatement cost (including all elements of Dr. Alexander's abatement plan) of $346 million for five years. As described more fully below, Dr. Kessler explains how that amount should be further reduced in order to apportion to each Defendant pharmacy the share of the total cost that corresponds to the Defendant's arguable share of contribution to the nuisance the jury found, and to exclude costs attributable to other responsible parties.

In his expert report, Mr. Bialecki assumes for purposes of his analysis that abatement would include treatment programs, and proposes alternative estimates of intervention costs for the Plaintiff counties. These estimates are based on the counties' actual OUD-related costs and projections of those costs for five years. Based on these projections, Mr. Bialecki estimates the total costs to fund five years of an abatement plan would fall within a range that would not exceed $35 million and would be further reduced if expenses covered by non-county funds were excluded.

Any abatement award should not extend beyond one year. Plaintiffs have stated that they intend to seek funds for five years of their plan at the upcoming trial. *See* Dkt. 4232 at 2. One year would be sufficient to address the current oversupply of prescription opioids that the jury found in light of (1) the State of Ohio data showing that, on average, OUD treatment lasts less than six months, *see* Expert Report of Dan Kessler ¶¶37- 42, and (2) the one-year limit on abatement set by the only court to date to have awarded an abatement remedy in a prescription opioids case. *See State of Oklahoma v. Purdue Pharma L.P. See State of Oklahoma v. Purdue Pharma L.P.*, No. CJ-

2017-816, 2019 WL 9241510, at *15 (Okl. Dist. Nov. 15, 2019), *rev'd on other grounds by State ex rel. Hunter v. Johnson & Johnson,* No. 118474, 2021 WL 5191372 (Okla., Nov. 9, 2021). Accordingly, Plaintiffs' estimates are overstated by at least a factor of five.

In addition, projecting the elements and costs of appropriate treatment programs and other interventions sought by Plaintiffs becomes more unreliable for each additional year into the future. *See, e.g.*, Trial Tr. (Dkt. 4050) at 2762, 2764, 2765 (Plaintiffs' witness Captain Villanueva testifying that "drug trends will change on a weekly basis"). Any period beyond one year would be speculative, and would result in program elements and funding that would be even more disconnected from the nuisance found by the jury.

## IV. THE COURT SHOULD APPORTION ANY ABATEMENT COST AWARD TO EACH DEFENDANT IN PROPORTION TO THE DEFENDANT'S SHARE OF CONTRIBUTION TO THE NUISANCE THE JURY FOUND

If the Court accepts any elements of Plaintiffs' Plan, the total cost awarded should be apportioned so that each Defendant bears a share of the total cost that corresponds to its share of contribution to the nuisance the jury found. Defendants have submitted reports of three experts, each of whom applied a different method to reasonably apportion costs so as to properly exclude the shares of opioid harms produced by causal factors completely unrelated to Defendants, including those related only to illicit opioids.

***Dr. Kessler***: Dr. Kessler determined each Defendant's share by using a statistical regression based on nationwide data to estimate the relationship between opioid shipments and mortality rates related to prescription opioids and to illicit opioids. Based on this regression, Dr. Kessler estimated the share of prescription opioid-related harms for each county attributable to each Defendant's red-flagged prescriptions (according to Plaintiffs' own red-flag analysis). Dr. Kessler estimates each Defendant's share of any abatement costs for each county as follows:

|  | T | Trumbull County |
|---|---|---|
| **CVS** | 0.445% | 0.308% |
| **Walgreens** | 0.693% | 0.821% |
| **Walmart** | 0.176% | 0.031%% |

*__Dr. Doyle__*: Dr. Joseph Doyle determined each Defendant's share based on a statistical regression that compared Ohio counties to similar counties in Illinois and New York. Based on this regression analysis, Dr. Doyle estimated the relationship between prescription opioid shipments and opioid mortality rates for the two Plaintiff counties. Then, using each Defendant's market shares of opioid prescriptions adjusted by the percentage of each's prescriptions that Plaintiffs' expert described as red-flagged, Dr. Doyle estimates each Defendant's share is no more than as follows:

|  | Lake County | Trumbull County |
|---|---|---|
| **CVS** | 2.3% | 0.6% |
| **Walgreens** | 2.2% | 2.5% |
| **Walmart** | 0.8% | 0.1% |

*__Dr. Chandra__*: Dr. Amitabh Chandra determined each Defendant's share using a three-step method. First, he used the analysis by Plaintiffs' epidemiologist Dr. Katherine Keyes of recent mortality data in the Plaintiff counties to determine the shares of opioid-related harms related to prescription opioids and to illicit opioids. Second, relying on economic principles, Dr. Chandra conservatively divides those mortality percentages among some (but not all) of the actors who, as Plaintiffs have acknowledged, contributed to the nuisance found by the jury, including the federal government, opioid manufacturers, prescribers, pharmacies, and diverters. Third, within the pharmacy sector's share of those amounts, Dr. Chandra apportions shares to each of the

Defendants based on their market shares of Plaintiffs' red-flagged prescriptions as applied to the market as a whole across OARRS data.

Based on this three-step analysis, Dr. Chandra estimates that each Defendant's share is no more than as follows:

|  | Lake County | Trumbull County |
|---|---|---|
| CVS | 2.8% | 0.7% |
| Walgreens | 2.8% | 2.0% |
| Walmart | 1.0% | 0.2% |

## V.    ABATEMENT ADMINISTRATION

Although Defendants disagree that the relief Plaintiffs seek is properly characterized as abatement, if the Court orders any funding, then the funding should be administered by a neutral third party agreed to by the parties and appointed by the Court (the "Administrator"). And to the extent the Court issues an order awarding funding of an abatement plan, it should retain jurisdiction over the plan and exercise judicial oversight over its administration.

Any funds that the Court orders Defendants to pay for abatement should be deposited into separate, dedicated bank accounts for each of the two Plaintiff counties. The accounts should not be owned, controlled, or otherwise directed by the Plaintiff counties, their employees, or their agents. The Administrator should have signature authority over the accounts and the authority to direct the disbursement of funds out of the accounts. The Administrator should maintain contemporaneous books and records reflecting, among other things, receipts and disbursements and each Defendant's balance in the accounts. Defendants should not be required to deposit the entirety of any funding the Court orders; instead, Defendants should deposit an amount of funds

necessary to begin administration of the plan ordered by the Court, with additional deposits as necessary as determined by the Administrator.

The Administrator should establish written procedures for the submission and consideration of funding requests. Those procedures should be agreed to by the parties and approved by the Court. At a minimum, the procedures should require that the Plaintiff counties make written requests for funds on an as-needed basis, specifying in each instance how the funds will be used, and that the Administrator review each request and determine whether it is for an expense that is within the scope of the abatement plan ordered by the Court and whether the amount is tailored to the requested need. To the extent that a request is made to fund treatment or other programs or services within the scope of the abatement plan, names of the persons receiving such treatment or services shall be run through each Defendant's dispensing data in a fashion sufficient to protect their privacy. If a Defendant did not dispense prescription opioids to that individual to a sufficient degree, the expense should not be allocated to that Defendant. The Administrator also should establish procedures for auditing the use of the funds that are disbursed to the Counties, to ensure that the funds are used for their intended and approved purposes and to prevent fraud on the fund.

The Administrator should provide a written report to the Court and to the parties on a quarterly basis. The report should identify the disbursements for the prior quarter and specify each Defendant's balance. Any funds that remain at the conclusion of the abatement period should be returned to Defendants.

Dated: March 28, 2022                  Respectfully submitted,

/s/ John M. Majoras
John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

/s/ Eric R. Delinsky
Eric R. Delinsky
Alexandra W. Miller
Graeme W. Bush
Paul B. Hynes, Jr.
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com
E-mail: gbush@zucerkman.com
E-mail: phynes@zuckerman.com

*Counsel for CVS Pharmacy, Inc., Ohio CVS Stores, L.L.C., CVS TN Distribution, L.L.C., CVS Rx Services, Inc., and CVS Indiana, L.L.C.*

11

/s/ Jeffrey A. Hall
Kaspar J. Stoffelmayr
Jeffrey A. Hall
Bartlit Beck LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
jeff.hall@bartlitbeck.com

Katherine L.I. Hacker
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
kat.hacker@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,
Walgreen Co., and Walgreen Eastern Co., Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system on all counsel of record on March 28, 2022.


/s/ Jeffrey A. Hall
Jeffrey A. Hall
Bartlit Beck LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
jeff.hall@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,*
*Walgreen Co., and Walgreen Eastern Co., Inc.*