# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| THE COUNTY BOARD OF ARLINGTON COUNTY, VIRGINIA, )<br>)<br>)<br>Plaintiff, )<br>v. )<br>)<br>PURDUE PHARMA L.P., *et al.*, )<br>)<br>Defendants. )<br>_____ ) | Civil Action No. 1:19-cv-402 (AJT/TCB) |

## MEMORANDUM OPINION AND ORDER

On April 5, 2019, Defendants removed this action from Virginia state court on the grounds that there is "complete diversity of citizenship between Plaintiff and all properly joined defendants." [Doc. 1 at 6]. On April 9, 2019, the Joint Panel on Multidistrict Litigation ("MDLP") issued Conditional Transfer Order 88, which conditionally transferred this action to the Multidistrict Litigation pending in the Northern District of Ohio, *In Re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804 (Polster, J.) ("Opiate MDL"). On April 10, 2019, Plaintiff The County Board of Arlington, County, Virginia filed its Motion to Remand [Doc. 9], its Supplemental Motion to Remand [Doc. 10], and Motion for Expedited Treatment of Motion to Remand [Doc. 11] (collectively, "the Motions to Remand"). On April 17, 2019, Defendants Express Scripts Holding Company and Express Scripts, Inc. moved to stay this action in light of the Conditional Transfer Order, pending a final transfer order. *See* [Doc. 29] ("the Motion to Stay").[1] The Court held a hearing on these motions on April 30, 2019, after which the Court

---

[1] Plaintiff has also filed a Motion to Consolidate Related Cases, including this case, in a related case, *Fauquier County, Virginia v. Purdue Pharma, L.P., et. al.*, Case No. 1:19-cv-364 (ECF No. 28), which is still pending.

took them under advisement.[2] For the reasons below, the Motions to Remand are GRANTED; the Motion to Stay is DENIED; and this action is REMANDED to the Circuit Court for the County of Arlington.

## I. BACKGROUND

On April 1, 2019, Plaintiff the County Board of Arlington County, Virginia ("Plaintiff" or "the County Board") filed this action in the Circuit Court of Arlington County, Virginia. On April 5, 2019, Defendants Actavis LLC ("Actavis"), Express Scripts Holding Company, and Express Scripts, Inc. (collectively, "Express Scripts") removed this action, in advance of being served,[3] pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. [Docs. 1, 2]. The Complaint [Doc. 1-1] identifies the following three classes of Defendants, in addition to an undefined number of Doe Defendants:

- Prescription drug manufacturers (the "Manufacturer Defendants");

- Pharmacy Benefit Managers, who act as intermediaries between manufacturers and wholesalers and/or retailers (the "PBM Defendants"); and

- Pharmacies and other wholesale and retail distributors of opioid medications (the "Distributor Defendants").

Briefly summarized, the 132-page Complaint alleges that all three classes of Defendants as well as the Doe Defendants were negligent and/or grossly negligent in flooding Arlington County, Virginia with prescription opioid medications and engaged in civil conspiracies to do so.

---

[2] Defendants noticed a hearing on the Motion to Stay for Friday, May 10, 2019. However, the Court heard arguments from counsel on the Motion to Stay at the May 3, 2019 hearing, in addition to arguments on the Motions to Remand.

[3] It is an unsettled issue whether a defendant may properly remove an action before being served. *Cheung v. Bristol-Myers Squibb Co.*, 282 F. Supp. 3d 638, 642 (S.D.N.Y. 2017), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) ("Here, it is undisputed that the defendants removed the cases before they were properly served. A plain reading of the forum defendant rule . . . permitted that removal."); *but see Hawkins v. Cottrell, Inc.*, 785 F. Supp. 2d 1361, 1370 (N.D. Ga. 2011) (concluding that "absurd results" would follow if defendants were allowed to engage in "snap removals" of actions before being properly served). Plaintiffs have not raised this objection as a grounds for remand and the Court has therefore not considered it.

2

The Complaint further alleges that the Manufacturer Defendants engaged in a marketing and promotional campaign based on misrepresentations about the risks and benefits of FDA-approved prescription opioid medications; the PBM Defendants "design prescription drug benefit programs and create formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed," thereby "allowing the drugs to enter the marketplace to be abused"; and the Distributor Defendants "fail[ed] to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and fail[ed] to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids." The Complaint asserts eleven causes of action in separate counts, all under Virginia law.[4]

Three non-diverse Defendants are named, all Distributors: McKesson Medical-Surgical Inc., General Injectables & Vaccines, Inc., and Insource, Inc. (collectively, "the Virginia Distributors"). Although complete diversity does not exist on the face of the Complaint, Activis removed the action on the grounds of fraudulent joinder, severance for improper joinder, and fraudulent misjoinder; and Express Scripts removed on the grounds of CAFA jurisdiction and federal question jurisdiction. *See* [Docs. 1, 2].

## III. ANALYSIS

In considering whether to stay this matter pending its transfer to the Opiate MDL, and thereby defer to the Opiate MDL Court for a ruling on the Motions to Remand and the jurisdictional issues embedded in them, the Court has balanced the benefits to be obtained

---

[4] Specifically, the counts are: Statutory Public Nuisance, against all Defendants (Count I); Common Law Public Nuisance, against all Defendants (Count II); Violation of the Virginia Consumer Protection Act, against the Manufacturer Defendants (Count III); Fraud, against the Manufacturer Defendants Count IV); Common Law Conspiracy, against all Defendants (Count V); Negligence Per Se, against the Manufacturer Defendants (Count VI); Negligence Per Se, against the Distributor Defendants (Count VII); Negligence, against all Defendants (Count VIII); Gross Negligence, all Defendants (Count IX); Willful and Wanton Negligence, against all Defendants (Count X); and Unjust Enrichment, against all Defendants (Count XI).

3

through a stay and transfer with the fundamental and limiting role this Court's jurisdiction plays with respect to the ability to act and the nullifying effect a lack of jurisdiction has on any proceedings, as well as principles of federalism and efficient judicial administration, all of which underscores the central importance of promptly disposing of challenges to federal jurisdiction.

Based on all the facts and circumstances, the Court is not persuaded that the benefits to be obtained through transfer in advance of a ruling on jurisdiction outweigh the importance of an early ruling on jurisdiction, particularly given what the Court concludes is the clear lack of federal jurisdiction over this action. To proceed otherwise would work substantial prejudice to the Plaintiff's right to proceed in the lawful forum of its choosing and the right of the state courts to adjudicate cases properly brought before them. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941) ("The power reserved to the states under the Constitution to provide for the determination of controversies in their courts, may be restricted only by the action of Congress in conformity to the Judiciary Articles of the Constitution. Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." (quotation omitted)). A stay of this action would also needlessly burden the transferee Opiate MDL with an action over which there is no jurisdiction.[5]

Turning to the merits of the Motions to Remand, Defendants assert the following five grounds for retaining jurisdiction:

---

[5] Nor would a remand preclude any coordination with state court proceedings on case management issues, including discovery, or in reaching a global resolution or settlement framework.

4

## A. Fraudulent Joinder

Defendants contend that the three non-diverse Virginia Distributors, McKesson Medical-Surgical Inc., General Injectables & Vaccines, Inc., and Insource, Inc., were "fraudulently joined." [Doc. 1 at 14].

The fraudulent joinder doctrine permits a federal court to "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1991). A defendant alleging fraudulent joinder must show either (1) "there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court" or (2) "there has been outright fraud in the plaintiff's pleading of jurisdictional facts." *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232 (4th Cir. 1993). "The party alleging fraudulent joinder bears a heavy burden," as it must show that there is "no possibility" that the plaintiff would be able to "establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Hartley v. CSX Trans. Inc.*, 187 F.3d 422, 424 (4th Cir. 1999). "This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Id.* at 424. Indeed, "[o]nce the court identifies [a] glimmer of hope for the plaintiff, the jurisdictional inquiry ends." *Id.* at 426. Defendants do not contend that there has been outright fraud, and therefore must sufficiently demonstrate that there is no possibility of relief or "glimmer of hope" as to Plaintiff's claims against the Virginia Distributors.

Defendants premise their jurisdictional position on the claim that "Plaintiff has not alleged that [the Virginia Distributors] did anything unlawful." [Doc. 1 at 14]. As characterized by the Defendants, the Complaint mentions the Virginia Distributors "in just a handful of the Complaint's 500-plus paragraphs, and those few paragraphs consist exclusively of boilerplate

5

jurisdictional recitals and do not include any allegation of wrongdoing." [Doc. 1 at 3–4].[6] Essentially, Defendants contend that in order to avoid diversity jurisdiction, the Plaintiff simply lumped the Virginia Distributors in with the other Distributors, without any alleged unlawful conduct specific to the Virginia Distributors.

Contrary to Defendants' characterization, the Complaint alleges in detail the involvement of the Virginia Distributors in the overall alleged conspiracy and scheme, including that the Virginia Distributors, like the other Distributors Defendants, "distribute the opioids from the point of manufacture to the point of delivery to the patient." [Doc. 1-1 at ¶ 3]. In that role, they

> could have and should have been able to stem the excess flow of opioids into Virginia and Arlington County, but they did not. Wholesale drug distributors receive prescription opioids from drug manufacturers and transfer the opioids to hospitals, pharmacies, doctors, and other healthcare providers who then dispense the drugs to patients. Distributors are required by federal and state law to control and report unlawful drug diversions. The Distributor Defendants deliberately ignored these responsibilities, lobbied for higher reporting thresholds and pocketed profits at the expense of Arlington County.

*Id.* at ¶ 15. Specifically, Plaintiff alleges that the Virginia Distributors:

- "purchased opioids from manufacturers," "sold them to pharmacies throughout Virginia," and thereby "played an integral role in opioids being distributed across Virginia" (*Id.* at ¶ 163);

- Did not "effectively monitor and report suspicious orders of prescription opioids and [] implement measures to prevent the filling of invalid and medically unnecessary

---

[6] Defendants argue:
  Here, there is no possibility that Plaintiff can establish a cause of action against the Nominal Distributor Defendants because Plaintiff has not alleged that they did anything unlawful. Notably, of the Complaint's 500-plus paragraphs, only ten (charitably read) mention the Nominal Distributor Defendants. (Compl. ¶¶ 136-138, 148-154.) Those ten paragraphs consist entirely of conclusory jurisdictional allegations that the Nominal Distributor Defendants are Virginia corporations that distribute pharmaceutical products. (*See id.*) Plaintiff nowhere alleges any actual wrongdoing by the Nominal Distributor Defendants that could plausibly give rise to a colorable claim against them.
*Id.* at 14 (footnote omitted).

6

prescriptions," which "greatly contributed to the vast increase in opioid overuse and addiction" in Virginia (*Id.* at ¶ 164);

- "Directly caused a public-health and law-enforcement crisis" in Virginia (*Id.* at ¶ 164);

- Shared the "same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription[] opioids that were incumbent upon the Manufacturer Defendants . . . under Virginia and federal law" (*Id.* at ¶ 309);

- Was required to "maintain effective controls against opioid diversion," "create and use a system to identify and report to law enforcement downstream suspicious orders," "track their shipments," "exercise due care in confirming the legitimacy of each and every order prior to filling," and to assure the public that they were "undertaking a duty to curb the opioid epidemic" (*Id.* at ¶¶ 310–17); and

- "[K]nowingly or negligently allowed diversion" and "negligently or intentionally failed to adequately control their supply lines to prevent diversion" (*Id.* at ¶¶ 320, 326).

Plaintiff does allege that the Virginia Distributors and the out-of-state Distributors engaged in the same or similar unlawful conduct; but at this stage, the Court must assume these allegations to be true, and that aspect of the allegations therefore does not evidence a lack of "any actual wrongdoing by the [Virginia Distributors] that could plausibly give rise to a colorable claim against them."

Moreover, the core substance of the Complaint alleges systemic opioid distribution practices that inextricably involved the Virginia Defendants as much as the other Defendants. As the South Carolina District Court explained in a similar case:

> As described in the filings in this case and in the cited authority from decisions from courts around the country handling similar litigation, the prescription drug supply system in the United States involves manufacturers, wholesale distributors, large chain pharmacies, community pharmacies, hospitals and other medical facilities, and licensed prescribers, all of whom are involved, at one stage or another

7

and in one capacity or another, of delivering prescription drugs to patients, who are the consumers. This delivery of prescription drugs takes place within a complex system that controls the price and flow of drugs in America. It is supposed to be a closed system in the sense that, according to laws and regulations cited in the Complaint, safeguards should be in place along the distribution chain to prevent prescription drugs from being diverted anywhere other than legitimate medical, scientific, and industrial channels. All of the Defendants are involved in the supply chain that delivers prescription drugs, including opioids, to patients. Based on the foregoing, the Court finds the Removing Defendants have failed to make a showing that the Employee Defendants were fraudulently joined.

*County of Anderson v. Rite Aid of S.C., Inc.*, No. 8:18-cv-1947, Doc. 44 at 12–13 (D.S.C. Aug. 20, 2018) (footnote omitted).

In light of these allegations, it cannot be said that there is "no possibility" or no "glimmer of hope" that Plaintiff can obtain relief from the Virginia Distributors. Accordingly, the citizenship of the non-diverse defendants may not be ignored under the fraudulent joinder doctrine.[7]

### B. Severance

Defendants next argue, alternatively, that pursuant to Federal Rule of Civil Procedure 21, the Court should sever and remand the claims against the Distributor Defendants (including the Virginia Distributors) from the Manufacturer and PBM Defendants, thereby preserving complete diversity jurisdiction over the latter and leaving Plaintiff's claims against the former to be resolved in state court. [Doc. 1 at 17].

Rule 21 of the Federal Rules of Civil Procedure permits a court "at any time, on just terms . . . [to] sever any claim against a party." As its text reflects, Rule 21 allows for severance to remedy misjoinder of claims, as opposed to parties. *See United States v. O'Neil*, 709 F.2d 361, 369 (5th Cir. 1983). Although the Court may, in its discretion, sever nondiverse parties to

---

[7] Defendants' contention that there is no possibility of recovery against the Virginia Distributors can be quickly tested definitively in state court proceedings upon remand through the filing of a demurrer, which imposes on the plaintiff a pleading standard higher than that under the fraudulent joinder doctrine; and if the demurrer is successful, it would allow for removal based on complete diversity.

8

achieve complete diversity, *see Koehler v. Dodwell*, 152 F.3d 304, 308 (4th Cir. 1998), the Supreme Court has cautioned that, in considering Rule 21 severance, courts "should carefully consider whether the dismissal of a nondiverse party will prejudice any of the parties in the litigation" and that "such authority should be exercised sparingly," *Newman-Green, Inc. v. Alfonzo-Lorrain*, 490 U.S. 826, 837, 838 (1989). Moreover, the Fourth Circuit has explained that joinder under Rule 20(a) (as compared with severance under Rule 21) is proper if "any right of relief aris[es] out of the same transaction *and* if any question of law or fact common to all of them will arise in the action." *Great Am. Ins. Co. v. Harleysville Mut. Cas. Co.*, 285 F.2d 262, 264 (4th Cir. 1961) (emphasis added);[8] *see also DirecTV, Inc. v. Leto*, 467 F.3d 842, 844 (3d Cir. 2006) (stating that misjoinder of claims "occurs when there is no common question of law or fact or when . . . the events that give rise to the plaintiff's claims against defendants do not stem from the same transaction"). In considering severance, the Court may also consider whether the party to be severed is a necessary and indispensable party under Federal Rule of Civil Procedure 19. *See Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 36 F.3d 540, 545–46 (6th Cir. 1994).[9] If a nondiverse party is necessary and indispensable under Rule 19, then "diversity remains incomplete and the case must be remanded to state court." *Id.*

Defendants essentially claim that Plaintiff's allegations against the Distributor Defendants are materially distinct from its allegations against the Manufacturer and PBM

---

[8] Rule 20 states that multiple defendants may be joined in one action if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

[9] A party is necessary if:
> the court cannot accord complete relief among existing parties; [ ] or that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). A necessary party is indispensable if the action cannot proceed without that party "in equity and good conscience." *Sullivan*, 117 F. Supp. 3d at 705 (quoting Fed. R. Civ. P. 19(b)).

9

Defendants, such that joinder was improper in the first instance under Federal Rule of Civil Procedure 20.[10] In that regard, Defendants contend that while Plaintiff's claims against the Manufacturer Defendants arise out of their marketing and promotion practices with regard to opioids, and against the PBM Defendants, their efforts to ensure that pharmacy benefit plans cover opioids, "Plaintiff's allegations against the Distributor Defendants have nothing to do with promotion of opioid medications or the design of benefit plans." [Doc. 1 at 20]. Instead, Plaintiff alleges that the Distributor Defendants failed to detect, halt, and report suspicious orders of opioid medications." *Id.* Severance would be appropriate, Defendants claim, because it would allow the claims against the Manufacturer and PBM Defendants to be transferred into the MDL, thereby allowing the diverse Defendants to benefit from the "significant efficiencies" in defending their action in the MDL rather than in individual actions throughout the country. *Id.* at 21–22.

Based on the allegations in the Complaint, the claims against the Distributor Defendants are substantially intertwined with those against the Manufacturer and PBM Defendants with regard to both questions of fact and law, and at least some of those issues arise out of the same transactions or occurrences, such that joinder of the claims against the Distributor Defendants was proper. Specifically, the Complaint alleges that both the Manufacturer and Distributor Defendants are required by law to control their inventories to prevent diversion and to report suspicious transactions to the Virginia Board of Pharmacy and have failed or are failing to do so. [Doc. 1-1 at ¶¶ 285, 291, 293]. Counts I, II, V, VIII, IX, X, and XI are asserted against all three

---

[10] Specifically, they argue:
> Defendants are severable under Rule 21 if they are either unnecessary or dispensable under Rule 19, or if the claims against them are sufficiently distinct from claims against other defendants under Rule 20. Here, the Distributor Defendants should be severed on both grounds, each of which preserves diversity jurisdiction as to the Manufacturer Defendants and PBM Defendants.

[Doc. 1 at 17].

10

groups of Defendants and share common questions of law, as those counts allege the same legal duties apply to all Defendants. Common questions of both fact and law as to all three groups of Defendants are particularly reflected in Count V (civil conspiracy), which alleges that they all acted in concert to flood the market with opioids. *Id.* at 130–32. In short, the overarching theory is that the Manufacturer, PBM, and Distributor Defendants worked in concert to pump opioids into this District, all acted out of the same pecuniary motives, and all violated their jointly applicable legal duties to monitor and report excessive volumes of those opioids. *See, e.g., id.* at ¶¶ 3–5, 15, 17, 128, 136–37, 149–50, 164, 285–93, 309–33.

For these reasons, joinder of these claims was proper under Rule 20 and severance under Rule 21 is not warranted.

### C. Fraudulent Misjoinder

Third, Defendants argue that remand is not warranted because of the fraudulent *misjoinder* of claims. [Doc. 1 at 23–24]. Like fraudulent joinder, fraudulent misjoinder is an exception to the well-pled complaint rule that allows a federal court to allow removal on the basis of diversity jurisdiction by disregarding the citizenship of non-diverse parties who were improperly joined. *Wyatt v. Charleston Area Med. Ctr.*, 651 F. Supp. 2d 492, 496 (S.D.W. Va. 2009). However, unlike fraudulent joinder, which occurs when a plaintiff joins a defendant against whom it has no feasible claim to defeat removal, fraudulent misjoinder "is an assertion that claims against certain defendants, *while provable*, have no real connection to the claims against other defendants in the same action and were only included in order to defeat diversity jurisdiction and removal." *Id.* (emphasis added).

11

Assuming, without deciding, that the citizenship of a non-diverse defendant may be disregarded under the doctrine of fraudulent misjoinder,[11] the claims against the Distributor Defendants are clearly connected to the claims against the Manufacturer and PBM Defendants. They are factually, legally, and logically related and all arise out of the same or related series of events, transactions and occurrences, including the same overall integrated distribution scheme in which they are alleged to be acting in concert. *See supra* Part II.B. The citizenship of the non-diverse Defendants may therefore not be disregarded under the doctrine of fraudulent misjoinder.

### D. CAFA

In their Supplemental Notice of Removal, Defendants assert that the Class Action Fairness Act ("CAFA"), which requires only minimal diversity between the parties, provides an independent ground for the Court to retain jurisdiction over this action. [Doc. 2 at 4]. Specifically, Defendants argue, "Plaintiff's Action is removable under CAFA because (i) it raises factual and legal issues of national importance that, consistent with CAFA's primary purpose, should be adjudicated in federal court; (ii) this Action qualifies for treatment as a class action; and (iii) CAFA's remaining jurisdictional requirements are satisfied." *Id.*

CAFA defines a "class action" as "any civil action filed under Federal Rule of Civil Procedure 23 or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representatives." 28 U.S.C. § 1332(d)(1)(B). "[W]hile a 'similar' state statute or rule need not contain all of the other conditions and administrative aspects of Rule 23, it must, at minimum, provide a procedure by which a member of a class whose claim is typical of

---

[11] Unlike fraudulent joinder, fraudulent misjoinder has not been widely recognized in the federal courts. *Construction and Application of Fraudulent Misjoinder Exception to Complete Diversity Rule*, 65 A.L.R. Fed. 2d 527 (originally published in 2012). *See Tinsley v. Streich*, 143 F. Supp. 3d 450, 458 (W.D. Va. 2015)(observing that the Fourth Circuit has not expressly recognized fraudulent misjoinder and acknowledging that district courts within the Fourth Circuit have disagreed as to whether fraudulent misjoinder is a cognizable ground from removal).

12

all members of the class can bring an action not only on his own behalf but also on behalf of all others in the class, such that it would not be unfair to bind all class members to the judgment entered for or against the representative party." *West Virginia v. CVS Pharm., Inc.*, 646 F.3d 169, 175 (4th Cir. 2011) (footnote omitted).

This action is not a class action. It has only one Plaintiff—the County Board. Moreover, it was not filed pursuant to any Virginia statute or rule that allows for representative claims or is otherwise similar to Rule 23. Defendants argue that although it was not filed as a class action, it is effectively a class action brought by the County Board on behalf of numerous residents of the County for harm they have suffered and are suffering as a result of the opioid crisis. [Doc. 2 at 7]. This contention is foreclosed by the Fourth Circuit's decision in *AU Optronics v. South Carolina*, 699 F.3d 385 (4th Cir. 2012).

In *AU Optronics*, the Fourth Circuit considered whether an action brought by South Carolina alleging harms imposed on its citizenry qualified as a mass action under CAFA and for that purpose considered whether to adopt the "claim-by-claim approach," adopted by some circuits, or the "whole-case approach," adopted by others. The Court adopted the "whole-case approach." *AU Optronics*, 699 F.3d at 394. Under the "whole-case approach," the proper analysis is to "consider the complaint in its entirety and decide from the nature and substance of its allegations what interest the state possesses in the lawsuit as a whole." *Id.* at 391. Using that approach, the Court concluded that South Carolina, rather than its citizens, was the real party in interest and the action was therefore not a "class action" under CAFA:

> South Carolina's claims for relief in these cases are each unique to the State and are consistent with its role as *parens patriae*, inasmuch as the State possesses a quasi-sovereign interest in enforcing—in state court—its laws with respect to price-fixing conspiracies. Furthermore, South Carolina is the sole named plaintiff in these lawsuits. Indeed, the provisions of the Antitrust Act and SCUTPA invoked in the complaints designate the State as the proper plaintiff.

*Id.* at 394.

13

Like the state plaintiff in *AU Optical*, the County Board's interest is primarily the protection of its citizens from the opioid crisis, which it alleges occurred in large part due to the Defendants' tortious conduct, and it brings this action to vindicate *its* interest in enforcing the state's laws, rather than on behalf of injured citizens to recover for *their* specific injuries. *See* [Doc. 1-1 at ¶ 21 ("Plaintiff also seeks an order compelling the abatement and removal of the public nuisance the Defendants have created, knew their misconduct would likely create and from which, they profited . . . .")]. Moreover, the damages sought involve outlays paid by Plaintiff with its own funds to deal with the opioid crisis, rather than direct damages suffered by the citizenry. For example, Plaintiff alleges,

> Arlington County is now having to allocate substantial taxpayer dollars, resources, staff, energy and time to address the damage the opioid scourge has left in its wake and to address its many casualties. The County's costs for incarceration and correction services have increased in recent years due to an increasing crime rate attributable to the opioid epidemic. The costs that the County has borne for foster care and other child placement services have similarly increased due to the increasing number of children who need such services because opioid addiction has destroyed the structure of their families. Fire and emergency medical services are over-utilized because of an increased number of opioid-related overdoses. The burden on law enforcement is substantially increased by opioid-related crimes related to prescription opioid theft, diversion, and sales on the black market. Courts, social workers, nurses, schools, intervention programs, and clinics have all been harmed. Nearly every aspect of Arlington County's budget has been significantly and negatively impacted by this Defendant-made epidemic.

*Id.* at ¶ 10. Under the analysis set forth in *AU Optical*, the County Board, rather than the County's citizens, is the real party in interest; and there is therefore an insufficient showing that the Court has CAFA jurisdiction.

### E. Federal Question Jurisdiction

Lastly, Defendants argue that removal was proper because the Court has federal question jurisdiction over the action, even though all of Plaintiff's claims are state tort claims. [Doc. 2 at 10]. Specifically, Defendants argue:

14

> Plaintiff alleges that certain "Manufacturer and Distributor Defendants" failed to discharge their duties to prevent diversion and report suspicious orders under Virginia and Federal law. (Compl. ¶¶ 285–93.) Plaintiff further alleges that the Defendants are bound by "the requirements of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*" (*id.* ¶ 285), are required to comply with certain federal regulations in order to register with the federal Drug Enforcement Authority (*id.* ¶¶ 287–90), and have intentionally failed to take certain protective and reporting measures, in violation of "Virginia and Federal law" (*id.* ¶ 291 (emphasis added)).
> . . .
> Plaintiff bases its claims, in part, on alleged noncompliance with federal regulations and violations of federal law. Resolving Plaintiff's claims would therefore require resolution of substantial federal questions such that the lawsuit originally could have been filed in federal court.

*Id.* at 10–11 (citations omitted).

Federal question jurisdiction exists only when a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). The "presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. at 804, 813 (1986). For a state-law claim to "necessarily" raise a federal issue, it must be found that within that claim, "every legal theory supporting the claim requires the resolution of a federal issue." *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014). The asserted state-law claim must therefore be essentially "meaningless" without reliance on federal law. *See, e.g., Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003).

Although the Complaint makes references to the federal Controlled Substances Act and the Defendants' reporting requirements under federal law, none of the claims depend exclusively, or even primarily, on Defendants' duties under these or other federal statutes. None of the eleven counts raised would be "meaningless" without consideration and construction of federal law. Accordingly, the Court does not have federal question jurisdiction over the claims, whose elements do not include any federal law issues or federal law claims for relief on their

15

face. *See Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 154 (4th Cir. 1994) (concluding "that the Plaintiffs' reference to federal environmental statutes in their state common law negligence action cannot support federal subject matter jurisdiction").

## IV. CONCLUSION

For the above reasons, it is hereby

ORDERED that Plaintiff The County Board of Arlington, County, Virginia's Motion to Remand [Doc. 9], Supplemental Motion to Remand [Doc. 10], and Motion for Expedited Treatment of Motion to Remand [Doc. 11] be, and the same hereby are, GRANTED; and this action is REMANDED to the Circuit Court of Arlington County, Virginia; and it is further

ORDERED that Moving Defendants' Motion for Temporary Stay of Proceedings Pending Likely Transfer to Multidistrict Litigation [Doc. 29] be, and the same hereby is, DENIED as moot.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
May 6, 2019