# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

      *County of Lake, Ohio v. Purdue*
      *Pharma L.P., et al.*,
        Case No. 18-op-45032 (N.D. Ohio)

      *County of Trumbull, Ohio v. Purdue*
      *Pharma, L.P., et al.*,
        Case No. 18-op-45079 (N.D. Ohio)

"Track 3 Cases"

**MDL No. 2804**
**Case No. 17-md-2804**
**Judge Dan Aaron Polster**

# DEFENDANTS' JOINT REPLY BRIEF REGARDING
## SELECT LEGAL ISSUES FOR REMEDIES PHASE

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.     PLAINTIFFS' ABATEMENT PLAN IS OVERBROAD ................................................... 1

      A.    Costs of Programs and Services to Address the Health, Societal, and Other Downstream Effects of a Nuisance Are Not Recoverable as Abatement ................... 2

      B.    Plaintiffs' "Abatement" Plan Is Not Tailored to the Nuisance That the Jury Found and Thus Violates the Seventh Amendment and Rule 42 .............................. 8

      C.    Plaintiffs' Abatement Plan Targets Conduct Unconnected to Defendants' Dispensing and Is Thus Unprecedented and Stunningly Overbroad ........................ 10

II.    JOINT-AND-SEVERAL LIABILITY IS NOT AVAILABLE, AND ANY AWARD MUST BE APPORTIONED AMONG ALL TORTFEASORS ........................ 14

      A.    Under Ohio Common Law and the Restatement, Each Defendant Should Be Liable Only for Its Share of Abatement Costs, and Plaintiffs Should Bear the Burden of Proving That Share ..................................................................... 15

      B.    Defendants Maintain Their Objection That Ohio's Joint-and-Several-Liability Statute Precludes Joint Liability Here ......................................................... 19

III.   THE CONSTITUTION REQUIRES A DIFFERENT FACTFINDER TO DECIDE THE REMEDY ................................................................................................. 20

      A.    The Seventh Amendment Requires a Jury to Decide the Remedy ........................... 20

      B.    If the Seventh Amendment Does Not Apply, a Different Judge Must Decide the Remedy .................................................................................................... 22

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Sheppard*,
   856 F.2d 741 (6th Cir. 1988) ........................................................................20, 23

*Arizona v. United States*,
   567 U.S. 387 (2012).................................................................................................4

*Att'y Gen. v. Utica Ins. Co.*,
   2 Johns. Ch. 371 (N.Y. Ch. 1817).......................................................................20

*Bowes v. City of Aberdeen*,
   109 P. 369 (Wash. 1910).......................................................................................13

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
   519 F.3d 969 (9th Cir. 2008) ...............................................................................12

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
   615 F.3d 496 (6th Cir. 2010) ..........................................................................11, 12

*City of Cleveland v. Lewis*,
   96 N.E.3d 990 (Ohio Ct. App. 2017).................................................................6, 7

*Cleveland v. JP Morgan Chase Bank, N.A.*,
   No. 98656, 2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ...........................15

*Dairy Queen, Inc. v. Wood*,
   369 U.S. 469 (1962)..............................................................................................21

*Davidson v. Bradford*,
   212 N.W. 476 (Iowa 1927) ..................................................................................12

*Freeman v. Grain Processing Corp.*,
   848 N.W.2d 58 (Iowa 2014)................................................................................22

*Fried v. Sungard Recovery Servs., Inc.*,
   925 F. Supp. 372 (E.D. Pa. 1996) .......................................................................22

*Gen. Cas. Co. of Wis. v. Hills*,
   561 N.W.2d 718 (Wis. 1997)...............................................................................22

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989)................................................................................................22

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002)..............................................................................................21

*Hymowitz v. Eli Lilly & Co.*,
   539 N.E.2d 1069 (N.Y. 1989)..............................................................................17

*In re Cordis Corp. Pacemaker Prod. Liab. Litig.*,
   No. C-3-86-543, 1992 WL 754061 (S.D. Ohio Dec. 23, 1992)............................22

ii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  379 F. Supp. 2d 348 (S.D.N.Y. 2005) ..................................................................17

*In re Nat'l Prescription Opiate Litig.*,
  No. 17-md-2804, 2019 WL 4194272 (N.D. Ohio Sept. 4, 2019) ......................14, 15

*In re Nat'l Prescription Opiate Litig.*,
  No. 19-3935, 2019 WL 7482137 (6th Cir. Oct. 10, 2019) ....................................24

*Jaffee v. United States*,
  592 F.2d 712 (3d Cir. 1979)...................................................................................22

*Kidis v. Reid*,
  976 F.3d 708 (6th Cir. 2020) .................................................................................19

*Longbottom v. Mercy Hosp. Clermont*,
  998 N.E.2d 419 (Ohio 2013) ...................................................................................7

*Nithiananthan v. Toirac*,
  2015-Ohio-1416 ......................................................................................................7

*Off. of Scioto Twp. Zoning Inspector v. Puckett*,
  31 N.E.3d 1254 (Ohio Ct. App. 2015)....................................................................8

*People v. ConAgra Grocery Prods. Co.*,
  227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017)....................................................3, 4, 9

*Rodriguez v. Tenn. Laborers Health & Welfare Fund*,
  89 F. App'x 949 (6th Cir. 2004) ...........................................................................14

*Smith v. Cutter Biological, Inc., a Div. of Miles Inc.*,
  823 P.2d 717 (Haw. 1991) .....................................................................................17

*State ex rel. Brown v. BASF Wyandotte Corp.*,
  Nos. 33533, 33545, 33549, 1975 WL 182459
  (Ohio Ct. App. Apr. 24, 1975) ..........................................................12, 13, 17, 18

*State ex rel. Hunter v. Johnson & Johnson*,
  499 P.3d 719 (Okla. 2021)..................................................................................1, 5

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)...............................................................................................19

*Thompson v. City of Brook Park*,
  No. 84068, 2004 WL 2340071 (Ohio Ct. App. Sept. 23, 2004)..............................6

*Tioga Pub. Sch. Dist. No. 15 of Williams Cnty. v. U.S. Gypsum Co.*,
  984 F.2d 915 (8th Cir. 1993) ..................................................................................1

*Tull v. United States*,
  481 U.S. 412 (1987)................................................................................................21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Pfizer Inc.*,
   560 F.2d 319 (8th Cir. 1977) ........................................................................................23

*United States v. Twp. of Brighton*,
   153 F.3d 307 (6th Cir. 1998) ........................................................................................18

*Williams v. Pennsylvania*,
   579 U.S. 1 (2016) ..........................................................................................................23

**STATUTES**

21 U.S.C. § 801 ....................................................................................................................10

Ohio Rev. Code § 2307.011 ................................................................................................20

Ohio Rev. Code § 2307.22 ..................................................................................................19

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009)..................................................................................8

66 C.J.S. Nuisances § 131 (Mar. 2022 update)...................................................................21

1 Dobbs, Law of Remedies § 5.7 (2d ed. 1993) .............................................................5, 6

Larsen, *Navigating the Federal Trial* § 19:4 (2021 ed.).....................................................23

Restatement (Second) of Torts (1965).......................................................................... *passim*

Restatement (Second) of Torts (1979) ..................................................................................7

## INTRODUCTION

Plaintiffs' response confirms that they seek a remedy for a nuisance that the jury never found.  Recognizing that the verdict form creates problems for them, Plaintiffs hope the Court will ignore it.  But the Seventh Amendment binds this Court and the parties to what the jury actually found—the oversupply and diversion of *legal prescription opioids*.  Not only do Plaintiffs attempt after the fact to broaden the nuisance the jury found, but their response also offers a limitless and unprecedented definition of abatement.  Not one case supports their request for the Court to require Defendants to fund a far-reaching list of programs to cure complex societal problems.  Hornbook law establishes that a defendant found to have caused a nuisance may be ordered to abate only the conduct that caused the nuisance and the nuisance itself—*not* to pay for the costs of every attenuated, downstream effect of the nuisance.

Other courts have warned that if public nuisance law is extended to the sale of lawful products, it "would become a monster that would devour in one gulp the entire law of tort."  *Tioga Pub. Sch. Dist. No. 15 of Williams Cnty. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993); *see also State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 726 (Okla. 2021).  Plaintiffs' extravagant abatement plan proves the wisdom in that prediction.  The Court should hold that the remedies trial must be limited to abating the nuisance the jury actually found, and it should exclude Plaintiffs' requests to remedy harms unrelated to Defendants' conduct.

## ARGUMENT

### I.  PLAINTIFFS' ABATEMENT PLAN IS OVERBROAD.

Any abatement remedies awarded by this Court must directly abate the specific public nuisance that the jury found at trial: the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels."  Dkt. 4176 at 2,

6.  The overwhelming majority of the abatement elements Plaintiffs propose, however, fail to address that nuisance, and instead seeks to cure broad, multidimensional social ills that were not the subject of a jury finding.

Plaintiffs do not deny that their abatement plan is designed to encompass health, societal, and other downstream effects of the nuisance, with no attempt to limit the relief reducing the oversupply of prescription opioids or even the harm caused by prescription opioids specifically. Instead, they insist that such a sweeping remedy is proper.  Plaintiffs try to brush away the well-founded limiting principles established by the authorities cited in Defendants' opening brief with factual distinctions of little significance.  Plaintiffs fail to cite even one example in which any court anywhere ever ordered any defendant or discrete group of defendants to abate a complex and multidimensional social ill—much less when those defendants are but a small subset of those that the plaintiffs accuse of causing the problem in the first place.  Plaintiffs' abatement plan lacks any basis in law, and the Court should reject it.

### A. Costs of Programs and Services to Address the Health, Societal, and Other Downstream Effects of a Nuisance Are Not Recoverable as Abatement.

The only relief available in Phase 2 is abatement—not any past or future damages.  *See* Dkt. 2519 at 2 (distinguishing abatement from damages).  Yet while Plaintiffs attempt to dress up their proposed plan as "abatement," in reality it has virtually nothing to do with abating the oversupply and diversion of legal prescription opioids—the only nuisance the jury found.  *See* Dkt. 4176 (verdict form).  Indeed, only the tiniest fraction of the plan addresses the oversupply of prescription opioids in Plaintiffs' counties: the amount earmarked for drug disposal programs to reduce any oversupply in Plaintiffs' communities (which itself is overbroad because it extends years beyond the period necessary to abate the current oversupply).  *See* Dkt. 4337 at 1–2 (Defs'

2

Amended Abatement Plan). The rest of Plaintiffs' plan targets, at best, the claimed health, societal, and other downstream effects of the oversupply rather than the oversupply itself.

Plaintiffs do not even attempt to deny that their abatement plan focuses primarily on these downstream effects. Instead, they insist that any "measures [that] directly address . . . interference with public health and safety" are appropriate. Opp. 7. Plaintiffs cite no authority for that sweeping proposition, however, which contradicts the only remotely close analogues for Plaintiffs' novel abatement plan. Consider the lead paint lawsuits brought by California municipalities. *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 560 (Cal. Ct. App. 2017). There, paint manufacturers were ordered to pay into an abatement fund to be used for lead inspections for homes, removal of lead paint from homes, and education for families and homeowners about hazards from lead-based paint currently in homes. *Id.* at 525, 568–69. The plan did *not* cover medical treatment or other programs or services to address the individual harms or other societal harms resulting from lead poisoning in children. *Id.* at 569. On appeal, the abatement fund was upheld as true abatement—and not a "'thinly-disguised' damages award"—precisely because the "sole purpose" and actual effect of the equitable remedy of abatement was "to eliminate the hazard that is causing prospective harm to the plaintiff." *Id.*

Plaintiffs argue that *ConAgra* is inapposite because "once the lead paint hazards at issue were remediated or removed, they no longer posed an ongoing health threat," Opp. 15, but exactly the same is true for removal of "excess" prescription opioids in Plaintiffs' counties. Plaintiffs themselves concede that "individuals exposed to excessive lead before the hazard was removed or remediated suffered their own negative health consequences," which in turn has societal ramifications. *Id.* But, Plaintiffs state, the exposed individuals "themselves posed no ongoing threat to *public* health or safety." *Id.* (emphasis in original). Plaintiffs cite no finding in *ConAgra*

to support that claim.  In fact, the plaintiffs in *ConAgra* introduced evidence that lead poisoning would "cause children to suffer impaired intellect and behavioral problems," that these effects were "irreversible," and that it could also lead to reproductive effects and cardiovascular disease when they are adults.  *ConAgra*, 227 Cal. Rptr. 3d at 515–16.  Plaintiffs do not even attempt to suggest any reason why the abatement of lead paint would *exclude* the treatment of individuals with lead poisoning while the abatement of an oversupply of legal prescription opioids would *include* treatment of opioid use disorder.  To the extent that Plaintiffs question whether the *ConAgra* plaintiffs ever requested payment of health-related costs, Opp. 14, n.13, that only proves that Plaintiffs' request here is unprecedented.

The only other distinction Plaintiffs offer is that lead paint was banned in 1978, while "Defendants and others will continue to dispense prescription opioids into the Counties" indefinitely.  Opp. 15.  Plaintiffs' argument, however, conflates the nuisance the jury found—the *oversupply and diversion of* prescription opioids—and the prescription opioids themselves.  Any argument premised on the notion that prescription opioids are *per se* harmful is preempted: The FDA has approved prescription opioids as safe and effective, and DEA has classified them as having a currently accepted medical use.  DEA also has authorized registrants, including Defendants, to dispense the prescription opioids at issue here, and thus any argument that suggests that Defendants (and others) will continue to contribute to the nuisance—a finding the jury did not make—simply by continuing to dispense prescription opioids second-guesses DEA's expert judgment and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).

Plaintiffs' other attempts to distinguish the authorities Defendants cited in their opening brief—making clear that health, societal, and other downstream effects fall outside the proper

4

scope of abatement—are unpersuasive.  Plaintiffs try to cabin the Oklahoma Supreme Court's refusal to award costs to "address social, health, and criminal issues arising from conduct alleged to be a nuisance" as an oddity of Oklahoma law.  *Hunter*, 499 P.3d at 729.  The Court made clear, however, that it was basing its decision on the "common law criminal and property-based limitations" that have shaped Oklahoma public nuisance and those limitations are similarly applicable to Ohio common law.  *Id.* at 731.  Indeed, in the *Muscogee (Creek) Nation v. Purdue Pharma L.P.* matter, this Court expressly acknowledged that "the claims presented by Plaintiffs and the arguments brought by Defendants" under Oklahoma law had "many similarities" to the Ohio nuisance claim at issue in the Track 1 and Track 3 cases.  Dkt. 1680 at 2.

Plaintiffs also emphasize that the Oklahoma Supreme Court held that Johnson & Johnson, as a drug manufacturer, did not control the instrumentality alleged to constitute the nuisance at the time it occurred.  Opp. 11.  It is true that this was one of several rationales for finding that J&J was not liable in the first place.  It is equally true here: The nuisance the jury found—which includes both oversupply and diversion—occurred only after the drugs were dispensed, not while they were behind a pharmacy counter.  *See* Dkt. 4202 at 30.  And it is all the more reason to limit any abatement award to Defendants' conduct—not attenuated, downstream effects.

Next, Plaintiffs argue that Defendants' statement from a leading remedies treatise that an "injunction abating the nuisance" is designed to make the plaintiff "free from the activity in question" is taken out of context.  1 Dobbs, Law of Remedies § 5.7(3) (2d ed. 1993).  Plaintiffs suggest this principle was limited to the law of equity only "prior to 1973."  Opp. 8 n.10.  But this enduring principle did not suddenly disappear in 1973.  Rather, another type of remedy—the "compensated injunction"—appeared, in which the nuisance victim was entitled to an injunction "only if he paid the defendant for the costs of the abatement."  1 Dobbs, Law of Remedies § 5.7(3).

Even for compensated injunctions, though, the proper scope of the remedy was to make the plaintiff "free from the activity in question," *id.* The emergence of the compensated injunction in 1973 is a distraction.

Plaintiffs also point to a longer passage for the treatise's proposition that "[d]amages" in a nuisance case "might be based on . . . the cost of eliminating the nuisance effects." *Id.* The extended passage provides that injunctions "may range widely in their scope" such that they "might only compel some adjustment in operating conditions" rather than "complete abatement of the offending condition." *Id.* But the fact that a proper abatement remedy might stop short of eliminating the nuisance provides no support whatsoever for Plaintiffs' plan, which goes beyond the nuisance to address health, societal, and other downstream effects. Plaintiffs also speculate that the treatise's description of "damages" based on "the cost of eliminating the nuisance effects" might have been limited to already-incurred costs, rather than future abatement costs. *Id.* In reality, the treatise includes no such qualifying language.

Plaintiffs' other attempts to distinguish Defendants' authorities likewise fail. Plaintiffs note that *Thompson v. City of Brook Park* involved only "past damages" for personal injuries suffered by a motorcycle driver who hit an abandoned tire on the highway. No. 84068, 2004 WL 2340071 (Ohio Ct. App. Sept. 23, 2004). That is true as far as it goes, but there is no indication in the case, and no reason to think, that those "damages"—the result of a jury trial—would have constituted abatement so long as the plaintiff had not yet incurred them. The medical costs of the motorcycle driver injured by the tire are damages, no matter when they are incurred, while the cost of removing the tire from the highway would be abatement. Indeed, Plaintiffs' own analysis of *City of Cleveland v. Lewis* proves the point. 96 N.E.3d 990 (Ohio Ct. App. 2017). As Plaintiffs observe, the city had already "incurred costs to have the structure demolished" and yet those costs

6

were still properly considered "abatement costs," not damages.  *Id.* at 998.  That is because the costs were associated with having "the structure demolished," *i.e.*, abating the nuisance, not personal injuries or downstream effects.  *Id.*

Plaintiffs similarly try to wish away another leading authority, the Restatement (Second) of Torts, by attempting to distinguish an action for injunction from an action for an abatement. But the Restatement groups the two remedies together and distinguishes them collectively from "an action for tort damages."  Restatement (Second) of Torts § 821B cmt. i (1979).  In a claim for damages, the court evaluates whether it is "unreasonable to inflict the harm without compensating for it," while in a claim for an injunction or abatement, "the question is whether the activity itself is so unreasonable that it must be stopped."  *Id.*  Again, the focus is on stopping the offending "activity itself" and not on the health, societal, and downstream effects of the activity.  *Id.*

As for *Nithiananthan v. Toirac*, Plaintiffs are correct that the plaintiffs in that case presented no evidence of "costs associated with psychological or medical treatment" caused by the neighbor's security camera, and so were not entitled to such an award.  2015-Ohio-1416, ¶ 54. What matters, though, is that the court characterized such hypothetical medical expenses as "costs to combat the effects of the . . . nuisance," which would have constituted "damages," rather than abatement costs.  *Id.*  So too here, Plaintiffs' attempt to recover the costs of health, societal, and downstream effects is an attempt to recover damages.  Plaintiffs also dismiss *Longbottom v. Mercy Hospital Clermont* as a case that "was not a nuisance action and did not involve an abatement remedy," Opp. 14; 998 N.E.2d 419 (Ohio 2013), but once again they miss the point.  *Longbottom* shows that an award for "anticipated medical expenses"—just like Plaintiffs' request for compensatory relief for personal injury and future related expenses—is properly considered a *damages* award and not equitable abatement.  998 N.E.2d at 421.

7

Finally, to be "abatable," the nuisance at issue must be "removable by reasonable means." *Off. of Scioto Twp. Zoning Inspector v. Puckett*, 31 N.E.3d 1254, 1264 (Ohio Ct. App. 2015) (quoting Black's Law Dictionary (9th ed. 2009)). Plaintiffs' attempt to hold Defendants responsible for the broad and ill-defined "opioid crisis"—which, again, is not the nuisance the jury found—violates this rule. Plaintiffs do not seriously argue otherwise. Instead, they object that *Puckett* was a case involving "defendants' use of their own real property" rather than "unreasonable interference with public health and safety." Opp. 10. But nothing in *Puckett*, or Ohio law more generally, supports the proposition that abatement relief is not limited to removing a nuisance "by reasonable means" if the case involves an interference with public health or safety. Plaintiffs further attempt to distinguish *Puckett* by arguing that "[s]imply stopping future oversupply and diversion is not enough to remove this nuisance from the Counties," but they fail to explain why that would allow the Court to disregard *Puckett*'s "reasonable means" requirement. *Id.* They also ignore (yet again) that the nuisance found by the jury was limited to the oversupply and diversion of legal prescription opioids, and that an abatement plan consisting of drug disposal and takeback would address that oversupply.

## B. Plaintiffs' "Abatement" Plan Is Not Tailored to the Nuisance That the Jury Found and Thus Violates the Seventh Amendment and Rule 42.

In ordering bifurcation of the liability and remedy phases, the Court expressly recognized that it would be "bound by the jury's findings of relevant facts" in fashioning an equitable remedy for any nuisance liability. Dkt. 2629 at 10. Thus, consistent with the Seventh Amendment, the Federal Rules of Civil Procedure, and its own prior orders, the Court cannot award abatement for a nuisance that is any broader than or different from the one the jury found. Yet Plaintiffs ask the Court to do exactly that, by proposing a plan that goes beyond abating any "oversupply of legal prescription opioids" caused by Defendants and instead aims to cure a host of health and societal

ills related to the abuse of prescription and illicit opioids.  The jury did not find that the nuisance was the "opioid epidemic," the "opioid crisis," or even opioid addiction and abuse.  Instead, the jury found only that the nuisance was the "oversupply of legal prescription opioids, and diversion of *those opioids* into the illicit market outside of appropriate medical channels" in each county. Dkt. 4176 at 2, 6 (emphasis added).

Plaintiffs contend that "the jury could not have found that 'oversupply' and 'diversion' of prescription opioids constituted a public nuisance unless it also found that such oversupply and diversion interfered with public health or safety," in light of the Court's jury instructions.  Opp. 5. But all Plaintiffs are doing is repeating the definition of a public nuisance in any case where the common public right at issue is public health or safety.  *See* Dkt. 4153 (Nov. 15 trial tr., vol. 28) at 7071:8–12.  In doing so, Plaintiffs suggest that *every* public nuisance based on public health or safety, by definition, is not abated until all follow-on harms and effects to public health and safety are abated.  Yet they point to no case in which a Court has ordered such broad relief.  The court in *ConAgra*—a public nuisance case where the common right was the public health—did not order such relief.  227 Cal. Rptr. 3d at 522 (finding that lead paint was a "public health problem" and a "threat to public health").

Plaintiffs alternatively argue that "the oversupply and diversion of prescription opioids has created (and continues to create and affect) a significant population of addicted individuals, many of whom have moved on to stronger drugs like heroin or illegally-manufactured fentanyl."  Opp. 6.  But that is, at best, a disputed issue of fact about which the jury made no finding.[1]  Defendants

---

[1] Plaintiffs objected to a special interrogatory on exactly this issue.  *See* Dkt. 4146-1 at 32 (Defendants' proposed special interrogatories distinguishing between Defendants' conduct causing a nuisance of diverted prescription opioids and a nuisance of illicit, non-prescription opioids); Dkt. 3449 at 126–27 (Plaintiffs object to a similar proposed special interrogatory in Track 1-B).  Plaintiffs must now accept the finding they insisted on—along with its limitations.

presented evidence rebutting Plaintiffs' so-called "gateway" thesis. Defendants' expert Dr. Murphy, for example, showed through data analysis that it was "not the same people that were getting [opioid] prescriptions who were later dying of heroin and fentanyl." Dkt. 4118 at 5990 (Nov. 4 trial tr., vol. 23). Particularly given that evidence, the lack of any interrogatory on Plaintiffs' gateway thesis, and the lack of any instruction requiring a jury finding on the issue, Plaintiffs' speculation as to the jury's thinking beyond their actual finding is just that—sheer speculation. Because the jury's verdict was limited to a *prescription opioid* nuisance, Plaintiffs' abatement plan cannot involve costs associated with any *illicit opioids*. It is irrelevant that *Plaintiffs'* expert believes "there's no other way to abate the opioid epidemic" as a whole, Opp. 11, except to "develop a comprehensive set of programs and services." Opp. 8.

Lastly, Plaintiffs again insist that "the implementation of programs and services related to, *inter alia*, the prevention, treatment, and recovery of opioid abuse and addiction" is necessary because "Defendants and others will continue to dispense prescription opioids into the Counties." Opp. 15.[2] Setting aside the obvious preemption concerns that raises, *see supra* at 4, the nuisance the jury found was the oversupply and diversion of prescription opioids, not the prescription opioids in and of themselves, and the jury did not consider Defendants' future dispensing conduct. *See* 21 U.S.C. § 801(1) (prescription opioids have a "useful and legitimate medical purpose.").

### C. Plaintiffs' Abatement Plan Targets Conduct Unconnected to Defendants' Dispensing and Is Thus Unprecedented and Stunningly Overbroad.

Plaintiffs' focus on remediating "the opioid crisis" generally—and not the oversupply of legal prescription opioids that the jury found—creates another fatal flaw: Their plan requires Defendants to pay for all opioid-related remediation, even those measures that address wrongs transparently unrelated to Defendants' dispensing conduct.

---

[2] *But see* CVS submissions at Dkts. 4316 & 4336.

As examples of the overbreadth of Plaintiffs' abatement plan, Defendants called attention to the plan's funding of a training program for police officers to reduce opioid-related stigma, and an expansion of pretrial diversion and specialized drug courts.  Opening Br. 11–12.  Plaintiffs respond with long quotations from their abatement expert's report about the important role of law enforcement officers and the criminal justice system.  *See* Opp. 18–19.  Quotations about the societal values of law enforcement do not address Defendants' legal argument.  For one thing, Plaintiffs' expert is again focused on *illicit* opioids rather than the oversupply of prescription opioids that the jury found.  For another, Plaintiffs' expert does not connect any expenditures on law enforcement or drug courts to Defendants' dispensing conduct.  Defendants have never played any role in training law enforcement, nor have they affected Plaintiffs' exercise of their own prosecutorial or adjudicatory discretion.  Because no connection exists between Defendants' dispensing—the conduct the jury found contributed to a public nuisance of prescription opioids— and the harm that Plaintiffs' abatement plan seeks to address, the plan must be rejected.

Plaintiffs' quibbles with Defendants' authorities miss the forest for the trees.  Defendants themselves highlighted that *City of Cleveland v. Ameriquest Mortgage Securities, Inc.* was decided on proximate cause grounds at the liability phase.  Opening Br. 12; 615 F.3d 496 (6th Cir. 2010).  Even still, *Ameriquest* observed that a "'complex assessment' [is] needed to determine which municipal expenditures increased . . . because of the ills caused by [Defendants' actions] rather than[] [the actions and circumstances] not related to [Defendants' actions]."  615 F.3d at 504–06.  Plaintiffs seem to think the fact that such a complex assessment is required at the liability phase means it is not also required at the remedies phase once liability is established.  But the Sixth Circuit was not just focused on the causal chain for liability; it also emphasized more generally "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote

action." *Id*. at 504 (quoting *Canyon Cnty. v. Syngenta Seeds, Inc*., 519 F.3d 969, 981 (9th Cir. 2008) (holding that defendant companies' hiring of undocumented immigrants was too remote from increased demand for public health care and law enforcement services)). Plaintiffs' efforts to hold Defendants responsible for every aspect of the multifaceted opioid nuisance in their counties is inconsistent with the *Ameriquest* court's directive.

It is hard to see what makes Plaintiffs think *Davidson v. Bradford* is "similarly distinguishable," except perhaps that its facts were not identical to the facts of this (unprecedented) case. Opp. 23; 212 N.W. 476 (Iowa 1927). As Plaintiffs explain, the court in *Davidson* held that an abatement remedy could not reach a portion of land that was "physically separated from that where the nuisance was maintained by a public road" and that "was entirely disassociated [from the nuisance] by the fact that it was rented to, and occupied by, a tenant who had no connection whatever with the nuisance." 212 N.W. at 478. The remedy could not stand because no causal nexus existed between the nuisance in the case and the abatement sought by the plaintiff. The same can be said for those elements of Plaintiffs' abatement plan that address harms entirely unrelated to Defendants' dispensing conduct, comprising the vast majority of the abatement plan.

Plaintiffs object that in *State ex rel. Brown v. BASF Wyandotte Corp.*, the court recognized the possibility that "damages may be apportioned among the independent polluters based upon the relative amounts of contaminants that each polluter deposited into the subject waterway" and reversed the trial court's "finding that apportionment [was] impossible" as "premature." Nos. 33533, 33545, 33549, 1975 WL 182459, at *5 (Ohio Ct. App. Apr. 24, 1975). Again, however, that has no relevance here. The defendants in the case were "three out-of-state chemical companies" that the State of Ohio alleged had "polluted Lake Erie with mercury." *Id.* at *1. Among other things, the State sought "[a] mandatory injunction ordering the defendants to remove or render

harmless the poisonous mercury allegedly deposited, or in the alternative, to pay money damages to the State to allow such removal or abatement." *Id.* The causal relationship between companies depositing mercury and requiring those companies to fund the clean-up *of that very same mercury* is obvious. That is why Plaintiffs' proposal for prescription drug disposal programs could be a proper abatement plan: It is designed to reduce an oversupply of prescription opioids in Plaintiffs' counties. When it came to *other* pollutants that the *BASF Wyandotte* defendants had not deposited in the lake, however, the court drew a clear line: "In no instance may the defendants in this lawsuit be held responsible for damages to Lake Erie caused by pollutants other than mercury and/or its derivative compounds. These defendants cannot be singled out and held solely responsible for the deteriorated condition of Lake Erie which was caused by innumerable contributors over hundreds of years." *Id.* at *5. Here, likewise, Defendants cannot be held responsible for illicit opioids they never dispensed or for harms that bear no connection to their dispensing activity.

Finally, Plaintiffs are right that Defendants inadvertently failed to note that a quoting parenthetical they cited from *Bowes v. City of Aberdeen* was from a dissenting opinion. 109 P. 369 (Wash. 1910). Defendants apologize for the error, but it does not affect the substance of their argument. In *Bowes*, the dissent stated that "to charge [a person] with the abatement of a nuisance" not caused by him "violates every principle of justice." *Id.* at 558 (Fullerton, J., dissenting). This well-established principle was not a point of controversy between the majority and the dissent. Rather, the majority upheld the city's decision to raise the elevation of certain privately owned property to abate flooding (and levy assessments on private property owners to cover some of the associated cost) as an "exercise of the police power" and "an ancient and well-known exercise of legislative power." *Id.* at 545–46 (plurality opinion). Of course, no such act of a legislature is at issue here, and thus no deviation from this principle is warranted. And of course, Plaintiffs do not

and cannot offer any substantive response to the common-sense notion that it is unjust to charge a defendant with abatement of conditions it did not create. Plaintiffs' abatement plan's focus on remediating "the opioid crisis" generally, rather than the harms caused by Defendants' dispensing conduct, should be rejected.

## II. JOINT-AND-SEVERAL LIABILITY IS NOT AVAILABLE, AND ANY AWARD MUST BE APPORTIONED AMONG ALL TORTFEASORS.

The Court should hold that any liability will be several only—a result required by Ohio statutory and common law. *See* Opening Br. 12–19.

In an attempt to avoid this, Plaintiffs first assert that "this Court has previously held" both that (1) "Ohio's joint-and-several-liability statute does not preclude joint liability in this case," and that (2) after the liability trial, "the burden shifts to Defendants to demonstrate the harm produced by their conduct is capable of apportionment." Opp. 1–2. Plaintiffs are only half right.

They are correct about the Court's holding on the statutory point, *see* Dkt. 2572 (CT1 Order on Pls' Nuisance MSJ) at 4–6, which Defendants readily acknowledged in their opening brief. Opening Br. 17–18 (recognizing that "[t]his Court held that this statutory scheme did not apply to Plaintiffs' 'claim to abate a nuisance'" and "maintain[ing] their objection that Ohio statutory law bars joint liability in this litigation"). This Court, of course, has the ability to modify its past interlocutory decisions, *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). Failing that, however, Defendants are entitled to preserve the issue for appeal.

Plaintiffs are wrong, however, about the Court's holding on the burden; there was no briefing on that question, and this Court did not hold that it is Defendants' burden to prove several liability. Opp. 1–2. It did not even hold that the *Pang* framework applies. All it held was that "apportionment of harm at this stage of the litigation [before trial] is premature," because "any apportionment decision depends on factual issues to be determined at trial." *In re Nat'l*

14

*Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4194272, at *4 (N.D. Ohio Sept. 4, 2019) (Dkt. 2572).  The Court then said that "[t]he framework articulated in *Pang v. Minch*, cited by Defendants, provides a useful procedural guide."  *Id.*  Other than quoting *Pang* and citing the Restatement, however, the Court did not announce what standard it would apply.  Now is the time to do so—and, as explained below, the standard should be several liability, with Plaintiffs bearing the burden to show which portion of the abatement plan each Defendant should be responsible for.

### A.    Under Ohio Common Law and the Restatement, Each Defendant Should Be Liable Only for Its Share of Abatement Costs, and Plaintiffs Should Bear the Burden of Proving That Share.

Plaintiffs want to put the burden on Defendants—only a small fraction of all those entities whom Plaintiffs themselves allege caused the nuisance found by the jury—to prove that Defendants do not owe the entire amount Plaintiffs say is necessary to abate that nuisance.  This approach is out of step with the Restatement and Ohio law.

The parties actually agree on several critical points.  All agree that Ohio public-nuisance law follows the common-law rules set forth in the Restatement.  Opp. 24–25; *see* Dkt. 2572 at 1; *see also, e.g.*, *Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *3 (Ohio Ct. App. Mar. 21, 2013).  All agree that joint-and-several liability is inapplicable (and the costs are apportioned) "when the harm is divisible."  Opp. 25; *see* Opening Br. 13–14.  And all agree that, under Restatement (Second) of Torts § 433B cmt. e (1965) ("Comment e"), Defendants do not "bear the burden of proving apportionment" if "there are too many causes of the nuisance."  Opp. 27; *see* Opening Br. 14–15.

The first disagreement is whether the harm is divisible.  The primary harm that Plaintiffs seek to remedy—opioid use disorder ("OUD") suffered by residents of the counties—is plainly divisible.  If Plaintiffs identified each resident with OUD who needs treatment, as Defendants have asked them to do in their discovery requests, then a determination could be made whether each

Defendant's allegedly unlawful dispensing was a substantial factor in causing each resident's OUD.

The second disagreement is whether Comment e applies here—*i.e.*, whether, when Plaintiffs themselves recognize that there are "[m]any, many, many causes" of the nuisance, Dkt. 4064 at 3558 (Oct. 21 trial tr., vol. 13), placing the burden on Defendants to prove apportionment "may cause disproportionate hardship."  Restatement § 433B cmt. e.  The answer is yes, Comment e applies.  Plaintiffs are attempting to place a "demanding" and "substantial" burden (Opp. 26–27) on three pharmacies to prove they should *not* be liable for the conduct of "virtually everyone," to use this Court's words.  Dkt. 4296 at 68.  Plaintiffs want the Court to force these Defendants to prove that they should not have to pay for the conduct of the "host of people to blame," from "the doctors" to the "manufacturers" and from the "drug cartels" to the DEA, FDA, and Ohio Board of Pharmacy.  Dkt. 4153 at 7177 (Nov. 15 trial tr., vol. 28).

The Restatement requires exactly the opposite.  When there are not "two or three" actors involved, but "so large a number of actors" that, when compared to "the total harm" of the nuisance found by the jury, the defendants "contribute[d] a relatively small and insignificant part" to the total damage, the burden of proving apportionment rests on the plaintiff.  Restatement § 433B cmt. e (offering the example of a lawsuit with "a hundred factories" that contributed to "the entire damage").

Applying presumptive joint-and-several liability here would cause "disproportionate hardship" for another reason: Plaintiffs were allowed to prove liability, over Defendants' repeated objections, *in the aggregate*.  *See* Opening Br. 16–17.  This is how they persuaded the Court to block Defendants from taking the sort of individualized discovery that would even *allow* any detailed proof of allocation, and how they were allowed to avoid at trial obvious bases for

16

apportionment.  Discovery in Phase 2 has only compounded the problem, as Plaintiffs have refused to respond to discovery requests for information on the individuals suffering from opioid abuse whom they seek to treat under their abatement plan.  *See* Opening Br. 17.  Having allowed Plaintiffs to prove their case in the aggregate over Defendants' objections, the Court would cause special hardship if it were to now shift the burden to Defendants to come forward with more granular proof (that is not within their possession and is being withheld from them).  There can be no joint-and-several liability, nor any burden shifting, in such circumstances.

Ohio cases have applied these principles in public-nuisance cases where not all the "innumerable contributors" to the harm "have been joined as defendants," holding that "in no instance may defendants be held jointly and severally liable" for the "damage done . . . by persons or entities not made defendants in the lawsuit."  *E.g.*, *BASF Wyandotte*, 1975 WL 182459, at *5. So have courts in other jurisdictions.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 372 n.69 (S.D.N.Y. 2005) (collecting cases).  When fewer than "all possible tort-feasors [are] before the court" and when "there is a great number of possible wrongdoers"—as there is here with the Court's severing of the manufacturer and distributor defendants and Plaintiffs' settlements with Giant Eagle and Rite Aid—liability "is several only" and the burden does not shift.  *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1074, 1078 (N.Y. 1989) (examining and applying the Restatement); *see, e.g.*, *Smith v. Cutter Biological, Inc., a Div. of Miles Inc.*, 823 P.2d 717, 725 (Haw. 1991) (same because fewer than "all [the many] responsible parties [were] joined").  This Court should hold that Defendants' liability must be several, and it is Plaintiffs' burden to show what portion Defendants should be required to bear.

The cases Plaintiffs cite, all from outside of Ohio, are distinguishable because they do not confront the many-tortfeasor circumstances that Comment e addresses.  Opp. 26–27; *see, e.g.*,

*United States v. Twp. of Brighton*, 153 F.3d 307, 319–20 (6th Cir. 1998) (applying a "federal common law" standard to a strict-liability case with two alleged CERCLA tortfeasors with control over the dumpsite, and finding that divisibility was "possible"). Indeed, Plaintiffs do not even attempt to argue that any of their cases are "Comment e" cases.

Plaintiffs devote only four sentences to the Comment e issue. *See* Opp. 27 (mistakenly citing "cmt. d" rather than Comment e). They insist that, because "the jury found each Defendant's conduct to be a substantial factor in causing the public nuisance," *id.*, the Court is precluded from finding that Defendants were a fraction of a "large a number of actors, each of whom contribute[d] a relatively small and insignificant part to the total harm," Restatement § 433B cmt. e. In other words, Plaintiffs hope the Court will conflate the jury's "substantial factor" finding *for liability* with Comment e's "relatively small and insignificant part to the total harm" inquiry *for apportionment*. Opp. 27.

The Restatement and Ohio law foreclose Plaintiffs' argument. *See, e.g.*, *BASF Wyandotte*, 1975 WL 182459, at *5. Comment e's apportionment inquiry, and the burden-shifting question more generally, does not even *arise* unless "two or more causes have combined to bring about harm to the plaintiff, and *each has been a substantial factor in producing the harm*." Restatement (Second) of Torts § 433A cmt. a (1965) (emphasis added). Thus, it will *always* be the case that a defendant seeking apportionment—and seeking for the plaintiff to bear the burden—already has been found to be "a substantial factor in producing the harm." *Id.* Comment e therefore *must* require a separate inquiry, apart from a jury's "substantial factor" inquiry, or it is surplusage. The answer to the question whether burden-shifting "may cause disproportionate hardship" because there are "so large a number of actors, each of whom contributes a relatively small and insignificant part to the total harm," Restatement § 433B cmt. e, is not preordained—indeed is not even

affected—by the fact that the defendant has already been found a "substantial factor" for liability purposes.

Plaintiffs simply ignore Defendants' due-process argument on this score.  But failing to follow Comment e—and failing to impose several liability only—would give rise to "an award [that] is grossly excessive" compared to Defendants' conduct.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416–17 (2003); *see Kidis v. Reid*, 976 F.3d 708, 715 (6th Cir. 2020).  When Plaintiffs themselves agree that the "*major causes* of the opioid epidemic" were *other* actors not before the Court in this case, Dkt. 4064 at 3532:24–3533:4 (Oct. 21 trial tr., vol. 13) (emphasis added), "it furthers no legitimate purpose and constitutes an arbitrary deprivation of property" to make these three Defendants pay for everything or prove that they should not have to.  *State Farm*, 538 U.S. at 416–17.

For these reasons, the Court should apply several liability and should place the burden on Plaintiffs to prove what portion, if any, of the abatement costs are attributable to each Defendant.

**B.      Defendants Maintain Their Objection That Ohio's Joint-and-Several-Liability Statute Precludes Joint Liability Here.**

In their opening brief, Defendants acknowledged that this Court has already held that Ohio's statutory abrogation of joint-and-several liability does not apply to Plaintiffs' claim here and explained why that decision was erroneous.  Opening Br. 18.  In response, Plaintiffs repeat this Court's reasoning.  Opp. 28.  But Defendants' unrebutted arguments show that the statute does not draw the legal-versus-equitable distinction Plaintiffs say it does.  It is not based on the label Plaintiffs place on a request for money ("economic damages" here, Dkt. 3327 at 197 ¶ 640), and it certainly is not based on whether a plaintiff's suit is one at law or in equity.  *Contra* Opp. 28 (citing two cases about this distinction).  By its express provisions, Ohio's statute applies to a defined term—"compensatory damages *that represent economic loss*," Ohio Rev. Code

§ 2307.22(A)(2) (emphasis added)—which the statute defines broadly to include what Plaintiffs seek here, such as "medical" and "other expenditures" that "will be incurred in the future because of the injury," *id.* § 2307.011(C).  Therefore, while the Court should have applied the statute in the first instance, now at the very least the Court should reject Plaintiffs' request for presumptive joint-and-several liability.

## III. THE CONSTITUTION REQUIRES A DIFFERENT FACTFINDER TO DECIDE THE REMEDY.

This Court may not serve as factfinder for Phase 2 both because the Seventh Amendment requires a jury to decide the underlying facts and because the Court's extensive "involve[ment] in the settlement negotiations" creates "the appearance of judicial bias" as a factfinder.  *Anderson v. Sheppard*, 856 F.2d 741, 746–47 (6th Cir. 1988).

### A. The Seventh Amendment Requires a Jury to Decide the Remedy.

The Seventh Amendment requires trial by jury both because the case would have been tried to a jury in 1791 and because of the legal nature of the relief sought.  *See* Opening Br. 20–22.

Plaintiffs' whole argument to the contrary depends on their contention that "[t]he request for an abatement fund is equitable," both historically and currently.  Opp. 29–35.  They point to numerous cases holding that "abatement" is generally considered a form of equitable relief today, Opp. 29–34, and to a few cases holding that claims by the government to abate a nuisance were historically brought in courts of equity, Opp. 34–35.

As for the historical cases, though, "it [wa]s an extremely rare case . . . for a Court of equity to interfere at all . . . to put down a *public* nuisance which did not violate the rights of property, but only contravened the general policy."  *Att'y Gen. v. Utica Ins. Co.*, 2 Johns. Ch. 371, 379–80 (N.Y. Ch. 1817) (court of equity collecting cases and finding "no jurisdiction" because it was not "sufficiently authorized to abate [the alleged public nuisance]," which involved the alleged

violation of a statute).  In fact, historically, "public nuisances [we]re public offenses over which the courts of *law* . . . had a uniform and undisputed cognizance," including to award the "common-law remed[y]" of a "judgment to abate the nuisance and for damages against defendant."  66 C.J.S. Nuisances § 131 (Mar. 2022 update) (emphasis added).

Plaintiffs' cases talk past these principles.  For example, Plaintiffs repeatedly cite *Tull v. United States*, 481 U.S. 412, 423 (1987), for the proposition that "[a] public nuisance action was a classic example of the kind of suit that relied on the injunctive relief provided by courts in equity." Opp. 34.  That proposition, however, does not help them.  *Tull* noted that the kind of "public nuisance cases brought in equity *sought injunctive relief, not monetary penalties*."  481 U.S. at 423–24.  "Indeed," the Court went on, "courts in equity refused to enforce such penalties"— precisely because they were traditionally a common-law remedy, *id.* at 424, much like abatement, *see* 66 C.J.S. Nuisances § 131.  Other historical authorities cited by Plaintiffs, on Plaintiffs' own description, dealt with public-nuisance actions "by injunction," Opp. 34, which is not this case.

Regardless of this history, Plaintiffs' case is not an action for any sort of equitable form of abatement; it is, in the words of Plaintiffs' own Complaint, an action for "economic damages." Dkt. 3327 at 197 ¶ 640.  That is why, no matter the historical or modern precedents they cite, the relief Plaintiffs seek is legal, not equitable: It is a claim for money damages, "the classic form of legal relief."  *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).

Plaintiffs emphasize the "equitable" label they place on their relief and argue that "the payment of money does not automatically transform an equitable claim for abatement into a legal claim for money damages."  Opp. 32.  But the label Plaintiffs choose to place on their requested relief does not govern; "the constitutional right to trial by jury cannot be made to depend upon the choice of words" the parties use.  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78 (1962); *see,*

*e.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 49 n.7 (1989); *In re Cordis Corp. Pacemaker Prod. Liab. Litig.*, No. C-3-86-543, 1992 WL 754061, at \*9 (S.D. Ohio Dec. 23, 1992).  The important point is not the label but the substance of the requested relief.  And the substance here is plainly legal, not equitable: Courts across the country hold that similar requests for the "creation of a common law fund for compensation or restoration" are requests for a "common law" (legal) remedy.  *E.g.*, *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 70 (Iowa 2014); *see also, e.g.*, *Gen. Cas. Co. of Wis. v. Hills*, 561 N.W.2d 718, 724 (Wis. 1997) ("[T]he cost of repairing and restoring damaged property and water to its original condition is a proper measure of compensatory damages."); *Fried v. Sungard Recovery Servs., Inc.*, 925 F. Supp. 372, 374 (E.D. Pa. 1996) ("Plaintiffs' claim for medical monitoring is a claim for legal damages in the form of future medical payments."); *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979) (request for "medical care and necessary treatment" is "a claim for money damages").  Plaintiffs thus cannot transform the legal nature of their relief merely by calling it equitable.

In the end, this is not about getting a "second bite at the liability apple."  Opp. 29.  It is about affording Defendants their Seventh Amendment rights on liability *and* relief.  The Court should order trial by jury.[3]

**B.      If the Seventh Amendment Does Not Apply, a Different Judge Must Decide the Remedy.**

If a judge, rather than a jury, will serve as a factfinder for the remedies phase, it cannot be this Court.  *See* Opening Br. 22–23.

---

[3] Plaintiffs also point to arguments Defendants made in their Joint Submission Concerning Plaintiffs' Abatement Plan.  Opp. 32–33.  But Defendants made those arguments because the Court has said that it plans to sit as factfinder in a bench trial, the Seventh Amendment notwithstanding.  The Joint Submission Concerning Plaintiffs' Abatement Plan is therefore made on the understanding that the Court will not change its mind; if it does, Defendants' legal strategy and arguments would change as well.

Plaintiffs do not disagree with the binding legal standard from cases such as *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016), which is that the Due Process Clause prohibits the appearance of judicial bias, including caused by a judge's "significant, personal involvement" in a case.  Nor do Plaintiffs attempt to explain why the Court's recent role as settlement master for two culminated settlements in this same MDL would not meet that standard, instead choosing to rest on factual differences between this case and the Supreme Court's cases in this area.  Opp. 39–40.

Treatises and case law agree that the Court acting as factfinder in this case would violate the Supreme Court's due-process standard.  One leading treatise has said it would be "inappropriate" for a judge to act both as the mediator and trier of fact in a bench trial; if the same judge did both things, it would "almost certainly bring into question the judge's impartiality when deciding the case."  Larsen, *Navigating the Federal Trial* § 19:4 (2021 ed.) (collecting cases).  The Sixth Circuit itself has held that a "district court [that] had become involved in the settlement negotiations, and had clearly determined that [the parties] should settle" on certain terms, had "evidenc[ed] . . . clear bias" requiring reversal.  *Anderson*, 856 F.2d at 747.  Just as in *Anderson*, this Court served as mediator for two different sets of settling defendants and these very same Plaintiffs and their counsel; it has therefore "participated in settlement negotiations to an extraordinary degree."  *United States v. Pfizer Inc.*, 560 F.2d 319, 322 (8th Cir. 1977).  This Court did more than just recommend a settlement, moreover; it strongly encouraged, oversaw, and approved two different settlements with these same plaintiffs concerning the same alleged nuisance.  If Phase 2 is to be a bench trial, due process requires a different judge to serve as factfinder.

In response, Plaintiffs emphasize that this Court and the Sixth Circuit rejected "similar arguments almost two and one-half years ago in 2019," and Plaintiffs insist that "the only change

since 2019 . . . weakens Defendants' arguments." Opp. 35–36. This ignores the critical developments since 2019 that provide the basis for Defendants' challenge here: in Plaintiffs' own words, "the culmination of the two national settlements last year," with this Court as mediator. Opp. 39. Nor did the Sixth Circuit's denial of mandamus relief bless this Court's actions; to the contrary, the panel members wrote that this Court should not "continue these actions." *In re Nat'l Prescription Opiate Litig.*, No. 19-3935, 2019 WL 7482137, at *2 (6th Cir. Oct. 10, 2019). The Sixth Circuit never considered whether this Court could serve as factfinder, let alone agreed that doing so was appropriate regardless of circumstances and events that arise only later. Plaintiffs thus cannot find refuge in the Sixth Circuit's earlier rulings.

That leaves only the question of why Defendants are making this argument now. The answer is straightforward: This is the first opportunity since the conclusion of the liability trial, and before the Court serves as factfinder, for Defendants to brief these legal issues. This issue would not have arisen had the Court allowed the jury to decide certain apportionment issues, as provided in the jury instructions Defendants proposed. Nor would this issue have arisen had the jury found for Defendants or if the Court had granted judgment as a matter of law or a new liability trial. This is, therefore, a ripe legal issue for the Court to decide before the start of the remedies trial.

## CONCLUSION

For these reasons, Defendants request that the Court: (1) limit the relief available to Plaintiffs to abatement of the nuisance condition the jury found, and to programs reasonably connected to Defendants' conduct in creating that very nuisance; (2) rule that liability is several, with Plaintiffs bearing the burden to show the amount attributable to each Defendant; and (3) order

a jury trial that protects Defendants' Seventh Amendment rights; or, in the alternative, transfer Phase 2 of this Track 3 trial to a different judge.

Dated: March 30, 2022

Respectfully submitted,

/s/  John M. Majoras
John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

/s/ Eric R. Delinsky
Eric R. Delinsky
Alexandra W. Miller
Graeme W. Bush
Paul B. Hynes, Jr.
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC  20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com
E-mail: gbush@zucerkman.com
E-mail: phynes@zuckerman.com

*Counsel for CVS Pharmacy, Inc., Ohio
CVS Stores, L.L.C., CVS TN Distribution,
L.L.C., CVS Rx Services, Inc., and CVS
Indiana, L.L.C.*

_/s/_ Jeffrey A. Hall
Kaspar J. Stoffelmayr
Jeffrey A. Hall
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
jeff.hall@bartlitbeck.com

Katherine L.I. Hacker
Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
kat.hacker@bartlitbeck.com
alex.harris@bartlitbeck.com

_Counsel for Walgreens Boots Alliance, Inc.,_
_Walgreen Co., and Walgreen Eastern Co., Inc._

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system on all counsel of record on March 30, 2022.


/s/  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*