# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*County of Lake, Ohio v. Purdue Pharma L.P., et al.*,<br>Case No. 18-op-45032 (N.D. Ohio)<br><br>*County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,<br>Case No. 18-op-45079 (N.D. Ohio) | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

## CVS'S ABATEMENT PHASE TRIAL BRIEF

Pursuant to the Court's Trial Order, Doc. 4322 at 5, CVS hereby submits its trial brief for the abatement phase. Consistent with the Court's prior directives for concise trial briefs, this brief does not contain an exhaustive presentation of CVS's anticipated defense at the abatement phase trial. Rather, it summarizes several issues that CVS anticipates will arise at trial. CVS will offer additional evidence and argument at the trial.

### SUMMARY OF LEGAL ISSUES

The Court will need to decide at least two overarching legal issues at the trial:

1. The Court will need to decide the scope of the abatement remedy. The controlling law applicable to this issue is discussed in defendants' joint legal brief (Doc. 4299) at pages 7-17 and defendants' reply in support thereof (Doc. 4342) at pages 6-19.

2. The Court will need to decide whether joint-and-several liability applies or whether liability should be apportioned among all tortfeasors. The controlling law applicable to this issue is discussed in defendants' joint legal brief (Doc. 4299) at pages 12-19 and their reply

(Doc. 4342) at pages 19-25.  The Court indicated at the April 13, 2022, status conference that it would apportion liability but left open the manner and degree.

## QUESTIONS RELATED TO THE SCOPE OF ABATEMENT

The Court will need to decide several questions related to the scope of the abatement remedy that are in dispute.  Those questions include, but are not limited to, the following:

1. The jury found that CVS was a substantial factor in causing a nuisance consisting of an "oversupply of legal prescription opioids" in the counties.  Doc. 4176 at 2, 6.  The Court will need to decide whether the abatement remedy can include programs and services that address the potential effects of the asserted oversupply, in addition to the oversupply itself.  According to the counties, potential effects of the oversupply may include, for example, county residents suffering from opioid addiction and all of the potential individual and societal harms that may have any connection, however remote, to such addiction.  CVS's position is that, as a matter of law, any abatement remedy must be limited to reducing the oversupply identified in the verdict form and cannot address any effects of that asserted nuisance.  Doc. 4299 at 7-17; Doc. 4342 at 6-19.

2. If the Court disagrees with CVS on the first question and decides, over CVS's objection, to order funding for addiction treatment to address the asserted effects of the oversupply found by the jury, the Court would need to resolve several disputes over the scope of treatment that can be awarded.  Those disputes include but are not limited to:

   (a)   Whether treatment for individuals who use illicit opioids should be included;

   (b)   Whether treatment for individuals who did not fill opioid prescriptions at CVS pharmacies in the counties should be included;

   (c)   Whether treatment for individuals that is paid for by government or private insurance, or by federal or state grants, should be included;

2

    (d)    Whether treatment for individuals who develop OUD in the future should be included; and

    (e)    Whether treatment for individuals who become county residents in the future should be included.

If the Court, over CVS's objection, includes funding for OUD treatment in its abatement order, CVS's position is that treatment for persons in any of the above categories must be excluded. Doc. 4337 at 4.  Ordering CVS to fund treatment for such persons would, among other things, exceed the scope of the verdict, the evidence, the factual and legal bounds of causation, and the legal contours of public nuisance.

The Court also would need to determine how a treatment program would be funded, administered, and supervised.  For example, the Court would need to decide:

    (a)    Whether defendants would fund treatment on a periodic basis or in a single lump sum, when the cost put forth by the counties is based on any number of different expert-generated assumptions that are untethered to any of the particular county residents with OUD who have received or may need treatment;

    (b)    How county residents with OUD would be screened and approved for treatment;

    (c)    Who would implement, administer, and oversee the treatment program, and to what extent that person (or persons) would provide periodic reporting to the Court and the parties; and

    (d)    Whether any funds allocated for treatment that are not used for treatment would be returned to defendants at the end of the program.

3.    If the Court disagrees with CVS on the first question, the Court also would need to decide whether the abatement remedy should include any of the myriad of social programs

3

and services proposed by the counties, in addition to addiction treatment. These additional programs and services purport to address individual and societal effects that, according to plaintiffs, may result from addiction to prescription or illicit opioids. Such social programs and services include, for example, job placement and job training programs for county residents with OUD as well as programs and services for their families and children. CVS's position is that it would be error for any abatement remedy to address these indirect effects of the nuisance. Should the Court disagree with CVS, it would need to resolve questions similar to the questions that would need to be resolved for any treatment program, namely, who would be eligible for these programs and services, and how each program or service would be funded, administered, and supervised.

## THE PARTIES' PROPOSED ABATEMENT PLANS

<u>The Counties' Abatement Plan</u>. The counties have proposed a five-year abatement plan that, according to their experts' estimates, would cost approximately $877 million. Only a tiny fraction of the plan would address the nuisance found by the jury—less than .01% would pay for safe storage and drug disposal programs.[1]

The overwhelming majority of the counties' plan—approximately $630 million or 72%— would pay for OUD treatment. Those costs, however, are based on expert-generated estimates of county residents with OUD, not on local data of the county residents who have received or are receiving treatment for OUD. Moreover, they include the costs of treatment for individuals who use illicit opioids (including individuals who have never abused prescription opioids), who did not have OUD as of the date of the jury's verdict, who never filled an opioid prescription at a CVS pharmacy in the counties, and whose treatment would be covered by government or private

---

[1] These figures are based on the revised expert report of Harvey Rosen and John Burke that the counties served on April 22, 2022. CVS reserves it rights to seek all appropriate relief related to this late-served report.

4

insurance or by federal and state grants. In other words, the counties are seeking funding to pay for treatment that has no connection to CVS's conduct in the counties, no connection to the jury's verdict, and no connection to any out-of-pocket costs that may be incurred in the future.

The rest of the counties' plan largely would pay for a myriad of social programs and services to address even more indirect effects of the asserted nuisance, including, for example, programs to screen and treat health conditions such as HIV and hepatitis C that may result from illicit opioid injection; programs to provide syringes and injection equipment to individuals who use illicit opioids; programs to address "burnout/compassion fatigue" among healthcare workers and emergency responders and to reduce the stigma by law enforcement personnel towards individuals with OUD; job training and placement programs for county residents; programs and services for families and children of individuals with OUD, such as foster care programs and mental health counseling and support services; and programs and services, including mental health counseling services, for individuals who are pregnant, incarcerated, homeless, and suffer from chronic pain.[2]

The counties provide no information whatsoever on how their proposed abatement plan would be administered and supervised, and no information on what safeguards would be put in place to ensure that any funds are not deposited into general funds and used for improper expenditures.

<u>CVS's Abatement Plan</u>.  Subject to CVS's objections to the viability of the counties' claims and theories, CVS has proposed an abatement plan that flows from counties' infirm claims and that would reduce the asserted oversupply nuisance that the jury found at the counties' prompting.  It would consist of (1) drug take-back and disposal programs in the

---

[2] The counties are not seeking, at this time, funding for the provider, dispenser, and patient education programs that are included in their abatement plan.  Doc. 4232 at 2.

5

counties, which CVS already operates, to remove the current oversupply;[3] and (2) a prohibition on the dispensing of Schedule II prescription opioids in the counties to halt any additional supply. Doc. 4336 at 1-2. As explained in CVS's prior submissions, CVS objected to the theories and claims that gave rise to the verdict and that requires this relief; they will be the subject of CVS's appeal. In this regard, CVS's position is that it is not right from a patient-care perspective, or legally, to prohibit the dispensing of medications. But it is the result that flows from the counties' theories. *Id.* at 2.

If the Court rejects CVS's legal position that abatement cannot address the effects of the nuisance, then any abatement awarded to address the effects should be limited to addressing the least indirect effects of the nuisance—namely, treatment for individuals with OUD. Any treatment that CVS is ordered (over its objections) to fund should be limited to individuals who meet the following criteria:

(1) Individuals whose OUD resulted from the abuse of prescription opioids rather than the use of illicit drugs;

(2) Individuals who filled sufficient opioid prescriptions at CVS pharmacies in the counties, based on CVS's dispensing data;

(3) Individuals who do not have government or private insurance to pay for their treatment and whose treatment would be paid for by the counties;

(4) Individuals who already had misused or abused prescription opioids as of the date of the verdict; and

---

[3] As part of its national drug take-back program, CVS has installed drug take-back kiosks in seven of its 14 pharmacies in the counties; the placement, characteristics, and maintenance of those kiosks are subject to DEA regulation, and not all CVS pharmacies can accommodate them. Doc. 4316 at 1 n.1. CVS also offers drug disposal bags to patients in connection with its first-fill opioid counseling program, has donated additional kiosks to law enforcement departments in the counties, and has offered to provide more. *Id.*

(5) Individuals who were county residents as of the date of the verdict.

Unlike the counties' experts, defense expert Matthew Bialecki analyzed the data for the treatment facilities that receive funding from the counties. Based on this data, Mr. Bialecki determined that, in 2021, the total costs of the OUD-related treatment provided by these county-funded facilities was $4.1 million, but that the counties themselves funded only $150,000 (or 3.6%) of that amount. By contrast, the counties seek more than $80 million for OUD treatment in the first year of their plan.

Based on his analysis of the counties' treatment data—which, again, the counties' experts do not consider—Mr. Bialecki has opined as follows:

(1) The estimated total cost of the OUD-related procedures that county-funded treatment centers will provide for county residents who had OUD as of the date of the verdict will be $16.7 million over the next five years;

(2) Of that $16.7 million in estimated costs, the counties would pay an estimated $600,000, or 3.5%. The other $16.1 million would be paid for by government or private insurance or by federal or state grants.[4]

Any treatment funding that is ordered by the Court (over CVS's objections) should be overseen by a neutral, third-party administrator as set forth in defendants' prior submissions. Doc. 4337 at 4-5 and 9-10. Because the costs of any future treatment are estimates based on many different assumptions (and because the counties' experts' assumptions in particular are not even drawn from the counties' treatment data), the funding should not be provided in full at the

---

[4] Another defense expert—Daniel Kessler—focuses on the counties' own estimates and the gross overstatements therein. He opines that the counties' estimates, on their face, must be reduced by 60% to account for, *inter alia*, the counties' overestimate of county residents with OUD and the share of those residents who will obtain treatment, and the counties' inclusion of treatment costs for insured people already receiving treatment.

outset. Instead, CVS and the other defendants should be required (again, over their objections) to provide an initial amount of funding at the outset, and the counties should have the ability to seek additional funding at regular intervals upon a showing that it actually is needed. Any funds provided by CVS for treatment of county residents with OUD that are not used by the end of the abatement period should be returned to CVS.

## APPORTIONMENT AND SETOFF

To the extent the Court orders CVS (over its objections) to fund programs or services to address the alleged effects of the nuisance, CVS is proposing two methods of allocating an appropriate share of the costs to CVS, which may be used in tandem. The first method, noted above, would employ CVS's dispensing data to determine if a county resident in need of services under an abatement plan ever filled opioid prescriptions at a CVS pharmacy in the counties and, if so, whether any such prescriptions were sufficient to cause that individual's OUD.

The second method will be provided by Dr. Amitabh Chandra, a professor of public policy at the Harvard University Kennedy School of Government and its Director of Health Policy Research. Dr. Chandra proposes a three-step method. Because the counties seek funding to address addiction irrespective of whether it results from prescription opioids versus illicit opioids, Step One of Dr. Chandra's analysis provides a means—rooted in the counties' own analysis—to determine the share attributable to prescription opioids. While CVS submits that it would not be legally or factually permissible to order CVS to fund any services for illegal drug use, Dr. Chandra's analysis allows the Court to account for the gateway effect in determining the prescription-opioid share, should the Court reject CVS's positions on the gateway theory. Step Two of Dr. Chandra's analysis applies microeconomic principles to apportion the prescription-opioid share among five sets of actors that the counties themselves identified at trial as causes of the nuisance (the federal government, manufacturers, prescribers, pharmacies, and diverters).

Step Three of Dr. Chandra's analysis then uses market-share data to determine CVS's portion of the pharmacy-sector share. This model will provide a "reasonable basis" for apportionment under applicable law. *See, e.g.*, Restatement (Second) of Torts § 840E. As noted in his report, if the Court seeks modifications to Dr. Chandra's model while he is on the stand, Dr. Chandra will endeavor to apply them.[5]

The costs of any programs or services to address the alleged effects of the nuisance, if ordered over CVS's objections, also must be set off against settlement amounts that the counties have received from other tortfeasors. The counties, combined, have received, or will receive in the future, the following amounts:

(1) $6 million from their settlement with Rite Aid, which had a greater market share than CVS in the two plaintiff counties and, under the counties' own analysis, a larger number of "red flag" prescriptions;

(2) $3 million from their settlement with Giant Eagle, which had a similar market share to CVS in the two plaintiff counties and, under the counties' own analysis, a slightly lower number of "red flag" prescriptions;

(3) Between $7.7 million and $9.8 million over 18 years from the settlements with AmerisourceBergen, Cardinal, and McKesson;

(4) Between $732,749 and $925,455 over 18 years from the settlement with Johnson and Johnson; and

(5) An unknown amount from the Ohio Attorney General's $24.7 million settlement with McKinsey.

---

[5] In addition to Dr. Chandra's analysis, CVS may rely, as well, on allocation methods adduced by its co-defendants.

9

The counties also have indicated they will participate in the Mallinckrodt and Purdue bankruptcy plans, should those plans be approved by the bankruptcy courts.

## EVIDENTIARY ISSUES

CVS cannot anticipate every evidentiary issue that will arise at trial, and it does not endeavor to identify every such issue here. CVS does anticipate, however, that the following evidentiary issues may arise and need to be resolved at trial:

1. The counties have indicated that they will seek wholesale admission of their expert reports, the appendices and exhibits thereto, and all of the materials that were relied on or considered by their experts. The expert report themselves, as well as the supporting and reliance materials, are rife with hearsay and are inadmissible under controlling Sixth Circuit precedent. *E.g.*, *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 729 (6th Cir. 1994). While the Court may review these materials in advance of the trial, they remain inadmissible under the Federal Rules of Evidence.

2. CVS anticipates that, as during the liability phase trial, the counties may seek to admit inadmissible hearsay through their two fact witnesses, April Caraway and Kim Fraser.

3. Based on recent disclosures by the counties, CVS is concerned Ms. Caraway and/or Ms. Fraser may provide testimony that is inconsistent with their deposition testimony and/or testimony that includes facts and/or opinions of which they disclaimed any knowledge during their depositions, that were developed after their depositions last month, and that additionally may violate the expert disclosure rules. Such testimony should be precluded.

Dated:  April 25, 2022

Respectfully submitted,

/s/ *Eric R. Delinsky*
Eric R. Delinsky
Alexandra W. Miller
Paul B. Hynes, Jr.
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC  20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com
E-mail: phynes@zuckerman.com

*Counsel for CVS Pharmacy, Inc., Ohio CVS Stores, LLC, CVS TN Distribution, L.L.C., CVS Rx Services, Inc., and CVS Indiana, L.L.C.*