UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track Three Cases | |

# PLAINTIFFS' TRIAL BRIEF FOR PHASE 2

April 25, 2022

# TABLE OF CONTENTS

*Table of Authorities*.............................................................................................................ii

**STATEMENT OF RELEVANT FACTS**......................................................................... 1

    A.   Abatement ................................................................................................... 1

    B.   Injunctive Relief......................................................................................... 4

**CONTROLLING LAW** ................................................................................................. 5

    A.   The public nuisance found by the jury is abatable.......................................... 5

    B.   The Court has considerable discretion when crafting appropriate equitable remedies such as abatement and injunctive relief............................................................................... 6

    C.   Under Ohio law, Defendants are jointly and severally liable for the entirety of the costs associated with Plaintiffs' abatement plan unless they can sufficiently demonstrate that the harm produced by their conduct is reasonably apportionable. ................................................... 7

    D.   The abatement award should not be reduced by past or future collateral source payments... ......................................................................................................... 10

**EVIDENTIARY ISSUES** ........................................................................................... 18

**CONCLUSION** ....................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adae v. State*,
No. 12AP-406, 2013 WL 85200 (Ohio App. 10th Dist. Jan. 8, 2013), *cause dismissed and remanded,* 993 N.E.2d 785 (Ohio 2013)................................................................12, 13, 16

*Alvis v. Henderson Obstetrics, S.C.*,
592 N.E.2d 678 (Ill. App. 3d Dist. 1992) ................................................................17

*Amlotte v. U.S.*,
292 F. Supp. 2d 922 (E.D. Mich. 2003)................................................................17

*Baker v. Goldblatt*,
955 F.2d 402 (6th Cir. 1992) ................................................................12, 17

*Biechele v. Norfolk & W. Ry. Co.*,
309 F. Supp. 354 (N.D. Ohio 1969)................................................................7

*Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*,
102 N.E.3d 579 (Ohio App. 10th Dist. 2017)................................................................10, 11, 16

*Bowles v. Skaggs*,
151 F.2d 817 (6th Cir. 1945) ................................................................6, 7

*Buchman v. Wayne Trace Loc. Sch. Dist. Bd. of Edn.*,
652 N.E.2d 952 (Ohio 1995)................................................................16, 17

*Burlington Northern & Santa Fe Ry. Co. v. United States*,
556 U.S. 599 (2009)................................................................8

*Carter-Jones Lumber Co. v. Dixie Distribg. Co.*,
166 F.3d 840 (6th Cir. 1999) ................................................................6, 7

*Cates v. Wilson*,
361 S.E.2d 734 (N.C. 1987)................................................................15, 18

*City of Larkspur v. Jacobs Engr. Group, Inc.*,
A123486, 2010 WL 2164406 (Cal. App. 1st Dist. May 28, 2010) (unpublished) ......14, 15, 16

*Concerned Pastors for Soc. Action v. Khouri*,
217 F. Supp. 3d 960 (E.D. Mich. 2016)................................................................7

*Englewood v. Turner*,
897 N.E.2d 213 (Ohio App. 2d Dist. 2008) ................................................................6

*Hamlin v. Charter Tp. of Flint*,
165 F.3d 426 (6th Cir. 1999) ................................................................................11

*Herlihy Moving & Storage, Inc. v. Adecco USA, Inc.*,
772 F. Supp. 2d 898 (S.D. Ohio 2011) ............................................................13, 16

*Holland v. Fla.*,
560 U.S. 631 (2010) ............................................................................................7

*Hudson v. Lazarus*,
217 F.2d 344 (D.C. Cir. 1954) ............................................................................14

*Jaques v. Manton*,
928 N.E.2d 434 (Ohio 2010) ..............................................................................12

*Kleybolte v. Buffon*,
105 N.E. 192 (Ohio 1913) ..................................................................................12

*Klosterman v. Fussner*,
651 N.E.2d 64 (Ohio App. 2d Dist. 1994) ............................................................13

*Louisiana Dept. of Transp. and Dev. v. Kansas City S. Ry. Co.*,
846 So. 2d 734 (La. 2003) ............................................................................15, 16

*Molzof v. U.S.*,
6 F.3d 461 (7th Cir. 1993) ............................................................................15, 17

*N. Tr. Co. v. County of Cook*,
481 N.E.2d 957 (Ill. App. 1st Dist. 1985) ............................................................17

*In re Natl. Prescription Opiate Litig.*,
1:17-MD-2804, 2019 WL 4043938 (N.D. Ohio Aug. 26, 2019) ...............................6

*Natl. Steel Corp. v. Great Lakes Towing Co.*,
574 F.2d 339 (6th Cir. 1978) ..............................................................................11

*State ex rel. Ohio Acad. of Tr. Lawyers v. Sheward*,
715 N.E.2d 1062 (Ohio 1999) .......................................................................12, 16

*Pakootas v. Teck Cominco Metals, Ltd.*,
905 F.3d 565 (9th Cir. 2018) ...............................................................................8

*Pang v. Minch*,
559 N.E.2d 1313 (Ohio 1990) ............................................................................8, 9

*People v. ConAgra Grocery Products Co.*,
227 Cal. Rptr. 3d 499 (Cal. App. 6th Dist. 2017) ..................................................6

iii

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946).............................................................................................7

*Pryor v. Webber*,
    263 N.E.2d 235 (Ohio 1970)....................................................................10, 11

*Rasimas v. Michigan Dept. of Mental Health*,
    714 F.2d 614 (6th Cir. 1983) ...............................................................................11

*Robinson v. Bates*,
    828 N.E.2d 657 (Ohio App. 1st Dist. 2005) ........................................................13

*Robinson v. Bates*,
    857 N.E.2d 1195 (Ohio 2006).........................................................................11, 14

*Roundhouse v. Owens-Illinois, Inc.*,
    604 F.2d 990 (6th Cir. 1979) .........................................................................14, 15

*Scioto Twp. Zoning Inspector v. Puckett*,
    31 N.E.3d 1254 (Ohio App. 4th Dist. 2015)........................................................6

*Scott v. Dorel Industries, Inc.*,
    3:09-CV-0799-K (BF), 2010 WL 11463303 (N.D. Tex. Oct. 29, 2010)...........15, 17

*Sony/ATV Publg., LLC v. Marcos*,
    651 Fed. Appx. 482 (6th Cir. 2016) (unpublished)..............................................7

*Sorrell v. Thevenir*,
    633 N.E.2d 504 (Ohio 1994)..........................................................................12, 16

*Sunnyland Farms, Inc. v. C. New Mexico Elec. Co-op., Inc.*,
    301 P.3d 387 (N.M. 2013) ...................................................................................14

*Tackett v. Village of Carey, Ohio*,
    306 CV 7014, 2007 WL 1500892 (N.D. Ohio May 18, 2007) ...............................6

*Thurman v. Yellow Freight Sys., Inc.*,
    90 F.3d 1160 (6th Cir. 1996) ...............................................................................11

*Thurman v. Yellow Freight Sys., Inc.*,
    97 F.3d 833 (6th Cir. 1996) .................................................................................11

*Town of E. Troy v. Soo Line R. Co.*,
    653 F.2d 1123 (7th Cir. 1980) .......................................................................14, 15

*U.S. Bank Nat. Ass'n v. U.S. E.P.A.*,
    563 F.3d 199 (6th Cir. 2009) ................................................................................8

*U.S. v. Alcan Aluminum Corp.*,
 964 F.2d 252 (3d Cir. 1992).............................................................................8

*U.S. v. First Nat. City Bank*,
 379 U.S. 378 (1965)........................................................................................7

*U.S. v. Hercules, Inc.*,
 247 F.3d 706 (8th Cir. 2001) ..........................................................................8

*Ulrich v. Veterans Admin. Hosp.*,
 853 F.2d 1078 (2d Cir. 1988)........................................................................15

*United States v. Twp. of Brighton*,
 153 F.3d 307 (6th Cir. 1998) ......................................................................8, 9

*Wiles v. Dept. of Educ.*,
 CV 04-00442 ACK-BMK, 2008 WL 11417491 (D. Haw. Oct. 3, 2008)...............15

*Williamson v. Metro. Prop. and Cas. Ins. Co.*,
 1:15-CV-958 JCH/LF, 2018 WL 1787510 (D.N.M. Apr. 12, 2018)......................14

STATUTES

OHIO REV. CODE § 2315.20 ...................................................................................12

OTHER AUTHORITIES

Cara Q. Hanson, *Ohio's Collateral Source Rule Following Robinson v. Bates and the
 Enactment of Ohio Revised Code Section 2315.20*,
 40 U. Toledo L. Rev. 711 (2009)................................................................12, 13

FED. R. EVID. 702................................................................................................18

http://myfloridalegal.com/webfiles.nsf/WF/MNOS-
 CDLFVP/$file/CVSSettlementAgreementwithExhibits.pdf ....................................5

Merriam-Webster, https://www.merriam-webster.com/dictionary/nullify...................6

RESTATEMENT (SECOND) OF TORTS § 433A (1965)................................................8, 9

RESTATEMENT (SECOND) OF TORTS § 433B (1965). ................................................8, 9

RESTATEMENT (SECOND) OF TORTS § 840E (1979) .................................................8, 9

RESTATEMENT (SECOND) OF TORTS § 920A (1979)..............................................10, 11

2 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 13:2 (3d ed.)......................11, 14

2 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 13:6 (3d ed.)......................15, 17

Pursuant to the Court's instructions (Dkt. #4322 at p. 5), Plaintiffs submit this trial brief setting forth the key facts, controlling law, and evidentiary issues pertinent to the Phase 2 nuisance abatement trial.  Plaintiffs reserve the right to revise their trial presentation as the needs of the case develop and in light of Defendants' evidence and arguments.

## STATEMENT OF RELEVANT FACTS

On November 23, 2021, the jury in the Phase 1 liability trial found that "the oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels" is a public nuisance (*i.e.*, a significant and unreasonable interference with public health and safety) in the Counties.  Dkt. #4176 at pp. 2, 6.  The jury also found that the wrongful conduct of each Defendant was a substantial factor in producing that public nuisance. *Id*. at pp. 3-4, 7-8.  During the Phase 2 trial, Plaintiffs will demonstrate that a comprehensive abatement plan and certain injunctive relief is reasonable and necessary to abate the public nuisance found by the jury.

### A.    Abatement

As demonstrated in the Phase 1 trial, Plaintiffs continue to be harmed in a variety of ways by the public nuisance found by the jury.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 3-13. Rates of opioid addiction, overdose deaths, and many other opioid-related harms have skyrocketed. *Id.* at pp. 5, 8-12.  Additionally, a significant number of prescription opioid users have transitioned to stronger drugs like heroin or illegally-manufactured fentanyl.  *Id.* at pp. 4, 6-8.  The public nuisance continues to exact tragic costs from Plaintiffs' communities, including by increasing crime rates, overburdening law enforcement, crowding the Counties' jails and addiction treatment facilities, undermining the employability of the workforce, and devastating families.  *Id.* at pp. 8-13.  These ongoing interferences with public health and safety cannot be eliminated, or even significantly minimized, without the implementation of programs and services related to the prevention, treatment, and recovery of opioid abuse and addiction.

Plaintiffs intend to demonstrate that the public nuisance found by the jury can be abated through the funding and implementation of a comprehensive abatement plan.  Plaintiffs' proposed

1

plan includes several categories of prospective measures specifically tailored to abate the public nuisance in these Counties:

- **Prevention measures** (*e.g.*, education of the public and providers; safe storage and drug disposal; community prevention and resiliency; harm reduction; and surveillance, evaluation, and leadership) geared towards reducing the widespread oversupply of prescription opioids in the communities so as to decrease injuries and deaths from these products;

- **Treatment measures** (*e.g.*, connecting individuals to care; treatment for opioid use disorder; managing complications attributable to the epidemic; workforce expansion and resiliency; naloxone distribution and training) geared towards better identifying individuals with OUD in the communities and removing clinical, economic, and social barriers diminishing their access to comprehensive, coordinated high-quality care;

- **Recovery measures** (*e.g.*, law enforcement training; pretrial diversion programs; OUD treatment for incarcerated individuals; expanded drug courts; reentry programs; vocational training, education, and job placement; mental health counseling and grief support) geared towards enhancing public safety and reintegration; and

- **Measures intended to specifically address the needs of special populations who have been uniquely affected by the opioid epidemic** (*e.g.*, pregnant women, new mothers, and infants; adolescents and young adults; families and children; homeless and housing insecure individuals; individuals with opioid misuse), including: prenatal screening; MAT treatment for pregnant women with OUD; neonatal care; residential transition programs and psychosocial support for pregnant women and new mothers; school-based and family-based prevention programs for children, adolescents, and young adults; resources for children and adolescents in child protective services, or who have lost one or both parents, as a result of opioid use; treatment and housing programs for homeless or housing insecure individuals with OUD; measures to identify and address individuals who misuse opioids.

This abatement plan mirrors many of the governmental and epidemiological reports and literature that predict that abating the nuisance requires long-term solutions. This is true due to the pervasiveness of the opioid epidemic and the rate of relapse of OUD in this population and that only a robust and continuous plan with periodic measurements of success followed by reaction and modification of the remedies can really work. Moreover, given the extensive evidence adduced in the Phase 1 trial demonstrating that Defendants' wrongful conduct led to both an oversupply and diversion of legal prescription opioids in the Counties and an increase in the abuse of heroin and illegally-manufactured fentanyl, and the associated harms related thereto, it is

important for any abatement plan to include measures to reduce the harms associated with both legal prescription opioids and illegally manufactured/obtained opioids.

In support of their abatement plan, Plaintiffs intend to offer the following expert testimony:

- Dr. Katherine Keyes will opine regarding the harms that the Counties have suffered as a result of Defendants' substantial contribution to the oversupply of opioid pills. She will also quantify the number of OUD patients who will likely need treatment in the Counties and other aspects of the harms suffered.

- Dr. Nancy Young will opine about the harms to the communities caused by the opioid epidemic, particularly as to the impact on child welfare systems and related agencies in the Counties, and some of the county programs necessary to remedy those harms. She provides estimates of the number of children affected by parental substance use disorder, the number of women who use prescription opioids in the Counties, and the number of children with opioid exposure and neonatal abstinence syndrome born each year in the Counties.

- Dr. Caleb Alexander will present the abatement plan that he has tailored for the Counties to remedy the opioid-related harms in their communities over the next fifteen years.

- Dr. John Burke will opine on the costs associated with Dr. Alexander's abatement plan. He will explain the annual cost of the abatement plan for each of the fifteen years it will be implemented. He will also calculate the present value of those future cost computations in case the Court decides to award abatement remedy monies in a lump sum.

Plaintiffs will also offer testimony from County fact witnesses to support their proposed abatement plan.

- Kim Fraser is the executive director of the Lake County Alcohol, Drug Addiction, and Mental Health Services Board. She will testify about the current programs that Lake County has to deal with the opioid epidemic and how those programs are inadequate to meet the needs of true abatement. She will also testify about how Dr. Alexander's plan fills the gaps in the needed abatement programs in Lake County.

- April Caraway is the executive director of the Trumbull County Mental Health and Recovery Board. She will testify about the current programs that Trumbull County has to deal with the opioid epidemic and how those programs are inadequate to meet the needs of true abatement. She will also testify about how Dr. Alexander's plan fills the gaps in the needed abatement programs in Trumbull County.

Plaintiffs contend that all of the abatement interventions proposed in Dr. Alexander's abatement plan are reasonable and necessary to abate the public nuisance found by the jury. Per the

Court's request, however, Plaintiffs will be prepared to address the Court's concerns that the abatement plan be tailored to what the Court heard and the jury verdict in Phase 1.  Plaintiffs will also address how certain aspects of the abatement plan might be more efficiently administered on a national and/or state-wide level.  In that regard, if and when a national and/or state-wide plan is instituted, and to the extent that occurs, Plaintiffs would be willing to have the Court order a remedy that alters certain local aspects of abatement at that time.

Plaintiffs have proposed in previous filings that an option is for the Court to retain jurisdiction over the abatement plan and exercise judicial oversight over its administration.  If the Court were so inclined to retain jurisdiction, Plaintiffs would seek the funds necessary to pay for the elements of abatement for the first five years and would ask that the Court review the effect of the plan at that time to determine how and whether the plan thereafter requires modification, addition, or reduction.  The five-year time period would permit sufficient time to perform necessary outreach, initiate infrastructure, and implement the first phase of the abatement strategies.  The abatement plan also provides for surveillance and evaluation of the abatement remedies which will allow Plaintiffs in five years to present evidence of the effectiveness of the plan and whether it requires modification at that time.

### B. Injunctive Relief

Because Defendants will continue to dispense prescription opioids into the Counties, certain injunctive relief is required to ensure that Defendants do not continue to exacerbate the public nuisance they have caused.  Based upon the evidence adduced at the Phase 1 trial, Plaintiffs will therefore ask the Court to order Defendants to implement and maintain adequate policies and procedures to ensure that Defendants and their employees comply with their legal obligations related to the dispensing of prescription opioids.  These include, but are not limited to: (1) implementing and maintaining an adequate controlled substance compliance program that includes written standard operating procedures and corporate policies related to the dispensing of controlled substances; (2) creating the necessary departments and committees, and designating the necessary personnel, to oversee that compliance program; (3) providing regular mandatory

4

training to all pharmacy and compliance personnel regarding controlled substance dispensing; (4) utilizing all the data available to it to identify and prevent diversion; (5) providing its pharmacists with the necessary tools, guidance, data, and resources (including, but not limited to, access to, and mandated use of, OARRS) to allow them to effectively exercise their corresponding responsibility when dispensing prescription opioids; (6) requiring that any red flags indicating diversion related to an opioid prescription be identified, investigated, and resolved before dispensing (or refusing to dispense) the prescription, and that the resolution be adequately documented, maintained electronically, and easily accessible to other pharmacy and compliance personnel; and (7) prohibiting the compensation, in whole or in part, of any employees by any monetary or non-pecuniary benefit that depends in any part on revenue or profitability targets or expectations specific to the sales of controlled substances.  Plaintiffs will also ask that this injunctive relief be in place for fifteen years and that an independent monitor be appointed to ensure Defendants' compliance.

A recently-executed settlement agreement between CVS and the State of Florida and its Office of the Attorney General, resolving that state's opioid-related claims against CVS,[1] provides some helpful guidance as to the type of injunctive relief that should be ordered in the present case. As part of that settlement, CVS agreed to certain injunctive relief related to its dispensing of prescription opioids.  **Ex. 1** (CVS Florida Settlement, Exhibit F).  Plaintiffs will present arguments at the close of the case as to why the injunctive relief in that settlement agreement does not fully and adequately protect the public and will explain how that plan of injunctive relief should be modified in this case.

## CONTROLLING LAW

### A.    The public nuisance found by the jury is abatable.

The entire purpose for abating a public nuisance is to eliminate (or at least significantly reduce) the effects of the unreasonable interference with public health and safety.  *See, e.g.,*

---

[1]    A full copy of the agreement is available at http://myfloridalegal.com/webfiles.nsf/WF/MNOS-CDLFVP/$file/CVSSettlementAgreementwithExhibits.pdf.

5

*Englewood v. Turner*, 897 N.E.2d 213, 221 (Ohio App. 2d Dist. 2008) ("To 'abate' means 'to put an end to, to nullify or to become void.'") (citation omitted);[2] *Tackett v. Village of Carey, Ohio*, 306 CV 7014, 2007 WL 1500892, at *6 (N.D. Ohio May 18, 2007) (noting that "the purpose of nuisance abatement is to promote the health of the community . . ."); *cf. People v. ConAgra Grocery Products Co.*, 227 Cal. Rptr. 3d 499, 562 (Cal. App. 6th Dist. 2017) ("Abatement is restricted to undoing already accomplished harmful conditions."). Stopping future wrongful conduct is insufficient if there remains an ongoing interference with public health and safety caused by Defendants' past conduct. The nuisance will not be fully (or even partially) abated until the ongoing hazards to public health and safety caused by Defendants' conduct are remediated. The programs and services proposed in Plaintiffs' abatement plan constitute "reasonable means" to remove these hazards. *Scioto Twp. Zoning Inspector v. Puckett*, 31 N.E.3d 1254, 1265 (Ohio App. 4th Dist. 2015).

> **B.  The Court has considerable discretion when crafting appropriate equitable remedies such as abatement and injunctive relief.**

As this Court has previously stated:

> In Ohio, "[w]hen a nuisance is established, the form and extent of the relief designed to abate the nuisance is within the discretion of the court." Thus, the Court, exercising its equitable powers, has the discretion to craft a remedy that will require Defendants, if they are found liable, to pay the prospective costs that will allow Plaintiffs' to abate the opioid crisis.

*In re Natl. Prescription Opiate Litig.*, 1:17-MD-2804, 2019 WL 4043938, at *2 (N.D. Ohio Aug. 26, 2019) (internal citation omitted). This is consistent with the broad discretion granted to courts of equity "to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distribg. Co.*, 166 F.3d 840, 846 (6th Cir. 1999). *See also Bowles v. Skaggs*, 151 F.2d 817, 820 (6th Cir. 1945) ("It is undoubtedly within the power of equity courts to mould their remedies to the needs of particular situations[.]"); *Sony/ATV Publg.,*

---

[2]    Merriam-Webster's Dictionary defines "nullify" to mean: (1) "to make null[;]" or (2) "to make of no value *or consequence*[.]"  Merriam-Webster, https://www.merriam-webster.com/dictionary/nullify (emphasis added).

6

*LLC v. Marcos*, 651 Fed. Appx. 482, 488 (6th Cir. 2016) (unpublished) ("In granting equitable relief, district courts enjoy broad discretion to fashion remedies balancing divergent interests."); *Biechele v. Norfolk & W. Ry. Co.*, 309 F. Supp. 354, 359 (N.D. Ohio 1969) ("Under the principles of equity, the Court has broad powers to fashion effective relief, even though it may have to retain a continuing jurisdiction to modify or change orders granted.").

The United States Supreme Court has emphasized the need for "flexibility" where courts are exercising their equity powers, in order to enable them "to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct particular injustices." *Holland v. Fla.*, 560 U.S. 631, 650 (2010) (cleaned up).  *See also Carter-Jones Lumber*, 166 F.3d at 846 ("Flexibility rather than rigidity has distinguished [equity jurisdiction].") (citation omitted). Moreover, where, as here, "the public interest is involved . . ., those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake."  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).  *See also U.S. v. First Nat. City Bank*, 379 U.S. 378, 383 (1965) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.") (citation omitted); *Concerned Pastors for Soc. Action v. Khouri*, 217 F. Supp. 3d 960, 979 (E.D. Mich. 2016) ("There can be no dispute that 'the public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental.'  Where the public interest is involved, 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'") (internal citation omitted).

**C.     Under Ohio law, Defendants are jointly and severally liable for the entirety of the costs associated with Plaintiffs' abatement plan unless they can sufficiently demonstrate that the harm produced by their conduct is reasonably apportionable.**

As explained in greater detail in Plaintiffs' Response in Opposition to Defendants' Joint Brief Regarding Select Legal Issues for Remedies Phase (Dkt. #4321 at § III), the jury's finding that each Defendant's conduct was a substantial factor in causing Plaintiffs' harm establishes a

prima facie evidentiary foundation supporting the imposition of joint and several liability against Defendants. *See Pang v. Minch*, 559 N.E.2d 1313, 1324 (Ohio 1990). Thus, *Defendants* bear the burden at trial of demonstrating "that the harm produced by their separate tortious acts is capable of apportionment." *Id.* at 1324-25; RESTATEMENT (SECOND) OF TORTS § 433B(2) & cmts. c-d (1965) ("Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."); RESTATEMENT (SECOND) OF TORTS § 840E, cmt. b (1979) ("Under the rule stated in § 433B, the burden rests upon the defendant to produce sufficient evidence to permit the apportionment to be made.").[3] Specifically, Defendants will have the burden at trial of proving to this Court, by a preponderance of the evidence, that a reasonable basis exists for apportioning the abatement plan among Defendants and any non-defendants whose conduct constitutes "a substantial factor in producing the harm[.]" RESTATEMENT (SECOND) OF TORTS § 433A, cmt. a (1965). This is a demanding burden that requires Defendants to provide concrete and specific evidence demonstrating that the harm is apportionable.[4]

If Defendants do not satisfy this burden, they must be held jointly and severally liable. *See Pang*, 559 N.E.2d at 1325 ("[I]t is the responsibility of the defendants to apportion the harm

---

[3]  *See also Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614 (2009) (applying Restatement § 433B and holding that "CERCLA defendants seeking to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists"); *U.S. Bank Nat. Ass'n v. U.S. E.P.A.*, 563 F.3d 199, 207 (6th Cir. 2009) ("The ultimate burden of proving divisibility is on the party invoking the doctrine.") (citing *United States v. R.W. Meyer, Inc*., 889 F.2d 1497, 1507 (6th Cir.1989); *United States v. Twp. of Brighton*, 153 F.3d 307, 319 (6th Cir. 1998) ("[A] defendant can avoid joint and several liability if it can prove divisibility in the district court, and we review the district court's determination for clear error").

[4]  *See, e.g., Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 589 (9th Cir. 2018) (noting that the burden of demonstrating divisibility under Restatement § 433B(2) "is 'substantial' because the divisibility analysis is 'intensely factual[,]'" requiring a "fact-intensive" assessment "generating 'concrete and specific' evidence") (citations omitted); *U.S. v. Hercules, Inc.*, 247 F.3d 706, 718 (8th Cir. 2001) ("Evidence supporting divisibility must be concrete and specific."); *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir. 1992) (noting that defendant's "burden in attempting to prove the divisibility of harm . . . is substantial, and the analysis will be factually complex . . .").

if joint and several liability is to be avoided."); RESTATEMENT (SECOND) OF TORTS § 433B cmt. d

("[T]he defendant may justly be required to assume the burden of producing that evidence, or if

he is not able to do so, of bearing the full responsibility."); *Twp. of Brighton*, 153 F.3d at 319

("Unlike comparative negligence, divisibility analysis is not an invitation to courts to attempt to

'split the difference.'  If they are in doubt, district courts should not settle on a compromise amount

that they think best approximates the relative responsibility of the parties.  Rather, if they are in

doubt, they should impose joint and several liability.").[5]  As the Ohio Supreme Court recognizes,

placing the burden on Defendants to prove apportionment serves the interests of justice:

> "The reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned.  In such a case the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility.  As between the proved tortfeasor who clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former."

*Pang*, 559 N.E.2d at 1324 (cleaned up) (quoting RESTATEMENT (SECOND) OF TORTS § 433B

cmt. d).  *See also* Dkt. #2561 (CT1 Causation MSJ Order) at p. 6 n.5 ("The same rationale applies

here, *i.e.* Defendants should not be allowed to avoid responsibility for the alleged misconduct

merely because it is difficult or impossible to trace individual harms to the conduct of individual

Defendants.").

---

[5] *See also* RESTATEMENT (SECOND) OF TORTS § 433A, cmt. i ("Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm."); RESTATEMENT (SECOND) OF TORTS § 840E, cmt. b ("When the apportionment cannot be made or when the defendant does not sustain his burden of proof as to the extent of his own contribution (see § 433B), he is held liable for the entire harm.").

**D.      The abatement award should not be reduced by past or future collateral source payments.**

Plaintiffs anticipate that Defendants will argue at trial that any abatement award should be reduced by the amount of any funding Plaintiffs have previously received, or may receive in the future, from collateral sources (*e.g.*, the federal government, the State of Ohio, charitable organizations, private insurers, etc.).[6] This argument should be rejected.  Ohio law does not require any such reduction and it would be inequitable to so reduce Plaintiffs' abatement award in this case.[7]

Historically, Ohio courts have applied the common law collateral-source rule in tort cases, which is "the judicial refusal to credit to the benefit of the wrongdoer money or services received in reparation of the injury caused which emanates from sources other than the wrongdoer." *Pryor v. Webber*, 263 N.E.2d 235, 238 (Ohio 1970) (citation omitted).[8]  *See also* RESTATEMENT (SECOND) OF TORTS § 920A (1979) ("Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.").  The rule is grounded in the policy that a tortfeasor should be liable for the harm caused by its wrongdoing, "and if any windfall results because of an outside payment, it is the innocent party who should benefit and not the one whose wrongful act caused injury." *Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*, 102 N.E.3d 579, 587

---

[6]   In this section, Plaintiffs are referring to payments from non-defendant third parties.  Settlement proceeds received by Plaintiffs from other defendants in this opioid litigation are a different matter.  Plaintiffs do not oppose the overall abatement award being reduced by the amount of the settlement proceeds received by Plaintiffs from other opioid-litigation defendants.

[7]   Notably, in the Track Four bellwether case, Judge Breyer, interpreting California law, which is substantially similar to Ohio law, recently granted the plaintiff's summary judgment motion on the defendants' collateral source and setoff defenses.  **Ex. 2** (CT4 MSJ Order) at p. 9 (rejecting defendants' argument that "funds from a collateral source can be used to offset [d]efendants' contribution to the [abatement] fund"; "California case law makes clear that the setoff defense applies to actions for damages, not the equitable remedy of an abatement fund.").

[8]   The doctrine has both a substantive and evidentiary component.  *Id.* at 239 ("Since, by the collateral source rule, the receipt of collateral benefits is deemed irrelevant and immaterial on the issue of damages, it follows, as a necessary concomitant, that not only are the benefits not to be deducted but that the receipt of such benefits is not to be admitted in evidence, or otherwise disclosed to the jury.").

(Ohio App. 10th Dist. 2017). *See also Robinson v. Bates*, 857 N.E.2d 1195, 1199 (Ohio 2006) (rule designed to prevent tortfeasor from being "given an advantage from third-party payments to the plaintiff"); *Natl. Steel Corp. v. Great Lakes Towing Co.*, 574 F.2d 339, 343–44 (6th Cir. 1978) ("Things which happen later and let an injured plaintiff escape some of the ultimate consequences of the wrong done to him do not inure to the benefit of the defendant.").[9]

Although the rule has typically been applied in the context of compensatory damage awards, courts have also applied it to equitable monetary remedies on occasion. *See Hamlin v. Charter Tp. of Flint*, 165 F.3d 426, 432–36 (6th Cir. 1999) (district court erred by deducting collateral payments from plaintiff's discrimination award, which included front pay award;[10] "Although we do not disagree with the general principle that a district court has discretion in awarding front pay, we believe that the decision of whether to offset collateral pension benefits from a discrimination award is a policy determination that should not be left to the individual discretion of each district court."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1170-71 (6th Cir. 1996) (district court erred in deducting collateral unemployment compensation and worker's compensation benefits from back pay award, an equitable remedy), *opinion amended on other grounds on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996); *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 626–28 (6th Cir. 1983) (unemployment benefits should not be deducted from back pay awards, nor should such awards "be reduced by the amount of income and social

---

[9]   *See also Pryor*, 263 N.E.2d at 238 ("The defendant wrongdoer should not, it is said, get the benefit of payments that come to the plaintiff from a 'collateral source' (i.e., 'collateral' to the defendant).") (citation omitted); RESTATEMENT (SECOND) OF TORTS § 920A cmt. b ("[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor."); 2 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 13:2 (3d ed.) ("If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing . . . the best interests of society are likely to be better served if the injured person benefits rather than the wrongdoer benefiting.") (citation omitted).

[10]   "The award of front pay is an equitable remedy within the discretion of the trial court." *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir. 1996).

security taxes which would have been deducted from the wages the claimant would have received but for discrimination").

Many attempts to abrogate the common-law rule by statute have been deemed unconstitutional by the Ohio Supreme Court.  *See State ex rel. Ohio Acad. of Tr. Lawyers v. Sheward*, 715 N.E.2d 1062, 1088-90 (Ohio 1999); *Sorrell v. Thevenir*, 633 N.E.2d 504, 508 (Ohio 1994).  In 2005, however, the Ohio legislature enacted OHIO REV. CODE § 2315.20, which partially abrogated the common-law rule in certain specific circumstances.  Section 2315.20 states, in relevant part:

> (A) In any *tort action* the defendant may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the *damages* that result from an injury, death, or loss to person or property that is the subject of the claim upon which the action is based . . .[11]
>
> ***
>
> (D) As used in this section:
>
> (1) "Tort action" means a civil action for *damages* for injury, death, or loss to person or property. . . .

OHIO REV. CODE § 2315.20(A), (D)(1) (emphasis added).  By its plain language, § 2315.20 does not apply in the present case because it applies only to tort actions seeking "damages."  *Id.*[12]  Here, Plaintiffs seek equitable abatement and injunctive relief.[13]

---

[11]  There are certain listed exceptions that are not relevant here.

[12]  *See Jaques v. Manton*, 928 N.E.2d 434, 438 (Ohio 2010) ("We are required to apply the plain language of a statute when it is clear and unambiguous."); *Kleybolte v. Buffon*, 105 N.E. 192, 193 (Ohio 1913) ("The court cannot read into [a statute in derogation of the common law] anything that does not come within the clear meaning of the language used, and the statute should not be given force beyond its plain terms."); *Baker v. Goldblatt*, 955 F.2d 402, 407–08 (6th Cir. 1992) ("When the common law regime is changed statutorily, the contours of that change can be ascertained only from the language of the statute that makes the change."); Cara Q. Hanson, *Ohio's Collateral Source Rule Following Robinson v. Bates and the Enactment of Ohio Revised Code Section 2315.20*, 40 U. Toledo L. Rev. 711, 750 (2009) ("Hanson") ("Because [§ 2315.20] is in derogation of the common law, the court should strictly construe the statute's meaning.").

[13]  Even assuming, *arguendo*, that the statute applied to Plaintiffs' claims, it would simply allow Defendants to "introduce evidence" at trial of the collateral source payments; it does not *require* this Court to reduce the abatement award by the amount of such payments.  OHIO REV. CODE § 2315.20(A); *see also Adae v. State*, No. 12AP-406, 2013 WL 85200, at *5 (Ohio App. 10th Dist. Jan. 8, 2013), *cause* (footnote continues on next page)

12

The principles and policy considerations underlying the common law collateral-source rule support the application of that rule in the present case. *Cf. Klosterman v. Fussner*, 651 N.E.2d 64, 68 (Ohio App. 2d Dist. 1994) (applying "the rationale of the traditional collateral source rule . . . even though the traditional collateral source rule itself would not apply"). As noted above, this Court has broad discretion in crafting equitable remedies. *Supra* at pp. 6-7. Equity would not be served by reducing the abatement award by the amount of any collateral source payments.

First, the only arguable justification for deducting collateral-source payments from an award is to prevent the plaintiff from receiving a windfall. If there is no potential for a windfall, no deduction is warranted. *Cf. Herlihy Moving & Storage, Inc. v. Adecco USA, Inc.*, 772 F. Supp. 2d 898, 899 (S.D. Ohio 2011) ("[W]here no potential for double recovery by [the plaintiffs] has been demonstrated, setoff should not be permitted."); *see also Adae*, 2013 WL 85200, at *8.

There is no legitimate risk of Plaintiffs receiving a windfall in this case. If the Court ultimately orders Defendants to pay only a portion of the total costs needed to abate the public nuisance they caused, Plaintiffs will not even receive a full recovery for their harm, let alone a double recovery.[14] And even if the Court determines that Defendants are jointly and severally liable for the entire abatement award, Plaintiffs still will not receive a windfall, as they will have to pay their attorneys' fees and expenses out of whatever funds they are awarded. *See, e.g., Robinson v. Bates*, 828 N.E.2d 657, 672–73 (Ohio App. 1st Dist. 2005) ("[T]he injured person seldom gets the compensation he 'recovers,' for a substantial attorney's fee usually comes out of it. The [collateral source rule] helps to remedy these problems inherent in compensating the tort

---

*dismissed and remanded*, 993 N.E.2d 785 (Ohio 2013); Hanson, 40 U. Toledo L. Rev. at 738 ("[T]here is no requirement [in § 2315.20] that the jury act in any particular way after receiving the information. They may choose to offset the damages, or they may choose to include the amount paid by the collateral source.").

[14] Moreover, any amounts the Counties pay for abatement under their own limited annual budget requires the shifting of expenditures from other departments, resulting not only in lost opportunity costs but also shortfalls and deficiencies in those other departments, leaving other necessary programs in their communities underfunded or unfunded.

13

victim.") (cleaned up), *aff'd on other grounds,* 857 N.E.2d 1195 (Ohio 2006).[15]

Moreover, even assuming, *arguendo*, that a windfall is theoretically possible, it should not be Defendants, the tortfeasors, that benefit from that windfall.  It would be inequitable to allow Defendants to escape the full consequences of their actions simply because the government or other third parties have directly or indirectly provided Plaintiffs with some financial assistance to address the opioid epidemic, or that they potentially may do so in the future.  *Cf. City of Larkspur*, 2010 WL 2164406, at *27 (applying collateral source rule to city's fraud claim arising from engineering work performed on bridge; "[P]ublic policy supports imposing the rule.  [The city] has an interest in having its officials pursue all possible sources of funding and a tort recovery made after securing such a benefit is not a windfall to the government agency, although it clearly would be a windfall to [the defendant] were it permitted to escape liability based on [the city's] efforts to secure alternative funding to protect the public's safety.  'No reason exists in these circumstances to confer a bonanza upon the party causing the injury.'") (citation omitted).

Indeed, courts regularly apply the collateral source rule to funds and benefits provided by federal, state, and local governments.  *See, e.g., Roundhouse v. Owens-Illinois, Inc.*, 604 F.2d 990, 994–95 (6th Cir. 1979) (receipt of federal funds in partial reimbursement of plaintiff's loss did not bar recovery of the full amount of damages caused by defendant's conduct; "In sum, we think that the rationale of the collateral source rule is fully applicable here[;] a wrongdoer cannot benefit from payments to the victim by a third party."); *Town of E. Troy v. Soo Line R. Co.*, 653 F.2d 1123,

---

[15]  *See also Hudson v. Lazarus*, 217 F.2d 344, 346 (D.C. Cir. 1954) (same); *Sunnyland Farms, Inc. v. C. New Mexico Elec. Co-op., Inc.*, 301 P.3d 387, 401 (N.M. 2013) ("[A] plaintiff's 'double recovery' is likely to be more egregious in theory than in practice; in reality, plaintiffs rarely receive their full damages, since they must pay attorney fees out of their damages.  Allocating the collateral contribution to their benefit, rather than to the benefit of the defendant, makes it more likely that the plaintiff will be fully compensated.") (internal citation omitted); *Williamson v. Metro. Prop. and Cas. Ins. Co.*, 1:15-CV-958 JCH/LF, 2018 WL 1787510, at *3 (D.N.M. Apr. 12, 2018); *City of Larkspur v. Jacobs Engr. Group, Inc.*, A123486, 2010 WL 2164406, at *27 (Cal. App. 1st Dist. May 28, 2010) (unpublished) ("The collateral source rule partially serves to compensate for the attorney's share and does not actually render 'double recovery' for the plaintiff.") (citation omitted); 2 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 13:2 (3d ed.) ("[T]he collateral source rule partially serves to compensate for the large portion of the plaintiff's recovery that ordinarily must be paid to his or her attorney under a contingent fee contract . . .").

1132 (7th Cir. 1980) (in public nuisance action, town's receipt of community development grant from the federal government did not prevent town from recovering its full damages against railroad for costs to remedy ground water pollution problem caused by railroad's negligence; "If the Town has obtained a windfall, such is the routine result of application of the collateral source rule."); *Louisiana Dept. of Transp. and Dev. v. Kansas City S. Ry. Co.*, 846 So. 2d 734, 743 (La. 2003) (environmental contamination case; "The overwhelming authority, therefore, supports our holding today in this case that the collateral source rule applies to the reimbursement [the plaintiff] received from [the federal government for remediation costs]. A wrongdoer's liability should not be reduced by the amount of collateral source payments to an injured plaintiff, even where the nature of the collateral source is a public relief provided to the plaintiff by application of federal or state law."); *City of Larkspur*, 2010 WL 2164406, at \*26 ("Federal and other state courts generally have encountered little difficulty in employing the collateral source rule when the payment is by a gratuitous source or from a government agency or government grant.") (citing cases, including *Roundhouse*, 604 F.2d 990).[16]

The rule's application is particularly appropriate where, as here, the harm impacts the

---

[16] *See also Molzof v. U.S.*, 6 F.3d 461, 464–68 (7th Cir. 1993) (plaintiff could recover future medical expenses despite fact that patient was entitled to free medical care from the government as a veteran; "'To force a plaintiff to choose between accepting public aid or bearing the expense of rehabilitation himself' . . . 'is an unreasonable choice.'") (citation omitted); *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1084 (2d Cir. 1988) ("[T]he district court's failure to award future medical expenses was erroneous if and to the extent it relied on the premise that the VA will provide plaintiff free care in the future. That this might result in a windfall for him is a matter for Congress, not the courts."); *Scott v. Dorel Industries, Inc.*, 3:09-CV-0799-K (BF), 2010 WL 11463303, at \*5 (N.D. Tex. Oct. 29, 2010) (collateral source rule barred evidence of "child's future Medicaid eligibility"); *Wiles v. Dept. of Educ.*, CV 04-00442 ACK-BMK, 2008 WL 11417491, at \*1 (D. Haw. Oct. 3, 2008) ("Based on the collateral source rule, the Court finds that Plaintiffs' recovery cannot be diminished by the fact that the State of California is responsible for funding Bryan's future educational and residential services."); *Cates v. Wilson*, 361 S.E.2d 734, 737, 739 (N.C. 1987) ("The instant case presents the issue of whether the collateral source rule embraces gratuitous government benefits. We hold it does[.]"; "[A]s between defendants who tortuously inflict injury and innocent taxpayers who fund programs such as Medicaid, we think it better than the loss fall on the tortfeasor."); 2 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 13:6 (3d ed.) ("In those instances in which medical services and other benefits supplied by the government have been paid as the result of injuries suffered at the hands of a tortfeasor that is independent of the federal government, the majority rule is that the benefits were received from a collateral source and cannot be proven in order to reduce the award of damages.").

health and welfare of the public. *See, e.g., Louisiana Dept. of Transp. and Dev.*, 846 So. 2d at 741 ("The welfare of our environment and the health of our citizens command that those persons or entities which are found to have polluted our state pay full restitution for the consequences of their acts. Violators of the LEQA should not be allowed to escape the consequences of their actions because the federal government chooses to provide financial assistance to states in essential and time-sensitive clean-up operations."); *City of Larkspur*, 2010 WL 2164406, at *27 (defendant should not be "permitted to escape liability based on [the city's] efforts to secure alternative funding to protect the public's safety").

Even putting aside the policy reasons justifying application of the rule as a general matter, it would be inequitable to deduct the particular collateral source payments potentially at issue in the present case from an abatement award. Defendants bear the burden of demonstrating their entitlement to, and the amount of, any offset from the overall abatement award based on collateral-source payments. *See Buchman v. Wayne Trace Loc. Sch. Dist. Bd. of Edn.*, 652 N.E.2d 952, 961 (Ohio 1995); *Bluemile*, 102 N.E.3d at 587; *Herlihy*, 772 F. Supp. 2d at 900; *Adae*, 2013 WL 85200, at *8. They cannot satisfy this burden.

To begin with, if deductible at all, a collateral source payment can only be deducted from the specific portion of an award to which the payment directly relates.[17] Thus, any collateral-source payments *previously* received by Plaintiffs could *only* be deducted, if at all, from an award compensating for *past* losses. But Plaintiffs are not seeking past damages. Abatement is a forward-looking equitable remedy. *See, e.g.,* Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at

---

[17] The Ohio Supreme Court has deemed unconstitutional statutes seeking to abrogate the common law collateral-source rule that required deductions from jury verdicts irrespective of whether the collateral benefit actually represents any portion of the jury's award. *See Sheward*, 715 N.E.2d at 1088, 1090 ("Present R.C. 2317.45 essentially gathers all evidence of collateral source payments, regardless of the category of harm for which it compensates and regardless of whether it compensates for past or future losses, tosses it in an indiscriminate heap along with all categories and items of compensatory damages, and authorizes, out of that, a general verdict replete with collateral benefit setoffs. Any prevention of double recovery that may result from this morass is fortuitous at best."); *Buchman*, 652 N.E.2d at 960 ("[T]he one inexorable source of agreement seems to be that there shall be no constitutionality without a requirement that deductible benefits be matched to those losses actually awarded by the jury."); *Sorrell*, 633 N.E.2d at 510.

p. 5; Dkt. #2519 (CT1 Order on Abatement *Daubert* Motion) at p. 2. Plaintiffs seek an abatement award in the amount necessary to prospectively abate the public nuisance as it *currently exists*. Thus, Defendants are already receiving the benefit of any past collateral-source payments received by Plaintiffs because the current nuisance presumably is not as severe as it otherwise might have been without those payments. Further deducting past collateral-source payments from an abatement award would serve no purpose other than to provide Defendants with an undeserved windfall.

Nor would it be equitable to deduct from the abatement award collateral source payments that Plaintiffs may potentially receive in the future. To receive an offset based on future collateral benefits, the party seeking the offset must demonstrate that such benefits can be determined "with a reasonable degree of certainty[,]" so that the award is not arbitrarily reduced by collateral benefits "that are not reasonably certain to be received." *Buchman*, 652 N.E.2d at 961. *See also Baker*, 955 F.2d at 408 (recognizing that the "calculation of [the plaintiff's] future collateral benefits . . . is fraught with uncertainty"). Courts have not hesitated to deny an offset where the future collateral benefits are speculative in nature, particularly where such benefits come from the government (*e.g.*, Medicaid payments, governmental grants, etc.). *See Amlotte v. U.S.*, 292 F. Supp. 2d 922, 930 (E.D. Mich. 2003) ("There has been a notable reluctance on the part of some courts to offsetting future medical costs.").[18] As one court aptly explained:

---

[18] *See also, e.g., Molzof*, 6 F.3d at 468 (noting that "the speculative nature of the prospective [veteran's medical] benefits prohibits us from offsetting the award"); *Scott*, 2010 WL 11463303, at *5 ("Texas courts have found future governmental assistance to be covered by the collateral source rule, reasoning that there is no guarantee the government will continue to provide such services and that the plaintiff is entitled to exercise her option to obtain services other than those offered by the government."); *Alvis v. Henderson Obstetrics, S.C.*, 592 N.E.2d 678, 685 (Ill. App. 3d Dist. 1992) ("[T]he trial court here refused to allow the jury to consider the free governmental services due to the uncertainty of their availability in the future. We find no error in the trial court's decision."); *N. Tr. Co. v. County of Cook*, 481 N.E.2d 957, 960 (Ill. App. 1st Dist. 1985) (same); 2 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 13:6 (3d ed.) ("Gratuitous public benefits that a plaintiff may receive in the future are within the collateral source rule, and thus may not be used to reduce the amount of damages awarded, because[, *inter alia*,] the continued availability of such benefits is uncertain, depending on the will of the legislature[.]").

The second reason for applying the collateral source rule to future public benefits is that the lack of certainty characterizing the availability of public resources renders it unwise to allow mitigation of damages premised on their continued existence.  All public programs exist subject to legislative approval.  While some programs maintain more stability than others, injured plaintiffs cannot count on their continued availability.  In the present case, for instance, none of the future public benefits introduced by the defendants—ICFs funded by Medicaid, special education funded by the federal government, and Aid for Families with Dependent Children—will necessarily continue for Morgan's lifetime.  The state and federal governments may restrict or withdraw Medicaid benefits.  Similarly, the federal government may abandon special education and welfare programs for any number of reasons, not the least of which is the need to balance an ever more unbalanced federal budget.  To encourage juries to mitigate damages based on tenuous public resources forces plaintiffs, like the foolish house builder in the parable, to rebuild lives on shifting sands.  The floods may come, and the winds blow, and great will be the fall.

*Cates*, 361 S.E.2d at 738–39 (internal citations omitted).[19]  Here, the availability and amount of any future collateral benefits from governmental or other third-party sources related to the opioid epidemic are speculative and uncertain.  Thus, they should not be deducted from the abatement award imposed on Defendants.

## EVIDENTIARY ISSUES

Plaintiffs anticipate that the primary evidentiary issues for the Court during trial will be the reliability and admissibility of Defendants' experts' opinions under Federal Rule of Evidence 702, particularly with regard to apportionment.[20]

## CONCLUSION

The public nuisance caused by Defendants is abatable and the abatement interventions, and their related costs, proposed by Plaintiffs' experts are reasonable and necessary to abate the public

---

[19]  Although *Cates* involved a medical malpractice claim seeking damages, the court's underlying rationale for applying the collateral source rule to future government benefits is equally true in the present case.

[20]  Defendants may also contest the reliability and admissibility of Plaintiffs' experts' opinions.  However, most of Plaintiffs' experts have already withstood prior *Daubert* challenges.  *See, e.g.,* Dkt. #2519 (CT1 Order on Abatement *Daubert* Motion) (denying *Daubert* challenges to abatement opinions of Dr. Alexander, Dr. Keyes, and Dr. Young); Dkt. #3946 (CT3 Order on Keyes *Daubert* Motion); Dkt. #3948 (CT3 Order on Alexander *Daubert* Motion).

nuisance in Lake and Trumbull Counties.  Injunctive relief is also warranted to ensure Defendants'

nuisance-causing tortious conduct does not continue.


Dated:  April 25, 2022

Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Trial Counsel*

19

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 2222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
Salvatore C. Badala
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger

21