# APPENDIX B

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement is made and entered into this 15th day of January 2022, among Endo, (defined below), the State of Florida and its Office of the Attorney General ("Plaintiff" or "State") (collectively, the "Settling Parties"), and State Outside Litigation Counsel (defined below) in the lawsuit captioned *State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma, L.P., et al*. (Case No. 2018-CA-001438) (Fla. Cir. Ct. Pasco County) (the "Florida AG Action").  This Settlement Agreement is intended by the Settling Parties to fully, finally and forever resolve, discharge and settle the Released Claims (as defined below), upon and subject to the terms and conditions hereof (the "Settlement").

WHEREAS, Plaintiff filed its complaint in the Florida AG Action (i) alleging, among other things, that Endo, among others, violated Florida law by deceptively marketing opioid pain medications so as to overstate their efficacy and downplay the associated risk of addiction, which resulted in a public nuisance in Florida; (ii) alleging that Endo, among others, violated the law by failing to monitor, report and not ship allegedly suspicious orders of opioid pain medications; (iii) alleging that Endo, among others, violated Fla. Stat. § 895.03(3), (4); and (iv) asserting Claims (as defined below) for damages, equitable abatement, civil penalties, attorneys' fees and reimbursed litigation costs, and other relief;

WHEREAS, Plaintiff brought the Florida AG Action in its sovereign capacity as the people's attorney in order to protect the public interest, including the interests of the State of Florida, its governmental subdivisions and its citizens;

WHEREAS, numerous Litigating Subdivisions (defined below) have filed Actions (defined below) in various forums against Endo, among others, raising Claims or allegations concerning, related to, based upon, or in connection with the Covered Conduct (defined below) and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action;

1

WHEREAS, there are numerous <u>Subdivisions</u> (defined below) that are not Litigating Subdivisions ("<u>Non-Litigating Subdivisions</u>") that could seek to file additional Actions raising Claims or allegations concerning, related to, based upon, or in connection with the Covered Conduct and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action and the Actions filed by Litigating Subdivisions;

WHEREAS, Endo (i) denies each and all of the Claims and allegations of wrongdoing made by Plaintiff in the Florida AG Action and by the Litigating Subdivisions in each of the Actions and maintains that it has meritorious defenses; (ii) denies all assertions of wrongdoing or liability against Endo arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Florida AG Action or in other Actions already brought by Litigating Subdivisions or that could be brought by such plaintiffs or by Non-Litigating Subdivisions, and contends that the factual allegations made in the Florida AG Action and the Litigating Subdivisions' Actions relating to Endo are false and materially inaccurate; (iii) denies that Plaintiff, or any Litigating Subdivision, or any other Subdivision, or any Florida resident, was harmed by any conduct of Endo alleged in the Florida AG Action, the Litigating Subdivisions' Actions, or otherwise; (iv) denies liability, expressly denies any wrongdoing, and denies it violated any federal or state statute or common law; and (v) maintains that Endo would be able to successfully defend against Plaintiff's Claims and allegations at trial, that the facts do not support the allegations, that Endo engaged in no misconduct or unlawful activity, and caused no harm to Plaintiff or to the Litigating Subdivisions, other Subdivisions, or any Florida residents;

WHEREAS, the Parties have investigated the facts and analyzed the relevant legal issues regarding the Claims and defenses that have been or could have been asserted in the Florida AG Action and any other Actions;

WHEREAS, the Parties have each considered the costs and delays and uncertainty associated with the continued prosecution and defense of the Florida AG Action and the other Actions;

WHEREAS, the Parties believe the Settlement set forth herein avoids the uncertainties of litigation and assures that the benefits reflected herein are obtained;

WHEREAS, Plaintiff has concluded that the terms of the Settlement are fair, reasonable and adequate and in the best interest of Plaintiff and all Subdivisions and Florida citizens and residents;

WHEREAS, Plaintiff has determined that continuation or commencement of Actions against Endo by Litigating Subdivisions or other Subdivisions would unduly interfere with Plaintiff's litigation authority to bring and resolve litigation in which the State has an interest and frustrate Plaintiff's efforts to obtain a favorable settlement;

WHEREAS, the Parties agree that neither this Agreement nor any statement made in the negotiation thereof shall be deemed or construed to be a concession as to any Claim, an admission, evidence of any violation of any statute or law, evidence of any liability or wrongdoing by Endo, or evidence of the truth of any of the Claims, allegations, denials, or defenses made in the Florida AG Action or the Litigating Subdivisions' Actions; and

WHEREAS, arm's-length settlement negotiations have taken place over the course of several weeks between Endo and Plaintiff;

WHEREAS, Plaintiff views prompt settlement on the terms enclosed herein to be in the public interest and crucial to the State of Florida and its citizens; recognizes that Subdivisions may, notwithstanding their willingness to sign on to this settlement, wish to reserve the right to challenge the Attorney General's authority to bind them in other litigation that does not arise out of or relate to the Covered Conduct; and represents that Plaintiff shall not use those Subdivisions' acceptance

3

of the terms of this Settlement as precedent in any litigation matter that does not arise out of or relate to the Covered Conduct;

NOW, THEREFORE, IT IS HEREBY AGREED by and between Plaintiff and Endo, by and through their respective counsel, as follows:

A.      **Definitions.**  As used in this Agreement, the following capitalized terms have the meanings specified below.

(a)      "Actions" means the Florida AG Action and any lawsuit by a Subdivision asserting any Released Claim against any Releasee.

(b)      "Agreement," "Settlement" or "Settlement Agreement" means this Settlement Agreement, together with any exhibits attached hereto, which are incorporated herein by reference.

(c)      "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. § 101, et seq.

(d)      "Bar" means either:  (1) a law barring all Subdivisions in the State of Florida from maintaining Released Claims against Releasees (either through a direct bar or through a grant of authority to release Claims and the exercise of such authority in full) or (2) a ruling by the Florida Supreme Court (or a District Court of Appeal if a decision is not subject to further review by the Florida Supreme Court) setting forth the general principle that Subdivisions in the State of Florida may not maintain any Released Claims against Releasees, whether on the ground of this Agreement (or the release in it) or otherwise.  For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Releasee (apart from the payments by Endo contemplated under this Agreement) shall not constitute a Bar.

(e)      "Claim" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees,

4

fines, penalties, expenses, costs or any other legal, equitable, civil, administrative or regulatory remedy whatsoever.

(f)　　"Claim-Over" means a Claim asserted by any entity that is not a Releasor against a Releasee on the basis of contribution, indemnity, or other claim-over on any theory relating to Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee) asserted by a Releasor.

(g)　　"Consent Judgment" means a consent decree, order, judgment, or similar action; in connection with this Agreement, the Parties have agreed to the entry of the Consent Judgment attached hereto as Exhibit H, which provides for the release set forth below and the dismissal with prejudice of any Released Claims that the State of Florida Office of the Attorney General has brought against Releasees, on the terms and conditions specified herein.

(h)　　"Court" means the Sixth Judicial Circuit Court in and for Pasco County, State of Florida.

(i)　　"Covered Conduct" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date of the Release (and any past, present or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) arising from or relating in any way to: (1) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including, but not limited to, any unbranded promotion, marketing, programs or campaigns relating to any Product or class of Products; (2) the characteristics, properties, risks or benefits of any Product; (3) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders placed with any Releasee; (4) the purchasing, selling, acquiring, disposing of, importing, exporting, applying for quota for, procuring quota for, handling, processing, packaging, supplying, distributing, converting, or otherwise engaging in any activity relating to, precursor or component Products, including, but not limited to, natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, active pharmaceutical ingredients, drug substances or any related intermediate Products; and (5) diversion control programs or suspicious order monitoring.

(j)　　"Effective Date of the Agreement" means 3 business days after the Initial Participation Date, provided that either a Bar exists or a sufficient number of Subdivisions have become Participating Subdivisions by the Initial Participation Date.  The Parties may alter the Effective Date of the Agreement by mutual written agreement.

(k)　　"Effective Date of the Release" means the date on which the Court enters the Consent Judgment.

5

(l)     "Endo" means Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.

(m)     "Execution Date" means the date on which this Agreement is executed by the last party to do so.

(n)     "Initial Participation Date" means the date by which Litigating Subdivisions must join to become initial Participating Subdivisions.  The Initial Participation Date shall be 30 days after the Execution Date.  The Parties may alter the Initial Participation Date by mutual written agreement.

(o)     "Litigating Subdivision" means a Subdivision (or Subdivision official) that has brought any Released Claim against any Releasees on or before December 31, 2021, including, but not limited to, the agreed list of Litigating Subdivisions set forth in Exhibit A.

(p)     "Litigation Costs" means attorneys' fees and investigative and litigation costs and expenses incurred in connection with Claims asserted against any Releasee in the Florida AG Action or any Litigating Subdivision's Action.

(q)     "Non-Joining Subdivision" means any Litigating Subdivision or Principal Subdivision that does not execute a subdivision settlement participation form attached as Exhibit D by the Post Effective Date Sign-on Deadline.

(r)     "Non-Litigating Subdivision" means a Subdivision that is not a Litigating Subdivision.

(s)     "Non-Participating Subdivision" means a Subdivision that is not or is not yet a Participating Subdivision.

(t)     "Opioid Remediation" means care, treatment and other programs and expenditures (including reimbursement for past such programs or expenditures, except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic.  Exhibit C provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation.  Qualifying expenditures may include reasonable related administrative expenses.[1]

(u)     "Participating Subdivision" means any Subdivision that executes a subdivision settlement participation form attached as Exhibit D.

(v)     "Parties" and "Settling Parties" means Endo and Plaintiff, with each being a "Party" and "Settling Party."

---

[1] Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person.

6

(w)  "Post-Effective Date Sign-on Deadline" means the deadline for Subdivisions to execute a subdivision settlement participation form attached as Exhibit D, which shall be 150 days after the Effective Date of the Agreement.

(x)  "Principal Subdivision" means:  (1) a County, regardless of population; or (2) a Subdivision that is not a County, but is a General Purpose Government entity (including a municipality, city, town, township, parish, village, borough, gore or any other entities that provide municipal-type government) with a population of more than 10,000, including, but not limited to, the agreed list of Principal Subdivisions attached hereto as Exhibit B.

(y)  "Product" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is:  (1) an opioid or opiate, as well as any product containing any such substance; or (2) benzodiazepine, carisoprodol, or gabapentin; or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought or dispensed to be used together that includes opioids or opiates.  "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance.  Notwithstanding the foregoing, nothing in this definition prohibits a Releasor from taking administrative or regulatory action related to benzodiazepine (including, but not limited to, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, and midazolam), carisoprodol, or gabapentin that is wholly independent from the use of such drugs in combination with opioids, *provided* such action does not seek money (including abatement and/or remediation) for conduct prior to the Execution Date.

(z)  "Qualified Settlement Fund" means the Florida Qualified Settlement Fund contemplated by this Agreement, into which all payments by Endo shall be made and which shall be established under the authority and jurisdiction of the Court and which shall be a "qualified settlement fund" within the meaning of 26 C.F.R. § 1.468B-1.

(aa)  "Qualified Settlement Fund Administrator" means the Administrator appointed to administer the Qualified Settlement Fund under the authority and jurisdiction of the Court.  The duties of the Qualified Settlement Fund Administrator shall be governed by this Agreement.  The identity of the Qualified Settlement Fund Administrator and a detailed description of the Qualified Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Qualified Settlement Fund Administrator's fees and costs, will be set forth in a separate document to be prepared by the Parties and filed with the Court to establish the fund and be attached later to this Agreement as Exhibit E.

(bb)  "Released Claims" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date of the Release.  Without limiting the foregoing, Released Claims

include any Claims that have been asserted against the Releasees by Plaintiff or any Litigating Subdivision in any federal, state or local Action or proceeding (whether judicial, arbitral or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those Actions or in any comparable Action or proceeding brought by Plaintiff, any of its Subdivisions, or any Releasor (whether or not such State, Subdivision, or Releasor has brought such Action or proceeding).  Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to this Agreement, whether or not such Claims relate to Covered Conduct.  The Parties intend that this term, "Released Claims," be interpreted broadly.  This Agreement does not release Claims by private individuals for damages for any alleged personal injuries arising out of their own use of any Product.  It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law.  Released Claims is also used herein to describe Claims brought or maintained by any Subdivision in the future that would have been Released Claims if they had been brought by a Releasor against a Releasee.

(cc)     "Releasees" means: (i) Endo Health Solutions Inc.; (ii) Endo Pharmaceuticals Inc.; (iii) all of their respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, assigns and insurers (in their capacity as such), including, but not limited to, Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., and Endo International plc; and (iv) the past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys and insurers of each of the foregoing entities and persons referenced in clauses (i) through (iii) above for actions or omissions that occurred during and related to their work for, or employment with, any of the foregoing entities with respect to the Released Claims.

(dd)     "Releasors" means with respect to Released Claims: (1) the State; (2) each Participating Subdivision; and (3) without limitation and to the maximum extent of the power of each of the State, the Florida Attorney General and/or Participating Subdivision to release Claims, (a) the State of Florida's and each Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and any person in his or her official capacity, whether elected or appointed to lead or serve any of the foregoing, and any agency, person or entity claiming by or through any of the foregoing; (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other special districts in the State of Florida, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Florida or any Subdivision in the State of Florida, whether or not any of them participates in this Agreement.  Nothing in this definition shall be construed to limit the definition of "Subdivision" in subsection A(gg) below.  In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide a subdivision settlement participation form (attached as Exhibit D) providing for a release to the fullest extent of the Participating Subdivision's authority, an executed copy of which shall be attached as an exhibit to and deemed to be a part of this Agreement.

(ee)  "State Outside Litigation Counsel" means Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.; Drake Martin Law Firm, LLC; Harrison Rivard Duncan & Buzzett, Chartered; Newsome Melton, P.A.; and Curry Law Group, P.A.

(ff)  "State-Subdivision Agreement" means a separate agreement among Plaintiff and all Participating Subdivisions providing for an allocation of, among other things, the Remediation Payment (defined below).  The State-Subdivision Agreement is attached hereto as Exhibit I.

(gg)  "Subdivision" means (1) any General Purpose Government entity (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore or any other entities that provide municipal-type government), School District, or Special District within a State, and (2) any other subdivision or subdivision official or sub-entity of or located within a State (whether political, geographical or otherwise, whether functioning or non-functioning, regardless of population overlap, and including, but not limited to, nonfunctioning governmental units and public institutions) that has filed or could file a lawsuit that includes a Released Claim against a Releasee in a direct, parens patriae, or any other capacity.  "General Purpose Government," "School District," and "Special District" shall correspond to the "five basic types of local governments" recognized by the U.S. Census Bureau and match the 2017 list of Governmental Units.  The three (3) General Purpose Governments are county, municipal, and township governments; the two (2) special purpose governments are School Districts and Special Districts.  "Fire District," "Health District," "Hospital District," and "Library District" shall correspond to categories of Special Districts recognized by the U.S. Census Bureau.  References to a State's Subdivisions or to a Subdivision "in," "of," or "within" a State include Subdivisions located within the State even if they are not formally or legally a sub-entity of the State.

**B.  Release and Dismissals in the Florida AG Action and other Actions.**

1.  It is the intention of the Settling Parties to fully and finally resolve all Released Claims that have been or could be brought against the Releasees by Plaintiff or any Subdivision with respect to the Covered Conduct, and that the release of such Claims does not affect Plaintiff's or the Subdivisions' Claims as to any other defendant.  Plaintiff represents and warrants that it will use its best efforts to obtain a consensual release of any and all Claims involving Covered Conduct that Plaintiff and all Subdivisions, including any Litigating Subdivision or Non-Litigating Subdivision, have asserted or could assert against the Releasees.  Regardless whether such consensual release is obtained, Plaintiff represents and warrants under this Agreement that it is exercising its authority under law to release any and all Claims involving Covered Conduct that

9

Plaintiff and all Subdivisions, including any Litigating Subdivision or Non-Litigating Subdivision, have asserted or could assert against the Releasees.  Plaintiff further represents and warrants that it will use all available authority to bind, and under this Agreement is exercising such authority to bind, Plaintiff and all Subdivisions, including all Litigating Subdivisions and Non-Litigating Subdivisions, regardless of whether they become Participating Subdivisions or Non-Joining Subdivisions, to the terms of this Agreement.

2.      In addition to the general release and dismissal to be provided by Plaintiff set forth in Sections D & E, Plaintiff will deliver to Endo signed agreements from:  (a) each Subdivision that executes a signed agreement by the Initial Participation Date; and (b) each Subdivision  that executes a signed agreement by the Post-Effective Date Sign-on Deadline (i.e., within 150 days following the Effective Date of the Agreement).   Such agreements shall include:  (a) the Subdivision's acceptance of the terms and conditions of this Agreement by signing the subdivision settlement participation form attached as <u>Exhibit D</u>; (b) in the case of a Litigating Subdivision, such Litigating Subdivision's agreement to implement an immediate cessation of any and all litigation activities relating to such Litigating Subdivision's Action as to all Releasees; (c) in the case of a Litigating Subdivision, an agreement that Plaintiff may represent that the Litigating Subdivision supports the Consent Judgment to be entered in accordance with Section F below; and (d) in the case of a Litigating Subdivision, such Litigating Subdivision's agreement to file, within the later of seven (7) days of the Effective Date of the Release, or seven (7) days of signing the subdivision settlement participation form, a notice or stipulation of voluntary dismissal with prejudice of any and all Released Claims asserted by the Litigating Subdivision against the Releasees, with each party to bear its own costs.

3.      Between the Execution Date and the Initial Participation Date, Plaintiff agrees to furnish to Endo a report listing the Subdivisions that have executed the signed agreements

10

described in Section B.2 and copies of such signed agreements on a weekly basis.  Plaintiff further agrees to furnish to Endo no later than noon Eastern Time on the day after the Initial Participation Date and a final report listing the Subdivisions that have executed the signed agreements described in Section B.2 by the Initial Participation Date and copies of all such signed agreements.  After the Initial Participation Date, the parties shall confer and establish a schedule for the regular provision of such reports and copies of signed agreements.

4.      Plaintiff represents and warrants that, if any Action remains pending against one or more Releasees after the Effective Date of the Agreement or is filed by a Subdivision against any Releasee on or after the Execution Date, Plaintiff will seek to obtain dismissal of such Action as to such Releasees as soon as reasonably possible.  Depending on facts and circumstances, Plaintiff may seek dismissal, among other ways, by intervening in such Action to move to dismiss or otherwise terminate the Subdivision's Claims in the Action or by commencing a declaratory judgment or other action that establishes a Bar to the Subdivision's Claims and Action.  For avoidance of doubt, Plaintiff will seek dismissal of an Action under this paragraph regardless whether the Subdivision in such Action is a Participating Subdivision.

5.      In the event that the actions required of Plaintiff in Section B.4 fail to secure the prompt dismissal or termination of any Action by any Subdivision against any Releasee, Plaintiff shall seek enactment of a legislative Bar as defined in Section A(d)(1) and will endeavor to achieve enactment as soon as is practicable.  Participating Subdivisions agree not to oppose any effort by Plaintiff to achieve enactment of a legislative Bar.

6.      Plaintiff further represents and warrants that no portion of the Remediation Payment or the Litigation Costs Payments will be distributed to or used for the benefit of any Subdivision unless and until Plaintiff has delivered to Endo a signed agreement from such Subdivision providing for the Subdivision's acceptance of the terms and conditions of this

11

Agreement, including its express agreement to be bound by the irrevocable releases set forth in Section D below.

C.     **Settlement Consideration.**

1.     **Remediation Payment and Litigation Costs Payments.**

(a)     On or before the later of (a) seven (7) days after the Effective Date of the Release, or (b) seven (7) days after (i) the Qualified Settlement Fund has been established under the authority and jurisdiction of the Court, and (ii) Endo has received a W-9 and wire instructions for the Qualified Settlement Fund, Endo Pharmaceuticals Inc. shall pay into the Qualified Settlement Fund the sum of sixty-five million dollars ($65,000,000), consisting of (a) fifty-five million dollars ($55,000,000) for opioid remediation (the "Remediation Payment"), to be allocated in accordance with subsection C.3 below; (b) five million dollars ($5,000,000) to be available to reimburse the State's Litigation Costs in accordance with subsection C.1(c) below (the "State Litigation Cost Payment"); and (c) five million dollars ($5,000,000) to be available to reimburse the Litigation Costs of Litigating Subdivisions in accordance with subsection C.1(b) below (the "Litigating Subdivision Litigation Cost Payment").  The State Litigation Cost Payment and the Litigating Subdivision Litigation Cost Payment shall collectively be referred to herein as the "Litigation Costs Payments."  The Qualified Settlement Fund Administrator shall allocate each of the Remediation Payment, the State Litigation Cost Payment, and the Litigating Subdivision Litigation Cost Payment into separate sub-funds within the Qualified Settlement Fund.  Release of the Remediation Payment and the Litigation Costs Payments from the Qualified Settlement Fund shall be subject to the conditions specified below.

(b)     An agreement on the handling of Litigating Subdivision Litigation Costs is attached as Exhibit G and incorporated herein by reference.  The Litigating Subdivision Litigation Cost Payment is to be available to reimburse counsel for Litigating Subdivisions that become Participating Subdivisions and who waive any other right(s) they may have to compensation in connection with this Settlement for reasonable Litigation Costs incurred in connection with their Claims against Releasees.

(1)     The Qualified Settlement Fund Administrator shall allow eligible counsel reimbursement for reasonable Litigation Costs as provided in Exhibit G.  Such Litigation Costs shall be divided among Participating Subdivisions as provided in Exhibit G under the jurisdiction and authority of the Court.  Any amount remaining in the Litigation Subdivision Litigation Costs Payment sub-fund after such allocation shall be returned to Endo.

(2)     No funds may be used to compensate Litigation Costs incurred by Non-Participating Subdivisions or Non-Litigating Subdivisions, or Litigation Costs arising out of representation of any such Subdivision.

(3)    No attorney for any Litigating Subdivision may receive any share of the Litigating Subdivision Litigation Cost Payment unless the following eligibility requirements are met and certified by the attorney:

    i.    The attorney must represent that s/he has no present intent to represent or participate in the representation of any Subdivision or any Releasor with respect to the litigation of any Released Claims against any Releasees.

    ii.    The attorney must represent that s/he will not charge or accept any referral fees for any Released Claims asserted or maintained against Releasees by any Subdivision or any Releasor.

    iii.    The attorney may not have, and must represent that s/he does not have, a claim for fees, costs or expenses related to the litigation of any Released Claims against any Releasees by any Subdivision or any Releasor after December 31, 2021.

    iv.    Notwithstanding the foregoing, nothing in this subsection C.1(b)(3) is intended to operate as a "restriction" on the right of any attorney to practice law within the meaning of Rule 5.6(b) of the Florida Rules of Professional Conduct or any equivalent provision of any other jurisdiction's rules of professional conduct.

(c)    Plaintiff shall file in the Court a motion for the State's Litigation Costs up to $5,000,000. Endo shall not oppose the motion so long as the State does not seek more than $5,000,000 in Litigation Costs. If any amount of the $5,000,000 is not awarded by the Court, that amount shall be returned to Endo. As set forth in Section C.2 below, in the event the Court awards the State Litigation Costs in excess of $5,000,000, the Releasees shall have no obligation to pay any amount in excess of the State Litigation Cost Payment.

2.    **No Other Payments by Releasees as to Covered Conduct, Released Claims, the Florida AG Action, Other Actions, Plaintiff, Subdivisions or State Outside Litigation Counsel or Litigation Costs.**  Other than the Remediation Payment and the Litigation Costs Payments by Endo Pharmaceuticals Inc. referenced in Section C.1(a), none of the Releasees shall have any obligation to make any further or additional payments in connection with Claims for Covered Conduct or Litigation Costs or this Settlement.

13

3.     **Apportionment of the Remediation Payment.**

(a)     It is the intent of the Parties that the Remediation Payment in Section C.1(a) be used exclusively for Opioid Remediation.

(b)     In accordance with the State-Subdivision Agreement in <u>Exhibit I</u>, the Remediation Payment shall be allocated by the Qualified Settlement Fund Administrator into three sub-funds:  an Abatement Accounts Sub-Fund (also known as a regional fund), a State Sub-Fund, and a Subdivision Sub-Fund to be allocated to the Abatement Accounts Sub-Fund or to another Participating Subdivision.

(c)     A detailed mechanism consistent with the foregoing for a Qualified Settlement Fund Administrator to follow in allocating, apportioning and distributing payments that will be filed with the Court and later attached as <u>Exhibit J</u>.

(d)     Endo shall have no duty, liability, or influence of any kind with respect to the apportionment and use of the Remediation Payment by the Qualified Settlement Fund Administrator.  Plaintiff specifically represents, however, that any such apportionment and use by the Qualified Settlement Fund Administrator shall be made in accordance with all applicable laws.

4.     **Release of the State Fund.**  Within a reasonable period after the Effective Date of the Agreement or otherwise as ordered by the Court, the Qualified Settlement Fund Administrator shall release the State Fund to Plaintiff.

5.     **Subdivision Payments to Subdivisions that Become Participating Subdivisions Prior to the Initial Participation Date.**  A Participating Subdivision that (a) completes a subdivision settlement participation form prior to the Initial Participation Date, (b) joins the Florida Opioid Allocation and Statewide Response Agreement (<u>Exhibit I</u>), and (c) in the case of a Litigating Subdivision, dismisses with prejudice any and all Released Claims asserted by the Litigating Subdivision against the Releasees shall be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Effective Date of the Agreement.

6.     **Subdivision Payments to Subdivisions that Become Participating Subdivisions After the Initial Participation Date.**  A Participating Subdivision that (a) completes a subdivision settlement participation form after the Initial Participation Date and by no later than the Post-

Effective Date Sign-on Deadline, (b) joins the Florida Opioid Allocation and Statewide Response Agreement (Exhibit I), and (c) in the case of a Litigating Subdivision, dismisses with prejudice any and all Released Claims asserted by the Litigating Subdivision against the Releasees shall be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Post-Effective Date Sign-on Deadline.

7. **Reversion to Endo of Amounts Forfeited by Non-Joining Subdivisions.**  Any Litigating Subdivision or Principal Subdivision that does not sign a participation agreement by the Post-Effective Date Sign-on Deadline will be deemed a Non-Joining Subdivision.  At Endo's request to the Qualified Settlement Fund Administrator, any Non-Joining Subdivision's share of the Remediation Payment (and to the extent any such subdivision is a Litigating Subdivision the Litigation Cost Payments) shall be returned to Endo within a reasonable time after the Post-Effective Date Sign-on Deadline.

8. **Agreement Null and Void if the Agreement Does Not Become Effective.**  In the event that the Effective Date of the Agreement does not occur and the Parties fail to agree to extend the Effective Date of the Agreement, the Agreement shall be null and void.

9. **Use of Evidence at Trial in the Florida AG Action.**  Plaintiff agrees that none of the Releasees will be a defendant in any trial of the Florida AG Action, that no Releasee will be subpoenaed or called to testify by Plaintiff in any trial of the Florida AG Action and that any evidence that references the Releasees or the Products will be used solely against other defendants in the Florida AG Action.

10. **Verdict Form.**  Plaintiff agrees that it will not seek to have any of the Releasees included on the verdict form in any trial related to the Florida AG Action and will oppose the efforts of any other party in the Florida AG Action to include any of the Releasees on the verdict form.

11. **Injunctive Relief.** As part of the Consent Judgment to be entered in accordance with Section F below, the Parties agree to the entry of injunctive relief terms attached in Exhibit F.

**D.** **Settlement of Claims and General Release.**

1. **Scope.** On the Effective Date of the Release, Plaintiff and each Releasor shall be deemed to have fully, finally and forever released all Releasees from all Released Claims. Plaintiff, on behalf of itself and all other Releasors (whether or not they have signed this Agreement or the subdivision settlement participation form in Exhibit D), hereby absolutely, unconditionally and irrevocably covenants not to bring, file, or claim, or to cause, assist, or permit to be brought, filed, or claimed, any Released Claims of any type in any forum whatsoever against Releasees. For the avoidance of doubt, Plaintiff agrees that this Settlement Agreement and the releases contained herein shall fully and completely resolve any past, present or future liability that any Releasee may have arising from, relating to or based on the Covered Conduct occurring prior to the Effective Date of the Release, whether in the Actions or otherwise. The releases provided for in this Agreement are intended by the Settling Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any and all Released Claims. This Settlement Agreement is, will constitute, and may be pleaded as a complete bar to any Released Claim asserted against Releasees, whether against Plaintiff, any Participating Subdivision, or any other Subdivision, including any Non-Joining Subdivision.

2. **General Release.** In connection with the releases provided pursuant to this Settlement Agreement, Plaintiff, on behalf of itself and all other Releasors referenced in Section D.1, expressly waives, releases and forever discharges any and all provisions, rights and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle

16

of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those that he, she, or it knows or believes to be true with respect to the Released Claims, but Plaintiff, on behalf of itself and all other Releasors, hereby expressly waives and fully, finally and forever settles, releases and discharges, upon the Effective Date of the Release, any and all Released Claims against the Releasees that may exist as of this date but which they do not know or suspect to exist, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect their decision to enter into this Settlement Agreement.

3.   **Claim-Over and Non-Party Settlement.**

(a)   Statement of Intent.  It is the intent of the Parties that:

(1)   The Remediation Payment and Litigation Cost Payments made under this Agreement shall be the sole payments made by the Releasees to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee);

(2)   Claims by Releasors against non-Parties should not result in additional payments by Releasees, whether through contribution, indemnification or any other means; and

(3)   The Settlement effects a good faith "release and covenant not to sue" within the meaning of Florida Statute § 768.31(5) and meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine, including, but not limited to, Fla. Stat. § 768.31(5), that reduces or discharges a released party's liability to any other parties, such that Releasees are discharged from all liability for contribution to any other alleged tortfeasor in the Florida AG Action and in any other Action, whenever filed.

17

(4)    The provisions of this Section D.3 are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

(b)    No Releasee shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory, from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner; *provided* that a Releasee shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Releasee from recovering amounts owed pursuant to insurance contracts.

(c)    To the extent that, on or after the Effective Date of the Agreement, any Releasor settles any Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee) ("Non-Party Covered Conduct Claims") it may have against any entity that is not a Releasee (a "Non-Released Entity") that is, as of the Effective Date of the Agreement, a defendant in the Florida AG Action or any other Action and provides a release to such Non-Released Entity (a "Non-Party Settlement"), including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will seek to include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on seeking contribution or indemnity of any kind from Releasees substantially equivalent to that required from Endo in subsection D.3(b) (except limited to such claims against Releasees), or a release from such Non-Released Entity in favor of the Releasees (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to seek to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

(d)    Claim-Over. In the event that any Releasor obtains a judgment with respect to a Non-Party Covered Conduct Claim against a Non-Released Entity that does not contain a prohibition like that in subsection D.3(b), or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection D.3(c), and such Non-Released Entity asserts a Claim-Over against a Releasee, Endo and that Releasor shall meet and confer concerning any additional appropriate means by which to ensure that Releasees are not required to make any payment with respect to Covered Conduct (beyond the amounts that will already have been paid by Endo under this Settlement Agreement).

(e)    In no event shall a Releasor be required to reduce the amount of a settlement or judgment against a Non-Released Entity in order to prevent additional payments by Releasees, whether through contribution, indemnification, or any other means.

4.    **Cooperation.** Releasors, including Plaintiff and Participating Subdivisions, agree that they will not publicly or privately encourage any other Releasor to bring or maintain any

Released Claim. Plaintiff further agrees that it will cooperate in good faith with the Releasees to secure the prompt dismissal of any and all Released Claims.

**E.    Cessation of Litigation Activities.**  It is the Parties' intent that all litigation activities in the Florida AG Action relating to Released Claims against the Releasees shall immediately cease as of the Execution Date.  Within seven (7) days after the Execution Date, Plaintiff agrees to take all steps reasonably necessary to implement the prompt cessation of such litigation activities, including by, for example, jointly requesting a severance of Endo from any trial in the Florida AG Action and/or a stay of further proceedings against Endo pending the implementation of this Settlement.

**F.    Entry of Consent Judgment Providing for Dismissal of All Claims Against Endo in the Florida AG Action with Prejudice.**  As soon as practicable following the Effective Date of the Agreement, Plaintiff shall file in the Court a Consent Judgment substantially in the form of Exhibit H, including a dismissal of the Florida AG Action with prejudice.  Notwithstanding the foregoing, the Consent Judgment shall provide that the Court shall retain jurisdiction for purposes of enforcing compliance with the injunctive terms set forth in Exhibit F.  The parties shall confer and agree as to the final form and time of filing prior to filing of the Consent Judgment.

**G.    No Admission of Liability.**  The Settling Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between Endo and Plaintiff and between Endo and all Releasors.  Endo is entering into this Settlement Agreement solely for the purposes of settlement, to resolve the Florida AG Action and all Actions and Released Claims and thereby avoid significant expense, inconvenience and uncertainty.  Endo denies the allegations in the Florida AG Action and the other Actions and denies any civil or criminal liability in the Florida AG Action and the other Actions.  Nothing contained herein may be taken as or deemed to be an admission or concession by Endo of:  (i) any violation of any law, regulation, or ordinance; (ii)

19

any fault, liability, or wrongdoing; (iii) the strength or weakness of any Claim or defense or allegation made in the Florida AG Action, in any other Action, or in any other past, present or future proceeding relating to any Covered Conduct or any Product; or (iv) any other matter of fact or law.  Nothing in this Settlement Agreement shall be construed or used to prohibit any Releasee from engaging in the manufacture, marketing, licensing, distribution or sale of branded or generic opioid medications or any other Product in accordance with applicable laws and regulations.

> **H.** **Miscellaneous Provisions.**

> 1. **Use of Agreement as Evidence.**  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement:  (i) is or may be deemed to be or may be used as an admission or evidence relating to any matter of fact or law alleged in the Florida AG Action or the other Actions, the strength or weakness of any claim or defense or allegation made in those cases, or any wrongdoing, fault, or liability of any Releasees; or (ii) is or may be deemed to be or may be used as an admission or evidence relating to any liability, fault or omission of Releasees in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that Releasees may file this Agreement in any action in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim or to support a claim for contribution and/or indemnification.

> 2. **Voluntary Settlement.**  This Settlement Agreement was negotiated in good faith and at arm's-length over several weeks, and the exchange of the Remediation Payment and

Litigation Costs Payment for the releases set forth herein is agreed to represent appropriate and fair consideration.

3. **Authorization to Enter Settlement Agreement.**  Each party specifically represents and warrants that this Settlement Agreement constitutes a legal, valid and binding obligation of such Party.  Each signatory to this Settlement Agreement on behalf of a Party specifically represents and warrants that he or she has full authority to enter into this Settlement Agreement on behalf of such Party.  Plaintiff specifically represents and warrants that it has concluded that the terms of this Settlement Agreement are fair, reasonable, adequate and in the public interest, and that it has satisfied all conditions and taken all actions required by law in order to validly enter into this Settlement Agreement.  Plaintiff specifically represents and warrants that, other than the Claims asserted in the Florida AG Action and the other Actions (whether filed previously or in the future), it has no interest (financial or otherwise) in any other Claim against any Releasee related to the Covered Conduct.  In addition, Plaintiff specifically represents and warrants that (i) it is the owner and holder of the Claims asserted in the Florida AG Action; (ii) it has not sold, assigned or otherwise transferred the Claims asserted in the Florida AG Action, or any portion thereof or rights related thereto, to any third party; and (iii) it believes in good faith that it has the power and authority to bind all persons and entities with an interest in the Florida AG Action and all Subdivisions.

4. **Representation With Respect to Participation Rate.**  The State of Florida represents and warrants for itself that it has a good-faith belief that all Litigating Subdivisions and all Principal Subdivisions will become Participating Subdivisions.  The State acknowledges the materiality of the foregoing representation and warranty.  State Outside Litigation Counsel, in good faith, believe this is a fair Settlement.  Therefore, State Outside Litigation Counsel will, in their best efforts, recommend this Settlement to all Subdivisions within Florida.

21

5.      **Dispute Resolution.**  If Plaintiff believes Endo is not in compliance with any term of this Settlement Agreement, then Plaintiff shall (i) provide written notice to Endo specifying the reason(s) why Plaintiff believes Endo is not in compliance with the Settlement Agreement; and (ii) allow Endo at least thirty (30) days to attempt to cure such alleged non-compliance (the "Cure Period").  In the event the alleged non-compliance is cured within the Cure Period, Endo shall not have any liability for such alleged non-compliance.  The State may not commence a proceeding to enforce compliance with this Agreement before the expiration of the Cure Period.

6.      **No Third-Party Beneficiaries.**  Except as to Releasees, nothing in this Settlement Agreement is intended to or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever.

7.      **Notices.**  All notices under this Agreement shall be in writing and delivered to the persons specified in this paragraph ("Notice Designees") via: (i) e-mail; and (ii) either hand delivery or registered or certified mail, return receipt requested, postage pre-paid.

Notices to Plaintiff shall be delivered to:

Attorney General
Florida State Capitol, PL-01
Tallahassee FL 32399-1050


        and

David C. Frederick
Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.
1615 M Street, NW
Washington D.C. 20036
dfrederick@kellogghansen.com


Notices to Endo shall be delivered to:

Geoffrey M. Wyatt
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue N.W.

Washington, D.C. 20005
geoffrey.wyatt@skadden.com

and

Matthew J. Maletta
Executive Vice President and Chief Legal Officer
Endo
1400 Atwater Drive
Malvern, Pennsylvania 19355
maletta.matthew@endo.com

8.      **Taxes.**  Each of the Parties acknowledges, agrees and understands that it is its intention that, for purposes of Section 162(f) of the Internal Revenue Code, the Remediation Payment by Endo constitutes restitution for damage or harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law.  The Parties acknowledge, agree and understand that only the Litigation Costs Payments represent reimbursement to Plaintiff or any other person or entity for the costs of any investigation or litigation, that no portion of the Remediation Payment represents reimbursement to Plaintiff or any other person or entity for the costs of any investigation or litigation, and no portion of the Remediation Payment represents or should properly be characterized as the payment of fines, penalties or other punitive assessments.  Plaintiff acknowledges, agrees and understands that Endo intends to allocate the cost of the Remediation Payment among the Releasees using a reasonable basis.  If requested by Endo, Plaintiff shall complete and file Form 1098-F with the Internal Revenue Service, identifying the Remediation Payment as remediation/restitution amounts, and shall furnish Copy B of such Form 1098-F to Endo.  Endo makes no warranty or representation to Plaintiff as to the tax consequences of the Remediation Payment or the Litigation Costs Payments or any portion thereof.

9.      **Binding Agreement.**  This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto.

10.     **Choice of Law.**  Any dispute arising from or in connection with this Settlement Agreement shall be governed by Florida law without regard to its choice-of-law provisions.

11.     **Jurisdiction.**  The Parties agree to submit and consent to the jurisdiction of the Court for the resolution of any disputes arising under the Settlement Agreement.

12.     **No Conflict Intended.**  The headings used in this Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Agreement. The definitions contained in this Agreement or any Exhibit hereto are applicable to the singular as well as the plural forms of such terms.

13.     **No Party Deemed to be the Drafter.**  None of the Parties hereto shall be deemed to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

14.     **Amendment; Waiver.**  This Agreement shall not be modified in any respect except by a writing executed by all the Parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving Party.  The waiver by any Party of any breach of this Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous.

15.     **Execution in Counterparts.**  This Agreement may be executed in one or more counterparts.  All executed counterparts and each of them shall be deemed to be one and the same instrument.

16.     **Severability.**  In the event any one or more provisions of this Settlement Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Settlement Agreement.

17.     **Statements to the Press.**  Any press release or other public statement concerning this Settlement Agreement will describe it positively and will not disparage any other Party.  No Party or attorney, agent, or representative of any Party shall state or suggest that this Settlement Agreement may be used to predict the value of any Claim or any future settlement agreement in any action or proceeding.

18.     **Integrated Agreement.**  This Agreement constitutes the entire agreement between the Settling Parties and no representations, warranties or inducements have been made to any Party concerning this Agreement other than the representations, warranties and covenants contained and memorialized herein.

19.     **Bankruptcy.**  The following provisions shall apply if, (i) within ninety (90) days of Endo's payment pursuant to Section C.1(a) above, a case is commenced with respect to Endo under the Bankruptcy Code, and (ii) a court of competent jurisdiction enters a final order determining such payment to be an avoidable preference under Section 547 of the Bankruptcy Code, and (iii) pursuant to such final order such payment is returned to Endo:

(a)     this Agreement, including all releases and covenants not to sue with respect to the Released Claims contained in this Agreement, shall immediately and automatically be deemed null and void as to Endo; and

(b)     the State and Subdivisions may assert any and all Released Claims against Endo in its bankruptcy case and seek to exercise all rights provided under the federal Bankruptcy Code (or other applicable bankruptcy or non-bankruptcy law) with respect to their Claims against Endo.

20.     **Most Favored Nations.**  If, after execution of this Agreement, there is a collective resolution—through settlement, bankruptcy or other mechanism—of substantially all claims

25

against Endo brought by states, counties, and municipalities (a "Global Resolution") under which, but for this Agreement, the Florida allocation would be greater than the sum of the Remediation Payment and Litigation Cost Payments on a net present value basis, Endo shall pay the difference between the sum of the Remediation Payment and Litigation Cost Payments and the amount that would have been allocated to Florida under the terms and in accordance with any such Global Resolution.  Additionally, if at any time within the ten months following the Execution Date Endo enters into a settlement with the attorney general of any state with a smaller population than Florida for a total settlement amount that exceeds $65,000,000, Endo shall pay the excess amount to Florida.

IN WITNESS WHEREOF, the Parties hereto, through their fully authorized representatives, have executed this Agreement as of the dates set forth below.

**ENDO HEALTH SOLUTIONS INC.**

By: _____

Name: Blaise Coleman
      President and CEO

Date: ___01/15/2022___

**ENDO PHARMACEUTICALS INC.**

By: _____

Name: Blaise Coleman
      President and CEO

Date: ___01/15/2022___

26

**PLAINTIFF**

**STATE OF FLORIDA,**
**including the OFFICE**
**OF THE ATTORNEY**
**GENERAL**

By: _____

Name: John Guard
      Chief Deputy Attorney General of Florida
      Pursuant to the authority delegated to him by
      Ashley Moody, Attorney General of Florida

Date: _____1/14/22_____

**STATE OUTSIDE LITIGATION COUNSEL**

**Kellogg, Hansen, Todd, Figel & Frederick,**
**P.L.L.C.**

By: _____

Name:  David C. Frederick

Date: _January 15, 2022_

**Drake Martin Law Firm, LLC**

By: _____

Name:  Drake Martin

Date: _____1-15-2022_____

27

**Exhibit A**

**LITIGATING SUBDIVISIONS**

**Counties**

Alachua County
Bay County
Bradford County
Brevard County
Broward County
Calhoun County
Clay County
County Commission of Monroe County
Dixie County
Escambia County
Gilchrist County
Gulf County
Hamilton County
Hernando County
Hillsborough County
Holmes County
Jackson County
Lake County
Lee County
Leon County
Levy County
Manatee County
Marion County
Miami-Dade County
Okaloosa County
Orange County
Osceola County
Palm Beach County
Pasco County
Pinellas County
Polk County
Putnam County
Santa Rosa County
Sarasota County
Seminole County
St. Johns County
St. Lucie County
Suwannee County

Taylor County
Union County
Volusia County
Walton County
Washington County

**<u>Cities</u>**

City of Apopka
City of Bradenton
City of Clearwater
City of Coconut Creek
City of Coral Gables
City of Coral Springs
City of Daytona Beach
City of Deerfield Beach
City of Delray Beach
City of Deltona
City of Florida City
City of Fort Lauderdale
City of Fort Pierce
City of Hallandale Beach
City of Homestead
City of Jacksonville
City of Lauderhill
City of Lynn Haven
City of Miami
City of Miami Gardens
City of Miramar
City of New Port Richey
City of Niceville
City of North Miami
City of Ocala
City of Ocoee
City of Orlando
City of Ormond Beach
City of Oviedo
City of Palatka
City of Palm Bay
City of Palmetto
City of Panama City
City of Pembroke Pines
City of Pensacola
City of Pinellas Park

City of Pompano Beach
City of Port St. Lucie
City of Sanford
City of Sarasota
City of St. Augustine
City of St. Petersburg
City of Stuart
City of Sweetwater
City of Tallahassee
City of Tampa
Town of Eatonville

## **Hospital Districts**

Halifax Hospital Medical Center
Lee Memorial Health System
North Broward Hospital District
Sarasota County Public Hospital District
West Volusia Hospital Authority

## **School Board**

School Board of Miami-Dade County

**<u>Exhibit B</u>**

| County | Principal Subdivisions | Regional % by County for Abatement Fund | City/County Fund % (Principal Subdivisions Only) |
|---|---|---|---|
| Alachua | | 1.24106016444867% | |
| | Alachua County | | 0.846347404896564% |
| | Alachua | | 0.013113332456932% |
| | Gainesville | | 0.381597611347118% |
| Baker | | 0.19317380413017% | |
| | Baker County | | 0.193173804130173% |
| Bay | | 0.83965637331199% | |
| | Bay County | | 0.539446037057239% |
| | Callaway | | 0.024953825526948% |
| | Lynn Haven | | 0.039205632014689% |
| | Panama City | | 0.155153855595736% |
| | Panama City Beach | | 0.080897023117378% |
| Bradford | | 0.18948420408137% | |
| | Bradford County | | 0.189484204081366% |
| Brevard | | 3.87879918044396% | |
| | Brevard County | | 2.387076812679440% |
| | Cape Canaveral | | 0.045560750208993% |
| | Cocoa | | 0.149245411423089% |
| | Cocoa Beach | | 0.084363286155357% |
| | Melbourne | | 0.383104682233196% |
| | Palm Bay | | 0.404817397481049% |
| | Rockledge | | 0.096603243797586% |
| | Satellite Beach | | 0.035975416223927% |
| | Titusville | | 0.240056418923581% |
| | West Melbourne | | 0.051997577065795% |
| Broward | | 9.05796267257777% | |
| | Broward County | | 4.062623697836280% |
| | Coconut Creek | | 0.101131719448042% |
| | Cooper City | | 0.073935445072532% |
| | Coral Springs | | 0.323406517663960% |
| | Dania Beach | | 0.017807041180440% |
| | Davie | | 0.266922227152987% |
| | Deerfield Beach | | 0.202423224724969% |
| | Fort Lauderdale | | 0.830581264530524% |
| | Hallandale Beach | | 0.154950491813518% |
| | Hollywood | | 0.520164608455721% |
| | Lauderdale Lakes | | 0.062625150434726% |
| | Lauderhill | | 0.144382838130419% |
| | Lighthouse Point | | 0.029131861802689% |
| | Margate | | 0.143683775129045% |
| | Miramar | | 0.279280208418825% |
| | North Lauderdale | | 0.066069624496039% |

| | | | |
|---|---|---|---|
| | Oakland Park | | 0.100430840698613% |
| | Parkland | | 0.045804060448432% |
| | Pembroke Pines | | 0.462832363602822% |
| | Plantation | | 0.213918725664437% |
| | Pompano Beach | | 0.335472163492860% |
| | Sunrise | | 0.286071106146452% |
| | Tamarac | | 0.134492458472026% |
| | Weston | | 0.138637811282768% |
| | West Park | | 0.029553115351569% |
| | Wilton Manors | | 0.031630331127078% |
| Calhoun | | 0.04712774078090% | |
| | Calhoun County | | 0.047127740780902% |
| Charlotte | | 0.73734623337592% | |
| | Charlotte County | | 0.690225755587238% |
| | Punta Gorda | | 0.047120477788680% |
| Citrus | | 0.96964577660634% | |
| | Citrus County | | 0.969645776606338% |
| Clay | | 1.19342946145639% | |
| | Clay County | | 1.193429461456390% |
| Collier | | 1.55133337642709% | |
| | Collier County | | 1.354822227370880% |
| | Marco Island | | 0.062094952002516% |
| | Naples | | 0.134416197053695% |
| Columbia | | 0.44678115079207% | |
| | Columbia County | | 0.342123248620213% |
| | Lake City | | 0.104659717919908% |
| DeSoto | | 0.11364040780249% | |
| | DeSoto County | | 0.113640407802487% |
| Dixie | | 0.10374458089993% | |
| | Dixie County | | 0.103744580899928% |
| Duval | | 5.43497515693510% | |
| | Jacksonville | | 5.295636466902910% |
| | Atlantic Beach | | 0.038891507601085% |
| | Jacksonville Beach | | 0.100447182431112% |
| Escambia | | 1.34163444924367% | |
| | Escambia County | | 1.010997622822650% |
| | Pensacola | | 0.330636826421023% |
| Flagler | | 0.38986471224388% | |
| | Flagler County | | 0.305009358365478% |
| | Palm Coast | | 0.084857169626457% |
| Franklin | | 0.04991128255001% | |
| | Franklin County | | 0.049911282550008% |
| Gadsden | | 0.12365607407671% | |
| | Gadsden County | | 0.123656074076710% |
| Gilchrist | | 0.06433376935497% | |

| | | | |
|---|---|---|---|
| | **Gilchrist County** | | 0.064333769354966% |
| Glades | | 0.04061283675771% | |
| | **Glades County** | | 0.040612836757713% |
| Gulf | | 0.05991423858784% | |
| | **Gulf County** | | 0.059914238587842% |
| Hamilton | | 0.04794119590977% | |
| | **Hamilton County** | | 0.047941195909773% |
| Hardee | | 0.06711004813185% | |
| | **Hardee County** | | 0.067110048131850% |
| Hendry | | 0.14446091529681% | |
| | **Hendry County** | | 0.144460915296806% |
| Hernando | | 1.51007594910967% | |
| | **Hernando County** | | 1.510075949109670% |
| Highlands | | 0.35718851023682% | |
| | **Highlands County** | | 0.293187022776017% |
| | **Avon Park** | | 0.025829016089707% |
| | **Sebring** | | 0.038172471371100% |
| Hillsborough | | 8.71098411365711% | |
| | **Hillsborough County** | | 6.523111204400210% |
| | **Plant City** | | 0.104218491142418% |
| | **Tampa** | | 1.975671881252980% |
| | **Temple Terrace** | | 0.107980721113446% |
| Holmes | | 0.08161242785125% | |
| | **Holmes County** | | 0.081612427851251% |
| Indian River | | 0.75307605878085% | |
| | **Indian River County** | | 0.654117789755259% |
| | **Sebastian** | | 0.038315915467486% |
| | **Vero Beach** | | 0.060642353558104% |
| Jackson | | 0.15893605879538% | |
| | **Jackson County** | | 0.158936058795375% |
| Jefferson | | 0.04082164778410% | |
| | **Jefferson County** | | 0.040821647784097% |
| Lafayette | | 0.03191177207568% | |
| | **Lafayette County** | | 0.031911772075683% |
| Lake | | 1.13921122451870% | |
| | **Lake County** | | 0.781548804039386% |
| | **Clermont** | | 0.075909163208877% |
| | **Eustis** | | 0.041929254097962% |
| | **Fruitland Park** | | 0.008381493024259% |
| | **Groveland** | | 0.026154034991644% |
| | **Lady Lake** | | 0.025048244425835% |
| | **Leesburg** | | 0.091339390184647% |
| | **Minneola** | | 0.016058475802978% |
| | **Mount Dora** | | 0.041021380070204% |
| | **Tavares** | | 0.031820984672908% |

| | | | |
|---|---|---|---|
| Lee | | 3.32537188335925% | |
| | Lee County | | 2.150386790650790% |
| | Bonita Springs | | 0.017374893143227% |
| | Cape Coral | | 0.714429677167259% |
| | Estero | | 0.012080171813344% |
| | Fort Myers | | 0.431100350584635% |
| Leon | | 0.89719924493933% | |
| | Leon County | | 0.471201146390692% |
| | Tallahassee | | 0.425998098548636% |
| Levy | | 0.25119240174806% | |
| | Levy County | | 0.251192401748057% |
| Liberty | | 0.01939945222513% | |
| | Liberty County | | 0.019399452225127% |
| Madison | | 0.06354028745471% | |
| | Madison County | | 0.063540287454706% |
| Manatee | | 2.72132334623483% | |
| | Manatee County | | 2.288523455470230% |
| | Bradenton | | 0.379930754632155% |
| | Palmetto | | 0.052869136132442% |
| Marion | | 1.70117616896044% | |
| | Marion County | | 1.332181664866660% |
| | Ocala | | 0.368994504093786% |
| Martin | | 0.86948729811605% | |
| | Martin County | | 0.788263440348682% |
| | Stuart | | 0.081223857767371% |
| Miami-Dade | | 5.23211978417292% | |
| | Miami-Dade County | | 4.322006939062770% |
| | Aventura | | 0.024619727884733% |
| | Coral Gables | | 0.071780152130635% |
| | Cutler Bay | | 0.009414653667847% |
| | Doral | | 0.013977628531358% |
| | Florida City | | 0.003929278792135% |
| | Hialeah | | 0.098015895784777% |
| | Hialeah Gardens | | 0.005452691410713% |
| | Homestead | | 0.024935668046393% |
| | Key Biscayne | | 0.013683477346364% |
| | Miami | | 0.292793005447970% |
| | Miami Beach | | 0.181409572478489% |
| | Miami Gardens | | 0.040683650931878% |
| | Miami Lakes | | 0.007836768607605% |
| | Miami Shores | | 0.006287935516250% |
| | Miami Springs | | 0.006169911892641% |
| | North Bay Village | | 0.005160355973775% |
| | North Miami | | 0.030379280716828% |
| | North Miami Beach | | 0.030391990953217% |

| | | | |
|---|---|---|---|
| | Opa-locka | | 0.007847663095938% |
| | Palmetto Bay | | 0.007404620570392% |
| | Pinecrest | | 0.008296152865650% |
| | South Miami | | 0.007833137111493% |
| | Sunny Isles Beach | | 0.007693324511219% |
| | Sweetwater | | 0.004116300841853% |
| Monroe | | 0.47638873858530% | |
| | Monroe County | | 0.388301353168081% |
| | Key West | | 0.088087385417219% |
| Nassau | | 0.47693346300195% | |
| | Nassau County | | 0.393774017807404% |
| | Fernandina Beach | | 0.083159445194550% |
| Okaloosa | | 0.81921286595494% | |
| | Okaloosa County | | 0.634511342251804% |
| | Crestview | | 0.070440130065665% |
| | Destin | | 0.014678507280787% |
| | Fort Walton Beach | | 0.077837487643835% |
| | Niceville | | 0.021745398712853% |
| Okeechobee | | 0.35349527869191% | |
| | Okeechobee County | | 0.353495278691906% |
| Orange | | 4.67102821454589% | |
| | Orange County | | 3.130743665036610% |
| | Apopka | | 0.097215150892295% |
| | Eatonville | | 0.008325204834538% |
| | Maitland | | 0.046728276208689% |
| | Ocoee | | 0.066599822928250% |
| | Orlando | | 1.160248481489900% |
| | Winter Garden | | 0.056264584996256% |
| | Winter Park | | 0.104903028159347% |
| Osceola | | 1.07345209294015% | |
| | Osceola County | | 0.837248691390376% |
| | Kissimmee | | 0.162366006872243% |
| | St. Cloud | | 0.073837394677534% |
| Palm Beach | | 8.60159437205259% | |
| | Palm Beach County | | 5.964262083621730% |
| | Belle Glade | | 0.020828445944817% |
| | Boca Raton | | 0.472069073961229% |
| | Boynton Beach | | 0.306498271771001% |
| | Delray Beach | | 0.351846579457498% |
| | Greenacres | | 0.076424835656644% |
| | Jupiter | | 0.125466374888059% |
| | Lake Worth | | 0.117146617297688% |
| | Lantana | | 0.024507151505292% |
| | North Palm Beach | | 0.044349646255964% |
| | Palm Beach Gardens | | 0.233675880256500% |

| | | | |
|---|---|---|---|
| | Palm Springs | | 0.038021764282493% |
| | Riviera Beach | | 0.163617057282493% |
| | Royal Palm Beach | | 0.049295743959188% |
| | Wellington | | 0.050183644758335% |
| | West Palm Beach | | 0.549265602541466% |
| Pasco | | 4.69208726049375% | |
| | Pasco County | | 4.429535538910390% |
| | New Port Richey | | 0.149879107494464% |
| | Zephyrhills | | 0.112672614088898% |
| Pinellas | | 7.93488981677650% | |
| | Pinellas County | | 4.793536735851510% |
| | Clearwater | | 0.633863120195985% |
| | Dunedin | | 0.102440873796068% |
| | Gulfport | | 0.047893986460330% |
| | Largo | | 0.374192990776726% |
| | Oldsmar | | 0.039421706033295% |
| | Pinellas Park | | 0.251666311990547% |
| | Safety Harbor | | 0.038061710739714% |
| | Seminole | | 0.095248695748172% |
| | St. Petersburg | | 1.456593090134460% |
| | Tarpon Springs | | 0.101970595049690% |
| Polk | | 2.15048302529773% | |
| | Polk County | | 1.601687701502640% |
| | Auburndale | | 0.028636162583534% |
| | Bartow | | 0.043971970660417% |
| | Haines City | | 0.047984773863106% |
| | Lakeland | | 0.294875668467647% |
| | Lake Wales | | 0.036293172133642% |
| | Winter Haven | | 0.097033576086743% |
| Putnam | | 0.38489319406788% | |
| | Putnam County | | 0.337937949352250% |
| | Palatka | | 0.046955244715628% |
| Santa Rosa | | 0.70126731951283% | |
| | Santa Rosa County | | 0.654635277951081% |
| | Milton | | 0.046632041561747% |
| Sarasota | | 2.80504385757853% | |
| | Sarasota County | | 1.968804722107020% |
| | North Port | | 0.209611771276754% |
| | Sarasota | | 0.484279979634570% |
| | Venice | | 0.142347384560186% |
| Seminole | | 2.14114826454432% | |
| | Seminole County | | 1.508694164839420% |
| | Altamonte Springs | | 0.081305566429869% |
| | Casselberry | | 0.080034542791008% |
| | Lake Mary | | 0.079767627826847% |

| | | | |
|---|---|---|---|
| | Longwood | | 0.061710013414747% |
| | Oviedo | | 0.103130858057164% |
| | Sanford | | 0.164243490361646% |
| | Winter Springs | | 0.062262000823623% |
| St. Johns | | 0.71033334955402% | |
| | St. Johns County | | 0.663822963111989% |
| | St. Augustine | | 0.046510386442027% |
| St. Lucie | | 1.50662784355224% | |
| | St. Lucie County | | 0.956289133909966% |
| | Fort Pierce | | 0.159535255653695% |
| | Port St. Lucie | | 0.390803453988581% |
| Sumter | | 0.32639887045945% | |
| | Sumter County | | 0.312364953738371% |
| | Wildwood | | 0.014033916721079% |
| Suwannee | | 0.19101487969217% | |
| | Suwannee County | | 0.191014879692165% |
| Taylor | | 0.09218189728241% | |
| | Taylor County | | 0.092181897282406% |
| Union | | 0.06515630322411% | |
| | Union County | | 0.065156303224115% |
| Volusia | | 3.13032967447995% | |
| | Volusia County | | 1.784428217305820% |
| | Daytona Beach | | 0.447556475211771% |
| | DeBary | | 0.035283616214775% |
| | DeLand | | 0.098983689498367% |
| | Deltona | | 0.199329190038370% |
| | Edgewater | | 0.058042202342606% |
| | Holly Hill | | 0.031615805142634% |
| | New Smyrna Beach | | 0.104065968305755% |
| | Orange City | | 0.033562287058147% |
| | Ormond Beach | | 0.114644516477187% |
| | Port Orange | | 0.177596501561906% |
| | South Daytona | | 0.045221205322611% |
| Wakulla | | 0.11512932120801% | |
| | Wakulla County | | 0.115129321208010% |
| Walton | | 0.26855821615101% | |
| | Walton County | | 0.268558216151006% |
| Washington | | 0.12012444410873% | |
| | Washington County | | 0.120124444108733% |

## Exhibit C

## List of Opioid Remediation Uses

### Schedule A
### Core Strategies

Subdivisions shall choose from among the abatement strategies listed in Schedule B.  However, priority shall be given to the following core abatement strategies ("*Core Strategies*").[2]

A. **NALOXONE OR OTHER FDA-APPROVED MEDICATION TO REVERSE OPIOID OVERDOSES**

1.  Expand training for first responders, schools, community support groups and families; and

2.  Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B. **MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

1.  Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2.  Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3.  Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4.  Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

---

[2]  As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE:  TREATMENT |
|---|

**A.      TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:[3]

1.      Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2.      Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions.

3.      Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.      Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.      Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.      Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[3] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

8.      Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including, but not limited to, training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Disseminate web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14.     Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

## B.      SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, programs or strategies that:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care with respect to treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

C.      **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.    Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.    Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.    Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.    Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.    Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.    Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.    Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.    Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.    Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.    Expand warm hand-off services to transition to recovery services.

12.    Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.    Develop and support best practices on addressing OUD in the workplace.

14.    Support assistance programs for health care providers with OUD.

15.    Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.    ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

    2.    Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

    3.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

    5.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.    Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.    Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.    Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E. ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

6.      Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including, but not limited to, parent skills training.

10.     Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

> ### PART TWO:  PREVENTION

## F.      **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including, but not limited to, improvements that:

    1.      Increase the number of prescribers using PDMPs;

    2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

3.    Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.    Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.    Increasing electronic prescribing to prevent diversion or forgery.

8.    Educating dispensers on appropriate opioid dispensing.

## G.    __PREVENT MISUSE OF OPIOIDS__

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Funding media campaigns to prevent opioid misuse.

2.    Corrective advertising or affirmative public education campaigns based on evidence.

3.    Public education relating to drug disposal.

4.    Drug take-back disposal or destruction programs.

5.    Funding community anti-drug coalitions that engage in drug prevention efforts.

6.    Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7.    Engaging non-profits and faith-based communities as systems to support prevention.

8.    Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.    School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing misuse of prescription medications and seem likely to be effective in preventing the uptake and use of opioids.

10.   Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.   Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other prescription medications, including emotional modulation and resilience skills.

12.   Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another prescription medication misuse.

**H.   PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.   Increased availability and distribution of naloxone and other medications that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.   Public health entities providing free naloxone to anyone in the community.

3.   Training and education regarding naloxone and other medications that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.   Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.   Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6.   Public education relating to emergency responses to overdoses.

7.   Public education relating to immunity and Good Samaritan laws.

8.   Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.   Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care,

and the full range of harm reduction and treatment services provided by these programs.

10.   Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.   Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.   Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.   Supporting screening for fentanyl in routine clinical toxicology testing.

| PART THREE:  OTHER STRATEGIES |
| --- |

## I.   FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1.   Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other medications.

2.   Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.   LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.   A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K. **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, Manufacturers, PDMPs, etc.).

## L. **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("*ADAM*") system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Exhibit D**

**Subdivision Settlement Participation Form**

| Governmental Entity: | State: |
|---|---|
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

The governmental entity identified above ("*Governmental Entity*"), in order to obtain and in consideration for the benefits provided to the Governmental Entity pursuant to the Settlement Agreement dated January 15, 2022 ("*Endo Settlement*"), and acting through the undersigned authorized official, hereby elects to participate in the Endo Settlement, release all Released Claims against all Releasees, and agrees as follows.

1. The Governmental Entity is aware of and has reviewed the Endo Settlement, understands that all terms in this Subdivision Settlement Participation Form have the meanings defined therein, and agrees that by signing this Subdivision Settlement Participation Form, the Governmental Entity elects to participate in the Endo Settlement and become a Participating Subdivision as provided therein.

2. The Governmental Entity shall immediately cease any and all litigation activities as to the Releasees and Released Claims and, within the later of 7 days following the entry of the Consent Judgment or 7 days of the Execution Date of this Subdivision Settlement Participation Form voluntarily dismiss with prejudice any Released Claims that it has filed.

3. The Governmental Entity agrees to the terms of the Endo Settlement pertaining to Subdivisions as defined therein.

4. By agreeing to the terms of the Endo Settlement and expressly agreeing to the releases provided for therein, the Governmental Entity is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date of the Agreement.

5. The Governmental Entity agrees to use any monies it receives through the Endo Settlement solely for the purposes provided therein.

6. The Governmental Entity submits to the jurisdiction of the Court for purposes limited to the Court's role as provided in, and for resolving disputes to the extent provided in, the Endo Settlement.

7. The Governmental Entity has the right to enforce those rights given to them in the Endo Settlement.

8. The Governmental Entity, as a Participating Subdivision, hereby becomes a Releasor for all purposes in the Endo Settlement, including, but not limited to, all provisions of Section D and E, and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority.  As a Releasor, the Governmental Entity hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Releasee in any forum whatsoever.  The releases provided for in the Endo Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Governmental Entity to release Claims.  The Endo Settlement shall be a complete bar to any Released Claim.

9. The Governmental Entity hereby takes on all rights and obligations of a Participating Subdivision as set forth in the Endo Settlement.

10. In connection with the releases provided for in the Endo Settlement, each Governmental Entity expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.

> A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Governmental Entity hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date of the Release, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Governmental Entities' decision to participate in the Endo Settlement.

11. Nothing herein is intended to modify in any way the terms of the Endo Settlement, to which the Governmental Entity hereby agrees.  To the extent this Subdivision Settlement

Participation Form is interpreted differently from the Endo Settlement in any respect, the Endo Settlement controls.

I have all necessary power and authorization to execute this Subdivision Settlement Participation Form on behalf of the Governmental Entity.

Signature:     _____

Name:          _____

Title:         _____

Date:          _____
               (the "<u>Execution Date of this Subdivision Settlement Participation Form</u>")

**Exhibit E**

**QUALIFIED SETTLEMENT FUND ADMINISTRATOR**

**[TO BE ADDED]**

## Exhibit F

### INJUNCTIVE RELIEF

**I.**    **Definitions Specific to this Exhibit**

A.    "Cancer-Related Pain Care" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

B.    "Downstream Customer Data" shall mean transaction information that Endo collects relating to its direct customers' sales to downstream customers, including chargeback data tied to Endo providing certain discounts, "867 data" and IQVIA data.

C.    "End-of-Life Care" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

D.    "Endo" shall mean Endo Pharmaceuticals Inc. ("EPI"), Par Pharmaceutical, Inc. ("PPI") and all of their parents, subsidiaries, predecessors, successors, joint ventures, divisions, assigns, officers, directors, agents, partners, principals, current employees, and affiliates acting on behalf of EPI or PPI in the United States.

E.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services and/or prescribe pharmaceutical products and any medical facility, practice, hospital, clinic or pharmacy.

F.    "Including but not limited to", when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

G.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

H.    "Lobby" and "Lobbying" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality.  As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

I.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium.  For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone or naltrexone.

J.       "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration ("FDA") and listed by the Drug Enforcement Administration ("DEA") as Schedule II, III, or IV pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol).  The term "Opioid Products(s)" shall not include (i) methadone, buprenorphine, or other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients ("APIs") used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

K.       "OUD" shall mean opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

L.       "Promote," "Promoting," "Promotion," and "Promotional" shall mean dissemination of information or other practices intended or reasonably anticipated to increase sales or prescriptions, or that attempts to influence prescribing practices of Health Care Providers in the United States.

M.       "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

N.       "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder and analogous Florida state laws and regulations.

O.       "Third Party" shall mean any person or entity other than Endo or a government entity.

P.       "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

Q.       "Unbranded Information" shall mean any information that does not identify a specific branded or generic product(s).

## II.    <u>Injunctive Relief</u>

A.       <u>General Provisions</u>

1.       Endo shall not make any written or oral statement about Opioids or any Opioid Product that is false, misleading, deceptive, unfair or unconscionable as defined under the law of Florida.

2.       Endo shall not represent that Opioids or any Opioid Products have approvals, characteristics, uses, benefits, or qualities that they do not have.

B.    Ban on Promotion

    1.    Endo shall not engage in Promotion of Opioids or Opioid Products, including but not limited to, by:

        a.    Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers, patients, or persons involved in determining the Opioid Products included in formularies;

        b.    Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

        c.    Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to Opioids or Opioid Products;

        d.    Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

        e.    Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

        f.    Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; or

        g.    Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

    2.    Notwithstanding subsection II.B.1 directly above, Endo may:

        a.    Maintain a corporate website;

        b.    Maintain a website that contains principally the following content for any Opioid Product:  the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

c.      Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in the state where the information is provided;

d.      Provide the following by mail, electronic mail, on or through Endo's corporate or product websites or through other electronic or digital methods:   FDA-approved package insert, medication guide, approved labeling for Opioid Products or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in the state where the information is provided;

e.      Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011), as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009), as updated or amended by the FDA;

f.      Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.      Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h.      Provide information relating solely to the pricing of any Opioid Product;

i.      Provide information, through a product catalog or similar means, related to an Opioid or Opioid Product, including, without limitation, pricing information, weight, color, shape, packaging size, type, reference listed drug, National Drug Code ("NDC") label, and such other descriptive information (including information set forth in a

standard Healthcare Distribution Alliance Form or technical data sheet and the FDA approval letter) sufficient to identify the products available, to place an order for a product, and to allow the product to be loaded into a customer's inventory and ordering system or Third Party pricing compendia;

j. Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy ("REMS") program or other federal or state law or regulation applicable in the state where the program is provided through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of Endo;

k. Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Endo as the source of the information; and

l. Provide rebates, discounts, and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, and Pharmacy Benefit Managers, except as prohibited by Section II.G.

3. Endo shall not engage in the following specific Promotional activity relating to any products indicated for the treatment of Opioid-induced side effects (for the avoidance of doubt, "Opioid-induced side effects" does not include addiction to Opioids or Opioid Products):

a. Employing or contracting with sales representatives or other persons to Promote products indicated for the treatment of Opioid-induced side effects to Health Care Providers or patients;

b. Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote products indicated for the treatment of Opioid-induced side effects;

c. Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote products indicated for the treatment of Opioid-induced side effects; or

d. Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products indicated for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4. Notwithstanding subsection II.B.3 directly above, Endo may Promote products for the treatment of Opioid-induced side effects (i) so long as such Promotion does not associate the product with Opioids or Opioid Products, or (ii) where such Promotion concerns a product's indication to reverse overdoses and/or treat Opioid addiction.  Nothing herein shall prevent Endo from linking to the FDA label associated with a product.

5. Treatment of Pain

   a. Endo shall not, either through Endo or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that encourages the utilization of Opioids or Opioid Products.

   b. Endo shall not, either through Endo or through Third Parties, Promote the concept that pain is undertreated in a manner that encourages the utilization of Opioids or Opioid Products.

   c. Endo shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or otherwise Promotes Opioids or Opioid Products.

6. Notwithstanding subsection II.B.5 directly above, Endo may Promote or provide educational information about the Treatment of Pain with non-Opioid products or therapies, including Promoting or providing educational information about such non-Opioid products or therapies as alternatives to Opioid use, or as part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

C. <u>No Financial Reward or Discipline Based on Volume of Opioid Sales</u>

1. Endo shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products.  For the avoidance of doubt, this provision shall not prohibit financial incentives (*e.g.*, customary raises or bonuses) based on the performance of the overall company or business segment, as measured by EBITDA, revenue, cash flow, or other similar financial metrics.

2. Endo shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to or from any person in return for the prescribing, sale, or use of an Opioid Product.  For the avoidance of doubt, this provision shall not prohibit rebates or chargebacks to the extent permitted by other sections of this Consent Judgment.

3. Endo's compensation policies and procedures shall ensure compliance with this Consent Judgment.

D.    Ban on Funding/Grants to Third Parties

1.    Endo shall not, directly or indirectly, provide financial support or In-Kind Support to any Third Party for Promotion of or education about Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6).  For the avoidance of doubt, this provision does not prohibit support expressly allowed by this Consent Judgment or required by a federal or state agency.

2.    Endo shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids or Opioid Products.

3.    Endo shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6).

4.    Endo shall not use, assist, or employ any Third Party to engage in any activity that Endo itself would be prohibited from engaging in pursuant to this Consent Judgment.

5.    Endo shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or reasonably foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.    Endo shall not compensate or provide In-Kind Support to Health Care Providers (other than Endo employees) or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payers, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers.  Nothing in this provision, however, prohibits Endo from using independent contractors who operate under the direction of Endo to provide information to a payor, formulary committee, or other similar entity as permitted in subsection II.B.2 provided that any such persons are bound by the terms of this Consent Judgment.  Nor does this provision prohibit the payment of customary rebates or other pricing concessions to third-party payers, including state Medicaid programs, as part of an overall pricing agreement.

7.    No officer or management-level employee of Endo may concurrently serve as a director, board member, employee, agent, or officer of any entity other than Endo International plc or a direct or indirect wholly-owned subsidiary thereof, that primarily engages in conduct that Promotes Opioids, Opioid

Products, or products indicated for the treatment of Opioid-related side effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or management-level employee of Endo from concurrently serving on the board of a hospital.

8.     Endo shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects. For the avoidance of doubt, nothing in this paragraph shall prohibit Endo from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or board member at any such entity.

9.     For the avoidance of doubt:

a.     Nothing in this Section II.D shall be construed or used to prohibit Endo from providing financial or In-Kind Support to:

i.     medical societies and patient advocate groups, who are principally involved in issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose; or

ii.     universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose.

b.     The prohibitions in this Section II.D shall not apply to engagement with Third Parties based on activities related to (i) medications with an FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage," to the extent they are sold to addiction treatment facilities; (ii) raw materials, APIs and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials, APIs and/or immediate precursors are sold or marketed exclusively to DEA registrants or sold outside the United States or its territories; or (iii) education warning about drug abuse or promoting prevention or treatment of drug misuse.

c.     Endo will be in compliance with subsections II.D.2 and II.D.3 with respect to support of an individual Third Party to the extent that the State of Florida determines that such support does not increase the

risk of the inappropriate use of Opioids and that Endo has not acted for the purpose of increasing the use of Opioids.

E.     <u>Lobbying Restrictions</u>

1.     Endo shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

      a.     encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids; or

      b.     pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.     Endo shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

      a.     The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

      b.     The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

      c.     The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

      d.     The limitation of initial prescriptions of Opioids to treat acute pain;

      e.     The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

      f.     The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

      g.     Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

      h.     The implementation or use of Opioid drug disposal systems.

3.    Endo shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of prescription drug monitoring programs ("PDMPs"), including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4.    Notwithstanding the foregoing restrictions in subsections II.E.1-3, the following conduct is not restricted:

a.    Lobbying against the enactment of any provision of any state, federal, municipal, or county taxes, fees, assessments, or other payments;

b.    Challenging the enforcement of, or suing for declaratory or injunctive relief with respect to legislation, rules or regulations referred to in subsection II.E.1;

c.    Communications made by Endo in response to a statute, rule, regulation, or order requiring such communication;

d.    Communications by an Endo representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

e.    Responding, in a manner consistent with this Consent Judgment, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to Endo from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

f.    Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections II.E.1-3, so long as Endo does not support specific portions of such legislation or regulation covered by subsection II.E.1 or oppose specific portions of such legislation or regulation covered by subsections II.E.2-3;

g.    Communicating with a federal or state agency in response to a Federal Register or similar notice or an unsolicited federal or state legislative committee request for public comment on proposed legislation;

h.    Responding to requests from the DEA, the FDA, or any other federal or state agency, and/or participating in FDA or other agency panels at the request of the agency; and

      i.     Participating in meetings and other proceedings before the FDA, FDA advisory committee or other FDA committee in connection with the approval, modification of approval, or oversight of Endo's own products.

5.     Endo shall provide notice of the prohibitions in Section II.E to all employees engaged in Lobbying; incorporate the prohibitions in Section II.E into trainings provided to Endo employees engaged in Lobbying; and certify that it has provided such notice and trainings to Endo employees engaged in Lobbying.

F.     <u>Ban on Certain High Dose Opioids</u>

1.     Endo shall not commence manufacturing, Promoting, or distributing any Opioid Product in strengths exceeding 30 milligrams of oxycodone per pill. For the avoidance of doubt, this restriction shall not apply to the manufacture or distribution of injectable Opioid Products used primarily in hospice, hospital, or other inpatient settings.

G.     <u>Ban on Prescription Savings Programs</u>

1.     Endo shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

2.     Endo shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

H.     <u>Monitoring and Reporting of Direct and Downstream Customers</u>.

1.     Endo shall operate an effective monitoring and reporting system in compliance with federal law, that shall include processes and procedures that:

      a.     Utilize all reasonably available transaction information to identify a Suspicious Order of an Opioid Product by a direct customer;

      b.     Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product;

      c.     Utilize all information Endo receives that bears upon a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by Endo's

employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media; and

d.      Upon request (unless otherwise required by law), report to the Florida Attorney General or State controlled substances regulatory agency any direct customer or downstream customer in Florida identified as part of the monitoring required by (a)-(c), above, and any customer relationship in Florida terminated by Endo relating to diversion or potential for diversion.  These reports shall include the following information, to the extent known to Endo:

i.      The identity of the downstream registrant and the direct customer(s) identified by Endo engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number;

ii.     The dates of reported distribution of controlled substances by direct customers to the downstream registrant during the relevant time period;

iii.    The drug name, drug family or NDC and dosage amounts reportedly distributed;

iv.     The transaction or order number of the reported distribution; and

v.      A brief narrative providing a description of the circumstances leading to Endo's conclusion that there is a risk of diversion.

2.      Endo shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless Endo investigates and finds that the order is not suspicious.

3.      Upon request, Endo shall promptly provide reasonable assistance to law enforcement investigations of potential diversion and/or suspicious circumstances involving Opioid Products in the United States.

4.      Endo agrees that it will refrain from providing an Opioid Product directly to a retail pharmacy or Health Care Provider.

I.      <u>Miscellaneous Terms</u>

1.      To the extent that any provision in this Consent Judgment conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail.  To the extent that any provision in this Consent Judgment is in conflict with federal or relevant state law or regulation such

that Endo cannot comply with both the law or regulation and the provision of this Consent Judgment, Endo may comply with such law or regulation.

2.    Endo will enter into this Consent Judgment solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Endo expressly denies.  No part of this Consent Judgment, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Endo.  This Consent Judgment is not intended for use by any Third Party for any purpose, including submission to any court for any purpose.

3.    For the avoidance of doubt, this Consent Judgment shall not be construed or used as a waiver or limitation of any defense otherwise available to Endo in any action, and nothing in this Consent Judgment shall be construed or used to prohibit Endo in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in litigation or other legal or administrative proceedings.

4.    Nothing in this Consent Judgment shall be construed to limit or impair Endo's ability (a) to communicate its positions and respond to media inquiries concerning litigation, investigations, reports, or other documents or proceedings relating to Endo or its Opioid Products, or (b) to maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products.

5.    Upon the request of the Attorney General of the State of Florida, Endo shall provide the Attorney General of the State of Florida with copies of the following, within 30 days of the request:

a.    Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Endo's Opioid Product(s); and

b.    Warning or untitled letters issued by the FDA regarding Endo's Opioid Product(s) and all correspondence between Endo and the FDA related to such letters.

6.    The parties by stipulation may agree to a modification of this Consent Judgment; provided that the parties may jointly agree to a modification only by a written instrument signed by or on behalf of both Endo and the Attorney General of the State of Florida.

J.    <u>Compliance with State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product</u>

1. Subject to subsection II.G.1 above, Endo shall comply with all applicable state laws and regulations that relate to the sale, Promotion, distribution, and disposal of Opioids or Opioid Products, including but not limited to:

    a. Florida controlled substances laws, including all guidance issued by the applicable state regulator(s);

    b. Florida consumer protection and unfair trade practices acts; and

    c. Florida laws and regulations related to opioid prescribing, distribution, and disposal.

## III.  Clinical Data Transparency

A. Data to Be Shared

1. Endo shall continue to share truthful and balanced summaries of the results of all Endo-Sponsored Studies through its publicly available website (*see* http://www.endo.com/endopharma/r-d/clinical-research):

    a. "Endo-Sponsored Studies" means pre-marketing clinical research and post-marketing clinical research that Endo "takes responsibility for and initiates" as "sponsor," as "sponsor" is defined in 21 C.F.R. § 312.3(b), and that involves an intervention with human subjects with an Opioid Product.

    b. The summaries may include redactions to protect personal identifying information, trade secret and confidential commercial information, and information that may provide a road map for defeating a product's abuse-deterrent properties.

2. With respect to any Endo-Sponsored Studies relating to any new Endo Opioid Product or new indication for an existing Endo Opioid Product, Endo shall, within 30 days after regulatory approval or 18 months after study completion, whichever occurs later, make the following clinical data available through a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal:

    a. Fully analyzable data set(s) (including individual de-identified participant-level data);

    b. The clinical study report(s) redacted for commercial or personal identifying information;

    c. The full protocol(s) (including the initial version, final version, and all amendments); and

        d.     Full statistical analysis plan(s) (including all amendments and documentation for additional work processes) and analytic code.

B.    <u>Third-Party Data Archive</u>

    1.     The third-party data archive referenced above shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

    2.     The panel may exclude research proposals with a commercial interest.

    3.     Endo shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

    4.     Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for Endo's pharmacovigilance staff. Every agreement shall require the lead Qualified Researcher to inform Endo's pharmacovigilance staff within 24 hours of any determination that research findings could bear on the risk-benefit assessment regarding the product. The lead Qualified Researcher may also share findings bearing on the risk-benefit assessment regarding the product with regulatory authorities. Endo's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying the appropriate regulatory authorities or the public.

    5.     Endo shall bear all costs for making data and/or information available to the third-party data archive.

## IV.   <u>Compliance</u>

A.    <u>Compliance Duration</u>

    1.     Sections II and III of this Exhibit shall be effective for 8 years from the date the Consent Judgment is entered.

    2.     Nothing in this Consent Judgment shall relieve Endo of its independent obligation to fully comply with the laws of the State of Florida after expiration of the 8-year period specified in this subsection.

B.    <u>Compliance Deadlines</u>

    1.     Endo must be in full compliance with the provisions included in this Consent Judgment by the date it is entered. Nothing herein shall be construed as permitting Endo to avoid existing legal obligations.

**V.** **Enforcement**

    A.    If the State believes that Endo is not in compliance with any term of this Consent Judgment, then the State shall:

        1.    Provide written notice specifying the reason(s) why the State believes Endo is not in compliance with this Consent Judgment; and

        2.    Allow Endo at least thirty (30) days to attempt to cure such alleged non-compliance (the "Cure Period").

    B.    In the event the alleged non-compliance is cured within the Cure Period, Endo shall not have any liability for such alleged non-compliance.

    C.    The State may not commence a proceeding to enforce compliance with this Consent Judgment before the expiration of the Cure Period.

    D.    All of the provisions of this Consent Judgment and any injunction entered pursuant to it shall apply to Endo, even if Endo subsequently files for or emerges from bankruptcy.

    E.    This Consent Judgment will be enforceable in the Court where it is entered.  In connection with any Chapter 11 Cases, if one is filed, this Agreement is also enforceable in the Bankruptcy Court.  After emergence, discharge, or dismissal of any bankruptcy, this Consent Judgment will continue to be enforceable in Court where it is entered.

**Exhibit G**

| Litigating Subdivisions | Litigating % |
|---|---|
| Alachua County | 1.05816035129% |
| Bay County | 0.67445165516% |
| Lynn Haven | 0.04901751350% |
| Panama City | 0.19398376765% |
| Bradford County | 0.23690587434% |
| Brevard County | 2.98448370497% |
| Palm Bay | 0.50612989069% |
| Broward County | 5.07936492081% |
| Coconut Creek | 0.12644166587% |
| Coral Springs | 0.40434454263% |
| Deerfield Beach | 0.25308310671% |
| Fort Lauderdale | 1.03844846403% |
| Hallandale Beach | 0.19372950859% |
| Lauderhill | 0.18051711842% |
| Miramar | 0.34917486807% |
| Pembroke Pines | 0.57866409659% |
| Pompano Beach | 0.41942982316% |
| Calhoun County | 0.05892226579% |
| Clay County | 1.49210564228% |
| Dixie County | 0.12970844069% |
| Jacksonville | 6.62096027198% |
| Escambia County | 1.26401710873% |
| Pensacola | 0.41338436010% |
| Gilchrist County | 0.08043439796% |
| Gulf County | 0.07490880386% |
| Hamilton County | 0.05993930201% |
| Hernando County | 1.88799834150% |
| Hillsborough County | 8.15563160424% |
| Tampa | 2.47011763704% |
| Holmes County | 0.10203733694% |
| Jackson County | 0.19871253203% |
| Lake County | 0.97714478977% |
| Lee County | 2.68855794752% |
| Leon County | 0.58912731073% |
| Tallahassee | 0.53261142529% |
| Levy County | 0.31405760629% |
| Manatee County | 2.86126568069% |
| Bradenton | 0.47501493885% |
| Palmetto | 0.06610054375% |
| Marion County | 1.66558296312% |
| Ocala | 0.46134170415% |
| Stuart | 0.10155152053% |
| Miami-Dade County | 5.40366326457% |

| | |
|---|---|
| Coral Gables | 0.08974436568% |
| Florida City | 0.00491264817% |
| Homestead | 0.03117624643% |
| Miami | 0.36606947420% |
| Miami Gardens | 0.05086543199% |
| North Miami | 0.03798221649% |
| Sweetwater | 0.00514647569% |
| Monroe County | 0.48548042317% |
| Okaloosa County | 0.79330868262% |
| Niceville | 0.02718755751% |
| Orange County | 3.91426593527% |
| Apopka | 0.12154490889% |
| Eatonville | 0.01041022990% |
| Ocoee | 0.08326757029% |
| Orlando | 1.45062055328% |
| Osceola County | 1.04678452875% |
| Palm Beach County | 7.45692091104% |
| Delray Beach | 0.43990221742% |
| Pasco County | 5.53810273982% |
| New Port Richey | 0.18738892341% |
| Pinellas County | 5.99320147610% |
| Clearwater | 0.79249823188% |
| Pinellas Park | 0.31465012070% |
| St. Petersburg | 1.82113048025% |
| Polk County | 2.00253750537% |
| Putnam County | 0.42251271420% |
| Palatka | 0.05870659963% |
| Santa Rosa County | 0.81846897819% |
| Sarasota County | 2.46153185360% |
| Sarasota | 0.60547934620% |
| Seminole County | 1.88627074203% |
| Oviedo | 0.12894113218% |
| Sanford | 0.20534823933% |
| St. Johns County | 0.82995603906% |
| St. Augustine | 0.05815040794% |
| St. Lucie County | 1.19561688264% |
| Fort Pierce | 0.19946168818% |
| Port St. Lucie | 0.48860871761% |
| Suwannee County | 0.23881962776% |
| Taylor County | 0.11525199728% |
| Union County | 0.08146278503% |
| Volusia County | 2.23101196784% |
| Daytona Beach | 0.55956515527% |
| Deltona | 0.24921473680% |
| Ormond Beach | 0.14333627199% |

| Walton County | 0.33576951344% |
|---|---|
| Washington County | 0.15018764545% |

**Exhibit H**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, STATE OF FLORIDA
WEST PASCO CIVIL DIVISION


STATE OF FLORIDA, OFFICE OF THE
ATTORNEY GENERAL, DEPARTMENT
OF LEGAL AFFAIRS,

        Plaintiff,

v.                                     No. 2018-CA-001438

PURDUE PHARMA L.P., et al.,

        Defendants.

_____

**CONSENT JUDGMENT**

      Plaintiff, the State of Florida, Office of the Attorney General, Department of Legal

Affairs ("Plaintiff"), brought the above-captioned action against Defendants Endo Health

Solutions Inc. and Endo Pharmaceuticals Inc. (together, "Endo"), among others, alleging:  that

Endo violated Florida law by deceptively marketing opioid pain medications so as to overstate

their efficacy and downplay the associated risk of addiction, which resulted in a public nuisance

in Florida; that Endo violated the law by failing to monitor, report and not ship allegedly

suspicious orders of opioid pain medications; and that Endo violated Fla. Stat. § 895.03(3) & (4)

(the "Florida AG Action").  Plaintiff brought the Florida AG Action in its sovereign capacity as

the people's attorney in order to protect the public interest, including the interests of the State of

Florida, its governmental subdivisions and its citizens.

      In addition, numerous governmental entities in Florida, including counties, cities, hospital

districts and school boards ("Subdivisions") have brought separate lawsuits ("Actions") in

various forums against Endo, among others.  These Actions assert claims that arise out of or relate to alleged conduct that is substantially similar to or overlaps with the conduct alleged in the Florida AG Action (the "Covered Conduct").

Endo denies the allegations in the Florida AG Action and other Actions and claims to have no liability whatsoever to Plaintiff or to any Subdivision or other governmental entity (whether such governmental entity has brought or is a party to another Action or not).  Plaintiff and Endo (the "Parties"), by their counsel, have agreed to a resolution of the Florida AG Action ("Agreement," attached to this judgment) and the entry of this Consent Judgment (including the injunctive terms incorporated herein) by the Court without trial or finding of admission or wrongdoing or liability of any kind.  Furthermore, under the Agreement, and as effectuated in this Consent Judgment, the Florida AG is exercising its authority to act in the public interest and release its own Claims as well as those of all Subdivisions, whether asserted previously or in the future, that arise out of or relate to the Covered Conduct.  Unless otherwise specified, capitalized terms used herein shall have the meanings specified in the Agreement.

NOW THEREFORE, without trial or adjudication of any issue of fact or law presented in the Florida AG Action or the other Actions, without this Consent Judgment constituting evidence against or admission by anyone with respect to any issue of fact or law, and upon the Parties' consent, IT IS HEREBY ORDERED AS FOLLOWS:

## I.    PARTIES

1.    Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are both Delaware corporations with their principal places of business in Pennsylvania.

2.     Plaintiff has the authority to act in the public interest and on behalf of the people of Florida as the people's attorney.

## II.     JURISDICTION

3.      This Court has jurisdiction over the Parties and the subject matter of this action.

## III.     AGREEMENT

4.      The Parties have agreed to resolution of the Florida AG Action under the terms of their Agreement, which is attached hereto as <u>Exhibit A</u>.  This Consent Judgment summarizes and gives effect to those terms.  In the event of a conflict between the terms of the Exhibits and this summary document, the terms of the Agreement shall govern.

## IV.     FINANCIAL TERMS

5.      On or before the later of (a) seven (7) days after the entry of this Consent Judgment, or (b) seven (7) days after (i) the Qualified Settlement Fund contemplated by the Agreement has been established under the authority and jurisdiction of the Court, and (ii) Endo has received a W-9 and wire instructions for the Qualified Settlement Fund, Endo Pharmaceuticals Inc. shall pay the sum of $65,000,000 into the Qualified Settlement Fund as specified in the Agreement, consisting of $55,000,000 to be allocated for opioid remediation, $5,000,000 to be available to reimburse State Litigation Costs, and $5,000,000 to be available to reimburse Litigating Subdivision Litigation Costs.

## V.     INJUNCTIVE TERMS

6.      The Parties have agreed that Endo shall be subject to the injunctive terms set forth in Exhibit __ to their Agreement.  Those agreed injunctive terms are expressly incorporated into and are given full force and effect by this Consent Judgment, and Endo shall comply with the injunctive terms as of the entry of this Consent Judgment.

7.      Compliance with injunctive terms may be enforced in this Court consistent with the terms specified in the injunctive provisions set forth in the Parties' Agreement.

## VI.     RELEASES AND DISMISSAL WITH PREJUDICE

8.      Plaintiff and Endo have agreed to the Release of certain Claims as provided in Sections D and E of the Agreement.  Such Releases are given in good faith within the meaning of Fla. Stat. § 768.31(5) and upon entry of this Consent Judgment shall be effective as to all Releasors.

9.      Plaintiff's Claims  against Endo are hereby DISMISSED WITH PREJUDICE, with each Party to bear its own costs except as specified in the Agreement.

## VII.     MISCELLANEOUS

10.      This Court retains jurisdiction to enforce the terms of this Consent Judgment.  The parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court.  This Consent Judgment may be modified only by order of this Court.

11.      This Consent Judgment shall remain in full force and effect for eight years from the date it is entered, at which time Endo's obligations under the Consent Judgment shall expire.

12.      Entry of this Consent Judgment is in the public interest.

IT IS SO ORDERED, ADJUDGED AND DECREED in Chambers at New Port Richey, Pasco Cunty, Florida, this __ day of January 2022.


_____
Honorable Kimberly Sharpe Byrd
Circuit Court Judge

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:


FOR STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF
LEGAL AFFAIRS

ASHLEY MOODY
ATTORNEY GENERAL


By: _____
        [to come]

Date: _____

[Additional approvals on subsequent pages]

OUTSIDE LITIGATION COUNSEL FOR STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS

By: _____
      [to come]

Date: _____

DEFENDANT ENDO HEALTH SOLUTIONS INC.


By:  _____
      Matthew J. Maletta
      Executive Vice President and Chief Legal Officer
      Endo
      1400 Atwater Drive
      Malvern, Pennsylvania 19355


Date:  _____


DEFENDANT ENDO PHARMACEUTICALS INC.


By:  _____
      Matthew J. Maletta
      Executive Vice President and Chief Legal Officer
      Endo
      1400 Atwater Drive
      Malvern, Pennsylvania 19355


Date:  _____

COUNSEL FOR DEFENDANTS ENDO HEALTH SOLUTIONS INC. AND ENDO PHARMACEUTICALS INC.

By: _____

    Geoffrey M. Wyatt
    Skadden, Arps, Slate, Meagher & Flom LLP
    1440 New York Avenue, N.W.
    Washington, D.C. 20005

**Exhibit I**

## FLORIDA OPIOID ALLOCATION AND STATEWIDE RESPONSE AGREEMENT

BETWEEN

### STATE OF FLORIDA DEPARTMENT OF LEGAL AFFAIRS, OFFICE OF THE ATTORNEY GENERAL

And

### CERTAIN LOCAL GOVERNMENTS IN THE STATE OF FLORIDA

This Florida Opioid Allocation and Statewide Response Agreement (the "Agreement") is entered into between the State of Florida ('State") and certain Local Governments ("Local Governments" and the State and Local Governments are jointly referred to as the "Parties" or individually as a "Party").  The Parties agree as follows:

Whereas, the people of the State and its communities have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain; and

Whereas, the State, through its Attorney General, and certain Local Governments, through their elected representatives and counsel, are separately engaged in litigation seeking to hold many of the same Pharmaceutical Supply Chain Participants accountable for the damage caused by their misfeasance, nonfeasance and malfeasance as the State; and

Whereas, certain of the Parties have separately sued Pharmaceutical Supply Chain participants for the harm caused to the citizens of both Parties and have collectively negotiated settlements with several Pharmaceutical Supply Chain Participants; and

Whereas, the Parties share a common desire to abate and alleviate the impacts of that misfeasance, nonfeasance and malfeasance throughout the State; and

Whereas, it is the intent of the State and its Local Governments to use the proceeds from any Settlements with Pharmaceutical Supply Chain Participants to increase the amount of funding presently spent on opioid and substance abuse education, treatment, prevention and other related programs and services, such as those identified in Exhibits "A" and "B," and to ensure that the funds are expended in compliance with evolving evidence-based "best practices;" and

Whereas, the State and its Local Governments enter into this Agreement and agree to the allocation and use of the proceeds of any settlement described herein

Wherefore, the Parties each agree to as follows:

1

A.    **Definitions**

As used in this Agreement:

1.    "Approved Purpose(s)" shall mean forward-looking strategies, programming and services used to expand the availability of treatment for individuals impacted by substance use disorders, to: (a) develop, promote, and provide evidence-based substance use prevention strategies; (b) provide substance use avoidance and awareness education; (c) decrease the oversupply of licit and illicit opioids; and (d) support recovery from addiction. Approved Purposes shall include, but are not limited to, the opioid abatement strategies listed in Exhibits "A" and "B" which are incorporated herein by reference.

2.    "Local Governments" shall mean all counties, cities, towns and villages located within the geographic boundaries of the State.

3.    "Managing Entities" shall mean the corporations selected by and under contract with the Florida Department of Children and Families or its successor ("DCF") to manage the daily operational delivery of behavioral health services through a coordinated system of care. The singular "Managing Entity" shall refer to a singular of the Managing Entities.

4.    "County" shall mean a political subdivision of the state established pursuant to s. 1, Art. VIII of the State Constitution.

5.    "Dependent Special District" shall mean a Special District meeting the requirements of Florida Statutes § 189.012(2).

6.    "Municipalities" shall mean cities, towns, or villages located in a County within the State that either have: (a) a Population greater than 10,000 individuals; or (b) a Population equal to or less than 10,000 individuals and that has either (i) filed a lawsuit against one or more Pharmaceutical Supply Chain Participants; or (ii) executes a release in connection with a settlement with a Pharmaceutical Supply Chain participant.  The singular "Municipality" shall refer to a singular city, town, or village within the definition of Municipalities.

7.    " 'Negotiating Committee" shall mean a three-member group comprised by representatives of the following: (1) the State; and (2) two representatives of Local Governments of which one representative will be from a Municipality and one shall be from a County (collectively, "Members") within the State.  The State shall be represented by the Attorney General or her designee.

8.    "Negotiation Class Metrics" shall mean those county and city settlement allocations which come from the official website of the Negotiation Class of counties and cities certified on September 11, 2019 by the U.S. District for the Northern District of Ohio in *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio).  The website is located at https://allocationmap.iclaimsonline.com.

9.    "Opioid Funds" shall mean monetary amounts obtained through a Settlement.

2

10. "Opioid Related" shall have the same meaning and breadth as in the agreed Opioid Abatement Strategies attached hereto as Exhibits "A" or "B."

11. "Parties" shall mean the State and Local Governments that execute this Agreement. The singular word "Party" shall mean either the State or Local Governments that executed this Agreement.

12. "PEC" shall mean the Plaintiffs' Executive Committee of the National Prescription Opiate Multidistrict Litigation pending in the United States District Court for the Northern District of Ohio.

13. "Pharmaceutical Supply Chain" shall mean the entities, processes, and channels through which Controlled Substances are manufactured, marketed, promoted, distributed or dispensed.

14. "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in, or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic.

15. "Population" shall refer to published U.S. Census Bureau population estimates as of July 1, 2019, released March 2020, and shall remain unchanged during the term of this Agreement. These estimates can currently be found at *https://www.census.gov*. *For purposes of Population under the definition of Qualified County, a County's population shall be the greater of its population as of the July 1, 2019, estimates or its actual population, according to the official U.S. Census Bureau count, which was released by the U.S. Census Bureau in August 2021.*

16. "Qualified County" shall mean a charter or non-chartered County that has a Population of at least 300,000 individuals and: (a) has an opioid taskforce or other similar board, commission, council, or entity (including some existing sub-unit of a County's government responsible for substance abuse prevention, treatment, and/or recovery) of which it is a member or it operates in connection with its municipalities or others on a local or regional basis; (b) has an abatement plan that has been either adopted or is being utilized to respond to the opioid epidemic; (c) is, as of December 31, 2021, either providing or is contracting with others to provide substance abuse prevention, recovery, and/or treatment services to its citizens; and (d) has or enters into an interlocal agreement with a majority of Municipalities (Majority is more than 50% of the Municipalities' total Population) related to the expenditure of Opioid Funds. The Opioid Funds to be paid to a Qualified County will only include Opioid Funds for Municipalities whose claims are released by the Municipality or Opioid Funds for Municipalities whose claims are otherwise barred. For avoidance of doubt, the word "operate" in connection with opioid task force means to do at least one of the following activities: (1) gathers data about the nature, extent, and problems being faced in communities within that County; (2) receives and reports recommendations from other government and private entities about activities that should be undertaken to abate the opioid epidemic to a County; and/or (3) makes recommendations to a County and other public and private leaders about steps, actions, or plans that should be undertaken to abate the opioid epidemic. For avoidance of doubt, the Population calculation required by subsection (d) does not include Population in unincorporated areas.

3

17.     "SAMHSA" shall mean the U.S. Department of Health & Human Services, Substance Abuse and Mental Health Services Administration.

18.     "Settlement" shall mean the negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the State and Local Governments or a settlement class as described in (B)(1) below.

19.     "State" shall mean the State of Florida.

**B.     Terms**

1.     **Only Abatement -** Other than funds used for the Administrative Costs and Expense Fund as hereinafter described or to pay obligations to the United States arising out of Medicaid or other federal programs, all Opioid Funds shall be utilized for Approved Purposes. In order to accomplish this purpose, the State will either: (a) file a new action with Local Governments as Parties; or (b) add Local Governments to its existing action, sever any settling defendants. In either type of action, the State will seek entry of a consent judgment, consent order or other order binding judgment binding both the State and Local Governments to utilize Opioid Funds for Approved Purposes ("Order") from the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division New Port Richey, Florida (the "Court"), except as herein provided.  The Order may be part of a class action settlement or similar device.  The Order shall provide for continuing jurisdiction by the Court to address non-performance by any party under the Order.

2.     **Avoid Claw Back and Recoupment -** Both the State and Local Governments wish to maximize any Settlement and Opioid Funds. In addition to committing to only using funds for the Expense Funds, Administrative Costs and Approved Purposes, both Parties will agree to utilize a percentage of funds for the Core Strategies highlighted in Exhibit A. Exhibit A contains the programs and strategies prioritized by the U.S. Department of Justice and/or the U.S. Department of Health & Human Services ("Core Strategies"). The State is trying to obtain the United States' agreement to limit or reduce the United States' ability to recover or recoup monies from the State and Local Government in exchange for prioritization of funds to certain projects. If no agreement is reached with the United States, then there will be no requirement that a percentage be utilized for Core Strategies.

3.     **No Benefit Unless Fully Participating -** Any Local Government that objects to or refuses to be included under the Order or refuses or fails to execute any of documents necessary to effectuate a Settlement shall not receive, directly or indirectly, any Opioid Funds and its portion of Opioid Funds shall be distributed to, and for the benefit of, the Local Governments. Funds that were a for a Municipality that does not join a Settlement will be distributed to the County where that Municipality is located. Funds that were for a County that does not join a Settlement will be distributed pro rata to Counties that join a Settlement. For avoidance of doubt, if a Local Government initially refuses to be included in or execute the documents necessary to effectuate a Settlement and subsequently effectuates such documents necessary to join a Settlement, then that Local Government will only lose those payments made under a Settlement while that Local Government was not a part of the Settlement. If a Local Government participates in a Settlement, that Local Government is thereby releasing the claims of its Dependent Special District claims, if any.

4.      **Distribution Scheme** – If a Settlement has a National Settlement Administrator or similar entity, all Opioids Funds will initially go to the Administrator to be distributed. If a Settlement does not have a National Settlement Administrator or similar entity, all Opioid Funds will initially go to the State, and then be distributed by the State as they are received from the Defendants according to the following distribution scheme. The Opioid Funds will be divided into three funds after deducting any costs of the Expense Fund detailed below.  Funds due the federal government, if any, pursuant to Section B-2, will be subtracted from only the State and Regional Funds below:

(a)      City/County Fund- The city/county fund will receive 15% of all Opioid Funds to directly benefit all Counties and Municipalities.  The amounts to be distributed to each County and Municipality shall be determined by the Negotiation Class Metrics or other metrics agreed upon, in writing, by a County and a Municipality, which are attached to this Agreement as Exhibit "C."  In the event that a Municipality has a Population less than 10,000 people and it does not execute a release or otherwise join a Settlement that Municipalities share under the Negotiation Class Metrics shall be reallocated to the County where that Municipality is located.

(b)      Regional Fund- The regional fund will be subdivided into two parts.

(i)      The State will annually calculate the share of each County within the State of the regional fund utilizing the sliding scale in paragraph 5 of the Agreement, and according to the Negotiation Class Metrics.

(ii)      For Qualified Counties, the Qualified County's share will be paid to the Qualified County and expended on Approved Purposes, including the Core Strategies identified in Exhibit A, if applicable.

(iii)      For all other Counties, the State will appropriate the regional share for each County and pay that share through DCF to the Managing Entities providing service for that County. The Managing Entities will be required to expend the monies on Approved Purposes, including the Core Strategies as directed by the Opioid Abatement Task Force or Council. The Managing Entities shall expend monies from this Regional Fund on services for the Counties within the State that are non-Qualified Counties and to ensure that there are services in every County. To the greatest extent practicable, the Managing Entities shall endeavor to expend monies in each County or for citizens of a County in the amount of the share that a County would have received if it were a Qualified County.

(c)      State Fund - The remainder of Opioid Funds will be expended by the State on Approved Purposes, including the provisions related to Core Strategies, if applicable.

(d)      To the extent that Opioid Funds are not appropriated and expended in a year by the State, the State shall identify the investments where settlement funds will be deposited. Any gains, profits, or interest accrued from the deposit of the Opioid Funds to the extent that any funds are not appropriated and expended within a calendar year, shall be the sole property of the Party that was entitled to the initial amount.

(e)      To the extent a County or Municipality wishes to pool, comingle, or otherwise transfer its share, in whole or part, of Opioid Funds to another County or Municipality, the comingling Municipalities may do so by written agreement.  The comingling Municipalities shall provide a copy of that agreement to the State and any settlement administrator to ensure that monies are directed consistent with such agreement. The County or Municipality receiving any such Opioid Funds shall assume the responsibility for reporting how such Opioid Funds were utilized under this Agreement.

5.      Regional Fund Sliding Scale- The Regional Fund shall be calculated by utilizing the following sliding scale of the Opioid Funds available in any year after deduction of Expenses and any funds due the federal government:

> A. Years 1-6:          40%
>
> B. Years 7-9:          35%
>
> C. Years 10-12:   34%
>
> D. Years 13-15:   33%
>
> E. Years 16-18:   30%

6.      Opioid Abatement Taskforce or Council - The State will create an Opioid Abatement Taskforce or Council (sometimes hereinafter "Taskforce" or "Council") to advise the Governor, the Legislature, DCF, and Local Governments on the priorities that should be addressed by expenditure of Opioid Funds and to review how monies have been spent and the results that have been achieved with Opioid Funds.

(a)      Size - The Taskforce or Council shall have ten Members equally balanced between the State and the Local Government representatives.

(b)      Appointments Local Governments - Two Municipality representatives will be appointed by or through Florida League of Cities.  Two county representatives, one from a Qualified County and one from a county within the State that is not a Qualified County, will be appointed by or through the Florida Association of Counties.  The final representative will alternate every two years between being a county representative (appointed by or through Florida Association of Counties) or a Municipality representative (appointed by or through the Florida League of Cities).  One Municipality representative must be from a city of less than 50,000 people.  One county representative must be from a county of less than 200,000 people and the other county representative must be from a county whose population exceeds 200,000 people.

(c)      Appointments State -

(i)      The Governor shall appoint two Members.

(ii)      The Speaker of the House shall appoint one Member.

6

(iii)   The Senate President shall appoint one Member.

(iv)   The Attorney General or her designee shall be a Member.

(d)      Chair - The Attorney General or designee shall be the chair of the Taskforce or Council.

(e)      Term - Members will be appointed to serve a four-year term and shall be staggered to comply with Florida Statutes § 20.052(4)(c).

(f)      Support - DCF shall support the Taskforce or Council and the Taskforce or Council shall be administratively housed in DCF.

(g)      Meetings - The Taskforce or Council shall meet quarterly in person or virtually using communications media technology as defined in section 120.54(5)(b)(2), Florida Statutes.

(h)      Reporting - The Taskforce or Council shall provide and publish a report annually no later than November 30th or the first business day after November 30th, if November 30th falls on a weekend or is otherwise not a business day.  The report shall contain information on how monies were spent the previous fiscal year by the State, each of the Qualified Counties, each of the Managing Entities, and each of the Local Governments.  It shall also contain recommendations to the Governor, the Legislature, and Local Governments for priorities among the Approved Purposes or similar such uses for how monies should be spent the coming fiscal year to respond to the opioid epidemic. Prior to July 1st of each year, the State and each of the Local Governments shall provide information to DCF about how they intend to expend Opioid Funds in the upcoming fiscal year.

(i)      Accountability - The State and each of the Local Governments shall report its expenditures to DCF no later than August 31st for the previous fiscal year. The Taskforce or Council will set other data sets that need to be reported to DCF to demonstrate the effectiveness of expenditures on Approved Purposes. In setting those requirements, the Taskforce or Council shall consider the Reporting Templates, Deliverables, Performance Measures, and other already utilized and existing templates and forms required by DCF from Managing Entities and suggest that similar requirements be utilized by all Parties to this Agreement.

(j)      Conflict of Interest - All Members shall adhere to the rules, regulations and laws of Florida including, but not limited to, Florida Statute §112.311, concerning the disclosure of conflicts of interest and recusal from discussions or votes on conflicted matters.

7.      **Administrative Costs**- The State may take no more than a 5% administrative fee from the State Fund and any Regional Fund that it administers for counties that are not Qualified Counties. Each Qualified County may take no more than a 5% administrative fee from its share of the Regional Funds. Municipalities and Counties may take no more than a 5% administrative fee from any funds that they receive or control from the City/County Fund.

8.       **Negotiation of Non-Multistate Settlements** - If the State begins negotiations with a Pharmaceutical Supply Chain Participant that is separate and apart from a multi-state negotiation, the State shall include Local Governments that are a part of the Negotiating Committee in such negotiations.  No Settlement shall be recommended or accepted without the affirmative votes of both the State and Local Government representatives of the Negotiating Committee.

9.       **Negotiation of Multistate or Local Government Settlements** - To the extent practicable and allowed by other parties to a negotiation, both Parties agree to communicate with members of the Negotiation Committee regarding the terms of any other Pharmaceutical Supply Chain Participant Settlement.

10.      **Program Requirements**- DCF and Local Governments desire to make the most efficient and effective use of the Opioid Funds.  DCF and Local Governments will work to achieve that goal by ensuring the following requirements will be minimally met by any governmental entity or provider providing services pursuant to a contract or grant of Opioid Funds:

a.       In either performing services under this Agreement or contracting with a provider to provide services with the Opioid Funds under this Agreement, the State and Local Governments shall be aware of and comply with all State and Federal laws, rules, Children and Families Operating Procedures (CFOPs), and similar regulations relating to the substance abuse and treatment services.

b.       The State and Local Governments shall have and follow their existing policies and practices for accounting and auditing, including policies relating to whistleblowers and avoiding fraud, waste, and abuse. The State and Local Governments shall consider additional policies and practices recommended by the Opioid Abatement Taskforce or Council. c. In any award or grant to any provider, State and Local Governments shall ensure that each provider acknowledges its awareness of its obligations under law and shall audit, supervise, or review each provider's performance routinely, at least once every year.

d. In contracting with a provider, the State and Local Governments shall set performance measures in writing for a provider.

e. The State and Local Governments shall receive and report expenditures, service utilization data, demographic information, and national outcome measures in a similar fashion as required by the 42.U.S.C. s. 300x and 42 U.S.C. s. 300x-21.

f. The State and Local Governments, that implement evidenced based practice models will participate in fidelity monitoring as prescribed and completed by the originator of the model chosen..

g. The State and Local Governments shall ensure that each year, an evaluation of the procedures and activities undertaken to comply with the requirements of this Agreement are completed.

h. The State and Local Governments shall implement a monitoring process that will demonstrate oversight and corrective action in the case of non-compliance, for all providers that receive Opioid Funds. Monitoring shall include:

(i)   Oversight of the any contractual or grant requirements;

(ii)   Develop and utilize standardized monitoring tools;

(iii)   Provide DCF and the Opioid Abatement Taskforce or Council with access to the monitoring reports; and

(iv)   Develop and utilize the monitoring reports to create corrective action plans for providers, where necessary.

11.   **Reporting and Records Requirements-** The State and Local Governments  shall follow their existing reporting and records retention requirements along with considering any additional recommendations from the Opioid Abatement Taskforce or Council. Local Governments shall respond and provide documents to any reasonable requests from the State or Opioid Abatement Taskforce or Council for data or information about programs receiving Opioid Funds.  The State and Local Governments shall ensure that any provider or sub-recipient of Opioid Funds at a minimum does the following:

(a)   Any provider shall establish and maintain books, records and documents (including electronic storage media) sufficient to reflect all income and expenditures of Opioid Funds. Upon demand, at no additional cost to the State or Local Government, any provider will facilitate the duplication and transfer of any records or documents during the term that it receives any Opioid Funds and the required retention period for the State or Local Government. These records shall be made available at all reasonable times for inspection, review, copying, or audit by Federal, State, or other personnel duly authorized by the State or Local Government.

(b)   Any provider shall retain and maintain all client records, financial records, supporting documents, statistical records, and any other documents (including electronic storage media) pertinent to the use of the Opioid Funds during the term of its receipt of Opioid Funds and retained for a period of six (6) years after its ceases to receives Opioid Funds or longer when required by law. In the event an audit is required by the State of Local Governments, records shall be retained for a minimum period of six (6) years after the audit report is issued or until resolution of any audit findings or litigation based on the terms of any award or contract.

(c)   At all reasonable times for as long as records are maintained, persons duly authorized by State or Local Government auditors shall be allowed full access to and the right to examine any of the contracts and related records and documents, regardless of the form in which kept.

(d)   A financial and compliance audit shall be performed annually and provided to the State.

(e)    All providers shall comply and cooperate immediately with any inspections, reviews, investigations, or audits deemed necessary by The Office of the Inspector General (section 20.055, F.S.) or the State.

(f)    No record may be withheld nor may any provider attempt to limit the scope of any of the foregoing inspections, reviews, copying, transfers or audits based on any claim that any record is exempt from public inspection or is confidential, proprietary or trade secret in nature; provided, however, that this provision does not limit any exemption to public inspection or copying to any such record.

12.    **Expense Fund** - The Parties agree that in any negotiation every effort shall be made to cause Pharmaceutical Supply Chain Participants to pay costs of litigation, including attorneys' fees, in addition to any agreed to Opioid Funds in the Settlement.   To the extent that a fund sufficient to pay the full contingent fees of Local Governments is not created as part of a Settlement by a Pharmaceutical Supply Chain Participant, the Parties agree that an additional expense fund for attorneys who represent Local Governments (herein "Expense Fund") shall be created out of the City/County fund for the purpose of paying the hard costs of a litigating Local Government and then paying attorneys' fees.

(a)    The Source of Funds for the Expense Fund- Money for the Expense Fund shall be sourced exclusively from the City/County Fund.

(b)    The Amount of the Expense Fund- The State recognizes the value litigating Local Governments bring to the State in connection with the Settlement because their participation increases the amount of Incentive Payments due from each Pharmaceutical Supply Chain Participant.  In recognition of that value, the amount of funds that shall be deposited into the Expense Fund shall be contingent upon on the percentage of litigating Local Government participation in the Settlement, according to the following table:

| Litigating Local Government Participation in the Settlement (by percentage of the population) | Amount that shall be paid into the Expense Fund from (and as a percentage of) the City/County fund |
|---|---|
| 96 to 100% | 10% |
| 91 to 95% | 7.5% |
| 86 to 90% | 5% |
| 85% | 2.5% |
| Less than 85% | 0% |

If fewer than 85% percent of the litigating Local Governments (by population) participate, then the Expense Fund shall not be funded, and this Section of the Agreement shall be null and void.

(c)    The Timing of Payments into the Expense Fund- Although the amount of the Expense Fund shall be calculated based on the entirety of payments due to the City/County fund over a ten-to-eighteen-year period, the Expense Fund shall be funded entirely from payments made by Pharmaceutical Supply Chain Participants during the first two payments of the Settlement.  Accordingly, to offset the amounts being paid from the

City/County Fund to the Expense Fund in the first two years, Counties or Municipalities may borrow from the Regional Fund during the first two years and pay the borrowed amounts back to the Regional Fund during years three, four, and five.

For the avoidance of doubt, the following provides an illustrative example regarding the calculation of payments and amounts that may be borrowed under the terms of this MOU, consistent with the provisions of this Section:

| | |
|---|---|
| Opioid Funds due to State of Florida and Local Governments (over 10 to 18 years): | $1,000 |
| Litigating Local Government Participation: | 100% |
| City/County Fund (over 10 to 18 years): | $150 |
| Expense Fund (paid over 2 years): | $15 |
| Amount Paid to Expense Fund in 1st year: | $7.5 |
| Amount Paid to Expense Fund in 2nd year | $7.5 |
| Amount that may be borrowed from Regional Fund in 1st year: | $7.5 |
| Amount that may be borrowed from Regional Fund in 2nd year: | $7.5 |
| Amount that must be paid back to Regional Fund in 3rd year: | $5 |
| Amount that must be paid back to Regional Fund in 4th year: | $5 |
| Amount that must be paid back to Regional Fund in 5th year: | $5 |

(d)     Creation of and Jurisdiction over the Expense Fund- The Expense Fund shall be established, consistent with the provisions of this Section of the Agreement, by order of the Court. The Court shall have jurisdiction over the Expense Fund, including authority to allocate and disburse amounts from the Expense Fund and to resolve any disputes concerning the Expense Fund.

(e)     Allocation of Payments to Counsel from the Expense Fund- As part of the order establishing the Expense Fund, counsel for the litigating Local Governments shall seek to have the Court appoint a third-neutral to serve as a special master for purposes of allocating the Expense Fund. Within 30 days of entry of the order appointing a special master for the Expense Fund, any counsel who intend to seek an award from the Expense Fund shall provide the copies of their contingency fee contracts to the special master. The special master shall then build a mathematical model, which shall be based on each litigating Local Government's share under the Negotiation Class Metrics and the rate set forth in their contingency contracts, to calculate a proposed award for each litigating Local Government who timely provided a copy of its contingency contract.

13.     **Dispute resolution-** Any one or more of the Local Governments or the State may object to an allocation or expenditure of Opioid Funds solely on the basis that the allocation or expenditure at issue (a) is inconsistent with the Approved Purposes; (b) is inconsistent with the distribution scheme as provided in paragraph,; (c) violates the limitations set forth herein with respect to administrative costs or the Expense Fund; or (d) to recover amounts advanced from the Regional Fund for the Expense Fund. There shall be no other basis for bringing an objection to the approval of an allocation or expenditure of Opioid Funds. In the event that there is a National Settlement Administrator or similar entity, the Local Governments sole action for non-payment of

11

amounts due from the City/County Fund shall be against the particular settling defendant and/or the National Settlement Administrator or similar entity.

### C. Other Terms and Conditions

1.      **Governing Law and Venue**:  This Agreement will be governed by the laws of the State of Florida.  Any and all litigation arising under the Agreement, unless otherwise specified in this Agreement, will be instituted in either: (a) the Court that enters the Order if the matter deals with a matter covered by the Order and the Court retains jurisdiction; or (b) the appropriate State court in Leon County, Florida.

2.      **Agreement Management and Notification:**   The Parties have identified the following individuals as Agreement Managers and Administrators:

    a.      State of Florida Agreement Manager:

    Greg Slemp

    PL-01, The Capitol, Tallahassee, FL 32399

    850-414-3300

    Greg.slemp@myfloridalegal.com

    b.      State of Florida Agreement Administrator

    Janna Barineau

    PL-01, The Capitol, Tallahassee, FL 32399

    850-414-3300

    Janna.barineau@myfloridalegal.com

    c.      Local Governments Agreement Managers and Administrators are listed on Exhibit C to this Agreement.

Changes to either the Managers or Administrators may be made by notifying the other Party in writing, without formal amendment to this Agreement.

3.      **Notices**.  All notices required under the Agreement will be delivered by certified mail, return receipt requested, by reputable air courier, or by personal delivery to the designee identified in paragraphs C.2., above.  Either designated recipient may notify the other, in writing, if someone else is designated to receive notice.

4.      **Cooperation with Inspector General:**  Pursuant to section 20.055, Florida Statutes, the Parties, understand and will comply with their duty to cooperate with the Inspector General in any investigation, audit, inspection, review, or hearing.

5.      **Public Records**:  The Parties will keep and maintain public records pursuant to Chapter 119, Florida Statutes and will comply will all applicable provisions of that Chapter.

6.      **Modification**:  This Agreement may only be modified by a written amendment between the appropriate parties. No promises or agreements made subsequent to the execution of this Agreement shall be binding unless express, reduced to writing, and signed by the Parties.

7.      **Execution in Counterparts**:  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

8.      **Assignment:**      The rights granted in this Agreement may not be assigned or transferred by any party without the prior written approval of the other party. No party shall be permitted to delegate its responsibilities or obligations under this Agreement without the prior written approval of the other parties.

9.      **Additional Documents:**  The Parties agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be reasonably necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

10.      **Captions:**  The captions contained in this Agreement are for convenience only and shall in no way define, limit, extend or describe the scope of this Agreement or any part of it.

11.      **Entire Agreement:**  This Agreement, including any attachments, embodies the entire agreement of the parties.  There are no other provisions, terms, conditions, or obligations.  This Agreement supersedes all previous oral or written communications, representations or agreements on this subject.

12.      **Construction:**  The parties hereto hereby mutually acknowledge and represent that they have been fully advised by their respective legal counsel of their rights and responsibilities under this Agreement, that they have read, know, and understand completely the contents hereof, and that they have voluntarily executed the same. The parties hereto further hereby mutually acknowledge that they have had input into the drafting of this Agreement and that, accordingly, in any construction to be made of this Agreement, it shall not be construed for or against any party, but rather shall be given a fair and reasonable interpretation, based on the plain language of the Agreement and the expressed intent of the parties.

13.      **Capacity to Execute Agreement:**  The parties hereto hereby represent and warrant that the individuals signing this Agreement on their behalf are duly authorized and fully competent to do so.

14. **Effectiveness:** This Agreement shall become effective on the date on which the last required signature is affixed to this Agreement.

**IN WITNESS THEREOF**, the parties hereto have caused the Agreement to be executed by their undersigned officials as duly authorized.

STATE OF FLORIDA

By: _John Guard_  DATED 11/15/2021

Its: _Chief Deputy Attorney General_

# EXHIBIT A

**Schedule A**

**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**")[, such that a minimum of __ % of the [aggregate] state-level abatement distributions shall be spent on [one or more of] them annually].[1]

A. Naloxone or other FDA-approved drug to reverse opioid overdoses

1. Expand training for first responders, schools, community support groups and families; and

2. Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B. Medication-Assisted Treatment ("MAT") Distribution and other opioid-related treatment

1. Increase distribution of MAT to non-Medicaid eligible or uninsured individuals;

2. Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3. Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4. Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication with other support services.

C. Pregnant & Postpartum Women

1. Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("OUD") and other Substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3. Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

D. Expanding Treatment for Neonatal Abstinence Syndrome

1. Expand comprehensive evidence-based and recovery support for NAS babies;

2. Expand services for better continuum of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Term Sheet.

E. Expansion of Warm Hand-off Programs and Recovery Services

1. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions. ;

4. Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansions above.

F. Treatment for Incarcerated Population

1. Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2. Increase funding for jails to provide treatment to inmates with OUD.

G. Prevention Programs

1. Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2. Funding for evidence-based prevention programs in schools.;

3. Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4. Funding for community drug disposal programs; and

5. Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H. Expanding Syringe Service Programs

1. Provide comprehensive syringe services programs with more wrap-around services including linkage to OUD treatment, access to sterile syringes, and linkage to care and treatment of infectious diseases.

I. Evidence-based data collection and research analyzing the effectiveness of the abatement strategies within the State.

# EXHIBIT B

**Schedule B**

**Approved Uses**

PART ONE: TREATMENT

## A.  TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:[2]

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.  Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training,

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Term Sheet.

scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. [Intentionally Blank – to be cleaned up later for numbering]

13. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B. SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in treatment for or recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved medication with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically-appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

### D. ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   c. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   e. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

f. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions

4. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E. ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    a. Increase the number of prescribers using PDMPs;

    b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

### G. PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Fund community anti-drug coalitions that engage in drug prevention efforts.

6. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7. Engage non-profits and faith-based communities as systems to support prevention.

8. Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address

mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

### H. PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, individuals at high risk of overdose, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities provide free naloxone to anyone in the community

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.

PART THREE: OTHER STRATEGIES

**I. FIRST RESPONDERS**

In addition to items in sections C, D, and H relating to first responders, support the following:

1. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J. LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitation, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local, or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services; to support training and technical assistance; or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to share reports, recommendations, or plans to spend opioid settlement funds; to show how opioid settlement funds have been spent; to report program or strategy outcomes; or to track, share, or visualize key opioid-related or health-related indicators and supports as identified through collaborative statewide, regional, local, or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

**K. TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

**L. RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection, and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

# EXHIBIT C

| County | Allocated Subdivisions | Regional % by County for Abatement Fund | City/County Fund % |
|---|---|---|---|
| Alachua | | 1.2410601644449% | |
| | Alachua County | | 0.8216895463034% |
| | Alachua | | 0.0131133332457% |
| | Archer | | 0.0002197055159% |
| | Gainesville | | 0.3815976113474% |
| | Hawthorne | | 0.0002705464604% |
| | High Springs | | 0.0119875686634% |
| | La Crosse | | 0.0009750567060% |
| | Micanopy | | 0.0021135307374% |
| | Newberry | | 0.0061027292159% |
| | Waldo | | 0.0029887212994% |
| Baker | | 0.1931738041304% | |
| | Baker County | | 0.1694492400374% |
| | Glen St. Mary | | 0.0000962346470% |
| | Macclenny | | 0.0236283294464% |
| Bay | | 0.8396563733124% | |
| | Bay County | | 0.5087726051554% |
| | Callaway | | 0.0249538255274% |
| | Lynn Haven | | 0.0392056320154% |
| | Mexico Beach | | 0.0056142929884% |
| | Panama City | | 0.1551538559604% |
| | Panama City Beach | | 0.0808970231174% |
| | Parker | | 0.0087046961784% |
| | Springfield | | 0.0163544427364% |
| Bradford | | 0.1894842040814% | |
| | Bradford County | | 0.1514243090904% |
| | Brooker | | 0.0004248850454% |
| | Hampton | | 0.0028389299594% |
| | Lawtey | | 0.0034008961084% |
| | Starke | | 0.0313924681324% |
| Brevard | | 3.8787991804444% | |
| | Brevard County | | 2.3230226685254% |
| | Cape Canaveral | | 0.0455607502094% |

| County | City | Subtotal | Percentage |
|---|---|---|---|
| | Cocoa | | 0.1492454114423% |
| | Cocoa Beach | | 0.0843632861555% |
| | Grant-Valkaria | | 0.0003213877406% |
| | Indialantic | | 0.0241367389024% |
| | Indian Harbour Beach | | 0.0210899136654% |
| | Malabar | | 0.0025057323317% |
| | Melbourne | | 0.3831046822334% |
| | Melbourne Beach | | 0.0120910663024% |
| | Melbourne Village | | 0.0037822032005% |
| | Palm Bay | | 0.4048173974815% |
| | Palm Shores | | 0.0001271023648% |
| | Rockledge | | 0.0966032437984% |
| | Satellite Beach | | 0.0359754162245% |
| | Titusville | | 0.2400564189245% |
| | West Melbourne | 9.0579626725789% | 0.0519975770665% |
| Broward | Broward County | | 3.9664035768789% |
| | Coconut Creek | | 0.1011317194488% |
| | Cooper City | | 0.0739354450739% |
| | Coral Springs | | 0.3234065176644% |
| | Dania Beach | | 0.0178070411809% |
| | Davie | | 0.2669222271535% |
| | Deerfield Beach | | 0.2024232247253% |
| | Fort Lauderdale | | 0.8305812645315% |
| | Hallandale Beach | | 0.1549504918149% |
| | Hillsboro Beach | | 0.0124070064639% |
| | Hollywood | | 0.5201646084569% |
| | Lauderdale-By-The-Sea | | 0.0228076113255% |
| | Lauderdale Lakes | | 0.0626251504355% |
| | Lauderhill | | 0.1443828381309% |
| | Lazy Lake | | 0.0000217889779% |
| | Lighthouse Point | | 0.0291318618039% |
| | Margate | | 0.1436837751299% |
| | Miramar | | 0.2792802084199% |
| | North Lauderdale | | 0.0650696244969% |

| County | Municipality | | |
|---|---|---|---|
| | Oakland Park | | 0.10043084069% |
| | Ocean Breeze | | 0.0053187723737% |
| | Parkland | | 0.045804060448% |
| | Pembroke Park | | 0.024597938908% |
| | Pembroke Pines | | 0.4628323636 03% |
| | Plantation | | 0.2139187256 64% |
| | Pompano Beach | | 0.3354721634 93% |
| | Sea Ranch Lakes | | 0.0050241748 70% |
| | Southwest Ranches | | 0.0259797231 78% |
| | Sunrise | | 0.286071106146% |
| | Tamarac | | 0.1344924584 72% |
| | Weston | | 0.1386378112 83% |
| | West Park | | 0.0295531153 52% |
| | Wilton Manors | | 0.0316303311 27% |
| Calhoun | | 0.047127740781% | |
| | Calhoun County | | 0.038866087128% |
| | Altha | | 0.0003667811 07% |
| | Blountstown | | 0.0078966882 93% |
| Charlotte | | 0.73734623376% | |
| | Charlotte County | | 0.6902257555 87% |
| | Punta Gorda | | 0.0471204777 89% |
| Citrus | | 0.96964577606 06% | |
| | Citrus County | | 0.9297156611 17% |
| | Crystal River | | 0.0219287892 66% |
| | Inverness | | 0.0180013262 22% |
| Clay | | 1.19342946145 6% | |
| | Clay County | | 1.0557648911 31% |
| | Green Cove Springs | | 0.0577625771 42% |
| | Keystone Heights | | 0.0007535354 43% |
| | Orange Park | | 0.0785892073 39% |
| | Penney Farms | | 0.0005610661 49% |
| Collier | | 1.55133337642 7% | |
| | Collier County | | 1.3546733360 30% |
| | Everglades | | 0.0001488913 41% |
| | Marco Island | | 0.0620949520 03% |

| Group | Locality | Subtotal | Percent |
|---|---|---|---|
| Columbia | Naples | 0.44678115079290% | 0.1344161970154% |
|  | Columbia County |  | 0.34188720113733% |
|  | Fort White |  | 0.0002360472474% |
|  | Lake City |  | 0.10465971792020% |
| DeSoto | DeSoto County | 0.11364040780200% | 0.09688846847467% |
|  | Arcadia |  | 0.0167557230506% |
| Dixie | Dixie County | 0.10374458090000% | 0.0988220879211% |
|  | Cross City |  | 0.0046392362828% |
|  | Horseshoe Beach |  | 0.0002814409496% |
| Duval | Jacksonville | 5.43497515693500% | 5.2705700649970% |
|  | Atlantic Beach |  | 0.0388915076016% |
|  | Baldwin |  | 0.0022515275897% |
|  | Jacksonville Beach |  | 0.1004471824318% |
|  | Neptune Beach |  | 0.0228148743181% |
| Escambia | Escambia County | 1.34163444924440% | 1.0058608715746% |
|  | Century |  | 0.0051367512492% |
|  | Pensacola |  | 0.3306368264214% |
| Flagler | Flagler County | 0.38986471224440% | 0.2797559934409% |
|  | Beverly Beach |  | 0.0001543385859% |
|  | Bunnell |  | 0.0095010895755% |
|  | Flagler Beach |  | 0.0154828836692% |
|  | Marineland |  | 0.0001143921274% |
|  | Palm Coast |  | 0.0848571696268% |
| Franklin | Franklin County | 0.04991128255000% | 0.0462543659668% |
|  | Apalachicola |  | 0.0017685386068% |
|  | Carabelle |  | 0.0018883779788% |
| Gadsden | Gadsden County | 0.12365607407770% | 0.0902118106428% |

| County | City | | |
|---|---|---|---|
| | Chattahoochee | | 0.0041816677772% |
| | Greensboro | | 0.0004920677723% |
| | Gretna | | 0.0022406331101% |
| | Havana | | 0.0054595944403% |
| | Midway | | 0.0012020255213% |
| | Quincy | | 0.0198679157223% |
| Gilchrist | Gilchrist County | 0.0643337693555% | 0.0612742333881% |
| | Bell | | 0.0009986614343% |
| | Fanning Springs | | 0.0003885700084% |
| | Trenton | | 0.0025710992247% |
| Glades | Glades County | 0.0406128367858% | 0.0404203674646% |
| | Moore Haven | | 0.0001924692994% |
| Gulf | Gulf County | 0.0599142385888% | 0.0547157519905% |
| | Port St. Joe | | 0.0048171795916% |
| | Wewahitchka | | 0.0003813070926% |
| Hamilton | Hamilton County | 0.0479411959106% | 0.0388170619316% |
| | Jasper | | 0.0048698362856% |
| | Jennings | | 0.0026237559406% |
| | White Springs | | 0.0016305417546% |
| Hardee | Hardee County | 0.0671100481326% | 0.0581003062806% |
| | Bowling Green | | 0.0017975905756% |
| | Wauchula | | 0.0066674286068% |
| | Zolfo Springs | | 0.0005447244176% |
| Hendry | Hendry County | 0.1444609152976% | 0.1221471874436% |
| | Clewiston | | 0.0175891514146% |
| | LaBelle | | 0.0047245764406% |
| Hernando | Hernando County | 1.5100759491106% | 1.4475216128496% |
| | Brooksville | | 0.0613192627583% |

| County | City | County % | City % |
|---|---|---|---|
|  | Weeki Wachee |  | 0.0012347086 78% |
| Highlands | Highlands County | 0.357188510237% | 0.287621754986% |
|  | Avon Park |  | 0.025829016090% |
|  | Lake Placid |  | 0.0055652677 90% |
|  | Sebring |  | 0.038172471371% |
| Hillsborough | Hillsborough County | 8.7109841136 57% | 6.5231112044 00% |
|  | Plant City |  | 0.104218491142% |
|  | Tampa |  | 1.9756718812 53% |
|  | Temple Terrace |  | 0.1079807211 13% |
| Holmes | Holmes County | 0.0816124278 51% | 0.0668050024 59% |
|  | Bonifay |  | 0.0069898026 863% |
|  | Esto |  | 0.0062697780 36% |
|  | Noma |  | 0.0012782866 31% |
|  | Ponce de Leon |  | 0.0001797590 57% |
|  | Westville |  | 0.0001797590 57% |
| Indian River | Indian River County | 0.7530760587 81% | 0.6235714602 17% |
|  | Fellsmere |  | 0.0049170457 34% |
|  | Indian River shores |  | 0.0253224223 82% |
|  | Orchid |  | 0.0003068614 21% |
|  | Sebastian |  | 0.0383159154 67% |
|  | Vero Beach |  | 0.0606423535 58% |
| Jackson | Jackson County | 0.1589360587 95% | 0.0752137317 04% |
|  | Alford |  | 0.0003032299 25% |
|  | Bascom |  | 0.0000617354 34% |
|  | Campbellton |  | 0.0016486992 34% |
|  | Cottondale |  | 0.0010930803 29% |
|  | Graceville |  | 0.0027944362 57% |
|  | Grandridge |  | 0.0000308677 17% |
|  | Greenwood |  | 0.0012928126 16% |
|  | Jacob City |  | 0.0000481173 235% |

| County | City | County % | City % |
|---|---|---|---|
|  | Malone |  | 0.0000926031151% |
|  | Marianna |  | 0.0735196388768% |
|  | Sneads |  | 0.0024040504426% |
| Jefferson |  | 0.0408216477844% |  |
|  | Jefferson County |  | 0.0375841690001% |
|  | Monticello |  | 0.0032374787783% |
| Lafayette |  | 0.0319117720276% |  |
|  | Lafayette County |  | 0.0315558585457% |
|  | Mayo |  | 0.0003558866619% |
| Lake |  | 1.1392112245519% |  |
|  | Lake County |  | 0.7574538273343% |
|  | Astatula |  | 0.0027272535579% |
|  | Clermont |  | 0.0759091632090% |
|  | Eustis |  | 0.0419292540980% |
|  | Fruitland Park |  | 0.0083814930024% |
|  | Groveland |  | 0.0261540349920% |
|  | Howey-In-The-Hills |  | 0.0029814583070% |
|  | Lady Lake |  | 0.0250482444260% |
|  | Leesburg |  | 0.0913390390185% |
|  | Mascotte |  | 0.0114156080025% |
|  | Minneola |  | 0.0160584758030% |
|  | Montverde |  | 0.0013472850570% |
|  | Mount Dora |  | 0.0410213800700% |
|  | Tavares |  | 0.0318209846730% |
|  | Umatilla |  | 0.0056233711728% |
| Lee |  | 3.3253718833559% |  |
|  | Lee County |  | 2.1152684075090% |
|  | Bonita Springs |  | 0.0173748931430% |
|  | Cape Coral |  | 0.7144296771670% |
|  | Estero |  | 0.0120801718130% |
|  | Fort Myers |  | 0.4311003505850% |
|  | Fort Myers Beach |  | 0.0005229335440% |
|  | Sanibel |  | 0.0345954477020% |
| Leon |  | 0.8971992449399% |  |
|  | Leon County |  | 0.4712011463910% |

| | | | 0.425998098549% |
|---|---|---|---|
| Levy | Tallahassee | 0.251192401748% | |
| | Levy County | | 0.200131750679% |
| | Bronson | | 0.005701448894% |
| | Cedar Key | | 0.005180329202% |
| | Chiefland | | 0.015326729337% |
| | Fanning Springs | | 0.000808007885% |
| | Inglis | | 0.004976965420% |
| | Otter Creek | | 0.000408543312% |
| | Williston | | 0.017774357715% |
| | Yankeetown | | 0.000884269303% |
| Liberty | | 0.019399452225% | |
| | Liberty County | | 0.019303217578% |
| | Bristol | | 0.000962346447% |
| Madison | | 0.063540287455% | |
| | Madison County | | 0.053145129837% |
| | Greenville | | 0.000110760631% |
| | Lee | | 0.000019973229% |
| | Madison | | 0.010264423758% |
| Manatee | | 2.721323346235% | |
| | Manatee County | | 2.201647174006% |
| | Anna Maria | | 0.009930326116% |
| | Bradenton | | 0.379930754632% |
| | Bradenton Beach | | 0.014012127744% |
| | Holmes Beach | | 0.028038781473% |
| | Longboat Key | | 0.034895046131% |
| | Palmetto | | 0.052869136132% |
| Marion | | 1.701176168960% | |
| | Marion County | | 1.303728928237% |
| | Belleview | | 0.009799592256% |
| | Dunnellon | | 0.018400790795% |
| | McIntosh | | 0.000145259844% |
| | Ocala | | 0.368994504094% |
| | Reddick | | 0.000107129135% |
| Martin | | 0.869487298116% | |

| | | |
|---|---|---|
| | Martin County | 0.7507627957758% |
| | Jupiter Island | 0.0208783896646% |
| | Ocean Breeze Park | 0.0082707323393% |
| | Sewall's Point | 0.0083560725551% |
| | Stuart | 0.0812238577767% |
| Miami-Dade | | 5.232119784173% |
| | Miami-Dade County | 4.2827676555252% |
| | Aventura | 0.0246197278855% |
| | Bal Harbour | 0.0100410867477% |
| | Bay Harbor Islands | 0.0042724551757% |
| | Biscayne Park | 0.0011348425357% |
| | Coral Gables | 0.0717801521319% |
| | Cutler Bay | 0.0094146536681% |
| | Doral | 0.0139776285319% |
| | El Portal | 0.0009242157607% |
| | Florida City | 0.0039292787924% |
| | Golden Beach | 0.0028470929519% |
| | Hialeah | 0.0980158957859% |
| | Hialeah Gardens | 0.0054526914119% |
| | Homestead | 0.0249356680461% |
| | Indian Creek | 0.0025438630269% |
| | Key Biscayne | 0.0136834773469% |
| | Medley | 0.0087482741319% |
| | Miami | 0.2927930054481% |
| | Miami Beach | 0.1814095724789% |
| | Miami Gardens | 0.0406836509327% |
| | Miami Lakes | 0.0078367686089% |
| | Miami Shores | 0.0062879355169% |
| | Miami Springs | 0.0061699118939% |
| | North Bay Village | 0.0051603559749% |
| | North Miami | 0.0303792807179% |
| | North Miami Beach | 0.0303919909539% |
| | Opa-locka | 0.0078476630969% |
| | Palmetto Bay | 0.0074046205709% |
| | Pinecrest | 0.0082961528669% |

| County | Place | | |
|---|---|---|---|
| | South Miami | | 0.0078333137111% |
| | Sunny Isles Beach | | 0.0076933245111% |
| | Surfside | | 0.0048698336285% |
| | Sweetwater | | 0.0041163008042% |
| | Virginia Gardens | | 0.0011729733244% |
| | West Miami | | 0.0026546236357% |
| Monroe | | 0.4763887385585% | |
| | Monroe County | | 0.3301247835469% |
| | Islamorada | | 0.0223573058808% |
| | Key Colony Beach | | 0.0047518126661% |
| | Key West | | 0.0880873885417% |
| | Layton | | 0.0001507070089% |
| | Marathon | | 0.0309167742141% |
| Nassau | | 0.4769334363002% | |
| | Nassau County | | 0.3927063579551% |
| | Callahan | | 0.0002251527759% |
| | Fernandina Beach | | 0.0831594451959% |
| | Hilliard | | 0.0008425070098% |
| Okaloosa | | 0.8191286595955% | |
| | Okaloosa County | | 0.6120596175455% |
| | Cinco Bayou | | 0.0007335622214% |
| | Crestview | | 0.0704401300066% |
| | Destin | | 0.0146785072815% |
| | Fort Walton Beach | | 0.0778374876445% |
| | Laurel Hill | | 0.0000798929144% |
| | Mary Esther | | 0.0093565497305% |
| | Niceville | | 0.0217453987135% |
| | Shalimar | | 0.0018248267965% |
| | Valparaiso | | 0.0104568930525% |
| Okeechobee | | 0.3534952786925% | |
| | Okeechobee County | | 0.3145438514055% |
| | Okeechobee | | 0.0389514272875% |
| Orange | | 4.6710282145465% | |
| | Orange County | | 3.0633303869795% |
| | Apopka | | 0.0972151508925% |

| | | | |
|---|---|---|---|
| | | Bay Lake | 0.0235665940013% |
| | | Belle Isle | 0.0107982536886% |
| | | Eatonville | 0.0083252204835% |
| | | Edgewood | 0.0097160678445% |
| | | Lake Buena Vista | 0.0103552111161% |
| | | Maitland | 0.0467282762099% |
| | | Oakland | 0.0054290866886% |
| | | Ocoee | 0.0665998229928% |
| | | Orlando | 1.1602484814906% |
| | | Windemere | 0.0075480646677% |
| | | Winter Garden | 0.0562645849996% |
| | | Winter Park | 0.1049030281159% |
| Osceola | | | 1.0734520929404% |
| | | Osceola County | 0.8372486913906% |
| | | Kissimmee | 0.1623660068722% |
| | | St. Cloud | 0.0738373946788% |
| Palm Beach | | | 8.6015943720535% |
| | | Palm Beach County | 5.5525484750526% |
| | | Atlantis | 0.0187512301690% |
| | | Belle Glade | 0.0208284459459% |
| | | Boca Raton | 0.4720690739619% |
| | | Boynton Beach | 0.3064982717771% |
| | | Briny Breezes | 0.0032574520012% |
| | | Cloud Lake | 0.0001888377980% |
| | | Delray Beach | 0.3518465794579% |
| | | Glen Ridge | 0.0005265669449% |
| | | Golf | 0.0042833496639% |
| | | Greenacres | 0.0764248356577% |
| | | Gulf Stream | 0.0106711513229% |
| | | Haverhill | 0.0010840015899% |
| | | Highland Beach | 0.0325109689349% |
| | | Hypoluxo | 0.0051530929829% |
| | | Juno Beach | 0.0167575388049% |
| | | Jupiter Island | 0.1254663748888% |
| | | Jupiter Inlet Colony | 0.0052765638499% |

| | | |
|---|---|---|
| | Lake Clarke Shores | 0.0075607749903% |
| | Lake Park | 0.0294332759980% |
| | Lake Worth | 0.1171466172298% |
| | Lantana | 0.0245071515505% |
| | Loxahatchee Groves | 0.0025311527899% |
| | Manalapan | 0.0216328223333% |
| | Mangonia Park | 0.0106965171795% |
| | North Palm Beach | 0.0443496462556% |
| | Ocean Ridge | 0.0127864978077% |
| | Pahokee | 0.0040182504447% |
| | Palm Beach | 0.1854768481233% |
| | Palm Beach Gardens | 0.2336758802557% |
| | Palm Beach Shores | 0.0141355986127% |
| | Palm Springs | 0.0380217642827% |
| | Riviera Beach | 0.1636170572828% |
| | Royal Palm Beach | 0.0492957439595% |
| | South Bay | 0.0018302740040% |
| | South Palm Beach | 0.0058666819677% |
| | Tequesta | 0.0318936145595% |
| | Wellington | 0.0501836447587% |
| | West Palm Beach | 0.5492656025415% |
| Pasco | | 4.6920872604949% |
| | Pasco County | 4.3192052398135% |
| | Dade City | 0.0558197267235% |
| | New Port Richey | 0.1498791074945% |
| | Port Richey | 0.0495299754585% |
| | San Antonio | 0.0021897921555% |
| | St. Leo | 0.0027908047615% |
| | Zephyrhills | 0.1126726140895% |
| Pinellas | | 7.9348898167775% |
| | Pinellas County | 4.5465931845535% |
| | Belleair | 0.0180957451215% |
| | Belleair Beach | 0.0042615606865% |
| | Belleair Bluffs | 0.0075026709655% |
| | Belleair Shore | 0.0004394110295% |

| | | |
|---|---|---|
| | Clearwater | 0.633863120196% |
| | Dunedin | 0.102440873796% |
| | Gulfport | 0.047893986460% |
| | Indian Rocks Beach | 0.008953453662% |
| | Indian Shores | 0.011323004874% |
| | Kenneth City | 0.017454786058% |
| | Largo | 0.374192990777% |
| | Madeira Beach | 0.022616957779% |
| | North Reddington Beach | 0.003820333909% |
| | Oldsmar | 0.039421706033% |
| | Pinellas Park | 0.251666311991% |
| | Redington Beach | 0.003611522882% |
| | Redington Shores | 0.006451352841% |
| | Safety Harbor | 0.038061710740% |
| | Seminole | 0.095248695748% |
| | South Pasadena | 0.029968921656% |
| | St. Pete Beach | 0.071791046619% |
| | St. Petersburg | 1.456593090134% |
| | Tarpon Springs | 0.101970595050% |
| | Treasure Island | 0.040652783215% |
| Polk | | 2.150483025298% |
| | Polk County | 1.558049828484% |
| | Auburndale | 0.028636162584% |
| | Bartow | 0.043971970660% |
| | Davenport | 0.005305615818% |
| | Dundee | 0.005597951255% |
| | Eagle Lake | 0.002580177987% |
| | Fort Meade | 0.007702403251% |
| | Frostproof | 0.005857603227% |
| | Haines City | 0.047984773863% |
| | Highland Park | 0.000063551182% |
| | Hillcrest Heights | 0.000005447244% |
| | Lake Alfred | 0.007489960729% |
| | Lake Hamilton | 0.002540231530% |
| | Lakeland | 0.294875668468% |

| County | Place | | |
|---|---|---|---|
| | Lake Wales | | 0.0362931721234% |
| | Mulberry | | 0.0054145607002% |
| | Polk City | | 0.0010803700093% |
| | Winter Haven | | 0.0970335760877% |
| Putnam | | 0.3848931940068% | |
| | Putnam County | | 0.3292259901829% |
| | Crescent City | | 0.0055616362943% |
| | Interlachen | | 0.0018774834489% |
| | Palatka | | 0.0469552447116% |
| | Pomona Park | | 0.0003794913447% |
| | Welaka | | 0.0008933480430% |
| Santa Rosa | | 0.7012673193513% | |
| | Santa Rosa County | | 0.5925239842160% |
| | Gulf Breeze | | 0.0619515079060% |
| | Jay | | 0.0001597858290% |
| | Milton | | 0.0466320415620% |
| Sarasota | | 2.8050438575790% | |
| | Sarasota County | | 1.9243152632510% |
| | Longboat Key | | 0.0448945885656% |
| | North Port | | 0.2096117712770% |
| | Sarasota | | 0.4842797796350% |
| | Venice | | 0.1423473845600% |
| Seminole | | 2.1411482644544% | |
| | Seminole County | | 1.5086941648390% |
| | Altamonte Springs | | 0.0813055664300% |
| | Casselberry | | 0.0800345427910% |
| | Lake Mary | | 0.0797676278270% |
| | Longwood | | 0.0617100134150% |
| | Oviedo | | 0.1031308580570% |
| | Sanford | | 0.1642434903620% |
| | Winter Springs | | 0.0622620008240% |
| St. Johns | | 0.7103333495540% | |
| | St. Johns County | | 0.6563348181310% |
| | Hastings | | 0.0000108944880% |
| | Marineland | | 0.0000000000000% |

| County | Name | Subtotal | Percentage |
|---|---|---|---|
| | St. Augustine | | 0.046510386442% |
| | St. Augustine Beach | | 0.007477250493% |
| St. Lucie | | 1.50662784352% | |
| | St. Lucie County | | 0.956156584302% |
| | Fort Pierce | | 0.159535255654% |
| | Port St. Lucie | | 0.390803453989% |
| | St. Lucie Village | | 0.000132549608% |
| Sumter | | 0.326398870459% | |
| | Sumter County | | 0.302273026046% |
| | Bushnell | | 0.006607507174% |
| | Center Hill | | 0.001312785844% |
| | Coleman | | 0.000748088199% |
| | Webster | | 0.001423546476% |
| | Wildwood | | 0.014033916721% |
| Suwannee | | 0.191014879692% | |
| | Suwannee County | | 0.161027800555% |
| | Branford | | 0.000929663004% |
| | Live Oak | | 0.029057416132% |
| Taylor | | 0.092181897282% | |
| | Taylor County | | 0.069969851319% |
| | Perry | | 0.022212045963% |
| Union | | 0.065156303224% | |
| | Union County | | 0.063629259109% |
| | Lake Butler | | 0.001398126003% |
| | Raiford | | 0.000017110236% |
| | Worthington Springs | | 0.000116207876% |
| Volusia | | 3.13032967448% | |
| | Volusia County | | 1.708575342287% |
| | Daytona Beach | | 0.447556475212% |
| | Daytona Beach Shores | | 0.039743093439% |
| | DeBary | | 0.035283616215% |
| | DeLand | | 0.098983689498% |
| | Deltona | | 0.199329190038% |
| | Edgewater | | 0.058042202343% |
| | Flagler Beach | | 0.000223337011% |

| | | | |
|---|---|---|---|
| | Holly Hill | | 0.0316158051143% |
| | Lake Helen | | 0.0049188614482% |
| | New Smyrna Beach | | 0.1040659683006% |
| | Oak Hill | | 0.0048208110870% |
| | Orange City | | 0.0335622287058% |
| | Ormond Beach | | 0.1146445164770% |
| | Pierson | | 0.0023332362510% |
| | Ponce Inlet | | 0.0238135355748% |
| | Port Orange | | 0.1775965015620% |
| | South Daytona | | 0.0452211205323% |
| Wakulla | | 0.1151293212080% | |
| | Wakulla County | | 0.1149531936470% |
| | Sopchoppy | | 0.0001071291350% |
| | St. Marks | | 0.0006899984260% |
| Walton | | 0.2685582161510% | |
| | Walton County | | 0.2242684895810% |
| | DeFuniak Springs | | 0.0170571372340% |
| | Freeport | | 0.0032901354770% |
| | Paxton | | 0.0239424538600% |
| Washington | | 0.1201244441090% | |
| | Washington County | | 0.1049084754040% |
| | Caryville | | 0.0014017574990% |
| | Chipley | | 0.0125504505600% |
| | Ebro | | 0.0002215212630% |
| | Vernon | | 0.0003613338630% |
| | Wausau | | 0.0006809055210% |
| | | 100.00% | 100.00% |

## Exhibit J

## MECHANISM BY WHICH QUALIFIED SETTLEMENT FUND ADMINISTRATOR IS TO ALLOCATE, APPORTION AND DISTRIBUTE PAYMENTS

## [TO BE ADDED]