1

1    IN THE DISTRICT COURT OF THE UNITED STATES
          FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3

     IN RE:                      Case No. 1:17-md-2804
4    NATIONAL PRESCRIPTION        Cleveland, Ohio
     OPIATE LITIGATION
5                                 May 4, 2022
     CASE TRACK THREE             12:08 p.m.
6

7

8                     - - - - -

9

10        TRANSCRIPT OF FINAL PRETRIAL PROCEEDINGS,

11        BEFORE THE HONORABLE DAN A. POLSTER,

12            UNITED STATES DISTRICT JUDGE,

13

14                     - - - - -

15

16

17

18   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
19                            801 West Superior Avenue
                              Cleveland, Ohio  44113
20                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
21

22   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
23

24

25

```
 1    APPEARANCES:
      For the Plaintiffs:          Peter H. Weinberger, Esq.
 2                                 Spangenberg, Shibley & Liber
                                   1001 Lakeside Avenue, Ste. 1700
 3                                 1900 East Ninth Street
                                   Cleveland, Ohio    44114
 4                                 216-696-3232

 5                                 W. Mark Lanier, Esq.
                                   M. Michelle Carreras, Esq.
 6                                 The Lanier Law Firm
                                   6810 FM 1960 West
 7                                 Houston, Texas    77069
                                   813-659-5200
 8
                                   Frank L. Gallucci, III, Esq.
 9                                 Plevin & Gallucci Company, LPA
                                   The Illuminating Building
10                                 Suite 2222
                                   55 Public Square
11                                 Cleveland, Ohio    44113
                                   216-861-0804
12
                                   Salvatore C. Badala, Esq.
13                                 Napoli Shkolnik
                                   360 Lexington Ave., 11th Floor
14                                 New York, New York   10017
                                   212-397-1000
15
                                   Paulina do Amaral, Esq.
16                                 Michael Jay Fuller, Jr., Esq.
                                   Alex Abston
17                                 Mildred Conroy
                                   Belinda Lower
18                                 Jason Boyd
                                   James Misocky
19
      For Walgreen Defendants:     Jeffrey A. Hall, Esq.
20                                 Bartlit Beck LLP
                                   54 West Hubbard Street, Ste.300
21                                 Chicago, Illinois   60654
                                   312-494-4400
22
                                   Katherine L.I. Hacker, Esq.
23                                 Bartlit Beck LLP
                                   1801 Wewatta Street, 12th Floor
24                                 Denver, Colorado   80202
                                   303-592-3100
25
                                   Michael Freeman
```

1    **APPEARANCES (CONTINUED):**

2

3    For CVS Defendants:        Eric R. Delinsky, Esq.
                                Paul B. Hynes, Jr., Esq.
4                               Alexandra W. Miller, Esq.
                                Anthony M. Ruiz, Esq.
5                               Zuckerman Spaeder - Washington
                                Suite 1000
6                               1800 M Street, NW
                                Washington, DC   20036
7                               202-778-1831

8                               Mark Vernazza, Esq.

9    For Walmart Defendants:    John M. Majoras, Esq.
                                Kerri Ruttenberg, Esq.
10                              Jones Day - Washington
                                51 Louisiana Avenue, N.W.
11                              Washington, D.C.   20001
                                202-879-3939
12
                                Tara A. Fumerton, Esq.
13                              Tina M. Tabacchi, Esq.
                                Jones Day - Chicago
14                              Suite 3500
                                77 West Wacker
15                              Chicago, Illinois   60601
                                312-782-3939
16

17   ALSO PRESENT:             Special Master David Cohen

18
                                - - - - -
19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>WEDNESDAY, MAY 4, 2022, 12:08 P.M.</u> |
| 2 | THE COURT:  All right.  Good afternoon, |
| 3 | everyone. |
| 4 | A whole lot of things have been filed.  I'm |
| 12:09:55 5 | trying very hard to make this abatement hearing |
| 6 | intelligible.  No Judge has ever done this.  I had hoped |
| 7 | a whole lot more would have been agreed upon between |
| 8 | counsel.  Maybe that was wishful thinking. |
| 9 | It would have been a lot more helpful to |
| 12:10:17 10 | me. |
| 11 | Candidly, it looks like I'll largely be |
| 12 | doing this on my own.  I mean, you'll be presenting |
| 13 | whatever you're presenting.  I'll be listening. |
| 14 | I'll end up doing, obviously, not what the |
| 12:10:31 15 | plaintiffs want me to do or not what the defendants want |
| 16 | me to do.  And trust me, the way I'll write it, I'll make |
| 17 | it as clear as I can to the Court of Appeals that neither |
| 18 | side was particularly helpful, but we'll get through it. |
| 19 | So first, we've got to get some ground |
| 12:10:53 20 | rules for admissibility of expert reports. |
| 21 | A whole lot of stuff's been filed.  I, you |
| 22 | know, I only want to do this once.  I believe that for a |
| 23 | proceeding like this, I could just admit the expert |
| 24 | reports of both sides, but I don't want to run some risk |
| 12:11:16 25 | that someone on the Sixth Circuit will say I did |

1    something wrong.

2              So I guess we'll just have to have, you

3    know, fairly short direct testimony from each of the

4    experts.

12:11:30 5              Everyone should presume that I have read

6    the reports.  I've thought about them.  But I don't -- I

7    mean, the defendants have objected to the admissibility.

8    Again, I think I could probably structure things and

9    overrule it, but I don't want to create

12:11:48 10   another -- another issue on appeal.

11             So unless the parties are in agreement, I

12   think that's what we'll just do.  We'll have short direct

13   testimony by everyone.  You'll have to use some of your

14   time for that.  I'm not extending this hearing.  So it

12:12:03 15  will shorten everyone's cross-examination.  If that's how

16   you want to do it, so be it.

17             So does anyone have anything more they want

18   to say about that?

19             (No response).

12:12:18 20             Okay.  Well, that's what we'll do then.

21             MR. WEINBERGER:  Your Honor, maybe I'll

22   take the opportunity to ask a question for -- to make

23   sure that we understand what you're talking about when

24   you say a short direct testimony.

12:12:40 25             THE COURT:  Well, enough to make your

1    record, Peter, because the defendants are objecting.

2                    MR. WEINBERGER:  Right.

3                    THE COURT:  I'm really not sure why they're

4    objecting, candidly.  It benefits them, too, and they can

5    use more of their time on cross, but they've raised it.

6    So again, I don't -- you know, I don't want to create an

7    issue.

8                    So you've got to put enough in so the

9    record's clear.  You're making the record of what these

10   people are saying.

11                   MR. WEINBERGER:  Right.

12                   So let me -- let me tell you what I'm

13   thinking, and then either the defendants or you could

14   react to it.

15                   We put up expert, an expert.  We have the

16   expert identify the expert report.  We have the expert

17   testify that this is a true and accurate copy of his

18   report, that it contains the expert's credentials, that

19   it contains all of the expert's opinions, the methodology

20   used.

21                   THE COURT:  Well, I don't think

22   that that's -- they're objecting to that.

23                   So there's no objection to credentials.  I

24   mean, you know, these experts are testifying.

25                   I think you've got to have them summarize

1    their conclusions.  So you're making a record so there's

2    oral testimony on what their conclusions are.

3                You don't need to go through every

4    paragraph of the report.  They can then refer to their

12:14:12  5    report for details, but you've got to get enough in there

6    so if the Court of Appeals wants to look and say, "Well,

7    I don't" -- you can say, "Here's what they said."

8                The defendants are going to have to do the

9    same thing.  I think it's somewhat of a waste of time,

12:14:29 10    but it's the same ground rules for both.

11                I mean, the defendants are saying you can't

12    just have them say, "Yes, here's my report, I've thought

13    of it, I've thought of it, I worked on it," and then the

14    report becomes testimony.

12:14:48 15                They're saying you can't do that.

16                MR. LANIER:  So they can -- Your Honor,

17    Mark Lanier here.

18                So they can just read the report out loud

19    as we ask them each opinion?

12:15:03 20                THE COURT:  Yeah, right.  They can

21    read -- they can read sections of their report, sure.

22                MR. LANIER:  I'm with you, it seems like a

23    waste, but we'll do whatever we need to do.

24                THE COURT:  Well, as I said, Mark, I

12:15:18 25    believe that I could -- you know, that there's ways

1    around that, that rule, but I don't think it -- no one

2    wants to do this twice.

3                    MR. LANIER:  Agreed.

4                    Judge, I'm not questioning you.  I'm -- I

12:15:32  5    find it -- I'm sure you find it twice as frustrating as I

6    do, but we'll do whatever needs to be done.

7                    We'll make it work, Judge.

8                    THE COURT:  Just that basically they have

9    to give the, you know, essentially it's a summary and

12:15:49 10    their key findings and conclusions, they have to recite,

11    recite them orally.

12                    MR. LANIER:  Understood.

13                    THE COURT:  Okay.  But no one has to go

14    through as if this were a jury.  That would be insanity.

12:16:01 15                    So that's what we'll do.

16                    MR. LANIER:  Okay.

17                    THE COURT:  All right.  Now, the

18    scheduling, you know, the question is do we want to start

19    at 8:30 or do you want to start at 9:00?  I don't really

12:16:18 20    care.  I mean, my plan is to get, you know, six, seven

21    hours of testimony per day.

22                    If we do more than that, everyone will just

23    get exhausted and that doesn't make any sense, but we

24    want to get through it.

12:16:33 25                    I'm doing whatever else I need to do during

1    the noon hour.

2                       I think there's one time I have to take a

3    plea or do something at 3:00 o'clock because of the

4    scheduling of that particular jail.  I couldn't do it

12:16:45  5    during the noon hour.

6                       But what, you know, you tell me what -- you

7    want to start at 9:00, that's fine.  If you want to start

8    at 8:30, we can start at 8:30.  I don't particularly want

9    to do it much earlier than that, but it's really up to

12:17:00 10    all of you.

11                       MR. LANIER:  Judge, I'll be bold and speak

12    out.

13                       As an early bird, 8:30 sounds marvelous to

14    me and we'll be there ready to go, but I'm obviously -- I

12:17:16 15    don't care.

16                       THE COURT:  It's up to the defendants,

17    right.  I mean, it's, you know, it's not a big deal to me

18    either way, but so plaintiffs say they're willing,

19    they're okay with 8:30.

12:17:25 20                       What about the defendants?

21                       MR. DELINSKY:  Judge, could we take it on a

22    day-by-day basis?

23                       THE REPORTER:  Wait.  Who's talking?

24                       Who's talking?  Oh, there you are.  Okay.

25                       Sorry, I see you Eric.  Go ahead.

1      MR. DELINSKY:  Nice to see you, Sue, by the

2  way.

3      Judge, could we take it day by day so, for

4  instance, we can start 8:30 on Tuesday, that's the first

12:17:45  5  day, and assuming my co-defendants don't have objections,

6  then we'll just see where we are each day?

7      THE COURT:  Okay.  Why don't we do this?

8      Who was that speaking?  That was --

9      MR. DELINSKY:  That was Eric, Your Honor.

12:17:55 10      THE COURT:  All right, fine.

11      Eric, why don't we do this, we'll plan to

12  start at 8:30.  If there's a particular reason or a

13  particular witness who can't do it until 9:00, then we'll

14  be at 9:00 that day.

12:18:08 15      And my feeling is we could do our best,

16  particularly since some of these people are out of town,

17  if we can go a little later and wrap up a witness at the

18  end of the day, we will.

19      So, I mean, rather than start someone and

12:18:22 20  go for half an hour, I probably won't do that.  So just

21  we'll try and make it understandable to everyone.

22      So that's sort of how we will be a little

23  flexible at the end to try and complete witnesses, but

24  obviously sometimes we're not going to be able to.

12:18:38 25      I don't control the cross-examination.

1          All right.  There's one day, May the 12th,

2     I have a Zoom meeting that's important from 9:00 to 10:00

3     so we're going to start at 10:00 o'clock on the 12th.

4          Now, I was uncertain, I'm hoping we're

12:19:02  5     going to be able to wrap up by Thursday, May 19th, but I

6     was a little unclear.

7          If we don't wrap up Thursday, May 19th, had

8     we agreed there would be no trial on the 20th and then we

9     would wrap up on the 23rd?  Or was I the only one who had

12:19:21 10     that?

11          MR. MAJORAS:  John Majoras, Your Honor.

12          Defendants agreed with that.

13          THE COURT:  All right.  So, John, you --

14          MR. WEINBERGER:  That was because of a

12:19:30 15     conflict that you had, Your Honor, on the 19th?

16          THE COURT:  Well, I thought I might go out

17     of town but I'm not -- I'm not going out of town.

18          MR. WEINBERGER:  Well, then why don't we

19     use the 20th?

12:19:41 20          THE COURT:  Well, it's okay with me.  It's

21     okay with me.  So we'll use the 20th if we need it.

22          All right.  If we wrap up, we'll wrap up.

23     Again, we're not going to have closing arguments.  We'll

24     just have post-hearing briefs.

12:19:58 25          So we'll have the 20th, if needed.

1        We should be able to wrap up on the 20th,

2   but I'm not -- I've not scheduled anything critical on

3   the 23rd, Monday, the 23rd.  If we need it, we need it.

4        All right.  We've got the maximum of 25

12:20:21  5   hours of direct and cross for each side.  I'll keep the

6   record.  I think I allowed a 30-minute introductory

7   statement to each side, which we can have.  You

8   don't -- I mean, candidly, I don't know if we need it,

9   but I'll allow that.

12:20:52 10        All right.  Mask protocol, I think it's

11   still a good idea for everyone to wear a mask except when

12   speaking.  And, of course, the witness takes off his or

13   her mask while testifying.  I think that's a wise idea,

14   unless someone has a strong objection to that.

12:21:13 15        I think we should -- basically that's what

16   we did for phase one.  I think we should do it for phase

17   two.

18        Anyone have any strong objection to that?

19        MR. LANIER:  Your Honor, in phase one you

12:21:25 20   did allow us at counsel table, I think, to take them off

21   if we're comfortable being the proper distance from each

22   other, as long as the counsel tables are kept separate.

23        I don't remember if that's the way it was

24   or if that was just my dream that it was that way.

12:21:43 25        MR. WEINBERGER:  We all wore masks.

1     MR. LANIER:  Oh, we did?

2          THE COURT:  I think everyone, everyone wore

3  a mask.

4          I wore a shield because I wanted people to

12:21:52  5  see my face, and I wasn't near everyone.

6          My recollection is that, unless you were

7  conducting an examination from counsel table, and you

8  generally didn't, I think most people did the lectern.

9          MR. LANIER:  I probably didn't remember

12:22:06  10  right because of oxygen deprivation, but I will certainly

11  follow your rules and will do that.

12          THE COURT:  Well, I think it's better to do

13  that.

14          MR. WEINBERGER:  Mark didn't realize that I

12:22:19  15  got my second booster so.

16          THE COURT:  Well, I -- you know, many of us

17  are -- well, everyone's younger than I am, but we're

18  not -- no one's real young.  I just think it makes sense,

19  so that's what we'll do, we'll do the same thing.

12:22:34  20          All right.  Defendants filed two objections

21  late yesterday or early in the morning.

22          I have looked at them.  I think we can try

23  to address them now.  It's the last time we're going to

24  have any hearing, and I think people need to know what --

12:23:01  25  what is going on.

1          The first one had to do with -- something

2   to do with Fraser.  There was an issue with her

3   testimony, and I don't --

4          MS. MILLER:  Judge Polster, Sasha Miller

12:23:28  5   for CVS.

6          That was filed on behalf of the defendants.

7   I'm happy to take you through the filing.

8          THE COURT:  I mean, my feeling is if you

9   think this is new, then I'll direct her to be deposed

12:23:42 10   between now and when her testimony is.

11          I mean, I want to -- I mean, if -- I mean,

12   I think, quite frankly, it's crazy to have her on without

13   either side being free to ask her about, you know, the

14   proposals for things in her county, whether it makes

12:24:02 15   sense, whether they've done it before, what their

16   experience has been.

17          I mean, what the heck, if she's not doing

18   that, I'm not sure what the value of her testimony is.

19          MS. MILLER:  Well, Your Honor, what we were

12:24:15 20   focused on in the motion is that she was going

21   to -- she's been disclosed as giving testimony about the

22   gaps between what they're doing in the county and what

23   Dr. Alexander and plaintiffs' abatement plan have

24   proposed.

12:24:33 25          And there's a history here, Your Honor.

| | |
|---|---|
| 1 | We sought their -- we sought Ms. Fraser's |
| 2 | deposition in advance of the abatement phase, |
| 3 | specifically on the topic of plaintiffs' abatement plan, |
| 4 | and plaintiffs objected to that and said Ms. Fraser will |
| 12:24:49  5 | not be offering testimony on plaintiffs' abatement plan. |
| 6 | THE COURT:  Well, what is she testifying |
| 7 | to?  The only issue in this trial is -- is the abatement |
| 8 | plan. |
| 9 | MS. MILLER:  Well, the initial disclosure, |
| 12:25:05 10 | Your Honor, was about the programs in the county, but it |
| 11 | was only subsequent to her deposition that plaintiffs, in |
| 12 | filing their witness disclosure, stated she would be |
| 13 | testifying, offering testimony, about the gaps between |
| 14 | the programs in the county. |
| 12:25:20 15 | THE COURT:  Ms. Miller, Ms. Miller, gaps in |
| 16 | the county are not relevant to this hearing. |
| 17 | MR. WEINBERGER:  Your Honor. |
| 18 | THE COURT:  The only thing -- the only |
| 19 | thing that's relevant is what, if any -- what, if any, |
| 12:25:38 20 | programs, whatever, that I'm going to order as proper |
| 21 | abatement for the nuisance that the jury found the |
| 22 | defendants responsible for. |
| 23 | So that's -- I mean, anyone who's not |
| 24 | testifying about that, I'm just going to say it's |
| 12:25:56 25 | irrelevant, we don't need that witness. |

1          So I don't want Ms. Fraser to talk about

2     generally what goes on in her county.

3               I mean, the only thing that's relevant is

4     what -- I mean, if she wants to say, "Look, this is what

12:26:11  5     we're doing now to try and help people who have Opioid

6     Use Disorder or, you know, suffering from the effects of

7     the opioid epidemic, this is what we're doing now and

8     this is how much it costs and this is what we need to do

9     if we had the money," I mean --

12:26:35 10               MR. WEINBERGER:  Your Honor.

11               THE COURT:  I mean, what else is she going

12     to testify to?

13               MR. WEINBERGER:  Your Honor, Pete

14     Weinberger.

12:26:43 15               At Page 43 of her deposition that was taken

16     by Ms. Miller, she was asked the following question,

17     Ms. Fraser:

18               "So there is some overlap between the

19     services and the programs that are currently offered in

12:26:59 20     Lake County and those that are contained in the proposed

21     abatement plan, is that right?

22               "Answer:  Yes.  But the current services

23     and supports don't go as far, are not as comprehensive

24     and are not as holistic in the approach as is outlined in

12:27:22 25     the abatement plan."

1          At no --

2                 MS. MILLER:  And then -- oh, I'm sorry,

3     Pete.

4                 THE COURT:  Well, look, the only value of

12:27:31  5     her testimony is her firsthand knowledge and experience

6     of what Lake County is doing and why they're doing it,

7     and if she thinks that there are things which they would

8     do if they didn't have the money, she can talk about

9     that.  And then the defendants can cross-examine her.

12:27:53 10                 And, you know, if you point out, "Well,

11     guess what, you really do have the money and you're not

12     doing this, or this isn't effective" or whatever, and,

13     you know, if Alexander has said, "Lake County should do

14     X, Y and Z," and Fraser says, "Well, we tried Y and Z and

12:28:10 15     it's not effective," she has firsthand knowledge.  All

16     right?

17                 She's not an expert.  She's a fact witness.

18     And both sides should be free to question her about her

19     actual knowledge what Lake County has been doing, what

12:28:27 20     they'd like to be doing, and how that fits in with what

21     either the plaintiffs have proposed or what the

22     defendants think are necessary.

23                 So I mean, I don't -- I do not understand

24     the defendants' objection, but if you think you were

12:28:43 25     misled and you need to depose her, do a quick deposition,

1    an hour or two, you can do it.

2                    MS. MILLER:  Thank you, Your Honor.

3                    We appreciate that.

4                    THE COURT:  I mean, otherwise there's no

12:28:56  5    relevance to her testimony, Ms. Miller, unless it's tied

6    to what the plaintiffs are proposing or the defendants

7    are proposing.

8                    MS. MILLER:  And, Your Honor, the basis for

9    the motion was that I asked Ms. Fraser questions

12:29:12 10    specifically about the differential between the programs

11    currently offered by the county and Alexander's abatement

12    plan, and she testified clearly, "I've not done any

13    evaluation like that or analysis."

14                    And subsequently in their witness

12:29:29 15    disclosures, plaintiffs stated that she would be

16    testifying on that topic.

17                    And so we were -- we did not have the

18    opportunity to fully depose her.

19                    THE COURT:  All right.  If you -- if

12:29:38 20    you -- I mean, you know, you can -- you can take a two

21    hour, up to two hours and depose her just on that.  You

22    know, she's -- you can ask her point blank, all right,

23    "What are you going to say about Alexander's plan?"

24                    And she'll say it, and then you can

12:29:54 25    cross-examine her, and you'll know exactly what she's

|   |   |
|---|---|
| 1 | going to say. |
| 2 | I don't know what she's going to say, but |
| 3 | presumably she's looked at it and she's got to be in a |
| 4 | position to say -- all right, if she says, "Look, we |
| 12:30:06  5 | don't need this in Lake County," well, that's going to be |
| 6 | a lot more conclusive to me than what some expert says. |
| 7 | She's there. |
| 8 | MS. MILLER:  Thank you, Your Honor. |
| 9 | THE COURT:  If she says, "We need it" and |
| 12:30:19 10 | why, well, I think that's probative.  Now you can |
| 11 | cross-examine her on it.  What the heck, she's the person |
| 12 | there responsible for providing the services in Lake |
| 13 | County; not some expert who's opining on what he or she |
| 14 | thinks Lake County needs. |
| 12:30:33 15 | All right.  That takes care of her. |
| 16 | Now, we -- |
| 17 | MS. FUMERTON:  Judge Polster. |
| 18 | THE COURT:  Yes. |
| 19 | MS. FUMERTON:  This is Tara Fumerton on |
| 12:30:42 20 | behalf of Walmart. |
| 21 | In the motion, we actually referenced that |
| 22 | the same arguments apply to the Trumbull County |
| 23 | representative April Caraway. |
| 24 | She was asked the exact same line of |
| 12:30:51 25 | questions and responded similarly that she had not taken |

1    any analysis to determine -- compare essentially what

2    Dr. Alexander is proposing and what the county is

3    currently doing.

4                So we would ask that the same ruling apply

12:31:06  5    to Ms. Caraway.

6                THE COURT:  I don't quite understand why

7    these witnesses would have said that or what -- I mean,

8    that's the whole point of having their testimony, to say,

9    "Look, this is -- this is the problem in my county, this

12:31:25 10    is -- we have X amount of money and this is how we're

11    spending it, and if we had -- if we had more money, these

12    are the things we need to do which we're not able to do

13    now."

14                What -- I mean, nothing else would be

12:31:38 15    relevant to this hearing.  So I don't quite understand

16    how anyone -- why the plaintiffs didn't make that clear

17    and why the defendants thought that these witnesses were

18    doing anything else.

19                I mean, if they're not doing that, what

12:31:56 20    would be the relevance of their testimony?

21                MR. WEINBERGER:  Your Honor, both of these

22    witnesses were subjected to 14 hours of deposition before

23    we tried the case, and another -- I can't

24    remember -- hour-and-a-half of deposition.

12:32:10 25                And they were asked, Your Honor, if they

1    didn't -- if they weren't asked questions about how they

2    felt their current programs were inadequate, or the

3    defendants didn't get a full picture of that, that's the

4    defendants' problem, not ours.

12:32:24  5                  What the defendants are --

6                  THE COURT:  Look, I'm -- they want

7    two -- they want two hours and it's got to be focused,

8    you know, point -- very specifically as to, you know, as

9    to what they think about Alexander's proposal, why they

12:32:41 10    think it's needed or why it's not.

11                  Okay?  That's it.  And no wandering around.

12                  So that's for Fraser, and who was the other

13    witness?

14                  MS. FUMERTON:  Your Honor, April Caraway.

12:32:58 15                  THE COURT:  Caraway.  All right.

16                  All right.  Now, the other -- the

17    defendants are claiming that Keyes and Alexander are new

18    opinions, not rebuttal.

19                  I mean, I'm going to let them testify to

12:33:23 20    whatever they want, okay?  You can cross-examine them.

21    All right?  I don't -- I have neither the time nor the

22    inclination to wade through and determine if there's

23    anything new.

24                  All right?

12:33:35 25                  I assume the plaintiffs are saying they are

1    specifically rebutting to something the defendants are

2    saying.  Right?

3                    MR. WEINBERGER:  Correct.

4                    MR. LANIER:  Correct.

12:33:45  5        THE COURT:  Well, they're allowed to do

6    that.  That's what a rebuttal -- what a rebuttal report

7    is.

8                    What -- what are the defendants claiming

9    that these two people are saying that's brand new, that's

12:34:01 10   unrelated to what they said before as opposed to saying,

11   "All right, you know, I gave you my first report; defense

12   expert says X, Y and Z and here's what I'm saying"?

13                   MR. DELINSKY:  So, Your Honor, to take

14   Caleb Alexander as an example, it's a short supplement,

12:34:21 15   it's two paragraphs, but in the second paragraph the

16   plaintiffs employed a new statistical analysis based on a

17   model that Dr. Alexander's -- the company he owns has

18   created and run.  That model hadn't been used in this

19   case previously, to my knowledge.  It had been used in

12:34:37 20   other cases such as in the Washington State case.

21                   But more importantly, regardless of what

22   model he uses, it provides new statistical

23   analysis/analyses about how long it takes for users of

24   opioids, including prescription opioids, to get to the

12:35:01 25   point of an overdose, that I don't believe responds to

| | |
|---|---|
| 1 | anything in -- any point made in our experts', certainly |
| 2 | doesn't respond to any apportionment point we make. |
| 3 | MR. WEINBERGER:  Judge. |
| 4 | THE COURT:  Well, I'm assuming it does.  If |
| 12:35:20 5 | it doesn't, I won't allow it. |
| 6 | MR. WEINBERGER:  Let me explain.  Let me |
| 7 | explain how it does, Your Honor. |
| 8 | THE COURT:  All right. |
| 9 | MR. WEINBERGER:  So the defendants, the |
| 12:35:28 10 | defendants have multiple experts saying that their |
| 11 | contribution to the opioid epidemic ended when the volume |
| 12 | of pills that they were dispensing decreased after 2013, |
| 13 | '14 or '15. |
| 14 | In response to that, this report which |
| 12:35:44 15 | takes into account a 2022 study that was done, a modeling |
| 16 | that was done by Dr. Alexander published in the journal |
| 17 | "Addiction" makes the point that people that were |
| 18 | dispensed pills, prescribed and dispensed prescription |
| 19 | opioid pills in 2011, continue to make up a significant |
| 12:36:08 20 | portion of those patients who are addicted and require |
| 21 | treatment in 2019. |
| 22 | So that is in direct response. |
| 23 | THE COURT:  All right.  That sounds to me |
| 24 | as proper rebuttal.  That's response so I'm overruling |
| 12:36:22 25 | that objection. |

1           Now, what -- what -- what's the issue with

2      Dr. Keyes that you think is brand new and that's not

3      responding to something one of the defendants' experts

4      say?

12:36:42  5           MR. HYNES:  Your Honor, Paul Hynes for CVS.

6           I think one issue we had -- and it applies

7      to both experts -- is that in the conference with Special

8      Master Cohen that preceded the trial order, we understood

9      that these rebuttal reports would be limited to

12:36:55 10      apportionment and in responding to the defendants'

11      apportionment experts.

12           And Dr. Keyes' report, for example, does

13      not deal with apportionment, but goes back into her

14      gateway theories which were the subject of her

12:37:09 15      track -- of her phase one testimony.

16           MR. WEINBERGER:  No, that's not -- A,

17      that's not true.  It wasn't limited.

18           And second of all --

19           THE COURT:  Whether it's limited or not,

12:37:18 20      the issue is whether her supplemental report is

21      responding to something that one of the experts, one of

22      the defense experts says about what she said.

23           MR. WEINBERGER:  Yes.

24           THE COURT:  So it's rebuttal.

12:37:29 25           If it's not, it's not.  Pretty simple.

1          MR. WEINBERGER:  It is.

2          Two things, Your Honor.

3          First part of the report addresses multiple

4     defense experts' theory that gateway, the gateway theory,

12:37:44 5     you know, prescription opioids leading to heroin and

6     Fentanyl, is either not valid or is not of the high

7     percentage, 80 percent, that Dr. Keyes testified to in

8     her direct in the phase two -- phase one trial, excuse

9     me, Your Honor.

12:38:04 10          And that it also addresses the issue of

11     whether she is overcalculating the number of people who

12     likely have OUD in Lake and Trumbull County based upon a

13     statistical study that they say she should be relying on.

14          She answers that, that that statistical

12:38:29 15     study undercounts.  That's number one.  That's her first

16     area of rebuttal.

17          And the second portion of her report

18     directly rebuts the concept raised in the defense expert

19     reports that the harm can be apportioned among the

12:38:47 20     various players that contributed to the opioid epidemic,

21     and she opines it cannot be apportioned and gives the

22     reasons for that.

23          THE COURT:  All right.  Well, that's fine.

24     It sounds like it's proper rebuttal, so I'm overruling

12:39:01 25     that objection.

1          All right.  So again, this is, you know,

2     this is what I'm going to have to decide and I want

3     everyone to focus on these issues.  All right?

4          You know, scope of abatement by category.

12:39:27  5     What services or programs for Lake County and Trumbull,

6     Trumbull County are properly considered abatement for the

7     public nuisance the jury found?

8          So that's one.

9          Then obviously with that, some estimate of

12:39:44 10     the costs for each category.

11          Then, you know, for how many years should

12     an abatement plan go.

13          I mean, the experts run things out for 15

14     years.  I think at some point some of the defendants or

12:40:06 15     defendants' experts are saying the Court shouldn't do

16     anything for more than one year.

17          I think the plaintiffs are

18     suggesting -- seem to be suggesting, well, we have a

19     five-year plan, and at the end of the five years, the

12:40:19 20     parties can come back in front of the Court and give an

21     assessment, and then the Court makes some decision as to

22     is something further needed, and if so, what.

23          That's about as far out as people

24     reasonably can predict, and no one can really determine

12:40:36 25     with any reasonable degree of certainty what's going to

1    happen in 15 years.

2                    Then the issue of, you know, whether -- is

3    it possible to apportion whatever I order among these

4    three defendants, or should it just be one-third,

12:41:01  5    one-third, one-third?

6                    And somewhat related to that is is

7    there -- is it, can the defendants demonstrate that

8    there's a rational basis to allocate some portion of

9    whatever I order to one or more other responsible parties

12:41:25 10    or groups of parties?

11                    Then should the money be paid directly to

12    the county or do we have to create some, some structure,

13    some Special Master, some entity to receive the money and

14    then distribute it to the county?  The problem is if we

12:41:52 15    do that, the defendants are going to have to pay for it.

16    So if the defendants are pushing for it, you know, you're

17    going to have to pay for it, obviously.

18                    I've been thinking, you know, of just, say

19    hypothetically, I have a five-year plan of having the

12:42:12 20    money be distributed annually, and require each county to

21    certify in advance that they are only going to spend this

22    money on the following categories of programs or

23    services, and to certify at the end of the year that

24    that's what they've done.

12:42:31 25                    And, you know, if there's a county

1    executive, then he or she would do it.  That's what we

2    have in Cuyahoga County.  I really didn't check to see

3    what Lake and Trumbull have, if they have commissioners

4    or an executive, but, I mean, have a certification like

5    that.

6                 And that way, I think if it's done

7    annually, that's the way to do it.

8                 I don't think it's a good idea to hand the

9    county five years of -- five years of payments.  I'm not

10   going to suggest that.  I'm not worried about these

11   defendants going out of business in the years two, three,

12   four or five, so I'm suggesting that.  But again if we

13   have to create some entity to oversee it, we would need

14   that.

15                You know, injunctive relief, I'm going to

16   have to determine that.  I've already told the parties

17   what my inclination is, and it has to do with each

18   defendant certifying that they have in place a system

19   that accomplishes certain things.  And if they don't,

20   they'll put it in place.

21                But so those are the things that, you know,

22   that I'll want testimony on and I'll have to decide

23   whenever I make my decision.

24                So I think that covers what I have.

25                Special Master Cohen, did I leave out

1    anything essential that I should have addressed?

2              SPECIAL MASTER COHEN:  On my list, Judge, I

3    don't see any gaps.

4              THE COURT:  All right.  Well, from the

12:44:30   5    defendants -- why don't we start from the plaintiffs'

6    side?

7              Anything that -- anything else that you

8    think we should address now?

9              MR. WEINBERGER:  Your Honor, one -- one of

12:44:41  10    the issues that's been briefed that may take some time in

11    terms of testimony is the issue of -- I'll call it

12    generally speaking -- the collateral source tool, and

13    whether the defendants can -- this is -- we're setting

14    aside the issue of settlements and monies that the

12:45:12  15    counties may have received, for example, from the

16    national settlement.

17              I'm not talking about those set-offs, which

18    were -- we understand will occur, and we have no

19    particular issue with that.

12:45:24  20              But there appears to be an attempt here,

21    looking at the defense expert reports, to have the Court

22    consider third party sources of funding, grants, programs

23    paid by tax dollars, all of which --

24              THE COURT:  Yeah, well, I'm not -- I'm -- I

12:45:49  25    see no reason to get into that.

1        I mean, I'll -- whatever, you know, the

2    point is what, what do these counties need to spend, all

3    right, over the next several years on what is -- what I

4    determine is properly considered abatement of the

12:46:11  5    nuisance found by the jury?

6        And again, I know the defendants are

7    somehow arguing that the only thing that can be abated is

8    the drugs themselves, so I either prevent the defendants

9    from selling opioids, dispensing opioids, or I do

12:46:32 10    nothing.

11        Well, I've told the parties I'm

12    categorically rejecting that.

13        First, I have no intention of prohibiting

14    the defendants from dispensing opioids.  I think that

12:46:45 15    probably would be illegal, and I can't imagine any court

16    upholding that, and I can't imagine -- under no

17    circumstances would I do it.

18        So the issue is the nuisance that the jury

19    found was the impact, the effect.  I mean, that

12:47:02 20    was -- that was -- the harm was the fact that they

21    accepted in some respects the gateway theory that people

22    became -- became addicted and developed Opioid Use

23    Disorder as a result of the defendants' conduct.

24        And everyone knows that has, you have

12:47:21 25    to -- you have to help those people.

1          So that's the nuisance.  The nuisance and

2     the impact on the county is that they have lots of

3     residents who are living there and need help if they're

4     going to be productive citizens of that county.

12:47:37  5          And if not, they are a nuisance because,

6     you know, they could die, they can commit crimes, they

7     can be, you know, homeless.  I mean, that's -- you know,

8     that's the nuisance.

9          It's not so much the drugs themselves; it's

12:47:53 10    the fact that people ingest the drugs, so the drugs

11    become the people who, in a nutshell -- the drugs aren't

12    just sitting around.  If the drugs were just in the

13    pharmacy, there's no nuisance for any drug in a pharmacy.

14    The nuisance is only when there's overuse and diversion,

12:48:16 15    and people get addicted or dependent.

16          And then they, the people themselves,

17    become the nuisance.  I don't know if I ever clearly said

18    that.  I mean, that's -- so the nuisance is the

19    people -- is the people who, without help, are a huge

12:48:32 20    problem for the counties.

21          So I'm not going to -- I'm not going to

22    worry about insurance or grants.  Obviously tax dollars,

23    that's where it's coming from, so the question -- so

24    that's what -- that's what any -- anything I order the

12:48:50 25    defendants to pay, it's going to address that.

1          So I'm -- I'm not inclined to consider

2     those things.

3              MR. DELINSKY:  But, Your Honor, if I may

4     for one second.

12:49:00  5          Number one, CVS has not had an opportunity

6     to brief this issue.  Plaintiffs included it in their

7     trial brief.  That was the first time, and this is a very

8     significant issue that will require substantial briefing.

9              Number two, what we're talking about meets

12:49:14 10    exactly what you're saying, Your Honor.  In other words,

11     if you were to determine that it is appropriate

12     abatement -- of course, over defendants' objection -- to

13     provide for treatment, treatment dollars for residents of

14     the counties to help address their Opioid Use Disorder,

12:49:33 15    the point we'd be making is some portion, some

16     significant portion of that treatment already is

17     available, whether it's from Medicare, Medicaid, private

18     insurance.

19              There's any number of ways that that's

12:49:48 20    available, and it's a significant funding source.

21              Third, Your Honor, you addressed this

22     issue.  I know there's been so many orders, and I hope --

23     I may not get it quite right, but you addressed this

24     issue in a *Daubert* motion in Track 1 regarding --

12:50:06 25    actually it was a *Daubert* motion against Dr. Alexander.

1          And what you -- I'm paraphrasing, Judge, so

2     I really don't mean to put words in your mouth -- but

3     what I read your opinion to state back then, I think this

4     was in August or September of '19, was that you would

5     consider this at trial, you'd hear evidence of these

6     other funding sources and how it works, and because it's

7     a Court of equity you would determine the degree to which

8     that impacts the needs of the community.

9          That's the right way to proceed here,

10    exactly as the Court outlined, that Your Honor will hear

11    evidence from our witnesses of the degree to which

12    Medicaid will provide for addiction treatment if the

13    patients can be reached, the degree to which private

14    insurance does and will continue to, and then Your Honor

15    will have the information.

16          Defendants simultaneously will have had

17    their opportunity to make their record in the event Your

18    Honor does not accept our position.  We can brief it in

19    post-trial briefing so that we have an opportunity, CVS

20    at least, to lay out our legal arguments as to why you

21    should consider it.

22          So that's what I propose is the correct way

23    forward.

24          THE COURT:  Well, if you want to spend your

25    time putting in, you know, witnesses who talk about

1     Medicare and Medicaid, fine; private insurance.

2                    But I, you know, and I don't think there's

3     anything in the law that suggests that defendants get a

4     windfall or something if they -- if someone thinks that

12:51:41  5   Medicaid, that Medicaid may fund something.

6                    Who knows what Medicaid's going to continue

7     to do.  All right?

8                    MR. DELINSKY:  Your Honor, you --

9                    THE COURT:  Some of these people

12:51:54 10   have -- well, most of them have -- the insurance is

11    Medicaid.  Presumably the county's not -- the county's

12    not providing money, double funding people who have

13    private insurance.

14                   So I mean, if you want to spend your

12:52:15 15   limited hours on that, I can't prevent you from doing it.

16    Whether I'll -- you know, I'm telling you I may or may

17    not even consider it, but if -- it's your 24 hours,

18    Mr. Delinsky, so --

19                   MR. DELINSKY:  All right.  Well, thank you,

12:52:30 20   Your Honor.

21                   THE COURT:  -- if you want to put it in,

22    put it in.

23                   MR. DELINSKY:  Thank you, Your Honor.

24                   And I believe it's 25.  I just want to make

12:52:36 25   sure you're not docking me an hour.

1          THE COURT:  Oh, I think I said 25.

2          MR. DELINSKY:  Okay.  Your Honor, just one

3    point and, look, we can move past this, but in your

4    order, the one I was referring to, Your Honor did devote

12:52:49  5    some sentences to explaining the following principle:

6    That the remedy of abatement is not a remedy of

7    punishment.  It is -- it is a remedy to figure out what

8    needs to be done to abate the nuisance.

9          And, of course, there's disagreements about

12:53:04 10    what that is, but putting those disagreements aside, I

11    think the point Your Honor was driving at in that moment

12    was that really what we're looking at, unlike a

13    negligence case or an intentional tort, really what we're

14    looking at here is what is needed to address the nuisance

12:53:25 15    that exists in the community.

16          And if that funding comes from someplace

17    else, then it may not -- you know, the funding that is

18    needed to address it is different.  And we don't think of

19    windfalls, we don't think of the concepts that may be in

12:53:39 20    play in a negligence suit or an intentional tort because

21    the remedy here is equitable, and it's exclusively to

22    abate a nuisance and not to punish.

23          So, Your Honor, we don't have to -- there

24    will be briefing on this.  It's a significant issue.  I

12:53:54 25    appreciate the opportunity for us to make our record.

1          THE COURT:  Okay.  But the point is if

2     you're making that argument, you have to then agree that

3     if for some reason, if for some reason, though, that

4     funding changes or ceases to be available, the defendants

12:54:08  5     are conceding they've got to pick it up.

6          MR. DELINSKY:  That's an issue we very well

7     will discuss and will be --

8          THE COURT:  Well, if you're not willing to

9     do that, then you're wasting your time even raising it,

12:54:20  10    Mr. Delinsky.  All right?  I mean, because you're

11    undercutting your own argument.

12          You're saying, "All right, these things

13    need to be done, but they're already being done and being

14    paid for by X, Y and Z and the counties don't need the

12:54:36  15    money," okay, but then you've got to concede that if that

16    changes over years two, three and four, then the

17    defendants will pay it.

18          If you're not willing to do that, I think

19    you're wasting your time.  You're wasting some of your 25

12:54:50  20    hours.

21          MR. DELINSKY:  Your Honor.

22          THE COURT:  And no Court of Appeals would,

23    I don't think.

24          MR. DELINSKY:  Your Honor, the proposal

12:54:58  25    that CVS has put in addresses that issue and would

1    provide for that flexibility, mindful, of course, Judge,

2    any time we talk about treatment, okay, and we talk about

3    the effects of the nuisance, I just feel compelled to say

4    we object to taking the remedy that far, but subject to

12:55:14  5    that objection, we have provided that.

6                THE COURT:  You may object to it, but as I

7    said, the nuisance, the nuisance is the people, and

8    what -- and the burden that they're placing upon the

9    county.

12:55:33 10                Again, to say that, "All we have to do is

11    abate the drugs," fine, if you -- you know, "And all a

12    Court can do is prevent the defendants from dispensing

13    opioids," you give that argument, but I don't -- I mean,

14    it's going to fall on deaf ears for me.  And I can't

12:55:53 15    imagine any Court of Appeals would think you were being

16    serious, for the nuisance has got to be the people who

17    have ingested the drugs and are a big problem because

18    they've got -- they are addicted or dependent.

19                That is the nuisance that the counties have

12:56:09 20    to deal with, and that's what I'm going to come up with a

21    plan to abate.

22                And I can't say it any clearer.  I may have

23    never said it that clearly, but I think that's what it

24    is.  So we should focus, should focus on that.

12:56:30 25                MR. WEINBERGER:  Your Honor, can I address

1    my friend Mr. Delinsky's comments for just a moment?

2               THE COURT:  Okay.

3               MR. WEINBERGER:  Not to belabor it.

4               So it's interesting that he references

12:56:43  5   either a negligence or an intentional tort case.

6               Well, in this case the jury found that the

7    defendants acted intentionally and illegally, and to

8    suggest that they get a windfall from funding in the

9    future that is uncertain and unclear, you know, runs

12:57:05 10   contrary to every aspect of collateral source -- of the

11   collateral source rule.

12               And, in fact, just recently Judge Breyer in

13   San Francisco ruled exactly that way, that the evidence

14   of collateral sources by way of funding or by way of tax

12:57:24 15   dollars does not come into evidence.

16               Now, the defendants, what you've said to

17   the defendants is, well, they can use their time to

18   present this evidence.

19               Well, if they have -- if they're going to

12:57:38 20   use their time to present this evidence because you're

21   ruling you'll at least hear it, then we have to spend

22   time to cross-examine those issues.

23               And so, for example, we have to go through

24   our grants, grant applications where the grant

12:57:52 25   applications clearly say that you have to certify that

1    there are not other sources of funding before you can get

2    those grants, or where Medicaid and coverage for Opioid

3    Use Disorder is dependent upon future legislation,

4    regulations and whether or not the State of Ohio

5    continues to opt into the Medicaid --

6                    THE COURT:  Medicaid expansion, that's

7    right.

8                    Okay, fine, but I know -- I know that.

9    Okay?  You don't need to put witnesses on.  Everyone

10   knows that, that it's just fortunate that Ohio opted in.

11                   But any -- and it was not done by an act of

12   the legislature.  It was the control Board, that Governor

13   Kasich managed to do an end run around the legislature

14   and Governor DeWine has continued it, but we have an

15   election.  You know, presumably Governor DeWine will

16   continue, but he doesn't have to.

17                   The point is so it's all conjecture, so

18   again I don't -- I don't think it's particularly

19   probative, but, I mean, those are the facts.  The facts

20   aren't in dispute that right now we have Medicaid

21   expansion.  It might continue.

22                   Grants, I don't think anyone should

23   spend -- I mean, you know, you may get a grant, you may

24   not, okay, so but again, I don't think anyone should

25   spend a great deal of time on it, but I can't prevent the

 1   defendants from, if they want to put it in, they want to

 2   submit a lot of briefs, fine.  But I'm not -- I

 3   think -- I believe Judge Breyer was right, but I'll have

 4   to make -- make my own independent decision.

12:59:40   5            MR. WEINBERGER:  That's all I have for the

 6   plaintiffs, Your Honor.

 7            THE COURT:  Okay.  Anything -- anything

 8   from the defendants, anything else from the defendants?

 9            MR. HALL:  Your Honor, Jeff Hall for

12:59:53  10   Walgreens.

11            One question about setup.

12            Would the courtroom be available Monday for

13   the tech people to spend a little time inside to make

14   sure it's --

13:00:03  15            THE COURT:  I think so.  I know that the

16   Court Connect people are going to be in tomorrow

17   afternoon.

18            Who was that speaking?  I'm sorry.

19            MR. HALL:  Jeff Hall for Walgreens, Your

13:00:13  20   Honor.

21            THE COURT:  Oh, sorry, Jeff.

22            I believe from 1:00 to 3:00 tomorrow the

23   Court Connect people and IT are going to be in the

24   courtroom.

13:00:23  25            That might be a good time, you know, anyone

1    else who wants -- I mean, that's the time to check out to

2    make sure everything's working that should be working.

3                    MR. HALL:  Did you say 1:00 to 3:00?

4                    THE COURT:  1:00 to 3:00.

13:00:38  5          THE CLERK:  Well, excuse me, this is

6    Robert.

7                    No, Court Connect needed to reschedule so

8    they're going to be coming Friday at 11:00.

9                    THE COURT:  Well, no one told me that.

13:00:48 10          THE CLERK:  Judge, it just happened this

11   morning.

12                    THE COURT:  Well, so it looks like Friday

13   at 11:00 o'clock, Mr. Hall, the tech people are there, so

14   the courtroom is certainly available.

13:01:03 15          I'm not using the courtroom on Monday.

16                    MR. HALL:  Okay.

17                    THE COURT:  So if you want to make an

18   appointment, you should make it with Mr. Pitts.

19                    You know, if you've got to have some people

13:01:12 20  in there, you won't be interfering with any court

21   proceeding because I'm not using the courtroom.

22                    MR. HALL:  Thank you.  We may need some

23   time.

24                    THE COURT:  We are selecting Magistrate

13:01:25 25  Judges for the two vacancies Monday, so I won't be using

           1    my courtroom at all.

           2                    MR. HALL:  Okay.  Thank you.

           3                    THE COURT:  Okay.  Anything -- so, Mr.

           4    Pitts, what time -- they are there from 11:00 to 1:00

13:01:40   5    tomorrow?

           6                    What time are they there?

           7                    THE CLERK:  They are coming Friday at

           8    11:00.  I'm not sure how long it will last.

           9                    THE COURT:  Okay.

13:01:47  10                    THE CLERK:  But it shouldn't be more than

          11    two, three hours, I wouldn't think, but I can't say how

          12    long they will be there.

          13                    THE COURT:  Well, why don't you, just so I

          14    have it on the calendar.  I'm not using the courtroom so

13:01:59  15    it's not a problem.

          16                    So looks like that period would make sense

          17    for any of the parties if they want their tech people

          18    there.  The courtroom is open.  Tech people are going to

          19    be in there.

13:02:10  20                    Why don't you people come in on Friday?

          21                    MR. HALL:  We'll make every effort.  Right

          22    now our tech person may not be there until after 2:00

          23    o'clock which is why we might need Monday time but --

          24                    THE COURT:  All right.  You should

13:02:26  25    coordinate that with Mr. Pitts just so someone -- you

1  know, we open it up.  Normally, I think we keep the

2  courtroom just sort of locked for security.

3              MR. HALL:  Understood.  Thank you.

4              THE COURT:  But we can arrange to have

13:02:36  5  someone there on Monday.

6              Okay.  Anything else that anyone can think

7  of?

8              Okay.  Stay safe, everyone, and we'll see

9  you all --

13:02:54 10              MR. WEINBERGER:  See you on Tuesday.

11              THE COURT:  -- Tuesday morning I guess now

12  at --

13              MR. WEINBERGER:  8:30.

14              THE COURT:  -- at 8:30.

13:03:03 15              Okay.

16              (Proceedings concluded at 1:03 p.m.)

17                       -  -  -  -

18              C E R T I F I C A T E

19              I certify that the foregoing is a correct
   transcript from the record of proceedings in the
20  above-entitled matter.

21

22  **/s/Susan Trischan**
   /S/ Susan Trischan, Official Court Reporter
23  Certified Realtime Reporter
   7-189 U.S. Court House
24  801 West Superior Avenue
   Cleveland, Ohio 44113
25  (216) 357-7087