226

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
CLEVELAND, OHIO

------------------------------X
**IN RE:**                          :  CASE NO. 1:17-md-2804
                                    :
NATIONAL PRESCRIPTION               :
OPIATE LITIGATION                   :  **VOLUME 2**
                                    :
TRACK THREE CASES                   :
                                    :  *(Pages 226 - 509)*
        *1:18-op-45032*             :
        *1:18-op-45079*             :
                                    :  WEDNESDAY, MAY 11, 2022
------------------------------X


TRANSCRIPT OF PHASE II ABATEMENT BENCH TRIAL PROCEEDINGS

HELD BEFORE THE HONORABLE DAN AARON POLSTER

SENIOR UNITED STATES DISTRICT JUDGE


Official Court Reporter:   Sarah Nageotte, RDR, CRR, CRC
                           United States District Court
                           Northern District of Ohio
                           801 West Superior Avenue
                           Court Reporters 7-189
                           Cleveland, Ohio 44113
                           Sarah_Nageotte@ohnd.uscourts.gov


        Proceedings recorded by mechanical stenography.
        Transcript produced with computer-aided transcription.

```
 1     APPEARANCES:

 2     For the Plaintiffs:          Peter H. Weinberger, Esquire
                                    SPANGENBERG SHIBLEY & LIBER LLP
 3                                  1001 Lakeside Avenue East
                                    Suite 1700
 4                                  Cleveland, Ohio 44114

 5
                                    W. Mark Lanier, Esquire
 6                                  THE LANIER LAW FIRM
                                    10940 W. Sam Houston Parkway N
 7                                  Suite 100
                                    Houston, Texas 77064
 8

 9                                  Frank L. Gallucci, III, Esquire
                                    PLEVIN & GALLUCCI COMPANY, L.P.A.
10                                  55 Public Square
                                    Suite 2222
11                                  Cleveland, Ohio 44113

12
                                    Salvatore C. Badala, Esquire
13                                  NAPOLI SHKOLNIK PLLC
                                    400 Broadhollow Road
14                                  Suite 305
                                    Melville, New York 11747
15

16                                  Maria Fleming, Esquire
                                    NAPOLI SHKOLNIK PLLC
17                                  1500 W. 3rd Street
                                    Suite 510
18                                  Cleveland, Ohio 44113

19
                                    Laura S. Fitzpatrick, Esquire
20                                  SIMMONS HANLY CONROY
                                    112 Madison Avenue
21                                  7th Floor
                                    New York, New York 10016
22

23

24

25
```

1     **APPEARANCES (Continued):**

2     For Defendant CVS:          **Eric R. Delinsky, Esquire**
                                  **Alexandra W. Miller, Esquire**
3                                 **Paul B. Hynes, Jr., Esquire**
                                  ZUCKERMAN SPAEDER LLP
4                                 1800 M Street NW
                                  Suite 1000
5                                 Washington, DC 20036

6

7     For Defendant Walgreens:    **Jeffrey A. Hall, Esquire**
                                  BARTLIT BECK LLP
8                                 54 West Hubbard Street
                                  Chicago, Illinois 60654

9

10                                **Katherine L.I. Hacker, Esquire**
                                  BARTLIT BECK LLP
11                                1801 Wewatta Street
                                  Suite 1200
12                                Denver, Colorado 80202

13

14    For Defendant Walmart:      **John M. Majoras, Esquire**
                                  JONES DAY
15                                51 Louisiana Avenue NW
                                  Washington, DC 20001

16

17                                **Tara A. Fumerton, Esquire**
                                  JONES DAY
18                                110 North Wacker Drive
                                  Suite 4800
19                                Chicago, Illinois 60606

20

21    ALSO PRESENT:               **David Cohen, Special Master**

22
                                          - - -
23

24

25

1                          <u>TABLE OF CONTENTS</u>

2      <u>WITNESSES/EVENTS</u>                                    <u>PAGE</u>

3      NANCY YOUNG                                          232

4           Direct Examination by Mr. Weinberger          232
            Cross-Examination by Ms. Hacker               276
5           Cross-Examination by Mr. Majoras              302
            Cross-Examination by Mr. Hynes                308
6           Redirect Examination by Mr. Weinberger        313
            Recross-Examination by Mr. Hynes              323

7
       G. CALEB ALEXANDER                                  325
8
            Direct Examination by Mr. Lanier              325
9           Cross-Examination by Mr. Delinsky             379

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | WEDNESDAY, MAY 11, 2022 |
| | 2 | - - - |
| | 3 | (Court resumed at 8:32 a.m.) |
| | 4 | - - - |
| 08:32:24 | 5 | THE COURT:  Good morning, everyone. |
| | 6 | COUNSEL EN MASSE:  Good morning, Judge. |
| | 7 | THE COURT:  You can be seated. |
| | 8 | And I guess before we start, did you work out |
| | 9 | something on the pages of the expert reports? |
| 08:32:38 | 10 | MR. HALL:  Your Honor, Jeff Hall for |
| | 11 | Walgreens. |
| | 12 | We took a look at the material Mr. Lanier identified. |
| | 13 | We do not object to the admission of table two, table three, |
| | 14 | figure 12, and figure 13 from P-23116, Dr. Keyes' April 21st |
| 08:33:02 | 15 | report.  Those were on the pages that plaintiff identified |
| | 16 | at the end of the day of her report. |
| | 17 | THE COURT:  Okay. |
| | 18 | MR. HALL:  We do object to her rebuttal report |
| | 19 | and the text on those pages for hearsay and other grounds, |
| 08:33:15 | 20 | including to the extent they contain -- |
| | 21 | THE COURT:  Let me see the document, please. |
| | 22 | MR. HALL:  Sure.  Handing up her rebuttal |
| | 23 | report and her original report. |
| | 24 | THE COURT:  All right.  Look, I'll take this |
| 08:33:43 | 25 | up at some other time.  You can brief it or whatever.  I |

         1    don't -- I mean, everything is -- I mean, essentially, I'm

         2    considering everything.

         3                    MR. HALL:  May I make one brief point, Your

         4    Honor?

08:33:54 5                    THE COURT:  Very briefly.  You want to submit

         6    briefs, I mean, I'll deal with all this stuff at the end.

         7    I'm obviously considering everything, so you want to brief,

         8    send me briefs on what you want do with expert reports.  I'm

         9    considering everything.

08:34:09 10                   MR. LANIER:  We will brief appropriately, Your

        11    Honor.  Thank you.

        12                    THE COURT:  I'm not going to waste time on all

        13    this stuff.

        14                    MR. HALL:  Thank you.

08:34:14 15                   THE COURT:  Candidly.

        16        It's essentially -- I'm considering everything.

        17    Whether it's formally admitted or not, it really doesn't

        18    matter.  I'm considering the -- what the experts say, what

        19    the -- you know, look, I've read their reports.  So what's

08:34:32 20   technically admitted, I'm not sure it makes any difference.

        21        Could someone tell me why -- whether it really makes a

        22    difference?

        23                    MR. HALL:  It might make a difference on

        24    appeal, Your Honor, but we can submit a short brief.

08:34:45 25                   THE COURT:  You're worried about appeal, trust

1    me, it isn't going to make a difference on appeal.  The

2    Court is going to look at what I did and is there a basis

3    for it.  If they think what I did is sound, they'll affirm

4    it.  If they don't think it's sound, they won't.

08:35:00  5              MR. HALL:  Understood.  Just for clarity of

6    the record is what I meant, Your Honor.

7              THE COURT:  All right.  You can put it in your

8    posttrial briefs, candidly.  I don't want to waste time on

9    this stuff.

08:35:11  10              MR. HALL:  Yes, sir.

11              THE COURT:  Let's move on with the witness,

12   please.

13              MR. WEINBERGER:  Your Honor, the plaintiffs

14   call Dr. Nancy Young.

08:35:47  15              THE COURT:  Ma'am, if you could raise your

16   right hand, please.

17                    (NANCY YOUNG, sworn)

18              THE COURT:  Thank you.

19              MR. WEINBERGER:  May I proceed, Your Honor?

08:36:12  20              THE COURT:  Yes.

21            **DIRECT EXAMINATION OF NANCY YOUNG**

22   **BY MR. WEINBERGER:**

23   **Q**    Dr. Young, please state your full name.

24   **A**    Nancy Katherine Young.

08:36:18  25   **Q**    Dr. Young, what is your profession?

1     **A**     I'm a social worker.

2     **Q**     And you are connected with a organization by the name

3     of Children and Family Futures, correct?

4     **A**     Yes, I am.

08:36:29 5     **Q**     And describe to the Court what that is, please.

6     **A**     It's a policy nonprofit firm.  We do consulting work

7     on all about children of parents with substance use and

8     mental health problems.

9     **Q**     And what is -- what is your relationship to that firm?

08:36:46 10    **A**     I'm the executive director and the cofounder.

11    **Q**     Who is the other founder?

12    **A**     My husband, Sid Gardner, who has expertise in

13    collaborative practice, children's policy.

14    **Q**     Okay.

08:37:03 15               MR. WEINBERGER:  Mr. Pitts, do we have the

16    Wolfe on?

17    **BY MR. WEINBERGER:**

18    **Q**     So, Dr. Young, this is a roadmap of what we are going

19    to talk about with you today.  Let's see if we can get

08:37:26 20    this -- there we go.

21          So we're going to talk about your background.  We're

22    going to talk about this organization, Children and Family

23    Futures.  We are going to go through your opinions.  And

24    we're going to talk about the needs of the two counties,

08:37:40 25    Lake and Trumbull.

|   |   |
|---|---|
| 1 | Fair enough? |
| 2 | **A**    Yes.  Thank you. |
| 3 | **Q**    Okay.  Now, with your assistance, have we prepared a |
| 4 | set of slides to go through your testimony today? |
| 08:37:54  5 | **A**    Yes, we have. |
| 6 | **Q**    Okay.  And those slides, we've marked them as CT32 |
| 7 | Demo 2, and we've given the Court a copy of the slides. |
| 8 | So this -- this is our first slide.  And it describes |
| 9 | you as executive director of Children and Family Futures, |
| 08:38:38 10 | correct? |
| 11 | **A**    Yes.  That's correct. |
| 12 | **Q**    All right.  Let's talk a little bit about your |
| 13 | background. |
| 14 | Would you go through your background, please, to -- |
| 08:38:49 15 | that provided you the experience and education to do what |
| 16 | you do today in your profession. |
| 17 | **A**    So my education, sociology as an undergrad.  Master's |
| 18 | of social work degree, which I concentrated in social |
| 19 | policy.  And then a PhD in social work also in macro |
| 08:39:11 20 | practice or social policy. |
| 21 | **Q**    Okay.  And then we have your employment as cofounder |
| 22 | and executive director of Children and Family Futures, |
| 23 | correct? |
| 24 | **A**    That's correct.  We just had our 25th anniversary, so |
| 08:39:25 25 | been doing this for a while.  And I'm coming up on 30 years |

1    post PhD.

2    **Q**    Okay.  So let's talk now, have you describe to the

3    Court your background, please.

4    **A**    So my work has always focused on children of parents

08:39:42 5    with substance use problems.  And during my doctoral

6    dissertation, I evaluated a Los Angeles Unified School

7    District early intervention program for children who had

8    prenatal exposure.  And it was really the first place in the

9    country that tried to intervene with young children to see

08:40:02 10   if they could help with some of the problems that they were

11   seeing as kids were getting into elementary school.  So I

12   followed the kids into elementary school and evaluated, as

13   it says, their social competence, their behavior, and

14   academic performance.

08:40:19 15       The NIDA, National Institute on Drug Abuse,

16   predoctoral fellowship was a bit unique because typically

17   NIDA funds universities and students can apply through the

18   university for support, but this was a proposal that I put

19   in directly to National Institute on Drug Abuse, and they

08:40:39 20   funded the last two years of my dissertation through a

21   fellowship.  So it was an award versus going through the

22   university for support.

23   **Q**    So let's now talk, have you describe to the Judge, the

24   focus of your career.

08:40:57 25   **A**    So always looking at this context of children who are

1    affected by their parents' substance use problem and what

2    that means for our health and social services as a result of

3    kids who have challenges and their parents who have

4    challenges.

08:41:17   5         So throughout history, we've had these issues that

6    policy has addressed in various ways.  So I've looked at

7    those economic and political influences and the social

8    factors that were affecting the different eras of drug use

9    in our country and their effects on children.

08:41:39  10         So as I mentioned, I'm coming up on 30 years, and the

11   focus throughout my career has been primarily on children

12   who are also in the child welfare system, who have

13   allegations of child abuse and neglect.  How do you prevent

14   removal?  How do you, importantly, bring together those

08:42:02  15   health, social service, education systems to provide the

16   services that are needed for children and their parents to

17   prevent their own substance use problem and to -- and to

18   prevent their mental health issues that may develop.

19         And so, importantly, we collect a lot of information

08:42:21  20   from communities around the country about what they're

21   trying to do to solve this problem and, important, what

22   works.

23   **Q**    Now, briefly, would you tell the Court what this slide

24   represents in terms of honors and awards that you've

08:42:41  25   received.

1    **A**    Right.  So the Administration on Children and

2    Families, the Outstanding Contractor for 21 years, we've

3    held a contract to implement the National Center on

4    Substance Abuse and Child Welfare.  And by "we" I mean

08:43:00  5    Children and Family Futures.

6         NASADAD, the National Association of State Alcohol and

7    Drug Abuse Directors, have awarded me a couple times for

8    awards for service and for women's treatment.

9         And then this special recognition by the National

08:43:19 10   Association For Children of Alcoholics and, more recently,

11   the Child Welfare League of America, at their 100-year

12   anniversary honored a hundred champions across the country.

13   And I'm very honored to have received that.

14   **Q**    So this slide describes some of your selected

08:43:38 15   affiliations and activities.  Would you briefly go through

16   this.

17   **A**    Sure.  These are just a few recent kinds of things

18   that we have done.  With the ABA Center on Children and the

19   Law, I presented with a woman who works at the Office of

08:43:55 20   Civil Rights.  We did a lengthy project on the civil rights

21   protections for persons with opioid use disorders to receive

22   medication-assisted treatment when they're part of the child

23   welfare and court systems.

24        The Office of the Assistant Secretary For Health, as

08:44:14 25   she was doing recommendations related to the difference

1    between diagnostic codes on neonatal abstinence syndrome and

2    neonatal opioid withdrawal syndrome, so I was part of the

3    expert committee with that.

4         Several times that I've testified at Congress.  You

08:44:35 5    see the various ones.  I think important in 2016, Senator

6    Brown and Senator Portman asked me to come here to Cleveland

7    to testify about the impact of the opioid epidemic in Ohio.

8         And then, several other times that I've testified at

9    Congress.

08:44:55 10         A few of the major publications, the consensus group

11    with SAMHSA, over 40 national leaders that we brought

12    together to put out a monograph from the Substance Abuse and

13    Mental Health Services Administration on treatment for

14    pregnant women with opioid use disorders.

08:45:16 15         The Quality Improvement Center For Community

16    Collaborative Court Teams, Ohio was one of the sites that we

17    selected to participate.  This was a specific initiative

18    that brought the court as the leader into this collaborative

19    practice to ensure that infants who were identified with

08:45:39 20    prenatal substance exposure had safety plans before they

21    went home.  And Trumbull County was one of the

22    implementation sites for what we referred to as this QIC,

23    Quality Improvement Center.

24         And then, very honored to have had the opportunity to

08:45:58 25    work with the National Association of Drug Court

1    Professionals.  A few years ago we published Family

2    Treatment Court Best Practice Standards, so these are courts

3    that operate in the civil docket of child abuse and neglect

4    that put together family treatment courts, similar to adult

08:46:14  5    drug courts but lots of differences because there's not a

6    criminal charge.

7    **Q**    So we have a slide now on current policy initiatives.

8         Tell us what this slide depicts.

9    **A**    The re -- both reauthorization for the Child Abuse

08:46:33 10    Prevention and Treatment Act and Promoting Safe and Stable

11    Families is due to happen during this federal fiscal year,

12    and I am consulting with the Health, Education, Labor and

13    Pensions, which is a Senate committee, on changes that

14    should be made in the CAPTA bill, based on our experience of

08:46:52 15    working with so many sites around the country about how

16    they're implementing that very specific plan of safe care

17    for infants and their families.

18         And then the Senate Finance Committee, again, they

19    oversee Promoting Safe and Stable Families, which is

08:47:09 20    everything after the initial charges of child abuse and

21    neglect.

22    **Q**    What is the CAPTA Act?

23    **A**    Child Abuse Prevention and Treatment Act over -- is

24    the entire front end of the child welfare system.  So from

08:47:23 25    the hotline, someone calls, says I have a concern about this

**N. Young (Direct by Weinberger)**                     240

1    child, and hotlines operate across the country to take those

2    calls.  Child welfare agencies' staff make a determination

3    of the immediacy of when they need to do an investigation if

4    an investigation is warranted, and then file the petitions

08:47:50  5    with the Court should they determine that this child needs

6    to be removed, and determine if those allegations of abuse

7    or neglect are substantiated.

8         In 2016, in reaction to infants and the increasing

9    number of infants that were going into the child welfare

08:48:11  10   system, primarily related to infants that were experiencing

11   neonatal abstinence syndrome, Congress changed the law and

12   reinstituted, if you will, this requirement that there be a

13   plan for the child's care and that it address the treatment

14   needs of the birth parents.  And they removed in the statute

08:48:36  15   that this was only related to illicit drugs, because they

16   recognized that infants could go through withdrawal from

17   drugs that were legal.

18        So big change that happened in our national policy

19   about infants with neonatal abstinence syndrome and exposure

08:48:54  20   to -- primarily it was opioids that was driving this during

21   2016.

22   **Q**    Okay.  So we've talked about your background, and now

23   I want to talk about Children and Family Futures for a

24   moment.

08:49:08  25        And we have a slide here that is entitled:  Ongoing

1     and Recent Technical Assistance Programs at CFF.

2          Describe for us what this slide depicts, please.

3     **A**     So I mentioned the National Center on Substance Abuse

4     and Child Welfare.  We've been the contractor since Congress

08:49:30  5     put an allocation in to say we needed a place in the country

6     that developed knowledge and provided technical assistance

7     to communities about this population of children in the

8     child welfare system whose parents had a substance use

9     problem.  We just were awarded our fifth rebid, so we're in

08:49:47 10     our 21st year of operating that contract for the federal

11     government.

12          As part of that contract over years, they've added

13     additional programs.  The Regional Partnership Grant

14     Program, there have been 110 in the country, several in

08:50:05 15     Ohio, one in Trumbull County.  These are competitive grants

16     that communities bid for to help them understand how to

17     bring these complex systems together on behalf of families.

18          Again, after the 2016 legislative change about infants

19     with prenatal exposure, the administration shifted our focus

08:50:28 20     for this program of in-depth technical assistance.  Over

21     half of the states have participated with us in about a

22     two-year technical assistance planning, strategic planning

23     process to improve their services and focus on their

24     outcomes.

08:50:46 25          We've also been the contractor to the Department of

1    Justice through the Office of Juvenile Justice and

2    Delinquency Prevention.

3        I mentioned the family treatment court standards.  We

4    provide technical assistance to all of OJJDP's grantees that

08:51:05  5    have family treatment courts.

6        Prevention and Family Recovery, similar.  It was

7    funded, however, by a foundation and really focused on

8    keeping infants and young children with their parents

9    whenever possible by providing services.

08:51:18  10       I mentioned the Quality Improvement Center.  We have a

11   program area that's specific to children of veterans and

12   recognizing the mental health needs that they have,

13   particularly when their parent comes back after deployment

14   and may develop a substance use problem.

08:51:36  15       And then the START, Sobriety Treatment and Recovery

16   Team, we're the national home for that initiative.  It

17   actually started here in Cleveland.  It's been operating in

18   Cleveland since the mid-1990s and now is implemented in many

19   sites around the country.  It's on the federal government's

08:51:56  20   clearinghouse of evidence-based programs.  And Governor

21   DeWine has been a very strong supporter of the START program

22   in Ohio.  And all of those that are asterisks are places --

23   are initiatives that have operated in Ohio.

24       So I've been to Ohio a lot related to these technical

08:52:19  25   assistance projects, in particular related to the family

1    treatment courts.  But we have staff -- we have a staff

2    member who lives here in Cleveland, and we have staff who

3    talk to the communities in Ohio every week.

4    **Q**     So with respect to the opioid epidemic, is it fair to

08:52:38  5    say, Dr. Young, that you and your organization at CFF have

6    been involved in assisting communities vis-a-vis the effect

7    on families, the effect on individuals as well as families,

8    including children?

9    **A**     Yes, we have.

08:52:58  10         We've watched since, you know, the early 1990s various

11    ways that children have been affected, but in around 2010 or

12    so our contract through the National Center on Substance Use

13    and Child Welfare, our project officer called and said that

14    she had had a briefing through SAMHSA about the opioid

08:53:19  15    epidemic, and she needed me and our staff to get up to speed

16    on opioids and to be ready, because this was going to be

17    something that we would have a lot of initiatives around and

18    needed a lot of expertise for.

19    **Q**     Dr. Young, have you been retained as an expert not

08:53:41  20    only in Lake and Trumbull County cases but in cases around

21    the country by communities and attorney generals?

22    **A**     Yes, I have.

23    **Q**     And have you testified in court proceedings, giving

24    testimony similar to what you intend to give today?

08:53:58  25    **A**     Yes, I have.

**N. Young (Direct by Weinberger)**                    244

1    **Q**     Where has that been?

2    **A**     In Huntington, in the trial for Huntington and Cabell

3    County, and also for the STATE of Washington.

4    **Q**     And have you been qualified as an expert in this -- in

08:54:13  5    your field in those cases?

6    **A**     Yes, I have.

7    **Q**     Okay.  Now, you have in front of you a copy of your

8    April 16, 2021 expert report, which we've marked, Your

9    Honor, as P-23128.

08:54:39  10          Correct?

11   **A**     Yes, I do.

12   **Q**     And we have a copy of your -- some of the -- or the

13   appendices to your report, which includes your curriculum

14   vitae, which is marked as P-23129, correct?

08:54:56  15   **A**     Yes.  That's correct.

16   **Q**     And after you gave a deposition in this case, you

17   submitted a short addendum to your report to correct a

18   couple of citations.  And that's marked as P-27576, correct?

19   **A**     Yes.  That's correct.

08:55:14  20   **Q**     Okay.  Now, does your report, and the addendum,

21   accurately reflect your opinions in this case and the bases

22   for the opinions?

23   **A**     Yes, it does.

24   **Q**     All right.  So let's talk about the scope of your

08:55:45  25   report.

1        Would you describe that to the Court, please.

2    **A**     Yes.  Really three questions:  Has there been an

3    effect of the opioid epidemic on children and families in

4    Lake and Trumbull Counties?

08:55:54  5        Has it affected child welfare services in those two

6    counties?

7        And what are the evidence-based interventions that

8    could be implemented to address the effect of the opioid

9    epidemic on children and their families in the communities?

08:56:10 10  **Q**     Okay.  So what are, at a high level — and we'll go

11   into the details — but what are your answers to those three

12   questions?

13   **A**     Yes to all three of them.  Yes, there has been a

14   profound effect on pregnant women and their infants, their

08:56:28 15  children, really multigeneration effects within families,

16   grandparents, others that are stepping in to care for these

17   children.

18        In the child welfare system in particular, we saw an

19   increase in the number of children, I mentioned infants in

08:56:46 20  particular, that were being placed in protective custody as

21   a result of their parents' opioid use disorders.

22        And over these 25, 30 years of really monitoring and

23   understanding what works, there are programs that are

24   effective and a way to put those programs in place that help

08:57:08 25  families to recover.

1    **Q**    With respect to the opinions that you hold in this

2    case, would you make -- would you ensure for us that the

3    opinions that you are rendering are to a reasonable degree

4    of certainty?

08:57:27  5    **A**    Yes.

6    **Q**    You agree that you will keep your opinions within

7    those standards?

8    **A**    Yes.

9    **Q**    Very good.

08:57:34 10    Now, let's talk about some of the methodology that you

11    used and the sources that you utilized in applying the

12    methodology to your ultimate opinions in this case.

13    Okay.  This -- what does this slide describe?

14    **A**    They're various administrative datasets that are

08:57:59 15    collected from child welfare submitted through the state to

16    the federal government.  The federal government cleans the

17    data, makes it anonymous, and then makes it available to

18    researchers.

19    I'll just take a minute, the reason why it says small

08:58:17 20    counties as a subset, those data are not available to anyone

21    through the data archive if that particular county has less

22    than a thousand children per year who are placed in

23    protective custody.

24    So as we looked at these datasets for the small

08:58:37 25    counties, we made a determination that we needed to group

1    the small counties together.  We couldn't identify which

2    county was Lake and Trumbull.  Only the large counties have

3    identification.  So there are five large counties in Ohio

4    that are identified in these datasets, and the rest are

08:58:58  5    grouped together as small counties.  That's what this "small

6    counties" means.  So it's a subset of NCANDS.

7        I described that front end of the system where there

8    are allegations of abuse or neglect.  There's a

9    determination made by the Court on if those allegations are

08:59:17  10   substantiated.  And all of that part of the system,

11   investigations, reports, sit in this National Child Abuse

12   and Neglect Data System, or NCANDS, so that's the front end

13   of the system.

14       The AFCARS part of the system is if that child is

08:59:38  15   placed in protective custody and there is a court order to

16   oversee that case, then that data sits in AFCARS, which is

17   about the foster care and adoption system of the country.

18       TEDS, or treatment admissions that are collected by

19   providers, again, rolled up providers of substance abuse

09:00:02  20   services and then rolled up to the states, submitted to the

21   federal government.

22       There are some special studies that have been done by

23   the Department of Health and Human Services.  As you see,

24   the Assistant Secretary For Planning and Evaluation and CDC,

09:00:14  25   as well as data that we used from the Department of

1    Education, and various other places in the research

2    literature that they've been looking particularly at infants

3    with prenatal exposure, infants who experience neonatal

4    abstinence syndrome, that have been published by the

09:00:33  5    American Academy of Pediatrics in particular.

6    **Q**      Okay.  Did you also obtain information from Lake and

7    Trumbull County specifically?

8    **A**      Yes, I did, both from reading the depositions of key

9    staff in the two counties as well as having the opportunity

09:00:53  10   to have interviews, conversations with the executive

11   director of the Lake County Department of Job & Family

12   Services, which ODJFS it's called here in Ohio, which

13   oversees both income support and child welfare services, and

14   Rick, whose name I won't try and pronounce the last name,

09:01:17  15   although I've known him for many years because of Trumbull

16   County's participation in the Regional Partnership Grant

17   Program.  And he was also really instrumental in that QIC,

18   the Quality Improvement Center, related to infants.  So I

19   had conversations with both of them.

09:01:37  20   **Q**    So a couple times in your testimony so far you've

21   talked about CFF's involvement in grants that have been

22   issued to assist -- to have you assist communities.

23        Do you understand that we are here today in the phase

24   II of this trial to determine the -- what is the appropriate

09:02:04  25   abatement remedy to abate the epidemic in this case?  Do you

1    understand that?

2    **A**     Yes, I do understand that.

3    **Q**     And so, in terms of your background and expertise,

4    while a lot of it is grant related, you also can provide

09:02:22  5    expertise as to what is needed in these counties, correct?

6    **A**     Well, in fact, the reason that the federal government

7    provides grants is to test strategies and to learn, to

8    develop knowledge.  So it is this entire body of work over

9    25 years that have been funded by the federal government or

09:02:41  10    by specific agencies that have evaluations as a component of

11    that so that we can learn what do you do about resolving

12    these problems.

13    **Q**     So you have identified five different populations

14    affected by the opioid epidemic who basically need help to

09:03:08  15    remedy the harm that's associated with the epidemic,

16    correct?

17    **A**     Yes.  That's correct.  Kind of --

18    **Q**     So slide 13, would you describe that for us, please.

19    **A**     Yeah.  Yes.  Taking a developmental perspective, which

09:03:21  20    is I think social work practice always is, you know, what --

21    at what stage is the child in their development, because

22    things are very different obviously for infants than for

23    adolescents.

24         So taking these five populations, from pregnant women,

09:03:36  25    the immediate effects for infants if they experience

1       withdrawal, the children who are affected by prenatal opioid

2       exposure, which is a larger population of children that have

3       opioid exposure but perhaps didn't manifest those immediate

4       withdrawal symptoms within the first 24 or 48 hours of life,

09:04:02  5   but they were exposed and may have long-term effects.

6            And then, this population we would refer to as, you

7       know, sort of postnatal environment.  So growing up with a

8       parent who has a opioid use disorder and the sometimes

9       trauma that children experience.  We've certainly all seen

09:04:23  10  that in our media about what's happened to too many children

11      that have experienced that situation of having a parent with

12      an opioid use disorder.

13           And then, that population of children who may be both

14      of those populations of both prenatal exposure, living in a

09:04:43  15  family with opioid use disorder, and are at high risk of

16      developing their own substance use problem as they enter

17      adolescence and young adulthood.

18  **Q**    So we're going to look at each of these populations

19      and your recommendations, correct?

09:04:59  20  **A**    Yes, we are.

21  **Q**    Okay.  So starting with pregnant women with OUD and

22      its effects.

23           What does this slide represent?  This is slide 14.

24  **A**    This is a study that is regularly collected from the

09:05:17  25  CDC about experiences for pregnant women.  And they reported

1    in 2019 that pregnant women reported using prescription

2    opioids during pregnancy, 6.6 percent of them in the nation.

3            And then, if we apply that to the number of births in

4    Ohio and Lake County, we see the number in one year of

09:05:41  5    infants who would have been exposed to prescription opioids

6    in the uterine environment.

7    **Q**    And the slide goes on to talk about the risks of OUD

8    during and after pregnancy?

9    **A**    Yes.  That's correct.

09:05:57 10   **Q**    Okay.  Describe that for us, please.

11   **A**    So while the exposure may not generate immediate

12   withdrawal, we do know that all of the children with

13   exposure need to be monitored and assessed for developmental

14   outcomes to see if there are interventions that are required

09:06:19 15   during that early childhood period, because that is really

16   the sweet spot of intervention for children who have been

17   exposed to substances and opioids during pregnancy.

18           So if we only looked at those that, again, manifested

19   immediate withdrawal, we'd be missing a large population of

09:06:42 20   children who need to have that assessment to look at their

21   developmental outcomes in infancy, toddlerhood, the

22   preschool period in order to get them ready for

23   kindergarten.  The school readiness component for this

24   population is critical.

09:07:04 25           And then we also know that for women, newer data that

1    has been coming out about the high risk of overdose death,

2    so if they were in treatment or they had a period of

3    abstinence, that if they use again in this critical period

4    that came from this particular study, from seven to

09:07:29  5    12 months.  So it means that we can't just say, aha, she's

6    delivered the baby, everything's fine.  We need to make sure

7    that she is engaged in services, that she has the supports

8    that are needed to prevent overdose death in this maternal

9    population.

09:07:48  10            THE COURT:  Doctor, could I ask you one

11    question?

12         6.6 percent of women reported using prescription

13    opioids during pregnancy.  Are those prescribed

14    prescriptions or diverted or, you know, stolen, whatever?

09:08:06  15    Are doctors actually prescribing those?

16            THE WITNESS:  They are both prescribed, if --

17    we do know that the Medicaid population is prescribed

18    prescription opioids during pregnancy at substantially

19    higher rates than women with private insurance.  But they

09:08:27  20    are both prescribed as well as the other populations that

21    you mention that may be diverted.

22            THE COURT:  Okay.  Thank you.

23            THE WITNESS:  And this particular data does

24    not follow up with that important question, so we don't know

09:08:41  25    to what extent that -- which population that is.

1          THE COURT:  Thank you.

2     **BY MR. WEINBERGER:**

3     **Q**     So slide 15 is a graph.

4          Would you tell us what this graph represents, please.

09:08:54  5     **A**     We mentioned the TEDS dataset, treatment episodes

6     dataset.  These are data from Ohio monitoring the women that

7     were admitted to treatment that identify their substance

8     that they're using when they're admitted to treatment.  And

9     you see in the mid 2000s was pretty consistent data, and

09:09:18  10    then, really, an escalation of both opioid and synthetics,

11    and then shifting to heroin as the substance that they were

12    using.

13         Again, this is the subpopulation of women who are

14    pregnant, so really important that we're making sure that

09:09:38  15    she and the infant during pregnancy are stable and that they

16    are provided services.

17    **Q**     So do you know, Dr. Young, does this track -- this

18    graph, for example, with respect to other opioids, opiate

19    synthetics, which is the orange line, does this track the

09:09:59  20    general population trends with respect to use of opioids

21    during this time frame?

22    **A**     It does track along that same time of for the public

23    systems.  And I mentioned when the federal contract officer

24    said to us, you need to really understand opioids and to

09:10:23  25    understand what communities can do to prevent children from

1    being placed in out-of-home care.  That was in that same

2    time period, 2010, 2011, which I understand to be, you know,

3    kind of that transition to -- to sometimes illegal use.  So

4    it tracks very much with what was going on in our

09:10:44 5    communities.

6    **Q**    So what are some of the interventions that are

7    required for pregnant women with opioid use disorder?

8    **A**    Well, certainly, before women become pregnant,

9    knowledge of the risk of using opioids during pregnancy,

09:11:06 10   specialized programming during pregnancy so that

11   medication-assisted treatment, which is the recommended

12   treatment by the obstetrics and gynecologists in the

13   country, as well as the American Society of Addiction

14   Medicine.  So specialized medication-assisted treatment

09:11:30 15   program that really focuses on, again, the stability for the

16   women, stability for the developing fetus, making sure that

17   the other kinds of conditions that she may need in order to

18   access to treatment are available, making sure that

19   discontinuation of treatment doesn't happen, because we want

09:11:50 20   to provide, again, a stable environment during pregnancy for

21   the infant.  And those other services that, again, that she

22   may need.

23       I mentioned the Child Abuse Prevention and Treatment

24   Act which requires that either before or before the --

09:12:09 25   before birth or before the infant goes home, that there's a

1    plan of safe care put in place.

2         So this is what changed in 2016 by Congress, that said

3    we have to ensure that these babies and their mother and

4    their family have a plan about how this baby is going to be

09:12:30 5    safe.

6         Unfortunately, too many babies were going home without

7    that, and there were documented infant deaths because that

8    had been missed during both the prenatal period at birth, so

9    plan of safe care.

09:12:48 10         So that put a burden on health care providers that,

11    you know, hospitals now must assure -- the governor must

12    assure that they have a plan that hospitals and that they're

13    implementing policies that hospitals identify and ensure

14    that there is a plan for this infant to go home.

09:13:06 15         And then, postpartum, I've mentioned already this high

16    risk of overdose death in the postpartum period that needs

17    to ensure that the family is engaged in services.

18  **Q**    So this next slide, slide 17, is from your report.

19         What does this depict?

09:13:30 20  **A**    Well, early on, we recognized that communities might

21    say, yes, we have to do something about this population of

22    infants.  And we tried to categorize, if you will, how this

23    developmental phase and what kinds of services need to be

24    put in place at these very critical points of intervention.

09:13:55 25         So we've mentioned prepregnancy, at -- during prenatal

1    care, at the time of birth.  And then it's not okay to just

2    say, okay, there is a plan in place, we can walk away,

3    because infants are at risk of poor developmental outcomes,

4    and we have to make sure that they have safety in where

09:14:15  5    they're going home, where they're living.

6        This was -- has been reproduced many, many times

7    across the country.  Many people have told me that this has

8    been very helpful to them, to help them organize the way

9    that they put interventions in place and sort of parcelize

09:14:33 10    the task of what do we need to do.

11        And it was published by the Office of National Drug

12    Control Policy to make sure that the country had a way to

13    really focus their practice and policy on this population of

14    infants and their families.

09:14:52 15  **Q**    Thank you.

16        So let's move on to the next -- the second population,

17    which is infants born with NAS and prenatal opioid exposure.

18        What is depicted in this slide, Dr. Young?

19  **A**    So we have mentioned this already, the immediate

09:15:10 20    withdrawal symptoms that infants can experience after birth

21    if they've been exposed to opioids during pregnancy.  That's

22    a list of the symptoms that pediatricians and neonatologists

23    are monitoring to determine that this is an infant that may

24    need intervention in that immediate postnatal period.

09:15:37 25        There -- the variation of which infant displays

         1    difficulty feeding or respiratory problems, it's a whole

         2    spectrum that requires neonatologists and pediatricians to

         3    be monitoring babies to determine if they actually need

         4    medication also to relieve their symptoms.

09:16:04 5    **Q**     So this slide, slide 19, is entitled:  Children

         6    Affected By Prenatal Opioid Exposure, NOWS and NAS.

         7         Now, we've heard about NAS, neonatal abstinence

         8    syndrome.  What is NOWS?

         9    **A**     NAS, or neonatal abstinence syndrome, was coined in

09:16:29 10   the 1970s to describe withdrawal of infants from opioids

        11    during that time period.  Since the '70s, NAS has become the

        12    diagnostic code that, again, pediatricians, neonatologists

        13    use for this withdrawal symptoms.

        14         But I mentioned the Assistant Secretary For Health

09:16:54 15   that recognizes we really need to have specific diagnostic

        16    criteria for what is opioids and what may be other drugs

        17    that the -- that the mother may have taken.  So the NAS is a

        18    larger pool, if you will, but only recently, only in the

        19    last actually six months, has the Department of Health and

09:17:19 20   Human Services come out with this diagnostic criteria for

        21    neonatal opioid withdrawal syndrome.

        22         So at present, most communities are still using the

        23    diagnostic codes for NAS, but, certainly, we're hopeful that

        24    as this information gets out more broadly, that we can make

09:17:37 25   a finer diagnosis of knowing the maternal history and being

1    able to monitored opioids specifically.

2    **Q**    So what specifically does this slide depict?

3    **A**    In -- if we look at those rates of this pretty

4    dramatic increase of diagnoses in Ohio, from 2006 to 2015,

09:18:04  5    the increase eight times over of 155 out of 10,000 births

6    with a diagnosis of neonatal abstinence syndrome, if we use

7    those percentages and apply those to the number of births in

8    Lake and Trumbull County, you see in one year how many

9    infants we're talking about.

09:18:26  10    So during that time period of -- that the data are

11    available for looking at the number of infants.

12    **Q**    All right.  From your 30-year experience looking at

13    data such as this, why is it that you believe that it is

14    appropriate to apply this -- this data on a percentage basis

09:18:52  15    to Lake and Trumbull?

16    **A**    Well, these data in particular from hospital

17    diagnostic coding that happens for paying claims,

18    researchers have looked at those data to determine by state

19    what is the rate of NAS diagnoses at birth.  So these are

09:19:13  20    Ohio-specific data.  And the data for Ohio applied to the

21    births in Lake and Trumbull is very appropriate to look at

22    the number of infants that were exposed.

23    And I misspoke when I said that that was in one year.

24    It's actually the number of births that are over a period of

09:19:35  25    time, a very small number of births actually in the two

1    counties.

2    **Q**    Right.

3         So slide 20, which is entitled:  Children Affected By

4    Prenatal Opioid Exposure and NAS, this is a -- contains a

09:19:50  5    table from your report.

6         Would you describe it for us, please.

7    **A**    So as I mentioned, looking across the developmental

8    spectrum, that drives the interventions.  How old is the

9    infant?  So we looked at infants and toddlers to determine

09:20:05 10    how many infants and toddlers there are in these two

11    counties that would determine the number of infants and

12    toddlers who need assessment and potentially interventions.

13         So the opioid exposure I mentioned, the 6.6 percent,

14    and while not all 6.6 percent of infants will display

09:20:31 15    withdrawal, they need to have assessments to ensure that

16    they're meeting their developmental milestones, so you see

17    the numbers that had opioid exposure.

18         And this is based on 2017 data, because that is the

19    most recent data in the scientific literature about the

09:20:51 20    prevalence rates of NAS in the state of Ohio.  So, again,

21    applying those Ohio rates to these two counties is the

22    number of births.

23         Then we know from following children with diagnoses

24    how many of them end up needing special education services.

09:21:12 25    It's about just over 19 percent of infants with NAS

1    diagnoses who need special education.  So you see in Lake

2    and Trumbull the number of children that will affect the

3    school districts in those two counties.

4         And then, the data that I mentioned that track by

5    state the NAS, this is also a more recent development in the

6    literature, that they also look at the delivering person's

7    diagnostic codes.  So they were able to determine how many

8    women went to the hospital to deliver a baby who had an

9    opioid-related diagnosis that was coded in the billing

10   system.  So you see how many infants with an opioid-related

11   diagnosis of their mother.

12   **Q**    So for the record, would you tell us, give us the

13   numbers under each of these categories for Lake and

14   Trumbull, please.

15   **A**    So for Lake County, prenatal exposure, 443.  Those

16   with prenatal exposure that would need special education

17   services, 85.  The number that were born to a woman with an

18   opioid-related diagnosis, 105.

19        The estimated number from that, with -- that would

20   actually have an NAS diagnosis, 77.  And then, again,

21   applying the percentage of infants with NAS diagnoses who

22   have special education needs, there would be 15 in -- per

23   year.

24        And similarly, for Trumbull, the numbers of infants

25   and toddlers in Trumbull County were about 6,300.  Opioid

1       exposure and special education needs, about 80.  Born to a

2       woman with an opioid-related, about 100.  And estimated

3       number with an NAS diagnosis, 73 of those.  And those that

4       would need special education would be 14 of infants and

09:23:18  5     toddlers who were zero to two in that time period, 2017.

6       **Q**     So this next slide, slide 22, describes the immediate

7       interventions for children affected by parental opioid

8       exposure and NAS.

9             Would you go through this with us, please.

09:23:39 10     **A**     So what pediatricians, neonatologists have learned

11      over the last decade in particular, really starting at a

12      specialized nursery at Yale, that they began to observe

13      different ways to work with infants and their mothers.  That

14      required a change in the NICU approach and really looked at

09:24:08 15     the developmental milestones for an infant.

16            So doing observations about is the infant able to eat?

17      Are they able to sleep for an appropriate period of time?

18      And can the infant be consoled?  So it's referred to as the

19      Eat, Sleep, Console method.

09:24:27 20           And the physician at Yale who really organized this

21      and has studied this has said the mother is the first line

22      of medicine, meaning that as -- as mothers and infants need

23      to bond, that hospitals needed to ensure that mothers and

24      infants had the place that they could do that.  They've

09:24:51 25     changed the way that hospitals have worked with mothers and

1    their infants to really focus on the assessment of is the

2    baby eating?  Are they sleeping?  Can they be consoled?

3    When that doesn't work, the pharmacological methods that

4    need to be put in place to make sure that the baby can

09:25:12  5    develop and thrive.

6         And then, importantly again, the specialized treatment

7    units that are allowing parents, mothers in particular, to

8    comfort their babies, just like probably everyone that's in

9    the room who experienced that wonder of birth in that

09:25:31  10    critical time period just after birth when you just have to

11    bond with that baby, so they changed the way that those --

12    those methods are going.

13         It shifts the automatic send the baby to the NICU to

14    revamping hospitals and their approach to ensure that the

09:25:54  15    dyad of the mother and the infant can stay together.  And

16    then, as I mentioned, the implementation of the safe plan of

17    care before the baby goes home.

18    **Q**    So back to slide 13.  We're now on to the third

19    population, children affected by prenatal opioid exposure,

09:26:14  20    and your next slide describes the effects on those children.

21         Would you please go through that with us.

22    **A**    These data come from, primarily from the American

23    Academy of Pediatricians who have reviewed the literature

24    over these long periods of time to understand the effects

09:26:35  25    for children who have prenatal exposure and have diagnoses

1   of NAS in particular and what that means about, again, this

2   early intervention that's needed for toddlers, what happens

3   in school age.

4       There's been a few studies, one very important one

09:26:57  5   from Australia that looked at their standardized testing for

6   all children in that area of where the researchers were, and

7   they looked over time at the infants who had had an NAS

8   diagnosis, those that were similar to those infants from the

9   same jurisdictions, and found that over time their academic

09:27:27 10   performance actually deteriorated on their standardized

11   testing.

12      So the school age interventions, the speech and

13   language, the issues with educational testing scores being

14   low, lower attention scores, all of those put a burden on

09:27:46 15   the school districts because, as we know, the school

16   districts are required to implement special education

17   services whenever a child is identified as needing special

18   education, so this is a tremendous burden for schools to

19   ensure that those services are in place.

09:28:07 20      And then the -- again, the behavioral and academic

21   challenges for high school.

22      And as we -- as we have been able to follow children

23   longer, this critical time period of adolescence and young

24   adulthood.  In particular, very disturbing studies that have

09:28:30 25   looked at children of parents with an opioid use disorder

1    and increased suicide attempts and increased successful

2    suicides among this population of adolescents.

3         I'm sure we're all familiar in the media of the call

4    to action that the surgeon general has done about the mental

09:28:53 5    health problems for adolescents, that the living with a

6    parent with an opioid use disorder is one of those big risk

7    factors for that population.

8    **Q**    All right.  So your next slide describes developmental

9    spectrum interventions.  This is slide 23.

09:29:13 10         Describe this for us, please.

11   **A**    Some of these we've talked about already.  The need

12   for ongoing assessments.  It's not a onetime thing, oh, this

13   child looks fine at 12 months and then we can just walk

14   away.  We have to ensure that the developmental assessments

09:29:30 15   are done over a period of time, so fine motor,

16   neurodevelopment, all of these -- speech and language, all

17   of these aspects of what a child has to do across their

18   areas of development need ongoing assessments.

19        We've mentioned already the need for special education

09:29:52 20   services for those children that begin to fall behind,

21   sensory integration, being able to attend to task, all of

22   those components that have been documented in the literature

23   as an effect for these children.

24        The mental health supports, particularly if they're

09:30:13 25   living in a family in which they have been separated from

1      their birth parents.  I mentioned the multigenerational

2      effects for grandparents and kin who are stepping in to

3      parent these children.  We've never really seen these

4      numbers of children that become orphaned, and the impact on

09:30:35  5   the family becomes very extreme.

6           So the individual counseling, as well as the family

7      focused interventions, not just for the child but for the

8      family and the intergenerational component of the

9      grandparents who are parenting these children.

09:30:55 10        It shifted about 2013, if my memory serves me right,

11     that if the data system recorded that the parent had a

12     substance use problem and that was associated with the

13     child's removal, that child was more likely to be placed in

14     a kinship provider than in a foster home.  So, again, the

09:31:20 15   impact on the family of parenting children that you're

16     grandparents and you're expected to move on and your

17     children are, you know, out of the house, and these are

18     parents who are dealing with their own child's opioid use

19     disorder or the death of their child and now the

09:31:38 20   responsibilities for the grandchildren.

21   **Q**    So the fourth population that you've described earlier

22     is children involved in child welfare services affected by

23     opioids and other substance use disorders.

24          What does this slide depict, number 24?

09:31:58 25   **A**    That is the continuum of the interventions that child

1    welfare puts in place on behalf of children with allegations

2    of abuse or, more often, much more often, neglect.

3    Particularly when we're talking about this population, the

4    allegations are of neglect.

09:32:17  5         So I described already the hotline reports, the

6    investigations, and assessments, making a determination with

7    a report to the court about the allegations and should those

8    allegations be substantiated.

9         Whenever possible, ensuring that the infant or the

09:32:37 10   child can stay with their birth family, so in-home services

11   means that the family is provided services without removal.

12        And then, the smaller population of children who are

13   placed in foster care or kinship care, and then those that

14   need a permanent place to live, in which case they move into

09:33:01 15   the adoption caseload.

16        So it's the continuum of child welfare practice.

17   **Q**    So I'm going to ask you a question that may be

18   obvious, the answer may be obvious to all of us, but I need

19   to ask it for the record.

09:33:13 20        With respect to the -- in Ohio, the child welfare

21   system, who bears the burden of that?

22   **A**    Taxpayers.

23   **Q**    Through county -- through county agencies?

24   **A**    Yes.  That's correct.

09:33:26 25        The county agencies contribute to the child welfare.

The state puts in money to pay for these services.  And the federal government.  So we all pay for these services for child welfare.

And important for adoption, because most people don't recognize that if a child is adopted from the child welfare system, the law was changed in 1999 in order to try and support adoptive families, so that child is entitled to Medicaid throughout their life until they transition to adulthood.  And so, the mental health services, all of those kinds of things that Medicaid pays for in a state are allocated to ensure that that child gets the services that they need.

So, again, all of us, the taxpayers, are paying for those services.

And the family, without being means tested, meaning that any family that adopts a child out of the child welfare system is entitled to income support as though the child was placed in foster care, so that they have the revenue needed, the income needed to ensure that that child has food, clothing, education, the things that parents pay for.

So it's an ongoing expense to the county, to the state, and to the federal government.  While we want permanency, absolutely, in that caregiving environment for that child, I think most people don't recognize, it's an ongoing financial burden to the taxpayers.

1   **Q**      So to the extent that there's an abatement remedy

2   that's decided in this case that provides funding from the

3   defendants to these -- to these counties, that takes the

4   burden off of these funding resources as well as the

09:35:26  5   taxpayers, correct?

6   **A**      Well, the county pays a portion of the adoption

7   assistance throughout the life of that child, so the burden

8   is being borne by the child welfare agency, both at the

9   county level and at the state level.

09:35:41  10   **Q**      Okay.  Now, this next slide depicts the effect or the

11   trends in out-of-home care associated with the increase in

12   overdose deaths.

13       Would you explain this to us, please, slide 25.

14   **A**      This was a study that was conducted by the Assistant

09:36:04  15   Secretary For Planning and Evaluation, which is a department

16   within the Department of Health and Human Services.

17       And they looked at the county level for the

18   association of the overdose death rates and these foster

19   care indicators.  So we described reports of maltreatment,

09:36:24  20   those that get substantiated as founded by, the Court makes

21   that determination, and then foster care placement.

22       And what they found, that for every ten percent

23   increase in the overdose death rate, that was associated

24   with these foster care indicators of increased reports of

09:36:44  25   maltreatment, increased substantiations, and increased

1    foster care placements.

2              THE COURT:  All right.  What are substantiated

3    reports?  What is that?

4              THE WITNESS:  So if you call the hotline and

09:37:00  5    say, I'm concerned about my neighbors' child, that's an

6    allegation.  You would say the child's left unsupervised and

7    I'm making essentially this allegation to child welfare.

8              THE COURT:  So that's something other than

9    maltreatment, just general concern that is substantiated?

09:37:16  10             THE WITNESS:  When it becomes maltreatment is

11   when the judge says these allegations are substantiated.

12   Child welfare has the burden to do an investigation, write a

13   report to the court, say this is what I found, here's the

14   evidence.  The judge makes a determination if those

09:37:32  15   allegations have been substantiated.

16             THE COURT:  Thank you.

17   **BY MR. WEINBERGER:**

18   **Q**     Now, this next slide, number 26, is a graph from your

19   report.

09:37:46  20        What is this graph intended to demonstrate?

21   **A**     Well, what we have been observing over the last 15

22   years in particular is this increasing rate of infants who

23   are being placed in care.

24        So I've already talked about this, you know, sweet

09:38:05  25   spot of intervention.  Infants have to have permanency in

1       their caregiving environment.  They have to bond with an --

2       with a caretaker.  You have to make that eye contact.  You

3       have to do that talking back and forth with a baby.

4             So there's a lot of attention because right now in our

09:38:25  5       country about 50,000 babies are placed in out-of-home care

6       each year.  And this has been an increasing trend over the

7       last decade, 15 years in particular.

8             So this looks at the data of infants, so children

9       under the age of one, who were placed in out-of-home care in

09:38:46  10      Ohio.  And then I mentioned that we needed to group the

11      small counties and the large counties.  So you see that Ohio

12      overall is the blue line.  That is the percentage of overall

13      children who are infants who are being placed in care.

14            But in the small counties, it's a percentage that is

09:39:08  15      somewhat higher than Ohio overall, and the large counties

16      have a somewhat lower rate of infants who are going into

17      out-of-home care.

18            But this increasing trend means that the child welfare

19      agencies in our country, in Ohio, in Lake and Trumbull, are

09:39:28  20      dealing with infants and young children who have all of

21      those situations that we've been describing, the

22      developmental needs, the need for ensuring permanency in

23      their caregiving environment.  And this shift has meant that

24      a large number of the children who are in foster care, about

09:39:49  25      40 percent, are under the age of five, young children that,

1    my view I guess, would be that we have a responsibility to

2    ensure they can have the best outcome possible.

3    **Q**    So this next slide is entitled:  Parental Drug Abuse

4    As Child Placement Factor.  And looks at the time frame or

09:40:16  5    the change between 2007 and 2017, correct?

6    **A**    That's correct.  Over the decade, these are change --

7    percentages in change over that time period.

8         And the characteristics of the things that are in the

9    rows on the left, those are the types of checkboxes, if you

09:40:40 10    will, that the worker can check off about what's associated

11    with this child's placement.

12        So I mentioned that there's a data system that once a

13    child gets put in foster care, they can say what were the

14    things that were going on with the family that were

09:40:56 15    associated with that parent's -- with that child's

16    placement.

17        And you see this dramatic increase in Ohio that drug

18    abuse by the parent is the largest increase of any reason

19    for removal.

09:41:13 20    **Q**    And that increase is 17.43 percent over the time --

21    over that ten-year time frame, correct?

22    **A**    Yes, it is.

23    **Q**    So what are the impacts on children in the child

24    welfare system?

09:41:31 25    **A**    We've talked about some of these already.  Even

1      though, as adults, we might be saying, this is the best

2      place for you to go, you need to be removed from your

3      parent, but that is a very big, traumatic experience for any

4      child, even young children, that need to be placed in

09:41:51  5      protective custody, so that trauma experience for the child.

6          And particularly, if the child is not placed with a

7      relative or they are placed with a relative and they have to

8      move from relative to relative or foster placement to foster

9      placement, each of those changes creates another traumatic

09:42:08 10      experience of separation for that child.

11          So the child welfare system is where we turn.

12      Children services is who we turn to to say, help these

13      individual children to be able to have the best adulthood

14      that they can by providing the social services, the mental

09:42:27 15      health services, the emotional and behavioral services that

16      are needed so that child has their best, best chance.

17          And then, we know for years now of being able to look

18      at what happens to kids.  Foster care is terrific.  We have

19      to have it.  It's really not the best place for a child to

09:42:50 20      grow up.  For all of those things, they need to have their

21      culture, their neighborhood, their family to remain the

22      same.  So all of those things that get shifted from time to

23      time for kids, they really face a lot of difficult

24      situations as they transition to adulthood.

09:43:13 25          A prominent researcher in the field just refers to it

1    as these kids have rotten outcomes.  Best as we can, we need

2    to be able to sustain the family in a way that that

3    individual child remains with the family whenever possible,

4    and we know how to do that to ensure that the family has the

09:43:35  5    supports that they need to parent their child.

6        And you see the list of the young children that become

7    homeless, they have much lower likelihood of attaining

8    higher education.  All of those things become burdens to

9    society, burdens to counties.

09:43:54 10   **Q**    And all of this impacts the child welfare system

11    itself, right?

12   **A**    Yes.  We've known for a while that, you know, worker

13    turnover is a very big challenge in the child welfare

14    system.  I mean, if any of us could imagine being that

09:44:13 15    frontline worker who goes out to do those investigations and

16    the trauma that they experience by seeing children that are

17    in these kinds of placements and in these kinds of

18    situations.

19        The "Great Resignation," we know that from these last

09:44:29 20    couple years of the pandemic.  We're experiencing that in

21    every line of business but particularly in the health and

22    human services, that that is a big challenge.

23        That means it's a financial burden on counties to meet

24    the needs of these workforce challenges for the recruitment,

09:44:49 25    the training, the ongoing training that's needed, and ways

1    to retain the staff.  So there's a lot of education that's

2    going on and sharing experiences from counties to counties

3    and states to states now on how you can retain workers,

4    because it's at such a critical phase.

09:45:09  5    **Q**    So we're about to end.

6    **A**    Yes.

7    **Q**    But let's end with the fifth category of population,

8    which is adolescent and young adults.  And your slide 30

9    contains information about that.

09:45:26 10        Would you tell us what this depicts.

11    **A**    Yes.  Children of parents with opioid use disorders

12    are just at greater risk of developing their own substance

13    use disorder, from both the potential of the prenatal

14    exposure but also the postnatal environment, that they have

09:45:43 15    a higher likelihood of developing their own problem.

16        In part, for children, adolescents who begin to

17    experiment and use, that I think most people recognize

18    happens in adolescents.  But for these kids that have a

19    parent with a substance use disorder, they are at higher

09:46:07 20    risk for developing their own problem, as well as we know

21    the areas of the brain that are not completely developed in

22    adolescents for decision-making, emotional regulation,

23    impulse control.

24        All of these things place these kids at higher risk

09:46:25 25    for problems, meaning that we need targeted prevention and

1    interventions for that population.

2    **Q**    And then, the final slide really kind of sums up the

3    various interventions and systems that are required to deal

4    with the effect of the epidemic on children and families.

09:46:48  5    Could you go through this with us, please.

6    **A**    I'll try and do that briefly.  It is a little complex.

7    But what I have learned over 30 years is that there

8    are certain practice interventions that communities need to

9    put in place.  That's the middle row of these strategies.

09:47:08 10    So a way to identify parents and their children who

11    have challenges related to substance use disorders, how we

12    get early access.  It's not okay at the time that the judge

13    says, your child is going to stay in out-of-home care, to

14    give a parent a phone number and say, go find treatment.

09:47:31 15    We have to have interventions that day to be able to

16    ensure that that parent is able to get into services.  And

17    we've demonstrated this over many years now, that when that

18    happens, the parent has a much higher rate of compliance

19    with treatment, treatment engagement, better chances of

09:47:46 20    reunification.

21    We know, too, that it's not okay to just say you're on

22    your own.  These are complex social services.  How do you

23    get someone the recovery support services that they need to

24    keep them engaged.

09:47:58 25    I've mentioned already the need for family

1    centeredness and the way we address children, infants, and

2    their parents.  And the beauty, really, of the way in which

3    the courts have stepped up in this docket of civil court to

4    increase the frequency of monitoring and ensuring that

09:48:20  5    parents are engaged in services.

6         The top row are the kinds of system supports that

7    communities need to have, a way of training, a way of

8    looking at their funding to ensure that there's -- these

9    services can stay in place.  And then we've documented over

09:48:36  10   these years the outcomes that are achieved when communities

11   are able to put these practices and systems in place.

12   **Q**   Thank you, Doctor.

13              MR. WEINBERGER:  Pass the witness, Your Honor.

14              MS. HACKER:  Your Honor, if we could just have

09:49:06  15   a few minutes to set up the technology.

16              THE COURT:  Okay.

17              **CROSS-EXAMINATION OF NANCY YOUNG**

18   **BY MS. HACKER:**

19   **Q**   Good morning, Dr. Young.

09:49:51  20   **A**   Good morning.

21   **Q**   We haven't had an opportunity to meet before, so I

22   want to start by introducing myself.

23        My name is Kat Hacker, and I represent Walgreens in

24   this case.

09:50:00  25        As you explained earlier, you understand the focus of

1    this trial is abatement, right?

2    **A**    Yes, I do.

3    **Q**    And the testimony you are giving us today relates to

4    some of the needs of special populations, like infants,

09:50:16 5    children, and families, right?

6    **A**    That is correct.

7    **Q**    Just to orient all of us, that is what plaintiffs have

8    called here Category 4, addressing needs of special

9    populations in their abatement plan.

09:50:28 10           Is that familiar to you?

11   **A**    Yes, it is.

12   **Q**    Have you spoken to Dr. Alexander about this case?

13   **A**    Yes, I have.

14   **Q**    When did you speak with Dr. Alexander?

09:50:41 15   **A**    At some point before submitting our reports.

16   **Q**    You didn't rely on Dr. Alexander's opinions in this

17   case?

18   **A**    My report was done independent of Dr. Alexander's

19   report.  But I am familiar with the way in which he has

09:51:04 20   crafted the abatement plan.

21   **Q**    Do you know if Dr. Alexander relied on your opinions

22   in this case?

23   **A**    In some situations, some of the data that I provided

24   about particularly the child welfare system and rates of

09:51:22 25   neonatal abstinence syndrome, I believe he relied on in this

1    case.

2    **Q**    Have you spoken to Dr. Harvey Rosen about this case?

3    **A**    No, I have not.

4    **Q**    Have you spoken to Dr. John Burke?

09:51:35  5    **A**    No, I have not.

6    **Q**    So I take it you have not reviewed the report of

7    Drs. Rosen and Burke in this case?

8    **A**    Not that I recall.

9    **Q**    Let's start today by talking about the groups of

09:51:47 10    people you discussed.

11         One group being pregnant women with opioid use

12    disorders.

13         Do you remember that?

14    **A**    Yes, I do.

09:52:00 15    **Q**    And you and Mr. Weinberger showed us this slide that

16    has a chart with one of your estimates, right?

17    **A**    That's correct.

18    **Q**    To get this estimate, you start with the assumption

19    that 6.6 percent of women reported using prescription

09:52:18 20    opioids during pregnancy?

21    **A**    Yes.  That's correct.  That's what the CDC has

22    reported.

23    **Q**    And for the record, this demonstrative was marked as

24    Plaintiffs' Demonstrative 77.

09:52:34 25         In parentheses here, you cite to 2019 PRAMS; is that

1    right?

2    **A**    Yes.  That's correct.

3    **Q**    PRAMS stands for Pregnancy Risk Assessment Monitoring

4    System.  Did I get that right?

09:52:49  5    **A**    Yes.  Yes, it does.

6    **Q**    And that Pregnancy Risk Assessment Monitoring System

7    is a survey project performed by the Centers for Disease

8    Control?

9    **A**    Yes.  That's correct.

09:53:00  10    **Q**    And the 6.6 percent figure that you use comes from an

11    article by Dr. Ko and a number of other authors that use

12    that PRAMS data?

13    **A**    Yes.  That's correct.

14    **Q**    Let's take a look at that article together.

09:53:21  15         Do you see that the title of this article is "Vital

16    Signs:  Prescription Opioid Pain Reliever Use During

17    Pregnancy"?

18    **A**    Yes, I do see the title.

19              MR. WEINBERGER:  Your Honor, can we see -- can

09:53:34  20    we have the article?

21    **BY MS. HACKER:**

22    **Q**    And just to be clear, Dr. Young, this is a report that

23    you cite in your expert report?

24    **A**    Yes, it is.

09:53:44  25              MR. WEINBERGER:  Can the witness be given a

1    copy of this report?

2                    MS. HACKER:  May I approach?

3                    THE COURT:  Yes.

4                    THE WITNESS:  Thank you.

5    **BY MS. HACKER:**

6    **Q**    And just so we're clear, this is the Dr. Ko article

7    that you relied on in your report, right?

8    **A**    Yes, it is.

9    **Q**    This publication is not specific to Ohio?

09:54:14 10    **A**    No, it is not.  Ohio does participate in PRAMS, but it

11    is not broken out with specific Ohio data.

12    **Q**    Let's look at Ohio's participation here, since you

13    mention that.

14         Down here in these footnotes, we see the various

09:54:31 15    states that participate in PRAMS, right?

16    **A**    Yes.

17    **Q**    And we can see the different response rates for each

18    state.

19         Do you see that, Dr. Young?

09:54:43 20    **A**    Yes, I do.

21    **Q**    And Ohio's response rate right here is 34.2 percent.

22         Do you see that?

23    **A**    Yes, I do.

24    **Q**    It's actually the lowest response rate of any state

09:54:52 25    that participates in PRAMS?

**N. Young (Cross by Hacker)**                    281

1    **A**    That's correct.

2    **Q**    And as you said, the statistics aren't separately

3    reported for Ohio?

4    **A**    That's correct.

09:55:03 5    **Q**    The statistics that are used in this article are also

6    from 2019; is that right?

7    **A**    That's correct.

8    **Q**    So there's no data from this year?

9    **A**    Not that's been released at this point.

09:55:18 10   **Q**    There's no data from last year?

11   **A**    2021 has not yet been released, correct.

12   **Q**    Has 2020 been released yet?

13   **A**    Not that I am aware of.

14   **Q**    Now, of the 6.6 percent of women who reported using

09:55:34 15   prescription opioids during pregnancy, some of those include

16   medically appropriate opioid exposure under a doctor's care,

17   correct?

18   **A**    That is correct.

19   **Q**    And, in fact, Judge Polster asked you a question

09:55:49 20   earlier about whether this included women who were

21   prescribed opioids versus who obtained them through

22   diversion.

23           Do you remember that?

24   **A**    Yes, I do.

09:55:58 25   **Q**    And your answer was:  We don't know to what extent

1    that -- which that population is.

2         Do you remember that?

3    **A**    Yes, I do.

4    **Q**    Let's take a look at a table in this article to help

09:56:10  5   answer that question for us.

6         I'm pulling up what is on page four, table 2.  The

7    title of it is:  Sources of prescription opioids and reasons

8    for use among respondents reporting use during pregnancy.

9         Do you see that?

09:56:27  10  **A**    Yes, I do.

11   **Q**    This table shows us that 91.3 percent of the women who

12   said they used prescription opioids during pregnancy were

13   actually prescribed opioids by a health care provider; is

14   that right?

09:56:44  15  **A**    I do see that.

16   **Q**    In fact, a majority of the women who reported using

17   prescription opioids during pregnancy here were prescribed

18   that opioid by their OB/GYN?

19   **A**    Yes, I do see that.

09:56:57  20  **Q**    And a little further down this table, we also see the

21   reason for prescription opioid use that these women

22   reported.

23        Do you see that?

24   **A**    Yes, I do.

09:57:11  25  **Q**    This shows us that 88.8 percent of these women used

1    prescription opioids during pregnancy to relieve pain?

2    **A**    Yes.  That's correct.

3    **Q**    There's nothing in this publication that says these

4    6.6 percent of women have an opioid use disorder?

09:57:29 5    **A**    That's correct.

6    **Q**    And there's nothing in this article that says these

7    6.6 percent of women even misused prescription opioids?

8    **A**    It doesn't say that specifically, but we do know that

9    a smaller percentage used them for reasons other than pain.

09:57:48 10    And I believe my report does say that that 6.6 places the

11    infants at risk, and that not all of those infants would

12    develop adverse consequences after birth.

13    **Q**    So since you mentioned it, let's talk about how many

14    of these women used prescription opioids for a reason other

09:58:09 15    than pain.

16         This table tells us the precise amount.  It was

17    14.4 percent of those women who used prescription opioids

18    for a reason other than pain; is that right?

19    **A**    Yes, it is.

09:58:20 20    **Q**    So going back to the slide that you and Mr. Weinberger

21    showed us earlier, the title of this slide, Pregnant Women

22    With OUD, does not actually refer to the estimates you're

23    providing us, right?

24    **A**    It refers to the risk for infants.  But you're

09:58:53 25    correct, it is all women using for the 6.6.

**N. Young (Cross by Hacker)**                284

1    **Q**    So just to be clear, that 6.6 percent of women are not

2    women who had opioid use disorder during pregnancy?

3    **A**    They're inclusive of those that had opioid use

4    disorder, that's correct.

09:59:11 5    **Q**    They're inclusive of, but it is not 6.6 percent of

6    women who have opioid use disorder during pregnancy?

7    **A**    That's correct.

8    **Q**    Because the population of women using prescription

9    opioids during pregnancy is different from the population of

09:59:27 10   women who have opioid use disorder during pregnancy, right?

11   **A**    The women with opioid use disorder are -- are part of

12   the overall population, that's correct.

13   **Q**    They're a subset of that population?

14   **A**    Yes, they are.

09:59:43 15   **Q**    I want to ask you about the difference in two other

16   populations you've looked at.

17        You spoke a little today about how adolescents have

18   been impacted by the opioid epidemic, right?

19   **A**    Yes.

09:59:54 20   **Q**    In your report, just to orient us, you have a section

21   on children, adolescents, and young adults, right?

22   **A**    Yes, I do.

23   **Q**    And if we page forward, just a few pages in that

24   section -- one more page, there we go -- you explained that

10:00:21 25   the NSDUH data -- and just to be clear, NSDUH is the

1    National Survey on Drug Use and Health, correct?

2    **A**    Correct.

3    **Q**    So the National Survey on Drug Use and Health data

4    shows that almost 1 million or 17.6 percent of adolescents

10:00:41 5    are estimated to misuse opioids; is that right?

6    **A**    Yes.  That's correct.

7    **Q**    And this comes from page 24 in your report.

8        Misuse, by the way, is just another way of saying

9    using opioids nonmedically, right?

10:01:01 10   **A**    I'm not sure if the survey on drug use and health

11    categorizes it in the same way that you've just categorized

12    it.  They have specific operational definitions of what does

13    misuse mean.

14    **Q**    Understood.

10:01:15 15       Then you continue here to explain that among

16    adolescents who misuse opioids, an estimated 2.6 percent are

17    estimated to have an opioid use disorder; is that right?

18    **A**    That's correct.

19    **Q**    Meaning, as you explained earlier, the group who has

10:01:36 20   an opioid use disorder is a smaller subset of those who

21    misuse opioids?

22    **A**    That's correct.

23    **Q**    We see here there's a substantial difference in the

24    group who have an opioid use disorder and the group who

10:01:54 25   merely misuse opioids?

**N. Young (Cross by Hacker)**                    286

**A**     I think what's important, however, is that adolescents

who are misusing opioids are placing themselves and the

other kids that they're driving with, the rest of their

family, they're placing them at great risk for the things

10:02:11  that we spoke about about adolescent development.  They

don't yet have all of the frontal lobe of executive

functioning developed, so they place themselves in risky

situations anyway.  So misusing an opioid and the

developmental stage of adolescent is a very critical time.

10:02:32  **Q**     You would agree that the subset we see here that is

2.6 percent of adolescents who have an opioid use disorder

is a substantial difference than the larger group that

merely misuses opioids?

**A**     I -- I agree that 2.6 percent is smaller than

10:02:52  17 percent, but I think it's a critical population for all

of us to be very concerned about, both the 17 percent and

those that have gone on to actually develop the criteria

that would classify them as a opioid use disorder.

**Q**     You don't think 2.6 percent is substantially smaller

10:03:14  than the larger group that misuses opioids?

**A**     I think I actually said that, I agree that it is

substantially smaller, but both populations are critical.

**Q**     Let's talk about another one of the groups you

discuss, infants with prenatal exposure.

10:03:31       An infant who has prenatal opioid exposure could have

1    been exposed in a variety of ways, right?

2    **A**    That's correct.

3    **Q**    They could have been exposed from a mother who is

4    using opioids as directed by her doctor?

10:03:44 5    **A**    That's correct.

6    **Q**    They could have been exposed from a mother who is

7    misusing prescription opioids?

8    **A**    Yes.  That's correct.

9    **Q**    Or they could have been exposed from a mother who is

10:03:55 10    using an illicit opioid like heroin or fentanyl who never

11    used prescription opioids?

12    **A**    I don't think the data substantiate that there are

13    many of those women who have never, but, yes, you're

14    correct.  Pregnant women, women in general don't typically

10:04:15 15    start, you know, using heroin as the first thing that they

16    use.  But you're correct, there are three different

17    populations.  I'm very aware of those.  And they each need a

18    different kind of intervention.

19    **Q**    So you agree that it is possible that an infant could

10:04:33 20    have been exposed to opioids prenatally from a mother who

21    used heroin who never once used prescription opioids?

22    **A**    It is possible.

23    **Q**    Of this group of infants with prenatal opioid

24    exposure, some of them may be diagnosed with neonatal

10:04:54 25    abstinence syndrome, as you explained earlier?

**N. Young (Cross by Hacker)**                     288

**A**     Yes.  Both -- all three of those populations.  And,

actually, you haven't referenced women who are on

medication-assisted treatment whose infants also could go

through withdrawal.  So rather than perhaps the three

populations, we're really talking about four.  So women who

are prescribed methadone, buprenorphine can also have an

infant who goes through withdrawal.

**Q**     So of those four sets of women, there's a portion

where the infant may be diagnosed with neonatal abstinence

syndrome?

**A**     There is a portion, yes.

**Q**     A large percentage of infants born with neonatal

abstinence syndrome are covered by Medicaid, right?

**A**     Right.  As I -- as we talked about, they're paid for

by the taxpayers, correct.

**Q**     So Medicaid already pays for the majority of medical

care and treatment costs for infants with neonatal

abstinence syndrome?

**A**     Actually, in our country, Medicaid pays for more than

half of the births.  But, again, that's not free money.

Just because it's a Medicaid-covered benefit, it's not free

to all the rest of us.

**Q**     And when you say it covers more than half the births,

I believe the static you cite is that 82 percent of those

costs are paid by Medicaid; is that right?

1      **A**    By the federal government, with a matching rate to the

2      state of how much the state pays for their reimbursement for

3      Medicaid, that's correct.

4      **Q**    And it is 82 percent that are covered?

10:06:29  5      **A**    I don't -- I don't recall that for that specific match

6      rate for Ohio of how much the Ohio-specific public pays for

7      their portion of the Medicaid costs.

8      **Q**    Let's see if I can refresh your recollection.  We'll

9      take a look at your report, which I'm pulling up on the

10:06:49 10      screen, at page 16.

11            You recognize this as your report in this case?

12      **A**    Yes, I do.

13      **Q**    And I'll point you to this sentence right here:  The

14      majority, 82 percent, of costs were paid by state Medicaid

10:07:13 15      programs.

16            Do you see that?

17      **A**    Yes, I do.

18      **Q**    In addition to Medicaid, Ohio receives other sources

19      of funding to address the opioid epidemic, right?

10:07:27 20      **A**    Yes.  The taxpayers have made additional resources

21      available.

22                  MR. WEINBERGER:  Your Honor, if I can just

23      interrupt.

24                  THE COURT:  Yes.

10:07:38 25                  MR. WEINBERGER:  May we have a continuing

         1    objection to testimony elicited regarding Medicaid,

         2    third-party sources of funding, or the like?

         3              THE COURT:  Well, overruled.

         4         Of course, I'll deal with it, but the defendants have

10:07:52 5    raised it, so if the doctor knows, she can answer it.

         6    **BY MS. HACKER:**

         7    **Q**    Dr. Young, I don't think you had an opportunity to

         8    answer the question, so I'll re-ask it for you.

         9         In addition to Medicaid, Ohio already receives

10:08:06 10   additional sources of funding to address the epidemic,

         11   right?

         12   **A**    Yes.  Congress has made money available to all of the

         13   states and communities because of the opioid crisis.

         14   **Q**    Let's talk about some of the funding that Congress has

10:08:17 15   made available.

         16        In the last two years, the federal government has

         17   actually instituted some very significant federal funding

         18   for people with opioid use disorder specifically, right?

         19   **A**    Yes.  That's correct.

10:08:27 20   **Q**    One of those programs includes the American Rescue

         21   Plan?

         22   **A**    Yes, it does.

         23   **Q**    That included $3 billion earmarked for substance abuse

         24   prevention?

10:08:40 25   **A**    I'm not sure if that allocation was for prevention.  I

**N. Young (Cross by Hacker)**                    291

1    believe that 3 million was -- I'm sorry -- again, the dollar

2    figure you gave me was three --

3    **Q**     3 billion.

4    **A**     3 billion.  That's what I thought.  But that's not all

10:08:56  5    prevention.  It's prevention and treatment and recovery

6    services administered by the states.

7    **Q**     So that 3 billion goes to substance abuse programs?

8    **A**     Prevention, treatment, and recovery, correct.

9    **Q**     Last year, Congress also passed the Consolidated

10:09:15 10    Appropriations Act, I believe it was known as H.R. 133,

11    right?

12    **A**     Yes.  That's correct.

13    **Q**     And that included another 3.8 billion in funding for

14    substance abuse treatment?

10:09:25 15    **A**     Yes.  Showing the impact of opioids on our states and

16    communities, correct.

17    **Q**     And it did include funding specifically for opioid

18    prevention and treatment?

19    **A**     Yes, it did.

10:09:37 20    **Q**     That bill also included 208 million for substance

21    abuse prevention, right?

22    **A**     I don't have those figures off the top of my head.  If

23    you're reading from the statute, then that sounds -- the

24    allocation for all block grant funded programs has

10:09:58 25    20 percent set aside specific to prevent substance use

1    problems, correct.

2    **Q**    So 208 million sounds about right?

3    **A**    If that's 20 percent of the overall allocation, then

4    yes.

10:10:12  5    **Q**    Another source of federal funding is the 21st Century

6    Cures Act, which established the state-targeted response to

7    the opioid crisis program, right?

8    **A**    Yes.  That's correct.

9    **Q**    And the federal government provided nearly $1 billion

10:10:28  10    through that program?

11    **A**    Yes.  Senator Portman and Ohio was instrumental in

12    getting those monies because of the impact that he saw in

13    his state, correct.

14    **Q**    And Ohio, in turn, specifically received over

10:10:42  15    $52 million through that grant program?

16    **A**    I don't know those numbers off the top of my head, but

17    Senator Portman did make sure that Ohio had funds because of

18    what he was seeing in his state, correct.

19    **Q**    Let's take a look at your report again and see if that

10:10:59  20    helps.

21         This is appendix two from your report.  Do you

22    recognize that?

23    **A**    Yes, I do.

24    **Q**    And this is marked as Plaintiffs' 23129.

10:11:09  25         Do you see here your description of the 21st Century

1    Cures Act?

2    **A**    Yes, I do.

3    **Q**    And you note that Ohio received 26 million in federal

4    funding in 2017, right?

10:11:25  5    **A**    Yes.

6    **Q**    And another 26 million in 2018, right?

7    **A**    Those are the allocations to Ohio that Congress made

8    available for the opioid crisis, correct.

9    **Q**    So Ohio was allocated about $52 million through the

10:11:40 10    21st Century Cures Act?

11    **A**    Yes.  That's correct.

12    **Q**    And we see here that that money supported a range of

13    projects and services; is that right?

14    **A**    Yes.

10:11:52 15    **Q**    Including medication-assisted treatment for opioid use

16    disorders?

17    **A**    Yes.  Each state could create their own plan of

18    meeting their own needs, so it was fairly flexible dollars

19    to be driven by the state's own needs assessment about what

10:12:12 20    kinds of services they needed to put in place.

21    **Q**    So the state can take those dollars and use them for

22    other things that you listed here, like vocational training,

23    housing, family recovery coaching, and peer support; is that

24    right?

10:12:27 25    **A**    Yes.  Those were the overall what could -- those

1   dollars could be spent on, correct.

2   **Q**    Are you aware that the entire state of Ohio did not

3   even end up spending all of this $52 million?

4   **A**    I'm not aware of that specific in Ohio.  I am aware of

10:12:51  5   that being a serious problem across the states.

6               THE COURT:  All right.  I'm not sure how

7   that's relevant unless it bears specifically on what went to

8   Lake and Trumbull County.

9               MS. HACKER:  Well --

10:13:07 10              THE COURT:  What Ohio did or didn't do in a --

11   in some past year, how -- so, I mean, if you want to spend

12   your time on it, that's fine, but, again, I don't see the

13   relevance.  But you've got limited time, and if you want to

14   keep asking the questions, it's up to you.

10:13:26 15              MS. HACKER:  Thank you, Your Honor.  We do

16   believe it's relevant if the state of Ohio has leftover

17   monies, but we understand that it is our time to spend.

18               THE COURT:  I'm not -- I'm not allocating any

19   money to the state of Ohio out of any abatement plan.

10:13:40 20   They're not -- they're not a plaintiff.

21         So the issue would be if -- certainly, if you can show

22   that Lake and Trumbull County received money for specific

23   services that the plaintiffs are seeking in their abatement

24   plan and they're not using it, that would be relevant.

10:14:00 25         But, again, it's your time and your questions, and if

1    the witness knows, she can certainly answer.

2    **BY MS. HACKER:**

3    **Q**    Dr. Young, you're also aware of the Substance Abuse

4    and Mental Health Services Administration; is that right?

10:14:19 5    **A**    That's correct, I am.

6    **Q**    Earlier I believe you used the abbreviation SAMHSA?

7    **A**    SAMHSA, correct.

8    **Q**    SAMHSA.

9    SAMHSA awarded Ohio another $17 million in 2022 to

10:14:33 10    address substance abuse; is that right?

11    **A**    Again, I don't know those numbers off of the top of my

12    head.  If that is the allocation for the regular substance

13    abuse prevention and treatment block grant, then that would

14    be an allocation from SAMHSA to the State of Ohio.

10:14:53 15    **Q**    And when there is an allocation from SAMHSA to the

16    State of Ohio, the STATE of Ohio can allocate those funds to

17    different counties among the state, right?

18    **A**    Yes, they do.

19    **Q**    And do particular counties apply for those funds?

10:15:10 20    **A**    I'm not sure of the requirements in Ohio about the

21    application process.  The State is required to tell the

22    federal government about how they've spent it.  I don't know

23    that the counties must also submit their plan to the State.

24    I would imagine, but I don't know that specifically.

10:15:31 25    **Q**    I'm showing you what's been marked as Walgreens MDL

**N. Young (Cross by Hacker)**                    296

1    Exhibit 5032.

2         I take it you've been to SAMHSA's website before,

3    right?

4    **A**    Yes, I have.  I've been to SAMHSA offices several

10:15:49  5    times, yes.

6    **Q**    And, Dr. Young, if you'd like a copy, I can hand it to

7    you, but the whole page is on the screen, so --

8    **A**    I can see it fine.  Thank you.

9    **Q**    What we have here is a printout from SAMHSA's website,

10:16:19 10    right?

11   **A**    Yes.  That's correct.

12   **Q**    And just to be clear, it's a government agency within

13   the Department of Health and Human Services?

14   **A**    Yes, it is.

10:16:26 15   **Q**    And they publish information about the grants they

16   issue each year?

17   **A**    Yes, they do.

18   **Q**    So what we're looking at here is the Ohio summaries of

19   fiscal year 2022?

10:16:43 20   **A**    Yes.  That's correct.

21              MS. HACKER:  Your Honor, Walgreens offers

22   Exhibit 5032, though we understand that Your Honor will take

23   it up at the end of the day.

24              THE COURT:  Okay.

25   **BY MS. HACKER:**

1       **Q**     So I want to direct your attention to the bottom to

2       this line here that says:  Total Substance Abuse Funds.

3            Do you see that?

4       **A**     Yes, I do.

10:17:06  5       **Q**     This tells us that Ohio received over $17 million in

6       SAMHSA grants for substance abuse in 2022, right?

7       **A**     That's correct.

8       **Q**     You said before you've never seen these kinds of funds

9       put into substance abuse treatment in the entirety of your

10:17:28  10       career, right?

11       **A**     Never has Congress allocated these kinds of funds,

12       never have they reacted so dramatically to a crisis of

13       substance abuse in our communities, correct.

14       **Q**     And it's remarkable that there are federal funds of

10:17:44  15       these amounts being put into communities to address the

16       opioid use and substance abuse problems?

17       **A**     It's remarkable because of the need, correct.

18       **Q**     One of the last things I'd like to talk to you about

19       today is what you did not do in this case.

10:18:01  20            Your background is in social policy, right?

21       **A**     That is correct.

22       **Q**     You're not a health care economist?

23       **A**     No, I am not.

24       **Q**     And you're not offering any opinions or estimates in

10:18:11  25       this case about the costs of the various programs or

**N. Young (Cross by Hacker)**                                    298

1    interventions you recommend?

2    **A**    That is correct.

3    **Q**    Throughout your testimony today, it has been clear

4    that you've devoted your entire career to children's --

10:18:27  5    children and families affected by substance abuse, right?

6    **A**    That is correct.

7    **Q**    Children and Family Futures' clients are generally

8    government agencies?

9    **A**    Most of our funding comes from government agencies,

10:18:42  10    but we're also funded by various foundations.

11    **Q**    But your clients specifically, not necessarily where

12    the funding comes from, but your clients are government

13    agencies?

14    **A**    Who we work with are counties, states, and tribes.

10:19:02  15    They would be considered our customers while others are the

16    funders.

17    **Q**    I would assume that you would like to see this court

18    order funding to provide treatment and services to children

19    and families to address the opioid epidemic in Lake and

10:19:19  20    Trumbull Counties, right?

21    **A**    I don't know that what I'd like is pertinent to this.

22    What I can tell you is that the impact has been great, and

23    it's evidenced by the funding that has been made available

24    from the taxpayers of our country to clean up the problem.

10:19:41  25    **Q**    If the Court does implement funds for programs for

**N. Young (Cross by Hacker)** 299

1      children and families in these counties, your company,

2      Children and Family Futures, has the capability to assist in

3      implementing the counties' proposed abatement plan programs

4      related to those populations, right?

10:20:02  5      **A**      All of our knowledge has been developed, the vast

6      majority of our knowledge has been developed with federal

7      funds, so that we provide those services to states,

8      counties, and tribes at no charge to them.

9      **Q**      You have worked for, I think you mentioned earlier,

10:20:23  10     the plaintiffs' attorneys involved in this case in other

11     opioids cases before, right?

12     **A**      Yes, I have.

13     **Q**      It's been about a dozen cases now?

14     **A**      No.  I don't believe a dozen.

10:20:33  15     **Q**      How many, do you think?

16     **A**      I believe I've been deposed eight times, and this is

17     the third time to give testimony at trial.

18     **Q**      Other than those eight times you've been deposed, have

19     you also done work in other cases where you have not been

10:20:50  20     deposed yet?

21     **A**      Yes, I have.

22     **Q**      And in the last three years, roughly, that you've been

23     doing this litigation-related work, it's taken about 10 to

24     15 percent of your professional time?

10:21:03  25     **A**      Yes.  I think what's important is I tend to do this on

1    weekends and nights, because I have a full-time job.

2    **Q**    I counted up all the invoices your company submitted

3    across those cases you've been involved in now, and it looks

4    like your company has been paid over $800,000 for your

10:21:21  5    involvement in those cases.

6         Does that sound about right?

7    **A**    I actually don't know that figure.  You know, I don't

8    do the accounting part of invoicing.  I do know that we've

9    been at this for some time, I think three years.  So I don't

10:21:39 10    know that figure, to be honest.

11    **Q**    Do you have any reason to dispute that it's been over

12    $800,000 now?

13    **A**    I don't have a reason to dispute, but I don't -- I

14    don't have the accurate figure.

10:21:51 15                    MS. HACKER:  Pass the witness.

16                    THE WITNESS:  Can I -- I'm sorry.  Could I do

17    one follow up to that?

18                    THE COURT:  Sure.

19                    THE WITNESS:  Because you said "your company."

10:22:01 20    It's actually a nonprofit organization.  I'm not the owner

21    of the company.  I don't benefit from any particular

22    contract per se.

23         So I realized after you started to walk away that the

24    connotation was that I have benefited.  Children and Family

10:22:19 25    Futures is a nonprofit organization, not -- not a for profit

1    making company that's billing these invoices.

2                    MS. HACKER:  Understood, Dr. Young.

3                    THE COURT:  Are you salaried?

4                    THE WITNESS:  Yes, I am.

10:22:30  5          THE COURT:  What is your salary?

6                    THE WITNESS:  This is going to be

7    embarrassing.

8                    THE COURT:  Ballpark.

9                    THE WITNESS:  About 210,000 a year.

10   **BY MS. HACKER:**

11   **Q**    And understood on your -- on your additional follow-up

12   there, Dr. Young.

13        I didn't mean any negative connotation by it.  I think

14   of it as your company because you founded Children and

10:22:52 15   Family Futures, right?

16   **A**    Yes, I did, with my husband, correct.

17   **Q**    And you're the executive director today?

18   **A**    Yes, I am.  We employ about 65 people.  And there's a

19   team that works with me on this, on these cases.

10:23:05 20   **Q**    And you've been the executive director for the

21   entirety of Children and Family Futures' existence?

22   **A**    Yes.  25 plus years, yes.

23                    MS. HACKER:  Pass the witness.

24                    THE COURT:  Any other defense counsel wish to

10:23:22 25   cross-examine, Dr. Young?

1          MR. MAJORAS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          **CROSS-EXAMINATION OF NANCY YOUNG**

4    **BY MR. MAJORAS:**

10:23:31  5    **Q**    Dr. Young, I'm going to switch locations.  Hopefully

6    can you hear me.  Okay?

7    **A**    Yes, I can.

8    **Q**    My name is John Majoras.  I'm one of the lawyers for

9    Walmart.  You and I have not had a chance to meet.  Good

10:23:53  10   morning.

11   **A**    Good morning.

12   **Q**    I have just a few follow-ups that I'd like to go back

13   to the slides that you and counsel for plaintiffs went

14   through.

10:24:02  15        First, I'd like to look at, and I'll put it up on the

16   screen for you --

17             MR. MAJORAS:  If I could have the ELMO,

18   please, Mr. Pitts.

19   **BY MR. MAJORAS:**

10:24:22  20   **Q**    So the first is from the deck that you went through

21   with Mr. Weinberger, which is slide 27?

22        In particular, I'd like you to look at the first line,

23   the drug abuse parent with the red that's been highlighted.

24        Do you see that?

10:24:36  25   **A**    Yes, I do.

1    **Q**    Now, the drug abuse, is that broken down at all

2    between the particular drug that is being abused or has been

3    abused by the parent?

4    **A**    No.  At this point, that is not.  But Ohio has been a

10:24:51  5    leader in trying to make better differentiation by

6    substance, particularly related to the infants that we've

7    been talking about, so in future years, they will be able to

8    break that out.  But the data that are presented now are

9    grouped together, that drug abuse by parent.

10:25:11  10    And I will also say that, as I explain in my report,

11    that this is a severe undercount of those factors that are

12    associated with a child's removal for various reasons about

13    why it doesn't get counted as accurately as we would like.

14    **Q**    So you have some concerns about the accuracy of the

10:25:34  15    data overall in terms of it being reported appropriately?

16    **A**    Only that it is undercounted.  And we know that from

17    various follow-up research studies that have been done that

18    have looked at the prevalence, as well as my experience of

19    being in every state and asking, does this prevalence rate

10:25:55  20    look right to you, and judges, attorneys, social workers,

21    I've never had anyone say that it's not an undercount.

22    **Q**    Is it your testimony that only the drug abuse part of

23    this chart is undercounted?

24    **A**    No.  I believe that many times, for reasons related to

10:26:13  25    the data system that many of these items may not be checked,

1    but the drug abuse in particular is an optional item for the

2    social worker to check, and that's the reason why it

3    sometimes doesn't.  And it's the reason why we've actually

4    had folks from Ohio speak to other states about what they're

10:26:38  5    doing to improve their data.

6    **Q**    So going back to my initial question about the drug

7    abuse portion, the one in red, that's not even broken down

8    between opioids or other drugs of abuse; is that correct?

9    **A**    At present, it is not.

10:26:53  10    **Q**    Okay.  So that would -- for example, items such as

11    meth and cocaine could very well be included within that red

12    line?

13    **A**    It could be.  I think what's important are, again, the

14    other studies that -- and the American Academy of Pediatrics

10:27:15  15    that says that the NAS rates are being driven by opioids.

16    **Q**    But in terms of the information presented today, I

17    just want to be clear, you agree that the red line is not

18    broken down by particular substances, correct?

19    **A**    That is correct.

10:27:31  20    **Q**    My other question on the chart, and this may go to

21    undercounting as well, are these presented as exclusive

22    reasons or, for example, could a child who has a drug abuse

23    parent also be subject to physical abuse and neglect, just

24    as examples?

10:27:48  25    **A**    It gets a little confusing.

1         But I'd like to go back to the previous question,

2    because you said it's not broken down by substances, and

3    alcohol is broken out separately from drug abuse.  So --

4    **Q**    Fair enough.  And I meant to say drugs.

10:28:03  5    **A**    Yeah.  So I want to clarify that.

6         And I'm sorry.  Could you re-ask the question --

7    **Q**    I guess my question is, is there any overlap in terms

8    of the data that's being presented?  So, for example, are

9    these being reported as the only child placement factors or

10:28:20 10    can there be overlap?  And I'll give you an example.

11        Could you have a child who has a drug abuse parent,

12    physical abuse, and neglect all reported together?

13    **A**    It's a little more complicated than that.  Because

14    children are not placed in foster care for reasons other

10:28:40 15    than the state statute that defines abuse or neglect, so the

16    allegations that are substantiated by the Court are various

17    forms of typically neglect.  Over 80 percent of children are

18    placed because of neglect.

19        So there are various -- each state has a statute that

10:29:00 20    defines what is neglect and what is abuse.  So children are

21    placed in out-of-home care for those factors.  These are

22    things that the caseworker would say, this is a factor in

23    the case that's associated with the abuse or neglect.

24        So they can check more than one box.  They're not

10:29:21 25    exclusive.

1       What's important is that from the time when I started

2   watching these data, it was less than -- about 15 to

3   18 percent of the time, it was checked that it was drug

4   abuse by the parent.  And now, across the nation, it's

5   40 percent.  And if it's an infant, it's over 60 percent of

6   the time that box is checked.

7   Q       So my question may be simpler than that, though.  My

8   question is, if a box is -- are these boxes that are being

9   checked exclusive reasons, or can there be multiple reasons

10  checked on a particular placement?

11  A       Yes.  I thought I did say that in my long explanation

12  about trying to help the Court and everyone understand these

13  data.

14  Q       The other thing I wanted to ask you about, this chart,

15  I think it's in the title, graph 18, it's percent change

16  over the time period; is that correct?

17  A       That's correct.

18  Q       I'd like you, if you would, turn -- or we'll look

19  at -- do you have the slide deck in front of you?

20  A       Yes, I do.

21  Q       If it's easier, you can look at it that way.  But I'm

22  going to go to slide number 19.

23      And the Court may recall from our prior trial, I have

24  this bad habit of writing on the slides when I put them up,

25  so I'm going to try and just take off my little notation

1    there.  That's the only reason I've got that yellow paper on

2    it.

3         Okay.  Are you with me on slide 19?

4    **A**    Yes, I am.

10:31:02  5    **Q**    In identifying the infants hospitalized for NAS in

6    both Lake and Trumbull Counties from 2013 through 2017,

7    those aren't actual hospitalization numbers, are they?

8    **A**    Those are the number of infants born with the rate

9    that has been established from those diagnostic codes

10:31:34 10    applied to the number of infants.

11    **Q**    So, in other words, you didn't look through births in

12    these counties during this period and look at specific

13    records of those births to identify whether infants were

14    hospitalized for NAS?

10:31:50 15    **A**    No.  The study primary author is Hirai.  And they have

16    looked at the diagnostic codes across the country to

17    determine the number and the rate of infants who were

18    diagnosed with NAS.

19    **Q**    So when you have reported here the 123 and the 229,

10:32:10 20    that's an estimate based on the rate you described earlier

21    in the slide multiplied by the number of births in those

22    counties during that period?

23    **A**    That's correct.

24                   THE COURT:  So it's an estimate and an

10:32:25 25    extrapolation from the data?

                        1                    THE WITNESS:  Yes, it is.

                        2                    THE COURT:  Okay.  Thank you.

                        3                    MR. MAJORAS:  Give me just a moment.

                        4            That's all I have.

        10:32:46  5            Thank you.

                        6                    MR. WEINBERGER:  Your Honor, I have a very

                        7     short --

                        8                    THE COURT:  Well, there was -- I was going

                        9     to --

        10:32:52 10                    MR. WEINBERGER:  I'm sorry.

                       11                    THE COURT:  I wanted to give our court

                       12     reporter a break.

                       13                    MR. HYNES:  That's fine.

                       14                    THE COURT:  I think -- why don't we take a

        10:32:58 15     break now, and then we'll pick up with the balance of the

                       16     cross and then redirect.

                       17            Take a 15-minute break.

                       18                        (Recess taken at 10:33 a.m.)

                       19                        (Court resumed at 10:51 a.m.)

        10:51:04 20                    THE COURT:  You may continue with

                       21     cross-examination.

                       22                    **CROSS-EXAMINATION OF NANCY YOUNG**

                       23     BY MR. HYNES:

                       24     **Q**     Welcome back, Dr. Young.

        10:51:23 25     **A**     Thank you.

**N. Young  (Cross by Hynes)**                    309

1     **Q**     Hi.  My name is Paul Hynes.

2                  THE COURT:  I guess I should say, just

3     technically, you're still under oath, Doctor.

4                  THE WITNESS:  Yes, I understand.

5     **BY MR. HYNES:**

6     **Q**     My name is Paul Hynes.  I represent CVS.  It's nice to

7     meet you.

8     **A**     Hello.

9     **Q**     I just have a few questions for you.

10:51:38  10            I want to turn back to slide 20 of the presentation

11    that Mr. Weinberger did with you.

12    **A**     Yes.

13    **Q**     Now, this is a table from your report, correct?

14    **A**     Yes, it is.

10:51:54  15    **Q**     Okay.  And there are certain footnotes that appear in

16    each row, correct?

17    **A**     That's correct.

18    **Q**     We don't have those footnotes on this slide, but there

19    probably wasn't space, right?

10:52:07  20    **A**     Correct.

21    **Q**     Okay.  Let's look at, I believe the correct page of

22    your report is page 15, and I've put it up here.  I just

23    have a few questions.

24            The estimated number with prenatal exposure --

10:52:30  25    **A**     That's correct.

1    **Q**     -- is it correct to say that you estimated the number

2    of births in the two counties based on data from 2015 to

3    '17?

4    **A**     That's correct.

10:52:43  5    **Q**     Okay.  And then, to estimate the number of babies with

6    NAS, you took a percentage, and that's footnote E [sic],

7    based on the percentage of infants with NAS per 1,000

8    hospital births with NAS.  You took that estimated

9    percentage and then applied it to the estimated number of

10:53:16  10    births you derived from 2015 to 2017 data to get your

11    number; is that correct?

12    **A**     That is correct.

13    **Q**     Okay.  Thank you.

14         Now, you testified earlier that you've talked -- you

10:53:32  15    talked with a few county employees?

16    **A**     Yes, that's right.

17    **Q**     Okay.  I believe it was two of them you talked with?

18    **A**     Yes.  A gentleman from Lake and a gentleman from

19    Trumbull, correct.

10:53:45  20    **Q**     Right.  And you read the depositions of I believe four

21    or five county employees?

22    **A**     That's correct.

23    **Q**     You didn't talk with any parents in the counties, did

24    you?

10:53:54  25    **A**     Not in Lake and Trumbull.  I've talked to parents in

1　other counties in Ohio but not -- not directly from Lake and

2　Trumbull, correct.

3　**Q**　Okay.  And you haven't talked with any pregnant women

4　in Lake and Trumbull Counties?

10:54:09　5　**A**　No, I have not.

6　**Q**　Okay.  And you haven't talked with any children in

7　Lake and Trumbull Counties?

8　**A**　No, I have not.

9　**Q**　Okay.  And you didn't -- you or your organization for

10:54:21　10　this case did not conduct any surveys of parents, pregnant

11　women, or children in Lake and Trumbull Counties?

12　**A**　No.  We rely on the scientific literature, not direct

13　surveys that we would have conducted, correct.

14　**Q**　Okay.  But you in some cases rely on national surveys,

10:54:41　15　don't you?

16　**A**　Yes.  That's correct.

17　**Q**　And you and your organization, for this case, did not

18　conduct any focus groups with parents, pregnant women, or

19　children in the counties?

10:54:52　20　**A**　That's correct.  Not for this case.

21　**Q**　Now, are you familiar with the ADAMHS Board?

22　**A**　Familiar with what an ADAMHS Board is and their

23　function.  I don't know any of the members of the Lake

24　County ADAMHS Board.

10:55:12　25　**Q**　You didn't speak with anyone from the ADAMHS Board?

**N. Young (Cross by Hynes)**                    312

1    **A**    I'm sorry.  I missed the first part.

2    **Q**    I'm sorry.  You didn't speak with anyone from the Lake

3    County ADAMHS Board?

4    **A**    Can I look back to the --

10:55:22 5    **Q**    Sure.

6    **A**    If you know for sure those folks are not on the Lake

7    County ADAMHS Board, then I can say, yes, I did not.

8    **Q**    Well, I'm just asking for your best recollection.

9    **A**    I don't believe that those -- any of those individuals

10:55:36 10   are on the Lake County ADAMHS Board, correct.

11   **Q**    Okay.  And are you familiar with the Trumbull County

12   Mental Health and Recovery Board?

13   **A**    I'm familiar with, again, their function and how they

14   operate in Ohio, yes.

10:55:48 15   **Q**    But you didn't talk with anyone from that board?

16   **A**    I don't believe that the two gentlemen -- the

17   gentleman that I spoke to from Trumbull County is from the

18   board, correct.

19   **Q**    Okay.  Are you aware that those two boards produced

10:56:10 20   transactional data on treatment services provided to county

21   residents, that they produced that data in this case?

22   **A**    That data was not made available to me, correct.

23   **Q**    So you did not review that data?

24   **A**    No, I did not.

10:56:23 25   **Q**    And you didn't ask the Lake County ADAMHS Board or the

1    Trumbull -- Trumbull County Mental Health and Recovery Board

2    for any other data to consider?

3    **A**    I don't recall asking for additional data.

4            MR. HYNES:  That's all I have.

10:56:42 5    Thank you, Dr. Young.

6            THE COURT:  Okay.  Mr. Weinberger.

7                  **REDIRECT EXAMINATION OF NANCY YOUNG**

8    **BY MR. WEINBERGER:**

9    **Q**    Dr. Young, you were asked about your 6.6 percent

10:57:19 10   figure from the 2019 PRAMS article, correct?

11   **A**    Yes.

12   **Q**    And looking again at that article published July 17,

13   2020, this looked at statistics from 2019, correct?

14   **A**    Yes.  That's correct.

10:57:45 15   **Q**    And specifically, the background says:  Prescription

16   opioid use during pregnancy has been associated with poor

17   outcomes for mothers and infants.  Studies using

18   administrative data have estimated that 14 to 22 percent of

19   women filled a prescription for opioids during pregnancy;

10:58:09 20   however, data on self-reported prescription opioid use

21   during pregnancy are limited.

22           Do you see that?

23   **A**    Yes, I do see that.

24   **Q**    So according to this, 14 to -- 14 to 22 percent filled

10:58:23 25   prescription opioids during pregnancy, but you used a figure

1   of 6.6 percent, right?

2   **A**     Correct.  That is what women reported.  Correct.

3   **Q**     So you were using a conservative figure, right?

4   **A**     Extremely.

10:58:35 5   **Q**     Right.

6        And in the results where they talk about that

7   6.6 percent, it says:  An estimated 6.6 percent of

8   respondents reported prescription opioid use during

9   pregnancy.  Among these women, 21.2 percent reported misuse,

10:58:59 10   parentheses, a source other than health care provider or a

11   reason for use other than pain.

12        Have I read that correctly?

13   **A**     Yes, you have.

14   **Q**     And, in fact, one of the conclusions is that:

10:59:16 15   Improved screening for opioid misuse and treatment of opioid

16   use disorder in pregnant patients might prevent adverse

17   outcomes.

18        Have I read that correctly?

19   **A**     Yes.  That's correct.

10:59:26 20   **Q**     Implementation of public health strategies, e.g.,

21   improving state prescription drug monitoring programs use

22   and enhancing provider training can support delivery of

23   evidence-based care for pregnant women.

24        Have I read that correctly?

10:59:42 25   **A**     Yes, you have.

1    **Q**    Are you aware of the fact that state prescription drug

2    monitoring program use is describing not only prescribers

3    using a PMP but also dispensers, like pharmacies like CVS,

4    Walgreens, and Walmart?

11:00:00  5    **A**    Yes, I'm familiar with that.

6    **Q**    Now, you made the comment that NAS is driven by

7    opioids.

8         Do you remember saying that?

9    **A**    Actually, it's the American Academy of Pediatrics who

11:00:20  10   has said that.

11   **Q**    So explain that to me.

12   **A**    Well, because of this situation that pediatricians

13   weren't anticipating the opioid crisis, the opioid epidemic,

14   so, you know, we didn't know as health care providers or

11:00:40  15   folks who were working in this arena that we needed to make

16   that differentiation in order to count prescription opioids,

17   you know, prospectively, in advance.

18        So the NAS coding or that diagnostic code, as I said,

19   was created specific for opioid withdrawal.  And then, over

11:01:04  20   time, it kind of got other things, other substances came

21   into being, you know, the methamphetamine era of the mid

22   2000s.  And if an infant was having toxicity, which is

23   different than withdrawal of opioids, based on a stimulant,

24   then there wasn't a diagnostic code to classify those

11:01:32  25   infants.  And so it became both.

1          But more recently, as we've discussed, Health and

2     Human Services, and specifically the Assistant Secretary For

3     Health, has put out guidance on using opioid withdrawal,

4     specifically for opioid withdrawal, and because of that, we

11:01:54   5     have to rely on these other research studies and other

6     experts who are telling the public, telling us that opioids

7     is what has driven this dramatic increase in infants'

8     withdrawal since, you know, the last decade in particular,

9     which, in turn, drives infants going into out-of-home care.

11:02:22  10     Q     So I have -- I've written here opioid use disorder

11     related -- relatedness to NAS, but before I ask you about

12     that.

13          You were asked -- or you testified that you did not

14     talk to mothers or children in Lake and Trumbull County?

11:02:42  15     A     That's correct.

16     Q     Do you recall that?

17     A     I do.

18     Q     Have you over the years, in your experience, talked to

19     mothers and children affected by the opioid epidemic?

11:02:58  20     A     Yes, absolutely.  A conversation that is extremely

21     vivid for me for a woman from Coshocton County that I had

22     the opportunity to visit there.  I've also been to Scioto

23     County and interviewed women that were in residential

24     treatment there.

11:03:17  25          But over my career, I've talked and conducted focus

1    groups and been involved with many individuals that have

2    opioid use disorder and are in treatment in various

3    locations.

4    **Q**    And as a result of those conversations, have you

11:03:36  5    reached a conclusion as to the extent to which opioid use

6    disorder in mothers exists in this country or in the state

7    of Ohio?

8    **A**    Well, because those would be anecdotal conversations,

9    it provides the context, it provides their experience.  The

11:03:57 10    mother in Coshocton in particular whose husband had an

11    industrial accident and started on prescription drugs and,

12    you know, in a very short time period, as she said she had

13    been able to get into recovery when her children were

14    removed and participate in the family treatment court in

11:04:17 15    that county, that she was doing well.  But, unfortunately,

16    her child's father had not done well, and it had been a very

17    bad situation for their family.  And that's been, as we

18    know, repeated time and time again.

19        So anecdotally, it provides that context, that flavor.

11:04:42 20    When I was here in Cleveland to provide testimony to Senator

21    Portman and Senator Brown, there was a gentleman who lost

22    his son to an opioid overdose who began using after having

23    his wisdom teeth extracted.  So those kinds of situations

24    that I am extremely well aware of.

11:05:08 25        But probably, you know, maybe because it's my age and

1    I'm a grandma, the grandparents who are devastated by both

2    the loss of their child who has the opioid use disorder or

3    devastated by the death of their child who are now raising

4    their children, the federal government has just started a

11:05:31  5    new technical assistance center specifically for

6    grandparents and kin who are raising their children.

7         This is sort of unheard of in our country, to have so

8    many families impacted that the federal government said we

9    need a technical assistance center just for grandparents who

11:05:49 10   are raising their children -- their grandchildren now.

11   **Q**    Dr. Young, you were asked about government funding,

12   including funding through the recent rescue plan, the

13   passage of the recent rescue plan, and H.R. 133.

14        Do you know how much of that has gone into Lake or

11:06:14 15   Trumbull County?

16   **A**    No, I don't.

17   **Q**    Do you know how long it will last?

18   **A**    Until it's spent and it will be gone.  There will be

19   no long-term resources available to Lake and Trumbull or to

11:06:29 20   the rest of the country.

21        Could I follow up on that?  Because I think there's a

22   key piece of this about, you know, the impact of funds that

23   were made available.

24        Because the substance abuse treatment prevention field

11:06:48 25   has been unfunded and inadequately funded for so long, that

```
  1        we don't have the infrastructure in communities to spend

  2        that money right away.  It sounds like, oh, great, Congress

  3        put money into this, you know, I like to say the taxpayers

  4        put money into it, and it went unspent.  No.  They're still

  5        building the infrastructure.

  6            It takes trained professionals.  It takes getting

  7        people on the ground to implement these programs.  It's not

  8        something that you can turn on a dime and get one allocation

  9        and say we solved the problem.  It is a long-term need and

 10        it is a long-term solution just to build the infrastructure

 11        of human resources that we need to implement these programs.

 12   Q    Is it your belief that the national monies that we've

 13        talked -- that you were asked about are a drop in the bucket

 14        in terms of what is needed to deal with the substance abuse

 15        problem, the opioid abuse problem in this country and its

 16        effect on families and children?

 17   A    It's a small amount compared to the need.  And I think

 18        that's evidenced by individuals that I did speak to that's

 19        in Lake and Trumbull that still talk about not being able to

 20        meet the demand.

 21            And remember when we talked about that you have to be

 22        able to engage with parents the day that they've delivered

 23        the baby?  They have to be able to -- workers have to be

 24        able to intervene with parents the day their child is

 25        removed.  Those kinds of resources take infrastructure over
```

**N. Young (Redirect by Weinberger)**           320

1      a longer period of time to build those programs, to train

2      the staff, to provide the expertise that's needed.  And the

3      reason why you have to do it then is about what that means

4      of the -- really, the magic of recovery and providing that

11:08:47    5      hope as that individual parent is devastated by the loss of

6      their child.

7              So that immediacy can't be understated about what's

8      needed in communities.

9      **Q**      You were asked by one of the defense lawyers whether

11:09:05    10     or not you had looked at treatment data from the counties.

11             Do you recall that?

12     **A**      Yes, I do.

13     **Q**      The -- is it your experience that statistics about

14     treatment severely result in undercounting of the number of

11:09:24    15     people that are actually suffering from opioid use disorder

16     in this country?

17     **A**      Oh, yes.  That's -- that's well established in the

18     literature for as long as I can remember.

19             There is a very big difference between need for

11:09:36    20     treatment and making a demand on treatment.  So you and I

21     may have, you know, Uncle Bob or someone in our family who

22     we all recognize has a problem.  We -- this person needs

23     treatment.  We recognize that person needs treatment.

24             But converting Uncle Bob from need to treatment to

11:09:58    25     actually seeking treatment is a very big step.  And a lot

1    of, unfortunately, damage and adverse consequences may be

2    evident in his life and the life of his family while we're

3    trying to get those resources in place to ensure that he's

4    able or she is able to get into treatment at that point when

11:10:25  5    they have the treatment that's made available.

6         So the lag between need for treatment, demand for

7    treatment, enter treatment, there are lag periods there, and

8    I believe it's our job to close that gap.

9    **Q**    And that's part of the reason for the need to develop

11:10:43 10    infrastructure.  And we're not just talking about building.

11    We're talking about people who can be trained to reach out

12    to individuals and counsel them or their families into

13    treatment, right?

14    **A**    Exactly.  It is -- it is both the infrastructure,

11:10:59 15    which has been underfunded for a very long time, but,

16    importantly, the personnel, the staff, the trained

17    professionals that are needed to be able to meet people,

18    provide that hope that they need, and the engagement in

19    services for them.

11:11:17 20    **Q**    And that's across a broad range of county departments.

21    It's not just social workers.  It's law enforcement, it's a

22    wide range of departments that are affected by that and need

23    to develop, we'll use the word infrastructure, to get over

24    that hurdle, right?

11:11:38 25    **A**    Correct.  Individuals -- you know, the reason why that

1    framework looks so complex is because individuals seek

2    services in lots of different places.

3          The police encounter, the, you know, car accidents,

4    emergency rooms, the criminal justice system, the child

11:12:02 5    welfare system, they all have been impacted by this

6    increased number of individuals who have opioid use

7    disorders and opioid misuse that are creating consequences

8    in our communities.

9                    MR. WEINBERGER:  Thank you, Dr. Young.

11:12:19 10          Nothing further, Your Honor.

11                    THE COURT:  Okay.  Any further recross?

12                    MS. HACKER:  No additional recross from

13    Walgreens, Your Honor.

14          I did just have one housekeeping item for the record.

11:12:35 15          I believe I misidentified one of the demonstratives we

16    looked at with Dr. Young, this slide that refers to

17    Dr. Young's estimates of pregnant women who use prescription

18    opioids.

19          I referred to it on the record as PT77.  It is

11:12:52 20    actually CT3-2, demo 2, from the plaintiffs, and it was page

21    14.

22                    MR. WEINBERGER:  We agree with that, Your

23    Honor.

24                    THE COURT:  Okay.

11:13:07 25                    MR. HYNES:  Very short recross, Your Honor.

1       THE COURT:  Okay.

2       **RECROSS-EXAMINATION OF NANCY YOUNG**

3   BY MR. HYNES:

4   **Q**    Hi, Dr. Young.  This will be really quick.

11:13:17   5       Mr. Weinberger just asked you some questions about

6   funding.

7   **A**    Yes.  That's correct.

8   **Q**    Okay.  You have not evaluated the funding of existing

9   programs for families and children in the counties, have

11:13:32  10  you?

11  **A**    I did not look at budgets for those programs, but we

12  identify various programs that we have been involved with in

13  Ohio and in Trumbull County.  But not to look at their

14  specific funding, that is correct.

11:13:51  15  **Q**    You couldn't say what their funding is sitting here

16  today?

17  **A**    Not off the top of my head.  I'd be surprised if

18  anybody could.

19  **Q**    Right.  And it's also not in your report?

11:14:00  20  **A**    The funding that has gone specific to the allocation

21  from the state to the counties is not in my report, correct.

22  **Q**    You don't have any opinions about the existing funding

23  of the programs in the counties?

24  **A**    No, I wouldn't agree with that.  I have opinions about

11:14:18  25  the existing funding I believe I just talked about.

1    **Q**    But they're not based on the actual funding that the

2    county agencies and departments have been receiving?

3    **A**    It's not the specific dollars that the taxpayers have

4    made available to those counties.  It's not the specific

11:14:36  5    dollars.  But the adequacy and the ability to convert need

6    to demand to access, I do have opinions about.

7    **Q**    Right.  But it's not based on the funds that the

8    agencies and departments have received in the past or are

9    receiving today?

11:14:52  10    **A**    That is correct.

11                    MR. HYNES:  Thank you.

12                    MR. MAJORAS:  Nothing from Walmart, Your

13    Honor.

14                    THE COURT:  Okay.  Thank you very much,

11:15:00  15    Dr. Young.

16        You may step down.

17                    THE WITNESS:  Thank you very much.

18                    MR. LANIER:  Your Honor, the next witness is

19    going to be Caleb Alexander.  And I know you have not asked

11:15:31  20    for paper copies but wanted electronic copies of everything.

21        There are these two massive charts that are going to

22    be so much easier to follow, I suspect, if you've got paper

23    copies, so I've got them for you, just in case.

24                    THE COURT:  Thank you.

11:16:00  25                    MR. LANIER:  Dr. Alexander, we have your

1      reports and your charts.  Do you want those?

2                  THE WITNESS:  Those would be great.

3                  MR. LANIER:  I just want to grab these reports

4      for him, please.

11:16:21  5              THE COURT:  Good morning, Doctor.

6                  THE WITNESS:  Good morning.

7                  THE COURT:  Could you please raise your right

8      hand for me.

9                      (G. CALEB ALEXANDER, sworn)

11:16:31 10              THE COURT:  Thank you very much.

11              **DIRECT EXAMINATION OF G. CALEB ALEXANDER**

12     **BY MR. LANIER:**

13     **Q**    Dr. Alexander, welcome back to the stand in this

14     trial.

11:16:38 15   **A**    Thank you very much.

16     **Q**    As I suspect you understand, we are in the remedy

17     phase, having already concluded the jury liability phase.

18     This phase is being tried simply in front of His Honor, so

19     I'll be asking my questions, ask you to direct your answers

11:16:54 20   to the Court.  And, of course, as always, he will tell us if

21     we are astray or if he's got additional questions I'm not

22     smart enough to ask.

23         Okay?

24     **A**    Yes.

11:17:07 25   **Q**    All right.  I have a roadmap for you.  We want to make

1    a thorough record here, but we want to do so as briefly as

2    possible, recognizing that the Court can read your report

3    and probably has read a good bit of it, if not all of it,

4    already.

11:17:24  5         Okay?

6    **A**    Yes.

7    **Q**    But we still want to put certain things on the record,

8    and so we're going to do that with three different stops

9    along the way.  We are going to talk about your

11:17:32 10   qualifications, then we'll talk about your opinions and

11    bases for those, and then what I'm calling complaints.  And

12    by that I simply mean some of the issues where we believe

13    the other side complains about the work you have done.

14         Okay?

11:17:50 15   **A**    Yes.

16    **Q**    So let's start with qualifications.

17         Now, you did testify during phase I of this case,

18    fair?

19    **A**    Yes.

11:17:59 20   **Q**    And during that phase, in your testimony, we went

21    through your curriculum vitae, your CV, also fair?

22    **A**    Yes, we did.

23              MR. LANIER:  Your Honor, we've got it marked

24    in this phase as Plaintiffs' Exhibit 4899.  We will be

11:18:18 25   moving it into evidence or attempting to later as you deal

1    with those things at the end of the day.

2    **BY MR. LANIER:**

3    **Q**    But for practical purposes, as a reminder to the Court

4    and to make sure we've got it on the record, are you still a

11:18:32  5    medical doctor?

6    **A**    Yes.

7    **Q**    Are you still an epidemiologist?

8    **A**    Yes, I am.

9    **Q**    And do you teach both medicine and epidemiology?

11:18:43 10   **A**    Yes, I do.

11   **Q**    And as a doctor, what kind of medicine do you

12   practice?

13   **A**    I'm a practicing general internist, so general

14   medicine for adults.

11:18:55 15   **Q**    And how is it that you came to be someone with such a

16   thorough expertise in matters like opioid use disorder?

17   **A**    Well, I've been interested in understanding the

18   genesis of the opioid epidemic as well as how to best abate

19   it for many years, and so, I've made it one of the foci of

11:19:23 20   my academic scholarship.

21   **Q**    And in that regard, have you gotten grants and

22   foundational funding for work on this area?

23   **A**    Yes, I have.

24   **Q**    And have you published, I would say innumerable, but

11:19:41 25   let's just say hundreds of articles, many of which are

1    relevant to this subject?

2    **A**    Yes, I have.

3    **Q**    And if you were to just put into your own words your

4    qualifications that make you a preeminent expert about

11:19:56  5    talking about how to go about solving these problems, how

6    would you put your expertise on the record?

7                    MR. DELINSKY:  Objection, Your Honor.

8    Leading.

9                    THE COURT:  Overruled.

11:20:12  10                    THE WITNESS:  I'd characterize myself, I'm a

11    practicing internist.  I'm a pharmaco-epidemiologist, a

12    professor of epidemiology.  I spent a significant amount of

13    my 20-plus year career in academic medicine working to

14    understand the genesis of the opioid epidemic as well as the

11:20:33  15    value of varied programs and services and interventions that

16    might best abate further harms.

17    **BY MR. LANIER:**

18    **Q**    Is this something you just got into because we hired

19    you in this case, or is this something where you have quite

11:20:49  20    a reputation already?

21    **A**    I've been interested in this for years, far prior to

22    my first engagement with litigation, which may have occurred

23    in 2017 or so.

24    **Q**    All right.  In that regard, then, let's move down the

11:21:06  25    road from your qualifications and let's talk about your

1    opinions and the bases for those opinions.

2                THE COURT:  Mr. Lanier, what exhibit did you

3    reference was the CV?  Because I didn't see that.  Maybe I

4    misheard it or I didn't see it on the chart.

11:21:20   5                MR. LANIER:  I'm sorry, Your Honor.

6            Plaintiffs' Exhibit 4899.

7                THE COURT:  Okay.  I didn't see that on the

8    index, so --

9                MR. LANIER:  Then I may have messed up in the

11:21:28  10    index, and if so, we will rectify that.  I'm sure as you and

11    I are having this dialogue right now, people are fast and

12    furious making sure that our index is proper.

13        Did you pass up a copy?  Okay.  Thank you.

14    **BY MR. LANIER:**

11:21:55  15    **Q**    And Mr. -- Dr. Alexander, excuse me, did you prepare a

16    report that is an abatement plan for addressing the opioid

17    crisis in Lake County and Trumbull County?

18    **A**    Yes, I did.

19    **Q**    And did you issue that report April 16th of 2021?

11:22:17  20    **A**    Yes, I did.

21    **Q**    We have marked your report Plaintiffs' Exhibit 23100,

22    and we'll be seeking to admit that later, but for our

23    purposes right now, what I'd like to do is walk through

24    those opinions you've got specifically with regard to the

11:22:41  25    spreadsheets that you did and attached as appendices.

1           Okay?

2    **A**    Yes.  That's fine.

3    **Q**    All right.  So here's the way -- I'm trying to figure

4    out how to do this as quickly as possible and not be

11:22:54 5    redundant.

6           So give the judge kind of an overall synopsis of how

7    you went about putting together an abatement plan so the

8    judge has a framework for understanding the appendices we'll

9    work from.

11:23:09 10   **A**    Of course.  And I'll try to answer briefly two

11   different ways.

12          First is to speak to the broad scientific approach,

13   which was to examine the foundational literature, the

14   literature that speaks to the matters at hand.  Also to

11:23:26 15   combine this with reviewing a number of materials that were

16   generated by the counties themselves.  And to review data

17   arising from both federal and state sources to supplement

18   data that may have been available that was county specific

19   and generated at the county level.

11:23:43 20          And I combined this with my conversations with local

21   experts on the ground, such as April Caraway and Lauren

22   Thorp and Kim Fraser.  And I also consulted with a team and

23   with professional colleagues who are themselves experts in

24   varied matters that are relevant to the matters at end.

11:24:08 25          And this is done in an iterative fashion, so it's

1    not -- it's not a linear fashion where you never look back.

2    Rather, it's an iterative fashion, where I look at the data,

3    I look at the peer-reviewed literature, I speak with

4    experts, I consult with colleagues, and iteratively develop

11:24:29  5    the plan.

6         To answer the second way:  The plan itself is focused

7    on a variety, perhaps 15 or 20 different categories of

8    programs, programs or services.  And each of these

9    categories is I believe important for a comprehensive and

11:24:50  10    coordinated abatement plan in each county.

11         The categories themselves are similar or identical

12    across the counties, but the magnitude, the volume of

13    services and programs are quite different, because the

14    counties are different in terms of their population, the

11:25:08  15    morbidity and mortality from the opioid epidemic, and the

16    like.

17  **Q**    All right.  So if we take your two ways, first the

18    plan where you examine the literature, you examine the data,

19    you dialogue with local experts, that's part of the

11:25:25  20    methodology of how you put your plan together?

21  **A**    Yes.  And -- yes.  And that includes consultation with

22    colleagues and professional experts as well.

23              MR. DELINSKY:  Your Honor, I just want to make

24    it clear on the record that when we're talking about experts

11:25:41  25    in the context of these drawings, it's not -- it's a

1    colloquial word, not a court-approved Rule 702 admitted

2    expert.

3                    MR. LANIER:  And I'll stipulate to that, Your

4    Honor.

11:25:54 5                    THE COURT:  It's people that Dr. Alexander

6    considers source of expertise.

7                    MR. LANIER:  Exactly.

8                    THE COURT:  Okay.  So you can -- I mean, you

9    can certainly cross-examine him, Mr. Delinsky, on who these

11:26:05 10   folks are.

11                   MR. LANIER:  Thank you, Judge.

12   **BY MR. LANIER:**

13   **Q**    And then, you've put together a plan, and the plan

14   itself you have divided up into four categories; is that

11:26:20 15   right?

16   **A**    Yes.

17   **Q**    And so that we've got those categories for His Honor,

18   would you walk through them for us.

19        Category 1.

11:26:34 20   **A**    Yes.  Category 1 is prevention, which is focusing on

21   reducing opioid oversupply and improving safe opioid use.

22   **Q**    All right.  So in total, we can just call it

23   prevention.

24        Category 2 would be what?

11:26:52 25   **A**    Category 2 is treatment, which is focused on

1    supporting individuals affected by the epidemic.

2    **Q**    And so, you will give His Honor a -- in each of these

3    categories, you will be providing the care that needs to be

4    done over an extended period of time to best abate the

11:27:13  5    opioid epidemic in each of these two counties; is that fair?

6    **A**    Yes, it is.

7    **Q**    And then you've got Category 3 for your plan.  And

8    what is in Category 3?

9    **A**    Category 3 is focused on recovery and enhancing public

11:27:27  10   safety and reintegration.

11   **Q**    And then your final category is Category 4.  What

12   would you give that as a global describer?

13   **A**    Well, Category 4 is focused on the needs of special

14   populations, such as youth, adolescents, pregnant women,

11:27:48  15   neonates, and the like.  So these are special populations of

16   particular concern.

17   **Q**    And so His Honor's got an ability, as he not only

18   reads through your report but reads through the appendices

19   to your report, which we'll tender into evidence, he's got

11:28:03  20   an ability to see what you believe to be the necessary

21   elements to help prevent, Category 1; the necessary elements

22   to help treat, Category 2; the necessary elements to help

23   aid recovery, Category 3; and the special elements necessary

24   to abate in special population areas.

11:28:28  25       You'll have those in buckets for His Honor, fair?

1    **A**     Yes.  That's correct.

2    **Q**     All right.  In that regard, what I'd like to do is

3    take next Plaintiffs' Exhibit 23105A.  And this is one of

4    your spreadsheets.  And in this, I'd like to be able to look

11:28:52  5    at the spreadsheet information you've given His Honor for

6    Lake County's opioid abatement estimates.

7         Do you see where I've got this in front of us, your

8    worksheet?

9    **A**     Yes, I do.

11:29:12  10   **Q**     All right.  We'll keep this out and we'll go through

11   this so that the Judge has an understanding and a framework

12   of what your testimony has been as we look through each of

13   these categories in the plan.

14        First, I need to ask you this question:  The

11:29:31  15   information that you have put into Plaintiffs' 23105A and

16   23105B, which is this same form of a document simply for

17   Trumbull County instead of Lake, right?

18   **A**     Yes.  That's right.  The same framework.

19   **Q**     All right.  So within that framework, have the figures

11:29:58  20   and the opinions and the material that you've put into these

21   spreadsheets been based upon what is reasonably probable

22   under the medical and scientific expertise that you have?

23   **A**     Yes.  I've done my best to identify the most relevant

24   scientific information and to estimate the magnitude of

11:30:26  25   programs and services that are needed within any category or

1    subcategory.

2    **Q**    All right.  Now, you told me that you've got one math

3    issue on these charts, and we'll get to that, because you

4    want to make sure His Honor is aware of that math issue; is

11:30:44  5    that correct?

6    **A**    Yes.  That's right.

7    **Q**    Okay.  Don't let me fail to do that.  But with the

8    exception of that math issue, do you stand by these figures

9    and these abatement plans that you have put together as

11:31:00 10    being reasonable to abate the opioid epidemic in Lake and

11    Trumbull Counties?

12    **A**    Yes.  I think they're not only reasonable but

13    important.

14    **Q**    Explain why you say that.

11:31:13 15    **A**    Well, because the morbidity and the mortality in the

16    counties continues to accrue.  And my review of materials

17    that have been provided to me, as well as discussions with

18    local experts on the ground, as well as the opportunity to

19    review abatement progress or lack thereof in jurisdictions

11:31:32 20    around the country, underscores to me that this is a problem

21    that can be addressed and needs to be addressed urgently.

22    And, you know, I was just -- so that's why.

23    **Q**    All right.  So let's start with Category 1,

24    prevention.

11:31:50 25            And you've got a number of different -- well, if we

1    look at the front page, it's kinds of an index for these

2    abatement categories.

3         Prevention, your goal here is to reduce opioid

4    oversupply and to improve safe opioid use.

11:32:13  5         Is that correct?

6    **A**    Yes, it is.

7    **Q**    And then you break this down into a number of

8    different areas.

9         First you have health professional education.

11:32:24 10        Can you explain what you're doing there.

11   **A**    Well, the focus of health professional education is to

12   be sure that prescribers are in tune with and using the best

13   evidence possible as they're undertaking -- as they're

14   treating individuals that may have pain.  Also to improve

11:32:44 15   their ability to identify and manage patients that have

16   opioid addiction.

17   **Q**    In this regard, we had some alarming testimony, to me

18   at least, from a *Morbidity and Mortality Weekly Report* of

19   July 17th, 2020, that was used by the defense in the last

11:33:13 20   witness, and it talked about, with a chart, the number of

21   pregnant women who have been given opioids by prescribing

22   doctors.  It was table 2.

23        Are you familiar with the idea that doctors are

24   actually prescribing opioids to pregnant women?

11:33:40 25   **A**    Well, I'm not shocked by it, but I certainly am

1    concerned.

2    **Q**    That 91.3 percent of the opioid use among pregnant

3    women came from a health care provider source, often the

4    OB/GYN, sometimes the family doctor or primary care doctor,

11:34:04  5    sometimes a dentist, sometimes an emergency room doctor.

6         Are you seeking funds to help educate the health

7    care -- no -- are you suggesting funds to help educate the

8    health care system to address issues like this?

9    **A**    Yes, I am.

11:34:22 10    **Q**    Now, by the same token, Ms. Young was also asked about

11    a slide that she had that indicated pregnant women with OUD

12    effects.  And in that slide, she talked about the report we

13    just looked at that 6.6 percent of women reported using

14    prescription opioids during pregnancy.

11:34:49 15         Obviously, not a reference to 6.6 having OUD but to

16    using prescription opioids.

17         Do you see that?

18    **A**    Yes, I do.

19    **Q**    When you figure out in your chart what percent of

11:35:04 20    women that are pregnant that have OUD, do you use the figure

21    like 6.6 users or do you use a different figure?

22    **A**    No.  I use a different methodology.  I don't use the

23    number of women receiving opioids, although, that's of

24    concern.  But that's not the strategy that I -- that I

11:35:24 25    undertake.

1    **Q**    All right.  So under prevention, we've got health

2    professional education.

3         We've got patient and public education.  Can you

4    explain what that is and why it's important.

5    **A**    Well, I mean, this is vital.  There are widespread

6    misconceptions about the nature and optimal management of

7    chronic pain as well as the management of opioid addiction

8    among the general public as well as patients.  There's also

9    widespread stigma, of course, that's vital to be addressed.

10        So patient and public education is designed to help

11   shift public opinion and help to lead to a greater informed

12   public and patient population that will understand that

13   addiction is just not -- it's not just a matter of bad

14   choices, that nobody wishes to have addiction any more so

15   than they wish to have colon cancer, and that it's

16   treatable, that there's safe and effective FDA-approved

17   medicines to treat it.

18        This category is also important to educate individuals

19   about how to best safely store and dispose of opioids, which

20   we'll come to in the next -- next category.  But it's vital

21   that the public and patients be educated regarding safe

22   storage and drug disposal.

23   **Q**    All right.  So on patient and public education, take

24   the first prong of what you spoke about, the education and

25   stigma prong.

1        If there is evidence that some people just don't want

2   to get treatment, are those people who need to be educated?

3   **A**     Well, I mean, we certainly can't accept the status

4   quo.  And the fact that many people are not interested in

11:37:10  5   treatment is a part of the problem.  It's not a part of the

6   solution.

7        So -- so that needs to be front and center in terms of

8   working to be sure that any inclination to decline treatment

9   isn't a function of lack of awareness about the fact that

11:37:28  10   treatment works, that there is a better path, that there are

11   millions of people living happy, healthy, successful lives

12   in recovery.  And we need to be sure that we're investing in

13   the treatment infrastructure as well, which we'll come to

14   shortly.

11:37:43  15   **Q**     All right.  So you give, obviously, printouts and

16   read-outs and great detailed data on each of these points

17   where I could take a week and go through your chart, but

18   we'll be putting your chart into evidence and so we don't

19   take a week to do it.

11:38:02  20        But I want to go to the next item under prevention.

21        Community prevention and resiliency.

22        Can you explain what that covers.

23   **A**     Absolutely.

24        Well, if you think of prevention, prevention can

11:38:14  25   happen on an individual level, reaching out to patients or

1      providers or other affected parties, but prevention can also

2      happen at a community level.  And particularly in hard-hit

3      communities, the fabric of the community has been frayed by

4      the opioid epidemic.  In other words, there's not the

11:38:35  5   community safety net that communities that have been less

6      severely affected have.

7           And so, this category of services and programs is

8      designed to implement evidence-based interventions, such as

9      providing community spaces, instituting peer or mentorship

11:38:54  10  programs and the like, that help to undertake prevention at

11     a community level.

12  **Q**     All right.  The next category -- the next subdivision

13     of Category 1, prevention, is harm reduction.

14          Can you give the Court an understanding of what you

11:39:12  15  have categorized as harm reduction.

16  **A**     Well, the best example of harm reduction are syringe

17     service programs, although, I also propose other types of

18     services.  And these don't just make good public health

19     sense — and there's an overwhelming amount of information to

11:39:31  20  support their public health value — they make good economic

21     sense.

22          Harm reduction is a pathway to treatment, so while

23     there are individuals that may be -- participate in syringe

24     programs, for example, that are not engaging in treatment,

11:39:48  25  it is a pathway for many individuals to ultimately enter the

1    treatment system.

2    **Q**    The *Wall Street Journal* today reported that for the

3    first time, U.S. drug overdose I think deaths exceeded a

4    hundred thousand based in part or largely on the fentanyl

11:40:08  5    increase and all that's come about.

6         Do you provide things like fentanyl testing strips and

7    things like that under your harm reduction category?

8    **A**    I do.  I do.

9    **Q**    Then the final subdivision of Category 1, prevention,

11:40:31 10    is surveillance, evaluation, and leadership.

11        Can you explain what that is and why that's important.

12    **A**    Well, it's vital that resources that may arise from

13    any source, whether a settlement or a judgment or another

14    source, are properly shepherded and stewarded, and so

11:40:49 15    this -- and it's also vital that interventions are made and

16    iteratively evaluated and so that measures are tracked and

17    so that we know what programs are working, what programs may

18    have fulfilled their objectives, where resources should be

19    reallocated.

11:41:08 20        So this is no less important than the other categories

21    that I include here, and it provides for staffing for

22    abatement coordination.

23    **Q**    In other words, can you just solve this problem by

24    taking a bunch of money and pouring it out into the county,

11:41:27 25    just fly a plane over and dump a bunch of money into the

1    county?  Will that do it?

2    **A**      No, it will not.

3    **Q**      Even the programs themselves, do you have to have an

4    infrastructure and very clear responsibilities for people

11:41:41  5    who are skilled and able and driven take jobs to oversee

6    programs and implementation of whatever His Honor does to

7    help abate this epidemic?

8    **A**      Yes.  That's vitally important.

9    **Q**      All right.  Let's move then from Category 1,

11:42:00  10    prevention, to Category 2, which is treatment.

11          And within the framework of that, have you given His

12    Honor what you consider to be a proper treatment proposal

13    for each of the two counties?

14    **A**      Yes, I have.

11:42:18  15    **Q**      And that treatment proposal starts out with one

16    subsection of connecting individuals to care.

17          Can you explain what you've done there.

18    **A**      Well, it's not an accident that it's first, Your

19    Honor.  And the reason that I include it is because many

11:42:39  20    people don't access care because of the gaps that occur in

21    our typically fragmented health care system.  And so, this

22    includes interventions such as a help line, the provision of

23    peer recovery coaches, transportation assistance, quick

24    response teams, which are teams that go out and reach people

11:43:02  25    that have recently overdosed in an effort to outreach to

1    them and to work to get them into treatment, as well as

2    bridge programs that can be established in emergency

3    departments and that allow for a warm handoff so that a

4    35-year-old woman that comes in that recently overdosed

11:43:19  5    isn't just given a phone number to call and sent back home

6    or sent back to the streets once she's discharged.

7    **Q**    Now, in this regard, I want to go and dig a little

8    deeper.  And so, I'm still on 23105A, which is Lake County,

9    but I've pulled up the actual spreadsheet where you connect

11:43:40  10   individuals to care that you're talking about, the 2A,

11   treatment.  And you specify these areas that you just said

12   to His Honor, the help line, peer recovery coaches,

13   transportation assistance, quick response teams, and the

14   bridge programs.

11:43:58  15        Is that fair to say, you break those out?

16   **A**    Yes.

17   **Q**    And you've done that with all the other categories

18   that we've been talking about or will talk about, you break

19   them out with what you perceive to be the need; is that

11:44:12  20   right?

21   **A**    Yes.

22   **Q**    And you do that on -- for year-by-year-by-year basis

23   starting with, from your report, 2021, though that's past

24   now.  But you can just move these years successively into

11:44:30  25   the future, is that fair?

1    **A**      Well, I do it for 15 years, so that's true, it's a

2    15-year plan, and it -- you know, a shift would require some

3    consideration of the data inputs and other matters.  But,

4    yes, I think for -- for illustrative purposes, yes, this

11:44:48  5    could be imagined shifted one year.

6    **Q**      All right.  Well, do you -- in the process for His

7    Honor as he works through this and for the appellate record,

8    we've got in brackets here on the screen, where you've put

9    bracket one under help line, bracket two under peer recovery

11:45:11  10    coaches, brackets three, four, five, six, seven under

11    transportation assistance, eight through 12, quick response

12    teams, 13 and 14, bridge programs.

13         Do you see those bracketed numbers?

14    **A**      Yes, I do.

11:45:24  15    **Q**      And His Honor is able to go to the next sheet.  And in

16    those bracketed numbers, do you provide not only what the

17    bracket applies to but the source from which you are

18    deriving your opinion and your information?

19    **A**      Yes, I do.

11:45:46  20    **Q**      So, for example, when you have number of full-time

21    equivalent help line staff at three, you have three 8-hour

22    shifts so that there's a 24-7 hotline coverage by a licensed

23    clinical social worker level staff and/or crisis

24    intervention specialist that's informed by substance abuse

11:46:10  25    and mental health services admin and the national help line.

1      Is that fair?

2   **A**    Yes.

3   **Q**    Okay.  And so, you can then -- the judge has the

4   ability and the appellate court has an ability to check all

11:46:24  5   of your figures to see where they are sourced and why you

6   have given the input that you do, true?

7   **A**    Yes.

8   **Q**    And then, also at the end of each of these sections,

9   you have what you call cost description, right?

11:46:43  10  **A**    Yes.  For most -- for most of the 20 categories within

11  these four, you know, for most of the 20 subcategories

12  within these four overarching categories, there are costs

13  that are provided as well.

14  **Q**    And you've done and cited those where you've got a

11:47:01  15  citation for the costs, like the bridge program costs per

16  emergency department, you give sources for those as well,

17  true?

18  **A**    That's correct.

19  **Q**    And so, that information, an economist like Dr. Rosen

11:47:16  20  or Dr. Burke would be able to take your data and put it into

21  total numbers, fair?

22  **A**    Yes.

23  **Q**    All right.  We did a deep dive there under 2A, but we

24  could do that same deep dive, and His Honor will be able to,

11:47:33  25  the appellate record will have, for all of the categories

1    and subcategories you've got, true?

2    **A**    Yes.  That's right.

3    **Q**    And we'll look at maybe some more in a moment, but 2B,

4    talk about treatment for opioid use disorder, please.  What

11:47:50  5    is that?

6    **A**    Well, that focuses on the direct provision of care for

7    people with opioid addiction.  I already noted that we have

8    safe and effective treatments.  They can reduce mortality by

9    as much as 50 percent, which is a mortality reduction that,

11:48:08 10   you know, clinicians from many different fields would love

11   to have for the various conditions that they manage.

12        And this category is focused on providing treatment

13   across different levels of care using a framework provided

14   by the American Society of Addiction Medicine.

11:48:27 15   **Q**    All right.  I'm going to interrupt you, Dr. Alexander,

16   and just once more, for illustrative purposes, and to have

17   on the record, I want to go to -- do a deeper dive to your

18   spreadsheets where you talk about treatment for opioid use

19   disorder, which would be on page 15 of Plaintiffs'

11:48:45 20   Exhibit 23105A.

21        The ASAM levels of care for OUD treatment, do you see

22   that?

23   **A**    Yes, I do.

24   **Q**    Now, the ASAM you said stands for the what?

11:49:03 25   **A**    American Society of Addiction Medicine.

1       **Q**     Is that like a fly-by-night organization or is this

2       something with credibility?

3       **A**     It's -- it's not a fly-by-night organization.  It's a

4       professional society of addiction specialists around the

11:49:18  5     country.

6       **Q**     They're the go-to people for this, aren't they?

7       **A**     I think it's the best -- as I've always done, I use

8       the best source of information that I was able to find for

9       the purpose at hand.  And I felt that for this purpose, ASAM

11:49:35  10    was a very good framework to use.

11      **Q**     All right.  And then you dig down and you start out by

12      talking about the total number of individuals with opioid

13      use disorder.  For 2021, you have 5,668.  That's bracketed

14      with bracket number one.

11:49:56  15            Do you see that?

16      **A**     Yes, I do.

17      **Q**     And so, bracket number one, we're able to look at the

18      next spreadsheet, the number of individuals with OUD in Lake

19      County.  Input:  5,934.  Your source:  2019 data, past

11:50:17  20    12 months, opioid use disorder, estimate provided by

21      Dr. Katherine Keyes.

22            Is this where you used her numbers that His Honor

23      heard about yesterday?

24      **A**     Yes, it is.

11:50:30  25    **Q**     Now, why, when she gives the number 5,934, do you have

1    the number 5,668?

2    **A**    Because I trend down the need for services over time

3    in order to account for what I estimate to be an improving

4    situation on the ground over time, and I do so by applying

11:50:55  5    a -- what I call a trend ratio, which is depicted as input

6    24.

7        And in some sense, I take a conservative approach,

8    because in year one, I already apply a modest reduction in

9    the level of services and programs.  And so I apply this

11:51:14 10    trend ratio of 0.96, so essentially I take 96 percent of the

11    estimate that Dr. Keyes provided.

12    **Q**    All right.  And then, over time, do you continue to

13    trend down the number of individuals with OUD and the

14    proportion of those who will be receiving treatment?

11:51:34 15    **A**    Well, I trend down the total number of individuals

16    with opioid use disorder using that trend ratio.

17        And I can discuss, if Your Honor is interested, how I

18    derive that trend ratio.

19        I trend up the proportion of individuals receiving

11:51:50 20    treatment over time, so that's input two.  And whereas in

21    year one, I believe that we can achieve and should achieve

22    40 percent of individuals receiving treatment.  By the end

23    of the 15 years, I estimate and believe that we can achieve

24    60 percent receiving treatment that have opioid use

11:52:09 25    disorder.

1    **Q**    And is that in part because of the education, both

2    patient and public education, that you have talked about

3    under the prevention tab?

4    **A**    It's a function of many different -- many of these

11:52:26 5    categories ultimately will help to feed the pipeline of

6    individuals entering treatment, so connecting individuals to

7    care, LEAD programs that are a part of public safety

8    initiatives, drug courts that are a part of the criminal

9    justice system.  These are like 3A, like apple, and 3B, like

11:52:49 10    boy, though there are many different components of the

11    abatement plan that will allow for an increase in the

12    proportion of people with addiction receiving a treatment

13    over time.

14    **Q**    And by the same token, I talked about the American --

11:53:02 15              THE COURT:  And I assume, Doctor, that also

16    would contribute to the reduction in the people who need the

17    treatment if those methods are successful?

18              THE WITNESS:  That's absolutely the case, Your

19    Honor, and that is -- I take that into account in applying

11:53:18 20    the trend ratio.  In other words, by year 15, I estimate

21    that the morbidity and mortality associated with the

22    epidemic can be halved in the communities, and so, there

23    will be lower need for treatment, in part, because more

24    people will have been successfully treated.

11:53:36 25    **BY MR. LANIER:**

1    **Q**    That's great.

2        Have you broken out this treatment -- and by the way,

3    you've got at the bottom of each of these charts your

4    abbreviations explaining it, so there will be no doubt about

11:53:52 5    that as well.

6        But as we look through this, are you able to also

7    specify, for example, the proportion of individuals to

8    receive MAT, or medications for addiction treatment, and

9    then break out those medications of what they may receive,

11:54:11 10    and have you gone to great detail here for the Court?

11    **A**    I -- yes, I have apportioned individuals across

12    different types of medications, for example.  And as with

13    all of the other inputs, I've provided the source of

14    information that I use to derive the estimates that I've

11:54:30 15    provided to the Court.

16    **Q**    And by the same token, do you also give the total

17    number of different types of professionals that would be

18    needed, whether the number of psychiatrists, psychiatrist

19    nurses, addiction counselors, peer review coaches or peer

11:54:52 20    navigators, program assistants, social workers, do you

21    provide all of that in an annualized basis?

22    **A**    I do.  In this instance, for what you just displayed,

23    this is for the subset of individuals with opioid use

24    disorder that I believe should be eligible and receive

11:55:10 25    assertive community treatment, which are individuals with

1    highly complex, comorbid illness that will benefit from the

2    greater intensity that the ACT program allows.

3    **Q**    Can you give me a practical everyday example of what

4    that means for someone to be highly complex, comorbidity

11:55:37  5    illnessed?

6    **A**    Yes.  This would include an individual that might

7    have, for example, severe mental illness as well as opioid

8    use disorder, so an individual that has poorly controlled

9    bipolar affective disorder or what colloquially is called

11:55:54  10    manic depression, may also have opioid addiction, could also

11    have HIV or could also have poorly controlled cardiovascular

12    disease, and might have insecure housing and may not be

13    gainfully employed.  And so, it's this type of individual

14    that will benefit from the greater intensity of services

11:56:16  15    that are afforded by the assertive community treatment

16    model.

17    **Q**    All right.  As we continue through Category 2 and the

18    treatment need, 2C, managing complications attributable to

19    the epidemic.

11:56:33  20        What type of groups are you talking about?  What type

21    of abatement work are you talking about here?

22    **A**    Well, here, I'm focused on a fairly narrow subset,

23    just three conditions, but three important ones:  HIV,

24    hepatitis C, and endocarditis.

11:56:54  25        So the first two are chronic infectious diseases, both

1    of which can be treated, and hep C can be cured.  And

2    endocarditis is a bacterial infection of the valves of the

3    heart.

4         And to be clear, I'm estimating here the needs for

11:57:13  5    treatment for individuals that I believe have these as a

6    function of the opioid epidemic.  So I'm not suggesting just

7    treat anybody with hep C in the community, but, rather, I've

8    estimated and provided the sources of information I used to

9    estimate the -- essentially the attributable population of

11:57:31  10   individuals with addiction that have hepatitis C, for

11   example.

12   **Q**    And, again, with all of these categories, just to be

13   clear, you give in bracketed numbers your references for how

14   you derive the numbers that you are giving to His Honor; is

11:57:53  15   that fair?

16   **A**    Yes.

17   **Q**    If you look at Category 2D, workforce expansion and

18   resiliency.

19        Can you explain the abatement need you're addressing

11:58:08  20   there.

21   **A**    Well, Your Honor, my conversation with individuals on

22   the ground in these counties and elsewhere makes it clear

23   that workforce issues are a big deal, a major deal.  And

24   partly the challenge is being able to recruit top talent and

11:58:24  25   take care of them and to make the jobs jobs that people want

1    to have, where they're well remunerated and where they are

2    working in settings that are tolerable long-term.

3         There's also a toll that's taken on people that are

4    caring for people with addiction.  And some of the programs

11:58:41  5    that I advise here and that are typically part of abatement

6    plans can be thought of as caring for the carers, in other

7    words, providing care for those that are delivering care.

8    So I'm talking about programs that address burnout and

9    compassion fatigue.

11:58:59  10         I also include in this category expansion of the

11    number of addiction treatment providers, medical social

12    workers, and pain treatment specialists.

13   **Q**    And we typically take a lunch break, but before we

14   do --

11:59:17  15              THE COURT:  We may go to 12:15 because of both

16   the continuity of this and my schedule.

17              MR. LANIER:  Thank you, Judge.

18              THE COURT:  Around 12:15 we'll pick a

19   convenient stop.

11:59:27  20              MR. LANIER:  That will be great.  Thank you,

21   Your Honor.

22   **BY MR. LANIER:**

23   **Q**    2E, distributing naloxone and providing training.

24        Why is this a necessary part of treatment abatement in

11:59:37  25   the counties?

1    **A**    Well, naloxone is a safe and effective opioid reversal

2    agent, and it can give people a second chance.

3         So I suggest a variety of different channels within

4    this subcategory, if you will, to distribute naloxone, four

12:00:03  5    to be specific.  So one is to first responders, the second

6    is through emergency departments, the third is for high-risk

7    patients, such as patients that are on chronic high-dose

8    opioids, and the last is through public lockboxes, no

9    different than we have for cardiac defibrillators.

12:00:25  10   **Q**    Ooh, that's great.

11        And if we work through the spreadsheets, that explains

12   the needs in Category 2 for treatment.

13        Let's go to Category 3 and try to get it out before

14   the lunch break as well.

12:00:41  15       Recovery.  You have explained that as enhancing public

16   safety and reintegration, and you start with the subcategory

17   of public safety.

18        What do you believe to be important abatement programs

19   related to public safety?

12:01:03  20   **A**    Well, comprehensive abatement has to consider the role

21   of public safety.  And in this -- in this category, I

22   consider things such as law enforcement assisted diversion

23   that allows for nonviolent offenders that fulfill certain

24   criteria to be eligible for treatment and to be channelled

12:01:24  25   through the treatment system, rather than through the legal

1      system.

2           Also, I think it's important to support opioid

3      investigators, individuals within police departments and

4      public safety programs that can investigate and disrupt and

12:01:40  5      dismantle fentanyl trafficking and other counterfeit opioid

6      trafficking networks.

7           And stigma reduction training is also important; in

8      other words, to be sure that law enforcement officers are

9      educated, just as the general public and just as patients

12:01:58  10      and their loved ones are, regarding the nature of addiction

11      and the fact that -- and the optimal management of chronic

12      pain.

13  **Q**      One of the things that impressed me -- that's

14      irrelevant, what impressed me.

12:02:09  15           One of the things I'd like to highlight in what you've

16      done here, and tell me if I understand it right, is that a

17      lot of these things that you're suggesting really don't take

18      that much money, they're almost a rounding error in what's

19      being done, but you've included them anyway.

12:02:28  20           Why is that?

21  **A**      Well, I'm not focused on the economics.  I have always

22      been asked and had as my North Star the science and the

23      epidemiology.  So, you know, I don't have precise estimates

24      or ideas, frankly, about the relative costs of these

12:02:51  25      different categories.

1     But I can tell you that if you look at abatement

2     programs around the country, Your Honor, these sorts of --

3     the sorts of programs and services that I'm suggesting here

4     are remarkably consistent in looking at different abatement

12:03:05  5     programs and different -- different policy statements about

6     how -- what needs to be done to address the opioid epidemic.

7     **Q**     All right.  In that regard, your next subcategory in

8     Category 3 is the criminal justice system.  Sensitive to

9     this Court, I'm sure, because just about every day His Honor

12:03:27 10     has not only our trial, but he's got a criminal docket that

11     he deals with as well.

12     What is it in the criminal justice system that you see

13     is necessary to invest or work with to better abate this

14     problem?

12:03:42 15     **A**     Well, there's -- there's remarkable -- there are

16     remarkably high rates of opioid use disorder among

17     individuals intersecting with the criminal justice system.

18     And if -- so there's a really important opportunity here, I

19     think one of the biggest opportunities, frankly, in many

12:04:01 20     communities around the country, which is to better integrate

21     treatment within the criminal justice system.

22     Now, I leave the direct treatment to be subsumed in

23     the treatment category that we've already discussed, so I

24     don't separately enumerate that here, but issues such as --

12:04:19 25     and opportunities such as drug courts, reentry and

1    reintegration programs, and transitional housing for

2    offenders who may be newly released that have opioid use

3    disorder.  These are vital steps in improving the care of

4    individuals that may have addiction that intersect with the

12:04:37  5    criminal justice system.

6    **Q**    All right.  And while you've got a number, for

7    example, in Lake County, 54 for the year of 2021, you've got

8    reentry costs per person at not a huge dollar amount.  But

9    to you, it's still an important thing to do; is that fair?

12:04:58  10   **A**    Yes.

11   **Q**    3C, you speak about the need for vocational training,

12   education, and job placement.

13        Please explain what you believe to be important there.

14   **A**    Well, again, many individuals with opioid use disorder

12:05:17  15   have -- are unemployed or underemployed, and gainful

16   employment is an important process allowing for individuals

17   to get a foothold and to put their lives back together.

18        So vocational training is a major opportunity, as

19   is -- as are other interventions such as recovery oriented

12:05:39  20   workplaces that are designed to better facilitate

21   individuals who may be in recovery, reentering the

22   workforce, rather than screening them out and saying, eh,

23   you've got a felony or you have addiction or you've been in

24   treatment and, you know, we can't take you.

12:06:00  25   **Q**    If we go back to the exhibit that was used by the

1    defendants, pulling from the report of Dr. Young, the MMWR

2    CDC's report from July 17, 2020, the table that you and I

3    looked at before, in that table, it talked about the women

4    responding to this questionnaire or whatever it was, said

12:06:33  5    the reasons for prescription opioid use, other than pain,

6    was 14 percent for a lot of them it was to relax or to

7    relieve tension or stress, help with feelings and emotions.

8         Is that related, for example, to the need to have a

9    job?  In other words, if you don't get these addicts a job

12:06:55 10    after you treat them, are they more likely to relapse?

11    **A**    Well, I think there are -- I'm sorry.  Can you ask the

12    question again, please?

13    **Q**    Yeah.  I'm just asking:  Is it important to get them a

14    job?

12:07:11 15         Why is it important to train people to find a job when

16    they're in recovery?

17    **A**    Well, employment -- again, underemployment or

18    unemployment is one of the factors, the social factors that

19    drives and perpetuates cycles of addiction.  And so,

12:07:31 20    vocational training is important because giving people who

21    are in early recovery or in active treatment, giving them an

22    income and a source of sustenance is important for their

23    well-being and will improve the likelihood of their

24    successfully staying in treatment.

12:07:50 25    **Q**    All right.  Category 3D, to conclude recovery, you've

1    got mental health counseling and grief support.

2        Can you explain why that is important as well and what

3    you've done there.

4    **A**    For far too long, often pain has been treated as if

12:08:09 5    there's one tool in the toolbox.  And, in fact, there are

6    many tools in the toolbox, and there's a whole set of tools

7    that are nonpharmacologic in nature; in other words, things

8    like psychological counseling.

9        And so, this category includes both the need for

12:08:25 10    psychological counseling, for greater staffing so that we

11    can deliver psychological counseling to many individuals

12    that have chronic pain, but it also importantly includes the

13    provision of grief support for individuals who may be

14    bereaved because they've lost a loved one from opioid

12:08:44 15    addiction.  And it includes the provision of mental health

16    counselors to provide such counseling and grief support.

17    **Q**    All right.  Having made it through Category 3 now,

18    let's look at your last category that you have, which are

19    the special populations.

12:09:00 20        And you've put that as Category 4, fair?

21    **A**    Yes.

22    **Q**    All right.  You start with pregnant women, new

23    mothers, and infants.  This is what His Honor has already

24    heard testimony about, this special category, from Dr. Young

12:09:20 25    today.

1    I want to talk to you about in general, first, about

2    what you've done here, and then I need to ask you a specific

3    question about what we've heard thus far.

4         Go ahead.

12:09:30  5    **A**    Yeah, so this is a special population and includes

6    intervention such as prenatal screening of pregnant women

7    for opioid use disorder, prenatal and postpartum

8    psychological or psychosocial services, housing services for

9    those that need it who are new mothers with opioid

12:09:49 10    addiction, and interventions for infants exposed to opioids

11    in utero.  And this includes interventions at the time of

12    delivery and in the perinatal period, but for some children,

13    they will require interventions during childhood as well.

14    **Q**    All right.  There was a suggestion in

12:10:08 15    cross-examination, based upon the demonstrative charts used

16    with Dr. Young, that perhaps you were using the idea that

17    6.6 percent of women were actually -- of pregnant women

18    actually had OUD.  And it was pointed out that the article

19    says that 6.6 percent of women reported using prescription

12:10:36 20    opioids.

21         So my question to you is:  Did you wrongly use

22    6.6 percent of pregnant women as having OUD?

23    **A**    I didn't use that number in order to derive the total

24    number of pregnant women with OUD, which is depicted as

12:10:57 25    input two.  And I describe the methodology that I use lower

1   in the spreadsheet.  But, no, I did not use that figure.

2   **Q**    All right.  So, for example, just at first blush if we

3   look at it, you have the number of pregnant women eligible

4   to receive universal prenatal screening at 2,192 for Lake

12:11:20  5   County in the year 2021, right?

6   **A**    Yes.

7   **Q**    But the total number of pregnant women sure isn't

8   6.6 percent of that.  You've got it down as just 32,

9   correct?

12:11:32  10   **A**    Correct.

11   **Q**    I mean, that's, what, 1.5 percent or something like

12   that, in that range, fair?  Or am I doing bad math?

13   **A**    I didn't use the 6 figure, and I would want to use the

14   calculator.

12:11:51  15   **Q**    All right.  Challenged me on that one.  I'll be close

16   or off.

17        All right.  You give your formula, though, for the

18   Court so that the Court can determine how to -- how you have

19   given this where you looked at the number of hospital live

12:12:06  20   births, the prevalence of OUD per 1,000 hospital deliveries,

21   based upon an average number of women who were diagnosed

22   with it at delivery, et cetera, Ohio Department of Health.

23        You give all of your data, don't you?

24   **A**    Yes, I do.

12:12:22  25   **Q**    All right.  And then 4B, adolescents and young adults,

1    explain what that is.

2    **A**    Adolescents and young adults are another vulnerable

3    population.  Their brains are, you know, rapidly developing,

4    as is their maturity, and they're at high risk for being

12:12:43  5    exposed to nonmedical opioid use and/or worse.  So this

6    category is focused on deploying school-based prevention

7    programs as well as screening individuals, and it also

8    supports these activities by employing school social workers

9    to a greater degree than have been used thus far or

12:13:07 10    resourced thus far within the counties.

11    **Q**    When we have this abatement plan in place, and it's

12    working the way you hope and we all hope it would, does that

13    mean that the schools will see an improvement not just with

14    those students but with -- will that rising tide lift all of

12:13:26 15    the boats, hopefully, and we'll have better peace in schools

16    and we'll have better students in schools and a better

17    learning environment and help the whole community?

18           MR. DELINSKY:  Objection, Your Honor.  Calls

19    for speculation.  Calls for predicting the future.

12:13:43 20           MR. LANIER:  Should it?

21           THE COURT:  That's -- I think that's what

22    everyone's trying to do.  If you want to ask him why he

23    included 4B --

24    **BY MR. LANIER:**

12:13:50 25    **Q**    Why did you include 4B?  Why did you include 4B?

1    **A**     I included it because adolescents and young adults are

2    a vulnerable population that have been hard hit by the

3    opioid epidemic.  And by investing in these individuals, we

4    can improve their immediate circumstances as well as improve

12:14:09  5    the broader community of which they're a part.

6    **Q**     4C, can you tell His Honor and the record what you've

7    put in there and why?

8    **A**     4C focuses on another special population, families and

9    children, and includes the support for children living with

12:14:25 10    parents that have opioid use disorder, support for children

11    in foster care, and support for children that may be adopted

12    and their families.

13    **Q**     And then 4D, homeless and housing insecure

14    individuals, explain, please.

12:14:40 15    **A**     4D is the relationship between housing -- homelessness

16    or housing insecurity and addiction is bidirectional, and

17    you can't take someone with addiction and offer them

18    treatment and expect that they're going to get better living

19    under a bus shelter.

12:15:01 20         So this category of services is focused on taking the

21    subset of individuals that, by my best scientific estimates,

22    I believe are homeless and have opioid use disorder and

23    providing them with a permanent supportive housing.

24         This isn't just giving them a key and a roof.  This is

12:15:23 25    giving them a shelter, but also the services and the

1    programs that they need to be successful in recovery, Your

2    Honor.  So it includes the provision of case management, if

3    needed, peer recovery coaches, and the like.

4    **Q**    And then, final, 4E, that is nothing in your chart

12:15:41  5    because you're saying that individuals with opioids misuse

6    have all been assumed in these other categories, so you

7    don't want to be duplicative, fair?

8    **A**    Yes.  Subsumed in these other categories.

9    **Q**    Subsumed.  Thank you.

12:15:55 10    And the last question in regards to this exhibit:

11    I've been quizzing you and using as an example Plaintiffs'

12    23105A, which is Lake County.  But did you go through all of

13    those same categories using specific data that you deem most

14    relevant for Trumbull County as well?

12:16:16 15    **A**    Yes, I did.

16    MR. LANIER:  And that, Your Honor, we have

17    marked as Plaintiffs' Exhibit 23105B, which we'll also

18    submit.

19    And, Your Honor, that brings us to the end of opinions

12:16:27 20    and bases, and it's a good time to break before complaints.

21    THE COURT:  Okay.  Thank you.

22    We will break until 1:15.

23    Have a good lunch, and then we'll pick up with the

24    balance of Dr. Alexander's testimony.

12:16:40 25    (Recess taken at 12:16 p.m.)

1                    A F T E R N O O N   S E S S I O N

2                              - - -

3                    (Court resumed at 1:27 p.m.)

4              THE COURT:  I apologize.  My sentencing took a

13:27:47  5    little longer than expected.

6          So, Doctor, you're still under oath from this morning.

7          And, Mr. Lanier, you may continue.

8              MR. WEINBERGER:  Your Honor, before we

9    continue, in the interest of efficiency, both for the Court

13:28:04 10   and for counsel, at this point, plaintiffs move to enter --

11   to be admitted into evidence the two spreadsheets, Exhibits

12   23105A and 23105B.

13             THE COURT:  Is there any objection?

14             MR. DELINSKY:  We object, Your Honor.

13:28:26 15            THE COURT:  What's the objection?

16             MR. DELINSKY:  Same grounds as with the expert

17   reports.  It's an out-of-court statement.  It is -- it is a

18   component of an expert report.  It's in --

19             THE COURT:  Well, it's now an in-court

13:28:37 20   statement.  He's testified to it.  There's no way --

21             MR. DELINSKY:  Your Honor, if I could be

22   heard, Your Honor.  If I could be heard, Your Honor.

23         Judge Faber in West Virginia was faced with the same

24   issue.  He kept these -- he kept the redress models out.

13:28:51 25            THE COURT:  Well, I'm admitting them.  Okay?

13:29:03

1    If you want to brief it, brief it.  I mean, there's no way a

2    court of appeals could understand this without having those

3    tables, Mr. Delinsky, all right?  I couldn't, you couldn't,

4    and no court could.

5                    MR. DELINSKY:  Well, Your Honor, what's

6    happened --

7                    THE COURT:  You want to brief it, fine.  It's

8    in.

9                    MR. LANIER:  All right.  Ready to go.

13:29:09 10                    THE COURT:  Let's move on.

11    **BY MR. LANIER:**

12    **Q**    All right.  Dr. Alexander, last stop on the road:

13    Complaints.

14        Mr. Hynes and I have drawn up a complaint chart here

13:29:25 15    for you to work through.  I want to talk about just a couple

16    of the complaint items that I know of.

17        First and foremost is your own complaint.  You said

18    there's a math error, and I said we'd just fix it on the

19    stand instead of redoing all of the charts.

13:29:45 20        Can you tell the Court what math error it is so that

21    we can make sure we put that on the record.

22    **A**    Yes.

23    **Q**    Which page?  Just tell me which page to put up and

24    we'll do it.

13:30:02 25    **A**    It is 4C, like Charlie.

1    **Q**    Math error is 4C, as in Charlie.

2         And is this on both Lake and Trumbull County?

3    **A**    Yes.

4    **Q**    All right.  Then what I'm going to do is go to 4C,

13:30:23 5    families and children, as to Plaintiffs' Exhibit 23105A,

6    which is Lake County, which is what we had been dealing

7    with.  4C is on page 36 -- no, 37 of the spreadsheet.  I'll

8    put it up here.

9         Please tell me how to direct the attention to the math

13:30:57 10    error.

11    **A**    If you could scroll down, please, to the description

12    of input one.

13    **Q**    All right.

14    **A**    That's fine.

13:31:06 15         So input one, in describing the source of information

16    that I used here, I wrote that an estimated 57,500 children

17    were residing in a household with a parent with OUD in Ohio

18    in 2017.  If you -- the value 1,197, which is the input,

19    reflects the product of 2.1 percent by 57,000 instead of

13:31:40 20    57,500.

21         In other words -- I'm sorry, let me just come back.

22    And after that sentence, if you could just highlight the

23    next sentence which is:  This estimate was multiplied by

24    2.1 percent.

13:31:52 25         So, essentially, I'm suggesting that I took 57,500 and

1    multiplied it by 2.1 percent.  And, in fact, what I

2    erroneously did was I took 57,000 and multiplied by

3    2.1 percent.

4         So, essentially, I reduced the estimated population of

13:32:10  5    children residing in a household with a parent with OUD in

6    Ohio, I inadvertently reduced that number by 500

7    individuals.  And so, the value that I provide is ever so

8    slightly smaller than what I believe to be the

9    scientifically true value.

13:32:28 10    **Q**    So your math was, instead of multiplying the 57,000

11    children times the average opioid overdose deaths of

12    2.1 percent, instead of multiplying that out properly, you

13    typed in to your calculator 57,000.

14         So those extra 500 children residing in a household at

13:32:57 15    2.1 percent would have equalled another ten people, in

16    essence?

17    **A**    Yes.

18    **Q**    So your input is low compared to what it would have

19    been at 1,207, correct?

13:33:16 20    **A**    Yes.

21    **Q**    In other words, that's one that's to the detriment of

22    the counties, it's not one that is an overestimate for the

23    counties, right?

24    **A**    That's true.

13:33:31 25    **Q**    And, in other words, you didn't make a mistake that

1    inures to our benefit, you made a mistake that inures to our

2    deficit, right?

3    **A**    Yes.  I believe that's true.

4    **Q**    All right.  Do we need to make the same correction in

13:33:47 5    the Trumbull County?

6    **A**    Yes, we do.

7    **Q**    So, in Trumbull County, if we look on 4C, which is

8    found on page 37 of Plaintiffs' Exhibit 23105B, number of

9    children living with parents of OUD, you've got that same

13:34:21 10   issue of 57,500.  But here your estimate was multiplied by

11   2.5 percent because of Trumbull County; is that right?

12   **A**    Yes.

13   **Q**    All right.  And so, the ultimate calculation you had

14   of 1,425 is, again, down, I guess this is by 11 people

13:34:47 15   instead of 10.  So the correct math would be 1,436 children

16   instead of 1,425, fair?

17   **A**    Yes.

18        I haven't done that calculation, but that looks right

19   to me.

13:35:03 20   **Q**    Okay.  Now, that's one complaint.

21        I want to look at other possible complaints that have

22   been raised.  Specifically, Dr. Kessler raises a question

23   about 1E.

24        Are you familiar with that complaint?

13:35:23 25   **A**    If you could remind me, that would be helpful.

1    **Q**    Frankly, I may just leave it for him.  1E is the harm

2    reduction under prevention.  I'm going to leave it for him

3    in the interest of time.  This gives me something to cross

4    him over.

13:35:45  5         Next, can you explain the difference between bed

6    capacity and whether or not an individual is in it for a

7    full year?

8    **A**    Yes.  I estimate treatment needs for the counties

9    based on a model that works to project what the capacity

13:36:19  10   needs will be in each community.  And in doing so, I use

11   treatment slots; in other words, slots that may be occupied

12   by a given individual in treatment.

13         But my model is not predicated on any requirement that

14   a particular individual be in treatment for any particular

13:36:40  15   length of time.

16         With that being said, I do want to say that treatment

17   we know often is far too short, that the American Society of

18   Addiction Medicine underscores that treatment less than

19   90 days is seldom adequate, that many individuals will

13:36:57  20   require treatment for a year or longer, and that the length

21   and that the likelihood of success of recovery, the longer

22   one is in treatment on average, the better the recovery.

23   And so, there's an overwhelming amount of evidence to

24   support those assertions.

13:37:14  25         But, again, I do not -- my model isn't predicated on

1     requiring any particular member of the county to be in

2     treatment for any particular length of time.

3     **Q**     All right.  Two more issues to cover here under

4     complaints.

13:37:30 5          One is the usage --

6               THE COURT:  Let me ask --

7               MR. LANIER:  Go ahead.

8               THE COURT:  I'm quite familiar with this from

9     my work.  All right?  I agree, based on my experience, less

13:37:42 10    than 90 -- less than 90 days is seldom effective.  Some

11    people need -- I've never had anyone a year, a constant

12    year, but some people need to go back again or for different

13    types of treatment.

14         But how did you -- well, if we go to section three,

13:38:03 15    whatever, when you computed the number of people with --

16    section two, number of people with OUD, and then -- how you

17    calculated the length of -- the length of treatment needed,

18    the cost, how did you do that?

19         I mean, I see you've got a certain number of people

13:38:26 20    and then a certain percentage ranging from 40 to 60 percent

21    to get treated, so you've got a number of people to achieve

22    treatment.

23         What did you put for days, costs?  Or average days or

24    costs?

13:38:41 25              THE WITNESS:  Well, if I could -- thank you

1          for the question, Your Honor.  And if I could separate the

2          cost matter and first just address how I -- how I estimated

3          the treatment needs in terms of treatment slots.

4               Essentially, I took the 40 percent of the total

13:38:56  5    population of 7,221 and -- which is the population that I

6          believe should be eligible for treatment --

7                    MR. WEINBERGER:  You're in Trumbull right now?

8          You're looking at Trumbull, right?

9                    THE WITNESS:  I'm sorry.  Thank you.

13:39:13  10   **BY MR. LANIER:**

11         **Q**    Go to Lake County.

12         **A**    Yeah, thank you.

13              So I took the 5,668 individuals in Lake County,

14         estimated that -- that have opioid use disorder and

13:39:24  15   estimated that 40 percent of them would be eligible for

16         treatment in the first year.

17                    THE COURT:  Right.

18                    THE WITNESS:  And of that population, I then

19         apportion them across different levels of care.  Some in --

13:39:39  20   if you look at rows nine through 12, some in outpatient

21         settings, in intensive outpatient, in rehab/residential, and

22         in inpatient settings.

23              And for those, essentially, I estimate as treatment

24         slots, so I'm not predicating a particular length of

13:39:59  25   treatment.  What I'm arguing is that in year one, there

1    should be 388 occupied treatment slots in the outpatient

2    setting, and that may be -- you know, there may be several

3    people that --

4                    THE COURT:  How did you get those particular

13:40:12  5    numbers, nine, ten, 11, and 12, your estimates for, you

6    know, you need 388 of the 2,267 in outpatient and 171 of the

7    2,267 in inpatient?

8                    THE WITNESS:  So I use a distribution from a

9    federal data source, the Treatment Episode Data Set, or

13:40:37 10    TEDS, that looks at the distribution of treatment admissions

11    across different levels of care.

12        So it allows for me to understand of everybody in

13    treatment, about what proportion are being admitted in

14    varied care settings.  And so, that 57 percent, the

13:40:55 15    25.1 percent, the 12 percent, and the 5.9 percent are

16    derived from this federal dataset that provides information

17    on -- of everybody receiving treatment, how many fall into

18    these four different bins.

19                    THE COURT:  Okay.  Thank you.

13:41:15 20    **BY MR. LANIER:**

21    **Q**    And if we wanted to find that, we could look at the

22    bracketed nine, ten, 11, and 12, and you will give your

23    sources, so the appellate court would be able to look at

24    that additionally and see that for each of your citations;

13:41:33 25    is that fair?

1    **A**     That's correct.

2         And then, the costs are provided secondarily, and

3    these are derived -- and the sources for these are also

4    provided, but these are derived from estimates from -- from

13:41:45 5    Ohio Medicaid programs.  And this is the cost of treatment

6    for individuals at these varied levels of care.

7         And then I also provide what are called the NADAC, or

8    National Average Drug Acquisition Cost, which reflect the

9    costs of pharmacologic treatment for these conditions.

13:42:08 10   **Q**     And so, on page 17, for example, in the Lake exhibit,

11   23105A, you've got at the end of these cost descriptions

12   suggested costs using the ASAM levels.  And you give it for

13   each category, explaining what year the dollars are in, nine

14   hours of treatment per week, excluding medication or

13:42:35 15   whatever it may be, 12 hours' treatment per week.  And you

16   continue to do that with all of the categories, including

17   residential treatment, inpatient treatment, OUD treatment

18   drug costs for the various different types of medicines that

19   would need to be used.  You give all of that data as well

13:42:58 20   for the economist to compute tomorrow?

21   **A**     Yes, I do.

22   **Q**     Thank you.

23        And then, the last area of -- well, let me do it this

24   way.

13:43:17 25        First, I want to also mark that I will tender later

1    the supplemental report that you have done.  It's very

2    brief.  But it's marked as Plaintiffs' Exhibit 4999, and

3    it's basically just two short paragraphs.

4         The one with substance is the second paragraph, and in

13:43:36  5    that, you have said that you have extensively researched the

6    harms associated with the oversupply of prescription

7    opioids.  In one investigation, my colleagues and I modeled

8    the trajectory of the opioid epidemic to evaluate the

9    relationship between opioid prescribing, opioid use

13:44:04  10    disorder, and fatal overdose in the United States.

11         Is this a recent peer-reviewed article that you

12    published?

13    **A**    Yes, it is.

14    **Q**    You footnote it as number one, and the footnote shows

13:44:16  15    this as being in *Addiction* journal in 2022.

16         This is in the last couple of months?

17    **A**    Yes.  Yeah.  I mean, it may have been released

18    electronically prior to that, but if it was, my guess is it

19    was still, you know, within 2021.

13:44:33  20    **Q**    Effect of reductions in opioid prescribing on opioid

21    use disorder and fatal overdose in the U.S.

22         Is this part of the modelling that you have used, or

23    is this fresh since the production of your report?  In other

24    words, does this change anything?

13:44:52  25    **A**    Well, I mean, this reflects the results of the

1    analyses that were included in this manuscript, and it's

2    relevant to this case because it demonstrates that the harms

3    that accrue from prescription opioid oversupply don't just

4    happen the day that the oversupply happens.  And just

13:45:10  5    analogously with tobacco, if you imagine everybody in, you

6    know, Trumbull County quitting smoking tomorrow, we wouldn't

7    see many of the gains, the salutary gains from that, for

8    months and years and years.  And that's exactly what we

9    found and empirically demonstrated in this report.

13:45:28 10    **Q**    Hence the enduring negative impact of prescription

11    opioids on opioid-related harms, including fatal overdose

12    and OUD?

13    **A**    Correct.

14    **Q**    All right.  And then, the last thing we have to talk

13:45:43 15    about, in terms of your testimony, is the NSDUH.  The Court

16    heard about this.  It was on the record yesterday, why Kerry

17    Keyes, Dr. Keyes did not use the NSDUH.  She was

18    specifically shown an article where you used it in

19    modelling.

13:46:06 20        Would you tell the Court your expert opinion on

21    whether or not the NSDUH figure would be appropriate for you

22    to use in your expert capacity in this case as you model

23    abatement.

24    **A**    Well, data isn't good or bad, right or wrong.  Data

13:46:28 25    has to be applied in a fit-for-purpose fashion.

1     The NSDUH is a valuable resource, and it can be

2     applied well to answer important questions relevant to the

3     public health and the matters at hand, and it can also be

4     misapplied and used in highly inappropriate ways.

13:46:46  5     So I don't know if that answers your question, but I

6     would say that the NSDUH, the value of a dataset, just like

7     a hammer, isn't an inherent function of the data per se.

8     It's how that tool is applied to answer a scientific

9     question.

13:47:05  10   **Q**     So then my question becomes this:  If it's to be

11    applied in a fit-for-purpose fashion, did you use it here?

12    **A**     Yes.  There are some instances where I use information

13    from the National Survey on Drug Use and Health in these

14    models.

13:47:22  15   **Q**     Did you use it to estimate the number of people with

16    OUD in the counties?

17    **A**     No, I did not.

18    **Q**     Why did you not use it for OUD?

19    **A**     Well, it undercounts the proportion of individuals

13:47:39  20   with opioid use disorder.  And I had reviewed and was

21    familiar with the approach used by Professor Keyes.  I had

22    examined that approach as well as a number of other

23    approaches, and I felt that her approach was much more

24    suitable as a means to estimate the number of individuals in

13:47:59  25   Lake and Trumbull County with opioid use disorder.

1    **Q**    All right.  Well, with that, sir, we have come to the

2    end of the road.

3                  MR. LANIER:  So I'll pass the witness, Your

4    Honor.

13:48:11  5                  THE COURT:  Okay.

6                  MR. DELINSKY:  Your Honor, it will just take

7    me a minute to set up.

8          And while I do that, Your Honor, could I just make a

9    clarifying point?

13:48:24  10          I don't mean to relitigate your ruling on the

11    admissibility of the redress models, but, Your Honor, I

12    believe we'll all be on the same page on this, that the

13    footnoted material in the redress models do not come in for

14    the truth of the matter asserted, they come in exclusively

13:48:43  15    as the basis for Dr. Alexander's estimates.

16                  THE COURT:  Well, right.  It's not hearsay.

17    It's for -- I mean, he could go through, Mr. Delinsky, line

18    by line, but he's not.  He's gone through the summary in his

19    testimony.  He's explained what he did.  He's explained the

13:49:04  20    basis, which is in all the footnotes and the backup.  And

21    his testimony is going to be unintelligible for me, for

22    cross-examination, for anyone in posthearing briefs, and for

23    the Court of Appeals unless these tables are admitted.

24          So they're admitted for -- because they demonstrate

13:49:27  25    what he said and the basis for his testimony.

|   |   |
|---|---|
| | 1 |
| 13:49:46 | 5 |
| 13:50:05 | 10 |
| 13:50:24 | 15 |
| 13:50:39 | 20 |
| 13:50:46 | 25 |

1        MR. LANIER:  Thank you, Judge --

2        THE COURT:  They're not -- you're correct.

3   Whether -- they're not there for the truth of the matter

4   asserted, it's there for his opinion and the basis for it.

5   And, you know, people can argue whether his opinions are

6   worthy of belief or not or whether he's made mathematical

7   errors or not or whether the sources he used are the most

8   accurate or not or whether his assumptions are accurate or

9   not, but the document -- the only way this hearing can be

10  intelligible is if his work product is admitted for what it

11  is.  It's his work product.

12       Okay.  And we can do the same thing for the work

13  product of any of the defendants' experts.  If they come in

14  with a -- with we'll call it an abatement plan, with charts

15  and backup showing what they did, their calculations, the

16  sources they used, the assumptions, and they put it in a

17  table, I'll admit it exactly the same way.

18       Okay.

19       MR. DELINSKY:  May I proceed, Your Honor?

20       THE COURT:  Yes.

21       **CROSS-EXAMINATION OF G. CALEB ALEXANDER**

22  **BY MR. DELINSKY:**

23  **Q**   Good afternoon, Dr. Alexander.

24       My name is Eric Delinsky.  I represent CVS.  I

25  probably live 50 miles from you in Washington, D.C., so

1    we're sort of neighbors?

2         But we haven't met before, correct?

3    **A**    Correct.

4    **Q**    Okay.  I want to start with your plan and its breadth.

13:51:03  5         Your plan is comprehensive, correct?

6    **A**    Yes.  I believe so.  Yes.

7    **Q**    And to use your words from a deposition I believe you

8    gave in this case, it's a soup-to-nuts plan?

9    **A**    Yes.

13:51:22  10   **Q**    Your plan proposes measures that would address

11   addiction to prescription opioids, correct?

12   **A**    Yes, it does.

13   **Q**    Your plan proposes measures to address the misuse of

14   prescription opioids, correct?

13:51:42  15   **A**    Yes.

16   **Q**    There are persons who may misuse or be addicted to

17   prescription opioids who never obtained them from CVS,

18   Walgreens, or Walmart, correct?

19   **A**    Yes.

13:51:57  20   **Q**    Your plan would encompass these persons, it would

21   encompass treatment for these persons who never filled

22   prescriptions for a prescription opioid at CVS, Walmart, or

23   Walgreens, correct?

24   **A**    Yes, it would.

13:52:13  25   **Q**    Your plan proposes measures that would address

1    addiction to and misuse of illegal opioids, like heroin and

2    illicit fentanyl, correct?

3    **A**    Yes.

4    **Q**    Heroin and illicit fentanyl pose massive problems and

13:52:34  5    cause enormous harms, correct?

6    **A**    Yes, they do.

7    **Q**    People don't obtain heroin and illicit fentanyl from

8    CVS, Walgreens, and Walmart, correct?

9    **A**    That's correct.

13:52:47 10    **Q**    They obtain them from drug dealers?

11    **A**    Well, they may obtain it from -- from a number of

12    illicit sources, but not from -- not from pharmacies.

13    **Q**    Your plan would encompass, however, addiction to and

14    the misuse of these illegal opioids?

13:53:08 15    **A**    Yes.  I think any abatement plan worth its salt has to

16    address the opioid epidemic, and there's just one opioid

17    epidemic that includes both the use of prescription opioids

18    as well as illicit opioids.  And many illicit opioid users,

19    of course, previously used prescription opioids.

13:53:28 20    **Q**    And I believe you've testified that you wouldn't even

21    know how to prepare an abatement plan that differentiated

22    between users of prescription opioids and users of illegal

23    opioids, correct?

24    **A**    Well, I don't -- I've -- again, I think that any

13:53:48 25    abatement plan has to tackle the opioid epidemic, so it

1    would be helpful to be reminded, you know, of what I may

2    have said previously, but I think that it's hard to imagine

3    a plan that would, you know, treat a young teen differently

4    because they happen to overdose and come to the emergency

13:54:09  5    department with their most recent drug of use being heroin,

6    for example, rather than oxycodone.

7    **Q**    Some parts of your plan, like syringe service

8    programs, SSPs, or needle exchanges, only pertain to the use

9    of illegal drugs, correct?

13:54:31  10    **A**    Well, we know that many users of these programs may

11    also use prescription opioids concomitantly and use them

12    nonmedically.

13          As I noted, the harm reduction programs, like syringe

14    service programs, aren't just about giving people syringes.

13:54:53  15    They're also about giving people a ladder or a bridge to

16    help connect them to treatment.

17    **Q**    So let me ask the question again.

18          A syringe service program, a needle exchange, provides

19    needles for users of heroin, correct?

13:55:07  20    **A**    Yes.

21    **Q**    And your plan encompasses polysubstance use, correct?

22    **A**    Well, I've designed a plan to abate the opioid

23    epidemic, but I do note in my report and would be happy to

24    elaborate on the importance of these efforts being

13:55:26  25    coordinated with simultaneous activities in the counties to

1    address the problems associated with the use of other

2    substances.

3    **Q**    Okay.  And today, there is an increasing problem of

4    the use of other substances, like illegal stimulants, along

13:55:47  5    with illegal opioids, correct?

6    **A**    Stimulants are -- many individuals have stimulant use

7    disorder or are using stimulants nonmedically, and many of

8    these individuals may be using prescription opioids

9    nonmedically or they may be using illicit opioids

13:56:04  10    nonmedically.

11    **Q**    Okay.  So you can have people -- so you talked about

12    prescription stimulants, but people are using cocaine with

13    illegal opioids today, correct?

14    **A**    Yes.

13:56:15  15    **Q**    And your plan would provide assistance to them,

16    correct?

17    **A**    Insofar as they're using opioids, my plan would focus

18    on helping them to access evidence-based treatment for

19    opioid use or opioid use disorder.

13:56:31  20    **Q**    People abuse illegal methamphetamines with illegal

21    opioids today, correct?

22    **A**    Some do, yes.

23    **Q**    And your plan would reach them?

24    **A**    Again, insofar as they are actively experiencing

13:56:48  25    sequela related to the opioid epidemic, my plan would enable

1    them to access, hopefully in an unfettered manner, services

2    and programs to help them speed their recovery.

3    **Q**    Your plan proposes to reeducate and retrain doctors,

4    correct?

13:57:07  5    **A**    Yes, it does.

6    **Q**    Your plan proposes addiction treatment -- excuse me, I

7    already asked you that.

8         Your plan provides for treatment for pain, correct?

9    **A**    My plan works to improve the management of chronic

13:57:30  10   pain so as to reduce our historic overreliance on opioids,

11   yes.

12   **Q**    Okay.  So it proposes resources for health care

13   workers to treat patients with pain, correct?

14   **A**    Yes.

13:57:50  15   **Q**    Your plan proposes inpatient treatment to treat people

16   suffering from opioid addiction, correct?

17   **A**    For a small subset that require such treatment, yes.

18   There are individuals that have -- for example, an

19   individual that has active endocarditis is at risk of

13:58:12  20   imminent death, and so, they require intravenous

21   antibiotics, they may require valve surgery.  And if they

22   have active opioid use disorder, that should be treated

23   simultaneously.

24   **Q**    Your plan proposes outpatient treatment for people

13:58:28  25   suffering from opioid addiction?

1    **A**    Yes.  That's true.

2    **Q**    Your plan provides for medication-assisted treatment

3    for people suffering from opioid addiction?

4    **A**    Correct.

13:58:42  5    **Q**    Your plan would provide for treatment for addiction to

6    illegal opioids, like heroin, just as it does for addiction

7    to prescription opioids?

8    **A**    Well, I've spoken about these being part and parcel of

9    the same problem.  And, you know, there are individuals

13:59:01  10    using heroin that started with prescription opioids, and,

11    frankly, there are individuals using heroin that may not

12    have even used a prescription opioid before but wouldn't

13    have started with the heroin but for the opioid epidemic and

14    the oversupply of prescription opioids.

13:59:17  15        So I think that as with other abatement plans that

16    I've carefully reviewed, they're all highly consistent in

17    tackling the opioid epidemic, which includes people using

18    illicit opioids.

19    **Q**    So your plan would treat somebody suffering from

13:59:32  20    addiction to heroin the same as it would treat someone

21    suffering from an addiction to a prescription opioid?

22    **A**    Well, they may need different types of services, but

23    my plan would enable either of them to have unfettered

24    access to what I hope would be high quality, comprehensive,

13:59:53  25    and coordinated care for their opioid addiction, yes.

1    **Q**      Your plan would provide the same quality of

2    personalized care for someone abusing heroin as it would for

3    someone suffering from addiction to a prescription opioid

4    even though the specific elements of the care may look

14:00:12  5    different, correct?

6    **A**      Yes.

7    **Q**      Your plan provides for special intensive treatment for

8    people with co-occurring mental health conditions, correct?

9    **A**      Yes, it does, for the small subset that has such

14:00:27 10    comorbid illness which can significantly complicate their

11    treatment and recovery from opioid use disorder.

12    **Q**      And that includes people, and I think you used the

13    example this morning, suffering from bipolar disorder as one

14    example, correct?

14:00:40 15    **A**      Yes.

16    **Q**      Your plan provides for special intensive treatment for

17    people suffering from other challenges such as homelessness,

18    correct?

19    **A**      I'm sorry.  Can you ask the question again, please.

14:00:53 20    **Q**      Your plan provides for special intensive treatment for

21    people suffering from other challenges, like homelessness?

22    **A**      Yes, it does.

23    **Q**      Okay.  And I believe you testified this morning, and

24    your report discusses it, assertive community treatment

14:01:10 25    programs are what your plan proposes to provide special

1    intensive treatment, correct?

2    **A**    Yes.

3    **Q**    Okay.  And these assertive community treatment

4    programs -- and the abbreviation is ACT, correct?

14:01:24  5    **A**    Yes.

6    **Q**    These ACT programs would be composed of

7    interdisciplinary teams, each one of which would be

8    comprised of a psychiatrist, two psychiatric nurses, two

9    employment specialists, two substance use disorder experts,

14:01:44 10    administrative staff, and social workers, correct?

11    **A**    Well, I'm not sure that that's correct.  I would want

12    to look at the detailed model.  But what I can say is people

13    with those sorts of -- people from those disciplines and

14    with that sort of experience should be individuals involved

14:02:01 15    in the care of these patients.

16        So -- but I didn't mean to suggest that, you know,

17    every single patient visit, for example, is managed by a

18    team of, you know, eight or ten different providers of the

19    variety that you suggested.

14:02:17 20    **Q**    Okay.  Could you please -- do you have your report up

21    there?

22    **A**    Yes, I do.

23    **Q**    Could you please turn to your report at page 38.  And

24    tell me when you're there.

14:02:32 25    **A**    Yes.  I'm here.

1    **Q**    Okay.  And if you could look at paragraph 114.  I'm

2    going to put this up on the ELMO.  It has all my

3    highlighting so you can see what else I think was

4    interesting in your report.  And I'm going to put a box

14:02:50  5    around the portion I want you to look at.

6         This is a paragraph that deals with assertive

7    community treatment or ACT, correct?

8    **A**    Yes.

9    **Q**    And you state in your report:  Through this model, an

14:03:07  10    interdisciplinary team with a psychiatrist, two psychiatric

11    nurses, two employment specialists, two SUD specialists, a

12    peer recovery coach, an administrative program staff, and

13    social workers or other master's or doctoral level

14    professionals will compose the ACT team, correct?

14:03:25  15    **A**    Well, here, I would want to cross reference this with

16    the redress model to know if I specifically called for that

17    intensity of service.  But I think those are the sorts of

18    disciplines that I believe are important to be included in

19    this treatment team.

14:03:39  20    **Q**    Your plan provides for drug treatment programs --

21    excuse me -- provides for drug disposal programs, correct?

22    **A**    Yes, it does.

23    **Q**    That includes drug take-back and the drug disposal

24    pouches, right?

14:03:55  25    **A**    Yes.  At a minimum, I believe I crossed out the

1    take-back programs.  I'm not sure I cost out the pouches,

2    which would be an example where I was perhaps more

3    conservative.

4    **Q**     Your plan calls for community prevention and

14:04:14 5    resiliency programs, correct?

6    **A**     Yes.  That's true.

7    **Q**     And these are programs that seek to strengthen social

8    bonds and promote healthy behaviors, correct?

9    **A**     Yes.

14:04:23 10   **Q**     Your plan, we've already discussed this a little bit,

11   provides for syringe services programs, right?

12   **A**     Yes, it would.

13   **Q**     And those are free needle programs, correct?

14   **A**     Well, they -- they consist of a lot more than just

14:04:34 15   giving people needles.  They consist of providing a bridge

16   to treatment for individuals that may be hard to reach or it

17   may have substantial misconceptions of what treatment

18   entails or how likely it is to be successful or how much it

19   costs and the like.  So it's a lot more than just giving

14:04:53 20   people needles.

21   **Q**     Your proposed abatement plan provides for fentanyl

22   testing strips, correct?

23   **A**     Yes.

24   **Q**     These testing strips can be used to detect whether an

14:05:11 25   illegal drug is laced with illicit fentanyl, correct?

G. C. Alexander (Cross by Delinsky)          390

1    **A**      Yes, or whether counterfeit pills, which have caused a

2    lot harm as well, contain fentanyl.

3    **Q**      Your plan proposes that fentanyl testing strips be

4    distributed to all individuals that use illicit substances

14:05:32  5    in the communities, correct?

6    **A**      Yes, I believe through the syringe service program

7    model or outreach.

8    **Q**      Your abatement plan provides for drug checking

9    machines, correct?

14:05:44  10    **A**      Yes.

11    **Q**      These drug checking machines chemically analyze

12    illegal drugs or counterfeit pills to determine if they are

13    laced with illegal fentanyl or another dangerous substance,

14    correct?

14:05:58  15    **A**      Yes.

16    **Q**      Okay.  And I believe you state in your report that the

17    use of drug checking machines in the United States has been

18    limited, to date, to raves and party centers, correct?

19    **A**      Well, and I think some law enforcement, you know,

14:06:16  20    settings have also used them.

21    **Q**      Okay.  Your abatement plan provides for 24-hour help

22    lines, correct?

23    **A**      Yes.

24    **Q**      And these help lines would be available for anyone

14:06:28  25    suffering from a substance use disorder, correct?

1    **A**    Or others that are impacted by the opioid epidemic.  I

2    mean, so they would be available to help -- help provide

3    immediate and useful information and access to individuals

4    that need help and need a number to call.

14:06:46  5    **Q**    And it would be -- they would be available to users of

6    opioids and their loved ones, correct?

7    **A**    Yes.

8    **Q**    And it would be available to users of other substances

9    and their loved ones, correct?

14:07:00  10   **A**    Well, it's not -- it's not designed for that.  I mean,

11   I don't -- I mean, I suppose anybody could call the line,

12   but the line is intended to support and address one of many

13   gaps in care that's been particularly important in

14   contributing to the high rates of harm that we continue to

14:07:21  15   see in the counties to this day from opioids.

16   **Q**    Your plan provides for peer recovery coaches, correct?

17   **A**    Yes.

18   **Q**    It provides for medical social workers, correct?

19   **A**    Yes, it does.

14:07:32  20   **Q**    And medical social workers address the psychosocial

21   needs of an individual such as housing and transportation,

22   correct?

23   **A**    Yes.  These can be important components of care that

24   help people to stay in treatment and engage in successful

14:07:49  25   recovery.

1  **Q**      Your plan provides for transportation assistance,

2  correct?

3  **A**      Yes.  Again, another gap that my discussions with

4  experts on the ground and my review of information from

14:08:01  5  community health improvement plans from the counties, as

6  well as information from around the country, has underscored

7  is really important, that is the transportation gap.

8  **Q**      And if you just put it in plain terms, your plan

9  provides assistance for people who may be receiving

14:08:16  10  outpatient treatment but can't get to the facility, correct?

11  **A**      Correct.

12  **Q**      Your plan provides for teams of first responders,

13  addiction counselors, and peer recovery coaches to provide

14  guidance to persons who have recently overdosed, correct?

14:08:33  15  **A**      Yes.  Another huge opportunity and currently one where

16  lots of people fall through the cracks.

17  **Q**      And those are called quick response teams, correct?

18  **A**      Yes.  Or sometimes I believe "DART" is also used.

19  That may be "drug abuse response team" or something to that

14:08:52  20  effect.

21  **Q**      Your plan would provide treatment for HIV to the

22  extent that the HIV patient is suffering from an opioid

23  addiction, correct?

24  **A**      Not -- not exactly.  It would provide treatment for

14:09:06  25  individuals that I estimate have HIV and would not have but

1    for the opioid epidemic.

2    **Q**    It would provide for treatment for persons suffering

3    from hepatitis C, subject to the exact same qualification

4    you just made?

14:09:20  5    **A**    Correct.

6    **Q**    It would provide treatment for persons suffering from

7    endocarditis, again, subject to the same qualification you

8    made?

9    **A**    Correct.

14:09:32 10    **Q**    Your plan would provide funding to expand the health

11    care workforce, correct?

12    **A**    Yes, insofar as this is important in improving the

13    opportunities of the county to address the opioid epidemic.

14    **Q**    So it would provide funding to expand the number of

14:09:52 15    providers who provide medication-assisted treatment,

16    correct?

17    **A**    Yes.  That's right.

18    **Q**    It would expand the number of medical providers who

19    can treat pain, correct?

14:10:02 20    **A**    Yes.

21    **Q**    It would -- it would include medical social workers,

22    along the lines of what we already discussed, right?

23    **A**    Yes.  That's true.

24    **Q**    Your plan would provide funding to address compassion

14:10:17 25    fatigue and burnout within the health care workforce,

1    correct?

2    **A**     Yes.  Attributable to the opioid epidemic.

3    **Q**     And I believe that you wrote that compassion fatigue

4    and burnout have resulted in decreased empathy in the health

14:10:31  5    care workforce, correct?

6    **A**     Well, yes.  But also as I mentioned, it's also

7    resulted in people not being interested in working in this

8    field.  The people that I have spoken with that are running

9    treatment programs have underscored that it's really hard

14:10:44 10    for the people that are working there because -- as I said,

11    because of the low remuneration and because of the caseloads

12    and because of the environments in which they're working.

13    And so, all of these have to be addressed if the counties

14    are to successfully expand treatment.

14:10:59 15    **Q**     Your plan would expand the -- excuse me,

16    Dr. Alexander.

17          Your plan would expand the availability of naloxone,

18    which is the overdose reversal drug, correct?

19    **A**     Yes.  That's true.

14:11:11 20    **Q**     And the utility of that one speaks for itself,

21    correct?

22    **A**     Yes.

23    **Q**     Okay.  Your plan would provide training to reduce the

24    stigma of opioid addiction that's held in law enforcement,

14:11:24 25    correct?

1    **A**     Yes.  As well as to educate regarding the treatability

2    of the disease.

3    **Q**     Your plan would provide for the creation or expansion,

4    depending on the circumstances, of pretrial diversion

14:11:38  5    programs, correct?

6    **A**     Yes.  That's true.

7    **Q**     Your plan would provide for specialized opioid units

8    in police departments to investigate higher level illicit

9    opioid trafficking, correct?

14:11:51  10    **A**     Yes.

11    **Q**     Your plan would expand the capacity of the courts in

12    the counties to accommodate more drug court proceedings,

13    correct?

14    **A**     Yes.

14:12:04  15    **Q**     And your plan would ensure there's a sufficient number

16    of court dockets, support staff, and case managers, correct?

17    **A**     That's right.

18    **Q**     Your plan would assist individuals released from

19    prison, correct?

14:12:17  20    **A**     The subset that have opioid use disorder and that need

21    such assistance, absolutely.  We know that the risks of

22    dying upon release for someone with opioid addiction are

23    incredibly high.  It's an incredibly vulnerable period, and

24    so it's vital that those people have services and programs

14:12:35  25    to help them have a smooth three-point landing once they're

1    released.

2    **Q**    So for that population, your plan would provide for

3    reentry programs, correct?

4    **A**    Yes.

14:12:48  5    **Q**    It would provide for housing, correct?

6    **A**    For the subset that need it that have opioid use

7    disorder and are at risk of, you know, living at a bus stop,

8    if that's the alternative, yes, it would.

9    **Q**    And your plan would provide job training for this

14:13:00  10   population, correct?

11   **A**    Vocational training is important for this population.

12   Yes, my plan would provide that.

13   **Q**    Separate and apart from the prison reentry programs,

14   your plan proposes funding for vocational training,

14:13:13  15   education, and job placement, correct?

16   **A**    Yes.

17   **Q**    And the goal is to promote economic development to

18   make gainful employment readily available to individuals in

19   the county with OUD or who have otherwise been impacted by

14:13:30  20   the opioid epidemic, correct?

21   **A**    Yes.

22   **Q**    And this includes job training, correct?

23   **A**    Yes, it does.

24   **Q**    It includes training on problem solving and coping

14:13:40  25   skills to help individuals respond to workplace stressors,

1    correct?

2    **A**    Yes.

3    **Q**    And your plan proposes initiatives to expand job

4    opportunities, not just for individuals with OUD but for all

14:13:56 5    residents of the communities, correct?

6    **A**    Well, I may speak to the importance of that in my

7    report, but I don't think I separately enumerate a line item

8    for that initiative in my redress models.

9              THE COURT:  Well, I just want to make sure

14:14:20 10    either you understood the question or I did.

11         Your plan hasn't proposed vocational training and job

12    placement for everyone in Lake County and Trumbull County,

13    have you?

14              THE WITNESS:  No, I have not.

14:14:39 15              THE COURT:  I understood your plan to have

16    those services for those individuals who have suffered from

17    OUD.

18              THE WITNESS:  That's correct.

19              THE COURT:  All right.  Well, that's what I

14:14:48 20    understood it to be.

21    **BY MR. DELINSKY:**

22    **Q**    All right.  Dr. Alexander, I'm looking at page 52.

23    Let's get this straight.  This may very well be a

24    misunderstanding on my part.

14:14:59 25         I'm looking at page 52 of your report, and I'm looking

1    at paragraph 164 --

2                    THE COURT:  This is the report and not the

3    chart?

4                    MR. DELINSKY:  Correct, Your Honor.

5    **BY MR. DELINSKY:**

6    **Q**    And I've placed a box -- I've handwrote a box around

7    the sentence that states:  Additionally, consideration

8    should be given to expanding job opportunities for all

9    residents of the communities to meet local needs created or

14:15:32 10   worsened by the opioid epidemic.

11       Correct?

12   **A**    Yes.  That's correct.

13   **Q**    Okay.  And again, this may be my understanding.  Is it

14   your testimony that funding for this initiative, for all

14:15:46 15   residents of the communities, were not included in your

16   redress models?

17   **A**    That's correct.  There are select comments and

18   recommendations that I make in the report that I don't

19   translate directly into line items that I believe -- that I

14:16:05 20   haven't attempted to enumerate.

21       And so, if you look at tab 3C of the redress model,

22   for example, for Lake County, Exhibit 23105A, the vocational

23   training, as -- Your Honor, as you suggested, is based on

24   the number of individuals with opioid use disorder.

14:16:27 25       There may be other places in my report as well where I

1    speak to the value of something at large, but I don't -- I

2    don't translate that into a specific line item in the

3    redress models.

4    **Q**    All right.  I appreciate the explanation for that, and

14:16:41  5    that goes down as my bad number one.  And I would imagine by

6    the end of our examination or discussion there will be a

7    number more.  So we'll mark that one.

8        Your plan provides funding for mental health

9    counseling and grief support, obviously, correct?

14:16:57  10    **A**    Yes.

11    **Q**    And the goal of this remedy is to ensure that mental

12    health services are available to all who may be in need

13    within the communities related to the opioid epidemic,

14    correct?

14:17:08  15    **A**    Yes.  I mean, specifically, individuals with chronic

16    pain, because often we've treated chronic pain with one tool

17    to great harm, and individuals that have lost loved ones or

18    otherwise been directly impacted by the opioid epidemic.

19    **Q**    It also includes people with mental illness, correct?

14:17:27  20    **A**    Well, not just -- no.  Not -- I mean, they could have

21    mental illness, but it's not -- my suggestion is not that we

22    ramp up, you know, psychiatric social workers to tackle

23    depression or something like that.  So they could have

24    mental illness, but when I'm enumerating the needs within

14:17:44  25    the community, it's always with a focus on individuals that

1    have opioid addiction or have otherwise been impacted by the

2    opioid epidemic.

3    **Q**     Okay.  And that includes children, individuals with

4    chronic pain, bereaved family members, correct?

14:18:01  5    **A**     Yeah.  For example, a seven-year-old girl who lost her

6    mom from an overdose, I think she should be able to avail

7    herself and her family should have access to the

8    psychological services that they need.

9    **Q**     And you set forth many reasons for the need for mental

14:18:17 10   health counseling and grief support, but one is you say it's

11   necessary to prevent future opioid use, correct?

12   **A**     Yes.  Unfortunately, there is frequent

13   intergenerational perpetuation of addiction.

14   **Q**     You propose funding for children who have been

14:18:35 15   orphaned by the epidemic?

16   **A**     Yes.

17   **Q**     Children who have lost a parent, correct?

18   **A**     Yes.  That's true.

19   **Q**     And children who have entered child protective

14:18:44 20   services or otherwise have come to the attention of child

21   protective services in some way related to the opioid

22   epidemic, correct?

23   **A**     Yes.

24   **Q**     Your plan proposes funding to address homelessness and

14:18:53 25   housing insecurity insofar as it's related to the opioid

1    epidemic, correct?

2    **A**    Well, like closely related.  In other words,

3    individuals that have active opioid addiction and are

4    homeless and housing insecure need to have stable housing if

14:19:10  5    they're going to succeed in their treatment.  And there's a

6    strong bidirectional relationship here, so for that subset

7    of individuals, I think that permanent support of housing is

8    a valuable set of services.

9    **Q**    And your plan would provide for housing for that

14:19:26  10    population, for that subset of general population?

11    **A**    Yes, it would.

12    **Q**    Okay.  Your -- let's talk about people.  Your plan

13    obviously reaches people suffering addiction to legal

14    prescription opioids, correct?

14:19:41  15    **A**    Yes.

16    **Q**    It reaches people suffering from addiction to illegal

17    opioids, correct?

18    **A**    Yes.

19    **Q**    I understand your views on the gateway, the gateway

14:19:54  20    theory, but it does reach people suffering from addiction to

21    illegal opioids who never have used prescription opioids,

22    correct?

23    **A**    Yes.

24    **Q**    Your plan reaches people suffering from opioid misuse

14:20:09  25    or opioid addiction who never filled prescriptions at CVS?

1     **A**     Yes, it does.

2     **Q**     At Walmart?

3     **A**     Correct.

4     **Q**     At Walgreens?

14:20:18  5     **A**     Yes.

6     **Q**     Your plan reaches people who are not addicted but, for

7     the reasons you explained earlier, misuse illegal opioids,

8     correct?

9     **A**     I'm sorry.  Can you ask the question again, please.

14:20:32  10    **Q**     Your plan reaches people who may not be addicted but

11    who misuse illegal opioids?

12    **A**     Yes, it does.

13    **Q**     Your plan reaches people who are not addicted but may

14    misuse prescription opioids?

14:20:46  15    **A**     Correct.

16    **Q**     Your plan reaches people suffering from opioid misuse

17    or addiction who have obtained prescription opioids through

18    theft, correct?

19    **A**     Yes.  I mean, the plan is a comprehensive plan to

14:21:03  20    address the opioid epidemic in these two communities.

21    **Q**     So it would reach -- it would reach persons suffering

22    from opioid misuse or opioid addiction who bought

23    prescription opioids on the street, correct?

24    **A**     It -- yes, it would.

14:21:18  25    **Q**     It would reach persons who bought -- took prescription

1      opioids out of a friend's medicine cabinet, correct?

2      **A**    Yes, it would.

3      **Q**    It would -- it would encompass people who obtained

4      their prescription opioids from friends or family members,

14:21:34 5    correct?

6      **A**    It would.  I mean, it would -- I didn't try to segment

7      these individuals out.  Whether or not they would access the

8      plan, that's -- you know, hopefully many would be reached by

9      the plan and touched by the plan and their lives improved by

14:21:49 10   it.

11     **Q**    Your plan reaches people who do not misuse opioids

12     today but may in the future, correct?

13     **A**    Yes.  I mean, as I showed, for example, in the

14     manuscript that we reviewed, there's a significant lag

14:22:06 15   between when exposure at a population level happens to

16     opioid oversupply and when the harms accrue.  So, I mean,

17     you could imagine someone that's not even born today that

18     develops trouble down the road but that wouldn't have but

19     for the oversupply of opioids in the community.

14:22:23 20   **Q**    Okay.  So I just want to -- let's just take a moment

21     there, okay, and make sure we understand one another.

22          Your plan runs 15 years?

23     **A**    Yes.  That's true.

24     **Q**    Okay.  And even though the dates got a little screwed

14:22:36 25   up due to the timing of your report and trial through no

1    fault of yours, it would in theory run from 2022 or 2023

2    through 2037 or 2038, correct?

3    **A**    Yes.

4    **Q**    Okay.  And so, in theory, you could have a person who

14:22:55  5   has never been exposed to opioids today, is exposed one way

6    or another to an opioid for the first time in 2024, is

7    suffering from opioid use disorder by 2027, and that

8    person -- your plan would encompass that person, correct?

9    **A**    Yes.  I don't think the opioid epidemic can be abated

14:23:21 10   in the communities without a plan that takes a comprehensive

11   approach at -- at addressing the harms that would otherwise

12   accrue.

13   **Q**    Okay.  So let's just get it straight.

14         Your plan may reach people who have never touched an

14:23:40 15   opioid, prescription or illegal, as of today but may in the

16   future and may develop OUD, correct?

17   **A**    Yes.  That's true.

18   **Q**    Okay.  And there are many different paths to

19   addiction, correct?

14:23:53 20   **A**    Yes.

21   **Q**    Some involve filling prescriptions at a pharmacy,

22   correct?

23   **A**    Yes, they do.

24   **Q**    Some don't?

14:24:01 25   **A**    That's also true.

1    **Q**    Some involve legal prescription opioids?

2    **A**    Yes.

3    **Q**    Some involve illegal opioids?

4    **A**    Yes.

14:24:09  5    **Q**    Some involve polysubstance use?

6    **A**    Yes.

7    **Q**    Your plan covers all of the different paths to opioid

8    addiction?

9    **A**    Yes, but focuses on the opioid epidemic, not other

14:24:22 10    substance use disorders.

11    **Q**    Okay.  Your plan not only reaches people suffering

12    from opioid use disorder or opioid misuse, it focuses as

13    well on their family members and loved ones, correct?

14    **A**    Yes.

14:24:39 15    **Q**    It reaches family members and loved ones of persons

16    suffering from addiction to illegal opioids?

17    **A**    Yes, insofar as, for example, if someone dies from an

18    overdose, I think that their -- the family members should

19    have access to counseling, for example.

14:24:56 20    **Q**    Okay.  And it reaches family members and loved ones of

21    persons suffering from addiction to heroin who have not yet

22    overdosed and hopefully won't, correct?

23    **A**    Yes.

24    **Q**    It will reach loved ones of persons who will develop

14:25:16 25    addiction in the future, correct?

1    **A**    Yes.

2    **Q**    It will reach the children of parents who will develop

3    addiction in the future, correct?

4    **A**    Yes.

14:25:24 5    **Q**    It will reach the children of parents who will develop

6    addiction to illegal drugs in the future, correct?

7    **A**    Yes.

8    **Q**    In theory, it could reach children not yet born,

9    correct?

14:25:35 10    **A**    Yes.

11    **Q**    And, of course, we've already discussed that your plan

12    would reach persons within the OUD population suffering from

13    homelessness and housing insecurity, correct?

14    **A**    Yes.

14:25:51 15    **Q**    Okay.  A goal of your plan -- a goal, okay?  A goal of

16    your plan is to ensure that no more children in the counties

17    wake up without a parent from a fatal overdose, correct?

18    **A**    Yes.

19    **Q**    A goal of your plan is to ensure that middle school

14:26:11 20    and high school students do not run into trouble with

21    opioids, correct?

22    **A**    Yes.  I mean, there are many, many benefits that you

23    can imagine accruing from implementation of this kind of

24    plan.  The primary goal is to reduce further harms, reduce

14:26:30 25    overdoses, reduce rates of development of new addiction.

1    But these other -- these other potential hardships and

2    tragedies, to the degree that they can be diverted, and I

3    believe -- or prevented, and I believe that many of them

4    can, then absolutely.  My plan is designed to reduce those

14:26:51  5    as well.

6    **Q**    And a goal of your plan is to divert people from the

7    criminal justice system to the treatment system, correct?

8    **A**    Yes.  That's true.

9    **Q**    A goal of your plan is to reduce the pain and

14:27:01  10   suffering and heartache that opioids have caused for so many

11   individuals within Lake and Trumbull Counties?

12   **A**    Yes.  That's true.

13   **Q**    A goal of your plan is to improve the lives of the

14   citizens of Lake and Trumbull Counties, correct?

14:27:15  15   **A**    Yes.

16   **Q**    Okay.  Your assignment was to draft a plan to abate

17   the opioid epidemic in Lake and Trumbull County, correct?

18   **A**    Yes.

19   **Q**    And that's what you did?

14:27:29  20   **A**    Yes.

21   **Q**    Okay.  Your plan is designed to abate the opioid

22   epidemic in the two counties?

23   **A**    Yes.

24   **Q**    You prepared an abatement plan -- well, excuse me.

14:27:40  25        In your mind, and I believe you already testified to

1    this, there's only one opioid epidemic, correct?

2    **A**     Well, I mean, I note that in response to queries about

3    illicit heroin or -- I'm sorry, illicit opioids on the one

4    hand and prescription opioids on the other -- and these two

14:28:02  5    products are remarkably similar from a pharmacologic

6    perspective.  If you look at the organic chemistry and the

7    chemical structure of the molecules, they're remarkably

8    similar, and we shouldn't be surprised that they have the

9    same or similar effects on the brain or the body.

14:28:18  10   And again, I've looked at a lot of abatement plans

11   over time, and I've not seen one that said -- you know, that

12   was predicated on a belief that we can address the opioid

13   epidemic and then just step to, and we're just going to

14   identify people that currently only have this type of opioid

14:28:36  15   use disorder, and these are the ones we're going to treat.

16   **Q**     Okay.  So for those reasons, the plan that you drafted

17   and that you've prepared and that you're proposing today is

18   a plan that, as we've discussed, reaches both legal

19   prescription opioids and illegal opioids, correct?

14:28:54  20   **A**     Well, there's more than one reason.  I mean, it's the

21   morally right thing to do, it makes great sense from a

22   public health perspective, it makes good economic sense.

23   If you look at the analyses that have been done on the

24   returns on investment of treatment, for example, practically

14:29:13  25   and sort of pragmatically, there's value to a plan.

1          So there are many reasons, not just one reason, that I

2     believe that all abatement plans that I have seen, none of

3     them have said we're just going to tackle this piece of the

4     pie and not try to address this other piece of the pie.  You

14:29:32 5     simply can't do it.  The plan won't work is the bottom line.

6     **Q**     And your plan, therefore, addresses both, correct,

7     illegal opioids and legal prescription opioids?

8     **A**     For all of those reasons and perhaps others, if I were

9     to think further, yes, that's why my plan addresses both.

14:29:49 10    **Q**     Now, your assignment was not to determine if CVS,

11    Walgreens, or Walmart caused the epidemic, correct?

12    **A**     That's correct.

13    **Q**     Your assignment was not to determine if CVS,

14    Walgreens, or Walmart should bear any of the costs of

14:30:02 15    abating the epidemic in the counties, correct?

16    **A**     My -- that's correct.  My assignment was to focus on

17    the science and the public health and to serve the truth as

18    best as I'm able.

19    **Q**     Your assignment was not to determine what portion of

14:30:18 20    abatement costs, if any, CVS, Walgreens, or Walmart should

21    bear, correct?

22    **A**     That's true.

23    **Q**     Okay.  Now, your plan sets out a framework to which

24    you testified to abate the opioid epidemic, correct?

14:30:28 25    **A**     Yes.

1    **Q**    And I believe you taught all of us about the four

2    general categories that comprise your abatement plan,

3    correct?

4    **A**    Yes.

14:30:40  5    **Q**    Okay.  And those categories -- let me just refresh my

6    memory.  Those categories were prevention, treatment,

7    recovery, and special populations, correct?

8    **A**    Yes.

9    **Q**    And then, within each of those categories, there are

14:30:55 10    several subcategories, correct?

11    **A**    That's correct.

12    **Q**    Okay.  And you've put forth a plan to abate the opioid

13    epidemic in several other cases, several other opioids

14    cases, correct?

14:31:06 15    **A**    Yes.

16    **Q**    You've proposed abatement plans in cases concerning

17    other communities, correct?

18    **A**    Yes.

19    **Q**    That includes Rhode Island?

14:31:15 20    **A**    Correct.

21    **Q**    Washington State?

22    **A**    Yes.

23    **Q**    West Virginia?

24    **A**    Yes.

14:31:21 25    **Q**    City of San Francisco?

1    **A**     Yes.

2    **Q**     Okay.  And you've proposed abatement plans in cases

3    concerning other classes of defendants, correct?

4    **A**     Yes, I have.

14:31:33  5    **Q**     So you've proposed abatement plans in cases concerning

6    only manufacturers, correct?

7    **A**     Yes.

8    **Q**     You've proposed opioid abatement plans in cases only

9    concerning wholesale distributors like Cardinal and McKesson

14:31:50 10    and AmerisourceBergen, correct?

11    **A**     Yes.

12    **Q**     And the plans that you have offered in these other

13    places and against other defendants all share the same

14    general categories and subcategories, even though there may

14:32:06 15    be some differences here and there?

16    **A**     Well, that's -- they're similar.  It's not -- can you

17    repeat the question, please?

18    **Q**     Sure.  Sure.  Sure.  And why don't we -- we can be

19    visual about it, okay?

14:32:24 20         So I'm looking at, and I'm putting on the ELMO,

21    Exhibit P23105A.

22         You recognize this as the redress model you prepared

23    titled:  Lake County Opioid Epidemic Abatement Plan

24    Estimates.  Okay?

14:32:44 25    **A**     Yes.

1    **Q**     And you spent some time with Mr. Lanier talking about

2    the abatement categories and subcategories that appear on

3    the right-hand side, categories 1 through 4 with lettered

4    subcategories beneath them.

14:32:57  5         Do you see that?

6    **A**     Yes, I do.

7    **Q**     Okay.  This general framework is consistent with the

8    framework you have proposed in cases involving other

9    communities and other classes of defendants, correct?

14:33:10 10   **A**     Yeah.  It's consistent.  I mean, the exact categories

11   and subcategories are not identical case to case, and there

12   are a variety of reasons for this.  But the -- but -- and

13   the grouping of specific subcategories within categories is

14   not necessarily identical either.

14:33:29 15        But the elements that are here, the types of services,

16   the types of program, and the foundation of science that we

17   have that these programs rest on, that is highly consistent,

18   and not only from my cases with one another but with an

19   enormous body of evidence beyond litigation-related

14:33:49 20   abatement activities.

21        So there's a lot of consistency across different

22   proposals, but they're different also.  There are

23   differences.  They're not identical.

24   **Q**     And outside the litigation context -- and I think you

14:34:05 25   just referenced this.

1          Outside the litigation context, you advocate for the

2     very abatement measures that appear in your plan with regard

3     to the two counties here as a means of abating the opioid

4     epidemic, correct?

14:34:21  5     **A**     Well, I and many, many others in many different forms.

6     I mean, there's -- it's fortunate -- despite the tragedy of

7     the opioid epidemic and the fact that we're two decades

8     later having this conversation, it's fortunate that there is

9     an enormous amount of consensus about what needs to be done.

14:34:40 10     **Q**     So outside the litigation context, when you are not

11     testifying for a municipality or a state or serving as an

12     expert witness, you are advocating for many of the same

13     measures that appear in your plans for Lake and Trumbull

14     County, correct?

14:35:04 15     **A**     Well, I mean, to the degree that they make good public

16     health sense, sure.  So if you take something like treatment

17     expansion, I may speak passionately or sort of -- you know,

18     I may speak about the importance of treatment expansion

19     beyond the context of litigation, if that answers your

14:35:24 20     question.

21     **Q**     And you may speak or advocate for SSP programs,

22     correct?

23     **A**     Absolutely.

24     **Q**     And you may speak and advocate for prescriber

14:35:37 25     education programs?

1   **A**     Yes.  I've spoken about and in some cases evaluated a

2   variety of different programs and services that can be used

3   to reduce opioid-related harms.

4   **Q**     Okay.  And you've published articles on the abatement

14:35:53  5   interventions that appear in your redress models and in your

6   expert report for Lake and Trumbull Counties, correct?

7   **A**     I've published some, yes.

8   **Q**     Okay.  You've participated in reports, sponsoring many

9   of the abatement measures in your plan here.  And I'm

14:36:12  10   thinking in particular of the Johns Hopkins report that's

11   attached as Exhibit A to your expert report.

12   **A**     Yes.  I believe -- if this is from *Evidence to Impact*,

13   I believe, it was probably about 2017 and produced in

14   collaboration with the Clinton Foundation and the Johns

14:36:31  15   Hopkins Bloomberg School of Public Health.

16   **Q**     Correct.  And the Hopkins publication you just

17   testified about contains many of the same interventions that

18   you testified about in your abatement plan in this case,

19   correct?

14:36:41  20   **A**     It does.  It was written at one point in time and it

21   was written for a different purpose and a bit of a different

22   audience, but, yes, the -- to the degree that a given topic

23   is examined there and relevant here, there would be overlap,

24   absolutely.

14:36:58  25   **Q**     Okay.  And if you were to propose an abatement plan to

1    a governor or to a legislator -- a legislature, the

2    interventions in your abatement plans in this case are the

3    interventions that you would propose to the governor or the

4    legislature, correct?

14:37:19  5    **A**    Well, I suppose it depends how much time I have and

6    what I'm charged to do.  I mean, if I'm -- if I have, you

7    know, five minutes for public comments, I might speak to

8    some dimensions of abatement.  If I was asked by a governor

9    tomorrow to propose a plan for her state, a statewide

14:37:40 10   program, my guess is that it would look -- it would -- it

11   would leverage and use much of the same evidence that's

12   reflected in my recent abatement reports that have been

13   litigation focused.

14   **Q**    Okay.  And I know, I remember back in trial one,

14:37:58 15   people took out testimony, Ms. Sullivan, you may remember

16   that, your old Congressional testimony.  I'm not doing

17   anything like that, okay?  Maybe later, but not right now,

18   okay?

19        But I do believe that you testified in the Washington

14:38:12 20   State trial -- because you did testify in that trial,

21   correct?

22   **A**    In the distributor trial in Washington, yes, I've

23   testified.

24   **Q**    Okay.  And you sponsored a similar abatement plan in

14:38:21 25   that trial, correct?

1    **A**    Yes.

2    **Q**    And you testified in that trial that if you were asked

3    by a governor or a legislature to propose an abatement plan,

4    it would be remarkably similar to the abatement plan you

14:38:39 5    proposed in the litigation, correct?  You remember that?

6    **A**    Well, I -- those sound like my words.  And I guess

7    just to qualify, it depends what I was asked to do, but

8    that -- yes, I think that I would -- it would be helpful to

9    know the context in which this conversation or testimony

14:38:57 10    happened.

11         But the bottom line is that the evidence is the

12    evidence about what needs to be done, and so if I was asked

13    today by a governor to design a plan for her state, I think

14    that I would -- that the plan would look very similar to

14:39:13 15    what I've designed in this instance, yes.

16    **Q**    And in this instance, you mean the plan you designed

17    for Lake and Trumbull Counties?

18    **A**    Well, that's right.  Although, I'd have the benefit of

19    18 months, and the scientific evidence moves quickly in some

14:39:26 20    domains, so, you know, there would be newer evidence to

21    bring to bear.

22         I mean, just consider the evidence from this morning

23    that overdoses have hit a new historical all-time high.  So

24    I would bring new evidence to bear, but my methodologic

14:39:43 25    approach and my scientific approach would be very similar to

1    what I've done.

2    **Q**    And subject to new information, the interventions

3    would be substantially similar to what you propose here?

4    **A**    Always guided by information that's provided to me by

14:39:57  5    the relevant parties, and by my discussions with local

6    stakeholders on the ground, and by my evolving experience in

7    abatement within communities around the country.

8    **Q**    And I believe you testified to this already, but your

9    plan is indeed rooted in public policy, correct?

14:40:14  10    **A**    Well, it's rooted in science.

11    **Q**    Okay.  It's rooted in science.

12           You believe that the measures set out in your report

13    in concert with one another can reduce opioid-related harms

14    in the counties by 50 percent over 15 years, correct?

14:40:36  15    **A**    Yes.  That's true.

16    **Q**    Okay.  Because you're projecting into the future,

17    further extrapolation would be required to fully estimate

18    the impact of the measures you propose, correct?

19    **A**    Yes.  That's true.

14:40:56  20    **Q**    Okay.  And estimating the expected impact of specific

21    interventions within specific communities is prone to

22    uncertainty, correct?

23    **A**    Yes.

24    **Q**    You understand that Lake and Trumbull County have

14:41:16  25    mobilized in many ways to address opioid misuse and

1    addiction, correct?

2    **A**    I understand that they have done a lot with not that

3    much, and I -- you know, the conversations that I had with

4    individuals such as Kim Fraser and April Caraway impressed

14:41:35  5    upon me their efforts, as did my reviews of the community

6    health assessment in Trumbull County and both counties'

7    community health improvement plans and a variety of other

8    materials that I had the opportunity to review as part of

9    this work.

14:41:52 10    **Q**    So Lake and Trumbull County -- Lake and Trumbull

11    Counties have mobilized in many ways to address opioid

12    misuse and addiction?

13    **A**    Well, I mean, I think -- I think overdose deaths were

14    higher last year than ever before in the counties, and this

14:42:09 15    year, they may be worse yet, if the experience in the

16    counties is similar to the experience nationally.

17         So I think that they, again, have done a lot with a

18    little, but I also think that it's clear from my review of

19    materials for this case that -- that there's an enormous

14:42:27 20    amount of work to be done in these communities.

21    **Q**    Both counties have made substantial investments to

22    address the epidemic, correct?

23    **A**    I think they have, yes.

24    **Q**    The investments also made by the counties to address

14:42:38 25    the epidemic are laudable, in your opinion, correct?

1    **A**    Yes.

2    **Q**    And you understand that the counties already are

3    undertaking many of the interventions that your plan

4    proposes, correct?

14:42:50  5    **A**    Well, they're undertaking some, and they're not

6    undertaking others.  And the ones that they're undertaking,

7    they're undertaking with varying degrees of resource or

8    resource constraint and varying amounts of rubber band and

9    Scotch Tape.  So I do understand that they have activity in

14:43:09  10    a number of areas, but I also understand that they have

11    enormous needs.

12    **Q**    Could you please turn to page 68 in your report,

13    Dr. Alexander.

14    **A**    60?

14:43:25  15    **Q**    68.

16    **A**    Okay.

17    **Q**    And if you could please look at the first sentence of

18    paragraph 216.  You state here:  The communities are already

19    undertaking many evidence-based abatement interventions that

14:43:50  20    reflect the overarching principles as well as strategies

21    that I outline above.

22          Do you see that language?

23    **A**    I do.  And --

24    **Q**    Did I read that language correctly?

14:43:59  25    **A**    Yes, you did.

1     **Q**     Is that a truthful statement?

2     **A**     It is, yes.

3     **Q**     Okay.  Both counties provide for addiction treatment,

4     correct?

14:44:10 5     **A**     With varying degrees of comprehensiveness and

6     coordination, yes, that's true.

7     **Q**     There are residential facilities in both counties,

8     correct?

9     **A**     Yes.

14:44:19 10    **Q**     There are ongoing initiatives to provide

11    opioid-related education and prevention in the counties?

12    **A**     There are many initiatives and many areas where there

13    are large amounts of unmet need.

14    **Q**     Okay.  There are drug disposal collection sites in

14:44:33 15    both counties, correct?

16    **A**     That's a great example.  I believe that disposal

17    sites -- it should be no harder to get rid of a bottle of

18    oxycodone than it is to get it filled in the first place.

19    And, unfortunately, it is harder to get rid of it and to do

14:44:47 20    so responsibly, so --

21    **Q**     How many drug disposal sites are there in CVS

22    pharmacies in Lake and Trumbull County?

23    **A**     I don't know.

24    **Q**     You don't know.

14:44:58 25          There are preexisting help lines to link individuals

1    to care in the counties, correct?

2    **A**    Yes.

3    **Q**    There are quick response teams in the counties,

4    correct?

14:45:08 5    **A**    I believe Newton Falls may be the community in

6    Trumbull County that may have a quick response team, and I

7    believe through the Sheriff's Office in Lake County there

8    may be a quick response team.  But I think this is another

9    great example where there may be some activity but that

14:45:26 10    there is an enormous opportunity to expand the breadth and

11    depth of these teams.

12    **Q**    Naloxone distribution and training are provided in

13    both counties through Project Dawn, correct?

14    **A**    Another great example.  That --

14:45:41 15    **Q**    Sir, before you give explanation, let's get a yes or a

16    no so the record is clear, and then you can give your

17    explanation.

18          Naloxone distribution and training are provided in

19    both counties through Project Dawn?

14:45:52 20    **A**    Yes, I believe that's true.

21    **Q**    And there are drug courts in both counties, correct?

22    **A**    I believe that's true.

23    **Q**    Okay.  Now, your abatement plan does not subtract any

24    of the preexisting services and programs in the counties

14:46:06 25    that already address opioid misuse and addiction?

1    **A**    It does not.

2    **Q**    Okay.  It doesn't subtract any preexisting funding

3    that support the services and programs in the counties

4    addressing opioid misuse and addiction?

14:46:22 5    **A**    It does not.  I didn't try to net out the current

6    provision of services when I made my estimates.

7    **Q**    Okay.  So you do not identify in your report or in

8    your redress models the pertinent services that already are

9    being provided in the counties and then net them out of your

14:46:40 10   plan?

11   **A**    Well, that's -- I mean, I qualitatively looked at a

12   large number of programs and services, but it's correct that

13   I didn't try to quantitatively net the volume of activities

14   out.  In part, because I have no way of knowing next year or

14:46:59 15   the year after or the year after that whether the current

16   provision is going to increase, decrease, or stay the same.

17   **Q**    So you do not differentiate in your plan between

18   preexisting services already in place and any additional

19   services that your plan may call for?

14:47:16 20   **A**    I didn't make recommendations about plans -- about

21   services on the margin.  I made recommendations for what I

22   thought would constitute a comprehensive and coordinated

23   abatement program.

24   **Q**    Okay.  So if the Court were to try to determine -- if

14:47:33 25   the Court were to try to determine what is needed above and

14:47:50

1    beyond what already is in place, your plan wouldn't provide

2    that information, correct?

3    **A**    Well, I think my report would provide a lot of

4    valuable information for the Court, but -- but I don't

5    directly enumerate the margin, if that's what you're asking.

6    **Q**    Okay.  So if the Court were to try to subtract from

7    your plan the services and programs that already are in the

8    counties, the Court -- the Court, or counsel for that

9    matter, would have to undertake that effort because --

14:48:11 10    because your report doesn't do that?

11    **A**    My report does not provide that information.  That's

12    correct.

13    **Q**    Okay.  And if the Court were to subtract out from your

14    plan the services and programs that already are in place in

14:48:27 15    the counties, that would operate to reduce the estimates of

16    what is needed to abate the epidemic, correct?

17    **A**    Yes, it would.  Although, it would become a much more

18    complex task going forward over time.  But, yes, it would

19    lead to a reduction in the estimates that I provide.

14:48:59 20    **Q**    You agree that any abatement plan must be tailored to

21    the particular community in which it's being implemented,

22    correct?

23    **A**    Yes, I do believe that.

24    **Q**    Okay.  And that goes for your plan too?

14:49:13 25    **A**    Correct.

**G. C. Alexander (Cross by Delinsky)**                424

1    **Q**      Your plan must be customized for each of the counties,

2    correct?

3    **A**      Yes.

4    **Q**      And you leave it to the counties ultimately to tailor

14:49:23  5    and customize your plan to their specific needs?

6    **A**      Yes.  The counties or the courts, other parties

7    involved.

8    **Q**      Okay.  You leave to the counties themselves to

9    ultimately determine the right mix of services to go into

14:49:41 10    their abatement plan, correct?

11    **A**      Yes.

12    **Q**      And you agree that the specific combination of

13    measures from your abatement plan that is implemented in

14    each county should be subject to the opinions of county

14:49:52 15    stakeholders, policymakers, and subject-matter experts in

16    the counties, correct?

17    **A**      Yes, I do.

18    **Q**      And the stakeholders in each county should make these

19    decisions, including elected officials, correct?

14:50:06 20    **A**      Yes.  Among others.

21    **Q**      County commissioners?

22    **A**      Yes.

23    **Q**      Other county officials?

24    **A**      Yes.

14:50:12 25    **Q**      Sheriffs?

1      **A**      Yes.

2      **Q**      Mayors?

3      **A**      Yes.

4      **Q**      Judges?

14:50:17  5      **A**      Yes.

6      **Q**      And so on?

7      **A**      I'm sorry?

8      **Q**      And so on.  There's other stakeholders, like by way of

9      example, not to call her out, like Ms. Fraser, correct?

14:50:27 10      **A**      Yes.  And people with lived experience, I mean, people

11      that have -- people that this plan is for, people --

12      **Q**      People in the communities?

13      **A**      People that have been directly impacted by the opioid

14      epidemic.

14:50:37 15      **Q**      In the communities?

16      **A**      In the communities, yes.

17      **Q**      Okay.  Now, you're a doctor, correct?

18      **A**      Yes.

19      **Q**      You're an internist?

14:50:47 20      **A**      Correct.

21      **Q**      You're a practicing internist.  I think you testified

22      at the first trial that you continue -- you continue to

23      practice and provide medical care to patients.  Correct?

24      **A**      Yes, I do.

14:50:59 25      **Q**      Okay.  You're a pharmaco-epidemiologist, correct?

```
          1    A     Yes.

          2    Q     Okay.  You're a professor?

          3    A     Yes.

          4    Q     Okay.  You're a scholar?

14:51:12  5    A     Did you say a scholar?

          6    Q     Scholar.

          7    A     I mean, I'm an academic.  I don't know if I would

          8    call -- I'm an academic.

          9    Q     Okay.  You write articles and you study -- you study

14:51:23  10   epidemiological issues like the opioid epidemic?

          11   A     That's true.

          12   Q     Okay.  Not a lawyer, correct?

          13   A     No.

          14   Q     You don't have a law degree?

14:51:32  15   A     I do not.

          16   Q     Not a legal expert, correct?

          17   A     Well, I've learned a lot from the past few years, but

          18   I don't --

          19   Q     You're not a legal expert?

14:51:41  20   A     I'm not a legal -- I wouldn't call myself a legal

          21   expert, no.

          22   Q     Okay.  You're not an expert in legal interpretation?

          23   A     No.

          24   Q     Not an expert in legal doctrine?

14:51:50  25   A     Not my focus.
```

1    **Q**    Okay.  You don't work in Lake County, correct?

2    **A**    I don't, but I've learned an enormous amount about the

3    county through my work there, that is, through my work in

4    this case.

14:52:02 5    **Q**    But you don't work in the county?

6    **A**    No.  I work in Baltimore.

7    **Q**    Okay.  You've never worked in Lake County?

8    **A**    I have not.  Although, I lived for four years in

9    Cleveland Heights, which as the crow flies is quite close.

14:52:15 10    **Q**    Okay.  And that's when you bagged groceries at Giant

11    Eagle, right?

12    **A**    It's not.  I grew up in Pittsburgh, which is where I

13    bagged groceries.

14    **Q**    Okay.  You don't work in Trumbull County because you

14:52:26 15    work in Baltimore, right?

16    **A**    That's correct.

17    **Q**    And you never worked in Trumbull County even though

18    you grew up in Pittsburgh?

19    **A**    That's correct.

14:52:32 20    **Q**    You're not a social worker, right?

21    **A**    No.  But I've worked closely with social workers

22    clinically and have worked in social services

23    administration -- I've collaborated with individuals that

24    are trained in social services administration.

14:52:45 25    **Q**    But you don't have a degree in social work, correct?

1    **A**    I do not.

2    **Q**    You're not an addiction treatment counselor, correct?

3    **A**    I'm not.

4    **Q**    Okay.  You're not a psychiatrist?

14:52:54  5    **A**    No.  But I see many patients with psychiatric disease,

6    but I myself am an internist, not a psychiatrist.

7    **Q**    And you're not a psychologist, correct?

8    **A**    Correct.

9    **Q**    You've never worked in law enforcement?

14:53:06  10    **A**    That's correct.

11    **Q**    You have no degree in law enforcement?

12    **A**    Correct.

13    **Q**    Never worked in a court, correct?

14    **A**    That's correct.

14:53:11  15    **Q**    You've never operated an addiction treatment clinic?

16    **A**    I've worked with many patients that have addiction and

17    studied addiction for many years, but I have not operated an

18    addiction treatment facility, no, I have not.

19    **Q**    And even though some of your patients -- and I believe

14:53:26  20    you testified about this in the first trial.  I believe that

21    you testified that some of your patients, as an internist,

22    suffer from substance use disorders, correct?

23    **A**    That's true.

24    **Q**    Okay.  And oftentimes you'll work with addiction

14:53:41  25    specialists in crafting treatment plans for them, correct?

1    **A**     Or I'll manage them myself.  It depends on the nature

2    of the case.  It's just like someone with heart failure,

3    sometimes I manage them, sometimes I refer them to

4    cardiology and comanage them.

14:53:55  5    **Q**     But you're not an addiction specialist yourself,

6    correct?

7    **A**     Well, I have spent a lot of time over the past 10 to

8    15 years studying the opioid epidemic, and I've learned a

9    lot about addiction in that context, and I've treated a lot

14:54:09  10   of patients with addiction, so I think those are the

11   experiences with addiction that I bring to this work.

12   **Q**     But when it comes to patient care, you yourself are

13   not an addiction specialist, correct?

14   **A**     I would characterize myself as an internist, as a

14:54:24  15   general internist.

16   **Q**     And not as an addiction specialist, correct?

17   **A**     I mean, again, clinically, addiction is just like

18   cardiovascular disease and pulmonary disease.  It's

19   something that I help manage as an internist.  But I haven't

14:54:41  20   hung up a shingle that says:  Dr. Alexander, MD, Addiction

21   Specialist.

22   **Q**     And you testified in the trial, the first trial in

23   this case, that you weren't an addiction specialist,

24   correct?

14:54:54  25   **A**     Which trial are you referring to?

1    **Q**     The one in this courtroom last October and November.

2    **A**     Oh, I see.  I mean, I think that my answers were

3    probably pretty similar, so I don't know my exact words.

4    But the bottom line is through my clinical work and through

14:55:10   5    my research, I've had a lot of opportunities to study

6    addiction and to understand addiction and to treat

7    addiction, but if I just met you on the street, I'd describe

8    myself as a general internist, not as an addiction

9    specialist.

14:55:22   10    **Q**     And you've never prescribed buprenorphine for

11    addiction treatment, have you?

12    **A**     In fact, I have, yes.

13    **Q**     Do you have the licensure to prescribe buprenorphine

14    for addiction treatment?

14:55:35   15    **A**     Well, let me think about that for a minute.  So I have

16    patients that are on buprenorphine, and I do not have an

17    X-waiver.  So I believe I may have misspoken and I probably

18    have not prescribed buprenorphine for them.

19         I have certainly prescribed other opioids, but I think

14:55:53   20    for these patients, some are stably maintained, but I don't

21    think that I have prescribed them because I don't have an

22    X-waiver.

23    **Q**     And you haven't prescribed methadone for addiction

24    treatment to any of your patients?

14:56:05   25    **A**     No, I have not.

1    **Q**    And you've never operated a syringe services program,

2    correct?

3    **A**    No, I have -- I've volunteered at a syringe service

4    program, but I have not operated one.

14:56:15  5    **Q**    Okay.  Let's go back to that first trial, the one we

6    just talked about, October-November, in this courtroom

7    involving these defendants.

8          You testified in that trial, correct?

9    **A**    Yes, I did.

14:56:24  10   **Q**    Okay.  But you didn't attend the remainder of the

11   trial, what occurred before you testified and what occurred

12   after you testified, correct?

13   **A**    That's correct.

14   **Q**    You didn't watch the trial, correct?

14:56:35  15   **A**    That's correct.

16   **Q**    You didn't review the testimony at trial of any other

17   witnesses, correct?

18   **A**    I believe that's correct.

19   **Q**    And you didn't review the jury instructions that Judge

14:56:47  20   Polster gave at the trial, correct?

21   **A**    That's definitely correct.

22   **Q**    Okay.

23             MR. DELINSKY:  Judge, now -- I have no idea

24   what time it is.  If you -- if you want to break, we'll

14:56:57  25   break.  If not, I'm happy to go.

1            THE COURT:  All right.  If this is a

2    convenient time.  I try to do it when it makes sense in your

3    examination.

4            So we'll take a break, 15 minutes, and then pick up

14:57:07  5    with the balance of your testimony, Doctor.

6                    (Recess taken at 2:57 p.m.)

7                    (Court resumed at 3:20 p.m.)

8            THE COURT:  Please be seated.

9            And, Doctor, you're still under oath from before the

15:20:40  10    break.

11            So you may continue, Mr. Delinsky.

12                MR. DELINSKY:  Thank you, Your Honor.

13    **BY MR. DELINSKY:**

14    **Q**    Dr. Alexander, one of the measures included in your

15:20:49  15    plan is a surveillance program, correct?

16    **A**    Can you repeat that, please?  I had trouble hearing.

17    **Q**    My apologies.

18            One of the measures included in your abatement plan

19    for the counties is a surveillance plan?

15:21:06  20    **A**    One of the measures -- I still didn't hear the last

21    part.  Surveillance...

22    **Q**    Program.  A surveillance program.

23    **A**    Yes.  Absolutely.

24    **Q**    Okay.  That's a component of the abatement plan you're

15:21:17  25    proposing for Lake and Trumbull Counties?

1       **A**      Absolutely.

2       **Q**      Okay.  And this is at core, I'm using my own words

3       here, it's a data gathering program and a data analysis

4       program?

15:21:26  5       **A**      Well, it's to provide a mission control for the

6       activities.  I mean, there has to be a cockpit where

7       information is coming in and midcourse corrections can be

8       made so that resources are allocated in a manner that

9       produces the greatest good for the greatest number while,

15:21:42  10      you know, fulfilling other objectives as well.

11      **Q**      And one of the ideas behind the program is that it

12      would gather a wide array of data and put it to use to

13      inform abatement on a moving-forward basis, correct?

14      **A**      Yes.

15:21:53  15      **Q**      And it would be a program to sort of gather data and

16      put it to use in future months and in future years?

17      **A**      Yes.  I mean, it should be as timely as possible, so

18      ideally, you want realtime data where you can sort of see

19      yesterday how many overdoses occurred and the like.  But,

15:22:14  20      yes, it would be a program to allow, again, for a mission

21      control for the abatement program to be run and

22      coordinated -- in a coordinated fashion with a -- and

23      producing the greatest return on investment.

24      **Q**      Okay.  And the surveillance program would entail the

15:22:31  25      creation of a team of professionals, correct?

1   **A**     It would require such.  I mean, there might be some

2   reorganization of individuals currently within the county

3   frameworks, but I think that new hires would be required as

4   well.

15:22:45  5   **Q**     And I believe your plan, but I'm sensitive to that it

6   might be in the report versus the redress model, so -- so

7   you'll clarify, okay?  I don't want to overstate.

8       But your plan recommends that the team include

9   epidemiologists and data scientists?

15:23:02  10   **A**     Yes.

11   **Q**     Okay.  And the surveillance program would allow for

12   relevant data from a variety of local, state, and national

13   sources to be gathered, curated, integrated, and analyzed?

14   **A**     That's correct.

15:23:21  15   **Q**     Okay.  And the purpose of the surveillance program and

16   this data would be to identify and respond to changing needs

17   in the community, correct?

18   **A**     Yes.

19   **Q**     Quality surveillance data on a moving-forward basis is

15:23:41  20   key to identifying and responding to changing needs in the

21   community?

22   **A**     Yes.

23   **Q**     The data is needed to better understand key aspects of

24   the dynamic nature of the epidemic that are not visible

15:24:01  25   through existing data channels?

**G. C. Alexander  (Cross by Delinsky)**                              435

1    **A**      Yes.

2    **Q**      And the truth is that the opioid epidemic is a complex

3    phenomenon, correct?

4    **A**      Yes, it is.

15:24:14  5    **Q**      The opioid epidemic continues to change and evolve at

6    a national and state level?

7    **A**      Yes.

8    **Q**      At a local level, these changes have often been even

9    more profound in the opioid epidemic?

15:24:31  10    **A**      Well, there's changes and evolution at every level.

11    **Q**      And at the local levels, at times the changes have

12    been even more profound when it comes to the opioid

13    epidemic?

14    **A**      Yes, that could be.

15:24:44  15    **Q**      And counties, therefore, need, as you've already

16    testified, timely and accurate information on a

17    going-forward basis, correct?

18    **A**      Yes.

19    **Q**      And counties need timely and accurate information to

15:24:58  20    make informed decisions on resource allocation in future

21    months and future years?

22    **A**      Yes.

23    **Q**      Without such information, the communities are flying

24    blind, no better off than an airplane without access to the

15:25:14  25    flight instrument panel?

           1    **A**      Right.  That's the analogy of a control room.  But I

           2    want to be clear, it's not -- it's not either data or no

           3    data, visibility or no visibility.  But, yes, it's

           4    important, the greater the coordination and integration and

15:25:36   5    curation of data that's available and information that

           6    county decision makers and others can use, the more -- the

           7    more responsive an abatement program can be deployed and

           8    successfully administered.

           9    **Q**      Okay.  And do you recall writing in your report that

15:25:58  10    without the information that would be supplied by the

          11    surveillance program, the communities would be flying blind,

          12    no better off than an airplane pilot without access to the

          13    flight instrument panel?

          14    **A**      Yes, I do.

15:26:14  15    **Q**      And you wrote that, correct?

          16    **A**      Yes, I did.

          17    **Q**      And you meant it, it was true, correct?

          18    **A**      Yes.

          19    **Q**      Now, when you testified back at our trial in October

15:26:23  20    and November, you talked about how prescription records

          21    could be used to determine if users of illegal opioids ever

          22    filled prescriptions for opioids.

          23          Do you recall that?

          24    **A**      No.  But I believe that to be the case.

15:26:44  25    **Q**      Correct.  So if you have a -- someone who's addicted

1    to heroin, you could use prescription records to determine

2    if that person ever filled prescriptions for prescription

3    opioids, correct?

4    **A**    Yes.

15:26:57 5    **Q**    Okay.  And one of the kinds of data that could be put

6    to use on a move-forward basis to assist abatement would be

7    prescription records or prescription data, correct?

8    **A**    One of many.  One of many.  Yes.

9    **Q**    And OARRS is one source of prescription records that

15:27:14 10    the counties might use on a move-forward basis, correct?

11    **A**    Again, one of many, but yes, it is.

12    **Q**    The counties can derive clinical information from

13    OARRS about patients and people, correct?

14    **A**    Yes.

15:27:26 15    **Q**    And OARRS can be used to identify patients who may

16    need treatment, correct?

17    **A**    Well, with a variety of caveats and limitations, I

18    think that OARRS is one of several databases that can be

19    valuable going forward, absolutely.

15:27:43 20    **Q**    Okay.  And another source of prescription records

21    could be the data maintained by retail pharmacies like CVS,

22    Walgreens, and Walmart, correct?

23    **A**    Yes.

24    **Q**    And the pharmacies could be called on to run queries

15:27:55 25    in their data, correct?

1    **A**     They could.

2    **Q**     And that would be appropriate and useful to your

3    surveillance program, correct?

4    **A**     Again, as one of many sources of information, it would

15:28:04 5    be a useful input, yes, it would.

6    **Q**     Okay.  Each of the measures in your abatement plan

7    should be assessed on a quarterly, biannual, or annual

8    basis, correct?

9    **A**     Yeah, so I know that the more frequent an assessment

15:28:32 10    occurs, the more rapidly such information could be used to

11    iteratively inform further abatement.  So there are some

12    measures that may be able to be assessed realtime, and I

13    would never argue against that.

14    **Q**     Okay.  And quarterly, biannual, or annual assessments

15:28:50 15    or assessments that occur even more regularly are a good

16    thing, correct?

17    **A**     Yeah.  I mean, as with data itself, it has to be fit

18    for purpose.  But there's no question that there is

19    important information that should be curated -- harmonized,

15:29:07 20    curated, and used in order to track the progress of the

21    abatement programs that I hope that these counties will have

22    the opportunity to undertake.

23    **Q**     And reassessing abatement measures as frequently as

24    possible is necessary because it -- those reassessments can

15:29:28 25    be used to inform further abatement, correct?

1    **A**      Yeah.  I mean, this isn't something where like you're

2    going to cycle, you know, weekly and sort of continually

3    pivot.  You know, there need to be sustained long-term

4    investments and sustained long-term commitments to the very

15:29:46 5   programs that I advise.  But -- but information can be used

6    valuably to reappraise the outcomes of those interventions

7    and to redeploy resources for the greatest good.

8    **Q**      And in those reassessments or what you recommend occur

9    on a quarterly, biannual, or annual basis, if not even more

15:30:10 10  regularly, correct?

11   **A**      Yes.

12   **Q**      And the more frequently an assessment occurs, or a

13   reassessment occurs, the more rapidly such information can

14   be used to iteratively inform abatement, correct?

15:30:26 15  **A**      Well, again, my program includes I believe 20

16   different categories of services and interventions, and it's

17   hard to talk about them all in the abstract.  So I would say

18   that for many measures, such as those I propose in my report

19   that we're discussing in paragraph 218, many of these

15:30:44 20  measures could be assessed on a, for example, a quarterly or

21   biannual or annual level, but there are other measures that

22   should be able to be assessed in -- in much closer to real

23   time in order to understand, you know, how the -- how the

24   steamship is faring.

15:31:03 25  **Q**      Okay.  Now, mindful that the frequency with which a

1    reassessment is needed may depend on the particular program,

2    as you just explained, the more frequent that an appropriate

3    assessment occurs, the more rapidly the resulting

4    information can be used to inform abatement moving forward,

15:31:29  5    correct?

6    **A**     I mean, again, there are costs to doing these

7    assessments.  There are costs to midcourse corrections, and

8    so, you know, I'm having a bit of a hard time answering your

9    questions in the abstract.

15:31:45 10         I think if we were talking about a specific instance,

11    like, you know, interventions for high school students to

12    help reduce nonmedical prescription opioids use, I could be

13    more specific about the types of measures that I believe are

14    appropriate or the frequency with which I think those

15:32:06 15    measures should be addressed.

16    **Q**     Dr. Alexander, could you please look at page 68 of

17    your report.  And in particular, paragraph 218, which is on

18    the ELMO.  And I'm boxing the sentence I want to read to

19    you.

15:32:27 20         Each measure should be assessed on a quarterly,

21    biannual, or annual basis, understanding that the more

22    frequent an assessment occurs, the more rapidly such

23    information can be used to iteratively inform further

24    abatement.

15:32:47 25         Did I read that sentence correctly from your report?

          1    **A**    Yes, you did.

          2    **Q**    Did you write that sentence?

          3    **A**    Yes, I did.

          4    **Q**    Do you stand by that sentence?

15:32:55  5    **A**    I do.

          6    **Q**    Is that sentence truthful?

          7    **A**    Yes.

          8    **Q**    Thank you.

          9           Now, you're on the faculty at the Johns Hopkins

15:33:05 10    Bloomberg School of Health, correct?

         11    **A**    Johns Hopkins Bloomberg School of Public Health.

         12    **Q**    Excuse me.  Thank you for the correction.

         13           What do you call it?  Do you call it Hopkins, do you

         14    call it Bloomberg, do you call it both?

15:33:19 15    **A**    I suppose it depends on who I'm speaking with.

         16    **Q**    What should I call it?

         17    **A**    Johns Hopkins Bloomberg School of Public Health.

         18    **Q**    You're trying to make it harder for me, huh?

         19              THE COURT:  Someone contributed to the full

15:33:36 20    part of that name.

         21              MR. DELINSKY:  Judge, I believe it was like $7

         22    billion or something like that.

         23              THE COURT:  All right.  Then they want

         24    their -- their part of the name in it.

15:33:45 25              MR. DELINSKY:  All right.  We will honor that.

1    **BY MR. DELINSKY:**

2    **Q**    Dr. Alexander, the faculty at the Johns Hopkins

3    Bloomberg School of Public Health coordinated the release of

4    a set of principles to guide state and local spending of

15:34:07 5    opioid litigation settlement funds, correct?

6    **A**    Yes.  A select group of faculty, but, yes, they did.

7    **Q**    Okay.  And a large number of organizations from

8    outside of Johns Hopkins signed on to those principles,

9    correct?

15:34:20 10    **A**    Yes.

11    **Q**    Are you familiar with those principles?

12    **A**    Yes.

13    **Q**    Okay.  One recommendation made in the guidelines is to

14    establish a dedicated fund for opioid litigation funds.

15:34:36 15         Do you agree with that recommendation?

16    **A**    I -- it would be helpful to have more context.

17    **Q**    Okay.  So, Dr. Alexander, I believe my colleague

18    provided you with a document labeled CVS-MDL-4997, correct?

19    **A**    Yes.

15:35:22 20    **Q**    And are these the -- is document CVS-MDL-4997 the

21    principles for the use of funds from the opioid litigation

22    that we just began to discuss?

23    **A**    Yes.

24    **Q**    Okay.  If you could please turn to page four of the

15:35:47 25    document.

```
 1          Okay.  Page four concerns principle number one:  Spend

 2    money to save lives.

 3          You agree with that principle, right?

 4    A     Yes.

 5    Q     Okay.  Pretty noncontroversial, right?

 6    A     Yes.

 7    Q     Now, you see as we move down on the page:  How can

 8    jurisdictions adopt this principle?

 9          Do you see that?

10    A     Yes.

11    Q     And number one is:  Establish a dedicated fund.

12          Do you see that?

13    A     Yes, I do.

14    Q     Okay.  And it says:  Ensuring that funds from the

15    opioid lawsuits are being used to help people with substance

16    use disorders is easier if dollars resulting from the

17    various legal actions go into a dedicated fund.

18          Correct?

19    A     Yes.

20    Q     You see that?

21    A     Yes.

22    Q     And then, above, if you go to the top of the page

23    again, you see it states:  Given the economic downturn, many

24    states and localities will be tempted to use the dollars to

25    fill holes in their budgets rather than expand needed
```

1   programs.

2       Do you see that?

3   **A**   Yes.

4   **Q**   Okay.  And it goes on to say:  Jurisdictions should

15:37:10  5   use the funds to supplement rather than replace existing

6   spending.

7       Do you see that?

8   **A**   Yes, I do.

9   **Q**   Okay.  So let's go back to my question.

15:37:17  10      Do you agree with the recommendation set forth in this

11  exhibit to establish a dedicated fund to hold opioid

12  litigation funds in a particular jurisdiction?

13  **A**   I think there's merit to that proposal.  I think there

14  are a number of ways that a fund -- such a fund could be

15:37:40  15  structured.  And I would want more time, you know, to

16  consider the merits of different strategies and structures.

17      But I believe in -- I believe in -- I agree with the

18  general principle that ensuring that funds from lawsuits are

19  used to help people with substance use disorders is easier

15:38:00  20  if there's some protection of those funds.

21  **Q**   Okay.  Now, the second principle -- well, I don't know

22  if it's a principle or a point, but beneath the language

23  about establishing a dedicated fund, it states:  Supplement

24  rather than supplant existing funding.

15:38:21  25      Do you see that?

15:38:41

1    **A**      Yes, I do.

2    **Q**      Okay.  And another purpose of establishing a dedicated

3    fund would be to ensure that opioid litigation funds are

4    used to supplement rather than replace existing spending on

5    the opioid epidemic.

6         Do you agree with that principle?

7    **A**      I think that's a complicated -- there's not a simple

8    answer to that question.  It's a -- it is a question that

9    ultimately depends, I think, and needs to be guided in part

15:38:57 10    on the specific communities and the context and

11    circumstances of specific communities, the magnitude of

12    their need, the magnitude of their current investments, the

13    stability of their current investments, the wisdom of their

14    current investments, and so forth.  So I'm afraid that I

15:39:16 15    don't have a simple yes-or-no answer for you on that one.

16    **Q**      Do you disagree with this principle that opioid

17    litigation funds should be used to supplement rather than

18    supplant existing funding for programs that are addressing

19    the opioid epidemic?

15:39:31 20    **A**      Again, that extends beyond the context of the

21    materials that I've submitted, and I think it's --

22    there's -- I don't -- I don't think -- I don't have a simple

23    answer to that question.

24    **Q**      Were you involved in the preparation of this document?

15:39:51 25    **A**      No, I was not.

1     **Q**     Did you endorse this document?

2     **A**     I -- I don't believe my name is on it, if that's what

3     you're asking.

4                    THE COURT:  Whose document is this?

15:40:02  5                    MR. DELINSKY:  This document comes from the

6     Johns Hopkins Bloomberg School of Public Health, Your Honor.

7                    THE COURT:  Oh, all right.

8                    THE WITNESS:  And specifically, Your Honor,

9     there is a fund that was generated from a philanthropic gift

15:40:17  10     by the mayor called the Bloomberg American Health

11     Initiative, and I believe that this document arose from the

12     Bloomberg American Health Initiative.

13                    THE COURT:  Okay.  Thank you.

14     **BY MR. DELINSKY:**

15:40:28  15     **Q**     So is it your testimony that you are not in a position

16     to either agree or disagree that opioid litigation funds

17     should be used to supplement rather than supplant existing

18     funding?

19     **A**     Well, I mean, there may be a program that is funded

15:40:46  20     through a grant from the CDC where the funding is at risk of

21     getting pulled in January of 2023, and it may be a valuable

22     program and a program that has delivered well for the

23     community, and so, I don't even know how you would consider

24     that.  Would that be an instance where I would be -- would

15:41:06  25     that be supplementing or would that be replacing or would

1    that be complementing if we were to pick up the costs of

2    that program going forward?

3          I guess my point is that the issues here are complex

4    with respect to how the funds should best be allocated, and

15:41:21  5    ultimately that allocation is something that I leave for the

6    Court and the communities to determine.

7    **Q**    Okay.  That allocation is not subject to any opinions

8    of yours, correct?

9    **A**    I think there are a lot of very good ideas in this

15:41:35  10    document entitled:  Principles For the Use of Funds From the

11    Opioid Litigation, and -- and I think there's a lot of -- a

12    lot of wisdom to be found in this, and I'm not surprised if

13    this has been endorsed by many parties.  But this is beyond

14    the scope of my report or the models that I've submitted for

15:41:55  15    this case.

16    **Q**    Okay.  Let's move on from number two and just go to

17    number three real quick:  Don't spend all the money at once.

18          And I'm going to read to you the last sentence of that

19    paragraph:  Should the opioid lawsuits result in a lump sum

15:42:16  20    payment to jurisdictions, they should consider establishing

21    an endowment so the dollars can be used over time.

22          Do you agree with that principle?

23    **A**    I do.

24    **Q**    That dollars should be allocated over some period of

15:42:28  25    years, correct?

1    **A**      Yes.  I do believe that.

2    **Q**      Okay.  The last one:  Report to the public on where

3    the money is going.

4         Am I safe in assuming you agree with that principle as

15:42:37 5    well?

6    **A**      Yes.

7    **Q**      Okay.  And you agree, do you not, that it would be

8    prudent to appoint an administrator to ensure that funds are

9    disbursed and used for appropriate opioid abatement

15:42:52 10   purposes?

11   **A**      I think that it's important that the funds are used

12   for the purposes that they're intended and that there is an

13   administrative structure in order to facilitate such.  But

14   whether or not that's a court-appointed administrator or

15:43:07 15   another mechanism is for the courts to decide.

16   **Q**      Are you aware that Lake County has settled its opioids

17   claims against Rite Aid?

18   **A**      I'm not.  I mean, I -- my understanding is that there

19   was one party to the prior phase I, if you will, that had

15:43:31 20   separated and that had settled, but I wasn't aware of the

21   particular party or the particular county or counties.

22   **Q**      Okay.  Let me go in reverse order.

23        You are aware, because you just said so, and I'm sure

24   you remember testifying here about Giant Eagle because

15:43:46 25   that's why I -- it came out that you bagged groceries at

1    Giant Eagle when you were a young kid.  Right?

2    **A**    Correct.

3    **Q**    Okay.  And you do know that Giant Eagle, who was here

4    when you testified at trial, entered into a settlement with

15:44:04  5    Lake and Trumbull Counties?

6    **A**    That's -- that's what I was referring to.  That's my

7    understanding.

8    **Q**    Okay.  And you are not aware that Rite Aid, which you

9    know is another pharmacy, entered into a settlement with

15:44:19 10    Lake and Trumbull Counties?

11    **A**    I don't believe I was aware of that, no.

12    **Q**    Okay.  Let's focus on Giant Eagle, okay?  Let's focus

13    on Giant Eagle.

14          Do you know how much Lake County received in the Giant

15:44:33 15    Eagle settlement?

16                    MR. WEINBERGER:  Objection.

17                    THE COURT:  Well --

18                    MR. DELINSKY:  Just a few questions, Your

19    Honor.

15:44:43 20                    THE COURT:  First of all, I don't know if it's

21    public, even if he knows it, and I'm not -- so I don't want

22    to make it public.

23                    MR. DELINSKY:  I won't elicit the amount.

24                    THE COURT:  And I'm not sure how it's possibly

15:44:52 25    relevant to his abatement plan, his testimony.

1    MR. DELINSKY:  Your Honor, we'll get to this.

2    About two or three questions.  That's all.

3                THE COURT:  All right.

4    **BY MR. DELINSKY:**

15:45:00  5    **Q**    All right.  Without specifying the amount, although I

6    do think it's public, do you know how much Lake County

7    received in the Giant Eagle settlement?

8                MR. WEINBERGER:  Objection.

9                THE COURT:  I'm going to sustain the

15:45:09 10    objection.

11                MR. DELINSKY:  It's just asking him if he

12    knows, Your Honor.  Not how much.  If he knows.

13                THE COURT:  All right.  I'll let him answer if

14    he knows, but he'd only know it -- well, if he read it in

15:45:21 15    the paper, then it's public.  If he got it through counsel,

16    I mean, whatever.

17         You can answer the question if you know.

18                THE WITNESS:  I do not know, Your Honor.

19                THE COURT:  Okay.

20    **BY MR. DELINSKY:**

21    **Q**    Same question for Trumbull County.  Is it safe to

22    assume you don't know how much Trumbull County received in

23    the Giant Eagle settlement?

24    **A**    That's correct.  I don't know.

15:45:36 25    **Q**    Okay.  And you obviously don't know how much either

1    Giant Eagle -- either Lake County or Trumbull County

2    received in the Rite Aid settlement because you don't know

3    about that settlement, correct?

4    **A**    That's correct.  I don't know.

15:45:49  5    **Q**    Okay.  Has either Lake County or Trumbull County asked

6    for your input on how to use any of the funds received in

7    the Giant Eagle settlement?

8    **A**    No.

9    **Q**    Okay.  Are you aware that Lake and Trumbull Counties

15:46:10  10   have received or will be receiving funds from other opioid

11   litigation resolutions?

12   **A**    No.  I've not followed -- I mean, any more so than

13   understanding that there's a deal that is perhaps close to

14   being completed or something or completed with distributors,

15:46:30  15   but I don't have any knowledge of the monies that Lake or

16   Trumbull County might receive as a part of that.

17   **Q**    Okay.  Has either Lake or Trumbull County asked for

18   your input on how to use any settlement funds that might be

19   received from a distributor settlement?

15:46:48  20   **A**    No.

21   **Q**    Okay.  Generally speaking, there have been three waves

22   of the opioid epidemic, correct?

23   **A**    Well, we and others are now describing a fourth wave,

24   but, yes, historically, the epidemic has been characterized

15:47:06  25   as existing in three waves.

G. C. Alexander (Cross by Delinsky)          452

1    **Q**    Okay.  The first wave was from '99 to 2010 and

2    principally concerned prescription opioids, correct?

3    **A**    Yes.

4    **Q**    Now, even though prescription opioids didn't go away,

15:47:26  5    okay -- and I've read your testimony on this, so I want to

6    be honest about it.  Understanding that prescription opioids

7    didn't go away, the second wave of the opioid epidemic was

8    from 2010 to 2013 and principally concerned heroin, correct?

9    **A**    Well, it was characterized by large increases in

15:47:45 10    heroin morbidity or mortality, yes.

11    **Q**    Okay.  And you agree that the second wave involving

12    heroin was largely as a result of increased geographic

13    availability of historically low-cost, high-purity heroin?

14    **A**    Those sound like my words.  And I think that's one of

15:48:14 15    the factors that contributed to that second wave.

16    **Q**    Okay.  The third wave of the opioid epidemic --

17    mindful there still were prescription opioids and there

18    still was heroin, the third wave of the opioid epidemic

19    began in 2014, and it principally concerns illegal fentanyl,

15:48:40 20    correct?

21    **A**    Yes.

22    **Q**    There has been a near exponential increase in overdose

23    deaths involving illicit fentanyl and other illicit

24    synthetic opioids, correct?

15:48:54 25    **A**    Yes.  Over the period from 2014 to -- I mean, it's --

1　　frankly, it's ongoing.

2　　**Q**　　And the impact of illicit fentanyl has been especially

3　　severe in the communities, correct?

4　　**A**　　Well, I mean, the communities have been hammered in

15:49:08　5　　multiple ways, but fentanyl has certainly caused many harms,

6　　yes.

7　　**Q**　　And the impact of illicit fentanyl has been especially

8　　severe in these communities, correct?

9　　**A**　　I believe that that's true, yes.

15:49:26　10　　**Q**　　And illicit fentanyl, just to be clear, I don't think

11　　there's any dispute about this, comes from criminal drug

12　　trafficking organizations and enterprises, correct?

13　　**A**　　Well, it's fed by an incredible thirst and demand for

14　　opioids and the relatively lower cost and higher purity of

15:49:44　15　　fentanyl relative to a bottle of pills, among other things.

16　　So there's not one factor alone.  Just as with other

17　　dimensions of the epidemic, it's a complex process, but --

18　　**Q**　　I'm not asking about factors.  I'm asking about

19　　sources.

15:50:00　20　　　　You don't go to your corner CVS to get illegal

21　　fentanyl, correct?

22　　**A**　　That's true.

23　　**Q**　　You don't go to the corner CVS to get your heroin

24　　laced with illegal fentanyl, correct?

15:50:10　25　　**A**　　That's true.

**Q**      When a person gets illegal fentanyl, they're getting it from a criminal organization, correct?

**A**      Well, they may be getting it from a friend, they may be getting from a family member, they may be getting it from, you know, a trafficking network, but they're certainly getting it through the illicit supply chain, yes.

**Q**      Okay.  And, ultimately, that illicit fentanyl is reaching the streets through drug cartels, correct?

**A**      Well, I -- you know, if -- to the degree that it's manufactured in China or Mexico and brought into the country, then I believe that cartels or major drug traffickers would be involved in its distribution.  But ultimately, it makes it down the supply chain and can be given as innocently as, you know, three kids at Ohio State or whatever the college was that were found dead within the past few weeks.  For all I know, I don't know the details of that case, but they may well have been given a counterfeit pill that they thought was -- they thought was just quote/unquote, you know, oxycodone and it actually was a counterfeit pill and it killed them.

**Q**      Illicit fentanyl reaches people through the illegal market, correct?

**A**      Yes.

**Q**      Okay.  Now, I think a few minutes ago you referred to, you know, a new developing fourth wave, right?

1    **A**    Yes.

2    **Q**    Okay.  And you wrote an article about that, right?

3    **A**    Yes, I have.

4    **Q**    Okay.  And the -- what you mean by that fourth wave is

15:51:42  5    that the opioid epidemic in recent years has come to include

6    the combination of illicit fentanyl with illegal stimulants

7    like cocaine or methamphetamine, correct?

8    **A**    That's correct.

9    **Q**    Okay.  And this is a new twist to the epidemic?

15:51:59  10    **A**    It is.  But the fourth wave is also characterized by

11    increasing use of stimulants, with or without opioids

12    combined with stimulants.

13    **Q**    Okay.  And this new wave, this fourth wave, is posing

14    urgent and novel public health challenges itself?

15:52:16  15    **A**    I believe that's true.

16    **Q**    Okay.  And this new twist, this new wave reflects the

17    rapidly evolving nature of the opioid epidemic, correct?

18    **A**    Yes.

19    **Q**    There are many different paths to opioid addiction,

15:52:33  20    right?

21    **A**    Yes.

22    **Q**    We talked about some of this, so let's be quick.

23    Prescription opioids are one path, correct?

24    **A**    Yes.

15:52:39  25    **Q**    Prescription opioids obtained illegally and used

           1    nonmedically is another path?

           2    **A**     Yes.

           3    **Q**     Heroin is a path, correct?

           4    **A**     That's another one.

15:52:47   5    **Q**     Fentanyl is another path, correct?

           6    **A**     Yes, it is.

           7    **Q**     And that's illegal fentanyl, correct?

           8    **A**     Yes.  Although, frankly, legal fentanyl has also

           9    caused plenty of problems.

15:52:56  10    **Q**     Both?

          11    **A**     Correct.

          12    **Q**     Okay.  The fourth wave is the illegal fentanyl,

          13    correct?

          14    **A**     The fourth wave is primarily characterized by rising

15:53:04  15    harms from stimulants and also from stimulants being

          16    combined with opioids.  Many people using stimulants are

          17    also using opioids, whether prescription opioids or

          18    nonprescription opioids.

          19    **Q**     And another path to opioid addiction involves

15:53:20  20    polysubstance use, correct?

          21    **A**     Yes.

          22    **Q**     And that's where a person -- I'll get the words wrong,

          23    and I certainly don't mean that pejoratively, but

          24    polysubstance use is when a person mixes opioid use with

15:53:34  25    other substances?

1    **A**    Yeah.  Many individuals may be prone to multiple use

2    disorders.

3    **Q**    Okay.  So it could be the combination of alcohol and a

4    legal or illegal opioid, correct?

15:53:45  5    **A**    Yes.

6    **Q**    The combination of marijuana with a legal or illegal

7    opioid?

8    **A**    Yes, it could.

9    **Q**    The combination of cocaine with a legal or illegal

15:53:53  10    opioid?

11    **A**    Yes.

12    **Q**    The combination of methamphetamine with a legal or

13    illegal opioid?

14    **A**    Yes.  But to be fair, I developed an opioid abatement

15:54:04  15    plan.  I didn't develop a plan to abate all substance use

16    disorders within the communities.

17    **Q**    Okay.  But your opioid abatement plan does address

18    polysubstance users to the extent that it involves the

19    misuse or addiction to opioids?

15:54:20  20    **A**    Yes.  It doesn't -- I don't exclude eligibility for

21    treatment, I don't exclude people that have multiple use

22    disorders from eligibility for treatment because they happen

23    to have another use disorder in addition to opioid use

24    disorder.

15:54:34  25    **Q**    And let's get back to the paths to addiction.

1        Polysubstance use is another path to addiction,

2   correct?

3   **A**    Yes.

4   **Q**    And there are many factors at play in leading to

15:54:44 5   addiction, correct?

6   **A**    Well, you know, biology, environment, and access are

7   sort of the big three.  But, yes, it's a complex concept.

8   **Q**    Okay.  Mental health can be in play in leading to

9   addiction, correct?

15:55:03 10   **A**    Untreated mental health such as untreated depression

11   or untreated bipolar affective disorder could be a risk

12   factor for addiction, yes.

13   **Q**    Okay.  And I believe you already testified to the

14   following, but a person's family situation could be a risk

15:55:17 15   factor that may lead to addiction, correct?

16   **A**    Yes.  There's often intergenerational perpetuation of

17   addiction.

18   **Q**    Okay.  Socioeconomic factors could contribute or be a

19   risk factor in leading to addiction, correct?

15:55:32 20   **A**    They could be.  It doesn't happen without access to

21   products, but, yes, those are risk factors.

22   **Q**    And opioid addiction is one of those diseases where

23   you just can't predict who's going to develop it, correct?

24   **A**    Not -- not with -- not with a lot of certainty, no.

15:55:51 25   **Q**    No.

1       There's just no means to predict which individuals who

2  are taking opioids will go on to develop addiction, correct?

3  **A**    Well, I mean, there's an enormous amount of evidence

4  suggesting the harms and the risks of nonmedical use and

15:56:07  5  addiction among individuals receiving opioids, so I wouldn't

6  want to suggest that -- that it's just sort of a crap shoot.

7  For example, we know that the dose and duration of opioids

8  received is significantly associated with the likelihood of

9  being on opioids long term or developing addiction.

15:56:34 10                  MR. DELINSKY:  Paul, 19.

11  **BY MR. DELINSKY:**

12  **Q**    Dr. Alexander, I believe we already covered this, but

13  you testified at trial in this case brought against --

14  brought by the State of Washington against distributors,

15:56:54 15  namely, Cardinal, McKesson, and AmerisourceBergen, correct?

16  **A**    Yes.

17  **Q**    And that was -- it was either this winter or this

18  spring, correct?

19  **A**    Yes.

15:57:12 20  **Q**    And I have put before you a transcript of your

21  testimony in that trial.  And if you could please turn to

22  page 5778.

23      And just for the record, the transcript has been

24  marked as CVS-MDL-5002.  And I'd like to direct you to lines

15:57:44 25  7 through 12.  And I'm putting these lines and I'm

1    highlighting them on the ELMO.

2        You were under oath when you testified at this trial,

3    correct?

4    **A**    Yes.

15:58:04 5    **Q**    And you stated, quote:  Unfortunately, it is a disease

6    that can't be predicted who is going to develop it.  We can

7    identify and know that there are some risks for addiction,

8    but there is no means to predict the significant minority of

9    individuals that are on opioids that will develop addiction.

15:58:27 10        Do you see that language?

11    **A**    Yes, I do.

12    **Q**    Did I read it correctly?

13    **A**    You did.  But it's not inconsistent with the statement

14    that I made previously either.  In other words --

15:58:38 15                THE COURT:  I don't think it's inconsistent

16    either, so I'm not -- I mean, I think that's what he said.

17    **BY MR. DELINSKY:**

18    **Q**    Do you agree with this testimony?

19    **A**    I do.

15:58:46 20                MR. DELINSKY:  Okay.  No further questions.

21                THE COURT:  I hope he would agree.  He said it

22    under oath.

23                MR. DELINSKY:  Good enough.  There's nothing

24    to talk about, Your Honor.  I didn't know if I had a 1001

15:58:57 25    violation maybe, but I didn't think so.

1        THE COURT:  All right.  I don't think it was

2    impeachment because it wasn't -- it was consistent.  But,

3    you know, there's no -- no problem bringing out that he said

4    the same thing in Washington State.

15:59:11  5        MR. DELINSKY:  All right.  I'm moving on, Your

6    Honor.

7    **BY MR. DELINSKY:**

8    **Q**    Dr. Alexander, polysubstance use is the norm rather

9    than the exception for most individuals with substance use

15:59:22 10  disorders, correct?

11   **A**    Yes.  I think that's -- that's often the case.

12   **Q**    Okay.  And a good number of people with heroin use

13   disorder have cocaine use disorder, correct?

14   **A**    Yes.

15:59:31 15  **Q**    And a good number of people with heroin use disorder

16   have methamphetamine use disorder too, correct?

17   **A**    Yes.

18   **Q**    Okay.  Now, as an epidemiologist, you make estimates?

19   **A**    Estimates?

15:59:48 20  **Q**    Estimates.

21   **A**    Yes.

22   **Q**    Okay.  And your analysis in this case includes

23   estimates, correct?

24   **A**    Yes.  It includes estimates and mathematical

16:00:00 25  projections, yes.

1    **Q**    Okay.  And whenever possible, you try to base your

2    estimates on local data, correct?

3    **A**    All other things held constant, yes, that's true.

4    **Q**    Okay.  Now, attached to your report, and we've already

16:00:18  5    discussed them, are two redress models, correct?

6    **A**    Yes.

7    **Q**    One is a redress model for Lake County, right?

8    **A**    Yes.

9    **Q**    And that's the document that Mr. Lanier marked as

16:00:39  10    P-23105A, correct?

11    **A**    Yes.

12    **Q**    And the title -- the title of your Lake County -- of

13    the Lake County redress model is:  Lake County Opioid

14    Epidemic Abatement Estimates, right?

16:00:57  15    **A**    Yes.

16    **Q**    The Trumbull County redress model that you prepared is

17    marked P-23105B, right?

18    **A**    Yes.

19    **Q**    The title of the Trumbull County redress model that

16:01:10  20    you prepared is:  Trumbull County Opioid Epidemic Abatement

21    Estimates, correct?

22    **A**    Yes.

23    **Q**    And the models indeed contain estimates, right?

24    **A**    They contain lots of scientific information supporting

16:01:28  25    estimates of the need for varied programs and services in

1    the counties.

2    **Q**    So just at a high level, we'll get into some more

3    details.

4         Your redress models are composed of estimates of the

16:01:42  5    resources that you believe are needed to carry out your

6    abatement plan?

7    **A**    Yes.  They -- I mean, they also contain populations

8    and lots of different types of scientific information that

9    serve as a foundation upon which those estimates are based.

16:02:03 10    **Q**    You know that the Lake County ADAMHS Board has

11    produced local data in this case, correct?

12    **A**    Well, I've reviewed some information specific to Lake

13    County, but I don't know of the specific documents that

14    you're referring to.

16:02:24 15    **Q**    Do you know that the Lake County ADAMHS Board produced

16    data that shows information about the persons who have

17    received treatment for opioid use disorder through providers

18    sponsored by the Lake County ADAMHS Board?

19    **A**    I don't know if I reviewed that as part of my work.

16:02:43 20    **Q**    If it's not listed in your reliance materials, that

21    means you didn't review it, correct?

22    **A**    That's correct.

23    **Q**    Do you recall reviewing it?

24    **A**    I do not.

16:02:52 25    **Q**    Okay.  Do you know that Trumbull County produced

1    comparable claims data on the persons who its service

2    providers provide treatment for opioid use disorder?

3    **A**    I'm not sure.  But claims data would provide a vast

4    undercount of -- typically a vast undercount of a population

16:03:22  5    having opioid use disorder.

6    **Q**    That's not my question.  My question simply is whether

7    you reviewed it.

8    **A**    I don't believe that I did.  But I would have to

9    review my materials relied upon list.

16:03:33  10    **Q**    If it's not contained in your materials relied upon

11    list, that means you didn't review it, correct?

12    **A**    That's -- by my best judgment, yes.

13    **Q**    And you don't recall reviewing it, correct?

14    **A**    I do not.

16:03:45  15    **Q**    Okay.  That data would show within the population of

16    persons who are receiving treatment what kind of treatment

17    they are receiving, correct?

18    **A**    I don't -- I don't know the nature of the data.  If I

19    didn't review the data, I can't speak to what it would

16:04:04  20    contain.

21         I would just say that claims data are a highly

22    imperfect and in many cases fundamentally flawed way of

23    understanding the population with opioid use disorder in a

24    given community.

16:04:18  25    **Q**    Okay.  But you don't know what's in it as you sit here

1    today?

2    **A**     Well, I know what claims data is.  I mean, as a

3    pharmaco-epidemiologist, it's the primary source of data

4    that I use on a daily basis to conduct the research that I

16:04:31  5    use.

6    **Q**     So you do use claims data on a regular basis in

7    conducting your research?

8    **A**     I do.  And as with all data, it has to be used in a

9    fit-for-purpose fashion.

16:04:41  10   **Q**     Okay.  And you don't know what fit-for-purpose fashion

11   the claims data produced by the Lake County ADAMHS Board and

12   the Trumbull County Mental Health and Recovery Board could

13   have been put to use today because you don't recall it and

14   you may not have reviewed it, correct?

16:04:57  15   **A**     No.  I don't -- I mean, there was a lot in that.

16       So claims data is very limited in estimating

17   populations in need of opioid use disorder treatment

18   because, unfortunately, as a wealth of evidence

19   demonstrates, they don't interact with the treatment system

16:05:13  20   and they're not getting treatment.  So claims data is --

21   would be highly imperfect, if not fundamentally flawed, for

22   the purposes that I needed data for in order to do the work

23   that I did.

24   **Q**     Okay.  So your testimony is is that the trove of local

16:05:36  25   data possessed by the Lake County ADAMHS Board and the

1    Trumbull County Mental Health and Recovery Board would not

2    have been useful and important to you?

3    **A**    Well, I -- what I thought you were asking about was

4    claims data.  And when you say "trove of local data," I

16:05:51  5    don't know what you mean by that.

6         But if you're referring to claims data, again, claims

7    data have pretty big limitations when trying to estimate

8    populations in need of treatment.

9    **Q**    And so, you wouldn't have put it to use, it wouldn't

16:06:05  10    have been important to you in devising your estimates in

11    this case?

12    **A**    I'm also interested in information that I -- that I

13    have access to as a scientist.  That's what I do.  And if I

14    was provided with information, I would look at it and

16:06:19  15    consider if I could use it or not and how.

16         But in this instance, it's not a source that I would

17    use to base estimates of the need of the OUD population.

18    **Q**    Okay.  In devising the estimates in your abatement

19    plan, you did not conduct any fieldwork in the counties,

16:06:39  20    correct?

21    **A**    I didn't visit the counties.  Although, as I've

22    mentioned, I lived close to Lake County for four years and

23    whatnot.  But I did review an enormous number of materials

24    produced or relevant to the counties, and I also spoke with

16:06:56  25    local experts on the ground.

1      **Q**     Okay.  Now, you reference in your report the use of

2   focus groups, correct?

3      **A**     It would be helpful to see that, if -- to --

4      **Q**     Sure.  Look at page 29, paragraph 87.  Oh.  I'm sorry.

16:07:50  5   I used the wrong word.

6           You didn't conduct -- oh, no.  Focus groups are there.

7           So these reports -- I'm reading to you, it's

8   highlighted.

9           On page 29 your report says:  These reports are

16:08:05 10   generated through focus groups and qualitative interviews of

11   individuals affected by the opioid epidemic, people who

12   actively use drugs, those who are in recovery, family

13   members of those with OUD, and community professionals that

14   work to address OUD.

16:08:20 15                MR. LANIER:  With due respect, Your Honor, he

16   has not given a copy of this.  I don't know if there's one

17   with the witness.  But Mr. Delinsky's covering up the

18   sentences before that talks about --

19                MR. DELINSKY:  I'll take that off.

16:08:32 20                MR. LANIER:  -- what these reports are that

21   are referenced there.  And these reports is pretty critical

22   to understanding the focus group question.

23                MR. DELINSKY:  Yeah, you can read the whole

24   thing.  Didn't mean to hide it.  Just wanted to make it

16:08:45 25   simple for you.

1

2       **BY MR. DELINSKY:**

3       **Q**     Do you see that language?

4       **A**     I do.  And I was going to ask, independently, if you

16:08:51  5     could just read or if I could highlight the prior sentence

6       which --

7       **Q**     I'll read it.

8              Additionally, since 2000, the OSAM network has

9       published semiannual reports on substance use trends across

16:09:06 10     eight subregions in Ohio and targeted response initiatives

11      to help guide additional interventions.

12             Did I read that correctly?

13      **A**     Yes.

14      **Q**     So the OSAM network is generating reports through

16:09:16 15     focus groups, correct?

16      **A**     They include information including focus groups and

17      qualitative interviews, yes.

18      **Q**     Okay.  But you didn't conduct any focus groups

19      yourself in the county.  Maybe you looked at OSAM report

20      focus groups, but you --

21                     (Court Reporter interjection.)

22                     MR. DELINSKY:  We'll do it over.  Sorry about

23      that.

24      **BY MR. DELINSKY:**

16:09:53 25     **Q**     You very well may have looked at OSAM reports,

1    correct?

2    **A**    Yes.

3    **Q**    But you yourself did not conduct any focus groups in

4    the counties in preparing your abatement plan for the

16:10:05  5    counties?

6    **A**    That's correct.

7    **Q**    Now, this language in your report also references

8    qualitative interviews of individuals affected by the opioid

9    epidemic, including people who actively use drugs, those who

16:10:24 10    are in recovery, family members of those with OUD, and

11    community professionals that work to address OUD, correct?

12    **A**    Yes.  That's true.

13    **Q**    Now, you did interview three community professionals

14    that work to address OUD, correct?

16:10:39 15    **A**    Well, they -- they cover a pretty wide swath of the

16    waterfront, but they're involved in the opioid abatement

17    response within their counties, yes.

18    **Q**    But you conducted no qualitative interviews of any

19    individuals in the counties who actively use drugs, correct?

16:10:59 20    **A**    That's correct.

21    **Q**    You conducted no qualitative interviews of any

22    individuals in the counties who are -- who are in recovery,

23    correct?

24    **A**    That's correct.

16:11:08 25    **Q**    You conducted no qualitative interviews of any -- any

1  family members in the counties of those with OUD, correct?

2  **A**     That's correct.

3  **Q**     You have participated in studies where surveys have

4  been conducted, correct?

16:11:29  5  **A**     I have used, you know, probably a dozen different

6  methodologies or more in studies that I've performed.

7  **Q**     Okay.  I'm asking about one, and that is, you've

8  participated in studies where surveys are conducted,

9  correct?

16:11:43  10  **A**     Yes.

11  **Q**     Okay.  You conducted no surveys of residents of Lake

12  or Trumbull Counties, correct?

13  **A**     That's correct.

14  **Q**     You conducted no surveys of OUD patients in Lake or

16:11:56  15  Trumbull Counties, correct?

16  **A**     I didn't survey or engage individually with patients.

17  I didn't feel that it was -- I felt confident, based on the

18  resources that I had available to me and the methods that I

19  used and the individuals that I spoke with and my

16:12:14  20  professional experience in other settings, that the

21  information that I had was sufficient in order to produce

22  these recommendations for the Court.

23  **Q**     You made the decision that it would be better to rely

24  on an estimate generated by another professor at another

16:12:43  25  university rather than conduct a survey of the people in the

1    two counties that are at issue, correct?

2    **A**    Well, I don't know that that would have been even in

3    the choice had I decided an alternative approach.  But I

4    have reviewed Professor Keyes' work.  I've followed her work

16:12:59 5    for some time.  I hold her in high regard.  I reviewed her

6    work and her methodology, and I believe that it's an

7    appropriate methodology for the task at hand.

8    **Q**    So whereas you involved the use of surveys in other

9    studies you've conducted, here you determined not to,

16:13:18 10    correct?

11    **A**    I mean, I've done surveys like looking at physicians'

12    willingness to deceive insurance companies on behalf of

13    patients.  I've never undertaken a survey trying to estimate

14    a population with opioid use disorder.  It would be, if not

16:13:34 15    a fool's errand, it would be a very, very dubious

16    undertaking.  And it's one that was not one that I

17    considered as a viable alternative or -- as a viable and

18    important alternative approach to the very good approach

19    that I believe that I took, which was to work with Dr. Keyes

16:13:54 20    and to review her methodology, be sure that I was

21    comfortable with it, and to use it.

22    **Q**    Well, you coauthored an article about prescription

23    opioid diversion by HIV patients, didn't you?

24    **A**    It would be helpful to see the article, please.

16:14:09 25    **Q**    Okay.  Sure.

1           MR. DELINSKY:  12, Paul.

2           MR. HYNES:  Judge, do you want a copy?

3     **BY MR. DELINSKY:**

4     **Q**     You've been handed, Dr. Alexander, an article marked

16:14:44 5    CVS-MDL-4995.

6           Do you see that article?

7     **A**     Yes, I do.

8     **Q**     That article is titled:  Estimating the Prevalence of

9     and Characteristics Associated With Prescription Opioid

16:14:58 10   Diversion Among a Clinic Population Living With HIV,

11    correct?

12    **A**     Yes.

13    **Q**     You are one of five authors of the article, correct?

14    **A**     Yes.

16:15:06 15   **Q**     Okay.  And this article involved the conduct of a

16    survey of several hundred participants from a large urban

17    HIV clinical setting, correct?

18    **A**     Yes.  This was a doctoral student's project examining

19    a completely different question than the one that would have

16:15:29 20   been the task at hand in this instance.  I mean, it's apples

21    and, you know, oranges.

22    **Q**     But here's the problem I have with your answers,

23    Dr. Alexander, is you're trying to guess why I'm asking you

24    the questions.  You are guessing that I am asking you these

16:15:47 25   questions because they may go to the generation of OUD

1    population, and I may not be asking you the questions for

2    these reasons.

3          Isn't it the case that surveys can be used to generate

4    information on any number of helpful subjects, correct?

16:16:03 5    **A**    Absolutely they can.

6                MR. WEINBERGER:  Objection to the comments of

7    counsel, and the argument of counsel.

8                THE COURT:  Well, the question that -- the way

9    you phrased it, Mr. Delinsky, is objectionable because

16:16:20 10   you're suggesting that he's guessing or speculating as to

11   the motive for your question, which is irrelevant.  You want

12   to just ask him a question about surveys, focus groups, you

13   can --

14               MR. DELINSKY:  Will do, Your Honor.  And I'm

16:16:35 15   sorry for interrupting.

16   **BY MR. DELINSKY:**

17   **Q**    Surveys can provide useful information on an array of

18   subjects that may have nothing to do with estimating the

19   size of an OUD population, correct?

16:16:46 20   **A**    Yes.  That's true.

21   **Q**    Okay.  This survey involved the prevalence of

22   diversion, correct?

23   **A**    Yes.

24   **Q**    Okay.  Other surveys you've conducted in connection

16:16:56 25   with other articles have involved excess pills after spine

1    and back surgery, right?

2    **A**    I believe that's untrue.  At least the most important,

3    I believe, and impactful article that I've published in that

4    regard was not a survey that I undertook.  It was a

16:17:17  5    meta-analysis of other studies that others have undertaken.

6    **Q**    Do you recall coauthoring an article called, Opioid

7    Oversupply After Joint and Spine Surgery:  A Prospective

8    Cohort Study?

9    **A**    I do.  Thank you.  Yes.  That's a different study, and

16:17:43  10    I would be happy to review it.  But I believe it would be --

11    it would have been based on claims data or electronic health

12    records.

13    **Q**    Okay.  Dr. Alexander, you've been handed what's been

14    marked as CVS-MDL-4994.

16:18:20  15        Do you have that?

16    **A**    Yes, I do.

17    **Q**    This is an article titled, Opioid Oversupply After

18    Joint and Spine Surgery:  A Prospective Cohort Study.

19    Correct?

16:18:32  20    **A**    Yes.

21    **Q**    You were one of the authors of this article, correct?

22    **A**    Yes, I am.

23    **Q**    Okay.  And if you look at the method, it says:  In

24    this prospective cohort study at a large inner city tertiary

16:18:44  25    care hospital, we recruited individuals greater than 18

G. C. Alexander (Cross by Delinsky)                475

1     years of age undergoing elective same day or inpatient joint

2     and spine surgery from August to November 2016.

3          Do you see that language?

4     **A**     Yes, I do.

16:18:57 5     **Q**     And then it says:  Using patient surveys via telephone

6     calls, we assessed patient-reported outcomes.

7          Do you see that language?

8     **A**     Yes, I do.

9     **Q**     So this article that you coauthored did involve the

16:19:05 10    conduct of a survey, correct?

11    **A**     Yes, it did.

12    **Q**     And it involved the conduct of a surgery concerning an

13    opioids issue?

14    **A**     A survey, yes.

16:19:17 15    **Q**     Okay.  Just like the prior article that you coauthored

16    did, correct?

17    **A**     Yes.

18    **Q**     So surveys can provide valuable information regarding

19    the use of legal or illegal opioids, correct?

16:19:26 20    **A**     Absolutely.

21    **Q**     And you didn't conduct one here, correct?

22    **A**     That's the -- that's true.

23    **Q**     Okay.  In preparing your abatement plan and the

24    redress models that accompany it, you did not talk to a

16:19:45 25    single person in either county suffering from opioid use

1    disorder, correct?

2    **A**      Yes.  I think that's true.

3    **Q**      You did not talk to any doctors in the counties who

4    prescribe medication-assisted treatment, whether it's

16:20:04  5    buprenorphine or other medications?

6    **A**      That's true.

7    **Q**      You did not talk to any of the professionals in either

8    county who actually treat patients with opioid use disorder,

9    correct?

16:20:17 10    **A**      I don't believe that I did.

11    **Q**      Okay.  You did not visit any treatment facilities in

12    the counties, correct?

13    **A**      No, I did not.

14    **Q**      You did not visit any residential facilities in the

16:20:27 15    counties?

16    **A**      I didn't perform a local trip to the counties in order

17    to develop this report.  With that said, I was comfortable

18    at the time that I submitted my report, and I remain

19    comfortable and confident, that the -- that I had sufficient

16:20:45 20    information to perform the task that I was requested to

21    fulfill.

22    **Q**      As you sit here today, you cannot name a single person

23    in either county suffering from opioid use disorder,

24    correct?

16:20:59 25    **A**      That's true.

1    **Q**      You have not examined a single person living in either

2    county who suffers from opioid use disorder, correct?

3    **A**      I mean, I've learned a great deal about opioid use

4    disorder and people's lived experience from many different

16:21:16  5    settings, and I have no reason to believe that it's

6    fundamentally different, you know, in -- that for the -- for

7    what's relevant in order to prepare my report, that the

8    experience is fundamentally different as a function of, you

9    know, living in county one or county two.  But I didn't

16:21:34  10    visit the counties or speak individually with individuals

11    with addiction in the counties.

12    **Q**      And you did not examine any person in either county

13    suffering from opioid use disorder, correct?

14    **A**      I did not.

16:21:46  15    **Q**      Okay.  You interviewed one person from Lake County in

16    preparing your abatement plan, correct?

17    **A**      Well, I would characterize it as a discussion rather

18    than an interview, but, yes, I think that is correct.

19    **Q**      You had a discussion with one person from Lake County

16:22:02  20    in preparing your abatement plan, correct?

21    **A**      Yes.

22    **Q**      And that was Ms. Fraser, correct?

23    **A**      Correct.

24    **Q**      You interviewed two people from -- I'm sorry.

16:22:11  25          You had discussions with only two people from Trumbull

1    County in the course of preparing your abatement plan for

2    Trumbull County, correct?

3    **A**      Yes.  I spoke with April Caraway and Lauren Thorp,

4    both of whom had expansive experience within the county.

16:22:28  5    And I believe I characterized earlier, they were able to

6    cover a large swath of the waterfront that was important to

7    me to speak with them about as I prepared my report.

8    **Q**      Okay.  Now, you provided an abatement plan and an

9    expert report in what we term as Track Two, correct?

16:22:52 10    **A**      Yes, I did.

11    **Q**      Track Two concerns Cabell County, West Virginia, and

12    the City of Huntington, West Virginia, that sits within

13    Cabell County, correct?

14    **A**      Yes.

16:23:02 15    **Q**      Okay.  And in preparing your abatement plan regarding

16    Cabell County and the City of Huntington and Track Two, you

17    interviewed 21 persons from the counties, from -- from

18    Cabell County and the City of Huntington, correct?

19    **A**      Well, I or members of my team spoke with and had

16:23:24 20    discussions with I believe 21 individuals, yes.

21    **Q**      Okay.  And you understand that Cabell County, West

22    Virginia, has less than one-fourth the population of Lake

23    and Trumbull Counties, correct?

24    **A**      I would have to think about the numbers, but the right

16:23:42 25    number of people to speak with is a number that gives me

1    confidence based on all of the other information that I have

2    available to me that my report is sound.  And some of the

3    individuals that I spoke with in Cabell were very narrow.

4    They may have been deep, but they were narrow in terms of

16:24:01  5    the scope of the area of -- the scope that they were able to

6    speak to.

7         So, you know, I speak with varying numbers of people

8    in varying settings, but the goal is always the same, which

9    is to use the information to triangulate what I'm hearing

16:24:20  10    from other sources and to be sure that the approaches that

11    I've taken, the assumptions, the scientific assumptions that

12    I've made, and the insights that I've tried to provide are

13    as scientifically valuable as possible.

14   **Q**    Okay.  So in a case involving a single county composed

16:24:40  15    of roughly 90,000 people, you had discussions with 21

16    people, yet in a case involving two counties with a combined

17    population of roughly 440,000 people, you -- you had only

18    three discussions, correct?

19   **A**    Well, I mean, that may be true.  You could also point

16:25:01  20    that Cabell has, you know, up to a nine or ten percent rate

21    of OUD, I believe.  I mean, it's off -- it's truly off the

22    charts.  Not to suggest that they're not serious issues here

23    as well, but, you know, the combined populations of these

24    counties with opioid use disorder is not fourfold that of

16:25:23  25    Cabell County.

1          So, again, I don't think that -- well, I think I've

2     spoken to the approach that I've used.

3     **Q**     Okay.  So at the end of the day, the problem in Cabell

4     County is more extensive than the problem in Lake and

16:25:37 5     Trumbull Counties, correct?

6     **A**     All of these counties, I mean, they were not selected

7     as bellwethers by accident.  All of these counties are in

8     very, very deep water.

9     **Q**     Okay.  But you only conducted three interviews, had

16:25:50 10     discussions with three people in preparing your abatement

11     plan here?

12     **A**     I reviewed an extraordinary number of materials, and

13     during the course of that work and all of the other

14     preparatory work, I spoke with these three individuals

16:26:05 15     that -- and I left those conversations feeling comfortable

16     that I had an adequate sense of the situation on the ground

17     in order to submit the materials that I've submitted.

18     **Q**     Now, in the redress models that you've prepared for

19     Lake and Trumbull Counties, you provide estimates of what

16:26:24 20     you believe is needed for treatment for opioid use disorder,

21     correct?

22     **A**     Yes.

23     **Q**     And this -- these estimates come in section 2B of the

24     redress models, right?

16:26:36 25     **A**     Yes.

1    **Q**     Okay.  Do you have the two redress models in front of

2    you?

3    **A**     Yes, I do.

4    **Q**     Okay.  I believe that section -- for the benefit of

16:26:47  5    everyone in the courtroom, that section 2B appears on page

6    15.

7          And, Dr. Alexander, these are sort of numbered in a

8    legal fashion, but if you look at the number on the far

9    right, that's the number that I'm referring to.

16:27:02  10          So I'm just going to look at the Lake County one for

11    now, okay?

12    **A**     Yes.

13    **Q**     Okay.  But as you testified in response to questions

14    from Mr. Lanier, the redress model for Trumbull County takes

16:27:15  15    the same form, correct?

16    **A**     Yes.

17    **Q**     Okay.  The numbers are different because the

18    population's different and features may be different, but

19    the form is the same, correct?

16:27:25  20    **A**     Yes.  The general structure is the same.

21    **Q**     Okay.  First question:  Do you remember Mark, my

22    friend Mark, asking you questions about ASAM, correct?

23    **A**     Yes, I do.

24    **Q**     Okay.  I just want to clarify the record on this.

16:27:47  25          ASAM did not supply any of the estimates, the actual

1    numerical estimates that appear in section 2B, correct?

2    **A**    That's correct.

3    **Q**    They provided the categories for which you developed

4    the estimates, correct?

16:28:06  5    **A**    Yes.  The four different levels of treatment

6    intensity.

7    **Q**    Okay.  Thank you for the clarification there.

8         All right.  Now, if we look at -- I want to look at

9    line one.  Okay?  And that line one reflects the total

16:28:25  10   number of individuals with OUD.

11        Do you see that?

12   **A**    Yes, I do.

13   **Q**    Okay.  And line one, in fact, contains your estimates

14   of the total number of individuals with OUD, correct?

16:28:38  15   **A**    Yes.  I mean, they're derived from Professor Keyes,

16   but I have used them for my report, and I think that they're

17   appropriate for such use.

18   **Q**    Okay.  So in this line, you provide estimates of the

19   number of persons in each county, depending on the redress

16:28:57  20   model that we look at, who may be suffering from opioid use

21   disorder in 2022, correct?

22   **A**    Well, beginning in 2021, but if -- the first column,

23   but, yes, in 2022 as well.

24   **Q**    Okay.  All right.  Well, let's go back to it.

16:29:14  25        You provide estimates for each county of a person

1    suffering from OUD in 2021, correct?

2    **A**    Yes.

3    **Q**    Same for 2022?

4    **A**    Correct.

16:29:21  5    **Q**    Estimates for 2023?

6    **A**    Yes.

7    **Q**    Estimates for '24?

8    **A**    Yes.

9    **Q**    Now I'm going to skip.  Estimates.

16:29:27  10    For '28?

11    **A**    Yes.

12    **Q**    Estimates for '32?

13    **A**    Yes.

14    **Q**    All the way to '35 you have estimates of the number of

16:29:34  15    persons in each county suffering from opioid use disorder?

16    **A**    Yes.

17    **Q**    Okay.  So for every year between '21 and '35, you

18    provide an estimate of the number of people that will suffer

19    from opioid use disorder in each county?

16:29:49  20    **A**    Yes.

21    **Q**    And you -- just -- we've already tread this ground,

22    but you don't know who any of these people are, correct?

23    **A**    I don't have names if that's what you're asking,

24    correct.

16:30:00  25    **Q**    And you didn't examine any of them, true?

1    **A**      That's correct.

2    **Q**      So the persons who underlie these estimates is unknown

3    to you, correct?

4    **A**      Yes.

16:30:07  5    **Q**      Okay.  And as you said, you didn't prepare the

6    estimates, Katherine Keyes did, correct?

7    **A**      Yes, although I reviewed her methodology and think

8    it's epidemiologically and scientifically sound.

9    **Q**      Okay.  And just so we're all clear on who Dr. Keyes

16:30:25  10   is, Dr. Keyes is a professor at Columbia, correct?

11   **A**      Yes.

12   **Q**      And Professor Keyes is another expert witness engaged

13   by the counties, correct?

14   **A**      Yes.

16:30:33  15   **Q**      Okay.  And now, let's move on with the redress model.

16          Okay.  You then estimate the number of persons who

17   will seek treatment for OUD, correct?

18   **A**      Well, I estimate a number that should receive

19   treatment, yes.

16:30:55  20   **Q**      Yes.  And that's encapsulated by both lines two and

21   three, right?

22   **A**      Yes.

23   **Q**      Okay.  Line two is the percentage of persons from the

24   OUD population to receive treatment, and line three is the

16:31:10  25   number of individuals with OUD to receive treatment,

**G. C. Alexander (Cross by Delinsky)**     485

1     correct?

2     **A**     Yes.

3     **Q**     And again, the population of these persons from the

4     OUD population to receive treatment are estimates, correct?

16:31:26 5     **A**     Yes.

6     **Q**     Okay.  So from the pool of persons that Katherine

7     Keyes estimates to suffer from OUD, you then estimate how

8     many of them will obtain treatment, correct?

9     **A**     Yes.  Although, I think the value 2,267 is really

16:31:44 10     better thought of as a treatment slot.  And we discussed

11     this I think a bit earlier.

12          In other words, I'm not suggesting that there be 2,267

13     unique people that all get one full year of treatment.  I'm

14     suggesting that there be 200 -- I'm sorry, 2,267 treatment

16:32:05 15     slots in that year.

16     **Q**     Fair question.  I apologize for not making that

17     adjustment based on your testimony.

18          So from the pool of persons in each county that

19     Dr. Keyes estimates suffer from OUD, you estimate the number

16:32:25 20     of treatment slots that will be needed to treat the

21     population who will receive treatment, correct?

22     **A**     Yes.  So it's an assessment essentially of

23     population-level treatment capacity.

24     **Q**     Okay.  So what we're seeing here, and it's, of course,

16:32:42 25     what epidemiologists do, so I don't mean to be pejorative

1    about it, but in the redress models, we're drawing an

2    estimate from an estimate, correct?  The first estimate is

3    the pool of persons suffering from OUD in each county, and

4    the second estimate is the slots that will be used for

16:33:07  5    treatment, correct?

6    **A**    Yes.  Yes.

7    **Q**    So it's an estimate from an estimate?

8    **A**    I mean, it's -- you could think of it as a subset of

9    Professor Keyes' estimate.  In other words, of the 5,668, a

16:33:22 10    40 percent subset would be eligible for -- there would be

11    that many treatment slots in year one.

12    **Q**    But that 40 percent figure is the result of an

13    estimate made by you, correct?

14    **A**    Well, it's a recommendation because I think if the

16:33:33 15    counties really want to get serious, and -- which is not to

16    suggest they're not serious already, so maybe those are the

17    wrong words.  But what I mean is that it's an estimate that

18    I think is achievable but would represent a -- a significant

19    place to begin ramping up treatment over time from the place

16:33:55 20    where both nationally and, based on my feedback that I've

21    received from the counties, the counties are at now.

22    **Q**    Okay.  So for each year in each county you are

23    estimating how many slots will be needed to treat the

24    persons who will obtain treatment, correct?

16:34:25 25    **A**    Yes.

**G. C. Alexander (Cross by Delinsky)**          487

1   **Q**     Okay.  And just to use Lake County as an example, you

2   estimate — and you began to talk about this — that

3   41.4 percent of the persons estimated have -- estimated have

4   OUD in Lake County will receive treatment in 2022, correct?

16:34:47 5   **A**     I'm sorry.  Where is that statistic that you're

6   looking at?

7   **Q**     So I'm looking at line two.

8   **A**     Uh-huh.

9   **Q**     Right under 2022.

16:34:56 10       41.4 percent, correct?

11   **A**     Oh, yes.  Yes.  Thank you.  Yes.

12   **Q**     Right.  So -- so, in Lake County, you estimate

13   41.4 percent of the persons estimated to have OUD in the

14   county will receive treatment in 2022, correct?

16:35:08 15   **A**     Yes.

16   **Q**     Okay.  In 2024, you estimate 44.3 percent, correct?

17   **A**     Yes.

18   **Q**     In 2027, you estimate 48.6 percent, correct?

19   **A**     Correct.

16:35:18 20   **Q**     And so on.

21       And you have comparable estimates for Lake County --

22   Trumbull County, excuse me?

23   **A**     Correct, ramping up to 60 percent by year 15.

24   **Q**     Correct.

16:35:29 25       Then you estimate how many of these persons will

1    receive medication to treat their addiction, correct?

2    **A**     Yes.

3    **Q**     Okay.  Now, many people can benefit from

4    medication-assisted treatment when they suffer from OUD,

16:35:48  5    correct?

6    **A**     Yeah.  I mean, it's -- it's safe and effective and can

7    reduce your likelihood of dying by as much as 50 percent, so

8    it's -- it's a pretty good option.

9    **Q**     Other people may not need medication-assisted

16:36:05  10    treatment to treat their OUD, correct?

11    **A**     Well, that's true.  That's true.  But the use of

12    medications has been -- these medicines have been vastly

13    underused, and it's a major opportunity for growth around

14    the country, is to improve and sort of routinize the use of

16:36:28  15    these medications.

16    **Q**     Okay.  So let's go to line -- line four, okay?

17          Line four is the proportion -- that's probably an

18    epidemiologist word that's above my head.  I'll call it the

19    percentage.  But it says the proportion of individuals with

16:36:50  20    OUD in treatment to receive MAT, correct?

21    **A**     Yes.

22    **Q**     Okay.  And then, just by way of example, in Lake

23    County, you estimate that 30 percent of the OUD population

24    will receive MAT in 2021, correct?

16:37:06  25    **A**     30 percent of the population in treatment.

1    **Q**    Thank you.  Correct.

2         And MAT, MAT is medication-assisted treatment, right?

3    **A**    Yes.  Or medications for addiction treatment, which

4    is --

16:37:20 5    **Q**    Okay.  And in 2022, you estimate in Lake County that

6    32.1 percent of the persons suffering from OUD will receive

7    medication-assisted treatment, correct?

8    **A**    Yeah.  I mean, these numbers are -- I mean, these

9    proportions are really perhaps best thought of as targets.

16:37:40 10   So it -- these are targets and the ultimate reductions that

11   I estimate can be achieved over 15 years are predicated upon

12   the counties' ability to meet these targets over time.

13        And so, the -- the -- I think the key thing is to

14   emphasize the end points, the bookmarks going from in year

16:38:03 15   one, 30 percent of people in treatment receiving

16   medication-assisted treatment, up to year 15, where

17   60 percent of people in treatment will receive

18   medication-assisted treatment.

19             MR. LANIER:  Your Honor, for clarification

16:38:16 20   sake on the record, I believe this is like that earlier

21   question that you caught that may have been misunderstood or

22   misstated.  I want to be sure that the record's clear.

23        The question was:  In 2022, you estimate in Lake

24   County that 32.1 percent of the persons suffering from OUD

16:38:36 25   will receive medication-assisted treatment, correct?

1          You said:  Yes.

2          Is that OUD, or did you mean 32.1 percent of those

3     individuals receiving treatment for OUD?

4              THE WITNESS:  It's -- it's -- it's the latter.

16:38:58 5     It's 32.1 percent of the treatment slots occupied where OUD

6     is being treated will include medication-assisted treatment.

7              MR. LANIER:  Thank you.  That's not the way

8     that question was asked, and I wanted to make sure the

9     answer was clear.

16:39:12 10          Thank you.

11    **BY MR. DELINSKY:**

12    **Q**    So going back to your testimony, what we see in lines

13    four and five regarding the population that will receive

14    medication-assisted treatment are targets, correct?

16:39:34 15    **A**    Yes.

16    **Q**    They're not even estimates.  They're just targets

17    you've put out there that you hope the counties will aspire

18    to achieve and achieve, correct?

19    **A**    Well, I believe that the -- I believe that these are

16:39:47 20    achievable and meaningful, so they strike a balance between

21    representing over time a significant improvement from where

22    the counties are at now and -- and, yet, I believe that

23    they're achievable and that they can result in a reduction

24    of 50 percent in morbidity and mortality over 15 years, if

16:40:09 25    the plan is implemented.

1    **Q**    Okay.  So let's just -- and by the way, these targets,

2    you provide these targets for the subpopulation that will

3    receive medication-assisted treatment for each year for each

4    county from 2021 through 2035, correct?

16:40:36  5    **A**    Yes.  That's true.

6    **Q**    Okay.  And so, let's just take stock of where we are

7    up to this point.

8         We have an estimate of the population of persons in

9    each county who suffer from OUD that Dr. Keyes prepared,

16:40:54  10    correct?

11    **A**    Yes.  That's right.

12    **Q**    We then have an estimate of the slots needed to treat

13    the persons who will receive treatment in a particular year,

14    correct?

16:41:11  15    **A**    Yes.  An estimate of the proportion of all people --

16    you know, the proportion of treatment slots as a fraction of

17    all people with opioid use disorder within the counties.

18    **Q**    Okay.  And then, below those two estimates, we have

19    targets of the subpopulation who you hope the counties will

16:41:38  20    be able to reach via medication-assisted treatment, correct?

21    **A**    Well, it's not just a hope.  I mean, the entire plan

22    is predicated, as we reviewed this morning, on many, many

23    different interventions to improve the access to and uptick

24    of treatment.  So, again, I think that these targets are

16:41:58  25    targets that can be achieved and that can produce

1    substantial gains for the communities over the 15-year

2    period.

3    **Q**    Are these targets a form of an estimate?

4    **A**    I mean, I -- I would consider them as -- as targets,

16:42:21  5    you know, rather than estimates.

6    **Q**    Okay.  So we have an estimate, then an estimate, then

7    a target, correct?

8    **A**    Correct.

9    **Q**    Okay.  All right.  Let's keep going a little bit.

16:42:33 10        Within the subpopulation of persons who will receive

11    medication-assisted treatment, you then include line items

12    on what kind of medication-assisted treatment they'll

13    receive, correct?

14    **A**    Yes.

16:42:52 15    **Q**    Okay.  And remember, Judge Polster asked you questions

16    about these lines, right?

17    **A**    Yes.  I mean, my -- I think Judge Polster's question

18    was about how time is managed and how treatment time is

19    managed in this model, and that was what gave me the

16:43:09 20    opportunity to indicate that if you look at input three,

21    when I talk about individuals receiving treatment, that

22    these need not be the same individuals in a given year.

23    **Q**    Okay.  So -- so you have a number -- let's look at

24    line number six, excuse me, okay.

16:43:31 25        And we're in the Lake County redress model, right?

1    **A**    Yes.

2    **Q**    For each year from 2021 to 2035, you provide a number

3    corresponding to the total number of individuals with OUD in

4    treatment to receive buprenorphine in Lake County, correct?

16:44:02  5    **A**    Yes.

6    **Q**    Okay.  Now -- and you include a number for each year,

7    correct?

8    **A**    Yes.

9    **Q**    So the number you include for 2021 is 412, right?

16:44:14  10    **A**    Correct.

11    **Q**    The number for 2028 is 560?

12    **A**    Correct.

13    **Q**    And the number for 2035 is 650?

14    **A**    Yes.

16:44:23  15    **Q**    Okay.  Are these numbers estimates or are they

16    targets?

17    **A**    They're -- they're estimates based on the -- based on

18    what I know about the distribution of treatment across these

19    three types of pharmacologic care.

16:44:43  20    **Q**    Okay.  And then you include comparable estimates for

21    each year in Lake County for naltrexone and methadone,

22    correct?

23    **A**    Yes.

24    **Q**    And you perform the same kind of estimates for what

16:45:08  25    kind of MAT will be used for Trumbull County as well,

1    correct?

2    **A**    Yes.  That's correct.

3    **Q**    And you do it for each year of your abatement plan,

4    correct?

16:45:15  5    **A**    Yes.

6    **Q**    From 2021 to 2035, correct?

7    **A**    Correct.

8    **Q**    So where we stand now, we have the initial estimate of

9    the number of people suffering from OUD in each county, then

16:45:26  10    we have an estimate of the slots needed to treat the people

11    who will be in treatment in a particular year, and then

12    below that, we have a target of the number of people who may

13    receive medication-assisted treatment, and then below that

14    target, we have an estimate of what medication that

16:45:50  15    subpopulation will receive.  Correct?

16    **A**    Yeah.  I mean, I would characterize both input two and

17    input four as targets rather than estimates.  In other

18    words, the -- the target that 40 percent of the total

19    population receive some type of treatment in that first

16:46:12  20    year, and then the target that a third of the treatment

21    population receive medication-assisted treatment.

22          But these numbers are not, of course, just pulled out

23    of a hat, and I provide sources and scientific

24    justifications for why I chose these numbers.

16:46:30  25    **Q**    So we have an estimate, followed by a target, followed

1    by a target, followed by estimates, correct?

2    **A**    Yes.

3    **Q**    Okay.  Now, there are other estimates or targets

4    contained in 2B, and I won't go -- we don't have the time or

16:46:56  5    Judge doesn't have the patience, Mark doesn't have the

6    patience to go through them all, okay?

7         But there's estimates on the number of patients in a

8    particular year or the number of slots in a particular year

9    needed for residential treatment, correct?

16:47:13  10    **A**    Yes.

11    **Q**    Needed for inpatient treatment, correct?

12    **A**    Yes.

13    **Q**    Needed for outpatient treatment, correct?

14    **A**    Yes.

16:47:21  15    **Q**    Are those estimates or are they targets?

16    **A**    I'd say those are estimates.

17    **Q**    Okay.  And then we have estimates of the number of

18    people who will receive treatment under that assertive

19    community treatment program that you and I talked about,

16:47:41  20    right?

21    **A**    Yes.

22    **Q**    We have estimates of the number of teams needed,

23    correct?

24    **A**    Yes.

16:47:46  25    **Q**    Estimates or targets, by the way?

1    **A**      Well, I -- if it's a percent, in this instance, I

2    would consider it a target.  So, in other words, input 13 is

3    a target.

4    **Q**      Understood.

16:48:00 5      Okay.  Okay.  Good enough.

6      And just to be clear, I think we're all on the same

7    page on this, you are -- these estimates or targets,

8    depending on which line we're looking at, are made in your

9    redress models for every year of your abatement plan for

16:48:20 10    each county, correct?

11    **A**      Yes.  Based on a large body of scientific evidence.

12    **Q**      Okay.  Now, the next thing I want to ask you about

13    we've already touched on in a way that I didn't expect.  So

14    this may be a little redundant, but let's go through it,

16:48:43 15    okay?

16      Let's go to year one of your plan, okay, and let's go

17    to line two.  We're in Lake County.

18      This line two contains the target subpopulation who

19    you target to receive treatment among the population of OUD

16:49:10 20    patients, correct?

21    **A**      Yes.  That's true.

22    **Q**      Okay.

23                THE COURT:  What line are you referring to

24    here?

16:49:15 25                MR. DELINSKY:  Line two, Your Honor, right at

1    the very top.

2                    THE COURT:  Are you on the chart or are you on

3    the report?

4                    MR. DELINSKY:  Oh, I'm sorry, Your Honor.  I

16:49:23  5    am in the Lake County redress model.

6                    THE COURT:  All right.

7                    MR. DELINSKY:  I am on page 15, in the bottom

8    right-hand corner.

9                    THE COURT:  Okay.  2B.  All right.  Fine.

16:49:35 10                    MR. DELINSKY:  Yes.  And now I'm on line two,

11   Your Honor.

12                    THE COURT:  All right.  Thanks very much.

13                    MR. DELINSKY:  Okay.  And I'm sorry if I got

14   confusing there.

15   **BY MR. DELINSKY:**

16   **Q**    So, Dr. Alexander, just -- let's just orient Judge

17   Polster again.

18        Line two contains the target number of individuals to

19   receive treatment for OUD from the OUD population in Lake

16:50:00 20   County, correct?

21   **A**    Yeah.  Or the target number of treatment slots.  So

22   essentially, of the 5,668 individuals estimated to have OUD

23   in Lake County in 2021, I suggest a target that 40 percent

24   of -- that essentially that treatment slots be generated for

16:50:20 25   40 percent of that population.

**G. C. Alexander (Cross by Delinsky)**                    498

1    **Q**    Okay.  And that percentage increases as we move

2    through the years, correct?

3    **A**    It does.  It increases significantly.  And that's part

4    of what drives the gains that can be recognized in the

16:50:33 5    community.

6    **Q**    So just -- I'm just picking some years out of the hat

7    for illustration purposes.

8         If we look at 2024, your target is 44.3 percent,

9    correct?

16:50:43 10    **A**    Yes.

11    **Q**    If we look at 2028, your target's 50 percent, correct?

12    **A**    Yes.

13    **Q**    And your final target in 2035 is 60 percent, correct?

14    **A**    Yes.

16:50:53 15    **Q**    And you provide the same targets in your Trumbull

16    County redress model, right?

17    **A**    Yes.

18    **Q**    Okay.  Now, I want to go to the notes that Mr. Lanier

19    talked about.

16:51:07 20         So if we turn the page, okay, are you with me?

21    **A**    Yes.

22    **Q**    And we're going to look at note two, because that's

23    what corresponds with line two that we were just looking at,

24    the -- the targets, the targeted slots for persons who will

16:51:33 25    receive treatment from within the OUD population, correct?

1      **A**      Yes.

2      **Q**      Okay.  Now, you indicate in the notes, and I'm going

3      to highlight this, okay:  Based on 2018 Treatment Episode

4      Data Set, TEDS, and 2018 National Survey on Drug Abuse and

16:52:02  5      Health, NSDUH, approximately 20 to 30 percent of individuals

6      with OUD were in treatment at some point in the last

7      12 months nationally.

8            Correct?

9      **A**      Yes.

16:52:13  10     **Q**      Okay.  So your target exceeds the actual rate of

11     treatment, correct?

12     **A**      Well, based on national estimates, although I'd go on

13     to say that the World Health Organization recommends a

14     minimum target of 40 percent.

16:52:32  15     **Q**      We're going to -- let's take this sentence by

16     sentence, because what the WHO is talking about is a target,

17     correct?

18     **A**      Yes.

19     **Q**      Okay.  That's not -- that WHO 40 percent number is not

16:52:47  20     a number of people who actually receive treatment, correct,

21     it's a target?

22     **A**      I believe that's true.

23     **Q**      Okay.  So the data you put out in your note two

24     indicates that as a -- as an actual matter, the data shows

16:53:03  25     20 to 30 percent of individuals with OUD were in treatment,

          1    correct?

          2    **A**    Yes.

          3    **Q**    Okay.  And if we were to take just year one of your

          4    plan, okay, where you target 40 percent, what this would

16:53:20  5    mean is that the data would show that maybe that 40 percent

          6    number may be 25 percent too high, right?

          7    **A**    I'm sorry.  Can you ask the question again?

          8    **Q**    Okay.  If you compare what that TEDS data and the

          9    NSDUH data would show, your 40 percent target for 2021 is

16:53:50 10    higher than that data, correct?

         11    **A**    It is higher than that data, although, I think it's a

         12    reasonable number to begin with in year one, and it's one

         13    that I considered and consulted with the local experts about

         14    and one that I think is supported by the totality of

16:54:08 15    evidence that I provide here to support the estimate.

         16    **Q**    Okay.  Now, the 40 percent figure you cite, that's

         17    what we just talked about, that's the target, right?

         18    **A**    That's a second source.  I believe I include three

         19    sources here, three different sources of information.

16:54:27 20    **Q**    For the target, correct?

         21    **A**    Yes.

         22    **Q**    But the data shows the 20 to 30 percent, correct?

         23    **A**    From 2018, from these two datasets, from a national

         24    sample, yes, 20 to 30 percent.

16:54:44 25    **Q**    Okay.  Now -- now, I want you to hold onto that data,

1    that 20 to 30 percent, okay?  That dataset is what I'm going

2    to ask you the next questions about, okay?  You good?

3    **A**     Yes.

4    **Q**     Okay.  If that data in the first line were to hold,

16:55:00  5    the number of persons seeking treatment or the number of

6    slots needed for treatment in the communities would be at

7    least 25 percent less than you estimate in year one?

8    **A**     Are you -- I didn't understand your question.

9              MR. LANIER:  I didn't either.

10   **BY MR. DELINSKY:**

11   **Q**     Let's assume we're at the high end of what the TEDS

12   data and the NSDUH data shows, okay, and that is that

13   30 percent of the OUD population receives treatment.  Okay?

14   Let's assume that.

16:55:40 15   **A**     Uh-huh.

16   **Q**     If that's the case, and if that were to hold in Lake

17   County in year one, your target would be 25 percent too

18   high, correct?

19   **A**     Well, that's a fair number of hypotheticals.  So these

16:55:54 20   data are from 2018.  They're from national rather than local

21   sources.  And they are not reflecting the totality of

22   interventions that I propose as part of this abatement plan.

23        So they reflect the 2018 standard, which nobody would

24   argue in their right mind is one that we should be proud of

16:56:17 25   or reflect a gold standard.

**G. C. Alexander (Cross by Delinsky)**                    502

1                And so, I think that the 40 percent strikes a

2       reasonable compromise between a number that is higher than

3       this 2018 estimates but one that is achievable.  And it's

4       also one that I was -- it's the type of estimate that I also

16:56:39 5      rely on local input as I make, such is the input that I

6       received from Ms. Fraser and Caraway and Thorp.

7       **Q**      Now, Dr. Alexander, you don't know the percentage of

8       people with OUD in each county that in 2020 or 2021 were in

9       treatment, do you?

16:56:59 10     **A**      I do not have that precise number.

11      **Q**      Okay.  So you called the TEDS data and the NSDUH data

12      hypothetical.  But in the same vein, in fairness, your

13      40 percent number is hypothetical too, correct?

14      **A**      Well, I don't -- I didn't mean to suggest that data

16:57:17 15     are hypothetical.  What I was suggesting was that there are

16      reasons that these estimates may or may not reflect the

17      situation on the ground in 2021 in Lake or Trumbull

18      Counties.

19      **Q**      And the 40 percent target that you've set for year one

16:57:35 20     may or may not represent the situation that ultimately comes

21      to pass either, correct?

22      **A**      That's true.  My report contains scientific estimates

23      that are my best professional judgments based on my

24      professional experience and training.

16:57:48 25     **Q**      And that answer were to apply for each estimate in

1    this line two for each year in each county, correct?

2    **A**    Yes.  That's true.  And in all of these instances,

3    these targets are based on my own professional judgment and

4    scientific experience, which is informed by a wealth of

16:58:09  5    scientific data as well as work with a large team and

6    colleagues and other experts with whom I consult.

7    **Q**    Okay.  Let's go back to the people who will be treated

8    with medication-assisted treatment, okay?

9         And if we go to the next page --

16:58:35  10                    MR. DELINSKY:  So, Your Honor, this is page 17

11    of the document.

12                        THE COURT:  Okay.  Thank you.

13    **BY MR. DELINSKY:**

14    **Q**    And Mr. Lanier walked us through some of these items.

16:58:45  15         Okay.  There's costs descriptions here, correct?

16    **A**    Yes.

17    **Q**    Okay.  And you assume -- and I know this gets

18    complicated, so let's walk through it, because I understand

19    the complication based on your testimony.

16:59:02  20         So let's go to the words, then we'll flesh out the

21    nuance, okay?

22         All right.  So you say as a cost description in line

23    six, buprenorphine costs per person per month, and then you

24    provide for 12 months, correct?

16:59:19  25    **A**    Yes.

1    **Q**    And that's one of the three medication-assisted

2    treatments, correct?

3    **A**    Yes.

4    **Q**    So for each slot for buprenorphine treatment, you are

16:59:30  5    allowing for 12 months of treatment?

6    **A**    Yes.  Continuous treatment for whoever's occupying

7    that treatment slot.

8    **Q**    Okay.  And that is the same for methadone?

9    **A**    Yes.

16:59:42 10   **Q**    That's the same for naltrexone, correct?

11   **A**    Yes.

12   **Q**    Okay.  That's the same for every year of your redress

13   model, correct?

14   **A**    Yes.

16:59:52 15   **Q**    And that's the same for Lake County as it is for

16   Trumbull County, correct?

17   **A**    I believe the same methodology's deployed, yes.

18   **Q**    Okay.  So it could be, as Judge Polster I believe

19   pointed out, that some people receive six months of

17:00:10 20   treatment, correct?

21   **A**    Yes.

22   **Q**    And that's sufficient, correct?

23   **A**    Yes.  Could be.

24   **Q**    Now, it could be somebody needs more, longer

17:00:17 25   treatment, longer than a year, correct?

1    **A**     Yes.  Could be six years.

2    **Q**     It could be a long time.

3          But regardless of what it is and how it washes out in

4    the laundry, your model allots for 12 months of

17:00:33  5    medication-assisted treatment for each slot each year,

6    correct?

7    **A**     Yes.  Essentially for -- you can think of these

8    essentially as treatment months, and that's correct.

9    **Q**     Okay.  And, by the way, you make the same assumptions

17:00:52  10   for residential treatment, correct?

11   **A**     Yes.

12   **Q**     You estimate 12 months of residential treatment per

13   slot, correct?

14   **A**     Well, yes, although, the treatment duration for

17:01:04  15   residential treatment is often -- it may be one month, it

16   may be three months, it -- it may be less commonly a longer

17   amount of time.  But this is a good example where I'm not

18   suggesting that an individual him or herself is in that slot

19   for the full period.

17:01:23  20   **Q**     But you budget 12 months for each slot for residential

21   treatment, correct?

22   **A**     Yes.

23   **Q**     You budget 12 months for each slot for intensive

24   outpatient treatment, correct?

17:01:33  25   **A**     Yes.

1  **Q**     You budget 12 months for each slot for inpatient

2  treatment, correct?

3  **A**     Yes.

4  **Q**     Okay.  You budget 12 months for each slot for

17:01:42  5  outpatient treatment, correct?

6  **A**     Yes.

7  **Q**     And that's for every year in your Lake County

8  abatement plan, correct?

9  **A**     Yes.  Although, the number of treatment slots is

17:01:56  10  changing over time.

11  **Q**     Okay.  And that same one-year assumption applies in

12  the same fashion in the Trumbull County redress model,

13  correct?

14  **A**     Yes.

17:02:05  15  **Q**     Okay.

16                 MR. DELINSKY:  Judge, it's 5:00.  What do you

17  want to do?

18                 THE COURT:  Well, not so much what I want to

19  do.  How much longer do the defendants plan to go?  I mean,

17:02:27  20  I was hoping we wouldn't need the doctor to come back

21  tomorrow, but we may.  I mean, I -- what you're doing with

22  your cross-examination is up to you.

23                 MR. DELINSKY:  Judge --

24                 THE COURT:  I was going to say, I understand

17:02:42  25  the thrust of a lot of these questions.  Anything I do is

1    going to be based on estimates, predictions.  And I don't

2    plan to give anyone a whole, you know, 15 years worth of

3    money.

4         My thought is whatever I do, I'll do annually, and

17:03:01  5    I'll require the county executive at the beginning of the

6    year to certify that the county is only going to spend the

7    money for these purposes.  And say 90 days at the end --

8    after the end of the year, they'll certify what they've

9    spent it on.

17:03:18 10         And if they haven't spent the money because, you know,

11    the estimates proved idealistic or Congress gave them a huge

12    amount of money or whatever, they'll return it.  And

13    conversely, if it turns out that the estimates were too low

14    or suddenly there's a huge wave of addiction and it needs an

17:03:39 15    adjustment upward, I'll consider that.

16         So that's what I'm planning to do, so --

17                   MR. DELINSKY:  Judge --

18                   THE COURT:  Anyway, in terms of timing, it's

19    up -- you know --

17:03:50 20                   MR. DELINSKY:  Judge, that's helpful.  I'm

21    done with this form of question.

22                   THE COURT:  Okay.

23                   MR. DELINSKY:  I don't want to keep you

24    overnight, but just in candor, Judge, I probably have an

17:04:02 25    hour at least.

```
 1                    THE COURT:  All right.

 2                    MR. DELINSKY:  I'm happy to go late.  I'm

 3       happy to go late.

 4                    THE COURT:  I'm not.  I'm not.  At some point,

 5       there's diminishing returns because everyone gets tired.

 6                    MR. DELINSKY:  Okay.

 7                    THE COURT:  The lawyers get tired, the witness

 8       gets tired.  Candidly, I'm not 25 anymore.

 9                    MR. LANIER:  Get out.

10                    THE COURT:  We'll just say Mr. Weinberger

11       knows how old I am, and I know how old he is.

12                    MR. WEINBERGER:  I'm tired.  I'm tired.

13                    THE COURT:  So if it's -- if it's a good -- if

14       this is a good as place as any to stop, we can stop.  I

15       mean, if you -- if you finished up an area, this is probably

16       as good a place as any.

17                    MR. DELINSKY:  This is a convenient spot.

18            And then, Dr. Alexander, my regrets for the extra

19       night.

20                    THE WITNESS:  Oh, I'm here for the courts and

21       the parties, so thank you.

22                    THE COURT:  We appreciate that.

23                    MR. DELINSKY:  Frank Gallucci has the best

24       recommendations for restaurants that he shared with us, so --

25                    MR. WEINBERGER:  So we're starting at 10:00?
```

1          THE COURT:  Tomorrow we're starting at 10:00

2    because there was something I need to attend to on Zoom.  So

3    we'll start at 10:00 a.m. tomorrow, and we'll pick up with

4    Dr. Alexander.

17:05:15   5          Okay.  Have a good evening, everyone.

6               MR. LANIER:  Will you give us the times

7    tomorrow?

8               THE COURT:  Oh, yeah, I was just going to --

9    everyone can sit down for a minute.  I was going to do that

17:05:24   10   now.

11        All right.  This is what I had for today.  For the

12   plaintiffs, I had 2.75.  And for the defense, I have 4.25.

13               MR. LANIER:  Consistent with ours, Your Honor.

14               THE COURT:  Okay.  All right.  Have a good

17:06:08   15   evening, everyone.  See you tomorrow.

16                             - - -

17          (Proceedings adjourned at 5:06 p.m.)

18

19

20                    **C E R T I F I C A T E**

21        I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
22   prepared from my stenotype notes.

23        */s/ Sarah E. Nageotte*              *5/11/2022*
          SARAH E. NAGEOTTE, RDR, CRR, CRC           DATE
24

25