UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
CLEVELAND, OHIO

------------------------------X

**IN RE:**                              :    Case No. 1:17-md-2804
                                         :
NATIONAL PRESCRIPTION                    :
OPIATE LITIGATION                        :
                                         :    **VOLUME 3**
TRACK THREE CASES                        :
                                         :    *(Pages 510 - 737)*
     *1:18-op-45032*                     :
     *1:18-op-45079*                     :
                                         :    Thursday, May 12, 2022
                                         :
------------------------------X

TRANSCRIPT OF PHASE II ABATEMENT BENCH TRIAL PROCEEDINGS

HELD BEFORE THE HONORABLE DAN AARON POLSTER

SENIOR UNITED STATES DISTRICT JUDGE

Official Court Reporter:   Susan Trischan,RMR,FCRR,CRR,CRC
                           United States District Court
                           Northern District of Ohio
                           801 West Superior Avenue
                           Court Reporters 7-189
                           Cleveland, Ohio 44113

Proceedings recorded by mechanical stenography.
Transcript produced with computer-aided transcription.

```
 1   APPEARANCES:

 2   For the Plaintiffs:      Peter H. Weinberger, Esquire
                              SPANGENBERG SHIBLEY & LIBER LLP
 3                            1001 Lakeside Avenue East
                              Suite 1700
 4                            Cleveland, Ohio 44114

 5
                              W. Mark Lanier, Esquire
 6                            THE LANIER LAW FIRM
                              10940 W. Sam Houston Parkway N
 7                            Suite 100
                              Houston, Texas 77064
 8

 9                            Frank L. Gallucci, III, Esquire
                              PLEVIN & GALLUCCI COMPANY, LPA
10                            55 Public Square
                              Suite 2222
11                            Cleveland, Ohio 44113

12
                              Salvatore C. Badala, Esquire
13                            NAPOLI SHKOLNIK PLLC
                              400 Broadhollow Road
14                            Suite 305
                              Melville, New York 11747
15

16                            Maria Fleming, Esquire
                              NAPOLI SHKOLNIK PLLC
17                            1500 W. 3rd Street
                              Suite 510
18                            Cleveland, Ohio 44113

19
                              Laura S. Fitzpatrick, Esquire
20                            SIMMONS HANLY CONROY
                              112 Madison Avenue
21                            7th Floor
                              New York, New York 10016
22

23

24

25
```

```
1    APPEARANCES (Continued):

2    For Defendant CVS:         Eric R. Delinsky, Esquire
                                Alexandra W. Miller, Esquire
3                               Paul B. Hynes, Jr., Esquire
                                Anthony M. Ruiz, Esquire
4                               ZUCKERMAN SPAEDER LLP
                                1800 M Street NW
5                               Suite 1000
                                Washington, DC 20036
6

7
     For Defendant Walgreens:   Jeffrey A. Hall, Esquire
8                               BARTLIT BECK LLP
                                54 West Hubbard Street
9                               Chicago, Illinois 60654

10
                                Katherine L.I. Hacker, Esquire
11                              BARTLIT BECK LLP
                                1801 Wewatta Street
12                              Suite 1200
                                Denver, Colorado 80202
13

14
     For Defendant Walmart:     John M. Majoras, Esquire
15                              JONES DAY
                                51 Louisiana Avenue NW
16                              Washington, DC 20001

17
                                Tara A. Fumerton, Esquire
18                              Jason Z. Zhou, Esquire
                                JONES DAY
19                              110 North Wacker Drive
                                Suite 4800
20                              Chicago, Illinois 60606

21

22
     ALSO PRESENT:              David Cohen, Special Master
23
                                     - - - -
24

25
```

|        |                                                        |
|--------|--------------------------------------------------------|
| 1      | THURSDAY, MAY 12, 2022, 10:10 A.M.                     |
| 2      | THE COURT:  Good morning.  Please be                   |
| 3      | seated.                                                |
| 4      | All right.  Glad the technical problems are            |
| 10:11:02 5 | fixed.                                             |
| 6      | And, Doctor, I just want to remind you                 |
| 7      | you're still under oath from yesterday.                |
| 8      | THE WITNESS:  Of course.                               |
| 9      | MR. LANIER:  Your Honor, did you say be                |
| 10:11:13 10 | seated?                                            |
| 11     | THE COURT:  Yes.  Oh, yes.                             |
| 12     | MR. LANIER:  I didn't hear it and I wasn't             |
| 13     | going to do it.                                        |
| 14     | THE COURT:  Oh, no.  Absolutely.  Sorry,               |
| 10:11:20 15 | Mr. Lanier.                                        |
| 16     | All right.  Mr. Delinsky, you may continue             |
| 17     | your cross-examination.                                |
| 18     | MR. DELINSKY:  Thank you, Your Honor.                  |
| 19     | CROSS-EXAMINATION OF G. CALEB ALEXANDER (RESUMED)      |
| 10:11:28 20 | BY MR. DELINSKY:                                   |
| 21     | Q.   Good morning, Dr. Alexander.                      |
| 22     | A.   Good morning.                                     |
| 23     | Q.   Didn't talk to anyone about your testimony        |
| 24     | overnight, correct?                                    |
| 10:11:36 25 | A.   No.  No, counsel.  No.                        |

Alexander - Cross/Delinsky                          514

1    Q.    Okay.  Let's stay with the redress a moment.  We're

2    going to move to a different part.  Okay?

3    A.    Okay.

4    Q.    And so let's just get the exhibit numbers in for

10:11:48 5    the record, and we're going to start with Lake County.

6                      P 23105A.  Do you have that?

7    A.    Yes, I do.

8    Q.    Okay.  And let's go to Page 29.  Okay?  And again,

9    we're looking in the bottom right, right-hand numbers.

10:12:06 10                      Tell me, are you there?

11   A.    Did you say Page 29?

12   Q.    Page 29.  And just for your reference, we're at

13   Section 3 B on the criminal justice system.

14   A.    Yes, I see that.

10:12:24 15   Q.    Okay.  You're with me?

16   A.    Yes.

17   Q.    All right.  Let me state the obvious and make sure

18   I have this right.

19                      This, this page of your redress model

10:12:37 20   addresses the subcategory of your abatement plan on the

21   criminal justice system, correct?

22   A.    Yes.  It does.

23   Q.    Okay.  And one item within this subcategory is

24   Opioid Drug Courts, correct?

10:12:54 25   A.    Yes.

Alexander - Cross/Delinsky                    515

1    Q.    Okay.  And we can see Item Number 1 in Line 1

2    concerns Opioid Drug Courts, correct?

3    A.    Yes.

4    Q.    And for each year from 2021 through 2035, you have

10:13:17  5    an estimated number of Opioid Drug Court participants,

6    correct?

7    A.    Yes.

8    Q.    Okay.  And you provide the same analysis for -- in

9    your Trumbull County redress model, correct?

10:13:32 10    A.    Similar, although using information relevant to

11    Trumbull County rather than Lake County.

12    Q.    Okay.  So different estimates, but nevertheless,

13    for Trumbull County, you provide estimates of the number

14    of Opioid Drug Court participants from 2021 through 2035

10:13:52 15    on an annual basis?

16    A.    Yes, I do.

17    Q.    Okay.  Now, can we go down to the note?

18    A.    Okay.

19    Q.    And Note 1 in particular.

10:14:07 20          And the -- in that note, and, here, I'm

21    going to put it up on the Elmo so everyone can see what

22    I'm talking about.

23          Thank you, Mr. Pitts.

24          Are you with me in this Note 1 here?  Let

10:14:36 25    me highlight it.

```
 1                        Do you see that?

 2      A.    Yes.

 3      Q.    Okay.  And then you have input 34, and that

 4   indicates the number of Lake County Treatment Court

 5   participants that report heroin or prescription opioids

 6   as their primary drug of choice.

 7                        Correct?

 8      A.    Yes.

 9      Q.    Okay.

10                        So 34 is the number of Lake County

11   Treatment Court participants that report heroin or

12   prescription drugs as their drug of choice?

13                        Correct?

14      A.    Yes.

15      Q.    Okay.  In year one of your plan, you provide for 54

16   Drug Court participants, correct?

17      A.    Yes.

18      Q.    In year two, you estimate 87 Drug Court

19   participants, correct?

20      A.    Yes.

21      Q.    But the actual number of Drug Court participants

22   that you report is 34, correct?

23      A.    Yes.

24      Q.    In year five, so that would be indicated here as

25   year 2025, you report 168 Opioid Drug Court participants,
```

Alexander - Cross/Delinsky                517

1    correct?

2    A.    Yes.

3    Q.    But again, the actual number of Drug Court

4    participants that you report here is 34, correct?

5    A.    Yes.

6          In -- yes, I believe that's using 2016

7    data, but, yes, that's correct.

8    Q.    So you are projecting increases in the number of

9    Opioid Drug Court participants in Lake County, correct?

10   A.    Yes.  That's right.

11         While simultaneously taking into account

12   reductions in the overall levels of morbidity and

13   mortality from opioids in the community as reflected by

14   the trend ratio as input four.

15   Q.    So let's look at year five of your plan where you

16   project 168 Opioid Drug Court participants.

17         That would reflect a roughly five

18   time -- times multiplier over the actual number of Opioid

19   Drug Court participants per year that you identify in

20   Line -- in Note 1, correct?

21   A.    That's right.

22   Q.    Okay.  Now, if we go down within Note 1, you have

23   two other lines.

24         One says, "Opioid Drug Courts capacity

25   growth years one to three."

Alexander - Cross/Delinsky                    518

1                       Do you see that?

2       A.    Yes.

3       Q.    And you say, you predict a 60% growth per annum,

4       right?

10:17:46  5       A.    Well, that -- that's a -- again, this is harkens to

6       our conversation yesterday.  That's a target, so that's a

7       recommendation, and it's based on the premise which I

8       think is supported by a large amount of data that Drug

9       Courts are underutilized and that far too many

10:18:03  10      individuals with Opioid Use Disorder that might otherwise

11      be eligible for Drug Courts are instead being channeled

12      through the sort of standard court pathway and ending up

13      incarcerated rather than treated.

14      Q.    I understand that.

10:18:20  15                      And because that's a recommendation, you

16      don't cite any data to support that projection, correct?

17      A.    Well, it's a recommendation for the community, but

18      there's a nontrivial amount of data, including from

19      federal sources and reports ranging from those

10:18:40  20      commissioned by the last administration to, you know, to

21      nonprofit and public health agencies and organizations

22      and the like, supporting the assertion that we need to do

23      a far better job of channelling individuals to Drug

24      Courts rather than the standard dockets by which they're

10:19:01  25      managed.

1    Q.    In this line of your redress model, you cite no

2    data to support a 60 percent increase in Opioid Drug

3    Court participation, correct?

4    A.    Well, it's a recommendation, but based on expert

10:19:17  5    opinion.

6    Q.    And you cite no data to support it in this line?

7    A.    That's correct.  That's correct.

8    Q.    You cite no studies to support it in this line?

9    A.    Again, it's my recommendation.

10:19:31 10          And -- but I don't provide, you know, I

11    would point to the other references within my report and

12    within this spreadsheet to support the general assertion

13    that Drug Courts are underutilized to a significant

14    degree.

10:19:49 15    Q.    And when you say it's your recommendation, so the

16    record's clear, it's your target, correct?

17    A.    That's correct.

18    Q.    Okay.  What you do cite here is your expert

19    opinion, correct?

10:20:02 20    A.    Well, mine and others.

21    Q.    Okay.  And to the extent you're citing others'

22    expert opinions here, you don't identify whose opinion

23    they are, correct?

24    A.    No, I'd be happy to provide those for the Court,

10:20:17 25    but I do not.

Alexander - Cross/Delinsky                    520

1    Q.    Okay.  Now, the line below that, you talk about

2    Opioid Drug Court capacity growth years four to 15,

3    correct?

4    A.    Yes.

10:20:27  5    Q.    And in those years, the rate of increase drops from

6    60 percent to 10 percent, correct?

7    A.    Yes.

8              So this is a good example of my effort to

9    scale more aggressively during the early years of the

10:20:41  10    abatement program and then to back off during the out

11    years, if you will.

12    Q.    And this 10 percent figure is a recommendation -- a

13    recommended target as well, correct?

14    A.    That's correct.

10:20:51  15    Q.    Okay.  And as with the line on top of it regarding

16    years one, two, three in this line, you don't cite any

17    data to support the 10 percent increase, correct?

18    A.    That's correct.

19              I would point to elsewhere in my report, as

10:21:09  20    well as the spreadsheet for supporting scientific

21    information.

22    Q.    You don't support any study -- you don't cite any

23    studies in this line supporting a 10 percent per annum

24    increase in Opioid Drug Court participation, do you?

10:21:24  25    A.    No.  I do not.

1    Q.    And you again, you cite expert opinion, correct?

2    A.    Yes.  That's correct.

3    Q.    And there are no citations for that expert opinion,

4    correct?

10:21:34  5    A.    That -- that's correct.

6                   I haven't named individuals, but again, I

7    would be happy to do so if that's helpful.

8    Q.    But it's not here in this document, correct?

9    A.    Correct.

10:21:44  10    Q.    Okay.  I want to -- let's turn to the previous

11    page, Dr. Alexander.  And again, we're in the Lake County

12    redress model.

13                   Oh, actually, before we move to that, let's

14    just do some quick housekeeping on what I just asked you

10:22:07  15    about.

16                   Can you pull the Trumbull County redress

17    model at P 23105B?

18    A.    Yes.

19    Q.    And can you please turn to Page 28?

10:22:24  20    A.    Okay.

21    Q.    Okay.

22                   And in Note 1 in the Trumbull County

23    redress model, you provide the same 60, 60 percent

24    projected or recommended increase for years one through

10:22:44  25    three in Opioid Drug Courts in Trumbull County, correct?

Alexander - Cross/Delinsky                522

1   A.   Yes.

2   Q.   You provide -- you recommend the same 10 percent

3   increase in Opioid Drug Court participation in years four

4   through 15, correct?

10:22:57 5   A.   Yes, I do.

6   Q.   And you source those recommended targets in the

7   same fashion, correct?

8   A.   I do.

9   Q.   Okay.  All right.  Let's go back to Lake County.

10:23:11 10             Correct?  You don't have to correct that.

11             Let's go back to Lake County.

12             All right.  So we're in now P 23105A,

13   right?

14   A.   Yes.

10:23:23 15   Q.   This is the Lake County redress model again,

16   correct?

17   A.   Yes.

18   Q.   And can you turn to Page 28?

19   A.   Okay.

10:23:39 20   Q.   Okay.  And Page 28 reflects your estimates

21   regarding the subcategory of your abatement plan on

22   public safety, correct?

23   A.   Yes.  Again, supplemented by my report, which

24   discusses the rationale and scientific evidence for this

10:24:02 25   category in further detail.

Alexander - Cross/Delinsky                    523

1    Q.    And we are now in subcategory 3 A of your Lake

2    County redress model, correct?

3    A.    Yes.

4    Q.    I'm going to put this on the screen again.  Item

10:24:23  5    Number 1 is Law Enforcement Assisted Diversion, correct?

6    A.    Yes.

7    Q.    These are programs to get people who come into the

8    criminal justice system diverted to treatment to the

9    extent they've OUD, correct?

10:24:42  10    A.    Yes.  To identify people and in some sense preempt

11    entry into the criminal justice system by allowing for

12    individuals, for example, that might be found having

13    overdosed to be diverted to treatment, yes.

14    Q.    Okay.  And then in Line 1, you estimate -- and by

10:25:03  15    the way, you -- just, there's an acronym here.  You call

16    these Law Enforcement Assisted Diversion programs LEAD,

17    L-E-A-D all caps, right?

18    A.    Yes.

19    Q.    Okay.  And then in the line designated Line Number

10:25:20  20    1, you say the total number of Law Enforcement Assisted

21    Diversion programs to be established for police

22    departments, correct?

23    A.    Yes.

24    Q.    And you predict that -- that a LEAD program should

10:25:39  25    be established for every 4.8 police departments in Lake

Alexander - Cross/Delinsky                    524

1    County, correct?

2    A.    Not -- not exactly.

3                I recommend that 4.8 programs be developed,

4    and this is based on an estimation that four police

10:26:01  5    departments can share a LEAD program.

6    Q.    Okay.  So this is a recommendation?

7    A.    Correct.

8    Q.    Okay.  I see.

9                And when we get down to Note 1 that

10:26:17 10    corresponds to Line 1, you indicate that the source for

11    this recommendation again is expert opinion, correct?

12    A.    Yes.

13    Q.    And on this line, you don't cite any studies for

14    that recommended figure, correct?

10:26:37 15    A.    That's correct.

16    Q.    You only cite expert opinion, correct?

17    A.    Yes.

18    Q.    Okay.  And if we looked at the Trumbull County

19    redress model, it would be the exact same in this regard,

10:26:52 20    correct?

21                The number might be different, but the

22    citations in support would be the same?

23    A.    I believe that's true, yes.

24    Q.    Okay.  Let's go to Page 32.

10:27:19 25                Okay.  Here on Page 32, we're in the

1    subcategory of your redress model for Lake County

2    concerning mental health counseling and grief support,

3    correct?

4    A.    Yes.

10:27:33  5    Q.    This is subcategory 3D of your Lake County redress

6    model?

7    A.    Yes, it is.

8    Q.    And it's subcategory 3D of your Trumbull County

9    redress model as well, correct?

10:27:45 10    A.    Yes.

11    Q.    And this section obviously concerns mental health

12    counseling and grief support?

13    A.    Yes.

14    Q.    In Line 6, you talk about mental health counselors,

10:28:01 15    right?

16    A.    Yes.

17    Q.    And you provide the total number of counselors

18    needed to deliver mental health and grief support,

19    correct?

10:28:15 20    A.    Yes.

21    Q.    And you provide a number of counselors needed to

22    deliver mental health and grief support on a -- for every

23    year in Lake County from 2021 to 2035, correct?

24    A.    That's correct.  Taking into account, again, the

10:28:33 25    decreasing level of, you know, the receding waters of the

Alexander - Cross/Delinsky          526

1   epidemic over time through the inclusion of the trend

2   ratio that I applied.

3   Q.   And you estimate that the Lake County should have a

4   little more than six counselors to deliver mental health

10:29:00  5   and grief support, correct?

6   A.   That's right.

7   Q.   Okay.

8                Now, if we go down to Note 6, okay, you say

9   that you -- Note 6, of course, corresponds to the line we

10:29:22  10   were just talking about on the total number of counselors

11   needed to deliver mental health and grief support,

12   correct?

13   A.   Yes.

14   Q.   Okay.  And in Note 6, you say the number -- you

10:29:32  15   estimate that a counselor will meet with six patients per

16   day, correct?

17   A.   Yes.

18   Q.   For 250 work days, correct?

19   A.   Yes.

10:29:47  20   Q.   You estimate one session per month, correct?

21   A.   Yes.  Conservatively.

22   Q.   And you source that with expert opinion again,

23   correct?

24   A.   Yes.

10:29:58  25                As in the other cases, there was never an

 1    instance where I had what I felt was a valuable published

 2    scientific analysis that I excluded and instead just

 3    provided expert opinion.

 4                    So these are settings where I worked with

 5    colleagues who are experts in the field, and considered a

 6    variety of inputs, including the expertise and

 7    recommendations of local experts on the ground in the

 8    communities to make the recommendations that I've made.

 9    Q.    All that's cited here is expert opinion, correct?

10    A.    That's correct.

11    Q.    You don't break out what experts you talked to,

12    correct?

13    A.    Again, I think I may have articulated that during

14    deposition, but I don't in this instance describe the

15    names nor the training of the individuals that I spoke

16    with.

17    Q.    Okay.  We can't glean that from this line of the

18    redress model, correct?

19    A.    That's correct.

20    Q.    Okay.

21                    And on the subject of your discussions with

22    people in the county, we discussed yesterday that you

23    spoke with Ms. Caraway and Ms. Thorpe from Trumbull

24    County, correct?

25    A.    Yes.

Alexander - Cross/Delinsky                    528

1    Q.    And you spoke with Ms. Fraser from Lake County,

2    correct?

3    A.    Correct.

4    Q.    You didn't speak with anybody else from the

10:31:19  5    counties, correct?

6    A.    That -- that's correct, although I reviewed a

7    significant volume of work reflecting the voices of

8    individuals in the county, but I didn't have personal

9    discussions with others from the county.

10:31:33 10    Q.    Am I right that you spoke with Ms. Fraser for

11    approximately 45 minutes?

12    A.    That sounds about right.

13    Q.    And am I right that you spoke with Ms. Thorpe and

14    Ms. Caraway for about the same amount of time?

10:31:46 15    A.    That sounds about right.

16    Q.    About 45 minutes?

17    A.    Yes.

18    Q.    Okay.  All right.  Let's turn to subcategory 2A of

19    your redress model.  Okay?

10:32:01 20                   That's on Page 12.

21                   Are you there?

22    A.    Yes, I am.

23    Q.    Okay.  This page of the Lake County redress model

24    concerns connecting individuals to care, correct?

10:32:34 25    A.    Yes.

1    Q.    It's subcategory 2A of your abatement plan,

2    correct?

3    A.    Yes.

4    Q.    And the Trumbull County redress model contains a

10:32:46  5    comparable Section 2A regarding connecting individuals to

6    care, correct?

7    A.    Yes, it does.

8    Q.    Okay.  One element within this subcategory is

9    transportation assistance, correct?

10:33:03  10    A.    Yes.

11    Q.    And just so the record's clear, transportation

12    assistance would entail helping people who don't have

13    means or methods of transportation to get from their home

14    or workplace to outpatient treatment, correct?

10:33:20  15    A.    Yes.  So I suppose in terms of outpatient

16    treatment, but, yes, it's to help, help people get to

17    where they need to go so they can get care.

18    Q.    Okay.  Now, your redress model that we're looking

19    at here does not specify how transportation assistance

10:33:52  20    should be provided by Lake County, correct?

21    A.    Are you referring to, for example, whether buses or

22    taxis or ride share or something like that?

23    Q.    Correct.  I'm referring to the logistics of how

24    this assistance actually should be implemented.

10:34:11  25    A.    Correct.  I don't provide that level of detail in

Alexander - Cross/Delinsky                    530

1    my models.

2    Q.    Okay.

3              Now, in fairness, in your report, you do

4    talk about options, like vouchers?

10:34:24  5              I think you talk about some others, too.

6              Vouchers, taxi reimbursement, and gas

7    cards, correct?

8    A.    Yes.

9    Q.    And that's for the county to consider, correct?

10:34:37 10   A.    Yes.  That's a great example where my report may

11   valuably supplement the information that's in these Excel

12   sheets.

13   Q.    But in these Excel sheets, you are not identifying,

14   by way of example, who should oversee the transportation

10:34:53 15   assistance program in Lake County, correct?

16   A.    Well, I don't know if I entirely agree because I do

17   consider supervision and evaluation and leadership of the

18   abatement program, and that would include the

19   transportation framework.

10:35:09 20   Q.    Correct.

21              But even in the section of your abatement

22   plan regarding leadership to which you just referred, you

23   don't identify who the leader should be?

24   A.    That's true.

10:35:22 25   Q.    And here with regard to transportation, you are not

1     identifying the individual within Lake County or

2     individuals who should administer and implement this

3     plan, correct?

4     A.    That's correct.

10:35:34  5     Q.    Okay.  And you're not specifying the agencies or

6     organizations that should provide these services,

7     correct?

8     A.    That's correct.

9                 I speak to that broadly, as you pointed

10:35:48 10    out, in my report.  But not -- not beyond that level of

11    detail.

12    Q.    Okay.  You leave the logistics of implementing this

13    program, the transportation -- transportation assistance

14    program, to the discretion of counties, correct?

10:36:03 15    A.    Yes, the counties and their varied stakeholders.

16    Q.    Okay.

17                So the who, what, when, where of how to

18    assist people with transportation is, you delegate to the

19    discretion of the counties, correct?

10:36:18 20    A.    Well, the counties and the courts, I suppose.

21    Q.    Okay.  You leave the method of providing

22    transportation assistance to the counties and the Court?

23    A.    Yes.

24    Q.    Okay.

10:36:30 25                And generally, if we look across your whole

Alexander - Cross/Delinsky                     532

1     abatement plan and the entirety of your redress models,

2     that's the approach, correct?

3     A.    Yes.

4     Q.    Okay.

10:36:39   5                 So the approach is you outline resources

6     needed for one program or another, but you leave it to

7     the counties to work out the logistics of how they'll be

8     delivered, correct?

9     A.    Yes.  The counties and the courts.

10:36:58  10   Q.    Okay.  Your abatement plans do not send -- descend

11    to the logistics of implementing the programs in your

12    abatement plan, correct?

13    A.    I'm sorry, did you say "descend"?

14    Q.    That's a lawyer word.  I'm sorry.

10:37:13  15   A.    Okay.

16    Q.    I'm sorry.

17                Your abatement plan does not provide the

18    logistics of how the programs in the plan are to be

19    implemented and who should implement them and where they

10:37:26  20   should be implemented.

21                Correct?

22    A.    That's correct.

23    Q.    Okay.  And the means and methods of implementing

24    your abatement plan are not contained in your plan

10:37:40  25   because they're subject to each county and to the Court?

```
  1      A.    Well, I identify programs and services and the

  2      volume of such.  I provide the scientific evidence base

  3      to support these estimates.  I project them over time,

  4      and I include in my plan the vital issue of supervision

10:38:04  5   and leadership and stewardship of these resources.

  6                    I don't go further than that.

  7      Q.    Okay.  So the ground level, grass roots means and

  8      methods of implementing the programs in your plan are to

  9      be determined by the counties and perhaps the Court,

10:38:28 10   correct?

 11      A.    Yes.

 12                    I mean, if you're talking about something

 13      at the level of, you know, should we add seven treatment

 14      beds in this Building A or should we build a new

10:38:40 15   treatment building, Building B, that level of detail I do

 16      not provide.

 17      Q.    And likewise, who should provide the treatment,

 18      correct?

 19                    Your abatement plan doesn't provide that?

10:38:51 20   A.    Well, I do enumerate a number of very dire

 21      workforce issues that I think have to be addressed, and

 22      that includes specifying specific disciplines where I

 23      think hiring is needed and the like.  But I don't -- I

 24      don't go on to say that, you know, this treatment

10:39:10 25   provider should pick up seven extra patients and that
```

1    treatment provider should pick up 10.

2    Q.    That's up to the counties, correct?

3    A.    The counties and the Courts.

4    Q.    Okay.  All right.  Let's go back to Row 3.

10:39:25  5         And Row 3 sets out the total number of

6    patients in need of transportation assistance for

7    outpatient OUD treatment.

8              Right?

9    A.    Yes.

10:39:38 10   Q.    And let's just take some sample years.

11              In year one -- I'm calling it year one.  I

12   think you probably understand why, Dr. Alexander.  I'm

13   just trying to avoid the awkwardness of the timing

14   disparity that's no one's fault, certainly not yours.

10:39:53 15   Okay?

16              So year one you understand to be 2021 in

17   this document, right?

18   A.    Yes, I do.

19   Q.    Okay.  So in year one, you propose 388 persons will

10:40:06 20   be in need of transportation assistance, correct?

21   A.    Yes.

22   Q.    Okay.  Let's just go to 2024; 454, right?

23   A.    Yes.

24   Q.    If we go to 2025, that's year five of the plan, 474

10:40:23 25   patients in need of transportation assistance for OUD

Alexander - Cross/Delinsky                    535

1    treatment, right?

2    A.    Yes.

3    Q.    Okay.  Now, let's turn the page.  Okay?

4              If we turn the page, we go back to

10:40:41  5    treatment, right?  The page on treatment that we spent

6    some time with yesterday afternoon.

7              You remember that, right?

8    A.    Yes.

9    Q.    Oh, I'm sorry.  I was wrong in saying turn the

10:40:52 10    page.  It's a few pages.

11             Go to Page 15 of the Lake County redress

12    model.

13    A.    Okay.

14    Q.    That's up on the screen right now, Section 2B,

10:41:08 15    right?

16    A.    Yes.

17    Q.    And in Section 2B, you set forth numbers of the

18    total number of individuals with OUD in treatment

19    to -- oh, I'm sorry -- I'm out -- highlighting the wrong

10:41:24 20    line.

21             Go down to Line 9, total number of

22    individuals with OUD in outpatient treatment settings.

23             Correct?

24    A.    Yes.

10:41:33 25    Q.    Do you see that line?

Alexander - Cross/Delinsky                    536

```
          1              And let's see if this works, if we can see

          2    everything on this screen.  I think maybe we can.

          3              So in year one of your plan, the total

          4    number of individuals with OUD in outpatient treatment

10:41:50  5    settings is 388, correct?

          6    A.   Yes.

          7    Q.   That's the same number as the patients in need of

          8    transportation assistance, correct?

          9    A.   Yes.

10:42:02 10    Q.   And then if we go to year 2024, just by way of

         11    example, it's 454 patients in outpatient treatment

         12    settings, correct?

         13    A.   Yes.

         14    Q.   And that's the same number of patients who are

10:42:16 15    listed as in need of transportation assistance, correct?

         16    A.   Yes.

         17              If --

         18    Q.   Well, let's just finish.

         19              And if we go to 2025, that's year five of

10:42:27 20    the plan, we have the same phenomenon where the number of

         21    individuals with -- receiving treatment in outpatient

         22    treatment setting is the same as the total number of

         23    patients in need for transportation assistance.

         24              Correct?

10:42:41 25    A.   Yes.
```

1          And if you look at input four on Page 13 of

2     this exhibit, I make an assumption of one voucher per

3     week for each of these individuals.

4          There may well be some of these individuals

10:42:58  5     that have a car.  There may be some that have two.  But

6     there may also be some that need three vouchers a week or

7     five vouchers a week rather than just one.

8          And so I assume conservatively one voucher

9     per week and use the entire outpatient OUD population to

10:43:20 10     estimate the total number of vouchers needed.

11          But this is a population level estimate.

12     Q.    Let's break that down.

13          Many patients in need of outpatient OUD

14     treatment will have cars, correct?

10:43:39 15     A.    Some.  Some may.  Some will, absolutely.

16     Q.    They will have access to family members or friends

17     who will have automobiles?

18     A.    Some may, and some will not.

19     Q.    Others may have means of using Uber or taxis,

10:43:59 20     correct?

21     A.    Some -- again, some may and some may not.

22          And treatment, transportation is a

23     consistently identified major barrier to treatment access

24     in many, many settings, including in these -- in these

10:44:17 25     specific counties.

Alexander - Cross/Delinsky                    538

1    Q.    Some may have access to public transportation,

2    correct?

3    A.    Again, I mean, there's not -- you know, this isn't

4    New York City, so the public transportation

10:44:33  5    infrastructure in these counties is not as well developed

6    as in many parts of the United States.

7                   And again, transportation or lack thereof

8    is consistently identified as a major treatment barrier

9    for many individuals with Opioid Use Disorder, including

10:44:50  10   in these two counties.

11   Q.    Some may have access to public transportation, some

12   may not?

13   A.    That's correct.

14   Q.    Okay.  And you haven't looked at any data in the

10:45:05  15   counties on who -- to quantify the some who may need

16   assistance and the some who may not need assistance,

17   correct?

18   A.    I've reviewed data specific to the counties

19   identifying transportation as an important barrier, but

10:45:23  20   I've not reviewed individual level data from the counties

21   indicating, you know, how many households report

22   transportation problems.

23   Q.    Okay.

24                  Now, if you go to Note 3, that corresponds

10:45:41  25   to Line 3 on the total number of patients in need of

```
 1   transportation assistance?

 2                 Do you see where I am?

 3   A.    Yes.

 4   Q.    You state as your source, "Retrieved From Tab 2B

 5   OUD Treatment."

 6                 Correct?

 7   A.    Yes.  That's correct.

 8   Q.    Okay.  And that's the input that we just looked at

 9   from subcategory 2B, correct?

10   A.    Yes.

11   Q.    You provide no other source corresponding to Line 3

12   for your estimate of the number of individuals with OUD

13   in outpatient treatment settings who need transportation

14   assistance, correct?

15   A.    That's correct.

16   Q.    Okay.  You provided a similar redress model in the

17   State of Rhode Island, correct?

18   A.    Yes.

19   Q.    Okay.  Bear with me for one sec, Dr. Alexander.

20                 I just want to make sure I don't lose my

21   papers.

22                 Paul, 21.

23                 Dr. Alexander, you've been handed CVS MDL

24   5004, correct?

25   A.    Yes.
```

1    Q.    Okay.  And this is a copy of the redress model you

2    provided on behalf of the State of Rhode Island in its

3    opioid litigation against drug manufacturers and

4    wholesale distributors, correct?

10:47:57 5    A.    Yes.

6    Q.    And this redress model for Rhode Island follows

7    form with the redress models for Lake and Trumbull

8    County, correct?

9    A.    Yes.  Similar.  Not identical.

10:48:18 10   Q.    Okay.  It is titled, "State of Rhode Island Opioid

11   Epidemic Abatement Estimates," correct?

12   A.    Yes.  June 1st, 2021.

13   Q.    Okay.  It has the same four categories of abatement

14   at the high level.  And by that, I'm referring to

10:48:37 15   categories one through four, correct?

16   A.    Yes.

17   Q.    Okay.  And for the most part, although there's some

18   deviation, the -- all of the subcategories in the Rhode

19   Island abatement plan are the same as in the Lake County

10:48:57 20   and Trumbull County abatement plans, correct?

21   A.    Yes.

22   Q.    Okay.  Let's go to Page 11 of the Rhode Island

23   redress model.

24               And this is -- Page 11 is the comparable

10:49:21 25   page -- well, strike that.

```
 1              Page 11 is the page of your Rhode Island

 2     redress model that corresponds to the connecting

 3     individuals to care page from the Lake County redress

 4     model that we were just looking at, correct?

 5     A.    Yes.

 6     Q.    Okay.  And if you go to Line -- sort of Item 3 is

 7     transportation assistance, correct?

 8     A.    Yes.

 9     Q.    Line 4 is the total number of patients in need of

10     transportation assistance for -- oh, no.  No.  I'm sorry.

11              Line 3 is the total number of patients

12     eligible to receive transportation assistance for

13     outpatient treatment, right?

14     A.    Yes.

15     Q.    And that's 2,037, right?

16     A.    Yes.

17     Q.    Okay.  2,037 for year one of that plan, which is

18     2022, right?

19     A.    Yes.

20     Q.    Okay.

21              Now, can you hold that number, 2,037?

22     A.    Yes.

23     Q.    If we go to Section 2B of your plan -- oh, I see.

24     I see.  You do the same thing in the Rhode Island model,

25     correct?
```

Alexander - Cross/Delinsky                542

1    A.    Yes.

2    Q.    Okay.  I got you.  I got you.

3              MR. WEINBERGER:  Well, can we have the

4    record reflect that it's the same number?  You said the

10:51:18  5    same thing.  It's the same number.

6              MR. DELINSKY:  Yes.  Same number.  That's

7    good.  That's good.

8    BY MR. DELINSKY:

9    Q.    All right.  There's a page in your redress models

10:51:31  10    on -- in the special populations on NAS babies, correct?

11    A.    In which redress model are you referring to?

12    Q.    Oh, I'm sorry.  I'm back to Lake and Trumbull

13    County redress models.

14              MR. LANIER:  Are we done with this one?

10:51:50  15              MR. DELINSKY:  We're done, Mark.

16    BY MR. DELINSKY:

17    Q.    So let's go back to P 23105A and P 23105B.

18    A.    Okay.

19    Q.    Okay.  Are you with me?

10:52:01  20    A.    Yes.

21    Q.    Okay.

22              In Section 4C of each plan, you

23    address -- you have some provisions for NAS babies,

24    correct?

10:52:16  25    A.    No.  I think that's Section 4A.

1    Q.    Ah-ha.  Thank you.  Section 4A, both for Lake

2    County and Trumbull County?

3    A.    Yes.

4    Q.    Okay.

10:52:26  5              I just want to just confirm for the record

6    that your plan doesn't include and is not based on any

7    figures or estimates provided by Nancy Young, who

8    testified yesterday, correct?

9    A.    Well, I have spoken with Dr. Young and members of

10:52:48  10    my team have spoken with members of her team.  So without

11    looking at specific inputs, I guess I wouldn't want

12    to -- it would be helpful to look at specific inputs.

13              If you have specific questions about them.

14    Q.    Well, let's -- let's go to Section 4A of your plan.

10:53:09  15    Okay?

16              And look at Lake County.  So I believe

17    we're on Page 33, if I'm not wrong.

18              Right?

19    A.    Yes.

10:53:19  20    Q.    Okay.

21              And I believe that it's Item 4 where your

22    plan speaks to NAS babies, correct?

23    A.    Yes.

24    Q.    And Item 4 is populated with Line 6 through 12,

10:53:55  25    correct?

Alexander - Cross/Delinsky                544

1    A.    Yes.

2    Q.    And those appear on the following page of your

3    report, correct?

4    A.    Yes.

10:54:00  5    Q.    Okay.  So we have six, seven, eight, nine, 10, 11,

6    12.

7              Now, some of those notes refer back to

8    previous notes, correct?

9    A.    I'm sorry.  You said some of those notes refer to

10:54:17 10    what?

11    Q.    Previous notes, like Number 6, for instance,

12    involves a computation that involves Note 1, right?

13    A.    Yes.

14    Q.    Okay.

10:54:26 15              Now, just take a look there.  And I really

16    don't mean this to be an ordeal but your -- the sourcing

17    for your estimates here are not based on any estimates

18    provided by Ms. Young, correct?

19    A.    They're based on the sources that I depict here.

10:54:43 20              That does include expert opinion, and

21    Dr. Young is one of many experts that I've consulted with

22    in the course of preparing this report and others.

23              So I don't know if that addresses your

24    question.

10:55:02 25    Q.    Well, you draw estimates here.  So, for instance,

Alexander - Cross/Delinsky                545

 1    among -- I am on Page 33 of your report.

 2                      Total number of children eligible to

 3    receive -- let's do an easier one.  Okay?

 4                      The first one, Line 6, total number of

10:55:29  5    infants diagnosed with NAS to receive medical care.

 6                      Do you see that?

 7    A.    Yes.

 8    Q.    Okay.  Did you generate that estimate or did you

 9    take that estimate from Nancy Young?

10:55:40 10    A.    If you go to the next page for input six, I provide

11    the source.

12                      And the source is not Dr. Young.

13    It's -- it's information from -- from an Ohio Neonatal

14    Abstinence Syndrome County Report.

10:56:01 15    Q.    And likewise, that's not sourced from any estimates

16    made by Dr. Keyes, correct?

17    A.    That's correct.

18    Q.    And if we were -- okay.  Let's take another one of

19    these estimates, number nine.

10:56:15 20                      Total number of children eligible to

21    receive early -- let's go to number eight.  Total number

22    of children to receive early intervention, age zero to

23    five years old.

24                      Okay?

10:56:27 25    A.    Yes.

1    Q.    If we go to number eight, you provide a percentage

2    there, correct?

3    A.    Yes.

4    Q.    You do not cite to Nancy Young.  You don't identify

10:56:41  5    her, correct?

6    A.    The source for number eight is expert opinion.

7    Q.    Okay.  And the expert opinion isn't spelled out,

8    correct?

9    A.    That's correct.

10:56:49  10    Q.    Okay.  If we go to Line 7, total number of infants

11    exposed to opioids but not diagnosed with NAS, okay?

12    A.    Yes.

13    Q.    That's Line 7.

14              You do not source that with Nancy Young,

10:57:06  15    correct?

16    A.    Yes.  That's just a straightforward, you know,

17    calculation.

18    Q.    Okay.  And you don't source that with Dr. Keyes,

19    correct?

10:57:14  20    A.    The -- correct.

21    Q.    Okay.  Super.

22              All right.  We just may be done with the

23    redress model, so thanks for your indulgence through

24    that.  Okay?

10:57:39  25    A.    Thank you.

Alexander - Cross/Delinsky                  547

1    Q.    You agree that there are persons who are addicted

2    to illegal opioids like heroin who have never used

3    prescription opioids, correct?

4    A.    Yes, I do.

10:58:00  5    Q.    Okay.  But you also believe, and you testified

6    yesterday, that there are persons who are addicted to

7    heroin or other illegal opioids as a result of their

8    prior misuse of, or addiction to, prescription opioids,

9    correct?

10:58:20 10    A.    Yes.

11    Q.    Okay.

12                You cannot identify any particular persons

13    in the counties who progressed to illegal drugs as a

14    result of their prior misuse or addiction to prescription

10:58:39 15    opioids, correct?

16    A.    That's -- that's correct.

17                That's not an exercise that I undertook.

18    Q.    Correct, because it was outside the scope of your

19    assignment that you were asked to complete.  You haven't

10:58:54 20    done work in the counties to try to identify any such

21    persons, if any.

22                Correct?

23    A.    Yes.  That's correct.

24    Q.    Okay.

10:59:05 25                You agree that any persons who may have

1    transitioned from prescription drugs to illegal drugs may

2    not have filled prescriptions at CVS, Walmart or

3    Walgreens?

4    A.   Yes, I do.

10:59:26  5    Q.   Okay.  You agree that any such persons may have

6    obtained prescription opioids from friends or family,

7    correct?

8    A.   I mean they -- they may have.  They may not have.

9              They may have filled at CVS.  They may not

10:59:49 10   have filled at CVS.

11             They may have obtained them from friends

12   and family.  They may not have obtained them from friends

13   and family.

14   Q.   You don't know one way or the other, correct?

10:59:58 15   A.   That's correct.

16   Q.   Okay.  You have not generated any data on the

17   numbers of persons, if any, in these two counties who

18   progressed to heroin or another illegal opioid as a

19   result of prior misuse of prescription opioids?

11:00:22 20   A.   Correct.

21             I didn't do that analysis.

22   Q.   And you're aware of no Lake County or Trumbull

23   County-specific data to this effect, correct?

24   A.   I'm sorry.  Can you repeat that question, please?

11:00:32 25   Q.   I'll withdraw it.  I'll withdraw it.

Alexander - Cross/Delinsky                    549

1          Now, in your report -- so I'm now talking

2    about your report.  I promised you -- sort of promised

3    you.  Hopefully I'll live up to it -- that we wouldn't go

4    back to the redress models.  Now I'm in your report.

11:00:49    5    Okay?

6               In your report, you cite an article in the

7    *New England Journal of Medicine* by Wilson Compton, Chris

8    Jones and Grant Baldwin, titled, "Relationship Between

9    Nonmedical Prescription-Opioid Use and Heroin Use."

11:01:02    10              Correct?

11   A.    Yes.

12   Q.    Okay.  You're familiar with that article, correct?

13   A.    Yes, I am.

14   Q.    Okay.  Let me first get a copy of that article out.

11:01:27    15              MR. HYNES:  Do you want a copy?

16              THE COURT:  Okay, thanks.

17   BY MR. DELINSKY:

18   Q.    All right.

19              Dr. Alexander, you've been handed what's

11:01:34    20   been marked as CVS MDL 4992, correct?

21   A.    Yes.

22   Q.    This is an article cited in your report, correct?

23   A.    Yes.

24   Q.    It's the Compton article that we just discussed,

11:01:48    25   correct?

Alexander - Cross/Delinsky                550

1    A.    Yes.

2    Q.    And you obviously have read this article, correct?

3    A.    Yes.

4    Q.    Okay.  I'd like to turn to Page 158 of this

11:01:59  5  article.

6              Okay.  I'm going to highlight the language

7    I'm going to ask you about.  Okay?

8              "Taken in total, the available data

9    suggests that nonmedical prescription-opioid use is

11:02:32  10  neither necessary nor sufficient for the initiation of

11    heroin use and that other factors are contributing to the

12    increase in the rate of heroin use and related

13    mortality."

14              Do you see that language?

11:02:53  15  A.    Yes.

16    Q.    Did I read it correctly?

17    A.    Yes.

18    Q.    Now, this article appears in the *New England*

19    *Journal of Medicine*, correct?

11:03:01  20  A.    Yes.  2016.

21    Q.    Okay.  The *New England Journal of Medicine* is one

22    of the most respected medical journals in the world,

23    correct?

24    A.    Yes.

11:03:09  25  Q.    You know Chris Jones, one of the co-authors of this

1    article, correct?

2    A.    Yes, I do.

3    Q.    You have co-authored articles with Chris Jones, the

4    co-author of this article, correct?

11:03:21  5    A.    Yes, I have.

6    Q.    You know that Mr. Jones has worked for FDA, SAMHSA,

7    and currently works for CDC, correct?

8    A.    Yes.

9    Q.    You know at the time that Mr. Jones wrote this

11:03:36 10    article, he worked for FDA, correct?

11    A.    I'd have to refresh my memory, but that -- that may

12    well be the case.

13    Q.    Okay.

14              And if we go to the first page of the

11:03:47 15    article, I think it provides us with this information.

16    It says that CMJ, that's Christopher M. Jones, was with

17    the Food & Drug Administration?

18              Do I have that right?

19              Was with the FDA in Silver Spring,

11:04:13 20    Maryland, correct?

21    A.    Okay.  Yes.

22    Q.    And that refreshes your memory, correct?

23    A.    Thank you.

24    Q.    Okay.

11:04:22 25              You know that another one of the authors,

1    Wilson Compton -- do you know him, too?

2    A.    I do.

3    Q.    Okay.  So you know he's a public servant as well,

4    correct?

11:04:31 5    A.    Yes.

6    Q.    He's the Deputy Director of the National Institute

7    on Drug Abuse, correct?

8    A.    Yes.

9    Q.    Okay.  You know the third author, Grant Baldwin,

11:04:40 10    correct?

11    A.    I do.

12    Q.    Okay.  He's a public servant, too, correct?

13    A.    Yes.

14    Q.    He's at CDC as well, correct?

11:04:46 15    A.    Correct.

16    Q.    And just so the record's clear, both Mr. Compton --

17    or that's probably Dr. Compton, isn't it?

18    A.    Yes.  He's an M.D.

19    Q.    Yeah.  How about, is it Dr. Baldwin, as well?

11:05:01 20    A.    I would just refer to -- yes.  Sure.

21    Q.    Okay.

22          Well, both Compton and Baldwin were working

23    in the Federal Government at the time this article was

24    published, as well as today, correct?

11:05:11 25    A.    Yes.

Alexander - Cross/Delinsky                          553

1    Q.    Okay.

2                  And by the way, with regard to Mr. Baldwin,

3    you know he's currently the Director of the Division of

4    Overdose Prevention at CDC, correct?

11:05:25  5    A.    I wasn't aware of that but that sounds quite

6    plausible.

7    Q.    Okay.  Let's go to Page 160 of the article.

8                  And the pages are on the bottom.

9                  I'm going to read and show on the screen a

11:05:54 10    line.

11                 "Heroin market forces, including increased

12    accessibility, reduced price, and high purity of heroin

13    appear to be major drivers of the recent increases in

14    rates of heroin use."

11:06:11 15                Do you see that language?

16    A.    Yes.

17    Q.    Did I read it correctly?

18    A.    Well, I'm just trying to get the context here.

19                 So the first sentence of the previous

11:06:31 20    paragraph discusses the transition from nonmedical use of

21    opioids to heroin, and notes that it appears to be part

22    of the progression of addiction in a subgroup of

23    nonmedical users.

24                 And then, as I understand it, the authors

11:06:45 25    go on to -- to examine and speak to whether or not

Alexander - Cross/Delinsky          554

1    policy-driven reductions in prescription opioids are

2    driving increases in heroin use.

3              And what they're speaking to here, I

4    believe, is to say that in the majority of studies,

11:07:03  5    increases in heroin use preceded the policy-driven

6    reductions in prescription opioid use, and then they, in

7    turn, go on to speak to other forces that appear to fuel

8    heroin markets.

9    Q.   Okay.  So let's -- let's take this step by step.

11:07:20 10   Okay?

11   A.   Yes.

12   Q.   So there's a sentence in this article that states,

13   "Alternatively, heroin market forces, including increased

14   accessibility, reduced price, and high purity of heroin

11:07:37 15   appear to be major drivers of the recent increases in

16   rates of heroin use."

17              You see that language, correct?

18   A.   I do.

19   Q.   And I read it into the record correctly?

11:07:46 20   A.   Yes.

21   Q.   All right.

22              And you're right that this article notes a

23   correlation between prescription opioid misuse and later

24   use of heroin, correct?

11:07:59 25   A.   Well, I think they include a variety of studies of

Alexander - Cross/Delinsky

555

```
          1   varying scientific strengths that move a little bit

          2   beyond correlation, but, yes, the article does speak to

          3   the relationship between prescription opioid use or

          4   nonmedical use on the one hand and heroin use on the

11:08:21  5   other hand.

          6   Q.   Okay.

          7              And the whole purpose of the article is to

          8   explore that relationship between nonmedical prescription

          9   opioid use and heroin use, right?

11:08:31 10   A.   Yes.

         11   Q.   Okay.

         12              And to figure out the push and pull of

         13   what's causing what, correct?

         14   A.   Yes.

11:08:38 15   Q.   Okay.  And you know what a meta-analysis is, right?

         16   A.   Yes.

         17   Q.   A meta-analysis, Dr. Keyes taught us all about.  I

         18   had no idea, in candor, what a meta-analysis was until

         19   Judge Polster asked Dr. Keyes to explain it.

11:08:57 20              But as I understood Dr. Keyes' testimony, a

         21   meta-analysis is when a scholar in a particular field

         22   evaluates and analyzes a broad array of literature on a

         23   subject and draws conclusions from it.

         24              Do I have that right?

11:09:10 25   A.   Yes.  Typically or perhaps exclusively in a
```

1   quantitative fashion.

2   Q.    Okay.  Now, is this sort of like a meta-analysis?

3   A.    I would not consider this a meta-analysis.

4   Q.    Okay.  But it does do what you said it does, is it

11:09:24  5   walks through and considers an array of articles that had

6   been published previously on the relationship between

7   nonmedical prescription opioid use and heroin use,

8   correct?

9   A.    Yes.

11:09:34 10   Q.    Okay.

11              And this article concludes that, taken in

12   total, the available data suggests that nonmedical

13   prescription opioid use is neither necessary nor

14   sufficient for the initiation of heroin use, and that

11:09:54 15   other factors are contributing to the increase in the

16   rate of heroin use, correct?

17   A.    Well, the -- I mean, the conclusion is that

18   prescription opioids and heroin are each elements of a

19   larger epidemic of opioid-related disorders and death,

11:10:07 20   and that viewing them from a unified perspective is

21   essential to improving public health, which is the

22   approach that I've taken.

23   Q.    I'm not fussing you on that portion of the article,

24   but it's not the portion I'm asking you about.

11:10:19 25              I'm asking you about this sentence.  In

1    this sentence, these -- while it may be a unified crisis,

2    while both may be critically important, both prescription

3    opioid issues and heroin use, I am not challenging that

4    we want to root out the misuse of both kinds of drugs.

11:10:40  5    Okay?  I'm not challenging that.

6                But what they're saying here is the

7    available data suggests that nonmedical prescription

8    opioid use, while it may be a problem unto itself, is

9    neither necessary nor sufficient for the initiation of

11:10:56  10    heroin use, correct?

11    A.    Yes.  I agree with that.

12                In other words, there are nonmedical users

13    that don't move on to heroin, and there are heroin users

14    that didn't start with nonmedical use.

11:11:08  15                I agree with that.

16    Q.    Okay.

17                And is it -- am I correct in saying that

18    there's sort of a difference of opinion on this subject

19    among respected persons in the public health and

11:11:27  20    epidemiology communities?

21    A.    What subject are you referring to?

22    Q.    The gateway effect.

23    A.    It would be helpful to have more information.

24    Q.    Okay.

11:11:38  25                Well, are there scholars in epidemiology

 1    and public health who would say that nonmedical

 2    prescription opioid use is sufficient for the initiation

 3    of heroin use or would none say that?

 4    A.    I don't think anyone in their right mind could, if

11:12:01  5    I understand what you're asking, because if you look at

 6    analyses of chronic prescription opioid users, as many as

 7    24 to 28 percent engage in nonmedical use.

 8                    And if you argued that that was sufficient,

 9    if I understand you, you would be suggesting that a

11:12:19 10    quarter or more of all chronic opioid users are using

 11    heroin.  It just doesn't, doesn't pass muster, if I

 12    understand the question correctly.

 13    Q.    Okay.  I appreciate it, Dr. Alexander.

 14                    NSDUH data.  Okay.  Mr. Lanier asked you

11:12:39 15    about NSDUH data, correct?

 16    A.    Yes.

 17    Q.    Now, for the benefit of Sue, who hasn't been in the

 18    courtroom for the last two days, let's go through what

 19    NSDUH data stands for.  And, Sue, it's -- and correct me

11:12:55 20    if I'm wrong, Dr. Alexander -- it's N-S-D-U-H, correct,

 21    Dr. Alexander?

 22    A.    Yes.  That's right.

 23    Q.    And that stands for the National Survey of Drug Use

 24    and Health, correct?

11:13:06 25    A.    I believe it may be "on" Drug Use and Health, but,

Alexander - Cross/Delinsky                559

1    yes, National Survey on Drug Use and Health.

2    Q.    Okay.

3              And that's an annual survey on drug use,

4    among other things, conducted by the Federal Government,

11:13:20 5    correct?

6    A.    Yes.

7    Q.    Okay.  I believe you testified that you use NSDUH

8    data, correct?

9    A.    Yes.

11:13:28 10    Q.    Okay.

11              Now, we've talked a little bit about other

12    opioid cases you have testified in for plaintiffs?

13              Correct?

14    A.    Yes.

11:13:37 15    Q.    Okay.  And I do not mean plaintiffs in a pejorative

16    way.  I just mean to indicate the difference between the

17    two sides of the fee.

18              Okay?

19    A.    That's fine.

11:13:49 20    Q.    Okay.

21              So one case in which you testified was the

22    State of Washington case against the big three

23    distributors, Cardinal, McKesson, and AmerisourceBergen,

24    correct?

11:14:03 25    A.    Yes.

Alexander - Cross/Delinsky                    560

1    Q.    Okay.

2                Another opioids case you testified in was a

3    case brought by the State of Rhode Island, which we've

4    already discussed, against manufacturers and wholesale

11:14:17  5    distributors, correct?

6    A.    No.  I haven't testified.

7                I believe I've been deposed, but I haven't

8    seen a courtroom in that case.

9    Q.    Okay.  That's a really fair point and I'm glad you

11:14:28  10    corrected it.

11                You are proposing an abatement plan in the

12    State of Rhode Island case, correct?

13    A.    Yes.

14    Q.    Okay.  We looked at it, right?

11:14:38  15    A.    That's true.

16    Q.    Okay.

17                You propose an abatement plan in the State

18    of Washington case, correct?

19    A.    Yes.

11:14:44  20    Q.    Okay.  And whereas, in this case, you didn't

21    estimate the OUD populations of Trumbull and Lake

22    Counties.  In the State of Rhode Island case you did

23    generate the estimate of the OUD population in the state,

24    correct?

11:15:07  25    A.    Yes.

Alexander - Cross/Delinsky                    561

1    Q.    And in the State of Rhode Island case, you

2    generated the estimated population of OUD -- patients

3    with OUD in the State of Rhode Island, correct?

4    A.    Yes.

11:15:27  5    Q.    And the source that you used to generate these

6    estimates was the NSDUH data, correct?

7    A.    I used dozens of sources.  I believe it would be

8    helpful to see the report, but if the report is based on

9    Apollo, which is an epidemiologic model of the opioid

11:15:53 10    epidemic, Your Honor, then it would have incorporated

11    dozens or more sources of information.

12                  The National Survey on Drug Use and Health

13    would be one of those sources.

14    Q.    Okay.  So as you sit here today, pick either one of

11:16:08 15    the jurisdictions.  Okay?

16                  What was -- what was the first thing, the

17    first set of data you looked at to generate your OUD

18    population?

19    A.    Well, I don't -- I mean, I don't line all the data

11:16:26 20    up and, you know, look at one and then just walk down the

21    line.

22                  So I don't know what the first set of data

23    would be, but the bottom line is that NSDUH is

24    incorporated into the Apollo model, and at a state level,

11:16:43 25    it is more feasible and I often have tried to use the

1    Apollo model in order to estimate the OUD population.

2    Q.    All right.  Paul, 22.

3                    MR. HYNES:  22 or 23?

4                    MR. LANIER:  You have Rhode Island up

11:17:11 5    there.

6    BY MR. DELINSKY:

7    Q.    Dr. Alexander, you've been handed CVS MDL 5005.

8                    Do you possess that document?

9    A.    Yes, I do.

11:17:42 10                    Thank you.

11    Q.    Okay.  This is an appendix to your abatement plans

12    in the State of Rhode Island, correct?

13    A.    Yes.

14    Q.    Okay.  And bear with me for one sec.

11:17:58 15                    If you could please turn to Page 5 of that.

16    And by the way, this document outlines how you went about

17    preparing your estimates, correct?

18    A.    Yes.

19    Q.    Okay.

11:18:17 20                    And so if we're on Page 5, you estimate a

21    population for prescription opioid nonmedical use,

22    correct?

23    A.    Yes.

24    Q.    Okay.

11:18:26 25                    And you look at the National Survey on Drug

Alexander - Cross/Delinsky                    563

1    Use and Health, correct?

2    A.    Yes.

3    Q.    Okay.  And then if we keep going in the

4    population -- in the -- if we keep going, I'm sorry, you

11:18:58  5    estimate the prescription -- on the next line down,

6    Opioid Use Disorder population, correct?

7    A.    Yes.

8    Q.    That's based on NSDUH, too, correct?

9    A.    NSDUH and other sources of information, such as the

11:19:17  10    Barocas, et al., manuscript which is noted two lines

11    further down.

12    Q.    Correct.

13              And I don't mean to suggest it's your only

14    source but it's one of the foundational sources in the

11:19:25  15    State of Rhode Island and the State of Washington from

16    which you build out your estimate, correct?

17    A.    Yes.

18              Again, yes, certainly in Rhode Island and

19    if there was Washington Apollo, then it would have also

11:19:41  20    incorporated NSDUH.

21    Q.    Okay.  So let's go to Apollo.  Okay?

22              You and your company, Monument Analytics --

23    let me step back.  I'm already getting compound.

24              You co-founded a company called Monument

11:19:57  25    Analytics, correct?

         1    A.    Yes.

         2    Q.    Okay.  And you were the majority owner of Monument

         3    Analytics, correct?

         4    A.    Yes.

11:20:04  5    Q.    And the work you have done in this litigation is

         6    through your -- is through Monument Analytics, correct?

         7    A.    Yes.

         8    Q.    Okay.

         9          You are not testifying here today on behalf

11:20:17 10    of Johns Hopkins, correct?

        11    A.    I am most certainly not.

        12    Q.    Okay.  And you're not testifying here in capacity

        13    as a professor at Johns Hopkins.  Rather, you're

        14    testifying through Monument Analytics, correct?

11:20:32 15    A.    Yes.

        16    Q.    Okay.

        17          You and your company, monument, have built

        18    a computer model to assist in measuring the opioid

        19    epidemic and potential abatement measures in particular

11:20:47 20    jurisdictions, correct?

        21    A.    Yes.  An epidemiologic model.

        22    Q.    Okay.  An epidemiologic model.

        23          And this model can be used to assist in

        24    measuring abatement needs, correct?

11:21:00 25    A.    Yes.

Alexander - Cross/Delinsky

565

1    Q.    I believe, as you've already testified, it employs

2    a wide array of data sets, correct?

3    A.    Yes.

4    Q.    Of which NSDUH is just one?

11:21:12  5    A.    Correct.

6    Q.    Okay.  It includes, like, Wonder data from CDC and

7    TEDS data, and all sorts of other data, correct?

8    A.    Yes.

9    Q.    Okay.

11:21:23  10         I do not purport to have the brain power

11   needed to understand Apollo.  Okay?  I just want to put

12   that out there.  So if I get something wrong, stop me.

13         But Apollo, as I understand it, processes

14   through 32 variables, which are known in Apollo as

11:21:45  15   compartments, correct?

16   A.    Yes.  I would -- they're not variables, but they're

17   compartments.  They're states, if you will.

18   Q.    Okay.  I'm sorry.  What was that last?

19   A.    States, S-T-A-T-E-S.  They're not variables.

11:22:00  20         There are many, many variables that reflect

21   the transitions and the transition probabilities between

22   compartments.

23   Q.    Okay.  So let's just talk about the 32 compartments

24   for a sec.

11:22:10  25         When you mean states, you don't mean, you

1    know, the State of Hawaii, the State of Ohio; you mean

2    medical states, correct?

3    A.    Yeah.  I mean a state at which -- I mean it's much

4    easier if the Apollo is depicted, the graphic, but I mean

11:22:28  5    a transition -- I mean a state at which a person is.

6              So Apollo allows for one to map people as

7    they progress through different states.

8              For example, the general population,

9    nonmedical users, prescription Opioid Use Disorder,

11:22:48 10    death, and the like.  So that's the -- that's the sense

11    in which I use the word, "State."

12    Q.    And there's 32 of these states that Apollo

13    assimilates and works with, correct?

14    A.    Correct.

11:22:59 15    Q.    Okay.

16              And then Apollo -- and I think this is

17    where you were going before -- Apollo processes the

18    interplay of 109 variables that are called parameter

19    estimates, correct?

11:23:14 20    A.    Yes.  They reflect the probability of an individual

21    moving from one compartment to another compartment.

22    Q.    Okay.

23              And the way Apollo works is that there's

24    computerized analytical interplay between the 32 states

11:23:33 25    and the 109 parameter estimates so they're working

1       together?

2                   Correct?

3       A.      Yeah.

4                   I would say that one applies transition

11:23:45  5     probabilities to people, and the people move through

6       these varied compartments.

7                   So if we know the likelihood of developing

8       nonmedical use from the general population, then we can

9       take a hundred people in the general population and

11:24:00 10     estimate, in a given month, how many are likely to move

11      to nonmedical use.

12                  And so we can apply these probabilities to

13      each of the transitions of interest, and then we

14      calibrate the model.  We compare the model against the

11:24:16 15     real world for data.  We have real world data for the

16      past eight or 10 years, and we have the model -- what the

17      model predicts for eight or 10 years, and so there's a

18      process of calibration.

19                  So we calibrate the model, we conduct what

11:24:31 20     are called uni-variate sensitivity analyses, where we

21      pull the lever on a given variable and see how much an

22      outcome like overdoses changes.  There are multi-variate

23      sensitivity analyses where we let lots of different -- we

24      pull lots of different levers simultaneously and see how

11:24:50 25     much the predicted outcomes change.

            1            And then, you know, it's built by a team

            2      and ultimately subject to peer review.  So those are sort

            3      of the five ways that we work to try to maximize the

            4      functioning of the model and the functioning of these

11:25:06   5      parameters.

            6      Q.    Okay.  You agree it's complicated to a layperson,

            7      right?

            8      A.    It is.  It is.  It's a fairly complex model.

            9      Q.    Yeah, okay.

11:25:19  10            And among many other things, the model,

           11      when you apply it, enables you, it gives you output on

           12      the portion of the OUD population without prior

           13      prescription use, by way of example, correct?

           14      A.    Yes.

11:25:38  15            I mean, one of the distinctions between

           16      Apollo and several other models that have been developed

           17      is that Apollo has a pathway built in to allow for people

           18      to develop heroin use disorder that didn't have

           19      antecedent prescription Opioid Use Disorder.

11:25:57  20            So a lot of the models prior to Apollo just

           21      sort of treated it as one pathway.  And in contrast to

           22      those models, Apollo allows for us to estimate this

           23      population.

           24      Q.    And the Apollo model, with all the inputs, for lack

11:26:11  25      of a better word, it can be run monthly, correct?

1    A.    It's run on a monthly cycle, yes.

2    Q.    And so each month is informed by the month before?

3    A.    Yes.

4    Q.    Okay.

11:26:23  5              And you've used this model in preparing

6    your abatement estimates and redress models in your

7    abatement plan in other cases, correct?

8    A.    Yes.

9              In cases where there's been sufficient

11:26:35  10   data, which is generally at a state rather than a county

11   level, and where the plaintiffs have requested and the

12   communities have requested, I've worked to develop an

13   Apollo for those models.

14   Q.    So by way of example, you use the Apollo model in

11:26:50  15   the State of Washington case, correct?

16   A.    Yes, I believe that's true.

17   Q.    And in the State of Rhode Island case as well,

18   correct?

19   A.    Yes.

11:26:58  20   Q.    Okay.

21             I believe you just answered this question

22   but you did not run Apollo for Lake County in preparing

23   your abatement plan, correct?

24   A.    I did not.

11:27:05  25             And I did address the reason why.

Alexander - Cross/Delinsky                    570

1    Q.    Okay.

2                And you didn't run it, you did not run the

3    Apollo model for Trumbull County in preparing your

4    abatement plan, correct?

11:27:14  5    A.    Correct, because I did not have the data to do so,

6    nor was I requested to do so.

7    Q.    Right.

8                When you're operating at a county level,

9    the quality and the nature of the data available is more

11:27:27 10    limited, correct?

11    A.    Yeah.

12                I mean, there's -- there's -- you know,

13    county level data has an upside, too, right, which is

14    that you have local experts on the ground and you have

11:27:41 15    county-level reports and such.

16                But I didn't have data and didn't attempt

17    to build a county level Apollo in this instance.

18    Q.    Okay.  Dr. Alexander, I am nearing the end.

19                I just have a few more questions.  Okay?

11:27:59 20    A.    Yes.

21    Q.    I'm going to ask you the following questions.

22    Everybody in this room, there's no jury, we're all

23    professionals.  I don't mean to disparage you in any way

24    whatsoever.  We just need to make a record of everything.

11:28:10 25    Okay?

```
          1    A.    Yes.

          2    Q.    You're working for a lot of other plaintiffs in

          3    opioid litigations, correct?

          4    A.    Yes.

11:28:16  5    Q.    Am I right that you're working with or have worked

          6    on a dozen or more cases on behalf of plaintiffs in the

          7    opioids litigations?

          8    A.    Yes.

          9    Q.    Okay.  West Virginia?

11:28:31 10    A.    Yes.

         11    Q.    California?

         12    A.    Yes.

         13    Q.    Washington, Rhode Island?

         14    A.    Yes.

11:28:37 15    Q.    I think there was an Arizona case?

         16    A.    I don't know if that's been disclosed or I don't

         17    know the status of that.

         18    Q.    Okay.

         19          Well, we're a defendant so we have your

11:28:49 20    report there.  It's been disclosed.

         21          The Arizona hospital case?

         22    A.    Yes.

         23    Q.    Okay.  And several other cases throughout the

         24    country, correct?

11:28:59 25    A.    Yes.
```

Alexander - Cross/Delinsky                572

1    Q.    Okay.

2                You're assisted by the folks at Monument

3    Analytics, correct?

4    A.    Yes.

11:29:06  5    Q.    These engagements are all run through Monument

6    Analytics -- and I don't mean that in a pejorative way --

7    correct?

8    A.    Yes.

9    Q.    Okay.

11:29:14 10                And as you've already testified, you're the

11   co-founder and majority owner of Monument, right?

12   A.    Yes.

13   Q.    You and Monument have billed several million

14   dollars in connection with your work for plaintiffs in

11:29:25 15   the opioids litigation, correct?

16   A.    Yes.

17   Q.    Okay.

18                I think you testified, as of last October

19   when we were here at trial, the first trial, you and

11:29:33 20   Monument Analytics had billed about $6 million?

21   A.    Yes.  Across, I think, the 17 cases, that's right.

22   Q.    Okay.  Today, it's more because you've been doing

23   work since then, correct?

24   A.    Yes.

11:29:44 25   Q.    Would I be right in saying that you and Monument

 1   have billed in excess of $7 million for the opioids

 2   cases?

 3   A.    I don't believe so.

 4   Q.    Okay.  More than six million, less than seven

11:29:56  5   million?

 6   A.    Yes.

 7   Q.    Okay.  And these billings, of course, include your

 8   own time?

 9   A.    Yes.

11:30:01 10   Q.    And your rate is $900 per hour?

11   A.    Yes.

12   Q.    Okay.

13           Dr. Alexander, thank you for indulging me

14   on those questions.

11:30:08 15   A.    Thank you.

16   Q.    And thank you for your time.

17   A.    Thank you.

18           MR. DELINSKY:  I pass the witness, Your

19   Honor.

11:30:13 20           THE COURT:  Okay.  Anyone else for

21   defendants?

22           MS. FUMERTON:  Yes, Your Honor.

23           THE COURT:  Okay.

24

25

1          CROSS-EXAMINATION OF G. CALEB ALEXANDER

2     BY MS. FUMERTON:

3     Q.    Good morning, Dr. Alexander.

4     A.    Good morning.

11:31:01 5     Q.    My name is Tara Fumerton.  I am one of the

6     attorneys for Walmart, and I actually had the pleasure of

7     taking your deposition back on February 11th of 2022.

8               Do you recall that?

9     A.    Yes, I do.

11:31:12 10    Q.    It's nice to see you again.

11    A.    Thank you.

12    Q.    I just have a couple quick questions that we'll

13    hopefully get through quickly.

14               Do you still have a copy of Plaintiffs'

11:31:24 15    Exhibit 23105A handy?

16    A.    Yes.

17    Q.    Which was your redress model for Lake County?

18    A.    Yes, I do.

19    Q.    Would you please pull that out and turn to Page 15.

11:31:47 20    A.    Okay.

21    Q.    Okay.

22               And I just want to circle back to something

23    you testified about yesterday and it pertains to actually

24    something you and I discussed at your deposition in

11:31:55 25    February.

1          So if you'd look at the redress model, this

2    is for Lake County.  And you testified yesterday that if

3    we look at Line 1 for year 2021, you are estimating the

4    total number of individuals with OUD in Lake County for

11:32:17  5    2021, which is based on Dr. Keyes' estimate, correct?

6    A.    Yes.

7    Q.    And then yesterday you also testified about Line 3,

8    and there it's listed as the total number of individuals

9    with OUD to receive treatment, and year 2021 for Lake

11:32:42 10    County, and you have estimated 2,267 individuals,

11    correct?

12    A.    Yes.

13    Q.    And then yesterday, I think you said something

14    along the lines -- and I actually have your testimony

11:32:54 15    here -- but that you think it's really better thought of

16    as a treatment slot.

17          And so what I'm trying to understand is

18    what exactly you meant by that because I think when we

19    talked about these numbers back in February, you never

11:33:09 20    used the term, "Slot."

21    A.    I'm sorry.  A treatment --

22          THE COURT:  I think slot, S-L-O-T.

23          THE WITNESS:  Oh, a treatment slot.  I see.

24    Thank you.

11:33:22 25          Yes.  A treatment slot.  Yes.

Alexander - Cross/Fumerton                    576

1    BY MS. FUMERTON:

2    Q.    Okay.

3                 And so as you explained yesterday, a slot

4    could mean that more than one person for a given year

11:33:30  5    could occupy that slot, correct?

6    A.    Yes.  Exactly.

7    Q.    Okay.

8                 So what I want to understand is what is

9    your estimate for 2021 for Lake County as to the total

11:33:43  10    number of individuals with OUD who will receive

11    treatment?

12    A.    Yeah.  I don't -- I don't have a precise estimate

13    of the total number of individuals.

14                 The footnote to entry two describes perhaps

11:34:02  15    an alternative way of thinking of these slots, which may

16    be -- I don't know if it's more intuitive or not, but it

17    stipulates or clarifies that this is the proportion of

18    individuals with OUD in treatment at any given month

19    during the year.

11:34:18  20                 But I don't have a precise number for the

21    number of unique individuals, the unique number of

22    bodies, if you will, that will receive treatment in year

23    one.

24    Q.    So in year one, you have the target of at least

11:34:34  25    2,267 individuals or slots, correct?

1    A.    Yes.

2    Q.    And it could be more than that.  So let's say it

3    was two individuals occupied each slot, is that

4    reasonable?

11:34:43  5    A.    It could be.

6                  It could be the same person coming back a

7    second time.  It could be one person occupying a slot for

8    two years.  It could be three people sharing a slot, yes.

9    Q.    You just don't know how many people for year one

11:35:00 10    will receive treatment for OUD in Lake County, correct?

11    A.    Well, I know treatment duration is far too short

12    and there's an enormous opportunity to improve that.

13                  And I know the evidence that speaks to the

14    benefits of longer treatment, but I don't have a precise

11:35:15 15    number of individuals that will receive treatment in year

16    one.

17    Q.    Okay.  And I just want to make sure the record's

18    clear.

19                  So you do not know what the number of

11:35:25 20    individuals -- and you don't have an estimate even -- of

21    what the number of individuals will be who receive

22    treatment for OUD in year one?

23    A.    That's --

24    Q.    In Lake County, correct?

11:35:37 25    A.    That's correct.

Alexander - Cross/Fumerton

578

```
              1   Q.    And let's say it was two individuals occupied one
              2   slot.
              3               That would be 4,534 individuals who would
              4   receive treatment for OUD, correct?
11:35:49      5   A.    Well, if it was two unique individuals that
              6   occupied every slot for six months each, then that
              7   calculation is -- although I would need to do the math,
              8   but that calculation sounds about right.
              9   Q.    Okay.  And approximate.  I mean these are all
11:36:05     10   estimates, right?
             11   A.    Yes.
             12   Q.    So 4,534 is about 80 percent of 5,668, correct?
             13   A.    Well, again --
             14   Q.    Just the math, right?
11:36:19     15   A.    Can you repeat the question, please?
             16   Q.    Sure.  4,534 is about 80 percent of your estimate
             17   of the individuals with OUD, which is 5,668, correct?
             18   A.    Yes.
             19   Q.    And just briefly -- do you have P 23105B, which is
11:36:47     20   the redress model for Trumbull County?
             21               THE COURT:  I want to make sure I
             22   understand this.
             23               Stick with 2021.  5,668, those are actual
             24   individuals that you're estimating, Doctor, that have
11:37:08     25   OUD?
```

Alexander - Cross/Fumerton                579

1              THE WITNESS:  Correct.

2              THE COURT:  Okay.  And then you're

3    projecting 40 percent of them will receive treatment in

4    2021, that's your estimate?

11:37:22 5              THE WITNESS:  I'm -- I'm projecting that

6    enough treatment slots be provided so that --

7              THE COURT:  Okay.  And a treatment slot

8    is -- is one year of treatment?

9              THE WITNESS:  Yes.

11:37:37 10              Or it's a -- it's a place for treatment.

11              So I'm suggesting in year one, Your Honor,

12    that 40 percent -- that in any given month, 40 percent of

13    the total population in the county with Opioid Use

14    Disorder is engaged in treatment.

11:37:56 15              In any given month of that first year, that

16    40 percent of that total number, 5,668, is engaged in

17    treatment.

18              THE COURT:  Okay.

19              And what is the -- what is the cost of

11:38:10 20    one -- monthly or annually?  Somewhere you've got this,

21    the cost of treatment of one person per month or one

22    person per year, however you do that.  That's

23    what's -- that's the cost that's projected, right?

24              THE WITNESS:  Yes, Your Honor.

11:38:24 25              So under, "Suggested costs," if we could

1    scroll down on the projector, the outpatient treatment

2    costs per month, for example, it's estimated in 2017

3    dollars to be $3,048.

4                    It's further down.  It's projected as well.

11:39:02  5            THE COURT:  Okay.  I think I understand

6    that.

7                    Thank you.

8    BY MS. FUMERTON:

9    Q.    And just to wrap this up, Dr. Alexander, if we look

11:39:12  10   at P 23105B, which is the redress model for Trumbull

11   County, and look at the same type of figures, they're

12   different because it's a different county, right?

13   A.    Yes.

14   Q.    You've estimated, based on Dr. Keyes' estimation,

11:39:26  15   that there are 7,221 total number of individuals with OUD

16   in year 2021, correct?

17   A.    Yes.

18   Q.    And based on the explanation you just gave, you say

19   you think there's 40 percent of them will have

11:39:42  20   a -- you're calculating 40 percent to have a treatment

21   slot for an entire year, and that gets you 2,888,

22   correct?

23   A.    Yes.

24                    Again, I think perhaps a more intuitive way

11:39:53  25   might be to say that during any given month in year one,

1    that 40 percent of the total population with Opioid Use

2    Disorder will be engaged in treatment.

3    Q.    But again, for Trumbull County, you aren't actually

4    providing an estimate of the number of individuals who

11:40:13 5    you think will receive treatment for OUD, correct?

6    A.    No.  That's correct.

7                    MS. FUMERTON:  Thank you.

8                    I pass the witness.

9                    THE WITNESS:  Thank you.

11:40:32 10        CROSS-EXAMINATION OF G. CALEB ALEXANDER

11   BY MR. HALL:

12   Q.    Good morning, Dr. Alexander.  My name's Jeff Hall,

13   I represent Walgreens.

14                   You and I have not met before, have we?

11:40:41 15   A.    I don't believe so.

16                   Good morning.

17   Q.    I want to follow up on several of the questions you

18   were asked about yesterday in your direct examination.

19                   First, let me show an article that you were

11:40:54 20   asked about.

21                   This is the article titled, *Vital Signs*:

22   *Prescription Opioid Pain Reliever Use During Pregnancy*,

23   and it was cited by Dr. Young.

24                   Do you remember being asked about this

11:41:19 25   article?

1    A.    Yes, I do.

2    Q.    Now, before yesterday, had you seen this article

3    before?

4    A.    I don't recall.

5                I look at an enormous amount of scientific

6    literature.

7                I don't recall.

8    Q.    Okay.  I did look and the article's not listed in

9    the materials that you relied on for purposes of your

10   opinion in this case.

11               Does that sound right to you?

12   A.    That -- that may be well the case, yes.

13   Q.    Is it fair to say -- well, let me be specific.

14               This is Page 4, Table 2, and there are

15   statistics about opioid use during pregnancy that are

16   displayed in this article.

17               And this is what you were asked about

18   yesterday, correct?

19   A.    Yes.

20   Q.    Is it fair to say you have not had an opportunity

21   to examine the underlying data concerning, for example,

22   the prescription opioids that were prescribed by OB/GYN,

23   midwife, prenatal care providers as cited in this

24   article?

25   A.    I don't know fully what you mean by "Examine the

1    underlying data."

2              It would be -- I would want to know what

3    the data source is.  It may well be one that I have

4    familiarity with, such as the National Survey on Drug Use

11:42:48  5    and Health.

6    Q.   All right.

7              But you aren't in a position to tell us

8    with respect to any of the prescriptions that are

9    included in this article as to whether those were

11:42:59 10   appropriate or inappropriate opioid prescriptions, are

11   you?

12   A.   No.  Not without further review.

13             But I'm not sure that that can be discerned

14   from this type of scientific information.

11:43:15 15   Q.   Now, you were asked yesterday -- I think the

16   question described this as alarming that there are health

17   care providers, doctors, surgeons, anesthesiologists,

18   that are prescribing opioids to women and -- when they're

19   pregnant, and it includes, as listed here, during surgery

11:43:38 20   before or during -- before pregnancy or during pregnancy.

21             Do you recall that question?

22   A.   Yes.

23   Q.   And you were asked whether part of the plan that

24   you are suggesting here or putting forth as the abatement

11:43:55 25   remedy for Lake and Trumbull Counties would help to

1    educate the health care system to address issues like

2    this.

3                    Do you recall that?

4    A.    Yes.

11:44:04  5    Q.    And so I just want the record to be clear.

6                    You are aware that the remedy included in

7    your abatement plan for Lake and Trumbull Counties would

8    include the education of doctors, surgeons,

9    anesthesiologists, other health care providers, about

11:44:25 10    opioid use during pregnancy and otherwise?

11    A.    Yes.

12    Q.    And that would be, under your plan, if it were

13    implemented, funded, this education of the health care

14    system, including the doctors and the anesthesiologists

11:44:39 15    and surgeons, by Walgreens, Walmart and Lake -- and,

16    excuse me, and CVS under the plaintiffs' case?

17    A.    Well, that's up to the Courts.

18                    That's up to the Courts.

19    Q.    But it's included in your plan set forward and

11:44:57 20    discussed yesterday, P 23105?

21    A.    Yes.

22    Q.    You were asked yesterday, also, about some of the

23    components of your abatement plan that actually really

24    don't take that much money, they're almost rounding

11:45:20 25    errors.

1          Do you remember that?

2    A.    Well, I don't know if I used those words, and I

3    guess it would -- but I do remember the general

4    conversation.

11:45:31  5    Q.    You're correct.  They were included, those words

6    were used in the question.

7               And I just want to ask you do you know if

8    Lake County and Trumbull County are doing some of the

9    things in your plan that don't cost a lot of money that

11:45:51 10    are effective and efficient in addressing the opioid

11    epidemic in Lake and Trumbull County?

12    A.    I mean, I typically have not focused on economics.

13               I have focused on the science and the

14    public health needs, and I have not spent a great deal of

11:46:08 15    time understanding the specific costs and the relative

16    costs of different activities proposed.

17               I do know that the counties, my

18    understanding is, have spent an extraordinary amount on

19    working to try to staunch the bleeding thus far.

11:46:27 20    Q.    Well, would you describe any of the components of

21    your plan as involving almost a rounding error and not a

22    significant expense?

23               Do you think that's a fair characterization

24    of any elements of your plan?

11:46:43 25    A.    I think questions of rounding errors are ones

1    beyond the scope of what I've worked to do.

2    Q.    Do you have P 23105A handy?

3              That's the redress model for Lake County.

4    A.    Yes, I do.

11:47:05 5    Q.    Let me show on the screen that document.

6              I'd like to ask you about the first

7    category in your abatement plan.

8              This one is for Lake County.  And that is

9    category one, prevention, reducing opioid oversupply, and

11:47:37 10    improving safe opioid use.

11             Do you see that category?

12    A.    Yes, I do.

13    Q.    Do you agree that this, this section, addresses

14    steps that would reduce the oversupply of prescription

11:47:54 15    opioids in Lake County and also reduce potential

16    diversion of those opioids?

17    A.    Yes.

18    Q.    And similarly, same question for Trumbull County in

19    P 23105B, would your answer be the same for Trumbull

11:48:13 20    County, category one?

21    A.    Yes.

22    Q.    Now, if we look at some of the detail here, turning

23    to Page 7, which is 1 C, safe storage and drug disposal,

24    let me know when you have that or you can look on the

11:48:30 25    screen, whatever is convenient.

1   A.   That's -- that's fine.  Please.

2   Q.   Okay.

3        And in this schedule, I want to make sure I

4   understand it, the Line 1 is the population and estimates

11:48:48  5   that you make, and it actually is fixed for the 15 years?

6        And then you include some suggested cost

7   data below from other locations.

8        Is that right?

9   A.   Yes, as well as the proportion of opioids out of

11:49:02  10   all medications collected at take-back programs.

11   Q.   And that's based on source number two?

12   A.   Yes.

13   Q.   All right.

14        Now, yesterday you said it should be no

11:49:17  15   harder to get rid of a box -- a bottle of Oxycodone than

16   it is to get it filled in the first place.

17        Do you recall that?

18   A.   Yes.

19   Q.   And that's one of the goals of safe storage and

11:49:28  20   drug disposal; that is, to make it easier for people who

21   have unused prescriptions to safely and appropriately

22   dispose of them.

23        Fair?

24   A.   Yes.

11:49:38  25   Q.   Now, you described these steps in your report.

Alexander - Cross/Hall                588

1        Do you recall that?

2   A.    Which steps are you referring to?

3   Q.    That is, the safe disposal, safe storage and drug

4   disposal steps.

11:49:59 5   A.    Yes.  I provide more context in my report for this,

6   and the scientific rationale for this category, yes.

7   Q.    Let's turn to that for a minute, please.

8        Do you have your report, which is P 23100

9   handy?

11:50:22 10        And specifically Page 22.

11  A.    Yes.

12  Q.    All right.

13        And in this section of your report, these

14  next two pages, is it fair to say you describe in some

11:50:36 15  more greater detail what these safe storage and drug

16  disposal steps involve that you recommend as part of your

17  abatement plan?

18  A.    Yes.

19  Q.    And if we just walk through them, in Paragraph 60,

11:50:50 20  you talk about something called -- maybe it's not

21  60 -- you talk about something called receptacles,

22  take-back receptacles.

23        Do you know what I'm describing?

24  A.    Yes.

11:51:08 25  Q.    And what are take-back receptacles with respect to

1    prescription opioids?

2    A.    They're a receptacle that people can use to drop

3    their unused opioids.

4    Q.    And are those installed in locations under the

11:51:25  5    direction and in coordination with the DEA regulations,

6    to your understanding?

7    A.    Yes.

8    Q.    All right.

9              And you mention in your report, in

11:51:38 10    Paragraph 62, you refer to these permanent collection

11    sites authorized by the DEA?

12              Is that right?

13    A.    Yes.

14    Q.    And on the next page of your report, we see a

11:51:54 15    picture of such a receptacle.

16              Right?

17    A.    Yes.

18    Q.    And do you know where that receptacle is located?

19              Is it in a DEA-approved site?

11:52:05 20    A.    I believe it's in a pharmacy.

21    Q.    Okay.  And you say in Paragraph 62, that Lake

22    County, across Lake County, there are seven permanent

23    collection sites.

24              Do you see that?

11:52:28 25    A.    Yes.

1    Q.    And those are at Government or police facilities,

2    correct?

3    A.    Yes.

4    Q.    And then you also refer to Trumbull County, and

11:52:41  5    we'll come to that in a minute.

6              Do you know, in addition or beyond the

7    seven sites you mention in Lake County, if there are any

8    others in addition to those seven?

9    A.    Well, at the time that I wrote this report, it was

11:52:56 10    based on the information that I had available to me at

11    the time.

12              And I believe that these reflected the

13    permanent sites.  They certainly reflected the permanent

14    sites that I was aware of at the time I wrote this

11:53:07 15    report, but I'm not aware of, you know, today how many

16    permanent sites there may be.

17    Q.    Were you aware, back when you wrote your report in

18    April, 2021, if those seven were all that was available

19    in Lake County?

11:53:22 20    A.    I -- I don't recall.

21              I mean, I don't recall.

22              The language suggests to me that I felt

23    that these reflected the sites, but there may well have

24    been others that I wasn't aware of.

11:53:39 25    Q.    Do you know whether -- well, let me refer back to

1      your testimony yesterday.

2                      Do you recall you were asked how many drug

3      disposal sites CVS had in its pharmacies in Lake and

4      Trumbull County and you said you don't know?

11:53:56  5                      Do you recall that testimony?

6      A.    Yes, I do.

7      Q.    Do you know whether Walgreens has any take-back

8      receptacles for prescription drugs in any of its

9      pharmacies in Lake County?

11:54:07 10  A.    I would imagine they may, but I don't know.

11     Q.    Okay.  Now, the next sentence in Paragraph 62

12     refers to drug disposal packets.

13                      Do you see that?

14     A.    Yes.

11:54:24 15  Q.    Are drug disposal packets another form of safe

16     disposal of prescription medicines?

17     A.    Yes, they are.

18     Q.    And what are drug disposal packets, please?

19     A.    They're essentially bags that have, you know,

11:54:40 20  chemicals in them that allow for products to

21     be -- pharmaceutical products to be rendered inert and

22     safely, safely thrown away.

23     Q.    Is it possible for someone who has excess

24     prescription medicines, who obtains a drug disposal

11:55:02 25  packet, to safely dispose of a prescription medicine in

1    their home?

2    A.    Yes.  I believe so.

3    Q.    Okay.

4              That would accomplish the goal you said

11:55:12  5    yesterday, at least in that instance, of making it as

6    easy for someone to get a prescription for an opioid as

7    it is to dispose of it?

8    A.    Yes.

9    Q.    In fact, it's a little easier if you already have

11:55:25  10    those, you can do it in your home.

11              Fair enough?

12    A.    Yes.

13    Q.    All right.

14              And do you know whether Walgreens provides

11:55:36  15    drug disposal packets in any of its stores, its

16    pharmacies, in Lake and Trumbull County?

17    A.    I don't.  Again, I wouldn't be surprised if they

18    do, but I don't know for sure.

19    Q.    And I take it then you don't know that Walgreens

11:55:51  20    provides them in pharmacies in Lake and Trumbull County

21    for free to people?

22    A.    I was not aware of that.

23    Q.    And one of your sentences in your report says drug

24    disposal packets are available at no cost across 11 sites

11:56:08  25    in Trumbull, and you refer to public facilities.

```
 1              But you didn't investigate whether any
 2   pharmacies had those as well?
 3   A.    I don't remember the process that I used to vet the
 4   literature in this instance, nor the level of detail in
 5   conversations that I may have had with experts on the
 6   ground to, you know, to produce the information that I
 7   provide here.
 8   Q.    Okay.
 9              And just to be clear, the conversations
10   with the experts on the ground are the 45-minute or so
11   conversations you had with Ms. Fraser in Lake County and
12   Ms. Caraway and Ms. Thorpe in Trumbull County?
13   A.    Yes, as well as reviewing materials relevant to the
14   counties in some cases generated by the counties
15   regarding their activities.
16   Q.    Did you ever go into a Walgreens or CVS or Walmart
17   in Lake and Trumbull County?
18   A.    If I had, it probably would have been when I lived
19   here during medical school, which was many years ago.
20   Q.    Okay.  Certainly not as part of your work in this
21   case, developing your abatement remedies?
22   A.    That's correct.
23   Q.    Do you agree that the provision of the safe
24   disposal programs, whether it's a drug take-back
25   receptacle as permitted by the DEA or the safe disposal
```

1    packets provided as an alternative, are efficient ways to

2    handle the oversupply of prescription opioids?

3    A.    Well, I mean, the -- by far, the most important way

4    is to decrease the oversupply at the start.  Right?

11:57:52  5    Because these are of a highly imperfect way of getting

6    all of the opioids off -- out of bedroom nightstands and

7    bathroom cabinets across these counties.

8              So the single most important way is to

9    decrease the use of these in the first place through

11:58:09 10    other, other parts of the abatement program that I

11    propose.

12             With that being said, I think in -- I think

13    we can do better with respect to collecting all the

14    unused opioids in the community.

11:58:20 15    Q.    And you agree that it has efficiencies when

16    pharmacies provide these disposal methods for customers

17    who have prescription medicines?

18    A.    Well, I don't think it should take the place of

19    many other interventions, including those targeting

11:58:37 20    prescribers and pharmacies per se, but, yes, there is

21    certainly some economy of giving somebody a disposal bag

22    when they get the prescription.

23    Q.    And you say that in the next paragraph of your

24    report, you say that unless disposal programs are

11:58:54 25    convenient, they are unlikely to be widely used and the

Alexander - Cross/Hall                          595

```
         1    use of pharmacies as part of a reverse logistics program,

         2    where the standard distribution system is reversed to

         3    return unused or unwanted product, has many efficiencies.

         4              That's consistent with your view, isn't it,

11:59:08 5    sir?

         6    A.   Yes, it is.

         7    Q.   And now, you mentioned stopping the oversupply at

         8    the start.

         9              That's part of the education of the health

11:59:16 10   care system that you referred to yesterday.

        11              True?

        12    A.   Yes.  And other components of my abatement program,

        13    such as education of the community at large.

        14    Q.   Now, you mentioned that you don't know if Walgreens

11:59:40 15   has a safe disposal receptacle or take-back receptacle in

        16    any of its stores in Lake County.

        17              Right?

        18    A.   Correct.

        19    Q.   You do know that Walgreens does have take-back

11:59:58 20   receptacles in some stores.

        21              Right?

        22    A.   Yes.  I believe that's true.

        23              I believe all the major pharmacy retailers

        24    have, at this point in time, begun to initiate these

12:00:12 25   sorts of programs.
```

Alexander - Cross/Hall

596

1    Q.    In fact, in your report on the very next page, you

2    show a take-back facility -- excuse me -- take-back

3    receptacle in a community pharmacy.

4              Do you see that?

12:00:29  5    A.    Yes.  I believe a Walgreens pharmacy.

6    Q.    Well, you don't say Walgreens, do you?

7    A.    I don't.  No.

8    Q.    And, in fact, there's a Walgreens logo on that

9    receptacle that's been photoshopped out of it, hasn't it?

12:00:45 10    A.    I would need to -- I would need to take a look.

11    Q.    Here's the same photo from Walgreens' web page and

12    we see the Walgreens logo.

13              The photo in your report had Walgreens

14    photoshopped out, right?

12:01:08 15              Did you do that?

16    A.    I may have done so, but I didn't do so for

17    this -- for this report or purpose.

18    Q.    Did anyone, other than you and the plaintiffs'

19    lawyers, have input into the use of that photo?

12:01:23 20    A.    Well, I don't think the plaintiffs' lawyers had any

21    input -- well, I mean I suppose they could have raised

22    concern but I've never been advised -- I didn't engage

23    with the plaintiffs' lawyers about this matter.  And to

24    the degree that I may have removed this logo, it was not

12:01:45 25    as part of litigation that I did so.

1              This is a slide that I've used in many

2       contexts that either predate or are separate from

3       litigation.  And my guess is that in doing so, that I

4       de-branded it, if you will, at some point in time.

12:02:02  5       Q.    Okay.  But there's no doubt you did remove the

6       logo, just so we're clear?

7       A.    Well, I don't -- again, I don't recall the genesis

8       of when this ended up in my opioid slide deck that I

9       typically use, but I think it's well-possible that

12:02:20 10       I -- that I removed the logo, yes.

11                     MR. HALL:  Pass the witness, Your Honor.

12                     THE COURT:  Okay.

13                     The question is how long -- how long do we

14       think redirect and recross will be?

12:02:33 15                     I'm happy to complete it so the Doctor can

16       be on his way if it's going to be relatively short, but

17       again, I don't control the questions.

18                     You all ask them.

19                     MR. LANIER:  Your Honor, I would like to

12:02:44 20       think that I can probably do redirect within 15, maybe 20

21       minutes, but it's pretty short.

22                     THE COURT:  Well --

23                     THE WITNESS:  Your Honor, please, I don't

24       mind waiting whatsoever.  So, please, don't do anything

12:02:59 25       on my behalf.

```
 1              THE COURT:  Well, I've got a matter at
 2   12:30.  I've got to break then.
 3              Maybe we can just see if we can wrap up.
 4   I'd like to see if the Doctor can leave.  So why don't we
 5   move expeditiously?
 6              MR. LANIER:  I'll go as quickly as I can,
 7   Judge.
 8              You listen fast and Sue types fast.
 9        REDIRECT EXAMINATION OF G. CALEB ALEXANDER
10   BY MR. LANIER:
11   Q.   Dr. Alexander, to try to make this go quicker, I
12   have done a roadmap showing how I've reorganized all of
13   these questions so that we've got it in three distinct
14   groups.
15              Okay?
16              There were challenges to the breadth of
17   your plan, to the way you worked up your plan, and to the
18   detail of your plan.
19              And I want to go into each of those areas.
20   I've segregated out the questions into those areas so
21   it's not just chronology of how you were asked.
22              Do you understand me?
23   A.   Yes.
24   Q.   All right.  I think this is the quickest way to do
25   this.
```

1               Let's start with the breadth of your plan.

2               Here's my question.

3               Is the epidemic caused by oversupply of

4      prescription opioids abatable?

12:04:14  5    A.    Yes, it is.

6      Q.    To abate it, must your plan include all patients

7      with Opioid Use Disorder?

8      A.    Yes.

9      Q.    Your plan and nonprescription opioid users, can you

12:04:37 10    solve the legal opioid epidemic by only educating the

11     people who use the drug legally?

12     A.    No.

13     Q.    In other words, can you segregate out the education

14     cost and say, "Only pay attention to this if you have

12:04:54 15    used prescription opioids; otherwise, ignore it"?

16     A.    No.

17     Q.    Can you solve this epidemic among the people who

18     use prescribed opioids by only providing emergency room

19     services and education to those people who use them

12:05:16 20    legally?

21     A.    No.

22     Q.    When someone comes in with an overdose and they're

23     an OD patient in an opioid situation, can you train the

24     doctors to say, "Before you treat them, try to find out

12:05:29 25    if they've ever used a prescription opioid from a certain

Alexander - Redirect/Lanier

600

1  pharmacy"?

2  A.  No.

3  Q.  Can you solve the legal opioid epidemic by ignoring

4  prescription users who have used other drugs as well?

12:05:49 5  A.  No.

6  Q.  The reach of your plan, next question, would your

7  plan turn these communities around and make them models

8  for Ohio?

9          MR. DELINSKY:  Objection, Your Honor.

12:06:04 10          MR. LANIER:  All right.  Let me ask it this

11  way.

12          THE COURT:  I'll sustain it.

13          MR. LANIER:  Yeah.

14          THE COURT:  I'll sustain it that way.

12:06:10 15          MR. LANIER:  Let me ask it -- I'll take

16  that off.  Let me ask it this way.

17  BY MR. LANIER:

18  Q.  Would your plan make a difference if it were put in

19  place?

12:06:17 20  A.  I think it could make a huge difference in the

21  communities, yes.

22  Q.  When you were asked about things like providing

23  needles, when clearly providing needles doesn't do

24  anything for someone who's popping OxyContin, right?

12:06:36 25  A.  True.

1    Q.    But you said it's a bridge to treatment.

2               Would you please explain.

3    A.    Well, if you speak with people that do harm

4    reduction, they'll tell you that the road to recovery is

12:06:49  5    paved with relationships.

6               And programs, such as syringe exchange,

7    often are the only and best entry point into the

8    treatment system for people that may be using, injecting

9    heroin or Fentanyl.

12:07:06  10              So these, these programs aren't just

11    functioning to let people swap needles.  They're

12    functioning to help increase access to an uptake of

13    treatment.

14    Q.    In that regard, you were asked questions about the

12:07:25  15    Hopkins plan, I think it was called.  It was Defendants'

16    Exhibit 49997.

17               Do you remember that?

18    A.    Yes.

19    Q.    In that plan itself, they talk about the importance

12:07:39  20    of needle exchange.

21               Is that fair to say?

22    A.    I wouldn't be surprised.

23    Q.    Is the same true for the Fentanyl testing strips

24    you provide?

12:07:58  25    A.    Yes.

1    Q.    Do they also serve as a bridge to treatment?

2    A.    Yes, they do.

3    Q.    And in that regard, like the Hopkins plan,

4    defendants' 4997, areas of need, it talks about certain

12:08:20  5    geographic areas would benefit from specific programs,

6    such as housing assistance or syringe services programs.

7              Do you include both of those in your plan?

8    A.    Yes, I do.

9    Q.    Last on the plan, breadth.  You were asked

12:08:53 10    questions about the Compton article.

11              Do you remember those?

12    A.    Yes, I do.

13    Q.    And the Compton's article, Compton article was

14    Defendants' Exhibit 4992.

12:09:06 15              First of all, you've already put into

16    context what the concern was in the article.

17              Fair?

18    A.    Yes, I did.

19    Q.    And so to further make sure the record is clear,

12:09:19 20    especially on appeal with regards to this, if we look at

21    the language on Page 156 and 157 as it has this context,

22    it talks about Siegal and others were among the first to

23    suggest the pathway from nonmedical use of opioids to

24    heroin use.  They found that in Ohio, 50 percent of

12:09:45 25    persons 18 to 33 years of age, who had recently begun

1    using heroin, reported having abused opioids, primarily

2    OxyContin, before initiating heroin use.

3                    That was a smaller study, that was an early

4    study, but have you continued to find that to be

12:10:04  5    typically true?

6    A.    Yes.

7    Q.    And this section continues on Page 157, that the,

8    "Studies suggest a clear link between nonmedical use of

9    prescription opioids and heroin use, especially among

12:10:23 10    persons with frequent nonmedical use or those with

11    prescription-opioid abuse or dependence."

12                    Do you find that to be true still today?

13    A.    Yes, I do.

14    Q.    And in conclusion, with this article, there are

12:10:40 15    some suggestions in the conclusion section that talk

16    about prevention efforts that target major risk factors

17    for initiation of opioid use, including the excess

18    availability of prescription opioids.  And other risk

19    factors that can be developed.  Are those things you

12:11:03 20    target in your plan?

21    A.    Yes, they are.

22    Q.    All right.

23                    Let's move on then from the breadth of your

24    plan to the next stop on the road, which is the way you

12:11:18 25    did your workup.

Alexander - Redirect/Lanier                    604

1              Okay?

2    A.    Yes.

3    Q.    Plan workup.

4              First of all, you were asked in regard to

12:11:28 5   your report about Page 29, Paragraph 87.  You said you

6    conducted no focus groups, no qualitative interviews, et

7    cetera.

8              Remember those questions?

9    A.    Yes.

12:11:39 10  Q.    So the record is clear, do you cite the OSAM

11   network who did focus groups and qualitative interviews?

12   A.    Yes, I do.

13   Q.    And do you do that in Paragraph 87 of your report

14   where you say the OSAM network has published semiannual

12:11:59 15  reports since 2000 using trends across eight subregions

16   in Ohio and targeted response initiatives?

17              Do you say that?

18   A.    Yes.  Yes.

19   Q.    And do these include focus groups and qualitative

12:12:14 20  interviews?

21   A.    Yes, they do.

22   Q.    Did you have to go and reinvent the wheel in this

23   case?

24   A.    No, I did not.

12:12:24 25  Q.    Did you feel a need to repeat what OSAM had done as

Alexander - Redirect/Lanier

605

1    if it were insufficient or inadequate?

2    A.    No, I did not.

3    Q.    Next, you were asked about some articles where you

4    had done some OUD survey questions.

5                    Do you remember that?

6    A.    Yes.

7    Q.    And you were shown Defendants' 4995, the article

8    you co-authored with a gal named Canan, or something?

9    A.    Yes, a doctoral student.

10   Q.    Wonderful.

11                   And Defendants' 4994 where you co-authored

12   with a doctor named Bickett, is that correct?

13   A.    Yes.  Another doctoral student.

14   Q.    And I would like for you to talk about whether or

15   not these articles are related or unrelated to your work

16   in this case?

17   A.    Well, I mean, they're related in that they reflect

18   two of many scientific investigations that I've

19   undertaken, but they're completely unrelated, insofar as

20   the plausibility and -- of my doing a primary survey

21   to -- as the optimal means to estimate the proportion of

22   individuals in the county that have Opioid Use Disorder.

23   Q.    Okay.  Next question.

24                   On interviewing, you were asked did you

25   interview and could you even name any OUD victims.

Alexander - Redirect/Lanier                         606

1                        Remember that?

2       A.    Yes.

3       Q.    Would it change anything you did if you knew the

4       name of an OUD victim in Lake or Trumbull County?

12:14:12 5      A.    No.

6       Q.    Can you see how interviewing a victim would have

7       changed any of the abatement plans that you made?

8       A.    No.

9       Q.    Were you challenged on the accuracy of any aspect

12:14:25 10     of your plan by anybody's interview, in any content of

11      any interview?

12                       In other words, did they show you an

13      interview of someone that makes you doubt your plan?

14      A.    You're asking today or yesterday?

12:14:44 15     Q.    Yes.  In the cross-examination.

16      A.    No, I was not.

17      Q.    Have you seen any interviews done by any of their

18      experts that make you feel weak about your plan or

19      question your plan?

12:14:56 20     A.    No, I have not.

21      Q.    Well, you told the Court in testimony yesterday

22      that you did speak with three individuals in this case

23      versus 21 in Cabell County, remember?

24      A.    Yes.

12:15:13 25     Q.    Now, these are larger counties.

1       Is it fair to say that they had better

2   people to answer those questions and you felt like you

3   got adequate information or do you feel like you're

4   missing data you need to get?

12:15:26  5   A.    I didn't feel like I was missing information.

6   Q.    Let's move from plan workup to plan detail, and

7   we'll be done.

8       I don't want the record to reflect that

9   perhaps you did an estimate of an estimate with a target

12:15:45 10   and then an estimate as if it waters down the

11   reliability.

12       You follow me?

13   A.    Yes, I do.

14   Q.    In other words, you remember the whisper game we

12:15:55 15   play as kids where you whisper to somebody and they

16   whisper to somebody, and by the time it makes it all the

17   way around, you've got all sorts of messes.

18       Right?

19   A.    Yes.

12:16:04 20   Q.    So my question to you is where you got targets and

21   where you've got estimates, are they reliable?

22   A.    Yes, they are.

23   Q.    Have you done them in accordance with the expertise

24   and science that your medicine and science has taught

12:16:23 25   you?

1   A.   Yes, I have.

2   Q.   And when you talked then -- all right.  Next

3   subject on your plan detail.

4          You talked about patients receiving

12:16:33  5   treatment, and you were challenged on Plaintiffs' Exhibit

6   23105A, Page 16, Note 2, and let's get that on the

7   screen.

8          Page 16, Note 2, the yearly estimate from

9   40 percent in year one to 60 percent in year 15, and

12:17:08  10   these are your targets for number of people to be

11   treated.

12          Remember?

13   A.   Yes.  The number of people in any given month that

14   would be receiving treatment.

12:17:23  15   Q.   All right.

16          In that regard, I want to make sure that

17   the record is clear.

18          You're talking about 12 months of treatment

19   slots, is that right?

12:17:38  20   A.   Yes.

21   Q.   So during any set month, the goal would be to have

22   40 percent in treatment in those slots.

23          Fair?

24   A.   Yes.

12:17:51  25   Q.   And that's true, whether it's the same person for

```
 1    one month, two months, three months in a row, right?

 2    A.    Yes.  During year one.

 3    Q.    Could be one person one month, they may come back

 4    six months later and need it again, right?

 5    A.    They might.

 6    Q.    But you want those beds available with the goal of

 7    having 40 percent of the OUD numbers being treated each

 8    month.

 9              Is that what you've set out?

10    A.    Yes, based on federal data and, you know, such as I

11    cite to support that input in the redress models.

12    Q.    Now, you were asked about various places in your

13    detail where you give various expert opinions.

14              Correct?

15    A.    Yes.

16    Q.    Are you comfortable with your estimates and goals

17    as informed by your expert opinion?

18    A.    Yes.

19    Q.    And comfortable is not a good legal word, and

20    Pete's going to correct me when I sit down so I want to

21    fix it now.

22              Are you saying with reasonable scientific

23    and medical certainty that you can say that your

24    estimates and goals are probable, more likely than not?

25    A.    Yes.
```

```
 1   Q.    And that is as to the numbers that you believe can

 2   be utilizing Drug Courts?

 3   A.    Yes.

 4   Q.    Do we want more people in those programs than are

 5   in them now?

 6   A.    Substantially more.

 7   Q.    Is that true as to where you expect that four

 8   police departments will need an L-E-A-D program?

 9   A.    Yes.

10   Q.    Are you saying that you can't fit five into one?

11   A.    Well, I provide sources for all of the inputs, and

12   the inputs reflect my best scientific and epidemiologic

13   judgment.

14   Q.    And does the same judgment inform your input on the

15   number of needed counselors?

16   A.    Yes.

17   Q.    If we're going to do this, do you want to

18   shortchange the counseling and the program?

19   A.    No.   That's -- that's often part of the problem,

20   and it needs to be part of the solution.

21   Q.    Did it inform the transportation needs?

22   A.    Yes, it did.

23   Q.    And if these numbers need to go up or go down, as

24   this is being implemented, would we know that?  Would His

25   Honor know that with your recommended annual reviews?
```

Timestamps: 12:19:23 (line 5), 12:19:35 (line 10), 12:19:53 (line 15), 12:20:02 (line 20), 12:20:19 (line 25)

1   A.    Well, I don't stipulate a particular cycle for

2   reviews, but I highlight many important measures that I

3   think can be tracked at varying intervals that the

4   counties and Your Honor would be -- have the opportunity

12:20:39  5   to use to make decisions going forward.

6   Q.    All right.

7                   Then there was a great deal of focus, seven

8   minutes by Mr. Delinsky by my count, on transportation

9   questions.

12:20:49 10                 Are you familiar with the term

11   "Micromanaging"?

12   A.    Yes.

13   Q.    Do you give reasonable funding and options for

14   transportation?

12:21:01 15   A.    I believe so, yes.

16   Q.    Do you tell the county exactly who needs what kind

17   of ride on what day of the week and how much it's going

18   to cost?

19   A.    No.  I mean, that sort of effort would collapse

12:21:14 20   under its own weight.

21   Q.    Do you leave the means and the methods to the

22   counties?

23   A.    Yes.

24   Q.    Do you, however, include monitoring, leadership,

12:21:25 25   stewardship, training and roles to make sure this is done

1    responsibly?

2    A.   Yes, I do.

3    Q.   And again, if His Honor's got an ability to review

4    this annually to see if the transportation's adequate or

12:21:39  5    too much, then that could tweak the model.

6              Is that fair to say?

7    A.   Yes, it could.

8    Q.   Next.

9              You were told that you, in 4A, do not cite

12:21:55 10   to Dr. Young.

11             I just to want make sure that the record is

12   clear.

13             You gave a report, and these spreadsheets

14   are an appendix to your report.

12:22:06 15            True?

16   A.   Yes.

17   Q.   And in 4A of your report, you've got a footnote

18   where you say specifically, "Additional testimony and

19   evidence regarding these populations is provided by

12:22:20 20   Dr. Nancy Young in her expert report.  I incorporate some

21   of this evidence into my redress models for pregnant

22   women, new mothers and infants."

23             You did say that, didn't you?

24   A.   Yes.

12:22:36 25   Q.   Next question.

1              NSDUH usage in Rhode Island.

2                   Can you explain why you used that number in

3      Rhode Island specifically in the Apollo model?

4      A.   Well, I use it in Apollo to estimate the number of

12:22:53  5      individuals with nonmedical prescription opioid use and

6      Opioid Use Disorder, heroin use disorder, but as was -- I

7      had the opportunity to clarify for the record, during a

8      few minutes ago, I don't take the number straight out of

9      NSDUH, and we modify it and we do so appropriately, based

12:23:16 10      on scientific information that demonstrates unequivocally

11      that NSDUH undercounts the population, especially the

12      population with heroin use disorder.

13      Q.   So you used Apollo in Rhode Island?

14      A.   Yes.

12:23:30 15      Q.   If Apollo was just NSDUH, wouldn't you just call it

16      NSDUH?

17      A.   Yes.

18      Q.   Almost done.

19                   The article that had the 6.6 percent,

12:23:57 20      remember the questions on those articles by the lawyer

21      for Walgreens?

22      A.   Yes.

23      Q.   My whole point is you hadn't seen or used this.

24                   You didn't rely on this for the 6.6

12:24:09 25      percent, did you?

Alexander - Redirect/Lanier                    614

1    A.    I didn't use the 6.6 percent to estimate the

2    population in question.

3    Q.    That's all I wanted to clarify.

4                  But as for doctor education, that is an

12:24:25  5    important thing to do, isn't it?

6    A.    It's vital.

7    Q.    Then the questions on pharmacies and bags for the

8    unused stuff, unused prescription drugs, remember?

9    A.    Yes.

12:24:41 10    Q.    Now, there's a difference between, for example, a

11    bag being available and a bag being given.

12                         True?

13    A.    Yes.

14    Q.    As His Honor puts together an abatement plan, do

12:25:00 15    you believe it would be useful to order pharmacies to

16    give a bag with every opioid prescription?

17    A.    Well, I would want to give that a little thought,

18    but clearly there are, with great ease, one can use the

19    records that pharmacies have to identify patients that,

12:25:21 20    by all means, would be -- it would be smartest to give

21    this to.

22                  So, for example, someone just getting six

23    tablets for an ankle sprain which, frankly, is about the

24    number that they should be getting of an

12:25:35 25    immediate-release opioid in an instance where it's

 1    indicated, I don't know that a bag would be absolutely

 2    vital.

 3                  But I do think there's an important

 4    difference between bags being available and bags being

 5    given.  And I also would just again say that this is,

 6    should by no means be a substitute for concerted efforts

 7    to reduce the amount of opioids that are leaving the

 8    pharmacies in the first place.

 9    Q.    All right.  Related question.

10                  Would it be useful to order that a box had

11    to be in every store that's selling drugs?

12    A.    Yes.

13    Q.    And then on the photo, did you -- this just is me

14    being a lawyer for a moment.

15                  Did you actually have Walgreens' permission

16    to use their logo when you made presentations?

17    A.    I did not.

18    Q.    I'd keep it off.

19                  I'm through, Your Honor.  I pass the

20    witness.

21                  THE COURT:  All right.  About how long do

22    you think we'll be?

23                  MR. DELINSKY:  Your Honor, I don't think

24    I'll be five minutes.

25                  I might be five.  I can't speak for my

```
 1   other co-defendants.
 2                     THE COURT:  All right.  Why don't we --
 3                     MR. DELINSKY:  But I can go, I can finish.
 4                     Jeff, do you have questions?
 5                     MR. HALL:  Sixty seconds.
 6                     MR. DELINSKY:  I think we can.
 7                     THE COURT:  All right.  That's fine.
 8                     MR. DELINSKY:  All right.
 9               RECROSS-EXAMINATION OF G. CALEB ALEXANDER
10   BY MR. DELINSKY:
11   Q.    We're moving fast, Doctor.
12                     You've just been handed what's been marked
13   as CVS MDL 5006, correct?
14   A.    Yes.
15   Q.    Okay.
16                     This is a technical appendix to your
17   redress models and abatement plan in the State of
18   Washington, correct?
19   A.    Yes.  I believe so.
20   Q.    I'm going to show you -- and you can look on Page 5
21   of the document.  You set forth your means of estimating
22   the prescription Opioid Use Disorder population, correct?
23   A.    Yes.
24   Q.    You characterize that population as B4, correct?
25   A.    Yes.
```

1    Q.    So B4, the prescription Opioid Use Disorder

2    population, is based on the NSDUH average annual rate of

3    prescription Opioid Use Disorder between 2002 and 2014

4    multiplied by the 2010 Washington population, correct?

12:28:08  5    A.    Yes.

6    Q.    And that's what you did in Washington, correct?

7    A.    I -- yes.

8    Q.    Okay.

9              Now, let's move, again, in the spirit of

12:28:17 10    speed, to the Compton article that Mr. Lanier asked you

11    questions about.

12    A.    Okay.

13    Q.    Okay?

14              And he asked you questions about the Siegal

12:28:31 15    study, correct?

16    A.    Yes.

17    Q.    About nonmedical use of opioids and the degree to

18    which that may or may not lead to heroin in Ohio.

19    Correct?

12:28:43 20    A.    Yes.

21    Q.    Okay.

22              But if we go to the second column on that

23    same page, Compton and Jones and the other co-author

24    explain that what they're trying to do in this article is

12:28:58 25    examine whether the findings from these small studies,

1    including Siegal, were consistent with the findings in

2    the broader population of nonmedical users?

3                    Correct?

4    A.    Yes.

12:29:14  5    Q.    Okay.

6                    And before we leave that document, all of

7    these studies involving prescription opioids and heroin

8    use involve the nonmedical use of prescription opioids,

9    correct?

12:29:30 10    A.    I would need to review the original source studies.

11    Q.    The Compton article concerns the nonmedical use of

12    prescription opioids, correct?

13    A.    Yes.  Yes, it does.

14    Q.    Okay.  One last area of questioning.

12:29:53 15                    The OSAM reports, okay, that Mr. Lanier

16    asked you about, the OSAM reports were not dedicated to

17    Trumbull County, correct?

18    A.    Correct.

19    Q.    They were not dedicated to Lake County, correct?

12:30:05 20    A.    Correct.

21    Q.    Reading an OSAM report is not the same as

22    interviewing the Chief Judge of the Lake County Drug

23    Courts and asking that person how many more slots do you

24    need, is it?

12:30:20 25    A.    Well, those are -- those are different -- yes,

```
 1   those are -- if you're asking whether those are the same

 2   thing, those are different things.

 3   Q.    Okay.

 4              And it's also a different thing from

 5   reading the OSAM report to ask the head of the Lake

 6   Geauga Treatment Center how many more beds they need,

 7   correct?

 8   A.    Yes.

 9              MR. DELINSKY:  Okay.  Thank you.

10              I have no further questions, Your Honor.

11              MR. HALL:  I don't have any, Your Honor.

12              THE COURT:  Okay.  Ms. Fumerton.

13              MS. FUMERTON:  None from Walmart, Your

14   Honor.

15              THE COURT:  Okay.

16              MR. LANIER:  Can I make one clarification

17   for the record?

18              The Chief Judge of the Lake County Drug

19   Courts, Lake County does not have any Drug Courts.

20              Thank you, Judge.

21              THE COURT:  All right.  Okay.  We'll take a

22   lunch break.

23              Doctor, thank you very much.

24              THE WITNESS:  Thank you very much, Your

25   Honor.
```

1          THE COURT:  Have safe travels.

2          (Witness excused.)

3          THE COURT:  We will re-assemble at 1:30.

4          Have a good lunch.

12:31:21    5          (Proceedings concluded at 12:31 p.m.)

6                    -  -  -  - -

1          THURSDAY, MAY 12, 2022, 1:33 P.M.

2               THE COURT:  Everyone can be seated and I

3     guess the Government may call its next witness.

4               MR. LANIER:  Yes, Your Honor.

13:33:17  5               And as they bring Dr. Burke here, we have

6     decided in the interest of time and the record not to put

7     on the stand our last two witnesses so we will be resting

8     after this.

9               It was a curve ball we threw the

13:33:33 10     defendants.  And in talking to the defendants over lunch,

11     if the Court does not mind, the parties would like to

12     take tomorrow off and then we will still finish before

13     the end of next week, but they've got their witnesses

14     lined up to start Monday morning.

13:33:49 15               And it seems to keep that schedule would

16     work with us.  If that's okay with the Court.  But we

17     want to obviously do whatever the Court feels.

18               THE COURT:  Okay.  Do you think we will

19     finish with Dr. Burke today?

13:34:02 20               MR. WEINBERGER:  Yes.

21               THE COURT:  I mean, there may be lengthy

22     cross-examination.  So, I mean, we should definitely

23     conclude with him.

24               MR. LANIER:  No question.  And if he runs

13:34:13 25     over until tomorrow, we run over until tomorrow.

```
 1              THE COURT:  All right.  So I don't -- I
 2   don't have a compelling problem.
 3              I do want to finish next week.  I mean,
 4   although I did -- I could, if I had to, go on to the
 5   23rd.  It would cause some issues, and I'd rather
 6   conclude next week.
 7              MR. LANIER:  We will be done next week,
 8   Judge.
 9              THE COURT:  Okay.
10              MR. LANIER:  You have my word on that.
11              THE COURT:  All right.
12              MR. DELINSKY:  And, Judge, just to add, it
13   is a little bit of a curve ball.  Of course, this stuff
14   happens through trial.
15              THE COURT:  Right.
16              MR. DELINSKY:  It's through no fault
17   whatsoever, but we just have to think through what this
18   means to the presentation of our case; do we need to, you
19   know, present county evidence of our own or not.
20              THE COURT:  I see.
21              MR. DELINSKY:  We have to figure it out the
22   answers to those questions.  So we'd appreciate the day,
23   Your Honor.  And I would just like to reiterate what
24   Mr. Lanier said, we will be done by the end of next week.
25              THE COURT:  All right.
```

1           MR. DELINSKY:  Assuming he doesn't conduct

2      the standard Lanier cross-examination.

3           THE COURT:  I mean he hasn't used much time

4      on direct so we'll see.

13:35:18   5           All right.  We'll go with Dr. Burke.

6           MR. WEINBERGER:  Just right up to the

7      witness stand.

8           THE COURT:  Hello, Doctor.  If you would

9      raise your right hand.

13:36:50  10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    JOHN F. BURKE,

2        of lawful age, a witness called by the PLAINTIFFS,

3              being first duly sworn, was examined

4                 and testified as follows:

13:36:56  5                THE COURT:  Thank you.

6                MR. WEINBERGER:  May I proceed, Your Honor?

7                THE COURT:  Yes, Mr. Weinberger.

8           DIRECT EXAMINATION OF JOHN F. BURKE

9     BY MR. WEINBERGER:

13:37:27 10     Q.    Would you please state your full name.

11     A.    Yes, sir.  My name is John F. Burke, Jr.

12     Q.    Dr. Burke, what is your profession?

13     A.    Excuse me?

14     Q.    What is your profession?

13:37:37 15     A.    I'm an economist.

16     Q.    What is the -- what does it mean to be an

17     economist?

18     A.    An economist is a social scientist that looks at us

19     people, primarily in terms of how do we earn our living,

13:37:53 20     do we sell our time for a wage or a salary, do we rent

21     out a building or a piece of land, do we get dividends,

22     how do we earn our living, and then how do we turn around

23     and spend that on food, clothing, shelter,

24     transportation, recreation, medicine.

13:38:08 25                    Add all those spendings up and it turns out

1    to be called gross national product.

2    Q.    Dr. Burke, I have put in front of you a large

3    folder that contains your report, which is marked as P

4    23127.  And at Page 389 to 398 is your CV, but I'm going

13:38:39  5    to put it up.  I'm going to put your CV up on the Elmo.

6              There's actually two volumes, Dr. Burke.

7    So let's just, if we can just go with the Elmo, your CV

8    starts at Page 389 of that exhibit, and I know you don't

9    need your CV, but why don't you tell the Court a little

13:39:07 10   bit about your background, education, what led you to

11   ultimately your Ph.D. in economics?

12   A.    Yes, sir.

13              I grew up in the Boston, Massachusetts

14   area, went to primary and secondary schools there.

13:39:22 15             Right out of high school, I served a tour

16   of duty in the United States Navy where I got my best

17   education.

18              After the Navy, I attended Boston College,

19   getting a degree in economics in 1961.  I was then

13:39:37 20   awarded a full scholarship to attend the University of

21   Notre Dame in South Bend, Indiana.  Got a Master's Degree

22   from Notre Dame in 1963.

23              And then a Ph.D. doctor of philosophy in

24   economics in 1967.

13:39:51 25             That's my formal education, but I still

1    consider myself to be a student of economics.  I'm still

2    reading, I'm still learning, I'm still trying to move up

3    the curve.

4    Q.    And have you been a teacher and Professor of

13:40:06  5    economics?

6    A.    Yes.  Yes, sir.

7                    That's what I've done for most of my life.

8                    I was a teacher at the University of Notre

9    Dame, a teaching assistant, and then I was an instructor

13:40:17 10    at Indiana University.

11                    I then moved down to southern Illinois and

12    taught at East Illinois University for a couple of years.

13                    I then moved my family to Cleveland, Ohio,

14    to take a job at what was then a brand new school in

13:40:32 15    Cleveland, Ohio.  That first year at Cleveland State.  We

16    were teaching in World War II Quonset Huts.  Quite a

17    school now.

18                    I taught there for 27 years.  I retired

19    from full-time teaching.  After 27 years at Cleveland

13:40:49 20    State, and with 37 years of public service, they let you

21    count your military time, also, and I was out of the

22    classroom for a couple of years, but then John Carroll

23    University called and I spent 21 years teaching

24    economics, mostly money and banking, at John Carroll.

13:41:05 25                    I retired from full-time teaching last

1    year.

2    Q.    And, Dr. Burke, do you have a corporation known as

3    Burke Rosen & Associates?

4    A.    Yes, that's an Ohio corporation and that's the

5    d/b/a.

6    Q.    Okay.  And do you practice in the field of

7    economics with Harvey Rosen?

8    A.    I do.

9    Q.    And how long has that been the case?

10   A.    In a formal sense, since 1973.

11              And in an informal sense, since 1967 when I

12   first moved to Cleveland, Harvey Rosen was my roommate at

13   Cleveland State University.

14              We shared an office.

15   Q.    And, Dr. Burke, have you, in addition to teaching,

16   have you also served as an expert witness for the last 50

17   years in civil litigation?

18   A.    Yes, sir, I have.

19              The first time a lawyer called me, I was

20   living in Illinois and it was 1966.

21   Q.    And explain to the Court some of the variety of

22   cases that, in which you've testified.  Some that, you

23   know, come to mind as most important or most significant.

24   A.    Yes, sir.

25              I testified in a variety of cases, always

1    on economics.  I'm never involved in who did what to who

2    or who's right or wrong.  I'm just a numbers guy.

3                 Some of the cases I've testified in, we

4    worked for Federal Judge Rubin in Cincinnati in the

13:42:39  5    Beverly Hills Supper Club fire, a nightclub that burned

6    down in the Cincinnati, Ohio area.

7                 We worked on the Bhopal India case where

8    Union Carbide let some kind of gas or something out into

9    the atmosphere and two or 300,000 members of the Indian

13:42:58 10    state were killed.

11                 Worked on the balcony collapse at the Hyatt

12    Regency.

13                 Worked on the bankruptcy in Federal Court

14    in Cincinnati of a company that made asbestos products.

13:43:14 15                 Worked on the 911 cases in New York City.

16                 Worked on the tragedy that happened at

17    Gander when a military flight crashed up there.  They

18    later made a Broadway play out of part of that action.

19                 Those are some of the cases I've worked on

13:43:40 20    with Harvey Rosen.

21    Q.    And have you been a consultant in cases on behalf

22    of both plaintiffs and defendants?

23    A.    Yes, sir.

24                 But if you get into either personal injury

13:43:52 25    or wrongful death kind of cases, in those kind of cases,

Burke - Direct/Weinberger                     629

1    it's almost always the plaintiffs' attorney that calls.

2    Defense attorneys seldom call.

3                 But you get into other kinds of cases,

4    stock cases or business evaluation cases or

13:44:09  5    discrimination cases or divorce cases, that's more 50/50,

6    60/40.

7    Q.    Rather than have you search through the materials

8    for a complete copy of your CV, I'm going to approach

9    you, if I may, and just ask you whether 83127, Pages 389

13:44:31  10   to 398, is an accurate copy of your curriculum vitae?

11   A.    Yes, sir, it is.

12   Q.    Have you and I worked on cases together in the

13   past?

14   A.    Yes, we have, for many years.

13:44:52  15   Q.    And you've also served as an economist for other

16   members of my firm going back a number of years?

17   A.    Yes, sir, I have.

18                 Indeed, I've worked for members of your

19   firm before you were a member of that firm.

13:45:08  20                 (Laughter.)

21   Q.    So that was just five or six years ago, right?

22   A.    Yes, sir.

23   Q.    All right.  What -- well, let me ask you this.

24                 Originally, initially, and including the

13:45:23  25   report that's before you, was authored by your partner,

1    Harvey Rosen?

2    A.    Yes.

3    Q.    Correct?

4          And last fall, did we ask you to step in

13:45:37 5    his shoes because of medical issues that Dr. Harvey Rosen

6    was suffering from?

7    A.    Yes, sir.

8    Q.    Can you elucidate that a little bit without getting

9    too much into his privacy?

13:45:50 10   A.    Harvey got diagnosed with pancreatic cancer.  So

11   far so good.

12         But he was unable to testify.  He couldn't

13   come to court, he couldn't appear in a deposition, and

14   Harvey and I worked together on all our cases, and he

13:46:07 15   asked me if I would step in and take over this case for

16   him.  And by the way, he did the same thing for me 20

17   years ago when I had bladder cancer.

18         So we go back and forth a lot.

19   Q.    All right.

13:46:22 20        The methodology, I'm going to ask you to

21   describe the methodology that was utilized in order for

22   you to come to your opinions in this case, but is the

23   methodology that is used by Burke Rosen used by both of

24   you, both of you in a similar fashion?

13:46:38 25   A.    Yes.  Not only is it used by both of us, but we've

1    put the methodology together ourselves 40 or 50 years

2    ago, and we together bring up the documents that we need

3    to perform that methodology.

4    Q.    All right.

13:46:55 5              So we retained, that is to say Lake and

6    Trumbull County, through counsel, retained Burke Rosen to

7    evaluate the remedy being sought by the counties in this

8    case, correct?

9    A.    Yes, sir.

13:47:16 10   Q.    And what did -- what were you asked to do?

11   A.    We were given a report prepared by a doctor named

12   Caleb Alexander, and we were asked to determine what the

13   cost would be of this remedial project in the Alexander

14   report.

13:47:35 15             We were asked to determine what the total

16   cost would be over a period of about 15 years.  And last

17   year, we were asked to determine the present value of

18   that plan, how much money you would need in total last

19   year in order to finance that plan so that you could

13:47:56 20   perform every item in Dr. Alexander's plan.

21              And at the end of the time period, end up

22   with zero money.  Do not have a surplus, do not have a

23   deficit.

24   Q.    All right.  So what is the -- what is it that you

13:48:12 25   did?

1            What's the methodology that you utilized?

2       Obviously, you've told us that you started with

3       Dr. Alexander's redress model for both counties, but tell

4       us the methodology that you went through.

13:48:27  5       A.    The methodology is kind of simple.  And like

6       everything else when you figure it out, it is kind of

7       simple and it's straightforward.

8                   So you really need to know just four pieces

9       of information.

13:48:42  10                  One of those pieces of information is how

11       long.  In this case, Alexander's report covers 15 years.

12                  The second piece of information you need is

13       a starting out point, a starting out cost.  Perhaps

14       you're going to hire somebody to perform a service.  What

13:49:03  15       is that figure today?  What does that figure cost today?

16       Or perhaps it's going to be a procedure, or perhaps it's

17       going to be a drug.  What does it cost today?  That's

18       step two.

19                  Step three is to say what do you anticipate

13:49:15  20       is going to happen to the cost of this item over the next

21       15 years?  Is it going to be constant; you know, a

22       thousand dollars this year, next year, next year, next

23       year, 15 years, or is it gradually going to grow from a

24       thousand to eleven hundred, 1300, to 1700, to 2000, or is

13:49:38  25       it going to decline?  Is it a thousand now, declining to

Burke - Direct/Weinberger                 633

1    800, 600, 400, three hundred?

2                    So that's step three.

3                    What is the growth rate you would apply,

4    positive or negative, to the cost of providing this

13:49:52  5    service or this item or this drug.

6                    And the fourth step is to determine what

7    are safe interest rates, what rates of return can you get

8    on your money if you get it today?  What can I invest it

9    at in a safe investment?  Because this is money that has

13:50:14 10    to be there over a period of time.

11                    So I like to say if you stop a random

12    economist on the street, and there's 70 or 80,000

13    economists in the United States, and you say to them you

14    need something for 15 years, it costs $100,000 per year

13:50:32 15    right now, it's going to grow at a rate of increase that

16    keeps pace with inflation plus two points above, two

17    percentage points above inflation, and you're going to

18    bring it back to present value at the rate of interest

19    you can get on U.S. Government bonds, what's the present

13:50:53 20    value of that sum?

21                    Every one of those 70 or 80,000 economists

22    is going to give you exactly the same answer to that

23    question because you gave them the four ingredients that

24    are needed:  Time, amount today, growth, discount.

13:51:15 25    Q.    All right.

1          Now, we've talked about the redress model

2     that you followed.  And let me just for the record

3     identify it as, for Lake County, P 23105A.  That's

4     actually under your file here in front of you if you ever

13:51:44  5     need to refer to it.

6     A.    Yes, and I have my own copy, too.

7     Q.    Okay.  And for Trumbull County, it's P 235105 B.

8          Do you recognize these two documents?

9     A.    Yes, sir, I do.

13:52:04 10     Q.    All right.

11          Now, in addition to the Alexander Monument

12     and analytics redress models, what other sources of

13     information did you have to utilize in order to evaluate

14     the costs from the standpoint of an economist?

13:52:28 15     A.    Well, Dr. Alexander's model told us what was needed

16     and also the time period.

17          So that question is answered.  Fifteen

18     years.

19          We then went out and looked at the various

13:52:41 20     items that are in that Life Care plan, and just to

21     make --

22     Q.    You called it a Life Care plan.

23     A.    Well, it's like a Life Care plan.  We treated it

24     like a Life Care plan but it's a Life Care plan for a

13:52:54 25     county.  It's a Life Care plan to fix a remediation

Burke - Direct/Weinberger                     635

1    needed in a county, what do you have to do to achieve

2    that.

3                So we looked at the various items.  And

4    just, for example, you might need a social worker to

13:53:07   5    perform a service.  So we went out and looked up the cost

6    of a social worker.

7                If Dr. Alexander's plan called for two

8    social workers, or one, or a part-time like .3 or two, we

9    went out and looked up the cost of a social worker.

13:53:25  10                We looked that up in the standard

11    industrial classification codes of the United States for

12    two areas, for the Lake County SMSA, which is part of

13    Cleveland, and for the Trumbull County, SMSA, which is a

14    separate, distinct economic area.

13:53:47  15                So that gave us the basis.  It might say

16    that social worker is $100,000.  We also then figured out

17    what fringe benefits you might have to pay that worker.

18    We then had to come up with a growth rate.  So if we had

19    enough statistics, we would look at what has happened to

13:54:08  20    the cost of social workers.

21                If we didn't have that, we would look at

22    the overall increase in wages for citizens in the United

23    States who are members of the labor force, and then the

24    last step is to go look at the Treasury Department and

13:54:26  25    see what the interest rates are.

1    Q.    Okay.

2                Now, originally, Burke Rosen or Dr. Rosen

3    issued a report on April 16th, 2021.  And subsequent to

4    that, you gave a deposition in February.  I think it was

13:54:47  5    in February of this year.

6    A.    Yes, sir.

7    Q.    Do you recall that?

8                And both before and after the deposition,

9    did you and Dr. Rosen make some modifications to your

13:55:01 10    report to correct some calculation issues that existed in

11    the first report?

12    A.    Yes.  We made some mistakes.  Those mistakes were

13    pointed out to us.  It's always been my policy when you

14    make a mistake, correct it.

13:55:15 15    Q.    All right.

16                And so you then issued your report, which

17    has been marked as P 23127, which is actually dated April

18    22nd, 2022?

19                Correct?

13:55:31 20    A.    Yes.

21    Q.    And after your deposition, did you also add to this

22    report, to each page of the report, an explanation, a

23    more full explanation, as to the sources of material that

24    you used to come to your conclusion on that particular

13:55:54 25    page of the chart?

A.    Yes, sir.  We thought that made it more obvious what we did and how we did it.

Didn't change the numbers, but it just made it more obvious.  If some other scientist, some other economist wanted to look at it, they would know exactly what we did, how we did it.

Q.    All right.  So let's -- let's go to your report.

I'm going to show it.  I'm going to show some examples of what you did.

So this is the -- this is Page 16 of 232 of your report.  It's -- the Bates stamp number is Page 16 of the report.

And let me see if I can get it a little closer.  Okay.  There we go.

So at the top of this page is listed Schedule 1A1.  And by the way, this is from the Lake portion of your report, Exhibit 1-1, entitled, "Category 1:  Prevention-Reducing Opioid Oversupply and Improving Safe Opioid Use."

And that's page 15 -- I'm sorry, yeah, Page 15 of P 23127.

Is that correct?

A.    Yes, sir.

Q.    All right.  So have you organized your report to track the Monument Analytics Caleb Alexander Redress

1    Model Exhibit?

2    A.    Yes, sir.

3    Q.    And --

4    A.    For the most part, we did that.  It's not

13:57:40 5    identical, but for the most part, we tracked it exactly.

6    Q.    So you did it by category.  So, for example, on

7    this particular page that I'm showing, it shows Alexander

8    Monument Analytics Category 1, and it shows all of the

9    subsections or subcategories of it, 1A to 1F, correct?

13:58:01 10    A.    Yes, sir.

11    Q.    Okay.

12                So then when we go to the very next page of

13    the report, this is entitled "Section 1A1, Showing Health

14    Professional Education Total Cost And Present Value,

13:58:21 15    2021-2035."

16                So explain to us what you did to formulate

17    and create this report.  This page of this report.

18    A.    Yes, sir.

19                The first column is Alexander's.  He laid

13:58:42 20    out the 15 years.  So it went from 2021 to 2035.

21                And what he's calling for here is a person

22    to deal with pharmacists.  So we looked at and we cite a

23    standard occupational category up there for how

24    much -- how much a pharmacist makes, how much the average

13:59:05 25    pharmacists make.

Burke - Direct/Weinberger

639

1          And in 2021, we thought that would be about

2     $135,865.

3          Now, to arrive at that figure, we looked at

4     that --

13:59:21  5   Q.   I'm going to go to the next page.

6          Is that what you're looking at?

7     A.   To the next page.

8     Q.   So this is -- this also shows Page 16 of 232, as

9     does this first page.  And basically this is -- this is

13:59:35 10   the backup information for the first page that I showed

11     you.

12          Correct?

13     A.   Yes.

14     Q.   All right.  So what is --

13:59:45 15   A.   So we could get --

16     Q.   What did you do?

17     A.   We could get data from the year 2019 that said they

18     made about $126,150.

19          We then had to come up with a growth rate

13:59:58 20   from 2019 to 2021, and that growth rate was initially

21     4.57, but it then declined to 2.99, which is a movement

22     in the -- in prices.

23          And if we make that movement every year,

24     then you go from 126 up to 135.  That is our base for the

14:00:25 25   year 2021.

1            And that brings us back to the first page

2       again, and that's where we have that $135,865 as the

3       starting point.

4            We then calculated fringe benefits.  And

14:00:42  5       although there are a lot of fringe benefits out there,

6       that range from legally required fringe benefits to stock

7       options and company cars and expense accounts, we only

8       looked at three of them.

9            We looked at the legally required, which is

14:00:59 10       mostly the employer's contribution to the Social Security

11       trust funds, and we looked at a medical plan.  Most

12       companies provide a medical plan.  You may put something

13       into the medical plan.  Your employer may put something

14       into the medical plan.  We looked at the portion the

14:01:20 15       employer put in.

16            And then lastly, there was a category for

17       savings, retirement, which are things like pension funds

18       and 401(k)s and Keogh plans and savings plans, company

19       matches.

14:01:33 20            So that gave us the fringe benefit column.

21            The next column is just those, just Columns

22       2 and 3 added together, and then Dr. Alexander said you

23       didn't need a full-time person doing this all the time

24       2080 hours a year; you only need this person doing this

14:01:57 25       job about a third of the time, .3.

1          So we took .3 of a person and that gave us

2     the next column, which is $53,310.

3          And last year, the present value and the

4     amount would be the same.  But as you can see in the

14:02:17  5   column called "Total Cost," over a period of time in the

6     future, that is going to grow from that 135,000 start,

7     it's going to grow into the future.  And then we're going

8     to discount it back to present value.

9     Q.    All right.

14:02:35 10        So did you do this same exercise for every

11    one of the categories and subcategories from Monument

12    Analytics, Dr. Caleb Alexander's redress models for both

13    counties?

14    A.    Every one.  Yes, sir.

14:03:00 15        The only constant was the 15 years.  We

16    frequently had to figure out a starting point.  We

17    frequently had to figure out a growth rate.  And then we

18    used the same discount rates for all columns.

19    Q.    And this, this exercise that you went through that

14:03:20 20   led to the production of this report, and particularly

21    these charts that go from Page 14 of your report to

22    Page 349 of your report -- I'm sorry -- to Page 183 of

23    your report, Bates stamp 349 -- let me back up.

24        This report, which is contained in P 23127,

14:04:00 25   Bates stamp 14, through Bates stamp 349, are all charts

          1     and tables that you created in similar fashion to the one

          2     that we just went through?

          3     A.    Yes.

          4                 The methodology is the same in all of them.

14:04:19  5     The numbers are going to be different, but the

          6     methodology is the same.

          7     Q.    Okay.

          8                 And when you did this, did you reach these

          9     opinions that's contained in these charts using a

14:04:35 10     reasonable degree of economic certainty?

         11     A.    Yes, sir.

         12                 MR. WEINBERGER:  So, Your Honor, at this

         13     point, we would move to have admitted into evidence P

         14     23127, Bates stamp 14 through 349.

14:05:06 15                 MS. FUMERTON:  Your Honor, defendants renew

         16     their objection to the expert reports coming in

         17     wholesale, but we also understand your position

         18     yesterday.  So we would object but, you know, subject to

         19     obviously your ruling.

14:05:19 20                 THE COURT:  Well, Mr. Weinberger, let's,

         21     just so the record is clear, if I'm -- it looks to me

         22     like Pages 9, 10, and 11 and 12 are the summaries.

         23                 Is that right?

         24                 MR. WEINBERGER:  They are the summaries and

14:05:42 25     I intended -- I intended to handle that separately, Your

1    Honor.

2                     THE COURT:  Well, why don't you have the

3    Doctor just identify, go through those summaries, which I

4    think everything, everything else is basically backup and

14:06:01  5    detail, correct?

6                     It's the backup and the detail and

7    explanation for the figures on the summary, Pages 9

8    through 13, correct?

9                     MR. WEINBERGER:  Yes, Your Honor.

14:06:09 10                     THE COURT:  All right.

11                     Well, why don't you, just so the record is

12    clear, if anyone ever looks at it, there will be

13    testimony on this.

14                     MR. WEINBERGER:  Your Honor, were you going

14:06:46 15    to say something else?

16                     THE COURT:  No, I want you to do that so

17    the record is clear.

18                     MR. WEINBERGER:  Yes.

19                     But to be clear, it is -- I understand the

14:06:56 20    importance of the summaries and we will go through those,

21    Your Honor.

22                     And it is true that the rest of the report

23    are backup to the summaries, but to the extent that the

24    Court intends to pick or choose, in its discretion, it is

14:07:17 25    important that each of these charts go into evidence,

 1    Your Honor, because it deals with each subcategory of the

 2    abatement plan.

 3                    THE COURT:  I understand that.

 4                    So, Doctor, essentially each of these pages

14:07:36  5    refers to an element of Dr. Alexander's plan for Lake

 6    County or Trumbull County, and it breaks it down year by

 7    year, 2021 to 2035, and it reflects your calculations of

 8    the cost per year?  Is that right?

 9                    Each of those, each of those elements of

14:08:04 10    Dr. Alexander's redress plan?

11                    MR. WEINBERGER:  That is a question for

12    you, Dr. Burke.

13                    THE WITNESS:  Yes, Your Honor.

14                    THE COURT:  Okay.

14:08:13 15    BY MR. WEINBERGER:

16    Q.    All right.  So let's go to the summaries.

17                    I'm going to show you P 23127.  That's

18    Page 9 of your report.

19                    Does this contain a summary by category of

14:08:35 20    the cost of the Lake County redress model, both total

21    cost and present value?

22    A.    Yes, it does.

23    Q.    Okay.

24                    And are these figures a summary of the rest

14:08:56 25    of the report and the calculations associated with those

Burke - Direct/Weinberger

645

1    for Lake County in the Lake County portion of the report?

2    A.    Yes, sir.

3              And they are last year's figures.

4    Q.    Right.

14:09:11  5    A.    If, if I were to redo this report again now, I

6    would have to use new interest rates because interest

7    rates have gone up.

8              I would also have to use new growth rates

9    because as we all know inflation has soared.

14:09:29 10              So I -- that would add another five percent

11    to the growth side of it.

12    Q.    Okay.  Understood.

13              Page 23127, Page 10, has a summary table by

14    year of all of these costs for Lake County.

14:09:58 15              Correct?

16    A.    Yes, sir.

17              And you can see that present value column.

18    Last year, 2022 was one year in the future.  It's no

19    longer in the future.  It's the present.

14:10:12 20              So everything in that queue would move up

21    one slot.  So the present value of 2022 would not be

22    $70,000 -- excuse me -- 70,671,000.  It would be the

23    total cost figure, 70,904.

24              And everything would move up one slot and

14:10:35 25    would increase.

Burke - Direct/Weinberger                    646

1          But as I said a minute ago, in addition,

2     we've all seen the figures on inflation coming out at 8.3

3     percent yesterday.  That would cause all of these figures

4     in the future to grow even faster than Harvey and I had.

14:10:53 5     Q.    Okay.

6          And similarly for Trumbull County, Page --

7     23127, Page 11, is this a summary by category of all of

8     the redress model subcategories, the cost of them, as

9     you've calculated them, both in terms of total cost and

14:11:21 10    present value?

11    A.    Yes, sir.

12         And it matches up with the approach we used

13    in Lake County, and you can see the headers are the same.

14    Q.    Okay.

14:11:30 15         And then with respect to Page 12, Bates

16    stamp Page 12 of this exhibit, is this the summary by

17    year for Trumbull County?

18    A.    Yes, sir.

19         MR. WEINBERGER:  Your Honor, I would move

14:11:47 20    to --

21         THE COURT:  I would like to know what

22    specifically is the defendants' objection to admitting

23    the report is.

24         MS. FUMERTON:  Your Honor, to be clear, we

14:11:55 25    don't have an objection to the summary tables.  And so to

Burke - Direct/Weinberger                    647

1    the extent --

2                    THE COURT:  Obviously the summaries are in,

3    Ms. Fumerton, but I mean the backup explains, you know,

4    element by element, year by year.

5                    So, I mean, the summary just by itself, I

6    mean, we're not going to be here for 20 years having

7    Dr. Rosen going through line by line in the record of

8    each of these calculations.

9                    That would be crazy, wouldn't you agree?

10                    MS. FUMERTON:  Well, I'm not sure I would

11   put it that way, Your Honor, but I think that to the

12   extent Your Honor is asking whether we can --

13                    THE COURT:  I guess I want to know why

14   you're objecting to admitting Dr. Burke and Rosen's

15   report, which is really simply mathematics.

16                    MS. FUMERTON:  Sure, Your Honor.

17                    To the extent that it is -- we're being

18   asked to admit the various parts and the years, we're not

19   going to -- well, subject to what the other defendants

20   think, I don't want to speak for them, but we won't

21   object to that.  But we do want to preserve a general

22   objection to expert reports coming in whole cloth.

23                    THE COURT:  Fine.  I'm talking about this

24   one, which is really just --

25                    MS. FUMERTON:  So, Your Honor, I think,

1    again, subject to one of the other defendants' --

2                THE COURT:  If anyone has a principled

3    objection to admitting all the backup pages, I'd like to

4    hear it.

14:13:18  5                MS. HACKER:  Your Honor, Walgreens has no

6    objection to the pages plaintiffs offer, which is, I

7    believe, Pages 9 through 349.

8                THE COURT:  Okay.  Thank you.

9                MR. DELINSKY:  Your Honor, CVS takes the

14:13:33 10    same position.

11                THE COURT:  Okay.  Thank you.

12                It can be admitted.

13                MR. DELINSKY:  But, Your Honor, with the

14    same caveat I articulated yesterday with regard to expert

14:13:41 15    materials, which is not for the truth of the matter

16    asserted but as support for the analysis.

17                THE COURT:  If you think that Dr. Rosen and

18    Dr. Burke made mathematical errors, you can point them

19    out.  Absolutely.  It just reflects exactly what they

14:13:55 20    did.

21                Fine.  All right.

22                MR. WEINBERGER:  Your Honor, I pass the

23    witness.

24

14:14:08 25                MS. FUMERTON:  Your Honor, if I may just

```
         1    have one minute to get set up.

         2                THE COURT:  Okay.

         3            CROSS-EXAMINATION OF JOHN F. BURKE

         4    BY MS. FUMERTON:

14:16:13 5    Q.   Good afternoon, Dr. Burke.

         6                Can you hear me okay?

         7    A.   I can.  Thank you.

         8    Q.   My name is Tara Fumerton, and I am one of the

         9    attorneys for Walmart in this case.

14:16:20 10                As you testified earlier, you are here to

        11    testify about the report that was originally rendered by

        12    your colleague Dr. Rosen, right?

        13    A.   Yes, ma'am.

        14    Q.   And in taking over for your colleague, Dr. Rosen,

14:16:38 15    you've reviewed all the materials that Dr. Rosen relied

        16    upon in forming his opinions, right?

        17    A.   Yes, ma'am.

        18                And I worked with Dr. Rosen as he was

        19    putting the report together, but he did the work.

14:16:51 20    Q.   And so for the document that has been admitted as

        21    Plaintiffs' Exhibit 23127, you've adopted that report and

        22    opinions as if they're your own, correct?

        23    A.   Is 23147, is that the Alexander report?

        24    Q.   I might have -- no, no, no.  It's 23127.  It's this

14:17:13 25    report here.
```

1    A.    Oh, that's our report.

2          Yes.

3    Q.    That's your report?

4    A.    Yes.

14:17:17  5    Q.    And you've adopted that as your own?

6    A.    Yes.

7    Q.    Correct?

8          So during the course of my questioning

9    today, I'm going to be asking you questions about that

14:17:28 10   report and your opinions.

11   A.    Yes.

12   Q.    And your work relating to the same.

13         And just to make things easier, when I'm

14   discussing the report and your opinions and your work,

14:17:38 15   I'm not just referring to you personally; I'll also be

16   referring, when I say you, I also mean whatever work

17   Dr. Rosen and other associates at Burke Rosen have done.

18         Does that make sense?

19   A.    It does.  We're kind of interchangeable.

14:17:54 20   Q.    Okay.  So with that out of the way, let's get

21   started.

22         Just to be clear, you weren't asked as part

23   of your assignment in this case to come up with a plan to

24   abate the oversupply of prescription opioids in Lake and

14:18:07 25   Trumbull Counties, correct?

            1    A.    Say that again, please.  Sorry.

            2    Q.    I'll slow down a little bit, too.  Sometimes I talk

            3    a little fast.

            4                You weren't asked as part of your

14:18:16    5    assignment in this case to come up with a plan to abate

            6    the oversupply of prescription opioids in Lake and

            7    Trumbull Counties?

            8    A.    Correct.

            9    Q.    And you have no expert opinion about what a plan

14:18:25   10    should look like, right?

           11    A.    Correct.  I don't hold myself out as knowledgeable

           12    in that area.  I've seen hundreds of them, maybe

           13    thousands, but I'm not an expert in that area.

           14    Q.    And so when it comes to what policies and programs

14:18:39   15    are appropriate to abate the oversupply of prescription

           16    opioids in Lake and Trumbull Counties, you don't have an

           17    expert opinion one way or the other as to what those

           18    should be?

           19    A.    You're correct.

14:18:50   20    Q.    Right?

           21                You said you're a numbers guy.

           22    A.    I'm a numbers guy, yes.

           23    Q.    Your expertise is limited to calculating the costs

           24    of the plan that Dr. Alexander is proposing, correct?

14:19:02   25    A.    That's what I was -- that was my assignment in this

1    case, yes.

2    Q.    Okay.  So I want to talk a little bit more

3    specifically about how you went about calculating those

4    costs.

5              So your starting point was Dr. Alexander's

6    abatement plan, correct?

7    A.    Yes.

8    Q.    And, in fact, for the most part, the computations

9    that you make in your report rely on the inputs provided

10   by Dr. Alexander, correct?

11   A.    Yes.

12   Q.    Those include inputs that describe the scope of

13   different services and programs under his proposed

14   abatement plan, right?

15   A.    Yes.

16   Q.    And so just as one of the examples, and we'll be

17   looking at some more specific schedules later, but for

18   the number of individuals that he estimates to have

19   Opioid Use Disorder to receive Buprenorphine treatment,

20   you used the inputs of those number of individuals that

21   Dr. Alexander gave you, correct?

22   A.    Yes.

23   Q.    And those inputs from Dr. Alexander also include,

24   in some cases, the cost of different services and

25   programs under the proposed abatement plan, right?

1    A.    Yes.

2    Q.    So sticking with the same example of the average

3    monthly cost for an individual to receive Buprenorphine

4    treatment, with respect to that cost, that's something

14:20:27 5    that you relied on to be provided by Dr. Alexander,

6    correct?

7    A.    Yes.

8    Q.    And with respect to all of these different inputs

9    that are included in Dr. Alexander's report, you took

14:20:39 10    those inputs as facts and assumed them to be true, right?

11    A.    I took them as a posit, yes.

12    Q.    You didn't undertake any effort to validate those

13    inputs, correct?

14    A.    You are correct, no effort.

14:20:52 15    Q.    And you have no opinion as to whether those inputs

16    are accurate or reliable?

17    A.    You're correct again.

18    Q.    Right?

19          So to the extent that Dr. Alexander

14:21:04 20    included inputs that were incorrect, your estimate of

21    abatement costs would likewise be incorrect, true?

22    A.    I wouldn't use that terminology, but if

23    Dr. Alexander changes his report, my report is going to

24    change correspondingly.

14:21:21 25          If you ask me how much is two and two and I

1    say four, and you say ah-hah, I meant to say three and

2    three, so you're wrong, no, I'm not wrong.  Two and two

3    is still four.

4    Q.    The math would still work out?

14:21:34 5    A.    The math would still work out.

6                But if Alexander changes his report, I am

7    going to change right along with him.

8    Q.    Or with the example we've already been using, the

9    number of individuals to receive Buprenorphine treatment,

14:21:48 10   if the Court determines or other folks determine

11   that -- suggest that that number's incorrect, and that

12   that number of individuals needs to change, your total

13   abatement cost would change as well, correct?

14   A.    Yes, it would.

14:22:01 15               And it would probably change

16   proportionately.  So if it is determined that

17   Dr. Alexander used X and he should only use half X, then

18   my report shows the value for providing X.

19               But if you only need half X, you take my

14:22:20 20   figure and divide it by two.

21   Q.    And that would probably depend on the specific

22   schedule at issue, is that fair?

23   A.    Of course it would.  Yes.

24   Q.    And you heard the expression "garbage in, garbage

14:22:32 25   out," right?

1      A.    Say again.

2      Q.    Garbage in, garbage out?

3      A.    Garbage in, garbage out works in all areas.  Your

4      clients give you bad information, you can probably stand

14:22:40  5      up in court and make a bad legal statement.

6      Q.    And same if you had gotten bad information for

7      estimating the costs of the abatement plan, your estimate

8      would also likewise be inaccurate?

9      A.    Absolutely correct, counselor.  Yes, you're right.

14:22:55 10      Q.    So if Dr. Alexander included a component in his

11     plan that was not necessary to abate the public nuisance

12     the jury found, then that component also should not be

13     included in your cost estimate, right?

14     A.    And I assume you talked to or cross-examined

14:23:11 15     Dr. Alexander, and you got him to remove that from his

16     plan.  And if you tell me what it is, I will remove it

17     from my plan.

18           But I can't remove it on my own.  I need

19     Dr. Alexander to change his opinion.

14:23:26 20     Q.    And likewise, if the Court were to find that a

21     portion of Dr. Alexander's plan was not necessary, that

22     would also reduce your costs, correct?

23     A.    I'm married to a Judge.  I've learned not to argue

24     with them a long time ago.

14:23:40 25           (Laughter.)

Burke - Cross/Fumerton

656

```
         1    Q.    Yes, sir.  So just, I think we're on the same page

         2    but I just want to make sure that it's very clear, if

         3    Dr. Alexander overstated the OUD population that needed a

         4    particular abatement service like treatment, then your

14:24:00 5    estimate of abatement costs would likewise be overstated?

         6    A.    Yes.  And proportionately.

         7              So if he overestimates by 10 percent, my

         8    figures are going to be overestimated by 10 percent.

         9    Q.    And if Dr. Alexander likewise overstated the

14:24:17 10   duration of a particular abatement service, such as the

        11    length of a particular OUD treatment, then your estimate

        12    of abatement costs would likewise be overstated, correct?

        13    A.    Yes, ma'am.

        14    Q.    And I just had a couple questions about something

14:24:31 15   that Mr. Weinberger had asked you about.

        16              If you go back to the summary pages --

        17    A.    If I what?

        18    Q.    The summary pages.  I'll direct you to the specific

        19    page.

14:24:44 20   A.    Yes.

        21              THE COURT:  I think these are Pages 9

        22    through 13, Doctor.

        23              THE WITNESS:  Thank you, Your Honor.

        24    A.    Yes.

14:24:57 25
```

1    BY MS. FUMERTON:

2    Q.    And I would put these up but actually mine suffered

3    the same fate as Mr. Delinsky.  I have writing all over

4    mine.

14:25:04  5              But let's take, for example, the Summary

6    Table 2 for Lake County, and that's on Page 10 of what's

7    been marked as Plaintiffs' Exhibit 23127.  I'm only

8    trying to cover up my writing.

9              You had mentioned that if given sort of the

14:25:46 10    lag in time, through nobody's fault of your own, that you

11   think these would all sort of need to be moved up and the

12   costs would be increased, is that right?

13   A.    They would move up one space in the queue, yes.

14   Because you can't go into a bank today and say, "I want

14:26:03 15   the interest I would have gotten if I had put this money

16   in an account last year."

17              They're not going to do that.

18   Q.    But that would be assuming all the inputs are also

19   the same.

14:26:12 20              So, for example, if the number of

21   individuals who needed OUD treatment had decreased from

22   the year prior, then your numbers would similarly need to

23   be adjusted so it might not necessarily be a total

24   increase, correct?

14:26:25 25   A.    Yes.

1          If Dr. Alexander finds that the number has

2     decreased, I'm going to change my report accordingly.

3     Q.    So you would need to do more than just simply

4     adjust these numbers; you would also have to look to see

5     whether or not all the other inputs should change,

6     correct?

7     A.    Yes.

8          And it's my experience that if you look at

9     medical costs last year for all these different kind of

10    items, the base is going to be bigger this year.  Things

11    go up.

12    Q.    Sometimes they do and sometimes they go down,

13    though, correct?

14    A.    Sometimes they go down, but most prices in

15    economics go up.

16    Q.    But you have no opinion and no knowledge one way or

17    the other as to whether or not, for example, the number

18    of individuals who have OUD has gone up or down since

19    last year, correct?

20    A.    You're right, I have no opinion.

21              THE COURT:  Doctor, Mr. Weinberger didn't

22    ask you, like, what discount rate you used, what interest

23    rate you assumed.

24              I would be -- I'm curious to know.  It may

25    be it's probably somewhere in your report, but I didn't

1    note it down.  So I would just be curious what you used.

2                THE WITNESS:  Last year when we prepared

3    this report, we checked with the United States Department

4    of the Treasury, and short-term Treasury instruments were

14:28:03  5    returning at that time about a third of a percent, .33.

6                So we used .33 for about the first four

7    years of our study.

8                We then looked at longer term instruments,

9    and that's called a yield curve.  And usually in a yield

14:28:23 10    curve, interest rates go up as maturity increases.  So we

11    increased our rate of interest according to the Treasury

12    to 1.38.

13                And then as we pushed out even further, for

14    the last five years, that yield curve -- again, longer

14:28:44 15    term maturities, higher interest rates -- we used 2.36.

16                I looked them up again this morning, and

17    interest rates have gone up.  The interest rate on a

18    one-year instrument is now 1.99; a two-year instrument,

19    2.66; a three-year instrument, 2.81; five-year

14:29:04 20    instrument, 2.89; a seven-year instrument, 2.94; and a

21    10-year instrument, 2.91.

22                Interest rates have gone up.

23                THE COURT:  Thank you.

24                MR. WEINBERGER:  Your Honor, did you want

14:29:23 25    to know the discount rates that were used, also?

1          THE COURT:  Well, I assume it extrapolates

2     off this.

3          MR. WEINBERGER:  Okay.

4          THE COURT:  I was more interested in sort

14:29:31  5     of the interest rates.

6          Thanks.

7     BY MS. FUMERTON:

8     Q.   Dr. Burke, in addition to relying on the cost

9     inputs that were set forth by Dr. Alexander, you also

14:29:43 10   provided some of your own cost estimates for certain

11    services and programs under the plan.

12         Correct?

13    A.   Yes.

14    Q.   And I think you looked at one of those with

14:29:53 15   Mr. Weinberger, the cost of a pharmacist, correct?

16    A.   Yes.

17    Q.   And that's because Dr. Alexander didn't provide

18    that cost, right?

19    A.   Correct.

14:30:01 20   Q.   And so in that case, you provided the initial input

21    for the cost of a pharmacist based on a median wage

22    data -- I'm sorry -- based on median wage data from the

23    Bureau of Labor Statistics, right?

24    A.   Yes.

14:30:15 25   Q.   And that's just one example of the type of initial

1    cost input that you provide in your report, correct?

2    A.    Yes.

3    Q.    And we're going to look at a lot of other examples

4    later, but I want to sort of set the stage a little bit

14:30:29  5    here of what you did use.

6                So in estimating the costs of services and

7    programs under Dr. Alexander's abatement plan, you did

8    not review any budgets for Lake County departments or

9    agencies, correct?

14:30:42  10   A.    Correct.

11   Q.    You also did not review any budgets for Trumbull

12   County departments or agencies, correct?

13   A.    Correct.

14   Q.    You, likewise, did not review any financial

14:30:53  15   statements for either Lake or Trumbull County or any of

16   their departments or agencies, right?

17   A.    Yes.

18   Q.    You didn't review any books or records from Lake or

19   Trumbull County or any of their departments or agencies,

14:31:05  20   correct?

21   A.    You're right.

22   Q.    And the same is true for third parties in Lake or

23   Trumbull County, such as treatment centers; you did not

24   review any of their budgets, expenditures, financial

14:31:18  25   statements, or books and records?

1    A.    You're right.

2    Q.    In addition to not reviewing Lake or Trumbull

3    County's records, you also didn't communicate with any

4    Lake or Trumbull County officials or employees in

14:31:32  5    connection with preparing your report, correct?

6    A.    Not many.

7          We had -- Harvey had a couple of

8    conversations with some people, but not many.

9    Q.    Okay.

14:31:39 10          And are you aware of whether or not those

11   conversations resulted in any specific inputs in your

12   report?

13   A.    No, I'm not.

14   Q.    And you did not, in forming your opinions,

14:31:51 15   communicate with any officials or employees of third

16   parties that provide programs or services in Lake or

17   Trumbull County to address opioid abuse and misuse,

18   correct?

19   A.    Right.

14:32:04 20          My assignment was to cost out the program

21   set up by Dr. Alexander.

22   Q.    But in doing that cost estimate, you didn't look at

23   any Lake or Trumbull County-specific documents, correct?

24   A.    Correct.

14:32:19 25   Q.    And also in creating your estimates, you did not

```
 1    speak with anyone in the counties regarding what services

 2    or programs the counties currently provide that may be

 3    the same or similar to services or programs under

 4    Dr. Alexander's plan?

 5    A.    You're right.  That's not part of Alexander's plan.

 6    Q.    And similarly, you, in estimating the cost of

 7    services and programs under the abatement plan, did not

 8    consider what the counties or their agencies or

 9    departments currently spend on similar services and

10    programs, correct?

11    A.    You're right.

12    Q.    Nor did you consider what the counties or their

13    agencies or departments have historically spent on

14    similar services and programs, correct?

15    A.    I think you're right.

16                I know you're right, but there's no history

17    here, is there?

18    Q.    But you never asked, so you don't know one way or

19    the other, correct?

20    A.    I do know one way or the other.

21                I don't believe there was an opioid;

22    epidemic in 1930 or 1940 or 1950, '60.  There's no

23    history here to look at.

24    Q.    Well what about the year before you did your

25    report?
```

1    A.    There's not much history.  There's history but it's

2    not much.

3    Q.    And did you, for the year before or the year before

4    that or the year before that, look at any of the

14:33:39 5    historical costs?

6    A.    No, I did not.

7    Q.    And you're not offering any expert opinion today as

8    to when the opioid crisis started, correct?

9    A.    I am not.

14:33:56 10   Q.    When you were estimating the costs for different

11   types of personnel, you did not speak with the counties,

12   their agencies or departments or third parties that

13   employ similar workers and ask them what they pay those

14   workers, right?

14:34:07 15   A.    You're correct.  I looked at the statistics for the

16   standard metropolitan statistical area.

17   Q.    And you mentioned earlier fringe benefits, that

18   that's something that you included when you were

19   estimating the cost for employing different types of

14:34:31 20   workers, correct?

21   A.    Yes.

22   Q.    And in estimating the cost of those fringe

23   benefits, you didn't distinguish between different

24   positions or roles, correct?

14:34:40 25   A.    Say again.

1    Q.    You did not distinguish between different positions

2    or roles?

3    A.    You're correct, I did not.

4    Q.    And so if you calculated fringe benefits to be

14:34:54 5    26.74 percent of a person's annual wage or salary across

6    the board, right?

7    A.    Right.  That's a national average from the

8    Department of Labor.

9    Q.    Okay.

14:35:03 10          And so in other words, you assumed that for

11   all the workers called for under Dr. Alexander's plan,

12   they would receive those fringe benefits, right?

13   A.    I did.

14   Q.    And you did not investigate or ask the counties or

14:35:16 15   their agencies or departments if, when they would employ

16   these workers, whether they would typically provide such

17   fringe benefits, correct?

18   A.    You are correct, but I think the counties are

19   obliged to apply those fringe benefits.

14:35:34 20   Q.    Well --

21   A.    If some workers, if you're a full-time worker and

22   there are fringe benefits, you have to get them.  You

23   can't discriminate.

24   Q.    So great example.  So you didn't distinguish

14:35:45 25   between whether an employee was going to be a full-time

1  employee or a part-time employee.  In fact, the first

2  example you looked at was .3 of a pharmacist?

3  A.    Right.  But first of all, I know .3 of a person

4  does not exist.  So it's got to be one person who spends

14:35:59  5  about a third of their time doing this job.

6              But you have to pay the fringe benefits for

7  the whole person, not .3 of a person.  That's the cost

8  allocated, but the fringe benefits apply to the whole

9  person.

14:36:12 10  Q.    Well, but at least some of the workers that, under

11  Dr. Alexander's proposals, they're not full-time,

12  correct?

13  A.    If they're not full-time, if you're less than 30

14  hours, then they let you get away without providing them

14:36:23 15  some fringe benefits.

16              But there are some fringe benefits that are

17  legally required.

18  Q.    And I'm not trying to fuss with that.

19              I'm just trying to make clear that you just

14:36:34 20  applied the same rate across the board and didn't

21  distinguish between the number of hours that an employee

22  would be working, correct?

23  A.    You're correct.

24  Q.    And so when we're talking about costs, I want to

14:36:46 25  talk a little bit about need.

1          And in estimating the costs of hiring these

2    different kinds of workers, you didn't speak with the

3    counties, their departments, their agencies or the third

4    parties in the counties who employed these workers to see

14:36:58  5    if they actually needed any additional workers that

6    Dr. Alexander was proposing, correct?

7    A.    You're right.

8          I looked at the statistics for the area,

9    and that includes all those workers you just mentioned.

14:37:11  10    Q.    And you looked at those statistics -- okay.

11    Correct.

12          And so you took, as posit, if Dr. Alexander

13    was proposing a particular worker, you did not

14    investigate whether the county actually needed that

14:37:25  15    worker, correct?

16    A.    You are correct again.

17          I looked at Dr. Alexander's report.

18    Q.    Okay.  I want to talk about some specific programs

19    and I'm going to try to not be clumsy about this.  But

14:37:40  20    going back and through the reports, I might be.

21          You have a copy of your report in front of

22    you, correct?

23    A.    I do.

24    Q.    And you have a copy of the two redress models as

14:37:48  25    well for Lake and Trumbull County?

Burke - Cross/Fumerton

1    A.    The Alexander reports?

2    Q.    Specifically, I'm referring to these.

3    A.    Yes.  Yes, I do.

4    Q.    Could you please turn to what is Page 124 of your

14:38:26  5    report, P 23127?  And I have it up on the screen as well.

6    A.    Page 124?

7    Q.    Yes.

8          And so it's 124 of the document that's been

9    marked as P 23127.  It's your original report, it would

14:38:44 10    be Page 71, but I think it's easiest if we stick with the

11    P numbers.  I can show you how it looks on the bottom.

12    Or maybe not.

13          There you go.

14          I also have a copy that I can give you if

14:39:00 15    that's easier.

16    A.    Could I see the bottom of that page you have,

17    please?

18    Q.    Yes.  Unfortunately, I have a little --

19    A.    That's not Page 124.  That's Page 71.

14:39:30 20    Q.    So I'm looking at the numbers at the bottom because

21    the backup that was added to this, I think it might be

22    easier for us to talk about that.

23          Which copy do you have in front of you?

24    Would it just be easier if I just gave you a copy?

14:39:42 25    A.    I have the April 22nd, 2022.

1    Q.    And do you have something that looks like this, has

2    this little sticker on it?

3    A.    Yes.

4    Q.    That's the version I want you to look at.

14:39:51  5    A.    Okay.  So what page do you want?

6    Q.    So 124.  If you go down to the very bottom

7    right-hand corner.

8    A.    Page 124.

9    Q.    And if it's easy, it's a Schedule 3A, Public

14:40:07 10    Safety, specifically 3A Law Enforcement Assisted

11    Diversion.

12    A.    Let me catch up with you.

13    Q.    Yeah.

14    A.    Okay.  I have Page 124 and it's 2A.

14:40:26 15    Q.    Do you have in front of you the same thing that's

16    on that screen?

17              Dr. Burke, would it help if I approached

18    you with a copy of what I'm looking at?

19    A.    No.  Which county are you in?

14:40:51 20              MR. WEINBERGER:  It's Page 71 of your

21    report.

22              MS. FUMERTON:  And, Your Honor, do you have

23    a copy of this exhibit in front of you?  We can give you

24    one as well.

14:40:59 25              THE COURT:  No, I can use the screen and I

1    have my big copy.  I can see fine on the screen.

2                    MS. FUMERTON:  Your Honor, may I approach

3    the witness?

4                    THE COURT:  All right.  Fine.

14:41:24  5                    MR. WEINBERGER:  I've got it right here.

6                    MS. FUMERTON:  Okay.  Try to make this a

7    little easier.

8                    (Discussion had off the record.)

9    BY MS. FUMERTON:

14:41:57 10    Q.    All right.

11                    Dr. Burke, I promise.  I hope we're going

12    to get into a rhythm here so this won't be this

13    difficult, but once we get on the same page literally.

14                    Are you there?

14:42:06 15    A.    I am there.

16    Q.    Okay.

17                    So on this page, which was as you point out

18    71 of 232, or in the Bates stamp at the bottom, Page 124,

19    you are calculating an initial cost for L-E-A-D programs,

14:42:29 20    also refer to as LEAD programs, to be established by

21    police departments, correct?

22    A.    Yes.

23    Q.    And you did not ask Lake or Trumbull Counties

24    whether they currently operate LEAD programs or what it

14:42:43 25    cost them to do so, correct?

1    A.    Correct.

2    Q.    Instead, you used a cost from a 2015 University of

3    Washington article that your colleague, Dr. Rosen, had

4    found, right?

14:42:54  5    A.    Yes.

6    Q.    And we can see that if we just look down here at

7    Notes and Sources that I highlighted, correct?

8    A.    Yes.

9              And it's footnoted on the next page, too.

14:43:08  10    Q.    Just so the record's clear, you're talking about

11    125.  And again, we have the same article.

12    A.    Yes.

13    Q.    And specifically at Page 16, correct?

14    A.    That's our source.

14:43:17  15    Q.    Okay.

16              So just so we're all on the same page, we

17    have the year in the first column, correct?

18    A.    Yes.

19    Q.    Then we have the LEAD programs to be established

14:43:36  20    for police departments.  And you have 4.8 listed here for

21    each year, correct?

22    A.    Yes.

23    Q.    And for the source of 4.8, that's one of the inputs

24    that you took as posit from Dr. Alexander, correct?

14:43:48  25    A.    Yes.

1    Q.    And so when you were then estimating the cost to

2    establish a LEAD program for a police department, you

3    went to the University of Washington article, and I guess

4    if we want to see the full methodology you started over

14:44:06 5    here, you've got a figure from that, and then you added

6    various growths to get the 30,000 figure here.

7              Then if we go back to the next page, you

8    included it here, correct?

9    A.    Yes.

14:44:24 10    Q.    And then you multiply that figure times 4.8 LEAD

11    programs?

12    A.    Yes.

13    Q.    You have an annual growth rate that we have listed

14    here and you give the total estimated cost, correct?

14:44:33 15    A.    Yes.

16    Q.    So first question, on this schedule, are you

17    estimating that you will be creating 4.8 LEAD programs

18    for Lake County each year so that there will be at the

19    end of the 2035, approximately 75 programs?

14:44:55 20    A.    That's what Dr. Alexander said.

21    Q.    Do you know how many police departments are in Lake

22    County?

23    A.    No.

24    Q.    But you understood that Dr. Alexander wanted to

14:45:10 25    establish 4.8 each year?

1    A.    Yes.

2    Q.    And the cost to establish one would be $30,061,

3    based on your calculations, correct?

4    A.    Yes.

14:45:20  5    Q.    And if Dr. Alexander had only intended to calculate

6    a total of 4.8 LEAD programs in Lake County, you would be

7    double counting for all these or more than double

8    counting, you'd be adding up all sorts of additional

9    costs, correct?

14:45:38 10    A.    Yes.  If that's what Dr. Alexander intended.

11                But if that's what he intended, I don't

12    think he would have put down 4.8, 4.8, 4.8 for each year.

13                I think he's saying this is what is needed

14    to remediate this problem.

14:45:53 15    Q.    Okay.  And let's just quickly look at that

16    University of Washington article that Dr. Rosen used for

17    his calculations.

18                And so --

19                MS. FUMERTON:  Jason, can you hand up

14:46:31 20    what's been marked as Defense Exhibit MDL 14900?

21                Thank you.

22    BY MS. FUMERTON:

23    Q.    Dr. Burke, is this the article from which you

24    took --

14:46:58 25    A.    Yes.

1    Q.    -- the cost for the LEAD program?  Yes?

2                You could see it states here University of

3    Washington with the date of June 24th, 2015.

4                If we look back at your cite on Page 125,

14:47:15  5    it's the same cite, correct?

6    A.    Yes.

7    Q.    Okay.  And it actually specifically says Page 16,

8    you should find this figure, correct?

9    A.    Yes.

14:47:23 10    Q.    So if we go to Page 16, we'll see that the cost for

11    establishing the program is $24,275, correct?

12    A.    Yes.

13    Q.    And that, in fact, matches your cost over here --

14    A.    Yes.

14:47:47 15    Q.    -- of 24,000, right?

16    A.    Yes.

17    Q.    And if we look at the Washington article, after

18    initially creating the program, the cost goes drastically

19    down, correct?

14:47:58 20    A.    The cost per person goes down.

21    Q.    Right.

22    A.    Not the cost.

23    Q.    And --

24    A.    I mean if there's 10 million people in this

14:48:05 25    program, you've got to pay $532 for each one of 10

Burke - Cross/Fumerton

675

1    million people.  Costs go up.

2    Q.    Okay.

3    A.    You have to know how many people are being served.

4    Q.    And so how many -- that's what I'm trying to

5    understand your calculations.

6              So how many people, going back, let's just

7    see what you took.  We agree you took this 24,275 figure,

8    correct?  Because that matches your input here.

9    A.    Yes.

10   Q.    Okay.  Now, put this aside for a second.

11             You then come up with the 2021 cost of

12   $30,061.25, correct?

13   A.    Yes.

14   Q.    And that's what you input here?

15   A.    Yes.

16   Q.    Okay.

17             But then you just keep using that same

18   input, which is the initial cost over and over and over

19   again, correct?

20   A.    Yes.

21   Q.    Nowhere in your calculations do you try to assess

22   how many people will be served, correct?

23   A.    Say again.

24   Q.    Nowhere in your calculations do you try to assess

25   how many people will be served, correct?

Burke - Cross/Fumerton

676

1    A.    Oh, I don't know how many people are going to be

2    served.  And apparently, Dr. Alexander didn't know

3    either.

4              But he said this is the capacity, this is

14:49:11  5    the amount of people you have to have available to

6    perform this service.  And like anything else, if you

7    have to rent a space and it costs a thousand dollars a

8    month to rent the space, and you only serve one person,

9    then the cost per person is a thousand dollars' worth of

14:49:32 10    rent.  Serve two people, it's only $500.  Serve three,

11    and it's only 333.

12              Those costs are going to go down as you

13    serve more people.

14              So to answer this question, we have to

14:49:44 15    know -- and apparently nobody does.  I don't -- how many

16    people are being served in that chart you just showed me

17    where the costs decline.  You expect costs to decline.

18    It's called an economy of scale.

19    Q.    And you didn't take that into consideration when

14:49:59 20    you were assessing what the costs of establishing 4.8 --

21    A.    Oh, I had the costs of establishing it.

22              Dr. Alexander gave me the cost of

23    establishing it; 24,275.  And a lot of those costs are

24    fixed costs.

14:50:14 25              You need to rent someplace, you need

Burke - Cross/Fumerton

677

1      machinery, you need equipment.  The only cost that might

2      be variable is the labor costs associated with it.

3      Q.    Right.  I appreciate, but that's all hypothetical,

4      right, as far as what -- you don't know -- all you did

14:50:31  5      was take this 24,275 figure, which is --

6      A.    That's all I did and that's all I had to do because

7      I didn't have the other figure to say how many people

8      were being served.

9              If you know how many were being served,

14:50:46 10      then you multiply that figure you have at the bottom

11      there, 532, by the number of people.

12      Q.    And that's what you would need to be able to

13      accurately estimate these costs, correct?

14      A.    Say again.

14:50:58 15      Q.    That's the figure you would need to be able to

16      accurately estimate these costs, correct?

17      A.    Yes.

18      Q.    Okay.

19      A.    But Dr. Alexander also, in other places in his

14:51:08 20      report, I think has said that the number of people that

21      need help in Lake County and Trumbull County.

22      Q.    Well, we can look at what Mr. -- Dr. Alexander

23      said.

24              You have the redress model for Lake County?

14:51:21 25      A.    Yeah.

1    Q.    That's P 23105A?

2    A.    Yeah.  He said you need to start with -- he said

3    you need these, these figures, in the LEAD program and

4    you need 4.8 people to serve this.

5                    And the total cost of doing that starts off

6    at $24,000.

7                    We adjusted it for the present time.

8    Q.    Well, is this 4.8 people or 4.8 LEAD programs?

9    A.    Programs, excuse me.

10   Q.    And what you're saying is you would need to know

11   the number of people being serviced to accurately assess

12   these costs?

13   A.    Yes.

14   Q.    And you didn't have that number, correct?

15   A.    I didn't have that number.

16   Q.    I want to take a look at another example.

17                    And before we do, I'm going to be focusing

18   on Lake County because it's easier to just look at one.

19   But you did the same thing with Trumbull County, correct?

20   A.    Yes.

21   Q.    Dr. Alexander may --

22   A.    Yes.

23   Q.    -- have given you a different number of LEAD

24   programs were necessary, but you otherwise used the same

25   2015 --

1    A.    Same methodology.

2    Q.    -- methodology?

3    A.    The numbers might be different because it's a

4    different geographic area, different economic area, but

14:52:57 5    the methodology is the same.

6    Q.    Okay.  Let's look at Page 130 of Exhibit P 23127.

7    That is 74 of your report, Dr. Burke.  I have it up on

8    the screen.

9              It's Schedule 3B1 for the Opioid Drug

14:53:20 10   Court.

11   A.    Yes.

12   Q.    Okay.  Are you there?

13   A.    I am.

14   Q.    So on this schedule, you provide the cost per

14:53:36 15   participant, excluding treatment costs.

16              Do you see that?

17   A.    Yes.

18   Q.    Of operating the Drug Court, correct?

19   A.    Yes.

14:53:44 20   Q.    And again, you did not ask the counties what it

21   actually costs them to operate their Drug Courts,

22   correct?

23   A.    Correct.

24   Q.    Instead, that cost comes from a December, 2005

14:53:57 25   University of Cincinnati article, correct?

Burke - Cross/Fumerton                    680

1    A.    Yes.

2    Q.    And I have it highlighted here, right?

3    A.    Yes.

4    Q.    And we can take a look at that article in just a

14:54:08  5   minute, but if we turn to the next page, this is the

6    backup for your Schedule 3B1 for Lake County, correct?

7    A.    Yes.

8    Q.    And based on the schedule, it looks like you took a

9    2003 figure of $5,770 -- I don't know if I said that

14:54:32 10  right --

11   A.    Yes.

12   Q.    $5,777.  So your initial input costs and then

13   brought it up to 2021, correct?

14   A.    Yes.

14:54:41 15  Q.    And when you brought it up to 2021, you got $9,855,

16   correct?

17   A.    Yes.

18   Q.    And that's the input that we see here?

19   A.    Yes.

14:54:51 20  Q.    Correct?

21             Okay.  So all starting from this 5,077

22   costs in 2003, right?

23   A.    Yes.

24   Q.    Now, again, you stated here your intent was to

14:55:07 25  exclude treatment costs in this figure, correct?

1    A.    Yes.  Excluding treatment.  That's what it says in

2    that column there.

3    Q.    And that's important because had you not excluded

4    treatment costs, you'd be double counting or more than

14:55:21  5    double counting the treatment provided to Drug Court

6    participants because those treatment costs are accounted

7    for in other ways in other places in your report,

8    correct?

9    A.    Yes.

14:55:32  10    Q.    So how certain are you that your figure excludes

11    treatment costs?

12    A.    How what?

13    Q.    How certain are you that your figure that you

14    provided here excludes treatment costs?

14:55:41  15    A.    I am certain a hundred percent based on my

16    methodology.

17            I started off with a figure of 5

18    points -- $5,777 in 2003.  I then adjusted it, and I told

19    you how I adjusted it to get to that starting point in

14:56:01  20    2021.

21            I'm absolutely sure that's what I did, and

22    I'm absolutely sure that's what those numbers would

23    verify.

24    Q.    Okay.  But --

14:56:12  25    A.    But I didn't do the study that came up with the

1    $5,777.

2    Q.    I understand that.  So let's look -- let's take a

3    look at that study, that's Footnote 1.  It's an

4    evaluation of Ohio's Drug Courts:  A Cost Benefit Study,

14:56:33  5    University of Cincinnati, December, 2005.

6                 And we've marked that as Defendants'

7    Exhibit MDL 14984.

8                 Do you have a copy of that, Doctor?

9    A.    I do.  I was just given it.

14:56:46  10    Q.    Absolutely.

11                 Are you ready, Dr. Burke, for a question?

12    A.    Yes.

13    Q.    So I want to direct your attention to Page 4 of

14    this article, and it's Page 8 of the exhibit.

14:57:34  15    A.    Page 4?

16    Q.    Yeah.  It will be Page 8 on the bottom left but

17    it's Page 4 of the article.

18    A.    Yes.

19    Q.    Do you have it up on the screen?

14:57:42  20    A.    Yes.

21    Q.    Okay.  And under this section, "Comparability of

22    the Courts," I want to draw your attention to the

23    sentence that says -- if I can find it -- "Like Drug

24    Courts across the United States, the Courts in this study

14:58:06  25    provide community based treatment services, judicial

1    monitoring and frequent urinalysis."

2                    Do you see that?

3    A.    I do.

4    Q.    Okay.

14:58:17 5                    And if we turn to Page 13 of the article.

6    A.    Say again.  13?

7    Q.    13.

8    A.    Yes.

9    Q.    You'll see sort of in the conclusion, "The marginal

14:58:33 10   costs per Drug Court case were estimated to be $5,777."

11                    Correct?

12   A.    Yes.

13   Q.    Nowhere does it say that it has excluded the

14   treatment costs that were present on the prior page,

14:58:49 15   correct?

16   A.    It does not say that.

17                    But it does say marginal cost.

18   Q.    And what -- and what does -- why would marginal

19   cost mean drug treatment?

14:59:00 20   A.    Definition of marginal cost is the added cost.

21   Q.    All right.  And --

22   A.    The new cost, when you add on a person, where you

23   add on a product, or -- it's the added cost.

24                    So it doesn't include any fixed cost,

14:59:15 25   doesn't include any cost from yesterday.  It's the

Burke - Cross/Fumerton

684

1    marginal cost, the new cost you incur for doing

2    something.

3    Q.    And so that would include the additional cost for

4    treating a person as part of their services through the

14:59:33 5    Drug Court, correct?

6    A.    Yeah, but no fixed costs are in my -- by

7    definition, there's two types of costs; there's fixed and

8    there's variable.

9              Only variable is marginal.  No fixed costs

14:59:47 10    are in that figure.  So that assumes you've got a

11    building, you've got a Court, you've got staff, you've

12    got all these things.  And what is the added cost of this

13    Court?  Marginal cost for a Drug Court case was assumed

14    to be $5,777.

15:00:03 15    Q.    And that's the -- and that includes drug treatment

16    costs, correct?  We looked at that on an earlier page.

17    A.    Yes.

18    Q.    And that's the figure that you used as your input

19    here?

15:00:17 20    A.    Yes.

21    Q.    $5,777?

22    A.    Yes.

23    Q.    And ended up over here?

24    A.    Yes.

15:00:21 25    Q.    For 9,000?

Burke - Cross/Fumerton                      685

1    A.    Yes.

2    Q.    So it actually should be that this is including

3    treatment cost, not excluding treatment cost, correct?

4    A.    I've tried to exclude treatment cost.

15:00:32  5                  That would be part of that element of the

6    other cost.  That would not be the marginal cost.

7    Q.    But we just established here when you're using that

8    $5,777 cost, that includes treatment costs and that was

9    the basis here.  So you have not excluded treatment

15:00:49 10   costs, correct?

11   A.    I think the report says the marginal cost, which

12   means the additional costs.

13                  So I've excluded the treatment cost.  It's

14   the marginal cost per drug case, as it says.

15:01:19 15   Q.    So just to be explicitly clear, since the earlier

16   page we looked at said that it included drug treatment

17   costs, correct, the Drug Courts across the United States

18   like the Courts in this study, provide community-based

19   treatment services?

15:01:33 20   A.    Yes.

21   Q.    Judicial monitoring and frequent urinalysis,

22   correct?

23   A.    Yes.

24                  MR. WEINBERGER:  Your Honor, I'm sorry.

15:01:38 25   The quotation says nothing about costs that she just

1    referred to.

2                    THE COURT:  Well --

3                    MR. WEINBERGER:  Page 4.

4                    MS. FUMERTON:  It says the Courts provide

15:01:52 5   treatment services.

6                    THE COURT:  Well, I'll sustain the

7    objection to the question.

8                    So why don't you pose another one.

9    BY MS. FUMERTON:

15:02:02 10  Q.    Okay.  Let me ask the question differently then.

11                   Again, the costs that are being estimated

12   here, the Courts in this study provide community-based

13   treatment services, correct?  Treatment services are

14   included here, correct?

15:02:15 15  A.    That's what it says.

16   Q.    Okay.

17                   And when we go back to the marginal costs,

18   it determines it to be $5,777.  And nowhere here does it

19   say that they're excluding treatment costs, correct?

15:02:36 20  A.    No, but it does say marginal.

21   Q.    It does but it does not say it's excluding

22   treatment costs, correct?

23   A.    Right, but it says marginal.

24   Q.    It says marginal.  I'm not debating that.

15:02:47 25                  Can you say with certainty that this

1    excludes treatment costs?

2    A.    Well, on Page 4, it says the Courts in this study

3    provide community-based treatment services, judicial

4    monitoring, and frequent urinalysis.

15:03:01  5            So they're doing all of that, but if they

6    do anything in addition, added costs, it's $5,777.

7    Q.    That's for the marginal costs per Drug Court --

8    A.    Yeah.

9    Q.    -- case, correct, compared to --

15:03:18 10   A.    So you bring in a new case, a new case comes in off

11   the street, what's the marginal cost of dealing with that

12   case?

13            $5,777.

14   Q.    So you don't think that this study and the number

15:03:30 15   you're trying to figure out is the marginal cost of a

16   Drug Court case over a regular criminal court case?

17   A.    Well, in that same line, they estimate a regular

18   case at costing less, but again, that's marginal cost.

19   That's not total cost.  It's just the added cost, the new

15:03:49 20   cost.

21   Q.    Dr. Burke, do you think the Courts in Trumbull

22   County understand what the costs are to run a Drug Court?

23            MR. WEINBERGER:  Objection.

24   A.    Sure.

15:04:04 25

1    BY MS. FUMERTON:

2    Q.    And you never --

3              THE COURT:  Overruled.

4    Q.    -- did any investigation to try to find that cost,

15:04:10 5   did you?

6    A.    I did not.

7    Q.    So let's look at another cost.

8              Can you please turn to Page 134 of your

9    report?

15:04:51 10  A.    Yes, ma'am.

11   Q.    And this schedule provides --

12   A.    Hold on a minute, please.

13   Q.    Yes.

14   A.    Okay.  134 of my report.

15:05:19 15  Q.    And I'm going by the number, the Bates stamp number

16   of Exhibit P 23127.  So it's report Page 78.

17   A.    When you said 134, are you --

18   Q.    I know.  I'm going to try to stop confusing you on

19   this.

15:05:33 20           So I'm looking at Page 78 of the report,

21   which is Page 134 of the exhibit.  And specifically, it's

22   3B3, Transitional Housing For Newly Released.

23   A.    Can you move that page up, please, so I can see the

24   bottom?

15:05:52 25           So it's Page 76.

1              MR. WEINBERGER:  78.

2              THE WITNESS:  That's where you want me to

3      go.

4              MR. WEINBERGER:  It's 78.

15:06:04  5    Q.   Did I misspeak?  I apologize if I misspoke.

6      A.   I'm with you.

7      Q.   Okay.

8              So on this Schedule 3B3, you are estimating

9      costs per person of transitional housing for individuals

15:06:38 10    newly released from incarceration, correct?

11     A.   Yes.

12     Q.   And you estimate $10,711 per person?

13     A.   Yes.

14     Q.   Correct?

15:06:50 15            And if we turn to Page 83 of your report,

16     which is Prenatal and Post-Partum Housing Services, we'll

17     see you're estimating the same $10,711 for housing

18     services per mother, correct?

19     A.   Could you show me the bottom of that page, please?

15:07:19 20    Q.   Absolutely.

21     A.   83.

22             Yes.  And it's the same source.

23     Q.   It's the same source.

24             So you have identified the housing costs

15:07:45 25    per person for housing services that are provided to new

1    mothers with OUD as the same as the housing costs for

2    individuals who need transitional housing

3    post-incarceration, correct?

4    A.    Yes.

15:07:58 5    Q.    And as you said, you used the same source.

6              And that source was not any investigation

7    of the actual cost of transitional housing in Lake and

8    Trumbull Counties, correct?

9    A.    What do you mean by actual costs?

15:08:13 10   Q.    Like, you didn't go to anybody in Lake or Trumbull

11   County --

12   A.    No, I sourced where I got my information from, and

13   I got it from the Culhane Report.

14   Q.    Right.  And that's from May of 2007, correct?

15:08:27 15   A.    Yes.

16   Q.    Okay.

17             Can you please turn to the Bates Number 65,

18   but I appreciate you like the other one.  So give me a

19   second and I'll get there.  I'll give it to you.

15:08:57 20            So it's your report, Page 41.  But it's

21   Exhibit Page 65 of P 23127.

22             Let me know when you're there.

23   A.    Thank you.

24             Yes.

15:09:26 25   Q.    Okay.

```
 1              And this schedule estimates the costs of

 2    outpatient treatment for individuals in Lake County with

 3    OUD, correct?

 4    A.    Yes, as per the Alexander report.

 5    Q.    And there's a similar schedule that does the same

 6    thing for Trumbull County, correct?

 7    A.    Yes.

 8    Q.    So again, the first column is year.

 9              The next column lists the number of

10    individuals with OUD in Lake County that are estimated by

11    Dr. Alexander to receive outpatient OUD treatment in each

12    of those years, correct?

13    A.    Yes.

14    Q.    And the next column is average cost per day,

15    correct?

16    A.    Yes.

17    Q.    And the citation for that column again is

18    Dr. Alexander's report, correct?

19    A.    Yes.

20    Q.    And that's because Dr. Alexander provided the

21    average cost per month for outpatient treatment, correct?

22    A.    Yes.

23    Q.    And then you take that average cost per month,

24    multiply it by 12 to get the average cost per year, and

25    then divide by 365 to get the average cost per day,
```

1    correct?

2    A.    Yes.

3    Q.    And you didn't validate whether the average cost

4    per month that Dr. Alexander provided was accurate,

15:10:42 5    correct?

6    A.    Say again.

7    Q.    You did not validate whether the average cost per

8    month that Dr. Alexander provided was accurate, correct?

9    A.    You're correct.  I accepted what Dr. Alexander had.

15:10:51 10    Q.    And you didn't check to see whether the average

11    cost per month that Dr. Alexander provided is consistent

12    with what the counties currently pay or have historically

13    paid for the same or similar treatment, correct?

14                    MR. WEINBERGER:  Objection.

15:11:01 15                    THE COURT:  Look, I'm not trying to try the

16    case.

17                    Dr. Burke has said that he didn't go

18    behind -- if Alexander gave him a figure, he used it.  He

19    didn't go behind it.  He didn't talk to anyone at Lake

15:11:13 20    County, he didn't talk to anyone at Trumbull County for

21    anything he did.

22                    Okay?  I mean, I don't think we need to

23    keep doing this for every chart.  He's going to be

24    consistent.

15:11:24 25                    Is that right, Doctor?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. FUMERTON:  Understood, Your Honor.

4          I'll move things along.

15:11:29  5          THE COURT:  All right.

6  BY MS. FUMERTON:

7  Q.    The next column reflects the number of days in the

8  year that are required for the treatment, correct?

9  A.    Yes.  And I see a mistake there.  It should be

15:11:41  10  365.25.

11  Q.    Okay.

12  A.    A leap year happens.

13  Q.    Putting aside the .25, but for each year of the

14  schedule, the number of days in a year required for

15:11:50  15  treatment that you estimated is for 365 days, right?

16  A.    Yes.

17  Q.    In other words, the entire year?

18  A.    Yes.

19  Q.    So for the year 2021, you're computing the cost for

15:12:02  20  388 people to receive treatment for the entire year,

21  correct?

22  A.    I don't know if that's 388 people.

23          It may be a thousand people.  It's just

24  that you need that number, that capacity, you need the

15:12:17  25  capacity to deal with 388 people but they may be

Burke - Cross/Fumerton                    694

1    different people over the year, some for a month, some

2    for several months.

3    Q.    And did you -- did you recall being asked this

4    question in your deposition a few months ago?

15:12:32  5    A.    I do.

6    Q.    And in that deposition, do you recall that you

7    referred to these as people?

8    A.    Yes.

9    Q.    Okay.

15:12:41 10          And so in your deposition, you stated that

11    you were computing the costs for these 388 people to

12    receive treatment for the entire year, correct?

13    A.    And I misunderstood what Dr. Alexander was saying

14    with the 388, and he checked up on that.

15:12:55 15    Q.    And how did you check up on that?

16    A.    We went -- I went back to Mr. Weinberger and

17    checked with him, and he checked with the sources, and

18    they say Dr. Alexander says that's capacity, that's

19    potential, that's the number of slots you need available.

15:13:12 20          And it's not 388 people.  It may be a

21    thousand people, each for three months or four months.

22    Q.    And so --

23    A.    And so I misunderstood what it was.  So I gave you

24    a bad answer -- I mean I gave you an honest answer but I

15:13:27 25    gave you a bad answer in the deposition.

1      Q.    And then Mr. Weinberger told you that answer was

2      wrong, and that you misunderstood Dr. Alexander?

3      A.    Yes.

4                  MR. WEINBERGER:  I object to that, Your

15:13:37  5      Honor.

6                  MS. FUMERTON:  Well, Your Honor, it's

7      changing the testimony as to how he's calculating these

8      costs, and I think we get to understand how he --

9                  THE COURT:  It was incorrect.  He gave an

15:13:45 10      incorrect answer of people.  He meant -- now it's slots,

11      okay, so --

12      BY MS. FUMERTON:

13      Q.    So you have no expert opinion, and your analysis

14      does not show how many people will actually be treated?

15:13:59 15      A.    That's correct.

16                  It's kind of like FTEs at a university or

17      college.  You get some people who take a full load, you

18      get some people who are there for a semester, you get

19      some people who take just one course, but the university

15:14:12 20      adds up the full-time equivalence at the end of the year

21      and that's what they report.

22                  That's what this is.  It's a full-time

23      equivalent.  It's a capacity figure.  It's a potential.

24      Q.    So this could be, as you said, a thousand people,

15:14:25 25      right?

Burke - Cross/Fumerton

696

1       A.    Could be a thousand.  I don't know how many it is.

2             But Dr. Alexander said that's the number of

3       slots you need available for people with these problems.

4       Q.    So when you were asked this question at your

15:14:37 5   deposition with respect to multiple schedules, correct,

6       where you had inputted 365 days?

7       A.    Yes.

8       Q.    And so if we turn the page, for example, Schedule

9       2B2 for intensive outpatient treatment, you've

15:14:52 10  essentially done the same thing?

11      A.    The same would apply.

12      Q.    You just misunderstood what Dr. Alexander was

13      proposing, correct?

14      A.    Yes.

15:14:59 15  Q.    So again, where it says number in intensive

16      outpatient treatment, you actually aren't opining and

17      you're not putting an input here as to how many

18      individuals will receive treatment?

19      A.    No.

15:15:09 20  Q.    That's --

21      A.    It's the number of slots that Dr. Alexander has.

22      Q.    Understood.  And it's otherwise unknown as to how

23      many people will be --

24      A.    I don't know how many people.  I don't think

15:15:22 25  Dr. Alexander knows how many people either.  He just

1      knows how many you have to have available for.

2      Q.    And that would be true for Trumbull County as well,

3      correct?

4      A.    True.

15:15:45  5      Q.    And not just for services but you did the same

6      365-day calculation with respect to drug treatment as

7      well, correct?

8      A.    Yes.

9      Q.    And that was the same error that you had made or

15:15:52 10      misunderstanding you had in your prior deposition,

11      correct?

12      A.    Yes.

13      Q.    Okay.  Let's move on to a different component of

14      the abatement plan.

15:16:05 15              Can you please turn to Page 29 of your

16      report, Page 165 of the exhibit?

17      A.    Yes.

18      Q.    Again, you have the year of the abatement and the

19      next column reflects the number of children that are

15:17:03 20      estimated to be in foster care, due to parental opioid

21      use, correct?

22      A.    Yes.

23      Q.    And that number's coming from Dr. Alexander?

24      A.    Yes.

15:17:14 25      Q.    And then there's a cost of -- for foster care, cost

1    per child, correct?

2    A.    Yes.

3    Q.    And those costs do not come from Dr. Alexander,

4    correct?

15:17:25  5    A.    That's correct.

6    Q.    Instead, they come from the document that's cited?

7    A.    Yes.

8    Q.    And we can go look at the detail if we need to, but

9    basically, you took that source and you took the per day

15:17:37 10    daily rates and converted them to be annual rates that

11    are reflected on the next page, correct?

12    A.    Yes.

13    Q.    And Dr. Alexander, in his report, does not specify

14    how long the children reflected in these schedules will

15:17:54 15    be in foster care, does he?

16    A.    You're correct.

17              Again, that's one of those capacity things.

18    There may be some children for three months, some

19    children for nine months, some children for a week.  But

15:18:06 20    Alexander says you need that capacity, you need that

21    potential, you need that available.

22    Q.    And so I think in your prior deposition, again, you

23    had testified that those were the actual number of

24    individual children?

15:18:19 25    A.    Yes.  And I was --

1    Q.    But you misunderstood?

2    A.    I misunderstood.

3    Q.    But your calculations then would assume that there

4    are 39 children for an entire year or more than 39

15:18:32 5    children occupying space for an entire year, and that

6    would be the cost for those children, correct?

7    A.    Yes.

8    Q.    And to be clear, you don't know what the average

9    length of stay in foster care is for children, correct?

15:18:47 10    A.    I do not.

11    Q.    Can you please turn to Page -- let's see -- 25 of

12    your report?  It's Page 34 of the exhibit.  It's Schedule

13    1E2a.

14    A.    Yes.

15:19:57 15    Q.    And because in this instance, unlike the prior one

16    we were looking at with the LEAD programs, these 8.8

17    machines are going to be the total over the 15-year

18    period, correct?

19    A.    Yes.

15:20:08 20    Q.    So there are no other costs?

21    A.    It's a one-time cost.

22    Q.    And you have a one-time cost of acquiring those

23    machines is $181,000, correct?

24    A.    Yes.

15:20:24 25    Q.    And if we turn to the next page, so it's two pages,

1    but Page 26 of your report, Page 36 of the exhibit, this

2    is the page Schedule 1E2b, that estimates the recurring

3    cost of the 8.8 drug checking machines in Lake County for

4    15 years, correct?

15:20:48 5    A.    Yes.

6    Q.    And do you know what a drug-checking machine is?

7    A.    Not really.

8    Q.    And here you estimated the number of technicians

9    needed to perform the recurring maintenance on the drug

15:21:01 10   checking machines, correct?

11   A.    Yes.  Dr. Alexander said you need one.

12   Q.    And though -- you estimate the cost of one

13   technician for the 8.8 machines over a 15-year period and

14   come up with $1.3 million total cost, correct?

15:21:18 15   A.    Yes.

16   Q.    And that's assuming that this individual's sole job

17   is to check those 8.8 machines, correct?

18   A.    Assuming what?

19   Q.    That this individual's job, sole job, over those 15

15:21:35 20   years is to check those 8.8 machines, correct?

21   A.    Yes.

22               You need one person.

23   Q.    And that's at a cost to Lake County of $1.3

24   million, correct?

15:21:48 25   A.    Yes.

1    Q.    Based on your estimates?

2                    MR. WEINBERGER:  So the record is correct,

3    you're talking about over a 15-year period of time.

4                    MS. FUMERTON:  I apologize if I said

15:22:10 5    something other than that but I was not intending

6    anything other than 15 years.

7                    MR. WEINBERGER:  Okay.

8    BY MS. FUMERTON:

9    Q.    And you do the same thing for Trumbull County.  I

15:22:26 10   think there were nine machines but you essentially said

11   for those nine machines it was a one-time cost, and

12   you'll hire a technician to service them for the

13   entire -- for the 15 years, correct?

14   A.    Yes.

15:22:39 15   Q.    And in Lake -- I'm sorry -- in Trumbull County --

16   why don't we look at it just to make sure it's clear.  So

17   if we go to Page 113 of your report.

18   A.    113, yes.

19   Q.    203 of the exhibit.

15:23:26 20                   This is showing the nine drug checking

21   machines at a cost of $186,000.

22   A.    Hold on a minute, please.

23                   113.

24                   Yes.

15:23:42 25   Q.    Okay.

1                    And if you turn to the next page, that's

2     Page 114 of the report, 205, you can see that for the

3     cost of the technician for Trumbull County, you were

4     estimating a total cost of $1.16 million over 15 years,

15:24:00  5     correct?

6     A.    Yes.

7     Q.    So if you add them both together, you're basically

8     talking $2.1 million, Lake and Trumbull Counties for two

9     technicians over a 15-year period to track -- to check

15:24:18 10    drug checking machines, correct?

11    A.    Yes.

12                   If you start off with this page, you have

13    to pay around $60,000 a year plus fringe benefits for 15

14    years, that's what it comes out to be.

15:24:37 15    Q.    Let's switch to Page 38 of your report, which is

16    Page 55 of the exhibit.

17    A.    Page 35?

18    Q.    36.  It's 55 of the exhibit.  36 of your report.

19    A.    Yes.

15:25:05 20    Q.    And this is Schedule 2A3, which is estimating

21    transportation assistance for individuals receiving OUD

22    treatment in Lake County, correct?

23    A.    Yes.

24    Q.    And again, these are numbers that you got from

15:25:25 25    Dr. Alexander, right?

1    A.    Yes.

2    Q.    When you were estimating the figures on this page,

3    did you do any investigation to understand what

4    percentage of individuals receiving OUD treatment in the

15:25:42 5    counties would actually need the transportation

6    assistance?

7    A.    I did not.

8              I thought they would be the numbers that

9    Dr. Alexander has, and he -- that's not the number of

15:25:52 10    people.  That's the number of vouchers needed.

11    Q.    And to the extent that this schedule would indicate

12    that every single person receiving outpatient OUD

13    treatment in Lake and Trumbull County would need

14    transportation assistance to get there, you don't have an

15:26:11 15    opinion one way or the other as to whether that's

16    appropriate, correct?

17    A.    I do not have an opinion on that.  You're right.

18    Q.    I just want to talk high level at some of the other

19    costs just to make sure I understand what you're

15:26:25 20    estimating.

21    A.    Say again, please.

22    Q.    Sorry.  I was just transitioning us.  I want to

23    talk about some other specific costs at a very high

24    level?

15:26:34 25              THE COURT:  If you're going into another

1    subject, Ms. Fumerton, it might be a good time for a

2    break.

3                MS. FUMERTON:  Yes, Your Honor.  I

4    apologize.

15:26:40 5                THE COURT:  No.  No problem.

6                I didn't want to cut you off.

7                So we'll take a 15-minute break and then

8    we'll hopefully conclude with the Doctor's testimony.

9                MS. FUMERTON:  Thank you, Your Honor.

15:26:49 10                (Recess taken.)

11                THE COURT:  Okay.  Please be seated.

12                And, Doctor, I just want to remind you

13    you're still under oath from before the break.

14                THE WITNESS:  Yes, Your Honor.

15:56:08 15                THE COURT:  Okay.

16    BY MS. FUMERTON:

17    Q.    Dr. Burke, during the break, I was able to direct

18    you to the next page I'm going to ask you about, which is

19    Page 17 of your report, which is Page 18 of the exhibit.

15:56:25 20                And that's Schedule 1A2.

21                Do you have that in front of you?

22    A.    I do.

23    Q.    Okay.  And I'm going to try to get us all out of

24    here in short order, but just have a few questions about

15:56:38 25    some specific schedules to make sure I understand what it

1    is that you're estimating.

2              Okay?

3              So the Schedule 1A2 is estimating the cost

4    to Lake County for paying doctors and other health

15:56:57  5    professionals to attend continuing medical education.

6              Is that correct?

7    A.    Yes.

8    Q.    Okay.  And for 15 years, you have estimated a total

9    cost of a little over three million, correct?

15:57:15  10    A.    Yes.

11    Q.    And you did the same thing for Trumbull County?

12    A.    Yes.

13    Q.    And that's on Page -- this page -- Page 105 of your

14    report, which is Page 187, and here you've estimated that

15:57:36  15    same cost of paying doctors to attend continuing medical

16    education of a little over one -- or about $1.5 million.

17              Is that right?

18    A.    Yes.

19    Q.    So if you add the 15-year cost for Lake and

15:57:54  20    Trumbull together, you're getting over $4 million that

21    Dr. Alexander's abatement plan is proposing for the

22    counties to pay doctors to attend continuing medical

23    education, correct?

24    A.    That's the cost of Alexander's plan, yes.

15:58:07  25    Q.    Can you turn to Page 24 of your report, which is,

1    for the record, Page 32 of Exhibit P 23127?

2    A.    Yes.

3    Q.    And this Schedule 1E1 estimates the cost for Lake

4    County to provide, in fact, heroin users with access to

15:58:59 5    syringes, correct?

6    A.    Yes.

7    Q.    And you estimate the cost for Lake County to do so

8    for 15 years would be a little over 7 -- or about $7.4

9    million, correct?

15:59:12 10    A.    Almost seven-and-a-half million, yes.

11    Q.    And you did the same for Trumbull County, and

12    that's on Page 112 of your report, which is Page 201 of

13    this exhibit.

14    A.    Yes.

15:59:35 15    Q.    And the total for Trumbull County of

16    Dr. Alexander's proposal for the counties to pay for

17    heroin users to have the access to syringes is, again,

18    over -- a little bit over $7.5 million, correct?

19    A.    Yes.

15:59:52 20    Q.    So for both Lake and Trumbull County, that's about

21    $15 million?

22    A.    Yes.

23    Q.    If you'd turn to Page -- Page 27 of your report,

24    which is Page 38 of this exhibit, and I'd ask you some

16:00:27 25    basic questions.  So if you just want to look on the

1    screen, that's fine, or you're welcome to have the hard

2    copy in front of you.

3    A.    I have the hard copy.

4    Q.    Okay.

16:00:35   5    A.    I have the screen, too.  Thank you.

6    Q.    And so this is Schedule 1E3, and this is

7    effectively estimating a cost for providing users of

8    illicit drugs with test strips to test those illicit

9    drugs before they take them to see if they have Fentanyl,

16:00:53  10    correct?

11    A.    Yes.

12    Q.    And you estimate, and under Dr. Alexander's

13    abatement plan, that for Lake County, the total cost

14    would be about $3.2 million of doing so, correct?

16:01:06  15    A.    Yes.

16    Q.    And then you do the same for Trumbull County.  And

17    for Trumbull County, that's shown on Page 115 of your

18    report, which is Page 207 of this exhibit.

19             And here you're estimating the cost to

16:01:29  20    Trumbull County of about $3.4 million for illicit users

21    of drugs to test whether or not those drugs have

22    Fentanyl, correct?

23    A.    Yes.

24    Q.    And so if you combine the 3.4 with the earlier

16:01:45  25    number, you're getting over -- over $6 million, is that

1   right?

2   A.    Yes.

3   Q.    And that's for Dr. Alexander's plan to -- the cost

4   of Dr. Alexander's -- let me start over.

16:02:00  5          That's for the cost.

6   A.    That's the cost of that part of this plan, yes.

7   Q.    Thank you.

8          Can I direct your attention to Page 55 of

9   your report, which is Page 93 of this exhibit, and I

16:02:34 10  really want to talk about these schedules altogether.  So

11  I want to sort of flip through them once you get there.

12         I want to talk about Schedules 2C, which

13  deal with managing and treating HIV, HCV, and

14  endocarditis.

16:03:07 15         Are you there?

16  A.    I'm on Page 55, yes.

17  Q.    Okay.  So Page 55 has an estimated cost for Lake

18  County of HCV and HIV screening, correct?

19  A.    Yes.

16:03:23 20  Q.    Page 56 has HCV treatment, correct?

21  A.    Yes.

22  Q.    And it's a large sum of almost 50 million for the

23  15 years to treat?

24  A.    What -- what page is that, please?

16:03:37 25  Q.    It's Page 56 of your report, Page 95 of this

         1    exhibit.

         2    A.    Yes.

         3    Q.    And then the next page, Page 57, which is Exhibit

         4    Page 97, if you can see the page number, this is

16:03:54  5    treatment of HIV, and that's over $10 million for 15

         6    years, correct?

         7    A.    Yes.

         8               A lot of money.

         9    Q.    And, in fact, be happy to look at the report, but

16:04:06 10    if you go to 2C and you add up all the different costs

        11    that Dr. Alexander's plan is proposing for the treatment

        12    of these other diseases --

        13               MR. WEINBERGER:  Well, these are

        14    applications.

16:04:24 15               THE COURT:  These are other -- these are

        16    other diseases that people with Opioid Use Disorder have.

        17    BY MS. FUMERTON:

        18    Q.    Well -- and let's be clear because I want to

        19    understand what we're looking at.

16:04:34 20               THE COURT:  This isn't everyone in Trumbull

        21    or Lake County with HIV or the heart infection.

        22               MS. FUMERTON:  That's absolutely fair, Your

        23    Honor, and I wasn't trying to suggest anything else.

        24               This would be people who have these

16:04:48 25    diseases and also have OUD, correct?

```
           1              THE COURT:  And probably got it because as

           2     a result of taking the drugs.

           3              MS. FUMERTON:  Well, respectfully, Your

           4     Honor, I don't know that there's testimony that suggests

16:04:57   5     that, but you were not attempting in your estimate to

           6     determine whether or not the individuals who --

           7              THE COURT:  Well, to be fair, everyone

           8     knows that you can get certain infectious diseases and

           9     heart infections from illegal drugs that you're

16:05:14  10     injecting.

          11              So I think that's a corollary.

          12              MS. FUMERTON:  Yes, Your Honor.

          13              Let's make sure that the record is clear on

          14     this front since you raised this point.

16:05:22  15     BY MS. FUMERTON:

          16     Q.    And I'm not trying to suggest that these treatment

          17     for people that do not also have OUD.

          18              But in estimating these costs, which if you

          19     total them all up for both counties, you get almost $200

16:05:35  20     million for treating and services related to individuals

          21     with these additional diseases.

          22              You did not make any effort to determine

          23     whether those individuals received those diseases as a

          24     result of their OUD, correct?

16:05:51  25     A.    Correct.
```

```
  1    Q.    And so the costs would include individuals who have
  2    those diseases and had them before they had OUD, correct?
  3    A.    It could, yes.
  4    Q.    Could you please turn to Page -- I need
16:06:25  5    glasses -- Page 62 of your report, which is Page 107 of
  6    this exhibit?
  7              I just want to make sure I understand what
  8    this schedule is estimating.
  9    A.    Yes.
16:06:43 10    Q.    So on Schedule 2D4, pain treatment specialists,
 11    essentially what you are doing is estimating the cost to
 12    hire seven pain doctors to treat -- let me ask that
 13    question again.
 14              You're trying to estimate the cost of
16:07:01 15    hiring seven pain treatment specialists to treat pain,
 16    correct?
 17    A.    Yes.
 18    Q.    And for Lake County, you're estimating a 15-year
 19    cost of almost 25 million, correct?
16:07:17 20    A.    Yes.
 21    Q.    And if we look at the Trumbull costs to hire pain
 22    treatment specialists, that's on Page 150 of your report,
 23    which is Page 276 of this exhibit, and for Trumbull
 24    County, Dr. Alexander estimates hiring six pain treatment
16:07:58 25    specialists at a cost to Lake County -- I'm sorry -- of
```

1  Trumbull County of over $16 million for a 15-year period,

2  correct?

3  A.    That's the cost of hiring those people.

4          I don't know if it's to Trumbull County or

5  not, but that's the cost of hiring those people, whoever

6  hires them.

7  Q.    And that's what I want to understand, too.

8          When you were estimating costs here, you're

9  not estimating the cost that would be paid by Lake or

10  Trumbull County; they could be paid by Medicaid, for

11  example?

12          MR. WEINBERGER:  Objection.

13  A.    Well, you're absolutely right.  I'm looking at the

14  cost of the plan, not who pays for it.

15          Catholic Charities, United Jewish Appeal,

16  next door neighbor, you win the lottery.  Lots of ways

17  you could pay for it.  I'm looking at the cost of it.

18  BY MS. FUMERTON:

19  Q.    Right.

20          And so you didn't make any effort to try to

21  subtract from these costs noncounty costs; in other

22  words, costs that would be paid by other entities?

23          THE COURT:  Hold it.  Hold it.

24          Ms. Fumerton, all Dr. Burke did was take

25  the plan that the other doctor did and he costed it out.

1    That's it.

2              He didn't -- he wasn't asked to say who

3    would pay for it or how it would be paid for, if it would

4    be paid.  Just how much it cost.

16:09:22  5              MS. FUMERTON:  Well, and, Your Honor, if it

6    was already clear to everybody and in the record before,

7    I apologize for raising it again, but I want to make

8    sure, given the assignment in this case, that it was

9    clear that --

16:09:31 10              THE COURT:  It's clear to me.  Okay?

11              MS. FUMERTON:  Okay.

12              THE COURT:  So I'm saying it's clear.

13              That's all this doctor did.  He costed out

14    the other plan.

16:09:38 15              He's not -- he wasn't asked to figure out

16    who would pay for it or if it would be ever paid for.

17              Some of it's being paid for now.

18              MS. FUMERTON:  Thank you, Your Honor.

19              And so just to tie that off --

16:09:51 20              THE COURT:  That's my job.

21    BY MS. FUMERTON:

22    Q.    I think it's very clear, I think probably based on

23    what Judge Polster just said, but so these are estimating

24    costs; not necessarily costs to the county, correct?

16:10:04 25    A.    I don't know whose costs they are.

1              They're just the cost of providing this

2    plan.

3    Q.    I want to touch on one other part of your report.

4              So in addition to relying on certain cost

16:10:54  5    inputs that were set forth by Dr. Alexander, and some

6    that you came up with, you testified that you relied on

7    certain cost inputs from Dr. Nancy Young, correct?

8    A.    From doctor?

9    Q.    Nancy Young.

16:11:07 10    A.    Yes.

11    Q.    And like with respect to Nancy, Dr. Young, you did

12    not take any attempt to -- I'm sorry -- like with respect

13    to Dr. Alexander with the cost inputs you got from

14    Dr. Young, you did not do any independent assessment as

16:11:23 15    to whether or not those costs were accurate, correct?

16    A.    You are correct.

17    Q.    And you didn't do anything else to otherwise

18    validate those costs, right?

19    A.    No.  I accepted them.

16:11:38 20    Q.    Do you know that Dr. Young testified yesterday?

21    A.    No.

22    Q.    Would it surprise you to learn that yesterday,

23    Dr. Young testified in this courtroom that she was not

24    offering any opinions or estimates in this case about the

16:11:53 25    costs of the various programs or interventions that she

1    recommends?

2    A.    No, that wouldn't surprise me or it would not not

3    surprise me.

4                  Whatever she testified to, she testified

16:12:07 5    to.

6    Q.    If Dr. Young was not -- if Dr. Young's testimony

7    yesterday was accurate that she was not providing any

8    cost estimates, do you know the source of the cost

9    estimates that you received from Dr. Young?

16:12:31 10   A.    Do I know what?

11   Q.    What the source is.

12   A.    For Young's report?  No, I do not.

13                  I have Young's report.  I could look at her

14   bibliography and see what the sources are, but I don't

16:12:42 15   know them from memory.

16   Q.    And do you understand that was a report from West

17   Virginia?

18   A.    Yes.  West Virginia.

19   Q.    And so you didn't look at any reports specific to

16:12:52 20   Lake and Trumbull that Dr. Young issued in this case,

21   correct?

22   A.    Correct.

23   Q.    And the figures in Dr. Young's West Virginia report

24   were often specific to West Virginia, correct?

16:13:00 25   A.    They were for West Virginia, yes.

Burke - Cross/Fumerton

716

1   Q.    And I think you touched on this before, but you're

2   familiar with the concept of sort of the cost benefit

3   analysis, talked about marginal cost, right?

4   A.    Those are two different concepts.

16:13:19  5   Q.    Fair enough.

6   A.    But I'm familiar with both of them.

7   Q.    Fair enough.

8             Let's talk about the cost benefit.

9             In your analysis, you looked at the cost of

16:13:28  10   the various elements of Dr. Alexander's abatement plan

11   but you did not apply any offsets to the extent there

12   would be a benefit to another portion of the counties'

13   programs, correct?

14   A.    Oh, no, I think I did.

16:13:42  15   Q.    And in what way are you -- do you think that you

16   provided offsets?

17   A.    It's my understanding that Dr. Alexander's plan is

18   the cost of remediation, and if you follow through with

19   his plan, you'll be through with this problem.

16:13:57  20             There's the benefit.

21   Q.    So you applied Dr. Alexander's plan as it was

22   written.

23             You did not undertake any additional

24   efforts to determine whether there would be any offset or

16:14:07  25   benefit to the counties, correct?

1       A.    No, I assumed there would be a benefit.

2             The benefit is you would remediate this

3       problem.  That's the benefit.

4       Q.    But you did not, in your cost estimates, subtract

16:14:20 5     any costs that the county might no longer incur, due to

6       the programs that had a benefit unrelated to Opioid Use

7       Disorder, correct?

8       A.    No, you're correct.  That was not in Alexander's

9       report.  It was not in mine.

16:14:40 10            MS. FUMERTON:  Thank you for your time

11      today, Dr. Burke.

12            I'm passing the witness.

13            THE WITNESS:  Yes, ma'am.  You're welcome.

14         CROSS-EXAMINATION OF JOHN F. BURKE

16:14:58 15   BY MR. HYNES:

16      Q.    Hello, Dr. Burke.

17      A.    Good afternoon.

18      Q.    My name is Paul Hynes.  I represent CVS.  We met

19      during your deposition a few months ago.

16:15:43 20            Good to see you.  And I think I speak for

21      all of us when I say please give our best to

22      Dr. Burke -- or, sorry, Dr. Rosen.  I always get you guys

23      confused.

24      A.    We're interchangeable.

16:15:56 25   Q.    I know.

1    A.    We're the Irish/Jews of Cleveland.  We go back and

2    forth.

3    Q.    Okay.  Well, please give our best to him, and we

4    hope he recovers.

16:15:58 5    A.    I'll pass that kind word on.  Thank you.

6    Q.    I just have a few questions.  This won't take much

7    time.

8            And just I want to, I think, clarify my

9    understanding of some of your testimony that you just

16:16:06 10   gave in response to Ms. Fumerton's questions.

11           And first, I want to talk about the slots.

12           Do you recall that testimony?

13   A.    Do you want talk about what?

14   Q.    You testified that your cost estimates for

16:16:21 15   treatment are based on having slots available for the

16   entire year.

17           Do you recall that --

18   A.    Yes.

19   Q.    -- testimony?

16:16:29 20   A.    Yes.

21   Q.    Okay.

22   A.    As per Alexander said.

23   Q.    Exactly.

24           And you clarified that from your deposition

16:16:36 25   back in February?

```
          1    A.    Yes.

          2    Q.    Okay.

          3                I think it's best or easiest if we look at

          4    an example.  So I'm going to look at Schedule 2B in your

16:16:49  5    report.

          6                I believe this is Lake County.  It's

          7    Page 77.  And I'll put it on the screen if that's easier

          8    for you.

          9                MR. WEINBERGER:  Can you move the page

16:17:11 10    down?

         11    BY MR. HYNES:

         12    Q.    Sorry.  It's 47 of 232, Pete, and the Bates number

         13    is 77.

         14    A.    Can you show me the bottom of that page, please?

16:17:23 15                MR. WEINBERGER:  47 on your report.

         16    Page 47.

         17                MR. HYNES:  And it's Schedule 2B7.  And you

         18    know what?  I'm sorry.  I started with the wrong one.  I

         19    apologize.

16:17:36 20                Talk about wasted effort.

         21    BY MR. HYNES:

         22    Q.    Let's go to Page 42.  So just back five pages.

         23    A.    42?

         24    Q.    Yep.

16:17:57 25    A.    Yes.
```

1    Q.    Okay.  I'm going to push it down so we can see it.

2              This schedule shows the estimated -- your

3    estimated costs for intensive outpatient treatment,

4    correct?

16:18:09  5    A.    Yes.

6    Q.    Okay.  The second column, this one, from the left

7    shows the number in intensive outpatient treatment,

8    correct?

9    A.    Yes.

16:18:24  10    Q.    Okay.

11              And you clarified about an hour ago those

12    are slots that are to be available on a year-round basis

13    and not unique individuals?

14    A.    That's my understanding.

16:18:35  15    Q.    Okay.

16              And to calculate your estimated costs, you

17    took the slots, let's just take 2022, 181, you multiplied

18    that by the average cost per day, $155.96, and you

19    multiply it by 365 days per year.  Maybe it should have

16:19:00  20    been 365.25 as you said.

21              And then you did the inflation adjustment

22    but that's how you calculated that overall cost for that

23    year.  Is that correct?

24    A.    Yes.

16:19:08  25    Q.    Okay.

1         Now, if in that year, only 100 and -- if in

2    that year, a slot, let's say 10 of those slots are not

3    used on a particular day, there's no cost in that day for

4    that slot?

16:19:33 5    A.    Perhaps.

6    Q.    Perhaps?

7    A.    It all depends on what -- what Dr. Alexander says

8    is needed in that area.

9         Is that a bed?  Is that a facility?  Is

16:19:48 10    that transportation?  Whatever -- if it's needed, it's

11    needed.  You may not use it, but if it's needed you've

12    got to have it on hand.

13    Q.    Okay.  And if it's not something that's being used

14    on a particular day --

16:20:01 15    A.    Yeah.

16         And also if it's an average, as you know

17    with any average, there's some numbers above, some

18    numbers below.

19         So today, you don't -- you have 10 empty

16:20:11 20    slots.  Tomorrow, you've got 10 additional slots that

21    you've got nothing to do with.

22    Q.    Okay.  Maybe we could take it to a higher level.

23         If a slot isn't used for a week --

24    A.    Ever.

16:20:25 25    Q.    If it isn't -- better.

1          If one slot isn't used for the entire year,

2     it's likely the cost would be lower than what you've

3     projected here?

4     A.    Yes.

16:20:37  5          And if one slot is not needed forever, then

6     I don't think Alexander would have had 181 there.  He

7     would have had 180.

8     Q.    Well, he's giving you an estimate or a target, so

9     it's possible that the number of slots needed ends up

16:20:50 10    being lower.

11              Fair?

12    A.    Yes, but you should ask Alexander that question.

13    Q.    Okay.  Let's now go to Page 47.  And that's Page 77

14    on the bottom right.

16:21:17 15    A.    Yes, I'm there.

16    Q.    This is Naltrexone.  I assume you're not familiar

17    with Naltrexone?

18    A.    I am not.

19    Q.    Okay.

16:21:24 20    A.    I was a hospital corps man in the United States

21    Navy, a pharmacist's mate, but that was about 60 years

22    ago.

23    Q.    Okay.  Well, it's a medicine.  Okay?

24    A.    Yes.

16:21:35 25    Q.    It's a pill.

1          And would you agree, Dr. Burke, that if

2   medicine is not needed in a particular week, then there

3   would be no cost for that medicine?

4   A.    No, I don't agree.  If it's a capacity, if you have

16:21:53 5   to have it on hand, then you have to have it on hand.

6          If you don't use it, I don't know how long

7   these medicines last.  Do they have a life, do they have

8   a shelf life?  But Dr. Caleb Alexander called for this

9   number of -- and that's the number he used.

16:22:11 10  Q.    Well, if you take your example and you have it on

11  hand and you don't use it, then that probably means you

12  have to buy less in the future?

13  A.    Well, I think if that's the case, you should have

14  gotten Alexander to agree to a different number; not me,

16:22:31 15  because I don't know the number.

16  Q.    I understand.

17  A.    I relied on Alexander for the number.

18  Q.    And I'm not trying to get you to agree to a

19  different number.

16:22:39 20         I am trying to understand if a slot is not

21  used, will there be a cost incurred for that slot?

22  A.    If you have to have it available, I think there

23  would be a cost.

24         THE COURT:  Well, this is not a fair

16:22:55 25  question to Dr. Burke.

1        All right?

2        He took what Alexander said and he put

3    it -- he did the math.

4        So and, quite frankly, the answer to that

5    question is quite complicated, and you need -- you'd need

6    someone from the county.  If you want to call someone

7    from the county, you know, you'd probably get a good

8    answer to that question.

9        I don't know what the answer would be.

10        MR. HYNES:  Okay.  Thank you, Dr. Burke.

11        THE WITNESS:  You're welcome.

12        MS. HACKER:  Nothing from Walgreens, Your

13    Honor.

14    REDIRECT EXAMINATION OF JOHN F. BURKE

15    BY MR. WEINBERGER:

16    Q.   Dr. Burke, you were asked the question or the

17    statement was made to you, "You did not look at the

18    counties' budgets, expenditures, financial statements,

19    books, and records."

20        Do you remember that?

21    A.   Yes.

22    Q.   Did you use a -- despite that, did you use a

23    well-recognized methodology for estimating these future

24    costs?

25    A.   Yes, I did.

1    Q.    And is that a methodology that you have used in the

2    past?

3    A.    Yes.  I would estimate several thousand times.

4    Q.    Is that a well -- do you know, is that a

16:24:14  5    well-recognized methodology used by economists like you

6    around the country?

7    A.    Yes, it is.

8    Q.    Okay.

9          You were asked about 1E2b, Page 26.  You

16:24:28 10    don't have to look for it.  I'm going to put it right up

11    on the screen.

12          You were asked the question, "Does this

13    estimate the number of technicians needed to perform

14    recurring maintenance?"

16:24:39 15          In fact, Dr. Burke, this is the cost of

16    laboratory technicians, correct?

17    A.    Yes.  That's what it says.

18    Q.    The cost of providing a clinical laboratory

19    technician, correct?

16:24:52 20    A.    Yes.

21    Q.    You were asked about treating complications of OUD.

22          That's what you costed out.  It was

23    complications that patients suffer from OUD; not HIV

24    without it, correct?

16:25:11 25    A.    Correct.

```
          1   Q.    And so your Schedules 2C on Page 55, 2C2, HCV

          2   treatment on 56, HIV treatment on 57, and endocarditis

          3   treatment on Page 58 for Lake County costs out the cost

          4   of treating those complications, correct?

16:25:49  5   A.    Yes, sir.

          6   Q.    Same thing true with respect to Trumbull?

          7   A.    Yes, sir.

          8                 MR. WEINBERGER:  Thank you, sir.

          9                 That's all I have.

16:25:58 10                 THE COURT:  Let's see if there's anything

         11   on that.

         12                 Any recross from any of the defendants?

         13                 MS. FUMERTON:  Not from Walmart, Your

         14   Honor.

16:26:07 15                 MR. HYNES:  Not for CVS.

         16                 MS. HACKER:  Nothing from Walgreens, Your

         17   Honor.

         18                 THE COURT:  Okay.  Very good.

         19                 Thank you, Doctor.  You may be excused.

16:26:16 20   Thank you for coming in here today.

         21                 THE WITNESS:  Thank you, Your Honor.

         22                 THE COURT:  And say hello to the Judge for

         23   me.

         24                 THE WITNESS:  I will do that.  Thank you.

16:26:24 25                 MR. WEINBERGER:  Watch your step there,
```

1      John.

2                      (Witness excused.)

3                      MR. LANIER:  Your Honor, at this point in

4      time, the plaintiffs rest.

16:27:06 5                      MR. WEINBERGER:  We have to move --

6                      MR. LANIER:  Oh, after we move for

7      admission of exhibits.

8                      THE COURT:  Well, I think we pretty much

9      have taken care of them, but I guess we should --

16:27:16 10                      MR. WEINBERGER:  Well, we didn't with

11      respect to Dr. Young's exhibits, Your Honor.

12                      THE COURT:  All right.  Well --

13                      MR. WEINBERGER:  I could give you the

14      numbers.

16:27:25 15                      THE COURT:  All right.

16                      MR. WEINBERGER:  Okay.

17                      THE COURT:  I think we had P 23128.

18                      MR. WEINBERGER:  Correct.  That's her

19      report.

16:27:34 20                      THE COURT:  All right.  Is there an

21      objection?

22                      I mean, again, none of these expert reports

23      are being admitted for the truth of what's contained in

24      them.

16:27:43 25                      They're being admitted for what they say.

1   They're the testimony and work product of these

2   particular experts.  They're -- so that's, that's why,

3   what I'm considering them for.

4              So but if there's any objection beyond

16:28:01 5   that, I guess they should be put on the record.

6              MR. DELINSKY:  Your Honor, we do object to

7   the admission of the expert reports as stated in the

8   submission we made.

9              I think what, if my memory serves me right,

16:28:14 10  Your Honor, what has been admitted to date have either

11  been selected excerpts or charts or, for lack of a better

12  word, work papers.

13             THE COURT:  A portion, there should be a

14  portion, what -- I think we should admit the portions of

16:28:39 15  it that she testified to or that, I don't know, the

16  summary charts.

17             I can't recall specifically.

18             MR. WEINBERGER:  She referred to a couple

19  of charts in her report, Your Honor.

16:28:49 20            THE COURT:  Those charts should be

21  admitted.

22             MR. WEINBERGER:  Okay.

23             THE COURT:  Any objection to any chart that

24  she referred to?

16:28:56 25            MR. WEINBERGER:  We can look at the slides.

1          The slides come right from the report.

2          There were some graphs and other charts.

3          THE COURT:  Let me just look at -- I

4    actually have them, I think.

16:29:12  5          All right.  Well, I mean, I'm not -- she

6    didn't have any mathematical computations or summaries

7    like the other experts, so I'm not sure.

8          I mean, I've got -- I've got my copy of the

9    slides that you used, Mr. Weinberger, and I'm looking.

16:29:49 10          MR. WEINBERGER:  Table 2 from her chart --

11   from her report.

12          THE COURT:  All right.  What --

13          MR. WEINBERGER:  Which is Slide 14.

14          THE COURT:  All right.  Let's look at that.

16:30:13 15          Well, any objection to Table 2?  Again,

16   it's not admitted for the truth of it.  She testified to

17   it, she relied on it, and I think it's used in, I think

18   Dr. Alexander may have used this, also.

19          So I'll admit -- I'll admit that page.

16:30:34 20          MS. HACKER:  And just to be clear for the

21   record, Your Honor, I believe that's Plaintiffs' Exhibit

22   23128, Page 10, just Table 2 that appears on Page 10.

23          THE COURT:  All right.  Well, I don't have

24   the -- pregnant women with OUD effects.

16:30:56 25          All right.  So Page 10.

 1                    MR. WEINBERGER:  Okay.

 2                    The next one is Slide 15 and it's Graph 2.

 3     Same page, Your Honor.

 4                    THE COURT:  All right.  Any objection to

16:31:17  5     this chart?

 6                    MS. HACKER:  Walgreens has no objection to

 7     charts themselves, your Honor.

 8                    THE COURT:  Okay.

 9                    MS. HACKER:  And just to be clear for the

16:31:23 10     record, I do not believe Dr. Alexander relied on these

11     numbers, but since Dr. Young did testify off these

12     charts, we have no objection to the charts themselves.

13                    THE COURT:  All right.  Any chart that she

14     specifically testified to can come in.

16:31:35 15                    So that's -- again, someone's going to have

16     to put the numbers in.  I don't have them.

17                    MR. WEINBERGER:  Your Honor, we'll take the

18     slides --

19                    THE COURT:  All right.

16:31:42 20                    MR. WEINBERGER:  -- apply it to the report

21     and we'll get the page numbers for you.

22                    THE COURT:  All right.

23                    The charts that she testified to.

24                    MR. WEINBERGER:  And P 27576 is her

16:31:57 25     addendum.  We'll withdraw that.  We didn't use any charts

 1   with respect to that.

 2                    And her CV is P 23129.

 3                    THE COURT:  All right.  Well, her CV can

 4   come in, again, as to -- it's her CV so.

 5                    Okay.

 6                    MS. HACKER:  And, Your Honor, just if I may

 7   for the record, P 23129, her CV appears at Pages 1

 8   through 9.

 9                    Pages 10 through 19 are -- in Plaintiffs'

10   Exhibit 23129, Pages 1 through 9 are Dr. Young's CV.

11                    Pages 10 through 19 are additional

12   appendices that she did not testify about, so we would

13   ask that it be limited to Pages 1 to 9.

14                    THE COURT:  All right.  That's fine.

15                    MR. WEINBERGER:  I think that takes care of

16   it, Your Honor.

17                    THE COURT:  Okay.  Fine.

18                    MR. HALL:  Your Honor, I just have, for the

19   record, with respect to Dr. Keyes' rebuttal report, we

20   had discussed that we did not object to the charts and

21   figures on -- from Pages 56 through 60 of Dr. Keyes'

22   report, but the rebuttal report doesn't have charts and

23   it has her opinions, two kinds; those she expressed on

24   the record, which are in the record, but it also includes

25   opinions that she did not testify to and I, therefore,

1    did not cross her on because I was not going to spend our

2    time on opinions that she didn't testify to.

3                    So it's a fully -- it's a three-page text

4    narrative document, and we object to the admission of the

5    rebuttal report.

6                    THE COURT:  Maybe we don't need it.

7                    She testified.

8                    MR. WEINBERGER:  We'll withdraw it, Your

9    Honor.

10                    MR. HALL:  Thank you.

11                    THE COURT:  Okay.

12                    MS. HACKER:  And just one additional

13    exhibit to take care of, Your Honor.

14                    We offered, during the cross-examination of

15    Dr. Young, Walgreens MDL 5032.

16                    THE COURT:  Okay.  Any objection to that?

17                    MS. HACKER:  Here.

18                    MR. WEINBERGER:  Oh, no objection.

19                    THE COURT:  Okay.  All right.  We've taken

20    care of exhibits so the plaintiffs have rested.

21                    So we will pick up with the defense counsel

22    on Monday.

23                    We'll start at 9:00 a.m. Monday.  I have an

24    early appointment, so we'll start at 9:00.

25                    I guess it would be helpful for the

1    plaintiffs if when the defendants know who you're going

2    to call, to let them know.

3                I think it's just courtesy so they'll be

4    prepared.

16:35:18  5                MR. HALL:  Yes.

6                MR. LANIER:  Special Master Cohen ordered

7    them to do so, Your Honor, and ordered us to do so.  So

8    we've got a good list coming in and it will make it real

9    smooth.

16:35:27 10                THE COURT:  Okay.  Well, it may be changing

11    as a result of you not calling Ms. Caraway and

12    Ms. Fraser.

13                MR. HYNES:  Your Honor, we have some

14    exhibits from Dr. Alexander's cross-examination.  We can

16:35:46 15    do them now or we can do them on Monday.

16                THE COURT:  Might as well do it now.

17                MR. HYNES:  Okay.

18                We have the Hopkins document.  It's CVS MDL

19    4997.

16:35:55 20                MR. WEINBERGER:  No objection.

21                THE COURT:  Okay.

22                MR. HYNES:  Okay.

23                We have the Compton article then as CVS MDL

24    4992.

16:36:06 25                MR. WEINBERGER:  We object to the article

1    coming into evidence.

2                    THE COURT:  Well, yeah, I mean, typically

3    these aren't -- I mean, the articles don't come in.

4                    I mean, they're --

16:36:28  5                    MR. HYNES:  Dr. Alexander -- okay.

6                    THE COURT:  We had testimony, and the

7    testimony, of course, is admissible.

8                    MR. HYNES:  We'll mark it as a

9    demonstrative for identification purposes.

16:36:37 10                    THE COURT:  Right.  Okay.

11                    MR. HYNES:  Okay.

12                    THE COURT:  Yeah, anything that

13    was -- anything that was shown the witness certainly is a

14    demonstrative exhibit.

16:36:45 15                    MR. HYNES:  Of course.

16                    We have the Rhode Island technical appendix

17    that was his document from the Rhode Island case.

18                    And that is -- oh, sorry.  I screwed up.

19                    That is Washington.  The technical appendix

16:37:08 20    is CVS MDL -- no, okay.  We'll mark these documents as

21    demonstratives.

22                    THE COURT:  All right.  They're just

23    demonstratives.  Okay.

24                    MR. HYNES:  Yeah.

16:37:23 25                    THE COURT:  Okay.

1            MR. HYNES:  So that's all we have.

2            THE COURT:  Okay, fine.

3            MR. HYNES:  Thank you.

4            THE COURT:  Okay.

16:37:31   5            So we'll start at 9:00 a.m. on Monday with

6     the defense case, and everyone's committed, we will wrap

7     this up sometime next week.

8            For the time today, I have 1.25 for the

9     plaintiffs, and collectively 3.5 hours for the defense.

16:37:51  10            So plaintiffs have a lot of time left.  I

11     hope you're not going to --

12            MR. LANIER:  Woo hoo!

13            THE COURT:  -- use 20 hours for

14     cross-examination.

16:37:59  15            MR. LANIER:  We won't, Your Honor.  I

16     guarantee we will be giving you time back.

17            THE COURT:  All right.  I wouldn't think

18     so, Mark.

19            MR. DELINSKY:  Your Honor, we are going to

16:38:12  20     invoke a constitutional estoppel.

21            THE COURT:  If he goes into 20, well, he's

22     not going to.  I don't think he will.

23            All right.  Well, have a good weekend.

24            MR. WEINBERGER:  We -- as to Dr. Burke,

16:38:20  25     obviously we already have exhibits offered.

1            THE COURT:  Yes.

2            MR. WEINBERGER:  The one thing that I

3    didn't offer was his CV.

4            THE COURT:  All right.  His CV can come in.

16:38:28  5            MR. LANIER:  Thank you, Judge, for your

6    time this week.

7            THE COURT:  Okay.

8            MR. DELINSKY:  Judge, can we leave papers

9    on the desk?

16:38:45 10            THE COURT:  Yeah, no one is going to be

11   using the courtroom.  Don't leave anything of great

12   value.

13            (Proceedings concluded at 4:38 p.m.)

14                      -  -  -  -

15             C E R T I F I C A T E

16            I certify that the foregoing is a correct

17   transcript from the record of proceedings in the

18   above-entitled matter.

19

20

21

22   **/s/Susan Trischan**
     /S/ Susan Trischan, Official Court Reporter
23   Certified Realtime Reporter

24   7-189 U.S. Court House
     801 West Superior Avenue
25   Cleveland, Ohio 44113
     (216) 357-7087

1                          **I N D E X**

2

3  <u>**WITNESSES**</u>:                                    <u>**PAGE**</u>

4   CROSS-EXAMINATION OF G. CALEB ALEXANDER           513

5    (RESUMED)

6   BY MR. DELINSKY

7   CROSS-EXAMINATION OF G. CALEB ALEXANDER           574

8   BY MS. FUMERTON

9   CROSS-EXAMINATION OF G. CALEB ALEXANDER           581

10   BY MR. HALL

11   REDIRECT EXAMINATION OF G. CALEB ALEXANDER        598

12   BY MR. LANIER

13   RECROSS-EXAMINATION OF G. CALEB ALEXANDER         616

14   BY MR. DELINSKY

15   DIRECT EXAMINATION OF JOHN F. BURKE               624

16   BY MR. WEINBERGER

17   CROSS-EXAMINATION OF JOHN F. BURKE                649

18   BY MS. FUMERTON

19   CROSS-EXAMINATION OF JOHN F. BURKE                717

20   BY MR. HYNES

21   REDIRECT EXAMINATION OF JOHN F. BURKE             724

22   BY MR. WEINBERGER

23

24                          * * * * *

25