1
2
3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
CLEVELAND, OHIO

4  ------------------------------X
5  **IN RE:**                        :  Case No. 1:17-md-2804
                                     :
6  NATIONAL PRESCRIPTION             :
   OPIATE LITIGATION                 :
                                     :  **VOLUME 4**
7  TRACK THREE CASES                 :
                                     :  *(Pages 738 - 1035)*
8       *1:18-op-45032*              :
        *1:18-op-45079*              :
9                                    :  Monday, May 16, 2022
                                     :
10 ------------------------------X

11

12

13     TRANSCRIPT OF PHASE II ABATEMENT BENCH TRIAL PROCEEDINGS

14        HELD BEFORE THE HONORABLE DAN AARON POLSTER

15           SENIOR UNITED STATES DISTRICT JUDGE

16

17

18

19

20  Official Court Reporter:   Susan Trischan, RDR, CRR,
                               United States District Court
21                             Northern District of Ohio
                               801 West Superior Avenue
22                             Court Reporters 7-189
                               Cleveland, Ohio 44113
23

24
    Proceedings recorded by mechanical stenography.
25  Transcript produced with computer-aided transcription.

1    **APPEARANCES:**

2    For the Plaintiffs:          **Peter H. Weinberger, Esquire**
                                  SPANGENBERG SHIBLEY & LIBER LLP
3                                 1001 Lakeside Avenue East
                                  Suite 1700
4                                 Cleveland, Ohio 44114

5
                                  **W. Mark Lanier, Esquire**
6                                 THE LANIER LAW FIRM
                                  10940 W. Sam Houston Parkway N
7                                 Suite 100
                                  Houston, Texas 77064
8

9                                 **Frank L. Gallucci, III, Esquire**
                                  PLEVIN & GALLUCCI COMPANY, LPA
10                                55 Public Square
                                  Suite 2222
11                                Cleveland, Ohio 44113

12
                                  **Salvatore C. Badala, Esquire**
13                                NAPOLI SHKOLNIK PLLC
                                  400 Broadhollow Road
14                                Suite 305
                                  Melville, New York 11747
15

16                                **Maria Fleming, Esquire**
                                  NAPOLI SHKOLNIK PLLC
17                                1500 W. 3rd Street
                                  Suite 510
18                                Cleveland, Ohio 44113

19
                                  **Laura S. Fitzpatrick, Esquire**
20                                SIMMONS HANLY CONROY
                                  112 Madison Avenue
21                                7th Floor
                                  New York, New York 10016
22

23

24

25

1    **APPEARANCES (Continued):**

2    For Defendant CVS:          **Eric R. Delinsky, Esquire**
                                 **Alexandra W. Miller, Esquire**
3                                **Paul B. Hynes, Jr., Esquire**
                                 **Anthony M. Ruiz, Esquire**
4                                ZUCKERMAN SPAEDER LLP
                                 1800 M Street NW
5                                Suite 1000
                                 Washington, DC 20036
6

7
     For Defendant Walgreens:   **Jeffrey A. Hall, Esquire**
8                                BARTLIT BECK LLP
                                 54 West Hubbard Street
9                                Chicago, Illinois 60654

10
                                 **Katherine L.I. Hacker, Esquire**
11                               BARTLIT BECK LLP
                                 1801 Wewatta Street
12                               Suite 1200
                                 Denver, Colorado 80202
13

14
     For Defendant Walmart:     **John M. Majoras, Esquire**
15                               JONES DAY
                                 51 Louisiana Avenue NW
16                               Washington, DC 20001

17
                                 **Tara A. Fumerton, Esquire**
18                               **Jason Z. Zhou, Esquire**
                                 JONES DAY
19                               110 North Wacker Drive
                                 Suite 4800
20                               Chicago, Illinois 60606

21

22
     ALSO PRESENT:              **David Cohen, Special Master**
23

24                                      - - -

08:53:11 25

1          <u>MONDAY, MAY 16, 2022, 9:12 A.M.</u>

2               THE COURT:  Okay.  Good morning, everyone.

3               Okay.  I guess we're ready for the defense

4    witnesses so.

09:12:13  5               MR. HYNES:  Yes.  Good morning, Judge

6    Polster.

7               THE COURT:  Call your first witness,

8    please.

9               MR. HYNES:  Our first witness is Matt

09:12:21 10    Bialecki.

11               THE COURT:  Raise your right hand, please.

12                    MATTHEW BIALECKI

13        of lawful age, a witness called by the DEFENSE,

14            being first duly sworn, was examined

09:12:43 15                and testified as follows:

16               THE COURT:  Thank you.

17               MR. HYNES:  Judge Polster.

18               THE COURT:  Yes?

19               MR. HYNES:  I handed Mr. Pitts a notebook

09:12:50 20    with some charts we're going to present.

21               THE COURT:  All right.  Very good.

22               MR. HYNES:  We also have another copy as

23    well.

24               THE COURT:  Okay.

09:12:59 25

1       DIRECT EXAMINATION OF MATTHEW BIALECKI

2    BY MR. HYNES:

3    Q.    Take off your mask, Mr. Bialecki.

4    A.    I'm sorry?

09:13:09  5    Q.    You can take off your mask.

6    A.    Oh, thanks.

7    Q.    All right.  Good morning, Mr. Bialecki.

8    A.    Good morning.

9    Q.    Can you please state your full name for the record?

09:13:21 10    A.    Matthew Bialecki.

11    Q.    And where do you live, sir?

12    A.    Elmhurst, Illinois.

13    Q.    Okay.  Thank you for taking the time to be here

14    with us today.

09:13:32 15    A.    Sure.  Thank you.

16    Q.    I want to start, first, by talking about your

17    credentials because you're an expert witness in this

18    case.

19              What profession do you work in?

09:13:40 20    A.    I'm a Certified Public Accountant but I provide

21    expert witness and consulting services.

22    Q.    Okay.  And --

23    A.    I'm sorry, for financial matters.

24    Q.    Thank you.

09:13:52 25              And are you licensed as a Certified Public

1    Accountant in any state?

2    A.    I'm licensed in Illinois.

3    Q.    And are you a member of the AICPA, the American

4    Institute of Certified Public Accountants?

09:14:07 5    A.    I am.

6    Q.    And what does that organization do?

7    A.    They provide guidance to accountants in terms of

8    continuing education and put out guidelines for how we do

9    our work and ethical considerations.

09:14:26 10   Q.    And do you hold any certifications from the AICPA?

11   A.    Yeah, I'm certified in financial forensics and I'm

12   a chartered global management accountant.

13   Q.    And so we have it for the record, where did you

14   attend college?

09:14:39 15   A.    Loyola University of Chicago.

16   Q.    And did you earn a degree?

17   A.    I did.

18   Q.    What was your degree in?

19   A.    Public accounting.

09:14:46 20   Q.    Now, do you have any formal education or training

21   in pharmacy?

22   A.    I do not.

23   Q.    Any formal education or training in medicine?

24   A.    No.

09:14:57 25   Q.    Any formal education or training in epidemiology?

Bialecki - Direct/Hynes

1    A.    No.

2    Q.    In your work on this case, have you reviewed

3    materials related to those subject matters?

4    A.    Certainly, yes.

09:15:12  5    Q.    But you're not an expert in those areas?

6    A.    No.

7    Q.    Okay.  Where are you employed?

8    A.    Alvarez & Marsal.

9    Q.    And can you explain to the Judge what Alvarez &

09:15:25 10    Marsal is?

11    A.    Sure.

12            It's a global consulting firm.  I guess I

13    would compare it to a smaller version of a big four

14    accounting firm, much smaller, but we provide similar

09:15:35 15    services.

16            So there is consulting services.  I think

17    we are originally known for restructuring.  My group is

18    the Disputes and Investigations.  So that's what the

19    people I work with focus on.

09:15:49 20    Q.    Okay.  So it's a -- is it a fairly large firm?

21    A.    Yeah.  It's over 6,000 people, over two billion in

22    revenues.

23    Q.    And you said your group is Disputes and

24    Investigations?

09:15:59 25    A.    Yes.

1    Q.    Okay.  What positions -- what is your position in

2    Alvarez & Marsal?

3    A.    I'm a managing director but I also serve as the

4    U.S. eastern region leader for Disputes and

09:16:12  5    Investigations.  And I'm part of the executive committee.

6                   MR. WEINBERGER:  Your Honor, can we have

7    the witness --

8    A.    Sure.  I can move up a little bit.

9                   MR. WEINBERGER:  I can't hear.

09:16:23 10    A.    Sorry about that.

11                   MR. HYNES:  Thanks.  Thanks,

12    Mr. Weinberger.

13    BY MR. HYNES:

14    Q.    Mr. Bialecki, can you describe your work at Alvarez

09:16:31 15    & Marsal?

16    A.    Sure.

17                   Like the name of my group, Disputes and

18    Investigations, I do both.  So disputes, I serve as an

19    expert witness and a consultant on litigation,

09:16:42 20    arbitrations involving damages and technical accounting

21    issues mainly.

22                   And then I also serve as a neutral

23    arbitrator on a number of matters, and I do

24    investigations, so corporate investigations, both for

09:17:00 25    corporations and I do work for Government agencies

1    sometimes, like the Security and Exchange Commission.

2    Q.    And all your work relates to accounting or

3    financial issues?

4    A.    Yes.

5    Q.    And one of your colleagues in Houston, Dean Graves,

6    has served as an expert witness for Mr. Lanier on a few

7    occasions?

8    A.    Yes.

9    Q.    And how long have you worked at Alvarez & Marsal?

10   A.    I've been there 13 years.

11   Q.    And where did you work before that?

12   A.    I was a partner with Deloitte.

13   Q.    And what was -- what was your position or what

14   positions did you hold at Deloitte?

15   A.    I started as a manager.  And when I left, I was a

16   partner.

17             And I also was what's called the PPD, so

18   Professional Practice Director for the midwest and north

19   central regions, which means I was responsible for risk

20   management.  I reviewed and signed off on every expert

21   report that was issued in those regions, in charge of

22   claim acceptance.  Basically, all kind of risk and

23   quality control issues.

24             And then I was the midwest insurance

25   industry leader and served as the fraud expert on the

1   audits of a lot of large insurance companies, like

2   Berkshire Hathaway and Allstate, The Hartford, Community

3   Mutual and a couple others.

4   Q.    Okay.  And let's talk about your work as an expert

09:18:31   5   witness.

6                     You have served in the past as an expert

7   witness on damages?

8   A.    I have.

9   Q.    Okay.  And an expert witness on other complex

09:18:40  10   financial and accounting issues?

11   A.    Yeah.  Expert witness or consultant in hundreds of

12   cases.

13   Q.    And in the course of your work, have you had

14   matters where you've estimated future revenues?

09:18:53  15   A.    Yes.  On a regular basis.

16   Q.    How about matters where you've estimated future

17   costs?

18   A.    Yes.

19   Q.    And when you're doing those sorts of things, is it

09:19:02  20   your practice to consider past or historical revenues and

21   costs?

22   A.    Yes.  Almost always.

23   Q.    Now, in this case, you are testifying for the

24   defendants.

09:19:13  25                     Have you ever in your other matters

1    testified for plaintiffs?

2    A.    Many times, yes.

3    Q.    And for Government agencies?

4    A.    Yes.

09:19:25 5    Q.    And like some of the other plaintiff experts in

6    this case, have you been retained in other opioids cases?

7    A.    I have, yes.

8    Q.    Does that include the Track One cases filed by

9    Cuyahoga and Summit Counties here in Ohio?

09:19:38 10    A.    Yes.

11    Q.    And the case filed by the Washington Attorney

12    General against the big three distributors?

13    A.    That's correct.

14    Q.    Let's now talk about your assignment in this case.

09:19:50 15    A.    Okay.

16    Q.    Okay?

17            You are testifying on behalf of CVS,

18    Walgreens, and Walmart?

19    A.    That's correct.

09:19:58 20    Q.    Have you reviewed the abatement plan proposed by

21    the plaintiffs' expert, Dr. Caleb Alexander?

22    A.    I have.

23    Q.    Have you reviewed the report of the plaintiffs', I

24    guess, damages expert?  I know this isn't about damages,

09:20:13 25    but plaintiffs' expert, Dr. John Burke?

Bialecki - Direct/Hynes                    749

         1    A.    Yes.

         2    Q.    And have you reviewed certain cost estimates

         3    provided by Dr. Alexander and Dr. Burke?

         4    A.    I have.

09:20:24 5    Q.    Are you prepared today to offer your own cost

         6    estimates based on what the counties -- or cost

         7    estimates -- strike that.

         8              Are you prepared to offer your own estimate

         9    of the treatment costs that the counties will pay in the

09:20:42 10   future?

         11   A.    Yes.

         12   Q.    And we'll get into this later, but what is your

         13   estimate of the counties' future treatment costs, what is

         14   that based on?

09:20:52 15   A.    It's based on historical information that was

         16   contained in the treatment data, so it's what they

         17   were -- have been paying historically.

         18   Q.    And you were not asked to estimate the costs that

         19   others, besides the counties, may pay for treatment in

09:21:11 20   the future.

         21              Is that correct?

         22   A.    No, I was not.

         23   Q.    Now, I just to want make it clear on the record

         24   what your assignment isn't.  Okay?

09:21:20 25   A.    Okay.

1    Q.    You are not offering any opinions on whether the

2    jury's verdict is correct or supported by the facts or

3    the law?

4    A.    No.

09:21:30  5    Q.    You are not offering any opinions about how many

6    residents of the counties have Opioid Use Disorder?

7    A.    I'm not, no.

8    Q.    You are not offering any opinions about how any of

9    those individuals should be treated?

09:21:42 10    A.    That's correct.

11    Q.    And you are not offering any opinions about the

12    efficacy or necessity of any elements of Dr. Alexander's

13    abatement plan?

14    A.    That's correct.

09:21:54 15    Q.    And you also are not offering any opinions on how

16    any abatement costs should be allocated or apportioned

17    between the defendants here or among any other

18    nonparties?

19    A.    No.

09:22:16 20    Q.    Are you familiar with -- have you become familiar

21    with the Lake County ADAMHS Board?

22    A.    I have, yes.

23    Q.    And have you become familiar with the Trumbull

24    County Mental Health and Recovery Board?

09:22:29 25    A.    Yes.

Bialecki - Direct/Hynes                    751

 1    Q.    All right.

 2                For simplicity, I'd like to just refer to

 3    those two boards as the ADAMHS Board.

 4    A.    Okay.

09:22:37  5    Q.    Is that okay?  All right.

 6                And are you aware of the ADAMHS Board

 7    contract with facilities that provide addiction treatment

 8    to county residents?

 9    A.    Yes, I understand that.

09:22:45 10    Q.    And are you aware that the ADAMHS Boards may

11    provide funding to those facilities?

12    A.    Yes.

13    Q.    And do those facilities include facilities like

14    Lake Geauga in Lake County and Compass in Trumbull

09:23:04 15    County?

16    A.    Yes.

17    Q.    Okay.  Let's refer to those as the ADAMHS Board

18    treatment facilities just so we don't have to go through

19    all of them again.

09:23:12 20    A.    Okay.

21    Q.    I want to talk about Medicaid.  Okay?

22    A.    Okay.

23    Q.    Do those ADAMHS Board treatment facilities provide

24    treatment to patients who are covered by Medicaid?

09:23:28 25    A.    Yes.

1    Q.    Mr. Bialecki, if, if in that scenario the

2    facilities provide treatment to a patient who is covered

3    by Medicaid, who pays the costs of the treatment?

4                    MR. WEINBERGER:  Objection.

09:23:44  5                    MR. HYNES:  What's the basis?

6                    THE COURT:  Well, if he knows, I'll

7    overrule the objection.

8                    MR. WEINBERGER:  The objection relates to

9    our continuing objection with respect to the issue of

09:23:54 10   Medicaid.

11                    THE COURT:  I've already said how I'm going

12   to deal with it.

13                    MR. WEINBERGER:  I understand.

14                    THE COURT:  I'll let everyone testify if

09:23:59 15   they want.

16                    If you know the answer, sir, you can give

17   the answer.

18   BY MR. HYNES:

19   Q.    Do you want me to reask the question?

09:24:08 20   A.    I think I remember.

21                    Yeah, it's paid by Medicaid.  It's not an

22   obligation to the county.

23   Q.    Trumbull County has produced claims data for

24   Medicaid patients, is that right?

09:24:20 25   A.    Yes.

```
  1    Q.    Lake County has not in this case?

  2    A.    That's -- that's correct.

  3    Q.    Based on your review of the Trumbull County claims

  4    data, approximately what percentage of the treatment

  5    costs for opioid-related diagnoses are paid for by

  6    Medicaid?

  7                    MR. WEINBERGER:  Objection.

  8                    THE COURT:  Well, wait a minute.

  9                    I'm not sure you've established that this

 10    witness would know the answer to that.

 11    BY MR. HYNES:

 12    Q.    Mr. Bialecki --

 13                    THE COURT:  What exactly he's reviewed.

 14                    MR. HYNES:  Okay.

 15    BY MR. HYNES:

 16    Q.    Mr. Bialecki, have you reviewed the claims data

 17    produced by Trumbull County?

 18    A.    I have.

 19    Q.    Does that claims data indicate whether a procedure

 20    or service is covered by Medicaid?

 21    A.    Yes.

 22    Q.    Okay.  And based on your review of that data --

 23    A.    I'm sorry.  Let me clarify.

 24    Q.    Yes.

 25    A.    I guess whether -- can you repeat the last
```

Bialecki - Direct/Hynes                                         754

1     question?

2     Q.    Does that, the claims data for Trumbull County --

3     A.    Yes.

4     Q.    -- does it indicate whether --

09:25:21  5              THE COURT:  What claims data is this

6     exactly?

7              I mean, what are the claims?

8     BY MR. HYNES:

9     Q.    Mr. Bialecki, the claims data --

09:25:31 10   A.    Yes.

11    Q.    -- what claims does that claims data relate to or

12    identify?

13    A.    So it identifies that the procedures that were

14    performed on patients by the subcontractors for the two

09:25:46 15   counties, for Lake -- well, for Trumbull County, we have

16    the information.  Not Lake County.  For Medicaid.

17    Q.    So it identifies treatment provided by the ADAMHS

18    Board treatment facilities in Trumbull County?

19    A.    Yes.  And costs and coverage.

09:26:01 20             So it would talk about whether, you know,

21    it was covered by the county or it was covered by

22    Medicaid for Trumbull.

23             MR. WEINBERGER:  So objection.

24             Mr. Hynes, you asked the question --

09:26:21 25             THE COURT:  I'm still confused as to what

1    you're asking, Mr. Hynes, and exactly what this data is

2    that the witness has examined.

3              MR. HYNES:  Understood.  I'm going to turn

4    to that right now, Judge Polster.

09:26:31  5              MR. WEINBERGER:  Well, I have one

6    other -- you asked the question about treatment provided

7    by the ADAMHS Board facilities in Trumbull County.

8              MR. DELINSKY:  He defined that five minutes

9    ago, Pete.

09:26:48  10             THE COURT:  Look, this isn't going

11   anywhere.

12             If you can ask a question that I

13   understand, I'll allow it.  If I don't understand it, I'm

14   going to sustain it.

09:26:57  15             MR. HYNES:  Okay.  Mr. Pitts, can I have

16   the Elmo, please?

17             THE COURT:  I mean, look.  Everyone knows

18   that Medicaid provides some of the payment.  All right?

19   I mean -- but I don't need the witness to tell me that,

09:27:25  20  and everyone knows that Medicaid is funded, whether it's

21   75 percent by the Federal Government, 25 percent by the

22   state.

23             I don't need a witness testimony on this.

24             MR. HYNES:  Okay.  I'm sorry, Judge

09:27:38  25  Polster.  The Elmo is frozen.

```
 1              THE COURT:  Well, again, I'm not sure this
 2    is relevant to anything I need to decide.
 3              I mean, we can stipulate that Medicaid pays
 4    for, you know -- if Medicaid pays for drug treatment and
 5    a patient's on Medicaid, Medicaid's going to pay for it.
 6              MR. HYNES:  Correct.
 7              THE COURT:  So, I mean, I don't need
 8    Mr. Bialecki to tell me that.
 9              MR. HYNES:  Okay.  Thank you, Your Honor.
10    A.    I think, though, you were asking the percentage.
11    BY MR. HYNES:
12    Q.    I will.  Let's walk through the claims data first
13    and then maybe we'll circle back to that, Mr. Bialecki.
14              Judge Polster asked about the claims data
15    so I just want to give him some background on that.
16    A.    Okay.
17    Q.    That is data that's been produced by both counties
18    in this case?
19    A.    Yes.
20    Q.    And does that data identify, among other things,
21    procedures or services provided by ADAMHS Board
22    facilities to patients with Opioid Use Disorder?
23    A.    Yes.
24    Q.    Okay.  Is the data voluminous?
25    A.    Yes.
```

1    Q.    Too much to review today in court?

2    A.    Yes.  For sure.

3    Q.    I just want to talk about what sort of information

4    the data provided to you in your work on this case.

09:29:00  5    Okay?

6    A.    Okay.

7    Q.    Okay.

8              And can you walk us through -- I put a

9    slide up here.

09:29:04  10             Can you just walk Judge Polster through the

11   information, the key information that the data provided

12   to you?

13   A.    Sure.

14             So patient number is a unique number that's

09:29:15  15   assigned to each patient.

16             Payor --

17   Q.    Mr. Bialecki, can I stop you right there?

18   A.    Yeah.

19   Q.    The unique number, is that because the patient and

09:29:28  20   the data is not identified by name?

21   A.    Yeah, absolutely.  And they may come in a number of

22   times.  There could be other procedures.  So the patient

23   number tracks all of that through.

24   Q.    Okay.  Thank you.

09:29:36  25             Go ahead.

Bialecki - Direct/Hynes

758

1    A.     And then payor, including Medicaid.  So it would be

2    whether the county pays or Medicaid.

3                   Treatment facility would be the

4    subcontracted provider that provides the services or you

09:29:50  5    had a defined term for that.

6    Q.     The ADAMHS Board Treatment Facility.

7    A.     Yes.  Yes.

8                   Diagnosis, so there would be a diagnosis

9    code every time they come in for a procedure.

09:30:04 10                   And there may be more than one.  There

11   could be up to four diagnosis codes that are contained in

12   the data.

13                   And then the procedure or service so there

14   could be multiple procedures on the same day or just one.

09:30:19 15                   Date of procedure or service is obvious, I

16   think.

17                   And then approved cost of the procedure or

18   service would be the costs that we're capturing for that

19   service.

09:30:32 20   Q.     Okay.

21                   And just to circle back on the Medicaid

22   question, so Trumbull County produced data that included

23   procedures or services that were covered by Medicaid?

24                   Is that right?

09:30:47 25   A.     Yes.

Bialecki - Direct/Hynes                759

1    Q.    And Lake County only provided that data through

2    about 2012?

3    A.    That's right.

4    Q.    Okay.

09:30:54  5              Based on your review of the Trumbull County

6    data, about what percentage of the costs of procedures or

7    services provided to patients with opioid-related

8    diagnoses were covered by Medicaid?

9    A.    Depending on the year, it was around 85 to 90

09:31:14  10   percent.

11   Q.    Thank you.

12              Now, based on your review of other

13   financial records in this case -- and, Mr. Pitts, you can

14   take down the Elmo, please.  Thank you.

09:31:31  15              Have the counties received federal and

16   state grants for treatment?

17   A.    Yes.

18   Q.    And based on your review of the financial records,

19   have those grants been used to fund treatment provided by

09:31:46  20   ADAMHS Board treatment facilities?

21              MR. WEINBERGER:  Objection.

22              THE COURT:  Overruled.

23   A.    Yes.

24   BY MR. HYNES:

09:31:55  25   Q.    And are those grants identified in financial

Bialecki - Direct/Hynes                    760

1    statements produced by the counties?

2    A.    Yes.

3    Q.    Now, we talked about the ADAMHS Board treatment

4    facilities.

09:32:07  5                  I want to --

6                  THE COURT:  Who gave these grants, the

7    federal and the state governments?

8                  THE WITNESS:  I think he was asking

9    specifically about federal.

09:32:16 10                  THE COURT:  All right.

11                  THE WITNESS:  I mean, did you say state?

12    I'm sorry.

13    BY MR. HYNES:

14    Q.    Well, have you also reviewed information about

09:32:21 15    state grants?

16    A.    Yes.

17    Q.    For example, have you reviewed spreadsheets

18    produced by the counties that track how federal and state

19    grants were allocated and spent by the ADAMHS boards?

09:32:31 20    A.    Yes.

21    Q.    Okay.  And we'll get into more of that later, Judge

22    Polster.

23    A.    I think just to clarify for the Judge, that the

24    federal grants are -- there's a requirement that they be

09:32:41 25    listed or they are listed out in the financials.

Bialecki - Direct/Hynes                    761

1          I don't think the state specifically are.

2     Q.    Okay.  And are some of the federal grants

3     administered through state Government agencies?

4     A.    Yes.

09:32:57  5     Q.    Now, the treatment facilities or treatment

6     providers in the counties that don't contract with the

7     ADAMHS Board, ADAMHS boards, okay, I want to talk about

8     those for a minute.

9     A.    Okay.

09:33:11 10     Q.    I think we've established this, but have you

11     reviewed county -- the counties' financial statements?

12     A.    Yes.

13     Q.    Have you reviewed other documents, other financial

14     records, related to county expenditures?

09:33:25 15     A.    Yes.

16     Q.    Have you seen any indication that the counties have

17     paid for any of the costs of treatment provided by

18     nonADAMHS Board facilities?

19     A.    I have not.

09:33:48 20     Q.    Okay.

21          I want to turn, Mr. Bialecki, to your

22     estimate of the treatment costs that the counties will

23     pay in the future.

24          And are those estimates based on the

09:34:00 25     treatment or the claims data that you've reviewed?

Bialecki - Direct/Hynes                762

                        THE COURT:  Do you know what, what, if any,

 1

 2    treatment was provided by nonADAMHS Board facilities in

 3    Trumbull County?

 4                        THE WITNESS:  Not from the information that

09:34:15  5    I was looking at.

 6                        I would be looking at the financial

 7    information.

 8                        THE COURT:  Well, you said you saw no, no

 9    information -- no documents, no information that the

09:34:23 10    counties have provided or paid for the cost of treatment

11    in nonADAMHS Board facilities.

12                        I just want to know if you know if there is

13    treatment for Opioid Use Disorder provided in Trumbull

14    County in nonADAMHS --

09:34:42 15    A.    Oh, yes.

16                        THE COURT:  -- facilities.

17                        THE WITNESS:  Certainly, there is.

18                        THE COURT:  There is?

19                        Do you know how much?

09:34:48 20                        THE WITNESS:  I don't know exactly, but

21    what I was looking at were the financials for the county

22    to determine whether they were paying for any of those.

23                        And -- but I certainly understand that

24    there's lots of other providers that provide services to

09:35:01 25    residents.

```
 1              THE COURT:  Do you know who is
 2    paying -- who's paying the cost of treatment at those
 3    other facilities?
 4              THE WITNESS:  Private insurance would cover
 5    some, and I'm sure there's some self-pay just -- just
 6    from typical, you know, matters that I would work on with
 7    health care providers.
 8              Those are -- typically the biggest would be
 9    private insurance, and then the small percentage would be
10    self-pay.
11              THE COURT:  Okay.  Thank you.
12              THE WITNESS:  Which is usually written off.
13              MR. HYNES:  Mr. Pitts, may I have the Elmo
14    again?  Thank you.
15    BY MR. HYNES:
16    Q.   Mr. Bialecki, there's a binder up there.
17              If you want to turn to Tab 2.
18    A.   Sure.
19    Q.   And by the way, Tab 1 is your report, if you ever
20    need to refer to it or consult it.
21    A.   Thank you.
22              MR. HYNES:  Mr. Weinberger, Judge Polster,
23    I gave you guys the same binder with the same tabs, so
24    Tab 2 is what we're going to look at right now.
25              MR. WEINBERGER:  Tab 1 has his report?
```

1               MR. HYNES:  Yes.

2               MR. WEINBERGER:  Okay.  That wasn't what

3     you provided us today.

4               MR. HYNES:  We're not going to seek to

09:36:26  5     admit that, Pete.  That's just if he needs to consult it.

6               MR. WEINBERGER:  Right.  But if he's going

7     to refer to his report, I have a notebook that's this big

8     that has his report and I would like to know what it is

9     that he's looking at, so.

09:36:40 10               MR. HYNES:  Why don't we see if he needs to

11     consult it and we can deal with it then?

12               MR. WEINBERGER:  Okay.

13               MR. HYNES:  Is that okay?

14               MR. WEINBERGER:  Sure.

09:36:49 15     BY MR. HYNES:

16     Q.    So Tab 2 in your binder, Mr. Bialecki, for the

17     record is CVS MDL 05019.

18               Mr. Bialecki, this chart is for Trumbull

19     County?

09:37:05 20     A.    Yes.

21     Q.    And does this chart contain your estimate of what

22     Trumbull County will pay for treatment costs during the

23     next five years?

24     A.    That's correct.

09:37:22 25     Q.    And this chart, just so we -- for background, has

1      two different patient populations.

2                    Is that right?

3      A.    Yes.

4      Q.    And what are they?

5      A.    Non-Medicaid and Medicaid.

6      Q.    Okay.

7                    And in looking at the treatment data, in

8      order -- you looked at the treatment data in order to

9      estimate these future costs?

10     A.    Yes.

11     Q.    Okay.

12                   And in deriving the patient populations,

13     you included all patients -- or your estimate was based

14     on all patients in the past who had received treatment

15     for an opioid-related primary diagnosis.

16                   Is that correct?

17     A.    That's correct.

18     Q.    Because the data has treatment for patients who

19     have other nonopioid diagnoses?

20     A.    Yes.

21     Q.    Did you make any distinction between treatment for

22     prescription opioid abuse and illicit opioid abuse?

23     A.    No.

24                   It was all opioid diagnoses were included.

25     Q.    And in terms of determining what procedures to

1    include, did you make any cuts or did you include all

2    services or all procedures provided to patients with

3    opioid-related diagnoses?

4    A.    No.

5              We had to make a determination of what we

6    were going to include, and we were going to

7    focus -- going to focus on treatment, but, you know, for

8    the opioid diagnoses, those are nationalized and, you

9    know, it's clear what is an opioid diagnosis so I can

10   look to guidance to determine what to include for those

11   categories.

12             But in terms of the actual treatments,

13   there's so many of them and they're so different and they

14   overlap different diagnoses, like it could be psychiatric

15   evaluation or it could be just some sort of general

16   treatment, that I didn't want to make this subjective.

17             So to be conservative, anything that was a

18   primary opioid diagnosis, I just included the -- included

19   the cost, even if it was kind of outside of our complete

20   methodology.

21   Q.    And that could include medical services like drug

22   screening that aren't treatment, you would include that

23   in the cost?

24   A.    Yeah, I mean we saw things like gas cards and

25   cellphones and things like that, but, you know, once we

1   made the determination that it's either all in or that,

2   you know, that we included just everything without adding

3   subjectivity to the calculation.

4   Q.    So if those things were for a patient with an

09:40:05  5   opioid-related primary diagnosis, you included them?

6   A.    Absolutely, yeah.

7   Q.    Now, let's turn to the schedule here.

8         It starts at the top with the non-Medicaid

9   patient population, and I know it's explained in the

09:40:18  10   footnotes, but can you just explain for Judge Polster how

11   you derived the future non-Medicaid patient population in

12   Trumbull County?

13   A.    Yes.

14         So that's just actual information from

09:40:35  15   2019, so it's the number of patients that we saw claims

16   for in that period.

17   Q.    Okay.

18         And is it fair to say that the number of

19   patients actually has gone down in 2020 and in 2021?

09:40:47  20   A.    It has.

21   Q.    Why did you use 2019?

22   A.    We tried to simplify things and use all of these

23   accounts from 2019 because we had different data.  And

24   when, you know, for one county we were using an average

09:41:03  25   of two years; in the other county, we were using just one

Bialecki - Direct/Hynes

1    year and increasing that and doing a reduction.  And, you

2    know, it was just more simple to do it this way.

3                    It also took out any effects that would

4    have been happening because of COVID and ability to treat

09:41:20  5    people.  And then it was more conservative.

6    Q.    And is 2019 also the last year we have complete

7    data for all counties, for both counties?

8    A.    Yes.

9    Q.    And the average treatment costs for non-Medicaid

09:41:37 10    patients, that's also explained in footnote two, but can

11    you explain how you derived the average treatment cost?

12    A.    Yes.

13                    So that's also 2019, so we determined what

14    the overall costs were for that period for opioid

09:41:57 15    treatment, and then that's simply just divided by the

16    number of patients.

17                    And then we increased that for inflation,

18    so using an inflation rate of three percent each year to

19    keep up with inflation.

09:42:13 20    Q.    The county-funded percentage is discussed in

21    footnote three.  And can you explain to Judge Polster

22    what that represents?

23    A.    Yes.

24                    So that's from the NHRB financial activity

09:42:26 25    reports so it's the report that goes to the state that,

1    it breaks out the funding that the ADAMHS boards get and

2    then how they spend it, and it shows what's federal and

3    what's state and what's local costs.

4                    So we used that data to make a

09:42:50  5    determination of what is funded just by the county as

6    opposed to federal and state.

7    Q.    A percentage that's funded by the county?

8    A.    Correct.

9    Q.    Okay.  There's -- up there where you're sitting

09:43:01 10    underneath your binder is a Redwell.

11    A.    Yes.

12    Q.    Do you want to pull that out?  And we have copies

13    for the parties?

14    A.    I have to move my water over here.

09:43:10 15    Q.    Is that -- I'll give you a minute to pull that out.

16                    Does that look like the spreadsheet that

17    you just described that tracks how grants are allocated

18    and spent by the ADAMHS boards in Trumbull County?

19    A.    Well, I'm used to seeing it in -- on the computer,

09:43:29 20    so --

21    Q.    Fair enough.

22    A.    -- let me just make sure here.

23    Q.    Hold on, Mr. Bialecki.

24                    For the record, that is DEF-MDL-14853.

09:43:43 25    A.    Yes.

1          MR. HYNES:  Judge Polster, would you like a

2     copy?

3          THE COURT:  No.

4          I've got a question.

09:43:50  5          MR. HYNES:  Okay.  Go ahead.

6          THE COURT:  Doctor -- Mr. Bialecki, I want

7     to make sure I understand these figures.

8          THE WITNESS:  Yes.

9          THE COURT:  All right.  For non-Medicaid

09:43:59 10   481 patients, I'm just looking at year one, average

11    treatment costs, $594.  That's the average treatment cost

12    that Trumbull County pays, right?

13         THE WITNESS:  Yes.

14         THE COURT:  All right.

09:44:10 15        And the third line, the county, Trumbull

16    County is funding 44.5 percent, which means that someone

17    else is funding 55.5 percent, right?

18         THE WITNESS:  Correct.

19         THE COURT:  So the total cost is roughly,

09:44:33 20   you know, that would mean the total, total treatment

21    cost, average total treatment cost would be, we'll call

22    it $1,300.

23         THE WITNESS:  Oh, I'm sorry.  I

24    misunderstood.

09:44:44 25        So average treatment cost would be for

1    total.  And then federal and state would cover 55

2    percent, and then --

3                     THE COURT:  So the total, the total average

4    treatment cost for non-Medicaid patients is $594?

09:45:04  5                     THE WITNESS:  Yes.

6                     THE COURT:  And of that, the county is

7    paying a little less than half, so a little less than

8    half of it?

9                     THE WITNESS:  Yes.  That's based on the

09:45:13 10    data.

11                     THE COURT:  All right.

12                     My question is -- all right -- these are

13    all patients with OUD, right?

14                     THE WITNESS:  Yes.

09:45:21 15                     THE COURT:  At least one of the diagnosis

16    codes for the treatment is OUD?

17                     THE WITNESS:  The primary diagnosis code.

18                     THE COURT:  The primary diagnosis.

19                     So I guess my question is why, why is the

09:45:33 20    average treatment cost about $600 for a non-Medicaid

21    patient and about $3400 for a Medicaid patient?

22                     THE WITNESS:  Yeah.  And I was wondering

23    the same thing and I just don't know.

24                     THE COURT:  Well, that makes no sense.

09:45:48 25                     THE WITNESS:  Well, but that's the data

 1     that the county has provided us.

 2                  THE COURT:  It may be that the data is

 3     wrong or your interpretation is wrong.

 4                  I can't -- I mean, the only explanation, if

09:46:02  5     this data is right, the only explanation I can think is

 6     that someone is really soaking the federal and state

 7     Government's by charging six times what private insurers

 8     are paying, or that Medicaid patients are getting five to

 9     six times more treatment --

09:46:23 10                  THE WITNESS:  Well --

11                  THE COURT:  -- than non-Medicaid patients.

12                  THE WITNESS:  Not private insurers, though,

13     because most people with private insurance wouldn't go to

14     these county facilities.  So it's the cost that, you

09:46:33 15     know, grants are paying, whether it's federal, state, or

16     county.

17                  THE COURT:  Well, you tell me that's costs.

18                  This doesn't --

19                  THE WITNESS:  Well, cost means what the

09:46:44 20     subcontractors are charging.

21                  THE COURT:  Well, all right.  Well, the

22     data doesn't make sense to me.

23                  So I don't know what to -- I don't know

24     what to make of this so, I mean, unless that's explained,

09:47:05 25     I can't do much with this.

1                THE WITNESS:  Yeah.  I mean I'm not a

2      Medicaid expert so I don't know what the rules are and

3      how they determine how their reimbursement rates work,

4      but, you know, this is based on the data that was

09:47:17  5      provided by the county on what they expend and

6      what -- these are payments that are being made to service

7      providers, basically subcontractors that provide service

8      for them for OUD.

9                MR. WEINBERGER:  Your Honor, in light of

09:47:30 10      that answer, I move to strike any testimony regarding

11      Medicaid.

12                He just said he's not a Medicaid expert.

13                THE COURT:  I'm not going to strike

14      everything.

09:47:37 15                I've already -- I've told Mr. Hynes as this

16      now stands, it doesn't do anything for me because it

17      doesn't make sense.  But I understand, Mr. Bialecki, you

18      didn't create any of this data.  No one's blaming you.

19      This is what was presented to you, and you put it on the

09:47:57 20      charts.  So I'm not questioning the accuracy of your

21      chart.

22                I'm saying that the data doesn't make any

23      sense to me.

24                MR. HYNES:  And just for the record,

09:48:07 25      Mr. Bialecki, that data was provided by the plaintiffs --

Bialecki - Direct/Hynes                    774

 1          THE WITNESS:  Yes.

 2          MR. HYNES:  -- in this case?

 3    A.    It was.

 4    BY MR. HYNES:

09:48:14  5    Q.    Okay.  And you didn't make any changes to the data?

 6    A.    No.

 7    Q.    And just for the average treatment cost for

 8    non-Medicaid patients, that was -- that was derived

 9    wholly and entirely from the 2019 data produced by

09:48:27 10    Trumbull County?

 11    A.    Yes.

 12    Q.    And if we can go down to the second-to-the bottom

 13    half of the chart that talks about Medicaid patients.

 14    A.    Yes.

09:48:40 15    Q.    And I know it's explained in footnotes four and

 16    five, but can you just explain how you derive the

 17    Medicaid patient population and the average treatment

 18    costs for those patients?

 19    A.    Yeah.

09:48:50 20          That was the same way.  So the same data

 21    that we received would identify what was a non-Medicaid

 22    versus Medicaid patient, and so those are merely, you

 23    know, counts of patients that were seen by the -- sorry.

 24    I keep forgetting what you termed the providers.

09:49:10 25    Q.    ADAMHS Board facilities?

Bialecki - Direct/Hynes                    775

1    A.    The ADAMHS facilities for 2019.

2              And then again, the total costs that

3    were -- or the total amounts that were paid by the ADAMHS

4    boards to those contractors, and then divided by the

09:49:25  5    number of patients to get the average treatment cost.

6    Q.    And why is the county-funded percentage zero

7    percent?

8    A.    Again, because if it's Medicaid that's actually

9    making the payments, then it's not by the counties.

09:49:39  10   It's -- so they wouldn't bear any obligation for those

11   payments.

12   Q.    Okay.

13              And so we have it for the record, can you

14   just walk through what the totals are at the bottom of

09:49:48  15   the chart?

16   A.    So for year one is $127,127.  And then there's an

17   escalation.  Year five, it's at $143,209, and the

18   five-year total is $675,243.

19   Q.    Thank you.

09:50:10  20              Mr. Bialecki, let's turn to Tab 3 in your

21   binder.

22   A.    Sure.  Let me just move this out of the way.

23   Q.    Okay.  Actually, Mr. Bialecki, let me circle back

24   on -- there was a large document that we referenced

09:50:37  25   before Judge Polster had his questions.

Bialecki - Direct/Hynes          776

1    A.    The one I just put away?

2    Q.    And that was that large financial activity report.

3    Yeah.

4    A.    Okay.

09:50:46 5    Q.    And that is what you used to determine the

6    county-funded percentage for non-Medicaid patients,

7    right?

8    A.    Yes.

9    Q.    Okay.

09:50:57 10    A.    Yeah.

11              When -- I think I talked about this.  When

12    I didn't have the document where it goes through all

13    these columns of how things are funded, whether it's

14    state, federal or they call levy or local, which would be

09:51:15 15    county-funded.

16    Q.    So you were able to see in that spreadsheet how

17    federal and state grants were spent by, in that case, the

18    Trumbull County Mental Health & Recovery Board?

19    A.    Yes.

09:51:29 20              So it would show, you know, the rows that

21    go down the left show the different categories of where

22    the funds were used, like treatment prevention, housing,

23    miscellaneous, and we were able to determine what

24    percentage were federal, which were state, and which were

09:51:49 25    county-funded.

1    Q.    Thank you.

2               And that, for the record, is DEF-MDL-14853.

3               Okay.  Now, let's turn to the chart behind

4    Tab 3.

5               This is CVS-MDL-05020.

6               Do you have it, Mr. Bialecki?

7    A.    Yes.

8    Q.    Okay.

9    A.    That's actually Tab 3, though?

10   Q.    Tab 3.

11   A.    Yep.

12   Q.    And that is -- that is essentially the same chart

13   that we just looked at, but this one's for Lake County

14   instead of Trumbull County?

15   A.    That's correct.

16   Q.    And so does this chart contain your estimate of

17   what Lake County will pay for treatment during the next

18   five years?

19   A.    Yes.

20   Q.    And did you use a similar methodology that you used

21   for the Trumbull County chart?

22   A.    I did, but there's a difference because Lake County

23   didn't provide Medicaid data.

24   Q.    Okay.

25   A.    So it's the same -- it's the same methodology,

           1    except to determine the number of Medicaid patients and

           2    treatment costs, I had to rely on the Trumbull data.

           3                 So basically I made the Medicaid patients

           4    in the same proportion as the non-Medicaid patients for

09:53:15   5    Lake and the average treatment cost is the same because,

           6    again, I wasn't provided with Medicaid data for that

           7    county.

           8    Q.    Okay.

           9                 And so it's clear, you took the ratio of

09:53:23  10    Medicaid, non-Medicaid-to-Medicaid patients from the

          11    Trumbull data and applied that to the Lake County and

          12    derived a Medicaid population from the non-Medicaid

          13    patients in Lake County?

          14    A.    Yes.

09:53:34  15    Q.    Okay.

          16                 And like you did for Trumbull, to figure

          17    out the non-Medicaid patients, you used the 2019 data for

          18    Lake County?

          19    A.    Yes.  That's correct.

09:53:49  20    Q.    And --

          21    A.    And then that states data going forward.

          22    Q.    Right.

          23    A.    And then average treatment cost was just the 2019

          24    cost divided by the number of patients, Medicaid patients

09:54:06  25    or non-Medicaid patients, and then that's increased every

1   year by three percent for inflation.

2   Q.   Now, in response to Judge Polster's question

3   earlier the, about the average treatment costs for

4   Trumbull for non-Medicaid patients, for Lake County, it's

09:54:32  5   higher, isn't it?

6   A.   Yes.

7   Q.   Okay.

8                And again, that's based on the Lake County

9   treatment data?

09:54:41 10   A.   That's correct.

11   Q.   And the county-funded percentage is lower than it

12   was in Trumbull County?

13   A.   Yes.

14   Q.   And did you compute the county-funded percentage in

09:54:56 15   a similar fashion?

16   A.   Yes.

17                So I would have used that big spreadsheet

18   that we were just looking at, and county-funded

19   percentage is 22.4 percent.

09:55:08 20   Q.   Okay.  And I think you have that spreadsheet up

21   there with you.

22   A.   Yes.

23   Q.   Can you just take a look at it.

24                That's DEF-MDL-14337.  I just want to

09:55:20 25   confirm for the record that is what you used to determine

Bialecki - Direct/Hynes                      780

1    the county-funded percentage --

2    A.   Yes.

3    Q.   -- for Lake County.

4    A.   Correct.

09:55:35 5    Q.   And is that spreadsheet similar to the one we

6    looked at for Trumbull County?

7    A.   Yes.

8    Q.   And so that spreadsheet allowed you to trace how

9    Lake County, the Lake County ADAMHS Board allocated and

09:55:54 10   spent federal and state grants?

11   A.   That's correct.

12   Q.   Okay.

13             Now, back up to the top, the non-Medicaid

14   patients, that was derived from the 2019 treatment data?

09:56:04 15   A.   Yes.  Yes.

16   Q.   For non -- okay.  So that's the pre-COVID treatment

17   data?

18   A.   Yes.

19   Q.   And you've already talked about how you derived the

09:56:22 20   Medicaid, number of Medicaid patients down below.

21             How about the average treatment costs for

22   Medicaid patients?  Because we didn't have data for

23   Medicaid patients after 2012 for Lake County.  Can you

24   just explain how you derived the average treatment cost

09:56:38 25   for Medicaid patients?

1    A.    That's based on Trumbull information as well, so it

2    would be the -- the 2019 average cost for Trumbull, and

3    then it's increased for inflation by three percent each

4    year.

09:56:56 5    Q.    Okay.

6                And if you could, Mr. Bialecki, I know this

7    is tedious, but walk through the totals at the bottom of

8    the chart.

9    A.    Sure.

09:57:07 10               Year one is $81,334.  Year two is $83,793.

11   Year three is $86,325.  Year four is $88,935.  Year five

12   is $91,623.  So the five-year total would be $432,010.

13   Q.    Thank you.  You can put that one to the side.

14               Now, I think --

09:57:42 15               THE COURT:  Again, Mr. Hynes, just so I

16   understand this.

17               These, these figures for Lake and Trumbull

18   County are for people treated for OUD at county-funded

19   facilities?

09:57:56 20               MR. HYNES:  Yes.

21               THE COURT:  Right?

22               MR. HYNES:  Yes.  Yes.

23               THE COURT:  All right.

24               That's why it just makes no sense to me

09:58:03 25   that the same facility, that the cost, the cost for

1    treatment of Medicaid patients versus non-Medicaid

2    patients is so radically different.

3              But I understand all this witness did was,

4    I mean --

09:58:22 5              MR. HYNES:  He just looked at the data.

6              THE COURT:  -- he looked at the data that

7    he got.  Okay.

8    BY MR. HYNES:

9    Q.    Yeah.

09:58:29 10             And, Mr. Bialecki, there are -- the ADAMHS

11   Board in Trumbull County and the ADAMHS Board in Lake

12   County, they contract with different treatment providers,

13   right?

14   A.    Yes.

09:58:37 15  Q.    So that could be an explanation for maybe some

16   differences in the costs?

17             MR. WEINBERGER:  I object to that.

18             THE COURT:  Well, this witness has no clue.

19             MR. HYNES:  Right.

09:58:47 20             THE COURT:  All he -- he took the -- he

21   took the data that was given to him and put it on the

22   chart, analyzed it.

23             I accept that.

24             MR. HYNES:  Okay.

09:58:54 25

1    BY MR. HYNES:

2    Q.    All right.  Tab 4.

3                Now, Mr. Weinberger may get up and argue

4    that you shouldn't consider federal and state grants in

09:59:09  5    your estimates, so does this chart back out any

6    adjustment for federal and state grants?

7    A.    It does.

8    Q.    And it's for Trumbull County?

9    A.    Yes.

09:59:25  10                So in the previous tab or demonstrative

11    that we looked at, there was a county-funded percentage

12    of 44.5 percent so that adjustment has been taken out.

13    Q.    And is that the only difference between this chart

14    and the prior one we looked at for Trumbull County?

09:59:41  15    A.    Yes.

16    Q.    Okay.

17                And I'll just, just so we can see it, there

18    is the county-funded percentage.  And in this one, it's

19    not there, right?

09:59:52  20    A.    Correct.

21    Q.    And if, if federal and state grants aren't

22    considered for non-Medicaid patients, what does that do

23    to the estimate of the future costs?

24    A.    So the previous estimate that you just showed was

10:00:14  25    $675,243.  And excluding that adjustment, the new

Bialecki - Direct/Hynes                    784

 1    five-year total is $1,518,218.

 2    Q.    Okay.

 3                    And just so we're clear, the only

 4    difference in this chart is you removed the federal and

10:00:32  5    state grants?

 6    A.    Correct.

 7    Q.    And you've done the same --

 8                    THE COURT:  I've got one question.

 9                    THE WITNESS:  Yes.

10:00:40 10                    THE COURT:  Mr. Bialecki, do you have

11    any -- did the data give you any indication for the

12    Medicaid patients as to how many of them qualified for

13    Medicaid because of what has been termed Medicaid

14    expansion under the Affordable Health Care Act versus

10:01:14 15    people who were previously on Medicaid before the

16    expansion?

17                    THE WITNESS:  It did not.

18                    Another interesting piece of that, too, was

19    sometimes people would be a Medicaid patient in one month

10:01:28 20    and they would be a non-Medicaid patient the next month

21    and go back and forth.

22                    THE COURT:  That depends on income, of

23    course.

24                    But as you know, about a half a million

10:01:37 25    people are now on Medicaid because of Medicaid expansion,

Bialecki - Direct/Hynes                                    785

1     but that could come, could go.

2                    So the data didn't indicate what percentage

3     of these Medicaid patients are on Medicaid solely because

4     of Medicaid expansion, is that right?

10:01:55  5                    THE WITNESS:  No.

6                    Really the only information per patient or

7     per procedure, really, that identified anything about

8     Medicaid was whether it was paid by Medicaid or it was

9     paid by the county.

10:02:08  10                   THE COURT:  Okay.  That's what I thought.

11                   Thank you.

12    BY MR. HYNES:

13    Q.   Mr. Bialecki, the chart we just looked at just for

14    the record is CVS-MDL-05021.

10:02:17  15                   And I think my question was did you create

16    a similar chart for Lake County?

17    A.   I did.

18    Q.   Let's just quickly look at that chart.

19                   That is Tab 5, and it is CVS-MDL-05022.

10:02:41  20                   Can you walk us through that chart,

21    Mr. Bialecki?

22    A.   Sure.

23                   So as you mentioned, it's similar to what

24    we just looked at for Trumbull County and would also

10:02:55  25    exclude the reduction for state and federal grants.

Bialecki - Direct/Hynes                    786

1     Q.    All right.

2                 And so it's the same chart we looked at

3     previously for Lake County?

4     A.    Yes.

10:03:06  5     Q.    Except that for the grants.

6     A.    And just to remind you, the county-funded

7     percentage for Lake County was 22.4 percent.

8     Q.    Okay.  And now that percentage has been taken out?

9     A.    Correct.

10:03:18 10     Q.    And that's the only change that has been made to

11     this chart from the prior Lake County chart?

12     A.    Yes.

13     Q.    Okay.  And what does that do to the totals?

14     A.    So the previous five-year total was $432,010.

10:03:35 15                 Taking out that adjustment brings the

16     five-year total to $1,926,566.

17     Q.    And again, that's CVS-MDL-05022.

18                 Mr. Bialecki, very quickly, the

19     computations that we just reviewed, they do differ a

10:04:13 20     little bit from the computations that were in your expert

21     report.

22                 I think you kind of explained this earlier?

23     A.    Yes.

24     Q.    Okay.

10:04:18 25                 And can you just walk through what -- what

Bialecki - Direct/Hynes

1    sort of simplifications you made to the computations?

2    A.    Yes.

3                 So, you know, as I talked about raising

4    2019 data so that's consistent, you know, amongst all of

5    our data sources.  And also prior to COVID, also is a

6    more conservative way to do it, we also had a decline

7    rate going forward, so reductions of number of patients

8    that were expected to be treated going forward.

9                 So that's been taken out.  So it's a flat

10   number going through all four years, no reduction.

11                And I'm trying to remember.

12   Q.    Did you have a percentage for patients who --

13   A.    Oh, initiation percentage, yeah.

14                So we had a reduction to just capture

15   patients who initially were exposed to opioids as

16   prescription opioids and we've taken that reduction out.

17   Q.    Okay.  And the result of these simplifications

18   actually increased your estimates?

19   A.    Yes.

20   Q.    Okay.

21                Now, let's assume the plaintiffs stand up

22   and argue that we should use their expert's estimate of

23   the treatment population.

24   A.    Yes.

25   Q.    You're aware that Dr. Alexander has provided his

 1    own estimate of what the treatment population in the two

 2    counties will be going forward?

 3    A.    Correct.

 4    Q.    And let's turn to Tab 6 in your binder.

 5                    This is CVS-MDL-05023.

 6    A.    Yes.

 7    Q.    This chart is similar to the very first chart we

 8    looked at for Trumbull County with one exception,

 9    correct?

10    A.    Yes.

11    Q.    And what's -- what's the one difference or the one

12    exception?

13    A.    That we're using Alexander's total treatment

14    population.

15    Q.    And can you just explain to Judge Polster how you

16    took Dr. Alexander's treatment population and broke it

17    out between Medicaid and non-Medicaid?

18    A.    Sure.

19                    Actually, I should correct that.  Well,

20    that's the only change that we made to the inputs and

21    there's still changes obviously that flow through to

22    different numbers.

23    Q.    Fair enough.

24    A.    But I think that's obvious.

25    Q.    Sure.

Bialecki - Direct/Hynes                    789

1    A.    So that the Medicaid-to-non-Medicaid patient

2    population is based on what we've seen historically in

3    the data, so it's 33 percent versus 67 percent.

4                 And that's based on Trumbull County data,

10:07:36  5    obviously, because we don't have Lake County Medicaid

6    data, and that's for 2019.

7    Q.    Thank you.  Thank you.

8                 And otherwise, this, the methodology in

9    this chart is the same as the methodology that you

10:07:49 10    employed for the very first Trumbull County chart we

11    looked at?

12    A.    Yes.

13    Q.    So the average treatment costs, for example, for

14    non-Medicaid and Medicaid patients comes from the 2019

10:08:03 15    Trumbull County data?

16    A.    Yes.

17    Q.    And you employ the same county-funded percentage

18    that you used in the first Trumbull County chart we

19    looked at?

10:08:17 20    A.    Yes.

21    Q.    And again that makes adjustments for amounts that

22    are funded through federal and state grants?

23    A.    That's correct.

24    Q.    And what impact does this have on the totals at the

10:08:35 25    bottom?

Bialecki - Direct/Hynes

790

1    A.    So the previous total would have been $675,243 for

2    the five-year total.

3                      The new one, based on Alexander's treatment

4    population, is $1,315,096.

10:08:55 5                      So it increases it almost double.

6    Q.    And that's for the whole five-year period?

7    A.    Correct.

8    Q.    And again that's CVS-MDL-05023?

9    A.    Correct.

10:09:14 10   Q.    Mr. Bialecki, did you create a similar chart for

11   Lake County?

12   A.    Yes.

13   Q.    All right.  And this is CVS-MDL-05024.

14                      And this is the same as the first Lake

10:09:47 15   County chart we looked at, except that it uses

16   Dr. Alexander -- Dr. Alexander's OUD treatment

17   population.

18                      Is that correct?

19   A.    Yes.

10:09:54 20   Q.    And it uses the same methodology that you used in

21   the first Lake County chart?

22   A.    That's right.

23   Q.    Okay.

24                      So number of patients, non-Medicaid

10:10:09 25   patients and average treatment costs for non-Medicaid

Bialecki - Direct/Hynes                    791

1    patients that's from the 2019 Lake County data?

2    A.    Yes.

3    Q.    And the county-funded percentage comes from that

4    large spreadsheet that we looked at earlier that shows

5    how grants are spent by the Lake County ADAMHS Board?

6    A.    That's correct.

7                THE COURT:  Well, I thought of one possible

8    explanation for the radical difference in average

9    treatment costs for non-Medicaid versus Medicaid

10   patients, and that is that the Medicaid patients may

11   be -- have more serious OUD or have -- require prolonged

12   treatment, more lengthy treatment, or repetitive

13   treatment because obviously, this is an average cost.

14                So some people need treatment for 30 days,

15   some might need it for a year.

16                THE WITNESS:  Absolutely.

17                THE COURT:  And some might be intermittent.

18                So it's possible that the Medicaid patients

19   require more prolonged treatment or intermittent

20   treatment, and that could -- but it still is a mystery to

21   me.

22                MR. HYNES:  I don't think Mr. Bialecki can

23   answer that question for you, Judge Polster.

24                THE COURT:  No, I don't think so.

25                MR. HYNES:  I'm sorry.

1          I wish he could.

2     BY MR. HYNES:

3     Q.    So, Mr. Bialecki, back to this Lake County chart,

4     I'm not sure where we left off, but this assumes

10:11:53 5     Dr. Alexander's OUD treatment population?

6     A.    I'm sorry.  Could you say that again?

7     Q.    Yeah.

8               This Lake County chart, CVS-MDL-05024.

9     A.    Yes.

10:12:06 10     Q.    It's the same as the first Lake County chart we

11    looked at, except that it assumes Dr. Alexander's OUD

12    treatment population?

13    A.    Yes.

14    Q.    And to break out the -- that treatment population

10:12:20 15    into non-Medicaid and Medicaid, you used the ratio from

16    the Trumbull County data where we have information on

17    Medicaid patients?

18    A.    Yes.  The 2019 Trumbull ratio.

19    Q.    Right.

10:12:35 20               Could you just walk through what the totals

21    are at the bottom when you used Dr. Alexander's treatment

22    population?

23    A.    Sure.

24               Year one is $264,193.  Year two, $269,245.

10:12:55 25    Year three, $274,068.  Year four, $278,667.  And year

Bialecki - Direct/Hynes                    793

1    five, $283,049.

2                    Five-year total is $1,369,223.

3                    When you compare it to the original

4    calculation using our -- the actual data for the number

10:13:23 5    of patients that were treated in Trumbull in 2019, you

6    get a five-year total of $432,000, so just over, I guess,

7    triple the total that we were getting before.

8    Q.    Thank you.

9                    If you could turn to Tab 6 -- or Tab 8,

10:13:53 10   sorry, Mr. Bialecki.

11   A.    I'm sorry.  It's hard to hear you.

12   Q.    Tab 8.

13                    And this is CVS-MDL-05025.

14   A.    Yes.

10:14:10 15   Q.    Now, this chart also assumes that -- assumes

16   Dr. Alexander's treatment population?

17   A.    That's correct.

18   Q.    And it's for Trumbull County?

19   A.    Yes.

10:14:21 20   Q.    And what's the difference between this chart and

21   the other chart we looked at for Trumbull County that

22   used Dr. Alexander's treatment population?

23   A.    The treatment populations -- oh, I'm sorry.

24   Q.    What's --

10:14:36 25   A.    You said the Alexander chart.

1    Q.    Yeah.  We looked at a chart a few minutes ago for

2    Trumbull County based on Dr. Alexander's treatment

3    population.

4                    Do you remember that?

10:14:43 5    A.    Yes, I do.

6    Q.    Okay.  How does this chart differ from that chart?

7    A.    So this one excludes the federal and state grants

8    that would have covered costs for some of the charges

9    from the subcontractors or the ADAMHS providers.

10:15:00 10    Q.    So the prior chart had, I think, 44-and-a-half

11    percent for the county-funded percentage right there but

12    this chart does not?

13    A.    Correct.

14    Q.    Otherwise, it's the same, the same methodology?

10:15:10 15    A.    Yes.

16    Q.    Okay.

17                    And what is removing or not considering the

18    percentage funded through federal and state grants, what

19    does that -- how does that impact the totals?

10:15:22 20    A.    So if we remove that adjustment, the previous

21    five-year total was $1,315,096.

22                    This total without considering the other

23    grants is $2,956,867, so over double increase.

24    Q.    It increases?

10:15:47 25    A.    Yes.

1    Q.    Okay.  And again that's CVS-MDL-05025.

2                 And you've created a similar chart for Lake

3    County, correct?

4    A.    Yes.

10:16:06  5               MR. HYNES:  And, Judge Polster, I know this

6    is tedious.  This is the last chart so --

7                 THE COURT:  No, that's fine.  I understand

8    the math.

9    BY MR. HYNES:

10:16:15 10  Q.    Okay.  So this one is for Lake County, right,

11   Mr. Bialecki?

12   A.    That's correct.

13   Q.    It assumes that Dr. Alexander treatment population,

14   correct?

10:16:24 15  A.    Yes.

16   Q.    Okay.

17                 But there's no adjustment that would be

18   right here in the prior chart for the county-funded

19   percentage?

10:16:33 20  A.    That's correct.

21   Q.    And for Lake County, based on that large

22   spreadsheet we looked at, the county-funded percentage

23   is, I think, 22-and-a-half percent.

24                 Do I have that right?

10:16:41 25  A.    22.4.

Bialecki - Direct/Hynes                796

1    Q.    Thank you.

2              But that's not in here?

3    A.    No.

4    Q.    So the costs go up?

5    A.    That's correct.

6    Q.    Otherwise, the methodology in this chart is the

7    same?

8    A.    It is.

9    Q.    Okay.

10             Can you just quickly walk through, you

11   know, maybe the first and last year totals and then the

12   five-year total.

13   A.    Sure.

14             So the first year total is $1,178,181.  The

15   five-year total is $1,262,267.

16             And so the five-year total, assuming the

17   Alexander population and excluding the grants, federal

18   and state grants, would be $6,106,106 compared to the

19   original calculation that just changed to the Alexander

20   population that was $1,369,223.

21             So a significant increase.

22   Q.    It goes up?

23   A.    Yes.

24   Q.    Okay.  And that's, again, CVS-MDL-05026.

25             MR. HYNES:  Judge Polster, it's 10:15.  I'm

Bialecki - Direct/Hynes                        797

```
         1   at a point where we could break or we could keep going.

         2                THE COURT:  We could keep going.

         3                MR. HYNES:  Okay.

         4   BY MR. HYNES:

10:18:25 5   Q.    Mr. Bialecki, I want to just spend a minute or two

         6   talking about hospitalizations for infants with Neonatal

         7   Abstinence Syndrome, otherwise known as NAS?

         8   A.    Yes.

         9   Q.    Okay.

10:18:45 10              Does the claims data that the counties

        11   produced that you reviewed, could you identify any costs

        12   in the claims data for NAS hospitalizations?

        13   A.    Claims data for -- yes.  Not in the claims data,

        14   no.

10:19:02 15  Q.    Okay.  You didn't see any costs in the claims data

        16   for NAS hospitalizations?

        17   A.    No.

        18   Q.    Have you seen any evidence in your review of the

        19   financial records and the financial data in this case

10:19:20 20  that the counties incur any costs for NAS

        21   hospitalizations?

        22   A.    No.

        23   Q.    Okay.  I want to turn very quickly to child

        24   services expenditures.

10:19:41 25  A.    Should I be looking at something or --
```

1    Q.    Not -- no, you're good.

2    A.    Okay.

3    Q.    You have not received any transactional data on

4    child services expenditures expended by the county or you

10:19:55 5    haven't reviewed any?

6    A.    No.

7    Q.    Okay.

8                I will put up what's been marked as

9    CVS-DEMO-014.

10:20:11 10                Have you located information about the

11    percentage of child services expenditures that are funded

12    through federal and state grants?

13    A.    Yes.

14    Q.    And can you walk Judge Polster through that,

10:20:25 15    please?

16    A.    Yes.

17                So we had information from the public

18    Children's Services Association of Ohio that would say

19    that -- that says that in 2018, 47 percent of child

10:20:39 20    services expenditures were funded with federal and state

21    grants.  And in 2020, 45 percent of child services

22    expenditures in Trumbull County were funded with federal

23    and state grants.

24                And that was from the Trumbull County

10:20:55 25    revenue data for 2020.

Bialecki - Direct/Hynes

799

1    Q.    Okay.  And how about Lake County?

2    A.    Lake County, very similar.

3                And we have information from 2018, Trumbull

4    was 47 percent, Lake County was 47.4 percent of child

10:21:12 5    services expenditures were funded with federal and state

6    grants.

7    Q.    We looked at that spreadsheet that showed how the

8    ADAMHS boards allocate and spend federal and state

9    grants, two spreadsheets.

10:21:26 10                Do you remember those?

11   A.    Yes.

12   Q.    Okay.  You didn't locate any spreadsheets like that

13   for any child services organizations in the two counties?

14   A.    No.

10:21:40 15   Q.    All right.

16                Shifting gears, Mr. Bialecki, do the

17   counties issue financial statements?

18   A.    They do.

19   Q.    Okay.

10:21:49 20                Are those financial statements audited by

21   the State of Ohio?

22   A.    Yes.

23   Q.    And have you reviewed those financial statements?

24   A.    I have.

10:21:59 25   Q.    And is -- I mean is reviewing financial statements

1  something you do as part of your regular work?

2  A.   Yes.

3           It's actually exciting for me.

4  Q.   Not for me.

10:22:10  5  A.   Nobody else in this room probably.

6  Q.   You have a binder up there with -- that has the

7  Lake County financial statements.  It's to your right.

8  A.   Yes.

9  Q.   And what are the most recent financial statements

10:22:27 10  for Lake County that you've located?

11  A.   2020.

12  Q.   Okay.

13           I believe the 2020 set is the first tab in

14  that binder.  That is DEF-MDL-14968.

10:22:44 15  A.   Yes.

16  Q.   And we have copies if folks want them.

17           MR. HYNES:  Judge Polster, would you like a

18  copy of the financial statements?

19           THE COURT:  Well, I can probably see them

10:22:58 20  on the screen.

21           MR. HYNES:  Okay.  I'll make sure to put up

22  the relevant pages.

23  BY MR. HYNES:

24  Q.   Mr. Bialecki, let's -- and I want to use

10:23:06 25  the -- this might be confusing to you, although I know

1    you do expert witness work.  I want to use the page

2    number at the very bottom left.  It's the Bates Number

3    page number.

4    A.    Yes.

10:23:16    5    Q.    Okay.  Can we turn to Page 27 of the Bates Number?

6                   The type is very small so I'm going to try

7    to zoom in here.

8                   Are you there, Mr. Bialecki?

9    A.    Yes.

10:23:38    10    Q.    Okay.  This, this page lays out statement of net

11    position.

12                   Do you see that?

13    A.    I do.

14    Q.    Can you just explain to Judge Polster what a

10:23:49    15    statement of net position is?

16    A.    Yes.

17                   It's kind of like an income statement for a

18    company, like a profit and loss statement, although in

19    Government, there's no profit and loss so it's a

10:24:02    20    statement of net position.

21                   So at the top here, we have assets so

22    obviously assets, things that the county has that can be

23    used for future obligations.

24                   Deferred outflows of resources, so it could

10:24:19    25    be things that they're going to have to expend but don't

```
 1    have to do right now but they already know about them or

 2    that are coming in, sorry.

 3                    And then you get to liabilities, so things

 4    like accounts payable so things they owe vendors, they

 5    owe wages, things like that.

 6                    Deferred inflows of resources, things like

 7    property taxes that they know that they are going to get

 8    and they're almost guaranteed to get but haven't received

 9    yet.

10                    And then you get to net position.

11                    So if you take, you know, the assets and

12    deferred outflows of resources and you subtract

13    liabilities and deferred inflows, you'll get to net

14    position.

15                    So taking your assets, basically

16    subtracting for what you owe and that's what's left over,

17    to simplify it.

18    Q.    Thank you.

19                    And up at the top is -- it's equity in

20    pooled cash and cash equivalents.

21    A.    Yes.

22    Q.    Can you explain what that is?

23    A.    It's basically cash.  People get confused sometimes

24    with cash equivalents when you have -- like for a

25    corporation, they would have, a cash equivalent might be
```

1    shares in General Motors and so it's something that can

2    be converted very easily and quickly to cash.

3    Q.    Okay.

4              And at the end of 2020, what did Lake

10:25:46  5    County have in cash and cash equivalents?

6    A.    $307 million.

7    Q.    Okay.  And there are other assets below that,

8    correct?

9    A.    Yes.

10:25:54 10    Q.    You have property taxes, for example?

11    A.    Yes.

12    Q.    Okay.

13    A.    Receivables, yeah.

14    Q.    Receivables.  Thank you.

10:26:01 15              And what were Lake County's total assets at

16    the end of 2020?

17    A.    $837 million.

18    Q.    Okay.

19              And I believe you explained to Judge

10:26:11 20    Polster, you take that number and subtract the

21    liabilities, correct?

22    A.    Yes.

23    Q.    And you get to the net position, which is down at

24    the bottom.  And what was Lake County's net position?

10:26:24 25    A.    To simplify it, you'd have to take into account

1    deferred inflows and outflows but total net position was,

2    to round, $481 million.

3    Q.    For Lake County at the end of 2020?

4    A.    Yes.  At December -- or at December 31st, 2020.

5                   So a statement of net position is always at

6    a point in time.

7    Q.    Thank you.

8                   If we could go to Page 36 of the Bates

9    numbering on the bottom left.

10                   Are you there, Mr. Bialecki?

11   A.    I am.

12                   MR. WEINBERGER:  What page is this?

13                   MR. HYNES:  Page 36 of the Bates numbering.

14   BY MR. HYNES:

15   Q.    Can you explain what this is, Mr. Bialecki?

16   A.    So this is a statement of revenues, expenditures

17   and changes in fund balance, so just to make the

18   distinction between what we were just looking at, the

19   statement in net position, as I said that's a point in

20   time and it's assets and liabilities, basically.

21                   This is for the year ended December 31st,

22   2020.  So it would have been, this is for a 12-month

23   period, and it looks at revenues and expenditures,

24   specifically of the ADAMHS Board for Lake County.

25   Q.    Okay.  So this is limited to the ADAMHS Board for

```
 1        Lake County?
 2        A.    Yes.
 3        Q.    There's a line?
 4        A.    And actually, I think I made -- did I say P & L
 5        statement for net position?  I meant balance sheet.  This
 6        would be a P & L statement so income and revenues and
 7        expenditures.  So I hope I didn't confuse anyone.
 8        Q.    Thank you for that clarification.
 9              And so there's a section at the top for
10        revenues, correct?
11        A.    Yes.
12        Q.    And can you just -- there's also budgeted amounts
13        and actual?
14        A.    Correct.
15        Q.    Can you explain that?  I think it's fairly obvious,
16        but --
17        A.    Yeah.
18              So just like actually, they're required, I
19        think, statutorily, but I'm not positive, to have
20        budgeted amounts and report actual amounts.
21              So it's just like a business would,
22        they -- they estimate what they think they'll have in
23        revenues and expenditures.  And then when, over time,
24        they would prepare this after, you know, December 31st,
25        2020 when they have final numbers.
```

1          And then actuals would be populated here

2    and compared to the budget.

3    Q.    And can you -- can you walk through what the Lake

4    County ADAMHS Board's budgeted and actual total revenues

10:29:17 5    were for the year ended December 31st, 2020?

6    A.    Sure.

7          So and there's two budgeted amounts there,

8    there's the original and the final.  I'm going to use the

9    final.

10:29:30 10          So the revenues that were budgeted for Lake

11    County for December 31st, 2020 were $14,751,302.

12          The actual revenues were $16,366,959.

13          So then the third column would say variance

14    with final budget, positive or negative, which is the

10:30:00 15    $1.6 million.

16          So that would mean that they had more

17    revenues than what they expected or budgeted for, for

18    that year of $1.6 million.

19    Q.    Okay.  Thank you.

10:30:11 20          There's a similar set of numbers for

21    expenditures, right?

22    A.    Yeah.

23          So 17.5 million for final budget, 16

24    million for actual.  And so a positive variance, meaning

10:30:26 25    they spent less than they expected of 1.4 million for the

Bialecki - Direct/Hynes                    807

1    2020 year.

2    Q.    Okay.

3              And at the bottom, it talks about fund

4    balance, end of year.  Can you explain what fund balance

10:30:38 5    is?

6    A.    Yeah.

7              So that's, you know, we had looked at the

8    changes in fund balances as, you know, kind of the

9    assets.

10:30:52 10              So this just shows that --the fund balance

11   at the beginning of the year of $3.9 million and

12   then -- for the actuals, and then it changed -- actually,

13   sorry -- sorry.  Fund balance for the end of the year,

14   the expected was the budgeted amount, 1.1 million, so

10:31:16 15   1,165,588.

16   Q.    Um-hum.

17   A.    The actual was, 4,194,154.

18              So the total fund balance at the end of the

19   year is $3 million more than expected because they had

10:31:35 20   positive variances so they had lower expenses.  They had

21   higher revenues, which resulted in higher fund balance

22   than expected.

23   Q.    Okay.  Thank you, Mr. Bialecki.

24   A.    Sure.

10:31:51 25   Q.    Very quickly, I think you discussed in your report

1    or cited in your report the fact that the financial

2    statements also discuss federal -- amounts from federal

3    grants that are expended or spent during the year.

4    A.    Yes.  Yes.

10:32:10  5    Q.    Let's just turn quickly to Page -- it's right after

6    Page 128.  The Bates Number does not appear on the next

7    page.

8                    Are you there?

9    A.    128?

10:32:40 10    Q.    The page after 128.  It's going to -- I'm going to

11    put it up for you -- for some reason, there's no Bates

12    Number.

13    A.    I see.

14    Q.    Okay.  So this is a -- are you there?

10:32:57 15    A.    I am.

16    Q.    Okay.

17    A.    And I see it on the screen here.

18    Q.    Okay.

19                    So this is a schedule that talks about or

10:33:04 20    identifies expenditures of federal awards for the year

21    ended December 31st, 2020?

22    A.    Yes.

23    Q.    And based on your review of the financial

24    statements, does it identify federal grants that were for

10:33:30 25    substance abuse treatment, for example?

1    A.    Yes.

2    Q.    I'm going to Page 134 of the Bates Number.

3                 Is that an example of a grant for substance

4    abuse treatment?

10:33:51  5    A.    I'm sorry.  What page was that?  134?

6    Q.    Yes.  Of the Bates numbering.

7    A.    Okay.

8                 Yes.

9    Q.    Okay.

10:34:03  10                 And that's a Block Grant for the prevention

11   and treatment of substance abuse?

12   A.    Right.  From the U.S. Department of Health & Human

13   Services.

14   Q.    And what did the county expend for that grant in

10:34:17  15   2020?

16   A.    $729,378.

17   Q.    Okay.

18                 And I think Judge Polster might have had a

19   question about this earlier, but you said it comes from

10:34:26  20   the U.S. Department of Health & Human Services, but it

21   was passed through the Ohio Department of Alcohol and

22   Drug Addiction Services?

23   A.    Yeah, ADAMHS Board.

24                 THE COURT:  And which county was that for?

10:34:43  25                 MR. HYNES:  Lake County.

```
 1              THE COURT:  Okay.  Thank you.
 2    BY MR. HYNES:
 3    Q.    And it also shows grants for foster care, for
 4    example?  And I'm on Page 129.  There's no Bates Number
10:35:03 5    on it, but you can see it on the screen.
 6    A.    Yes.
 7    Q.    And how much money -- how much in federal grants
 8    for foster care did the county expend in 2020?
 9    A.    $2,698,240.
10:35:25 10   Q.    Okay.
11              And there are other grants above related to
12    child services, like the Stephanie Tubbs Jones Child
13    Welfare Services Program?
14    A.    Yes.
10:35:34 15   Q.    Okay.
16    A.    And that's a -- oh, I'm sorry.  Was there a
17    question?
18    Q.    What was that?
19    A.    Yes.  That's right.
10:35:41 20   Q.    And if we go to Page 131, it shows another grant
21    that's relevant, and we're just picking out some
22    examples, but this right here is a grant for the
23    state-targeted response to the opioid crisis?
24    A.    Yes.  For $692,651.
10:36:07 25              I think the Tubbs one I mentioned in my
```

Bialecki - Direct/Hynes                    811

           1    report.  I don't know if these other ones I did.

           2    Q.    Okay.

           3    A.    Probably.

           4    Q.    This is a grant, again, from the U.S. Department of

10:36:16   5    Health and Human Services?

           6    A.    Yes.

           7    Q.    And it passes through the Ohio Department of

           8    Jobs & Family Services?

           9    A.    Correct.

10:36:24  10    Q.    Thank you.

          11               Now, the next tab in that binder has the

          12    Lake County audited financial statements for 2019?

          13    A.    Yes.

          14    Q.    These are similar to the financial statements for

10:36:44  15    2020 that we just looked at?

          16    A.    Yes.

          17    Q.    Okay.

          18               I don't want to spend as much time on them,

          19    but let's go through them quickly.

10:36:51  20               And this is DEF-MDL-1940.

          21    A.    14940.

          22    Q.    14940.  Thank you, Mr. Bialecki.

          23    A.    Sure.

          24    Q.    And these are also audited by the State of Ohio?

10:37:09  25    A.    Yes.  Prepared by the county auditor and then

812

1    audited by the state auditor.

2    Q.   Okay.

3              And if we go to Page 27 of the Bates

4    numbering, I'll let you get there.  I'm going to zoom in

10:37:34  5    because the type is very small.

6              Are you there?

7    A.   I am.

8    Q.   Okay.  Is that the statement of net position for

9    Lake County at the end of December -- as of December

10:37:58 10    31st, 2019?

11   A.   Yes.

12   Q.   Okay.  And is this the format very similar, if not

13   identical, to the statement of net position we looked at

14   in the 2020 version?

10:38:09 15   A.   Yes.

16   Q.   Okay.  And so what does it say about cash and cash

17   equivalents?

18   A.   That the total, as of December 31st, 2019, is $256

19   million.

10:38:22 20   Q.   Okay.  And total assets?

21   A.   Total assets are $785 million.

22   Q.   Okay.  And after you take into account liabilities,

23   what are you left with as a net position?

24   A.   So if you net out the 337 in liabilities, net

10:38:37 25   position is $451 million.

Bialecki - Direct/Hynes

813

1    Q.   So that's the Lake County's net position, as of

2    December 31st, 2019?

3    A.   Yes.

4    Q.   Okay.

5             And if we could turn to Page 36 of the

6    Bates numbering, this is the statement of revenue and

7    expenditures for the Lake County ADAMHS Board, correct?

8    A.   I'm sorry.  Could you repeat the page?

9    Q.   Page 36.

10   A.   Yes.

11   Q.   Okay.

12   A.   Correct.

13   Q.   Thank you.

14            So similar format, budgeted amounts and

15   actual, correct?

16   A.   Yes.

17   Q.   Okay.

18            Total revenue was budgeted to be $14.7 but

19   they ended up with about 15-and-a-half million?

20   A.   Right.  So a positive variance of 806,000.

21   Q.   Okay.  And then expenditures, they expected 17

22   million but spent 15 million?

23   A.   Yes.

24            Yeah, their original budget, they had

25   budget 14.7 million but then upped it to 17 but then

1    actual was 15, so $2 million in fewer expenditures than

2    they expected.

3    Q.    They spent two million less than they expected?

4    A.    Yes.

10:40:00 5    Q.    Okay.

6                    And then the fund balance at the end of the

7    year, they expected to have 1.1 million and ended up with

8    about 3.9?

9    A.    Right.

10:40:10 10                   Almost 4 million, and that's due to the

11    positive variances in both lower revenues -- or higher

12    revenues and lower expenditures of almost $3 million.

13    Q.    Thank you.

14                   And lastly, with this one, it's actually

10:40:29 15    the same thing.  It's right after Page 124, starts the

16    discussion of federal grants.

17                   And --

18    A.    Okay.

19    Q.    Mr. Bialecki, I don't want to spend a lot of time

10:40:49 20    on this, it is tedious, but this also identifies some

21    grants related to substance abuse treatment?

22    A.    Yes.

23    Q.    Okay.  And that's in the county's audited financial

24    statements as of December 31st, 2019?

10:41:04 25    A.    Yeah.

1            Sorry.  As an accountant, I have to say the

2   supplemental information to the financial statements to

3   be technically correct.

4   Q.    Thank you.

10:41:16  5            You've also looked at financial statements

6   for Trumbull County?

7   A.    Yes.

8   Q.    Yes.  That's in the other binder up there?

9            THE COURT:  I think this might be, if we're

10:41:23 10   switching to Trumbull County, it might be a good time to

11   take our midmorning break.

12            MR. HYNES:  Okay.

13            THE COURT:  Take 15 minutes, and then come

14   back for the balance of Mr. Bialecki's testimony.

10:41:34 15            MR. HYNES:  Okay.  Thank you, Judge

16   Polster.

17            Thank you.

18            (Recess taken.)

19            THE COURT:  Okay.  Please be seated.

11:02:00 20            And, Mr. Bialecki, you're still under oath

21   from before the break.

22            THE WITNESS:  Thank you.

23            THE COURT:  You may continue, Mr. Hynes.

24            MR. HYNES:  Thank you, Judge Polster.

11:02:09 25

Bialecki - Direct/Hynes                    816

1    BY MR. HYNES:

2    Q.    Mr. Bialecki, before we took a break, we were

3    turning to the financial statements for Trumbull County,

4    which should be in a binder --

11:02:18  5    A.    Oh.

6    Q.    -- the larger binder that's back to your right.

7    A.    Okay.

8    Q.    Have you reviewed financial statements for Trumbull

9    County in the course of your work on this case?

11:02:36  10    A.    Yes.

11    Q.    Okay.  And what are the most recent financial

12    statements you have identified for Trumbull County?

13    A.    For the year ended December 31st, 2020.

14    Q.    Okay.

11:02:50  15             And like the Trumbull County financial

16    statements, are the Trumbull County -- are the Trumbull

17    County financial statements also audited by the State of

18    Ohio?

19    A.    You mean like the Lake County?

11:03:01  20    Q.    Yes.

21    A.    Yes, they are.

22    Q.    Okay.  Can we turn to Bates Number 67 on the bottom

23    left?

24             And this is, for the record, DEF-MDL-14944.

11:03:34  25             I'll just put it up, actually.

1          Mr. Bialecki, are you on Page 67?

2     A.   Yes, sir.

3     Q.   Okay.

4          Is that the statement of net position for

11:03:53  5   Trumbull County as of December 31st, 2020?

6     A.   It is.

7     Q.   All right.

8          And for Judge Polster's benefit, is this

9     similar in concept or same in concept to what we looked

11:04:03 10  at for the net position of Lake County?

11    A.   Yes.

12    Q.   Okay.

13         And so at the top, it identifies equity in

14    pooled cash and cash equivalents?

11:04:15 15  A.   Correct.

16    Q.   Okay.

17         And again, I think you explained this

18    before but just to confirm, that's cash and other

19    instruments or assets that can be converted to cash

11:04:25 20  quickly?

21    A.   Yes.

22    Q.   Okay.

23         And how much in cash and cash equivalents

24    did Trumbull County have at the end of 2020?

11:04:35 25  A.   Around $142 million.

Bialecki - Direct/Hynes                    818

1   Q.    Okay.

2               And then if we go further down, it gives a

3   number for total assets, correct?

4   A.    Correct.

11:04:45  5   Q.    Okay.

6   A.    Of 458 million.

7   Q.    And that takes into account not only the cash and

8   cash equivalents, but other receivables and other assets?

9   A.    That's correct.

11:04:55 10   Q.    Okay.

11               And like the net position statement we

12   looked at for Lake County, does it also back out the

13   liabilities to arrive at a net position?

14   A.    To simplify it, yes.

11:05:08 15               We also have to add in the deferred

16   outflows and reduce the deferred inflows, but, you know,

17   most of it is assets less liabilities, would be net

18   position.

19   Q.    Okay.  We have a lot of people in the audience now.

11:05:24 20   A.    Hello to everyone.

21   Q.    They came for Mr. Weinberger's cross-examination.

22   A.    I have to sit up straight here and fix my tie.

23               THE COURT:  Well, we have some fine

24   students from Hawken who are here to see a little bit of

11:05:37 25   the trial and talk to me over the noon hour so welcome to

1  them.

2              THE WITNESS:  Welcome.

3              MR. HYNES:  Now I've got to -- yeah.

4  BY MR. HYNES:

11:05:45 5  Q.    So I think we were interrupted there, Mr. Bialecki,

6  but can you just talk about what the total net position

7  for Trumbull County was at the end of 2020?

8  A.    So at December 31st, 2020, the net position for

9  Trumbull County is 190 million.

11:06:02 10  Q.    Thank you.

11              Mr. Bialecki, can we turn to Page 176 of

12  Defendants' MDL 14944?

13  A.    Sure.

14  Q.    Correction, Page 175.

11:06:35 15              Are you there?

16  A.    I am.

17  Q.    And can you just explain to Judge Polster what that

18  is?

19  A.    So similar to the one that we looked at for Lake

11:06:45 20  County, this is the schedule of revenues, expenditures

21  and changes in fund balance, budget and actual, non-GAAP

22  budgetary basis for the community health mental fund.  So

23  this would be what we have been calling the ADAMHS Board

24  for Trumbull County.

11:07:04 25              And so in the corporate world, again, it

Bialecki - Direct/Hynes

820

1       would be like an income statement or P & L, profit and

2       loss statement, so it would show the revenues,

3       expenditures and then changes in fund balance for the

4       community mental health fund.

11:07:26  5   Q.    Okay.

6             So you mentioned the Trumbull County ADAMHS

7       Board.

8             Just so the record is clear, that's the

9       Trumbull County Mental Health and Recovery Board?

11:07:34 10   A.    Yes.

11      Q.    Thank you.

12            And like the last one we looked at for the

13      Lake County ADAMHS Board, it walks through revenues,

14      expenditures, and fund balance as you've explained.

11:07:45 15           Can you talk through what the budgeted and

16      actual amounts for total revenue was at the end of 2020?

17      A.    Sure.

18            So the budgeted amount for total revenues

19      is $5.6 million, and the actual revenues were just over

11:08:06 20   $7 million.

21            So there's a positive revenue budget

22      variance of $1.4 million.  So meaning that actual

23      expenditures -- or actual revenues exceeded what they

24      expected to have in revenues by 1.4 million.

11:08:23 25   Q.    Thank you.

1          And can you also explain what the budgeted

2     and actual amounts for total expenditures were kind of in

3     the middle of that page?

4     A.    Certainly.

11:08:35  5          Total expenditures, the budgeted amount is

6     8.4 million.  Actual is about $8 million.  And so there's

7     a positive fund balance, a variance to balance here of

8     $419,525.

9          So expenditures were less than what was

11:09:01 10   budgeted.

11    Q.    Okay.

12         So to be clear, when you say a positive

13    variance, you mean they spent less than they expected to?

14    A.    Yes.

11:09:12 15        So it's less than budget and budget is

16    typically, you know, what you expect to spend or what you

17    expect the numbers to come in at.

18    Q.    Okay.

19         And can you explain to Judge Polster what

11:09:21 20   the fund balance at the end of the year was from a budget

21    standpoint and then an actual standpoint?

22    A.    Yes.

23         So they expected the fund balance -- and

24    this is obviously driven by revenues and

11:09:32 25   expenditures -- you start with the beginning fund balance

Bialecki - Direct/Hynes

822

1      and then you add in -- or subtract the change.

2                  So the fund balance at the end of the year,

3      the budgeted amount was $3.8 million.  The actual was

4      $5.6 million.  So there's a positive budget variance or

11:09:54 5      comparison of $1. -- $1,858,568, which is the sum of the

6      two positive variances above.

7      Q.    Okay.

8      A.    So the fund balance exceeds what they expected it

9      to, by $1.9 million.

11:10:13 10     Q.    Right.

11                 And is it correct to say they actually had

12     more -- their fund balance at the end of the year was

13     greater than what they expected to spend for the entire

14     year?

11:10:23 15     A.    Yes.

16     Q.    Now, like the Lake County financial statements,

17     does the Trumbull County financial statements also

18     identify federal grants that the county expended

19     throughout the year?

11:10:44 20     A.    It does.

21     Q.    Let's turn back, it's actually to near the

22     beginning of the document.  It's Bates Number 5 of

23     Defendants' MDL 14944.

24     A.    I'm there.

11:11:16 25     Q.    Okay.  So is this the excerpt of the financial

Bialecki - Direct/Hynes

1    statements that identifies the federal grants that have

2    been expended throughout the year of 2020?

3    A.    Yes.

4    Q.    Okay.  And, again, we're down on Page 5.

11:11:33   5              And does it also identify grants related to

6    substance abuse treatment?

7    A.    Yes.

8    Q.    Is this one example on Page -- I'm on Page 7, Block

9    Grants For Prevention and Treatment of Substance Abuse?

11:11:56   10   A.    Yes.

11   Q.    And what's -- what's the amount that Trumbull

12   County received from those block grants or expended from

13   those block grants during 2020?

14   A.    $492,966.

11:12:11   15   Q.    Okay.

16              And, again, that was a federal grant that

17   passed through the Ohio Department of Mental

18   Health & Addiction Services?

19   A.    Yes.

11:12:21   20   Q.    Okay.

21              And below that, is there an opioid grant?

22   A.    Yes.  There's an opioid STR grant.

23   Q.    And what was the amount of that grant?

24   A.    $291,273.

11:12:47   25   Q.    And like the Lake County statement on grants, it

Bialecki - Direct/Hynes                    824

 1     also identifies -- oops.  That would not have been

 2     good -- grants for foster care received, Title IV-E

 3     grants for foster care?

 4     A.    And what page are you referencing?

11:13:09  5     Q.    Page 9.

 6     A.    Oh, nine in the Bates Number.  Sorry.  Okay.

 7                 Yes.  That's correct.

 8     Q.    Okay.  And what's the total amount of those grants

 9     that was received during the year?  Sorry, strike that.

11:13:31 10                 The total amount that was expended

11     throughout the year from those grants?

12     A.    It's $3,256,842.

13     Q.    Okay.  All right.

14                 Again, for the record, that is Defendants'

11:13:57 15     MDL 14944.

16                 Mr. Bialecki, if you could turn to the next

17     tab in your Trumbull County financial statement binder.

18     A.    Um-hmm.  Yes.

19     Q.    And this is Defendants' MDL 14928.

11:14:16 20                 And is that the -- are those the audited

21     financial statements for Trumbull County for the year

22     ended December 31st, 2019?

23     A.    Yes, they are.

24     Q.    And are they similar to the financial statements

11:14:31 25     that we just looked at for 2020?

1    A.    Yes.

2    Q.    Okay.  Can you please turn to Bates 66 of

3    Defendants' MDL 14928?

4    A.    Okay.  I'm there.

11:15:07  5    Q.    And is that the statement of net position for

6    Trumbull County?

7    A.    Yes.

8    Q.    As of December 31st, 2019?

9    A.    Sorry.

11:15:14  10                   Yes.

11    Q.    And similar to the one we looked at for 2020, it

12    starts at the top for assets with equity in pooled cash

13    and cash equivalents?

14    A.    Correct.

11:15:27  15    Q.    And what's that amount?

16    A.    So total cash and cash equivalents as of December

17    31st, 2019 is $137,722,961.

18    Q.    Okay.

19                   And, again, that's cash or instruments or

11:15:46  20    other assets that could be converted to cash quickly?

21    A.    Yes.

22    Q.    And what are the total assets for Trumbull County

23    as of December 31st, 2019?

24    A.    $435,360 -- 435,368,638.

11:16:06  25    Q.    Okay.

1          And once you back out the liabilities and,

2     as you said before, account for deferred inflows and

3     outflows, what are you left with for a net position for

4     Trumbull County as of December 31st, 2019?

11:16:20  5     A.    $187,496,263.

6     Q.    Thank you.

7     A.    I think you're becoming an accountant now.

8     Q.    That would not be a good -- that would not be a

9     good situation.

11:16:40 10          All right.  Could we turn to Page Bates 174

11    of Defendants' MDL 14928?

12    A.    Oh, sorry, the same -- the same year.

13    Q.    The same year.  We're still in 2019.

14    A.    74.

11:17:08 15          Did I -- sorry, could you repeat the page

16    number?

17    Q.    Bates 174.

18    A.    Oh, 174.  Sorry.

19          Okay.

11:17:19 20    Q.    And is that like what we looked at for 2020, a

21    schedule of revenue and expenditures for the Trumbull

22    County Mental Health and Recovery Board?

23    A.    For 2019?

24    Q.    Sorry, strike that.

11:17:35 25          2019.  Thank you.

1   A.    Yes.

2   Q.    Okay.

3               So at the top there, it walks through what

4   total revenues were budgeted and what total revenues were

11:17:47 5   actually received?

6   A.    Correct.

7   Q.    Can you walk through that for us?

8   A.    Sure.

9               So the budgeted revenues are $5,582,800.

11:17:59 10   Actual revenues were $6,412,339.

11              And so there's a variance with final budget

12   which is positive of $829,539, which means that their

13   actual revenues exceeded what they expected or what they

14   budged for, for the year ended December 31st, 2019.

11:18:29 15   Q.    Okay.  And in the middle there, there's some lines

16   for expenditures.

17              Correct?

18   A.    Yes, there are.

19   Q.    Okay.  Could you just walk through the budgeted and

11:18:41 20   actual totals?

21   A.    Sure.

22   Q.    For total expenditures?

23   A.    Total expenditures budgeted are $8,147,160.

24   Actual, $6,756,169.  So a variance with final budget,

11:18:57 25   which is positive of $1,390,991, which we've talked about

1   before, means if budgeted -- actual budged expenditures

2   are less than -- if actual expenditures are less than

3   budgeted, it means typically they've spent less than they

4   expected.

5                   So it's a positive variance of $1.4

6   million.

7   Q.    Okay.

8                   And just the fund balance at the end of the

9   year, what was expected or budgeted and what was the

10  actual?

11  A.    Yeah.

12                  Again, so when you combine the positive

13  variance for revenue and for expenditures, it means that

14  the fund balance at the end of the year was expected to

15  be four million but because of those positive variances,

16  it was $6,247,526.  So a total positive variance with

17  budget of $2,220,530, so the fund balance was more than

18  what they expected by over $2 million.

19  Q.    And it was also more than what they expected to

20  spend for the entire year of 2019?

21  A.    Yeah.

22                  So the fund balance is more than what they

23  will -- well, what they expected for revenues for that

24  year, yes.

25  Q.    Thank you.  Or revenues, sorry.

1    A.    Actually, the actual -- the actual expenditures,

2    too, are just -- the fund balance is just under what they

3    expect to spend for the whole year, for that year.

4    Q.    Okay.  Let me clarify that because my question was

11:20:34  5    wrong.

6              The actual fund balance at the end of the

7    year was greater than what they expected to receive in

8    revenues?

9    A.    Yes.  That's right.

11:20:40  10   Q.    For the entire year.

11             Thank you.  Okay.

12             Now, we're going to turn back to the front

13   of the document, to Bates 00006 of Defendants' MDL 14928.

14   A.    Okay.

11:21:09  15   Q.    And does this describe federal grants and federal

16   awards that were expended during the year of 2019?

17   A.    Yes.

18   Q.    Okay.

19             And does it identify grants related to

11:21:23  20   substance abuse that were expended by the county in 2019?

21   A.    Yes.

22   Q.    Okay.

23             And are these some examples here of block

24   grants for the prevention and treatment of substance

11:21:39  25   abuse?

1    A.    Yes.

2    Q.    And what's the total amount of that grant that was

3    expended?

4    A.    $500,966.

11:21:48  5    Q.    Okay.

6                   And we just looked at this for the last

7    one.  There was also the opioid STR grant.  And what was

8    the amount expended for that grant?

9    A.    That was $291,510.

11:22:00  10    Q.    Okay.

11                  And we also had the Stephanie Tubbs Jones

12   Child Welfare Services Program Grant.  And how much was

13   spent from that grant?

14   A.    Sorry.

11:22:15  15                  $162,576.

16   Q.    Okay.

17                  And then we have the Foster Care Title IV-E

18   grant down near the bottom.  And what was expended from

19   that grant?

11:22:28  20   A.    $3,152,465.

21   Q.    Okay.  Thank you, Mr. Bialecki.

22                  You can put that binder away.

23                  I want to turn back just for a minute or

24   two to your analysis of the treatment data.

11:23:07  25   A.    All right.

1    Q.   Are you all set?

2    A.   I am.

3              Thank you.

4    Q.   Okay.  Do you have the charts that we looked at

11:23:20 5   before up?

6    A.   I do.

7    Q.   Thank you.

8              I want to just turn to Tab 2, which is

9    CVS-MDL-05019.

11:23:35 10  A.   Yes.

11   Q.   Can you just explain for us, Mr. Bialecki -- well,

12   strike that.

13             The non-Medicaid patient population and the

14   Medicaid patient population that you used, I think we

11:23:50 15  established, is from the data for 2019?

16   A.   Yes.

17   Q.   The treatment data?

18   A.   Yes.

19             It was identified, you know, what was

11:23:58 20  Medicaid, what was not.

21   Q.   All right.

22             And can you just explain for us how many

23   non-Medicaid patients and how many Medicaid patients

24   ADAMHS Board facilities in Trumbull County treated for

11:24:13 25  opioid-related diagnoses or for Opioid Use Disorder

Bialecki - Direct/Hynes
832

1    treatment?

2    A.    How many?

3    Q.    Yeah.

4    A.    Well, 481 for non-Medicaid, and 966 for Medicaid.

11:24:26 5    Q.    Okay.

6    A.    Typically a ratio of like a third non-Medicaid and

7    two-thirds Medicaid.

8    Q.    Okay.

9              And those, those numbers came from the 2019

11:24:36 10   data?

11   A.    Yes.

12   Q.    And of those patients, do you know how many

13   Trumbull County funded some or all of their treatment?

14   A.    I forget.

11:25:00 15             Trumbull -- I mean it's usually between 85

16   and 90 percent.  I think for that year, maybe -- I'm not

17   positive so I'm not going to say.

18             Somewhere around there.

19   Q.    Those were the Medicaid patients, right?

11:25:10 20   A.    Oh, yeah, Medicaid.

21   Q.    Okay.

22             Based on your analysis, the county would

23   have only paid the cost for treatment for non-Medicaid

24   patients?

11:25:21 25   A.    Oh, yeah.

```
          1    Q.   And that here is 481 in 2019?

          2    A.   Yes.

          3              Sorry.  I misheard your question.

          4    Q.   That's okay.

11:25:37  5              We don't have data for the number of

          6    patients -- number of Medicaid patients that Lake County

          7    ADAMHS Board facilities treated in 2019?

          8    A.   Correct.

          9    Q.   But we do have the number of non-Medicaid patients

11:25:55 10    that those facilities treated in 2019.

         11              Can you tell us how many non-Medicaid

         12    patients Lake County ADAMHS Board facilities treated in

         13    2019?

         14    A.   232.

11:26:08 15    Q.   Okay.

         16              Did -- a few more questions on the data.

         17              Did you and your team double-check your

         18    computations from the counties' data that you have

         19    discussed with us this morning?

11:26:25 20    A.   Yes.

         21    Q.   And did you double-check your cost estimates that

         22    are displayed in the charts we've gone over this morning?

         23    A.   Yes.  I hope we triple checked.

         24    Q.   Are you aware of any --

11:26:37 25    A.   But we'll find out.
```

1   Q.   Are you aware of any errors in your computations?

2   A.   No.

3                MR. HYNES:  For the Court Reporter's

4   benefit, I'd just like to go through the exhibits and

5   identify them for the record, Judge Polster.

6                THE COURT:  Okay.

7                MR. HYNES:  We do intend to move to admit

8   the ones that we went through.

9                The first chart in Tab 2 was CVS-MDL-05019.

10  And again, that's the chart for Trumbull County treatment

11  costs.

12               I'm not actually going to show all of them.

13               But the next one that we went through with

14  Mr. Bialecki is CVS-MDL-05020, and that's his estimate

15  for the Lake County treatment costs.

16               The next one is CVS-MDL-05021, and that is

17  his estimate of the Trumbull County treatment costs but

18  not making any adjustments for federal or state grants.

19               The next one is CVS-MDL-05022, and that is

20  an estimate of the Lake County treatment costs, based on

21  actual costs but excluding any adjustments for federal

22  and state grants.

23               And then we have a set of charts based on

24  Dr. Alexander's treatment population.  The first was

25  CVS-MDL-05023, and that is for Trumbull County.  Again,

1    based on Dr. Alexander's treatment population.

2                    The next is CVS-MDL-05024, and that is the

3    Lake County estimate of treatment costs based on

4    Dr. Alexander's treatment population.

11:28:35  5              And then we have CVS-MDL-05025, and that is

6    the Trumbull County estimate based on Dr. Alexander's

7    treatment population estimate, but it excludes any

8    adjustments for federal and state grants.

9                    And then we had CVS-MDL-05026.  That's the

11:28:59  10   same chart but for Lake County.  It's based on

11   Dr. Alexander's estimate of the treatment population and

12   excludes any adjustment for federal and state grants.

13                   The other exhibits that we intend to move

14   in are the two spreadsheets that trace both ADAMHS

11:29:17  15   Boards' allocation and spending of federal and state

16   grants.

17                   The Trumbull County one is Defendants' MDL

18   14853.  The Lake County one is Defendants' MDL 14337.

19                   And then we have the financial statements,

11:29:40  20   which we'll also move in.  The Lake County 2020 financial

21   statement is Defendants' MDL 14968.  And the Lake County

22   financial statements for 2019 are Defendants' MDL 14940.

23                   And then we have the Trumbull County

24   financial statements for 2020.  That is Defendants' MDL

11:30:10  25   14944.  And for 2019, the Trumbull County financial

1    statements are Defendants' MDL 14928.

2                  And then we had two demonstratives that we

3    marked as demonstratives.  One identified the information

4    provided by the county treatment data, and that is

11:30:41  5    CVS-DEMO-012.  And then we had a demonstrative on grants

6    for child services expenditures, and that is

7    CVS-DEMO-014.

8                  And with that, I do not have any further

9    questions at this time for Mr. Bialecki.

11:30:58  10                  Thank you, Mr. Bialecki.

11                  THE WITNESS:  Thank you.

12                  THE COURT:  Okay.  We can have

13    cross-examination.

14                  MR. WEINBERGER:  May I proceed, Your Honor?

11:32:07  15                  THE COURT:  Yes, you may.

16

17

18

19

20

21

22

23

24

25

1        CROSS-EXAMINATION OF MATTHEW BIALECKI

2    BY MR. WEINBERGER:

3    Q.    Welcome, members of the Hawken school.  My son is

4    an alumni of the school so I know how proud he was to go

5    there.  And welcome to the courtroom of Judge Polster.

6              Mr. Bialecki, we're going to cover some

7    things today in my cross-examination of you, but let me

8    first ask you for the record, you -- you have prepared a

9    43-page report, expert report, giving notice to us of

10   your opinions.

11             Correct?

12   A.    Yes.

13   Q.    And that expert report is not coming into evidence,

14   apparently, or is not going to be moved into evidence.

15             The fact is, is that the opinions that you

16   rendered in that report in scope were significantly

17   larger than what you testified to in court today.

18             Correct?

19   A.    I don't know if I agree with that.

20             I mean --

21   Q.    Well --

22   A.    There were additional opinions, yes, that we've

23   taken out some of those to simplify and to make the

24   report -- make the calculations more conservative.

25   Q.    Right.

```
         1              Some of your opinions were critical of the
         2   analysis done by Dr. Alexander.
         3              Right?
         4   A.    Yes.
11:33:32 5   Q.    Some of your opinions that you're not testifying to
         6   today were critical of the analysis done by Dr.
         7   Burke/Rosen, right?
         8   A.    I'm sorry.  I didn't hear the first part.
         9   Q.    Some of your opinions in your report that you are
11:33:45 10  not testifying to today were critical of the analysis by
         11  Burke Rosen?
         12  A.    Yes.
         13  Q.    So here's what we're going to cover today.
         14              This is a roadmap of my cross-examination
11:34:02 15  of you.
         16              See that?
         17  A.    I do.
         18  Q.    All right.
         19              We're going to start with who is Matthew
11:34:10 20  Bialecki.  And we're going to talk about the work, the
         21  scope of the work that was done, and who did the work.
         22  Okay?
         23              And then the third stop on the road is
         24  going to be your opinions.  And the fourth stop is going
11:34:26 25  to be the flaws in your opinions.
```

Bialecki - Cross-Weinberger                    839

1                      Okay?

2    A.   Okay.

3    Q.   So let's -- let's talk, first of all, about who you

4    are.

11:34:41  5    A.   I'm a lot thinner now than that picture, by the

6    way.

7    Q.   I'm sorry.  I didn't hear you.

8    A.   I said I'm a lot thinner than that picture.

9    Q.   So you have submitted a -- you have submitted a

11:35:14 10    resumé or a CV, right?

11    A.   Yes.

12    Q.   In this case?

13    A.   Correct.

14    Q.   And you are the managing Director of Alvarez &

11:35:27 15    Marsal, right?

16    A.   Yes.

17    Q.   And your primary role is in the disputes and

18    investigations section of that company.

19                      Right?

11:35:39 20    A.   Yes.

21    Q.   And in your -- in your CV, you talk about your

22    representative experience and that CV, which is marked as

23    CVS-05018, describes your experience in litigation,

24    arbitration, mediation, and forensic investigations.

11:36:08 25                      Right?

1    A.    Yes.

2    Q.    And it lists over 70 separate assignments.

3          Right?

4    A.    Yes.

11:36:15  5    Q.    Not one of them in your list of assignments deals

6    with anything involving the opioid epidemic or the opioid

7    crisis in either Lake or Trumbull County or in this

8    country.

9          Correct?

11:36:32 10    A.    I don't think so, no.

11    Q.    And, in fact, what your CV -- the only mention of

12    the opioid epidemic and your involvement has to do with

13    your engagement in this case and your engagement in -- on

14    behalf of the distributors in what we call CT One, which

11:37:00 15    is the case that was brought originally by Cuyahoga and

16    Summit Counties.

17          So that's what you have listed involving

18    work on the opioid case in your CV.

19          Right?

11:37:14 20    A.    Well, I guess I don't know if that's the only

21    mention, without looking at my full CV.

22    Q.    Well, before you were retained by McKesson and

23    AmerisourceBergen and Cardinal Health in the Cuyahoga and

24    Summit County cases, you had absolutely no expert work,

11:37:41 25    no involvement in your education or experience associated

Bialecki - Cross-Weinberger
841

1    with the opioid epidemic, correct?

2    A.    Correct.

3    Q.    And so what you -- what you have in your report, I

4    know you haven't testified about it today, but everything

11:37:57  5    that you have in your report about the opioid epidemic

6    and what are the costs associated with that is what you

7    learned in this case.

8                    Right?

9    A.    Well, in this case, and in other matters that I've

11:38:19 10    worked on.

11    Q.    Right.

12                    In the McKesson, Cardinal Health, and

13    AmerisourceBergen retention, and in this case on behalf

14    of CVS, Walgreens and Walmart, right?

11:38:31 15    A.    Yes.

16    Q.    So we have established, have we not, you agree with

17    me, that before you were retained by McKesson,

18    CVS -- McKesson and the other distributors, and CVS and

19    the other pharmacies, you had no opioid-related case

11:39:00 20    experience, right?

21    A.    Right.  No case experience, yes.

22    Q.    Now, your company, Alvarez & Marsal, publishes a

23    newsletter, right?

24    A.    Yes.

11:39:22 25    Q.    And you can retrieve those newsletters by going to

1    the Alvarez & Marsal website, right?

2    A.    Yes.

3    Q.    Before you were retained by the distributors and

4    then CVS and the other retail pharmacies, Walgreens and

11:39:42  5    Walmart, did you search the Alvarez & Marsal website to

6    see whether or not there had been any publications

7    written by any of your colleagues about the opioid or

8    substance abuse epidemic?

9    A.    No.

11:40:18  10    Q.    Sir, I told you that we were going to talk about

11    who is Matthew Bialecki -- Bialecki, sorry.

12              You are an accountant, right?

13    A.    Yes.

14    Q.    You are an expert witness, right?

11:40:37  15    A.    Yes.

16    Q.    You are an arbitrator, right?

17    A.    Yes.

18    Q.    And you are a consultant, right?

19    A.    Correct.

11:40:48  20    Q.    Now, you are not an epidemiologist, are you?

21    A.    I'm not.

22    Q.    You are not a public health expert, are you?

23    A.    No.

24    Q.    You are not a medical doctor?

11:41:11  25    A.    No.  No.

Bialecki - Cross-Weinberger

843

1    Q.    You are not an economist like Dr. Burke, right?

2    A.    No, but as an accountant, you deal with a lot of

3    economic issues and estimates and, you know, things like

4    present value calculations and stuff like that.

5              So I'm not an economist, but I deal with

6    economic issues as an accountant.

7    Q.    So but you do not hold yourself out as an expert in

8    economics, right?

9    A.    I do not.

10   Q.    And there's nothing that you can testify to today

11   that is to a reasonable degree of economic certainty,

12   correct?

13   A.    I'm not sure about that.

14   Q.    You are not a pharmacist, right?

15   A.    I am not.

16   Q.    You are not a statistician, right?

17   A.    Again, similar to that would be closer to, out of

18   the list of things that we're going through, statistician

19   and economist would be areas that I deal with as an

20   accountant because certainly we look at statistics on a

21   regular basis.

22              I work on many cases with lots and lots of

23   big data, millions and millions of records, so there is a

24   certain portion of, you know, like I said, those two

25   categories would be closest to -- to bringing in areas

Bialecki - Cross-Weinberger                844

1    that I do, but I wouldn't hold myself out as being a

2    statistician.

3    Q.    So you -- you don't hold yourself out as an expert

4    in statistics, right?

11:42:43  5    A.    No.

6    Q.    And you are not a social worker, right?

7    A.    I am not.

8    Q.    And you have no expertise, experience, or

9    background in law enforcement, right?

11:42:54 10    A.    No.

11    Q.    And you certainly are not an addiction expert,

12    right?

13    A.    I am not, no.

14    Q.    And you are not a foster care expert, right?

11:43:03 15    A.    No.

16    Q.    And you are not a child welfare expert, are you?

17    A.    No.

18    Q.    So before you were retained in this case, and

19    before you reviewed materials for this case or for the

11:43:32 20    case involving the big three distributors, you had no

21    knowledge, expertise or -- well, you had no knowledge or

22    expertise in the opioid epidemic, the cause, the effect

23    of the epidemic, or how to abate it, correct?

24    A.    Well, I don't know if that's true.

11:43:53 25            I mean, I had no expertise I would probably

1    say, but knowledge, yes.  I mean, everybody read about

2    it.

3    Q.    Okay.  So what you knew about the opioid epidemic

4    is what you read in newspapers or other publications,

5    right?

6    A.    Yes.

7    Q.    But that didn't make you an expert, did it?

8    A.    No.

9    Q.    And so you had -- you did no, no research before

10   you were retained in this case or in the McKesson

11   distributors case about the opioid epidemic, right?

12   A.    I don't know.

13            That was years ago.  I may have.

14   Q.    I'm sorry?

15   A.    I said that was years ago.  Before I was retained,

16   I may have, yeah.

17            I mean I certainly would have been

18   contacted before I was retained and I may have done some

19   research to understand the issues.

20            That's certainly what I typically do.

21   Q.    Well, you remember, sir, I asked you about whether

22   or not you looked at the Alvarez & Marsal website,

23   and -- to see whether or not there was anything about the

24   opioid epidemic?

25   A.    Yes.

1    Q.    In the newsletters?

2    A.    Yes.

3    Q.    And your answer was no?

4    A.    Specific to that, yes.

11:45:15   5    Q.    All right.  Can we hand out Plaintiffs' Exhibit

6    4879, P 4879?

7              While we're handing that out, do you

8    remember a managing doctor by the name of David,

9    Dr. David Gruber?

11:45:42  10    A.    No.

11    Q.    You don't remember him as having been employed by

12    Alvarez & Marsal?

13    A.    No.

14              We have hundreds of managing directors.

11:46:04  15    Q.    So you have Plaintiffs' Exhibit P 4879 in front of

16    you?

17    A.    Yes.

18    Q.    Do you -- do you recognize the general format of

19    this document?

11:46:31  20    A.    No.

21    Q.    So but you see that it says it's A & M.  That's

22    your logo, right?

23    A.    Yes.

24              The graphics look the same, but this form

11:46:43  25    of document, I'm not used to seeing.

1  Q.   All right.  So this document is entitled,

2  "Substance Abuse:  A Crisis in Need of Disruption,"

3  right?

4  A.   Yes.

11:46:55 5  Q.   And it says published on Alvarez & Marsal

6  Management Consulting Professional Services, right?

7  A.   I think it says it's published on, and then the

8  bottom part, our website, and then management consulting

9  would be the group --

11:47:16 10  Q.   Right.

11  A.   -- that he's in, which isn't -- I don't even

12  recognize that.  We don't have a group called management

13  consulting.

14  Q.   So on the back, some of the back pages of this

11:47:25 15  document, it describes about the authors?

16  A.   Yes.

17  Q.   David Gruber, M.D., MBA, is Managing Director and

18  Director of Research with Alvarez & Marsal Health Care

19  Industry Group in New York, specializing in strategy,

11:47:43 20  business development, commercial due diligence, analytics

21  and health benefits.

22           MR. HYNES:  Objection.

23  BY MR. WEINBERGER:

24  Q.   Have I read that correctly?

11:47:55 25           MR. HYNES:  Objection, Your Honor.

 1           Mr. Bialecki has already said he does not

 2   know the person who authored this, has never seen this

 3   before, is not familiar with it, and he's testified he's

 4   not an expert in epidemiology or in the opioid epidemic.

11:48:07  5           He is simply an accountant.

 6           THE COURT:  Well, I'm not sure where we're

 7   going with this, so I may allow one or two more

 8   questions, but unless Mr. Bialecki shows any knowledge of

 9   any of this, I'll sustain any further questions.

11:48:24 10           MR. WEINBERGER:  Well, Your Honor, this,

11   this is a document that's been published by his company,

12   his employer.

13           THE COURT:  I understand that.

14           But unless he -- all he is is an

11:48:35 15   accountant.  So there -- he said there's tens of

16   thousands of employees so --

17           THE WITNESS:  Yeah, and I wouldn't say that

18   our company publishes anything.  I would guess that

19   there's some -- or hope there's some disclaimer about the

11:48:54 20   opinions of this person.

21           THE COURT:  No, it's published by your

22   company, there's no question about it.  That's why

23   Mr. Weinberger is asking you questions but that doesn't

24   mean that Mr. Bialecki knows anything about -- remember,

11:49:05 25   he said he knew nothing.  He did no professional

           1    assignments whatsoever involving the opioid epidemic

           2    until very recently.

           3                    And this is 2017.  It's five years ago.

           4                    MR. MAJORAS:  Your Honor, John Majoras.

11:49:24   5                    Just as a further objection, the very last

           6    paragraph --

           7                    THE COURT:  Let me just see if there any --

           8    I'll allow one more question and see if Mr. Bialecki

           9    knows anything related to this document.

11:49:33  10                    THE WITNESS:  And just to clarify, too,

          11    this is published on our website, and typically there's

          12    disclaimers on the website.

          13                    THE COURT:  Well, I don't care where -- it

          14    was published by your company.

11:49:42  15                    THE WITNESS:  Right.

          16                    THE COURT:  So that's why Mr. Weinberger is

          17    asking you about it.

          18                    THE WITNESS:  Understood.

          19    BY MR. WEINBERGER:

11:49:49  20    Q.    Right.  Do you know Steven Boyd?

          21    A.    I do not.

          22    Q.    Okay.  So before you accepted the retention in this

          23    case, you did not review this document 48 -- P 4879?

          24    A.    I've never seen it before.

11:50:12  25    Q.    And you never searched the archives of Alvarez &

1    Marsal to determine whether or not this document existed?

2    A.    I don't remember whether I did or not, but I don't

3    remember ever seeing this.

4    Q.    Well, how is it you -- how is it that you were

5    selected to provide accounting services in this

6    particular case?

7    A.    How was it?

8              I was contacted by Covington and Burling,

9    an attorney there, David Heller, who I had worked with

10   previously, and retained based on my background and

11   experience with Covington likely.

12   Q.    And who does Covington and Burling representing?

13   A.    McKesson.

14   Q.    And how is it that you were retained by CVS and the

15   other pharmacies in this case?

16   A.    I presented to other distributors and other

17   pharmacies and presented qualifications and went through

18   a process of evaluation, and they made determinations

19   whether they wanted to retain me as well.

20   Q.    So back to your subject matter expertise, I think

21   we've established you have never written about the opioid

22   epidemic?

23   A.    I have not, no.

24   Q.    Before your retention, right?

25   A.    I have not, no.

Bialecki - Cross-Weinberger                851

1    Q.    You have not done any significant studying about

2    the issue, right?

3    A.    I don't know what you mean by significant.

4              Like I said, I likely did some research

11:51:59  5    before being retained, but certainly no significant work.

6              But that's typical with most of my

7    engagements.  I work in lots of different industries and

8    for lots of different companies and, you know, what's

9    important for me is the -- is the, what I'm being asked

11:52:17  10   to do, and that's look at financial data and interpret

11   it.

12              And that's no different here.

13   Q.    Okay.

14              You had made no presentations -- before

11:52:25  15   your retention in this case, you made no presentations

16   about the opioid epidemic, right?

17   A.    No.  That's right.

18   Q.    Did you have any experience whatsoever, prior to

19   your retention in this case, about how Governments,

11:52:43  20   counties like Lake and Trumbull County, were dealing with

21   the opioid epidemic and the effect on their communities?

22   A.    No, not beyond what I have said.

23              I may have read articles and things like

24   that.

11:52:55  25   Q.    Did you have any experience whatsoever, before your

Bialecki - Cross-Weinberger

852

1    retention in this case, about what the harms to the

2    community were as a result of the opioid epidemic?

3    A.    Not beyond what was from the public domain.

4    Q.    Did you have any -- did you have any experience or

11:53:14 5    expertise in the addiction prevalence and dependency on

6    opioids that led to the opioid epidemic?

7    A.    I don't think so, no.

8    Q.    Did you have any experience whatsoever in the

9    subject of how to abate a public nuisance caused by the

11:53:42 10    opioid epidemic?

11    A.    No.

12          I mean, I'm an accountant; not, you know,

13    an expert in those areas.

14    Q.    So let's talk about the Matthew Bialecki assignment

11:54:03 15    and the scope of your work.

16          We talked a little bit about how you were

17    assigned or how you got connected originally with a

18    lawyer for the distributors and then ultimately had

19    discussions with the pharmacies.

11:54:17 20          Right?

21    A.    Yes.

22    Q.    And was -- was there somebody from your company

23    that initially assigned you to this project, or was it

24    based on your initial direct conversation with the

11:54:33 25    Covington and Burling lawyer?

1    A.    My direct conversation.

2    Q.    Why, why you?

3              Why are you the person to testify here in

4    court regarding these issues that -- these accounting

5    issues?

6              MR. HYNES:  Your Honor, we're going to

7    object to this as this gets into attorney communications

8    with Mr. Bialecki.

9              MR. WEINBERGER:  Well, we're interested

10   in --

11             THE COURT:  I'm going to sustain the

12   objection to the question in the way it's asked.

13   BY MR. WEINBERGER:

14   Q.    Well, to your knowledge, is there anyone else at

15   Marsal and Alvarez -- Alvarez & Marsal, who has specific

16   knowledge of accounting issues or economic issues

17   associated with the opioid epidemic?

18   A.    I guess I don't know that narrowly.

19             I mean, there's lots of -- we have lots of

20   experts that focus on damages and accounting issues and

21   work in all different industries, so that's not something

22   different.

23             You know, I -- I think -- and I don't know

24   for sure, you know, why I was retained -- but certainly,

25   I had worked on a case involving a pharmacy company for

Bialecki - Cross-Weinberger

854

1    David Haller at Covington, and that may be the reason he

2    came back to me.

3    Q.    Okay.

4    A.    Not similar issues.  I mean they weren't

11:56:07  5    opioid-related issues but probably the combination of

6    damages and pharmacy.

7    Q.    Okay.

8                My next question on this visual is how, how

9    is Alvarez & Marsal paid?  In other words, I'm interested

11:56:23 10    in how do you -- do you create billings?  How is that

11    done?  How is that computed?

12    A.    So all of our -- or at least in my group and for

13    me, all the matters we work on, we bill by the hour.  And

14    there's different rates for different people that work on

11:56:44 15    matters.

16                And we have a system that tracks hours and

17    creates bills monthly, and those, those are sent out and

18    hopefully paid.

19    Q.    So now I want to talk about the scope of your work,

11:57:03 20    which is actually on Page 4 of your report.

21                Your -- the scope of your work was to

22    respond to assertions of economists, Burke and Rosen.

23                Right?

24    A.    Yeah.  Do you mind if I look at what you're

11:57:16 25    referencing?

1    Q.   Go right ahead.

2    A.   Thank you.

3    Q.   Are you there in your report?

4    A.   I am.

11:57:25 5              Thank you.

6    Q.   Okay.

7              And that is a true statement, what I put up

8    here, "Respond to assertions of economists, Burke/Rosen"?

9    A.   And of Dr. Alexander.

11:57:36 10   Q.   Right.  Respond to assertions of Dr. Alexander,

11   right?

12   A.   Correct.

13   Q.   Now, it was not within the scope of your work to

14   propose an alternate abatement plan, correct?

11:57:54 15   A.   Not within the scope of my work?

16   Q.   Yes.

17              In other words, your work did not include

18   proposing an alternate abatement plan?

19              Isn't that what your report says, Page 4?

11:58:10 20   A.   Proposing an alternate -- I mean, I say I've been

21   asked to provide an alternate calculation of estimated --

22   oh, intervention costs, yeah.

23              But I say that I am not offering an opinion

24   on the efficacy or necessity of intervention

11:58:34 25   program or --

1    Q.    Right.  You state -- you state here, "I also do not

2    have an opinion on the efficacy or necessity of any

3    particular current, past, proposed intervention program

4    of either of the counties to reduce opioid abuse and

11:59:01  5    dependence."

6                 Correct?

7    A.    Yes.

8    Q.    You go on to say, "Further, I have not been engaged

9    to determine whether how -- whether or how any estimated

11:59:12 10    intervention costs should be allocated among the

11    defendants."

12                 Right?

13    A.    That's correct.

14    Q.    "Or among any party or nonparty in this action."

11:59:22 15                 Right?

16    A.    Yes.

17    Q.    And then you go on to say, "Although I make certain

18    adjustments to estimate costs based on the jury verdict."

19                 Right?

11:59:34 20    A.    Yes.

21    Q.    So it is correct, what I've written here, that you

22    have no opinion on the efficacy or necessity of any

23    current, past, or proposed intervention program to reduce

24    the opioid abuse and dependence, right?

11:59:58 25    A.    I'm sorry.  Can you repeat that?

1      Q.    Yeah.

2                  You see what I've written there?

3                  Do you agree with that?

4      A.    Yes.

12:00:08  5      Q.    Okay.

6                  And nor do you have any opinion about

7      allocation of costs among either the three defendants or

8      nonparties, right?

9      A.    Absolutely, yes.

12:00:24 10      Q.    So in reference to the work that was -- that you

11      did and that your company did in this case, we've been

12      able to obtain from defense counsel your billings through

13      March 31st, 2022.

14                  And we're going to provide those to you.

12:00:51 15      They're P -- they're Exhibit P 4888 P 4895.

16                  THE COURT:  I think, Mr. Weinberger, if

17      we're going into a new area, this might be a good time

18      for a lunch break.

19                  So we will recess for one hour, and then

12:01:25 20      pick up with the balance of the cross-examination.

21                  And everyone can be seated.  That's fine.

22                  So we're going to break for lunch.

23                  MR. WEINBERGER:  Okay.  Thank you, Your

24      Honor.

12:01:54 25                  (Luncheon recess taken.)

<u>MONDAY, MAY 16, 2022, 1:09 P.M.</u>

THE COURT:  Okay.  Please be seated.

And, Mr. Bialecki, I just want to remind you you're still under oath from this morning.

THE WITNESS:  Thank you.

THE COURT:  So, Mr. Weinberger, you may proceed.

CROSS-EXAMINATION OF MATTHEW BIALECKI (RESUMED)

BY MR. WEINBERGER:

Q.   Mr. Bialecki, we were just about to go over your billings, which have been marked as P Exhibit 4888 to 4895.

Do you have those in front of you?

A.   Yes.

Q.   And if we start with the very first bill, May 12th, 2021, which is 4888, this is signed by you and addressed to Mr. Bush at Zuckerman Spaeder, right?

A.   Yes.

Q.   And if you go to the very next page, it breaks down the number of hours and who generated those hours at Alvarez & Marsal, right?

A.   Yes.

Q.   And that very first bill, which is for services from inception through April 30th, 2021, equals $435,418, right?

1    A.    Yes.

2    Q.    Okay.

3          And the next bill, which is 4889, which is

4    for May 1st through May 31st, 2021, over onto the next

13:11:35  5    page, totals $274,579, right?

6    A.    Yes.

7    Q.    By the way, if we look at the first bill, your name

8    does not appear on that billing, right?

9    A.    Right.

13:11:49 10    Q.    And the same with the second bill, right?

11    A.    Correct.

12    Q.    And the person, Mr. Andrew Moore, who generated

13    most of the hours on the first bill, this is a

14    description of him from the Alvarez & Marsal web page.

13:12:16 15          Right?

16    A.    Yes.

17    Q.    Okay.

18          Now, like you, he had no experience in

19    costing out what it would take to abate the opioid

13:12:32 20    epidemic before being involved in this case, right?

21    A.    I don't think so, no.

22    Q.    All right.

23          And the second person who's listed, and I

24    don't know if this is -- it's, the name is Frank

13:12:48 25    Esposito.  Is that the same as Robert Esposito?

Bialecki - Cross-Weinberger                    860

1    A.    No.

2    Q.    Okay.  Is Frank Esposito still with the company?

3    A.    Yes.

4    Q.    Okay.  All right.

13:12:59  5              So the next bill also does not have your

6    name on it, right?

7    A.    No.

8    Q.    And Exhibit 4890 is for services from September 1st

9    through September 30th, 2021.  And it's a rather small

13:13:29 10   bill of $3,553.

11              Your name does not appear on that, right?

12   A.    Right.

13   Q.    And the next bill, Exhibit 4891, is for services in

14   November of 2021 -- I'm sorry -- October 1st through

13:13:49 15   October 31st, 2021, is for $19,034.

16              And again your name does not appear on

17   there, right?

18   A.    Correct.

19   Q.    And the next bill, which is Exhibit 4892, for

13:14:08 20   services in December, 2021, is for $90,175; and again,

21   your name does not appear on that either, right?

22   A.    Correct.

23   Q.    And Exhibit 4893, for services in January of this

24   year, 2022, is for $14,105.

13:14:34 25              And your name does not appear on that

Bialecki - Cross-Weinberger                          861

 1    either, right?

 2    A.    Yes.

 3    Q.    And then Exhibit 4894, which is for February of

 4    2022, is for $95,923, and your name appears for the first

13:14:57  5    time on a bill, and it shows that you generated 11 hours.

 6                Right?

 7    A.    Yes.

 8                I should say billed 11 hours.  Yes.

 9    Q.    All right.

13:15:14 10                So the report that was generated in this

11    case, which is Exhibit 05018, was generated in and

12    produced March of 2022?

13                Right?

14    A.    Yes.

13:15:37 15    Q.    And so for the services rendered in March of 2022,

16    04895, that bill was $242,000, of which 52 hours was

17    billed by you.

18                Right?

19    A.    Yes.

13:16:03 20    Q.    So have you -- have you added up the number of

21    hours that were generated by your firm from the date of

22    inception through March 31st, 2022?

23    A.    No.

24    Q.    Does the figure 2,036 hours sound reasonable in

13:16:28 25    terms of number of hours?

Bialecki - Cross-Weinberger                     862

1    A.    2000 -- yeah, that doesn't seem unreasonable.

2    Q.    And if you added up all of these bills, they would

3    have totaled $1,280,000, does that sound right?

4    A.    And what was the total you say?

13:16:52  5    Q.    $1,280,000.

6    A.    Yes.

7    Q.    And of the 2,000 or so hours that the firm billed

8    Zuckerman Spaeder for the work, 63 hours of that was your

9    time.

13:17:11  10                  Right?

11   A.    That much was billed, yeah.

12   Q.    Now, you discussed with us this morning the

13   financial statements of the two counties.

14                  Right?

13:17:49  15   A.    Yes.

16   Q.    And specifically, with respect to Lake County, you

17   showed us this page of Defendants' MDL Exhibit 14968,

18   which is the statement of net position for December 31st,

19   2020.

13:18:33  20                  Do you recall that?

21   A.    I do.

22   Q.    And, sir, with respect to the receivables, which is

23   revenues received by the county that are listed here,

24   property taxes, sales taxes, et cetera, due from other

13:18:55  25   Governments, et cetera, do you know whether or not any of

1    those funds are restricted in terms of use?

2    A.    I'm certain that probably some of them are.

3    Q.    And which ones are?

4    A.    I'd need the full financial statements to tell you.

13:19:10  5    Q.    I'm sorry?

6    A.    I would need a copy of the full financial

7    statements to tell you.

8    Q.    Okay.

9          Well, but you're making the point that

13:19:18  10    there were surpluses, the county had surpluses both with

11    respect to revenues that are listed here as well as from

12    grants?

13          Right?

14    A.    I was answering questions that were posed to me

13:19:34  15    about this document.

16    Q.    Well, but did you investigate, sir, the reasons for

17    the surpluses?

18    A.    I wasn't asked to do that so --

19    Q.    So the answer is no, right?

13:19:47  20    A.    I can tell you what they are if you let me see the

21    document.

22    Q.    Well, you weren't provided any documents that would

23    reflect the reasons for the surpluses, correct?

24    A.    Provided documents -- yeah, the financial

13:20:06  25    statements would -- well, it depends on what you're

Bialecki - Cross-Weinberger

864

1    talking about here.

2              There's all kinds of surpluses in this

3    document.  You know, the surpluses related, that I talked

4    about specifically that you're not showing me, I don't

13:20:21  5    know if the reasons are in there or not.

6              I could look at the document, if -- if

7    you'd give it to me.

8    Q.    Okay.

9              So did you, before you came here to testify

13:20:33 10    about these surpluses, do any investigation of the

11    reasons for the surplus?

12    A.    I read the financial statements, but I just don't

13    remember if there were specific reasons.

14    Q.    Okay.

13:20:49 15              So before you testified here this morning,

16    did you do any investigation of the effect of COVID on

17    the generation of these surpluses for the years that were

18    covered by these financial statements?

19    A.    I don't know what you mean by any investigation.

13:21:08 20    Q.    Did you analyze the effect of COVID on any of these

21    surpluses?

22    A.    Any of -- did I analyze the effect of COVID on

23    these surpluses?

24              Not specifically, no.

13:21:21 25    Q.    Okay.

Bialecki - Cross-Weinberger

865

1           Did you analyze the impact of COVID on

2     transportation available to patients with -- or to

3     persons with Opioid Use Disorder?

4     A.    No, but that's why we adjusted our calculations, to

13:21:40  5     take into effect the effects of COVID.

6           That's why we used the 2019 numbers instead

7     of the later numbers in what we're presenting today.

8           But as far as the financial statements of

9     the county, no.  And these were, you know, there's

13:21:55 10    multiple years we're talking about, too, so I don't know

11    specifically what year you're talking about; 2021, 2020,

12    2019.

13    Q.    Did you -- did you analyze the surpluses in the

14    light of the impact of COVID on group counseling for

13:22:11 15    these persons?

16    A.    For which document?  Which surplus are you talking

17    about?

18    Q.    For the surpluses that you directed our attention

19    to, specifically with respect to the ADAMHS boards?

13:22:26 20    A.    And which surplus?  There's multiple surpluses.

21    Q.    Any of the surpluses.

22           Did you analyze the effect of COVID on

23    group counseling with respect to any of those surpluses?

24    A.    Not specifically, no.

13:22:41 25    Q.    It's reasonable to assume that group counseling was

Bialecki - Cross-Weinberger                    866

1    affected by COVID, right?

2    A.    I don't know.

3               I'd have to do that analysis.

4    Q.    Okay.

13:22:51 5               Did you analyze, with respect to the

6    surpluses, the impact of COVID on the county residential

7    facilities?

8    A.    I mean, that's not my expertise, no.

9               I'm looking at financial statements and

13:23:05 10   looking at, you know, that there is a surplus.  And if

11   it's -- if there are reasons contained in the financial

12   statements, yes, I would have looked at those and those

13   would have been reported.

14              But am I going to analyze residential

13:23:17 15   facilities and determine the impact of COVID?  I'm an

16   accountant.  Why would I do that?  And how?

17   Q.    You're a numbers guy.  You're a numbers guy, pure

18   and simple.  For purposes of this case, you're a numbers

19   guy, right?

13:23:29 20   A.    Yes.

21   Q.    Okay.

22              So did you talk with anyone or did you ask

23   to talk with anyone at the county about the reasons for

24   the surpluses that show up on the financial statements?

13:23:38 25   A.    No.

1    Q.    Did you review the testimony of any of the county

2    employees, the deposition testimony, where they may have

3    been asked about the reasons for the surpluses?

4    A.    Yeah.

13:23:54  5          First, I guess back to the last question, I

6    don't know if we were given access to anybody at the

7    county.  We certainly would have reviewed testimony

8    of -- if there -- specifically, if there were reasons for

9    surplus.

13:24:08  10   Q.    All right.  And what did they say?

11   A.    You mean out of almost a hundred depositions, I

12   can't tell you right now.

13   Q.    Well, did you, you know, in the 52 hours or 63

14   hours of work -- I can't remember which one -- did you

13:24:22  15   review any of the depositions personally?

16   A.    I did.

17   Q.    Okay.

18          Well, did any of those depositions reflect

19   any testimony about the reasons for the financial

13:24:32  20   surpluses that you've pointed out in your direct

21   testimony?

22   A.    Obviously, it wouldn't be me that would be

23   reviewing everything.

24          There's a full team, and that's why there's

13:24:42  25   thousands of hours.  And this is the same team, by the

1    way, that's worked on multiple other opioid projects

2    where we have the same methodology.

3    Q.    Right.

4    A.    That's why I would have had fewer hours, and they

13:24:55  5    would have been reviewing the detail of those hundred,

6    almost a hundred depositions.

7    Q.    Right.  But the team's not testifying today; you

8    are.

9    A.    Yes.

13:25:02  10    Q.    Right.

11                    And my question for you is can you point me

12    to any testimony that was reviewed that reflects

13    information about the reason for the surpluses?

14    A.    Not as I sit here today, no.

13:25:16  15    Q.    The grant money, did you investigate -- and the

16    surpluses that existed as the result of grant money --

17    did you investigate whether the grants limit the use of

18    the money?

19    A.    I don't know if the surpluses exist because of the

13:25:37  20    grants.

21    Q.    Well, do they or don't they?

22                    You're the financial guy.

23    A.    Well, that's not what you're asking me.  You --

24    Q.    Well, I'm going to ask you that now.

13:25:45  25                    THE COURT:  Hold.  Hold.

1          MR. WEINBERGER:  I'm sorry.

2               THE COURT:  Let Mr. Bialecki finish his

3     answer.

4               MR. WEINBERGER:  I'm sorry.  I will, Your

13:25:52 5     Honor.

6     A.    Can you repeat the question, please?

7     Q.    Yes.

8               Did you investigate whether or not any of

9     the grant money that either of these counties received

13:25:59 10    had restrictions on the use of the money?

11    A.    Yes.

12    Q.    And did they?

13    A.    Yes.  Some of them did.

14    Q.    And did you analyze whether that was the reason for

13:26:15 15    the surplus?

16    A.    No.

17    Q.    While you were doing your evaluation in this case,

18    were you asked to evaluate the financial ability of the

19    defendants to pay for abatement costs in this case?

13:26:38 20               MR. HYNES:  I'm just going to object to the

21    extent this gets into attorney communications with

22    Mr. Bialecki about the scope of his work.

23               MR. WEINBERGER:  I'm just asking it in

24    general, did you investigate this.

13:26:47 25               THE COURT:  Yeah, did you -- I'll overrule

1    the objection.

2                  He can answer the question if he did.

3    A.    No.

4    BY MR. WEINBERGER:

13:27:05  5    Q.    Now, for your treatment charts, sir, starting with

6    the chart which is marked as CVS-MDL-05019, you used the

7    number 481 for non-Medicaid patients, and the number 966

8    for Medicaid patients for Trumbull County.

9                  Right?

13:27:58 10    A.    Yes.

11    Q.    So you were measuring the population of OUD

12    patients, based upon claims data as reflected in the

13    footnotes.

14                  Right?

13:28:11 15    A.    I wasn't -- I wasn't measuring.

16                  I was quantifying, based on the data that

17    was provided.  So that's the number of patients that

18    was -- that were identified within the data.

19    Q.    And would you agree, sir, that the use of claims

13:28:25 20    data is unreliable in computing the number of OUD

21    patients that exist within the counties?

22    A.    That's not what I'm measuring here either.

23                  It's OUD patients or patients that were

24    treated in ADAMHS facilities that were -- their diagnosis

13:28:49 25    was identified as having something to do with opioids.

Bialecki - Cross-Weinberger                871

1    Q.    Right.

2               And would you agree that that data is

3    unreliable in predicting the number of people within the

4    counties who have some sort of opioid-related disorder?

13:29:04  5    A.    That's outside of my expertise.

6               I wouldn't know.

7    Q.    So you reviewed the deposition of -- and report of

8    Dr. Keyes, right?

9    A.    Yes.

13:29:15 10    Q.    You know Dr. Keyes is an epidemiologist?

11    A.    I do.

12    Q.    Right?

13               And you reviewed the report and deposition

14    of Dr. Alexander, right?

13:29:26 15    A.    Yes.

16    Q.    Did you do that personally?

17    A.    I did, for those.

18    Q.    And you know that he is a pharmacal epidemiologist,

19    right?

13:29:37 20    A.    Yes.

21    Q.    And are you aware of the fact that both of these

22    epidemiologists have testified in court that the use of

23    claims data is not a reliable source for predicting the

24    number of people with Opioid Use Disorders in any

13:30:01 25    particular county or city?

Bialecki - Cross-Weinberger                    872

1    A.    That's not what I'm determining here.

2    Q.    Okay.

3              You have neither the background nor the

4    expertise to dispute that concept, right?

13:30:14  5    A.    Yeah, that's not my area.

6              I'm an accountant.

7    Q.    You have not included in your numbers on any of

8    these charts, except for those that are based upon the

9    Alexander numbers, you have not included in your numbers

13:30:33 10    in these charts the number of OUD patients in the

11    counties who have not sought treatment.

12              Correct?

13    A.    That wasn't part of my approach.

14              What I was looking at was people who are

13:30:50 15    diagnosed with opioid issues that were treated by the

16    county facilities, the ADAMHS Board facilities.

17    Q.    So is the answer, "You are correct, Mr. Weinberger,

18    I did not include in my numbers the number of OUD

19    patients who have not sought treatment"?

13:31:09 20    A.    That's not in my -- that's outside of my expertise.

21    Q.    So you didn't do that, correct?

22    A.    So I did not, no.

23              I wouldn't do it because it's outside of my

24    expertise.

13:31:20 25    Q.    All right.

Bialecki - Cross-Weinberger        873

1        So if we look at Defendants' Exhibit

2    CVS-MDL-10519 together, if we wanted to look at the

3    actual costs, regardless of whether the county paid for

4    it or Medicaid paid for it, one could multiply 481 times

13:31:44  5    $594 and come to a figure, and then multiply 966 times

6    $3,392, come to a figure, and add those two figures

7    together.

8        Right?

9    A.    I'm sorry.  I missed the first part.

13:31:58 10        To get to what number?

11    Q.    To get to the total cost, regardless of who paid

12    for it.

13    A.    Yes.

14    Q.    You haven't done that here, have you?

13:32:11 15    A.    No.

16    Q.    Now, when you looked at the treatment costs and

17    came up with these numbers of 594 and $3,392, depending

18    if these were Medicaid or non-Medicaid patients, you told

19    us that you had this data from the claims data of

13:32:54 20    Trumbull County.

21        Let's just talk about Trumbull County.

22        Right?

23    A.    Yes.

24    Q.    Did you yourself actually look at the claims data?

13:33:01 25    A.    Yes.

1    Q.    And --

2    A.    I mean, it's huge, but I've gone through it, yes.

3    Q.    Okay.  So what are -- what are some of the

4    diagnosis codes?

13:33:14  5              What do they represent?

6    A.    There's bipolar, there's opioid -- I think OUD, I

7    think there's lots of different ones that say opioid.

8              There's -- I don't remember specifically

9    any more than those, but --

13:33:36  10    Q.    Um-hmm.

11    A.    -- there's lots of different ones.

12    Q.    And when we look at the category of description of

13    the procedure or service, what does the claims data, what

14    information is provided?

13:33:51  15    A.    So it might say counseling or treatment or it might

16    say, you know, crisis counseling or it might say, you

17    know -- that, that's a lot more detailed so it would talk

18    about all different procedures that could be, you know,

19    opioid-related or not.

13:34:12  20    Q.    So you remember from reading Dr. Alexander's

21    redress model that under the treatment category, there

22    are various categories of treatment.

23              Do you recall that?

24    A.    Yes.

13:34:28  25    Q.    And so when you analyzed the cost of treatment

Bialecki - Cross-Weinberger

875

```
         1    using the claims data, did you analyze how many of the

         2    patients received MAT treatment?

         3    A.    How many?  That wouldn't have been relevant to my

         4    calculation.

13:34:49 5    Q.    So your answer is no?

         6    A.    No.

         7    Q.    What is MAT treatment?

         8    A.    It's medication -- I forget what the A is,

         9    something treatment.

13:35:04 10   Q.    Medications for Addiction Treatment?

         11   A.    Yeah, so like Methadone.

         12   Q.    Did you analyze in the claims data from the

         13   description of the procedure or service how many of the

         14   patients were treated in an outpatient facility?

13:35:28 15   A.    Not specifically.

         16   Q.    Did you analyze from the claims data how many

         17   people were treated in the category of intensive

         18   outpatient?

         19                 Do you remember that being a separate

13:35:44 20   category?

         21   A.    Yeah.

         22   Q.    Okay.  Did you analyze that?

         23   A.    No.

         24                 Well, analyze, yes.

13:35:49 25                 If it was part of the claims data and it
```

Bialecki - Cross-Weinberger                    876

1    was part of the costs that the county had incurred, yes,

2    we would capture that but --

3    Q.    Okay.

4          But how many related to either outpatient

13:35:58  5    or intensive outpatient?

6    A.    That, we didn't -- that wasn't part of our

7    analysis.

8          We didn't categorize these into the buckets

9    that you are describing.

13:36:07 10    Q.    Did you analyze how many of these patients within

11    the claims data were receiving residential treatment?

12    A.    When you say analyze, yes.

13          We analyzed all the --

14    Q.    How many were there?

13:36:19 15    A.    We analyzed all the data that was contained in the

16    treatment data.

17          We just didn't bucket it in the way that

18    you're asking.

19    Q.    Okay.

13:36:27 20          Did you -- did you arrive at a number, so

21    let's not use the word "Analysis."  Did you arrive at a

22    number as to how many were treated in -- I already asked

23    you about intensive outpatient.

24          How about with respect to the number of

13:36:46 25    people that were hospitalized?

Bialecki - Cross-Weinberger

877

1    A.    No.

2    Q.    Did you -- could you analyze, from the claims data,

3    how many patients missed appointments because they had no

4    transportation?

13:37:07 5    A.    Could I?

6                I don't know.  I don't think so, no.

7    Q.    Now, back to this charge on the county treatment

8    data, one of the -- one of the things that the data

9    provided was the approved cost of the procedure or

13:37:24 10   service.

11               Right?

12   A.    Yes.

13   Q.    And it was the -- it was that approved cost that

14   you used to evaluate and come to a number of average

13:37:36 15   treatment costs.

16               Right?

17   A.    That's right.

18   Q.    Okay.  So did you have information as to what the

19   billed cost was?

13:37:49 20   A.    I don't think so, no.

21   Q.    Well, if we're trying to figure out the cost per

22   patient, the actual cost per patient, regardless of

23   whether it's paid by Medicaid or by some other source,

24   would it be important to analyze the billed cost?

13:38:13 25   A.    Yes.

1          And if your client would have -- well, I

2     don't know because that's all we had was approved because

3     that's all your clients provided.

4     Q.    So you did not analyze these costs in connection

13:38:25  5     with billed costs, correct?

6     A.    All we had was approved costs so that's what we

7     used.

8     Q.    Right.

9               And when you reviewed the Burke Rosen

13:38:38  10     report, is it fair to say that the costs that were used

11     were costs that would be billed.

12               Right?

13     A.    I don't know.

14               I analyzed the data that I was provided,

13:38:52  15     and approved costs was what was provided.

16               And to me, approved costs made sense.  If I

17     have a cost and it's approved, that's what the county is

18     paying.

19     Q.    So let's talk about the charts where you applied

13:39:18  20     the Keyes/Alexander Opioid Use Disorder

21     populations -- population numbers.

22     A.    Yes, sir.

23     Q.    This is Exhibit MDL 05023.

24               Do you have that in front of you?

13:39:42  25               Do you see it on the screen?

Bialecki - Cross-Weinberger                    879

```
         1   A.    I do.  Thank you.

         2   Q.    Okay.

         3              So if, if we wanted to calculate the costs

         4   per year, regardless of who paid for them, one could

13:39:59 5   multiply 960 times $594, for non-Medicaid patients,

         6   right?

         7   A.    Yes.

         8   Q.    And I've done that, and it totals $570,240.

         9              Does that look right from your perspective

13:40:20 10  as an accountant?

        11   A.    Yes.

        12   Q.    And if I did the same thing with respect to

        13   Medicaid patients, you would multiply 1,928 times $3,392,

        14   and I've done that, and the cost would be $6,539,776.

13:40:48 15             Right?

        16   A.    Yes.

        17   Q.    And if you totalled that cost between the two

        18   cohort of patients, the number would be $7,110,016.

        19              Does that look right?

13:41:07 20  A.    Yes.

        21   Q.    And so if, if we wanted to use your costs,

        22   realizing we've just talked about some of the limitations

        23   associated with those numbers, and wanted to figure out

        24   what the total cost was using the Keyes/Alexander

13:41:34 25  treatment OUD populations, for the first year of the
```

Bialecki - Cross-Weinberger                    880

 1   plan, it would be $7,110,016.

 2                   Right?

 3   A.    I'm sorry.  Can you go through that again?

 4   Q.    Yeah.

13:41:51  5              The total costs for the first year,

 6   using --

 7   A.    I mean --

 8   Q.    -- the patient population of 2,888 would be

 9   $7,110,016, right?

13:42:04 10   A.    I'm sorry.  I missed the first part of what you

11   were saying.

12                   Apologize.

13   Q.    Okay.  I'll try it again.

14              Using the Alexander/Keyes number of OUD

13:42:16 15   patients --

16   A.    Yes, sir.

17   Q.    -- and without regard to who pays for it, the total

18   cost of the -- of treating those patients for the first

19   year of the plan would be $7,110,016.

13:42:33 20              Right?

21   A.    I'm just saying if you apply my methodology where

22   I've calculated an average treatment cost and determine

23   how many patients, and then we use his number of patients

24   instead, that's the number that I would get to as, you

13:42:50 25   know, assuming everything's the same, yes.

Bialecki - Cross-Weinberger                    881

1    Q.    I appreciate that's what you did.

2                And my question is if we did the same thing

3    without regard to who paid for it, the total cost would

4    be over $7 million in the first year.

13:43:06  5                Correct?

6    A.    I guess I'd have to think more about what other

7    inputs are going into this and what might change, but

8    if -- you know, I think your math is correct.

9    Q.    All right.

13:43:32 10                And if we applied the same analysis to the

11   Lake County Exhibit 05204, and we multiplied 754 times

12   $1,563, the number that you would get would be

13   $1,178,502?

14                Does that look right?

13:43:54 15   A.    Yes.

16   Q.    And if you multiplied 1,513 patients, Medicaid

17   patients, times the average treatment cost of $3,392, you

18   would get a number for Lake County of $5,152,448 for

19   Medicaid patients.

13:44:26 20                Right?

21   A.    Yes.

22   Q.    And if you added those two figures together, you

23   would get, for Lake County, for the 2,267 patients, a

24   cost in the first year of treating them of $6,330,950.

13:45:00 25                Right?

1    A.    I just want to think about this for a second here.

2                (Pause.)  Yeah, again I'd probably want to

3    think about this more, about whether there are factors

4    that may influence this, but the math is correct.

13:45:43 5   Q.    Okay.

6                Now, sir, you -- you or your company

7    received a lot of documents that were produced by

8    Trumbull County in this case.

9                Right?

13:45:54 10  A.    Yes.

11               MR. WEINBERGER:  Can we pass out P 4900,

12   please?

13               THE WITNESS:  Thank you.

14   BY MR. WEINBERGER:

13:46:32 15  Q.    So P 4900 is Trumbull Document 4676627?

16   A.    Yes.

17   Q.    And you see it's entitled, "PartnerSolutions

18   Reporting Services"?

19   A.    Yes.

13:46:52 20  Q.    Do you see where it says, "Profile of 12,949

21   Trumbull County Mental Health and Recovery Board clients,

22   2020 through October 7th, 2020"?

23               Do you see that?

24   A.    I do.

13:47:17 25  Q.    And have you seen this document before?

Bialecki - Cross-Weinberger                              883

```
          1    A.    I'm pretty sure I have, yes.

          2    Q.    So did you know that partners -- sorry?

          3                MR. LANIER:  The Judge can't see it.

          4                MR. WEINBERGER:  Sorry.  Is that better?

13:47:37  5                MR. LANIER:  The other way.

          6                MR. WEINBERGER:  There we go.

          7                MR. LANIER:  Thank you.

          8                MR. WEINBERGER:  Thank you, my brother.

          9    BY MR. WEINBERGER:

13:47:45 10    Q.    Did you say you've seen this document before?

         11    A.    Yes.

         12    Q.    Okay.

         13                So this is -- this is the reporting agency

         14    that is actually the claims processing agency for the

13:47:56 15    county?

         16                Did you know that?

         17    A.    No.

         18    Q.    So on this document for the year through October

         19    7th, 2020, it indicates, just for Opioid Use Disorders,

13:48:14 20    the average cost -- there were 1,695 clients, and the

         21    average cost was $4,748.

         22                Do you see that?

         23    A.    Yes.

         24    Q.    And this is only for patients with that one

13:48:29 25    diagnosis.
```

Bialecki - Cross-Weinberger

1          You realize that patients with Opioid Use

2     Disorder can have multiple diagnoses?

3     A.    I -- I guess how do I know that that's just for one

4     diagnosis?  Because you're telling me or --

13:48:44  5     Q.    Well, assume that it is.

6              And my question is are there patients where

7     Opioid Use Disorder is a secondary diagnosis and not a

8     primary diagnosis that are treated in Trumbull County?

9     A.    I guess I don't know what this means because I

13:49:05  10    don't -- I mean, there are certainly -- people can

11    certainly have multiple diagnoses, but I don't know what

12    this means by Opioid Use Disorder or how they determine

13    how to get this population or what's involved in these

14    claims and what's -- what's included, because we never

13:49:24  15    received any of the detail behind any of these numbers.

16              All I see is one line item for $8 million.

17    Q.    Right.  Wait, I'm glad you pointed that out.

18              That annual cost of $8 million for 1,695

19    patients.

13:49:41  20              Well, sir, when you -- when you arrived at

21    your estimates for your prior charts for either the

22    Medicaid or non-Medicaid patients, did you utilize this

23    document?

24    A.    No.

13:49:54  25              You know, I tried to reconcile it between

Bialecki - Cross-Weinberger

885

1    the two, but I couldn't because, you know, there's the

2    total cost of eight million.  I can't get to it because I

3    don't have the detail.  I can't match it up to the claims

4    data.

13:50:08   5            The claims data, I have line by line

6    procedures and diagnosis codes, and all four different

7    diagnosis codes, I've got many, many different types of

8    diagnoses.  I have the specific procedures, I have the

9    costs per procedure.

13:50:24   10            I even tried to go to the second -- to

11    these pages behind here, too, and, you know, if I go

12    through these listings and try and even -- which is not

13    what I wanted to do on my data.  I brought in all the

14    procedures when there was an opioid diagnosis code.

13:50:41   15            But here, I even tried to look at, okay,

16    alcohol couldn't be, you know -- is likely not opioid

17    procedure.  Then we've got AOD.  Well, that's generally

18    drugs.

19            And then I've got BH counseling.  I don't

13:50:56   20    know.  SUD crisis, that's broad.  I don't know if that's

21    opioid or not.

22            Buprenorphine, Naloxone, you know, there's

23    costs there, yes.  Those would be opioids.

24            So if I add those up, those come up to

13:51:10   25    about a million dollars here or actually it's more.

1    Maybe one-and-a-half million here.

2              Bus passes, I don't know.  Career

3    exploration, I don't know.  Cellphones, I don't know.

4    Clothing, I don't know.  Gas cards.  And then even when

13:51:26  5    you go through all these numbers, I come to 26 million

6    here on total dollars.

7              Well, there's dollars and total dollars so

8    I'm not sure.

9              I guess there's Medicaid and non-Medicaid.

13:51:37 10              You know, here, this only gives me the top

11    10 most common primary diagnostic groups so I can't even

12    reconcile these numbers to something that's even more

13    detailed.  So really I can't use this at all.

14    Q.    Well, sir, if you compare this document to the

13:51:53 15    claims data spreadsheets that your outfit looked at,

16    would you agree that this document contains a lot more

17    detail?

18    A.    No.  Not at all.

19    Q.    So you're -- you're suggesting that this is a

13:52:11 20    document that should not be relied on?

21    A.    I could rely on it if -- maybe if I got the detail

22    behind it and I can reconcile these numbers, understand

23    where they're coming from and understand how they came to

24    these categorizations, how they determined what's Opioid

13:52:30 25    Use Disorder costs, how do they come to their average

Bialecki - Cross-Weinberger                    887

1    costs, what are the costs per procedure, who are the

2    patients, how do they count the patients, are

3    these -- there's, you know, they say 169,000 Opioid Use

4    Disorder claims.

13:52:45  5              Okay.  Well, there's one line item about

6    them here.  I mean, how am I supposed to analyze this

7    information?

8    Q.    Well, did you ask -- did you ask counsel for CVS or

9    the other pharmacies for any more detail than --

13:53:00 10   A.    I didn't need to.

11              I had the claims data from the counties

12   that was by patient, by procedure.

13   Q.    Did you -- did you analyze the claims data -- when

14   you say by patient, did you follow a patient, a patient's

13:53:18 15   claims data, using the patient identifier through a

16   year's worth of treatment?

17   A.    Through the whole year, yeah.

18   Q.    Okay.

19              And do you have some document that analyzes

13:53:30 20   what the course of treatment was for a particular patient

21   using the patient identifier?

22   A.    Yeah.

23              I mean, the data itself shows it.  So --

24   Q.    Where is it?

13:53:41 25   A.    One --

Bialecki - Cross-Weinberger                888

1    Q.    Where is it for us to see in court?

2    A.    Do you mind if I finish my answer, please?

3          The data shows the treatment, every

4    treatment that each patient is receiving.

13:53:54 5          So some patients may have one procedure

6    throughout the whole year.  Some patients might have 30.

7    And so you can see every procedure that is performed for

8    each patient year by year, and the patient number doesn't

9    change.

13:54:07 10         And it even goes back and forth to the same

11   patient number, maybe Medicaid patient versus

12   non-Medicaid patient.

13   Q.    And did you create some document that demonstrates

14   that so we can see here in court?

13:54:21 15  A.    You can look at the data and see it.

16         You have that information.

17   Q.    So your answer is no?

18   A.    The course of -- I don't understand what you're

19   saying.

13:54:29 20  Q.    For your report or attached to your report or for

21   any of the documents here in court for us and the Judge

22   to look at, do you have a document that shows -- shows a

23   patient's progress through treatment or how a patient

24   progressed through treatment?

13:54:46 25  A.    No.

Bialecki - Cross-Weinberger                889

1           MR. WEINBERGER:  Thank you, sir.

2                Those are all the questions I have.

3                THE WITNESS:  Thank you.

4                MR. LANIER:  With one possible exception.

13:54:58  5   BY MR. WEINBERGER:

6   Q.   So -- yeah, you're absolutely right.

7                So earlier in your direct examination, the

8   Judge asked you what is the -- what is the reason for the

9   difference in treatment costs between the counties as

13:55:15 10   well as between Medicaid and non-Medicaid patients.

11                Remember that?

12   A.   I do.

13   Q.   And you said you couldn't give an explanation for

14   that.

13:55:23 15                Right?

16   A.   I said I didn't know, no.

17                MR. WEINBERGER:  Thank you, sir.

18                That's all I have.

19                THE WITNESS:  Thank you.

13:55:31 20                THE COURT:  Okay.  Any --

21                MR. HYNES:  Can I have one minute to

22   confer, Your Honor?

23                THE COURT:  Sure.  Sure.

24

25

1          REDIRECT EXAMINATION OF MATTHEW BIALECKI

2     BY MR. HYNES:

3     Q.    Thank you, Your Honor, and Mr. Bialecki, for your

4     patience.

13:56:09 5                I just have one or two questions.

6     A.    No problem.

7     Q.    Mr. Weinberger was asking you about the 2020

8     financial statements for Lake County.

9     A.    Yes.

13:56:16 10    Q.    And whether you were able to assess the impacts of

11    the COVID-19 pandemic on those financial statements.

12                Do you remember those questions?

13    A.    Yes.

14    Q.    You also analyzed the 2019 financial statements for

13:56:29 15    Lake County.

16                Correct?

17    A.    Yes.

18    Q.    And we've been over those today in court, didn't

19    we?

13:56:36 20    A.    Yes.

21    Q.    And those financial statements relate to a period

22    before the COVID-19 pandemic, is that correct?

23    A.    That's correct.

24                MR. HYNES:  Thank you.

13:56:42 25                No further questions.  Thank you for your

1      time.

2                    Your Honor, thank you for your patience as

3      we went through this detailed financial information.  I

4      know it's tedious.

13:56:49 5                    THE COURT:  You're welcome.

6                    Anything on that?

7                    MR. WEINBERGER:  No, Your Honor.

8                    THE COURT:  Thank you, sir.

9                    We appreciate your testimony.

13:56:56 10                    You may be excused.

11                    THE WITNESS:  All right.  Thank you,

12      everyone.

13                    (Witness excused.)

14                    THE COURT:  You may be excused, sir.

13:57:08 15                    Thank you.

16                    Yes, leave all the documents.

17                    THE WITNESS:  All right.  Thank you.

18                    THE COURT:  Unless there was something you

19      brought.

13:57:14 20                    If you brought something --

21                    THE WITNESS:  I brought some stuff.

22                    THE COURT:  Well, you should take back

23      anything that you brought, sir.

24                    MR. HYNES:  Your Honor, would you like

13:57:43 25      these copies?

1            THE COURT:  I don't need them.

2            All right.  Defense may call its next

3      witness, please.

4            MR. MAJORAS:  Your Honor, we're getting

13:58:33  5      him, but our next witness will be Dr. Daniel Kessler.

6            THE COURT:  Good afternoon, Doctor.

7            If you would raise your right hand, please.

8                 DANIEL KESSLER

9      of lawful age, a witness called by the DEFENSE,

13:59:59  10      being first duly sworn, was examined

11             and testified as follows:

12            THE COURT:  Thank you.

13            MR. MAJORAS:  Your Honor, if we could just

14      do a few more housekeeping matters.

14:00:10  15            And, Mr. Pitts, we could take the Elmo down

16      for a moment, please.

17            MS. FUMERTON:  Your Honor, may I approach?

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION OF DANIEL KESSLER

2    BY MR. MAJORAS:

3    Q.    Dr. Kessler, I believe we have delivered documents

4    to everyone.  So we will try to proceed without having

5    too many interruptions.

6                Would you please introduce yourself to the

7    Court.

8    A.    My name's Daniel Kessler.

9    Q.    And, Dr. Kessler, what do you do?

10   A.    I'm a professor at Stanford.

11   Q.    How long have you been a professor at Stanford?

12   A.    Oh, gosh, 25 years.

13   Q.    I would ask you generally to describe your fields

14   in which you focus on in your academic work.

15               Please do that.

16   A.    I -- I write in health economics and policy and

17   applied econometrics.

18   Q.    Dr. Kessler, in doing your work for the defendant

19   pharmacies in this case, you prepared an expert report,

20   is that right?

21   A.    Yes.

22   Q.    As parts of that expert report, you had your

23   Curriculum Vitae with your experiences and various pieces

24   of information?

25   A.    Yes.

1    Q.    I'm going to ask you in your binder to refer to Tab

2    1, please, which is WMT-MDL 01612.

3                    Let me know when you're ready.

4    A.    Yes.

5    Q.    And do you recognize -- the first page of this

6    exhibit is just the first page of your report, correct?

7    A.    Yes.

8    Q.    The title?

9                    And the remaining pages are your CV, is

10   that right?

11   A.    Yes.

12   Q.    Okay.

13                   Mr. Ferry, if we could bring that up,

14   please.  You'll see it in a minute on the monitor in

15   front of you.

16   A.    Oh.

17   Q.    And I'll leave it to you.  You can follow along

18   with the monitor or you can look at your document.

19                   What I'd like you to do is take us through,

20   not in any way a line-by-line detail, but some of the

21   information in your CV which goes to the expertise that

22   you just described.

23                   So, first of all, you're a Ph.D.?

24   A.    Yes.

25   Q.    Where did you receive your degree?

1    A.    MIT.

2    Q.    And that was in 1994?

3    A.    Yes.

4    Q.    And for the record, MIT is Massachusetts Institute

5    of Technology?

6    A.    Yes.

7    Q.    If you wouldn't mind pulling that microphone just a

8    little closer to you.

9              Thank you.

10             You also have a J.D., juris doctor degree?

11   A.    Yes.

12   Q.    And where did you receive that?

13   A.    From Stanford.

14   Q.    Have you ever been a practicing attorney?

15   A.    No.

16   Q.    And then you also -- you started your post-high

17   school education by getting a Bachelor of Arts from

18   Harvard University, correct?

19   A.    Yes.

20   Q.    And that's in economics?

21   A.    Yes.

22   Q.    And I'm not sure I asked you this, but your MIT

23   Ph.D., what field is that in?

24   A.    I mean I worked on health economics, law and

25   economics, and, you know, applied econometrics.

1    Q.    What is econometrics?

2                THE COURT:  Could I ask you one question,

3    Doctor?

4                THE WITNESS:  Sure.

14:04:07  5                THE COURT:  I'm impressed that you got a

6    J.D. from Stanford in 1993, and a Ph.D. from MIT in 1994.

7                I'm familiar with getting a J.D.  it's not

8    easy.  You got a J.D. and a Ph.D. simultaneously

9    literally?

14:04:27  10                THE WITNESS:  Yes.  Yes.

11                THE COURT:  From one institution on two

12    different coasts?

13                Can you explain how you -- how you did

14    that?

14:04:35  15                THE WITNESS:  Sure.

16                I mean, it took me six, six years, so I

17    went to MIT from 1988 to 1990.

18                Then went to Stanford law school from, you

19    know, '90 to '92.

14:04:53  20                THE COURT:  I see.

21                THE WITNESS:  And then sort of finished the

22    two up together from '92 to June of '94.

23                THE COURT:  Okay.  Thank you.

24    BY MR. MAJORAS:

14:05:03  25    Q.    Was it easy?

1    A.    I don't think I could do it now.

2    Q.    So looking at your academic positions, which is on

3    Page -- the numbers I'm going to use, it's been a little

4    confusing here, the numbers I'll use for pages are at the

5    very bottom right of the document in front of you.

6                      So if you look at WMT-MDL-01612.37, which

7    is the --

8    A.    Yes.

9    Q.    Okay.

10                      So just so I make sure you and I are on the

11    same page, which is in front of you on the screens.

12    Right?

13    A.    Yes.

14    Q.    You mentioned you teach at Stanford, is that right?

15    A.    Yes.

16    Q.    It says here on your CV you were a professor by

17    courtesy.

18                      What does that mean?

19    A.    That means that they gave me an appointment so that

20    I'll teach a class for them and not get paid.

21    Q.    That's a pretty good courtesy.

22    A.    Well, yeah.

23    Q.    I hope they showed you some courtesy in return?

24    A.    Well, that's the courtesy they're showing me.

25    Q.    Fair enough.

14:06:16

14:06:31

14:06:47

14:06:58

14:07:21

1            And that shows, as the start time for that

2       particular position, is 2021.

3            But then I show -- I see you have some

4       other Stanford teaching experience.

5            Could you go through those for us, please?

6       A.    Sure.

7            I mean, I've been teaching since I started

8       as Assistant Professor in 1994 at the business school,

9       and then I moved over to law school and have been

10      teaching, was teaching there for a while.

11           And now my teaching responsibilities are to

12      do a university-wide class in health care finance and

13      regulation for all the professional students, for the

14      MDs, the J.D.s and the MBAs.

15      Q.    So if you look back through your teaching career,

16      at least since you've been at Stanford, could you

17      describe for the Court the types of classes and material

18      that you've been teaching?

19      A.    Sure.

20           Gosh, it's -- so it's varied.  I mean, when

21      I started at the business school, I taught a core MBA

22      class for a while, and then I moved to doing a class on

23      social innovation and nonprofit management.

24           And then I gradually, as my interests moved

25      to health care, started teaching this health care finance

1    class.  And when I moved over to law school, I did that

2    and taught a class in tax policy for a while.

3              And now I just manage the university-wide

4    class.

14:07:37  5    Q.    So I see if you look at the, I guess it's the fifth

6    item in your academic positions, you have, again, a

7    professor by courtesy at the school of med.

8              Just like the previous one we talked about?

9    A.    Oh, yes.  Uh-huh.

14:07:49 10   Q.    Was that essentially a prior iteration of what

11   you're doing today?

12   A.    Yeah.

13             The medical school restructured its

14   Department of Health Research and Policy, which is the

14:08:01 15   sort of economics and epidemiology group.  And I can't

16   even tell you exactly how they restructured it but now

17   I'm part of what they call the Center For Primary Care

18   and Outcomes Research.

19   Q.    I also see that you are a senior fellow at the

14:08:21 20   Hoover Institution at Stanford University.

21             Could you describe that position?

22   A.    Sure.

23             Being a senior fellow at Hoover, Hoover is

24   part of Stanford University, and being a senior fellow

14:08:32 25   there, it's like being a tenured Professor at Stanford.

1          And they pay part of my salary to offset

2     the law school's and business school's responsibility.

3     Q.    In addition to teaching at the various institutions

4     you've identified, you also conduct research?

5     A.    Yes.

6     Q.    And do you conduct research for the Hoover

7     Institution?

8     A.    The -- I wouldn't put it like that.

9          I mean, I do my own research.  I mean, the

10     Hoover doesn't tell me what -- what research to do.

11          You know, I write papers on what I want to

12     write them on.

13     Q.    In terms of just writing the papers that you do, do

14     you have a particular focus over time on that?

15     A.    Yeah, I mean over the last decade or so, I've

16     really moved into working in health care, health

17     economics, policy, finance and quality of care.

18     Q.    Do you consider yourself to be a health economist?

19     A.    Yes.

20     Q.    Let's look at, again.  And I don't mean to slight

21     you.  You have a number of awards, fellowships and other

22     university affiliations on this page.

23          Let me just pick up a few of those.

24          In the second line, you have Health Care

25     Research Award, National Institute for Health Care

1    Management Foundation.

2              What is that?

3    A.   The National Health Care -- the National and Super

4    Health Care Management Foundation is a private foundation

5    that exists to promote research in health policy and

6    organizations.

7              And I guess I got an award for a paper I

8    wrote, and this now is almost 20 years ago.

9    Q.   Another paper you received an award for is the

10   Kenneth J. Arrow Award.  And I believe in your

11   conversations with me, you indicated you were

12   particularly proud of that.

13             Could you tell us why?

14   A.   Yeah, I mean this is a -- this is a fairly

15   prestigious award, and I was lucky enough to get it when

16   Ken was still with us.

17             And he actually -- he actually gave it to

18   me, and that was really a -- a special time for me.

19   Q.   You also indicate that you're an affiliate with the

20   Center For Health Policy at Stanford University from '97

21   through the present.

22             What is that?

23   A.   That's this unit of the medical school that I think

24   now has been reconstituted as the Department of Health

25   policy.

1          It's jointly run with the -- whatever, the

2    Center for Primary Care and Outcomes Research.

3    Q.    The final thing I want to ask you about is your

4    work as a research associate for the National Bureau of

5    Economic Research.

6          You've been doing that since 1999?

7    A.    Yes.

8    Q.    What does that entail?

9    A.    Well, the National Bureau of Economic Research is a

10   nonprofit -- the country's, you know, leading nonprofit

11   research organization that's an association of economics

12   professors, mostly, and economists and sociologists that

13   conduct research and, you know, have conferences and

14   stuff through the NBER, through the National Bureau of

15   Economic Research.

16   Q.    In terms of the amount of time that you spend with

17   that, could you describe that for us?

18   A.    Not so much anymore.

19          I, you know, I'll go to an occasional

20   meeting.

21          I do contribute working papers to the NBER

22   series, but I've been pretty busy doing, you know,

23   teaching this university-wide class and working in my

24   administrative capacity at Hoover.

25   Q.    So if we turn to the second page of your CV, which

1    is the Exhibit WMT-MDL-01612, and this is Page 38 of the

2    exhibit, these list your academic publications?

3    A.    Yes.

4    Q.    You have a couple of different types of

5    publications throughout your CV that you list.

6              When you call something an academic

7    publication, what are you referring to?

8    A.    Well, these are mostly technical publications for

9    an academic or a sort of more technical management

10   audience.

11             Most of them are peer-reviewed.  I couldn't

12   swear everything on here is peer-reviewed, but I think

13   most of them are peer-reviewed.

14             And then the nonacademic publication

15   section is more, you know, less technical for a broader

16   audience.

17   Q.    When you say that a number of these publications

18   are peer-reviewed, what does peer-reviewed mean?

19   A.    Oh, that, you know, I -- I write the paper, and

20   then I get back a hundred thousand comments that I have

21   to incorporate in order to get it published.

22             No, I apologize.

23             It means I -- it gets reviewed by someone

24   in the field, like another economist or, you know, a

25   statistician or an epidemiologist or whomever, depending

Kessler - Direct/Majoras 904

1     on the topics of the paper.

2                  And then they offer comments, and sometimes

3     the editors reject the paper because it's, you know, not

4     good enough.  And sometimes they say, well, if you make

14:13:52 5   these changes like the reviewers wanted, then we'll

6     accept it and that's the process.

7     Q.    So that was going to be my next question is are

8     these only economists who are reviewing your papers?

9     A.    No.

14:14:03 10              Depends on the topic of the paper.

11    Sometimes -- they're usually sent to economists.  Most of

12    these papers are focused on economics.

13                 But sometimes statisticians will review

14    them.  Sometimes epidemiologists.  Sometimes clinicians.

14:14:22 15   You'll get a clinician reviewer, and they'll have

16    opinions, too.

17    Q.    Now, you were not a -- when you say clinician, are

18    you talking principally of doctors, medical doctors?

19    A.    Yes.

14:14:31 20   Q.    You're not a medical doctor, correct?

21    A.    No.

22    Q.    And you're not an epidemiologist, right?

23    A.    No.

24    Q.    You have familiarity, though, in reviewing

14:14:38 25   epidemiology papers?

1    A.    I don't review for epidemiology journals typically,

2    but I've certainly, you know, read a bunch of papers like

3    that over time.

4    Q.    And by review, I meant more generally.

5                In your work, in your academic work, do you

6    research epidemiology papers?

7    A.    Oh, yes, for sure.

8    Q.    I didn't -- I didn't total up the number of

9    academic publications, but a quick ballpark says

10   somewhere in the neighborhood of 50 or 60.

11               Does that sound right?

12   A.    Yeah, that sounds about right.

13   Q.    And you have some specifically related to opioids,

14   correct?

15   A.    Yes.

16   Q.    So let's identify those if you would, please, for

17   the record.

18   A.    Sure.

19               The most -- the most recent one, which is

20   forthcoming in the American Journal of Managed Care is a

21   paper about the relationship between provider age and

22   opioid prescribing behavior.

23               And what we show in that paper is

24   relatively what I think is a new finding, which is that

25   older providers prescribe opioids much more intensively

1    than younger providers do.

2    Q.    Do you have any other papers related to the opioid

3    topic?

4    A.    I do.

5                    The third paper on your list, "The Effects

6    of Medicare Advantage on Opioid Use," is also on this

7    topic.

8                    What that paper shows is that counties that

9    have a lot of Medicare Advantage enrollment -- Medicare

10   Advantage is the privately managed piece of

11   Medicare -- counties that have a lot of Medicare

12   Advantage enrollment have lower rates of -- lower opioid

13   prescription rates than counties that don't, after

14   adjusting for differences in the characteristics of those

15   counties.

16   Q.    Now, are there any other papers, research interests

17   or seminars that you have that you find to have

18   particular bearing on the matters that you're going to

19   testify about today?

20   A.    Not -- not directly, but, I mean, you know, the use

21   of health care data and, you know, mortality data to

22   measure quality of care and cost of care, more broadly,

23   that's what I've been doing for the past 25 years.

24   Q.    Are you familiar with the terminology

25   "meta-analysis"?

1    A.    Yes.

2    Q.    Is meta studies another way of saying that?

3    A.    Yes.

4    Q.    What is that?

14:17:17  5    A.    A meta-analysis is a study that pools the work of

6    multiple other studies in order to gain statistical power

7    on a question that it's seeking to answer.

8    Q.    In the types of research that you analyzed in the

9    general part of your work over, let's say over the last

14:17:37 10    25 years, do you look at meta-analysis or meta studies?

11    A.    Oh, yes.  Yeah.

12    Q.    And is that sort of the end-all-be-all of a study?

13    A.    No, I mean meta-analyses are a useful technique.

14           They're particularly useful when you're

14:17:58 15    pooling similar populations with small samples that you

16    can then bulk up to a larger population to get more power

17    to answer a question.

18    Q.    Flipping through your CV again, if we look to

19    Page 43 of the exhibit, actually Page 7 of your CV.

14:18:19 20    A.    Yes:

21    Q.    There's a heading, "Academic Manuscripts in

22    Progress."

23           I assume that means exactly what it says?

24    A.    Yes.

14:18:27 25    Q.    Okay.  These are academic papers you're currently

1    working on?

2    A.    Yes.

3    Q.    And then you also have, the next section are

4    nonacademic publications.

5              What are those?

6    A.    Those are things that I've written for a broader

7    audience, you know, lots -- you know, some popular press,

8    some, you know, the One Percent Steps For Health Care

9    Reform is a project run by some folks at Yale, where they

10   asked a bunch of us to write an essay about a change to

11   the health care system that would reduce costs by one

12   percent.

13             And the theory is if you could get a bunch

14   of those together and they were all sensible policies,

15   you could maybe bring costs down.

16   Q.    And then finally, toward the end of your CV and our

17   exhibit, the very last page, you have a heading,

18   "Referee/Reviewer."

19             What is that?

20   A.    These are organizations for which I've served as a

21   referee or reviewer.

22             So, for example, I mean the journals, you

23   know, as I was criticizing the reviewers before, you

24   know, I serve as a reviewer for the American Journal of

25   Health Economics, the American Economic Review, journals

Kessler - Direct/Majoras                 909

1      like that, for the organizations.  Like the National

2      Institutes of Health or the American Cancer Society, I

3      served as a reviewer for grant applications.

4      Q.    And you list the different organizations for which

14:19:57  5    you've done that over time?

6      A.    Yes.

7      Q.    Dr. Kessler, we've asked you to testify here in

8      your role with your expertise as a health care economist.

9                    And I'm going to ask you, in providing your

14:20:10 10   testimony today, will you agree that the opinions you

11     offer will be given with a reasonable degree of

12     professional certainty in your role as a health care

13     economist?

14     A.    Yes.

14:20:23 15   Q.    Okay.

16                   One of the things, too, that I will do

17     today is ask you about certain other experts who have

18     already testified to the Court, including Dr. Alexander

19     and Dr. Keyes.

14:20:33 20                  And in doing that, since you weren't here,

21     I'm going to ask you to assume that they testified

22     consistent with their reports.

23                   Okay?

24     A.    Okay.

14:20:41 25   Q.    If there's -- if there's a difference, and there's

        1    going to be one in particular I will bring up, I will

        2    raise that with you.

        3                But you had a chance to review their

        4    reports prior to testifying today?

14:20:51 5    A.    Yes.

        6    Q.    And, in fact, much of your opinions that you offer

        7    are in relation to the opinions in their reports.

        8                Right?

        9    A.    Yes.

14:21:01 10   Q.    Okay.

       11                I mentioned Dr. Alexander and Dr. Keyes?

       12    Are there other plaintiffs' experts reports that you've

       13    reviewed as part of your work?

       14    A.    Yes.

14:21:17 15   Q.    Which ones?

       16    A.    I reviewed Dr. McCann's report.

       17                I reviewed -- I'm just looking at my

       18    documents, considered list to make sure I don't leave

       19    anything out by accident.

14:21:35 20   Q.    While you're doing that, let me identify a few

       21    things for the record.  And if you could again pull that

       22    microphone close, I'd appreciate it.

       23    A.    I apologize.

       24                There you go.

14:21:45 25   Q.    So you're looking at the documents you considered,

1    which is the list you put together as part of your

2    report?

3    A.    Yes.

4    Q.    And I will tell you that if you're still looking

14:21:53  5    for it, it's in Tab 2 of your binder and it's identified

6    as WMT-MDL-01612.

7              So --

8    A.    0161 -- oh, yes.

9              Oh, that seems to be my CV.

14:22:13 10   Q.    If you look in Tab 2 of your --

11   A.    Oh, I'm with you.

12             I'm sorry.

13             Yep.

14   Q.    Okay.

14:22:18 15            So now that we're on the same page

16   literally, the expert -- the Plaintiffs' expert reports

17   that you've reviewed for your opinions in this phase of

18   the case, that involve which plaintiffs' experts?

19   A.    Just go down the list?

14:22:33 20            Professor David Cutler, Carmen Catizone,

21   Professor Keyes, Dr. McCann, Mr. Rafalski, the report of

22   Professors Rosen and Burke, Professor Alexander, and then

23   supplemental reports of some of those people.

24   Q.    And if we continue throughout this document, I

14:22:58 25   think it's a four-page document, maybe a few more pages,

1    these list the various documents and things that you've

2    reviewed as part of your work in this case.

3              Is that right?

4    A.    Yes, up to the time of the filing of my report.

14:23:12  5              Yes.

6    Q.    And if you look at the bottom right-hand number

7    again, number -- Page 49?

8    A.    Yes.

9    Q.    There's a heading, "Academic Literature," and you

14:23:24 10    list quite a number of items under that category.

11              Right?

12    A.    Yes.

13    Q.    As a general matter, what are these and why were

14    you reviewing them?

14:23:35 15    A.    Most of these are academic research papers that I

16    reviewed to provide me with background and information

17    about the issues in this case.

18    Q.    You've read all those papers?

19    A.    Yes.

14:24:00 20    Q.    So now, prior to your testimony, you worked with me

21    to put together some slides to help illustrate your

22    testimony.

23              Is that right?

24    A.    Yes.

14:24:08 25    Q.    A PowerPoint presentation?

1    A.    Uh-huh.

2    Q.    All right.

3              If we take a look at that, and as you

4    testify today, will that be helpful in assisting the

14:24:17 5   Court to understand your testimony?

6    A.    I -- I think it will.  I hope it will.

7    Q.    So if we could put that up on the screen, please,

8    which has been marked as WMT-DEM-002.

9              Okay.  Dr. Kessler, let's get into the

14:24:34 10  heart of this.

11             What were you asked to do in this case?

12   What was your charge?

13   A.    Well, I'm just going to give you the exact charge,

14   which was to assess the analyses of Professors Alexander

14:24:57 15  and Rosen and the estimates of costs -- of the costs of

16   Professor Alexander's abatement plan.  If necessary, to

17   propose alternatives to their calculations.

18             And then to allocate the costs of Professor

19   Alexander's abatement plan between defendants and other

14:25:15 20  factors, and then to allocate the costs among defendants.

21   Q.    Okay.

22             So if we -- I think many people are

23   familiar with pie charts, if you will.

24   A.    Yeah.

14:25:23 25  Q.    So the first opinion you're looking at is the

1    overall costs reported out by Dr. Alexander and

2    doctor -- and maybe Dr. Burke?

3    A.    Yes.

4    Q.    And then the second opinion you're offering in

14:25:36 5    terms of allocation is more the different pieces of that

6    pie.

7              Is that right -- is that fair?

8    A.    Yes.  That's correct.

9    Q.    Okay.

14:25:44 10             So let's take a look at your summary of

11    opinions which is on the first slide here.

12             And before we get into those, one last

13    question.

14             When you're looking at the abatement plan

14:25:54 15    set out by Dr. Alexander, are you in any way assessing

16    whether any individual pieces of that plan are necessary

17    or not?

18    A.    No.

19    Q.    So in other words, you're taking his numbers as a

14:26:08 20    given and then analyzing from there.

21             Is that -- is that fair?

22    A.    Well, I'm taking his overall plan as given, and

23    then, you know, as necessary, correcting the numbers when

24    they're -- when they weren't right.

14:26:21 25    Q.    Okay.

1          So what's your first opinion that you are

2     going to be offering today and then supporting?

3     A.    My first opinion is that correcting five

4     overstatements in the estimate of the costs, the

14:26:35 5     abatement plan, and excluding from the abatement plan

6     costs that are not going to be paid by the counties

7     reduces the purported cost of the five-year abatement

8     plan from about $865 million to about $346 million.

9     Q.    And you note here that you found five principal

14:26:58 10    overstatements.

11          Is that right?

12    A.    Yes.

13    Q.    Okay.  We'll talk about each of those in detail.

14          So the first issue in terms of what is the

14:27:05 15    size of the pie, your analysis is that if you correct the

16    overstatements you found, you reduce that in the

17    five-year plan to a little over $346 million.

18          Is that right?

19    A.    Yes.

14:27:19 20    Q.    Okay.

21          What's your second opinion, the summary of

22    your second opinion you plan to offer?

23    A.    My second opinion is that these abatement costs can

24    be reasonably allocated to defendants based on their

14:27:31 25    challenged conduct.

Kessler - Direct/Majoras

916

1        And that's going to be to, first, determine

2    how much of the abatement costs were due to defendants'

3    challenge conduct, you know, collectively, rather than

4    costs caused by other entities like manufacturers,

14:27:53 5    prescribers, illegal drug cartels.

6        And then secondly, to allocate costs to the

7    defendants individually.

8    Q.    And in the opinions you offer, you focused on what

9    you consider to be the costs appropriately allocated to

14:28:08 10    the defendant pharmacies.

11        Right?

12    A.    Yes.

13    Q.    In other words, you don't -- you don't then try to

14    break down separately where you think other costs might

14:28:18 15    be appropriately allocated?

16    A.    No.

17    Q.    So among the other potential parties who have a

18    role in opioid distribution, for example, you don't try

19    to define what their respective allocations are?

14:28:30 20    A.    No.

21    Q.    Why not?

22    A.    That wasn't necessary for the task at hand.

23        My understanding of the task at hand was to

24    determine how much of the abatement costs were allocable

14:28:45 25    to the defendants' challenged conduct collectively, and

1    then to each defendant individually.

2    Q.    Okay.

3                So let's take a little closer look at the

4    opinions that support each of these two summaries.

5                If we go to the next slide, please.

6                Now, your -- what is your first

7    overstatement that you found in the Alexander report,

8    Alexander/Burke reports?

9    A.    My first concern with the plaintiffs' reports is

10   that they overstate the number of individuals with OUD.

11   Q.    Why does that matter?

12   A.    That's important because the estimate of the costs

13   of abatement, much of which are costs of treatment for

14   OUD, is going to, you know, depend very strongly on the

15   number of people who have it.

16   Q.    So one of the things you looked at is going to

17   Dr. Keyes and her method of estimating the OUD

18   populations?

19   A.    Yes.

20   Q.    Okay.

21               So take us through slowly -- you can make

22   reference to the chart if you'd like -- what it is that

23   you were doing to analyze whether or not that OUD

24   population was properly stated.

25   A.    Sure.

1              Well, so what Professor Keyes does is to

2       estimate the size of the OUD populations using what's

3       called a mortality multiplier method.

4              And mortality multiplier methods

5       are -- it's fancy words for a very simple concept, which

6       is to say that if you want to estimate the size of a

7       population, let's call it "N," you can do that by

8       counting up the number of deaths, "D," in the population,

9       and then dividing that by the death rate, "R," for the

10      same population.

11             And the reason that works, you can see in

12      the third part of that equation, is that, you know, D

13      divided by R is equal to D divided by D over N.  But

14      then, you know, the Ds cancel and you just get back "N."

15             So that's the idea behind mortality

16      multiplier methods.

17      Q.    And are mortality multiplier methods used in the

18      types of work that you've reviewed and seen with respect

19      to estimating populations?

20      A.    Yes.

21      Q.    And have you relied upon them at times?

22      A.    Yeah.  Applied correctly, it's a perfectly

23      reasonable way to calculate the size of a population.

24      Q.    Okay.  So let's continue on then.

25             What is your concern about the way

1    Dr. Keyes applied the multiplier method?

2    A.    Sure.

3              Well, so I mean in the current context,

4    what we'd like to do is to determine the size of the

5    population of people with OUD.  And so the way to do that

6    would be -- or one way to do that would be to know the

7    number of any drug-related deaths of people with OUD, and

8    then divide that by the any drug-related death rate of

9    people with OUD.

10             And if you had the, you know, numerator and

11   denominator there, then you would know the size of the

12   population of people with OUD.

13             But Professor Keyes doesn't correctly apply

14   that method.

15   Q.    Before you --

16   A.    I'm sorry.

17   Q.    I'm sorry.  I just want to interrupt and make sure

18   we're clear.

19             In the slide, you started off with, I'll

20   call it a generic formula, the one that starts with N.

21             Do you see that?

22   A.    Oh, yes.  Yes.

23   Q.    So when you fill it in with the words, "the people

24   with OUD, the drug-related deaths" language in the second

25   formula, is that still the correct formula if you were to

1    do this correctly?

2    A.    Yes.   Absolutely.

3              That's just putting more detail on the

4    generic version of the formula above.

14:32:44  5    Q.    Okay.

6              So then you were going to tell us what you

7    thought Dr. Keyes did wrong in applying that.

8    A.    Yes.

9              So my concern with Dr. Keyes' application

14:32:53 10    of this method, I have two principal concerns.

11              First, that the death rate that she uses of

12    .52 per 100 person years is flawed for reasons that I'll

13    say more about.

14              And second, that the mortality multiplier

14:33:13 15    formula that she actually uses is mathematically not what

16    I have up there on the screen.   It's not correct.

17    Q.    Okay.   Let's start with the first one about the

18    death rate.

19              And we did -- the Court heard testimony

14:33:25 20    about the .52.

21    A.    Yes.

22    Q.    If we'd turn to -- I believe that's on your next

23    slide.

24    A.    Yes.

14:33:35 25    Q.    So please continue with your explanation of why she

1    did not do this appropriately in your opinion.

2    A.    Sure.

3              Well, so to get the .52 number, what

4    Professor Keyes does is relies on a study by a woman

5    named Larney, a meta-analysis of 55 studies that cover a

6    bunch, you know, 623 study years.

7              And then what we're going to do is take

8    that death rate and put that in the denominator of the

9    equation and put in the numerator the count of deaths,

10   any drug-related deaths in the -- in Lake and Trumbull

11   Counties.

12   Q.    Okay.

13   A.    So the problem is is that this Larney meta-analysis

14   of the 55 studies that Professor Keyes uses to get that

15   .52, 48 of them are from outside the United States and

16   more than half of the study years were from long ago,

17   from 2000 and earlier, from years ago.

18              Further, if you look at the studies, it's

19   combining death rates from studies that are based on very

20   disparate populations, time periods and impacts, which is

21   a fluid approach to the mortality multiplier method.

22   Q.    Let me take you through a few of those things

23   directly.

24              You've had a chance, I believe you said, to

25   review both Dr. Keyes' initial report and her

1    supplemental report issued a month or a few months ago?

2    A.    Yes.

3    Q.    Does she -- to use her .52 rate, which we saw her

4    multiply out in this case, in obtaining the .52 rate, is

14:35:33   5    there any other source besides the Larney study where she

6    obtains that?

7    A.    No.  It's from Larney.

8    Q.    Let's take a look at Larney.

9    A.    Okay.

14:35:42  10    Q.    If you could turn to -- we'll take a look at parts

11    of Larney, if you would.

12               If you could turn to Page -- I'm

13    sorry -- Tab 3 of your binder.

14    A.    Yep.  I'm with you.

14:36:03  15    Q.    Now, you've reviewed the Larney report, is that

16    right?

17    A.    Yes.

18    Q.    In what level of detail?

19    A.    A lot of detail.

14:36:11  20               I read the -- I read the report.  I looked

21    at the eAppendix.  I looked at some of the studies that

22    were cited in the eAppendix.

23    Q.    So I have here on the screen in front of you, it's

24    a couple-page document which we've marked as

14:36:33  25    WMT-MDL-01614.

1          Do you recognize this as material from the

2    Larney report?

3    A.    Yes.  It's from the online supplement to the Larney

4    paper, yes.

14:36:45  5    Q.    Okay.

6          And in particular, the first page of this

7    document that's on the screen in front of you, just using

8    some examples, explain to the Court how you're aware of

9    the timing of the data and the locations of where it was

14:37:03  10    gathered in the underlying studies.

11    A.    Sure.

12          So this is the list of 55 studies that form

13    the basis for Professor Keyes' estimate.  And you can see

14    at the bottom of the figure is the .52 number.

14:37:22  15          So, and what this figure shows is the first

16    author, the principal author of the paper, the year of

17    publication of the paper, the country from which the

18    cohort of people observed in the paper came from, and

19    then it graphs the mortality rate, the drug-related

14:37:48  20    mortality rate found in the paper with the 95 percent

21    confidence bars on it.

22          And then in the right-most column, lists

23    the weight that that study got in the meta-analysis

24    calculation of the overall mortality rate, which ended up

14:38:09  25    to be .52.

1    Q.    If you look at the dates in the left-hand side of

2    that, for example, you had highlighted the Australian

3    study with 2008, does that tell you the date in which the

4    data was gathered?

14:38:26  5    A.    No.  No.

6                    To get that, you need to cross-reference

7    this figure with another piece of the Larney paper

8    supplement.

9                    That's the eAppendix 5 which is immediately

14:38:49 10    following Figure 721.

11    Q.    Okay.  So we'll take a look at that in a second.

12                   Let me ask just a few more questions about

13    this page and WMT-MDL-01614, the first page.

14                   How many -- have you analyzed how many of

14:39:03 15    these studies that made up the meta study, how many of

16    them were from data in the United States?

17    A.    Yeah.  Seven.

18    Q.    Have you done any analysis as to analyzing how

19    recent the data is more broadly than the specifics shown

14:39:26 20    out in this study?

21    A.    Oh, yes.  Yeah.

22    Q.    And what were your observations?

23    A.    Well, my observations were that more than half of

24    the study years covered by these 55 studies were from the

14:39:42 25    year 2000 and earlier.

1    Q.    Is that significant to you?

2    A.    Yes.

3          I mean, it means that we're calculating the

4    drug-related mortality rate from more than 20 years ago

14:40:00  5    with most of the studies.

6    Q.    And just so there's no confusion, when you're

7    talking about most studies, you're talking about the full

8    set; not just the U.S.?

9    A.    Yes.

14:40:09 10          Most of the 55.

11    Q.    So if you turn the page, please, in WMT-MDL-01614.

12    Steve, if we can go to the next page, please.

13          Thank you.

14          You had indicated that there was some

14:40:27 15    additional information available on the website?

16    A.    Yes.

17    Q.    So what is the -- tell us what this is and what you

18    found helpful to do with it.

19    A.    Sure.

14:40:36 20          Well, what this is is eAppendix 5 from the

21    supplement to the Larney paper, but I filtered it to

22    include only the 55 studies that are in Figure 721.

23          So the Larney meta-analysis actually -- the

24    set of studies that Professor Keyes took from it is a

14:41:02 25    subset of all the studies covered, and that's okay.  I

1   mean, but you had to modify eAppendix 5 because that

2   listed all the studies in the whole Larney paper.

3                   So I took eAppendix 5, flagged the 55

4   studies that were in 721, that formed the basis for

5   Professor Keyes' estimate, and then reproduced them here

6   for the -- for the trial.

7   Q.    So if we look at the second column, which is

8   labeled, "Years of Cohort Observation," cohort

9   observation, that's the individuals studied within the

10  study, correct?

11  A.    Yes.  Those are the years of data that were -- were

12  observed in the particular study.

13  Q.    So in this case, rather than just looking at the

14  date of publication, we can actually see when the

15  individuals were studied.

16                   Is that right?

17  A.    Yes.

18  Q.    Okay.

19                   Let's take a look at the middle column,

20  which is the sample description where there's a fair

21  amount of wording.

22                   And just so we're clear, our Exhibit

23  WMT-01614 has three pages of discussion where you've

24  reprinted the analysis of the 55 studies.

25                   Is that right?

```
 1    A.    Yes.
 2    Q.    Okay.
 3                So the sample description, what is the
 4    purpose of the sample description?
 5    A.    That's -- that's a short blurb produced by
 6    Professor Larney and the co-authors that describes the
 7    population on which each of these studies in their
 8    meta-analysis was based.
 9    Q.    And to be clear, the exhibit that we're looking at
10    with the descriptions and the years, this is actually
11    information provided by Dr. Larney and her fellow
12    authors, right?
13    A.    Yes.
14                I didn't change -- the only thing I changed
15    here was to limit the table to the 55 studies in 721.
16                I didn't change any of this.
17    Q.    So these three pages match up to that list of
18    studies we just saw a moment ago on Page 1 of the
19    exhibit?
20    A.    Yes.
21    Q.    Okay.
22                If we could take down the blow-up, please,
23    Steve, so I can see.
24                And then if you continue on with the
25    columns, the "N" in the column, is that the number of
```

Kessler - Direct/Majoras                    928

1    people who are studied within each individual study?

2    A.    Yes.

3    Q.    If you look at the last -- I'm sorry.  We'll skip

4    that question.

5                    I'll go on.

6                    Does the chart show how the Larney paper

7    combines the death rates measured across all of those

8    populations, time periods and impacts?

9    A.    No.

10   Q.    How does she do it and how do you know?

11   A.    I mean, what she does is to assign each study a

12   percentage weight, which is on Figure 721, which is a

13   function of the sample size but also of other factors.

14                   They explain how they do that in the paper.

15                   And then weights each of the studies

16   according to the percentage weight that Larney and her

17   co-authors assign it.

18   Q.    And in the material that we just observed, the

19   descriptions of the studies, does that in some part

20   identify the types of issues that the study participants

21   are suffering from, whether it's a drug addiction or

22   certain other type of effect?

23   A.    Yes.

24   Q.    What's the significance of that?

25   A.    Well, the significance of that, that's sort of

           1    leading to another concern I have with Professor Keyes'

           2    use of this meta-analysis, is some of these populations

           3    have OUD and some of them don't necessarily have OUD.

           4                    And so we can talk about that maybe in a

14:45:46   5    few minutes.

           6    Q.    Well, let's go right there.

           7                    Let's -- I think that's on the next slide.

           8    A.    Okay.

           9    Q.    Slide 4 of your slide deck.

14:45:54  10    A.    Yes.

          11    Q.    Okay.

          12    A.    So this, this is sort of the second concern I have

          13    with Professor Keyes' analysis.

          14                    So remember, the correct multiplier formula

14:46:11  15    would give you the number of people with OUD by taking

          16    the number of any drug-related deaths of people with OUD

          17    and dividing it by the any-drug-related-death rate of

          18    people with OUD.

          19                    But what Professor Keyes' does is to take

14:46:30  20    the number of any drug-related deaths of anyone and

          21    divide it by the any-drug-related-death rate of

          22    extramedical opioid users.

          23                    And so you can see from the red

          24    highlighting, there are two problems.  The first problem

14:46:49  25    is that she's assuming that extramedical opioid users are

1   the same as people with OUD.

2                    And second, she's assuming that everyone

3   who suffers a drug-related death must have OUD.

4                    And my concern is that those assumptions

14:47:07  5   are not valid.

6   Q.    So how do you know that she, if you look at the

7   part highlighted in red, how do you know that Dr. Keyes

8   is, for example, in the numerator, looking at any

9   drug-related to the deaths of anyone?

14:47:21 10   A.    Well, if you review her report, that's -- that's

11   the statistic that she's, you know, basing her

12   calculation off of.

13   Q.    And if she were to do it accurately, what type of

14   statistic would she use?

14:47:38 15   A.    You'd want to know the number of any drug-related

16   deaths of people with OUD.

17   Q.    Is that number available?

18   A.    I don't know.

19                    It might be.  I would have to do further

14:47:55 20   research to determine that.

21   Q.    Did you look for it?

22   A.    I did look for it.

23                    I was not able to find it in the searches

24   that I did.

14:48:05 25   Q.    And then the, if you look at the denominator of

1    that formula in the red, it talks about death rate of

2    extramedical opioid users.

3                Why is it that you said Dr. Keyes used that

4    in her formula rather than the correct formulation?

14:48:22  5    A.    Well, that's what the Larney paper meta-analysis

6    does is tabulate the drug-related death rate of

7    extramedical opioid users.

8                That's what they say they do.  That's what

9    they do.

14:48:41 10    Q.    Let's take a look at the paper, and you can show me

11    where it says that in the paper.

12    A.    Sure.

13    Q.    That's in Tab 5 of your binder, and the exhibit

14    number is WMT --

14:48:53 15                THE COURT:  Why do you think that's an

16    invalid assumption, and do you have a better way, a

17    better way to estimate it?

18                THE WITNESS:  I think it's an invalid

19    assumption because we know for sure that extramedical

14:49:11 20    opioid use or misuse is a much broader group of people

21    than people with OUD.

22                And so when you include that group, you're

23    going to get a lower death rate, which is, of course,

24    going to raise your estimate of the number of people with

14:49:32 25    OUD because you're putting something smaller in the

1    denominator which is going to make the numerator larger.

2              That's my concern.

3              THE COURT:  Well, I mean, other than

4    anecdotally, when you say you know that, I mean, I

14:49:49 5    suppose -- I mean, there may be some people who start

6    using, using prescription opioids extramedically, and

7    they don't have OUD, but they're certainly likely to get

8    it if they keep going, right, because that's -- I mean,

9    that's why they would keep going.

14:50:16 10             MR. MAJORAS:  Sorry to object to Your

11   Honor's questions, but I'm not sure Dr. Kessler has the

12   expertise to opine as to the likelihood of

13   transitioning --

14             THE COURT:  Well, but he's -- he's

14:50:29 15   criticized Dr. Keyes, and I'm trying to understand his

16   criticism or if he's got some -- if he's got a better

17   method, better way to do it, that's what I'm trying to

18   get at.

19             THE WITNESS:  And I think I can

14:50:42 20   be responsive to --

21             THE COURT:  He might.  He might.

22             THE WITNESS:  Well, I think I can be

23   responsive --

24             MR. LANIER:  And in that regard, Your

14:50:47 25   Honor, I do want to lodge an objection.  He continues to

1    say "we. We know, we know."

2                    THE COURT:  That's what I was trying to get

3    at.

4                    MR. LANIER:  And I appreciate that you said

14:50:54  5    it; "you."  You made it to him personally.

6                    I'd ask that he testify based on what he

7    knows and not whoever this "We" is.

8    BY MR. MAJORAS:

9    Q.   So, Dr. Kessler, let's go directly to His Honor's

14:51:10 10   question.

11                   You were about to respond.  Please do.

12   A.   Yes, let's try to be responsive.  So could we have

13   Slide 5, please?

14                   So I should say, I should say I know that

14:51:24 15   the population of opioid misusers is broader than the

16   number of people with OUD, and I know that because the

17   National Survey on Drug Use and Health tracks both misuse

18   of opioids and OUD.

19                   And for Ohio in 2019, 2020, the NSDUH

14:51:49 20   reports that there were 412,000 opioid misusers and

21   119,000 people with OUD.

22                   Now, keep in mind, to be an opioid misuser

23   or an extramedical user, all you need to do is use an

24   opioid in a manner not directed by a doctor.

14:52:12 25                   So that's a fairly broad category.

Kessler - Direct/Majoras                    934

1          And the concern that I have is that the

2    Larney article explicitly states that it's measuring the

3    death rate of this broader population, and so that's not

4    going to give you an accurate picture of the mortality

14:52:38  5    rate of the narrower population, people with OUD.

6    BY MR. MAJORAS:

7    Q.    Dr. Kessler, not to jump ahead in your opinions but

8    just so His Honor knows what's coming, you do, in fact,

9    identify a number that you think is the appropriate one

14:52:56 10    to use for the OUD populations in these two counties,

11    correct?

12    A.    Yes.

13    Q.    And we'll take you through your explanation as to

14    how and why you do that.

14:53:06 15          Okay?

16    A.    Okay.

17    Q.    And, Your Honor, if you want me to do that right

18    now, I can but --

19          THE COURT:  No, I don't want to throw

14:53:14 20    off -- you've got a logical progression.

21          I just had a question.  I would have

22    forgotten.  I could have noted it down but it seemed to

23    make sense to ask it right then.

24          MR. MAJORAS:  Thank you, Your Honor.

14:53:24 25          We'll cover it.

BY MR. MAJORAS:

Q.    Let's just get -- let's finish your discussion, how
you said that you know that the Larney article is using
extramedical opioid users as part of its data.

          Is that right?

A.    Yes.

Q.    Okay.  So let's look again at what's in Tab 5 of
your binder, the Larney article.

          And that is WMT-MDL-01488.

          And you can see that on the screen in front
of you.

A.    Yes.

Q.    So if we, if we look at just the title of the
article, about using extramedical opioids, what does that
tell you?

A.    That's -- that's what this meta-analysis is about.
And if you look at the objective, that's --

Q.    Before you go to that --

A.    Yeah.

Q.    -- one of the criticisms that Dr. Keyes lodged
about your work is that she said you didn't do analysis
beyond the title of the article.

          Did you?

A.    What -- yes, I did.

Q.    Why don't you take us through that.

1    A.    Okay.

2              So you can look at the -- just a couple

3    lines down, you can look at the objective which repeats

4    this, this fact.

14:54:39  5              You can look inside the study selection box

6    which repeats this fact.

7              You can look inside the -- I'm sorry -- the

8    next box down is Study Selection.  Sorry to be -- cohorts

9    of people using extramedical opioids.

14:55:03 10              You can look at the inclusion and exclusion

11   criteria in the paper.

12             We included cohort studies of people who

13   used extramedical opioids.  Then it says cohorts did not

14   need to be opioid-dependent or have Opioid Use Disorder

14:55:24 15   to be included.

16             So that's the principal basis for my

17   concern.

18   Q.    And so it's clear in terms of your early answer to

19   His Honor's question, what is the -- what is the term or

14:55:41 20   how is the term "Extramedical opioid use" defined for

21   this article?

22             I believe it's in the very top of the page

23   we're looking at, which is the second page of the

24   article.

14:55:51 25   A.    Oh, I'm sorry.  I'm lapsing into jargon.

1            Yeah, "Extramedical opioid use includes the

2      use of heroin, illicit opioids, and the use of

3      prescription opioids outside the bounds of a doctor's

4      order."

14:56:07  5            So that's the definition of both misuse and

6      extramedical use.

7            Extramedical is a, I believe, a term that

8      is favored in -- by European and Australian analysts.

9      Q.    Earlier we looked at materials from Exhibit E,

14:56:26 10      which is the backup material for the Larney report.

11            And I don't know that you need to pull that

12      up.  I can if you want me to.

13            In the narrative descriptions of the

14      studies, do those provide you any information as to

14:56:39 15      whether or not they are only studying individuals found

16      to have Opioid Use Disorder?

17      A.    Yes.  They -- they do.

18            I mean, some of them definitely are based

19      on populations with Opioid Use Disorder, but some of them

14:56:57 20      aren't.

21            I mean, it's a mixture, and of course

22      that's -- that's not a criticism.  That's consistent with

23      what the authors of this paper had always intended to do.

24      Q.    So taking all of those comments and thoughts

14:57:12 25      together, does that give you any opinion in terms of the

Kessler - Direct/Majoras                938

        1    reliability of using the Larney study as the method for

        2    putting it into the multiplier formula?

        3    A.    Yes.

        4              I mean, the fact that it's based on mostly

14:57:34 5    populations not in the United States, mostly populations

        6    from long ago, populations that may not be

        7    opioid-dependent or have OUD, these are concerns that

        8    would lead to it not being valid for use for the purpose

        9    to which Professor Keyes is putting it.

14:57:55 10   Q.    Okay.

       11              Why don't we turn to Slide 6 of your

       12    prepared PowerPoint presentation.  And you have something

       13    which is labeled as, "Mistake Number 2-B in Dr. Keyes'

       14    Analysis"?

14:58:13 15             Could you explain that?

       16    A.    Yes, this is -- to go back to the ratio, this is

       17    kind of what I think of as the numerator problem.

       18              So we've been talking about the denominator

       19    problem, the problem with the death rate that Professor

14:58:30 20   Keyes uses.

       21              This is a numerator problem.  So the

       22    problem here is that you can't derive the size of the OUD

       23    population by dividing the number of any drug-related

       24    deaths of any person with or without OUD by the

14:58:49 25   any-drug-related-death rate of people with OUD.

1          What you need is the number of any

2     drug-related deaths of people with OUD.

3          I apologize if this is a little bit hard to

4     keep clear, but that's -- that's the heart of the

5     problem.

6     Q.    And why is it that you believe that's what

7     Dr. Keyes did?

8     A.    Well, because if you look at her materials, you'll

9     see that the number of deaths that were put into the

10    numerator was not limited to deaths of only people with

11    OUD.

12    Q.    And because you've already apologized to me about

13    the complexity of a formula, you have an example you can

14    share?

15    A.    Yeah.

16          So the example I have is if, that Professor

17    Keyes' formula would say that if there's a thousand

18    students at Harvard, let's say, who went to any high

19    school, and one percent of Shaker Heights high school

20    students go to Harvard, then what this formula, the way

21    Professor Keyes is applying it, would say is that there

22    must be a hundred thousand students at Shaker Heights

23    high school.  Right?

24          It would take a thousand students who are

25    at Harvard from any high school and divide it by .01, the

1    rate at which Shaker Heights high school students go to

2    Harvard, to get the population of students at Shaker

3    Heights high school.

4                    Now, you know, obviously when you put it

15:00:33  5    this way, it makes no sense.  Right?  And because the

6    problem is that what we need is the number of students at

7    Harvard who went to Shaker Heights high school, that is

8    to say the number of decedents who had OUD, not the

9    number of students at Harvard who went to any high

15:00:55 10    school, not the number of drug-related deaths of any

11    person.

12    Q.    Earlier we had some visitors to the courtroom from

13    Hawken high school, a local high school, so I'm happy we

14    didn't use something that somebody might stand up in the

15:01:10 15    audience and dispute the numbers on you.

16    A.    I just -- I just made these up.  I don't know any

17    of the --

18    Q.    But it's to make your point in terms of how

19    Dr. Keyes applies the formula?

15:01:20 20    A.    Yes.  That's right.

21    Q.    Okay.

22                    So taking you just answered this question

23    in a similar format, but adding in addition this

24    criticism of yours, what is your opinion as to the

15:01:30 25    reliability of how Dr. Keyes estimated the OUD

Kessler - Direct/Majoras                    941

1    populations in Trumbull and Lake Counties?

2    A.    My opinion is that the way that Dr. Keyes estimated

3    those populations is not reliable.  It's incorrect for

4    several reasons.

15:01:47  5    Q.    And those are the reasons you described for us?

6    A.    Yes.

7    Q.    Okay.

8          And give the Court -- you'll show some

9    numbers later, but give the Court your understanding of

15:01:57  10    the significance of getting that number wrong and the way

11    Dr. Alexander formulates his abatement program.

12    A.    Well, this is really a core number because the

13    abatement plan is, you know, one of the very -- the

14    biggest portions of its costs is the treatment of people

15:02:19  15    with OUD.

16          And so if you get the number of people who

17    have OUD wrong, that's really going to drive the

18    treatment cost number to be wrong, too.

19          MR. MAJORAS:  Your Honor, I don't know if

15:02:37  20    you have preferences but I'm moving to another topic at

21    this point.

22          THE COURT:  All right.

23          Well, this is probably then as good a time

24    as any.  So we'll take our afternoon break, 15 minutes,

15:02:45  25    and then pick up the balance of Dr. Kessler's testimony.

1                MR. MAJORAS:  Thank you, Your Honor.

2                THE WITNESS:  Thank you.

3                (Recess taken.)

4                THE COURT:  Okay.  You may be seated.

15:21:02  5                And, Doctor, you're still under oath from

6    before the break.

7    BY MR. MAJORAS:

8    Q.    Dr. Kessler, we're about to move on to a new topic

9    but before I do that, I want to clarify one thing that

15:21:16 10    you talked about.

11                If you look at Slide 4, and indicated in

12    the red that that's what the concern was as to how

13    Dr. Keyes had estimated the formula, that she was using a

14    broader category in the numerator than drug-related

15:21:36 15    deaths of people with OUD.

16                Is that right?

17    A.    Yes.

18    Q.    And the problem with having a larger number

19    than -- or the effect of having a larger number than just

15:21:48 20    the people with deaths -- with OUD who suffered death is

21    that it overstates the multiplier, right?  The end result

22    of the multiplier?

23    A.    Yes.

24    Q.    Okay.  Let's move on to what you thought is a

15:22:04 25    better approach, takes us to Slide 7.

1          On this goes directly to what Judge Polster

2    was asking you earlier, that in your work on this case,

3    you believe that you have a number of OUD deaths in this

4    county, these counties, that are more accurate?

15:22:24  5          Is that right?

6    A.    Yes.

7    Q.    And more reliable?

8    A.    Yes.

9    Q.    Okay.  So why don't you take us through this.

15:22:30 10          Yours starts with the NSDUH number.

11          Let's please tell us a little bit more

12    about NSDUH, why you use it.

13    A.    Sure.

14          So the NSDUH, which is an acronym for the

15:22:45 15    National Survey on Drug Use and Health, is a

16    comprehensive data source that's all about drug misuse in

17    the United States.

18          It's run by the U.S. Government, by the

19    Department of Health & Human Services, has been in

15:23:03 20    operation for now, I think, almost 20 years.  It's based

21    on annual in-person interviews with a random sample of

22    about 70,000 people, and they ask an extensive battery of

23    questions to try to allow users of the survey to

24    distinguish disorders like OUD from mere misuse.

15:23:33 25          And this second bullet that I have here, so

1    the Federal Government, that Department of Health & Human

2    Services is well-aware of the concerns that you might

3    have when you're asking people about potentially

4    sensitive issues.  And so they've designed extensive

15:23:57 5   procedures to try to address those concerns.

6              Among them, assuring very strict

7    confidentiality to respondents.  For example, you know,

8    when you try to tabulate things from the NSDUH using the

9    HHS front end website, you often can't get tabulations

15:24:23 10  for small areas because they suppress it to prevent

11   people from being able to back out the identity of any of

12   the respondents.

13             In addition, another thing that they do at

14   the Substance Abuse and Mental Health Administration,

15:24:45 15  which is the piece of HHS that administers the NSDUH, is

16   that they segregate the sensitive questions in the survey

17   and allow those to be posed to the respondents through a

18   computer self-interviewing process.

19             So these are in-person interviews, but when

15:25:14 20  they turn to things like, you know, sensitive questions

21   as they define them, like, you know, using heroin and

22   stuff like that, the reviewer, the interviewer allows the

23   respondent to enter those responses privately on a

24   computer, which doesn't contain, you know, information

15:25:38 25  that the interviewer could then use to back out who the

1    person actually is.

2                    So that's the survey.  And I'll add that in

3    my opinion, this survey is the gold standard for

4    answering this type of question.  It's relied on

15:26:03  5    by -- certainly by the Federal Government and also by

6    state and local Governments for policy decisions

7    regarding illicit drug use and drug misuse and is

8    the -- is the basis for hundreds of studies, you know,

9    over the past several decades, even more than, you know,

15:26:26 10    maybe, I don't know, I mean a lot of studies and

11    researchers who do this kind of work in top peer-reviewed

12    journals.

13    Q.    Is this something you only learned in the context

14    of this case?

15:26:43 15    A.    I was familiar with NSDUH beforehand, but I

16    only -- I've dug into it quite a bit on this case, yes.

17    Q.    Does the NSDUH data have any limitations?

18    A.    It does have limitations.

19    Q.    And are you aware that Dr. Keyes in particular has

15:27:04 20    offered an opinion that it undercounts the amount of

21    people with Opioid Use Disorder because it may not

22    include homeless and incarcerated individuals?

23    A.    Yes.

24                    I mean, she's correct, that the sampling

15:27:22 25    frame excludes incarcerated people.  It excludes certain

1   homeless people, people without fixed addresses.

2                   I think that's a -- that's an important

3   concern.  I agree with that.

4   Q.    Yet you rely on that data for your analysis here?

5   A.    I do, yes.

6   Q.    Why?

7   A.    Well, I mean, the difficulty is that, you know, I

8   think this is an important concern.

9                   I think, you know, I have not been able to

10   find any quantitative estimates of the extent of

11   undercounting in NSDUH of OUD, any reliable quantitative

12   estimates of that.

13                   Third, you know, although I understand the

14   concern that she's voicing and agree that it may be

15   relevant in certain circumstances, for the purpose of

16   counting the number of people with OUD in Ohio today, I'm

17   less convinced that the sampling frame problems are

18   important.

19                   And that's because if you ask, well, how

20   many people as a fraction of the population are not being

21   covered by these sampling frame exclusions in Ohio today,

22   and the number of people who are, you know,

23   institutionalized, incarcerated or homeless

24   without -- without fixed address is something in the

25   ballpark of one percent of the population.

Kessler - Direct/Majoras                    947

1               And so even if that subpopulation would be

2       much more likely to have OUD, which I'm willing to

3       believe that that's a true concern, it's really not going

4       to move the needle on the population average calculation

5       all that much, even if it were, you know, double or

6       triple the rate of everybody else.

7               It's only one percent of the population,

8       and so you're not going to, you know, swing the total

9       count of OUD all that much.

10               So while I understand the concern, and it

11       certainly may be relevant in certain circumstances, in

12       this particular circumstance I'm not persuaded that it's

13       hugely relevant.

14               And then, if the alternative -- and then,

15       finally, this is a survey that's widely accepted.  And if

16       the alternative is Dr. Keyes' calculation, which I know

17       is wrong, then, yes, I think this is a more reliable way

18       to obtain this information.

19       Q.    Now, the NSDUH does not report out specific Opioid

20       Use Disorder populations for either Mahoning or Lake

21       County, right?

22               I said Mahoning.  Trumbull, Trumbull or

23       Lake County?

24       A.    It does not.

25               It's for this confidentiality reason that

1    we've discussed.

2    Q.   So why don't you explain to us how you use the data

3    that is available to come up with your numbers, which I

4    believe is Slide 8.

15:30:34 5    A.   Yes.

6              So what, NSDUH does provide data on rates

7    of OUD at the state level but not at the substate level.

8              And for Ohio in 2019-2020, the OUD rate,

9    according to the NSDUH, is 1.210 percent.

15:30:58 10             So then the question is, well, okay, can

11   you apply that to Lake and Trumbull.

12             What you can get from NSDUH is the rate of

13   prescription OUD, not for Lake and Trumbull, but for

14   substate aggregations of counties that include Lake and

15:31:20 15   Trumbull.

16   Q.   So a substate aggregation would be a grouping of

17   perhaps some counties?

18   A.   Yeah, a grouping of, like, three counties.

19             I forget which are in the Lake and Trumbull

15:31:31 20   groups.

21             But, anyway, what you can get from NSDUH is

22   that the rate of prescription OUD for the substate area

23   that includes Lake is .75 percent, and for the substate

24   area that includes Trumbull is .80 percent, and those are

15:31:51 25   both lower than Ohio's overall rate of prescription OUD.

1          So what that suggests to me is that it

2     would be conservative to apply Ohio's OUD rate to

3     Lake -- to the populations of Lake and Trumbull counties

4     to calculate the count of people with OUD in Lake and

15:32:20  5     Trumbull counties.

6     Q.   So despite some indication that the Lake and

7     Trumbull County rate could be lower, you, nonetheless,

8     used the higher Ohio-wide rate, is that fair?

9     A.   Yes.

15:32:31 10    Q.   And then what you do with that is you take the

11    rate, the 1.210 percent, and you apply that by the

12    populations of the two counties?

13    A.   By the over-12 population, yes, because that's the

14    sampling frame for the NSDUH.

15:32:44 15    Q.   And once you've done that, you came up with your

16    numbers for the two respective counties?

17    A.   Yes.

18    Q.   Let's turn to the next slide.

19          Why don't you tell us what you're reporting

15:32:59 20    in Slide 9.

21    A.   Sure.

22          So the first column with numbers in it,

23    that's using the 1.210 percent number for Ohio and

24    multiplying that by the over-12 population in Lake and

15:33:22 25    Trumbull, and that yields a count of 2,414 people with

1    OUD in Lake and 2,048 people with OUD in Trumbull.

2                    And the second column compares that to

3    Professor Keyes' estimate, which is 5,934 people in 2019

4    with OUD and 7,560 people with OUD in 2019.

15:33:50  5    Q.    So I'd like now to turn to, just to remind the

6    Court in part, how these OUD numbers are used by

7    Dr. Alexander.

8                    If you would refer to Page -- I'm

9    sorry -- Tab 7 of your binder.

15:34:06 10                    For the record, it is P 23105A-01.

11                    It's also on the screen in front of you.

12    A.    Yes.  Yes.

13    Q.    Do you recognize this as what we've been referring

14    to as the Lake County redress report by Dr. Alexander?

15:34:26 15    A.    Yes.

16    Q.    I'd like you to turn to, if you look at the page

17    numbers on the bottom of your tab, it's Page 15 of P

18    23105A.

19    A.    Yes.

15:34:49 20    Q.    So this is -- this is the specific chart in

21    Dr. Alexander's report where he identifies the amount of

22    treatment needed for OUD.

23                    Is that fair?

24    A.    Yes.

15:35:03 25    Q.    And he starts with, in Line 1 across the top, he

1    starts with the population, and that's derived from

2    Dr. Keyes' number, correct?

3    A.    Yes.

4    Q.    And if you were to replace her number with the

15:35:24  5    number that you have identified and derived from the

6    NSDUH number, that would cut the population numbers by

7    more than half.

8              Is that fair?

9    A.    Yes.

15:35:36 10   Q.    So as these then are multiplied out throughout

11   Dr. Alexander's report, that has a significant

12   implication in each year in terms of the number of people

13   that he's identified within the OUD population?

14   A.    Yes.

15:35:59 15   Q.    If you look across Tab 1 or, I'm sorry, Line 1 --

16   and, again, you weren't here for the testimony.

17   Dr. Alexander had some testimony about how he reduced the

18   population year by year to reflect various reasons why

19   that population would change over time.

15:36:19 20             Are you aware of how he did that?

21   A.    Yes.

22   Q.    Okay.  Could you explain that?

23   A.    Yes.

24             Dr. Alexander applied what I think he

15:36:30 25   called a trend -- a trend growth factor or a trend

1    growth -- oh, what did he call it?  -- intervention

2    population trend ratio.

3    Q.    What is that?  Are you familiar with that term?

4    A.    No.  It's -- it's a term created by Dr. Alexander.

15:36:58  5            I mean, but it's relevant in his -- the

6    context of his report.

7    Q.    And do you understand that he had chosen his target

8    by trying to get to a 50 percent population by year 2035?

9    A.    Yes.  I understand from his report that it's his

15:37:21 10    opinion that the number of people with OUD will half by

11    2035.

12    Q.    And do you have an opinion as to the

13    appropriateness of that reduction over time and how it

14    was done?

15:37:37 15    A.    Well, I'm not aware of any analysis that he did to

16    support that.

17            I mean, my understanding is that he -- it

18    was just his opinion that that would happen, and then the

19    intervention population trend ratio is the -- what you

15:37:57 20    need year by year to bring that about, to bring that back

21    down to 2035.

22            So I do not have an opinion as to whether

23    that's -- yeah, I just don't have any opinion.

24            I don't see the basis for it, so I would

15:38:12 25    not opine that it was reliable.

1    Q.    So now that His Honor knows what's coming, you take

2    your OUD population estimate based on NSDUH, and you

3    replace that across Dr. Alexander's report.

4               Correct?

15:38:33  5    A.    Yes.

6               I retain his intervention population trend

7    ratio.

8               I just changed the starting value.

9    Q.    And you determined -- we will have a slide to show

15:38:46 10    this -- you determined what you believe to be the impact

11    on how the costs were overstated as a result?

12    A.    Yes.

13    Q.    Okay.

14               We'll get to that, but let's get to your

15:38:55 15    next --

16               THE COURT:  You're continuing his

17    reduction, even though you don't think it's supported?

18               THE WITNESS:  Yes, because

19    I -- that's -- that's an aspect I'm just taking as given

15:39:13 20    from his report.

21               THE COURT:  Okay.

22               THE WITNESS:  I mean I'm taking a lot of

23    things as given from his report that I don't necessarily

24    agree with, just to focus on, you know, a limited number

15:39:26 25    of things that I definitely disagree with and was able to

 1    correct.

 2                    THE COURT:  So essentially, you're starting

 3    at a much -- you're starting at a much lower point but

 4    continuing his assumption that in 15 years, it will be

15:39:40  5    halved?

 6                    THE WITNESS:  Yes.

 7                    THE COURT:  Based on presumably the success

 8    of the interventions?

 9                    I think that's what he's basing it on, that

15:39:50 10    these interventions will have some success.

11                    THE WITNESS:  I can't recall exactly the

12    complete basis for why he did that, but I think it's in a

13    paragraph in his report.

14    BY MR. MAJORAS:

15:40:12 15    Q.    Just so we're aware --

16                    THE COURT:  I think it's a combination of

17    success on the front end and reducing the number of new

18    people in the counties with OUD and success in treating a

19    number of the people who have it now will result over

15:40:29 20    time in reducing the number of people in the counties

21    with OUD.

22                    I think that's --

23                    THE WITNESS:  I think that's -- I think

24    that's right.

15:40:37 25                    THE COURT:  -- a layperson's summary.

1              THE WITNESS:  I think that's right.

2              THE COURT:  Okay.

3              THE WITNESS:  I'm taking that as a given,

4       though.

15:40:44  5              THE COURT:  Okay.  All right.

6       BY MR. MAJORAS:

7       Q.    And just so I don't bury the lead, I suppose, let's

8       turn to Slide 13.  We'll come back and forth to this over

9       time.

15:40:53 10              In Slide 13, you take the various

11      categories of your corrections to the reports and you

12      identified the impact it has if you apply it, all else

13      being equal, to what's in Dr. Alexander's abatement plan?

14      A.    Yes.

15:41:14 15     Q.    Okay.  So in particular, the second line --

16      A.    Yes.

17      Q.    Let me back up.

18              The first line shows the total that

19      Dr. Alexander has, and if you correct it with the OUD

15:41:26 20     estimate that you are using, what is the reduction in the

21      plan as Dr. Alexander states it?

22      A.    You go from about $865 million to about $514

23      million.

24      Q.    And that's a reduction of how much?

15:41:42 25     A.    About $300 -- you know, $350 million.

Kessler - Direct/Majoras                    956

1     Q.    And that's about 41 percent of his total?

2     A.    That's the percent that you're reducing it, yes.

3     Q.    Okay.

4                 So let's go -- let's go on to your next

15:41:57  5     concern about overstatements, which is Slide 10.

6     A.    Sure.

7     Q.    Take us -- take us through this opinion, please, on

8     what you see as an additional overstatement.

9     A.    So my second concern is that plaintiffs are

15:42:16 10     overstating the number of people with OUD who will obtain

11     treatment.

12                 And the basis for that concern is that

13     Dr. Alexander assumes that 40 percent of people will

14     obtain treatment in 2021, rising to 60 percent by 2035.

15:42:38 15                 But I wasn't able to see any analysis that

16     provided a basis for those assumptions, so what I did was

17     go to the NSDUH and tried to calculate from NSDUH, first,

18     how many people in Ohio who had OUD were receiving

19     treatment; and, second, to try to determine how many

15:43:13 20     people with OUD felt a need for treatment over and above

21     those who were -- who were receiving it.

22                 And by, "Felt a need for treatment," the

23     NSDUH asks people who say that they felt a need, whether

24     they made an effort to obtain treatment or not.

15:43:33 25                 And what I did was assume that everybody

1    who felt a need for treatment, whether or not they made

2    an effort to obtain it, should be counted as a cost of

3    abatement of offering them treatment, everyone who is

4    getting treatment, plus everyone who felt a need for

15:43:54  5    treatment, whether or not they made an effort to obtain

6    it.

7              And I assumed in my calculations that those

8    people should all be eligible for treatment for purposes

9    of calculating abatement costs immediately, no delay.

15:44:13 10             And so what I'm going to assume is that

11   abatement will pay for 38.4 percent of people with OUD to

12   receive treatment, subject to qualifications that we'll

13   talk about in a few moments; that is, every person with

14   OUD who would be expected to receive treatment or feel a

15:44:33 15   need for treatment today.

16   Q.   Okay.  So let's back up just a bit.

17             In your first bullet point as you identify,

18   you say that plaintiffs assume.

19             I will tell you that Dr. Alexander

15:44:47 20   testified that it was his target to have 40 percent in

21   treatment by year one, rising to 60 percent by year 15.

22             Okay?

23   A.   Okay.

24   Q.   All right.

15:45:01 25             Now, did you review what Dr. Alexander

Kessler - Direct/Majoras                958

1    relied upon for establishing his target?

2    A.    I did.

3              As it was stated in his report.

4    Q.    And if you'll refer to Tab 6 of your binder.

15:45:22 5    A.    Oh, yes.  Uh-huh.

6    Q.    So, first, before we dig into Tab 6, do you have an

7    opinion as to whether 40 percent initially and 60 percent

8    by year 15 is an appropriate target?

9    A.    I think, you know, well, my opinion is that I think

15:45:41 10   it was 38.4 percent is an ambitious target but an

11   appropriate one for use in calculating abatement costs

12   because it counts everybody who's getting treatment, plus

13   everybody with OUD who has reported that they feel a need

14   for treatment, whether or not they made an effort to

15:46:07 15   obtain it.

16   Q.    So even though current data shows that only about

17   28.6 percent are actually getting treatment, there's an

18   additional nine and change percent who believe they need

19   treatment and you're including those in your numbers?

15:46:22 20   A.    Yes.

21   Q.    All right.  So let's look to the article that

22   Dr. Alexander relied upon, which is I'll refer you to Tab

23   6, which has been marked as WMT-MDL-01594.

24              Are you there?

15:46:37 25   A.    Yes.

1    Q.    And what is this?  What is this article?

2    A.    This is an article from UNAIDS about countries

3    setting targets for access to HIV prevention and

4    treatment and care for injecting drug users from 2012.

15:47:01  5    Q.    And if you look at the second page of the article,

6    in fact, there's a discussion about setting targets?

7    A.    Yes.

8    Q.    And if you refer now to the third page of the

9    exhibit, which is WMT-MDL-01594.47, do you see the part

15:47:20  10    that's highlighted under the box?

11              I'll blow that up for you.

12    A.    Yes.

13    Q.    Do you want to read that into the record, please?

14    A.    Yes.

15:47:29  15              "These targets are intended to be broadly

16    indicative only and countries will need to consider the

17    local context to assess what levels they should aim to

18    achieve.  The targets selected should enable those

19    implementing programmes to know whether they are making a

15:47:47  20    difference to the epidemic and to what level services

21    should be maintained or expanded to effectively control

22    the epidemic.  In the future, as new and more robust

23    evidence emerges, these indicative target levels may be

24    revised."

15:48:03  25    Q.    Based on Dr. Alexander's testimony that he's using

1    targets citing this article as part of his reason for

2    that, what is your opinion as to whether the appropriate

3    way of identifying the OUD populations to be treated

4    should be?

15:48:27 5    A.    My opinion is that, you know, abatement should

6    account for everyone who is getting treatment, subject to

7    some discussion we'll have in a few minutes, plus anyone

8    who feels any need for treatment, even people who report

9    that they made no effort to obtain it.

15:48:46 10              If anyone who feels the need for treatment,

11    should be encouraged to get it immediately.

12    Q.    And that's the 38.4 percent that you use?

13    A.    Yes.

14    Q.    Let's refer again to Slide 13.

15:48:58 15              You've -- you've quantified the difference

16    it would make if you were to apply your rate instead of

17    the targets with Dr. Alexander.

18              Is that correct?

19    A.    Yes.

15:49:09 20    Q.    And if we look in particular, it's the third line

21    of this chart.

22              Is that correct?

23    A.    Yes.

24    Q.    Sir, to be clear, what you're doing is you're

15:49:23 25    taking the abatement costs and numbers with your initial

1    correction and then you're making this additional

2    correction to that.

3              Correct?

4    A.    Yes.

15:49:32  5    Q.    A lot of corrections, corrections in there.

6    A.    Yes.  But you said it correctly.

7    Q.    Thank you.

8    A.    Yes.

9    Q.    And if you take into account this factor of the

15:49:42 10    treatment rate, what is your reduction to the overall

11    plan?

12    A.    After correcting for the overestimation of the

13    number of people with OUD, if you replace the 40 to 60

14    percent series with the 38.4 -- I apologize -- whatever

15:50:09 15    that number is, then you'd reduce treatment costs by

16    about $19 million to a total of $495 million.

17    Q.    Let's go to your next opinion about overstatements.

18    And I believe that's Slide 11.

19    A.    Yes.

15:50:28 20    Q.    So this you refer to as your overstatement number

21    three.

22              Could you explain to the Court what your

23    concern is?

24    A.    Yes.

15:50:39 25              My concern here is that Professors Burke

1    and Rosen, when they tallied up the treatment costs for

2    people with OUD, assumed that people with OUD will get

3    treatment 365 days per year, but we know, or I know from

4    the treatment episode data set that OUD treatment lengths

15:51:08 5    in Ohio on average are less than 365 days per year.

6              And what I present in the table in the

7    first panel here is for the four types of treatment that

8    Professor Alexander's plan includes, outpatient

9    treatment, intensive outpatient treatment, residential

15:51:30 10    treatment and inpatient treatment, the number of days per

11    year of treatment that Professors Burke and Rosen assume,

12    and then the actual average number of days of treatment

13    per year in Ohio in the treatment episode data set.  And

14    what that shows is that the actual average number of

15:51:55 15    treatment days per year per person with OUD is much

16    lower.

17    Q.    So let's break that down a bit.

18              First, you refer to Treatment Episode Data

19    Set.  That TEDS, T-E-D-S?

15:52:08 20    A.    Yes.

21    Q.    So when you refer in your chart to TEDS, that's

22    what you mean?

23    A.    Yes.

24    Q.    Is the TEDS data that you're looking at specific to

15:52:16 25    Ohio?

1    A.    Yes.

2    Q.    So the data that you're reporting is Ohio data; not

3    nationwide or some other grouping?

4    A.    No, it's Ohio data.

15:52:27 5    Q.    And what is the significance of the treatment days

6    being significantly less than 365 days a year, even for

7    the longest outpatient treatment?

8    A.    Well, that's going to reduce the estimate or the

9    costs proportionately, because if you assume that every

15:52:46 10   person with OUD is being treated 365 days when, in fact,

11   they're going to be treated, you know, between 38 and 152

12   days, depending on the modality of treatment, then that's

13   going to raise your estimate of the costs substantially.

14   Q.    So now I'm just going to ask you to put the

15:53:06 15   specific numbers into the record.

16               The TEDS data for outpatient OUD treatment

17   is what?

18   A.    The average treatment length in Ohio is 152 days.

19   Q.    And how about the average treatment length for

15:53:19 20   intensive outpatient treatment?

21   A.    115 days.

22   Q.    What is the average treatment period for

23   residential OUD treatment?

24   A.    41 days.

15:53:32 25   Q.    And same question for inpatient OUD treatment.

A.    38 days.

Q.    I'm going to ask you to turn back again to the redress report from Dr. Alexander, which is your Tab 7.

A.    Sure.

Q.    And for the record, it's P 23105A.

      And I'll, again, ask you to turn to the: Page where he looks at his Category 2B, treatment for Opioid Use Disorder?

A.    2B.

      Oh, yeah.

Q.    So this is -- this is Page 15 of the exhibit.

A.    I'm -- I'm there.

Q.    Okay.

      Now, I mentioned earlier there was one piece of Dr. Alexander's testimony that was different than what we've heard before, and that relates to the number of individuals in this chart.

      And what he testified was it's not the number of individuals, as you look at Lines 3 through 12; it's the number of slots, S-L-O-T-S.

A.    Okay.

Q.    So his testimony was that, for example, on Line 3, that as he used his 40 percent target, it's not the number of people he expects to receive treatment; it's the number of slots that are needed.

Kessler - Direct/Majoras

965

1         Does that clarify the issue on the 365

2    days?

3    A.    I mean, what -- what is slots?

4    Q.    I will -- assume for me that a slot is availability

15:55:23 5    of that particular treatment.

6    A.    Okay.  I mean, no.  That doesn't -- that doesn't

7    fix the problem, no.

8    Q.    Why not?

9    A.    Well, I mean, first of all, I mean, it can't be

15:55:46 10   that there's 2,267 slots if there's -- could you just

11   move this down a little bit?

12         If there's --

13   Q.    What line would you like to see?

14   A.    Yeah, if there's 5,668 unique people, and the

15:56:10 15   treatment lengths are, you know, less than half a year,

16   right, because the average treatment length was, you

17   know, for the longest one was, like, a hundred and -- I

18   forget what the number is.

19   Q.    152, I believe.

15:56:28 20   A.    Oh, okay.  So, yeah, less than half a year.

21         So if that's true, then you'd actually be,

22   if this was slots, you'd be treating -- let's just say it

23   was half a year, right?

24         Then you'd be treating double 2,267 every

15:56:48 25   year, right?  Because if, if every year you had two slots

1   that you could fit people into, then what he would be

2   saying is that you'd be treating, you know, twice 2,267

3   number of people.

4                     But then that's saying that the treatment

15:57:11  5   rate for OUD is going to be something like 80 percent,

6   which is, I mean, very high, I mean very highly

7   aspirational.

8                     So it doesn't really make sense that this

9   can be slots.  It doesn't add up.

15:57:29 10                     But even if it were slots, the county only

11   pays for treatment when it's rendered.  I mean, the

12   county is not, most of the treatments in this plan is

13   going to community-based providers.

14                     I mean, the way that it's costed out here

15:57:52 15   is that they go to community-based providers and pay

16   them, you know, as they should, to treat a person with

17   OUD for however long they do it.

18                     But then, if that were the case, the county

19   wouldn't -- wouldn't pay for the availability of

15:58:15 20   treatment.  They'd pay for actual treatment that's

21   actually rendered, which would be the number I calculate.

22                     So, yes, just saying this is slots,

23   whatever that is, does not resolve this problem.

24   Q.    So if a slot -- and I'll ask you again to assume

15:58:38 25   that Dr. Alexander testified that an individual slot

1    could be --

2                    THE COURT:  Well, Doctor, if the treatment

3    were paid -- were provided at a county facility, your

4    analysis would be different, would it not?  Because of

5    all the fixed costs at the facility.  They would have to

6    have the slots, the beds, the professionals, et cetera.

7                    THE WITNESS:  No, I -- I mean,

8    respectfully, I don't think so, Your Honor.

9                    I mean, the way that this is costed out is

10   in terms of the cost of the actual delivery of a

11   treatment to a provider, whether it be a community-based

12   provider or a county-owned provider.

13                   And if it were a county-owned provider,

14   then, you know, they would adjust their supply of

15   treatment availability such that it accommodated the flow

16   of people at the rates that Professor Alexander is saying

17   should be paid.

18                   THE COURT:  Well, but a -- but a

19   residential facility has fixed costs, and they've got to

20   have the capacity for what they assume they're going to

21   need.

22                   And if in a given month, for whatever

23   reason, fewer people don't seek treatment, well, they

24   still have all those costs.  They can't just say, "All

25   right.  We're laying off our providers, all our staff for

1      a month.  You come back, come back in June."

2                  You can't do that.  So that's my point.

3                  If, if this is contracted out, I think

4      you're right.  Then, you know, they pay on a per capita

16:00:27 5      basis, you've got a month's treatment, you get X dollars,

6      we pay X dollars to that facility.  But if it's in a

7      county facility, basically most of the costs are fixed.

8                  THE WITNESS:  Yeah, I mean I --

9                  THE COURT:  Other than maybe say it's

16:00:44 10      medically-assisted treatment, clearly you're not going to

11      need the drugs if the person isn't taking them, but most

12      of the costs are the overhead, the personnel, the beds,

13      et cetera.

14                  THE WITNESS:  Yeah, I mean but -- and I

16:00:59 15      still -- I'm afraid I have to disagree because if, you

16      know, the rates that Dr. Alexander has used to cost out

17      the cost of these treatments have already folded into

18      them what you have to give providers, community-based or

19      county-owned, to maintain sufficient capacity to meet

16:01:27 20      demand when it's there.

21                  Right?  I mean the fact that a facility is

22      going to be owned by, you know, Mercy or something

23      relative to the county, that shouldn't matter.  Right?

24      We should be paying them the same rate per treatment

16:01:45 25      delivered, and that rate should incorporate what we have

1    to give them in order to maintain sufficient capacity to

2    meet the --

3                 THE COURT:  But the county doesn't -- the

4    county doesn't pay itself.

16:01:58   5                 If the county funds a facility, the county

6    is running it.

7                 THE WITNESS:  Yes, but the way this was

8    costed out is on this per-treatment-delivered basis.  And

9    so, I mean, if it were, indeed, cheaper to, you know,

16:02:18  10    have the people go to Mercy at the rates that Professor

11    Alexander specified, then that's what they should do.

12                 Now, if the county wants to operate a

13    facility and, you know, as an accounting matter, charge

14    to the fund, the abatement fund, the cost of delivering

16:02:38  15    the services that Professor Alexander says should be

16    delivered, that's okay, too, but it would be at the same

17    rate.

18                 I mean, there'd be no reason to give the

19    county, you know, more than you'd give Mercy to do it.

16:02:57  20                 Maybe another way to think about it is, you

21    know, if, if the county is providing insurance coverage

22    to people or the State of Ohio through Medicaid, you

23    know, when those people get actual services at a

24    federally qualified health center, for example, you know,

16:03:17  25    they pay them a rate per service delivered.

Kessler - Direct/Majoras                    970

1              And the FQHC or Mercy, they negotiate a

2       rate with the county or with the Ohio Medicaid that's

3       enough to let them maintain the right capacity as best

4       they can and deliver the services as they're needed.

16:03:40  5              THE COURT:  Okay.  Mr. Majoras.

6                   THE WITNESS:  I hope that's helpful.

7                   THE COURT:  Thank you.

8       BY MR. MAJORAS:

9       Q.    And in looking at Dr. Alexander's abatement plan,

16:03:48 10     the way he calculates his costs is based on the per

11      treatment; not establishing a new facility, is that

12      correct?

13      A.    Yes.

14      Q.    You then took your average days of treatment and

16:04:03 15     applied that through doctor abatement -- Dr. Alexander's

16      redress formula and you reached a conclusion as to how

17      much the plan is overstated.

18                   Is that right?

19      A.    Yes.

16:04:17 20     Q.    Let's go -- go to Slide 13 again.

21                   So this in particular is the fourth line of

22      your corrections, to correct for the overestimate of

23      treatment length.

24                   Correct?

16:04:32 25     A.    Yes.

1   Q.    And what's the reduction that is derived from that?

2   A.    $95 million approximately, which brings the cost of

3   the plan down to around $400 million.

4   Q.    And to be clear, that adjustment is being made off

5   of the $350 million plan, is that right?

6               The 350 million if it's corrected for OUD?

7   A.    That's being made off the $495 million amount in

8   the row above.

9   Q.    Okay.  Thank you.

10               Let's go back to Slide 11, please.

11               Now, your fourth overstatement is shown on

12   Slide 4 -- I'm sorry -- Slide 11.

13               Would you please explain it.

14   A.    Yes.

15               So here, my concern is the plaintiffs using

16   an estimate of the number of heroin users in Lake and

17   Trumbull County that's almost double the number in NSDUH.

18   Q.    And as you look at Dr. Alexander's plan, what is

19   the significance of the number of heroin users?

20   A.    The sort of treatment for, I believe it's

21   complications due to the epidemic, that's two -- I think

22   that's 2-C in his system, is keyed off the number of

23   opioid injection drug users, which is heroin users.

24               I believe that's -- yes.

25   Q.    So you used the NSDUH numbers as you did earlier

1    when estimating the overall OUD population?

2    A.   Yes.

3    Q.   Do you know where the -- Dr. Alexander's estimate

4    of heroin users comes from?

16:06:31  5    A.   We could look at his report.

6              I think he -- he explains he applies an

7    adjustment factor to the NSDUH number, I believe.

8    Q.   What is your opinion about his use of an adjustment

9    factor?

16:06:53  10   A.   I understand the concern that he's expressing, but

11   my concern is that Dr. Alexander, in his recent

12   peer-reviewed work, uses the NSDUH count of the number of

13   heroin users without an adjustment factor to -- in his

14   peer-reviewed work.

16:07:16  15             And so I guess if it were me, I would apply

16   the same standards that I use in my peer-reviewed work to

17   the testimony that I give in court.

18   Q.   So let's -- I'm sorry.  Let's pull up the article

19   that you just spoke about.

16:07:33  20             If you look at Tab 9 of your binder, you'll

21   see the document's been labeled WMT-MDL-01605.

22   A.   Yes.

23   Q.   And this is an article entitled "Modeling

24   Mitigation Strategies to Reduce Opioid-Related Morbidity

16:07:52  25   and Mortality in the U.S."

1          Is that right?

2     A.    Yes.

3     Q.    This is the report you're referring to?

4     A.    Yes.

16:07:58  5     Q.    And we can see, if you look at the list of authors,

6     that Dr. G. Caleb Alexander is identified as one of the

7     authors?

8     A.    Yes.

9     Q.    So where, where in this -- where in this most

16:08:10 10     recent article of his do you find that he used the NSDUH

11     heroin numbers without adjusting them?

12     A.    Let's see, where does -- I should be able to find

13     this.

14     Q.    Why don't we start --

16:08:37 15     A.    I apologize.

16     Q.    -- with Page 3?

17     A.    Pardon me.  Go ahead.

18     Q.    I was going to say why don't we start on Page 3.

19     A.    Okay.

16:08:47 20     Q.    If we look at the very top of the paragraph.

21     A.    Oh, yes.

22          Initial population for the 32 compartments

23     was estimated using one of four national databases:

24     Census, CDC, Wonder, NSDUH, or the NES -- the National

16:09:08 25     Epidemiologic Survey on alcohol and related conditions.

1    Q.    And if you turn to the next page of his article --

2    A.    For estimates of the act -- sorry, for estimates of

3    the active OUD population, we relied on NSDUH data, and

4    that's what I'm referencing.

16:09:26  5    Q.    And if you return -- if you turn to the next page,

6    specifically as to heroin, in the top paragraph, maybe

7    about two-thirds of the way through, there's a sentence

8    beginning, "Second."

9    A.    Oh, yes.

16:09:45  10             "Second, we used NSDUH data to derive

11    estimates of the numbers of people with prescription

12    opioid nonmedical use, heroin use, and prescription OUD,

13    adjusting for NSDUH's double-counting of people who have

14    both prescription OUD and heroin use disorder."

16:10:04  15             Yes.

16    Q.    And finally, I think if you look at the, I think

17    it's the last page, just the next page over, which is

18    Page 5 of WMT-MDL-01605.

19    A.    Yes.

16:10:15  20    Q.    The very top, top paragraph.

21    A.    Yes.

22             "We also included sensitivity analyses

23    focused on heroin users, since evidence suggests that

24    NSDUH may significantly underestimate the population of

16:10:31  25    heroin users in the U.S.  The results of the sensitivity

1    analyses are described in the eAppendix in the

2    supplement."

3    Q.    And --

4    A.    That's what he says.

16:10:44  5    Q.    And did you observe any sensitivity analyses

6    indicating that the NSDUH number should not be used?

7                    MR. WEINBERGER:  Objection.

8                    THE COURT:  Overruled.

9    A.    I looked in the eSupplement -- in the eAppendix in

16:11:06 10    the supplement, and I could not find any sensitivity

11    analysis focused on heroin users.

12                    So I, yeah, I couldn't find any.

13    BY MR. MAJORAS:

14    Q.    So in your analysis, in your adjustment, you used

16:11:19 15    the NSDUH numbers without effectively doubling them.

16                    Correct?

17    A.    Yes.

18    Q.    And let's look -- let's look and see what the

19    impact of that is on Slide 13.

16:11:41 20                    Because this would be, I guess, the fifth

21    line down, correct, overstatement of number of heroin

22    users.  And what did you find the reduction to be?

23    A.    That, that reduced the costs of the abatement plan

24    by about $3 million to about $397 million.

16:11:57 25    Q.    Okay.  Let's go back to your slide, Slide 12,

1    please.

2                    I'm sorry.  Before we do that, let me bring

3    it back.  Go to Slide 13, please, Steve.

4                    You also make an adjustment for what you

16:12:18  5    call the erroneous reliance on west -- WV, West Virginia

6    data?

7    A.    Yes.

8    Q.    What is the basis of that correction?

9    A.    Maybe go back a slide.

16:12:32 10                    Oops.  Other way.  Keep going.

11    Q.    Dr. Alexander -- Dr. Alexander -- Dr. Kessler --

12    A.    There you go.

13                    Thank you.

14                    Yes.  So the fifth overstatement is

16:12:57 15    Professor Alexander's use of West Virginia data to

16    calculate the total number of pregnant women with OUD in

17    Trumbull County but not in Lake County.

18                    I mean, for -- in his calculation for Lake

19    County, he uses the total number -- or actually, let me

16:13:21 20    just turn to this in my report.  I apologize.

21                    Yeah, the number of pregnant women with OUD

22    is the product of the number of births in the county,

23    Trumbull or Lake, and the prevalence of OUD per thousand

24    hospital deliveries.

16:13:53 25                    And in Lake County, he uses the prevalence

1    of OUD per thousand hospital deliveries in Ohio, but in

2    Trumbull County, he uses the prevalence of OUD per

3    thousand hospital deliveries in West Virginia.

4                  So that just seems like it must be a

16:14:23  5    mistake.

6    Q.   And once you make that, that correction, you

7    further reduce the total costs in Dr. Alexander's plan,

8    five-year plan, by $2,308,000?

9    A.   Yes.   That's right.

16:14:38 10    Q.   Okay.   Now, let's go to Slide 12.

11                  In addition to some -- the items you've

12    already talked about, you also take a look at costs that

13    are not paid by the counties.

14                  Is that right?

16:14:59 15    A.   Yes.

16    Q.   Okay.   Please, please explain what you've done.

17    A.   So this, this sort of class of overstatements is

18    about some categories of abatement costs that are not

19    going to be paid by the counties, that are going to be

16:15:23 20    paid by people's existing insurance.

21                  And so I -- here I subtract off the cost of

22    those treatments that can be expected to be paid by the

23    people's existing insurance from the total abatement

24    costs, the total cost of the abatement plan.

16:15:47 25    Q.   What is your basis for using 91.6 percent of people

Kessler - Direct/Majoras                          978

1   with OUD?

2   A.    In Ohio who have health insurance?

3   Q.    Yes.

4   A.    That's from the NSDUH.

16:16:00  5   Q.    Okay.

6   A.    So the NSDUH will let you tabulate how many people

7   in Ohio who have OUD, have either public or private

8   health insurance, Medicaid, you know, Medicaid, Medicaid,

9   or private insurance.

16:16:17 10          And it's 91.6 percent of them.

11   Q.    Then you also talk about medical care for

12   complications, which is another factor or another

13   category in Dr. Alexander's plan?

14   A.    Yes.

16:16:32 15          So this is a -- this is a -- I should

16   probably refer back to his plan -- I believe most -- this

17   is really for injection drug users.  That's medical care

18   for complications attributable to OUD is his language

19   that is meant to refer to the people in, I believe in

16:17:06 20   Group 2-C who are heroin users primarily.

21          And according to the NSDUH, 62.3 percent of

22   heroin users had public or private health insurance.

23          So those costs that are costed out in those

24   sections of Professor Alexander's plan will already be

16:17:31 25   covered by Medicaid or other insurers.

```
 1    Q.    Earlier you had --

 2                THE COURT:  Well, Doctor, let me -- I mean,

 3    you're saying they will be covered, but you've got to

 4    take as a given the jury found that these defendants were

 5    substantial cause of the opioid epidemic in Lake and

 6    Trumbull Counties.

 7                Is there a reason why the taxpayers,

 8    through Medicaid or insurance companies or their, you

 9    know, customers, should bear the costs versus these

10    defendants?

11                I mean, they are bearing it now, but

12    that -- you're taking it as a given that they will and

13    should continue to bear them going forward, aren't you?

14                THE WITNESS:  No, not necessarily.

15                I mean, if the -- if the -- I mean, the

16    concern that I have is that many of these people will

17    just continue to get their care from their usual sources,

18    and then those will ultimately be charged to Ohio

19    Medicaid or to the employers.

20                THE COURT:  Maybe, maybe not.  That's

21    what's happening now.

22                They're going to, you know, county

23    facilities or private facilities in the county and that's

24    how the bills are being paid.

25                But is there a reason why the taxpayers, as
```

1    opposed to these defendants, should continue to do that

2    if the jury found the defendants liable?

3                    You're just assuming that the way it's been

4    going before this lawsuit should continue.

16:19:19  5                    THE WITNESS:  Well, I mean, obviously I

6    would defer, you know, to Your Honor about if these costs

7    should be charged to defendants, and they were actually

8    paid for by the abatement plan.

9                    So by that, I mean that it wasn't just a

16:19:39 10    windfall to counties.

11                    THE COURT:  Agreed.

12                    No one is suggesting the counties should be

13    given money for purposes other than we're talking about,

14    treatment in these categories.  Agree a hundred percent.

16:19:54 15                    But if -- you're saying it was overstated

16    abatement costs.

17                    It really isn't an overstatement of

18    abatement costs.  The costs are real.  All right.  It's a

19    question of who pays for them.  Do we continue the

16:20:11 20    existing funding model pre-litigation, which was a

21    combination of public insurance, which is

22    Medicare/Medicaid and private insurance, or maybe a

23    little self-pay, or maybe that some of it's probably

24    written off per, or the costs are allocated to the

16:20:34 25    defendants as part of the abatement plan.

1              So it's not really overstating the costs.

2                    THE WITNESS:  Well, I mean, again --

3                    THE COURT:  It would be if someone would

4       hand them the money and they wouldn't spend it this way

16:20:45  5       and it would just go into the county's general fund but,

6       trust me, that isn't going to happen.

7                    THE WITNESS:  Well, I mean, I certainly

8       defer, obviously defer to you, Your Honor, about that.

9                    I mean, if this is going to be used to pay

16:20:58 10      for this, and it is, you know, your opinion that that is

11      the right way to do this, then, yeah, this would not be

12      an overstatement.

13                   THE COURT:  Okay.  Thank you.

14                   THE WITNESS:  Yes.

16:21:11 15      BY MR. MAJORAS:

16      Q.    So, Dr. Kessler, if someone has insurance, whether

17      Medicare -- I'm sorry -- Medicaid or some private

18      insurance, and they decide to seek treatment in whatever

19      way they want, and it's paid for by the insurance,

16:21:25 20      there's nothing out-of-pocket to the counties, correct?

21      A.    Yes.

22      Q.    And you understand it's the two counties who are

23      the plaintiffs in this case, correct?

24      A.    Yes.

16:21:37 25      Q.    Do you have -- are you aware of any studies or

1      literature that talks about if a Government option is

2      available for treatment and someone has private

3      insurance, the likelihood they access the Government

4      versus the private insurance method of treatment?

16:21:59  5                    MR. WEINBERGER:  Objection.

6                    THE COURT:  If he knows of studies,

7      overruled.

8      A.    I mean, I -- off the top of my head, I couldn't

9      quote you a study.

16:22:13 10                    I think the more important --

11                    MR. WEINBERGER:  Objection.  Move to strike

12      this answer.

13                    THE COURT:  Well, I mean he's answered it.

14                    He doesn't know any study.

16:22:23 15                    And besides, this isn't an issue for a

16      study.  I've already -- I think we've covered this.  But

17      he doesn't know of any study.  So he's answered it.

18                    THE WITNESS:  May I continue, or should I

19      stop?

16:22:35 20                    THE COURT:  Do you know of any study?

21                    THE WITNESS:  No, but what I was going to

22      say was that --

23                    MR. WEINBERGER:  Objection.

24                    THE COURT:  Well, I think if there's

16:22:47 25      another question, then there should be another question.

1          THE WITNESS:  Okay.

2     BY MR. MAJORAS:

3     Q.    Do you have an opinion, as a health care economist,

4     whether faced with the option of Government-provided care

16:22:59 5    or care that would otherwise be provided by the provider

6     of your choice through health insurance --

7          MR. WEINBERGER:  Objection.

8     Q.    -- for which form of treatment --

9          THE COURT:  Well, let's hear the question.

16:23:07 10        MR. WEINBERGER:  I'm sorry.  I'm sorry.

11    BY MR. MAJORAS:

12    Q.    Which form of treatment someone is more likely to

13    use?

14         MR. WEINBERGER:  Objection.

16:23:15 15        Beyond the scope of his report.

16         THE COURT:  Yeah, it's beyond the scope of

17    his expertise and just general opinion.  I might have a

18    general opinion.

19         If he's going to render an expert opinion,

16:23:23 20   I think that should have been disclosed, but that would

21    be the only kind of opinion I would allow you to elicit.

22         MR. MAJORAS:  And, Your Honor, I'll just

23    make my record on this.

24         This is directly in response to questions

16:23:35 25   that you raised, which were outside of the report.

1          THE COURT:  If he's got -- if you want to

2     phrase it does he have an opinion based upon a reasonable

3     degree of scientific certainty on this, I'll -- if you

4     think it was responsive to my question, I'll -- you can

16:23:51  5     elicit it and then the plaintiffs can cross-examine.

6          MR. MAJORAS:  So let me ask it that way.

7     BY MR. MAJORAS:

8     Q.    Dr. Kessler, do you have an expert opinion as a

9     health care economist to a reasonable degree of certainty

16:24:02 10     in that field as to whether individuals with choices of

11     Government-provided care for these addiction-type issues

12     as opposed to private providers of their choice covered

13     by health insurance, whether they're likely to avail

14     themselves of one or the other?

16:24:31 15     A.    Not with regard -- with regard to that specific

16     question.

17     Q.    Okay.  Then we'll move on.

18     A.    I don't have an answer for that.

19     Q.    Thank you.  We'll move on.

16:24:41 20          If we go to Slide 13, please.

21          The adjustments that you believe needed to

22     be made, however, were made in your analysis and resulted

23     in reductions, again, to the Alexander abatement plan.

24          Is that right?

16:25:01 25     A.    Yes.

Kessler - Direct/Majoras                985

1       Q.    And those are the last three lines of the chart on

2       Slide 13?

3       A.    Yes.

4       Q.    So the first is with respect to costs of people

16:25:12  5   with OUD in treatment, is that right?

6       A.    Yes.

7       Q.    And you believe the adjustments should be a further

8       reduction of over $34 million?

9       A.    Yes.

16:25:20 10   Q.    And likewise, with the next line, costs for medical

11      care for complications attributable to OUD for insured

12      people, you have an adjustment of over $2 million?

13      A.    Yes.

14      Q.    And by adjustment, that's a reduction?

16:25:35 15   A.    Yes.

16      Q.    And then the final line, "Excluding costs of pain

17      treatment, specialists for insured people," you further

18      reduce the number by eleven-and-a-half million dollars?

19      A.    Yes.  That's correct.

16:25:56 20   Q.    Now, you've also prepared a slide that goes through

21      the exact same process we just did but you did it on a

22      one-year plan using Dr. Alexander's abatement redress

23      model.

24              Is that right?

16:26:09 25   A.    Yes.

1    Q.    Let's look at Slide 14.

2              So again, the process that you just went

3    through in Slide 13, you applied to the one-year costs

4    that Dr. Alexander has estimated.

5              Correct?

6    A.    Yes.

7    Q.    And he starts off with a total cost of $155,200,000

8    rounded, and after your reductions, the one-year cost:

9    Would be reduced to $68,002,000, correct?

10   A.    Yes.

11   Q.    And again, you do not -- other than making

12   adjustments that you've talked about in your testimony

13   today, you don't try to reduce any of the treatment as

14   suggested by Dr. Alexander.  Right?

15   A.    No.

16   Q.    So you don't address the efficacy of the treatment

17   or not?

18   A.    No.

19   Q.    Or whether it's related to specifically the

20   prescription opioids?

21   A.    Not in this calculation, no.  Correct.

22   Q.    Okay.

23              Let's move -- let's move to the second part

24   of your analysis, which to use my analogy earlier, we're

25   talking now about the slices of the overall pie.

1    A.    Yes.

2    Q.    And we can take down Slide 14, please.

3               Thank you.

4               Let's go to Slide 15.

16:27:45  5               Okay.  So now we're talking about

6    allocation of the costs to the defendants in this case,

7    correct?

8    A.    Yes.

9    Q.    Is it your opinion, to a reasonable degree of

16:27:54  10   scientific certainty within your field, that costs can be

11   allocated appropriately to the defendants in this case?

12   A.    Yes.

13   Q.    Okay.

14              Why don't you take us through how you went

16:28:07  15   about doing that?

16   A.    Sure.

17              So the -- I think -- I mean, it's certainly

18   my opinion, and I believe also the opinion expressed by

19   plaintiffs' experts, that there are many factors that

16:28:24  20   have caused -- that are related to, I should say, the

21   harm that's arisen from opioids, including the

22   manufacturers, prescribers, other pharmacies dispensing

23   and illegal drug cartels.

24              In addition, there are demand factors that

16:28:48  25   are at work:  Deindustrialization, lack of opportunity,

1    disability, pain and work injury.

2             And supply factors other than prescription

3    opioids that are at work playing a role in the process

4    that's led us to where we are today.

16:29:08  5             So what that suggests to me is that there

6    needs to be a method to apportion or allocate costs to,

7    first, you know, the defendants versus all these other

8    forces, and then in particular, to the defendants'

9    challenged conduct, which in my understanding is their

16:29:39 10   red flag -- I'm going to use their red flagged

11   prescriptions as a measure of their challenged conduct as

12   specified by Dr. McCann.

13   Q.    So let me just back up.

14             So Dr. McCann is an expert who testified in

16:29:54 15   the trial last fall.

16             Is that right?

17   A.    Yes.

18   Q.    And he provided specific information as to each

19   defendant on quantifying the prescriptions that should

16:30:07 20   have been red flagged and were not to his view

21   appropriately resolved?

22   A.    Yes.

23             Dr. McCann specified prescriptions that

24   were -- that he red flagged that were not appropriately

16:30:24 25   resolved, yes.

1    Q.    Okay.

2              So you talk on Slide 15 about a three-step

3    model that you use?

4              Let's turn to Slide 16.

16:30:33  5              And this, this takes us through the steps,

6    is that right?

7    A.    Yes.

8    Q.    Let's talk about Step 1, please.

9              What did you do?

16:30:41 10   A.    So Step 1 of this process was to estimate

11   regression models to determine the portion of

12   opioid-related mortality that was associated with

13   prescription opioid shipments.

14              And the purpose of this step is to

16:31:04 15   apportion the variation in opioid-related mortality to

16   the part associated with shipments, as opposed to all the

17   other parts that we were just talking about a few minutes

18   ago.

19   Q.    So I'm sure Judge Polster has seen regression

16:31:25 20   models and analyses in these cases, but can you just give

21   us a brief discussion of what a regression model does and

22   why you think it was appropriate to use in this case?

23   A.    Yes.

24              I mean, what a regression does is exactly

16:31:38 25   what we're looking for in this matter in front of us

```
 1        today, which is to apportion variation in an outcome to

 2        pieces that are associated with other -- with different

 3        factors.

 4                     And in this case, the outcome is variation

 5        in opioid-related mortality across U.S. counties and over

 6        time, and the factors are shipments, and then, you know,

 7        other potential factors that played a role in the

 8        process.

 9    Q.    And once you put your model together and worked

10        through it, did you reach any conclusions?

11    A.    I did.

12                     I separately estimated models for

13        prescription opioid-related and illicit opioid-related

14        mortality, and I allowed shipments to have a lagged

15        effect.

16                     So mortality today is going to be affected

17        by a history of prescription opioid shipments.

18                     And I controlled for a bunch of other

19        factors that previous research has suggested were also

20        associated with opioid-related mortality.  And the result

21        of that work is in my report.

22    Q.    Why are you looking at mortality?

23    A.    Well, mortality is, of course, the ultimate harm.

24        And it's also available across counties and over time and

25        reliably measured.
```

1          THE COURT:  Well, except -- except, Doctor,

2     I agree, mortality is the ultimate harm, but there's

3     nothing -- nothing that can be done for those people.

4          I'm not saying there aren't things that

5     can't be done to reduce mortality in the future, and

6     that's -- but that's not really abating the mortality

7     that has happened.

8          I can't -- no one can -- those people are

9     gone.  So, I mean, is it -- I'm not understanding why you

10    would focus all this on mortality.

11         THE WITNESS:  Yes.  Yes, Your Honor.

12         I mean, it's -- it's because mortality is a

13    measure, is an aspect of harm that's well-measured and

14    measurable from which we can back out an apportionment of

15    different causes.

16         And I should add that this is -- this is

17    also used by plaintiffs' experts.  I mean, Professor

18    Alexander uses mortality to apportion harm.

19         In the earlier phase of the trial, there

20    was a report filed by Professor David Cutler.  That used

21    mortality to apportion harm.

22         So it's a reasonable scientific response to

23    the problem at hand of how do we divide up the harm

24    that's occurred among the different factors that played a

25    role in it.

1          THE COURT:  I hear the words but I'm not

2     sure it's germane but --

3     BY MR. MAJORAS:

4     Q.    Dr. Kessler, your final estimates of dollars amount

16:35:25 5     in this case, you're not simply looking at the costs of

6     mortality, are you?

7     A.    Oh, no.  No.  No.

8               The mortality is only a way of

9     apportionment.  The size of the pie is keyed off of

16:35:43 10     Professor Alexander's estimate of the cost of abatement

11     with my corrections.

12               So the mortality aspect is only with regard

13     to the apportionment, both between defendants and

14     everything else, and between defendants' challenged

16:36:05 15     conduct and the conduct of defendants that plaintiffs do

16     not challenge.

17     Q.    In using mortality here for your regression model,

18     is it fair to say that that's a proxy for rate of harm?

19     A.    Yes.

16:36:21 20     Q.    Okay.

21               And why does that matter?  Why are you

22     trying to determine that?

23     A.    Well, I mean, in order to apportion, you know, the

24     harm which has, as Judge Polster's pointed out, many

16:36:39 25     different aspects, there has to be some uniform way to do

1    that.  And a regression based on mortality is the best

2    way to do that.

3                    And it's accepted by plaintiffs' experts to

4    use mortality as a method of apportioning harm.  And so

16:37:04 5    that's why I adopted it.

6    Q.    And in running your regression, did you reach a

7    conclusion as to what the appropriate association was

8    between increased shipments of opioids and opioid

9    mortality?

16:37:21 10    A.    Yes, I did.

11    Q.    What was -- what was your result?

12    A.    Let me -- I mean, the result is in my report.

13                    So what I found -- so I examined the

14    relationship between prescription opioid mortality and

16:37:52 15    shipments, both current shipments and lagged shipments,

16    shipments in the past, and the relationship between

17    illicit opioid mortality and shipments, in both current

18    shipments and lagged shipments in the past.

19                    And I found that a permanent increase in

16:38:15 20    opioid shipments had a statistically significant positive

21    association with the prescription opioid mortality rate

22    and a statistically insignificant positive association

23    with the illicit opioid mortality rate.

24                    I can give you the exact numbers.  They're

16:38:42 25    in my report.

Kessler - Direct/Majoras                  994

1    Q.    You could tell us how you apply that in just a

2    moment, but let's -- once your regression model provided

3    the results to you, did you do any testing of those

4    results to determine the robustness?

16:38:58 5    A.    Yes, I did.

6    Q.    What did you do?

7    A.    I did what for me is standard procedure when I

8    estimate models like this.  So one thing I did was to

9    vary the set of control variables, which should not, if

16:39:17 10   the model is robust, materially change the coefficients

11   that you get.

12                    And it didn't.

13   Q.    You've mentioned specifically that you did the

14   regression analysis here?

16:39:31 15   A.    Yep.

16   Q.    And is that something that you do frequently in

17   your line of work?

18   A.    Yeah.

19                    That's -- that's what I do.  Probably every

16:39:42 20   day for the past 20 years, I look at regression output.

21   Q.    And I believe you mentioned even back to your time

22   when you received your Ph.D. from MIT, econometrics was

23   an area of your study?

24   A.    Yes.  That was one of my sub -- one of my

16:40:04 25   subfields.

1    Q.    Once you had the coefficients from your model, from

2    your regression model, what did you do next?

3                    And I believe that takes us to Slide 17.

4    A.    No, we're on 16.

16:40:16  5    Q.    I'm sorry 16 still.

6                    Step 2.  What did you do in Step 2?

7    A.    So once I had the estimates from the regression

8    model, what I did was to calculate the amount of

9    prescription opioid mortality and illicit opioid

16:40:31 10    mortality that's allocable to defendants' flagged

11    dispensing.

12                    So in particular, you know, I plugged in

13    the number of flagged MMEs filled by each defendant from

14    Dr. McCann, used the regression coefficients I estimated

16:41:00 15    from Step 1 to calculate the opioid-related mortality,

16    both prescription and illicit opioid-related mortality

17    allocable to defendants' challenged conduct, and then

18    used that to calculate the percentage of opioid-related

19    mortality allocable to defendants' challenged conduct

16:41:19 20    overall.

21    Q.    So in your regression model, you were able to

22    determine, to a statistically significant degree, the

23    relationship between increased shipments of MME and harm.

24                    Is that fair?

16:41:39 25    A.    Well, for prescription opioid mortality, there was

1    a statistically significant association between a

2    permanent increase in shipments and mortality, but for

3    illicit opioid mortality, there was not a statistically

4    significant association between a permanent increase in

16:42:00  5    shipments and mortality.

6    Q.   So in Step 2, though, you took the coefficient

7    derived from your regression model and you applied it

8    specifically to the flagged MMEs of each defendant,

9    correct?

16:42:14 10    A.   Yes.

11    Q.   Okay.  And then what do you do in Step 3?

12    A.   Well, Step 3 is pretty simple.

13              I just applied that percentage from Step 2

14    to total abatement costs, to the adjusted total abatement

16:42:35 15    costs.

16              So the dollar value of abatement costs

17    allocable to defendants' challenged conduct is equal to

18    the percentage that I got from what we talked about in

19    Step 2, multiplied by the adjusted total pie of abatement

16:42:55 20    costs.

21    Q.   So in plain language, all these steps combined

22    allowed you to do what?

23    A.   What these steps combined allowed me to do is to

24    allocate variation in harm to shipments in general as

16:43:15 25    opposed to other factors in Step 1.

1          To allocate -- to calculate the share of

2     opioid-related mortality allocable to flagged dispensing

3     in particular of defendants according to Dr. McCann.

4          And then to take that and allocate

5     abatement costs to defendants on that basis.

6     Q.   So in terms of the way you went about this, how

7     would that differ, for example, of simply taking market

8     shares of the defendants?

9     A.   In two ways.

10          First, this allocates to shipments in

11     particular as opposed to all other factors that played a

12     role in bringing about the situation that we're in;

13     whereas, just using market share.  Just multiplying

14     market share by abatement costs would not take account of

15     the fact that there were many factors other than

16     shipments that contributed to the current situation.

17          The second thing that what I did

18     accomplishes, other than just using market share, is to

19     focus on defendants' challenged conduct, on the

20     challenged conduct of defendants.

21          In particular, you know, market share -- a

22     market share-based allocation system would implicitly say

23     that defendants should be responsible for abatement costs

24     proportional to the number of dispensed MMEs, number of

25     dispensed opioids, even opioids that were dispensed that

1        were medically necessary and, you know, never flagged by

2        plaintiffs as improper.

3                        Whereas what I'm doing is saying I'm going

4        to accept as given Dr. McCann's assessment of which

16:45:29  5        shipments -- sorry -- which dispenses should not have

6        been filled, and that's incidentally giving a very broad

7        interpretation.

8                        I mean, Dr. McCann didn't exactly say that,

9        but I'm assuming that anything he flagged is a challenged

16:45:47 10        MME that should not have been filled.

11                        So this is taking a broad view of his

12        assessment and then applying that to determine the

13        abatement costs for which defendants should be held

14        responsible.

16:46:05 15        Q.    Now, the result of your work that you just

16        described was to find a percentage allocable to each

17        defendant and each county?

18        A.    Yes.

19        Q.    And it differs by county because there's different

16:46:20 20        challenged conduct and numbers of prescriptions in each

21        county, correct?

22        A.    Yes.  Different challenged conduct and different

23        market shares of defendants, of different defendants,

24        both, yes.

16:46:32 25        Q.    Okay.  Let's turn to Page 17.

Kessler - Direct/Majoras

999

```
         1              On Page 17 of your slide deck, you have two
         2    different charts.
         3              The top chart, you apply the percentages to
         4    the uncorrected costs in each county.  Is that right?
16:46:56 5    A.   Yes.
         6    Q.   So in other words, you take the cost numbers
         7    identified by the plaintiffs' experts in their reports
         8    and apply the percentages without making any adjustments
         9    to the overall costs.
16:47:09 10             Correct?
        11    A.   Yes.
        12    Q.   All right.
        13             So as we see at the top, those are
        14    identified both to Lake and Trumbull County?
16:47:16 15             What is the percentage allocable to the
        16    challenged conduct of Walmart in Lake County?
        17    A.   .176 percent.
        18    Q.   What is the same number for CVS in Lake County?
        19    A.   .445 percent.
16:47:39 20   Q.   And what is the number for Walgreens for the same
        21    basis in Lake County?
        22    A.   .693 percent.
        23    Q.   And then if we turn to Trumbull County, the
        24    percentage that you have determined is allocable to
16:47:54 25   Walmart?
```

Kessler - Direct/Majoras

1000

1    A.    .031 percent.

2    Q.    And the same question for CVS?

3    A.    .308 percent.

4    Q.    And with respect to Walgreens?

16:48:04  5    A.    .821 percent.

6    Q.    So what you did in the remainder of that chart,

7    then, is to multiply those percentage numbers or apply

8    those percentage numbers to the abatement costs as

9    outlined by the plaintiffs' experts?

16:48:18 10    A.    Yes.

11    Q.    Okay.

12             And then if we look at the bottom part of

13    Slide 17, this time you do a very similar chart but you

14    apply it to what you refer to as the five-year corrected

16:48:31 15    cost?

16             The corrected cost would be those numbers

17    derived from Chart 13 or Slide 13 that we saw earlier?

18    A.    Yes.

19    Q.    Okay.

16:48:41 20             And these are your final -- after taking

21    out what you viewed to be the overstatements in the

22    plaintiffs' numbers, you have final numbers, and those

23    are the ones reflected as almost $150 million for Lake

24    and $197 million for Trumbull, taking as a given that

16:49:00 25    those programs as presented by the plaintiffs' experts?

1    A.    Yes.

2    Q.    Okay.  So then you do the multiplication again.

3            Do the percentages change in either county?

4    A.    No.  No.

16:49:12  5           This is just changing the going from the

6    top panel to the bottom panel, is just changing the

7    overall pie; not the division up of the pie.

8    Q.    So let's turn to Slide 18.

9            And Slide 18, what you do is, is you take

16:49:31 10   effectively the results of what we just saw in Slide 17

11   and total them?

12   A.    Yes.

13   Q.    All right.

14           So if we look at our slide, if you are

16:49:39 15   looking at dollar amounts using your method of allocation

16   and the plaintiffs' numbers as they have testified, the

17   number for Walmart is $813,496, combined between the two

18   counties?

19           Is that right?

16:49:57 20   A.    Yes.

21   Q.    And the number between -- the number for CVS on the

22   uncorrected costs is $3,176,181, correct?

23   A.    Yes.

24   Q.    Same question with regard to Walgreens; for both

16:50:16 25   counties is $6,617,013?

Kessler - Direct/Majoras                    1002

1    A.    Yes.

2    Q.    And then our final column --

3              MR. MAJORAS:  And, Your Honor, I will tell

4    you I'm going to move for admission of these slides but

16:50:26  5    in case that doesn't happen, I feel compelled to put

6    these into the record.

7              THE COURT:  All right.  That's fine.

8    BY MR. MAJORAS:

9    Q.    In the final column, what you've done is you've

16:50:34 10    again totalled for both those two counties what you've

11    determined to be the allocable costs but then corrected

12    for what you described earlier in your testimony.

13              Right?

14    A.    Yes.

16:50:43 15    Q.    And the total for Walmart is $324,322?

16    A.    Yes.

17    Q.    The total for CVS is $1,271,284?

18    A.    Yes.

19    Q.    And the total for Walgreens is $2,653,319 -- I'm

16:51:07 20    sorry -- $2,653,319.  Is that right?

21    A.    Yes.

22    Q.    And having gone through all this and having laid it

23    out now to Judge Polster, what is your confidence in the

24    accuracy and your ability to allocate these costs in the

16:51:27 25    way you've done so?

A.    My confidence is very high.

            I mean, this is a standard approach using a

regression to apportion variation in harm among many

different factors.

16:51:47            Then I accepted as given plaintiffs'

assessment of the defendants' challenged conduct,

calculated the consequence of that challenged conduct for

harm, and apportioned the costs of the harm to defendants

based on that proportion.

16:52:09            MR. MAJORAS:  Thank you, Dr. Kessler.

            I have no further questions at this time.

            Your Honor, I'll wait until later to offer

specific exhibits into evidence if that's appropriate.

            THE COURT:  All right.  I just have one,

16:52:19 one question.

            So if I understand this, Doctor, you are

giving your best expert assessment that Walmart should

be -- should be required to pay about $12,000 a year for

the next five years to Trumbull County and about $52,

16:52:56 $53,000 a year to Lake County?

            All I did was divide --

            THE WITNESS:  I see.

            THE COURT:  -- I looked at Slide 17 and

divided, since it's five-year costs, I roughly divided by

16:53:13 five.

1          So that's roughly what you

2     are -- you -- your expert opinion has concluded?

3                    THE WITNESS:  Yes.

4                    I mean it's --

16:53:26  5                    THE COURT:  Okay.  I just wanted to make

6     sure that it's -- that I got it right.

7                    MR. MAJORAS:  Your Honor, if I may just ask

8     one follow-up on that.

9     BY MR. MAJORAS:

16:53:35 10    Q.    Dr. Kessler, in answering those questions or any of

11    the questions that you've been discussing in this place,

12    you're not, in fact, endorsing any particular part of

13    Dr. Alexander's actual abatement plans and items in it.

14                    Are you?

16:53:48 15    A.    No.  No, I'm not endorsing any part of it.

16                    MR. MAJORAS:  Thank you, Your Honor.

17                    THE COURT:  Okay.

18                    How -- Mr. Lanier, about how long do

19    you -- I'm happy to go for a while, or I don't want to

16:54:19 20    cut you off in the middle.

21                    If you want to go for half an hour.

22                    MR. LANIER:  You wouldn't cut it off in the

23    middle.  We did start at 9:00.  I'm ready to go now.  I

24    probably have about an hour-and-a-half to two hours that

16:54:34 25    I will spend in cross.

| | |
|---|---|
| 1 | THE COURT:  Why don't you go for about a |
| 2 | half hour?  It may be easier to break it that way. |
| 3 | MR. LANIER:  That would be great. |
| 4 | THE COURT:  So you pick a time, a spot that |
| 16:54:43  5 | makes sense in what you're doing. |
| 6 | MR. LANIER:  You know, obviously there's a |
| 7 | benefit to trying it to you because I don't have to |
| 8 | explain the invention of the wheel.  So I'll go as |
| 9 | quickly as I can and maybe go through it a lot quicker |
| 16:54:59 10 | than I think. |
| 11 | THE COURT:  Okay. |
| 12 | MR. LANIER:  But depends on how questions |
| 13 | are answered. |

```
 1            CROSS-EXAMINATION OF DANIEL KESSLER
 2     BY MR. LANIER:
 3     Q.    All right.
 4                  Sir, my name is Mark Lanier.  I've not met
 5     you before, I don't think.
 6                  Have I ever met you before?
 7     A.    I don't think so.
 8     Q.    Well, I've lectured a few times at Stanford law
 9     school and I've met a lot of faculty but I'm not sure
10     that I've met you there.
11                  I just -- so I wasn't being caustic.  I
12     just wanted to make sure.
13                  Here's a roadmap for the three ways that I
14     want to cross-examine you.
15                  The first is I want to talk about some
16     things that are missing, both as to you as an individual
17     in your testimony and as to you in your analysis and as
18     to you in your report.
19                  Okay.
20                  And after we do that -- and hopefully we'll
21     get through that this afternoon.  After we do that, I've
22     got a stop I'm calling restoration.
23                  That's where I want to look at the opinions
24     of my experts that you've criticized and see if I can't
25     restore some of their reputation, if you will.
```

1            And then the last thing I want to do is I

2     want to just do some testing of your model and see if

3     your model will sink or float.  All right?

4            So with that, let's start with what's

16:56:27 5     missing.

6            And what I've tried to do is divide this

7     stop up a little bit and just ask some very simple

8     questions that I think in expediency of time may make it

9     go a lot quicker.

16:56:42 10           Let me give these supplies to the folks

11     over there.

12           All right.  Question number one.  Do you

13     have an abatement plan?

14     A.    No.

16:57:02 15     Q.    Do you express an opinion on the plaintiffs'

16     abatement plan?

17     A.    Do you mean like on the necessity or sufficiency

18     or --

19     Q.    The various elements of what they want to use to

16:57:19 20     abate.

21     A.    No.

22     Q.    Next, let's do the numbers questions next.

23           Do you have any epidemiology degrees at

24     all?

16:57:42 25     A.    No.

1    Q.    Do you have any opioid EPI publications?

2    A.    No.

3    Q.    Did you try to do an EPI study in this case to

4    determine numbers?

16:58:04  5    A.    Well, I guess I don't think of a study as an EPI

6    study or a non-EPI study.

7              I mean, I think that epidemiologists,

8    economic epidemiologists like that were working on the

9    issues that we are today and health economists are really

16:58:25 10    doing the same thing, are really trying to reach the same

11    goal.

12    Q.    I'm sorry, sir.

13              Is that a yes or a no?  Did you try to do

14    an epidemiological study in this case?

16:58:37 15    A.    I guess I don't -- I'm not sure what a --

16    Q.    You don't know what one is?

17    A.    Yeah, I -- I can't really answer that.

18    Q.    All right.

19              So let's just say don't know what one is.

16:58:47 20              I want to talk briefly about what may be

21    missing from your allocation model before we go into

22    tomorrow.

23              Okay.

24              Now, you know by allocation model, I'm

16:59:07 25    talking about what you did at the end of your examination

Kessler - Cross/Lanier                          1009

          1    where you parcelled it out.

          2                 All right?

          3                 First of all, has your model ever been

          4    peer-reviewed, your three-step method to allocate

16:59:29  5    responsibility and damage?

          6    A.   Well, this -- this particular application of this

          7    method has not been peer-reviewed.

          8                 I prepared it for an expert report.  But

          9    the general approach is something that's been around for

16:59:49 10    a long time.

         11    Q.   We'll talk about the general approach.

         12                 I'm talking about what you call your

         13    three-step model.

         14                 Your three-step model to allocate

17:00:02 15    responsibility in a public nuisance case, has it ever

         16    been peer-reviewed?

         17    A.   Yeah, I -- I just -- I just don't know because

         18    there have been peer-reviewed papers written on this

         19    general topic, but I --

17:00:21 20    Q.   That use your three-step --

         21                 MR. MAJORAS:  Your Honor, if the witness

         22    may finish his answers.

         23                 THE COURT:  Hold it.

         24                 I think it's a specific question as to

17:00:29 25    whether, Doctor, your regression analysis, three-step

1    model, whichever way you want to refer to it, that that

2    came up with this -- you know, I'm just looking at

3    Page 17, the .176 percent, the .445 percent, et cetera,

4    whether that's been peer-reviewed.

17:00:52  5              I think that was the question.  Right,

6    Mr. Lanier?

7              MR. LANIER:  That's it.  That's exactly

8    right.

9    BY MR. LANIER:

17:00:56 10   Q.    My three-step model allocating costs to defendants

11   proportional to their behavior, has that ever been

12   peer-reviewed?

13   A.    The general approach here is common in economics.

14              This particular model with these particular

17:01:19 15   data and coefficients have not been peer-reviewed.

16   Q.    Is your model of allocating costs to defendants

17   proportional to red flagged prescriptions, has that

18   model -- is that model based on published science?

19   A.    Yes.

17:01:47 20              The use of regressions to apportion

21   variation in harm to different factors is based on

22   published science.

23   Q.    So if I look in your expert report, I'm going to

24   see some scientific references for your method.

17:02:08 25              Is that what you're telling us?

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    Aside from the Pindyck, or what's the name of your |
| 3 | Professor you had at MIT? |
| 4 | You cited his second edition textbook from |
| 17:02:19  5 | 1980 for what a regression analysis is. |
| 6 | Aside from that, will I find anything in |
| 7 | there that says in an opioid situation, this is an |
| 8 | appropriate method to calculate? |
| 9 | A.    Yes. |
| 17:02:35  10 | Q.    Okay. |
| 11 | What science sources, so I can pull them |
| 12 | tonight, please? |
| 13 | A.    They're -- they're in my report. |
| 14 | Q.    Yes, sir. |
| 17:02:44  15 | Will you please signal where? |
| 16 | You've got your report in front of you. |
| 17 | A.    So papers that, if you look at Footnote 58 in my |
| 18 | report. |
| 19 | Q.    All right.  Let's go to your report. |
| 17:03:19  20 | "Abatement costs can be allocated between |
| 21 | defendants and other factors, with a three-step process." |
| 22 | This is on Page 23 starting with |
| 23 | Paragraph 56. |
| 24 | Do you see that? |
| 17:03:30  25 | A.    Yes. |

          1   Q.    All right.

          2              Then here in 57, you start detailing what

          3   you do.

          4              "I use a three-step process to allocate the

17:03:41  5   costs to defendants' challenged conduct versus other

          6   factors."

          7              Do you see that?

          8   A.    Yes.

          9   Q.    No footnote yet, right?

17:03:50 10   A.    Well, I apologize, I was responding to your

         11   question about the use of regression analysis.

         12   Q.    No, sir, I did not say regression analysis.

         13              You did.

         14              My question to you is -- let's just be

17:04:04 15   clear -- this three-step process to allocate the costs to

         16   defendants' challenged conduct versus other factors, you

         17   don't give a citation to any scientific publication that

         18   supports this three-step process, do you?

         19   A.    Well, I was responding to your question about the

17:04:29 20   model, which I understood to mean the regression model.

         21              And for that, I would direct you to the

         22   studies in Footnote 58.

         23   Q.    Okay.

         24              Well, Footnote 58 is -- let's take this a

17:04:52 25   step at a time.

```
  1              The three-step process --

  2    A.    Yes.

  3    Q.    -- that you used, that's my first question.  Your

  4    three-step process -- we'll go to Footnote 58 in a

  5    minute.

  6    A.    Yes.

  7    Q.    But you use a three-step process to allocate the

  8    costs.

  9              Is that based on published science, the

 10    three-step process, or did you invent it here?

 11    A.    There's -- there's -- this is not a mysterious

 12    thing.

 13              All this is, is a regression which follows

 14    what other people in the literature have done, if you

 15    look at the studies in Footnote 58.

 16              Then it just takes the coefficients from

 17    that regression and plugs in the conduct that plaintiffs

 18    are challenging as improper.

 19              It is a -- it's just an arithmetic

 20    calculation.

 21              There is no -- there's no mystery here.

 22    Q.    Okay.

 23              So we'll look tonight at -- I'll pull these

 24    articles on Footnote 58, and these are going to tell us

 25    to use the three-step process to evaluate and allocate
```

1    costs to defendants' challenged conduct?

2    A.    No, they won't.

3    Q.    Okay.

4    A.    They won't.

17:06:08  5    Q.    Then please answer my question.

6              MR. MAJORAS:  Objection.  Objection, Your

7    Honor.

8              He's answered the question.

9              THE COURT:  Overruled.  Overruled.

17:06:13 10    A.    There's nothing --

11    BY MR. LANIER:

12    Q.    Here's the question, sir.

13              Do you have a scientific basis that is

14    published science that supports and uses your three-step

17:06:29 15    process to allocate costs to challenged conduct?

16              Do you?

17    A.    All the three-step process is, is taking output

18    from a regression model and multiplying it by a number.

19              There is -- no one would think to write a

17:06:51 20    peer-reviewed article about that because it's -- it's a

21    trivial result of what a regression is meant to do.

22    Q.    With due respect, this is not a trivial case and

23    this is not a trivial result that you have suggested to

24    the Court.

17:07:07 25              Do you believe it to be?

Kessler - Cross/Lanier                    1015

1    A.    Certainly not.

2    Q.    Thank you.

3                We'll come back to this tomorrow.  We'll

4    pull those articles and see if they are.

17:07:15  5                You understand the Judge is the gatekeeper

6    for what's legitimate science and what's junk science,

7    right?

8    A.    I do understand.

9    Q.    Has your model been tested; specifically your model

17:07:28 10    that you're using, this three-step process, has it been

11    tested?

12    A.    The -- it's -- this isn't my three-step process.

13                I mean, this is merely running a

14    regression, taking -- taking the output from the

17:07:50 15    regression and multiplying it by a variable to get a

16    predicted value.

17    Q.    Sir, you say in your report, you say in your

18    slides, you've said in your testimony it's my three-step

19    model.

17:08:07 20                I'm going back to that and I'm asking you

21    has your three-step model been tested?

22                Did you test it in this case?

23    A.    Yes.  I tested it in the manner that I mentioned

24    when we discussed it before.

17:08:27 25    Q.    So the Court's heard all of your testimony on how

1   you tested your model to see if it's coming to an

2   appropriate conclusion?

3   A.    Yes.

4   Q.    All right.

17:08:37   5              Does your model have a known or potential

6   error rate?

7   A.    I don't understand the question.

8   Q.    Well, you know what a potential error rate is

9   because you've already talked about statistical

17:08:54  10   significance, haven't you?

11   A.    Yes.

12   Q.    And you know what a P value is, don't you?

13   A.    Yes.

14   Q.    And you know what a range is, don't you?

17:09:03  15   A.    Yes.

16   Q.    But you gave precise figures of how much you

17   believe, based upon your three-step model, is owed by

18   these defendants.

19              And my question to you, sir, is do you have

17:09:18  20   any known or potential error rate that you are assigning

21   to that?

22              MR. MAJORAS:  Objection.  Misstates

23   testimony.

24              THE COURT:  Overruled.

17:09:29  25   A.    You -- I could calculate a confidence interval

1    around my estimates.

2                    I did not do so, but I could certainly do

3    so.

4    BY MR. LANIER:

17:09:48 5    Q.    Does any group --

6    A.    Well, excuse me.  I didn't -- that's not an

7    accurate reflection of what I said.

8    Q.    Okay.  I thought you said -- let's be exactly

9    right.

17:09:59 10    A.    Yes.

11    Q.    I thought you said "I could"?

12    A.    Calculate a confidence interval, yes.

13    Q.    Right.  That is calculating a known or potential

14    error rate.

17:10:10 15    A.    No.

16    Q.    A confidence interval --

17                    THE COURT:  Hold it.  Let --

18    A.    No.

19                    THE COURT:  What's the difference?

17:10:17 20                    THE WITNESS:  The difference -- this is not

21    an error rate in my model.

22                    This is a confidence interval around the

23    estimate.

24    BY MR. LANIER:

17:10:27 25    Q.    All right.  That's -- hey, that's what the

1    terminology means of a known or potential error rate.

              In other words, I'm 95 percent confident

2

3    that between this range and this range lies the answer,

4    and that both ranges make it statistically significant.

17:10:46  5           Do you understand?  That's basic

6    statistics, right?

7    A.    Yeah, that -- that's not how I would describe it.

8    Q.    All right.

9              So if that's the way the Courts interpret

17:10:59 10   it under *Daubert* and under epidemiology, you're just not

11   an epidemiologist, and you don't describe it that way?

12             Is that fair?

13   A.    Yeah.

14             I mean the way I would describe it is the

17:11:13 15  way I described it, which is that the confidence interval

16   around my estimates could be calculated based on the

17   standard errors of the regression coefficients.

18   Q.    Okay.  But here's the reason the Judge's question

19   is on the center of the nail.

17:11:31 20            I asked you does your model have a known or

21   potential error rate.

22             Your answer was, "I could do a confidence

23   interval but didn't."

24   A.    Yes.

17:11:42 25  Q.    And so the question is what's the difference

             1   between doing a confidence interval and having a known or

             2   potential error rate?

             3                You're saying they're different.  Well,

             4   then, answer my question.

17:11:55     5                Does your model have a known or potential

             6   error rate?

             7                You haven't answered it, if you think your

             8   answer is different.

             9   A.   I guess I just don't understand what you mean by

17:12:06    10   "Error rate."

            11   Q.   Okay.  I mean it in the epidemiological sense.

            12                You know what a confidence interval is?

            13   A.   Yes.

            14   Q.   And do you know what a P value is when you

17:12:17    15   determine a confidence interval?

            16   A.   Yes.

            17   Q.   And you know what a .05 P value indicates on a

            18   confidence interval?

            19   A.   Yes, I do.

17:12:25    20   Q.   It indicates a potential error rate of five out of

            21   a hundred; you are 95 percent confident the answer lies

            22   within a range.

            23                But there's a five percent chance it's

            24   outside the range.

17:12:40    25                That's all a confidence interval is, isn't

1    it?

2                    MR. MAJORAS:  Objection.

3                    Is this a question or testimony, Your

4    Honor?

17:12:46 5                    THE COURT:  That was a question.

6                    So overruled.

7    A.    What a confidence interval is, is that if you were

8    to take a new sample from the same population a hundred

9    times, then 95 times out of a hundred, the estimate that

17:13:11 10    you obtained in the sample that you obtained would lie

11    within those bounds.

12                    That is the definition of a confidence

13    interval.

14    BY MR. LANIER:

17:13:24 15    Q.    Does any group supply standards that govern your

16    three-step model of allocating fault and responsibility?

17    A.    I -- I don't understand at all.

18                    What sort of group?

19    Q.    Has the scientific community given widespread

17:13:55 20    acceptance to your three-step model of allocating

21    responsibility?

22    A.    All -- yes.

23    Q.    Where?

24    A.    If you look -- the reference manual on scientific

17:14:13 25    evidence talks about the use of regressions to apportion

1    variation among different factors, and then combined with

2    the use of Dr. McCann's flags, I am offering the opinion

3    that it is the portion of variation and mortality

4    associated with those flagged dispenses that form the

5    basis for allocating responsibility to defendants.

6    Q.    Well, we'll get into this more tomorrow, but just

7    for tonight I want to make sure that I pull everything I

8    need to pull.

9               So your three-step process, you've got this

10   Footnote 58 that talks about U.S. drug-related mortality

11   rates, that talks about using census data to understand

12   county-level differences in drug mortality and

13   opioid-related mortality.  And you've got the

14   implications of county-level variation in U.S. opioid

15   distribution.

16              Correct?

17   A.    Yes.

18              These pertain to my --

19   Q.    Sir --

20   A.    Oh, sorry.  I apologize.

21   Q.    -- this has to be Q and A now.

22              And those are the only citations you give

23   in this entire section of your three-step process, except

24   for the Pindyck book where you quoted from or referenced

25   the 1980 edition, which I guess was when you were in

1     school there, is that right?

2     A.    Well, that's the one I have on my bookshelf.

3     Q.    Yeah, that was one of your textbooks, I bet, wasn't

4     it?

17:16:15  5          I mean, Robert Pindyck, didn't you have

6     him?

7     A.    I don't recall.

8     Q.    Okay.

9          So other than the fact that you referenced

17:16:24  10    that to talk about what I'm going to assume is regression

11    analysis, that's the only citation you give anywhere in

12    the scientific community to justify all of this,

13    including you multiplying the estimates from Step 1,

14    using MMEs instead of pill count, multiplying the share

17:16:48  15    of opioid-related mortality allocable.  None of this has

16    any footnote to any science that's ever been published,

17    does it?

18    A.    Well, that's not quite accurate.

19          I mean, I also -- we glossed over a

17:17:04  20    citation to Professor Alexander's report, I believe.

21    Q.    Okay.  So you're using him as your science for

22    this?

23    A.    I'm using his use of mortality to apportion harm.

24    Yes.  That's Footnote 59.

17:17:23  25    Q.    All right.

1       So other than the fact that you consider

2   Professor Alexander to be an expert in this case that you

3   would look to for science, you have no other science,

4   other than that Footnote 58 to reference us to today?

17:17:39  5       Is that fair?

6       MR. MAJORAS:  Objection.  That misstates

7   his testimony.

8       THE COURT:  Overruled.

9   A.    That's not my opinion.

17:17:44 10       What I'm doing is simply running a

11   regression to apportion variance and mortality, and then

12   applying plaintiffs' estimates of defendants' challenged

13   conduct with those regression coefficients.

14       This is a standard way that economists

17:18:08 15   apportion harm to different sources in a matter such as

16   this.

17       I cannot provide you with a citation just

18   sitting here today to support that, though.

19   Q.    All right.

17:18:24 20       We'll pick back up with that part tomorrow

21   but I've got about 10 minutes left of His Honor's time,

22   and I'd like to talk to you about one more thing that

23   seems missing in case there's some homework you want to

24   do on it tonight as well.

17:18:39 25       All right?

1      This is the article that you referenced,

2  this being Walmart 01486, "The Effects of Medicare

3  Advantage on Opioid Use."

4      This is your opioid article, right?

17:18:52  5  A.   It's one of them.

6  Q.   One of two, correct?

7  A.   Yes.

8  Q.   And we'll get to the fact that you never started

9  writing opioid articles until after you'd been hired by

17:19:02 10  the opioid industry.

11      That's true, too, isn't it?

12  A.   No.

13  Q.   Well, sir, when is your first opioid article?

14  A.   When was it published or when was it started?

17:19:13 15  Q.   Either.

16  A.   This paper was started before I began working for

17  Walmart.

18  Q.   That wasn't my question.

19      You just changed the answer artfully.

17:19:26 20      I said you have done no opioid work

21  before -- published work before you got retained by the

22  opioid industry.

23      That was my question.

24      MR. MAJORAS:  Objection, Your Honor, to the

17:19:38 25  term, "Opioid industry."

1    THE COURT:  If you want to use another

2    term, fine.

3    BY MR. LANIER:

4    Q.    Purdue, 2016.  How is that?  $40,000.

17:19:54  5    A.    I think it was 30,000.

6    Q.    Well, I've got it here.

7              We'll look at it.

8    A.    But I don't know.

9    Q.    Plaintiffs' 49023, that looks like 40,000 to me.

17:20:10  10              How about you?

11    A.    Okay.

12    Q.    And that is to Daniel P. Kessler?

13    A.    You're right.

14    Q.    Paul Coplan, you remember him at Purdue?

17:20:21  15    A.    You're correct.

16    Q.    So now let's go back to where I started this, which

17    I said you never had started or published anything

18    related to opioids until after you had been hired by

19    the -- I said opioid industry -- I'll change it to the

17:20:39  20    largest manufacturer of opioids in the history of the

21    United States, Purdue Pharma.

22              True?

23    A.    Yes.  You are correct.

24    Q.    All right.

17:20:50  25              So now, after you'd been hired by Purdue

1        Pharma, you go to work on opioid publications and you've

2        got two to your name?

3                   Is that fair?

4        A.    Yes.

17:21:07  5    Q.    And if we look at this one, you have to disclose

6        any conflicts of interest you might have, don't you?

7        A.    Yes.

8        Q.    And you failed to disclose your work for Purdue

9        Pharma, didn't you?

17:21:30 10    A.    That work was completed before this article

11       was -- the research here was started.

12       Q.    That wasn't my question, sir.

13                  My question was you failed to disclose that

14       you had received money as a consultant who you sought to

17:21:49 15    do research for Purdue Pharma, you didn't make that

16       disclosure, did you?

17       A.    The requirements of disclosure in this context are

18       for payments that you received when the research was

19       conducted.

17:22:11 20                 And as I did disclose in this article, I

21       had received payments in this matter when this research

22       was going on.

23       Q.    I'm going to give you CT-311-DEMO-10.

24                  I'll put it up here.  This is the online

17:22:32 25    disclosure you used in this case, along with that of your

Kessler - Cross/Lanier                                1027

1    co-authors, Baker and Bundorf.

                 Do you see this?

3    A.    Yes.

4    Q.    And in the acknowledgements and disclosures,

5    sir --

6    A.    Yes.

7    Q.    -- it doesn't say people are currently serving.

8                 Mr. Baker talks about where he has, past

9    tense, served as a consultant to Kaiser, to Blue Shield;

10   that he's received, past tense, consulting fees from

11   other insurers, hospitals, integrated delivery systems,

12   and other makers and providers of medical products and

13   services.

14                Do you see that?

15   A.    Yes.

16   Q.    Now, Ms. Bundorf says that she's received, past

17   tense, consulting fees from AON, St. Joe's, Quinn

18   Emanuel -- by the way, did you know that they were the

19   law firm that represented Purdue Pharma in this case?

20   A.    No.

21   Q.    She has received, past tense, research support from

22   others.  And then we get to you.

23                Do you see that?

24   A.    Yes.

25   Q.    Now, you say you have, past tense, received

Kessler - Cross/Lanier                    1028

 1    speaking and consulting fees from insurers, integrated

 2    delivery systems, and other providers of medical products

 3    and services.

 4              You don't list makers, do you?

17:24:23  5    A.    No.

 6    Q.    You don't mention that you're working for a law

 7    firm in litigation, or was that before the litigation

 8    started?

 9    A.    I -- I can't remember.

17:24:42 10    Q.    Do you not remember when you first got retained in

11    this case or had the first conversation?

12    A.    I guess my first conversation was in June of 2018.

13    Q.    June of 2018.  And yet this is published in 2019?

14    A.    Yes.

17:25:08 15    Q.    So you failed to disclose the conversation?

16    A.    No.  No.

17              If you look at the published article, it

18    has the disclosure in it.

19    Q.    The published article is published in its final

17:25:21 20    form March of 2020.  And you were first visited about the

21    case in 2017.  Is that true?

22    A.    I think 2018.

23    Q.    So now 2018?

24    A.    Yes.  I think it was --

17:25:38 25    Q.    2018, that's what you had said.

1    A.    Yes.

2    Q.    June of 2018.

3    A.    Yes.

4    Q.    And you are engaged and still working today in

17:25:49  5    2022, right?

6    A.    Yes.

7    Q.    But for some reason, you did not deem this to be a

8    conflict that needed disclosure when you published?

9    A.    No.  No.  It -- the disclosure is in the published

17:26:02 10    article.

11              It's there.  You're mixing two, two --

12              THE COURT:  Where is it in the article?

13              THE WITNESS:  At the bottom.  Go to the

14    bottom of the article.

17:26:13 15    BY MR. LANIER:

16    Q.    The bottom of the article, sir, doesn't give you

17    that.

18    A.    Oh, it's in there.  I know it is.

19    Q.    No, it references you to --

17:26:22 20              THE COURT:  Well, let's let the doctor

21    point it out.

22              He wrote the article.

23              THE WITNESS:  I don't have a copy -- I

24    don't have a copy of the document.

17:26:29 25              MR. LANIER:  It was in the booklet that you

Kessler - Cross/Lanier

1030

1    were provided, I believe, by the other side.

2                    May I approach, Your Honor?  I apologize

3    for walking up.

4                    THE COURT:  That's all right.  If the

17:26:36  5    doctor said it's there, he wrote it, he's in a better

6    position to find it than --

7    BY MR. LANIER:

8    Q.    Tell us where it is, please.

9    A.    Somehow this version that you have has it stripped

17:26:48 10    out of it.

11                    I'll give you -- I'll give you the copy of

12    the article from the journal that has the disclosure.

13                    I don't know how this doesn't have it.

14    Q.    It's got -- the answer to that, sir, is it's got a

17:27:05 15    link --

16    A.    No.

17    Q.    -- from the article to this --

18    A.    This is -- this is just totally incorrect.

19                    THE COURT:  All right.  Well, look, Doctor.

17:27:18 20    Overnight, if you -- if this is somehow an incorrect

21    version, if you can find the correct one --

22                    THE WITNESS:  Yeah, that's fine.

23                    THE COURT:  That's fine.

24                    THE WITNESS:  I'll bring it in.

17:27:29 25                    THE COURT:  Of course.

1          MR. LANIER:  And we'll see the disclosure

2   there and see if it's the same I've referenced or not.

3          Your Honor, then this would be a fine place

4   to stop for the evening.

17:27:37  5          THE COURT:  Okay.  Good.

6          MR. LANIER:  I'm also good to keep going.

7          THE COURT:  No, I think, candidly, we have

8   diminishing returns.

9          I think 5:30 is long enough with a jury or

17:27:50 10  without.  Unless we could get someone who is out of town

11  off with a little longer, I'm going do it for their

12  consideration.

13          So we will break for the evening.

14          We'll see you tomorrow, Doctor.  And, let's

17:28:03 15  see.  Tomorrow, we might as well start at 8:30 tomorrow.

16          MR. LANIER:  Okay.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  If counsel wanted to quick take

19  up exhibits really fast -- if it's going to be long, -I

17:28:21 20  don't think it would be too long.  I can deal with them

21  now.

22          You can be excused, Doctor.

23          THE WITNESS:  Thank you.

24          THE COURT:  You're not necessary for the

17:28:28 25  exhibits.

```
 1              That's between me and the lawyers.

 2                   THE WITNESS:  Thank you.

 3                   THE COURT:  So I think at the end of

 4    Mr. Bialecki's testimony, Mr. Hynes listed the exhibits.

 5    I just have to find my spot.

 6                   MR. HYNES:  That's correct, Your Honor.

 7                   THE COURT:  I'll find them because I wrote

 8    them down carefully.

 9                   MR. HYNES:  If you'd like me to go through

10    them, I can.

11                   THE COURT:  No, I'm going to -- okay.  I've

12    got them.

13              All right.  I've got the list.  I assume

14    the plaintiffs have it.

15              Is there any objection to any of these?

16                   MR. WEINBERGER:  No objection.

17                   THE COURT:  Okay.  So just so it's clear,

18    these are the ones that come in without objection.

19              05019, 05020, 05021, 05022, 05023, 05024,

20    25, and 26.

21              And then we had the spreadsheets 14853,

22    14337.

23              And then there were financial statements

24    for the two counties for years 2019 and '20.  So that's

25    14968 and 14940, 14944, and 14928.
```

```
 1            MR. HYNES:  That is correct.

 2            THE COURT:  All right.

 3            Were there any exhibits that the plaintiffs

 4   wanted to offer with Mr. Bialecki?

 5            MR. WEINBERGER:  Yes.  His billing

 6   statements, P 4888.

 7            THE COURT:  Wait.  Let me just go --

 8            MR. WEINBERGER:  To P 4895.

 9            THE COURT:  What were those again, Peter?

10            MR. WEINBERGER:  I'm sorry?

11            THE COURT:  Let me have those again.

12            MR. WEINBERGER:  4888 to 4895.

13            THE COURT:  Any objection to those?

14            MR. HYNES:  No objection, Your Honor.

15            THE COURT:  Okay.  They're in without

16   objection.

17            Okay.  And then we'll take up Dr. Kessler's

18   exhibits tomorrow.

19            Okay.  Have a good evening.

20            MR. HYNES:  Thank you, Your Honor.

21            MR. WEINBERGER:  Thank you, Judge.

22            THE COURT:  Oh, I guess I should do the

23   time.

24            I had four-and-a-half hours for the

25   defendants, and 1.75 for the plaintiffs.
```

1            (Proceedings concluded at 5:31 p.m.)

2                 -   -   -   -

3            C E R T I F I C A T E

4             I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11   **/s/Susan Trischan**
      /S/ Susan Trischan, Official Court Reporter
12   Certified Realtime Reporter

13   7-189 U.S. Court House
      801 West Superior Avenue
14   Cleveland, Ohio 44113
      (216) 357-7087
15

16

17

18

19

20

21

22

23

24

25

1035

```
 1                         I N D E X

 2

 3    WITNESSES:                                      PAGE

 4     DIRECT EXAMINATION OF MATTHEW BIALECKI           742

 5     BY MR. HYNES

 6     CROSS-EXAMINATION OF MATTHEW BIALECKI            837

 7     BY MR. WEINBERGER

 8     CROSS-EXAMINATION OF MATTHEW BIALECKI (RESUMED)  858

 9     BY MR. WEINBERGER

10     REDIRECT EXAMINATION OF MATTHEW BIALECKI         890

11     BY MR. HYNES

12     DIRECT EXAMINATION OF DANIEL KESSLER             893

13     BY MR. MAJORAS

14     CROSS-EXAMINATION OF DANIEL KESSLER             1006

15     BY MR. LANIER

16

17                         *  *  *  *  *

18

19

20

21

22

23

24

25
```