1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
                   CLEVELAND, OHIO
3

4
     -----------------------------X
5   **IN RE:**              :  Case No. 1:17-md-2804
                     :
6   NATIONAL PRESCRIPTION    :
   OPIATE LITIGATION       :
7                     :  **VOLUME 6**
   TRACK THREE CASES       :
8                     :  *(Pages 1308 - 1342)*
       *1:18-op-45032*     :
9       *1:18-op-45079*     :
                     :  Wednesday, May 18, 2022
10                   :
     -----------------------------X
11

12

13     TRANSCRIPT OF PHASE II ABATEMENT BENCH TRIAL PROCEEDINGS

14       HELD BEFORE THE HONORABLE DAN AARON POLSTER

15         SENIOR UNITED STATES DISTRICT JUDGE

16

17

18

19

20   Official Court Reporter:  Gregory S. Mizanin, RDR, CRR
                        United States District Court
21                       Northern District of Ohio
                        801 West Superior Avenue
22                       Court Reporters 7-189
                        Cleveland, Ohio 44113
23                        Gregory_Mizanin@ohnd.uscourts.gov

24
   Proceedings recorded by mechanical stenography.
25   Transcript produced with computer-aided transcription.

1    **APPEARANCES:**

2    For the Plaintiffs:          **Peter H. Weinberger, Esquire**
                                  SPANGENBERG SHIBLEY & LIBER LLP
3                                 1001 Lakeside Avenue East
                                  Suite 1700
4                                 Cleveland, Ohio 44114

5
                                  **W. Mark Lanier, Esquire**
6                                 THE LANIER LAW FIRM
                                  10940 W. Sam Houston Parkway N
7                                 Suite 100
                                  Houston, Texas 77064

8

9                                 **Frank L. Gallucci, III, Esquire**
                                  PLEVIN & GALLUCCI COMPANY, L.P.A.
10                                55 Public Square
                                  Suite 2222
11                                Cleveland, Ohio 44113

12
                                  **Salvatore C. Badala, Esquire**
13                                NAPOLI SHKOLNIK PLLC
                                  400 Broadhollow Road
14                                Suite 305
                                  Melville, New York 11747

15

16                                **Maria Fleming, Esquire**
                                  NAPOLI SHKOLNIK PLLC
17                                1500 W. 3rd Street
                                  Suite 510
18                                Cleveland, Ohio 44113

19

20                                **Laura S. Fitzpatrick, Esquire**
                                  SIMMONS HANLY CONROY
                                  112 Madison Avenue
21                                7th Floor
                                  New York, New York 10016

22

23

24

25

```
 1    APPEARANCES (Continued):

 2    For Defendant CVS:        Eric R. Delinsky, Esquire
                                Alexandra W. Miller, Esquire
 3                              Paul B. Hynes, Jr., Esquire
                                Anthony M. Ruiz, Esquire
 4                              ZUCKERMAN SPAEDER LLP
                                1800 M Street NW
 5                              Suite 1000
                                Washington, DC 20036
 6

 7
       For Defendant Walgreens:  Jeffrey A. Hall, Esquire
 8                               BARTLIT BECK LLP
                                 54 West Hubbard Street
 9                               Chicago, Illinois 60654

10
                                 Katherine L.I. Hacker, Esquire
11                               BARTLIT BECK LLP
                                 1801 Wewatta Street
12                               Suite 1200
                                 Denver, Colorado 80202
13

14
       For Defendant Walmart:    Tara A. Fumerton, Esquire
15                               Jason Z. Zhou, Esquire
                                 JONES DAY
16                               110 North Wacker Drive
                                 Suite 4800
17                               Chicago, Illinois 60606

18

19    ALSO PRESENT:             David Cohen, Special Master

20
                                    - - -
21

22

23

24

25
```

```
 1                    WEDNESDAY, MAY 18, 2022

 2                          -  -  -

 3            (Proceedings commenced at 9:04 a.m.)

 4                          -  -  -

 5            THE COURT:  Good morning.  How are you all

 6    doing?

 7        Okay.  I guess we need to take care of any exhibits

 8    from yesterday.  I guess we should start with the defendants

 9    because they were your witnesses.

10            MS. FUMERTON:  Your Honor, Tara Fumerton.

11        For Dr. Kessler, we showed these to plaintiffs

12    already, and I believe they don't have any objection, but

13    they can obviously say if they do.

14        The first, the WMT-MDL-01612.  That's Dr. Kessler's

15    CV.

16            THE COURT:  Any objection?

17            MR. WEINBERGER:  No objection.

18            THE COURT:  Okay.

19            MS. FUMERTON:  The next one is WMT-Demo-002,

20    and that's the slide deck that has the summary of his

21    opinions and charts.

22            THE COURT:  Any objection to those?

23            MR. WEINBERGER:  No objection.

24            THE COURT:  Thank you.

25            MS. FUMERTON:  The next one is WMT-MDL-01614,
```

1      and that's the Larney figure 7.21 and the eAppendix that

2      Dr. Kessler created.

3                    MR. WEINBERGER:  No objection.

4                    THE COURT:  Okay.  That's in.

5                    MS. FUMERTON:  And the last one is

6      WMT-MDL-01612, which is Dr. Kessler's expert report, but

7      we're just seeking to admit Appendix E, which is at pages 59

8      through 66.

9                    MR. WEINBERGER:  Those are the regression --

10                   MS. FUMERTON:  The regression.

11                   MR. WEINBERGER:  -- calculations?

12          No objection.

13                   THE COURT:  Ms. Fumerton, what was the full

14     number for the slide deck?

15                   MS. FUMERTON:  It was Demo 002.

16                   THE COURT:  All right.  Thank you.

17          Are plaintiffs seeking to admit anything with respect

18     to exhibits?

19                   MR. WEINBERGER:  P4900.  Your Honor, that's

20     the Trumbull County Mental Health and Recovery Board -- I

21     think it's a three- or four-page document.  It charts, among

22     other things, the OUD patients.

23                   THE COURT:  Any objection to that?

24                   MS. FUMERTON:  No objection.

25                   THE COURT:  Thank you.

1      MR. WEINBERGER:  P4902 and 4904, which are the

2   two Purdue checks written to Dr. Kessler.

3      MS. FUMERTON:  So can we see a copy of that,

4   because I don't think -- that's not what ours are showing

5   for the numbers.

6      THE COURT:  Let's make sure we get the numbers

7   right.  The checks should come in, but if they're different

8   numbers, we need to clarify that.

9      MS. FUMERTON:  Yeah, because I have P4902 as

10   something different.

11      MR. WEINBERGER:  We'll figure it out.

12      MS. FUMERTON:  And, Your Honor, the only other

13   thing is I think we might be objecting to those, depending

14   on which documents they are, because one of those are not

15   actually a check as described and not something that Dr.

16   Kessler had recognized, but I need to see the documents

17   before I can assert my objections.

18      MR. WEINBERGER:  It's -- one's a check

19   request, and one is a check, but we'll show you the

20   documents.

21      THE COURT:  The point is he acknowledged the

22   money came.  So that's all.  So they --

23      MS. FUMERTON:  Well, yes, Your Honor.  It's so

24   hard to do this in the abstract because I'm sort of arguing

25   against documents I'm not seeing right now, but we would

1   object based on the fact that I don't think that the request

2   was something that he was copied on and, in fact, was not

3   something that he recalled as to -- and was different --

4                THE COURT:  Well, overruled.  He acknowledged

5   getting money from Purdue in 2016 and 2017, so this is the

6   evidence of it, so it will come in over objection, but I

7   want to have the right number.

8                MS. FUMERTON:  Well -- okay.  Your Honor, can

9   we just reserve a final ruling on that until we --

10               THE COURT:  Well, I'm ruling that they're in.

11  I saw the checks.  I mean, I'll go back and see what my

12  notes say, and I hope I wrote down the number.

13       Can someone find these so we can see what they are?

14               MS. FITZPATRICK:  Yes, Your Honor.

15       According to my notes --

16       Laura Fitzpatrick.

17       I'm looking --

18               THE COURT:  I have 4904, which was another

19  13,600 in May of 2017, so those --

20               MS. FITZPATRICK:  And P4902, Your Honor, is

21  the $40,000 check request to Dr. Kessler.  That's P4902.

22  But we're printing out copies now for defendants so they can

23  confirm.

24               THE COURT:  4902 is the $40,000 --

25               MS. FUMERTON:  Your Honor, if you have a copy

1    of that -- thank you.

2         I don't believe that that's the -- not a check -- Your

3    Honor, that's the one that he did not recall seeing.  And,

4    in fact, that's different than the amount that he ultimately

5    testified that he recalled receiving from them.  That's why

6    we have a little bit of --

7              THE COURT:  Well, my notes say he recalled

8    getting $40,000 and then he got some more the next year.

9              MS. FUMERTON:  Your Honor, that's actually not

10   what he testified to.  He testified that he received --

11             (Court Reporter interjection.)

12             MS. FUMERTON:  He testified that he thought he

13   received about 30,000 from them, and Mr. Lanier showed them

14   this document, which is an internal Purdue document.  He's

15   not on it.  And he said, well, that's not -- you know, if

16   you say it's 40, I suppose.

17        But this is not a check.  That is actually --

18             THE COURT:  Let's put in the contract, all

19   right?  Let's put the contract in, which he acknowledged.

20             MS. FUMERTON:  So I don't believe there is a

21   contract.

22             THE COURT:  Yes, there is.  I saw it and it

23   was --

24             MR. WEINBERGER:  Contract is 4901.

25             THE COURT:  Let's put in 4901 and forget the

1    checks because that has an amount that was a certain amount

2    of hours.  I think $800 an hour, up to $40,000.  Let's put

3    in the contract.

4              MS. FUMERTON:  Your Honor, also this is

5    unsigned.

6              THE COURT:  It went in.  He said this was his

7    contract.  So forget the checks.  We'll put in the contract.

8              MS. FUMERTON:  So 4901 then is the only one

9    that will go in?

10              THE COURT:  Let's put in 4901.  We got his

11    testimony and we got the contract --

12              MS. FUMERTON:  Okay.  Thank you, Your Honor.

13              MR. WEINBERGER:  Your Honor, for the record,

14    we -- the plaintiffs are in agreement with that

15    modification.

16              THE COURT:  Thank you.

17              MR. WEINBERGER:  And then the final one, Your

18    Honor, is 4905, which is the Kessler regression model

19    calculations, which is a repeat of one of the documents that

20    Walmart has; however, it contains the red circles that were

21    made with the witness that reflects those parts of the

22    calculation that were not significant.

23         So when Mr. Lanier was cross-examining the witness, we

24    made a separate exhibit that showed those elements of the

25    calculation that were not significant, not statistically

1   significant.

2              THE COURT:  Any objection to that?

3              MS. FUMERTON:  No, Your Honor.

4              THE COURT:  4905 may come in.

5         Okay.  That takes care of everything from both sides

6   on Dr. Kessler.

7         All right.  Then we have Dr. Chandra.  We'll start

8   with the defendants, what they would like to admit.

9              MS. MILLER:  Good morning, Your Honor.

10        The first thing that we would like to admit is

11   CVS-MDL-5015, that's Dr. Chandra's CV.

12             THE COURT:  Okay.  Any objection to that?

13             MR. WEINBERGER:  No objection.

14             THE COURT:  That's in.

15             MS. MILLER:  CVS-MDL-5012, that's Exhibit 2 to

16   Dr. Chandra's report.

17             MR. WEINBERGER:  No objection.

18             THE COURT:  Okay.  That's in.

19             MS. MILLER:  DEF-MDL-11897, that's the Lake

20   County complaint that Dr. Chandra testified about.

21             THE COURT:  Any objection to that?

22             MR. WEINBERGER:  Well, the -- first of all, it

23   is a complaint that was originally filed but did not include

24   these defendants.  Generally a complaint is not admissible

25   in evidence.  I realize he said he took it into account.  So

1    we're objecting to the --

2                 MR. DELINSKY:  Your Honor, the basis for

3    admissions is the party admission rule, and a complaint and

4    answer are perhaps the most fertile ground for party

5    admissions.  That's the design of them.  So they're -- I'm

6    sorry.  So they're independently admissible, and he

7    testified he relied on them.  The purpose of his reliance to

8    which he testified was that --

9                 I'm almost done, Pete.

10                It was that he -- there are statements in here about

11   the culpability of manufacturers on which he relied in

12   identifying the different sectors.

13                THE COURT:  I'll admit it.  Everyone knows

14   that plaintiffs sued a number of other entities in

15   their Lake and Trumbull County complaints besides these

16   pharmacies, so it's a matter of public record anyway.

17                MR. WEINBERGER:  Your Honor, just for the

18   record, a party -- a plaintiff cannot admit to the

19   culpability of another independent --

20                THE COURT:  It doesn't matter.  It's evidence

21   that the plaintiffs made allegations against other entities.

22   For whatever that's worth, that's a fact that plaintiffs did

23   make allegations against other entities.  Some entities have

24   settled.  Some I've severed and are pending.  Three are

25   here, so -- well, three -- the three defendants are here,

 1    but there were a number of others named, so it's evidence of

 2    that.  And Dr. Chandra said he took that into account.  So

 3    the complaint speaks for itself anyway.

 4         Any other exhibits?

 5              MS. MILLER:  Yes, Your Honor.

 6         DEF-MDL-11899, that's the Trumbull County complaint.

 7              THE COURT:  Well, the ruling's the same, and

 8    the defendant -- plaintiffs have their same objection.

 9              MS. MILLER:  Next exhibit is CVS-MDL-5013,

10    which is Exhibit 3A to Dr. Chandra's report.

11              MR. WEINBERGER:  No objection.

12              THE COURT:  Okay.  That can come in.

13              MS. MILLER:  CVS-MDL-5014, which is Exhibit 3B

14    to Dr. Chandra's report.

15              MR. WEINBERGER:  No objection.

16              THE COURT:  Thank you.

17              MS. MILLER:  And then moving to the

18    demonstratives.

19         CVS Demo 015, the slide entitled Allocation

20    Methodology.

21              MR. WEINBERGER:  No objection.

22              THE COURT:  Thank you.

23              MS. MILLER:  CVS Demo 016, the slide entitled

24    Scenario 1.

25              MR. WEINBERGER:  No objection.

```
1                    THE COURT:  Thank you.
2                    MS. MILLER:  CVS Demo 018, slide entitled
3         Scenario 2.
4                    MR. WEINBERGER:  No objection.
5                    THE COURT:  Thank you.
6                    MS. MILLER:  CVS Demo 019, slide entitled
7         Scenario 3.
8                    MR. WEINBERGER:  No objection.
9                    THE COURT:  Thank you.
10                    MS. MILLER:  And then, finally, we'd like to
11         mark Dr. Chandra's expert report for identification, which
12         is CVS-MDL-05008.
13                    THE COURT:  Okay.  That expert report is
14         marked for identification?
15                    MS. MILLER:  Yes, Your Honor.
16                    MR. WEINBERGER:  No objection to it being
17         marked for identification.
18                    THE COURT:  All right.  And then for the
19         plaintiffs.
20                    MR. WEINBERGER:  We have no Chandra exhibits,
21         related exhibits.
22                    THE COURT:  I can't remember -- now the one
23         exhibit you we talked about and we were going to work on a
24         stipulation, did we have that in?
25                    MR. WEINBERGER:  That's 4900, Your Honor.
```

1    Yes.

2                  THE COURT:  That's in, yes.

3                  MS. MILLER:  And, Your Honor, we have some

4    additional documents that we've already shown and shared

5    with the plaintiffs, and they have no objection to them

6    coming in.

7                  THE COURT:  All right.  Let's put those in.

8                  MR. WEINBERGER:  To be clear, these are

9    documents that were not used with a witness, right?  But --

10                 MS. MILLER:  Yes, Pete.

11                 MR. WEINBERGER:  -- we have agreed to allow

12   for their admission into evidence.

13                 MS. MILLER:  Thank you very much.

14        DEF-MDL-14530, that's the Rite Aid settlement with

15   Lake and Trumbull Counties.

16        DEF-MDL-15070, that's the Giant Eagle settlement with

17   plaintiffs.

18        DEF-MDL-15069, plaintiffs' interrogatory responses.

19        DEF-MDL-14325, that's the Lake County Provider Agency

20   Quality Improvement Utilization Review for Lake-Geauga

21   Recovery Centers.

22        DEF-MDL-14329, a letter from Melanie Blasko to

23   Kimberly Fraser attaching funding proposal documents from

24   Lake-Geauga Recovery Centers.

25        DEF-MDL-14385, a letter from Jonathan Lee to Kimberly

1    Fraser attaching funding proposal documents from Signature
2    Health.
3         DEF-MDL-14396, letter from Shelly Zimmerman to Lake
4    County ADAMHS Board members attaching funding proposal
5    documents from Windsor Laurelwood.
6         DEF-MDL-14405, Lake County Provider Agency Improvement
7    and Utilization Review for Signature Health.
8         DEF-MDL-14407, Lake County Provider Agency Improvement
9    and Utilization Review for Windsor Laurelwood Center.
10        DEF-MDL-14713, ADAMHS Board quarterly report.
11        DEF-MDL-14765, an e-mail from Lauren Thorpe to April
12   Caraway related to updated opioid action plan.
13        DEF-MDL-14817, an e-mail from A. Clark to C. Walter
14   regarding SOR 2.0, Year 2 guidance.
15        That's all we have, Your Honor.
16             THE COURT:  Okay.  Anything corresponding from
17   the plaintiffs that were used?
18             MR. WEINBERGER:  No, Your Honor.
19             THE COURT:  Okay.
20             MR. HALL:  Your Honor, I just have one issue
21   with respect to --
22             THE COURT REPORTER:  Who is speaking?
23             MR. HALL:  Jeff Hall for Walgreens.
24        And I believe there's an agreement that
25   Miss Fitzpatrick is just going to show us the actual

1    documents, but it's P23116, which were charts and figures

2    used during the direct examination of Dr. Keyes.

3         And as we said on the record, we do not object to the

4    charts and figures on pages 56 through 60 of her report.

5    And as I understand, they were going to be excerpted just to

6    show the charts and figures that she described.

7         Same point for P23126, which was Dr. Young's --

8              THE COURT REPORTER:  One second.  It's the

9    same point for P --

10             MR. HALL:  P23128 -- excuse me -- P23128, and

11   they are charts and graphs on pages 6, 27, 36, 41, and 46 of

12   her report.

13        And also P23129, which is just the CV, pages 1 through

14   9.  We do not object.

15        And my understanding is that there's agreement on all

16   of these, we just haven't seen the final excerpted versions.

17   Subject to that, I think we're all set.

18             MS. FITZPATRICK:  Yes, Your Honor.  Mr. Hall's

19   correct.  We will be providing those excerpted PDFs which

20   will reflect exactly what Mr. Hall put into the record.

21             THE COURT:  All right.  I thought I would

22   discuss a little bit about the post-hearing briefs, what

23   would be useful to me.

24        You know, I really at this point have no idea, not

25   sure what either side is urging me to do.  I mean, I can

1     start with the defendants.

2          I had ordered the defendants to produce their

3     abatement plan, their plan which they thought over -- you

4     know, they're objecting that there should even be one

5     because they think they should have won the first phase of

6     the trial or get a new trial, or whatever, but assuming the

7     verdict stands, what they think a fair abatement plan would

8     be, and I never got one.  So there are obviously

9     consequences to that.

10          Candidly, the testimony of the last two experts, I

11     mean, these were the -- the opinions of these experts.  I

12     have no idea if -- I assume that counsel is subscribing --

13     the parties are subscribing to them or they wouldn't have

14     put these witnesses on.  But Dr. Kessler's conclusion that

15     in his expert opinion these three defendants together should

16     bear 1.3 percent of the abatement cost, I have to

17     categorically reject out of hand.

18          And you know that.  And you know why.  Because the

19     jury found that these three defendants, their conduct had a

20     substantial effect, you know -- substantial cause of the

21     opioid epidemic in these two counties.  And guess what, I

22     didn't define substantial in mathematical terms, but

23     everyone knows it's a heck of a lot more than 1.3 percent.

24     If the jury thought that what these three pharmacies did

25     caused only 1 percent of whatever happened, the verdict

1   would have been different.  They would have had to find the

2   defendants not liable, and you know that.

3       So I don't know -- so I've got to reject -- if that's

4   the defendants' position, it's categorically rejected, it's

5   inconsistent with the verdict.  I don't need a brief.  No

6   brief you can file can change that, and you know that.  It's

7   categorically rejected.

8       Dr. Chandra had a little bit more, but even his bottom

9   line, again, not a substantial -- not a substantial cause.

10  So I've got to categorically reject that.  I don't know what

11  you're suggesting to me.  So I'm not getting anything from

12  the defendants.

13      Again, on the plaintiffs' side, I don't know really

14  what the plaintiffs' position is.  I mean, if you're -- you

15  know, I listened to the experts, I had read the reports

16  beforehand, I knew what they were going to say.  They said

17  what I expected them to say.

18      I don't know if the plaintiffs' position is that these

19  three defendants should bear 100 percent of the abatement

20  cost.  I mean, again, the experts, you know, they gave me

21  their charts, their figures.  I don't know what your

22  positions are.

23      But the point is if I'm just going to get briefs from

24  the plaintiffs urging me to, you know, assess $3 billion

25  over 15 years and I get briefs from the defendants urging,

1    you know, 1 percent of some diminished amount, I don't need

2    them.  You can really save your clients the time and the

3    money.  I don't need them.  I won't pay any attention to

4    them.

5         I will do the best I can.  No judge in history has

6    ever had to do this, so I have no model.  I'll do it.  And

7    then it will go up to the Court of Appeals, and they can

8    take a look at it along with everything else from the trial.

9         If either side has something that will help me, I'm

10   happy to receive it.  I welcome some help.  It's a difficult

11   position for a judge to do something completely uncharted.

12   No one's ever done this.

13        So if either side wants to give me something that will

14   help me, I'm happy to receive it.  But if it's -- I don't

15   need -- I don't need briefs summarizing what the experts

16   said, okay?  I mean, quite frankly, you know, there wasn't a

17   great deal new out of the hearing, and I didn't expect there

18   to be much.  I didn't expect these experts to retract their

19   reports, for gosh sakes.  No one did.

20        So it's really up to you.  We've got the dates, I

21   think it's the June 6th simultaneous briefs and then the

22   June 13th simultaneous replies.  If you want to file

23   something that's helpful to me, I'm happy to receive it.  If

24   you don't, you don't have to.  I'll do what I need to do

25   myself.  I was prepared for this hearing.  I took good

```
 1    notes.  I've got a good team, and I will produce something.

 2         So I'll pretty much leave it to you.  I'm obviously

 3    not going to issue anything till at least June 6th and see

 4    what gets submitted.  And if something gets submitted, I

 5    won't issue anything until June 13th.  If someone submits

 6    something, the other side certainly has a chance to respond.

 7         So that's my best thought.  But what I'm really

 8    looking for -- and I'm really looking for something --

 9    something real, something that each side would think that a

10    moderately-intelligent judge who's been paying attention for

11    four-and-a-half years might actually order.  And if you want

12    to produce that to me in your suggestions, then I'm more

13    than happy to receive it, but I don't need advocacy or what

14    these experts said.

15         And also I think the parties had said some time ago

16    that you were working together to try to come up with some

17    sort of agreed-upon injunction provisions that would ensure

18    that each defendant, one has in place an adequate policy,

19    trains their pharmacists in it, gives the pharmacists the

20    tools to effectuate it, and then has some sort of monitoring

21    system in place along with other things to make sure their

22    pharmacists are doing what they're supposed to be doing.

23         And I'm hoping that the parties are working on that.

24    Are you working together on that, I hope?

25                   MR. LANIER:  Your Honor, at this point we --
```

1        THE COURT:  It's probably better for the court

2    reporter for you to stay seated.

3        MR. LANIER:  Sorry, Judge.  It's just my

4    respect thing kicks in.

5        Judge, the parties have been so wound up in presenting

6    this trial to you, this phase of the trial to you, that we

7    haven't had a chance yet to proceed past just general dialog

8    on this issue, but I will commit to you on behalf of the

9    plaintiffs that we will diligently press that forward as the

10   next issue to be dealt with as we try to process this.

11       THE COURT:  All right.  Thank you, Mr. Lanier.

12       It wouldn't surprise me if there are a number of

13   things already in place at some or all of the defendants,

14   based on, you know, what's happened over the past few years

15   and these trials.

16       So, again, I'm not looking to, you know, certainly

17   micromanage the pharmacy business.  I just want to make sure

18   that there are things in place to make sure that each

19   pharmacist does what he or she is supposed to do in

20   exercising his or her corresponding responsibility under the

21   CSA.  That's it.

22       MR. DELINSKY:  Your Honor, may I just be heard

23   for a moment?

24       THE COURT:  Sure.

25       MR. DELINSKY:  Your Honor, we agreed to the

1   briefing -- well, actually, I want to start in a different

2   place.  And this part of it, Your Honor, I'm speaking only

3   for CVS.  We obviously have it -- I don't want to speak for

4   any other defendants with whom we haven't had the

5   opportunity to confer on, Your Honor.

6        We do plan, Your Honor, with providing you with a

7   path, okay?  I am not going to promise you that you're going

8   to like our path.  You may not, and I think it's a fair bet

9   the plaintiffs won't, but we think it will be a rational

10  path.

11       We think that the challenge before Your Honor is on

12  the assumption that Your Honor overrules our objections that

13  abatement can't proceed past an injunctive form of relief

14  along the lines of what we talked about, like drug take-back

15  to reduce the oversupply on the assumption that the Court

16  will move to relief in some of these effects of the

17  oversupply.

18       We recognize that the task before Your Honor is

19  difficult.  It's difficult in many respects.  One of the

20  areas it's difficult in -- it's something that I think we've

21  all learned in sitting in this courtroom is that the data on

22  OUD just isn't very good.  And it's no expert's fault, it's

23  just not very good.  So there's challenges here insofar as

24  Your Honor is going to grant relief along those lines.

25       We intended to propose a path.  And, again, I'm not

1    promising anyone's going to like it.  My guess is people may

2    not like it, but we are going to endeavor to propose

3    something to you that we believe is workable, and we've put

4    it in writing, there's been comments on it throughout trial.

5    But we will try, Your Honor.  Again, that's only speaking

6    for CVS.

7                    THE COURT:  Well, thank you, Mr. Delinsky.

8           And I should -- I think I've already made it clear

9    that, I mean, whatever amount of money I order to be paid

10   for specific purposes, I'm going to have the money paid

11   annually, and I'm going to require the County to say in

12   advance -- to certify that we're only going to spend this

13   money on these purposes, and then to provide an accounting

14   of roughly 90 days at the end of the year to say what

15   they've done.

16          And if it turns out that they didn't need it all, then

17   it either gets returned or applied to the next year, and

18   then we'd adjust the next year.  I mean, these experts, no

19   one knows for sure what's going to happen even the first

20   year, okay?  I mean, how many people, you know, will get

21   treatment.  Whether we, you know, go from 40 percent to

22   60 percent, as one of the experts said.  I mean, it might,

23   it might not.

24          But, again, no one's going to just hand money out and

25   it just gets used for other purposes.  So I'll calibrate it,

1   and I'll probably, you know, have another -- another sort of

2   an assessment hearing proceeding in some period of time to

3   see how it's working and whether the amount of money was

4   adequate, whether it's accomplishing anything.

5       I mean, only a fool would just say, "I know what's

6   going to happen in the next 15 years, and here it is, and

7   I'm not looking at it again."  This is very complicated.

8       So I wouldn't get -- no one should get really hung up

9   on what's the most accurate estimate of the number of people

10  who need treatment because I'm going to come up with

11  something, and if the number is too high, it will be

12  adjusted down.  And if it's too low, it will be adjusted up

13  and calibrated.  So don't get hung up on that.

14      Whatever I do is a starting point, and it will -- I'm

15  sure it will be some adjustment.

16      So the key really is, all right, what are the

17  components of the plan?  What services, programs can clearly

18  be shown to be needed to abate the opioid epidemic that the

19  jury found, okay?  And it may not be any -- everything, but

20  directed to that.

21      Everyone knows there was an opioid problem before

22  there was an oversupply and diversion of prescription

23  opioids.  And, guess what, there will be an opioid problem

24  when this scourge is ultimately abated, reduced.  There will

25  be drug cartels that are going to sell heroin and who knows

1    what else into Lake, Trumbull County, and everywhere.

2         So I've got to figure that out, and then I've got to

3    figure out, all right, what is fair and equitable to assess

4    upon these three defendants, given everything that everyone

5    else knows, okay?  And I'm sitting in a court of equity, and

6    I will come up with something.

7         But I am suggesting that both sides, if they want to

8    be helpful, give me something that if they were me, if you

9    were me, you might seriously consider doing.  All right?

10   That's what I'm looking for.  All right?  If you were a

11   judge and you had to do this and you had to decide it, is

12   this something you would seriously consider?  Okay?  And

13   it's not, you know, maybe where the plaintiffs are and it's

14   certainly not the 1 percent.  So, again, if you want to be

15   helpful, that would be helpful.

16        You know, obviously you can, you know, write anything

17   you want.  But I thought I would make that clear.  I've

18   obviously been giving it a lot of thought, so I thought

19   generally lawyers like to know what a judge is thinking.

20             MR. DELINSKY:  Your Honor, may I just make one

21   additional point?  And thank you very much for your insight

22   into your thinking and how we can be helpful.  It is

23   appreciated, Your Honor.

24        I just wanted to flag one other issue, which is the

25   following.  I know I'm speaking for the defense on this, I

1   suspect I may also be making a point of the plaintiffs'

2   mind, but I'll leave it to them.  And that is that there

3   were points in the trial where we collected testimony based

4   on each of our own work, and it may not be apparent to Your

5   Honor why we did it or what it means, how it fits into the

6   puzzle.

7        So that is one thing, because we didn't have closing

8   arguments and we intended a post-trial briefing to be the

9   opportunity for us to tie it together, we do think it's

10  important -- and we ask and we know Your Honor will keep an

11  open mind in your evaluation of the evidence -- that we have

12  that opportunity to say, you know, Dr. Alexander said this

13  and this is why it's significant in our view of the world.

14  It may not be something that dawns on you immediately, but

15  that is one very important function we see in the post-trial

16  briefing, and we just want to make sure we have that

17  opportunity.

18              THE COURT:  You can have that -- again, it's

19  only going to matter to me if it's -- if it's connected to

20  your advocating a position that makes sense, that's

21  realistic, that's fair, and it's something that you think if

22  you were a judge you would conceivably do.  Otherwise, I

23  mean, it's -- you know, it may be accurate, but it

24  doesn't -- doesn't get you anywhere, doesn't get me

25  anywhere.

```
 1              MR. DELINSKY:  Understood, Your Honor.  It
 2   can't be in the ether.  It has to be, you know, grounded
 3   and --
 4              THE COURT:  That's the idea, right.
 5              MR. DELINSKY:  Understood, Your Honor.
 6              THE COURT:  All right.  Well, again, I
 7   appreciate that the parties were very efficient in what they
 8   did, streamlined it, realized you probably didn't need
 9   everything that you planned and we didn't need all the days,
10   and that's fine.  Everyone's busy.
11        So stay safe.  And the matter is submitted, and I will
12   work on it diligently with my team.
13        Mr. Loge has reminded me that we didn't set page
14   limits.
15              MR. LANIER:  You thinking like 1500 a side?
16              THE COURT:  No.
17        What do you think -- I mean, now knowing what I want
18   or at least what I would like, what I want, what are you
19   suggesting?
20              MR. DELINSKY:  Your Honor, could we think
21   about that question?
22              THE COURT:  All right.  Really -- again, you
23   can write 500 pages.  And if it's not helpful to me, trust
24   me, I'm not going to spend a lot of time on it.  All right?
25   I'll try and -- however many pages there are, what I'm going
```

```
 1    to zero right in on, is this something helpful to me.  And
 2    the danger is if it's 500 pages, I might miss it, the two
 3    pages that are.  So I wouldn't, you know -- probably my team
 4    will find it, but -- so --
 5                    MR. DELINSKY:  Just on the defense side --
 6                    THE COURT:  Why don't you confer.  Confer what
 7    you want to do.  And I mean, it's -- obviously it would be
 8    the same on each side, so I don't really -- again, I'm --
 9    the length to me really doesn't matter because if it's not
10    helpful, it's not helpful.
11        We have -- Special Master Cohen has reminded me that
12    there is injunctive relief in the Florida settlement.  Is
13    that document public?
14                    MR. WEINBERGER:  Yes, it is, Your Honor.
15                    THE COURT:  That's public.  I would start
16    there, okay?  I haven't seen it.
17        Do we have a copy of --
18                    MR. WEINBERGER:  We actually attached it to
19    our brief.  It was like a trial brief that -- I think it was
20    a --
21                    THE COURT:  Actually the trial brief.  All
22    right.
23                    MR. WEINBERGER:  Your Honor, before we
24    adjourn, I'd like to make a couple of comments, if I may, on
25    behalf of the plaintiffs.
```

 1                    THE COURT:  Okay.

 2                    MR. WEINBERGER:  As the Court has pointed out,

 3       this ends a phase of this litigation that has lasted

 4       four-and-a-half years.  And on behalf of Mr. Lanier and our

 5       team and the plaintiffs, we want to thank the Court for your

 6       diligence and your patience for setting clear parameters for

 7       us and for allowing both sides to fully present the evidence

 8       that we believe was important to the case.

 9            We want to thank all the Court's staff.  We want to

10       thank particularly Special Master Cohen.

11                 Every time I come down to this courthouse and sit in

12       this courtroom, I am reminded of the importance of this

13       system of justice, and particularly the federal system,

14       which permits lawyers like us to try cases before a court

15       and jury in the most magnificent courtrooms in our country,

16       that this is just an example of.

17                 And I am reminded of the fact that the reason why we,

18       the taxpayers, build courtrooms like this is because we all

19       as citizens and particularly we as trial lawyers understand

20       the importance of the judicial system.  And I think we don't

21       think about that enough.  We don't talk about it enough.

22       And particularly in a case like this, as we've come to this

23       courtroom many times over the last four-and-a-half years, at

24       least I personally have not fully appreciated the

25       significance of the federal judicial system and the federal

1    judges who, of course, are the most important cog in that

2    system.

3         So I just wanted to speak for us.

4         I also wanted to say that having tried cases all over

5    the state, both in the state and the federal courthouse,

6    I've had an opportunity to come up against great trial

7    lawyers and professionals, and there is no better group of

8    lawyers in my mind or professionals than defense counsel who

9    we faced in this case.  And sure, we've had lots of

10   disagreements, but that's natural.  And so I wanted to thank

11   our esteemed counsel on the other side.

12        And then finally, before Mr. Lanier grabs the

13   microphone, I want to give Mr. Boyd from Lake County an

14   opportunity to say a few words.

15             MR. BOYD:  Thank you.

16        Your Honor, and the Court, and the team that's

17   representing Lake and Trumbull County --

18             THE COURT REPORTER:  You'll need to keep your

19   voice up.

20             MR. BOYD:  On behalf of the leadership of the

21   Board of the Lake County Commissioners, our 230,000

22   residents, I'm sure my colleagues in Trumbull County who

23   could not be here today --

24             THE COURT REPORTER:  You'll need to speak

25   slower for the record.

1    MR. BOYD:  That's why I'm an urban planner and

2    not an administrator.

3        THE COURT:  You're doing fine, Mr. Boyd.

4        MR. BOYD:  I want to express my sincere

5    appreciation and gratitude to Your Honor and the Court staff

6    for not only the past two weeks but the fall, the six or

7    seven weeks we were here in this wonderful facility.  And I

8    look forward to the future steps ahead.

9        And, once again, thank you on behalf of the Lake

10   County Board of Commissioners and our 230,000 residents.

11   Thank you.

12       MR. LANIER:  Your Honor, if I can have the

13   final word for the plaintiffs to say that not only do I echo

14   what has been said by everybody, but a special appreciation

15   for those of us, and I'm sure I'm speaking on behalf of at

16   least the CVS lawyers because we've talked about it outside

17   of court, but for those of us who are not in-staters who

18   have come in from outside this jurisdiction, and frankly the

19   first time I've ever practiced in front of you has been this

20   case, our deep gratitude and our deep respect and our

21   deepest honor for who you are and the way this court has

22   been conducted, the way this hearing has been conducted.

23       I have never in my life said this before, but I'm

24   about to say, if you ever need a criminal appointment for a

25   lawyer from Texas to come up here, I would volunteer in a

 1    criminal case.  I'd make Jeff -- or Eric come with me -- not

 2    Jeff, I don't want him -- I'd make Eric come up with me, and

 3    we would criminally defend someone who was pro se if we

 4    could do it in this court with your people, because it's

 5    been such an honor to be here.

 6         And, frankly, I'm just a bit maudlin that you're not

 7    going to be setting us for another trial.

 8              MR. DELINSKY:  Just a few things, Your Honor.

 9         Number 1, I join in the offer, and I would love to do

10    that for -- on many counts.

11         But, Peter, as a third-generation lawyer, my

12    grandfather was a lawyer, my dad was and is a lawyer, your

13    words choked me up.  And I really -- I can't meet them, but

14    thank you.  Thank you for everything you said about

15    everything and Special Master Cohen.

16         Judge Polster, thank you for the hospitality you

17    showed us as out-of-towners.  These have been difficult

18    proceedings, but we certainly appreciate the respect you've

19    given us, the latitude, and indulgence you've given me in

20    particular at times.

21         So thank you.  And I'm sorry I can't say more, Pete,

22    but I can't do it better than you did.

23              THE COURT:  All right.

24              MR. HALL:  Your Honor, if I could just

25    briefly.

1          THE COURT:  Sure.

2          MR. HALL:  On behalf of Miss Hacker and

3   myself, I would just like to thank you and your entire team

4   for allowing us to join seamlessly and welcoming us here.

5   We've done a lot of work to get ready, and we've done our

6   best, but we really appreciate how you've conducted the

7   hearing and let us participate.  So thank you.

8          MS. FUMERTON:  And, Your Honor, I know

9   Mr. Majoras couldn't be here this morning, but I know what

10  I'm saying is on behalf of him as well.

11      Thank you for all your patience with us, and thank you

12  to Special Master Cohen for all his patience with us, and

13  especially me.  So thank you.

14          THE COURT:  Everyone's welcome.

15      And Peter, I appreciate your saying that.  And, you

16  know, we don't -- we don't talk about it as much as we

17  should, you know.

18      I said at the beginning, I didn't think the opioid

19  epidemic was properly, you know -- should be handled with by

20  our branch of the government, that it was the responsibility

21  primarily of the other two branches, but it's here and I

22  would do my best.

23      I've probably done some things well, some things maybe

24  not so well.  I said at the beginning I've had the best

25  lawyers in the country.  I've said that many times.  That's

1    absolutely the case.  But we're all lucky we live in a

2    country where we can do what we've done.  Probably very few

3    places in the world where we could have done what we did,

4    maybe a handful.

5         I don't know if -- I mean -- and it's a tribute.  You

6    know, we've got some pretty good judges, we've got some

7    very, very good lawyers who know what they're doing and know

8    how to do it, and it's -- I think the reason we have a, you

9    know, the federal courthouse, some of the majesties, I think

10   it has an impact on all of us to remind of us what we've

11   got.  I sure as hell hope we don't lose it.

12        I mean, anyone who's thinking has got to be pretty

13   darn worried, because if the other two branches of

14   government aren't working well, you can have the best judges

15   in the world, we can't hold things together on our own.

16   Everyone knows that.  We can do the best we can.

17        So, again, I appreciate everyone's hard work, you

18   know, in advocating hard for your clients and doing a very

19   professional job.  You know, when we've had to try cases,

20   we've tried them.  When we worked out settlements, we worked

21   out settlements.  We do both at the same time.

22        But I think, Mr. Weinberger, I appreciate your saying

23   that because it's -- those of us in the Judicial Branch and

24   the legal branch, candidly we need to talk about it more

25   because most people in the country don't know what happens

1    in court, what they know is probably not accurate.

2    Sometimes -- I mean, we don't have big press offices, we

3    don't hold press conferences, issue releases, hold press

4    conferences where people could ask us questions.

5         So the public really doesn't know what we do and how

6    we do it, and they may have distorted ideas.  So I think it

7    behooves all of us to do what we can to talk about it in our

8    communities and say, look, this is what we've got, it's real

9    important, hearings aren't fake.  Every judge you have,

10   state or federal, is going to hold a transparent hearing and

11   anyone can watch it.  If there's witnesses, if there's

12   documents, both sides can bring it in and have a hearing,

13   and the judge is going to issue a written opinion that

14   everyone can see.  And if there's evidence, there's

15   evidence.  And if there's not, there's not.  And that's why

16   we have courts.  But we need to talk about it so that people

17   understand it or else we'll lose it.

18        Okay.  Thank you.  Stay safe.  And I look forward to

19   reading your submissions.

20        (Proceedings concluded at 9:55 a.m.)

21

22              **C E R T I F I C A T E**
         I certify that the foregoing is a correct transcript
23   of the record of proceedings in the above-entitled matter
     prepared from my stenotype notes.
24
              */s/ Gregory S. Mizanin*           *May 18, 2022*
25            GREGORY S. MIZANIN, RDR, CRR                 DATE