# Exhibit 2

STRICTLY CONFIDENTIAL

# DISTRIBUTORS' TEXAS SETTLEMENT AGREEMENT

STRICTLY CONFIDENTIAL

# TABLE OF CONTENTS

DISTRIBUTORS' TEXAS SETTLEMENT AGREEMENT ........................................................ 1

I.      Overview ................................................................................................. 1

II.     Definitions .............................................................................................. 1

III.    Condition to Effectiveness of Agreement ............................................. 12

IV.    Participation by Subdivisions ............................................................... 13

V.      Settlement Payments ............................................................................ 14

VI.    Allocation and Use of Settlement Payments. ....................................... 26

VII.   Enforcement ......................................................................................... 27

VIII.   Plaintiffs' Attorneys' Fees and Costs .................................................. 27

IX.    Texas Additional Restitution Amount .................................................. 29

X.      Release .................................................................................................. 29

XI.    Later Litigating Subdivisions ............................................................... 33

XII.   Reductions/Offsets .............................................................................. 37

XIII.   Injunctive Relief in the Absence of a Global Settlement ..................... 38

XIV.   Miscellaneous ...................................................................................... 39


Exhibit A     Alleged Harms ............................................................................. A-1

Exhibit B     Later Litigating Subdivision Suspension and Offset Determinations ................. B-1

Exhibit C     List of Opioid Remediation Uses .............................................. C-1

Exhibit D     Primary Subdivisions ................................................................ D-1

Exhibit E     Agreed List of Texas Litigating Subdivisions ........................... E-1

Exhibit F     Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities ..... F-1

Exhibit G     Settlement Payment Schedule .................................................... G-1

Exhibit H     Illustrative Examples of Settlement Prepayments ..................... H-1

Exhibit I      ABC IRS Form 1098-F ............................................................. I-1

Exhibit J      Cardinal Health IRS Form 1098-F ............................................ J-1

Exhibit K     McKesson IRS Form 1098-F ..................................................... K-1

Exhibit L     Texas Participation Form and Release ....................................... L-1

Exhibit M    Stipulations of Discontinuance with Prejudice .......................... M-1

Exhibit N     Texas Opioid Settlement Sharing Agreement ............................ N-1

Exhibit O     List of Texas Subdivisions and Special Districts Represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LP .... O-1

STRICTLY CONFIDENTIAL

Exhibit P    Case Management Order.................................................................................P-1

Exhibit Q    List of States .............................................................................................. Q-1

Exhibit R    Proposed Injunctive Relief Term Sheet .....................................................R-1

Exhibit S    Non-Litigating Texas Subdivisions Which Have Qualified as Participating
             Subdivisions................................................................................................S-1

Exhibit T    Texas Litigating Subdivisions with a Population of At Least 500,000 ...............T-1

STRICTLY CONFIDENTIAL

# DISTRIBUTORS' TEXAS SETTLEMENT AGREEMENT

## I.    Overview

This Distributors' Texas Settlement Agreement ("Agreement") sets forth the terms and conditions of a settlement agreement between and among the State of Texas ("Texas"); Dallas County, Texas; Bexar County, Texas; "Participating Subdivisions" as that term is defined herein; McKesson Corporation ("McKesson"); Cardinal Health, Inc. ("Cardinal"); and AmerisourceBergen Corporation ("Amerisource") (collectively, the "Parties") to resolve opioid-related Claims against McKesson, Cardinal, and/or Amerisource (collectively, the "Settling Distributors").

The Parties intend the terms of this Agreement to parallel the terms of the Distributor Global Settlement Agreement ("*Global Settlement*"). As of the date of this signing, Texas intends to join the Global Settlement if it becomes effective. If the Global Settlement becomes effective by July 1, 2022, its terms will supersede the terms of this Agreement except for Section III.B (Dismissal of Claims), Section VIII (Plaintiffs' Attorneys' Fees and Costs), Section IX (Release), and Section XIV.D (No Admission). If the Global Settlement is not effective by the aforementioned date, this Agreement and the Texas Consent Judgment giving effect to its terms will control.

The Settling Distributors have agreed to the below terms for the sole purpose of settlement, and nothing herein, including in any exhibit to this Agreement, may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, or any misfeasance, nonfeasance, or malfeasance, all of which the Settling Distributors expressly deny. No part of this Agreement, including its statements and commitments, and its exhibits, shall constitute or be used as evidence of any liability, fault, or wrongdoing by the Settling Distributors. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose. This Agreement is not contingent on the Global Settlement taking effect.

This Agreement and the associated Texas Consent Judgement resolve the Settling Distributors' portion of the litigation coordinated before Justice Robert Schaffer as *In Re Texas Opioid Litigation*, 18-0358 (152 Jud. Dist. Ct. Harris Cty.) with respect to Participating Subdivisions. The following two cases were designated by the Court as bellwether cases: (1) *County of Dallas* v. *Purdue Pharma L.P.*, Case No. 2018-77098 and (2) *County of Bexar* v. *Purdue Pharma L.P.*, Case No. 2018-77066.

## II.    Definitions

For all sections of this Agreement except as otherwise specified, the following definitions apply:

A.    "*Actions*." (1) *In Re Texas Opioid Litigation*, 18-0358/2018 (152 Jud. Dist. Ct. Harris County); (2) *The County of Dallas, v. Purdue Pharma L.P.*, Case No. 2018-77098; (3) *County of Bexar, v. Purdue Pharma L.P.*, Case No. 2018-77066; (4) State of Texas Office of the

STRICTLY CONFIDENTIAL

Attorney General investigation.

B.    "*Agreement*." This Distributors' Texas Settlement Agreement, inclusive of all exhibits.

C.    "*Alleged Harms*." The alleged past, present, and future financial, societal, and public nuisance harms and related expenditures arising out of the alleged misuse and abuse of Products, non-exclusive examples of which are described in the documents listed on Exhibit A, all of which were filed in connection with the case captioned *In re National Prescription Opiate Litigation*, No. 1-17-md-02804 (N.D. Ohio) (the "MDL"), that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by the Settling Distributors.

D.    "*Annual Payment*." The total amount payable to the Texas Qualified Settlement Fund Administrator by the Settling Distributors on the Payment Date each year, as calculated by the Texas Qualified Settlement Fund Administrator pursuant to Section V.B.1.d. For the avoidance of doubt, this term does not include the Texas Additional Restitution Amount or amounts paid pursuant to Section VIII.

E.    "*Appropriate Official*." As defined in Section XIV.F.3.

F.    "*Bar*." Either: (1) a law in Texas barring Subdivisions from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full) or (2) a ruling by the Texas Supreme Court setting forth the general principle that Subdivisions may not maintain any Released Claims against Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from the Annual Payments by Settling Distributors under this Agreement) shall not constitute a Bar.

G.    "*Bellwether Counties*." Bexar County, Texas and Dallas County, Texas.

H.    "*Case-Specific Resolution*." Either: (1) a law in Texas barring the Subdivision at issue from maintaining any Released Claims against any Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full); or (2) a ruling by a court of competent jurisdiction over the Subdivision at issue that the Subdivision may not maintain any Released Claims at issue against any Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from the Annual Payments by Settling Distributors under this Agreement) shall not constitute a Case-Specific Resolution.

I.    "*Chapter 403*."  Tex. Gov't Code Ann. Chapter 403.

J.    "*Claim*." Any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract,

STRICTLY CONFIDENTIAL

controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

K. "*Claim Over*." A Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

L. "*Consent Judgment Court*." The Travis County court to which the Texas Consent Judgment is presented for approval and/or entry as to the State.

M. "*Compensatory Restitution Amount*." The aggregate amount of payments paid or incurred by the Settling Distributors hereunder other than amounts paid as attorneys' fees and costs provided in <u>Section VIII</u>.

N. "*Covered Conduct*." Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (1) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (2) the characteristics, properties, risks, or benefits of any Product; (3) the reporting, disclosure, non-reporting or non- disclosure to federal, state or other regulators of orders placed with any Released Entity; or (4) diversion control programs or suspicious order monitoring; *provided*, *however*, that as to any Claim that a Releasor has brought or could bring, Covered Conduct does not include non- compliance with statutory or administrative supply security standards concerning cleanliness of facilities or stopping counterfeit products, so long as such standards apply to the storage and distribution of both controlled and non-controlled pharmaceuticals.

O. "*Effective Date*." The date of entry of the Texas Consent Judgment, which shall be filed not later than thirty (30) calendar days after the Initial Participation Date.

STRICTLY CONFIDENTIAL

P.     "*Final Order*." An order or judgment of a court of competent jurisdiction with respect to the applicable subject matter (1) which has not been reversed or superseded by a modified or amended order, is not currently stayed, and as to which any right to appeal or seek certiorari, review, reargument, stay, or rehearing has expired, and as to which no appeal or petition for certiorari, review, reargument, stay, or rehearing is pending or (2) as to which an appeal has been taken or petition for certiorari, review, reargument, stay, or rehearing has been filed and (a) such appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay, or rehearing was sought or (b) the time to appeal further or seek certiorari, review, reargument, stay, or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay, or rehearing is pending.

Q.     "*Global Contingency Fee Fund*."  The Contingency Fee Fund as defined in Exhibit R to the Global Settlement.

R.     "*Global Litigating Subdivision Cost Fund*."  The Litigating Subdivision Cost Fund as defined in Exhibit R to the Global Settlement.

S.     "*Global Settlement*." The proposed agreement, in which Texas intends to participate if it becomes effective, the terms of which are set forth in or shall be materially the same as those set forth in the December 23, 2021 Distributor Settlement Agreement, resolving the litigation and claims brought or threatened to be brought by states and subdivisions against the Settling Distributors, including claims against the Settling Distributors asserted in the multi-district litigation *In re: Nationwide Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio) ("MDL") and state court prescription opiate litigation.

T.     "*Global Settlement Fund Administrator*" The Settlement Fund Administrator as defined in Section I.MMM of the Global Settlement.

U.     "*Global Settlement Fund Escrow*."  The Settlement Fund Escrow as defined in Section I.NNN of the Global Settlement.

V.     "*Global Settlement Net Abatement Amount*." The "Net Abatement Amount" defined in the Global Settlement, an amount of $18,554,013,693.

W.     "*Incentive Payment A*." The incentive payment described in Section V.F.1.

X.     "*Incentive Payment B*." The incentive payment described in Section V.F.2.

Y.     "*Incentive Payment C*." The incentive payment described in Section V.F.3.

Z.     "*Incentive Payment D*." The incentive payment described in Section V.F.4.

AA.     "*Incentive Payment Final Eligibility Date*." The date that is the earlier of (1) the fifth Payment Date; (2) the date of completion of opening statements in a trial of any action brought by a Subdivision that includes a Released Claim against a Released Entity when such date is more than two (2) years after the Effective Date; or (3) two (2) years after the Effective Date in the event a trial of an action brought by a Subdivision that includes a Released Claim against a Released

Entity began after the Initial Participation Date but before two (2) years after the Effective Date.

BB.    "*Initial Participating Subdivision*." A Subdivision that meets the requirement set forth in Section IV.E.

CC.    "*Initial Participation Date*." March 10, 2022.

DD.    "*Later Litigating Subdivision*." A Subdivision (or Subdivision official asserting the right of such a Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that: (1) first files a lawsuit bringing a Released Claim against a Released Entity after the Effective Date; or (2) adds a Released Claim against a Released Entity after the Effective Date to a lawsuit brought before the Effective Date that, prior to the Effective Date, did not include any Released Claims against a Released Entity; (3) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a legislative Bar or legislative Case-Specific Resolution as of the Effective Date, (b) such legislative Bar or legislative Case-Specific Resolution is subject to a Revocation Event after the Effective Date, and (c) the earlier of the date of completion of opening statements in a trial in an action brought by a Subdivision that includes a Released Claim against a Released Entity or one hundred eighty (180) calendar days from the Revocation Event passes without a Bar or Case-Specific Resolution being implemented as to that Litigating Subdivision or the Litigating Subdivision's Released Claims being dismissed; or (4) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a judicial Bar or judicial Case-Specific Resolution as of the Effective Date, (b) such judicial Bar or Case-Specific Resolution is subject to a Revocation Event after the Effective Date, and (c) such Litigating Subdivision takes any action to further, assert, or revive a Released Claim in a lawsuit against a Released Entity other than seeking a stay or dismissal.

EE.    "*Later Participating Subdivision*." A Participating Subdivision that is not an Initial Participating Subdivision but meets the requirements set forth in Section IV.C.

FF.    "*Litigating Subdivision*." A Subdivision (or Subdivision official) that brought any Released Claim against any Released Entity prior to the Effective Date. Exhibit E is an agreed list of all Texas Litigating Subdivisions. Exhibit E will be updated periodically, including any appropriate corrections, and a final version of Exhibit E will be attached hereto as of the Effective Date.

GG.    "*Non-Litigating Subdivision*." Any Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

HH.    "*Non-Participating Subdivision*." Any Subdivision that is not a Participating Subdivision.

II.    "*Non-Party Covered Conduct Claim*." Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

JJ.    "*Non-Party Settlement*." A settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

5

STRICTLY CONFIDENTIAL

KK. "*Non-Released Entity*." An entity that is not a Released Entity.

LL. "*Offset Cap*." The dollar amount which the dollar-for-dollar offset described in Section XI.A cannot exceed in a Payment Year, to be calculated by multiplying the amount of the relevant Annual Payment apportioned to Texas and its Subdivisions for that Payment Year by the percentage for the applicable Participation Tier as set forth in Exhibit B.

MM. "*Opioid Remediation*." Care, treatment, and other programs and expenditures (including, reimbursement for past such programs or expenditures[1] except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products; (2) treat or mitigate opioid use or related disorders; or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic. Exhibit C provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.

NN. "*Opioid Tax*." Any tax, assessment, license fee, surcharge or any other fee (other than a fixed prospective excise tax or similar tax or fee that has no restriction on pass-through) imposed by Texas on a Settling Distributor on the sale, transfer or distribution of opioid products.

OO. "*Other State Resolution*." A settlement with, or judgment obtained by, a State other than Texas and/or a Subdivision(s) in that other State relating to one or more Claims involving, arising out of or relating to Covered Conduct, including attorney's fees and costs payable under such settlement or judgment.

PP. "*Participating Subdivision*." Any Subdivision that meets the requirements for becoming a Participating Subdivision under Section IV. Participating Subdivisions include both Initial Participating Subdivisions and Later Participating Subdivisions.

QQ. "*Participation Tier*." The Participation Tier shall be determined as set forth in Section V.K.

RR. "*Parties*." As defined in Section I (each, a "*Party*").

SS. "*Payment Date*." The date by which the Settling Distributors must make the Annual Payment pursuant to Section V.B. The Payment Date for Payment Year 1 shall be ten (10) calendar days after the Effective Date.  The Payment Date for Payment Year 2 shall be July 15, 2022. The Payment Date for each subsequent Payment Year shall be July 15 of that Payment Year.

TT. "*Payment Year*." The calendar year during which the applicable Annual Payment is due pursuant to Section V.B. Payment Year 1 is 2021 (even if the payment terms herein provide for the first payment to fall in 2022), Payment Year 2 is 2022 and so forth, with 2038 being the final Payment Year. References to payment "for a Payment Year" mean the Annual Payment due during that year. References to eligibility "for a Payment Year" mean eligibility in connection with the Annual Payment due during that year.

UU. "*Preliminary Agreement Date*." The date upon which this Agreement becomes

---

[1] Reimbursement includes amounts paid to any governmental entities for past expenditures or programs.

fully executed.

VV.   "*Prepayment Notice.*" As defined in Section V.I.1.

WW.   "*Primary Subdivision.*" A Subdivision that is a General Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government) with population over ten thousand (10,000); *provided*, *however*, that as used in connection with Incentive Payment C, the population threshold is thirty thousand (30,000). Attached as Exhibit D is an agreed list of the Primary Subdivisions.

XX.   "*Product.*" Any chemical substance, whether used for medicinal or non- medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is: (1) an opioid or opiate, as well as any product containing any such substance; (2) benzodiazepine, carisoprodol, or gabapentin; or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, any variant of these substances or any similar substance. Notwithstanding the foregoing, nothing in this Section II.RR prohibits Texas from taking administrative or regulatory action related to benzodiazepine (including, but not limited to, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, and midazolam), carisoprodol, or gabapentin that is wholly independent from the use of such drugs in combination with opioids, *provided* such action does not seek money (including abatement and/or remediation) for conduct prior to the Effective Date.

YY.   "*Released Claims.*" Any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, Released Claims include any Claims that have been asserted against a Settling Distributor by Texas or a Litigating Subdivision in any federal, state or local action or proceeding (whether judicial, arbitral or administrative) based on, arising out of, or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by Texas, Subdivision or Releasor (whether or not Texas, Subdivision or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to this Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that this term, "Released Claims," be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe claims brought by a Later Litigating Subdivision or other non-party Subdivision that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

ZZ.   "*Released Entities.*" With respect to Released Claims, the Settling Distributors and (1) all past and present subsidiaries, divisions, predecessors, successors, and assigns (in each case,

7

STRICTLY CONFIDENTIAL

whether direct or indirect) of each Settling Distributor; (2) all past and present subsidiaries and divisions (in each case, whether direct or indirect) of any entity described in clause (1); (3) the respective past and present officers, directors, members, trustees, and employees of any of the foregoing (each for actions that occurred during and related to their work for, or employment with, any of the Settling Distributors or the foregoing entities); (4) all past and present joint ventures (whether direct or indirect) of each Settling Distributor or its subsidiaries, including in such Settling Distributor's or subsidiary's capacity as a participating member in such joint venture; (5) all direct or indirect parents and shareholders of the Settling Distributors (solely in their capacity as parents or shareholders of the applicable Settling Distributor with respect to Covered Conduct); and (6) any insurer of any Settling Distributor or any person or entity otherwise described in clauses (1)-(5) (solely in its role as insurer of such person or entity). For the avoidance of doubt, CVS Health Corp., Walgreens Boots Alliance, Inc., and Walmart Inc. (collectively, the "Pharmacies") are not Released Entities, nor are their direct or indirect past or present subsidiaries, divisions, predecessors, successors, assigns, joint ventures, shareholders, officers, directors, members, trustees, or employees (shareholders, officers, directors, members, trustees, and employees for actions related to their work for, employment with, or involvement with the Pharmacies) Released Entities. Notwithstanding the prior sentence, any joint venture or past or present subsidiary of a Settling Distributor is a Released Entity, including any joint venture between a Settling Distributor or any Settling Distributor's subsidiary and a Pharmacy (or any subsidiary of a Pharmacy). Lists of Settling Distributors' subsidiaries, joint ventures, and predecessor entities are appended to this Agreement as Exhibit F. With respect to joint ventures (including predecessor entities), only entities listed on Exhibit F are Released Entities. With respect to wholly-owned subsidiaries (including predecessor entities), Exhibit F represents a good faith effort by the Settling Distributors to list all such entities, but any and all wholly- owned subsidiaries (including predecessor entities) of any Settling Distributor are Released Entities, whether or not they are listed on Exhibit F. For the avoidance of doubt, any entity acquired, or joint venture entered into, by a Settling Distributor after the Initial Participation Date is not a Released Entity.

AAA. "*Releasors*." With respect to Released Claims, (1) Texas, including the Texas Department of State Health Services; (2) the Bellwether Counties; (3) each Participating Subdivision; and (4) without limitation and to the maximum extent of the power of Texas's Attorney General and/or each Participating Subdivision to release Claims, (a) Texas's and Participating Subdivisions' departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts and other Special Districts in Texas, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to Texas or its Subdivisions, whether or not any of them participate in this Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. Texas's Attorney General represents that he or she has or has obtained (or will obtain no later than the Initial Participation Date) the authority set forth in Section X.E. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Texas Participation Form, providing for a release to the fullest extent of the

STRICTLY CONFIDENTIAL

Participating Subdivision's authority.

BBB.    "*Revocation Event*." With respect to a Bar, Settlement Class Resolution, or Case-Specific Resolution, a revocation, rescission, reversal, overruling, or interpretation that in any way limits the effect of such Bar, Settlement Class Resolution, or Case-Specific Resolution on Released Claims, or any other action or event that otherwise deprives the Bar, Settlement Class Resolution, or Case-Specific Resolution of force or effect in any material respect.

CCC.    "*Settlement Class Resolution*." A class action resolution in a court of competent jurisdiction with respect to a class of Subdivisions that (1) conforms with Texas's statutes, case law, and rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in Texas and such order has become a Final Order; (3) is binding on all Non-Participating Subdivisions (other than opt-outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions may not bring any Released Claims against any Released Entities, whether on the ground of this Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Settling Distributors other than those provided for in this Agreement, or contain any provision inconsistent with any provision of this Agreement. If applicable state law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing more than the opt-out percentage specified in the Global Settlement. In seeking certification of any Settlement Class, Texas and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and should have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case or for purposes unrelated to this Agreement.

DDD.    "*Settlement Payment Schedule*." The schedule attached to this Agreement as Exhibit G.

EEE.    "*Settlement Prepayment*." As defined in Section V.I.1.

FFF.    "*Settlement Prepayment Reduction Schedule*." As defined in Section V.I.1.

GGG. "*Settling Distributors*." McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation (each, a "*Settling Distributor*").

HHH. "*State Cap*." The total of a Settling Distributor's share of the amounts payable under the Global Settlement (a) to a State other than Texas for a Payment Year assuming that State is eligible for Incentive Payments A and D and that no offset or suspension is applicable with respect to that State, and (b) for attorney's fees and costs that would have been owed during that Payment Year times that State's allocable share as specified in the Global Settlement.

III.    "*States*." The states, commonwealths, and territories of the United States of America, as well as the District of Columbia, but not including West Virginia (each a "State"). The fifty-five (55) States are listed in Exhibit Q. Each "State" also includes its departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind, any other units of State government, attorneys, including its Attorney General, and any person in his or her official

STRICTLY CONFIDENTIAL

capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing.

JJJ. "*Subdivision*." Any (1) General Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government), School District, or Special District within Texas and (2) any other subdivision or subdivision official or sub-entity of or located within Texas (whether political, geographical or otherwise, whether functioning or non-functioning, regardless of population overlap, and including, but not limited to, Nonfunctioning Governmental Units and public institutions) that has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae*, or any other capacity. "General Purpose Government," "School District," and "Special District" shall correspond to the "five basic types of local governments" recognized by the U.S. Census Bureau and match the 2017 list of Governmental Units.[2] The three (3) General Purpose Governments are county, municipal, and township governments; the two (2) special purpose governments are School Districts and Special Districts.[3] "Fire District," "Health District," "Hospital District," and "Library District" shall correspond to categories of Special Districts recognized by the U.S. Census Bureau.[4] References to Texas's Subdivisions or to a Subdivision "in," "of" or "within" Texas include Subdivisions located within Texas even if they are not formally or legally a sub-entity of Texas; *provided*, *however*, that a "Health District" that includes any of the following words or phrases in its name shall not be considered a Subdivision: mosquito, pest, insect, spray, vector, animal, air quality, air pollution, clean air, coastal water, tuberculosis, and sanitary.

KKK. "*Suspension Amount*." The amount calculated as follows: the per capita amount corresponding to the applicable Participation Tier as set forth in Exhibit B multiplied by the population of the Later Litigating Subdivision.

LLL. "*Suspension Cap*." The amount calculated as follows: the suspension percentage corresponding to the applicable Participation Tier as set forth in Exhibit B multiplied by the amount of the relevant Annual Payment apportioned to Texas and the Participating Subdivisions in each year of the suspension.

MMM. "*Suspension Deadline*." With respect to a lawsuit filed by a Later Litigating Subdivision asserting a Released Claim, the deadline set forth in Exhibit B corresponding to the

---

[2] https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html

[3] *E.g.*, U.S. Census Bureau, "Technical Documentation: 2017 Public Use Files for State and Local Government Organization" at 7 (noting that "the Census Bureau recognizes five basic types of local governments," that three of those are "general purpose governments" (county governments, municipal governments, and township governments), and that the other two are "school district and special district governments"), https://www2.census.gov/programs-surveys/gus/datasets/2017/2017_gov_org_meth_tech_doc.pdf.

[4] A list of 2017 Government Units provided by the Census Bureau identifies 38,542 Special Districts and categorizes them by "FUNCTION_NAME." "Govt_Units_2017_Final" spreadsheet, "Special District" sheet, included in "Independent Governments - list of governments with reference information," https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html. As used herein, "Fire District" corresponds to Special District function name "24 – Local Fire Protection," "Health District" corresponds to Special District function name "32 – Health," "Hospital District" corresponds to Special District function name "40 – Hospitals," and "Library District" corresponds to Special District function name "52 – Libraries." *See id*.

STRICTLY CONFIDENTIAL

applicable Participation Tier.

NNN. "*Texas Abatement Amount*." $1,167,644,106.34, which is the Global Settlement Net Abatement Amount multiplied by the Texas Overall Allocation Percentage.

OOO. "*Texas Additional Restitution Amount*." $29,652,876.43, which is the portion of the "Additional Restitution Amount" specified by the Global Settlement that is allocated to Texas under that agreement.

PPP. "*Texas Consent Judgment*." A consent judgment in a form to be agreed by Texas and the Settling Distributors prior to the Initial Participation Date that, among other things, (1) approves this Agreement and (2) provides for the release set forth in Section X, including the dismissal with prejudice of any Released Claims that Texas or either of the Bellwether Counties has brought against Released Entities and is subject to the sole jurisdiction and enforcement of the court in the Consent Judgment Court.

QQQ. "*Texas Consolidated Litigation Court*." The Court that is the Hon. Robert Schaffer, In Re: Texas Opioid Litigation, 18-0358 (152d Jud. Dist. Ct., Harris Cty) to which the Agreement is presented for entry and enforcement, except as to matters addressed in the Texas Consent Judgment.

RRR. "*Texas Overall Allocation Percentage*." 6.2932157196%, which is Texas's Overall Allocation Percentage as set forth in the Global Settlement.

SSS. "*Texas Participation Form*." The form attached as Exhibit L or a substantially similar form that Participating Subdivisions[5] must execute and return to the Texas Qualified Settlement Fund Administrator, and which shall (1) make such Participating Subdivisions signatories to this Agreement, (2) include a full and complete release of any and all of such Subdivision's claims, and (3) require the prompt dismissal with prejudice of any Released Claims that have been filed by any such Participating Subdivision. For the avoidance of doubt, the Parties agree that to the extent the form references the Global Settlement, it is intended to include this Agreement.

TTT. "*Texas Qualified Settlement Fund*." The fund established by the Texas Consolidated Litigation Court pursuant to this Agreement into which the Annual Payments are made under Section V.

UUU. "*Texas Qualified Settlement Fund Administrator*." The entity appointed by the Texas Consolidated Litigation Court that annually determines the Annual Payment (including calculating Incentive Payments pursuant to Section IV and any amounts subject to suspension, offset, or reduction pursuant to Sections XI and XII) administers the Texas Qualified Settlement Fund, and distributes amounts from the Texas Qualified Settlement Fund pursuant to this Agreement. The duties of the Texas Qualified Settlement Fund Administrator shall be governed

---

[5] For purposes of this definition for Participating Subdivisions, it is the intent of the Parties to this Agreement that the Texas Opioid Council gives special consideration under the Texas Allocation Statute, including without limitation, Tex. Gov't Code §403.501(5) and §403.508(a)(2), as to whether any Special District was a litigating Special District prior to the date this Agreement was fully executed

by this Agreement and shall be specified in detail by the Parties prior to the Initial Participation Date.

VVV.  "*Texas Qualified Settlement Fund Escrow*." If the Global Settlement is not effective by July 1, 2022, the interest-bearing escrow fund established by the Texas Consolidated Litigation Court pursuant to this Agreement to hold disputed or suspended payments made under this Agreement, and to hold the first Annual Payment until 10 calendar days after the Effective Date. This fund may be the Settlement Fund Escrow as defined in the Global Settlement.

WWW.  "*Texas Settlement Amount.*" In the event the Global Settlement is not effective by July 1, 2022, $1,271,427,627.66, which reflects the Texas Abatement Amount, Texas Additional Restitution Amount, and the attorneys' fees and costs described in <u>Section VIII.B</u> and <u>Section VIII.C</u>.

XXX.  "*Threshold Motion*." A motion to dismiss or equivalent dispositive motion made at the outset of litigation under applicable procedure. A Threshold Motion must include as potential grounds for dismissal any applicable Bar or the relevant release by Texas or Participating Subdivision provided under this Agreement and, where appropriate on Threshold Motion under applicable law, any applicable limitations defense.

### III.    Condition to Effectiveness of Agreement

A.  *Conditions Precedent*. If any of the conditions in this <u>Section III.A</u> is not satisfied, this Agreement will have no further effect and all releases and other commitments or obligations contained herein or in any Texas Participation Form will be void.

1.  No later than the Initial Participation Date, Texas's Attorney General shall exercise to the fullest extent his or her powers to release all Claims for Covered Conduct.

2.  No later than the Initial Participation Date, Texas's Attorney General shall secure the releases specified in <u>Section X.E</u>.

3.  No later than February 18, 2022, all Texas Litigating Subdivisions with a population of at least 500,000 (as set forth in <u>Exhibit T</u>) shall meet the requirements to become a Participating Subdivision as detailed in <u>Section IV</u>.  Copies of the Texas Participation Forms for such Subdivisions will be delivered to the Settling Distributors by that date to be held in escrow until the Effective Date.

4.  No later than March 10, 2022, at least 96% of the Texas Litigating Subdivisions, as measured by population, shall meet the requirements to become a Participating Subdivision as detailed in <u>Section IV</u>.  Copies of the Texas Participation Forms for such Subdivisions will be delivered to the Settling Distributors by that date to be held in Escrow until the Effective Date.

B.  *Dismissal of Claims*. Upon the execution of this Agreement, while awaiting final approval of this Agreement by the Bellwether Counties, the Parties agree to stay or extend all deadlines and proceedings in the Actions as to Released Claims against the Settling Distributors and to jointly move for the claims against the Settling Distributors to be severed from the Actions

STRICTLY CONFIDENTIAL

(with such severance to take effect upon the Effective Date of this Agreement). It is the Parties' intent that all litigation activities in the Actions relating to the Bellwether Counties' claims against the Settling Distributors shall immediately cease as of the date of the execution of this Agreement and that the claims against the Settling Distributors not be further prosecuted. Concurrently with the execution of this Agreement, the Settling Distributors and the Bellwether Counties will execute a Stipulation of Dismissal with Prejudice, in the form annexed hereto in Exhibit M. In the event the Court declines to so order the discontinuance of the Actions with prejudice as against the Settling Distributors, each Settling Distributor shall be entitled to terminate the Agreement as to itself and shall be excused from all obligations under the Agreement.

## IV.    Participation by Subdivisions

A.    *Requirements for Becoming a Participating Subdivision—Litigating Subdivisions/Later Litigating Subdivisions*. A Litigating Subdivision or Later Litigating Subdivision may become a Participating Subdivision by either returning an executed Texas Participation Form and upon prompt dismissal of its legal action or by having its claims extinguished by operation or law or released by the Texas Attorney General. A Litigating Subdivision or Later Litigating Subdivision may not become a Participating Subdivision after the completion of opening statements in a trial of the lawsuit it brought that includes a Released Claim against a Released Entity.

B.    *Initial Participating Subdivisions*. A Subdivision qualifies as an Initial Participating Subdivision if it meets the applicable requirements for becoming a Participating Subdivision by the Initial Participation Date.

C.    *Later Participating Subdivisions*. A Subdivision that is not an Initial Participating Subdivision may become a Later Participating Subdivision by meeting the applicable requirements for becoming a Participating Subdivision after the Initial Participation Date and agreeing to be subject to the terms of the agreement reached by Texas with Initial Participating Subdivisions. A Later Participating Subdivision shall not receive any share of any base or incentive payments paid to the Texas Qualified Settlement Fund that were due before it became a Participating Subdivision.

D.    *Notice*. In conjunction and accordance with the notice process anticipated in the Global Settlement, the Office of the Texas Attorney General has previously provided individual notice to all Non-Litigating Subdivisions eligible to participate in the settlement and the requirements for participation. Such notice included publication and other standard forms of notification. Nothing contained herein shall preclude Texas from providing further notice to, or from contacting any of its Subdivision(s) about, becoming a Participating Subdivision.

E.    *Requirements for Becoming a Participating Subdivision—Non-Litigating Subdivisions*. A Non-Litigating Subdivision may become a Participating Subdivision by either executing a Texas Participation Form specifying that the Subdivision: (1) agrees to the terms of this Agreement pertaining to Subdivisions, (2) releases all Released Claims against all Released Entities, and (3) submits to the jurisdiction of the Texas Consolidated Litigation Court for purposes limited to that court's role under the Agreement or by having their claims extinguished by operation of law or release by the Texas Attorney General.

STRICTLY CONFIDENTIAL

F.     *Non-Participating Subdivisions*. Non-Participating Subdivisions shall not directly receive any portion of any base or incentive payments paid to the Texas Qualified Settlement Fund and Texas may choose that its Non-Participating Subdivisions are ineligible for benefits from the fund.

G.     *Representation With Respect to Participation Rate*. Texas represents and warrants for itself that it has a good faith belief that all of Texas's Litigating Subdivisions that are represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LLC will become Participating Subdivisions. Texas acknowledges the materiality of the foregoing representation and warranty. Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LLC represent and warrant that they have a good faith belief that this Agreement is a fair settlement and that they will therefore recommend this Agreement to their Subdivision clients within Texas. A list of Litigating Subdivisions represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LLC is annexed hereto as Exhibit O. Additionally, Texas represents and warrants that the list annexed hereto as Exhibit S are Subdivisions that, as of January 31, 2022, have met the requirements to become Participating Subdivisions under the terms of this Agreement and the Global Settlement.

H.     *Case Management Order.* Within five (5) calendar days of entry of the Court's entry of an order discontinuing the Actions brought by the Bellwether Counties consistent with the Stipulation of Dismissal with Prejudice submitted by those counties per Section III.B, the Parties will seek to have entered the Case Management Order annexed hereto as Exhibit P. And, further, the Settling Distributors will participate in making motions to dismiss barred claims upon their release.

I.     *Unpaid Allocations to Later Participating Subdivisions and Non-Participating Subdivisions*. Any base payment and incentive payments allocated to a Later Participating Subdivision or Non-Participating Subdivision that cannot be paid pursuant to Section IV.C will be allocated consistent with the terms of Exhibit N.[6]

J.     *Texas Participation Forms.* Within seven (7) calendar days of the Effective Date, Texas shall transmit to the Settling Distributors copies of all Texas Participation Forms received as of the Effective Date that Texas has not already transmitted to the Settling Distributors pursuant to the deadlines set forth in Section III.A.3 or Section III.A.4. If any Subdivision subsequently becomes a Participating Subdivision, Texas will transmit a copy of that Texas Participation Form within seven (7) calendar days of receipt.

**V.     Settlement Payments**

A.     *Texas Qualified Settlement Fund*. Until such time as the Global Settlement becomes effective, all payments under this Section V shall be made into the Texas Qualified Settlement

---

[6] For the avoidance of doubt, the Settling Distributors are not parties to Exhibit N and dispute, and do not concede, any characterizations of their conduct therein.  Further, the Settling Distributors expressly deny any statements or implications within Exhibit N or any other agreement between Texas and one or more of its Subdivisions, concerning alleged misconduct by any Settling Distributor.  As stated herein, the Settling Distributors expressly deny any liability, fault, or wrongdoing.  The Settling Distributors have entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation.

STRICTLY CONFIDENTIAL

Fund, except that where specified, they shall be made into the Texas Qualified Settlement Fund Escrow. The Texas Qualified Settlement Fund shall be allocated and used only as specified in Section VI and Exhibit N.

B.     *Annual Payments*. The Settling Distributors shall make eighteen (18) Annual Payments, each comprised of base and incentive payments as provided in this Section V and as determined by the Texas Qualified Settlement Fund Administrator as set forth in this Agreement.

1.     All data relevant to the determination of the Annual Payment and allocations to Texas and its Participating Subdivisions shall be submitted to the Settlement Administrator no later than sixty (60) calendar days prior to the Payment Date for each Annual Payment. The Texas Qualified Settlement Fund Administrator shall then determine the Annual Payment and the amount to be paid to Texas and its Participating Subdivisions, by:

a.     determining, the amount of base and incentive payments to which Texas is entitled by applying the criteria under Sections V.D, E and F;

b.     applying any suspensions, offsets or reductions as specified under Sections V, XI and XII

c.     applying any adjustment required as a result of prepayment or significant financial constraint, as specified under Sections V.I and J; and

d.     determining the total amount owed by Settling Distributors (including any amounts to be held in the Texas Qualified Settlement Fund Escrow pending resolution of a case by a Later Litigating Subdivision as described in Section XI) to Texas and the Participating Subdivisions.

e.     the Texas Qualified Settlement Fund Administrator shall then allocate the Annual Payment to Texas and then among the Participating Subdivisions receiving direct allocations.

2.     The Texas Qualified Settlement Fund Administrator shall also apply the allocation percentages set forth in Section V.H and determine for each Settling Distributor the amount of its allocable share of the Annual Payment. For the avoidance of doubt, each Settling Distributor's liability for its share of the Annual Payment is several, and not joint.

3.     As soon as possible but no later than fifty (50) calendar days prior to the Payment Date for each Annual Payment and following the determination described in paragraph 1 above, the Texas Qualified Settlement Fund Administrator shall give notice to the Settling Distributors and Texas of the amount of the Annual Payment, the amount to be received by Texas and the amount to be received by Participating Subdivisions receiving direct allocations. The Texas Qualified Settlement Fund Administrator shall also apply the allocation percentages set forth in Section V.H and give notice to each Settling Distributor of the amount of its allocable share of the Annual Payment.

4.     Within twenty-one (21) calendar days of the notice provided by the Texas

Qualified Settlement Fund Administrator, Texas and any Settling Distributor may dispute, in writing, the calculation of the Annual Payment, or the amount to be received by Texas and/or its Participating Subdivisions. Such disputing Party must provide a written notice of dispute to the Texas Qualified Settlement Fund Administrator, Texas, and the Settling Distributors identifying the nature of the dispute and the amount of money that is disputed.

5. Within twenty-one (21) calendar days of the sending of a written notice of dispute, if Texas or any Settling Distributor is affected by the dispute, Texas or the affected Settling Distributor(s) may each submit a response, in writing, to the Texas Qualified Settlement Fund Administrator, Texas and the Settling Distributors identifying the basis for disagreement with the notice of dispute.

6. If no response is filed, the Texas Qualified Settlement Fund Administrator shall adjust the amount calculated consistent with the written notice of dispute, and Settling Distributors shall pay the adjusted amount as the Annual Payment on the Payment Date. If a written response to the written notice of dispute is timely sent to the Texas Qualified Settlement Fund Administrator, the Texas Qualified Settlement Fund Administrator shall notify the Settling Distributors of the preliminary amount to be paid, which shall be the greater of the amount originally calculated by the Settling Administrator or the amount that would be consistent with the notice of dispute, provided, however that in no circumstances shall the preliminary amount to be paid be higher than the maximum amount of base and Incentive Payments A and D for that Payment Year as set forth on Exhibit G. For the avoidance of doubt, a transfer of suspended payments from the Texas Qualified Settlement Fund Escrow pursuant to Section XI does not count toward determining whether the amount to be paid is higher than the maximum amount of base and Incentive Payments A and D for that Payment Year as set forth in Exhibit G.

7. The Texas Qualified Settlement Fund Administrator shall place any disputed amount of the preliminary amount paid by the Settling Distributors into the Texas Qualified Settlement Fund Escrow and shall disburse any undisputed amount to Texas and the Participating Subdivisions within fifteen (15) calendar days of the Payment Date or at such later time as directed by the Texas Consolidated Litigation Court.

8. Disputes described in this Section V.B shall be resolved in accordance with the terms of Section VII.

C.   *Procedure for Annual Payment in Payment Years 1 and 2*. The process described in Section V.B shall not apply to Payment Years 1 and 2. The procedure in lieu of Section V.B for Payment Years 1 and 2 is as set forth below:

1. The Payment Date for Payment Year 1 shall be ten (10) calendar days after the Effective Date.  By or on September 30, 2021, the Settling Distributors paid into the Global Settlement Fund Escrow the total amount of the base payment and Incentive Payment A for Texas (the amount specified in Exhibit G) for Payment Year 1. In the event that the conditions set forth in Section III.A are not met, the funds held in escrow for the Texas Annual Payment for Payment Year 1 shall immediately revert to the Settling Distributors.   The Texas Qualified Settlement Fund Administrator shall allocate the

Payment Year 1 payment, pursuant to <u>Section VI</u>, <u>Exhibit N</u>, and Chapter 403, among Texas and the Subdivisions receiving a direct allocation[7]. The Annual Payment for Payment Year 1 shall be transferred from the Global Settlement Escrow to the Texas Qualified Settlement Fund (and then to Texas and its Initial Participating Subdivisions) within ten (10) calendar days following the Effective Date, *provided that* the Texas Qualified Settlement Fund Administrator shall leave in the Texas Qualified Settlement Fund funds allocated to Participating Subdivisions, pursuant to <u>Exhibit N</u> and Chapter 403, that are not Initial Participating Subdivisions.

2.     The Payment Date for Payment Year 2 shall be July 15, 2022. On or before the Payment Date for Payment Year 2, the Settling Distributors shall pay into the Texas Qualified Settlement Fund the total amount of the base payment and Incentive Payment A for State (the amount specified in <u>Exhibit G</u>) due for Payment Year 2. The Texas Qualified Settlement Fund Administrator shall disburse such amounts to Texas and its Participating Subdivisions within fifteen (15) calendar days of the Payment Date or at such later time as directed by the Texas Consolidated Litigation Court.

3.     *Texas Qualified Settlement Fund*. Any disputes as to the allocation of the Annual Payments in Payment Years 1 and 2 shall be resolved pursuant to the process set forth in <u>Section V.B</u> above, except that in Payment Year 1, the Texas Qualified Settlement Fund Administrator shall have until ten (10) calendar days after the Initial Participation Date to give notice of the amount to be received by Texas, and the amount to be received by Texas's Participating Subdivisions.

D.     *Payment Date for Subsequent Payment Years*. For Payment Year 3 and successive Payment Years, the Annual Payment shall be made pursuant to the process set forth in <u>Section V.B</u>, except that, with respect to Payment Year 3, Texas shall have up to the Payment Date for Payment Year 3 to become eligible for Incentive Payment A and thus avoid the reductions set forth in <u>Section XII</u>. If Texas enacts a Bar less than sixty (60) calendar days before the Payment Date for Payment Year 3, Settling Distributors shall pay, within thirty (30) calendar days of the Payment Year 3 Payment Date, the difference between the Annual Payment as calculated by the Texas Qualified Settlement Fund Administrator and the amount that would have been owed had the Texas Qualified Settlement Fund Administrator taken the Bar into account.

E.     *Base Payments*. Subject to the suspension, reduction and offset provisions set forth in <u>Sections XI</u> and <u>XII</u>, the Settling Distributors shall collectively make base payments equal to fifty-five percent (55%) of the Texas Abatement Amount. These payments will be due in installments consistent with <u>Exhibit G</u> over the eighteen (18) Payment Years and as adjusted by the Texas Qualified Settlement Fund Administrator pursuant to the provisions in <u>Sections V</u>, <u>XI</u> and <u>XII</u>.

F.     *Incentive Payments*. Subject to the suspension, reduction, and offset provisions set forth in <u>Sections XI</u> and <u>XII</u>, the Settling Distributors shall collectively make potential additional

---

[7] $23,500,000.00 of the direct allocation shall be paid directly by the Texas Qualified Settlement Fund Administrator from the Annual Payment for Payment Year 1 to the counties of Bexar, Dallas, Tarrant, Harris, and Collin, wiring instructions to be provided, as follows:  (1) $9,983,357.11 to Bexar County; (2) $9,983,357.11 to Dallas County; (3) $2,218,523.80 to Tarrant County; (4) $986,071.49 to Harris County; and (5) $328,690.49 to Collin County.

STRICTLY CONFIDENTIAL

incentive payments totaling up to a maximum of forty-five percent (45%) of the Texas Abatement Amount, with the actual amount depending on whether and the extent to which Texas meets the criteria set forth below. The incentive payments shall be divided among four (4) categories, referred to as Incentive Payments A-D. Incentive Payments A-C will be due in installments over the eighteen (18) Payment Years, and Incentive Payment D will be due in installments over thirteen (13) years beginning with Payment Year 6. The incentive payments shall be made to Texas based on its eligibility for that year under the criteria set forth below.

    1.    <u>Incentive Payment A</u>. Incentive Payment A shall be equal to forty percent (40%) of the Texas Settlement Abatement Amount, *provided* that Texas satisfies the requirements of Incentive Payment A. Incentive Payment A will be due as part of the Annual Payment in each of the eighteen (18) Payment Years that Texas is eligible for Incentive Payment A and shall equal a total potential maximum of $467,057,643 if Texas is eligible for all eighteen (18) Payment Years. Texas's share of Incentive Payment A in a given year, *provided* that Texas is eligible, shall equal the total maximum amount available for Incentive Payment A for that year as reflected in <u>Exhibit G</u>. Eligibility for Incentive Payment A is as follows:

    a.    For the Payment Years 1 and 2, Texas is deemed eligible for Incentive Payment A.

    b.    For each Payment Year other than Payment Years 1 and 2, Texas is eligible for Incentive Payment A if, as of sixty (60) calendar days prior to the Payment Date (except that in Payment Year 3, this date is as of the Payment Date), (i) there is a Bar in full force and effect, (ii) there is a Settlement Class Resolution in full force and effect, (iii) the Released Claims of all of the following entities are released through the execution of Texas Participation Forms, or there is a Case-Specific Resolution against such entities: all Primary Subdivisions, Litigating Subdivisions, School Districts with a K-12 student enrollment of at least 25,000 or 0.10% of Texas's population, whichever is greater, and Health Districts and Hospital Districts that have at least one hundred twenty-five (125) hospital beds in one or more hospitals rendering services in that district; or (iv) a combination of the actions in clauses (i)-(iii) has achieved the same level of resolution of Claims by Subdivisions (*e.g.*, a Bar against future litigation combined with full joinder by Litigating Subdivisions). For the avoidance of doubt, <u>clause (iv)</u> cannot be satisfied unless all Litigating Subdivisions are Participating Subdivisions or there is a Case-Specific Resolution against any such Subdivisions that are not Participating Subdivisions.

    c.    Notwithstanding <u>Section V.F.1.b</u>, for each Payment Year other than Payment Years 1 and 2, if Texas is not eligible for Incentive Payment A as of the Incentive Payment Final Eligibility Date, Texas shall not be eligible for Incentive Payment A for that Payment Year or any subsequent Payment Years.

    d.    If the Settling Distributors made a payment under Incentive Payment A solely on the basis of a Bar or Settlement Class Resolution and that Bar or Settlement Class Resolution is subsequently removed, revoked, rescinded,

reversed, overruled, interpreted in a manner to limit the scope of the release, or otherwise deprived of force or effect in any material respect, Texas shall not be eligible for Incentive Payment A thereafter, unless Texas requalifies for Incentive Payment A through any method pursuant to Section V.F.1.b, in which case Texas shall be eligible for Incentive Payment A less any litigation fees and costs incurred by Settling Distributor in the interim, except that, if the re-imposition occurs after the completion of opening statements in a trial involving a Released Claim, Texas shall not be eligible for Incentive Payment A (unless this exception is waived by the Settling Distributors).

2.    Incentive Payment B. Incentive Payment B shall be available to Texas if it is not eligible for Incentive Payment A for the applicable Payment Year. Incentive Payment B shall be equal to up to twenty-five percent (25%) of the Texas Settlement Abatement Amount. Incentive Payment B will be due as part of the Annual Payment in each of the eighteen (18) Payment Years that Texas is eligible for Incentive Payment B and equal a total potential maximum of $291,911,027 if Texas is eligible for all eighteen (18) Payment Years. Texas's maximum share of Incentive Payment B in a given year shall equal the total maximum amount available for Incentive Payment B for that year as reflected in Exhibit G. Eligibility for Incentive Payment B is as follows:

a.    Texas is not eligible for Incentive Payment B for a Payment Year for which it is eligible for Incentive Payment A.

b.    Subject to Section V.F.2.a, the amount of Incentive Payment B for which Texas is eligible in a Payment Year shall be a percentage of that Texas's maximum share of Incentive Payment B based on the extent to which (A) Litigating Subdivisions are Participating Subdivisions or (B) there is a Case-Specific Resolution against Litigating Subdivisions, collectively, "*Incentive B Eligible Subdivisions*." The percentage of Texas's maximum share of Incentive Payment B that Texas is eligible for in a Payment Year shall be determined according to the table below:

| Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population[8] | Incentive Payment B Eligibility Percentage |
|---|---|
| Up to 85% | 0% |

---

[8] The "Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population" shall be determined by the aggregate population of Texas's Litigating Subdivisions that are Incentive B Eligible Subdivisions divided by the aggregate population of Texas's Litigating Subdivisions. In calculating Texas's population that resides in Litigating Subdivisions, (a) the population of Texas's Litigating Subdivisions shall be the sum of the population of all Litigating Subdivisions, notwithstanding that persons may be included within the population of more than one Litigating Subdivision, and (b) the population that resides in Incentive B Eligible Subdivisions shall be the sum of the population of the Incentive B Eligible Subdivisions, notwithstanding that persons may be included within the population of more than one Incentive B Eligible Subdivision. An individual Litigating Subdivision shall not be included more than once in the numerator, and shall not be included more than

STRICTLY CONFIDENTIAL

| Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population[8] | Incentive Payment B Eligibility Percentage |
|---|---|
| 85%+ | 30% |
| 86+ | 40% |
| 91+ | 50% |
| 95+ | 60% |
| 99%+ | 95% |
| 100% | 100% |

c.     Texas's Incentive Payment B amount shall be discounted to reflect Texas's eligibility percentage for that Payment Year per the table above.

d.     Texas's eligibility for Incentive Payment B for a Payment Year with the exception of Payment Year 1, which shall be determined on the Initial Participation Date; *provided* that the percentage of Incentive Payment B for which Texas is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

3.     <u>Incentive Payment C</u>. Incentive Payment C shall be available to Texas if Texas is not eligible for Incentive Payment A for a Payment Year. Incentive Payment C shall be equal to up to 15% of the Texas Settlement Abatement Amount. Incentive Payment C will be due as part of the Annual Payment in each of the eighteen (18) Payment Years that Texas is eligible for Incentive Payment C and equal a total potential maximum of $175,146,616 if Texas is eligible for all eighteen (18) Payment Years. The maximum Incentive Payment C in a given year shall equal the total maximum amount available for Incentive Payment C for that year as reflected in <u>Exhibit G</u> multiplied by Texas's Incentive Payment C Eligibility Percentage. Eligibility for Incentive Payment C is as follows:

a.     Texas is not eligible for Incentive Payment C for a Payment Year in which it is eligible for Incentive Payment A.

b.     Subject to <u>Section V.F.3.a</u>, the amount of Incentive Payment C for which Texas is eligible in a Payment Year shall be a percentage of Texas's maximum share of Incentive Payment C based on the extent to which (A) Non-Litigating Primary Subdivisions with a population over thirty thousand (30,000) and Litigating Subdivisions are Participating Subdivisions or (B) there is a Case-Specific Resolution against Non-Litigating Primary Subdivisions with a population over thirty thousand (30,000) and Litigating Subdivisions, collectively, "*Incentive*

---

once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit. For the avoidance of doubt, if the population that resides in Incentive B Eligible Subdivisions is less than 85% of the population of Litigating Subdivisions, Texas shall not be eligible for any portion of Incentive Payment B.

STRICTLY CONFIDENTIAL

*C Eligible Subdivisions*.” The percentage of Texas's maximum share of Incentive Payment C that Texas is eligible for in a Payment Year shall be determined according to the table below:

| Percentage of Relevant Subdivision Population that is Incentive C Eligible Population [9] | Incentive Payment C Eligibility Percentage |
|---|---|
| Up to 60% | 0% |
| 60%+ | 25% |
| 70%+ | 35% |
| 75%+ | 40% |
| 80%+ | 45% |
| 85%+ | 55% |
| 90%+ | 60% |
| 93%+ | 65% |
| 94%+ | 75% |
| 95+ | 90% |
| 98+ | 95% |
| 100% | 100% |

      c.     The amount Texas receives under Incentive Payment C shall be discounted to reflect Texas's eligibility percentage for that Payment Year per the table above.

      d.     Texas's eligibility for Incentive Payment C for a Payment Year shall be determined as of sixty (60) calendar days prior to the Payment Date for that Payment Year with the exception of Payment Year 1, which shall be determined on the Initial Participation Date; *provided* that the percentage of Incentive Payment C

---

[9] The "Percentage of Relevant Subdivision Population that is Incentive C Eligible Population" shall be determined by the aggregate population of Incentive C Eligible Subdivisions divided by the aggregate population of the Non-Litigating Primary Subdivisions with a population over 30,000 and Litigating Subdivisions ("*Incentive Payment C Subdivisions*"). In calculating the population that resides in Incentive Payment C Subdivisions, (a) the population shall be the sum of the population of all Incentive Payment C Subdivisions, notwithstanding that persons may be included within the population of more than one Incentive Payment C Subdivision, and (b) the population that resides in Incentive C Eligible Subdivisions shall be the sum of the population of the Incentive C Eligible Subdivisions, notwithstanding that persons may be included within the population of more than one Incentive C Eligible Subdivision. An individual Incentive Payment C Subdivision shall not be included more than once in the numerator, and shall not be included more than once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit. For the avoidance of doubt, if the population that resides in Incentive C Eligible Subdivisions is less than 60% of the population of Incentive Payment C Subdivisions, Texas shall not be eligible for any portion of Incentive Payment C.

for which Texas is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

4.  <u>Incentive Payment D</u>. Incentive Payment D shall be applied at Payment Year 6. Incentive Payment D shall be equal to 5% of the Texas Settlement Abatement Amount. Incentive Payment D will be due as part of the Annual Payment for each of thirteen (13) Payment Years (from Payment Year 6 to Payment Year 18) that Texas is eligible for Incentive Payment D and equal a total potential maximum of $58,382,205 if Texas is eligible for all thirteen (13) Payment Years. Texas's Incentive Payment D in a given year shall equal the total maximum amount set forth in <u>Exhibit G</u>. Eligibility for Incentive Payment D is as follows:

a.  Texas is eligible for Incentive Payment D if there has been no Later Litigating Subdivision that has had a Claim against a Released Entity survive more than six (6) months after denial in whole or in part of a Threshold Motion.

b.  Texas's for Incentive Payment D shall be determined as of sixty (60) calendar days prior to the Payment Date. If a Later Litigating Subdivision's lawsuit survives more than six (6) months after denial in whole or in part of a Threshold Motion after that date, Texas shall not be eligible for Incentive Payment D for the Payment Year in which that occurs and any subsequent Payment Year.

c.  Notwithstanding <u>Sections V.F.4</u>, Texas can become re- eligible for Incentive Payment D if the lawsuit that survived a Threshold Motion is dismissed pursuant to a later motion on grounds included in the Threshold Motion, in which case Texas shall be eligible for Incentive Payment D less any litigation fees and costs incurred by Settling Distributor in the interim, except that if the dismissal motion occurs after the completion of opening statements in such action, Texas shall not be eligible for Incentive Payment D.

d.  For the avoidance of doubt, Texas may be eligible for Incentive Payment D whether or not it is eligible for Incentive Payments A-C.

5.  The eligibility criteria set forth in <u>paragraphs 1-4</u> above are intended to be consistent with the Global Settlement. To the extent that the Global Settlement becomes effective and the terms of the eligibility criteria for Incentive Payments A-D are more favorable to Texas under the Global Settlement than the terms set forth in <u>paragraphs 1-4</u>, the terms of the Global Settlement shall control.

G.  *Reductions/Offsets*. The base and incentive payments are subject to suspension, reduction, and offset as provided in <u>Sections XI</u> and <u>XII</u>.

H.  *Allocation of Payments among Settling Distributors*. Payments due from the Settling Distributors under this <u>Section V</u>, <u>Section VIII</u>, and <u>Section IX</u> will be allocated among the Settling Distributors as follows: McKesson – 38.1%; Amerisource – 31.0%; Cardinal – 30.9%. A Settling Distributor's sole responsibility for payments under this Agreement shall be to make its share of each payment. The obligations of the Settling Distributors in this Agreement are several and not joint. No Settling Distributor shall be responsible for any portion of another Settling

STRICTLY CONFIDENTIAL

Distributor's share.

I.     *Pre-payment Option*.

1.     Any Settling Distributor shall have the right, subject to the limitations set forth in Section V.I.3, to prepay any base payment or incentive payment in whole or in part, without premium or penalty (a "*Settlement Prepayment*") by providing at least fourteen (14) calendar days prior written notice to the Texas Qualified Settlement Fund Administrator (a "*Prepayment Notice*"). Any Prepayment Notice shall specify: (a) the gross amount of the Settlement Prepayment, (b) the manner in which such Settlement Prepayment shall be applied to reduce such Settling Distributor's future share of Annual Payments (*i.e.*, to which future Annual Payments owed by such Settling Distributor the Settlement Prepayment should be applied) (such manner of application, a "*Settlement Prepayment Reduction Schedule*"), (c) the net present value of the Settlement Prepayment as of the Prepayment Date based on the Settlement Prepayment Reduction Schedule using a discount rate equal to the prime rate as published by *The Wall Street Journal* on the date of the Prepayment Notice plus 1.75% (such net present value amount, the "*Net Settlement Prepayment Amount*"), and (d) the date on which the prepayment will be made, which shall be no more than fifteen (15) calendar days after the date of the Prepayment Notice (the "*Prepayment Date*").

2.     On the Prepayment Date the Settling Distributor shall pay the Net Settlement Prepayment Amount to the Texas Qualified Settlement Fund and such amount shall be used only as specified in Section VI. Following such payment, all future Annual Payments allocated to the applicable Settling Distributor under Sections V.E and V.F shall be reduced pursuant to the Settlement Prepayment Reduction Schedule, and Exhibit G will be updated to give effect to such reduction, and going forward such updated schedule will be Exhibit G.

3.     A Settling Distributor's right to make prepayments shall be subject to the following limitations:

a.     Prepayments may apply to base payments or to both base and incentive payments. If the prepayment applies to both base and incentive payments, the prepayments will apply proportionately across base and incentive payments.

b.     A Settling Distributor shall make no more than three (3) prepayments over the eighteen (18) year payment term. A Settling Distributor shall not make more than one (1) prepayment in a five (5) year period and there shall not be prepayments made in the first two (2) Payment Years.

c.     Prepayments shall only be applied to one (1) or more of the three (3) Payment Years following the prepayment.

d.     The total amount of a prepayment of base payments after discounting calculations shall not be larger than the base payment for the Payment Year with the lowest Annual Payment amount affected by the prepayment. The total amount of a prepayment for both base payments and incentive payments shall

not be larger than the base payment and anticipated incentive payments for the lowest Payment Year affected by the prepayment. The "anticipated incentive payment" for a future Payment Year shall reflect the incentives earned by Texas as of the time of the prepayment and any offsets or adjustments known at that time.

e.     In a Payment Year against which there has been a prepayment, if the amount Texas is calculated to receive is greater than the amount prepaid prior to discounting calculations, the Settling Distributor shall pay the difference. If, in a Payment Year for which there has been a prepayment, the amount that Texas is calculated to receive is less than the amount calculated at the time of the prepayment, there shall be a credit for the difference to the Settling Distributor to be applied in the subsequent Payment Year(s), if any.

4.     For illustrative purposes only, attached as Exhibit H are examples showing a Settlement Prepayment, the related calculation of the Net Settlement Prepayment Amount, and the related adjustment to the Settlement Payment Schedule.

J.     *Significant Financial Constraint.*

1.     If the Global Settlement does not become effective, a Settling Distributor's allocable share of the Annual Payment for a Payment Year may, at the election of such Settling Distributor, be deferred either (a) up to the amount by which that share plus (i) such Settling Distributor's share of amounts payable during that Payment Year under Section V and Section VIII and (ii) amounts payable (if any) during that Payment Year by that Settling Distributor under any Other State Resolutions up to the applicable State Caps for the States of such Other State Resolutions, would in total exceed twenty percent (20%) of such Settling Distributor's total operating cash flow (as determined pursuant to United States generally accepted accounting principles) for its fiscal year that concluded most recently prior to the due date for that Annual Payment; or (b) (i) up to twenty-five percent (25%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies is below BBB or Baa2 or (ii) up to one hundred percent (100%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies is below BBB- or Baa3. As used herein, the "applicable" State Cap refers to the State that is the beneficiary of the Other State Resolution at issue or, in the case of an Other State Resolution with a Subdivision(s), the State in which such Subdivision(s) is located.  In the case of multiple Other State Resolutions in a State (e.g., with the State and/or separately with Subdivisions in it), payments under them shall count cumulatively towards the applicable State Cap.

2.     If the reason for exceeding twenty percent (20%) of a Settling Distributor's total operating cash flow or the decrease in credit rating is substantially attributable to the incurrence of debt to fund post-settlement acquisitions or to the payment of dividends and/or share repurchases that together are of an amount that exceeds the total amount of those two items for the prior fiscal year, no deferral is available. A Settling Distributor shall not be allowed to defer payment for a Payment Year if that Settling Distributor engaged in any share repurchases in the three fiscal quarters prior to the Payment Date for that Payment

Year.

3.      If a Settling Distributor has reason to believe that it will not be able to pay some or all of its allocable share of the Annual Payment for a Payment Year, it shall provide at least ninety (90) calendar days' prior written notice to the Texas Qualified Settlement Fund Administrator and to Texas (a "*Deferred Payment Notice*"). Any Deferred Payment Notice shall specify and include: (a) the gross amount of the payments owed (including the estimated allocable portion of the Annual Payment, and amounts owed under <u>Section V</u> and <u>Section VIII</u>, by the relevant Settling Distributor); (b) the amount that the Settling Distributor believes it will be unable to pay; (c) the accounting and audited financial documents upon which the Settling Distributor relied for making this determination; and (d) any other relevant information for Texas to consider.

4.      A Settling Distributor shall not utilize this provision during the first three (3) Payment Years. If a Settling Distributor defers some or all of the payments due in a Payment Year pursuant to this <u>Section V.J</u>, it shall not repurchase any shares, or fund new acquisitions with an acquisition price greater than $250 million, during the deferral period until the deferred amount is fully repaid with interest. Any amounts deferred shall bear interest at an interest rate equal to the prime rate as published by the Wall Street Journal on the date of the Deferral Payment Notice plus 0.5%.

5.      The Settling Distributor shall pay all deferred amounts, including applicable interest on the next Payment Date. If the amounts previously deferred (including interest) together with the Settling Distributor's share of all payments due for a Payment Year would allow for a deferral under <u>Section V.J.1</u>, the Settling Distributor shall pay as much of the previously deferred amounts (including interest) as it can pay without triggering the ability to defer payment and may defer the remainder as permitted under (and subject to the restrictions of) this <u>Section V.J</u>.

6.      Deferrals will apply proportionally across base payments and incentive payments. For the avoidance of doubt, this <u>Section V.J</u> applies fully to Payment Years after the first three (3) Payment Years, including the base payments and all incentive payments due pursuant to this Agreement during the Payment Year at issue.

7.      If a Settling Distributor could pay a portion of its allocable share of the Annual Payments due pursuant to this Agreement during a Payment Year without triggering this <u>Section V.J</u>, the Settling Distributor shall be required to pay that portion as scheduled and only the excess would be subject to deferral at the election of the Settling Distributor (in whole or in part) as provided herein.

8.      The Settling Distributor shall pay any deferred amounts, including applicable interest on or before the date on which the payment is due for Payment Year 18.

9.      If the Global Settlement becomes effective, this provision shall be superseded by the Significant Financial Constraint provision set forth therein.

K.      *Participation Tier Calculations*. Texas will be eligible for benefits associated with any tier implemented in the Global Settlement. If a suspension is put into effect and it is later

STRICTLY CONFIDENTIAL

determined that Texas would have been entitled to additional protection from the suspension due to tier participation, any excess funds captured by the moratorium will be reimbursed. If the Global Settlement does not become effective by July 1, 2022, Texas will be eligible for benefits associated with any tier in the Global Settlement, based on the level of subdivision participation in Texas. Any disputes as to the determination of the Participation Tier shall be decided pursuant to Section VII.

## VI.   Allocation and Use of Settlement Payments.

A.     Payments shall be allocated according to the Intrastate Term Sheet annexed hereto as Exhibit N and incorporated herein by reference, subject to the following provisions:

B.     Both the entire Texas Abatement Amount and the Texas Additional Restitution Amount shall be for Opioid Remediation.

C.     *Nature of Payment*. Each of the Parties and each of the Participating Subdivisions acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

1.     It has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

2.     (a) Texas and Participating Subdivisions sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by Texas and Participating Subdivisions; (b) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by Texas and Participating Subdivisions; and (c) the portion of the Compensatory Restitution Amount received by Texas or Participating Subdivision is no greater than the amount of the Alleged Harms allegedly suffered by Texas or Participating Subdivision;

3.     The payment of the Compensatory Restitution Amount by the Settling Distributors constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by the Settling Distributors;

4.     The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, Texas and Participating Subdivisions to the same position or condition that they would be in had Texas and Participating Subdivisions not suffered the Alleged Harms; and

5.     For the avoidance of doubt: (a) no portion of the Compensatory Restitution Amount represents reimbursement to Texas or any Participating Subdivision or other person or entity for the costs of any investigation or litigation, (b) the entire Compensatory Restitution Amount is properly characterized as described in Section VI.B, and (c) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, or other punitive assessments.

STRICTLY CONFIDENTIAL

D.     The Texas Abatement Amount shall be allocated according to this Agreement, the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit N and incorporated herein by reference (the *"Texas Intrastate Term Sheet"*), subject to Section VI.B, and according to Texas law, including without limitation the guidelines established in Chapter 403, Subchapter R.

## VII.     Enforcement

A.     *Enforceability.* The terms of the Agreement and the Texas Consent Judgment will be enforceable solely by the Texas Consolidated Litigation Court and the Texas Consent Judgment Court, limited to the role of each court in this Agreement.  Participating Subdivisions shall not have enforcement rights against the Settling Distributors with respect to the Texas Consent Judgment, except as to payments that would be allocated to the Texas Qualified Settlement Fund; *provided, however,* that Texas shall establish a process for Participating Subdivisions to notify it of any perceived violations of the Texas Consent Judgment. Texas will continue to serve as an "initial Settling State Member" of the Enforcement Committee of the Global Settlement in conformance with Exhibit B to the Global Settlement.

B.     *Jurisdiction.* The Settling Distributors consent to the jurisdiction of the Texas Consolidated Litigation Court for the limited purposes of enforcing this Agreement and to the Texas Consent Judgment Court for the limited purpose of enforcing the Texas Consent Judgment.

C.     *Dispute Resolution.* The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this section to resolve the dispute.

D.     *Resolution by the Court.* Disputes not resolved informally shall be resolved in the appropriate court as set forth in this Agreement, except as to disputes involving Injunctive Relief under the Texas Consent Judgment, which shall be governed by Section XIII.

E.     *Enforcement.* If the Global Settlement becomes effective by July 1, 2022, disputes between or among the Parties shall be governed by the enforcement and dispute resolution provisions of the Global Settlement.

## VIII.     Plaintiffs' Attorneys' Fees and Costs

A.     It is the intent of the Parties that, if the Global Settlement becomes effective, the attorneys' fees and costs for Texas and its Subdivisions shall be addressed as set forth in Section VIII.B and Section VIII.C.  If the Global Settlement does not become effective, attorneys' fees and costs for Texas and its Subdivisions shall be addressed as set forth in Section VIII.C and Section VIII.D.

B.     If the Global Settlement becomes effective by July 1, 2022:

1.     The Parties agree that Texas subdivision counsel are eligible for the Contingency Fee Fund, and upon application by the Texas Plaintiff's Steering Committee and approval by the Fee Panel, eligible for fees from the Global Contingency Fee Fund of

STRICTLY CONFIDENTIAL

an estimated $33,578,899.00, in subdivision attorneys' fees. This reflects the Global Contingency Fee Fund model's current estimate of Texas's subdivisions in the Global Contingency Fee Fund, and would be paid by the Global Settlement Fund Administrator into the Texas Qualified Settlement Fund over 7 Payment Years and allocated by the Texas Qualified Settlement Fund Administrator subject to Texas Consolidated Litigation Court jurisdiction. The Parties agree that the amount of $33,578,899.00 represents the current estimate of the Texas subdivision counsel's share of the Global Contingency Fee Fund. The actual amount may be greater or less. If the actual amount is less than the foregoing estimate, the remainder shall be subject to payment by the State of Texas under Exhibit N, Section C. The Parties further agree that if the Global Contingency Fee Fund pays any fees into the Texas Qualified Settlement Fund, the amounts paid will be allocated to individual lawyers/firms consistent with the Global Contingency Fee Fund.

2.      The Parties agree that, under the Global Settlement, Texas Subdivisions counsel are eligible for the Global Litigating Subdivision Cost Fund, and upon application by the Texas Plaintiff's Steering Committee and approval by the Global Settlement Fund Administrator, eligible for expenses from the Global Litigating Subdivision Cost Fund (which, if Texas Subdivisions were to receive an amount equal to Texas's Overall Allocation Percentage (6.29312157196%) of the Global Litigating Subdivision Cost Fund would be $7,551,745.89), to be paid through the Global Settlement Fund Administrator into the Texas Qualified Settlement Fund, subject to Texas Consolidated Litigation Court jurisdiction, over 3 Payment Years. The Parties agree that the amount that the Texas Subdivisions receive from the Global Litigating Subdivision Cost Fund may be more or less than the $7,5551,745.89 estimate, and the actual amount will be decided by the administrator of the Global Litigating Subdivision Cost Fund. If such amount is less than the foregoing estimate, the remainder is subject to payment by the State of Texas under Exhibit N, Section C.

3.      Attorneys' fees and costs for Texas and its Subdivisions shall be addressed (except as set forth in Section VIII.C) through the mechanisms set forth in the Global Settlement and Exhibit R (Agreement on Attorneys' Fees, Expenses and Costs) to the Global Settlement, including the eligibility criteria therein, Exhibit T (Agreement on the State Cost Fund Administration) to the Global Settlement, and Exhibit N (Texas Intrastate Allocation Agreement) to this Agreement. The Texas Qualified Settlement Fund Administrator shall not distribute fees or costs from the Global Contingency Fee Fund or Global Litigating Subdivision Cost Fund to any lawyer or firm who has not met the eligibility criteria set forth in Exhibit R to the Global Settlement.

C.      Regardless of whether and when the Global Settlement becomes effective, no later than fifteen (15) calendar days after the Effective Date, the Settling Distributors shall pay $33,000,000 in litigation costs and expenses to the Texas Bellwether Counties, payment instructions for and allocation of which shall be made at the direction of the Texas Bellwether Counties; *provided, however*, that, for the avoidance of doubt, any payment made pursuant to this Section VIII.C is expressly conditioned upon the conditions precedent set forth in Section III.A.3 and Section III.A.4.

STRICTLY CONFIDENTIAL

D.      If the Global Settlement does not become effective by July 1, 2022, the Settling Distributors shall pay into the Texas Qualified Settlement Fund the following amounts, subject to the jurisdiction and guidelines of the Texas Consolidated Litigation Court:

1.      $4,796,985.57 to reimburse Participating Subdivision attorneys' fees upon application by eligible counsel who waive enforcement of their contingency fee contracts. This amount will be paid on July 15, 2022 and each subsequent Payment Date until and including Payment Year 7 for a total payment of $33,578,899.00.

2.      Litigating Subdivisions shall submit litigation costs to the Texas Consolidated Litigation Court, which shall review and approve documented litigation costs, which shall then be paid by Settling Distributors, within 60 calendar days of such determination, up to a maximum of $7,551,745.89.

3.      The amounts paid by Settling Distributors under this Section VIII.D will be paid consistent with the schedule set forth in Exhibit G, which is consistent with Exhibit M to the Global Settlement.

## IX.      Texas Additional Restitution Amount

A.      *Texas Additional Restitution Amount*. Pursuant to the schedule set forth in Exhibit G, the Settling Distributors shall pay the Additional Restitution Amount to Texas.  Such funds shall be paid, on the schedule set forth in Exhibit G, on the Payment Date for each relevant Payment Year.

B.      *Use of Funds*. All funds paid under this Section IX shall be part of the Compensatory Restitution Amount, shall be used for Opioid Remediation and shall be governed by the same requirements as specified in Section VI.C.

## X.      Release

A.      *Scope*. As of the Effective Date, the Released Entities are hereby released and forever discharged from all Released Claims. Texas (for itself and its Releasors) and each Participating Subdivision hereby absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of Texas and its Attorney General to release claims. This Agreement shall be a complete bar to any Released Claim.

B.      *Claim-Over and Non-Party Settlement*.

1.      It is the intent of the Parties that: Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract), from other parties for their payment obligations under this Agreement; the payments made under this Settlement Agreement shall be the sole payments made by the Released Entities to the

STRICTLY CONFIDENTIAL

Releasors involving, arising out or, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity); Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties. The provisions of this Section X.B are intended to be implemented consistent with these principles.

2.      This Agreement and the releases and dismissals provided for herein are made in good faith.

3.      No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, *provided* that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

4.      To the extent that, on or after the Initial Participation Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from the Settling Distributors in Section X.B.3, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this Section X.B.4 is a material term of this Agreement. If a Releasor uses best efforts (which must be documented and substantiated by such Releasor) to obtain such prohibition and/or release but is unable to do so, the Released Entities' remedy is that Section X.B.5 applies. For purposes of this Section X.B, references to "settle" or "settlement" include consent or stipulated judgments and other forms of relief that the Releasor does not oppose.

5.      If any Releasor settles a Non-Party Covered Conduct Claim with any Non-Released Entity and fails, following documented and substantiated best efforts, to obtain the prohibition and/or release required by Section X.B.4, and if the Non-Released Entity in turn asserts a Claim-Over, the following shall apply:

a.      The Released Entity shall move to dismiss such Claim-Over on the grounds that this Agreement moots or otherwise extinguishes the Claim-Over. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and shall join in such motion. The Released Entity shall move to dismiss, in litigation, arbitration, or other appropriate proceeding, such Claim-Over on the grounds that this Agreement moots or

otherwise extinguishes the Claim-Over. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and shall join in such motion.

b.      If the Claim-Over proceeds despite such motion (including if material substantive proceedings are permitted to go forward during the pendency of such motion), the Releasor shall reduce the settlement it obtained against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, including, if necessary, by returning monies paid to the Releasor by the Non-Released Entity, and shall fully hold the Released Entity harmless from such Claim-Over (including, if necessary, by returning monies paid by Released Entities to the Releasor under this Agreement).

6.      In the event that any Releasor obtains a judgment with respect to Non- Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that described in Section X.B.3 or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy:

a.      If the Non-Released Entity in turn successfully asserts a Claim-Over against a Released Entity, except as provided in Section X.B.7, the Releasor shall reduce its Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, including, if necessary, by returning monies paid to the Releasor in satisfaction of a judgment against or settlement with the Non-Released Entity, and to fully hold the Released Entity harmless from such Claim-Over (including, if necessary, by returning monies paid by Released Entities to the Releasor under this Agreement).

b.      For purposes of this provision, successful assertion of a Claim- Over means either (i) a final monetary judgment in litigation, arbitration or other proceeding; *provided* that the applicable State Attorney(s) General had notice of and opportunity to intervene in the proceeding giving rise to such judgment or (ii) a settlement; *provided* that the Released Entity sought the applicable State Attorney(s) General's consent to the settlement and such consent was either obtained or unreasonably withheld. Should the judgment against the Released Entity resolve claims that are not Claim-Over claims, the reduction of the Claim and/or judgment shall be for the Claim-Over portion only, which shall be distinguishable in the judgment.

c.      The Released Entity will take reasonable and necessary steps to defend against the Claim-Over and will consent to the intervention of any Releasor seeking to defend against the Claim-Over. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and shall join in, and with respect to all other proceedings shall not unreasonably withhold consent to, any motion by any of the Released Entities to dismiss any Claim-Over on the grounds that this Agreement moots or otherwise extinguishes any such Claim-Over.

STRICTLY CONFIDENTIAL

7.     To the extent that the Claim-Over is based on a contractual indemnity, the obligations under <u>Section X.B.4</u>, <u>Section X.B.5</u>, and <u>Section X.B.6</u> shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Each Settling Distributor shall notify Texas, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entity asserts a Claim-Over arising out of contractual indemnity against it.

C.     *General Release*. In connection with the releases provided for in this Agreement, Texas (for itself and its Releasors) and each Participating Subdivision expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any Texas or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent**. A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but Texas (for itself and its Releasors) and each Participating Subdivision hereby expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect Texas's decision to enter into this Agreement or the Participating Subdivisions' decision to participate in this Agreement.

D.     *Assigned Interest Waiver.* To the extent Texas has any direct or indirect interest in any rights of a third party that is a debtor under the Bankruptcy Code as a result of a claim arising out of Covered Conduct by way of assignment or otherwise, including as a result of being the beneficiary of a trust or other distribution entity, to assert claims against a Settling Distributor (whether derivatively or otherwise), under any legal or equitable theory, including for indemnification, contribution, or subrogation, Texas waives the right to assert any such claim, or to receive a distribution or any benefit on account of such claim and such claim, distribution, or benefit shall be deemed assigned to such Settling Distributor.

E.     *Res Judicata*. Nothing in this Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in this Agreement, and/or any Texas Consent Judgment or other judgment entered on this Agreement, gives rise to under applicable law.

F.     *Representation and Warranty*. The signatories hereto on behalf of Texas expressly represent and warrant that they have (or have obtained, or will obtain no later than the Initial Participation Date) the authority to settle and release, to the maximum extent of Texas's power, all Released Claims of (1) Texas; (2) all past and present executive departments, state agencies,

32

STRICTLY CONFIDENTIAL

divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts; and (3) any of Texas's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license;[10] and (4) any Participating Subdivision. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of Texas's Governor. Also for the purposes of clause (3), a release from Texas's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

G.    *Effectiveness*. The releases set forth in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Texas Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Texas Qualified Settlement Fund or any portion thereof.

H.    *Cooperation*. Releasors (1) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (2) will reasonably cooperate with and not oppose any effort by Settling Distributors to secure the prompt dismissal of any and all Released Claims.

I.    *Non-Released Claims*. Notwithstanding the foregoing or anything in the definition of Released Claims, this Agreement does not waive, release or limit any criminal liability, Claims for liability under tax law, Claims under securities law by Texas as an investor, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under this Agreement for enforcement of this Agreement.

## XI.    Later Litigating Subdivisions

A.    *Released Claims against Released Entities*. Subject to Section XI.B, the following shall apply in the event a Later Litigating Subdivision maintains a lawsuit for a Released Claim against a Released Entity after the Effective Date:

1.    The Released Entity shall take ordinary and reasonable measures to defend the action, including filing a Threshold Motion with respect to the Released Claim. The Released Entity shall further notify Texas and Texas Qualified Settlement Fund Administrator immediately upon notice of a Later Litigating Subdivision bringing a lawsuit for a Released Claim, and shall not oppose Texas's submission in support of the Threshold Motion.

2.    The provisions of this Section XI.A.2 apply if the Later Litigating Subdivision is a Primary Subdivision (except as provided in Section XI.A.2.f):

a.    If a lawsuit including a Released Claim survives until the

---

[10] In Texas, the department and agency that have the duties and powers in clauses (2) and (3) are the Department of State Health Services.

Suspension Deadline for that lawsuit, the Texas Qualified Settlement Fund Administrator shall calculate the Suspension Amount applicable to the next Payment due from the Settling Distributor(s) at issue and apportioned to Texas and the Participating Subdivisions; *provided*, *however*, that the Suspension Amount for a Payment Year cannot exceed the Suspension Cap. The Suspension Amount shall be paid into the Texas Qualified Settlement Fund Escrow account. If the Suspension Amount exceeds the Suspension Cap for that Payment Year, then the remaining amount will be paid into the Texas Qualified Settlement Fund Escrow in the following Payment Year, subject to the Suspension Cap, and so forth in each succeeding Payment Year until the entire Suspension Amount has been paid into the Texas Qualified Settlement Fund Escrow or the Released Claim is resolved, as provided below, whichever comes first. A suspension does not apply during the pendency of any appeal dismissing the lawsuit for a Released Claim in whole.

b.      If the Released Claim is resolved with finality without requirement of payment by the Released Entity, the placement of any remaining balance of the Suspension Amount into the Texas Qualified Settlement Fund Escrow shall cease and the Texas Qualified Settlement Fund Administrator shall immediately transfer amounts in the Texas Qualified Settlement Fund Escrow on account of the suspension to Texas and the Participating Subdivisions. The lawsuit will not cause further suspensions unless the Released Claim is reinstated upon further review, legislative action, or otherwise.

c.      If the Released Claim is resolved with finality on terms requiring payment by the Released Entity, the Texas Qualified Settlement Fund Administrator will transfer the amounts in the Texas Qualified Settlement Fund Escrow on account of the suspension to the Settling Distributor(s) at issue necessary to satisfy the payment obligation of the Released Entity to the relevant Later Litigating Subdivision. If any balance remains in the Texas Qualified Settlement Fund Escrow on account of the suspension after transfer of the amount necessary to satisfy the payment obligation, the Texas Qualified Settlement Fund Administrator will immediately transfer the balance to Texas and the Participating Subdivisions. If the payment obligation of the Released Entity to the relevant Later Litigating Subdivision exceeds the amounts in the Texas Qualified Settlement Fund Escrow on account of the suspension, the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly Offset Cap, for the excess amount against its obligation to pay its allocable share of Annual Payments that would be apportioned to Texas and to the Participating Subdivisions. The offset shall be applied as follows: first against the Settling Distributor's allocable share of the Annual Payment due in Payment Year 18, up to the Offset Cap for that Payment Year, with any remaining amounts above the Offset Cap applied against the Settling Distributor's allocable share of the Annual Payment due in Payment Year 17, up to the Offset Cap for that Payment Year, and so forth for each preceding Payment Year until the entire amount to be offset has been applied or no future Payment Years remain.

d.      If the lawsuit asserting a Released Claim is resolved with finality on

terms requiring payment by the Released Entity, and the Released Claim did not give rise to a suspension of Annual Payments (*e.g.*, because it was resolved during Payment Years 1 or 2, during which Texas is deemed eligible for Incentive Payment A and thus no suspension of payments took place, as provided by Section XI.B), the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly Offset Cap, for the amount paid. The offset shall be applied against the relevant Settling Distributor's allocable portion of the Annual Payments starting in Payment Year 18 and working backwards as set forth in Section XI.A.2.c. If the lawsuit for a Released Claim is otherwise resolved by the Released Entity, without the Settling Distributor filing a Threshold Motion despite an opportunity to do so, and the Released Claim did not give rise to a suspension of any Settling Distributor's portion of any Annual Payments, the Settling Distributor at issue shall not receive any offset for the amount paid.

e.     If more than one Primary Subdivision becomes a Later Litigating Subdivision, a single Suspension Cap applies and the total amounts deducted from the Annual Payment in a given Payment Year cannot exceed the Suspension Cap. For the avoidance of doubt, an individual Primary Subdivision shall not trigger more than one suspension regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit.

f.     This Section XI.A.2 shall not apply with respect to a Primary Subdivision that is either (i) a Later Litigating Subdivision under clause (3) of the definition of that term solely because a legislative Bar or legislative Case-Specific Resolution applicable as of the Effective Date is invalidated by judicial decision after the Effective Date or (ii) a Later Litigating Subdivision under clause (4) of the definition of that term. Such a Primary Subdivision shall be treated as a General Purpose Government under Section XI.A.3.

3.     The terms of this Section XI.A.3 apply if a Later Litigating Subdivision is not a Primary Subdivision (except for Primary Subdivisions referenced in Section XI.A.2.f) but is a General Purpose Government, School District, Health District or Hospital District: if the Released Claim is resolved with finality on terms requiring payment by the Released Entity, the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly Offset Cap, for the amount paid against its portion of the obligation to make Annual Payments that would be apportioned to Texas and to the Participating Subdivisions. The offset shall be applied as follows: first against the relevant Settling Distributor's allocable share of the Annual Payment due in Payment Year 18, up to the Offset Cap for that Payment Year, with any remaining amounts above the Offset Cap applied against the Payment due in Payment Year 17, up to the Offset Cap for that Payment Year, and so forth for each preceding Payment Year until the entire amount to be offset has been applied or no future Payment Year remains. If the Released Claim is resolved on terms requiring payment during the first two (2) Payment Years, in no case will any amounts be offset against the amounts due in Payment Years 1 and 2.

4.     In no event shall the total of Suspension Amounts and offsets pursuant to this Section applicable to Texas in a Payment Year for that Payment Year exceed the Offset

STRICTLY CONFIDENTIAL

Cap for Texas. If, in a Payment Year, the total of Suspension Amounts and offsets applicable to Texas exceeds the Offset Cap, the Suspension Amounts shall be reduced so that the total of Suspension Amounts and offsets equals the Offset Cap.

5.       For the avoidance of doubt, any offset pursuant to this Section XI that is not eligible for Incentive Payment A shall continue to apply even if Texas subsequently becomes eligible for Incentive Payment A.

6.       "*Terms requiring payment*" shall mean (i) a final monetary judgment or (ii) a settlement; *provided* that the Released Entity sought the Texas Attorney General's consent to the settlement and such consent was either obtained or unreasonably withheld. Should the judgment or settlement resolve claims that are not Released Claims, the offset shall be for the Released Claims portion only, which shall be distinguishable in the judgment or settlement.

B.       *Exceptions*.

1.       Section XI.A shall not apply where Texas meets the eligibility criteria for and is entitled to Incentive Payment A for the Payment Year at issue, except as expressly provided therein. For the avoidance of doubt, because Texas is deemed eligible for Incentive Payment A for Payment Years 1 and 2 under Section V.F.1.c, a suspension of Payments under Section XI.A.2 shall not apply to Texas for those Payment Years.

2.       An offset under Sections XI.A.2 and XI.A.3 shall not apply where the Later Litigating Subdivision opted out of a Settlement Class Resolution at issue that was in full force and effect as of the due date of the payment for Payment Year 2 and that remains in full force and effect; *provided* that an offset relating to that Subdivision may apply under Section XII.

3.       Section XI.A shall not apply where the Later Litigating Subdivision seeks less than $10 million, or so long as its total claim is reduced to less than $10 million, in the lawsuit for a Released Claim at issue.

4.       An offset under Section XI.A.3 shall not apply where the applicable Participation Tier is Participation Tier 1 and the population of the Later Litigating Subdivision is under 10,000.

5.       If the applicable Participation Tier is Participation Tier 2 or higher, and the Later Litigating Subdivision has a population less than 10,000, the offset under Section XI.A.3 shall only apply to amounts paid pursuant to a settlement or judgment that are over $10 million per case or resolution. Any type of consolidated or aggregated or joined or class actions, however styled, shall be considered a single case, and any resolutions that occur within a sixty (60) calendar day period of each other and involve Later Litigating Subdivisions that share some common counsel and/or are in Texas or are created by the same or related judgments, settlement agreements, or other instruments or are conditioned upon one another, shall be considered a single resolution. For the avoidance of doubt, any such case or resolution shall have only a single $10,000,000 exemption from the offset under Section XI.A.3.

C.     *No Effect on Other Provisions*. A suspension, reduction or offset under <u>Section XI.A</u> shall not affect the Injunctive Relief Terms or the Texas Consent Judgment.

## XII.    Reductions/Offsets

A.     *Offset Relating to Incentive Payment A*. If Texas is not eligible for Incentive Payment A at the third Payment Date,[11] Settling Distributors shall receive an offset.[12] The offset shall be the dollar amount difference between (1) the total amount of the Incentive Payment A due from Settling Distributors on the Effective Date and on the Payment Date for Payment Year 2 allocated to Texas and the Participating Subdivisions, and (2) the total amount of Incentive Payments B and C that would have been due from Settling Distributors on the Effective Date and on the Payment Date for Payment Year 2 so allocated but for Texas's deemed eligibility for Incentive Payment A. The offset shall be applied in equal installments to reduce the Settling Distributor's Payments for Payment Years 3 through 7 that would be apportioned to Texas or the Participating Subdivisions, and shall remain applicable even if that Texas subsequently becomes eligible for Incentive Payment A.

B.     *Settlement Class Resolution Opt-Outs*. If Texas is eligible for Incentive Payment A on the basis of a Settlement Class Resolution, and a Primary Subdivision that opted out of the Settlement Class Resolution maintains a lawsuit asserting a Released Claim against a Released Entity, the following shall apply. If the lawsuit asserting a Released Claim either survives a Threshold Motion or has an unresolved Threshold Motion fewer than sixty (60) calendar days prior to the scheduled start of a trial involving a Released Claim, and is resolved with finality on terms requiring payment by the Released Entity, the Settling Distributor at issue shall receive a dollar-for-dollar offset for the amount paid against its obligation to make remaining Incentive Payment A payments that would be apportioned to Texas or Participating Subdivisions. For the avoidance of doubt, an offset shall not be applicable under this <u>Section XII.B</u> if it is applicable under <u>Section XI.A</u> with respect to the Subdivision at issue.

C.     *Revoked Bar, Settlement Class Resolution, or Case-Specific Resolution*. If the Settling Distributors made any Annual Payments that included any incentive payments earned as a result of the existence of a Bar, Settlement Class Resolution, or Case-Specific Resolution after the determination of the amount of such Annual Payment, and there is subsequently a Revocation Event with respect to that Bar, Settlement Class Resolution, or Case-Specific Resolution, the Settling Distributors shall receive a dollar-for-dollar offset against the portion of remaining Annual Payments that would be allocated to Texas and the Participating Subdivisions. This offset will be calculated as the dollar amount difference between (1) the total amount of incentive payments paid by the Settling Distributors by virtue of the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event and (2) the total amount of incentive payments that would have been due from the Settling Distributors during that time had the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event not been in effect. The amount of Incentive Payments that would have been due, referenced in <u>clause (2)</u> above, will be

---

[11] In the event that Texas has passed a legislative bar before the Payment Date for Payment Year 3 that would otherwise qualify Texas for Incentive Payment A, but such legislation is not effective until a date in 2023 after the Payment Date for Payment Year 3, Texas will not be required to make the offset required by this <u>Section XIV.A</u>.

[12] For purposes of this provision, in determining whether Texas would not be eligible for Incentive Payment A for Payment Year 3, the criteria set forth in <u>Section V.F.1.b</u> shall apply to that Payment Year.

calculated one hundred eighty (180) calendar days after the Revocation Event; for purposes of calculating the amount of incentive payments that would have been due, any relevant Subdivision shall be included as a Participating Subdivision if: (1) its Released Claims are extinguished by any subsequent Bar, Settlement Class Resolution, or Case-Specific Resolution in effect as of the date of such calculation, or (2) it becomes a Participating Subdivision (in addition to all other Participating Subdivisions) prior to the date of such calculation.

D.     *Certain Taxes*. Amounts paid by a Settling Distributor under an Opioid Tax in Texas in a Payment Year shall give rise to a dollar-for-dollar offset against that Settling Distributor's obligation to pay its share of the Annual Payment in that Payment Year that would be allocated to Texas or Participating Subdivisions in it. If such amounts paid exceed that Settling Distributor's share of the Annual Payment allocable to Texas or Participating Subdivisions in that Payment Year, the excess shall carry forward as an offset against its allocable share of remaining Annual Payments that would be allocated to Texas or Participating Subdivisions.

E.     *Not Subject to Suspension Cap or Offset Cap*. For the avoidance of doubt, neither the Suspension Cap nor the Offset Cap applies to the offsets and reductions set forth in this Section XII.

## XIII.   Injunctive Relief in the Absence of a Global Settlement

A.     It is the intent of the Parties that significant injunctive relief shall be implemented through the Global Settlement that will benefit Texas as a whole, as well as other States. The Injunctive Relief Term Sheet is annexed hereto as Exhibit R.

B.     Texas, currently intends to participate in such settlement and shall benefit from the injunctive relief set forth therein.

C.     In the event that the Global Settlement does not become effective, the Parties will meet and confer about elements of the injunctive relief that can be implemented in Texas on a statewide-only basis, with the understanding that:

1.     Implementation of injunctive terms on a Texas-only basis is limited and creates additional costs to Settling Distributors, given their nationwide operations;

2.     Elements of injunctive relief for this Agreement shall include those terms in the Global Settlement that can reasonably be implemented on a statewide-only basis. The Sections of Exhibit R that will be considered by the Parties for implementation are Sections I through XIV, and XVI, which, among other things, set forth requirements for internal controls, oversight, training, tracking, and prevention designed to prevent improper distribution of opioids; and

3.     The parties agree that modifications will be necessary before Sections VIII, IX, X, XI, XII, XIII, XIV, XVI of Exhibit R can be implemented with respect to conduct that occurs solely within Texas.  The parties further agree that modifications may be required before Sections I, II, III, IV, V, VI and VII of Exhibit R can be implemented in the event that the Global Settlement does not become effective. A Settling Distributor shall be under no obligation to implement any of the requirements contained in Exhibit R until

STRICTLY CONFIDENTIAL

the meet and confer process is completed and there is agreement as to the necessary modifications.

    4.    To the extent practicable, these meet and confers will be coordinated with the meet and confers on injunctive relief with the States of New York, Ohio, and Rhode Island, and the Parties agree that, to the extent practicable, the injunctive relief terms for these four States should be consistent.

    5.    In the event the meet and confer process does not lead to agreement on statewide injunctive relief terms, the matter will be submitted to arbitration.

## XIV.    Miscellaneous

    A.    *Population of General Purpose Governments*. The population figures for General Purpose Governments shall be the published U.S. Census Bureau's population estimates for July 1, 2019, released May 2020. These population figures shall remain unchanged during the term of this Agreement.

    B.    *Population of Special Districts*. For any purpose in this Agreement in which the population of a Special District is used other than Section V.F.1.b: (a) School Districts' population will be measured by the number of students enrolled who are eligible under the Individuals with Disabilities Education Act ("*IDEA*") or Section 504 of the Rehabilitation Act of 1973; (b) Health Districts' and Hospital Districts' population will be measured at twenty-five percent (25%) of discharges; and (c) all other Special Districts' (including Fire Districts' and Library Districts') population will be measured at ten percent (10%) of the population served.

    C.    *Population Associated with Sheriffs*. For any purpose in this Agreement in which the population associated with a lawsuit by a sheriff is used, the population will be measured at 20% of the capacity of the jail(s) operated by the sheriff.

    D.    *No Admission*. The Settling Distributors do not admit liability or wrongdoing. Neither this Agreement nor the Texas Consent Judgment shall be considered, construed or represented to be (1) an admission, concession or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to the Settling Distributors. It is the understanding and intent of the Parties that this Agreement shall not be entered into evidence in any other action against the Settling Distributors, among other reasons, because it is not relevant to such action.  For the avoidance of doubt, nothing herein shall prohibit a Settling Distributor from entering this Agreement into evidence in any litigation or arbitration concerning a Settling Distributor's right to coverage under an insurance contract.

    E.    *Most-Favored-Nation Provision*. If, after execution of this Agreement, there is a collective resolution—through settlement, bankruptcy, or other mechanism—of substantially all Claims against the Settling Distributors via the Global Settlement under which Texas or the Bellwether Counties would have received a greater monetary amount than the sum of all amounts provided in this Agreement, Settling Distributors shall remit to Texas and the Bellwether Counties the difference between the sums of the amounts provided in this Agreement and the monetary amount that Texas and the Bellwether Counties would have received if they had been participants in the Global Settlement according to the payment schedule in the Global Settlement.

F.    *Tax Cooperation and Reporting*.

1.    Upon request by any Settling Distributor, Texas and Participating Subdivisions agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for the Settling Distributors to establish the statements set forth in Section VI.C and to track and assist in the report of remediation disbursements as agreed to among the Settling Distributors to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

2.    Without limiting the generality of Section XIV.F.1, Texas, the Bellwether Counties and each Participating Subdivision shall cooperate in good faith with any Settling Distributor with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

3.    Texas, on behalf of itself and all Participating Subdivisions, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "*Appropriate Official*"). If the Global Settlement does not become effective by July 1, 2022, Texas shall direct and ensure that the Appropriate Official timely (a) file (i) at the time this Agreement becomes binding on the Parties, an IRS Form 1098-F in the form attached as Exhibit I, Exhibit J, and Exhibit K with respect to each of the Settling Distributors and (ii) any legally required returns or amended returns with any applicable governmental authority, or any returns requested by the respective Settling Distributors, and (b) provide to each of the Settling Distributors a copy of (i) the IRS Form 1098-F filed with respect to such Settling Distributor and (ii) any legally required written statement pursuant to any applicable law and any other document referred to in clause (a)(ii) above. Any such form, return, or statement shall be prepared and filed in a manner fully consistent with Section VI.C.

4.    Texas and its Participating Subdivisions agree that any return, amended return, or written statement filed or provided pursuant to paragraph 3, and any similar document, shall be prepared and filed in a manner consistent with reporting each Settling Distributor's portion of the Texas Settlement Amount as the "Total amount to be paid" pursuant to this Agreement in Box 1 of IRS Form 1098-F, each Settling Distributor's portion of the Texas Settlement Amount less the Compensatory Restitution Amount as the "Amount to be paid for violation or potential violation" in Box 2 of IRS Form 1098-F and each Settling Distributor's portion of the Compensatory Restitution Amount as "Restitution/remediation amount" in Box 3 of IRS Form 1098-F, as reflected in the attached Exhibit I, Exhibit J, and Exhibit K. If Texas or the Appropriate Official shall be required to file any return, amended return, or written statement contemplated by this Section XIV.F other than an IRS Form 1098-F in the form attached as Exhibit I, Exhibit J, and Exhibit K, Texas shall direct and ensure that the Appropriate Official provides to each Settling Distributor a draft of such return, amended return, or written statement in respect of such Settling Distributor no later than sixty (60) calendar days prior to the due date thereof and shall accept and reflect any reasonable comments of such Settling Distributor

on the return, amended return, or written statement in respect of such Settling Distributor.

5.    For the avoidance of doubt, neither the Settling Distributors nor Texas and Participating Subdivisions make any warranty or representation to Texas, the Bellwether Counties, any Participating Subdivision or any Releasor as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

G.    *Bankruptcy.* The following provisions shall apply if a Settling Distributor enters Bankruptcy (a Settling Distributor which does so and takes the actions, or is otherwise subjected to the actions, referred to in (i) and/or (ii) herein being referred to as a "*Bankrupt Settling Distributor*") and (i) the Bankrupt Settling Distributor's bankruptcy estate recovers, pursuant to 11 U.S.C. § 550, any payments made under this Agreement, or (ii) this Agreement is deemed executory and is rejected by such Settling Distributor pursuant to 11 U.S.C. § 365:

1.    In the event that Texas deems (by written notice to the Settling Distributors other than the Bankrupt Settling Distributor) that the financial obligations of this Agreement have been terminated and rendered null and void as to such Bankrupt Settling Distributor (except as provided in Section XIV.G.1.a below) due to a material breach by such Bankrupt Settling Distributor, whereupon, with respect to Texas:

a.    all agreements, all concessions, all reductions of Releasing Parties' Claims, and all releases and covenants not to sue, contained in this Agreement shall immediately and automatically be deemed null and void as to such Bankrupt Settling Distributor; Texas and Litigating Subdivisions shall be deemed immediately and automatically restored to the same position they were in immediately prior to their entry into this Agreement in respect to such Bankrupt Settling Distributor and Texas and Litigating Subdivisions shall have the right to assert any and all claims against such Bankrupt Settling Distributor in the Bankruptcy or otherwise, subject to any automatic stay, without regard to any limits or agreements as to the amount of the settlement otherwise provided in this Agreement; *provided*, *however*, that notwithstanding the foregoing sentence, (i) all reductions of Releasing Parties' Claims, and all releases and covenants not to sue, contained in this Agreement shall remain in full force and effect as to all persons or entities other than the Bankrupt Settling Distributor itself; and (ii) in the event Texas and any Litigating Subdivision asserts any Released Claim against a Bankrupt Settling Distributor after the rejection and/or termination of this Agreement with respect to such Settling Distributor as described in this Section XIV.G.1.a and receives a judgment, settlement or distribution arising from such Released Claim, then the amount of any payments that Texas and any Litigating Subdivision has previously received from such Bankrupt Settling Distributor under this Agreement shall be applied to reduce the amount of any such judgment, settlement or distribution (*provided* that no credit shall be given against any such judgment, settlement or distribution for any payment that Texas and any Litigating Subdivision is required to disgorge or repay to the Bankrupt Settling Distributor's bankruptcy estate); and

b.    Texas may exercise all rights provided under the federal Bankruptcy

STRICTLY CONFIDENTIAL

Code (or other applicable bankruptcy or non-bankruptcy law) with respect to its Claims against such Bankrupt Settling Distributor subject to all defenses and rights of the Bankrupt Settling Distributor.

H.    *No Third-Party Beneficiaries*. Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not Texas or a Released Entity. Texas may not assign or otherwise convey any right to enforce any provision of this Agreement.

I.    *Cooperation*. Each Party and each Participating Subdivision agrees to use its best efforts and to cooperate with the other Parties and Participating Subdivisions to cause this Agreement and the Texas Consent Judgment to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party and each Participating Subdivision agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement or the Texas Consent Judgment by any other person, and will support the integrity and enforcement of the terms of this Agreement and the Texas Consent Judgment.

J.    *Jurisdiction*. The Texas Consolidated Litigation Court shall retain jurisdiction for the purposes set forth in this Agreement and the Texas Consent Judgment Court shall retain jurisdiction for the limited purposes as set forth in this Agreement.

K.    *Successors*. This Agreement is binding upon, and inures to the benefit of, a Settling Distributor's successors and assigns. A Settling Distributor shall not, in one (1) transaction or a series of related transactions, sell or transfer U.S. assets having a fair market value equal to twenty-five percent (25%) or more of the consolidated assets of such Settling Distributor (other than sales or transfers of inventories, or sales or transfers to an entity owned directly or indirectly by such Settling Distributor) where the sale or transfer is announced after the Effective Date, is not for fair consideration, and would foreseeably and unreasonably jeopardize such Settling Distributor's ability to make the payments under this Agreement that are due on or before the third Payment Date following the close of a sale or transfer transaction, unless the Settling Distributor obtains the acquiror's agreement that it will be either a guarantor of or successor to the percentage of that Settling Distributor's remaining Payment Obligations under this Agreement equal to the percentage of the Settling Distributor's consolidated assets being sold or transferred in such transaction. Percentages under this Section XIV.K shall be determined in accordance with United States generally accepted accounting principles and as of the date of the Settling Distributor's most recent publicly filed consolidated balance sheet prior to the date of entry into the sale or transfer agreement at issue. Any objection under this Section XIV.K not raised within twenty (20) calendar days of the announcement of the relevant transaction is waived.

L.    *No Violations of Applicable Law*. Nothing in this Agreement shall be construed to authorize or require any action by Settling Distributors in violation of applicable federal, state, or other laws.

M.    *Modification*. This Agreement may be modified by a written agreement of the Parties or, in the case of the Texas Consent Judgment, by court proceedings resulting in a modified

STRICTLY CONFIDENTIAL

judgment of the Court. For purposes of modifying this Agreement or the Texas Consent Judgment, Settling Distributors may contact the Texas Attorney General for purposes of coordinating this process.

N. *No Waiver*. Any failure by any Party to this Agreement to insist upon the strict performance by any other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement.

O. *Entire Agreement*. This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto, except as provided herein. In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

P. *Counterparts*. This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

Q. *Notice*. All notices or other communications under this Agreement shall be provided to the following via email *and* overnight delivery to:

*Copy to AmerisourceBergen Corporation's attorneys at:*
Michael T. Reynolds
Cravath, Swaine & Moore LLP
825 8th Avenue
New York, NY 10019
mreynolds@cravath.com

*Copy to Cardinal Health, Inc.'s attorneys at:*
Elaine Golin
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
epgolin@wlrk.com

*Copy to McKesson Corporation's attorneys at:*
Thomas J. Perrelli
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
TPerrelli@jenner.com

*Copy to Texas at:*

STRICTLY CONFIDENTIAL

Lesley French
Steven Robinson
Stephanie Eberhardt
Assistant Attorney General
Office of the Attorney General
PO Box 12548
Austin, Texas 78711-2548
lesley.french@oag.texas.gov
steven.robinson@oag.texas.gov
stephanie.eberhardt@oag.texas.gov


*For Plaintiff Dallas County:*
Jeffrey B. Simon
Simon Greenstone Panatier, P.C.
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Phone: (214) 276-7680
jsimon@sgptrial.com

*For Plaintiff Bexar County:*
Mikal C. Watts
Watts Guerra LLC
4 Dominion Dr.
Bldg 3, Suite 100
San Antonio, Texas 78257
Phone: (210) 447-0500
mcwatts@wattsguerra.com


[Signatures begin on next page.]

STRICTLY CONFIDENTIAL

**Authorized and agreed to by:**

STATE OF TEXAS

Dated: 2/11/22

By: _____

Ken Paxton
Texas Attorney General

STRICTLY CONFIDENTIAL

**Authorized and agreed to by:**

COUNTY OF DALLAS, TEXAS

Dated:   02/07/22

By:  _____

Jeffrey Simon
Shareholder

STRICTLY CONFIDENTIAL

**Authorized and agreed to by:**

COUNTY OF BEXAR, TEXAS

Dated: ___02/07/22_____

By: _Mikal Watts_____

Mikal Watts
Capital Partner

**Authorized and agreed to by:**

AMERISOURCEBERGEN CORPORATION

Dated:     February 7, 2022

By: *Elizabeth S. Campbell*
Elizabeth S. Campbell (Feb 8, 2022 15:17 EST)

Elizabeth Campbell
Executive Vice President and Chief Legal Officer

STRICTLY CONFIDENTIAL

Authorized and agreed to by:

CARDINAL HEALTH, INC.

Dated:    2/7/2022                        By: _____

Jessica L. Mayer
Chief Legal and Compliance Officer

**Authorized and agreed to by:**

MCKESSON CORPORATION

Dated:   February 8, 2022

By:   _____

Saralisa Brau
Corporate Secretary

## Exhibit A

## Alleged Harms[13]

1.     Expert report of Professor David Cutler, dated March 25, 2019.

2.     Expert report of Dr. Jeffrey B. Liebman, dated March 25, 2019.

3.     Expert report of Professor Thomas McGuire regarding damages to Bellwethers, dated March 25, 2019.

4.     Report of Professor Thomas McGuire regarding public nuisance, dated March 25, 2019

---

[13] The parties agree that these reports describe the harms alleged, but were not relied on in the conduct of the Texas bellwether litigation or the Texas Intrastate Term Sheet at Exhibit N.

**Exhibit B**

**Later Litigating Subdivision Suspension and Offset Determinations**

| Participation Tier | Per Capita Amount[1] | Suspension Percentage | Offset Cap | Suspension Deadline and Ending Point |
|---|---|---|---|---|
| 1 | $2,500 | 66% | 66% | Earlier of (1) 6 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |
| 2 | $2,000 | 33.33% | 34% | Earlier of (1) 6 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |
| 3 | $1,500 | 27.5% | 30% | Earlier of (1) 9 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |
| 4 | $1,000 | 20% | 25% | Earlier of (1) 9 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |

---

[1] Population will be measured at the level of the Later Litigating Subdivision.

## Exhibit C

## List of Opioid Remediation Uses

### Schedule A
### Core Strategies

Texas shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("Core Strategies").[1]

**A.    NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

1.    Expand training for first responders, schools, community support groups and families; and

2.    Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

**B.    MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

1.    Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2.    Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3.    Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4.    Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

**C.    PREGNANT & POSTPARTUM WOMEN**

1.    Expand Screening, Brief Intervention, and Referral to Treatment ("*SBIRT*") services to non-Medicaid eligible or uninsured pregnant women;

2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3. Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

**D.   EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

1. Expand comprehensive evidence-based and recovery support for NAS babies;

2. Expand services for better continuum of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

**E.   EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4. Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansions above.

**F.   TREATMENT FOR INCARCERATED POPULATION**

1. Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2. Increase funding for jails to provide treatment to inmates with OUD.

**G.   PREVENTION PROGRAMS**

1. Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2. Funding for evidence-based prevention programs in schools;

3.      Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.      Funding for community drug disposal programs; and

5.      Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

**H.      EXPANDING SYRINGE SERVICE PROGRAMS**

1.      Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

**I.      EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN STATE**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |

### A.  TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Disseminate of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14.     Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

**B.      SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.      Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.   Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

**C.    CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.   Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.   Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.   Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.   Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.   Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.   Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.   Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.   Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.   Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.    Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.    Expand warm hand-off services to transition to recovery services.

12.    Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.    Develop and support best practices on addressing OUD in the workplace.

14.    Support assistance programs for health care providers with OUD.

15.    Engage non-profits and the faith community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.    ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   a.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

   b.    Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

   c.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

       e.      Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

       f.      Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.**      **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

6.      Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F.**  **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including but not limited to improvements that:

   a. Increase the number of prescribers using PDMPs;

   b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.     Increasing electronic prescribing to prevent diversion or forgery.

8.     Educating dispensers on appropriate opioid dispensing.

**G.**     **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Funding media campaigns to prevent opioid misuse.

2.     Corrective advertising or affirmative public education campaigns based on evidence.

3.     Public education relating to drug disposal.

4.     Drug take-back disposal or destruction programs.

5.     Funding community anti-drug coalitions that engage in drug prevention efforts.

6.     Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7.     Engaging non-profits and faith-based communities as systems to support prevention.

8.     Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.     School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.    Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.     PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.     Public health entities providing free naloxone to anyone in the community.

3.     Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.     Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.     Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6.     Public education relating to emergency responses to overdoses.

7.     Public education relating to immunity and Good Samaritan laws.

8.     Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.     Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Supporting screening for fentanyl in routine clinical toxicology testing.

| PART THREE: OTHER STRATEGIES |
| --- |

## I.   **FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1. Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.   **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid Texas Qualified Settlement Funds; (b) to show how opioid Texas Qualified Settlement Funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-

related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.     Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.     Provide resources to staff government oversight and management of opioid abatement programs.

## K.     TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1.     Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.     Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

## L.     RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.     Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.     Research non-opioid treatment of chronic pain.

3.     Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.     Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.     Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.     Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

7.     Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("ADAM") system.

8.     Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.     Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

# Exhibit D

## Primary Subdivisions[14]

1. Abilene city*
2. Allen city*
3. Amarillo city*
4. Anderson County*
5. Angelina County*
6. Arlington city*
7. Atascosa County*
8. Austin city*
9. Austin County*
10. Bastrop County*
11. Baytown city*
12. Beaumont city*
13. Bedford city*
14. Bee County*
15. Bell County*
16. Bexar County*
17. Bowie County*
18. Brazoria County*
19. Brazos County*
20. Brown County*
21. Brownsville city*
22. Bryan city*
23. Burleson city*
24. Burnet County*
25. Caldwell County*
26. Cameron County*
27. Carrollton city*
28. Cass County*
29. Cedar Hill city*
30. Cedar Park city*
31. Chambers County*
32. Cherokee County*
33. Cibolo city*
34. Cleburne city*
35. College Station city*
36. Collin County*
37. Comal County*
38. Conroe city*
39. Cooke County*
40. Coppell city*
41. Copperas Cove city*
42. Corpus Christi city*
43. Coryell County*
44. Dallas city*
45. Dallas County*
46. Deer Park city*
47. Del Rio city*
48. Denton city*
49. Denton County*
50. DeSoto city*
51. Duncanville city*
52. Ector County*
53. Edinburg city*
54. El Paso city*
55. El Paso County*
56. Ellis County*
57. Erath County*
58. Euless city*
59. Fannin County*
60. Farmers Branch city*
61. Flower Mound town*
62. Fort Bend County*
63. Fort Worth city*
64. Friendswood city*
65. Frisco city*
66. Galveston city*
67. Galveston County*
68. Garland city*
69. Georgetown city*
70. Grand Prairie city*
71. Grapevine city*
72. Grayson County*
73. Gregg County*
74. Guadalupe County*
75. Hale County*
76. Haltom City city*
77. Hardin County*
78. Harker Heights city*
79. Harlingen city*
80. Harris County*
81. Harrison County*
82. Hays County*
83. Henderson County*
84. Hidalgo County*
85. Hill County*
86. Hood County*
87. Hopkins County*
88. Houston city*
89. Howard County*
90. Hunt County*
91. Huntsville city*
92. Hurst city*
93. Irving city*
94. Jasper County*
95. Jefferson County*
96. Jim Wells County*
97. Johnson County*
98. Kaufman County*
99. Keller city*
100. Kendall County*
101. Kerr County*
102. Killeen city*
103. Kleberg County*
104. Kyle city*
105. La Porte city*
106. Lamar County*
107. Lancaster city*
108. Laredo city*
109. League City city*
110. Leander city*
111. Lewisville city*
112. Liberty County*
113. Little Elm city*
114. Longview city*
115. Lubbock city*
116. Lubbock County*
117. Lufkin city*
118. Mansfield city*
119. Matagorda County*
120. Maverick County*
121. McAllen city*
122. McKinney city*
123. McLennan County*
124. Medina County*
125. Mesquite city*
126. Midland city*
127. Midland County*
128. Midlothian city*
129. Mission city*
130. Missouri City city*
131. Montgomery County*
132. Nacogdoches city*
133. Nacogdoches County*
134. Navarro County*
135. New Braunfels city*

[14] Primary Subdivisions marked with asterisks have populations above 30,000.

136. North Richland Hills city*
137. Nueces County*
138. Odessa city*
139. Orange County*
140. Parker County*
141. Pasadena city*
142. Pearland city*
143. Pflugerville city*
144. Pharr city*
145. Plano city*
146. Polk County*
147. Port Arthur city*
148. Potter County*
149. Randall County*
150. Richardson city*
151. Rockwall city*
152. Rockwall County*
153. Rosenberg city*
154. Round Rock city*
155. Rowlett city*
156. Rusk County*
157. San Angelo city*
158. San Antonio city*
159. San Juan city*
160. San Marcos city*
161. San Patricio County*
162. Schertz city*
163. Sherman city*
164. Smith County*
165. Socorro city*
166. Southlake city*
167. Starr County*
168. Sugar Land city*
169. Tarrant County*
170. Taylor County*
171. Temple city*
172. Texarkana city*
173. Texas City city*
174. The Colony city*
175. Titus County*
176. Tom Green County*
177. Travis County*
178. Tyler city*
179. Upshur County*
180. Val Verde County*
181. Van Zandt County*
182. Victoria city*
183. Victoria County*
184. Waco city*
185. Walker County*
186. Waller County*
187. Washington County*
188. Waxahachie city*
189. Weatherford city*
190. Webb County*
191. Weslaco city*
192. Wharton County*
193. Wichita County*
194. Wichita Falls city*
195. Williamson County*
196. Wilson County*
197. Wise County*
198. Wood County*
199. Wylie city*
200. Addison town
201. Alamo city
202. Alice city
203. Alton city
204. Alvin city
205. Andrews city
206. Andrews County
207. Angleton city
208. Anna city
209. Aransas County
210. Athens city
211. Azle city
212. Balch Springs city
213. Bandera County
214. Bay City city
215. Beeville city
216. Bellaire city
217. Bellmead city
218. Belton city
219. Benbrook city
220. Big Spring city
221. Blanco County
222. Boerne city
223. Bonham city
224. Borger city
225. Bosque County
226. Brenham city
227. Brownwood city
228. Buda city
229. Burkburnett city
230. Burleson County
231. Calhoun County
232. Callahan County
233. Camp County
234. Canyon city
235. Celina city
236. Clay County
237. Clute city
238. Colleyville city
239. Colorado County
240. Comanche County
241. Converse city
242. Corinth city
243. Corsicana city
244. Crowley city
245. Dawson County
246. Deaf Smith County
247. Denison city
248. DeWitt County
249. Dickinson city
250. Dimmit County
251. Donna city
252. Dumas city
253. Duval County
254. Eagle Pass city
255. Eastland County
256. El Campo city
257. Elgin city
258. Ennis city
259. Fair Oaks Ranch city
260. Falls County
261. Fate city
262. Fayette County
263. Forest Hill city
264. Forney city
265. Franklin County
266. Fredericksburg city
267. Freeport city
268. Freestone County
269. Frio County
270. Fulshear city
271. Gaines County
272. Gainesville city
273. Galena Park city
274. Gatesville city
275. Gillespie County
276. Glenn Heights city
277. Gonzales County
278. Granbury city
279. Gray County
280. Greenville city
281. Grimes County
282. Groves city
283. Henderson city
284. Hereford city
285. Hewitt city
286. Hidalgo city
287. Highland Village city
288. Hockley County
289. Horizon City city
290. Houston County
291. Humble city

292. Hutchinson County
293. Hutto city
294. Ingleside city
295. Jacinto City city
296. Jackson County
297. Jacksonville city
298. Jones County
299. Karnes County
300. Katy city
301. Kerrville city
302. Kilgore city
303. Kingsville city
304. La Marque city
305. Lake Jackson city
306. Lakeway city
307. Lamb County
308. Lampasas County
309. Lavaca County
310. Lee County
311. Leon County
312. Leon Valley city
313. Levelland city
314. Limestone County
315. Live Oak city
316. Live Oak County
317. Llano County
318. Lockhart city
319. Lumberton city
320. Madison County
321. Manor city
322. Manvel city
323. Marshall city
324. Melissa city
325. Mercedes city
326. Milam County
327. Mineral Wells city
328. Montague County
329. Moore County
330. Morris County
331. Mount Pleasant city
332. Murphy city
333. Nederland city
334. Newton County
335. Nolan County
336. Orange city
337. Palestine city
338. Palo Pinto County
339. Pampa city
340. Panola County
341. Paris city
342. Pearsall city
343. Pecos city

344. Pecos County
345. Plainview city
346. Pleasanton city
347. Port Lavaca city
348. Port Neches city
349. Portland city
350. Princeton city
351. Prosper town
352. Rains County
353. Raymondville city
354. Red Oak city
355. Red River County
356. Reeves County
357. Richmond city
358. Rio Grande City city
359. Robertson County
360. Robinson city
361. Robstown city
362. Rockport city
363. Roma city
364. Royse City city
365. Runnels County
366. Sabine County
367. Sachse city
368. Saginaw city
369. San Benito city
370. San Jacinto County
371. Santa Fe city
372. Scurry County
373. Seabrook city
374. Seagoville city
375. Seguin city
376. Selma city
377. Shelby County
378. Snyder city
379. South Houston city
380. Stafford city
381. Stephenville city
382. Sulphur Springs city
383. Sweetwater city
384. Taylor city
385. Terrell city
386. Terry County
387. Tomball city
388. Trinity County
389. Trophy Club town
390. Tyler County
391. Universal City city
392. University Park city
393. Uvalde city
394. Uvalde County
395. Vernon city

396. Vidor city
397. Ward County
398. Watauga city
399. Webster city
400. West University Place city
401. White Settlement city
402. Wilbarger County
403. Willacy County
404. Young County
405. Zapata County
406. Zavala County

## Exhibit E

## Agreed List of Texas Litigating Subdivisions

1. Angelina (TX), County of
2. Bailey (TX), County of
3. Bastrop (TX), County of
4. Bexar (TX), County of
5. Bexar County Hospital District d/b/a University Health System (TX)
6. Bowie (TX), County of
7. Brazos (TX), County of
8. Brooks (TX), County of
9. Burleson (TX), County of
10. Burnet (TX), County of
11. Caldwell (TX), County of
12. Calhoun (TX), County of
13. Cameron (TX), County of
14. Camp (TX), County of
15. Cass (TX), County of
16. Castro (TX), County of
17. Cherokee (TX), County of
18. Childress (TX), County of
19. Clay (TX), County of
20. Colorado (TX), County of
21. Cooke (TX), County of
22. Coryell (TX), County of
23. Dallas (TX), County of
24. Dallas County Hospital District d/b/a Parkland Health & Hospital System (TX)
25. Delta (TX), County of
26. Dimmit (TX), County of
27. Duval (TX), County of
28. Eagle Pass (TX), City of
29. Ector (TX), County of
30. El Paso (TX), County of
31. Ellis (TX), County of
32. Falls (TX), County of
33. Fannin (TX), County of
34. Fort Bend (TX), County of
35. Franklin (TX), County of
36. Freestone (TX), County of
37. Galveston (TX), County of
38. Grayson (TX), County of
39. Guadalupe (TX), County of
40. Guadalupe Valley Hospital a/k/a Guadalupe Regional Medical Center (TX)
41. Harris (TX), County of
42. Harris County Hospital District d/b/a Harris Health System (TX)
43. Harrison (TX), County of
44. Haskell (TX), County of
45. Hays (TX), County of
46. Henderson (TX), County of
47. Hidalgo (TX), County of
48. Hopkins (TX), County of
49. Houston (TX), City of
50. Houston (TX), County of
51. Irving Independent School District (TX)
52. Jasper (TX), County of
53. Jefferson (TX), County of
54. Jim Hogg (TX), County of
55. Jim Wells (TX), County of
56. Johnson (TX), County of
57. Jones (TX), County of
58. Kaufman (TX), County of
59. Kendall (TX), County of
60. Kerr (TX), County of
61. Kinney (TX), County of
62. Kleberg (TX), County of
63. La Salle (TX), County of
64. Lamar (TX), County of
65. Laredo (TX), City of
66. Leon (TX), County of
67. Leon Valley (TX), City of
68. Liberty (TX), County of
69. Limestone (TX), County of
70. Lubbock (TX), County of
71. Madison (TX), County of
72. Marion (TX), County of
73. Maverick (TX), County of
74. McLennan (TX), County of
75. McMullen (TX), County of
76. Milam (TX), County of
77. Mitchell (TX), County of
78. Montgomery (TX), County of
79. Morris (TX), County of
80. Nacogdoches (TX), County of
81. Newton (TX), County of
82. Nolan (TX), County of
83. Nueces (TX), County of
84. Nueces County Hospital District (TX)
85. Ochiltree County Hospital District (TX)
86. Orange (TX), County of
87. Palo Pinto County Hospital District a/k/a Palo Pinto General Hospital (TX)
88. Panola (TX), County of
89. Polk (TX), County of
90. Potter (TX), County of
91. Red River (TX), County of
92. Roberts (TX), County of
93. Robertson (TX), County of
94. Rockwall (TX), County of
95. Rusk (TX), County of
96. San Antonio (TX), City of
97. San Patricio (TX), County of
98. San Saba (TX), County of
99. Shackelford (TX), County of
100. Shelby (TX), County of
101. Smith (TX), County of
102. Socorro Independent School District (TX)
103. Stephens (TX), County of
104. Tarrant (TX), County of
105. Tarrant County Hospital District (TX) d/b/a JPS Health Network
106. Terrell (TX), County of
107. Texarkana Independent School District (TX)
108. Throckmorton (TX), County of
109. Titus (TX), County of
110. Travis (TX), County of
111. Trinity (TX), County of
112. Upshur (TX), County of
113. Uvalde (TX), County of
114. Van Zandt (TX), County of
115. Walker (TX), County of
116. Waller (TX), County of
117. Webb (TX), County of
118. West Wharton County (TX) Hospital District
119. Wichita (TX), County of
120. Williamson (TX), County of
121. Wilson (TX), County of
122. Wilson County Memorial Hospital District (TX)
123. Wood (TX), County of
124. Zavala (TX), County of

## Exhibit F

## Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities

### ABC

- A.T. Pharma Consultancy FZC
- AB Eurco Ltd
- AB Financing, LLC
- AB Finco Ltd
- AB Nokco Ltd
- AB Singapore Investments Pte. Ltd.
- AB Specialty Solutions, LLC
- ABBP International Company
- ABSG Canada Holdings, Inc.
- Access M.D. Inc.
- AERO LINK Courier GmbH
- Agri-Laboratories, LTD
- Agstrata, LLC
- AH Schweiz GmbH
- AH UK Holdco 1 Limited
- Alcura France
- Alcura Health España, S.A.
- Alcura UK Limited
- Alliance Boots BV
- Alliance Boots Schweiz Investments GmbH
- Alliance Health Services, Inc.
- Alliance Healthcare (Distribution) Limited
- Alliance Healthcare Acores (f/k/a Proconfar, S.A.)
- Alliance Healthcare Ecza Deposu Anonim Şirketi
- Alliance Healthcare España Holdings, S.L.
- Alliance Healthcare España S.A.
- Alliance Healthcare France SA
- Alliance Healthcare Group France SA
- Alliance Healthcare Management Services (Nederland) B.V.
- Alliance Healthcare Management Services Limited
- Alliance Healthcare Nederland B.V.
- Alliance Healthcare Norge AS
- Alliance Healthcare Participações SGPS, unipessoal, Lda.
- Alliance Healthcare Répartition
- Alliance Healthcare Romania SRL
- Alliance Healthcare S.A.
- Alliance Healthcare s.r.o.
- Alliance Healthcare s.r.o. Slovakia Branch
- Alliance Healthcare Services France (f/k/a Alliance Healthcare Formation SAS)
- Alliance Healthcare Technology Services Limited
- Alliance Healthcare Turkey Holding A.S.
- Alliance Healthcare Yatirim Holding Anonim Şirketi
- Alliance Home Health Care, Inc.
- Alliance UniChem IP Limited
- Alloga (Nederland) B.V.
- Alloga France SAS
- Alloga Logifarma, S.A.
- Alloga Logistica (España) S.L.
- ALLOGA LOGISTICS ROMANIA SRL
- Alloga Portugal - Armazenagem e Distribuicao Farmaceutica, Lda
- Alloga UK Limited
- AllyDVM, Inc.
- Almus Farmaceutica, S.A.
- Almus France
- Almus Pharmacuticals Limited
- Almus, Lda.
- Alphega SA
- Ambulatory Pharmaceutical Services, Inc.
- American Medical Distributors, Inc.
- American Oncology Network, LLC
- Amerisource Health Services Corporation
- Amerisource Health Services, LLC
- Amerisource Health Services, LLC d/b/a American Health Packaging
- Amerisource Heritage Corporation
- AmeriSource Heritage LLC
- Amerisource Receivables Financial Corporation
- Amerisource Sales Corporation
- AmerisourceBergen Associate Assistance Fund
- AmerisourceBergen BC, ULC
- AmerisourceBergen Canada Corporation
- AmerisourceBergen Canada GP LLC
- AmerisourceBergen Canada GP, LLC
- AmerisourceBergen Canada Holdings LP
- AmerisourceBergen Consulting Services, Inc.
- AmerisourceBergen Consulting Services, LLC
- AmerisourceBergen Corporation
- AmerisourceBergen Drug Corporation
- AmerisourceBergen Foundation
- AmerisourceBergen Global Holdings GmbH
- AmerisourceBergen Global Investments S.a.r.l.
- AmerisourceBergen Global Manufacturer Services GmbH

- AmerisourceBergen Group GmbH
- AmerisourceBergen Holding Corporation
- AmerisourceBergen Integrated Services Offering, LLC
- AmerisourceBergen International Holdings Inc.
- AmerisourceBergen International Investments, LLC
- AmerisourceBergen Luxembourg s.a.r.l.
- AmerisourceBergen Services Corporation
- AmerisourceBergen Sourcing, LLC
- AmerisourceBergen Specialty Group Canada Corporation
- AmerisourceBergen Specialty Group Canada Holdings, Inc.
- AmerisourceBergen Specialty Group, Inc.
- AmerisourceBergen Specialty Group, LLC
- AmerisourceBergen Swiss Holdings GmbH
- AmerisourceBergen Switzerland GmbH
- AmerisourceBergen UK Holdings Ltd
- Anderson Packaging, Inc.
- AndersonBrecon Inc.
- Animal Prescriptions Limited
- Animalytix LLC
- Apluspharma Ltd
- Apotheek Hagi B.V.
- Apotheek Lichtenvoorde B.V.
- APS Acquisitions Corporation
- APS Enterprises Holding Company, Inc.
- Armila UAB
- ASD Hemophilia Management, LLC
- ASD Hemophilia Program, L.P.
- ASD Specialty Healthcare, Inc.
- ASD Specialty Healthcare, LLC
- ASD Specialty Healthcare, LLC d/b/a ASD Healthcare
- ASD Specialty Healthcare, LLC d/b/a Besse Medical
- ASD Specialty Healthcare, LLC d/b/a Oncology Supply
- Automed Technologies (Canada) Inc.
- Automed Technologies (Canada) ULC
- Automed Technologies, Inc.
- BBC Laboratories
- BBC Operating Sub, Inc.
- BBC Packing Corporation
- BBC Special Packaging, Inc.
- BBC Transportation Co.
- Beachcourse Limited
- Bellco Drug Corp.
- Bellco Health Corp.
- Bergen Brunswig Corporation
- Bergen Brunswig Drug Company
- Bergen Brunswig Realty Services, Inc.
- Bermuda Equity Holdings, Ltd.
- Beverly Acquisition Corporation
- Blue Hill II, Inc.
- Blue Hill, Inc.
- BluePoint Intellectual Property, LLC
- Boots Nederland B.V.
- Boots Norge AS
- BP Pharmaceuticals Laboratories Unlimited Company
- BPL Brasil Participacoes Ltda.
- BPL Brazil Holding Company s.a.r.l.
- BPL Brazil, LLC
- BPL Group, LLC
- BPL Pharmaceuticals Holding Unlimited Company
- BPLH Ireland Company Dublin, Zug Branch
- BPLH Ireland Unlimited Company
- Brecon Holdings Limited
- Brecon Pharmaceuticals Holdings Limited
- Brecon Pharmaceuticals Limited
- Bridge Medical, Inc.
- Brownstone Pharmacy, Inc.
- Bruin Acquisition Corp.
- Burt's Pharmacy, LLC
- Cameron Stewart Lifescience Canada Inc.
- Cannes RJ Participacoes S.A.
- Capstone Med, Inc.
- Capstone Pharmacy of Delaware, Inc.
- CDRF Parent LLC
- CDRF Parent, Inc.
- Centaur Services Limited
- Centro Farmaceutico Asturiano, SA
- Century Advertising Inc.
- Chapin Drug Company
- Choice Medical, Inc.
- Clinical Outcomes Resource Application Corporation
- Clinical Outcomes Resource Application, Inc.
- CliniCare Concepts, Inc.
- ClinPharm, L.L.C.
- Committed Provider Services, LLC
- Compuscript, Inc.
- Computran Systems, Inc.
- Corrections Pharmacies Licensing Company, L.L.C.
- Corrections Pharmacies of California, LP
- Corrections Pharmacies of Hawaii, LP
- Corrections Pharmacies, L.L.C.
- Cubex, LLC
- Dataplarm Sarl
- DD Wholesale, Inc.
- Dialysis Purchasing Alliance, Inc.
- Directlog

Exhibit F
2

- Documedics Acquisition Co., Inc.
- Drug Service, Inc.
- Dunnington Drug, Inc.
- Dunnington RX Services of Massachusetts, Inc.
- Dunnington RX Services of Rhode Island, Inc.
- Durr-Fillauer Medical, Inc.
- Durvet, Inc.
- Dymaxium Healthcare Innovations, Ltd.
- Dymaxium Holdings, Ltd.
- Dymaxium, Ltd.
- Entel d.o.o.
- Escalante Solutions, L.P.
- Esko Itriyat Sanayi ve Ticaret Anonim Şirketi
- Euro Registratie Collectief B.V.
- European Physician Networks GmbH
- Express Pharmacy Services, Inc.
- Falcon Acquisition Sub, LLC
- Family Center Pharmacy, Inc.
- Feeders Advantage, LCC
- General Drug Company
- Goot Nursing Home Pharmacy, Inc.
- Goot Westbridge Pharmacy, Inc.
- Goot's Goodies, Inc.
- Goot's Pharmacy & Orthopedic Supply, Inc.
- Green Barn, Inc
- H. D. Smith Holding Company
- H. D. Smith Holdings, LLC
- H. D. Smith Wholesale Drug Co.
- H. D. Smith, LLC
- HAI Acquisition, Inc.
- HDS Solutions, LLC
- Health Services Capital Corporation
- Healthcare Prescription Services, Inc.
- HealthForward Inc.
- HealthQuest Partner II, L.P.
- HealthTronics Data Solutions LLC
- HealthTronics Data Solutions, LLC
- HealthTronics Information Technology Solutions, Inc.
- Hedef International Holdings BV
- Home Medical Equipment Health Company
- Hydra Pharm SPA
- I.g.G. of America, Inc.
- IHS Acquisition XXX, Inc.
- Imedex, Inc.
- Imedex, LLC
- Independent Pharmacy Buying Group, Inc.
- Innomar Pharmacy (BC) Inc.
- Innomar Pharmacy (SK) Inc.
- Innomar Pharmacy Inc.
- Innomar Specialty Pharmacy, Inc.
- Innomar Strategies Inc.
- Innovation Cancer, Inc.
- Insta-Care Holdings, Inc.
- Insta-Care Pharmacy Services Corporation
- Intake Initiatives Incorporated
- IntegraConnect NewCo, LLC
- Integrated Commercialization Solutions, Inc.
- Integrated Commercialization Solutions, LLC
- Integrated Health Systems Outcomes Coalition, LLC
- Inteplex, Inc.
- Interfill, LLC
- International Oncology Network Solutions, Inc.
- International Physician Networks, L.L.C.
- International Rheumatology Network, L.L.C.
- IntrinsiQ Holdings, Inc.
- IntrinsiQ Specialty Solutions, Inc.
- IntrinsiQ Tendler, Inc.
- IntrinsiQ, LLC
- J.M. Blanco, Inc.
- James Brudnick Company, Inc.
- K/S Instrument Corp.
- KRP Investments, Inc.
- Labpak Limited
- LAD Drug Corporation
- Leading Educational Research Network, LLC
- Lexicon Pharmacy Services, L.L.C.
- Liberty Acquisition Corp.
- Libra C.V.
- Los Angeles Drug Corporation
- M.D.P. Properties, Inc.
- Managed Care Network, Inc.
- Marshall Reinardy LLC
- Medical Health Industries, Inc.
- Medical Initiatives, Inc.
- Medidyne Corp.
- Medselect Inc.
- Memorial Pet Care, Inc.
- Micro Technologies Canada Inc.
- MWI Buying Group Limited (formerly St. Francis Limited)
- MWI Supply (UK Acquisition) Limited
- MWI Supply (UK Holdings) Limited
- MWI Supply (UK) Limited
- MWI Veterinary Supply Co.
- MWI Veterinary Supply, Inc.
- Nareks Ecza Deposu Ticaret Anonim Şirketi
- Network for Medical Communication & Research Analytics, LLC
- New Jersey Medical Corporation
- Nexiapharma, SL
- NMCR Holdings, Inc.
- NMCR-Europe, LLC
- Northeast Veterinary Supply Company, LLC
- Oktal Pharma d.o.o

Exhibit F

3

- Oktal Pharma d.o.o
- Oktal Pharma d.o.o [Zagreb]
- Oktal Pharma d.o.o.
- Oktal Pharma Hungary K.f.t.
- Omni Med B, Inc.
- OPH Oktal Pharma d.o.o
- OTC Direct Limited
- Paris Acquisition Corp.
- Pharm Plus Acquisition, Inc.
- Pharma One Corporation Limited
- Pharmacy Corporation of America
- Pharmacy Corporation of America - Massachusetts, Inc.
- Pharmacy Healthcare Solutions, Ltd.
- Pharmacy Review Services, Inc.
- Pharmdata s.r.o.
- PharMEDium Healthcare Corporation
- PharMEDium Healthcare Holdings LLC
- PharMEDium Healthcare Holdings, Inc.
- PharMEDium Healthcare LLC
- PharMEDium Pharmacy Services, LLC
- PharMEDium R.E., LLC
- PharMEDium Services, LLC
- PharMerica Drug Systems, Inc.
- PharMerica Technology Solutions, LLC
- Pharmerica, Inc.
- Pitango HealthTech Fund I, L.P.
- Planet Software Limited
- PMSI MSA Services, Inc.
- PMSI, Inc.
- PPSC USA, LLC
- Premier Pharmacy, Inc.
- Premier Source Diagnostics Inc.
- Premier Source, LLC
- Prescribe Wellness, LLC
- Profarma Distribuidora de Produtos Farmaceuticos S.A.
- Ramuneles Vaistine UAB
- Reimbursement Education Network, LLC
- Rightpak, Inc.
- Rombro's Drug Center, Inc.
- Roscoe Acquisition Corporation
- S.R.P. (Services de la Répartition Pharmaceutique)
- SecureDVM, LLC
- Securos Europe GmbH
- Silver Streak I, LLC
- Skills in Healthcare France
- Skills in Healthcare Pazarlama ve Tanitim Hizmetleri Anonim Şirketi
- Skills in Healthcare Romania S.r.l.
- Smart ID Works, LLC
- Smith Medical Partners, LLC
- Snipetjernveien 10 Norge AS
- Solana Beach, Inc.
- Southwest Pharmacies, Inc.
- Southwestern Drug Corporation
- SparkSense Analytics, Inc.
- Specialty Advancement Network, LLC
- Specialty Pharmacy of California, Inc.
- Specialty Pharmacy, Inc.
- Spielberg Acquisition Corp.
- Spits B.V.
- Stadt Solutions, LLC
- Stephar B.V.
- Strategic Pharmaceutical Solutions, Inc.
- Swine Solutions Network, LLC
- Taylor & Manno Asset Recovery, Inc.
- Telepharmacy Solutions, Inc.
- Terra-Lab d.o.o
- The Allen Company
- The Lash Group, Inc.
- The Lash Group, LLC
- TheraCom, L.L.C.
- ThermoSecure Medical Equipment GmbH
- TMESYS, Inc.
- TrakCel Holding Company, Inc.
- Trellis Healthcare Consulting, L.L.C.
- Trellis Healthcare Consulting, LLC
- True Blue Indemnity Company
- United Company of Pharmacists SAE
- Universal Packaging Systems, Inc.
- US Bioservices Corporation
- Valley Wholesale Drug Co., LLC
- Value Apothecaries, Inc.
- Vedco, Inc.
- Vetbridge Animal Health, LLC
- Vetbridge Product Development (NM-OMP) LLC
- VetSpace Limited
- VetSpace, Inc.
- Vetswest Limited
- W.C. International Limited
- WBA Acquisitions Luxco 9 S.à.r.l.
- Wight Nederland Holdco 2 B.V.
- Wight Nederland Holdco 4 BV
- WML, LLC
- Woodglen Properties Limited
- Woodglen Properties Limited Portugal Branch
- World Courier (Aust) Pty. Ltd.
- World Courier (Austria) GmbH
- World Courier (Austria) GmbH – Serbia Branch
- World Courier (Deutschland) GmbH
- World Courier (Finland) Oy
- World Courier (India) Private Limited
- World Courier (Ireland) Limited

Exhibit F

4

- World Courier (Lithuania), UAB
- World Courier (Malaysia) Sdn. Bhd.
- World Courier (Norway) AS
- World Courier (NZ) Limited
- World Courier (Poland) Sp. Z.o.o.
- World Courier (Shanghai) Co., Ltd Guangzhou Branch
- World Courier (Shanghai) Co., Ltd.
- World Courier (Shanghai) Co., Ltd., Beijing Branch
- World Courier (Sweden) AB
- World Courier (Switzerland) SA
- World Courier (U.K.) Limited
- World Courier Asia (Thailand) Co., Ltd.
- World Courier Belgium s.a.
- World Courier Bulgaria
- World Courier Czech Republic s.r.o.
- World Courier de Chile Limitada
- World Courier de Colombia S.A.
- World Courier de Espana, S.A.
- World Courier de Mexico S.A. de C.V.
- World Courier de Portugal, Lda.
- World Courier de Uruguay S.A.
- World Courier del Ecuador S.A.
- World Courier del Peru S.A.
- World Courier Denmark A/S
- World Courier do Brasil Transportes Internacionais Ltda.
- World Courier France S.A.R.L.
- World Courier Ground (Europe) Limited
- World Courier Ground, Inc.
- World Courier Group Logistics, Inc.
- World Courier Group S.a.r.l.
- World Courier Group, Inc.
- World Courier Group, Inc. Taiwan Branch
- World Courier Hellas Limited Liability Company
- World Courier Holland BV
- World Courier Hong Kong Limited
- World Courier Hungary Freight Forwarder and Service Provider Limited Liability Company
- World Courier Israel Ltd.
- World Courier Italia srl
- World Courier K.K. Japan
- World Courier Korea Co., Ltd.
- World Courier Limited (Russia)
- World Courier Logistics (Europe) Limited
- World Courier Logistics (UK) Limited
- World Courier Logistics, Inc.
- World Courier Logistics, Inc. (DE)
- World Courier Logistics, Inc. (NY)
- World Courier Management Limited
- World Courier Management, Inc.
- World Courier of Canada Ltd
- World Courier Operations Kenya Limited
- World Courier Philippines – Representative Office
- World Courier Romania S.R.L.
- World Courier S.A.
- World Courier Singapore Pte Ltd
- World Courier Slovak Republic s.r.o.
- World Courier South Africa (Proprietary) Limited
- World Courier Tasimacilik ve Lojistik Hizmetleri Ticaret Limited Sirketi
- World Courier Ukraine LLC
- World Courier Venezuela, S.A.
- World Courier Zagreb d.o.o.
- World Courier, Inc.
- World Courier, kurirske storitve,d.o.o.
- World Customs Brokerage, Inc.
- Xcenda (UK) Limited
- Xcenda GmbH
- Xcenda Switzerland GmbH
- Xcenda, L.L.C.
- ZU Vase Zdravije

## Cardinal Health

- A+ Secure Packaging, LLC
- Abilene Nuclear, LLC
- Access Closure, Inc.
- Acuity GPO, LLC
- Aero-Med, Ltd.
- Allegiance (BVI) Holding Co. Ltd.
- Allegiance Corporation
- Allegiance Healthcare (Labuan) Pte. Ltd.
- Allegiance I, LLC
- Allegiance Labuan Holdings Pte. Ltd.
- API (Suppliers) Limited
- AssuraMed Acquisition Corp.
- AssuraMed Group, Inc.
- AssuraMed Holding, Inc.
- AssuraMed Intermediate Holding, Inc.
- AssuraMed, Inc.
- C. International, Inc.
- Cardinal Distribution Holding Corporation - I
- Cardinal Distribution Holding Corporation - II
- Cardinal Health 100, Inc.
- Cardinal Health 104 LP
- Cardinal Health 105, Inc.

- Cardinal Health 107, LLC
- Cardinal Health 108, LLC
- Cardinal Health 110, LLC
- Cardinal Health 112, LLC
- Cardinal Health 113, LLC
- Cardinal Health 114, Inc.
- Cardinal Health 115, LLC
- Cardinal Health 116, LLC
- Cardinal Health 118, LLC
- Cardinal Health 119, LLC
- Cardinal Health 121, LLC
- Cardinal Health 122, LLC
- Cardinal Health 123, LLC
- Cardinal Health 124, LLC
- Cardinal Health 125, LLC
- Cardinal Health 126, LLC
- Cardinal Health 127, Inc.
- Cardinal Health 128, LLC
- Cardinal Health 130, LLC
- Cardinal Health 131, LLC
- Cardinal Health 132, LLC
- Cardinal Health 133, Inc.
- Cardinal Health 2, LLC
- Cardinal Health 200, LLC
- Cardinal Health 201 Canada L.P.
- Cardinal Health 201, Inc.
- Cardinal Health 215, LLC
- Cardinal Health 222 (Thailand) Ltd.
- Cardinal Health 242, LLC
- Cardinal Health 246, Inc.
- Cardinal Health 247, Inc.
- Cardinal Health 249, LLC
- Cardinal Health 250 Dutch C.V.
- Cardinal Health 251, LLC
- Cardinal Health 252, LLC
- Cardinal Health 253, LP
- Cardinal Health 3, LLC
- Cardinal Health 414, LLC
- Cardinal Health 418, Inc.
- Cardinal Health 5, LLC
- Cardinal Health 500, LLC
- Cardinal Health 524, LLC
- Cardinal Health 529, LLC
- Cardinal Health 6, Inc.
- Cardinal Health 7, LLC
- Cardinal Health 8, LLC
- Cardinal Health Australia 503 Pty Ltd.
- Cardinal Health Austria 504 GmbH
- Cardinal Health Belgium 505 BVBA
- Cardinal Health Canada Holdings Cooperatie U.A.
- Cardinal Health Canada Inc.
- Cardinal Health Capital Corporation
- Cardinal Health Cardiology Solutions, LLC
- Cardinal Health Chile Limitada
- Cardinal Health Colombia S.A.S.
- Cardinal Health Commercial Technologies, LLC
- Cardinal Health Corporate Solutions, LLC
- Cardinal Health D.R. 203 II Ltd.
- Cardinal Health Denmark ApS
- Cardinal Health do Brasil Ltda.
- Cardinal Health Finance
- Cardinal Health Finland Oy
- Cardinal Health Foundation
- Cardinal Health France 506 SAS
- Cardinal Health Funding, LLC
- Cardinal Health Germany 507 GmbH
- Cardinal Health Germany Manufacturing GmbH
- Cardinal Health Holding International, Inc.
- Cardinal Health International Philippines, Inc.
- Cardinal Health IPS, LLC
- Cardinal Health Ireland 419 Designated Activity Company
- Cardinal Health Ireland 508 Limited
- Cardinal Health Ireland Manufacturing Limited
- Cardinal Health Ireland Unlimited Company
- Cardinal Health Italy 509 S.r.l.
- Cardinal Health Japan G.K.
- Cardinal Health Korea Limited
- Cardinal Health Luxembourg 420 S.a.r.l.
- Cardinal Health Luxembourg 522 S.a.r.l.
- Cardinal Health Malaysia 211 Sdn. Bhd.
- Cardinal Health Malta 212 Limited
- Cardinal Health Managed Care Services, LLC
- Cardinal Health Medical Products India Private Limited
- Cardinal Health Mexico 244 S. de R.L. de C.V.
- Cardinal Health Mexico 514 S. de R.L. de C.V.
- Cardinal Health Middle East FZ-LLC
- Cardinal Health MPB, Inc.
- Cardinal Health Napoleon Holding, LLC
- Cardinal Health Netherlands 502 B.V.
- Cardinal Health Netherlands 525 Cooperatie U.A.
- Cardinal Health Netherlands 528 B.V.
- Cardinal Health Norway AS
- Cardinal Health P.R. 120, Inc.
- Cardinal Health P.R. 218, Inc.
- Cardinal Health P.R. 220, LLC
- Cardinal Health P.R. 436, Inc.
- Cardinal Health Panama, S. de R.L.
- Cardinal Health Pharmaceutical Contracting, LLC
- Cardinal Health Pharmacy Services, LLC
- Cardinal Health Poland Spolka z ograniczona odpowiedzialnoscia
- Cardinal Health Portugal 513, Unipessoal Lda.
- Cardinal Health Russia

Exhibit F
6

- Cardinal Health Singapore 225 Pte. Ltd.
- Cardinal Health Spain 511 S.L.
- Cardinal Health Sweden 512 A.B.
- Cardinal Health Switzerland 515, GmbH
- Cardinal Health Systems, Inc.
- Cardinal Health Technologies Switzerland GmbH
- Cardinal Health Technologies, LLC
- Cardinal Health U.K. 418 Limited
- Cardinal Health U.K. 432 Limited
- Cardinal Health U.K. Holding Limited
- Cardinal Health U.K. International Holding LLP
- Cardinal Health, Inc.
- Cardinal MED Equipment Consulting (Shanghai) Co., Ltd.
- Cirpro de Delicias S.A. de C.V.
- Clinic Pharmacies III, LLC
- Clinic Pharmacies, LLC
- Community Pharmacy Enterprises, LLC
- Convertors de Mexico S.A. de C.V.
- Cordis (Shanghai) MED Devices Co., Ltd.
- Cordis Cashel Unlimited Company
- Cordis Corporation
- Cornerstone Rheumatology LP
- Covidien Manufacturing Solutions, S.A.
- Dutch American Manufacturers II (D.A.M. II) B.V.
- Ellipticare, LLC
- EPIC Insurance Company
- Especialidades Medicas Kenmex S.A. de C.V.
- Experience East, LLC
- Flexible Stenting Solutions, Inc.
- Frog Horned Capital, Inc.
- Generic Drug Holdings, Inc.
- GetOutcomes, LLC
- Griffin Capital, LLC
- HDG Acquisition, Inc.
- imgRx Healdsburg, Inc.
- imgRx Salud, Inc.
- imgRx SJ Valley, Inc.
- imgRx SLO, Inc.
- imgRx Sonoma, Inc.
- InnerDyne Holdings, Inc.
- Innovative Therapies, Inc.
- Instant Diagnostic Systems, Inc.
- InteCardia-Tennessee East Catheterization, LLC
- ITI Sales, LLC
- Kendall-Gammatron Limited
- Killilea Development Company, Ltd.
- Kinray I, LLC
- KPR Australia Pty. Ltd.
- KPR Switzerland Sales GmbH
- KPR U.S., LLC
- Leader Drugstores, Inc.

- Ludlow Technical Products Canada, Ltd.
- Marin Apothecaries
- Medicap Pharmacies Incorporated
- Medicine Shoppe Capital Corporation
- Medicine Shoppe International, Inc.
- Medicine Shoppe Internet, Inc.
- Mediquip Sdn. Bhd.
- Mirixa Corporation
- MosaicGPO, LLC
- mscripts Holdings, LLC
- mscripts Systems India Private Limited
- mscripts, LLC
- Nippon Covidien Ltd.
- One Cloverleaf, LLC
- Outcomes Incorporated
- Owen Shared Services, Inc.
- Pharmacy Operations Of New York, Inc.
- Pharmacy Operations, Inc.
- Physicians Purchasing, Inc.
- Pinnacle Intellectual Property Services, Inc.
- Pinnacle Intellectual Property Services-International, Inc.
- Quiroproductos de Cuauhtemoc S. de R.L. de C.V.
- RainTree Administrative Services, LLC
- RainTree Care Management, LLC
- RainTree GPO, LLC
- Ransdell Surgical, Inc.
- Red Oak Sourcing, LLC
- Renal Purchasing Group, LLC
- RGH Enterprises, Inc.
- RT Oncology Services Corporation
- Rxealtime, Inc.
- Sierra Radiopharmacy, L.L.C.
- Sonexus Health Access & Patient Support, LLC
- Sonexus Health Distribution Services, LLC
- Sonexus Health Financial Solutions, LLC
- Sonexus Health Pharmacy Services, LLC
- Sonexus Health, LLC
- TelePharm, LLC
- The Harvard Drug Group, L.L.C.
- Tianjin ITI Trading Company
- Tradex International, Inc.
- Traverse GPO, LLC
- Wavemark Lebanon Offshore s.a.l.
- Wavemark, Inc.
- Red Oak Sourcing, LLC
- API (Suppliers) Limited
- Sierra Radiopharmacy, L.L.C.
- Abilene Nuclear, LLC
- InteCardia-Tennessee East Catheterization, LLC
- Kendall-Gammatron Limited
- Almus Pharmaceuticals USA LLC

- Cardinal Health (H.K.) Co. Limited
- Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
- Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
- Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
- Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
- Dalian Zhongda Pharmaceutical Company Limited
- NaviHealth Holdings, LLC
- Parch, L.L.C.
- 6464661 Canada Inc.
- AB Acquisitions Luxco 3A S.A.R.I.
- Academy Of Managed Care Medicine, L.L.C.
- Alaris Medical 1 (Suisse) Sarl
- Alaris Medical New Zealand Limited
- Allegiance Healthcare International GmbH
- Allegiance Pro Inc.
- Allied Healthcare Services, Inc.
- Almus Pharmaceuticals Singapore Pte. Ltd.
- Almus Pharmaceuticals USA LLC
- American Threshold Industries, Inc.
- Anoka, LLC
- ARCH Collection Corporation
- ARCH, S.A.
- Armand Scott, LLC
- Aurum Pharmaceuticals Limited
- Behrens Inc.
- Beijing Baiji Advanced Specialty Company Limited
- Bellwether Oncology Alliance, Inc.
- Bentley Merger Sub, LLC
- Bindley Western Funding Corporation
- Bindley Western Industries II Of Maine, Inc.
- Biosigna GmbH Institut für Biosignalverarbeitung und Systemanalyse
- Bird Products (Japan) Ltd.
- Bird Products Corporation
- Boots Retail Holdings (USA) Inc.
- Brighton Capital, Inc.
- Buffalo Merger Corp.
- BW Transportation Services, Inc.
- Cardal II, LLC
- Cardal, Inc.
- Cardinal Florida, Inc.
- Cardinal Health (Beijing) China Pharmaceutical Co., Ltd.
- Cardinal Health (Beijing) Medical Trading Co., Ltd.
- Cardinal Health (Beijing) Pharmacy Co., Ltd.
- Cardinal Health (Chengdu) Pharmacy Co., Ltd.
- Cardinal Health (China) Investment Co., Ltd.

- Cardinal Health (Chongqing) Pharmaceutical Co., Ltd.
- Cardinal Health (Chongqing) Pharmacy Co., Ltd.
- Cardinal Health (H.K.) Co. Limited
- Cardinal Health (Hubei) Pharmaceutical Co., Ltd.
- Cardinal Health (L) Co., Ltd.
- Cardinal Health (Liaoning) Pharmaceutical Co., Ltd.
- Cardinal Health (P02296)
- Cardinal Health (P04080)
- Cardinal Health (Shanghai) Commercial and Trading Company Limited
- Cardinal Health (Shanghai) Cosmetics Trading Co., Ltd.
- Cardinal Health (Shanghai) Logistics Co., Ltd.
- Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
- Cardinal Health (Shanghai) Pharmacy Co., Ltd.
- Cardinal Health (Shanxi) Pharmaceutical Co., Ltd.
- Cardinal Health (Shenyang) Pharmacy Co., Ltd.
- Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
- Cardinal Health (Tianjin) Pharmaceutical Co., Ltd.
- Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
- Cardinal Health (WuXi) Pharmacy Co., Ltd.
- Cardinal Health (Zhejiang) Pharmaceutical Co., Ltd.
- Cardinal Health 101, Inc.
- Cardinal Health 102, Inc.
- Cardinal Health 103, Inc.
- Cardinal Health 106, Inc.
- Cardinal Health 109, Inc.
- Cardinal Health 111, LLC
- Cardinal Health 113, LLC
- Cardinal Health 117, LLC
- Cardinal Health 129, Inc.
- Cardinal Health 208, Inc.
- Cardinal Health 301, LLC
- Cardinal Health 400, Inc.
- Cardinal Health 401, Inc.
- Cardinal Health 402, Inc.
- Cardinal Health 403, Inc.
- Cardinal Health 404, Inc.
- Cardinal Health 405, Inc.
- Cardinal Health 406, Inc.
- Cardinal Health 406, LLC
- Cardinal Health 407, Inc.
- Cardinal Health 408, Inc.
- Cardinal Health 409, Inc.
- Cardinal Health 410, Inc.
- Cardinal Health 411, Inc.

- Cardinal Health 412, Inc.
- Cardinal Health 413, Inc.
- Cardinal Health 415, Inc.
- Cardinal Health 416, Inc.
- Cardinal Health 417, Inc.
- Cardinal Health 419, LLC
- Cardinal Health 420, LLC
- Cardinal Health 421 Limited Partnership
- Cardinal Health 421, Inc.
- Cardinal Health 422, Inc.
- Cardinal Health 501 Dutch C.V.
- Cardinal Health Austria 201 GmbH
- Cardinal Health Bermuda 224, Ltd.
- Cardinal Health Brasil 423 Servicos Farmaceuticos Nucleares Ltda
- Cardinal Health Canada 204, Inc.
- Cardinal Health Canada 301, Inc.
- Cardinal Health Canada 302, Inc.
- Cardinal Health Canada 307, ULC
- Cardinal Health Canada 403, Inc.
- Cardinal Health Canada 437, Inc.
- Cardinal Health Canada Inc.
- Cardinal Health Canada LP
- Cardinal Health Cayman Islands Holding Co. Ltd
- Cardinal Health Cayman Islands Ltd.
- Cardinal Health China Co., Ltd.
- Cardinal Health D.R. 203 Limited
- Cardinal Health Europe IT GmbH
- Cardinal Health France 205 SAS
- Cardinal Health France 309 SAS
- Cardinal Health Germany 206 GmbH
- Cardinal Health Germany 234 GmbH
- Cardinal Health Germany 318 GmbH
- Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
- Cardinal Health Hong Kong Limited
- Cardinal Health I, Inc.
- Cardinal Health Imaging, LLC
- Cardinal Health India Private Limited
- Cardinal Health International Ventures, Ltd.
- Cardinal Health Ireland 406 Ltd.
- Cardinal Health Ireland 527 General Partnership
- Cardinal Health Italy 208 S.r.l.
- Cardinal Health Italy 312 S.p.A.
- Cardinal Health Lease Funding 2002A, LLC
- Cardinal Health Lease Funding 2002AQ, LLC
- Cardinal Health Lease Funding 2003A, LLC
- Cardinal Health Lease Funding 2003AQ, LLC
- Cardinal Health Lease Funding 2003B, LLC
- Cardinal Health Lease Funding 2003BQ, LLC
- Cardinal Health Lease Funding 2004A, LLC
- Cardinal Health Lease Funding 2004AQ, LLC
- Cardinal Health Luxembourg 523 S.a.r.l.

- Cardinal Health Mauritius Holding 226 Ltd.
- Cardinal Health Mexico 213, S.A. de C.V.
- Cardinal Health Netherlands 238 BV
- Cardinal Health Netherlands 526 B.V.
- Cardinal Health Netherlands Financing C.V.
- Cardinal Health Netherlands Holding B.V.
- Cardinal Health New Zealand 313 Limited
- Cardinal Health Norway 315 A/S
- Cardinal Health P.R. 227, Inc.
- Cardinal Health P.R. 409 B.V.
- Cardinal Health PTS, Inc.
- Cardinal Health PTS, LLC
- Cardinal Health S.A. 319 (Proprietary) Limited
- Cardinal Health Singapore 304
- Cardinal Health Singapore 423 Pte. Ltd.
- Cardinal Health Spain 219 S.L.U.
- Cardinal Health Spain 239 SA
- Cardinal Health Specialty Pharmacy, LLC
- Cardinal Health Sweden 220 AB
- Cardinal Health Sweden 314 AB
- Cardinal Health Switzerland 221 Sarl
- Cardinal Health Switzerland 317 Sarl
- Cardinal Health Trading (Shanghai) Co., Ltd.
- Cardinal Health U.K. 100 Limited
- Cardinal Health U.K. 101 Limited
- Cardinal Health U.K. 102 Limited
- Cardinal Health U.K. 103 Limited
- Cardinal Health U.K. 104 Limited
- Cardinal Health U.K. 105 Limited
- Cardinal Health U.K. 106 Limited
- Cardinal Health U.K. 223 Limited
- Cardinal Health U.K. 232 Limited
- Cardinal Health U.K. 235 Limited
- Cardinal Health U.K. 236 Limited
- Cardinal Health U.K. 240 Limited
- Cardinal Health U.K. 305 Limited
- Cardinal Health U.K. 306 Limited
- Cardinal Health U.K. 433 Limited
- Cardinal Health U.K. 434 Limited
- Cardinal Syracuse, Inc.
- Cardinal.Com Holdings, Inc.
- Care Fusion Development Private Limited
- Care Fusion Incorporated
- CareFusion 202, Inc.
- CareFusion 203, Inc.
- CareFusion 205, Inc.
- CareFusion 206, Inc.
- CareFusion 207, Inc.
- CareFusion 209, Inc.
- CareFusion 210, Inc.
- CareFusion 211, Inc.
- CareFusion 212, LLC
- CareFusion 213, LLC

Exhibit F

9

- CareFusion 214, LLC
- CareFusion 2200, Inc.
- CareFusion 2201, Inc.
- CareFusion 302, LLC
- CareFusion 303, Inc.
- CareFusion 304, LLC
- CareFusion Australia 200 Pty Ltd.
- CareFusion Australia 316 Pty Limited
- CareFusion Australia 500 Pty Ltd
- CareFusion Belgium 202 BVBA
- CareFusion Brasil 231 Servico e Comercia de Productos Medicos Ltda
- CareFusion Corporation
- CareFusion EIT, LLC
- CareFusion Iberia 308 S.L.U.
- CareFusion Italy 237 Srl
- CareFusion Italy 311 Srl
- CareFusion Japan 228 K.K.
- CareFusion Japan 233, Inc.
- CareFusion Luxembourg 501 Sarl
- CareFusion Manufacturing Ireland 241 Limited
- CareFusion Manufacturing, LLC
- CareFusion Netherlands 214 B.V.
- CareFusion Netherlands 238 BV
- CareFusion Netherlands 310 B.V.
- CareFusion Netherlands 503 B.V.
- CareFusion New Zealand 217 Limited
- CareFusion New Zealand 313 Limited
- CareFusion Resources, LLC
- CareFusion Singapore 243 Pte. Ltd.
- CareFusion Solutions, LLC
- CareFusion U.K. 284 Limited
- CareFusion U.K. 286 Limited
- CareFusion U.K. 287 Limited
- CareFusion U.K. 288 Limited
- Cascade Development, Inc.
- CCB, Inc.
- CDI Investments, Inc.
- Centralia Pharmacy, Inc.
- Centricity, LLC
- Chapman Drug Company
- Chengdu Baiji Advanced Specialty Pharmacy Company Limited
- Cheshire Merger Sub, Inc.
- CMI Net, Inc.
- College Park Plaza Associates, Inc.
- Comprehensive Medical Imaging-Anaheim Hills, Inc.
- Comprehensive Medical Imaging-Apple Valley, Inc.
- Comprehensive Medical Imaging-Boynton Beach, Inc.
- Comprehensive Medical Imaging-Downey, Inc.
- Comprehensive Medical Imaging-Encino, Inc.
- Comprehensive Medical Imaging-Fort Lauderdale, Inc.
- Comprehensive Medical Imaging-Fremont, Inc.
- Comprehensive Medical Imaging-Hesperia, Inc.
- Comprehensive Medical Imaging-Huntington Beach, Inc.
- Comprehensive Medical Imaging-Palm Springs, Inc.
- Comprehensive Medical Imaging-Rancho Cucamonga, Inc.
- Comprehensive Medical Imaging-Rancho Mirage, Inc.
- Comprehensive Medical Imaging-Salisbury, Inc.
- Comprehensive Medical Imaging-Sherman Oaks, Inc.
- Comprehensive Medical Imaging-Tempe, Inc.
- Comprehensive Medical Imaging-Van Nuys, Inc.
- Comprehensive Medical Imaging-Victorville, Inc.
- Comprehensive Medical Imaging-Westlake Village, Inc.
- Comprehensive Open MRI-Carmichael, Inc.
- Comprehensive Open MRI-Folsom, Inc.
- Comprehensive Open MRI-Fullerton, Inc.
- Comprehensive Open MRI-Laguna Hills, Inc.
- Comprehensive Open MRI-Sacramento, Inc.
- Comprehensive Reimbursement Consultants, Inc.
- Consumer2patient, LLC
- CR Medicap, Inc.
- Curaspan Health Group, Inc.
- Cytokine Pharmasciences, Inc.
- Dalian Zhongda Pharmaceutical Company Limited
- Daniels Pharmaceuticals Limited
- DC Merger Corp
- Denver Biomedical, Inc.
- Desert PET, LLC
- Dik Drug Company, LLC
- Dik Medical Supplies, LLC
- Discor Limited
- Dismed Inc.
- Dohmen Distribution Partners Southeast, L.L.C.
- Dover Communications, LLC
- Duquoin Pharmacy, Inc.
- Dutch American Manufacturers (D.A.M.) B.V.
- East Iowa Pharmacies, Inc.
- EGIS Holdings, Inc.
- Eldon Laboratories Limited
- Ellicott Drug Company
- EME Medical, Inc.
- Enturia Canada ULC
- Enturia de Mexico S. de R.L. de C.V.
- Enturia Limited

- Enturican, Inc.
- EON Media Inc.
- Eureka Merger Sub, Inc.
- European Pharmaceuticals Group Ltd.
- First Choice, Inc. Of Maine
- Flower Merger Corp.
- Futuremed Health Care Products Limited Partnership
- Futuremed Healthcare Products Corporation
- Futuremed Holdings General Partner Inc.
- Fuzhou Baiji Pharmacy Company Limited
- Gala Design, Inc.
- Gelatin Products International, Inc.
- Geodax Technology, Inc.
- Glacier Corporation
- Grand Avenue Pharmacy, Inc.
- Graphic Holdings, Inc.
- Griffin Group Document Management Services, Inc.
- Guangzhou Baiji Advanced Specialty Pharmaceutical Chain Stores Company Limited
- Guangzhou Baiji Drug Store Company Limited
- Guangzhou City Kangwei Information Technology Company Limited
- Guangzhou Ruixun Pharmaceutical Company Limited
- Guizhou Yibai Medical Co., Ltd.
- Hangzhou Baiji Advanced Specialty Drug Store Company Limited
- Heartland Diagnostic Services, Inc.
- HLS Advantage, LLC
- Homecare (North-West) Limited
- Humiston-Keeling, Inc.
- IMI Of Boca Raton, Inc.
- IMI Of Miami, Inc.
- IMI Of North Miami Beach, Inc.
- Inland Empire Regional Pet Center, LLC
- InnerDyne, Inc.
- Inpharm Nationwide Limited
- InteCardia-Tennessee East Diagnostic, LLC
- Intercare Holdings Limited
- Intercare Investments Limited
- Intercare Properties Plc
- Iowa Falls Pharmacy, Inc.
- IVAC Overseas Holdings LP
- JakaMed AB AB
- Jinan Baiji Drug Store Company Limited
- JRG, Ltd.
- Kendall Patient Recovery BVBA
- Kinetic Surgical, LLC
- Kinray, Inc.
- Kinray, LLC
- KPR Italia S.r.l.

- KPR U.S., Inc.
- Kunming Baiji Advanced Specialty Pharmacy Company Limited
- Lake Charles Pharmaceutical Supply Company, LLC
- Liaoning Longda Pharmaceutical Co., Ltd.
- Liberty Communications Network, LLC
- Ludlow Technical Products Corporation
- Macarthy Group Trustees Limited
- Macarthys Laboratories Limited
- Macarthy's Limited
- Marmac Distributors, Inc.
- Martindale Pharma GmbH
- Martindale Pharmaceuticals Limited
- Medcon S.A.
- MedEd Resources, LLC
- Medesta Associates, LLC
- Medical Concepts Development, Inc.
- Medical Diagnostic Leasing, Inc
- Medical Education Systems, LLC
- Medical Media Communications, LLC
- Medical Strategies, Inc.
- MediQual Systems, Inc.
- Meditrol Automation Systems, Inc.
- Meditrol, Inc.
- MedMined, Inc.
- Mercury Merger Sub, LLC
- Mesa Merger Corp.
- MicroGas Limited
- MicroMedical Deutschland GmbH
- Microport Healthcare, LLC
- Midland Pharmacies, Inc
- Mississippi Medical Supply Cooperative, L.L.C.
- MRI Equipment Partners, Ltd.
- Mudhen Merger Corp.
- Multi-Medica S.A.
- Multipharm Limited
- Nanjing Baiji Advanced Specialty Drug Store Company Limited
- Nanning Baiji Advanced Specialty Pharmacy Company Limited
- Nationwide Ostomy Supplies Limited
- Navigator Health, Inc.
- NaviHealth Holdings, LLC
- NaviHealth SM Holdings, Inc.
- NaviHealth, Inc.
- Nexus Healthcare, Inc.
- Nitric Bio Therapeudics, Inc.
- Northern Michigan Supply Alliance, L.L.C.
- Ohio Valley-Clarksburg, Inc.
- Oncology Holdings, Inc.
- Onpointe Medical Communications, LLC
- Oval (Shanghai) Technologies, Inc.

Exhibit F

- Oval Technologies (H.K.) Pty Limited
- Owen Healthcare Building, Inc.
- Pacific Surgical Innovations, Inc.
- Panther Merger Sub II, Inc.
- Panther Merger Sub, Inc.
- Parch, L.L.C.
- Parch, L.L.C. State File
- ParMed Pharmaceuticals, LLC
- PatientScribe Inc.
- PCI Acquisition I, Inc.
- PCI Acquisition II, Inc.
- PCI Services Holdings, Inc.
- PCI Services III, Inc.
- PCI/Acquisition III, Inc.
- PCI/All Pack Holdings, Inc.
- PCI/Delvco, Inc. State File
- PCI/Tri-Line (Usa), Inc.
- Pharmaceutical & Diagnostic Services, LLC
- Pharmacy Service Corporation
- Phillipi Holdings, Inc.
- PHR Staffing, Inc.
- Post-Acute Care Center For Research, LLC
- Practicome Solutions, LLC
- Princeton Diagnostic Isotopes, Inc.
- Priority Healthcare Services Corporation
- Procedure-Based Instrument Services, L.L.C.
- Productos Urologos de Mexico S.A. de C.V.
- Professional Health-Care Resources, Inc.
- Pyxis Capital Corporation
- Pyxis Funding II, LLC
- Pyxis Funding, LLC
- R Cubed, Inc.
- R. P. Scherer Hardcapsule (West)
- R.P. Scherer Inc.
- R.P. Scherer Technologies, Inc.
- Radiopharmacy Of Boise, Inc.
- Radiopharmacy Of Northern California, Inc.
- Renlar Systems, Inc.
- RightCare Solutions, Inc.
- Royal Merger Sub, Inc.
- Scela, Inc.
- Scriptline, Inc.
- SensorMedics (Deutschland) GmbH
- SensorMedics Corporation
- Shanghai Baiwei Drug Store Company Limited
- Shanghai Cardinal Baiwei Drug Store Co., Ltd.
- Shanghai Jinyi Health Management Consultation Co., Ltd.
- Shanghai Luoda Pharmaceutical Company Limited
- Shenzhen Zhengdan Investment Company Limited
- Simolo (GL) Limited
- Sistemas Medicos ALARIS S.A. de C.V.
- Snowden Pencer Holdings, Inc.
- Snowden Pencer, Inc.
- Solomons Company
- Source Medical Corporation
- SRX, Inc.
- Strategic Implications International, LLC
- Supplyline Technologies Limited
- Surgical Carepair, L.L.C.
- Surgical Instrument Repair Service, L.L.C.
- Syncor Belgium SPRL
- Syncor Diagnostics Bakersfield, LLC
- Syncor Diagnostics Dallas, LLC
- Syncor Diagnostics Encino, LLC
- Syncor Diagnostics Fullerton, LLC
- Syncor Diagnostics Laguna Hills, LLC
- Syncor Diagnostics Plano, LLC
- Syncor Diagnostics Sacramento, LLC
- Syncor Financing Corporation
- Syncor Italy srl
- The Enright Group, Inc.
- The Heron Corporation
- The LVC Corporation
- Tianjin Cardinal Pharma Co., Ltd.
- Toledo Pharmacy Company
- Tropic Merger Sub, Inc.
- UroMed, Inc.
- VIASYS Healthcare Ireland Limited
- VIASYS Healthcare Island EHF
- VIASYS Healthcare S.A.R.L.
- VIASYS Holdings Inc.
- VIASYS NeuroCare France SAS
- VIASYS Polymer Products LLC
- Virginia Imaging Center, LLC
- Virginia Merger Corporation
- Vistant Corporation
- Vistant Holdings, Inc.
- Vubiq Inc.
- Wenzhou Xinte Pharmaceutical Co., Ltd.
- West Hudson, Inc.
- West Texas Nuclear Pharmacy Partners
- Wholesale (PI) Limited
- Williams Drug Distributors, Inc.
- Wolf Merger Corp.
- Wrangler Acquisition Sub, Inc.
- Wuhan Baiji New & Special Drug Store Company Limited
- Xiamen Cardinal Baiwei Drug Store Co., Ltd.
- Xi'an Baiji Advanced Specialty Pharmacy Company Limited
- Yorkshire Pharmacy, Inc.

Exhibit F
12

# McKesson

- "Aewige" ärztliche Wirtschaftsgesellschaft m.b.H., HG Wien
- "die apoteeke in teesdorf" Mag. pharm. Gerda Kohlhauser KG, LG Wiener Neustadt
- "Esplanade-Apotheke" Mag. pharm. Anna-Maria Köck KG, Landesgericht Wels
- "Panther Apotheke" Mag. pharm. Sandra Krokos KG, Landesgericht Graz
- 10101 Woodloch Forest LLC
- 2012 DREAM LIMITED, England
- 28CVR LIMITED, England
- 3068312 Nova Scotia ULC
- 3069163 Nova Scotia Limited
- 3069164 Nova Scotia Limited
- 30MC LIMITED, England
- 701985 N.B. INC.
- A C FERGUSON (CHEMIST) LIMITED, England
- A. SUTHRELL (HAULAGE) LIMITED, England
- A.F.M. Bergamo S.p.A., Italy
- A.L.I. Holdings LLC
- A.L.I. Imaging Systems Corp.
- A.L.I. Technologies (International) LLC
- AAH BUILDERS SUPPLIES LIMITED, England
- AAH FURB PENSION TRUSTEE LIMITED, England
- AAH Glass & Windows Limited, England
- AAH Ireland, Dublin
- AAH LIMITED, England
- AAH Lloyds Insurance (IoM) Limited, Isle Of Man
- AAH LLOYDS PENSION TRUSTEES LIMITED, England
- AAH NOMINEES LIMITED, England
- AAH ONE LIMITED, Scotland
- AAH PHARMACEUTICALS LIMITED, England
- AAH TWENTY FOUR LIMITED, Scotland
- AAH TWENTY LIMITED, England
- AAH TWENTY SIX LIMITED, England
- ABG Apotheken-Beratungsgesellschaft mbH, Stuttgart
- Access Health NZ Limited
- AccessMed Holdings, Inc.
- AccessMed, Inc. (AccessMed, LLC)
- AccessMed, LLC
- ACME DRUG CO. LIMITED, Scotland
- ADDED MARKETING LIMITED, England

- Adler Apotheke Krems Mag. Gabriele Denk KG, LG Krems an der Donau
- Adler-Apotheke Mag.pharm. Ingrid Chvatal KG, LG Leoben
- Admenta Beteiligungs GmbH, HG Wien
- Admenta Denmark ApS, Copenhagen
- Admenta Deutschland GmbH, Stuttgart
- ADMENTA HOLDINGS LIMITED, England
- ADMENTA ITALIA S.P.A., CCIAA di Bologna
- ADMENTA PENSION TRUSTEES LIMITED, England
- Admenta Sweden AB
- ADMENTA UK LIMITED, England
- Admenta Verwaltungs GmbH, HG Wien
- AFM S.p.A., CCIAA di Bologna
- AHLP PHARMACY LIMITED, England
- ALCHEM (SOUTHERN) LIMITED, England
- ALPE-ADRIA PHARMA farmacevtsko podjetje d.o.o., Ljubljana
- Alphar Ayeneux, Belgium
- Alphar Gilly DL, Belgium
- Alphar Monceau sur Sambre, Belgium
- Alphar Partners SA, Belgium
- Alte Löwen-Apotheke Mag. pharm. Kristina Taubald KG, HG Wien
- Alte Spora Apotheke Mag.pharm. Stephan Öhlzelt KG, LG St. Pölten
- Amethyst Acquisition Corp.
- Ancavion GmbH, AG Darmstadt
- Ancillary Management Solutions, Inc.
- Anton-Bruckner-Apotheke Mag.pharm. Christian Schwarzenbrunner KG, LG Linz
- AOR Holding Company of Indiana, Inc. (AOR Holding Company of Indiana, LLC)
- AOR Holding Company of Indiana, LLC
- AOR Management Company of Alabama, Inc.
- AOR Management Company of Arizona, Inc. (AOR Management Company of Arizona, LLC)
- AOR Management Company of Arizona, LLC
- AOR Management Company of Central Florida, Inc.
- AOR Management Company of Florida, Inc.
- AOR Management Company of Indiana, Inc. (AOR Management Company of Indiana, LLC)
- AOR Management Company of Indiana, LLC
- AOR Management Company of Kansas, Inc.
- AOR Management Company of Missouri, Inc. (AOR Management Company of Missouri, LLC)
- AOR Management Company of Missouri, LLC
- AOR Management Company of Nevada, Inc.

- AOR Management Company of New York, Inc.
- AOR Management Company of North Carolina, Inc.
- AOR Management Company of Ohio, Inc.
- AOR Management Company of Oklahoma, Inc. (AOR Management Company of Oklahoma, LLC)
- AOR Management Company of Oklahoma, LLC
- AOR Management Company of Oregon, Inc.
- AOR Management Company of Pennsylvania, Inc. (AOR Management Company of Pennsylvania, LLC)
- AOR Management Company of Pennsylvania, LLC
- AOR Management Company of South Carolina, Inc.
- AOR Management Company of Texas, Inc.
- AOR Management Company of Virginia, Inc. (AOR Management Company of Virginia, LLC)
- AOR Management Company of Virginia, LLC
- AOR of Indiana Management Partnership
- AOR of Texas Management Limited Partnership
- AOR of Texas Management, LLC
- AOR Real Estate, Inc. (AOR Real Estate, LLC)
- AOR Real Estate, LLC
- AOR Synthetic Real Estate, Inc. (AOR Synthetic Real Estate, LLC)
- AOR Synthetic Real Estate, LLC
- AORIP, Inc.
- AORT Holding Company, Inc. (AORT Holding Company, LLC)
- AORT Holding Company, LLC
- AORT LP, LLC
- Aporana AS
- Apotheke "Zum Bergmann" Mag.pharm. Sabine Tuttner KG, LG Leoben
- Apotheke "Zur heiligen Dreifaltigkeit" Mag. pharm. Edith Schuller-Grundnig KG, Landesgericht Korneuburg
- Apotheke "Zur Mutter Gottes" Mag. pharm. Karin Nozicka KG, HG Wien
- Apotheke Atzgersdorf Mr. Hermann Latzin KG, Wien
- Apotheke im Messepark Mag. pharm. Dietmar Purin KG, LG Feldkirch
- Apotheke Niklasdorf Mag. pharm. Matthias Schöggl KG, LG Leoben
- APOTHEKE U1 TROSTSTRASSE, Mag. pharm. Max Wellan KG, HG Wien
- Apotheke Zum heiligen Antonius Mag. pharm. Walter Staschek KG, LG Wiener Neustadt
- Apotheke zum heiligen Schutzengel Mag.pharm. Barbara Penz-Arzberger KG, Landesgericht Graz
- Apotheke zum Patriarchen Mag. pharm. Brigitte Kölbl KG, HG Wien
- Apotheke Zur hl. Dreifaltigkeit Mag. pharm. Doris Richter KG, LG Wiener Neustadt
- Apotheke Zur Hütte Mag. pharm. Mrak KG, LG Leoben
- Apovest AS
- Apovest Drift AS
- Art Acquisition Subsidiary, Inc.
- Ascalon International, Inc.
- ATLAS Travel Clinic Limited, England
- Attentus Medical Sales, Incorporated (Attentus Medical Sales, LLC)
- Attentus Medical Sales, LLC
- Awarix, Inc.
- Axis Medical Management, Inc.
- AYRSHIRE PHARMACEUTICALS LIMITED, Scotland
- AZIENDA FARMACEUTICA MUNICIPALE di Cremona S.p.A., CCIAA di Cremona
- Azienda Farmacie Milanesi S.p.A., CCIAA di Milano
- Babbingore Limited, Dublin
- BAILLIESTON HEALTH CENTRE PHARMACY LIMITED, Scotland
- Ballycane Pharmacy Limited, Ireland
- BANNISTER & THATCHER LIMITED, England
- BARCLAY PHARMACEUTICALS (ATHERSTONE) LIMITED, England
- BARCLAY PHARMACEUTICALS LIMITED, England
- BARLEY CHEMISTS HOLDINGS LIMITED, England
- BARRY SHOOTER (ROMFORD) LIMITED, England
- BDI Pharma, Inc. (BDI Pharma, LLC)
- BDI Pharma, LLC
- Beausejour Drugs Limited
- BEAUTY CARE DRUGSTORES LIMITED, England
- Beldere Corporation
- BeneVi Health LLC (Biologics, Inc.)
- BENU Apotheken B.V., Chamber of commerce Amsterdam
- BENU Nederland BV, Kamer van Koophandel Amsterdam
- BERKSHIRE MEDICAL SUPPLIES LIMITED, England
- BETTERLIFEHEALTHCARE LIMITED, England
- BIG PHARMA LIMITED, Scotland
- Biologics, Inc.
- Blackhall Pharmaceutical Distributors Limited

- Blackhawk Development LLC
- Blackstaff Pharmaceuticals Limited, England
- Blomsterdalen Apotek AS
- Blue Medical Supply, Inc. (McKesson Medical-Surgical Inc.)
- Boad Seven, Inc.
- BOFH Holdings Unlimited Company, Ireland
- Bottomline Medical Solutions, LLC (Linear Holdings, LLC)
- Breamor Pharmacy Limited, Ireland
- Brevard Radiation Oncology, LLC
- Brickyard Acquisition Inc. (Biologics, Inc.)
- BRIDPORT MEDICAL CENTRE SERVICES LIMITED, England
- Brocacef Groep N.V., Maarssen
- Brockton Radiation Oncology, LLC
- Brooklyn Radiation Oncology, LLC
- Brukar Enterprises, Inc.
- Bullet Acquisition Corporation
- CAHILL MAY ROBERTS GROUP LIMITED, Dublin
- California Golden State Finance Company
- Camic Pharmacies Limited, Ireland
- Canada Distribution Holdings Limited Partnership
- Canada Retail Holdings Limited Partnership Societe en Commandite Gestion Detail Canada
- Cancer Treatment Associates of Northeast Missouri, LLC
- CARONET TRADING LIMITED, England
- Carrollton Radiation Therapy Center, LLC
- Cascade Medical Supply, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
- Cavalier Acquisition Company LLC
- CCCN NW Building JV, LLC
- Celesio Business Services Ltd., Ireland
- CENTRALE D`ADMINISTRATION DE BIENS IMMOBILIERS, Bobigny
- CGSF Funding Corporation (CGSF Funding LLC)
- CGSF Funding LLC
- Chem Labs Limited, Dublin
- CHNG Newco LLC
- CHNG NewSub Inc.
- City Properties, S.A.
- Civiche Farmacie Desio S.p.A., Italy
- Claimone, LLC (Linear Holdings, LLC)
- ClaimSecure Inc. (SUCCESSOR)
- CLARK CARE GROUP LIMITED, England
- CLARK MUNRO LIMITED, Scotland
- ClarusONE Sourcing Services LLP
- Clinicians Database, L.L.C.
- CMR Holdings Ltd, Dublin
- Coleham, Dublin
- Colorado Cancer Centers, LLC
- Combined Enterprises Corporation
- COMPANY CHEMISTS ASSOCIATION LIMITED, England
- COMPTOIR MONEGASQUE DE BIOCHIMIE, Monaco
- COMPTOIR PHARMACEUTIQUE MEDITERRANEEN, Monaco
- CONSORZIO SERVIZI SALUTARI S.C.A. R.L., Italy
- CookCo, Inc.
- Cophana SA, Belgium
- Corporation Groupe Pharmessor/Pharmessor Group Corporation (SUCCESSOR 10/01/2017)
- Corporation of America
- CoverMyMeds LLC
- CoverMYMeds Specialty Pharmacy Holdings LLC
- CoverMYMeds Specialty Pharmacy LLC
- CPG Industries, Inc.
- Crocker Plaza Company (Crocker Plaza LLC)
- Crocker Plaza LLC
- CROSS AND HERBERT (DEVON) LIMITED, England
- CROSS AND HERBERT (HOLDINGS) LIMITED, England
- CROSS AND HERBERT LIMITED, England
- Crowley`s Blackrock Limited, Dublin
- Cypress Import Brokerage LLC
- Cypress Medical Products LLC
- D & K Healthcare Resources LLC
- D & K Healthcare Resources, Inc. (D & K Healthcare Resources LLC)
- D & K Pharmacy Solutions, Inc.
- D & K Receivables Corporation
- D.F. O'Neill (Chemists) Ltd, Dublin
- Dale Apotek AS
- Danubia-Apotheke Mag. pharm. Barbara Sedelies KG, HG Wien
- Dargle Pharmacies Holdings Limited, Ireland
- DATACARE Datenpflege des Pharmagroßhandels Ges.m.b.H., HG Wien
- DATAPHARM, Paris
- Daytona Beach Radiation Oncology, LLC
- DC Land Company
- DCAZ Land Company
- Delta Clinical Research, LLC
- DEPOTRADE, Bobigny
- Derm Vantage, LLC
- Diana-Apotheke Dr. et Mag. pharm. Michaela Stipsits KG, LG Eisenstadt

-15-

- Die Apotheke Ebenfurth, Mag.pharm. Beate Haage-Löwe KG, LG Wiener Neustadt
- Dispensing Solutions Acquisition Corporation (DS Holdings, Inc.)
- Dispensing Solutions, Inc. (Dispensing Solutions, LLC)
- Dispensing Solutions, LLC (DS Holdings, Inc.)
- Ditt Apotek Amfi Os AS
- Ditt Apotek Rodberg AS
- Ditt Apotek Sorumsand AS
- Diversified Healthcare, LLC
- Dix Bulles Pharma, Belgium
- DLI Market Intelligence ApS, Denmark
- DOL Pharmacy Limited, Ireland
- Donnybrook Pharmacy Limited, Ireland
- Downtown Los Angeles Radiation Oncology, LLC
- DS Holdings, Inc. (DS Holdings, LLC)
- DS Holdings, LLC (McKesson Medical-Surgical Top Holdings Inc.)
- DSRX, Inc. (DS Holdings, Inc.)
- Dublin 2016 Acquisition, LLC
- Dublin Holdings Acquisitions, LLC (Vantage Oncology Holdings, LLC)
- Dublin POS I Acquisition Corp. (POS I Corp.)
- East Indy CC, LLC
- ECLIPSE HEALTHCARE LIMITED, England
- Edwards Medical Supply, Inc.
- EM Acquisition Corporation
- Emploi AS
- Engel-Apotheke Mag. pharm. Susanne Zauner KG, LG Wiener Neustadt
- Ephrata Diamond Spring Water Co.
- ESCON (ST NEOTS) LIMITED, England
- Espafarmed S.L., Belgium
- EUROSANTE (Société en liquidation), Luxembourg
- Evesland Limited, Dublin
- EVOLUTION HOMECARE SERVICES LIMITED, England
- EXPERT HEALTH LIMITED, England
- Family Pharmacy @ Las Colinas LLC
- Fana Apotek AS
- FAR.CO.SAN S.p.A., CCIAA di Arezzo
- FARILLON LIMITED, England
- Farmacia Garbatella I S.r.l., Italy
- Farmacie Comunali di Modena S.p.A., Italy
- Farmacie Comunali di Padova S.p.A., Italy
- Farmacie di Sassuolo S.p.A., Italy
- Farmacie Pratesi Pratofarma S.p.A., CCIAA di Prato
- FARMALVARION S.R.L. SOCIO UNICO, Italy
- FASTPRO International, Inc.
- Federal Medical Supplies, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
- Felview Limited, Dublin
- First Aid Service, Inc.
- First Choice Medical Supply Holding, Inc. (First Choice Medical Supply Holding, LLC)
- First Choice Medical Supply Holding, LLC
- First Choice Medical Supply, LLC
- FIRTH & PILLING LIMITED, England
- Flex-Master Technology Holdings, Inc.
- Floriani-Apotheke Mag.pharm. Doris Leykauf KG, LG Graz
- Foremost de Venezuela, S.A. (Forvensa)
- Foremost Homes Hawaii, Ltd.
- Foremost Iran Corporation
- Foremost Shir, Inc.
- Foremost Tehran, Inc.
- FOSTER & PLUMPTON GROUP LIMITED, England
- FOSTER & PLUMPTON LIMITED, England
- Foundation For Opioid Response Efforts
- G J MALEY LIMITED, Isle Of Man
- G K CHEMISTS (GLOS) LIMITED, England
- G K CHEMISTS LIMITED, England
- GEHE Immobilien GmbH & Co. KG, Stuttgart
- GEHE Immobilien Verwaltungs-GmbH, Stuttgart
- GEHE Pharma Handel GmbH, Stuttgart
- General Medical Inc.
- GEORGE STAPLES (STOKE) LIMITED, England
- Gerard Ryan Pharmacy (Clonmel) Limited, Dublin
- GERSTHOFER-APOTHEKE Mag.pharm. Elisabeth Reisegger KG, HG Wien
- Giardina Enterprises, Inc.
- Glendale Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Golden State Company, Ltd.
- Golden State Corporate Services LLC
- Golden State Insurance Company Limited
- Golden State Milk Products Company
- Goodman Manufacturing Company
- Gorrys Pharmacy Limited, Ireland
- Goviltown Limited, Westmeath
- GPL 2007 LIMITED, England
- GRAEME PHARMACY (STIRLING) LIMITED, Scotland
- GREENS PHARMACEUTICAL (HOLDINGS) LIMITED, England
- Greenville Radiation Care, Inc.
- Greystones Pharmacy Limited, Dublin

- GROUPE PHR, France
- Gulf South Medical Supply, Inc. (Gulf South Medical Supply, LLC)
- Gulf South Medical Supply, LLC
- Gwinnett Radiation Oncology, LLC
- H THATCHER LIMITED, England
- Haleston Enterprises Limited, Dublin
- HBO & Company (VI), Inc.
- HBO & Company of Georgia
- HBOC Ventures, Inc.
- HC Beteiligungsgesellschaft mbH, HG Wien
- HDSC Acquisition Corp.
- Health Data Sciences Corporation
- Health Mart Atlas, LLC
- Health Mart Systems, Inc.
- HEALTH NEEDS LIMITED, England
- HEALTHCLASS LIMITED, England
- Heinz Management Co.
- Helmard Holdings Limited, Dublin
- HEP HealthQx Holdings, Inc. (McKesson Technologies Inc.)
- Herba Chemosan Apotheker-AG, HG Wien
- HERBERT FERRYMAN LIMITED, England
- Hercules Parent LLC
- Herz - Jesu Apotheke Mag. pharm. Marianne Keller KG, HG Wien
- Herz Jesu Apotheke & Parfümerie Mag. pharm. Ingrid Heller KG, LG Feldkirch
- HF Land Company
- HFN of Northwest Florida, Inc.
- HIGGINS & SON (CHEMISTS) LIMITED, England
- HILL-SMITH (WARRINGTON) LIMITED, England
- HisComp Co., Zee Medical Service Co.
- HMS Acquisition Corp.
- HOLLYFAR - Marcas e Comunicação, Unipessoal, Lda., Portugal
- HOLMSCROFT HC LIMITED, Scotland
- HOLON, S.A., Portugal
- Honeybee Bridge LLC
- HTP Inc. (HTP LLC)
- HTP LLC
- Hubertus-Apotheke Mag.pharm. E. Klettenhofer KG, HG Wien
- HUSKY AQUISITION INC.
- Hygeia Bottled Water, Inc.
- HYWEL DAVIES (CAERPHILLY) LIMITED, England
- IHA Corp.
- Imagine Health, Inc.
- INDEPENDENT PHARMACY CARE CENTRES (2008) LIMITED, England
- Indian River Radiation Oncology, LLC
- Infolab, LLC
- Innovent Oncology, LLC
- INSPIRON DISTRIBUTION LIMITED, England
- Integrated Cancer Care, LLC
- Integrated Pathology Services
- IntelliClaim, Inc.
- Inten GmbH, Stuttgart
- Intercal, Inc.
- International Dairy Engineering Co. of Asia, Inc.
- InterQual Inc.
- intraFUSION GP, LLC
- Intrafusion Holding Corp.
- intraFUSION Purchasing Network, LLC
- intraFUSION Research Network, LLC
- Inviva, McKesson Pharma Care Network Corporation / La Corporation Inviva, Reseau de soins pharmacologiques McKesson (SUCCESSOR)
- Iowa Pharmaceutical Services, LLC
- IPCC LIMITED, England
- IPD Holdings, Inc.
- J S DENT LIMITED, England
- Bradbury (Surgical) Limited, Northern Ireland
- J.G. Crowley Pharmacy Limited, Dublin
- JACS, Inc.
- Jaron, Inc.
- Jeffersonville Radiation Technology, LLC
- Jessheim Apotek AS
- Jewett Drug Co.
- Jewett Drug LLC
- Johannes Apotheke Mag. pharm. Deutsch KG, LG Graz
- JOHN BELL & CROYDEN LIMITED, England
- JOHN HAMILTON (PHARMACEUTICALS) LIMITED, Scotland
- Jupiter Acquisition Ltd.
- Kairnbury, Dublin
- Kathleen Properties Subdivision Association, Inc.
- Keling Limited
- Keltman Pharmaceuticals, Inc. (Linear Holdings, LLC)
- Kemofarmacija, veletrgovina za oskrbo zdravstva, d.d., Ljubljana
- Keystone/Ozone Pure Water Company
- Kilshallow Limited, Dublin
- KINGSWOOD CHEMISTS LIMITED, England
- KINGSWOOD GK LIMITED, England
- Kitco, Inc.
- Knowledgeable Healthcare Solutions, Inc.
- Kreuz-Apotheke KG, HG Wien

- KWS & P, Inc
- KWS & P/SFA, Inc.
- KYLE & CARRICK HOLDINGS LIMITED, Scotland
- Laboratoria Flandria NV, Belgium
- Laboratory Supply Company
- Labsco Holdings, Inc. (McKesson Medical-Surgical Inc.)
- Leesburg Radiation Oncology, LLC
- LEVELCROWN LIMITED, England
- Liberty Real Estate NJ LLC
- Lind-Apotheke Mag. pharm. Alexander Telesko KG, LG Klagenfurt
- Linear Holdings, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- Linear Holdings, LLC (Linear Holdings, Inc.)
- Linear Medical Solutions, LLC
- LINFORD PHARMACIES LIMITED, England
- LISEAPOTEKENE AS
- Lissone Farmacie S.p.A., CCIAA di Monza e Brianza
- LIVINGSTON HEALTH CENTRE (P.D) CO. LIMITED, Scotland
- LKW, Inc.
- LLOYDS CHEMISTS LIMITED, England
- LLOYDS CHEMISTS RETAIL (NORTHERN) LIMITED, England
- LLOYDS CHEMISTS RETAIL LIMITED, England
- LLOYDS GROUP PROPERTIES LIMITED, England
- Lloyds Pharmacy Clinical Homecare Limited, England
- LLOYDS PHARMACY LIMITED, England
- LLOYDS PROPERTIES LIMITED, England
- LLOYDS Property Management Company Belgium S.A., Belgium
- LLOYDS RETAIL CHEMISTS LIMITED, England
- Lloyds Retail S.r.l., Socio Unico, Italy
- LLOYDSFARMACIA ROMA 4 S.R.L., Italy
- Lloydspharma Group S.A., Belgium
- Lloydspharma S.A., Belgium
- Lloydspharmacy Ireland Limited, Dublin
- Lory Apotheke Mag. pharm. Karin Eichinger KG, HG Wien
- LP Clinical Homecare Group Limited, England
- LPL ONE LIMITED, England
- M H GILL LIMITED, England
- M PAYNE & CO LIMITED, England
- Macfor International Finance Company
- MACON Acquisition Corp.
- Macro Helix LLC

- Madison Acquisition Inc.
- Marathon Acquisition Subsidiary, Inc.
- Mariahilf-Apotheke Mag. pharm. Christoph Rücklinger KG, LG St. Pölten
- Mariahilf-Apotheke Mag. pharm. Helga Mann KG, Landesgericht Graz
- Marien-Apotheke Mag. pharm. Thomas Job KG, LG Eisenstadt
- Marien-Apotheke, Mag.pharm. Eva Grabner KG, Landesgericht Korneuburg
- Maryland First Aid Co., Inc.
- MASTA Limited, England
- Masters Drug Company, Inc.
- MATIS Immobilien OHG, Stuttgart
- Maurice F. Dougan Limited, Dublin
- May Roberts Ltd, Dublin
- MCK Acquisition Corp.
- McK International Financial Holdings (Barbados) SRL
- McKesson (Cayman Islands) Inc.
- McKesson (Shanghai) Trading Company Limited
- McKesson + Strategic Solutions ULC / Solutions Strategiques McKesson + ULC
- McKesson Automation Systems Inc.
- McKesson Belgium Holdings SPRL, Belgium
- McKesson Canada Corporation/La Corporation McKesson Canada (SUCCESSOR)
- McKesson Canada Finance IA ULC
- McKesson Canada Finance IB ULC
- McKesson Capital Funding Corp.
- McKesson Capital Funding Corporation
- McKesson Capital LLC
- McKesson Central Fill LLC (McKesson Distribution Holdings LLC)
- McKesson Contract Research Organization LLC
- McKesson Cork Business Solutions Unlimited Company
- McKesson Corporate Properties, Inc.
- McKesson Corporation
- McKesson Development Corp.
- McKesson Distribution Holdings LLC
- McKesson Drug Company LLC
- McKesson Europe AG
- McKesson Europe Holdings GmbH & Co. KGaA
- McKesson Europe Holdings Verwaltungs GmbH
- McKesson Financial Holdings II Unlimited Company
- McKesson Financial Holdings Unlimited Company
- McKesson Financing Trust III
- McKesson Financing Trust IV

- McKesson Foundation Inc.
- McKESSON FRANCE HOLDINGS, Bobigny
- McKesson France Retail, Bobigny B
- McKesson Funding Company of Canada
- McKesson Global Procurement & Sourcing Limited
- McKesson Global Sourcing Limited
- McKesson Global Sourcing Limited [Irish Branch]
- McKesson Health Solutions Holdings LLC
- McKesson Health Solutions LLC
- McKesson Health Solutions Puerto Rico Inc.
- McKesson Health Solutions Texas Inc.
- McKesson High Volume Solutions Inc.
- McKesson Information Solutions Finance S.a.r.l.
- McKesson Information Solutions Holdings II S.a.r.l.
- McKesson Information Solutions Holdings III S.a.r.l.
- McKesson Information Solutions Holdings IV S.a.r.l.
- McKesson Information Solutions Holdings V S.a.r.l.
- McKesson Information Solutions III LLC
- McKesson Information Solutions Inc. (McKesson Information Solutions LLC)
- McKesson Information Solutions IV LLC
- McKesson Information Solutions LLC
- McKesson Information Solutions Topholdings S.a.r.l.
- McKesson Information Solutions UK Limited
- McKesson International Bermuda IP2A Limited
- McKesson International Bermuda IP2B Unlimited
- McKesson International Bermuda IP3A Limited
- McKesson International Bermuda IP3B Unlimited (McKesson International Bermuda IP3A Limited)
- McKesson International Bermuda IP4A Limited
- McKesson International Bermuda IP4B Unlimited (McKesson International Bermuda IP4A Limited)
- McKesson International Bermuda IP5A Limited
- McKesson International Bermuda IP5B Unlimited (McKesson International Bermuda IP5A Limited)
- McKesson International Bermuda Opco1A Limited
- McKesson International Bermuda Opco1B Unlimited (McKesson International Bermuda Opco1A Limited)
- McKesson International Bermuda Opco3A Limited

- McKesson International Bermuda Opco3B Unlimited (McKesson International Bermuda Opco3A Limited)
- McKesson International Bermuda Opco4A Limited
- McKesson International Bermuda Opco4B Unlimited
- McKesson International Finance III Limited (McKesson US Finance Corporation)
- McKesson International Finance S.a.r.l.
- McKesson International Holdings III S.a.r.l.
- McKesson International Holdings IV S.a.r.l.
- McKesson International Holdings S.a.r.l.
- McKesson International Holdings Unlimited Company
- McKesson International Holdings VI S.a.r.l.
- McKesson International Holdings VII S.a.r.l.
- McKesson International Investment Corp.
- McKesson International Ireland I Limited
- McKesson International LLC
- McKesson International Malaysia Sdn Bhd
- McKesson International S.a.r.l.
- McKesson International Topholdings S.a.r.l.
- McKesson Ireland Limited
- McKesson Logistics Solutions
- McKesson Medical Imaging Company Ltd. (predecessor)
- McKesson Medical-Surgical FDT Inc.
- McKesson Medical-Surgical Government Solutions LLC
- McKesson Medical-Surgical Holdings Inc.
- McKesson Medical-Surgical Inc.
- McKesson Medical-Surgical Iowa Inc.
- McKesson Medical-Surgical Iowa Supply Inc.
- McKesson Medical-Surgical Maine Inc.
- McKesson Medical-Surgical Manufacturing Inc.
- McKesson Medical-Surgical MediMart Inc.
- McKesson Medical-Surgical MediNet Inc.
- McKesson Medical-Surgical Minnesota Inc. (McKesson Medical-Surgical Holdings Inc.)
- McKesson Medical-Surgical Minnesota Supply Inc.
- McKesson Medical-Surgical Supply Chain Services LLC
- McKesson Medical-Surgical Top Holdings Inc.
- McKesson Medication Management Holdings Inc.
- McKesson Medication Management Virgin Islands Inc.
- McKesson Norway Holdings AS
- McKesson Pharmacy Optimization LLC
- McKesson Pharmacy Systems Canada ULC
- McKesson Pharmacy Systems LLC

- McKesson Plasma and Biologics LLC
- McKesson Prescription Drug Plan LLC
- McKesson Property Company, Inc.
- McKesson Purchasing Company LLC
- McKesson Services Inc. (McKesson Services LLC)
- McKesson Services LLC
- Medcon Services Services Inc.
- McKesson Sourcing Services Inc.
- McKesson Specialized Distribution Inc. / McKesson Distribution Specialisee Inc. (Successor)
- McKesson Specialty Arizona Inc.
- McKesson Specialty Care Distribution Corporation (McKesson Specialty Care Distribution LLC)
- McKesson Specialty Care Distribution JV LLC
- McKesson Specialty Care Distribution LLC
- McKesson Specialty Corporation
- McKesson Specialty Distribution LLC
- McKesson Specialty Health Innovative Practice Services, LLC
- McKesson Specialty Health Management Services LLC
- McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC
- McKesson Specialty Health Pharmaceutical & Biotech Solutions, LP (McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC)
- McKesson Specialty Health Technology Products LLC
- McKesson Specialty Pharmacy, LP (RxC Acquisition Company)
- McKesson Specialty Prescription Services (Atlantic) Corporation/Corporation McKesson Services de Prescription Spécialisée (Atlantique)
- McKesson Specialty Prescription Services (B.C.) Corporation
- McKesson Specialty Prescription Services Corporation
- McKesson SPS (Manitoba) Corporation
- McKesson Strategic Services Limited
- McKesson Technologies Inc.
- McKesson Trading Company
- McKesson Transportation Systems, Inc.
- McKesson UK Finance I Limited
- McKesson UK Finance II Limited
- McKesson UK Finance V Limited
- McKesson UK Holdings Limited
- McKesson US Finance Corporation
- McKesson US Holdings GP
- McKesson Ventures LLC
- McKesson Ventures Unlimited Company
- McQueary Bros. Drug Company

- McQueary Bros. Drug Company, LLC
- McSweeney Dispensers 10 Limited, Ireland
- McSweeney Dispensers 23 Limited, Ireland
- MDD pharma N.V., Belgium
- MED3000 Health Solutions Southeast
- MED3000 RPG
- Medaid Supply, Inc.
- Medcon Telemedicine Technology, Inc.
- Median Healthcare Services Unlimited Company, Ireland
- Medical & Vaccine Products, Inc.
- Medical Advisory Services for Travellers Abroad Limited, England
- Medical Specialties Distributors Holdings, Inc. (MSD Parent Corporation)
- Medical Specialties Distributors, LLC
- Medical Specialties Holdings Corp. (Medical Specialties Holdings II Corp.)
- Medical Specialties Holdings II Corp.
- Medicentres Canada Inc. (SUCCESSOR)
- Medicine Shoppe Atlantic Corporation
- Medicine Shoppe Canada Corporation
- Medicine Shoppe Canada Real Estate Corporation
- MEDIMART LIMITED, England
- MediVation, Inc.
- MedVentive Inc.
- MeMed CZ s.r.o., Praha
- Menges Medizintechnik Schweiz AG, Sankt Gallen
- Merlin Subsidiary Inc.
- Merrick Healthcare Limited
- Metabolic Healthcare Holdings Limited, England
- Metabolic Healthcare Limited, England
- Metropolitan Integrated Cancer Center, L.L.C.
- MH/USON Radiation Management Company, LLC
- MHD-USO General, LLC
- MHD-USO Management Company, LP
- MHS Connecticut LLC
- Michigan Pharmaceutical Services, LLC
- Mid-Atlantic Radiation Oncology LLC
- Millennium Merger Corporation
- Mohawk Liqueur Corporation
- Mohren-Apotheke Mag. Christian Müller KG, LG Graz
- Moore Medical LLC (McKesson Medical-Surgical Government Solutions LLC)
- Mosaic Acquisition Corporation
- MOUNT PHARMACY LIMITED, England
- MSA Products LLC
- MSD Acquisition Corp. (Medical Specialties Holdings Corp.)

- MSD Parent Corporation (MSD Acquisition Corp.)
- Multum Information Services, Inc.
- MUNRO PHARMACY LIMITED, Scotland
- MWPC Acquisition Corp.
- MWPC Acquisition Corp. (PA)
- My MHealth Limited, England & Wales
- myhca, inc.
- NARO, LLC
- National Oncology Alliance, Inc.
- Natureline, Dublin
- NDC of Canada, Inc.
- NDCHealth Corporation
- NDCHealth Pharmacy Systems and Services, Inc.
- Nebraska Pharmaceutical Services, LLC
- Negatron, Inc.
- Nensi d.o.o., Ljubljana
- NERO GP, LLC
- New Experimental Therapeutics of San Antonio, LLC
- NEW KIRK PHARMACY LIMITED, Scotland
- New Mexico Pharmaceutical Services, LLC
- NewHealthCo, LLC
- NexCura, LLC (McKesson Specialty Health Technology Products LLC)
- Nibelungen-Apotheke Mag. pharm. Michaela Wachter KG, LG St. Pölten
- Norsk Medisinaldepot AS
- North Carolina Pharmaceutical Services, LLC
- Northeast Pennsylvania Radiation Oncology, LP
- Northern Arizona Oncology Centers, LLC
- Northern Boulevard Radiation Oncology Management, LLC
- Northern San Fernando Valley Radiation Oncology, LLC
- Northstar Healthcare Holdings Limited
- Northstar Healthcare Holdings Unlimited Company
- Northstar Healthcare Limited
- Northstar Healthcare Unlimited Company
- Northstar International Holdings Limited
- Northstar Rx LLC
- Norvern Enterprises, Inc.
- NR Direct, Inc. (McKesson Patient Care Solutions Inc.)
- O`Leary Pharmacy (Lucan) Limited, Dublin
- OCP FORMATION, Bobigny
- OCP PORTUGAL, PRODUTOS FARMACÊUTICOS, S.A., Maia
- OCP REPARTITION, Bobigny B
- OCP, Bobigny
- Oncology Holdings II, Inc.
- Oncology Holdings, Inc.
- Oncology Rehab Partners, LLC
- Oncology Therapeutics Network Corporation
- Oncology Today, LP
- OnMark, Inc.
- Optimed Health Limited, England & Wales
- Orca Acquisition Corp.
- Ørebekk Apotek AS
- Oswald-Apotheke Mag. pharm. Ilse Pedevilla KG, LG Feldkirch
- OTN Generics, Inc.
- OTN Participant, Inc.
- Outpatient Infusion Systems, Inc
- Øygarden Apotek AS
- P C Cahill & Company Limited, Dublin
- P.L.C.E., Inc.
- Packet Merger Sub Inc.
- PALEMODA LIMITED, England
- Palm Merger Sub, Inc.
- Panther Acquisition Corporation
- Panther-Apotheke Mag. pharm. Margarete Breyha KG., LG St. Pölten
- Paracelsus-Apotheke Mag. pharm. Dr. Birgit Müller KG, Austria
- Pathology Service Associates, LLC
- Pathway Purchasing Network, LLC
- Patient Account Management Services, Inc.
- PAUL WHEELER LIMITED, England
- PCB SA, Belgium
- PEEL STREET PHARMACY LIMITED, England
- peerVue, Inc. (DE)
- peerVue, Inc. (NH)
- Pemberton Marketing International Limited
- Penn-Chem Corporation
- PERILLA Grundstücks-Verwaltungsgesellschaft mbH & Co. KG, AG München
- Per-Se Transaction Services, Inc.
- PF2 McKesson Technologies Inc.
- PF2 SpinCo Inc.
- Pharma Belgium Belmedis SA, Belgium
- PHARMA PARTNERS, Belgium
- Pharma Services (NI) Limited, Northern Ireland
- Pharmaceutical Distributors Federation Ireland Company Limited By Guarantee
- Pharmaceutical Support Services, Inc.
- Pharmacie Ananga-Talom, Belgium
- Pharmacie de la Bascule, Belgium
- PHARMACTIV DISTRIBUTION, Bobigny B
- Pharmacy O`Riada Holdings Limited, Dublin
- PHARMAGEN LIMITED, England
- PHILIP GOODMAN LIMITED, England
- PHR ANTILLES, FORT DE FRANCE

-21-

- PhyServ Solutions, Inc.
- Physician Micro Systems, Inc.
- Physician Oncology Services Management Company, LLC
- Physician Reliance Holdings, LLC
- Physician Reliance Maryland, LP
- Physician Reliance Network, Inc. (Physician Reliance Network, LLC)
- Physician Reliance Network, LLC
- Physician Reliance, L.P.
- Physician Reliance, LLC
- Physician Sales & Service Limited Partnership
- Physician Sales & Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- Pindsle Apotek AS
- PMLX Limited
- POC Management Group, LLC (Dispensing Solutions, Inc.)
- Podiatry Online, Inc.
- Portico Systems of Delaware, Inc.
- POS I Corp. (Dublin 2016 Acquisition, LLC)
- Presbyterian Cancer Center-Dallas, LLC
- Prescribing Support Services Limited, England & Wales
- Prima Brands Limited, Northern Ireland
- PRIMELIGHT LIMITED, England
- Prismedica S.A.S.
- PRN Physician Reliance, LLC
- Pro-AvO GmbH, Deutschland
- Proclaim, Inc. (McKesson Medical-Surgical MediMart Inc.)
- PRODILAB, France
- Providence Radiation Oncology Partners LLC
- PSS China Sourcing Limited
- PSS Global Holdings
- PSS Global Sourcing China Business Trust
- PSS Global Sourcing Hong Kong Limited
- PSS Global Sourcing Limited [Hong Kong]
- PSS HK 1 Limited
- PSS Holding, Inc. (McKesson Medical-Surgical Inc.)
- PSS Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- PSS Southeast Asia Limited
- PSS World Medical, Inc.
- PST Products, LLC
- PST Services, Inc. (PST Products, LLC)
- Purchasing Alliance for Clinical Therapeutics, LLC
- R F FOSKETT & SON LIMITED, England
- R GORDON DRUMMOND LIMITED, England
- R/X Automation Solutions, LLC

- Raabtal-Apotheke Mag.pharm. Karin Drawetz KG, Landesgericht Graz
- Radiation Oncology Services of America, Inc.
- Radiotherapy Clinic Holdings, LLC
- Radiotherapy Clinics of Kentuckiana, LLC
- Radiotherapy Clinics of Kentuckiana-2, LLC
- Radius Data Solutions, LLC
- Radius Reimbursement Services, LLC
- Radunnco, Inc.
- Rancare, Inc.
- Randolph Home Care Inc.
- Randolph Medical Inc.
- RCOG Cancer Centers, LLC
- Rebel Distributors Corp. (McKesson Medical-Surgical Top Holdings Inc.)
- recucare GmbH, Stuttgart
- recusana GmbH, Stuttgart
- Regenbogenapotheke "Am Leberberg" Mag. pharm. Andreas Portisch KG, HG Wien
- RelayHealth Corporation (McKesson Information Solutions LLC)
- Renoir Acquisition Corporation
- Renoir Acquisition Corporation (DE)
- RESEAU SANTE, BREST
- RetraceHealth, Inc.
- Rexall Pharmacy Group Ltd.
- Rexall/Pharma Plus Pharmacies (BC) Ltd.
- Rexall/Pharma Plus Pharmacies (Sask) Ltd.
- Rexall/Pharma Plus Pharmacies Ltd.
- Riel, Inc.
- Riverside Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- R-jet, Incorporated
- RMCC Cancer Center, Inc. (RMCC Cancer Center, LLC)
- RMCC Cancer Center, LLC
- ROSA of Eastern Shore, LLC
- ROSA of Georgia, LLC
- ROSA of South Alabama, LLC
- ROSA of Southern New Jersey, LLC
- Roth Medical Services, Inc.
- RPRS, LLC
- RX Information Technology LLC
- RxC Acquisition Company
- RxCrossroads 3PL LLC
- Ryle and De Lacy Pharmacies Limited, Ireland
- S.K.U., Inc.
- Salus-Apotheke Mag. pharm. Simone Gaigg KG, Salzburg
- Salvator - Apotheke Mag. pharm. Gertrude Pölzl KG, LG Leoben
- San Bruno Mountain Ltd., A California Limited Partnership

- Sandviken Apotek AS
- Sangers (Northern Ireland) Limited, Northern Ireland
- SANOVA Pharma GesmbH, HG Wien
- SAVORY & MOORE (JERSEY) LIMITED, Jersey
- SAVORY & MOORE LIMITED, Scotland
- SCHOLES (CHEMISTS) LIMITED, England
- Schutzengelapotheke Neufeld Mag. Schweifer KG, LG Eisenstadt
- Scrip Pak, LLC (Linear Holdings, LLC)
- Script2U Holdings LLC
- Script2U LLC
- ScriptHero LLC
- ScriptHero Pharmacy Holdings LLC
- ScriptHero Pharmacy LLC
- Select RX, LLC (Linear Holdings, LLC)
- SelectPlus Oncology, LLC
- Sens Arbeidsinkludering AS
- Sens Eiendom AS
- Sens Gruppen AS
- Sens Utvikling AS
- SERVICE DE LA REPARTITION PHARMACEUTIQUE, Paris
- SF Valley Derm Equipment I, LLC
- Sherman Oaks Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Sherman Oaks Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
- Shoup Properties, Inc.
- SHS V Medtech Investments GmbH & Co. KG
- Simply Medical LLC
- SIVEM Pharmaceuticals ULC/SIVEM Produits Pharmaceutiques ULC
- Six R Investments, Inc.
- SOCIETE COOPERATIVE OUEST PARTAGE, BREST
- SOCIETE D`ETUDES ET DE REALISATIONS INFORMATIQUES, Monaco
- Sofarmex BVBA, Belgium
- Sofiadis SCRL, Belgium
- Soldier Acquisition Corporation
- SOPI The Lough Limited, Ireland
- SOPI Youghal Limited, Ireland
- SourceTenn LLC
- South Alabama Cancer Centers, LLC
- South Bay Radiation Oncology, LLC
- South Pacific Medical Inc.
- Southeast Merger Corp.
- Southeast Texas Cancer Centers, L.P.
- Southern California Radiation Oncology, LLC
- Spider Acquisition Corporation
- Spirit Acquisition Corporation
- Spring Valley Industries, LLC
- St. Louis Pharmaceutical Services, LLC
- St. Lucas-Apotheke Mag.pharm. Ilona Elisabeth Leitner KG, HG Wien
- St. Markus Apotheke Dr. Elke Kramberger-Kaplan KG, LG Linz
- St. Richard Apotheke Mag.pharm. Ursula Kohl KG, Landesgericht Korneuburg
- Stadion-Apotheke Mag. pharm. Ulrike Grosser-Schmidt KG, LG St. Pölten
- Stadt-Apotheke "Zur heiligen Barbara" Mag. pharm. Igor Mauritsch KG, Austria
- Stadtapotheke Fürstenfeld Mag. pharm. Waltraud Maier KG, Landesgericht Graz
- Stat RX USA, LLC (Linear Holdings, LLC)
- STATIM FINANCE LIMITED, England
- STEPHEN SMITH LIMITED, Guernsey
- Sterling Medical Services, LLC (McKesson Patient Care Solutions Inc.)
- STQ LLC
- Strategic Health Alliance II, Inc.
- Strategic Health Alliance Management Corp.
- Strategic Sourcing Services LLC
- Streator Radiation Oncology, LLC
- Stubaital-Apotheke Mag.pharm. Christian Kernstock KG, LG Innsbruck
- Summa Script LLC
- Sund Apotek AS
- SUPERFIELD LIMITED, England
- Supplylogix LLC
- T AND I WHITE LIMITED, England
- T. Sheridan Sales & Marketing, Dublin
- Tabor Apotheke Mag. pharm. Wolfram Schaden KG, LG Steyr
- Targa Parent Holdings, LLC
- TBC Products, Inc.
- Temperature Controlled Pharmaceuticals Limited
- Test Corporation changed 2 GM 3 AG
- Test Entity - Corporation
- Test Entity - Corporation (Glenette)
- Test Entity - LLC (Anne)
- Test Entity - LLC (Glenette)
- Test Entity - LLC (Karen)
- Test Entity - LLC (Melissa)
- Test Entity - LP
- Test Entity - Manager LLC
- Test Entity - Member LLC
- Test Entity - Parent Corporation
- Texas Pharmaceutical Services, LLC
- Texas Proton Therapy Center, LLC
- The Oregon Cancer Centers, Ltd.

- Theratech, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- Thriftymed, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- THURNBY ROSE LIMITED, England
- Titus Home Health Care LLC
- Tjellesen Max Jenne A/S, Rodovre
- Todin A/S, Denmark
- TOPS Pharmacy Services, Inc.
- Tower Radiation Technology, LLC
- Tracer Enterprises LLC
- Tri-State Radiation Oncology Centers, LLC
- Tuna Acquisition Corp.
- Tyler Radiation Equipment Leasing, LLC
- Unicare Dispensers 16 Limited, Ireland
- Unicare Dispensers 27 Limited, Ireland
- Unicare Dispensers 5 Limited, Ireland
- Unicare Pharmacy Group Limited, Dublin
- United Drug (Wholesale) Limited
- United Drug Distributors Ireland Limited
- Unity Oncology, LLC
- Urbani-Apotheke Mag. pharm. Bernhard Prattes KG, LG Graz
- US Oncology Corporate, Inc.
- US Oncology Holdings, Inc.
- US Oncology Lab Services, LLC
- US Oncology Pharmaceutical Services, LLC
- US Oncology Pharmacy GPO, L.P.
- US Oncology Reimbursement Solutions, LLC
- US Oncology Research, Inc. (US Oncology Research, LLC)
- US Oncology Research, LLC
- US Oncology Specialty, LP
- US Oncology, Inc.
- USCITA LIMITED, England
- USON Insurance Company
- USON Risk Retention Group, Inc.
- Utah Acquisition Corporation
- Valley Equipment Company
- Vantage Acquisition Company, LLC (Vantage Oncology, LLC)
- Vantage Acquisition Finance, LLC (Vantage Oncology, LLC)
- Vantage Cancer Care - Alabama, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care - Indiana, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care - New Mexico, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Network of Alabama, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Network of Indiana, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Network of New Mexico, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Networks, LLC
- Vantage Cancer Centers of Georgia, LLC
- Vantage Central Ohio Radiation Therapy, LLC
- Vantage Equipment Acquisition, LLC
- Vantage Exton Radiation Oncology, LLC
- Vantage Medical Management Services, LLC
- Vantage Mokena Radiation Oncology, LLC
- Vantage Oncology - Brooklyn, LLC
- Vantage Oncology Centers - Beverly Hills, LLC
- Vantage Oncology Finance Co. (Vantage Oncology, LLC)
- Vantage Oncology Holdings, LLC
- Vantage Oncology LLC PAC Corporation
- Vantage Oncology Physics, LLC
- Vantage Oncology Treatment Centers - Brevard, LLC
- Vantage Oncology Treatment Centers - Brockton, LLC
- Vantage Oncology Treatment Centers - Central Florida, LLC (Vantage Oncology Treatment Centers, LLC)
- Vantage Oncology Treatment Centers - Northern Arizona, LLC
- Vantage Oncology Treatment Centers - Ohio, LLC (Vantage Oncology Treatment Centers, LLC)
- Vantage Oncology Treatment Centers - San Antonio, LLC (Vantage Oncology Treatment Centers, LLC)
- Vantage Oncology Treatment Centers - Tri-State, LLC
- Vantage Oncology Treatment Centers, LLC
- Vantage Oncology, LLC
- Vantage Operational Support Services, LLC
- Vantage Radiation Oncology Associates, LLC
- Vantage San Antonio Radiation Oncology, LLC (Vantage Oncology Treatment Centers - San Antonio, LLC)
- Vantage South Suburban Radiation Oncology, LLC
- VC Services, Inc.
- VEC GP, LLC
- VerbalCare, LLC
- Verdal Apotek AS
- Very Important Products, Inc.
- Visitacion Associates
- Vitapharm, proizvodnja in trgovina farmacevtskih izdelkov d.o.o., Murska Sobota
- Vitusapotek Jessheim Storsenter AS
- Vitus-Apoteket Torvbyen Fredrikstad AS
- VOTC-Queens, LLC

- Vulcan Acquisition Subsidiary, Inc.
- W H CHANTER LIMITED, England
- W H GREEN (CHEMISTS) LIMITED, England
- W JAMIESON (CHEMISTS) LIMITED, England
- W.H.C.P. (DUNDEE) LIMITED, Scotland
- Walsh Distribution, L.L.C.
- Walsh Healthcare Solutions LLC
- Walsh Healthcare Solutions, Inc.
- Walsh Heartland, L.L.C.
- Walsh Southwest L.L.C.
- Well.ca ULC
- West Florida Radiation Therapy, LLC
- West Wholesale Drug Co.
- WESTCLOSE LIMITED, England
- Western Tumor Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Westside LA Derm Equipment I, LLC
- WFCC Radiation Management Company, LLC
- Wickham Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Wiley Industries, LLC
- Wilkes Barre Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
- Wilkes-Barre Radiation Oncology, LLC
- Windmill Realty, LLC
- WOODSIDE PHARMACY (GLASGOW) LIMITED, Scotland
- World Medical Government Solutions, LLC
- WorldMed Shared Services, Inc.
- WZ-WundZentren GmbH, AG Düsseldorf
- Ybbstal-Apotheke Mag.pharm. Adelheid Tazreiter KG, LG St. Pölten
- Zeepro, Inc.

## Exhibit G

## Texas Settlement Payment Schedule

| | Payment 1 | Payment 2 | Payment 3 | Payment 4 | Payment 5 | Payment 6 | Payment 7 | Payment 8 | Payment 9 | Payment 10 | Payment 11 | Payment 12 | Payment 13 | Payment 14 | Payment 15 | Payment 16 | Payment 17 | Payment 18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restitution/Abatement | $50,888,859.97 | $51,452,327.94 | $50,422,107.24 | $50,422,107.24 | $50,613,588.97 | $50,613,588.97 | $50,613,588.97 | $57,710,933.28 | $57,710,933.28 | $57,710,933.28 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $1,067,044,206.34 |
| Base | $28,878,379.80 | $50,840,768.81 | $32,087,034.90 | $32,087,034.90 | $33,387,037.66 | $33,387,037.66 | $33,387,037.66 | $42,077,312.55 | $42,077,312.55 | $42,077,312.55 | $34,955,797.35 | $34,955,797.35 | $34,955,797.35 | $34,955,797.35 | $34,955,797.35 | $34,955,797.35 | $34,955,797.35 | $34,955,797.35 | $662,263,254.49 |
| Bonus A | $33,000,247.67 | $32,072,033.53 | $27,428,954.47 | $27,428,954.47 | $27,428,954.47 | $25,761,221.84 | $25,761,221.84 | $30,601,081.86 | $30,601,081.86 | $30,601,081.86 | $25,422,298.80 | $25,422,298.80 | $25,422,298.80 | $25,422,298.80 | $25,422,298.80 | $25,422,298.80 | $25,422,298.80 | $25,422,298.80 | $540,070,041.04 |
| Bonus B | $33,116,316.05 | $53,751,049.46 | $37,264,849.04 | $37,264,849.04 | $54,082,000.03 | $54,082,000.03 | $54,082,000.03 | $19,139,251.16 | $19,139,251.16 | $19,139,251.16 | $15,588,994.25 | $15,588,994.25 | $15,588,994.25 | $15,588,994.25 | $15,588,994.25 | $15,588,994.25 | $15,588,994.25 | $15,588,994.25 | $520,141,126.59 |
| Bonus C | $7,670,921.63 | $4,477,208.67 | $4,477,208.67 | $4,477,208.67 | $5,865,204.82 | $5,865,204.82 | $5,865,204.82 | $11,475,630.70 | $11,475,630.70 | $11,475,630.70 | $9,333,196.55 | $9,333,196.55 | $9,333,196.55 | $9,333,196.55 | $9,333,196.55 | $9,333,196.55 | $9,333,196.55 | $9,333,196.55 | $175,160,915.95 |
| Bonus D | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $4,490,938.87 | $58,382,205.31 |
| Below-Fee Attorney Fees and Costs | $33,000,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $33,000,000.00 |
| Texas Additional Restitution Amount | $56,773,600.33 | $53,861,520.57 | $11,814,025.13 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $109,452,492.43 |
| Contingency Fee Fund | $4,796,985.57 | $4,796,985.57 | $4,796,985.57 | $4,796,985.57 | $4,796,985.57 | $4,796,985.57 | $4,796,985.57 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $33,578,899.00 |
| Litigating Subdivision Cost Fund | $7,533,245.89 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,533,245.89 |
| Total Payment | $102,007,348.76 | $69,100,640.428 | $70,410,564.94 | $70,410,564.94 | $70,410,564.94 | $70,410,564.94 | $70,410,564.94 | $77,310,933.28 | $77,310,933.28 | $77,310,933.28 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $64,869,137.02 | $3,173,472,427.66 |

**Exhibit H**

**Illustrative Examples of Settlement Prepayments**

**Example 1:** *Gross Settlement Prepayment: $195,352,203.41*

Settlement Prepayment Reduction Schedule: Reduce Settlement Payments for Year 6 by $65,613,969.37, Year 11 by $64,869,117.02, and Year 16 Settlement Payments by $64,869,117.02

Net Settlement Prepayment Amount (assumes discount rate of 5%): $168,752,578.25 $56,679,813.72 for Year 6 in Year 3, $56,036,382.26 for Year 11 in Year 8, and $56,036,382.26 for Year 16 in Year 13)

| Payment Year | Initial Settlement Payment Schedule | Gross Prepayment Amount (-) | Net Prepayment Amount (+) | Prepayment Applied To | Revised Settlement Payment Schedule |
|---|---|---|---|---|---|
| 1 | $49,880,836.97 | | | | $49,880,836.97 |
| 2 | $52,422,327.94 | | | | $52,422,327.94 |
| 3 | $52,422,327.94 | | $56,679,813.72 | Year 6 | $109,102,141.66 |
| 4 | $65,613,969.37 | | | | $65,613,969.36 |
| 5 | $65,613,969.37 | | | | $65,613,969.36 |
| 6 | $65,613,969.37 | $65,613,969.37 | | | $0.00 |
| 7 | $65,613,969.37 | | | | $65,613,969.36 |
| 8 | $77,169.933.28 | | $56,036,382.26 | Year 11 | $133,206,315.54 |
| 9 | $77,169.933.28 | | | | $77,169.933.28 |
| 10 | $77,169.933.28 | | | | $77,169.933.28 |
| 11 | $64,869,117.02 | $64,869,117.02 | | | $0.00 |
| 12 | $64,869,117.02 | | | | $64,869,117.02 |
| 13 | $64,869,117.02 | | $56,036,382.26 | Year 16 | $120,905,499.28 |
| 14 | $64,869,117.02 | | | | $64,869,117.02 |
| 15 | $64,869,117.02 | | | | $64,869,117.02 |
| 16 | $64,869,117.02 | $64,869,117.02 | | | $0.00 |
| 17 | $64,869,117.02 | | | | $64,869,117.02 |
| 18 | $64,869,117.03 | | | | $64,869,117.02 |
| **Total** | **$1,167,644,106.34** | **$195,352,203.41** | **$168,752,578.25** | | **$1,141,044,481.09** |

**Exhibit I**

**ABC IRS Form 1098-F**

| 0303 | ☐ VOID | ☐ CORRECTED | | |
|---|---|---|---|---|

| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Total amount required to be paid<br>$ 394,142,564.57 | OMB No. 1545-2284<br>Form **1098-F**<br>(Rev. January 2022) | **Fines, Penalties, and Other Amounts** |
| [APPROPRIATE OFFICIAL]<br>The State of Texas<br>[ADDRESS] | 2 Amount to be paid for violation or potential violation<br>$ 22,980,499.92 | | |
| | 3 Restitution/remediation amount | For calendar year<br>20 22 | |
| FILER'S TIN<br>XX-XXXXXXX | PAYER'S TIN<br>23-3079390 | $ 371,162,064.66 | 5 Date of order/agreement | **Copy A** |
| | | 4 Compliance amount<br>$ | XX/XX/2022 | **For Internal Revenue Service Center** |
| PAYER'S name<br>AmerisourceBergen Corporation | 6 Court or entity<br>Harris County District Court and jurisdiction of other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | | **File with Form 1096.** |
| Street address (including apt. no.)<br>1 West First Avenue | 7 Case number<br>Case No. 18-0358/2018 and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | | **For Privacy Act and Paperwork Reduction Act Notice, see the** |
| City or town, state or province, country, and ZIP or foreign postal code<br>Conshohocken, PA 19428 | 8 Case name or names of parties to suit, order, or agreement<br>In re Texas Opioid Litigation and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | | **current General Instructions for Certain Information Returns.** |
| | 9 Code<br>A, B | | |

| Form **1098-F** (Rev. 1-2022) | Cat. No. 71382B | www.irs.gov/Form1098F | Department of the Treasury - Internal Revenue Service |
|---|---|---|---|

**Do Not Cut or Separate Forms on This Page — Do Not Cut or Separate Forms on This Page**

Exhibit I
1

**Exhibit J**

**Cardinal Health IRS Form 1098-F**

| 0303 | ☐ VOID | ☐ CORRECTED | |
|---|---|---|---|

| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Total amount required to be paid<br>$ 392,871,136.95 | OMB No. 1545-2284 | |
|---|---|---|---|
| [APPROPRIATE OFFICIAL]<br>The State of Texas<br>[ADDRESS] | 2 Amount to be paid for violation or potential violation<br>$ 22,906,369.27 | Form **1098-F**<br>(Rev. January 2022)<br>For calendar year<br>20 22 | **Fines, Penalties, and Other Amounts** |

| FILER'S TIN<br>XX-XXXXXXX | PAYER'S TIN<br>31-0958666 | 3 Restitution/remediation amount<br>$ 369,964,767.68 | 5 Date of order/agreement<br>XX/XX/2022 | **Copy A**<br>**For** |
|---|---|---|---|---|

| PAYER'S name<br>Cardinal Health, Inc. and consolidated subsidiaries | 4 Compliance amount<br>$ | **Internal Revenue Service Center** |
|---|---|---|

| Street address (including apt. no.)<br>7000 Cardinal Place | 6 Court or entity<br>Harris County District Court and jurisdictions of other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | **File with Form 1096.** |
|---|---|---|

| City or town, state or province, country, and ZIP or foreign postal code<br>Dublin, Ohio  43017 | 7 Case number<br>Case No. 18-0358/2018 and other cases settled under the Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | **For Privacy Act and Paperwork Reduction Act Notice, see the** |
|---|---|---|

| | 8 Case name or names of parties to suit, order, or agreement<br>In re Texas Opioid Litigation and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | **current General Instructions for Certain Information** |
|---|---|---|

| | 9 Code<br>A, B | **Returns.** |
|---|---|---|

| Form **1098-F** (Rev. 1-2022) | Cat. No. 71382B | www.irs.gov/Form1098F | Department of the Treasury - Internal Revenue Service |
|---|---|---|---|

**Do Not Cut or Separate Forms on This Page  —  Do Not Cut or Separate Forms on This Page**

**Exhibit K**

## McKesson IRS Form 1098-F

```
0303        ☐ VOID    ☐ CORRECTED
```

| | |
|---|---|
| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | **1** Total amount required to be paid |

FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.

[APPROPRIATE OFFICIAL]
The State of Texas
[ADDRESS]

**1** Total amount required to be paid
$ 484,413,926.14

**2** Amount to be paid for violation or potential violation
$ 28,243,775.70

**3** Restitution/remediation amount
$ 456,170,150.44

OMB No. 1545-2284

Form **1098-F**
(Rev. January 2022)

For calendar year
20 22

**Fines, Penalties, and Other Amounts**

FILER'S TIN
XX-XXXXXXX

PAYER'S TIN
23-3079390

**4** Compliance amount
$

**5** Date of order/agreement
XX/XX/2022

**Copy A**
**For**
**Internal Revenue**
**Service Center**

PAYER'S name
McKesson Corporation

Street address (including apt. no.)
6535 N. State Highway 161

City or town, state or province, country, and ZIP or foreign postal code
Irving, TX 75039

**6** Court or entity
Harris County District Court and jurisdictions of other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of []

**7** Case number
Case No. 18-0358/2018 and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of []

**8** Case name or names of parties to suit, order, or agreement
In re Texas Opioid Litigation and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of []

**9** Code
A, B

**File with Form 1096.**

For Privacy Act and Paperwork Reduction Act Notice, see the **current General Instructions for Certain Information Returns.**

Form **1098-F** (Rev. 1-2022)   Cat. No. 71382B   www.irs.gov/Form1098F   Department of the Treasury - Internal Revenue Service

**Do  Not  Cut  or  Separate  Forms  on  This  Page  —  Do  Not  Cut  or  Separate  Forms  on  This  Page**

Exhibit K
1

STRICTLY CONFIDENTIAL

**EXHIBIT L**

**Texas Participation Form and Release**

The Texas governmental entity identified on the signature page below ("*Governmental Entity*"), in order to obtain and in consideration for the benefits provided to the Governmental Entity pursuant to the Texas Settlement Agreement dated February 7, 2022 ("*Distributor Texas Settlement*"), and acting through the undersigned authorized official, hereby elects to participate in the Distributors' Texas Settlement, release all Released Claims against all Released Entities, and agrees as follows.

1. The Governmental Entity is aware of and has reviewed the Distributors' Texas Settlement, understands that all terms in this Texas Participation Form have the meanings defined therein, and agrees that by signing this Texas Participation Form, the Governmental Entity elects to participate in the Distributors' Texas Settlement and become a Participating Subdivision as provided therein.

2. The Governmental Entity shall, jointly with the Distributors, within 14 calendar days of the Effective Date file a dismissal with prejudice of any Released Claims that it has filed and file a joint motion with the Distributors to sever claims.

3. The Governmental Entity agrees to the terms of the Distributors' Texas Settlement pertaining to Subdivisions as defined therein.

4. By agreeing to the terms of the Distributors' Texas Settlement and becoming a Releasor, the Governmental Entity is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date.

5. The Governmental Entity agrees to use any monies it receives through the Distributors' Texas Settlement as provided therein.

6. The Governmental Entity submits to the jurisdiction of the Texas Consolidated Litigation Court..  If the Global Settlement becomes effective by July 1, 2022, the Governmental Entity agrees to arbitrate disputes before the National Arbitration Panel as described in Section VI.F.1, Section VI.F.2, Section VIII.C.1, Section XI.B.4, Section XIV.E.3, Section XIV.E.4, Section XIV.T.2, and Exhibit P, of the Global Settlement.  For the avoidance of doubt, nothing contained in this Texas Participation Form, or in the Distributors' Texas Settlement, constitutes consent, express or implied, by the Governmental Entity or its selected counsel, to the jurisdiction of any federal court, including without limitation the MDL, for any purpose.

7. The Governmental Entity has the right to enforce the Distributors' Texas Settlement in the Texas Consolidated Litigation Court as provided therein.

8. The Governmental Entity, as a Participating Subdivision, hereby becomes a Releasor for all purposes in the Distributors' Texas Settlement, including, but not limited to, all

STRICTLY CONFIDENTIAL

provisions of Section X, and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority. As a Releasor, the Governmental Entity hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Distributors' Texas Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Governmental Entity to release claims. The Distributors' Texas Settlement shall be a complete bar to any Released Claim.

9. The Governmental Entity shall have all rights and obligations of a Participating Subdivision as set forth in the Distributors' Texas Settlement.

10. In connection with the releases provided for in the Distributors' Texas Settlement, each Governmental Entity expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.

> A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Governmental Entity hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Governmental Entities' decision to participate in the Distributors' Texas Settlement.

11. Nothing herein is intended to modify in any way the terms of the Distributors' Texas Settlement, to which Governmental Entity hereby agrees. To the extent this Texas Participation Form is interpreted differently from the Distributors' Texas Settlement in any respect, the Distributors' Texas Settlement controls.

I have all necessary power and authorization to execute this Texas Participation Form on behalf of the Governmental Entity.

STRICTLY CONFIDENTIAL

| Governmental Entity: | State: |
|---|---|
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

Signature: _____

Name: _____

Title: _____

Date: _____

## Exhibit M

## Stipulations of Dismissal with Prejudice

[This page intentionally left blank.]

MDL PRETRIAL CAUSE NO. 2018-77098

| | | |
|---|---|---|
| County of Dallas | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | 116th JUDICIAL DISTRICT |
| | § | |
| Purdue Pharma, L.P., et al., | § | |
| | § | |
| *Defendants*. | § | DALLAS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MDL PRETRIAL CAUSE NO. 2018-77066

| | | |
|---|---|---|
| County of Bexar | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | 224th JUDICIAL DISTRICT |
| | § | |
| Purdue Pharma, L.P., et al., | § | |
| | § | |
| *Defendants*. | § | BEXAR COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | 152nd JUDICIAL DISTRICT |
| | § | |
| MDL NO. 18-0358 | § | HARRIS COUNTY, TEXAS |

## **STIPULATION OF DISMISSAL WITH PREJUDICE**

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, counsel

of record for Plaintiffs Dallas County, Texas and Bexar County, Texas and Defendants McKesson

Corporation, McKesson Medical-Surgical Inc., Cardinal Health, Inc., Cardinal Health 105, Inc., Cardinal Health 108, LLC, Cardinal Health 110, LLC, Cardinal Health 112, LLC, Cardinal Health 200, LLC, Cardinal Health 414, LLC, AmerisourceBergen Corporation, and AmerisourceBergen Drug Corporation, (collectively, "Distributor Defendants"), that, pursuant to Texas Rule of Civil Procedure 162, the following actions are hereby voluntarily nonsuited with prejudice as to Distributor Defendants only, without costs as to any party against the other:

1.  *County of Dallas v. Purdue Pharma L.P.*, Case No. 2018-77098; and

2.  *County of Bexar v. Purdue Pharma L.P.*, Case No. 2018-77066;

Dated:  February _____, 2022
New York, NY

Agreed as to form and substance:

| **REED SMITH LLP** | **SIMON GREENSTONE PANATIER, PC** |
|---|---|
| _/s/ Stan Perry_____ | _____ |
| Stan Perry | Jeffery B. Simon |
| State Bar No. 15799920 | Simon Greenstone Panatier |
| sperry@reedsmith.com | 1201 Elm Street Suite 3400 |
| Nicole S. Soussan | Dallas, Texas |
| State Bar No. 24079371 | Phone: (214) 276-7680 |
| nsoussan@reedsmith.com | jsimon@sgptrial.com |
| Emma L. Short | |
| State Bar No. 24101001 | **THE LANIER LAW FIRM, P.C.** |
| eshort@reedsmith.com | |
| REED SMITH LLP | _____ |
| 811 Main Street, Suite 1700 | Dara Hegar |
| Houston, Texas 77002 | The Lanier Law Firm P.C. |
| Telephone: 713.469.3800 | 10940 W. Sam Houston Pkwy N, Suite 100 |
| Facsimile:  713.469.3899 | Houston, Texas 77064 |
| | Dara.hegar@lanierlawfirm.com |
| Joseph J. Mahady | |
| jmahady@reedsmith.com | |
| REED SMITH LLP | *Counsel for Plaintiff Dallas County* |
| Three Logan Square | |
| 1717 Arch Street, Suite 3100 | |
| Philadelphia, Pennsylvania 19103 | |

Telephone: 215.851.8100
Facsimile:  215.851.1420

*Counsel for Defendants*
*AmerisourceBergen Corporation and*
*AmerisourceBergen Drug Corporation*

**BAKER & HOSTETLER LLP**

  */s/ Michael W. Mengis*
Michael W. Mengis, *attorney-in-charge*
State Bar No. 13941040
mmengis@bakerlaw.com
Matt R. Raley
State Bar No. 24051224
mraley@bakerlaw.com
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: 713-751-1600
Fax: 713-751-1717

*Of Counsel*:
Enu Mainigi
emainigi@wc.com
F. Lane Heard
lheard@wc.com
Steven M. Pyser
spyser@wc.com
Ashley W. Hardin
ahardin@wc.com
Colleen McNamara
cmcnamara@wc.com
Michael R. Fishman
mfishman@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Phone: 202-434-5000
Fax: 202-434-5029

*Attorneys for Defendants Cardinal Health,*
*Inc., Cardinal Health 105, Inc., Cardinal*
*Health 108, LLC, Cardinal Health 110,*
*LLC, Cardinal Health 112, LLC, Cardinal*

**WATTS GUERRA LLC**

_____
Mikal Watts
Shelly Sanford
WATTS GUERRA LLC
4 Dominion Dr.
Bld 3, Suite 100
San Antonio, TX 78257
Phone: (210) 447-0500
mcw@wattsguerra.com
ssanford@wattsguerra.com

*Counsel for Plaintiff Bexar County*

Exhibit M
4

*Health 200, LLC, Cardinal Health 414, LLC*

**SMYSER KAPLAN & VESELKA, L.L.P.**

 */s/ Craig Smyser*
Craig Smyser
Texas Bar No. 18777575
csmyser@skv.com
David Isaak
Texas Bar No. 24012887
disaak@skv.com
Crystal Robles
Texas Bar No. 24083754
crobles@skv.com
Shaun Clarke
Texas Bar No. 24056972
sclarke@skv.com
Karima Maloney
Texas Bar No. 24041383
kmaloney@skv.com
SMYSER KAPLAN & VESELKA, L.L.P.
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Phone: 713-221-2300
Fax: 713-221-2320

*Of Counsel:*

Sonya D. Winner
Cortlin H. Lannin

**COVINGTON & BURLING LLP**

Andrew P. Stanner
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington DC, 20001
Phone:  202-662-6000

*Counsel for Defendant McKesson Corporation and McKesson Medical-Surgical Inc.*

SO ORDERED:

Dated: _____

                                               _____
Honorable Judge Robert Schaffer
152nd Judicial District Court

**Exhibit N**

**Texas Opioid Settlement Sharing Agreement**

# TEXAS OPIOID ABATEMENT FUND COUNCIL AND SETTLEMENT ALLOCATION TERM SHEET

**WHEREAS**, the people of the State of Texas and its communities have been harmed through the National and Statewide epidemic caused by licit and illicit opioid use and distribution within the State of Texas; and now,

**WHEREAS**, the State of Texas, though its elected representatives and counsel, including the Honorable Ken Paxton, Attorney General of the State of Texas, and certain Political Subdivisions, through their elected representatives and counsel, are separately engaged in litigation seeking to hold those entities in the supply chain accountable for the damage caused; and now,

**WHEREAS**, the State of Texas, through its Attorney General and its Political Subdivisions, share a common desire to abate and alleviate the impacts of the epidemic throughout the State of Texas; and now,

**THEREFORE**, the State of Texas and its Political Subdivisions, subject to completing formal documents effectuating the Parties' agreements, enter into this State of Texas and Texas Political Subdivisions' Opioid Abatement Fund Council and Settlement Allocation Term Sheet (Texas Term Sheet) relating to the allocation and use of the proceeds of any Settlements as described.

## A. Definitions

As used in this Texas Term Sheet:

1. "The State" shall mean the State of Texas acting through its Attorney General.

2. "Political Subdivision(s)" shall mean any Texas municipality and county.

3. "The Parties" shall mean the State of Texas, the Political Subdivisions, and the Plaintiffs' Steering Committee and Liaison Counsel (PSC) in the Texas Opioid MDL, *In Re: Texas Opioid Litigation*, MDL No. 2018-63587, in the 152d District Court of Harris County, Texas.

4. "Litigating Political Subdivision" means a Political Subdivision that filed suit in the state courts of the State of Texas prior to the Execution Date of this Agreement, whether or not such case was transferred to Texas Opioid MDL, or removed to federal court.

5. "National Fund" shall mean any national fund established for the benefit of the Texas Political Subdivisions.  In no event shall any National Fund be used to create federal jurisdiction, equitable or otherwise, over the Texas Political Subdivisions or those similarly situated state-court litigants who are included in the state coalition, nor shall the National Fund require participating in a class action or signing a participation agreement as part of the criteria for participating in the National Fund.

6. "Negotiating Committee" shall mean a three-member group comprising four representatives for each of (1) the State; (2) the PSC; and (3) Texas'

Political Subdivisions (collectively, "Members"). The State shall be represented by the Texas Attorney General or his designees. The PSC shall be represented by attorneys Mikal Watts, Jeffrey Simon, Dara Hegar, Dan Downey, or their designees. Texas' Political Subdivisions shall be represented by Clay Jenkins (Dallas County Judge), Terrence O'Rourke (Special Assistant County Attorney, Harris County), Nelson Wolff (Bexar County Judge), and Nathaniel Moran (Smith County Judge) or their designees.

7. "Settlement" shall mean the negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant that includes the State and Political Subdivisions.

8. "Opioid Funds" shall mean monetary amounts obtained through a Settlement as defined in this Texas Term Sheet.

8. "Approved Purpose(s)" shall mean those uses identified in Exhibit A hereto.

9. "Pharmaceutical Supply Chain" shall mean the process and channels through which opioids or opioids products are manufactured, marketed, promoted, distributed, or dispensed.

10. "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution, or dispensing of an opioid analgesic.

11. "Texas Opioid Council" shall mean the Council described in Exhibit A hereto, which has the purpose of ensuring the funds recovered by Texas (through the joint actions of the Attorney General and the Texas Political Subdivisions) are allocated fairly and spent to remediate the opioid crisis in Texas, using efficient and cost-effective methods that are directed to the hardest hit regions in Texas while also ensuring that all Texans benefit from prevention and recovery efforts.

## B. Allocation of Settlement Proceeds

1. All Opioid Funds distributed in Texas shall be divided with 15% going to Political Subdivisions ("Subdivision Share"), 70% to the Texas Opioid Abatement Fund through the Texas Opioid Council (Texas Abatement Fund Share) identified and described on Exhibits A and C hereto, and 15% to the Office of the Texas Attorney General as Counsel for the State of Texas ("State Share"). Out of the Texas Opioid Abatement Fund, reasonable expenses up to 1% shall be paid to the Texas Comptroller for the administration of the Texas Opioid Council pursuant to the Opioid

Abatement Fund (Texas Settlement) Opioid Council Agreement, Exhibit A hereto.

2. The Subdivisions Share shall be allocated in accordance with the division of proceeds on Exhibit B hereto.

3. The Texas Abatement Fund Share shall be allocated to the Opioid Council to be apportioned in accordance with the guidelines of Exhibit A, and Exhibit C hereto.

4. In the event a Subdivision merges, dissolves, or ceases to exist, the allocation percentage for that Subdivision shall be redistributed as directed by the settlement document, and if not specified, equitably based on the composition of the successor Subdivision. If a Subdivision for any reason is excluded from a specific settlement, the allocation percentage for that Subdivision shall be redistributed as directed by the settlement document, and if not specified, equitably among the participating Subdivisions.

5. Funds obtained from parties unrelated to the Litigation, via grant, bequest, gift or the like, separate and distinct from the Litigation, may be directed to the Texas Opioid Council and disbursed as set forth below.

6. The Subdivision share shall be initially deposited and paid in cash directly to the Subdivision under the authority and guidance of the Texas MDL Court, who shall direct any Settlement funds to be held in trust in a

segregated account to benefit the Subdivisions and to be promptly distributed as set forth herein and in accordance with Exhibit B.

7. Nothing in this Texas Term Sheet should alter or change any Subdivision's rights to pursue its own claim. Rather, the intent of this Texas Term Sheet is to join all parties to disburse settlement proceeds from one or more defendants to all parties participating in that settlement within Texas.

8. Opioid Funds from the Texas Abatement Fund Share shall be directed to the Texas Opioid Council and used in accordance with the guidelines as set out on Exhibit A hereto, and the Texas Abatement Fund Share shall be distributed to the Texas Opioid Council under the authority and guidance of the Texas MDL Court, consistent with Exhibits A and C, and the by-laws of the Texas Opioid Council documents and disbursed as set forth therein, including without limitation all abatement funds and the 1% holdback for expenses.

9. The State of Texas and the Political Subdivisions understand and acknowledge that additional steps may need to be undertaken to assist the Texas Opioid Council in its mission, at a predictable level of funding, regardless of external factors.

## C. Payment of Counsel and Litigation Expenses

1. Any Master Settlement Agreement settlement will govern the payment of fees and litigation expenses to the Parties. The Parties agree to direct control of any Texas Political Subdivision fees and expenses to the "Texas Opioid Fee and Expense Fund," which shall be allocated and distributed by the Texas MDL Court, *In re: Texas Opioid Litigation*, MDL No. 2018-63587, in the 152nd District Court of Harris County, Texas, and with the intent to compensate all counsel for Texas Political Subdivisions who have not chosen to otherwise seek compensation for fees and expenses from any federal MDL common benefit fund.

2. The Parties agree that no portion of the State of Texas 15% allocation share from any settlement shall be administered through the National Fund, the Texas MDL Court, or Texas Opioid Fee and Expense Fund, but shall be directed for payment to the State of Texas by the State of Texas.

3. The State of Texas and the Texas Political Subdivisions, and their respective attorneys, agree that all fees – whether contingent, hourly, fixed or otherwise – owed by the Texas Political Subdivisions shall be paid out of the National Fund or as otherwise provided for herein to the Texas Opioid Fee and Expense Fund to be distributed by the 152nd

District Court of Harris County, Texas pursuant to its past and future orders.

4.  From any opioid-related settlements with McKesson, Cardinal Health, ABDC, and Johnson & Johnson, and for any future opioid-related settlements negotiated, in whole or in part, by the Negotiating Committee with any other Pharmaceutical Supply Chain Participant, the funds to be deposited in the Texas Opioid Fee and Expense Fund shall be 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions of each payment (annual or otherwise) to the State of Texas for that settlement, plus expenses from the National Fund, and shall be sought by Texas Political Subdivision Counsel initially through the National Fund.  The Texas Political Subdivisions' percentage share of fees and expenses from the National Fund shall be directed to the Texas Opioid Fee and Expense Fund in the Texas MDL, as soon as is practical, for allocation and distribution in accordance with the guidelines herein.

5.  If the National Fund share to the Texas Political Subdivisions is insufficient to cover the guaranteed 9.3925%, plus expenses from the National Fund, per subsection 4, immediately *supra*, or if payment from the National Fund is not received within 12  months after the date the

first payment is made by the Defendants pursuant to the settlement, then the Texas Political Subdivisions shall recover up to 12.5% of the Texas Political Subdivision Share to make up any difference.

6. If the National Fund and the Texas Political Subdivision share are insufficient to cover the guaranteed 9.3925%, plus expenses from the National Fund, or if payment from the National Fund is not received within 12 months after the date the first payment is made by the Defendants pursuant to the settlement, then the Texas Political Subdivisions shall recover up to 8.75% of the Abatement Fund Share to make up any difference. In no event shall the Texas Political Subdivision share exceed 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions of any settlement, plus expenses from the National Fund. In the event that any payment is received from the National Fund such that the total amount in fees and expenses exceeds 9.3925%, the Texas Political Subdivisions shall return any amounts received greater than 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions to those respective Funds.

7. For each settlement utilizing a National Fund, the Texas Political Subdivisions need only make one attempt at seeking fees and expenses there.

8. The total amount of the Texas Opioid Fee and Expense Fund shall be reduced proportionally, according to the agreed upon allocation of the Texas Subdivision Fund, for any Texas litigating Political Subdivision that (1) fails to enter the settlement; and (2) was filed in Texas state court, and was transferred to the Texas MDL (or removed before or during transfer to the Texas MDL) as of the execution date of this Agreement.

**D. The Texas Opioid Council and Texas Abatement Fund**

The Texas Opioid Council and Texas Abatement Fund is described in detail at Exhibit A, incorporated herein by reference.

**E. Settlement Negotiations**

1. The State and Negotiating Committee agree to inform each other in advance of any negotiations relating to a Texas-only settlement with a Pharmaceutical Supply Chain Participant that includes both the State and its Political Subdivisions and shall provide each other the opportunity to participate in all such negotiations. Any Texas-only Settlement agreed to with the State and Negotiating Committee shall be subject to the approval

of a majority of litigating Political Subdivisions. The Parties further agree to keep each other reasonably informed of all other global settlement negotiations with Pharmaceutical Supply Chain Participants and to include the Negotiating Committee or designees.  Neither this provision, nor any other, shall be construed to state or imply that either the State or the Negotiating Committee is unauthorized to engage in settlement negotiations with Pharmaceutical Supply Chain Participants without prior consent or contemporaneous participation of the other, or that either party is entitled to participate as an active or direct participant in settlement negotiations with the other.  Rather, while the State's and Negotiation Committee's efforts to achieve worthwhile settlements are to be collaborative, incremental stages need not be so.

2. Any Master Settlement Agreement (MSA) shall be subject to the approval and jurisdiction of the Texas MDL Court.

3. As this is a Texas-specific effort, the Committee shall be Chaired by the Attorney General. However, the Attorney General, or his designees, shall endeavor to coordinate any publicity or other efforts to speak publicly with the other Committee Members.

4. The State of Texas, the Texas MDL Plaintiff's Steering Committee representatives, or the Political Subdivision representatives may withdraw

from coordinated Settlement discussions detailed in this Section upon 10 business days' written notice to the remaining Committee Members and counsel for any affected Pharmaceutical Supply Chain Participant. The withdrawal of any Member releases the remaining Committee Members from the restrictions and obligations in this Section.

5. The obligations in this Section shall not affect any Party's right to proceed with trial or, within 30 days of the date upon which a trial involving that Party's claims against a specific Pharmaceutical Supply Chain Participant is scheduled to begin, reach a case specific resolution with that particular Pharmaceutical Supply Chain Participant.

## F. Amendments

The Parties agree to make such amendments as necessary to implement the intent of this agreement.

### Acknowledgment of Agreement

We, the undersigned, have participated in the drafting of the above Texas Term Sheet, including consideration based on comments solicited from Political Subdivisions. This document has been collaboratively drafted to maintain all individual claims while allowing the State and its Political Subdivisions to cooperate in exploring all possible means of resolution. Nothing in this agreement binds any party to any specific outcome. Any resolution under this document will require

acceptance by the State of Texas and a majority of the Litigating Political Subdivisions.

We, the undersigned, hereby accept the STATE OF TEXAS AND TEXAS POLITICAL SUBDIVISIONS' OPIOID ABATEMENT FUND COUNCIL AND SETTLEMENT ALLOCATION TERM SHEET. We understand that the purpose of this Texas Term Sheet is to permit collaboration between the State of Texas and Political Subdivisions to explore and potentially effectuate earlier resolution of the Opioid Litigation against Pharmaceutical Supply Chain Participants. We also understand that an additional purpose is to create an effective means of distributing any potential settlement funds obtained under this Texas Term Sheet between the State of Texas and Political Subdivisions in a manner and means that would promote an effective and meaningful use of the funds in abating the opioid epidemic throughout Texas.

Executed this __13__ day of May, 2020.

**FOR THE STATE OF TEXAS:**

**KENNETH PAXTON, JR.**
**ATTORNEY GENERAL**

**FOR THE SUBDIVISIONS**
**AND TEXAS MDL PSC:**

**MIKAL WATTS**
**WATTS GUERRA LLP**

**JEFFREY SIMON**
**SIMON GREENSTONE PANATIER, PC**

**DARA HEGAR**
**LANIER LAW FIRM, PC**

**DAN DOWNEY**
**DAN DOWNEY, PC**

:sas

# EXHIBIT A

## Opioid Abatement Fund (Texas) Settlement

### Opioid Council

As part of the settlement agreement and upon its execution, the parties will form the Texas Opioid Council (Council) to establish the framework that ensures the funds recovered by Texas (through the joint actions of the Attorney General and the state's political subdivisions) are allocated fairly and spent to remediate the opioid crisis in Texas, using efficient and cost-effective methods that are directed to the hardest hit regions in Texas while also ensuring that all Texans benefit from prevention and recovery efforts.

## I.    Structure

The Council will be responsible for the processes and procedures governing the spending of the funds held in the Texas Abatement Fund, which will be approximately 70% of all funds obtained through settlement and/or litigation of the claims asserted by the State and its subdivisions in the investigations and litigation related to the manufacturing, marketing, distribution, and sale of opioids and related pharmaceuticals.

Money paid into the abatement fund will be held by an independent administrator, who shall be responsible for the ministerial task of releasing funds solely as authorized below by the Council, and accounting for all payments to and from the fund.

The Council will be formed when a court of competent jurisdiction enters an order settling the matter, including any order of a bankruptcy court. The Council's members must be appointed within sixty (60) days of the date the order is entered.

A. Membership

The Council shall be comprised of the following thirteen (13) members:

1. *Statewide Members.*

Six members appointed by the Governor and Attorney General to represent the State's interest in opioid abatement. The statewide members are appointed as follows:

a. The Governor shall appoint three (3) members who are licensed health professionals with significant experience in opioid interventions;

b. The Attorney General shall appoint three (3) members who are licensed professionals with significant experience in opioid incidences; and

c. The Governor will appoint the Chair of the Council as a non-voting member. The Chair may only cast a vote in the event there is a tie of the membership.

2. *Regional Members.*

Six (6) members appointed by the State's political subdivisions to represent their designated Texas Health and Human Services Commission "HHSC" Regional Healthcare

1

Partnership (Regions) to ensure dedicated regional, urban, and rural representation on the Council. The regional appointees must be from either academia or the medical profession with significant experience in opioid interventions. The regional members are appointed as follows:

    a.  One member representing Regions 9 and 10 (Dallas Ft-Worth);
    b.  One member representing Region 3 (Houston);
    c.  One member representing Regions 11, 12, 13, 14, 15, 19 (West Texas);
    d.  One member representing Regions 6, 7, 8, 16 (Austin-San Antonio);
    e.  One member representing Regions 1, 2, 17, 18 (East Texas); and
    f.  One member representing Regions 4, 5, 20 (South Texas).

B.  Terms

All members of the Council are appointed to serve staggered two-year terms, with the terms of members expiring February 1 of each year. A member may serve no more than two consecutive terms, for a total of four consecutive years. For the first term, four (4) members (two (2) statewide and two (2) for the subdivisions) will serve a three-year term. A vacancy on the Council shall be filled for the unexpired term in the same manner as the original appointment. The Governor will appoint the Chair of the Council who will not vote on Council business unless there is a tie vote, and the subdivisions will appoint a Vice-Chair voting member from one of the regional members.

C.  Governance

*1.  Administration*

The Council is attached administratively to the Comptroller.  The Council is an independent, quasi-governmental agency because it is responsible for the statewide distribution of the abatement settlement funds.  The Council is exempt from the following statutes:

    a.  Chapter 316 of the Government Code (Appropriations);
    b.  Chapter 322 of the Government Code (Legislative Budget Board);
    c.  Chapter 325 of the Government Code (Sunset);
    d.  Chapter 783 of the Government Code (Uniform Grants and Contract Management);
    e.  Chapter 2001 of the Government Code (Administrative Procedure);
    f.  Chapter 2052 of the Government Code (State Agency Reports and Publications);
    g.  Chapter 2261 of the Government Code (State Contracting Standards and Oversight);
    h.  Chapter 2262 of the Government Code (Statewide Contract Management);

      i.  Chapter 262 of the Local Government Code (Purchasing and Contracting Authority of Counties); and

      j.  Chapter 271 of the Local Government Code (Purchasing and Contracting Authority of Municipalities, Counties, and Certain Other Local Governments).

## 2. *Transparency*

The Council will abide by state laws relating to open meetings and public information, including Chapters 551 and 552 of the Texas Government Code.

      i.  The Council shall hold at least four regular meetings each year. The Council may hold additional meetings on the request of the Chair or on the written request of three members of the council. All meetings shall be open to the public, and public notice of meetings shall be given as required by state law.

     ii.  The Council may convene in a closed, non-public meeting:

          a.  If the Commission must discuss:

              1.  Negotiation of contract awards; and

              2.  Matters specifically exempted from disclosure by federal and state statutes.

          b.  All minutes and documents of a closed meeting shall remain under seal, subject to release only order of a court of competent jurisdiction.

## 3. *Authority*

The Council does not have rulemaking authority.  The terms of each Judgment, Master Settlement Agreement, or any Bankruptcy Settlement for Texas control the authority of the Council and the Council may not stray outside the bounds of the authority and power vested by such settlements. Should the Council require legal assistance in determining their authority, the Council may direct the executive director to seek legal advice from the Attorney General to clarify the issue.

## D. Operation and Expenses

The independent administrator will set aside up to one (1) percent of the settlement funds for the administration of the Council for reasonable costs and expenses of operating the foregoing duties, including educational activities.

## 1. *Executive Director*

The Comptroller will employ the executive director of the Council and other personnel as necessary to administer the duties of the Council and carry out the functions of the Council. The executive director must have at least 10 years of experience in government or public administration and is classified as a Director V/B30 under the State Auditor's State Classification.   The Comptroller will pay the salaries of the Council employees from the

one (1) percent of the settlement funds set aside for the administration of the Council. The Comptroller will request funds from the Texas Abatement Fund Point of Contact.

 2. *Travel Reimbursement*

A person appointed to the Council is entitled to reimbursement for the travel expenses incurred in attending Council duties.  A member of the Council may be reimbursed for actual expenses for meals, lodging, transportation, and incidental expenses in accordance with travel rates set by the federal General Services Administration.

## II.    Duties/Roles

It is the duty of the Council to determine and approve the opioid abatement strategies and funding awards.

### A. Approved Abatement Strategies

The Council will develop the approved Texas list of abatement strategies based on but not limited to the existing national list of opioid abatement strategies (see attached Appendix A) for implementing the Texas Abatement Fund.

1. The Council shall only approve strategies which are evidence-informed strategies.
2. The Texas list of abatement strategies must be approved by majority vote.  The majority vote must include a majority from both sides of the statewide members and regional members in order to be approved, e.g., at least four (4) of six (6) members on each side.

### B. Texas Abatement Fund Point of Contact

The Council will determine a single point of contact called the Abatement Fund Point of Contact (POC) to be established as the sole entity authorized to receive requests for funds and approve expenditures in Texas and order the release of funds from the Texas Abatement Fund by the independent administrator.  The POC may be an independent third party selected by the Council with expertise in banking or financial management.  The POC will manage the Opioid Council Bank Account (Account).  Upon a vote, the Council will direct the POC to contact the independent administrator to release funds to the Account.  The Account is outside the State Treasury and not managed by any state or local officials. The POC is responsible for payments to the qualified entities selected by the Council for abatement fund awards.  The POC will submit a monthly financial statement on the Account to the Council.

### C. Auditor

An independent auditor appointed by the Council will perform an audit on the Account on an annual basis and report its findings, if any, to the Council.

### D. Funding Allocation

The Council is the sole decision-maker on the funding allocation process of the abatement funds. The Council will develop the application and award process based on the parameters outlined below.  An entity seeking funds from the Council must apply for funds; no funds will be awarded without an application. The executive director and personnel may assist the Council in gathering and compiling the applications for consideration; however, the Council members are the sole decision-makers of awards and funding determination.   The Council will use the following processes to award funds:

1. *Statewide Funds*. The Council will consider, adopt and approve the allocation methodology attached as Exhibit C, based upon population health data and prevalence of opioid incidences, at the Council's initial meeting. Adoption of such methodology will allow each Region to customize the approved abatement strategies to fit its communities' needs. The statewide regional funds will account for seventy-five (75) percent of the total overall funds, less the one (1) percent administrative expense described herein.

2. *Targeted Funds*. Each Region shall reserve  twenty-five (25) percent of the overall funds, for targeted interventions in the specific Region as identified by opioid incidence data. The Council must approve on an annual basis the uses for the targeted  abatement strategies and applications available to every Region, including education and outreach programs. Each Region without approved uses for the targeted funds from the Council, based upon a greater percentage of opioid incidents compared to its population, is subject to transfer of all or a portion of the targeted funds for that Region for uses based upon all Regions' targeted funding needs as approved by the Council on an annual basis.

3. *Annual Allocation*. Statewide regional funds and targeted funds will be allocated on an annual basis.  If a Region lapses its funds, the funds will be reallocated based on all Regions' funding needs.

E. Appeal Process

The Council will establish an appeal process to permit the applicants for funding (state or subdivisions) to challenge decisions by the Council-designated point of contact on requests for funds or expenditures.

1. To challenge a decision by the designated point of contact, the State or a subdivision must file an appeal with the Council within thirty (30) days of the decision. The Council then has thirty (30) days to consider and rule on the appeal.
2. If the Council denies the appeal, the party may file an appeal with the state district court of record where the final opioid judgment or Master Settlement Agreement is filed. The Texas Rules of Civil Procedure and Rules of Evidence will govern these proceedings. The Council may request representation from the Attorney General in these proceedings.

In making its determination, the state district court shall apply the same clear error standards contained herein that the Council must follow when rendering its decision.

3. The state district court will make the final decision and the decision is not appealable.

4. Challenges will be limited and subject to penalty if abused.

5. Attorneys' fees and costs are not recoverable in these appeals.

F. Education

The Council may determine that a percentage of the funds in the Abatement Fund from the targeted funds be used to develop an education and outreach program to provide materials on the consequences of opioid drug use, prevention and interventions. Any material developed will include online resources and toolkits for communities.

# APPENDIX A

# OPIOID ABATEMENT STRATEGIES

| PART ONE: TREATMENT |
|---|

A. __TREAT OPIOID USE DISORDER (OUD)__

1.  Expand availability of treatment for Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) issues, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.  Support and reimburse services that include the full American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH issues, including but not limited to:

    a.  Medication-Assisted Treatment (MAT);

    b.  Recruiting MAT Providers and Training;

    c.  Abstinence-based treatment;

    d.  Treatment, recovery, or other services provided by states, subdivisions, community health centers; non-for-profit providers; or for-profit providers; or

    e.  Treatment by providers that focus on OUD treatment as well as treatment by providers that offer OUD treatment along with treatment for other SUD/MH issues;

    f.  Recovery high schools

3.  Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH issues, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.  "Support the establishment of the hub-and-spoke model of OUD treatment in all counties where possible, and across county lines where necessary."

5.  Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-informed, promising, or emerging practices such as adequate methadone dosing.

6.  Support mobile intervention, treatment, and recovery services, offered by qualified professionals, for persons with OUD and any co-occurring SUD/MH issues or persons who have experienced an opioid overdose.

7. Treatment of mental health trauma issues resulting from the traumatic experiences of the opioid user (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such mental health trauma.

8. Support detoxification (detox) services for persons with OUD and any co-occurring SUD/MH issues, including medical detox, referral to treatment, or connections to other services or supports.

9. Training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists.

10. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH issues.

11. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

12. Scholarships and supports for certified addiction counselors and other mental and behavioral health providers involved in addressing OUD any co-occurring SUD/MH issues, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

13. Provide training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

16. Support State or local learning collaboratives so that physicians involved in the care and treatment of those with OUD are kept abreast of the latest developments in evidence-based treatment.

17. Support State or local drop-in centers where those with OUD may go to seek assistance with recovery when they are ready to begin the process.

18. Support creation of teams in hospitals and emergency rooms to work with those with OUD and direct them to appropriate facilities for evidence-based treatment of OUD, including MAT.

B. **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

1. Provide the full continuum of care of recovery services for OUD and any co-occurring SUD/MH issues, including supportive housing, residential treatment, medical detox services, peer support services and counseling, community navigators, case management, and connections to community-based services.

2. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH issues.

3. Provide access to housing for people with OUD and any co-occurring SUD/MH issues, including supportive housing, housing assistance programs, or training for housing providers.

4. Provide community support services to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH issues

5. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH issues.

6. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH issues.

7. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH issues.

8. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

9. Engage non-profits, the faith community, and community coalitions to support people in treatment and recovery and to support family members in their efforts to manage the opioid user in the family.

10. Training and development of procedures for government staff to appropriately interact and provide social and other services to current and recovering opioid users, including reducing stigma.

11. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

### C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs and appropriate training for all health care providers  to identify those with potential problems in order to reduce the transition from use to disorders.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

6. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH issues, or persons who have experienced an opioid overdose, into community treatment or recovery services through a bridge clinic or similar approach.

7. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH issues or persons that have experienced an opioid overdose.

8. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

9. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH issues or to persons who have experienced an opioid overdose.

10. Provide funding for peer navigators, recovery coaches, care coordinators, or care managers that offer assistance to persons with OUD and any co-occurring SUD/MH issues or to persons who have experienced on opioid overdose.

11. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

12. Develop and support best practices on addressing OUD in the workplace.

13. Support assistance programs for health care providers with OUD.

14. Engage non-profits and the faith community as a system to support outreach for treatment.

15. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH issues.

16. Develop or support a National Treatment Availability Clearinghouse – a multistate/nationally accessible database whereby health care providers can list locations for currently available in-patient and out-patient OUD treatment services that are accessible on a real-time basis by persons who seek treatment.

## D. ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS AND RURAL COUNTY UNATTENDED DEATHS

1. Address the needs of persons with OUD and any co-occurring SUD/MH issues who are involved or are at risk of becoming involved in the criminal justice system.

2. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH issues, including established strategies such as:

   a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   c. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model; or

   e. Officer intervention strategies.

3. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH issues to evidence-informed treatment, including MAT, and related services.

4. Implementing or supporting pilot programs for the voluntary testing of individuals who enter local (city or county) criminal justice facilities, and for those identified with OUD, offer induction of evidence-based treatment, including MAT.

5. Support treatment and recovery courts for persons with OUD and any co-occurring SUD/MH issues, but only if they provide referrals to evidence-informed treatment, including MAT.

6. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH issues who are incarcerated in jail or prison.

7. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH issues who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

8. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

9. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH issues to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section;

10. Provide training to Justices of the Peace on unattended deaths involving drug use and reimbursement of transfer to and costs or expenses of a Medical Examiner to enhance better death understanding, statistics and recording on overdose involved deaths.

E. **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

1. Support evidence-informed, promising, or emerging treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH issues.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs and training for all health care providers to identify women with potential opioid

use disorder so that they might be given the option of referral to a proper treatment program.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH issues.

4. Other measures to address Neonatal Abstinence Syndrome, including prevention, education, and treatment of OUD and any co-occurring SUD/MH issues.

5. Provide training to health care providers that work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family support for parenting women with OUD and any co-occurring SUD/MH issues.

7. Enhanced family supports and childcare services for parents with OUD and any co-occurring SUD/MH issues.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH issues, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

11. Provision of education and psychosocial support services to children born with Neonatal Abstinance Syndrome.

12. Support family and baby reunification in recovery housing.

PART TWO:  PREVENTION

**F.  PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

1.  Trainingand continuing education of health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

2.  Academic counter-detailing to educate prescribers on appropriate opioid prescribing.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    a.  Increase the number of prescribers using PDMPs;

    b.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    c.  Enable states to use PDMP data in support of surveillance or intervention strategies.

6.  Development and implementation of a national PDMP – Fund development of a multistate/national PDMP that permits information sharing while providing appropriate safeguards on sharing of private health information, including but not limited to:

    a.  Integration of PDMP data with electronic health records, overdose episodes, and decision support tools for health care providers relating to OUD.

    b.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database.

7.  Increase electronic prescribing to prevent diversion or forgery

8.  Educate Dispensers on appropriate opioid dispensing.

9.  Develop and train physicians on algorithm for proper evidence-based pain management.

10.     Fund State or local hotline so health care providers with questions regarding proper pain management or opioid prescribing can call and have an expert answer their questions.

11. Support for health information systems consistent with State regulations.

**G.  PREVENT MISUSE OF OPIOIDS**

1. Corrective advertising or affirmative public education campaigns.

2. Public education relating to drug disposal.

3. Drug take-back disposal or destruction programs.

4. Fund community anti-drug coalitions that engage in drug prevention efforts.

5. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

6. Engage non-profits and faith community as a system to support prevention.

7. School and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

8. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

9. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

10. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

11. Support local law enforcement task forces aimed at disrupting and eliminating the manufacturers and distributers of illegal opioids.

**H.  PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

1.  Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, opioid users, families and friends of opioid users, schools, community navigators and outreach workers, drug offenders upon release from jail/prison, or other members of the general public.

2.  Public health entities provide free naloxone and training to anyone in the community.

3.  Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, and other members of the general public.

4.  Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.  Public education relating to emergency responses to overdoses.

7.  Public education relating to immunity and Good Samaritan laws.

8.  Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.  Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH issues.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH issues.

10

<div style="border:1px solid black; text-align:center; padding:10px;">

PART THREE:  OTHER STRATEGIES

</div>

**I.  FIRST RESPONDERS**

1.  Law enforcement expenditures relating to the opioid epidemic.

2.  Educate first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

**J.  LEADERSHIP, PLANNING AND COORDINATION**

1.  Community regional planning to identify goals for reducing harms related to the opioid epidemic, to identify areas and populations with the greatest needs for treatment intervention services, or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.  A government dashboard to track key opioid-related indicators and supports as identified through collaborative community processes.

3.  Invest in infrastructure or staffing at government and not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH issues, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

**K.  TRAINING**

1.  Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH issues, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.);

3.  Medical Provider education;

4.  Media Campaigns

**L.  RESEARCH**

11

1. Support opioid abatement research, including but not limited to:

   a. Monitoring, surveillance, and evaluation of programs and strategies described in this opioid abatement strategy list.

   b. Research non-opioid treatment of chronic pain.

   c. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

   d. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

   e. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

   f. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

   g. Research on expanded modalities such as prescription methadone that can expand access to MAT;

   h. Research on the effectiveness of Recovery High Schools and other educational interventions;

   i. Research to track abatement progress in urban and rural areas.

M.  MISCELLANEOUS

1. It is the intent of the Parties to the Texas Term Sheet in adopting the Abatement Strategies herein that the Council be guided by the allocation methodology in Exhibit C to the Texas Term Sheet in approving Regional strategies and that the Council consider the proportional share of the individual members in each Region when allocating the funds for approved abatement strategies within each Region.

2. It is the intent of the Parties to the Texas Term Sheet in adopting the Abatement Strategies herein that the Opioid Council have the flexibility to add, change or alter the Abatement Strategies herein as necessary to fulfill the intent that opioid abatement strategies best meet the needs of the Regions, subdivisions and intent of this document.

# EXHIBIT B

Exhibit B: Municipal Area Allocations: 15% of Total ($150 million)

(County numbers refer to distribution to the county governments after payment to cities within county borders has been made. Minimum distribution to each county is $1000.)

| Municipal Area | Allocation | Municipal Area | Allocation |
|---|---|---|---|
| Abbott | $688 | Lakeport | $463 |
| Abernathy | $110 | Lakeside | $4,474 |
| Abilene | $563,818 | Lakeside City | $222 |
| Ackerly | $21 | Lakeview | $427 |
| Addison | $58,094 | Lakeway | $31,657 |
| Adrian | $181 | Lakewood Village | $557 |
| Agua Dulce | $43 | Lamar County | $141,598 |
| Alamo | $22,121 | Lamb County | $50,681 |
| Alamo Heights | $28,198 | Lamesa | $29,656 |
| Alba | $3,196 | Lampasas | $28,211 |
| Albany | $180 | Lampasas County | $42,818 |
| Aledo | $331 | Lancaster | $90,653 |
| Alice | $71,291 | Laredo | $763,174 |
| Allen | $315,081 | Latexo | $124 |
| Alma | $1,107 | Lavaca County | $45,973 |
| Alpine | $29,686 | Lavon | $7,435 |
| Alto | $3,767 | Lawn | $58 |
| Alton | $11,540 | League City | $302,418 |
| Alvarado | $29,029 | Leakey | $256 |
| Alvin | $113,962 | Leander | $88,641 |
| Alvord | $358 | Leary | $797 |
| Amarillo | $987,661 | Lee County | $30,457 |
| Ames | $5,571 | Lefors | $159 |
| Amherst | $22 | Leon County | $67,393 |
| Anahuac | $542 | Leon Valley | $23,258 |
| Anderson | $19 | Leona | $883 |
| Anderson County | $268,763 | Leonard | $8,505 |
| Andrews | $18,983 | Leroy | $176 |
| Andrews County | $37,606 | Levelland | $46,848 |
| Angelina County | $229,956 | Lewisville | $382,094 |
| Angleton | $62,791 | Lexington | $2,318 |
| Angus | $331 | Liberty | $72,343 |
| Anna | $9,075 | Liberty County | $531,212 |
| Annetta | $5,956 | Liberty Hill | $2,780 |
| Annetta North | $34 | Limestone County | $135,684 |

(Table continues on multiple pages below)

| | | | |
|---|---|---|---|
| Annetta South | $602 | Lincoln Park | $677 |
| Annona | $738 | Lindale | $24,202 |
| Anson | $5,134 | Linden | $3,661 |
| Anthony | $4,514 | Lindsay | $1,228 |
| Anton | $444 | Lipan | $44 |
| Appleby | $1,551 | Lipscomb County | $10,132 |
| Aquilla | $208 | Little Elm | $69,326 |
| Aransas County | $266,512 | Little River-Academy | $798 |
| Aransas Pass | $57,813 | Littlefield | $7,678 |
| Archer City | $10,554 | Live Oak | $32,740 |
| Archer County | $45,534 | Live Oak County | $39,716 |
| Arcola | $7,290 | Liverpool | $1,435 |
| Argyle | $11,406 | Livingston | $73,165 |
| Arlington | $735,803 | Llano | $23,121 |
| Armstrong County | $974 | Llano County | $115,647 |
| Arp | $2,009 | Lockhart | $49,050 |
| Asherton | $112 | Lockney | $3,301 |
| Aspermont | $9 | Log Cabin | $1,960 |
| Atascosa County | $176,903 | Lometa | $1,176 |
| Athens | $105,942 | Lone Oak | $1,705 |
| Atlanta | $30,995 | Lone Star | $8,283 |
| Aubrey | $15,141 | Longview | $482,254 |
| Aurora | $1,849 | Loraine | $188 |
| Austin County | $76,030 | Lorena | $3,390 |
| Austin | $4,877,716 | Lorenzo | $11,358 |
| Austwell | $109 | Los Fresnos | $11,185 |
| Avery | $138 | Los Indios | $159 |
| Avinger | $1,115 | Los Ybanez | $0 |
| Azle | $32,213 | Lott | $1,516 |
| Bailey | $950 | Lovelady | $249 |
| Bailey County | $15,377 | Loving County | $1,000 |
| Bailey's Prairie | $5,604 | Lowry Crossing | $783 |
| Baird | $2,802 | Lubbock | $319,867 |
| Balch Springs | $27,358 | Lubbock County | $1,379,719 |
| Balcones Heights | $23,811 | Lucas | $5,266 |
| Ballinger | $9,172 | Lueders | $508 |
| Balmorhea | $63 | Lufkin | $281,592 |
| Bandera | $2,893 | Luling | $29,421 |
| Bandera County | $86,815 | Lumberton | $36,609 |
| Bangs | $3,050 | Lyford | $3,071 |

| | | | |
|---|---|---|---|
| Bardwell | $362 | Lynn County | $6,275 |
| Barry | $200 | Lytle | $7,223 |
| Barstow | $61 | Mabank | $19,443 |
| Bartlett | $3,374 | Madison County | $49,492 |
| Bartonville | $8,887 | Madisonville | $11,458 |
| Bastrop | $46,320 | Magnolia | $26,031 |
| Bastrop County | $343,960 | Malakoff | $12,614 |
| Bay City | $57,912 | Malone | $439 |
| Baylor County | $29,832 | Manor | $12,499 |
| Bayou Vista | $6,240 | Mansfield | $150,788 |
| Bayside | $242 | Manvel | $12,305 |
| Baytown | $216,066 | Marble Falls | $37,039 |
| Bayview | $41 | Marfa | $65 |
| Beach City | $12,505 | Marietta | $338 |
| Bear Creek | $906 | Marion | $275 |
| Beasley | $130 | Marion County | $54,728 |
| Beaumont | $683,010 | Marlin | $21,634 |
| Beckville | $1,247 | Marquez | $1,322 |
| Bedford | $94,314 | Marshall | $108,371 |
| Bedias | $3,475 | Mart | $928 |
| Bee Cave | $12,863 | Martin County | $10,862 |
| Bee County | $97,844 | Martindale | $2,437 |
| Beeville | $24,027 | Mason | $777 |
| Bell County | $650,748 | Mason County | $3,134 |
| Bellaire | $41,264 | Matador | $1,203 |
| Bellevue | $56 | Matagorda County | $135,239 |
| Bellmead | $14,487 | Mathis | $15,720 |
| Bells | $1,891 | Maud | $423 |
| Bellville | $7,488 | Maverick County | $115,919 |
| Belton | $72,680 | Maypearl | $986 |
| Benavides | $152 | McAllen | $364,424 |
| Benbrook | $43,919 | McCamey | $542 |
| Benjamin | $951 | McGregor | $9,155 |
| Berryville | $14,379 | McKinney | $450,383 |
| Bertram | $182 | McLean | $14 |
| Beverly Hills | $4,336 | McLendon-Chisholm | $411 |
| Bevil Oaks | $549 | Mcculloch County | $20,021 |
| Bexar County | $7,007,152 | Mclennan County | $529,641 |
| Big Lake | $547 | Mcmullen County | $1,000 |
| Big Sandy | $4,579 | Meadow | $1,121 |

| | | | |
|---|---|---|---|
| Big Spring | $189,928 | Meadowlakes | $905 |
| Big Wells | $236 | Meadows Place | $18,148 |
| Bishop | $8,213 | Medina County | $48,355 |
| Bishop Hills | $323 | Megargel | $611 |
| Blackwell | $31 | Melissa | $15,381 |
| Blanco | $6,191 | Melvin | $345 |
| Blanco County | $49,223 | Memphis | $7,203 |
| Blanket | $147 | Menard | $991 |
| Bloomburg | $1,010 | Menard County | $14,717 |
| Blooming Grove | $352 | Mercedes | $21,441 |
| Blossom | $198 | Meridian | $3,546 |
| Blue Mound | $2,888 | Merkel | $10,117 |
| Blue Ridge | $1,345 | Mertens | $239 |
| Blum | $1,622 | Mertzon | $29 |
| Boerne | $45,576 | Mesquite | $310,709 |
| Bogata | $3,649 | Mexia | $21,096 |
| Bonham | $100,909 | Miami | $455 |
| Bonney | $2,510 | Midland County | $279,927 |
| Booker | $1,036 | Midland | $521,849 |
| Borden County | $1,000 | Midlothian | $95,799 |
| Borger | $69,680 | Midway | $78 |
| Bosque County | $71,073 | Milam County | $97,386 |
| Bovina | $173 | Milano | $904 |
| Bowie | $83,620 | Mildred | $286 |
| Bowie County | $233,190 | Miles | $93 |
| Boyd | $6,953 | Milford | $6,177 |
| Brackettville | $8 | Miller's Cove | $97 |
| Brady | $27,480 | Millican | $417 |
| Brazoria | $11,537 | Mills County | $19,931 |
| Brazoria County | $1,021,090 | Millsap | $34 |
| Brazos Bend | $462 | Mineola | $48,719 |
| Brazos Country | $902 | Mineral Wells | $92,061 |
| Brazos County | $342,087 | Mingus | $189 |
| Breckenridge | $23,976 | Mission | $124,768 |
| Bremond | $5,554 | Missouri City | $209,633 |
| Brenham | $54,750 | Mitchell County | $20,850 |
| Brewster County | $60,087 | Mobeetie | $52 |
| Briarcliff | $572 | Mobile City | $2,034 |
| Briaroaks | $57 | Monahans | $5,849 |
| Bridge City | $80,756 | Mont Belvieu | $19,669 |

| | | | |
|---|---|---|---|
| Bridgeport | $33,301 | Montague County | $94,796 |
| Briscoe County | $977 | Montgomery | $1,884 |
| Broaddus | $31 | Montgomery County | $2,700,911 |
| Bronte | $99 | Moody | $828 |
| Brooks County | $20,710 | Moore County | $40,627 |
| Brookshire | $6,406 | Moore Station | $772 |
| Brookside Village | $1,110 | Moran | $50 |
| Brown County | $193,417 | Morgan | $605 |
| Browndell | $152 | Morgan's Point | $3,105 |
| Brownfield | $14,452 | Morgan's Point Resort | $8,024 |
| Brownsboro | $3,176 | Morris County | $53,328 |
| Brownsville | $425,057 | Morton | $167 |
| Brownwood | $166,572 | Motley County | $3,344 |
| Bruceville-Eddy | $1,692 | Moulton | $999 |
| Bryan | $246,897 | Mount Calm | $605 |
| Bryson | $1,228 | Mount Enterprise | $1,832 |
| Buckholts | $1,113 | Mount Pleasant | $65,684 |
| Buda | $10,784 | Mount Vernon | $6,049 |
| Buffalo | $11,866 | Mountain City | $1,548 |
| Buffalo Gap | $88 | Muenster | $4,656 |
| Buffalo Springs | $188 | Muleshoe | $4,910 |
| Bullard | $7,487 | Mullin | $384 |
| Bulverde | $14,436 | Munday | $2,047 |
| Bunker Hill Village | $472 | Murchison | $2,302 |
| Burkburnett | $37,844 | Murphy | $51,893 |
| Burke | $1,114 | Mustang | $7 |
| Burleson County | $70,244 | Mustang Ridge | $2,462 |
| Burleson | $151,779 | Nacogdoches | $205,992 |
| Burnet | $33,345 | Nacogdoches County | $198,583 |
| Burnet County | $189,829 | Naples | $4,224 |
| Burton | $937 | Nash | $7,999 |
| Byers | $77 | Nassau Bay | $11,247 |
| Bynum | $380 | Natalia | $625 |
| Cactus | $4,779 | Navarro | $334 |
| Caddo Mills | $43 | Navarro County | $103,513 |
| Caldwell | $18,245 | Navasota | $37,676 |
| Caldwell County | $86,413 | Nazareth | $124 |
| Calhoun County | $127,926 | Nederland | $44,585 |
| Callahan County | $12,894 | Needville | $10,341 |
| Callisburg | $101 | Nevada | $237 |

| | | | |
|---|---|---|---|
| Calvert | $772 | New Berlin | $4 |
| Cameron | $11,091 | New Boston | $6,953 |
| Cameron County | $537,026 | New Braunfels | $307,313 |
| Camp County | $28,851 | New Chapel Hill | $288 |
| Camp Wood | $422 | New Deal | $338 |
| Campbell | $1,116 | New Fairview | $2,334 |
| Canadian | $1,090 | New Home | $9 |
| Caney City | $2,005 | New Hope | $1,024 |
| Canton | $56,734 | New London | $4,129 |
| Canyon | $26,251 | New Summerfield | $442 |
| Carbon | $620 | New Waverly | $2,562 |
| Carl's Corner | $48 | Newark | $520 |
| Carmine | $385 | Newcastle | $914 |
| Carrizo Springs | $1,671 | Newton | $6,102 |
| Carrollton | $310,255 | Newton County | $158,006 |
| Carson County | $29,493 | Neylandville | $163 |
| Carthage | $18,927 | Niederwald | $16 |
| Cashion Community | $322 | Nixon | $2,283 |
| Cass County | $93,155 | Nocona | $16,536 |
| Castle Hills | $12,780 | Nolan County | $50,262 |
| Castro County | $4,420 | Nolanville | $4,247 |
| Castroville | $4,525 | Nome | $391 |
| Cedar Hill | $70,127 | Noonday | $226 |
| Cedar Park | $185,567 | Nordheim | $697 |
| Celeste | $1,280 | Normangee | $6,192 |
| Celina | $18,283 | North Cleveland | $105 |
| Center | $58,838 | North Richland Hills | $146,419 |
| Centerville | $385 | Northlake | $8,905 |
| Chambers County | $153,188 | Novice | $76 |
| Chandler | $17,364 | Nueces County | $1,367,932 |
| Channing | $2 | O'Brien | $76 |
| Charlotte | $4,257 | O'Donnell | $27 |
| Cherokee County | $156,612 | Oak Grove | $2,769 |
| Chester | $1,174 | Oak Leaf | $612 |
| Chico | $2,928 | Oak Point | $9,011 |
| Childress | $37,916 | Oak Ridge | $358 |
| Childress County | $50,582 | Oak Ridge North | $33,512 |
| Chillicothe | $172 | Oak Valley | $7 |
| China | $522 | Oakwood | $148 |
| China Grove | $598 | Ochiltree County | $15,476 |

| | | | |
|---|---|---|---|
| Chireno | $1,568 | Odem | $7,420 |
| Christine | $354 | Odessa | $559,163 |
| Cibolo | $13,690 | Oglesby | $29 |
| Cisco | $7,218 | Old River-Winfree | $21,653 |
| Clarendon | $114 | Oldham County | $10,318 |
| Clarksville | $20,891 | Olmos Park | $9,801 |
| Clarksville City | $54 | Olney | $6,088 |
| Claude | $26 | Olton | $1,197 |
| Clay County | $72,050 | Omaha | $4,185 |
| Clear Lake Shores | $6,682 | Onalaska | $31,654 |
| Cleburne | $228,184 | Opdyke West | $479 |
| Cleveland | $96,897 | Orange | $311,339 |
| Clifton | $9,939 | Orange County | $689,818 |
| Clint | $375 | Orange Grove | $1,677 |
| Clute | $51,350 | Orchard | $867 |
| Clyde | $17,287 | Ore City | $6,806 |
| Coahoma | $2,291 | Overton | $7,900 |
| Cochran County | $3,389 | Ovilla | $13,391 |
| Cockrell Hill | $512 | Oyster Creek | $9,633 |
| Coffee City | $1,087 | Paducah | $125 |
| Coke County | $5,522 | Paint Rock | $141 |
| Coldspring | $447 | Palacios | $14,036 |
| Coleman | $5,442 | Palestine | $178,009 |
| Coleman County | $4,164 | Palisades | $240 |
| College Station | $258,147 | Palm Valley | $1,918 |
| Colleyville | $46,049 | Palmer | $12,666 |
| Collin County | $1,266,721 | Palmhurst | $4,660 |
| Collingsworth County | $19,234 | Palmview | $7,577 |
| Collinsville | $1,831 | Palo Pinto County | $124,621 |
| Colmesneil | $2,211 | Pampa | $67,227 |
| Colorado City | $8,405 | Panhandle | $9,536 |
| Colorado County | $49,084 | Panola County | $80,699 |
| Columbus | $6,867 | Panorama Village | $1,292 |
| Comal County | $396,142 | Pantego | $12,898 |
| Comanche | $16,503 | Paradise | $52 |
| Comanche County | $50,964 | Paris | $201,180 |
| Combes | $1,710 | Parker | $10,307 |
| Combine | $1,892 | Parker County | $476,254 |
| Commerce | $33,869 | Parmer County | $15,866 |
| Como | $415 | Pasadena | $356,536 |

| | | | |
|---|---|---|---|
| Concho County | $3,859 | Pattison | $1,148 |
| Conroe | $466,671 | Patton Village | $9,268 |
| Converse | $27,693 | Payne Springs | $1,770 |
| Cooke County | $200,451 | Pearland | $333,752 |
| Cool | $731 | Pearsall | $11,570 |
| Coolidge | $243 | Pecan Gap | $719 |
| Cooper | $362 | Pecan Hill | $229 |
| Coppell | $86,593 | Pecos | $7,622 |
| Copper Canyon | $489 | Pecos County | $46,997 |
| Copperas Cove | $133,492 | Pelican Bay | $1,199 |
| Corinth | $75,298 | Penelope | $415 |
| Corpus Christi | $1,812,707 | Penitas | $312 |
| Corral City | $143 | Perryton | $23,364 |
| Corrigan | $21,318 | Petersburg | $1,691 |
| Corsicana | $87,310 | Petrolia | $17 |
| Coryell County | $123,659 | Petronila | $5 |
| Cottle County | $875 | Pflugerville | $86,408 |
| Cottonwood | $289 | Pharr | $144,721 |
| Cottonwood Shores | $1,203 | Pilot Point | $11,613 |
| Cotulla | $1,251 | Pine Forest | $3,894 |
| Coupland | $266 | Pine Island | $3,141 |
| Cove | $387 | Pinehurst | $32,671 |
| Covington | $519 | Pineland | $4,138 |
| Coyote Flats | $1,472 | Piney Point Village | $15,738 |
| Crandall | $12,094 | Pittsburg | $20,526 |
| Crane | $10,599 | Plains | $129 |
| Crane County | $26,146 | Plainview | $60,298 |
| Cranfills Gap | $128 | Plano | $1,151,608 |
| Crawford | $383 | Pleak | $270 |
| Creedmoor | $16 | Pleasant Valley | $308 |
| Cresson | $1,086 | Pleasanton | $29,011 |
| Crockett | $23,403 | Plum Grove | $258 |
| Crockett County | $18,210 | Point | $1,519 |
| Crosby County | $18,388 | Point Blank | $355 |
| Crosbyton | $1,498 | Point Comfort | $447 |
| Cross Plains | $4,877 | Point Venture | $588 |
| Cross Roads | $244 | Polk County | $370,831 |
| Cross Timber | $542 | Ponder | $1,282 |
| Crowell | $6,335 | Port Aransas | $31,022 |
| Crowley | $22,345 | Port Arthur | $367,945 |

| | | | |
|---|---|---|---|
| Crystal City | $19,412 | Port Isabel | $9,802 |
| Cuero | $24,689 | Port Lavaca | $11,752 |
| Culberson County | $789 | Port Neches | $38,849 |
| Cumby | $5,320 | Portland | $76,517 |
| Cuney | $606 | Post | $2,332 |
| Cushing | $1,120 | Post Oak Bend City | $1,034 |
| Cut and Shoot | $2,141 | Poteet | $6,767 |
| DISH | $19 | Poth | $3,974 |
| Daingerfield | $12,476 | Potter County | $371,701 |
| Daisetta | $5,370 | Pottsboro | $12,302 |
| Dalhart | $11,609 | Powell | $110 |
| Dallam County | $21,686 | Poynor | $1,180 |
| Dallas County | $8,538,291 | Prairie View | $7,600 |
| Dallas | $2,999,902 | Premont | $3,321 |
| Dalworthington Gardens | $6,060 | Presidio | $148 |
| Danbury | $4,231 | Presidio County | $787 |
| Darrouzett | $101 | Primera | $2,958 |
| Dawson | $600 | Princeton | $19,245 |
| Dawson County | $46,911 | Progreso | $8,072 |
| Dayton | $47,122 | Progreso Lakes | $39 |
| Dayton Lakes | $38 | Prosper | $22,770 |
| De Kalb | $1,035 | Providence Village | $508 |
| De Leon | $8,218 | Putnam | $14 |
| De Witt County | $68,895 | Pyote | $22 |
| DeCordova | $13,778 | Quanah | $207 |
| DeSoto | $72,400 | Queen City | $4,837 |
| Deaf Smith County | $34,532 | Quinlan | $7,304 |
| Dean | $141 | Quintana | $492 |
| Decatur | $56,669 | Quitaque | $8 |
| Deer Park | $49,388 | Quitman | $15,619 |
| Del Rio | $59,056 | Rains County | $53,190 |
| Dell City | $15 | Ralls | $3,967 |
| Delta County | $30,584 | Rancho Viejo | $3,836 |
| Denison | $210,426 | Randall County | $278,126 |
| Denton | $458,334 | Ranger | $12,186 |
| Denton County | $1,132,298 | Rankin | $1,613 |
| Denver City | $2,104 | Ransom Canyon | $930 |
| Deport | $42 | Ravenna | $685 |
| Detroit | $965 | Raymondville | $7,466 |
| Devers | $191 | Reagan County | $25,215 |

| | | | |
|---|---|---|---|
| Devine | $4,354 | Real County | $5,073 |
| Diboll | $25,533 | Red Lick | $23 |
| Dickens | $71 | Red Oak | $26,843 |
| Dickens County | $1,873 | Red River County | $29,306 |
| Dickinson | $83,683 | Redwater | $1,058 |
| Dilley | $2,633 | Reeves County | $103,350 |
| Dimmit County | $33,294 | Refugio | $8,839 |
| Dimmitt | $1,012 | Refugio County | $46,216 |
| Dodd City | $1,211 | Reklaw | $1,136 |
| Dodson | $447 | Reno | $3,791 |
| Domino | $196 | Reno | $11,164 |
| Donley County | $22,370 | Retreat | $52 |
| Donna | $13,798 | Rhome | $12,285 |
| Dorchester | $231 | Rice | $1,972 |
| Double Oak | $4,765 | Richardson | $260,315 |
| Douglassville | $574 | Richland | $210 |
| Dripping Springs | $811 | Richland Hills | $24,438 |
| Driscoll | $39 | Richland Springs | $2,234 |
| Dublin | $14,478 | Richmond | $77,606 |
| Dumas | $26,229 | Richwood | $12,112 |
| Duncanville | $58,328 | Riesel | $1,118 |
| Duval County | $49,109 | Rio Bravo | $8,548 |
| Eagle Lake | $4,882 | Rio Grande City | $25,947 |
| Eagle Pass | $56,005 | Rio Hondo | $3,550 |
| Early | $14,838 | Rio Vista | $4,419 |
| Earth | $242 | Rising Star | $1,933 |
| East Bernard | $5,554 | River Oaks | $11,917 |
| East Mountain | $2,494 | Riverside | $858 |
| East Tawakoni | $2,723 | Roanoke | $275 |
| Eastland | $15,896 | Roaring Springs | $461 |
| Eastland County | $52,275 | Robert Lee | $85 |
| Easton | $329 | Roberts County | $547 |
| Ector | $1,108 | Robertson County | $44,642 |
| Ector County | $480,000 | Robinson | $18,002 |
| Edcouch | $4,101 | Robstown | $40,154 |
| Eden | $497 | Roby | $428 |
| Edgecliff Village | $2,232 | Rochester | $674 |
| Edgewood | $13,154 | Rockdale | $20,973 |
| Edinburg | $120,884 | Rockport | $54,253 |
| Edmonson | $136 | Rocksprings | $25 |

| | | | |
|---|---|---|---|
| Edna | $18,194 | Rockwall | $114,308 |
| Edom | $2,149 | Rockwall County | $168,820 |
| Edwards County | $975 | Rocky Mound | $280 |
| El Campo | $31,700 | Rogers | $3,818 |
| El Cenizo | $621 | Rollingwood | $4,754 |
| El Lago | $5,604 | Roma | $16,629 |
| El Paso | $1,224,371 | Roman Forest | $8,610 |
| El Paso County | $2,592,121 | Ropesville | $2,122 |
| Eldorado | $50 | Roscoe | $778 |
| Electra | $15,716 | Rose City | $4,012 |
| Elgin | $26,284 | Rose Hill Acres | $2,311 |
| Elkhart | $301 | Rosebud | $1,489 |
| Ellis County | $315,372 | Rosenberg | $126,593 |
| Elmendorf | $746 | Ross | $147 |
| Elsa | $7,720 | Rosser | $549 |
| Emhouse | $83 | Rotan | $1,493 |
| Emory | $3,878 | Round Mountain | $454 |
| Enchanted Oaks | $1,299 | Round Rock | $475,992 |
| Encinal | $1,515 | Round Top | $140 |
| Ennis | $81,839 | Rowlett | $99,963 |
| Erath County | $102,616 | Roxton | $47 |
| Escobares | $40 | Royse City | $23,494 |
| Estelline | $909 | Rule | $800 |
| Euless | $92,824 | Runaway Bay | $6,931 |
| Eureka | $334 | Runge | $255 |
| Eustace | $2,089 | Runnels County | $33,831 |
| Evant | $2,068 | Rusk | $17,991 |
| Everman | $7,692 | Rusk County | $151,390 |
| Fair Oaks Ranch | $8,077 | Sabinal | $1,811 |
| Fairchilds | $81 | Sabine County | $46,479 |
| Fairfield | $1,245 | Sachse | $23,400 |
| Fairview | $32,245 | Sadler | $925 |
| Falfurrias | $2,221 | Saginaw | $31,973 |
| Falls City | $41 | Salado | $3,210 |
| Falls County | $34,522 | San Angelo | $536,509 |
| Fannin County | $131,653 | San Antonio | $4,365,416 |
| Farmers Branch | $94,532 | San Augustine | $25,182 |
| Farmersville | $10,532 | San Augustine County | $37,854 |
| Farwell | $343 | San Benito | $40,015 |
| Fate | $3,473 | San Diego | $11,771 |

| | | | |
|---|---|---|---|
| Fayette County | $92,440 | San Elizario | $7,831 |
| Fayetteville | $391 | San Felipe | $1,498 |
| Ferris | $13,873 | San Jacinto County | $197,398 |
| Fisher County | $5,518 | San Juan | $28,845 |
| Flatonia | $5,661 | San Leanna | $36 |
| Florence | $3,949 | San Marcos | $325,688 |
| Floresville | $21,699 | San Patricio | $4,213 |
| Flower Mound | $215,256 | San Patricio County | $271,916 |
| Floyd County | $9,049 | San Perlita | $2,219 |
| Floydada | $6,357 | San Saba | $10,057 |
| Foard County | $5,764 | San Saba County | $17,562 |
| Follett | $212 | Sanctuary | $17 |
| Forest Hill | $26,132 | Sandy Oaks | $9,863 |
| Forney | $80,112 | Sandy Point | $1,637 |
| Forsan | $576 | Sanford | $308 |
| Fort Bend County | $1,506,719 | Sanger | $22,237 |
| Fort Stockton | $4,411 | Sansom Park | $223 |
| Fort Worth | $2,120,790 | Santa Anna | $329 |
| Franklin | $3,931 | Santa Clara | $87 |
| Franklin County | $25,783 | Santa Fe | $33,272 |
| Frankston | $274 | Santa Rosa | $2,138 |
| Fredericksburg | $56,486 | Savoy | $2,349 |
| Freeport | $72,973 | Schertz | $60,110 |
| Freer | $3,271 | Schleicher County | $5,695 |
| Freestone County | $50,495 | Schulenburg | $2,560 |
| Friendswood | $140,330 | Scotland | $148 |
| Frio County | $19,954 | Scottsville | $708 |
| Friona | $2,848 | Scurry | $1,110 |
| Frisco | $405,309 | Scurry County | $73,116 |
| Fritch | $4,548 | Seabrook | $30,270 |
| Frost | $321 | Seadrift | $991 |
| Fruitvale | $2,344 | Seagoville | $17,106 |
| Fulshear | $5,272 | Seagraves | $7,531 |
| Fulton | $1,602 | Sealy | $20,637 |
| Gaines County | $54,347 | Seguin | $376,538 |
| Gainesville | $153,980 | Selma | $22,429 |
| Galena Park | $13,093 | Seminole | $16,092 |
| Gallatin | $1,253 | Seven Oaks | $3,917 |
| Galveston | $488,187 | Seven Points | $7,452 |
| Galveston County | $1,124,093 | Seymour | $14,218 |

| | | | |
|---|---|---|---|
| Ganado | $5,510 | Shackelford County | $1,288 |
| Garden Ridge | $11,351 | Shady Shores | $594 |
| Garland | $420,244 | Shallowater | $1,907 |
| Garrett | $2,510 | Shamrock | $4,328 |
| Garrison | $3,555 | Shavano Park | $3,178 |
| Gary City | $450 | Shelby County | $109,925 |
| Garza County | $8,944 | Shenandoah | $47,122 |
| Gatesville | $26,994 | Shepherd | $147 |
| George West | $6,207 | Sherman | $330,585 |
| Georgetown | $225,896 | Sherman County | $7,930 |
| Gholson | $1,505 | Shiner | $4,042 |
| Giddings | $12,674 | Shoreacres | $958 |
| Gillespie County | $63,191 | Silsbee | $66,442 |
| Gilmer | $33,951 | Silverton | $14 |
| Gladewater | $24,638 | Simonton | $1,906 |
| Glasscock County | $1,000 | Sinton | $23,658 |
| Glen Rose | $540 | Skellytown | $400 |
| Glenn Heights | $16,593 | Slaton | $154 |
| Godley | $3,115 | Smiley | $655 |
| Goldsmith | $677 | Smith County | $758,961 |
| Goldthwaite | $1,225 | Smithville | $17,009 |
| Goliad | $3,563 | Smyer | $300 |
| Goliad County | $34,660 | Snook | $1,422 |
| Golinda | $100 | Snyder | $9,018 |
| Gonzales | $14,882 | Socorro | $11,125 |
| Gonzales County | $33,230 | Somerset | $1,527 |
| Goodlow | $221 | Somervell County | $57,076 |
| Goodrich | $9,643 | Somerville | $3,806 |
| Gordon | $365 | Sonora | $7,337 |
| Goree | $749 | Sour Lake | $17,856 |
| Gorman | $3,107 | South Houston | $25,620 |
| Graford | $23 | South Mountain | $154 |
| Graham | $235,428 | South Padre Island | $30,629 |
| Granbury | $71,735 | Southlake | $70,846 |
| Grand Prairie | $445,439 | Southmayd | $7,096 |
| Grand Saline | $36,413 | Southside Place | $885 |
| Grandfalls | $65 | Spearman | $14,000 |
| Grandview | $6,600 | Splendora | $7,756 |
| Granger | $2,741 | Spofford | $7 |
| Granite Shoals | $11,834 | Spring Valley Village | $16,404 |

| | | | |
|---|---|---|---|
| Granjeno | $43 | Springlake | $3 |
| Grapeland | $7,287 | Springtown | $14,244 |
| Grapevine | $129,195 | Spur | $427 |
| Gray County | $65,884 | St. Hedwig | $111 |
| Grays Prairie | $17 | St. Jo | $7,360 |
| Grayson County | $539,083 | St. Paul | $21 |
| Greenville | $203,112 | Stafford | $75,145 |
| Gregg County | $243,744 | Stagecoach | $3,036 |
| Gregory | $4,697 | Stamford | $398 |
| Grey Forest | $474 | Stanton | $3,838 |
| Grimes County | $94,878 | Staples | $19 |
| Groesbeck | $5,745 | Star Harbor | $151 |
| Groom | $965 | Starr County | $99,896 |
| Groves | $40,752 | Stephens County | $35,244 |
| Groveton | $8,827 | Stephenville | $83,472 |
| Gruver | $1,166 | Sterling City | $62 |
| Guadalupe County | $146,824 | Sterling County | $939 |
| Gun Barrel City | $36,302 | Stinnett | $4,097 |
| Gunter | $4,609 | Stockdale | $741 |
| Gustine | $34 | Stonewall County | $1,822 |
| Hackberry | $94 | Stratford | $8,378 |
| Hale Center | $6,042 | Strawn | $987 |
| Hale County | $79,150 | Streetman | $5 |
| Hall County | $8,933 | Sudan | $32 |
| Hallettsville | $6,895 | Sugar Land | $321,561 |
| Hallsburg | $272 | Sullivan City | $6,121 |
| Hallsville | $10,239 | Sulphur Springs | $124,603 |
| Haltom City | $71,800 | Sun Valley | $4 |
| Hamilton | $3,581 | Sundown | $2,592 |
| Hamilton County | $66,357 | Sunnyvale | $3,248 |
| Hamlin | $4,656 | Sunray | $2,571 |
| Hansford County | $16,416 | Sunrise Beach Village | $2,083 |
| Happy | $327 | Sunset Valley | $9,425 |
| Hardeman County | $15,219 | Surfside Beach | $6,530 |
| Hardin | $100 | Sutton County | $6,541 |
| Hardin County | $379,800 | Sweeny | $4,503 |
| Harker Heights | $113,681 | Sweetwater | $68,248 |
| Harlingen | $165,429 | Swisher County | $7,251 |
| Harris County | $14,966,202 | Taft | $5,861 |
| Harrison County | $185,910 | Tahoka | $430 |

| | | | |
|---|---|---|---|
| Hart | $86 | Talco | $372 |
| Hartley County | $786 | Talty | $9,124 |
| Haskell | $10,829 | Tarrant County | $6,171,159 |
| Haskell County | $22,011 | Tatum | $972 |
| Haslet | $1,908 | Taylor | $57,945 |
| Hawk Cove | $674 | Taylor County | $351,078 |
| Hawkins | $7,932 | Taylor Lake Village | $412 |
| Hawley | $931 | Taylor Landing | $153 |
| Hays | $506 | Teague | $1,714 |
| Hays County | $529,489 | Tehuacana | $12 |
| Hearne | $16,824 | Temple | $280,747 |
| Heath | $28,751 | Tenaha | $4,718 |
| Hebron | $687 | Terrell | $148,706 |
| Hedley | $70 | Terrell County | $5,737 |
| Hedwig Village | $13,067 | Terrell Hills | $9,858 |
| Helotes | $15,790 | Terry County | $25,423 |
| Hemphill | $8,035 | Texarkana | $192,094 |
| Hemphill County | $14,394 | Texas City | $298,702 |
| Hempstead | $21,240 | Texhoma | $156 |
| Henderson | $59,966 | Texline | $865 |
| Henderson County | $327,965 | The Colony | $114,297 |
| Henrietta | $2,720 | The Hills | $1,004 |
| Hereford | $20,423 | Thompsons | $1,897 |
| Hewitt | $19,776 | Thorndale | $1,595 |
| Hickory Creek | $16,510 | Thornton | $270 |
| Hico | $5,534 | Thorntonville | $87 |
| Hidalgo | $26,621 | Thrall | $825 |
| Hidalgo County | $1,253,103 | Three Rivers | $4,669 |
| Hideaway | $922 | Throckmorton | $29 |
| Higgins | $43 | Throckmorton County | $5,695 |
| Highland Haven | $320 | Tiki Island | $2,178 |
| Highland Park | $43,383 | Timbercreek Canyon | $369 |
| Highland Village | $50,315 | Timpson | $12,642 |
| Hill Country Village | $6,485 | Tioga | $2,390 |
| Hill County | $127,477 | Tira | $185 |
| Hillcrest | $5,345 | Titus County | $70,611 |
| Hillsboro | $46,609 | Toco | $4 |
| Hilshire Village | $859 | Todd Mission | $1,680 |
| Hitchcock | $28,796 | Tolar | $2,369 |
| Hockley County | $46,407 | Tom Bean | $2,293 |

| | | | |
|---|---|---|---|
| Holiday Lakes | $1,795 | Tom Green County | $282,427 |
| Holland | $77 | Tomball | $34,620 |
| Holliday | $5,910 | Tool | $14,787 |
| Hollywood Park | $9,424 | Toyah | $40 |
| Hondo | $115,288 | Travis County | $4,703,473 |
| Honey Grove | $7,196 | Trent | $63 |
| Hood County | $292,105 | Trenton | $3,089 |
| Hooks | $2,702 | Trinidad | $5,859 |
| Hopkins County | $149,518 | Trinity | $23,652 |
| Horizon City | $7,520 | Trinity County | $105,766 |
| Horseshoe Bay | $48,173 | Trophy Club | $29,370 |
| Houston County | $78,648 | Troup | $7,918 |
| Houston | $7,021,793 | Troy | $5,320 |
| Howard County | $89,330 | Tulia | $8,911 |
| Howardwick | $84 | Turkey | $737 |
| Howe | $9,177 | Tuscola | $138 |
| Hubbard | $3,635 | Tye | $1,766 |
| Hudson | $6,840 | Tyler | $723,829 |
| Hudson Oaks | $15,637 | Tyler County | $131,743 |
| Hudspeth County | $985 | Uhland | $1,545 |
| Hughes Springs | $4,442 | Uncertain | $185 |
| Humble | $73,952 | Union Grove | $994 |
| Hunt County | $309,851 | Union Valley | $666 |
| Hunters Creek Village | $14,708 | Universal City | $28,428 |
| Huntington | $8,792 | University Park | $50,833 |
| Huntsville | $80,373 | Upshur County | $128,300 |
| Hurst | $99,187 | Upton County | $8,499 |
| Hutchins | $9,551 | Uvalde | $18,439 |
| Hutchinson County | $74,630 | Uvalde County | $36,244 |
| Hutto | $38,346 | Val Verde County | $117,815 |
| Huxley | $738 | Valentine | $207 |
| Idalou | $1,999 | Valley Mills | $2,228 |
| Impact | $8 | Valley View | $1,824 |
| Indian Lake | $473 | Van | $6,206 |
| Industry | $604 | Van Alstyne | $43,749 |
| Ingleside on the Bay | $142 | Van Horn | $211 |
| Ingleside | $40,487 | Van Zandt County | $248,747 |
| Ingram | $5,243 | Vega | $974 |
| Iola | $3,164 | Venus | $9,792 |
| Iowa Colony | $4,090 | Vernon | $81,337 |

| | | | |
|---|---|---|---|
| Iowa Park | $23,487 | Victoria | $84,598 |
| Iraan | $56 | Victoria County | $520,886 |
| Iredell | $216 | Vidor | $95,620 |
| Irion County | $9,105 | Vinton | $622 |
| Irving | $427,818 | Volente | $333 |
| Italy | $5,349 | Von Ormy | $513 |
| Itasca | $8,694 | Waco | $512,007 |
| Ivanhoe | $26 | Waelder | $3,427 |
| Jacinto City | $14,141 | Wake Village | $174 |
| Jack County | $14,799 | Walker County | $184,624 |
| Jacksboro | $23,254 | Waller County | $126,206 |
| Jackson County | $37,984 | Waller | $11,295 |
| Jacksonville | $80,179 | Wallis | $2,698 |
| Jamaica Beach | $4,913 | Walnut Springs | $183 |
| Jarrell | $2,423 | Ward County | $67,920 |
| Jasper | $78,422 | Warren City | $66 |
| Jasper County | $248,855 | Washington County | $83,727 |
| Jayton | $63 | Waskom | $5,346 |
| Jeff Davis County | $8,500 | Watauga | $33,216 |
| Jefferson | $11,194 | Waxahachie | $152,094 |
| Jefferson County | $756,614 | Weatherford | $207,872 |
| Jersey Village | $36,347 | Webb County | $505,304 |
| Jewett | $9,338 | Webberville | $1,280 |
| Jim Hogg County | $12,718 | Webster | $53,202 |
| Jim Wells County | $166,539 | Weimar | $5,830 |
| Joaquin | $810 | Weinert | $234 |
| Johnson City | $3,581 | Weir | $443 |
| Johnson County | $408,692 | Wellington | $9,111 |
| Jolly | $26 | Wellman | $383 |
| Jones County | $22,001 | Wells | $1,357 |
| Jones Creek | $5,078 | Weslaco | $73,949 |
| Jonestown | $6,419 | West | $3,522 |
| Josephine | $881 | West Columbia | $17,958 |
| Joshua | $20,619 | West Lake Hills | $17,056 |
| Jourdanton | $9,600 | West Orange | $42,452 |
| Junction | $4,825 | West Tawakoni | $6,995 |
| Justin | $8,575 | West University Place | $34,672 |
| Karnes City | $11,632 | Westbrook | $43 |
| Karnes County | $35,249 | Westlake | $41,540 |
| Katy | $52,467 | Weston | $266 |

| | | | |
|---|---|---|---|
| Kaufman | $27,607 | Weston Lakes | $189 |
| Kaufman County | $353,047 | Westover Hills | $4,509 |
| Keene | $38,296 | Westworth Village | $7,842 |
| Keller | $79,189 | Wharton | $31,700 |
| Kemah | $28,325 | Wharton County | $72,887 |
| Kemp | $6,419 | Wheeler | $447 |
| Kempner | $330 | Wheeler County | $26,273 |
| Kendall County | $100,643 | White Deer | $1,273 |
| Kendleton | $13 | White Oak | $15,305 |
| Kenedy | $676 | White Settlement | $23,304 |
| Kenedy County | $1,000 | Whiteface | $155 |
| Kenefick | $416 | Whitehouse | $29,017 |
| Kennard | $132 | Whitesboro | $18,932 |
| Kennedale | $21,024 | Whitewright | $7,098 |
| Kent County | $939 | Whitney | $73 |
| Kerens | $1,924 | Wichita County | $552,371 |
| Kermit | $5,652 | Wichita Falls | $832,574 |
| Kerr County | $218,452 | Wickett | $87 |
| Kerrville | $190,357 | Wilbarger County | $55,124 |
| Kilgore | $105,583 | Willacy County | $24,581 |
| Killeen | $535,650 | Williamson County | $1,195,987 |
| Kimble County | $20,480 | Willis | $24,384 |
| King County | $1,000 | Willow Park | $26,737 |
| Kingsville | $20,083 | Wills Point | $43,765 |
| Kinney County | $2,142 | Wilmer | $426 |
| Kirby | $8,752 | Wilson | $12 |
| Kirbyville | $10,690 | Wilson County | $121,034 |
| Kirvin | $2 | Wimberley | $724 |
| Kleberg County | $124,109 | Windcrest | $12,908 |
| Knollwood | $1,160 | Windom | $1,087 |
| Knox City | $1,962 | Windthorst | $3,385 |
| Knox County | $11,730 | Winfield | $290 |
| Kosse | $2,468 | Wink | $120 |
| Kountze | $19,716 | Winkler County | $61,163 |
| Kress | $186 | Winnsboro | $28,791 |
| Krugerville | $1,508 | Winona | $319 |
| Krum | $9,661 | Winters | $6,229 |
| Kurten | $686 | Wise County | $289,074 |
| Kyle | $51,835 | Wixon Valley | $441 |
| La Feria | $10,381 | Wolfe City | $5,466 |

| | | | | |
|---|---|---|---|---|
| La Grange | $9,623 | | Wolfforth | $4,022 |
| La Grulla | $1,708 | | Wood County | $267,048 |
| La Joya | $8,457 | | Woodbranch | $9,617 |
| La Marque | $98,930 | | Woodcreek | $358 |
| La Porte | $91,532 | | Woodloch | $1,012 |
| La Salle County | $14,975 | | Woodsboro | $1,130 |
| La Vernia | $3,217 | | Woodson | $122 |
| La Villa | $572 | | Woodville | $20,340 |
| La Ward | $321 | | Woodway | $25,713 |
| LaCoste | $159 | | Wortham | $376 |
| Lacy-Lakeview | $11,599 | | Wylie | $114,708 |
| Ladonia | $2,011 | | Yantis | $2,072 |
| Lago Vista | $13,768 | | Yoakum County | $34,924 |
| Laguna Vista | $3,689 | | Yoakum | $20,210 |
| Lake Bridgeport | $232 | | Yorktown | $5,447 |
| Lake City | $2,918 | | Young County | $44,120 |
| Lake Dallas | $25,314 | | Zapata County | $56,480 |
| Lake Jackson | $75,781 | | Zavala County | $38,147 |
| Lake Tanglewood | $613 | | Zavalla | $1,088 |
| Lake Worth | $20,051 | | | |

# EXHIBIT C

Exhibit C: TX Opioid Council & Health Care Region Allocations plus Administrative Costs
70% of Total ($700 million)

| Health Care Region Allocation*: $693 million; Administrative Costs: $7 million | | |
|---|---|---|
| Region | Counties in Health Care Region | Allocation |
| 1 | Anderson, Bowie, Camp, Cass, Cherokee, Delta, Fannin, Franklin, Freestone, Gregg, Harrison, Henderson, Hopkins, Houston, Hunt, Lamar, Marion, Morris, Panola, Rains, Red, River, Rusk, Smith, Titus, Trinity, Upshur, Van, Zandt, Wood | $38,223,336 |
| 2 | Angelina, Brazoria, Galveston, Hardin, Jasper, Jefferson, Liberty, Nacogdoches, Newton, Orange, Polk, Sabine, San Augustine, San Jacinto, Shelby, Tyler | $54,149,215 |
| 3 | Austin, Calhoun, Chambers, Colorado, Fort Bend, Harris, Matagorda, Waller, Wharton | $120,965,680 |
| 4 | Aransas, Bee, Brooks, De Witt, Duval, Goliad, Gonzales, Jackson, Jim Wells, Karnes, Kenedy, Kleberg, Lavaca, Live Oak, Nueces, Refugio, San Patricio, Victoria | $27,047,477 |
| 5 | Cameron, Hidalgo, Starr, Willacy | $17,619,875 |
| 6 | Atascosa, Bandera, Bexar, Comal, Dimmit, Edwards, Frio, Gillespie, Guadalupe, Kendall, Kerr, Kinney, La Salle, McMullen, Medina, Real, Uvalde, Val Verde, Wilson, Zavala | $68,228,047 |
| 7 | Bastrop, Caldwell, Fayette, Hays, Lee, Travis | $50,489,691 |
| 8 | Bell, Blanco, Burnet, Lampasas, Llano, Milam, Mills, San Saba, Williamson | $24,220,521 |
| 9 | Dallas, Kaufman | $66,492,094 |
| 10 | Ellis, Erath, Hood, Johnson, Navarro, Parker, Somervell, Tarrant, Wise | $65,538,414 |
| 11 | Brown, Callahan, Comanche, Eastland, Fisher, Haskell, Jones, Knox, Mitchell, Nolan, Palo Pinto, Shackelford, Stephens, Stonewall, Taylor | $9,509,818 |
| 12 | Armstrong, Bailey, Borden, Briscoe, Carson, Castro, Childress, Cochran, Collingsworth, Cottle, Crosby, Dallam, Dawson, Deaf Smith, Dickens, Donley, Floyd, Gaines, Garza, Gray, Hale, Hall, Hansford, Hartley, Hemphill, Hockley, Hutchinson, Kent, King, Lamb, Lipscomb, Lubbock, Lynn, Moore, Motley, Ochiltree, Oldham, Parmer, Potter, Randall, Roberts, Scurry, Sherman, Swisher, Terry, Wheeler, Yoakum | $23,498,027 |
| 13 | Coke, Coleman, Concho, Crockett, Irion, Kimble, Mason, McCulloch, Menard, Pecos, Reagan, Runnels, Schleicher, Sterling, Sutton, Terrell, Tom Green | $5,195,605 |
| 14 | Andrews, Brewster, Crane, Culberson, Ector, Glasscock, Howard, Jeff Davis, Loving, Martin, Midland, Presidio, Reeves, Upton, Ward, Winkler | $12,124,354 |
| 15 | El Paso, Hudspeth | $17,994,285 |
| 16 | Bosque, Coryell, Falls, Hamilton, Hill, Limestone, McLennan | $9,452,018 |
| 17 | Brazos, Burleson, Grimes, Leon, Madison, Montgomery, Robertson, Walker, Washington | $23,042,947 |
| 18 | Collin, Denton, Grayson, Rockwall | $39,787,684 |
| 19 | Archer, Baylor, Clay, Cooke, Foard, Hardeman, Jack, Montague, Throckmorton, Wichita, Wilbarger, Young | $12,665,268 |
| 20 | Jim Hogg, Maverick, Webb, Zapata | $6,755,656 |
|  | Administrative Costs | $7,000,000 |

* Each Region shall reserve 25% of its allocation for Targeted Funds under the guidelines of Exhibit A.

**EXHIBIT O**

**List of Texas Subdivisions and Special Districts Represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LP**

| | |
|---|---|
| ANGELINA COUNTY | Simon Greenstone Panatier, P.C. |
| BEE COUNTY | Simon Greenstone Panatier, P.C. |
| BEXAR COUNTY | Watts Guerra LLP |
| Bexar County Hospital District d/b/a University Health System | Watts Guerra LLP |
| BLANCO COUNTY | Simon Greenstone Panatier, P.C. |
| BOWIE COUNTY | Simon Greenstone Panatier, P.C. |
| BURLESON COUNTY | Watts Guerra LLP |
| BURNET COUNTY | Simon Greenstone Panatier, P.C. |
| CAMERON COUNTY | Watts Guerra LLP |
| CAMP COUNTY | Simon Greenstone Panatier, P.C. |
| CASS COUNTY | Simon Greenstone Panatier, P.C. |
| CHAMBERS COUNTY | Watts Guerra LLP |
| CHEROKEE COUNTY | Simon Greenstone Panatier, P.C. |
| COOKE COUNTY | Simon Greenstone Panatier, P.C. |
| CORYELL COUNTY | Simon Greenstone Panatier, P.C. |
| DALLAS COUNTY | Simon Greenstone Panatier, P.C. |
| DELTA COUNTY | Simon Greenstone Panatier, P.C. |
| DIMMIT COUNTY | Simon Greenstone Panatier, P.C. |
| ECTOR COUNTY | Simon Greenstone Panatier, P.C. |
| FALLS COUNTY | Simon Greenstone Panatier, P.C. |
| FANNIN COUNTY | Simon Greenstone Panatier, P.C. |
| FORT BEND COUNTY | The Lanier Law Firm |
| FRANKLIN COUNTY | Simon Greenstone Panatier, P.C. |
| FREESTONE COUNTY | Simon Greenstone Panatier, P.C. |
| GRAYSON COUNTY | Simon Greenstone Panatier, P.C. |
| HARDIN COUNTY | Simon Greenstone Panatier, P.C. |
| HARRISON COUNTY | Watts Guerra LLP |
| HOPKINS COUNTY | Simon Greenstone Panatier, P.C. |
| Houston city | The Lanier Law Firm |
| HOUSTON COUNTY | Simon Greenstone Panatier, P.C. |
| JASPER COUNTY | Simon Greenstone Panatier, P.C. |
| JIM WELLS COUNTY | Watts Guerra LLP |
| KENDALL COUNTY | Simon Greenstone Panatier, P.C. |

| | |
|---|---|
| KERR COUNTY | Watts Guerra LLP |
| LAMAR COUNTY | Simon Greenstone Panatier, P.C. |
| LEON COUNTY | Watts Guerra LLP |
| LIMESTONE COUNTY | Simon Greenstone Panatier, P.C. |
| MARION COUNTY | Simon Greenstone Panatier, P.C. |
| MCMULLEN COUNTY | Simon Greenstone Panatier, P.C. |
| MILAM COUNTY | Simon Greenstone Panatier, P.C. |
| MORRIS COUNTY | Simon Greenstone Panatier, P.C. |
| NACOGDOCHES COUNTY | Simon Greenstone Panatier, P.C. |
| NEWTON COUNTY | Simon Greenstone Panatier, P.C. |
| NUECES COUNTY | The Lanier Law Firm |
| Nueces County Hospital District | The Lanier Law Firm |
| ORANGE COUNTY | Simon Greenstone Panatier, P.C. |
| PANOLA COUNTY | Simon Greenstone Panatier, P.C. |
| PARKER COUNTY | Simon Greenstone Panatier, P.C. |
| POTTER COUNTY | Simon Greenstone Panatier, P.C. |
| RED RIVER COUNTY | Simon Greenstone Panatier, P.C. |
| ROBERTSON COUNTY | Simon Greenstone Panatier, P.C. |
| RUSK COUNTY | Simon Greenstone Panatier, P.C. |
| SHELBY COUNTY | Simon Greenstone Panatier, P.C. |
| SMITH COUNTY | Simon Greenstone Panatier, P.C. |
| TARRANT COUNTY | The Lanier Law Firm |
| TITUS COUNTY | Simon Greenstone Panatier, P.C. |
| TRAVIS COUNTY | The Lanier Law Firm |
| TRINITY COUNTY | Simon Greenstone Panatier, P.C. |
| UPSHUR COUNTY | Simon Greenstone Panatier, P.C. |
| VAN ZANDT COUNTY | Simon Greenstone Panatier, P.C. |
| WILLIAMSON COUNTY | Watts Guerra LLP |
| WOOD COUNTY | Simon Greenstone Panatier, P.C. |

**Exhibit P**

**Case Management Order**


MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | 152nd JUDICIAL DISTRICT |
| | § | |
| MDL NO. 18-0358 | § | HARRIS COUNTY, TEXAS |


**CASE MANAGEMENT ORDER APPLICABLE TO NON-SETTLED PLAINTIFFS
ASSERTING CLAIMS AGAINST SETTLING DEFENDANTS**

This Case Management Order ("CMO") shall apply to all Political Subdivisions, including counties, municipalities, and special districts with cases pending as of [*Date of Final Court Approval of Settlement*] against Settling Defendants and to all new plaintiffs filing cases after that date against Settling Defendants (collectively, "Plaintiff" or "Plaintiffs"), whose claims are pending in this coordinated proceeding and not released by the Settlement Agreement in this action entered into on [*settlement date*] ("Settlement Agreement"). As used herein, "Settling Defendants" refers to McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Corporation, and all Released Entities as that term is defined in the Settlement Agreement. Pursuant to the order of the Texas MDL Panel, all such new cases filed in the State of Texas shall be assigned to the *In re Texas Opioid Litigation* pending before this Court and shall be subject to the terms of this CMO.

Good cause appearing, it is ordered as follows:

A.     <u>**Plaintiffs' Requirement to Produce Certain Specified Information About**</u>

<u>**Their Claims**</u>

1.  **Plaintiffs' Production Requirements**.  Each Plaintiff shall serve the following documents and/or information upon counsel for Settling Defendants:

(a)     **Fact Sheet**.  Each Plaintiff shall serve upon the Settling Defendants within the deadlines specified herein a completed copy of the Fact Sheet, attached herein.  Each Plaintiff that has already completed, executed, and served a Fact Sheet shall serve upon the Settling Defendants within the deadlines specified herein an updated Fact Sheet reflecting any material change in the facts underlying the Plaintiff's claims or shall affirm that no such material change applies.  Simultaneously with its service of its Fact Sheet or affirmation, each Plaintiff shall serve upon Settling Defendants a verified statement under oath setting forth how each element of their claims has not been resolved pursuant to the terms of the Settlement and the state and regional abatement fund provided therein.

(b)     **Record Production**.

(i)     Each Plaintiff shall produce all records establishing the existence of each of their claims.  If Plaintiff claims the existence of a public nuisance, Plaintiff shall produce all records establishing the existence of a public nuisance, a definition of the nuisance and evidence to support its existence, and all records supporting a claim for nuisance "abatement" relief (including without limitation a categorization and itemization of any requested nuisance abatement relief and evidence to support each component of such relief).

(ii)     Each Plaintiff shall produce all records supporting a claim of damages or any other type of monetary relief, including but not limited to abatement remedies or any other injunctive relief that would require any expenditure by the Defendants.  Such

records shall include a categorization and itemization of claimed damages or other type of relief, and calculations and evidence for each component of such claimed relief, specified as to claims against each Settling Defendant.  Each Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.

(iii)    For any other relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that will make the expenditures, when and how long those entities will make the expenditures, and the nature and amount of the expenditures, including how they will address any and all alleged harms.  Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

(iv)    Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly unnecessary prescriptions shall identify those prescriptions, to whom and by whom the prescriptions were written, the pharmacy that filled each such prescription, whether the Plaintiff was reimbursed for them, and the Plaintiff's basis for identifying the prescriptions.

(v)    Each Plaintiff seeking any form of relief based directly or indirectly upon harm allegedly attributable to prescription opioid orders that the Plaintiff contends the Settling Defendants should not have shipped pursuant to a suspicious order regulation shall identify those orders, including the date of each such order; the product(s) ordered; the quantities ordered; the pharmacy or other dispensing entity that placed the order; and the Plaintiff's basis for identifying the order, including any sources relied upon and algorithms used.  Each Plaintiff shall include its definition of what constitutes a suspicious order.

(c)  **Affidavit**.  Each Plaintiff shall serve on counsel for Settling Defendants an affidavit signed by the Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO.  If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d)  **Expert Reports**.  Each Plaintiff shall serve on counsel for Settling Defendants a case-specific expert report or reports executed by a qualified expert, under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report").  The Case-Specific Expert Report shall include all matter required to comply with the Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, and at least:

(i)  *Plaintiff's Information*.  The Plaintiff's name;

(ii)  *Expert's Information*.  The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii)  *Plaintiff's Records*.  All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv)  *Reliance Materials*.  All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v)  *Locations*.  If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with

specificity how Plaintiff has been affected by such public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi)    *Subjects of Report(s)*.  The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to rely, including but not limited to the following:

(1)  Whether the Plaintiff's records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2)  Whether the Plaintiff's records reviewed by the expert(s) indicate the existence of a nuisance and, if so, the nature of the nuisance;

(3)  Whether the Plaintiff's records reviewed by the expert(s) indicate that Settling Defendants engaged in any wrongful conduct and, if so, the nature and details of that conduct (including, but not limited to, (a) any allegedly unnecessary prescriptions or (b) any specific orders of prescription opioids that the expert opines that the Settling Defendants should not have shipped), and the basis for identifying (a) or (b) as wrongful;

(4)  An opinion that there is in fact a causal relationship between the individual Plaintiff's claims and Settling Defendants' alleged conduct and the basis for that opinion;

(5)  An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, statutory penalties, and any other claim for damages or any other monetary relief, including but not limited to abatement remedies or any other injunctive relief that would require any expenditure by the Defendants, with specific detailed calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

(6) All computer code, work papers, data, and other sources underlying any calculations or other analysis relating to the subject matter of subparagraphs (1) - (5) above and necessary to replicate those calculations or analysis.

2. **Deadline to comply**.

      (a)      For each Plaintiff with claims pending against Settling Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced no later than [DATE], or ninety (90) days after the date such Plaintiff elects not to settle its claims, whichever is sooner.

      (b)      For each Plaintiff with claims newly filed in or transferred to this proceeding against Settling Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

3. **Failure to comply**.

      (a)      *Notice of Non-Compliance and Opportunity to Cure*.  If any Plaintiff fails to comply with any provision of this Order, Settling Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance.  Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance.  During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Settling Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's petition, shall be held in abeyance.

      (b)      *Failure to Cure*.  If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by

the Settling Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Settling Defendants.

(c)     *Extensions of Time*.  The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

(d)     The Plaintiff shall be permitted to supplement the disclosures described in Sections B.1, including expert reports, and C only to extent appropriate to address factual information that the Plaintiff did not have access to and could not reasonably have obtained by the deadline under this Order, including any extension granted by the Court for good cause.  Any such supplementation must be made promptly upon receipt of the information that was previously unavailable and shall identify the specific information that was previously unavailable.  This opportunity to supplement does not relieve the Plaintiff of its responsibility to comply with this CMO fully and completely on the basis of information within its possession or that it reasonably could obtain at the time compliance is first required.  No lay or expert testimony may be offered at trial by the Plaintiff on any subject described in Sections B-1 and C that is not disclosed fully and at the times required by this Order.  Plaintiff, however, must continue to comply with all Texas Rules of Civil Procedure, including the duty to supplement its document production with newly discovered or identified documents.

**B.      Discovery on Statute of Limitations and Other Time-Based Defenses**

1.  Each Plaintiff must, within the time frames established by Section B.2, serve upon counsel for the Settling Defendants an affidavit signed by the Plaintiff and its counsel providing the following information: (1) the date the Plaintiff first learned that the harms alleged in its petition may be related to Settling Defendants' conduct; (2) how the Plaintiff first learned the harms alleged in its petition may be related to Settling Defendants' conduct; (3) the date the Plaintiff

first spoke to or corresponded with an attorney about potential litigation against Settling

Defendants or any other party concerning the conduct or harms alleged in its Petition; and (4) the

date the Plaintiff first retained counsel for litigation relating to those alleged conduct or harms.

Settling Defendants are permitted to serve written discovery on each Plaintiff related to these

topics (and others), and each such Plaintiff must respond to the discovery prior to any

depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days

to respond to such discovery.

  **C.**  **Further Proceedings**

  Within 30 days following the completion of all disclosures required by this Order, or 30

days following the Court's resolution of any dispute concerning the adequacy of those

disclosures, whichever is later, Settling Defendants may file a motion to dismiss the Petition.

Settling Defendants may also submit expert-related motions or move for summary judgment on

the ground that Plaintiff's claims fail as a matter of law based on the expert reports and other

disclosures required under Sections B and C of this Order.  Until further order of the Court, all

proceedings in these cases other than those set forth in this Order shall be stayed.

SO ORDERED:

Dated: _____

               _____
               Honorable Judge Robert Schaffer
               152nd Judicial District Court

IN RE: TEXAS OPIOID LITIGATION; NO. 18-0358; PLAINTIFF FACT SHEET*

Plaintiff: _____  Case caption / number: _____  Contact attorney: _____

1. Identify the approximate date (i.e., month and year) when Plaintiff ("You") claims it was first injured and began to incur damages as a result of each Defendants' conduct. *The earliest date identified is the start of the relevant date range in response to the remaining requests*.

2. Identify each prescription opioid medication that You claim contributed to Your alleged damages and the manufacturer and distributor of each identified medication.

3. Identify each category of damages that You allege, including but not limited to injunctive relief that You seek and any monetary damages based on Your payment for or reimbursement of allegedly improper or medically unnecessary opioid prescriptions. For each category, list Your annual budget and expenditures.

4. Identify the expenditures You claim are related to defendants' conduct, the sources of the funds expended, the fund balances at the beginning of each year, and the applicable rules regarding fund balances, by year, related to: (a) law enforcement; (b) EMS; (c) fire; (d) court/prosecution; (e) prison/jail/corrections/incarceration; (f) substance abuse treatment; (g) public health; (h) child/family services; (i) workers compensation; and (j) health insurance.

5. Identify any funds You received that could reimburse for the costs of opioid related expenses, including but not limited to grants and donations, court costs, fees (including as part of a criminal trial diversion program), restitution, or asset forfeitures.

6. Identify each pharmacy, pharmacist, and healthcare provider ("HCP") within Your geographic boundaries that You are aware has been the target of a law enforcement or administrative investigation concerning the prescribing or dispensing of prescription opioids and the disposition of any related criminal charges filed.

7. Identify by year each (a) HCP who wrote allegedly medically unnecessary opioid prescriptions in Your geographical boundaries and (b) pharmacy that received prescription opioids as a result of an alleged suspicious order.

8. Identify each HCP within Your boundaries who You claim wrote prescriptions for opioid medications in reliance on the improper marketing of the manufacturing defendants.

9. Provide the annual number of overdose deaths of Your residents and the number who misused or were otherwise harmed by opioids and, for each, identify the drug(s) on which they overdosed, misused, or were otherwise harmed and the basis for this determination.

10. Provide the annual number of arrests involving the possession, consumption, or sale of opioids (including a charge of conspiracy to commit or engaging in organized criminal activity related to opioids). "Opioids" in this context includes any drug in the opioid or opiate family, including but not limited to prescription opioids, heroin, and fentanyl.

11. Identify every notification You provided to any State or Federal agency of suspected wrongful conduct related to prescription opioids, including but not limited to the date of each notification and the general nature of the suspected wrongdoing.

12. Provide the names, members, dates of operation, budget, and source(s) of funding for any opioid-related task force or other program or group You have participated in, including but not limited to any prescription disposal program, addiction treatment programs, or drug abuse prevention or education programs You have used related to opioid use or diversion.

 * *To avoid unnecessary delay, contact Liaison Counsel for Manufacturer or Distributor Defendants immediately with any questions, including about meaning or scope of these requests.*

**Exhibit Q**

**List of States**

| | | | |
|---|---|---|---|
| 1. | Alabama | 44. | South Carolina |
| 2. | Alaska | 45. | South Dakota |
| 3. | American Samoa | 46. | Tennessee |
| 4. | Arizona | 47. | Texas |
| 5. | Arkansas | 48. | United States Virgin Islands |
| 6. | California | 49. | Utah |
| 7. | Colorado | 50. | Vermont |
| 8. | Connecticut | 51. | Virginia |
| 9. | Delaware | 52. | Washington |
| 10. | Florida | 53. | Washington, District of Columbia |
| 11. | Georgia | 54. | Wisconsin |
| 12. | Guam | 55. | Wyoming |
| 13. | Hawaii | | |
| 14. | Idaho | | |
| 15. | Illinois | | |
| 16. | Indiana | | |
| 17. | Iowa | | |
| 18. | Kansas | | |
| 19. | Kentucky | | |
| 20. | Louisiana | | |
| 21. | Maine | | |
| 22. | Maryland | | |
| 23. | Massachusetts | | |
| 24. | Michigan | | |
| 25. | Minnesota | | |
| 26. | Mississippi | | |
| 27. | Missouri | | |
| 28. | Montana | | |
| 29. | Nebraska | | |
| 30. | Nevada | | |
| 31. | New Hampshire | | |
| 32. | New Jersey | | |
| 33. | New Mexico | | |
| 34. | New York | | |
| 35. | North Carolina | | |
| 36. | North Dakota | | |
| 37. | Northern Mariana Islands | | |
| 38. | Ohio | | |
| 39. | Oklahoma | | |
| 40. | Oregon | | |
| 41. | Pennsylvania | | |
| 42. | Puerto Rico | | |
| 43. | Rhode Island | | |

**Exhibit R**

**Injunctive Relief**

I.    **INTRODUCTION**

A.    Within ninety (90) days of the Effective Date unless otherwise set forth herein, each Injunctive Relief Distributor shall implement the injunctive relief terms set forth in Sections II through XIX (the "*Injunctive Relief Terms*") in its Controlled Substance Monitoring Program ("*CSMP*").

B.    The Effective Date of these Injunctive Relief Terms shall be defined by Section I.P of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as <u>Exhibit R</u>.

II.    **TERM AND SCOPE**

A.    The duration of the Injunctive Relief Terms contained in Sections IV through XVI shall be ten (10) years from the Effective Date.

B.    McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation are referred to collectively throughout these Injunctive Relief Terms as the "*Injunctive Relief Distributors*" or individually as an "*Injunctive Relief Distributor*." Each Injunctive Relief Distributor is bound by the terms herein.

C.    The requirements contained in Sections VIII through XV shall apply to the distribution of Controlled Substances to Customers by each Injunctive Relief Distributor's Full-Line Wholesale Pharmaceutical Distribution Business, including by any entities acquired by the Injunctive Relief Distributors that are engaged in the Full-Line Wholesale Pharmaceutical Distribution Business. The prior sentence is not limited to activity physically performed at each Injunctive Relief Distributor's distribution centers and includes activity covered by the prior sentence performed by each Injunctive Relief Distributor at any physical location, including at its corporate offices or at the site of a Customer with respect to Sections III through XV.

III.    **DEFINITIONS**

A.    "*Audit Report*." As defined in Section XVIII.H.3.

B.    "*Chain Customers*." Chain retail pharmacies that have centralized corporate headquarters and have multiple specific retail pharmacy locations from which Controlled Substances are dispensed to individual patients.

C.    "*Chief Diversion Control Officer*." As defined in Section IV.A.

D.    "*Clearinghouse*." The system established by Section XVII.

E.     "*Clearinghouse Advisory Panel.*" As defined in Section XVII.B.4.

F.     "*Controlled Substances.*" Those substances designated under schedules II-V pursuant to the federal Controlled Substances Act and the laws and regulations of the Settling States that incorporate federal schedules II-V. For purposes of the requirements of the Injunctive Relief Terms, Gabapentin shall be treated as a Controlled Substance, except for purposes of Section XII for Customers located in States that do not regulate it as a controlled substance or similar designation (e.g., drug of concern).

G.     "*Corrective Action Plan.*" As defined in Section XIX.B.7.b.

H.     "*CSMP.*" As defined in Section I.A.

I.     "*CSMP Committee.*" As defined in Section VI.A.

J.     "*Customers.*" Refers collectively to current, or where applicable potential, Chain Customers and Independent Retail Pharmacy Customers. "Customers" do not include long-term care facilities, hospital pharmacies, and pharmacies that serve exclusively inpatient facilities.

K.     "*Data Security Event.*" Refers to any compromise, or threat that gives rise to a reasonable likelihood of compromise, by unauthorized access or inadvertent disclosure impacting the confidentiality, integrity, or availability of Dispensing Data.

L.     "*Dispensing Data.*" Includes, unless altered by the Clearinghouse Advisory Panel: (i) unique patient IDs; (ii) patient zip codes; (iii) the dates prescriptions were dispensed; (iv) the NDC numbers of the drugs dispensed; (v) the quantities of drugs dispensed; (vi) the day's supply of the drugs dispensed; (vii) the methods of payment for the drugs dispensed; (viii) the prescribers' names; (ix) the prescribers' NPI or DEA numbers; and (x) the prescribers' zip codes or addresses. The Clearinghouse will be solely responsible for collecting Dispensing Data.

M.     "*Draft Report.*" As defined in Section XVIII.H.1.

N.     "*Effective Date.*" As defined in Section I.B.

O.     "*Full-Line Wholesale Pharmaceutical Distribution Business.*" Activity engaged in by distribution centers with a primary business of supplying a wide range of branded, generic, over-the-counter and specialty pharmaceutical products to Customers.

P.     "*Highly Diverted Controlled Substances.*" Includes: (i) oxycodone; (ii) hydrocodone; (iii) hydromorphone; (iv) tramadol; (v) oxymorphone; (vi) morphine; (vii) methadone; (viii) carisoprodol; (ix) alprazolam; and (x) fentanyl. The Injunctive Relief Distributors shall confer annually and review this list to determine whether changes are appropriate and shall add Controlled Substances to

the list of Highly Diverted Controlled Substances as needed based on information provided by the DEA and/or other sources related to drug diversion trends. The Injunctive Relief Distributors shall notify the State Compliance Review Committee and the Monitor of any additions to the list of Highly Diverted Controlled Substances. Access to Controlled Substances predominately used for Medication-Assisted Treatment shall be considered when making such additions.

Q.    "*Independent Retail Pharmacy Customers.*" Retail pharmacy locations that do not have centralized corporate headquarters and dispense Controlled Substances to individual patients.

R.    "*Injunctive Relief Distributors.*" As defined in Section II.B.

S.    "*Injunctive Relief Terms.*" As defined in Section I.A.

T.    "*Monitor.*" As defined in Section XVIII.A.

U.    "*National Arbitration Panel.*" As defined by Section I.GG of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as <u>Exhibit R</u>.

V.    "*NDC.*" National Drug Code.

W.    "*non-Controlled Substance.*" Prescription medications that are not Controlled Substances.

X.    "*Notice of Potential Violation.*" As defined in Section XIX.B.2.

Y.    "*Order.*" A unique Customer request on a specific date for (i) a certain amount of a specific dosage form or strength of a Controlled Substance or (ii) multiple dosage forms and/or strengths of a Controlled Substance. For the purposes of this definition, each line item on a purchasing document or DEA Form 222 is a separate order, except that a group of line items either in the same drug family or DEA base code (based upon the structure of a Injunctive Relief Distributor's CSMP) may be considered to be a single order.

Z.    "*Pharmacy Customer Data.*" Aggregated and/or non-aggregated data provided by the Customer for a 90-day period.

    1.    To the extent feasible based on the functionality of a Customer's pharmacy management system, Pharmacy Customer Data shall contain (or, in the case of non-aggregated data, shall be sufficient to determine) the following:

        a)    A list of the total number of prescriptions and dosage units for each NDC for all Controlled Substances and non-Controlled Substances;

       b)     A list of the top five prescribers of each Highly Diverted Controlled Substance by dosage volume and the top ten prescribers of all Highly Diverted Controlled Substances combined by dosage volume. For each prescriber, the data shall include the following information:

           (1)     Number of prescriptions and doses prescribed for each Highly Diverted Controlled Substance NDC;

           (2)     Number of prescriptions for each unique dosage amount (number of pills per prescription) for each Highly Diverted Controlled Substance NDC;

           (3)     Prescriber name, DEA registration number, and address; and

           (4)     Medical practice/specialties, if available;

       c)     Information on whether the method of payment was cash for (a) Controlled Substances, and (b) non-Controlled Substances; and

       d)     Information on top ten patient residential areas by five-digit ZIP code prefix for filled Highly Diverted Controlled Substances by dosage volume, including number of prescriptions and doses for each Highly Diverted Controlled Substance NDC.

    2.     Injunctive Relief Distributors are not required to obtain Pharmacy Customer Data for all Customers. Pharmacy Customer Data only needs to be obtained under circumstances required by the Injunctive Relief Terms and the applicable CSMP policies and procedures. Each Injunctive Relief Distributor's CSMP policies and procedures shall describe the appropriate circumstances under which and methods to be used to obtain and analyze Pharmacy Customer Data.

    3.     Injunctive Relief Distributors shall only collect, use, disclose or retain Pharmacy Customer Data consistent with applicable federal and state privacy and consumer protections laws. Injunctive Relief Distributors shall not be required to collect, use, disclose or retain any data element that is prohibited by law or any element that would require notice to or consent from the party who is the subject of the data element, including, but not limited to, a third party (such as a prescriber) to permit collection, use, disclosure and/or retention of the data.

AA.     "*Potential Violation.*" As defined in Section XIX.B.1.

BB.     "*Reporting Periods.*" As defined in Section XVIII.C.1.

CC.  "*Settling State.*" As defined by Section I.OOO of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as <u>Exhibit R</u>.

DD.  "*State Compliance Review Committee.*" The initial State Compliance Review Committee members are representatives from the Attorneys General Offices of Connecticut, Florida, New York, North Carolina, Tennessee, and Texas. The membership of the State Compliance Review Committee may be amended at the discretion of the Settling States.

EE.  "*Suspicious Orders.*" As defined under federal law and regulation and the laws and regulations of the Settling States that incorporate the federal Controlled Substances Act. Suspicious Orders currently include, but are not limited to, orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

FF.  "*Threshold.*" The total volume of a particular drug family, DEA base code, or a particular formulation of a Controlled Substance that an Injunctive Relief Distributor shall allow a Customer to purchase in any particular period. This term may be reassessed during Phase 2-B of the Clearinghouse.

GG.  "*Third Party Request.*" A request from an entity other than an Injunctive Relief Distributor, a Settling State, or the Monitor pursuant to a subpoena, court order, data practices act, freedom of information act, public information act, public records act, or similar law.

HH.  "*Top Prescriber.*" A prescriber who, for a Customer, is either (i) among the top five (5) prescribers of each Highly Diverted Controlled Substance or (ii) among the top ten (10) prescribers of Highly Diverted Controlled Substances combined, as determined from the most recent Pharmacy Customer Data for that Customer.

## IV.  <u>CSMP PERSONNEL</u>

A.  Each Injunctive Relief Distributor shall establish or maintain the position of Chief Diversion Control Officer, or other appropriately titled position, to oversee the Injunctive Relief Distributor's CSMP. The Chief Diversion Control Officer shall have appropriate experience regarding compliance with the laws and regulations concerning Controlled Substances, in particular laws and regulations requiring effective controls against the potential diversion of Controlled Substances. The Chief Diversion Control Officer shall report directly to either the senior executive responsible for U.S. pharmaceutical distribution or the most senior legal officer at the Injunctive Relief Distributor.

B.  The Chief Diversion Control Officer shall be responsible for the approval of material revisions to the CSMP.

C.  The Chief Diversion Control Officer shall provide at least quarterly reports to the CSMP Committee regarding the Injunctive Relief Distributor's operation of the

CSMP, including the implementation of any changes to the CSMP required by these Injunctive Relief Terms.

D.     An Injunctive Relief Distributor's CSMP functions, including, but not limited to, the onboarding and approval of new Customers for the sale of Controlled Substances, setting and adjusting Customer Thresholds for Controlled Substances, terminating or suspending Customers, and submitting Suspicious Orders and other reports to Settling States (or the Clearinghouse, when operational), but excluding support necessary to perform these functions, shall be conducted exclusively by the Injunctive Relief Distributor's CSMP personnel or qualified third-party consultants.

E.     Staffing levels of each Injunctive Relief Distributor's CSMP department shall be reviewed periodically, but at least on an annual basis, by the Injunctive Relief Distributor's CSMP Committee. This review shall include consideration of relevant developments in technology, law, and regulations to ensure the necessary resources are in place to carry out the program in an effective manner.

F.     Personnel in an Injunctive Relief Distributor's CSMP department shall not report to individuals in an Injunctive Relief Distributor's sales department, and sales personnel shall not be authorized to make decisions regarding the promotion, compensation, demotion, admonition, discipline, commendation, periodic performance reviews, hiring, or firing of CSMP personnel.

G.     The CSMP policies and procedures shall be published in a form and location readily accessible to all CSMP personnel at each Injunctive Relief Distributor.

## V.     <u>INDEPENDENCE</u>

A.     For each Injunctive Relief Distributor, sales personnel compensated with commissions shall not be compensated based on revenue or profitability targets or expectations for sales of Controlled Substances. However, each Injunctive Relief Distributor's personnel may, as applicable, be compensated (including incentive compensation) based on formulas that include total sales for all of the Injunctive Relief Distributor's products, including Controlled Substances. The compensation of sales personnel shall not include incentive compensation tied solely to sales of Controlled Substances.

B.     For any Injunctive Relief Distributor personnel who are compensated at least in part based on Customer sales, the Injunctive Relief Distributor shall ensure the compensation of such personnel is not decreased by a CSMP-related suspension or termination of a Customer or as a direct result of the reduction of sales of Controlled Substances to a Customer pursuant to the CSMP.

C.     The Injunctive Relief Distributors' sales personnel shall not be authorized to make decisions regarding the implementation of CSMP policies and procedures, the design of the CSMP, the setting or adjustment of Thresholds, or other actions taken pursuant to the CSMP, except sales personnel must provide information

regarding compliance issues to CSMP personnel promptly. The Injunctive Relief Distributors' sales personnel are prohibited from interfering with, obstructing, or otherwise exerting control over any CSMP department decision-making.

D.    Each Injunctive Relief Distributor shall review its compensation and non-retaliation policies and, if necessary, modify and implement changes to those policies to effectuate the goals of, and incentivize compliance with, the CSMP.

E.    Each Injunctive Relief Distributor shall maintain a telephone, email, and/or web-based "hotline" to permit employees and/or Customers to anonymously report suspected diversion of Controlled Substances or violations of the CSMP, Injunctive Relief Distributor company policy related to the distribution of Controlled Substances, or applicable law. Each Injunctive Relief Distributor shall share the hotline contact information with their employees and Customers. Each Injunctive Relief Distributor shall maintain all complaints made to the hotline, and document the determinations and bases for those determinations made in response to all complaints.

## VI.    <u>OVERSIGHT</u>

A.    To the extent not already established, each Injunctive Relief Distributor shall establish a committee that includes senior executives with responsibility for legal, compliance, distribution and finance to provide oversight over its CSMP (the "*CSMP Committee*"). The Chief Diversion Control Officer shall be a member of the CSMP Committee. The CSMP Committee shall not include any employee(s) or person(s) performing any sales functions on behalf of the Injunctive Relief Distributor; provided that service on the CSMP Committee by any senior executives listed in this paragraph whose responsibilities may include, but are not limited to, management of sales functions shall not constitute a breach of the Injunctive Relief Terms.

B.    Each Injunctive Relief Distributor's CSMP Committee shall have regular meetings during which the Chief Diversion Control Officer shall present to the CSMP Committee with respect to, and the CSMP Committee shall evaluate, among other things: (1) any material modifications and potential enhancements to the CSMP including, but not limited to, those relating to Customer due diligence and Suspicious Order monitoring and reporting; (2) any significant new national and regional diversion trends involving Controlled Substances; (3) the Injunctive Relief Distributor's adherence to the CSMP policies and procedures, the Injunctive Relief Terms, and applicable laws and regulations governing the distribution of Controlled Substances; and (4) any technology, staffing, or other resource needs for the CSMP. The CSMP Committee shall have access to all CSMP reports. The CSMP Committee will review and approve the specific metrics used to identify the Red Flags set forth in Section VIII.

C.    On a quarterly basis, each Injunctive Relief Distributor's CSMP Committee shall send a written report to the Injunctive Relief Distributor's Chief Executive, Chief

Financial, and Chief Legal Officer, as well as its Board of Directors, addressing: (1) the Injunctive Relief Distributor's substantial adherence to the CSMP policies and procedures, the Injunctive Relief Terms, and applicable laws and regulations governing the distribution of Controlled Substances; (2) recommendations as appropriate about the allocation of resources to ensure the proper functioning of the Injunctive Relief Distributor's CSMP; and (3) significant revisions to the CSMP. The Board of Directors or a committee thereof at each Injunctive Relief Distributor shall document in its minutes its review of the quarterly CSMP Committee reports.

D.      To the extent not already established, the Board of Directors of each Injunctive Relief Distributor shall establish its own compliance committee (the "*Board Compliance Committee*") to evaluate, at a minimum, and on a quarterly basis: (1) the CSMP Committee's written reports; (2) the Injunctive Relief Distributor's substantial adherence to the CSMP policies and procedures, the Injunctive Relief Terms, and applicable laws and regulations governing the distribution of Controlled Substances; (3) the Injunctive Relief Distributor's code of conduct and any whistleblower reporting policies, including those prescribed by Section V.E; and (4) any significant regulatory and/or government enforcement matters within the review period relating to the distribution of Controlled Substances. An Injunctive Relief Distributor meets this requirement if it established, prior to the Effective Date, multiple committees of its Board of Directors that together have responsibilities outlined in this paragraph.

E.      The Board Compliance Committee shall have the authority to: (1) require management of the Injunctive Relief Distributor to conduct audits on any CSMP or legal and regulatory concern pertaining to Controlled Substances distribution, and to update its full Board of Directors on those audits; (2) to commission studies, reviews, reports, or surveys to evaluate the Injunctive Relief Distributor's CSMP performance; (3) request meetings with the Injunctive Relief Distributor's management and CSMP staff; and (4) review the appointment, compensation, performance, and replacement of the Injunctive Relief Distributor's Chief Diversion Control Officer.

## VII.   <u>MANDATORY TRAINING</u>

A.      Each Injunctive Relief Distributor shall require all new CSMP personnel to attend trainings on its CSMP, its obligations under the Injunctive Relief Terms, and its duties with respect to maintaining effective controls against potential diversion of Controlled Substances and reporting Suspicious Orders pursuant to state and federal laws and regulations prior to conducting any compliance activities for the Injunctive Relief Distributor without supervision.

B.      Each Injunctive Relief Distributor shall provide annual trainings to CSMP personnel on its CSMP, its obligations under the Injunctive Relief Terms, and its duties to maintain effective controls against potential diversion of Controlled

Substances and report Suspicious Orders pursuant to state and federal laws and regulations.

C.    On an annual basis, each Injunctive Relief Distributor shall test its CSMP personnel on their knowledge regarding its CSMP, its obligations under the Injunctive Relief Terms, and its duties to maintain effective controls against potential diversion of Controlled Substances and to report Suspicious Orders pursuant to state and federal laws and regulations.

D.    Each Injunctive Relief Distributor shall train all third-party compliance consultants (defined as non-employees who are expected to devote fifty percent (50%) or more of their time to performing work related to the Injunctive Relief Distributor's CSMP, excluding information technology consultants not engaged in substantive functions related to an Injunctive Relief Distributor's CSMP) performing compliance functions for the Injunctive Relief Distributor in the same manner as the Injunctive Relief Distributor's CSMP personnel.

E.    At least every three (3) years in the case of existing employees, and within the first six months of hiring new employees, each Injunctive Relief Distributor shall require operations, sales, and senior executive employees to attend trainings on its CSMP, its obligations under the Injunctive Relief Terms, the hotline established in Section V.E, and its duties to maintain effective controls against potential diversion of Controlled Substances and report Suspicious Orders pursuant to state and federal laws and regulations.

## VIII.  <u>RED FLAGS</u>

A.    Within one hundred and twenty days (120) of the Effective Date, each Injunctive Relief Distributor shall, at a minimum, apply specific metrics to identify the potential Red Flags described in Section VIII.D with respect to Independent Retail Pharmacy Customers. For Chain Customers, the metrics used to identify the Red Flags described in Section VIII.D may be adjusted based on the specific business model and supplier relationships of the Chain Customer.

B.    Each Injunctive Relief Distributor shall evaluate and, if necessary, enhance or otherwise adjust the specific metrics it uses to identify Red Flags set forth in Section VIII.D.

C.    Each Injunctive Relief Distributor shall provide annually to the Monitor the specific metrics it uses to identify Red Flags as set forth in Section VIII.D. The Monitor shall review the metrics used to identify Red Flags as set forth in Section VIII.D to assess whether the metrics are reasonable. The Monitor may, at its discretion, suggest revisions to the metrics in the annual Audit Report as part of the Red Flags Review set forth in Section XVIII.F.3.f. Each Injunctive Relief Distributor may rely on its specific metrics to comply with the requirements of Section VIII unless and until the Monitor proposes a revised metric in connection with Section XVIII.H.

D.     For purposes of the Injunctive Relief Terms, "*Red Flags*" are defined as follows:

1.     **Ordering ratio of Highly Diverted Controlled Substances to non-Controlled Substances:** Analyze the ratio of the order volume of all Highly Diverted Controlled Substances to the order volume of all non-Controlled Substances to identify Customers with significant rates of ordering Highly Diverted Controlled Substances.

2.     **Ordering ratio of Highly Diverted Controlled Substance base codes or drug families to non-Controlled Substances:** Analyze the ratio of the order volume of each Highly Diverted Controlled Substance base code or drug family to the total order volume of all non-Controlled Substances to identify Customers with significant rates of ordering each Highly Diverted Controlled Substance base code or drug family.

3.     **Excessive ordering growth of Controlled Substances:** Analyze significant increases in the ordering volume of Controlled Substances using criteria to identify customers that exhibit percentage growth of Controlled Substances substantially in excess of the percentage growth of non-Controlled Substances.

4.     **Unusual formulation ordering:** Analyze ordering of Highly Diverted Controlled Substances to identify customers with significant ordering of high-risk formulations. High-risk formulations include, but are not limited to, 10mg hydrocodone, 8mg hydromorphone, 2mg alprazolam, single-ingredient buprenorphine (*i.e.*, buprenorphine without naloxone), and highly-abused formulations of oxycodone. On an annual basis (or as otherwise necessary), high-risk formulations of Highly Diverted Controlled Substances may be added, removed, or revised based on the Injunctive Relief Distributors' assessment and regulatory guidance.

5.     **Out-of-area patients:** Analyze Pharmacy Customer Data or Dispensing Data to assess volume of prescriptions for Highly Diverted Controlled Substances for out-of-area patients (based on number of miles traveled between a patient's zip code and the pharmacy location, depending on the geographic area of interest) taking into consideration the percentage of out-of-area patients for non-Controlled Substances.

6.     **Cash prescriptions:** Analyze Pharmacy Customer Data or Dispensing Data to assess percentage of cash payments for purchases of Controlled Substances taking into consideration the percentage of cash payments for purchases of non-Controlled Substances.

7.     **Prescriber activity of Customers:** Analyze Pharmacy Customer Data or Dispensing Data to identify Customers that are dispensing Highly Diverted Controlled Substance prescriptions for Top Prescribers as follows:

-10-

a) Top Prescribers representing a significant volume of dispensing where the prescriber's practice location is in excess of 50 miles from the pharmacy ("out-of-area"), relative to the percentage of out-of-area prescriptions for non-Controlled Substances.

b) Top Prescribers representing prescriptions for the same Highly Diverted Controlled Substances in the same quantities and dosage forms indicative of pattern prescribing (e.g., a prescriber providing many patients with the same high-dose, high-quantity supply of 30mg oxycodone HCL prescription without attention to the varying medical needs of the prescriber's patient population).

c) Top Prescribers where the top five (5) or fewer prescribers represent more than fifty percent (50%) of total prescriptions for Highly Diverted Controlled Substances during a specified period.

8. **Public regulatory actions against Customers:** Review information retrieved from companies that provide licensing and disciplinary history records (e.g., LexisNexis), and/or other public sources, including governmental entities, showing that the Customer, pharmacists working for that Customer, or the Customer's Top Prescribers have been subject, in the last five (5) years, to professional disciplinary sanctions regarding the dispensing or handling of Controlled Substances or law enforcement action related to Controlled Substances diversion. Continued licensing by a relevant state agency may be considered, but shall not be dispositive, in resolving the Red Flag. For Chain Customer locations, representations from each Chain Customer that it reviews its pharmacists' licensing statuses annually and for the regulatory actions described in this paragraph has either (i) taken appropriate employment action, or (ii) disclosed the regulatory action to the Injunctive Relief Distributor, may be considered in resolving the Red Flag.

9. **Customer termination data:** Review information from the Injunctive Relief Distributor's due diligence files and, when operable, from the Clearinghouse, subject to Section VIII.F, regarding Customers that have been terminated from ordering Controlled Substances by another distributor due to concerns regarding Controlled Substances.

E. For any Red Flag evaluation in Section VIII.D that may be performed using Pharmacy Customer Data or Dispensing Data, an Injunctive Relief Distributor will analyze the Red Flag using Pharmacy Customer Data, to the extent feasible based on the functionality of a Customer's pharmacy management system, until Dispensing Data is collected and analyzed by the Clearinghouse as described in Section XVII. Until Dispensing Data is collected and analyzed by the Clearinghouse, an Injunctive Relief Distributor may satisfy the Red Flag evaluations in Sections VIII.D.5 through VIII.D.7 by engaging in considerations of out-of-area patients, cash payments for prescriptions and Top Prescribers

without satisfying the specific requirements of Sections VIII.D.5 through VIII.D.7. In the event that the Clearinghouse is not collecting and analyzing Dispensing Data within two years of the Effective Date, the Injunctive Relief Distributors and the State Compliance Review Committee shall meet and confer to consider alternatives for the performance of the analysis required by Sections VIII.D.5 through VIII.D.7 using Pharmacy Customer Data.

F.     As provided for in Section XVII.C.4, the foregoing Red Flag evaluations may be performed by the Clearinghouse and reported to the relevant Injunctive Relief Distributors.

G.     The Injunctive Relief Distributors and the State Compliance Review Committee shall work in good faith to identify additional potential Red Flags that can be derived from the data analytics to be performed by the Clearinghouse.

## IX.   <u>ONBOARDING</u>

A.     For each Injunctive Relief Distributor, prior to initiating the sale of Controlled Substances to a potential Customer, a member of the Injunctive Relief Distributor's CSMP department (or a qualified third-party compliance consultant trained on the Injunctive Relief Distributor's CSMP) shall perform the following due diligence:

1.     Interview the pharmacist-in-charge, either over the telephone, via videoconference, or in person. The interview shall include questions regarding the manner in which the potential Customer maintains effective controls against the potential diversion of Controlled Substances.

2.     Obtain a "Pharmacy Questionnaire" completed by the owner and/or pharmacist-in-charge of the potential Customer. The Pharmacy Questionnaire shall require going-concern potential Customers to list their top ten (10) prescribers for Highly Diverted Controlled Substances combined, along with the prescriber's specialty, unless the Injunctive Relief Distributor is able to obtain this data otherwise. The Pharmacy Questionnaire shall also require disclosure of the identity of all other distributors that serve the potential Customer, and whether the potential Customer has been terminated or suspended from ordering Controlled Substances by another distributor and the reason for any termination or suspension. The Pharmacy Questionnaire shall request information that would allow the Injunctive Relief Distributor to identify Red Flags, including questions regarding the manner in which the potential Customer maintains effective controls against the potential diversion of Controlled Substances. A potential Customer's responses to the Pharmacy Questionnaire shall be verified, to the extent applicable and practicable, against external sources (for example, the Clearinghouse, once operational, and Automation of Reports and Consolidated Orders System ("*ARCOS*") data made available to the Injunctive Relief Distributor by the

DEA). The Pharmacy Questionnaire shall be maintained by the Injunctive Relief Distributor in a database accessible to its CSMP personnel.

3.      Complete a written onboarding report to be maintained in a database accessible to the Injunctive Relief Distributor's CSMP personnel reflecting the findings of the interview and any site visit, the findings regarding the identification of and, if applicable, conclusion concerning any Red Flag associated with the pharmacy, as well as an analysis of the Pharmacy Questionnaire referenced in the preceding paragraph.

4.      For going-concern potential Customers, review Pharmacy Customer Data to assist with the identification of any Red Flags.

5.      Document whether the potential Customer or the pharmacist-in-charge has been subject to any professional disciplinary sanctions or law enforcement activity related to Controlled Substances dispensing, and, if so, the basis for that action. For Chain Customers, this provision shall apply to the potential specific pharmacies in question.

B.      For Chain Customers, each Injunctive Relief Distributor may obtain the information in Section IX.A from a corporate representative of the Chain Customer.

C.      In the event that an Injunctive Relief Distributor identifies one or more unresolved Red Flags or other information indicative of potential diversion of Controlled Substances through the onboarding process or otherwise, the Injunctive Relief Distributor shall refrain from selling Controlled Substances to the potential Customer pending additional due diligence. If following additional due diligence, the Injunctive Relief Distributor is unable to resolve the Red Flags or other information indicative of diversion, the Injunctive Relief Distributor shall not initiate the sale of Controlled Substances to the potential Customer and shall report the potential Customer consistent with Section XIV. If the Injunctive Relief Distributor determines that the potential Customer may be onboarded for the sale of Controlled Substances, the Injunctive Relief Distributor shall document the decision and the bases for its decision. Such a good faith determination, if documented, shall not serve, without more, as the basis of a future claim of non-compliance with the Injunctive Relief Terms. For Chain Customers, these provisions shall apply to the potential specific pharmacies in question.

## X.    ONGOING DUE DILIGENCE

A.      Each Injunctive Relief Distributor shall periodically review its procedures and systems for detecting patterns or trends in Customer order data or other information used to evaluate whether a Customer is maintaining effective controls against diversion.

B.      Each Injunctive Relief Distributor shall conduct periodic proactive compliance reviews of its Customers' performance in satisfying their corresponding

-13-

responsibilities to maintain effective controls against the diversion of Controlled Substances.

C.      Each Injunctive Relief Distributor shall review ARCOS data made available to it by the DEA and, once operational, by the Clearinghouse, to assist with Customer specific due diligence. For Chain Customers, this provision shall apply to the potential specific pharmacies in question.

D.      Each Injunctive Relief Distributor shall conduct due diligence as set forth in its CSMP policies and procedures in response to concerns of potential diversion of Controlled Substances at its Customers. For Chain Customers, these provisions shall apply to the specific pharmacies in question. The due diligence required by an Injunctive Relief Distributor's CSMP policies and procedures may depend on the information or events at issue. The information or events raising concerns of potential diversion of Controlled Substances at a Customer include but are not limited to:

  1.      The discovery of one or more unresolved Red Flags;

  2.      The receipt of information directly from law enforcement or regulators concerning potential diversion of Controlled Substances at or by a Customer;

  3.      The receipt of information concerning the suspension or revocation of pharmacist's DEA registration or state license related to potential diversion of Controlled Substances;

  4.      The receipt of reliable information through the hotline established in Section V.E concerning suspected diversion of Controlled Substances at the Customer;

  5.      The receipt of reliable information from another distributor concerning suspected diversion of Controlled Substances at the Customer; or

  6.      Receipt of other reliable information that the Customer is engaged in conduct indicative of diversion or is failing to adhere to its corresponding responsibility to prevent the diversion of Highly Diverted Controlled Substances.

E.      On an annual basis, each Injunctive Relief Distributor shall obtain updated pharmacy questionnaires from five hundred (500) Customers to include the following:

  1.      The top 250 Customers by combined volume of Highly Diverted Controlled Substances purchased from the Injunctive Relief Distributor measured as of the end of the relevant calendar year; and

-14-

2.     Additional Customers selected as a representative sample of various geographic regions, customer types (Independent Retail Pharmacy Customers and Chain Customers), and distribution centers. Each Injunctive Relief Distributor's Chief Diversion Control Officer shall develop risk-based criteria for the sample selection.

F.     Scope of Review

1.     For reviews triggered by Section X.D, an Injunctive Relief Distributor shall conduct due diligence and obtain updated Pharmacy Customer Data or equivalent, or more comprehensive data from the Clearinghouse if needed, as set forth in its CSMP policies and procedures.

2.     For questionnaires collected pursuant to Section X.E, Injunctive Relief Distributors shall conduct a due diligence review consistent with the Injunctive Relief Distributors' CSMP policies and procedures. These annual diligence reviews shall be performed in addition to any of the diligence reviews performed under Section X.D, but may reasonably rely on reviews performed under Section X.D.

3.     If the Injunctive Relief Distributor decides to terminate the Customer due to concerns regarding potential diversion of Controlled Substances, the Injunctive Relief Distributor shall promptly cease the sale of Controlled Substances to the Customer and report the Customer consistent with Section XIV. If the Injunctive Relief Distributor decides not to terminate the Customer, the Injunctive Relief Distributor shall document that determination and the basis therefor. Such a good faith determination, if documented, shall not, without more, serve as the basis of a future claim of non-compliance with the Injunctive Relief Terms.

## XI.   SITE VISITS

A.     Each Injunctive Relief Distributor shall conduct site visits, including unannounced site visits, where appropriate, of Customers, as necessary, as part of Customer due diligence.

B.     During site visits, an Injunctive Relief Distributor's CSMP personnel or qualified third-party compliance consultants shall interview the pharmacist-in-charge or other relevant Customer employees, if appropriate, about any potential Red Flags and the Customer's maintenance of effective controls against the potential diversion of Controlled Substances.

C.     An Injunctive Relief Distributor's CSMP personnel or qualified third-party compliance consultants who conduct site visits shall document the findings of any site visit.

D.     Site visit and all other compliance reports shall be maintained by each Injunctive Relief Distributor in a database accessible to all CSMP personnel.

## XII.   THRESHOLDS

A.   Each Injunctive Relief Distributor shall use Thresholds to identify potentially Suspicious Orders of Controlled Substances from Customers.

B.   Each Injunctive Relief Distributor's CSMP department shall be responsible for the oversight of the process for establishing and modifying Thresholds. The sales departments of the Injunctive Relief Distributors shall not have the authority to establish or adjust Thresholds for any Customer or participate in any decisions regarding establishment or adjustment of Thresholds.

C.   Injunctive Relief Distributors shall not provide Customers specific information about their Thresholds or how their Thresholds are calculated.

    1.   <u>Threshold Setting</u>

        a)   Injunctive Relief Distributors shall primarily use model-based thresholds. For certain circumstances, Injunctive Relief Distributors may apply a non-model threshold based on documented customer diligence and analysis.

        b)   Each Injunctive Relief Distributor shall include in its Annual Threshold Analysis and Assessment Report (as required by Section XVIII.F.3.c) to the Monitor summary statistics regarding the use of non-model thresholds and such information shall be considered by the Monitor as part of its Threshold Setting Process Review in the annual Audit Report.

        c)   For the purposes of establishing and maintaining Thresholds, each Injunctive Relief Distributor shall take into account the Controlled Substances diversion risk of each drug base code. The diversion risk of each base code should be defined and reassessed annually by the Injunctive Relief Distributor's CSMP Committee and reviewed by the Monitor.

        d)   Each Injunctive Relief Distributor shall establish Thresholds for new Customers prior to supplying those Customers with Controlled Substances and shall continue to have Thresholds in place at all times for each Customer to which it supplies Controlled Substances.

        e)   When ordering volume from other distributors becomes readily available from the Clearinghouse, an Injunctive Relief Distributor shall consider including such information as soon as reasonably practicable in establishing and maintaining Thresholds.

f)      Each Injunctive Relief Distributor shall incorporate the following guiding principles in establishing and maintaining Customer Thresholds, except when inapplicable to non-model Thresholds:

      (1)    Thresholds shall take into account the number of non-Controlled Substance dosage units distributed to, dispensed and/or number of prescriptions dispensed by the Customer to assist with the determination of Customer size. As a general matter, smaller customers should have lower Thresholds than larger customers.

      (2)    For the purposes of establishing and maintaining Thresholds, Injunctive Relief Distributors shall use statistical models that are appropriate to the underlying data.

      (3)    For the purposes of establishing and maintaining Thresholds, Injunctive Relief Distributors shall take into account a Customer's ordering and/or dispensing history for a specified period of time.

      (4)    For the purposes of establishing and maintaining Thresholds, Injunctive Relief Distributors shall take into account the ordering history of Customers within similar geographic regions, or, where appropriate for Chain Customers, ordering history within the chain.

      (5)    If appropriate, Thresholds may take into account the characteristics of Customers with similar business models.

            (a)    A Customer's statement that it employs a particular business model must be verified, to the extent practicable, before that business model is taken into account in establishing and maintaining a Customer's Threshold.

2.    <u>Threshold Auditing</u>

a)    The Injunctive Relief Distributors shall review their respective Customer Thresholds at least on an annual basis and modify them where appropriate.

b)    Each Injunctive Relief Distributor's CSMP department shall annually evaluate its Threshold setting methodology and processes and its CSMP personnel's performance in adhering to those policies.

3.    <u>Threshold Changes</u>

a)     An Injunctive Relief Distributor may increase or decrease a Customer Threshold as set forth in its CSMP policies and procedures, subject to Sections XII.C.3.b through XII.C.3.e.

b)     Prior to approving any Threshold change request by a Customer, each Injunctive Relief Distributor shall conduct due diligence to determine whether an increase to the Threshold is warranted. This due diligence shall include obtaining from the Customer the basis for the Threshold change request, obtaining and reviewing Dispensing Data and/or Pharmacy Customer Data for the previous three (3) months for due diligence purposes, and, as needed, conducting an on-site visit to the Customer. This Threshold change request diligence shall be conducted by the Injunctive Relief Distributor's CSMP personnel.

c)     No Injunctive Relief Distributor shall proactively contact a Customer to suggest that the Customer request an increase to any of its Thresholds, to inform the Customer that its Orders-to-date are approaching its Thresholds or to recommend to the Customer the amount of a requested Threshold increase. It shall not be a violation of this paragraph to provide Chain Customer headquarters reporting on one or more individual Chain Customer pharmacy location(s) to support the anti-diversion efforts of the Chain Customer's headquarters staff, and it shall not be a violation of this paragraph for the Injunctive Relief Distributor's CSMP personnel to contact Customers to seek to understand a Customer's ordering patterns.

d)     An Injunctive Relief Distributor's Chief Diversion Control Officer may approve criteria for potential adjustments to Customer Thresholds to account for circumstances where the Thresholds produced by the ordinary operation of the statistical models require modification. Such circumstances include adjustments to account for seasonal ordering of certain Controlled Substances that are based on documented diligence and analysis, adjustments made to permit ordering of certain Controlled Substances during a declared national or state emergency (e.g., COVID-19 pandemic), IT errors, and data anomalies causing results that are inconsistent with the design of the statistical models. Each Injunctive Relief Distributor shall include in its Annual Threshold Analysis and Assessment Report (as required by Section XVIII.F.3.c) to the Monitor information regarding the use of this paragraph and such information shall be considered by the Monitor as part of its Threshold Setting Process Review in the annual Audit Report.

e)     Any decision to raise a Customer's Threshold in response to a request by a Customer to adjust its Threshold must be documented

in a writing and state the reason(s) for the change. The decision must be consistent with the Injunctive Relief Distributor's CSMP and documented appropriately.

## XIII.   SUSPICIOUS ORDER REPORTING AND NON-SHIPMENT

A.   Each Injunctive Relief Distributor shall report Suspicious Orders to the Settling States ("*Suspicious Order Reports*" or "*SORs*"), including those Settling States that do not currently require such SORs, at the election of the Settling State.

B.   For the SORs required by the Injunctive Relief Terms, each Injunctive Relief Distributor shall report Orders that exceed a Threshold for Controlled Substances set pursuant to the processes in Section XII that are blocked and not shipped.

C.   No Injunctive Relief Distributor shall ship any Order that it (i) reports pursuant to Sections XIII.A or XIII.B, or (ii) would have been required to report pursuant to Sections XIII.A or XIII.B had the Settling State elected to receive SORs.

D.   In reporting Suspicious Orders to the Settling States, the Injunctive Relief Distributors shall file SORs in a standardized electronic format that is uniform among the Settling States and contains the following information fields:

1.   Customer name;

2.   Customer address;

3.   DEA registration number;

4.   State pharmacy license number;

5.   Date of order;

6.   NDC number;

7.   Quantity;

8.   Explanation for why the order is suspicious (up to 250 characters): Details that are order-specific regarding why an order was flagged as a Suspicious Order, including specific criteria used by an Injunctive Relief Distributor's Threshold system (except phrases such as "order is of unusual size" without any additional detail are not acceptable); and

9.   Name and contact information for a knowledgeable designee within the Injunctive Relief Distributor's CSMP department to be a point of contact for the SORs.

E.   On a quarterly basis, each Injunctive Relief Distributor shall provide a summary report to the Settling States that elect to receive it that provides the following

information for the relevant quarter with respect to the top ten (10) Customers by volume for each Highly Diverted Controlled Substance base code that have placed a Suspicious Order for that base code, in that quarter (for Chain Customers, only individual pharmacies in the chain will considered for evaluation as a top ten (10) Customer):

1. The number of SORs submitted for that Customer by base code;

2. The Customer's order volume by base code for the quarter for all Highly Diverted Controlled Substances;

3. The Customer's order frequency by base code for the quarter for all Highly Diverted Controlled Substances;

4. For each Highly Diverted Controlled Substance base code, the ratio of the Customer's order volume for that base code to the volume of all pharmaceutical orders for the quarter; and

5. The ratio of the Customer's order volume of all Controlled Substances to the volume of all pharmaceutical orders for the quarter.

F. The Injunctive Relief Distributors shall only be required to file a single, uniform, electronic form of SOR with any Settling State that receives SORs pursuant to these Injunctive Relief Terms. A Settling State retains the authority pursuant to applicable state law or relevant state agency authority to request additional information about a particular SOR.

G. It is the objective of the Settling States and the Injunctive Relief Distributors for the Injunctive Relief Distributors to provide SORs to Settling States that identify the same Suspicious Orders as reported to the DEA pursuant to the definition and requirements of the federal Controlled Substances Act and its regulations, although the fields of the SORs submitted to the Settling States as required by Section XIII may differ from the content required by the DEA. To the extent federal definitions and requirements materially change during the term of the Injunctive Relief Terms, the Injunctive Relief Distributors may be required to adjust the format and content of the SORs to meet these federal requirements. The Injunctive Relief Distributors and the State Compliance Review Committee will engage in good faith discussions regarding such adjustments.

H. It shall not be a violation of the Injunctive Relief Terms if an Injunctive Relief Distributor ships a Suspicious Order or fails to submit or transmit a SOR if:

1. The shipment of the Suspicious Order or failed SOR transmission was due to a computer error (data entry mistakes, coding errors, computer logic issues, software malfunctions, and other computer errors or IT failures); and

2.      The Injunctive Relief Distributor reports the error, including a description of measures that will be taken to prevent recurrence of the error, to any affected Settling State, the State Compliance Review Committee, and the Monitor within five (5) business days of its discovery.

## XIV.  <u>TERMINATED CUSTOMERS</u>

A.      Each Injunctive Relief Distributor shall report to the Clearinghouse, once operational, within five (5) business days (or as otherwise required by state statute or regulation), Customers it has terminated from eligibility to receive Controlled Substances or refused to onboard for the sale of Controlled Substances due to concerns regarding the Customer's ability to provide effective controls against the potential diversion of Controlled Substances following the Effective Date.

B.      The Injunctive Relief Distributors shall report to the relevant Settling State(s), within five (5) business days (or as otherwise required by state statute or regulation) Customers located in such Settling States that it has terminated from eligibility to receive Controlled Substances or refused to onboard for the sale of Controlled Substances due to concerns regarding the Customer's ability to provide effective controls against the potential diversion of Controlled Substances following the Effective Date. Such reports will be made in a uniform format. The Injunctive Relief Distributors and the State Compliance Review Committee shall use best efforts to agree on such uniform format for inclusion prior to the requirement taking effect.

C.      In determining whether a Customer should be terminated from eligibility to receive Controlled Substances, Injunctive Relief Distributors shall apply factors set out in their CSMP policies and procedures, which shall include the following conduct by a Customer:

1.      Has generated an excessive number of Suspicious Orders, which cannot otherwise be explained;

2.      Has routinely demonstrated unresolved Red Flag activity;

3.      Has continued to fill prescriptions for Highly Diverted Controlled Substances that raise Red Flags following an Injunctive Relief Distributor's warning or communication about such practices;

4.      Has failed to provide Pharmacy Customer Data or Dispensing Data in response to a request from an Injunctive Relief Distributor or otherwise refuses to cooperate with the Injunctive Relief Distributor's CSMP after providing the Customer with a reasonable amount of time to respond to the Injunctive Relief Distributor's requests;

5.      Has been found to have made material omissions or false statements on a Pharmacy Questionnaire (the requirements for the contents of a Pharmacy Questionnaire are described in Section IX); or

6.      Has been the subject of discipline by a State Board of Pharmacy within the past three (3) years or has had its owner(s) or pharmacist-in-charge subject to license probation or termination within the past five (5) years by a State Board of Pharmacy for matters related to Controlled Substances dispensing or a federal or state felony conviction.

D.      Once the Clearinghouse has made Customer termination data available to each Injunctive Relief Distributor, each Injunctive Relief Distributor shall consider terminating Customers that have been terminated from eligibility to receive Controlled Substances by another distributor as a result of suspected diversion of Controlled Substances if the Customer is ordering only Controlled Substances from the Injunctive Relief Distributor. If the Injunctive Relief Distributor determines not to terminate Customers to which this paragraph applies, the Injunctive Relief Distributor shall document its decision-making. A good-faith decision to continue shipping Controlled Substances to Customers to which this paragraph applies, shall not serve, without more, as the basis of a future claim of non-compliance with the Injunctive Relief Terms.

E.      For Chain Customers, the provisions in Section XIV.A-D shall apply to the specific pharmacies in question.

## XV.    EMERGENCIES

A.      In the circumstances of declared national or state emergencies in which the healthcare community relies on the Injunctive Relief Distributors for critical medicines, medical supplies, products, and services, the Injunctive Relief Distributors may be required to temporarily modify their respective CSMP processes to meet the critical needs of the supply chain. These modifications may conflict with the requirements of the Injunctive Relief Terms.

B.      In the case of a declared national or state emergency, the Injunctive Relief Distributors shall be required to give notice to the State Compliance Review Committee of any temporary material changes to their CSMP processes which may conflict with the requirements of the Injunctive Relief Terms and specify the sections of the Injunctive Relief Terms which will be affected by the temporary change.

C.      The Injunctive Relief Distributors shall document all temporary changes to their CSMP processes and appropriately document all customer-specific actions taken as a result of the declared national or state emergency.

D.      The Injunctive Relief Distributors shall provide notice to the State Compliance Review Committee at the conclusion of the declared national or state emergency, or sooner, stating that the temporary CSMP processes put into place have been suspended.

E.      Provided the Injunctive Relief Distributors comply with the provisions of Sections XV.A through XV.D, the Injunctive Relief Distributors will not face liability for

any deviations from the requirements of the Injunctive Relief Terms taken in good faith to meet the critical needs of the supply chain in response to the declared national or state emergency. Nothing herein shall limit Settling States from pursuing claims against the Injunctive Relief Distributors based on deviations from the requirements of the Injunctive Relief Terms not taken in good faith to meet the critical needs of the supply chain in response to a declared national or state emergency.

## XVI.  COMPLIANCE WITH LAWS AND RECORDKEEPING

A.  The Injunctive Relief Distributors acknowledge and agree that they must comply with applicable state and federal laws governing the distribution of Controlled Substances.

B.  Good faith compliance with the Injunctive Relief Terms creates a presumption that the Injunctive Relief Distributors are acting reasonably and in the public interest with respect to Settling States' existing laws requiring effective controls against diversion of Controlled Substances and with respect to the identification, reporting, and blocking of Suspicious Orders of Controlled Substances.

C.  The requirements of the Injunctive Relief Terms are in addition to, and not in lieu of, any other requirements of state or federal law applicable to Controlled Substances distribution. Except as provided in Section XVI.D, nothing in the Injunctive Relief Terms shall be construed as relieving Injunctive Relief Distributors of the obligation to comply with such laws, regulations, or rules. No provision of the Injunctive Relief Terms shall be deemed as permission for Injunctive Relief Distributors to engage in any acts or practices prohibited by such laws, regulations, or rules.

D.  In the event of a conflict between the requirements of the Injunctive Relief Terms and any other law, regulation, or requirement such that an Injunctive Relief Distributor cannot comply with the law without violating the Injunctive Relief Terms or being subject to adverse action, including fines and penalties, the Injunctive Relief Distributor shall document such conflicts and notify the State Compliance Review Committee and any affected Settling State the extent to which it will comply with the Injunctive Relief Terms in order to eliminate the conflict within thirty (30) days of the Injunctive Relief Distributor's discovery of the conflict. The Injunctive Relief Distributor shall comply with the Injunctive Relief Terms to the fullest extent possible without violating the law.

E.  In the event of a change or modification of federal or state law governing the distribution of Controlled Substances that creates an actual or potential conflict with the Injunctive Relief Terms, any Injunctive Relief Distributor, any affected Settling State, or the State Compliance Review Committee may request that the Injunctive Relief Distributors, State Compliance Review Committee, and any affected Settling State meet and confer regarding the law change. During the meet and confer, the Injunctive Relief Distributors, the State Compliance Review

Committee, and any affected Settling State will address whether the change or modification in federal or state law requires an amendment to the Injunctive Relief Terms. In the event the Injunctive Relief Distributors, the State Compliance Review Committee, and any affected Settling State cannot agree on a resolution, and the dispute relates to whether the generally applicable Injunctive Relief Terms herein should be changed, an Injunctive Relief Distributor, the State Compliance Review Committee, or any affected Settling State may submit the question to the National Arbitration Panel. If the dispute relates to whether a change in an individual State's law requires a modification of the Injunctive Relief Terms only with respect to that State, an Injunctive Relief Distributor, the State Compliance Review Committee, or any affected Settling State may seek resolution of the dispute pursuant to Section XIX. Maintenance of competition in the industry and the potential burden of inconsistent obligations by Injunctive Relief Distributors shall be a relevant consideration in such resolution.

F.    <u>Recordkeeping</u>: Each Injunctive Relief Distributor shall retain records it is required to create pursuant to its obligations hereunder in an electronic or otherwise readily accessible format. The Settling States shall have the right to review records provided to the Monitor pursuant to Section XVIII. Nothing in the Injunctive Relief Terms prohibits a Settling State from issuing a lawful subpoena for records pursuant to an applicable law.

## XVII.  <u>CLEARINGHOUSE</u>

A.    Creation of the Clearinghouse

1.    The Clearinghouse functions shall be undertaken by a third-party vendor or vendors.

2.    The vendor(s) will be chosen through a process developed and jointly agreed upon by the Injunctive Relief Distributors and the State Compliance Review Committee.

3.    Consistent with the process developed by the Injunctive Relief Distributors and the State Compliance Review Committee, within two (2) months of the Effective Date, the Injunctive Relief Distributors shall issue a Request for Proposal to develop the systems and capabilities for a Clearinghouse to perform the services of a data aggregator.

4.    Within five (5) months of the Effective Date, the Clearinghouse Advisory Panel shall select one or more entities to develop the systems for the Clearinghouse and perform data aggregator services. The Clearinghouse Advisory Panel shall select a vendor or vendors that employ or retain personnel who have adequate expertise and experience related to the pharmaceutical industry, the distribution of Controlled Substances, and the applicable requirements of the Controlled Substances Act and the DEA's implementing regulations.

5.    Within sixty (60) days of the selection of a vendor(s) to serve as the Clearinghouse, the Injunctive Relief Distributors shall negotiate and finalize a contract with the vendor(s). The date that the contract is signed by the Injunctive Relief Distributors and the vendor(s) shall be referred to as the "*Clearinghouse Retention Date*."

6.    The development of the Clearinghouse shall proceed on a phased approach as discussed in Sections XVII.C and XVII.D.

**B.    Governance and Staffing of the Clearinghouse**

1.    *Capabilities.* The selected vendor or vendors shall staff the Clearinghouse in a manner that ensures the development of robust data collection, analytics and reporting capabilities for the Settling States and Injunctive Relief Distributors. To the extent additional expertise is required for the engagement, the vendor(s) may retain the services of third-party consultants.

2.    *Independence.* While performing services for the Clearinghouse, all vendors and consultants, and their staff working on the Clearinghouse, shall be independent (*i.e.*, not perform services of any kind, including as a consultant or an employee on behalf of any Injunctive Relief Distributor outside of the ordinary business operations of the Clearinghouse). Independence may be achieved by implementing appropriate ethical walls with employees who are currently performing or who have previously performed work for an Injunctive Relief Distributor within two years of the Clearinghouse Retention Date.

3.    *Liability*. The Injunctive Relief Distributors are entitled to rely upon information or data received from the Clearinghouse, whether in oral, written, or other form. No Injunctive Relief Distributor, and no individual serving on the Clearinghouse Advisory Panel, shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any Party for or in connection with any action taken or not taken by the Clearinghouse. In addition, no Injunctive Relief Distributor, and no individual serving on the Clearinghouse Advisory Panel, shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any Party for or in connection with any action taken or not taken by an Injunctive Relief Distributor based on incorrect, inaccurate, incomplete or otherwise erroneous information or data provided by the Clearinghouse, unless the information or data was incorrect, inaccurate, incomplete or otherwise erroneous because the Injunctive Relief Distributor itself provided incorrect, inaccurate, incomplete or otherwise erroneous data or information to the Clearinghouse. For any legal requirements that are assumed by the Clearinghouse during Phase 2-B pursuant to Section XVII.D.3, liability shall be addressed pursuant to Section XVII.D.3.c.

4.  *Clearinghouse Advisory Panel*. The State Compliance Review Committee and Injunctive Relief Distributors shall create a Clearinghouse Advisory Panel no later than sixty (60) days after the Effective Date to oversee the Clearinghouse.

    a)  The Clearinghouse Advisory Panel shall have an equal number of members chosen by the State Compliance Review Committee on the one hand, and the Injunctive Relief Distributors on the other. The size of the Clearinghouse Advisory Panel will be decided by the State Compliance Review Committee and the Injunctive Relief Distributors, and the State Compliance Review Committee and the Injunctive Relief Distributors may select as members third-party experts, but no more than one half of each side's representatives may be such third-party experts. At least one member chosen by the State Compliance Review Committee will be based on consultation with the National Association of State Controlled Substances Authorities.

    b)  During the first two years of the operation of the Clearinghouse, the Clearinghouse Advisory Panel shall meet (in-person or remotely) at least once per month. After the first two years of operation, the Clearinghouse Advisory Panel shall meet at least quarterly. The Monitor may attend Clearinghouse Advisory Panel meetings and may provide recommendations to the Clearinghouse Advisory Panel.

    c)  The Clearinghouse Advisory Panel shall establish a subcommittee to advise on issues related to privacy, the Health Insurance Portability and Accountability Act of 1996 ("*HIPAA*"), and data security and a subcommittee to advise on issues related to Dispensing Data. It may establish additional subcommittees. Subcommittees may include individuals who are not members of the Clearinghouse Advisory Panel. The Clearinghouse Advisory Panel may invite one or more prescribers, dispensers, and representatives from state Prescription Drug Monitoring Programs ("*PDMP*") to serve on the Dispensing Data subcommittee. Each Injunctive Relief Distributor shall have a representative on each subcommittee created by the Clearinghouse Advisory Panel.

    d)  The Clearinghouse Advisory Panel may delegate tasks assigned to it by the Injunctive Relief Terms to the Executive Director.

5.  *Executive Director*. One employee of the vendor, or one representative from the vendor group in the event that there are multiple vendors, shall be an Executive Director who shall manage day-to-day operations and report periodically to the Clearinghouse Advisory Panel.

C.  **Phase 1 of the Clearinghouse: Data Collection, Initial Analytics and Reporting**

1.  System Development

a)  Within one (1) year of the Clearinghouse Retention Date, the Clearinghouse shall develop systems to receive and analyze data obtained from the Injunctive Relief Distributors pursuant to electronic transmission formats to be agreed upon by the Clearinghouse Advisory Panel.

b)  In developing such systems, the Clearinghouse shall ensure that:

(1)  The systems provide robust reporting and analytic capabilities.

(2)  Data obtained from Injunctive Relief Distributors shall be automatically pulled from the existing order management data platforms (e.g., SAP).

(3)  The systems shall be designed to receive data from sources other than the Injunctive Relief Distributors, including pharmacies, non-Injunctive Relief Distributors, the DEA, State Boards of Pharmacy, and other relevant sources, pursuant to standardized electronic transmission formats.

(4)  The systems shall be designed to protect personally identifiable information ("*PII*") and protected health information ("*PHI*") from disclosure and shall comply with HIPAA and any federal and state laws relating to the protection of PII and PHI.

(5)  The Clearinghouse will establish a HIPAA-compliant database that can be accessed by state authorities, the Injunctive Relief Distributors, and any entities that subsequently participate in the Clearinghouse. The database that will be made available to the Injunctive Relief Distributors and any non-governmental entities that subsequently participate in the Clearinghouse will also blind commercially sensitive information.

(6)  State authorities shall have access to the HIPAA-compliant database via web-based tools and no additional or specialized equipment or software shall be required. This access shall allow state authorities to query the HIPAA-compliant database without limitation.

(7)    The Injunctive Relief Distributors shall be permitted to use data obtained from the Clearinghouse for anti-diversion purposes, including the uses expressly contemplated by the Injunctive Relief Terms. The Injunctive Relief Distributors shall not sell (or obtain license fees for) data obtained from Clearinghouse to any third-parties. Nothing in the Injunctive Relief Terms shall prohibit an Injunctive Relief Distributor from using its own data, including data provided to the Injunctive Relief Distributor by third-parties other than the Clearinghouse, for any commercial purposes, including selling or licensing its data to third-parties.

2.    Aggregation of Data

a)    It is the goal of the Settling States and the Injunctive Relief Distributors for the Clearinghouse to obtain comprehensive data from all distributors, pharmacies, and other relevant data sources to provide maximum permissible transparency into the distribution and dispensing of Controlled Substances. During Phase 1, the Clearinghouse Advisory Panel shall develop recommendations for ways to achieve this goal.

b)    In Phase 1, the Injunctive Relief Distributors shall provide and/or facilitate the collection of, and the Clearinghouse shall collect and maintain, the following:

(1)    Injunctive Relief Distributor transaction data for Controlled Substances and non-Controlled Substances, specified at the NDC, date, quantity, and customer level.

(2)    Injunctive Relief Distributor information on Customers that have been terminated and/or declined onboarding due to concerns regarding Controlled Substance dispensing following the Effective Date.

c)    The Clearinghouse shall make available to the Injunctive Relief Distributors, in a format to be determined by the Clearinghouse Advisory Panel, blinded data for their CSMP due diligence functions. The data will include all Controlled Substances and non-Controlled Substances and be refreshed on a regular basis. The Clearinghouse will also seek to provide non-identifying information regarding whether a single distributor is associated with multiple warehouses with unique DEA registrations (e.g., multiple distribution centers operated by a single distributor), in the data it makes available.

d)     During Phase 1, the Clearinghouse Advisory Panel (with input from its Dispensing Data subcommittee) will develop an operational plan to obtain Dispensing Data directly from pharmacies, unless the Clearinghouse Advisory Panel determines it is inadvisable to do so. The operational plan developed by the Clearinghouse Advisory Panel shall address compliance with HIPAA and shall include recommendations to facilitate the collection of Dispensing Data in compliance with HIPAA and relevant state privacy laws. To the extent possible, the Clearinghouse will begin collecting Dispensing Data during Phase 1.

e)     Nothing in the Injunctive Relief Terms shall require the Injunctive Relief Distributors to indemnify or otherwise be responsible to pharmacy customers for any claims resulting from the provision of Dispensing Data to the Clearinghouse, including, but not limited to, claims related to any data breaches occurring with the data transmitted to or maintained by the Clearinghouse.

3.    State and Federal Reporting Requirements

a)     The Injunctive Relief Distributors shall comply with state and federal transactional and Suspicious Order reporting requirements related to Controlled Substances as follows:

(1)    Until such time as the Clearinghouse is able to provide transactional and Suspicious Order regulatory reporting to the states on behalf of the Injunctive Relief Distributors, the Injunctive Relief Distributors shall continue to file all required reports under state law and those reports required by these Injunctive Relief Terms.

(2)    Once the Clearinghouse is able to process and submit such reports, the Clearinghouse may process and submit those reports on behalf of each Injunctive Relief Distributor to the states. At all times during Phase 1, each Injunctive Relief Distributor shall remain responsible for the identification of Suspicious Orders and will remain liable for a failure to submit transactional data or Suspicious Order reports required under state law or these Injunctive Relief Terms.

(3)    An Injunctive Relief Distributor may elect to fulfill its reporting obligations directly, rather than have the Clearinghouse assume the responsibility for the transmission of the various reports.

4.　　Additional Reports and Analytics

a)　　In consultation with the Clearinghouse Advisory Panel, the Clearinghouse shall work to develop additional reports and analyses to assist the Settling States and the Injunctive Relief Distributors in addressing Controlled Substance diversion, including, but not limited to, identifying Red Flags consistent with Section VIII.

b)　　The Clearinghouse will generate analyses and reports to be used by the Settling States and the Injunctive Relief Distributors based on format and content recommended by the Clearinghouse Advisory Panel. In order to refine the format and reach final recommendations, the Clearinghouse shall prepare sample analytical reports for a sample geographic region to review with the Clearinghouse Advisory Panel. The sample reports will also be shared with the DEA in an effort to receive additional feedback.

c)　　After the content and format of the sample reports have been approved by the Clearinghouse Advisory Panel, the Clearinghouse will begin producing reports on a periodic basis.

d)　　The Clearinghouse will develop capabilities to provide Settling States customized reports upon reasonable request to assist in their efforts to combat the diversion of Controlled Substances and for other public health and regulatory purposes.

e)　　After the Clearinghouse has obtained sufficient Dispensing Data from Customers, the Clearinghouse shall commence providing standard reports to the Settling States and Injunctive Relief Distributors that will include summaries and analysis of Dispensing Data. The reports and analytics of Dispensing Data shall be developed in consultation with the Clearinghouse Advisory Panel (including its Dispensing Data subcommittee) and shall include, but not be limited to:

(1)　　Identification of Customers whose dispensing may indicate Red Flags consistent with Section VIII, as determined by the Clearinghouse from aggregate data; and

(2)　　Identification of Customers whose aggregate dispensing volumes for Highly Diverted Controlled Substances are disproportionately high relative to the population of the relevant geographic area.

f)　　The Clearinghouse shall also prepare reports and analyses for the Settling States and Injunctive Relief Distributors identifying prescribers whose prescribing behavior suggests they may not be

engaged in the legitimate practice of medicine. Such reports and analysis shall be developed in consultation with the Clearinghouse Advisory Panel (including its Dispensing Data subcommittee) and shall seek to identify and evaluate:

(1) Prescribers who routinely prescribe large volumes of Highly Diverted Controlled Substances relative to other prescribers with similar specialties, including health care professionals who prescribe a large number of prescriptions for high dosage amounts of Highly Diverted Controlled Substances;

(2) Prescribers whose prescriptions for Highly Diverted Controlled Substances are routinely and disproportionately filled in a geographic area that is unusual based on the prescriber's location; and

(3) Prescribers who routinely prescribe out-of-specialty or out-of-practice area without legitimate reason.

g) Reports or analysis generated by the Clearinghouse may not be based on complete data due to a lack of participation by non-Injunctive Relief Distributors and pharmacies. As such, Injunctive Relief Distributors shall not be held responsible for actions or inactions related to reports and analysis prepared by the Clearinghouse which may be based on incomplete data due to a lack of participation by non-Injunctive Relief Distributors and pharmacies.

**D. Phase 2 of the Clearinghouse: Additional Data Collection and Analytics and Assumption of CSMP Functions**

Within one (1) year of Phase 1 of the Clearinghouse being operational, the Clearinghouse and the Clearinghouse Advisory Panel shall develop a detailed strategic and implementation plan for Phase 2 of the Clearinghouse ("*Phase 2 Planning Report*"). Phase 2 will consist of two parts. Phase 2-A will focus on increasing data collection from non-Injunctive Relief Distributors, pharmacies and other data sources and developing enhanced analytics based on the experiences gained from Phase 1. Phase 2-A will also include recommendations for the development of uniform federal and state reporting. Phase 2-B will involve the potential assumption of various CSMP activities, including Threshold setting and order management by the Clearinghouse. The Phase 2 Planning Report will address both Phase 2-A and Phase 2-B. After the completion of the Phase 2 Planning Report, individual Injunctive Relief Distributors, in their sole discretion, may elect not to proceed with Phase 2-B as provided by Section XVII.E. If one or more Injunctive Relief Distributors elect to proceed with Phase 2-B, the goal will be to have Phase 2-B fully operational within two (2) years of the Clearinghouse

Retention Date and no later than three (3) years of the Clearinghouse Retention Date.

1.      Phase 2-A: Additional Data Collection and Analytics

      a)      During Phase 2-A, the Clearinghouse will continue the functions defined in Phase 1 and work to expand the scope of its data collection and enhance its analytics and reporting capabilities including the following:

            (1)      Integration of data from additional sources, including:

                  (a)      Transaction data from other distributors, including manufacturers that distribute directly to retail pharmacies and pharmacies that self-warehouse; and

                  (b)      Where possible, state PDMP data and other data, including, but not limited to, State Board of Medicine and Board of Pharmacy sanctions, and agreed-upon industry data. If state PDMP data is effectively duplicative of Dispensing Data already obtained in Phase 1, it will not be necessary for the Clearinghouse to obtain state PDMP data.

            (2)      Development of additional metrics analyzing the data available from the additional data sources (PDMP, other pharmacy data, sanction authorities, and third-party volume projections).

            (3)      Development of real-time or near real-time access to distribution data, dispensing data and other data sources.

            (4)      Refinement of methodologies for analyzing Dispensing Data to identify suspicious prescribers.

            (5)      Development of additional capabilities to provide Settling States, the Injunctive Relief Distributors and potentially the DEA customized reporting from the Clearinghouse upon reasonable request.

2.      Phase 2-A: Uniform Required Reporting

      a)      The Clearinghouse and the Clearinghouse Advisory Panel shall develop uniform reporting recommendations for potential implementation by state regulators in order to allow the Injunctive Relief Distributors to satisfy their obligations under the Injunctive

Relief Terms and state and federal laws in a uniform and consistent manner.

b)    It is a goal of the Settling States and the Injunctive Relief Distributors to:

    (1)    Streamline and simplify required reporting which will benefit the Injunctive Relief Distributors and the Settling States, as well as the DEA;

    (2)    Develop uniform transactional and Suspicious Order reporting requirements; and

    (3)    Provide for the submission of uniform Suspicious Order reports.

3.    Phase 2-B: Clearinghouse Assumption of CSMP Functions

a)    With respect to Phase 2-B, the Phase 2 Planning Report shall address:

    (1)    Engagement with stakeholders, including the DEA, to develop the system of Threshold setting and Suspicious Order reporting to potentially be provided by the Clearinghouse;

    (2)    Development of technology and rules, including any proposed changes to federal law or regulations;

    (3)    Development of models for the identification of Suspicious Orders and setting universal Thresholds in a manner consistent with Section XII. These models shall include active order management and order fulfillment protocols to ensure that orders are compared to relevant Thresholds by the Clearinghouse before shipment instructions are provided by the Clearinghouse to the Injunctive Relief Distributors. The models shall also include the identification of Suspicious Orders when they are placed by Customers, which will be held before shipment or blocked based on instructions provided by the Clearinghouse to the Injunctive Relief Distributors.

    (4)    Development of criteria governing distribution to Customers that have placed one or more Orders that exceed a Threshold;

<div style="margin-left: 2em;">

(5) Development of rules for allocating Orders placed by Customers that have more than one Distributor if one or more Orders exceed a Threshold;

(6) Development of a pilot project for a sample geographic region to perform data analysis to test the models for Threshold setting and the identification of Suspicious Orders.

</div>

b) Following implementation of Phase 2-B, the Injunctive Relief Distributors participating in Phase 2-B and the State Compliance Review Committee shall meet and confer with respect to whether to expand the scope of the Clearinghouse to cover additional anti-diversion functions, such as the performance of due diligence.

c) CSMP functions that have been assumed by the Clearinghouse during Phase 2-B will no longer be performed by participating Injunctive Relief Distributors individually through their CSMPs. CSMP functions performed by the Clearinghouse will assist participating Injunctive Relief Distributors to satisfy the applicable legal obligations of those Injunctive Relief Distributors. The Clearinghouse's performance of CSMP functions will not relieve participating Injunctive Relief Distributors from their legal obligations unless (i) the Injunctive Relief Distributors and the State Compliance Review Committee jointly enter into a written agreement for the Clearinghouse to assume legal requirements during Phase 2-B; and (ii) all vendors and consultants working on the Clearinghouse agree in writing to assume such obligations. Nothing in this paragraph shall apply to any Injunctive Relief Distributor that does not participate in Phase 2-B pursuant to Section XVII.E.

**E.    Option to Opt Out of Phase 2-B**

1. Each Injunctive Relief Distributor shall have the option, in its sole discretion, to elect not to participate in Phase 2-B at any point. In the event that an Injunctive Relief Distributor elects not to participate in Phase 2-B, that Injunctive Relief Distributor shall cease to have any obligation to fund future costs directly related to Phase 2-B of the Clearinghouse or to implement the Clearinghouse's determinations as to identification of Suspicious Orders and Suspicious Order reporting. If an Injunctive Relief Distributor elects not to participate in Phase 2-B, that Injunctive Relief Distributor shall remain responsible for the requirements specified for Phase 1 and Phase 2-A of the Clearinghouse and shall be responsible for contributing to the costs associated with Phase 1 and Phase 2-A.

2. In the event that an Injunctive Relief Distributor elects not to participate in Phase 2-B, the Clearinghouse Advisory Panel shall discuss and make recommendations for any necessary adjustments to the Phase 2-B capabilities described in Section XVII.D.3.

**F. Funding**

1. The establishment and ongoing operations of the Clearinghouse shall be funded by the Injunctive Relief Distributors for a period of ten (10) years commencing on the Clearinghouse Retention Date.

2. For each of the first two (2) years of the operation of the Clearinghouse, the Injunctive Relief Distributors will make total payments of $7.5 million per year combined. For years three (3) through ten (10), the Injunctive Relief Distributors will make total payments of $3 million per year combined. Additional costs associated with Phase 2-B shall be billed to the Injunctive Relief Distributors participating in Phase 2-B.

3. Payments by the Injunctive Relief Distributors for the Clearinghouse shall be allocated among the Injunctive Relief Distributors as set forth in Section IV.H of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as Exhibit R.

4. In the event that the cost of the Clearinghouse exceeds the amounts provided by the Injunctive Relief Distributors, the Injunctive Relief Distributors and State Compliance Review Committee shall meet-and-confer on alternatives, which may include:

    a) Limiting the operations of the Clearinghouse consistent with a revised budget;

    b) Seeking additional sources of funding for the Clearinghouse; and/or

    c) Allocating, in a manner consistent with the allocation of payments between the Injunctive Relief Distributors as set forth in Section XVII.F.3, additional amounts that are the responsibility of the Injunctive Relief Distributors to be used for the operation of the Clearinghouse.

5. The Injunctive Relief Distributors and the State Compliance Review Committee agree to engage in good faith discussions regarding potential continued operation and funding of the Clearinghouse following the initial ten (10) year period of Clearinghouse operations.

6. The Injunctive Relief Distributors and the State Compliance Review Committee shall develop a means to obtain payments from other parties that may use or benefit from the Clearinghouse, including, but not limited

to, other settling defendants, non-Injunctive Relief Distributors, or other parties and the Clearinghouse Advisory Panel shall consider other funding sources for the Clearinghouse. This may include consideration of a user fee or other model by which non-Injunctive Relief Distributors that use the Clearinghouse will contribute to funding the Clearinghouse.

7.    In the event that ten (10) or more Settling States reach agreements with any national retail chain pharmacies to resolve claims related to the distribution of Controlled Substances, the Settling States' Attorneys' General agree to make participation in the Clearinghouse, including providing data to the Clearinghouse and contribution to the cost of the operation of the Clearinghouse, a condition of any settlement. The Settling States' Attorneys' General agree to make best efforts to ensure that any other settling distributors and/or pharmacies participate in the Clearinghouse. To the extent that the Attorneys General are able to secure participation by additional distributors and/or pharmacies, it is anticipated that, to the extent practicable based on the financial and relative size of the settling distributor and/or pharmacy, those entities will contribute to the cost of the operation of the Clearinghouse. The Injunctive Relief Distributors' obligation to fund the Clearinghouse shall be partially reduced by contributions obtained from other distributors and/or pharmacies pursuant to a formula to be determined by the Clearinghouse Advisory Panel.

## G.    Confidentiality

1.    All data provided to the Clearinghouse shall be confidential.

2.    Information provided by distributors participating in the Clearinghouse may not be provided to any other entity or individual outside those expressly contemplated by the Injunctive Relief Terms.

3.    The Clearinghouse may not provide to any distributor information specific to another distributor. Notwithstanding the prior sentence, the Clearinghouse may provide blinded data to a distributor reflecting total Orders (across all distributors) for a particular Customer, region, and/or state at the base code and NDC number level and all transactional data information. Such information may only be used by receiving distributors for purposes of identifying, minimizing, or otherwise addressing the risk of Controlled Substances diversion. No distributor or pharmacy, including the Injunctive Relief Distributors, shall attempt to obtain revenue from this information. Such information provided by the Clearinghouse shall be compliant with all applicable laws and regulations.

4.    If the Clearinghouse receives a request for disclosure of any data, material or other information created or shared under the Injunctive Relief Terms, pursuant to a Third Party Request, the Clearinghouse shall notify the

Injunctive Relief Distributors and the Clearinghouse Advisory Panel of the Third Party Request and any confidential information to be disclosed so that the Injunctive Relief Distributors may seek a protective order or otherwise challenge or object to the disclosure. The Clearinghouse shall provide the Injunctive Relief Distributors and the Clearinghouse Advisory Panel with at least ten (10) days' advance notice before complying with any Third Party Request for confidential information, except where state law requires a lesser period of advance notice.

**H.  Data Integrity**

1.  The Clearinghouse shall use best-in-class technology to preserve the integrity of the data.

2.  The Clearinghouse shall report any data breaches under HIPAA and state law that occur as a result of any of its data collection and reporting activities to the Settling States and other authorities as required by law.

3.  The Injunctive Relief Distributors and the Settling States shall not be liable for any breaches of any databases maintained by the Clearinghouse. This does not excuse the Clearinghouse or its vendor(s) from compliance with all state and federal laws and regulations governing (1) the protection of personal information and protected health information, or (2) notifications relating to Data Security Events.

**I.  Credit for Investment in the Clearinghouse**

1.  The Injunctive Relief Distributors and the State Compliance Review Committee shall negotiate in good faith regarding a potential credit against Injunctive Relief Distributors' overall settlement obligations if costs exceed the amounts specified in Section XVII.F.

## XVIII. <u>MONITOR</u>

A.  Monitor Selection and Engagement

1.  The Injunctive Relief Distributors shall engage a Monitor to perform the reviews described in Section XVIII.F. The Monitor shall employ or retain personnel who have appropriate qualifications related to the pharmaceutical industry and the laws governing the distribution of pharmaceuticals, the distribution of Controlled Substances, and the applicable requirements of federal and state law. The Monitor may also employ or retain personnel who have appropriate qualifications in the audit and review of sample documents in order to conduct the reviews described in Section XVIII.F. To the extent additional expertise is required for the engagement, the Monitor may retain the services of third-party consultants.

2. The Monitor must perform each review described in Section XVIII.F in a professionally independent and objective fashion, as defined in the most recent Government Auditing Standards issued by the United States Government Accountability Office. A Monitor shall not be engaged in active litigation involving one or more of the Injunctive Relief Distributors or Settling States or present a potential conflict of interest involving matters concerning an Injunctive Relief Distributor, except by agreement of the affected parties. If the Monitor is employed by an entity that performed work for any Injunctive Relief Distributor or any of the Settling States prior to the Effective Date, the Monitor will cause to be implemented appropriate ethical walls between the Monitor team and the employees of the firm who have previously performed work for an Injunctive Relief Distributor or any of the Settling States.

3. The process for selecting the Monitor shall be as follows:

a) Within sixty (60) calendar days of the Effective Date, the Injunctive Relief Distributors and the State Compliance Review Committee shall exchange pools of recommended candidates to serve as the Monitor. The pools shall each contain the names of three (3) individuals, groups of individuals, or firms.

b) After receiving the pools of Monitor candidates, the Injunctive Relief Distributors and the State Compliance Review Committee shall have the right to meet with the candidates and conduct appropriate interviews of the personnel who are expected to work on the project. The Injunctive Relief Distributors (individually or in combination) and the State Compliance Review Committee may veto any of the candidates, and must do so in writing within thirty (30) days of receiving the pool of candidates. If all three (3) candidates within a pool are rejected by either the Injunctive Relief Distributors or the State Compliance Review Committee, the party who rejected the three (3) candidates may direct the other party to provide up to three (3) additional qualified candidates within thirty (30) calendar days of receipt of said notice.

c) If the Injunctive Relief Distributors or the State Compliance Review Committee do not object to a proposed candidate, the Injunctive Relief Distributors or the State Compliance Review Committee shall so notify the other in writing within thirty (30) days of receiving the pool of candidates. If more than one candidate remains, the State Compliance Review Committee shall select the Monitor from the remaining candidates. Within thirty (30) calendar days of the selection of the Monitor, the Injunctive Relief Distributors shall retain the Monitor, and finalize all terms of engagement, supplying a copy of an engagement letter to the State Compliance Review Committee. The terms of engagement

shall include a process by which Injunctive Relief Distributors may challenge Monitor costs as excessive, duplicative or unnecessary, which process must be approved by the State Compliance Review Committee.

4.  The Injunctive Relief Distributors shall be responsible for the Monitor's fees and costs directly related to its performance of the work specified by the Injunctive Relief Terms up to a limit of $1,000,000 per year per Injunctive Relief Distributor (*i.e.*, a total of $3,000,000 per year).

5.  Prior to each year, the Monitor shall submit a combined annual budget to the Injunctive Relief Distributors and State Compliance Review Committee that shall not exceed a total of $3,000,000. The Monitor shall submit quarterly reports to the Injunctive Relief Distributors and the State Compliance Review Committee tracking actual spend to the annual budget.

6.  In the event that any of the Injunctive Relief Distributors or State Compliance Review Committee believe that the Monitor is not performing its duties and responsibilities under the Injunctive Relief Terms in a reasonably cost effective manner, an Injunctive Relief Distributor or the State Compliance Review Committee shall recommend in writing changes to the Monitor's practices to reduce cost. The Monitor, Injunctive Relief Distributors, and the State Compliance Review Committee shall meet and confer in good faith in response to such a recommendation.

7.  In the event that the Injunctive Relief Distributor and the State Compliance Review Committee cannot agree on whether the recommended cost reductions are warranted, either the State Compliance Review Committee or the Injunctive Relief Distributors may submit the question to the National Arbitration Panel, who shall determine whether the Monitor is performing its duties and responsibilities under the Injunctive Relief Terms in a reasonably cost effective manner, and, if not, the necessary changes to the Monitor's practices to reduce cost.

8.  If the National Arbitration Panel determines that the Monitor cannot complete the reviews described in Section XVIII.F within the combined annual budget of $3,000,000, the National Arbitration Panel shall require the Monitor to provide the Injunctive Relief Distributors and the State Compliance Review Committee with a written report explaining why it is not possible to complete the reviews within budget and all steps the Monitor has taken to perform its duties and responsibilities under the Injunctive Relief Terms in a reasonably cost effective manner. After receiving the Monitor's report, the Injunctive Relief Distributors, and the State Compliance Review Committee shall meet and confer in good faith to determine whether an increase in the combined budget is appropriate. If the Injunctive Relief Distributors and the State Compliance Review

Committee cannot reach an agreement on the amount of the reasonable costs in excess of $3,000,000 for the relevant year, the issue will be submitted to the National Arbitration Panel for resolution. The National Arbitration Panel may award additional costs up to total cap of $5,000,000 for the relevant year ($3,000,000 plus an additional $2,000,000).

9.      Unless the Injunctive Relief Distributors and the State Compliance Review Committee agree otherwise as part of the meet and confer process in the prior paragraph (such as by agreeing to limit the Monitor's duties and responsibilities for the remainder of the year), the amount above $3,000,000 and up to the total cap of $5,000,000 in a given year necessary for the Monitor to complete the reviews described in Section XVIII.F shall be divided evenly among the Injunctive Relief Distributors without reducing any other amounts that are the responsibility of the Injunctive Relief Distributors.

B.    Early Termination of the Monitor

1.      In the event any of the Injunctive Relief Distributors or State Compliance Review Committee believe that the Monitor is not performing its duties and responsibilities under the Injunctive Relief Terms in a reasonably professional, competent and independent manner, an Injunctive Relief Distributor or the State Compliance Review Committee shall recommend replacement of the Monitor in writing. The Injunctive Relief Distributors and the State Compliance Review Committee shall meet and confer in good faith in response to a recommendation to replace the Monitor. If the State Compliance Review Committee and the Injunctive Relief Distributors agree that the Monitor should be replaced, a replacement Monitor will be selected in the manner set forth in Section XVIII.A.3.

2.      In the event the Injunctive Relief Distributor and the State Compliance Review Committee cannot agree on whether the Monitor should be replaced, either the State Compliance Review Committee or the Injunctive Relief Distributors may submit the question of the Monitor's dismissal to the National Arbitration Panel, and the Monitor shall only be dismissed if that panel finds that there is Good Cause for dismissal. Good Cause for dismissal shall mean (a) a material and substantial breach of the terms of the Monitor's obligations under the Injunctive Relief Terms; (b) any act of dishonesty, misappropriation, embezzlement, intentional fraud, or similar conduct by the Monitor; (c) any clear pattern of bias or prejudice in favor or against any party by the Monitor; (d) conduct by the Monitor that demonstrates unfitness to fulfill the functions of the Monitor reasonably and competently; or (e) conflicts of interest described in Section XVIII.A.2. If the panel finds that the Monitor should be dismissed, a replacement Monitor will be selected in the manner set forth in Section XVIII.A.3.

3.     In addition, if the Monitor resigns for any reason, a replacement Monitor will be selected in the manner set forth in Section XVIII.A.3.

C.     Term and Reporting Periods

1.     The term of the Monitor will be five (5) years from the date the Monitor is appointed, divided into one-year periods for purposes of the reviews and reporting described in Section XVIII ("*Reporting Periods*").

D.     Monitor Access to Information

1.     In connection with its reviews set forth in Section XVIII.F, the Monitor may request to interview employees with appropriate authority and responsibilities as necessary. In the event that an Injunctive Relief Distributor believes that the Monitor is requesting an unreasonable number of interviews or requesting interviews of employees who do not have relevant information to the reviews required by Section XVIII.F, the Injunctive Relief Distributor and State Compliance Review Committee shall meet and confer in good faith to resolve this issue.

2.     The Chief Diversion Control Officer of each Injunctive Relief Distributor or a direct report of the Chief Diversion Control Officer shall serve as the primary point of contact for the Monitor to facilitate the Monitor's access to documents, materials, or staff necessary to conduct the reviews specified in Section XVIII.F. The Monitor shall communicate any request for documents, materials, or access to staff to the Chief Diversion Control Officers or their designees.

3.     If at any time the Monitor believes there is undue delay, resistance, interference, limitation, or denial of access to any records or to any employee or former employee deemed necessary by the Monitor to conduct the reviews specified in Section XVIII.F, the Monitor shall notify the Chief Diversion Control Officer of the Injunctive Relief Distributor and they shall meet and confer to resolve such issue. If the Monitor believes that the matter was not resolved, the Monitor shall immediately report the issue to the State Compliance Review Committee.

4.     To the extent any of the documents requested by the Monitor contain material protected from disclosure by any legal privilege, including the attorney-client privilege or attorney work product protections, an Injunctive Relief Distributor may redact such material before providing the documents to the Monitor, but must provide the Monitor with a privilege log describing the redacted information and identifying the basis for redaction.

5.     Notwithstanding any other information referenced and produced pursuant to Section XVIII, the Monitor shall have access to, and each Injunctive Relief Distributor's Chief Diversion Control Officer shall produce to the

-41-

Monitor, any settlement agreements with government entities entered into after the Effective Date specifically concerning the requirements contained in the Injunctive Relief Terms and an Injunctive Relief Distributor's distribution of Controlled Substances (as opposed to distribution of pharmaceutical products in general).

E.  Settling States' Access to Monitor

1.  Other than in connection with the initiation of a Notice of Potential Violation set forth in Section XIX.B.2, should the Monitor believe it needs to initiate communication with the State Compliance Review Committee regarding an Injunctive Relief Distributor's compliance with the Injunctive Relief Terms, the Monitor's communications should include the Chief Diversion Control Officer or counsel of the affected Injunctive Relief Distributor, regardless of the form of communication.

2.  The State Compliance Review Committee shall have access to any settlement agreements produced to the Monitor pursuant to Section XVIII.D.5.

F.  Reviews to be Conducted by the Monitor

1.  There shall be two (2) types of reviews to be conducted by the Monitor:

a)  Customer-specific reviews, as set forth in Section XVIII.F.2; and

b)  System reviews, as set forth in Section XVIII.F.3.

2.  Customer-Specific Reviews

a)  The following Customer-specific reviews will be conducted by the Monitor for each Injunctive Relief Distributor for each of the Reporting Periods:

(1)  Threshold Change Request Review ("*TCR Review*");

(2)  Onboarding New Customer Review ("*Onboarding Review*");

(3)  Ongoing Due Diligence Review ("*Ongoing Diligence Review*");

(4)  Customer Termination Review ("*Termination Review*"); and

(5)  Orders that Exceed Thresholds but are Shipped Review ("*Exceeded Threshold Review*").

b)    Sample selection and audit periods for TCR Reviews, Onboarding Reviews, Ongoing Diligence Reviews, Termination Reviews, and Exceeded Threshold Reviews:

(1)    For each Reporting Period, the Monitor will review a representative sample of files for the performance of the TCR Reviews, Onboarding Reviews, and Ongoing Diligence Reviews. The Monitor shall select a sample representative of various geographic regions, customer types (Independent Retail Pharmacy Customers or Chain Customer), and distribution centers.

(2)    The Monitor will meet and confer with each of the Injunctive Relief Distributors to determine the appropriate audit period within each Reporting Period from which the samples will be selected (e.g. samples will be selected from the first six (6) months of a reporting period to allow the Monitor time to perform its review during the remainder of the reporting period).

(3)    Within thirty (30) calendar days following the close of the agreed-upon audit period, the Injunctive Relief Distributors (or the Clearinghouse once operational, if able to do so) will provide the Monitor with the following lists of relevant Customers for each type of review:

(a)    A list of all Customers that requested at least one Threshold increase for a Highly Diverted Controlled Substance during the relevant audit period, including the number of such requests by each Customer;

(b)    A list of all Customers that were onboarded during the relevant audit period and, during that period, ordered and received Highly Diverted Controlled Substances;

(c)    A list of all Customers that were the subject of an Ongoing Diligence Review during the relevant audit period;

(d)    A list of all Customers that, for reasons related to Controlled Substance regulatory compliance, were terminated during the relevant audit period; and

(e)    A list of all Orders for Highly Diverted Controlled Substances where a decision was made to ship the Order even though the order exceeded the otherwise

-43-

applicable Threshold, with number of such shipped orders.

(4)  Within fifteen (15) calendar days of compiling this Customer information for sample selection, each Injunctive Relief Distributor shall propose a reasonable number of customer files for each review to the Monitor.

(5)  Within fifteen (15) calendar days of receiving the lists specified above from the Injunctive Relief Distributors, the Monitor shall choose representative files to be reviewed from these lists. Each list will include the Customers' zip code, geographic region, distribution center, and customer type (Independent Retail Pharmacy Customer or Chain Customer).

c)  TCR Reviews

(1)  For each Reporting Period, the Monitor shall conduct a TCR Review for a sample review of Customers who requested at least one Threshold increase for Highly Diverted Controlled Substances for each Injunctive Relief Distributor. For the TCR Reviews, the Monitor shall review the information contained in the files of the sample Customers and determine whether the information reflects substantial compliance with the requirements of Section XII.C.3.

d)  Onboarding Reviews

(1)  For each Reporting Period, the Monitor shall conduct an Onboarding Review of a sample of Customers that were onboarded during the applicable audit period and, during that period, ordered and received Highly Diverted Controlled Substances from the Injunctive Relief Distributor. For the Onboarding Reviews, the Monitor shall review the information contained in the files of the sample Customers and determine whether the information reflects substantial compliance with the requirements of Section IX.

e)  Ongoing Diligence Reviews

(1)  For each Reporting Period, the Monitor shall conduct an Ongoing Diligence Review of a sample of Customers for each Injunctive Relief Distributor that was the subject of an Ongoing Diligence Review during the relevant audit period. For the Ongoing Diligence Reviews, the Monitor shall review the information contained in the files of the

sample of Customers and determine whether the information reflects substantial compliance with the requirements of Section X.

f)     Termination Reviews

(1)     For each Reporting Period, the Monitor shall conduct a review of a sample of Customers that were terminated by each Injunctive Relief Distributor during the audit period. For the Termination Reviews, the Monitor shall review the information contained in the files of the sample of Customers and determine whether the information reflects substantial compliance with the requirements of Section XIV.

g)     Exceeded Threshold Review

(1)     For each Reporting Period, the Monitor shall conduct a review of a sample of Orders for Highly Diverted Controlled Substances where a decision was made by the Injunctive Relief Distributor to ship the Order even though the Order exceeded the applicable Threshold. For the Exceeded Threshold Reviews, the Monitor shall review the information contained in the Customer files related to the Orders and determine whether the information reflects substantial compliance with the requirements of Section XIII.B.

3.     Annual System Reviews:

a)     The following system reviews will be conducted by the Monitor for each Injunctive Relief Distributor for each of the Reporting Periods:

(1)     CSMP Review;

(2)     Threshold Setting Process Review;

(3)     Suspicious Orders and Suspicious Order Report Review;

(4)     Compensation Review;

(5)     Red Flag Review; and

(6)     Review of CSMP Integration with Clearinghouse.

b)     CSMP Review

(1)    For each Reporting Period, the Monitor shall conduct a review of the following materials from each Injunctive Relief Distributor:

    (a)    Current CSMP policies and procedures;

    (b)    Organizational charts for the departments that are relevant to the CSMP organization;

    (c)    Logs and/or summaries of any reports received on the "hot line" required by Section V.E and the action or response of an Injunctive Relief Distributor to any such reports;

    (d)    Copies of the quarterly reports provided by the Chief Diversion Control Officer to the CSMP Committee as required by Section IV.C;

    (e)    Copies of the quarterly reports provided by the CSMP Committee to senior management and the Board of Directors as required by Section VI.C; and

    (f)    Copies of the materials used for the training required by Section VII and lists of the attendees of the training.

c)    Threshold Setting Process Review:

(1)    For each Reporting Period, each Injunctive Relief Distributor or its outside consultants shall prepare a summary report describing how its Threshold-setting methodology for Independent Retail Pharmacy Customers and Chain Customers complies with Section XII (the "*Annual Threshold Analysis and Assessment Report*").

(2)    For each Reporting Period, the Monitor shall review the Annual Threshold Analysis and Assessment Report, determine whether the information reflects substantial compliance with the requirements of Section XII, and include any Observations and Recommendations, as defined in Section XVIII.G, in its annual Audit Report.

d)    Suspicious Orders and Suspicious Order Reporting Review:

(1)    For each Reporting Period, each Injunctive Relief Distributors will provide the Monitor with a report containing summary metrics for the Suspicious Orders that were reported to the DEA and the Settling States (the

"*Suspicious Order Metrics Report*"). In the Suspicious Order Metrics Report, the Injunctive Relief Distributors will also provide summary metrics for Orders of Highly Diverted Controlled Substances that exceeded a Threshold but were still shipped.

(2)    For each Reporting Period, the Monitor shall review the Suspicious Order Metrics Report, determine whether the information reflects substantial compliance with the requirements of Section XIII, and include any Observations and Recommendations in its annual Audit Report.

e)    Compensation Reviews:

(1)    For each Reporting Period, the Monitor will review compensation-related policy documents for each Injunctive Relief Distributor for sales personnel. The Monitor shall analyze those documents and determine whether the compensation policies of each Injunctive Relief Distributor comply with the requirements contained in Section V.

f)    Red Flags Review:

(1)    For each Reporting Period, the Monitor shall review the Red Flags defined in Section VIII and their incorporation into each Injunctive Relief Distributor's policies and procedures. The Monitor shall determine whether the information reflects substantial compliance with the requirements of Section VIII and include any Observations and Recommendations, as called for by Section VIII.C, about those definitions in its annual Audit Report.

g)    Review of CSMP Integration with the Clearinghouse:

(1)    For each Reporting Period, each Injunctive Relief Distributor shall prepare a report summarizing the status of the Injunctive Relief Distributor's CSMP integration with the operation of the Clearinghouse ("*Clearinghouse Integration Report*"). The Monitor shall review each Injunctive Relief Distributor's Clearinghouse Integration Report, determine whether the information reflects substantial compliance with the requirements of Section XVII, and include any Observations and Recommendations in its annual Audit Report.

G.    Observations and Recommendations:

1. If the Monitor notes any areas for potential improvement during the course of the reviews conducted pursuant to the Injunctive Relief Terms, the Monitor shall include any such recommendations in the Audit Report. Collectively, any such questions, concerns or recommendations will be referred to as "*Observations and Recommendations*."

H. Audit Reports:

1. No later than one hundred and twenty (120) calendar days prior to the end of a Reporting Period and/or at any other time deemed reasonably necessary by the Monitor, the Monitor shall provide each Injunctive Relief Distributor with a draft report detailing any instances of substantial non-compliance with the applicable provisions of the Injunctive Relief Terms from the reviews in Section XVIII.F (the "*Draft Report*"). The Draft Report will also describe any Observations and Recommendations.

2. Within thirty (30) calendar days of its receipt of the Draft Report, the Injunctive Relief Distributor will provide comments and responses to the Draft Report. The Injunctive Relief Distributor will, among other things:

   a) Respond to each instance of substantial non-compliance, including, where appropriate, describing any corrective action taken (or to be taken).

   b) Respond to each Observation and Recommendation.

3. Within thirty (30) calendar days of its receipt of the Injunctive Relief Distributors' responses to the Draft Report, the Monitor shall provide a final report (the "*Audit Report*") to each Injunctive Relief Distributor and the State Compliance Review Committee. The Monitor shall provide the State Compliance Review Committee with a copy of an Injunctive Relief Distributor's response to the Draft Report.

4. No action or lack of action by the Settling States regarding information received from the Monitor concerning an Injunctive Relief Distributor's conduct shall be considered affirmation, acceptance, or ratification of that conduct by the Settling States.

I. Confidentiality:

1. Materials and information provided by the Injunctive Relief Distributors to the Monitor that are designated "*Confidential*" (and any parts, portions, or derivations thereof) (the "*Confidential Information*") will be kept confidential and not be shown, disclosed, or distributed to any other party, including any other Injunctive Relief Distributor.

2. The Monitor will not use materials or information received from one Injunctive Relief Distributor, or information or analysis developed using

the Confidential Information of an Injunctive Relief Distributor, in its assessment of any other Injunctive Relief Distributor. Because each Injunctive Relief Distributor operates pursuant to its own unique policies and procedures intended to comply with legal and other requirements of the Injunctive Relief Terms, the Monitor shall apply the standards of each Injunctive Relief Distributor to its reviews without preference to the practices or standards applied by any other Injunctive Relief Distributor.

3.      If any of the Settling States or the Monitor receive a request for disclosure of any material or information created or shared under the Injunctive Relief Terms, pursuant to a Third Party Request, the Settling State or the Monitor, respectively, shall notify the Injunctive Relief Distributors of the Third Party Request and the Confidential Information to be disclosed so that the Injunctive Relief Distributors may seek a protective order or otherwise challenge or object to the disclosure. The Settling State or the Monitor will provide the Injunctive Relief Distributors with at least ten (10) days' advance notice before complying with any Third Party Request for Confidential Information, except where state law requires a lesser period of advance notice.

4.      Nothing herein will be deemed to prevent any party from claiming any applicable exemption to the public information act, freedom of information act, public records act, or similar law.

## XIX.   ENFORCEMENT OF INJUNCTIVE RELIEF TERMS

A.      State Compliance Review Committee:

1.      Any Settling State may initiate a review of a Potential Violation consistent with the process set forth in Section XIX.

2.      The State Compliance Review Committee shall assign the Monitor the responsibilities set forth in Sections XIX.B.3 through XIX.B.7, regarding review of a Potential Violation and an opportunity to cure, except with respect to matters requiring interpretation of the Injunctive Relief Terms subject to Section XIX.C.2. The objective of the Monitor shall be to facilitate a resolution among the parties, providing an opportunity to cure, as applicable, for the party against whom a Potential Violation has been alleged.

3.      No less than six (6) months before the Monitor's term expires pursuant to Section XVIII, the State Compliance Review Committee and Injunctive Relief Distributors shall meet and confer in good faith to determine the parameters and processes for continued enforcement, consistent to the maximum extent possible with the provisions set forth in Section XIX, for the period after the Monitor's term has ended. Absent agreement between the State Compliance Review Committee and Injunctive Relief

Distributors, all provisions set forth in Section XIX involving the Monitor are excused after the Monitor's term has ended.

4.       Should an Injunctive Relief Distributor allege in good faith that a Settling State or the Monitor has impaired the ability of the Injunctive Relief Distributor to meet the Injunctive Relief Terms, the Injunctive Relief Distributor may request the State Compliance Review Committee to mediate any dispute in an effort to avoid the time and expense of litigation regarding interpretation and enforcement of the Injunctive Relief Terms.

B.       Process for Review of Potential Violations and Opportunity to Cure:

1.       Definition of "Potential Violation": A Potential Violation occurs when an Injunctive Relief Distributor is alleged to not be in substantial compliance with (i) the Injunctive Relief Terms or (ii) a Corrective Action Plan adopted consistent with the process set forth in Section XIX.B.7.

2.       Submission of Notice of Potential Violation. An allegation of a Potential Violation shall be submitted to the State Compliance Review Committee in writing by one or more Settling States ("*Notice of Potential Violation*" or "*Notice*") and shall include the following to the extent practicable:

a)       Specification of the particular Injunctive Relief Term(s) and/or Corrective Action Plan(s) implicated by the Potential Violation;

b)       Description of the Potential Violation with specificity;

c)       The reasoning for and, if available, any documentation supporting the allegation that a Potential Violation has occurred, including whether the Potential Violation is a matter identified by the Monitor in an Audit Report; and

d)       Description of the time-sensitivity of the Potential Violation, if relevant.

3.       Assignment to Monitor. The State Compliance Review Committee shall review every Notice. If the State Compliance Review Committee reasonably believes that further review is warranted, the State Compliance Review Committee shall forward the Notice to the Monitor. The Monitor shall ensure that the Injunctive Relief Distributor that is the subject of the Notice receives a copy of the Notice and a proposed schedule consistent with the process set forth in Sections XIX.B.4 and XIX.B.5.

4.       Response to Notice of Potential Violation. Within thirty (30) days of receipt of the Notice of Potential Violation, the Injunctive Relief Distributor that is the subject of the Notice shall provide a written response to the referring Settling State(s), the Monitor, and the State Compliance Review Committee. The response (a) shall set forth the

reasons the Injunctive Relief Distributor that is the subject of the Notice believes that it is in substantial compliance with the relevant Injunctive Relief Term(s) and/or Corrective Action Plan(s), and (b) as applicable, shall explain efforts undertaken to cure the Potential Violation and a schedule for completing the efforts to cure.

5. <u>Conference for Parties re Notice of Potential Violation</u>. The parties to the Notice shall meet or otherwise confer regarding the Potential Violation. The parties and the Monitor shall make themselves available for such a meeting (which may at any party's election be a virtual or technology-based meeting), provided, however, that the meeting is not required to take place sooner than fifteen (15) days after a written response to the Notice of Potential Violation.

6. <u>Process for Previously-Submitted Notices of Potential Violation</u>. At the request of the parties to a Notice, the Monitor shall determine whether the Notice implicates the same or similar issues as a previously submitted Notice or is a matter previously identified by the Monitor in an Audit Report involving the same party alleged to have engaged in a Potential Violation, and make an initial determination as to whether the issues needs to be addressed anew. The Monitor shall inform the Settling State and Injunctive Relief Distributor involved in the previous Notice or the subject of a matter previously identified by the Monitor in an Audit Report of its determination within five (5) business days of receipt of the Notice. The Settling State and Injunctive Relief Distributor shall have five (5) business days to object to the determination. If an objection is made, the Monitor shall respond to the objection within five (5) business days. If no objection is made, the party involved in the prior Notice may rely on the response to the previously submitted Notice or matter previously identified by the Monitor in an Audit Report and no further action shall be required.

7. <u>Monitor Resolution of Potential Violation and Opportunity to Cure</u>. Within thirty (30) days of the meeting pursuant to Section XIX.B.5, the Monitor, taking into consideration the submissions of the parties involved in the Notice and other information available to the Monitor, shall resolve the Notice as follows:

a) If the Monitor reasonably believes that a Potential Violation is not ongoing or has been substantially resolved as of thirty (30) days from the meeting pursuant to Section XIX.B.5, the Monitor shall provide written notice to the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice.

b) If the Monitor reasonably believes that a Potential Violation is ongoing and has not been substantially resolved as of thirty (30) days from the meeting pursuant to Section XIX.B.5, the Monitor

shall provide written notice to the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice and request that the Injunctive Relief Distributor prepare, within thirty (30) days of the receipt of such written notice, a Corrective Action Plan to remedy such Potential Violation, including a reasonable period for implementation of such plan. The Monitor may extend the period of time to submit a Corrective Action Plan up to ninety (90) days based on a reasonable request by the affected party.

c)    A Corrective Action Plan may address multiple Potential Violations, and an existing Corrective Action Plan may be amended to address additional Potential Violations.

d)    Within ten (10) business days of submission of a Corrective Action Plan regarding a Potential Violation, the Monitor shall confer with the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice regarding the proposed Corrective Action Plan. The Monitor may recommend revisions in its discretion. The conference required by this paragraph may at any party's election be a virtual or technology-based meeting.

e)    Within thirty (30) days of the conference in Section XIX.B.7.d, the Monitor shall advise the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice whether the Monitor has adopted the proposed Corrective Action Plan or whether the Monitor has adopted it after making modifications. The Monitor shall also set forth a reasonable period for implementation of any such plan that has been adopted. The Injunctive Relief Distributor that is subject to a Corrective Action Plan adopted by the Monitor must begin to comply with the Corrective Action Plan within five (5) business days of receiving notice of the Corrective Action Plan has been adopted, unless it seeks review by the State Compliance Review Committee pursuant to Section XIX.C.1.

C.    Enforcement Responsibilities of State Compliance Review Committee:

1.    The Settling State(s) or Injunctive Relief Distributor involved in a Notice may request the State Compliance Review Committee to review the resolution (including a resolution pursuant to Section XIX.B.7.a) and/or Corrective Action Plan adopted by the Monitor regarding that Notice. Any such request must be made within five (5) business days of a resolution or adoption of a Corrective Action Plan by the Monitor. The State Compliance Review Committee, taking into consideration the resolution by the Monitor, submissions of the Settling State(s) or Injunctive Relief

Distributor, and other information available to the Committee, shall within thirty (30) days of receipt of the request resolve the matter by written notice to the affected parties, which shall include the State Compliance Review Committee's reasoning in reaching its resolution. The State Compliance Review Committee may agree, disagree, or modify any resolution or Corrective Action Plan that it reviews. An Injunctive Relief Distributor that is subject to a Corrective Action Plan that is affirmed or affirmed as amended by the State Compliance Review Committee must within five (5) business days begin to comply with the Corrective Action Plan.

2.  The State Compliance Review Committee shall review any issues raised by a Notice regarding the interpretation of the Injunctive Relief Terms at the request of the Settling State(s), Injunctive Relief Distributor involved in a Notice, or the Monitor. Such a request may be made at any time after the Notice's submission, and the request will not extend the timelines set forth in Sections XIX.B and XIX.C.1. The State Compliance Review Committee shall notify the Monitor, Settling State(s) and Injunctive Relief Distributor involved in the Notice of its determination. Settling States and Injunctive Relief Distributors do not waive their rights to challenge the interpretation of the Injunctive Relief Terms by the State Compliance Review Committee in any subsequent proceeding pursuant to Section XIX.E.2.

3.  The State Compliance Review Committee may, independent of a Notice of Potential Violation, review requests by a Monitor, Settling State, or Injunctive Relief Distributor regarding the interpretation of the Injunctive Relief Terms. The State Compliance Review Committee shall notify the Monitor and requesting party of its interpretation, including the State Compliance Review Committee's reasoning in reaching its conclusion. Settling States and Injunctive Relief Distributors do not waive their rights to challenge the interpretation of the Injunctive Relief Terms by the State Compliance Review Committee in any subsequent proceeding pursuant to Section XIX.E.2.

4.  The State Compliance Review Committee shall make available to all Settling States and Injunctive Relief Distributors any interpretation it issues pursuant to Sections XIX.C.2 and XIX.C.3.

D.  Composition of State Compliance Review Committee:

1.  A Settling State on the State Compliance Review Committee that is in active litigation with one or more of the Injunctive Relief Distributors, or in another potential conflict of interest involving compliance with Controlled Substances laws and regulations, may not serve on the State Compliance Review Committee for matters involving the affected Injunctive Relief Distributor, and the remaining Settling States on the

State Compliance Review Committee shall within five (5) business days select an alternate Settling State as a replacement.

2. If the affected state on the State Compliance Review Committee disputes that it has a disqualifying active litigation or other conflict of interest, the determination of whether that state has a conflict disqualifying it from serving on the State Compliance Review Committee shall be made by the remaining states on the State Compliance Review Committee.

E. Enforcement Actions:

1. Any written notice or resolution by the State Compliance Review Committee regarding the matters set forth in Sections XIX.B and XIX.C shall provide the State Compliance Review Committee's assessment of the matter but will not be an official opinion of any individual Settling State.

2. Following the issuance of a written notice or resolution of the State Compliance Review Committee pursuant to Section XIX.C, a Settling State or Injunctive Relief Distributor may take whatever action it deems necessary related to the written notice or resolution issued by the State Compliance Review Committee, provided that the Settling State or Injunctive Relief Distributor is either (a) the Settling State that sought review by the State Compliance Review Committee, or (b) the Injunctive Relief Distributor that is the subject of the Potential Violation at issue. Such action may include but is not limited to bringing an action to enforce the settlement agreement, filing a new original action, or, the parties to a Notice attempting to negotiate a Corrective Action Plan directly with each other.

3. The Settling States agree that prior to taking any court or administrative action, other than an action that is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the Settling State, or that a public emergency requiring immediate action exists, it will follow the process outlined in Sections XIX.B and XIX.C.

4. A Settling State or Injunctive Relief Distributor must bring a court or administrative action within six (6) months of any resolution of the State Compliance Review Committee, unless the alleged violation is also an independent violation of state or federal law, or an action that a Settling State concludes is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the State, or that a public emergency requiring immediate action exists, in which cases, the applicable statute of limitations (if any) for sovereign actions shall apply.

## **Non-Litigating Texas Subdivisions Which Have Qualified as Participating Subdivisions**

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 1 | Abilene, City of | 123,420 | Yes | Yes |
| 2 | Addison, City of | 16,263 | Yes | Yes |
| 3 | Alamo Heights, City of | 8,374 | Yes | Yes |
| 4 | Alamo, City of | 19,910 | Yes | Yes |
| 5 | Albany, City of | 1,786 | Yes | Yes |
| 6 | Alice, City of | 18,682 | Yes | Yes |
| 7 | Allen, City of | 105,623 | Yes | Yes |
| 8 | Alpine, City of | 6,006 | Yes | Yes |
| 9 | Alton, City of | 18,105 | Yes | Yes |
| 10 | Alvin, City of | 26,723 | Yes | Yes |
| 11 | Amarillo, City of | 199,371 | Yes | Yes |
| 12 | Anderson County | 57,735 | Yes | Yes |
| 13 | Angleton, City of | 19,431 | Yes | Yes |
| 14 | Anna, City of | 15,000 | Yes | Yes |
| 15 | Anthony, City of | 5,236 | Yes | Yes |
| 16 | Aransas County | 23,510 | Yes | Yes |
| 17 | Argyle, City of | 4,112 | Yes | Yes |
| 18 | Arlington, City of | 398,854 | Yes | Yes |
| 19 | Armstrong County | 1,887 | Yes | Yes |
| 20 | Atascosa County | 51,153 | Yes | Yes |
| 21 | Athens, City of | 12,753 | Yes | Yes |
| 22 | Atlanta, City of | 5,495 | Yes | Yes |
| 23 | Aubrey, City of | 3,731 | Yes | Yes |
| 24 | Austin County | 30,032 | Yes | Yes |
| 25 | Austin, City of | 978,908 | Yes | Yes |
| 26 | Azle, City of | 13,351 | Yes | Yes |
| 27 | Balch Springs, City of | 25,007 | Yes | Yes |
| 28 | Balcones Heights, City of | 3,282 | Yes | Yes |
| 29 | Ballinger, City of | 3,659 | Yes | Yes |
| 30 | Bandera County | 23,112 | Yes | Yes |
| 31 | Bastrop, City of | 8,776 | Yes | Yes |
| 32 | Bay City, City of | 17,535 | Yes | Yes |
| 33 | Baylor County | 3,577 | Yes | Yes |
| 34 | Baytown, City of | 77,192 | Yes | Yes |
| 35 | Beach City, City of | 2,664 | Yes | Yes |
| 36 | Beaumont, City of | 116,825 | Yes | Yes |
| 37 | Bedford, City of | 49,049 | Yes | Yes |
| 38 | Beeville, City of | 12,793 | Yes | Yes |
| 39 | Bell County | 362,924 | Yes | Yes |
| 40 | Bellaire, City of | 18,971 | Yes | Yes |
| 41 | Bellmead, City of | 10,744 | Yes | Yes |
| 42 | Belton, City of | 22,885 | Yes | Yes |
| 43 | Benbrook, City of | 23,502 | Yes | Yes |
| 44 | Beverley Hills, City of | 2,494 | Yes | Yes |
| 45 | Big Spring, City of | 28,187 | Yes | Yes |
| 46 | Blanket, City of | 372 | Yes | Yes |

[15] The parties agree that this Exhibit S is subject to on-going review and updates.

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|-------------|---------------------------|--------------------|-------------------------|
| 47 | Blue Ridge, City of | 834 | Yes | Yes |
| 48 | Boerne, City of | 18,232 | Yes | Yes |
| 49 | Bonham, City of | 36,172 | Yes | Yes |
| 50 | Borger, City of | 12,415 | Yes | Yes |
| 51 | Bosque County | 18,685 | Yes | Yes |
| 52 | Bowie, City of | 5,050 | Yes | Yes |
| 53 | Brazoria County | 374,264 | Yes | Yes |
| 54 | Breckenridge, City of | 5,457 | Yes | Yes |
| 55 | Brenham, City of | 17,863 | Yes | Yes |
| 56 | Brewster, County of | 9,321 | Yes | Yes |
| 57 | Bridge City, City of | 7,961 | Yes | Yes |
| 58 | Bridgeport, City of | 6,465 | Yes | Yes |
| 59 | Brookside Village, City of | 1,359 | Yes | Yes |
| 60 | Brown County | 37,864 | Yes | Yes |
| 61 | Brownsville, City of | 182,781 | Yes | Yes |
| 62 | Brownwood, City of | 18,546 | Yes | Yes |
| 63 | Bryan, City of | 86,276 | Yes | Yes |
| 64 | Buda, City of | 16,906 | Yes | Yes |
| 65 | Bulverde, City of | 5,162 | Yes | Yes |
| 66 | Bunker Hill Village, City of | 3,940 | Yes | Yes |
| 67 | Burkburnett, City of | 11,270 | Yes | Yes |
| 68 | Burleson, City of | 48,225 | Yes | Yes |
| 69 | Burnet, City of | 6,266 | Yes | Yes |
| 70 | Caldwell, City of | 4,315 | Yes | Yes |
| 71 | Callahan County | 13,943 | Yes | Yes |
| 72 | Canton, City of | 3,805 | Pending documents | No |
| 73 | Carrollton, City of | 139,248 | Yes | Yes |
| 74 | Carson County | 5,926 | Yes | Yes |
| 75 | Carthage, City of | 6,535 | Yes | Yes |
| 76 | Castle Hills, City of | 4,447 | Yes | Yes |
| 77 | Cedar Hill, City of | 47,930 | Yes | Yes |
| 78 | Cedar Park, City of | 79,462 | Yes | Yes |
| 79 | Celina, City of | 16,299 | Yes | Yes |
| 80 | Chambers County | 43,837 | Yes | Yes |
| 81 | Chandler, City of | 3,003 | Yes | Yes |
| 82 | Cibolo, City of | 31,281 | Yes | Yes |
| 83 | Cisco, City of | 3,784 | Yes | Yes |
| 84 | Clear Lake Shores, City of | 1,190 | Yes | Yes |
| 85 | Cleburne, City of | 31,295 | Yes | Yes |
| 86 | Cleveland, City of | 8,061 | Yes | Yes |
| 87 | Clint, City of | 664 | Yes | Yes |
| 88 | Clute, City of | 11,690 | Yes | Yes |
| 89 | Clyde, City of | 3,817 | Yes | Yes |
| 90 | Coffee City, City of | 252 | Yes | Yes |
| 91 | Coke County | 3,303 | Yes | Yes |
| 92 | Coleman, City of | 4,373 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 93 | College Station, City of | 117,911 | Yes | Yes |
| 94 | Colleyville, City of | 27,091 | Yes | Yes |
| 95 | Collin County | 1,034,730 | Yes | Yes |
| 96 | Columbus, City of | 3,617 | Yes | Yes |
| 97 | Comal County | 156,209 | Yes | Yes |
| 98 | Comanche County | 13,635 | Yes | Yes |
| 99 | Comanche, City of | 4,178 | Yes | Yes |
| 100 | Conroe, City of | 91,079 | Yes | Yes |
| 101 | Converse, City of | 28,171 | Yes | Yes |
| 102 | Coppell, City of | 41,421 | Yes | Yes |
| 103 | Copperas Cove, City of | 33,235 | Yes | Yes |
| 104 | Corinth, City of | 22,099 | Yes | Yes |
| 105 | Corpus Christi, City of | 326,586 | Yes | Yes |
| 106 | Corsicana, City of | 23,906 | Yes | Yes |
| 107 | Crowley, City of | 16,460 | Yes | Yes |
| 108 | Cuero, City of | 8,297 | Yes | Yes |
| 109 | Cumby, City of | 693 | Pending documents | No |
| 110 | Daisetta, City of | 938 | Yes | Yes |
| 111 | Dallam County | 7,304 | Yes | Yes |
| 112 | Dallas, City of | 1,343,573 | Yes | Yes |
| 113 | Dalworthington Gardens, City of | 2,188 | Yes | Yes |
| 114 | Danbury, City of | 1,201 | Yes | Yes |
| 115 | Dawson County | 12,728 | Yes | Yes |
| 116 | Dayton, City of | 7,952 | Yes | Yes |
| 117 | De Leon, City of | 2,418 | Yes | Yes |
| 118 | Deaf Smith County | 18,546 | Yes | Yes |
| 119 | Decatur, City of | 6,738 | Yes | Yes |
| 120 | Deer Park, City of | 33,474 | Yes | Yes |
| 121 | Del Rio, City of | 35,760 | Yes | Yes |
| 122 | Denison, City of | 26,425 | Yes | Yes |
| 123 | Denton County | 887,207 | Yes | Yes |
| 124 | Denton, City of | 141,541 | Yes | Yes |
| 125 | Denver, City of | 4,880 | Yes | Yes |
| 126 | DeSoto, City of | 52,988 | Yes | Yes |
| 127 | Detroit, City of | 1,037 | Yes | Yes |
| 128 | DeWitt County | 20,160 | Yes | Yes |
| 129 | Diboll, City of | 5,266 | Yes | Yes |
| 130 | Dickinson, City of | 21,129 | Yes | Yes |
| 131 | Dilley, City of | 4,401 | Yes | Yes |
| 132 | Donna, City of | 16,338 | Yes | Yes |
| 133 | Dripping Springs, City of | 4,119 | Yes | Yes |
| 134 | Dublin, City of | 3,554 | Pending documents | No |
| 135 | Dumas, City of | 13,827 | Yes | Yes |
| 136 | Duncanville, City of | 38,751 | Yes | Yes |
| 137 | Eagle Lake, City of | 3,739 | Yes | Yes |
| 138 | Early, City of | 2,986 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 139 | Eastland County | 18,360 | Yes | Yes |
| 140 | Eastland, City of | 3,853 | Yes | Yes |
| 141 | Edinburg, City of | 101,170 | Yes | Yes |
| 142 | Edna, City of | 5,767 | Yes | Yes |
| 143 | El Campo, City of | 11,539 | Yes | Yes |
| 144 | El Lago, City of | 2,710 | Yes | Yes |
| 145 | El Paso, City of | 681,728 | Yes | Yes |
| 146 | Elgin, City of | 10,314 | Yes | Yes |
| 147 | Elmendorf, City of | 1,835 | Yes | Yes |
| 148 | Elsa, City of | 7,225 | Yes | Yes |
| 149 | Enchanted Oaks, City of | 315 | Yes | Yes |
| 150 | Ennis, City of | 20,357 | Yes | Yes |
| 151 | Erath County | 42,698 | Yes | Yes |
| 152 | Euless, City of | 57,197 | Yes | Yes |
| 153 | Everman, City of | 6,255 | Yes | Yes |
| 154 | Fair Oaks Ranch, City of | 10,042 | Yes | Yes |
| 155 | Fairfield, City of | 2,916 | Yes | Yes |
| 156 | Fairview, City of | 8,832 | Yes | Yes |
| 157 | Fannin County | 35,514 | Yes | Yes |
| 158 | Farmers Branch, City of | 48,158 | Yes | Yes |
| 159 | Fate, City of | 15,603 | Yes | Yes |
| 160 | Fayette County | 25,346 | Yes | Yes |
| 161 | Flower Mound Town | 79,135 | Yes | Yes |
| 162 | Forest Hill, City of | 12,988 | Yes | Yes |
| 163 | Forney, City of | 27,236 | Yes | Yes |
| 164 | Fort Worth, City of | 909,585 | Yes | Yes |
| 165 | Fredericksburg, City of | 11,496 | Yes | Yes |
| 166 | Freeport, City of | 12,136 | Yes | Yes |
| 167 | Friendswood, City of | 40,290 | Yes | Yes |
| 168 | Frio County | 20,306 | Yes | Yes |
| 169 | Frisco, City of | 200,490 | Yes | Yes |
| 170 | Fulshear, City of | 13,914 | Yes | Yes |
| 171 | Gaines County | 21,492 | Yes | Yes |
| 172 | Gainesville, City of | 16,886 | Yes | Yes |
| 173 | Galena Park, City of | 10,757 | Yes | Yes |
| 174 | Galveston, City of | 50,446 | Yes | Yes |
| 175 | Garden Ridge, City of | 3,961 | Yes | Yes |
| 176 | Garland, City of | 239,928 | Yes | Yes |
| 177 | Gatesville, City of | 12,401 | Yes | Yes |
| 178 | Georgetown, City of | 79,604 | Yes | Yes |
| 179 | Giddings, City of | 5,055 | Yes | Yes |
| 180 | Gillespie County | 26,988 | Yes | Yes |
| 181 | Gilmer, City of | 5,105 | Yes | Yes |
| 182 | Glenn Heights, City of | 13,377 | Yes | Yes |
| 183 | Gonzales County | 20,837 | Yes | Yes |
| 184 | Gonzales, City of | 7,517 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 185 | Graham, City of | 8,675 | Yes | Yes |
| 186 | Granbury, City of | 10,730 | Yes | Yes |
| 187 | Grand Prairie, City of | 194,543 | Yes | Yes |
| 188 | Grand Saline, City of | 3,115 | Yes | Yes |
| 189 | Granite Shoals, City of | 5,121 | Yes | Yes |
| 190 | Grapevine, City of | 55,281 | Yes | Yes |
| 191 | Gray County | 21,886 | Yes | Yes |
| 192 | Greenville, City of | 28,827 | Yes | Yes |
| 193 | Gregg County | 123,945 | Yes | Yes |
| 194 | Gregory, City of | 1,977 | Yes | Yes |
| 195 | Grimes County | 28,880 | Yes | Yes |
| 196 | Groves, City of | 15,480 | Yes | Yes |
| 197 | Guadalupe County | 166,847 | Yes | Yes |
| 198 | Gun Barrel City, City of | 6,084 | Yes | Yes |
| 199 | Gunter, City of | 1,247 | Yes | Yes |
| 200 | Hale Center, City of | 2,088 | Yes | Yes |
| 201 | Hale County | 33,406 | Yes | Yes |
| 202 | Hall County | 3,048 | Yes | Yes |
| 203 | Hallsburg, City of | 476 | Yes | Yes |
| 204 | Haltom, City of | 43,874 | Yes | Yes |
| 205 | Harker Heights, City of | 32,421 | Yes | Yes |
| 206 | Harlingen, City of | 65,022 | Yes | Yes |
| 207 | Haskell, City of | 3,195 | Yes | Yes |
| 208 | Hedwig Village, City of | 2,671 | Yes | Yes |
| 209 | Helotes, City of | 9,175 | Yes | Yes |
| 210 | Hemphill County | 3,994 | Yes | Yes |
| 211 | Hempstead, City of | 7,691 | Yes | Yes |
| 212 | Henderson, City of | 13,154 | Yes | Yes |
| 213 | Hewitt, City of | 14,937 | Yes | Yes |
| 214 | Hickory Creek, City of | 4,574 | Yes | Yes |
| 215 | Hidalgo, City of | 14,183 | Yes | Yes |
| 216 | Highland Park, City of | 9,168 | Yes | Yes |
| 217 | Highland Village, City of | 16,668 | Yes | Yes |
| 218 | Hill Country Village, City of | 584 | Yes | Yes |
| 219 | Hill County | 36,649 | Yes | Yes |
| 220 | Hilshire Village, City of | 875 | Yes | Yes |
| 221 | Hitchcock, City of | 7,800 | Yes | Yes |
| 222 | Hockley County | 23,021 | Yes | Yes |
| 223 | Hondo, City of | 9,251 | Yes | Yes |
| 224 | Hood County | 61,643 | Yes | Yes |
| 225 | Horizon City, City of | 19,642 | Yes | Yes |
| 226 | Howard County | 36,664 | Yes | Yes |
| 227 | Hudson Oaks, City of | 2,383 | Yes | Yes |
| 228 | Hughes Springs, City of | 1,479 | Yes | Yes |
| 229 | Humble, City of | 15,824 | Yes | Yes |
| 230 | Hunt County | 98,594 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 231 | Huntsville, City of | 42,241 | Yes | Yes |
| 232 | Hurst, City of | 38,655 | Yes | Yes |
| 233 | Hutchinson County | 20,938 | Yes | Yes |
| 234 | Hutto, City of | 27,947 | Yes | Yes |
| 235 | Ingleside, City of | 10,192 | Yes | Yes |
| 236 | Iowa Colony, City of | 1,811 | Yes | Yes |
| 237 | Irving, City of | 239,798 | Yes | Yes |
| 238 | Jacinto City, City of | 10,466 | Yes | Yes |
| 239 | Jacksboro, City of | 4,379 | Yes | Yes |
| 240 | Jackson County | 14,760 | Yes | Yes |
| 241 | Jacksonville, City of | 14,815 | Yes | Yes |
| 242 | Johnson City, City of | 1,860 | Yes | Yes |
| 243 | Jonestown, City of | 1,967 | Yes | Yes |
| 244 | Josephine, City of | 1,366 | Yes | Yes |
| 245 | Joshua, City of | 7,477 | Yes | Yes |
| 246 | Karnes City, City of | 3,404 | Yes | Yes |
| 247 | Karnes County | 15,601 | Yes | Yes |
| 248 | Kaufman, City of | 7,330 | Yes | Yes |
| 249 | Keene, City of | 6,396 | Yes | Yes |
| 250 | Keller, City of | 47,213 | Yes | Yes |
| 251 | Kemah, City of | 3,057 | Yes | Yes |
| 252 | Kent County | 647 | Yes | Yes |
| 253 | Kerrville, City of | 23,754 | Yes | Yes |
| 254 | Kilgore, City of | 14,852 | Yes | Yes |
| 255 | Killeen, City of | 151,666 | Yes | Yes |
| 256 | Kingsville, City of | 25,315 | Yes | Yes |
| 257 | Kirby, City of | 8,664 | Yes | Yes |
| 258 | Kyle, City of | 48,393 | Yes | Yes |
| 259 | La Feria, City of | 7,267 | Yes | Yes |
| 260 | La Grange, City of | 4,667 | Yes | Yes |
| 261 | La Marque, City of | 17,319 | Yes | Yes |
| 262 | La Porte, City of | 34,976 | Yes | Yes |
| 263 | La Vernia, City of | 925 | Yes | Yes |
| 264 | Lake Dallas, City of | 8,016 | Yes | Yes |
| 265 | Lake Jackson, City of | 27,220 | Yes | Yes |
| 266 | Lake Worth, City of | 4,929 | Yes | Yes |
| 267 | Lakewood Village, City of | 562 | Yes | Yes |
| 268 | Lampasas County | 21,428 | Yes | Yes |
| 269 | Lancaster, City of | 39,228 | Yes | Yes |
| 270 | Lavaca County | 20,154 | Yes | Yes |
| 271 | League, City of | 107,536 | Yes | Yes |
| 272 | Leander, City of | 62,608 | Yes | Yes |
| 273 | Lee County | 17,239 | Yes | Yes |
| 274 | Leon Valley, City of | 12,306 | Yes | Yes |
| 275 | Leonard, City of | 2,481 | Yes | Yes |
| 276 | Lewisville, City of | 109,212 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 277 | Liberty Hill, City of | 2,041 | Yes | Yes |
| 278 | Liberty, City of | 8,397 | Yes | Yes |
| 279 | Lindsay, City of | 1,257 | Yes | Yes |
| 280 | Little Elm, City of | 53,126 | Yes | Yes |
| 281 | Live Oak County | 12,207 | Yes | Yes |
| 282 | Live Oak, City of | 16,499 | Yes | Yes |
| 283 | Llano County | 21,795 | Yes | Yes |
| 284 | Lockhart, City of | 14,133 | Yes | Yes |
| 285 | Lockney, City of | 1,612 | Yes | Yes |
| 286 | Longview, City of | 81,631 | Yes | Yes |
| 287 | Lorena, City of | 1,995 | Yes | Yes |
| 288 | Lorenzo, City of | 1,181 | Yes | Yes |
| 289 | Lubbock, City of | 258,862 | Yes | Yes |
| 290 | Lucas, City of | 7,763 | Yes | Yes |
| 291 | Lufkin, City of | 35,021 | Yes | Yes |
| 292 | Lyford, City of | 2,547 | Yes | Yes |
| 293 | Magnolia, City of | 2,124 | Yes | Yes |
| 294 | Manor, City of | 13,866 | Yes | Yes |
| 295 | Mansfield, City of | 72,419 | Yes | Yes |
| 296 | Manvel, City of | 12,671 | Yes | Yes |
| 297 | Marble Falls, City of | 6,542 | Yes | Yes |
| 298 | Marlin, City of | 5,607 | Yes | Yes |
| 299 | Marshall, City of | 22,831 | Yes | Yes |
| 300 | Matagorda County | 36,643 | Yes | Yes |
| 301 | Maud, City of | 1,138 | Yes | Yes |
| 302 | McAllen, City of | 143,268 | Yes | Yes |
| 303 | McGregor, City of | 5,144 | Yes | Yes |
| 304 | McKinney, City of | 199,177 | Yes | Yes |
| 305 | Medina County | 51,584 | Yes | Yes |
| 306 | Melissa, City of | 12,117 | Yes | Yes |
| 307 | Mercedes, City of | 16,604 | Yes | Yes |
| 308 | Mesquite, City of | 140,937 | Yes | Yes |
| 309 | Mexia, City of | 7,344 | Yes | Yes |
| 310 | Midland County | 176,832 | Yes | Yes |
| 311 | Midland, City of | 146,038 | Yes | Yes |
| 312 | Midlothian, City of | 33,532 | Yes | Yes |
| 313 | Mineola, City of | 4,685 | Yes | Yes |
| 314 | Mineral Wells, City of | 15,213 | Yes | Yes |
| 315 | Mission, City of | 84,331 | Yes | Yes |
| 316 | Missouri, City of | 75,457 | Yes | Yes |
| 317 | Mobile City, City of | 125 | Yes | Yes |
| 318 | Monahans, City of | 7,618 | Yes | Yes |
| 319 | Montague County | 19,818 | Yes | Yes |
| 320 | Moore County | 20,940 | Yes | Yes |
| 321 | Mount Enterprise, City of | 448 | Yes | Yes |
| 322 | Mount Pleasant, City of | 15,978 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 323 | Mountain City, City of | 739 | Yes | Yes |
| 324 | Muleshoe, City of | 5,798 | Yes | Yes |
| 325 | Murphy, City of | 20,500 | Yes | Yes |
| 326 | Nacogdoches, City of | 32,877 | Yes | Yes |
| 327 | Natalia, City of | 1,220 | Yes | Yes |
| 328 | Navarro County | 50,113 | Yes | Yes |
| 329 | Nederland, City of | 17,371 | Yes | Yes |
| 330 | New Braunfels, City of | 90,209 | Yes | Yes |
| 331 | Normangee, City of | 586 | Yes | Yes |
| 332 | North Richland Hills, City of | 70,670 | Yes | Yes |
| 333 | Northlake, City of | 2,726 | Yes | Yes |
| 334 | Oak Point, City of | 4,410 | Yes | Yes |
| 335 | Oak Ridge North, City of | 3,149 | Yes | Yes |
| 336 | Odessa, City of | 123,334 | Yes | Yes |
| 337 | Oldham County | 2,112 | Yes | Yes |
| 338 | Orange, City of | 18,118 | Yes | Yes |
| 339 | Overton, City of | 2,896 | Yes | Yes |
| 340 | Palacios, City of | 4,590 | Yes | Yes |
| 341 | Palestine, City of | 17,730 | Yes | Yes |
| 342 | Palmview, City of | 5,733 | Yes | Yes |
| 343 | Palo Pinto County | 29,189 | Yes | Yes |
| 344 | Pampa, City of | 17,068 | Yes | Yes |
| 345 | Panorama Village, City of | 3,207 | Yes | Yes |
| 346 | Pasadena, City of | 151,227 | Yes | Yes |
| 347 | Pearland, City of | 122,460 | Yes | Yes |
| 348 | Pearsall, City of | 10,609 | Yes | Yes |
| 349 | Pecos County | 15,823 | Yes | Yes |
| 350 | Pecos, City of | 10,461 | Yes | Yes |
| 351 | Penitas, City of | 4,769 | Yes | Yes |
| 352 | Pflugerville, City of | 65,380 | Yes | Yes |
| 353 | Pharr, City of | 79,112 | Yes | Yes |
| 354 | Piney Point Village, City of | 3,425 | Yes | Yes |
| 355 | Plainview, City of | 20,143 | Yes | Yes |
| 356 | Plano, City of | 287,677 | Yes | Yes |
| 357 | Pleasanton, City of | 10,855 | Yes | Yes |
| 358 | Port Arthur, City of | 54,280 | Yes | Yes |
| 359 | Port Lavaca, City of | 11,854 | Yes | Yes |
| 360 | Port Neches, City of | 12,655 | Yes | Yes |
| 361 | Portland, City of | 17,268 | Yes | Yes |
| 362 | Poteet, City of | 3,437 | Yes | Yes |
| 363 | Poth, City of | 2,035 | Yes | Yes |
| 364 | Prairie View, City of | 6,678 | Yes | Yes |
| 365 | Presidio County | 6,975 | Pending documents | No |
| 366 | Primera, City of | 4,872 | Yes | Yes |
| 367 | Princeton, City of | 18,388 | Yes | Yes |
| 368 | Prosper Town, Texas | 24,579 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 369 | Queen City, City of | 1,644 | Yes | Yes |
| 370 | Quinlan, City of | 1,560 | Yes | Yes |
| 371 | Rains County | 12,514 | Yes | Yes |
| 372 | Randall County | 137,713 | Yes | Yes |
| 373 | Ransom Canyon, City of | 1,056 | Yes | Yes |
| 374 | Raymondville, City of | 10,880 | Yes | Yes |
| 375 | Red Oak, City of | 13,464 | Yes | Yes |
| 376 | Reeves County | 15,976 | Yes | Yes |
| 377 | Refugio County | 7,145 | Yes | Yes |
| 378 | Reno, City of (Parker County) | 2,962 | Yes | Yes |
| 379 | Reno, City of (Lamar County) | 3,309 | Yes | Yes |
| 380 | Richland Hills, City of | 8,051 | Yes | Yes |
| 381 | Richmond, City of | 12,578 | Yes | Yes |
| 382 | Rio Grande City, City of | 14,511 | Yes | Yes |
| 383 | Rio Hondo, City of | 2,640 | Yes | Yes |
| 384 | Rising Star, City of | 876 | Yes | Yes |
| 385 | Roanoke, City of | 8,341 | Yes | Yes |
| 386 | Robinson, City of | 11,926 | Yes | Yes |
| 387 | Robstown, City of | 11,261 | Yes | Yes |
| 388 | Rockdale, City of | 5,531 | Yes | Yes |
| 389 | Rockport, City of | 10,604 | Yes | Yes |
| 390 | Rockwall, City of | 45,888 | Yes | Yes |
| 391 | Rollingwood, City of | 1,532 | Yes | Yes |
| 392 | Roma, City of | 11,490 | Yes | Yes |
| 393 | Rosenberg, City of | 38,307 | Yes | Yes |
| 394 | Round Rock, City of | 133,372 | Yes | Yes |
| 395 | Rowlett, City of | 67,339 | Yes | Yes |
| 396 | Royse City, City of | 14,702 | Yes | Yes |
| 397 | Runnels County | 10,264 | Yes | Yes |
| 398 | Sabine County | 10,542 | Yes | Yes |
| 399 | Sachse, City of | 26,046 | Yes | Yes |
| 400 | Saginaw, City of | 24,310 | Yes | Yes |
| 401 | San Angelo, City of | 101,004 | Yes | Yes |
| 402 | San Benito, City of | 24,243 | Yes | Yes |
| 403 | San Elizario, City of | 9,126 | Yes | Yes |
| 404 | San Felipe, City of | 766 | Yes | Yes |
| 405 | San Jacinto County | 28,859 | Yes | Yes |
| 406 | San Juan, City of | 37,008 | Pending documents | No |
| 407 | San Marcos, City of | 64,776 | Yes | Yes |
| 408 | San Perlita, City of | 730 | Yes | Yes |
| 409 | San Saba, City of | 3,128 | Yes | Yes |
| 410 | Santa Fe, City of | 13,449 | Yes | Yes |
| 411 | Schertz, City of | 42,042 | Yes | Yes |
| 412 | Scurry County | 16,703 | Yes | Yes |
| 413 | Seabrook, City of | 14,149 | Yes | Yes |
| 414 | Seagoville, City of | 16,861 | Yes | Yes |

| #   | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|-----|-------------|---------------------------|--------------------|-------------------------|
| 415 | Sealy, City of | 6,450 | Yes | Yes |
| 416 | Seguin, City of | 29,992 | Yes | Yes |
| 417 | Selma, City of | 11,132 | Yes | Yes |
| 418 | Shavano Park, Ctiy of | 3,787 | Yes | Yes |
| 419 | Sherman County | 3,059 | Yes | Yes |
| 420 | Sherman, City of | 44,002 | Yes | Yes |
| 421 | Shiner, City of | 2,192 | Yes | Yes |
| 422 | Slaton, City of | 5,960 | Yes | Yes |
| 423 | Smithville, City of | 4,363 | Yes | Yes |
| 424 | Snyder, City of | 11,023 | Yes | Yes |
| 425 | Socorro, City of | 34,370 | Yes | Yes |
| 426 | Somerville, City of | 1,473 | Yes | Yes |
| 427 | South Houston, City of | 17,438 | Yes | Yes |
| 428 | Southlake, City of | 32,376 | Yes | Yes |
| 429 | Spring Valley Village, City of | 4,282 | Yes | Yes |
| 430 | Springtown, City of | 2,940 | Yes | Yes |
| 431 | Stafford, City of | 17,362 | Yes | Yes |
| 432 | Starr County | 64,633 | Yes | Yes |
| 433 | Stephenville, City of | 21,247 | Yes | Yes |
| 434 | Stonewall County | 1,476 | Yes | Yes |
| 435 | Sugar Land, City of | 118,488 | Yes | Yes |
| 436 | Sullivan City, City of | 4,176 | Yes | Yes |
| 437 | Sulphur Springs, City of | 16,234 | Yes | Yes |
| 438 | Surfside Beach, City of | 627 | Yes | Yes |
| 439 | Sweetwater, City of | 10,469 | Yes | Yes |
| 440 | Taylor County | 138,034 | Yes | Yes |
| 441 | Taylor Lake Village, City of | 3,639 | Yes | Yes |
| 442 | Taylor, City of | 17,383 | Yes | Yes |
| 443 | Temple, City of | 78,439 | Yes | Yes |
| 444 | Terrell Hills, City of | 5,371 | Yes | Yes |
| 445 | Terrell, City of | 18,869 | Yes | Yes |
| 446 | Terry County | 12,337 | Yes | Yes |
| 447 | Texarkana, City of | 36,317 | Yes | Yes |
| 448 | Texas City, City of | 50,094 | Yes | Yes |
| 449 | The Colony, City of | 44,438 | Yes | Yes |
| 450 | Thorndale, City of | 1,407 | Yes | Yes |
| 451 | Tom Green County | 119,200 | Yes | Yes |
| 452 | Tomball, City of | 11,778 | Yes | Yes |
| 453 | Tool, City of | 2,214 | Yes | Yes |
| 454 | Trenton, City of | 695 | Yes | Yes |
| 455 | Trophy Club Town, Texas | 12,451 | Yes | Yes |
| 456 | Troup, City of | 1,928 | Yes | Yes |
| 457 | Tye, City of | 1,206 | Yes | Yes |
| 458 | Tyler County | 21,672 | Yes | Yes |
| 459 | Tyler, City of | 106,985 | Yes | Yes |
| 460 | Universal City, City of | 20,890 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 461 | University Park, City of | 24,985 | Yes | Yes |
| 462 | Uvalde, City of | 16,001 | Yes | Yes |
| 463 | Val Verde County | 49,025 | Yes | Yes |
| 464 | Valley Mills, City of | 1,302 | Yes | Yes |
| 465 | Valley View, City of | 953 | Yes | Yes |
| 466 | Van Alstyne, City of | 3,906 | Yes | Yes |
| 467 | Van Horn, City of | 1,760 | Yes | Yes |
| 468 | Van, City of | 2,669 | Yes | Yes |
| 469 | Vernon, City of | 10,323 | Yes | Yes |
| 470 | Victoria County | 92,084 | Yes | Yes |
| 471 | Victoria, City of | 66,916 | Yes | Yes |
| 472 | Vidor, City of | 10,403 | Yes | Yes |
| 473 | Waco, City of | 139,236 | Yes | Yes |
| 474 | Ward County | 11,998 | Yes | Yes |
| 475 | Washington County | 35,882 | Yes | Yes |
| 476 | Waskom, City of | 1,617 | Yes | Yes |
| 477 | Watauga, City of | 24,481 | Yes | Yes |
| 478 | Waxahachie, City of | 37,988 | Yes | Yes |
| 479 | Weatherford, City of | 33,547 | Yes | Yes |
| 480 | Webberville, City of | 412 | Yes | Yes |
| 481 | Webster, City of | 11,451 | Yes | Yes |
| 482 | Weslaco, City of | 41,629 | Yes | Yes |
| 483 | West Lake Hills, City of | 3,311 | Yes | Yes |
| 484 | West Orange, City of | 3,342 | Yes | Yes |
| 485 | West University Place, City of | 15,585 | Yes | Yes |
| 486 | Weston Lakes, City of | 3,670 | Yes | Yes |
| 487 | Wharton County | 41,556 | Yes | Yes |
| 488 | Wharton, City of | 8,711 | Yes | Yes |
| 489 | White Oak, City of | 6,331 | Yes | Yes |
| 490 | White Settlement, City of | 17,851 | Yes | Yes |
| 491 | Whitehouse, City of | 8,489 | Yes | Yes |
| 492 | Wichita Falls, City of | 104,683 | Yes | Yes |
| 493 | Wilbarger County | 12,769 | Yes | Yes |
| 494 | Willacy County | 21,358 | Yes | Yes |
| 495 | Willis, City of | 6,566 | Yes | Yes |
| 496 | Willow Park, City of | 5,265 | Yes | Yes |
| 497 | Wills Point, City of | 3,577 | Yes | Yes |
| 498 | Windcrest, City of | 5,851 | Yes | Yes |
| 499 | Wise County | 69,984 | Yes | Yes |
| 500 | Woodway, City of | 8,865 | Yes | Yes |
| 501 | Wylie, City of | 53,067 | Yes | Yes |
| 502 | Yoakum County | 8,631 | Yes | Yes |
| 503 | Yorktown, City of | 1,916 | Yes | Yes |
| 504 | Young County | 18,010 | Yes | Yes |
| 505 | Zapata County | 14,179 | Yes | Yes |

**Exhibit T**

**Texas Litigting Subdivisions with a Population of at Least 500,000**

1. Harris (TX), County of
2. Dallas (TX), County of
3. Houston (TX), City of
4. Tarrant (TX), County of
5. Bexar (TX), County of
6. San Antonio (TX), City of
7. Travis (TX), County of
8. Hidalgo (TX), County of
9. El Paso (TX), County of
10. Fort Bend (TX), County of
11. Montgomery (TX), County of
12. Williamson (TX), County of