# Exhibit 3

**JANSSEN TEXAS STATE-WIDE OPIOID SETTLEMENT AGREEMENT AND
SETTLEMENT TERM SHEET**

## I. Overview

This Agreement sets forth the principal terms and conditions of a settlement agreement between and among the State of Texas, all Texas Participating Subdivisions, and Janssen (collectively, "the Parties") to resolve opioid-related Claims against Janssen.

The Parties intend the terms of this Agreement to parallel the terms of the Global Prescription Opiate Litigation Settlement Agreement ("Global Settlement") dated July 21, 2021. If the Global Settlement becomes effective by February 15, 2022, its terms will supersede the terms of this Agreement except for Sections III (Monetary Relief and Payments), VI (Dismissal of Claims), VII (Release), and IX (Attorney Fee and Cost Payments).

Janssen has agreed to the below terms for the sole purpose of settlement, and nothing herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose. This Agreement is not contingent on the Global Settlement taking effect.

This Agreement resolves Janssen's portion of *State of Texas v. Janssen Pharmaceuticals, Inc. et al.*, Cause No. D-1-GN-19-005458; *County of Dallas v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77098 and *County of Bexar v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77066, both bellwether cases in *In re: Texas Opioid Litigation*, MDL No. 18-0358 (Harris County, Texas); *Tarrant County v. Purdue Pharma, L.P. et al.*, MDL No. 2804, Case No. TXN/3:18-cv00518; and cases brought by Participating Subdivisions.

## II. Definitions[1]

A.   "*Actions*" means of *State of Texas v. Janssen Pharmaceuticals, Inc. et al.*, Cause No. D-1-GN-19-005458; *County of Dallas v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77098 and *County of Bexar v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77066, both bellwether cases in *In re: Texas Opioid Litigation*, MDL No. 18-0358 (Harris County, Texas); *Tarrant County v. Purdue Pharma, L.P. et al.*, MDL No. 2804, Case No. TXN/3:18-cv00518; and cases brought by Participating Subdivisions.

B.   "*Agreement*" means this term sheet together with the exhibits thereto.

C.   "*Bar*" means either (1) a ruling by the highest court of the State setting forth the general principle that no Subdivisions or Special Districts in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law barring Subdivisions and Special Districts in the State from

_____
[1] Capitalized terms not defined in this Agreement have the same meaning they have in the Global Settlement.

1

maintaining or asserting Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (3) a Settlement Class Resolution in the State with full force and effect. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement) shall not constitute a Bar.

D.      "*Case-Specific Resolution*" means either (1) a law barring specified Subdivisions or Special Districts from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); (2) a ruling by a court of competent jurisdiction over a particular Subdivision or Special District that has the legal effect of barring the Subdivision or Special District from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) in the case of a Special District, a release consistent with Section VII below. For the avoidance of doubt, a law, ruling, or release that is conditioned or predicated upon a post-Effective Date payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it) shall not constitute a Case-Specific Resolution.

E.      "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

F.      "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the date of execution of this Agreement (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (a) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any

Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

G.  "*Consent Judgment*" means a consent decree, order, judgment, or similar action.

H.  "*Court*" means the court to which the Agreement and the Consent Judgment are presented for approval and/or entry.

I.  *"Direct Share Allocation"* means 1.9% of Texas's allocation of the Global Settlement Abatement Amount in the Global Settlement ($268,381,445.79) allocated to Bexar, Dallas, and Tarrant Counties under the separate Janssen Opioid Settlement Agreement and Settlement Term Sheet with Bexar County, Dallas County, and Tarrant County.

J.  "*Effective Date*" means the date of entry of a final Consent Judgment, which shall be filed no later than 30 days after the Initial Participation Date.

K.  "*Finality*" means:

   a.  the Agreement and the Consent Judgment have been approved and entered by the Court as to Janssen, including the release of all Released Claims against Released Entities as provided in this Agreement;

   b.  for all lawsuits brought by the State against Released Entities for Released Claims, either previously filed or filed as part of the entry of the Consent Judgment, the Court has stated in the Consent Judgment or otherwise entered an order finding that all Released Claims against Released Entities asserted in the lawsuit have been resolved by agreement; and

   c.  (1) the time for appeal or to seek review of or permission to appeal from the approval and entry as described in subsection (a) hereof and entry of such order described in subsection (b) hereof has expired; or (2) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described in (a) hereof and the order described in subsection (b) hereof have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

L.  "*Global Settlement*" means an agreement in which the State of Texas participates, except to the extent modified by this Agreement whose terms shall control in the event that the

3

conditions specified in Section III.B.1 are met, resolving the litigation and claims brought or threatened to be brought by states and subdivisions against Janssen, including claims against Janssen asserted in the multi-district litigation *In re: Nationwide Prescription Opiate Litigation,* MDL No. 2804 (N.D. Ohio) ("MDL") and state court prescription opiate litigation.

M. "*Initial Participation Date*" means the date by which Subdivisions must join to become initial Participating Subdivisions. The Initial Participation Date shall be 30 days after the execution of this Agreement.

N. "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.

O. "*Later Litigating Special District*" means a Special District (or Special District Official asserting the right of or for the Special District to recover for alleged harms to the Special District and/or the people thereof) that is not a Litigating Special District and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the execution date of this Agreement. It may also include a Litigating Special District whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Special District takes any affirmative step in its lawsuit other than seeking a stay or removal.

P. "*Later Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that is not a Litigating Subdivision and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date. It may also include a Litigating Subdivision whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the Effective Date, when such Litigating Subdivision takes any affirmative step in its lawsuit other than seeking a stay or removal.

Q. "*Litigating Special District*" means a Special District (or Special District official) that brought any Released Claims against any Released Entities on or before the execution date of this Agreement that were not separately resolved prior to that date. A list of Litigating Special Districts will be agreed to by the parties.

R. "*Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that brought any Released Claims against any Released Entities on or before the Effective Date that were not separately resolved prior to that date. A list of Litigating Subdivisions will be agreed to by the parties.

S. "*Non-Litigating Special District*" means a Special District that is neither a Litigating Special District nor a Later Litigating Special District.

T. "*Non-Litigating Subdivision*" means a Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

4

U.  "*Non-Participating Subdivision*" means a Subdivision that is not a Participating Subdivision.

V.  "*Participating Subdivision*" means a Subdivision that signs the Election and Release Form annexed as Exhibit A and meets the requirements for becoming a Participating Subdivision under subsection VIII.A. Dallas, Bexar, and Tarrant Counties shall execute the Election and Release Form annexed as Exhibit A and shall be Participating Subdivisions.

W.  "*Primary Subdivision*" means a Subdivision that has a population of 30,000 or more residents pursuant to the 2019 U.S. Census estimate.

X.  "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the avoidance of doubt, "Product" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. "Product" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

Y.  "*Qualified Settlement Fund*" means the Texas Qualified Settlement Fund established by this Agreement into which all payments by Janssen are made, unless otherwise expressly provided in this Agreement, and which shall be established under the authority and jurisdiction of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas, for the Subdivision share, and under the authority and jurisdiction of the Court in which the Consent Judgment is filed for the State share.

Z.  "*Qualified Settlement Fund Administrator*" means the Administrator appointed to administer the Texas Qualified Settlement Fund under the authority and jurisdiction of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas, for the Regional Share and the Subdivision share, to include Subdivision allocations, fees and expenses, and under the authority and jurisdiction of the Court in which the Consent Judgment is filed for the State share.

AA.  "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the State or any of its Litigating

5

Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by the State, any of its Subdivisions or Special Districts, or any Releasor (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought by a Later Litigating Subdivision or other non-party Subdivision or Special District that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

BB.   "*Released Entities*" means Janssen and (1) all of Janssen's past and present direct or indirect parents, subsidiaries, divisions, predecessors, successors, assigns, including Noramco, Inc. and Tasmanian Alkaloids PTY. LTD.; (2) the past and present direct or indirect subsidiaries, divisions, and joint ventures, of any of the foregoing; (3) all of Janssen's insurers (solely in their role as insurers with respect to the Released Claims); (4) all of Janssen's, or of any entity described in subsection (1), past and present joint ventures; and (5) the respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, agents, and employees of any of the foregoing (for actions that occurred during and related to their work for, or employment with, Janssen). Any person or entity described in subsections (3)-(5) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity.

CC.   "*Releasors*" means (1) the State of Texas; (2) each Participating Subdivision, including Dallas, Bexar, and Tarrant Counties; and (3) without limitation and to the maximum extent of the power of the State of Texas's Attorney General, and/or each Participating Subdivision to release Claims, (a) the State of Texas's and/or Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts, and other Special Districts in the State, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Texas or Subdivisions in the State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide an Election and Release Form providing for a release to the fullest extent of the Participating Subdivision's authority, which shall be attached as an exhibit to the

6

Agreement. The State of Texas's Attorney General represents that he or she has or has obtained the authority set forth in the Representation and Warranty Section.

DD. "*Settlement Class Resolution*" means a class action resolution in a court of competent jurisdiction in the State with respect to a class of Subdivisions and Special Districts in the State that (1) conforms with the State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in the State and has achieved Finality; (3) is binding on all Non-Participating Subdivisions and Special Districts in the State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions or Special Districts may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Janssen other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable State law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing 1% or more of the State's population opt out. In seeking certification of any Settlement Class, the applicable State and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

EE. "*Special District*" means a formal and legally recognized sub-entity of the State that is authorized by State law to provide one or a limited number of designated functions, including but not limited to school districts, fire districts, healthcare & hospital districts, and emergency services districts. Special Districts do not include sub-entities of the State that provide general governance for a defined area that would qualify as a Subdivision.

FF. "*State*" means the State of Texas.

GG. "*Subdivision(s)*" means a formal and legally recognized sub-entity of the State of Texas that provides general governance for a defined area, including a county, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and other functional levels of sub-entities of the State that provide general governance for a defined area. Historic, non-functioning sub-entities of the State of Texas are not Subdivisions, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, parens patriae, or any other capacity. For purposes of this Agreement, the term Subdivision does not include Special Districts. A list of Texas Subdivisions will be agreed to prior to any Subdivision sign-on period.

### III.   Monetary Relief and Payments

A.   Remediation and Restitution Payments

   1.   Within 30 days after the execution of this Agreement, Janssen shall pay into the Qualified Settlement Fund the sum of $291,841,754.89, representing Texas's

allocation of the Global Settlement Abatement Amount in the Global Settlement ($268,381,445.79), plus the fees and costs provided for in Sections IX.A.1, IX.A.2, and IX.A.3, totaling $28,559,556.57, minus the Direct Share Allocation to Bexar, Dallas, and Tarrant Counties. Release of these funds is contingent upon the satisfaction of the conditions described in Section III.B below. If the conditions described in Section III.B below are not satisfied, the amount paid under this Section shall revert to Janssen.

2.  After theDirect Share Allocation to Bexar, Dallas, and Tarrant Counties as described in Section I. I, the remainder per Section III.A.1. above shall be allocated in accordance with the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit B and incorporated herein by reference (the *"Texas Intrastate Term Sheet"*). Accordingly, the Subdivision Share shall be: $39,492,329.75; the Texas Opioid Abatement Fund Share shall be $184,297,538.82; and the State Share shall be $39,492,329.75.

B.  Release of Payment for Full Joinder of Litigating Subdivisions and Special Districts and Support of Legislative Bar in 2021

1.  If the Texas Attorney General notifies Janssen within 45 days of the date of execution of this Agreement that (1) Litigating Subdivisions and Litigating Special Districts representing 96% of the population of Litigating Subdivisions and Special Districts have become Participating Subdivisions or Participating Special Districts or had their claims released consistent with Section VII, and (2) all such Subdivisions and Special Districts support the legislative enactment of a Bar as defined in Section II.C.2 and are using their best efforts to achieve enactment in 2021, the State shall be entitled to the full amount payable under this Agreement on or before December 31, 2021. In such event, the amount paid by Janssen into the Qualified Settlement Fund under Section III.A shall be disbursed on December 31, 2021. The State and counsel for Dallas, Bexar, and Tarrant Counties acknowledge the materiality of their becoming Participating Subdivisions, release of claims consistent with Section VII, and their meaningful support for legislative enactment of a Bar to qualify for an accelerated payment under this subsection.

2.  To the extent that less than 100% of the population of Litigating Subdivisions and Litigating Special Districts become Participating Subdivisions or Participating Special Districts, Janssen shall be entitled to a reimbursement of the full allocation for each Non-Participating Subdivision or Non-Participating Special District, from the total $268,381,445.79 plus attorney fees and costs.

## IV.  Intra-State Allocation

Janssen's payments shall be allocated according to this Agreement and the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit B and incorporated herein by reference (the *"Texas Intrastate Term Sheet"*), and pursuant to Tex. Gov't Code Ann. §405.505 (2019) and Opioid Abatement Trust Fund established by Tex. Gov't Code

Ann.§405.506 (2019), according to the guidelines established in Tex. Gov't Code Ann. Chapter 403, Subchapter R, Statewide Opioid Settlement.

## V.    Injunctive Relief

The Parties agree to the injunctive relief as specified in Exhibit C.

## VI.    Dismissal of Claims

Upon the execution of this Agreement, while awaiting formal approval of the Agreement by the Commissioners Courts of Dallas, Bexar, and Tarrant Counties, the Parties agree to stay or extend all deadlines and proceedings in the Actions as to Janssen and to jointly move for the claims against Janssen to be severed from the Actions. It is the Parties' intent that all litigation activities in the Actions relating to the State of Texas and Dallas, Bexar, and Tarrant Counties' claims against Janssen shall immediately cease as of the date of the execution of this Agreement and that the claims against Janssen not be included in the trial of the Actions against the other defendants. Concurrently with the execution of this Agreement, the State of Texas and Dallas, Bexar, and Tarrant Counties will execute an Agreed Motion to Dismiss with Prejudice, in the form annexed hereto as Exhibit D. The Parties will hold Dallas, Bexar and Tarrant Counties' Agreed Motion to Dismiss with Prejudice in escrow until the Counties' Commissioners Courts approve the Agreement or a resolution is passed satisfying the approval process of the Agreement. Once approval is given, Dallas, Bexar, and Tarrant Counties and/or Janssen shall promptly submit the executed Agreed Motion to Dismiss with Prejudice to the courts in which their actions are pending with a request that it be so ordered. In the event the Counties' Commissioners Courts fail to approve the Agreement or the Court declines to so order the discontinuance of the Actions with prejudice as against Janssen, Janssen shall be entitled to terminate the Agreement and shall be excused from all obligations under it. Concurrently with the execution of this Agreement, Janssen and the State will execute a separate Agreed Motion to Dismiss with Prejudice covering the State's claims against Janssen. The State's Agreed Motion to Dismiss with Prejudice will be held in escrow until the Effective Date and shall be submitted to the Court with a request that it be so ordered concurrently with the entry of the Consent Judgment implementing this Agreement.

## VII.    Release

A.    *Scope*. As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. The State of Texas (for itself and its Releasors), Dallas, Bexar, and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the

9

State of Texas, its Attorney General, and each Releasor to release claims. The Release shall be a complete bar to any Released Claim.

B. *Claim Over and Non-Party Settlement.*

1. *Statement of Intent.* It is the intent of the Parties that:

   a. Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

   b. the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

   c. Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

   d. the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

   e. The provisions of this subsection VII.B are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2. *Contribution/Indemnity Prohibited.* No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3. *Non-Party Settlement.* To the extent that, on or after the Effective Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Janssen in subsection VII.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

10

4.  *Claim-Over*. In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection VII.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection VII.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, that Releasor and Janssen shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Settlement Agreement by Janssen:

    a.  Janssen shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Settlement Agreement, whichever is later;

    b.  Janssen and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that it is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement;

    c.  That Releasor and Janssen shall take steps sufficient and permissible under the law of the State of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement. Such steps may include, where permissible:

        i.   Filing of motions to dismiss or such other appropriate motion by Janssen or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

        ii.  Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

        iii. Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

        iv.  Return of monies paid by Janssen to that Releasor under this Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

        v.   Payment of monies to Janssen by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

11

      vi.      Credit to Janssen under this Settlement Agreement to reduce the overall amounts to be paid under the Settlement Agreement such that it is held harmless from the Claim-Over; and

      vii.     Such other actions as that Releasor and Janssen may devise to hold Janssen harmless from the Claim-Over.

   d.     The actions of that Releasor and Janssen taken pursuant to paragraph (c) must, in combination, ensure Janssen is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Agreement.

   e.     In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Janssen may seek review by the National Arbitration Panel, provided that, if the parties agree, such dispute may be heard by the Court where the Consent Judgment was filed. The National Arbitration Panel shall have authority to require Releasors to implement a remedy that includes one or more of the actions specified in paragraph (c) sufficient to hold Released Entities fully harmless. In the event that the panel's actions do not result in Released Entities being held fully harmless, Janssen shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold Janssen harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Janssen may have. If the Global Settlement does not become effective by February 15, 2022, then disputes shall be heard by the Court where the Consent Judgment was filed.

5.     To the extent that the Claim-Over is based on a contractual indemnity, the obligations under subsection VII.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Janssen shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

C.   *General Release.* In connection with the releases provided for in the Agreement, the State of Texas (for itself and its Releasors), Dallas, Bexar, and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by

him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors), Dallas, Bexar, and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Subdivisions' decision to participate in the Agreement.

D.    *Cooperation.* Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims. The State shall use its best efforts to secure releases consistent with this Section from all Litigating or Later Litigating Subdivisions and Special Districts.

E.    *Res Judicata.* Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement, and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

F.    *Representation and Warranty.* The signatories of this Agreement on behalf of the State of Texas and its Participating Subdivisions expressly represent and warrant that they will, on or before the Effective Date, have (or have obtained) the authority to settle and release, to the maximum extent of the state's power, all Released Claims of (1) the State of Texas, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State of Texas's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license; and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

G.    *Effectiveness.* The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

13

H.    *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of
      Released Claims, the Agreement does not waive, release or limit any criminal liability,
      Claims for any outstanding liability under any tax or securities law, Claims against parties
      who are not Released Entities, Claims by private individuals and any claims arising under
      the Agreement for enforcement of the Agreement.

## VIII.    Participation by Subdivisions

A.    *Requirements for Becoming a Participating Subdivision: Litigating Subdivisions/Later
      Litigating Subdivisions.* A Litigating Subdivision or Later Litigating Subdivision in the State
      may become a Participating Subdivision by either executing an Election and Release Form
      and upon prompt dismissal of its legal action or by having its claims extinguished by
      operation or law or released by the State's Office of the Attorney General.

B.    *Notice.* In conjunction and accordance with the notice process anticipated in the Global
      Settlement, the State's Office of the Attorney General shall send individual notice to all
      Subdivisions in the State of Texas eligible to participate in the settlement and the
      requirements for participation. Such notice may include publication and other standard
      forms of notification.

C.    *Requirements for Becoming a Participating Subdivision: Non-Litigating Subdivisions.* A
      Non-Litigating Subdivision may become a Participating Subdivision by either executing an
      Election and Release Form specifying (1) that the Subdivision agrees to the terms of this
      Agreement pertaining to Subdivisions, (2) that the Subdivision releases all Released Claims
      against all Released Entities, and (3) that the Subdivision submits to the jurisdiction of the
      court where the Consent Judgment is filed for purposes limited to that court's role under the
      Agreement or by having their claims extinguished by operation or law or released by the
      State's Office of the Attorney General.

D.    *Non-Participating Subdivisions.* Non-Participating Subdivisions shall not directly receive
      any portion of any payments paid to the Texas Qualified Settlement Fund and the State may
      choose that its Non-Participating Subdivisions are ineligible for benefits from the fund.

E.    *Representation With Respect to Participation Rate.* The State of Texas represents and
      warrants for itself that it has a good faith belief that virtually all of Texas's Litigating
      Subdivisions will become Participating Subdivisions. The State acknowledges the
      materiality of the foregoing representation and warranty. Counsel for Bexar, Dallas, and
      Tarrant Counties, in good faith, believe this is a fair Settlement. Therefore, counsel for
      Bexar, Dallas, and Tarrant Counties will, in their best efforts, recommend this Settlement to
      their subdivision clients within Texas. Further, counsel for Bexar, Dallas, and Tarrant
      Counties will use their best efforts to secure participation by all Subdivisions within Texas.

F.    Within 5 days of entry of the Notice of Dismissal per subsection VI, the Parties will seek to
      have entered the Case Management Order annexed hereto as Exhibit F. And, further,
      Janssen will participate in making motions to dismiss barred claims upon their release.

## IX.    Attorney Fee and Cost Payments

14

A.  The terms for attorney fee and cost payments are as follows:

1.  Janssen shall pay $19,363,740.68, representing 6.2932157196% of Janssen's maximum payment into the Contingency Fee Fund and Common Benefit Fund under the Global Settlement ($307,692,307.73), into the attorney's fee sub-fund within the Texas Qualified Settlement Fund, to be available to reimburse Participating Subdivision attorney fees, upon application by eligible counsel who waive their contingency fees. If the Global Settlement takes effect, counsel for Participating Subdivisions shall make best efforts to apply for and recover maximum awardable attorney fees from Janssen's maximum payment into the Global Settlement Contingency Fee Fund and Global Settlement Common Benefit Fund, and shall direct the administrators of such Funds to rebate any and all payments such counsel would have received (the *"Global Settlement Subdivision Fee Award"*) to Janssen until Janssen has been repaid the full $19,363,740.68. If the Global Settlement Subdivision Fee Award is less than $14,522,805.51, Participating Subdivisions shall repay Janssen from the attorney fee funds allocated by the Texas Intrastate Term Sheet, annexed hereto as Exhibit B, until Janssen has been repaid $14,522,805.51 under this paragraph. For the avoidance of doubt, in no event shall Janssen recoup less than $14,522,805.51.

    a.  These fees shall be divided amongst Participating Subdivisions, including Dallas, Bexar, and Tarrant Counties, as provided in the Texas Intrastate Term Sheet. Nothing in Section IX.A.1 is intended to limit the application of Sections C.5 and C.6 of the Texas Intrastate Term Sheet.

2.  Janssen shall pay $7,307,851.17 in attorneys' fees to the State of Texas, which represents the State's share (10.8573789344%) of the Additional Restitution Amount ($67,307,692) referenced in the Global Settlement, as provided in Exhibit N of the Global Settlement. If the Global Settlement takes effect and the amount paid under this paragraph exceeds the State's share of the Additional Restitution Amount under the Global Settlement, then the amount due under this paragraph shall be reduced dollar for dollar by, and the State shall repay to Janssen, that excess amount.

3.  Janssen shall pay $1,887,964.72, representing 6.2932157196% of Janssen's maximum payment into the Litigating Subdivision Cost Fund under the Global Settlement ($30,000,000), into the Qualified Settlement Fund, to be available to compensate Attorneys for Participating Subdivisions for costs and expenses arising out of representation of Participating Litigating Subdivisions related to their litigation against Janssen. The costs and expenses shall be divided under the jurisdiction of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas. No funds in the Litigating Subdivision Cost Fund may be used to compensate the costs incurred by Non-Participating Subdivisions or Non-Litigating Subdivisions or costs and expenses arising out of representation of any such Subdivision. If the Global Settlement takes effect, counsel for Participating Litigating Subdivisions shall make best efforts to apply for and recover maximum awardable costs from Janssen's maximum payment into the Global Settlement

15

Litigating Subdivision Cost Fund, and shall direct the administrators of such Fund to rebate any and all payments such counsel would have received (the *"Global Settlement Litigating Subdivision Cost Award"*) to Janssen until Janssen has been repaid the full $1,887,964.72. Counsel for Participating Litigating Subdivisions paid under this paragraph shall direct the administrators of the Global Settlement Litigating Subdivision Cost Fund to rebate any and all payments such counsel would have received to Janssen until Janssen has been repaid the full amount paid under this provision. If such rebate does not reimburse Janssen fully for payments made under this paragraph, Janssen shall be repaid an additional amount from the Subdivision portion of the Texas Qualified Settlement Fund sufficient to reimburse Janssen for the full amount paid under this paragraph, as specified in the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit B.

4.      In addition to the payment pursuant to the foregoing paragraph (IX.A.3), the Qualified Settlement Fund Administrator shall allow reimbursement for reasonable costs and expenses as allowed by the Texas Intrastate Term Sheet from the Subdivision Share and Texas Abatement Fund Share, as provided in the Texas Intrastate Term Sheet, to be available to reimburse Participating Subdivision attorney's costs and expenses upon application by eligible counsel who waive their contingency fees. These costs and expenses shall be divided under the jurisdiction and authority of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas, amongst Participating Subdivisions, including Dallas, Bexar, and Tarrant Counties, as provided in the Texas Intrastate Term Sheet. Any excess costs or expenses not allocated to reimburse Participating Subdivision attorney's costs and expenses pursuant to this Agreement under Exhibit B shall be replaced into to the Subdivision Share and Abatement Share Funds by the Qualified Settlement Fund Administrator.

5.      The State of Texas shall seek costs through the State Cost Fund established by Exhibit S of the Global Settlement.

6.      For the avoidance of doubt, nothing in this Section IX requires Janssen to make any payment beyond that described in Section III.A.1.

7.      Nothing in this agreement is intended to limit the application of the Texas Intrastate Term Sheet, which includes the calculation and process for allocation of fees and costs for Texas Political Subdivisions.

B.      An Attorney may not receive any payment from the Texas Attorney Fee Fund (which includes both the Contingency Fee Fund and the Common Benefit Fund) unless the following eligibility criteria are met and annually certified by the Attorney:

1.      The Attorney must expressly waive the enforcement against the Litigating Subdivision client of all Fee Entitlements (other than under State Back-Stop Agreements) arising out of or related to any or all Qualifying Representations of any

Participating Litigating Subdivision prior to applying for attorneys' fees from the Attorney Fee Fund or costs from the Cost Funds. All applications for attorneys' fees or costs under this Fee Agreement shall include an affirmation by the Attorney of such waiver and notice to the client(s) of such waiver. Such waiver shall not preclude the Attorney from submitting such Fee Entitlements to the Fee Panel as a factor for consideration in allocating payments from the Attorney Fee Fund or in connection with a State Back-Stop Agreement. For the avoidance of doubt, no Attorney may recover fees or costs under this Fee Agreement unless the Attorney expressly agrees not to enforce Fee Entitlements as to each and every Participating Litigating Subdivision represented by that Attorney, but such Attorneys may participate in and receive funds from a State Back-Stop Agreement.

2.    The Attorney must represent that s/he has no present intent to represent or participate in the representation of any Later Litigating Subdivision or any Releasor with respect to Released Claims against Released Entities.

3.    The Attorney must represent s/he will not charge or accept any referral fees for any Released Claims brought against Released Entities by Later Litigating Subdivisions. For the avoidance of doubt, this representation shall not prohibit Attorneys from receiving allocated shares of any future common benefit assessments arising out of settlements or judgments with Later Litigating Subdivisions represented by other Attorneys that are the result of the MDL Court's Common Benefit order.

4.    The Attorney may not have and must represent that s/he does not have a Fee Entitlement related to a Later Litigating Subdivision.

## X.    **Enforcement and Dispute Resolution**

A.    The terms of the Agreement are enforceable by the Participating Subdivisions before the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas. and by the State for the Consent Judgment applicable to the State in the court where the Consent Judgment is filed. Janssen consents to the jurisdiction of the Texas MDL Court, and to the court in which the Consent Judgment is filed, limited to resolution of disputes identified in subsection X.C for resolution in the court in which the Consent Judgment is filed.

B.    The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this section to resolve the dispute.

C.    Disputes not resolved informally shall be resolved in the Court that entered the Consent Judgment for disputes with the Attorney General, or the Texas MDL Court for disputes with subdivisions.

## XI.    **Miscellaneous**

A.    Statement on Restitution and Cooperation

1.  The Parties agree that, unless required by law or as otherwise provided herein, no less than 86.5% of the total maximum amount paid into the Qualified Settlement Fund, which assumes full joinder and attaining of all incentive payments, shall be directed to remediation and for restitution of harms allegedly caused by Janssen's conduct, and no more than 13.5% of that maximum amount shall be directed to payment of attorney fees. This assumes "fees" paid to the State's Office of the Attorney General may be paid to remediation and restitution.

2.  The Parties agree that the purpose of the Qualified Settlement Fund, other than the amounts directed to payment of attorney fees and litigation costs, will be to receive from Janssen and pay over to the State and Participating Subdivisions monies to remediate the harms allegedly caused by Janssen's conduct or to provide restitution for such alleged harms that were previously incurred. The payments received by the Settlement Fund, other than the amounts directed to attorney fees and costs, shall be disbursed to the State and Participating Subdivisions, which were allegedly harmed by Janssen in a manner consistent with their above-stated remedial and/or restitutive purpose. No amount paid to the Fund or paid over to any requesting entity constitutes a fine or penalty.

3.  The State and each Participating Subdivision shall, prior to receipt of any direct payments from the Texas Qualified Settlement Fund, provide the Texas Qualified Settlement Fund Administrator with a written statement certifying that: (1) the entity suffered harm allegedly caused by Janssen; (2) the payments to be received by the entity from Janssen represent an amount that is less than or equal to the actual monetary damage allegedly caused by Janssen; and (3) the entity shall use such payments for the sole purpose of remediating the harm allegedly caused by Janssen or to provide restitution for such alleged harms that were previously incurred.

4.  The Texas Qualified Settlement Fund Administrator shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering the Consent Judgment becomes binding. On the Form 1098-F, the Texas Qualified Settlement Fund Administrator or requesting entity, as applicable, shall identify such payments from Janssen as remediation/restitution amounts. The Texas Qualified Settlement Fund Administrator or State, as applicable, shall also, on or before January 31 of the year following the calendar year in which the order entering the Consent Judgment becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Janssen.

B.  Nothing in this Agreement shall be construed to authorize or require any action by Janssen in violation of applicable federal, state, or other laws.

C.  *Future Litigation Contracts.* The State of Texas, by and through its Attorney General, represents that, to the extent permissible by law, it will not approve any future Subdivision or Special District outside counsel contracts for opioid litigation against Janssen.

D. *Modification*. This Agreement may be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court. For purposes of modifying this Agreement or the Consent Judgment, Janssen may contact the Texas Attorney General and Counsel for Dallas, Bexar and Tarrant Counties for purposes of coordinating this process.

E. Any failure by any party to this Agreement to insist upon the strict performance by any other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Judgment.

F. *Entire Agreement*. This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto, except as provided herein. In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

G. *Counterparts*. This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

H. *Notice*. All notices under this Agreement shall be provided to the following via email and Overnight Mail:

Defendant:

Copy to Janssen's attorneys at:

Charles C. Lifland
Daniel R. Suvor
400 South Hope Street, 18th Floor Los Angeles, CA  90071
Phone: (213) 430-6000
clifland@omm.com
dsuvor@omm.com


For the Attorney General:

Stephanie Eberhardt
Assistant Attorney General
Office of the Attorney General
PO Box 12548
Austin, Texas 78711-2548
stephanie.eberhardt@oag.texas.gov


For Plaintiff Dallas County:

Jeffrey B. Simon
Simon Greenstone Panatier, P.C.
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Phone: (214) 276-7680
jsimon@sgptrial.com


For Plaintiff Bexar County:

Mikal C. Watts
Watts Guerra LLC
4 Dominion Dr.,
Bldg 3, Suite 100
San Antonio, Texas 78257
Phone: (210) 447-0500
mcw@wattsguerra.com


For Plaintiff Tarrant County:

Dara Hegar
The Lanier Law Firm P.C.
10940 West Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
Phone: (713) 659-5200
Dara.Hegar@LanierLawFirm.com


**Approved:**


Dated: _____

JOHNSON & JOHNSON, JANSSEN
PHARMACEUTICALS, INC., ORTHO-MCNEIL-
JANSSEN PHARMACEUTICALS, INC. N/K/A
JANSSEN PHARMACEUTICALS, INC., AND
JANSSEN PHARMACEUTICA INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.

By: _____

Marc Larkins
Assistant Corporate Secretary
Johnson & Johnson

20

Jeffrey B. Simon
Simon Greenstone Panatier, P.C.
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Phone: (214) 276-7680
jsimon@sgptrial.com

For Plaintiff Bexar County:

Mikal C. Watts
Watts Guerra LLC
4 Dominion Dr.,
Bldg 3, Suite 100
San Antonio, Texas 78257
Phone: (210) 447-0500
mcw@wattsguerra.com

For Plaintiff Tarrant County

Dara Hegar
The Lanier Law Firm P.C.
10940 West Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
Phone: (713) 659-5200
Dara.Hegar@LanierLawFirm.com

**Approved:**

Dated: /0-/8-2/

JOHNSON & JOHNSON, JANSSEN
PHARMACEUTICALS, INC., ORTHO-MCNEIL-
JANSSEN PHARMACEUTICALS, INC. N/K/A
JANSSEN PHARMACEUTICALS, INC., AND
JANSSEN PHARMACEUTICA INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.

By: _____

Marc Larkins
Assistant Corporate Secretary
Johnson & Johnson

20

Dated: /0-/5-21

THE STATE OF TEXAS

By: _____

Brent Webster
First Assistant Attorney General
Office of the Texas Attorney General

Dated: 10/15/21

THE COUNTY OF DALLAS, TEXAS

By: _____
Signature

Jeffrey Simon
Printed Name

Shareholder
Title

Attorneys for the County of Dallas, Texas

Dated: _____

THE COUNTY OF BEXAR, TEXAS

By: _____
Signature

_____
Printed Name

_____
Title

Attorneys for the County of Bexar, Texas

Dated: 10/15/21

THE COUNTY OF TARRANT, TEXAS

21

Dated: _____

THE STATE OF TEXAS

By: _____

Brent Webster
First Assistant Attorney General
Office of the Texas Attorney General

Dated: _____

THE COUNTY OF DALLAS, TEXAS

By: _____
Signature

_____
Printed Name

_____
Title

Attorneys for the County of Dallas, Texas

Dated: October 15, 2021

THE COUNTY OF BEXAR, TEXAS

By: *Mikal C. Watts*
_____
Signature

Mikal Watts
_____
Printed Name

Partner, Watts Guerra LLC
_____
Title

Attorneys for the County of Bexar, Texas

Dated: 10/15/21

THE COUNTY OF TARRANT, TEXAS

21

By: _Dara Hegar_____

Signature

Dara Hegar
_____

Printed Name

Managing Attorney
_____

Title

Attorneys for the County of Tarrant, Texas

**Exhibit A**

## TEXAS SUBDIVISION ELECTION AND RELEASE FORM

This Election and Release Form for Texas Participating Subdivisions resolves opioid-related Claims against Janssen under the terms and conditions set forth in the Janssen Texas State-Wide Opioid Settlement Agreement between Janssen, the State of Texas, and the Counties of Dallas and Bexar (the "Agreement"), the provisions of which are here incorporated by reference in their entirety. Upon executing this Election and Release Form, a Participating Subdivision agrees that, in exchange for the consideration described in the Agreement, the Participating Subdivision is bound by all the terms and conditions of the Agreement, including but not limited to the Release found in Section VII of the Agreement and the provisions concerning participation by Subdivisions in Section VIII, and the Participating Subdivision and its signatories expressly represent and warrant on behalf of themselves that they have, or will have obtained on or before the Effective Date or on or before the execution of this Election and Release Form if executed after the Effective Date, the authority to settle and release, to the maximum extent of the Subdivision's power, all Released Claims related to Covered Conduct. If this Election and Release Form is executed on or before the Initial Participation Date, the Participating Subdivision shall dismiss Janssen and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Janssen or a Released Entity no later than the Initial Participation Date. If this Election and Release Form is executed after the Initial Participation Date, the Participating Subdivision shall dismiss Janssen and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Janssen or a Released Entity concurrently with the execution of this form. By executing this Election and Release Form, the Participating Subdivision submits to the jurisdiction of the Court where the Consent Judgment is filed for purposes limited to that Court's role under the Agreement.

24

Dated: _____

[TX SUBDIVISION]

By: _____
[COUNSEL]
[FIRM]
[ADDRESS]
[TELEPHONE]
[EMAIL ADDRESS]

*Counsel for [TX SUBDIVISION]*

**Exhibit B**

## TEXAS OPIOID SETTLEMENT SHARING AGREEMENT

[To be added]

**Exhibit C**

## Injunctive Relief

### A.    Definitions Specific to this Exhibit

1.    "*Cancer-Related Pain Care*" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

2.    "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen"), including all of their subsidiaries, predecessors, successors, current officers, directors, employees, representatives, agents, affiliates, parents, and assigns acting on behalf of Janssen in the United States.

3.    "*End-of-Life Care*" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

4.    "*Health Care Provider*" means any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, practice, hospital, clinic, or pharmacy.

5.    "*In-Kind Support*" means payment or assistance in the form of goods, commodities, services, or anything else of value.

6.    "*Lobby*" and "*Lobbying*" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq*., and any analogous state or local provisions governing the person or entity being lobbied. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

7.    "*Opioid(s)*" means all naturally occurring, synthetic, or semisynthetic substances that interact with opioid receptors and act like opium. For the avoidance of doubt, the term "Opioid(s)" does not include Imodium.

8.    "*Opioid Product(s)*" means all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Products(s)" shall not include (i) methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients (APIs) used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

9. "*OUD*" means opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

10. "*Product(s) for the Treatment of Opioid-Induced Side Effects*" means any over-the-counter or prescription remedy used to treat those side effects identified on the FDA label for any Opioid Product, except that, for purposes of the Agreement, Product(s) for the Treatment of Opioid-Induced Side Effects shall not include products that treat OUD or respiratory depression.

11. "*Promote*," "*Promoting*," "*Promotion*," and "*Promotional*" means dissemination of information or other practices intended or reasonably anticipated to increase sales, prescriptions, or that attempts to influence prescribing practices in the United States. These terms shall not include the provision of scientific information or data in response to unsolicited requests from Health Care Providers or payors as allowed in subsection C.2.e-h.

12. "*Third Party(ies)*" means any person or entity other than Janssen or a government entity.

13. "*Treatment of Pain*" means the provision of therapeutic modalities to alleviate or reduce pain.

14. "*Unbranded Information*" means any information that does not identify a specific branded or generic product.

## B. Ban on Selling and Manufacturing Opioids

1. Janssen shall not manufacture or sell any Opioids or Opioid Products for distribution in the State of Texas. Janssen represents that prior to the Effective Date, it de-listed all of its Opioid Products and no longer ships any of them to or within the United States. Janssen shall provide notice to the State of Texas when the last of the inventory Janssen has shipped has expired.

2. Notwithstanding subsection B.1 above, Janssen may continue to manufacture Nucynta and Nucynta ER (collectively "Nucynta") in accordance with the terms of its April 2, 2015 contract with Depomed, Inc., rights to which were assigned to Collegium Pharmaceutical, Inc. ("Collegium") on February 13, 2020, so long as Janssen is not Promoting Nucynta, or selling Nucynta to anyone other than Collegium. Janssen shall not extend, amend, or otherwise alter the terms of its April 2, 2015 contract or enter into any similar agreement related to Nucynta or any other Opioid or Opioid Product. For the term of its April 2, 2015 contract, or until the expiration of subsection B.1, whichever is shorter, Janssen shall make an annual report to the State of Texas showing the amount of Nucynta manufactured in accordance with the April 2, 2015 contract.

C.   **Ban on Promotion**

    1.   Janssen shall not engage in Promotion of Opioids or Opioid Products including but not limited to, by:

        a.   Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients, or to persons involved in determining the Opioid Products included in formularies;

        b.   Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

        c.   Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs for Promotion of Opioids or Opioid Products;

        d.   Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

        e.   Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

        f.   Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

        g.   Engaging in internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet.

    2.   Notwithstanding subsection C.1 directly above, Janssen may:

        a.   Maintain a corporate website;

        b.   Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

        c.   Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in Texas;

d.  Provide the following by mail, electronic mail, on or through Janssen's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in Texas;

e.  Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

f.  Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.  Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h.  Provide information relating solely to the pricing of any Opioid Product;

i.  Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy (REMS) program or other federal or state law or regulation applicable in Texas through an independent Third Party, which shall be responsible for the program's content without the participation of Janssen; and

j.  Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Janssen as the source of the information.

3.      Janssen shall not engage in the Promotion of Products for the Treatment of Opioid-Induced Side Effects, including but not limited to:

      a.      Employing or contracting with sales representatives or other persons to Promote Products for the Treatment of Opioid-Induced Side Effects to Health Care Providers or patients;

      b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote Products for the Treatment of Opioid-Induced Side Effects;

      c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote Products for the Treatment of Opioid-Induced Side Effects;

      d.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Products for the Treatment of Opioid-Induced Side Effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4.      Notwithstanding subsection C.3 directly above, Janssen may Promote Products for the Treatment of Opioid-Induced Side Effects so long as such Promotion does not associate the product with Opioids or Opioid Products.

5.      Treatment of Pain

      a.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the Treatment of Pain, except that Janssen may continue to Promote the Treatment of Pain with branded non-Opioids, including Tylenol and Motrin.

      b.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the concept that pain is undertreated, except in connection with Promoting the use of branded non-Opioids, including Tylenol and Motrin, for the Treatment of Pain.

      c.      Janssen shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or that otherwise Promotes Opioids or Opioid Products.

6.      Notwithstanding subsection C.5 above:

      a.      Janssen may Promote or provide educational information about the Treatment of Pain with non-Opioids or therapies such as acetaminophen or non-steroidal anti-inflammatory drugs (NSAIDs), including Promoting or providing educational information about such non-Opioids or therapies as alternatives to Opioid use, or as

33

part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

b.      Janssen may provide educational information about the Treatment of Pain related to medical procedures involving devices manufactured or sold by Janssen, including educational information about Opioids or Opioid Products, so long as such information does not Promote Opioids or Opioid Products.

7.      The Promotional conduct prohibited in subsection C is not prohibited insofar as it relates to the Promotion of Opioids or Opioid Products for Cancer-Related Pain Care or End-of-Life Care only, and so long as Janssen is identified as the sponsor or source of such Promotional conduct.

## D.      No Financial Reward or Discipline Based on Volume of Opioid Sales

1.      Janssen shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products;

2.      Janssen shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to any person in return for the prescribing, sale, use, or distribution of an Opioid Product; and

3.      Janssen's compensation policies and procedures shall ensure compliance with the Agreement.

## E.      Ban on Funding/Grants to Third Parties

1.      Janssen shall not directly or indirectly provide financial support or In-Kind Support to any Third Party that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects (subject to subsections C.2, 4, and 6), including educational programs or websites that Promote Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects, excluding financial support otherwise required by the Agreement, a court order, or by a federal or state agency.

2.      Janssen shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects.

3.      Janssen shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects (subject to subsections C.2, 4, and 6).

34

4.      Janssen shall not use, assist, or employ any Third Party to engage in any activity that Janssen itself would be prohibited from engaging in pursuant to the Agreement. To the extent Janssen supports trade groups engaged in Lobbying, Janssen shall stipulate that such support not be used for any purpose prohibited by the Agreement.

5.      Janssen shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      Janssen shall not compensate or support Health Care Providers or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payors, i.e., any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers.

7.      No officer or management-level employee of Janssen may concurrently serve as a director, board member, employee, agent, or officer of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or management-level employee of Janssen from concurrently serving on the board of a hospital.

8.      Janssen shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects. For avoidance of doubt, nothing in this paragraph shall prohibit Janssen from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or Board member at any such entity.

## F.      **Lobbying Restrictions**

1.      Janssen shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

   a.      Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

   b.      Has the effect of limiting access to any non-Opioid alternative pain treatments; or

   c.      Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.      Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

a. The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

b. The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

c. The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

d. The limitation of initial prescriptions of Opioids to treat acute pain;

e. The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

f. The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

g. Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

h. The implementation or use of Opioid drug disposal systems.

3. Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of PDMPs, including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4. Notwithstanding the foregoing restrictions in subsections F.1-3, the following conduct is not restricted:

a. Challenging the enforcement of or suing for declaratory or injunctive relief with respect to legislation, rules, or regulations referred to in subsection F.1;

b. Communications made by Janssen in response to a statute, rule, regulation, or order requiring such communication;

c. Communications by a Janssen representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

d. Responding, in a manner consistent with the Agreement, to an unsolicited request for the input on the passage of legislation or the promulgation of any

36

rule or regulation when such request is submitted in writing specifically to Janssen from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation; or

e. Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections F.1-3, so long as the company does not support specific portions of such legislation or regulation covered by subsection F.1 or oppose specific portions of such legislation or regulation covered by subsections F.2-3.

5. Janssen shall provide notice of the prohibitions in subsection F to all employees engaged in Lobbying; shall incorporate the prohibitions in subsection F into trainings provided to Janssen employees engaged in Lobbying; and shall certify to the State of Texas that it has provided such notice and trainings to Janssen employees engaged in Lobbying.

## G.    Ban on Prescription Savings Programs

1. Janssen shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

2. Janssen shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

3. Janssen shall not directly or indirectly assist patients, Health Care Providers, or pharmacies with the claims and/or prior authorization process required for third-party payors to approve payment for any Opioid Product.

## H.    General Terms

1. Janssen shall not make any written or oral statement about Opioids or any Opioid Product that is unfair, false, misleading, or deceptive as defined under the law of Texas. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

2. Janssen shall not represent that Opioids or any Opioid Product(s) have approvals, characteristics, uses, benefits, or qualities that they do not have. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

3. For the avoidance of doubt, the Agreement shall not be construed or used as a waiver or limitation of any defense otherwise available to Janssen in any action, and nothing in the Agreement is intended to or shall be construed to prohibit Janssen in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in defense of litigation or other legal proceedings.

4. Upon the request of the Texas Attorney General, Janssen shall provide the Texas Attorney General with copies of the following, within thirty (30) days of the request:

a. Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Janssen's Opioid Product(s); and

b. Warning or untitled letters issued by the FDA regarding Janssen's Opioid Product(s) and all correspondence between Janssen and the FDA related to such letters.

5. The Agreement applies to conduct that results in the Promotion of Opioids or Opioid Products, or the Treatment of Pain inside the United States.

6. Janssen will enter into the Agreement solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of the Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. The Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

7. Nothing in the Agreement shall be construed to limit or impair Janssen's ability to:

a. Communicate its positions and respond to media inquiries concerning litigation, investigations, reports or other documents or proceedings relating to Janssen or its Opioid Products.

b. Maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products, including the website, www.factsaboutourprescriptionopioids.com.

## I. Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product

1. Janssen shall comply with all applicable state laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids or Opioid Products, including conduct permitted by subsection B.2, provided that nothing in this paragraph requires Janssen to violate federal law or regulations, including but not limited to:

- a. Texas Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

- b. Texas Consumer Protection Laws;

- c. Texas laws, regulations, and guidelines related to opioid prescribing, distribution, and disposal;

## J. Clinical Data Transparency

1.      Janssen agrees to continue sharing clinical trial data under the Yale University Open Data Access (YODA) Project to allow researchers qualified under the program to access the company's proprietary data under the terms of the project.

2.      In the event Yale University discontinues or withdraws from the YODA Project agreement with Janssen, Janssen shall make its clinical research data regarding Opioids and Opioid Products, and any additional clinical research data that Janssen sponsors and controls regarding Opioids and Opioid Products, available to an independent entity that is the functional equivalent of the YODA Project under functionally equivalent terms.

## K.      Enforcement

1.      For the purposes of resolving disputes with respect to compliance with this Exhibit, should the State of Texas have a reasonable basis to believe that Janssen has engaged in a practice that violates a provision of this Exhibit subsequent to the Effective Date, the State of Texas shall notify Janssen in writing of the specific objection, identify with particularity the provision of the Agreement that the practice appears to violate, and give Janssen thirty (30) days to respond in writing to the notification; provided, however, that the State of Texas may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

2.      Upon receipt of written notice, Janssen shall provide a good faith written response to the State's notification, containing either a statement explaining why Janssen believes it is in compliance with the provisions of this Exhibit of the Agreement, or a detailed explanation of how the alleged violation occurred and a statement explaining how Janssen intends to remedy the alleged breach. Nothing in this section shall be interpreted to limit the State of Texas's civil investigative demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable law, and Janssen reserves all of its rights in responding to a CID or investigative subpoena issued pursuant to such authority.

3.      The State of Texas may agree, in writing, to provide Janssen with additional time beyond thirty (30) days to respond to a notice provided under subsection K.1, above, without Court approval.

4.      Upon giving Janssen thirty (30) days to respond to the notification described above, the State shall also be permitted reasonable access to inspect and copy relevant, non-privileged, non-work product records and documents in possession, custody, or control of Janssen that relate to Janssen's compliance with each provision of the Agreement pursuant to the State of Texas's CID or investigative subpoena authority.

5.      The State of Texas may assert any claim that Janssen has violated the Agreement in a separate civil action to enforce compliance with the Agreement, or may seek any other relief afforded by law for violations of the Agreement, but only after providing Janssen an opportunity to respond to the notification described in subsection K.1, above; provided, however, the State of Texas may take any action if the State believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

6. In the event of a conflict between the requirements of the Agreement and any other law, regulation, or requirement such that Janssen cannot comply with the law without violating the terms of the Agreement or being subject to adverse action, including fines and penalties, Janssen shall document such conflicts and notify the State of the extent to which it will comply with the Agreement in order to eliminate the conflict within thirty (30) days of Janssen's discovery of the conflict. Janssen shall comply with the terms of the Agreement to the fullest extent possible without violating the law.

7. Janssen or the State may request that Janssen and the State meet and confer regarding the resolution of an actual or potential conflict between the Agreement and any other law, or between interpretations of the Agreement by different courts. Nothing herein is intended to modify or extend the jurisdiction of any single judicial authority as provided by law.

## L. **Compliance Duration**

1. Subsections B-J of this Exhibit shall be effective for 10 years from the Effective Date.

2. Nothing in this Agreement shall relieve Janssen of its independent obligation to fully comply with the laws of the State of Texas after expiration of the 10-year period specified in this subsection.

## M. **Compliance Deadlines**

1. Janssen must be in full compliance with the provisions included this Agreement by the Effective Date. Nothing herein shall be construed as permitting Janssen to avoid existing legal obligations.

**Exhibit D**

MDL PRETRIAL CAUSE NO. _____

| | | |
|---|---|---|
| _____, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| | § | |
| _____, | § | |
| *Defendants.* | § | _____ COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | 152ND JUDICIAL DISTRICT |
| | § | |
| | § | HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AGREED MOTION TO DISMISS WITH PREJUDICE CLAIMS AGAINST JANSSEN PHARMACEUTICALS, INC., ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC, JANSSEN PHARMACEUTICA, AND JOHNSON & JOHNSON

Plaintiff _____ and Defendants Janssen Pharmaceuticals, Inc., its predecessor companies Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc. (jointly "Janssen"), its parent company, Johnson & Johnson, and Noramco ("J&J," and together with Janssen, "Defendants"), file this Agreed Motion to Dismiss with Prejudice and, in support thereof, respectfully show the Court as follows:

Plaintiff and Defendants (collectively, the "Parties") have settled their disputes by mutual agreement. Therefore, Plaintiff no longer desires to pursue this lawsuit against the above-named Defendants. Accordingly, the parties jointly move that the Court enter an Order dismissing all claims against the Defendants with prejudice.

42

WHEREFORE, PREMISES CONSIDERED, Plaintiff _____ and Janssen Pharmaceuticals, Inc., its predecessor companies Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc., and its parent company, Johnson & Johnson, respectfully request that this Court enter an Order granting this Agreed Motion to Dismiss with Prejudice, dismissing Plaintiff's claims with prejudice to the re-filing of same, and ordering each party bear its respective attorneys' fees and costs incurred herein.

Dated: _____, 2021                Respectfully submitted,

By: */s/ Steven J. Wingard*
Stephen E. McConnico
Texas Bar No. 3450300
Steven J. Wingard
Texas Bar No. 00788694
John W. Ellis
Texas Bar No. 24078473
SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
512-495-6300 – Phone
512-495-6399 – Fax
smcconnico@scottdoug.com
swingard@scottdoug.com
jellis@scottdoug.com

*Of Counsel:*

Charles C. Lifland (*admitted pro hac vice*)
Sabrina Strong (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com
sstrong@omm.com
Stephen D. Brody (*admitted pro hac vice*)
O'MELVENY & MYERS LLP

43

1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
sbrody@omm.com

*Attorneys for Defendants Johnson & Johnson,*
*Janssen Pharmaceuticals, Inc., Ortho-McNeil-*
*Janssen Pharmaceuticals, Inc. n/k/a Janssen*
*Pharmaceuticals, Inc., and Janssen Pharmaceutica,*
*Inc. n/k/a Janssen Pharmaceuticals, Inc.*

[SIGNATURE BLOCK OF COUNSEL FOR
SETTLING PLAINTIFF]

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record are being served with a copy of this document on
_____ in accordance with the Texas Rules of Civil Procedure.

*/s/ Steven J. Wingard*
Steven J. Wingard

44

**Exhibit E**

## List of Litigating Subdivisions and Litigating Special Districts

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Angelina County | Dies & Parkhurst, L.L.P.; Simon Greenstone Panatier Bartlett, P.C. | | 86,715 |
| Bailey County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 7,000 |
| Bastrop County | Phipps Deacon Purnell PLLC | | 88,723 |
| Bee County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 32,565 |
| Bexar County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 2,003,554 |
| Bexar County Hospital District | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Phipps Deacon Purnell PLLC | Bexar County | [TBD] |
| Blanco County | Simon Greenstone Panatier Bartlett, P.C.; Deborah F. Earley; Martin Walker, P.C.; James M. Harris, Jr.; Jeffrey Law Firm; Chris Byrd Law | | 11,931 |
| Bowie County | Simon Greenstone Panatier Bartlett, P.C.; Dunn Nutter & Morgan; Martin Walker, P.C. | | 93,245 |
| Brazos County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough; Matthew S. Daniel | | 229,211 |
| Brooks County | Phipps Deacon Purnell PLLC | | 7,093 |

| Burnet County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 48,155 |
|---|---|---|---|
| Caldwell County | Phipps Deacon Purnell PLLC | | 43,664 |
| Calhoun County | Phipps Deacon Purnell PLLC | | 21,290 |
| Cameron County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 423,163 |
| Camp County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 13,094 |
| Cass County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 30,026 |
| Castro County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 7,530 |
| Cherokee County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Richards Penn; Ament & Peacock | | 52,646 |
| Childress County | Altman Legal Group; Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 7,306 |
| City of Eagle Pass | Napoli Shkolnik PLLC; Luis R. Vera & Associates | Maverick County | 29,684 |
| City of Houston | The Lanier Law Firm; Law Office of Richard Schechter, P.C.; Reich and Binstock LLP; Baker Wotring LLP | Harris County | 2,320,268 |
| City of Laredo | Napoli Shkolnik PLLC; Luis R. Vera & Associates | Webb County | 262,491 |
| City of Leon Valley | Phipps Deacon Purnell PLLC; Denton Navarro | Bexar County | 12,306 |

47

| | Rocha Bernal & Zech P.C. | | |
|---|---|---|---|
| City of San Antonio | The Herrera Law Firm; Baron & Budd, P.C.; Greene, Ketchum, Farrell, Bailey & Tweel LLP; Hill Peterson Carper Bee & Deitzler PLLC; Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A.; McHugh Fuller; Powell & Majestro | Bexar County | 1,547,253 |
| Clay County | Harrison Davis Steakley Morrison Jones, P.C.; Altman Legal Group; Haley & Olson | | 10,471 |
| Colorado County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 21,493 |
| Cooke County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 41,257 |
| Coryell County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 75,951 |
| Dallas County | Simon Greenstone Panatier Bartlett, P.C.; Lanier Law Firm; Cochran Firm | | 2,635,516 |
| Dallas County Hospital District | Burns Charest LLP; Harrison Davis Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | Dallas County | [TBD] |
| Delta County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 5,331 |
| Dimmit County | Simon Greenstone Panatier Bartlett, | | 10,124 |

48

| | P.C.; Richard A. Dodd, LC; The Armstrong Firm, PLLC | | |
|---|---|---|---|
| Duval County | The Barrera Law Firm; The Snapka Law Firm | | 11,157 |
| Ector County | Simon Greenstone Panatier Bartlett, P.C.; Law Office of Robert E. White | | 166,223 |
| El Paso County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 839,238 |
| Ellis County | Motley Rice LLC; Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 184,826 |
| Falls County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 17,297 |
| Fannin County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 35,514 |
| Fort Bend County | Roy L. Cordes, Jr. (County Attorney) | | 811,688 |
| Franklin County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 10,725 |
| Freestone County | Simon Greenstone Panatier Bartlett, P.C.; The Beckham Group | | 19,717 |
| Galveston County | Watts Guerra LLP; O'Neill Law | | 342,139 |
| Grayson County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Sanders, Motley, Young & Gallardo, PLLC | | 136,212 |
| Guadalupe County | Phipps Deacon Purnell PLLC | | 166,847 |
| Guadulupe Valley Hospital | Burns Charest LLP; Harrison Davis | Guadalupe County | [TBD] |

49

|  | Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. |  |  |
|---|---|---|---|
| Hardin County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. |  | 57,602 |
| Harris County | Gallagher Law Firm; Fibich Leebron Copeland Briggs; Dan Downey, P.C. |  | 4,713,325 |
| Harris County Hospital District | Gallagher Law Firm; Fibich Leebron Copeland Briggs; Dan Downey, P.C. | Harris County | [TBD] |
| Harrison County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Truelove Law Firm, PLLC |  | 66,553 |
| Haskell County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson |  | 5,658 |
| Hays County | Phipps Deacon Purnell PLLC |  | 230,191 |
| Henderson County | Motley Rice LLC; Fears Nachawati, PLLC; Mathew S. Daniel; Ferrer Poirot & Wansbrough |  | 82,737 |
| Hidalgo County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Hinojosa Law Firm, P.C. |  | 868,707 |
| Hopkins County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. |  | 37,084 |
| Houston County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, |  | 22,968 |

50

| | P.C.; Griffith & Griffith, P.C. | | |
|---|---|---|---|
| Irving Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | Dallas County | [TBD] |
| Jasper County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 35,529 |
| Jefferson County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 251,565 |
| Jim Hogg County | The Barrera Law Firm; The Snapka Law Firm | | 5,200 |
| Jim Wells County | The Barrera Law Firm; The Snapka Law Firm; The Gutierrez Law Firm; Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 40,482 |
| Johnson County | Fears Nachawati, PLLC; McLean Law Firm, P.C.; Ferrer Poirot & Wansbrough | | 175,817 |
| Jones County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 20,083 |
| Kaufman County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 136,154 |
| Kendall County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Armstrong Firm, PLLC | | 47,431 |
| Kerr County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 52,600 |
| Kinney County | Harrison Davis Steakley Morrison | | 3,667 |

51

| | Jones, P.C.; Haley & Olson | | |
|---|---|---|---|
| Kleberg County | Michael J. Krueger; The Snapka Law Firm | | 30,680 |
| Lamar County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 49,859 |
| LaSalle County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 7,520 |
| Leon County | Watts Guerra LLP; O'Neill Law; The Gallagher Law Firm | | 17,404 |
| Liberty County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz; Husain Law & Associates, PC; Law Offices of Randall P. Gunter, P.C. | | 88,219 |
| Limestone County | The Beckham Group | | 23,437 |
| Lubbock County | Phipps Deacon Purnell PLLC | | 310,569 |
| Madison County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 14,284 |
| Marion County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 9,854 |
| Maverick County | Napoli Shkolnik PLLC | | 58,722 |
| McLennan County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 256,623 |
| McMullen County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Armstrong Firm, PLLC | | 743 |
| Milam County | Simon Greenstone Panatier Bartlett, | | 24,823 |

| | | | |
|---|---|---|---|
| | P.C.; Fisher, Boyd, Johnson & Huguenard, L.L.P; Richard A. Dodd, LC | | |
| Mitchell County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 8,545 |
| Montgomery County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 607,391 |
| Morris County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 12,388 |
| Nacogdoches County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Lanier Law Firm | | 65,204 |
| Newton County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 13,595 |
| Nolan County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 14,714 |
| Nueces County | The Law Office of Richard Schechter, P.C.; The Lanier Law Firm; The Law Office of James B. Ragan; Reich & Binstock, LLP; The Purnell Law Firm; Phipps Anderson Deacon LLP | | 362,294 |
| Nueces County Hospital District | The Law Office of Richard Schechter, P.C.; The Lanier Law Firm; The Law Office of James B. Ragan; Reich & Binstock, LLP; The Purnell Law Firm; | Nueces County | [TBD] |

53

| | Phipps Anderson Deacon LLP | | |
|---|---|---|---|
| Orange County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 83,396 |
| Ochiltree County Hospital District | Beggs & Lane RLLP; Frazer PLC; The Bilek Law Firm, L.L.P.; The Kuykendall Group; Law Office of Grant D. Amey, LLC | Ochiltree County | [TBD] |
| Palo Pinto County Hospital District | Burns Charest LLP; Harrison Davis Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | Palo Pinto County | [TBD] |
| Panola County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Love Law Firm, P.C.; Adkison Law Firm | | 23,194 |
| Parker County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 142,878 |
| Polk County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 51,353 |
| Potter County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Lanier Law Firm; Templeton, Smithee, Hayes, Heinrich & Russell, LLP; Mullin, Hoard & Brown, LLP | | 117,415 |
| Red River County | Simon Greenstone Panatier Bartlett, P.C. | | 12,023 |

| Roberts County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 854 |
|---|---|---|---|
| Robertson County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC; The Beckham Group | | 17,074 |
| Rockwall County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 104,915 |
| Rusk County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Love Law Firm, P.C.; Adkison Law Firm | | 54,406 |
| San Patricio County | Alexander Dubose Jefferson Townsend; Joel H. Thomas; Phipps Deacon Purnell LLP | | 66,730 |
| San Saba County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 6,055 |
| Shackelford County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 3,265 |
| Shelby County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Adkison Law Firm | | 25,274 |
| Smith County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 232,751 |
| Socorro Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | El Paso County | [TBD] |
| Stephens County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 9,366 |
| Tarrant County | The Lanier Law Firm; Law Offices of Tom Hall | | 2,102,515 |
| Tarrant County Hospital District | Wick Phillips Gould & Martin, LLP | Tarrant County | [TBD] |

55

| Terrell County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 776 |
|---|---|---|---|
| Texarkana Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | Bowie County | [TBD] |
| Throckmorton County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 1,501 |
| Titus County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 32,750 |
| Travis County | Hendler Flores; Law Office of Richard Schechter, P.C.; Reich and Binstock LLP; The Lanier Law Firm | | 1,273,954 |
| Trinity County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 14,651 |
| Upshur County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Tefteller Law PLLC | | 41,753 |
| Uvalde County | Phipps Deacon Purnell PLLC | | 26,741 |
| Van Zandt County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 56,590 |
| Walker County | Correro & Leisure, P.C.; Park & Durham; G. Allan Van Fleet, P.C. | | 72,791 |
| Waller County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 55,246 |
| Webb County | Cicala Law Firm; Sanford Heisler Sharp | | 276,652 |
| West Wharton County Hospital District | Beggs & Lane RLLP; Frazer PLC; The Bilek Law Firm, | Wharton County | [TBD] |

56

| | L.L.P.; The Kuykendall Group; Law Office of Grant D. Amey, LLC | | |
|---|---|---|---|
| Wichita County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson; Altman Law Group | | 132,230 |
| Williamson County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 590,551 |
| Wilson County | Phipps Deacon Purnell PLLC | | 51,070 |
| Wilson County Memorial Hospital District | Phipps Deacon Purnell PLLC | Wilson County | [TBD] |
| Wood County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 45,539 |
| Zavala County | Napoli Shkolnik PLLC; Luis R. Vera & Associates | | 11,840 |

## Exhibit F

## MASTER FILE NO. 2018-63587

|   |   |
|---|---|
| § | IN THE DISTRICT COURT |
| § | |
| IN RE: TEXAS OPIOID LITIGATION § | |
| MDL No. 18-0358 § | HARRIS COUNTY, TEXAS |
| § | |
| § | |
| *This Document Relates to All Cases* § | 152ND JUDICIAL DISTRICT |

## **CASE MANAGEMENT ORDER**

This Case Management Order ("CMO") shall apply to all plaintiffs with cases pending as of
[*Date of Final Court Approval of Settlement*] against Defendants and to all new plaintiffs filing
cases after that date against Defendants (collectively, "Plaintiff" or "Plaintiffs"), whose claims are
pending in this coordinated proceeding and not released by the Settlement Agreement in this action
entered into on [*settlement date*] ("Settlement Agreement"). As used herein, "Defendants" refers to
Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc.
n/k/a Janssen Pharmaceuticals, Inc., Noramco, and Janssen Pharmaceutica, Inc. n/k/a Janssen
Pharmaceuticals, Inc. Pursuant to the order of the Texas Multidistrict Litigation Panel, all
subsequent related and tag-along proceedings filed in the State of Texas and transferred to this
Multidistrict Litigation Proceeding, *In re: Texas Opioid Litigation*, MDL No. 18-0358, pending
before this Court and docketed under Master File No. 2018-63587, shall be subject to the terms of
this CMO.

Good cause appearing, it is ordered as follows:

### A. **Filing of Amended Petitions**

1. Each Plaintiff with an existing case as of [*Date of Final Court Approval of
Settlement*], shall file and serve on Defendants within ninety (90) days of that date an Amended

58

Petition satisfying the requirements of the Texas Rules of Civil Procedure and this CMO, if that Plaintiff's case is not dismissed with prejudice prior to this deadline pursuant to the Settlement Agreement. Plaintiff's counsel shall comply with Texas Rule of Civil Procedure 65 when filing any such Amended Petition.

2. The time for Defendants to file a response to a new Petition or Amended Petition shall not begin to run until after the receipt by counsel for the Defendants of the Case-Specific Expert Report(s) required pursuant to this CMO, and after the claims process is concluded as described in Section B.3 below, whichever is later.

**B. Plaintiffs' Requirement to Produce Certain Specified Information About Their Claims**

1. **Plaintiffs' Production Requirements.** Each Plaintiff shall serve the following documents and/or information upon counsel for Defendants:

(a) **Fact Sheet.** If not already completed, executed, and served, each Plaintiff shall serve upon the Defendants within the deadlines specified herein a completed copy of the Fact Sheet, attached as Exhibit A to this Case Management Order. Each Plaintiff that has already completed, executed, and served a compliant Fact Sheet shall serve upon the Defendants within the deadlines specified herein an updated Fact Sheet reflecting any material change in the facts underlying the Plaintiff's claims or shall affirm that no such material change applies. Simultaneously with its service of its Fact Sheet or affirmation, each Plaintiff shall serve upon Defendants a verified statement under oath setting forth how each element of their claims has not been resolved pursuant to the terms of the Settlement and the state and regional abatement fund provided therein.

(b) **Record Production.**

(i) Each Plaintiff shall produce all records establishing the existence of a public nuisance within the Plaintiff's territory or borders, including a definition of the nuisance and evidence to support its existence.

(ii) Each Plaintiff shall produce all records supporting a claim for nuisance "abatement" relief within the Plaintiff's territory or borders, including a categorization and itemization of any requested nuisance abatement relief and evidence to support each component of such relief.

(iii) Each Plaintiff shall produce all records supporting a claim of damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages. Each Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.

(iv) For any other relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that will make the expenditures, when and how long those entities will make the expenditures, and the nature of the expenditures, including how they will address any and all alleged harms. Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

(v) Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly unnecessary prescriptions shall identify those prescriptions, to whom and by whom the prescriptions were written, the pharmacy that filled each such prescription, whether the Plaintiff was reimbursed for them, and the Plaintiff's basis for identifying the prescriptions.

60

(c)     **Affidavit.** An affidavit signed by each Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit A to this Case Management Order; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO. If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d)     **Expert Reports.** Each Plaintiff shall serve on counsel for Defendants a case-specific expert report or reports executed by a qualified expert, under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report"). The Case-Specific Expert Report shall include all matter required to comply with Texas Rule of Civil Procedure 195, Texas law, and at least:

(i)     *Plaintiff's Information.* The Plaintiff's name;

(ii)     *Expert's Information.* The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii)     *Plaintiff's Records.* All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv)     *Reliance Materials.* All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v)     *Locations.* If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity how

Plaintiff has been affected by such public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi)     *Subjects of Report(s)*. The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to rely, including but not limited to the following:

(1)     Whether the Plaintiff's records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2)     Whether the Plaintiff's records reviewed by the expert(s) indicate the existence of a nuisance and, if so, the nature of the nuisance;

(3)     Whether the Plaintiff's records reviewed by the expert(s) indicate that Defendants engaged in any wrongful conduct and, if so, the nature of that conduct;

(4)     An opinion that there is in fact a causal relationship between the individual Plaintiff's claims and Defendants' alleged conduct and the basis for that opinion;

(5)     An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

2.     **Deadline to comply.**

(a)     For each Plaintiff with claims pending against Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced no later than [DATE], or ninety (90) days after the date such Plaintiff elects not to settle its claims, whichever is sooner.

(b)     For each Plaintiff with claims newly filed in or transferred to this proceeding against Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

3.     **Failure to comply.**

(a)     *Notice of Non-Compliance and Opportunity to Cure*. If any Plaintiff fails to comply with any provision of this Order, Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance. Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's petition, shall be held in abeyance.

(b)     *Failure to Cure*. If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Defendants.

(c)     *Extensions of Time*. The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

C. **Discovery on Statute of Limitations and Other Time-Based Defenses**

1.     Plaintiffs must, within the time frames established by Section B.2, serve upon counsel for the Defendants an affidavit signed by the Plaintiff and its counsel providing the following information: (1) the date the Plaintiff first learned that the harms alleged in its petition may be related to Defendants' conduct; (2) how the Plaintiff first learned the harms alleged in its petition may be related to Defendants' conduct; (3) the date the Plaintiff first spoke to or corresponded with an attorney about potential litigation in this matter; and (4) the date the Plaintiff first retained counsel for litigation in this matter. Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each such Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

D. **Case-Specific Discovery and Related Dispositive Motion Practice**

1.     If a Plaintiff complies with the production requirements outlined above in Sections B and C, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that: (a) grants the Parties one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct discovery on issues raised by the productions; and (b) sets a briefing schedule that gives the Parties forty-five (45) days from the close of discovery for the Parties to submit summary judgment motions and *Daubert/Robinson* motions, twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

2.     During such discovery, the Parties are permitted to: serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of both fact and expert witnesses for the Plaintiff for up to seven hours each, with counsel for Defendants questioning first at each deposition. If a Plaintiff serves any written discovery upon

64

Defendants, the Parties shall meet and confer about an appropriate deadline for responding to such discovery, which deadline shall be at least sixty (60) days after service of such discovery. The Court's use of the term "specific to the Plaintiff" is intended to express the Court's intention not to permit additional "generic" discovery against the Defendant at this time. No other depositions may be taken during the expedited discovery period absent prior leave granted by the Court upon a showing of good cause.

        3.     If a case survives the Defendant's summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative discovery is necessary and to discuss other case management issues. Discovery with regard to any other defendants will be addressed at this time as well. The filing and briefing of summary judgment motions and *Daubert/Robinson* motions after the expedited discovery discussed above shall not prejudice or otherwise foreclose the opportunity for any Party or other defendant to file later, non-duplicative summary judgment and *Daubert/Robinson* motions after completing full fact and expert discovery. The Court's use of the term "non-duplicative" is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period or *Daubert/Robinson* motions concerning witnesses addressed in *Daubert/Robinson* motions filed at the conclusion of the expedited discovery period.

        4.     The foregoing provisions do not preclude any Party or other defendant from filing non-duplicative dispositive motions, including motions relating to personal jurisdiction.

SO ORDERED.

Dated: _____

                                         _____

                                       Hon. Robert K. Schaffer
                                       Presiding Judge

66