# Exhibit A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>**This document relates to:**<br><br>*ALL CASES* | CASE NO. 1:17-md-2804<br><br>**Judge Dan Aaron Polster**<br><br>**ONGOING COMMON BENEFIT ORDER** |

**I.** **Introduction.**

Since the commencement of these MDL proceedings in January 2018, numerous attorneys – including counsel appointed by this court to serve as Co-Lead Counsel, Liaison Counsel, members of the Plaintiffs' Executive Committee ("PEC"), various other committees, and counsel authorized by MDL leadership – have advanced many tens of millions of dollars in out-of-pocket expenses and devoted an enormous number of hours to shoulder the laboring oars in this litigation. These attorneys have done so on a contingent basis, with no guarantee of payment. They have performed and continue to perform the work of common discovery; of retaining, developing, and qualifying experts; of preparing and trying multiple bellwether cases; and of negotiating complex national settlements that provide billions of dollars in abatement recoveries to federal and state court litigating plaintiffs and beyond.

This common benefit work, which the Court has charged appointed counsel to undertake, is an absolute necessity and serves the interests of not only the litigants but also the Court and the nation. "By making manageable litigation that otherwise would run out of control, [leadership counsel] serve interests of the court, the litigants, the other counsel, and the bar, and the public at large, who are entitled to their chance at access to unimpacted courts." *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1017 (5th Cir. 1977).

This common benefit work must and will continue in this MDL in order to fulfill the purposes of 28 U.S.C. §1407, as well as the expectations of the Judicial Panel on Multi-District Litigation ("the Panel"). The instant Ongoing Common Benefit Order is designed to ensure that the costs of counsel's prior and ongoing work, which inures to the common benefit of so many interested parties, will be equitably spread among all beneficiaries, as authorized and established by the United States Supreme Court in its common benefit doctrine, and as reaffirmed in the extensive jurisprudence thereunder.  As the Supreme Court has recognized for over a century, and as MDL Courts have repeatedly implemented in their common benefit orders, this common benefit doctrine entitles plaintiffs' attorneys to an award beyond their own contingent fees, assessed from funds paid in judgments and settlements that their litigation efforts help to secure.  *See, e.g.*, *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 126-27 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977); *In re Diet Drugs*, 582 F.3d 524, 546-47 (3d Cir. 2009); *In re General Motors LLC Ignition Switch Litig.*, 977 F. Supp. 3d 170 (S.D.N.Y. 2020); *In re Vioxx Prods. Liab. Litig.*, 802 F.Supp.2d 740, 769 (E.D. La. 2011); 5 William B. Rubenstein, *Newberg on Class Actions* §§ 15:113-117 (5th ed. 2018).

II.  **Common Benefit Orders in MDL No. 2804.**

Throughout the course of these MDL proceedings, the Court has issued a series of Orders designed to ensure that leadership counsel appointed by this Court, and others who perform common benefit work, are incentivized to do so with reasonable expectation of reimbursement and compensation for their efforts.  The Court has always anticipated that a portion of counsel's remuneration will include reasonable assessments levied upon judgments and settlements that rely upon common benefit work.

The earlier common benefit-related orders of this Court, all of which remain in effect, include: *Order Regarding Plaintiff Attorneys' Fees and Expenses* (docket no. 358); *Order Establishing Common Benefit Fee Fund and Directing Certain Payments* (docket no. 3794); *Order Appointing Certified Public Accountant to Maintain and Act as Escrow Agent for the Common Benefit Fee Fund* (docket no. 3810); *Order Regarding Contingency Fees* (docket no. 3814); *Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* (docket no. 3828); *Order Regarding Fee Panel, Fund Administrator and Assistants* (docket no. 4030); *Order Appointing Fee Committee and Addressing Related Matters* (docket no. 4286); and *Order Establishing Application Protocols for Reimbursement of Common Benefit Attorneys' Fees Under the Janssen and Distributors Settlement Agreements* (docket no. 4344).

This Order does not abrogate any of those earlier Orders. It provides an ongoing framework and structure to apply the common benefit doctrine to Opioid Cases[1] that: (1) are not brought by State Attorneys General; and (2) are not otherwise included in global settlements that have their own negotiated, Court-approved common benefit fees and cost structures. For example, the recent global settlements with the three largest Distributors (McKesson, AmerisourceBergen, and Cardinal Health), and with Manufacturer Janssen, provide for a fee fund to compensate counsel for common benefit work; therefore, no additional common benefit contribution from

---

[1] "Opioid Cases" is defined as "litigation in any court throughout the United States involving the marketing, distribution, sale, or use of Opioid related drugs." *ARCOS Protective Order* ¶5 at 5 (docket no. 1545).

governmental subdivisions participating in these global settlements (or their counsel[3]) is necessary or appropriate.

Notably, over two years ago, the PEC moved for entry of an Order establishing a common benefit fee fund, *see* docket no. 3112, and the Court "invited any interested party to file an opposition brief if they were so inclined," *Order* at 1 (docket no. 3397). The Court received dozens of position papers, *see id.* at 1 n.1 and 2 n.3 (listing submissions), as well as a Report from the Court's expert consultant at the time, Professor William B. Rubenstein, *see* docket no. 3319.[4] After prolonged and serious consideration, the Court declined to enter an Ongoing Common Benefit Order at that juncture in the case. Specifically, on July 27, 2020, the Court issued an *Order Denying **Without Prejudice** the PEC's Motion for Common Benefit Fee Order* (docket no. 3397) (emphasis added). In that Order, the Court observed:

> [T]here is a wide consensus confirming the accuracy of the PEC's statements that: (1) "scores of attorneys from the PEC firms and others" have "performed [work] for the common benefit of plaintiffs in the [MDL] proceedings," as well as in other opioid cases; and (2) those attorneys are entitled to some measure of "reimbursement and compensation of expenses and work incurred and performed for the common benefit" of those plaintiffs. The Court shares in this consensus.
>
> * * *
>
> The threshold question presented by the PEC's motion, however, is whether entry of a common benefit order is appropriate ***at this time***. The Court concludes the time is not ripe because plaintiffs and defendants state uniformly that, given current settlement negotiations, they anticipate a global settlement will probably moot the need for a common benefit order.

---

[3] To be clear, counsel for a participating subdivision owes no additional common benefit contribution *related to the participating subdivision*. If the same counsel also represents a *non*-participating subdivisions, then counsel *does* owe a 7.5% common benefit assessment related to any eventual recovery by that non-participating subdivision. *See Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* at 18 (docket no. 3828).

[4] The Court has reviewed again all of these submissions in preparation for drafting this Order.

*Id*. at 2-3 (citations omitted, emphasis in original).

About one year later, the "Big 3" Distributors and Janssen announced conditional global settlements with governmental-entity plaintiffs. These multi-billion dollar settlements are now finalized and initial settlement payments will begin to flow shortly. These settlements are complex, with intensely negotiated participation provisions and fee and cost structures, including common benefit provisions.[5] This Court retains an ongoing role in supervising and enforcing these common benefit-related agreements, as reflected in the above-listed Orders.

In addition to these two global settlements, however, various MDL Defendants have recently entered into other settlements of Opioid Cases that do not include common benefit provisions. And the Court anticipates that MDL Defendants will reach additional global and non-global settlements in the future, some of which may not include specific, negotiated, Court-approved and -supervised fee and cost structures providing for an equitable contribution towards compensation of counsel who performed common benefit work. Thus, the Court concludes the time has now come to enter an Ongoing Common Benefit Order that applies to certain settlements and judgments in Opioid Cases.

### III. The Panel's Recent Order.

In addition to the imminency of other settlements and judgments in Opioid Cases that will be secured through reliance upon common benefit work, the Court notes that recent comments by the Judicial Panel on Multidistrict Litigation ("the Panel") also suggest the time has come for an Ongoing Common Benefit Order.

---

[5] The Distributors/Janssen settlement-related documents and other, ongoing settlement-related information are posted at https://nationalopioidsettlement.com/.

The Panel has explicitly recognized the intensive efforts and substantial progress of MDL No. 2084.  Having (at least for now) discontinued transfer of new cases into this MDL, the Panel is looking toward the completion of this Court's MDL work, and to assuring that its ongoing benefits are provided to subsequent related cases in order to avoid duplicative work and costs.  In an Order issued a few weeks ago, the Panel stated:

> [C]ommon discovery has largely been completed, several bellwether trials have been prepared, and a bellwether remand process established.  And myriad claims have been resolved through substantial settlements.
>
> * * *
>
> We see no reason why the parties in subsequent actions, subject to the same conditions imposed on the parties to MDL No. 2804, should not be able to avail themselves of the documents and depositions accumulated in this MDL.  The involved courts may find useful guidance in the numerous pretrial rulings of the Honorable Dan A. Poster in this docket.
>
> The parties also can employ alternatives to transfer to minimize whatever, if any, possibilities may arise of duplicative discovery or inconsistent pretrial rulings.  Thus, even absent transfer, most of the benefits of the MDL are available to expedite resolution of these cases.

*In re: National Prescription Opiate Litig.*, Case MDL No. 2804, Order at 2-3 (docket no. 9586) (J.P.M.L. Apr. 8, 2022) (citations omitted).

Of course, if "the parties in subsequent actions" are able to "avoid duplicative discovery" by obtaining access to "the documents and depositions accumulated in this MDL" – which are housed in an MDL Repository that is managed and paid for by the MDL PEC – those parties are taking appropriate advantage of work by others that inure to their and the common benefit.  As such, the Panel's Order suggests strongly that the time has now come for entry of an Ongoing Common Benefit Order.

### IV. Assuring Full Use and Fair Payment For Past and Ongoing Common Benefit Work.

The costs advanced, and the work dedicated, by the PEC to pursue the common discovery, pretrial proceedings, and bellwether trials in this MDL have been virtually unprecedented in their magnitude and intensity, continuing (unabated during COVID) for over four years.

Unlike most MDLs, there are literally hundreds of different Defendants named in the Opioid MDL cases, several of which are Fortune 50 companies. There are also numerous categories of Plaintiffs, ranging from individuals to private businesses to governmental subdivisions. To pursue all of the claims in this MDL, the PEC has so far, since its appointment in February 2018: (1) advanced about $86 Million in common benefit assessments, and incurred about an additional $24 Million in held costs; (2) collected, analyzed, and maintained over 70,000 terabytes of discovery from MDL defendants, third parties, bellwether plaintiffs, and other exhibits; (3) taken, defended, or collected over 900 relevant depositions; (4) retained, developed, and obtained reports from over 60 scientific, medical, public health, and economics experts; (5) fully prepared two bellwether cases for trial in the MDL Court (Case Tracks One and Two); (6) begun preparing another five bellwether cases (Case Tracks Seven through Eleven) for trial; and (7) supported trial of four other bellwether cases that were remanded to transferor courts (Track Two to West Virginia; Track Four to Chicago; Track Five to Oklahoma; and Track Six to San Francisco).

The trial-readiness of the Track One bellwether case in Fall of 2019 catalyzed what became the "Big 3" Distributors and Janssen national settlements, worth about $26 Billion. It is egregious understatement to observe that this $26 Billion settlement, which provides funds to States and local governments across the nation to abate the Opioid Crisis, inured to the common benefit of parties who were not litigating in Track One, or for that matter in the MDL. The PEC's work has also

assisted in the trial of state court cases brought by Attorneys General and various cities and counties, some of which have separately settled for (in total) roughly an additional $2 Billion (without any common benefit assessment). A total of 11 MDL active cases have been designated for trial against over a dozen different Defendant families. The common benefit work is intensive and ongoing.

The PEC should not solely bear the cost, in time and money, of obtaining this extensive and essential discovery product. The fruits of the labors expended pursuing claims in this MDL should and have and will be made available to all Opioid Case plaintiffs, subject to an assessment that spreads the costs equitably among all beneficiaries, without up-front expense to them.

Moreover, the MDL *Defendants* are also entitled to protection from costly and time-consuming duplicative discovery demands. These are the very demands that MDL centralization under 28 U.S.C. § 1407 is designed to prevent, by providing that – as much as possible – common discovery is done, comprehensively, once, rather than multiple times. The discovery effort has been arduous and expensive on both sides. The Court must be concerned with conserving the resources of Defendants as well as Plaintiffs. This Ongoing Common Benefit Order ensures that discovery and litigation tasks, once completed, need not be repeated, as their results are made accessible to all – with the costs thereof equitably spread – in lieu of repetitive expenditures of time, money, and effort. The provisions of this Order are designed to ensure that Defendants will not be subjected to wholesale repetition of discovery obligations they already met, either in cases remanded to transferor Courts or in factually related cases in other courts, by obligating the PEC

to maintain and make available this discovery product, subject to the assessment this Order imposes.[6]

This Court, assisted by its Court-appointed Special Masters, has actively supervised this centralized discovery: resolving discovery disputes, entering myriad discovery rulings, and making sure that discovery has proceeded in a fair, orderly, and proportional way, under the guidance of the federal rules, to fulfill the consistency, efficiency, and convenience goals of § 1407. Defendants should not be subjected in non-MDL litigation to demands for documents and information they have already produced, or for depositions and reports that have already been taken and submitted, in MDL No. 2804. An Ongoing Common Benefit Order will thus provide fairness to all MDL parties.

A unique and dramatic example of the PEC's accomplishments in this MDL bears noting. Early in the litigation, the PEC sought, over the objection of the United States Drug Enforcement Agency ("DEA"), the production to MDL plaintiffs of key data compiled in the DEA's Automated Records and Consolidated Orders System / Diversion Analysis and Detection System ("ARCOS/DADS") database. In a series of Orders, the Court ordered the DEA to produce complete transactional ARCOS data for the period of January 1, 2006 through December 31, 2014 – first for six states (Ohio, West Virginia, Illinois, Alabama, Michigan, and Florida), and then for the remaining States and Territories. *See Order Regarding ARCOS Data* (docket no. 233); *Second Order Regarding ARCOS Data* (docket no. 397); *Third Order Regarding ARCOS Data* (docket no. 668).

---

[6] Accordingly, in any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the plaintiffs' access to such documents or evidence, and to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

The DEA produced ARCOS data to the PEC in essentially raw form.  The PEC then organized, programmed, analyzed, and reported this data at great expense. As this Court has previously observed, the resulting detailed and vastly-more-user-friendly database readily shows "the number of opioid pills delivered to each City and County in America, partitioned by manufacturer and distributor and pharmacy." *Second Order Regarding ARCOS Data* at 2 (docket no. 397). This information has proved "essential" in enabling the parties in federal and state court Opioid Cases to correctly identify defendants, file and amend complaints, design discovery, bring and defend motions, develop damages and abatement models, inform experts, prepare for trial, and engage in meaningful settlement discussions.  *Id*.

Ultimately, the PEC's "ARCOS database," as produced to, organized within, and protected by[7] this Court, now vests the Court with a centrality to the nationwide opioid litigation unmatched in other MDLs. The initial and ongoing efforts of the PEC to obtain, organize, and analyze the ARCOS data, and make it available in meaningful and useable form to all parties, provides an indispensable and uniquely beneficial resource to opioid litigants. The time and out-of-pocket costs to develop this common resource may and should be equitably spread among all beneficiaries.

This Court, which has ongoing jurisdiction over the ARCOS data produced by the DEA, as organized, analyzed, and made available by the PEC and this Court's protective and case management Orders, has the authority and may exercise the discretion to condition the use of the data by all parties in the MDL and their counsel, and all non-MDL litigants and their counsel (other than the States), who seek to use it for their non-MDL investigations and cases, upon payment of a back-end, contingent assessment.  The same is true of the other discovery obtained and managed by the PEC and residing in the MDL Repository.

---

[7] Access to the ARCOS data continues to be governed by the Court's *ARCOS Protective Order* (docket no. 1545).

### V.     Parties and Counsel that will be Assessed.

For the reasons set out below, this Ongoing Common Benefit Order will apply to: (1) plaintiffs with Opioid Cases pending in or remanded from MDL 2804, and their counsel; (2) plaintiffs' counsel who have signed a Participation Agreement with respect to any of their opioid claims and plaintiffs; (3) other plaintiffs and claims represented by plaintiffs' counsel with Opioid Cases pending in or remanded from MDL 2804; and (4) opioid claims and plaintiffs, whether inside or outside this MDL, that have relied upon work product developed within MDL 2804. Excepted from this list are cases and claims brought by State Attorneys General, and cases where a global settlement has its own MDL-Court-Approved common benefit structure.

The Court's authority over the first category of plaintiffs is plain. *See In re Diet Drugs*, 582 F.3d 524, 546–47 (3rd Cir. 2009) ("The Judicial Panel for Multidistrict Litigation is empowered, under 28 U.S.C. § 1407, to transfer related cases to a single court, and that court has—and is expected to exercise—the ability to craft a plaintiffs' leadership organization to assist with case management. Inherent in that ability . . . is the power to fashion some way of compensating the attorneys who provide class-wide services."); *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 617 F. App'x 136, 141 (3rd Cir. 2015) (same); *see also In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir.1977).

Regarding the second category, there is also no question that a common benefit assessment upon a Plaintiff's attorney is appropriate when the attorney agrees to it.  Pursuant to an "Opioid Litigation Participation Agreement," the Plaintiffs Co-Lead Counsel and the PEC have agreed to provide common benefit work product to any signatory "Participating Counsel."  The Court

incorporates into this Order this Participation Agreement, and the obligations it contains that are imposed upon Co-Lead Counsel and the PEC and Participating Counsel.

With respect to the third and fourth categories, this Court earlier noted that the propriety of "common benefit fee assessments on attorneys with cases not before the MDL judge is an unsettled issue." *Order Regarding Contingency Fees* at 10 n.27 (docket no. 3814). That said, there is ample authority for the proposition that common benefit fee assessments on attorneys with cases not before the MDL judge is permitted and appropriate in certain circumstances. *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 617 F. App'x 136, 141 (3rd Cir. 2015); *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 180 (S.D.N.Y. 2020) (allowing the assessment).

For example, with respect to the third category, the Court has authority over plaintiffs' counsel by and through their MDL cases. MDL courts, using their equity powers when applying the common benefit doctrine, regularly extend that authority over counsel's other, non-MDL cases in order to "preempt[] an extreme version of the free-rider problem: the lawyer who files only one case in the MDL to gain access to common benefit work and then leverages the knowledge gained from that work to settle dozens or hundreds of unfiled claims." *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 181 (S.D.N.Y. 2020).

The Court notes that MDL courts routinely caution against exercising authority to impose common benefit assessments on non-MDL cases *actually filed* in state courts, due to respect for principles of comity and because state courts can exercise their own authority over those plaintiffs to solve the free-rider problem. *See id.*; *see also In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 268 (E.D.N.Y. 2006); *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 166 (4th Cir. 1992). In this instance, however, this Court firmly believes that levying a common benefit tax upon this category of Plaintiffs and their counsel is crucial because of: (1) the

virtually unprecedented expense incurred by the PEC for the common benefit in obtaining and synthesizing the ARCOS data; and (2) the absolutely essential character of the ARCOS data in allowing any and all opioid plaintiffs to prosecute their cases in the first place. In other words, the potential free-rider problem present in the Opioid Litigation is even more extreme than anything Judge Furman contemplated in *In re General Motors*, and it would be inequitable in the extreme for this Court not to remedy that problem through this Order.

Finally, with respect to the fourth category, MDL courts appear virtually unanimous on their authority to subject a recovery in a non-MDL forum to an appropriate assessment if the plaintiffs or their counsel ***actually used*** common benefit work product. As Judge Furman observed:

> To be clear, the Firms do not appear to dispute that, if they actually used Common Benefit Work Product in a state-court or unfiled case, the Court has authority to subject any recovery in the latter to an assessment. That is for good reason, as the courts that have addressed the issue appear to be unanimous in upholding assessments in such circumstances. *See, e.g., In re Prempro Prods. Liab. Litig.*, No. 4:03-CV-1507 (BRW), 2014 WL 12758478, at *2 (E.D. Ark. Nov. 25, 2014) ("[I]n cases where lawyers used . . . common benefit work and obtained a . . . recovery in any state or federal forum, the recovery was subject to an assessment." (internal quotation marks and brackets omitted)); *In re Fosamax Prods. Liab. Litig.*, No. 06-MD-1789 (JFK), ECF No. 1012, at 6-7, 2011 WL 13257632 (S.D.N.Y. Apr. 28, 2011) (providing that "any plaintiff's counsel with cases not in the MDL who utilizes any aspect of the MDL common benefit work product . . . shall be subject to" an assessment, part of which was to be "subtracted from the client portion" of recoveries); *In re Phenylpropanolamine Prods. Liab. Litig.*, MDL No. 1407 (BJR), 2009 WL 6042809, at *1, 2009 U.S. Dist. LEXIS 126729, at *3 (W.D. Wa. Sept. 18, 2009) (noting that, "for state cases in which counsel wished to avail themselves of common benefit product, there was a three percent holdback").

*In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 184–85 (S.D.N.Y. 2020).

Here, as stated previously, the PEC's work in obtaining and processing the ARCOS data in particular, and pursuing and collecting the vast other Opioid Case discovery more broadly, is so

fundamental to this category of plaintiffs' claims, that whether or not they signed a Participation Agreement—or the *ARCOS Protective Order's* Acknowledgement of Protective Order and Agreement to be Bound, *see* docket no. 1545-1 & 1545-2— it is unlikely their claims would have any settlement value or likelihood of positive judgment had these plaintiffs not *actually utilized* the work the PEC did for the common benefit.

Accordingly, the Court imposes a common benefit assessment upon amounts paid in settlement or judgment in the four categories of cases listed in the first paragraph of this Section. Excepted from all of these categories are cases and claims brought by State Attorneys General and cases where a global settlement has its own MDL-Court-Approved common benefit structure.

**VI.  Determining An Appropriate Ongoing Common Benefit Assessment Amount.**

When assessing common-benefit fees and costs combined, district courts generally award a fixed percentage of every recovery, often between 3% and 11%, as particular circumstances warrant. *See* 5 Rubenstein, *Newberg on Class Actions*, § 15:117 at 440-43. The Court concludes it is appropriate in this case to impose a holdback assessment of 7.5% going forward.[8] This is in the mainstream of MDL assessments generally, and is here imposed in an MDL where the scope and magnitude of common benefit expenditures and effort is virtually unparalleled, and in which such costs and efforts will be ongoing for some time in connection with discovery, trials, and trial preparation in Tracks 7-11, and in coordination with related actions, all as the Panel contemplates and expects.

The Court earlier imposed a 7.5% common benefit assessment on: (1) settlement amounts paid in Track One, *see Order Establishing Common Benefit Fee Fund and Directing Certain*

---

[8] To be clear, this assessment will not be imposed upon any payment due under a settlement or judgment that was entered before the date of this Order.

- 14 -

*Payments* (docket no. 3794) at 5-6; and (2) the gross recovery of any subdivision that did not participate in the global Distributors and Janssen Settlements, *see Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* (docket no. 3828) at 18.  Moreover, in his *Report* to the Court two years ago, Professor Rubenstein observed that the common benefit assessment in large MDLs "is generally calculated in the range of 5% for fees and 2.5% for costs."  *Report* at 2 (docket no. 3319).  Thus, there is ample precedent for imposition of a 7.5% assessment.

Court-appointed counsel have the responsibility to make sure the burdens of common benefit work are allocated among all beneficiaries, both inside and outside the court.  This is usually done through the use of Participation Agreements.  *See In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 617 Fed. Appx. 136, 141 (3rd Cir. 2015) (affirming an Order "permit[ting] the Steering Committee to, essentially, trade work product for a share in the recovery in cases *not* before the MDL.")  Numerous counsel have executed Participation Agreements in this MDL. Plaintiffs' Co-Lead Counsel or their designees are hereby authorized and directed to condition sharing of MDL work product (including that related to common fact discovery, data, and development of MDL experts) on the execution of a Participation Agreement consistent with this Order.

While the global Distributors and Janssen Settlement Agreements will defray significant accrued common benefits costs and fees, it will not fully reimburse or compensate all of them, nor will it reimburse or compensate the substantial ongoing work to be done – including: (1) work in this MDL, in Opioid Cases upon remand, and in other opioid-related proceedings; (2) efforts in

pursuit of claims against non-settling Defendants; and (3) with respect to the categories of affected plaintiffs not included in settlements (e.g. Third Party Payors and Hospitals).

It bears noting that the amount collected pursuant to the 7.5% assessment is ***not*** necessarily what the Court will award to eventual applicants for common benefit awards. The Court mandates the 7.5% assessment only to ensure appropriate awards of common benefit fees and expenses are possible; the Court has no current opinion on what the total amount of any such awards will be, or who is or will be eligible.[9] *See In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 909-10 (N.D. Ohio 2003) (awarding $43 million in common benefit fee awards from a $50 million fund, and directing the remainder should be used for "payment of certain costs associated with effectuating the settlement and, if possible, distribution to the settlement class").

### VII. Common Benefit Fund Account.

In connection with the Distributors and Janssen Settlement Agreements, the Court appointed a Fee Panel to oversee distribution of $1.6 Billion in attorney fees, including $960 Million in Common Benefit Fees; and the Court appointed Special Master Cohen (who is a Fee Panel Member) to oversee distribution of another $200 Million in Expense Reimbursement, a large portion of which is Common Benefit Expenses. The Fee Panel and Special Master Cohen have engaged counsel and accountants, created Trusts, and arranged for these funds to be invested in order to generate additional money for payment of administrative expenses.

---

[9] Provisions and procedures for reimbursement of common costs and compensation for common benefit time will be made in further Orders. At this juncture, the Court anticipates ordering that any funds held back by Defendants that are not approved and awarded as common benefit fees or costs by the Court will be returned to the plaintiffs or their counsel from whom the assessments were held back; however, the Court will make that determination at a later date.

To maximize efficiency, the Court concludes that the appointed Fee Panel should oversee the Court Common Benefit Fund into which assessments will be deposited, so that all Funds may be administered in the same way and use the same accountants, lawyers, investment advisors, and so on (as the Panel may choose or change within their discretion).[10]  The Court is ***not*** directing the Fee Panel to undertake any work toward determining awards from this Court Common Benefit Fund.  The Court will determine at a future time, with input from counsel, when and how such awards will be made.

Accordingly, the Court herby appoints David R. Cohen, Randi S. Ellis and Hon. David R. Herndon (the "Fee Panel") to administer and oversee the Court Common Benefit Fund pursuant to and in a manner consistent in all respects with the Court's August 8, 2021 Order (docket no. 3828).  The Court further orders that the Court Common Benefit Fee Fund shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" as described in Treasury Regulations Section 1.468B-1, and shall remain subject to the continuing jurisdiction of this Court.  Special Master David R. Cohen shall serve as Trustee and Administrator of the qualified settlement fund for purposes of Treasury Regulations Section 1.468B-2(k)(3), and shall be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Court Common Benefit Fund.

---

[10] The Court is also overseeing a Common Benefit Fund associated only with Track One settlements.  *See Order Establishing Common Benefit Fee Fund and Directing Certain Payments* (docket no. 3794); *Order Appointing Certified Public Accountant to Maintain and Act as Escrow Agent for the Common Benefit Fee Fund* (docket no. 3810).  The Court also directs escrow agent Mr. Greggory Dantio to coordinate with Special Master Cohen to take advantage of investment advisors hired by the Fee Panel.

**VIII. Conclusion.**

For all the reasons stated above, the Court hereby **ORDERS** and **IMPOSES** an MDL Common Benefit assessment of 7.5% of gross recoveries from any Opioid Case that: (1) is not brought by a State Attorney General, and (2) is not otherwise included in a global settlement that has its own negotiated, MDL-Court-approved Common Benefit fee and cost structures.  This 7.5% assessment is payable from the attorneys' fee portions of such gross recoveries and applies to all settlements reached and judgments entered after the date of this Order.[11]  If the 7.5% amount exceeds one-half (½) of counsel's total contingency fee for a given client, then the contingent assessment will instead be limited to one-half (½) of the contingency fee of counsel on each settlement or judgment, unless a prior or subsequent Order of this Court states otherwise.

To ensure collection of this Common Benefit Assessment, each Defendant named in any case pending in MDL No. 2804 is hereby **ORDERED** to hold back the 7.5% common benefit percentage from all applicable judgments and settlements entered after the date of this Order and to deposit such amounts into the Court Common Benefit Fund.  Each Defendant shall report all judgments, settlements, and payments to Special Master Cohen and Co-Lead Counsel, and verify that the holdback is placed into the Court Common Benefit Fund until further Order of this Court.

---

[11] An example of how this calculation would work in a state-wide settlement involving claims by both the State Attorney General and governmental subdivisions within that State is as follows.  MDL "Defendant X" enters into a $440M state-wide settlement that resolves all claims made by the State and the subdivisions within it.  The total settlement amount from Defendant X is comprised of: (a) $400M, payable in 10 equal annual installments, to be shared by the State and subdivisions and used for abatement; plus (b) $40M for reimbursement of the State's and subdivisions' attorney fees and litigation costs, payable immediately in one lump sum. The settlement includes no common benefit fund to compensate counsel in this MDL (or elsewhere) who have performed common benefit work.  Using the assumption that half of the $400M settlement payment for abatement will be received by the State and the other half by the subdivisions – which assumption also underlies the Distributors and Janssen global settlements – the common benefit assessment would be 7.5% of the $200M subdivision share = $15M, payable in 10 equal annual installments.  Defendant X would thus be required to make 10 annual payments of $1.5M to the Court Common Benefit Fund. This example assumes all counsel have at least a 15% contingent fee; if some counsel have a lower percentage, the parties may move the Court for modification of the assessment.

Plaintiff Co-Lead and Liaison Counsel, or their designees, are hereby authorized and directed to obtain Participation Agreements with any and all counsel for plaintiffs in Opioid Cases, regardless of where or whether their cases or claims are filed, as a condition of access to and utilization of MDL 2804 work product.

Finally, the Court notes that, in his 2020 Report to the Court, Professor Rubenstein cautioned that "[a] single common benefit assessment levied on multiple different types of settlements involving many different types of plaintiffs and multiple defendants runs the risk of being too crude an approach." *Report* at 5 (docket no. 3319).  The Court agrees that ***all*** common benefit assessment orders are necessarily blunt instruments ***when first imposed***.  It is only after fee applications are received and weighed, the Court and its advisors sharpen their pencils, and common benefit awards are carefully crafted and issued, that the instrument of a common benefit assessment is honed.  These steps will take place in the future: this Court will enter further Orders as necessary regarding the operation, payment, allocation, award, and distribution of funds held back pursuant to this common benefit assessment, including return of collected funds if applicable. In the meantime, this Order ensures that future appropriate common benefit awards are possible and that parties and counsel who use common benefit work pay their fair share.

All of that said, the Court recognizes that the particular circumstances of a settlement or judgment in an Opioid Case may justify a case-specific modification of this Order.  The parties are free to move for modification at that time.

**IT IS SO ORDERED**.

                                       */s/Dan Aaron Polster*
                                       **DAN AARON POLSTER**
                                       **UNITED STATES DISTRICT JUDGE**

Dated: May 9, 2022