No. _____
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

In re: County of Harris, Texas; County of Rockwall, Texas; County of Ellis, Texas;
County of Walker, Texas; City of Albuquerque, New Mexico;
City of Santa Fe, New Mexico; and
Certain Municipalities in Arkansas and South Carolina,
*Petitioners*,

On Petition for a Writ of Mandamus to the United States District Court for the Northern District
of Ohio, Eastern Division, In Re: National Prescription Opiate Litigation,
Cause No. 1:17-md-2804, 1:19-op-45713

## PETITION FOR WRIT OF MANDAMUS
## OF HARRIS, ROCKWALL, ELLIS, WALKER COUNTIES, TEXAS,
## ALBUQUERQUE AND SANTA FE CITIES, NEW MEXICO, AND
## CERTAIN MUNICIPALITIES IN ARKANSAS AND SOUTH CAROLINA

S. Ann Saucer
TX Bar 00797885, LA Bar 21368
N. Majed Nachawati
TX Bar 24038319
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711
asaucer@fnlawfirm.com
mn@fnlawfirm.com

Dan Downey
TX Bar 06085400
DAN DOWNEY, P.C.
Tel. (512) 569-3400
Dandowney427@gmail.com

John B. White, Jr. (S.C. Bar 5996)
Marghretta H. Shisko (S.C. Bar 100106)
JOHN B. WHITE, JR. P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC  29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

F. Jerome Tapley
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
(205) 328 2200
jtapley@CoryWatson.com

*Counsel for Petitioners*
*Additional Counsel on Signature Page*

## **Complete List of Petitioners**

Texas Municipalities:
County of Harris, County of Rockwall, County of Ellis, and County of Walker

New Mexico Municipalities:
City of Albuquerque and City of Santa Fe

Arkansas Municipalities:
City of Adona, City of Alexander, City of Alicia, City of Allport, City of Alma, City of Almyra, City of Alpena, City of Altheimer, City of Altus, City of Amagon, City of Amity, City of Anthonyville, City of Antoine, City of Arkadelphia, City of Arkansas City, City of Ash Flat, City of Ashdown, City of Atkins, City of Aubrey, City of Augusta, City of Austin, City of Avoca, City of Bald Knob, City of Banks, City of Barling, City of Bassett, City of Batesville, City of Bauxite, City of Bay, City of Bearden, City of Beaver, City of Beebe, City of Beedeville, City of Bella Vista, City of Bellefonte, City of Belleville, City of Ben Lomond, City of Benton, City of Bentonville, City of Bergman, City of Berryville, City of Bethel Heights, City of Big Flat, City of Bigelow, City of Biggers, City of Birdsong, City of Biscoe, City of Black Oak, City of Black Rock, City of Black Springs, City of Blevins, City of Blue Eye, City of Blue Mountain, City of Bluff City, City of Blytheville, City of Bodcaw, City of Bonanza, City of Bono, City of Booneville, City of Bradford, City of Bradley, City of Branch, City of Briarcliff, City of Brinkley, City of Brookland, City of Bryant, City of Buckner, City of Bull Shoals, City of Burdette, City of Cabot, City of Caddo Valley, City of Caldwell, City of Cale, City of Calico Rock, City of Calion, City of Camden, City of Cammack Village, City of Campbell Station, City of Caraway, City of Carlisle, City of Carthage, City of Casa, City of Cash, City of Caulksville, City of Cave City, City of Cave Springs, City of Cedarville, City of Centerton, City of Central City, City of Charleston, City of Cherokee Village, City of Cherry Valley, City of Chester, City of Chidester, City of Clarendon, City of Clarksville, City of Clinton, City of Coal Hill, City of Colt, City of Concord, City of Conway, City of Corning, City of Cotter, City of Cotton Plant, City of Cove, City of Coy, City of Crawfordsville, City of Crossett, City of Cushman, City of Daisy, City of Damascus, City of Danville, City of Dardanelle, City of Datto, City of De Queen, City of Decatur, City of Delaplaine, City of Delight, City of Dell, City of Denning, City of Dermott, City of Des Arc, City of Devalls Bluff, City of Dewitt, City of Diamond City, City of Diaz, City of Dierks, City of Donaldson, City of Dover, City of Dumas, City of Dyer, City of Dyess, City of Earle, City of East Camden, City of Edmondson, City of Egypt, City of El Dorado, City of Elaine, City of Elkins, City of Elm Springs,

City of Emerson, City of Emmet, City of England, City of Enola, City of Etowah, City of Eudora, City of Eureka Springs, City of Evening Shade, City of Everton, City of Fairfield Bay, City of Fargo, City of Farmington, City of Fayetteville, City of Felsenthal, City of Fifty-Six, City of Fisher, City of Flippin, City of Fordyce, City of Foreman, City of Forrest City, City of Fort Smith, City of Fouke, City of Fountain Hill, City of Fountain Lake, City of Fourche, City of Franklin, City of Friendship, City of Fulton, City of Garfield, City of Garland, City of Garner, City of Gassville, City of Gateway, City of Gentry, City of Georgetown, City of Gilbert, City of Gillett, City of Gillham, City of Gilmore, City of Glenwood, City of Goshen, City of Gosnell, City of Gould, City of Grady, City of Grannis, City of Gravette, City of Green Forest, City of Greenbrier, City of Greenland, City of Greenway, City of Greenwood, City of Greers Ferry, City of Griffithville, City of Grubbs, City of Guion, City of Gum Springs, City of Gurdon, City of Guy, City of Hackett, City of Hamburg, City of Hampton, City of Hardy, City of Harrell, City of Harrisburg, City of Harrison, City of Hartford, City of Hartman, City of Haskell, City of Hatfield, City of Havana, City of Haynes, City of Hazen, City of Heber Springs, City of Hector, City of Helena-West Helena, City of Hermitage, City of Hickory Ridge, City of Higden, City of Higginson, City of Highfill, City of Highland, City of Hindsville, City of Holland, City of Holly Grove, City of Hope, City of Horatio, City of Horseshoe Bend, City of Horseshoe Lake, City of Hot Springs, City of Houston, City of Hoxie, City of Hughes, City of Humnoke, City of Humphrey, City of Hunter, City of Huntington, City of Huntsville, City of Huttig, City of Imboden, City of Jacksonport, City of Jacksonville, City of Jasper, City of Jennette, City of Jericho, City of Jerome, City of Johnson, City of Joiner, City of Jonesboro, City of Judsonia, City of Junction City, City of Keiser, City of Kensett, City of Keo, City of Kibler, City of Kingsland, City of Knobel, City of Knoxville, City of La Grange, City of Lafe, City of Lake City, City of Lake View, City of Lake Village, City of Lakeview, City of Lamar, City of Lavaca, City of Leachville, City of Lead Hill, City of Leola, City of Lepanto, City of Leslie, City of Letona, City of Lewisville, City of Lexa, City of Lincoln, City of Little Flock, City of Littlerock, City of Lockesburg, City of London, City of Lonoke, City of Lonsdale, City of Louann, City of Lowell, City of Luxora, City of Lynn, City of Madison, City of Magazine, City of Magness, City of Magnolia, City of Malvern, City of Mammoth Spring, City of Manila, City of Mansfield, City of Marianna, City of Marie, City of Marion, City of Marked Tree, City of Marmaduke, City of Marshall, City of Marvell, City of Maumelle, City of Mayflower, City of Maynard, City of Mccaskill, City of Mccrory, City of Mcdougal, City of Mcgehee, City of Mcnab, City of Mcneil, City of Mcrae, City of Melbourne, City of Mena, City of Menifee, City of Midland, City of Mineral Springs, City of Minturn, City of Mitchellville, City of Monette, City of Monticello, City of Montrose, City of Moorefield, City of

Moro, City of Morrilton, City of Morrison Bluff, City of Mount Ida, City of Mount Pleasant, City of Mount Vernon, City of Mountain Home, City of Mountain Pine, City of Mountain View, City of Mountainburg, City of Mulberry, City of Murfreesboro, City of Nashville, City of Newark, City of Newport, City of Nimmons, City of Norfork, City of Norman, City of Norphlet, City of North Little Rock, City of O'kean, City of Oak Grove, City of Oak Grove Heights, City of Oakhaven, City of Oden, City of Ogden, City of Oil Trough, City of Okolona, City of Ola, City of Omaha, City of Oppelo, City of Osceola, City of Oxford, City of Ozan, City of Ozark, City of Palestine, City of Pangburn, City of Paragould, City of Paris, City of Parkdale, City of Parkin, City of Patmos, City of Patterson, City of Pea Ridge, City of Peach Orchard, City of Perla, City of Perry, City of Perrytown, City of Perryville, City of Piggott, City of Pindall, City of Pine Bluff, City of Pineville, City of Plainview, City of Pleasant Plains, City of Plumerville, City of Pocahontas, City of Pollard, City of Portia, City of Portland, City of Pottsville, City of Powhatan, City of Poyen, City of Prairie Grove, City of Prattsville, City of Prescott, City of Pyatt, City of Quitman, City of Ratcliff, City of Ravenden, City of Ravenden Springs, City of Rector, City of Redfield, City of Reed, City of Reyno, City of Rison, City of Rockport, City of Roe, City of Rogers, City of Rondo, City of Rose Bud, City of Rosston, City of Rudy, City of Russell, City of Russellville, City of Salem, City of Salesville, City of Scranton, City of Searcy, City of Sedgwick, City of Shannon Hills, City of Sheridan, City of Sherrill, City of Sherwood, City of Shirley, City of Sidney, City of Siloam Springs, City of Smackover, City of Smithville, City of South Lead Hill, City of Sparkman, City of Springdale, City of Springtown, City of St. Charles, City of St. Francis, City of St. Joe, City of St. Paul, City of Stamps, City of Star City, City of Stephens, City of Strawberry, City of Strong, City of Stuttgart, City of Subiaco, City of Success, City of Sulphur Rock, City of Sulphur Springs, City of Summit, City of Sunset, City of Swifton, City of Taylor, City of Texarkana, City of Thornton, City of Tillar, City of Tinsman, City of Tollette, City of Tontitown, City of Traskwood, City of Trumann, City of Tuckerman, City of Tull, City of Tupelo, City of Turrell, City of Twin Groves, City of Tyronza, City of Ulm, City of Valley Springs, City of Van Buren, City of Vandervoort, City of Victoria, City of Vilonia, City of Viola, City of Wabbaseka, City of Waldenburg, City of Waldo, City of Waldron, City of Walnut Ridge, City of Ward, City of Warren, City of Washington, City of Watson, City of Weiner, City of Weldon, City of West Fork, City of West Memphis, City of West Point, City of Western Grove, City of Wheatley, City of Whelen Springs, City of White Hall, City of Wickes, City of Widener, City of Wiederkehr Village, City of Williford, City of Willisville, City of Wilmar, City of Wilmot, City of Wilson, City of Wilton, City of Winchester, City of Winslow, City of Winthrop, City of Wooster, City of Wrightsville, City of Wynne, City of Yellville, City of

Zinc, County of Arkansas, County of Ashley, County of Baxter, County of Benton, County of Boone, County of Bradley, County of Calhoun, County of Carroll, County of Chicot, County of Clark, County of Clay, County of Cleburne, County of Cleveland, County of Columbia, County of Conway, County of Craighead, County of Crawford, County of Crittenden, County of Cross, County of Dallas, County of Desha, County of Drew, County of Faulkner, County of Franklin, County of Fulton, County of Garland, County of Grant, County of Greene, County of Hempstead, County of Hot Spring, County of Howard, County of Independence, County of Izard, County of Jackson, County of Jefferson, County of Johnson, County of Lafayette, County of Lawrence, County of Lee, County of Lincoln, County of Little River, County of Logan, County of Lonoke, County of Madison, County of Marion, County of Miller, County of Mississippi, County of Monroe, County of Montgomery, County of Nevada, County of Newton, County of Ouachita, County of Perry, County of Phillips, County of Pike, County of Poinsett, County of Polk, County of Pope, County of Prairie, County of Pulaski, County of Randolph, County of Saline, County of Scott, County of Searcy, County of Sebastian, County of Sevier, County of Sharp, County of St. Francis, County of Stone, County of Union, County of Van Buren, County of Washington, County of White, County of Woodruff, and County of Yell

South Carolina Municipalities:
Aiken County, Anderson County, Calhoun County, Cherokee County, Chester County, Dillon County, Edgefield County, Florence County, Greenville County, Greenwood County, Horry County, Lancaster County, Laurens County, Marion County, Marlboro County, McCormick County, Newberry County, Oconee County, Pickens County, Spartanburg County, Sumter County, Union County, York County, Abbeville County, Allendale County, Bamberg County, Barnwell County, Beaufort County, Chesterfield County, Clarendon County, Colleton County, Dorchester County, Fairfield County, Hampton County, Jasper County, Kershaw County, Kershaw County Hospital Board, Lee County, Orangeburg County, Saluda County, Williamsburg County, City of Myrtle Beach, and Lexington County

**TABLE OF CONTENTS**

I.    INTRODUCTION..................................................................................1

II.   STATEMENT OF RELIEF SOUGHT ................................................2

III.  STATEMENT OF ISSUES PRESENTED ..........................................3

IV.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND. .......4

   A.  The District Court's Order Strips State Litigants of Part of Their Recoveries and Their Rights to State Court Discovery. ...........................4

   B.  Petitioners' State-Filed Opioid Cases Have Either Never Been in Federal Court, or Were Only in Federal Court After an Improper Removal. ........................................................................................6

   C.  The Court's Order Was Issued Without Notice, an Opportunity to Be Heard, or Proof that MDL 2804 Court-Appointed Counsel Provide A Benefit to Petitioners' Cases. ...............................................................8

   D.  The Order Relies on the PEC's Work with ARCOS Data Notwithstanding that Neither the PEC Nor Its ARCOS Data Provides Any Benefit to the State Cases.....................................................................10

V.   REASONS WHY A WRIT OF MANDAMUS SHOULD ISSUE .............14

   A.  A Mandamus Writ Is the Only Adequate Remedy .................................15

   B.  Petitioners Have a Clear and Indisputable Right to Proceed in State Court Without Having Discovery Obstructed and Recoveries Siphoned Off to a Federal Fund. .........................................................................16

     1.  The District Court does not have the authority to dictate fees and expenses in state court cases................................................................16

       a.  The common-fund exception to the American Rule is inapplicable because the proceeds from state court cases are outside of the District Court's authority................................................................17

       b.  Independently, the common-fund doctrine is inapplicable because the work of District Court-appointed counsel is not traceable to future proceeds in state court cases....................................................22

       c.  The Order violates Texas law. ......................................................24

     2.  The Order violates the Anti-Injunction Act. .......................................26

     3.  The Order violates the Due Process Clause.........................................29

   C.  The Writ Is Otherwise Appropriate under the Circumstances. ...........31

VI.  CONCLUSION....................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Air Crash Disaster at Fla. Everglades*,
    549 F.2d 1006 (5th Cir. 1977) ...........................................................................17

*Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*,
    398 U.S. 281 (1970)..................................................................................26, 27

*In re Avandia Marketing, Sales Practices and Products Liability
    Litig.*,
    617 F. App'x 136 (3d Cir. 2015) .....................................................................20

*In re Baycol Prod.*,
    No. MDL 1431, 2004 WL 190272 (D. Minn. Jan. 29, 2004)...........................20

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980)........................................................................................17

*U.S. ex rel. Bogart v. King Pharmas.*,
    493 F.3d 323 (3d Cir. 2007) .......................................................................17, 22

*Brillhart v. Excess Ins. Co. of Am.*,
    316 U.S. 491 (1942)........................................................................................31

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia*,
    542 U.S. 367 (2004)........................................................................................15

*Colonial Pipeline Co. v. Morgan*,
    474 F.3d 211 (6th Cir. 2007) ..........................................................................31

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
    No. 16-MD-02744, 2017 WL 6402992 (E.D. Mich. Mar. 21, 2017)................20

*In re Fed. Skywalk Cases*,
    680 F.2d 1175 (8th Cir. 1982) ........................................................................27

*Garcia v. Fed. Nat'l Mortg. Ass'n*,
    782 F.3d 736 (6th Cir. 2015) ..........................................................................29

*Geier v. Sundquist*,
    372 F.3d 784 (6th Cir. 2004) ........................................................22, 23

*In re Gen. Motors LLC Ignition Switch Litig.*,
    477 F. Supp. 3d 170 (S.D.N.Y. 2020) ...............................................21

*United States ex rel. Grubbs v. Kanneganti*,
    No. 1:05-CV-323, 2007 WL 9718264 (E.D. Tex. June 4, 2007) .....................26

*Guba v. Huron Co.*,
    600 Fed. App'x 374 (6th Cir. 2015) ..................................................30

*Hall v. Cole*,
    412 U.S. 1 (1973)...........................................................................23

*In re Harris County, TX*,
    No. 21-3637 (6th Cir. March 11, 2022)...................................7, 11, 15

*Hartland v. Alaska Airlines*,
    544 F.2d 992 (9th Cir. 1976) ...............................................16, 19, 20

*In re High Sulfur Content Gasoline Products Liability Litig.*,
    517 F.3d 220 (5th Cir. 2008) ............................................................30

*Hill v. Martin*,
    296 U.S. 393 (1935)........................................................................26

*In re Lidoderm Antitrust Litigation*,
    No. 14-md-02521-WHO, 2017 WL 3478810 (N.D. Cal. 2017) .....................20

*Martingale LLC v. City of Louisville*,
    361 F.3d 297 (6th Cir. 2004) .....................................................26, 28

*Middlesex County Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982)........................................................................31

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970)........................................................................23

*Mitchum v. Foster*,
    407 U.S. 225 (1972)........................................................................27

*In re Motors Liquidation Co.*,
   829 F.3d 135 (2d Cir. 2016) .................................................................30

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950).............................................................................30

*In re Nat'l Prescription Opiate Litig.*,
   927 F.3d 919 (6th Cir. 2019) .......................................................11, 12

*In re Nat'l Prescription Opiate Litig.*,
   MDL 2804 (N.D. Ohio July 22, 2021) ................................................13

*Re: Opioid Litigation*,
   South Carolina Supreme Court Order August 9, 2018 .......................28

*Roche v. Evaporated Milk Ass'n*,
   319 U.S. 21 (1943)...............................................................................15

*In re Roundup Prod. Liab. Litig.*,
   544 F. Supp. 3d 950 (N.D. Cal. 2021) (appeal pending)....................21

*Schlagenhauf v. Holder*,
   379 U.S. 104 (1964).............................................................................15

*Shimman v. Int'l Union of Operating Engineers, Loc. 18*,
   744 F.2d 1226 (6th Cir. 1984) ............................................................23

*In re Showa Denko K.K. L–Tryptophan Products Liability Litigation–
   II*,
   953 F.2d 162 (4th Cir. 1992) .......................................................*passim*

*In re Simons*,
   567 F.3d 800 (6th Cir. 2009) ..............................................................14

*Sprague v. Ticonic Nat'l Bank*,
   307 U.S. 161 (1939).............................................................................18

*Summit Valley Indus. Inc. v. Loc. 112, United Bhd. of Carpenters &
   Joiners of Am.*,
   456 U.S. 717 (1982).............................................................................16

*In re Syngenta AG MIR 162 Corn Litig.*,
   No. 14-MD-2591-JWL, 2015 WL 2165341 (D. Kan. May 8, 2015) ..........20, 22

*In re United States*,
   32 F.4th 584 (6th Cir. 2022) ..................................................................15

*In re Univ. of Michigan*,
   936 F.3d 460 (6th Cir. 2019) ..........................................................16, 31

*Vietti v. Welsh & McGough, PLLC*,
   No. 21-CV-58-JFH-SH, 2022 WL 1288314 (N.D. Okla. Apr. 30,
   2022) ........................................................................................................26

*Vincent v. Hughes Air West, Inc.*,
   557 F.2d 759 (9th Cir. 1977) ..........................................................17, 19

*In re Zyprexa Products Liability Litigation*,
   467 F. Supp. 2d 256 (E.D. N.Y. 2006) .............................................20, 31

**Statutes**

28 U.S.C. § 2283 ...................................................................................26, 27

TEX. GOV'T CODE §§403.501-511 .............................................................25

TEX. GOV'T CODE §403.506(c) .................................................................25

TEX. GOV'T CODE §403.507 .....................................................................25

TEX. GOV'T CODE §2254.106 ...................................................................24

TEX. GOV'T CODE §2254.108(d) ..............................................................24

TEX. GOV'T CODE §2254.110 ...................................................................24

TEX. GOV'T CODE §2254.1036(a) .............................................................24

TEX. GOV'T CODE §2254.1038(a) .............................................................24

**Other Authorities**

15 Fed. Prac. & Proc. Juris. § 3866 (4th ed.)............................................20

U.S. CONST. amend. V .............................................................................29

ix

## I.    INTRODUCTION

Petitioners are municipalities who initiated state-court litigation to abate the opioid epidemic in their communities. Without waiving objections to jurisdiction,[1] Petitioners seek a writ of mandamus requiring that the District Court in MDL 2804 vacate its order obstructing discovery in Petitioners' state court cases and requiring that settlements and judgments in these state cases be paid in part into a federal court fund.

Five of the Petitioners were granted writ relief by this Court, and as a result, their cases were remanded from MDL 2804 to the state courts with jurisdiction. However, on May 9, 2022, without any prior motion, notice, or opportunity for hearing, the District Court issued an Order explicitly commandeering aspects of state court cases, including Petitioners' cases. The Order requires that 7.5% of future opioid case settlements and judgments be diverted from *inter alia* Petitioners' state-court cases and deposited into the District Court's common-benefit fund. According to the Order's explanation of how the 7.5% is to be calculated, upwards of **75**% of attorney fees and costs must be paid to the federal fund from statewide settlements outside the District Court's jurisdiction and reach.

This Order also obstructs discovery in state courts and purports to divest state Judges of control over discovery in state cases. According to the Order, defendants

---

[1] Petitioners hereby make a special appearance objecting to federal jurisdiction.

need not re-produce documents and evidence in cases remanded to state court; however, plaintiffs not signatory to a federal "Participation Agreement" cannot access any of these documents and evidence—except through discovery in their home forum, i.e., except through the discovery the Order bars. For South Carolina and Texas Petitioners, the Order purports to contradict standing discovery orders issued in state court cases. This is a clear usurpation of power, because the District Court does not have jurisdiction to prevent defendants from producing their own documents in state court cases where they are parties. If the Order stands, substantial evidence will be outside the reach of governmental-entity plaintiffs trying to litigate their state court cases.

Petitioners have no adequate remedy other than to seek a writ of mandamus. Petitioners either were never before the District Court or are no longer before the District Court.[2] The Order is both clearly erroneous and a usurpation of authority.

## II.  STATEMENT OF RELIEF SOUGHT

Petitioners ask that this Court vacate the Ongoing Common Benefit Order to the extent that it applies to cases over which the District Court does not have subject-matter jurisdiction and authority, and issue a writ forbidding the District Court from dictating attorney fees, expenses, discovery, and evidence in cases not properly

---

[2] With the exception of Walker County, which remains in MDL 2804 notwithstanding the lack of federal subject matter jurisdiction.

before the District Court. This writ is not brought on behalf of plaintiffs whose cases belong in federal court, plaintiffs who agreed to pay a common benefit assessment through a Participation Agreement, or plaintiffs specifically proven to have actually substantially benefited from and used MDL 2804 work product.[3]

## III.  STATEMENT OF ISSUES PRESENTED

1. Can a District Court enter orders controlling attorney's fees, expenses, and discovery in cases over which the District Court lacks jurisdiction or authority?

2. Can a District Court, without notice and an opportunity to be heard, require that a percentage of judgments and settlements, in cases over which the District Court lacks jurisdiction and authority, be deposited into a federal fund?

3. Can a District Court require that a percentage of judgments and settlements, in cases over which the District Court lacks jurisdiction and authority, be deposited into a federal common benefit fund without proof that court-appointed counsel's work can be traced to a substantial benefit in such cases?

---

[3] The term "MDL 2804 work product" does not include the DEA's "ARCOS data," which is addressed below.

4.  Can a District Court order that a defendant in a state court case need not

produce documents and evidence when the state court has ruled otherwise?

## IV.   STATEMENT OF FACTS AND PROCEDURAL BACKGROUND.

### A. The District Court's Order Strips State Litigants of Part of Their Recoveries and Their Rights to State Court Discovery.

The District Court, without prior notice or an opportunity to be heard, entered

an order that dispossesses Petitioners of future litigation recoveries, divests state-

court judges of the authority to manage discovery in cases before them, and usurps

existing state court discovery orders. The District Court's "Ongoing Common

Benefit Order" provides that, "each Defendant named in any case pending in MDL

2804 is hereby ORDERED to hold back the 7.5% common benefit percentage from

all applicable judgments and settlements entered after the date of this Order and to

deposit such amounts into the Court Common Benefit Fund." Exhibit 1, Ongoing

Common Benefit Order, Doc. 4428 ("Order"), at 18. While the Order compels all

Defendants in MDL 2804 to make these deposits, the Order is not limited to

judgments and settlements of the **cases** pending in MDL 2804. The Order also

applies to *inter alia* all Opioid cases that were remanded from MDL 2804 after being

wrongfully removed, and appears to apply to every opioid case a plaintiff's lawyer

has if that lawyer has or had a case in MDL 2804.[4] As the District Court recognizes,

---

[4]  *See* Order, 11 ("will apply to . . . other plaintiffs and claims represented by plaintiffs' counsel with Opioid Cases pending in or remanded from MDL 2804"), 12

the Judicial Panel on Multidistrict Litigation (J.P.M.L.) has stopped the transfer of cases to MDL 2804,[5] yet the District Court Order taxes and dictates discovery practices for newly filed cases, state or federal.

The 7.5% number is also misleading in effect. The Order dictates how the assessment "would work in a state-wide settlement involving claims by both the State Attorney General and governmental subdivisions within the State." Order, 18 n.11. If there is a $400 million abatement payment plus $40 million for fees and costs, both divided equally between the State and subdivisions, then "the common benefit assessment [owed to the federal fund] would be 7.5% of the $200M subdivision share = **$15M**[.]" *Id.* (emphasis added). In this hypothetical, the subdivisions' fees and expense recovery is $20 million (half of the $40 million fee/cost total). The Order thus takes $15 million out of $20 million—**75% rather than 7.5%**—for the federal common benefit fund. Thus, the federal Plaintiffs' Executive Committee lawyers (PEC) walk away with the lion's share of the fee and cost compensation after doing no work at all in state cases.

---

("Court has authority over plaintiffs' counsel by and through their MDL cases" and is making "assessments on non-MDL cases *actually filed* in state courts"). *See also* Order, 3 n.1 (Opioid Cases defined as opioid-related litigation "in any court throughout the United States"), n.11 (example indicating application to state-wide settlements).

[5] *See id.* at 6.

The Order also prevents state court judges from entering discovery orders pursuant to state law and facts applicable in the state cases, and would operate to abrogate existing state court orders. Specifically, the Order states that:

> [I]n any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the plaintiffs' access to such documents or evidence, and to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

Order, 9 n.6; *see also id.* at 8 ("in factually related cases in other courts"). The reference to other "provisions" is significant: plaintiffs cannot access documents or evidence unless they are party to "Participation Agreements," and this prerequisite applies "**regardless of where or whether their cases or claims are filed**." Order, 19 (emphasis added). The Order thereby purports to strip *inter alia* Petitioners of their rights to compel the production of "documents or evidence" from Defendants in state court cases, regardless of the fact that federal subject matter jurisdiction never existed as to these cases.[6]

## B. Petitioners' State-Filed Opioid Cases Have Either <u>Never</u> Been in Federal Court, or Were Only in Federal Court After an Improper Removal.

Harris, Rockwall, and Ellis Counties, Texas, and Albuquerque and Santa Fe Cities, New Mexico, are now proceeding in state courts, thanks to this Honorable

---

[6] Petitioners will fight application of the Order in all state cases and reserve the right to do so.

Court granting their writ of mandamus. Exhibit 2, Order, *In re Harris County, TX*, No. 21-3637 (6th Cir. March 11, 2022) ("*Harris County* Order"). This Court found that Petitioners' motions to remand had been pending an unduly long time, that the unanimity of the decisions of courts that had adjudicated opioid defendants' removals lent significant support to Petitioners' arguments, and that Petitioners lacked an alternative remedy. *Id.* at 3-5. On March 11, 2022, this Court granted Petitioners' writ, ordered the District Court to promptly address Petitioners' remand motions, and required the District Court to submit a status report every thirty days. *Id.* at 5. Petitioners' cases were remanded to state court by March 30, 2022, without any objection from any Defendant[7]—demonstrating federal subject matter jurisdiction was never proper.

To the knowledge of the undersigned, the status of the Walker County, Texas case has not yet appeared on any monthly status reports on remand motions by the District Court to this Court. The only such report of which Petitioners are aware was made on April 1, 2022.

---

[7] Exhibit 3, Remand Order, Doc. 4335 (N.D. Ohio March 26, 2022) (Rockwall and Ellis County, Texas, remanded after removing Pharmacy Defendants consented to remand); Exhibit 4, Remand Order, Doc. 4341 (N.D. Ohio March 30, 2022) (Harris County, Texas and Cities of Santa Fe and Albuquerque, New Mexico, cases were remanded after defendants "did not submit supplementary filings as … required" in the New Mexico cases; the Harris County removal was mooted).

The Arkansas and South Carolina Petitioners are all proceeding in the state courts with jurisdiction over their claims. These cases for the most part were never in federal court; a handful were wrongfully removed and remanded back to state court before transfer to the JPML.

### C. The Court's Order Was Issued Without Notice, an Opportunity to Be Heard, or Proof that MDL 2804 Court-Appointed Counsel Provide A Benefit to Petitioners' Cases.

The District Court's Order was entered without motion, a hearing, or proof that PEC lawyers substantially benefitted any of Petitioners' state-initiated opioid cases.[8]

Two years ago, the PEC filed a motion requesting a common benefit assessment order, and this motion was denied without prejudice.[9] That motion sought only a 7% common-fund assessment.[10] A tsunami of objections were filed, including objections filed by certain Petitioners here.[11] Objectors explained that the PEC was an **impediment** to the efforts of State plaintiffs to negotiate settlements

---

[8] *See* Exhibit 5, Docket Sheet excerpts, Entry for Document 4428 (omitting Related Document number identification of any prior motion).

[9] *See* Order, 4.

[10] Exhibit 6, Am. Mot. for Entry of Order Establishing Common Benefit Fund, Doc. 3112 (filed N.D. Ohio Jan. 28, 2020).

[11] *See* Exhibit 7, R&R Addressing Mot. for Common Benefit Fund, Doc. 3319 (N.D. Ohio June 3, 2020), at 1 (listing thirteen opposition briefs).

with the opioid defendants.[12] Other objectors explained that cases were being worked up in the state courts without any help from the PEC.[13]

The District Court appointed Professor William Rubenstein to make a recommendation. The Professor reported that, "[t]o demonstrate their entitlement to a common benefit fee, proponents must show that their work 'substantially benefited' the cases to be taxed."[14] However, the PEC failed to "substantiate [their legal arguments] with proper supporting affidavits or documents" to demonstrate "that their efforts have substantially benefited the many satellite cases they seek to tax."[15] On May 9, 2022, when the District Court entered its Order diverting 7.5% of Petitioners' future recoveries to the federal fund, this deficiency was not corrected, and no responsive pleadings or hearing was allowed to make the record clear.

Consistent with the PEC's inability to prove entitlement to proceeds from cases on which it never worked, a prior District Court Order stated the PEC would no longer try. On July 22, 2021, a District Court fee-related Order memorialized that "[t]he PEC . . . makes clear it is ***not*** seeking a global common benefit order

---

[12] *See, e.g.,* Exhibit 7, R&R, 6 (National Association of AGs claimed irreparable disruption).

[13] *See, e.g.,* Exhibit 8, County of Harris' Br. in Resp. to Prof. Rubenstein's R&R, Doc. 3350 (N.D. Ohio June 23, 2020), at 2-3 (explaining how "[t]he parties to the State of Texas' *In Re Texas Opioid Litigation* have heavily litigated the claims of Texas governmental entities for years without any assistance from the PEC.").

[14] *Id.* at 2.

[15] *Id.* at 4 n.2.

applicable to any other case. Specifically, . . . the PEC will not seek to make it applicable to settlement proceeds or judgments payable . . . to any state court plaintiff that is entirely outside of the Court's jurisdiction (with certain understandable exceptions)."[16] Less than nine months later, the Order increases the assessment and does the very thing the PEC allegedly was "***not*** seeking."

Simply put, the May 9, 2022, Order was not preceded by a relevant motion, notice, hearing, or proof that the 7.5% holdback was sought or earned in any state-filed case.

### D. The Order Relies on the PEC's Work with ARCOS Data[17] Notwithstanding that Neither the PEC Nor Its ARCOS Data Provides Any Benefit to the State Cases.

The Order acknowledges the "routine[] caution against exercising authority to impose common benefit assessments on non-MDL cases actually filed in state courts." Order, 12 (emphasis omitted). The Order does so anyway. As to why state court cases are subjected to a federal common benefit assessment, the Order states:

> [L]evying a common benefit tax upon this category of Plaintiffs and their counsel is crucial because of: (1) the virtually unprecedented expense by the PEC for the common benefit in obtaining and synthesizing the ARCOS data; and (2) the absolutely essential character of the ARCOS data in allowing any and all opioid plaintiffs to prosecute their cases in the first place.

---

[16] Exhibit 9, Order Establishing Common Benefit Fee Fund and Directing Certain Payments, Doc. 3794, at 3 (emphasis in original).

[17] ARCOS is the Drug Enforcement Administration's Automation of Reports and Consolidated Orders System database.

Order, 12-13. This reasoning is impeached by six counterfactual points.

First, several Petitioners were not free "to prosecute their cases **in the first place**" (*id.,* emphasis supplied). Petitioners' cases were stayed for years in the District Court, which lacked jurisdiction and would not grant Petitioners leave to file anything—not even a remand motion.[18]

Second, the PEC were no help. Rather than benefitting Petitioners, MDL 2804 presented a roadblock that took some Petitioners years of court filings to navigate. Petitioners finally succeeded in their petition to this Court for a writ of mandamus.[19] The PEC never assisted any Petitioner, even though it was obvious that the cases were wrongfully removed.[20]

Third, the PEC's work on the ARCOS data is not "absolutely essential" to Petitioners' cases. There is **no** showing of substantial benefit to Petitioners. The ARCOS data stops at 2014,[21] and is limited to 14 products. Additionally, Petitioners are using superior sources of information, including, for example, Defendants' data, state governmental data, industry group data, and local information; these sources

---

[18] *See* Exhibit 2, *Harris County* Order, 2.

[19] *See In re Harris County, Texas,* No. 21-3637 (6th Cir.), at Doc. 1-3 (exhibits illustrating that five Petitioners filed remand motions in the transferor courts, tried filing remand motions in MDL 2804 but were denied leave, filed remand motions in the J.P.M.L., and ultimately applied to this Court for a writ).

[20] *See id.*; *see also* § IV.B & note 7 *supra*.

[21] *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 925-26 (6th Cir. 2019) (the time period for ARCOS production ended December 31, 2014).

are more relevant, in terms of products, dates, and plaintiff-specific facts, than the ARCOS data.[22]

Fourth, if Petitioners wanted the ARCOS data, Petitioners would not need the PEC. The PEC stipulated to a protective order that would have kept the ARCOS data under seal.[23] When the Washington Post appealed, this Court vacated the protective order.[24] Therefore, if Petitioners wanted to use ARCOS data, they would not need to get it from the PEC.

Fifth, the PEC explicitly and repeatedly promised that the ARCOS data would not be the basis for a common benefit tax against recoveries.[25] Now, however, the District Court *sua sponte* cites ARCOS data as its basis for taxing state cases. *See* Order, 12-13 (quoted above).

---

[22] *E.g.*, Texas Prescription Monitoring Program, https://txpmp.org/.

[23] *See In re Nat'l Prescription Opiate Litig.*, 927 F.3d at 930 ("the parties stipulated to a protective order. . . . It is a grave mischaracterization to state that Plaintiffs 'energetically fought' over the issue of public disclosure when they neither raised it before the district court nor even objected when the district court stated that the issue was not disputed.").

[24] *In re Nat'l Prescription Opiate Litig.*, 927 F.3d at 938 ("we hold that the district court abused its discretion in finding 'good cause' not to permit disclosure of the ARCOS data pursuant to state public records requests").

[25] Exhibit 10, MDL 2804: Second Amended Notice of ARCOS Disclosure, Doc. 1613, at 1 (first paragraph of letter from PEC "explains how you may obtain, **without charge**, refined data . . . from the ARCOS database") (emphasis added), *ibid* ("the MDL PEC is making available to you **without charge** the unprocessed ARCOS data"), *ibid* ("We are also providing you, **again without charge**, access to the result of that investment") (emphasis added); *see also* Exhibit 11, The Mayor and City Council of Baltimore's Request as Amicus Curiae for Modification of the Court's August 12, 2021 Order, Doc. 3888, at 2-4.

Sixth, the PEC has already been more than compensated for ARCOS data processing expenses. While the District Court categorizes ARCOS compilation as a "virtually unprecedented expense,"[26] the Order fails to quantify what that expense actually was. To the knowledge of undersigned, the expense was previously reported by the PEC as in the area of one million dollars. The PEC has already been reimbursed a thousand times over. At the end of 2019, the Court ordered a hold-back from Track One settlements, and in July 2021, $14.2 million in fees and $7.1 million in expenses were disbursed.[27] More recently, two settling defendant groups agreed to pay $50 million into the MDL PEC-only Expense Fund;[28] an additional $160 million into a Participating Subdivision Counsel Expense Fund; and, more than $1,900,000,000.00 ($1.9 billion) into an attorney's fee fund (consisting of 40% contingency fee and 60% common benefit fee).[29]

---

[26]  Order,  13.

[27]  Exhibit 9, Order Establishing Common Benefit Fee Fund and Directing Certain Payments, Doc. 3794, *In re Nat'l Prescription Opiate Litig.,* MDL 2804 (N.D. Ohio July 22, 2021).

[28]  Exhibit 12, Order to Establish QSF, Doc. 3828, p. 15 ("total of $50,000,000 . . . into the agreed-upon MDL Expense Fund.").

[29]  *Id*. at 16 (7.5% of gross recovery, non-participating subdivisions). *See also* Distributor Master Settlement Agreement Exhibit R at R-2 https://opioidfeepaneldocuments.files.wordpress.com/2022/04/exhibit-r_distributor_settlement_agreement_3.25.22_final.pdf; Janssen Master Settlement Agreement Exhibit R at R-3 https://opioidfeepaneldocuments.files.wordpress.com/2022/04/exhibt-r-janssen-agreement-03302022-final2.pdf.

\* \* \*

To summarize, there is no dispute that:

- Petitioners filed their cases in state court.

- No Defendant tried to justify the wrongful removals of the five Petitioners' cases.

- Thus MDL 2804 did not and does not have subject matter jurisdiction over Petitioners' cases.

- Petitioners and their counsel have not signed a federal "Participation Agreement."

- No MDL "common benefit" work has been used in the Petitioners' cases.

- Petitioners intend to litigate their claims against the retail pharmacy defendants and other non-settling defendants in state court.

- Once Petitioners do so, the District Court's Order will substantially hamper their ability to prosecute and, if appropriate, resolve their cases by purporting to control discovery.

- The Order was issued without notice or opportunity to be heard.

## V.    REASONS WHY A WRIT OF MANDAMUS SHOULD ISSUE

"A party seeking relief in mandamus generally must demonstrate a 'clear and indisputable' right to that relief." *In re Simons*, 567 F.3d 800, 801 (6th Cir. 2009)

14

(citations omitted). One traditional use of the writ has been to confine the court against which mandamus is sought "to a lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). To confine writs to only extraordinary causes, three conditions must be satisfied. First, petitioners cannot have adequate alternative means to obtain the relief they seek. *Id.* at 380. Second, petitioners must show a "clear and indisputable" right to the relief sought. *Id.* at 381 (quotation omitted). Third, petitioners must show that issuing the writ is otherwise "appropriate under the circumstances." *Id. See also Harris County* Order, 3-4. Each requisite is addressed in turn below.

## A. A Mandamus Writ Is the Only Adequate Remedy

"[A] mandamus lies, if there be no other *adequate*, *specific*, *legal* remedy." *In re United States*, 32 F.4th 584, 590 (6th Cir. 2022) (quotation omitted). There is no other adequate remedy, as there is no final judgment the District Court can issue in Petitioners' cases. Most Petitioners were never in federal court; five were recently remanded pursuant to the *Harris County* Order, and one Petitioner's case, Walker County's, remains in MDL 2804 but should soon be remanded to state court.

A "writ is appropriately … issued when there is usurpation of judicial power or a clear abuse of discretion." *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964) (quotation omitted). Where, as here, the district court usurped judicial power by

ordering persons not within its jurisdiction to make payments into a court-designated fee fund, a writ of mandamus should issue to correct the jurisdictional overreach. *See, e.g., Hartland v. Alaska Airlines,* 544 F.2d 992 (9th Cir. 1976).

### B. Petitioners Have a Clear and Indisputable Right to Proceed in State Court Without Having Discovery Obstructed and Recoveries Siphoned Off to a Federal Fund.

#### 1. The District Court does not have the authority to dictate fees and expenses in state court cases.

"Under the American Rule it is well established that attorney's fees 'are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.'" *Summit Valley Indus. Inc. v. Loc. 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 721 (1982) (citation omitted). Absent recognized exceptions, "the rule has been consistently followed for almost 200 years." *Id*.

"A court can only act if it has power. And a court only has power if an act of Congress or the Constitution grants it." *In re Univ. of Michigan*, 936 F.3d 460, 467 (6th Cir. 2019). No statute or rule authorizes common benefit fees in multidistrict litigation. The District Court's reliance upon the common-fund doctrine as an exception to the American Rule is misplaced. First, every Circuit Court to address the issue has decided that if a district court does not have authority over the litigation, then it lacks authority to distribute proceeds from the litigation. Second, Petitioners should not be forced to pay for legal services they never received. Third, the Order violates state law.

16

### a. The common-fund exception to the American Rule is inapplicable because the proceeds from state court cases are outside of the District Court's authority.

The Supreme Court defined the common fund doctrine as follows:

[P]ersons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. **Jurisdiction over the fund involved in the litigation** allows a court to prevent this inequity by assessing the attorneys' fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted) (emphasis added). The court's ability to "legitimately exercise authority or control" over the fund is "crucial." *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 770 (9th Cir. 1977). Because the MDL court cannot "legitimately exercise authority or control" over settlements and judgments in other courts—beyond the MDL—the common-fund doctrine cannot support ordering holdbacks from non-MDL cases. *See id.* at 771 n.11; *see also In re Air Crash Disaster at Fla. Everglades*, 549 F.2d 1006, 1018 (5th Cir. 1977) ("Determination of whether a fund exists is a combination of traditional and pragmatic concepts centering around the power of the court to control the alleged fund."); *id.* at 1018 n.16 ("Central, of course, is authority to adjudicate the rights and duties of interested parties."); *U.S. ex rel. Bogart v. King Pharmas.*, 493 F.3d 323, 329 (3d Cir. 2007) ("Application of the common fund doctrine . . . requires court 'control over a fund or jurisdiction over the parties.'"). The District

Court's attempt to do so is a gross overreach of its authority and an unwarranted expansion of the common fund doctrine.

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 167 (1939) (cited at Order, 2), underscores that the common-fund doctrine requires court control over the fund in order for the court to assess fees and costs. In *Sprague*, the fund consisted of specific property held by the defendant trustee in the case, i.e., certain bonds used to secure bank deposits, and this property was before the court. 307 U.S. at 162-63. The *Sprague* petitioner "established the claims of [others] pertaining to the same bonds." *Id*. at 166.

Consistently, the Circuit Courts have recognized that authority over the fund is an essential predicate to application of the common fund doctrine. For example, *In re Genetically Modified Rice Litigation* explains that "the district court overseeing the MDL does not have authority over separate disputes between state-court *plaintiffs*" and the defendant. 764 F.3d 864, 874 (8th Cir. 2014) ("*GMO Rice*"). "[S]tate-court cases, related or not, are not before the district court." *Id.* That remained true "[e]ven if the state plaintiffs' *attorneys* participated in the MDL" because the MDL court "does not have authority over separate disputes between state-court *plaintiffs* and" the defendant. *Id.*; *see also id.* (noting "the district court **does not have the power** to order parties in cases not before it to contribute to the Fund" (emphasis added)).

18

In *Hartland v. Alaska Airlines*, two claimants settled with the defendant airline, and the MDL judge required them to pay a portion of their recoveries as a holdback in anticipation of common benefit attorneys' fees and expenses. 544 F.2d at 996-97. Neither of the settled claims, however, was part of the MDL. One settlement resolved a state-court claim; the other settled before any suit was filed. *See id.* at 996-99. The appellate court issued a writ of mandamus to overturn the order, deeming the MDL court's decision to assess fees against non-MDL recoveries a "usurpation of power." *Id.* at 1001. The MDL court had no authority "to compel lawyers who were not parties to the action to pay" a holdback. *Id.* The Ninth Circuit subsequently followed *Hartland*, finding "the district court had no jurisdiction to compel [a non-party] to pay." *Vincent*, 557 F.2d at 766.

The Fourth Circuit similarly held that the MDL court "has **no power** to extend the obligations of its [holdback] order" to non-MDL plaintiffs. *In re Showa Denko K.K. L–Tryptophan Products Liability Litigation–II*, 953 F.2d 162, 166 (4th Cir. 1992) (emphasis added). The MDL court's authority "is limited to cases and controversies between persons who are properly parties to the cases transferred." *Id.* at 165-66. "[A]ny attempt without service of process to reach others who are unrelated is beyond the court's power." *Id.* at 166 (citing *Hartland*); *see also id.* (noting the MDL court "has no power to extend the obligations of its orders" to claimants outside MDL).

19

Other tribunals similarly recognize that a court does not have the authority to order that certain recoveries in cases not before the court be paid into a common benefit fund.[30] In sum, "[t]he **only** circuit courts of appeal to have addressed this issue have held that a district court does not have such jurisdiction to subject parties not before it to common benefit assessments." *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2015 WL 2165341, at *2 (D. Kan. May 8, 2015) (citing *Showa Denko*, 953 F.2d at 165–66; *GMO Rice*, 764 F.3d at 873–74) (emphasis added).

---

[30] *See In re Avandia Marketing, Sales Practices and Products Liability Litig.*, 617 F. App'x 136, 141 (3d Cir. 2015) ("[A] transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties to the cases transferred."); *In re Zyprexa Products Liability Litigation*, 467 F. Supp. 2d 256, 268–69 (E.D. N.Y. 2006) (assessing state cases "should, in the first instance, be left to state court judges"); *In re Lidoderm Antitrust Litigation*, No. 14-md-02521-WHO, 2017 WL 3478810, at *3 (N.D. Cal. 2017) ("[D]istrict courts operating pursuant to their multi-district litigation powers do 'not have jurisdiction to order holdbacks from state-court plaintiffs' recoveries' absent some 'independent basis for jurisdiction over these state-court actions.'") (quoting *GMO Rice*, 764 F.3d at 874); *In re Baycol Prod.*, No. MDL 1431, 2004 WL 190272 (D. Minn. Jan. 29, 2004) (court lacked jurisdiction to assess fees and costs against parties whose cases had not been transferred into the MDL; amending PTO accordingly). *Cf. In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 6402992, at *3 (E.D. Mich. Mar. 21, 2017) ("although a transferee judge has the authority to appoint a committee of attorneys to conduct consolidated discovery and can require parties in the MDL cases to make payments into a common discovery fund, that authority does not extend to parties or attorneys involved in related state court proceedings, un-transferred federal cases, or unfiled claims." (quoting 15 Fed. Prac. & Proc. Juris. § 3866 (4th ed.), citing *Showa Denko*, 953 F.2d at 164; *Hartland*, 544 F.2d at 1001)).

Here, the District Court acknowledged that other courts "routinely caution" against commandeering fees from cases filed in state court, but the court then ignored the routine limitations because of a purported "free-rider problem" caused by what it wrongly perceived to be the "unprecedented expense" of the ARCOS data. Order, 11, 12, 13 (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 181 (S.D.N.Y. 2020)). Contrary to the District Court's reliance on *General Motors,* that case did "**not** apply [the common-fund tax] to state-court cases in which the Firms did not use Common Benefit Work Product." 477 F. Supp. 3d at 192 (emphasis added).

Nor is the "free-rider" theory a legitimate basis for seizing authority over proceeds in state-court cases where, as here, no federal work product is used and no "participation agreement" regarding such work product was signed. As one federal court observed last year:

> But free riding occurs all across our legal system. The presence of free riding, and the desire to address it, is not itself a source of judicial power. The power of a court to address free riding concerns—just like the power of a court to address any concern—must actually come from somewhere. . . . [T]hat power does not seem to come from the common fund doctrine.

*In re Roundup Prod. Liab. Litig.*, 544 F. Supp. 3d 950, 960 (N.D. Cal. 2021) (discussing *General Motors*) (appeal pending).

The presence of Defendants before the MDL 2804 Court did not give that court authority over **cases** pending elsewhere. *See GMO Rice*,764 F.3d at 874

("district court overseeing the MDL does not have authority over separate disputes between state-court plaintiffs" and defendant); *Bogart,* 493 F.3d at 329 (finding no authority "hold[ing] that jurisdiction over the defendant, alone, is sufficient to confer authority" to order payment of attorneys' fees from other plaintiffs' recoveries); *Showa Denko*, 953 F.2d at 166 (rejecting argument that jurisdiction over defendant grants authority to order holdback from non-MDL recoveries); *Syngenta*, 2015 WL 2165341, at *3 ("this Court's jurisdiction over the defendant and some attorneys with respect to cases in the MDL does not grant it jurisdiction to issue orders requiring assessments in cases not before this Court.").

Consistently, that a lawyer appears before the District Court does not grant authority over the lawyer's cases pending in different courts. "Even if the state plaintiffs' *attorneys* participated in the MDL, the district court overseeing the MDL does not have authority over separate disputes between state-court *plaintiffs* and [the defendant]." *GMO Rice*, 764 F.3d at 874; *see also Syngenta*, 2015 WL 2165341, at *3 (quoted above).

### b. *Independently, the common-fund doctrine is inapplicable because the work of District Court-appointed counsel is not traceable to future proceeds in state court cases*

The common benefit fund doctrine requires that the "benefits must be traceable with some accuracy" and "there must be reason for confidence that the costs can in fact be shifted with some exactitude to those benefitting." *Geier v.*

*Sundquist*, 372 F.3d 784, 790 (6th Cir. 2004). Federal courts have equitable power to award attorney's fees where "overriding considerations indicate the need for such a recovery." *Hall v. Cole*, 412 U.S. 1, 5 (1973) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-392 (1970)). In *Hall* and *Mills*, reimbursement of attorney's fees to those who provided a "substantial service" "simply shift[ed] the costs of litigation to the class that has benefited from them and that would have had to pay them had it brought the suit." *Hall,* 412 U.S. at 8-9 (quotation omitted). "*Mills* and *Hall* did not change the requirement that the benefit be received in common by those against whom the fee award operates." *Shimman v. Int'l Union of Operating Engineers, Loc. 18*, 744 F.2d 1226, 1234–35 (6th Cir. 1984).

The common-fund prerequisites clearly are not satisfied. Even after Professor Rubenstein's report, the District Court taxed Petitioners' cases without proof that the PEC has or will provide them any legal services or benefit. The Order does not "trace[] with some accuracy" or explain with any "confidence" or "exactitude," *see Geier*, 372 F.3d at 790, why Petitioners' cases benefit from the federal PEC. Instead, the Order relies upon what could **at most** be incidental, i.e. the stale ARCOS data (*see* Order, 12-13). However, "[a]n incidental benefit . . . will not justify a fee award." *Shimman*, 744 F.2d at 1235.  Moreover, the PEC repeatedly promised the

ARCOS data would **not** be cause for a common benefit tax, the PEC has been amply compensated, and the ARCOS data is inferior to more current sources of proof.[31]

### c. The Order violates Texas law.

The Order violates Texas law. Texas law forbids the payment of any contingency fee for legal services on behalf of a Texas political subdivision unless several prerequisites are satisfied. "[N]o fees may be paid to any person under the contract **or under any theory of recovery**" without compliance with several prerequisites of the Texas Government Code.[32] Any contingent fee must be approved – before the legal work is performed – by the political subdivision and the Texas Attorney General ("Texas OAG") after statutorily prescribed notice.[33] The amount and payment of such fees are regulated.[34] Contingency fees and expenses must be based on work performed for the political subdivision.[35]

In addition, the Texas Political Subdivisions and the Texas OAG executed a binding agreement ("Texas Intrastate Allocation Agreement"), which caps fees from any statewide opioid settlement at 9.3925% plus expenses, and places such

---

[31] *See* §IV.D *supra*.
[32] TEX. GOV'T CODE §2254.110 (emphasis added).
[33] TEX. GOV'T CODE §2254.1036(a) (notice and open meeting approval requirements), §2254.1036(a)(1)(B) (content of public notice), §2254.1036(b) (requisite written statements of political subdivision); TEX. GOV'T CODE §2254.1038(a) ("political subdivision must receive attorney general approval").
[34] TEX. GOV'T CODE §2254.106(b, c) (directing computation).
[35] TEX. GOV'T CODE §2254.108(d).

24

recoveries under **the sole jurisdiction** of state Judge Schaffer, presiding over the Texas intra-state MDL Court.[36] The settlements that have occurred have complied with this term sheet.[37] An entire Texas code subchapter, Government Code Subchapter R, "Statewide Opioid Settlement Agreement," was enacted in 2021.[38] Texas statutory law thereby codified the Texas Intrastate Allocation Agreement regarding distribution terms,[39] and the deposit and allocation of settlement money.[40]

Any recovery of a percentage fee from a political subdivision in Texas is ineffective and unenforceable unless and until review and approval by the Texas OAG, Texas political subdivisions, and Judge Schaffer.[41] The PEC has not attempted to comply with any of these provisions of Texas law, which the Order violates. A District Court cannot usurp the authority of the Texas Legislature, but does so here.[42]

---

[36] Exhibit 13, Motion to Establish Application Protocols *et al.*, *In re: Texas Opioid Litigation,* No. 2018-63587 (152nd Jud. Dist. Ct. Harris County, Texas April 26, 2022), at Exhibit N to Exhibit B, ¶C.1 (control of any "fees and expenses to the 'Texas Opioid Fee and Expense Fund,' which shall be allocated and distributed by the Texas MDL Court").

[37] *See, e.g., id.* at Exhibit A (Janssen), Exhibit B (Distributors). These and other settlements (Endo, Teva) are posted on the Texas OAG website. *E.g.,* https://www.texasattorneygeneral.gov/sites/default/files/global/files/Teva%20-%20Final%20Texas%20AG%20Settlement%202.4.22.pdf.

[38] TEX. GOV'T CODE §§403.501-511.

[39] *See, e.g.,* TEX. GOV'T CODE §403.506(c) (codifying percent distributions).

[40] TEX. GOV'T CODE §403.507.

[41] *See* notes 33-41 *supra.*

[42] *See* §V.B.2, §V.C *infra.*

## 2.  The Order violates the Anti-Injunction Act.

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "The Supreme Court has, on several occasions, recognized that the Anti–Injunction Act creates an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions." *Martingale LLC v. City of Louisville*, 361 F.3d 297, 302 (6th Cir. 2004) (quotation omitted). The phrase "proceedings in a State court" is "comprehensive" and "includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process." *Hill v. Martin*, 296 U.S. 393, 403 (1935). A federal order that would bar discovery in a state case implicates the Anti-Injunction Act.[43] "[T]he prohibition of § 2283 cannot be evaded by addressing the order to the parties." *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 287 (1970).

---

[43] *See Vietti v. Welsh & McGough, PLLC,* No. 21-CV-58-JFH-SH, 2022 WL 1288314, at *4 (N.D. Okla. Apr. 30, 2022) (request that federal court enjoin state-court deposition subpoena fell "squarely within the Anti-Injunction Act's prohibition"); *see also, e.g.*, *United States ex rel. Grubbs v. Kanneganti*, No. 1:05-CV-323, 2007 WL 9718264, at *3 (E.D. Tex. June 4, 2007) (court lacked authority to protect a party from "noticed deposition in the state court proceeding").

The Supreme Court has "expressly rejected the view that the anti-injunction statute merely states a flexible doctrine of comity, and made clear that the statute imposes an absolute ban upon the issuance of a federal injunction against a pending state court proceeding, in the absence of one of the recognized exceptions." *Mitchum v. Foster*, 407 U.S. 225, 228–29 (1972) (note omitted). "[A] federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear." *Atl. Coast*, 398 U.S. at 294. "[A] simultaneous in personam state action does not interfere with the jurisdiction of a federal court in a suit involving the same subject matter." *In re Fed. Skywalk Cases*, 680 F.2d 1175, 1183 (8th Cir. 1982).

The District Court's Order provides that state courts cannot compel Defendants to produce documents and evidence in accordance with state rules if the documents and evidence were produced in MDL 2804.[44] The Order then forbids Petitioners from accessing any such documents or evidence, because Petitioners are non-signatories to a "Participation Agreement."[45] The Order is not titled an

---

[44] Order, 9 n.6 ("in any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL").

[45] Order, 9 n.6, 19 (quoted above at §IV.A).

"injunction," but the title is not controlling; the Order's practical effect is in the nature of a federal court injunction of state court proceedings.[46] The Anti-Injunction Act is violated because the Order prevents state court judges from controlling discovery in cases before them and none of the statutory exceptions apply.

The Order also contradicts existing discovery orders in intrastate MDLs. Texas Judge Robert Schaffer, presiding over *In re Texas Opioid Litigation*, No. 18-0358, promulgated orders dictating the production of documents, including documents produced in MDL 2804.[47] Similarly, South Carolina Judge Perry Gravely, vested "with exclusive jurisdiction to hear and dispose of all opioid litigation [cases],"[48] requires that defendants produce to the South Carolina plaintiffs "all document productions from MDL 2804 . . . that are not specific to the State of Ohio," as well as "all deposition transcripts of Rule 30(b)(6) witnesses and employees from the MDL."[49] This Order further provides that the defendants must

---

[46] For example, *Martingale* finds that the Anti-Injunction Act cannot be evaded by omitting a request for an injunction and asking instead for declaratory relief, if declaratory relief would have the same practical effect as an injunction. 361 F.3d at 303.

[47] Exhibit 14, ESI Production Protocol, *In Re: Texas Opioid Litigation*, No. 2018-63587, 4 ("each Texas MDL Defendant shall produce the non-jurisdiction specific documents and ESI that it has previously produced in the National MDL … to the individual member of Plaintiffs' Leadership Counsel"); Exhibit 15, Protocol for Coordination with the National MDL, *In Re: Texas Opioid Litigation*, No. 2018-63587.

[48] *Re: Opioid Litigation,* South Carolina Supreme Court Order August 9, 2018.

[49] Exhibit 16, CMO No. 2 (South Carolina), at §C.1.

28

make these productions on a rolling basis "as additional documents are produced by Defendants in the MDL proceedings."[50]

The Order appears to contradict these prior orders by seemingly adding the additional prerequisite, not otherwise required, that plaintiffs' counsel become parties to a federal "Participation Agreement." *See* Order, 19. The quagmire that the Order, if valid, would create in the state consolidated Courts is precisely why the Anti-Injunction Act is necessary. Defendants are ordered in state court to produce the documents to plaintiffs; however, according to the federal Order, plaintiffs cannot see them because they are non-signatories to the "Participation Agreement," that, *inter alia*, gives the federal court jurisdiction over counsel and counsel's cases.[51]

### 3. The Order violates the Due Process Clause.

"No person shall…be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. ("Due Process Clause"). The Sixth Circuit and Supreme Court have long held that due process, "requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015) (quotations omitted).

---

[50] *Id.*

[51] *See* Exhibit 17, Opioid Participation Agreement, Doc. 3352-3, I.A (incorporating Doc. 358), I.B & II.B (submission to federal court orders), I.C (unfiled and state cases included), II.D (must deposit money in federal fund).

A primary purpose of the notice requirement of the Due Process Clause is to ensure that a party is well apprised of the matter potentially affecting one's property rights and that the party is ensured that the opportunity for a hearing is meaningful. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("Th[e] right to be heard has little reality or worth unless one is informed that the matter [which has the potential to affect one's rights] is pending and can choose for himself whether to appear or default, acquiesce or contest."). "[T]he root requirement of the Due Process Clause is that generally an individual [must] be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Guba v. Huron Co.*, 600 Fed. App'x 374, 382 (6th Cir. 2015) (quotation omitted).

"Legal claims are sufficient to constitute property such that a deprivation would trigger due process scrutiny." *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016). "On a broad public level, fee disputes, like other litigation with millions at stake, ought to be litigated openly," and "when a judge constructs a process for setting fees, the process must contain at least the procedural minima of due process: notice and an opportunity to be heard." *In re High Sulfur Content Gasoline Products Liability Litig.*, 517 F.3d 220, 230-31 (5th Cir. 2008) (quotation omitted).

Not only are Petitioners deprived of a portion of case recoveries without any prior motion, notice, or hearing, but the Order contradicts prior representations made by the PEC.[52]

### C. The Writ Is Otherwise Appropriate under the Circumstances.

Mandamus is "appropriate to prevent intrusion by the federal judiciary on a delicate area of federal-state relations[.]" *In re Univ. of Michigan*, 936 F.3d at 466 (quotation omitted). "Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942); *see also Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) (recognizing a "strong federal policy against federal-court interference with pending state judicial proceedings," grounded in notions of comity and federalism); *Colonial Pipeline Co. v. Morgan*, 474 F.3d 211, 222 (6th Cir. 2007) ("the state's interest in administration of its judicial system is important ... [and] federal court interference would be an offense to the state's interest" (quotation omitted)). "Principles of comity and respect for the state courts' supervision of their own dockets and the attorneys before them" counsel against "compel[ling] attorneys who represent both state and federal plaintiffs to set aside a portion of their fee recoveries in state cases." *Zyprexa*, 467 F. Supp. 2d at 268.  In *Showa Denko*, the Fourth Circuit concluded that a holdback order created

---

[52] *See* §IV.C & note 16 *supra*.

the "very real potential of interfering with discovery proceedings in state court" and "raise[d] questions of conflict with the policy of comity between federal and state courts." 953 F.2d at 166.

The Order's substantial interference with state courts cannot be seriously denied as it contradicts numerous provisions of state law governing contingency fee contracts and opioid settlement proceeds,[53] and countermands the standing discovery orders of at least two state court jurists.[54]

## VI.    CONCLUSION

Petitioners respectfully request, consistent with their objections to federal jurisdiction, that their petition be granted, that the District Court's Ongoing Common Benefit Order be vacated to the degree it affects cases not pending in MDL 2804 and to cases with meritorious remand motions, that the District Court be prohibited from entering any order affecting Petitioners' cases (other than remand to state court and associated defense sanctions), and for such other relief as may be just.

Date: May 25, 2022                    Respectfully Submitted,[55]

                                      */s/ S. Ann Saucer*
                                      S. Ann Saucer
                                      Texas Bar No. 00797885
                                      Louisiana Bar No. 21368
                                      asaucer@fnlawfirm.com
                                      N. Majed Nachawati

---

[53] *See* §V.B.1.c *supra*.
[54] *See* §V.B.2 *supra*.
[55] Signatories specially appear, preserving objections to federal jurisdiction.

Texas Bar No. 24038319
mn@fnlawfirm.com
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711
Fax (214) 890-0712

Matthew S. Daniel
Texas Bar No. 24047575
mdaniel@lawyerworks.com
FERRER POIROT & WANSBROUGH
2603 Oak Lawn Ave. Ste. 300
Dallas, TX 75219
Tel. (214) 521-4412
Fax (866) 513-0115

*Counsel for Petitioners Ellis and Rockwall
Counties, Texas, Cities of Albuquerque and Santa
Fe, New Mexico*

Shelly A. Sanford
State Bar No. 00784904
WATTS GUERRA LLP
811 Barton Springs Rd. #725
Austin, TX 78704
Telephone: (210) 447-0500
Facsimile: (210) 447-0502
ssanford@wattsguerra.com

*On behalf of the Court-Appointed Liaison Counsel
for Texas Local Entity Plaintiffs to Federal MDL
2804*[56]

Pia Salazar
pia@salazar-sullivanlaw.com
Patrick Sullivan

---

[56] Exhibit 18, Order Appointing Leadership for the Plaintiffs, *In re: Texas Opioid Litigation,* No. 2018-63587 (Nov. 26, 2018).

pat@salazar-sullivanlaw.com
SALAZAR, SULLIVAN & JASIONOWSKI
100 Gold Avenue SW, Suite 201
Albuquerque, New Mexico 87102
Tel. (505) 314-1414
Fax. (505) 31401419

*Counsel for Petitioners City of Albuquerque, New
Mexico; City of Santa Fe, New Mexico*

THE GALLAGHER LAW FIRM
Michael T. Gallagher
SBOT Bar No. 5395
Texas State Bar No.07586000
Pamela McLemore
Texas State Bar No. 24099711
Boyd Smith
Texas State Bar No. 18638400
SDOT Bar No.: 8203
2905 Sackett Street
Houston, Texas 77098
(713) 222-8080
(713) 222-0066 – facsimile
mike@gld-law.com

Tommy Fibich
Texas State Bar No. 06952600
SDOT Bar #: 5482
Jay Henderson
Texas State Bar No. 09424050
Sara J. Fendia
Texas State Bar No. 06898800
FIBICH, LEEBRON, COPELAND BRIGGS
1150 Bissonnet Street
Houston, Texas 77005
Telephone: (713) 751-0025
Facsimile: (713) 751-0030
Email: tfibich@fibichlaw.com

Dan Downey

Dan Downey, P.C.
SBOT Bar # 459
Texas State Bar No. 06085400
1609 Shoal Creek Blvd. #100
Austin, TEXAS 78701
Telephone: (512) 569-3400
Dandowney427@gmail.com

*Counsel for Petitioner County of Harris, Texas*

Mark A. Correro
TX State Bar No. 24045702
Law Office of Mark A. Correro, P.C.
2900 North Loop West, Suite 400
Houston, TX 77092
(713) 955-3102
mark@correrolaw.com

*Counsel for Petitioner Walker County*

F. Jerome Tapley
Cory Watson, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
Direct: (205) 271-7112
Main: (205) 328-2200
Toll Free: (800) 852-6299
jtapley@CoryWatson.com

*Counsel for Petitioners County of Arkansas, AR;
County of Ashley, AR; County of Baxter, AR;
County of Benton, AR; County of Boone, AR;
County of Bradley, AR; County of Calhoun, AR;
County of Carroll, AR; County of Chicot, AR;
County of Clark, AR; County of Clay, AR; County
of Cleburne, AR; County of Cleveland, AR; County
of Columbia, AR; County of Conway, AR; County
of Craighead, AR; County of Crawford, AR;
County of Crittenden, AR; County of Cross, AR;
County of Dallas, AR; County of Desha, AR;*

*County of Drew, AR; County of Faulkner, AR; County of Franklin, AR; County of Fulton, AR; County of Garland, AR; County of Grant, AR; County of Greene, AR; County of Hempstead, AR; County of Hot Spring, AR; County of Howard, AR; County of Independence, AR; County of Izard, AR; County of Jackson, AR; County of Jefferson, AR; County of Johnson, AR; County of Lafayette, AR; County of Lawrence, AR; County of Lee, AR; County of Lincoln, AR; County of Little River, AR; County of Logan, AR; County of Lonoke, AR; County of Madison, AR; County of Marion, AR; County of Miller, AR; County of Mississippi, AR; County of Monroe, AR; County of Montgomery, AR; County of Nevada, AR; County of Newton, AR; County of Ouachita, AR; County of Perry, AR; County of Phillips, AR; County of Pike, AR; County of Poinsett, AR; County of Polk, AR; County of Pope, AR; County of Prairie, AR; County of Pulaski, AR; County of Randolph, AR; County of Saline, AR; County of Scott, AR; County of Searcy, AR; County of Sebastian, AR; County of Sevier, AR; County of Sharp, AR; County of St. Francis, AR; County of Stone, AR; County of Union, AR; County of Van Buren, AR; County of Washington, AR; County of White, AR; County of Woodruff, AR; County of Yell, AR; City of Benton, AR; City of Bentonville, AR; City of Conway, AR; City of Fayetteville, AR; City of Fort Smith, AR; City of Hot Springs, AR; City of Jacksonville, AR; City of Jonesboro, AR; City of Littlerock, AR; City of Monticello, AR; City of North Little Rock, AR; City of Pine Bluff, AR; City of Rogers, AR; City of Sherwood, AR; City of Springdale, AR; City of Texarkana, AR; City of Adona, AR; City of Alexander, AR; City of Alicia, AR; City of Allport, AR; City of Alma, AR; City of Almyra, AR; City of Alpena, AR; City of Altheimer, AR; City of Altus, AR; City of Amagon, AR; City of Amity, AR; City of Anthonyville, AR; City of Antoine, AR; City of*

*Arkadelphia, AR; City of Arkansas City, AR; City of Ash Flat, AR; City of Ashdown, AR; City of Atkins, AR; City of Aubrey, AR; City of Augusta, AR; City of Austin, AR; City of Avoca, AR; City of Bald Knob, AR; City of Banks, AR; City of Barling, AR; City of Bassett, AR; City of Batesville, AR; City of Bauxite, AR; City of Bay, AR; City of Bearden, AR; City of Beaver, AR; City of Beebe, AR; City of Beedeville, AR; City of Bella Vista, AR; City of Bellefonte, AR; City of Belleville, AR; City of Ben Lomond, AR; City of Bergman, AR; City of Berryville, AR; City of Bethel Heights, AR; City of Big Flat, AR; City of Bigelow, AR; City of Biggers, AR; City of Birdsong, AR; City of Biscoe, AR; City of Black Oak, AR; City of Black Rock, AR; City of Black Springs, AR; City of Blevins, AR; City of Blue Eye, AR; City of Blue Mountain, AR; City of Bluff City, AR; City of Blytheville, AR; City of Bodcaw, AR; City of Bonanza, AR; City of Bono, AR; City of Booneville, AR; City of Bradford, AR; City of Bradley, AR; City of Branch, AR; City of Briarcliff, AR; City of Brinkley, AR; City of Brookland, AR; City of Bryant, AR; City of Buckner, AR; City of Bull Shoals, AR; City of Burdette, AR; City of Cabot, AR; City of Caddo Valley, AR; City of Caldwell, AR; City of Cale, AR; City of Calico Rock, AR; City of Calion, AR; City of Camden, AR; City of Cammack Village, AR; City of Campbell Station, AR; City of Caraway, AR; City of Carlisle, AR; City of Carthage, AR; City of Casa, AR; City of Cash, AR; City of Caulksville, AR; City of Cave City, AR; City of Cave Springs, AR; City of Cedarville, AR; City of Centerton, AR; City of Central City, AR; City of Charleston, AR; City of Cherokee Village, AR; City of Cherry Valley, AR; City of Chester, AR; City of Chidester, AR; City of Clarendon, AR; City of Clarksville, AR; City of Clinton, AR; City of Coal Hill, AR; City of Colt, AR; City of Concord, AR; City of Corning, AR; City of Cotter,*

*AR; City of Cotton Plant, AR; City of Cove, AR; City of Coy, AR; City of Crawfordsville, AR; City of Crossett, AR; City of Cushman, AR; City of Daisy, AR; City of Damascus, AR; City of Danville, AR; City of Dardanelle, AR; City of Datto, AR; City of De Queen, AR; City of Decatur, AR; City of Delaplaine, AR; City of Delight, AR; City of Dell, AR; City of Denning, AR; City of Dermott, AR; City of Des Arc, AR; City of Devalls Bluff, AR; City of Dewitt, AR; City of Diamond City, AR; City of Diaz, AR; City of Dierks, AR; City of Donaldson, AR; City of Dover, AR; City of Dumas, AR; City of Dyer, AR; City of Dyess, AR; City of Earle, AR; City of East Camden, AR; City of Edmondson, AR; City of Egypt, AR; City of El Dorado, AR; City of Elaine, AR; City of Elkins, AR; City of Elm Springs, AR; City of Emerson, AR; City of Emmet, AR; City of England, AR; City of Enola, AR; City of Etowah, AR; City of Eudora, AR; City of Eureka Springs, AR; City of Evening Shade, AR; City of Everton, AR; City of Fairfield Bay, AR; City of Fargo, AR; City of Farmington, AR; City of Felsenthal, AR; City of Fifty-Six, AR; City of Fisher, AR; City of Flippin, AR; City of Fordyce, AR; City of Foreman, AR; City of Forrest City, AR; City of Fouke, AR; City of Fountain Hill, AR; City of Fountain Lake, AR; City of Fourche, AR; City of Franklin, AR; City of Friendship, AR; City of Fulton, AR; City of Garfield, AR; City of Garland, AR; City of Garner, AR; City of Gassville, AR; City of Gateway, AR; City of Gentry, AR; City of Georgetown, AR; City of Gilbert, AR; City of Gillett, AR; City of Gillham, AR; City of Gilmore, AR; City of Glenwood, AR; City of Goshen, AR; City of Gosnell, AR; City of Gould, AR; City of Grady, AR; City of Grannis, AR; City of Gravette, AR; City of Green Forest, AR; City of Greenbrier, AR; City of Greenland, AR; City of Greenway, AR; City of Greenwood, AR; City of Greers Ferry, AR; City of Griffithville,*

*AR; City of Grubbs, AR; City of Guion, AR; City of Gum Springs, AR; City of Gurdon, AR; City of Guy, AR; City of Hackett, AR; City of Hamburg, AR; City of Hampton, AR; City of Hardy, AR; City of Harrell, AR; City of Harrisburg, AR; City of Harrison, AR; City of Hartford, AR; City of Hartman, AR; City of Haskell, AR; City of Hatfield, AR; City of Havana, AR; City of Haynes, AR; City of Hazen, AR; City of Heber Springs, AR; City of Hector, AR; City of Helena-West Helena, AR; City of Hermitage, AR; City of Hickory Ridge, AR; City of Higden, AR; City of Higginson, AR; City of Highfill, AR; City of Highland, AR; City of Hindsville, AR; City of Holland, AR; City of Holly Grove, AR; City of Hope, AR; City of Horatio, AR; City of Horseshoe Bend, AR; City of Horseshoe Lake, AR; City of Houston, AR; City of Hoxie, AR; City of Hughes, AR; City of Humnoke, AR; City of Humphrey, AR; City of Hunter, AR; City of Huntington, AR; City of Huntsville, AR; City of Huttig, AR; City of Imboden, AR; City of Jacksonport, AR; City of Jasper, AR; City of Jennette, AR; City of Jericho, AR; City of Jerome, AR; City of Johnson, AR; City of Joiner, AR; City of Judsonia, AR; City of Junction City, AR; City of Keiser, AR; City of Kensett, AR; City of Keo, AR; City of Kibler, AR; City of Kingsland, AR; City of Knobel, AR; City of Knoxville, AR; City of La Grange, AR; City of Lafe, AR; City of Lake City, AR; City of Lake View, AR; City of Lake Village, AR; City of Lakeview, AR; City of Lamar, AR; City of Lavaca, AR; City of Leachville, AR; City of Lead Hill, AR; City of Leola, AR; City of Lepanto, AR; City of Leslie, AR; City of Letona, AR; City of Lewisville, AR; City of Lexa, AR; City of Lincoln, AR; City of Little Flock, AR; City of Lockesburg, AR; City of London, AR; City of Lonoke, AR; City of Lonsdale, AR; City of Louann, AR; City of Lowell, AR; City of Luxora, AR; City of Lynn, AR; City of Madison, AR; City of Magazine, AR; City*

*of Magness, AR; City of Magnolia, AR; City of Malvern, AR; City of Mammoth Spring, AR; City of Manila, AR; City of Mansfield, AR; City of Marianna, AR; City of Marie, AR; City of Marion, AR; City of Marked Tree, AR; City of Marmaduke, AR; City of Marshall, AR; City of Marvell, AR; City of Maumelle, AR; City of Mayflower, AR; City of Maynard, AR; City of Mccaskill, AR; City of Mccrory, AR; City of Mcdougal, AR; City of Mcgehee, AR; City of Mcnab, AR; City of Mcneil, AR; City of Mcrae, AR; City of Melbourne, AR; City of Mena, AR; City of Menifee, AR; City of Midland, AR; City of Mineral Springs, AR; City of Minturn, AR; City of Mitchellville, AR; City of Monette, AR; City of Montrose, AR; City of Moorefield, AR; City of Moro, AR; City of Morrilton, AR; City of Morrison Bluff, AR; City of Mount Ida, AR; City of Mount Pleasant, AR; City of Mount Vernon, AR; City of Mountain Home, AR; City of Mountain Pine, AR; City of Mountain View, AR; City of Mountainburg, AR; City of Mulberry, AR; City of Murfreesboro, AR; City of Nashville, AR; City of Newark, AR; City of Newport, AR; City of Nimmons, AR; City of Norfork, AR; City of Norman, AR; City of Norphlet, AR; City of O'kean, AR; City of Oak Grove, AR; City of Oak Grove Heights, AR; City of Oakhaven, AR; City of Oden, AR; City of Ogden, AR; City of Oil Trough, AR; City of Okolona, AR; City of Ola, AR; City of Omaha, AR; City of Oppelo, AR; City of Osceola, AR; City of Oxford, AR; City of Ozan, AR; City of Ozark, AR; City of Palestine, AR; City of Pangburn, AR; City of Paragould, AR; City of Paris, AR; City of Parkdale, AR; City of Parkin, AR; City of Patmos, AR; City of Patterson, AR; City of Pea Ridge, AR; City of Peach Orchard, AR; City of Perla, AR; City of Perry, AR; City of Perrytown, AR; City of Perryville, AR; City of Piggott, AR; City of Pindall, AR; City of Pineville, AR; City of*

40

*Plainview, AR; City of Pleasant Plains, AR; City of Plumerville, AR; City of Pocahontas, AR; City of Pollard, AR; City of Portia, AR; City of Portland, AR; City of Pottsville, AR; City of Powhatan, AR; City of Poyen, AR; City of Prairie Grove, AR; City of Prattsville, AR; City of Prescott, AR; City of Pyatt, AR; City of Quitman, AR; City of Ratcliff, AR; City of Ravenden, AR; City of Ravenden Springs, AR; City of Rector, AR; City of Redfield, AR; City of Reed, AR; City of Reyno, AR; City of Rison, AR; City of Rockport, AR; City of Roe, AR; City of Rondo, AR; City of Rose Bud, AR; City of Rosston, AR; City of Rudy, AR; City of Russell, AR; City of Russellville, AR; City of Salem, AR; City of Salesville, AR; City of Scranton, AR; City of Searcy, AR; City of Sedgwick, AR; City of Shannon Hills, AR; City of Sheridan, AR; City of Sherrill, AR; City of Shirley, AR; City of Sidney, AR; City of Siloam Springs, AR; City of Smackover, AR; City of Smithville, AR; City of South Lead Hill, AR; City of Sparkman, AR; City of Springtown, AR; City of St. Charles, AR; City of St. Francis, AR; City of St. Joe, AR; City of St. Paul, AR; City of Stamps, AR; City of Star City, AR; City of Stephens, AR; City of Strawberry, AR; City of Strong, AR; City of Stuttgart, AR; City of Subiaco, AR; City of Success, AR; City of Sulphur Rock, AR; City of Sulphur Springs, AR; City of Summit, AR; City of Sunset, AR; City of Swifton, AR; City of Taylor, AR; City of Thornton, AR; City of Tillar, AR; City of Tinsman, AR; City of Tollette, AR; City of Tontitown, AR; City of Traskwood, AR; City of Trumann, AR; City of Tuckerman, AR; City of Tull, AR; City of Tupelo, AR; City of Turrell, AR; City of Twin Groves, AR; City of Tyronza, AR; City of Ulm, AR; City of Valley Springs, AR; City of Van Buren, AR; City of Vandervoort, AR; City of Victoria, AR; City of Vilonia, AR; City of Viola, AR; City of Wabbaseka, AR; City of Waldenburg, AR; City of Waldo, AR; City of Waldron, AR; City*

*of Walnut Ridge, AR; City of Ward, AR; City of Warren, AR; City of Washington, AR; City of Watson, AR; City of Weiner, AR; City of Weldon, AR; City of West Fork, AR; City of West Memphis, AR; City of West Point, AR; City of Western Grove, AR; City of Wheatley, AR; City of Whelen Springs, AR; City of White Hall, AR; City of Wickes, AR; City of Widener, AR; City of Wiederkehr Village, AR; City of Williford, AR; City of Willisville, AR; City of Wilmar, AR; City of Wilmot, AR; City of Wilson, AR; City of Wilton, AR; City of Winchester, AR; City of Winslow, AR; City of Winthrop, AR; City of Wooster, AR; City of Wrightsville, AR; City of Wynne, AR; City of Yellville, AR; and City of Zinc, AR;*

John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
JOHN B. WHITE, JR. P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC  29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

*Counsel for Petitioners Aiken County, SC; Anderson County, SC; Calhoun County, SC; Cherokee County, SC; Chester County, SC; Dillon County, SC; Edgefield County, SC; Florence County, SC; Greenville County, SC; Greenwood County, SC; Horry County, SC; Lancaster County, SC; Laurens County, SC; Marion County, SC; Marlboro County, SC; McCormick County, SC; Newberry County, SC; Oconee County, SC; Pickens County, SC; Spartanburg County, SC; Sumter County, SC; Union County, SC; and York County, SC*

Joseph J. Cappelli

Marc J. Bern & Partners LLP
101 West Elm Street, Ste. 520
Conshohocken, PA 19428
(610) 941-4444
jcappelli@bernllp.com

*Counsel for Petitioners Abbeville County, SC;*
*Allendale County, SC; Bamberg County, SC;*
*Barnwell County, SC; Beaufort County, SC;*
*Chesterfield County, SC; Clarendon County, SC;*
*Colleton County, SC; Dorchester County, SC;*
*Fairfield County, SC; Hampton County, SC;*
*Jasper County, SC; Kershaw County, SC and*
*Kershaw County Hospital Board; Lee County, SC;*
*Orangeburg County, SC; Saluda County, SC;*
*Williamsburg County, SC; and City of Myrtle*
*Beach, SC*

John S. Simmons
Simmons Law Firm, LLC
1711 Pickens Street
Columbia, SC 29201
(803) 779-4600
jsimmons@simmonslawfirm.com

*Counsel for Petitioner Lexington County, SC*

**CERTIFICATE OF COMPLIANCE**

The foregoing petition complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because it contains 7,800 words, excluding accompanying documents required by Fed. R. App. P. 21(a)(2)(C) and items excluded from any length computation per Fed. R. App. P. 32(f). The words are counted using the word-count function on Microsoft Word 2016 software.

This petition complies with the requirements of Fed. R. App. P. 32(a) and Fed. R. App. P. 32(c)(2) because it has been prepared using Microsoft Word 2016 in Times New Roman, 14-point font.

*/s/ S. Ann Saucer*
S. Ann Saucer

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of May 2022, a copy of this petition, appendix, and exhibits was filed electronically through this Court's CM/ECF system.

I further certify that service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.

*/s/ S. Ann Saucer*
S. Ann Saucer

**APPENDIX**

| Exhibit No. | Description | Location in Record | Page ID Range |
|---|---|---|---|
| 1 | Ongoing Common Benefit Order | 1:17-md-02804, Doc. 4428 | 516405-516422 |
| 2 | Order, *In re Harris County, TX* | 21-3637, Doc. 6-1 | Pages 1-5 |
| 3 | Remand Order | 1:17-md-02804, Doc. 4335 | 575458-575459 |
| 4 | Remand Order | 1:17-md-02804, Doc. 4341 | 575661-575662 |
| 5 | Docket Sheet excerpts, Entry for Document 4428 (omitting Related Document number identification) | 1:17-md-02804 | N/A |
| 6 | Amended Motion for Entry of Order Establishing Common Benefit Fund | 1:17-md-02804, Doc. 3112 | 481997-482011 |
| 7 | Report and Recommendation Addressing Motion for Common Benefit Fund | 1:17-md-02804, Doc. 3319 | 494887-494896 |
| 8 | County of Harris' Brief in Response to Professor Rubenstein's Report and Recommendation | 1:17-md-02804, Doc. 3350 | 495854-495876 |
| 9 | Order Establishing Common Benefit Fee Fund and Directly Certain Payments | 1:17-md-02804, Doc. 3794 | 514769-514774 |
| 10 | MDL 2804: Second Amended Notice of ARCOS Disclosure | 1:17-md-02804, Doc. 1613 | 45100-45103 |
| 11 | The Mayor and City Council of Baltimore's Request as Amicus Curiae for Modification of the Court's August 12, 2021 Order | 1:17-md-02804, Doc. 3888 | 534813-534825 |
| 12 | Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and | 1:17-md-02804, Doc. 3828 | 516405-516422 |

46

| | Distribution Process, and Approve Common Benefit Cost Payment and Assessment | | |
|---|---|---|---|
| 13 | Motion to Establish Application Protocols to the Arbitration Fee Panel for Reimbursement of Attorney Fees and Costs Under the Janssen Texas State-Wide Opioid Settlement Agreement and the Distributors Texas Settlement Agreement | *In re: Texas Opioid Litigation,* No. 2018-63587 | Pages 1-334 |
| 14 | ESI Production Protocol | *In re: Texas Opioid Litigation,* No. 2018-63587 | Pages 1-20 |
| 15 | Protocol for Coordination with the National MDL | *In re: Texas Opioid Litigation,* No. 2018-63587 | Pages 1-10 |
| 16 | Case Management Order No. 2 | In re: South Carolina Opioid Litigation, Case No. 2018-CP-23-01294 | Pages 1-4 |
| 17 | Opioid Participation Agreement | 1:17-md-02804, Doc. 3352-3 | 495961-495967 |
| 18 | Order Appointing Leadership for the Plaintiffs | *In re: Texas Opioid Litigation,* No. 2018-63587 | Pages 1-2 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | **CASE NO. 1:17-md-2804** |
| **This document relates to:** | **Judge Dan Aaron Polster** |
| ***ALL CASES*** | **ONGOING COMMON BENEFIT ORDER** |

## I.     Introduction.

Since the commencement of these MDL proceedings in January 2018, numerous attorneys – including counsel appointed by this court to serve as Co-Lead Counsel, Liaison Counsel, members of the Plaintiffs' Executive Committee ("PEC"), various other committees, and counsel authorized by MDL leadership – have advanced many tens of millions of dollars in out-of-pocket expenses and devoted an enormous number of hours to shoulder the laboring oars in this litigation. These attorneys have done so on a contingent basis, with no guarantee of payment. They have performed and continue to perform the work of common discovery; of retaining, developing, and qualifying experts; of preparing and trying multiple bellwether cases; and of negotiating complex national settlements that provide billions of dollars in abatement recoveries to federal and state court litigating plaintiffs and beyond.

This common benefit work, which the Court has charged appointed counsel to undertake, is an absolute necessity and serves the interests of not only the litigants but also the Court and the nation. "By making manageable litigation that otherwise would run out of control, [leadership counsel] serve interests of the court, the litigants, the other counsel, and the bar, and the public at large, who are entitled to their chance at access to unimpacted courts." *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1017 (5th Cir. 1977).

**EXHIBIT
1**

This common benefit work must and will continue in this MDL in order to fulfill the purposes of 28 U.S.C. §1407, as well as the expectations of the Judicial Panel on Multi-District Litigation ("the Panel"). The instant Ongoing Common Benefit Order is designed to ensure that the costs of counsel's prior and ongoing work, which inures to the common benefit of so many interested parties, will be equitably spread among all beneficiaries, as authorized and established by the United States Supreme Court in its common benefit doctrine, and as reaffirmed in the extensive jurisprudence thereunder.  As the Supreme Court has recognized for over a century, and as MDL Courts have repeatedly implemented in their common benefit orders, this common benefit doctrine entitles plaintiffs' attorneys to an award beyond their own contingent fees, assessed from funds paid in judgments and settlements that their litigation efforts help to secure.  *See, e.g.*, *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 126-27 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977); *In re Diet Drugs*, 582 F.3d 524, 546-47 (3d Cir. 2009); *In re General Motors LLC Ignition Switch Litig.*, 977 F. Supp. 3d 170 (S.D.N.Y. 2020); *In re Vioxx Prods. Liab. Litig.*, 802 F.Supp.2d 740, 769 (E.D. La. 2011); 5 William B. Rubenstein, *Newberg on Class Actions* §§ 15:113-117 (5th ed. 2018).


II.     **Common Benefit Orders in MDL No. 2804.**

Throughout the course of these MDL proceedings, the Court has issued a series of Orders designed to ensure that leadership counsel appointed by this Court, and others who perform common benefit work, are incentivized to do so with reasonable expectation of reimbursement and compensation for their efforts.  The Court has always anticipated that a portion of counsel's remuneration will include reasonable assessments levied upon judgments and settlements that rely upon common benefit work.

The earlier common benefit-related orders of this Court, all of which remain in effect, include: *Order Regarding Plaintiff Attorneys' Fees and Expenses* (docket no. 358); *Order Establishing Common Benefit Fee Fund and Directing Certain Payments* (docket no. 3794); *Order Appointing Certified Public Accountant to Maintain and Act as Escrow Agent for the Common Benefit Fee Fund* (docket no. 3810); *Order Regarding Contingency Fees* (docket no. 3814); *Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* (docket no. 3828); *Order Regarding Fee Panel, Fund Administrator and Assistants* (docket no. 4030); *Order Appointing Fee Committee and Addressing Related Matters* (docket no. 4286); and *Order Establishing Application Protocols for Reimbursement of Common Benefit Attorneys' Fees Under the Janssen and Distributors Settlement Agreements* (docket no. 4344).

This Order does not abrogate any of those earlier Orders.  It provides an ongoing framework and structure to apply the common benefit doctrine to Opioid Cases[1] that: (1) are not brought by State Attorneys General; and (2) are not otherwise included in global settlements that have their own negotiated, Court-approved common benefit fees and cost structures. For example, the recent global settlements with the three largest Distributors (McKesson, AmerisourceBergen, and Cardinal Health), and with Manufacturer Janssen, provide for a fee fund to compensate counsel for common benefit work; therefore, no additional common benefit contribution from

---

[1] "Opioid Cases" is defined as "litigation in any court throughout the United States involving the marketing, distribution, sale, or use of Opioid related drugs."  *ARCOS Protective Order* ¶5 at 5 (docket no. 1545).

governmental subdivisions participating in these global settlements (or their counsel[3]) is necessary or appropriate.

Notably, over two years ago, the PEC moved for entry of an Order establishing a common benefit fee fund, *see* docket no. 3112, and the Court "invited any interested party to file an opposition brief if they were so inclined," *Order* at 1 (docket no. 3397). The Court received dozens of position papers, *see id.* at 1 n.1 and 2 n.3 (listing submissions), as well as a Report from the Court's expert consultant at the time, Professor William B. Rubenstein, *see* docket no. 3319.[4] After prolonged and serious consideration, the Court declined to enter an Ongoing Common Benefit Order at that juncture in the case. Specifically, on July 27, 2020, the Court issued an *Order Denying **Without Prejudice** the PEC's Motion for Common Benefit Fee Order* (docket no. 3397) (emphasis added). In that Order, the Court observed:

> [T]here is a wide consensus confirming the accuracy of the PEC's statements that: (1) "scores of attorneys from the PEC firms and others" have "performed [work] for the common benefit of plaintiffs in the [MDL] proceedings," as well as in other opioid cases; and (2) those attorneys are entitled to some measure of "reimbursement and compensation of expenses and work incurred and performed for the common benefit" of those plaintiffs. The Court shares in this consensus.
>
> * * *
>
> The threshold question presented by the PEC's motion, however, is whether entry of a common benefit order is appropriate **at this time**. The Court concludes the time is not ripe because plaintiffs and defendants state uniformly that, given current settlement negotiations, they anticipate a global settlement will probably moot the need for a common benefit order.

---

[3] To be clear, counsel for a participating subdivision owes no additional common benefit contribution *related to the participating subdivision*. If the same counsel also represents a *non*-participating subdivisions, then counsel *does* owe a 7.5% common benefit assessment related to any eventual recovery by that non-participating subdivision. *See Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* at 18 (docket no. 3828).

[4] The Court has reviewed again all of these submissions in preparation for drafting this Order.

*Id*. at 2-3 (citations omitted, emphasis in original).

About one year later, the "Big 3" Distributors and Janssen announced conditional global settlements with governmental-entity plaintiffs.  These multi-billion dollar settlements are now finalized and initial settlement payments will begin to flow shortly. These settlements are complex, with intensely negotiated participation provisions and fee and cost structures, including common benefit provisions.[5]  This Court retains an ongoing role in supervising and enforcing these common benefit-related agreements, as reflected in the above-listed Orders.

In addition to these two global settlements, however, various MDL Defendants have recently entered into other settlements of Opioid Cases that do not include common benefit provisions.  And the Court anticipates that MDL Defendants will reach additional global and non-global settlements in the future, some of which may not include specific, negotiated, Court-approved and -supervised fee and cost structures providing for an equitable contribution towards compensation of counsel who performed common benefit work.  Thus, the Court concludes the time has now come to enter an Ongoing Common Benefit Order that applies to certain settlements and judgments in Opioid Cases.

## III.    The Panel's Recent Order.

In addition to the imminency of other settlements and judgments in Opioid Cases that will be secured through reliance upon common benefit work, the Court notes that recent comments by the Judicial Panel on Multidistrict Litigation ("the Panel") also suggest the time has come for an Ongoing Common Benefit Order.

---

[5] The Distributors/Janssen settlement-related documents and other, ongoing settlement-related information are posted at https://nationalopioidsettlement.com/.

The Panel has explicitly recognized the intensive efforts and substantial progress of MDL No. 2084.  Having (at least for now) discontinued transfer of new cases into this MDL, the Panel is looking toward the completion of this Court's MDL work, and to assuring that its ongoing benefits are provided to subsequent related cases in order to avoid duplicative work and costs.  In an Order issued a few weeks ago, the Panel stated:

> [C]ommon discovery has largely been completed, several bellwether trials have been prepared, and a bellwether remand process established.  And myriad claims have been resolved through substantial settlements.
>
> * * *
>
> We see no reason why the parties in subsequent actions, subject to the same conditions imposed on the parties to MDL No. 2804, should not be able to avail themselves of the documents and depositions accumulated in this MDL.  The involved courts may find useful guidance in the numerous pretrial rulings of the Honorable Dan A. Poster in this docket.
>
> The parties also can employ alternatives to transfer to minimize whatever, if any, possibilities may arise of duplicative discovery or inconsistent pretrial rulings.  Thus, even absent transfer, most of the benefits of the MDL are available to expedite resolution of these cases.

*In re: National Prescription Opiate Litig.*, Case MDL No. 2804, Order at 2-3 (docket no. 9586) (J.P.M.L. Apr. 8, 2022) (citations omitted).

Of course, if "the parties in subsequent actions" are able to "avoid duplicative discovery" by obtaining access to "the documents and depositions accumulated in this MDL" – which are housed in an MDL Repository that is managed and paid for by the MDL PEC – those parties are taking appropriate advantage of work by others that inure to their and the common benefit.  As such, the Panel's Order suggests strongly that the time has now come for entry of an Ongoing Common Benefit Order.

**IV.     Assuring Full Use and Fair Payment For Past and Ongoing Common Benefit Work.**

The costs advanced, and the work dedicated, by the PEC to pursue the common discovery, pretrial proceedings, and bellwether trials in this MDL have been virtually unprecedented in their magnitude and intensity, continuing (unabated during COVID) for over four years.

Unlike most MDLs, there are literally hundreds of different Defendants named in the Opioid MDL cases, several of which are Fortune 50 companies.  There are also numerous categories of Plaintiffs, ranging from individuals to private businesses to governmental subdivisions.  To pursue all of the claims in this MDL, the PEC has so far, since its appointment in February 2018: (1) advanced about $86 Million in common benefit assessments, and incurred about an additional $24 Million in held costs; (2) collected, analyzed, and maintained over 70,000 terabytes of discovery from MDL defendants, third parties, bellwether plaintiffs, and other exhibits; (3) taken, defended, or collected over 900 relevant depositions; (4) retained, developed, and obtained reports from over 60 scientific, medical, public health, and economics experts; (5) fully prepared two bellwether cases for trial in the MDL Court (Case Tracks One and Two); (6) begun preparing another five bellwether cases (Case Tracks Seven through Eleven) for trial; and (7) supported trial of four other bellwether cases that were remanded to transferor courts (Track Two to West Virginia; Track Four to Chicago; Track Five to Oklahoma; and Track Six to San Francisco).

The trial-readiness of the Track One bellwether case in Fall of 2019 catalyzed what became the "Big 3" Distributors and Janssen national settlements, worth about $26 Billion. It is egregious understatement to observe that this $26 Billion settlement, which provides funds to States and local governments across the nation to abate the Opioid Crisis, inured to the common benefit of parties who were not litigating in Track One, or for that matter in the MDL.  The PEC's work has also

assisted in the trial of state court cases brought by Attorneys General and various cities and counties, some of which have separately settled for (in total) roughly an additional $2 Billion (without any common benefit assessment).  A total of 11 MDL active cases have been designated for trial against over a dozen different Defendant families.  The common benefit work is intensive and ongoing.

The PEC should not solely bear the cost, in time and money, of obtaining this extensive and essential discovery product.  The fruits of the labors expended pursuing claims in this MDL should and have and will be made available to all Opioid Case plaintiffs, subject to an assessment that spreads the costs equitably among all beneficiaries, without up-front expense to them.

Moreover, the MDL ***Defendants*** are also entitled to protection from costly and time-consuming duplicative discovery demands.  These are the very demands that MDL centralization under 28 U.S.C. § 1407 is designed to prevent, by providing that – as much as possible – common discovery is done, comprehensively, once, rather than multiple times.  The discovery effort has been arduous and expensive on both sides. The Court must be concerned with conserving the resources of Defendants as well as Plaintiffs.  This Ongoing Common Benefit Order ensures that discovery and litigation tasks, once completed, need not be repeated, as their results are made accessible to all – with the costs thereof equitably spread – in lieu of repetitive expenditures of time, money, and effort.  The provisions of this Order are designed to ensure that Defendants will not be subjected to wholesale repetition of discovery obligations they already met, either in cases remanded to transferor Courts or in factually related cases in other courts, by obligating the PEC

to maintain and make available this discovery product, subject to the assessment this Order imposes.[6]

This Court, assisted by its Court-appointed Special Masters, has actively supervised this centralized discovery: resolving discovery disputes, entering myriad discovery rulings, and making sure that discovery has proceeded in a fair, orderly, and proportional way, under the guidance of the federal rules, to fulfill the consistency, efficiency, and convenience goals of § 1407.  Defendants should not be subjected in non-MDL litigation to demands for documents and information they have already produced, or for depositions and reports that have already been taken and submitted, in MDL No. 2804.  An Ongoing Common Benefit Order will thus provide fairness to all MDL parties.

A unique and dramatic example of the PEC's accomplishments in this MDL bears noting. Early in the litigation, the PEC sought, over the objection of the United States Drug Enforcement Agency ("DEA"), the production to MDL plaintiffs of key data compiled in the DEA's Automated Records and Consolidated Orders System / Diversion Analysis and Detection System ("ARCOS/DADS") database.   In a series of Orders, the Court ordered the DEA to produce complete transactional ARCOS data for the period of January 1, 2006 through December 31, 2014 – first for six states (Ohio, West Virginia, Illinois, Alabama, Michigan, and Florida), and then for the remaining States and Territories. *See Order Regarding ARCOS Data* (docket no. 233); *Second Order Regarding ARCOS Data* (docket no. 397); *Third Order Regarding ARCOS Data* (docket no. 668).

---

[6] Accordingly, in any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the plaintiffs' access to such documents or evidence, and to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

The DEA produced ARCOS data to the PEC in essentially raw form.  The PEC then organized, programmed, analyzed, and reported this data at great expense. As this Court has previously observed, the resulting detailed and vastly-more-user-friendly database readily shows "the number of opioid pills delivered to each City and County in America, partitioned by manufacturer and distributor and pharmacy." *Second Order Regarding ARCOS Data* at 2 (docket no. 397). This information has proved "essential" in enabling the parties in federal and state court Opioid Cases to correctly identify defendants, file and amend complaints, design discovery, bring and defend motions, develop damages and abatement models, inform experts, prepare for trial, and engage in meaningful settlement discussions.  *Id.*

Ultimately, the PEC's "ARCOS database," as produced to, organized within, and protected by[7] this Court, now vests the Court with a centrality to the nationwide opioid litigation unmatched in other MDLs. The initial and ongoing efforts of the PEC to obtain, organize, and analyze the ARCOS data, and make it available in meaningful and useable form to all parties, provides an indispensable and uniquely beneficial resource to opioid litigants. The time and out-of-pocket costs to develop this common resource may and should be equitably spread among all beneficiaries.

This Court, which has ongoing jurisdiction over the ARCOS data produced by the DEA, as organized, analyzed, and made available by the PEC and this Court's protective and case management Orders, has the authority and may exercise the discretion to condition the use of the data by all parties in the MDL and their counsel, and all non-MDL litigants and their counsel (other than the States), who seek to use it for their non-MDL investigations and cases, upon payment of a back-end, contingent assessment.  The same is true of the other discovery obtained and managed by the PEC and residing in the MDL Repository.

---

[7] Access to the ARCOS data continues to be governed by the Court's *ARCOS Protective Order* (docket no. 1545).

**V.      Parties and Counsel that will be Assessed.**

For the reasons set out below, this Ongoing Common Benefit Order will apply to: (1) plaintiffs with Opioid Cases pending in or remanded from MDL 2804, and their counsel; (2) plaintiffs' counsel who have signed a Participation Agreement with respect to any of their opioid claims and plaintiffs; (3) other plaintiffs and claims represented by plaintiffs' counsel with Opioid Cases pending in or remanded from MDL 2804; and (4) opioid claims and plaintiffs, whether inside or outside this MDL, that have relied upon work product developed within MDL 2804. Excepted from this list are cases and claims brought by State Attorneys General, and cases where a global settlement has its own MDL-Court-Approved common benefit structure.

The Court's authority over the first category of plaintiffs is plain. *See In re Diet Drugs*, 582 F.3d 524, 546–47 (3rd Cir. 2009) ("The Judicial Panel for Multidistrict Litigation is empowered, under 28 U.S.C. § 1407, to transfer related cases to a single court, and that court has—and is expected to exercise—the ability to craft a plaintiffs' leadership organization to assist with case management. Inherent in that ability . . . is the power to fashion some way of compensating the attorneys who provide class-wide services."); *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 617 F. App'x 136, 141 (3rd Cir. 2015) (same); *see also In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir.1977).

Regarding the second category, there is also no question that a common benefit assessment upon a Plaintiff's attorney is appropriate when the attorney agrees to it.  Pursuant to an "Opioid Litigation Participation Agreement," the Plaintiffs Co-Lead Counsel and the PEC have agreed to provide common benefit work product to any signatory "Participating Counsel."   The Court

- 11 -

incorporates into this Order this Participation Agreement, and the obligations it contains that are imposed upon Co-Lead Counsel and the PEC and Participating Counsel.

With respect to the third and fourth categories, this Court earlier noted that the propriety of "common benefit fee assessments on attorneys with cases not before the MDL judge is an unsettled issue." *Order Regarding Contingency Fees* at 10 n.27 (docket no. 3814). That said, there is ample authority for the proposition that common benefit fee assessments on attorneys with cases not before the MDL judge is permitted and appropriate in certain circumstances. *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 617 F. App'x 136, 141 (3rd Cir. 2015); *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 180 (S.D.N.Y. 2020) (allowing the assessment).

For example, with respect to the third category, the Court has authority over plaintiffs' counsel by and through their MDL cases. MDL courts, using their equity powers when applying the common benefit doctrine, regularly extend that authority over counsel's other, non-MDL cases in order to "preempt[] an extreme version of the free-rider problem: the lawyer who files only one case in the MDL to gain access to common benefit work and then leverages the knowledge gained from that work to settle dozens or hundreds of unfiled claims." *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 181 (S.D.N.Y. 2020).

The Court notes that MDL courts routinely caution against exercising authority to impose common benefit assessments on non-MDL cases *actually filed* in state courts, due to respect for principles of comity and because state courts can exercise their own authority over those plaintiffs to solve the free-rider problem. *See id.*; *see also In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 268 (E.D.N.Y. 2006); *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 166 (4th Cir. 1992). In this instance, however, this Court firmly believes that levying a common benefit tax upon this category of Plaintiffs and their counsel is crucial because of: (1) the

virtually unprecedented expense incurred by the PEC for the common benefit in obtaining and synthesizing the ARCOS data; and (2) the absolutely essential character of the ARCOS data in allowing any and all opioid plaintiffs to prosecute their cases in the first place. In other words, the potential free-rider problem present in the Opioid Litigation is even more extreme than anything Judge Furman contemplated in *In re General Motors*, and it would be inequitable in the extreme for this Court not to remedy that problem through this Order.

Finally, with respect to the fourth category, MDL courts appear virtually unanimous on their authority to subject a recovery in a non-MDL forum to an appropriate assessment if the plaintiffs or their counsel ***actually used*** common benefit work product.  As Judge Furman observed:

> To be clear, the Firms do not appear to dispute that, if they actually used Common Benefit Work Product in a state-court or unfiled case, the Court has authority to subject any recovery in the latter to an assessment. That is for good reason, as the courts that have addressed the issue appear to be unanimous in upholding assessments in such circumstances. *See, e.g., In re Prempro Prods. Liab. Litig.*, No. 4:03-CV-1507 (BRW), 2014 WL 12758478, at *2 (E.D. Ark. Nov. 25, 2014) ("[I]n cases where lawyers used . . . common benefit work and obtained a . . . recovery in any state or federal forum, the recovery was subject to an assessment." (internal quotation marks and brackets omitted)); *In re Fosamax Prods. Liab. Litig.*, No. 06-MD-1789 (JFK), ECF No. 1012, at 6-7, 2011 WL 13257632 (S.D.N.Y. Apr. 28, 2011) (providing that "any plaintiff's counsel with cases not in the MDL who utilizes any aspect of the MDL common benefit work product . . . shall be subject to" an assessment, part of which was to be "subtracted from the client portion" of recoveries); *In re Phenylpropanolamine Prods. Liab. Litig.*, MDL No. 1407 (BJR), 2009 WL 6042809, at *1, 2009 U.S. Dist. LEXIS 126729, at *3 (W.D. Wa. Sept. 18, 2009) (noting that, "for state cases in which counsel wished to avail themselves of common benefit product, there was a three percent holdback").

*In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 184–85 (S.D.N.Y. 2020).

Here, as stated previously, the PEC's work in obtaining and processing the ARCOS data in particular, and pursuing and collecting the vast other Opioid Case discovery more broadly, is so

fundamental to this category of plaintiffs' claims, that whether or not they signed a Participation Agreement—or the *ARCOS Protective Order's* Acknowledgement of Protective Order and Agreement to be Bound, *see* docket no. 1545-1 & 1545-2— it is unlikely their claims would have any settlement value or likelihood of positive judgment had these plaintiffs not *actually utilized* the work the PEC did for the common benefit.

Accordingly, the Court imposes a common benefit assessment upon amounts paid in settlement or judgment in the four categories of cases listed in the first paragraph of this Section. Excepted from all of these categories are cases and claims brought by State Attorneys General and cases where a global settlement has its own MDL-Court-Approved common benefit structure.

### VI.    Determining An Appropriate Ongoing Common Benefit Assessment Amount.

When assessing common-benefit fees and costs combined, district courts generally award a fixed percentage of every recovery, often between 3% and 11%, as particular circumstances warrant. *See* 5 Rubenstein, *Newberg on Class Actions*, § 15:117 at 440-43. The Court concludes it is appropriate in this case to impose a holdback assessment of 7.5% going forward.[8] This is in the mainstream of MDL assessments generally, and is here imposed in an MDL where the scope and magnitude of common benefit expenditures and effort is virtually unparalleled, and in which such costs and efforts will be ongoing for some time in connection with discovery, trials, and trial preparation in Tracks 7-11, and in coordination with related actions, all as the Panel contemplates and expects.

The Court earlier imposed a 7.5% common benefit assessment on: (1) settlement amounts paid in Track One, *see Order Establishing Common Benefit Fee Fund and Directing Certain*

---

[8] To be clear, this assessment will not be imposed upon any payment due under a settlement or judgment that was entered before the date of this Order.

*Payments* (docket no. 3794) at 5-6; and (2) the gross recovery of any subdivision that did not participate in the global Distributors and Janssen Settlements, *see Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* (docket no. 3828) at 18.  Moreover, in his *Report* to the Court two years ago, Professor Rubenstein observed that the common benefit assessment in large MDLs "is generally calculated in the range of 5% for fees and 2.5% for costs."  *Report* at 2 (docket no. 3319).  Thus, there is ample precedent for imposition of a 7.5% assessment.

Court-appointed counsel have the responsibility to make sure the burdens of common benefit work are allocated among all beneficiaries, both inside and outside the court.  This is usually done through the use of Participation Agreements.  *See In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 617 Fed. Appx. 136, 141 (3rd Cir. 2015) (affirming an Order "permit[ting] the Steering Committee to, essentially, trade work product for a share in the recovery in cases *not* before the MDL.")  Numerous counsel have executed Participation Agreements in this MDL. Plaintiffs' Co-Lead Counsel or their designees are hereby authorized and directed to condition sharing of MDL work product (including that related to common fact discovery, data, and development of MDL experts) on the execution of a Participation Agreement consistent with this Order.

While the global Distributors and Janssen Settlement Agreements will defray significant accrued common benefits costs and fees, it will not fully reimburse or compensate all of them, nor will it reimburse or compensate the substantial ongoing work to be done – including: (1) work in this MDL, in Opioid Cases upon remand, and in other opioid-related proceedings; (2) efforts in

pursuit of claims against non-settling Defendants; and (3) with respect to the categories of affected plaintiffs not included in settlements (e.g. Third Party Payors and Hospitals).

It bears noting that the amount collected pursuant to the 7.5% assessment is ***not*** necessarily what the Court will award to eventual applicants for common benefit awards.  The Court mandates the 7.5% assessment only to ensure appropriate awards of common benefit fees and expenses are possible; the Court has no current opinion on what the total amount of any such awards will be, or who is or will be eligible.[9]  *See In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig*., 268 F. Supp. 2d 907, 909-10 (N.D. Ohio 2003) (awarding $43 million in common benefit fee awards from a $50 million fund, and directing the remainder should be used for "payment of certain costs associated with effectuating the settlement and, if possible, distribution to the settlement class").


**VII.    Common Benefit Fund Account.**

In connection with the Distributors and Janssen Settlement Agreements, the Court appointed a Fee Panel to oversee distribution of $1.6 Billion in attorney fees, including $960 Million in Common Benefit Fees; and the Court appointed Special Master Cohen (who is a Fee Panel Member) to oversee distribution of another $200 Million in Expense Reimbursement, a large portion of which is Common Benefit Expenses.  The Fee Panel and Special Master Cohen have engaged counsel and accountants, created Trusts, and arranged for these funds to be invested in order to generate additional money for payment of administrative expenses.

---

[9] Provisions and procedures for reimbursement of common costs and compensation for common benefit time will be made in further Orders.  At this juncture, the Court anticipates ordering that any funds held back by Defendants that are not approved and awarded as common benefit fees or costs by the Court will be returned to the plaintiffs or their counsel from whom the assessments were held back; however, the Court will make that determination at a later date.

To maximize efficiency, the Court concludes that the appointed Fee Panel should oversee the Court Common Benefit Fund into which assessments will be deposited, so that all Funds may be administered in the same way and use the same accountants, lawyers, investment advisors, and so on (as the Panel may choose or change within their discretion).[10]  The Court is ***not*** directing the Fee Panel to undertake any work toward determining awards from this Court Common Benefit Fund.  The Court will determine at a future time, with input from counsel, when and how such awards will be made.

Accordingly, the Court herby appoints David R. Cohen, Randi S. Ellis and Hon. David R. Herndon (the "Fee Panel") to administer and oversee the Court Common Benefit Fund pursuant to and in a manner consistent in all respects with the Court's August 8, 2021 Order (docket no. 3828).  The Court further orders that the Court Common Benefit Fee Fund shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" as described in Treasury Regulations Section 1.468B-1, and shall remain subject to the continuing jurisdiction of this Court.  Special Master David R. Cohen shall serve as Trustee and Administrator of the qualified settlement fund for purposes of Treasury Regulations Section 1.468B-2(k)(3), and shall be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Court Common Benefit Fund.

---

[10] The Court is also overseeing a Common Benefit Fund associated only with Track One settlements.  *See Order Establishing Common Benefit Fee Fund and Directing Certain Payments* (docket no. 3794); *Order Appointing Certified Public Accountant to Maintain and Act as Escrow Agent for the Common Benefit Fee Fund* (docket no. 3810).  The Court also directs escrow agent Mr. Greggory Dantio to coordinate with Special Master Cohen to take advantage of investment advisors hired by the Fee Panel.

**VIII.  Conclusion.**

For all the reasons stated above, the Court hereby **ORDERS** and **IMPOSES** an MDL Common Benefit assessment of 7.5% of gross recoveries from any Opioid Case that: (1) is not brought by a State Attorney General, and (2) is not otherwise included in a global settlement that has its own negotiated, MDL-Court-approved Common Benefit fee and cost structures.  This 7.5% assessment is payable from the attorneys' fee portions of such gross recoveries and applies to all settlements reached and judgments entered after the date of this Order.[11]  If the 7.5% amount exceeds one-half (½) of counsel's total contingency fee for a given client, then the contingent assessment will instead be limited to one-half (½) of the contingency fee of counsel on each settlement or judgment, unless a prior or subsequent Order of this Court states otherwise.

To ensure collection of this Common Benefit Assessment, each Defendant named in any case pending in MDL No. 2804 is hereby **ORDERED** to hold back the 7.5% common benefit percentage from all applicable judgments and settlements entered after the date of this Order and to deposit such amounts into the Court Common Benefit Fund.  Each Defendant shall report all judgments, settlements, and payments to Special Master Cohen and Co-Lead Counsel, and verify that the holdback is placed into the Court Common Benefit Fund until further Order of this Court.

---

[11] An example of how this calculation would work in a state-wide settlement involving claims by both the State Attorney General and governmental subdivisions within that State is as follows.  MDL "Defendant X" enters into a $440M state-wide settlement that resolves all claims made by the State and the subdivisions within it.  The total settlement amount from Defendant X is comprised of: (a) $400M, payable in 10 equal annual installments, to be shared by the State and subdivisions and used for abatement; plus (b) $40M for reimbursement of the State's and subdivisions' attorney fees and litigation costs, payable immediately in one lump sum. The settlement includes no common benefit fund to compensate counsel in this MDL (or elsewhere) who have performed common benefit work.  Using the assumption that half of the $400M settlement payment for abatement will be received by the State and the other half by the subdivisions – which assumption also underlies the Distributors and Janssen global settlements – the common benefit assessment would be 7.5% of the $200M subdivision share = $15M, payable in 10 equal annual installments.  Defendant X would thus be required to make 10 annual payments of $1.5M to the Court Common Benefit Fund. This example assumes all counsel have at least a 15% contingent fee; if some counsel have a lower percentage, the parties may move the Court for modification of the assessment.

Plaintiff Co-Lead and Liaison Counsel, or their designees, are hereby authorized and directed to obtain Participation Agreements with any and all counsel for plaintiffs in Opioid Cases, regardless of where or whether their cases or claims are filed, as a condition of access to and utilization of MDL 2804 work product.

Finally, the Court notes that, in his 2020 Report to the Court, Professor Rubenstein cautioned that "[a] single common benefit assessment levied on multiple different types of settlements involving many different types of plaintiffs and multiple defendants runs the risk of being too crude an approach."  *Report* at 5 (docket no. 3319).  The Court agrees that **all** common benefit assessment orders are necessarily blunt instruments **when first imposed**.  It is only after fee applications are received and weighed, the Court and its advisors sharpen their pencils, and common benefit awards are carefully crafted and issued, that the instrument of a common benefit assessment is honed.  These steps will take place in the future: this Court will enter further Orders as necessary regarding the operation, payment, allocation, award, and distribution of funds held back pursuant to this common benefit assessment, including return of collected funds if applicable.  In the meantime, this Order ensures that future appropriate common benefit awards are possible and that parties and counsel who use common benefit work pay their fair share.

All of that said, the Court recognizes that the particular circumstances of a settlement or judgment in an Opioid Case may justify a case-specific modification of this Order.  The parties are free to move for modification at that time.

**IT IS SO ORDERED**.

    /s/Dan Aaron Polster
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

Dated: May 9, 2022

No.  21-3637

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 11, 2022
DEBORAH S. HUNT, Clerk

In re:  HARRIS COUNTY, TX, et al.,                    )
                                                                           )          O R D E R
                Petitioners.                                      )

Before:  GUY, CLAY, and DONALD, Circuit Judges.

This mandamus petition arises from multidistrict litigation concerning the over-prescription of opioid medications.  Three counties in Texas—Harris, Rockwall, and Ellis—and two cities in New Mexico—Albuquerque and Santa Fe—petition for a writ of mandamus.  They seek to compel the district court to adjudicate their motions to remand, each of which has been pending at least three years, and each of which challenges the district court's subject matter jurisdiction.  On our invitation, the district court responded.  We grant the petition.

Starting in 2017, cities, counties, and states began filing actions throughout the country against manufacturers and distributors of prescription opioid medications.  The Judicial Panel on Multidistrict Litigation ("JPML") centralized the proceedings in the Northern District of Ohio ("the MDL").  Shortly after the cases were centralized, the district court met with counsel and organized the parties into categories or tracks overseen by steering committees.  It also imposed a moratorium on filing substantive motions, including those to remand, so it could best use its limited resources and organize the litigation.  Motions to remand filed prior to centralization remained pending.  Despite this moratorium, the district court addressed some motions to remand challenging its jurisdiction.  It remanded one case for lack of federal question jurisdiction (removed on the basis that the state law claims were inextricably intertwined with federal issues).  It denied remand in other cases involving Indian tribes that were removed under



EXHIBIT
2

Case: 1:17-md-02804-DAP  Doc #: 4486-1  Filed:  05/26/22  78 of 556.  PageID #: 584142
Case: 21-3637    Document: 6-1    Filed: 03/11/2022    Page: 2

No. 21-3637
-2-

the federal officer removal statute.  After state court judges from two States had contacted the district court to request remand of the cases transferred from their jurisdictions to promote judicial efficiency, it remanded one of the cases because the parties did not object.  It remanded the other case because there were no federal causes of action and federal jurisdiction was otherwise very tenuous.  Apart from jurisdiction, it remanded several cases to facilitate processing overlapping claims against various categories of defendants and jurisdictions.  Further, it noted that it might remand additional cases so other courts could work parallel to the MDL to try segments of the case and pursue settlements.

Petitioners' motions to remand—promptly filed following removal of their cases from state court and challenging the district court's jurisdiction on various grounds, some overlapping—remain pending.  Although the district court has revisited its moratorium, it kept it in place so that bellwether trials and/or settlement efforts could continue.  In the meantime, litigation of the MDL has continued apace, with the district court addressing other threshold legal issues and dispositive motions.  Against this backdrop, Petitioners moved the district court for suggestions of remand.  In non-document orders, the district court denied the motions without any explanation.  The JPML also denied Petitioners' motions to remand, while at the same time recognizing that they were entitled to a ruling on their motions.  Petitioners' motions, however, remain unadjudicated.

Mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes."  *Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (internal quotation marks and citation omitted).  "The traditional use of the writ in aid of appellate jurisdiction . . . has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction."  *Id.* (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)).  To preserve its use to only extraordinary causes, petitioners must satisfy three conditions.  First, they cannot have adequate alternative means to obtain the relief they seek.  *Id.*

No. 21-3637
-3-

at 380−81.  Second, petitioners must show a "clear and indisputable" right to the relief sought. *Id.* at 381 (citation omitted).  Finally, petitioners must show that issuing the writ is otherwise "appropriate under the circumstances."  *Id.*

Petitioners lack adequate alternative remedies, given that they have sought and been denied a suggestion of remand before the MDL and a remand before the JPML.  *See In re Wilson*, 451 F.3d 161, 168−69 (3d Cir. 2006); *In re Patenaude*, 210 F.3d 135, 141−42 (3d Cir. 2000).

Petitioners also have a clear and indisputable right to relief.  We may issue a writ "where a district court persistently and without reason refuses to adjudicate a case properly before it." *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661−62 (1978) (internal quotation marks and citation omitted).  "The rule of law applies in multidistrict litigation . . . just as it does in any individual case."  *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020).  Consequently, "determination of the parties' rights in an individual case must be based on the same legal rules that apply in other cases, as applied to the record in that case alone."  *Id.*; *see also Hamer v. LivaNova Deutschland GmbH*, 994 F.3d 173, 177 (3d Cir. 2021).  Thus, while an MDL court has "broad discretion to create efficiencies and to avoid unnecessary duplication in its management of pretrial proceedings in the MDL," it must find those efficiencies within the applicable statutes, "rather than in violation of them."  *In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 845.  The district court's reasons supporting its delay—the economic impact of the litigation; the efficiencies created by imposing a stay while a global settlement was sought; concern that lifting the stay would jeopardize settlement efforts; and that Petitioners will benefit from any global settlement reached—are grounded in policy with no basis in statute or the Federal Rules of Civil Procedure.  Moreover, a party's rights in one case cannot be impinged upon "to create efficiencies in the MDL generally."  *Id.*

No. 21-3637
-4-

Finally, issuance of the writ is appropriate.  Remand is required "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction."  28 U.S.C. § 1447(c).  The seemingly mandatory nature of this provision weighs in favor of finding that the district court clearly abused its discretion in abating rulings on the pending remand motions. Subject matter jurisdiction is of paramount importance, given that it "governs a court's adjudicatory capacity."  *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).  Thus, although it may be raised "at any time," *id.* at 434, it is generally regarded as a threshold matter.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998).  Further, courts must adhere to jurisdictional rules "regardless of the costs [they] impose[]."  *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004); *see also Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 339 (5th Cir. 2014) ("[T]he so-called waste of judicial resources that occurs when we dismiss a case for lack of jurisdiction is the price that we pay for federalism." (internal quotation marks and citations omitted)).

We recognize that, in MDL cases, district courts "face[] unique challenges not present when administrating cases on a routine docket."  *Hamer*, 994 F.3d at 178.  Thus, MDL courts are "granted significant latitude to manage their dockets and to mitigate 'potential burdens on the defendants and court.'"  *Id.* (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 246 (3d Cir. 2013)).  District courts managing multidistrict litigation "reasonably may conclude that the court's time, especially early in the litigation, is better spent on activities other than deciding scores or hundreds of individual remand motions."  *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (per curiam) (Kaplan, J., concurring).  But we are no longer at the outset of this litigation, and Petitioners' motions have been pending an unduly long time. Numerous courts, prior to transfer of cases into the MDL, addressed and granted pending motions to remand.  *See, e.g.*, *Mecklenburg Cnty. v. Purdue Pharma, L.P.*, No. 3:19-cv-00463, 2019 WL 3207795, at *2, *7 (E.D. Va. July 16, 2019) (collecting cases).  Although portions of

No. 21-3637
-5-

those jurisdictional questions were fact driven, the unanimity of these decisions lends significant support to the merits of Petitioners' jurisdictional arguments.  The district court's concern that it lacks adequate resources to address Petitioners' motions (and those of numerous other movants), is also not supported by the record.  The district court has frequently decided representative issues and applied that disposition to other parties in lieu of permitting all parties to file repetitive motions.  It has already taken this tack in addressing prior motions to remand, and we see no reason it cannot continue to employ this course to adjudicate the pending motions to remand. The district court shall submit a status report every thirty (30) days advising the court of the status of the pending motions and actions taken in complying with this order.

Accordingly, the petition for a writ of mandamus is **GRANTED**.  The district court shall promptly address Petitioners' motions.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| | ) |
| *County of Burleson v. Walmart Inc., et al.,* Case No. 1:20-op-45054 | ) ) ) |
| | ) |
| *County of Duval* v. *CVS Health Corporation, et al.,* Case No. 1:19-op-45861 | ) ) ) ) |
| | ) |
| *County of Jim Hogg* v. *CVS Health Corporation, et al.,* Case No. 1:19-op-46160 | ) ) ) ) |
| | ) |
| *County of Jim Wells* v. *CVS Pharmacy, Inc., et al.,* Case No. 1:19-op-45884 | ) ) ) |
| | ) |
| *County of Kleberg* v. *CVS Health Corporation, et al.,* Case No. 1:19-op-46159 | ) ) ) ) |
| | ) |
| *County of Williamson v. Walgreens Boots Alliance, et al.,* Case No. 1:19-op-46161 | ) ) ) |
| | ) |
| *Dallas County Hospital District* v. *Amneal Pharmaceuticals, Inc., et al.,* Case No. 1:20-op-45142 | ) ) ) ) |
| | ) |
| *Ellis County* v. *Walgreens Boots Alliance, Inc., et al.,* Case No. 1:19-op-45860 | ) ) ) |
| | ) |
| *Harris County Hospital District* v. *McKesson Corporation et al.,* Case No. 1:21-op-45096 | ) ) ) ) |
| | ) |
| *Rockwall County* v. *CVS Health Corporation, et al.,* Case No. 1:19-op-45859 | ) ) ) ) |

**MDL 2804**

**Case No. 1:17-md-2804**

**Judge Dan Aaron Polster**

**REMAND ORDER**

EXHIBIT
**3**

Pending in this case is a motion to remand.   On March 25, 2022, the removing Pharmacy
Defendants consented to remand of this case for the purpose of facilitating the Defendants' ability
to select bellwether cases in the Texas MDL.   Accordingly, this case is remanded to the state court
in Texas from which it was removed

**IT IS SO ORDERED.**


*/s/ Dan Aaron Polster  March 26, 2022*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | **MDL 2804** |
| | **Case No. 1:17-MD-2804** |
| THIS DOCUMENT RELATES TO: | |
| | **Judge Dan Aaron Polster** |
| *County of Harris v. Purdue Pharma L.P. et al.* 1:18-op-45677 | **REMAND ORDER** |
| *City of Albuquerque v. Teva Pharmaceuticals USA, Inc., et al.* 1:20-op-45136 | |
| *City of Santa Fe v. Purdue Pharma L.P., et al.* 1:20-op-45137 | |

On March 11, 2022, in light of the Sixth Circuit order issued that same day regarding the motions to remand in the above-captioned cases, the Court ordered, "In any case where Defendants have previously filed an opposition, Defendants shall review their response and file a supplementary joint brief only if they ***now*** have a good faith basis to believe the Court has subject-matter jurisdiction to hear the case." Doc. #: 4303 at 1 (emphasis in original).  In other words, a defendant who does not file a supplementary brief indicates to the Court that they no longer have a good faith basis to believe the Court has subject-matter jurisdiction.  Furthermore, Defendants had until March 25 to file these supplementary filings setting forth their basis for maintaining their opposition to remand.  *Id.*  Defendants, however, have not complied with the Court's March 11 order.

In *City of Albuquerque* and *City of Santa Fe, New Mexico*, removing Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. (collectively, "Endo") merely "advise[d] the


EXHIBIT
4

Court that they [did] not intend to submit any further briefing in support of their previous filings,"
and therefore did not submit supplementary filings as the Court required.  Doc. #: 4332.

In *County of Harris*, nothing was filed and the removal is effectively moot.  That case was
removed by the Distributor Defendants.[1]  Because Harris County, Texas has since joined the
Distributors' Texas settlement, the Distributor Defendants are no longer in that case.

Accordingly, all three cases are **REMANDED** to their respective state courts in New
Mexico and Texas from which they were removed.

**IT IS SO ORDERED.**

 /s/ Dan Aaron Polster  March 30, 2022
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

---

[1] The removing defendants here were the Distributor Defendants, comprising AmerisourceBergen Drug
Corporation, McKesson Corporation, McKesson Medical-Surgical Inc., and the Cardinal Health Defendants.  1:18-
op-45677 Doc. #: 53 at 2.

Cat08,MDL2804,Protect,TrSched

## U.S. District Court
## Northern District of Ohio (Cleveland)
## CIVIL DOCKET FOR CASE #: 1:17–md–02804–DAP

In Re: National Prescription Opiate Litigation
Assigned to: Judge Dan Aaron Polster (MDL 2804)
Case in other court:  6th Circuit, 18–03839
                6th Circuit, 18–03860
                6th Circuit, 18–04054
                6th Circuit, 18–04115
                6th Circuit, 19–04097
                6th Circuit, 19–04099
                6th Circuit, 21–03460
Cause: 28:1446 Petition for Removal– Personal Injury

Date Filed: 12/12/2017
Jury Demand: Both
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 05/09/2022 | 4428 | **Ongoing Common Benefit Order**. Judge Dan Aaron Polster on 5/9/22. (P,R) (Entered: 05/09/2022) |

**EXHIBIT**
**5**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| In Re National Prescription Opiate Litigation | MDL 2804 |
| *This document relates to:* | Case No. 17-md-2804 |
| Track One Cases | Hon. Dan Aaron Polster |

### *AMENDED* MOTION FOR ENTRY OF ORDER ESTABLISHING COMMON BENEFIT FUND

Plaintiffs, through the undersigned Court-appointed Plaintiffs' Co-Lead Counsel and Plaintiffs' Liaison Counsel, and on behalf of the Plaintiffs' Executive Committee, respectfully submit this Motion for Entry of an Order Establishing Common Benefit Fund, in the exercise of the Court's case management authority as Transferee Court in these multidistrict proceedings, and pursuant to its earlier Order Regarding Plaintiff Attorneys' Fees and Expenses – Protocol for Work Performed and Expenses Incurred (Doc 358), to provide for the reimbursement and compensation of expenses and work incurred and performed for the common benefit of plaintiffs in the federal courts (including proceedings in and on appeal from this Court, the federal courts on remand, and the bankruptcy courts) and state courts, as more fully described in the accompanying (Proposed) Order. This Order is modeled on similar court orders that have become commonplace in MDL case management, as necessary and appropriate mechanisms to effectuate the purposes of the common benefit doctrine established by the United States Supreme Court nearly 150 years ago, and since applied specifically to complex multidistrict litigation by successive editions of the Manual for Complex Litigation, and utilized and endorsed by district and appellate courts throughout the country.



EXHIBIT

**6**

## INTRODUCTION

Since the very inception of commercial activity giving rise to what we now recognize as complex litigation, the Supreme Court has recognized both the equitable imperative and practical necessity of providing judicially supervised and enforced mechanisms to spread the costs of efforts undertaken for the common benefit among all beneficiaries.[1]  The Supreme Court's resulting "common benefit doctrine," empowering the district courts to apportion such fees and costs among all beneficiaries as a matter of federal equity jurisdiction, was the pre-existing principle that modern MDL courts have adopted and operationalized through common benefit orders.  Every edition of the Federal Judicial Center's *Manual for Complex Litigation* has prescribed both that a plaintiff's leadership structure be appointed at the outset of the litigation, and that provision be made to reimburse and pay these appointed counsel, on a contingent basis from all plaintiffs' recoveries, for the costs and services those they and other authorized counsel incur and provide to conduct and advance its prosecution and resolution.[2]  A robust jurisprudence of case management orders establishing common benefit funds through assessment of a modest percentage of plaintiffs' recoveries has developed, as reflected in the authorities cited here and in the accompanying (Proposed) Order, and courts and commentators have analyzed the norms and expectations arising from this jurisprudence, recognized the MDL common benefit mechanism as distinct from other fee award regimes (such as class action fees under

---

[1] *Trustees v. Greenough*, 105 U.S. 527 (1881); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1884); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing v. Van Gemert*, 444 U.S. 472 (1980).

[2] *See Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004), §§ 10.21-10.225; 14.21-14.216; 22.62, and corresponding sections in the Third (1995) and Second (1985) editions.  Similar provisions in the (revised) First Edition of the *Manual*, published in 1973, were the bases for the Fifth Circuit's landmark decision affirming MDL transferee courts' broad case management authority to provide for common benefit assessments in *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1012-1019 (Fifth Cir. 1977).

Fed. R. Civ. P. 23), and provided a backdrop against which a reasonable amount in this particular case can be established.[3]

## **ARGUMENT**

Plaintiffs here request a common benefit assessment of 7% (6% fees, 1% costs) to be assessed and administered as set forth in greater detail in the accompanying (Proposed) Order, which, like the other MDL common benefit orders cited here, provides a systematic protocol for common benefit assessment, administration, supervision and award by the court.  *See* (Proposed) Order Establishing Common Benefit Fund, Sections 1-4, pp. 4-9.

The Supreme Court's common benefit trinity of *Trustees v. Greenough*, *Central Railroad & Banking Co. v. Pettus*, and *Sprague v. Ticonic National Bank* predated the multidistrict litigation statute, modern class actions*,* and pharmaceutical and consumer products and services that give rise to most contemporary MDLs.  But these seminal and far-seeing decisions are far from dead letter, and their invocation of the federal district courts' equity powers to assess fees and costs from the recoveries of those benefitting from others efforts not only survived but thrived in the wake of the merger of law and equity, to find now routine expression in the common benefit orders of MDL courts.

The entry of common benefit orders by MDL courts long has been approved as a case management exercise, arising not only the courts' equity jurisdiction under the common benefit doctrine, but from the additional authority of MDL courts to assess common benefit fees and costs that "comes from the inherent 'managerial' power over the consolidated litigation."  *In re Cook Medical, Inc., Pelvic Repair* Systems, 365 F. Supp. 3d 685, 695 (MDL No. 2440) (S.D.W.V. 2019) (collecting cases).  *See also In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977); *In re*

---

[3] *See, e.g.,* Rubenstein, "On What a Common Benefit Order Is, Is Not, and Should Be," Class Action Attorney Fee Digest 87 (March 2009); *In re Avandia Marketing Sales Practices, and Prods. Liab. Litig.* (MDL No. 1871), 2012 WL 6923367 (E.D. Pa. 2012).

*Zyprexa Prods. Liab. Litig.* (MDL No. 1596), 467 F. Supp. 2d 256, 265-267 (E.D.N.Y. 2009); *In re Sulzer Hip Prosthesis and Knee Prosthesis Prods. Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003), *affirmed*, 398 F.3d 778 (6th Cir. 2005); *Manual For Complex Litigation* § 14.215 (4th ed., Federal Judicial Center 2004). A trial court has managerial power that has been described as "the power inherent in every court to control the disposition of the causes on is docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S. Ct. 162, 166, 81 L. Ed. 153, 158 (1936), as cited in *Florida Everglades*, 549 F. 2d at 1012.

Assessments in the 7%-9% range are not uncommon in contemporary MDLs.  *See, e.g., In re Aqueous Film-Forming Foam Prods. Liab. Litig.*, Case No. 2:28-MN-2873, Docket No. 72 (D.S.C. Apr. 29, 2019) (9%); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 510 (W.D. La. 2017) (8.6%); *In re Bard IVC Filters Prods. Liab. Litig.*, Case No. 2-15-MD-02641, Docket No. 372 ( D. Ariz. Dec. 18, 2015) (8%); *see also Bard IVC Filters*, 2018 WL 4279834 at *1; *In re Invokana Prods. Liab. Litig.*, Case No. 3:16-md-02750, Docket No. 58 (D.N.J. Mar. 21, 2017) (7%).  In the *Gadolinium MDL*, this Court ordered a 6% assessment (5% fees/1% costs) in the exercise of its case management authority. *See In re Gadolinium Based Contrast Agents Prods. Liab. Litig.*, Case No. 08-GD-50000, Docket No. 277 (N.D. Ohio Feb. 20, 2009).  The above-cited orders and decisions, and those included in the Rubenstein "Common Benefit " survey, supra, provide ample support for a 7% assessment in the instant *National Prescription Opiate* MDL proceedings, which is one of near-universally recognized, unprecedented challenge and complexity.

Despite the unusually intensive (and expensive) commitment made by common benefit counsel on dual litigation and resolution tracks of MDL 2804, both in this district and in the other federal and state courts to which its related remand, bellwether, and bankruptcy work has spread, Plaintiffs seek a midrange assessment of 7%.  This is an ordinary assessment applied to truly

extraordinary proceedings, and, in this context, a modest one in recognition of the goals and priorities of this litigation.  It is a requested assessment grounded, both historically and operationally, in equity.

## **CONCLUSION**

As the Supreme Court perceived, and the experience of transferee courts in numerous MDLs has borne out, the reasonableness of a common benefit assessment is in the eye of the judicial beholder.  The court is intimately aware of the quantity and quality of the work performed for the common benefit to date, the magnitude of the out of pocket expenses it has required, the complexity of the legal and factual issues implicated in this litigation, the skill and commitment of the lawyers, and the benefit their work has conferred, and will continue to confer, on litigants across the country.  Plaintiffs respectfully request entry of a Common Benefit Order, in the accompanying form, that provides for a reasonable, indeed modest, 6%/1% set-aside, a percentage well within the mainstream of MDL assessments, in this extraordinary case.


Dated:  January 28, 2020                    Respectfully submitted,


                                            /s/ *Paul J. Hanly, Jr.*
                                            Paul J. Hanly, Jr.
                                            SIMMONS HANLY CONROY
                                            112 Madison Avenue, 7th Floor
                                            New York, NY 10016
                                            (212) 784-6400
                                            (212) 213-5949 (fax)
                                            phanly@simmonsfirm.com

                                            Joseph F. Rice
                                            MOTLEY RICE LLC
                                            28 Bridgeside Blvd.
                                            Mt. Pleasant, SC 29464
                                            (843) 216-9000
                                            (843) 216-9290 (Fax)
                                            jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/ Peter H. Weinberger*
Peter H. Weinberger

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No.: 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: | Judge Dan Aaron Polster |
| *ALL CASES* | |

**(PROPOSED) *CORRECTED* ORDER ESTABLISHING COMMON BENEFIT FUND**

On January 4, 2018, the Court appointed a Plaintiffs' leadership structure charged with advancing this MDL litigation for the common benefit of all Plaintiffs.  (Doc #37).  The Court's *Order Regarding Plaintiff Attorneys' Fees and Expenses – Protocol for Work Performed and Expenses Incurred* (Doc. #358) ("Protocol Order") sets forth detailed instructions for the performance of common benefit work, and for the type of work and expenses that could qualify for potential compensation and reimbursement.  Under this authority and guidance, Plaintiffs' Co-Lead Counsel, Liaison Counsel, the members of the Plaintiffs' Executive Committee, and others duly authorized to perform common benefit work, have done so on an entirely contingent basis.  These counsel have invested more than one million hours and tens of millions of dollars to fund the substantial expenses of conducting extensive discovery against dozens of Defendants, in what many call the most complex civil litigation our courts have faced.

The Court is aware, from its active supervision of all aspects of the MDL proceedings, of the volume and quality of the work performed to advance the cases of all litigants.  This work has included hundreds of depositions, master pleadings, dispositive motions, scores of experts in

multiple disciplines, bellwether selection and development, pretrial motion practice, trial preparation, federal appellate litigation, and the representation and protection of the MDL Plaintiffs' interests in any bankruptcy case concerning or involving any Defendant in these MDL Proceedings.  These intensive litigation efforts have proceeded in parallel with similarly intensive efforts toward meaningful and effective settlement resolutions designed to address the massive societal challenges that have given rise to the opioids litigation.

The Court has and continues to require a cooperative approach by all litigating plaintiffs in federal court as well as state court.  The Court encouraged and approved of the sharing of work-product generated by the MDL plaintiffs with the Attorneys General for their respective cases.  For example, the Court has overseen the production, processing, and sharing of the massive Automated Reports and Consolidated Ordering System ("ARCOS") database, which has been programmed, analyzed, and shared, in a user-friendly format, with litigating Attorneys General, and with counsel litigating state court actions.  The MDL team has engaged in intensive settlement discussions with Defendants, under the auspices of this Court and with the assistance of its Special Masters.  Many joint meetings, at the request of the Attorneys General and/or the Defendants, have occurred in Cleveland and elsewhere in pursuit of both litigation and resolution.  The expenses of the Special Masters and their assistants have been funded 100% by the parties in federal court.  All of this work has informed and worked to the common benefit of all Opioids-related litigation, whether in state court, federal court, or an Attorney General action.

Given this background, the Court concludes it is just and appropriate to provide a system of assessment on some (but not all) of the settlements and recoveries to which this substantial effort has contributed, commensurate with common benefit assessments ordered in recent MDLs.

This Order is entered to provide for the fair and equitable sharing, by and among all appropriate beneficiaries, of the cost of the services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs in this complex litigation.  This is accomplished by directing each Defendant who has appeared in these proceedings, and over whom this Court has exercised jurisdiction, to either hold back a small percentage of their Opioids-related settlements, or to self-fund the designated percentage, in certain types of cases.  This Court's authority in this regard derives from the Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881), and further applied in *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1884); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); and *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980).  Courts have long approved the doctrine's application in the MDL context as a case management exercise, recognizing an additional source of authority for MDL courts to access common benefit fees and costs that "comes from the inherent 'managerial' power over the consolidated litigation."  *In re Cook Medical, Inc., Pelvic Repair* Systems, 365 F. Supp. 3d 685, 695 (MDL No. 2440) (S.D.W.V. 2019) (collecting cases).  *See also In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); *In re Air Crash Disaster at Florida Everglades on December 29,1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977); *In re  Zyprexa Prods. Liab. Litig.* (MDL No. 1596), 467 F. Supp. 2d 256, 265-267 (E.D.N.Y. 2009); *In re Sulzer Hip Prosthesis and Knee Prosthesis Prods. Liab. Litig.*, 268 F.Supp.2d 907 (N.D. Ohio 2003), *affirmed*, 398 F.3d 778 (6th Cir. 2005); *Manual For Complex Litigation* §14.215 (4th ed., Federal Judicial Center 2004).

Various surveys of common benefit assessments in historical and contemporary MDLs have been conducted documenting a wide range of assessments, with many clustering in a range of 4-6%.  *See, e.g.*, Rubenstein, "On What A Common Benefit Order Is, Is Not, and Should Be,"

Class Action Attorney Fee Digest 87 (March 2009); *In re Avandia Marketing, Sales Practices, and Prods. Liab. Litig.* (MDL No. 1871), 2012 WL 6923367 (E.D. Pa. 2012) (surveying cases and awarding 6.25%).  Assessments in the 7%-9% range are not uncommon in contemporary MDLs.  *See, e.g., In re Aqueous Film-Forming Foam Prods. Liab. Litig.*, case no. 2:28-MN-2873, docket no. 72 (D.S.C. Apr. 29, 2019) (9%); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 510 (W.D. La. 2017) (8.6%); *In re Bard IVC Filters Prods. Liab. Litig.*, case no. 2-15-MD-02641, docket no. 372 ( D. Ariz. Dec. 18, 2015) (8%); *see also Bard IVC Filters,* 2018 WL 4279834 at *1; *In re Ivokana Prods. Liab. Litig.*, case no. 3:16-md-02750, docket no. 58 (D.N.J. Mar. 21, 2017) (7%).  In the *Gadolinium MDL*, this Court ordered a 6% assessment (5% fees/1% costs) in the exercise of its case management authority.  *See In re Gadolinium Based Contrast Agents Prods. Liab. Litig.*, case no. 08-GD-50000, docket no. 277 (N.D. Ohio Feb. 20, 2009). These cases provide ample support for a similar assessment in the instant MDL proceedings.

**ACCORDINGLY, it is hereby ORDERED as follows**:

1.      **Application**

This Order applies to all cases and claims now pending, previously or later filed in, transferred to, or removed to, this Court and treated as part of the coordinated proceedings known as *In re: National Prescription Opiate Litigation*, MDL No. 2804.  This Order further applies to: (1) all cases, claims and classes described in paragraph 2.c. of this Order, (2) all parties named in these cases, (3) all attorneys who represent such parties as clients who have cases now pending in, or later filed in, transferred to, or removed to, this Court, and (4) any and all plaintiffs' attorneys and their clients who have relied upon, used, accepted, or have had access to MDL generated work product whether with the express approval of the PEC or not, and (5) all plaintiffs' attorneys with state court cases and/or tolled or unfiled claims who have signed or will sign Participation Agreements with the PEC to share in the work-product of this MDL.

2.     <u>**Common Benefit Assessment and Holdback by Defendants**</u>

    **a.**     All parties in these MDL proceedings and their attorneys, and those described in Paragraph 1 above, who have agreed or agree to settle, compromise, dismiss, or reduce the amount of a claim, or who recovered or recover a judgment (with or without trial) for monetary damages (including compensatory and punitive damages) or other monetary relief (including costs of abatement or costs of other equitable relief) with respect to any Opioids-related claims that have been or could have been brought by, on behalf of, or for the benefit of any of the MDL plaintiffs, are subject to an assessment of the Gross Monetary Recovery (defined below), to be withheld or self-funded by each Defendant and paid into the Common Benefit Fund by each Defendant, as provided herein.

    **b.**     The assessment amount shall be six percent (6%) for common benefit attorneys' fees and one percent (1%) for common benefit costs.  The assessment represents a hold back (*See In re Zyprexa Products. Liab. Litig.*, 467 F.Supp.2d 256, 266 (2d Cir. 2006).

    **c.**     With respect to all cases or claims as to which a settlement is entered into, or a settlement or judgment was or is paid, from and after October 20, 2019, that provides or purports to provide for the satisfaction, release, dismissal or compromise of the Opioids-related claims:  (1) of any or all private, public, or government entity plaintiffs (including Cities, Counties, municipalities, and Indian Tribes) whose cases are components of MDL 2804; (2) of any or all potential members of the Negotiation Class defined in the September 11, 2019 *Order Certifying Negotiation Class and Approving Notice* (Doc # 2591); or (3) that are or are purported to be brought for the benefit of any of the foregoing MDL No. 2804 plaintiffs, every settling Defendant is directed to withhold this 7% assessment (6% fees/1% costs) from the Gross Monetary Recovery; or, in the alternative, to self-fund an additional equivalent amount, depending upon the terms of the particular settlement, and promptly to pay that amount into the Common Benefit Fund. ***For***

*clarification, no assessment is due from a Defendant on any portion of a judgment or settlement in a State Attorney General action that resolves or satisfies that State's own damages claims.*

        **d.**     In measuring the "Gross Monetary Recovery,"

        (1)     Court costs that are to be paid by a settling Defendant shall be excluded.

        (2)     All fixed and certain payments are included, whether characterized as damages, abatement costs, or anything else.  Each defendant may choose to pay the present value of any fixed and certain payments to be made in the future, as if made in an up-front payment. The timing of assessment payments on settlements including future payments is subject to the agreement of the parties and the approval of the Court.

        (3)     The value of non-cash products or services provided by a Defendant shall be included, with the value subject to negotiation for purposes of this assessment.  Any disputes regarding the value of non-cash products or services, or any other aspect of Gross Monetary Recovery, will be resolved by the Court.

        **3.**     **Establishment of Common Benefit Fund**

An interest-bearing account will be established at a financial institution to be determined, under this Court's ongoing jurisdiction, to receive funds from Defendants and to disburse funds to approved recipients as provided in the Protocol Order, this Order, and further Orders of this Court. These funds will be held as funds subject to the direction of this Court and are hereinafter referred to as the "Common Benefit Fund."  No party or attorney has any individual right to any of these funds except to the extent of amounts directed to be disbursed to such person by order of this Court. These funds do not constitute the separate property of any party or attorney and are not subject to garnishment or attachment for the debts of any party or attorney except when and as directed to be disbursed to a specific person as provided by Court order.

     **a.**     The Court will appoint by subsequent order a qualified certified public accountant (the "CPA") to establish this account and act as escrow agent, keep detailed records of all deposits and withdrawals, and to prepare tax returns and other tax filings.  Each Defendant that enters a settlement, funds a judgment, or otherwise resolves a case covered by this Order shall within seven (7) days report in writing to the CPA the gross monetary payments paid, or to be paid, under the resolution.

     **b.**     Upon subsequent Orders of this Court, payments may be made from the Common Benefit Fund to counsel who did or will provide services or incur expenses for the joint and common benefit of plaintiffs in addition to their own client(s), whether those counsel are representing claimants in these MDL proceedings or in state-filed cases, including Attorneys General actions, or are representing the interests of the MDL Plaintiffs in any bankruptcy case concerning or involving any Defendant in these MDL Proceedings.  Such counsel who maintain actions in state court and obtain rulings that inure to the benefit of all plaintiffs, whether in the MDL or in state court, shall be permitted to submit, for common benefit consideration, the time and expenses associated with obtaining such rulings.  Amounts paid to counsel pursuant to private fee agreements must be disclosed so that the Court can ensure amounts counsel may also receive from the Common Benefit Fund are reasonable.

     **c.**     All submissions and applications for common benefit fees and/or costs, whether made by counsel performing such work in the MDL or in state courts, must comply with the procedures, requirements and guidelines of the Protocol Order, which is incorporated herein by reference.  Counsel performing common benefit work in state courts, who have not previously submitted their time and costs under the Protocol Order shall have 45 days to do so from the date of any future settlement to which their work applies.  If an attorney applies for and receives

common benefit treatment, all of the cases in which the attorney and/or his or her law firm are counsel of record are subject to the 7% assessment.[1]  This Court retains the discretion to amend or supplement the Protocol Order, and this Order, as necessary and appropriate to reflect ongoing developments in the litigation.

      **d.**     Payments for Common Benefit fees and/or expenses will not exceed the fair value of the services performed, plus any court-approved multiplier, or the reasonable amount of the expenses incurred.  The total of payments received by an attorney for (i) Common Benefit fees and/or expenses plus (ii) fees and/or expenses from all other sources (e.g. contingent fees) must be reasonable.  Depending upon the total amount of the Common Benefit Fund, amounts paid to counsel may be limited to part of the value of such services and expenses.

      **e.**     No amounts will be disbursed without review and approval by this Court under such mechanism as this Court may deem just and proper under the circumstances.  The Court will later determine whether it will decide disbursement amounts with the help of a Fee Committee, a Special Master, and/or other mechanisms.  Each Defendant's counsel shall provide at least quarterly notice to this Court, or its designee, and to Plaintiffs' Co-Lead Counsel, of the names and docket numbers of the cases for which it has withheld an assessment.  Monthly statements from the escrow agent shall be provided to Plaintiffs' Co-Lead Counsel or designee, Defendant's Liaison Counsel, and this Court or this Court's designee, showing, with respect to the funds controlled by the escrow agent, aggregate amounts of the monthly deposits, disbursements, interest earned, financial institution charges if any, and current balance.

      **f.**     If the Common Benefit Fund exceeds the amount needed to make all

---

[1] By making application for Common Benefit fees or costs, an attorney is automatically eligible for work-product sharing as outlined in the Participation Agreement.

payments of Court-approved costs, fees, and any Court-approved multiplier on any fees, this Court may order a refund to those who have contributed to the Common Benefit Fund.  Any such refund will be made in proportion to the amount of the contributions.

g.      Nothing in this Order shall be deemed to modify, alter, or change the terms of any fee contracts between plaintiffs' counsel and their individual clients.

**4.      <u>Further Proceedings and Continuing Jurisdiction</u>**

a.      This Order is without prejudice to such other assessments of or awards of fees and costs as may be ordered by this Court under Rule 23(h), the common benefit doctrine, or that may be provided by contract between attorneys and clients.  The intent of this Order is to establish, secure, and supervise a fund to promote the purposes and policies of the common benefit doctrine and provide a source for equitable payment of services rendered and costs incurred for the benefit of Opioids plaintiffs.

b.      If all parties to a future settlement agree that exceptional circumstances warrant a departure from the holdback obligations, or other provisions of this Order, they shall submit affidavits thereon and request appropriate relief from this Court.

c.      Any disputes or requests for relief from or modification of this Order will be decided by this Court in the exercise of its continuing jurisdiction over the parties, and its authority and discretion under the common benefit doctrine.

**IT IS SO ORDERED.**

_____
Honorable Dan Aaron Polster

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| _____ | ) | **Case No. 1:17-MD-2804** |
| **IN RE: NATIONAL PRESCRIPTION** | ) | |
| **OPIATE LITIGATION** | ) | **Professor William B. Rubenstein** |
|  | ) | |
|  | ) | |
|  | ) | **REPORT AND RECOMMENDATION** |
|  | ) | **ADDRESSING MOTION FOR** |
|  | ) | **COMMON BENEFIT FUND** |
| _____ | ) | |

Before the Court is Plaintiffs' *Amended* Motion for Entry of Order Establishing Common Benefit Fund.  Doc. #: 3112.  Numerous parties and non-parties have filed oppositions to the motion, Docs. ##: 3181, 3185, 3186, 3189, 3190, 3191, 3192, 3193, 3194, 3195, 3197, 3198, 3209, and the movants have filed a reply, Doc. #: 3212.  Pursuant to my role as expert consultant for the Court, *see* Doc. #: 3218, I recommend that the Court solicit additional briefing from interested parties before issuing a ruling on the motion.  This report explains the reasoning behind that recommendation and sets forth specific questions for further briefing.

A common benefit fee is a type of fee device typically employed in MDLs that consolidate numerous individual cases – each with its own individually-retained plaintiffs' attorney (IRPA) – and authorize a smaller group of attorneys to run the plaintiffs' side of the case as the plaintiffs' steering committee (PSC).  The common benefit fee requires the IRPAs to share a portion of their attorney's fee with the PSC.  (A common benefit fee may be taxed against the recoveries of un-represented settling parties in the same manner.)  In doing so, the common benefit fee solves two inter-related problems: (1) it ensures that the IRPAs are not unjustly enriched by reaping their full contingent fee even though other lawyers are doing some portion of their work, and (2) it simultaneously provides a mechanism for funding those other

1

EXHIBIT
**7**

lawyers' (the PSC's) work.  The intra-lawyer tax is labelled a "common benefit fee," in that it pays for legal work (typically, the PSC's) that "commonly benefited" any settling case.  *See generally* William B. Rubenstein, 5 *Newberg on Class Actions* § 15:112 (5th ed.) (hereinafter *Newberg on Class Actions*).

Ideally, the lawyers in a case of this structure work out the common benefit tax among themselves; if contracting is a viable option, then resort to court-imposed measures is unnecessary.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 29(3)(d) (Am. Law Inst. 2011) ("(3) A beneficiary is liable in restitution only if . . . (d) liability will not impose an obligation that should properly have been the subject of contract between the claimant and the beneficiary.").  Where contracting has not worked – or where it cannot work – PSCs have turned to the courts for common benefit orders.  To demonstrate their entitlement to a common benefit fee, proponents must show that their work "substantially benefited" the cases to be taxed.  *See In re Genetically Modified Rice Litig.*, 835 F.3d 822, 830 (8th Cir. 2016) ("The equitable common-benefit doctrine permits a district court to redistribute costs among plaintiffs when the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.") (internal quotation marks and citations omitted); *In re Diet Drugs*, 582 F.3d 524, 546 (3d Cir. 2009) ("[I]n order to obtain common benefit fees, an attorney must confer a substantial benefit to members of an ascertainable class, and the court must ensure that the costs are proportionately spread among that class.").  The tax is generally calculated in the range of 5% for fees and 2.5% for costs.  5 *Newberg on Class Actions* § 15:117.

If MDLs invariably resulted in a single aggregate settlement in the MDL forum, assessing common benefit fees would be straightforward and would parallel, in many ways, the assessment of a class action fee at the conclusion of a common fund class action case.  The problem in MDLs of this type is that, because there are so many lawyers and clients, large and small satellite settlements may arise throughout the course of the MDL – and often in advance of (or instead of) an aggregate settlement.  This raises a timing issue: if a common benefit assessment is appropriate, it may need to be levied prior to an aggregate settlement, lest satellite settlement monies be distributed and then lie outside the reach of a later levy.  MDL courts have solved this timing problem by developing a two-stage common benefit fee process.  At the first stage, a common benefit fee is assessed against early settlements and the monies are placed in an escrow account.  The mechanism for effectuating the monetary transfer from the IRPAs (or their settling clients) to the escrow fund is typically an order from the Court requiring that a defendant settling any case "hold back" a certain percentage of the settlement for this purpose.  *Id.* at § 15:115.[1]  At the second stage, usually after the PSC has reached an aggregate settlement, common benefit fees are distributed from the escrow fund via a normal fee application, with any excess funds being returned to the taxed parties.  *Id.*

The present motion is a first stage – assessment – motion, seeking a common benefit assessment of 7% (6% fees, 1% costs).  Doc. #: 3112 at 3.  The Plaintiffs' Executive Committee ("PEC") argues that it has worked tirelessly over a two-year period, at enormous financial and personal cost, and that its many efforts have served to move the litigation forward.  Doc. #: 3212

---

[1] This Court entered such a holdback order at the time of the initial bellwether settlements in this matter, though it ordered that the plaintiffs themselves direct the monies to an escrow fund.  *See* Order Regarding Track One Settlement Funds, Doc. #: 2980 at 1-2 (ordering, so as "ensure that any eventual common benefit assessment remains payable from settlement funds," that "the Track One Plaintiffs shall place into escrow 7.5% of any settlement funds they receive or received from any defendant").

at 3 (stating that the common benefit work includes "taking 550 depositions; serving 330 third party subpoenas; developing scores of experts; briefing and prevailing on multiple motions to dismiss and motions for summary judgment; preparing for multiple bellwether trials; and analyzing over 162 million pages of documents," and stating that the common benefit lawyers have expended "over 1.2 million hours of their time," and have paid "nearly $100 million" to "fund the common benefit work.").[2]  Essentially, the PEC contends that all of the time and money its members have invested have helped clarify factual and legal issues and helped establish the groundwork from which settlements might emerge.  Even opponents of the proposed assessment acknowledge some of these facts.  *See, e.g.*, Doc. #: 3192 at 2 ("[T]he Opposing Governmental Plaintiffs do not gainsay the value of the work that the Plaintiffs' Executive Committee (the 'PEC') and other plaintiffs' counsel have completed in the present multidistrict litigation (the 'MDL'). These attorneys are entitled to just compensation for their important work.").  The PEC has undertaken this work on a contingent basis, of course, meaning it may ultimately receive no compensation for those efforts.  Nonetheless, given the common benefit work to date (coupled with many other factors), it is not implausible that: (1) even absent a global settlement, one or more defendants could settle with single plaintiffs or groups of plaintiffs, and (2) the PEC's common benefit work will have significantly contributed to those outcomes, thereby conferring a "substantial benefit" and entitling the PEC to a common benefit fee.  That possibility, the PEC argues, demonstrates that a common benefit assessment order is timely.

---

[2] Some opponents point out that the moving papers, at present, proffer no factual support for any of these statements.  *See, e.g.*, Doc. #: 3189 at 5.  To the extent that the movants aim to demonstrate factually that their efforts have substantially benefited the many satellite cases they seek to tax, and the time and costs expended to achieve that end, the record would be stronger if their legal arguments were substantiated with proper supporting affidavits or documents.

Yet, my recommendation is that the Court proceed cautiously with respect to this request. This MDL is truly unique and, as with many aspects of this litigation, the present common benefit motion tests uncharted waters.  Four factors are of note.

*First*, the fee application comes in advance of any aggregate settlement.  This fact alone is fairly normal, as described above.  But in that normal situation, the Court levying the fee envisions that, if a future aggregate settlement is to take place, it is highly likely that the PSC will have created it and the MDL court will be the forum in which it is effectuated.  What is unique here is that it is entirely unclear at this point if an aggregate settlement is feasible, what structure it might take, which defendants will settle, what role this forum will play in it, and whether the settlement structure will require a "common benefit fee" approach to ensuring that these PEC's lawyers are compensated for their efforts.

*Second*, to the extent that the present motion aims to tax satellite settlements, those too differ from the typical MDL.  In the typical case, there are many plaintiffs and one or a few defendants.  Here, there are numerous different types of plaintiffs (cities, counties, tribes, hospitals, third-party-payors, and so on) and dozens and dozens of different defendants involved in distinct aspects of the pharmaceutical chain (manufacture, distribution, retail sale, etc.).  The permutations of possible settlements – and settlement types – are staggering.  A single common benefit assessment levied on multiple different types of settlements involving many different types of plaintiffs and multiple defendants runs the risk of being too crude an approach.

*Third*, the fact that most of the satellite settlements the PEC seeks to tax involve cases brought by state, county, city, or tribal governmental entities presents another unique factor that may pose difficult legal questions.

*Fourth*, the Court is being asked to rule on this motion while complex, multi-party aggregate settlement negotiations are underway and, as many opponents to the motion warn, any ruling from this Court concerning either a fee entitlement or calculation level could significantly impact those negotiations.  Indeed, the warnings are dire:  the National Association of Attorneys General suggests a common benefit fee might "disrupt" settlement progress "irreparably," Doc. #: 3181 at 1; the Defendants argue that a common benefit order would "seriously jeopardize" global settlement possibilities, Doc. #: 3186 at 1; and certain Governmental Plaintiffs contend that the order would "sabotage" global settlement efforts, Doc. #: 3192 at 3.

Cumulatively, these assertions show that the Court is being asked to act on novel legal issues in a state of factual uncertainty.

Given these difficult competing concerns, I recommend that the Court seek additional information to assist in its consideration of these complex issues.  Below, I identify five specific issues and set forth specific questions for further briefing on each issue.  I recommend that the Court issue an Order (a) requiring that the movants submit a brief addressing all five of the issues set forth below and (b) inviting any other interested party to submit a brief addressing any or all of these issues.

1.      The public record reflects that a global settlement may encompass a separate pot of money dedicated solely to attorney's fees.  *See, e.g.*, Doc. #: 3192 at 3 ("[I]t should be obvious from what has been publicly disclosed that any multi-billion-dollar resolution spearheaded by the Attorneys General would necessarily entail requests by the Distributor Defendants and Johnson & Johnson for broad releases and the resolution of claims for attorneys' fees, including by the MDL counsel. For that reason, the Proposed Order is unnecessary to protect the interests of the

MDL PEC or to reach a fair allocation of the available total fees among counsel prosecuting these cases in different jurisdictions.").

The Court should invite briefing on the following question:

**Q1:   (a) How likely is it that a global settlement will have specific funds to compensate all attorneys in these matters such that the Court will not need to render a common benefit order? (b) Can the Court simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks and, if not, why not?**

2.      Following the initial bellwether settlements, with the cooperation of the underlying attorneys, this Court entered an order that the settling parties escrow 7.5% of their recoveries in anticipation of a future common benefit order.  Doc. #: 2980.  As the parties are aware, other exemplary cases are scheduled for trial in federal courts throughout the country.  As noted above, court-ordered common benefit assessments are necessary only when the lawyers cannot voluntarily reach agreement among themselves.

The Court should invite briefing of the following question:

**Q2:   (a) How likely is it that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution?   (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement and how they might be resolved.**

3.      Some opponents of this request note that the PEC could attempt to enter agreements with state court plaintiffs as well.  Doc. #: 3191 at 10 ("Before the MDL Plaintiffs are permitted to exact a 7% tax on any state court recovery or settlement, the MDL Plaintiffs should have to obtain the written consent of state court plaintiffs to contribute to the common benefit fund. . . . If the MDL Plaintiffs want to condition the sharing of work product or anything else on a state court plaintiff's agreement to contribute to the common benefit fund, the MDL Plaintiffs should have to lay out the terms of the deal in writing and obtain written consent.").  Moreover, other parties propose that, in lieu of a common benefit assessment on state court

settlements, which raises significant federalism concerns, the PEC could simply seek a lien against those cases in state court.  Doc. #: 3192 at 11 ("To the extent that local counsel proceed to litigate individually in state court, the MDL is free to assert an 'attorneys lien' in state court to compensate them for the benefits conferred and costs saved to local counsel. The proper amount of such compensation will likely vary by circumstance. Relevant factors may include (i) the usefulness of the MDL attorney's work to the prosecution of a state court case, (ii) state court counsel's own costs and time spent prosecuting the case, and (iii) the total amount of attorney fees made available in that jurisdiction. State courts recognize that counsel should be paid for their contribution to successful litigation, and can be trusted to make it happen.").

The Court should invite briefing of the following question:

**Q3:  (a) How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution?  (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.**

4.      Percentage-based fee awards are a function of two data points – the percentage assessed and the amount it is a percentage of.  My empirical data from 35 fee assessments and 26 cost assessments show that the average assessment is 4.99% for fees and 2.49% for costs (about 7.5% altogether), and the median assessment is 4% for fees and 2% for costs (about 6% altogether).  5 *Newberg on Class Actions* § 15:117.  The PEC's request of 6% for fees and 1% for costs (7% altogether) is therefore, in total, just below the mean and just above the median.  Yet empirical data strongly demonstrate that percentage-based attorney's fees decrease as settlement values increase.  *Id*. at § 15:81.  Potential settlements in this matter could be enormous.  *See, e.g*., Doc. #: 3186 at 2 ("[A] 7% share of the settlement framework announced in October 2019 would exceed $3.3 billion. And that would be just the beginning: the PEC will

8

attempt to recover additional fees under contingency agreements, to say nothing of the amounts that other plaintiffs' counsel will demand.").

The Court should invite briefing of the following question:

**Q4:    (a) How should a common benefit assessment account for the potential size of the taxed settlements, if at all? (b) Does the PEC's proposed 7% common benefit assessment properly account for the potential size of settlements in this matter?  If so, explain how.  If not, explain how it should be adjusted to do so.**

5.    Some opponents of the common benefit assessment point out that the IRPAs' underlying contingent fee agreements are with public entities, often at below-market rates.  *See, e.g.*, Doc. #: 3192 at 9 & n.4 ("[A]ssessments under the Proposed Order are potentially excessive and, if charged to local counsel, will dramatically and unfairly reduce their contracted for contingency rates. [FN4] Many of the firms signing this letter entered contingency contracts with their public entity clients at rates far less than they would charge private clients."); *id*. at 10 ("Unlike the ordinary contingency litigation involving private plaintiffs, if there were to be a global settlement here, local counsel will receive nowhere near the typical attorney fee contingencies (30-33 1/3%), as against which the 7% assessment would be applied.").

The Court should invite briefing of the following question:

**Q5:    (a) How should a common benefit assessment account for the size of the underlying IRPA's contingent fee, if at all?  (b) Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPAs' contingent fee contracts?  If so, explain how.  If not, identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence.**

* * *

It is my recommendation that the Court (a) direct that the movants submit a brief no more than 25 pages in total length addressing all of these issues and (b) invite any other interested entity (whether or not a formal party within this MDL) to submit a similarly-limited brief

addressing any or all of these issues.  After the Court has received and reviewed these responses, it will be in a better position to issue a ruling on the outstanding motion, as necessary.

As this report and recommendation concludes my assignment at this time, I ask that the Court provide notice to the parties that my work in this matter has ended as of the Order date.  If the Court would welcome my assistance again, as the MDL progresses, I would of course be honored to be re-retained at that time.

Respectfully submitted,

*/s/ William B. Rubenstein*
**WILLIAM B. RUBENSTEIN**

**Dated:  June 3, 2020**

10

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*County of Harris v. Purdue Pharma, et al.*, Case No. 1:18-op-45677-DAP | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

## COUNTY OF HARRIS' BRIEF IN RESPONSE TO PROFESSOR RUBENSTEIN'S REPORT AND RECOMMENDATION

EXHIBIT

**8**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................................1

FACTUAL BACKGROUND AND RECENT DEVELOPMENTS............................................2

ARGUMENT............................................................................................................................6

    I.   One Obstacle to Harris County Agreeing to a Common Benefit Order Is that This Court Does Not Have Subject Matter Jurisdiction over Harris County's Case. ...................................6

        A.    In the absence of federal subject matter jurisdiction, this Court cannot adjudicate attorney fees. ............................................................................................7

        B.    Substantial federalism concerns further compel the conclusion that the PEC cannot be rewarded for undermining the *In re Texas Opioid Litigation* MDL. ..........9

    II.   Another Obstacle to Harris County Agreeing to Pay the PEC Is that the County Does Not Owe Anything to the PEC. ...................................................................................................10

    III.  The Lien Approach Is Not an Appropriate or Viable Alternative Allowing the PEC to Be Paid for Settlements and Judgements of Harris County's Case...............................................12

REQUEST FOR HEARING ....................................................................................................15

CONCLUSION.......................................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alabama v. Bozeman*,
    533 U.S. 146 (2001) .................................................................................................7

*Am. Telecom Co. v. Republic of Lebanon*,
    501 F.3d 534 (6th Cir. 2007) ...............................................................................8

*Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*,
    934 F.3d 876 (8th Cir. 2019), *cert. denied,* No. 19-656, 2020 WL 3146690
    (U.S. June 15, 2020)...............................................................................................7

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) .............................................................................................8

*Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human
    Res.*,
    532 U.S. 598 (2001) ...........................................................................................10

*County of Harris v. Purdue Pharma, L.P. et al*,
    No. 2017-83618 (133 Jud. Dist., D.C. Tex. Dec. 13, 2007)..................................6

*County of Harris v. Purdue Pharma, L.P., et al*,
    No. 4:18-cv-00490 (S.D. Tex. Feb. 20, 2018) ......................................................6

*Curry v. Del Priore*,
    941 F.2d 730 (9th Cir. 1991) .............................................................................14

*Davis v. Detroit Pub. Sch. Cmty. Dist.*,
    899 F.3d 437 (6th Cir. 2018) ...............................................................................8

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*,
    941 F.2d 1217 (D.C. Cir. 1991) ........................................................................15

*In re Distributors*,
    No. 19-0783 (Tex. Oct. 18, 2019)........................................................................3

*In re Distributors, Relators*,
    No. 01-19-00550-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019) ................3

*Fort Bend Cty., Texas v. Davis*,
    139 S. Ct. 1843 (2019) ......................................................................................8, 9

*Franklin v. Peterson*,
    878 F.3d 631 (8th Cir. 2017) ...............................................................................7

*Gonzalez v. Thaler,*
   565 U.S. 134 (2012) ........................................................................................8, 9

*Gravel v. Am. Leadership Project,*
   249 F.R.D. 264 (N.D. Ohio 2008)......................................................................8

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ..........................................................................................9

*Healy v. Ratta,*
   292 U.S. 263 (1934) ..........................................................................................9

*Kalyawongsa v. Moffett,*
   105 F.3d 283 (6th Cir. 1997) ..........................................................................14

*Key Tronic Corp. v. United States,*
   511 U.S. 809 (1994) ........................................................................................10

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ..........................................................................................8

*Loren v. Blue Cross & Blue Shield of Mich.,*
   505 F.3d 598 (6th Cir. 2007) ............................................................................7

*Madeksho v. Abraham, Watkins, Nichols & Friend,*
   112 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en
   banc) ...............................................................................................................15

*Ex parte McCardle,*
   7 Wall. 506, 19 L.Ed. 264 (1868) .................................................................7, 8

*Permanent Mission of India to the United Nations v. City of New York,*
   551 U.S. 193 (2007) ........................................................................................13

*Peter v. Nantkwest, Inc.,*
   140 S. Ct. 365 (2019) ......................................................................................10

*Printz v. United States,*
   521 U.S. 898 (1997) ..........................................................................................9

*In re Purdue Pharma, L.P.,*
   No. 19-0785 (Tex. Oct. 18, 2019) .....................................................................3

*In re Purdue Pharma LP, et al., Relators,*
   No. 01-19-00551-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019) .................3

*Shamrock Oil & Gas Corp. v. Sheets,*
   313 U.S. 100 (1941) ..........................................................................................9

*Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.*,
549 U.S. 422 (2007) ...................................................................................8

*Smith v. State*,
490 S.W.2d 902 (Tex. Civ. App.—Corpus Christi 1972), *writ refused NRE*
(Apr. 25, 1973)..........................................................................................15

*State by and through Tennessee Gen. Assembly v. U.S. Dep't of State*,
931 F.3d 499 (6th Cir. 2019), pet. docketed (March 17, 2020) ...............8

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ................................................................................7, 8

*Syngenta Crop Prot., Inc. v. Henson*,
537 U.S. 28 (2002) ....................................................................................9

*Tarrant Cty. Hosp. Dist. v. Jones*,
664 S.W.2d 191 (Tex. App.—Fort Worth 1984, no writ) ......................15

*TC Power Ltd. v. Guardian Indus. Corp.*,
969 F. Supp. 2d 839 (E.D. Mich. 2013) .................................................14

*In re Texas Opioid Litig.*,
No. 18-0358 (Tex. MDL Panel June 13, 2018) .......................................2

*In re Texas Opioid Litig.*,
No. 18-0358 (Tex. MDL Panel Sept. 5, 2018).........................................2

*Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of
Adjustment, Cent. Region*,
558 U.S. 67 (2009) ....................................................................................7

*United States v. Kentucky Home Mut. Life Ins. Co.*,
292 F.2d 39 (6th Cir. 1961) ...................................................................14

*Youghiogheny & Ohio Coal Co. v. Vahalik*,
970 F.2d 161 (6th Cir. 1992) .................................................................14

**Statutes & Rules**

5 U.S.C. § 552(a)(4)(E) ...............................................................................10

28 U.S.C. § 1407...........................................................................................10

28 U.S.C. § 1447(c) .......................................................................................7

Fed. R. Civ. P. 23 .........................................................................................11

Tex. Gov't Code §§ 74.161 -74.163 .............................................................9

iv

**Other Authorities**

7 Am. Jur. 2d Attorneys at Law § 320 .........................................................................................13

Black's Law Dictionary 941 (8th ed. 2004)..............................................................................13

Charles Silver, Geoffrey P. Miller, *The Quasi-Class Action Method of Managing
   Multi-District Litigations: Problems and a Proposal,* 63 VAND. L. REV. 107,
   120 (2010)...................................................................................................................10

### INTRODUCTION AND SUMMARY OF THE ARGUMENT

Harris County files this Brief without waiver of its challenge and objections to jurisdiction. In his Report and Recommendation to the Court, Professor William B. Rubenstein identifies what the Plaintiffs' Executive Committee (PEC) must show to succeed in its demand for a share of attorney's fees in opioid litigation: "To demonstrate their entitlement to a common benefit fee, proponents must show that their work 'substantially benefitted' the cases to be taxed."[1] Professor Rubenstein has reported to the Court that "no factual support" in the form of any "supporting affidavits or documents" were filed by the PEC to legitimize their argument that satellite cases received any substantial benefit from the PEC's efforts.[2] The PEC simply demanded an order diverting potentially billions of dollars to them without proof. Professor Rubenstein also reported that the PEC's motion was met with "dire" "warnings" to the effect that acceding to the PEC's demand might "'disrupt' settlement progress 'irreparably,'" "would 'seriously jeopardize' global settlement possibilities," and "would 'sabotage' global settlement efforts."[3] Thus, the PEC's unsubstantiated demand jeopardized settlement efforts occurring outside of this case. The PEC cannot possibly meet the substantial benefit standard.

The County of Harris, Texas, is an interested party opposed to the entry of the PEC's Amended Motion for Entry of Order Establishing Common Benefit Fund. [Doc. #: 3112]. This brief is filed pursuant to this Court's Order. [Doc. #: 3320].

---

[1]  Report and Recommendation Addressing Motion for Common Benefit Fund (hereinafter R&R), p. 2 [Doc. #: 3319, PageID #: 494888].

[2]  R&R, p. 4 n. 2 ("Some opponents point out that the moving papers, at present, proffer no factual support for any of these statements. *See, e.g.,* Doc. #: 3189 at 5. To the extent that the movants aim to demonstrate factually that their efforts have substantially benefited the many satellite cases they seek to tax, and the time and costs expended to achieve that end, the record would be stronger if their legal arguments were substantiated with proper supporting affidavits or documents.") [Doc. #: 3319, PageID #: 494890].

[3]  R&R, p. 6 (internal citations omitted) [Doc. #: 3319, PageID #: 494892].

Harris County responds to Professor Rubenstein's Question 3, and provides a relevant factual update bolstering the substantial federalism concerns that are an obstacle to granting the PEC's request. Harris County is included in the recent Texas settlement, which falls within the jurisdiction of the Texas State Court MDL (Factual Background *infra*). Harris County owes no money to the PEC because the PEC was, if anything, an obstacle to that settlement—much less can the PEC show that it conferred a substantial benefit (Factual Background, Argument § II *infra*). Independently, both the substantial federalism concerns noted by Professor Rubenstein and the strict limitations on federal subject matter jurisdiction are obstacles to the PEC's overreaching fee demand (Argument § I *infra*).  These obstacles to granting the PEC's common benefit demand cannot be overcome by renaming the common benefit award a "lien" (Argument § III *infra*).

## FACTUAL BACKGROUND AND RECENT DEVELOPMENTS

On June 13, 2018, the Texas Multidistrict Litigation Panel established the Texas MDL, *In Re Texas Opioid Litigation*, No. 18-0358.[4] The Honorable Robert Schaffer, Judge of the 152nd Judicial District Court, Harris County, Texas, was appointed to preside over the State's MDL.[5] This proceeding includes claims brought by more than 43 Texas counties, and the Texas Attorney General, against numerous defendants.

The parties to the State of Texas' *In Re Texas Opioid Litigation* have heavily litigated the claims of Texas governmental entities for years without any assistance from the PEC. Since his appointment, Judge Schaffer has not only presided over pre-trial motions and discovery, but has

---

[4] Exhibit 1, Order of Multidistrict Litigation Panel, *In re Texas Opioid Litig.*, No. 18-0358 (Tex. MDL Panel June 13, 2018).
[5] Exhibit 2, Order of Multidistrict Litigation Panel, *In re Texas Opioid Litig.*, No. 18-0358 (Tex. MDL Panel Sept. 5, 2018).

set three bellwether cases for trial. Dallas and Bexar County are set for trial on April 12, 2021.[6] Arduous trial preparation has been ongoing in Judge Schaffer's court, including several hearings resolving substantive Texas state law issues, and ongoing regularly scheduled status conferences and resolution of scores of discovery disputes.[7] The Texas litigants maintain a document depository and are reviewing documents produced by defendants in the Texas state litigation. The manufacturer defendants moved to dismiss the Texas Counties' claims, and after voluminous briefing and oral argument, Judge Schaffer denied this motion. The distributor defendants' dismissal motion suffered the same fate. Both sets of motions challenged the viability of claims under Texas law, and the hundreds of pages of legal briefing called upon Judge Schaffer to resolve Texas state law issues. Both orders were unsuccessfully challenged in the Texas Court of Appeals in Houston, and that failing, to the Texas Supreme Court, which also denied the defendants' writ requests.[8] All of these proceedings have followed Texas state law, and the PEC has had no productive involvement in any of the litigation over which Judge Schaffer has presided for years.

On May 28, 2020, the Texas Attorney General announced the successful negotiation of an agreement entitled Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet, (hereinafter "Term Sheet"), between it and lawyers representing Texas political

---

[6] Exhibit 3, 1st Am. Bellwether One Docket Control Order, *In re Texas Opioid Litig*., No. 18-0358 (152nd Jud. Dist., Tex. March 31, 2020) (setting Dallas and Bexar Counties for trial). Kendall County will be the Defendants' trial pick.

[7] *See* Exhibit 4, Docket Sheet, *In re Texas Opioid Litig*., No. 18-0358.

[8] Exhibit 5, Memorandum Opinion, *In re Distributors, Relators*, No. 01-19-00550-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019); Exhibit 6, Memorandum Opinion, *In re Purdue Pharma LP, et al., Relators*, No. 01-19-00551-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019); Exhibit 7, Texas Supreme Court Orders Pronounced October 18, 2019, denying *In re Distributors*, No. 19-0783 (Tex. Oct. 18, 2019), and *In re Purdue Pharma, L.P*., No. 19-0785 (Tex. Oct. 18, 2019).

3

subdivisions, concerning the division of future settlement proceeds and attorneys' fees.[9] Driven by the progress of ongoing discussions with certain defendants concerning settlement, the parties have agreed that the proceeds of any settlement will be directed 15% to the State of Texas through the office of the Texas Attorney General, 15% to the political subdivisions, and 70% to an opioid council to be established to disburse the money throughout the State for opioid treatment and abatement. In addition, a separate fund for payment of attorneys' fees will be established from which the lawyers representing political subdivisions will be paid. This is the first agreement of its kind in the nation and illustrates how much farther along Texas is toward an aggregate settlement. It is likely this Term Sheet will serve as a template for similar agreements in other states.

The entire process will be administered by Judge Shaffer through the Texas MDL.  He will have jurisdiction to resolve any complaints associated with the disbursement of funds, attorneys' fees,  or any other issues that might arise.  It is reasonable to assume that he may also direct that a common benefit fund be established to pay the Texas lawyers,  who have been engaged in arguing and briefing motions applying substantive Texas law, and discovery proceedings under Texas Rules of Procedure, all of which have facilitated the settlement of the cases under his care. It is easy to imagine the disruption created by a federal court order taxing such settlements for common benefit fees, (whether designated an "assessment" or "lien"), where Judge Schaffer may have issued a similar order affecting those very cases.  The major difference, of course, is that Judge Shaffer would actually have jurisdiction to issue such an order.

---

[9]   Exhibit 8, Term Sheet. *See also* Press Release, Texas Attorney General Ken Paxton, AG Paxton Reaches Bipartisan Agreement with Texas Counties and Cities in Preparation for Settlement with Opioid Defendants (May 28, 2020), available at https://www.texasattorneygeneral.gov/news/releases/ag-paxton-reaches-bipartisan-agreement-texas-counties-and-cities-preparation-settlement-opioid (last visited June 17, 2020).

This agreement was negotiated by the office of the Texas Attorney General along with lawyers for the Texas political subdivisions. Fifteen percent of the proceeds of any settlement will be paid to the Texas Attorney General. This Court has no authority to assess or impose any lien on those proceeds, and has recognized that limitation in at least two prior orders.[10]

The agreement also includes Texas political subdivisions that were wrongfully removed to the federal MDL and which have languished there for up to two years without a ruling on their motions to remand.  The most egregious circumstances involve Harris County, Texas.  No Texas statewide settlement can be reached without Harris County, the largest in Texas and the third largest in the nation.[11] The Texas Attorney General has for that reason included Harris County, (and other Texas counties wrongfully removed), in the negotiation of the Term Sheet. An assessment or lien by this Court on the settlement proceeds earmarked for Harris County, despite the Court's lack of jurisdiction over the underlying case, could jeopardize the Term Sheet agreement negotiated by the Texas Attorney General.

This Court has recognized the importance of the involvement of state attorneys general in state proceedings, "because their participation is critical if there is to be any global resolution."[12] The Texas Attorney General, and lawyers for the Texas political subdivisions have been engaged in serious discussions with certain defendants, creating the Term Sheet to establish a protocol for the receipt and distribution of settlement proceeds. As of this writing, Texas and Ohio are the

---

[10] *See*  Order of 1/24/18 [Doc. #:94, PageID #: 523] ("the Court recognizes it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations"); Order of 2/27/18 [Doc. #: 146, PageID #: 806] ("The Court recognizes it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting.").

[11]  *See* https://www.census.gov/newsroom/press-releases/2020/pop-estimates-county-metro.html; https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/popest/popest-table1.png.

[12]  Order of 2/27/2018 [Doc. #: 146, PageID #: 806].

only states that have done so and Texas alone enjoys the benefit of a mature state MDL proceeding through which settlement can be effectuated.  If global resolution of the opioid litigation is the goal of this Court, then the sensible course would be to lift the moratorium and remand Harris County, and the other Texas cases wrongfully removed, to the Texas MDL, (without assessment or lien), for participation in any  upcoming resolution of these cases.

### ARGUMENT

> **Q3:  (a) How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution?  (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.**

## I.  One Obstacle to Harris County Agreeing to a Common Benefit Order Is that This Court Does Not Have Subject Matter Jurisdiction over Harris County's Case.

Harris County brought its suit in the 133rd Judicial District Court of Harris County, Texas, in 2017.[13] Notwithstanding a wholesale lack of federal subject matter jurisdiction, three of the dozens of defendants removed the case to the United States District Court for the Southern District of Texas, Houston Division (Case No. 4:18-cv-004590) on February 15, 2018.[14] Certain that federal jurisdiction was lacking, Harris County filed its motion to remand a mere five days later, on February 20, 2018.[15] More than two years later, that motion to remand remains pending.

After refusing to help Harris County secure a remand, the PEC cannot benefit by collecting a tax on Harris County's recovery. The PEC's obstructionist behavior threatened rather than substantially benefited the Texas settlement. That Harris County's case is stalled in a

---

[13]  *See* Plaintiff's Original Petition, *County of Harris v. Purdue Pharma, L.P. et al*, No. 2017-83618 (133 Jud. Dist., D.C. Tex. Dec. 13, 2007) [1:18-op45677-DAP, Doc. #: 144-3].
[14]  Distributor Defendants' Notice of Removal [1:18-op-45677-DAP, Doc. #: 114-2].
[15]  Exhibit 9, Motion to Remand and Brief, *County of Harris v. Purdue Pharma, L.P., et al*, No. 4:18-cv-00490 (S.D. Tex. Feb. 20, 2018) [1:18-op-45677-DAP, Doc. #: 114-4].

court lacking subject matter jurisdiction is no substitute for the substantial benefit test that the PEC must meet.

### A. In the absence of federal subject matter jurisdiction, this Court cannot adjudicate attorney fees.

No federal statute, no federal rule, no controlling authority, and no apposite practice justifies the PEC's fee demand (*see* §II *infra*). There is, however, an abundance of controlling authority compelling the return of Harris County's case to state court and forbidding any federal ruling beyond a remand order.

Pursuant to the black letter of federal law, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case **shall** be remanded." 28 U.S.C. § 1447(c) (emphasis added). The use of the word "shall" is mandatory.[16]

Remand of a case upon the exposure of a jurisdictional defect is not only a statutory mandate, but it is also the outcome decreed in controlling jurisprudence. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868); *see also Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 84 (2009) (parenthetically quoting *Steel*); *Loren v. Blue Cross & Blue Shield of Mich*., 505 F.3d 598, 607 (6th Cir. 2007) (quoting *Steel*). "[J]urisdiction . . . is always our first and fundamental question." *Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*, 934 F.3d 876, 880 (8th Cir. 2019), *cert. denied,* No. 19-656, 2020 WL 3146690 (U.S. June 15, 2020) (quoting *Franklin v. Peterson*, 878 F.3d 631, 635 (8th Cir. 2017)). "As a threshold matter, this Court must determine whether it has subject matter jurisdiction over the

---

[16]   *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily 'the language of command.'") (citation omitted).

lawsuit." *Gravel v. Am. Leadership Project*, 249 F.R.D. 264, 265 (N.D. Ohio 2008) (citing *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007)).

To the degree that the PEC intends that this Court impose a fee order or lien upon a case without subject matter jurisdiction, this jurisdictional overreach would stand in defiance of controlling precedent. "When a court lacks jurisdiction, it '**cannot proceed at all** in any cause.'" *State by and through Tennessee Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019), pet. docketed (March 17, 2020) (quoting *Steel*, 523 U.S. at 94 (quoting *McCardle*, 74 U.S. at 514)) (emphasis added).[17] "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, . . . which is not to be expanded by judicial decree," and "[i]t is to be presumed that a cause lies outside this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). "Unlike most arguments, challenges to subject-matter jurisdiction may be raised by the defendant 'at any point in the litigation,' and courts must consider them *sua sponte*." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)). *See also Arbaugh v. Y&H Corp*., 546 U.S. 500, 514 (2006) (Federal Courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.") (citation omitted). Therefore, a ruling cannot be made in Harris County's case because there is no subject matter jurisdiction in the first instance.

---

[17]  *See also Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp*., 549 U.S. 422, 430–31 (2007) ("a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)") (citing *Steel*, 523 U.S. at 93—102); *Davis v. Detroit Pub. Sch. Cmty. Dist*., 899 F.3d 437, 445 (6th Cir. 2018) ("Without jurisdiction the court cannot proceed at all in any cause.") (parenthetically quoting *Steel*, 523 U.S. at 94 (quoting *McCardle*, 74 U.S. at 514)).

**B. Substantial federalism concerns further compel the conclusion that the PEC cannot be rewarded for undermining the *In re Texas Opioid Litigation* MDL.**

The limits on federal subject matter jurisdiction are mandatory in all circumstances, but disregard of jurisdictional limits is all the more troubling where, as here, state sovereignty over its own courts is threatened. The Texas State Legislature enacted a state multidistrict litigation procedure engineered to afford efficient pretrial proceedings. *See* Tex. Gov't Code §§ 74.161 - 74.163. Like its federal counterpart, Texas' multidistrict protocol authorizes transfer, by order of a judicial panel, of civil actions involving common questions of fact to a specified district court for consolidated or coordinated pretrial proceedings where the transfer furthers convenience for the parties and where it will promote just and efficient conduct of the actions. *See* Tex. Gov't Code § 74.162. As explained above, Texas has established an *In re Texas Opioid* Multidistrict litigation, and the Texas settlement falls under the jurisdiction of Texas Judge Schaffer.

Our "system of 'dual sovereignty'" protects the States from encroachment by the federal government. *Printz v. United States*, 521 U.S. 898, 918 (1997) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). "'Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined.'" *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941) (quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934)). The policy underlying removal statutes "is one calling for the strict construction of such legislation." *Shamrock*, 313 U.S. at 108; *see also Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002) (parenthetically quoting same). Just last year, the United States Supreme Court in *Fort Bend* recognized that policing the boundary between state and federal jurisdiction remains the task of every federal judge when the Court reiterated that objections to subject matter jurisdiction must be considered *sua sponte*. *See Fort Bend*, 139 S. Ct. at 1849 (citing *Gonzalez*, 565 U.S. at 141).

9

The limitations on federal subject matter jurisdiction and the sovereignty of state courts would be violated if cases, properly in the state MDL, are subjected to a federal fee order.

## II.     Another Obstacle to Harris County Agreeing to Pay the PEC Is that the County Does Not Owe Anything to the PEC.

Pursuant to the American Rule, attorneys' fees are paid by the party who contracted to pay counsel for their representation.[18] There are statutory exceptions to the American Rule,[19] but when Congress promulgated Title 28, United States Code, Section 1407, Congress omitted any fee-shifting provision allowing payment to MDL counsel.[20] This Congressional inaction alone should give serious pause to an extra-jurisdictional expansion of the common benefit fund practice, if not the practice itself. The Supreme Court said last year that, "Congress must provide a sufficiently 'specific and explicit' indication of its intent to overcome the American Rule's presumption against fee shifting." *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 372 (2019) (citation omitted). Congress omitted an exception to the American Rule in the MDL statute, and the Supreme Court has never stated that the common benefit fund doctrine applies in MDLs.[21]

---

[18] *See Key Tronic Corp. v. United States*, 511 U.S. 809, 814–15 (1994) ("Our cases establish that attorney's fees generally are not a recoverable cost of litigation 'absent explicit congressional authorization.' . . . Recognition of the availability of attorney's fees therefore requires a determination that 'Congress intended to set aside this longstanding American rule of law.'") (citations omitted).

[19] *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 602-03 (2001) (explaining that the "American Rule" is a general practice of not awarding fees to a prevailing party absent explicit statutory authority, and collecting statutory exceptions to American Rule). *Buckhannon* was superseded on other grounds, i.e., amendments to FOIA and the catalyst theory, 5 U.S.C. § 552(a)(4)(E).

[20] *See* 28 U.S.C. § 1407 (omitting fee-shifting provision); Charles Silver, Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal,* 63 VAND. L. REV. 107, 120 (2010) ("The source of an MDL judge's power to remunerate is not obvious . . . . The MDL statute says nothing about fees.") (notes omitted).

[21] *See* Silver and Miller, *supra* note 20, at 109 ("This practice supposedly rests on the common fund doctrine, a creature of the law of restitution which undergirds fee awards in class actions. Yet the Supreme Court has never said the doctrine applies in MDLs").

The statutory omission is compounded by the lack of any rule addressing common benefit fees. Class action fees are allowed in, and policed through, Federal Rule of Civil Procedure 23; no Rule has been promulgated to allow, much less compel, a PEC award to a Committee in Multidistrict Litigation.[22] Exacerbating the lack of statutory authority and the omission of authority in any federal rule, Professor Rubenstein identified four factors distinguishing the PEC's MDL request from the chartered waters of other litigation. R&R, pp. 5-6 [Doc. #: 3319, PageID #: 494891-92]. Thus, the question of what could justify forcing Harris County or its contractually retained counsel to compensate the PEC is no trivial matter.

The only raison d'être that could possibly justify the PEC's demand is that, absent this Court's intervention on the PEC's behalf, the PEC will not receive adequate compensation for its work substantially benefiting parties who have not hired the PEC to represent them. That the PEC must thread its fee demand through the eye of this needle is manifestly clear from Professor Rubenstein's report. The underlying justification for a common benefit award is that "other lawyers are doing some portion of their work," his report explains. R&R, p. 1 [Doc. #: 3319, PageID #: 494887]. Professor Rubenstein identifies what the PEC must show to succeed in its motion: "To demonstrate their entitlement to a common benefit fee, proponents must show that their work 'substantially benefitted' the cases to be taxed." R&R, p. 2 [Doc. #: 3319, PageID #: 494888]. But, as Professor Rubenstein found, the PEC presented "no factual support." R&R, p. 4 n.2 [Doc. #: 3319, PageID #: 494890]. The PEC felt entitled to demand payouts potentially in the billions *without any proof.*

Here, the PEC cannot prove that it substantially contributed to the Texas settlement, over which Judge Schaffer will exercise jurisdiction. The opposite is true. In response to the PEC's

---

[22] *See* Silver and Miller, *supra* note 20, at 120-21 (explaining that the federal class action rule does not provide authority for entry of fee awards in MDLs under the common benefit doctrine).

common benefit motion, which was both factually unsubstantiated and legally unprecedented, many opponents filed "dire" "warnings." *See* R&R, p. 6 (collecting quotes from opposition briefs); *accord id.* at p. 4 n. 2 (explaining lack of factual support), pp. 5-6 (listing four factors that reveal lack of prior apposite precedent) [Doc. #: 3319, PageID #: 494891-93]. The National Association of Attorneys General, certain Governmental Plaintiffs, and the Defendants themselves filed a chorus of disapproval, explaining the threat that the PEC was imposing by filing its motion in this Court. In opposition to the PEC's motion, the dire warnings included: "the National Association of Attorneys General suggests a common benefit fee might 'disrupt' settlement progress 'irreparably,' . . . the Defendants argue that a common benefit order would 'seriously jeopardize' global settlement possibilities, . . . and certain Governmental Plaintiffs contend that the order would 'sabotage' global settlement efforts[.]" R&R, p. 6 (internal citations omitted) [Doc. #: 3319, PageID #: 494892].[23]

Therefore, jurisdiction aside, the PEC cannot meet the substantial benefit test justifying recovery of settlement proceeds where, as here, its efforts only harmed the settlement negotiations.

### III.    The Lien Approach Is Not an Appropriate or Viable Alternative Allowing the PEC to Be Paid for Settlements and Judgements of Harris County's Case.

In his report to this Court, Professor Rubenstein references the proposal advanced by "other parties" to avoid the "significant federalism concerns" associated with a common benefit assessment on state court settlements, through the use of a "lien" against those very cases. R&R, pp. 7-8 [Doc. #: 3319, PageID #: 494893-94]. As quoted in Professor Rubenstein's report, any lien would be brought "in state court" (R&R, p. 8 (parenthetically quoting Doc. #: 3192 at 11));

---

[23] *Cf.* Silver and Miller, *supra* note 20, at 131 ("lead attorneys are fiduciaries who must put the interests of claimants and non-lead lawyers ahead of their own. Recently, however, lead attorneys have used their control of settlement negotiations to increase their compensation").

therefore, the charging lien theory, as it was raised in the brief quoted by Professor Rubenstein, cannot be a vehicle for an order of this Court awarding the PEC compensation. If members of the PEC choose to appear before Judge Schaffer and explain to him how they have garnered recovery in his court, as to justify a lien under Texas law, then that is an issue for another day.

To the extent that the Professor's Query 3(b) asks whether attorney liens could legitimize the PEC's motion soliciting a fee order from ***this Court***, the lien theory is unavailing. As explained above, the obstacle to the PEC's overreaching more than raises the substantial federalisms concern cited by Professor Rubenstein, because the lack of subject matter jurisdiction means the Court cannot issue an order in Harris County's case. Whether described as an "assessment" or "lien," the imposition of either by a federal court on a state court is prohibited. For several reasons, a lien cannot possibly be a vehicle for directing funds to the PEC where, as here, the settlement arose from a state court MDL. Most fundamentally, an attorney charging lien is limited to the suit in which the judgment was recovered. 7 Am. Jur. 2d Attorneys at Law § 320 ("In the absence of a statute or a special agreement, a charging lien does not extend beyond the charges and fees in the suit in which the judgment was recovered."). Therefore, this Court has no authority over recovery, under the guise of a "lien" or otherwise, in cases not properly before the Court. The Texas settlement that has given rise to Harris County's settlement opportunity is before Judge Schaffer's court, not this Court.

Relatedly, a lien by its very nature is tied to the encumbered property.[24] There is no jurisdictional basis for this Court to force payment to a set of lawyers this Court appointed, to

---

[24] *See Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007) (quoting Black's Law Dictionary definitions that, a "lien" was defined as "[a] charge or security or incumbrance upon property" and, concluding that, "The practical effects of a lien bear out these definitions of liens as interests in property."); *see also* Black's Law Dictionary 941 (8th ed. 2004) (defining "lien" as a "legal right or interest that a creditor has in another's property");

work up federal cases, where the settlement commits the *res* to Judge Schaffer's authority and oversight. In *Kalyawongsa v. Moffett*, 105 F.3d 283, 286-87 (6th Cir. 1997), the Sixth Circuit recognized the district court's supplemental jurisdiction to award attorneys' fees where the plaintiffs' lawyer sought recovery for his work in the case before that district court, and looked to state law on the fee issue. The court reasoned that fees are part of "the underlying litigation," and quoted a Ninth Circuit case that, "fee disputes arising from litigation **pending before a district court** fall within that court's ancillary jurisdiction." *Id*. at 287 (quoting *Curry v. Del Priore*, 941 F.2d 730, 731 (9th Cir. 1991)) (emphasis added). A subsequent decision interpreting *Kalyawongsa* did not exercise jurisdiction over an attorneys' lien, even where the asserted lien applied to rights in a settlement of the case pending before that court, where the plaintiffs' counsel sought to recover against the defendants rather than the party plaintiff.[25]

Moreover, even assuming a jurisdictional basis, which is strongly denied, a nationwide "lien" cannot be issued because state law requirements for such a lien have not been met, making the lien theory "too crude an approach."[26] For example, under the operative law in certain

---

*United States v. Kentucky Home Mut. Life Ins. Co*., 292 F.2d 39, 42 (6th Cir. 1961) ("A lien is a charge or encumbrance upon property to secure the payment or performance of a debt, duty, or other obligation.").

[25] *TC Power Ltd. v. Guardian Indus. Corp*., 969 F. Supp. 2d 839, 842 (E.D. Mich. 2013) (even though plaintiffs' attorney was attempting to recover legal fees earned in the litigation, court would not exercise supplemental jurisdiction over fee dispute and found it insufficiently related to the main action, reasoning that plaintiffs' firm was "seeking to recover fees from *Defendants*, based not on any written agreement with Defendants, but instead on claims of having a charging lien and/or third-party beneficiary rights in the Settlement Agreement").

*Cf. Youghiogheny & Ohio Coal Co. v. Vahalik*, 970 F.2d 161, 162 (6th Cir. 1992) (recognizing that jurisdiction over a lien can be distinct from jurisdiction over benefits, court held that the Administrative Law Judge and Benefits Review Board did not have subject matter jurisdiction to enforce lien).

[26] *Cf.* R&R, p. 5 [Doc. 3319, PageID #: 494891] (discussing challenge of different types of settlements and parties).

jurisdictions, attorney's charging liens are asserted against clients, not against other lawyers.[27] Under Texas law, the attorney's lien has been described as a lien that an attorney has over money **actually collected**, and arising from the case **in which the attorney performed services**.[28] At this point, a lien could not possibly be established under Texas law, because there is no money that the PEC collected for Harris County, nor did the PEC perform work in Judge Schaffer's court. In fact, the PEC has only served to harm Harris County's recovery by failing to assist in the remand and, instead, prosecuting the common benefit motion.[29] The PEC does not possibly have a lien over monies Harris County collects as a result of the Texas AG settlement and funds distributed by Texas state Judge Schaffer.

### REQUEST FOR HEARING

Harris County respectfully requests that this Honorable Court conduct a hearing and grant the County an opportunity to be heard on its objection to the imposition of any fee arising from settlement or judgment of Harris County's case. In addition, and/or in the alternative, the County also asks to be heard on its pending remand motion.

---

[27] *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 941 F.2d 1217, 1219 (D.C. Cir. 1991) ("Attorney's liens are asserted by counsel against the client.").

[28] *E.g., Madeksho v. Abraham, Watkins, Nichols & Friend*, 112 S.W.3d 679, 689 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc) (plurality op.) ("After judgment, attorneys who earn a contingency fee are equitable owners (not mere claimants) of their portion of the judgment.") (note omitted); *Tarrant Cty. Hosp. Dist. v. Jones*, 664 S.W.2d 191, 196 (Tex. App.—Fort Worth 1984, no writ) ("It is well settled that an attorney has a lien for attorney's fees on money collected by him for his client."); *Smith v. State*, 490 S.W.2d 902, 910 (Tex. Civ. App.—Corpus Christi 1972), *writ refused NRE* (Apr. 25, 1973) ("to raise the issue of a possessory lien, the attorney must make a demand for the unpaid amount or balance").

[29] Upon information and belief, this point may be better substantiated if the Motion to Unseal filed this day is granted, and the undersigned is allowed access to the closed-door proceedings. *See also* § II *supra*.

15

**CONCLUSION**

The PEC's common benefit motion has instigated a firestorm of controversy for good reason. The PEC demanded potentially billions in fees *sans* proof. The PEC has done nothing to assist the Texas settlement, and if anything threatened the settlement by filing its extra-jurisdictional fee demand. If one group of lawyers is allowed to take a percentage of settlement proceeds arising out of different jurisdictions, without proof, then why cannot Judge Schaffer order that the PEC lawyers who are subject to personal jurisdiction in Texas pay the Texas MDL? Texas is the first and most comprehensive settlement, and Harris County is of the opinion that the PEC is riding on Texas' coattails. Or, for that matter, what about the States that have, unlike the PEC, actually tried opioid cases? Why not force the PEC to pay compensation because of the settlement momentum generated by those trials? There are excellent reasons why the American Rule has survived for as long as it has.

Professor Rubenstein articulated a standard the PEC cannot meet, at least not as to Harris County, that the PEC's work somehow "substantially benefited" Harris County's recovery. (R&R, p. 2). That is one obstacle to any agreement. A second is that this Court lacks subject matter jurisdiction over Harris County's case. If there is a jurisdiction that would allow a "lien" in these circumstances, it is not Texas.  The answers to Professor Rubenstein's Query, as is relevant to Harris County, only compels the conclusion that any common benefit award to the PEC cannot include cases over which there is no federal subject matter jurisdiction in the first instance.

Date: June 23, 2020

| Respectfully submitted, | |
|---|---|
| OFFICE OF HARRIS COUNTY ATTORNEY, VINCE RYAN | */s/ Michael T. Gallagher*<br>THE GALLAGHER LAW FIRM |

16

| | |
|---|---|
| */s/ Vince Ryan*<br>Vince Ryan<br>Harris County Attorney<br>Texas Bar No. 17489500<br>Robert W. Soard<br>First Assistant Harris County Attorney<br>Texas Bar No. 18819100<br>Terence L. O'Rourke<br>Special Assistant Harris County Attorney<br>Texas Bar No. 15311000<br>John W. Odam, Jr.<br>General Counsel<br>Texas Bar No. 15192000<br>Pegi S. Block<br>Assistant County Attorney<br>Texas Bar No. 02498250<br>1019 Congress, 15th Floor<br>Houston, Texas 77002<br>Telephone:  (713) 274-5103<br>Facsimile (713) 755-1553<br>Vince,Ryan@cao,hetx.net<br>Robert.Soard@cao.hetx.net<br>Terence.Orourke@cao.hetx.net | Michael T. Gallagher<br>SDOT Bar No. 5395<br>Texas State Bar No.07586000 Pamela McLemore<br>Texas State Bar No. 24099711 Boyd Smith<br>Texas State Bar No. 18638400 SDOT Bar No.: 8203<br>2905 Sackett Street<br>Houston, Texas 77098<br>(713) 222-8080<br>(713) 222-0066 – facsimile  mike@gld-law.com<br>COUNSEL FOR PLAINTIFF<br><br>Tommy Fibich<br>Texas State Bar No. 06952600 SDOT Bar #: 5482<br>Jay Henderson<br>Texas State Bar No. 09424050 Sara J. Fendia<br>Texas State Bar No. 06898800<br>FIBICH, LEEBRON, COPELAND BRIGGS<br>1150 Bissonnet Street<br>Houston, Texas 77005<br>Telephone:  (713) 751-0025<br>Facsimile:   (713) 751-0030  Email:<br>tfibich@fibichlaw.com<br>COUNSEL FOR PLAINTIFF |
| | Dan Downey<br>Dan Downey, P.C.<br>SDOT Bar # 459<br>Texas State Bar No.  06085400  1609 Shoal Creek Blvd. #100<br>Austin, TEXAS 78701<br>Telephone: (713) 907-9700<br>Dandowney427@gmail.com<br>COUNSEL FOR PLAINTIFF |

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2020, a copy of the foregoing document was served on all counsel of record listed below via the Court's ECF system and/or via U.S. Mail.

   */s/ Micheal T. Gallagher*
Michael T. Gallagher

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION** | ) | **CASE NO. 1:17-MD-2804** |
| **OPIATE LITIGATION** | ) | |
| | ) | **JUDGE POLSTER** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| *"All  Cases"* | ) | |
| | ) | |
| | ) | **ORDER ESTABLISHING** |
| | ) | **COMMON BENEFIT FEE FUND** |
| | ) | **AND DIRECTING CERTAIN** |
| | ) | **PAYMENTS** |

This Order addresses the "hold-back" amounts that the Court ordered the Track One Plaintiffs to place into escrow, and also touches on Common Benefit fees and expenses.

In December of 2019, after several defendants in the Track One trial reached monetary settlements with Plaintiffs Cuyahoga and Summit Counties, the Court directed the Counties to place into escrow a portion of their settlement funds. *See* docket no. 2980.  At that time, the Court explained it was "weighing whether it is appropriate to enter an order addressing the issue of MDL common benefit fees and expenses, and if so, the appropriate 'hold-back' assessment amount;" but the Court "had not reached a decision on these issues."  *Id.* at 1.  Accordingly, the Court directed "the Track One Plaintiffs [to] place into escrow 7.5% of any settlement funds they receive or received from any defendant in this case," from which a common benefit assessment (if any) would later be paid.  *Id.* at 2.  That money – totaling about $21.3 million – has been sitting in escrow ever since.

About a month after the Court's hold-back Order, the Plaintiffs' Executive Committee



**EXHIBIT**
**9**

("PEC") moved for entry of an Order establishing a common benefit fee fund.  After receiving

substantial briefing from dozens of interested parties, and invaluable counsel from expert consultant

Professor William B. Rubenstein, the Court observed:

> there is a wide consensus confirming the accuracy of the PEC's statements that: (1)
> "scores of attorneys from the PEC firms and others" have "performed [work] for the
> common benefit of plaintiffs in the [MDL] proceedings," as well as in other opioid
> cases, reply brief at 3, 1 (docket no. 3212); and (2) those attorneys are entitled to
> some measure of "reimbursement and compensation of expenses and work incurred
> and performed for the common benefit" of those plaintiffs, *id.* at 1.  The Court shares
> in this consensus.

Docket no. 3397 at 2.

Nonetheless, the Court concluded that neither imposing a common benefit assessment or

establishing a common benefit fund was appropriate *at that time*.  *Id.*  Among other reasons, the

Court observed that, "[b]ecause of the inordinate complexity of this MDL, the Court is hesitant to

enter a 'one-size-fits-all' common benefit order applicable by default to every possible settlement

permutation."  *Id.* at 5.  Indeed, the parties agreed it was "likely that a global settlement [would]

provide a separate fund and/or other mechanisms for payment of both common benefit and private

contractual fees and costs," which could "moot the need for a common benefit order."  *Id.* at 4, 3

(internal quotation marks omitted).

The PEC and the Track One Counties have now submitted a motion asking the Court to

allow distribution of the $21.3 Million held in escrow.  *See* docket no. 3762 ("*Agreed Motion*").  The

motion reflects an agreement between the Track One Counties and the PEC, alone, on how the fees

associated with the Track One settlements should be divided amongst them, and asks the Court to

permit that division.  The PEC asks for the following, and the Counties agree:

2

- a 5% Common Benefit Fee assessment against *only* the settlement funds received by Summit and Cuyahoga Counties in the Track One bellwether trial;

- establishment of a Common Benefit Fee fund to receive the 5% Summit/Cuyahoga fee assessment, as well as possible future fee assessments, to be held pending further Orders of this Court.

- a 2.5% Common Benefit Expense assessment against *only* the settlement funds received by Summit and Cuyahoga Counties in the Track One bellwether trial; and

- payment of the 2.5% Summit/Cuyahoga expense assessment to the PEC MDL Capital Account as partial reimbursement of Track One litigation expenses.[1]

- termination of the escrow requirements.

The PEC also makes clear it is *not* seeking a global common benefit order applicable to any other

case.  Specifically, the PEC explains that:

- although it may later seek Orders imposing common benefit fee and expense assessments on future settlements and judgments – and may seek different assessments on different settlements and judgments – the PEC is not requesting any such Orders at this time;

- with regard to any future common benefit Order, the PEC will not seek to make it applicable to settlement proceeds or judgments payable to a State Attorney General, nor to any state court plaintiff that is entirely outside of the Court's jurisdiction (with certain understandable exceptions); and

- with regard to any future common benefit Order, the PEC will not seek to make it applicable to settlement proceeds if the settlement already provides for a separate fund for full payment

---

[1] Regarding the 2.5% expense assessment of $7.1 Million, the PEC asks that it be distributed directly to the PEC MDL Capital Account, instead of first going into the Common Benefit Fund and then being distributed from there.  The Court permits this procedure with the understanding, and upon the condition, that none of this money will be used to reimburse any individual attorney or law firm.  Given the PEC's averments that the $7.1 Million equals only about half of the amount the PEC advanced for expenses in the Track One bellwether case, and that all of these expenses met the Court's requirements, the Court is not overly concerned that these funds would reimburse an attorney for expenses that were not properly incurred.  *See* Declaration of Peter H. Weinberger (docket no. 3761-1); docket no. 358 (Order Regarding Plaintiff Attorneys' Fees and Expenses – Protocol for Work Performed and Expenses Incurred).  Nonetheless, reimbursement to individual counsel of common benefit expenses will occur only after formal application and the expenses are audited and approved. The Court will reconcile the $7.1 Million payment as necessary at that time.

of common benefit fees and expenses (except with respect to plaintiffs who opt out).
*See* docket no. 3765.

The Court appreciates the narrow purpose of the *Agreed Motion* and agrees that the specific requests made are appropriate at this time. Accordingly, the Court now **ORDERS** as follows.

**1.      Establishment of MDL No. 2804 Common Benefit Fund.**

An interest-bearing account will be established at a financial institution to be proposed by the PEC, under this Court's ongoing jurisdiction, to receive the Summit/Cuyahoga assessment and any appropriate future assessments, to be held pending further Orders of this Court. These funds will be held subject to the direction of this Court and are hereinafter referred to as the "Common Benefit Fund." No party or attorney has any individual right to any of these funds except to the extent of amounts directed to be disbursed to that party or attorney by order of this Court. These funds do not constitute the separate property of any party or attorney and are not subject to garnishment or attachment for the debts of any party or attorney except when and as directed to be disbursed to a specific person as provided by Court order.

a.      The Court will appoint by subsequent Order upon PEC recommendation a qualified certified public accountant (the "Common Benefit Fund CPA") to maintain this account and act as escrow agent, keep detailed records of all deposits and withdrawals, and to prepare tax returns and other tax filings.

b.      If the Common Benefit Fund ultimately exceeds the amount needed to make all future payments of Court-approved common benefit fees and expenses, the Court will order the remaining funds be returned to those plaintiffs whose settlements have contributed to the

Common Benefit Fund, including Summit and Cuyahoga Counties.  Any such refund will be made in proportion to the amount of the contributions.

c.        Nothing in this Order shall be deemed to modify, alter, or change the term of any fee contract between plaintiffs' counsel and their individual clients.


**2.        The CT1 Common Benefit Fee Assessment.**

Summit and Cuyahoga Counties shall, within seven (7) days of the Order appointing the Common Benefit Fund CPA, deposit an amount equivalent to five percent (5%) of their recoveries from their bellwether settlement and previously subject to this Court's Order Regarding Track One Settlement Funds (docket no. 2980).  Specifically, a payment of 5% ($14.2 million) of the net monetary recovery received by Summit County and Cuyahoga County will be made as a contribution to the MDL No. 2804 Common Benefit Fund, to be based on each County's share of the total recovery.  The Common Benefit Fund shall be funded from fees charged pursuant to each counties' contract with private counsel.


**3.        Expense Reimbursement.**

Summit and Cuyahoga Counties shall, within seven (7) days of the Order appointing the Common Benefit Fund CPA, pay to the PEC MDL Capital Account an amount equivalent to two-and-a-half percent (2.5%) of their recoveries from their bellwether settlement and previously subject to this Court's Order Regarding Track One Settlement Funds (docket no. 2980).  Specifically, a payment of 2.5% ($7.1 million) of the net monetary recovery received by Summit County and Cuyahoga County will be paid to the PEC MDL Capital Account, to be based on each County's

share of the total recovery.  The unreimbursed portion of these CT1 expenses paid by the PEC may be submitted for payment, as appropriate, from future common benefit assessments ordered by this Court.

**4.      Further Proceedings and Continuing Jurisdiction.**

This Order is without prejudice to any other assessments of or awards of fees and costs as may be ordered by this Court under any jurisdictional mechanism including Rule 23(h), the common benefit doctrine, a Court-approved agreement among the parties to any global or comprehensive settlement with any defendant, or that may be provided by contract between attorneys and clients.

Nothing in this Order precludes the parties from negotiating, agreeing upon, and proposing a different fee structure in a global settlement of claims against any defendant that provides a different fund or mechanism for fairly compensating common benefit work and costs.  Nothing in this Order precludes any party from objecting to or opposing any future proposal regarding common benefit assessments or awards.

Any disputes or requests for relief from or modification of this Order will be decided by this Court in the exercise of its continuing jurisdiction over the parties subject to this Order, and its authority and discretion under the common benefit doctrine.

**IT IS SO ORDERED.**

*/s/ Dan Aaron Polster*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

**Dated:** July 22, 2021

6



KIMBERLY LAMBERT ADAMS
BRIAN H. BARR
MICHAEL C. BIXBY
M. ROBERT BLANCHARD
BRANDON L. BOGLE
W. TROY BOUK
WESLEY A. BOWDEN
VIRGINIA M. BUCHANAN
WILLIAM F. CASH III
JEFF GADDY
REBECCA D. GILLILAND
  (LICENSED ONLY IN ALABAMA)

RACHAEL R. GILMER
FREDRIC G. LEVIN
MARTIN H. LEVIN
ROBERT M. LOEHR
STEPHEN A. LUONGO
M. JUSTIN LUSKO
NEIL E. McWILLIAMS, JR.
CLAY MITCHELL
PETER J. MOUGEY
DANIEL A. NIGH
TIMOTHY M. O'BRIEN

MIKE PAPANTONIO
CHRISTOPHER G. PAULOS
EMMIE J. PAULOS
A. RENEE PRESTON
ROBERT E. PRICE
MARK J. PROCTOR
TROY A. RAFFERTY
MATTHEW D. SCHULTZ
W. CAMERON STEPHENSON
THOMAS A. TAYLOR
LEO A. THOMAS
BRETT VIGODSKY

OF COUNSEL:
LAURA S. DUNNING
  (LICENSED ONLY IN ALABAMA)
BEN W. GORDON, JR.
ARCHIE C. LAMB, JR.
PAGE A. POERSCHKE
  (LICENSED ONLY IN ALABAMA)
CHRISTOPHER V. TISI
  (LICENSED IN WASHINGTON, D.C.
  AND MARYLAND)

LEFFERTS L. MABIE, JR. (1925-1996)
D.L. MIDDLEBROOKS (1926-1997)
DAVID H. LEVIN (1928-2002)
STANLEY B. LEVIN (1938-2009)

**RE: <u>MDL 2804: SECOND AMENDED NOTICE OF ARCOS DISCLOSURE</u>**

Dear Counsel:

You are receiving this letter from the Plaintiffs' Executive Committee of *In re National Opioid Prescription Litigation*, MDL No. 2804. This letter explains how you may obtain, without charge, refined data that shows in detail everything we know from the ARCOS database regarding which opioids flowed into your clients' jurisdictions, and how they got there.

By way of background, ARCOS (Automation of Reports and Consolidated Orders System) is an automated, comprehensive drug reporting system administered by the DEA which monitors the flow of controlled substances from (1) their point of manufacture through (2) commercial distribution channels to (3) point of sale or dissemination at the dispensing/retail level (such as hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions). All DEA registrants who manufacture and/or distribute controlled substances are required to report to ARCOS.

In the MDL litigation, the DEA produced a subset of ARCOS Data reflecting all transactions nationally by every registered manufacturer and distributor of opioid drug products. In total, the ARCOS Data produced by the DEA has 500,709,803 transaction records. In order for the data to be useful, the Opioid MDL Executive Committee hired a strategic litigation consulting group out of Washington, D.C. to process, validate and augment the opioid ARCOS data. In doing so, the consulting group made certain corrections to and exclusions from the county-level processed ARCOS data, which are explained in the attached **Appendix**.

Pursuant to agreement with the DEA and by order of the federal MDL Judge, the Honorable Dan A. Polster, the MDL PEC is making available to you without charge the unprocessed ARCOS data in the same format it was received from the DEA. This data is what you would receive if you filed a *Touhy Request* with the DEA.

The PEC has found, however, that the data was not useful as received, so we spent extensive resources making it useful. We are also providing you, again without charge, access to the result of that investment. The PEC's ARCOS website allows you to go straight to the county-level processed ARCOS data and county-level reports and download the information you need in order to understand from the ARCOS database exactly which opioid products flowed into your clients' jurisdictions and how they got there. While you have the right to download the unprocessed ARCOS data and process it yourself, we urge you to avoid that step and instead simply access the PEC's processed ARCOS data and reports.

**EXHIBIT 10**

To obtain either the unprocessed ARCOS data or access to the PEC's ARCOS website, please contact ARCOSRequest@levinlaw.com.

Sincerely,

Peter J. Mougey
On Behalf of the Plaintiffs' Executive
Committee

## Appendix:  Exclusions/Corrections to the ARCOS Data
## Reflected in the County-Level Reports

a. Duplicate transactions are excluded when the same transaction was reported to ARCOS more than once by the same registrant. [1]

b. Transactions are excluded where the Drug Code from the NDC dictionary is not one of the 14 opioids tracked by the DEA.

c. Transactions are excluded when the Action Indicator code, Correction Number, or both suggest the reported transaction is erroneous.

d. All transactions involving reverse distributors, analytical labs, importers, exporters, or researchers are excluded.

e. Transactions between two registrants are excluded when the transaction is reported by the registrant *receiving* the shipment, because the transaction was already reported to ARCOS by the registrant *sending* the shipment.

f. Transactions with obvious errors in the reported Quantity are excluded.

g. Transactions with Transaction Code "X" (Lost-in- Transit) are excluded, because "Transaction Code X" is an explanatory code which does not affect an ARCOS registrant's inventory.[2]

h. The Calculated Base Weight in Grams was corrected when it was calculated using an incorrect Ingredient Base Weight from the NDC dictionary.

---

[1] The ARCOS Data had 610,381 duplicate transactions in December 2007 for one of the Cardinal Health distribution centers (Seller DEA Number: RC0221236). All but one of each set of exact duplicate transactions was excluded.

[2] ARCOS Handbook, §5.8.3, p. 5-19.

i. Where the ARCOS Data (NDC, Drug Code, and Drug Name) differed from the NDC Dictionarythe ARCOS Data was updated to reflect the information in the November 2018 NDC Dictionary.[3]

j. For clarity, the trade name of the drug product ("Trade/Product Name") and the dosage form ("Package Measure") were added to the ARCOS Data using the NDC Dictionary.

k. Deletion requests and originally-reported transactions are excluded where: (1) they cancel each other out, or (2) the ARCOS Data already includes an adjusted or corrected transaction.

---

[3] The DEA's NDC dictionary is available at www.deadiversion.usdoj.gov/arcos/ndc/ndcfile.txt. The dictionary is explained at www.deadiversion.usdoj.gov/arcos/ndc/readme.txt. The DEA updates the NDC dictionary monthly to correct errors, add new drug products, and remove discontinued drug products. The consultant used the NDC dictionary updated on November 1, 2018, plus any discontinued drug products from earlier versions of the NDC dictionary in May 2018 –October 2018. An alternative NDC dictionary is maintained by the FDA (www.accessdata.fda.gov/scripts/cder/ndc/index.cfm).

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| All Cases | |

**THE MAYOR AND CITY COUNCIL OF BALTIMORE'S REQUEST AS *AMICUS CURIAE* FOR MODIFICATION OF THE COURT'S AUGUST 12, 2021 ORDER APPROVING COMMON BENEFIT ASSESSMENT**

The Mayor and City Council of Baltimore ("the City") requests as *amicus curiae*[1] that the Court modify its August 12, 2021 order approving a common benefit assessment. Doc # 3828. Without requiring notice to state court plaintiffs or giving state court plaintiffs an opportunity to be heard, the Court's August 12 order granted the Plaintiffs' Executive Committee's ("PEC") August 10, 2021 motion, Doc. # 3823, and required non-settling state court plaintiffs to contribute 7.5% of their settlements and judgments to the PEC. The Court lacks jurisdiction over state court plaintiffs and cannot require them to contribute to the PEC from their own settlements and judgments.

---

[1] The City's filing of this request as an "interested party" and *amicus curiae* is made without consenting to this Court's jurisdiction—and without prejudice to the City's and its attorneys' rights to contest this Court's jurisdiction—over the City, its counsel Susman Godfrey LLP, or Case No. 24-C-18-000515 pending in the Circuit Court for Baltimore City, Maryland, and without prejudice to the City's right to seek appellate review of any order the Court enters regarding the common benefit fund.

1

**EXHIBIT 11**

The City thought the PEC understood this. The PEC told this Court as recently as June 2021 that it would not seek to impose common benefit fund assessments on "any state court plaintiff that is not subject to the Court's jurisdiction," Doc. # 3765 at 2, and this Court recognized that commitment in its July 22, 2021 order approving the creation of a common benefit fund, Doc. # 3794 at 3. But with its August 10 motion, the PEC abandoned its past representations and sought an improper cash grab from any state court litigant that accepted ARCOS data from the PEC.

This Court lacks jurisdiction to force state court plaintiffs like the City to contribute to the PEC, and the PEC's attempt to force contribution from state court plaintiffs lacks merit for three additional reasons: (1) Supreme Court case law does not permit the PEC to impose a common benefit fund assessment on litigants that reach their own settlements, (2) the exorbitant 7.5% assessment (which is greater than the 7% assessment the PEC initially sought, Doc. # 3112) bears no relation to the benefit the PEC conferred on state court plaintiffs by providing the ARCOS data a few weeks before the data became publicly available, and (3) the PEC should be estopped from demanding payment for the ARCOS data because the PEC promised state court plaintiffs they would receive the ARCOS data "without charge," and state court plaintiffs detrimentally relied on that promise by withdrawing their own Touhy requests to obtain the data.

The Court should modify and strike the portion of its order that imposes a 7.5% assessment on state court litigants that reach their own settlements or judgments. Like many other state court plaintiffs, the City is actively litigating its own case, taking its own depositions, and developing its own expert work. There is no legal basis for the PEC to expect contribution from the City or any other state court plaintiff that obtains its own settlement or judgment, and the Court lacks jurisdiction to require contribution from state court plaintiffs.

**BACKGROUND**

I.  **In 2018 and 2019, the Court streamlined the process for obtaining ARCOS data, and it did not require litigants obtaining the data to pay the PEC**

In mid-2018, the Court issued a series of orders that required the DEA to produce to the MDL plaintiffs ARCOS data from the period 2006 to 2014. Doc. #s 233, 397, 668. The Court first ordered the production of ARCOS data related to six bellwether states and then expanded its order to cover all ARCOS data for the entire United States. Doc. #s 233, 397.

On April 12, 2019, with the agreement of DOJ, DEA, and the MDL plaintiffs, the Court issued an opinion and consolidated ARCOS protective order, which allowed state court litigants to obtain the ARCOS data. Doc. # 1545. As the PEC explained in its March 15, 2019 motion seeking this order, Doc. # 1447, the order relieved the DOJ and DEA of the burden of having to respond to thousands of Touhy requests and made sure litigants across the country had access to the ARCOS data. This Court did not indicate in its April 12, 2019 order or in any of its rulings that state court litigants or anyone else would have to pay the PEC for the ARCOS data.

A few weeks after the Court's April 12, 2019 order, the PEC made the ARCOS data available to state court litigants. The PEC explained what it was doing in a May 6, 2019 letter to state court litigants, which stated three times that the PEC was providing the data "***without charge***." Ex. 1 (emphasis added). The PEC stated in the first paragraph of its letter that "This letter explains how you may obtain, ***without charge***, refined data that shows in detail everything we know from the ARCOS database regarding which opioids flowed into your clients' jurisdictions, and how they got there." Ex. 1 at 1 (emphasis added). The PEC explained that this Court was making the data available free of charge in accordance with an agreement with the DEA: "Pursuant to agreement with the DEA and by order of the federal MDL Judge, the Honorable Dan A. Polster, the MDL PEC is making available to you ***without charge*** the

3

unprocessed ARCOS data in the same format it was received from the DEA. This data is what you would receive if you filed a *Touhy Request* with the DEA." Ex. 1 at 1 (emphasis added). The PEC explained that it took certain steps to filter the data and that "[w]e are also providing you, ***again without charge***, access to the result of that investment." Ex. 1 at 1 (emphasis added). The PEC even "urged" state court plaintiffs not to do their own data processing: "While you have the right to download the unprocessed ARCOS data and process it yourself, ***we urge you to avoid that step*** and instead simply access the PEC's processed ARCOS data and reports." Ex. 1 at 1 (emphasis added).

The PEC's letter could not have been clearer about two points: (1) state court litigants would receive the ARCOS data free of charge, and (2) there was no need for state court litigants to obtain or process the data on their own. Now, the PEC is doing an about-face on both points and saying that state court litigants have to pay the PEC because they did not process their own data. The Court should not tolerate this bait and switch.

The City took the PEC's letter at face value and relied on it in making decisions about how to develop its case. At the time the City learned that it would be able to receive the ARCOS data from the PEC, it had a pending Touhy request and had been in communication with the DOJ about obtaining the ARCOS data. After the data became available through the MDL, the DOJ requested that the City withdraw its Touhy request, and the City agreed to do so. The City would not have withdrawn its Touhy request if it had known the MDL PEC planned to charge a 7.5% assessment for using the ARCOS data, contrary to the PEC's representations that the data was available "without charge."

Just a short time after the City received the data from the PEC, the data became publicly available. On July 15, 2019, following a successful appeal by *The Washington Post* and several

4

other media organizations, the Court lifted the ARCOS protective order as to all pre-2013 ARCOS data. Doc. # 1845. The Court later allowed the release of ARCOS data for 2013 and 2014, the full span of ARCOS data available in the MDL.

By January 17, 2020, the complete 2006 to 2014 ARCOS data was on *The Washington Post*'s website, where it remains today. Visitors to that site are able to download the 2006-2014 raw data for any county they choose (unlike through the MDL-approved process, which only allowed a county to get data for its own county, Doc. # 668). *See Drilling into the DEA's pain pill database*, Washington Post (Jan. 17, 2020), https://www.washingtonpost.com/graphics/2019/ investigations/dea-pain-pill-database/. Visitors can also download distributor, manufacturer, and pharmacy data for any county in the country and see with a few clicks of a button the five distributors, manufacturers, and pharmacies that were responsible for the most opioids in any county in the country.

## II. In 2020, the PEC sought to impose a common benefit fund assessment on all opioid plaintiffs but later accepted that the Court lacked jurisdiction over state court plaintiffs

On January 28, 2020, the PEC moved for entry of an order establishing a common benefit fund. Doc. # 3112. On February 4, 2020, the Court issued a scheduling order calling for all interested parties to respond to the PEC's motion by February 28, 2020. The City and many other interested parties filed oppositions to the common benefit fund. Doc. # 3191. The City's opposition and several other oppositions explained that the PEC's proposed common benefit fund improperly sought to require contribution from state court plaintiffs that were beyond the Court's jurisdiction. Doc. # 3191 at 3–6. On July 27, 2020, the Court denied the PEC's common benefit fund motion without prejudice to refiling. Doc. # 3397.

A year later, the PEC filed a motion seeking to establish a common benefit fund that would receive funds from the Summit and Cuyahoga settlement holdback. In a June 22, 2021 supplemental brief supporting the common benefit fund motion, the PEC told the MDL Court:

> The PEC clarifies that no common benefit fee or litigation expense reimbursement will be charged against any settlement proceeds or judgment paid to any State Attorney General, or to any state court plaintiff that is not subject to the Court's jurisdiction (unless that plaintiff or counsel executed a participation agreement), consistent with the Court's prior order (Doc. # 358).

Doc. # 3765 at 2. On July 22, 2021, the Court established the common benefit fund. Doc. # 3794. The Court stated in its order that the PEC had explained to the Court that "with regard to any future common benefit Order, the PEC will not seek to make it applicable to settlement proceeds or judgments payable to a State Attorney General, ***nor to any state court plaintiff that is entirely outside of the Court's jurisdiction (with certain understandable exceptions)***." Doc. # 3794 at 3 (emphasis added).

### III. Contrary to its representations, the PEC's August 10 motion sought to impose common-benefit fund assessments on state court plaintiffs, and this Court granted the motion

Less than two months after the PEC told the Court it would not seek a common benefit fund assessment from "any state court plaintiff that is not subject to the Court's jurisdiction," the PEC sought to do just that. In its August 10, 2021 motion, the PEC asked the Court to impose a 7.5% assessment on any state court plaintiff that received ARCOS data from the PEC, Doc. # 3823 at 17–19, even though the PEC had told state court plaintiffs they would receive the data "without charge." This change of position would be problematic enough if the ARCOS data was proprietary PEC data, but it is sitting on *The Washington Post*'s website for anyone to review and download.

On August 12, 2021, two days after the PEC filed the motion, the Court granted the PEC's motion without requiring notice to state court litigants or providing an opportunity for a

response. This procedure violated the due process rights of state court plaintiffs, and at the very least, the Court should call for a response from state court plaintiffs and consider, on the basis of the responses received, modifying the August 12 order and striking the portion of that order that allows the PEC to impose a 7.5% assessment on state court settlements and judgments.

**ARGUMENT**

In 2020, this Court received briefing from numerous interested parties on how to structure a common benefit fund. That briefing made clear that this Court lacks jurisdiction over state court plaintiffs like the City, which have non-MDL counsel and did not sign a participation agreement with the MDL plaintiffs. The Court declined to implement a common benefit fund in 2020, and for a time the PEC accepted the uniform case law establishing that this Court lacks jurisdiction over state court plaintiffs. Now that the PEC is trying to secure sufficient support for a $26 billion settlement that will contribute billions in attorney's fees to the PEC, the PEC has had a change in tune. It sought to impose a fine on any state court plaintiff that opts out of the settlement, in an apparent effort to discourage those state court plaintiffs from depriving the PEC of substantial attorney's fees or derailing the settlement altogether.

In its August 10 motion, the PEC still could not show that the Court has jurisdiction over state court plaintiffs—it does not—so the PEC urged the Court to use its jurisdiction over the ARCOS data to assess a "back-end, contingent assessment of 7.5%" on all state court plaintiffs that used the ARCOS data. Doc. # 3823 at 18. The PEC's proposal suffered from numerous defects, and the Court should modify the portion of its August 12 order that required this unjustified post hoc assessment from state court plaintiffs.

**I.      This Court lacks jurisdiction over state court plaintiffs like the City**

In its February 27, 2020 opposition to amended motion for entry of order establishing common benefit fund, the City explained that this Court lacks jurisdiction to impose a common

7

benefit fund assessment on state court litigants, and the City incorporates its opposition here. Doc. # 3191 at 3–6. In its briefing, the City explained that this Court has already recognized that it lacks jurisdiction over state courts, Doc. No. 643 at 4, and that federal appellate courts have repeatedly and uniformly rejected the position that a federal court may exercise jurisdiction over state court proceedings and force state court litigants to contribute to a federal common benefit fund. *In re Genetically Modified Rice Litigation*, 764 F.3d 864, 874 (8th Cir. 2014) (holding that the district court lacked the authority to "order parties in cases not before it to contribute to the Fund"); *In re Showa Denko K.K. L-Trytophan Products Liability Litigation-II*, 953 F.2d 162, 166 (4th Cir. 1992) (holding that the district court "simply has no power to extend the obligations" of its common benefit fund order to state court plaintiffs); *Hartland v. Alaska Airlines*, 544 F.2d 992, 1001 (9th Cir. 1976) (holding that the district court "had not even a semblance of jurisdiction—original, ancillary, or pendent—to order anything or anybody, and least of all to compel lawyers who were not parties to the action to pay $3,250 into a fund").

The PEC cannot create jurisdiction over the City and its litigation based on the City's use of ARCOS data. The PEC cites nothing that would allow this Court to establish jurisdiction over any entity that received ARCOS data. The Court certainly never provided notice to state court plaintiffs that they were subjecting themselves to the jurisdiction of the Court because they were receiving ARCOS data, a premise that is not constitutionally sound and derives no support from the case law. The Court does not even have any control over the data at this point given that the Court lifted its ARCOS protective order and allowed the data to become publicly available and disseminated widely. The Court cannot force subdivisions beyond its jurisdictional reach to contribute to the PEC on the basis that the subdivisions received data from the PEC years ago that became publicly available a few weeks after the PEC provided it.

The Court's lack of jurisdiction should end the matter, but there are three additional reasons that the Court should modify the portion of its order that imposes a common benefit fund assessment on state court plaintiffs that received ARCOS data from the PEC.

**II.      Supreme Court case law does not support the Court imposing a common benefit assessment on litigants that reach their own settlements**

In the City's February 27, 2020 opposition, the City explained that exacting a common benefit fund assessment on the City's case would be inconsistent with the Supreme Court's common benefit fund jurisprudence if the City reached its own settlement, and the City incorporates that briefing here. Doc. # 3191 at 6–9. In its February 27, 2020 opposition, the City cited *Boeing Co. v. Van Gemert*, in which the Supreme Court explained:

> Since the decision in *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5. S.Ct. 387, 28 L.Ed. 915 (1885), this Court has recognized consistently that a litigant or a lawyer *who recovers a common fund for the benefit of persons other than himself or his client* is entitled to a reasonable attorney's fee from the fund as a whole. See *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); cf. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

444 U.S. 472, 478 (1980) (emphasis added). The Supreme Court further explained that the "doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense" and "[j]urisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Id.*

At the time the City filed its February 27, 2020 opposition, it was unknown what the settlement structure would look like, but now it is clear that the PEC's proposed assessment on state court litigants directly conflicts with *Boeing*. The PEC's August 10, 2021 motion sought a 7.5% assessment *only* from "cases resolved outside the Settlement Agreement." Doc. # 3823 at

9

2. The PEC will not generate settlement funds for the cases resolved outside the Settlement Agreement, and contribution is not appropriate under *Boeing*.

If the City opts out of the settlement, the City will not receive the benefits of the PEC's settlement, and no assessment is appropriate under Supreme Court case law. Opt-out state court plaintiffs' attorneys, like the City's attorneys, will have to continue litigating their cases in order to achieve recoveries, so under the common benefit fund jurisprudence, it is inappropriate to apply the common benefit fund requirement to state court plaintiffs. *See also In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019 (5th Cir. 1977) (holding that "[o]ne who hires and pays his own lawyer is not a free rider if the attorney is a contributor to the final results" and approving the district court's decision to "exclud[e] from the 8% contributions attorneys who continued to be active").

III.   **The 7.5% assessment impermissibly bears no relation to the benefit state court plaintiffs received from having access to ARCOS data a few weeks before it became publicly available**

The 7.5% assessment is also improper because it bears no relationship to the benefit that state court plaintiffs received from obtaining the ARCOS data from the PEC. In *Boeing*, when upholding the common benefit fund, the Supreme Court relied on the guidance of its prior holding in *Alyeska Pipeline Service Co. v. Wilderness Society* that a common benefit fund is appropriate where "the benefits could be traced with some accuracy" and "there was reason for confidence that the costs of litigation could indeed be shifted with some exactitude to those benefiting." 444 U.S. at 479 (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 265 n.39 (1980)) (internal quotation marks omitted) (alterations omitted).

The benefits of the PEC providing the ARCOS data to state court plaintiffs are not traceable with any accuracy, and they are certainly not worth a 7.5% assessment, which could amount to tens or hundreds of millions of dollars. The PEC provided the ARCOS data to state

court plaintiffs starting in May 2019. Within a few weeks, the data was made publicly available for the years 2006 through 2012, and by January 2020, the full span of ARCOS data was publicly available on *The Washington Post*'s website.

As justification for the substantial assessment, the PEC points to the work they did to "organize and analyze" the data, but they overstate the importance of this work. Doc. No. 3823 at 18. The PEC's work consisted of filtering the data to show which distributors, manufacturers, and pharmacies provided the opioids. It was not complicated work, and if the City had known that the PEC might charge tens of millions of dollars for it (contrary to the PEC's representations that it was provided "without charge"), the City would have done its own work during the two years it has had the data. *The Washington Post*, moreover, has replicated much of the PEC's work, providing a user friendly interface that shows the five distributors, manufacturers, and pharmacies that provided the most opioids in every county in the country, and providing a ranking of all the distributors, manufacturers, and pharmacies that provided opioids to a county. No assessment is appropriate at all, and the 7.5% assessment bears no relationship to the marginal benefit the PEC provided state court plaintiffs.

**IV.    State court plaintiffs detrimentally relied on the PEC's promise that data was available without charge, so the PEC should be estopped from applying a retroactive assessment**

In its May 6, 2019 letter to state court plaintiffs, the PEC told state court plaintiffs ***three times*** they would receive the ARCOS data "without charge," and state court litigants like the City relied on that representation, obtained the data from the PEC, and withdrew their own Touhy requests to get the data. Now that state court plaintiffs have detrimentally relied on the PEC's representations, the PEC should be estopped from assessing a retroactive 7.5% assessment on any litigant that received the ARCOS data from the PEC. *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557 (6th Cir. 2009) (holding that estoppel arises when a person makes a

misrepresentation of a material fact and the party asserting estoppel detrimentally and reasonably relied on the party making the representation).

State court litigants like the City should at least be given the opportunity to delete the ARCOS data they received from the PEC and obtain the ARCOS data on their own before the 7.5% assessment applies to their cases. It will now be easy to obtain the ARCOS data because the City and other state court litigants can download the data directly from *The Washington Post*'s website.

## CONCLUSION

The Court should modify its order and strike the requirement that state court litigants that do not join the settlement must provide 7.5% of their future settlements and judgments to the PEC. The Court lacks jurisdiction to impose the assessment, the assessment is improper under common benefit fund jurisprudence, and the assessment conflicts with the PEC's representation that it would not charge for the ARCOS data.

Dated: August 24, 2021                    Respectfully submitted,

                                          */s/ Seth Ard*

                                          JAMES L. Shea
                                          City Solicitor
                                          Sara Gross, Chief Solicitor
                                          Thomas P.G. Webb, Chief Solicitor
                                          BALTIMORE CITY LAW DEPARTMENT
                                          100 N. Holliday Street, Room 101
                                          Baltimore, Maryland 21202
                                          Tel: 410-396-3930
                                          Fax: 410-547-1025
                                          james.shea@baltimorecity.gov
                                          sara.gross@baltimorecity.gov
                                          tom.webb@baltimorecity.gov

William Christopher Carmody
Arun Subramanian
Seth Ard
Jillian Hewitt
Max Straus
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: 212-336-8330
Fax: 212-336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com
jhewitt@susmangodfrey.com
mstraus@susmangodfrey.com

Ian Crosby
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Tel: 206-516-3880
Fax: 206-516-3883
icrosby@susmangodfrey.com

Sylvanus M. Polky
SUSMAN GODFREY L.L.P.
1000 Lousiana Street, Suite 5100
Houston, TX 77002
Tel: 713-651-5096
Fax: 713-651-9366
spolky@susmangodfrey.com

*Attorneys for Plaintiff Mayor & City Council of Baltimore*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2021, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by,

and may be obtained through, the Court CM/ECF system.

*/s/ Seth Ard*
Seth Ard



KIMBERLY LAMBERT ADAMS
BRIAN H. BARR
MICHAEL C. BIXBY
M. ROBERT BLANCHARD
BRANDON L. BOGLE
W. TROY BOUK
WESLEY A. BOWDEN
VIRGINIA M. BUCHANAN
WILLIAM F. CASH III
JEFF GADDY
REBECCA D. GILLILAND
*(LICENSED ONLY IN ALABAMA)*

RACHAEL R. GILMER
FREDRIC G. LEVIN
MARTIN H. LEVIN
ROBERT M. LOEHR
STEPHEN A. LUONGO
M. JUSTIN LUSKO
NEIL E. McWILLIAMS, JR.
CLAY MITCHELL
PETER J. MOUGEY
DANIEL A. NIGH
TIMOTHY M. O'BRIEN

MIKE PAPANTONIO
CHRISTOPHER G. PAULOS
EMMIE J. PAULOS
A. RENEE PRESTON
ROBERT E. PRICE
MARK J. PROCTOR
TROY A. RAFFERTY
MATTHEW D. SCHULTZ
W. CAMERON STEPHENSON
THOMAS A. TAYLOR
LEO A. THOMAS
BRETT VIGODSKY

OF COUNSEL:
LAURA S. DUNNING
  *(LICENSED ONLY IN ALABAMA)*
BEN W. GORDON, JR.
ARCHIE C. LAMB, JR.
PAGE A. POERSCHKE
  *(LICENSED ONLY IN ALABAMA)*
CHRISTOPHER V. TISI
  *(LICENSED IN WASHINGTON, D.C.
  AND MARYLAND)*

LEFFERTS L. MABIE, JR. (1925-1996)
D.L. MIDDLEBROOKS (1926-1997)
DAVID H. LEVIN (1928-2002)
STANLEY B. LEVIN (1938-2009)

### RE: <u>MDL 2804: SECOND AMENDED NOTICE OF ARCOS DISCLOSURE</u>

Dear Counsel:

You are receiving this letter from the Plaintiffs' Executive Committee of *In re National Opioid Prescription Litigation*, MDL No. 2804.  This letter explains how you may obtain, without charge, refined data that shows in detail everything we know from the ARCOS database regarding which opioids flowed into your clients' jurisdictions, and how they got there.

By way of background, ARCOS (Automation of Reports and Consolidated Orders System) is an automated, comprehensive drug reporting system administered by the DEA which monitors the flow of controlled substances from (1) their point of manufacture through (2) commercial distribution channels to (3) point of sale or dissemination at the dispensing/retail level (such as hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions). All DEA registrants who manufacture and/or distribute controlled substances are required to report to ARCOS.

In the MDL litigation, the DEA produced a subset of ARCOS Data reflecting all transactions nationally by every registered manufacturer and distributor of opioid drug products. In total, the ARCOS Data produced by the DEA has 500,709,803 transaction records. In order for the data to be useful, the Opioid MDL Executive Committee hired a strategic litigation consulting group out of Washington, D.C. to process, validate and augment the opioid ARCOS data. In doing so, the consulting group made certain corrections to and exclusions from the county-level processed ARCOS data, which are explained in the attached **Appendix**.

Pursuant to agreement with the DEA and by order of the federal MDL Judge, the Honorable Dan A. Polster, the MDL PEC is making available to you without charge the unprocessed ARCOS data in the same format it was received from the DEA. This data is what you would receive if you filed a *Touhy Request* with the DEA.

The PEC has found, however, that the data was not useful as received, so we spent extensive resources making it useful. We are also providing you, again without charge, access to the result of that investment.  The PEC's ARCOS website allows you to go straight to the county-level processed ARCOS data and county-level reports and download the information you need in order to understand from the ARCOS database exactly which opioid products flowed into your clients' jurisdictions and how they got there. While you have the right to download the unprocessed ARCOS data and process it yourself, we urge you to avoid that step and instead simply access the PEC's processed ARCOS data and reports.

OFFICE: 316 S. BAYLEN STREET · SUITE 600 · PENSACOLA, FL 32502
CORRESPONDENCE: P.O. BOX 12308 · PENSACOLA, FL 32591   CONTACT: (850) 435-7000 · (850) 435-7020 FAX · WWW.LEVINLAW.COM

1

To obtain either the unprocessed ARCOS data or access to the PEC's ARCOS website, please contact ARCOSRequest@levinlaw.com.

Sincerely,

Peter J. Mougey
On Behalf of the Plaintiffs' Executive Committee

OFFICE: 316 S. BAYLEN STREET · SUITE 600 · PENSACOLA, FL 32502
CORRESPONDENCE: P.O. BOX 12308 · PENSACOLA, FL 32591   CONTACT: (850) 435-7000 · (850) 435-7020 FAX · WWW.LEVINLAW.COM

2

## Appendix:  Exclusions/Corrections to the ARCOS Data
## Reflected in the County-Level Reports

a. Duplicate transactions are excluded when the same transaction was reported to ARCOS more than once by the same registrant. [1]

b. Transactions are excluded where the Drug Code from the NDC dictionary is not one of the 14 opioids tracked by the DEA.

c. Transactions are excluded when the Action Indicator code, Correction Number, or both suggest the reported transaction is erroneous.

d. All transactions involving reverse distributors, analytical labs, importers, exporters, or researchers are excluded.

e. Transactions between two registrants are excluded when the transaction is reported by the registrant *receiving* the shipment, because the transaction was already reported to ARCOS by the registrant *sending* the shipment.

f. Transactions with obvious errors in the reported Quantity are excluded.

g. Transactions with Transaction Code "X" (Lost-in- Transit) are excluded, because "Transaction Code X" is an explanatory code which does not affect an ARCOS registrant's inventory.[2]

h. The Calculated Base Weight in Grams was corrected when it was calculated using an incorrect Ingredient Base Weight from the NDC dictionary.

---

[1] The ARCOS Data had 610,381 duplicate transactions in December 2007 for one of the Cardinal Health distribution centers (Seller DEA Number: RC0221236). All but one of each set of exact duplicate transactions was excluded.

[2] ARCOS Handbook, §5.8.3, p. 5-19.

i. Where the ARCOS Data (NDC, Drug Code, and Drug Name) differed from the NDC Dictionarythe ARCOS Data was updated to reflect the information in the November 2018 NDC Dictionary.[3]

j. For clarity, the trade name of the drug product ("Trade/Product Name") and the dosage form ("Package Measure") were added to the ARCOS Data using the NDC Dictionary.

k. Deletion requests and originally-reported transactions are excluded where: (1) they cancel each other out, or (2) the ARCOS Data already includes an adjusted or corrected transaction.

---

[3] The DEA's NDC dictionary is available at www.deadiversion.usdoj.gov/arcos/ndc/ndcfile.txt. The dictionary is explained at www.deadiversion.usdoj.gov/arcos/ndc/readme.txt. The DEA updates the NDC dictionary monthly to correct errors, add new drug products, and remove discontinued drug products. The consultant used the NDC dictionary updated on November 1, 2018, plus any discontinued drug products from earlier versions of the NDC dictionary in May 2018 –October 2018. An alternative NDC dictionary is maintained by the FDA (www.accessdata.fda.gov/scripts/cder/ndc/index.cfm).

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL No. 2804** |
| This document relates to: | **Case No. 17-MD-2804** |
| *All actions* | **Judge Dan Aaron Polster** |

### ORDER TO ESTABLISH QUALIFIED SETTLEMENT FUND, APPOINT PANEL OF COMMON BENEFIT AND CONTINGENCY FEE FUND ARBITERS, APPROVE FEE FUND ALLOCATION AND DISTRIBUTION PROCESS, AND APPROVE COMMON BENEFIT COST PAYMENT AND ASSESSMENT

The Plaintiffs' Executive Committee ("PEC") appointed by this Court, on behalf of the subdivisions that have reached resolutions (the "Settlement Agreements"[1]) with Defendants McKesson Corporation ("McKesson"), Cardinal Health, Inc. ("Cardinal") AmerisourceBergen Corporation ("AmerisourceBergen") (McKesson, Cardinal, and AmerisourceBergen, (collectively, the "Settling Distributors"), and Janssen[2] (the Settling Distributors and Janssen are collectively the "Settling Defendants"), have moved for entry of an Order:  (i) approving the establishment, under this Court's continuing jurisdiction, of a Qualified Settlement Fund, to be called the Attorney Fee Fund (the "Fund"); (ii) appointing an Administrator for the Fund (the "Administrator"); (iii) determining that the Fund, including its two constituent funds described

---

[1] Any capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Settlement Agreements, including those terms defined in Exhibit R: "Agreement on Attorneys' Fees, Costs, and Expenses" of the Settlement Agreements ("Exhibit R").  For the avoidance of doubt, the term "Settlement Agreements" shall refer to the Settlement Agreements between and among the Settling States, Settling Distributors, and Participating Subdivisions and the Settling States, Janssen, and Participating Subdivisions (as those terms are defined therein), respectively, inclusive of all exhibits (including Exhibit R) thereof.

[2] "Janssen" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.



**EXHIBIT 12**

below (the "Common Benefit Fund" and the "Contingency Fee Fund"), constitutes a single qualified settlement fund within the meaning of section 468B of the Internal Revenue Code of 1986, as amended, and Treasury Regulation Sections l.468B-l, et seq.; and (iv) approving a one-time payment into the agreed upon MDL Expense Fund; (v) approving a common benefit assessment of 7.5% on any cases resolved outside the Settlement Agreement and Fee Fund Process against any of the Settling Defendants; (vi) establishing, as a qualified settlement fund, a Costs Fund (as defined below in Section VI) comprised of the MDL Expense Fund and the Litigating Subdivision Fund (as more fully described in Exhibit R), and appointing an administrator for the Costs Fund (the "Costs Fund Administrator").

## I.    Creation of the Fund Under MDL Court Jurisdiction

Pursuant to the terms of the Settlement Agreements, the Settling Defendants have agreed, if the conditions to making such payments set forth in the Settlement Agreements are met, to make payments into the Fund, as more specifically described in Exhibit R of the Settlement Agreements, under the continuing jurisdiction of this Court, that will be used to reimburse attorneys' fees that have been incurred in furtherance of the opioid litigation related to these defendants, including, but not limited to, work done and fees incurred with respect to opioid litigation generally and against other defendants.  The Fund will consist of the following separate sub-funds, which shall together constitute a single qualified settlement fund, and will remain subject to the continuing and exclusive jurisdiction of this Court:

- The Common Benefit Fund, which shall be 60% of the Fund, and which shall hold and disburse funds intended to cover common benefit work as defined in previous Orders of the Court; and

- The Contingency Fee Fund, which shall be 40% of the Fund, and which shall hold and disburse funds intended to compensate eligible counsel for work on behalf of the Participating Litigating Subdivisions, in lieu of enforcement of contingency fee contracts with such Subdivisions. Eligibility of counsel for both funds shall be determined under the terms of the Settlement Agreements.

Subject to the conditions for making payments set forth in the Distributors Settlement Agreement, as well as Sections IV, XII, and XIII of the Distributors' Settlement Agreement, which allow for certain reductions, suspensions, or offsets, the Settling Distributors, collectively, will pay a total of $1,292,307,693.00 (the "Distributor Total Payment") into the Fund.  The Distributor Total Payment shall be pro-rated in accordance with the Distributors' Settlement Agreement and its Exhibit R (Exhibit A hereto) and in accord with the allocation set forth below among the Settling Distributors, over a period of seven years.  Each Settling Distributor shall pay its pro rata share of the total payment.  Should any provision of the Distributors' Settlement Agreement pertaining to relevant reductions, suspensions, or offsets be triggered, the appropriate amounts shall revert from the Fund to the Settling Distributors or reduce the Distributor Total Payment consistent with the provisions in the Distributors' Settlement Agreement.

The Distributor Total Payment and the Settling Distributors' portion of the one-time payment into the MDL Expense Fund will be allocated among the Settling Distributors as follows: McKesson — 38.1%; AmerisourceBergen — 31.0%; Cardinal — 30.9%.  A Settling Distributor's sole responsibility for payments to the Fund under this Section shall be to make its share of each payment.

Subject to the conditions for making payments set forth in Exhibit B hereto and in the Janssen Settlement Agreement, which allow for certain reductions, suspensions, or offsets, Janssen will pay a total of $307,692,308.00 (the "Janssen Total Payment") into the Fund. The Janssen Total Payment shall be prorated in accordance with the Janssen Agreement and its Exhibit R (Exhibit B hereto) over a period of seven years. Should any provison of the Janssen Settlement Agreement pertaining to relevant reductions, suspensions, or offsets be triggered, the appropriate amounts

shall revert from the Fund to Janssen or reduce the Janssen Total Payment consistent with the provisions in the Janssen Settlement Agreement.

The obligations of the Settling Defendants in these Settlement Agreements are several and not joint.  No Settling Defendant shall be responsible for any portion of another Settling Defendant's share.

The obligations of the Settling Defendants in the Settlement Agreements arise out of the claims in this MDL case brought by the Settling States and the Participating Subdivisions related to the alleged past, present, and future financial, societal, and public nuisance harms and related expenditures arising out of the alleged misuse and abuse of opioid products that have allegedly been caused by the Settling Defendants.  For the avoidance of doubt, the Distributor Total Payment and Janssen Total Payment are separate and distinct from the Compensatory Restitution Amount (as defined by the Settling Distributors and Janssen Settlement Agreements), which is compensatory restitution (within the meaning of 26 U.S.C. Section 162(f)(2)(A)) paid as damages by the Settling Defendants for the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions.

**II.  Common Benefit Fund and Contingency Fee Fund**

Amounts in the Fund shall be allocated to the Common Benefit Fund and the Contingency Fee Fund as set forth in the Settlement Agreements.  The payments are to be made in the amounts, on the yearly schedule, and subject to the adjustments set forth in Exhibit R to the Settlement Agreements, and Exhibit R thereto.  Each year, 60% of each payment shall be deposited into the Common Benefit Fund and 40% of each payment shall be deposited into the Contingency Fee Fund.  Should any condition set forth in the Settlement Agreements for making payments into the Fund or MDL Expense Fund go unmet, the Settling Defendants will be under no obligation to make any payment of any amount.

The Court hereby hereby appoints, as the movants request, three experienced jurists/special masters with prior complex and MDL litigation experience, to oversee and allocate the Common Benefit Fund and the Contingency Fee Fund, and an Administrator to oversee administration and administrative costs of the Fund, as Fee Panel Arbiters.  In the interest of transparency, proportionality, and efficiency, the Court appoints the same Arbiters to oversee the disbursement of the Common Benefit Fund as the Contingency Fee Fund.

With respect to the Contingency Fee Fund, the Fee Panel Arbiters are directed to establish and implement procedures for the distribution of the Contingency Fee Fund consistent with the terms of Exhibit R of the Settlement Agreements attached hereto.  As part of that process, counsel submitting fee petitions for each Participating Litigating Subdivision will represent they waive enforcement rights against the subdivision clients of all contracts entered into in conjunction with the Qualifying Representation prior to applying for attorneys' fees or costs, under the Contingency Fee Fund.  To the extent a State allocation agreement or process provides for a fee fund, such agreements shall be enforceable on their stated terms.

Awards of fees from the Contingency Fee Fund shall be available to Attorneys with Qualifying Representations of Participating Litigating Subdivisions eligible to receive an allocation under the Settlement Agreements, as set forth in Exhibit G to the Settlement Agreements, and shall be made applying the Mathematical Model attached as Exhibit A to the attached Exhibit R Fee Agreements (the "Mathematical Model").  The collection of the data and calculations for the Mathematical Model has been a cooperative effort among private counsel for a large number of Litigating Subdivisions.  The Fee Panel is encouraged to continue working with those counsel in application of the Mathematical Model. The Fee Panel shall oversee the application of the Mathematical Model and resolve any questions or disputes concerning the

Case: 1:17-md-02804-DAP  Doc #: 4486-1  Filed:  05/26/22  167 of 556.  PageID #: 584231
Case: 1:17-md-02804  Doc #: 3828  Filed:  08/12/21  6 of 18.  PageID #: 516410


eligibility of an Attorney to participate as required in <u>Section I.Y</u> of Exhibit R to the Distributors' Settlement Agreement and Sections II.G-H of Exhibit R to the Janssen Settlement Agreement. The Fee Panel is empowered to hear disputes concerning and ensure the accuracy of the mathematical calculation. As to awards from the Contingency Fee Fund, there shall be no right of appeal. Any appeal of an award of the Fee Panel from the Common Benefit Fund will be made to this Court and be reviewed under an abuse of discretion standard.

The Court hereby: (1) authorizes the Arbiters to commence start-up work which shall be compensated consistent with an agreed budget and cap by the Settling Defendants (which may be reimbursed from interest accruing in the Fund); (2) directs the Arbiters, once the conditions necessary for the Settlement Agreements to come into effect are fulfilled, to set up a process to receive requests for common benefit fees and set forth the required materials to be provided to them in connection with fee petitions; (3) directs the Arbiters to make a preliminary recommendation on the distribution of common benefit fees; and (4) directs the Arbiters to address any requests to be heard regarding that preliminary recommendation by attorneys that sought common-benefit fees and make a final recommendation to the Court. This Court will make the final determination of an approved distribution of any common benefit funds. No distributions shall be made from the Contingency Fee Fund or the Common Benefit Fund except through the process established by this Order and by the Arbiters pursuant to this Order.

All payments into the Fund, and any interest thereon, will be held by the Fund until disbursed by the Arbiters or the Court, or by the Administrator or Trustee acting under the Court's supervision, in accordance with the terms of the Settlement Agreement and any escrow agreement governing the Fund. No parties or their counsel, including the Participating Subdivisions and their

- 6 -

counsel, shall be considered to be in constructive receipt, as determined under federal income tax principles, of any amounts held by the Fund.

The Fund shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" as described in Treasury Regulations Section 1.468B-1, and shall remain subject to the continuing jurisdiction of this Court.  The Contingency Fee Fund and the Common Benefit Fund shall be established as sub-funds that together constitute a single qualified settlement fund.

The Court appoints David R. Cohen one of the Court-appointed Arbiters to serve as Trustee and as the Administrator of the qualified settlement fund for purposes of Treasury Regulations Section l.468B-2(k)(3) and shall be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Fund. The Administrator or Trustee shall be responsible for responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority, as well as questions from the Department of Labor.  The Administrator or Trustee shall also be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Fund, as well as paying any associated interest and penalties. All such tax, interest, and penalty payments and all expenses and costs incurred in connection with taxation of the Fund (including, without limitation, expenses of tax attorneys and accountants) shall be paid from the Fund and shall be considered administrative costs of the settlement.

With respect to work undertaken prior to the fulfillment of the conditions precedent of the Settlement Agreements, the Settling Defendants shall pay such costs up to an agreed amount, but shall be repaid for such expenditures from the first interest generated by the Fund.  In the event that the conditions precedent of the Settlement Agreements are not fulfilled, the Settling Defendants shall not be compensated for these expenditures.

No bond shall be required.  The Fund shall be held under this Court's ongoing jurisdiction, at a financial institution approved by the Court in a subsequent Order.  All amounts deposited in the Fund shall be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk, consistent with the limitations set forth in the Settlement Agreements.  Post the Effective Date, the services of the Court-appointed Arbiters, and any vendors and services they determine to be necessary and appropriate to conduct and complete their work, shall be paid or reimbursed from the Fund.

The Administrator or Trustee will obtain a Federal Taxpayer Identification Number for the Fund upon entry of an order by this Court establishing the Fund.  The Administrator shall be authorized, upon final distribution of all monies paid into the Fund to take appropriate steps to wind down the Fund and thereafter be discharged from any further responsibility with respect to the Fund.

**III.     Appointment of Fee Panel**

The Court hereby appoints David R. Cohen, Randi S. Ellis, and Hon. David R. Herndon (ret.) to serve as Arbiters on the Fee Panel, charged with the fair, equitable and reasonable allocation of awards from the Common Benefit Fund and Contingency Fee Fund pursuant to the terms and provisions of the Settlement Agreements.

David R. Cohen is well known to this Court, and intimately familiar with the issues of the Opioids litigation, both generally and as they relate to the claims against the Settling Defendants. He has extensive experience as a special master for federal judges in other MDLs as well, and as a mediator and arbitrator.

Randi S. Ellis has served as a court-appointed mediator, special master, or neutral in over two dozen major MDLs, class actions, and mass torts. This service to numerous courts includes

the allocation of settlement proceeds among claimants, determining the reasonableness of attorneys' fees, and common benefit fund determinations.

Hon. David R. Herndon (ret.) retired recently from 27 years as a judge, including service as an MDL Transferee Judge in major MDLs and other federal complex cases that were successfully resolved through mass tort or class action settlements.

Each of these Arbiters has worked with thousands of lawyers from across the country in the MDL and complex litigation context, and is thoroughly familiar with the interests and issues involved in the fair and reasonable consideration and allocation of common benefit and contingency fees.

## IV.  Description of the Fund Conditions and Criteria

The Court hereby directs the Fee Panel to administer the Fund in accordance with the Settlement Agreements and the principles of transparency and equity, the following requirements and conditions for any attorney seeking an award from the Fund:

A.  Amounts disbursed from the Fund are available only to Attorneys engaged in Qualifying Representations.  No Attorney may apply for or recover from the Fund any costs incurred or fees arising from representing a Non-Settling State or a Non-Participating Subdivision [or Tribe – if a Tribe fee fund is created and utilizes the same process for administrative purposes.].

B.  Attorneys requesting disbursement from the Fund must disclose to the Fee Panel prior to any award from the Fund:  (1) any and all attorneys' fees, including referral fees, expenses paid, promises for payment, or any other Fee Entitlement to any applicant in any opioid litigation; (2) any payment, expectation of payment, or opportunity to participate in a State Back-Stop Agreement or any other agreement regarding payment of fees; and (3) any right to payment from any other fund created under either of the Settlement Agreements or from funds paid under either of them.

C.  In order to receive an award from the Fund, prior to applying for such award, an Attorney must:   (1) expressly waive the enforcement against the Litigating Subdivision client of all Fee Entitlements (other than under State Back-Stop Agreements) arising out of or related to any or all Qualifying Representations of any Participating Litigating Subdivision (such waiver shall not preclude the Attorney from submitting such Fee Entitlements to the Fee Panel as a factor for consideration in allocating payments from the  Fund or in connection with a State

- 9 -

Back-Stop Agreement; for the avoidance of doubt, no Attorney may recover fees under Exhibit R to the Settlement Agreements unless the Attorney expressly agrees not to enforce Fee Entitlements as to each and every Participating Litigating Subdivision represented by that Attorney, but such Attorneys may participate in and receive funds from a State Back-Stop Agreement); (2) provide notice to the applicable client(s) of the waiver described in subsection (1); (3) represent that s/he has no present intent to represent or participate in the representation of any Later Litigating Subdivision or any Releasor with respect to Released Claims against Released Entities; (4) represent that s/he has not and will not engage in any advertising or solicitation related to Released Claims against Released Entities where such advertising or solicitation relates to a representation that the Attorney could not undertake consistent with the ethics opinion referenced in Section II.I.4 of Exhibit R to the Settlement Agreements and attached hereto as Exhibit C; (5) represent that s/he will not charge or accept any referral fees for any Released Claims brought against Released Entities by Later Litigating Subdivisions; (6) not have and must represent that s/he does not have any Fee Entitlement related to a Later Litigating Subdivision; (7) certify that s/he has reviewed the ethics opinion referenced in Section II.I.4 of Exhibit R to Settlement Agreements and will act in conformity with such opinion; (8) fully disclose the participation, or the anticipation of participation, in any agreement with a Settling State or Participating Subdivision concerning fees arising out of or related to the Settling Distributors' Settlement Agreements, including any fees paid or anticipated to be paid or any State Back-Stop Agreement; (9) identify for the Fee Panel whether s/he utilized state litigation work product or MDL work product, including, but not limited to, ARCOS data, document repositories, experts developed in the MDL, and deposition transcripts, as well as whether s/he signed the MDL participation agreement; and (10) represent and affirm that, having exercised his/her independent judgment, s/he believes the Settlement Agreements to be fair and will make or has made best efforts to recommend the Settlement Agreements to his/her Subdivision clients in Settling States (having exercised his/her independent judgment in the best interest of each client individually before determining whether to recommend joining the settlement).

D.      In order to continue receiving awards from the Fund, an attorney must provide an annual certification that he or she continues to meet the eligibility requirements spelled out above in Section IV (C), and in Exhibit R of the Distributors Settlement Agreement.

E.      Attorneys applying to the Fund knowingly and expressly agree to be bound by the decisions of the Fee Panel and waive the ability to assert the lack or enforceability of the allocation reached through the arbitration procedures outlined below in Exhibit R of the Settlement Agreements.

Nothing in the Agreements shall preclude an Attorney from applying for compensation from multiple fee funds and cost funds. There are currently at least the following funds:

Contingency Fee Fund, Common Benefit Fund, multiple State Back-Stop Agreements, State Counsel Fee Funds, State Cost Funds and Subdivision Cost Funds. It is anticipated there will be additional fee and costs funds established in the future. Applying to one or multiple fee and costs funds does not preclude an Attorney from applying to additional fee and cost funds if the specific eligibility criteria is met. In applying to the funds that are overseen by the Arbiters as described herein, in an effort to provide full transparency, applicants must disclose any intent and expectation to apply to other funds even if not overseen by the Arbiters, as set forth in Exhibit R of the Settlement Agreements.

In making their determinations, the Arbiters are hereby charged to give consideration to the *Johnson*[3] factors, as these have been applied and interpreted by the federal courts with reference to common benefit and other court-awarded fees, as well as the following factors, which may be applied and given relative weight in the Arbiters' collective discretion:

A.  the applicant's contemporaneously recorded time and labor dedicated to Qualifying Representations along with the applicant's financial commitment to such Qualifying Representations. Claimed "time" will not be automatically accepted by the Fee Panel but will be critically reviewed and given substantially more weight and consideration if such time was subject to the audit process described in any Pretrial Order(s) governing the collection of common benefit time;

B.  the novelty, time, and complexity of the Qualifying Representations;

C.  the skill requisite to perform legal services properly and the undesirability of the case;

D.  the preclusion of other employment by the applicant due to time dedicated to Qualifying Representations;

E.  the "common benefit," if any alleged to have been conferred by the applicant and whether such common benefit work product by that applicant was used by others in parallel litigations against Released Entities whether within or outside of the MDL, provided that for any applicant claiming that s/he substantially benefitted cases other than those in which s/he entered an appearance as counsel must substantiate such claims by proffering factual support, such as proper supporting

---

[3] *Johnson v. Georgia Highway Express, Inc.,* 488 F. 2d 714, 717-19 (5th Cir.1974).

affidavits or other documents as determined by the Fee Panel with input from applicants for Participating Litigating Subdivisions;

F.     any "common detriment," as set forth in Section II.C.4. of Exhibit R to the Settlement Agreements;

G.     any contingent fee agreements or other Fee Entitlements with Participating Subdivisions, enforcement of which, except for State Back-Stop Agreements, are waived in conjunction with the application, the nature and extent of any work for those Participating Subdivisions, whether such Participating Subdivisions actively litigated and, if so, the nature and procedural history of such case(s);

H.     the experience, reputation, and ability of the applicant;

I.     whether the applicant's clients brought claims against the Released Entities;

J.     the status of discovery in the cases primarily handled by the applicant;

K.     the nature of any work by the applicant on "bellwether" cases or cases that were similarly active in litigation;

L.     any pressure points successfully exerted by the applicant in cases against the Settling Defendants or any risk for Settling Defendants created by the applicant in cases against them;

M.     any risk for defendants created by applicants in cases against the Settling Defendants;

N.     successful and unsuccessful motion practice in cases worked on by the applicant;

O.     the date of filing of any cases filed by the applicant;

P.     obtaining consolidation of the litigation in the applicant's jurisdiction;

Q.     the number and population of entities represented by the applicant and the fees that would have been awarded under the extinguished contingent fee agreements;

R.     whether the applicants' clients brought claims against the Settling Defendants;

S.     whether the applicant has had a leadership role in the litigation, whether in state or federal court;

T.     whether the applicant has had a leadership role in any negotiations aimed at resolving the litigation;

U.     whether the applicant's cases have survived motions to dismiss;

V.     the extent to which the applicant contributed to the work product used for the common benefit of opioids litigants, including, without limitation, work on

ARCOS data, Prescription Data Monitoring Programs, IQVIA data, depositions, document production, and analysis experts, briefs and pleadings, trial preparations and trials;

W.   the extent to which litigation was done prior to and contributed to completion of settlement negotiations, as distinct from litigation that was done litigating after the announcement of the Settlement Agreements, such latter litigation both being of less value and potentially resulting in a common detriment to the settlement process; and

X.   any other factors that the Fee Panel finds to be appropriate to consider after input from applicants to the Attorney Fee Fund.

The Court notes that the goal of the Settlement Agreements is to provide for maximum participation by the Subdivisions, maximum abatement funding for all Subdivisions nationally, and the maximum peace for Released Entities.  Therefore, representing a Non-Participating Litigating Subdivision or Later Litigating Subdivision does not further the goal of the Settlements, should not be considered Common Benefit, and shall be considered an adverse impact on the attempt to maximize funds available to Participating Subdivisions' abatement programs.  The Fee Panel shall consider this concept of "common detriment" set forth in this paragraph in all of its decision making.

To the extent an applicant has already been paid or expects to be paid a fee in connection with a settlement of opioid litigation, the details of such payment must be disclosed to the Arbiters prior to the issuance of an award.  Any applicant claiming that he or she substantially benefited cases other than those in which he or she entered an appearance as counsel must substantiate those claims by proffering factual support, such as proper supporting affidavits and other documents. (See Rubenstein, William B., "Report and Recommendation Addressing Motion for Common Benefit Fund," 4 & 4 n.5, In re: Nat'l Prescription Opiate Litig., Case: 1:17-md-02804, Doc #: 3319 (June 3, 2020).)

Other than as set forth above, fees allocated and awarded to applicants from the Fund outlined herein shall not be subject to any additional common benefit order, including the common benefit order requested below, or other effort to tax recoveries awarded by the Fee Panel.

## V.     Description of Fund Procedures

Because it is anticipated that there will be multiple firms listed on contingent fee agreements with Litigating Subdivisions, the Court directs the Fee Panel to establish procedures, with input from Attorneys for Participating Litigating Subdivisions, for who should petition for fees from such groups and to whom the fee shall be paid and thereafter distributed to all co-counsel in accordance with applicable agreements.  The Court charges the Fee Panel to:  (1) review the applications of all Attorneys seeking compensation from the Common Benefit Fund, including determining eligibility for each Attorney as set forth above in Section II.G. of Exhibit R to the Settlement Agreements; (2) reduce, on an annual basis, the Settling Defendants' payment obligations, as set forth in Section II.C.6 of Exhibit R of the Settlement Agreements, and inform the Settling Defendants and the MDL PEC of all such amounts and adjust the Settling Defendants' payment obligations accordingly; and (3) using criteria set forth in Section II.C. and II.G of Exhibit R of the Settlement Agreements, allocate amounts from the Common Benefit Fund to eligible Attorneys, including payment amounts for each Payment Year.  In making such allocations (regardless of the Participation Tier achieved), the Fee Panel shall apply the principles set forth in Section II.C.4 of Exhibit R to the Settling Distributors' Settlement Agreement and shall allocate any reduction in the payments of Settling Defendants specified in Section II.C.6 of Exhibit R to the amounts paid to Attorneys will a Fee Entitlement to Litigating Subdivisions that are not Participating Subdivisions.

With respect to the Contingency Fee Fund, the Court hereby charges the Fee Panel to: (1) review the applications of all applicants seeking compensation from the Contingency Fee Fund,

including determining eligibility for each Attorney as set forth in Section II.G of Exhibit R to the Settlement Agreements; (2) apply the Mathematical Model described in and attached to Exhibit R to the Settlement Agreements; and (3) use such allocations to reduce payments on an annual basis, the payment obligations of the Settling Defendants to the Fund as set forth and in Section II.D.4 of Exhibit R to the Settlement Agreements, and distributions therefrom; and to inform the Settling Defendants and the MDL PEC of all such adjustments.

**VI.    Costs Fund**

As more fully set forth in Sections II.E and II.F of Exhibit R to the Settlement Agreements, and as summarized herein, the Settling Defendants and the PEC have agreed that certain costs paid by the PEC produced specific common benefit to all, including: (1) costs of Special Masters; (2) cost of processing, managing, and maintaining the ARCOS Data; and (3) cost of creating and maintaining the Document System made available to all litigating parties.  The Parties have agreed that the Settling Distributors will make a $40,384,615 payment and Janssen will make a $9,615,385 payment of common benefit costs, for a total of $50,000,000, intended to be directed towards these items, directly into the agreed-upon MDL Expense Fund.  The Settling Defendants have likewise agreed to make payments totaling $150,000,000 into a Litigating Subdivision Cost Fund, as set forth in Exhibit R to the Settlement Agreements.  Litigating Subdivisions are those subdivisions that have commenced their lawsuits as of the Trigger Date, as defined in the Settlement Agreements.

The MDL Expense Fund and the Litigating Subdivision Cost Fund shall be treated as sub-funds of a qualified settlement fund (the "Costs Fund"). The Court hereby appoints David R. Cohen as the Costs Fund Administrator. The Costs Fund Administrator is authorized to retain and utilize, under his supervision, accountants and/or other professionals and vendors, as necessary

and appropriate, to assist in the administration and distribution of the Costs Fund and its sub-funds, pursuant to the terms of the Settlement Agreements and Exhibit R.  All expenses of Costs Fund administration shall be borne by the Costs Fund.

**VII.    Common Benefit Assessment of Non-Participating Subdivisions**

The PEC seeks, and the Attorneys General for Settling States and the Settling Defendants do not oppose, a Common Benefit Fee Order of 7.5% on the gross recovery of any Non-Participating Subdivision that is subject to this Court's jurisdiction, represented by a PEC firm or a firm receiving a Common Benefit Fee, or one in which counsel signed a Participation Agreement but is a Non-Participating Litigating Subdivision.  Such assessments would be paid by such Non-Participating Subdivision into the  MDL Common Benefit Fund.[4]

It should be recalled that, early in this MDL, the PEC sought, over the objection of the United States Drug Enforcement Agency ("DEA"), the production to MDL plaintiffs of key data compiled in the DEA's Automated Records and Consolidated Orders System/Diversion Analysis and Detection System ("ARCOS/DADS") database.  The Court ordered the DEA to produce complete transactional ARCOS data for the period of January 1, 2006 through December 31, 2014,

---

[4] *See e.g.*, *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.*, case no. 08-GD-50000, docket no. 277 (N.D. Ohio Feb. 20, 2009) (setting a 6% common benefit assessment – 5.0% for fees and 1.0% for expenses); *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 919 n.19 (N.D. Ohio 2003) (setting a 5.5% common benefit assessment – 4.8% for fees and 0.7% for expenses); *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 2012 WL 6923367 at *1 (E.D. Pa. Oct. 19, 2012) (awarding common benefit fees and expenses after having set a 7% assessment); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 661 (E.D. La. 2010) (awarding 6.5% of the total settlement amount for common benefit fees); *In re Juul Labs, Inc., Mktg., Sales Prac., and Prods. Liab. Litig.*, MDL No. 2913 (N.D. Cal.) ECF No. 586 (CMO No. 5(A)) (7%-10%); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, ECF No. 17634 (12% fees, 2.75% expenses); *In re Syngenta AG MIR162 Corn Litig.*, MDL No. 2591 (D. Kan.) ECF No. 936 (7.5%-14%); *In re Davol, Inc./C.R. Bard, Inc. Polypropylene Hernia Mesh Products Liability Litig.*, 2:18-md- 02846-EAS-KAJ ("Hernia Mesh") ECF No. 70 (CMO No. 11) (10% fees, 3% expenses); *In re E. I. Dupont De Nemours & Co. C-8 Pers. Injury Litig.*, MDL No. 2433 (S.D. Ohio) 2018 WL 4810290 (S.D. Ohio 2018) (9%); *In re Aredia and Zometa Prods. Liab. Litig.*, MDL 1760 (3:06-md-1760) (M.D. Tenn.) (ECF No. 593, Aug. 30, 2007) (8%).

first for six states (Ohio, West Virginia, Illinois, Alabama, Michigan, and Florida), and then for the remaining States and Territories, in a series of Orders, governing its production and use under its Protective Order (Doc # 167) See, e.g., Order Regarding ARCOS Data ( Doc # 233, 04/11/18); Second Order Regarding ARCOS Data ( Doc # 397, 05/08/18); Third Order Regarding ARCOS Data ( Doc #668, 06/26/18).

The ARCOS data produced to the PEC in essentially raw form was organized, programmed, and analyzed by the PEC and, as this Court has previously observed, the resulting detailed data, which readily shows " the number of opioid pills delivered to each City and County in America, partitioned by manufacturer and distributor and pharmacy," has proved "essential" in enabling the parties to file and amend complaints, design discovery, bring and defend motions, develop damages and abatement models, inform experts, prepare for trial, and engage in meaningful settlement discussions. See Second Order Regarding ARCOS Data, Doc #397 at p. 2. The indispensable nature of this common fund of data, as produced to, organized in, and protected by this Court, vests it with a centrality to the nationwide opioids litigation unmatched in other MDLs.  The initial and ongoing efforts of the PEC to obtain, organize and analyze, and make it available in meaningful and useable form to litigants provides a uniquely beneficial and indispensable resource to opioids litigants.  The costs to develop this common resource may and should be equitably spread among all beneficiaries.

This Court, which has ongoing jurisdiction over the ARCOS data produced by the DEA, as organized, analyzed and made available by the PEC and as made available subject to this Court's protective and case management Orders, has the authority and may exercise the discretion to condition the use of this data by all parties to the MDL and their counsel, and all litigants and their counsel (other than the States) who wish access to it for use in their non-MDL investigations and

cases, upon the imposition of a back-end, contingent assessment of 7.5% of their recoveries from any judgments or settlements not part of settlements otherwise providing for contributions into a Court- supervised MDL Common Benefit Fund, with such 7.5%  assessment payable from the attorneys' fee portions of such recoveries.

WHEREFORE, as set forth in detail above, the Court grants the Agreed Motion of the PEC and the Settling Defendants, and hereby:

A.   Consents to take continuing jurisdiction over the Fund and the Costs Fund pursuant to Treasury Regulation Section 1.468Bl (c)(1);

B.   Appoints Messrs. David R. Cohen and David R. Herndon, and Ms. Randi S. Ellis as Fee Panel to oversee a process for allocation and distribution of the MDL Contingency Fee Fund and the Common Benefit Fund consistent with this agreed motion and the terms of the Settlement Agreements and Exhibits R thereto, which are attached and made a part of this Order;

C.   Appoints David R. Cohen as Administrator or Trustee to oversee the Fund;

D.   Establishes the Costs Fund, comprised of sub- funds the MDL Expense Fund and the Litigating Subdivision Cost Fund, as described in and pursuant to the Settlement Agreements and Exhibits R, and appoints David R, Cohen as Costs Fund Administrator; and

E.   Approves an MDL Common Benefit assessment against the Non-Participating Subdivisions of 7.5% of their gross recoveries from any judgments or settlements not part of settlements otherwise providing for contributions into a Court-supervised MDL Common Benefit Fund, with such 7.5% assessment payable only from the attorneys' fee portions of such gross recoveries.

This Court will enter such further Orders as may be necessary and appropriate regarding future common benefit assessments paid into the Fund.

It is so ORDERED.

DATED:  August 12, 2021                    /s/ Dan Aaron Polster
                                           District Judge Dan Aaron Polster



FILED
Marilyn Burgess
District Clerk

APR 26 2022

Time: _____
Harris County, Texas
By _____ Katina Williams

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| **IN RE: TEXAS OPIOID LITIGATION** | § | **IN THE DISTRICT COURT** |
| | § | |
| **MDL NO. 18-0358** | § | **152ND JUDICIAL DISTRICT** |
| | § | |
| *This Document Relates to All Cases* | § | **HARRIS COUNTY, TEXAS** |

## MOTION TO ESTABLISH APPLICATION PROTOCOLS TO THE ARBITRATION FEE PANEL FOR REIMBURSEMENT OF ATTORNEY FEES AND COSTS UNDER THE JANSSEN TEXAS STATE-WIDE OPIOID SETTLEMENT AGREEMENT AND THE DISTRIBUTORS TEXAS SETTLEMENT AGREEMENT

**TO THE HONORABLE JUDGE SCHAFFER:**

The Texas Plaintiff's Steering Committee and Texas MDL Fee Committee file this Motion to Establish Application Protocols to the Arbitration Fee Panel for Reimbursement of Attorney Fees and Costs Under the Janssen Texas State-Wide Settlement Agreement (hereinafter, "Texas Janssen Settlement") and the Distributors' Texas Settlement Agreement (hereinafter, "Texas Distributors Settlement"), and in support thereof show:

**I.    Overview**

This MDL was formed by the Supreme Court of the State of Texas in June of 2018. On November 28, 2018, this Court entered an Order that formed the Texas Plaintiff's Steering Committee. Early in this MDL, on June 4, 2019, the Court entered an Order Regarding Plaintiff Attorneys' Protocol for Work Performed and Expenses Incurred.

On June 5, 2020, this Court issued an Order Granting Plaintiff Steering Committee Motion to Appoint Fee Committee to Determine Allocation of Fees and Expenses with the responsibility to convene, establish procedures relating to auditing attorney fee and expense reimbursement requests, and make recommendations to the Court on the allocation of fees and expenses to participating counsel, with a detailed billing guide. To be eligible for the Fee Funds established in



EXHIBIT
**13**

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

1

the Texas Settlements, Participating Subdivision Counsel must have either submitted monthly time reports to the Texas MDL or have provided contemporaneously maintained time reports in a Texas MDL Fee and Expense Application that was due to the Texas MDL Fee Committee by 5:00 p.m. on March 24, 2022. The Texas MDL Fee Committee's Report to the Court on the Texas MDL Fee Applications Process and Status was filed with the Court on the general docket on April 22, 2022.

On October 9, 2020, state court opioid litigants, including Texas subdivisions, entered into an agreement with the Federal Plaintiff's Executive Committee to establish a three-member arbitration panel to establish the process for the award of fees from Janssen and/or the settling distributors in the event of settlements.

On October 16, 2021, Texas subdivisions entered into the Janssen Texas State-Wide Opioid Settlement Agreement with the Janssen defendants ("Texas Janssen Settlement"). As of the date of this Motion, 100% of the Texas litigating political subdivisions have approved the Janssen Settlement and the settlement has funded in full into the Texas Qualified Settlement Fund established by this Court.

On February 11, 2022, Texas subdivisions entered into the Distributors' Texas Settlement ("Texas Distributors Settlement"), which became effective on April 11, 2022, with 100% of the Texas litigating political subdivisions providing releases for the settlement by March 10, 2022, and the filing of the State of Texas's Consent Judgment.

## II.     Global Terms for Allocating Settlement Fees and Costs are Superseded by the Texas Settlements.

The Texas Janssen Settlement and the Texas Distributors Settlement are not contingent upon either global settlement being effectuated. Both settlements provide for this Court's establishment of the Texas Qualified Settlement Fund, and this Court's continuing jurisdiction,

administration and oversight of fees and expenses. [Exhibit A, Texas Janssen Settlement at p. 1 and Section IX; Exhibit B, Texas Distributors Settlement at p. 1 and Section VIII].

Both settlements expressly establish that the Texas settlements supersede the terms of the Janssen and Distributor Global Settlements with respect to attorneys' fees and costs. [*Id.*].

Both settlements fundamentally differ from the global settlements' attorneys' fees and costs provisions. The Texas Janssen Settlement front-loaded fees and expenses into the Texas Qualified Settlement Fund; accordingly, compensation for attorneys' fees, costs, and expenses incurred in the representation of Texas clients is not delayed. Any award from the Arbitration Panel as to Janssen is solely to reimburse Janssen from the global fee fund for fee and cost payments already deposited in the Texas QSF under this Court's jurisdiction.

The Texas Distributors Settlement front-loaded a portion of costs and fees, incorporates the Texas back-stop and fee cap established in the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet, and requires only contingency fee (a purely mathematical formula) application to the Arbitration Fee Panel and global fee fund, with no application for common benefit funds.

Further, as a condition in the Texas Janssen and Texas Distributors settlements, the portion of the Texas attorney's fees and expenses relating to the global funds require only a *best-efforts* application with specified Texas eligibility criteria. Similarly, a condition in the Texas Distributors Settlement is an application by eligible Texas counsel solely to recoup contingency fees on a mathematical formula, and a designated amount of costs. On April 1, 2022, the Federal MDL Court entered an Order establishing protocols for reimbursement by Global settlement participants' counsel under the Global Janssen Settlement and Global Distributors Settlement.

3

Because both the Texas Janssen Settlement and the Texas Distributors Settlement are expressly subject to the exclusive jurisdiction and oversight of this Court as to the Settlements, and both settlements establish the eligibility criteria and mechanisms for fee and cost applications to the Arbitration Panel [Ex. A, Section IX.B; Ex. B, Section VIII], the Texas PSC and the Texas MDL Fee Committee seek to establish the protocols for application of these funds to the Arbitration Panel. Subsequent to notice of such awards to this Court, the PSC and the Texas MDL Fee Committee seek authorization for the Fee Panel to direct transfer of any award as per the Texas Janssen Settlement Agreement and Texas Distributors Settlement Agreement.

While this Court also has exclusive jurisdiction over the two additional Texas settlements with the Endo/Par defendants and the TEVA defendants, neither have a corresponding global settlement at issue in this Motion.

An explanation of the application for global funds under the Texas Janssen Settlement and the Texas Distributors Settlement is set forth in Sections III and IV below.

**III.     Global Funds Under the Texas Janssen Settlement**

Fees and costs under the Texas Janssen Settlement of $19,363,740.68 in attorney's fees and $1,887,964.72, respectively, were deposited into the Texas Qualified Settlement Fund established by this Court.[1] A portion of the fees and costs included monies Janssen funded into the Global Attorneys' Fees and Cost Funds for the benefit of Texas Counsel. Under the Texas Janssen Settlement, Texas counsel is required to use best efforts to apply for and recover such funds from the Global funds and direct the administrators of such funds to rebate all payments such counsel is awarded to Janssen. Unlike the Global Janssen Settlement that pays over 9 years, pays fees over 7 years, and costs over 3 years, the Texas Janssen Settlement is fully deposited and distributable.

---

[1]  These amounts represent Janssen's maximum payment into the Global Funds at 6.2932157196% of the Global Attorney Fee Fund ($307,692,307.73) and the Global Cost Fund ($30,000,000.00). Ex. A, Section IX.

The obligations of the PSC, on behalf of Texas Counsel, solely related to reimbursement to Janssen of the Texas share of fees and costs paid into the Global funds.

The Global Fee fund is divided 40% to Contingency Fee and 60% to Common Benefit Fee. The Arbitration Panel and the Janssen Global Settlement adopt and establish a mathematical formula for Contingent Fees, and the Texas Janssen Settlement establishes the criteria upon which Texas Counsel may be awarded Common Benefit Fees.

The mathematical formula was established by Mr. Joseph Tann, who calculated the contingent fee as to Texas Participating Subdivisions to the Arbitration Panel to recover, for reimbursement to Janssen, approximately $8,118,791 in contingent fees out of the $19,363,740.68 deposited by Janssen into the Texas QSF. The Texas Janssen Settlement establishes the criteria for application (and reimbursement to Janssen) to the Arbitration Panel for both the $8,118,791 and the remaining $11,244,949.68. Specifically, the Texas Janssen Settlement criteria for application establishes that Texas counsel may receive payment from the Texas Attorney Fee Fund, which includes both the Contingency Fee Fund and the Common Benefit Fund, and the Attorney Cost Fund, if the following 4 prongs of the eligibility criteria in Section IX.B of the Texas Janssen Settlement are met:

1. The Attorney must expressly waive the enforcement against the Litigating Subdivision client of all Fee Entitlements (other than under State Back Stop Agreements) arising out of or related to any or all Qualifying Representations of any Participating Litigating Subdivision prior to applying for attorneys' fees from the Attorney Fee Fund or costs from the Cost Funds. All applications for attorneys' fees or costs under this Fee Agreement shall include an affirmation by the Attorney of such waiver and notice to the client(s) of such waiver. Such waiver shall not preclude the Attorney from

submitting such Fee Entitlement to the [Arbitration] Fee Panel as a factor for consideration in allocating payments from the Attorney Fee Fund or in connection with a State Back-Stop Agreement. For the avoidance of doubt, no Attorney may recover fees or costs under this Fee Agreement unless the Attorney expressly agrees not to enforce Fee Entitlements as to each and every Participating Litigating Subdivision represented by that Attorney, but such Attorneys may participate in and receive funds from a State Back-Stop Agreement;

2. The Attorney must represent s/he has no present intent to represent or participate in the representation of any Later Litigating Subdivision or any Releasor with respect to Released Claims against Released Entities;

3. The Attorney must represent s/he will not charge or accept any referral fees for any Released Claims brought against Released Entities by later Litigating Subdivisions. For the avoidance of doubt, this representation shall not prohibit Attorneys from receiving allocated shares of any future common benefit assessments arising out of settlements or judgments with Later Litigating Subdivisions represented by other Attorneys that are the result of the MDL Court's Common Benefit order;

4. The Attorney may not have and must represent that s/he does not have a Fee Entitlement to a Later Litigating Subdivision.

[Exhibit A, Section IX. B 1-4].

IV.    **Global Funds Under the Texas Distributors Settlement**

Of the more than $1.29 billion in global fees and costs set aside for participating counsel, the Texas Counsel's application to the global funds is solely to the Contingency Fee Fund (as a mathematical formula) in the amount of approximately $33,578,899, and to reimburse documented

6

costs of $7,551,745.89 from the $120 million global costs fund.[2] Upon award by the [Arbitration] Fee Panel, such fees and costs are to be paid by the global administrator directly into the Texas Qualified Settlement Fund (per the global payment schedule) as awarded by the Panel and under the jurisdiction of this Court. [Ex. B, Section VIII.B 1 and 2].

The Texas Distributors Settlement expressly establishes that Texas Counsel are eligible for the funds by stating that the "Parties agree that Texas subdivision counsel are eligible for the Contingency Fee Fund, and upon application by the Texas Plaintiff's Steering Committee and approval by the [Arbitration] Fee Panel, eligible for fees from the Global Contingency Fee Fund of an estimated $33,578,899.00, in subdivision attorney fees" as a reflection of the Texas subdivision attorney share of the fund. [Ex. B, Section VIII.B.1]. The Parties further agreed that Texas Subdivisions counsel are eligible for the Global Cost Fund. [Ex. B, Section VIII.B.2]. The prongs of eligibility criteria and mechanisms for the Contingency Fee for the Texas Distributors Settlement are established in Section Y of the Global Settlement.

As with the Texas Janssen Settlement, the mathematical formula was established by Mr. Joseph Tann, which substantiates and supplies that mathematical calculation as to Texas Participating Subdivisions to the Arbitration Panel to recover from the Global Contingency Fee Fund the allocated amount of approximately $33,578,899, upon providing the inputs for the formula and establishing the eligibility criteria in Global Fund, Exhibit R, Section Y:1-10 (Eligibility).

---

[2] These amounts represent the Distributors' maximum payment into the Global Funds at 6.2932157196% of the Global Attorney Fee Fund ($1,292,307,692.73) and the Global Cost Fund ($120,000,000). Ex. B, Section VIII.

V.     **Proposed Application Process to the Arbitration Panel**

The PSC and Fee Committee propose that the process as established in the Texas Janssen Settlement, the Texas Distributors Settlement, and through the Arbitration Fee Panel Agreement be implemented, and that the Court:

1. Adopt and authorize the Arbitration Fee Panel to establish a deadline of May 5, 2022, for the Texas Contingency Fees, and to implement the mathematical formula used to calculate Texas Contingency Fee from the Global Settlement Contingency Fee Fund, and direct payment according to the respective Texas settlements for the estimated $8,118,791 (Texas Janssen Settlement) and estimated $33,578,899 (Texas Distributors Settlement);

2. Authorize the Arbitration Fee Panel to establish a deadline of May 5, 2022, for a cost application, to review and award Costs from the Costs Fund in the amounts provided in the Texas Janssen Settlement ($1,887,964.72) and Texas Distributors Settlement ($7,551,745.89), and direct payment from any award according to the respective Texas settlements;

3. Approve and Authorize the Arbitration Fee Panel to establish an application deadline of May 5, 2022, and to conduct a review as to the estimated $11,244,949 from the Janssen common benefit fund in accordance with the Texas Janssen Settlement Agreement. Further, to authorize the Fee Panel, under this provision only, to invite input from the Texas MDL Liaisons to the Panel to provide insight into the quantity and quality of the work claimed in the Fee Applications and submissions. All information exchanged between the Fee Panel and such Attorneys shall be treated by all participants as confidential. Further, to authorize the Fee Panel, under this provision

8

only and upon a majority vote of the Panel, to conduct interviews with Fee applicants at the discretion of the Panel, to ask questions regarding information contained in the Fee Applications and any Attorney Time Reports in the presence of a court reporter if desired; all such information is to be used solely by the Fee Panel, must be treated as confidential, and may not be disclosed beyond the Fee Panel for any purpose. Further directing that none of the Fee Panel meetings, interviews, fee applications, or related submissions or materials are subject to discovery;

4.  Directing that, after deliberation, the Arbitration Fee Panel shall issue their preliminary Fee and Cost award for Texas Settlement Counsel on or before June 5, 2022, to the Texas applicants through the Texas MDL Fee Committee Liaisons, after having considered all relevant factors in the Arbitration Panel Agreement and Texas Janssen and Distributor Settlement Agreements. The Arbitration Fee Panel shall direct the Texas Fee Committee to consult with participating Texas Counsel as to the Arbitration Fee Panel's preliminary award and provide the preliminary award to participating Texas Counsel. The Texas Fee Committee shall have fifteen (15) days after the Arbitration Panel's preliminary award to accept the preliminary Fee and Cost award, or submit a detailed written objections to the Fee Panel to include a statement that the fee or cost allocation is disputed, the basis and reasoning for the dispute along with any relevant legal authority, a proposed resolution, and a request to appear before the Fee Panel by zoom or in person through the Texas Liaison representatives or any two designated persons. More persons may be included upon a reasonable request for leave and identification of such persons to the Fee Panel. Any such conference shall be in the presence of a court reporter and is subject to use by the Fee Panel. The Arbitration Fee

9

Panel shall make final recommendations within thirty (30) days of the disputed preliminary award, issue any award to reimburse the Janssen Contingency Fee Fund, and authorize costs to be provided to the Arbitration Panel in the respective amounts in the settlement for approval; establish a deadline of May 5, 2022, to provide a Texas Fee and Cost application to the Arbitration Panel; establish an Arbitration Panel Award deadline of thirty (30) days thereafter (June 6, 2022), and establish an appeal process to the Arbitration Fee Panel of fifteen (15) days thereafter (June 21, 2022). The Arbitration Panel's final recommendation shall authorize the Arbitration Panel and this Court to direct reimbursement to Janssen of any Arbitration Award for fees or costs by the Panel, and direct payment into the Texas Qualified Settlement Fund for the benefit of identified Texas participating subdivision counsel any Fee Awards, and the payment of any Costs award to the Texas Qualified Settlement Fund to reimburse Texas PSC and counsel costs as per the global fee fund schedule for payment;

5. Directing that the Arbitration Fee Panel shall notify the Court of its final allocations from the Global Fee and Cost Funds under the Texas Janssen Settlement and the Texas Distributors Settlement and shall simultaneously notify the administrator of the respective Funds.

This process is intended to be consistent with the Arbitration Fee Panel's approval of deadlines and process of global settlement Texas participating subdivision counsel.

WHEREFORE, PREMISES CONSIDERED, Movants pray that the Court grant their Motion, and for such other and further relief to which they may show themselves to be justly entitled.

Respectfully submitted,

**SIMON GREENSTONE PANATIER, P.C.**

*/s/ Jeffrey B. Simon*
Jeffrey B. Simon, Lead Counsel, TX PSC
TX State Bar No. 00788420
1201 Elm Street, Suite 3400
Dallas, Texas 75270 Tel: 214-276-7680
Fax: 214-276-7699
jsimon@sgptrial.com

Plaintiff's Steering Committee Chairman

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2022, a true and correct copy of the Plaintiff Steering Committee's Motion was served to all counsel of record.

*/s/ Jeffrey B. Simon*
Jeffrey B. Simon, Chair, TX PSC

## CERTIFICATE OF CONFERENCE

Pursuant to Harris County Local Rule 3.3.6, this is to certify that on April 22, 2022, I conferred with counsel for Allergan Finance, opposing counsel, and asked if they were going to oppose our motion. Defendant indicated they do not oppose Plaintiffs' motion. Thus, this motion is presented to the Court for consideration.

*/s/ Jeffrey Simon*
Jeffrey Simon

11



# EXHIBIT A

## JANSSEN TEXAS STATE-WIDE OPIOID SETTLEMENT AGREEMENT AND SETTLEMENT TERM SHEET

### I.  Overview

This Agreement sets forth the principal terms and conditions of a settlement agreement between and among the State of Texas, all Texas Participating Subdivisions, and Janssen (collectively, "the Parties") to resolve opioid-related Claims against Janssen.

The Parties intend the terms of this Agreement to parallel the terms of the Global Prescription Opiate Litigation Settlement Agreement ("Global Settlement") dated July 21, 2021. If the Global Settlement becomes effective by February 15, 2022, its terms will supersede the terms of this Agreement except for Sections III (Monetary Relief and Payments), VI (Dismissal of Claims), VII (Release), and IX (Attorney Fee and Cost Payments).

Janssen has agreed to the below terms for the sole purpose of settlement, and nothing herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose. This Agreement is not contingent on the Global Settlement taking effect.

This Agreement resolves Janssen's portion of *State of Texas v. Janssen Pharmaceuticals, Inc. et al.*, Cause No. D-1-GN-19-005458; *County of Dallas v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77098 and *County of Bexar v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77066, both bellwether cases in *In re: Texas Opioid Litigation*, MDL No. 18-0358 (Harris County, Texas); *Tarrant County v. Purdue Pharma, L.P. et al.*, MDL No. 2804, Case No. TXN/3:18-cv00518; and cases brought by Participating Subdivisions.

### II.  Definitions[1]

A.  "*Actions*" means of *State of Texas v. Janssen Pharmaceuticals, Inc. et al.*, Cause No. D-1-GN-19-005458; *County of Dallas v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77098 and *County of Bexar v. Purdue Pharma, L.P. et al.*, MDL Pretrial Cause No. 2018-77066, both bellwether cases in *In re: Texas Opioid Litigation*, MDL No. 18-0358 (Harris County, Texas); *Tarrant County v. Purdue Pharma, L.P. et al.*, MDL No. 2804, Case No. TXN/3:18-cv00518; and cases brought by Participating Subdivisions.

B.  "*Agreement*" means this term sheet together with the exhibits thereto.

C.  "*Bar*" means either (1) a ruling by the highest court of the State setting forth the general principle that no Subdivisions or Special Districts in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law barring Subdivisions and Special Districts in the State from

---

[1] Capitalized terms not defined in this Agreement have the same meaning they have in the Global Settlement.

maintaining or asserting Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (3) a Settlement Class Resolution in the State with full force and effect. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement) shall not constitute a Bar.

D.  *"Case-Specific Resolution"* means either (1) a law barring specified Subdivisions or Special Districts from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); (2) a ruling by a court of competent jurisdiction over a particular Subdivision or Special District that has the legal effect of barring the Subdivision or Special District from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) in the case of a Special District, a release consistent with Section VII below. For the avoidance of doubt, a law, ruling, or release that is conditioned or predicated upon a post-Effective Date payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it) shall not constitute a Case-Specific Resolution.

E.  *"Claim"* means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

F.  *"Covered Conduct"* means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the date of execution of this Agreement (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (a) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any

2

Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

G.  *"Consent Judgment"* means a consent decree, order, judgment, or similar action.

H.  *"Court"* means the court to which the Agreement and the Consent Judgment are presented for approval and/or entry.

I.  *"Direct Share Allocation"* means 1.9% of Texas's allocation of the Global Settlement Abatement Amount in the Global Settlement ($268,381,445.79) allocated to Bexar, Dallas, and Tarrant Counties under the separate Janssen Opioid Settlement Agreement and Settlement Term Sheet with Bexar County, Dallas County, and Tarrant County.

J.  *"Effective Date"* means the date of entry of a final Consent Judgment, which shall be filed no later than 30 days after the Initial Participation Date.

K.  *"Finality"* means:

   a.  the Agreement and the Consent Judgment have been approved and entered by the Court as to Janssen, including the release of all Released Claims against Released Entities as provided in this Agreement;

   b.  for all lawsuits brought by the State against Released Entities for Released Claims, either previously filed or filed as part of the entry of the Consent Judgment, the Court has stated in the Consent Judgment or otherwise entered an order finding that all Released Claims against Released Entities asserted in the lawsuit have been resolved by agreement; and

   c.  (1) the time for appeal or to seek review of or permission to appeal from the approval and entry as described in subsection (a) hereof and entry of such order described in subsection (b) hereof has expired; or (2) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described in (a) hereof and the order described in subsection (b) hereof have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

L.  *"Global Settlement"* means an agreement in which the State of Texas participates, except to the extent modified by this Agreement whose terms shall control in the event that the

conditions specified in Section III.B.1 are met, resolving the litigation and claims brought or threatened to be brought by states and subdivisions against Janssen, including claims against Janssen asserted in the multi-district litigation *In re: Nationwide Prescription Opiate Litigation,* MDL No. 2804 (N.D. Ohio) ("MDL") and state court prescription opiate litigation.

M.    *"Initial Participation Date"* means the date by which Subdivisions must join to become initial Participating Subdivisions. The Initial Participation Date shall be 30 days after the execution of this Agreement.

N.    *"Janssen"* means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.

O.    *"Later Litigating Special District"* means a Special District (or Special District Official asserting the right of or for the Special District to recover for alleged harms to the Special District and/or the people thereof) that is not a Litigating Special District and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the execution date of this Agreement. It may also include a Litigating Special District whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Special District takes any affirmative step in its lawsuit other than seeking a stay or removal.

P.    *"Later Litigating Subdivision"* means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that is not a Litigating Subdivision and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date. It may also include a Litigating Subdivision whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the Effective Date, when such Litigating Subdivision takes any affirmative step in its lawsuit other than seeking a stay or removal.

Q.    *"Litigating Special District"* means a Special District (or Special District official) that brought any Released Claims against any Released Entities on or before the execution date of this Agreement that were not separately resolved prior to that date. A list of Litigating Special Districts will be agreed to by the parties.

R.    *"Litigating Subdivision"* means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that brought any Released Claims against any Released Entities on or before the Effective Date that were not separately resolved prior to that date. A list of Litigating Subdivisions will be agreed to by the parties.

S.    *"Non-Litigating Special District"* means a Special District that is neither a Litigating Special District nor a Later Litigating Special District.

T.    *"Non-Litigating Subdivision"* means a Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

4

U.  "*Non-Participating Subdivision*" means a Subdivision that is not a Participating Subdivision.

V.  "*Participating Subdivision*" means a Subdivision that signs the Election and Release Form annexed as Exhibit A and meets the requirements for becoming a Participating Subdivision under subsection VIII.A. Dallas, Bexar, and Tarrant Counties shall execute the Election and Release Form annexed as Exhibit A and shall be Participating Subdivisions.

W.  "*Primary Subdivision*" means a Subdivision that has a population of 30,000 or more residents pursuant to the 2019 U.S. Census estimate.

X.  "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the avoidance of doubt, "Product" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. "Product" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

Y.  "*Qualified Settlement Fund*" means the Texas Qualified Settlement Fund established by this Agreement into which all payments by Janssen are made, unless otherwise expressly provided in this Agreement, and which shall be established under the authority and jurisdiction of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas, for the Subdivision share, and under the authority and jurisdiction of the Court in which the Consent Judgment is filed for the State share.

Z.  "*Qualified Settlement Fund Administrator*" means the Administrator appointed to administer the Texas Qualified Settlement Fund under the authority and jurisdiction of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas, for the Regional Share and the Subdivision share, to include Subdivision allocations, fees and expenses, and under the authority and jurisdiction of the Court in which the Consent Judgment is filed for the State share.

AA.  "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the State or any of its Litigating

Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by the State, any of its Subdivisions or Special Districts, or any Releasor (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought by a Later Litigating Subdivision or other non-party Subdivision or Special District that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

BB.    *"Released Entities"* means Janssen and (1) all of Janssen's past and present direct or indirect parents, subsidiaries, divisions, predecessors, successors, assigns, including Noramco, Inc. and Tasmanian Alkaloids PTY. LTD.; (2) the past and present direct or indirect subsidiaries, divisions, and joint ventures, of any of the foregoing; (3) all of Janssen's insurers (solely in their role as insurers with respect to the Released Claims); (4) all of Janssen's, or of any entity described in subsection (1), past and present joint ventures; and (5) the respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, agents, and employees of any of the foregoing (for actions that occurred during and related to their work for, or employment with, Janssen). Any person or entity described in subsections (3)-(5) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity.

CC.    *"Releasors"* means (1) the State of Texas; (2) each Participating Subdivision, including Dallas, Bexar, and Tarrant Counties; and (3) without limitation and to the maximum extent of the power of the State of Texas's Attorney General, and/or each Participating Subdivision to release Claims, (a) the State of Texas's and/or Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts, and other Special Districts in the State, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Texas or Subdivisions in the State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide an Election and Release Form providing for a release to the fullest extent of the Participating Subdivision's authority, which shall be attached as an exhibit to the

Agreement. The State of Texas's Attorney General represents that he or she has or has obtained the authority set forth in the Representation and Warranty Section.

DD. *"Settlement Class Resolution"* means a class action resolution in a court of competent jurisdiction in the State with respect to a class of Subdivisions and Special Districts in the State that (1) conforms with the State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in the State and has achieved Finality; (3) is binding on all Non-Participating Subdivisions and Special Districts in the State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions or Special Districts may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Janssen other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable State law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing 1% or more of the State's population opt out. In seeking certification of any Settlement Class, the applicable State and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

EE. *"Special District"* means a formal and legally recognized sub-entity of the State that is authorized by State law to provide one or a limited number of designated functions, including but not limited to school districts, fire districts, healthcare & hospital districts, and emergency services districts. Special Districts do not include sub-entities of the State that provide general governance for a defined area that would qualify as a Subdivision.

FF. *"State"* means the State of Texas.

GG. *"Subdivision(s)"* means a formal and legally recognized sub-entity of the State of Texas that provides general governance for a defined area, including a county, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and other functional levels of sub-entities of the State that provide general governance for a defined area. Historic, non-functioning sub-entities of the State of Texas are not Subdivisions, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, parens patriae, or any other capacity. For purposes of this Agreement, the term Subdivision does not include Special Districts. A list of Texas Subdivisions will be agreed to prior to any Subdivision sign-on period.

### III.   Monetary Relief and Payments

A.   Remediation and Restitution Payments

   1.   Within 30 days after the execution of this Agreement, Janssen shall pay into the Qualified Settlement Fund the sum of $291,841,754.89, representing Texas's

7

allocation of the Global Settlement Abatement Amount in the Global Settlement ($268,381,445.79), plus the fees and costs provided for in Sections IX.A.1, IX.A.2, and IX.A.3, totaling $28,559,556.57, minus the Direct Share Allocation to Bexar, Dallas, and Tarrant Counties. Release of these funds is contingent upon the satisfaction of the conditions described in Section III.B below. If the conditions described in Section III.B below are not satisfied, the amount paid under this Section shall revert to Janssen.

2.  After theDirect Share Allocation to Bexar, Dallas, and Tarrant Counties as described in Section I. I, the remainder per Section III.A.1. above shall be allocated in accordance with the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit B and incorporated herein by reference (the *"Texas Intrastate Term Sheet"*). Accordingly, the Subdivision Share shall be: $39,492,329.75; the Texas Opioid Abatement Fund Share shall be $184,297,538.82; and the State Share shall be $39,492,329.75.

B.  Release of Payment for Full Joinder of Litigating Subdivisions and Special Districts and Support of Legislative Bar in 2021

1.  If the Texas Attorney General notifies Janssen within 45 days of the date of execution of this Agreement that (1) Litigating Subdivisions and Litigating Special Districts representing 96% of the population of Litigating Subdivisions and Special Districts have become Participating Subdivisions or Participating Special Districts or had their claims released consistent with Section VII, and (2) all such Subdivisions and Special Districts support the legislative enactment of a Bar as defined in Section II.C.2 and are using their best efforts to achieve enactment in 2021, the State shall be entitled to the full amount payable under this Agreement on or before December 31, 2021. In such event, the amount paid by Janssen into the Qualified Settlement Fund under Section III.A shall be disbursed on December 31, 2021. The State and counsel for Dallas, Bexar, and Tarrant Counties acknowledge the materiality of their becoming Participating Subdivisions, release of claims consistent with Section VII, and their meaningful support for legislative enactment of a Bar to qualify for an accelerated payment under this subsection.

2.  To the extent that less than 100% of the population of Litigating Subdivisions and Litigating Special Districts become Participating Subdivisions or Participating Special Districts, Janssen shall be entitled to a reimbursement of the full allocation for each Non-Participating Subdivision or Non-Participating Special District, from the total $268,381,445.79 plus attorney fees and costs.

## IV.     Intra-State Allocation

Janssen's payments shall be allocated according to this Agreement and the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit B and incorporated herein by reference (the *"Texas Intrastate Term Sheet"*), and pursuant to Tex. Gov't Code Ann. §405.505 (2019) and Opioid Abatement Trust Fund established by Tex. Gov't Code

8

Ann.§405.506 (2019), according to the guidelines established in Tex. Gov't Code Ann. Chapter 403, Subchapter R, Statewide Opioid Settlement.

## V.    Injunctive Relief

The Parties agree to the injunctive relief as specified in Exhibit C.

## VI.    Dismissal of Claims

Upon the execution of this Agreement, while awaiting formal approval of the Agreement by the Commissioners Courts of Dallas, Bexar, and Tarrant Counties, the Parties agree to stay or extend all deadlines and proceedings in the Actions as to Janssen and to jointly move for the claims against Janssen to be severed from the Actions. It is the Parties' intent that all litigation activities in the Actions relating to the State of Texas and Dallas, Bexar, and Tarrant Counties' claims against Janssen shall immediately cease as of the date of the execution of this Agreement and that the claims against Janssen not be included in the trial of the Actions against the other defendants. Concurrently with the execution of this Agreement, the State of Texas and Dallas, Bexar, and Tarrant Counties will execute an Agreed Motion to Dismiss with Prejudice, in the form annexed hereto as Exhibit D. The Parties will hold Dallas, Bexar and Tarrant Counties' Agreed Motion to Dismiss with Prejudice in escrow until the Counties' Commissioners Courts approve the Agreement or a resolution is passed satisfying the approval process of the Agreement. Once approval is given, Dallas, Bexar, and Tarrant Counties and/or Janssen shall promptly submit the executed Agreed Motion to Dismiss with Prejudice to the courts in which their actions are pending with a request that it be so ordered. In the event the Counties' Commissioners Courts fail to approve the Agreement or the Court declines to so order the discontinuance of the Actions with prejudice as against Janssen, Janssen shall be entitled to terminate the Agreement and shall be excused from all obligations under it. Concurrently with the execution of this Agreement, Janssen and the State will execute a separate Agreed Motion to Dismiss with Prejudice covering the State's claims against Janssen. The State's Agreed Motion to Dismiss with Prejudice will be held in escrow until the Effective Date and shall be submitted to the Court with a request that it be so ordered concurrently with the entry of the Consent Judgment implementing this Agreement.

## VII.    Release

A.    *Scope*. As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. The State of Texas (for itself and its Releasors), Dallas, Bexar, and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the

State of Texas, its Attorney General, and each Releasor to release claims. The Release shall be a complete bar to any Released Claim.

B.  *Claim Over and Non-Party Settlement.*

1.  *Statement of Intent.* It is the intent of the Parties that:

    a.  Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

    b.  the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

    c.  Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

    d.  the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

    e.  The provisions of this subsection VII.B are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2.  *Contribution/Indemnity Prohibited.* No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3.  *Non-Party Settlement.* To the extent that, on or after the Effective Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Janssen in subsection VII.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

10

4.    *Claim-Over.* In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection VII.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection VII.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, that Releasor and Janssen shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Settlement Agreement by Janssen:

a.    Janssen shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Settlement Agreement, whichever is later;

b.    Janssen and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that it is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement;

c.    That Releasor and Janssen shall take steps sufficient and permissible under the law of the State of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement. Such steps may include, where permissible:

    i.    Filing of motions to dismiss or such other appropriate motion by Janssen or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

    ii.    Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

    iii.    Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

    iv.    Return of monies paid by Janssen to that Releasor under this Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

    v.    Payment of monies to Janssen by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

    vi.    Credit to Janssen under this Settlement Agreement to reduce the overall amounts to be paid under the Settlement Agreement such that it is held harmless from the Claim-Over; and

    vii.    Such other actions as that Releasor and Janssen may devise to hold Janssen harmless from the Claim-Over.

    d.    The actions of that Releasor and Janssen taken pursuant to paragraph (c) must, in combination, ensure Janssen is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Agreement.

    e.    In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Janssen may seek review by the National Arbitration Panel, provided that, if the parties agree, such dispute may be heard by the Court where the Consent Judgment was filed. The National Arbitration Panel shall have authority to require Releasors to implement a remedy that includes one or more of the actions specified in paragraph (c) sufficient to hold Released Entities fully harmless. In the event that the panel's actions do not result in Released Entities being held fully harmless, Janssen shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold Janssen harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Janssen may have. If the Global Settlement does not become effective by February 15, 2022, then disputes shall be heard by the Court where the Consent Judgment was filed.

    5.    To the extent that the Claim-Over is based on a contractual indemnity, the obligations under subsection VII.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Janssen shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

C.    *General Release.* In connection with the releases provided for in the Agreement, the State of Texas (for itself and its Releasors), Dallas, Bexar, and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

    **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by

him or her, would have materially affected his or her settlement with
the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors), Dallas, Bexar, and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Subdivisions' decision to participate in the Agreement.

D.     *Cooperation.* Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims. The State shall use its best efforts to secure releases consistent with this Section from all Litigating or Later Litigating Subdivisions and Special Districts.

E.     *Res Judicata.* Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement, and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

F.     *Representation and Warranty.* The signatories of this Agreement on behalf of the State of Texas and its Participating Subdivisions expressly represent and warrant that they will, on or before the Effective Date, have (or have obtained) the authority to settle and release, to the maximum extent of the state's power, all Released Claims of (1) the State of Texas, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State of Texas's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license; and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

G.     *Effectiveness.* The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

13

H.   *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under the Agreement for enforcement of the Agreement.

## VIII.   Participation by Subdivisions

A.   *Requirements for Becoming a Participating Subdivision: Litigating Subdivisions/Later Litigating Subdivisions.* A Litigating Subdivision or Later Litigating Subdivision in the State may become a Participating Subdivision by either executing an Election and Release Form and upon prompt dismissal of its legal action or by having its claims extinguished by operation or law or released by the State's Office of the Attorney General.

B.   *Notice.* In conjunction and accordance with the notice process anticipated in the Global Settlement, the State's Office of the Attorney General shall send individual notice to all Subdivisions in the State of Texas eligible to participate in the settlement and the requirements for participation. Such notice may include publication and other standard forms of notification.

C.   *Requirements for Becoming a Participating Subdivision: Non-Litigating Subdivisions.* A Non-Litigating Subdivision may become a Participating Subdivision by either executing an Election and Release Form specifying (1) that the Subdivision agrees to the terms of this Agreement pertaining to Subdivisions, (2) that the Subdivision releases all Released Claims against all Released Entities, and (3) that the Subdivision submits to the jurisdiction of the court where the Consent Judgment is filed for purposes limited to that court's role under the Agreement or by having their claims extinguished by operation or law or released by the State's Office of the Attorney General.

D.   *Non-Participating Subdivisions.* Non-Participating Subdivisions shall not directly receive any portion of any payments paid to the Texas Qualified Settlement Fund and the State may choose that its Non-Participating Subdivisions are ineligible for benefits from the fund.

E.   *Representation With Respect to Participation Rate.* The State of Texas represents and warrants for itself that it has a good faith belief that virtually all of Texas's Litigating Subdivisions will become Participating Subdivisions. The State acknowledges the materiality of the foregoing representation and warranty. Counsel for Bexar, Dallas, and Tarrant Counties, in good faith, believe this is a fair Settlement. Therefore, counsel for Bexar, Dallas, and Tarrant Counties will, in their best efforts, recommend this Settlement to their subdivision clients within Texas. Further, counsel for Bexar, Dallas, and Tarrant Counties will use their best efforts to secure participation by all Subdivisions within Texas.

F.   Within 5 days of entry of the Notice of Dismissal per subsection VI, the Parties will seek to have entered the Case Management Order annexed hereto as Exhibit F. And, further, Janssen will participate in making motions to dismiss barred claims upon their release.

## IX.   Attorney Fee and Cost Payments

14

A.    The terms for attorney fee and cost payments are as follows:

1.    Janssen shall pay $19,363,740.68, representing 6.2932157196% of Janssen's maximum payment into the Contingency Fee Fund and Common Benefit Fund under the Global Settlement ($307,692,307.73), into the attorney's fee sub-fund within the Texas Qualified Settlement Fund, to be available to reimburse Participating Subdivision attorney fees, upon application by eligible counsel who waive their contingency fees. If the Global Settlement takes effect, counsel for Participating Subdivisions shall make best efforts to apply for and recover maximum awardable attorney fees from Janssen's maximum payment into the Global Settlement Contingency Fee Fund and Global Settlement Common Benefit Fund, and shall direct the administrators of such Funds to rebate any and all payments such counsel would have received (the *"Global Settlement Subdivision Fee Award"*) to Janssen until Janssen has been repaid the full $19,363,740.68. If the Global Settlement Subdivision Fee Award is less than $14,522,805.51, Participating Subdivisions shall repay Janssen from the attorney fee funds allocated by the Texas Intrastate Term Sheet, annexed hereto as Exhibit B, until Janssen has been repaid $14,522,805.51 under this paragraph. For the avoidance of doubt, in no event shall Janssen recoup less than $14,522,805.51.

    a.    These fees shall be divided amongst Participating Subdivisions, including Dallas, Bexar, and Tarrant Counties, as provided in the Texas Intrastate Term Sheet. Nothing in Section IX.A.1 is intended to limit the application of Sections C.5 and C.6 of the Texas Intrastate Term Sheet.

2.    Janssen shall pay $7,307,851.17 in attorneys' fees to the State of Texas, which represents the State's share (10.8573789344%) of the Additional Restitution Amount ($67,307,692) referenced in the Global Settlement, as provided in Exhibit N of the Global Settlement. If the Global Settlement takes effect and the amount paid under this paragraph exceeds the State's share of the Additional Restitution Amount under the Global Settlement, then the amount due under this paragraph shall be reduced dollar for dollar by, and the State shall repay to Janssen, that excess amount.

3.    Janssen shall pay $1,887,964.72, representing 6.2932157196% of Janssen's maximum payment into the Litigating Subdivision Cost Fund under the Global Settlement ($30,000,000), into the Qualified Settlement Fund, to be available to compensate Attorneys for Participating Subdivisions for costs and expenses arising out of representation of Participating Litigating Subdivisions related to their litigation against Janssen. The costs and expenses shall be divided under the jurisdiction of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas. No funds in the Litigating Subdivision Cost Fund may be used to compensate the costs incurred by Non-Participating Subdivisions or Non-Litigating Subdivisions or costs and expenses arising out of representation of any such Subdivision. If the Global Settlement takes effect, counsel for Participating Litigating Subdivisions shall make best efforts to apply for and recover maximum awardable costs from Janssen's maximum payment into the Global Settlement

Litigating Subdivision Cost Fund, and shall direct the administrators of such Fund to rebate any and all payments such counsel would have received (the *"Global Settlement Litigating Subdivision Cost Award"*) to Janssen until Janssen has been repaid the full $1,887,964.72. Counsel for Participating Litigating Subdivisions paid under this paragraph shall direct the administrators of the Global Settlement Litigating Subdivision Cost Fund to rebate any and all payments such counsel would have received to Janssen until Janssen has been repaid the full amount paid under this provision. If such rebate does not reimburse Janssen fully for payments made under this paragraph, Janssen shall be repaid an additional amount from the Subdivision portion of the Texas Qualified Settlement Fund sufficient to reimburse Janssen for the full amount paid under this paragraph, as specified in the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit B.

4. In addition to the payment pursuant to the foregoing paragraph (IX.A.3), the Qualified Settlement Fund Administrator shall allow reimbursement for reasonable costs and expenses as allowed by the Texas Intrastate Term Sheet from the Subdivision Share and Texas Abatement Fund Share, as provided in the Texas Intrastate Term Sheet, to be available to reimburse Participating Subdivision attorney's costs and expenses upon application by eligible counsel who waive their contingency fees. These costs and expenses shall be divided under the jurisdiction and authority of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas, amongst Participating Subdivisions, including Dallas, Bexar, and Tarrant Counties, as provided in the Texas Intrastate Term Sheet. Any excess costs or expenses not allocated to reimburse Participating Subdivision attorney's costs and expenses pursuant to this Agreement under Exhibit B shall be replaced into to the Subdivision Share and Abatement Share Funds by the Qualified Settlement Fund Administrator.

5. The State of Texas shall seek costs through the State Cost Fund established by Exhibit S of the Global Settlement.

6. For the avoidance of doubt, nothing in this Section IX requires Janssen to make any payment beyond that described in Section III.A.1.

7. Nothing in this agreement is intended to limit the application of the Texas Intrastate Term Sheet, which includes the calculation and process for allocation of fees and costs for Texas Political Subdivisions.

B. An Attorney may not receive any payment from the Texas Attorney Fee Fund (which includes both the Contingency Fee Fund and the Common Benefit Fund) unless the following eligibility criteria are met and annually certified by the Attorney:

1. The Attorney must expressly waive the enforcement against the Litigating Subdivision client of all Fee Entitlements (other than under State Back-Stop Agreements) arising out of or related to any or all Qualifying Representations of any

16

Participating Litigating Subdivision prior to applying for attorneys' fees from the Attorney Fee Fund or costs from the Cost Funds. All applications for attorneys' fees or costs under this Fee Agreement shall include an affirmation by the Attorney of such waiver and notice to the client(s) of such waiver. Such waiver shall not preclude the Attorney from submitting such Fee Entitlements to the Fee Panel as a factor for consideration in allocating payments from the Attorney Fee Fund or in connection with a State Back-Stop Agreement. For the avoidance of doubt, no Attorney may recover fees or costs under this Fee Agreement unless the Attorney expressly agrees not to enforce Fee Entitlements as to each and every Participating Litigating Subdivision represented by that Attorney, but such Attorneys may participate in and receive funds from a State Back-Stop Agreement.

2. The Attorney must represent that s/he has no present intent to represent or participate in the representation of any Later Litigating Subdivision or any Releasor with respect to Released Claims against Released Entities.

3. The Attorney must represent s/he will not charge or accept any referral fees for any Released Claims brought against Released Entities by Later Litigating Subdivisions. For the avoidance of doubt, this representation shall not prohibit Attorneys from receiving allocated shares of any future common benefit assessments arising out of settlements or judgments with Later Litigating Subdivisions represented by other Attorneys that are the result of the MDL Court's Common Benefit order.

4. The Attorney may not have and must represent that s/he does not have a Fee Entitlement related to a Later Litigating Subdivision.

## X.    Enforcement and Dispute Resolution

A. The terms of the Agreement are enforceable by the Participating Subdivisions before the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas. and by the State for the Consent Judgment applicable to the State in the court where the Consent Judgment is filed. Janssen consents to the jurisdiction of the Texas MDL Court, and to the court in which the Consent Judgment is filed, limited to resolution of disputes identified in subsection X.C for resolution in the court in which the Consent Judgment is filed.

B. The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this section to resolve the dispute.

C. Disputes not resolved informally shall be resolved in the Court that entered the Consent Judgment for disputes with the Attorney General, or the Texas MDL Court for disputes with subdivisions.

## XI.    Miscellaneous

A. Statement on Restitution and Cooperation

17

1. The Parties agree that, unless required by law or as otherwise provided herein, no less than 86.5% of the total maximum amount paid into the Qualified Settlement Fund, which assumes full joinder and attaining of all incentive payments, shall be directed to remediation and for restitution of harms allegedly caused by Janssen's conduct, and no more than 13.5% of that maximum amount shall be directed to payment of attorney fees. This assumes "fees" paid to the State's Office of the Attorney General may be paid to remediation and restitution.

2. The Parties agree that the purpose of the Qualified Settlement Fund, other than the amounts directed to payment of attorney fees and litigation costs, will be to receive from Janssen and pay over to the State and Participating Subdivisions monies to remediate the harms allegedly caused by Janssen's conduct or to provide restitution for such alleged harms that were previously incurred. The payments received by the Settlement Fund, other than the amounts directed to attorney fees and costs, shall be disbursed to the State and Participating Subdivisions, which were allegedly harmed by Janssen in a manner consistent with their above-stated remedial and/or restitutive purpose. No amount paid to the Fund or paid over to any requesting entity constitutes a fine or penalty.

3. The State and each Participating Subdivision shall, prior to receipt of any direct payments from the Texas Qualified Settlement Fund, provide the Texas Qualified Settlement Fund Administrator with a written statement certifying that: (1) the entity suffered harm allegedly caused by Janssen; (2) the payments to be received by the entity from Janssen represent an amount that is less than or equal to the actual monetary damage allegedly caused by Janssen; and (3) the entity shall use such payments for the sole purpose of remediating the harm allegedly caused by Janssen or to provide restitution for such alleged harms that were previously incurred.

4. The Texas Qualified Settlement Fund Administrator shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering the Consent Judgment becomes binding. On the Form 1098-F, the Texas Qualified Settlement Fund Administrator or requesting entity, as applicable, shall identify such payments from Janssen as remediation/restitution amounts. The Texas Qualified Settlement Fund Administrator or State, as applicable, shall also, on or before January 31 of the year following the calendar year in which the order entering the Consent Judgment becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Janssen.

B. Nothing in this Agreement shall be construed to authorize or require any action by Janssen in violation of applicable federal, state, or other laws.

C. *Future Litigation Contracts.* The State of Texas, by and through its Attorney General, represents that, to the extent permissible by law, it will not approve any future Subdivision or Special District outside counsel contracts for opioid litigation against Janssen.

18

D.  *Modification.* This Agreement may be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court. For purposes of modifying this Agreement or the Consent Judgment, Janssen may contact the Texas Attorney General and Counsel for Dallas, Bexar and Tarrant Counties for purposes of coordinating this process.

E.  Any failure by any party to this Agreement to insist upon the strict performance by any other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Judgment.

F.  *Entire Agreement.* This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto, except as provided herein. In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

G.  *Counterparts.* This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

H.  *Notice.* All notices under this Agreement shall be provided to the following via email and Overnight Mail:

Defendant:

Copy to Janssen's attorneys at:

Charles C. Lifland
Daniel R. Suvor
400 South Hope Street, 18th Floor Los Angeles, CA 90071
Phone: (213) 430-6000
clifland@omm.com
dsuvor@omm.com


For the Attorney General:

Stephanie Eberhardt
Assistant Attorney General
Office of the Attorney General
PO Box 12548
Austin, Texas 78711-2548
stephanie.eberhardt@oag.texas.gov


For Plaintiff Dallas County:

Jeffrey B. Simon
Simon Greenstone Panatier, P.C.
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Phone: (214) 276-7680
jsimon@sgptrial.com


For Plaintiff Bexar County:

Mikal C. Watts
Watts Guerra LLC
4 Dominion Dr.,
Bldg 3, Suite 100
San Antonio, Texas 78257
Phone: (210) 447-0500
mcw@wattsguerra.com


For Plaintiff Tarrant County:

Dara Hegar
The Lanier Law Firm P.C.
10940 West Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
Phone: (713) 659-5200
Dara.Hegar@LanierLawFirm.com


**Approved:**

Dated: _____                    JOHNSON & JOHNSON, JANSSEN
                                     PHARMACEUTICALS, INC., ORTHO-MCNEIL-
                                     JANSSEN PHARMACEUTICALS, INC. N/K/A
                                     JANSSEN PHARMACEUTICALS, INC., AND
                                     JANSSEN PHARMACEUTICA INC. N/K/A
                                     JANSSEN PHARMACEUTICALS, INC.

                                     By: _____
                                         Marc Larkins
                                         Assistant Corporate Secretary
                                         Johnson & Johnson

Jeffrey B. Simon
Simon Greenstone Panatier, P.C.
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Phone: (214) 276-7680
jsimon@sgptrial.com


For Plaintiff Bexar County:

Mikal C. Watts
Watts Guerra LLC
4 Dominion Dr.,
Bldg 3, Suite 100
San Antonio, Texas 78257
Phone: (210) 447-0500
mcw@wattsguerra.com


For Plaintiff Tarrant County:

Dara Hegar
The Lanier Law Firm P.C.
10940 West Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
Phone: (713) 659-5200
Dara.Hegar@LanierLawFirm.com



**Approved:**


Dated: *10-18-21*

JOHNSON & JOHNSON, JANSSEN
PHARMACEUTICALS, INC., ORTHO-MCNEIL-
JANSSEN PHARMACEUTICALS, INC. N/K/A
JANSSEN PHARMACEUTICALS, INC., AND
JANSSEN PHARMACEUTICA INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.

By: _____
Marc Larkins
Assistant Corporate Secretary
Johnson & Johnson

20

Dated: _10-15-21_

THE STATE OF TEXAS

By: _____

Brent Webster
First Assistant Attorney General
Office of the Texas Attorney General


Dated: _10/15/21_

THE COUNTY OF DALLAS, TEXAS

By: _____
Signature

_Jeffrey Simon_____
Printed Name

_Shareholder_____
Title


Attorneys for the County of Dallas, Texas


Dated: _____

THE COUNTY OF BEXAR, TEXAS

By: _____
Signature

_____
Printed Name

_____
Title

Attorneys for the County of Bexar, Texas


Dated: _10/15/21_

THE COUNTY OF TARRANT, TEXAS

21

Dated: _____                    THE STATE OF TEXAS

                                     By: _____

                                         Brent Webster
                                         First Assistant Attorney General
                                         Office of the Texas Attorney General


Dated: _____                    THE COUNTY OF DALLAS, TEXAS

                                     By: _____
                                         Signature

                                         _____
                                         Printed Name

                                         _____
                                         Title


                                     Attorneys for the County of Dallas, Texas


Dated: October 15, 2021              THE COUNTY OF BEXAR, TEXAS

                                     By: *Mikal C. Watts*
                                         Signature

                                         Mikal Watts
                                         Printed Name

                                         Partner, Watts Guerra LLC
                                         Title

                                     Attorneys for the County of Bexar, Texas


Dated: 10/15/21                      THE COUNTY OF TARRANT, TEXAS


21

By:  _Dara Hegar_____
Signature

Dara Hegar
_____
Printed Name

Managing Attorney
_____
Title

Attorneys for the County of Tarrant, Texas

22

**Exhibit A**

## TEXAS SUBDIVISION ELECTION AND RELEASE FORM

This Election and Release Form for Texas Participating Subdivisions resolves opioid-related Claims against Janssen under the terms and conditions set forth in the Janssen Texas State-Wide Opioid Settlement Agreement between Janssen, the State of Texas, and the Counties of Dallas and Bexar (the "Agreement"), the provisions of which are here incorporated by reference in their entirety. Upon executing this Election and Release Form, a Participating Subdivision agrees that, in exchange for the consideration described in the Agreement, the Participating Subdivision is bound by all the terms and conditions of the Agreement, including but not limited to the Release found in Section VII of the Agreement and the provisions concerning participation by Subdivisions in Section VIII, and the Participating Subdivision and its signatories expressly represent and warrant on behalf of themselves that they have, or will have obtained on or before the Effective Date or on or before the execution of this Election and Release Form if executed after the Effective Date, the authority to settle and release, to the maximum extent of the Subdivision's power, all Released Claims related to Covered Conduct. If this Election and Release Form is executed on or before the Initial Participation Date, the Participating Subdivision shall dismiss Janssen and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Janssen or a Released Entity no later than the Initial Participation Date. If this Election and Release Form is executed after the Initial Participation Date, the Participating Subdivision shall dismiss Janssen and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Janssen or a Released Entity concurrently with the execution of this form. By executing this Election and Release Form, the Participating Subdivision submits to the jurisdiction of the Court where the Consent Judgment is filed for purposes limited to that Court's role under the Agreement.

Dated: _____

[TX SUBDIVISION]

By: _____
[COUNSEL]
[FIRM]
[ADDRESS]
[TELEPHONE]
[EMAIL ADDRESS]

*Counsel for [TX SUBDIVISION]*

**Exhibit B**

## TEXAS OPIOID SETTLEMENT SHARING AGREEMENT

[To be added]

**Exhibit C**

28

## Injunctive Relief

### A.    Definitions Specific to this Exhibit

1.    "*Cancer-Related Pain Care*" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

2.    "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen"), including all of their subsidiaries, predecessors, successors, current officers, directors, employees, representatives, agents, affiliates, parents, and assigns acting on behalf of Janssen in the United States.

3.    "*End-of-Life Care*" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

4.    "*Health Care Provider*" means any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, practice, hospital, clinic, or pharmacy.

5.    "*In-Kind Support*" means payment or assistance in the form of goods, commodities, services, or anything else of value.

6.    "*Lobby*" and "*Lobbying*" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq*., and any analogous state or local provisions governing the person or entity being lobbied. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

7.    "*Opioid(s)*" means all naturally occurring, synthetic, or semisynthetic substances that interact with opioid receptors and act like opium. For the avoidance of doubt, the term "Opioid(s)" does not include Imodium.

8.    "*Opioid Product(s)*" means all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Products(s)" shall not include (i) methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients (APIs) used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

29

9. *"OUD"* means opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

10. *"Product(s) for the Treatment of Opioid-Induced Side Effects"* means any over-the-counter or prescription remedy used to treat those side effects identified on the FDA label for any Opioid Product, except that, for purposes of the Agreement, Product(s) for the Treatment of Opioid-Induced Side Effects shall not include products that treat OUD or respiratory depression.

11. *"Promote," "Promoting," "Promotion,"* and *"Promotional"* means dissemination of information or other practices intended or reasonably anticipated to increase sales, prescriptions, or that attempts to influence prescribing practices in the United States. These terms shall not include the provision of scientific information or data in response to unsolicited requests from Health Care Providers or payors as allowed in subsection C.2.e-h.

12. *"Third Party(ies)"* means any person or entity other than Janssen or a government entity.

13. *"Treatment of Pain"* means the provision of therapeutic modalities to alleviate or reduce pain.

14. *"Unbranded Information"* means any information that does not identify a specific branded or generic product.

## B. Ban on Selling and Manufacturing Opioids

1. Janssen shall not manufacture or sell any Opioids or Opioid Products for distribution in the State of Texas. Janssen represents that prior to the Effective Date, it de-listed all of its Opioid Products and no longer ships any of them to or within the United States. Janssen shall provide notice to the State of Texas when the last of the inventory Janssen has shipped has expired.

2. Notwithstanding subsection B.1 above, Janssen may continue to manufacture Nucynta and Nucynta ER (collectively "Nucynta") in accordance with the terms of its April 2, 2015 contract with Depomed, Inc., rights to which were assigned to Collegium Pharmaceutical, Inc. ("Collegium") on February 13, 2020, so long as Janssen is not Promoting Nucynta, or selling Nucynta to anyone other than Collegium. Janssen shall not extend, amend, or otherwise alter the terms of its April 2, 2015 contract or enter into any similar agreement related to Nucynta or any other Opioid or Opioid Product. For the term of its April 2, 2015 contract, or until the expiration of subsection B.1, whichever is shorter, Janssen shall make an annual report to the State of Texas showing the amount of Nucynta manufactured in accordance with the April 2, 2015 contract.

C.     **Ban on Promotion**

    1.    Janssen shall not engage in Promotion of Opioids or Opioid Products including but not limited to, by:

        a.    Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients, or to persons involved in determining the Opioid Products included in formularies;

        b.    Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

        c.    Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs for Promotion of Opioids or Opioid Products;

        d.    Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

        e.    Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

        f.    Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

        g.    Engaging in internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet.

    2.    Notwithstanding subsection C.1 directly above, Janssen may:

        a.    Maintain a corporate website;

        b.    Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

        c.    Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in Texas;

d.    Provide the following by mail, electronic mail, on or through Janssen's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in Texas;

e.    Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

f.    Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.    Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h.    Provide information relating solely to the pricing of any Opioid Product;

i.    Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy (REMS) program or other federal or state law or regulation applicable in Texas through an independent Third Party, which shall be responsible for the program's content without the participation of Janssen; and

j.    Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Janssen as the source of the information.

3.      Janssen shall not engage in the Promotion of Products for the Treatment of Opioid-Induced Side Effects, including but not limited to:

     a.      Employing or contracting with sales representatives or other persons to Promote Products for the Treatment of Opioid-Induced Side Effects to Health Care Providers or patients;

     b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote Products for the Treatment of Opioid-Induced Side Effects;

     c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote Products for the Treatment of Opioid-Induced Side Effects;

     d.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Products for the Treatment of Opioid-Induced Side Effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4.      Notwithstanding subsection C.3 directly above, Janssen may Promote Products for the Treatment of Opioid-Induced Side Effects so long as such Promotion does not associate the product with Opioids or Opioid Products.

5.      Treatment of Pain

     a.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the Treatment of Pain, except that Janssen may continue to Promote the Treatment of Pain with branded non-Opioids, including Tylenol and Motrin.

     b.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the concept that pain is undertreated, except in connection with Promoting the use of branded non-Opioids, including Tylenol and Motrin, for the Treatment of Pain.

     c.      Janssen shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or that otherwise Promotes Opioids or Opioid Products.

6.      Notwithstanding subsection C.5 above:

     a.      Janssen may Promote or provide educational information about the Treatment of Pain with non-Opioids or therapies such as acetaminophen or non-steroidal anti-inflammatory drugs (NSAIDs), including Promoting or providing educational information about such non-Opioids or therapies as alternatives to Opioid use, or as

part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

b.     Janssen may provide educational information about the Treatment of Pain related to medical procedures involving devices manufactured or sold by Janssen, including educational information about Opioids or Opioid Products, so long as such information does not Promote Opioids or Opioid Products.

7.     The Promotional conduct prohibited in subsection C is not prohibited insofar as it relates to the Promotion of Opioids or Opioid Products for Cancer-Related Pain Care or End-of-Life Care only, and so long as Janssen is identified as the sponsor or source of such Promotional conduct.

D.    **No Financial Reward or Discipline Based on Volume of Opioid Sales**

1.     Janssen shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products;

2.     Janssen shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to any person in return for the prescribing, sale, use, or distribution of an Opioid Product; and

3.     Janssen's compensation policies and procedures shall ensure compliance with the Agreement.

E.    **Ban on Funding/Grants to Third Parties**

1.     Janssen shall not directly or indirectly provide financial support or In-Kind Support to any Third Party that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects (subject to subsections C.2, 4, and 6), including educational programs or websites that Promote Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects, excluding financial support otherwise required by the Agreement, a court order, or by a federal or state agency.

2.     Janssen shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects.

3.     Janssen shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects (subject to subsections C.2, 4, and 6).

34

4.      Janssen shall not use, assist, or employ any Third Party to engage in any activity that Janssen itself would be prohibited from engaging in pursuant to the Agreement. To the extent Janssen supports trade groups engaged in Lobbying, Janssen shall stipulate that such support not be used for any purpose prohibited by the Agreement.

5.      Janssen shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      Janssen shall not compensate or support Health Care Providers or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payors, i.e., any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers.

7.      No officer or management-level employee of Janssen may concurrently serve as a director, board member, employee, agent, or officer of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or management-level employee of Janssen from concurrently serving on the board of a hospital.

8.      Janssen shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-Induced Side Effects. For avoidance of doubt, nothing in this paragraph shall prohibit Janssen from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or Board member at any such entity.

F.      **Lobbying Restrictions**

1.      Janssen shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

      a.      Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

      b.      Has the effect of limiting access to any non-Opioid alternative pain treatments; or

      c.      Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.      Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

35

a.     The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

b.     The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

c.     The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

d.     The limitation of initial prescriptions of Opioids to treat acute pain;

e.     The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

f.     The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

g.     Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

h.     The implementation or use of Opioid drug disposal systems.

3.     Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of PDMPs, including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4.     Notwithstanding the foregoing restrictions in subsections F.1-3, the following conduct is not restricted:

a.     Challenging the enforcement of or suing for declaratory or injunctive relief with respect to legislation, rules, or regulations referred to in subsection F.1;

b.     Communications made by Janssen in response to a statute, rule, regulation, or order requiring such communication;

c.     Communications by a Janssen representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

d.     Responding, in a manner consistent with the Agreement, to an unsolicited request for the input on the passage of legislation or the promulgation of any

36

rule or regulation when such request is submitted in writing specifically to Janssen from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation; or

e.      Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections F.1-3, so long as the company does not support specific portions of such legislation or regulation covered by subsection F.1 or oppose specific portions of such legislation or regulation covered by subsections F.2-3.

5.      Janssen shall provide notice of the prohibitions in subsection F to all employees engaged in Lobbying; shall incorporate the prohibitions in subsection F into trainings provided to Janssen employees engaged in Lobbying; and shall certify to the State of Texas that it has provided such notice and trainings to Janssen employees engaged in Lobbying.

## G.      Ban on Prescription Savings Programs

1.      Janssen shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

2.      Janssen shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

3.      Janssen shall not directly or indirectly assist patients, Health Care Providers, or pharmacies with the claims and/or prior authorization process required for third-party payors to approve payment for any Opioid Product.

## H.      General Terms

1.      Janssen shall not make any written or oral statement about Opioids or any Opioid Product that is unfair, false, misleading, or deceptive as defined under the law of Texas. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

2.      Janssen shall not represent that Opioids or any Opioid Product(s) have approvals, characteristics, uses, benefits, or qualities that they do not have. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

3.      For the avoidance of doubt, the Agreement shall not be construed or used as a waiver or limitation of any defense otherwise available to Janssen in any action, and nothing in the Agreement is intended to or shall be construed to prohibit Janssen in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in defense of litigation or other legal proceedings.

4.      Upon the request of the Texas Attorney General, Janssen shall provide the Texas Attorney General with copies of the following, within thirty (30) days of the request:

      a.      Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Janssen's Opioid Product(s); and

      b.      Warning or untitled letters issued by the FDA regarding Janssen's Opioid Product(s) and all correspondence between Janssen and the FDA related to such letters.

5.      The Agreement applies to conduct that results in the Promotion of Opioids or Opioid Products, or the Treatment of Pain inside the United States.

6.      Janssen will enter into the Agreement solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of the Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. The Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

7.      Nothing in the Agreement shall be construed to limit or impair Janssen's ability to:

      a.      Communicate its positions and respond to media inquiries concerning litigation, investigations, reports or other documents or proceedings relating to Janssen or its Opioid Products.

      b.      Maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products, including the website, www.factsaboutourprescriptionopioids.com.

I.      **Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1.      Janssen shall comply with all applicable state laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids or Opioid Products, including conduct permitted by subsection B.2, provided that nothing in this paragraph requires Janssen to violate federal law or regulations, including but not limited to:

      a.      Texas Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

      b.      Texas Consumer Protection Laws;

      c.      Texas laws, regulations, and guidelines related to opioid prescribing, distribution, and disposal;

J.      **Clinical Data Transparency**

38

1.    Janssen agrees to continue sharing clinical trial data under the Yale University Open Data Access (YODA) Project to allow researchers qualified under the program to access the company's proprietary data under the terms of the project.

2.    In the event Yale University discontinues or withdraws from the YODA Project agreement with Janssen, Janssen shall make its clinical research data regarding Opioids and Opioid Products, and any additional clinical research data that Janssen sponsors and controls regarding Opioids and Opioid Products, available to an independent entity that is the functional equivalent of the YODA Project under functionally equivalent terms.

K.    **Enforcement**

1.    For the purposes of resolving disputes with respect to compliance with this Exhibit, should the State of Texas have a reasonable basis to believe that Janssen has engaged in a practice that violates a provision of this Exhibit subsequent to the Effective Date, the State of Texas shall notify Janssen in writing of the specific objection, identify with particularity the provision of the Agreement that the practice appears to violate, and give Janssen thirty (30) days to respond in writing to the notification; provided, however, that the State of Texas may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

2.    Upon receipt of written notice, Janssen shall provide a good faith written response to the State's notification, containing either a statement explaining why Janssen believes it is in compliance with the provisions of this Exhibit of the Agreement, or a detailed explanation of how the alleged violation occurred and a statement explaining how Janssen intends to remedy the alleged breach. Nothing in this section shall be interpreted to limit the State of Texas's civil investigative demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable law, and Janssen reserves all of its rights in responding to a CID or investigative subpoena issued pursuant to such authority.

3.    The State of Texas may agree, in writing, to provide Janssen with additional time beyond thirty (30) days to respond to a notice provided under subsection K.1, above, without Court approval.

4.    Upon giving Janssen thirty (30) days to respond to the notification described above, the State shall also be permitted reasonable access to inspect and copy relevant, non-privileged, non-work product records and documents in possession, custody, or control of Janssen that relate to Janssen's compliance with each provision of the Agreement pursuant to the State of Texas's CID or investigative subpoena authority.

5.    The State of Texas may assert any claim that Janssen has violated the Agreement in a separate civil action to enforce compliance with the Agreement, or may seek any other relief afforded by law for violations of the Agreement, but only after providing Janssen an opportunity to respond to the notification described in subsection K.1, above; provided, however, the State of Texas may take any action if the State believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

6.      In the event of a conflict between the requirements of the Agreement and any other law, regulation, or requirement such that Janssen cannot comply with the law without violating the terms of the Agreement or being subject to adverse action, including fines and penalties, Janssen shall document such conflicts and notify the State of the extent to which it will comply with the Agreement in order to eliminate the conflict within thirty (30) days of Janssen's discovery of the conflict. Janssen shall comply with the terms of the Agreement to the fullest extent possible without violating the law.

7.      Janssen or the State may request that Janssen and the State meet and confer regarding the resolution of an actual or potential conflict between the Agreement and any other law, or between interpretations of the Agreement by different courts. Nothing herein is intended to modify or extend the jurisdiction of any single judicial authority as provided by law.

L.      **Compliance Duration**

1.      Subsections B-J of this Exhibit shall be effective for 10 years from the Effective Date.

2.      Nothing in this Agreement shall relieve Janssen of its independent obligation to fully comply with the laws of the State of Texas after expiration of the 10-year period specified in this subsection.

M.      **Compliance Deadlines**

1.      Janssen must be in full compliance with the provisions included this Agreement by the Effective Date. Nothing herein shall be construed as permitting Janssen to avoid existing legal obligations.

**Exhibit D**

MDL PRETRIAL CAUSE NO. _____

| | | |
|---|---|---|
| _____, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| _____, | § | |
| *Defendants.* | § | _____ COUNTY, TEXAS |

**************************************************************************

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | 152ND JUDICIAL DISTRICT |
| | § | |
| | § | HARRIS COUNTY, TEXAS |

**************************************************************************

## AGREED MOTION TO DISMISS WITH PREJUDICE CLAIMS AGAINST JANSSEN PHARMACEUTICALS, INC., ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC, JANSSEN PHARMACEUTICA, AND JOHNSON & JOHNSON

Plaintiff _____ and Defendants Janssen Pharmaceuticals, Inc., its predecessor companies Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc. (jointly "Janssen"), its parent company, Johnson & Johnson, and Noramco ("J&J," and together with Janssen, "Defendants"), file this Agreed Motion to Dismiss with Prejudice and, in support thereof, respectfully show the Court as follows:

Plaintiff and Defendants (collectively, the "Parties") have settled their disputes by mutual agreement. Therefore, Plaintiff no longer desires to pursue this lawsuit against the above-named Defendants. Accordingly, the parties jointly move that the Court enter an Order dismissing all claims against the Defendants with prejudice.

42

WHEREFORE, PREMISES CONSIDERED, Plaintiff _____ and Janssen

Pharmaceuticals, Inc., its predecessor companies Ortho-McNeil-Janssen Pharmaceuticals, Inc. and

Janssen Pharmaceutica, Inc., and its parent company, Johnson & Johnson, respectfully request that

this Court enter an Order granting this Agreed Motion to Dismiss with Prejudice, dismissing

Plaintiff's claims with prejudice to the re-filing of same, and ordering each party bear its respective

attorneys' fees and costs incurred herein.

Dated: _____, 2021      Respectfully submitted,

By: */s/ Steven J. Wingard* _____
Stephen E. McConnico
Texas Bar No. 3450300
Steven J. Wingard
Texas Bar No. 00788694
John W. Ellis
Texas Bar No. 24078473
SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
512-495-6300 – Phone
512-495-6399 – Fax
smcconnico@scottdoug.com
swingard@scottdoug.com
jellis@scottdoug.com

*Of Counsel:*

Charles C. Lifland (*admitted pro hac vice*)
Sabrina Strong (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com
sstrong@omm.com
Stephen D. Brody (*admitted pro hac vice*)
O'MELVENY & MYERS LLP

1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
sbrody@omm.com

***Attorneys for Defendants Johnson & Johnson,
Janssen Pharmaceuticals, Inc., Ortho-McNeil-
Janssen Pharmaceuticals, Inc. n/k/a Janssen
Pharmaceuticals, Inc., and Janssen Pharmaceutica,
Inc. n/k/a Janssen Pharmaceuticals, Inc.***


[SIGNATURE BLOCK OF COUNSEL FOR
SETTLING PLAINTIFF]


## CERTIFICATE OF SERVICE

I hereby certify that counsel of record are being served with a copy of this document on
_____ in accordance with the Texas Rules of Civil Procedure.


*/s/ Steven J. Wingard*
Steven J. Wingard

**Exhibit E**

List of Litigating Subdivisions and Litigating Special Districts

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Angelina County | Dies & Parkhurst, L.L.P.; Simon Greenstone Panatier Bartlett, P.C. | | 86,715 |
| Bailey County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 7,000 |
| Bastrop County | Phipps Deacon Purnell PLLC | | 88,723 |
| Bee County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 32,565 |
| Bexar County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 2,003,554 |
| Bexar County Hospital District | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Phipps Deacon Purnell PLLC | Bexar County | [TBD] |
| Blanco County | Simon Greenstone Panatier Bartlett, P.C.; Deborah F. Earley; Martin Walker, P.C.; James M. Harris, Jr.; Jeffrey Law Firm; Chris Byrd Law | | 11,931 |
| Bowie County | Simon Greenstone Panatier Bartlett, P.C.; Dunn Nutter & Morgan; Martin Walker, P.C. | | 93,245 |
| Brazos County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough; Matthew S. Daniel | | 229,211 |
| Brooks County | Phipps Deacon Purnell PLLC | | 7,093 |

46

| | | | |
|---|---|---|---|
| Burnet County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 48,155 |
| Caldwell County | Phipps Deacon Purnell PLLC | | 43,664 |
| Calhoun County | Phipps Deacon Purnell PLLC | | 21,290 |
| Cameron County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 423,163 |
| Camp County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 13,094 |
| Cass County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 30,026 |
| Castro County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 7,530 |
| Cherokee County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Richards Penn; Ament & Peacock | | 52,646 |
| Childress County | Altman Legal Group; Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 7,306 |
| City of Eagle Pass | Napoli Shkolnik PLLC; Luis R. Vera & Associates | Maverick County | 29,684 |
| City of Houston | The Lanier Law Firm; Law Office of Richard Schechter, P.C.; Reich and Binstock LLP; Baker Wotring LLP | Harris County | 2,320,268 |
| City of Laredo | Napoli Shkolnik PLLC; Luis R. Vera & Associates | Webb County | 262,491 |
| City of Leon Valley | Phipps Deacon Purnell PLLC; Denton Navarro | Bexar County | 12,306 |

|  | Rocha Bernal & Zech P.C. |  |  |
|---|---|---|---|
| City of San Antonio | The Herrera Law Firm; Baron & Budd, P.C.; Greene, Ketchum, Farrell, Bailey & Tweel LLP; Hill Peterson Carper Bee & Deitzler PLLC; Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A.; McHugh Fuller; Powell & Majestro | Bexar County | 1,547,253 |
| Clay County | Harrison Davis Steakley Morrison Jones, P.C.; Altman Legal Group; Haley & Olson |  | 10,471 |
| Colorado County | The Coffman Law Firm; Mitchell A. Toups, Ltd. |  | 21,493 |
| Cooke County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. |  | 41,257 |
| Coryell County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC |  | 75,951 |
| Dallas County | Simon Greenstone Panatier Bartlett, P.C.; Lanier Law Firm; Cochran Firm |  | 2,635,516 |
| Dallas County Hospital District | Burns Charest LLP; Harrison Davis Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | Dallas County | [TBD] |
| Delta County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. |  | 5,331 |
| Dimmit County | Simon Greenstone Panatier Bartlett, |  | 10,124 |

48

| | | | |
|---|---|---|---|
| | P.C.; Richard A. Dodd, LC; The Armstrong Firm, PLLC | | |
| Duval County | The Barrera Law Firm; The Snapka Law Firm | | 11,157 |
| Ector County | Simon Greenstone Panatier Bartlett, P.C.; Law Office of Robert E. White | | 166,223 |
| El Paso County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 839,238 |
| Ellis County | Motley Rice LLC; Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 184,826 |
| Falls County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 17,297 |
| Fannin County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 35,514 |
| Fort Bend County | Roy L. Cordes, Jr. (County Attorney) | | 811,688 |
| Franklin County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 10,725 |
| Freestone County | Simon Greenstone Panatier Bartlett, P.C.; The Beckham Group | | 19,717 |
| Galveston County | Watts Guerra LLP; O'Neill Law | | 342,139 |
| Grayson County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Sanders, Motley, Young & Gallardo, PLLC | | 136,212 |
| Guadalupe County | Phipps Deacon Purnell PLLC | | 166,847 |
| Guadulupe Valley Hospital | Burns Charest LLP; Harrison Davis | Guadalupe County | [TBD] |

| | Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | | |
|---|---|---|---|
| Hardin County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 57,602 |
| Harris County | Gallagher Law Firm; Fibich Leebron Copeland Briggs; Dan Downey, P.C. | | 4,713,325 |
| Harris County Hospital District | Gallagher Law Firm; Fibich Leebron Copeland Briggs; Dan Downey, P.C. | Harris County | [TBD] |
| Harrison County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Truelove Law Firm, PLLC | | 66,553 |
| Haskell County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 5,658 |
| Hays County | Phipps Deacon Purnell PLLC | | 230,191 |
| Henderson County | Motley Rice LLC; Fears Nachawati, PLLC; Mathew S. Daniel; Ferrer Poirot & Wansbrough | | 82,737 |
| Hidalgo County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Hinojosa Law Firm, P.C. | | 868,707 |
| Hopkins County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 37,084 |
| Houston County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, | | 22,968 |

50

| | P.C.; Griffith & Griffith, P.C. | | |
|---|---|---|---|
| Irving Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | Dallas County | [TBD] |
| Jasper County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 35,529 |
| Jefferson County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 251,565 |
| Jim Hogg County | The Barrera Law Firm; The Snapka Law Firm | | 5,200 |
| Jim Wells County | The Barrera Law Firm; The Snapka Law Firm; The Gutierrez Law Firm; Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 40,482 |
| Johnson County | Fears Nachawati, PLLC; McLean Law Firm, P.C.; Ferrer Poirot & Wansbrough | | 175,817 |
| Jones County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 20,083 |
| Kaufman County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 136,154 |
| Kendall County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Armstrong Firm, PLLC | | 47,431 |
| Kerr County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 52,600 |
| Kinney County | Harrison Davis Steakley Morrison | | 3,667 |

| | Jones, P.C.; Haley & Olson | | |
|---|---|---|---|
| Kleberg County | Michael J. Krueger; The Snapka Law Firm | | 30,680 |
| Lamar County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 49,859 |
| LaSalle County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 7,520 |
| Leon County | Watts Guerra LLP; O'Neill Law; The Gallagher Law Firm | | 17,404 |
| Liberty County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz; Husain Law & Associates, PC; Law Offices of Randall P. Gunter, P.C. | | 88,219 |
| Limestone County | The Beckham Group | | 23,437 |
| Lubbock County | Phipps Deacon Purnell PLLC | | 310,569 |
| Madison County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 14,284 |
| Marion County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 9,854 |
| Maverick County | Napoli Shkolnik PLLC | | 58,722 |
| McLennan County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 256,623 |
| McMullen County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Armstrong Firm, PLLC | | 743 |
| Milam County | Simon Greenstone Panatier Bartlett, | | 24,823 |

| | | | |
|---|---|---|---|
| | P.C.; Fisher, Boyd, Johnson & Huguenard, L.L.P; Richard A. Dodd, LC | | |
| Mitchell County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 8,545 |
| Montgomery County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 607,391 |
| Morris County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 12,388 |
| Nacogdoches County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Lanier Law Firm | | 65,204 |
| Newton County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 13,595 |
| Nolan County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 14,714 |
| Nueces County | The Law Office of Richard Schechter, P.C.; The Lanier Law Firm; The Law Office of James B. Ragan; Reich & Binstock, LLP; The Purnell Law Firm; Phipps Anderson Deacon LLP | | 362,294 |
| Nueces County Hospital District | The Law Office of Richard Schechter, P.C.; The Lanier Law Firm; The Law Office of James B. Ragan; Reich & Binstock, LLP; The Purnell Law Firm; | Nueces County | [TBD] |

| | Phipps Anderson Deacon LLP | | |
|---|---|---|---|
| Orange County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 83,396 |
| Ochiltree County Hospital District | Beggs & Lane RLLP; Frazer PLC; The Bilek Law Firm, L.L.P.; The Kuykendall Group; Law Office of Grant D. Amey, LLC | Ochiltree County | [TBD] |
| Palo Pinto County Hospital District | Burns Charest LLP; Harrison Davis Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | Palo Pinto County | [TBD] |
| Panola County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Love Law Firm, P.C.; Adkison Law Firm | | 23,194 |
| Parker County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 142,878 |
| Polk County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 51,353 |
| Potter County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Lanier Law Firm; Templeton, Smithee, Hayes, Heinrich & Russell, LLP; Mullin, Hoard & Brown, LLP | | 117,415 |
| Red River County | Simon Greenstone Panatier Bartlett, P.C. | | 12,023 |

| | | | |
|---|---|---|---|
| Roberts County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 854 |
| Robertson County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC; The Beckham Group | | 17,074 |
| Rockwall County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 104,915 |
| Rusk County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Love Law Firm, P.C.; Adkison Law Firm | | 54,406 |
| San Patricio County | Alexander Dubose Jefferson Townsend; Joel H. Thomas; Phipps Deacon Purnell LLP | | 66,730 |
| San Saba County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 6,055 |
| Shackelford County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 3,265 |
| Shelby County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Adkison Law Firm | | 25,274 |
| Smith County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 232,751 |
| Socorro Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | El Paso County | [TBD] |
| Stephens County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 9,366 |
| Tarrant County | The Lanier Law Firm; Law Offices of Tom Hall | | 2,102,515 |
| Tarrant County Hospital District | Wick Phillips Gould & Martin, LLP | Tarrant County | [TBD] |

55

| Terrell County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 776 |
|---|---|---|---|
| Texarkana Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | Bowie County | [TBD] |
| Throckmorton County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 1,501 |
| Titus County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 32,750 |
| Travis County | Hendler Flores; Law Office of Richard Schechter, P.C.; Reich and Binstock LLP; The Lanier Law Firm | | 1,273,954 |
| Trinity County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 14,651 |
| Upshur County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Tefteller Law PLLC | | 41,753 |
| Uvalde County | Phipps Deacon Purnell PLLC | | 26,741 |
| Van Zandt County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 56,590 |
| Walker County | Correro & Leisure, P.C.; Park & Durham; G. Allan Van Fleet, P.C. | | 72,791 |
| Waller County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 55,246 |
| Webb County | Cicala Law Firm; Sanford Heisler Sharp | | 276,652 |
| West Wharton County Hospital District | Beggs & Lane RLLP; Frazer PLC; The Bilek Law Firm, | Wharton County | [TBD] |

|  |  |  |  |
|---|---|---|---|
|  | L.L.P.; The Kuykendall Group; Law Office of Grant D. Amey, LLC |  |  |
| Wichita County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson; Altman Law Group |  | 132,230 |
| Williamson County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs |  | 590,551 |
| Wilson County | Phipps Deacon Purnell PLLC |  | 51,070 |
| Wilson County Memorial Hospital District | Phipps Deacon Purnell PLLC | Wilson County | [TBD] |
| Wood County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. |  | 45,539 |
| Zavala County | Napoli Shkolnik PLLC; Luis R. Vera & Associates |  | 11,840 |

**Exhibit F**

MASTER FILE NO. 2018-63587

|  |  |  |
|---|---|---|
|  | § | IN THE DISTRICT COURT |
|  | § |  |
| IN RE: TEXAS OPIOID LITIGATION | § |  |
| MDL No. 18-0358 | § | HARRIS COUNTY, TEXAS |
|  | § |  |
|  | § |  |
| *This Document Relates to All Cases* | § | 152ND JUDICIAL DISTRICT |

## CASE MANAGEMENT ORDER

This Case Management Order ("CMO") shall apply to all plaintiffs with cases pending as of

[*Date of Final Court Approval of Settlement*] against Defendants and to all new plaintiffs filing

cases after that date against Defendants (collectively, "Plaintiff" or "Plaintiffs"), whose claims are

pending in this coordinated proceeding and not released by the Settlement Agreement in this action

entered into on [*settlement date*] ("Settlement Agreement"). As used herein, "Defendants" refers to

Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc.

n/k/a Janssen Pharmaceuticals, Inc., Noramco, and Janssen Pharmaceutica, Inc. n/k/a Janssen

Pharmaceuticals, Inc. Pursuant to the order of the Texas Multidistrict Litigation Panel, all

subsequent related and tag-along proceedings filed in the State of Texas and transferred to this

Multidistrict Litigation Proceeding, *In re: Texas Opioid Litigation*, MDL No. 18-0358, pending

before this Court and docketed under Master File No. 2018-63587, shall be subject to the terms of

this CMO.

Good cause appearing, it is ordered as follows:

A.    **Filing of Amended Petitions**

1.    Each Plaintiff with an existing case as of [*Date of Final Court Approval of Settlement*], shall file and serve on Defendants within ninety (90) days of that date an Amended

Petition satisfying the requirements of the Texas Rules of Civil Procedure and this CMO, if that Plaintiff's case is not dismissed with prejudice prior to this deadline pursuant to the Settlement Agreement. Plaintiff's counsel shall comply with Texas Rule of Civil Procedure 65 when filing any such Amended Petition.

2.      The time for Defendants to file a response to a new Petition or Amended Petition shall not begin to run until after the receipt by counsel for the Defendants of the Case-Specific Expert Report(s) required pursuant to this CMO, and after the claims process is concluded as described in Section B.3 below, whichever is later.

**B.      Plaintiffs' Requirement to Produce Certain Specified Information About Their Claims**

1.      **Plaintiffs' Production Requirements.** Each Plaintiff shall serve the following documents and/or information upon counsel for Defendants:

(a)      **Fact Sheet.** If not already completed, executed, and served, each Plaintiff shall serve upon the Defendants within the deadlines specified herein a completed copy of the Fact Sheet, attached as Exhibit A to this Case Management Order. Each Plaintiff that has already completed, executed, and served a compliant Fact Sheet shall serve upon the Defendants within the deadlines specified herein an updated Fact Sheet reflecting any material change in the facts underlying the Plaintiff's claims or shall affirm that no such material change applies. Simultaneously with its service of its Fact Sheet or affirmation, each Plaintiff shall serve upon Defendants a verified statement under oath setting forth how each element of their claims has not been resolved pursuant to the terms of the Settlement and the state and regional abatement fund provided therein.

(b)      **Record Production.**

(i)      Each Plaintiff shall produce all records establishing the existence of a public nuisance within the Plaintiff's territory or borders, including a definition of the nuisance and evidence to support its existence.

(ii)      Each Plaintiff shall produce all records supporting a claim for nuisance "abatement" relief within the Plaintiff's territory or borders, including a categorization and itemization of any requested nuisance abatement relief and evidence to support each component of such relief.

(iii)      Each Plaintiff shall produce all records supporting a claim of damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages. Each Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.

(iv)      For any other relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that will make the expenditures, when and how long those entities will make the expenditures, and the nature of the expenditures, including how they will address any and all alleged harms. Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

(v)      Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly unnecessary prescriptions shall identify those prescriptions, to whom and by whom the prescriptions were written, the pharmacy that filled each such prescription, whether the Plaintiff was reimbursed for them, and the Plaintiff's basis for identifying the prescriptions.

      (c)     **Affidavit.** An affidavit signed by each Plaintiff and its counsel (i)
attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit
A to this Case Management Order; (ii) attesting that records have been collected in compliance with
this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO. If
any of the documents or records described in this Section B do not exist, the signed affidavit by the
Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not
exist.

      (d)     **Expert Reports.** Each Plaintiff shall serve on counsel for Defendants
a case-specific expert report or reports executed by a qualified expert, under oath, and subject to the
penalties of perjury (a "Case-Specific Expert Report"). The Case-Specific Expert Report shall
include all matter required to comply with Texas Rule of Civil Procedure 195, Texas law, and at
least:

      (i)     *Plaintiff's Information.* The Plaintiff's name;

      (ii)     *Expert's Information.* The name, professional address, and
curriculum vitae of the expert, including a list of all publications authored by the expert within the
preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's
professional experience;

      (iii)     *Plaintiff's Records.* All records reviewed by the expert in
preparation of the Case-Specific Expert Report;

      (iv)     *Reliance Materials.* All materials relied on by the expert in
preparation of the Case-Specific Expert Report;

      (v)     *Locations.* If the Plaintiff is asserting a public nuisance claim,
the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity how

Plaintiff has been affected by such public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi)    *Subjects of Report(s)*. The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to rely, including but not limited to the following:

(1)    Whether the Plaintiff's records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2)    Whether the Plaintiff's records reviewed by the expert(s) indicate the existence of a nuisance and, if so, the nature of the nuisance;

(3)    Whether the Plaintiff's records reviewed by the expert(s) indicate that Defendants engaged in any wrongful conduct and, if so, the nature of that conduct;

(4)    An opinion that there is in fact a causal relationship between the individual Plaintiff's claims and Defendants' alleged conduct and the basis for that opinion;

(5)    An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

2. **Deadline to comply.**

(a)    For each Plaintiff with claims pending against Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced no later than [DATE], or ninety (90) days after the date such Plaintiff elects not to settle its claims, whichever is sooner.

(b)    For each Plaintiff with claims newly filed in or transferred to this proceeding against Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

3. **Failure to comply.**

(a)    *Notice of Non-Compliance and Opportunity to Cure*. If any Plaintiff fails to comply with any provision of this Order, Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance. Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's petition, shall be held in abeyance.

(b)    *Failure to Cure*. If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Defendants.

(c)    *Extensions of Time*. The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

63

**C.**   **Discovery on Statute of Limitations and Other Time-Based Defenses**

1.    Plaintiffs must, within the time frames established by Section B.2, serve upon counsel for the Defendants an affidavit signed by the Plaintiff and its counsel providing the following information: (1) the date the Plaintiff first learned that the harms alleged in its petition may be related to Defendants' conduct; (2) how the Plaintiff first learned the harms alleged in its petition may be related to Defendants' conduct; (3) the date the Plaintiff first spoke to or corresponded with an attorney about potential litigation in this matter; and (4) the date the Plaintiff first retained counsel for litigation in this matter. Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each such Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

**D.**   **Case-Specific Discovery and Related Dispositive Motion Practice**

1.    If a Plaintiff complies with the production requirements outlined above in Sections B and C, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that: (a) grants the Parties one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct discovery on issues raised by the productions; and (b) sets a briefing schedule that gives the Parties forty-five (45) days from the close of discovery for the Parties to submit summary judgment motions and *Daubert/Robinson* motions, twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

2.    During such discovery, the Parties are permitted to: serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of both fact and expert witnesses for the Plaintiff for up to seven hours each, with counsel for Defendants questioning first at each deposition. If a Plaintiff serves any written discovery upon

Defendants, the Parties shall meet and confer about an appropriate deadline for responding to such discovery, which deadline shall be at least sixty (60) days after service of such discovery. The Court's use of the term "specific to the Plaintiff" is intended to express the Court's intention not to permit additional "generic" discovery against the Defendant at this time. No other depositions may be taken during the expedited discovery period absent prior leave granted by the Court upon a showing of good cause.

3.      If a case survives the Defendant's summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative discovery is necessary and to discuss other case management issues. Discovery with regard to any other defendants will be addressed at this time as well. The filing and briefing of summary judgment motions and *Daubert/Robinson* motions after the expedited discovery discussed above shall not prejudice or otherwise foreclose the opportunity for any Party or other defendant to file later, non-duplicative summary judgment and *Daubert/Robinson* motions after completing full fact and expert discovery. The Court's use of the term "non-duplicative" is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period or *Daubert/Robinson* motions concerning witnesses addressed in *Daubert/Robinson* motions filed at the conclusion of the expedited discovery period.

4.      The foregoing provisions do not preclude any Party or other defendant from filing non-duplicative dispositive motions, including motions relating to personal jurisdiction.

SO ORDERED.

Dated: _____

_____
Hon. Robert K. Schaffer
Presiding Judge

*p250*

# EXHIBIT B

(Pulled from website: https://texasattorneygeneral.gov/news/releases/paxton-
secures-1167-billion-texas-global-opioid-agreement)

STRICTLY CONFIDENTIAL

# DISTRIBUTORS' TEXAS SETTLEMENT AGREEMENT

STRICTLY CONFIDENTIAL

# TABLE OF CONTENTS

DISTRIBUTORS' TEXAS SETTLEMENT AGREEMENT ........................................................ 1

I.         Overview.................................................................................................................. 1

II.        Definitions............................................................................................................... 1

III.       Condition to Effectiveness of Agreement ............................................................. 12

IV.       Participation by Subdivisions................................................................................ 13

V.        Settlement Payments ............................................................................................. 14

VI.       Allocation and Use of Settlement Payments. ....................................................... 26

VII.      Enforcement .......................................................................................................... 27

VIII.     Plaintiffs' Attorneys' Fees and Costs .................................................................. 27

IX.       Texas Additional Restitution Amount................................................................... 29

X.        Release .................................................................................................................. 29

XI.       Later Litigating Subdivisions ............................................................................... 33

XII.      Reductions/Offsets ............................................................................................... 37

XIII.     Injunctive Relief in the Absence of a Global Settlement...................................... 38

XIV.     Miscellaneous....................................................................................................... 39


Exhibit A     Alleged Harms ..................................................................................... A-1

Exhibit B     Later Litigating Subdivision Suspension and Offset Determinations.................B-1

Exhibit C     List of Opioid Remediation Uses........................................................ C-1

Exhibit D     Primary Subdivisions.......................................................................... D-1

Exhibit E     Agreed List of Texas Litigating Subdivisions .................................... E-1

Exhibit F     Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities..... F-1

Exhibit G     Settlement Payment Schedule............................................................. G-1

Exhibit H     Illustrative Examples of Settlement Prepayments ............................. H-1

Exhibit I     ABC IRS Form 1098-F......................................................................... I-1

Exhibit J     Cardinal Health IRS Form 1098-F....................................................... J-1

Exhibit K     McKesson IRS Form 1098-F ............................................................... K-1

Exhibit L     Texas Participation Form and Release.................................................. L-1

Exhibit M     Stipulations of Discontinuance with Prejudice .................................. M-1

Exhibit N     Texas Opioid Settlement Sharing Agreement..................................... N-1

Exhibit O     List of Texas Subdivisions and Special Districts Represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LP .... O-1

STRICTLY CONFIDENTIAL

Exhibit P    Case Management Order.................................................................................P-1

Exhibit Q    List of States ........................................................................................... Q-1

Exhibit R    Proposed Injunctive Relief Term Sheet ..............................................R-1

Exhibit S    Non-Litigating Texas Subdivisions Which Have Qualified as Participating
             Subdivisions.........................................................................................S-1

Exhibit T    Texas Litigating Subdivisions with a Population of At Least 500,000 ...............T-1

STRICTLY CONFIDENTIAL

## DISTRIBUTORS' TEXAS SETTLEMENT AGREEMENT

### I.      Overview

This Distributors' Texas Settlement Agreement ("Agreement") sets forth the terms and conditions of a settlement agreement between and among the State of Texas ("Texas"); Dallas County, Texas; Bexar County, Texas; "Participating Subdivisions" as that term is defined herein; McKesson Corporation ("McKesson"); Cardinal Health, Inc. ("Cardinal"); and AmerisourceBergen Corporation ("Amerisource") (collectively, the "Parties") to resolve opioid-related Claims against McKesson, Cardinal, and/or Amerisource (collectively, the "Settling Distributors").

The Parties intend the terms of this Agreement to parallel the terms of the Distributor Global Settlement Agreement ("*Global Settlement*"). As of the date of this signing, Texas intends to join the Global Settlement if it becomes effective. If the Global Settlement becomes effective by July 1, 2022, its terms will supersede the terms of this Agreement except for Section III.B (Dismissal of Claims), Section VIII (Plaintiffs' Attorneys' Fees and Costs), Section IX (Release), and Section XIV.D (No Admission). If the Global Settlement is not effective by the aforementioned date, this Agreement and the Texas Consent Judgment giving effect to its terms will control.

The Settling Distributors have agreed to the below terms for the sole purpose of settlement, and nothing herein, including in any exhibit to this Agreement, may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, or any misfeasance, nonfeasance, or malfeasance, all of which the Settling Distributors expressly deny. No part of this Agreement, including its statements and commitments, and its exhibits, shall constitute or be used as evidence of any liability, fault, or wrongdoing by the Settling Distributors. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose. This Agreement is not contingent on the Global Settlement taking effect.

This Agreement and the associated Texas Consent Judgement resolve the Settling Distributors' portion of the litigation coordinated before Justice Robert Schaffer as *In Re Texas Opioid Litigation*, 18-0358 (152 Jud. Dist. Ct. Harris Cty.) with respect to Participating Subdivisions. The following two cases were designated by the Court as bellwether cases: (1) *County of Dallas* v. *Purdue Pharma L.P.*, Case No. 2018-77098 and (2) *County of Bexar* v. *Purdue Pharma L.P.*, Case No. 2018-77066.

### II.     Definitions

For all sections of this Agreement except as otherwise specified, the following definitions apply:

*A.      "Actions."* (1) *In Re Texas Opioid Litigation*, 18-0358/2018 (152 Jud. Dist. Ct. Harris County); (2) *The County of Dallas, v. Purdue Pharma L.P.*, Case No. 2018-77098; (3) *County of Bexar, v. Purdue Pharma L.P.*, Case No. 2018-77066; (4) State of Texas Office of the

STRICTLY CONFIDENTIAL

Attorney General investigation.

B.    *"Agreement."* This Distributors' Texas Settlement Agreement, inclusive of all exhibits.

C.    *"Alleged Harms."* The alleged past, present, and future financial, societal, and public nuisance harms and related expenditures arising out of the alleged misuse and abuse of Products, non-exclusive examples of which are described in the documents listed on <u>Exhibit A</u>, all of which were filed in connection with the case captioned *In re National Prescription Opiate Litigation*, No. 1-17-md-02804 (N.D. Ohio) (the "MDL"), that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by the Settling Distributors.

D.    *"Annual Payment."* The total amount payable to the Texas Qualified Settlement Fund Administrator by the Settling Distributors on the Payment Date each year, as calculated by the Texas Qualified Settlement Fund Administrator pursuant to <u>Section V.B.1.d</u>. For the avoidance of doubt, this term does not include the Texas Additional Restitution Amount or amounts paid pursuant to <u>Section VIII</u>.

E.    *"Appropriate Official."* As defined in <u>Section XIV.F.3</u>.

F.    *"Bar."* Either: (1) a law in Texas barring Subdivisions from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full) or (2) a ruling by the Texas Supreme Court setting forth the general principle that Subdivisions may not maintain any Released Claims against Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from the Annual Payments by Settling Distributors under this Agreement) shall not constitute a Bar.

G.    *"Bellwether Counties."* Bexar County, Texas and Dallas County, Texas.

H.    *"Case-Specific Resolution."* Either: (1) a law in Texas barring the Subdivision at issue from maintaining any Released Claims against any Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full); or (2) a ruling by a court of competent jurisdiction over the Subdivision at issue that the Subdivision may not maintain any Released Claims at issue against any Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from the Annual Payments by Settling Distributors under this Agreement) shall not constitute a Case-Specific Resolution.

I.    *"Chapter 403."* Tex. Gov't Code Ann. Chapter 403.

J.    *"Claim."* Any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract,

STRICTLY CONFIDENTIAL

controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

K.    "*Claim Over*." A Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

L.    "*Consent Judgment Court*." The Travis County court to which the Texas Consent Judgment is presented for approval and/or entry as to the State.

M.    "*Compensatory Restitution Amount*." The aggregate amount of payments paid or incurred by the Settling Distributors hereunder other than amounts paid as attorneys' fees and costs provided in Section VIII.

N.    "*Covered Conduct*." Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (1) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (2) the characteristics, properties, risks, or benefits of any Product; (3) the reporting, disclosure, non-reporting or non- disclosure to federal, state or other regulators of orders placed with any Released Entity; or (4) diversion control programs or suspicious order monitoring; *provided, however*, that as to any Claim that a Releasor has brought or could bring, Covered Conduct does not include non- compliance with statutory or administrative supply security standards concerning cleanliness of facilities or stopping counterfeit products, so long as such standards apply to the storage and distribution of both controlled and non-controlled pharmaceuticals.

O.    "*Effective Date*." The date of entry of the Texas Consent Judgment, which shall be filed not later than thirty (30) calendar days after the Initial Participation Date.

STRICTLY CONFIDENTIAL

P. *"Final Order."* An order or judgment of a court of competent jurisdiction with respect to the applicable subject matter (1) which has not been reversed or superseded by a modified or amended order, is not currently stayed, and as to which any right to appeal or seek certiorari, review, reargument, stay, or rehearing has expired, and as to which no appeal or petition for certiorari, review, reargument, stay, or rehearing is pending or (2) as to which an appeal has been taken or petition for certiorari, review, reargument, stay, or rehearing has been filed and (a) such appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay, or rehearing was sought or (b) the time to appeal further or seek certiorari, review, reargument, stay, or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay, or rehearing is pending.

Q. *"Global Contingency Fee Fund."* The Contingency Fee Fund as defined in Exhibit R to the Global Settlement.

R. *"Global Litigating Subdivision Cost Fund."* The Litigating Subdivision Cost Fund as defined in Exhibit R to the Global Settlement.

S. *"Global Settlement."* The proposed agreement, in which Texas intends to participate if it becomes effective, the terms of which are set forth in or shall be materially the same as those set forth in the December 23, 2021 Distributor Settlement Agreement, resolving the litigation and claims brought or threatened to be brought by states and subdivisions against the Settling Distributors, including claims against the Settling Distributors asserted in the multi-district litigation *In re: Nationwide Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio) ("MDL") and state court prescription opiate litigation.

T. *"Global Settlement Fund Administrator"* The Settlement Fund Administrator as defined in Section I.MMM of the Global Settlement.

U. *"Global Settlement Fund Escrow."* The Settlement Fund Escrow as defined in Section I.NNN of the Global Settlement.

V. *"Global Settlement Net Abatement Amount."* The "Net Abatement Amount" defined in the Global Settlement, an amount of $18,554,013,693.

W. *"Incentive Payment A."* The incentive payment described in Section V.F.1.

X. *"Incentive Payment B."* The incentive payment described in Section V.F.2.

Y. *"Incentive Payment C."* The incentive payment described in Section V.F.3.

Z. *"Incentive Payment D."* The incentive payment described in Section V.F.4.

AA. *"Incentive Payment Final Eligibility Date."* The date that is the earlier of (1) the fifth Payment Date; (2) the date of completion of opening statements in a trial of any action brought by a Subdivision that includes a Released Claim against a Released Entity when such date is more than two (2) years after the Effective Date; or (3) two (2) years after the Effective Date in the event a trial of an action brought by a Subdivision that includes a Released Claim against a Released

STRICTLY CONFIDENTIAL

Entity began after the Initial Participation Date but before two (2) years after the Effective Date.

BB.    *"Initial Participating Subdivision."* A Subdivision that meets the requirement set forth in Section IV.E.

CC.    *"Initial Participation Date."* March 10, 2022.

DD.    *"Later Litigating Subdivision."* A Subdivision (or Subdivision official asserting the right of such a Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that: (1) first files a lawsuit bringing a Released Claim against a Released Entity after the Effective Date; or (2) adds a Released Claim against a Released Entity after the Effective Date to a lawsuit brought before the Effective Date that, prior to the Effective Date, did not include any Released Claims against a Released Entity; (3) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a legislative Bar or legislative Case-Specific Resolution as of the Effective Date, (b) such legislative Bar or legislative Case-Specific Resolution is subject to a Revocation Event after the Effective Date, and (c) the earlier of the date of completion of opening statements in a trial in an action brought by a Subdivision that includes a Released Claim against a Released Entity or one hundred eighty (180) calendar days from the Revocation Event passes without a Bar or Case-Specific Resolution being implemented as to that Litigating Subdivision or the Litigating Subdivision's Released Claims being dismissed; or (4) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a judicial Bar or judicial Case-Specific Resolution as of the Effective Date, (b) such judicial Bar or Case-Specific Resolution is subject to a Revocation Event after the Effective Date, and (c) such Litigating Subdivision takes any action to further, assert, or revive a Released Claim in a lawsuit against a Released Entity other than seeking a stay or dismissal.

EE.    *"Later Participating Subdivision."* A Participating Subdivision that is not an Initial Participating Subdivision but meets the requirements set forth in Section IV.C.

FF.    *"Litigating Subdivision."* A Subdivision (or Subdivision official) that brought any Released Claim against any Released Entity prior to the Effective Date. Exhibit E is an agreed list of all Texas Litigating Subdivisions. Exhibit E will be updated periodically, including any appropriate corrections, and a final version of Exhibit E will be attached hereto as of the Effective Date.

GG.    *"Non-Litigating Subdivision."* Any Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

HH.    *"Non-Participating Subdivision."* Any Subdivision that is not a Participating Subdivision.

II.    *"Non-Party Covered Conduct Claim."* Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

JJ.    *"Non-Party Settlement."* A settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

5

KK.     *"Non-Released Entity."* An entity that is not a Released Entity.

LL.     *"Offset Cap."* The dollar amount which the dollar-for-dollar offset described in Section XI.A cannot exceed in a Payment Year, to be calculated by multiplying the amount of the relevant Annual Payment apportioned to Texas and its Subdivisions for that Payment Year by the percentage for the applicable Participation Tier as set forth in Exhibit B.

MM.     *"Opioid Remediation."* Care, treatment, and other programs and expenditures (including, reimbursement for past such programs or expenditures[1] except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products; (2) treat or mitigate opioid use or related disorders; or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic. Exhibit C provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.

NN.     *"Opioid Tax."* Any tax, assessment, license fee, surcharge or any other fee (other than a fixed prospective excise tax or similar tax or fee that has no restriction on pass-through) imposed by Texas on a Settling Distributor on the sale, transfer or distribution of opioid products.

OO.     *"Other State Resolution."* A settlement with, or judgment obtained by, a State other than Texas and/or a Subdivision(s) in that other State relating to one or more Claims involving, arising out of or relating to Covered Conduct, including attorney's fees and costs payable under such settlement or judgment.

PP.     *"Participating Subdivision."* Any Subdivision that meets the requirements for becoming a Participating Subdivision under Section IV. Participating Subdivisions include both Initial Participating Subdivisions and Later Participating Subdivisions.

QQ.     *"Participation Tier."* The Participation Tier shall be determined as set forth in Section V.K.

RR.     *"Parties."* As defined in Section I (each, a *"Party"*).

SS.     *"Payment Date."* The date by which the Settling Distributors must make the Annual Payment pursuant to Section V.B. The Payment Date for Payment Year 1 shall be ten (10) calendar days after the Effective Date. The Payment Date for Payment Year 2 shall be July 15, 2022. The Payment Date for each subsequent Payment Year shall be July 15 of that Payment Year.

TT.     *"Payment Year."* The calendar year during which the applicable Annual Payment is due pursuant to Section V.B. Payment Year 1 is 2021 (even if the payment terms herein provide for the first payment to fall in 2022), Payment Year 2 is 2022 and so forth, with 2038 being the final Payment Year. References to payment "for a Payment Year" mean the Annual Payment due during that year. References to eligibility "for a Payment Year" mean eligibility in connection with the Annual Payment due during that year.

UU.     *"Preliminary Agreement Date."* The date upon which this Agreement becomes

---

[1] Reimbursement includes amounts paid to any governmental entities for past expenditures or programs.

STRICTLY CONFIDENTIAL

fully executed.

VV.    *"Prepayment Notice."* As defined in Section V.I.1.

WW.    *"Primary Subdivision."* A Subdivision that is a General Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government) with population over ten thousand (10,000); *provided, however,* that as used in connection with Incentive Payment C, the population threshold is thirty thousand (30,000). Attached as Exhibit D is an agreed list of the Primary Subdivisions.

XX.    *"Product."* Any chemical substance, whether used for medicinal or non- medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is: (1) an opioid or opiate, as well as any product containing any such substance; (2) benzodiazepine, carisoprodol, or gabapentin; or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, any variant of these substances or any similar substance. Notwithstanding the foregoing, nothing in this Section II.RR prohibits Texas from taking administrative or regulatory action related to benzodiazepine (including, but not limited to, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, and midazolam), carisoprodol, or gabapentin that is wholly independent from the use of such drugs in combination with opioids, *provided* such action does not seek money (including abatement and/or remediation) for conduct prior to the Effective Date.

YY.    *"Released Claims."* Any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, Released Claims include any Claims that have been asserted against a Settling Distributor by Texas or a Litigating Subdivision in any federal, state or local action or proceeding (whether judicial, arbitral or administrative) based on, arising out of, or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by Texas, Subdivision or Releasor (whether or not Texas, Subdivision or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to this Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that this term, "Released Claims," be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe claims brought by a Later Litigating Subdivision or other non-party Subdivision that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

ZZ.    *"Released Entities."* With respect to Released Claims, the Settling Distributors and (1) all past and present subsidiaries, divisions, predecessors, successors, and assigns (in each case,

7

STRICTLY CONFIDENTIAL

whether direct or indirect) of each Settling Distributor; (2) all past and present subsidiaries and divisions (in each case, whether direct or indirect) of any entity described in clause (1); (3) the respective past and present officers, directors, members, trustees, and employees of any of the foregoing (each for actions that occurred during and related to their work for, or employment with, any of the Settling Distributors or the foregoing entities); (4) all past and present joint ventures (whether direct or indirect) of each Settling Distributor or its subsidiaries, including in such Settling Distributor's or subsidiary's capacity as a participating member in such joint venture; (5) all direct or indirect parents and shareholders of the Settling Distributors (solely in their capacity as parents or shareholders of the applicable Settling Distributor with respect to Covered Conduct); and (6) any insurer of any Settling Distributor or any person or entity otherwise described in clauses (1)-(5) (solely in its role as insurer of such person or entity). For the avoidance of doubt, CVS Health Corp., Walgreens Boots Alliance, Inc., and Walmart Inc. (collectively, the "Pharmacies") are not Released Entities, nor are their direct or indirect past or present subsidiaries, divisions, predecessors, successors, assigns, joint ventures, shareholders, officers, directors, members, trustees, or employees (shareholders, officers, directors, members, trustees, and employees for actions related to their work for, employment with, or involvement with the Pharmacies) Released Entities. Notwithstanding the prior sentence, any joint venture or past or present subsidiary of a Settling Distributor is a Released Entity, including any joint venture between a Settling Distributor or any Settling Distributor's subsidiary and a Pharmacy (or any subsidiary of a Pharmacy). Lists of Settling Distributors' subsidiaries, joint ventures, and predecessor entities are appended to this Agreement as Exhibit F. With respect to joint ventures (including predecessor entities), only entities listed on Exhibit F are Released Entities. With respect to wholly-owned subsidiaries (including predecessor entities), Exhibit F represents a good faith effort by the Settling Distributors to list all such entities, but any and all wholly- owned subsidiaries (including predecessor entities) of any Settling Distributor are Released Entities, whether or not they are listed on Exhibit F. For the avoidance of doubt, any entity acquired, or joint venture entered into, by a Settling Distributor after the Initial Participation Date is not a Released Entity.

AAA. "*Releasors*." With respect to Released Claims, (1) Texas, including the Texas Department of State Health Services; (2) the Bellwether Counties; (3) each Participating Subdivision; and (4) without limitation and to the maximum extent of the power of Texas's Attorney General and/or each Participating Subdivision to release Claims, (a) Texas's and Participating Subdivisions' departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts and other Special Districts in Texas, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to Texas or its Subdivisions, whether or not any of them participate in this Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. Texas's Attorney General represents that he or she has or has obtained (or will obtain no later than the Initial Participation Date) the authority set forth in Section X.E. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Texas Participation Form, providing for a release to the fullest extent of the

STRICTLY CONFIDENTIAL

Participating Subdivision's authority.

BBB. *"Revocation Event."* With respect to a Bar, Settlement Class Resolution, or Case-Specific Resolution, a revocation, rescission, reversal, overruling, or interpretation that in any way limits the effect of such Bar, Settlement Class Resolution, or Case-Specific Resolution on Released Claims, or any other action or event that otherwise deprives the Bar, Settlement Class Resolution, or Case-Specific Resolution of force or effect in any material respect.

CCC. *"Settlement Class Resolution."* A class action resolution in a court of competent jurisdiction with respect to a class of Subdivisions that (1) conforms with Texas's statutes, case law, and rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in Texas and such order has become a Final Order; (3) is binding on all Non-Participating Subdivisions (other than opt-outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions may not bring any Released Claims against any Released Entities, whether on the ground of this Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Settling Distributors other than those provided for in this Agreement, or contain any provision inconsistent with any provision of this Agreement. If applicable state law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing more than the opt-out percentage specified in the Global Settlement. In seeking certification of any Settlement Class, Texas and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and should have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case or for purposes unrelated to this Agreement.

DDD. *"Settlement Payment Schedule."* The schedule attached to this Agreement as Exhibit G.

EEE. *"Settlement Prepayment."* As defined in Section V.I.1.

FFF. *"Settlement Prepayment Reduction Schedule."* As defined in Section V.I.1.

GGG. *"Settling Distributors."* McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation (each, a *"Settling Distributor"*).

HHH. *"State Cap."* The total of a Settling Distributor's share of the amounts payable under the Global Settlement (a) to a State other than Texas for a Payment Year assuming that State is eligible for Incentive Payments A and D and that no offset or suspension is applicable with respect to that State, and (b) for attorney's fees and costs that would have been owed during that Payment Year times that State's allocable share as specified in the Global Settlement.

III. *"States."* The states, commonwealths, and territories of the United States of America, as well as the District of Columbia, but not including West Virginia (each a "State"). The fifty-five (55) States are listed in Exhibit Q. Each "State" also includes its departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind, any other units of State government, attorneys, including its Attorney General, and any person in his or her official

STRICTLY CONFIDENTIAL

capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing.

JJJ.   "*Subdivision.*" Any (1) General Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government), School District, or Special District within Texas and (2) any other subdivision or subdivision official or sub-entity of or located within Texas (whether political, geographical or otherwise, whether functioning or non-functioning, regardless of population overlap, and including, but not limited to, Nonfunctioning Governmental Units and public institutions) that has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae*, or any other capacity. "General Purpose Government," "School District," and "Special District" shall correspond to the "five basic types of local governments" recognized by the U.S. Census Bureau and match the 2017 list of Governmental Units.[2] The three (3) General Purpose Governments are county, municipal, and township governments; the two (2) special purpose governments are School Districts and Special Districts.[3] "Fire District," "Health District," "Hospital District," and "Library District" shall correspond to categories of Special Districts recognized by the U.S. Census Bureau.[4] References to Texas's Subdivisions or to a Subdivision "in," "of" or "within" Texas include Subdivisions located within Texas even if they are not formally or legally a sub-entity of Texas; *provided, however*, that a "Health District" that includes any of the following words or phrases in its name shall not be considered a Subdivision: mosquito, pest, insect, spray, vector, animal, air quality, air pollution, clean air, coastal water, tuberculosis, and sanitary.

KKK.   "*Suspension Amount.*" The amount calculated as follows: the per capita amount corresponding to the applicable Participation Tier as set forth in Exhibit B multiplied by the population of the Later Litigating Subdivision.

LLL.   "*Suspension Cap.*" The amount calculated as follows: the suspension percentage corresponding to the applicable Participation Tier as set forth in Exhibit B multiplied by the amount of the relevant Annual Payment apportioned to Texas and the Participating Subdivisions in each year of the suspension.

MMM. "*Suspension Deadline.*" With respect to a lawsuit filed by a Later Litigating Subdivision asserting a Released Claim, the deadline set forth in Exhibit B corresponding to the

---

[2] https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html

[3] *E.g.*, U.S. Census Bureau, "Technical Documentation: 2017 Public Use Files for State and Local Government Organization" at 7 (noting that "the Census Bureau recognizes five basic types of local governments," that three of those are "general purpose governments" (county governments, municipal governments, and township governments), and that the other two are "school district and special district governments"), https://www2.census.gov/programs-surveys/gus/datasets/2017/2017_gov_org_meth_tech_doc.pdf.

[4] A list of 2017 Government Units provided by the Census Bureau identifies 38,542 Special Districts and categorizes them by "FUNCTION_NAME." "Govt_Units_2017_Final" spreadsheet, "Special District" sheet, included in "Independent Governments - list of governments with reference information," https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html. As used herein, "Fire District" corresponds to Special District function name "24 – Local Fire Protection," "Health District" corresponds to Special District function name "32 – Health," "Hospital District" corresponds to Special District function name "40 – Hospitals," and "Library District" corresponds to Special District function name "52 – Libraries." *See id.*

STRICTLY CONFIDENTIAL

applicable Participation Tier.

NNN.  *"Texas Abatement Amount."* $1,167,644,106.34, which is the Global Settlement Net Abatement Amount multiplied by the Texas Overall Allocation Percentage.

OOO.  *"Texas Additional Restitution Amount."* $29,652,876.43, which is the portion of the "Additional Restitution Amount" specified by the Global Settlement that is allocated to Texas under that agreement.

PPP.  *"Texas Consent Judgment."* A consent judgment in a form to be agreed by Texas and the Settling Distributors prior to the Initial Participation Date that, among other things, (1) approves this Agreement and (2) provides for the release set forth in Section X, including the dismissal with prejudice of any Released Claims that Texas or either of the Bellwether Counties has brought against Released Entities and is subject to the sole jurisdiction and enforcement of the court in the Consent Judgment Court.

QQQ.  *"Texas Consolidated Litigation Court."* The Court that is the Hon. Robert Schaffer, In Re: Texas Opioid Litigation, 18-0358 (152d Jud. Dist. Ct., Harris Cty) to which the Agreement is presented for entry and enforcement, except as to matters addressed in the Texas Consent Judgment.

RRR.  *"Texas Overall Allocation Percentage."* 6.2932157196%, which is Texas's Overall Allocation Percentage as set forth in the Global Settlement.

SSS.  *"Texas Participation Form."* The form attached as Exhibit L or a substantially similar form that Participating Subdivisions[5] must execute and return to the Texas Qualified Settlement Fund Administrator, and which shall (1) make such Participating Subdivisions signatories to this Agreement, (2) include a full and complete release of any and all of such Subdivision's claims, and (3) require the prompt dismissal with prejudice of any Released Claims that have been filed by any such Participating Subdivision. For the avoidance of doubt, the Parties agree that to the extent the form references the Global Settlement, it is intended to include this Agreement.

TTT.  *"Texas Qualified Settlement Fund."* The fund established by the Texas Consolidated Litigation Court pursuant to this Agreement into which the Annual Payments are made under Section V.

UUU.  *"Texas Qualified Settlement Fund Administrator."* The entity appointed by the Texas Consolidated Litigation Court that annually determines the Annual Payment (including calculating Incentive Payments pursuant to Section IV and any amounts subject to suspension, offset, or reduction pursuant to Sections XI and XII) administers the Texas Qualified Settlement Fund, and distributes amounts from the Texas Qualified Settlement Fund pursuant to this Agreement. The duties of the Texas Qualified Settlement Fund Administrator shall be governed

---

[5] For purposes of this definition for Participating Subdivisions, it is the intent of the Parties to this Agreement that the Texas Opioid Council gives special consideration under the Texas Allocation Statute, including without limitation, Tex. Gov't Code §403.501(5) and §403.508(a)(2), as to whether any Special District was a litigating Special District prior to the date this Agreement was fully executed

STRICTLY CONFIDENTIAL

by this Agreement and shall be specified in detail by the Parties prior to the Initial Participation Date.

VVV. *"Texas Qualified Settlement Fund Escrow."* If the Global Settlement is not effective by July 1, 2022, the interest-bearing escrow fund established by the Texas Consolidated Litigation Court pursuant to this Agreement to hold disputed or suspended payments made under this Agreement, and to hold the first Annual Payment until 10 calendar days after the Effective Date. This fund may be the Settlement Fund Escrow as defined in the Global Settlement.

WWW. *"Texas Settlement Amount."* In the event the Global Settlement is not effective by July 1, 2022, $1,271,427,627.66, which reflects the Texas Abatement Amount, Texas Additional Restitution Amount, and the attorneys' fees and costs described in Section VIII.B and Section VIII.C.

XXX. *"Threshold Motion."* A motion to dismiss or equivalent dispositive motion made at the outset of litigation under applicable procedure. A Threshold Motion must include as potential grounds for dismissal any applicable Bar or the relevant release by Texas or Participating Subdivision provided under this Agreement and, where appropriate on Threshold Motion under applicable law, any applicable limitations defense.

**III.    Condition to Effectiveness of Agreement**

A.    *Conditions Precedent.* If any of the conditions in this Section III.A is not satisfied, this Agreement will have no further effect and all releases and other commitments or obligations contained herein or in any Texas Participation Form will be void.

1.    No later than the Initial Participation Date, Texas's Attorney General shall exercise to the fullest extent his or her powers to release all Claims for Covered Conduct.

2.    No later than the Initial Participation Date, Texas's Attorney General shall secure the releases specified in Section X.E.

3.    No later than February 18, 2022, all Texas Litigating Subdivisions with a population of at least 500,000 (as set forth in Exhibit T) shall meet the requirements to become a Participating Subdivision as detailed in Section IV. Copies of the Texas Participation Forms for such Subdivisions will be delivered to the Settling Distributors by that date to be held in escrow until the Effective Date.

4.    No later than March 10, 2022, at least 96% of the Texas Litigating Subdivisions, as measured by population, shall meet the requirements to become a Participating Subdivision as detailed in Section IV. Copies of the Texas Participation Forms for such Subdivisions will be delivered to the Settling Distributors by that date to be held in Escrow until the Effective Date.

B.    *Dismissal of Claims.* Upon the execution of this Agreement, while awaiting final approval of this Agreement by the Bellwether Counties, the Parties agree to stay or extend all deadlines and proceedings in the Actions as to Released Claims against the Settling Distributors and to jointly move for the claims against the Settling Distributors to be severed from the Actions

STRICTLY CONFIDENTIAL

(with such severance to take effect upon the Effective Date of this Agreement). It is the Parties' intent that all litigation activities in the Actions relating to the Bellwether Counties' claims against the Settling Distributors shall immediately cease as of the date of the execution of this Agreement and that the claims against the Settling Distributors not be further prosecuted. Concurrently with the execution of this Agreement, the Settling Distributors and the Bellwether Counties will execute a Stipulation of Dismissal with Prejudice, in the form annexed hereto in Exhibit M. In the event the Court declines to so order the discontinuance of the Actions with prejudice as against the Settling Distributors, each Settling Distributor shall be entitled to terminate the Agreement as to itself and shall be excused from all obligations under the Agreement.

### IV.    Participation by Subdivisions

A.    *Requirements for Becoming a Participating Subdivision—Litigating Subdivisions/Later Litigating Subdivisions*. A Litigating Subdivision or Later Litigating Subdivision may become a Participating Subdivision by either returning an executed Texas Participation Form and upon prompt dismissal of its legal action or by having its claims extinguished by operation or law or released by the Texas Attorney General. A Litigating Subdivision or Later Litigating Subdivision may not become a Participating Subdivision after the completion of opening statements in a trial of the lawsuit it brought that includes a Released Claim against a Released Entity.

B.    *Initial Participating Subdivisions*. A Subdivision qualifies as an Initial Participating Subdivision if it meets the applicable requirements for becoming a Participating Subdivision by the Initial Participation Date.

C.    *Later Participating Subdivisions*. A Subdivision that is not an Initial Participating Subdivision may become a Later Participating Subdivision by meeting the applicable requirements for becoming a Participating Subdivision after the Initial Participation Date and agreeing to be subject to the terms of the agreement reached by Texas with Initial Participating Subdivisions. A Later Participating Subdivision shall not receive any share of any base or incentive payments paid to the Texas Qualified Settlement Fund that were due before it became a Participating Subdivision.

D.    *Notice*. In conjunction and accordance with the notice process anticipated in the Global Settlement, the Office of the Texas Attorney General has previously provided individual notice to all Non-Litigating Subdivisions eligible to participate in the settlement and the requirements for participation. Such notice included publication and other standard forms of notification. Nothing contained herein shall preclude Texas from providing further notice to, or from contacting any of its Subdivision(s) about, becoming a Participating Subdivision.

E.    *Requirements for Becoming a Participating Subdivision—Non-Litigating Subdivisions*. A Non-Litigating Subdivision may become a Participating Subdivision by either executing a Texas Participation Form specifying that the Subdivision: (1) agrees to the terms of this Agreement pertaining to Subdivisions, (2) releases all Released Claims against all Released Entities, and (3) submits to the jurisdiction of the Texas Consolidated Litigation Court for purposes limited to that court's role under the Agreement or by having their claims extinguished by operation of law or release by the Texas Attorney General.

13

STRICTLY CONFIDENTIAL

F.     *Non-Participating Subdivisions*. Non-Participating Subdivisions shall not directly receive any portion of any base or incentive payments paid to the Texas Qualified Settlement Fund and Texas may choose that its Non-Participating Subdivisions are ineligible for benefits from the fund.

G.     *Representation With Respect to Participation Rate*. Texas represents and warrants for itself that it has a good faith belief that all of Texas's Litigating Subdivisions that are represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LLC will become Participating Subdivisions. Texas acknowledges the materiality of the foregoing representation and warranty. Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LLC represent and warrant that they have a good faith belief that this Agreement is a fair settlement and that they will therefore recommend this Agreement to their Subdivision clients within Texas. A list of Litigating Subdivisions represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LLC is annexed hereto as Exhibit O. Additionally, Texas represents and warrants that the list annexed hereto as Exhibit S are Subdivisions that, as of January 31, 2022, have met the requirements to become Participating Subdivisions under the terms of this Agreement and the Global Settlement.

H.     *Case Management Order*. Within five (5) calendar days of entry of the Court's entry of an order discontinuing the Actions brought by the Bellwether Counties consistent with the Stipulation of Dismissal with Prejudice submitted by those counties per Section III.B, the Parties will seek to have entered the Case Management Order annexed hereto as Exhibit P. And, further, the Settling Distributors will participate in making motions to dismiss barred claims upon their release.

I.     *Unpaid Allocations to Later Participating Subdivisions and Non-Participating Subdivisions*. Any base payment and incentive payments allocated to a Later Participating Subdivision or Non-Participating Subdivision that cannot be paid pursuant to Section IV.C will be allocated consistent with the terms of Exhibit N.[6]

J.     *Texas Participation Forms*. Within seven (7) calendar days of the Effective Date, Texas shall transmit to the Settling Distributors copies of all Texas Participation Forms received as of the Effective Date that Texas has not already transmitted to the Settling Distributors pursuant to the deadlines set forth in Section III.A.3 or Section III.A.4. If any Subdivision subsequently becomes a Participating Subdivision, Texas will transmit a copy of that Texas Participation Form within seven (7) calendar days of receipt.

**V.     Settlement Payments**

A.     *Texas Qualified Settlement Fund*. Until such time as the Global Settlement becomes effective, all payments under this Section V shall be made into the Texas Qualified Settlement

---

[6] For the avoidance of doubt, the Settling Distributors are not parties to Exhibit N and dispute, and do not concede, any characterizations of their conduct therein. Further, the Settling Distributors expressly deny any statements or implications within Exhibit N or any other agreement between Texas and one or more of its Subdivisions, concerning alleged misconduct by any Settling Distributor. As stated herein, the Settling Distributors expressly deny any liability, fault, or wrongdoing. The Settling Distributors have entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation.

STRICTLY CONFIDENTIAL

Fund, except that where specified, they shall be made into the Texas Qualified Settlement Fund Escrow. The Texas Qualified Settlement Fund shall be allocated and used only as specified in Section VI and Exhibit N.

B.    *Annual Payments.* The Settling Distributors shall make eighteen (18) Annual Payments, each comprised of base and incentive payments as provided in this Section V and as determined by the Texas Qualified Settlement Fund Administrator as set forth in this Agreement.

1.    All data relevant to the determination of the Annual Payment and allocations to Texas and its Participating Subdivisions shall be submitted to the Settlement Administrator no later than sixty (60) calendar days prior to the Payment Date for each Annual Payment. The Texas Qualified Settlement Fund Administrator shall then determine the Annual Payment and the amount to be paid to Texas and its Participating Subdivisions, by:

a.    determining, the amount of base and incentive payments to which Texas is entitled by applying the criteria under Sections V.D, E and F;

b.    applying any suspensions, offsets or reductions as specified under Sections V, XI and XII

c.    applying any adjustment required as a result of prepayment or significant financial constraint, as specified under Sections V.I and J; and

d.    determining the total amount owed by Settling Distributors (including any amounts to be held in the Texas Qualified Settlement Fund Escrow pending resolution of a case by a Later Litigating Subdivision as described in Section XI) to Texas and the Participating Subdivisions.

e.    the Texas Qualified Settlement Fund Administrator shall then allocate the Annual Payment to Texas and then among the Participating Subdivisions receiving direct allocations.

2.    The Texas Qualified Settlement Fund Administrator shall also apply the allocation percentages set forth in Section V.H and determine for each Settling Distributor the amount of its allocable share of the Annual Payment. For the avoidance of doubt, each Settling Distributor's liability for its share of the Annual Payment is several, and not joint.

3.    As soon as possible but no later than fifty (50) calendar days prior to the Payment Date for each Annual Payment and following the determination described in paragraph 1 above, the Texas Qualified Settlement Fund Administrator shall give notice to the Settling Distributors and Texas of the amount of the Annual Payment, the amount to be received by Texas and the amount to be received by Participating Subdivisions receiving direct allocations. The Texas Qualified Settlement Fund Administrator shall also apply the allocation percentages set forth in Section V.H and give notice to each Settling Distributor of the amount of its allocable share of the Annual Payment.

4.    Within twenty-one (21) calendar days of the notice provided by the Texas

STRICTLY CONFIDENTIAL

Qualified Settlement Fund Administrator, Texas and any Settling Distributor may dispute, in writing, the calculation of the Annual Payment, or the amount to be received by Texas and/or its Participating Subdivisions. Such disputing Party must provide a written notice of dispute to the Texas Qualified Settlement Fund Administrator, Texas, and the Settling Distributors identifying the nature of the dispute and the amount of money that is disputed.

5.      Within twenty-one (21) calendar days of the sending of a written notice of dispute, if Texas or any Settling Distributor is affected by the dispute, Texas or the affected Settling Distributor(s) may each submit a response, in writing, to the Texas Qualified Settlement Fund Administrator, Texas and the Settling Distributors identifying the basis for disagreement with the notice of dispute.

6.      If no response is filed, the Texas Qualified Settlement Fund Administrator shall adjust the amount calculated consistent with the written notice of dispute, and Settling Distributors shall pay the adjusted amount as the Annual Payment on the Payment Date. If a written response to the written notice of dispute is timely sent to the Texas Qualified Settlement Fund Administrator, the Texas Qualified Settlement Fund Administrator shall notify the Settling Distributors of the preliminary amount to be paid, which shall be the greater of the amount originally calculated by the Settling Administrator or the amount that would be consistent with the notice of dispute, provided, however that in no circumstances shall the preliminary amount to be paid be higher than the maximum amount of base and Incentive Payments A and D for that Payment Year as set forth on Exhibit G. For the avoidance of doubt, a transfer of suspended payments from the Texas Qualified Settlement Fund Escrow pursuant to Section XI does not count toward determining whether the amount to be paid is higher than the maximum amount of base and Incentive Payments A and D for that Payment Year as set forth in Exhibit G.

7.      The Texas Qualified Settlement Fund Administrator shall place any disputed amount of the preliminary amount paid by the Settling Distributors into the Texas Qualified Settlement Fund Escrow and shall disburse any undisputed amount to Texas and the Participating Subdivisions within fifteen (15) calendar days of the Payment Date or at such later time as directed by the Texas Consolidated Litigation Court.

8.      Disputes described in this Section V.B shall be resolved in accordance with the terms of Section VII.

C.      *Procedure for Annual Payment in Payment Years 1 and 2.* The process described in Section V.B shall not apply to Payment Years 1 and 2. The procedure in lieu of Section V.B for Payment Years 1 and 2 is as set forth below:

1.      The Payment Date for Payment Year 1 shall be ten (10) calendar days after the Effective Date. By or on September 30, 2021, the Settling Distributors paid into the Global Settlement Fund Escrow the total amount of the base payment and Incentive Payment A for Texas (the amount specified in Exhibit G) for Payment Year 1. In the event that the conditions set forth in Section III.A are not met, the funds held in escrow for the Texas Annual Payment for Payment Year 1 shall immediately revert to the Settling Distributors. The Texas Qualified Settlement Fund Administrator shall allocate the

STRICTLY CONFIDENTIAL

Payment Year 1 payment, pursuant to <u>Section VI</u>, <u>Exhibit N</u>, and Chapter 403, among Texas and the Subdivisions receiving a direct allocation[7].  The Annual Payment for Payment Year 1 shall be transferred from the Global Settlement Escrow to the Texas Qualified Settlement Fund (and then to Texas and its Initial Participating Subdivisions) within ten (10) calendar days following the Effective Date, *provided that* the Texas Qualified Settlement Fund Administrator shall leave in the Texas Qualified Settlement Fund funds allocated to Participating Subdivisions, pursuant to <u>Exhibit N</u> and Chapter 403, that are not Initial Participating Subdivisions.

        2.      The Payment Date for Payment Year 2 shall be July 15, 2022. On or before the Payment Date for Payment Year 2, the Settling Distributors shall pay into the Texas Qualified Settlement Fund the total amount of the base payment and Incentive Payment A for State (the amount specified in <u>Exhibit G</u>) due for Payment Year 2. The Texas Qualified Settlement Fund Administrator shall disburse such amounts to Texas and its Participating Subdivisions within fifteen (15) calendar days of the Payment Date or at such later time as directed by the Texas Consolidated Litigation Court.

        3.      *Texas Qualified Settlement Fund.* Any disputes as to the allocation of the Annual Payments in Payment Years 1 and 2 shall be resolved pursuant to the process set forth in <u>Section V.B</u> above, except that in Payment Year 1, the Texas Qualified Settlement Fund Administrator shall have until ten (10) calendar days after the Initial Participation Date to give notice of the amount to be received by Texas, and the amount to be received by Texas's Participating Subdivisions.

        D.      *Payment Date for Subsequent Payment Years.* For Payment Year 3 and successive Payment Years, the Annual Payment shall be made pursuant to the process set forth in <u>Section V.B</u>, except that, with respect to Payment Year 3, Texas shall have up to the Payment Date for Payment Year 3 to become eligible for Incentive Payment A and thus avoid the reductions set forth in <u>Section XII</u>. If Texas enacts a Bar less than sixty (60) calendar days before the Payment Date for Payment Year 3, Settling Distributors shall pay, within thirty (30) calendar days of the Payment Year 3 Payment Date, the difference between the Annual Payment as calculated by the Texas Qualified Settlement Fund Administrator and the amount that would have been owed had the Texas Qualified Settlement Fund Administrator taken the Bar into account.

        E.      *Base Payments.* Subject to the suspension, reduction and offset provisions set forth in <u>Sections XI</u> and <u>XII</u>, the Settling Distributors shall collectively make base payments equal to fifty-five percent (55%) of the Texas Abatement Amount. These payments will be due in installments consistent with <u>Exhibit G</u> over the eighteen (18) Payment Years and as adjusted by the Texas Qualified Settlement Fund Administrator pursuant to the provisions in <u>Sections V</u>, <u>XI</u> and <u>XII</u>.

        F.      *Incentive Payments.* Subject to the suspension, reduction, and offset provisions set forth in <u>Sections XI</u> and <u>XII</u>, the Settling Distributors shall collectively make potential additional

---

[7] $23,500,000.00 of the direct allocation shall be paid directly by the Texas Qualified Settlement Fund Administrator from the Annual Payment for Payment Year 1 to the counties of Bexar, Dallas, Tarrant, Harris, and Collin, wiring instructions to be provided, as follows: (1) $9,983,357.11 to Bexar County; (2) $9,983,357.11 to Dallas County; (3) $2,218,523.80 to Tarrant County; (4) $986,071.49 to Harris County; and (5) $328,690.49 to Collin County.

STRICTLY CONFIDENTIAL

incentive payments totaling up to a maximum of forty-five percent (45%) of the Texas Abatement Amount, with the actual amount depending on whether and the extent to which Texas meets the criteria set forth below. The incentive payments shall be divided among four (4) categories, referred to as Incentive Payments A-D. Incentive Payments A-C will be due in installments over the eighteen (18) Payment Years, and Incentive Payment D will be due in installments over thirteen (13) years beginning with Payment Year 6. The incentive payments shall be made to Texas based on its eligibility for that year under the criteria set forth below.

      1.    Incentive Payment A. Incentive Payment A shall be equal to forty percent (40%) of the Texas Settlement Abatement Amount, *provided* that Texas satisfies the requirements of Incentive Payment A. Incentive Payment A will be due as part of the Annual Payment in each of the eighteen (18) Payment Years that Texas is eligible for Incentive Payment A and shall equal a total potential maximum of $467,057,643 if Texas is eligible for all eighteen (18) Payment Years. Texas's share of Incentive Payment A in a given year, *provided* that Texas is eligible, shall equal the total maximum amount available for Incentive Payment A for that year as reflected in Exhibit G. Eligibility for Incentive Payment A is as follows:

      a.    For the Payment Years 1 and 2, Texas is deemed eligible for Incentive Payment A.

      b.    For each Payment Year other than Payment Years 1 and 2, Texas is eligible for Incentive Payment A if, as of sixty (60) calendar days prior to the Payment Date (except that in Payment Year 3, this date is as of the Payment Date), (i) there is a Bar in full force and effect, (ii) there is a Settlement Class Resolution in full force and effect, (iii) the Released Claims of all of the following entities are released through the execution of Texas Participation Forms, or there is a Case-Specific Resolution against such entities: all Primary Subdivisions, Litigating Subdivisions, School Districts with a K-12 student enrollment of at least 25,000 or 0.10% of Texas's population, whichever is greater, and Health Districts and Hospital Districts that have at least one hundred twenty-five (125) hospital beds in one or more hospitals rendering services in that district; or (iv) a combination of the actions in clauses (i)-(iii) has achieved the same level of resolution of Claims by Subdivisions (*e.g.*, a Bar against future litigation combined with full joinder by Litigating Subdivisions). For the avoidance of doubt, clause (iv) cannot be satisfied unless all Litigating Subdivisions are Participating Subdivisions or there is a Case-Specific Resolution against any such Subdivisions that are not Participating Subdivisions.

      c.    Notwithstanding Section V.F.1.b, for each Payment Year other than Payment Years 1 and 2, if Texas is not eligible for Incentive Payment A as of the Incentive Payment Final Eligibility Date, Texas shall not be eligible for Incentive Payment A for that Payment Year or any subsequent Payment Years.

      d.    If the Settling Distributors made a payment under Incentive Payment A solely on the basis of a Bar or Settlement Class Resolution and that Bar or Settlement Class Resolution is subsequently removed, revoked, rescinded,

STRICTLY CONFIDENTIAL

reversed, overruled, interpreted in a manner to limit the scope of the release, or otherwise deprived of force or effect in any material respect, Texas shall not be eligible for Incentive Payment A thereafter, unless Texas requalifies for Incentive Payment A through any method pursuant to Section V.F.1.b, in which case Texas shall be eligible for Incentive Payment A less any litigation fees and costs incurred by Settling Distributor in the interim, except that, if the re-imposition occurs after the completion of opening statements in a trial involving a Released Claim, Texas shall not be eligible for Incentive Payment A (unless this exception is waived by the Settling Distributors).

2.  Incentive Payment B. Incentive Payment B shall be available to Texas if it is not eligible for Incentive Payment A for the applicable Payment Year. Incentive Payment B shall be equal to up to twenty-five percent (25%) of the Texas Settlement Abatement Amount. Incentive Payment B will be due as part of the Annual Payment in each of the eighteen (18) Payment Years that Texas is eligible for Incentive Payment B and equal a total potential maximum of $291,911,027 if Texas is eligible for all eighteen (18) Payment Years. Texas's maximum share of Incentive Payment B in a given year shall equal the total maximum amount available for Incentive Payment B for that year as reflected in Exhibit G. Eligibility for Incentive Payment B is as follows:

a.  Texas is not eligible for Incentive Payment B for a Payment Year for which it is eligible for Incentive Payment A.

b.  Subject to Section V.F.2.a, the amount of Incentive Payment B for which Texas is eligible in a Payment Year shall be a percentage of that Texas's maximum share of Incentive Payment B based on the extent to which (A) Litigating Subdivisions are Participating Subdivisions or (B) there is a Case-Specific Resolution against Litigating Subdivisions, collectively, *"Incentive B Eligible Subdivisions."* The percentage of Texas's maximum share of Incentive Payment B that Texas is eligible for in a Payment Year shall be determined according to the table below:

| Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population[8] | Incentive Payment B Eligibility Percentage |
|---|---|
| Up to 85% | 0% |

---

[8] The "Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population" shall be determined by the aggregate population of Texas's Litigating Subdivisions that are Incentive B Eligible Subdivisions divided by the aggregate population of Texas's Litigating Subdivisions. In calculating Texas's population that resides in Litigating Subdivisions, (a) the population of Texas's Litigating Subdivisions shall be the sum of the population of all Litigating Subdivisions, notwithstanding that persons may be included within the population of more than one Litigating Subdivision, and (b) the population that resides in Incentive B Eligible Subdivisions shall be the sum of the population of the Incentive B Eligible Subdivisions, notwithstanding that persons may be included within the population of more than one Incentive B Eligible Subdivision. An individual Litigating Subdivision shall not be included more than once in the numerator, and shall not be included more than

STRICTLY CONFIDENTIAL

| Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population[8] | Incentive Payment B Eligibility Percentage |
|---|---|
| 85%+ | 30% |
| 86+ | 40% |
| 91+ | 50% |
| 95+ | 60% |
| 99%+ | 95% |
| 100% | 100% |

c.      Texas's Incentive Payment B amount shall be discounted to reflect Texas's eligibility percentage for that Payment Year per the table above.

d.      Texas's eligibility for Incentive Payment B for a Payment Year with the exception of Payment Year 1, which shall be determined on the Initial Participation Date; *provided* that the percentage of Incentive Payment B for which Texas is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

3.      Incentive Payment C. Incentive Payment C shall be available to Texas if Texas is not eligible for Incentive Payment A for a Payment Year. Incentive Payment C shall be equal to up to 15% of the Texas Settlement Abatement Amount. Incentive Payment C will be due as part of the Annual Payment in each of the eighteen (18) Payment Years that Texas is eligible for Incentive Payment C and equal a total potential maximum of $175,146,616 if Texas is eligible for all eighteen (18) Payment Years. The maximum Incentive Payment C in a given year shall equal the total maximum amount available for Incentive Payment C for that year as reflected in Exhibit G multiplied by Texas's Incentive Payment C Eligibility Percentage. Eligibility for Incentive Payment C is as follows:

a.      Texas is not eligible for Incentive Payment C for a Payment Year in which it is eligible for Incentive Payment A.

b.      Subject to Section V.F.3.a, the amount of Incentive Payment C for which Texas is eligible in a Payment Year shall be a percentage of Texas's maximum share of Incentive Payment C based on the extent to which (A) Non-Litigating Primary Subdivisions with a population over thirty thousand (30,000) and Litigating Subdivisions are Participating Subdivisions or (B) there is a Case-Specific Resolution against Non-Litigating Primary Subdivisions with a population over thirty thousand (30,000) and Litigating Subdivisions, collectively, "*Incentive*

---

once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit. For the avoidance of doubt, if the population that resides in Incentive B Eligible Subdivisions is less than 85% of the population of Litigating Subdivisions, Texas shall not be eligible for any portion of Incentive Payment B.

STRICTLY CONFIDENTIAL

*C Eligible Subdivisions.*" The percentage of Texas's maximum share of Incentive Payment C that Texas is eligible for in a Payment Year shall be determined according to the table below:

| Percentage of Relevant Subdivision Population that is Incentive C Eligible Population [9] | Incentive Payment C Eligibility Percentage |
|---|---|
| Up to 60% | 0% |
| 60%+ | 25% |
| 70%+ | 35% |
| 75%+ | 40% |
| 80%+ | 45% |
| 85%+ | 55% |
| 90%+ | 60% |
| 93%+ | 65% |
| 94%+ | 75% |
| 95+ | 90% |
| 98+ | 95% |
| 100% | 100% |

  c. The amount Texas receives under Incentive Payment C shall be discounted to reflect Texas's eligibility percentage for that Payment Year per the table above.

  d. Texas's eligibility for Incentive Payment C for a Payment Year shall be determined as of sixty (60) calendar days prior to the Payment Date for that Payment Year with the exception of Payment Year 1, which shall be determined on the Initial Participation Date; *provided* that the percentage of Incentive Payment C

---

[9] The "Percentage of Relevant Subdivision Population that is Incentive C Eligible Population" shall be determined by the aggregate population of Incentive C Eligible Subdivisions divided by the aggregate population of the Non-Litigating Primary Subdivisions with a population over 30,000 and Litigating Subdivisions ("*Incentive Payment C Subdivisions*"). In calculating the population that resides in Incentive Payment C Subdivisions, (a) the population shall be the sum of the population of all Incentive Payment C Subdivisions, notwithstanding that persons may be included within the population of more than one Incentive Payment C Subdivision, and (b) the population that resides in Incentive C Eligible Subdivisions shall be the sum of the population of the Incentive C Eligible Subdivisions, notwithstanding that persons may be included within the population of more than one Incentive C Eligible Subdivision. An individual Incentive Payment C Subdivision shall not be included more than once in the numerator, and shall not be included more than once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit. For the avoidance of doubt, if the population that resides in Incentive C Eligible Subdivisions is less than 60% of the population of Incentive Payment C Subdivisions, Texas shall not be eligible for any portion of Incentive Payment C.

STRICTLY CONFIDENTIAL

for which Texas is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

       4.    <u>Incentive Payment D</u>. Incentive Payment D shall be applied at Payment Year 6. Incentive Payment D shall be equal to 5% of the Texas Settlement Abatement Amount. Incentive Payment D will be due as part of the Annual Payment for each of thirteen (13) Payment Years (from Payment Year 6 to Payment Year 18) that Texas is eligible for Incentive Payment D and equal a total potential maximum of $58,382,205 if Texas is eligible for all thirteen (13) Payment Years. Texas's Incentive Payment D in a given year shall equal the total maximum amount set forth in <u>Exhibit G</u>. Eligibility for Incentive Payment D is as follows:

           a.    Texas is eligible for Incentive Payment D if there has been no Later Litigating Subdivision that has had a Claim against a Released Entity survive more than six (6) months after denial in whole or in part of a Threshold Motion.

           b.    Texas's for Incentive Payment D shall be determined as of sixty (60) calendar days prior to the Payment Date. If a Later Litigating Subdivision's lawsuit survives more than six (6) months after denial in whole or in part of a Threshold Motion after that date, Texas shall not be eligible for Incentive Payment D for the Payment Year in which that occurs and any subsequent Payment Year.

           c.    Notwithstanding <u>Sections V.F.4</u>, Texas can become re- eligible for Incentive Payment D if the lawsuit that survived a Threshold Motion is dismissed pursuant to a later motion on grounds included in the Threshold Motion, in which case Texas shall be eligible for Incentive Payment D less any litigation fees and costs incurred by Settling Distributor in the interim, except that if the dismissal motion occurs after the completion of opening statements in such action, Texas shall not be eligible for Incentive Payment D.

           d.    For the avoidance of doubt, Texas may be eligible for Incentive Payment D whether or not it is eligible for Incentive Payments A-C.

       5.    The eligibility criteria set forth in <u>paragraphs 1-4</u> above are intended to be consistent with the Global Settlement. To the extent that the Global Settlement becomes effective and the terms of the eligibility criteria for Incentive Payments A-D are more favorable to Texas under the Global Settlement than the terms set forth in <u>paragraphs 1-4</u>, the terms of the Global Settlement shall control.

       G.    *Reductions/Offsets*. The base and incentive payments are subject to suspension, reduction, and offset as provided in <u>Sections XI</u> and <u>XII</u>.

       H.    *Allocation of Payments among Settling Distributors*. Payments due from the Settling Distributors under this <u>Section V</u>, <u>Section VIII</u>, and <u>Section IX</u> will be allocated among the Settling Distributors as follows: McKesson – 38.1%; Amerisource – 31.0%; Cardinal – 30.9%. A Settling Distributor's sole responsibility for payments under this Agreement shall be to make its share of each payment. The obligations of the Settling Distributors in this Agreement are several and not joint. No Settling Distributor shall be responsible for any portion of another Settling

STRICTLY CONFIDENTIAL

Distributor's share.

I.   *Pre-payment Option.*

1.   Any Settling Distributor shall have the right, subject to the limitations set forth in Section V.I.3, to prepay any base payment or incentive payment in whole or in part, without premium or penalty (a "*Settlement Prepayment*") by providing at least fourteen (14) calendar days prior written notice to the Texas Qualified Settlement Fund Administrator (a "*Prepayment Notice*"). Any Prepayment Notice shall specify: (a) the gross amount of the Settlement Prepayment, (b) the manner in which such Settlement Prepayment shall be applied to reduce such Settling Distributor's future share of Annual Payments (*i.e.*, to which future Annual Payments owed by such Settling Distributor the Settlement Prepayment should be applied) (such manner of application, a "*Settlement Prepayment Reduction Schedule*"), (c) the net present value of the Settlement Prepayment as of the Prepayment Date based on the Settlement Prepayment Reduction Schedule using a discount rate equal to the prime rate as published by *The Wall Street Journal* on the date of the Prepayment Notice plus 1.75% (such net present value amount, the "*Net Settlement Prepayment Amount*"), and (d) the date on which the prepayment will be made, which shall be no more than fifteen (15) calendar days after the date of the Prepayment Notice (the "*Prepayment Date*").

2.   On the Prepayment Date the Settling Distributor shall pay the Net Settlement Prepayment Amount to the Texas Qualified Settlement Fund and such amount shall be used only as specified in Section VI. Following such payment, all future Annual Payments allocated to the applicable Settling Distributor under Sections V.E and V.F shall be reduced pursuant to the Settlement Prepayment Reduction Schedule, and Exhibit G will be updated to give effect to such reduction, and going forward such updated schedule will be Exhibit G.

3.   A Settling Distributor's right to make prepayments shall be subject to the following limitations:

a.   Prepayments may apply to base payments or to both base and incentive payments. If the prepayment applies to both base and incentive payments, the prepayments will apply proportionately across base and incentive payments.

b.   A Settling Distributor shall make no more than three (3) prepayments over the eighteen (18) year payment term. A Settling Distributor shall not make more than one (1) prepayment in a five (5) year period and there shall not be prepayments made in the first two (2) Payment Years.

c.   Prepayments shall only be applied to one (1) or more of the three (3) Payment Years following the prepayment.

d.   The total amount of a prepayment of base payments after discounting calculations shall not be larger than the base payment for the Payment Year with the lowest Annual Payment amount affected by the prepayment. The total amount of a prepayment for both base payments and incentive payments shall

STRICTLY CONFIDENTIAL

not be larger than the base payment and anticipated incentive payments for the lowest Payment Year affected by the prepayment. The "anticipated incentive payment" for a future Payment Year shall reflect the incentives earned by Texas as of the time of the prepayment and any offsets or adjustments known at that time.

e.      In a Payment Year against which there has been a prepayment, if the amount Texas is calculated to receive is greater than the amount prepaid prior to discounting calculations, the Settling Distributor shall pay the difference. If, in a Payment Year for which there has been a prepayment, the amount that Texas is calculated to receive is less than the amount calculated at the time of prepayment, there shall be a credit for the difference to the Settling Distributor to be applied in the subsequent Payment Year(s), if any.

4.      For illustrative purposes only, attached as Exhibit H are examples showing a Settlement Prepayment, the related calculation of the Net Settlement Prepayment Amount, and the related adjustment to the Settlement Payment Schedule.

J.      *Significant Financial Constraint.*

1.      If the Global Settlement does not become effective, a Settling Distributor's allocable share of the Annual Payment for a Payment Year may, at the election of such Settling Distributor, be deferred either (a) up to the amount by which that share plus (i) such Settling Distributor's share of amounts payable during that Payment Year under Section V and Section VIII and (ii) amounts payable (if any) during that Payment Year by that Settling Distributor under any Other State Resolutions up to the applicable State Caps for the States of such Other State Resolutions, would in total exceed twenty percent (20%) of such Settling Distributor's total operating cash flow (as determined pursuant to United States generally accepted accounting principles) for its fiscal year that concluded most recently prior to the due date for that Annual Payment; or (b) (i) up to twenty-five percent (25%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies is below BBB or Baa2 or (ii) up to one hundred percent (100%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies is below BBB- or Baa3. As used herein, the "applicable" State Cap refers to the State that is the beneficiary of the Other State Resolution at issue or, in the case of an Other State Resolution with a Subdivision(s), the State in which such Subdivision(s) is located.  In the case of multiple Other State Resolutions in a State (e.g., with the State and/or separately with Subdivisions in it), payments under them shall count cumulatively towards the applicable State Cap.

2.      If the reason for exceeding twenty percent (20%) of a Settling Distributor's total operating cash flow or the decrease in credit rating is substantially attributable to the incurrence of debt to fund post-settlement acquisitions or to the payment of dividends and/or share repurchases that together are of an amount that exceeds the total amount of those two items for the prior fiscal year, no deferral is available. A Settling Distributor shall not be allowed to defer payment for a Payment Year if that Settling Distributor engaged in any share repurchases in the three fiscal quarters prior to the Payment Date for that Payment

STRICTLY CONFIDENTIAL

Year.

3.      If a Settling Distributor has reason to believe that it will not be able to pay some or all of its allocable share of the Annual Payment for a Payment Year, it shall provide at least ninety (90) calendar days' prior written notice to the Texas Qualified Settlement Fund Administrator and to Texas (a "*Deferred Payment Notice*"). Any Deferred Payment Notice shall specify and include: (a) the gross amount of the payments owed (including the estimated allocable portion of the Annual Payment, and amounts owed under Section V and Section VIII, by the relevant Settling Distributor); (b) the amount that the Settling Distributor believes it will be unable to pay; (c) the accounting and audited financial documents upon which the Settling Distributor relied for making this determination; and (d) any other relevant information for Texas to consider.

4.      A Settling Distributor shall not utilize this provision during the first three (3) Payment Years. If a Settling Distributor defers some or all of the payments due in a Payment Year pursuant to this Section V.J, it shall not repurchase any shares, or fund new acquisitions with an acquisition price greater than $250 million, during the deferral period until the deferred amount is fully repaid with interest. Any amounts deferred shall bear interest at an interest rate equal to the prime rate as published by the Wall Street Journal on the date of the Deferral Payment Notice plus 0.5%.

5.      The Settling Distributor shall pay all deferred amounts, including applicable interest on the next Payment Date. If the amounts previously deferred (including interest) together with the Settling Distributor's share of all payments due for a Payment Year would allow for a deferral under Section V.J.1, the Settling Distributor shall pay as much of the previously deferred amounts (including interest) as it can pay without triggering the ability to defer payment and may defer the remainder as permitted under (and subject to the restrictions of) this Section V.J.

6.      Deferrals will apply proportionally across base payments and incentive payments. For the avoidance of doubt, this Section V.J applies fully to Payment Years after the first three (3) Payment Years, including the base payments and all incentive payments due pursuant to this Agreement during the Payment Year at issue.

7.      If a Settling Distributor could pay a portion of its allocable share of the Annual Payments due pursuant to this Agreement during a Payment Year without triggering this Section V.J, the Settling Distributor shall be required to pay that portion as scheduled and only the excess would be subject to deferral at the election of the Settling Distributor (in whole or in part) as provided herein.

8.      The Settling Distributor shall pay any deferred amounts, including applicable interest on or before the date on which the payment is due for Payment Year 18.

9.      If the Global Settlement becomes effective, this provision shall be superseded by the Significant Financial Constraint provision set forth therein.

K.      *Participation Tier Calculations.* Texas will be eligible for benefits associated with any tier implemented in the Global Settlement. If a suspension is put into effect and it is later

STRICTLY CONFIDENTIAL

determined that Texas would have been entitled to additional protection from the suspension due to tier participation, any excess funds captured by the moratorium will be reimbursed. If the Global Settlement does not become effective by July 1, 2022, Texas will be eligible for benefits associated with any tier in the Global Settlement, based on the level of subdivision participation in Texas. Any disputes as to the determination of the Participation Tier shall be decided pursuant to Section VII.

**VI.** **Allocation and Use of Settlement Payments.**

A.      Payments shall be allocated according to the Intrastate Term Sheet annexed hereto as Exhibit N and incorporated herein by reference, subject to the following provisions:

B.      Both the entire Texas Abatement Amount and the Texas Additional Restitution Amount shall be for Opioid Remediation.

C.      *Nature of Payment.* Each of the Parties and each of the Participating Subdivisions acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

1.      It has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

2.      (a) Texas and Participating Subdivisions sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by Texas and Participating Subdivisions; (b) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by Texas and Participating Subdivisions; and (c) the portion of the Compensatory Restitution Amount received by Texas or Participating Subdivision is no greater than the amount of the Alleged Harms allegedly suffered by Texas or Participating Subdivision;

3.      The payment of the Compensatory Restitution Amount by the Settling Distributors constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by the Settling Distributors;

4.      The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, Texas and Participating Subdivisions to the same position or condition that they would be in had Texas and Participating Subdivisions not suffered the Alleged Harms; and

5.      For the avoidance of doubt: (a) no portion of the Compensatory Restitution Amount represents reimbursement to Texas or any Participating Subdivision or other person or entity for the costs of any investigation or litigation, (b) the entire Compensatory Restitution Amount is properly characterized as described in Section VI.B, and (c) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, or other punitive assessments.

STRICTLY CONFIDENTIAL

D.     The Texas Abatement Amount shall be allocated according to this Agreement, the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit N and incorporated herein by reference (the *"Texas Intrastate Term Sheet"*), subject to Section VI.B, and according to Texas law, including without limitation the guidelines established in Chapter 403, Subchapter R.

## VII.    Enforcement

A.     *Enforceability.* The terms of the Agreement and the Texas Consent Judgment will be enforceable solely by the Texas Consolidated Litigation Court and the Texas Consent Judgment Court, limited to the role of each court in this Agreement. Participating Subdivisions shall not have enforcement rights against the Settling Distributors with respect to the Texas Consent Judgment, except as to payments that would be allocated to the Texas Qualified Settlement Fund; *provided, however,* that Texas shall establish a process for Participating Subdivisions to notify it of any perceived violations of the Texas Consent Judgment. Texas will continue to serve as an "initial Settling State Member" of the Enforcement Committee of the Global Settlement in conformance with Exhibit B to the Global Settlement.

B.     *Jurisdiction.* The Settling Distributors consent to the jurisdiction of the Texas Consolidated Litigation Court for the limited purposes of enforcing this Agreement and to the Texas Consent Judgment Court for the limited purpose of enforcing the Texas Consent Judgment.

C.     *Dispute Resolution.* The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this section to resolve the dispute.

D.     *Resolution by the Court.* Disputes not resolved informally shall be resolved in the appropriate court as set forth in this Agreement, except as to disputes involving Injunctive Relief under the Texas Consent Judgment, which shall be governed by Section XIII.

E.     *Enforcement.* If the Global Settlement becomes effective by July 1, 2022, disputes between or among the Parties shall be governed by the enforcement and dispute resolution provisions of the Global Settlement.

## VIII.   Plaintiffs' Attorneys' Fees and Costs

A.     It is the intent of the Parties that, if the Global Settlement becomes effective, the attorneys' fees and costs for Texas and its Subdivisions shall be addressed as set forth in Section VIII.B and Section VIII.C. If the Global Settlement does not become effective, attorneys' fees and costs for Texas and its Subdivisions shall be addressed as set forth in Section VIII.C and Section VIII.D.

B.     If the Global Settlement becomes effective by July 1, 2022:

1.     The Parties agree that Texas subdivision counsel are eligible for the Contingency Fee Fund, and upon application by the Texas Plaintiff's Steering Committee and approval by the Fee Panel, eligible for fees from the Global Contingency Fee Fund of

STRICTLY CONFIDENTIAL

an estimated $33,578,899.00, in subdivision attorneys' fees. This reflects the Global Contingency Fee Fund model's current estimate of Texas's subdivisions in the Global Contingency Fee Fund, and would be paid by the Global Settlement Fund Administrator into the Texas Qualified Settlement Fund over 7 Payment Years and allocated by the Texas Qualified Settlement Fund Administrator subject to Texas Consolidated Litigation Court jurisdiction. The Parties agree that the amount of $33,578,899.00 represents the current estimate of the Texas subdivision counsel's share of the Global Contingency Fee Fund. The actual amount may be greater or less. If the actual amount is less than the foregoing estimate, the remainder shall be subject to payment by the State of Texas under Exhibit N, Section C. The Parties further agree that if the Global Contingency Fee Fund pays any fees into the Texas Qualified Settlement Fund, the amounts paid will be allocated to individual lawyers/firms consistent with the Global Contingency Fee Fund.

2.      The Parties agree that, under the Global Settlement, Texas Subdivisions counsel are eligible for the Global Litigating Subdivision Cost Fund, and upon application by the Texas Plaintiff's Steering Committee and approval by the Global Settlement Fund Administrator, eligible for expenses from the Global Litigating Subdivision Cost Fund (which, if Texas Subdivisions were to receive an amount equal to Texas's Overall Allocation Percentage (6.29312157196%) of the Global Litigating Subdivision Cost Fund would be $7,551,745.89), to be paid through the Global Settlement Fund Administrator into the Texas Qualified Settlement Fund, subject to Texas Consolidated Litigation Court jurisdiction, over 3 Payment Years. The Parties agree that the amount that the Texas Subdivisions receive from the Global Litigating Subdivision Cost Fund may be more or less than the $7,5551,745.89 estimate, and the actual amount will be decided by the administrator of the Global Litigating Subdivision Cost Fund. If such amount is less than the foregoing estimate, the remainder is subject to payment by the State of Texas under Exhibit N, Section C.

3.      Attorneys' fees and costs for Texas and its Subdivisions shall be addressed (except as set forth in Section VIII.C) through the mechanisms set forth in the Global Settlement and Exhibit R (Agreement on Attorneys' Fees, Expenses and Costs) to the Global Settlement, including the eligibility criteria therein, Exhibit T (Agreement on the State Cost Fund Administration) to the Global Settlement, and Exhibit N (Texas Intrastate Allocation Agreement) to this Agreement. The Texas Qualified Settlement Fund Administrator shall not distribute fees or costs from the Global Contingency Fee Fund or Global Litigating Subdivision Cost Fund to any lawyer or firm who has not met the eligibility criteria set forth in Exhibit R to the Global Settlement.

C.      Regardless of whether and when the Global Settlement becomes effective, no later than fifteen (15) calendar days after the Effective Date, the Settling Distributors shall pay $33,000,000 in litigation costs and expenses to the Texas Bellwether Counties, payment instructions for and allocation of which shall be made at the direction of the Texas Bellwether Counties; *provided, however*, that, for the avoidance of doubt, any payment made pursuant to this Section VIII.C is expressly conditioned upon the conditions precedent set forth in Section III.A.3 and Section III.A.4.

STRICTLY CONFIDENTIAL

D.    If the Global Settlement does not become effective by July 1, 2022, the Settling Distributors shall pay into the Texas Qualified Settlement Fund the following amounts, subject to the jurisdiction and guidelines of the Texas Consolidated Litigation Court:

1.    $4,796,985.57 to reimburse Participating Subdivision attorneys' fees upon application by eligible counsel who waive enforcement of their contingency fee contracts. This amount will be paid on July 15, 2022 and each subsequent Payment Date until and including Payment Year 7 for a total payment of $33,578,899.00.

2.    Litigating Subdivisions shall submit litigation costs to the Texas Consolidated Litigation Court, which shall review and approve documented litigation costs, which shall then be paid by Settling Distributors, within 60 calendar days of such determination, up to a maximum of $7,551,745.89.

3.    The amounts paid by Settling Distributors under this Section VIII.D will be paid consistent with the schedule set forth in Exhibit G, which is consistent with Exhibit M to the Global Settlement.

IX.    **Texas Additional Restitution Amount**

A.    *Texas Additional Restitution Amount.* Pursuant to the schedule set forth in Exhibit G, the Settling Distributors shall pay the Additional Restitution Amount to Texas. Such funds shall be paid, on the schedule set forth in Exhibit G, on the Payment Date for each relevant Payment Year.

B.    *Use of Funds.* All funds paid under this Section IX shall be part of the Compensatory Restitution Amount, shall be used for Opioid Remediation and shall be governed by the same requirements as specified in Section VI.C.

X.    **Release**

A.    *Scope.* As of the Effective Date, the Released Entities are hereby released and forever discharged from all Released Claims. Texas (for itself and its Releasors) and each Participating Subdivision hereby absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of Texas and its Attorney General to release claims. This Agreement shall be a complete bar to any Released Claim.

B.    *Claim-Over and Non-Party Settlement.*

1.    It is the intent of the Parties that: Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract), from other parties for their payment obligations under this Agreement; the payments made under this Settlement Agreement shall be the sole payments made by the Released Entities to the

29

STRICTLY CONFIDENTIAL

Releasors involving, arising out or, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity); Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties. The provisions of this Section X.B are intended to be implemented consistent with these principles.

2.      This Agreement and the releases and dismissals provided for herein are made in good faith.

3.      No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, *provided* that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

4.      To the extent that, on or after the Initial Participation Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from the Settling Distributors in Section X.B.3, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this Section X.B.4 is a material term of this Agreement. If a Releasor uses best efforts (which must be documented and substantiated by such Releasor) to obtain such prohibition and/or release but is unable to do so, the Released Entities' remedy is that Section X.B.5 applies. For purposes of this Section X.B, references to "settle" or "settlement" include consent or stipulated judgments and other forms of relief that the Releasor does not oppose.

5.      If any Releasor settles a Non-Party Covered Conduct Claim with any Non-Released Entity and fails, following documented and substantiated best efforts, to obtain the prohibition and/or release required by Section X.B.4, and if the Non-Released Entity in turn asserts a Claim-Over, the following shall apply:

a.      The Released Entity shall move to dismiss such Claim-Over on the grounds that this Agreement moots or otherwise extinguishes the Claim- Over. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and shall join in such motion. The Released Entity shall move to dismiss, in litigation, arbitration, or other appropriate proceeding, such Claim-Over on the grounds that this Agreement moots or

STRICTLY CONFIDENTIAL

otherwise extinguishes the Claim-Over. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and shall join in such motion.

b. If the Claim-Over proceeds despite such motion (including if material substantive proceedings are permitted to go forward during the pendency of such motion), the Releasor shall reduce the settlement it obtained against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, including, if necessary, by returning monies paid to the Releasor by the Non-Released Entity, and shall fully hold the Released Entity harmless from such Claim-Over (including, if necessary, by returning monies paid by Released Entities to the Releasor under this Agreement).

6. In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that described in Section X.B.3 or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy:

a. If the Non-Released Entity in turn successfully asserts a Claim-Over against a Released Entity, except as provided in Section X.B.7, the Releasor shall reduce its Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, including, if necessary, by returning monies paid to the Releasor in satisfaction of a judgment against or settlement with the Non-Released Entity, and to fully hold the Released Entity harmless from such Claim-Over (including, if necessary, by returning monies paid by Released Entities to the Releasor under this Agreement).

b. For purposes of this provision, successful assertion of a Claim-Over means either (i) a final monetary judgment in litigation, arbitration or other proceeding; *provided* that the applicable State Attorney(s) General had notice of and opportunity to intervene in the proceeding giving rise to such judgment or (ii) a settlement; *provided* that the Released Entity sought the applicable State Attorney(s) General's consent to the settlement and such consent was either obtained or unreasonably withheld. Should the judgment against the Released Entity resolve claims that are not Claim-Over claims, the reduction of the Claim and/or judgment shall be for the Claim-Over portion only, which shall be distinguishable in the judgment.

c. The Released Entity will take reasonable and necessary steps to defend against the Claim-Over and will consent to the intervention of any Releasor seeking to defend against the Claim-Over. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and shall join in, and with respect to all other proceedings shall not unreasonably withhold consent to, any motion by any of the Released Entities to dismiss any Claim-Over on the grounds that this Agreement moots or otherwise extinguishes any such Claim-Over.

STRICTLY CONFIDENTIAL

7.    To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section X.B.4, Section X.B.5, and Section X.B.6 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Each Settling Distributor shall notify Texas, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entity asserts a Claim-Over arising out of contractual indemnity against it.

C.    *General Release.* In connection with the releases provided for in this Agreement, Texas (for itself and its Releasors) and each Participating Subdivision expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any Texas or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but Texas (for itself and its Releasors) and each Participating Subdivision hereby expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect Texas's decision to enter into this Agreement or the Participating Subdivisions' decision to participate in this Agreement.

D.    *Assigned Interest Waiver.* To the extent Texas has any direct or indirect interest in any rights of a third party that is a debtor under the Bankruptcy Code as a result of a claim arising out of Covered Conduct by way of assignment or otherwise, including as a result of being the beneficiary of a trust or other distribution entity, to assert claims against a Settling Distributor (whether derivatively or otherwise), under any legal or equitable theory, including for indemnification, contribution, or subrogation, Texas waives the right to assert any such claim, or to receive a distribution or any benefit on account of such claim and such claim, distribution, or benefit shall be deemed assigned to such Settling Distributor.

E.    *Res Judicata.* Nothing in this Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in this Agreement, and/or any Texas Consent Judgment or other judgment entered on this Agreement, gives rise to under applicable law.

F.    *Representation and Warranty.* The signatories hereto on behalf of Texas expressly represent and warrant that they have (or have obtained, or will obtain no later than the Initial Participation Date) the authority to settle and release, to the maximum extent of Texas's power, all Released Claims of (1) Texas; (2) all past and present executive departments, state agencies,

STRICTLY CONFIDENTIAL

divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts; and (3) any of Texas's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license;[10] and (4) any Participating Subdivision. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of Texas's Governor. Also for the purposes of clause (3), a release from Texas's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

G. *Effectiveness.* The releases set forth in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Texas Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Texas Qualified Settlement Fund or any portion thereof.

H. *Cooperation.* Releasors (1) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (2) will reasonably cooperate with and not oppose any effort by Settling Distributors to secure the prompt dismissal of any and all Released Claims.

I. *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, this Agreement does not waive, release or limit any criminal liability, Claims for liability under tax law, Claims under securities law by Texas as an investor, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under this Agreement for enforcement of this Agreement.

## XI. Later Litigating Subdivisions

A. *Released Claims against Released Entities.* Subject to Section XI.B, the following shall apply in the event a Later Litigating Subdivision maintains a lawsuit for a Released Claim against a Released Entity after the Effective Date:

1. The Released Entity shall take ordinary and reasonable measures to defend the action, including filing a Threshold Motion with respect to the Released Claim. The Released Entity shall further notify Texas and Texas Qualified Settlement Fund Administrator immediately upon notice of a Later Litigating Subdivision bringing a lawsuit for a Released Claim, and shall not oppose Texas's submission in support of the Threshold Motion.

2. The provisions of this Section XI.A.2 apply if the Later Litigating Subdivision is a Primary Subdivision (except as provided in Section XI.A.2.f):

a. If a lawsuit including a Released Claim survives until the

---

[10] In Texas, the department and agency that have the duties and powers in clauses (2) and (3) are the Department of State Health Services.

STRICTLY CONFIDENTIAL

Suspension Deadline for that lawsuit, the Texas Qualified Settlement Fund Administrator shall calculate the Suspension Amount applicable to the next Payment due from the Settling Distributor(s) at issue and apportioned to Texas and the Participating Subdivisions; *provided, however*, that the Suspension Amount for a Payment Year cannot exceed the Suspension Cap. The Suspension Amount shall be paid into the Texas Qualified Settlement Fund Escrow account. If the Suspension Amount exceeds the Suspension Cap for that Payment Year, then the remaining amount will be paid into the Texas Qualified Settlement Fund Escrow in the following Payment Year, subject to the Suspension Cap, and so forth in each succeeding Payment Year until the entire Suspension Amount has been paid into the Texas Qualified Settlement Fund Escrow or the Released Claim is resolved, as provided below, whichever comes first. A suspension does not apply during the pendency of any appeal dismissing the lawsuit for a Released Claim in whole.

b. If the Released Claim is resolved with finality without requirement of payment by the Released Entity, the placement of any remaining balance of the Suspension Amount into the Texas Qualified Settlement Fund Escrow shall cease and the Texas Qualified Settlement Fund Administrator shall immediately transfer amounts in the Texas Qualified Settlement Fund Escrow on account of the suspension to Texas and the Participating Subdivisions. The lawsuit will not cause further suspensions unless the Released Claim is reinstated upon further review, legislative action, or otherwise.

c. If the Released Claim is resolved with finality on terms requiring payment by the Released Entity, the Texas Qualified Settlement Fund Administrator will transfer the amounts in the Texas Qualified Settlement Fund Escrow on account of the suspension to the Settling Distributor(s) at issue necessary to satisfy the payment obligation of the Released Entity to the relevant Later Litigating Subdivision. If any balance remains in the Texas Qualified Settlement Fund Escrow on account of the suspension after transfer of the amount necessary to satisfy the payment obligation, the Texas Qualified Settlement Fund Administrator will immediately transfer the balance to Texas and the Participating Subdivisions. If the payment obligation of the Released Entity to the relevant Later Litigating Subdivision exceeds the amounts in the Texas Qualified Settlement Fund Escrow on account of the suspension, the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly Offset Cap, for the excess amount against its obligation to pay its allocable share of Annual Payments that would be apportioned to Texas and to the Participating Subdivisions. The offset shall be applied as follows: first against the Settling Distributor's allocable share of the Annual Payment due in Payment Year 18, up to the Offset Cap for that Payment Year, with any remaining amounts above the Offset Cap applied against the Settling Distributor's allocable share of the Annual Payment due in Payment Year 17, up to the Offset Cap for that Payment Year, and so forth for each preceding Payment Year until the entire amount to be offset has been applied or no future Payment Years remain.

d. If the lawsuit asserting a Released Claim is resolved with finality on

STRICTLY CONFIDENTIAL

terms requiring payment by the Released Entity, and the Released Claim did not give rise to a suspension of Annual Payments (*e.g.*, because it was resolved during Payment Years 1 or 2, during which Texas is deemed eligible for Incentive Payment A and thus no suspension of payments took place, as provided by Section XI.B), the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly Offset Cap, for the amount paid. The offset shall be applied against the relevant Settling Distributor's allocable portion of the Annual Payments starting in Payment Year 18 and working backwards as set forth in Section XI.A.2.c. If the lawsuit for a Released Claim is otherwise resolved by the Released Entity, without the Settling Distributor filing a Threshold Motion despite an opportunity to do so, and the Released Claim did not give rise to a suspension of any Settling Distributor's portion of any Annual Payments, the Settling Distributor at issue shall not receive any offset for the amount paid.

        e.     If more than one Primary Subdivision becomes a Later Litigating Subdivision, a single Suspension Cap applies and the total amounts deducted from the Annual Payment in a given Payment Year cannot exceed the Suspension Cap. For the avoidance of doubt, an individual Primary Subdivision shall not trigger more than one suspension regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit.

        f.     This Section XI.A.2 shall not apply with respect to a Primary Subdivision that is either (i) a Later Litigating Subdivision under clause (3) of the definition of that term solely because a legislative Bar or legislative Case- Specific Resolution applicable as of the Effective Date is invalidated by judicial decision after the Effective Date or (ii) a Later Litigating Subdivision under clause (4) of the definition of that term. Such a Primary Subdivision shall be treated as a General Purpose Government under Section XI.A.3.

        3.     The terms of this Section XI.A.3 apply if a Later Litigating Subdivision is not a Primary Subdivision (except for Primary Subdivisions referenced in Section XI.A.2.f) but is a General Purpose Government, School District, Health District or Hospital District: if the Released Claim is resolved with finality on terms requiring payment by the Released Entity, the Settling Distributor at issue shall receive a dollar- for-dollar offset, subject to the yearly Offset Cap, for the amount paid against its portion of the obligation to make Annual Payments that would be apportioned to Texas and to the Participating Subdivisions. The offset shall be applied as follows: first against the relevant Settling Distributor's allocable share of the Annual Payment due in Payment Year 18, up to the Offset Cap for that Payment Year, with any remaining amounts above the Offset Cap applied against the Payment due in Payment Year 17, up to the Offset Cap for that Payment Year, and so forth for each preceding Payment Year until the entire amount to be offset has been applied or no future Payment Year remains. If the Released Claim is resolved on terms requiring payment during the first two (2) Payment Years, in no case will any amounts be offset against the amounts due in Payment Years 1 and 2.

        4.     In no event shall the total of Suspension Amounts and offsets pursuant to this Section applicable to Texas in a Payment Year for that Payment Year exceed the Offset

STRICTLY CONFIDENTIAL

Cap for Texas. If, in a Payment Year, the total of Suspension Amounts and offsets applicable to Texas exceeds the Offset Cap, the Suspension Amounts shall be reduced so that the total of Suspension Amounts and offsets equals the Offset Cap.

5.     For the avoidance of doubt, any offset pursuant to this Section XI that is not eligible for Incentive Payment A shall continue to apply even if Texas subsequently becomes eligible for Incentive Payment A.

6.     '*"Terms requiring payment"* shall mean (i) a final monetary judgment or (ii) a settlement; *provided* that the Released Entity sought the Texas Attorney General's consent to the settlement and such consent was either obtained or unreasonably withheld. Should the judgment or settlement resolve claims that are not Released Claims, the offset shall be for the Released Claims portion only, which shall be distinguishable in the judgment or settlement.

B.     *Exceptions.*

1.     Section XI.A shall not apply where Texas meets the eligibility criteria for and is entitled to Incentive Payment A for the Payment Year at issue, except as expressly provided therein. For the avoidance of doubt, because Texas is deemed eligible for Incentive Payment A for Payment Years 1 and 2 under Section V.F.1.c, a suspension of Payments under Section XI.A.2 shall not apply to Texas for those Payment Years.

2.     An offset under Sections XI.A.2 and XI.A.3 shall not apply where the Later Litigating Subdivision opted out of a Settlement Class Resolution at issue that was in full force and effect as of the due date of the payment for Payment Year 2 and that remains in full force and effect; *provided* that an offset relating to that Subdivision may apply under Section XII.

3.     Section XI.A shall not apply where the Later Litigating Subdivision seeks less than $10 million, or so long as its total claim is reduced to less than $10 million, in the lawsuit for a Released Claim at issue.

4.     An offset under Section XI.A.3 shall not apply where the applicable Participation Tier is Participation Tier 1 and the population of the Later Litigating Subdivision is under 10,000.

5.     If the applicable Participation Tier is Participation Tier 2 or higher, and the Later Litigating Subdivision has a population less than 10,000, the offset under Section XI.A.3 shall only apply to amounts paid pursuant to a settlement or judgment that are over $10 million per case or resolution. Any type of consolidated or aggregated or joined or class actions, however styled, shall be considered a single case, and any resolutions that occur within a sixty (60) calendar day period of each other and involve Later Litigating Subdivisions that share some common counsel and/or are in Texas or are created by the same or related judgments, settlement agreements, or other instruments or are conditioned upon one another, shall be considered a single resolution. For the avoidance of doubt, any such case or resolution shall have only a single $10,000,000 exemption from the offset under Section XI.A.3.

STRICTLY CONFIDENTIAL

C.    *No Effect on Other Provisions.* A suspension, reduction or offset under <u>Section XI.A</u> shall not affect the Injunctive Relief Terms or the Texas Consent Judgment.

**XII.    Reductions/Offsets**

A.    *Offset Relating to Incentive Payment A.* If Texas is not eligible for Incentive Payment A at the third Payment Date,[11] Settling Distributors shall receive an offset.[12] The offset shall be the dollar amount difference between (1) the total amount of the Incentive Payment A due from Settling Distributors on the Effective Date and on the Payment Date for Payment Year 2 allocated to Texas and the Participating Subdivisions, and (2) the total amount of Incentive Payments B and C that would have been due from Settling Distributors on the Effective Date and on the Payment Date for Payment Year 2 so allocated but for Texas's deemed eligibility for Incentive Payment A. The offset shall be applied in equal installments to reduce the Settling Distributor's Payments for Payment Years 3 through 7 that would be apportioned to Texas or the Participating Subdivisions, and shall remain applicable even if that Texas subsequently becomes eligible for Incentive Payment A.

B.    *Settlement Class Resolution Opt-Outs.* If Texas is eligible for Incentive Payment A on the basis of a Settlement Class Resolution, and a Primary Subdivision that opted out of the Settlement Class Resolution maintains a lawsuit asserting a Released Claim against a Released Entity, the following shall apply. If the lawsuit asserting a Released Claim either survives a Threshold Motion or has an unresolved Threshold Motion fewer than sixty (60) calendar days prior to the scheduled start of a trial involving a Released Claim, and is resolved with finality on terms requiring payment by the Released Entity, the Settling Distributor at issue shall receive a dollar-for-dollar offset for the amount paid against its obligation to make remaining Incentive Payment A payments that would be apportioned to Texas or Participating Subdivisions. For the avoidance of doubt, an offset shall not be applicable under this <u>Section XII.B</u> if it is applicable under <u>Section XI.A</u> with respect to the Subdivision at issue.

C.    *Revoked Bar, Settlement Class Resolution, or Case-Specific Resolution.* If the Settling Distributors made any Annual Payments that included any incentive payments earned as a result of the existence of a Bar, Settlement Class Resolution, or Case-Specific Resolution after the determination of the amount of such Annual Payment, and there is subsequently a Revocation Event with respect to that Bar, Settlement Class Resolution, or Case-Specific Resolution, the Settling Distributors shall receive a dollar-for-dollar offset against the portion of remaining Annual Payments that would be allocated to Texas and the Participating Subdivisions. This offset will be calculated as the dollar amount difference between (1) the total amount of incentive payments paid by the Settling Distributors by virtue of the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event and (2) the total amount of incentive payments that would have been due from the Settling Distributors during that time had the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event not been in effect. The amount of Incentive Payments that would have been due, referenced in <u>clause (2)</u> above, will be

---

[11] In the event that Texas has passed a legislative bar before the Payment Date for Payment Year 3 that would otherwise qualify Texas for Incentive Payment A, but such legislation is not effective until a date in 2023 after the Payment Date for Payment Year 3, Texas will not be required to make the offset required by this <u>Section XIV.A.</u>

[12] For purposes of this provision, in determining whether Texas would not be eligible for Incentive Payment A for Payment Year 3, the criteria set forth in <u>Section V.F.1.b</u> shall apply to that Payment Year.

STRICTLY CONFIDENTIAL

calculated one hundred eighty (180) calendar days after the Revocation Event; for purposes of calculating the amount of incentive payments that would have been due, any relevant Subdivision shall be included as a Participating Subdivision if: (1) its Released Claims are extinguished by any subsequent Bar, Settlement Class Resolution, or Case-Specific Resolution in effect as of the date of such calculation, or (2) it becomes a Participating Subdivision (in addition to all other Participating Subdivisions) prior to the date of such calculation.

D.      *Certain Taxes.* Amounts paid by a Settling Distributor under an Opioid Tax in Texas in a Payment Year shall give rise to a dollar-for-dollar offset against that Settling Distributor's obligation to pay its share of the Annual Payment in that Payment Year that would be allocated to Texas or Participating Subdivisions in it. If such amounts paid exceed that Settling Distributor's share of the Annual Payment allocable to Texas or Participating Subdivisions in that Payment Year, the excess shall carry forward as an offset against its allocable share of remaining Annual Payments that would be allocated to Texas or Participating Subdivisions.

E.      *Not Subject to Suspension Cap or Offset Cap.* For the avoidance of doubt, neither the Suspension Cap nor the Offset Cap applies to the offsets and reductions set forth in this Section XII.

### XIII.   Injunctive Relief in the Absence of a Global Settlement

A.      It is the intent of the Parties that significant injunctive relief shall be implemented through the Global Settlement that will benefit Texas as a whole, as well as other States. The Injunctive Relief Term Sheet is annexed hereto as Exhibit R.

B.      Texas, currently intends to participate in such settlement and shall benefit from the injunctive relief set forth therein.

C.      In the event that the Global Settlement does not become effective, the Parties will meet and confer about elements of the injunctive relief that can be implemented in Texas on a statewide-only basis, with the understanding that:

1.      Implementation of injunctive terms on a Texas-only basis is limited and creates additional costs to Settling Distributors, given their nationwide operations;

2.      Elements of injunctive relief for this Agreement shall include those terms in the Global Settlement that can reasonably be implemented on a statewide-only basis. The Sections of Exhibit R that will be considered by the Parties for implementation are Sections I through XIV, and XVI, which, among other things, set forth requirements for internal controls, oversight, training, tracking, and prevention designed to prevent improper distribution of opioids; and

3.      The parties agree that modifications will be necessary before Sections VIII, IX, X, XI, XII, XIII, XIV, XVI of Exhibit R can be implemented with respect to conduct that occurs solely within Texas. The parties further agree that modifications may be required before Sections I, II, III, IV, V, VI and VII of Exhibit R can be implemented in the event that the Global Settlement does not become effective. A Settling Distributor shall be under no obligation to implement any of the requirements contained in Exhibit R until

STRICTLY CONFIDENTIAL

the meet and confer process is completed and there is agreement as to the necessary modifications.

      4.     To the extent practicable, these meet and confers will be coordinated with the meet and confers on injunctive relief with the States of New York, Ohio, and Rhode Island, and the Parties agree that, to the extent practicable, the injunctive relief terms for these four States should be consistent.

      5.     In the event the meet and confer process does not lead to agreement on statewide injunctive relief terms, the matter will be submitted to arbitration.

### XIV. Miscellaneous

    A.    *Population of General Purpose Governments.* The population figures for General Purpose Governments shall be the published U.S. Census Bureau's population estimates for July 1, 2019, released May 2020. These population figures shall remain unchanged during the term of this Agreement.

    B.    *Population of Special Districts.* For any purpose in this Agreement in which the population of a Special District is used other than <u>Section V.F.1.b</u>: (a) School Districts' population will be measured by the number of students enrolled who are eligible under the Individuals with Disabilities Education Act ("*IDEA*") or Section 504 of the Rehabilitation Act of 1973; (b) Health Districts' and Hospital Districts' population will be measured at twenty-five percent (25%) of discharges; and (c) all other Special Districts' (including Fire Districts' and Library Districts') population will be measured at ten percent (10%) of the population served.

    C.    *Population Associated with Sheriffs.* For any purpose in this Agreement in which the population associated with a lawsuit by a sheriff is used, the population will be measured at 20% of the capacity of the jail(s) operated by the sheriff.

    D.    *No Admission.* The Settling Distributors do not admit liability or wrongdoing. Neither this Agreement nor the Texas Consent Judgment shall be considered, construed or represented to be (1) an admission, concession or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to the Settling Distributors. It is the understanding and intent of the Parties that this Agreement shall not be entered into evidence in any other action against the Settling Distributors, among other reasons, because it is not relevant to such action. For the avoidance of doubt, nothing herein shall prohibit a Settling Distributor from entering this Agreement into evidence in any litigation or arbitration concerning a Settling Distributor's right to coverage under an insurance contract.

    E.    *Most-Favored-Nation Provision.* If, after execution of this Agreement, there is a collective resolution—through settlement, bankruptcy, or other mechanism—of substantially all Claims against the Settling Distributors via the Global Settlement under which Texas or the Bellwether Counties would have received a greater monetary amount than the sum of all amounts provided in this Agreement, Settling Distributors shall remit to Texas and the Bellwether Counties the difference between the sums of the amounts provided in this Agreement and the monetary amount that Texas and the Bellwether Counties would have received if they had been participants in the Global Settlement according to the payment schedule in the Global Settlement.

STRICTLY CONFIDENTIAL

F.    *Tax Cooperation and Reporting.*

1.    Upon request by any Settling Distributor, Texas and Participating Subdivisions agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for the Settling Distributors to establish the statements set forth in <u>Section VI.C</u> and to track and assist in the report of remediation disbursements as agreed to among the Settling Distributors to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

2.    Without limiting the generality of <u>Section XIV.F.1</u>, Texas, the Bellwether Counties and each Participating Subdivision shall cooperate in good faith with any Settling Distributor with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

3.    Texas, on behalf of itself and all Participating Subdivisions, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "*Appropriate Official*"). If the Global Settlement does not become effective by July 1, 2022, Texas shall direct and ensure that the Appropriate Official timely (a) file (i) at the time this Agreement becomes binding on the Parties, an IRS Form 1098-F in the form attached as <u>Exhibit I</u>, <u>Exhibit J</u>, and <u>Exhibit K</u> with respect to each of the Settling Distributors and (ii) any legally required returns or amended returns with any applicable governmental authority, or any returns requested by the respective Settling Distributors, and (b) provide to each of the Settling Distributors a copy of (i) the IRS Form 1098-F filed with respect to such Settling Distributor and (ii) any legally required written statement pursuant to any applicable law and any other document referred to in <u>clause (a)(ii)</u> above. Any such form, return, or statement shall be prepared and filed in a manner fully consistent with <u>Section VI.C</u>.

4.    Texas and its Participating Subdivisions agree that any return, amended return, or written statement filed or provided pursuant to <u>paragraph 3</u>, and any similar document, shall be prepared and filed in a manner consistent with reporting each Settling Distributor's portion of the Texas Settlement Amount as the "Total amount to be paid" pursuant to this Agreement in Box 1 of IRS Form 1098-F, each Settling Distributor's portion of the Texas Settlement Amount less the Compensatory Restitution Amount as the "Amount to be paid for violation or potential violation" in Box 2 of IRS Form 1098-F and each Settling Distributor's portion of the Compensatory Restitution Amount as "Restitution/remediation amount" in Box 3 of IRS Form 1098-F, as reflected in the attached <u>Exhibit I</u>, <u>Exhibit J</u>, and <u>Exhibit K</u>. If Texas or the Appropriate Official shall be required to file any return, amended return, or written statement contemplated by this <u>Section XIV.F</u> other than an IRS Form 1098-F in the form attached as <u>Exhibit I</u>, <u>Exhibit J</u>, and <u>Exhibit K</u>, Texas shall direct and ensure that the Appropriate Official provides to each Settling Distributor a draft of such return, amended return, or written statement in respect of such Settling Distributor no later than sixty (60) calendar days prior to the due date thereof and shall accept and reflect any reasonable comments of such Settling Distributor

STRICTLY CONFIDENTIAL

on the return, amended return, or written statement in respect of such Settling Distributor.

5.    For the avoidance of doubt, neither the Settling Distributors nor Texas and Participating Subdivisions make any warranty or representation to Texas, the Bellwether Counties, any Participating Subdivision or any Releasor as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

G.    *Bankruptcy.* The following provisions shall apply if a Settling Distributor enters Bankruptcy (a Settling Distributor which does so and takes the actions, or is otherwise subjected to the actions, referred to in (i) and/or (ii) herein being referred to as a "*Bankrupt Settling Distributor*") and (i) the Bankrupt Settling Distributor's bankruptcy estate recovers, pursuant to 11 U.S.C. § 550, any payments made under this Agreement, or (ii) this Agreement is deemed executory and is rejected by such Settling Distributor pursuant to 11 U.S.C. § 365:

1.    In the event that Texas deems (by written notice to the Settling Distributors other than the Bankrupt Settling Distributor) that the financial obligations of this Agreement have been terminated and rendered null and void as to such Bankrupt Settling Distributor (except as provided in Section XIV.G.1.a below) due to a material breach by such Bankrupt Settling Distributor, whereupon, with respect to Texas:

a.    all agreements, all concessions, all reductions of Releasing Parties' Claims, and all releases and covenants not to sue, contained in this Agreement shall immediately and automatically be deemed null and void as to such Bankrupt Settling Distributor; Texas and Litigating Subdivisions shall be deemed immediately and automatically restored to the same position they were in immediately prior to their entry into this Agreement in respect to such Bankrupt Settling Distributor and Texas and Litigating Subdivisions shall have the right to assert any and all claims against such Bankrupt Settling Distributor in the Bankruptcy or otherwise, subject to any automatic stay, without regard to any limits or agreements as to the amount of the settlement otherwise provided in this Agreement; *provided, however,* that notwithstanding the foregoing sentence, (i) all reductions of Releasing Parties' Claims, and all releases and covenants not to sue, contained in this Agreement shall remain in full force and effect as to all persons or entities other than the Bankrupt Settling Distributor itself; and (ii) in the event Texas and any Litigating Subdivision asserts any Released Claim against a Bankrupt Settling Distributor after the rejection and/or termination of this Agreement with respect to such Settling Distributor as described in this Section XIV.G.1.a and receives a judgment, settlement or distribution arising from such Released Claim, then the amount of any payments that Texas and any Litigating Subdivision has previously received from such Bankrupt Settling Distributor under this Agreement shall be applied to reduce the amount of any such judgment, settlement or distribution (*provided* that no credit shall be given against any such judgment, settlement or distribution for any payment that Texas and any Litigating Subdivision is required to disgorge or repay to the Bankrupt Settling Distributor's bankruptcy estate); and

b.    Texas may exercise all rights provided under the federal Bankruptcy

STRICTLY CONFIDENTIAL

Code (or other applicable bankruptcy or non-bankruptcy law) with respect to its Claims against such Bankrupt Settling Distributor subject to all defenses and rights of the Bankrupt Settling Distributor.

H.     *No Third-Party Beneficiaries.* Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not Texas or a Released Entity. Texas may not assign or otherwise convey any right to enforce any provision of this Agreement.

I.     *Cooperation.* Each Party and each Participating Subdivision agrees to use its best efforts and to cooperate with the other Parties and Participating Subdivisions to cause this Agreement and the Texas Consent Judgment to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party and each Participating Subdivision agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement or the Texas Consent Judgment by any other person, and will support the integrity and enforcement of the terms of this Agreement and the Texas Consent Judgment.

J.     *Jurisdiction.* The Texas Consolidated Litigation Court shall retain jurisdiction for the purposes set forth in this Agreement and the Texas Consent Judgment Court shall retain jurisdiction for the limited purposes as set forth in this Agreement.

K.     *Successors.* This Agreement is binding upon, and inures to the benefit of, a Settling Distributor's successors and assigns. A Settling Distributor shall not, in one (1) transaction or a series of related transactions, sell or transfer U.S. assets having a fair market value equal to twenty-five percent (25%) or more of the consolidated assets of such Settling Distributor (other than sales or transfers of inventories, or sales or transfers to an entity owned directly or indirectly by such Settling Distributor) where the sale or transfer is announced after the Effective Date, is not for fair consideration, and would foreseeably and unreasonably jeopardize such Settling Distributor's ability to make the payments under this Agreement that are due on or before the third Payment Date following the close of a sale or transfer transaction, unless the Settling Distributor obtains the acquiror's agreement that it will be either a guarantor of or successor to the percentage of that Settling Distributor's remaining Payment Obligations under this Agreement equal to the percentage of the Settling Distributor's consolidated assets being sold or transferred in such transaction. Percentages under this Section XIV.K shall be determined in accordance with United States generally accepted accounting principles and as of the date of the Settling Distributor's most recent publicly filed consolidated balance sheet prior to the date of entry into the sale or transfer agreement at issue. Any objection under this Section XIV.K not raised within twenty (20) calendar days of the announcement of the relevant transaction is waived.

L.     *No Violations of Applicable Law.* Nothing in this Agreement shall be construed to authorize or require any action by Settling Distributors in violation of applicable federal, state, or other laws.

M.     *Modification.* This Agreement may be modified by a written agreement of the Parties or, in the case of the Texas Consent Judgment, by court proceedings resulting in a modified

STRICTLY CONFIDENTIAL

judgment of the Court. For purposes of modifying this Agreement or the Texas Consent Judgment, Settling Distributors may contact the Texas Attorney General for purposes of coordinating this process.

N.     *No Waiver.* Any failure by any Party to this Agreement to insist upon the strict performance by any other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement.

O.     *Entire Agreement.* This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto, except as provided herein. In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

P.     *Counterparts.* This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

Q.     *Notice.* All notices or other communications under this Agreement shall be provided to the following via email *and* overnight delivery to:

*Copy to AmerisourceBergen Corporation's attorneys at:*
Michael T. Reynolds
Cravath, Swaine & Moore LLP
825 8th Avenue
New York, NY 10019
mreynolds@cravath.com

*Copy to Cardinal Health, Inc.'s attorneys at:*
Elaine Golin
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
epgolin@wlrk.com

*Copy to McKesson Corporation's attorneys at:*
Thomas J. Perrelli
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
TPerrelli@jenner.com

*Copy to Texas at:*

STRICTLY CONFIDENTIAL

Lesley French
Steven Robinson
Stephanie Eberhardt
Assistant Attorney General
Office of the Attorney General
PO Box 12548
Austin, Texas 78711-2548
lesley.french@oag.texas.gov
steven.robinson@oag.texas.gov
stephanie.eberhardt@oag.texas.gov

*For Plaintiff Dallas County:*
Jeffrey B. Simon
Simon Greenstone Panatier, P.C.
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Phone: (214) 276-7680
jsimon@sgptrial.com

*For Plaintiff Bexar County:*
Mikal C. Watts
Watts Guerra LLC
4 Dominion Dr.
Bldg 3, Suite 100
San Antonio, Texas 78257
Phone: (210) 447-0500
mcwatts@wattsguerra.com

[Signatures begin on next page.]

STRICTLY CONFIDENTIAL

**Authorized and agreed to by:**

STATE OF TEXAS

Dated:  2/11/22

By:  _Ken Paxton_

Ken Paxton
Texas Attorney General

45

STRICTLY CONFIDENTIAL

**Authorized and agreed to by:**

COUNTY OF DALLAS, TEXAS

Dated:     02/07/22

By: _____

Jeffrey Simon
Shareholder

STRICTLY CONFIDENTIAL

**Authorized and agreed to by:**

COUNTY OF BEXAR, TEXAS

Dated:   02/07/22                    By:   _Mikal Watts_

Mikal Watts
Capital Partner

**Authorized and agreed to by:**

                                          AMERISOURCEBERGEN CORPORATION

Dated:      February 7, 2022

                                 By:  *Elizabeth S. Campbell*
                                        Elizabeth S. Campbell (Feb 8, 2022 15:17 EST)
                                        Elizabeth Campbell
                                        Executive Vice President and Chief Legal Officer

STRICTLY CONFIDENTIAL

Authorized and agreed to by:

CARDINAL HEALTH, INC.

Dated: ___2/7/2022___     By: _____

Jessica L. Mayer
Chief Legal and Compliance Officer

**Authorized and agreed to by:**

MCKESSON CORPORATION

Dated:   February 8, 2022

By:   _____
Saralisa Brau
Corporate Secretary

## Exhibit A

## Alleged Harms[13]

1.  Expert report of Professor David Cutler, dated March 25, 2019.

2.  Expert report of Dr. Jeffrey B. Liebman, dated March 25, 2019.

3.  Expert report of Professor Thomas McGuire regarding damages to Bellwethers, dated March 25, 2019.

4.  Report of Professor Thomas McGuire regarding public nuisance, dated March 25, 2019

---

[13] The parties agree that these reports describe the harms alleged, but were not relied on in the conduct of the Texas bellwether litigation or the Texas Intrastate Term Sheet at Exhibit N.

**Exhibit B**

**Later Litigating Subdivision Suspension and Offset Determinations**

| Participation Tier | Per Capita Amount[1] | Suspension Percentage | Offset Cap | Suspension Deadline and Ending Point |
|---|---|---|---|---|
| 1 | $2,500 | 66% | 66% | Earlier of (1) 6 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |
| 2 | $2,000 | 33.33% | 34% | Earlier of (1) 6 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |
| 3 | $1,500 | 27.5% | 30% | Earlier of (1) 9 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |
| 4 | $1,000 | 20% | 25% | Earlier of (1) 9 months after denial of a motion to dismiss, (2) 12 months from filing, or (3) 6 months before final pre-trial conference, and until final judgment affirmed on appeal, including dismissal. |

---

[1] Population will be measured at the level of the Later Litigating Subdivision.

**Exhibit C**

**List of Opioid Remediation Uses**

**Schedule A**
**Core Strategies**

Texas shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("Core Strategies").[1]

**A.  NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

   1.  Expand training for first responders, schools, community support groups and families; and

   2.  Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

**B.  MEDICATION-ASSISTED TREATMENT ("_MAT_") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

   1.  Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

   2.  Provide education to school-based and youth-focused programs that discourage or prevent misuse;

   3.  Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

   4.  Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

**C.  PREGNANT & POSTPARTUM WOMEN**

   1.  Expand Screening, Brief Intervention, and Referral to Treatment ("_SBIRT_") services to non-Medicaid eligible or uninsured pregnant women;

   2.  Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3. Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

**D.  EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

1. Expand comprehensive evidence-based and recovery support for NAS babies;

2. Expand services for better continuum of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

**E.  EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4. Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansions above.

**F.  TREATMENT FOR INCARCERATED POPULATION**

1. Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2. Increase funding for jails to provide treatment to inmates with OUD.

**G.  PREVENTION PROGRAMS**

1. Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2. Funding for evidence-based prevention programs in schools;

3.   Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.   Funding for community drug disposal programs; and

5.   Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H.   **EXPANDING SYRINGE SERVICE PROGRAMS**

1.   Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I.   **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN STATE**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
| --- |

**A.**    **TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.    Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Disseminate of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service– Opioids web-based training curriculum and motivational interviewing.

14. Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

**B.**     **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.    Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.    Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.    Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.    Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.    Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.    Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.    Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.    Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.    Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.    Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.    Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

C. **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.     Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.     Expand warm hand-off services to transition to recovery services.

12.     Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.     Develop and support best practices on addressing OUD in the workplace.

14.     Support assistance programs for health care providers with OUD.

15.     Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.     ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.      Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    a.      Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

    b.      Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

    c.      "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    d.      Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

  e.  Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

  f.  Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.  Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.  Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.  Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.  Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.  Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.  Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.**  **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

6. Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

| PART TWO: PREVENTION |
|---|

**F.** **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including but not limited to improvements that:

   a. Increase the number of prescribers using PDMPs;

   b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.    Increasing electronic prescribing to prevent diversion or forgery.

8.    Educating dispensers on appropriate opioid dispensing.

**G.**    **<u>PREVENT MISUSE OF OPIOIDS</u>**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Funding media campaigns to prevent opioid misuse.

2.    Corrective advertising or affirmative public education campaigns based on evidence.

3.    Public education relating to drug disposal.

4.    Drug take-back disposal or destruction programs.

5.    Funding community anti-drug coalitions that engage in drug prevention efforts.

6.    Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7.    Engaging non-profits and faith-based communities as systems to support prevention.

8.    Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.    School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.    Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.     PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.      Public health entities providing free naloxone to anyone in the community.

3.      Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.      Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.      Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6.      Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Supporting screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

**I.**     **FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.     Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.     Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.**     **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.     Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.     A dashboard to (a) share reports, recommendations, or plans to spend opioid Texas Qualified Settlement Funds; (b) to show how opioid Texas Qualified Settlement Funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-

-14-

related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

**K.** **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

**L.** **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("ADAM") system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Exhibit D**

**Primary Subdivisions[14]**

| | | | | | |
|---|---|---|---|---|---|
| 1. | Abilene city* | 46. | Deer Park city* | 91. | Huntsville city* |
| 2. | Allen city* | 47. | Del Rio city* | 92. | Hurst city* |
| 3. | Amarillo city* | 48. | Denton city* | 93. | Irving city* |
| 4. | Anderson County* | 49. | Denton County* | 94. | Jasper County* |
| 5. | Angelina County* | 50. | DeSoto city* | 95. | Jefferson County* |
| 6. | Arlington city* | 51. | Duncanville city* | 96. | Jim Wells County* |
| 7. | Atascosa County* | 52. | Ector County* | 97. | Johnson County* |
| 8. | Austin city* | 53. | Edinburg city* | 98. | Kaufman County* |
| 9. | Austin County* | 54. | El Paso city* | 99. | Keller city* |
| 10. | Bastrop County* | 55. | El Paso County* | 100. | Kendall County* |
| 11. | Baytown city* | 56. | Ellis County* | 101. | Kerr County* |
| 12. | Beaumont city* | 57. | Erath County* | 102. | Killeen city* |
| 13. | Bedford city* | 58. | Euless city* | 103. | Kleberg County* |
| 14. | Bee County* | 59. | Fannin County* | 104. | Kyle city* |
| 15. | Bell County* | 60. | Farmers Branch city* | 105. | La Porte city* |
| 16. | Bexar County* | 61. | Flower Mound town* | 106. | Lamar County* |
| 17. | Bowie County* | 62. | Fort Bend County* | 107. | Lancaster city* |
| 18. | Brazoria County* | 63. | Fort Worth city* | 108. | Laredo city* |
| 19. | Brazos County* | 64. | Friendswood city* | 109. | League City city* |
| 20. | Brown County* | 65. | Frisco city* | 110. | Leander city* |
| 21. | Brownsville city* | 66. | Galveston city* | 111. | Lewisville city* |
| 22. | Bryan city* | 67. | Galveston County* | 112. | Liberty County* |
| 23. | Burleson city* | 68. | Garland city* | 113. | Little Elm city* |
| 24. | Burnet County* | 69. | Georgetown city* | 114. | Longview city* |
| 25. | Caldwell County* | 70. | Grand Prairie city* | 115. | Lubbock city* |
| 26. | Cameron County* | 71. | Grapevine city* | 116. | Lubbock County* |
| 27. | Carrollton city* | 72. | Grayson County* | 117. | Lufkin city* |
| 28. | Cass County* | 73. | Gregg County* | 118. | Mansfield city* |
| 29. | Cedar Hill city* | 74. | Guadalupe County* | 119. | Matagorda County* |
| 30. | Cedar Park city* | 75. | Hale County* | 120. | Maverick County* |
| 31. | Chambers County* | 76. | Haltom City city* | 121. | McAllen city* |
| 32. | Cherokee County* | 77. | Hardin County* | 122. | McKinney city* |
| 33. | Cibolo city* | 78. | Harker Heights city* | 123. | McLennan County* |
| 34. | Cleburne city* | 79. | Harlingen city* | 124. | Medina County* |
| 35. | College Station city* | 80. | Harris County* | 125. | Mesquite city* |
| 36. | Collin County* | 81. | Harrison County* | 126. | Midland city* |
| 37. | Comal County* | 82. | Hays County* | 127. | Midland County* |
| 38. | Conroe city* | 83. | Henderson County* | 128. | Midlothian city* |
| 39. | Cooke County* | 84. | Hidalgo County* | 129. | Mission city* |
| 40. | Coppell city* | 85. | Hill County* | 130. | Missouri City city* |
| 41. | Copperas Cove city* | 86. | Hood County* | 131. | Montgomery County* |
| 42. | Corpus Christi city* | 87. | Hopkins County* | 132. | Nacogdoches city* |
| 43. | Coryell County* | 88. | Houston city* | 133. | Nacogdoches County* |
| 44. | Dallas city* | 89. | Howard County* | 134. | Navarro County* |
| 45. | Dallas County* | 90. | Hunt County* | 135. | New Braunfels city* |

---

[14] Primary Subdivisions marked with asterisks have populations above 30,000.

| | | | | | |
|---|---|---|---|---|---|
| 136. | North Richland Hills city* | 188. | Waxahachie city* | 240. | Comanche County |
| 137. | Nueces County* | 189. | Weatherford city* | 241. | Converse city |
| 138. | Odessa city* | 190. | Webb County* | 242. | Corinth city |
| 139. | Orange County* | 191. | Weslaco city* | 243. | Corsicana city |
| 140. | Parker County* | 192. | Wharton County* | 244. | Crowley city |
| 141. | Pasadena city* | 193. | Wichita County* | 245. | Dawson County |
| 142. | Pearland city* | 194. | Wichita Falls city* | 246. | Deaf Smith County |
| 143. | Pflugerville city* | 195. | Williamson County* | 247. | Denison city |
| 144. | Pharr city* | 196. | Wilson County* | 248. | DeWitt County |
| 145. | Plano city* | 197. | Wise County* | 249. | Dickinson city |
| 146. | Polk County* | 198. | Wood County* | 250. | Dimmit County |
| 147. | Port Arthur city* | 199. | Wylie city* | 251. | Donna city |
| 148. | Potter County* | 200. | Addison town | 252. | Dumas city |
| 149. | Randall County* | 201. | Alamo city | 253. | Duval County |
| 150. | Richardson city* | 202. | Alice city | 254. | Eagle Pass city |
| 151. | Rockwall city* | 203. | Alton city | 255. | Eastland County |
| 152. | Rockwall County* | 204. | Alvin city | 256. | El Campo city |
| 153. | Rosenberg city* | 205. | Andrews city | 257. | Elgin city |
| 154. | Round Rock city* | 206. | Andrews County | 258. | Ennis city |
| 155. | Rowlett city* | 207. | Angleton city | 259. | Fair Oaks Ranch city |
| 156. | Rusk County* | 208. | Anna city | 260. | Falls County |
| 157. | San Angelo city* | 209. | Aransas County | 261. | Fate city |
| 158. | San Antonio city* | 210. | Athens city | 262. | Fayette County |
| 159. | San Juan city* | 211. | Azle city | 263. | Forest Hill city |
| 160. | San Marcos city* | 212. | Balch Springs city | 264. | Forney city |
| 161. | San Patricio County* | 213. | Bandera County | 265. | Franklin County |
| 162. | Schertz city* | 214. | Bay City city | 266. | Fredericksburg city |
| 163. | Sherman city* | 215. | Beeville city | 267. | Freeport city |
| 164. | Smith County* | 216. | Bellaire city | 268. | Freestone County |
| 165. | Socorro city* | 217. | Bellmead city | 269. | Frio County |
| 166. | Southlake city* | 218. | Belton city | 270. | Fulshear city |
| 167. | Starr County* | 219. | Benbrook city | 271. | Gaines County |
| 168. | Sugar Land city* | 220. | Big Spring city | 272. | Gainesville city |
| 169. | Tarrant County* | 221. | Blanco County | 273. | Galena Park city |
| 170. | Taylor County* | 222. | Boerne city | 274. | Gatesville city |
| 171. | Temple city* | 223. | Bonham city | 275. | Gillespie County |
| 172. | Texarkana city* | 224. | Borger city | 276. | Glenn Heights city |
| 173. | Texas City city* | 225. | Bosque County | 277. | Gonzales County |
| 174. | The Colony city* | 226. | Brenham city | 278. | Granbury city |
| 175. | Titus County* | 227. | Brownwood city | 279. | Gray County |
| 176. | Tom Green County* | 228. | Buda city | 280. | Greenville city |
| 177. | Travis County* | 229. | Burkburnett city | 281. | Grimes County |
| 178. | Tyler city* | 230. | Burleson County | 282. | Groves city |
| 179. | Upshur County* | 231. | Calhoun County | 283. | Henderson county |
| 180. | Val Verde County* | 232. | Callahan County | 284. | Hereford city |
| 181. | Van Zandt County* | 233. | Camp County | 285. | Hewitt city |
| 182. | Victoria city* | 234. | Canyon city | 286. | Hidalgo city |
| 183. | Victoria County* | 235. | Celina city | 287. | Highland Village city |
| 184. | Waco city* | 236. | Clay County | 288. | Hockley County |
| 185. | Walker County* | 237. | Clute city | 289. | Horizon City city |
| 186. | Waller County* | 238. | Colleyville city | 290. | Houston County |
| 187. | Washington County* | 239. | Colorado County | 291. | Humble city |

| | | | | | |
|---|---|---|---|---|---|
| 292. | Hutchinson County | 344. | Pecos County | 396. | Vidor city |
| 293. | Hutto city | 345. | Plainview city | 397. | Ward County |
| 294. | Ingleside city | 346. | Pleasanton city | 398. | Watauga city |
| 295. | Jacinto City city | 347. | Port Lavaca city | 399. | Webster city |
| 296. | Jackson County | 348. | Port Neches city | 400. | West University Place city |
| 297. | Jacksonville city | 349. | Portland city | 401. | White Settlement city |
| 298. | Jones County | 350. | Princeton city | 402. | Wilbarger County |
| 299. | Karnes County | 351. | Prosper town | 403. | Willacy County |
| 300. | Katy city | 352. | Rains County | 404. | Young County |
| 301. | Kerrville city | 353. | Raymondville city | 405. | Zapata County |
| 302. | Kilgore city | 354. | Red Oak city | 406. | Zavala County |
| 303. | Kingsville city | 355. | Red River County | | |
| 304. | La Marque city | 356. | Reeves County | | |
| 305. | Lake Jackson city | 357. | Richmond city | | |
| 306. | Lakeway city | 358. | Rio Grande City city | | |
| 307. | Lamb County | 359. | Robertson County | | |
| 308. | Lampasas County | 360. | Robinson city | | |
| 309. | Lavaca County | 361. | Robstown city | | |
| 310. | Lee County | 362. | Rockport city | | |
| 311. | Leon County | 363. | Roma city | | |
| 312. | Leon Valley city | 364. | Royse City city | | |
| 313. | Levelland city | 365. | Runnels County | | |
| 314. | Limestone County | 366. | Sabine County | | |
| 315. | Live Oak city | 367. | Sachse city | | |
| 316. | Live Oak County | 368. | Saginaw city | | |
| 317. | Llano County | 369. | San Benito city | | |
| 318. | Lockhart city | 370. | San Jacinto County | | |
| 319. | Lumberton city | 371. | Santa Fe city | | |
| 320. | Madison County | 372. | Scurry County | | |
| 321. | Manor city | 373. | Seabrook city | | |
| 322. | Manvel city | 374. | Seagoville city | | |
| 323. | Marshall city | 375. | Seguin city | | |
| 324. | Melissa city | 376. | Selma city | | |
| 325. | Mercedes city | 377. | Shelby County | | |
| 326. | Milam County | 378. | Snyder city | | |
| 327. | Mineral Wells city | 379. | South Houston city | | |
| 328. | Montague County | 380. | Stafford city | | |
| 329. | Moore County | 381. | Stephenville city | | |
| 330. | Morris County | 382. | Sulphur Springs city | | |
| 331. | Mount Pleasant city | 383. | Sweetwater city | | |
| 332. | Murphy city | 384. | Taylor city | | |
| 333. | Nederland city | 385. | Terrell city | | |
| 334. | Newton County | 386. | Terry County | | |
| 335. | Nolan County | 387. | Tomball city | | |
| 336. | Orange city | 388. | Trinity County | | |
| 337. | Palestine city | 389. | Trophy Club town | | |
| 338. | Palo Pinto County | 390. | Tyler County | | |
| 339. | Pampa city | 391. | Universal City city | | |
| 340. | Panola County | 392. | University Park city | | |
| 341. | Paris city | 393. | Uvalde city | | |
| 342. | Pearsall city | 394. | Uvalde County | | |
| 343. | Pecos city | 395. | Vernon city | | |

## Exhibit E

## Agreed List of Texas Litigating Subdivisions

1. Angelina (TX), County of
2. Bailey (TX), County of
3. Bastrop (TX), County of
4. Bexar (TX), County of
5. Bexar County Hospital District d/b/a University Health System (TX)
6. Bowie (TX), County of
7. Brazos (TX), County of
8. Brooks (TX), County of
9. Burleson (TX), County of
10. Burnet (TX), County of
11. Caldwell (TX), County of
12. Calhoun (TX), County of
13. Cameron (TX), County of
14. Camp (TX), County of
15. Cass (TX), County of
16. Castro (TX), County of
17. Cherokee (TX), County of
18. Childress (TX), County of
19. Clay (TX), County of
20. Colorado (TX), County of
21. Cooke (TX), County of
22. Coryell (TX), County of
23. Dallas (TX), County of
24. Dallas County Hospital District d/b/a Parkland Health & Hospital System (TX)
25. Delta (TX), County of
26. Dimmit (TX), County of
27. Duval (TX), County of
28. Eagle Pass (TX), City of
29. Ector (TX), County of
30. El Paso (TX), County of
31. Ellis (TX), County of
32. Falls (TX), County of
33. Fannin (TX), County of
34. Fort Bend (TX), County of
35. Franklin (TX), County of
36. Freestone (TX), County of
37. Galveston (TX), County of
38. Grayson (TX), County of
39. Guadalupe (TX), County of
40. Guadalupe Valley Hospital a/k/a Guadalupe Regional Medical Center (TX)
41. Harris (TX), County of
42. Harris County Hospital District d/b/a Harris Health System (TX)

43. Harrison (TX), County of
44. Haskell (TX), County of
45. Hays (TX), County of
46. Henderson (TX), County of
47. Hidalgo (TX), County of
48. Hopkins (TX), County of
49. Houston (TX), City of
50. Houston (TX), County of
51. Irving Independent School District (TX)
52. Jasper (TX), County of
53. Jefferson (TX), County of
54. Jim Hogg (TX), County of
55. Jim Wells (TX), County of
56. Johnson (TX), County of
57. Jones (TX), County of
58. Kaufman (TX), County of
59. Kendall (TX), County of
60. Kerr (TX), County of
61. Kinney (TX), County of
62. Kleberg (TX), County of
63. La Salle (TX), County of
64. Lamar (TX), County of
65. Laredo (TX), City of
66. Leon (TX), County of
67. Leon Valley (TX), City of
68. Liberty (TX), County of
69. Limestone (TX), County of
70. Lubbock (TX), County of
71. Madison (TX), County of
72. Marion (TX), County of
73. Maverick (TX), County of
74. McLennan (TX), County of
75. McMullen (TX), County of
76. Milam (TX), County of
77. Mitchell (TX), County of
78. Montgomery (TX), County of
79. Morris (TX), County of
80. Nacogdoches (TX), County of
81. Newton (TX), County of
82. Nolan (TX), County of
83. Nueces (TX), County of
84. Nueces County Hospital District (TX)
85. Ochiltree County Hospital District (TX)
86. Orange (TX), County of

87. Palo Pinto County Hospital District a/k/a Palo Pinto General Hospital (TX)
88. Panola (TX), County of
89. Polk (TX), County of
90. Potter (TX), County of
91. Red River (TX), County of
92. Roberts (TX), County of
93. Robertson (TX), County of
94. Rockwall (TX), County of
95. Rusk (TX), County of
96. San Antonio (TX), City of
97. San Patricio (TX), County of
98. San Saba (TX), County of
99. Shackelford (TX), County of
100. Shelby (TX), County of
101. Smith (TX), County of
102. Socorro Independent School District (TX)
103. Stephens (TX), County of
104. Tarrant (TX), County of
105. Tarrant County Hospital District (TX) d/b/a JPS Health Network
106. Terrell (TX), County of
107. Texarkana Independent School District (TX)
108. Throckmorton (TX), County of
109. Titus (TX), County of
110. Travis (TX), County of
111. Trinity (TX), County of
112. Upshur (TX), County of
113. Uvalde (TX), County of
114. Van Zandt (TX), County of
115. Walker (TX), County of
116. Waller (TX), County of
117. Webb (TX), County of
118. West Wharton County (TX) Hospital District
119. Wichita (TX), County of
120. Williamson (TX), County of
121. Wilson (TX), County of
122. Wilson County Memorial Hospital District (TX)
123. Wood (TX), County of
124. Zavala (TX), County of

## Exhibit F

## Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities

### ABC

- A.T. Pharma Consultancy FZC
- AB Eurco Ltd
- AB Financing, LLC
- AB Finco Ltd
- AB Nokco Ltd
- AB Singapore Investments Pte. Ltd.
- AB Specialty Solutions, LLC
- ABBP International Company
- ABSG Canada Holdings, Inc.
- Access M.D. Inc.
- AERO LINK Courier GmbH
- Agri-Laboratories, LTD
- Agstrata, LLC
- AH Schweiz GmbH
- AH UK Holdco 1 Limited
- Alcura France
- Alcura Health España, S.A.
- Alcura UK Limited
- Alliance Boots BV
- Alliance Boots Schweiz Investments GmbH
- Alliance Health Services, Inc.
- Alliance Healthcare (Distribution) Limited
- Alliance Healthcare Acores (f/k/a Proconfar, S.A.)
- Alliance Healthcare Ecza Deposu Anonim Şirketi
- Alliance Healthcare España Holdings, S.L.
- Alliance Healthcare España S.A.
- Alliance Healthcare France SA
- Alliance Healthcare Group France SA
- Alliance Healthcare Management Services (Nederland) B.V.
- Alliance Healthcare Management Services Limited
- Alliance Healthcare Nederland B.V.
- Alliance Healthcare Norge AS
- Alliance Healthcare Participações SGPS, unipessoal, Lda.
- Alliance Healthcare Répartition
- Alliance Healthcare Romania SRL
- Alliance Healthcare S.A.
- Alliance Healthcare s.r.o.
- Alliance Healthcare s.r.o. Slovakia Branch
- Alliance Healthcare Services France (f/k/a Alliance Healthcare Formation SAS)
- Alliance Healthcare Technology Services Limited

- Alliance Healthcare Turkey Holding A.S.
- Alliance Healthcare Yatirim Holding Anonim Şirketi
- Alliance Home Health Care, Inc.
- Alliance UniChem IP Limited
- Alloga (Nederland) B.V.
- Alloga France SAS
- Alloga Logifarma, S.A.
- Alloga Logistica (España) S.L.
- ALLOGA LOGISTICS ROMANIA SRL
- Alloga Portugal - Armazenagem e Distribuicao Farmaceutica, Lda
- Alloga UK Limited
- AllyDVM, Inc.
- Almus Farmaceutica, S.A.
- Almus France
- Almus Pharmaceuticals Limited
- Almus, Lda.
- Alphega SA
- Ambulatory Pharmaceutical Services, Inc.
- American Medical Distributors, Inc.
- American Oncology Network, LLC
- Amerisource Health Services Corporation
- Amerisource Health Services, LLC
- Amerisource Health Services, LLC d/b/a American Health Packaging
- Amerisource Heritage Corporation
- AmeriSource Heritage LLC
- Amerisource Receivables Financial Corporation
- Amerisource Sales Corporation
- AmerisourceBergen Associate Assistance Fund
- AmerisourceBergen BC, ULC
- AmerisourceBergen Canada Corporation
- AmerisourceBergen Canada GP LLC
- AmerisourceBergen Canada GP, LLC
- AmerisourceBergen Canada Holdings LP
- AmerisourceBergen Consulting Services, Inc.
- AmerisourceBergen Consulting Services, LLC
- AmerisourceBergen Corporation
- AmerisourceBergen Drug Corporation
- AmerisourceBergen Foundation
- AmerisourceBergen Global Holdings GmbH
- AmerisourceBergen Global Investments S.a.r.l.
- AmerisourceBergen Global Manufacturer Services GmbH

- AmerisourceBergen Group GmbH
- AmerisourceBergen Holding Corporation
- AmerisourceBergen Integrated Services Offering, LLC
- AmerisourceBergen International Holdings Inc.
- AmerisourceBergen International Investments, LLC
- AmerisourceBergen Luxembourg s.a.r.l.
- AmerisourceBergen Services Corporation
- AmerisourceBergen Sourcing, LLC
- AmerisourceBergen Specialty Group Canada Corporation
- AmerisourceBergen Specialty Group Canada Holdings, Inc.
- AmerisourceBergen Specialty Group, Inc.
- AmerisourceBergen Specialty Group, LLC
- AmerisourceBergen Swiss Holdings GmbH
- AmerisourceBergen Switzerland GmbH
- AmerisourceBergen UK Holdings Ltd
- Anderson Packaging, Inc.
- AndersonBrecon Inc.
- Animal Prescriptions Limited
- Animalytix LLC
- Apluspharma Ltd
- Apotheek Hagi B.V.
- Apotheek Lichtenvoorde B.V.
- APS Acquisitions Corporation
- APS Enterprises Holding Company, Inc.
- Armila UAB
- ASD Hemophilia Management, LLC
- ASD Hemophilia Program, L.P.
- ASD Specialty Healthcare, Inc.
- ASD Specialty Healthcare, LLC
- ASD Specialty Healthcare, LLC d/b/a ASD Healthcare
- ASD Specialty Healthcare, LLC d/b/a Besse Medical
- ASD Specialty Healthcare, LLC d/b/a Oncology Supply
- Automed Technologies (Canada) Inc.
- Automed Technologies (Canada) ULC
- Automed Technologies, Inc.
- BBC Laboratories
- BBC Operating Sub, Inc.
- BBC Packing Corporation
- BBC Special Packaging, Inc.
- BBC Transportation Co.
- Beachcourse Limited
- Bellco Drug Corp.
- Bellco Health Corp.
- Bergen Brunswig Corporation
- Bergen Brunswig Drug Company
- Bergen Brunswig Realty Services, Inc.

- Bermuda Equity Holdings, Ltd.
- Beverly Acquisition Corporation
- Blue Hill II, Inc.
- Blue Hill, Inc.
- BluePoint Intellectual Property, LLC
- Boots Nederland B.V.
- Boots Norge AS
- BP Pharmaceuticals Laboratories Unlimited Company
- BPL Brasil Participacoes Ltda.
- BPL Brazil Holding Company s.a.r.l.
- BPL Brazil, LLC
- BPL Group, LLC
- BPL Pharmaceuticals Holding Unlimited Company
- BPLH Ireland Company Dublin, Zug Branch
- BPLH Ireland Unlimited Company
- Brecon Holdings Limited
- Brecon Pharmaceuticals Holdings Limited
- Brecon Pharmaceuticals Limited
- Bridge Medical, Inc.
- Brownstone Pharmacy, Inc.
- Bruin Acquisition Corp.
- Burt's Pharmacy, LLC
- Cameron Stewart Lifescience Canada Inc.
- Cannes RJ Participacoes S.A.
- Capstone Med, Inc.
- Capstone Pharmacy of Delaware, Inc.
- CDRF Parent LLC
- CDRF Parent, Inc.
- Centaur Services Limited
- Centro Farmaceutico Asturiano, SA
- Century Advertising Inc.
- Chapin Drug Company
- Choice Medical, Inc.
- Clinical Outcomes Resource Application Corporation
- Clinical Outcomes Resource Application, Inc.
- CliniCare Concepts, Inc.
- ClinPharm, L.L.C.
- Committed Provider Services, LLC
- Compuscript, Inc.
- Computran Systems, Inc.
- Corrections Pharmacies Licensing Company, L.L.C.
- Corrections Pharmacies of California, LP
- Corrections Pharmacies of Hawaii, LP
- Corrections Pharmacies, L.L.C.
- Cubex, LLC
- Datapharm Sarl
- DD Wholesale, Inc.
- Dialysis Purchasing Alliance, Inc.
- Directlog

Exhibit F
2

- Documedics Acquisition Co., Inc.
- Drug Service, Inc.
- Dunnington Drug, Inc.
- Dunnington RX Services of Massachusetts, Inc.
- Dunnington RX Services of Rhode Island, Inc.
- Durr-Fillauer Medical, Inc.
- Durvet, Inc.
- Dymaxium Healthcare Innovations, Ltd.
- Dymaxium Holdings, Ltd.
- Dymaxium, Ltd.
- Entel d.o.o.
- Escalante Solutions, L.P.
- Esko Itriyat Sanayi ve Ticaret Anonim Şirketi
- Euro Registratie Collectief B.V.
- European Physician Networks GmbH
- Express Pharmacy Services, Inc.
- Falcon Acquisition Sub, LLC
- Family Center Pharmacy, Inc.
- Feeders Advantage, LCC
- General Drug Company
- Goot Nursing Home Pharmacy, Inc.
- Goot Westbridge Pharmacy, Inc.
- Goot's Goodies, Inc.
- Goot's Pharmacy & Orthopedic Supply, Inc.
- Green Barn, Inc
- H. D. Smith Holding Company
- H. D. Smith Holdings, LLC
- H. D. Smith Wholesale Drug Co.
- H. D. Smith, LLC
- HAI Acquisition, Inc.
- HDS Solutions, LLC
- Health Services Capital Corporation
- Healthcare Prescription Services, Inc.
- HealthForward Inc.
- HealthQuest Partner II, L.P.
- HealthTronics Data Solutions LLC
- HealthTronics Data Solutions, LLC
- HealthTronics Information Technology Solutions, Inc.
- Hedef International Holdings BV
- Home Medical Equipment Health Company
- Hydra Pharm SPA
- I.g.G. of America, Inc.
- IHS Acquisition XXX, Inc.
- Imedex, Inc.
- Imedex, LLC
- Independent Pharmacy Buying Group, Inc.
- Innomar Pharmacy (BC) Inc.
- Innomar Pharmacy (SK) Inc.
- Innomar Pharmacy Inc.
- Innomar Specialty Pharmacy, Inc.
- Innomar Strategies Inc.
- Innovation Cancer, Inc.

- Insta-Care Holdings, Inc.
- Insta-Care Pharmacy Services Corporation
- Intake Initiatives Incorporated
- IntegraConnect NewCo, LLC
- Integrated Commercialization Solutions, Inc.
- Integrated Commercialization Solutions, LLC
- Integrated Health Systems Outcomes Coalition, LLC
- Inteplex, Inc.
- Interfill, LLC
- International Oncology Network Solutions, Inc.
- International Physician Networks, L.L.C.
- International Rheumatology Network, L.L.C.
- IntrinsiQ Holdings, Inc.
- IntrinsiQ Specialty Solutions, Inc.
- IntrinsiQ Tendler, Inc.
- IntrinsiQ, Inc.
- J.M. Blanco, Inc.
- James Brudnick Company, Inc.
- K/S Instrument Corp.
- KRP Investments, Inc.
- Labpak Limited
- LAD Drug Corporation
- Leading Educational Research Network, LLC
- Lexicon Pharmacy Services, L.L.C.
- Liberty Acquisition Corp.
- Libra C.V.
- Los Angeles Drug Corporation
- M.D.P. Properties, Inc.
- Managed Care Network, Inc.
- Marshall Reinardy LLC
- Medical Health Industries, Inc.
- Medical Initiatives, Inc.
- Medidyne Corp.
- Medselect Inc.
- Memorial Pet Care, Inc.
- Micro Technologies Canada Inc.
- MWI Buying Group Limited (formerly St. Francis Limited)
- MWI Supply (UK Acquisition) Limited
- MWI Supply (UK Holdings) Limited
- MWI Supply (UK) Limited
- MWI Veterinary Supply Co.
- MWI Veterinary Supply, Inc.
- Nareks Ecza Deposu Ticaret Anonim Şirketi
- Network for Medical Communication & Research Analytics, LLC
- New Jersey Medical Corporation
- Nexiapharma, SL
- NMCR Holdings, Inc.
- NMCR-Europe, LLC
- Northeast Veterinary Supply Company, LLC
- Oktal Pharma d.o.o

Exhibit F

3

- Oktal Pharma d.o.o
- Oktal Pharma d.o.o [Zagreb]
- Oktal Pharma d.o.o.
- Oktal Pharma Hungary K.f.t.
- Omni Med B, Inc.
- OPH Oktal Pharma d.o.o
- OTC Direct Limited
- Paris Acquisition Corp.
- Pharm Plus Acquisition, Inc.
- Pharma One Corporation Limited
- Pharmacy Corporation of America
- Pharmacy Corporation of America - Massachusetts, Inc.
- Pharmacy Healthcare Solutions, Ltd.
- Pharmacy Review Services, Inc.
- Pharmdata s.r.o.
- PharMEDium Healthcare Corporation
- PharMEDium Healthcare Holdings LLC
- PharMEDium Healthcare Holdings, Inc.
- PharMEDium Healthcare LLC
- PharMEDium Pharmacy Services, LLC
- PharMEDium R.E., LLC
- PharMEDium Services, LLC
- PharMerica Drug Systems, Inc.
- PharMerica Technology Solutions, LLC
- Pharmerica, Inc.
- Pitango HealthTech Fund I, L.P.
- Planet Software Limited
- PMSI MSA Services, Inc.
- PMSI, Inc.
- PPSC USA, LLC
- Premier Pharmacy, Inc.
- Premier Source Diagnostics Inc.
- Premier Source, LLC
- Prescribe Wellness, LLC
- Profarma Distribuidora de Produtos Farmaceuticos S.A.
- Ramuneles Vaistine UAB
- Reimbursement Education Network, LLC
- Rightpak, Inc.
- Rombro's Drug Center, Inc.
- Roscoe Acquisition Corporation
- S.R.P. (Services de la Répartition Pharmaceutique)
- SecureDVM, LLC
- Securos Europe GmbH
- Silver Streak I, LLC
- Skills in Healthcare France
- Skills in Healthcare Pazarlama ve Tanitim Hizmetleri Anonim Şirketi
- Skills in Healthcare Romania S.r.l.
- Smart ID Works, LLC
- Smith Medical Partners, LLC
- Snipetjernveien 10 Norge AS
- Solana Beach, Inc.
- Southwest Pharmacies, Inc.
- Southwestern Drug Corporation
- SparkSense Analytics, Inc.
- Specialty Advancement Network, LLC
- Specialty Pharmacy of California, Inc.
- Specialty Pharmacy, Inc.
- Spielberg Acquisition Corp.
- Spits B.V.
- Stadt Solutions, LLC
- Stephar B.V.
- Strategic Pharmaceutical Solutions, Inc.
- Swine Solutions Network, LLC
- Taylor & Manno Asset Recovery, Inc.
- Telepharmacy Solutions, Inc.
- Terra-Lab d.o.o
- The Allen Company
- The Lash Group, Inc.
- The Lash Group, LLC
- TheraCom, L.L.C.
- ThermoSecure Medical Equipment GmbH
- TMESYS, Inc.
- TrakCel Holding Company, Inc.
- Trellis Healthcare Consulting, L.L.C.
- Trellis Healthcare Consulting, LLC
- True Blue Indemnity Company
- United Company of Pharmacists SAE
- Universal Packaging Systems, Inc.
- US Bioservices Corporation
- Valley Wholesale Drug Co., LLC
- Value Apothecaries, Inc.
- Vedco, Inc.
- Vetbridge Animal Health, LLC
- Vetbridge Product Development (NM-OMP) LLC
- VetSpace Limited
- VetSpace, Inc.
- Vetswest Limited
- W.C. International Limited
- WBA Acquisitions Luxco 9 S.à.r.l.
- Wight Nederland Holdco 2 B.V.
- Wight Nederland Holdco 4 BV
- WML, LLC
- Woodglen Properties Limited
- Woodglen Properties Limited Portugal Branch
- World Courier (Aust) Pty. Ltd.
- World Courier (Austria) GmbH
- World Courier (Austria) GmbH – Serbia Branch
- World Courier (Deutschland) GmbH
- World Courier (Finland) Oy
- World Courier (India) Private Limited
- World Courier (Ireland) Limited

Exhibit F

4

- World Courier (Lithuania), UAB
- World Courier (Malaysia) Sdn. Bhd.
- World Courier (Norway) AS
- World Courier (NZ) Limited
- World Courier (Poland) Sp. Z.o.o.
- World Courier (Shanghai) Co., Ltd Guangzhou Branch
- World Courier (Shanghai) Co., Ltd.
- World Courier (Shanghai) Co., Ltd., Beijing Branch
- World Courier (Sweden) AB
- World Courier (Switzerland) SA
- World Courier (U.K.) Limited
- World Courier Asia (Thailand) Co., Ltd.
- World Courier Belgium s.a.
- World Courier Bulgaria
- World Courier Czech Republic s.r.o.
- World Courier de Chile Limitada
- World Courier de Colombia S.A.
- World Courier de Espana, S.A.
- World Courier de Mexico S.A. de C.V.
- World Courier de Portugal, Lda.
- World Courier de Uruguay S.A.
- World Courier del Ecuador S.A.
- World Courier del Peru S.A.
- World Courier Denmark A/S
- World Courier do Brasil Transportes Internacionais Ltda.
- World Courier France S.A.R.L.
- World Courier Ground (Europe) Limited
- World Courier Ground, Inc.
- World Courier Group Logistics, Inc.
- World Courier Group S.a.r.l.
- World Courier Group, Inc.
- World Courier Group, Inc. Taiwan Branch
- World Courier Hellas Limited Liability Company
- World Courier Holland BV
- World Courier Hong Kong Limited

- World Courier Hungary Freight Forwarder and Service Provider Limited Liability Company
- World Courier Israel Ltd.
- World Courier Italia srl
- World Courier K.K. Japan
- World Courier Korea Co., Ltd.
- World Courier Limited (Russia)
- World Courier Logistics (Europe) Limited
- World Courier Logistics (UK) Limited
- World Courier Logistics, Inc.
- World Courier Logistics, Inc. (DE)
- World Courier Logistics, Inc. (NY)
- World Courier Management Limited
- World Courier Management, Inc.
- World Courier of Canada Ltd
- World Courier Operations Kenya Limited
- World Courier Philippines – Representative Office
- World Courier Romania S.R.L.
- World Courier S.A.
- World Courier Singapore Pte Ltd
- World Courier Slovak Republic s.r.o.
- World Courier South Africa (Proprietary) Limited
- World Courier Tasimacilik ve Lojistik Hizmetleri Ticaret Limited Sirketi
- World Courier Ukraine LLC
- World Courier Venezuela, S.A.
- World Courier Zagreb d.o.o.
- World Courier, Inc.
- World Courier, kurirske storitve,d.o.o.
- World Customs Brokerage, Inc.
- Xcenda (UK) Limited
- Xcenda GmbH
- Xcenda Switzerland GmbH
- Xcenda, L.L.C.
- ZU Vase Zdravije

## Cardinal Health

- A+ Secure Packaging, LLC
- Abilene Nuclear, LLC
- Access Closure, Inc.
- Acuity GPO, LLC
- Aero-Med, Ltd.
- Allegiance (BVI) Holding Co. Ltd.
- Allegiance Corporation
- Allegiance Healthcare (Labuan) Pte. Ltd.
- Allegiance I, LLC
- Allegiance Labuan Holdings Pte. Ltd.
- API (Suppliers) Limited

- AssuraMed Acquisition Corp.
- AssuraMed Group, Inc.
- AssuraMed Holding, Inc.
- AssuraMed Intermediate Holding, Inc.
- AssuraMed, Inc.
- C. International, Inc.
- Cardinal Distribution Holding Corporation - I
- Cardinal Distribution Holding Corporation - II
- Cardinal Health 100, Inc.
- Cardinal Health 104 LP
- Cardinal Health 105, Inc.

- Cardinal Health 107, LLC
- Cardinal Health 108, LLC
- Cardinal Health 110, LLC
- Cardinal Health 112, LLC
- Cardinal Health 113, LLC
- Cardinal Health 114, Inc.
- Cardinal Health 115, LLC
- Cardinal Health 116, LLC
- Cardinal Health 118, LLC
- Cardinal Health 119, LLC
- Cardinal Health 121, LLC
- Cardinal Health 122, LLC
- Cardinal Health 123, LLC
- Cardinal Health 124, LLC
- Cardinal Health 125, LLC
- Cardinal Health 126, LLC
- Cardinal Health 127, Inc.
- Cardinal Health 128, LLC
- Cardinal Health 130, LLC
- Cardinal Health 131, LLC
- Cardinal Health 132, LLC
- Cardinal Health 133, Inc.
- Cardinal Health 2, LLC
- Cardinal Health 200, LLC
- Cardinal Health 201 Canada L.P.
- Cardinal Health 201, Inc.
- Cardinal Health 215, LLC
- Cardinal Health 222 (Thailand) Ltd.
- Cardinal Health 242, LLC
- Cardinal Health 246, Inc.
- Cardinal Health 247, Inc.
- Cardinal Health 249, LLC
- Cardinal Health 250 Dutch C.V.
- Cardinal Health 251, LLC
- Cardinal Health 252, LLC
- Cardinal Health 253, LP
- Cardinal Health 3, LLC
- Cardinal Health 414, LLC
- Cardinal Health 418, Inc.
- Cardinal Health 5, LLC
- Cardinal Health 500, LLC
- Cardinal Health 524, LLC
- Cardinal Health 529, LLC
- Cardinal Health 6, Inc.
- Cardinal Health 7, LLC
- Cardinal Health 8, LLC
- Cardinal Health Australia 503 Pty Ltd.
- Cardinal Health Austria 504 GmbH
- Cardinal Health Belgium 505 BVBA
- Cardinal Health Canada Holdings Cooperatie U.A.
- Cardinal Health Canada Inc.
- Cardinal Health Capital Corporation
- Cardinal Health Cardiology Solutions, LLC
- Cardinal Health Chile Limitada
- Cardinal Health Colombia S.A.S.
- Cardinal Health Commercial Technologies, LLC
- Cardinal Health Corporate Solutions, LLC
- Cardinal Health D.R. 203 II Ltd.
- Cardinal Health Denmark ApS
- Cardinal Health do Brasil Ltda.
- Cardinal Health Finance
- Cardinal Health Finland Oy
- Cardinal Health Foundation
- Cardinal Health France 506 SAS
- Cardinal Health Funding, LLC
- Cardinal Health Germany 507 GmbH
- Cardinal Health Germany Manufacturing GmbH
- Cardinal Health Holding International, Inc.
- Cardinal Health International Philippines, Inc.
- Cardinal Health IPS, LLC
- Cardinal Health Ireland 419 Designated Activity Company
- Cardinal Health Ireland 508 Limited
- Cardinal Health Ireland Manufacturing Limited
- Cardinal Health Ireland Unlimited Company
- Cardinal Health Italy 509 S.r.l.
- Cardinal Health Japan G.K.
- Cardinal Health Korea Limited
- Cardinal Health Luxembourg 420 S.a.r.l.
- Cardinal Health Luxembourg 522 S.a.r.l.
- Cardinal Health Malaysia 211 Sdn. Bhd.
- Cardinal Health Malta 212 Limited
- Cardinal Health Managed Care Services, LLC
- Cardinal Health Medical Products India Private Limited
- Cardinal Health Mexico 244 S. de R.L. de C.V.
- Cardinal Health Mexico 514 S. de R.L. de C.V.
- Cardinal Health Middle East FZ-LLC
- Cardinal Health MPB, Inc.
- Cardinal Health Napoleon Holding, LLC
- Cardinal Health Netherlands 502 B.V.
- Cardinal Health Netherlands 525 Cooperatie U.A.
- Cardinal Health Netherlands 528 B.V.
- Cardinal Health Norway AS
- Cardinal Health P.R. 120, Inc.
- Cardinal Health P.R. 218, Inc.
- Cardinal Health P.R. 220, LLC
- Cardinal Health P.R. 436, Inc.
- Cardinal Health Panama, S. de R.L.
- Cardinal Health Pharmaceutical Contracting, LLC
- Cardinal Health Pharmacy Services, LLC
- Cardinal Health Poland Spolka z ograniczona odpowiedzialnoscia
- Cardinal Health Portugal 513, Unipessoal Lda.
- Cardinal Health Russia

Exhibit F

6

- Cardinal Health Singapore 225 Pte. Ltd.
- Cardinal Health Spain 511 S.L.
- Cardinal Health Sweden 512 A.B.
- Cardinal Health Switzerland 515, GmbH
- Cardinal Health Systems, Inc.
- Cardinal Health Technologies Switzerland GmbH
- Cardinal Health Technologies, LLC
- Cardinal Health U.K. 418 Limited
- Cardinal Health U.K. 432 Limited
- Cardinal Health U.K. Holding Limited
- Cardinal Health U.K. International Holding LLP
- Cardinal Health, Inc.
- Cardinal MED Equipment Consulting (Shanghai) Co., Ltd.
- Cirpro de Delicias S.A. de C.V.
- Clinic Pharmacies III, LLC
- Clinic Pharmacies, LLC
- Community Pharmacy Enterprises, LLC
- Convertors de Mexico S.A. de C.V.
- Cordis (Shanghai) MED Devices Co., Ltd.
- Cordis Cashel Unlimited Company
- Cordis Corporation
- Cornerstone Rheumatology LP
- Covidien Manufacturing Solutions, S.A.
- Dutch American Manufacturers II (D.A.M. II) B.V.
- Ellipticare, LLC
- EPIC Insurance Company
- Especialidades Medicas Kenmex S.A. de C.V.
- Experience East, LLC
- Flexible Stenting Solutions, Inc.
- Frog Horned Capital, Inc.
- Generic Drug Holdings, Inc.
- GetOutcomes, LLC
- Griffin Capital, LLC
- HDG Acquisition, Inc.
- imgRx Healdsburg, Inc.
- imgRx Salud, Inc.
- imgRx SJ Valley, Inc.
- imgRx SLO, Inc.
- imgRx Sonoma, Inc.
- InnerDyne Holdings, Inc.
- Innovative Therapies, Inc.
- Instant Diagnostic Systems, Inc.
- InteCardia-Tennessee East Catheterization, LLC
- ITI Sales, LLC
- Kendall-Gammatron Limited
- Killilea Development Company, Ltd.
- Kinray I, LLC
- KPR Australia Pty. Ltd.
- KPR Switzerland Sales GmbH
- KPR U.S., LLC
- Leader Drugstores, Inc.
- Ludlow Technical Products Canada, Ltd.
- Marin Apothecaries
- Medicap Pharmacies Incorporated
- Medicine Shoppe Capital Corporation
- Medicine Shoppe International, Inc.
- Medicine Shoppe Internet, Inc.
- Mediquip Sdn. Bhd.
- Mirixa Corporation
- MosaicGPO, LLC
- mscripts Holdings, LLC
- mscripts Systems India Private Limited
- mscripts, LLC
- Nippon Covidien Ltd.
- One Cloverleaf, LLC
- Outcomes Incorporated
- Owen Shared Services, Inc.
- Pharmacy Operations Of New York, Inc.
- Pharmacy Operations, Inc.
- Physicians Purchasing, Inc.
- Pinnacle Intellectual Property Services, Inc.
- Pinnacle Intellectual Property Services-International, Inc.
- Quiroproductos de Cuauhtemoc S. de R.L. de C.V.
- RainTree Administrative Services, LLC
- RainTree Care Management, LLC
- RainTree GPO, LLC
- Ransdell Surgical, Inc.
- Red Oak Sourcing, LLC
- Renal Purchasing Group, LLC
- RGH Enterprises, Inc.
- RT Oncology Services Corporation
- Rxealtime, Inc.
- Sierra Radiopharmacy, L.L.C.
- Sonexus Health Access & Patient Support, LLC
- Sonexus Health Distribution Services, LLC
- Sonexus Health Financial Solutions, LLC
- Sonexus Health Pharmacy Services, LLC
- Sonexus Health, LLC
- TelePharm, LLC
- The Harvard Drug Group, L.L.C.
- Tianjin ITI Trading Company
- Tradex International, Inc.
- Traverse GPO, LLC
- Wavemark Lebanon Offshore s.a.l.
- Wavemark, Inc.
- Red Oak Sourcing, LLC
- API (Suppliers) Limited
- Sierra Radiopharmacy, L.L.C.
- Abilene Nuclear, LLC
- InteCardia-Tennessee East Catheterization, LLC
- Kendall-Gammatron Limited
- Almus Pharmaceuticals USA LLC

- Cardinal Health (H.K.) Co. Limited
- Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
- Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
- Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
- Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
- Dalian Zhongda Pharmaceutical Company Limited
- NaviHealth Holdings, LLC
- Parch, L.L.C.
- 6464661 Canada Inc.
- AB Acquisitions Luxco 3A S.A.R.I.
- Academy Of Managed Care Medicine, L.L.C.
- Alaris Medical 1 (Suisse) Sarl
- Alaris Medical New Zealand Limited
- Allegiance Healthcare International GmbH
- Allegiance Pro Inc.
- Allied Healthcare Services, Inc.
- Almus Pharmaceuticals Singapore Pte. Ltd.
- Almus Pharmaceuticals USA LLC
- American Threshold Industries, Inc.
- Anoka, LLC
- ARCH Collection Corporation
- ARCH, S.A.
- Armand Scott, LLC
- Aurum Pharmaceuticals Limited
- Behrens Inc.
- Beijing Baiji Advanced Specialty Company Limited
- Bellwether Oncology Alliance, Inc.
- Bentley Merger Sub, LLC
- Bindley Western Funding Corporation
- Bindley Western Industries II Of Maine, Inc.
- Biosigna GmbH Institut für Biosignalverarbeitung und Systemanalyse
- Bird Products (Japan) Ltd.
- Bird Products Corporation
- Boots Retail Holdings (USA) Inc.
- Brighton Capital, Inc.
- Buffalo Merger Corp.
- BW Transportation Services, Inc.
- Cardal II, LLC
- Cardal, Inc.
- Cardinal Florida, Inc.
- Cardinal Health (Beijing) China Pharmaceutical Co., Ltd.
- Cardinal Health (Beijing) Medical Trading Co., Ltd.
- Cardinal Health (Beijing) Pharmacy Co., Ltd.
- Cardinal Health (Chengdu) Pharmacy Co., Ltd.
- Cardinal Health (China) Investment Co., Ltd.

- Cardinal Health (Chongqing) Pharmaceutical Co., Ltd.
- Cardinal Health (Chongqing) Pharmacy Co., Ltd.
- Cardinal Health (H.K.) Co. Limited
- Cardinal Health (Hubei) Pharmaceutical Co., Ltd.
- Cardinal Health (L) Co., Ltd.
- Cardinal Health (Liaoning) Pharmaceutical Co., Ltd.
- Cardinal Health (P02296)
- Cardinal Health (P04080)
- Cardinal Health (Shanghai) Commercial and Trading Company Limited
- Cardinal Health (Shanghai) Cosmetics Trading Co., Ltd.
- Cardinal Health (Shanghai) Logistics Co., Ltd.
- Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
- Cardinal Health (Shanghai) Pharmacy Co., Ltd.
- Cardinal Health (Shanxi) Pharmaceutical Co., Ltd.
- Cardinal Health (Shenyang) Pharmacy Co., Ltd.
- Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
- Cardinal Health (Tianjin) Pharmaceutical Co., Ltd.
- Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
- Cardinal Health (WuXi) Pharmacy Co., Ltd.
- Cardinal Health (Zhejiang) Pharmaceutical Co., Ltd.
- Cardinal Health 101, Inc.
- Cardinal Health 102, Inc.
- Cardinal Health 103, Inc.
- Cardinal Health 106, Inc.
- Cardinal Health 109, Inc.
- Cardinal Health 111, LLC
- Cardinal Health 113, LLC
- Cardinal Health 117, LLC
- Cardinal Health 129, Inc.
- Cardinal Health 208, Inc.
- Cardinal Health 301, LLC
- Cardinal Health 400, Inc.
- Cardinal Health 401, Inc.
- Cardinal Health 402, Inc.
- Cardinal Health 403, Inc.
- Cardinal Health 404, Inc.
- Cardinal Health 405, Inc.
- Cardinal Health 406, Inc.
- Cardinal Health 406, LLC
- Cardinal Health 407, Inc.
- Cardinal Health 408, Inc.
- Cardinal Health 409, Inc.
- Cardinal Health 410, Inc.
- Cardinal Health 411, Inc.

Exhibit F
8

- Cardinal Health 412, Inc.
- Cardinal Health 413, Inc.
- Cardinal Health 415, Inc.
- Cardinal Health 416, Inc.
- Cardinal Health 417, Inc.
- Cardinal Health 419, LLC
- Cardinal Health 420, LLC
- Cardinal Health 421 Limited Partnership
- Cardinal Health 421, Inc.
- Cardinal Health 422, Inc.
- Cardinal Health 501 Dutch C.V.
- Cardinal Health Austria 201 GmbH
- Cardinal Health Bermuda 224, Ltd.
- Cardinal Health Brasil 423 Servicos Farmaceuticos Nucleares Ltda
- Cardinal Health Canada 204, Inc.
- Cardinal Health Canada 301, Inc.
- Cardinal Health Canada 302, Inc.
- Cardinal Health Canada 307, ULC
- Cardinal Health Canada 403, Inc.
- Cardinal Health Canada 437, Inc.
- Cardinal Health Canada Inc.
- Cardinal Health Canada LP
- Cardinal Health Cayman Islands Holding Co. Ltd
- Cardinal Health Cayman Islands Ltd.
- Cardinal Health China Co., Ltd.
- Cardinal Health D.R. 203 Limited
- Cardinal Health Europe IT GmbH
- Cardinal Health France 205 SAS
- Cardinal Health France 309 SAS
- Cardinal Health Germany 206 GmbH
- Cardinal Health Germany 234 GmbH
- Cardinal Health Germany 318 GmbH
- Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
- Cardinal Health Hong Kong Limited
- Cardinal Health I, Inc.
- Cardinal Health Imaging, LLC
- Cardinal Health India Private Limited
- Cardinal Health International Ventures, Ltd.
- Cardinal Health Ireland 406 Ltd.
- Cardinal Health Ireland 527 General Partnership
- Cardinal Health Italy 208 S.r.l.
- Cardinal Health Italy 312 S.p.A.
- Cardinal Health Lease Funding 2002A, LLC
- Cardinal Health Lease Funding 2002AQ, LLC
- Cardinal Health Lease Funding 2003A, LLC
- Cardinal Health Lease Funding 2003AQ, LLC
- Cardinal Health Lease Funding 2003B, LLC
- Cardinal Health Lease Funding 2003BQ, LLC
- Cardinal Health Lease Funding 2004A, LLC
- Cardinal Health Lease Funding 2004AQ, LLC
- Cardinal Health Luxembourg 523 S.a.r.l.
- Cardinal Health Mauritius Holding 226 Ltd.
- Cardinal Health Mexico 213, S.A. de C.V.
- Cardinal Health Netherlands 238 BV
- Cardinal Health Netherlands 526 B.V.
- Cardinal Health Netherlands Financing C.V.
- Cardinal Health Netherlands Holding B.V.
- Cardinal Health New Zealand 313 Limited
- Cardinal Health Norway 315 A/S
- Cardinal Health P.R. 227, Inc.
- Cardinal Health P.R. 409 B.V.
- Cardinal Health PTS, Inc.
- Cardinal Health PTS, LLC
- Cardinal Health S.A. 319 (Proprietary) Limited
- Cardinal Health Singapore 304
- Cardinal Health Singapore 423 Pte. Ltd.
- Cardinal Health Spain 219 S.L.U.
- Cardinal Health Spain 239 SA
- Cardinal Health Specialty Pharmacy, LLC
- Cardinal Health Sweden 220 AB
- Cardinal Health Sweden 314 AB
- Cardinal Health Switzerland 221 Sarl
- Cardinal Health Switzerland 317 Sarl
- Cardinal Health Trading (Shanghai) Co., Ltd.
- Cardinal Health U.K. 100 Limited
- Cardinal Health U.K. 101 Limited
- Cardinal Health U.K. 102 Limited
- Cardinal Health U.K. 103 Limited
- Cardinal Health U.K. 104 Limited
- Cardinal Health U.K. 105 Limited
- Cardinal Health U.K. 106 Limited
- Cardinal Health U.K. 223 Limited
- Cardinal Health U.K. 232 Limited
- Cardinal Health U.K. 235 Limited
- Cardinal Health U.K. 236 Limited
- Cardinal Health U.K. 240 Limited
- Cardinal Health U.K. 305 Limited
- Cardinal Health U.K. 306 Limited
- Cardinal Health U.K. 433 Limited
- Cardinal Health U.K. 434 Limited
- Cardinal Syracuse, Inc.
- Cardinal.Com Holdings, Inc.
- Care Fusion Development Private Limited
- Care Fusion Incorporated
- CareFusion 202, Inc.
- CareFusion 203, Inc.
- CareFusion 205, Inc.
- CareFusion 206, Inc.
- CareFusion 207, Inc.
- CareFusion 209, Inc.
- CareFusion 210, Inc.
- CareFusion 211, Inc.
- CareFusion 212, LLC
- CareFusion 213, LLC

- CareFusion 214, LLC
- CareFusion 2200, Inc.
- CareFusion 2201, Inc.
- CareFusion 302, LLC
- CareFusion 303, Inc.
- CareFusion 304, LLC
- CareFusion Australia 200 Pty Ltd.
- CareFusion Australia 316 Pty Limited
- CareFusion Australia 500 Pty Ltd
- CareFusion Belgium 202 BVBA
- CareFusion Brasil 231 Servico e Comercia de Productos Medicos Ltda
- CareFusion Corporation
- CareFusion EIT, LLC
- CareFusion Iberia 308 S.L.U.
- CareFusion Italy 237 Srl
- CareFusion Italy 311 Srl
- CareFusion Japan 228 K.K.
- CareFusion Japan 233, Inc.
- CareFusion Luxembourg 501 Sarl
- CareFusion Manufacturing Ireland 241 Limited
- CareFusion Manufacturing, LLC
- CareFusion Netherlands 214 B.V.
- CareFusion Netherlands 238 BV
- CareFusion Netherlands 310 B.V.
- CareFusion Netherlands 503 B.V.
- CareFusion New Zealand 217 Limited
- CareFusion New Zealand 313 Limited
- CareFusion Resources, LLC
- CareFusion Singapore 243 Pte. Ltd.
- CareFusion Solutions, LLC
- CareFusion U.K. 284 Limited
- CareFusion U.K. 286 Limited
- CareFusion U.K. 287 Limited
- CareFusion U.K. 288 Limited
- Cascade Development, Inc.
- CCB, Inc.
- CDI Investments, Inc.
- Centralia Pharmacy, Inc.
- Centricity, LLC
- Chapman Drug Company
- Chengdu Baiji Advanced Specialty Pharmacy Company Limited
- Cheshire Merger Sub, Inc.
- CMI Net, Inc.
- College Park Plaza Associates, Inc.
- Comprehensive Medical Imaging-Anaheim Hills, Inc.
- Comprehensive Medical Imaging-Apple Valley, Inc.
- Comprehensive Medical Imaging-Boynton Beach, Inc.
- Comprehensive Medical Imaging-Downey, Inc.
- Comprehensive Medical Imaging-Encino, Inc.
- Comprehensive Medical Imaging-Fort Lauderdale, Inc.
- Comprehensive Medical Imaging-Fremont, Inc.
- Comprehensive Medical Imaging-Hesperia, Inc.
- Comprehensive Medical Imaging-Huntington Beach, Inc.
- Comprehensive Medical Imaging-Palm Springs, Inc.
- Comprehensive Medical Imaging-Rancho Cucamonga, Inc.
- Comprehensive Medical Imaging-Rancho Mirage, Inc.
- Comprehensive Medical Imaging-Salisbury, Inc.
- Comprehensive Medical Imaging-Sherman Oaks, Inc.
- Comprehensive Medical Imaging-Tempe, Inc.
- Comprehensive Medical Imaging-Van Nuys, Inc.
- Comprehensive Medical Imaging-Victorville, Inc.
- Comprehensive Medical Imaging-Westlake Village, Inc.
- Comprehensive Open MRI-Carmichael, Inc.
- Comprehensive Open MRI-Folsom, Inc.
- Comprehensive Open MRI-Fullerton, Inc.
- Comprehensive Open MRI-Laguna Hills, Inc.
- Comprehensive Open MRI-Sacramento, Inc.
- Comprehensive Reimbursement Consultants, Inc.
- Consumer2patient, LLC
- CR Medicap, Inc.
- Curaspan Health Group, Inc.
- Cytokine Pharmasciences, Inc.
- Dalian Zhongda Pharmaceutical Company Limited
- Daniels Pharmaceuticals Limited
- DC Merger Corp
- Denver Biomedical, Inc.
- Desert PET, LLC
- Dik Drug Company, LLC
- Dik Medical Supplies, LLC
- Discor Limited
- Dismed Inc.
- Dohmen Distribution Partners Southeast, L.L.C.
- Dover Communications, LLC
- Duquoin Pharmacy, Inc.
- Dutch American Manufacturers (D.A.M.) B.V.
- East Iowa Pharmacies, Inc.
- EGIS Holdings, Inc.
- Eldon Laboratories Limited
- Ellicott Drug Company
- EME Medical, Inc.
- Enturia Canada ULC
- Enturia de Mexico S. de R.L. de C.V.
- Enturia Limited

- Enturican, Inc.
- EON Media Inc.
- Eureka Merger Sub, Inc.
- European Pharmaceuticals Group Ltd.
- First Choice, Inc. Of Maine
- Flower Merger Corp.
- Futuremed Health Care Products Limited Partnership
- Futuremed Healthcare Products Corporation
- Futuremed Holdings General Partner Inc.
- Fuzhou Baiji Pharmacy Company Limited
- Gala Design, Inc.
- Gelatin Products International, Inc.
- Geodax Technology, Inc.
- Glacier Corporation
- Grand Avenue Pharmacy, Inc.
- Graphic Holdings, Inc.
- Griffin Group Document Management Services, Inc.
- Guangzhou Baiji Advanced Specialty Pharmaceutical Chain Stores Company Limited
- Guangzhou Baiji Drug Store Company Limited
- Guangzhou City Kangwei Information Technology Company Limited
- Guangzhou Ruixun Pharmaceutical Company Limited
- Guizhou Yibai Medical Co., Ltd.
- Hangzhou Baiji Advanced Specialty Drug Store Company Limited
- Heartland Diagnostic Services, Inc.
- HLS Advantage, LLC
- Homecare (North-West) Limited
- Humiston-Keeling, Inc.
- IMI Of Boca Raton, Inc.
- IMI Of Miami, Inc.
- IMI Of North Miami Beach, Inc.
- Inland Empire Regional Pet Center, LLC
- InnerDyne, Inc.
- Inpharm Nationwide Limited
- InteCardia-Tennessee East Diagnostic, LLC
- Intercare Holdings Limited
- Intercare Investments Limited
- Intercare Properties Plc
- Iowa Falls Pharmacy, Inc.
- IVAC Overseas Holdings LP
- JakaMed AB AB
- Jinan Baiji Drug Store Company Limited
- JRG, Ltd.
- Kendall Patient Recovery BVBA
- Kinetic Surgical, LLC
- Kinray, Inc.
- Kinray, LLC
- KPR Italia S.r.l.
- KPR U.S., Inc.
- Kunming Baiji Advanced Specialty Pharmacy Company Limited
- Lake Charles Pharmaceutical Supply Company, LLC
- Liaoning Longda Pharmaceutical Co., Ltd.
- Liberty Communications Network, LLC
- Ludlow Technical Products Corporation
- Macarthy Group Trustees Limited
- Macarthys Laboratories Limited
- Macarthy's Limited
- Marmac Distributors, Inc.
- Martindale Pharma GmbH
- Martindale Pharmaceuticals Limited
- Medcon S.A.
- MedEd Resources, LLC
- Medesta Associates, LLC
- Medical Concepts Development, Inc.
- Medical Diagnostic Leasing, Inc
- Medical Education Systems, LLC
- Medical Media Communications, LLC
- Medical Strategies, Inc.
- MediQual Systems, Inc.
- Meditrol Automation Systems, Inc.
- Meditrol, Inc.
- MedMined, Inc.
- Mercury Merger Sub, LLC
- Mesa Merger Corp.
- MicroGas Limited
- MicroMedical Deutschland GmbH
- Microport Healthcare, LLC
- Midland Pharmacies, Inc
- Mississippi Medical Supply Cooperative, L.L.C.
- MRI Equipment Partners, Ltd.
- Mudhen Merger Corp.
- Multi-Medica S.A.
- Multipharm Limited
- Nanjing Baiji Advanced Specialty Drug Store Company Limited
- Nanning Baiji Advanced Specialty Pharmacy Company Limited
- Nationwide Ostomy Supplies Limited
- Navigator Health, Inc.
- NaviHealth Holdings, LLC
- NaviHealth SM Holdings, Inc.
- NaviHealth, Inc.
- Nexus Healthcare, Inc.
- Nitric Bio Therapeudics, Inc.
- Northern Michigan Supply Alliance, L.L.C.
- Ohio Valley-Clarksburg, Inc.
- Oncology Holdings, Inc.
- Onpointe Medical Communications, LLC
- Oval (Shanghai) Technologies, Inc.

- Oval Technologies (H.K.) Pty Limited
- Owen Healthcare Building, Inc.
- Pacific Surgical Innovations, Inc.
- Panther Merger Sub II, Inc.
- Panther Merger Sub, Inc.
- Parch, L.L.C.
- Parch, L.L.C. State File
- ParMed Pharmaceuticals, LLC
- PatientScribe Inc.
- PCI Acquisition I, Inc.
- PCI Acquisition II, Inc.
- PCI Services Holdings, Inc.
- PCI Services III, Inc.
- PCI/Acquisition III, Inc.
- PCI/All Pack Holdings, Inc.
- PCI/Delvco, Inc. State File
- PCI/Tri-Line (Usa), Inc.
- Pharmaceutical & Diagnostic Services, LLC
- Pharmacy Service Corporation
- Phillipi Holdings, Inc.
- PHR Staffing, Inc.
- Post-Acute Care Center For Research, LLC
- Practicome Solutions, LLC
- Princeton Diagnostic Isotopes, Inc.
- Priority Healthcare Services Corporation
- Procedure-Based Instrument Services, L.L.C.
- Productos Urologos de Mexico S.A. de C.V.
- Professional Health-Care Resources, Inc.
- Pyxis Capital Corporation
- Pyxis Funding II, LLC
- Pyxis Funding, LLC
- R Cubed, Inc.
- R. P. Scherer Hardcapsule (West)
- R.P. Scherer Inc.
- R.P. Scherer Technologies, Inc.
- Radiopharmacy Of Boise, Inc.
- Radiopharmacy Of Northern California, Inc.
- Renlar Systems, Inc.
- RightCare Solutions, Inc.
- Royal Merger Sub, Inc.
- Scela, Inc.
- Scriptline, Inc.
- SensorMedics (Deutschland) GmbH
- SensorMedics Corporation
- Shanghai Baiwei Drug Store Company Limited
- Shanghai Cardinal Baiwei Drug Store Co., Ltd.
- Shanghai Jinyi Health Management Consultation Co., Ltd.
- Shanghai Luoda Pharmaceutical Company Limited
- Shenzhen Zhengdan Investment Company Limited
- Simolo (GL) Limited

- Sistemas Medicos ALARIS S.A. de C.V.
- Snowden Pencer Holdings, Inc.
- Snowden Pencer, Inc.
- Solomons Company
- Source Medical Corporation
- SRX, Inc.
- Strategic Implications International, LLC
- Supplyline Technologies Limited
- Surgical Carepair, L.L.C.
- Surgical Instrument Repair Service, L.L.C.
- Syncor Belgium SPRL
- Syncor Diagnostics Bakersfield, LLC
- Syncor Diagnostics Dallas, LLC
- Syncor Diagnostics Encino, LLC
- Syncor Diagnostics Fullerton, LLC
- Syncor Diagnostics Laguna Hills, LLC
- Syncor Diagnostics Plano, LLC
- Syncor Diagnostics Sacramento, LLC
- Syncor Financing Corporation
- Syncor Italy srl
- The Enright Group, Inc.
- The Heron Corporation
- The LVC Corporation
- Tianjin Cardinal Pharmacy Co., Ltd.
- Toledo Pharmacy Company
- Tropic Merger Sub, Inc.
- UroMed, Inc.
- VIASYS Healthcare Ireland Limited
- VIASYS Healthcare Island EHF
- VIASYS Healthcare S.A.R.L.
- VIASYS Holdings Inc.
- VIASYS NeuroCare France SAS
- VIASYS Polymer Products LLC
- Virginia Imaging Center, LLC
- Virginia Merger Corporation
- Vistant Corporation
- Vistant Holdings, Inc.
- Vubiq Inc.
- Wenzhou Xinte Pharmaceutical Co., Ltd.
- West Hudson, Inc.
- West Texas Nuclear Pharmacy Partners
- Wholesale (PI) Limited
- Williams Drug Distributors, Inc.
- Wolf Merger Corp.
- Wrangler Acquisition Sub, Inc.
- Wuhan Baiji New & Special Drug Store Company Limited
- Xiamen Cardinal Baiwei Drug Store Co., Ltd.
- Xi'an Baiji Advanced Specialty Pharmacy Company Limited
- Yorkshire Pharmacy, Inc.

# McKesson

- "Aewige" ärztliche Wirtschaftsgesellschaft m.b.H., HG Wien
- "die apoteeke in teesdorf" Mag. pharm. Gerda Kohlhauser KG, LG Wiener Neustadt
- "Esplanade-Apotheke" Mag. pharm. Anna-Maria Köck KG, Landesgericht Wels
- "Panther Apotheke" Mag. pharm. Sandra Krokos KG, Landesgericht Graz
- 10101 Woodloch Forest LLC
- 2012 DREAM LIMITED, England
- 28CVR LIMITED, England
- 3068312 Nova Scotia ULC
- 3069163 Nova Scotia Limited
- 3069164 Nova Scotia Limited
- 30MC LIMITED, England
- 701985 N.B. INC.
- A C FERGUSON (CHEMIST) LIMITED, England
- A. SUTHRELL (HAULAGE) LIMITED, England
- A.F.M. Bergamo S.p.A., Italy
- A.L.I. Holdings LLC
- A.L.I. Imaging Systems Corp.
- A.L.I. Technologies (International) LLC
- AAH BUILDERS SUPPLIES LIMITED, England
- AAH FURB PENSION TRUSTEE LIMITED, England
- AAH Glass & Windows Limited, England
- AAH Ireland, Dublin
- AAH LIMITED, England
- AAH Lloyds Insurance (IoM) Limited, Isle Of Man
- AAH LLOYDS PENSION TRUSTEES LIMITED, England
- AAH NOMINEES LIMITED, England
- AAH ONE LIMITED, Scotland
- AAH PHARMACEUTICALS LIMITED, England
- AAH TWENTY FOUR LIMITED, Scotland
- AAH TWENTY LIMITED, England
- AAH TWENTY SIX LIMITED, England
- ABG Apotheken-Beratungsgesellschaft mbH, Stuttgart
- Access Health NZ Limited
- AccessMed Holdings, Inc.
- AccessMed, Inc. (AccessMed, LLC)
- AccessMed, LLC
- ACME DRUG CO. LIMITED, Scotland
- ADDED MARKETING LIMITED, England
- Adler Apotheke Krems Mag. Gabriele Denk KG, LG Krems an der Donau
- Adler-Apotheke Mag.pharm. Ingrid Chvatal KG, LG Leoben
- Admenta Beteiligungs GmbH, HG Wien
- Admenta Denmark ApS, Copenhagen
- Admenta Deutschland GmbH, Stuttgart
- ADMENTA HOLDINGS LIMITED, England
- ADMENTA ITALIA S.P.A., CCIAA di Bologna
- ADMENTA PENSION TRUSTEES LIMITED, England
- Admenta Sweden AB
- ADMENTA UK LIMITED, England
- Admenta Verwaltungs GmbH, HG Wien
- AFM S.p.A., CCIAA di Bologna
- AHLP PHARMACY LIMITED, England
- ALCHEM (SOUTHERN) LIMITED, England
- ALPE-ADRIA PHARMA farmacevtsko podjetje d.o.o., Ljubljana
- Alphar Ayeneux, Belgium
- Alphar Gilly DL, Belgium
- Alphar Monceau sur Sambre, Belgium
- Alphar Partners SA, Belgium
- Alte Löwen-Apotheke Mag. pharm. Kristina Taubald KG, HG Wien
- Alte Spora Apotheke Mag.pharm. Stephan Öhlzelt KG, LG St. Pölten
- Amethyst Acquisition Corp.
- Ancavion GmbH, AG Darmstadt
- Ancillary Management Solutions, Inc.
- Anton-Bruckner-Apotheke Mag.pharm. Christian Schwarzenbrunner KG, LG Linz
- AOR Holding Company of Indiana, Inc. (AOR Holding Company of Indiana, LLC)
- AOR Holding Company of Indiana, LLC
- AOR Management Company of Alabama, Inc.
- AOR Management Company of Arizona, Inc. (AOR Management Company of Arizona, LLC)
- AOR Management Company of Arizona, LLC
- AOR Management Company of Central Florida, Inc.
- AOR Management Company of Florida, Inc.
- AOR Management Company of Indiana, Inc. (AOR Management Company of Indiana, LLC)
- AOR Management Company of Indiana, LLC
- AOR Management Company of Kansas, Inc.
- AOR Management Company of Missouri, Inc. (AOR Management Company of Missouri, LLC)
- AOR Management Company of Missouri, LLC
- AOR Management Company of Nevada, Inc.

- AOR Management Company of New York, Inc.
- AOR Management Company of North Carolina, Inc.
- AOR Management Company of Ohio, Inc.
- AOR Management Company of Oklahoma, Inc. (AOR Management Company of Oklahoma, LLC)
- AOR Management Company of Oklahoma, LLC
- AOR Management Company of Oregon, Inc.
- AOR Management Company of Pennsylvania, Inc. (AOR Management Company of Pennsylvania, LLC)
- AOR Management Company of Pennsylvania, LLC
- AOR Management Company of South Carolina, Inc.
- AOR Management Company of Texas, Inc.
- AOR Management Company of Virginia, Inc. (AOR Management Company of Virginia, LLC)
- AOR Management Company of Virginia, LLC
- AOR of Indiana Management Partnership
- AOR of Texas Management Limited Partnership
- AOR of Texas Management, LLC
- AOR Real Estate, Inc. (AOR Real Estate, LLC)
- AOR Real Estate, LLC
- AOR Synthetic Real Estate, Inc. (AOR Synthetic Real Estate, LLC)
- AOR Synthetic Real Estate, LLC
- AORIP, Inc.
- AORT Holding Company, Inc. (AORT Holding Company, LLC)
- AORT Holding Company, LLC
- AORT LP, LLC
- Aporana AS
- Apotheke "Zum Bergmann" Mag.pharm. Sabine Tuttner KG, LG Leoben
- Apotheke "Zur heiligen Dreifaltigkeit" Mag. pharm. Edith Schuller-Grundnig KG, Landesgericht Korneuburg
- Apotheke "Zur Mutter Gottes" Mag. pharm. Karin Nozicka KG, HG Wien
- Apotheke Atzgersdorf Mr. Hermann Latzin KG, Wien
- Apotheke im Messepark Mag. pharm. Dietmar Purin KG, LG Feldkirch
- Apotheke Niklasdorf Mag. pharm. Matthias Schöggl KG, LG Leoben
- APOTHEKE U1 TROSTSTRASSE, Mag. pharm. Max Wellan KG, HG Wien
- Apotheke Zum heiligen Antonius Mag. pharm. Walter Staschek KG, LG Wiener Neustadt
- Apotheke zum heiligen Schutzengel Mag.pharm. Barbara Penz-Arzberger KG, Landesgericht Graz
- Apotheke zum Patriarchen Mag. pharm. Brigitte Kölbl KG, HG Wien
- Apotheke Zur hl. Dreifaltigkeit Mag. pharm. Doris Richter KG, LG Wiener Neustadt
- Apotheke Zur Hütte Mag. pharm. Mrak KG, LG Leoben
- Apovest AS
- Apovest Drift AS
- Art Acquisition Subsidiary, Inc.
- Ascalon International, Inc.
- ATLAS Travel Clinic Limited, England
- Attentus Medical Sales, Incorporated (Attentus Medical Sales, LLC)
- Attentus Medical Sales, LLC
- Awarix, Inc.
- Axis Medical Management, Inc.
- AYRSHIRE PHARMACEUTICALS LIMITED, Scotland
- AZIENDA FARMACEUTICA MUNICIPALE di Cremona S.p.A., CCIAA di Cremona
- Azienda Farmacie Milanesi S.p.A., CCIAA di Milano
- Babbingore Limited, Dublin
- BAILLIESTON HEALTH CENTRE PHARMACY LIMITED, Scotland
- Ballycane Pharmacy Limited, Ireland
- BANNISTER & THATCHER LIMITED, England
- BARCLAY PHARMACEUTICALS (ATHERSTONE) LIMITED, England
- BARCLAY PHARMACEUTICALS LIMITED, England
- BARLEY CHEMISTS HOLDINGS LIMITED, England
- BARRY SHOOTER (ROMFORD) LIMITED, England
- BDI Pharma, Inc. (BDI Pharma, LLC)
- BDI Pharma, LLC
- Beausejour Drugs Limited
- BEAUTY CARE DRUGSTORES LIMITED, England
- Beldere Corporation
- BeneVi Health LLC (Biologics, Inc.)
- BENU Apotheken B.V., Chamber of commerce Amsterdam
- BENU Nederland BV, Kamer van Koophandel Amsterdam
- BERKSHIRE MEDICAL SUPPLIES LIMITED, England
- BETTERLIFEHEALTHCARE LIMITED, England
- BIG PHARMA LIMITED, Scotland
- Biologics, Inc.
- Blackhall Pharmaceutical Distributors Limited

- Blackhawk Development LLC
- Blackstaff Pharmaceuticals Limited, England
- Blomsterdalen Apotek AS
- Blue Medical Supply, Inc. (McKesson Medical-Surgical Inc.)
- Boad Seven, Inc.
- BOFH Holdings Unlimited Company, Ireland
- Bottomline Medical Solutions, LLC (Linear Holdings, LLC)
- Breamor Pharmacy Limited, Ireland
- Brevard Radiation Oncology, LLC
- Brickyard Acquisition Inc. (Biologics, Inc.)
- BRIDPORT MEDICAL CENTRE SERVICES LIMITED, England
- Brocacef Groep N.V., Maarssen
- Brockton Radiation Oncology, LLC
- Brooklyn Radiation Oncology, LLC
- Brukar Enterprises, Inc.
- Bullet Acquisition Corporation
- CAHILL MAY ROBERTS GROUP LIMITED, Dublin
- California Golden State Finance Company
- Camic Pharmacies Limited, Ireland
- Canada Distribution Holdings Limited Partnership
- Canada Retail Holdings Limited Partnership Societe en Commandite Gestion Detail Canada
- Cancer Treatment Associates of Northeast Missouri, Ltd.
- CARONET TRADING LIMITED, England
- Carrollton Radiation Therapy Center, LLC
- Cascade Medical Supply, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
- Cavalier Acquisition Company LLC
- CCCN NW Building JV, LLC
- Celesio Business Services Ltd., Ireland
- CENTRALE D`ADMINISTRATION DE BIENS IMMOBILIERS, Bobigny
- CGSF Funding Corporation (CGSF Funding LLC)
- CGSF Funding LLC
- Chem Labs Limited, Dublin
- CHNG Newco LLC
- CHNG NewSub Inc.
- City Properties, S.A.
- Civiche Farmacie Desio S.p.A., Italy
- Claimone, LLC (Linear Holdings, LLC)
- ClaimSecure Inc. (SUCCESSOR)
- CLARK CARE GROUP LIMITED, England
- CLARK MUNRO LIMITED, Scotland
- ClarusONE Sourcing Services LLP
- Clinicians Database, L.L.C.
- CMR Holdings Ltd, Dublin

- Coleham, Dublin
- Colorado Cancer Centers, LLC
- Combined Enterprises Corporation
- COMPANY CHEMISTS ASSOCIATION LIMITED, England
- COMPTOIR MONEGASQUE DE BIOCHIMIE, Monaco
- COMPTOIR PHARMACEUTIQUE MEDITERRANEEN, Monaco
- CONSORZIO SERVIZI SALUTARI S.C.A. R.L., Italy
- CookCo, Inc.
- Cophana SA, Belgium
- Corporation Groupe Pharmessor/Pharmessor Group Corporation (SUCCESSOR 10/01/2017)
- Corporation of America
- CoverMyMeds LLC
- CoverMYMeds Specialty Pharmacy Holdings LLC
- CoverMYMeds Specialty Pharmacy LLC
- CPG Industries, Inc.
- Crocker Plaza Company (Crocker Plaza LLC)
- Crocker Plaza LLC
- CROSS AND HERBERT (DEVON) LIMITED, England
- CROSS AND HERBERT (HOLDINGS) LIMITED, England
- CROSS AND HERBERT LIMITED, England
- Crowley`s Blackrock Limited, Dublin
- Cypress Import Brokerage LLC
- Cypress Medical Products LLC
- D & K Healthcare Resources LLC
- D & K Healthcare Resources, Inc. (D & K Healthcare Resources LLC)
- D & K Pharmacy Solutions, Inc.
- D & K Receivables Corporation
- D.F. O'Neill (Chemists) Ltd, Dublin
- Dale Apotek AS
- Danubia-Apotheke Mag. pharm. Barbara Sedelies KG, HG Wien
- Dargle Pharmacies Holdings Limited, Ireland
- DATACARE Datenpflege des Pharmagroßhandels Ges.m.b.H., HG Wien
- DATAPHARM, Paris
- Daytona Beach Radiation Oncology, LLC
- DC Land Company
- DCAZ Land Company
- Delta Clinical Research, LLC
- DEPOTRADE, Bobigny
- Derm Vantage, LLC
- Diana-Apotheke Dr. et Mag. pharm. Michaela Stipsits KG, LG Eisenstadt

- Die Apotheke Ebenfurth, Mag.pharm. Beate Haage-Löwe KG, LG Wiener Neustadt
- Dispensing Solutions Acquisition Corporation (DS Holdings, Inc.)
- Dispensing Solutions, Inc. (Dispensing Solutions, LLC)
- Dispensing Solutions, LLC (DS Holdings, Inc.)
- Ditt Apotek Amfi Os AS
- Ditt Apotek Rodberg AS
- Ditt Apotek Sorumsand AS
- Diversified Healthcare, LLC
- Dix Bulles Pharma, Belgium
- DLI Market Intelligence ApS, Denmark
- DOL Pharmacy Limited, Ireland
- Donnybrook Pharmacy Limited, Ireland
- Downtown Los Angeles Radiation Oncology, LLC
- DS Holdings, Inc. (DS Holdings, LLC)
- DS Holdings, LLC (McKesson Medical-Surgical Top Holdings Inc.)
- DSRX, Inc. (DS Holdings, Inc.)
- Dublin 2016 Acquisition, LLC
- Dublin Holdings Acquisitions, LLC (Vantage Oncology Holdings, LLC)
- Dublin POS I Acquisition Corp. (POS I Corp.)
- East Indy CC, LLC
- ECLIPSE HEALTHCARE LIMITED, England
- Edwards Medical Supply, Inc.
- EM Acquisition Corporation
- Emploi AS
- Engel-Apotheke Mag. pharm. Susanne Zauner KG, LG Wiener Neustadt
- Ephrata Diamond Spring Water Co.
- ESCON (ST NEOTS) LIMITED, England
- Espafarmed S.L., Belgium
- EUROSANTE (Société en liquidation), Luxembourg
- Evesland Limited, Dublin
- EVOLUTION HOMECARE SERVICES LIMITED, England
- EXPERT HEALTH LIMITED, England
- Family Pharmacy @ Las Colinas LLC
- Fana Apotek AS
- FAR.CO.SAN S.P.A., CCIAA di Arezzo
- FARILLON LIMITED, England
- Farmacia Garbatella I S.r.l., Italy
- Farmacie Comunali di Modena S.p.A., Italy
- Farmacie Comunali di Padova S.p.A., Italy
- Farmacie di Sassuolo S.p.A., Italy
- Farmacie Pratesi Pratofarma S.p.A., CCIAA di Prato
- FARMALVARION S.R.L. SOCIO UNICO, Italy
- FASTPRO International, Inc.
- Federal Medical Supplies, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
- Felview Limited, Dublin
- First Aid Service, Inc.
- First Choice Medical Supply Holding, Inc. (First Choice Medical Supply Holding, LLC)
- First Choice Medical Supply Holding, LLC
- First Choice Medical Supply, LLC
- FIRTH & PILLING LIMITED, England
- Flex-Master Technology Holdings, Inc.
- Floriani-Apotheke Mag.pharm. Doris Leykauf KG, LG Graz
- Foremost de Venezuela, S.A. (Forvensa)
- Foremost Homes Hawaii, Ltd.
- Foremost Iran Corporation
- Foremost Shir, Inc.
- Foremost Tehran, Inc.
- FOSTER & PLUMPTON GROUP LIMITED, England
- FOSTER & PLUMPTON LIMITED, England
- Foundation For Opioid Response Efforts
- G J MALEY LIMITED, Isle Of Man
- G K CHEMISTS (GLOS) LIMITED, England
- G K CHEMISTS LIMITED, England
- GEHE Immobilien GmbH & Co. KG, Stuttgart
- GEHE Immobilien Verwaltungs-GmbH, Stuttgart
- GEHE Pharma Handel GmbH, Stuttgart
- General Medical Inc.
- GEORGE STAPLES (STOKE) LIMITED, England
- Gerard Ryan Pharmacy (Clonmel) Limited, Dublin
- GERSTHOFER-APOTHEKE Mag.pharm. Elisabeth Reisegger KG, HG Wien
- Giardina Enterprises, Inc.
- Glendale Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Golden State Company, Ltd.
- Golden State Corporate Services LLC
- Golden State Insurance Company Limited
- Golden State Milk Products Company
- Goodman Manufacturing Company
- Gorrys Pharmacy Limited, Ireland
- Goviltown Limited, Westmeath
- GPL 2007 LIMITED, England
- GRAEME PHARMACY (STIRLING) LIMITED, Scotland
- GREENS PHARMACEUTICAL (HOLDINGS) LIMITED, England
- Greenville Radiation Care, Inc.
- Greystones Pharmacy Limited, Dublin

- GROUPE PHR, France
- Gulf South Medical Supply, Inc. (Gulf South Medical Supply, LLC)
- Gulf South Medical Supply, LLC
- Gwinnett Radiation Oncology, LLC
- H THATCHER LIMITED, England
- Haleston Enterprises Limited, Dublin
- HBO & Company (VI), Inc.
- HBO & Company of Georgia
- HBOC Ventures, Inc.
- HC Beteiligungsgesellschaft mbH, HG Wien
- HDSC Acquisition Corp.
- Health Data Sciences Corporation
- Health Mart Atlas, LLC
- Health Mart Systems, Inc.
- HEALTH NEEDS LIMITED, England
- HEALTHCLASS LIMITED, England
- Heinz Management Co.
- Helmard Holdings Limited, Dublin
- HEP HealthQx Holdings, Inc. (McKesson Technologies Inc.)
- Herba Chemosan Apotheker-AG, HG Wien
- HERBERT FERRYMAN LIMITED, England
- Hercules Parent LLC
- Herz - Jesu Apotheke Mag. pharm. Marianne Keller KG, HG Wien
- Herz Jesu Apotheke & Parfümerie Mag. pharm. Ingrid Heller KG, LG Feldkirch
- HF Land Company
- HFN of Northwest Florida, Inc.
- HIGGINS & SON (CHEMISTS) LIMITED, England
- HILL-SMITH (WARRINGTON) LIMITED, England
- HisComp Co., Zee Medical Service Co.
- HMS Acquisition Corp.
- HOLLYFAR - Marcas e Comunicação, Unipessoal, Lda., Portugal
- HOLMSCROFT HC LIMITED, Scotland
- HOLON, S.A., Portugal
- Honeybee Bridge LLC
- HTP Inc. (HTP LLC)
- HTP LLC
- Hubertus-Apotheke Mag.pharm. E. Klettenhofer KG, HG Wien
- HUSKY AQUISITION INC.
- Hygeia Bottled Water, Inc.
- HYWEL DAVIES (CAERPHILLY) LIMITED, England
- IHA Corp.
- Imagine Health, Inc.
- INDEPENDENT PHARMACY CARE CENTRES (2008) LIMITED, England
- Indian River Radiation Oncology, LLC
- Infolab, LLC
- Innovent Oncology, LLC
- INSPIRON DISTRIBUTION LIMITED, England
- Integrated Cancer Care, LLC
- Integrated Pathology Services
- IntelliClaim, Inc.
- Inten GmbH, Stuttgart
- Intercal, Inc.
- International Dairy Engineering Co. of Asia, Inc.
- InterQual Inc.
- intraFUSION GP, LLC
- Intrafusion Holding Corp.
- intraFUSION Purchasing Network, LLC
- intraFUSION Research Network, LLC
- Inviva, McKesson Pharma Care Network Corporation / La Corporation Inviva, Reseau de soins pharmacologiques McKesson (SUCCESSOR)
- Iowa Pharmaceutical Services, LLC
- IPCC LIMITED, England
- IPD Holdings, Inc.
- J S DENT LIMITED, England
- Bradbury (Surgical) Limited, Northern Ireland
- J.G. Crowley Pharmacy Limited, Dublin
- JACS, Inc.
- Jaron, Inc.
- Jeffersonville Radiation Technology, LLC
- Jessheim Apotek AS
- Jewett Drug Co.
- Jewett Drug LLC
- Johannes Apotheke Mag. pharm. Deutsch KG, LG Graz
- JOHN BELL & CROYDEN LIMITED, England
- JOHN HAMILTON (PHARMACEUTICALS) LIMITED, Scotland
- Jupiter Acquisition Ltd.
- Kairnbury, Dublin
- Kathleen Properties Subdivision Association, Inc.
- Keling Limited
- Keltman Pharmaceuticals, Inc. (Linear Holdings, LLC)
- Kemofarmacija, veletrgovina za oskrbo zdravstva, d.d., Ljubljana
- Keystone/Ozone Pure Water Company
- Kilshallow Limited, Dublin
- KINGSWOOD CHEMISTS LIMITED, England
- KINGSWOOD GK LIMITED, England
- Kitco, Inc.
- Knowledgeable Healthcare Solutions, Inc.
- Kreuz-Apotheke KG, HG Wien

- KWS & P, Inc
- KWS & P/SFA, Inc.
- KYLE & CARRICK HOLDINGS LIMITED, Scotland
- Laboratoria Flandria NV, Belgium
- Laboratory Supply Company
- Labsco Holdings, Inc. (McKesson Medical-Surgical Inc.)
- Leesburg Radiation Oncology, LLC
- LEVELCROWN LIMITED, England
- Liberty Real Estate NJ LLC
- Lind-Apotheke Mag. pharm. Alexander Telesko KG, LG Klagenfurt
- Linear Holdings, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- Linear Holdings, LLC (Linear Holdings, Inc.)
- Linear Medical Solutions, LLC
- LINFORD PHARMACIES LIMITED, England
- LISEAPOTEKENE AS
- Lissone Farmacie S.p.A., CCIAA di Monza e Brianza
- LIVINGSTON HEALTH CENTRE (P.D) CO. LIMITED, Scotland
- LKW, Inc.
- LLOYDS CHEMISTS LIMITED, England
- LLOYDS CHEMISTS RETAIL (NORTHERN) LIMITED, England
- LLOYDS CHEMISTS RETAIL LIMITED, England
- LLOYDS GROUP PROPERTIES LIMITED, England
- Lloyds Pharmacy Clinical Homecare Limited, England
- LLOYDS PHARMACY LIMITED, England
- LLOYDS PROPERTIES LIMITED, England
- LLOYDS Property Management Company Belgium S.A., Belgium
- LLOYDS RETAIL CHEMISTS LIMITED, England
- Lloyds Retail S.r.l., Socio Unico, Italy
- LLOYDSFARMACIA ROMA 4 S.R.L., Italy
- Lloydspharma Group S.A., Belgium
- Lloydspharma S.A., Belgium
- Lloydspharmacy Ireland Limited, Dublin
- Lory Apotheke Mag. pharm. Karin Eichinger KG, HG Wien
- LP Clinical Homecare Group Limited, England
- LPL ONE LIMITED, England
- M H GILL LIMITED, England
- M PAYNE & CO LIMITED, England
- Macfor International Finance Company
- MACON Acquisition Corp.
- Macro Helix LLC

- Madison Acquisition Inc.
- Marathon Acquisition Subsidiary, Inc.
- Mariahilf-Apotheke Mag. pharm. Christoph Rücklinger KG, LG St. Pölten
- Mariahilf-Apotheke Mag. pharm. Helga Mann KG, Landesgericht Graz
- Marien-Apotheke Mag. pharm. Thomas Job KG, LG Eisenstadt
- Marien-Apotheke, Mag.pharm. Eva Grabner KG, Landesgericht Korneuburg
- Maryland First Aid Co., Inc.
- MASTA Limited, England
- Masters Drug Company, Inc.
- MATIS Immobilien OHG, Stuttgart
- Maurice F. Dougan Limited, Dublin
- May Roberts Ltd, Dublin
- MCK Acquisition Corp.
- McK International Financial Holdings (Barbados) SRL
- McKesson (Cayman Islands) Inc.
- McKesson (Shanghai) Trading Company Limited
- McKesson + Strategic Solutions ULC / Solutions Strategiques McKesson + ULC
- McKesson Automation Systems Inc.
- McKesson Belgium Holdings SPRL, Belgium
- McKesson Canada Corporation/La Corporation McKesson Canada (SUCCESSOR)
- McKesson Canada Finance IA ULC
- McKesson Canada Finance IB ULC
- McKesson Capital Funding Corp.
- McKesson Capital Funding Corporation
- McKesson Capital LLC
- McKesson Central Fill LLC (McKesson Distribution Holdings LLC)
- McKesson Contract Research Organization LLC
- McKesson Cork Business Solutions Unlimited Company
- McKesson Corporate Properties, Inc.
- McKesson Corporation
- McKesson Development Corp.
- McKesson Distribution Holdings LLC
- McKesson Drug Company LLC
- McKesson Europe AG
- McKesson Europe Holdings GmbH & Co. KGaA
- McKesson Europe Holdings Verwaltungs GmbH
- McKesson Financial Holdings II Unlimited Company
- McKesson Financial Holdings Unlimited Company
- McKesson Financing Trust III
- McKesson Financing Trust IV

- McKesson Foundation Inc.
- McKESSON FRANCE HOLDINGS, Bobigny
- McKesson France Retail, Bobigny B
- McKesson Funding Company of Canada
- McKesson Global Procurement & Sourcing Limited
- McKesson Global Sourcing Limited
- McKesson Global Sourcing Limited [Irish Branch]
- McKesson Health Solutions Holdings LLC
- McKesson Health Solutions LLC
- McKesson Health Solutions Puerto Rico Inc.
- McKesson Health Solutions Texas Inc.
- McKesson High Volume Solutions Inc.
- McKesson Information Solutions Finance S.a.r.l.
- McKesson Information Solutions Holdings II S.a.r.l.
- McKesson Information Solutions Holdings III S.a.r.l.
- McKesson Information Solutions Holdings IV S.a.r.l.
- McKesson Information Solutions Holdings V S.a.r.l.
- McKesson Information Solutions III LLC
- McKesson Information Solutions Inc. (McKesson Information Solutions LLC)
- McKesson Information Solutions IV LLC
- McKesson Information Solutions LLC
- McKesson Information Solutions Topholdings S.a.r.l.
- McKesson Information Solutions UK Limited
- McKesson International Bermuda IP2A Limited
- McKesson International Bermuda IP2B Unlimited
- McKesson International Bermuda IP3A Limited
- McKesson International Bermuda IP3B Unlimited (McKesson International Bermuda IP3A Limited)
- McKesson International Bermuda IP4A Limited
- McKesson International Bermuda IP4B Unlimited (McKesson International Bermuda IP4A Limited)
- McKesson International Bermuda IP5A Limited
- McKesson International Bermuda IP5B Unlimited (McKesson International Bermuda IP5A Limited)
- McKesson International Bermuda Opco1A Limited
- McKesson International Bermuda Opco1B Unlimited (McKesson International Bermuda Opco1A Limited)
- McKesson International Bermuda Opco3A Limited
- McKesson International Bermuda Opco3B Unlimited (McKesson International Bermuda Opco3A Limited)
- McKesson International Bermuda Opco4A Limited
- McKesson International Bermuda Opco4B Unlimited
- McKesson International Finance III Limited (McKesson US Finance Corporation)
- McKesson International Finance S.a.r.l.
- McKesson International Holdings III S.a.r.l.
- McKesson International Holdings IV S.a.r.l.
- McKesson International Holdings S.a.r.l.
- McKesson International Holdings Unlimited Company
- McKesson International Holdings VI S.a.r.l.
- McKesson International Holdings VII S.a.r.l.
- McKesson International Investment Corp.
- McKesson International Ireland I Limited
- McKesson International LLC
- McKesson International Malaysia Sdn Bhd
- McKesson International S.a.r.l.
- McKesson International Topholdings S.a.r.l.
- McKesson Ireland Limited
- McKesson Logistics Solutions
- McKesson Medical Imaging Company Ltd. (predecessor)
- McKesson Medical-Surgical FDT Inc.
- McKesson Medical-Surgical Government Solutions LLC
- McKesson Medical-Surgical Holdings Inc.
- McKesson Medical-Surgical Inc.
- McKesson Medical-Surgical Iowa Inc.
- McKesson Medical-Surgical Iowa Supply Inc.
- McKesson Medical-Surgical Maine Inc.
- McKesson Medical-Surgical Manufacturing Inc.
- McKesson Medical-Surgical MediMart Inc.
- McKesson Medical-Surgical MediNet Inc.
- McKesson Medical-Surgical Minnesota Inc. (McKesson Medical-Surgical Holdings Inc.)
- McKesson Medical-Surgical Minnesota Supply Inc.
- McKesson Medical-Surgical Supply Chain Services LLC
- McKesson Medical-Surgical Top Holdings Inc.
- McKesson Medication Management Holdings Inc.
- McKesson Medication Management Virgin Islands Inc.
- McKesson Norway Holdings AS
- McKesson Pharmacy Optimization LLC
- McKesson Pharmacy Systems Canada ULC
- McKesson Pharmacy Systems LLC

-19-

- McKesson Plasma and Biologics LLC
- McKesson Prescription Drug Plan LLC
- McKesson Property Company, Inc.
- McKesson Purchasing Company LLC
- McKesson Services Inc. (McKesson Services LLC)
- McKesson Services LLC
- McKesson Sourcing Services Inc.
- McKesson Specialized Distribution Inc. / McKesson Distribution Specialise Inc. (Successor)
- McKesson Specialty Arizona Inc.
- McKesson Specialty Care Distribution Corporation (McKesson Specialty Care Distribution LLC)
- McKesson Specialty Care Distribution JV LLC
- McKesson Specialty Care Distribution LLC
- McKesson Specialty Corporation
- McKesson Specialty Distribution LLC
- McKesson Specialty Health Innovative Practice Services, LLC
- McKesson Specialty Health Management Services LLC
- McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC
- McKesson Specialty Health Pharmaceutical & Biotech Solutions, LP (McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC)
- McKesson Specialty Health Technology Products LLC
- McKesson Specialty Pharmacy, LP (RxC Acquisition Company)
- McKesson Specialty Prescription Services (Atlantic) Corporation/Corporation McKesson Services de Prescription Spécialisée (Atlantique)
- McKesson Specialty Prescription Services (B.C.) Corporation
- McKesson Specialty Prescription Services Corporation
- McKesson SPS (Manitoba) Corporation
- McKesson Strategic Services Limited
- McKesson Technologies Inc.
- McKesson Trading Company
- McKesson Transportation Systems, Inc.
- McKesson UK Finance I Limited
- McKesson UK Finance II Limited
- McKesson UK Finance V Limited
- McKesson UK Holdings Limited
- McKesson US Finance Corporation
- McKesson US Holdings GP
- McKesson Ventures LLC
- McKesson Ventures Unlimited Company
- McQueary Bros. Drug Company

- McQueary Bros. Drug Company, LLC
- McSweeney Dispensers 10 Limited, Ireland
- McSweeney Dispensers 23 Limited, Ireland
- MDD pharma N.V., Belgium
- MED3000 Health Solutions Southeast
- MED3000 RPG
- Medaid Supply, Inc.
- Medcon Telemedicine Technology, Inc.
- Median Healthcare Services Unlimited Company, Ireland
- Medical & Vaccine Products, Inc.
- Medical Advisory Services for Travellers Abroad Limited, England
- Medical Specialties Distributors Holdings, Inc. (MSD Parent Corporation)
- Medical Specialties Distributors, LLC
- Medical Specialties Holdings Corp. (Medical Specialties Holdings II Corp.)
- Medical Specialties Holdings II Corp.
- Medicentres Canada Inc. (SUCCESSOR)
- Medicine Shoppe Atlantic Corporation
- Medicine Shoppe Canada Corporation
- Medicine Shoppe Canada Real Estate Corporation
- MEDIMART LIMITED, England
- MediVation, Inc.
- MedVentive Inc.
- MeMed CZ s.r.o., Praha
- Menges Medizintechnik Schweiz AG, Sankt Gallen
- Merlin Subsidiary Inc.
- Merrick Healthcare Limited
- Metabolic Healthcare Holdings Limited, England
- Metabolic Healthcare Limited, England
- Metropolitan Integrated Cancer Center, L.L.C.
- MH/USON Radiation Management Company, LLC
- MHD-USO General, LLC
- MHD-USO Management Company, LP
- MHS Connecticut LLC
- Michigan Pharmaceutical Services, LLC
- Mid-Atlantic Radiation Oncology LLC
- Millennium Merger Corporation
- Mohawk Liqueur Corporation
- Mohren-Apotheke Mag. Christian Müller KG, LG Graz
- Moore Medical LLC (McKesson Medical-Surgical Government Solutions LLC)
- Mosaic Acquisition Corporation
- MOUNT PHARMACY LIMITED, England
- MSA Products LLC
- MSD Acquisition Corp. (Medical Specialties Holdings Corp.)

- MSD Parent Corporation (MSD Acquisition Corp.)
- Multum Information Services, Inc.
- MUNRO PHARMACY LIMITED, Scotland
- MWPC Acquisition Corp.
- MWPC Acquisition Corp. (PA)
- My MHealth Limited, England & Wales
- myhca, inc.
- NARO, LLC
- National Oncology Alliance, Inc.
- Natureline, Dublin
- NDC of Canada, Inc.
- NDCHealth Corporation
- NDCHealth Pharmacy Systems and Services, Inc.
- Nebraska Pharmaceutical Services, LLC
- Negatron, Inc.
- Nensi d.o.o., Ljubljana
- NERO GP, LLC
- New Experimental Therapeutics of San Antonio, LLC
- NEW KIRK PHARMACY LIMITED, Scotland
- New Mexico Pharmaceutical Services, LLC
- NewHealthCo, LLC
- NexCura, LLC (McKesson Specialty Health Technology Products LLC)
- Nibelungen-Apotheke Mag. pharm. Michaela Wachter KG, LG St. Pölten
- Norsk Medisinaldepot AS
- North Carolina Pharmaceutical Services, LLC
- Northeast Pennsylvania Radiation Oncology, LP
- Northern Arizona Oncology Centers, LLC
- Northern Boulevard Radiation Oncology Management, LLC
- Northern San Fernando Valley Radiation Oncology, LLC
- Northstar Healthcare Holdings Limited
- Northstar Healthcare Holdings Unlimited Company
- Northstar Healthcare Limited
- Northstar Healthcare Unlimited Company
- Northstar International Holdings Limited
- Northstar Rx LLC
- Norvern Enterprises, Inc.
- NR Direct, Inc. (McKesson Patient Care Solutions Inc.)
- O'Leary Pharmacy (Lucan) Limited, Dublin
- OCP FORMATION, Bobigny
- OCP PORTUGAL, PRODUTOS FARMACÊUTICOS, S.A., Maia
- OCP REPARTITION, Bobigny B
- OCP, Bobigny
- Oncology Holdings II, Inc.
- Oncology Holdings, Inc.
- Oncology Rehab Partners, LLC
- Oncology Therapeutics Network Corporation
- Oncology Today, LP
- OnMark, Inc.
- Optimed Health Limited, England & Wales
- Orca Acquisition Corp.
- Ørebekk Apotek AS
- Oswald-Apotheke Mag. pharm. Ilse Pedevilla KG, LG Feldkirch
- OTN Generics, Inc.
- OTN Participant, Inc.
- Outpatient Infusion Systems, Inc
- Øygarden Apotek AS
- P C Cahill & Company Limited, Dublin
- P.L.C.E., Inc.
- Packet Merger Sub Inc.
- PALEMODA LIMITED, England
- Palm Merger Sub, Inc.
- Panther Acquisition Corporation
- Panther-Apotheke Mag. pharm. Margarete Breyha KG., LG St. Pölten
- Paracelsus-Apotheke Mag. pharm. Dr. Birgit Müller KG, Austria
- Pathology Service Associates, LLC
- Pathway Purchasing Network, LLC
- Patient Account Management Services, Inc.
- PAUL WHEELER LIMITED, England
- PCB SA, Belgium
- PEEL STREET PHARMACY LIMITED, England
- peerVue, Inc. (DE)
- peerVue, Inc. (NH)
- Pemberton Marketing International Limited
- Penn-Chem Corporation
- PERILLA Grundstücks-Verwaltungsgesellschaft mbH & Co. KG, AG München
- Per-Se Transaction Services, Inc.
- PF2 McKesson Technologies Inc.
- PF2 SpinCo Inc.
- Pharma Belgium Belmedis SA, Belgium
- PHARMA PARTNERS, Belgium
- Pharma Services (NI) Limited, Northern Ireland
- Pharmaceutical Distributors Federation Ireland Company Limited By Guarantee
- Pharmaceutical Support Services, Inc.
- Pharmacie Ananga-Talom, Belgium
- Pharmacie de la Bascule, Belgium
- PHARMACTIV DISTRIBUTION, Bobigny B
- Pharmacy O'Riada Holdings Limited, Dublin
- PHARMAGEN LIMITED, England
- PHILIP GOODMAN LIMITED, England
- PHR ANTILLES, FORT DE FRANCE

-21-

- PhyServ Solutions, Inc.
- Physician Micro Systems, Inc.
- Physician Oncology Services Management Company, LLC
- Physician Reliance Holdings, LLC
- Physician Reliance Maryland, LP
- Physician Reliance Network, Inc. (Physician Reliance Network, LLC)
- Physician Reliance Network, LLC
- Physician Reliance, L.P.
- Physician Reliance, LLC
- Physician Sales & Service Limited Partnership
- Physician Sales & Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- Pindsle Apotek AS
- PMLX Limited
- POC Management Group, LLC (Dispensing Solutions, Inc.)
- Podiatry Online, Inc.
- Portico Systems of Delaware, Inc.
- POS I Corp. (Dublin 2016 Acquisition, LLC)
- Presbyterian Cancer Center-Dallas, LLC
- Prescribing Support Services Limited, England & Wales
- Prima Brands Limited, Northern Ireland
- PRIMELIGHT LIMITED, England
- Prismedica S.A.S.
- PRN Physician Reliance, LLC
- Pro-AvO GmbH, Deutschland
- Proclaim, Inc. (McKesson Medical-Surgical MediMart Inc.)
- PRODILAB, France
- Providence Radiation Oncology Partners LLC
- PSS China Sourcing Limited
- PSS Global Holdings
- PSS Global Sourcing China Business Trust
- PSS Global Sourcing Hong Kong Limited
- PSS Global Sourcing Limited [Hong Kong]
- PSS HK 1 Limited
- PSS Holding, Inc. (McKesson Medical-Surgical Inc.)
- PSS Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- PSS Southeast Asia Limited
- PSS World Medical, Inc.
- PST Products, LLC
- PST Services, Inc. (PST Products, LLC)
- Purchasing Alliance for Clinical Therapeutics, LLC
- R F FOSKETT & SON LIMITED, England
- R GORDON DRUMMOND LIMITED, England
- R/X Automation Solutions, LLC

- Raabtal-Apotheke Mag.pharm. Karin Drawetz KG, Landesgericht Graz
- Radiation Oncology Services of America, Inc.
- Radiotherapy Clinic Holdings, LLC
- Radiotherapy Clinics of Kentuckiana, LLC
- Radiotherapy Clinics of Kentuckiana-2, LLC
- Radius Data Solutions, LLC
- Radius Reimbursement Services, LLC
- Radunnco, Inc.
- Rancare, Inc.
- Randolph Home Care Inc.
- Randolph Medical Inc.
- RCOG Cancer Centers, LLC
- Rebel Distributors Corp. (McKesson Medical-Surgical Top Holdings Inc.)
- recucare GmbH, Stuttgart
- recusana GmbH, Stuttgart
- Regenbogenapotheke "Am Leberberg" Mag. pharm. Andreas Portisch KG, HG Wien
- RelayHealth Corporation (McKesson Information Solutions LLC)
- Renoir Acquisition Corporation
- Renoir Acquisition Corporation (DE)
- RESEAU SANTE, BREST
- RetraceHealth, Inc.
- Rexall Pharmacy Group Ltd.
- Rexall/Pharma Plus Pharmacies (BC) Ltd.
- Rexall/Pharma Plus Pharmacies (Sask) Ltd.
- Rexall/Pharma Plus Pharmacies Ltd.
- Riel, Inc.
- Riverside Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- R-jet, Incorporated
- RMCC Cancer Center, Inc. (RMCC Cancer Center, LLC)
- RMCC Cancer Center, LLC
- ROSA of Eastern Shore, LLC
- ROSA of Georgia, LLC
- ROSA of South Alabama, LLC
- ROSA of Southern New Jersey, LLC
- Roth Medical Services, Inc.
- RPRS, LLC
- RX Information Technology LLC
- RxC Acquisition Company
- RxCrossroads 3PL LLC
- Ryle and De Lacy Pharmacies Limited, Ireland
- S.K.U., Inc.
- Salus-Apotheke Mag. pharm. Simone Gaigg KG, Salzburg
- Salvator - Apotheke Mag. pharm. Gertrude Pölzl KG, LG Leoben
- San Bruno Mountain Ltd., A California Limited Partnership

- Sandviken Apotek AS
- Sangers (Northern Ireland) Limited, Northern Ireland
- SANOVA Pharma GesmbH, HG Wien
- SAVORY & MOORE (JERSEY) LIMITED, Jersey
- SAVORY & MOORE LIMITED, Scotland
- SCHOLES (CHEMISTS) LIMITED, England
- Schutzengelapotheke Neufeld Mag. Schweifer KG, LG Eisenstadt
- Scrip Pak, LLC (Linear Holdings, LLC)
- Script2U Holdings LLC
- Script2U LLC
- ScriptHero LLC
- ScriptHero Pharmacy Holdings LLC
- ScriptHero Pharmacy LLC
- Select RX, LLC (Linear Holdings, LLC)
- SelectPlus Oncology, LLC
- Sens Arbeidsinkludering AS
- Sens Eiendom AS
- Sens Gruppen AS
- Sens Utvikling AS
- SERVICE DE LA REPARTITION PHARMACEUTIQUE, Paris
- SF Valley Derm Equipment I, LLC
- Sherman Oaks Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Sherman Oaks Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
- Shoup Properties, Inc.
- SHS V Medtech Investments GmbH & Co. KG
- Simply Medical LLC
- SIVEM Pharmaceuticals ULC/SIVEM Produits Pharmaceutiques ULC
- Six R Investments, Inc.
- SOCIETE COOPERATIVE OUEST PARTAGE, BREST
- SOCIETE D'ETUDES ET DE REALISATIONS INFORMATIQUES, Monaco
- Sofarmex BVBA, Belgium
- Sofiadis SCRL, Belgium
- Soldier Acquisition Corporation
- SOPI The Lough Limited, Ireland
- SOPI Youghal Limited, Ireland
- SourceTenn LLC
- South Alabama Cancer Centers, LLC
- South Bay Radiation Oncology, LLC
- South Pacific Medical Inc.
- Southeast Merger Corp.
- Southeast Texas Cancer Centers, L.P.
- Southern California Radiation Oncology, LLC
- Spider Acquisition Corporation
- Spirit Acquisition Corporation

- Spring Valley Industries, LLC
- St. Louis Pharmaceutical Services, LLC
- St. Lucas-Apotheke Mag.pharm. Ilona Elisabeth Leitner KG, HG Wien
- St. Markus Apotheke Dr. Elke Kramberger-Kaplan KG, LG Linz
- St. Richard Apotheke Mag.pharm. Ursula Kohl KG, Landesgericht Korneuburg
- Stadion-Apotheke Mag. pharm. Ulrike Grosser-Schmidt KG, LG St. Pölten
- Stadt-Apotheke "Zur heiligen Barbara" Mag. pharm. Igor Mauritsch KG, Austria
- Stadtapotheke Fürstenfeld Mag. pharm. Waltraud Maier KG, Landesgericht Graz
- Stat RX USA, LLC (Linear Holdings, LLC)
- STATIM FINANCE LIMITED, England
- STEPHEN SMITH LIMITED, Guernsey
- Sterling Medical Services, LLC (McKesson Patient Care Solutions Inc.)
- STQ LLC
- Strategic Health Alliance II, Inc.
- Strategic Health Alliance Management Corp.
- Strategic Sourcing Services LLC
- Streator Radiation Oncology, LLC
- Stubaital-Apotheke Mag.pharm. Christian Kernstock KG, LG Innsbruck
- Summa Script LLC
- Sund Apotek AS
- SUPERFIELD LIMITED, England
- Supplylogix LLC
- T AND I WHITE LIMITED, England
- T. Sheridan Sales & Marketing, Dublin
- Tabor Apotheke Mag. pharm. Wolfram Schaden KG, LG Steyr
- Targa Parent Holdings, LLC
- TBC Products, Inc.
- Temperature Controlled Pharmaceuticals Limited
- Test Corporation changed 2 GM 3 AG
- Test Entity - Corporation
- Test Entity - Corporation (Glenette)
- Test Entity - LLC (Anne)
- Test Entity - LLC (Glenette)
- Test Entity - LLC (Karen)
- Test Entity - LLC (Melissa)
- Test Entity - LP
- Test Entity - Manager LLC
- Test Entity - Member LLC
- Test Entity - Parent Corporation
- Texas Pharmaceutical Services, LLC
- Texas Proton Therapy Center, LLC
- The Oregon Cancer Centers, Ltd.

- Theratech, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- Thriftymed, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
- THURNBY ROSE LIMITED, England
- Titus Home Health Care LLC
- Tjellesen Max Jenne A/S, Rodovre
- Todin A/S, Denmark
- TOPS Pharmacy Services, Inc.
- Tower Radiation Technology, LLC
- Tracer Enterprises LLC
- Tri-State Radiation Oncology Centers, LLC
- Tuna Acquisition Corp.
- Tyler Radiation Equipment Leasing, LLC
- Unicare Dispensers 16 Limited, Ireland
- Unicare Dispensers 27 Limited, Ireland
- Unicare Dispensers 5 Limited, Ireland
- Unicare Pharmacy Group Limited, Dublin
- United Drug (Wholesale) Limited
- United Drug Distributors Ireland Limited
- Unity Oncology, LLC
- Urbani-Apotheke Mag. pharm. Bernhard Prattes KG, LG Graz
- US Oncology Corporate, Inc.
- US Oncology Holdings, Inc.
- US Oncology Lab Services, LLC
- US Oncology Pharmaceutical Services, LLC
- US Oncology Pharmacy GPO, L.P.
- US Oncology Reimbursement Solutions, LLC
- US Oncology Research, Inc. (US Oncology Research, LLC)
- US Oncology Research, LLC
- US Oncology Specialty, LP
- US Oncology, Inc.
- USCITA LIMITED, England
- USON Insurance Company
- USON Risk Retention Group, Inc.
- Utah Acquisition Corporation
- Valley Equipment Company
- Vantage Acquisition Company, LLC (Vantage Oncology, LLC)
- Vantage Acquisition Finance, LLC (Vantage Oncology, LLC)
- Vantage Cancer Care - Alabama, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care - Indiana, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care - New Mexico, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Network of Alabama, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Network of Indiana, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Network of New Mexico, LLC (Vantage Cancer Care Networks, LLC)
- Vantage Cancer Care Networks, LLC
- Vantage Cancer Centers of Georgia, LLC
- Vantage Central Ohio Radiation Therapy, LLC
- Vantage Equipment Acquisition, LLC
- Vantage Exton Radiation Oncology, LLC
- Vantage Medical Management Services, LLC
- Vantage Mokena Radiation Oncology, LLC
- Vantage Oncology - Brooklyn, LLC
- Vantage Oncology Centers - Beverly Hills, LLC
- Vantage Oncology Finance Co. (Vantage Oncology, LLC)
- Vantage Oncology Holdings, LLC
- Vantage Oncology LLC PAC Corporation
- Vantage Oncology Physics, LLC
- Vantage Oncology Treatment Centers - Brevard, LLC
- Vantage Oncology Treatment Centers - Brockton, LLC
- Vantage Oncology Treatment Centers - Central Florida, LLC (Vantage Oncology Treatment Centers, LLC)
- Vantage Oncology Treatment Centers - Northern Arizona, LLC
- Vantage Oncology Treatment Centers - Ohio, LLC (Vantage Oncology Treatment Centers, LLC)
- Vantage Oncology Treatment Centers - San Antonio, LLC (Vantage Oncology Treatment Centers, LLC)
- Vantage Oncology Treatment Centers - Tri-State, LLC
- Vantage Oncology Treatment Centers, LLC
- Vantage Oncology, LLC
- Vantage Operational Support Services, LLC
- Vantage Radiation Oncology Associates, LLC
- Vantage San Antonio Radiation Oncology, LLC (Vantage Oncology Treatment Centers - San Antonio, LLC)
- Vantage South Suburban Radiation Oncology, LLC
- VC Services, Inc.
- VEC GP, LLC
- VerbalCare, LLC
- Verdal Apotek AS
- Very Important Products, Inc.
- Visitacion Associates
- Vitapharm, proizvodnja in trgovina farmacevtskih izdelkov d.o.o., Murska Sobota
- Vitusapotek Jessheim Storsenter AS
- Vitus-Apoteket Torvbyen Fredrikstad AS
- VOTC-Queens, LLC

- Vulcan Acquisition Subsidiary, Inc.
- W H CHANTER LIMITED, England
- W H GREEN (CHEMISTS) LIMITED, England
- W JAMIESON (CHEMISTS) LIMITED, England
- W.H.C.P. (DUNDEE) LIMITED, Scotland
- Walsh Distribution, L.L.C.
- Walsh Healthcare Solutions LLC
- Walsh Healthcare Solutions, Inc.
- Walsh Heartland, L.L.C.
- Walsh Southwest L.L.C.
- Well.ca ULC
- West Florida Radiation Therapy, LLC
- West Wholesale Drug Co.
- WESTCLOSE LIMITED, England
- Western Tumor Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Westside LA Derm Equipment I, LLC
- WFCC Radiation Management Company, LLC
- Wickham Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
- Wiley Industries, LLC
- Wilkes Barre Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
- Wilkes-Barre Radiation Oncology, LLC
- Windmill Realty, LLC
- WOODSIDE PHARMACY (GLASGOW) LIMITED, Scotland
- World Medical Government Solutions, LLC
- WorldMed Shared Services, Inc.
- WZ-WundZentren GmbH, AG Düsseldorf
- Ybbstal-Apotheke Mag.pharm. Adelheid Tazreiter KG, LG St. Pölten
- Zeepro, Inc.

## Exhibit G

## Texas Settlement Payment Schedule

| Contribution/Allocation | Payment 1 | Payment 2 | Payment 3 | Payment 4 | Payment 5 | Payment 6 | Payment 7 | Payment 8 | Payment 9 | Payment 10 | Payment 11 | Payment 12 | Payment 13 | Payment 14 | Payment 15 | Payment 16 | Payment 17 | Payment 18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base | $49,892,336.87 | $52,412,127.84 | $52,412,127.84 | $46,813,908.37 | $45,813,908.37 | $45,813,908.37 | $45,813,908.37 | $77,168,035.28 | $77,168,035.28 | $77,188,068.38 | $64,868,117.82 | $64,868,117.82 | $64,868,117.82 | $64,888,157.02 | $64,888,157.02 | $64,868,117.02 | $64,868,117.02 | $64,868,117.02 | $64,888,117.83 | $1,063,646,686.34 |
| Bonus A | $26,636,376.20 | $46,549,708.25 | $32,340,948.31 | $32,807,634.80 | $37,067,684.90 | $35,162,627.06 | $35,162,827.64 | $42,077,313.25 | $42,077,312.55 | $42,077,312.84 | $34,962,307.79 | $34,093,307.73 | $34,093,307.79 | $34,953,767.36 | $34,962,767.28 | $34,962,767.28 | $34,093,767.35 | $644,604,558.48 | | |
| Bonus B | $25,202,057.87 | $22,671,956.13 | $22,671,958.13 | $27,626,014.47 | $27,626,094.47 | $25,738,952.84 | $25,738,952.84 | $36,001,645.86 | $36,601,641.86 | $36,601,881.86 | $25,422,388.80 | $25,422,388.80 | $25,422,388.80 | $25,422,390.86 | $25,422,390.86 | $25,422,388.80 | $482,087,842.54 | | | |
| Bonus C | $13,128,338.85 | $13,795,048.48 | $13,795,048.48 | $52,364,654.04 | $47,586,454.24 | $36,205,808.83 | $36,695,808.83 | $38,126,061.58 | $38,126,061.13 | $38,126,061.13 | $15,888,984.25 | $13,883,984.25 | $13,838,984.25 | $15,886,994.25 | $15,888,994.25 | $15,888,994.25 | $291,611,636.36 | | | |
| Bonus D | $7,875,021.69 | $8,277,290.67 | $8,277,200.67 | $28,362,385.48 | $38,366,351.44 | $38,651,604.02 | $38,651,804.02 | $11,475,800.79 | $11,475,800.79 | $11,474,662.79 | $8,510,384.35 | $8,714,386.35 | $8,734,386.35 | $8,832,386.58 | $8,832,386.58 | $8,735,386.58 | $175,146,813.35 | | | |
| Bonus E | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $4,498,938.87 | $88,382,305.31 | | | |
| Subtractor Attorney Fees and Costs | $ 32,027,088.80 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $32,060,000.00 |
| Texas Additional Restitution Amount | $4,777,988.38 | $11,881,388.37 | $11,013,836.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $38,052,876.43 |
| Contingency Fee Fund | $4,796,986.37 | $4,796,986.37 | $4,796,986.37 | $4,796,986.37 | $0.00 | $4,796,986.37 | $4,796,986.37 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $33,576,666.86 |
| Litigating Subdivision Cost Fund | $7,101,545.86 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,101,740.49 |
| **Total Payment** | $162,323,388.74 | $158,066,464.88 | $142,115,138.84 | $178,418,954.94 | $170,148,984.84 | $170,618,864.84 | $170,418,984.84 | $171,188,833.26 | $171,188,833.26 | $177,188,835.36 | $64,868,117.82 | $64,868,117.02 | $64,888,117.02 | $64,888,117.02 | $64,868,117.02 | $64,868,117.82 | $64,868,117.83 | $64,268,117.83 | $86,271,022,602.66 |

**Exhibit H**

<u>**Illustrative Examples of Settlement Prepayments**</u>

**Example 1:**   *Gross Settlement Prepayment: $195,352,203.41*

Settlement Prepayment Reduction Schedule: Reduce Settlement Payments for Year 6 by $65,613,969.37, Year 11 by $64,869,117.02, and Year 16 Settlement Payments by $64,869,117.02

Net Settlement Prepayment Amount (assumes discount rate of 5%): $168,752,578.25 $56,679,813.72 for Year 6 in Year 3, $56,036,382.26 for Year 11 in Year 8, and $56,036,382.26 for Year 16 in Year 13)

| Payment Year | Initial Settlement Payment Schedule | Gross Prepayment Amount (-) | Net Prepayment Amount (+) | Prepayment Applied To | Revised Settlement Payment Schedule |
|---|---|---|---|---|---|
| 1 | $49,880,836.97 | | | | $49,880,836.97 |
| 2 | $52,422,327.94 | | | | $52,422,327.94 |
| 3 | $52,422,327.94 | | $56,679,813.72 | Year 6 | $109,102,141.66 |
| 4 | $65,613,969.37 | | | | $65,613,969.36 |
| 5 | $65,613,969.37 | | | | $65,613,969.36 |
| 6 | $65,613,969.37 | $65,613,969.37 | | | $0.00 |
| 7 | $65,613,969.37 | | | | $65,613,969.36 |
| 8 | $77,169.933.28 | | $56,036,382.26 | Year 11 | $133,206,315.54 |
| 9 | $77,169.933.28 | | | | $77,169.933.28 |
| 10 | $77,169.933.28 | | | | $77,169.933.28 |
| 11 | $64,869,117.02 | $64,869,117.02 | | | $0.00 |
| 12 | $64,869,117.02 | | | | $64,869,117.02 |
| 13 | $64,869,117.02 | | $56,036,382.26 | Year 16 | $120,905,499.28 |
| 14 | $64,869,117.02 | | | | $64,869,117.02 |
| 15 | $64,869,117.02 | | | | $64,869,117.02 |
| 16 | $64,869,117.02 | $64,869,117.02 | | | $0.00 |
| 17 | $64,869,117.02 | | | | $64,869,117.02 |
| 18 | $64,869,117.03 | | | | $64,869,117.02 |
| **Total** | **$1,167,644,106.34** | **$195,352,203.41** | **$168,752,578.25** | | **$1,141,044,481.09** |

## Exhibit I

## <u>ABC IRS Form 1098-F</u>

| 0303 | ☐ VOID | ☐ CORRECTED | | |
|---|---|---|---|---|
| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.<br><br>[APPROPRIATE OFFICIAL]<br>The State of Texas<br>[ADDRESS] | **1** Total amount required to be paid<br>$ 394,142,564.57 | OMB No. 1545-2284<br>Form **1098-F**<br>(Rev. January 2022) | **Fines, Penalties, and Other Amounts** |
| | **2** Amount to be paid for violation or potential violation<br>$ 22,980,499.92 | | |
| | **3** Restitution/remediation amount | For calendar year<br>20 22 | |
| FILER'S TIN<br>XX-XXXXXXX | PAYER'S TIN<br>23-3079390 | $ 371,162,064.66 | **5** Date of order/agreement | Copy A |
| PAYER'S name<br>AmerisourceBergen Corporation | | **4** Compliance amount<br>$ | XX/XX/2022 | For<br>Internal Revenue Service Center |
| Street address (including apt. no.)<br>1 West First Avenue | | **6** Court or entity<br>Harris County Distinct Court and jurisdictions of other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | File with Form 1096. |
| City or town, state or province, country, and ZIP or foreign postal code<br>Conshohocken, PA 19428 | | **7** Case number<br>Case No. 18-0358/2018 and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | For Privacy Act and Paperwork Reduction Act Notice, see the current General Instructions for Certain Information Returns. |
| | | **8** Case name or names of parties to suit, order, or agreement<br>In re Texas Opioid Litigation and other court settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | |
| | | **9** Code<br>A, B | |

Form **1098-F** (Rev. 1-2022)          Cat. No. 71382B          www.irs.gov/Form1098F          Department of the Treasury - Internal Revenue Service

**Do  Not  Cut  or  Separate  Forms  on  This  Page  —  Do  Not  Cut  or  Separate  Forms  on  This  Page**

Exhibit I

1

Exhibit J

## Cardinal Health IRS Form 1098-F

| | | | | |
|---|---|---|---|---|
| 0303 ☐ VOID ☐ CORRECTED | | | | |

| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Total amount required to be paid<br>$ 392,871,136.95 | OMB No. 1545-2284 | | Fines, Penalties, and Other Amounts |
|---|---|---|---|---|
| [APPROPRIATE OFFICIAL]<br>The State of Texas<br>[ADDRESS] | 2 Amount to be paid for violation or potential violation<br>$ 22,906,369.27 | Form **1098-F**<br>(Rev. January 2022) | | |
| | 3 Restitution/remediation amount<br>$ 369,964,767.68 | For calendar year<br>20 22 | | |
| FILER'S TIN<br>XX-XXXXXXX | PAYER'S TIN<br>31-0958666 | 4 Compliance amount<br>$ | 5 Date of order/agreement<br>XX/XX/2022 | Copy A<br>For<br>Internal Revenue<br>Service Center |
| PAYER'S name<br>Cardinal Health, Inc. and consolidated subsidiaries | | 6 Court or entity<br>Harris County District Court and jurisdiction of other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | | File with Form 1098.<br>For Privacy Act and |
| Street address (including apt. no.)<br>7000 Cardinal Place | | 7 Case number<br>Case No. 18-0358/2018 and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | | Paperwork Reduction Act Notice, see the current General |
| City or town, state or province, country, and ZIP or foreign postal code<br>Dublin, Ohio  43017 | | 8 Case name or names of parties to suit, order, or agreement<br>In re Texas Opioid Litigation and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in such agreement) and Texas, dated as of [] | | Instructions for Certain Information Returns. |
| | | 9 Code<br>A, B | | |

Form **1098-F** (Rev. 1-2022)      Cat. No. 71382B      www.irs.gov/Form1098F      Department of the Treasury - Internal Revenue Service

**Do  Not  Cut  or  Separate  Forms  on  This  Page  —  Do  Not  Cut  or  Separate  Forms  on  This  Page**

Exhibit J
1

Exhibit K

## McKesson IRS Form 1098-F

| 0303 | ☐ VOID | ☐ CORRECTED | | |
|---|---|---|---|---|
| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.<br><br>[APPROPRIATE OFFICIAL]<br>The State of Texas<br>[ADDRESS] | 1 Total amount required to be paid<br>$ 484,413,926.14<br>2 Amount to be paid for violation or potential violation<br>$ 28,243,775.70<br>3 Restitution/remediation amount | OMB No. 1545-2284<br>Form **1098-F**<br>(Rev. January 2022)<br>For calendar year<br>20 22 | **Fines, Penalties, and Other Amounts** | |
| FILER'S TIN<br>XX-XXXXXXX | PAYER'S TIN<br>23-3079390 | $ 456,170,150.44<br>4 Compliance amount<br>$ | 5 Date of order/agreement<br>XX/XX/2022 | **Copy A** |
| PAYER'S name<br>McKesson Corporation | | 6 Court or entity<br>Harris County District Court and jurisdictions of other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in each agreement) and Texas, dated as of [] | | **For Internal Revenue Service Center** |
| Street address (including apt. no.)<br>6535 N. State Highway 161 | | 7 Case number<br>Case No. 18-0364/2018 and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in each agreement) and Texas, dated as of [] | | **File with Form 1096.** |
| City or town, state or province, country, and ZIP or foreign postal code<br>Irving, TX 75039 | | 8 Case name or names of parties to suit, order, or agreement<br>is re Texas Opioid Litigation and other cases settled under the Settlement Agreement entered into by the Settling Distributors (as defined in each agreement) and Texas, dated as of [] | | For Privacy Act and Paperwork Reduction Act Notice, see the current General Instructions for Certain Information Returns. |
| | | 9 Code<br>A, B | | |

| | | |
|---|---|---|
| Form **1098-F** (Rev. 1-2022) | Cat. No. 71382B     www.irs.gov/Form1098F | Department of the Treasury - Internal Revenue Service |

**Do Not Cut or Separate Forms on This Page — Do Not Cut or Separate Forms on This Page**

STRICTLY CONFIDENTIAL

## EXHIBIT L

### Texas Participation Form and Release

The Texas governmental entity identified on the signature page below ("*Governmental Entity*"), in order to obtain and in consideration for the benefits provided to the Governmental Entity pursuant to the Texas Settlement Agreement dated February 7, 2022 ("*Distributor Texas Settlement*"), and acting through the undersigned authorized official, hereby elects to participate in the Distributors' Texas Settlement, release all Released Claims against all Released Entities, and agrees as follows:

1. The Governmental Entity is aware of and has reviewed the Distributors' Texas Settlement, understands that all terms in this Texas Participation Form have the meanings defined therein, and agrees that by signing this Texas Participation Form, the Governmental Entity elects to participate in the Distributors' Texas Settlement and become a Participating Subdivision as provided therein.

2. The Governmental Entity shall, jointly with the Distributors, within 14 calendar days of the Effective Date file a dismissal with prejudice of any Released Claims that it has filed and file a joint motion with the Distributors to sever claims.

3. The Governmental Entity agrees to the terms of the Distributors' Texas Settlement pertaining to Subdivisions as defined therein.

4. By agreeing to the terms of the Distributors' Texas Settlement and becoming a Releasor, the Governmental Entity is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date.

5. The Governmental Entity agrees to use any monies it receives through the Distributors' Texas Settlement as provided therein.

6. The Governmental Entity submits to the jurisdiction of the Texas Consolidated Litigation Court.. If the Global Settlement becomes effective by July 1, 2022, the Governmental Entity agrees to arbitrate disputes before the National Arbitration Panel as described in Section VI.F.1, Section VI.F.2, Section VIII.C.1, Section XI.B.4, Section XIV.E.3, Section XIV.E.4, Section XIV.T.2, and Exhibit P, of the Global Settlement. For the avoidance of doubt, nothing contained in this Texas Participation Form, or in the Distributors' Texas Settlement, constitutes consent, express or implied, by the Governmental Entity or its selected counsel, to the jurisdiction of any federal court, including without limitation the MDL, for any purpose.

7. The Governmental Entity has the right to enforce the Distributors' Texas Settlement in the Texas Consolidated Litigation Court as provided therein.

8. The Governmental Entity, as a Participating Subdivision, hereby becomes a Releasor for all purposes in the Distributors' Texas Settlement, including, but not limited to, all

STRICTLY CONFIDENTIAL

provisions of Section X, and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority. As a Releasor, the Governmental Entity hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Distributors' Texas Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Governmental Entity to release claims. The Distributors' Texas Settlement shall be a complete bar to any Released Claim.

9. The Governmental Entity shall have all rights and obligations of a Participating Subdivision as set forth in the Distributors' Texas Settlement.

10. In connection with the releases provided for in the Distributors' Texas Settlement, each Governmental Entity expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Governmental Entity hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Governmental Entities' decision to participate in the Distributors' Texas Settlement.

11. Nothing herein is intended to modify in any way the terms of the Distributors' Texas Settlement, to which Governmental Entity hereby agrees. To the extent this Texas Participation Form is interpreted differently from the Distributors' Texas Settlement in any respect, the Distributors' Texas Settlement controls.

I have all necessary power and authorization to execute this Texas Participation Form on behalf of the Governmental Entity.

STRICTLY CONFIDENTIAL

| Governmental Entity: | State: |
|---|---|
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

Signature: _____

Name: _____

Title: _____

Date: _____

**Exhibit M**

**Stipulations of Dismissal with Prejudice**

[This page intentionally left blank.]

MDL PRETRIAL CAUSE NO. 2018-77098

| | | |
|---|---|---|
| County of Dallas | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 116th JUDICIAL DISTRICT |
| | § | |
| Purdue Pharma, L.P., et al., | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MDL PRETRIAL CAUSE NO. 2018-77066

| | | |
|---|---|---|
| County of Bexar | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 224th JUDICIAL DISTRICT |
| | § | |
| Purdue Pharma, L.P., et al., | § | |
| | § | |
| *Defendants.* | § | BEXAR COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | 152nd JUDICIAL DISTRICT |
| | § | |
| MDL NO. 18-0358 | § | HARRIS COUNTY, TEXAS |

## STIPULATION OF DISMISSAL WITH PREJUDICE

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, counsel

of record for Plaintiffs Dallas County, Texas and Bexar County, Texas and Defendants McKesson

Exhibit M

2

Corporation, McKesson Medical-Surgical Inc., Cardinal Health, Inc., Cardinal Health 105, Inc.,

Cardinal Health 108, LLC, Cardinal Health 110, LLC, Cardinal Health 112, LLC, Cardinal Health

200, LLC, Cardinal Health 414, LLC, AmerisourceBergen Corporation, and AmerisourceBergen

Drug Corporation, (collectively, "Distributor Defendants"), that, pursuant to Texas Rule of Civil

Procedure 162, the following actions are hereby voluntarily nonsuited with prejudice as to

Distributor Defendants only, without costs as to any party against the other:

1. *County of Dallas v. Purdue Pharma L.P.*, Case No. 2018-77098; and

2. *County of Bexar v. Purdue Pharma L.P.*, Case No. 2018-77066;

Dated: February _____, 2022
New York, NY

Agreed as to form and substance:

**REED SMITH LLP**

/s/ Stan Perry
Stan Perry
State Bar No. 15799920
sperry@reedsmith.com
Nicole S. Soussan
State Bar No. 24079371
nsoussan@reedsmith.com
Emma L. Short
State Bar No. 24101001
eshort@reedsmith.com
REED SMITH LLP
811 Main Street, Suite 1700
Houston, Texas 77002
Telephone: 713.469.3800
Facsimile: 713.469.3899

Joseph J. Mahady
jmahady@reedsmith.com
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103

**SIMON GREENSTONE PANATIER, PC**

_____
Jeffery B. Simon
Simon Greenstone Panatier
1201 Elm Street Suite 3400
Dallas, Texas
Phone: (214) 276-7680
jsimon@sgptrial.com

**THE LANIER LAW FIRM, P.C.**

_____
Dara Hegar
The Lanier Law Firm P.C.
10940 W. Sam Houston Pkwy N, Suite 100
Houston, Texas 77064
Dara.hegar@lanierlawfirm.com

*Counsel for Plaintiff Dallas County*

Exhibit M
3

Telephone: 215.851.8100
Facsimile: 215.851.1420

*Counsel for Defendants*
*AmerisourceBergen Corporation and*
*AmerisourceBergen Drug Corporation*

**BAKER & HOSTETLER LLP**

*/s/ Michael W. Mengis*
Michael W. Mengis, *attorney-in-charge*
State Bar No. 13941040
mmengis@bakerlaw.com
Matt R. Raley
State Bar No. 24051224
mraley@bakerlaw.com
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: 713-751-1600
Fax: 713-751-1717

*Of Counsel:*
Enu Mainigi
emainigi@wc.com
F. Lane Heard
lheard@wc.com
Steven M. Pyser
spyser@wc.com
Ashley W. Hardin
ahardin@wc.com
Colleen McNamara
cmcnamara@wc.com
Michael R. Fishman
mfishman@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Phone: 202-434-5000
Fax: 202-434-5029

*Attorneys for Defendants Cardinal Health,*
*Inc., Cardinal Health 105, Inc., Cardinal*
*Health 108, LLC, Cardinal Health 110,*
*LLC, Cardinal Health 112, LLC, Cardinal*

**WATTS GUERRA LLC**

Mikal Watts
Shelly Sanford
WATTS GUERRA LLC
4 Dominion Dr.
Bld 3, Suite 100
San Antonio, TX 78257
Phone: (210) 447-0500
mcw@wattsguerra.com
ssanford@wattsguerra.com

*Counsel for Plaintiff Bexar County*

Exhibit M
4

*Health 200, LLC, Cardinal Health 414, LLC*

**SMYSER KAPLAN & VESELKA, L.L.P.**

 */s/ Craig Smyser*
Craig Smyser
Texas Bar No. 18777575
csmyser@skv.com
David Isaak
Texas Bar No. 24012887
disaak@skv.com
Crystal Robles
Texas Bar No. 24083754
crobles@skv.com
Shaun Clarke
Texas Bar No. 24056972
sclarke@skv.com
Karima Maloney
Texas Bar No. 24041383
kmaloney@skv.com
SMYSER KAPLAN & VESELKA, L.L.P.
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Phone: 713-221-2300
Fax: 713-221-2320

*Of Counsel:*

Sonya D. Winner
Cortlin H. Lannin

**COVINGTON & BURLING LLP**

Andrew P. Stanner
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington DC, 20001
Phone: 202-662-6000

*Counsel for Defendant McKesson Corporation and McKesson Medical-Surgical Inc.*

SO ORDERED:

Dated: _____

                                _____
                                  Honorable Judge Robert Schaffer
                                  152nd Judicial District Court

<u>**Exhibit N**</u>

<u>**Texas Opioid Settlement Sharing Agreement**</u>

## TEXAS OPIOID ABATEMENT FUND COUNCIL AND SETTLEMENT ALLOCATION TERM SHEET

**WHEREAS,** the people of the State of Texas and its communities have been harmed through the National and Statewide epidemic caused by licit and illicit opioid use and distribution within the State of Texas; and now,

**WHEREAS,** the State of Texas, though its elected representatives and counsel, including the Honorable Ken Paxton, Attorney General of the State of Texas, and certain Political Subdivisions, through their elected representatives and counsel, are separately engaged in litigation seeking to hold those entities in the supply chain accountable for the damage caused; and now,

**WHEREAS,** the State of Texas, through its Attorney General and its Political Subdivisions, share a common desire to abate and alleviate the impacts of the epidemic throughout the State of Texas; and now,

**THEREFORE,** the State of Texas and its Political Subdivisions, subject to completing formal documents effectuating the Parties' agreements, enter into this State of Texas and Texas Political Subdivisions' Opioid Abatement Fund Council and Settlement Allocation Term Sheet (Texas Term Sheet) relating to the allocation and use of the proceeds of any Settlements as described.

**A. Definitions**

    As used in this Texas Term Sheet:

1. "The State" shall mean the State of Texas acting through its Attorney General.

2. "Political Subdivision(s)" shall mean any Texas municipality and county.

3. "The Parties" shall mean the State of Texas, the Political Subdivisions, and the Plaintiffs' Steering Committee and Liaison Counsel (PSC) in the Texas Opioid MDL, *In Re: Texas Opioid Litigation*, MDL No. 2018-63587, in the 152d District Court of Harris County, Texas.

4. "Litigating Political Subdivision" means a Political Subdivision that filed suit in the state courts of the State of Texas prior to the Execution Date of this Agreement, whether or not such case was transferred to Texas Opioid MDL, or removed to federal court.

5. "National Fund" shall mean any national fund established for the benefit of the Texas Political Subdivisions.  In no event shall any National Fund be used to create federal jurisdiction, equitable or otherwise, over the Texas Political Subdivisions or those similarly situated state-court litigants who are included in the state coalition, nor shall the National Fund require participating in a class action or signing a participation agreement as part of the criteria for participating in the National Fund.

6. "Negotiating Committee" shall mean a three-member group comprising four representatives for each of (1) the State; (2) the PSC; and (3) Texas'

Political Subdivisions (collectively, "Members"). The State shall be represented by the Texas Attorney General or his designees. The PSC shall be represented by attorneys Mikal Watts, Jeffrey Simon, Dara Hegar, Dan Downey, or their designees. Texas' Political Subdivisions shall be represented by Clay Jenkins (Dallas County Judge), Terrence O'Rourke (Special Assistant County Attorney, Harris County), Nelson Wolff (Bexar County Judge), and Nathaniel Moran (Smith County Judge) or their designees.

7. "Settlement" shall mean the negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant that includes the State and Political Subdivisions.

8. "Opioid Funds" shall mean monetary amounts obtained through a Settlement as defined in this Texas Term Sheet.

8. "Approved Purpose(s)" shall mean those uses identified in Exhibit A hereto.

9. "Pharmaceutical Supply Chain" shall mean the process and channels through which opioids or opioids products are manufactured, marketed, promoted, distributed, or dispensed.

10. "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution, or dispensing of an opioid analgesic.

11. "Texas Opioid Council" shall mean the Council described in Exhibit A hereto, which has the purpose of ensuring the funds recovered by Texas (through the joint actions of the Attorney General and the Texas Political Subdivisions) are allocated fairly and spent to remediate the opioid crisis in Texas, using efficient and cost-effective methods that are directed to the hardest hit regions in Texas while also ensuring that all Texans benefit from prevention and recovery efforts.

**B. Allocation of Settlement Proceeds**

1. All Opioid Funds distributed in Texas shall be divided with 15% going to Political Subdivisions ("Subdivision Share"), 70% to the Texas Opioid Abatement Fund through the Texas Opioid Council (Texas Abatement Fund Share) identified and described on Exhibits A and C hereto, and 15% to the Office of the Texas Attorney General as Counsel for the State of Texas ("State Share"). Out of the Texas Opioid Abatement Fund, reasonable expenses up to 1% shall be paid to the Texas Comptroller for the administration of the Texas Opioid Council pursuant to the Opioid

4

Abatement Fund (Texas Settlement) Opioid Council Agreement, Exhibit A hereto.

2. The Subdivisions Share shall be allocated in accordance with the division of proceeds on Exhibit B hereto.

3. The Texas Abatement Fund Share shall be allocated to the Opioid Council to be apportioned in accordance with the guidelines of Exhibit A, and Exhibit C hereto.

4. In the event a Subdivision merges, dissolves, or ceases to exist, the allocation percentage for that Subdivision shall be redistributed as directed by the settlement document, and if not specified, equitably based on the composition of the successor Subdivision. If a Subdivision for any reason is excluded from a specific settlement, the allocation percentage for that Subdivision shall be redistributed as directed by the settlement document, and if not specified, equitably among the participating Subdivisions.

5. Funds obtained from parties unrelated to the Litigation, via grant, bequest, gift or the like, separate and distinct from the Litigation, may be directed to the Texas Opioid Council and disbursed as set forth below.

6. The Subdivision share shall be initially deposited and paid in cash directly to the Subdivision under the authority and guidance of the Texas MDL Court, who shall direct any Settlement funds to be held in trust in a

segregated account to benefit the Subdivisions and to be promptly distributed as set forth herein and in accordance with Exhibit B.

7. Nothing in this Texas Term Sheet should alter or change any Subdivision's rights to pursue its own claim. Rather, the intent of this Texas Term Sheet is to join all parties to disburse settlement proceeds from one or more defendants to all parties participating in that settlement within Texas.

8. Opioid Funds from the Texas Abatement Fund Share shall be directed to the Texas Opioid Council and used in accordance with the guidelines as set out on Exhibit A hereto, and the Texas Abatement Fund Share shall be distributed to the Texas Opioid Council under the authority and guidance of the Texas MDL Court, consistent with Exhibits A and C, and the by-laws of the Texas Opioid Council documents and disbursed as set forth therein, including without limitation all abatement funds and the 1% holdback for expenses.

9. The State of Texas and the Political Subdivisions understand and acknowledge that additional steps may need to be undertaken to assist the Texas Opioid Council in its mission, at a predictable level of funding, regardless of external factors.

**C. Payment of Counsel and Litigation Expenses**

1. Any Master Settlement Agreement settlement will govern the payment of fees and litigation expenses to the Parties. The Parties agree to direct control of any Texas Political Subdivision fees and expenses to the "Texas Opioid Fee and Expense Fund," which shall be allocated and distributed by the Texas MDL Court, *In re: Texas Opioid Litigation*, MDL No. 2018-63587, in the 152nd District Court of Harris County, Texas, and with the intent to compensate all counsel for Texas Political Subdivisions who have not chosen to otherwise seek compensation for fees and expenses from any federal MDL common benefit fund.

2. The Parties agree that no portion of the State of Texas 15% allocation share from any settlement shall be administered through the National Fund, the Texas MDL Court, or Texas Opioid Fee and Expense Fund, but shall be directed for payment to the State of Texas by the State of Texas.

3. The State of Texas and the Texas Political Subdivisions, and their respective attorneys, agree that all fees – whether contingent, hourly, fixed or otherwise – owed by the Texas Political Subdivisions shall be paid out of the National Fund or as otherwise provided for herein to the Texas Opioid Fee and Expense Fund to be distributed by the 152nd

District Court of Harris County, Texas pursuant to its past and future orders.

4. From any opioid-related settlements with McKesson, Cardinal Health, ABDC, and Johnson & Johnson, and for any future opioid-related settlements negotiated, in whole or in part, by the Negotiating Committee with any other Pharmaceutical Supply Chain Participant, the funds to be deposited in the Texas Opioid Fee and Expense Fund shall be 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions of each payment (annual or otherwise) to the State of Texas for that settlement, plus expenses from the National Fund, and shall be sought by Texas Political Subdivision Counsel initially through the National Fund. The Texas Political Subdivisions' percentage share of fees and expenses from the National Fund shall be directed to the Texas Opioid Fee and Expense Fund in the Texas MDL, as soon as is practical, for allocation and distribution in accordance with the guidelines herein.

5. If the National Fund share to the Texas Political Subdivisions is insufficient to cover the guaranteed 9.3925%, plus expenses from the National Fund, per subsection 4, immediately *supra*, or if payment from the National Fund is not received within 12 months after the date the

first payment is made by the Defendants pursuant to the settlement, then the Texas Political Subdivisions shall recover up to 12.5% of the Texas Political Subdivision Share to make up any difference.

6. If the National Fund and the Texas Political Subdivision share are insufficient to cover the guaranteed 9.3925%, plus expenses from the National Fund, or if payment from the National Fund is not received within 12 months after the date the first payment is made by the Defendants pursuant to the settlement, then the Texas Political Subdivisions shall recover up to 8.75% of the Abatement Fund Share to make up any difference. In no event shall the Texas Political Subdivision share exceed 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions of any settlement, plus expenses from the National Fund. In the event that any payment is received from the National Fund such that the total amount in fees and expenses exceeds 9.3925%, the Texas Political Subdivisions shall return any amounts received greater than 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions to those respective Funds.

7. For each settlement utilizing a National Fund, the Texas Political Subdivisions need only make one attempt at seeking fees and expenses there.

8. The total amount of the Texas Opioid Fee and Expense Fund shall be reduced proportionally, according to the agreed upon allocation of the Texas Subdivision Fund, for any Texas litigating Political Subdivision that (1) fails to enter the settlement; and (2) was filed in Texas state court, and was transferred to the Texas MDL (or removed before or during transfer to the Texas MDL) as of the execution date of this Agreement.

**D. The Texas Opioid Council and Texas Abatement Fund**

The Texas Opioid Council and Texas Abatement Fund is described in detail at Exhibit A, incorporated herein by reference.

**E. Settlement Negotiations**

1. The State and Negotiating Committee agree to inform each other in advance of any negotiations relating to a Texas-only settlement with a Pharmaceutical Supply Chain Participant that includes both the State and its Political Subdivisions and shall provide each other the opportunity to participate in all such negotiations. Any Texas-only Settlement agreed to with the State and Negotiating Committee shall be subject to the approval

of a majority of litigating Political Subdivisions. The Parties further agree to keep each other reasonably informed of all other global settlement negotiations with Pharmaceutical Supply Chain Participants and to include the Negotiating Committee or designees.  Neither this provision, nor any other, shall be construed to state or imply that either the State or the Negotiating Committee is unauthorized to engage in settlement negotiations with Pharmaceutical Supply Chain Participants without prior consent or contemporaneous participation of the other, or that either party is entitled to participate as an active or direct participant in settlement negotiations with the other.  Rather, while the State's and Negotiation Committee's efforts to achieve worthwhile settlements are to be collaborative, incremental stages need not be so.

2. Any Master Settlement Agreement (MSA) shall be subject to the approval and jurisdiction of the Texas MDL Court.

3. As this is a Texas-specific effort, the Committee shall be Chaired by the Attorney General. However, the Attorney General, or his designees, shall endeavor to coordinate any publicity or other efforts to speak publicly with the other Committee Members.

4. The State of Texas, the Texas MDL Plaintiff's Steering Committee representatives, or the Political Subdivision representatives may withdraw

from coordinated Settlement discussions detailed in this Section upon 10 business days' written notice to the remaining Committee Members and counsel for any affected Pharmaceutical Supply Chain Participant. The withdrawal of any Member releases the remaining Committee Members from the restrictions and obligations in this Section.

5. The obligations in this Section shall not affect any Party's right to proceed with trial or, within 30 days of the date upon which a trial involving that Party's claims against a specific Pharmaceutical Supply Chain Participant is scheduled to begin, reach a case specific resolution with that particular Pharmaceutical Supply Chain Participant.

**F. Amendments**

The Parties agree to make such amendments as necessary to implement the intent of this agreement.

### Acknowledgment of Agreement

We, the undersigned, have participated in the drafting of the above Texas Term Sheet, including consideration based on comments solicited from Political Subdivisions. This document has been collaboratively drafted to maintain all individual claims while allowing the State and its Political Subdivisions to cooperate in exploring all possible means of resolution. Nothing in this agreement binds any party to any specific outcome. Any resolution under this document will require

acceptance by the State of Texas and a majority of the Litigating Political Subdivisions.

We, the undersigned, hereby accept the STATE OF TEXAS AND TEXAS POLITICAL SUBDIVISIONS' OPIOID ABATEMENT FUND COUNCIL AND SETTLEMENT ALLOCATION TERM SHEET. We understand that the purpose of this Texas Term Sheet is to permit collaboration between the State of Texas and Political Subdivisions to explore and potentially effectuate earlier resolution of the Opioid Litigation against Pharmaceutical Supply Chain Participants. We also understand that an additional purpose is to create an effective means of distributing any potential settlement funds obtained under this Texas Term Sheet between the State of Texas and Political Subdivisions in a manner and means that would promote an effective and meaningful use of the funds in abating the opioid epidemic throughout Texas.

Executed this __13__ day of May, 2020.

**FOR THE STATE OF TEXAS:**

**KENNETH PAXTON, JR.**
**ATTORNEY GENERAL**

**FOR THE SUBDIVISIONS**
**AND TEXAS MDL PSC:**

**MIKAL WATTS**
**WATTS GUERRA LLP**

**JEFFREY SIMON**
**SIMON GREENSTONE PANATIER, PC**

**DARA HEGAR**
**LANIER LAW FIRM, PC**

**DAN DOWNEY**
**DAN DOWNEY, PC**

:sas

# EXHIBIT A

## Opioid Abatement Fund (Texas) Settlement

## Opioid Council

As part of the settlement agreement and upon its execution, the parties will form the Texas Opioid Council (Council) to establish the framework that ensures the funds recovered by Texas (through the joint actions of the Attorney General and the state's political subdivisions) are allocated fairly and spent to remediate the opioid crisis in Texas, using efficient and cost-effective methods that are directed to the hardest hit regions in Texas while also ensuring that all Texans benefit from prevention and recovery efforts.

## I.     Structure

The Council will be responsible for the processes and procedures governing the spending of the funds held in the Texas Abatement Fund, which will be approximately 70% of all funds obtained through settlement and/or litigation of the claims asserted by the State and its subdivisions in the investigations and litigation related to the manufacturing, marketing, distribution, and sale of opioids and related pharmaceuticals.

Money paid into the abatement fund will be held by an independent administrator, who shall be responsible for the ministerial task of releasing funds solely as authorized below by the Council, and accounting for all payments to and from the fund.

The Council will be formed when a court of competent jurisdiction enters an order settling the matter, including any order of a bankruptcy court. The Council's members must be appointed within sixty (60) days of the date the order is entered.

### A. Membership

The Council shall be comprised of the following thirteen (13) members:

1. *Statewide Members.*

Six members appointed by the Governor and Attorney General to represent the State's interest in opioid abatement. The statewide members are appointed as follows:

    a. The Governor shall appoint three (3) members who are licensed health professionals with significant experience in opioid interventions;

    b. The Attorney General shall appoint three (3) members who are licensed professionals with significant experience in opioid incidences; and

    c. The Governor will appoint the Chair of the Council as a non-voting member. The Chair may only cast a vote in the event there is a tie of the membership.

2. *Regional Members.*

Six (6) members appointed by the State's political subdivisions to represent their designated Texas Health and Human Services Commission "HHSC" Regional Healthcare

1

Partnership (Regions) to ensure dedicated regional, urban, and rural representation on the Council. The regional appointees must be from either academia or the medical profession with significant experience in opioid interventions. The regional members are appointed as follows:

    a.  One member representing Regions 9 and 10 (Dallas Ft-Worth);
    b.  One member representing Region 3 (Houston);
    c.  One member representing Regions 11, 12, 13, 14, 15, 19 (West Texas);
    d.  One member representing Regions 6, 7, 8, 16 (Austin-San Antonio);
    e.  One member representing Regions 1, 2, 17, 18 (East Texas); and
    f.  One member representing Regions 4, 5, 20 (South Texas).

B.  Terms

All members of the Council are appointed to serve staggered two-year terms, with the terms of members expiring February 1 of each year. A member may serve no more than two consecutive terms, for a total of four consecutive years. For the first term, four (4) members (two (2) statewide and two (2) for the subdivisions) will serve a three-year term. A vacancy on the Council shall be filled for the unexpired term in the same manner as the original appointment. The Governor will appoint the Chair of the Council who will not vote on Council business unless there is a tie vote, and the subdivisions will appoint a Vice-Chair voting member from one of the regional members.

C.  Governance

*1. Administration*

The Council is attached administratively to the Comptroller. The Council is an independent, quasi-governmental agency because it is responsible for the statewide distribution of the abatement settlement funds. The Council is exempt from the following statutes:

    a.  Chapter 316 of the Government Code (Appropriations);
    b.  Chapter 322 of the Government Code (Legislative Budget Board);
    c.  Chapter 325 of the Government Code (Sunset);
    d.  Chapter 783 of the Government Code (Uniform Grants and Contract Management);
    e.  Chapter 2001 of the Government Code (Administrative Procedure);
    f.  Chapter 2052 of the Government Code (State Agency Reports and Publications);
    g.  Chapter 2261 of the Government Code (State Contracting Standards and Oversight);
    h.  Chapter 2262 of the Government Code (Statewide Contract Management);

2

     i.  Chapter 262 of the Local Government Code (Purchasing and Contracting Authority of Counties); and

    j.  Chapter 271 of the Local Government Code (Purchasing and Contracting Authority of Municipalities, Counties, and Certain Other Local Governments).

### 2. *Transparency*

The Council will abide by state laws relating to open meetings and public information, including Chapters 551 and 552 of the Texas Government Code.

    i.  The Council shall hold at least four regular meetings each year. The Council may hold additional meetings on the request of the Chair or on the written request of three members of the council. All meetings shall be open to the public, and public notice of meetings shall be given as required by state law.

    ii.  The Council may convene in a closed, non-public meeting:

        a.  If the Commission must discuss:

            1.  Negotiation of contract awards; and

            2.  Matters specifically exempted from disclosure by federal and state statutes.

        b.  All minutes and documents of a closed meeting shall remain under seal, subject to release only order of a court of competent jurisdiction.

### 3. *Authority*

The Council does not have rulemaking authority. The terms of each Judgment, Master Settlement Agreement, or any Bankruptcy Settlement for Texas control the authority of the Council and the Council may not stray outside the bounds of the authority and power vested by such settlements. Should the Council require legal assistance in determining their authority, the Council may direct the executive director to seek legal advice from the Attorney General to clarify the issue.

### D. Operation and Expenses

The independent administrator will set aside up to one (1) percent of the settlement funds for the administration of the Council for reasonable costs and expenses of operating the foregoing duties, including educational activities.

### 1. *Executive Director*

The Comptroller will employ the executive director of the Council and other personnel as necessary to administer the duties of the Council and carry out the functions of the Council. The executive director must have at least 10 years of experience in government or public administration and is classified as a Director V/B30 under the State Auditor's State Classification. The Comptroller will pay the salaries of the Council employees from the

one (1) percent of the settlement funds set aside for the administration of the Council. The Comptroller will request funds from the Texas Abatement Fund Point of Contact.

### 2. *Travel Reimbursement*

A person appointed to the Council is entitled to reimbursement for the travel expenses incurred in attending Council duties. A member of the Council may be reimbursed for actual expenses for meals, lodging, transportation, and incidental expenses in accordance with travel rates set by the federal General Services Administration.

## II. Duties/Roles

It is the duty of the Council to determine and approve the opioid abatement strategies and funding awards.

### A. Approved Abatement Strategies

The Council will develop the approved Texas list of abatement strategies based on but not limited to the existing national list of opioid abatement strategies (see attached Appendix A) for implementing the Texas Abatement Fund.

1. The Council shall only approve strategies which are evidence-informed strategies.
2. The Texas list of abatement strategies must be approved by majority vote. The majority vote must include a majority from both sides of the statewide members and regional members in order to be approved, e.g., at least four (4) of six (6) members on each side.

### B. Texas Abatement Fund Point of Contact

The Council will determine a single point of contact called the Abatement Fund Point of Contact (POC) to be established as the sole entity authorized to receive requests for funds and approve expenditures in Texas and order the release of funds from the Texas Abatement Fund by the independent administrator. The POC may be an independent third party selected by the Council with expertise in banking or financial management. The POC will manage the Opioid Council Bank Account (Account). Upon a vote, the Council will direct the POC to contact the independent administrator to release funds to the Account. The Account is outside the State Treasury and not managed by any state or local officials. The POC is responsible for payments to the qualified entities selected by the Council for abatement fund awards. The POC will submit a monthly financial statement on the Account to the Council.

### C. Auditor

An independent auditor appointed by the Council will perform an audit on the Account on an annual basis and report its findings, if any, to the Council.

### D. Funding Allocation

The Council is the sole decision-maker on the funding allocation process of the abatement funds. The Council will develop the application and award process based on the parameters outlined below. An entity seeking funds from the Council must apply for funds; no funds will be awarded without an application. The executive director and personnel may assist the Council in gathering and compiling the applications for consideration; however, the Council members are the sole decision-makers of awards and funding determination. The Council will use the following processes to award funds:

1. *Statewide Funds*. The Council will consider, adopt and approve the allocation methodology attached as Exhibit C, based upon population health data and prevalence of opioid incidences, at the Council's initial meeting. Adoption of such methodology will allow each Region to customize the approved abatement strategies to fit its communities' needs. The statewide regional funds will account for seventy-five (75) percent of the total overall funds, less the one (1) percent administrative expense described herein.

2. *Targeted Funds*. Each Region shall reserve twenty-five (25) percent of the overall funds, for targeted interventions in the specific Region as identified by opioid incidence data. The Council must approve on an annual basis the uses for the targeted abatement strategies and applications available to every Region, including education and outreach programs. Each Region without approved uses for the targeted funds from the Council, based upon a greater percentage of opioid incidents compared to its population, is subject to transfer of all or a portion of the targeted funds for that Region for uses based upon all Regions' targeted funding needs as approved by the Council on an annual basis.

3. *Annual Allocation*. Statewide regional funds and targeted funds will be allocated on an annual basis. If a Region lapses its funds, the funds will be reallocated based on all Regions' funding needs.

E. Appeal Process

The Council will establish an appeal process to permit the applicants for funding (state or subdivisions) to challenge decisions by the Council-designated point of contact on requests for funds or expenditures.

1. To challenge a decision by the designated point of contact, the State or a subdivision must file an appeal with the Council within thirty (30) days of the decision. The Council then has thirty (30) days to consider and rule on the appeal.
2. If the Council denies the appeal, the party may file an appeal with the state district court of record where the final opioid judgment or Master Settlement Agreement is filed. The Texas Rules of Civil Procedure and Rules of Evidence will govern these proceedings. The Council may request representation from the Attorney General in these proceedings.

In making its determination, the state district court shall apply the same clear error standards contained herein that the Council must follow when rendering its decision.

3. The state district court will make the final decision and the decision is not appealable.
4. Challenges will be limited and subject to penalty if abused.
5. Attorneys' fees and costs are not recoverable in these appeals.


F. Education

The Council may determine that a percentage of the funds in the Abatement Fund from the targeted funds be used to develop an education and outreach program to provide materials on the consequences of opioid drug use, prevention and interventions. Any material developed will include online resources and toolkits for communities.

# APPENDIX A

# OPIOID ABATEMENT STRATEGIES

| PART ONE:  TREATMENT |
| --- |

**A.  TREAT OPIOID USE DISORDER (OUD)**

1. Expand availability of treatment for Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) issues, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse services that include the full American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH issues, including but not limited to:

   a. Medication-Assisted Treatment (MAT);

   b. Recruiting MAT Providers and Training;

   c. Abstinence-based treatment;

   d. Treatment, recovery, or other services provided by states, subdivisions, community health centers; non-for-profit providers; or for-profit providers; or

   e. Treatment by providers that focus on OUD treatment as well as treatment by providers that offer OUD treatment along with treatment for other SUD/MH issues;

   f. Recovery high schools

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH issues, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. "Support the establishment of the hub-and-spoke model of OUD treatment in all counties where possible, and across county lines where necessary."

5. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-informed, promising, or emerging practices such as adequate methadone dosing.

6. Support mobile intervention, treatment, and recovery services, offered by qualified professionals, for persons with OUD and any co-occurring SUD/MH issues or persons who have experienced an opioid overdose.

1

7. Treatment of mental health trauma issues resulting from the traumatic experiences of the opioid user (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such mental health trauma.

8. Support detoxification (detox) services for persons with OUD and any co-occurring SUD/MH issues, including medical detox, referral to treatment, or connections to other services or supports.

9. Training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists.

10. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH issues.

11. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

12. Scholarships and supports for certified addiction counselors and other mental and behavioral health providers involved in addressing OUD any co-occurring SUD/MH issues, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

13. Provide training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

16. Support State or local learning collaboratives so that physicians involved in the care and treatment of those with OUD are kept abreast of the latest developments in evidence-based treatment.

17. Support State or local drop-in centers where those with OUD may go to seek assistance with recovery when they are ready to begin the process.

18. Support creation of teams in hospitals and emergency rooms to work with those with OUD and direct them to appropriate facilities for evidence-based treatment of OUD, including MAT.

**B. SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

1. Provide the full continuum of care of recovery services for OUD and any co-occurring SUD/MH issues, including supportive housing, residential treatment, medical detox services, peer support services and counseling, community navigators, case management, and connections to community-based services.

2. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH issues.

3. Provide access to housing for people with OUD and any co-occurring SUD/MH issues, including supportive housing, housing assistance programs, or training for housing providers.

4. Provide community support services to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH issues

5. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH issues.

6. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH issues.

7. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH issues.

8. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

9. Engage non-profits, the faith community, and community coalitions to support people in treatment and recovery and to support family members in their efforts to manage the opioid user in the family.

10. Training and development of procedures for government staff to appropriately interact and provide social and other services to current and recovering opioid users, including reducing stigma.

11. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

3

## C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs and appropriate training for all health care providers  to identify those with potential problems in order to reduce the transition from use to disorders.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

6. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH issues, or persons who have experienced an opioid overdose, into community treatment or recovery services through a bridge clinic or similar approach.

7. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH issues or persons that have experienced an opioid overdose.

8. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

9. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH issues or to persons who have experienced an opioid overdose.

10. Provide funding for peer navigators, recovery coaches, care coordinators, or care managers that offer assistance to persons with OUD and any co-occurring SUD/MH issues or to persons who have experienced on opioid overdose.

11. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

12. Develop and support best practices on addressing OUD in the workplace.

13. Support assistance programs for health care providers with OUD.

14. Engage non-profits and the faith community as a system to support outreach for treatment.

15. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH issues.

16. Develop or support a National Treatment Availability Clearinghouse – a multistate/nationally accessible database whereby health care providers can list locations for currently available in-patient and out-patient OUD treatment services that are accessible on a real-time basis by persons who seek treatment.

**D.  ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS AND RURAL COUNTY UNATTENDED DEATHS**

1. Address the needs of persons with OUD and any co-occurring SUD/MH issues who are involved or are at risk of becoming involved in the criminal justice system.

2. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH issues, including established strategies such as:

   a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   c. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model; or

   e. Officer intervention strategies.

3. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH issues to evidence-informed treatment, including MAT, and related services.

4. Implementing or supporting pilot programs for the voluntary testing of individuals who enter local (city or county) criminal justice facilities, and for those identified with OUD, offer induction of evidence-based treatment, including MAT.

5. Support treatment and recovery courts for persons with OUD and any co-occurring SUD/MH issues, but only if they provide referrals to evidence-informed treatment, including MAT.

6. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH issues who are incarcerated in jail or prison.

7. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH issues who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

8. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

9. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH issues to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section;

10. Provide training to Justices of the Peace on unattended deaths involving drug use and reimbursement of transfer to and costs or expenses of a Medical Examiner to enhance better death understanding, statistics and recording on overdose involved deaths.

E. **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

1. Support evidence-informed, promising, or emerging treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH issues.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs and training for all health care providers to identify women with potential opioid

6

use disorder so that they might be given the option of referral to a proper treatment program.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH issues.

4. Other measures to address Neonatal Abstinence Syndrome, including prevention, education, and treatment of OUD and any co-occurring SUD/MH issues.

5. Provide training to health care providers that work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family support for parenting women with OUD and any co-occurring SUD/MH issues.

7. Enhanced family supports and childcare services for parents with OUD and any co-occurring SUD/MH issues.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH issues, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

11. Provision of education and psychosocial support services to children born with Neonatal Abstinence Syndrome.

12. Support family and baby reunification in recovery housing.

---

## PART TWO:  PREVENTION

---

**F.  PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

1.  Training and continuing education of health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

2.  Academic counter-detailing to educate prescribers on appropriate opioid prescribing.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    a.  Increase the number of prescribers using PDMPs;

    b.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    c.  Enable states to use PDMP data in support of surveillance or intervention strategies.

6.  Development and Implementation of a national PDMP—Fund development of a multistate/national PDMP that permits information sharing while providing appropriate safeguards on sharing of private health information, including but not limited to:

    a.  Integration of PDMP data with electronic health records, overdose episodes, and decision support tools for health care providers relating to OUD.

    b.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database.

7.  Increase electronic prescribing to prevent diversion or forgery

8.  Educate Dispensers on appropriate opioid dispensing.

9.  Develop and train physicians on algorithm for proper evidence-based pain management.

8

10.     Fund State or local hotline so health care providers with questions regarding proper pain management or opioid prescribing can call and have an expert answer their questions.

11. Support for health information systems consistent with State regulations.

## G. PREVENT MISUSE OF OPIOIDS

1.  Corrective advertising or affirmative public education campaigns.

2.  Public education relating to drug disposal.

3.  Drug take-back disposal or destruction programs.

4.  Fund community anti-drug coalitions that engage in drug prevention efforts.

5.  Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction — including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

6.  Engage non-profits and faith community as a system to support prevention.

7.  School and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

8.  School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

9.  Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

10. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

11. Support local law enforcement task forces aimed at disrupting and eliminating the manufacturers and distributers of illegal opioids.

## H. PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

9

1.  Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, opioid users, families and friends of opioid users, schools, community navigators and outreach workers, drug offenders upon release from jail/prison, or other members of the general public.

2.  Public health entities provide free naloxone and training to anyone in the community.

3.  Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, and other members of the general public.

4.  Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.  Public education relating to emergency responses to overdoses.

7.  Public education relating to immunity and Good Samaritan laws.

8.  Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.  Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH issues.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH issues.

10

---

**PART THREE:  OTHER STRATEGIES**

---

I. **FIRST RESPONDERS**

1. Law enforcement expenditures relating to the opioid epidemic.

2. Educate first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

J. **LEADERSHIP, PLANNING AND COORDINATION**

1. Community regional planning to identify goals for reducing harms related to the opioid epidemic, to identify areas and populations with the greatest needs for treatment intervention services, or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A government dashboard to track key opioid-related indicators and supports as identified through collaborative community processes.

3. Invest in infrastructure or staffing at government and not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH issues, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

K. **TRAINING**

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH issues, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.);

3. Medical Provider education;

4. Media Campaigns

L. **RESEARCH**

11

1. Support opioid abatement research, including but not limited to:

    a. Monitoring, surveillance, and evaluation of programs and strategies described in this opioid abatement strategy list.

    b. Research non-opioid treatment of chronic pain.

    c. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

    d. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

    e. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

    f. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

    g. Research on expanded modalities such as prescription methadone that can expand access to MAT;

    h. Research on the effectiveness of Recovery High Schools and other educational interventions;

    i. Research to track abatement progress in urban and rural areas.

## M. MISCELLANEOUS

1. It is the intent of the Parties to the Texas Term Sheet in adopting the Abatement Strategies herein that the Council be guided by the allocation methodology in Exhibit C to the Texas Term Sheet in approving Regional strategies and that the Council consider the proportional share of the individual members in each Region when allocating the funds for approved abatement strategies within each Region.

2. It is the intent of the Parties to the Texas Term Sheet in adopting the Abatement Strategies herein that the Opioid Council have the flexibility to add, change or alter the Abatement Strategies herein as necessary to fulfill the intent that opioid abatement strategies best meet the needs of the Regions, subdivisions and intent of this document.

12

# EXHIBIT B

Exhibit B: Municipal Area Allocations: 15% of Total ($150 million)
(County numbers refer to distribution to the county governments after payment to cities within
county borders has been made. Minimum distribution to each county is $1000.)

| Municipal Area | Allocation | Municipal Area | Allocation |
|---|---|---|---|
| Abbott | $688 | Lakeport | $463 |
| Abernathy | $110 | Lakeside | $4,474 |
| Abilene | $563,818 | Lakeside City | $222 |
| Ackerly | $21 | Lakeview | $427 |
| Addison | $58,094 | Lakeway | $31,657 |
| Adrian | $181 | Lakewood Village | $557 |
| Agua Dulce | $43 | Lamar County | $141,598 |
| Alamo | $22,121 | Lamb County | $50,681 |
| Alamo Heights | $28,198 | Lamesa | $29,656 |
| Alba | $3,196 | Lampasas | $28,211 |
| Albany | $180 | Lampasas County | $42,818 |
| Aledo | $331 | Lancaster | $90,653 |
| Alice | $71,291 | Laredo | $763,174 |
| Allen | $315,081 | Latexo | $124 |
| Alma | $1,107 | Lavaca County | $45,973 |
| Alpine | $29,686 | Lavon | $7,435 |
| Alto | $3,767 | Lawn | $58 |
| Alton | $11,540 | League City | $302,418 |
| Alvarado | $29,029 | Leakey | $256 |
| Alvin | $113,962 | Leander | $88,641 |
| Alvord | $358 | Leary | $797 |
| Amarillo | $987,661 | Lee County | $30,457 |
| Ames | $5,571 | Lefors | $159 |
| Amherst | $22 | Leon County | $67,393 |
| Anahuac | $542 | Leon Valley | $23,258 |
| Anderson | $19 | Leona | $883 |
| Anderson County | $268,763 | Leonard | $8,505 |
| Andrews | $18,983 | Leroy | $176 |
| Andrews County | $37,606 | Levelland | $46,848 |
| Angelina County | $229,956 | Lewisville | $382,094 |
| Angleton | $62,791 | Lexington | $2,318 |
| Angus | $331 | Liberty | $72,343 |
| Anna | $9,075 | Liberty County | $531,212 |
| Annetta | $5,956 | Liberty Hill | $2,780 |
| Annetta North | $34 | Limestone County | $135,684 |

(Table continues on multiple pages below)

| | | | |
|---|---|---|---|
| Annetta South | $602 | Lincoln Park | $677 |
| Annona | $738 | Lindale | $24,202 |
| Anson | $5,134 | Linden | $3,661 |
| Anthony | $4,514 | Lindsay | $1,228 |
| Anton | $444 | Lipan | $44 |
| Appleby | $1,551 | Lipscomb County | $10,132 |
| Aquilla | $208 | Little Elm | $69,326 |
| Aransas County | $266,512 | Little River-Academy | $798 |
| Aransas Pass | $57,813 | Littlefield | $7,678 |
| Archer City | $10,554 | Live Oak | $32,740 |
| Archer County | $45,534 | Live Oak County | $39,716 |
| Arcola | $7,290 | Liverpool | $1,435 |
| Argyle | $11,406 | Livingston | $73,165 |
| Arlington | $735,803 | Llano | $23,121 |
| Armstrong County | $974 | Llano County | $115,647 |
| Arp | $2,009 | Lockhart | $49,050 |
| Asherton | $112 | Lockney | $3,301 |
| Aspermont | $9 | Log Cabin | $1,960 |
| Atascosa County | $176,903 | Lometa | $1,176 |
| Athens | $105,942 | Lone Oak | $1,705 |
| Atlanta | $30,995 | Lone Star | $8,283 |
| Aubrey | $15,141 | Longview | $482,254 |
| Aurora | $1,849 | Loraine | $188 |
| Austin County | $76,030 | Lorena | $3,390 |
| Austin | $4,877,716 | Lorenzo | $11,358 |
| Austwell | $109 | Los Fresnos | $11,185 |
| Avery | $138 | Los Indios | $159 |
| Avinger | $1,115 | Los Ybanez | $0 |
| Azle | $32,213 | Lott | $1,516 |
| Bailey | $950 | Lovelady | $249 |
| Bailey County | $15,377 | Loving County | $1,000 |
| Bailey's Prairie | $5,604 | Lowry Crossing | $783 |
| Baird | $2,802 | Lubbock | $319,867 |
| Balch Springs | $27,358 | Lubbock County | $1,379,719 |
| Balcones Heights | $23,811 | Lucas | $5,266 |
| Ballinger | $9,172 | Lueders | $508 |
| Balmorhea | $63 | Lufkin | $281,592 |
| Bandera | $2,893 | Luling | $29,421 |
| Bandera County | $86,815 | Lumberton | $36,609 |
| Bangs | $3,050 | Lyford | $3,071 |

| | | | |
|---|---|---|---|
| Bardwell | $362 | Lynn County | $6,275 |
| Barry | $200 | Lytle | $7,223 |
| Barstow | $61 | Mabank | $19,443 |
| Bartlett | $3,374 | Madison County | $49,492 |
| Bartonville | $8,887 | Madisonville | $11,458 |
| Bastrop | $46,320 | Magnolia | $26,031 |
| Bastrop County | $343,960 | Malakoff | $12,614 |
| Bay City | $57,912 | Malone | $439 |
| Baylor County | $29,832 | Manor | $12,499 |
| Bayou Vista | $6,240 | Mansfield | $150,788 |
| Bayside | $242 | Manvel | $12,305 |
| Baytown | $216,066 | Marble Falls | $37,039 |
| Bayview | $41 | Marfa | $65 |
| Beach City | $12,505 | Marietta | $338 |
| Bear Creek | $906 | Marion | $275 |
| Beasley | $130 | Marion County | $54,728 |
| Beaumont | $683,010 | Marlin | $21,634 |
| Beckville | $1,247 | Marquez | $1,322 |
| Bedford | $94,314 | Marshall | $108,371 |
| Bedias | $3,475 | Mart | $928 |
| Bee Cave | $12,863 | Martin County | $10,862 |
| Bee County | $97,844 | Martindale | $2,437 |
| Beeville | $24,027 | Mason | $777 |
| Bell County | $650,748 | Mason County | $3,134 |
| Bellaire | $41,264 | Matador | $1,203 |
| Bellevue | $56 | Matagorda County | $135,239 |
| Bellmead | $14,487 | Mathis | $15,720 |
| Bells | $1,891 | Maud | $423 |
| Bellville | $7,488 | Maverick County | $115,919 |
| Belton | $72,680 | Maypearl | $986 |
| Benavides | $152 | McAllen | $364,424 |
| Benbrook | $43,919 | McCamey | $542 |
| Benjamin | $951 | McGregor | $9,155 |
| Berryville | $14,379 | McKinney | $450,383 |
| Bertram | $182 | McLean | $14 |
| Beverly Hills | $4,336 | McLendon-Chisholm | $411 |
| Bevil Oaks | $549 | Mcculloch County | $20,021 |
| Bexar County | $7,007,152 | Mclennan County | $529,641 |
| Big Lake | $547 | Mcmullen County | $1,000 |
| Big Sandy | $4,579 | Meadow | $1,121 |

| | | | |
|---|---|---|---|
| Big Spring | $189,928 | Meadowlakes | $905 |
| Big Wells | $236 | Meadows Place | $18,148 |
| Bishop | $8,213 | Medina County | $48,355 |
| Bishop Hills | $323 | Megargel | $611 |
| Blackwell | $31 | Melissa | $15,381 |
| Blanco | $6,191 | Melvin | $345 |
| Blanco County | $49,223 | Memphis | $7,203 |
| Blanket | $147 | Menard | $991 |
| Bloomburg | $1,010 | Menard County | $14,717 |
| Blooming Grove | $352 | Mercedes | $21,441 |
| Blossom | $198 | Meridian | $3,546 |
| Blue Mound | $2,888 | Merkel | $10,117 |
| Blue Ridge | $1,345 | Mertens | $239 |
| Blum | $1,622 | Mertzon | $29 |
| Boerne | $45,576 | Mesquite | $310,709 |
| Bogata | $3,649 | Mexia | $21,096 |
| Bonham | $100,909 | Miami | $455 |
| Bonney | $2,510 | Midland County | $279,927 |
| Booker | $1,036 | Midland | $521,849 |
| Borden County | $1,000 | Midlothian | $95,799 |
| Borger | $69,680 | Midway | $78 |
| Bosque County | $71,073 | Milam County | $97,386 |
| Bovina | $173 | Milano | $904 |
| Bowie | $83,620 | Mildred | $286 |
| Bowie County | $233,190 | Miles | $93 |
| Boyd | $6,953 | Milford | $6,177 |
| Brackettville | $8 | Miller's Cove | $97 |
| Brady | $27,480 | Millican | $417 |
| Brazoria | $11,537 | Mills County | $19,931 |
| Brazoria County | $1,021,090 | Millsap | $34 |
| Brazos Bend | $462 | Mineola | $48,719 |
| Brazos Country | $902 | Mineral Wells | $92,061 |
| Brazos County | $342,087 | Mingus | $189 |
| Breckenridge | $23,976 | Mission | $124,768 |
| Bremond | $5,554 | Missouri City | $209,633 |
| Brenham | $54,750 | Mitchell County | $20,850 |
| Brewster County | $60,087 | Mobeetie | $52 |
| Briarcliff | $572 | Mobile City | $2,034 |
| Briaroaks | $57 | Monahans | $5,849 |
| Bridge City | $80,756 | Mont Belvieu | $19,669 |

| | | | |
|---|---|---|---|
| Bridgeport | $33,301 | Montague County | $94,796 |
| Briscoe County | $977 | Montgomery | $1,884 |
| Broaddus | $31 | Montgomery County | $2,700,911 |
| Bronte | $99 | Moody | $828 |
| Brooks County | $20,710 | Moore County | $40,627 |
| Brookshire | $6,406 | Moore Station | $772 |
| Brookside Village | $1,110 | Moran | $50 |
| Brown County | $193,417 | Morgan | $605 |
| Browndell | $152 | Morgan's Point | $3,105 |
| Brownfield | $14,452 | Morgan's Point Resort | $8,024 |
| Brownsboro | $3,176 | Morris County | $53,328 |
| Brownsville | $425,057 | Morton | $167 |
| Brownwood | $166,572 | Motley County | $3,344 |
| Bruceville-Eddy | $1,692 | Moulton | $999 |
| Bryan | $246,897 | Mount Calm | $605 |
| Bryson | $1,228 | Mount Enterprise | $1,832 |
| Buckholts | $1,113 | Mount Pleasant | $65,684 |
| Buda | $10,784 | Mount Vernon | $6,049 |
| Buffalo | $11,866 | Mountain City | $1,548 |
| Buffalo Gap | $88 | Muenster | $4,656 |
| Buffalo Springs | $188 | Muleshoe | $4,910 |
| Bullard | $7,487 | Mullin | $384 |
| Bulverde | $14,436 | Munday | $2,047 |
| Bunker Hill Village | $472 | Murchison | $2,302 |
| Burkburnett | $37,844 | Murphy | $51,893 |
| Burke | $1,114 | Mustang | $7 |
| Burleson County | $70,244 | Mustang Ridge | $2,462 |
| Burleson | $151,779 | Nacogdoches | $205,992 |
| Burnet | $33,345 | Nacogdoches County | $198,583 |
| Burnet County | $189,829 | Naples | $4,224 |
| Burton | $937 | Nash | $7,999 |
| Byers | $77 | Nassau Bay | $11,247 |
| Bynum | $380 | Natalia | $625 |
| Cactus | $4,779 | Navarro | $334 |
| Caddo Mills | $43 | Navarro County | $103,513 |
| Caldwell | $18,245 | Navasota | $37,676 |
| Caldwell County | $86,413 | Nazareth | $124 |
| Calhoun County | $127,926 | Nederland | $44,585 |
| Callahan County | $12,894 | Needville | $10,341 |
| Callisburg | $101 | Nevada | $237 |

| | | | |
|---|---|---|---|
| Calvert | $772 | New Berlin | $4 |
| Cameron | $11,091 | New Boston | $6,953 |
| Cameron County | $537,026 | New Braunfels | $307,313 |
| Camp County | $28,851 | New Chapel Hill | $288 |
| Camp Wood | $422 | New Deal | $338 |
| Campbell | $1,116 | New Fairview | $2,334 |
| Canadian | $1,090 | New Home | $9 |
| Caney City | $2,005 | New Hope | $1,024 |
| Canton | $56,734 | New London | $4,129 |
| Canyon | $26,251 | New Summerfield | $442 |
| Carbon | $620 | New Waverly | $2,562 |
| Carl's Corner | $48 | Newark | $520 |
| Carmine | $385 | Newcastle | $914 |
| Carrizo Springs | $1,671 | Newton | $6,102 |
| Carrollton | $310,255 | Newton County | $158,006 |
| Carson County | $29,493 | Neylandville | $163 |
| Carthage | $18,927 | Niederwald | $16 |
| Cashion Community | $322 | Nixon | $2,283 |
| Cass County | $93,155 | Nocona | $16,536 |
| Castle Hills | $12,780 | Nolan County | $50,262 |
| Castro County | $4,420 | Nolanville | $4,247 |
| Castroville | $4,525 | Nome | $391 |
| Cedar Hill | $70,127 | Noonday | $226 |
| Cedar Park | $185,567 | Nordheim | $697 |
| Celeste | $1,280 | Normangee | $6,192 |
| Celina | $18,283 | North Cleveland | $105 |
| Center | $58,838 | North Richland Hills | $146,419 |
| Centerville | $385 | Northlake | $8,905 |
| Chambers County | $153,188 | Novice | $76 |
| Chandler | $17,364 | Nueces County | $1,367,932 |
| Channing | $2 | O'Brien | $76 |
| Charlotte | $4,257 | O'Donnell | $27 |
| Cherokee County | $156,612 | Oak Grove | $2,769 |
| Chester | $1,174 | Oak Leaf | $612 |
| Chico | $2,928 | Oak Point | $9,011 |
| Childress | $37,916 | Oak Ridge | $358 |
| Childress County | $50,582 | Oak Ridge North | $33,512 |
| Chillicothe | $172 | Oak Valley | $7 |
| China | $522 | Oakwood | $148 |
| China Grove | $598 | Ochiltree County | $15,476 |

| | | | |
|---|---|---|---|
| Chireno | $1,568 | Odem | $7,420 |
| Christine | $354 | Odessa | $559,163 |
| Cibolo | $13,690 | Oglesby | $29 |
| Cisco | $7,218 | Old River-Winfree | $21,653 |
| Clarendon | $114 | Oldham County | $10,318 |
| Clarksville | $20,891 | Olmos Park | $9,801 |
| Clarksville City | $54 | Olney | $6,088 |
| Claude | $26 | Olton | $1,197 |
| Clay County | $72,050 | Omaha | $4,185 |
| Clear Lake Shores | $6,682 | Onalaska | $31,654 |
| Cleburne | $228,184 | Opdyke West | $479 |
| Cleveland | $96,897 | Orange | $311,339 |
| Clifton | $9,939 | Orange County | $689,818 |
| Clint | $375 | Orange Grove | $1,677 |
| Clute | $51,350 | Orchard | $867 |
| Clyde | $17,287 | Ore City | $6,806 |
| Coahoma | $2,291 | Overton | $7,900 |
| Cochran County | $3,389 | Ovilla | $13,391 |
| Cockrell Hill | $512 | Oyster Creek | $9,633 |
| Coffee City | $1,087 | Paducah | $125 |
| Coke County | $5,522 | Paint Rock | $141 |
| Coldspring | $447 | Palacios | $14,036 |
| Coleman | $5,442 | Palestine | $178,009 |
| Coleman County | $4,164 | Palisades | $240 |
| College Station | $258,147 | Palm Valley | $1,918 |
| Colleyville | $46,049 | Palmer | $12,666 |
| Collin County | $1,266,721 | Palmhurst | $4,660 |
| Collingsworth County | $19,234 | Palmview | $7,577 |
| Collinsville | $1,831 | Palo Pinto County | $124,621 |
| Colmesneil | $2,211 | Pampa | $67,227 |
| Colorado City | $8,405 | Panhandle | $9,536 |
| Colorado County | $49,084 | Panola County | $80,699 |
| Columbus | $6,867 | Panorama Village | $1,292 |
| Comal County | $396,142 | Pantego | $12,898 |
| Comanche | $16,503 | Paradise | $52 |
| Comanche County | $50,964 | Paris | $201,180 |
| Combes | $1,710 | Parker | $10,307 |
| Combine | $1,892 | Parker County | $476,254 |
| Commerce | $33,869 | Parmer County | $15,866 |
| Como | $415 | Pasadena | $356,536 |

| | | | |
|---|---|---|---|
| Concho County | $3,859 | Pattison | $1,148 |
| Conroe | $466,671 | Patton Village | $9,268 |
| Converse | $27,693 | Payne Springs | $1,770 |
| Cooke County | $200,451 | Pearland | $333,752 |
| Cool | $731 | Pearsall | $11,570 |
| Coolidge | $243 | Pecan Gap | $719 |
| Cooper | $362 | Pecan Hill | $229 |
| Coppell | $86,593 | Pecos | $7,622 |
| Copper Canyon | $489 | Pecos County | $46,997 |
| Copperas Cove | $133,492 | Pelican Bay | $1,199 |
| Corinth | $75,298 | Penelope | $415 |
| Corpus Christi | $1,812,707 | Penitas | $312 |
| Corral City | $143 | Perryton | $23,364 |
| Corrigan | $21,318 | Petersburg | $1,691 |
| Corsicana | $87,310 | Petrolia | $17 |
| Coryell County | $123,659 | Petronila | $5 |
| Cottle County | $875 | Pflugerville | $86,408 |
| Cottonwood | $289 | Pharr | $144,721 |
| Cottonwood Shores | $1,203 | Pilot Point | $11,613 |
| Cotulla | $1,251 | Pine Forest | $3,894 |
| Coupland | $266 | Pine Island | $3,141 |
| Cove | $387 | Pinehurst | $32,671 |
| Covington | $519 | Pineland | $4,138 |
| Coyote Flats | $1,472 | Piney Point Village | $15,738 |
| Crandall | $12,094 | Pittsburg | $20,526 |
| Crane | $10,599 | Plains | $129 |
| Crane County | $26,146 | Plainview | $60,298 |
| Cranfills Gap | $128 | Plano | $1,151,608 |
| Crawford | $383 | Pleak | $270 |
| Creedmoor | $16 | Pleasant Valley | $308 |
| Cresson | $1,086 | Pleasanton | $29,011 |
| Crockett | $23,403 | Plum Grove | $258 |
| Crockett County | $18,210 | Point | $1,519 |
| Crosby County | $18,388 | Point Blank | $355 |
| Crosbyton | $1,498 | Point Comfort | $447 |
| Cross Plains | $4,877 | Point Venture | $588 |
| Cross Roads | $244 | Polk County | $370,831 |
| Cross Timber | $542 | Ponder | $1,282 |
| Crowell | $6,335 | Port Aransas | $31,022 |
| Crowley | $22,345 | Port Arthur | $367,945 |

| | | | |
|---|---|---|---|
| Crystal City | $19,412 | Port Isabel | $9,802 |
| Cuero | $24,689 | Port Lavaca | $11,752 |
| Culberson County | $789 | Port Neches | $38,849 |
| Cumby | $5,320 | Portland | $76,517 |
| Cuney | $606 | Post | $2,332 |
| Cushing | $1,120 | Post Oak Bend City | $1,034 |
| Cut and Shoot | $2,141 | Poteet | $6,767 |
| DISH | $19 | Poth | $3,974 |
| Daingerfield | $12,476 | Potter County | $371,701 |
| Daisetta | $5,370 | Pottsboro | $12,302 |
| Dalhart | $11,609 | Powell | $110 |
| Dallam County | $21,686 | Poynor | $1,180 |
| Dallas County | $8,538,291 | Prairie View | $7,600 |
| Dallas | $2,999,902 | Premont | $3,321 |
| Dalworthington Gardens | $6,060 | Presidio | $148 |
| Danbury | $4,231 | Presidio County | $787 |
| Darrouzett | $101 | Primera | $2,958 |
| Dawson | $600 | Princeton | $19,245 |
| Dawson County | $46,911 | Progreso | $8,072 |
| Dayton | $47,122 | Progreso Lakes | $39 |
| Dayton Lakes | $38 | Prosper | $22,770 |
| De Kalb | $1,035 | Providence Village | $508 |
| De Leon | $8,218 | Putnam | $14 |
| De Witt County | $68,895 | Pyote | $22 |
| DeCordova | $13,778 | Quanah | $207 |
| DeSoto | $72,400 | Queen City | $4,837 |
| Deaf Smith County | $34,532 | Quinlan | $7,304 |
| Dean | $141 | Quintana | $492 |
| Decatur | $56,669 | Quitaque | $8 |
| Deer Park | $49,388 | Quitman | $15,619 |
| Del Rio | $59,056 | Rains County | $53,190 |
| Dell City | $15 | Ralls | $3,967 |
| Delta County | $30,584 | Rancho Viejo | $3,836 |
| Denison | $210,426 | Randall County | $278,126 |
| Denton | $458,334 | Ranger | $12,186 |
| Denton County | $1,132,298 | Rankin | $1,613 |
| Denver City | $2,104 | Ransom Canyon | $930 |
| Deport | $42 | Ravenna | $685 |
| Detroit | $965 | Raymondville | $7,466 |
| Devers | $191 | Reagan County | $25,215 |

| | | | |
|---|---|---|---|
| Devine | $4,354 | Real County | $5,073 |
| Diboll | $25,533 | Red Lick | $23 |
| Dickens | $71 | Red Oak | $26,843 |
| Dickens County | $1,873 | Red River County | $29,306 |
| Dickinson | $83,683 | Redwater | $1,058 |
| Dilley | $2,633 | Reeves County | $103,350 |
| Dimmit County | $33,294 | Refugio | $8,839 |
| Dimmitt | $1,012 | Refugio County | $46,216 |
| Dodd City | $1,211 | Reklaw | $1,136 |
| Dodson | $447 | Reno | $3,791 |
| Domino | $196 | Reno | $11,164 |
| Donley County | $22,370 | Retreat | $52 |
| Donna | $13,798 | Rhome | $12,285 |
| Dorchester | $231 | Rice | $1,972 |
| Double Oak | $4,765 | Richardson | $260,315 |
| Douglassville | $574 | Richland | $210 |
| Dripping Springs | $811 | Richland Hills | $24,438 |
| Driscoll | $39 | Richland Springs | $2,234 |
| Dublin | $14,478 | Richmond | $77,606 |
| Dumas | $26,229 | Richwood | $12,112 |
| Duncanville | $58,328 | Riesel | $1,118 |
| Duval County | $49,109 | Rio Bravo | $8,548 |
| Eagle Lake | $4,882 | Rio Grande City | $25,947 |
| Eagle Pass | $56,005 | Rio Hondo | $3,550 |
| Early | $14,838 | Rio Vista | $4,419 |
| Earth | $242 | Rising Star | $1,933 |
| East Bernard | $5,554 | River Oaks | $11,917 |
| East Mountain | $2,494 | Riverside | $858 |
| East Tawakoni | $2,723 | Roanoke | $275 |
| Eastland | $15,896 | Roaring Springs | $461 |
| Eastland County | $52,275 | Robert Lee | $85 |
| Easton | $329 | Roberts County | $547 |
| Ector | $1,108 | Robertson County | $44,642 |
| Ector County | $480,000 | Robinson | $18,002 |
| Edcouch | $4,101 | Robstown | $40,154 |
| Eden | $497 | Roby | $428 |
| Edgecliff Village | $2,232 | Rochester | $674 |
| Edgewood | $13,154 | Rockdale | $20,973 |
| Edinburg | $120,884 | Rockport | $54,253 |
| Edmonson | $136 | Rocksprings | $25 |

| | | | |
|---|---|---|---|
| Edna | $18,194 | Rockwall | $114,308 |
| Edom | $2,149 | Rockwall County | $168,820 |
| Edwards County | $975 | Rocky Mound | $280 |
| El Campo | $31,700 | Rogers | $3,818 |
| El Cenizo | $621 | Rollingwood | $4,754 |
| El Lago | $5,604 | Roma | $16,629 |
| El Paso | $1,224,371 | Roman Forest | $8,610 |
| El Paso County | $2,592,121 | Ropesville | $2,122 |
| Eldorado | $50 | Roscoe | $778 |
| Electra | $15,716 | Rose City | $4,012 |
| Elgin | $26,284 | Rose Hill Acres | $2,311 |
| Elkhart | $301 | Rosebud | $1,489 |
| Ellis County | $315,372 | Rosenberg | $126,593 |
| Elmendorf | $746 | Ross | $147 |
| Elsa | $7,720 | Rosser | $549 |
| Emhouse | $83 | Rotan | $1,493 |
| Emory | $3,878 | Round Mountain | $454 |
| Enchanted Oaks | $1,299 | Round Rock | $475,992 |
| Encinal | $1,515 | Round Top | $140 |
| Ennis | $81,839 | Rowlett | $99,963 |
| Erath County | $102,616 | Roxton | $47 |
| Escobares | $40 | Royse City | $23,494 |
| Estelline | $909 | Rule | $800 |
| Euless | $92,824 | Runaway Bay | $6,931 |
| Eureka | $334 | Runge | $255 |
| Eustace | $2,089 | Runnels County | $33,831 |
| Evant | $2,068 | Rusk | $17,991 |
| Everman | $7,692 | Rusk County | $151,390 |
| Fair Oaks Ranch | $8,077 | Sabinal | $1,811 |
| Fairchilds | $81 | Sabine County | $46,479 |
| Fairfield | $1,245 | Sachse | $23,400 |
| Fairview | $32,245 | Sadler | $925 |
| Falfurrias | $2,221 | Saginaw | $31,973 |
| Falls City | $41 | Salado | $3,210 |
| Falls County | $34,522 | San Angelo | $536,509 |
| Fannin County | $131,653 | San Antonio | $4,365,416 |
| Farmers Branch | $94,532 | San Augustine | $25,182 |
| Farmersville | $10,532 | San Augustine County | $37,854 |
| Farwell | $343 | San Benito | $40,015 |
| Fate | $3,473 | San Diego | $11,771 |

| | | | |
|---|---|---|---|
| Fayette County | $92,440 | San Elizario | $7,831 |
| Fayetteville | $391 | San Felipe | $1,498 |
| Ferris | $13,873 | San Jacinto County | $197,398 |
| Fisher County | $5,518 | San Juan | $28,845 |
| Flatonia | $5,661 | San Leanna | $36 |
| Florence | $3,949 | San Marcos | $325,688 |
| Floresville | $21,699 | San Patricio | $4,213 |
| Flower Mound | $215,256 | San Patricio County | $271,916 |
| Floyd County | $9,049 | San Perlita | $2,219 |
| Floydada | $6,357 | San Saba | $10,057 |
| Foard County | $5,764 | San Saba County | $17,562 |
| Follett | $212 | Sanctuary | $17 |
| Forest Hill | $26,132 | Sandy Oaks | $9,863 |
| Forney | $80,112 | Sandy Point | $1,637 |
| Forsan | $576 | Sanford | $308 |
| Fort Bend County | $1,506,719 | Sanger | $22,237 |
| Fort Stockton | $4,411 | Sansom Park | $223 |
| Fort Worth | $2,120,790 | Santa Anna | $329 |
| Franklin | $3,931 | Santa Clara | $87 |
| Franklin County | $25,783 | Santa Fe | $33,272 |
| Frankston | $274 | Santa Rosa | $2,138 |
| Fredericksburg | $56,486 | Savoy | $2,349 |
| Freeport | $72,973 | Schertz | $60,110 |
| Freer | $3,271 | Schleicher County | $5,695 |
| Freestone County | $50,495 | Schulenburg | $2,560 |
| Friendswood | $140,330 | Scotland | $148 |
| Frio County | $19,954 | Scottsville | $708 |
| Friona | $2,848 | Scurry | $1,110 |
| Frisco | $405,309 | Scurry County | $73,116 |
| Fritch | $4,548 | Seabrook | $30,270 |
| Frost | $321 | Seadrift | $991 |
| Fruitvale | $2,344 | Seagoville | $17,106 |
| Fulshear | $5,272 | Seagraves | $7,531 |
| Fulton | $1,602 | Sealy | $20,637 |
| Gaines County | $54,347 | Seguin | $376,538 |
| Gainesville | $153,980 | Selma | $22,429 |
| Galena Park | $13,093 | Seminole | $16,092 |
| Gallatin | $1,253 | Seven Oaks | $3,917 |
| Galveston | $488,187 | Seven Points | $7,452 |
| Galveston County | $1,124,093 | Seymour | $14,218 |

| | | | |
|---|---|---|---|
| Ganado | $5,510 | Shackelford County | $1,288 |
| Garden Ridge | $11,351 | Shady Shores | $594 |
| Garland | $420,244 | Shallowater | $1,907 |
| Garrett | $2,510 | Shamrock | $4,328 |
| Garrison | $3,555 | Shavano Park | $3,178 |
| Gary City | $450 | Shelby County | $109,925 |
| Garza County | $8,944 | Shenandoah | $47,122 |
| Gatesville | $26,994 | Shepherd | $147 |
| George West | $6,207 | Sherman | $330,585 |
| Georgetown | $225,896 | Sherman County | $7,930 |
| Gholson | $1,505 | Shiner | $4,042 |
| Giddings | $12,674 | Shoreacres | $958 |
| Gillespie County | $63,191 | Silsbee | $66,442 |
| Gilmer | $33,951 | Silverton | $14 |
| Gladewater | $24,638 | Simonton | $1,906 |
| Glasscock County | $1,000 | Sinton | $23,658 |
| Glen Rose | $540 | Skellytown | $400 |
| Glenn Heights | $16,593 | Slaton | $154 |
| Godley | $3,115 | Smiley | $655 |
| Goldsmith | $677 | Smith County | $758,961 |
| Goldthwaite | $1,225 | Smithville | $17,009 |
| Goliad | $3,563 | Smyer | $300 |
| Goliad County | $34,660 | Snook | $1,422 |
| Golinda | $100 | Snyder | $9,018 |
| Gonzales | $14,882 | Socorro | $11,125 |
| Gonzales County | $33,230 | Somerset | $1,527 |
| Goodlow | $221 | Somervell County | $57,076 |
| Goodrich | $9,643 | Somerville | $3,806 |
| Gordon | $365 | Sonora | $7,337 |
| Goree | $749 | Sour Lake | $17,856 |
| Gorman | $3,107 | South Houston | $25,620 |
| Graford | $23 | South Mountain | $154 |
| Graham | $235,428 | South Padre Island | $30,629 |
| Granbury | $71,735 | Southlake | $70,846 |
| Grand Prairie | $445,439 | Southmayd | $7,096 |
| Grand Saline | $36,413 | Southside Place | $885 |
| Grandfalls | $65 | Spearman | $14,000 |
| Grandview | $6,600 | Splendora | $7,756 |
| Granger | $2,741 | Spofford | $7 |
| Granite Shoals | $11,834 | Spring Valley Village | $16,404 |

| | | | |
|---|---|---|---|
| Granjeno | $43 | Springlake | $3 |
| Grapeland | $7,287 | Springtown | $14,244 |
| Grapevine | $129,195 | Spur | $427 |
| Gray County | $65,884 | St. Hedwig | $111 |
| Grays Prairie | $17 | St. Jo | $7,360 |
| Grayson County | $539,083 | St. Paul | $21 |
| Greenville | $203,112 | Stafford | $75,145 |
| Gregg County | $243,744 | Stagecoach | $3,036 |
| Gregory | $4,697 | Stamford | $398 |
| Grey Forest | $474 | Stanton | $3,838 |
| Grimes County | $94,878 | Staples | $19 |
| Groesbeck | $5,745 | Star Harbor | $151 |
| Groom | $965 | Starr County | $99,896 |
| Groves | $40,752 | Stephens County | $35,244 |
| Groveton | $8,827 | Stephenville | $83,472 |
| Gruver | $1,166 | Sterling City | $62 |
| Guadalupe County | $146,824 | Sterling County | $939 |
| Gun Barrel City | $36,302 | Stinnett | $4,097 |
| Gunter | $4,609 | Stockdale | $741 |
| Gustine | $34 | Stonewall County | $1,822 |
| Hackberry | $94 | Stratford | $8,378 |
| Hale Center | $6,042 | Strawn | $987 |
| Hale County | $79,150 | Streetman | $5 |
| Hall County | $8,933 | Sudan | $32 |
| Hallettsville | $6,895 | Sugar Land | $321,561 |
| Hallsburg | $272 | Sullivan City | $6,121 |
| Hallsville | $10,239 | Sulphur Springs | $124,603 |
| Haltom City | $71,800 | Sun Valley | $4 |
| Hamilton | $3,581 | Sundown | $2,592 |
| Hamilton County | $66,357 | Sunnyvale | $3,248 |
| Hamlin | $4,656 | Sunray | $2,571 |
| Hansford County | $16,416 | Sunrise Beach Village | $2,083 |
| Happy | $327 | Sunset Valley | $9,425 |
| Hardeman County | $15,219 | Surfside Beach | $6,530 |
| Hardin | $100 | Sutton County | $6,541 |
| Hardin County | $379,800 | Sweeny | $4,503 |
| Harker Heights | $113,681 | Sweetwater | $68,248 |
| Harlingen | $165,429 | Swisher County | $7,251 |
| Harris County | $14,966,202 | Taft | $5,861 |
| Harrison County | $185,910 | Tahoka | $430 |

| | | | |
|---|---|---|---|
| Hart | $86 | Talco | $372 |
| Hartley County | $786 | Talty | $9,124 |
| Haskell | $10,829 | Tarrant County | $6,171,159 |
| Haskell County | $22,011 | Tatum | $972 |
| Haslet | $1,908 | Taylor | $57,945 |
| Hawk Cove | $674 | Taylor County | $351,078 |
| Hawkins | $7,932 | Taylor Lake Village | $412 |
| Hawley | $931 | Taylor Landing | $153 |
| Hays | $506 | Teague | $1,714 |
| Hays County | $529,489 | Tehuacana | $12 |
| Hearne | $16,824 | Temple | $280,747 |
| Heath | $28,751 | Tenaha | $4,718 |
| Hebron | $687 | Terrell | $148,706 |
| Hedley | $70 | Terrell County | $5,737 |
| Hedwig Village | $13,067 | Terrell Hills | $9,858 |
| Helotes | $15,790 | Terry County | $25,423 |
| Hemphill | $8,035 | Texarkana | $192,094 |
| Hemphill County | $14,394 | Texas City | $298,702 |
| Hempstead | $21,240 | Texhoma | $156 |
| Henderson | $59,966 | Texline | $865 |
| Henderson County | $327,965 | The Colony | $114,297 |
| Henrietta | $2,720 | The Hills | $1,004 |
| Hereford | $20,423 | Thompsons | $1,897 |
| Hewitt | $19,776 | Thorndale | $1,595 |
| Hickory Creek | $16,510 | Thornton | $270 |
| Hico | $5,534 | Thorntonville | $87 |
| Hidalgo | $26,621 | Thrall | $825 |
| Hidalgo County | $1,253,103 | Three Rivers | $4,669 |
| Hideaway | $922 | Throckmorton | $29 |
| Higgins | $43 | Throckmorton County | $5,695 |
| Highland Haven | $320 | Tiki Island | $2,178 |
| Highland Park | $43,383 | Timbercreek Canyon | $369 |
| Highland Village | $50,315 | Timpson | $12,642 |
| Hill Country Village | $6,485 | Tioga | $2,390 |
| Hill County | $127,477 | Tira | $185 |
| Hillcrest | $5,345 | Titus County | $70,611 |
| Hillsboro | $46,609 | Toco | $4 |
| Hilshire Village | $859 | Todd Mission | $1,680 |
| Hitchcock | $28,796 | Tolar | $2,369 |
| Hockley County | $46,407 | Tom Bean | $2,293 |

| | | | |
|---|---|---|---|
| Holiday Lakes | $1,795 | Tom Green County | $282,427 |
| Holland | $77 | Tomball | $34,620 |
| Holliday | $5,910 | Tool | $14,787 |
| Hollywood Park | $9,424 | Toyah | $40 |
| Hondo | $115,288 | Travis County | $4,703,473 |
| Honey Grove | $7,196 | Trent | $63 |
| Hood County | $292,105 | Trenton | $3,089 |
| Hooks | $2,702 | Trinidad | $5,859 |
| Hopkins County | $149,518 | Trinity | $23,652 |
| Horizon City | $7,520 | Trinity County | $105,766 |
| Horseshoe Bay | $48,173 | Trophy Club | $29,370 |
| Houston County | $78,648 | Troup | $7,918 |
| Houston | $7,021,793 | Troy | $5,320 |
| Howard County | $89,330 | Tulia | $8,911 |
| Howardwick | $84 | Turkey | $737 |
| Howe | $9,177 | Tuscola | $138 |
| Hubbard | $3,635 | Tye | $1,766 |
| Hudson | $6,840 | Tyler | $723,829 |
| Hudson Oaks | $15,637 | Tyler County | $131,743 |
| Hudspeth County | $985 | Uhland | $1,545 |
| Hughes Springs | $4,442 | Uncertain | $185 |
| Humble | $73,952 | Union Grove | $994 |
| Hunt County | $309,851 | Union Valley | $666 |
| Hunters Creek Village | $14,708 | Universal City | $28,428 |
| Huntington | $8,792 | University Park | $50,833 |
| Huntsville | $80,373 | Upshur County | $128,300 |
| Hurst | $99,187 | Upton County | $8,499 |
| Hutchins | $9,551 | Uvalde | $18,439 |
| Hutchinson County | $74,630 | Uvalde County | $36,244 |
| Hutto | $38,346 | Val Verde County | $117,815 |
| Huxley | $738 | Valentine | $207 |
| Idalou | $1,999 | Valley Mills | $2,228 |
| Impact | $8 | Valley View | $1,824 |
| Indian Lake | $473 | Van | $6,206 |
| Industry | $604 | Van Alstyne | $43,749 |
| Ingleside on the Bay | $142 | Van Horn | $211 |
| Ingleside | $40,487 | Van Zandt County | $248,747 |
| Ingram | $5,243 | Vega | $974 |
| Iola | $3,164 | Venus | $9,792 |
| Iowa Colony | $4,090 | Vernon | $81,337 |

| | | | |
|---|---|---|---|
| Iowa Park | $23,487 | Victoria | $84,598 |
| Iraan | $56 | Victoria County | $520,886 |
| Iredell | $216 | Vidor | $95,620 |
| Irion County | $9,105 | Vinton | $622 |
| Irving | $427,818 | Volente | $333 |
| Italy | $5,349 | Von Ormy | $513 |
| Itasca | $8,694 | Waco | $512,007 |
| Ivanhoe | $26 | Waelder | $3,427 |
| Jacinto City | $14,141 | Wake Village | $174 |
| Jack County | $14,799 | Walker County | $184,624 |
| Jacksboro | $23,254 | Waller County | $126,206 |
| Jackson County | $37,984 | Waller | $11,295 |
| Jacksonville | $80,179 | Wallis | $2,698 |
| Jamaica Beach | $4,913 | Walnut Springs | $183 |
| Jarrell | $2,423 | Ward County | $67,920 |
| Jasper | $78,422 | Warren City | $66 |
| Jasper County | $248,855 | Washington County | $83,727 |
| Jayton | $63 | Waskom | $5,346 |
| Jeff Davis County | $8,500 | Watauga | $33,216 |
| Jefferson | $11,194 | Waxahachie | $152,094 |
| Jefferson County | $756,614 | Weatherford | $207,872 |
| Jersey Village | $36,347 | Webb County | $505,304 |
| Jewett | $9,338 | Webberville | $1,280 |
| Jim Hogg County | $12,718 | Webster | $53,202 |
| Jim Wells County | $166,539 | Weimar | $5,830 |
| Joaquin | $810 | Weinert | $234 |
| Johnson City | $3,581 | Weir | $443 |
| Johnson County | $408,692 | Wellington | $9,111 |
| Jolly | $26 | Wellman | $383 |
| Jones County | $22,001 | Wells | $1,357 |
| Jones Creek | $5,078 | Weslaco | $73,949 |
| Jonestown | $6,419 | West | $3,522 |
| Josephine | $881 | West Columbia | $17,958 |
| Joshua | $20,619 | West Lake Hills | $17,056 |
| Jourdanton | $9,600 | West Orange | $42,452 |
| Junction | $4,825 | West Tawakoni | $6,995 |
| Justin | $8,575 | West University Place | $34,672 |
| Karnes City | $11,632 | Westbrook | $43 |
| Karnes County | $35,249 | Westlake | $41,540 |
| Katy | $52,467 | Weston | $266 |

| | | | |
|---|---|---|---|
| Kaufman | $27,607 | Weston Lakes | $189 |
| Kaufman County | $353,047 | Westover Hills | $4,509 |
| Keene | $38,296 | Westworth Village | $7,842 |
| Keller | $79,189 | Wharton | $31,700 |
| Kemah | $28,325 | Wharton County | $72,887 |
| Kemp | $6,419 | Wheeler | $447 |
| Kempner | $330 | Wheeler County | $26,273 |
| Kendall County | $100,643 | White Deer | $1,273 |
| Kendleton | $13 | White Oak | $15,305 |
| Kenedy | $676 | White Settlement | $23,304 |
| Kenedy County | $1,000 | Whiteface | $155 |
| Kenefick | $416 | Whitehouse | $29,017 |
| Kennard | $132 | Whitesboro | $18,932 |
| Kennedale | $21,024 | Whitewright | $7,098 |
| Kent County | $939 | Whitney | $73 |
| Kerens | $1,924 | Wichita County | $552,371 |
| Kermit | $5,652 | Wichita Falls | $832,574 |
| Kerr County | $218,452 | Wickett | $87 |
| Kerrville | $190,357 | Wilbarger County | $55,124 |
| Kilgore | $105,583 | Willacy County | $24,581 |
| Killeen | $535,650 | Williamson County | $1,195,987 |
| Kimble County | $20,480 | Willis | $24,384 |
| King County | $1,000 | Willow Park | $26,737 |
| Kingsville | $20,083 | Wills Point | $43,765 |
| Kinney County | $2,142 | Wilmer | $426 |
| Kirby | $8,752 | Wilson | $12 |
| Kirbyville | $10,690 | Wilson County | $121,034 |
| Kirvin | $2 | Wimberley | $724 |
| Kleberg County | $124,109 | Windcrest | $12,908 |
| Knollwood | $1,160 | Windom | $1,087 |
| Knox City | $1,962 | Windthorst | $3,385 |
| Knox County | $11,730 | Winfield | $290 |
| Kosse | $2,468 | Wink | $120 |
| Kountze | $19,716 | Winkler County | $61,163 |
| Kress | $186 | Winnsboro | $28,791 |
| Krugerville | $1,508 | Winona | $319 |
| Krum | $9,661 | Winters | $6,229 |
| Kurten | $686 | Wise County | $289,074 |
| Kyle | $51,835 | Wixon Valley | $441 |
| La Feria | $10,381 | Wolfe City | $5,466 |

| | | | |
|---|---|---|---|
| La Grange | $9,623 | Wolfforth | $4,022 |
| La Grulla | $1,708 | Wood County | $267,048 |
| La Joya | $8,457 | Woodbranch | $9,617 |
| La Marque | $98,930 | Woodcreek | $358 |
| La Porte | $91,532 | Woodloch | $1,012 |
| La Salle County | $14,975 | Woodsboro | $1,130 |
| La Vernia | $3,217 | Woodson | $122 |
| La Villa | $572 | Woodville | $20,340 |
| La Ward | $321 | Woodway | $25,713 |
| LaCoste | $159 | Wortham | $376 |
| Lacy-Lakeview | $11,599 | Wylie | $114,708 |
| Ladonia | $2,011 | Yantis | $2,072 |
| Lago Vista | $13,768 | Yoakum County | $34,924 |
| Laguna Vista | $3,689 | Yoakum | $20,210 |
| Lake Bridgeport | $232 | Yorktown | $5,447 |
| Lake City | $2,918 | Young County | $44,120 |
| Lake Dallas | $25,314 | Zapata County | $56,480 |
| Lake Jackson | $75,781 | Zavala County | $38,147 |
| Lake Tanglewood | $613 | Zavalla | $1,088 |
| Lake Worth | $20,051 | | |

# EXHIBIT C

Exhibit C: TX Opioid Council & Health Care Region Allocations plus Administrative Costs
70% of Total ($700 million)

| Health Care Region Allocation*: $693 million; Administrative Costs: $7 million | | |
|---|---|---|
| Region | Counties in Health Care Region | Allocation |
| 1 | Anderson, Bowie, Camp, Cass, Cherokee, Delta, Fannin, Franklin, Freestone, Gregg, Harrison, Henderson, Hopkins, Houston, Hunt, Lamar, Marion, Morris, Panola, Rains, Red, River, Rusk, Smith, Titus, Trinity, Upshur, Van, Zandt, Wood | $38,223,336 |
| 2 | Angelina, Brazoria, Galveston, Hardin, Jasper, Jefferson, Liberty, Nacogdoches, Newton, Orange, Polk, Sabine, San Augustine, San Jacinto, Shelby, Tyler | $54,149,215 |
| 3 | Austin, Calhoun, Chambers, Colorado, Fort Bend, Harris, Matagorda, Waller, Wharton | $120,965,680 |
| 4 | Aransas, Bee, Brooks, De Witt, Duval, Goliad, Gonzales, Jackson, Jim Wells, Karnes, Kenedy, Kleberg, Lavaca, Live Oak, Nueces, Refugio, San Patricio, Victoria | $27,047,477 |
| 5 | Cameron, Hidalgo, Starr, Willacy | $17,619,875 |
| 6 | Atascosa, Bandera, Bexar, Comal, Dimmit, Edwards, Frio, Gillespie, Guadalupe, Kendall, Kerr, Kinney, La Salle, McMullen, Medina, Real, Uvalde, Val Verde, Wilson, Zavala | $68,228,047 |
| 7 | Bastrop, Caldwell, Fayette, Hays, Lee, Travis | $50,489,691 |
| 8 | Bell, Blanco, Burnet, Lampasas, Llano, Milam, Mills, San Saba, Williamson | $24,220,521 |
| 9 | Dallas, Kaufman | $66,492,094 |
| 10 | Ellis, Erath, Hood, Johnson, Navarro, Parker, Somervell, Tarrant, Wise | $65,538,414 |
| 11 | Brown, Callahan, Comanche, Eastland, Fisher, Haskell, Jones, Knox, Mitchell, Nolan, Palo Pinto, Shackelford, Stephens, Stonewall, Taylor | $9,509,818 |
| 12 | Armstrong, Bailey, Borden, Briscoe, Carson, Castro, Childress, Cochran, Collingsworth, Cottle, Crosby, Dallam, Dawson, Deaf Smith, Dickens, Donley, Floyd, Gaines, Garza, Gray, Hale, Hall, Hansford, Hartley, Hemphill, Hockley, Hutchinson, Kent, King, Lamb, Lipscomb, Lubbock, Lynn, Moore, Motley, Ochiltree, Oldham, Parmer, Potter, Randall, Roberts, Scurry, Sherman, Swisher, Terry, Wheeler, Yoakum | $23,498,027 |
| 13 | Coke, Coleman, Concho, Crockett, Irion, Kimble, Mason, McCulloch, Menard, Pecos, Reagan, Runnels, Schleicher, Sterling, Sutton, Terrell, Tom Green | $5,195,605 |
| 14 | Andrews, Brewster, Crane, Culberson, Ector, Glasscock, Howard, Jeff Davis, Loving, Martin, Midland, Presidio, Reeves, Upton, Ward, Winkler | $12,124,354 |
| 15 | El Paso, Hudspeth | $17,994,285 |
| 16 | Bosque, Coryell, Falls, Hamilton, Hill, Limestone, McLennan | $9,452,018 |
| 17 | Brazos, Burleson, Grimes, Leon, Madison, Montgomery, Robertson, Walker, Washington | $23,042,947 |
| 18 | Collin, Denton, Grayson, Rockwall | $39,787,684 |
| 19 | Archer, Baylor, Clay, Cooke, Foard, Hardeman, Jack, Montague, Throckmorton, Wichita, Wilbarger, Young | $12,665,268 |
| 20 | Jim Hogg, Maverick, Webb, Zapata | $6,755,656 |
| | Administrative Costs | $7,000,000 |

* Each Region shall reserve 25% of its allocation for Targeted Funds under the guidelines of Exhibit A.

**EXHIBIT O**

**List of Texas Subdivisions and Special Districts Represented by Simon Greenstone Panatier, PC, The Lanier Law Firm, P.C., and Watts Guerra LP**

| | |
|---|---|
| ANGELINA COUNTY | Simon Greenstone Panatier, P.C. |
| BEE COUNTY | Simon Greenstone Panatier, P.C. |
| BEXAR COUNTY | Watts Guerra LLP |
| Bexar County Hospital District d/b/a University Health System | Watts Guerra LLP |
| BLANCO COUNTY | Simon Greenstone Panatier, P.C. |
| BOWIE COUNTY | Simon Greenstone Panatier, P.C. |
| BURLESON COUNTY | Watts Guerra LLP |
| BURNET COUNTY | Simon Greenstone Panatier, P.C. |
| CAMERON COUNTY | Watts Guerra LLP |
| CAMP COUNTY | Simon Greenstone Panatier, P.C. |
| CASS COUNTY | Simon Greenstone Panatier, P.C. |
| CHAMBERS COUNTY | Watts Guerra LLP |
| CHEROKEE COUNTY | Simon Greenstone Panatier, P.C. |
| COOKE COUNTY | Simon Greenstone Panatier, P.C. |
| CORYELL COUNTY | Simon Greenstone Panatier, P.C. |
| DALLAS COUNTY | Simon Greenstone Panatier, P.C. |
| DELTA COUNTY | Simon Greenstone Panatier, P.C. |
| DIMMIT COUNTY | Simon Greenstone Panatier, P.C. |
| ECTOR COUNTY | Simon Greenstone Panatier, P.C. |
| FALLS COUNTY | Simon Greenstone Panatier, P.C. |
| FANNIN COUNTY | Simon Greenstone Panatier, P.C. |
| FORT BEND COUNTY | The Lanier Law Firm |
| FRANKLIN COUNTY | Simon Greenstone Panatier, P.C. |
| FREESTONE COUNTY | Simon Greenstone Panatier, P.C. |
| GRAYSON COUNTY | Simon Greenstone Panatier, P.C. |
| HARDIN COUNTY | Simon Greenstone Panatier, P.C. |
| HARRISON COUNTY | Watts Guerra LLP |
| HOPKINS COUNTY | Simon Greenstone Panatier, P.C. |
| Houston city | The Lanier Law Firm |
| HOUSTON COUNTY | Simon Greenstone Panatier, P.C. |
| JASPER COUNTY | Simon Greenstone Panatier, P.C. |
| JIM WELLS COUNTY | Watts Guerra LLP |
| KENDALL COUNTY | Simon Greenstone Panatier, P.C. |

| | |
|---|---|
| KERR COUNTY | Watts Guerra LLP |
| LAMAR COUNTY | Simon Greenstone Panatier, P.C. |
| LEON COUNTY | Watts Guerra LLP |
| LIMESTONE COUNTY | Simon Greenstone Panatier, P.C. |
| MARION COUNTY | Simon Greenstone Panatier, P.C. |
| MCMULLEN COUNTY | Simon Greenstone Panatier, P.C. |
| MILAM COUNTY | Simon Greenstone Panatier, P.C. |
| MORRIS COUNTY | Simon Greenstone Panatier, P.C. |
| NACOGDOCHES COUNTY | Simon Greenstone Panatier, P.C. |
| NEWTON COUNTY | Simon Greenstone Panatier, P.C. |
| NUECES COUNTY | The Lanier Law Firm |
| Nueces County Hospital District | The Lanier Law Firm |
| ORANGE COUNTY | Simon Greenstone Panatier, P.C. |
| PANOLA COUNTY | Simon Greenstone Panatier, P.C. |
| PARKER COUNTY | Simon Greenstone Panatier, P.C. |
| POTTER COUNTY | Simon Greenstone Panatier, P.C. |
| RED RIVER COUNTY | Simon Greenstone Panatier, P.C. |
| ROBERTSON COUNTY | Simon Greenstone Panatier, P.C. |
| RUSK COUNTY | Simon Greenstone Panatier, P.C. |
| SHELBY COUNTY | Simon Greenstone Panatier, P.C. |
| SMITH COUNTY | Simon Greenstone Panatier, P.C. |
| TARRANT COUNTY | The Lanier Law Firm |
| TITUS COUNTY | Simon Greenstone Panatier, P.C. |
| TRAVIS COUNTY | The Lanier Law Firm |
| TRINITY COUNTY | Simon Greenstone Panatier, P.C. |
| UPSHUR COUNTY | Simon Greenstone Panatier, P.C. |
| VAN ZANDT COUNTY | Simon Greenstone Panatier, P.C. |
| WILLIAMSON COUNTY | Watts Guerra LLP |
| WOOD COUNTY | Simon Greenstone Panatier, P.C. |

**Exhibit P**

**Case Management Order**

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | 152nd JUDICIAL DISTRICT |
| | § | |
| MDL NO. 18-0358 | § | HARRIS COUNTY, TEXAS |

**CASE MANAGEMENT ORDER APPLICABLE TO NON-SETTLED PLAINTIFFS
ASSERTING CLAIMS AGAINST SETTLING DEFENDANTS**

This Case Management Order ("CMO") shall apply to all Political Subdivisions, including counties, municipalities, and special districts with cases pending as of [*Date of Final Court Approval of Settlement*] against Settling Defendants and to all new plaintiffs filing cases after that date against Settling Defendants (collectively, "Plaintiff" or "Plaintiffs"), whose claims are pending in this coordinated proceeding and not released by the Settlement Agreement in this action entered into on [*settlement date*] ("Settlement Agreement"). As used herein, "Settling Defendants" refers to McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Corporation, and all Released Entities as that term is defined in the Settlement Agreement. Pursuant to the order of the Texas MDL Panel, all such new cases filed in the State of Texas shall be assigned to the *In re Texas Opioid Litigation* pending before this Court and shall be subject to the terms of this CMO.

Good cause appearing, it is ordered as follows:

A.    **Plaintiffs' Requirement to Produce Certain Specified Information About Their Claims**

1. **Plaintiffs' Production Requirements.** Each Plaintiff shall serve the following documents and/or information upon counsel for Settling Defendants:

(a)    **Fact Sheet**. Each Plaintiff shall serve upon the Settling Defendants within the deadlines specified herein a completed copy of the Fact Sheet, attached herein. Each Plaintiff that has already completed, executed, and served a Fact Sheet shall serve upon the Settling Defendants within the deadlines specified herein an updated Fact Sheet reflecting any material change in the facts underlying the Plaintiff's claims or shall affirm that no such material change applies. Simultaneously with its service of its Fact Sheet or affirmation, each Plaintiff shall serve upon Settling Defendants a verified statement under oath setting forth how each element of their claims has not been resolved pursuant to the terms of the Settlement and the state and regional abatement fund provided therein.

(b)    **Record Production**.

(i)    Each Plaintiff shall produce all records establishing the existence of each of their claims. If Plaintiff claims the existence of a public nuisance, Plaintiff shall produce all records establishing the existence of a public nuisance, a definition of the nuisance and evidence to support its existence, and all records supporting a claim for nuisance "abatement" relief (including without limitation a categorization and itemization of any requested nuisance abatement relief and evidence to support each component of such relief).

(ii)    Each Plaintiff shall produce all records supporting a claim of damages or any other type of monetary relief, including but not limited to abatement remedies or any other injunctive relief that would require any expenditure by the Defendants. Such

records shall include a categorization and itemization of claimed damages or other type of relief, and calculations and evidence for each component of such claimed relief, specified as to claims against each Settling Defendant. Each Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.

        (iii)     For any other relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that will make the expenditures, when and how long those entities will make the expenditures, and the nature and amount of the expenditures, including how they will address any and all alleged harms. Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

        (iv)     Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly unnecessary prescriptions shall identify those prescriptions, to whom and by whom the prescriptions were written, the pharmacy that filled each such prescription, whether the Plaintiff was reimbursed for them, and the Plaintiff's basis for identifying the prescriptions.

        (v)     Each Plaintiff seeking any form of relief based directly or indirectly upon harm allegedly attributable to prescription opioid orders that the Plaintiff contends the Settling Defendants should not have shipped pursuant to a suspicious order regulation shall identify those orders, including the date of each such order; the product(s) ordered; the quantities ordered; the pharmacy or other dispensing entity that placed the order; and the Plaintiff's basis for identifying the order, including any sources relied upon and algorithms used. Each Plaintiff shall include its definition of what constitutes a suspicious order.

(c)    **Affidavit**. Each Plaintiff shall serve on counsel for Settling Defendants an affidavit signed by the Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO. If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d)    **Expert Reports**. Each Plaintiff shall serve on counsel for Settling Defendants a case-specific expert report or reports executed by a qualified expert, under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report"). The Case-Specific Expert Report shall include all matter required to comply with the Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, and at least:

(i)    *Plaintiff's Information*. The Plaintiff's name;

(ii)    *Expert's Information*. The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii)    *Plaintiff's Records*. All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv)    *Reliance Materials*. All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v)    *Locations*. If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with

specificity how Plaintiff has been affected by such public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi) *Subjects of Report(s)*. The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to rely, including but not limited to the following:

(1) Whether the Plaintiff's records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2) Whether the Plaintiff's records reviewed by the expert(s) indicate the existence of a nuisance and, if so, the nature of the nuisance;

(3) Whether the Plaintiff's records reviewed by the expert(s) indicate that Settling Defendants engaged in any wrongful conduct and, if so, the nature and details of that conduct (including, but not limited to, (a) any allegedly unnecessary prescriptions or (b) any specific orders of prescription opioids that the expert opines that the Settling Defendants should not have shipped), and the basis for identifying (a) or (b) as wrongful;

(4) An opinion that there is in fact a causal relationship between the individual Plaintiff's claims and Settling Defendants' alleged conduct and the basis for that opinion;

(5) An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, statutory penalties, and any other claim for damages or any other monetary relief, including but not limited to abatement remedies or any other injunctive relief that would require any expenditure by the Defendants, with specific detailed calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

(6) All computer code, work papers, data, and other sources underlying any calculations or other analysis relating to the subject matter of subparagraphs (1) - (5) above and necessary to replicate those calculations or analysis.

2. **Deadline to comply**.

        (a)      For each Plaintiff with claims pending against Settling Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced no later than [DATE], or ninety (90) days after the date such Plaintiff elects not to settle its claims, whichever is sooner.

        (b)      For each Plaintiff with claims newly filed in or transferred to this proceeding against Settling Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

3. **Failure to comply**.

        (a)      *Notice of Non-Compliance and Opportunity to Cure*. If any Plaintiff fails to comply with any provision of this Order, Settling Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance. Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Settling Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's petition, shall be held in abeyance.

        (b)      *Failure to Cure*. If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by

the Settling Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Settling Defendants.

(c) *Extensions of Time*. The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

(d) The Plaintiff shall be permitted to supplement the disclosures described in Sections B.1, including expert reports, and C only to extent appropriate to address factual information that the Plaintiff did not have access to and could not reasonably have obtained by the deadline under this Order, including any extension granted by the Court for good cause. Any such supplementation must be made promptly upon receipt of the information that was previously unavailable and shall identify the specific information that was previously unavailable. This opportunity to supplement does not relieve the Plaintiff of its responsibility to comply with this CMO fully and completely on the basis of information within its possession or that it reasonably could obtain at the time compliance is first required. No lay or expert testimony may be offered at trial by the Plaintiff on any subject described in Sections B-1 and C that is not disclosed fully and at the times required by this Order. Plaintiff, however, must continue to comply with all Texas Rules of Civil Procedure, including the duty to supplement its document production with newly discovered or identified documents.

**B.** **Discovery on Statute of Limitations and Other Time-Based Defenses**

1. Each Plaintiff must, within the time frames established by Section B.2, serve upon counsel for the Settling Defendants an affidavit signed by the Plaintiff and its counsel providing the following information: (1) the date the Plaintiff first learned that the harms alleged in its petition may be related to Settling Defendants' conduct; (2) how the Plaintiff first learned the harms alleged in its petition may be related to Settling Defendants' conduct; (3) the date the Plaintiff

first spoke to or corresponded with an attorney about potential litigation against Settling Defendants or any other party concerning the conduct or harms alleged in its Petition; and (4) the date the Plaintiff first retained counsel for litigation relating to those alleged conduct or harms. Settling Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each such Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

### C.    Further Proceedings

Within 30 days following the completion of all disclosures required by this Order, or 30 days following the Court's resolution of any dispute concerning the adequacy of those disclosures, whichever is later, Settling Defendants may file a motion to dismiss the Petition. Settling Defendants may also submit expert-related motions or move for summary judgment on the ground that Plaintiff's claims fail as a matter of law based on the expert reports and other disclosures required under Sections B and C of this Order. Until further order of the Court, all proceedings in these cases other than those set forth in this Order shall be stayed.

SO ORDERED:

Dated: _____                    _____
                                                Honorable Judge Robert Schaffer
                                                152nd Judicial District Court

IN RE: TEXAS OPIOID LITIGATION; NO. 18-0358; PLAINTIFF FACT SHEET*

Plaintiff: _____ Case caption / number: _____ Contact attorney: _____

1. Identify the approximate date (i.e., month and year) when Plaintiff ("You") claims it was first injured and began to incur damages as a result of each Defendants' conduct. *The earliest date identified is the start of the relevant date range in response to the remaining requests.*

2. Identify each prescription opioid medication that You claim contributed to Your alleged damages and the manufacturer and distributor of each identified medication.

3. Identify each category of damages that You allege, including but not limited to injunctive relief that You seek and any monetary damages based on Your payment for or reimbursement of allegedly improper or medically unnecessary opioid prescriptions. For each category, list Your annual budget and expenditures.

4. Identify the expenditures You claim are related to defendants' conduct, the sources of the funds expended, the fund balances at the beginning of each year, and the applicable rules regarding fund balances, by year, related to: (a) law enforcement; (b) EMS; (c) fire; (d) court/prosecution; (e) prison/jail/corrections/incarceration; (f) substance abuse treatment; (g) public health; (h) child/family services; (i) workers compensation; and (j) health insurance.

5. Identify any funds You received that could reimburse for the costs of opioid related expenses, including but not limited to grants and donations, court costs, fees (including as part of a criminal trial diversion program), restitution, or asset forfeitures.

6. Identify each pharmacy, pharmacist, and healthcare provider ("HCP") within Your geographic boundaries that You are aware has been the target of a law enforcement or administrative investigation concerning the prescribing or dispensing of prescription opioids and the disposition of any related criminal charges filed.

7. Identify by year each (a) HCP who wrote allegedly medically unnecessary opioid prescriptions in Your geographical boundaries and (b) pharmacy that received prescription opioids as a result of an alleged suspicious order.

8. Identify each HCP within Your boundaries who You claim wrote prescriptions for opioid medications in reliance on the improper marketing of the manufacturing defendants.

9. Provide the annual number of overdose deaths of Your residents and the number who misused or were otherwise harmed by opioids and, for each, identify the drug(s) on which they overdosed, misused, or were otherwise harmed and the basis for this determination.

10. Provide the annual number of arrests involving the possession, consumption, or sale of opioids (including a charge of conspiracy to commit or engaging in organized criminal activity related to opioids). "Opioids" in this context includes any drug in the opioid or opiate family, including but not limited to prescription opioids, heroin, and fentanyl.

11. Identify every notification You provided to any State or Federal agency of suspected wrongful conduct related to prescription opioids, including but not limited to the date of each notification and the general nature of the suspected wrongdoing.

12. Provide the names, members, dates of operation, budget, and source(s) of funding for any opioid-related task force or other program or group You have participated in, including but not limited to any prescription disposal program, addiction treatment programs, or drug abuse prevention or education programs You have used related to opioid use or diversion.

*To avoid unnecessary delay, contact Liaison Counsel for Manufacturer or Distributor Defendants immediately with any questions, including about meaning or scope of these requests.*

**Exhibit Q**

**List of States**

| | | | |
|---|---|---|---|
| 1. | Alabama | 44. | South Carolina |
| 2. | Alaska | 45. | South Dakota |
| 3. | American Samoa | 46. | Tennessee |
| 4. | Arizona | 47. | Texas |
| 5. | Arkansas | 48. | United States Virgin Islands |
| 6. | California | 49. | Utah |
| 7. | Colorado | 50. | Vermont |
| 8. | Connecticut | 51. | Virginia |
| 9. | Delaware | 52. | Washington |
| 10. | Florida | 53. | Washington, District of Columbia |
| 11. | Georgia | 54. | Wisconsin |
| 12. | Guam | 55. | Wyoming |
| 13. | Hawaii | | |
| 14. | Idaho | | |
| 15. | Illinois | | |
| 16. | Indiana | | |
| 17. | Iowa | | |
| 18. | Kansas | | |
| 19. | Kentucky | | |
| 20. | Louisiana | | |
| 21. | Maine | | |
| 22. | Maryland | | |
| 23. | Massachusetts | | |
| 24. | Michigan | | |
| 25. | Minnesota | | |
| 26. | Mississippi | | |
| 27. | Missouri | | |
| 28. | Montana | | |
| 29. | Nebraska | | |
| 30. | Nevada | | |
| 31. | New Hampshire | | |
| 32. | New Jersey | | |
| 33. | New Mexico | | |
| 34. | New York | | |
| 35. | North Carolina | | |
| 36. | North Dakota | | |
| 37. | Northern Mariana Islands | | |
| 38. | Ohio | | |
| 39. | Oklahoma | | |
| 40. | Oregon | | |
| 41. | Pennsylvania | | |
| 42. | Puerto Rico | | |
| 43. | Rhode Island | | |

**Exhibit R**

**Injunctive Relief**

I.  **INTRODUCTION**

A.  Within ninety (90) days of the Effective Date unless otherwise set forth herein, each Injunctive Relief Distributor shall implement the injunctive relief terms set forth in Sections II through XIX (the "*Injunctive Relief Terms*") in its Controlled Substance Monitoring Program ("*CSMP*").

B.  The Effective Date of these Injunctive Relief Terms shall be defined by Section I.P of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as Exhibit R.

II.  **TERM AND SCOPE**

A.  The duration of the Injunctive Relief Terms contained in Sections IV through XVI shall be ten (10) years from the Effective Date.

B.  McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation are referred to collectively throughout these Injunctive Relief Terms as the "*Injunctive Relief Distributors*" or individually as an "*Injunctive Relief Distributor.*" Each Injunctive Relief Distributor is bound by the terms herein.

C.  The requirements contained in Sections VIII through XV shall apply to the distribution of Controlled Substances to Customers by each Injunctive Relief Distributor's Full-Line Wholesale Pharmaceutical Distribution Business, including by any entities acquired by the Injunctive Relief Distributors that are engaged in the Full-Line Wholesale Pharmaceutical Distribution Business. The prior sentence is not limited to activity physically performed at each Injunctive Relief Distributor's distribution centers and includes activity covered by the prior sentence performed by each Injunctive Relief Distributor at any physical location, including at its corporate offices or at the site of a Customer with respect to Sections III through XV.

III.  **DEFINITIONS**

A.  "*Audit Report.*" As defined in Section XVIII.H.3.

B.  "*Chain Customers.*" Chain retail pharmacies that have centralized corporate headquarters and have multiple specific retail pharmacy locations from which Controlled Substances are dispensed to individual patients.

C.  "*Chief Diversion Control Officer.*" As defined in Section IV.A.

D.  "*Clearinghouse.*" The system established by Section XVII.

E.  *"Clearinghouse Advisory Panel."* As defined in Section XVII.B.4.

F.  *"Controlled Substances."* Those substances designated under schedules II-V pursuant to the federal Controlled Substances Act and the laws and regulations of the Settling States that incorporate federal schedules II-V. For purposes of the requirements of the Injunctive Relief Terms, Gabapentin shall be treated as a Controlled Substance, except for purposes of Section XII for Customers located in States that do not regulate it as a controlled substance or similar designation (e.g., drug of concern).

G.  *"Corrective Action Plan."* As defined in Section XIX.B.7.b.

H.  *"CSMP."* As defined in Section I.A.

I.  *"CSMP Committee."* As defined in Section VI.A.

J.  *"Customers."* Refers collectively to current, or where applicable potential, Chain Customers and Independent Retail Pharmacy Customers. "Customers" do not include long-term care facilities, hospital pharmacies, and pharmacies that serve exclusively inpatient facilities.

K.  *"Data Security Event."* Refers to any compromise, or threat that gives rise to a reasonable likelihood of compromise, by unauthorized access or inadvertent disclosure impacting the confidentiality, integrity, or availability of Dispensing Data.

L.  *"Dispensing Data."* Includes, unless altered by the Clearinghouse Advisory Panel: (i) unique patient IDs; (ii) patient zip codes; (iii) the dates prescriptions were dispensed; (iv) the NDC numbers of the drugs dispensed; (v) the quantities of drugs dispensed; (vi) the day's supply of the drugs dispensed; (vii) the methods of payment for the drugs dispensed; (viii) the prescribers' names; (ix) the prescribers' NPI or DEA numbers; and (x) the prescribers' zip codes or addresses. The Clearinghouse will be solely responsible for collecting Dispensing Data.

M.  *"Draft Report."* As defined in Section XVIII.H.1.

N.  *"Effective Date."* As defined in Section I.B.

O.  *"Full-Line Wholesale Pharmaceutical Distribution Business."* Activity engaged in by distribution centers with a primary business of supplying a wide range of branded, generic, over-the-counter and specialty pharmaceutical products to Customers.

P.  *"Highly Diverted Controlled Substances."* Includes: (i) oxycodone; (ii) hydrocodone; (iii) hydromorphone; (iv) tramadol; (v) oxymorphone; (vi) morphine; (vii) methadone; (viii) carisoprodol; (ix) alprazolam; and (x) fentanyl. The Injunctive Relief Distributors shall confer annually and review this list to determine whether changes are appropriate and shall add Controlled Substances to

the list of Highly Diverted Controlled Substances as needed based on information provided by the DEA and/or other sources related to drug diversion trends. The Injunctive Relief Distributors shall notify the State Compliance Review Committee and the Monitor of any additions to the list of Highly Diverted Controlled Substances. Access to Controlled Substances predominately used for Medication-Assisted Treatment shall be considered when making such additions.

Q.    "*Independent Retail Pharmacy Customers.*" Retail pharmacy locations that do not have centralized corporate headquarters and dispense Controlled Substances to individual patients.

R.    "*Injunctive Relief Distributors.*" As defined in Section II.B.

S.    "*Injunctive Relief Terms.*" As defined in Section I.A.

T.    "*Monitor.*" As defined in Section XVIII.A.

U.    "*National Arbitration Panel.*" As defined by Section I.GG of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as Exhibit R.

V.    "*NDC.*" National Drug Code.

W.    "*non-Controlled Substance.*" Prescription medications that are not Controlled Substances.

X.    "*Notice of Potential Violation.*" As defined in Section XIX.B.2.

Y.    "*Order.*" A unique Customer request on a specific date for (i) a certain amount of a specific dosage form or strength of a Controlled Substance or (ii) multiple dosage forms and/or strengths of a Controlled Substance. For the purposes of this definition, each line item on a purchasing document or DEA Form 222 is a separate order, except that a group of line items either in the same drug family or DEA base code (based upon the structure of a Injunctive Relief Distributor's CSMP) may be considered to be a single order.

Z.    "*Pharmacy Customer Data.*" Aggregated and/or non-aggregated data provided by the Customer for a 90-day period.

     1.    To the extent feasible based on the functionality of a Customer's pharmacy management system, Pharmacy Customer Data shall contain (or, in the case of non-aggregated data, shall be sufficient to determine) the following:

          a)    A list of the total number of prescriptions and dosage units for each NDC for all Controlled Substances and non-Controlled Substances;

-3-

b)    A list of the top five prescribers of each Highly Diverted Controlled Substance by dosage volume and the top ten prescribers of all Highly Diverted Controlled Substances combined by dosage volume. For each prescriber, the data shall include the following information:

(1)    Number of prescriptions and doses prescribed for each Highly Diverted Controlled Substance NDC;

(2)    Number of prescriptions for each unique dosage amount (number of pills per prescription) for each Highly Diverted Controlled Substance NDC;

(3)    Prescriber name, DEA registration number, and address; and

(4)    Medical practice/specialties, if available;

c)    Information on whether the method of payment was cash for (a) Controlled Substances, and (b) non-Controlled Substances; and

d)    Information on top ten patient residential areas by five-digit ZIP code prefix for filled Highly Diverted Controlled Substances by dosage volume, including number of prescriptions and doses for each Highly Diverted Controlled Substance NDC.

2.    Injunctive Relief Distributors are not required to obtain Pharmacy Customer Data for all Customers. Pharmacy Customer Data only needs to be obtained under circumstances required by the Injunctive Relief Terms and the applicable CSMP policies and procedures. Each Injunctive Relief Distributor's CSMP policies and procedures shall describe the appropriate circumstances under which and methods to be used to obtain and analyze Pharmacy Customer Data.

3.    Injunctive Relief Distributors shall only collect, use, disclose or retain Pharmacy Customer Data consistent with applicable federal and state privacy and consumer protections laws. Injunctive Relief Distributors shall not be required to collect, use, disclose or retain any data element that is prohibited by law or any element that would require notice to or consent from the party who is the subject of the data element, including, but not limited to, a third party (such as a prescriber) to permit collection, use, disclosure and/or retention of the data.

AA.    *"Potential Violation."* As defined in Section XIX.B.1.

BB.    *"Reporting Periods."* As defined in Section XVIII.C.1.

CC.  *"Settling State."* As defined by Section I.OOO of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as <u>Exhibit R</u>.

DD.  *"State Compliance Review Committee."* The initial State Compliance Review Committee members are representatives from the Attorneys General Offices of Connecticut, Florida, New York, North Carolina, Tennessee, and Texas. The membership of the State Compliance Review Committee may be amended at the discretion of the Settling States.

EE.  *"Suspicious Orders."* As defined under federal law and regulation and the laws and regulations of the Settling States that incorporate the federal Controlled Substances Act. Suspicious Orders currently include, but are not limited to, orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

FF.  *"Threshold."* The total volume of a particular drug family, DEA base code, or a particular formulation of a Controlled Substance that an Injunctive Relief Distributor shall allow a Customer to purchase in any particular period. This term may be reassessed during Phase 2-B of the Clearinghouse.

GG.  *"Third Party Request."* A request from an entity other than an Injunctive Relief Distributor, a Settling State, or the Monitor pursuant to a subpoena, court order, data practices act, freedom of information act, public information act, public records act, or similar law.

HH.  *"Top Prescriber."* A prescriber who, for a Customer, is either (i) among the top five (5) prescribers of each Highly Diverted Controlled Substance or (ii) among the top ten (10) prescribers of Highly Diverted Controlled Substances combined, as determined from the most recent Pharmacy Customer Data for that Customer.

IV.  **CSMP PERSONNEL**

A.  Each Injunctive Relief Distributor shall establish or maintain the position of Chief Diversion Control Officer, or other appropriately titled position, to oversee the Injunctive Relief Distributor's CSMP. The Chief Diversion Control Officer shall have appropriate experience regarding compliance with the laws and regulations concerning Controlled Substances, in particular laws and regulations requiring effective controls against the potential diversion of Controlled Substances. The Chief Diversion Control Officer shall report directly to either the senior executive responsible for U.S. pharmaceutical distribution or the most senior legal officer at the Injunctive Relief Distributor.

B.  The Chief Diversion Control Officer shall be responsible for the approval of material revisions to the CSMP.

C.  The Chief Diversion Control Officer shall provide at least quarterly reports to the CSMP Committee regarding the Injunctive Relief Distributor's operation of the

-5-

CSMP, including the implementation of any changes to the CSMP required by these Injunctive Relief Terms.

D.  An Injunctive Relief Distributor's CSMP functions, including, but not limited to, the onboarding and approval of new Customers for the sale of Controlled Substances, setting and adjusting Customer Thresholds for Controlled Substances, terminating or suspending Customers, and submitting Suspicious Orders and other reports to Settling States (or the Clearinghouse, when operational), but excluding support necessary to perform these functions, shall be conducted exclusively by the Injunctive Relief Distributor's CSMP personnel or qualified third-party consultants.

E.  Staffing levels of each Injunctive Relief Distributor's CSMP department shall be reviewed periodically, but at least on an annual basis, by the Injunctive Relief Distributor's CSMP Committee. This review shall include consideration of relevant developments in technology, law, and regulations to ensure the necessary resources are in place to carry out the program in an effective manner.

F.  Personnel in an Injunctive Relief Distributor's CSMP department shall not report to individuals in an Injunctive Relief Distributor's sales department, and sales personnel shall not be authorized to make decisions regarding the promotion, compensation, demotion, admonition, discipline, commendation, periodic performance reviews, hiring, or firing of CSMP personnel.

G.  The CSMP policies and procedures shall be published in a form and location readily accessible to all CSMP personnel at each Injunctive Relief Distributor.

V.  **INDEPENDENCE**

A.  For each Injunctive Relief Distributor, sales personnel compensated with commissions shall not be compensated based on revenue or profitability targets or expectations for sales of Controlled Substances. However, each Injunctive Relief Distributor's personnel may, as applicable, be compensated (including incentive compensation) based on formulas that include total sales for all of the Injunctive Relief Distributor's products, including Controlled Substances. The compensation of sales personnel shall not include incentive compensation tied solely to sales of Controlled Substances.

B.  For any Injunctive Relief Distributor personnel who are compensated at least in part based on Customer sales, the Injunctive Relief Distributor shall ensure the compensation of such personnel is not decreased by a CSMP-related suspension or termination of a Customer or as a direct result of the reduction of sales of Controlled Substances to a Customer pursuant to the CSMP.

C.  The Injunctive Relief Distributors' sales personnel shall not be authorized to make decisions regarding the implementation of CSMP policies and procedures, the design of the CSMP, the setting or adjustment of Thresholds, or other actions taken pursuant to the CSMP, except sales personnel must provide information

-6-

regarding compliance issues to CSMP personnel promptly. The Injunctive Relief Distributors' sales personnel are prohibited from interfering with, obstructing, or otherwise exerting control over any CSMP department decision-making.

D.     Each Injunctive Relief Distributor shall review its compensation and non-retaliation policies and, if necessary, modify and implement changes to those policies to effectuate the goals of, and incentivize compliance with, the CSMP.

E.     Each Injunctive Relief Distributor shall maintain a telephone, email, and/or web-based "hotline" to permit employees and/or Customers to anonymously report suspected diversion of Controlled Substances or violations of the CSMP, Injunctive Relief Distributor company policy related to the distribution of Controlled Substances, or applicable law. Each Injunctive Relief Distributor shall share the hotline contact information with their employees and Customers. Each Injunctive Relief Distributor shall maintain all complaints made to the hotline, and document the determinations and bases for those determinations made in response to all complaints.

## VI.     OVERSIGHT

A.     To the extent not already established, each Injunctive Relief Distributor shall establish a committee that includes senior executives with responsibility for legal, compliance, distribution and finance to provide oversight over its CSMP (the "*CSMP Committee*"). The Chief Diversion Control Officer shall be a member of the CSMP Committee. The CSMP Committee shall not include any employee(s) or person(s) performing any sales functions on behalf of the Injunctive Relief Distributor; provided that service on the CSMP Committee by any senior executives listed in this paragraph whose responsibilities may include, but are not limited to, management of sales functions shall not constitute a breach of the Injunctive Relief Terms.

B.     Each Injunctive Relief Distributor's CSMP Committee shall have regular meetings during which the Chief Diversion Control Officer shall present to the CSMP Committee with respect to, and the CSMP Committee shall evaluate, among other things: (1) any material modifications and potential enhancements to the CSMP including, but not limited to, those relating to Customer due diligence and Suspicious Order monitoring and reporting; (2) any significant new national and regional diversion trends involving Controlled Substances; (3) the Injunctive Relief Distributor's adherence to the CSMP policies and procedures, the Injunctive Relief Terms, and applicable laws and regulations governing the distribution of Controlled Substances; and (4) any technology, staffing, or other resource needs for the CSMP. The CSMP Committee shall have access to all CSMP reports. The CSMP Committee will review and approve the specific metrics used to identify the Red Flags set forth in Section VIII.

C.     On a quarterly basis, each Injunctive Relief Distributor's CSMP Committee shall send a written report to the Injunctive Relief Distributor's Chief Executive, Chief

Financial, and Chief Legal Officer, as well as its Board of Directors, addressing: (1) the Injunctive Relief Distributor's substantial adherence to the CSMP policies and procedures, the Injunctive Relief Terms, and applicable laws and regulations governing the distribution of Controlled Substances; (2) recommendations as appropriate about the allocation of resources to ensure the proper functioning of the Injunctive Relief Distributor's CSMP; and (3) significant revisions to the CSMP. The Board of Directors or a committee thereof at each Injunctive Relief Distributor shall document in its minutes its review of the quarterly CSMP Committee reports.

D.   To the extent not already established, the Board of Directors of each Injunctive Relief Distributor shall establish its own compliance committee (the "*Board Compliance Committee*") to evaluate, at a minimum, and on a quarterly basis: (1) the CSMP Committee's written reports; (2) the Injunctive Relief Distributor's substantial adherence to the CSMP policies and procedures, the Injunctive Relief Terms, and applicable laws and regulations governing the distribution of Controlled Substances; (3) the Injunctive Relief Distributor's code of conduct and any whistleblower reporting policies, including those prescribed by Section V.E; and (4) any significant regulatory and/or government enforcement matters within the review period relating to the distribution of Controlled Substances. An Injunctive Relief Distributor meets this requirement if it established, prior to the Effective Date, multiple committees of its Board of Directors that together have responsibilities outlined in this paragraph.

E.   The Board Compliance Committee shall have the authority to: (1) require management of the Injunctive Relief Distributor to conduct audits on any CSMP or legal and regulatory concern pertaining to Controlled Substances distribution, and to update its full Board of Directors on those audits; (2) to commission studies, reviews, reports, or surveys to evaluate the Injunctive Relief Distributor's CSMP performance; (3) request meetings with the Injunctive Relief Distributor's management and CSMP staff; and (4) review the appointment, compensation, performance, and replacement of the Injunctive Relief Distributor's Chief Diversion Control Officer.

## VII.   **MANDATORY TRAINING**

A.   Each Injunctive Relief Distributor shall require all new CSMP personnel to attend trainings on its CSMP, its obligations under the Injunctive Relief Terms, and its duties with respect to maintaining effective controls against potential diversion of Controlled Substances and reporting Suspicious Orders pursuant to state and federal laws and regulations prior to conducting any compliance activities for the Injunctive Relief Distributor without supervision.

B.   Each Injunctive Relief Distributor shall provide annual trainings to CSMP personnel on its CSMP, its obligations under the Injunctive Relief Terms, and its duties to maintain effective controls against potential diversion of Controlled

Substances and report Suspicious Orders pursuant to state and federal laws and regulations.

C.     On an annual basis, each Injunctive Relief Distributor shall test its CSMP personnel on their knowledge regarding its CSMP, its obligations under the Injunctive Relief Terms, and its duties to maintain effective controls against potential diversion of Controlled Substances and to report Suspicious Orders pursuant to state and federal laws and regulations.

D.     Each Injunctive Relief Distributor shall train all third-party compliance consultants (defined as non-employees who are expected to devote fifty percent (50%) or more of their time to performing work related to the Injunctive Relief Distributor's CSMP, excluding information technology consultants not engaged in substantive functions related to an Injunctive Relief Distributor's CSMP) performing compliance functions for the Injunctive Relief Distributor in the same manner as the Injunctive Relief Distributor's CSMP personnel.

E.     At least every three (3) years in the case of existing employees, and within the first six months of hiring new employees, each Injunctive Relief Distributor shall require operations, sales, and senior executive employees to attend trainings on its CSMP, its obligations under the Injunctive Relief Terms, the hotline established in Section V.E, and its duties to maintain effective controls against potential diversion of Controlled Substances and report Suspicious Orders pursuant to state and federal laws and regulations.

## VIII.   RED FLAGS

A.     Within one hundred and twenty days (120) of the Effective Date, each Injunctive Relief Distributor shall, at a minimum, apply specific metrics to identify the potential Red Flags described in Section VIII.D with respect to Independent Retail Pharmacy Customers. For Chain Customers, the metrics used to identify the Red Flags described in Section VIII.D may be adjusted based on the specific business model and supplier relationships of the Chain Customer.

B.     Each Injunctive Relief Distributor shall evaluate and, if necessary, enhance or otherwise adjust the specific metrics it uses to identify Red Flags set forth in Section VIII.D.

C.     Each Injunctive Relief Distributor shall provide annually to the Monitor the specific metrics it uses to identify Red Flags as set forth in Section VIII.D. The Monitor shall review the metrics used to identify Red Flags as set forth in Section VIII.D to assess whether the metrics are reasonable. The Monitor may, at its discretion, suggest revisions to the metrics in the annual Audit Report as part of the Red Flags Review set forth in Section XVIII.F.3.f. Each Injunctive Relief Distributor may rely on its specific metrics to comply with the requirements of Section VIII unless and until the Monitor proposes a revised metric in connection with Section XVIII.H.

D.  For purposes of the Injunctive Relief Terms, "*Red Flags*" are defined as follows:

1.  **Ordering ratio of Highly Diverted Controlled Substances to non-Controlled Substances:** Analyze the ratio of the order volume of all Highly Diverted Controlled Substances to the order volume of all non-Controlled Substances to identify Customers with significant rates of ordering Highly Diverted Controlled Substances.

2.  **Ordering ratio of Highly Diverted Controlled Substance base codes or drug families to non-Controlled Substances:** Analyze the ratio of the order volume of each Highly Diverted Controlled Substance base code or drug family to the total order volume of all non-Controlled Substances to identify Customers with significant rates of ordering each Highly Diverted Controlled Substance base code or drug family.

3.  **Excessive ordering growth of Controlled Substances:** Analyze significant increases in the ordering volume of Controlled Substances using criteria to identify customers that exhibit percentage growth of Controlled Substances substantially in excess of the percentage growth of non-Controlled Substances.

4.  **Unusual formulation ordering:** Analyze ordering of Highly Diverted Controlled Substances to identify customers with significant ordering of high-risk formulations. High-risk formulations include, but are not limited to, 10mg hydrocodone, 8mg hydromorphone, 2mg alprazolam, single-ingredient buprenorphine (*i.e.*, buprenorphine without naloxone), and highly-abused formulations of oxycodone. On an annual basis (or as otherwise necessary), high-risk formulations of Highly Diverted Controlled Substances may be added, removed, or revised based on the Injunctive Relief Distributors' assessment and regulatory guidance.

5.  **Out-of-area patients:** Analyze Pharmacy Customer Data or Dispensing Data to assess volume of prescriptions for Highly Diverted Controlled Substances for out-of-area patients (based on number of miles traveled between a patient's zip code and the pharmacy location, depending on the geographic area of interest) taking into consideration the percentage of out-of-area patients for non-Controlled Substances.

6.  **Cash prescriptions:** Analyze Pharmacy Customer Data or Dispensing Data to assess percentage of cash payments for purchases of Controlled Substances taking into consideration the percentage of cash payments for purchases of non-Controlled Substances.

7.  **Prescriber activity of Customers:** Analyze Pharmacy Customer Data or Dispensing Data to identify Customers that are dispensing Highly Diverted Controlled Substance prescriptions for Top Prescribers as follows:

a) Top Prescribers representing a significant volume of dispensing where the prescriber's practice location is in excess of 50 miles from the pharmacy ("out-of-area"), relative to the percentage of out-of-area prescriptions for non-Controlled Substances.

b) Top Prescribers representing prescriptions for the same Highly Diverted Controlled Substances in the same quantities and dosage forms indicative of pattern prescribing (e.g., a prescriber providing many patients with the same high-dose, high-quantity supply of 30mg oxycodone HCL prescription without attention to the varying medical needs of the prescriber's patient population).

c) Top Prescribers where the top five (5) or fewer prescribers represent more than fifty percent (50%) of total prescriptions for Highly Diverted Controlled Substances during a specified period.

8. **Public regulatory actions against Customers:** Review information retrieved from companies that provide licensing and disciplinary history records (e.g., LexisNexis), and/or other public sources, including governmental entities, showing that the Customer, pharmacists working for that Customer, or the Customer's Top Prescribers have been subject, in the last five (5) years, to professional disciplinary sanctions regarding the dispensing or handling of Controlled Substances or law enforcement action related to Controlled Substances diversion. Continued licensing by a relevant state agency may be considered, but shall not be dispositive, in resolving the Red Flag. For Chain Customer locations, representations from each Chain Customer that it reviews its pharmacists' licensing statuses annually and for the regulatory actions described in this paragraph has either (i) taken appropriate employment action, or (ii) disclosed the regulatory action to the Injunctive Relief Distributor, may be considered in resolving the Red Flag.

9. **Customer termination data:** Review information from the Injunctive Relief Distributor's due diligence files and, when operable, from the Clearinghouse, subject to Section VIII.F, regarding Customers that have been terminated from ordering Controlled Substances by another distributor due to concerns regarding Controlled Substances.

E. For any Red Flag evaluation in Section VIII.D that may be performed using Pharmacy Customer Data or Dispensing Data, an Injunctive Relief Distributor will analyze the Red Flag using Pharmacy Customer Data, to the extent feasible based on the functionality of a Customer's pharmacy management system, until Dispensing Data is collected and analyzed by the Clearinghouse as described in Section XVII. Until Dispensing Data is collected and analyzed by the Clearinghouse, an Injunctive Relief Distributor may satisfy the Red Flag evaluations in Sections VIII.D.5 through VIII.D.7 by engaging in considerations of out-of-area patients, cash payments for prescriptions and Top Prescribers

-11-

without satisfying the specific requirements of Sections VIII.D.5 through VIII.D.7. In the event that the Clearinghouse is not collecting and analyzing Dispensing Data within two years of the Effective Date, the Injunctive Relief Distributors and the State Compliance Review Committee shall meet and confer to consider alternatives for the performance of the analysis required by Sections VIII.D.5 through VIII.D.7 using Pharmacy Customer Data.

F.    As provided for in Section XVII.C.4, the foregoing Red Flag evaluations may be performed by the Clearinghouse and reported to the relevant Injunctive Relief Distributors.

G.    The Injunctive Relief Distributors and the State Compliance Review Committee shall work in good faith to identify additional potential Red Flags that can be derived from the data analytics to be performed by the Clearinghouse.

## IX.   ONBOARDING

A.    For each Injunctive Relief Distributor, prior to initiating the sale of Controlled Substances to a potential Customer, a member of the Injunctive Relief Distributor's CSMP department (or a qualified third-party compliance consultant trained on the Injunctive Relief Distributor's CSMP) shall perform the following due diligence:

    1.    Interview the pharmacist-in-charge, either over the telephone, via videoconference, or in person. The interview shall include questions regarding the manner in which the potential Customer maintains effective controls against the potential diversion of Controlled Substances.

    2.    Obtain a "Pharmacy Questionnaire" completed by the owner and/or pharmacist-in-charge of the potential Customer. The Pharmacy Questionnaire shall require going-concern potential Customers to list their top ten (10) prescribers for Highly Diverted Controlled Substances combined, along with the prescriber's specialty, unless the Injunctive Relief Distributor is able to obtain this data otherwise. The Pharmacy Questionnaire shall also require disclosure of the identity of all other distributors that serve the potential Customer, and whether the potential Customer has been terminated or suspended from ordering Controlled Substances by another distributor and the reason for any termination or suspension. The Pharmacy Questionnaire shall request information that would allow the Injunctive Relief Distributor to identify Red Flags, including questions regarding the manner in which the potential Customer maintains effective controls against the potential diversion of Controlled Substances. A potential Customer's responses to the Pharmacy Questionnaire shall be verified, to the extent applicable and practicable, against external sources (for example, the Clearinghouse, once operational, and Automation of Reports and Consolidated Orders System ("*ARCOS*") data made available to the Injunctive Relief Distributor by the

DEA). The Pharmacy Questionnaire shall be maintained by the Injunctive Relief Distributor in a database accessible to its CSMP personnel.

3.  Complete a written onboarding report to be maintained in a database accessible to the Injunctive Relief Distributor's CSMP personnel reflecting the findings of the interview and any site visit, the findings regarding the identification of and, if applicable, conclusion concerning any Red Flag associated with the pharmacy, as well as an analysis of the Pharmacy Questionnaire referenced in the preceding paragraph.

4.  For going-concern potential Customers, review Pharmacy Customer Data to assist with the identification of any Red Flags.

5.  Document whether the potential Customer or the pharmacist-in-charge has been subject to any professional disciplinary sanctions or law enforcement activity related to Controlled Substances dispensing, and, if so, the basis for that action. For Chain Customers, this provision shall apply to the potential specific pharmacies in question.

B.  For Chain Customers, each Injunctive Relief Distributor may obtain the information in Section IX.A from a corporate representative of the Chain Customer.

C.  In the event that an Injunctive Relief Distributor identifies one or more unresolved Red Flags or other information indicative of potential diversion of Controlled Substances through the onboarding process or otherwise, the Injunctive Relief Distributor shall refrain from selling Controlled Substances to the potential Customer pending additional due diligence. If following additional due diligence, the Injunctive Relief Distributor is unable to resolve the Red Flags or other information indicative of diversion, the Injunctive Relief Distributor shall not initiate the sale of Controlled Substances to the potential Customer and shall report the potential Customer consistent with Section XIV. If the Injunctive Relief Distributor determines that the potential Customer may be onboarded for the sale of Controlled Substances, the Injunctive Relief Distributor shall document the decision and the bases for its decision. Such a good faith determination, if documented, shall not serve, without more, as the basis of a future claim of non-compliance with the Injunctive Relief Terms. For Chain Customers, these provisions shall apply to the potential specific pharmacies in question.

X.  **ONGOING DUE DILIGENCE**

A.  Each Injunctive Relief Distributor shall periodically review its procedures and systems for detecting patterns or trends in Customer order data or other information used to evaluate whether a Customer is maintaining effective controls against diversion.

B.  Each Injunctive Relief Distributor shall conduct periodic proactive compliance reviews of its Customers' performance in satisfying their corresponding

-13-

responsibilities to maintain effective controls against the diversion of Controlled Substances.

C.       Each Injunctive Relief Distributor shall review ARCOS data made available to it by the DEA and, once operational, by the Clearinghouse, to assist with Customer specific due diligence. For Chain Customers, this provision shall apply to the potential specific pharmacies in question.

D.       Each Injunctive Relief Distributor shall conduct due diligence as set forth in its CSMP policies and procedures in response to concerns of potential diversion of Controlled Substances at its Customers. For Chain Customers, these provisions shall apply to the specific pharmacies in question. The due diligence required by an Injunctive Relief Distributor's CSMP policies and procedures may depend on the information or events at issue. The information or events raising concerns of potential diversion of Controlled Substances at a Customer include but are not limited to:

1.       The discovery of one or more unresolved Red Flags;

2.       The receipt of information directly from law enforcement or regulators concerning potential diversion of Controlled Substances at or by a Customer;

3.       The receipt of information concerning the suspension or revocation of pharmacist's DEA registration or state license related to potential diversion of Controlled Substances;

4.       The receipt of reliable information through the hotline established in Section V.E concerning suspected diversion of Controlled Substances at the Customer;

5.       The receipt of reliable information from another distributor concerning suspected diversion of Controlled Substances at the Customer; or

6.       Receipt of other reliable information that the Customer is engaged in conduct indicative of diversion or is failing to adhere to its corresponding responsibility to prevent the diversion of Highly Diverted Controlled Substances.

E.       On an annual basis, each Injunctive Relief Distributor shall obtain updated pharmacy questionnaires from five hundred (500) Customers to include the following:

1.       The top 250 Customers by combined volume of Highly Diverted Controlled Substances purchased from the Injunctive Relief Distributor measured as of the end of the relevant calendar year; and

-14-

2.  Additional Customers selected as a representative sample of various geographic regions, customer types (Independent Retail Pharmacy Customers and Chain Customers), and distribution centers. Each Injunctive Relief Distributor's Chief Diversion Control Officer shall develop risk-based criteria for the sample selection.

F.  Scope of Review

1.  For reviews triggered by Section X.D, an Injunctive Relief Distributor shall conduct due diligence and obtain updated Pharmacy Customer Data or equivalent, or more comprehensive data from the Clearinghouse if needed, as set forth in its CSMP policies and procedures.

2.  For questionnaires collected pursuant to Section X.E, Injunctive Relief Distributors shall conduct a due diligence review consistent with the Injunctive Relief Distributors' CSMP policies and procedures. These annual diligence reviews shall be performed in addition to any of the diligence reviews performed under Section X.D, but may reasonably rely on reviews performed under Section X.D.

3.  If the Injunctive Relief Distributor decides to terminate the Customer due to concerns regarding potential diversion of Controlled Substances, the Injunctive Relief Distributor shall promptly cease the sale of Controlled Substances to the Customer and report the Customer consistent with Section XIV. If the Injunctive Relief Distributor decides not to terminate the Customer, the Injunctive Relief Distributor shall document that determination and the basis therefor. Such a good faith determination, if documented, shall not, without more, serve as the basis of a future claim of non-compliance with the Injunctive Relief Terms.

## XI.  SITE VISITS

A.  Each Injunctive Relief Distributor shall conduct site visits, including unannounced site visits, where appropriate, of Customers, as necessary, as part of Customer due diligence.

B.  During site visits, an Injunctive Relief Distributor's CSMP personnel or qualified third-party compliance consultants shall interview the pharmacist-in-charge or other relevant Customer employees, if appropriate, about any potential Red Flags and the Customer's maintenance of effective controls against the potential diversion of Controlled Substances.

C.  An Injunctive Relief Distributor's CSMP personnel or qualified third-party compliance consultants who conduct site visits shall document the findings of any site visit.

D.  Site visit and all other compliance reports shall be maintained by each Injunctive Relief Distributor in a database accessible to all CSMP personnel.

## XII. THRESHOLDS

A.     Each Injunctive Relief Distributor shall use Thresholds to identify potentially Suspicious Orders of Controlled Substances from Customers.

B.     Each Injunctive Relief Distributor's CSMP department shall be responsible for the oversight of the process for establishing and modifying Thresholds. The sales departments of the Injunctive Relief Distributors shall not have the authority to establish or adjust Thresholds for any Customer or participate in any decisions regarding establishment or adjustment of Thresholds.

C.     Injunctive Relief Distributors shall not provide Customers specific information about their Thresholds or how their Thresholds are calculated.

        1.     Threshold Setting

                a)     Injunctive Relief Distributors shall primarily use model-based thresholds. For certain circumstances, Injunctive Relief Distributors may apply a non-model threshold based on documented customer diligence and analysis.

                b)     Each Injunctive Relief Distributor shall include in its Annual Threshold Analysis and Assessment Report (as required by Section XVIII.F.3.c) to the Monitor summary statistics regarding the use of non-model thresholds and such information shall be considered by the Monitor as part of its Threshold Setting Process Review in the annual Audit Report.

                c)     For the purposes of establishing and maintaining Thresholds, each Injunctive Relief Distributor shall take into account the Controlled Substances diversion risk of each drug base code. The diversion risk of each base code should be defined and reassessed annually by the Injunctive Relief Distributor's CSMP Committee and reviewed by the Monitor.

                d)     Each Injunctive Relief Distributor shall establish Thresholds for new Customers prior to supplying those Customers with Controlled Substances and shall continue to have Thresholds in place at all times for each Customer to which it supplies Controlled Substances.

                e)     When ordering volume from other distributors becomes readily available from the Clearinghouse, an Injunctive Relief Distributor shall consider including such information as soon as reasonably practicable in establishing and maintaining Thresholds.

f)  Each Injunctive Relief Distributor shall incorporate the following guiding principles in establishing and maintaining Customer Thresholds, except when inapplicable to non-model Thresholds:

(1)  Thresholds shall take into account the number of non-Controlled Substance dosage units distributed to, dispensed and/or number of prescriptions dispensed by the Customer to assist with the determination of Customer size. As a general matter, smaller customers should have lower Thresholds than larger customers.

(2)  For the purposes of establishing and maintaining Thresholds, Injunctive Relief Distributors shall use statistical models that are appropriate to the underlying data.

(3)  For the purposes of establishing and maintaining Thresholds, Injunctive Relief Distributors shall take into account a Customer's ordering and/or dispensing history for a specified period of time.

(4)  For the purposes of establishing and maintaining Thresholds, Injunctive Relief Distributors shall take into account the ordering history of Customers within similar geographic regions, or, where appropriate for Chain Customers, ordering history within the chain.

(5)  If appropriate, Thresholds may take into account the characteristics of Customers with similar business models.

(a)  A Customer's statement that it employs a particular business model must be verified, to the extent practicable, before that business model is taken into account in establishing and maintaining a Customer's Threshold.

2.  Threshold Auditing

a)  The Injunctive Relief Distributors shall review their respective Customer Thresholds at least on an annual basis and modify them where appropriate.

b)  Each Injunctive Relief Distributor's CSMP department shall annually evaluate its Threshold setting methodology and processes and its CSMP personnel's performance in adhering to those policies.

3.  Threshold Changes

-17-

a)      An Injunctive Relief Distributor may increase or decrease a Customer Threshold as set forth in its CSMP policies and procedures, subject to Sections XII.C.3.b through XII.C.3.e.

b)      Prior to approving any Threshold change request by a Customer, each Injunctive Relief Distributor shall conduct due diligence to determine whether an increase to the Threshold is warranted. This due diligence shall include obtaining from the Customer the basis for the Threshold change request, obtaining and reviewing Dispensing Data and/or Pharmacy Customer Data for the previous three (3) months for due diligence purposes, and, as needed, conducting an on-site visit to the Customer. This Threshold change request diligence shall be conducted by the Injunctive Relief Distributor's CSMP personnel.

c)      No Injunctive Relief Distributor shall proactively contact a Customer to suggest that the Customer request an increase to any of its Thresholds, to inform the Customer that its Orders-to-date are approaching its Thresholds or to recommend to the Customer the amount of a requested Threshold increase. It shall not be a violation of this paragraph to provide Chain Customer headquarters reporting on one or more individual Chain Customer pharmacy location(s) to support the anti-diversion efforts of the Chain Customer's headquarters staff, and it shall not be a violation of this paragraph for the Injunctive Relief Distributor's CSMP personnel to contact Customers to seek to understand a Customer's ordering patterns.

d)      An Injunctive Relief Distributor's Chief Diversion Control Officer may approve criteria for potential adjustments to Customer Thresholds to account for circumstances where the Thresholds produced by the ordinary operation of the statistical models require modification. Such circumstances include adjustments to account for seasonal ordering of certain Controlled Substances that are based on documented diligence and analysis, adjustments made to permit ordering of certain Controlled Substances during a declared national or state emergency (e.g., COVID-19 pandemic), IT errors, and data anomalies causing results that are inconsistent with the design of the statistical models. Each Injunctive Relief Distributor shall include in its Annual Threshold Analysis and Assessment Report (as required by Section XVIII.F.3.c) to the Monitor information regarding the use of this paragraph and such information shall be considered by the Monitor as part of its Threshold Setting Process Review in the annual Audit Report.

e)      Any decision to raise a Customer's Threshold in response to a request by a Customer to adjust its Threshold must be documented

in a writing and state the reason(s) for the change. The decision must be consistent with the Injunctive Relief Distributor's CSMP and documented appropriately.

## XIII. SUSPICIOUS ORDER REPORTING AND NON-SHIPMENT

A.     Each Injunctive Relief Distributor shall report Suspicious Orders to the Settling States ("*Suspicious Order Reports*" or "*SORs*"), including those Settling States that do not currently require such SORs, at the election of the Settling State.

B.     For the SORs required by the Injunctive Relief Terms, each Injunctive Relief Distributor shall report Orders that exceed a Threshold for Controlled Substances set pursuant to the processes in Section XII that are blocked and not shipped.

C.     No Injunctive Relief Distributor shall ship any Order that it (i) reports pursuant to Sections XIII.A or XIII.B, or (ii) would have been required to report pursuant to Sections XIII.A or XIII.B had the Settling State elected to receive SORs.

D.     In reporting Suspicious Orders to the Settling States, the Injunctive Relief Distributors shall file SORs in a standardized electronic format that is uniform among the Settling States and contains the following information fields:

1.     Customer name;

2.     Customer address;

3.     DEA registration number;

4.     State pharmacy license number;

5.     Date of order;

6.     NDC number;

7.     Quantity;

8.     Explanation for why the order is suspicious (up to 250 characters): Details that are order-specific regarding why an order was flagged as a Suspicious Order, including specific criteria used by an Injunctive Relief Distributor's Threshold system (except phrases such as "order is of unusual size" without any additional detail are not acceptable); and

9.     Name and contact information for a knowledgeable designee within the Injunctive Relief Distributor's CSMP department to be a point of contact for the SORs.

E.     On a quarterly basis, each Injunctive Relief Distributor shall provide a summary report to the Settling States that elect to receive it that provides the following

information for the relevant quarter with respect to the top ten (10) Customers by volume for each Highly Diverted Controlled Substance base code that have placed a Suspicious Order for that base code, in that quarter (for Chain Customers, only individual pharmacies in the chain will considered for evaluation as a top ten (10) Customer):

1.  The number of SORs submitted for that Customer by base code;

2.  The Customer's order volume by base code for the quarter for all Highly Diverted Controlled Substances;

3.  The Customer's order frequency by base code for the quarter for all Highly Diverted Controlled Substances;

4.  For each Highly Diverted Controlled Substance base code, the ratio of the Customer's order volume for that base code to the volume of all pharmaceutical orders for the quarter; and

5.  The ratio of the Customer's order volume of all Controlled Substances to the volume of all pharmaceutical orders for the quarter.

F.   The Injunctive Relief Distributors shall only be required to file a single, uniform, electronic form of SOR with any Settling State that receives SORs pursuant to these Injunctive Relief Terms. A Settling State retains the authority pursuant to applicable state law or relevant state agency authority to request additional information about a particular SOR.

G.   It is the objective of the Settling States and the Injunctive Relief Distributors for the Injunctive Relief Distributors to provide SORs to Settling States that identify the same Suspicious Orders as reported to the DEA pursuant to the definition and requirements of the federal Controlled Substances Act and its regulations, although the fields of the SORs submitted to the Settling States as required by Section XIII may differ from the content required by the DEA. To the extent federal definitions and requirements materially change during the term of the Injunctive Relief Terms, the Injunctive Relief Distributors may be required to adjust the format and content of the SORs to meet these federal requirements. The Injunctive Relief Distributors and the State Compliance Review Committee will engage in good faith discussions regarding such adjustments.

H.   It shall not be a violation of the Injunctive Relief Terms if an Injunctive Relief Distributor ships a Suspicious Order or fails to submit or transmit a SOR if:

1.  The shipment of the Suspicious Order or failed SOR transmission was due to a computer error (data entry mistakes, coding errors, computer logic issues, software malfunctions, and other computer errors or IT failures); and

2.     The Injunctive Relief Distributor reports the error, including a description of measures that will be taken to prevent recurrence of the error, to any affected Settling State, the State Compliance Review Committee, and the Monitor within five (5) business days of its discovery.

## XIV.   TERMINATED CUSTOMERS

A.     Each Injunctive Relief Distributor shall report to the Clearinghouse, once operational, within five (5) business days (or as otherwise required by state statute or regulation), Customers it has terminated from eligibility to receive Controlled Substances or refused to onboard for the sale of Controlled Substances due to concerns regarding the Customer's ability to provide effective controls against the potential diversion of Controlled Substances following the Effective Date.

B.     The Injunctive Relief Distributors shall report to the relevant Settling State(s), within five (5) business days (or as otherwise required by state statute or regulation) Customers located in such Settling States that it has terminated from eligibility to receive Controlled Substances or refused to onboard for the sale of Controlled Substances due to concerns regarding the Customer's ability to provide effective controls against the potential diversion of Controlled Substances following the Effective Date. Such reports will be made in a uniform format. The Injunctive Relief Distributors and the State Compliance Review Committee shall use best efforts to agree on such uniform format for inclusion prior to the requirement taking effect.

C.     In determining whether a Customer should be terminated from eligibility to receive Controlled Substances, Injunctive Relief Distributors shall apply factors set out in their CSMP policies and procedures, which shall include the following conduct by a Customer:

1.     Has generated an excessive number of Suspicious Orders, which cannot otherwise be explained;

2.     Has routinely demonstrated unresolved Red Flag activity;

3.     Has continued to fill prescriptions for Highly Diverted Controlled Substances that raise Red Flags following an Injunctive Relief Distributor's warning or communication about such practices;

4.     Has failed to provide Pharmacy Customer Data or Dispensing Data in response to a request from an Injunctive Relief Distributor or otherwise refuses to cooperate with the Injunctive Relief Distributor's CSMP after providing the Customer with a reasonable amount of time to respond to the Injunctive Relief Distributor's requests;

5.     Has been found to have made material omissions or false statements on a Pharmacy Questionnaire (the requirements for the contents of a Pharmacy Questionnaire are described in Section IX); or

6.     Has been the subject of discipline by a State Board of Pharmacy within the past three (3) years or has had its owner(s) or pharmacist-in-charge subject to license probation or termination within the past five (5) years by a State Board of Pharmacy for matters related to Controlled Substances dispensing or a federal or state felony conviction.

D.     Once the Clearinghouse has made Customer termination data available to each Injunctive Relief Distributor, each Injunctive Relief Distributor shall consider terminating Customers that have been terminated from eligibility to receive Controlled Substances by another distributor as a result of suspected diversion of Controlled Substances if the Customer is ordering only Controlled Substances from the Injunctive Relief Distributor. If the Injunctive Relief Distributor determines not to terminate Customers to which this paragraph applies, the Injunctive Relief Distributor shall document its decision-making. A good-faith decision to continue shipping Controlled Substances to Customers to which this paragraph applies, shall not serve, without more, as the basis of a future claim of non-compliance with the Injunctive Relief Terms.

E.     For Chain Customers, the provisions in Section XIV.A-D shall apply to the specific pharmacies in question.

## XV.    EMERGENCIES

A.     In the circumstances of declared national or state emergencies in which the healthcare community relies on the Injunctive Relief Distributors for critical medicines, medical supplies, products, and services, the Injunctive Relief Distributors may be required to temporarily modify their respective CSMP processes to meet the critical needs of the supply chain. These modifications may conflict with the requirements of the Injunctive Relief Terms.

B.     In the case of a declared national or state emergency, the Injunctive Relief Distributors shall be required to give notice to the State Compliance Review Committee of any temporary material changes to their CSMP processes which may conflict with the requirements of the Injunctive Relief Terms and specify the sections of the Injunctive Relief Terms which will be affected by the temporary change.

C.     The Injunctive Relief Distributors shall document all temporary changes to their CSMP processes and appropriately document all customer-specific actions taken as a result of the declared national or state emergency.

D.     The Injunctive Relief Distributors shall provide notice to the State Compliance Review Committee at the conclusion of the declared national or state emergency, or sooner, stating that the temporary CSMP processes put into place have been suspended.

E.     Provided the Injunctive Relief Distributors comply with the provisions of Sections XV.A through XV.D, the Injunctive Relief Distributors will not face liability for

any deviations from the requirements of the Injunctive Relief Terms taken in good faith to meet the critical needs of the supply chain in response to the declared national or state emergency. Nothing herein shall limit Settling States from pursuing claims against the Injunctive Relief Distributors based on deviations from the requirements of the Injunctive Relief Terms not taken in good faith to meet the critical needs of the supply chain in response to a declared national or state emergency.

## XVI. COMPLIANCE WITH LAWS AND RECORDKEEPING

A. The Injunctive Relief Distributors acknowledge and agree that they must comply with applicable state and federal laws governing the distribution of Controlled Substances.

B. Good faith compliance with the Injunctive Relief Terms creates a presumption that the Injunctive Relief Distributors are acting reasonably and in the public interest with respect to Settling States' existing laws requiring effective controls against diversion of Controlled Substances and with respect to the identification, reporting, and blocking of Suspicious Orders of Controlled Substances.

C. The requirements of the Injunctive Relief Terms are in addition to, and not in lieu of, any other requirements of state or federal law applicable to Controlled Substances distribution. Except as provided in Section XVI.D, nothing in the Injunctive Relief Terms shall be construed as relieving Injunctive Relief Distributors of the obligation to comply with such laws, regulations, or rules. No provision of the Injunctive Relief Terms shall be deemed as permission for Injunctive Relief Distributors to engage in any acts or practices prohibited by such laws, regulations, or rules.

D. In the event of a conflict between the requirements of the Injunctive Relief Terms and any other law, regulation, or requirement such that an Injunctive Relief Distributor cannot comply with the law without violating the Injunctive Relief Terms or being subject to adverse action, including fines and penalties, the Injunctive Relief Distributor shall document such conflicts and notify the State Compliance Review Committee and any affected Settling State the extent to which it will comply with the Injunctive Relief Terms in order to eliminate the conflict within thirty (30) days of the Injunctive Relief Distributor's discovery of the conflict. The Injunctive Relief Distributor shall comply with the Injunctive Relief Terms to the fullest extent possible without violating the law.

E. In the event of a change or modification of federal or state law governing the distribution of Controlled Substances that creates an actual or potential conflict with the Injunctive Relief Terms, any Injunctive Relief Distributor, any affected Settling State, or the State Compliance Review Committee may request that the Injunctive Relief Distributors, State Compliance Review Committee, and any affected Settling State meet and confer regarding the law change. During the meet and confer, the Injunctive Relief Distributors, the State Compliance Review

-23-

Committee, and any affected Settling State will address whether the change or modification in federal or state law requires an amendment to the Injunctive Relief Terms. In the event the Injunctive Relief Distributors, the State Compliance Review Committee, and any affected Settling State cannot agree on a resolution, and the dispute relates to whether the generally applicable Injunctive Relief Terms herein should be changed, an Injunctive Relief Distributor, the State Compliance Review Committee, or any affected Settling State may submit the question to the National Arbitration Panel. If the dispute relates to whether a change in an individual State's law requires a modification of the Injunctive Relief Terms only with respect to that State, an Injunctive Relief Distributor, the State Compliance Review Committee, or any affected Settling State may seek resolution of the dispute pursuant to Section XIX. Maintenance of competition in the industry and the potential burden of inconsistent obligations by Injunctive Relief Distributors shall be a relevant consideration in such resolution.

F.  Recordkeeping: Each Injunctive Relief Distributor shall retain records it is required to create pursuant to its obligations hereunder in an electronic or otherwise readily accessible format. The Settling States shall have the right to review records provided to the Monitor pursuant to Section XVIII. Nothing in the Injunctive Relief Terms prohibits a Settling State from issuing a lawful subpoena for records pursuant to an applicable law.

## XVII. CLEARINGHOUSE

A.  Creation of the Clearinghouse

   1.  The Clearinghouse functions shall be undertaken by a third-party vendor or vendors.

   2.  The vendor(s) will be chosen through a process developed and jointly agreed upon by the Injunctive Relief Distributors and the State Compliance Review Committee.

   3.  Consistent with the process developed by the Injunctive Relief Distributors and the State Compliance Review Committee, within two (2) months of the Effective Date, the Injunctive Relief Distributors shall issue a Request for Proposal to develop the systems and capabilities for a Clearinghouse to perform the services of a data aggregator.

   4.  Within five (5) months of the Effective Date, the Clearinghouse Advisory Panel shall select one or more entities to develop the systems for the Clearinghouse and perform data aggregator services. The Clearinghouse Advisory Panel shall select a vendor or vendors that employ or retain personnel who have adequate expertise and experience related to the pharmaceutical industry, the distribution of Controlled Substances, and the applicable requirements of the Controlled Substances Act and the DEA's implementing regulations.

5.    Within sixty (60) days of the selection of a vendor(s) to serve as the Clearinghouse, the Injunctive Relief Distributors shall negotiate and finalize a contract with the vendor(s). The date that the contract is signed by the Injunctive Relief Distributors and the vendor(s) shall be referred to as the "*Clearinghouse Retention Date.*"

6.    The development of the Clearinghouse shall proceed on a phased approach as discussed in Sections XVII.C and XVII.D.

**B.    Governance and Staffing of the Clearinghouse**

1.    *Capabilities.* The selected vendor or vendors shall staff the Clearinghouse in a manner that ensures the development of robust data collection, analytics and reporting capabilities for the Settling States and Injunctive Relief Distributors. To the extent additional expertise is required for the engagement, the vendor(s) may retain the services of third-party consultants.

2.    *Independence.* While performing services for the Clearinghouse, all vendors and consultants, and their staff working on the Clearinghouse, shall be independent (*i.e.*, not perform services of any kind, including as a consultant or an employee on behalf of any Injunctive Relief Distributor outside of the ordinary business operations of the Clearinghouse). Independence may be achieved by implementing appropriate ethical walls with employees who are currently performing or who have previously performed work for an Injunctive Relief Distributor within two years of the Clearinghouse Retention Date.

3.    *Liability.* The Injunctive Relief Distributors are entitled to rely upon information or data received from the Clearinghouse, whether in oral, written, or other form. No Injunctive Relief Distributor, and no individual serving on the Clearinghouse Advisory Panel, shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any Party for or in connection with any action taken or not taken by the Clearinghouse. In addition, no Injunctive Relief Distributor, and no individual serving on the Clearinghouse Advisory Panel, shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any Party for or in connection with any action taken or not taken by an Injunctive Relief Distributor based on incorrect, inaccurate, incomplete or otherwise erroneous information or data provided by the Clearinghouse, unless the information or data was incorrect, inaccurate, incomplete or otherwise erroneous because the Injunctive Relief Distributor itself provided incorrect, inaccurate, incomplete or otherwise erroneous data or information to the Clearinghouse. For any legal requirements that are assumed by the Clearinghouse during Phase 2-B pursuant to Section XVII.D.3, liability shall be addressed pursuant to Section XVII.D.3.c.

4. *Clearinghouse Advisory Panel.* The State Compliance Review Committee and Injunctive Relief Distributors shall create a Clearinghouse Advisory Panel no later than sixty (60) days after the Effective Date to oversee the Clearinghouse.

 a) The Clearinghouse Advisory Panel shall have an equal number of members chosen by the State Compliance Review Committee on the one hand, and the Injunctive Relief Distributors on the other. The size of the Clearinghouse Advisory Panel will be decided by the State Compliance Review Committee and the Injunctive Relief Distributors, and the State Compliance Review Committee and the Injunctive Relief Distributors may select as members third-party experts, but no more than one half of each side's representatives may be such third-party experts. At least one member chosen by the State Compliance Review Committee will be based on consultation with the National Association of State Controlled Substances Authorities.

 b) During the first two years of the operation of the Clearinghouse, the Clearinghouse Advisory Panel shall meet (in-person or remotely) at least once per month. After the first two years of operation, the Clearinghouse Advisory Panel shall meet at least quarterly. The Monitor may attend Clearinghouse Advisory Panel meetings and may provide recommendations to the Clearinghouse Advisory Panel.

 c) The Clearinghouse Advisory Panel shall establish a subcommittee to advise on issues related to privacy, the Health Insurance Portability and Accountability Act of 1996 ("*HIPAA*"), and data security and a subcommittee to advise on issues related to Dispensing Data. It may establish additional subcommittees. Subcommittees may include individuals who are not members of the Clearinghouse Advisory Panel. The Clearinghouse Advisory Panel may invite one or more prescribers, dispensers, and representatives from state Prescription Drug Monitoring Programs ("*PDMP*") to serve on the Dispensing Data subcommittee. Each Injunctive Relief Distributor shall have a representative on each subcommittee created by the Clearinghouse Advisory Panel.

 d) The Clearinghouse Advisory Panel may delegate tasks assigned to it by the Injunctive Relief Terms to the Executive Director.

5. *Executive Director.* One employee of the vendor, or one representative from the vendor group in the event that there are multiple vendors, shall be an Executive Director who shall manage day-to-day operations and report periodically to the Clearinghouse Advisory Panel.

C. **Phase 1 of the Clearinghouse: Data Collection, Initial Analytics and Reporting**

    1.    System Development

        a)    Within one (1) year of the Clearinghouse Retention Date, the Clearinghouse shall develop systems to receive and analyze data obtained from the Injunctive Relief Distributors pursuant to electronic transmission formats to be agreed upon by the Clearinghouse Advisory Panel.

        b)    In developing such systems, the Clearinghouse shall ensure that:

            (1)    The systems provide robust reporting and analytic capabilities.

            (2)    Data obtained from Injunctive Relief Distributors shall be automatically pulled from the existing order management data platforms (e.g., SAP).

            (3)    The systems shall be designed to receive data from sources other than the Injunctive Relief Distributors, including pharmacies, non-Injunctive Relief Distributors, the DEA, State Boards of Pharmacy, and other relevant sources, pursuant to standardized electronic transmission formats.

            (4)    The systems shall be designed to protect personally identifiable information ("*PII*") and protected health information ("*PHI*") from disclosure and shall comply with HIPAA and any federal and state laws relating to the protection of PII and PHI.

            (5)    The Clearinghouse will establish a HIPAA-compliant database that can be accessed by state authorities, the Injunctive Relief Distributors, and any entities that subsequently participate in the Clearinghouse. The database that will be made available to the Injunctive Relief Distributors and any non-governmental entities that subsequently participate in the Clearinghouse will also blind commercially sensitive information.

            (6)    State authorities shall have access to the HIPAA-compliant database via web-based tools and no additional or specialized equipment or software shall be required. This access shall allow state authorities to query the HIPAA-compliant database without limitation.

(7) The Injunctive Relief Distributors shall be permitted to use data obtained from the Clearinghouse for anti-diversion purposes, including the uses expressly contemplated by the Injunctive Relief Terms. The Injunctive Relief Distributors shall not sell (or obtain license fees for) data obtained from Clearinghouse to any third-parties. Nothing in the Injunctive Relief Terms shall prohibit an Injunctive Relief Distributor from using its own data, including data provided to the Injunctive Relief Distributor by third-parties other than the Clearinghouse, for any commercial purposes, including selling or licensing its data to third-parties.

2. Aggregation of Data

a) It is the goal of the Settling States and the Injunctive Relief Distributors for the Clearinghouse to obtain comprehensive data from all distributors, pharmacies, and other relevant data sources to provide maximum permissible transparency into the distribution and dispensing of Controlled Substances. During Phase 1, the Clearinghouse Advisory Panel shall develop recommendations for ways to achieve this goal.

b) In Phase 1, the Injunctive Relief Distributors shall provide and/or facilitate the collection of, and the Clearinghouse shall collect and maintain, the following:

(1) Injunctive Relief Distributor transaction data for Controlled Substances and non-Controlled Substances, specified at the NDC, date, quantity, and customer level.

(2) Injunctive Relief Distributor information on Customers that have been terminated and/or declined onboarding due to concerns regarding Controlled Substance dispensing following the Effective Date.

c) The Clearinghouse shall make available to the Injunctive Relief Distributors, in a format to be determined by the Clearinghouse Advisory Panel, blinded data for their CSMP due diligence functions. The data will include all Controlled Substances and non-Controlled Substances and be refreshed on a regular basis. The Clearinghouse will also seek to provide non-identifying information regarding whether a single distributor is associated with multiple warehouses with unique DEA registrations (e.g., multiple distribution centers operated by a single distributor), in the data it makes available.

-28-

d)  During Phase 1, the Clearinghouse Advisory Panel (with input from its Dispensing Data subcommittee) will develop an operational plan to obtain Dispensing Data directly from pharmacies, unless the Clearinghouse Advisory Panel determines it is inadvisable to do so. The operational plan developed by the Clearinghouse Advisory Panel shall address compliance with HIPAA and shall include recommendations to facilitate the collection of Dispensing Data in compliance with HIPAA and relevant state privacy laws. To the extent possible, the Clearinghouse will begin collecting Dispensing Data during Phase 1.

e)  Nothing in the Injunctive Relief Terms shall require the Injunctive Relief Distributors to indemnify or otherwise be responsible to pharmacy customers for any claims resulting from the provision of Dispensing Data to the Clearinghouse, including, but not limited to, claims related to any data breaches occurring with the data transmitted to or maintained by the Clearinghouse.

3.  State and Federal Reporting Requirements

a)  The Injunctive Relief Distributors shall comply with state and federal transactional and Suspicious Order reporting requirements related to Controlled Substances as follows:

(1)  Until such time as the Clearinghouse is able to provide transactional and Suspicious Order regulatory reporting to the states on behalf of the Injunctive Relief Distributors, the Injunctive Relief Distributors shall continue to file all required reports under state law and those reports required by these Injunctive Relief Terms.

(2)  Once the Clearinghouse is able to process and submit such reports, the Clearinghouse may process and submit those reports on behalf of each Injunctive Relief Distributor to the states. At all times during Phase 1, each Injunctive Relief Distributor shall remain responsible for the identification of Suspicious Orders and will remain liable for a failure to submit transactional data or Suspicious Order reports required under state law or these Injunctive Relief Terms.

(3)  An Injunctive Relief Distributor may elect to fulfill its reporting obligations directly, rather than have the Clearinghouse assume the responsibility for the transmission of the various reports.

4.     Additional Reports and Analytics

a)     In consultation with the Clearinghouse Advisory Panel, the Clearinghouse shall work to develop additional reports and analyses to assist the Settling States and the Injunctive Relief Distributors in addressing Controlled Substance diversion, including, but not limited to, identifying Red Flags consistent with Section VIII.

b)     The Clearinghouse will generate analyses and reports to be used by the Settling States and the Injunctive Relief Distributors based on format and content recommended by the Clearinghouse Advisory Panel. In order to refine the format and reach final recommendations, the Clearinghouse shall prepare sample analytical reports for a sample geographic region to review with the Clearinghouse Advisory Panel. The sample reports will also be shared with the DEA in an effort to receive additional feedback.

c)     After the content and format of the sample reports have been approved by the Clearinghouse Advisory Panel, the Clearinghouse will begin producing reports on a periodic basis.

d)     The Clearinghouse will develop capabilities to provide Settling States customized reports upon reasonable request to assist in their efforts to combat the diversion of Controlled Substances and for other public health and regulatory purposes.

e)     After the Clearinghouse has obtained sufficient Dispensing Data from Customers, the Clearinghouse shall commence providing standard reports to the Settling States and Injunctive Relief Distributors that will include summaries and analysis of Dispensing Data. The reports and analytics of Dispensing Data shall be developed in consultation with the Clearinghouse Advisory Panel (including its Dispensing Data subcommittee) and shall include, but not be limited to:

(1)     Identification of Customers whose dispensing may indicate Red Flags consistent with Section VIII, as determined by the Clearinghouse from aggregate data; and

(2)     Identification of Customers whose aggregate dispensing volumes for Highly Diverted Controlled Substances are disproportionately high relative to the population of the relevant geographic area.

f)     The Clearinghouse shall also prepare reports and analyses for the Settling States and Injunctive Relief Distributors identifying prescribers whose prescribing behavior suggests they may not be

-30-

engaged in the legitimate practice of medicine. Such reports and analysis shall be developed in consultation with the Clearinghouse Advisory Panel (including its Dispensing Data subcommittee) and shall seek to identify and evaluate:

    (1)    Prescribers who routinely prescribe large volumes of Highly Diverted Controlled Substances relative to other prescribers with similar specialties, including health care professionals who prescribe a large number of prescriptions for high dosage amounts of Highly Diverted Controlled Substances;

    (2)    Prescribers whose prescriptions for Highly Diverted Controlled Substances are routinely and disproportionately filled in a geographic area that is unusual based on the prescriber's location; and

    (3)    Prescribers who routinely prescribe out-of-specialty or out-of-practice area without legitimate reason.

g)    Reports or analysis generated by the Clearinghouse may not be based on complete data due to a lack of participation by non-Injunctive Relief Distributors and pharmacies. As such, Injunctive Relief Distributors shall not be held responsible for actions or inactions related to reports and analysis prepared by the Clearinghouse which may be based on incomplete data due to a lack of participation by non-Injunctive Relief Distributors and pharmacies.

**D.    Phase 2 of the Clearinghouse: Additional Data Collection and Analytics and Assumption of CSMP Functions**

Within one (1) year of Phase 1 of the Clearinghouse being operational, the Clearinghouse and the Clearinghouse Advisory Panel shall develop a detailed strategic and implementation plan for Phase 2 of the Clearinghouse ("*Phase 2 Planning Report*"). Phase 2 will consist of two parts. Phase 2-A will focus on increasing data collection from non-Injunctive Relief Distributors, pharmacies and other data sources and developing enhanced analytics based on the experiences gained from Phase 1. Phase 2-A will also include recommendations for the development of uniform federal and state reporting. Phase 2-B will involve the potential assumption of various CSMP activities, including Threshold setting and order management by the Clearinghouse. The Phase 2 Planning Report will address both Phase 2-A and Phase 2-B. After the completion of the Phase 2 Planning Report, individual Injunctive Relief Distributors, in their sole discretion, may elect not to proceed with Phase 2-B as provided by Section XVII.E. If one or more Injunctive Relief Distributors elect to proceed with Phase 2-B, the goal will be to have Phase 2-B fully operational within two (2) years of the Clearinghouse

Retention Date and no later than three (3) years of the Clearinghouse Retention Date.

1.  Phase 2-A: Additional Data Collection and Analytics

   a)  During Phase 2-A, the Clearinghouse will continue the functions defined in Phase 1 and work to expand the scope of its data collection and enhance its analytics and reporting capabilities including the following:

      (1)  Integration of data from additional sources, including:

         (a)  Transaction data from other distributors, including manufacturers that distribute directly to retail pharmacies and pharmacies that self-warehouse; and

         (b)  Where possible, state PDMP data and other data, including, but not limited to, State Board of Medicine and Board of Pharmacy sanctions, and agreed-upon industry data. If state PDMP data is effectively duplicative of Dispensing Data already obtained in Phase 1, it will not be necessary for the Clearinghouse to obtain state PDMP data.

      (2)  Development of additional metrics analyzing the data available from the additional data sources (PDMP, other pharmacy data, sanction authorities, and third-party volume projections).

      (3)  Development of real-time or near real-time access to distribution data, dispensing data and other data sources.

      (4)  Refinement of methodologies for analyzing Dispensing Data to identify suspicious prescribers.

      (5)  Development of additional capabilities to provide Settling States, the Injunctive Relief Distributors and potentially the DEA customized reporting from the Clearinghouse upon reasonable request.

2.  Phase 2-A: Uniform Required Reporting

   a)  The Clearinghouse and the Clearinghouse Advisory Panel shall develop uniform reporting recommendations for potential implementation by state regulators in order to allow the Injunctive Relief Distributors to satisfy their obligations under the Injunctive

-32-

Relief Terms and state and federal laws in a uniform and consistent manner.

b)     It is a goal of the Settling States and the Injunctive Relief Distributors to:

     (1)     Streamline and simplify required reporting which will benefit the Injunctive Relief Distributors and the Settling States, as well as the DEA;

     (2)     Develop uniform transactional and Suspicious Order reporting requirements; and

     (3)     Provide for the submission of uniform Suspicious Order reports.

3.     Phase 2-B: Clearinghouse Assumption of CSMP Functions

a)     With respect to Phase 2-B, the Phase 2 Planning Report shall address:

     (1)     Engagement with stakeholders, including the DEA, to develop the system of Threshold setting and Suspicious Order reporting to potentially be provided by the Clearinghouse;

     (2)     Development of technology and rules, including any proposed changes to federal law or regulations;

     (3)     Development of models for the identification of Suspicious Orders and setting universal Thresholds in a manner consistent with Section XII. These models shall include active order management and order fulfillment protocols to ensure that orders are compared to relevant Thresholds by the Clearinghouse before shipment instructions are provided by the Clearinghouse to the Injunctive Relief Distributors. The models shall also include the identification of Suspicious Orders when they are placed by Customers, which will be held before shipment or blocked based on instructions provided by the Clearinghouse to the Injunctive Relief Distributors.

     (4)     Development of criteria governing distribution to Customers that have placed one or more Orders that exceed a Threshold;

(5)    Development of rules for allocating Orders placed by Customers that have more than one Distributor if one or more Orders exceed a Threshold;

(6)    Development of a pilot project for a sample geographic region to perform data analysis to test the models for Threshold setting and the identification of Suspicious Orders.

b)    Following implementation of Phase 2-B, the Injunctive Relief Distributors participating in Phase 2-B and the State Compliance Review Committee shall meet and confer with respect to whether to expand the scope of the Clearinghouse to cover additional anti-diversion functions, such as the performance of due diligence.

c)    CSMP functions that have been assumed by the Clearinghouse during Phase 2-B will no longer be performed by participating Injunctive Relief Distributors individually through their CSMPs. CSMP functions performed by the Clearinghouse will assist participating Injunctive Relief Distributors to satisfy the applicable legal obligations of those Injunctive Relief Distributors. The Clearinghouse's performance of CSMP functions will not relieve participating Injunctive Relief Distributors from their legal obligations unless (i) the Injunctive Relief Distributors and the State Compliance Review Committee jointly enter into a written agreement for the Clearinghouse to assume legal requirements during Phase 2-B; and (ii) all vendors and consultants working on the Clearinghouse agree in writing to assume such obligations. Nothing in this paragraph shall apply to any Injunctive Relief Distributor that does not participate in Phase 2-B pursuant to Section XVII.E.

**E.**    **Option to Opt Out of Phase 2-B**

1.    Each Injunctive Relief Distributor shall have the option, in its sole discretion, to elect not to participate in Phase 2-B at any point. In the event that an Injunctive Relief Distributor elects not to participate in Phase 2-B, that Injunctive Relief Distributor shall cease to have any obligation to fund future costs directly related to Phase 2-B of the Clearinghouse or to implement the Clearinghouse's determinations as to identification of Suspicious Orders and Suspicious Order reporting. If an Injunctive Relief Distributor elects not to participate in Phase 2-B, that Injunctive Relief Distributor shall remain responsible for the requirements specified for Phase 1 and Phase 2-A of the Clearinghouse and shall be responsible for contributing to the costs associated with Phase 1 and Phase 2-A.

2. In the event that an Injunctive Relief Distributor elects not to participate in Phase 2-B, the Clearinghouse Advisory Panel shall discuss and make recommendations for any necessary adjustments to the Phase 2-B capabilities described in Section XVII.D.3.

F. **Funding**

1. The establishment and ongoing operations of the Clearinghouse shall be funded by the Injunctive Relief Distributors for a period of ten (10) years commencing on the Clearinghouse Retention Date.

2. For each of the first two (2) years of the operation of the Clearinghouse, the Injunctive Relief Distributors will make total payments of $7.5 million per year combined. For years three (3) through ten (10), the Injunctive Relief Distributors will make total payments of $3 million per year combined. Additional costs associated with Phase 2-B shall be billed to the Injunctive Relief Distributors participating in Phase 2-B.

3. Payments by the Injunctive Relief Distributors for the Clearinghouse shall be allocated among the Injunctive Relief Distributors as set forth in Section IV.H of the Settlement Agreement, dated as of July 21, 2021, which incorporates these Injunctive Relief Terms as Exhibit R.

4. In the event that the cost of the Clearinghouse exceeds the amounts provided by the Injunctive Relief Distributors, the Injunctive Relief Distributors and State Compliance Review Committee shall meet-and-confer on alternatives, which may include:

   a) Limiting the operations of the Clearinghouse consistent with a revised budget;

   b) Seeking additional sources of funding for the Clearinghouse; and/or

   c) Allocating, in a manner consistent with the allocation of payments between the Injunctive Relief Distributors as set forth in Section XVII.F.3, additional amounts that are the responsibility of the Injunctive Relief Distributors to be used for the operation of the Clearinghouse.

5. The Injunctive Relief Distributors and the State Compliance Review Committee agree to engage in good faith discussions regarding potential continued operation and funding of the Clearinghouse following the initial ten (10) year period of Clearinghouse operations.

6. The Injunctive Relief Distributors and the State Compliance Review Committee shall develop a means to obtain payments from other parties that may use or benefit from the Clearinghouse, including, but not limited

to, other settling defendants, non-Injunctive Relief Distributors, or other parties and the Clearinghouse Advisory Panel shall consider other funding sources for the Clearinghouse. This may include consideration of a user fee or other model by which non-Injunctive Relief Distributors that use the Clearinghouse will contribute to funding the Clearinghouse.

7. In the event that ten (10) or more Settling States reach agreements with any national retail chain pharmacies to resolve claims related to the distribution of Controlled Substances, the Settling States' Attorneys' General agree to make participation in the Clearinghouse, including providing data to the Clearinghouse and contribution to the cost of the operation of the Clearinghouse, a condition of any settlement. The Settling States' Attorneys' General agree to make best efforts to ensure that any other settling distributors and/or pharmacies participate in the Clearinghouse. To the extent that the Attorneys General are able to secure participation by additional distributors and/or pharmacies, it is anticipated that, to the extent practicable based on the financial and relative size of the settling distributor and/or pharmacy, those entities will contribute to the cost of the operation of the Clearinghouse. The Injunctive Relief Distributors' obligation to fund the Clearinghouse shall be partially reduced by contributions obtained from other distributors and/or pharmacies pursuant to a formula to be determined by the Clearinghouse Advisory Panel.

## G.    Confidentiality

1. All data provided to the Clearinghouse shall be confidential.

2. Information provided by distributors participating in the Clearinghouse may not be provided to any other entity or individual outside those expressly contemplated by the Injunctive Relief Terms.

3. The Clearinghouse may not provide to any distributor information specific to another distributor. Notwithstanding the prior sentence, the Clearinghouse may provide blinded data to a distributor reflecting total Orders (across all distributors) for a particular Customer, region, and/or state at the base code and NDC number level and all transactional data information. Such information may only be used by receiving distributors for purposes of identifying, minimizing, or otherwise addressing the risk of Controlled Substances diversion. No distributor or pharmacy, including the Injunctive Relief Distributors, shall attempt to obtain revenue from this information. Such information provided by the Clearinghouse shall be compliant with all applicable laws and regulations.

4. If the Clearinghouse receives a request for disclosure of any data, material or other information created or shared under the Injunctive Relief Terms, pursuant to a Third Party Request, the Clearinghouse shall notify the

Injunctive Relief Distributors and the Clearinghouse Advisory Panel of the Third Party Request and any confidential information to be disclosed so that the Injunctive Relief Distributors may seek a protective order or otherwise challenge or object to the disclosure. The Clearinghouse shall provide the Injunctive Relief Distributors and the Clearinghouse Advisory Panel with at least ten (10) days' advance notice before complying with any Third Party Request for confidential information, except where state law requires a lesser period of advance notice.

### H. Data Integrity

1. The Clearinghouse shall use best-in-class technology to preserve the integrity of the data.

2. The Clearinghouse shall report any data breaches under HIPAA and state law that occur as a result of any of its data collection and reporting activities to the Settling States and other authorities as required by law.

3. The Injunctive Relief Distributors and the Settling States shall not be liable for any breaches of any databases maintained by the Clearinghouse. This does not excuse the Clearinghouse or its vendor(s) from compliance with all state and federal laws and regulations governing (1) the protection of personal information and protected health information, or (2) notifications relating to Data Security Events.

### I. Credit for Investment in the Clearinghouse

1. The Injunctive Relief Distributors and the State Compliance Review Committee shall negotiate in good faith regarding a potential credit against Injunctive Relief Distributors' overall settlement obligations if costs exceed the amounts specified in Section XVII.F.

## XVIII. MONITOR

### A. Monitor Selection and Engagement

1. The Injunctive Relief Distributors shall engage a Monitor to perform the reviews described in Section XVIII.F. The Monitor shall employ or retain personnel who have appropriate qualifications related to the pharmaceutical industry and the laws governing the distribution of pharmaceuticals, the distribution of Controlled Substances, and the applicable requirements of federal and state law. The Monitor may also employ or retain personnel who have appropriate qualifications in the audit and review of sample documents in order to conduct the reviews described in Section XVIII.F. To the extent additional expertise is required for the engagement, the Monitor may retain the services of third-party consultants.

2.    The Monitor must perform each review described in Section XVIII.F in a professionally independent and objective fashion, as defined in the most recent Government Auditing Standards issued by the United States Government Accountability Office. A Monitor shall not be engaged in active litigation involving one or more of the Injunctive Relief Distributors or Settling States or present a potential conflict of interest involving matters concerning an Injunctive Relief Distributor, except by agreement of the affected parties. If the Monitor is employed by an entity that performed work for any Injunctive Relief Distributor or any of the Settling States prior to the Effective Date, the Monitor will cause to be implemented appropriate ethical walls between the Monitor team and the employees of the firm who have previously performed work for an Injunctive Relief Distributor or any of the Settling States.

3.    The process for selecting the Monitor shall be as follows:

a)    Within sixty (60) calendar days of the Effective Date, the Injunctive Relief Distributors and the State Compliance Review Committee shall exchange pools of recommended candidates to serve as the Monitor. The pools shall each contain the names of three (3) individuals, groups of individuals, or firms.

b)    After receiving the pools of Monitor candidates, the Injunctive Relief Distributors and the State Compliance Review Committee shall have the right to meet with the candidates and conduct appropriate interviews of the personnel who are expected to work on the project. The Injunctive Relief Distributors (individually or in combination) and the State Compliance Review Committee may veto any of the candidates, and must do so in writing within thirty (30) days of receiving the pool of candidates. If all three (3) candidates within a pool are rejected by either the Injunctive Relief Distributors or the State Compliance Review Committee, the party who rejected the three (3) candidates may direct the other party to provide up to three (3) additional qualified candidates within thirty (30) calendar days of receipt of said notice.

c)    If the Injunctive Relief Distributors or the State Compliance Review Committee do not object to a proposed candidate, the Injunctive Relief Distributors or the State Compliance Review Committee shall so notify the other in writing within thirty (30) days of receiving the pool of candidates. If more than one candidate remains, the State Compliance Review Committee shall select the Monitor from the remaining candidates. Within thirty (30) calendar days of the selection of the Monitor, the Injunctive Relief Distributors shall retain the Monitor, and finalize all terms of engagement, supplying a copy of an engagement letter to the State Compliance Review Committee. The terms of engagement

shall include a process by which Injunctive Relief Distributors may challenge Monitor costs as excessive, duplicative or unnecessary, which process must be approved by the State Compliance Review Committee.

4. The Injunctive Relief Distributors shall be responsible for the Monitor's fees and costs directly related to its performance of the work specified by the Injunctive Relief Terms up to a limit of $1,000,000 per year per Injunctive Relief Distributor (*i.e.*, a total of $3,000,000 per year).

5. Prior to each year, the Monitor shall submit a combined annual budget to the Injunctive Relief Distributors and State Compliance Review Committee that shall not exceed a total of $3,000,000. The Monitor shall submit quarterly reports to the Injunctive Relief Distributors and the State Compliance Review Committee tracking actual spend to the annual budget.

6. In the event that any of the Injunctive Relief Distributors or State Compliance Review Committee believe that the Monitor is not performing its duties and responsibilities under the Injunctive Relief Terms in a reasonably cost effective manner, an Injunctive Relief Distributor or the State Compliance Review Committee shall recommend in writing changes to the Monitor's practices to reduce cost. The Monitor, Injunctive Relief Distributors, and the State Compliance Review Committee shall meet and confer in good faith in response to such a recommendation.

7. In the event that the Injunctive Relief Distributor and the State Compliance Review Committee cannot agree on whether the recommended cost reductions are warranted, either the State Compliance Review Committee or the Injunctive Relief Distributors may submit the question to the National Arbitration Panel, who shall determine whether the Monitor is performing its duties and responsibilities under the Injunctive Relief Terms in a reasonably cost effective manner, and, if not, the necessary changes to the Monitor's practices to reduce cost.

8. If the National Arbitration Panel determines that the Monitor cannot complete the reviews described in Section XVIII.F within the combined annual budget of $3,000,000, the National Arbitration Panel shall require the Monitor to provide the Injunctive Relief Distributors and the State Compliance Review Committee with a written report explaining why it is not possible to complete the reviews within budget and all steps the Monitor has taken to perform its duties and responsibilities under the Injunctive Relief Terms in a reasonably cost effective manner. After receiving the Monitor's report, the Injunctive Relief Distributors, and the State Compliance Review Committee shall meet and confer in good faith to determine whether an increase in the combined budget is appropriate. If the Injunctive Relief Distributors and the State Compliance Review

Committee cannot reach an agreement on the amount of the reasonable costs in excess of $3,000,000 for the relevant year, the issue will be submitted to the National Arbitration Panel for resolution. The National Arbitration Panel may award additional costs up to total cap of $5,000,000 for the relevant year ($3,000,000 plus an additional $2,000,000).

9. Unless the Injunctive Relief Distributors and the State Compliance Review Committee agree otherwise as part of the meet and confer process in the prior paragraph (such as by agreeing to limit the Monitor's duties and responsibilities for the remainder of the year), the amount above $3,000,000 and up to the total cap of $5,000,000 in a given year necessary for the Monitor to complete the reviews described in Section XVIII.F shall be divided evenly among the Injunctive Relief Distributors without reducing any other amounts that are the responsibility of the Injunctive Relief Distributors.

B. Early Termination of the Monitor

1. In the event any of the Injunctive Relief Distributors or State Compliance Review Committee believe that the Monitor is not performing its duties and responsibilities under the Injunctive Relief Terms in a reasonably professional, competent and independent manner, an Injunctive Relief Distributor or the State Compliance Review Committee shall recommend replacement of the Monitor in writing. The Injunctive Relief Distributors and the State Compliance Review Committee shall meet and confer in good faith in response to a recommendation to replace the Monitor. If the State Compliance Review Committee and the Injunctive Relief Distributors agree that the Monitor should be replaced, a replacement Monitor will be selected in the manner set forth in Section XVIII.A.3.

2. In the event the Injunctive Relief Distributor and the State Compliance Review Committee cannot agree on whether the Monitor should be replaced, either the State Compliance Review Committee or the Injunctive Relief Distributors may submit the question of the Monitor's dismissal to the National Arbitration Panel, and the Monitor shall only be dismissed if that panel finds that there is Good Cause for dismissal. Good Cause for dismissal shall mean (a) a material and substantial breach of the terms of the Monitor's obligations under the Injunctive Relief Terms; (b) any act of dishonesty, misappropriation, embezzlement, intentional fraud, or similar conduct by the Monitor; (c) any clear pattern of bias or prejudice in favor or against any party by the Monitor; (d) conduct by the Monitor that demonstrates unfitness to fulfill the functions of the Monitor reasonably and competently; or (e) conflicts of interest described in Section XVIII.A.2. If the panel finds that the Monitor should be dismissed, a replacement Monitor will be selected in the manner set forth in Section XVIII.A.3.

3.     In addition, if the Monitor resigns for any reason, a replacement Monitor will be selected in the manner set forth in Section XVIII.A.3.

C.     Term and Reporting Periods

1.     The term of the Monitor will be five (5) years from the date the Monitor is appointed, divided into one-year periods for purposes of the reviews and reporting described in Section XVIII ("*Reporting Periods*").

D.     Monitor Access to Information

1.     In connection with its reviews set forth in Section XVIII.F, the Monitor may request to interview employees with appropriate authority and responsibilities as necessary. In the event that an Injunctive Relief Distributor believes that the Monitor is requesting an unreasonable number of interviews or requesting interviews of employees who do not have relevant information to the reviews required by Section XVIII.F, the Injunctive Relief Distributor and State Compliance Review Committee shall meet and confer in good faith to resolve this issue.

2.     The Chief Diversion Control Officer of each Injunctive Relief Distributor or a direct report of the Chief Diversion Control Officer shall serve as the primary point of contact for the Monitor to facilitate the Monitor's access to documents, materials, or staff necessary to conduct the reviews specified in Section XVIII.F. The Monitor shall communicate any request for documents, materials, or access to staff to the Chief Diversion Control Officers or their designees.

3.     If at any time the Monitor believes there is undue delay, resistance, interference, limitation, or denial of access to any records or to any employee or former employee deemed necessary by the Monitor to conduct the reviews specified in Section XVIII.F, the Monitor shall notify the Chief Diversion Control Officer of the Injunctive Relief Distributor and they shall meet and confer to resolve such issue. If the Monitor believes that the matter was not resolved, the Monitor shall immediately report the issue to the State Compliance Review Committee.

4.     To the extent any of the documents requested by the Monitor contain material protected from disclosure by any legal privilege, including the attorney-client privilege or attorney work product protections, an Injunctive Relief Distributor may redact such material before providing the documents to the Monitor, but must provide the Monitor with a privilege log describing the redacted information and identifying the basis for redaction.

5.     Notwithstanding any other information referenced and produced pursuant to Section XVIII, the Monitor shall have access to, and each Injunctive Relief Distributor's Chief Diversion Control Officer shall produce to the

-41-

Monitor, any settlement agreements with government entities entered into after the Effective Date specifically concerning the requirements contained in the Injunctive Relief Terms and an Injunctive Relief Distributor's distribution of Controlled Substances (as opposed to distribution of pharmaceutical products in general).

E.    Settling States' Access to Monitor

    1.    Other than in connection with the initiation of a Notice of Potential Violation set forth in Section XIX.B.2, should the Monitor believe it needs to initiate communication with the State Compliance Review Committee regarding an Injunctive Relief Distributor's compliance with the Injunctive Relief Terms, the Monitor's communications should include the Chief Diversion Control Officer or counsel of the affected Injunctive Relief Distributor, regardless of the form of communication.

    2.    The State Compliance Review Committee shall have access to any settlement agreements produced to the Monitor pursuant to Section XVIII.D.5.

F.    Reviews to be Conducted by the Monitor

    1.    There shall be two (2) types of reviews to be conducted by the Monitor:

        a)    Customer-specific reviews, as set forth in Section XVIII.F.2; and

        b)    System reviews, as set forth in Section XVIII.F.3.

    2.    Customer-Specific Reviews

        a)    The following Customer-specific reviews will be conducted by the Monitor for each Injunctive Relief Distributor for each of the Reporting Periods:

            (1)    Threshold Change Request Review ("*TCR Review*");

            (2)    Onboarding New Customer Review ("*Onboarding Review*");

            (3)    Ongoing Due Diligence Review ("*Ongoing Diligence Review*");

            (4)    Customer Termination Review ("*Termination Review*"); and

            (5)    Orders that Exceed Thresholds but are Shipped Review ("*Exceeded Threshold Review*").

b)     Sample selection and audit periods for TCR Reviews, Onboarding Reviews, Ongoing Diligence Reviews, Termination Reviews, and Exceeded Threshold Reviews:

    (1)     For each Reporting Period, the Monitor will review a representative sample of files for the performance of the TCR Reviews, Onboarding Reviews, and Ongoing Diligence Reviews. The Monitor shall select a sample representative of various geographic regions, customer types (Independent Retail Pharmacy Customers or Chain Customer), and distribution centers.

    (2)     The Monitor will meet and confer with each of the Injunctive Relief Distributors to determine the appropriate audit period within each Reporting Period from which the samples will be selected (e.g. samples will be selected from the first six (6) months of a reporting period to allow the Monitor time to perform its review during the remainder of the reporting period).

    (3)     Within thirty (30) calendar days following the close of the agreed-upon audit period, the Injunctive Relief Distributors (or the Clearinghouse once operational, if able to do so) will provide the Monitor with the following lists of relevant Customers for each type of review:

        (a)     A list of all Customers that requested at least one Threshold increase for a Highly Diverted Controlled Substance during the relevant audit period, including the number of such requests by each Customer;

        (b)     A list of all Customers that were onboarded during the relevant audit period and, during that period, ordered and received Highly Diverted Controlled Substances;

        (c)     A list of all Customers that were the subject of an Ongoing Diligence Review during the relevant audit period;

        (d)     A list of all Customers that, for reasons related to Controlled Substance regulatory compliance, were terminated during the relevant audit period; and

        (e)     A list of all Orders for Highly Diverted Controlled Substances where a decision was made to ship the Order even though the order exceeded the otherwise

applicable Threshold, with number of such shipped orders.

(4)    Within fifteen (15) calendar days of compiling this Customer information for sample selection, each Injunctive Relief Distributor shall propose a reasonable number of customer files for each review to the Monitor.

(5)    Within fifteen (15) calendar days of receiving the lists specified above from the Injunctive Relief Distributors, the Monitor shall choose representative files to be reviewed from these lists. Each list will include the Customers' zip code, geographic region, distribution center, and customer type (Independent Retail Pharmacy Customer or Chain Customer).

c)    TCR Reviews

(1)    For each Reporting Period, the Monitor shall conduct a TCR Review for a sample review of Customers who requested at least one Threshold increase for Highly Diverted Controlled Substances for each Injunctive Relief Distributor. For the TCR Reviews, the Monitor shall review the information contained in the files of the sample Customers and determine whether the information reflects substantial compliance with the requirements of Section XII.C.3.

d)    Onboarding Reviews

(1)    For each Reporting Period, the Monitor shall conduct an Onboarding Review of a sample of Customers that were onboarded during the applicable audit period and, during that period, ordered and received Highly Diverted Controlled Substances from the Injunctive Relief Distributor. For the Onboarding Reviews, the Monitor shall review the information contained in the files of the sample Customers and determine whether the information reflects substantial compliance with the requirements of Section IX.

e)    Ongoing Diligence Reviews

(1)    For each Reporting Period, the Monitor shall conduct an Ongoing Diligence Review of a sample of Customers for each Injunctive Relief Distributor that was the subject of an Ongoing Diligence Review during the relevant audit period. For the Ongoing Diligence Reviews, the Monitor shall review the information contained in the files of the

sample of Customers and determine whether the information reflects substantial compliance with the requirements of Section X.

f)    Termination Reviews

    (1)    For each Reporting Period, the Monitor shall conduct a review of a sample of Customers that were terminated by each Injunctive Relief Distributor during the audit period. For the Termination Reviews, the Monitor shall review the information contained in the files of the sample of Customers and determine whether the information reflects substantial compliance with the requirements of Section XIV.

g)    Exceeded Threshold Review

    (1)    For each Reporting Period, the Monitor shall conduct a review of a sample of Orders for Highly Diverted Controlled Substances where a decision was made by the Injunctive Relief Distributor to ship the Order even though the Order exceeded the applicable Threshold. For the Exceeded Threshold Reviews, the Monitor shall review the information contained in the Customer files related to the Orders and determine whether the information reflects substantial compliance with the requirements of Section XIII.B.

3.    Annual System Reviews:

a)    The following system reviews will be conducted by the Monitor for each Injunctive Relief Distributor for each of the Reporting Periods:

    (1)    CSMP Review;

    (2)    Threshold Setting Process Review;

    (3)    Suspicious Orders and Suspicious Order Report Review;

    (4)    Compensation Review;

    (5)    Red Flag Review; and

    (6)    Review of CSMP Integration with Clearinghouse.

b)    CSMP Review

        (1)    For each Reporting Period, the Monitor shall conduct a review of the following materials from each Injunctive Relief Distributor:

               (a)    Current CSMP policies and procedures;

               (b)    Organizational charts for the departments that are relevant to the CSMP organization;

               (c)    Logs and/or summaries of any reports received on the "hot line" required by Section V.E and the action or response of an Injunctive Relief Distributor to any such reports;

               (d)    Copies of the quarterly reports provided by the Chief Diversion Control Officer to the CSMP Committee as required by Section IV.C;

               (e)    Copies of the quarterly reports provided by the CSMP Committee to senior management and the Board of Directors as required by Section VI.C; and

               (f)    Copies of the materials used for the training required by Section VII and lists of the attendees of the training.

   c)    Threshold Setting Process Review:

        (1)    For each Reporting Period, each Injunctive Relief Distributor or its outside consultants shall prepare a summary report describing how its Threshold-setting methodology for Independent Retail Pharmacy Customers and Chain Customers complies with Section XII (the *"Annual Threshold Analysis and Assessment Report"*).

        (2)    For each Reporting Period, the Monitor shall review the Annual Threshold Analysis and Assessment Report, determine whether the information reflects substantial compliance with the requirements of Section XII, and include any Observations and Recommendations, as defined in Section XVIII.G, in its annual Audit Report.

   d)    Suspicious Orders and Suspicious Order Reporting Review:

        (1)    For each Reporting Period, each Injunctive Relief Distributors will provide the Monitor with a report containing summary metrics for the Suspicious Orders that were reported to the DEA and the Settling States (the

"*Suspicious Order Metrics Report*"). In the Suspicious Order Metrics Report, the Injunctive Relief Distributors will also provide summary metrics for Orders of Highly Diverted Controlled Substances that exceeded a Threshold but were still shipped.

(2)    For each Reporting Period, the Monitor shall review the Suspicious Order Metrics Report, determine whether the information reflects substantial compliance with the requirements of Section XIII, and include any Observations and Recommendations in its annual Audit Report.

e)    Compensation Reviews:

(1)    For each Reporting Period, the Monitor will review compensation-related policy documents for each Injunctive Relief Distributor for sales personnel. The Monitor shall analyze those documents and determine whether the compensation policies of each Injunctive Relief Distributor comply with the requirements contained in Section V.

f)    Red Flags Review:

(1)    For each Reporting Period, the Monitor shall review the Red Flags defined in Section VIII and their incorporation into each Injunctive Relief Distributor's policies and procedures. The Monitor shall determine whether the information reflects substantial compliance with the requirements of Section VIII and include any Observations and Recommendations, as called for by Section VIII.C, about those definitions in its annual Audit Report.

g)    Review of CSMP Integration with the Clearinghouse:

(1)    For each Reporting Period, each Injunctive Relief Distributor shall prepare a report summarizing the status of the Injunctive Relief Distributor's CSMP integration with the operation of the Clearinghouse ("*Clearinghouse Integration Report*"). The Monitor shall review each Injunctive Relief Distributor's Clearinghouse Integration Report, determine whether the information reflects substantial compliance with the requirements of Section XVII, and include any Observations and Recommendations in its annual Audit Report.

G.    Observations and Recommendations:

1.     If the Monitor notes any areas for potential improvement during the course of the reviews conducted pursuant to the Injunctive Relief Terms, the Monitor shall include any such recommendations in the Audit Report. Collectively, any such questions, concerns or recommendations will be referred to as "*Observations and Recommendations.*"

H.    Audit Reports:

1.     No later than one hundred and twenty (120) calendar days prior to the end of a Reporting Period and/or at any other time deemed reasonably necessary by the Monitor, the Monitor shall provide each Injunctive Relief Distributor with a draft report detailing any instances of substantial non-compliance with the applicable provisions of the Injunctive Relief Terms from the reviews in Section XVIII.F (the "*Draft Report*"). The Draft Report will also describe any Observations and Recommendations.

2.     Within thirty (30) calendar days of its receipt of the Draft Report, the Injunctive Relief Distributor will provide comments and responses to the Draft Report. The Injunctive Relief Distributor will, among other things:

     a)    Respond to each instance of substantial non-compliance, including, where appropriate, describing any corrective action taken (or to be taken).

     b)    Respond to each Observation and Recommendation.

3.     Within thirty (30) calendar days of its receipt of the Injunctive Relief Distributors' responses to the Draft Report, the Monitor shall provide a final report (the "*Audit Report*") to each Injunctive Relief Distributor and the State Compliance Review Committee. The Monitor shall provide the State Compliance Review Committee with a copy of an Injunctive Relief Distributor's response to the Draft Report.

4.     No action or lack of action by the Settling States regarding information received from the Monitor concerning an Injunctive Relief Distributor's conduct shall be considered affirmation, acceptance, or ratification of that conduct by the Settling States.

I.    Confidentiality:

1.     Materials and information provided by the Injunctive Relief Distributors to the Monitor that are designated "*Confidential*" (and any parts, portions, or derivations thereof) (the "*Confidential Information*") will be kept confidential and not be shown, disclosed, or distributed to any other party, including any other Injunctive Relief Distributor.

2.     The Monitor will not use materials or information received from one Injunctive Relief Distributor, or information or analysis developed using

the Confidential Information of an Injunctive Relief Distributor, in its assessment of any other Injunctive Relief Distributor. Because each Injunctive Relief Distributor operates pursuant to its own unique policies and procedures intended to comply with legal and other requirements of the Injunctive Relief Terms, the Monitor shall apply the standards of each Injunctive Relief Distributor to its reviews without preference to the practices or standards applied by any other Injunctive Relief Distributor.

3.    If any of the Settling States or the Monitor receive a request for disclosure of any material or information created or shared under the Injunctive Relief Terms, pursuant to a Third Party Request, the Settling State or the Monitor, respectively, shall notify the Injunctive Relief Distributors of the Third Party Request and the Confidential Information to be disclosed so that the Injunctive Relief Distributors may seek a protective order or otherwise challenge or object to the disclosure. The Settling State or the Monitor will provide the Injunctive Relief Distributors with at least ten (10) days' advance notice before complying with any Third Party Request for Confidential Information, except where state law requires a lesser period of advance notice.

4.    Nothing herein will be deemed to prevent any party from claiming any applicable exemption to the public information act, freedom of information act, public records act, or similar law.

## XIX.  ENFORCEMENT OF INJUNCTIVE RELIEF TERMS

A.    State Compliance Review Committee:

1.    Any Settling State may initiate a review of a Potential Violation consistent with the process set forth in Section XIX.

2.    The State Compliance Review Committee shall assign the Monitor the responsibilities set forth in Sections XIX.B.3 through XIX.B.7, regarding review of a Potential Violation and an opportunity to cure, except with respect to matters requiring interpretation of the Injunctive Relief Terms subject to Section XIX.C.2. The objective of the Monitor shall be to facilitate a resolution among the parties, providing an opportunity to cure, as applicable, for the party against whom a Potential Violation has been alleged.

3.    No less than six (6) months before the Monitor's term expires pursuant to Section XVIII, the State Compliance Review Committee and Injunctive Relief Distributors shall meet and confer in good faith to determine the parameters and processes for continued enforcement, consistent to the maximum extent possible with the provisions set forth in Section XIX, for the period after the Monitor's term has ended. Absent agreement between the State Compliance Review Committee and Injunctive Relief

Distributors, all provisions set forth in Section XIX involving the Monitor are excused after the Monitor's term has ended.

4. Should an Injunctive Relief Distributor allege in good faith that a Settling State or the Monitor has impaired the ability of the Injunctive Relief Distributor to meet the Injunctive Relief Terms, the Injunctive Relief Distributor may request the State Compliance Review Committee to mediate any dispute in an effort to avoid the time and expense of litigation regarding interpretation and enforcement of the Injunctive Relief Terms.

B. Process for Review of Potential Violations and Opportunity to Cure:

1. Definition of "Potential Violation": A Potential Violation occurs when an Injunctive Relief Distributor is alleged to not be in substantial compliance with (i) the Injunctive Relief Terms or (ii) a Corrective Action Plan adopted consistent with the process set forth in Section XIX.B.7.

2. Submission of Notice of Potential Violation. An allegation of a Potential Violation shall be submitted to the State Compliance Review Committee in writing by one or more Settling States ("*Notice of Potential Violation*" or "*Notice*") and shall include the following to the extent practicable:

    a) Specification of the particular Injunctive Relief Term(s) and/or Corrective Action Plan(s) implicated by the Potential Violation;

    b) Description of the Potential Violation with specificity;

    c) The reasoning for and, if available, any documentation supporting the allegation that a Potential Violation has occurred, including whether the Potential Violation is a matter identified by the Monitor in an Audit Report; and

    d) Description of the time-sensitivity of the Potential Violation, if relevant.

3. Assignment to Monitor. The State Compliance Review Committee shall review every Notice. If the State Compliance Review Committee reasonably believes that further review is warranted, the State Compliance Review Committee shall forward the Notice to the Monitor. The Monitor shall ensure that the Injunctive Relief Distributor that is the subject of the Notice receives a copy of the Notice and a proposed schedule consistent with the process set forth in Sections XIX.B.4 and XIX.B.5.

4. Response to Notice of Potential Violation. Within thirty (30) days of receipt of the Notice of Potential Violation, the Injunctive Relief Distributor that is the subject of the Notice shall provide a written response to the referring Settling State(s), the Monitor, and the State Compliance Review Committee. The response (a) shall set forth the

-50-

reasons the Injunctive Relief Distributor that is the subject of the Notice believes that it is in substantial compliance with the relevant Injunctive Relief Term(s) and/or Corrective Action Plan(s), and (b) as applicable, shall explain efforts undertaken to cure the Potential Violation and a schedule for completing the efforts to cure.

5. <u>Conference for Parties re Notice of Potential Violation</u>. The parties to the Notice shall meet or otherwise confer regarding the Potential Violation. The parties and the Monitor shall make themselves available for such a meeting (which may at any party's election be a virtual or technology-based meeting), provided, however, that the meeting is not required to take place sooner than fifteen (15) days after a written response to the Notice of Potential Violation.

6. <u>Process for Previously-Submitted Notices of Potential Violation</u>. At the request of the parties to a Notice, the Monitor shall determine whether the Notice implicates the same or similar issues as a previously submitted Notice or is a matter previously identified by the Monitor in an Audit Report involving the same party alleged to have engaged in a Potential Violation, and make an initial determination as to whether the issues needs to be addressed anew. The Monitor shall inform the Settling State and Injunctive Relief Distributor involved in the previous Notice or the subject of a matter previously identified by the Monitor in an Audit Report of its determination within five (5) business days of receipt of the Notice. The Settling State and Injunctive Relief Distributor shall have five (5) business days to object to the determination. If an objection is made, the Monitor shall respond to the objection within five (5) business days. If no objection is made, the party involved in the prior Notice may rely on the response to the previously submitted Notice or matter previously identified by the Monitor in an Audit Report and no further action shall be required.

7. <u>Monitor Resolution of Potential Violation and Opportunity to Cure</u>. Within thirty (30) days of the meeting pursuant to Section XIX.B.5, the Monitor, taking into consideration the submissions of the parties involved in the Notice and other information available to the Monitor, shall resolve the Notice as follows:

a) If the Monitor reasonably believes that a Potential Violation is not ongoing or has been substantially resolved as of thirty (30) days from the meeting pursuant to Section XIX.B.5, the Monitor shall provide written notice to the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice.

b) If the Monitor reasonably believes that a Potential Violation is ongoing and has not been substantially resolved as of thirty (30) days from the meeting pursuant to Section XIX.B.5, the Monitor

shall provide written notice to the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice and request that the Injunctive Relief Distributor prepare, within thirty (30) days of the receipt of such written notice, a Corrective Action Plan to remedy such Potential Violation, including a reasonable period for implementation of such plan. The Monitor may extend the period of time to submit a Corrective Action Plan up to ninety (90) days based on a reasonable request by the affected party.

c)    A Corrective Action Plan may address multiple Potential Violations, and an existing Corrective Action Plan may be amended to address additional Potential Violations.

d)    Within ten (10) business days of submission of a Corrective Action Plan regarding a Potential Violation, the Monitor shall confer with the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice regarding the proposed Corrective Action Plan. The Monitor may recommend revisions in its discretion. The conference required by this paragraph may at any party's election be a virtual or technology-based meeting.

e)    Within thirty (30) days of the conference in Section XIX.B.7.d, the Monitor shall advise the State Compliance Review Committee and the Settling State(s) and Injunctive Relief Distributor involved in the Notice whether the Monitor has adopted the proposed Corrective Action Plan or whether the Monitor has adopted it after making modifications. The Monitor shall also set forth a reasonable period for implementation of any such plan that has been adopted. The Injunctive Relief Distributor that is subject to a Corrective Action Plan adopted by the Monitor must begin to comply with the Corrective Action Plan within five (5) business days of receiving notice of the Corrective Action Plan has been adopted, unless it seeks review by the State Compliance Review Committee pursuant to Section XIX.C.1.

C.    Enforcement Responsibilities of State Compliance Review Committee:

1.    The Settling State(s) or Injunctive Relief Distributor involved in a Notice may request the State Compliance Review Committee to review the resolution (including a resolution pursuant to Section XIX.B.7.a) and/or Corrective Action Plan adopted by the Monitor regarding that Notice. Any such request must be made within five (5) business days of a resolution or adoption of a Corrective Action Plan by the Monitor. The State Compliance Review Committee, taking into consideration the resolution by the Monitor, submissions of the Settling State(s) or Injunctive Relief

Distributor, and other information available to the Committee, shall within thirty (30) days of receipt of the request resolve the matter by written notice to the affected parties, which shall include the State Compliance Review Committee's reasoning in reaching its resolution. The State Compliance Review Committee may agree, disagree, or modify any resolution or Corrective Action Plan that it reviews. An Injunctive Relief Distributor that is subject to a Corrective Action Plan that is affirmed or affirmed as amended by the State Compliance Review Committee must within five (5) business days begin to comply with the Corrective Action Plan.

2. The State Compliance Review Committee shall review any issues raised by a Notice regarding the interpretation of the Injunctive Relief Terms at the request of the Settling State(s), Injunctive Relief Distributor involved in a Notice, or the Monitor. Such a request may be made at any time after the Notice's submission, and the request will not extend the timelines set forth in Sections XIX.B and XIX.C.1. The State Compliance Review Committee shall notify the Monitor, Settling State(s) and Injunctive Relief Distributor involved in the Notice of its determination. Settling States and Injunctive Relief Distributors do not waive their rights to challenge the interpretation of the Injunctive Relief Terms by the State Compliance Review Committee in any subsequent proceeding pursuant to Section XIX.E.2.

3. The State Compliance Review Committee may, independent of a Notice of Potential Violation, review requests by a Monitor, Settling State, or Injunctive Relief Distributor regarding the interpretation of the Injunctive Relief Terms. The State Compliance Review Committee shall notify the Monitor and requesting party of its interpretation, including the State Compliance Review Committee's reasoning in reaching its conclusion. Settling States and Injunctive Relief Distributors do not waive their rights to challenge the interpretation of the Injunctive Relief Terms by the State Compliance Review Committee in any subsequent proceeding pursuant to Section XIX.E.2.

4. The State Compliance Review Committee shall make available to all Settling States and Injunctive Relief Distributors any interpretation it issues pursuant to Sections XIX.C.2 and XIX.C.3.

D. Composition of State Compliance Review Committee:

1. A Settling State on the State Compliance Review Committee that is in active litigation with one or more of the Injunctive Relief Distributors, or in another potential conflict of interest involving compliance with Controlled Substances laws and regulations, may not serve on the State Compliance Review Committee for matters involving the affected Injunctive Relief Distributor, and the remaining Settling States on the

State Compliance Review Committee shall within five (5) business days select an alternate Settling State as a replacement.

    2.    If the affected state on the State Compliance Review Committee disputes that it has a disqualifying active litigation or other conflict of interest, the determination of whether that state has a conflict disqualifying it from serving on the State Compliance Review Committee shall be made by the remaining states on the State Compliance Review Committee.

E.    Enforcement Actions:

    1.    Any written notice or resolution by the State Compliance Review Committee regarding the matters set forth in Sections XIX.B and XIX.C shall provide the State Compliance Review Committee's assessment of the matter but will not be an official opinion of any individual Settling State.

    2.    Following the issuance of a written notice or resolution of the State Compliance Review Committee pursuant to Section XIX.C, a Settling State or Injunctive Relief Distributor may take whatever action it deems necessary related to the written notice or resolution issued by the State Compliance Review Committee, provided that the Settling State or Injunctive Relief Distributor is either (a) the Settling State that sought review by the State Compliance Review Committee, or (b) the Injunctive Relief Distributor that is the subject of the Potential Violation at issue. Such action may include but is not limited to bringing an action to enforce the settlement agreement, filing a new original action, or, the parties to a Notice attempting to negotiate a Corrective Action Plan directly with each other.

    3.    The Settling States agree that prior to taking any court or administrative action, other than an action that is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the Settling State, or that a public emergency requiring immediate action exists, it will follow the process outlined in Sections XIX.B and XIX.C.

    4.    A Settling State or Injunctive Relief Distributor must bring a court or administrative action within six (6) months of any resolution of the State Compliance Review Committee, unless the alleged violation is also an independent violation of state or federal law, or an action that a Settling State concludes is necessary to address an immediate threat to the health, safety, or welfare of the citizens of the State, or that a public emergency requiring immediate action exists, in which cases, the applicable statute of limitations (if any) for sovereign actions shall apply.

**Exhibit S**[15]

**Non-Litigating Texas Subdivisions Which Have Qualified as Participating Subdivisions**

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 1 | Abilene, City of | 123,420 | Yes | Yes |
| 2 | Addison, City of | 16,263 | Yes | Yes |
| 3 | Alamo Heights, City of | 8,374 | Yes | Yes |
| 4 | Alamo, City of | 19,910 | Yes | Yes |
| 5 | Albany, City of | 1,786 | Yes | Yes |
| 6 | Alice, City of | 18,682 | Yes | Yes |
| 7 | Allen, City of | 105,623 | Yes | Yes |
| 8 | Alpine, City of | 6,006 | Yes | Yes |
| 9 | Alton, City of | 18,105 | Yes | Yes |
| 10 | Alvin, City of | 26,723 | Yes | Yes |
| 11 | Amarillo, City of | 199,371 | Yes | Yes |
| 12 | Anderson County | 57,735 | Yes | Yes |
| 13 | Angleton, City of | 19,431 | Yes | Yes |
| 14 | Anna, City of | 15,000 | Yes | Yes |
| 15 | Anthony, City of | 5,236 | Yes | Yes |
| 16 | Aransas County | 23,510 | Yes | Yes |
| 17 | Argyle, City of | 4,112 | Yes | Yes |
| 18 | Arlington, City of | 398,854 | Yes | Yes |
| 19 | Armstrong County | 1,887 | Yes | Yes |
| 20 | Atascosa County | 51,153 | Yes | Yes |
| 21 | Athens, City of | 12,753 | Yes | Yes |
| 22 | Atlanta, City of | 5,495 | Yes | Yes |
| 23 | Aubrey, City of | 3,731 | Yes | Yes |
| 24 | Austin County | 30,032 | Yes | Yes |
| 25 | Austin, City of | 978,908 | Yes | Yes |
| 26 | Azle, City of | 13,351 | Yes | Yes |
| 27 | Balch Springs, City of | 25,007 | Yes | Yes |
| 28 | Balcones Heights, City of | 3,282 | Yes | Yes |
| 29 | Ballinger, City of | 3,659 | Yes | Yes |
| 30 | Bandera County | 23,112 | Yes | Yes |
| 31 | Bastrop, City of | 8,776 | Yes | Yes |
| 32 | Bay City, City of | 17,535 | Yes | Yes |
| 33 | Baylor County | 3,577 | Yes | Yes |
| 34 | Baytown, City of | 77,192 | Yes | Yes |
| 35 | Beach City, City of | 2,664 | Yes | Yes |
| 36 | Beaumont, City of | 116,825 | Yes | Yes |
| 37 | Bedford, City of | 49,049 | Yes | Yes |
| 38 | Beeville, City of | 12,793 | Yes | Yes |
| 39 | Bell County | 362,924 | Yes | Yes |
| 40 | Bellaire, City of | 18,971 | Yes | Yes |
| 41 | Bellmead, City of | 10,744 | Yes | Yes |
| 42 | Belton, City of | 22,885 | Yes | Yes |
| 43 | Benbrook, City of | 23,502 | Yes | Yes |
| 44 | Beverley Hills, City of | 2,494 | Yes | Yes |
| 45 | Big Spring, City of | 28,187 | Yes | Yes |
| 46 | Blanket, City of | 372 | Yes | Yes |

[15] The parties agree that this Exhibit S is subject to on-going review and updates.

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 47 | Blue Ridge, City of | 834 | Yes | Yes |
| 48 | Boerne, City of | 18,232 | Yes | Yes |
| 49 | Bonham, City of | 36,172 | Yes | Yes |
| 50 | Borger, City of | 12,415 | Yes | Yes |
| 51 | Bosque County | 18,685 | Yes | Yes |
| 52 | Bowie, City of | 5,050 | Yes | Yes |
| 53 | Brazoria County | 374,264 | Yes | Yes |
| 54 | Breckenridge, City of | 5,457 | Yes | Yes |
| 55 | Brenham, City of | 17,863 | Yes | Yes |
| 56 | Brewster, County of | 9,321 | Yes | Yes |
| 57 | Bridge City, City of | 7,961 | Yes | Yes |
| 58 | Bridgeport, City of | 6,465 | Yes | Yes |
| 59 | Brookside Village, City of | 1,359 | Yes | Yes |
| 60 | Brown County | 37,864 | Yes | Yes |
| 61 | Brownsville, City of | 182,781 | Yes | Yes |
| 62 | Brownwood, City of | 18,546 | Yes | Yes |
| 63 | Bryan, City of | 86,276 | Yes | Yes |
| 64 | Buda, City of | 16,906 | Yes | Yes |
| 65 | Bulverde, City of | 5,162 | Yes | Yes |
| 66 | Bunker Hill Village, City of | 3,940 | Yes | Yes |
| 67 | Burkburnett, City of | 11,270 | Yes | Yes |
| 68 | Burleson, City of | 48,225 | Yes | Yes |
| 69 | Burnet, City of | 6,266 | Yes | Yes |
| 70 | Caldwell, City of | 4,315 | Yes | Yes |
| 71 | Callahan County | 13,943 | Yes | Yes |
| 72 | Canton, City of | 3,805 | Pending documents | No |
| 73 | Carrollton, City of | 139,248 | Yes | Yes |
| 74 | Carson County | 5,926 | Yes | Yes |
| 75 | Carthage, City of | 6,535 | Yes | Yes |
| 76 | Castle Hills, City of | 4,447 | Yes | Yes |
| 77 | Cedar Hill, City of | 47,930 | Yes | Yes |
| 78 | Cedar Park, City of | 79,462 | Yes | Yes |
| 79 | Celina, City of | 16,299 | Yes | Yes |
| 80 | Chambers County | 43,837 | Yes | Yes |
| 81 | Chandler, City of | 3,003 | Yes | Yes |
| 82 | Cibolo, City of | 31,281 | Yes | Yes |
| 83 | Cisco, City of | 3,784 | Yes | Yes |
| 84 | Clear Lake Shores, City of | 1,190 | Yes | Yes |
| 85 | Cleburne, City of | 31,295 | Yes | Yes |
| 86 | Cleveland, City of | 8,061 | Yes | Yes |
| 87 | Clint, City of | 664 | Yes | Yes |
| 88 | Clute, City of | 11,690 | Yes | Yes |
| 89 | Clyde, City of | 3,817 | Yes | Yes |
| 90 | Coffee City, City of | 252 | Yes | Yes |
| 91 | Coke County | 3,303 | Yes | Yes |
| 92 | Coleman, City of | 4,373 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 93 | College Station, City of | 117,911 | Yes | Yes |
| 94 | Colleyville, City of | 27,091 | Yes | Yes |
| 95 | Collin County | 1,034,730 | Yes | Yes |
| 96 | Columbus, City of | 3,617 | Yes | Yes |
| 97 | Comal County | 156,209 | Yes | Yes |
| 98 | Comanche County | 13,635 | Yes | Yes |
| 99 | Comanche, City of | 4,178 | Yes | Yes |
| 100 | Conroe, City of | 91,079 | Yes | Yes |
| 101 | Converse, City of | 28,171 | Yes | Yes |
| 102 | Coppell, City of | 41,421 | Yes | Yes |
| 103 | Copperas Cove, City of | 33,235 | Yes | Yes |
| 104 | Corinth, City of | 22,099 | Yes | Yes |
| 105 | Corpus Christi, City of | 326,586 | Yes | Yes |
| 106 | Corsicana, City of | 23,906 | Yes | Yes |
| 107 | Crowley, City of | 16,460 | Yes | Yes |
| 108 | Cuero, City of | 8,297 | Yes | Yes |
| 109 | Cumby, City of | 693 | Pending documents | No |
| 110 | Daisetta, City of | 938 | Yes | Yes |
| 111 | Dallam County | 7,304 | Yes | Yes |
| 112 | Dallas, City of | 1,343,573 | Yes | Yes |
| 113 | Dalworthington Gardens, City of | 2,188 | Yes | Yes |
| 114 | Danbury, City of | 1,201 | Yes | Yes |
| 115 | Dawson County | 12,728 | Yes | Yes |
| 116 | Dayton, City of | 7,952 | Yes | Yes |
| 117 | De Leon, City of | 2,418 | Yes | Yes |
| 118 | Deaf Smith County | 18,546 | Yes | Yes |
| 119 | Decatur, City of | 6,738 | Yes | Yes |
| 120 | Deer Park, City of | 33,474 | Yes | Yes |
| 121 | Del Rio, City of | 35,760 | Yes | Yes |
| 122 | Denison, City of | 26,425 | Yes | Yes |
| 123 | Denton County | 887,207 | Yes | Yes |
| 124 | Denton, City of | 141,541 | Yes | Yes |
| 125 | Denver, City of | 4,880 | Yes | Yes |
| 126 | DeSoto, City of | 52,988 | Yes | Yes |
| 127 | Detroit, City of | 1,037 | Yes | Yes |
| 128 | DeWitt County | 20,160 | Yes | Yes |
| 129 | Diboll, City of | 5,266 | Yes | Yes |
| 130 | Dickinson, City of | 21,129 | Yes | Yes |
| 131 | Dilley, City of | 4,401 | Yes | Yes |
| 132 | Donna, City of | 16,338 | Yes | Yes |
| 133 | Dripping Springs, City of | 4,119 | Yes | Yes |
| 134 | Dublin, City of | 3,554 | Pending documents | No |
| 135 | Dumas, City of | 13,827 | Yes | Yes |
| 136 | Duncanville, City of | 38,751 | Yes | Yes |
| 137 | Eagle Lake, City of | 3,739 | Yes | Yes |
| 138 | Early, City of | 2,986 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 139 | Eastland County | 18,360 | Yes | Yes |
| 140 | Eastland, City of | 3,853 | Yes | Yes |
| 141 | Edinburg, City of | 101,170 | Yes | Yes |
| 142 | Edna, City of | 5,767 | Yes | Yes |
| 143 | El Campo, City of | 11,539 | Yes | Yes |
| 144 | El Lago, City of | 2,710 | Yes | Yes |
| 145 | El Paso, City of | 681,728 | Yes | Yes |
| 146 | Elgin, City of | 10,314 | Yes | Yes |
| 147 | Elmendorf, City of | 1,835 | Yes | Yes |
| 148 | Elsa, City of | 7,225 | Yes | Yes |
| 149 | Enchanted Oaks, City of | 315 | Yes | Yes |
| 150 | Ennis, City of | 20,357 | Yes | Yes |
| 151 | Erath County | 42,698 | Yes | Yes |
| 152 | Euless, City of | 57,197 | Yes | Yes |
| 153 | Everman, City of | 6,255 | Yes | Yes |
| 154 | Fair Oaks Ranch, City of | 10,042 | Yes | Yes |
| 155 | Fairfield, City of | 2,916 | Yes | Yes |
| 156 | Fairview, City of | 8,832 | Yes | Yes |
| 157 | Fannin County | 35,514 | Yes | Yes |
| 158 | Farmers Branch, City of | 48,158 | Yes | Yes |
| 159 | Fate, City of | 15,603 | Yes | Yes |
| 160 | Fayette County | 25,346 | Yes | Yes |
| 161 | Flower Mound Town | 79,135 | Yes | Yes |
| 162 | Forest Hill, City of | 12,988 | Yes | Yes |
| 163 | Forney, City of | 27,236 | Yes | Yes |
| 164 | Fort Worth, City of | 909,585 | Yes | Yes |
| 165 | Fredericksburg, City of | 11,496 | Yes | Yes |
| 166 | Freeport, City of | 12,136 | Yes | Yes |
| 167 | Friendswood, City of | 40,290 | Yes | Yes |
| 168 | Frio County | 20,306 | Yes | Yes |
| 169 | Frisco, City of | 200,490 | Yes | Yes |
| 170 | Fulshear, City of | 13,914 | Yes | Yes |
| 171 | Gaines County | 21,492 | Yes | Yes |
| 172 | Gainesville, City of | 16,886 | Yes | Yes |
| 173 | Galena Park, City of | 10,757 | Yes | Yes |
| 174 | Galveston, City of | 50,446 | Yes | Yes |
| 175 | Garden Ridge, City of | 3,961 | Yes | Yes |
| 176 | Garland, City of | 239,928 | Yes | Yes |
| 177 | Gatesville, City of | 12,401 | Yes | Yes |
| 178 | Georgetown, City of | 79,604 | Yes | Yes |
| 179 | Giddings, City of | 5,055 | Yes | Yes |
| 180 | Gillespie County | 26,988 | Yes | Yes |
| 181 | Gilmer, City of | 5,105 | Yes | Yes |
| 182 | Glenn Heights, City of | 13,377 | Yes | Yes |
| 183 | Gonzales County | 20,837 | Yes | Yes |
| 184 | Gonzales, City of | 7,517 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 185 | Graham, City of | 8,675 | Yes | Yes |
| 186 | Granbury, City of | 10,730 | Yes | Yes |
| 187 | Grand Prairie, City of | 194,543 | Yes | Yes |
| 188 | Grand Saline, City of | 3,115 | Yes | Yes |
| 189 | Granite Shoals, City of | 5,121 | Yes | Yes |
| 190 | Grapevine, City of | 55,281 | Yes | Yes |
| 191 | Gray County | 21,886 | Yes | Yes |
| 192 | Greenville, City of | 28,827 | Yes | Yes |
| 193 | Gregg County | 123,945 | Yes | Yes |
| 194 | Gregory, City of | 1,977 | Yes | Yes |
| 195 | Grimes County | 28,880 | Yes | Yes |
| 196 | Groves, City of | 15,480 | Yes | Yes |
| 197 | Guadalupe County | 166,847 | Yes | Yes |
| 198 | Gun Barrel City, City of | 6,084 | Yes | Yes |
| 199 | Gunter, City of | 1,247 | Yes | Yes |
| 200 | Hale Center, City of | 2,088 | Yes | Yes |
| 201 | Hale County | 33,406 | Yes | Yes |
| 202 | Hall County | 3,048 | Yes | Yes |
| 203 | Hallsburg, City of | 476 | Yes | Yes |
| 204 | Haltom, City of | 43,874 | Yes | Yes |
| 205 | Harker Heights, City of | 32,421 | Yes | Yes |
| 206 | Harlingen, City of | 65,022 | Yes | Yes |
| 207 | Haskell, City of | 3,195 | Yes | Yes |
| 208 | Hedwig Village, City of | 2,671 | Yes | Yes |
| 209 | Helotes, City of | 9,175 | Yes | Yes |
| 210 | Hemphill County | 3,994 | Yes | Yes |
| 211 | Hempstead, City of | 7,691 | Yes | Yes |
| 212 | Henderson, City of | 13,154 | Yes | Yes |
| 213 | Hewitt, City of | 14,937 | Yes | Yes |
| 214 | Hickory Creek, City of | 4,574 | Yes | Yes |
| 215 | Hidalgo, City of | 14,183 | Yes | Yes |
| 216 | Highland Park, City of | 9,168 | Yes | Yes |
| 217 | Highland Village, City of | 16,668 | Yes | Yes |
| 218 | Hill Country Village, City of | 584 | Yes | Yes |
| 219 | Hill County | 36,649 | Yes | Yes |
| 220 | Hilshire Village, City of | 875 | Yes | Yes |
| 221 | Hitchcock, City of | 7,800 | Yes | Yes |
| 222 | Hockley County | 23,021 | Yes | Yes |
| 223 | Hondo, City of | 9,251 | Yes | Yes |
| 224 | Hood County | 61,643 | Yes | Yes |
| 225 | Horizon City, City of | 19,642 | Yes | Yes |
| 226 | Howard County | 36,664 | Yes | Yes |
| 227 | Hudson Oaks, City of | 2,383 | Yes | Yes |
| 228 | Hughes Springs, City of | 1,479 | Yes | Yes |
| 229 | Humble, City of | 15,824 | Yes | Yes |
| 230 | Hunt County | 98,594 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 231 | Huntsville, City of | 42,241 | Yes | Yes |
| 232 | Hurst, City of | 38,655 | Yes | Yes |
| 233 | Hutchinson County | 20,938 | Yes | Yes |
| 234 | Hutto, City of | 27,947 | Yes | Yes |
| 235 | Ingleside, City of | 10,192 | Yes | Yes |
| 236 | Iowa Colony, City of | 1,811 | Yes | Yes |
| 237 | Irving, City of | 239,798 | Yes | Yes |
| 238 | Jacinto City, City of | 10,466 | Yes | Yes |
| 239 | Jacksboro, City of | 4,379 | Yes | Yes |
| 240 | Jackson County | 14,760 | Yes | Yes |
| 241 | Jacksonville, City of | 14,815 | Yes | Yes |
| 242 | Johnson City, City of | 1,860 | Yes | Yes |
| 243 | Jonestown, City of | 1,967 | Yes | Yes |
| 244 | Josephine, City of | 1,366 | Yes | Yes |
| 245 | Joshua, City of | 7,477 | Yes | Yes |
| 246 | Karnes City, City of | 3,404 | Yes | Yes |
| 247 | Karnes County | 15,601 | Yes | Yes |
| 248 | Kaufman, City of | 7,330 | Yes | Yes |
| 249 | Keene, City of | 6,396 | Yes | Yes |
| 250 | Keller, City of | 47,213 | Yes | Yes |
| 251 | Kemah, City of | 3,057 | Yes | Yes |
| 252 | Kent County | 647 | Yes | Yes |
| 253 | Kerrville, City of | 23,754 | Yes | Yes |
| 254 | Kilgore, City of | 14,852 | Yes | Yes |
| 255 | Killeen, City of | 151,666 | Yes | Yes |
| 256 | Kingsville, City of | 25,315 | Yes | Yes |
| 257 | Kirby, City of | 8,664 | Yes | Yes |
| 258 | Kyle, City of | 48,393 | Yes | Yes |
| 259 | La Feria, City of | 7,267 | Yes | Yes |
| 260 | La Grange, City of | 4,667 | Yes | Yes |
| 261 | La Marque, City of | 17,319 | Yes | Yes |
| 262 | La Porte, City of | 34,976 | Yes | Yes |
| 263 | La Vernia, City of | 925 | Yes | Yes |
| 264 | Lake Dallas, City of | 8,016 | Yes | Yes |
| 265 | Lake Jackson, City of | 27,220 | Yes | Yes |
| 266 | Lake Worth, City of | 4,929 | Yes | Yes |
| 267 | Lakewood Village, City of | 562 | Yes | Yes |
| 268 | Lampasas County | 21,428 | Yes | Yes |
| 269 | Lancaster, City of | 39,228 | Yes | Yes |
| 270 | Lavaca County | 20,154 | Yes | Yes |
| 271 | League, City of | 107,536 | Yes | Yes |
| 272 | Leander, City of | 62,608 | Yes | Yes |
| 273 | Lee County | 17,239 | Yes | Yes |
| 274 | Leon Valley, City of | 12,306 | Yes | Yes |
| 275 | Leonard, City of | 2,481 | Yes | Yes |
| 276 | Lewisville, City of | 109,212 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 277 | Liberty Hill, City of | 2,041 | Yes | Yes |
| 278 | Liberty, City of | 8,397 | Yes | Yes |
| 279 | Lindsay, City of | 1,257 | Yes | Yes |
| 280 | Little Elm, City of | 53,126 | Yes | Yes |
| 281 | Live Oak County | 12,207 | Yes | Yes |
| 282 | Live Oak, City of | 16,499 | Yes | Yes |
| 283 | Llano County | 21,795 | Yes | Yes |
| 284 | Lockhart, City of | 14,133 | Yes | Yes |
| 285 | Lockney, City of | 1,612 | Yes | Yes |
| 286 | Longview, City of | 81,631 | Yes | Yes |
| 287 | Lorena, City of | 1,995 | Yes | Yes |
| 288 | Lorenzo, City of | 1,181 | Yes | Yes |
| 289 | Lubbock, City of | 258,862 | Yes | Yes |
| 290 | Lucas, City of | 7,763 | Yes | Yes |
| 291 | Lufkin, City of | 35,021 | Yes | Yes |
| 292 | Lyford, City of | 2,547 | Yes | Yes |
| 293 | Magnolia, City of | 2,124 | Yes | Yes |
| 294 | Manor, City of | 13,866 | Yes | Yes |
| 295 | Mansfield, City of | 72,419 | Yes | Yes |
| 296 | Manvel, City of | 12,671 | Yes | Yes |
| 297 | Marble Falls, City of | 6,542 | Yes | Yes |
| 298 | Marlin, City of | 5,607 | Yes | Yes |
| 299 | Marshall, City of | 22,831 | Yes | Yes |
| 300 | Matagorda County | 36,643 | Yes | Yes |
| 301 | Maud, City of | 1,138 | Yes | Yes |
| 302 | McAllen, City of | 143,268 | Yes | Yes |
| 303 | McGregor, City of | 5,144 | Yes | Yes |
| 304 | McKinney, City of | 199,177 | Yes | Yes |
| 305 | Medina County | 51,584 | Yes | Yes |
| 306 | Melissa, City of | 12,117 | Yes | Yes |
| 307 | Mercedes, City of | 16,604 | Yes | Yes |
| 308 | Mesquite, City of | 140,937 | Yes | Yes |
| 309 | Mexia, City of | 7,344 | Yes | Yes |
| 310 | Midland County | 176,832 | Yes | Yes |
| 311 | Midland, City of | 146,038 | Yes | Yes |
| 312 | Midlothian, City of | 33,532 | Yes | Yes |
| 313 | Mineola, City of | 4,685 | Yes | Yes |
| 314 | Mineral Wells, City of | 15,213 | Yes | Yes |
| 315 | Mission, City of | 84,331 | Yes | Yes |
| 316 | Missouri, City of | 75,457 | Yes | Yes |
| 317 | Mobile City, City of | 125 | Yes | Yes |
| 318 | Monahans, City of | 7,618 | Yes | Yes |
| 319 | Montague County | 19,818 | Yes | Yes |
| 320 | Moore County | 20,940 | Yes | Yes |
| 321 | Mount Enterprise, City of | 448 | Yes | Yes |
| 322 | Mount Pleasant, City of | 15,978 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 323 | Mountain City, City of | 739 | Yes | Yes |
| 324 | Muleshoe, City of | 5,798 | Yes | Yes |
| 325 | Murphy, City of | 20,500 | Yes | Yes |
| 326 | Nacogdoches, City of | 32,877 | Yes | Yes |
| 327 | Natalia, City of | 1,220 | Yes | Yes |
| 328 | Navarro County | 50,113 | Yes | Yes |
| 329 | Nederland, City of | 17,371 | Yes | Yes |
| 330 | New Braunfels, City of | 90,209 | Yes | Yes |
| 331 | Normangee, City of | 586 | Yes | Yes |
| 332 | North Richland Hills, City of | 70,670 | Yes | Yes |
| 333 | Northlake, City of | 2,726 | Yes | Yes |
| 334 | Oak Point, City of | 4,410 | Yes | Yes |
| 335 | Oak Ridge North, City of | 3,149 | Yes | Yes |
| 336 | Odessa, City of | 123,334 | Yes | Yes |
| 337 | Oldham County | 2,112 | Yes | Yes |
| 338 | Orange, City of | 18,118 | Yes | Yes |
| 339 | Overton, City of | 2,896 | Yes | Yes |
| 340 | Palacios, City of | 4,590 | Yes | Yes |
| 341 | Palestine, City of | 17,730 | Yes | Yes |
| 342 | Palmview, City of | 5,733 | Yes | Yes |
| 343 | Palo Pinto County | 29,189 | Yes | Yes |
| 344 | Pampa, City of | 17,068 | Yes | Yes |
| 345 | Panorama Village, City of | 3,207 | Yes | Yes |
| 346 | Pasadena, City of | 151,227 | Yes | Yes |
| 347 | Pearland, City of | 122,460 | Yes | Yes |
| 348 | Pearsall, City of | 10,609 | Yes | Yes |
| 349 | Pecos County | 15,823 | Yes | Yes |
| 350 | Pecos, City of | 10,461 | Yes | Yes |
| 351 | Penitas, City of | 4,769 | Yes | Yes |
| 352 | Pflugerville, City of | 65,380 | Yes | Yes |
| 353 | Pharr, City of | 79,112 | Yes | Yes |
| 354 | Piney Point Village, City of | 3,425 | Yes | Yes |
| 355 | Plainview, City of | 20,143 | Yes | Yes |
| 356 | Plano, City of | 287,677 | Yes | Yes |
| 357 | Pleasanton, City of | 10,855 | Yes | Yes |
| 358 | Port Arthur, City of | 54,280 | Yes | Yes |
| 359 | Port Lavaca, City of | 11,854 | Yes | Yes |
| 360 | Port Neches, City of | 12,655 | Yes | Yes |
| 361 | Portland, City of | 17,268 | Yes | Yes |
| 362 | Poteet, City of | 3,437 | Yes | Yes |
| 363 | Poth, City of | 2,035 | Yes | Yes |
| 364 | Prairie View, City of | 6,678 | Yes | Yes |
| 365 | Presidio County | 6,975 | Pending documents | No |
| 366 | Primera, City of | 4,872 | Yes | Yes |
| 367 | Princeton, City of | 18,388 | Yes | Yes |
| 368 | Prosper Town, Texas | 24,579 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 369 | Queen City, City of | 1,644 | Yes | Yes |
| 370 | Quinlan, City of | 1,560 | Yes | Yes |
| 371 | Rains County | 12,514 | Yes | Yes |
| 372 | Randall County | 137,713 | Yes | Yes |
| 373 | Ransom Canyon, City of | 1,056 | Yes | Yes |
| 374 | Raymondville, City of | 10,880 | Yes | Yes |
| 375 | Red Oak, City of | 13,464 | Yes | Yes |
| 376 | Reeves County | 15,976 | Yes | Yes |
| 377 | Refugio County | 7,145 | Yes | Yes |
| 378 | Reno, City of (Parker County) | 2,962 | Yes | Yes |
| 379 | Reno, City of (Lamar County) | 3,309 | Yes | Yes |
| 380 | Richland Hills, City of | 8,051 | Yes | Yes |
| 381 | Richmond, City of | 12,578 | Yes | Yes |
| 382 | Rio Grande City, City of | 14,511 | Yes | Yes |
| 383 | Rio Hondo, City of | 2,640 | Yes | Yes |
| 384 | Rising Star, City of | 876 | Yes | Yes |
| 385 | Roanoke, City of | 8,341 | Yes | Yes |
| 386 | Robinson, City of | 11,926 | Yes | Yes |
| 387 | Robstown, City of | 11,261 | Yes | Yes |
| 388 | Rockdale, City of | 5,531 | Yes | Yes |
| 389 | Rockport, City of | 10,604 | Yes | Yes |
| 390 | Rockwall, City of | 45,888 | Yes | Yes |
| 391 | Rollingwood, City of | 1,532 | Yes | Yes |
| 392 | Roma, City of | 11,490 | Yes | Yes |
| 393 | Rosenberg, City of | 38,307 | Yes | Yes |
| 394 | Round Rock, City of | 133,372 | Yes | Yes |
| 395 | Rowlett, City of | 67,339 | Yes | Yes |
| 396 | Royse City, City of | 14,702 | Yes | Yes |
| 397 | Runnels County | 10,264 | Yes | Yes |
| 398 | Sabine County | 10,542 | Yes | Yes |
| 399 | Sachse, City of | 26,046 | Yes | Yes |
| 400 | Saginaw, City of | 24,310 | Yes | Yes |
| 401 | San Angelo, City of | 101,004 | Yes | Yes |
| 402 | San Benito, City of | 24,243 | Yes | Yes |
| 403 | San Elizario, City of | 9,126 | Yes | Yes |
| 404 | San Felipe, City of | 766 | Yes | Yes |
| 405 | San Jacinto County | 28,859 | Yes | Yes |
| 406 | San Juan, City of | 37,008 | Pending documents | No |
| 407 | San Marcos, City of | 64,776 | Yes | Yes |
| 408 | San Perlita, City of | 730 | Yes | Yes |
| 409 | San Saba, City of | 3,128 | Yes | Yes |
| 410 | Santa Fe, City of | 13,449 | Yes | Yes |
| 411 | Schertz, City of | 42,042 | Yes | Yes |
| 412 | Scurry County | 16,703 | Yes | Yes |
| 413 | Seabrook, City of | 14,149 | Yes | Yes |
| 414 | Seagoville, City of | 16,861 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 415 | Sealy, City of | 6,450 | Yes | Yes |
| 416 | Seguin, City of | 29,992 | Yes | Yes |
| 417 | Selma, City of | 11,132 | Yes | Yes |
| 418 | Shavano Park, Ctiy of | 3,787 | Yes | Yes |
| 419 | Sherman County | 3,059 | Yes | Yes |
| 420 | Sherman, City of | 44,002 | Yes | Yes |
| 421 | Shiner, City of | 2,192 | Yes | Yes |
| 422 | Slaton, City of | 5,960 | Yes | Yes |
| 423 | Smithville, City of | 4,363 | Yes | Yes |
| 424 | Snyder, City of | 11,023 | Yes | Yes |
| 425 | Socorro, City of | 34,370 | Yes | Yes |
| 426 | Somerville, City of | 1,473 | Yes | Yes |
| 427 | South Houston, City of | 17,438 | Yes | Yes |
| 428 | Southlake, City of | 32,376 | Yes | Yes |
| 429 | Spring Valley Village, City of | 4,282 | Yes | Yes |
| 430 | Springtown, City of | 2,940 | Yes | Yes |
| 431 | Stafford, City of | 17,362 | Yes | Yes |
| 432 | Starr County | 64,633 | Yes | Yes |
| 433 | Stephenville, City of | 21,247 | Yes | Yes |
| 434 | Stonewall County | 1,476 | Yes | Yes |
| 435 | Sugar Land, City of | 118,488 | Yes | Yes |
| 436 | Sullivan City, City of | 4,176 | Yes | Yes |
| 437 | Sulphur Springs, City of | 16,234 | Yes | Yes |
| 438 | Surfside Beach, City of | 627 | Yes | Yes |
| 439 | Sweetwater, City of | 10,469 | Yes | Yes |
| 440 | Taylor County | 138,034 | Yes | Yes |
| 441 | Taylor Lake Village, City of | 3,639 | Yes | Yes |
| 442 | Taylor, City of | 17,383 | Yes | Yes |
| 443 | Temple, City of | 78,439 | Yes | Yes |
| 444 | Terrell Hills, City of | 5,371 | Yes | Yes |
| 445 | Terrell, City of | 18,869 | Yes | Yes |
| 446 | Terry County | 12,337 | Yes | Yes |
| 447 | Texarkana, City of | 36,317 | Yes | Yes |
| 448 | Texas City, City of | 50,094 | Yes | Yes |
| 449 | The Colony, City of | 44,438 | Yes | Yes |
| 450 | Thorndale, City of | 1,407 | Yes | Yes |
| 451 | Tom Green County | 119,200 | Yes | Yes |
| 452 | Tomball, City of | 11,778 | Yes | Yes |
| 453 | Tool, City of | 2,214 | Yes | Yes |
| 454 | Trenton, City of | 695 | Yes | Yes |
| 455 | Trophy Club Town, Texas | 12,451 | Yes | Yes |
| 456 | Troup, City of | 1,928 | Yes | Yes |
| 457 | Tye, City of | 1,206 | Yes | Yes |
| 458 | Tyler County | 21,672 | Yes | Yes |
| 459 | Tyler, City of | 106,985 | Yes | Yes |
| 460 | Universal City, City of | 20,890 | Yes | Yes |

| # | City/County | Population (2019 Estimate) | Executed Agreement | Received by Distributor |
|---|---|---|---|---|
| 461 | University Park, City of | 24,985 | Yes | Yes |
| 462 | Uvalde, City of | 16,001 | Yes | Yes |
| 463 | Val Verde County | 49,025 | Yes | Yes |
| 464 | Valley Mills, City of | 1,302 | Yes | Yes |
| 465 | Valley View, City of | 953 | Yes | Yes |
| 466 | Van Alstyne, City of | 3,906 | Yes | Yes |
| 467 | Van Horn, City of | 1,760 | Yes | Yes |
| 468 | Van, City of | 2,669 | Yes | Yes |
| 469 | Vernon, City of | 10,323 | Yes | Yes |
| 470 | Victoria County | 92,084 | Yes | Yes |
| 471 | Victoria, City of | 66,916 | Yes | Yes |
| 472 | Vidor, City of | 10,403 | Yes | Yes |
| 473 | Waco, City of | 139,236 | Yes | Yes |
| 474 | Ward County | 11,998 | Yes | Yes |
| 475 | Washington County | 35,882 | Yes | Yes |
| 476 | Waskom, City of | 1,617 | Yes | Yes |
| 477 | Watauga, City of | 24,481 | Yes | Yes |
| 478 | Waxahachie, City of | 37,988 | Yes | Yes |
| 479 | Weatherford, City of | 33,547 | Yes | Yes |
| 480 | Webberville, City of | 412 | Yes | Yes |
| 481 | Webster, City of | 11,451 | Yes | Yes |
| 482 | Weslaco, City of | 41,629 | Yes | Yes |
| 483 | West Lake Hills, City of | 3,311 | Yes | Yes |
| 484 | West Orange, City of | 3,342 | Yes | Yes |
| 485 | West University Place, City of | 15,585 | Yes | Yes |
| 486 | Weston Lakes, City of | 3,670 | Yes | Yes |
| 487 | Wharton County | 41,556 | Yes | Yes |
| 488 | Wharton, City of | 8,711 | Yes | Yes |
| 489 | White Oak, City of | 6,331 | Yes | Yes |
| 490 | White Settlement, City of | 17,851 | Yes | Yes |
| 491 | Whitehouse, City of | 8,489 | Yes | Yes |
| 492 | Wichita Falls, City of | 104,683 | Yes | Yes |
| 493 | Wilbarger County | 12,769 | Yes | Yes |
| 494 | Willacy County | 21,358 | Yes | Yes |
| 495 | Willis, City of | 6,566 | Yes | Yes |
| 496 | Willow Park, City of | 5,265 | Yes | Yes |
| 497 | Wills Point, City of | 3,577 | Yes | Yes |
| 498 | Windcrest, City of | 5,851 | Yes | Yes |
| 499 | Wise County | 69,984 | Yes | Yes |
| 500 | Woodway, City of | 8,865 | Yes | Yes |
| 501 | Wylie, City of | 53,067 | Yes | Yes |
| 502 | Yoakum County | 8,631 | Yes | Yes |
| 503 | Yorktown, City of | 1,916 | Yes | Yes |
| 504 | Young County | 18,010 | Yes | Yes |
| 505 | Zapata County | 14,179 | Yes | Yes |

## **Exhibit T**

### **Texas Litigting Subdivisions with a Population of at Least 500,000**

1.  Harris (TX), County of
2.  Dallas (TX), County of
3.  Houston (TX), City of
4.  Tarrant (TX), County of
5.  Bexar (TX), County of
6.  San Antonio (TX), City of
7.  Travis (TX), County of
8.  Hidalgo (TX), County of
9.  El Paso (TX), County of
10. Fort Bend (TX), County of
11. Montgomery (TX), County of
12. Williamson (TX), County of

FILED
Marilyn Burgess
District Clerk

APR 26 2022

Time: _____
Harris County, Texas
By _____ Katina Williams
Deputy

**MASTER FILE NO. 2018-63587**

P4

| | | |
|---|---|---|
| IN RE: TEXAS OPIOID LITIGATION | § | IN THE DISTRICT COURT |
| | § | |
| MDL NO. 18-0358 | § | 152ᴺᴰ JUDICIAL DISTRICT |
| | § | |
| *This Document Relates to All Cases* | § | HARRIS COUNTY, TEXAS |

**ORDER GRANTING PLAINTIFF STEERING COMMITTEE AND TEXAS MDL FEE COMMITTEE'S MOTION TO ESTABLISH APPLICATION PROTOCOLS TO THE ARBITRATION FEE PANEL FOR REIMBURSEMENT OF ATTORNEY FEES AND COSTS UNDER THE JANSSEN TEXAS STATE-WIDE OPIOID SETTLEMENT AGREEMENT AND THE DISTRIBUTORS TEXAS SETTLEMENT AGREEMENT**

BE IT REMEMBERED that on the 29ᵗʰ day of April, 2022, came on to be considered the Plaintiff Steering Committee and Texas MDL Fee Committee's Motion to Establish Application Protocols to the Arbitration Fee Panel for Reimbursement of Attorney Fees and Costs under the Janssen Texas State-Wide Opioid Settlement Agreement and the Distributors' Texas Settlement Agreement. Having considered the Motion and arguments of counsel, the Court is of the opinion that the Motion should be GRANTED.

It is, accordingly, ORDERED, ADJUDGED AND DECREED that Plaintiffs' Motion is hereby GRANTED under the following terms:

The court grants Plaintiff Steering Committee and the Texas MDL Fee Committee's Motion to Establish Application Protocols to the Arbitration Fee Panel for Reimbursement of Attorney Fees and Costs under the Janssen Texas State-Wide Opioid Settlement Agreement and the Distributors' Texas Settlement Agreement.

It is further ordered that the process as established as is currently in the Texas Janssen Settlement the Distributors' Texas Settlement, and through the Arbitration Panel Agreement be implemented as follows:

1.        This Court authorizes the Arbitration Fee Panel to establish a deadline of May 5, 2022, for the Texas Contingency Fees, and to implement the mathematical formula used to

1

calculate Texas Contingency Fee from the Global Settlement Contingency Fee Fund, and direct payment according to the respective Texas settlements for the estimated $8,118,791 (Texas Janssen Settlement) and estimated $33,578,899 (Texas Distributors Settlement);

2.      This Court authorizes the Arbitration Fee Panel to establish a deadline of May 5, 2022, for a cost application, to review and award Costs from the Costs Fund in the amounts provided in the Texas Janssen Settlement ($1,887,964.72) and Texas Distributors Settlement ($7,551,745.89), and direct payment from any award according to the respective Texas settlements;

3.      This Court approves and authorizes the Arbitration Fee Panel to establish an application deadline of May 5, 2022, and to conduct a review as to the estimated $11,244,949 from the Janssen common benefit fund in accordance with the Texas Janssen Settlement Agreement. Further, to authorize the Fee Panel, under this provision only, to invite input from the Texas MDL Liaisons to the Panel to provide insight into the quantity and quality of the work claimed in the Fee Applications and submissions. All information exchanged between the Fee Panel and such Attorneys shall be treated by all participants as confidential. Further, to authorize the Fee Panel, under this provision only and upon a majority vote of the Panel, to conduct interviews with Fee applicants at the discretion of the Panel, to ask questions regarding information contained in the Fee Applications and any Attorney Time Reports in the presence of a court reporter if desired; all such information is to be used solely by the Fee Panel, must be treated as confidential, and may not be disclosed beyond the Fee Panel for any purpose. Further directing that none of the Fee Panel meetings, interviews, fee applications, or related submissions or materials are subject to discovery;

4.      This Court directs that, after deliberation, the Arbitration Fee Panel shall issue their preliminary Fee and Cost award for Texas Settlement Counsel on or before June 5, 2022, to the Texas applicants through the Texas MDL Fee Committee Liaisons, after having considered all

relevant factors in the Arbitration Panel Agreement and Texas Janssen and Distributor Settlement Agreements. The Arbitration Fee Panel shall direct the Texas Fee Committee to consult with participating Texas Counsel as to the Arbitration Fee Panel's preliminary award and provide the preliminary award to participating Texas Counsel. The Texas Fee Committee shall have fifteen (15) days after the Arbitration Panel's preliminary award to accept the preliminary Fee and Cost award, or submit a detailed written objections to the Fee Panel to include a statement that the fee or cost allocation is disputed, the basis and reasoning for the dispute along with any relevant legal authority, a proposed resolution, and a request to appear before the Fee Panel by zoom or in person through the Texas Liaison representatives or any two designated persons. More persons may be included upon a reasonable request for leave and identification of such persons to the Fee Panel. Any such conference shall be in the presence of a court reporter and is subject to use by the Fee Panel. The Arbitration Fee Panel shall make final recommendations within thirty (30) days of the disputed preliminary award, issue any award to reimburse the Janssen Contingency Fee Fund, and authorize costs to be provided to the Arbitration Panel in the respective amounts in the settlement for approval; establish a deadline of May 5, 2022, to provide a Texas Fee and Cost application to the Arbitration Panel; establish an Arbitration Panel Award deadline of thirty (30) days thereafter (June 6, 2022), and establish an appeal process to the Arbitration Fee Panel of fifteen (15) days thereafter (June 21, 2022). The Arbitration Panel's final recommendation shall authorize the Arbitration Panel and this Court to direct reimbursement to Janssen of any Arbitration Award for fees or costs by the Panel, and direct payment into the Texas Qualified Settlement Fund for the benefit of identified Texas participating subdivision counsel any Fee Awards, and the payment of any Costs award to the Texas Qualified Settlement Fund to reimburse Texas PSC and counsel costs as per the global fee fund schedule for payment.

5.      The Court directs that the Arbitration Fee Panel shall notify the Court of its final allocations from the Global Fee and Cost Funds under the Texas Janssen Settlement and the Texas Distributors Settlement and shall simultaneously notify the administrator of the respective Funds.

This Court shall retain jurisdiction and authority over the allocation of fees and costs under the Texas Janssen Settlement and the Texas Distributor Settlement.

ORDERED this _____ day of _____, 2022.


_____
HONORABLE ROBERT SCHAFFER
JUDGE PRESIDING

4

2/18/2019 2:57:00 PM
Marilyn Burgess District Clerk
Harris County
Envelope No: 31273285
By: WILLIAMS, KATINA L
Filed: 2/18/2019 2:57:00 PM

Pgs-20

ENTX

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| IN RE: TEXAS OPIOID LITIGATION | § | IN THE DISTRICT COURT |
| | § | |
| MDL NO. 18-0358 | § | 152ND JUDICIAL DISTRICT |
| | § | |
| *This Document Relates to All Cases* | § | HARRIS COUNTY, TEXAS |

## ELECTRONICALLY STORED INFORMATION PRODUCTION PROTOCOL

**1.      PURPOSE**

This Order will govern production of Documents and ESI (as defined below) by Plaintiffs and Defendants (the "Parties") as described in the Texas Rules of Procedure 192, 196, and 197. This Order shall apply to the production of hard-copy and electronic documents by the Parties in this proceeding, captioned as *In re: Texas Opioid Litigation*, Case No. 2018-63587, which includes any related actions that have been or will be originally filed in this Court or transferred to this Court (the "Litigation").

The production of documents and ESI by the Parties also shall be subject to the provisions of orders concerning coordination with the National MDL, confidentiality, privilege, and/or protected health information as agreed to among the Parties and/or entered by the Court in this Litigation.

The Parties reserve all objections under the Texas Rules of Civil Procedure and applicable decision authority other than concerning matters that are addressed in this Order.

Nothing in this Order shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections to the discoverability, admissibility, or confidentiality of documents or ESI. Nothing in this Order shall be interpretd to supercede the provisions or orders governing confidentiality, privilege, and/or

**EXHIBIT**

**14**

protected health information entered by this Court in this Litigation, unless expressly provided for in such an order.

## 2. DEFINITIONS

a. **"Confidentiality Designation"** means the legend affixed to Documents or ESI for confidential or highly confidential information as defined by, and subject to, the terms of the order concerning confidentiality agreed to and/or entered by the Court in this Litigation.

b. **"Document"** is defined to be synonymous in meaning and equal in scope to the usage of the term "Documents and tangible things" in Texas Rule of Civil Procedure 192.3, and expressly includes all "electronic or magnetic data" as contemplated by Rule 196.4. The term "document" shall include hard-copy documents, electronic documents, and ESI as defined herein.

c. **"Electronic Document or Data"** means documents or data existing in electronic form at the time of collection, including but not limited to: e-mail or other means of electronic communications, word processing files (e.g., Microsoft Word), computer slide presentations (e.g., PowerPoint or Keynote slides), spreadsheets (e.g., Excel), and image files (e.g., PDF).

d. **"Electronically stored information"** or **"ESI,"** as used herein, is subject to Rule 196.4 of the Texas Rules of Civil Procedure and has the same meaning as "Electronic or Magnetic Data" as that term is used in Rule 196.4 and includes Electronic Documents or Data, and computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.

e. **"Extracted Full Text"** means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body information.

f. **"Hard-Copy Document"** means documents existing in paper form at the time of collection.

g.      **"Hash Value"** is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set. The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same Hash Value, no matter how similar they appear, is less than one in one billion.

h.      **"Load files"** means an electronic file containing information identifying a set of paper-scanned images, processed ESI, or native format files, as well as the corresponding Extracted Full Text or OCR text files, and containing agreed-upon extracted or user-created metadata, as well as information indicating unitization (i.e., document breaks and document relationships such as those between an email and its attachments) used to load that production set into the document review platform of the   Party receiving a production ("Receiving Party"), and correlate its data within that platform. A load file is used to import all image, native, and text files and their corresponding production information into a document database. The Producing Party shall produce a load file for all produced documents with each particular production in accordance with specifications provided herein.

i.      **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

j.      **"Metadata"** means: (i) information embedded in or associated with a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, redaction status, privilege status, or confidentiality status created during the course of processing documents or

ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device on which it was stored, or the custodian or non-custodial data source from which it was collected. Nothing in this order shall require any party to manually populate the value for any metadata field.

k. "**Native Format**" or "**native file**" means the format of ESI in which it was generated and/or used by the Party Producing ESI or documents (the "Producing Party") in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is an .xls or .xslx file.

l. "**Optical Character Recognition**" or "**OCR**" means the optical character recognition technology used to read the text within electronic images of paper Documents and create a file containing a visible, searchable text format of such Documents.

m. "**Searchable Text**" means the native text extracted from an electronic document and any Optical Character Recognition text ("OCR text") generated from the electronic image of a paper Document.

## 3. E-DISCOVERY LIAISON

The Parties will identify to each other liaisons who are and will be knowledgeable about and responsible for discussing their respective ESI ("E-discovery Liaisons"). Each Party's designated E-discovery Liaison(s) will be, or will have access to those who are, familiar with their Party's respective electronic systems and capabilities and knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

**4.     IDENTIFICATION OF DOCUMENTS AND ESI**

a.     The Parties agree to meet and confer to discuss (i) the identification of the custodial and noncustodial data sources containing potentially relevant ESI for potential collection, review, and production; (ii) additional parameters for scoping the review and production efforts (e.g., application of date ranges, de-NIST'ing, etc.); (iii) potential use and identification of search terms, tools, or techniques; (iv) the identification and production of documents and ESI from custodial and non-custodial sources that do not require the use of search terms, tools, or techniques; (v) the method each Party proposes to use to identify and de-duplicate duplicate documents, and any exceptions to such de-duplication the Party proposes to implement; and (vi) the treatment of nonresponsive documents within parent-child families. The meet and confer between Plaintiffs and each Defendant will take place by the later of seven (7) calendar days following entry of this Order, or ten (10) days after the particular Defendant is served with a first document request herein.

b.     The Parties further agree to meet and confer to the extent that this Order imposes any undue burden or expense on any Plaintiff or Defendant with respect to its response to any particular discovery request.

c.     Nothing in this order shall be deemed to be a waiver of any Party's right to reasonably seek agreement from the other Parties, or a Court ruling, to modify proposed or previously agreed-to search terms, techniques, or tools (including any proposed as supplements).

**5.     DEDUPLICATION**

a.     To the extent exact duplicate documents reside within a Party's ESI data set, the Party shall produce only a single, deduplicated copy of a responsive document. "Exact duplicate" shall mean bit-for-bit identity of the document content with exact hash value matches; so-called "near duplicates" will not be included within this definition.

b.      To the extent a party de-duplicates its documents, it shall de-duplicate stand-alone documents or entire document families in their ESI sources by the use of MD5, SHA-1, or SHA256 hash values. Where any such documents have attachments, hash values must be identical for both the document plus-attachment (including associated metadata) as well as for any attachment (including associated metadata) standing alone.

c.      A Producing Party shall de-duplicate documents across custodians and populatea field of data that identifies each custodian who had a copy of the produced document (the "Duplicate Custodian" field) in addition to a separate field of data identifying the custodian whose document is produced; such de-duplicated documents shall be deemed produced from custodial files of each such identified custodian for all purposes in this Litigation, including use at deposition and trial. A Producing Party shall use a uniform description of a particular custodian across productions. Multiple custodians in the "Duplicate Custodian" field shall be separated by a semicolon. Entity/departmental custodians should be identified with a description of the entity or department to the extent applicable.

d.      No Party shall identify and/or eliminate duplicates by manual review or some method other than by use of the technical comparison using MD5 or SHA-1 hash values outlined above.

e.      Hard-Copy Documents shall not be eliminated as duplicates of ESI.

f.      If the Producing Party makes supplemental productions following an initial production, that Party also shall provide with each supplemental production an overlay file to allow the Receiving Party to update the "Duplicate Custodian" field. The overlay file shall include all custodians listed in the "Duplicate Custodian" field in prior productions and any custodians newly identified in the current supplemental production.

6.      **PRODUCTION FORMAT AND PROCESSING SPECIFICATIONS**

a.      Standard Format. Unless otherwise specified in Section 6(b) or pursuant to Section 6(j) below, the Parties shall produce documents in tagged image file format ("TIFF"). TIFFs of ESI shall convey the same information and image as the original document, including all commenting, versioning, and formatting that is visible in any view of the document in its native application. All hidden text will be expanded, extracted, and rendered in the TIFF file and, to the extent possible, the Producing Party will instruct its vendor to force off Auto Date. Any TIFFs produced shall be single-page, 300 DPI, Group IV TIFF files. After initial production in image file format is complete, a party must demonstrate particularized need for production of ESI in its native format.

b.      Native Format. Except as provided by Section 6(j) below, the Parties shall produce all spreadsheets, computer slide presentations, audio files, video files, and other file types that cannot be accurately represented in TIFF format in native format, provided, however, that the Parties will meet and confer regarding appropriate format of production for databases and structured data (e.g., Microsoft Access, Oracle, or other proprietary databases). For each document produced in native format, a responding Party shall also produce a corresponding cover page in TIFF image format, specifying that the document has been "produced in native format" and endorsed with the Bates Number and Confidentiality Designation, if applicable, which will be inserted into the image population in place of the native file. When the native file is produced, the Producing Party shall preserve the integrity of the electronic document's contents, i.e., its original formatting and metadata.

c.      Color. Documents containing color need not be produced in color. The Producing Party will honor reasonable requests for a color image of a document, if production in color is necessary to understand the meaning or content of the document.

d.     Embedded Objects. If documents contain embedded objects, the Parties shall extract the embedded objects as separate documents and treat them like attachments to the document to the extent reasonably possible. To the extent reasonably possible, images embedded in emails shall not be extracted and produced separately.

e.     Load Files. Each production of ESI and Documents shall be accompanied by Concordance or comma delimited load files (.dat and .opt) containing a field with the full path and filename to files produced in native format and also containing metadata fields identified in Appendix A, to the extent the information is available in the original ESI file and can be extracted without unreasonable burden using standard litigation support processing platforms (except for vendor-generated fields related to the litigation production, such as "BEGDOC", "ENDDOC", bases for redaction, and Confidentiality Designations).

f.     .Txt Files. For all documents containing extracted full text or OCR text, the Producing Party shall provide searchable document level .txt files (named using the Bates start/"BEGDOC"), which shall reside in the same file directory as the images for such documents.

g.     Bates Numbering and Other Unique Identifiers. Every item or file of ESI that is produced shall be identified by a unique page identifier ("Bates Number") and a Production Volume Number for any storage device (e.g., CD, USB, hard drive) containing such files. All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index. There must be no spaces in any Bates number. Any numbers with less than 8 digits will be front padded with zeros to reach the required 8 digits. All ESI produced in TIFF format shall contain a unique Bates Number on each page of the document, electronically "burned" onto the image at a location that does not obliterate, conceal, or interfere with any information from the source

document. If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (e.g., unsupported file format, file corruption, inaccessible password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed," along with a log identifying each such file; the associated metadata for the file with the technical problem shall be produced if technically possible. A Receiving Party thereafter may raise with the Producing Party any questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

      h.    <u>Hard-Copy Documents</u>. Except as otherwise set forth in this paragraph, the Parties agree that responsive paper documents shall be converted to single-page TIFF files, and produced following the same protocols set forth in Section 6(a) above, including the production of OCR text that is generated to make such documents searchable. Generally, all paper documents will be scanned and produced electronically, unless a Party establishes good cause for making such documents available via paper and reasonable access is provided to the opposing Party to review the documents directly. In scanning all Hard-Copy Documents, Hard-Copy Documents should be logically unitized. Accordingly, distinct documents should not be merged into a single record, and single documents should not be split into multiple records. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), each of the Hard-Copy Documents should be separately scanned, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending documents and attachment fields. The Parties will make their best efforts to unitize the documents correctly. Producing Hard-Copy Documents as provided herein does not change their character from Hard-Copy Documents into

ESI. For Hard-Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN," "SOURCE," "CONFIDENTIAL," and "REDACTION," as well as "BEGATTACH" and "ENDATTACH" fields where applicable.

       i.     <u>Confidentiality Designation</u>. To the extent any Document or ESI (or portion thereof) produced as a TIFF image in accordance with this Order is designated as confidential or highly confidential under the order concerning confidentiality agreed and/or entered in this Litigation, the Producing Party will brand the required Confidentiality Designation in a corner of any TIFF images representing the produced item and in a consistent font type and size that does not obscure any part of the underlying image or Bates number, to the extent possible.

       j.     <u>Redactions</u>. A Party may use redactions to protect attorney-client or work product privileges consistent with the order concerning privilege agreed and/or entered in this Litigation. Other than as permitted by this Order or the order concerning confidentiality agreed and/or entered in this Litigation, no redactions for relevance may be made within a produced document or ESI item. Any redactions shall be clearly indicated on the face of the document, with each redacted portion of the document stating that it has been redacted and the basis for the redactions, and a metadata field shall indicate that the document contains redactions and the basis for the redaction (e.g., "A/C Privilege"). Where a responsive document contains both redacted and nonredacted content, the Producing Party shall produce the remainder of the non-redacted portions of the document and the text/OCR corresponding to the non-redacted portions. Email header information (e.g., date, subject line, etc.) should not be redacted unless it is independently privileged. The production of a document in a redacted form does not affect the Producing Party's obligation to timely assert and substantiate the assertion of privilege over the

content in a privilege log. Redacted versions of spreadsheets, computer slide presentations, and word processing files containing hidden text (e.g., track changes, hidden columns, comments, notes, markups, etc.) shall be produced in color in TIFF format. The Parties shall honor reasonable requests for the production of particular redacted documents in other formats where the TIFF image is not reasonably usable.

k.     Parent-Child Relationships. The Parties acknowledge and agree that parent-child relationships within a document family (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved. Responsive non-privileged electronic documents attached to an email or embedded within other electronic documents and hard-copy documents attached or appended to hard-copy documents must be mapped to their parent by the beginning Bates number and immediately follow that parent file in the sequence of the production. Email attachments and embedded files or links "BEGATTACH" and "ENDATTACH" fields listing the unique beginning Bates number of the parent documents and ending number of the last attachment must be populated for each child and parent document.

l.     OCR. OCR software shall be set to the highest quality setting during processing.

m.     Deviation from Production Specifications. If a particular document or category of documents warrant a different format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

n.     Productions from Other Proceedings. Notwithstanding anything to the contrary herein, the production of documents made by Defendants in other civil investigations, litigations, and/or administrative actions by federal (including Congressional), state, or local government entities, if produced in this Litigation, shall be made in the format in which they were previously produced, including any previously produced metadata, load files, and accompanying text files.

o.   Use at Deposition. Any document produced in native that a party identifies and/or marks as an exhibit at a deposition must include as part of that identification or exhibit the produced corresponding cover page in TIFF image format, endorsed with document's Bates Number and Confidentiality Designation, as described in Section 6(a), above.

## 7.   PRODUCTION MEDIA

The Producing Party shall produce documents on readily accessible, computer or electronic media, including CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as the Parties may agree (the "Production Media"). Each piece of Production Media shall be encrypted and assigned a production number or other unique identifying label ("Production Volume Number") corresponding to the date of the production of documents on the Production Media as well as the sequence of the material in that production, and shall include (a) the name of the litigation and the case number; (b) the identity of the Producing Party; (c) the production date; (d) the Bates Number range of the materials contained on such Production Media item; and (e) the Production Volume Number of the Production Media. The Producing Party shall accompany all document productions with a transmittal cover letter identifying by Bates number the documents produced. If the Producing Party produces documents via secure FTP site, the Producing Party shall specify the date through which the materials will remain available via the secure FTP site and the Producing Party shall, within a reasonable time, accommodate requests from another Party or Parties that documents be reposted to the FTP site.

## 8.   COST SHIFTING

The costs of production pursuant to this Order shall be borne by the Producing Party. However, in agreeing to this Order, no Party waives or relinquishes any right or interest it may

have under the Texas Rules of Civil Procedure to seek cost shifting or apportionment for the costs of electronic discovery.

## 9.  THIRD-PARTY ESI

a.      A Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this Order and the order concerning confidentiality agreed and/or entered in this litigation with the subpoena and state that the Parties in the litigation have requested that third-Parties produce documents in accordance with the specifications set forth herein.

b.      The Issuing Party shall produce a copy to all other Parties of any documents and ESI (including any metadata) obtained under subpoena to a non-Party.

c.      If the non-Party production is not Bates-stamped, the Issuing Party will endorse the non-Party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

## 10.  BEST EFFORTS COMPLIANCE AND DISPUTES

The Parties agree to use their best efforts to comply with and resolve any differences concerning compliance with any provision/s of this Order. If a Producing Party cannot comply in a particular circumstance with this Order, such Party shall promptly inform the Receiving Party in writing why compliance with the Order is not reasonable or feasible. No Party may seek relief from the Court concerning compliance or non-compliance with the Order until it has met and conferred with the other Party in a good faith effort to resolve or narrow the area of disagreement.

11.    **MODIFICATION**

This Order may be modified by a Stipulated Order of the Parties or by the Court for good

cause shown.

IT IS SO ORDERED.

Date: _____    _____
                                 4/2/2019
                                 HONORABLE ROBERT SCHAFFER
                                 PRESIDING JUDGE 152ND DISTRICT COURT

## APPENDIX A: ESI METADATA AND CODING FIELDS

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| BegDoc | Bates number of the first page of the document. | All | Prefix-0000000001 |
| EndDoc | Bates number of the last page of the document. | All | Prefix-0000000002 |
| BegAttach | Bates number of the first page of the first document of the document family. | All | Prefix-0000000001 |
| EndAttach | Bates number of the last page of the last document of the document family. | All | Prefix-0000000004 |
| PageCount | Number of printed pages in the document. | All | 2 |
| Confidential | Confidentiality designation, if any, of the document | All | Confidential<br>Highly Confidential |
| Custodian | Names of all custodians who possessed the document, including deduplicated values, in format: Last name,<br>First name.<br><br>Where multiple individuals share first and last name, individuals should be distinguished by an initial which is kept constant<br>between productions. For instance: Smith, John A. and Smith, John B.<br><br>For documents from centralized repositories where custodian name(s) are unavailable, identifying source information should be | All | Doe, John; Smith, John; Smith, Jane |
| Duplicate Custodian | Names of all other custodians who possessed the document. | ESI | |
| Duplicate Custodian File Name | The names of unproduced duplicate copies of files. | ESI | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Duplicate Custodians Directory Path | The file path/directory path correlating to the unproduced duplicate copies of files. | ESI | |
| Source | Source shall be used in connection with document obtained from third-Parties and identify the third-Party having provided the particular material.  If the third-Party's production of documents included individual custodian information, such information shall also be included in the "CUSTODIAN" field. | | |
| Subject/E-Subject | Subject line of an e-mail. | E-mails | Text of the subject line |
| To | All recipients that were included on the "To" line of the e-mail. | E-mails | John.Doe@e-mail.com |
| From | The name and e-mail address of the sender of the e-mail. | E-mails | Jane.Doe@e-mail.com |
| CC | All recipients that were included on the "CC" line of the e-mail. | E-mails | Bill.Black@email.com |
| BCC | All recipients that were included on the "BCC" line of the e-mail. | E-mails | ceo-gs@email.com |
| DateSent | Date an e-mail was sent. | E-mails | 01/01/2015 |
| TimeSent | Time an e-mail was sent. | E-mails | 12:30:00 |
| DateModified | Date the document was last modified. | E-attachments; Electronic documents | 01/01/2015 |
| TimeModified | Time the document was last modified. | E-attachments; Electronic documents | 12:30:00 |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| DateCreated | Date the document was created. | E-attachments; Electronic documents | 01/01/2015 |
| TimeCreated | Time the document was created. | E-attachments; Electronic documents | 12:30:00 |
| Family Date | Date last modified or, for e-mails, sent date of the parent | Electronic documents; E-attachments | 01/01/2015 |
| Family Time | Time last modified or, for e-mails, sent time of the parent | Electronic documents; E-attachments | 12:30:00 |
| DateReceived | Date email was received. | E-mails | 01/01/2015 |
| TimeReceived | Time email was received. | E-mails | 12:30:00 |
| DateAccessed | Date document last accessed | Electronic documents; E-attachments | 01/01/2015 |
| Date Last Printed | Date the document was last printed. | E-attachments; Electronic documents | 01/01/2015 |
| Time Last Printed | Time the document was last printed. | E-attachments; Electronic documents | 12:30:00 |
| Date Last Saved | Date the document was last saved. | E-attachments; Electronic documents | 01/01/2015 |
| Importance | Level assigned by creator | E-mails | High |
| Conversation | E-mail conversation designation | E-mail | Re: Smith Summary |
| Conversation Index | | E-mail | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| Title/E-Title | Title of document | E-attachments; Electronic documents | Smith Summary |
| Redaction | Basis for redactions in document. | E-attachments; Electronic documents | |
| FileName | File name of original document | Electronic documents; E-attachments | Microsoft Word 2007/2010 |
| File Type | Application type | Electronic documents; E-attachments | Word |
| File Size | Size of file | All | 40 gb |
| File Extension | The file extension of the document. | E- attachments; Electronic documents | .doc |
| NativeLink | Relative file path to each native file on the production media. | All documents produced in native format | \Natives\Document 12345.doc |
| Author | Document author/creater | E- attachments; Electronic documents | John Doe |
| Company | Party making the production | All | Company X |
| Title | Document Title | E- attachments; Electronic documents | Text of the title line |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| HASH | MD5 or SHA-1 Hash value | Electronic documents; E-attachments; E-mails | |
| Prod Volume | Production Volume | All | Defendant X Volume 1 |
| File Path | | | |
| AttachDocID | | Electronic documents; E-attachments; E-mails | |
| ATTACHNAME | | | |
| ATTACHRANGE | | | |
| FOREIGN LANGUAGE | | | |
| TIME ZONE PROCESSED | | | |
| E-LAST MODIFIED BY | | | |
| MESSAGE TYPE | | | |
| CALENDAR MEETING STOP/START | | | |
| RECORD TYPE | | | |
| HAS HIDDEN DATA | | | |
| HIDDEN COLUMNS | | | |
| HIDDEN NOTES | | | |
| HIDDEN ROWS | | | |
| HIDDEN SHEETS | | | |

| Field Name | Field Description | Populated For | Example Values |
|---|---|---|---|
| HIDDEN SHEETS COUNT | | | |
| HIDDEN SLIDES | | | |
| HIDDEN TEXT | | | |
| HIDDEN TRACK CHANGES | | | |
| HIDDEN VERY HIDDEN SHEETS | | | |
| HIDDEN VERY HIDDEN SHEETS COUNT | | | |
| HIDDEN WHITE TEXT | | | |
| HIDDEN WORKBOOK | | | |
| HIDDEN WORK BOOK WRITE PROTECTED | | | |
| MESSAGE ID | | | |
| NUMBER OF ATTACHMENTS | | | |
| ORIGINAL FOLDER PATH | | | |
| IS EMBEDDED | | | |
| TextPath | Relative file path to each extracted text/OCR text file on the production media. | All | \Text\Document_1234 5.txt |

2/15/2019 5:56:51 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 31255490
By: WILLIAMS, KATINA L
Filed: 2/15/2019 5:56:51 PM

Pgs-10

ENTX

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| IN RE: TEXAS OPIOID LITIGATION | § | IN THE DISTRICT COURT |
| | § | |
| MDL NO. 18-0358 | § | 152ND JUDICIAL DISTRICT |
| | § | |
| *This Document Relates to All Cases* | § | HARRIS COUNTY, TEXAS |

## PROTOCOL FOR COORDINATION
## WITH THE NATIONAL MDL

### I.    General Provisions and Scope

a.    The Texas MDL Panel, pursuant to TEX. R. JUD. ADMIN. 13, created by order this consolidated action "In Re: Texas Opioid Litigation" on June 13, 2018 (the "Texas MDL"). By order of September 5, 2018, the Texas MDL panel transferred all pending and future tag-along cases to this court for pretrial management under the Rule. This Court entered Case Management Order #1 on December 26, 2018. Except as set forth in this Order or prior orders

*or supercedes*

issued by this Court, nothing in this Order modifies the prior stay issued in this Texas MDL.

b.    Related proceedings involving overlapping defendants, factual allegations, and theories of recovery are pending in state and federal courts across the country. Those proceedings include *In re: National Prescription Opiate Litigation*, MDL No. 2804, currently pending before Judge Dan A. Polster in the Northern District of Ohio, Case No. 1:17-md-02804-DAP (the "National MDL"). The National MDL was transferred by the Judicial Panel of Multidistrict Litigation to Judge Polster on December 12, 2017, who entered Case Management Order #1 on April 11, 2018. Although the parties and factual allegations between this Texas MDL and the National MDL may overlap, the parties and issues are not identical in all respects, there are differences in the procedural law applicable and in the substantive causes of action asserted, and the National MDL and Texas MDL proceedings are separate and distinct MDL proceedings. Judge Polster has "recognized that 'state courts are independent jurisdictions,' and no party

1

EXHIBIT
15

waives any jurisdictional rights or obligation with regard to discovery, trial setting, or trial by agreeing to coordinate with the MDL…." *Id.*, Doc. #1029, Order, p. 1, Para. I.a, October 9, 2018. That order further states "[N]othing in this Order applies to or limits in any way or sets requirements within any attorney general investigation or attorney general action pending in state court." *Id.* p. 2, Para. I.c.[1] Further, this Court has stated it will operate independently of any other courts. *See* Status Conference, *In re: Texas Opioid Litigation*, MDL No. 2018-63587, November 16, 2018, 16:9-16 ("[T]his Court is not going to operate under anyone else's MDL. This is an independent action….And we will act independently of the other courts….That is why the State MDL Panel created this.").

       c.      This Court's goal is to engage in a cooperative effort to coordinate, to the extent practicable, and consistent with Texas law, parallel and overlapping proceedings in the National MDL in order to reduce costs and avoid unnecessary duplication of effort. While there are important benefits to coordination for all parties, this Court also recognizes that state courts and federal courts have independent jurisdictions, and no party waives any jurisdictional rights or obligations with regard to discovery, trial setting, or trial by agreeing to coordinate discovery, including participating in depositions that are noticed or cross-noticed in the National MDL.

       d.      As the *Manual for Complex Litigation* notes, "[s]tate and federal judges, faced with the lack of a comprehensive statutory scheme, have undertaken innovative efforts to coordinate parallel or related litigation." To that end, this Order sets forth procedures that will apply in *In re Texas Opioid Litigation*, MDL No. 18-0358 in the 152nd Judicial District Court of Harris County, Texas to facilitate, to the extent practicable, coordination with the National MDL.

---

[1] Judge Polster stated in a prior order governing deposition protocols: "However, nothing in this Order applies to or limits in any way or sets requirements within any attorney general investigation or attorney general action pending in state court." *Id.*, Doc. #643, Order, p. 4, Para. I.f.1., June 20, 2018.

e.      It is the intent and objective of this Court to allow discovery to proceed in this MDL Proceeding in coordination with opioid-related cases pending in the National MDL, to the extent practicable and appropriate.

f.      The Court therefore orders the Parties to cooperatively work together in the Texas MDL proceeding, and make reasonable attempts to coordinate the production of documents, and coordinate dates with the scheduling of depositions conducted in the National MDL.  This Order is not intended to define the scope of discovery that will be permitted in the Texas MDL.  This

or limit

Court intends to maintain control over the scope and scheduling of discovery in this Texas MDL as an independent jurisdiction and will address any conflicts that arise between Orders in the Texas MDL and the National MDL.

g.      The rules and orders governing proceedings in this lawsuit shall be the Texas Rules of Civil Procedure and the orders of this Court. However, consistent with those orders and Texas law and the importance of managing this Texas MDL to promote efficiency and avoid duplicative discovery efforts in this Texas MDL, the Court orders the parties to this Texas MDL to use their best efforts to communicate, cooperate, and coordinate with the National MDL concerning discovery, including document production, scheduling and taking depositions, and working on agreements for the cross-noticing of depositions. This order applies to all cases that are today or may in the future become part of this Texas MDL, and it binds all the parties, their counsel, and their law firms, in such cases, including all attorneys appointed by this Court to leadership positions in this Texas MDL.

## II.    Production of Documents/Written Discovery

a.      The Court orders that in the event any discovery request in this Texas MDL propounded on a Defendant is duplicative of any other discovery request in this case, or to a discovery request propounded on that Defendant in the National MDL, the Defendant may

incorporate the response to the other request by express reference and by providing the requesting party a copy of the response to the other request. A duplicate request is not a basis for objection, provided, however, Defendants may seek relief from the Court if they are subjected to unreasonable cumulative and duplicative discovery in accordance with Texas Rule of Civil Procedure 192.4.

b.      Within ten (10) business days from the date of this order, the Defendants' Texas MDL Liaison Counsel shall report on the status of the production of documents and electronically stored information ("ESI") previously produced in the National MDL to Texas MDL Local Entity and State Plaintiffs, through their Liaison and Leadership Counsel.  In addition, the Texas MDL Liaison and Leadership Counsel shall meet and confer to address practical and logistical issues related to the production of documents and ESI previously produced in the National MDL, including which member of Plaintiffs' Texas MDL Liaison and Leadership Counsel will be responsible for receiving the production.

c.      Within thirty (30) days from the date of this order or upon entry of the Protective Order governing this Texas MDL, whichever is later, each Texas MDL Defendant shall produce the non-jurisdiction specific documents and ESI that it has previously produced in the National MDL ("National MDL Production") to the individual member of Plaintiffs' Leadership Counsel identified in Section II, Paragraph b. above.

d.      The production to individual member of Plaintiffs' Leadership Counsel identified in Section II, Paragraph b, above, shall be deemed production to the plaintiffs who have asserted claims against the producing party.  The Plaintiffs' Leadership Council shall be responsible for segregating access to the materials produced consistent with the access restrictions of this Court's Protective Order.  The National MDL Production will be produced in the same manner as it was produced in the National MDL.  It is further ordered that contemporaneously with the

production by Defendants to Plaintiffs of the National MDL Production, Defendants shall provide Plaintiffs any production logs and/or indexes that were produced with the National MDL Production. In addition, each Defendant producing National MDL Production pursuant to this paragraph will provide a log identifying the materials, if any, that it has withheld from the materials that Defendant previously produced in the National MDL.

e.      The authenticity of documents produced in the Texas MDL pursuant to this Order or subsequently in this Texas MDL will be governed by the Texas Rules of Civil Procedure, the Texas Rules of Evidence, or other applicable law. The production of the National MDL Production in accordance with this Order shall be treated as a production of documents in response to written discovery as described in Texas Rule of Civil Procedure 193.7.

f.      It is further ordered that all documents and ESI discovery productions made in the Texas MDL are made pursuant to the terms of the Texas MDL Protective Order, whether or not the documents had previously been produced in the National MDL. As such, any disputes relating to the document production shall be governed by the Texas Rules of Civil Procedure and shall be adjudicated by this Court.

## III.    Depositions

a.      The Court orders the Texas MDL parties to cooperate to coordinate the dates of depositions in this Texas MDL with the National MDL. However, if reasonable efforts to coordinate are unsuccessful, the Parties in this Texas MDL will not be required to delay depositions until such time as those depositions can be taken jointly in the National MDL. Disputes related to depositions shall be addressed pursuant to Section VI of this Order.

b.      It is further ordered that any deposition taken in the Texas MDL proceeding shall be taken in accordance with the Texas Rules of Civil Procedure.

c.&#x20;&#x20;&#x20;&#x20;&#x20;&#x20;This Court recognizes the relationship between the availability of documents to be reviewed in preparation for depositions and ability to achieve the goals of avoiding unnecessary duplication of efforts. With respect to depositions occurring in the National MDL that are cross-noticed[2] in this Texas MDL after the date of this order, counsel for any witness, and, in the cases of former employees, for a party affiliated with that witness, shall use best efforts to minimize the necessity for the continued or further deposition of that witness by making a good faith effort to ensure that the deposing counsel has received the production of information relevant to the witness sufficiently in advance of the deposition to permit proper and comprehensive examination of the witness on the date scheduled. This obligation exists whether or not documents have been requested through discovery in this Texas MDL.

d.&#x20;&#x20;&#x20;&#x20;&#x20;&#x20;In cases where National MDL depositions are cross-noticed with depositions in this Texas MDL after the date of this order, the cross-noticing Defendant/party producing the witness shall work with Plaintiffs' Texas MDL Liaison and Leadership Counsel to cooperatively and efficiently make the National MDL Production previously produced by the applicable cross-noticing Defendant/party available to the Plaintiffs, subject to the Protective Order entered by this Court. The Parties will work in good faith to ensure that this production is made at least fourteen (14) days before the date of the deposition.

## IV.&#x20;&#x20;&#x20;**Custodial Files**

a.&#x20;&#x20;&#x20;&#x20;&#x20;&#x20;For National MDL witnesses whose depositions are cross-noticed in this Texas MDL and for whom a custodial file was produced in the National MDL, the witness's custodial file will be produced to the plaintiffs in this Texas MDL at least fourteen (14) calendar days prior to

---

[2] A cross-notice served on a party in the Texas MDL who has not brought claims against the serving party at the time the cross-notice is served, shall not preclude that served party from taking a later deposition of that party to which the notice pertains, unless that served party participates in the cross-noticed deposition..

the deposition. If a custodial file, as referenced in this paragraph, is not produced prior to a cross-noticed deposition, then the limitations regarding an additional deposition of the witness shall not apply.

b.    When a cross-notice has been served in this Texas MDL for a deposition noticed in the National MDL, the cross-noticing Defendant/Party producing the witness shall ~~work in good faith~~ make a custodial production, if relevant custodial materials exist, to the Plaintiffs' Leadership Counsel in this Texas MDL at least fourteen (14) days before the date of the deposition.

c.    When a cross-notice has been served in this Texas MDL for a deposition noticed in the National MDL, Plaintiffs may inquire of the cross-noticing Defendant/Party producing the witness whether, upon the cross-noticing Defendants' information and belief, the witness has personal knowledge of Texas-specific issues, including Texas-specific documents in their custodial file. If the witness's Texas-specific documents have not yet been produced in the Texas MDL, Defendants shall ~~work in good faith to~~ produce such documents no later than fourteen (14) days prior to the date of the deposition.

V.    **Procedures Related to Cross-Noticing Depositions**

a    To afford adequate notice to parties in this Texas MDL of National MDL depositions that a party seeks to cross-notice in this Texas MDL, within five (5) days of a deposition date being agreed upon in writing in the National MDL by a party to this Texas MDL who is also a party in the National MDL, the party seeking to cross-notice the deposition in this Texas MDL shall provide to Plaintiffs' Texas MDL Liaison and Leadership Counsel and counsel for the noticed party, even before formal notice or cross-notices are served, the following information: requesting party; responding party; deponent; agreed deposition date; anticipated location; anticipated start time; and the state court cases in which the requesting party intends to cross-notice the deposition. It is the

obligation of the party seeking to cross-notice to promptly provide any updates to the same.

      b.      Cross-notices of depositions noticed in this Texas MDL will be served within the timeframe required under the Texas Rules of Civil Procedure.

      c.      The parties shall work cooperatively to ensure that the Texas MDL Plaintiffs shall have meaningful participation in any National MDL deposition noticed in this case. Meaningful participation shall include the opportunity to lodge objections to any question and answer, and the reasonable opportunity to examine the witness. The parties shall conduct examinations so as to avoid duplicative questioning. To effectuate this objective, at least five (5) days before any deposition noticed in the National MDL, the Plaintiffs' Texas MDL Liaison and State Leadership Counsel will notify the party producing the witness, which, if any, plaintiffs in this Texas MDL intend to attend and participate in the deposition, and the amount of time plaintiffs' counsel in this Texas MDL anticipate seeking for non-duplicative questioning of the witness. The parties examination time of the witness by counsel in the Texas MDL may be in addition to the time alotted to the National MDL counsel. The parties shall thereafter meet and confer to resolve any issues around deposition length, and to the extent that disputes remain, the parties will submit any disputed issues to the Court. The amount of additional deposition time for questioning by counsel on behalf of the Texas MDL Plaintiffs will be negotiated by Texas MDL Liaison and Leadership Counsel and counsel for Defendant/Party producing witness. To the extent that any other disputes remain, the parties will submit any other disputed issues to the Court.

      d.      The Court intends to issue a separate order Establishing Deposition Protocol, which will include further specifics governing depositions taken in this Texas MDL.[3]

## VI.    Objections and Disputes

      a.      Any party objecting to a cross-notice of a deposition noticed in the Texas MDL shall notify counsel for the party presenting the noticed witness and/or counsel for the party that issued the cross notice, as well as Texas MDL Liaison and State Leadership Counsel of the

---

[3] That protocol shall include, *inter alia*, a method by which the Texas MDL plaintiffs can cross-notice depositions of witnesses noticed in the National MDL or this Texas MDL.

objection.

b. The parties involved in the dispute shall make a good faith attempt to meet and confer prior to filing a motion to quash, and shall meet and confer prior to submitting a dispute to the Court. Any disputes submitted to the Court must be stated in writing.

c. If a motion to quash is filed in this Texas MDL related to a deposition originally noticed in the National MDL and then cross-noticed in this Texas MDL, the motion to quash will only affect the cross-notice, and will not limit or prevent the originally noticed deposition from going forward.

d. By cooperating with the National MDL in the conduct of discovery (i.e by receiving previously produced discovery and by participating in cross-noticed depositions) the litigants currently in or later added to the Texas MDL do not waive their right to have this Court hear any discovery disputes and/or rule on discovery objections.

## VII. Deposition Of Witnesses Already Taken In The National MDL

a. The Court orders that within thirty (30) days of the entry of a Protective Order in this Texas MDL or this Order, whichever occurs later, Defendants shall produce transcripts of depositions taken in the National MDL of their non-jurisdiction specific employees or non-jurisdiction specific former employees ("Defendants' Witnesses") and all related exhibits for Defendants' Witnesses' depositions already taken in the National MDL to the Texas MDL Plaintiffs. Prior to noticing a deposition of a deponent that has already been taken in the National

---

~~1 The Court acknowledges that there are deposition transcripts, or portions thereof, and deposition exhibits designated Confidential or Highly Confidential pursuant to the National MDL Protective Order by individuals and entities that are not parties to the Texas MDL. The obligation to produce transcripts and exhibits in Section VI, Paragraph a. does not require production of testimony or exhibits designated as Confidential or Highly Confidential by an individual or entity who is not a party to the Texas MDL. In addition, to the extent deposition testimony or depositions exhibits from the National MDL were designated Confidential or Highly Confidential by a party to this Texas MDL, only the parties to the cases in this Texas MDL where the designating party is a party may have access to the designated testimony and exhibits.~~

MDL, and for which a transcript and related exhibits have been produced by a Defendant to this Texas MDL, the Texas MDL plaintiff seeking to notice that deposition shall provide notice to the applicable defendant and meet and confer concerning plaintiff's basis for seeking the deposition.

      b.      If the parties are unable to resolve the issue through a meet and confer, the plaintiff seeking the deposition shall submit its request for the deposition to the Texas MDL Court.

      c.      To the extent that a witness deposed in the National MDL is allowed to be re-deposed in this Texas MDL, the scope of any additional deposition questioning in this Texas MDL shall be governed by the parties' agreement to have the later deposition to proceed or pursuant to any applicable order or parameters set by this Court.

      d.      It is further ordered that the admissibility of the deposition testimony of Defendants' Witnesses taken in the National MDL will be governed by the Texas Rules of Civil Procedures, the Texas Rules of Evidence, and any rulings on admissibility by the Texas MDL court or the trial court.

**IT IS SO ORDERED.**

Signed:
4/2/2019

_____

HONORABLE ROBERT SCHAFFER
PRESIDING JUDGE
152ND DISTRICT COURT

10

ELECTRONICALLY FILED - 2019 Sep 27 2:54 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2301294

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | |
| ) | IN THE COURT OF COMMON PLEAS |
| ) | |
| | |
| IN RE: SOUTH CAROLINA OPIOID ) | Honorable Perry H. Gravely |
| LITIGATION ) | |
| ) | Civil Action No.  2018-CP-23-01294 |
| *This document relates to all cases.* ) | |
| ) | |

## CASE MANAGEMENT ORDER NO. 2

The Court hereby enters this Case Management Order No. 2 as an amendment to the Case Management Order No. 1 (June 26, 2019) (hereinafter "CMO #1).  CMO #1 is amended to add the following provision and all other provisions of CMO #1 shall remain in effect.

**A.**     **Bankruptcies**

All CMOs and other Orders shall not apply to any party which has filed for bankruptcy protection and an Order of Stay issued. The cases shall proceed as to all other parties unless otherwise ordered by the Court.

**B.**     **Privileges**

The Court recognizes that cooperation among counsel and parties is essential for the orderly and expeditious resolution of this litigation.  The communication, transmission, or dissemination of information among Plaintiffs' counsel in this coordinated litigation, or among Defendants' counsel in this coordinated litigation, shall not be deemed a waiver of the attorney-client privilege, the protection afforded by the work product doctrine, the protection afforded to material prepared for litigation, the joint prosecution or joint defense privilege, or any other privilege to which a party may be entitled.  Cooperative efforts shall not in any way be used against

1

**EXHIBIT**

**16**

ELECTRONICALLY FILED - 2019 Sep 27 2:54 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2301294

any of the parties, be cited as purported evidence of conspiracy, wrongful action or wrongful conduct, and shall not be communicated to the jury at trial.  Nothing in this paragraph shall in any way affect the applicability of any privileges or protections against disclosure otherwise available under law.

**C.**     **Initial Discovery**

1.     Within 30 days of entry of this Order, Defendants shall produce to Plaintiffs: (a) all document productions from MDL 2804, *In re: National Prescription Opiate Litigation* (the "MDL"), that are not specific to the State of Ohio and; (b) all deposition transcripts of Rule 30(b)(6) witnesses and employees from the MDL; and (c) provide a list of all other deposition transcripts from the MDL which have not been provided.  This production shall be a rolling production as additional documents are produced by Defendants in the MDL proceedings.  These productions shall be served in the same format and with the same bates numbers as used in the MDL.

2.     In addition, these documents and transcripts shall be produced subject to all applicable confidentiality designations as used in the MDL, and shall be treated as though those confidentiality designations were made under the Protective Order entered in the South Carolina litigations, subject to further order and/or modification by the Courts of the State of South Carolina. By producing these documents from the MDL, Defendants do not waive and specifically reserve all objections and defenses, including lack of personal jurisdiction. Further, by Plaintiffs receiving these documents, Plaintiffs do not submit to jurisdiction of the MDL Court and further will not be deemed to be subject to participation in any common benefit fund, cost sharing, and/or assessments

ELECTRONICALLY FILED - 2019 Sep 27 2:54 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2301294

if the MDL, nor will Plaintiffs be deemed to have subject themselves to any MDL participation agreement.

        3.   All other discovery shall be stayed until the Court has addressed the issues at the hearing set forth in Section E.

**D.**    <u>**Responsive Pleadings**</u>**:**

For the filing of responsive pleadings by Defendants as set forth in Section VI. A. of the Case Management Order #1 (6/26/19), the 60 days shall begin to run as of August 23, 2019.

**E.**    <u>**Hearing-October 24, 2019**</u>

Other matters which were raised by the various proposals for Amended Case Management Order No. 2 shall be determined after all parties have the opportunity to be heard at a hearing scheduled for Thursday, October 24, 2019 in Greenville, South Carolina.  More specifically, the Court will address the following issues:  (1) when bellwether cases should be selected and the procedure for doing so; (2) whether proposed "Fact Sheets" should be adopted in the South Carolina litigation; (3) whether the South Carolina litigation should abide by the MDL Discovery protocol; (4) tentative dates for Scheduling Order; and (5) any other matters identified by the Court prior to the hearing.

IT IS SO ORDERED.


September 27,  2019                s/  Perry H. Gravely
                                     South Carolina Circuit Judge for Opioid Litigation


*Judge Gravely's e-signature on following page*

ELECTRONICALLY FILED - 2019 Sep 27 2:54 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2301294



### Greenville Common Pleas

**Case Caption:**   Greenville County Of  vs.  Rite Aid Of South Carolina Inc  , defendant, et al

**Case Number:**   2018CP2301294

**Type:**   Order/Other

So Ordered

s/ Honorable Perry H. Gravely, #2755

Electronically signed on 2019-09-27 13:11:20    page 4 of 4

**EXHIBIT C**

**OPIOID LITIGATION PARTICIPATION AGREEMENT**

This Agreement is made this_____day of_____,   20__,   by   and between  Plaintiffs' Co-Lead Counsel appointed by the  United States District Court for the Northern  District  of  Ohio  in  MDL  2804  and  _____  [Name  of  Law Firm].

WHEREAS, the United States District Court for the Northern District of Ohio, Eastern Division (Polster, J.) has appointed Paul J. Hanly, Jr., Joseph F. Rice and Paul T. Farrell, Jr. to serve as Co-Lead Counsel, has appointed Peter T. Weinberg, Troy Rafferty and Steven Skikos as  Liaison  Counsel,  and  has  appointed  17  additional  attorneys  as  members  of Plaintiffs' Executive Committee (all of the foregoing attorneys collectively referred to as the "PEC" for simplicity of reference) to conduct and facilitate the pretrial proceedings in the coordinated  federal  multidistrict  actions  entitled  <u>In  Re:  National  Prescription  Opiate Litigation</u>;

WHEREAS,  the  PEC  in  association  with  other  attorneys  working  for  the  common benefit of plaintiffs have developed or are in the process of developing common benefit work product which will be valuable in the litigation of federal and state court proceedings involving opioids ("PEC Common Benefit Work Product"); and

WHEREAS,  undersigned  counsel  is  not  a  member  of  the  PEC  and  is  desirous  of acquiring the PEC Common Benefit Work Product and establishing an amicable, working relationship with the PEC for the mutual benefit of their clients ("Participating Counsel");

NOW  THEREFORE,  in  consideration  of  the  covenants  and  promises  contained herein, and intending to be legally bound hereby, the parties agree as follows:

2000208. 7

1

**EXHIBIT**

**17**

## I.  SCOPE OF AGREEMENT.

### A.  Purpose.

This Participation Agreement is a voluntary Participation Agreement between plaintiffs' attorneys who have cases pending in the MDL and/or in state court.  This Participation Agreement supplements and does not in any respect supplant any of the provisions of the Court's Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc. #358), all of which provisions are incorporated herein by reference. This agreement is entered to provide the fair and equitable sharing among plaintiffs, and their counsel, of the burden of services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs in this complex litigation.  This Participation Agreement is a private cooperative agreement among attorneys retained by governmental entities and other plaintiffs, to share common benefit work product both in this MDL and in the various state courts in this complex litigation. This Participation Agreement is not intended to encompass the Attorneys General of the 50 states, American Samoa, the District of Columbia, Guam, Northern Mariana Islands, Puerto Rico and the Virgin Islands.   Participating Counsel who sign on to this Agreement thereby become entitled to receive the MDL PEC Common Benefit Work Product[10] and the state court work product of those attorneys who have signed the Participation Agreement if that work product has been provided to the PEC.

PEC Participating Counsel recognize that plaintiffs who have cases pending in separate and independent jurisdictions are *voluntarily* agreeing to share common benefit work product developed in these jurisdictions, including the MDL, California, Connecticut,

---

[10] This does not include the ARCOS/DADS data which is being made available under a separate agreement and procedure approved by the MDL Court.

Illinois, New York, Pennsylvania, Texas, and other states. Participating Counsel further recognize the separate and independent rights of each jurisdiction and of the litigants therein to fully represent the interests of their clients, including the right to conduct discovery, set cases for trial, conduct jury trials and/or resolve cases.  The Agreement and the Court's Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc. #358) shall not be cited by a party to the Participation Agreement in any other court in support of a position that adversely impacts the jurisdictional rights and obligations of the state courts and state court Participating Counsel.

       **B.**       <u>**Governing Principles – The Common Benefit Doctrine.**</u>

The governing principles are derived from the United States Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881); refined in, *inter alia, Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116 (1884); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co*., 396 U.S. 375 (1970); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); and approved and implemented in the MDL context, in *inter alia, In re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); and *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

The reimbursement of common benefit costs and the payment of common benefit fees is subject to further order of the court to assure adherence to the principles and objectives of the equitable common fund doctrine under the particular circumstances of any judgment or resolution.

       **C.**       <u>**Rights and Obligations of Participating Counsel.**</u>

Upon execution of this Agreement, the PEC will provide to Participating Counsel

access to the PEC Common Benefit Work Product, including access to all documents and data produced to date and hereafter in the MDL as well as all transcripts, exhibits and sealed materials.[11] Participating Counsel agree that all cases in which they have a fee interest, including unfiled cases and cases filed in state and/or federal court, are subject to the terms of this Agreement. Participating Counsel shall provide to Co-Lead Counsel upon execution of this Agreement a list of each client represented by them who has filed a civil action related to the opioids crisis together with the Court and docket number of each such case, and shall further provide to Co-Lead Counsel a list of each client represented by them who has not yet filed a civil action related to the opioids crisis. Participating Counsel shall supplement these lists on a quarterly basis.

## II. <u>AGREEMENT TO PAY AN ASSESSMENT ON GROSS RECOVERY</u>

Participating Counsel hereby agree to pay a reasonable assessment on the gross recovery actually received by clients of the undersigned Participating Counsel, as defined below, on all claims against Defendants for monetary damages or for injunctive relief, whether said recovery is by way of settlements or judgments.  Such payment shall be paid from the fees of Participating Counsel, the client recovery, or by the settling defendant, depending on the circumstance of the settlement or judgment.

### A.    **Gross Recovery Defined.**

Gross recovery includes any and all amounts actually paid to clients of Participating Counsel by Defendants. In measuring the "gross recovery," the parties are to (a) exclude court costs that are to be paid by the Defendants; and (b) include the present value of any fixed and certain payments agreed or ordered to be made in the future. The assessment shall

---

[11] The PEC reserves the right to implement additional restrictive requirements necessary for the receipt of certain third-party documents and data.

apply to all cases in which Participating Counsel have a fee interest, whether pending in the MDL or in state courts and whether tolled, filed, unfiled, or subsequently filed by Participating Counsel.

**B.     Assessment Amount To Be Determined.**

The assessment amount referenced above imposed upon the gross recovery of a client represented by Participating Counsel shall be a percentage of the gross recovery fixed by the Court following review of the recommendations of the Fee Committee established pursuant to section 2 of the Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc #358) referenced above.  In no event shall such percentage exceed the maximum percentage assessed upon the gross recovery of a client represented by any PEC member. The intent being to assure Participating Counsel they will be assessed a percentage no higher than that which a PEC member firm is assessed.  The Court in its discretion may assess a greater percentage on the gross recovery of any counsel, other than any member of the PEC, who has not signed this Participation Agreement.

**C.     Covered Cases.**

The assessment provisions set forth above apply to all cases now pending or later filed in or transferred or removed to MDL 2804. Participating Counsel who sign the Participation Agreement further agree to pay the assessment amount on all cases in which they have a fee interest, whether unfiled or filed in state or other courts.

Counsel who do not sign the Participation Agreement are not required to pay an assessment on state court cases or on unfiled cases, provided, however, that such counsel may be subject to an increased assessment on all opioid cases in which they have a fee interest if they receive PEC Common Benefit Work Product or otherwise benefit from the

work performed in connection with the MDL.

      **D.**      **Attorney Fee Lien.**

      With respect to each client whom they represent in connection with any opioid-related claims that are subject to the terms of this Participation Agreement and any Order implementing this Agreement, each counsel governed hereby shall deposit or cause to be deposited in the Opioid Fee and Expense Fund to be established in MDL 2804 the percentage assessments created hereby. Such counsel, on behalf of themselves, their affiliated counsel, and their clients, hereby grant and convey to the PEC a lien upon and/or a security interest in any recovery by any client whom they represent in connection with opioid-related claims in order to secure payment in accordance with the provisions of this Participation Agreement. Such counsel will undertake all actions and execute all documents which are reasonably necessary to effectuate and/or perfect this lien and/or security interest.  This Participation Agreement is not intended to perfect a lien and/or security interest on any State Attorney General.

**III.**  <u>**COMMON BENEFIT FEES AND EXPENSES.**</u>

      Participating Counsel subject to the prior Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc #358) shall be eligible to the recovery of common benefit fees and expenses. The format for the recovery of authorized common benefit fees and expenses shall be in accordance with Exhibit A attached hereto.  If any work performed on state court litigation is authorized as common benefit work, Participating Counsel agree to make available the state work product and documents to the MDL and PEC and other Participating Counsel.  If Participating Counsel intend to seek payment for common benefit work, they shall comply with the federal court Order Regarding Plaintiff Attorneys' Fees and Expenses.  In addition,

they shall provide Co-Lead Counsel a statement that a given case should be considered a bellwether case at the time they do the work.

**IV.    INTENT OF THE PARTIES**

The parties to this Agreement confirm their mutual intent to pursue the payment of all attorney fees directly by any and all defendants and preserve the gross recovery for each client. Further the terms of this Agreement are intended to apply only if the defendants do not provide for an adequate direct payment of attorney fees and expenses.

**V.    CONFIDENTIALITY**

Documents shall be produced to Participating Counsel upon entry of the MDL Protective Order or an appropriate state court protective order.  The terms of the Participation Agreement and any documents and/or information exchanged and/or shared pursuant thereto shall be attorney work product and is confidential as between Participating Counsel and the MDL PEC.

_____
**FIRM NAME**

_____
I elect to be a Participating Counsel

**PLAINTIFFS' EXECUTIVE COMMITTEE**

Dated: _____    _____

11/26/2018 4:34 PM
Chris Daniel - District Clerk Harris County
Envelope No. 29250652
By: KATINA WILLIAMS
Filed: 11/26/2018 4:34 PM

Pgs-2

ENTX

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MDL PRETRIAL CAUSE NO. 2018-63587



| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| | § | |
| | § | |
| IN RE TEXAS OPIOID LITIGATION | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | 152nd JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER APPOINTING LEADERSHIP FOR THE PLAINTIFFS

On this day came to be considered, the appointment of the Texas's Lead Counsel and the creation of leadership for the Texas Local Entity Plaintiffs[1] and related issues, and the Court hereby orders as follows:

It is ORDERED that Texas Local Entity Plaintiffs will have a Plaintiffs' Steering Committee with the following membership:  Dan Downey, Tommy Fibich, Mike Gallagher, Dara Hegar, Scott Hendler, Majed Nachawati, Jim Perdue, Dennis Reich, Richard Schechter, Jeffrey Simon, Kathy Snapka, and Mikal Watts.

 It is further ORDERED that Jay Henderson and Pam McClemore shall be appointed as co-Liaison Counsel for the Texas Local Entity Plaintiffs;

It is further ORDERED that Shelly Sanford be appointed as Liaison Counsel for the Texas Local Entity Plaintiffs to the federal MDL 2804;

---

[1] "Texas Local Entity Plaintiffs" refers to the non-State of Texas plaintiffs and is meant to include counties, municipalities, hospitals districts, unions, and all plaintiffs currently in this MDL or to be added other than the State of Texas, by and through the Texas Attorney General.

Order Appointing Leadership for the Plaintiffs

EXHIBIT
18

It is further ORDERED that Patrick Sweeten be appointed as Lead Counsel for the State of Texas, without prejudice to any rights by the State of Texas to seek rehearing or appeal of its Motion to Remand.

Signed this _____ day of November, 2018.

Signed:
11/28/2018

HONORABLE ROBERT SCHAFFER