# APPENDIX B

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement is made and entered into this 29th day of March, 2022, between Teva, (defined below) and the State of Florida and its Office of the Attorney General ("Plaintiff" or "State") (collectively, the "Settling Parties"), in the lawsuit captioned *State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma, L.P., et al.* (Case No. 2018-CA-001438) (Fla. Cir. Ct. Pasco County) (the "Florida AG Action"). This Settlement Agreement is intended by the Settling Parties to fully, finally and forever resolve, discharge and settle the Released Claims (as defined below), upon and subject to the terms and conditions hereof (the "Settlement").

WHEREAS, Plaintiff filed its complaint in the Florida AG Action (i) alleging, among other things, that Teva, among others, violated Florida law by deceptively marketing opioid pain medications so as to overstate their efficacy and downplay the associated risk of addiction, which resulted in a public nuisance in Florida; (ii) alleging that Teva, among others, violated the law by failing to monitor, report and not ship allegedly suspicious orders of opioid pain medications; (iii) alleging that Teva, among others, violated Fla. Stat. § 895.03(3), (4); and (iv) asserting Claims (as defined below) for damages, equitable abatement, civil penalties, attorneys' fees and reimbursed litigation costs, and other relief;

WHEREAS, Plaintiff brought the Florida AG Action in its sovereign capacity as the people's attorney in order to protect the public interest, including the interests of the State of Florida, its governmental subdivisions and its citizens;

WHEREAS, numerous Litigating Subdivisions (defined below) have filed Actions (defined below) in various forums against Teva, among others, raising Claims or allegations concerning, related to, based upon, or in connection with the Covered Conduct (defined below) and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action;

WHEREAS, there are numerous Subdivisions (defined below) that are not Litigating Subdivisions ("Non-Litigating Subdivisions") that could seek to file additional Actions raising Claims or allegations concerning, related to, based upon, or in connection with the Covered Conduct and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action and the Actions filed by Litigating Subdivisions;

WHEREAS, Teva (i) denies each and all of the Claims and allegations of wrongdoing made by Plaintiff in the Florida AG Action and by the Litigating Subdivisions in each of the Actions and maintains that it has meritorious defenses; (ii) denies all assertions of wrongdoing or liability against Teva arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Florida AG Action or in other Actions already brought by Litigating Subdivisions or that could be brought by such plaintiffs or by Non-Litigating Subdivisions, and contend that the factual allegations made in the Florida AG Action and the Litigating Subdivisions' Actions relating to Teva are false and materially inaccurate; (iii) denies that Plaintiff, or any Litigating Subdivision, or any other Subdivision, or any Florida resident, was harmed by any conduct of Teva alleged in the Florida AG Action, the Litigating Subdivisions' Actions, or otherwise; (iv) denies liability, expressly denies any wrongdoing, and denies Teva violated any federal or state statute or common law; and (v) maintains that Teva would be able to successfully defend against Plaintiff's Claims and allegations at trial, that the facts do not support the

1

allegations, that Teva engaged in any misconduct or unlawful activity and that Teva's conduct caused no harm to Plaintiff or to the Litigating Subdivisions, other Subdivisions, or any Florida residents;

WHEREAS, the Parties have investigated the facts and analyzed the relevant legal issues regarding the Claims and defenses that have been or could have been asserted in the Florida AG Action and any other Actions;

WHEREAS, the Parties have each considered the costs and delays and uncertainty associated with the continued prosecution and defense of the Florida AG Action and the other Actions;

WHEREAS, the Parties believe the Settlement set forth herein avoids the uncertainties of litigation and assures that the benefits reflected herein are obtained;

WHEREAS, Plaintiff has concluded that the terms of the Settlement are fair, reasonable and adequate and in the best interest of Plaintiff and all Subdivisions and Florida citizens and residents;

WHEREAS, Plaintiff has determined that continuation or commencement of Actions against Teva by Litigating Subdivisions or other Subdivisions would unduly interfere with Plaintiff's litigation authority to bring and resolve litigation in which the State has an interest and frustrate Plaintiff's efforts to obtain a favorable settlement;

WHEREAS, the Parties agree that neither this Agreement nor any statement made in the negotiation thereof shall be deemed or construed to be a concession as to any Claim, an admission, evidence of any violation of any statute or law, evidence of any liability or wrongdoing by Teva, or evidence of the truth of any of the Claims, allegations, denials, or defenses made in the Florida AG Action or the Litigating Subdivisions' Actions; and

WHEREAS, arm's-length settlement negotiations have taken place over the course of several weeks between Teva and Plaintiff;

WHEREAS, Plaintiff views prompt settlement on the terms enclosed herein to be in the public interest and crucial to the State of Florida and its citizens; recognizes that Subdivisions may, notwithstanding their willingness to sign on to this settlement, wish to reserve the right to challenge the Attorney General's authority to bind them in other litigation that does not arise out of or relate to the Covered Conduct; and represents that Plaintiff shall not use those Subdivisions' acceptance of the terms of this Settlement as precedent in any litigation matter that does not arise out of or relate to the Covered Conduct;

NOW, THEREFORE, IT IS HEREBY AGREED by and between Plaintiff and Teva by and through their respective counsel, as follows:

A.    **Definitions.**  As used in this Agreement, the following capitalized terms have the meanings specified below.

(a)    "Actions" means the Florida AG Action and any lawsuit by a Subdivision asserting any Released Claim against any Releasee.

(b)    "Agreement," "Settlement" or "Settlement Agreement" means this Settlement Agreement, together with any exhibits attached hereto, which are incorporated herein by reference.

(c)    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. § 101, et seq.

(d)    "Bar" means either: (1) a law barring all Subdivisions in the State of Florida from maintaining Released Claims against Releasees (either through a direct bar or through a grant of authority to release Claims and the exercise of such authority in full); or, (2) a ruling by the Florida Supreme Court (or a District Court of Appeal if a decision is not subject to further review by the Florida Supreme Court) setting forth the general principle that Subdivisions in the State of Florida may not maintain any Released Claims against Releasees, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Releasee (apart from the payments by Teva contemplated under this Agreement) shall not constitute a Bar.

(e)    "Claim" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative or regulatory remedy whatsoever.

(f)    "Claim-Over" means a Claim asserted by any entity that is not a Releasor against a Releasee on the basis of contribution, indemnity, or other claim-over on any theory relating to Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee) asserted by a Releasor.

(g)    "Consent Judgment" means a consent decree, order, judgment, or similar action; in connection with this Agreement, the Parties have agreed to the entry of the

3

Consent Judgment attached hereto as <u>Exhibit H</u>, which provides for the release set forth below and the dismissal with prejudice of any Released Claims that the State of Florida Office of the Attorney General has brought against Releasees, on the terms and conditions specified herein.

(h)     "<u>Court</u>" means the Sixth Judicial Circuit Court in and for Pasco County, State of Florida.

(i)     "<u>Covered Conduct</u>" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date of the Release (and any past, present or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) arising from or relating in any way to: (1) the availability, discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including, but not limited to, any unbranded promotion, marketing, programs or campaigns relating to any Product or class of Products; (2) the characteristics, properties, risks or benefits of any Product; (3) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders placed with any Releasee; (4) the purchasing, selling, acquiring, disposing of, importing, exporting, applying for quota for, procuring quota for, handling, processing, packaging, supplying, distributing, converting, or otherwise engaging in any activity relating to, precursor or component Products, including, but not limited to, natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, active pharmaceutical ingredients, drug substances or any related intermediate Products; and, (5) diversion control programs or suspicious order monitoring.

(j)     "<u>Effective Date of the Agreement</u>" means 3 business days after the Initial Participation Date, provided that either a Bar exists or a mutually sufficient number of Subdivisions have become Participating Subdivisions by the Initial Participation Date. The Parties may alter the Effective Date of the Agreement by mutual written agreement.

(k)     "<u>Effective Date of the Release</u>" means the date on which the Court enters the Consent Judgment.

(l)     "<u>Execution Date</u>" means the date on which this Agreement is executed by the last party to do so.

(m)     "<u>Initial Participation Date</u>" means the date by which Litigating Subdivisions must join to become initial Participating Subdivisions. The Initial Participation Date shall be 30 days after the Execution Date. The Parties may alter the Initial Participation Date by mutual written agreement.

(n)  "Litigating Subdivision" means a Subdivision (or Subdivision official) that has brought any Released Claim against any Releasees on or before December 31, 2021, including, but not limited to, the agreed list of Litigating Subdivisions set forth in Exhibit A.

(o)  "Litigation Costs" means attorneys' fees and investigative and litigation costs and expenses incurred in connection with Claims asserted against any Releasee in the Florida AG Action or any Litigating Subdivision's Action.

(p)  "Non-Joining Subdivision" means any Litigating Subdivision or Principal Subdivision that does not execute a subdivision settlement participation form attached as Exhibit D by the Post Effective Date Sign-on Deadline.

(q)  "Non-Litigating Subdivision" means a Subdivision that is not a Litigating Subdivision.

(r)  "Non-Participating Subdivision" means a Subdivision that is not or is not yet a Participating Subdivision.

(s)  "Opioid Remediation" means care, treatment and other programs and expenditures (including reimbursement for past such programs or expenditures, except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic.  Exhibit C provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation.  Qualifying expenditures may include reasonable related administrative expenses. [1]  Teva denies that such relief comprises cognizable abatement.

(t)  "Participating Subdivision" means any Subdivision that executes a subdivision settlement participation form attached as Exhibit D.

(u)  "Parties" and "Settling Parties" means Teva and Plaintiff, with each being a "Party" and "Settling Party."

(v)  "Post-Effective Date Sign-on Deadline" means the deadline for Subdivisions to execute a subdivision settlement participation form attached as Exhibit D, which shall be 150 days after the Effective Date of the Agreement.

(w)  "Principal Subdivision" means:  (1) a County, regardless of population; or (2) a Subdivision that is not a County, but is a General Purpose Government entity (including a municipality, city, town, township, parish, village, borough, gore or any other entities that provide municipal-type government) with a population of more than 10,000, including, but not limited to, the agreed list of Principal Subdivisions attached hereto as Exhibit A.

---

[1] Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person.

5

(x)      "Product" means any chemical substance, whether licit or illicit, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is: (1) an opioid or opiate, as well as any product containing any such substance; or (2) benzodiazepine, a muscle relaxer, carisoprodol, or gabapentin; or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought or dispensed to be used together that includes opioids or opiates. "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, chlordiazepoxide, clobazam, clorazepate, flurazepam, lorazepam, temazepam, carisoprodol, cyclobenzaprine, orphenadrine, tizanidine gabapentin, or any variant of these substances or any similar substance. Notwithstanding the foregoing, nothing in this definition prohibits a Releasor from taking administrative or regulatory action related to benzodiazepine (including, but not limited to, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, and midazolam), carisoprodol, or gabapentin that is wholly independent from the use of such drugs in combination with opioids, *provided* such action does not seek money (including abatement and/or remediation) for conduct prior to the Execution Date.

(y)      "Qualified Settlement Fund" means the Florida Qualified Settlement Fund contemplated by this Agreement, into which all payments by Teva shall be made and which shall be established under the authority and jurisdiction of the Court and which shall be a "qualified settlement fund" within the meaning of 26 C.F.R. § 1.468B-1.

(z)      "Qualified Settlement Fund Administrator" means the Administrator appointed to administer the Qualified Settlement Fund under the authority and jurisdiction of the Court. The duties of the Qualified Settlement Fund Administrator shall be governed by this Agreement. The identity of the Qualified Settlement Fund Administrator and a detailed description of the Qualified Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Qualified Settlement Fund Administrator's fees and costs, will be set forth in a separate document to be prepared by the Parties and filed with the Court to establish the fund and be attached later to this Agreement as Exhibit E.

(aa)     "Released Claims" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date of the Release. Without limiting the foregoing, Released Claims include any Claims that have been asserted against the Releasees by Plaintiff or any Litigating Subdivision in any federal, state or local Action or proceeding (whether judicial, arbitral or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those Actions or in any comparable Action or proceeding brought by Plaintiff, any of its Subdivisions, or any Releasor (whether or not such State, Subdivision, or Releasor has brought such Action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to this Agreement, whether or not such

Claims relate to Covered Conduct. The Parties intend that this term, "Released Claims," be interpreted broadly. This Agreement does not release Claims by private individuals for damages for any alleged personal injuries arising out of their own use of any Product. But in any action arising from or relating to such Claims or the Covered Conduct, the Releasees may assert as a defense or otherwise argue that the Remediation Payments required herein serve as a measure of compensation for personal injuries or for other legal or equitable claims or demands asserted by private individuals or others. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought or maintained by any Subdivision in the future that would have been Released Claims if they had been brought by a Releasor against a Releasee.

(bb) "Releasees" means: (i) Teva; (ii) all of its respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, assigns and insurers (in their capacity as such); and (iii) the past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys and insurers of each of the foregoing entities and persons referenced in clauses (i) through (iii) above for actions or omissions that occurred during and related to their work for, or employment with, any of the foregoing entities with respect to the Released Claims.

(cc) "Releasors" means with respect to Released Claims: (1) the State; (2) without limitation, all of the State of Florida's departments, agencies, divisions, boards, commissions, instrumentalities of any kind, including without limitation the Florida Attorney General, Florida Board of Pharmacy, Florida Department of Health, and Florida Department of Business and Professional Regulation, and any person in his or her official capacity, whether elected or appointed to lead or serve any of the foregoing, and any agency, person or entity claiming by or through any of the foregoing; (3) each Participating Subdivision; and (4) without limitation and to the maximum extent of the power of each of the State, the Florida Attorney General and/or Participating Subdivision to release Claims, (a) the State of Florida's and each Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and any person in his or her official capacity, whether elected or appointed to lead or serve any of the foregoing, and any agency, person or entity claiming by or through any of the foregoing; (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other special districts in the State of Florida, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Florida or any Subdivision in the State of Florida, whether or not any of them participates in this Agreement. Nothing in this definition shall be construed to limit the definition of "Subdivision" in subsection A(ii) below. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide a subdivision settlement participation form (attached as Exhibit D) providing for a release to the fullest extent of the Participating Subdivision's authority, an executed copy of which shall be attached as an exhibit to and deemed to be a part of this Agreement.

7

(dd)  "Settlement Amount" means $177,114,999, to be used for opioid remediation.

(ee)  "Settlement Payment" means $194,826,499, reflecting the total cash payment inclusive of the Settlement Amount ($177,114,999), the State's outside counsel Litigation Costs ($8,855,750), and the Litigation Costs of Litigating Subdivisions ($8,855,750).

(ff)  "Settlement Product" means "Naloxone Hydrochloride Nasal Spray" (4 mg strength) that is listed in Teva's then-current generics catalog, which can be viewed at www.tevagenerics.com, and is provided to the State as part of the settlement, at no cost as set forth in Section C.2 and Exhibit K.

(gg)  "State Outside Litigation Counsel" means Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.; Drake Martin Law Firm, LLC; Harrison Rivard Duncan & Buzzett, Chartered; Newsome Melton, P.A.; and Curry Law Group, P.A.

(hh)  "State-Subdivision Agreement" means a separate agreement among Plaintiff and all Participating Subdivisions providing for an allocation of, among other things, the Settlement Payment (defined below).  The State-Subdivision Agreement is attached hereto as Exhibit I.

(ii)  "Subdivision" means (1) any General Purpose Government entity (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore or any other entities that provide municipal-type government), School District, or Special District within a State, and (2) any other subdivision or subdivision official or sub-entity of or located within a State (whether political, geographical or otherwise, whether functioning or non-functioning, regardless of population overlap, and including, but not limited to, nonfunctioning governmental units and public institutions) that has filed or could file a lawsuit that includes a Released Claim against a Releasee in a direct, *parens patriae*, or any other capacity.  "General Purpose Government," "School District," and "Special District" shall correspond to the "five basic types of local governments" recognized by the U.S. Census Bureau and match the 2017 list of Governmental Units.  The three (3) General Purpose Governments are county, municipal, and township governments; the two (2) special purpose governments are School Districts and Special Districts.  "Fire District," "Health District," "Hospital District," and "Library District" shall correspond to categories of Special Districts recognized by the U.S. Census Bureau.  References to a State's Subdivisions or to a Subdivision "in," "of," or "within" a State include Subdivisions located within the State even if they are not formally or legally a sub-entity of the State.

(jj)  "Teva" means (i) Teva Pharmaceutical Industries Ltd. and, (ii) all of its respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, assigns, and insurers (in their capacity as such), and (iii) all of the foregoing respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys, and insurers of the foregoing entities and persons referenced in clauses (i) and (ii) above for actions or omissions that occurred during and related to

8

their work for, or employment with, any of the foregoing entities with respect to the Released Claims.

**B.      Release and Dismissals in the Florida AG Action and other Actions.**

1.       It is the intention of the Settling Parties to fully and finally resolve all Released Claims that have been or could be brought against the Releasees by Plaintiff or any Subdivision with respect to the Covered Conduct, and that the release of such Claims does not affect Plaintiff's or the Subdivisions' Claims as to any other defendant.  Plaintiff represents and warrants that it will use its best efforts to obtain a consensual release of any and all Claims involving Covered Conduct that Plaintiff and all Subdivisions, including any Litigating Subdivision or Non-Litigating Subdivision, have asserted or could assert against the Releasees.  Regardless whether such consensual release is obtained, Plaintiff represents and warrants under this Agreement that it is exercising its authority under law to release any and all Claims involving Covered Conduct that Plaintiff and all Subdivisions, including any Litigating Subdivision or Non-Litigating Subdivision, have asserted or could assert against the Releasees.  Plaintiff further represents and warrants that it will use all available authority to bind, and under this Agreement is exercising such authority to bind, Plaintiff and all Subdivisions, including all Litigating Subdivisions and Non-Litigating Subdivisions, regardless of whether they become Participating Subdivisions or Non-Joining Subdivisions, to the terms of this Agreement.

2.       In addition to the general release and dismissal to be provided by Plaintiff set forth in Sections D.1 & D.2, Plaintiff will deliver to Teva signed agreements from: (a) each Subdivision that executes a signed agreement by the Initial Participation Date; and (b) each Subdivision that executes a signed agreement by the Post-Effective Date Sign-on Deadline (i.e., within 150 days following the Effective Date of the Agreement).  Such agreements shall include:

(a)      the Subdivision's acceptance of the terms and conditions of this Agreement by signing the subdivision settlement participation form attached as <u>Exhibit D</u>;

(b)      in the case of a Litigating Subdivision, such Litigating Subdivision's agreement to implement an immediate cessation of any and all litigation activities relating to such Litigating Subdivision's Action as to all Releasees;

(c)      in the case of a Litigating Subdivision, an agreement that Plaintiff may represent that the Litigating Subdivision supports the Consent Judgment to be entered in accordance with Section F below; and,

(d)      in the case of a Litigating Subdivision, such Litigating Subdivision's agreement to file, within the later of seven (7) days of the Effective Date of the Release, or seven (7) days of signing the subdivision settlement participation form, a notice or stipulation of voluntary dismissal with prejudice of any and all Released Claims asserted by the Litigating Subdivision against the Releasees, with each party to bear its own costs.

3.       Between the Execution Date and the Initial Participation Date, Plaintiff agrees to furnish to Teva a report listing the Subdivisions that have executed the signed agreements described in Section B.2(a) and copies of such signed agreements on a weekly basis.  Plaintiff further agrees to furnish to Teva no later than noon Eastern Time on the day after the Initial

Participation Date and a final report listing the Subdivisions that have executed the signed agreements described in Section B.2(a) by the Initial Participation Date and copies of all such signed agreements.  After the Initial Participation Date, the parties shall confer and establish a schedule for the regular provision of such reports and copies of signed agreements.

4.    Plaintiff represents and warrants that, if any Action remains pending against one or more Releasees after the Effective Date of the Agreement or is filed by a Subdivision against any Releasee on or after the Execution Date, Plaintiff will seek to obtain dismissal of such Action as to such Releasees as soon as reasonably possible.  Depending on facts and circumstances, Plaintiff may seek dismissal, among other ways, by intervening in such Action to move to dismiss or otherwise terminate the Subdivision's Claims in the Action or by commencing a declaratory judgment or other action that establishes a Bar to the Subdivision's Claims and Action.  For avoidance of doubt, Plaintiff will seek dismissal of an Action under this paragraph regardless whether the Subdivision in such Action is a Participating Subdivision.

5.    In the event that the actions required of Plaintiff in Section B fail to secure the prompt dismissal or termination of any Action by any Subdivision against any Releasee, Plaintiff shall seek enactment of a legislative Bar as defined in Section A(d) and will endeavor to achieve enactment as soon as is practicable.  Participating Subdivisions agree not to oppose any effort by Plaintiff to achieve enactment of a legislative Bar.

6.    Plaintiff further represents and warrants that no portion of the Settlement Amount, Settlement Product, or the Litigation Costs Payments will be distributed to or used for the benefit of any Subdivision unless and until Plaintiff has delivered to Teva a signed agreement from such Subdivision providing for the Subdivision's acceptance of the terms and conditions of this Agreement, including its express agreement to be bound by the irrevocable releases set forth in Section B below.

C.    **Settlement Consideration.**

1.    **Settlement Amount and Litigation Costs Payments.**

(a)    On or before the later of (a) seven (7) days after the Effective Date of the Release, or (b) seven (7) days after (i) the Qualified Settlement Fund has been established under the authority and jurisdiction of the Court, and (ii) Teva has received a W-9 and wire instructions for the Qualified Settlement Fund,

(b)    Teva shall pay into the Qualified Settlement Fund the total sum of $194,826,499 consisting of:

(1)    $177,114,999 for opioid remediation to be paid over a period of 15 years (the "Teva Settlement Amount") and allocated in accordance with subsection C.1(b)(6)below;

(2)    $8,855,750, to be available to reimburse Teva's share of the State's Litigation Costs in accordance with subsection C.1(b)(6) below (the "Teva State Litigation Cost Payment"); and

10

(3)    $8,855,750 to be available to reimburse Teva's share of the Litigation Costs of Litigating Subdivisions in accordance with subsection C.1(b)(6) below (the "Teva <u>Litigating Subdivision Litigation Cost Payment</u>").

(4)    The Teva State Litigation Cost Payment and the Teva Litigating Subdivision Litigation Cost Payment shall collectively be referred to herein as the "Teva <u>Litigation Costs Payments</u>."

(5)    The Qualified Settlement Fund Administrator shall allocate each of the Teva Settlement Amount, the Teva State Litigation Cost Payment, and the Teva Litigating Subdivision Litigation Cost Payment into separate sub-funds within the Qualified Settlement Fund.  Release of the Teva Settlement Amount and the Teva Litigation Costs Payments from the Qualified Settlement Fund shall be subject to the conditions specified below.

(6)    The Teva Settlement Payment shall be paid into the Qualified Settlement Fund in accordance with the payment schedule set forth below:

    (A)    Consistent with the terms of Section C.1(a) above, Teva shall pay into the Florida Qualified Settlement Fund the sum of $59,038,333.

    (B)    On or before January 1, 2023, Teva shall pay the sum of: $23,615,333;

    (C)    On or before January 1, 2024, Teva shall pay the sum of: $5,903,833;

    (D)    On or before January 1, 2025, Teva shall pay the sum of: $5,903,833;

    (E)    On or before January 1, 2026, Teva shall pay the sum of: $5,903,833;

    (F)    On or before January 1, 2027, Teva shall pay the sum of: $5,903,833;

    (G)    On or before January 1, 2028, Teva shall pay the sum of: $5,903,833;

    (H)    On or before January 1, 2029, Teva shall pay the sum of: $5,903,833;

11

(I)   On or before January 1, 2030, Teva shall pay the sum of: $5,903,833;

(J)   On or before January 1, 2031, Teva shall pay the sum of: $5,903,833;

(K)   On or before January 1, 2032, Teva shall pay the sum of: $5,903,833;

(L)   On or before January 1, 2033, Teva shall pay the sum of: $5,903,833;

(M)   On or before January 1, 2034, Teva shall pay the sum of: $17,711,500;

(N)   On or before January 1, 2035, Teva shall pay the sum of: $17,711,500; and,

(O)   On or before January 1, 2036, Teva shall pay the sum of: $17,711,500.

2.   *Settlement Product.*  Teva shall further provide, for a period of ten (10) years, settlement product supplied by Teva USA to one facility per order at no cost to the State, designated by the State, as more fully described in Exhibit K. The Parties agree that the WAC value of the Settlement Product to be provided under this Agreement is $84,000,000.

3.   *Litigation Costs.* An agreement on the handling of Litigating Subdivision Litigation Costs is attached as Exhibit G and incorporated herein by reference.  The Litigating Subdivision Litigation Cost Payments are to be available to reimburse counsel for Litigating Subdivisions that become Participating Subdivisions and who waive any other right(s) they may have to compensation in connection with this Settlement for reasonable Litigation Costs incurred in connection with their Claims against Releasees.

(a)   The Qualified Settlement Fund Administrator shall allow eligible counsel reimbursement for reasonable Litigation Costs as provided in Exhibit G.  Such Litigation Costs shall be divided among Participating Subdivisions as provided in Exhibit G under the jurisdiction and authority of the Court.  Any amount remaining in the Litigation Subdivision Litigation Costs Payment sub-fund after such allocation shall be returned to Teva.

(b)   No funds may be used to compensate Litigation Costs incurred by Non-Participating Subdivisions or Non-Litigating Subdivisions, or Litigation Costs arising out of representation of any such Subdivision.

(c)   No attorney for any Litigating Subdivision may receive any share of the Litigating Subdivision Litigation Cost Payment unless the following eligibility requirements are met and certified by the attorney:

12

    i.    The attorney must represent that s/he has no present intent to represent or participate in the representation of any Subdivision or any Releasor with respect to the litigation of any Released Claims against any Releasees.

    ii.    The attorney must represent that s/he will not charge or accept any referral fees for any Released Claims asserted or maintained against Releasees by any Subdivision or any Releasor.

    iii.    The attorney may not have, and must represent that s/he does not have, a claim for fees, costs or expenses related to the litigation of any Released Claims against any Releasees by any Subdivision or any Releasor after December 31, 2021.

    iv.    Notwithstanding the foregoing, nothing in this subsection C.1(b)(3) is intended to operate as a "restriction" on the right of any attorney to practice law within the meaning of Rule 5.6(b) of the Florida Rules of Professional Conduct or any equivalent provision of any other jurisdiction's rules of professional conduct.

    (d)    Plaintiff shall file in the Court a motion for the State's Litigation Costs up to $8,855,750 from Teva.  Teva shall not oppose the motion so long as the State does not seek more than $8,855,750 from Teva in Litigation Costs.  If any amount of the $8,855,750 from Teva is not awarded by the Court, that amount shall be returned to Teva.  As set forth in Section C.4 below, in the event the Court awards the State Litigation Costs in excess of the respective amounts listed above, Teva shall have no obligation to pay any amount in excess of the State Litigation Cost Payment.

    4.    **No Other Payments by Releasees as to Covered Conduct, Released Claims, the Florida AG Action, Other Actions, Plaintiff, Subdivisions or State Outside Litigation Counsel or Litigation Costs.**  Other than the Teva Settlement Amount and the Litigation Costs Payments by Teva referenced in Sections C.1 and C.3, Teva shall have no obligation to make any further or additional payments in connection with Claims for Covered Conduct or Litigation Costs or this Settlement.

    5.    **Apportionment of the Settlement Payment**.

    (a)    It is the intent of the Parties that the Remediation Payment in Section C.1(b) be used exclusively for Opioid Remediation.

    (b)    In accordance with the State-Subdivision Agreement in <u>Exhibit I</u>, each yearly Settlement Payment shall be allocated by the Qualified Settlement Fund Administrator into three sub-funds: an Abatement Accounts Sub-Fund (also known as a regional fund), a State Sub-Fund, and a Subdivision Sub-Fund to be allocated to the Abatement Accounts Sub-Fund or to another Participating Subdivision.

13

        (c)     A detailed mechanism consistent with the foregoing for a Qualified Settlement Fund Administrator to follow in allocating, apportioning and distributing payments that will be filed with the Court and later attached as <u>Exhibit J</u>.

        (d)     Teva shall have no duty, liability, or influence of any kind with respect to the apportionment and use of the Settlement Payment by the Qualified Settlement Fund Administrator. Plaintiff specifically represents, however, that any such apportionment and use by the Qualified Settlement Fund Administrator shall be made in accordance with all applicable laws.

6.     **Release of the State Fund.** Within a reasonable period after the Effective Date of the Agreement or otherwise as ordered by the Court, the Qualified Settlement Fund Administrator shall release the State Fund to Plaintiff.

7.     **Subdivision Payments to Subdivisions that Become Participating Subdivisions Prior to the Initial Participation Date.** A Participating Subdivision that (a) completes a subdivision settlement participation form prior to the Initial Participation Date, (b) joins the Florida Opioid Allocation and Statewide Response Agreement (<u>Exhibit I</u>), and (c) in the case of a Litigating Subdivision, dismisses with prejudice any and all Released Claims asserted by the Litigating Subdivision against the Releasees shall be eligible to receive payment of a share of the Settlement Payment within a reasonable period after the Effective Date of the Agreement.

8.     **Subdivision Payments to Subdivisions that Become Participating Subdivisions After the Initial Participation Date.** A Participating Subdivision that (a) completes a subdivision settlement participation form after the Initial Participation Date and by no later than the Post-Effective Date Sign-on Deadline, (b) joins the Florida Opioid Allocation and Statewide Response Agreement (<u>Exhibit I</u>), and (c) in the case of a Litigating Subdivision, dismisses with prejudice any and all Released Claims asserted by the Litigating Subdivision against the Releasees shall be eligible to receive payment of a share of the Settlement Payment within a reasonable period after the Post-Effective Date Sign-on Deadline.

9.     **Reversion to Teva of Amounts Forfeited by Non-Joining Subdivisions.** Any Litigating Subdivision or Principal Subdivision that does not sign a participation agreement by the Post-Effective Date Sign-on Deadline will be deemed a Non-Joining Subdivision. At Teva's request to the Qualified Settlement Fund Administrator, any Non-Joining Subdivision's share of the Settlement Payment (and to the extent any such subdivision is a Litigating Subdivision the Litigation Cost Payments) shall be returned to Teva within a reasonable time after the Post-Effective Date Sign-on Deadline.

10.     **Agreement Null and Void if the Agreement Does Not Become Effective.** In the event that the Effective Date of the Agreement does not occur and the Parties fail to agree to extend the Effective Date of the Agreement, the Agreement shall be null and void.

11.     **Use of Evidence at Trial in the Florida AG Action.** Plaintiff agrees that none of the Releasees will be a defendant in any trial of the Florida AG Action, that no Releasee will be subpoenaed or called to testify by Plaintiff in any trial of the Florida AG Action, and that any evidence that references the Releasees or the Products will be used solely against other defendants in the Florida AG Action.

12.      **Verdict Form.**  Plaintiff agrees that it will not seek to have any of the Releasees included on the verdict form in any trial related to the Florida AG Action and will oppose the efforts of any other party in the Florida AG Action to include any of the Releasees on the verdict form.

13.      **Injunctive Relief.**  As part of the Consent Judgment to be entered in accordance with Section F below, the Parties agree to the entry of injunctive relief terms attached in Exhibit F.

D.      **Settlement of Claims and General Release.**

1.      **Scope.**  On the Effective Date of the Release, Plaintiff and each Releasor shall be deemed to have fully, finally and forever released all Releasees from all Released Claims.  Plaintiff, on behalf of itself and all other Releasors (whether or not they have signed this Agreement or the subdivision settlement participation form in Exhibit D), hereby absolutely, unconditionally and irrevocably covenants not to bring, file, or claim, or to cause, assist, or permit to be brought, filed, or claimed, any Released Claims of any type in any forum whatsoever against Releasees.  For the avoidance of doubt, Plaintiff agrees that this Settlement Agreement and the releases contained herein shall fully and completely resolve any past, present or future liability that any Releasee may have arising from, relating to or based on the Covered Conduct occurring prior to the Effective Date of the Release, whether in the Actions or otherwise.  The releases provided for in this Agreement are intended by the Settling Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any and all Released Claims.  This Settlement Agreement is, will constitute, and may be pleaded as a complete bar to any Released Claim asserted against Releasees, whether against Plaintiff, any Participating Subdivision, or any other Subdivision, including any Non-Joining Subdivision.

2.      **General Release.**  In connection with the releases provided pursuant to this Settlement Agreement, Plaintiff, on behalf of itself and all other Releasors referenced in Section A(cc), expressly waives, releases and forever discharges any and all provisions, rights and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code, which reads:

**General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those that he, she, or it knows or believes to be true with respect to the Released Claims, but Plaintiff, on behalf of itself and all other Releasors, hereby expressly waives and fully, finally and forever settles, releases and discharges, upon the Effective Date of the Release, any and all Released Claims against the Releasees that may exist as of this date but which they do not know or suspect to exist, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect their decision to enter into this Settlement Agreement.

15

3.    **Claim-Over and Non-Party Settlement.**

(a)    Statement of Intent.  It is the intent of the Parties that:

(1)    The Settlement Amount and Litigation Cost Payments made under this Agreement shall be the sole payments made by the Releasees to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee);

(2)    Claims by Releasors against non-Parties should not result in additional payments by Releasees, whether through contribution, indemnification or any other means; and

(3)    The Settlement effects a good faith "release and covenant not to sue" within the meaning of Florida Statute § 768.31(5) and meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine, including, but not limited to, Fla. Stat. § 768.31(5), that reduces or discharges a released party's liability to any other parties, such that Releasees are discharged from all liability for contribution to any other alleged tortfeasor in the Florida AG Action and in any other Action, whenever filed.

(4)    The provisions of this Section D.3 are intended to be implemented consistent with these principles.  This Agreement and the releases and dismissals provided for herein are made in good faith.

(b)    No Releasee shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory, from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner; *provided* that a Releasee shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it or with respect to any person or entity that brings any other form of action against Teva arising out of or related to Covered Conduct.  For the avoidance of doubt, nothing herein shall prohibit a Releasee from recovering amounts owed pursuant to insurance contracts.

(c)    To the extent that, on or after the Effective Date of the Agreement, any Releasor settles any Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee) ("Non-Party Covered Conduct Claims") it may have against any entity that is not a Releasee (a "Non-Released Entity") that is, as of the Effective Date of the Agreement, a defendant in the Florida AG Action or any other Action and provides a release to such Non-Released Entity (a "Non-Party Settlement"), including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will seek to include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on seeking contribution or indemnity of any kind from Releasees

16

substantially equivalent to that required from Teva in subsection D.3(b) (except limited to such claims against Releasees), or a release from such Non-Released Entity in favor of the Releasees (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to seek to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

(d)     Claim-Over. In the event that any Releasor obtains a judgment with respect to a Non-Party Covered Conduct Claim against a Non-Released Entity that does not contain a prohibition like that in subsection D.3(b), or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection D.3(c), and such Non-Released Entity asserts a Claim-Over against a Releasee, Teva and that Releasor shall meet and confer concerning any additional appropriate means by which to ensure that Releasees are not required to make any payment with respect to Covered Conduct (beyond the amounts that will already have been paid by Teva under this Settlement Agreement).

(e)     In no event shall a Releasor be required to reduce the amount of a settlement or judgment against a Non-Released Entity in order to prevent additional payments by Releasees, whether through contribution, indemnification, or any other means.

4.     **Cooperation.** Releasors, including Plaintiff and Participating Subdivisions, agree that they will not publicly or privately encourage any other Releasor to bring or maintain any Released Claim. Plaintiff further agrees that it will cooperate in good faith with the Releasees to secure the prompt dismissal of any and all Released Claims.

E.     **Cessation of Litigation Activities.** It is the Parties' intent that all litigation activities in the Florida AG Action relating to Released Claims against the Releasees shall immediately cease as of the Execution Date. Within seven (7) days after the Execution Date, Plaintiff agrees to take all steps reasonably necessary to implement the prompt cessation of such litigation activities, including by, for example, jointly requesting a severance of Teva from any trial in the Florida AG Action and/or a stay of further proceedings against Teva pending the implementation of this Settlement.

F.     **Entry of Consent Judgment Providing for Dismissal of All Claims Against Teva in the Florida AG Action with Prejudice.** As soon as practicable following the Effective Date of the Agreement, Plaintiff shall file in the Court a Consent Judgment substantially in the form of Exhibit H, including a dismissal of the Florida AG Action with prejudice. Notwithstanding the foregoing, the Consent Judgment shall provide that the Court shall retain jurisdiction for purposes of enforcing compliance with the injunctive terms set forth in Exhibit H. The parties shall confer and agree as to the final form and time of filing prior to filing of the Consent Judgment.

G.     **No Admission of Liability.** The Settling Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between Teva and Plaintiff and between Teva and all Releasors. Teva is entering into this Settlement Agreement solely for the purposes of settlement, to resolve the Florida AG Action and all Actions and Released Claims and thereby avoid significant expense, inconvenience and uncertainty. Teva denies the allegations in the Florida AG Action and the other Actions and denies any civil or criminal liability in the Florida

17

AG Action and the other Actions.  Nothing contained herein may be taken as or deemed to be an admission or concession by Teva of:  (i) any violation of any law, regulation, or ordinance; (ii) any fault, liability, or wrongdoing; (iii) the strength or weakness of any Claim or defense or allegation made in the Florida AG Action, in any other Action, or in any other past, present or future proceeding relating to any Covered Conduct or any Product; (iv) the legal viability of the claims and theories in the Florida AG Action and the other Actions, including but not limited to the legal viability of the relief sought or (v) any other matter of fact or law.  Nothing in this Settlement Agreement shall be construed or used to prohibit any Releasee from engaging in the conduct of its business relating to in the manufacture, marketing, licensing, distribution or sale of branded or generic opioid medications or any other Product in accordance with applicable laws and regulations.

### H.     Miscellaneous Provisions.

1.     **Use of Agreement as Evidence.**  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement:  (i) is or may be deemed to be or may be used as an admission or evidence relating to any matter of fact or law alleged in the Florida AG Action or the other Actions, the strength or weakness of any claim or defense or allegation made in those cases, or any wrongdoing, fault, or liability of any Releasees; or (ii) is or may be deemed to be or may be used as an admission or evidence relating to any liability, fault or omission of Releasees in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that Releasees may file this Agreement in any action in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim or to support a claim for contribution and/or indemnification; or to support any other argument or defense by a Releasee that the Remediation Payments provide a measure of compensation for asserted harms or otherwise satisfy the relief sought.

2.     **Voluntary Settlement.**  This Settlement Agreement was negotiated in good faith and at arm's-length over several weeks, and the exchange of the Settlement Amount and Litigation Costs Payment for the releases set forth herein is agreed to represent appropriate and fair consideration.

3.     **Authorization to Enter Settlement Agreement.**  Each party specifically represents and warrants that this Settlement Agreement constitutes a legal, valid and binding obligation of such Party.  Each signatory to this Settlement Agreement on behalf of a Party specifically represents and warrants that he or she has full authority to enter into this Settlement Agreement on behalf of such Party.  Plaintiff specifically represents and warrants that it has concluded that the terms of this Settlement Agreement are fair, reasonable, adequate and in the public interest, and that it has satisfied all conditions and taken all actions required by law in order to validly enter into this Settlement Agreement.  Plaintiff specifically represents and warrants that, other than the Claims asserted in the Florida AG Action and the other Actions (whether filed previously or in the future), it has no interest (financial or otherwise) in any other Claim against any Releasee related to the Covered Conduct.  In addition, Plaintiff specifically represents and

18

warrants that (i) it is the owner and holder of the Claims asserted in the Florida AG Action; (ii) it has not sold, assigned or otherwise transferred the Claims asserted in the Florida AG Action, or any portion thereof or rights related thereto, to any third party; and (iii) it believes in good faith that it has the power and authority to bind all persons and entities with an interest in the Florida AG Action and all Subdivisions.

4.     **Representation With Respect to Participation Rate.**   The State of Florida represents and warrants for itself that it has a good-faith belief that all Subdivisions will become Participating Subdivisions.  The State will seek to secure participation by all Subdivisions.   State Outside Litigation Counsel, in good faith, believe this is a fair Settlement.  Therefore, State Outside Litigation Counsel will, in their best efforts, recommend this Settlement to all Subdivisions within Florida.  The State acknowledges the materiality of the foregoing representation and warranty.

5.     **Dispute Resolution.**  If Plaintiff or Teva believes the other is not in compliance with any term of this Settlement Agreement, then that party shall (i) provide written notice to the other party specifying the reason(s) why it believes the other is not in compliance with the Settlement Agreement; and (ii) allow the other party at least thirty (30) days to attempt to cure such alleged non-compliance (the "Cure Period").  In the event the alleged non-compliance is cured within the Cure Period, the other party shall have no liability for such alleged non-compliance.  No party may commence a proceeding to enforce compliance with this Agreement before the expiration of the Cure Period.

6.     **No Third-Party Beneficiaries.**  Except as to Releasees, nothing in this Settlement Agreement is intended to or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever.

7.     **Notices.**  All notices under this Agreement shall be in writing and delivered to the persons specified in this paragraph ("Notice Designees") via: (i) e-mail; and (ii) either hand delivery or registered or certified mail, return receipt requested, postage pre-paid.Notices to Plaintiff shall be delivered to:

*For the State of Florida:*

Attorney General
Florida State Capitol, PL-01
Tallahassee FL 32399-1050

*Copy to Florida's Counsel:*

David C. Frederick
Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.
1615 M Street, NW
Washington D.C. 20036
dfrederick@kellogghansen.com

Notices to Teva shall be delivered to:

*For Teva:*

19

Teva Pharmaceuticals
Attn: General Counsel's Office
400 Interpace Parkway
Parsippany, NJ 07054

*Copy to Teva Counsel:*

Eric W. Sitarchuk
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
eric.sitarchuk@morganlewis.com

Rebecca J. Hillyer
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
rebecca.hillyer@morganlewis.com

8.    **Taxes.** Each of the Parties acknowledges, agrees, and understands that it is its intention that, for purposes of Section 162(f) of the Internal Revenue Code, the provision of the Settlement Amount and the Settlement Product by Teva (other than amounts directed to attorneys' fees and costs) constitutes restitution for damage or harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law. The Parties acknowledge, agree and understand that, other than the amounts directed to attorneys' fees and costs, no other portion of the Settlement Amount and/or Settlement Product represents reimbursement to the State, any Participating Subdivision or other person or entity for the costs of any investigation or litigation, and no portion of the Settlement Amount and/or Settlement Product represents or should properly be characterized as the payment of fines, penalties, or other punitive assessments, and furthermore, the combined value of the Settlement Amount and the Settlement Product constitute less than one times damages sought by the State. The State and every Participating Subdivision shall complete and file Form 1098-F with the Internal Revenue Service, identifying the Settlement Amount and the Settlement Product (other than amounts directed to attorney fees and costs) as remediation/restitution amounts. The State shall furnish Copy B of its Form 1098-F to Teva and shall otherwise fully comply with the requirements of Section 162(f) and Section 6050X of the Internal Revenue Code and all treasury regulations relating to those provisions of the Internal Revenue Code. Participating Subdivisions shall furnish Copy B their 1098-F forms to Teva and shall otherwise fully comply with the requirements of Section 162(f) and Section 6050X of the Internal Revenue Code and all treasury regulations relating to those provisions of the Internal Revenue Code, and the State shall have no obligation to ensure Participating Subdivisions' compliance with this provision   Teva makes no warranty or representation to the State or any Participating Subdivision as to the tax consequences of the Settlement Amount or the Settlement Product or any portion thereof.

9. **Binding Agreement.** This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto.

10. **Choice of Law.** Any dispute arising from or in connection with this Settlement Agreement shall be governed by Florida law without regard to its choice-of-law provisions.

11. **Jurisdiction.** The Parties agree to submit and consent to the jurisdiction of the Court for the resolution of any disputes arising under the Settlement Agreement.

12. **No Conflict Intended.** The headings used in this Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Agreement. The definitions contained in this Agreement or any Exhibit hereto are applicable to the singular as well as the plural forms of such terms.

13. **No Party Deemed to be the Drafter.** None of the Parties hereto shall be deemed to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

14. **Amendment; Waiver.** This Agreement shall not be modified in any respect except by a writing executed by all the Parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving Party. The waiver by any Party of any breach of this Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent or contemporaneous.

15. **Execution in Counterparts.** This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument.

16. **Severability.** In the event any one or more provisions of this Settlement Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Settlement Agreement.

17. **Statements to the Press.** Any press release or other public statement concerning this Settlement Agreement will describe it positively and will not disparage any other Party. No Party or attorney, agent, or representative of any Party shall state or suggest that this Settlement Agreement may be used to predict the value of any Claim or any future settlement agreement in any action or proceeding.

18. **Integrated Agreement.** This Agreement constitutes the entire agreement between the Settling Parties and no representations, warranties or inducements have been made to any Party concerning this Agreement other than the representations, warranties and covenants contained and memorialized herein.

19. **Bankruptcy.** The following provisions shall apply if, (i) within ninety (90) days of Teva's payments pursuant to Section C.1(b) above, a case is commenced with respect to Teva under the Bankruptcy Code, and (ii) a court of competent jurisdiction enters a final order

21

determining such payment to be an avoidable preference under Section 547 of the Bankruptcy Code, and (iii) pursuant to such final order such payment is returned to Teva:

      (a)    this Agreement, including all releases and covenants not to sue with respect to the Released Claims contained in this Agreement, shall immediately and automatically be deemed null and void as to Teva; and

      (b)    the State and Subdivisions may assert any and all Released Claims against Teva in its bankruptcy case and seek to exercise all rights provided under the federal Bankruptcy Code (or other applicable bankruptcy or non-bankruptcy law) with respect to their Claims against Teva.

20.    **Most Favored Nations.**  If, after execution of this Agreement, there is a collective resolution—through settlement, bankruptcy or other mechanism—of substantially all claims against Teva brought by states, counties, and municipalities nationwide (a "Global Resolution") under which, but for this Agreement, the Florida allocation of the Settlement Amount, the Litigation Cost Payments, the payment period, or the terms of Injunctive Relief, would be more favorable to the State, Teva shall pay the excess amounts, adjust the payment period, and/or agree to modify the terms of the consent judgment to reflect changes to the Injunctive Relief that would apply to Florida, if requested to do so by the Florida Attorney General's Office.  Any reduction in the payment period under this paragraph shall be subject to an appropriate reduction in net present value calculated at seven percent (7%) per annum.

~    ~    ~

IN WITNESS WHEREOF, the Parties hereto, through their fully authorized representatives, have executed this Agreement as of the dates set forth below.

[SIGNATURE PAGES BELOW]

22

SEEN AND AGREED:

**TEVA**

By: _____

Name:  Eric W. Sitarchuk
Rebecca J. Hillyer
Morgan Lewis & Bockius LLP
Attorneys for Teva
*On behalf of Teva*

Date:  3/29/22

SEEN AND AGREED:

**PLAINTIFF**

**STATE OF FLORIDA,
including the OFFICE
OF THE ATTORNEY
GENERAL**

By: _____

Name: John Guard
     Chief Deputy Attorney General of Florida
     Pursuant to the authority delegated to him by
     Ashley Moody, Attorney General of Florida

Date: 3/29/22

**STATE OUTSIDE LITIGATION COUNSEL**

**Kellogg, Hansen, Todd, Figel & Frederick,
P.L.L.C.**

By: _____

Name: David C. Frederick

Date: 3.29.2022

**Drake Martin Law Firm, LLC**

By: _____

Name: Drake Martin

Date: 3/29/2022

24

## EXHIBIT A

## Litigating Subdivisions

### Counties

Alachua County

Bay County

Bradford County

Brevard County

Broward County

Calhoun County

Clay County

Dixie County

Escambia County

Gilchrist County

Gulf County

Hamilton County

Hernando County

Hillsborough County

Holmes County

Jackson County

Lake County

Lee County

Leon County

Levy County

Manatee County

Marion County

Miami-Dade County

Monroe County

Okaloosa County

Orange County

Osceola County

Palm Beach County

Pasco County

Pinellas County

Polk County

Putnam County

Saint Johns County

Saint Lucie County

Santa Rosa County

Sarasota County

Seminole County

Suwannee County
Taylor County
Union County
Volusia County
Walton County
Washington County


**Cities**

Apopka
Bradenton
Clearwater
Coconut Creek
Coral Gables
Coral Springs
Daytona Beach
Daytona Beach Shores
Deerfield Beach
Delray Beach
Deltona
Eatonville (Town)
Florida City
Fort Lauderdale
Fort Pierce
Hallandale Beach
Homestead
Jacksonville
Lauderhill
Lynn Haven
Miami
Miami Gardens
Miramar
New Ormond Beach
New Port Ritchey
Niceville
North Miami
Ocala
Ocoee
Orlando
Oviedo
Palatka
Palm Bay
Palmetto

Panama City

Pembroke Pines

Pensacola

Pinellas Park

Pompano Beach

Port Saint Lucie

Saint Augustine

Saint Petersburg

Sanford

Sarasota

Stuart

Sweetwater

Tallahassee

Tampa

## **Other**

Florida Health Sciences Center Inc., et al. (North Broward Hospital District and Halifax Hospital Medical Center)

Lee Memorial Health System, d/b/a Lee Health

Sarasota County, FL, Public Hospital District

West Volusia Hospital Authority

Miami-Dade County School Board

**Principal Subdivisions**

| County | Principal Subdivisions | Regional % by County for Abatement Fund | City/County Fund % (Principal Subdivisions Only) |
|---|---|---|---|
| Alachua | | 1.24106016444867% | |
| | Alachua County | | 0.846347404896564% |
| | Alachua | | 0.013113332456932% |
| | Gainesville | | 0.381597611347118% |
| Baker | | 0.19317380413017% | |
| | Baker County | | 0.193173804130173% |
| Bay | | 0.83965637331199% | |
| | Bay County | | 0.539446037057239% |
| | Callaway | | 0.024953825526948% |
| | Lynn Haven | | 0.039205632014689% |
| | Panama City | | 0.155153855595736% |
| | Panama City Beach | | 0.080897023117378% |
| Bradford | | 0.18948420408137% | |
| | Bradford County | | 0.189484204081366% |
| Brevard | | 3.87879918044396% | |
| | Brevard County | | 2.387076812679440% |
| | Cape Canaveral | | 0.045560750208993% |
| | Cocoa | | 0.149245411423089% |
| | Cocoa Beach | | 0.084363286155357% |
| | Melbourne | | 0.383104682233196% |
| | Palm Bay | | 0.404817397481049% |
| | Rockledge | | 0.096603243797586% |
| | Satellite Beach | | 0.035975416223927% |
| | Titusville | | 0.240056418923581% |
| | West Melbourne | | 0.051997577065795% |
| Broward | | 9.05796267257777% | |
| | Broward County | | 4.062623697836280% |
| | Coconut Creek | | 0.101131719448042% |
| | Cooper City | | 0.073935445072532% |
| | Coral Springs | | 0.323406517663960% |
| | Dania Beach | | 0.017807041180440% |
| | Davie | | 0.266922227152987% |
| | Deerfield Beach | | 0.202423224724969% |
| | Fort Lauderdale | | 0.830581264530524% |
| | Hallandale Beach | | 0.154950491813518% |
| | Hollywood | | 0.520164608455721% |
| | Lauderdale Lakes | | 0.062625150434726% |
| | Lauderhill | | 0.144382838130419% |
| | Lighthouse Point | | 0.029131861802689% |
| | Margate | | 0.143683775129045% |
| | Miramar | | 0.279280208418825% |
| | North Lauderdale | | 0.066069624496039% |

| | | | |
|---|---|---|---|
| | Oakland Park | | 0.100430840698613% |
| | Parkland | | 0.045804060448432% |
| | Pembroke Pines | | 0.462832363602822% |
| | Plantation | | 0.213918725664437% |
| | Pompano Beach | | 0.335472163492860% |
| | Sunrise | | 0.286071106146452% |
| | Tamarac | | 0.134492458472026% |
| | Weston | | 0.138637811282768% |
| | West Park | | 0.029553115351569% |
| | Wilton Manors | | 0.031630331127078% |
| Calhoun | | 0.04712774078090% | |
| | Calhoun County | | 0.047127740780902% |
| Charlotte | | 0.73734623337592% | |
| | Charlotte County | | 0.690225755587238% |
| | Punta Gorda | | 0.047120477788680% |
| Citrus | | 0.96964577660634% | |
| | Citrus County | | 0.969645776606338% |
| Clay | | 1.19342946145639% | |
| | Clay County | | 1.193429461456390% |
| Collier | | 1.55133337642709% | |
| | Collier County | | 1.354822227370880% |
| | Marco Island | | 0.062094952002516% |
| | Naples | | 0.134416197053695% |
| Columbia | | 0.44678115079207% | |
| | Columbia County | | 0.342123248620213% |
| | Lake City | | 0.104659717919908% |
| DeSoto | | 0.11364040780249% | |
| | DeSoto County | | 0.113640407802487% |
| Dixie | | 0.10374458089993% | |
| | Dixie County | | 0.103744580899928% |
| Duval | | 5.43497515693510% | |
| | Jacksonville | | 5.295636466902910% |
| | Atlantic Beach | | 0.038891507601085% |
| | Jacksonville Beach | | 0.100447182431112% |
| Escambia | | 1.34163444924367% | |
| | Escambia County | | 1.010997622822650% |
| | Pensacola | | 0.330636826421023% |
| Flagler | | 0.38986471224388% | |
| | Flagler County | | 0.305009358365478% |
| | Palm Coast | | 0.084857169626457% |
| Franklin | | 0.04991128255001% | |
| | Franklin County | | 0.049911282550008% |
| Gadsden | | 0.12365607407671% | |
| | Gadsden County | | 0.123656074076710% |
| Gilchrist | | 0.06433376935497% | |

| | | | |
|---|---|---|---|
| | **Gilchrist County** | | 0.064333769354966% |
| Glades | | 0.04061283675771% | |
| | **Glades County** | | 0.040612836757713% |
| Gulf | | 0.05991423858784% | |
| | **Gulf County** | | 0.059914238587842% |
| Hamilton | | 0.04794119590977% | |
| | **Hamilton County** | | 0.047941195909773% |
| Hardee | | 0.06711004813185% | |
| | **Hardee County** | | 0.067110048131850% |
| Hendry | | 0.14446091529681% | |
| | **Hendry County** | | 0.144460915296806% |
| Hernando | | 1.51007594910967% | |
| | **Hernando County** | | 1.510075949109670% |
| Highlands | | 0.35718851023682% | |
| | **Highlands County** | | 0.293187022776017% |
| | **Avon Park** | | 0.025829016089707% |
| | **Sebring** | | 0.038172471371100% |
| Hillsborough | | 8.71098411365711% | |
| | **Hillsborough County** | | 6.523111204400210% |
| | **Plant City** | | 0.104218491142418% |
| | **Tampa** | | 1.975671881252980% |
| | **Temple Terrace** | | 0.107980721113446% |
| Holmes | | 0.08161242785125% | |
| | **Holmes County** | | 0.081612427851251% |
| Indian River | | 0.75307605878085% | |
| | **Indian River County** | | 0.654117789755259% |
| | **Sebastian** | | 0.038315915467486% |
| | **Vero Beach** | | 0.060642353558104% |
| Jackson | | 0.15893605879538% | |
| | **Jackson County** | | 0.158936058795375% |
| Jefferson | | 0.04082164778410% | |
| | **Jefferson County** | | 0.040821647784097% |
| Lafayette | | 0.03191177207568% | |
| | **Lafayette County** | | 0.031911772075683% |
| Lake | | 1.13921122451870% | |
| | **Lake County** | | 0.781548804039386% |
| | **Clermont** | | 0.075909163208877% |
| | **Eustis** | | 0.041929254097962% |
| | **Fruitland Park** | | 0.008381493024259% |
| | **Groveland** | | 0.026154034991644% |
| | **Lady Lake** | | 0.025048244425835% |
| | **Leesburg** | | 0.091339390184647% |
| | **Minneola** | | 0.016058475802978% |
| | **Mount Dora** | | 0.041021380070204% |
| | **Tavares** | | 0.031820984672908% |

| | | | |
|---|---|---|---|
| Lee | | 3.32537188335925% | |
| | Lee County | | 2.150386790650790% |
| | Bonita Springs | | 0.017374893143227% |
| | Cape Coral | | 0.714429677167259% |
| | Estero | | 0.012080171813344% |
| | Fort Myers | | 0.431100350584635% |
| Leon | | 0.89719924493933% | |
| | Leon County | | 0.471201146390692% |
| | Tallahassee | | 0.425998098548636% |
| Levy | | 0.25119240174806% | |
| | Levy County | | 0.251192401748057% |
| Liberty | | 0.01939945222513% | |
| | Liberty County | | 0.019399452225127% |
| Madison | | 0.06354028745471% | |
| | Madison County | | 0.063540287454706% |
| Manatee | | 2.72132334623483% | |
| | Manatee County | | 2.288523455470230% |
| | Bradenton | | 0.379930754632155% |
| | Palmetto | | 0.052869136132442% |
| Marion | | 1.70117616896044% | |
| | Marion County | | 1.332181664866660% |
| | Ocala | | 0.368994504093786% |
| Martin | | 0.86948729811605% | |
| | Martin County | | 0.788263440348682% |
| | Stuart | | 0.081223857767371% |
| Miami-Dade | | 5.23211978417292% | |
| | Miami-Dade County | | 4.322006939062770% |
| | Aventura | | 0.024619727884733% |
| | Coral Gables | | 0.071780152130635% |
| | Cutler Bay | | 0.009414653667847% |
| | Doral | | 0.013977628531358% |
| | Florida City | | 0.003929278792135% |
| | Hialeah | | 0.098015895784777% |
| | Hialeah Gardens | | 0.005452691410713% |
| | Homestead | | 0.024935668046393% |
| | Key Biscayne | | 0.013683477346364% |
| | Miami | | 0.292793005447970% |
| | Miami Beach | | 0.181409572478489% |
| | Miami Gardens | | 0.040683650931878% |
| | Miami Lakes | | 0.007836768607605% |
| | Miami Shores | | 0.006287935516250% |
| | Miami Springs | | 0.006169911892641% |
| | North Bay Village | | 0.005160355973775% |
| | North Miami | | 0.030379280716828% |
| | North Miami Beach | | 0.030391990953217% |

| | | | |
|---|---|---|---|
| | Opa-locka | | 0.007847663095938% |
| | Palmetto Bay | | 0.007404620570392% |
| | Pinecrest | | 0.008296152865650% |
| | South Miami | | 0.007833137111493% |
| | Sunny Isles Beach | | 0.007693324511219% |
| | Sweetwater | | 0.004116300841853% |
| Monroe | | 0.47638873858530% | |
| | Monroe County | | 0.388301353168081% |
| | Key West | | 0.088087385417219% |
| Nassau | | 0.47693346300195% | |
| | Nassau County | | 0.393774017807404% |
| | Fernandina Beach | | 0.083159445194550% |
| Okaloosa | | 0.81921286595494% | |
| | Okaloosa County | | 0.634513142251804% |
| | Crestview | | 0.070440130065665% |
| | Destin | | 0.014678507280787% |
| | Fort Walton Beach | | 0.077837487643835% |
| | Niceville | | 0.021745398712853% |
| Okeechobee | | 0.35349527869191% | |
| | Okeechobee County | | 0.353495278691906% |
| Orange | | 4.67102821454589% | |
| | Orange County | | 3.130743665036610% |
| | Apopka | | 0.097215150892295% |
| | Eatonville | | 0.008325204834538% |
| | Maitland | | 0.046728276208689% |
| | Ocoee | | 0.066599822928250% |
| | Orlando | | 1.160248481489900% |
| | Winter Garden | | 0.056264584996256% |
| | Winter Park | | 0.104903028159347% |
| Osceola | | 1.07345209294015% | |
| | Osceola County | | 0.837248691390376% |
| | Kissimmee | | 0.162366006872243% |
| | St. Cloud | | 0.073837394677534% |
| Palm Beach | | 8.60159437205259% | |
| | Palm Beach County | | 5.964262083621730% |
| | Belle Glade | | 0.020828445944817% |
| | Boca Raton | | 0.472069073961229% |
| | Boynton Beach | | 0.306498271771001% |
| | Delray Beach | | 0.351846579457498% |
| | Greenacres | | 0.076424835656644% |
| | Jupiter | | 0.125466374880059% |
| | Lake Worth | | 0.117146617297688% |
| | Lantana | | 0.024507151505292% |
| | North Palm Beach | | 0.044349646255964% |
| | Palm Beach Gardens | | 0.233675880256500% |

| | | | |
|---|---|---|---|
| | Palm Springs | | 0.038021764282493% |
| | Riviera Beach | | 0.163617057282493% |
| | Royal Palm Beach | | 0.049295743959188% |
| | Wellington | | 0.050183644758335% |
| | West Palm Beach | | 0.549265602541466% |
| Pasco | | 4.69208726049375% | |
| | Pasco County | | 4.429535538910390% |
| | New Port Richey | | 0.149879107494464% |
| | Zephyrhills | | 0.112672614088898% |
| Pinellas | | 7.93488981677650% | |
| | Pinellas County | | 4.793536735851510% |
| | Clearwater | | 0.633863120195985% |
| | Dunedin | | 0.102440873796068% |
| | Gulfport | | 0.047893986460330% |
| | Largo | | 0.374192990776726% |
| | Oldsmar | | 0.039421706033295% |
| | Pinellas Park | | 0.251666311990547% |
| | Safety Harbor | | 0.038061710739714% |
| | Seminole | | 0.095248695748172% |
| | St. Petersburg | | 1.456593090134460% |
| | Tarpon Springs | | 0.101970595049690% |
| Polk | | 2.15048302529773% | |
| | Polk County | | 1.601687701502640% |
| | Auburndale | | 0.028636162583534% |
| | Bartow | | 0.043971970660417% |
| | Haines City | | 0.047984773863106% |
| | Lakeland | | 0.294875668467647% |
| | Lake Wales | | 0.036293172133642% |
| | Winter Haven | | 0.097033576086743% |
| Putnam | | 0.38489319406788% | |
| | Putnam County | | 0.337937949352250% |
| | Palatka | | 0.046955244715628% |
| Santa Rosa | | 0.70126731951283% | |
| | Santa Rosa County | | 0.654635277951081% |
| | Milton | | 0.046632041561747% |
| Sarasota | | 2.80504385757853% | |
| | Sarasota County | | 1.968804722107020% |
| | North Port | | 0.209611771276754% |
| | Sarasota | | 0.484279979634570% |
| | Venice | | 0.142347384560186% |
| Seminole | | 2.14114826454432% | |
| | Seminole County | | 1.508694164839420% |
| | Altamonte Springs | | 0.081305566429869% |
| | Casselberry | | 0.080034542791008% |
| | Lake Mary | | 0.079767627826847% |

| | | | |
|---|---|---|---|
| | Longwood | | 0.061710013414747% |
| | Oviedo | | 0.103130858057164% |
| | Sanford | | 0.164243490361646% |
| | Winter Springs | | 0.062262000823623% |
| St. Johns | | 0.71033334955402% | |
| | St. Johns County | | 0.663822963111989% |
| | St. Augustine | | 0.046510386442027% |
| St. Lucie | | 1.50662784355224% | |
| | St. Lucie County | | 0.956289133909966% |
| | Fort Pierce | | 0.159535255653695% |
| | Port St. Lucie | | 0.390803453988581% |
| Sumter | | 0.32639887045945% | |
| | Sumter County | | 0.312364953738371% |
| | Wildwood | | 0.014033916721079% |
| Suwannee | | 0.19101487969217% | |
| | Suwannee County | | 0.191014879692165% |
| Taylor | | 0.09218189728241% | |
| | Taylor County | | 0.092181897282406% |
| Union | | 0.06515630322411% | |
| | Union County | | 0.065156303224115% |
| Volusia | | 3.13032967447995% | |
| | Volusia County | | 1.784428217305820% |
| | Daytona Beach | | 0.447556475211771% |
| | DeBary | | 0.035283616214775% |
| | DeLand | | 0.098983689498367% |
| | Deltona | | 0.199329190038370% |
| | Edgewater | | 0.058042202342606% |
| | Holly Hill | | 0.031615805142634% |
| | New Smyrna Beach | | 0.104065968305755% |
| | Orange City | | 0.033562287058147% |
| | Ormond Beach | | 0.114644516477187% |
| | Port Orange | | 0.177596501561906% |
| | South Daytona | | 0.045221205322611% |
| Wakulla | | 0.11512932120801% | |
| | Wakulla County | | 0.115129321208010% |
| Walton | | 0.26855821615101% | |
| | Walton County | | 0.268558216151006% |
| Washington | | 0.12012444410873% | |
| | Washington County | | 0.120124444108733% |

## EXHIBIT C

## OPIOID REMEDIATION

**Schedule A**
**Core Strategies**

Subdivisions shall choose from among the abatement strategies listed in Schedule B.  However, priority shall be given to the following core abatement strategies ("*Core Strategies*").[1]

A.    **NALOXONE OR OTHER FDA-APPROVED MEDICATION TO REVERSE OPIOID OVERDOSES**

1.    Expand training for first responders, schools, community support groups and families; and

2.    Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B.    **MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

1.    Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2.    Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3.    Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4.    Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

C. **PREGNANT & POSTPARTUM WOMEN**

1. Expand Screening, Brief Intervention, and Referral to Treatment ("*SBIRT*") services to non-Medicaid eligible or uninsured pregnant women;

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3. Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

D. **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

1. Expand comprehensive evidence-based and recovery support for NAS babies;

2. Expand services for better continuum of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E. **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4. Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansions above.

F. **TREATMENT FOR INCARCERATED POPULATION**

1. Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2. Increase funding for jails to provide treatment to inmates with OUD.

G. **PREVENTION PROGRAMS**

1. Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2. Funding for evidence-based prevention programs in schools;

3. Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4. Funding for community drug disposal programs; and

5. Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H. **EXPANDING SYRINGE SERVICE PROGRAMS**

1. Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I. **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE:  TREATMENT |
| --- |

**A.**     **TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:[2]

1.     Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2.     Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions.

3.     Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.     Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.     Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.     Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.     Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

8.     Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.     Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including, but not limited to, training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Disseminate of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14.     Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

**B.**     <u>**SUPPORT PEOPLE IN TREATMENT AND RECOVERY**</u>

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1.     Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.     Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.     Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.   Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.   Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.   Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.   Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.   Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.   Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.   Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.   Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.   Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.   Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.   Create and/or support recovery high schools.

15.   Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.   CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.      Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.      Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.      Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.      Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.      Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.      Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.      Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.      Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.      Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.     Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.     Expand warm hand-off services to transition to recovery services.

12.     Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.     Develop and support best practices on addressing OUD in the workplace.

14.     Support assistance programs for health care providers with OUD.

15.     Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

### D.     ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

   2.     Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

   3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

   5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.  Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.  Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.  Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.  Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.  ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.  Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.  Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.  Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.  Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

6.      Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including, but not limited to, parent skills training.

10.     Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

| PART TWO:  PREVENTION |
| --- |

**F.      PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including, but not limited to, improvements that:

1.      Increase the number of prescribers using PDMPs;

2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

3.      Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increasing electronic prescribing to prevent diversion or forgery.

8.      Educating dispensers on appropriate opioid dispensing.

## G.    <u>PREVENT MISUSE OF OPIOIDS</u>

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Funding media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Funding community anti-drug coalitions that engage in drug prevention efforts.

6.      Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7.      Engaging non-profits and faith-based communities as systems to support prevention.

8.    Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.    School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.   Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.   Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.   Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.    PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.    Public health entities providing free naloxone to anyone in the community.

3.    Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.    Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.    Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6.    Public education relating to emergency responses to overdoses.

7.      Public education relating to immunity and Good Samaritan laws.

8.      Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.      Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.     Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.     Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.     Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.     Supporting screening for fentanyl in routine clinical toxicology testing.

---

PART THREE:  OTHER STRATEGIES

---

**I.    FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.      Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.      Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.    LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.      Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment

intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.    A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.    Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.    Provide resources to staff government oversight and management of opioid abatement programs.

**K.    <u>TRAINING</u>**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1.    Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.    Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

**L.    <u>RESEARCH</u>**

Support opioid abatement research that may include, but is not limited to, the following:

1.    Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.    Research non-opioid treatment of chronic pain.

3.    Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.    Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("*ADAM*") system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## EXHIBIT D

## Subdivision Settlement Participation Form

| Governmental Entity: | State: |
|---|---|
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

The governmental entity identified above ("*Governmental Entity*"), in order to obtain and in consideration for the benefits provided to the Governmental Entity pursuant to the Settlement Agreement dated _____ ("*Teva Settlement*"), and acting through the undersigned authorized official, hereby elects to participate in the Teva Settlement, release all Released Claims against all Releasees, and agrees as follows.

1. The Governmental Entity is aware of and has reviewed the Teva Settlement, understands that all terms in this Subdivision Settlement Participation Form have the meanings defined therein, and agrees that by signing this Subdivision Settlement Participation Form, the Governmental Entity elects to participate in the Teva Settlement and become a Participating Subdivision as provided therein.

2. The Governmental Entity shall immediately cease any and all litigation activities as to the Releasees and Released Claims and, within the later of 7 days following the entry of the Consent Judgment or 7 days of the Execution Date of this Subdivision Settlement Participation Form voluntarily dismiss with prejudice any Released Claims that it has filed.

3. The Governmental Entity agrees to the terms of the Teva Settlement pertaining to Subdivisions as defined therein.

4. By agreeing to the terms of the Teva Settlement and expressly agreeing to the releases provided for therein, the Governmental Entity is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date of the Agreement.

5. The Governmental Entity agrees to use any monies it receives through the Teva Settlement solely for the purposes provided therein.

6. The Governmental Entity submits to the jurisdiction of the Court for purposes limited to the Court's role as provided in, and for resolving disputes to the extent provided in, the Teva Settlement.

7.  The Governmental Entity has the right to enforce those rights given to them in the Teva Settlement.

8.  The Governmental Entity, as a Participating Subdivision, hereby becomes a Releasor for all purposes in the Teva Settlement, including, but not limited to, all provisions of Section D and E, and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority.  As a Releasor, the Governmental Entity hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Releasee in any forum whatsoever.  The releases provided for in the Teva Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Governmental Entity to release Claims.  The Teva Settlement shall be a complete bar to any Released Claim.

9.  The Governmental Entity hereby takes on all rights and obligations of a Participating Subdivision as set forth in the Teva Settlement.

10. In connection with the releases provided for in the Teva Settlement, each Governmental Entity expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.

> A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Governmental Entity hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date of the Release, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Governmental Entities' decision to participate in the Teva Settlement.

11. Nothing herein is intended to modify in any way the terms of the Teva Settlement, to which the Governmental Entity hereby agrees.  To the extent this Subdivision Settlement

Participation Form is interpreted differently from the Teva Settlement in any respect, the Teva Settlement controls.

I have all necessary power and authorization to execute this Subdivision Settlement Participation Form on behalf of the Governmental Entity.

Signature: _____

Name: _____

Title: _____

Date: _____
(the "<u>Execution Date of this Subdivision Settlement Participation Form</u>")

**EXHIBIT E**

*draft*

**Qualified Settlement Fund Administrator Terms**

I.  **Definitions**

A.  This Qualified Settlement Fund Administrator Terms document incorporates all defined terms in the Settlement Agreement and the Escrow Agreement, unless otherwise defined herein, and shall be interpreted in a manner consistent with the Settlement Agreement and Escrow Agreement to the greatest extent feasible.

B.  *Settlement Fund Administrator*.  Wilmington Trust, National Association ("Wilmington Trust" or "Settlement Fund Administrator") shall serve as the Settlement Fund Administrator and is intended to serve as an "administrator" as defined in *Treas. Reg*. § 1.468B-2(k)(3).  In the event that Wilmington Trust becomes unable to continue to serve as the Settlement Fund Administrator, the Parties shall meet and confer and agree upon a replacement.

II.  **Establishment of the Settlement Fund Administrator**

A.  *Selection of the Settlement Fund Administrator.*

   i.  Wilmington Trust is selected as the Settlement Fund Administrator.

   ii.  The Qualified Settlement Fund ("QSF") is being established pursuant to order of the Court to resolve or satisfy one or more contested claims that have resulted or may result from an event (or a related series of events) that has occurred and that is alleged to have given rise to at least one claim asserting liability arising out of a tort, breach of contract or violation of law.  The QSF is subject to the continuing jurisdiction of the Court and is intended to qualify as a "qualified settlement fund" as defined in *Treas. Reg*. § 1.468B-1(a).  The purpose of the QSF includes, but is not necessarily limited to, (i) receiving, holding, and investing the payment to be made by Teva under the Settlement Agreement, and (ii) distributing amounts in accordance with the Settlement Agreement and the Escrow Agreement.  The duties of the Settlement Fund Administrator shall be to serve these purposes and are subject to the terms of the Escrow Agreement.  The Settlement Fund Administrator shall manage the QSF in a manner designed to preserve principal and accrue income by investing in instruments/securities comprised of (a) United States Agency, Government Sponsored Enterprises or Treasury securities or obligations (or a mutual fund invested solely in such instruments); (b) cash equivalent securities including SEC registered money market funds and collateralized money market accounts; and/or (c) deposit and similar interest-bearing, or non-interest bearing accounts, and certificates of deposit subject to Federal

Depository Insurance Corporation protections as available.  The Settlement Fund Administrator shall hold and distribute the funds deposited in the QSF as provided in the Settlement Agreement and subject to the procedural and security requirements set forth in sections 1.3 to 1.5 of the Escrow Agreement.

    iii.   The term of the Settlement Fund Administrator shall continue until all funds are distributed pursuant to the terms of the Settlement Agreement unless the Settlement Fund Administrator is removed pursuant to the Escrow Agreement.

B.  *Governance of the Settlement Fund Administrator.*

    i.   The Settlement Fund Administrator will administer and disburse funds from the Abatement Accounts Sub-Fund, State Sub-Fund, Subdivision Sub-Fund and State and Subdivision Litigation Costs Sub-Funds as provided in the Settlement Agreement and subject to the procedural and security requirements set forth in sections 1.3 to 1.5 of the Escrow Agreement.  The Settlement Fund Administrator will also perform other duties as described in these terms and in the Settlement Agreement.

    ii.   All parties to the Settlement Agreement are entitled to rely upon information received from the Settlement Fund Administrator, whether in oral, written, or other form.  On Teva's request, the State will instruct the Settlement Fund Administrator to promptly provide statements setting forth the activity in the QSF to Teva.  The State shall also notify Teva regarding any payments or expenses paid from the QSF upon receipt of a request for such information from Teva.  No Party to the Settlement Agreement shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any other party for or in connection with any action taken or not taken by the Settlement Fund Administrator, except as between the State and the Settlement Fund Administrator to the extent provided for in the Escrow Agreement.

C.  *Removal of the Settlement Fund Administrator.*

    i.   The Settlement Fund Administrator may be removed pursuant to the Escrow Agreement or for failure to perform its duties.

    ii.   The terms of this Exhibit E shall apply to any replacement Settlement Fund Administrator.

D.  *Funding of the Settlement Fund Administrator.*

    i.   The costs and fees associated with or arising out of the duties of the Settlement Fund Administrator shall be paid out of the State Sub-Fund.

    ii.   The costs and fees associated with the Settlement Fund Administrator shall be established in the Escrow Agreement.

**III.    Calculation and Allocation of Annual Payments**

A. *General Principles.*

    i. This Section is intended to implement the relevant provisions of the Settlement Agreement and the exhibits therein, including the Florida Opioid Allocation and Statewide Response Agreement. To the extent this Section III conflicts with the Settlement Agreement and the exhibits therein, the Settlement Agreement shall control.

    ii. With respect to the payment instructions to be provided by the State as described in the following subsection III.B, the Settlement Fund Administrator is entitled to rely upon the State's instructions, provided in written form and copied to Teva, for the purpose for which it was submitted, provided that neither Teva nor any Participation Subdivision has objected to those instructions pursuant to the procedures described in the following subsection III.B.

B. *Payments*

    i. The State shall calculate the distributions due to Participating Subdivisions and shall provide those calculations to the Participating Subdivisions and Teva in advance of the payment date. Notice as to Teva shall be made in accordance with subsection H.7 of the Agreement and notice as to Participating Subdivisions shall be made as instructed by each Participating Subdivision.

    ii. Objections to distributions proposed to be made by the State may be made within seven (7) calendar days of receipt of notice by sending a written objection by email to the following addresses: john.guard@myfloridalegal.com; greg.slemp@myfloridalegal.com; sabrina.donovan@myfloridalegal.com. In the event the email address to which objections are to be sent changes, the State shall notify Teva and the Participating Subdivision of such change, and any deadline to provide an objection shall be suspended until the State has confirmed Teva and the Participating Subdivisions' receipt of such notice.

    iii. In connection with the notice, the State shall request from each Participating Subdivision: (i) a completed W-9, and (ii) instructions concerning how the subdivision wishes to be paid (check or wire), and, if applicable, wiring instructions or the address where the payment should be mailed. Any costs for the form of payment to the Participating Subdivision shall be deducted from the calculated settlement payment.

    iv. In the absence of any timely objection, the State's proposed calculations shall be final, and the State shall provide the final calculations to the Settlement Fund Administrator along with the W-9s, payment instructions, and other required information under the Escrow Agreement and direct the Settlement Fund Administrator to pay those amounts in accordance with the Escrow Agreement.

    v. In all events, the State shall provide notice to Teva in the event of any objection regarding the distribution of any payment and, at its option,

Teva may elect to join any objection that is made by a Participating Subdivision.  In the case of any objection, whether by Teva or a Participating Subdivision, the State and the entity or entities (including Teva, if applicable) objecting to the payment shall resolve that objection. If that resolution made by one entity affects other entities (including Teva, if applicable), the State shall provide notice to those affected and resolve the objection in accordance with the Settlement Agreement or the Florida Opioid Allocation and Statewide Response Agreement.

vi. Pending the resolution of any objections as provided above, the State may provide instructions to the Settlement Fund Administrator to pay any undisputed portion. Before doing so, it shall provide notice to Teva and the Participating Subdivisions of the dispute and a breakdown of the proposed partial payments.  Upon such notice, Teva and the Participating Subdivisions shall have an opportunity to object to the proposed partial payments in accordance with the procedures outlined in the foregoing subsections.

vii. In consultation with the State, and subject to the terms of the Settlement Agreement, the Settlement Fund Administrator may set reasonable limits on the frequency with which it makes payments and may set other reasonable restrictions on complying with requests made by the State or the Participating Subdivisions, to limit the burdens and costs imposed on the Settlement Fund Administrator.

C. *Extensions.*

i. The schedule provided for in this Section III shall be adjusted based on what is practicable.  The Settlement Fund Administrator shall provide notice to the State and Teva regarding whether the deadlines provided for in Section III or in the Escrow Agreement need to be adjusted.  The State shall communicate that notice to the Participating Subdivisions.

ii. The deadlines in this Section III may be extended by the written agreement of the State and Teva.

## IV.    Reporting Obligations

The Settlement Fund is intended to be classified as a "qualified settlement fund" within the meaning of Treasury regulations Section 1.468B-1, et seq. (and corresponding or similar provisions of state, local, or foreign law, as applicable).  The Settlement Fund Administrator shall not take any action or tax position inconsistent with such treatment. The State shall obtain any necessary orders from the Court to qualify the Settlement Fund as a "qualified settlement fund."  The Settlement Fund Administrator shall promptly take all other steps necessary for qualifying and operating the QSF as a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1.  These obligations include, without limitation, the following:

i. Regulation § 1.468B-3 Statement.  The Settlement Fund Administrator will prepare a "Regulation § 1.468B-3 Statement" pursuant to Treas. Reg.

4

§ 1.468B-3(e) on behalf of Teva and provide copies to Teva's counsel for review and approval by January 15 of each year pertaining to transfers to or from the Settlement Fund involving Teva that were made in the preceding calendar year.  The "Regulation § 1.468B-3 Statement" may be a joint statement as permitted under Treas. Reg. § 1.468B-3(e)(2)(ii).

ii.  <u>Regulation § 1.468B-1 Relation Back Election.</u>  If required, the Settlement Fund Administrator will prepare and attach to the income tax return of the QSF a "Regulation § 1.468B-1 Relation Back Election" pursuant to Treas. Reg. § 1.468B-1(j) for approval and execution by Teva and the Settlement Fund Administrator.  The Settlement Fund Administrator will forward a copy of the "Regulation § 1.468B-1 Relation Back Election" to Teva promptly after filing the same.

iii.  <u>Income Tax Returns.</u>  The Settlement Fund Administrator shall obtain federal (and, if applicable, state) taxpayer identification number(s) for the Settlement Fund and provide the same to Teva.  The Settlement Fund Administrator shall also timely and properly prepare and file on behalf of the QSF:  (i) federal tax, information and withholding returns in accordance with Treas. Reg. § 1.468B-2 and the other provisions of the Internal Revenue Code of 1986, as amended; and (ii) all necessary state and local tax returns.

iv.  <u>Tax Detriment.</u>  Notwithstanding any effort or failure of the Settlement Fund Administrator and/or the parties hereto to treat the QSF as a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1 effective as of the date hereof, if Teva incurs any taxes or additional tax liability, interest, penalties or other tax-related losses of any kind (such tax liability, interest, penalties and/or losses hereinafter collectively referred to as "Tax Detriments") resulting from income earned by the QSF, such Tax Detriment shall be paid out of the State Sub-Fund or the Abatement Accounts Sub-Fund of the QSF, as the State may direct, or in the absence of sufficient funds in these Sub-Funds or at the State's option, by the State.

v.  Notwithstanding any other provision of this Exhibit E or the Settlement Agreement, the parties hereto acknowledge and agree that Teva has made no representations or warranties regarding the tax consequences and shall have no liability to the State, the Settlement Fund Administrator, the Participating Subdivisions or any other party with respect to matters related to such tax consequences.  Further, the Settlement Agreement, including this Exhibit E, shall be binding on the Parties and the Settlement Fund Administrator, and shall continue to apply, notwithstanding the tax consequences of any payments made pursuant to the Settlement Agreement and this Exhibit E.

<u>**EXHIBIT F**</u>

<u>**INJUNCTIVE RELIEF**</u>

I.    <u>**Definitions Specific to this Exhibit**</u>

   A.    "Cancer-Related Pain Care" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

   B.    "End-of-Life Care" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

   C.    "Downstream Customer Data" shall mean transaction information that Teva collects relating to its direct customers' sales to downstream customers, including chargeback data tied to Teva providing certain discounts, "867 data" and IQVIA data.

   D.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services and/or prescribe pharmaceutical products and any medical facility, practice, hospital, clinic or pharmacy.

   E.    "Including but not limited to", when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

   F.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

   G.    "Lobby" and "Lobbying" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

   H.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium. For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone or naltrexone.

   I.    "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration ("FDA") and listed by the Drug Enforcement Administration ("DEA") as Schedule II, III, or IV pursuant to the federal Controlled Substances Act (including but not limited to

buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Products(s)" shall not include (i) methadone, buprenorphine, or other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients ("APIs") used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

J.    "OUD" shall mean opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

K.    "Promote," "Promoting," "Promotion," and "Promotional" shall mean dissemination of information or other practices intended or reasonably anticipated to increase sales or prescriptions, or that attempts to influence prescribing practices of Health Care Providers in the United States.

L.    "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

M.    "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder and analogous Florida state laws and regulations.

N.    "Teva" means Teva Pharmaceuticals USA, Inc. ("Teva USA"); Cephalon, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Warner Chilcott Co., LLC; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc. f/k/a Watson Laboratories Inc.-Salt Lake City; and Actavis Laboratories FL, Inc. f/k/a Watson Laboratories, Inc.-Florida.

O.    "Third Party" shall mean any person or entity other than Teva or a government entity.

P.    "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

Q.    "Unbranded Information" shall mean any information that does not identify a specific branded or generic product(s).

2

## II.    **Injunctive Relief**

A.    General Provisions

1.    Teva shall not make any written or oral statement about Opioids or any Opioid Product that is false, misleading, and/or deceptive as defined under the law of Florida.

2.    Teva shall not represent that Opioids or any Opioid Products have approvals, characteristics, uses, benefits, or qualities that they do not have.

B.    Ban on Promotion

1.    Teva shall not engage in the Promotion of Opioids or Opioid Products including, but not limited to, by:

a.    Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers, patients, or persons involved in determining the Opioid Products included in formularies;

b.    Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

c.    Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to Opioids or Opioid Products;

d.    Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

e.    Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

f.    Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; or

3

     g.     Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

2.     Notwithstanding subsection II.B.1 directly above, Teva may:

     a.     Maintain a corporate website;

     b.     Maintain a website that contains principally the following content for any Opioid Product: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

     c.     Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in the state where the information is provided. Teva may, in relation to its expressly required participation in the Transmucosal Immediate Release Fentanyl ("TIRF") Risk Evaluation and Mitigation Strategy ("REMS") Program, remain involved in the preparation of materials and training concerning the process for enrollment in the TIRF REMS Program;

     d.     Provide the following by mail, electronic mail, on or through Teva's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in the state where the information is provided;

     e.     Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011), as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009), as updated or amended by the FDA;

4

f.    Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.    Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h.    Provide information relating solely to the pricing of any Opioid Product;

i.    Provide information, through a product catalog or similar means, related to an Opioid or Opioid Product, including, without limitation, pricing information, weight, color, shape, packaging size, type, reference listed drug, National Drug Code ("NDC") label, and such other descriptive information (including information set forth in a standard Healthcare Distribution Alliance Form or technical data sheet and the FDA approval letter) sufficient to identify the products available, to place an order for a product, and to allow the product to be loaded into a customer's inventory and ordering system or Third Party pricing compendia;

j.    Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved REMS program or other federal or state law or regulation applicable in the state where the program is provided through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of Teva;

k.    Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Teva as the source of the information; and

5

l.      Provide rebates, discounts, and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, and Pharmacy Benefit Managers, except as prohibited by Section II.G.

3.      Teva shall not engage in the following specific Promotional activity relating to any products indicated for the treatment of Opioid-induced side effects (for the avoidance of doubt, "Opioid-induced side effects" does not include addiction to Opioids or Opioid Products):

a.      Employing or contracting with sales representatives or other persons to Promote products indicated for the treatment of Opioid-induced side effects to Health Care Providers or patients;

b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote products indicated for the treatment of Opioid-induced side effects;

c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote products indicated for the treatment of Opioid-induced side effects; or

d.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products indicated for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4.      Notwithstanding subsection II.B.3 directly above, Teva may Promote products for the treatment of Opioid-induced side effects (i) so long as such Promotion does not associate the product with Opioids or Opioid Products, or (ii) where such Promotion concerns a product's indication to reverse overdoses and/or treat Opioid addiction. Nothing herein shall prevent Teva from linking to the FDA label associated with a product.

5.      Treatment of Pain

a.      Teva shall not, either through Teva or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that encourages the utilization of Opioids or Opioid Products.

b.      Teva shall not, either through Teva or through Third Parties, Promote the concept that pain is undertreated in a manner that encourages the utilization of Opioids or Opioid Products.

      c.     Teva shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or otherwise Promotes Opioids or Opioid Products.

6.     Notwithstanding subsection II.B.5 directly above, Teva may Promote or provide educational information about the Treatment of Pain with non-Opioid products or therapies, including Promoting or providing educational information about such non-Opioid products or therapies as alternatives to Opioid use, or as part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

C.     <u>No Financial Reward or Discipline Based on Volume of Opioid Sales</u>

1.     Teva shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products. For the avoidance of doubt, this provision shall not prohibit financial incentives (*e.g.*, customary raises or bonuses) based on the performance of the overall company or business segment, as measured by EBITDA, revenue, cash flow, or other similar financial metrics.

2.     Teva shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to or from any person in return for the prescribing, sale, or use of an Opioid Product. For the avoidance of doubt, this provision shall not prohibit rebates or chargebacks to the extent permitted by other sections of this Consent Judgment.

3.     Teva's compensation policies and procedures shall be designed to ensure compliance with this Consent Judgment and other legal requirements.

D.     <u>Ban on Funding/Grants to Third Parties</u>

1.     Teva shall not, directly or indirectly, provide financial support or In-Kind Support to any Third Party for Promotion of or education about Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6). For the avoidance of doubt, this provision does not prohibit support expressly allowed by this Consent Judgment or required by a federal or state agency.

2.     Teva shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids or Opioid Products.

3.      Teva shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6).

4.      Teva shall not use, assist, or employ any Third Party to engage in any activity that Teva itself would be prohibited from engaging in pursuant to this Consent Judgment.

5.      Teva shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or reasonably foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      Teva shall not compensate or provide In-Kind Support to Health Care Providers (other than Teva employees) or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payers, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. Nothing in this provision, however, prohibits Teva from using independent contractors who operate under the direction of Teva to provide information to a payor, formulary committee, or other similar entity as permitted in subsection II.B.2 provided that any such persons are bound by the terms of this Consent Judgment. Nor does this provision prohibit the payment of customary rebates or other pricing concessions to third-party payers, including state Medicaid programs, as part of an overall pricing agreement.

7.      No officer or executive management-level employee of Teva may concurrently serve as a director, board member, employee, agent, or officer of any entity other than Teva Pharmaceutical Industries Ltd. or a direct or indirect wholly-owned subsidiary thereof, that primarily engages in conduct that Promotes Opioids, Opioid Products, or products indicated for the treatment of Opioid-related side effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or executive management-level employee of Teva from concurrently serving on the board of a hospital.

8.      Teva shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects. For the avoidance of doubt, nothing in this paragraph shall prohibit Teva from fully and accurately responding to unsolicited

requests or inquiries about a person's fitness to serve as an employee or board member at any such entity.

9.     For the avoidance of doubt:

    a.     Nothing in this Section II.D shall be construed or used to prohibit Teva from providing financial or In-Kind Support to:

        (i)     medical societies and patient advocate groups, who are principally involved in issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose; or

        (ii)     universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose;

        (iii)     the American Medical Association (AMA), the American Cancer Society (ACS) or any other medical society solely dedicated to cancer treatment; or

        (iv)     trade associations including, without limitation, PhRMA (Pharmaceutical Research and Manufacturers of America), HDA (Healthcare Distribution Alliance), AAM (Association for Accessible Medications), PCMA (Pharmaceutical Care Management Association), and NACDS (National Association of Chain Drug Stores), or successor organizations to any of the foregoing.

    b.     The prohibitions in this Section II.D shall not apply to engagement with Third Parties based on activities related to (i) medications with an FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage," to the extent they are sold to addiction treatment facilities; (ii) raw materials, APIs and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials, APIs and/or immediate precursors are sold or marketed exclusively to DEA registrants or sold outside the United

States or its territories; or (iii) education warning about drug abuse or promoting prevention or treatment of drug misuse.

c.      Teva will be in compliance with subsections II.D.2 and II.D.3 with respect to support of an individual Third Party to the extent that the State of Florida determines that such support does not increase the risk of the inappropriate use of Opioids and that Teva has not acted for the purpose of increasing the use of Opioids.

E.      <u>Lobbying Restrictions</u>

1.      Teva shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

a.      encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids; or

b.      pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.      Teva shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

a.      The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

b.      The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

c.      The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

d.      The limitation of initial prescriptions of Opioids to treat acute pain;

e.      The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

f.      The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

g.      Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

h.      The implementation or use of Opioid drug disposal systems.

3.      Teva shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of prescription drug monitoring programs ("PDMPs"), including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4.      Notwithstanding the foregoing restrictions in subsections II.E.1-3, the following conduct is not restricted:

a.      Lobbying against the enactment of any provision of any state, federal, municipal, or county taxes, fees, assessments, or other payments;

b.      Challenging the enforcement of, or suing for declaratory or injunctive relief with respect to legislation, rules or regulations referred to in subsection II.E.1;

c.      Communications made by Teva in response to a statute, rule, regulation, or order requiring such communication;

d.      Communications by a Teva representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

e.      Responding, in a manner consistent with this Consent Judgment, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to Teva from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

f.      Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections

11

II.E.1-3, so long as Teva does not support specific portions of such legislation or regulation covered by subsection II.E.1 or oppose specific portions of such legislation or regulation covered by subsections II.E.2-3;

g. Communicating with a federal or state agency in response to a Federal Register or similar notice or an unsolicited federal or state legislative committee request for public comment on proposed legislation;

h. Responding to requests from the DEA, the FDA, or any other federal or state agency, and/or participating in FDA or other agency panels at the request of the agency; and

i. Participating in meetings and other proceedings before the FDA, FDA advisory committee or other FDA committee in connection with the approval, modification of approval, or oversight of Teva's own products.

5. Teva shall provide notice of the prohibitions in Section II.E to all employees engaged in Lobbying; incorporate the prohibitions in Section II.E into trainings provided to Teva employees engaged in Lobbying; and certify that it has provided such notice and trainings to Teva employees engaged in Lobbying.

F. <u>Monitoring and Reporting of Off-Label Use</u>

1. Teva shall monitor for off-label prescribing of its brand Opioid Products in the United States as provided for in the TIRF REMS Program..

2. Upon request of one of the following, Teva shall provide the requestor with the data and analysis described in Subsection II.F.1, to be used for law enforcement, counter-detailing, academic or medical research, or public health and other non-commercial purposes:  Florida Attorney General or other law enforcement agency, Florida medical board, Florida board of pharmacy, Qualified Researchers, medical and pharmacy directors of health systems or clinics, medical associations, and other public health officials, including but not limited to city health authorities, county medical directors, and Florida public health authorities.

3. Teva shall provide the data and analysis described in Subsection VI.E.1 in chart format, including breakdown of prescriptions by year, diagnosis,  and county.

G.     <u>Ban on High Dose Opioids.</u>

1.     After any related commercial commitments existing on the Effective Date of the Release have expired, Teva shall not manufacture, promote, or distribute any oxycodone pill that exceeds 40 milligrams.

H.     <u>Ban on Prescription Savings Programs</u>

1.     Teva shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.  This does not preclude Teva from offering discounts or rebates to commercial partners on entire portfolios of products, including providing discounts, coupons, rebates, or other methods for use by retail chain pharmacies, such as CVS, Walgreens, Rite Aid and the like.

2.     Teva shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

I.     <u>Monitoring and Reporting of Direct and Downstream Customers.</u>

1.     Teva shall operate an effective monitoring and reporting system in compliance with federal law, that shall include processes and procedures that:

a.     Utilize all reasonably available transaction information to identify a Suspicious Order of an Opioid Product by a direct customer;

b.     Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product;

c.     Utilize all information Teva receives that bears upon a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by Teva's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media; and

d.     Upon request (unless otherwise required by law), report to the Florida Attorney General or State controlled substances regulatory agency any direct customer or downstream customer in Florida identified as part of the monitoring required by (a)-(c), above, and any customer relationship in such State terminated by Teva relating

13

to diversion or potential for diversion. These reports shall include the following information, to the extent known to Teva:

(i)     The identity of the downstream registrant and the direct customer(s) identified by Teva engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number;

(ii)    The dates of reported distribution of controlled substances by direct customers to the downstream registrant during the relevant time period;

(iii)   The drug name, drug family or NDC and dosage amounts reportedly distributed;

(iv)    The transaction or order number of the reported distribution; and

(v)     A brief narrative providing a description of the circumstances leading to Teva's conclusion that there is a risk of diversion.

2.      Teva shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless Teva investigates and finds that the order is not suspicious.

3.      Upon request, Teva shall provide cooperation and assistance to any federal, state or local law enforcement investigations of potential diversion or suspicious circumstances involving Opioid Products, including criminal law enforcement agencies, drug control agencies, professional licensing boards, and Attorney General's offices.

4.      Teva agrees that it will refrain from providing an Opioid Product directly to a retail pharmacy or Health Care Provider.

J.    <u>Miscellaneous Terms</u>

1.      To the extent that any provision in this Consent Judgment conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail. To the extent that any provision in this Consent Judgment is in conflict with federal or relevant state law or regulation such that Teva cannot comply with both the law or regulation and the provision of this Consent Judgment, Teva may comply with such law or regulation.

2.     Teva will enter into this Consent Judgment solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Teva expressly denies. No part of this Consent Judgment, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Teva. This Consent Judgment is not intended for use by any Third Party for any purpose, including submission to any court for any purpose.

3.     For the avoidance of doubt, this Consent Judgment shall not be construed or used as a waiver or limitation of any defense otherwise available to Teva in any action, and nothing in this Consent Judgment shall be construed or used to prohibit Teva in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in litigation or other legal or administrative proceedings.

4.     Nothing in this Consent Judgment shall be construed to limit or impair Teva's ability (a) to communicate its positions and respond to media inquiries concerning litigation, investigations, reports, or other documents or proceedings relating to Teva or its Opioid Products, or (b) to maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products.

5.     Nothing in this Consent Judgment shall prohibit Teva from divesting any Opioid or Opioid Product, in each case, including providing technical development services, transferring know-how and patents, and/or providing such other support services in connection therewith.

6.     This Consent Judgment applies to the manufacture, sales, Promotion, marketing and distribution by Teva within the United States and its territories or involving Health Care Providers.

7.     Upon the request of the Attorney General of the State of Florida, Teva shall provide the Attorney General of the State of Florida with copies of the following, within 30 days of the request:

   a.     Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Teva's Opioid Product(s); and

   b.     Warning or untitled letters issued by the FDA regarding Teva's Opioid Product(s) and all correspondence between Teva and the FDA related to such letters.

8.   The parties by stipulation may agree to a modification of this Consent Judgment; provided that the parties may jointly agree to a modification only by a written instrument signed by or on behalf of both Teva and the Attorney General of the State of Florida.

9.   If, after the Effective Date of the Release, Teva enters into any collective resolution of substantially all opioid claims brought by states, counties, and municipalities (a "Global Resolution") that contains injunctive relief terms that are more favorable than the terms of this Consent Judgment, then this Consent Judgment will be revised to contain such more favorable injunctive relief terms.   Teva shall provide the State a copy of any Other State Settlement within thirty (30) days of its effective date.

K.   <u>Compliance with State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product</u>

1.   Subject to subsection II.G.1 above, Teva shall continue to comply with all applicable state laws and regulations that relate to the sale, Promotion, distribution, and disposal of Opioids or Opioid Products, including but not limited to:

a.   Florida Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

b.   Florida Consumer Protection Laws; and

c.   Florida laws and regulations related to opioid prescribing, distribution, and disposal.

III.   **Clinical Data Transparency**

A.   <u>Data to Be Shared</u>

1.   Teva shall continue to share truthful and balanced summaries of the results of all Teva-Sponsored Studies through its publicly available website (*see* https://www.tevapharm.com/teva-clinical-trials):

a.   "Teva-Sponsored Studies" means pre-marketing clinical research and post-marketing clinical research that Teva "takes responsibility for and initiates" as "sponsor," as "sponsor" is defined in 21 C.F.R. § 312.3(b), and that involves an intervention with human subjects with an Opioid Product.

b.   The summaries may include redactions to protect personal identifying information, trade secret and confidential commercial

information, and information that may provide a road map for defeating a product's abuse-deterrent properties.

2.    With respect to any Teva-Sponsored Studies relating to any new Teva Opioid Product or new indication for an existing Teva Opioid Product, Teva shall, within 6 months after regulatory approval or 18 months after study completion, whichever occurs later, make the following clinical data that is reasonably accessible and in its possession, custody, and control available through a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal:

a.    Fully analyzable data set(s) (including individual de-identified participant-level data);

b.    The clinical study report(s) redacted for commercial or personal identifying information;

c.    The full protocol(s) (including the initial version, final version, and all amendments); and

d.    Full statistical analysis plan(s) (including all amendments and documentation for additional work processes).

e.    Data related to Investigator Sponsored Studies are not subject to the requirements in Section III.

B.    <u>Third-Party Data Archive</u>

1.    The third-party data archive referenced above shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

2.    The panel may exclude research proposals with a commercial interest.

3.    Teva shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

4.    Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for Teva's pharmacovigilance staff. Every agreement shall require the lead Qualified Researcher to inform Teva's pharmacovigilance staff within 24 hours of any determination that research findings could bear on the risk-benefit assessment regarding the product. The lead Qualified Researcher may also share findings bearing on the risk-benefit assessment regarding

17

the product with regulatory authorities. Teva's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying the appropriate regulatory authorities or the public.

5. Teva shall bear all costs for making data and/or information available to the third-party data archive.

IV. **Compliance**

A. Compliance Duration

1. Sections II and III of this Exhibit shall be effective for 15 years from the Effective Date of the Release.

2. Nothing in this Consent Judgment shall relieve Teva of its independent obligation to fully comply with the laws of the State of Florida after expiration of the 13-year period specified in this subsection.

B. Compliance Deadlines

1. Teva must be in full compliance with the provisions included in this Consent Judgment by the Effective Date of the Release. Nothing herein shall be construed as permitting Teva to avoid existing legal obligations.

V. **Enforcement**

A. If the State believes that Teva is not in compliance with any term of this Final Consent Order, then the State shall:

1. Provide written notice specifying the reason(s) why the State believes Teva is not in compliance with this Final Consent Order; and

2. Allow Teva at least thirty (30) days to attempt to cure such alleged non-compliance (the "Cure Period").

B. The State may not commence a proceeding to enforce compliance with this Final Consent Order before the expiration of the Cure Period, provided that the State may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

C. Teva agrees to venue for any proceedings related to this paragraph in the Court in which the State of Florida files this Consent Judgment.

**EXHIBIT G**
*draft*

| Litigating Subdivision | Local Litigation Cost Share |
|---|---|
| Alachua County | 1.0580563941118500% |
| Apopka | 0.1215329679172490% |
| Bay County | 0.6743853947971450% |
| Bradenton | 0.4749682718143620% |
| Bradford County | 0.2368825999247740% |
| Brevard County | 2.9841904994087900% |
| Broward County | 5.0788659071877600% |
| Calhoun County | 0.0589164770693348% |
| Clay County | 1.4919590528781900% |
| Clearwater | 0.7924203742280190% |
| Coconut Creek | 0.1264292438193310% |
| Coral Gables | 0.0897355488925041% |
| Coral Springs | 0.4043048184848150% |
| Daytona Beach | 0.5595101817342350% |
| Daytona Beach Shores | 0.0049121655318066% |
| Deerfield Beach | 0.2530582429837640% |
| Delray Beach | 0.4398589999657240% |
| Deltona | 0.2491902531195310% |
| Dixie County | 0.1296956977011560% |
| Escambia County | 1.2638929275031100% |
| Florida City | 0.0049121655318066% |
| Fort Lauderdale | 1.0383464434128300% |
| Fort Pierce | 0.1994420924009210% |
| Gilchrist County | 0.0804264958213678% |
| Gulf County | 0.0749014445716371% |
| Hallandale Beach | 0.1937104759647790% |
| Hamilton County | 0.0599334133716682% |
| Hernando County | 1.8878128582969600% |
| Hillsborough County | 8.1548303679879300% |
| Holmes County | 0.1020273124575380% |
| Homestead | 0.0311731835713032% |
| Jackson County | 0.1986930098567910% |
| Jacksonville | 6.6203098069205700% |
| Lake County | 0.9770487918320040% |
| Lauderhill | 0.1804993838228590% |
| Lee County | 2.6882938146892400% |

| | |
|---|---|
| Leon County | 0.5890694329150050% |
| Levy County | 0.3140267522345930% |
| Lynn Haven | 0.0490126978571018% |
| Manatee County | 2.8609845804763200% |
| Marion County | 1.6654193307333400% |
| Miami | 0.3660335103211090% |
| Miami Gardens | 0.0508604347992879% |
| Miami-Dade County | 5.4031323908059000% |
| Miramar | 0.3491405639774380% |
| Monroe County | 0.4854327279611400% |
| New Port Richey | 0.1873705137049190% |
| Niceville | 0.0271848865105896% |
| North Miami | 0.0379784849873643% |
| Ocala | 0.4612963804104470% |
| Ocoee | 0.0832593898064393% |
| Okaloosa County | 0.7932307453439410% |
| Orange County | 3.9242890922912800% |
| Orlando | 1.4504780395102400% |
| Ormond Beach | 0.1433221901630030% |
| Osceola County | 1.0466816891766000% |
| Oviedo | 0.1289284555802000% |
| Palatka | 0.0587008320945097% |
| Palm Bay | 0.5060801668138730% |
| Palm Beach County | 7.4561883184436100% |
| Palmetto | 0.0660940498103573% |
| Panama City | 0.1939647100403620% |
| Pasco County | 5.5375586582705800% |
| Pembroke Pines | 0.5786072467153300% |
| Pensacola | 0.4133437478506440% |
| Pinellas County | 5.9926126841466200% |
| Pinellas Park | 0.3146192084285860% |
| Polk County | 2.0023407694530500% |
| Pompano Beach | 0.4193886169870580% |
| Port St. Lucie | 0.4885607150696560% |
| Putnam County | 0.4224712051535060% |
| Sanford | 0.2053280652400960% |
| Santa Rosa County | 0.8183885690911740% |
| Sarasota | 0.6054198619009580% |
| Sarasota County | 2.4612900245585600% |
| Seminole County | 1.8860854285512600% |

| | |
|---|---|
| **St. Augustine** | 0.0581446950541711% |
| **St. Johns County** | 0.8298745014344930% |
| **St. Lucie County** | 1.1954994212769900% |
| **St. Petersburg** | 1.8209515663656500% |
| **Stuart** | 0.1015415437774050% |
| **Suwannee County** | 0.2387961653329590% |
| **Sweetwater** | 0.0051459700834591% |
| **Tallahassee** | 0.5325590997752980% |
| **Tampa** | 2.4698749645037000% |
| **Taylor County** | 0.1152406745465610% |
| **Town of Eatonville** | 0.0049121655318066% |
| **Union County** | 0.0814547818592183% |
| **Volusia County** | 2.2307927858357100% |
| **Walton County** | 0.3357365263317270% |
| **Washington County** | 0.1501728905211320% |

**EXHIBIT H**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, STATE OF FLORIDA
WEST PASCO CIVIL DIVISION

STATE OF FLORIDA, OFFICE OF THE
ATTORNEY GENERAL, DEPARTMENT
OF LEGAL AFFAIRS,

      Plaintiff,

v.                                                                    No. 2018-CA-001438

PURDUE PHARMA L.P., et al.,

      Defendants.

_____

**CONSENT JUDGMENT**

Plaintiff, the State of Florida, Office of the Attorney General, Department of Legal

Affairs ("Plaintiff" or "Florida AG"), brought the above-captioned action against Defendants

Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Actavis, LLC, and Actavis Pharma, Inc.

(together, "Teva"), among others, alleging: that Teva violated Florida law by deceptively

marketing opioid pain medications so as to overstate their efficacy and downplay the associated

risk of addiction, which resulted in what Florida has alleged is a public nuisance in Florida; that

Teva violated the law by failing to monitor, report and not ship allegedly suspicious orders of

opioid pain medications; that Teva violated Fla. Stat. § 501.204(1); and that Teva violated Fla.

Stat. § 895.03(3) & (4) (the "Florida AG Action").  Plaintiff brought the Florida AG Action in its

sovereign capacity as the people's attorney in order to protect the public interest, including the

interests of the State of Florida, its governmental subdivisions and its citizens.

In addition, numerous governmental entities in Florida ("Subdivisions") have brought

separate lawsuits ("Actions") in various forums against Teva, among others.  These Actions

assert claims that arise out of or relate to alleged conduct that is substantially similar to or overlaps with the conduct alleged in the Florida AG Action (the "Covered Conduct").

Teva denies the allegations in the Florida AG Action and other Actions and claims to have no liability to Plaintiff or to any Subdivision or other governmental entity (whether such governmental entity has brought or is a party to another Action or not).  Plaintiff and Teva (the "Parties"), by their counsel, have agreed to a resolution of the Florida AG Action ("Agreement," attached to this judgment) and the entry of this Consent Judgment (including the injunctive terms incorporated herein) by the Court without trial or finding of admission or wrongdoing or liability of any kind.  Furthermore, under the Agreement, and as effectuated in this Consent Judgment, the Florida AG is exercising its authority to act in the public interest and release its own Claims as well as those of all Subdivisions, whether asserted previously or in the future, that arise out of or relate to the Covered Conduct.  Unless otherwise specified, capitalized terms used herein shall have the meanings specified in the Agreement.

NOW THEREFORE, without trial or adjudication of any issue of fact or law presented in the Florida AG Action or the other Actions, without this Consent Judgment constituting evidence against or admission by anyone with respect to any issue of fact or law, and upon the Parties' consent, IT IS HEREBY ORDERED AS FOLLOWS:

## I.        PARTIES

1.        Defendant Teva Pharmaceuticals USA, Inc., is a Delaware corporation with its principal places of business in Pennsylvania.  Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  Defendant Actavis, LLC is a Delaware limited liability company with its principal place of business in New Jersey.  Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in New Jersey.

2

2.      Plaintiff has the authority to act in the public interest and on behalf of the people of Florida as the people's attorney.

## II.      JURISDICTION

3.      This Court has jurisdiction over the Parties and the subject matter of this action and all city and county Litigating Subdivisions and all other Participating Subdivisions, each of which submits to the jurisdiction of the Court for purposes limited to the Court's role as provided in, and for resolving disputes to the extent provided in, the Teva Settlement.

## III.      AGREEMENT

4.      The Parties have agreed to resolution of the Florida AG Action under the terms of their Agreement, which is attached hereto as Exhibit A.  In the event of a conflict between the terms of the Exhibits and this summary document, the terms of the Agreement shall govern.

## IV.      FINANCIAL TERMS

5.      On or before the later of (a) seven (7) days after the entry of this Consent Judgment, or (b) seven (7) days after (i) the Qualified Settlement Fund contemplated by the Agreement has been established under the authority and jurisdiction of the Court, and (ii) Teva has received a W-9 and wire instructions for the Qualified Settlement Fund, Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Actavis, LLC, and Actavis Pharma, Inc.  shall pay the sum of $194,826,499  into the Qualified Settlement Fund as specified in the Agreement, consisting of $177,114,999 to be allocated for opioid remediation, $8,855,750  to be available to reimburse State Litigation Costs, and $8,855,750  to be available to reimburse Litigating Subdivision Litigation Costs.

6.      As contemplated by the Settlement Agreement, Plaintiff has filed a motion to establish a Qualified Settlement Fund and appoint a settlement fund administrator, which is contained in Exhibit B to this Consent Judgment, and a motion for State Litigation Costs, which

3

is contained in <u>Exhibit C</u> to this Consent Judgment.  The Court will enter separate orders with respect to these motions.

7.      Subsection C.1(b) of the Parties' Agreement provides with respect to the portion of the payment to be allocated for opioid remediation that it shall be allocated by the Qualified Settlement Fund Administrator into three sub-funds:  an Abatement Accounts Sub-Fund (also known as a regional fund), a State Sub-Fund, and a Subdivision Sub-Fund.  Subsection C.3 of the Parties' Agreement provides that the amount to be available to reimburse State Litigation Costs shall be allocated by the Qualified Settlement Fund Administrator to a State Litigation Cost Payment Sub-Fund and that the amount to be available to reimburse Litigation Subdivision Litigation Costs shall be allocated by the Qualified Settlement Fund Administrator to a Litigating Subdivision Litigation Cost Sub-Fund.  The Court approves the allocations set forth in the Agreement and the requirements governing distribution from each, the satisfaction of which will be determined at the appropriate time.

8.      The Parties' Agreement provides that Subdivisions that elect to participate in the settlement by the Initial Participation Date and complete other requirements specified in the Agreement may be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Effective Date of the Agreement.  The Parties' Agreement further provides that Subdivisions that elect to participate in the settlement after the Initial Participation Date and complete other requirements specified in the Agreement may be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Post-Effective Date Sign-on Deadline.

9.      The Parties previously agreed to an Initial Participation Date of April 28, 2022. Pursuant to the Agreement's terms, the Effective Date of the Agreement is _____, and the Post-Effective Date Sign-on Deadline is _____.

## V.      INJUNCTIVE TERMS

10.     The Parties have agreed that Teva shall be subject to the injunctive terms set forth in Exhibit F to the Agreement.

11.     Compliance with injunctive terms may be enforced in this Court consistent with the terms specified in the injunctive provisions set forth in Exhibit F to the Agreement.

## VI.      PROVISION OF SETTLEMENT PRODUCT

12.     The Parties have agreed that pursuant to the Agreement, the Office of the Attorney General, on behalf of the State, shall have the right to place periodic orders, not to exceed four (4) quarterly orders per year, to Teva USA for fulfillment of Settlement Product (Naloxone Hydrochloride Nasal Spray) over a period of ten (10) years, subject to Teva's good faith and reasonable efforts to meet the logistical requirements necessary to commence manufacturing of the needed increase in units.

13.     The Parties have agreed that the total value of the Settlement Product to be provided under the Agreement is $84,000,000.

14.     The terms and logistics for the ordering and delivery of Settlement Product are specified in Exhibit K to the Agreement.

## VII.     RELEASES AND DISMISSAL WITH PREJUDICE

15.     Plaintiff and Teva have agreed to the Release of certain Claims as provided in Sections D and E of the Agreement.  Such Releases are given in good faith within the meaning of Fla. Stat. § 768.31(5) and upon entry of this Consent Judgment shall be effective as to all Releasors.

5

16.     Plaintiff's Claims against Teva are hereby DISMISSED WITH PREJUDICE, with each Party to bear its own costs except as specified in the Agreement.

### VIII.   MISCELLANEOUS

17.     This Court retains jurisdiction to enforce the terms of this Consent Judgment.  The parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court.  This Consent Judgment may be modified only by order of this Court.

18.     This Consent Judgment shall remain in full force and effect for eight years from the date it is entered, at which time Teva's obligations under the Consent Judgment shall expire.

19.     Entry of this Consent Judgment is in the public interest.

IT IS SO ORDERED, ADJUDGED AND DECREED in Chambers at New Port Richey, Pasco Cunty, Florida, this __ day of April 2022.


_____
Honorable Kimberly Sharpe Byrd
Circuit Court Judge

6

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:

**<u>TEVA</u>**

By: _____
Name: Eric W. Sitarchuk
       Rebecca J. Hillyer
       Attorneys for Teva
       *On behalf of Teva*
Date: _____

**<u>PLAINTIFF</u>**

**STATE OF FLORIDA, including the
OFFICE OF THE ATTORNEY GENERAL**


By: _____
Name: John Guard
       Chief Deputy Attorney General of Florida
       Pursuant to the authority delegated to him
       by Ashley Moody, Attorney General of
       Florida


Date: _____

**<u>STATE OUTSIDE LITIGATION COUNSEL</u>**

**Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.**


By: _____
Name:  David C. Frederick

Date: _____

**Drake Martin Law Firm, LLC**


By: _____
Name:  Drake Martin

Date: _____

7

## EXHIBIT I

### State - Subdivision Agreement

## FLORIDA OPIOID ALLOCATION AND STATEWIDE RESPONSE AGREEMENT

BETWEEN

STATE OF FLORIDA DEPARTMENT OF LEGAL AFFAIRS,
OFFICE OF THE ATTORNEY GENERAL

And

CERTAIN LOCAL GOVERNMENTS IN THE STATE OF FLORIDA

This Florida Opioid Allocation and Statewide Response Agreement (the "Agreement") is entered into between the State of Florida ('State") and certain Local Governments ("Local Governments" and the State and Local Governments are jointly referred to as the "Parties" or individually as a "Party").  The Parties agree as follows:

Whereas, the people of the State and its communities have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain; and

Whereas, the State, through its Attorney General, and certain Local Governments, through their elected representatives and counsel, are separately engaged in litigation seeking to hold many of the same Pharmaceutical Supply Chain Participants accountable for the damage caused by their misfeasance, nonfeasance and malfeasance as the State; and

Whereas, certain of the Parties have separately sued Pharmaceutical Supply Chain participants for the harm caused to the citizens of both Parties and have collectively negotiated settlements with several Pharmaceutical Supply Chain Participants; and

Whereas, the Parties share a common desire to abate and alleviate the impacts of that misfeasance, nonfeasance and malfeasance throughout the State; and

Whereas, it is the intent of the State and its Local Governments to use the proceeds from any Settlements with Pharmaceutical Supply Chain Participants to increase the amount of funding presently spent on opioid and substance abuse education, treatment, prevention and other related programs and services, such as those identified in Exhibits "A" and "B," and to ensure that the funds are expended in compliance with evolving evidence-based "best practices;" and

Whereas, the State and its Local Governments enter into this Agreement and agree to the allocation and use of the proceeds of any settlement described herein

Wherefore, the Parties each agree to as follows:

1

A.     **Definitions**

As used in this Agreement:

1.     "Approved Purpose(s)" shall mean forward-looking strategies, programming and services used to expand the availability of treatment for individuals impacted by substance use disorders, to: (a) develop, promote, and provide evidence-based substance use prevention strategies; (b) provide substance use avoidance and awareness education; (c) decrease the oversupply of licit and illicit opioids; and (d) support recovery from addiction. Approved Purposes shall include, but are not limited to, the opioid abatement strategies listed in Exhibits "A" and "B" which are incorporated herein by reference.

2.     "Local Governments" shall mean all counties, cities, towns and villages located within the geographic boundaries of the State.

3.     "Managing Entities" shall mean the corporations selected by and under contract with the Florida Department of Children and Families or its successor ("DCF") to manage the daily operational delivery of behavioral health services through a coordinated system of care. The singular "Managing Entity" shall refer to a singular of the Managing Entities.

4.     "County" shall mean a political subdivision of the state established pursuant to s. 1, Art. VIII of the State Constitution.

5.     "Dependent Special District" shall mean a Special District meeting the requirements of Florida Statutes § 189.012(2).

6.     "Municipalities" shall mean cities, towns, or villages located in a County within the State that either have: (a) a Population greater than 10,000 individuals; or (b) a Population equal to or less than 10,000 individuals and that has either (i) filed a lawsuit against one or more Pharmaceutical Supply Chain Participants; or (ii) executes a release in connection with a settlement with a Pharmaceutical Supply Chain participant.  The singular "Municipality" shall refer to a singular city, town, or village within the definition of Municipalities.

7.     "'Negotiating Committee" shall mean a three-member group comprised by representatives of the following: (1) the State; and (2) two representatives of Local Governments of which one representative will be from a Municipality and one shall be from a County (collectively, "Members") within the State.  The State shall be represented by the Attorney General or her designee.

8.     "Negotiation Class Metrics" shall mean those county and city settlement allocations which come from the official website of the Negotiation Class of counties and cities certified on September 11, 2019 by the U.S. District for the Northern District of Ohio in *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio).  The website is located at https://allocationmap.iclaimsonline.com.

9.     "Opioid Funds" shall mean monetary amounts obtained through a Settlement.

2

10.    "Opioid Related" shall have the same meaning and breadth as in the agreed Opioid Abatement Strategies attached hereto as Exhibits "A" or "B."

11.    "Parties" shall mean the State and Local Governments that execute this Agreement. The singular word "Party" shall mean either the State or Local Governments that executed this Agreement.

12.    "PEC" shall mean the Plaintiffs' Executive Committee of the National Prescription Opiate Multidistrict Litigation pending in the United States District Court for the Northern District of Ohio.

13.    "Pharmaceutical Supply Chain" shall mean the entities, processes, and channels through which Controlled Substances are manufactured, marketed, promoted, distributed or dispensed.

14.    "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in, or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic.

15.    "Population" shall refer to published U.S. Census Bureau population estimates as of July 1, 2019, released March 2020, and shall remain unchanged during the term of this Agreement. These estimates can currently be found at *https://www.census.gov. For purposes of Population under the definition of Qualified County, a County's population shall be the greater of its population as of the July 1, 2019, estimates or its actual population, according to the official U.S. Census Bureau count, which was released by the U.S. Census Bureau in August 2021.*

16.    "Qualified County" shall mean a charter or non-chartered County that has a Population of at least 300,000 individuals and: (a) has an opioid taskforce or other similar board, commission, council, or entity (including some existing sub-unit of a County's government responsible for substance abuse prevention, treatment, and/or recovery) of which it is a member or it operates in connection with its municipalities or others on a local or regional basis; (b) has an abatement plan that has been either adopted or is being utilized to respond to the opioid epidemic; (c) is, as of December 31, 2021, either providing or is contracting with others to provide substance abuse prevention, recovery, and/or treatment services to its citizens; and (d) has or enters into an interlocal agreement with a majority of Municipalities (Majority is more than 50% of the Municipalities' total Population) related to the expenditure of Opioid Funds. The Opioid Funds to be paid to a Qualified County will only include Opioid Funds for Municipalities whose claims are released by the Municipality or Opioid Funds for Municipalities whose claims are otherwise barred. For avoidance of doubt, the word "operate" in connection with opioid task force means to do at least one of the following activities: (1) gathers data about the nature, extent, and problems being faced in communities within that County; (2) receives and reports recommendations from other government and private entities about activities that should be undertaken to abate the opioid epidemic to a County; and/or (3) makes recommendations to a County and other public and private leaders about steps, actions, or plans that should be undertaken to abate the opioid epidemic. For avoidance of doubt, the Population calculation required by subsection (d) does not include Population in unincorporated areas.

3

17.    "SAMHSA" shall mean the U.S. Department of Health & Human Services, Substance Abuse and Mental Health Services Administration.

18.    "Settlement" shall mean the negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the State and Local Governments or a settlement class as described in (B)(1) below.

19.    "State" shall mean the State of Florida.

**B.    Terms**

1.    **Only Abatement -** Other than funds used for the Administrative Costs and Expense Fund as hereinafter described or to pay obligations to the United States arising out of Medicaid or other federal programs, all Opioid Funds shall be utilized for Approved Purposes. In order to accomplish this purpose, the State will either: (a) file a new action with Local Governments as Parties; or (b) add Local Governments to its existing action, sever any settling defendants. In either type of action, the State will seek entry of a consent judgment, consent order or other order binding judgment binding both the State and Local Governments to utilize Opioid Funds for Approved Purposes ("Order") from the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division New Port Richey, Florida (the "Court"), except as herein provided.  The Order may be part of a class action settlement or similar device.  The Order shall provide for continuing jurisdiction by the Court to address non-performance by any party under the Order.

2.    **Avoid Claw Back and Recoupment -** Both the State and Local Governments wish to maximize any Settlement and Opioid Funds. In addition to committing to only using funds for the Expense Funds, Administrative Costs and Approved Purposes, both Parties will agree to utilize a percentage of funds for the Core Strategies highlighted in Exhibit A. Exhibit A contains the programs and strategies prioritized by the U.S. Department of Justice and/or the U.S. Department of Health & Human Services ("Core Strategies"). The State is trying to obtain the United States' agreement to limit or reduce the United States' ability to recover or recoup monies from the State and Local Government in exchange for prioritization of funds to certain projects. If no agreement is reached with the United States, then there will be no requirement that a percentage be utilized for Core Strategies.

3.    **No Benefit Unless Fully Participating -** Any Local Government that objects to or refuses to be included under the Order or refuses or fails to execute any of documents necessary to effectuate a Settlement shall not receive, directly or indirectly, any Opioid Funds and its portion of Opioid Funds shall be distributed to, and for the benefit of, the Local Governments. Funds that were a for a Municipality that does not join a Settlement will be distributed to the County where that Municipality is located. Funds that were for a County that does not join a Settlement will be distributed pro rata to Counties that join a Settlement. For avoidance of doubt, if a Local Government initially refuses to be included in or execute the documents necessary to effectuate a Settlement and subsequently effectuates such documents necessary to join a Settlement, then that Local Government will only lose those payments made under a Settlement while that Local Government was not a part of the Settlement. If a Local Government participates in a Settlement, that Local Government is  thereby releasing the claims of its Dependent Special District claims, if any.

4

4.      **Distribution Scheme** – If a Settlement has a National Settlement Administrator or similar entity, all Opioids Funds will initially go to the Administrator to be distributed. If a Settlement does not have a National Settlement Administrator or similar entity, all Opioid Funds will initially go to the State, and then be distributed by the State as they are received from the Defendants according to the following distribution scheme. The Opioid Funds will be divided into three funds after deducting any costs of the Expense Fund detailed below.  Funds due the federal government, if any, pursuant to Section B-2, will be subtracted from only the State and Regional Funds below:

(a)      City/County Fund- The city/county fund will receive 15% of all Opioid Funds to directly benefit all Counties and Municipalities.  The amounts to be distributed to each County and Municipality shall be determined by the Negotiation Class Metrics or other metrics agreed upon, in writing, by a County and a Municipality, which are attached to this Agreement as Exhibit "C."  In the event that a Municipality has a Population less than 10,000 people and it does not execute a release or otherwise join a Settlement that Municipalities share under the Negotiation Class Metrics shall be reallocated to the County where that Municipality is located.

(b)      Regional Fund- The regional fund will be subdivided into two parts.

(i)      The State will annually calculate the share of each County within the State of the regional fund utilizing the sliding scale in paragraph 5 of the Agreement, and according to the Negotiation Class Metrics.

(ii)      For Qualified Counties, the Qualified County's share will be paid to the Qualified County and expended on Approved Purposes, including the Core Strategies identified in Exhibit A, if applicable.

(iii)      For all other Counties, the State will appropriate the regional share for each County and pay that share through DCF to the Managing Entities providing service for that County. The Managing Entities will be required to expend the monies on Approved Purposes, including the Core Strategies as directed by the Opioid Abatement Task Force or Council. The Managing Entities shall expend monies from this Regional Fund on services for the Counties within the State that are non-Qualified Counties and to ensure that there are services in every County. To the greatest extent practicable, the Managing Entities shall endeavor to expend monies in each County or for citizens of a County in the amount of the share that a County would have received if it were a Qualified County.

(c)      State Fund - The remainder of Opioid Funds will be expended by the State on Approved Purposes, including the provisions related to Core Strategies, if applicable.

(d)      To the extent that Opioid Funds are not appropriated and expended in a year by the State, the State shall identify the investments where settlement funds will be deposited. Any gains, profits, or interest accrued from the deposit of the Opioid Funds to the extent that any funds are not appropriated and expended within a calendar year, shall be the sole property of the Party that was entitled to the initial amount.

(e)        To the extent a County or Municipality wishes to pool, comingle, or otherwise transfer its share, in whole or part, of Opioid Funds to another County or Municipality, the comingling Municipalities may do so by written agreement.  The comingling Municipalities shall provide a copy of that agreement to the State and any settlement administrator to ensure that monies are directed consistent with such agreement. The County or Municipality receiving any such Opioid Funds shall assume the responsibility for reporting how such Opioid Funds were utilized under this Agreement.

5.        Regional Fund Sliding Scale- The Regional Fund shall be calculated by utilizing the following sliding scale of the Opioid Funds available in any year after deduction of Expenses and any funds due the federal government:

    A. Years 1-6:          40%

    B. Years 7-9:          35%

    C. Years 10-12:   34%

    D. Years 13-15:   33%

    E. Years 16-18:   30%

6.        Opioid Abatement Taskforce or Council - The State will create an Opioid Abatement Taskforce or Council (sometimes hereinafter "Taskforce" or "Council") to advise the Governor, the Legislature, DCF, and Local Governments on the priorities that should be addressed by expenditure of Opioid Funds and to review how monies have been spent and the results that have been achieved with Opioid Funds.

    (a)        Size - The Taskforce or Council shall have ten Members equally balanced between the State and the Local Government representatives.

    (b)        Appointments Local Governments - Two Municipality representatives will be appointed by or through Florida League of Cities.  Two county representatives, one from a Qualified County and one from a county within the State that is not a Qualified County, will be appointed by or through the Florida Association of Counties.  The final representative will alternate every two years between being a county representative (appointed by or through Florida Association of Counties) or a Municipality representative (appointed by or through the Florida League of Cities).  One Municipality representative must be from a city of less than 50,000 people.  One county representative must be from a county of less than 200,000 people and the other county representative must be from a county whose population exceeds 200,000 people.

    (c)        Appointments State -

        (i)        The Governor shall appoint two Members.

        (ii)        The Speaker of the House shall appoint one Member.

6

(iii)   The Senate President shall appoint one Member.

(iv)   The Attorney General or her designee shall be a Member.

(d)      Chair - The Attorney General or designee shall be the chair of the Taskforce or Council.

(e)      Term - Members will be appointed to serve a four-year term and shall be staggered to comply with Florida Statutes § 20.052(4)(c).

(f)      Support - DCF shall support the Taskforce or Council and the Taskforce or Council shall be administratively housed in DCF.

(g)      Meetings - The Taskforce or Council shall meet quarterly in person or virtually using communications media technology as defined in section 120.54(5)(b)(2), Florida Statutes.

(h)      Reporting - The Taskforce or Council shall provide and publish a report annually no later than November 30th or the first business day after November 30th, if November 30th falls on a weekend or is otherwise not a business day.  The report shall contain information on how monies were spent the previous fiscal year by the State, each of the Qualified Counties, each of the Managing Entities, and each of the Local Governments.  It shall also contain recommendations to the Governor, the Legislature, and Local Governments for priorities among the Approved Purposes or similar such uses for how monies should be spent the coming fiscal year to respond to the opioid epidemic. Prior to July 1st of each year, the State and each of the Local Governments shall provide information to DCF about how they intend to expend Opioid Funds in the upcoming fiscal year.

(i)      Accountability - The State and each of the Local Governments shall report its expenditures to DCF no later than August 31st for the previous fiscal year. The Taskforce or Council will set other data sets that need to be reported to DCF to demonstrate the effectiveness of expenditures on Approved Purposes. In setting those requirements, the Taskforce or Council shall consider the Reporting Templates, Deliverables, Performance Measures, and other already utilized and existing templates and forms required by DCF from Managing Entities and suggest that similar requirements be utilized by all Parties to this Agreement.

(j)      Conflict of Interest - All Members shall adhere to the rules, regulations and laws of Florida including, but not limited to, Florida Statute §112.311, concerning the disclosure of conflicts of interest and recusal from discussions or votes on conflicted matters.

7.      **Administrative Costs**- The State may take no more than a 5% administrative fee from the State Fund and any Regional Fund that it administers for counties that are not Qualified Counties. Each Qualified County may take no more than a 5% administrative fee from its share of the Regional Funds. Municipalities and Counties may take no more than a 5% administrative fee from any funds that they receive or control from the City/County Fund.

7

8.      **Negotiation of Non-Multistate Settlements** - If the State begins negotiations with a Pharmaceutical Supply Chain Participant that is separate and apart from a multi-state negotiation, the State shall include Local Governments that are a part of the Negotiating Committee in such negotiations.  No Settlement shall be recommended or accepted without the affirmative votes of both the State and Local Government representatives of the Negotiating Committee.

9.      **Negotiation of Multistate or Local Government Settlements** - To the extent practicable and allowed by other parties to a negotiation, both Parties agree to communicate with members of the Negotiation Committee regarding the terms of any other Pharmaceutical Supply Chain Participant Settlement.

10.      **Program Requirements**- DCF and Local Governments desire to make the most efficient and effective use of the Opioid Funds.  DCF and Local Governments will work to achieve that goal by ensuring the following requirements will be minimally met by any governmental entity or provider providing services pursuant to a contract or grant of Opioid Funds:

a.      In either performing services under this Agreement or contracting with a provider to provide services with the Opioid Funds under this Agreement, the State and Local Governments shall be aware of and comply with all State and Federal laws, rules, Children and Families Operating Procedures (CFOPs), and similar regulations relating to the substance abuse and treatment services.

b.      The State and Local Governments shall have and follow their existing policies and practices for accounting and auditing, including policies relating to whistleblowers and avoiding fraud, waste, and abuse. The State and Local Governments shall consider additional policies and practices recommended by the Opioid Abatement Taskforce or Council. c. In any award or grant to any provider, State and Local Governments shall ensure that each provider acknowledges its awareness of its obligations under law and shall audit, supervise, or review each provider's performance routinely, at least once every year.

d. In contracting with a provider, the State and Local Governments shall set performance measures in writing for a provider.

e. The State and Local Governments shall receive and report expenditures, service utilization data, demographic information, and national outcome measures in a similar fashion as required by the 42.U.S.C. s. 300x and 42 U.S.C. s. 300x-21.

f. The State and Local Governments, that implement evidenced based practice models will participate in fidelity monitoring as prescribed and completed by the originator of the model chosen..

g. The State and Local Governments shall ensure that each year, an evaluation of the procedures and activities undertaken to comply with the requirements of this Agreement are completed.

h. The State and Local Governments shall implement a monitoring process that will demonstrate oversight and corrective action in the case of non-compliance, for all providers that receive Opioid Funds. Monitoring shall include:

(i)    Oversight of the any contractual or grant requirements;

(ii)   Develop and utilize standardized monitoring tools;

(iii)  Provide DCF and the Opioid Abatement Taskforce or Council with access to the monitoring reports; and

(iv)   Develop and utilize the monitoring reports to create corrective action plans for providers, where necessary.

11.    **Reporting and Records Requirements-** The State and Local Governments  shall follow their existing reporting and records retention requirements along with considering any additional recommendations from the Opioid Abatement Taskforce or Council. Local Governments shall respond and provide documents to any reasonable requests from the State or Opioid Abatement Taskforce or Council for data or information about programs receiving Opioid Funds.  The State and Local Governments shall ensure that any provider or sub-recipient of Opioid Funds at a minimum does the following:

(a)    Any provider shall establish and maintain books, records and documents (including electronic storage media) sufficient to reflect all income and expenditures of Opioid Funds. Upon demand, at no additional cost to the State or Local Government, any provider will facilitate the duplication and transfer of any records or documents during the term that it receives any Opioid Funds and the required retention period for the State or Local Government. These records shall be made available at all reasonable times for inspection, review, copying, or audit by Federal, State, or other personnel duly authorized by the State or Local Government.

(b)    Any provider shall retain and maintain all client records, financial records, supporting documents, statistical records, and any other documents (including electronic storage media) pertinent to the use of the Opioid Funds during the term of its receipt of Opioid Funds and retained for a period of six (6) years after its ceases to receives Opioid Funds or longer when required by law. In the event an audit is required by the State of Local Governments, records shall be retained for a minimum period of six (6) years after the audit report is issued or until resolution of any audit findings or litigation based on the terms of any award or contract.

(c)    At all reasonable times for as long as records are maintained, persons duly authorized by State or Local Government auditors shall be allowed full access to and the right to examine any of the contracts and related records and documents, regardless of the form in which kept.

(d)    A financial and compliance audit shall be performed annually and provided to the State.

9

(e)    All providers shall comply and cooperate immediately with any inspections, reviews, investigations, or audits deemed necessary by The Office of the Inspector General (section 20.055, F.S.) or the State.

(f)    No record may be withheld nor may any provider attempt to limit the scope of any of the foregoing inspections, reviews, copying, transfers or audits based on any claim that any record is exempt from public inspection or is confidential, proprietary or trade secret in nature; provided, however, that this provision does not limit any exemption to public inspection or copying to any such record.

12.    **Expense Fund** - The Parties agree that in any negotiation every effort shall be made to cause Pharmaceutical Supply Chain Participants to pay costs of litigation, including attorneys' fees, in addition to any agreed to Opioid Funds in the Settlement.  To the extent that a fund sufficient to pay the full contingent fees of Local Governments is not created as part of a Settlement by a Pharmaceutical Supply Chain Participant, the Parties agree that an additional expense fund for attorneys who represent Local Governments (herein "Expense Fund") shall be created out of the City/County fund for the purpose of paying the hard costs of a litigating Local Government and then paying attorneys' fees.

(a)    The Source of Funds for the Expense Fund- Money for the Expense Fund shall be sourced exclusively from the City/County Fund.

(b)    The Amount of the Expense Fund- The State recognizes the value litigating Local Governments bring to the State in connection with the Settlement because their participation increases the amount of Incentive Payments due from each Pharmaceutical Supply Chain Participant.  In recognition of that value, the amount of funds that shall be deposited into the Expense Fund shall be contingent upon on the percentage of litigating Local Government participation in the Settlement, according to the following table:

| Litigating Local Government Participation in the Settlement (by percentage of the population) | Amount that shall be paid into the Expense Fund from (and as a percentage of) the City/County fund |
|---|---|
| 96 to 100% | 10% |
| 91 to 95% | 7.5% |
| 86 to 90% | 5% |
| 85% | 2.5% |
| Less than 85% | 0% |

If fewer than 85% percent of the litigating Local Governments (by population) participate, then the Expense Fund shall not be funded, and this Section of the Agreement shall be null and void.

(c)    The Timing of Payments into the Expense Fund- Although the amount of the Expense Fund shall be calculated based on the entirety of payments due to the City/County fund over a ten-to-eighteen-year period, the Expense Fund shall be funded entirely from payments made by Pharmaceutical Supply Chain Participants during the first two payments of the Settlement.  Accordingly, to offset the amounts being paid from the

10

City/County Fund to the Expense Fund in the first two years, Counties or Municipalities may borrow from the Regional Fund during the first two years and pay the borrowed amounts back to the Regional Fund during years three, four, and five.

For the avoidance of doubt, the following provides an illustrative example regarding the calculation of payments and amounts that may be borrowed under the terms of this MOU, consistent with the provisions of this Section:

| | |
|---|---|
| Opioid Funds due to State of Florida and Local Governments (over 10 to 18 years): | $1,000 |
| Litigating Local Government Participation: | 100% |
| City/County Fund (over 10 to 18 years): | $150 |
| Expense Fund (paid over 2 years): | $15 |
| Amount Paid to Expense Fund in 1st year: | $7.5 |
| Amount Paid to Expense Fund in 2nd year | $7.5 |
| Amount that may be borrowed from Regional Fund in 1st year: | $7.5 |
| Amount that may be borrowed from Regional Fund in 2nd year: | $7.5 |
| Amount that must be paid back to Regional Fund in 3rd year: | $5 |
| Amount that must be paid back to Regional Fund in 4th year: | $5 |
| Amount that must be paid back to Regional Fund in 5th year: | $5 |

(d)  Creation of and Jurisdiction over the Expense Fund- The Expense Fund shall be established, consistent with the provisions of this Section of the Agreement, by order of the Court.  The Court shall have jurisdiction over the Expense Fund, including authority to allocate and disburse amounts from the Expense Fund and to resolve any disputes concerning the Expense Fund.

(e)  Allocation of Payments to Counsel from the Expense Fund- As part of the order establishing the Expense Fund, counsel for the litigating Local Governments shall seek to have the Court appoint a third-neutral to serve as a special master for purposes of allocating the Expense Fund.  Within 30 days of entry of the order appointing a special master for the Expense Fund, any counsel who intend to seek an award from the Expense Fund shall provide the copies of their contingency fee contracts to the special master.  The special master shall then build a mathematical model, which shall be based on each litigating Local Government's share under the Negotiation Class Metrics and the rate set forth in their contingency contracts, to calculate a proposed award for each litigating Local Government who timely provided a copy of its contingency contract.

13.  **Dispute resolution-** Any one or more of the Local Governments or the State may object to an allocation or expenditure of Opioid Funds solely on the basis that the allocation or expenditure at issue (a) is inconsistent with the Approved Purposes; (b) is inconsistent with the distribution scheme as provided in paragraph,; (c) violates the limitations set forth herein with respect to administrative costs or the Expense Fund; or (d) to recover amounts advanced from the Regional Fund for the Expense Fund. There shall be no other basis for bringing an objection to the approval of an allocation or expenditure of Opioid Funds. In the event that there is a National Settlement Administrator or similar entity, the Local Governments sole action for non-payment of

11

amounts due from the City/County Fund shall be against the particular settling defendant and/or the National Settlement Administrator or similar entity.

**C. Other Terms and Conditions**

1. **Governing Law and Venue**:  This Agreement will be governed by the laws of the State of Florida.  Any and all litigation arising under the Agreement, unless otherwise specified in this Agreement, will be instituted in either: (a) the Court that enters the Order if the matter deals with a matter covered by the Order and the Court retains jurisdiction; or (b) the appropriate State court in Leon County, Florida.

2. **Agreement Management and Notification:**  The Parties have identified the following individuals as Agreement Managers and Administrators:

    a.    State of Florida Agreement Manager:

    Greg Slemp

    PL-01, The Capitol, Tallahassee, FL 32399

    850-414-3300

    Greg.slemp@myfloridalegal.com

    b.    State of Florida Agreement Administrator

    Janna Barineau

    PL-01, The Capitol, Tallahassee, FL 32399

    850-414-3300

    Janna.barineau@myfloridalegal.com

    c.    Local Governments Agreement Managers and Administrators are listed on Exhibit C to this Agreement.

Changes to either the Managers or Administrators may be made by notifying the other Party in writing, without formal amendment to this Agreement.

3. **Notices**.  All notices required under the Agreement will be delivered by certified mail, return receipt requested, by reputable air courier, or by personal delivery to the designee identified in paragraphs C.2., above.  Either designated recipient may notify the other, in writing, if someone else is designated to receive notice.

4. **Cooperation with Inspector General:**  Pursuant to section 20.055, Florida Statutes, the Parties, understand and will comply with their duty to cooperate with the Inspector General in any investigation, audit, inspection, review, or hearing.

5. **Public Records**: The Parties will keep and maintain public records pursuant to Chapter 119, Florida Statutes and will comply will all applicable provisions of that Chapter.

6. **Modification**: This Agreement may only be modified by a written amendment between the appropriate parties. No promises or agreements made subsequent to the execution of this Agreement shall be binding unless express, reduced to writing, and signed by the Parties.

7. **Execution in Counterparts**: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

8. **Assignment:** The rights granted in this Agreement may not be assigned or transferred by any party without the prior written approval of the other party. No party shall be permitted to delegate its responsibilities or obligations under this Agreement without the prior written approval of the other parties.

9. **Additional Documents:** The Parties agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be reasonably necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

10. **Captions:** The captions contained in this Agreement are for convenience only and shall in no way define, limit, extend or describe the scope of this Agreement or any part of it.

11. **Entire Agreement:** This Agreement, including any attachments, embodies the entire agreement of the parties. There are no other provisions, terms, conditions, or obligations. This Agreement supersedes all previous oral or written communications, representations or agreements on this subject.

12. **Construction:** The parties hereto hereby mutually acknowledge and represent that they have been fully advised by their respective legal counsel of their rights and responsibilities under this Agreement, that they have read, know, and understand completely the contents hereof, and that they have voluntarily executed the same. The parties hereto further hereby mutually acknowledge that they have had input into the drafting of this Agreement and that, accordingly, in any construction to be made of this Agreement, it shall not be construed for or against any party, but rather shall be given a fair and reasonable interpretation, based on the plain language of the Agreement and the expressed intent of the parties.

13. **Capacity to Execute Agreement:** The parties hereto hereby represent and warrant that the individuals signing this Agreement on their behalf are duly authorized and fully competent to do so.

13

14.    **Effectiveness:**  This Agreement shall become effective on the date on which the last required signature is affixed to this Agreement.

**IN WITNESS THEREOF**, the parties hereto have caused the Agreement to be executed by their undersigned officials as duly authorized.

STATE OF FLORIDA

By: John Guard                                11/15/2021
                                                    DATED
Its: Chief Deputy Attorney General

14

# EXHIBIT A

**Schedule A**

**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**")[, such that a minimum of __ % of the [aggregate] state-level abatement distributions shall be spent on [one or more of] them annually].[1]

A. Naloxone or other FDA-approved drug to reverse opioid overdoses

1. Expand training for first responders, schools, community support groups and families; and

2. Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B. Medication-Assisted Treatment ("MAT") Distribution and other opioid-related treatment

1. Increase distribution of MAT to non-Medicaid eligible or uninsured individuals;

2. Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3. Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4. Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication with other support services.

C. Pregnant & Postpartum Women

1. Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("OUD") and other Substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3. Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

D. Expanding Treatment for Neonatal Abstinence Syndrome

1. Expand comprehensive evidence-based and recovery support for NAS babies;

2. Expand services for better continuum of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Term Sheet.

E. Expansion of Warm Hand-off Programs and Recovery Services

1. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions. ;

4. Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansions above.

F. Treatment for Incarcerated Population

1. Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2. Increase funding for jails to provide treatment to inmates with OUD.

G. Prevention Programs

1. Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2. Funding for evidence-based prevention programs in schools.;

3. Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4. Funding for community drug disposal programs; and

5. Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H. Expanding Syringe Service Programs

1. Provide comprehensive syringe services programs with more wrap-around services including linkage to OUD treatment, access to sterile syringes, and linkage to care and treatment of infectious diseases.

I. Evidence-based data collection and research analyzing the effectiveness of the abatement strategies within the State.

# EXHIBIT B

**Schedule B**

**Approved Uses**

PART ONE: TREATMENT

## A.  TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:[2]

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.  Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training,

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Term Sheet.

scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. [Intentionally Blank – to be cleaned up later for numbering]

13. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B. SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in treatment for or recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved medication with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically-appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D. ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

> a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

> b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

> c. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

> d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

> e. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

f. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions

4. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

### E. ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   a. Increase the number of prescribers using PDMPs;

   b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

## G. PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Fund community anti-drug coalitions that engage in drug prevention efforts.

6. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7. Engage non-profits and faith-based communities as systems to support prevention.

8. Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address

mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

### H. PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, individuals at high risk of overdose, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities provide free naloxone to anyone in the community

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.

PART THREE: OTHER STRATEGIES

**I. FIRST RESPONDERS**

In addition to items in sections C, D, and H relating to first responders, support the following:

1. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J. LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitation, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local, or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services; to support training and technical assistance; or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to share reports, recommendations, or plans to spend opioid settlement funds; to show how opioid settlement funds have been spent; to report program or strategy outcomes; or to track, share, or visualize key opioid-related or health-related indicators and supports as identified through collaborative statewide, regional, local, or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

**K. TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

**L. RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection, and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

# EXHIBIT C

| County | Allocated Subdivisions | Regional % by County for Abatement Fund | City/County Fund % |
|---|---|---|---|
| Alachua | | 1.24106016449% | |
| | Alachua County | | 0.821689546303% |
| | Alachua | | 0.013113332457% |
| | Archer | | 0.000219705515% |
| | Gainesville | | 0.381597611347% |
| | Hawthorne | | 0.000270546460% |
| | High Springs | | 0.011987568663% |
| | La Crosse | | 0.000975056706% |
| | Micanopy | | 0.002113530737% |
| | Newberry | | 0.006102729215% |
| | Waldo | | 0.002988721299% |
| Baker | | 0.19317380413 0% | |
| | Baker County | | 0.169449240037% |
| | Glen St. Mary | | 0.000096234647% |
| | Macclenny | | 0.023628329446% |
| Bay | | 0.83965637312% | |
| | Bay County | | 0.508772605155% |
| | Callaway | | 0.024953825527% |
| | Lynn Haven | | 0.039205632015% |
| | Mexico Beach | | 0.005614292988% |
| | Panama City | | 0.155153855596% |
| | Panama City Beach | | 0.080897023117% |
| | Parker | | 0.008704696178% |
| | Springfield | | 0.016354442736% |
| Bradford | | 0.189484204081% | |
| | Bradford County | | 0.151424309090% |
| | Brooker | | 0.000424885045% |
| | Hampton | | 0.002838982959% |
| | Lawtey | | 0.003400896108% |
| | Starke | | 0.031392468132% |
| Brevard | | 3.87879918044 4% | |
| | Brevard County | | 2.323022668525% |
| | Cape Canaveral | | 0.045560750209% |

| | | |
|---|---|---|
| | Cocoa | 0.149245411423% |
| | Cocoa Beach | 0.084363286155% |
| | Grant-Valkaria | 0.0003213874 06% |
| | Indialantic | 0.024136738902% |
| | Indian Harbour Beach | 0.021089913665% |
| | Malabar | 0.002505732317% |
| | Melbourne | 0.383104682233% |
| | Melbourne Beach | 0.012091066302% |
| | Melbourne Village | 0.003782203200% |
| | Palm Bay | 0.404817397481% |
| | Palm Shores | 0.000127102364% |
| | Rockledge | 0.096603243798% |
| | Satellite Beach | 0.035975416224% |
| | Titusville | 0.240056418924% |
| | West Melbourne | 0.051997577066% |
| Broward | | 9.057962672578% |
| | Broward County | 3.966403576878% |
| | Coconut Creek | 0.101131719448% |
| | Cooper City | 0.073935445073% |
| | Coral Springs | 0.323406517664% |
| | Dania Beach | 0.017807041180% |
| | Davie | 0.266922227153% |
| | Deerfield Beach | 0.202423224725% |
| | Fort Lauderdale | 0.830581264531% |
| | Hallandale Beach | 0.154950491814% |
| | Hillsboro Beach | 0.012407006463% |
| | Hollywood | 0.520164608456% |
| | Lauderdale-By-The-Sea | 0.022807611325% |
| | Lauderdale Lakes | 0.062625150435% |
| | Lauderhill | 0.144382838130% |
| | Lazy Lake | 0.000021788977% |
| | Lighthouse Point | 0.029131861803% |
| | Margate | 0.143683775129% |
| | Miramar | 0.279280208419% |
| | North Lauderdale | 0.066069624496% |

| County | Place | | |
|---|---|---|---|
| | Oakland Park | | 0.1004308406999% |
| | Ocean Breeze | | 0.0053818772737% |
| | Parkland | | 0.0458040604448% |
| | Pembroke Park | | 0.0245979389908% |
| | Pembroke Pines | | 0.4628323636003% |
| | Plantation | | 0.2139187255664% |
| | Pompano Beach | | 0.3354721634993% |
| | Sea Ranch Lakes | | 0.0050241748870% |
| | Southwest Ranches | | 0.0259797231782% |
| | Sunrise | | 0.2860711061469% |
| | Tamarac | | 0.1344924584729% |
| | Weston | | 0.1386378112839% |
| | West Park | | 0.0295531153529% |
| | Wilton Manors | | 0.0316303311279% |
| Calhoun | | 0.0471277407819% | |
| | Calhoun County | | 0.0388660871289% |
| | Altha | | 0.0003667811079% |
| | Blountstown | | 0.0078966882939% |
| Charlotte | | 0.7373462333769% | |
| | Charlotte County | | 0.6902257555879% |
| | Punta Gorda | | 0.0471204777899% |
| Citrus | | 0.9696457766069% | |
| | Citrus County | | 0.9297156611179% |
| | Crystal River | | 0.0219287892669% |
| | Inverness | | 0.0180013262229% |
| Clay | | 1.1934294614569% | |
| | Clay County | | 1.0557648911319% |
| | Green Cove Springs | | 0.0577625771429% |
| | Keystone Heights | | 0.0007535354439% |
| | Orange Park | | 0.0785892073399% |
| | Penney Farms | | 0.0005610661499% |
| Collier | | 1.5513333764279% | |
| | Collier County | | 1.3546733360309% |
| | Everglades | | 0.0001488913419% |
| | Marco Island | | 0.0620949520039% |

| County | City | | |
|---|---|---|---|
| Columbia | Naples | 0.446781150792% | 0.1344161970544% |
| | Columbia County | | 0.341887201373% |
| | Fort White | | 0.0002360472474% |
| | Lake City | | 0.1046597179204% |
| DeSoto | | 0.1136404078024% | |
| | DeSoto County | | 0.0968846847464% |
| | Arcadia | | 0.0167557230564% |
| Dixie | | 0.1037445809004% | |
| | Dixie County | | 0.0988220879214% |
| | Cross City | | 0.0046392362824% |
| | Horseshoe Beach | | 0.0002814409494% |
| Duval | | 5.434975156935% | |
| | Jacksonville | | 5.270570064997% |
| | Atlantic Beach | | 0.0388915076014% |
| | Baldwin | | 0.0022515275894% |
| | Jacksonville Beach | | 0.1004471824314% |
| | Neptune Beach | | 0.0228148743184% |
| Escambia | | 1.341634449244% | |
| | Escambia County | | 1.005860871574% |
| | Century | | 0.0051367512494% |
| | Pensacola | | 0.330636826421% |
| Flagler | | 0.389864712244% | |
| | Flagler County | | 0.2797559344094% |
| | Beverly Beach | | 0.0001543385854% |
| | Bunnell | | 0.0095010895754% |
| | Flagler Beach | | 0.0154828836694% |
| | Marineland | | 0.0001143921274% |
| | Palm Coast | | 0.0848571696264% |
| Franklin | | 0.0499111282550% | |
| | Franklin County | | 0.0462543659664% |
| | Apalachicola | | 0.0017685386064% |
| | Carabelle | | 0.0018883779784% |
| Gadsden | | 0.1236560740774% | |
| | Gadsden County | | 0.0902118106424% |

| County | City | County Total | Percentage |
|---|---|---|---|
| | Chattahoochee | | 0.0041816677712% |
| | Greensboro | | 0.0004920677723% |
| | Gretna | | 0.0022406331101% |
| | Havana | | 0.0054599544403% |
| | Midway | | 0.0012020255213% |
| | Quincy | | 0.0198679152233% |
| Gilchrist | Gilchrist County | 0.064333769355% | 0.0612742338811% |
| | Bell | | 0.0009986614343% |
| | Fanning Springs | | 0.0003885700084% |
| | Trenton | | 0.0025710992477% |
| Glades | Glades County | 0.0406128367588% | 0.0402036746464% |
| | Moore Haven | | 0.0001924692947% |
| Gulf | Gulf County | 0.0599142385888% | 0.0547157519050% |
| | Port St. Joe | | 0.0048171795910% |
| | Wewahitchka | | 0.0003813070920% |
| Hamilton | Hamilton County | 0.0479411959100% | 0.0388170619310% |
| | Jasper | | 0.0048698362850% |
| | Jennings | | 0.0026237559400% |
| | White Springs | | 0.0016305417540% |
| Hardee | Hardee County | 0.0671100481320% | 0.0581003062800% |
| | Bowling Green | | 0.0017975905750% |
| | Wauchula | | 0.0066674286860% |
| | Zolfo Springs | | 0.0005447244170% |
| Hendry | Hendry County | 0.1444609152970% | 0.1221471874430% |
| | Clewiston | | 0.0175891514140% |
| | LaBelle | | 0.0047245766440% |
| Hernando | Hernando County | 1.5100759491100% | 1.4475216128490% |
| | Brooksville | | 0.0613196275830% |

| County | Municipality | | |
|---|---|---|---|
| | Weeki Wachee | | 0.001234708678% |
| Highlands | Highlands County | 0.35718851023 7% | 0.287621754986% |
| | Avon Park | | 0.025829016090% |
| | Lake Placid | | 0.005565267790% |
| | Sebring | | 0.038172471371% |
| Hillsborough | Hillsborough County | 8.710984113657% | 6.523111204400% |
| | Plant City | | 0.104218491142% |
| | Tampa | | 1.975671881253% |
| | Temple Terrace | | 0.109807211113% |
| Holmes | Holmes County | 0.081612427851% | 0.066805002459% |
| | Bonifay | | 0.006898026863% |
| | Esto | | 0.006269778036% |
| | Noma | | 0.001278286631% |
| | Ponce de Leon | | 0.000179759057% |
| | Westville | | 0.000179759057% |
| Indian River | Indian River County | 0.753076058781% | 0.623571460217% |
| | Fellsmere | | 0.004917045734% |
| | Indian River shores | | 0.025322422382% |
| | Orchid | | 0.000306861421% |
| | Sebastian | | 0.038315915467% |
| | Vero Beach | | 0.060642535358% |
| Jackson | Jackson County | 0.158936058795% | 0.075213731704% |
| | Alford | | 0.000303229925% |
| | Bascom | | 0.000061735434% |
| | Campbellton | | 0.001648699234% |
| | Cottondale | | 0.001093080329% |
| | Graceville | | 0.002794436257% |
| | Grandridge | | 0.000030867717% |
| | Greenwood | | 0.001292812616% |
| | Jacob City | | 0.000481173235% |

| | | | |
|---|---|---|---|
| | Malone | | 0.00009260315% |
| | Marianna | | 0.073519638768% |
| | Sneads | | 0.002404050426% |
| Jefferson | | 0.040821647784% | |
| | Jefferson County | | 0.037584169001% |
| | Monticello | | 0.003237478783% |
| Lafayette | | 0.031911772076% | |
| | Lafayette County | | 0.031555885457% |
| | Mayo | | 0.000355886619% |
| Lake | | 1.139211224519% | |
| | Lake County | | 0.757453827343% |
| | Astatula | | 0.002727253579% |
| | Clermont | | 0.075909163209% |
| | Eustis | | 0.041929254098% |
| | Fruitland Park | | 0.008381493024% |
| | Groveland | | 0.026154034992% |
| | Howey-In-The-Hills | | 0.002981458307% |
| | Lady Lake | | 0.025048244426% |
| | Leesburg | | 0.091339390185% |
| | Mascotte | | 0.011415608025% |
| | Minneola | | 0.016058475803% |
| | Montverde | | 0.001347285057% |
| | Mount Dora | | 0.041021380070% |
| | Tavares | | 0.031820984673% |
| | Umatilla | | 0.005623371728% |
| Lee | | 3.325371883359% | |
| | Lee County | | 2.115268407509% |
| | Bonita Springs | | 0.017374893143% |
| | Cape Coral | | 0.714429677167% |
| | Estero | | 0.012080171813% |
| | Fort Myers | | 0.431100350585% |
| | Fort Myers Beach | | 0.000522935440% |
| | Sanibel | | 0.034595447702% |
| Leon | | 0.897199244939% | |
| | Leon County | | 0.471201146391% |

| | | | |
|---|---|---|---|
| Levy | Tallahassee | 0.25119240174 8% | 0.42599809854 9% |
| | Levy County | | 0.20013175069 79% |
| | Bronson | | 0.00570144894 4% |
| | Cedar Key | | 0.00518032920 2% |
| | Chiefland | | 0.01532672933 7% |
| | Fanning Springs | | 0.00080800788 5% |
| | Inglis | | 0.00497696542 0% |
| | Otter Creek | | 0.00040854331 2% |
| | Williston | | 0.01777435771 5% |
| | Yankeetown | | 0.00088426930 3% |
| Liberty | Liberty County | 0.01939945222 5% | 0.01930321757 8% |
| | Bristol | | 0.00096236464 7% |
| Madison | Madison County | 0.06354028745 5% | 0.05314512983 7% |
| | Greenville | | 0.00011076063 1% |
| | Lee | | 0.00001997322 9% |
| | Madison | | 0.01026442375 8% |
| Manatee | Manatee County | 2.72132334623 5% | 2.20164717400 06% |
| | Anna Maria | | 0.00993032611 6% |
| | Bradenton | | 0.37993075463 2% |
| | Bradenton Beach | | 0.01401212774 4% |
| | Holmes Beach | | 0.02803878147 3% |
| | Longboat Key | | 0.03489504613 1% |
| | Palmetto | | 0.05286913613 2% |
| Marion | Marion County | 1.70117616896 0% | 1.30372889283 7% |
| | Belleview | | 0.00799959225 6% |
| | Dunnellon | | 0.01840079079 5% |
| | McIntosh | | 0.00014525984 4% |
| | Ocala | | 0.36899450409 4% |
| | Reddick | | 0.00010712913 5% |
| Martin | | 0.86948729811 6% | |

| | | | |
|---|---|---|---|
| | Martin County | | 0.75076279578% |
| | Jupiter Island | | 0.02087383946% |
| | Ocean Breeze Park | | 0.00827073293% |
| | Sewall's Point | | 0.00835607255% |
| | Stuart | | 0.08122385767% |
| Miami-Dade | | 5.23211978184173% | |
| | Miami-Dade County | | 4.28279675552% |
| | Aventura | | 0.02461972788 5% |
| | Bal Harbour | | 0.01004108674 7% |
| | Bay Harbor Islands | | 0.00427245517 5% |
| | Biscayne Park | | 0.00113484253 5% |
| | Coral Gables | | 0.07178015213 1% |
| | Cutler Bay | | 0.00941465366 8% |
| | Doral | | 0.01397762853 1% |
| | El Portal | | 0.00092421576 0% |
| | Florida City | | 0.00392927879 2% |
| | Golden Beach | | 0.00284709295 1% |
| | Hialeah | | 0.09801589578 5% |
| | Hialeah Gardens | | 0.00545269141 1% |
| | Homestead | | 0.02493566680 46% |
| | Indian Creek | | 0.00254386302 6% |
| | Key Biscayne | | 0.01368347734 6% |
| | Medley | | 0.00874827413 1% |
| | Miami | | 0.29279300544 8% |
| | Miami Beach | | 0.18140957247 8% |
| | Miami Gardens | | 0.04068360593 2% |
| | Miami Lakes | | 0.00783676860 8% |
| | Miami Shores | | 0.00628793551 6% |
| | Miami Springs | | 0.00616991189 3% |
| | North Bay Village | | 0.00516035597 4% |
| | North Miami | | 0.03037928071 7% |
| | North Miami Beach | | 0.03039199095 3% |
| | Opa-locka | | 0.00784766309 6% |
| | Palmetto Bay | | 0.00740462057 0% |
| | Pinecrest | | 0.00829615286 6% |

|  |  |  |  |
|---|---|---|---|
|  | South Miami |  | 0.0078333137111% |
|  | Sunny Isles Beach |  | 0.0076933245111% |
|  | Surfside |  | 0.0048698836285% |
|  | Sweetwater |  | 0.0041163008042% |
|  | Virginia Gardens |  | 0.0011729733244% |
|  | West Miami |  | 0.0026546236357% |
| Monroe |  | 0.4763887388585% |  |
|  | Monroe County |  | 0.3301247854690% |
|  | Islamorada |  | 0.0223573058080% |
|  | Key Colony Beach |  | 0.0047518126610% |
|  | Key West |  | 0.0880873854170% |
|  | Layton |  | 0.0001507070890% |
|  | Marathon |  | 0.0309167421410% |
| Nassau |  | 0.4769334630002% |  |
|  | Nassau County |  | 0.3927063579510% |
|  | Callahan |  | 0.0002251527590% |
|  | Fernandina Beach |  | 0.0831594451950% |
|  | Hilliard |  | 0.0008425070980% |
| Okaloosa |  | 0.8192128659555% |  |
|  | Okaloosa County |  | 0.6120596175450% |
|  | Cinco Bayou |  | 0.0007335622140% |
|  | Crestview |  | 0.0704401300660% |
|  | Destin |  | 0.0146785072810% |
|  | Fort Walton Beach |  | 0.0778374876440% |
|  | Laurel Hill |  | 0.0000798929140% |
|  | Mary Esther |  | 0.0093565497300% |
|  | Niceville |  | 0.0217453987130% |
|  | Shalimar |  | 0.0018248267960% |
|  | Valparaiso |  | 0.0104568930520% |
| Okeechobee |  | 0.3534952786920% |  |
|  | Okeechobee County |  | 0.3145438514050% |
|  | Okeechobee |  | 0.0389514272870% |
| Orange |  | 4.6710282145460% |  |
|  | Orange County |  | 3.0633303869790% |
|  | Apopka |  | 0.0972151508920% |

| County | City | Value | Value |
|---|---|---|---|
| | Bay Lake | | 0.023566594013% |
| | Belle Isle | | 0.010798253686% |
| | Eatonville | | 0.008325204835% |
| | Edgewood | | 0.009716067845% |
| | Lake Buena Vista | | 0.010355211161% |
| | Maitland | | 0.046728276209% |
| | Oakland | | 0.005429086686% |
| | Ocoee | | 0.066599822928% |
| | Orlando | | 1.160248481490% |
| | Windemere | | 0.007548064667% |
| | Winter Garden | | 0.056264584996% |
| | Winter Park | | 0.104903028159% |
| Osceola | | 1.073452092940% | |
| | Osceola County | | 0.837248691390% |
| | Kissimmee | | 0.162366006872% |
| | St. Cloud | | 0.073837394678% |
| Palm Beach | | 8.601594372053% | |
| | Palm Beach County | | 5.552548475026% |
| | Atlantis | | 0.018751230169% |
| | Belle Glade | | 0.020828445945% |
| | Boca Raton | | 0.472069073961% |
| | Boynton Beach | | 0.306498271771% |
| | Briny Breezes | | 0.003257452012% |
| | Cloud Lake | | 0.000188837798% |
| | Delray Beach | | 0.351846579457% |
| | Glen Ridge | | 0.000052656694% |
| | Golf | | 0.004283349663% |
| | Greenacres | | 0.076424835657% |
| | Gulf Stream | | 0.010671151322% |
| | Haverhill | | 0.001084001589% |
| | Highland Beach | | 0.032510968934% |
| | Hypoluxo | | 0.005153092982% |
| | Juno Beach | | 0.016757538804% |
| | Jupiter Island | | 0.125466374888% |
| | Jupiter Inlet Colony | | 0.005276563849% |

| | | |
|---|---|---|
| | Lake Clarke Shores | 0.0075607749903% |
| | Lake Park | 0.0294332759880% |
| | Lake Worth | 0.1171466172298% |
| | Lantana | 0.0245071515505% |
| | Loxahatchee Groves | 0.0025311527899% |
| | Manalapan | 0.0216328223333% |
| | Mangonia Park | 0.0106965717795% |
| | North Palm Beach | 0.0443494646256% |
| | Ocean Ridge | 0.0127864978077% |
| | Pahokee | 0.0040018250447% |
| | Palm Beach | 0.1854768481233% |
| | Palm Beach Gardens | 0.2336758880257% |
| | Palm Beach Shores | 0.0141355986127% |
| | Palm Springs | 0.0380217642827% |
| | Riviera Beach | 0.1636170572827% |
| | Royal Palm Beach | 0.0492957439599% |
| | South Bay | 0.0018302740040% |
| | South Palm Beach | 0.0058666681967% |
| | Tequesta | 0.0318936145957% |
| | Wellington | 0.0501836447587% |
| | West Palm Beach | 0.5492656025417% |
| Pasco | | 4.6920872604949% |
| | Pasco County | 4.3192052398137% |
| | Dade City | 0.0558197267237% |
| | New Port Richey | 0.1498791074947% |
| | Port Richey | 0.0495299754587% |
| | San Antonio | 0.0021897921557% |
| | St. Leo | 0.0027908004761% |
| | Zephyrhills | 0.1126726140897% |
| Pinellas | | 7.9348898167777% |
| | Pinellas County | 4.5465931845537% |
| | Belleair | 0.0180957451217% |
| | Belleair Beach | 0.0042615606867% |
| | Belleair Bluffs | 0.0075026709657% |
| | Belleair Shore | 0.0004394110297% |

| | | |
|---|---|---|
| | Clearwater | 0.63386312019 6% |
| | Dunedin | 0.102440873796% |
| | Gulfport | 0.047893986460% |
| | Indian Rocks Beach | 0.008953453662% |
| | Indian Shores | 0.011323004874% |
| | Kenneth City | 0.017454786058% |
| | Largo | 0.374192990777% |
| | Madeira Beach | 0.022616957779% |
| | North Reddington Beach | 0.003820333909% |
| | Oldsmar | 0.039421706033% |
| | Pinellas Park | 0.251666311991% |
| | Redington Beach | 0.003611522882% |
| | Redington Shores | 0.006451352841% |
| | Safety Harbor | 0.038061710740% |
| | Seminole | 0.095248695748% |
| | South Pasadena | 0.029968921656% |
| | St. Pete Beach | 0.071910466619% |
| | St. Petersburg | 1.456593090134% |
| | Tarpon Springs | 0.101970595050% |
| | Treasure Island | 0.040652783215% |
| Polk | | 2.150483025298% |
| | Polk County | 1.558049828484% |
| | Auburndale | 0.028636162584% |
| | Bartow | 0.043971970660% |
| | Davenport | 0.005305615818% |
| | Dundee | 0.005597951255% |
| | Eagle Lake | 0.002580177987% |
| | Fort Meade | 0.007702403251% |
| | Frostproof | 0.005857603227% |
| | Haines City | 0.047984773863% |
| | Highland Park | 0.000063551182% |
| | Hillcrest Heights | 0.000005447244% |
| | Lake Alfred | 0.007489960729% |
| | Lake Hamilton | 0.002540231530% |
| | Lakeland | 0.294875668468% |

| County | County % | Place | Percentage |
|---|---|---|---|
| | | Lake Wales | 0.0362931721234% |
| | | Mulberry | 0.0054145607702% |
| | | Polk City | 0.0010803700093% |
| | | Winter Haven | 0.0970335760687% |
| Putnam | 0.3848931940068% | | |
| | | Putnam County | 0.329225990182% |
| | | Crescent City | 0.0055616362994% |
| | | Interlachen | 0.0018774834893% |
| | | Palatka | 0.0469552447163% |
| | | Pomona Park | 0.0003794913443% |
| | | Welaka | 0.0008934980433% |
| Santa Rosa | 0.7012673193513% | | |
| | | Santa Rosa County | 0.5925239842163% |
| | | Gulf Breeze | 0.0619515079063% |
| | | Jay | 0.0001597858293% |
| | | Milton | 0.0466320415623% |
| Sarasota | 2.8050438575793% | | |
| | | Sarasota County | 1.9243152632513% |
| | | Longboat Key | 0.0448945885653% |
| | | North Port | 0.2096117712773% |
| | | Sarasota | 0.4842797963563% |
| | | Venice | 0.1423473845603% |
| Seminole | 2.1411482644543% | | |
| | | Seminole County | 1.5086941644393% |
| | | Altamonte Springs | 0.0813055664303% |
| | | Casselberry | 0.0800345427913% |
| | | Lake Mary | 0.0797676278273% |
| | | Longwood | 0.0617100134153% |
| | | Oviedo | 0.1031308580573% |
| | | Sanford | 0.1642434903623% |
| | | Winter Springs | 0.0622620008243% |
| St. Johns | 0.7103333495543% | | |
| | | St. Johns County | 0.6563348181313% |
| | | Hastings | 0.0000108944883% |
| | | Marineland | 0.0000000000003% |

| | | | |
|---|---|---|---|
| | St. Augustine | | 0.0465103864420% |
| | St. Augustine Beach | | 0.0074772504930% |
| St. Lucie | | 1.5066278435520% | |
| | St. Lucie County | | 0.9561565843020% |
| | Fort Pierce | | 0.1595352556540% |
| | Port St. Lucie | | 0.3908034539890% |
| | St. Lucie Village | | 0.0001325496080% |
| Sumter | | 0.3263988704590% | |
| | Sumter County | | 0.3022730260460% |
| | Bushnell | | 0.0066075071740% |
| | Center Hill | | 0.0013127858440% |
| | Coleman | | 0.0007480881990% |
| | Webster | | 0.0014235464760% |
| | Wildwood | | 0.0140339167210% |
| Suwannee | | 0.1910148796920% | |
| | Suwannee County | | 0.1610278005550% |
| | Branford | | 0.0009296630040% |
| | Live Oak | | 0.0290574161320% |
| Taylor | | 0.0921818972820% | |
| | Taylor County | | 0.0699698513190% |
| | Perry | | 0.0222120459630% |
| Union | | 0.0651563032240% | |
| | Union County | | 0.0636292591090% |
| | Lake Butler | | 0.0013981260030% |
| | Raiford | | 0.0000171023600% |
| | Worthington Springs | | 0.0001162078760% |
| Volusia | | 3.1303296744800% | |
| | Volusia County | | 1.7085753422870% |
| | Daytona Beach | | 0.4475564752120% |
| | Daytona Beach Shores | | 0.0397430934390% |
| | DeBary | | 0.0352836162150% |
| | DeLand | | 0.0989836894980% |
| | Deltona | | 0.1993291900380% |
| | Edgewater | | 0.0580422024340% |
| | Flagler Beach | | 0.0002233370110% |

| | | | |
|---|---|---|---|
| | Holly Hill | | 0.0316158051435% |
| | Lake Helen | | 0.0049188614825% |
| | New Smyrna Beach | | 0.1040659683065% |
| | Oak Hill | | 0.0048208110875% |
| | Orange City | | 0.0335622870585% |
| | Ormond Beach | | 0.1146445164775% |
| | Pierson | | 0.0023333262515% |
| | Ponce Inlet | | 0.0238135357485% |
| | Port Orange | | 0.1775965015625% |
| | South Daytona | | 0.0452212053235% |
| Wakulla | | 0.1151293212085% | |
| | Wakulla County | | 0.1149531936475% |
| | Sopchoppy | | 0.0001071291355% |
| | St. Marks | | 0.0006899984265% |
| Walton | | 0.2685582161515% | |
| | Walton County | | 0.2242684895815% |
| | DeFuniak Springs | | 0.0170571372345% |
| | Freeport | | 0.0032901354775% |
| | Paxton | | 0.0239424538605% |
| Washington | | 0.1201244441095% | |
| | Washington County | | 0.1049084754045% |
| | Caryville | | 0.0014017574995% |
| | Chipley | | 0.0125504505605% |
| | Ebro | | 0.0002215212635% |
| | Vernon | | 0.0003613338635% |
| | Wausau | | 0.0006809055215% |
| | | 100.00% | 100.00% |



<u>**EXHIBIT J**</u>
*draft*

# ESCROW AGREEMENT

This Escrow Agreement dated this ___ day of _____, 2022 (the "**Escrow Agreement**"), is entered into by and among <u>STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL – DEPARTMENT OF LEGAL AFFAIRS</u>, a <u>GOVERNMENT ENTITY LOCATED IN THE UNITED STATES</u> ("**State")**, and Wilmington Trust, National Association, as escrow agent ("**Escrow Agent**").

## RECITALS

**WHEREAS**, the people of the State and its communities allege that they have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain with respect to the manufacture, distribution, and dispensing of opioid products; and

**WHEREAS**, the State, through its Attorney General, and certain counties, cities, towns, and other municipalities, through their elected representatives and counsel, are separately engaged in litigation against many of the same Pharmaceutical Supply Chain Participants in connection with the manufacture, distribution, and dispensing of opioid products (collectively referred to as the "**Litigation**"); and

**WHEREAS**, certain of the Pharmaceutical Supply Chain entities have separately settled or may separately settle with the State (collectively referred to as the "**Settlements**" or individually as a "**Settlement**") conditioned on obtaining joinder and participation in those settlements from the certain of the State's counties, cities, towns, and other municipalities (collectively referred to as the "**Local Governments**"); and

**WHEREAS**, the State and its Local Governments have entered into an agreement entitled the Florida Opioid Allocation and Statewide Response Agreement (the "**Agreement**") under which the State and its Local Governments have agreed to the allocation and distribution from the Settlements relating to the Litigation; and

**WHEREAS**, it is necessary for the State to enter into this Escrow Agreement with the Escrow Agent to allow for the distribution of proceeds from each of the Settlements to the Local Governments and the State pursuant to the Agreement; and

**WHEREAS**, the State seeks to establish this account as a Qualified Settlement Fund as that term is utilized in section 468B of the Internal Revenue Code of 1986, as amended, and Treasury Regulation Sections 26 C.F.R. §1.468B-1 et seq.; and

**WHEREAS**, the State has sought and received an order from the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division New Port Richey, Florida (the "Court") ordering the creation of this account and approving the form of this Escrow Agreement and the State is subject to continuing jurisdiction by the Court; and

**WHEREAS**, the State is establishing this account to resolve or satisfy one or more contested claims with respect to the manufacture, distribution, and dispensing of opioid products against Pharmaceutical Supply Chain Participants who have settled their claims against the State and/or Local Governments arising out of alleged tortious conduct and/or violations of law; and

**WHEREAS**, the funds placed in the account are segregated from other funds and assets belonging to the State; and

1

**NOW, THEREFORE,** in consideration of the premises, and further consideration of the covenants set forth hereafter, it is hereby agreed mutually as follows:

# ARTICLE 1
# ESCROW DEPOSIT

1.1.   Receipt of Escrow Property.

(a)    Upon execution of this Escrow Agreement by each of the parties hereto, the State shall cause funds from a Settlement in the amount of **$194,826,499** to be deposited into a United States Dollar denominated account (the "**Escrow Account**") established by the Escrow Agent.  The Escrow Account is set forth below:

> Manufacturers & Traders Trust Co.
> ABA# 031100092
> A/C# 155084-000
> A/C Name: Florida Opioid Settlement Fund Teva
> Attn: Global Capital Markets

(b)    The Escrow Agent will hold the deposit and any subsequent deposits in the Escrow Account, together with all investments thereof and all interest accumulated thereon and proceeds therefrom (the "**Escrow Property**"), in escrow upon the terms and conditions set forth in this Escrow Agreement and shall not disburse funds from the Escrow Account except as provided herein.

(c)    The State may further request that Escrow Property in the Teva Account be further subdivided into  sub-accounts within the Teva Account in accordance with the State's settlement agreement with Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Actavis, LLC, and Actavis Pharma, Inc. (the "Teva Agreement").  The State shall provide directions prior to or soon after deposit on how Escrow Property shall be subdivided. The State may adjust or transfer Escrow Property between sub-accounts within the Teva Account after receipt consistent with the terms of the Teva Agreement.  Based on the Teva Agreement it is expected that the Teva Account may be divided into five sub-accounts: (1) a State sub-account; (2) a city/county or subdivision sub-account; (3) an abatement sub-account; (4) a State attorney's fees and costs sub-account; and (5) a Local Government attorney's fee and costs sub-account.

1.2.   Investments.

(a)    The Escrow Agent shall invest the Escrow Property in accordance with the written instructions provided to the Escrow Agent and signed by the State in such investments (i) as shall from time to time be selected by the State and (ii) be investments the Escrow Agent is able to hold.  In all events, the proceeds shall be managed in a manner designed to preserve principal and accrue income by investing in instruments/securities comprised of (a) United States Agency, Government Sponsored Enterprises or Treasury securities or obligations (or a mutual fund invested solely in such instruments); (b) cash equivalent securities including SEC registered money market funds and collateralized money market accounts; and/or (c) deposit and similar interest-bearing, or non-interest bearing accounts, and certificates of deposit subject to Federal Depository Insurance Corporation protections as available.  In the absence of written investment instructions from the State, the Escrow Agent shall hold the Escrow Property un-invested, without interest thereon.  For the avoidance of doubt, any investment earnings and income on the Escrow Property shall become part of the Escrow Property, and shall be disbursed in accordance with Section 1.3 below. The Escrow Agent shall make no disbursement, investment or other use of funds until and unless it has collected

2

funds. The Escrow Agent shall not be liable for collection items until such proceeds have been received or the Federal Reserve has given the Escrow Agent credit for the funds.

(b)    The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement.  The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement.  The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account.  The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

(c)    In the event that market conditions are such that negative interest applies to amounts deposited with the Escrow Agent, the State shall be responsible for the payment of such interest and the Escrow Agent shall be entitled to deduct from amounts on deposit with it an amount necessary to pay such negative interest. For the avoidance of doubt, the indemnification protections afforded to the Escrow Agent under Section 3.1 of this Agreement shall cover any interest-related expenses (including, but not limited to, negative interest) incurred by the Escrow Agent in the performance of its duties hereunder.

1.3.    <u>Disbursements</u>.

(a)    <u>The State shall provide direction to Escrow Agent of any disbursement of Escrow Property and all directions shall be in writing (a "**Written Direction**" and as used herein, the term "**Written Direction**" may refer, variably, to a writing substantially in the form of either Exhibit "A-1" or Exhibit "A-2," as the context may require). It is expected that disbursements of Escrow Property will happen periodically depending on the terms of the Settlements. It is expected that at least two disbursements will be made in the first calendar year of the Escrow Agreement.</u>

(b)    In the event that Escrow Agent makes any payment to any other party pursuant to this Escrow Agreement and for any reason such payment (or any portion thereof) is required to be returned to the Escrow Account or another party or is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a receiver, trustee or other party under any bankruptcy or insolvency law, other federal or state law, common law or equitable doctrine, then the recipient shall repay to the Escrow Agent upon written request the amount so paid to it.

(c)    The Escrow Agent shall, in its sole discretion, comply with judgments or orders issued or process entered by any court with respect to the Escrow Property, including without limitation any attachment, levy or garnishment, without any obligation to determine such court's jurisdiction in the matter and in accordance with its normal business practices.  If the Escrow Agent complies with any such judgment, order or process, then Escrow Agent shall not be liable to the State or any other person by reason of such compliance, regardless of the final disposition of any such judgment, order or process.

(d)    The State understands and agrees that the Escrow Agent shall have no obligation or duty to act upon a Written Direction delivered to the Escrow Agent for the disbursement of Escrow Property under this Escrow Agreement if such Written Direction is not (i) in writing, (ii) signed by, in the case of the State, any individual designated by the State on <u>Exhibit B</u> hereto (each such individual an "**Authorized Representative**"), and (iii) delivered to, and able to be authenticated by, the Escrow Agent in accordance with Section 1.5.

(e)     Upon request, the Escrow Agent will furnish monthly statements to the State setting forth the activity in the Escrow Account.  Upon request by the State, the Escrow Agent will furnish monthly statements to Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Actavis, LLC, and Actavis Pharma, Inc. setting forth the activity in the Teva Account (including all constituent sub-accounts of the Teva Account). the Escrow Agent will furnish monthly statements to that Pharmaceutical Supply Chain Participant setting forth the activity in that Pharmaceutical Supply Chain Participant's Sub-Fund (including all constituent sub-funds of that Sub-Fund) within the Escrow Account.

(f)     The State may specify in a Written Direction whether the Escrow Property shall be disbursed by way of wire transfer or check.  If the written notice for the disbursement of funds does not so specify the disbursement means, the Escrow Agent may disburse the Escrow Property by any means chosen by the Escrow Agent.

## 1.4.   Written Direction and Other Instruction.

(a)     With respect to any Written Direction or any other notice, direction or other instruction required to be delivered by the State to the Escrow Agent under this Escrow Agreement, the Escrow Agent is authorized to follow and rely upon any and all such instructions given to it from time to time if the Escrow Agent believes, in good faith, that such instruction is genuine and to have been signed by an Authorized Representative of the State.  The Escrow Agent shall have no duty or obligation to verify that the person who sent such instruction is, in fact, a person duly authorized to give instructions on behalf of the State, other than to verify that the signature of the Authorized Representative on any such instruction appears to be the signature of such person  The State acknowledges and agrees that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Escrow Agent, and that there may be more secure methods of transmitting instructions other than the method selected by the State. The Escrow Agent shall have no responsibility or liability for any loss which may result from:

(i)  any action taken or not taken by the Escrow Agent in good faith reliance on any such signatures, telephonic and email confirmations or instructions;

(ii)  the State's reliance upon or use of any particular method of delivering instructions to the Escrow Agent, including the risk of interception of such instruction and misuse by third parties; or

(iii) any officer or Authorized Representative named in an incumbency certificate or Exhibit B delivered hereunder prior to actual receipt by the Escrow Agent of a more current incumbency certificate or an updated Exhibit B and a reasonable time for the Escrow Agent to act upon such updated or more current certificate or Exhibit.

(b)     The State may, at any time, update Exhibit B by signing and submitting to the Escrow Agent an updated Exhibit.  An updated Exhibit B shall constitute a Written Direction that is subject to the authentication and security requirements set forth in Section 1.5 below.  Any updated Exhibit shall not be effective unless the Escrow Agent countersigns a copy thereof.  The Escrow Agent shall be entitled to a reasonable time to act to implement any changes on an updated Exhibit.

## 1.5.   Delivery and Authentication of Written Direction.

(a)     A Written Direction must be delivered to the Escrow Agent by one of the delivery methods set forth in Section 4.3.

(b)     The State and the Escrow Agent hereby agree that the following security procedures will be used to verify the authenticity of a Written Direction delivered by the State to the Escrow Agent under this Escrow Agreement:

(i)    The Written Direction must include the name and signature of the person delivering the disbursement request to the Escrow Agent.  The Escrow Agent will check that the name and signature of the person identified on the Written Direction appears to be the same as the name and signature of an Authorized Representative;

(ii)   The Escrow Agent will make a telephone call to the Authorized Representative purporting to deliver the Written Direction (which Authorized Representative shall be the same as the Authorized Representative who delivered the Written Direction) at any telephone number for such Authorized Representative as set forth on Exhibit B, as applicable, to obtain oral confirmation of delivery of the Written Direction; and

(iii)  If the Written Direction is sent by email to the Escrow Agent, the Escrow Agent also shall review such email address to verify that it appears to have been sent from an email address for an Authorized Representative as set forth on Exhibit B, or from an email address for a person authorized under Exhibit B, to email a Written Direction to the Escrow Agent on behalf of the Authorized Representative).

(c)     The State acknowledges and agrees that given its particular circumstances, including the nature of its business, the size, type and frequency of its instructions, transactions and files, internal procedures and systems, the alternative security procedures offered by the Escrow Agent and the security procedures in general use by other customers and banks similarly situated, the security procedures set forth in this Section 1.5 are a commercially reasonable method of verifying the authenticity of a payment order in a Written Direction.

(d)     The Escrow Agent is authorized to execute and the State expressly agrees to be bound by any payment order in a Written Direction issued in its name (and associated funds transfer) (i) that is accepted by the Escrow Agent in accordance with the security procedures set forth in this Section 1.5, whether or not authorized by the State and/or (ii) that is authorized by or on behalf of the State or for which the State is otherwise bound under the law of agency, whether or not the security procedures set forth in this Section 1.5 were followed, and to debit the Escrow Account for the amount of the payment order. Notwithstanding anything else, the Escrow Agent shall be deemed to have acted in good faith and without negligence, gross negligence or misconduct if the Escrow Agent is authorized to execute the payment order under this Section 1.5.  Any action taken by the Escrow Agent pursuant to this Section 1.5 prior to the Escrow Agent's actual receipt and acknowledgement of a notice of revocation, cancellation or amendment of a Written Direction shall not be affected by such notice of revocation, cancellation or amendment of a Written Direction.

(e)     The security procedures set forth in this Section 1.5 are intended to verify the authenticity of payment orders provided to the Escrow Agent and are not designed to, and do not, detect errors in the transmission or content of any payment order.  The Escrow Agent is not responsible for detecting an error in the payment order, regardless of whether the State believes the error was apparent, and the Escrow Agent is not liable for any losses arising from any failure to detect an error.

(f)     When instructed to credit or pay a party by both name and a unique numeric or alpha-numeric identifier (e.g. ABA number or account number), the Escrow Agent, and any other banks participating in the funds transfer, may rely solely on the unique identifier, even if it identifies a party

different than the party named. The State agrees to be bound by the rules of any funds transfer network used in connection with any payment order accepted by the Escrow Agent hereunder.

(g)     The Escrow Agent shall not be obliged to make any payment requested under this Escrow Agreement if it is unable to validate the authenticity of the request by the security procedures set forth in this Section 1.5.  The Escrow Agent's inability to confirm a payment order may result in a delay or failure to act on that payment order. Notwithstanding anything else in this Escrow Agreement, the Escrow Agent shall not be required to treat a payment order as having been received until the Escrow Agent has authenticated it pursuant to the security procedures in this Section 1.5 and shall not be liable or responsible for any losses arising in relation to such delay or failure to act.

1.6.    <u>Income Tax Allocation and Reporting</u>.

(a)     The Escrow Account shall be treated at all times as a "Qualified Settlement Fund" within the meaning of Treas. Reg. § 1.468B-1.  The State and Escrow Agent, in cooperation with settling Pharmaceutical Supply Chain Participants shall jointly and timely take such actions as necessary or advisable to qualify the Escrow Account as a "Qualified Settlement Fund" within the meaning of Treas. Reg. § 1.468B-1 and fulfill the requirements of such Treasury Regulation, including making a "relation-back election" under Treas. Reg. § 1.468B-1(j)(2), if applicable, to the earliest permitted date.  If applicable, Settlement Fund Administrator (as defined below) will prepare, or cause to have prepared, the "relation-back election" pursuant to Treas. Reg. § 1.468B-1(j)(2) for execution by the relevant settling Pharmaceutical Supply Chain Participants and the State and attach to it the Escrow Account's first income tax return.  For purposes of § 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" of the Escrow Account shall be Wilmington Trust National Association as the settlement fund administrator (the "Settlement Fund Administrator") and Settlement Fund Administrator shall take all actions to ensure that the Settlement Fund Administrator qualifies as such. Settlement Fund Administrator shall timely and properly prepare, deliver to all necessary parties for signature, and file all necessary documentation for any elections required or advisable under Treas. Reg. §1.468B-1.  Settlement Fund Administrator will obtain an employer identification number for the Escrow Account and timely prepare, or cause to have prepared, a "Regulation Section 1.468B-3 Statement" pursuant to Treas. Reg. §1.468B-3(e) on behalf of the settling Pharmaceutical Supply Chain Participants and provide copies to each settling Pharmaceutical Supply Chain Participant's counsel for review and approval. Settlement Fund Administrator shall timely and properly prepare and file any informational and other tax returns (including state, local or foreign) necessary or advisable with respect to the Escrow Account and the distributions and payments therefrom including without limitation the returns described in Treas. Reg. §1.468B-2(k), and to the extent applicable Treas. Reg. §1.468B-2(1).

(b)     Prior to the execution of this Escrow Agreement, or within two days thereafter, the State shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request.   The State understands that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

(c)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property.  Settlement Fund Administrator shall be responsible for the timely and proper preparation and delivery of any necessary documentation for signature by all necessary parties, and the timely filing of all tax returns and other tax reports required by law.  No settling

6

Pharmaceutical Supply Chain Participant nor their respective counsel shall have any liability or responsibility for taxes or tax expenses, for preparing (or paying for others to prepare) tax returns, tax reports, or calculation of any tax payments, or for obtaining or maintaining the tax status desired for the Escrow Account. If any portion of the Escrow Account is returned to a settling Pharmaceutical Supply Chain Participant pursuant to the terms of a Settlement, that settling Pharmaceutical Supply Chain Participant shall provide Escrow Agent with a properly completed IRS Form W-9.

1.7.     Termination. This Escrow Agreement shall terminate on December 31, 2039, at which time the Escrow Agent is authorized and directed to disburse the Escrow Property in accordance with Section 1.3 (Disbursements) and this Escrow Agreement shall be of no further force and effect, except that the provisions of Sections 1.6 (Tax Allocation and Reporting), and 3.2 (Limitation of Liability) hereof shall survive termination.

# ARTICLE 2
# DUTIES OF THE ESCROW AGENT

2.1.     Scope of Responsibility. Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties expressly and specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature. Under no circumstances will the Escrow Agent be deemed to be a fiduciary to the State or any other person under this Escrow Agreement or otherwise. The Escrow Agent will not be responsible or liable for the failure of the State to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document. References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the parties and the Escrow Agent has no duties or obligations with respect thereto. The Escrow Agent acts hereunder as escrow agent only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof. The Escrow Agent shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of the Escrow Property, written instructions, or any other documents in connection therewith, and will not be regarded as making nor be required to make, any representations thereto. This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement, any other agreement or otherwise.
All rights, protections, privileges, indemnities and benefits granted or afforded the Escrow Agent under this Agreement shall be deemed applicable to all actions taken, suffered or omitted by the Settlement Fund Administrator under this Agreement. Additionally, information provided to Wilmington Trust in its capacity as Escrow Agent will not be imputed to be known by the Settlement Fund Administrator unless Wilmington Trust in that capacity has been made aware of such information as well.

2.2.     Rights of the Escrow Agent. No provision of this Escrow Agreement shall require the Escrow Agent to expend or risk its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement. The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with

this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.  The Escrow Agent shall be protected in acting upon any written instruction, notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which the Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of this Escrow Agreement and items amending the terms of this Escrow Agreement, provided that the Escrow Agent complies with the security procedures governing written instructions set forth in Section 1.5 above.

2.3.  Attorneys and Agents.  The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by the Escrow Agent.  The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees and shall not be responsible for the acts or omissions of such agents, representatives, attorneys, custodians or nominees appointed with due care.

2.4.  Right Not Duty Undertaken.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

# ARTICLE 3
## PROVISIONS CONCERNING THE ESCROW AGENT

3.1.  Indemnification.  The Escrow Agent shall have a first lien against the Escrow Account to secure the obligations of the parties hereunder.  The terms of this paragraph shall survive termination of this Escrow Agreement.

3.2.  Limitation of Liability.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF OR IN CONNECTION WITH THIS ESCROW AGREEMENT, THE ESCROW ACCOUNT, THE ESCROW PROPERTY, OR THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S NEGLIGENCE, OR WILLFUL MISCONDUCT, (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, OR (III) ANY AMOUNT IN EXCESS OF THE VALUE OF THE ESCROW PROPERTY.

3.3.  Resignation or Removal.  The Escrow Agent may, at any time, resign as escrow agent hereunder by furnishing written notice of its resignation to the State. At such time, all fees and expenses to which the Escrow Agent is entitled shall be immediately due and payable to Escrow Agent. The State may remove the Escrow Agent by furnishing to the Escrow Agent a written notice of its removal along with payment of all fees and expenses to which it is entitled through the date of termination.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the State, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If

the State has failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, the Escrow Agent shall be entitled, at its sole discretion and at the expense of State, to petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the State.

3.4.    <u>Compensation</u>. (a) The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as <u>Exhibit C</u>, which compensation shall be paid by the State.  Such compensation is intended for the Escrow Agent's services as contemplated by this Escrow Agreement. In addition to such compensation, in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, then the Escrow Agent shall be compensated for such extraordinary services and any services or work performed by Escrow Agent in connection with any delay, controversy, and reimbursed for all costs and expenses.

The terms of this Section 3.4 shall survive termination of this Escrow Agreement.

3.5.    <u>Disagreements</u>.  If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, refuse to act until the Escrow Agent (a) receives a final non-appealable order of a court of competent jurisdiction directing delivery of the Escrow Property or (b) receives a written instruction, executed by each of the parties involved in such disagreement or dispute, in a form reasonably acceptable to the Escrow Agent, directing delivery of the Escrow Property.  The Escrow Agent will be entitled to act on any such written instruction or final, non-appealable order of a court of competent jurisdiction without further question, inquiry or consent.  The Escrow Agent may file an interpleader action in a state or federal court, and upon the filing thereof, the Escrow Agent will be relieved of all liability as to the Escrow Property and will be entitled to recover reasonable and documented out-of-pocket attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. In the event the Escrow Agent receives conflicting instructions hereunder, the Escrow Agent shall be fully protected in refraining from acting until such conflict is resolved to the satisfaction of the Escrow Agent.

3.6.    <u>Merger or Consolidation</u>.  Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

3.7.    <u>Attachment of Escrow Property; Compliance with Legal Orders</u>.  In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction.  In the event that the Escrow Agent obeys or complies with any such writ, order or

decree it shall not be liable to the State or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

3.8.  Force Majeure.  The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions; loss or malfunctions of utilities including but not limited to, computer (hardware or software), payment systems, or communications services; hacking, cyber-attacks or other unauthorized infiltration of Escrow Agent's information technology infrastructure; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

3.9.  Compliance with Legal Orders.  The Escrow Agent shall be entitled to consult with legal counsel in the event that a question or dispute arises with regard to the construction of any of the provisions hereof, and shall incur no liability to the State premised on the contention that the Escrow Agent should not have sought or relied on the advice of counsel.

3.10.  No Financial Obligation.  The Escrow Agent shall not be required to use its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Escrow Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security which it deems, in its sole and absolute discretion, to be satisfactory.

# ARTICLE 4
# MISCELLANEOUS

4.1.  Successors and Assigns.  This Escrow Agreement shall be binding on and inure to the benefit of the State and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of any of the State and the Escrow Agent shall be binding unless and until written notice of such assignment shall be delivered to the other party and the Escrow Agent and shall require the prior written consent of the other party and the Escrow Agent (such consent not to be unreasonably withheld).

4.2.  Escheat.  The State is aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  The Escrow Agent shall have no liability to the State or any other party, should any or all of the Escrow Property escheat by operation of law.

4.3.  Notices.  All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by overnight delivery with a reputable national overnight delivery service, (iv) by mail or by certified mail, return receipt requested, and postage prepaid, or (v) by electronic transmission; including by way of e-mail (as long as such email is accompanied by a PDF or similar version of the relevant document bearing the signature of an Authorized Representative for the party sending the notice) with email confirmation of receipt.  If any notice is mailed, it shall be deemed given five business days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of the State to notify the Escrow Agent in writing of any name or

address changes.  In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to the State:

STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Attention:  John Guard, Chief Deputy Attorney General
Telephone: (850) 544-8303
Facsimile:
Email address: john.guard@myfloridalegal.com

With a copy to:
STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Attention:  Sabrina Donovan, Director of Administration
Telephone: (850) 414-3535
Facsimile:
Email address: Sabrina.donovan@myfloridalegal.com

And a copy to:
STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Attention:  Greg Slemp, Senior Assistant Attorney General
Telephone: (850) 414-3300
Facsimile:
Email address: greg.slemp@myfloridalegal.com

And a copy to:

Drake Martin
Drake Martin Law Firm
PO Box 4787
Santa Rosa Beach, FL 32459-4787
Telephone: (850) 608-3140
Facsimile:
Email address: drake@drakemartinlawfirm.com

And a copy to:

Eric W. Sitarchuk
Rebecca J. Hillyer
Morgan Lewis & Bockius, LLP
Telephone: (215) 963-5840
Email address: eric.sitarchuk@morganlewis.com; rebecca.hillyer@morganlewis.com
*Attorneys for Teva*

11

If to the Escrow Agent:

Wilmington Trust, National Association
Corporate Client Services
1100 N. Market Street
Wilmington, DE  19890
Attn: Beth Andrews
Telephone: (302) 636-6680
Email address:  bandrews@wilmingtontrust.com

4.4.    Governing Law.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to any laws relating to choice of laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

4.5.    Venue.   The State and the Escrow Agent hereby consent to the exclusive personal jurisdiction of the courts located in **New Castle County in the State of Delaware** in the event of a dispute arising out of or under this Escrow Agreement.  The State and the Escrow Agent hereby irrevocably waives any objection to the laying of the venue of any suit, action or proceeding and irrevocably submits to the exclusive jurisdiction of such court in such suit, action or proceeding.

4.6.    Entire Agreement.  This Escrow Agreement and the exhibits hereto set forth the entire agreement and understanding of the parties related to the Escrow Property and supersedes all prior agreements and understandings, oral or written.  If a court of competent jurisdiction declares a provision invalid, it will be ineffective only to the extent of the invalidity, so that the remainder of the provision and Escrow Agreement will continue in full force and effect.   In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the Agreement, as with respect to the rights of the State and the Local Governments, the terms of the Agreement shall control and prevail; provided, in no event shall the Escrow Agent be bound by the terms of the Agreement.  This Escrow Agreement is not intended to confer upon any person other than the parties hereto any rights or remedies.

4.7.    Amendment.  This Escrow Agreement may be amended, modified, supplemented, superseded, rescinded, or canceled only by a written instrument executed by the State and the Escrow Agent; provided that Exhibit B, as applicable, may be amended at any time in accordance with Section 1.4.

4.8.    Waivers.  The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

4.9.    Interpretation.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement. Unless otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Any references to an Exhibit is a reference to an Exhibit of this Escrow Agreement.

4.10.    Electronic Signatures; Facsimile Signatures; Counterparts.  This Escrow Agreement may be executed in one or more counterparts.  Such execution of counterparts may occur by manual signature, electronic signature, facsimile signature, manual signature transmitted by means of facsimile transmission or manual signature contained in an imaged document attached to an email transmission, and any such execution that is not by manual signature shall have the same legal effect, validity and enforceability as a manual signature.  Each such counterpart executed in accordance with the foregoing shall be deemed an original, with all such counterparts together constituting one and the same instrument.  The exchange of executed copies of this Escrow Agreement or of executed signature pages to this Escrow Agreement by electronic transmission, facsimile transmission or as an imaged document attached to an email transmission shall constitute effective execution and delivery hereof. Any copy of this Escrow Agreement which is fully executed and transmitted in accordance with the terms hereof may be used for all purposes in lieu of a manually executed copy of this Escrow Agreement and shall have the same legal effect, validity and enforceability as if executed by manual signature.

4.11.    Waiver of Jury Trial. **THE STATE HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN RESOLVING ANY CLAIM OR COUNTERCLAIM RELATING TO OR ARISING OUT OF THIS ESCROW AGREEMENT.**

[The remainder of this page left intentionally blank.]

      IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

STATE

By: _____
Name:
Title:
Date:


WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Escrow Agent

By: _____
Name:
Title:
Date:



**EXHIBIT A-1**
**Form of Written Direction**

**VIA [DELIVERY METHOD]:**

[date]

Wilmington Trust, National Association
[Corporate Client Services
1100 N. Market Street
Wilmington, DE 19890]
Attention: [name]

**Re: Escrow Account No.: [##], [escrow account name]**

Ladies and Gentlemen:

Reference is made to the Escrow Agreement, dated as of _____, 20__ entered into by and among STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL- DEPARTMENT OF LEGAL AFFAIRS ("**State**"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, as escrow agent (the "**Escrow Agent**"). Capitalized terms defined in the Escrow Agreement shall have the same meanings when used herein. This letter is a Written Direction referred to in Section 1.3(a) of the Escrow Agreement.

The State of Florida, Office of Attorney General- Department of Legal A hereby instructs the Escrow Agent to release the funds in the Escrow Account in the amounts, and to the account(s), as follows:

| | |
|---|---|
| Amount: | |
| Beneficiary Bank Name: | |
| Beneficiary Bank Address Line 1: | |
| Beneficiary Bank Address Line 2: | |
| Beneficiary Bank Address Line 3: | |
| ABA#: | |
| SWIFT#: | |
| Beneficiary Account Title: | |
| Beneficiary Account No./IBAN: | |
| Beneficiary Address Line 1: | |
| Beneficiary Address | |



| Line 2: | |
|---|---|
| Beneficiary Address Line 3: | |
| Additional Information: | |

**STATE OF FLORIDA**
**OFFICE OF ATTORNEY GENERAL**
**DEPARTMENT OF LEGAL AFFAIRS**


By: _____

Name:

Title:

Date:

16



**EXHIBIT A-2**
**Form of Written Direction**

**VIA [DELIVERY METHOD]:**


[date]


Wilmington Trust, National Association
[Corporate Client Services
1100 N. Market Street
Wilmington, DE  19890]
Attention: [name]

**Re:  Escrow Account No.:  [##],  [escrow account name]**

Ladies and Gentlemen:

Reference is made to the Escrow Agreement, dated as of _____, 20__ entered into by and among STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL- DEPARTMENT OF LEGAL AFFAIRS ("**State**"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, as escrow agent (the "**Escrow Agent**").  Capitalized terms defined in the Escrow Agreement shall have the same meanings when used herein. This letter is a Written Direction referred to in Section 1.3(a) of the Escrow Agreement.

The State of Florida, Office of Attorney General- Department of Legal Affairs hereby instructs the Escrow Agent to release the funds in the Escrow Account in the amounts, and to the account(s), according to the attached spreadsheet.

**STATE OF FLORIDA**
**OFFICE OF ATTORNEY GENERAL**
**DEPARTMENT OF LEGAL AFFAIRS**


By: _____
Name:
Title:
Date:


17



**[SEE ATTACHED]**



**EXHIBIT B**

**CERTIFICATE AS TO AUTHORIZED SIGNATURES
OF THE STATE**

The State hereby designates each of the following persons as its Authorized Representative for purposes of this Escrow Agreement, and confirms that the title, contact information and specimen signature of each such person as set forth below is true and correct.  Each such Authorized Representative is authorized to initiate and approve transactions of all types for the Escrow Account established under this Escrow Agreement to which this <u>Exhibit B</u> is attached, on behalf of the State.

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):<br>*If more than one, list all* | Office:<br>Cell:<br>Home:<br>Other: |
| **E-mail** (required):<br>*If more than one, list all* | Email 1:<br>Email 2: |
| **Facsimile:** | |

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):<br>*If more than one, list all* | Office:<br>Cell:<br>Home:<br>Other: |
| **E-mail** (required):<br>*If more than one, list all* | Email 1:<br>Email 2: |
| **Facsimile:** | |

| | |
|---|---|
| **Name** (print): | |
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required):<br>*If more than one, list all* | Office:<br>Cell:<br>Home:<br>Other: |



| **E-mail** (required): | Email 1: |
|---|---|
| *If more than one, list all* | Email 2: |
| **Facsimile:** | |

---

**COMPLETE BELOW TO UPDATE <u>EXHIBIT B</u>**

If the State wishes to change the names or details of any of its Authorized Representatives, the State must complete, sign and send to Escrow Agent an updated copy of this <u>Exhibit B-1</u> with such changes.  Any updated <u>Exhibit B</u> shall be effective once signed by the State and Escrow Agent and shall entirely supersede and replace any prior <u>Exhibit B</u> attached to this Escrow Agreement or submitted to Escrow Agent.

**STATE**

By:_____

Name:

Title:

Date:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By:_____

Name:

Title:

Date:

---

*Internal Use Only:*

☐  Updated details of Authorized Representatives completed in full

☐  Signed by a representative of the State per relevant board resolutions/certificate of incumbency on file (if relevant).

☐  Call-back performed to the State to confirm authenticity of updated <u>Exhibit B</u>:

Person Called:_____  Date of Call:_____  Time of Call:____am/pm

Reviewed by (name):_____Signature:_____Date:_____



## <u>EXHIBIT C</u>

### Fees of Escrow Agent

**<u>Acceptance Fee:</u>**                                                                                    **waived**

Initial Fees as they relate to Wilmington Trust, N.A. acting in the capacity of Escrow Agent – includes review of the Escrow Agreement; acceptance of the Escrow appointment; setting up of Escrow Account(s) and accounting records; and coordination of receipt of funds for deposit to the Escrow Account(s). **Acceptance Fee payable prior to, or within one business day after, the Escrow Agreement is executed by all parties.**


**<u>Escrow Agent Administration Fee:</u>**                                                   **$10,000.00**

For ordinary administrative services by Escrow Agent – includes daily routine account management; investment transactions; cash transaction processing (including wire and check processing); monitoring claim notices pursuant to the agreement; disbursement of funds in accordance with the agreement; and mailing of trust account statements to all applicable parties.  This fee shall be payable annually**.**

**Disbursement Fee:**

| | |
|---|---|
| Initial disbursement by wire: | $100/disbursement |
| Initial disbursement by check: | $75/disbursement |
| For each subsequent disbursement to an existing payee: | $40/disbursement |




***Wilmington Trust, N.A.'s fees are based on the following assumptions:***

- Number of Escrow Accounts to be established: One (1)
- Estimated Term of Escrow Agreement: TBD
- Investment of Escrow Property in: TBD


**<u>Out-of-Pocket Expenses:</u>**                                                         **Billed At Cost**

**EXHIBIT K**

**State Plan for Acceptance and Delivery of Settlement Product**

**Orders to TEVA USA**

The Office of the Attorney General, on behalf of the State, shall have the right to place periodic orders, not to exceed four (4) quarterly orders per year, to Teva USA for fulfillment of Settlement Product over a period of ten (10) years from the Effective Date of the Release, subject to Teva's good faith and reasonable efforts to meet the logistical requirements necessary to commence manufacturing of the needed increase in units.

Orders submitted to Teva USA on behalf of the State pursuant to this Settlement Agreement shall in all respects be processed and filled by Teva USA as though such orders had been submitted by Teva USA's regular paying customers except to the extent inconsistent with the terms of the Settlement Agreement and the terms herein.

The total volume of Settlement Product requested shall not exceed the following quantity during a twelve-month period:

> o   Naloxone Hydrochloride Nasal Spray (4 mg dosage): 75,000 kits (2 units per kit) (to be ordered only in batches of 50,000 kits, 25,000 kits, or 12,500 kits, unless otherwise agreed to by the Parties).

The Parties agree that the total WAC value of the Settlement Product to be provided under this Agreement is $84,000,000, and that for purposes of this Agreement the WAC value per kit is $125. Teva agrees to provide up to 672,000 kits at no cost to the State over the ten (10) year period of this Agreement.

The Settlement Product order from the State shall be in writing and directed to Teva USA's affiliate Anda, Inc., 2915 Weston Road, Weston, FL 33331, Attention: Patrick Cochrane, patrick.cochrane@andanet.com and Anthony Mihelich, anthony.mihelich@andanet.com.  Each Settlement Product order must identify the quantity of the Settlement Product, the available annual amount remaining for fulfillment, and the total quantity of Settlement Product delivered by Teva USA as of the date of the order.  The total value of orders placed by the State shall not exceed $84,000,000 at the agreed WAC value of $125 per kit. Teva may reject any order that if fulfilled would cause the total value of all Settlement Product delivered to the State to exceed this amount, in which case Teva shall have no obligation to fulfill or deliver the order, and the State shall reduce the order to an amount that does not exceed $84,000,000 total for all orders by the State.

Teva USA shall respond to the State's order request within seven (7) calendar days confirming the order.  Teva USA will use its commercially reasonable efforts to ship the order directly to the facility designated by the State within six (6) months of the order at no cost to the State and shall provide the State with estimated delivery dates for receipt of the Settlement Product. Notwithstanding the foregoing, for each order from the State following the initial order, Teva USA agrees that it will use its good faith efforts to ship Settlement Product to the facility designated by the State within ninety (90) days of the order.

1

For purposes of this State Plan for Acceptance and Delivery of Settlement Product, the term "Force Majeure Event" means any event reasonably beyond the control of the Parties, including wars, hostilities, revolution, riots, civil commotion, national emergency, unavailability of supplies, epidemics, fire, flood, earthquake, force of nature, explosion, terrorist act, embargo, or any act of God, or any law, proclamation, regulation, ordinance, or other act or order of any court or governmental authority.  In the event of a Force Majeure Event or other inability to supply any order made by the State for Settlement Product, Teva USA shall promptly provide written notice to the State. Teva USA and the State shall meet and confer within seven (7) days of such written notice to establish a commercially reasonable plan to resolve any inability to supply as quickly as reasonably possible.

**Delivery to State-Designated Facility**

Delivery of the Settlement Product shall occur no more than five (5) business days after the shipment date. Should delivery within this deadline not occur, Teva USA agrees to notify the State in writing and to work in good faith to resolve shipping or delivery issues that may arise.

Shipping shall occur in the same manner that Teva USA regularly ships this Settlement Product and any damages to the Settlement Product or other shipping damages or liability arising prior to receipt of the Settlement Product by the State shall be fully the responsibility of Teva USA. Should damage to Settlement Product occur during shipping, Teva USA agrees to re-ship the amount damaged promptly and at no cost to the State.

The State shall designate one location per order for delivery.  In writing and no later than the State's initial Settlement Product order, the State will designate the facility in Florida that will receive the Settlement Product on behalf of the State.  The State reserves the right to designate a different delivery location within Florida during the pendency of this Settlement Agreement at its discretion.

Should the State determine that an alternate state facility or agency will receive the Settlement Product during the pendency of the settlement, the State shall notify Teva USA and its affiliate Anda, Inc. in writing through the Settlement Product order.

The State agrees to receive the Settlement Product in a location with appropriate storage accommodations and will comply with all applicable state and federal laws surrounding receipt of the Settlement Product.

The State shall inspect the Settlement Product within five (5) business days upon arrival at the state facility.  If the State identifies damages to the Settlement Product during the inspection, Teva USA agrees to work in good faith to replace the damaged Settlement Product promptly.

Delivery of the Settlement Product is complete when Teva USA delivers all units of a particular order to the state facility and when both parties or their designees sign an invoice confirming the amount of units of Settlement Product received by the State.

**Distribution by State**

The State intends to distribute the Settlement Product to law enforcement agencies, first responders, and healthcare professionals throughout Florida. ("Recipients"). The time, place, and manner of distribution of the Settlement Product by the State will be determined solely by the State.  The State will require appropriate training on proper use of the Settlement Product by Recipients.

The State retains the right to alter its distribution plan according to the State's needs, including the right to store the Settlement Product at a state facility for any length of time. The State may distribute the Settlement Product as it deems best to address the opioid-related public health crisis in Florida, and alteration of distribution to Recipients shall be at the sole discretion of the State without regard to the preferences or recommendations of Teva USA.