# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**

**This document relates to:**

    *County of Lake, Ohio v. Purdue Pharma L.P., et al.,*
      Case No. 18-op-45032 (N.D. Ohio)

    *County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.,*
      Case No. 18-op-45079 (N.D. Ohio)

  **"Track 3 Cases"**

**MDL No. 2804**
**Case No. 17-md-2804**
**Judge Dan Aaron Polster**

## <u>WALGREENS' AND WALMART'S</u>
## <u>JOINT ABATEMENT PHASE CLOSING SUBMISSION</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

I.  PLAINTIFFS DID NOT CARRY THEIR BURDEN TO PROVE ENTITLEMENT
TO THE ABATEMENT RELIEF THEY REQUEST ........................................................ 3

    A.  Costs of Programs and Services to Address the Health, Societal, and Other
Downstream Effects of a Nuisance Are Not Recoverable as Abatement or
Consistent with the Jury's Verdict ................................................................... 4

    B.  Plaintiffs Did Not Prove that the "Opioid Crisis" Is "Abatable" ................................ 9

    C.  Plaintiffs Have Not Presented Persuasive Evidence That Their Proposed
Abatement Plan Would Resolve a Nuisance in Their Communities or
What Such Plan Would Likely Cost Them ...................................................... 10

II.  ANY ABATEMENT RELIEF MUST FOLLOW CERTAIN
LIMITING PRINCIPLES ................................................................................... 17

    A.  Any Relief Awarded Must Be Traditional Relief of the Type Awarded
by the English Court of Chancery .................................................................. 18

    B.  Any Abatement Relief Should be Final, Non-Speculative, And Limited
to One Year .................................................................................................... 21

    C.  The Court Should Exclude the Most Remote Categories of Abatement Relief ........ 24

    D.  Any Final Award Must Set Off Settlements From Third Parties .............................. 26

    E.  The Court Should Exclude Amounts Paid By Insurance and Other
Third Parties ................................................................................................... 27

    F.  Any Abatement Relief Must Have Clear Mechanisms to Prevent Waste
and Fraud ....................................................................................................... 31

III.  THE AWARD MUST BE APPORTIONED AMONG DEFENDANTS AND
OTHER TORTFEASORS ................................................................................... 33

    A.  Under the Restatement and Ohio Nuisance Cases, Defendants Can Be
Liable Only for the Portion of the Abatement Award Reasonably
Attributable to Them ...................................................................................... 34

    B.  Plaintiffs' Arguments for Joint Liability Are Meritless and Would Result
in Constitutional Violations ........................................................................... 36

        1.  The framework set forth in *Pang v. Minch* does not apply here ...................... 36

        2.  The award can be apportioned even under *Pang*'s limited-and-
discrete-tortfeasor framework ........................................................................ 40

        3.  Apportionment does not conflict with the jury's "substantial
factor" finding ................................................................................................ 43

        4.  Refusing to apportion would violate the Constitution ..................................... 44

**TABLE OF CONTENTS**
(continued)

Page

IV.   POTENTIAL APPORTIONMENT FRAMEWORKS ...................................................... 47

     A.   Option 1: Corrected Cost Figures ............................................................... 47

     B.   Option 2: Eliminating the Most Remote Relief ............................................ 49

     C.   Option 3: Adjusted OUD Population Estimate ............................................ 50

     D.   Option 4: Eliminating Projected Costs Not Attributable to Prescription Opioids ............................................................................... 51

     E.   Option 5: Plaintiffs' Uncorrected Projections ............................................. 52

V.   ANY INJUNCTIVE RELIEF THE COURT ORDERS MUST BE CONCRETE, FEASIBLE, AND SUPPORTED BY THE EVIDENCE PRESENTED AT TRIAL ........ 54

VI.   ANY "ABATEMENT" AWARD IS IMPROPER FOR REASONS RAISED ELSEWHERE AND EXPRESSLY PRESERVED HERE ................................................. 57

CONCLUSION ...................................................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v.*
   *Consol. Aluminum Corp.*,
   696 F.2d 437 (6th Cir. 1982) ..................................................................57

*Arizona v. United States*,
   567 U.S. 387 (2012)..............................................................................54

*Atlas Life Ins. Co. v. W.I. S., Inc.*,
   306 U.S. 563 (1939)..............................................................................18

*Att'y Gen. v. Utica Ins. Co.*,
   2 Johns. Ch. 371 (N.Y. Ch. 1817)........................................................19

*Austin v. United States*,
   509 U.S. 602 (1993)..........................................................................45, 46

*Basic Mgmt. Inc. v. United States*,
   569 F. Supp. 2d 1106 (D. Nev. 2008) ..................................................30

*Boeing Co. v. Cascade Corp.*,
   207 F.3d 1177 (9th Cir. 2000) ..............................................................30

*Boyle v. Zacharie*,
   31 U.S. 648 (1832)................................................................................18

*Brannon v. Bd. of Educ. of Tiro Consol. Sch. Dist. of Crawford Cnty.*,
   124 N.E. 235 (Ohio 1919) ....................................................................55

*Broad. Music, Inc. v. Xanthas, Inc.*,
   855 F.2d 233 (5th Cir. 1988) ................................................................14

*Cannell v. Mahoning Cnty. Comm'rs*,
   No. 94 C.A. 32, 1995 WL 152500 (Ohio Ct. App. Mar. 31, 1995)......56

*Celmer v. Rodgers*,
   No. 2004-T-0083, 2005 WL 3610479 (Ohio Ct. App. Dec. 29, 2005)...26

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
   863 F.3d 474 (6th Cir. 2017) ................................................................25

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
   615 F.3d 496 (6th Cir. 2010) ............................................................25, 26

*City of Mansfield v. Brister*,
   81 N.E. 631 (Ohio 1907)...................................................................35, 42

*Cleveland v. JP Morgan Chase Bank, N.A.*,
   No. 98656, 2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ...........34

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) ............................................................................57

*Collette v. Collette*,
    No. 20423, 2001 WL 986209 (Ohio Ct. App. Aug. 22, 2001) .............................21

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................................7

*Country Club Hills Homeowners Ass'n v. Jefferson Metro. Hous. Auth.*,
    449 N.E.2d 460 (Ohio Ct. App. 1981)................................................................56

*Davidson v. Bradford*,
    212 N.W. 476 (Iowa 1927) ................................................................................10

*Eastwood Mall, Inc. v. Slanco*,
    626 N.E.2d 59 (Ohio 1994) ..........................................................................22, 57

*F.P. Dev., LLC v. Charter Twp. of Canton*,
    16 F.4th 198 (6th Cir. 2021) ..............................................................................45

*Fariss v. Lynchburg Foundry*,
    769 F.2d 958 (4th Cir. 1985) .............................................................................30

*Galayda v. Lake Hosp. Sys., Inc.*,
    644 N.E.2d 298 (Ohio 1994) .............................................................................22

*Gillespie v. Travelscape LLC*,
    No. C13-0622, 2014 WL 4243706 (W.D. Wash Aug. 26, 2014) .........................28

*Gonzales v. Raich*,
    545 U.S. 1 (2005)...............................................................................................54

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999)...........................................................................17, 18, 19, 20

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)...........................................................................................26

*Hymowitz v. Eli Lilly & Co.*,
    539 N.E.2d 1069 (N.Y. 1989)...........................................................................39

*In re Acushnet River & New Bedford Harbor: Proc. re Alleged PCB Pollution*,
    712 F. Supp. 994 (D. Mass. 1989) ....................................................................19

*In re Debs*,
    158 U.S. 564 (1895)...........................................................................................19

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    379 F. Supp. 2d 348 (S.D.N.Y. 2005)................................................................39

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804, 2019 WL 4621690 (N.D. Ohio Sept. 24, 2019) .........................................29

*In re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804, 2020 WL 425965 (N.D. Ohio Jan. 27, 2020) .........................................3, 43

*In re Nat'l Prescription Opiate Litig.*,
No. 17-md-2804, 2020 WL 7330956 (N.D. Ohio Dec. 9, 2020) ...........................................39

*Ironworkers Loc. Union 68 v. AstraZeneca Pharms., LP*,
634 F.3d 1352 (11th Cir. 2011) .............................................................32

*Jaques v. Manton*,
928 N.E.2d 434 (Ohio 2010) ..............................................................31

*Kidis v. Reid*,
976 F.3d 708 (6th Cir. 2020) ..............................................................44

*Lewis v. Lead Indus. Ass'n*,
178 N.E.3d 1046 (Ill. 2021) ............................................................27, 29

*Liddell v. Board of Educ. of City of St. Louis*,
771 F. Supp. 1496 (E.D. Mo. 1991) ..........................................................32

*Lussier v. Runyon*,
50 F.3d 1103 (1st Cir. 1995) ..............................................................30

*Mays v. Moran*,
Nos. 97CA2385, 97CA2386, 1999 WL 181400 (Ohio Ct. App. Mar. 18, 1999) ...................42

*Miami Twp. Bd. of Trs. v. Weinle*,
174 N.E.3d 1270 (Ohio Ct. App. 2021) ..............................................21, 56, 57

*Moore v. United States*,
429 U.S. 20 (1976) ........................................................................14

*Mugler v. Kansas*,
123 U.S. 623 (1887) .......................................................................19

*Oberhaus v. Alexander*,
274 N.E.2d 771 (Ohio Ct. App. 1971) ................................................10, 17

*Off. of Scioto Twp. Zoning Inspector v. Puckett*,
31 N.E.3d 1254 (Ohio Ct. App. 2015) .......................................................9

*Oyler & Oyler v. Louisville & Nashville R.R. Co.*,
18 Ohio App. 481 (1923) ..............................................................35, 36

*Palmer v. Conn. Ry. & Lighting Co.*,
311 U.S. 544 (1941) .......................................................................22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Pang v. Minch*,
   559 N.E.2d 1313 (Ohio 1990) ...................................................36, 37, 40, 41

*People v. ConAgra Grocery Prods. Co.*,
   17 Cal. App. 5th 51 (2017) ....................................................................4, 29

*Plain Dealer Publ'g Co. v. Cleveland Typographical Union No. 53*,
   520 F.2d 1220 (6th Cir. 1975) .......................................................................56

*Price Bros. Co. v. Phila. Gear Corp.*,
   649 F.2d 416 (6th Cir. 1981) ..........................................................................14

*Robinson v. Bates*,
   857 N.E.2d 1195 (Ohio 2006) .......................................................................29

*Royal Indem. Co. v. Becker*,
   173 N.E. 194 (Ohio 1930) ..............................................................................27

*Ryan v. Mackolin*,
   237 N.E.2d 377 (Ohio 1968) ..........................................................................41

*San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*,
   291 S.W.2d 697 (Tex. 1956).............................................................................21

*Schmidt v. Lessard*,
   414 U.S. 473 (1974).........................................................................................56

*Seifert v. Burroughs*,
   526 N.E.2d 813 (Ohio 1988) ..........................................................................26

*Sharon Twp. Bd. of Trs. v. Crutchfield*,
   No. 3286-M, 2002 WL 31015601 (Ohio Ct. App. 2002) ......................................22

*Smith v. Cutter Biological, Inc., a Div. of Miles Inc.*,
   823 P.2d 717 (Haw. 1991) ..............................................................................40

*Spalla v. Fransen*,
   936 N.E.2d 559 (Ohio Ct. App. 2010).............................................................26

*Springfield City Sch. Support Pers. v. State Emp. Rels. Bd.*,
   616 N.E.2d 983 (1992).....................................................................................56

*State ex rel. Brown v. BASF Wayandotte Corp.*,
   Nos. 33533, 33545, 33549, 1975 WL 182459
   (Ohio Ct. App. Apr. 24, 1975) (per curiam)........................................36, 39, 42, 44

*State ex rel. Hunter v. Johnson & Johnson*,
   499 P.3d 719 (Okla. 2021)..........................................................................5, 23

*State ex rel. Miller v. Anthony*,
   647 N.E.2d 1368 (Ohio 1995) ........................................................................21

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................................................44, 45

*State v. Purdue Pharma L.P.*,
    No. CJ-2017-816, 2019 WL 9241510 (Okla. Dist. Ct. Nov. 15, 2019) ..................................23

*Szedlock v. Tenet*,
    139 F. Supp. 2d 725 (E.D. Va. 2001) ....................................................................................29

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019) ............................................................................................................45

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ..............................................................................................................45

*United States v. Davis*,
    31 F. Supp. 2d 45 (D.R.I. 1998) ...........................................................................................30

*United States v. Lucien*,
    347 F.3d 45 (2d Cir. 2003) ....................................................................................................32

*United States v. Twp. of Brighton*,
    153 F.3d 307 (6th Cir. 1998) ................................................................................................40

*White v. Long*,
    231 N.E.2d 337 (Ohio Ct. App. 1967) .................................................................................56

**STATUTES**

42 U.S.C. § 9613 ..........................................................................................................................30

Ohio Rev. Code § 2307.28 ......................................................................................................26, 27

Ohio Rev. Code § 2315.20 ......................................................................................................29, 31

Ohio Rev. Code § 4729.24 .............................................................................................................55

Ohio Rev. Code § 4729.26 .............................................................................................................55

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009) ...........................................................................................9

43A C.J.S. Injunctions § 376 (May 2022 update) ..................................................................21, 24

43A C.J.S. Injunctions § 451 (May 2022 update) ........................................................................21

66 C.J.S. Nuisances § 166 (May 2022 update) .......................................................................31, 35

66 C.J.S. Nuisances § 194 (May 2022 update) ...............................................................................3

CDC, *U.S. Opioid Dispensing Rate Maps* ...................................................................................24

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Comm. on Gov't Reform and Oversight, Health Care Fraud: All Public
   and Private Payers Need Federal Criminal Anti-Fraud Protections,
   H.R. Rep. No. 104-747 (1996)...............................................................................32

1 Dobbs, Law of Remedies § 5.7 (2d ed. 1993) ........................................................10

Fed R. Civ. P. 65 .......................................................................................................56

National Health Care Anti-Fraud Association,
   *The Challenge of Health Care Fraud* ................................................................32

Ohio Juri. 3d Admin. Law § 160 (June 2022 update)................................................55

Restatement (Second) of Contracts § 352 (1981) ......................................................22

Restatement (Second) of Torts § 433A (1965) .................................................. *passim*

Restatement (Second) of Torts § 433B (1965) .................................................. *passim*

Restatement (Second) of Torts § 821B (1979) ........................................................10

Restatement (Second) of Torts § 840E (1979) ..........................................34, 35, 36

Restatement (Second) of Torts § 912 (1979)............................................................22

Arthur C. Rounds, *Injunctions Against Liquor Nuisances*,
   9 Harv. L. Rev. 521 (1896) .................................................................................19

J.R. Spencer, *Public Nuisance: A Critical Examination*,
   48 Cambridge L.J. 55 (1989) ...............................................................................19

2 Story, Commentaries on Equity Jurisprudence § 923 (12th ed. 1877) .......................19

21 Wright & Miller, Fed. Prac. & Proc. Evid. § 5013.2 (2d ed. Apr. 2022 update).....................14

Walgreens and Walmart ("Defendants") submit this closing brief pursuant to the Court's Trial Order, Doc. 4463. In Phase I, the jury found a specific nuisance—the oversupply and diversion of prescription opioids—in Lake and Trumbull Counties ("Plaintiffs" or "the Counties"). Although that verdict followed a trial focused on three pharmacy defendants alone, Plaintiffs, defendants, and the Court all agree that pharmacies are not the only responsible parties, or even the primarily responsible parties. Yet, now in Phase II, Plaintiffs insist that these three pharmacy defendants alone should pay *all* of Plaintiffs' inflated cost estimates for a sweeping, never-before-implemented government spending program that purports to address a broad variety of purportedly opioid-related societal problems in the Counties, not just the problems resulting from oversupply and diversion of prescription opioids.

There are several flaws with that position, chief of which is that the "abatement" Plaintiffs seek is designed to address *a different and much wider societal problem than the nuisance the jury found.* As laid out in Section I below, the Seventh Amendment dictates that the Court cannot award relief beyond the scope of the jury's verdict. This means that any abatement relief must address the elimination of the nuisance condition, not the purported consequences of the nuisance. Even setting aside that constitutional limitation, Plaintiffs have not satisfied the Sixth Circuit's directive to show that the three pharmacy defendants' conduct directly caused the broader crisis that Plaintiffs now demand those three defendants alone must abate. Nor did Plaintiffs prove that the broad constellation of purportedly opioid-related problems in their communities is abatable. If anything, the evidence showed the opposite: Plaintiffs' own expert admitted that, at best, Plaintiffs' proposed plan will achieve only a 50% reduction in the number of people with opioid use disorder ("OUD") in the two counties in fifteen years. Even if *some* form of abatement could be appropriate, Plaintiffs did not meet their burden of proving what programs are necessary in their communities,

1

let alone the likely cost of them. *See infra* Section I. For these reasons and others, Defendants object to both the liability finding and the appropriateness of the abatement remedy. Those objections are preserved in Defendants' previous filings as well as in this brief, including the proposed conclusions of law in Exhibit D. *See* Dkt. 4202, 4204, 4256, 4258.

Without waiving those objections, Defendants understand that the Court intends to award Plaintiffs some form of abatement relief. If it does so, it must follow the bedrock legal principles set forth in Section II. In short, any award must (1) be a traditional form of relief in equity, (2) be non-speculative; (3) exclude remote categories of requested relief; (4) set off third-party settlements, (5) award monetary relief only to compensate for actual economic loss to Plaintiffs (meaning costs paid by third parties rather than Plaintiffs must be deducted), and (6) include fraud prevention mechanisms.

Any award of abatement must also be fairly apportioned among all responsible parties. *See infra* Section III. Basic principles of equity and Ohio law preclude the Court from holding the three pharmacy defendants fully responsible for remedying the entire opioid problem in the Counties, when everyone acknowledges that those defendants bear only a minuscule share of the responsibility for that problem. That is especially so because it is the Court's design—a pharmacy-only trial excluding the numerous other parties Plaintiffs sued, as well as Defendants' contribution claims against other potentially responsible parties—that has led to these three defendants facing judgment alone, with none of the other potentially responsible parties. Unrebutted evidence showed that CVS, Walgreens, and Walmart collectively contributed no more than 1.3% to 6.7% to allegedly prescription-opioid-related harms in Lake County, and 1.2% to 2.8% in Trumbull County. Dkt. 4455, May 16 trial tr., vol. 4, at 998:15–1000:5, Dkt. 4460, May 17 trial tr., vol. 5, at 1255:1–1257:3; WMT DEM 002 at 13; CVS Demo-16. The Court has suggested that it must

categorically reject that evidence because it goes against the jury's finding that the three defendants were a "substantial factor" in the oversupply and diversion of prescription opioids in the Counties. But the Court previously ruled that even a mere 0.03% share of responsibility could support that finding. *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2020 WL 425965, at *2 (N.D. Ohio Jan. 27, 2020). The Court should therefore rule, consistent with the evidence, that neither law nor equity supports joint liability in this case, and apportion relief accordingly.

The Court has said it intends to award an abatement plan that falls somewhere between the plans presented by both sides at trial, as well as certain injunctive relief. Without waiving any of the arguments set out at trial, or in this brief and others, Defendants have tried to comply with the Court's request that the parties propose such an award. As a result, in Section IV, Defendants set out five paths that would—over Defendants' objections—lead to a middle-ground award like the one the Court has requested. Those paths would result in one-year awards ranging from around $4 million to around $12 million as to Walgreens for both Counties, and ranging from about $250,000 to about $2 million as to Walmart for both Counties.

At the Court's request, and without waiving their objections to injunctive relief, Defendants also propose an injunctive relief order at Exhibit C. *See* Section V. Finally, in Section VI, Defendants preserve their remaining legal arguments for why any award in this case would be improper.

## I.    PLAINTIFFS DID NOT CARRY THEIR BURDEN TO PROVE ENTITLEMENT TO THE ABATEMENT RELIEF THEY REQUEST

It was Plaintiffs' burden to propose and prove abatement relief that will abate the nuisance that the jury found—the "oversupply of legal prescription opioids, and diversion of those opioids," in Lake and Trumbull Counties. Dkt. 4176 at 2, 6; *see* also 66 C.J.S. Nuisances § 194 (May 2022 update) ("In general, the burden of proof rests on plaintiff to establish the

3

plaintiff's essential allegations, and this rule applies in a suit by the state or other public entity to enjoin a public nuisance."). They did not carry that burden. First, Plaintiffs' abatement plan focuses on the health, societal, and other purported indirect and downstream effects of all forms of opioid abuse, which are not recoverable as abatement (to the contrary, they are damages). Moreover, such harms are not included within the jury's verdict. Second, Plaintiffs have not proved that such effects of opioid abuse are "abatable" by reasonable means. Third, Plaintiffs did not carry their burden of proving that their largely generic abatement plan, which admittedly does not account for Plaintiffs' already-existing programs and services, would remedy a nuisance in *their* particular communities.

### A.    Costs of Programs and Services to Address the Health, Societal, and Other Downstream Effects of a Nuisance Are Not Recoverable as Abatement or Consistent with the Jury's Verdict.

"An equitable remedy's sole purpose is to *eliminate the hazard* that is causing *prospective* harm to the plaintiff." *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 132 (2017) (emphasis added). Here, however, Plaintiffs ask for substantial sums of money to address the *health, societal, and other indirect, downstream effects* of a nuisance rather than the nuisance itself. For example, Plaintiffs seek funding not only for the collection and storage of excess prescription opioids, but also for the treatment of individuals with OUD, screening and treatment for HIV, hepatitis C, and endocarditis, programs and services for families and children of individuals with OUD, and job placement and training for individuals with OUD, among other things. The Court should reject these requests for at least two reasons.

First, money to address the health consequences and other downstream effects of a nuisance constitutes damages, not abatement. As the Oklahoma Supreme Court recognized, it would be unprecedented to allow a plaintiff "to collect a cash payment from a defendant that the district court line-item apportioned to address social, health, and criminal issues arising from

conduct alleged to be a nuisance." *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 729 (Okla. 2021). Such an award inherently "does not stop the act or omission that constitutes a nuisance," and therefore inherently is not abatement. *Id.* The Court should reject Plaintiffs' proposed plan for that reason alone.

Second, any remedies the Court awards must directly abate the specific public nuisance that the jury found at trial: the "oversupply of *legal prescription opioids*, and diversion of *those opioids* into the illicit market outside of appropriate medical channels." Dkt. 4176 at 2, 6 (emphasis added). Defendants proposed a question on the verdict form that would have made clear whether the nuisance the jury found was based on prescription opioids, illicit opioids, or both. Plaintiffs objected to that interrogatory on the ground that it is not an "essential element of the public nuisance cause of action" and does not "have much, if anything, to do with the scope of any abatement remedy." *See* Dkt. 4146-1 at 34 (proposing special interrogatory); Dkt. 3793 at 19–20 (objecting to special interrogatory). The Court sided with Plaintiffs and declined defendants' requested interrogatory on illicit opioids. So the jury made only the finding Plaintiffs asked it to make: that oversupply and diversion of *prescription* opioids is a nuisance in Plaintiffs' counties.[1]

In contrast to the nuisance the jury found, Plaintiffs' proposed plan addresses a broad set of societal problems that Plaintiffs refer to as "the opioid crisis." *See* Dkt. 4446, May 11 trial tr., vol. 2, at 332–335:7–335:13, 381 (Plaintiffs' expert Dr. Alexander explaining that his proposed plan aims to address the entire "opioid epidemic," not just the oversupply of legal prescription opioids and diversion of those opioids). Plaintiffs' abatement plan goes far beyond the nuisance

---

[1] Indeed, a verdict based on illicit opioid use would be invalid, as it would necessarily be based on indirect harms that Defendants did not proximately cause. *See* infra Section II(F).

the jury found because it almost entirely addresses downstream consequences of the nuisance, not the nuisance condition itself, and it aims to ameliorate harms caused by illicit opioids such as heroin and fentanyl.

Plaintiffs' own experts acknowledged material deficiencies in Plaintiffs' efforts to establish that the societal ills caused by the abuse of those illicit opioids were connected to the oversupply or diversion of *prescription* opioids. Plaintiffs' expert Dr. Keyes admitted that the literature she reviewed suggests that 20.5% of people who started using heroin had never previously misused a prescription opioid, that 97.7% of people who started heroin had previously used other, non-opioid illicit drugs, and that only 3.5% of people who use a prescription opioid will at some point in their lives try heroin (with a much smaller percentage who develop an addiction to heroin). Dkt. 4090, Oct. 26 trial tr., vol. 16 at 4131:5–4131:15; 4135:2–4135:6; 4138:5–4138:22. By her own analysis, approximately 35% of opioid mortality in the Counties cannot be attributed—directly or indirectly—to prescription opioids. *See* Dkt. 4438, May 10 trial tr., vol. 1, at 102:17–104:9; WAG Demo-32.

Plaintiffs' expert Dr. Alexander similarly testified that some individuals who use illicit opioids never used a prescription opioid, and that some individuals become addicted to opioids without exposure to prescription opioids. Dkt. 4446, May 11 trial tr., vol. 2, at 401:19–401:23; *id.* at 404:18–405:10. He also admitted that he could not quantify the number of persons who may have progressed to heroin or another illegal opioid as a result of prior misuse of prescription opioids (*id*. at 458:16–458:20). Defense expert Dr. Murphy testified—without rebuttal—that illicit opioid abuse existed long before prescription opioids became widely available and will exist indefinitely. Dkt. 4118, Nov. 4 trial tr., vol. 23 at 5942:14–5943:4; 5978:22–5979:7. As the Court stated, "Everyone knows there was an opioid problem before there was an oversupply and

diversion of prescription opioids. And, guess what, there will be an opioid problem when this scourge is ultimately abated, reduced." Dkt. 4464, May 18 trial tr., vol. 6, at 1331:21–1332:1.[2] In short, Plaintiffs have never established, through their experts or otherwise, that prescription opioids, much less these Defendants' dispensing of prescription opioids, directly caused the effects of illicit opioid abuse their plan is designed to abate.

Because Plaintiffs' plan seeks relief inconsistent with the jury's verdict, the Court should reject it. "[A]ny model supporting a plaintiff's damages case must be consistent with its liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (quotation marks omitted). A verdict finding oversupply and diversion of prescription opioids does not entitle Plaintiffs to have Defendants solve all arguably opiate-adjacent societal issues in their counties. Plaintiffs must be the ones to bear the consequences of their failure to create a plan tailored only to what the jury decided in their favor.[3] *See id.* The Court should therefore limit any relief it awards to measures that Plaintiffs have proven will abate the nuisance the jury found—and only that nuisance.

As noted in prior briefing that Defendants incorporate here, *see* Dkt. 4299 at 8–9, 20–21, consistent with the Seventh Amendment, the Federal Rules of Civil Procedure, and the Court's

---

[2] Remarkably, Plaintiffs seek funding for test strips and machines that can identify whether illegal drugs like heroin are tainted with another illegal drug, fentanyl. The testing seeks to make the illicit drugs "safer" for the user and to avoid overdoses that occur so regularly with even small amounts of fentanyl. Leaving aside the efficacy of such testing and whether illicit drug users would even avail themselves of it or include it as part of their illegal transactions, it does not abate any OUD issues those users may be facing. Arguably, it may encourage more illicit opioid abuse. And of course, it has nothing to do with abating the oversupply and diversion of legal prescription opioids. Yet Plaintiffs seek more than $8.3 million for these materials over the course of their 15-year plan. Dkt. 4447, May 12 trial tr., vol. 3, at 707:6–707:14; P23127_00034-39; P23127_00203-208.

[3] Without waiving their position that none of the categories of relief purporting to remedy health, societal, and downstream effects of the nuisance are proper abatement relief in this case, at the Court's direction, Defendants have provided alternate abatement plans in this brief that assume Plaintiffs' broader conception of the nuisance. *See infra* Section IV.

own prior orders, the Court cannot and should not award abatement for a nuisance that is any broader than or different from the one the jury found. The jury did not find a nuisance of "people themselves," or the constellation of problems Plaintiffs lump under the umbrella of the "opioid crisis." *See* Dkt. 4420, May 4 Pretrial Conf. tr., at 31 (Court states, "The nuisance and the impact on the county is that they have lots of residents who are living there and need help . . . [a]nd if not, they are a nuisance because . . . they could die, they can commit crimes, they can be . . . homeless."); *id.* (Court further states, "The nuisance is only when there's overuse and diversion, and people get addicted or dependent. And then they, the people themselves, become the nuisance."). The jury found a nuisance of oversupply and diversion of prescription opioids in the two Counties. The abatement award must be limited accordingly.

For these reasons, Defendants ask that the Court reconsider its stated intention to award Plaintiffs funding for measures such as treatment of OUD in individuals. Even Plaintiffs do not dispute that the three pharmacy defendants did not cause all OUD in the Counties, and the jury verdict never said that they did. Yet Plaintiffs made no attempt to limit their OUD-related abatement to prescription opioids, much less the three pharmacy defendants' dispensing conduct.

In short, Plaintiffs' abatement plan does not abate the nuisance the jury found. *See generally* Dkts. 4299, 4342. Only a tiny fraction of the plan addresses the "oversupply of prescription opioids, and diversion of those opioids" in Plaintiffs' counties—namely, the $127,734 of the $2.83 billion plan (or less than one-hundredth of one percent) that would pay for safe storage and drug disposal programs. *See* P-23127_00009; P-23127 _00011. The remainder of the plan is overbroad and not consistent with the jury's verdict. It must be rejected accordingly.

### B.      Plaintiffs Did Not Prove that the "Opioid Crisis" Is "Abatable."

There is another serious problem with Plaintiffs' request for three pharmacy defendants to abate "the opioid crisis" writ large: "the opioid crisis" is not reasonably abatable. Plaintiffs must prove that the public nuisance they allege is "abatable." During the liability phase of the trial, Plaintiffs' counsel reaffirmed as much. *See* Dkt. 4064, Oct. 21 trial tr., vol. 13, at 3476:12–3476:15 ("I have to prove that the epidemic is abatable, in other words, it's not just a problem that's going to exist forever. That's a required element."). The Court agreed. *Id.* at 3476:23–3478:2.

Under Ohio law, an "abatable nuisance" is "[a] nuisance that reasonable persons would regard as being removable by reasonable means." *Off. of Scioto Twp. Zoning Inspector v. Puckett*, 31 N.E.3d 1254, 1264 (Ohio Ct. App. 2015) (quoting Black's Law Dictionary (9th ed. 2009)). Plaintiffs cannot satisfy this requirement. If the nuisance is understood to encompass all societal issues placed under the umbrella of the "opioid crisis" (as Plaintiffs suggest), then even Plaintiffs' experts acknowledge that the three pharmacy defendants, acting alone, cannot possibly "remove" it. Plaintiffs' abatement expert, Dr. Alexander, testified that even if the Counties adopted every measure he recommended, it would still reduce opioid-related harms by only 50% in 15 years.[4] *See* Dkt. 4446, May 11 trial tr., vol. 2, at 349:18–349:24; *id.* at 417:12–417:15. Indeed, the Court itself has acknowledged that "[e]veryone knows there was an opioid problem before there was an oversupply and diversion of prescription opioids.  And, guess what, there will be an opioid problem when this scourge is ultimately abated, reduced. There will be

---

[4] Even then, Dr. Alexander testified that his projections rely on an optimistic "target[]" that by the end of the plan, 60% of individuals suffering from OUD will actually avail themselves of treatment offerings when research shows that less than 30% currently do so.  Dkt. 4447, May 12 trial tr., vol. 3, at 608:8–608:14; Dkt. 4455, May 16 trial tr., vol. 4, at 958:6–958:20.

drug cartels that are going to sell heroin and who knows what else into Lake, Trumbull County, and everywhere." Dkt. 4464, May 18 trial tr., vol. 6, at 1331:21–1332:1.

All parties agree, then, that there is no action Defendants could take—reasonable or otherwise—to end or "remove" what Plaintiffs have deemed the "opioid crisis" in Lake and Trumbull Counties. This Court should therefore refuse Plaintiffs' request that Defendants abate a broad set of societal problems unrelated to the oversupply and diversion of prescription opioids that the jury found.

C.  **Plaintiffs Have Not Presented Persuasive Evidence That Their Proposed Abatement Plan Would Resolve a Nuisance in Their Communities or What Such Plan Would Likely Cost Them.**

Plaintiffs failed to prove that any aspect of their abatement plan is necessary to abate the nuisance the jury found *in these Counties*. Plaintiffs similarly failed to present a non-speculative basis for the cost of abatement services in their Counties. Either of these problems provides reason to deny their requested relief. *See Oberhaus v. Alexander*, 274 N.E.2d 771, 772 (Ohio Ct. App. 1971) (when plaintiffs fail to "disclose evidence sufficient for this remedy," no remedy can be provided).

The purpose of the abatement remedy is to eliminate the condition that constitutes the nuisance or the conduct that caused it. As a leading treatise explains, in a section titled "The Remedial Options in Nuisance Cases," an "injunction abating the nuisance" is designed to make the plaintiff "free from the activity in question." 1 Dobbs, Law of Remedies § 5.7(3) (2d ed. 1993); *see* Restatement (Second) of Torts § 821B cmt. i (1979) (in an action for abatement, "the question is whether the activity itself is so unreasonable that it must be stopped"). Thus, there must be a sufficiently close causal connection between the nuisance at issue and the abatement measures ordered by the Court. *Cf. Davidson v. Bradford*, 212 N.W. 476 (Iowa 1927) (voiding

portion of abatement order reaching parcel of land separated from nuisance-producing tract by public road, and collecting cases similarly restricting abatement relief).

Plaintiffs were required to prove all aspects of their abatement case—including how the abatement they seek will remedy the nuisance the jury found *in their communities*. Yet, in the abatement phase, Plaintiffs produced *no* witnesses employed in Lake or Trumbull Counties, or any other witness who had researched the specific needs of those counties. As a result, there is no evidence in the record that the Plaintiffs actually need the abatement measures that they seek. To the contrary, the evidence shows that they do *not* need many of the requested services. For example, Trumbull County did not have a single provider who reached 90% capacity for treatment of intravenous drug abuse during Fiscal Year 2021. DEF-MDL-14713. And defendants' expert Matthew Bialecki testified that the specific agencies within Lake and Trumbull County responsible for addressing substance abuse and addiction—the Lake ADAMHS Board and the Trumbull Mental Health and Recovery Board—each had multi-million-dollar surpluses in their fund balances at the end of 2019 and 2020. Bialecki Abatement Phase Trial Tr. at 803:23–804:5; 807:3–22; 813:14–814:13; 819:5–819:9; 820:8–822:9; 826:20–827:18; *see also* DEF-MDL-14968; DEF-MDL-14940; DEF-MDL-14944; DEF-MDL-14928. Despite repeated requests from the Court to provide historical cost figures, *see, e.g.*, Dkt. 4271, Plaintiffs offered no evidence regarding whether the Counties currently offer the services they ask defendants to fund, let alone whether the Counties would incur out-of-pocket costs if they were to implement them.

And even if the Counties needed some amount of money for OUD treatment of some individuals, Plaintiffs' estimates of those numbers are inflated and speculative. As Dr. Kessler testified, the formula Dr. Keyes used for determining the number of individuals with OUD in

each county is fatally flawed. Dkt. 4455, May 16 trial tr., vol. 4, at 920:5–920:16. By using the

number of drug-related deaths of any person to estimate the population of persons with OUD,

Dr. Keyes assumes that every person who suffered a drug-related death had OUD. *See id*. at

939:12–940:11; WMT DEM 002 at 6. But Dr. Keyes provided no basis for that assumption, and

it defies common sense. For example, someone who died from an overdose of cocaine (not an

opioid) would be part of the larger population of drug-related deaths, but likely would not have

OUD (characterized by compulsive use of *opioids*). Likewise, someone who used heroin one

time and overdosed would not meet the definition of OUD, but that person would be part of the

larger drug-related death population.  Dr. Keyes's analysis is the equivalent of assuming all

people who died of cancer were smokers. Some might have been, but it is nonsensical to assume

that all of them were.

Not surprisingly, Plaintiffs offered no rebuttal to that criticism, and no defense of Dr.

Keyes's mistakes. The best they can muster is that Dr. Keyes is an epidemiologist and defense

expert Dr. Kessler is not. But that is a red herring, as no credible epidemiologist would use Dr.

Keyes's erroneous formula in their regular practice. *See* Dkt. 4460, May 17 trial tr., vol. 5, at

1067:8–1067:14; *id.* at 1070:3–1070:9. In any event, Dr. Kessler is a health care economist who

works in the same field and who has decades of experience analyzing epidemiological studies

and the same kind of data as epidemiologists. Dkt. 4455, May 16 trial tr., vol. 4, at 900:18–

900:19; *id.* at 904:7–904:16; *id.* at 905:5–905:7.

Compounding the failure to provide a reliable estimate of the number of people with

OUD, Dr. Alexander testified at trial that he provided no estimate of the proportion of those

individuals who will actually seek treatment. Dkt. 4446, May 11 trial tr., vol. 2, at 485:6–485:15.

Instead, contrary to the plain language of his report, he testified that he calculated costs for

treatment "slots." In other words, when he estimates, for instance, that in 2021 for Lake County the "[t]otal number of individuals with OUD to receive treatment" is 2,267 (P-23105a), Dr. Alexander is "not suggesting that there be 2,267 unique people that all get one full year of treatment" but that there be "2,267 treatment slots in that year." Dkt. 4446, May 11 trial tr., vol. 2, at 485:6–485:15; *see also id.* at 370:5–370:15; 372:13–373:3; 493:2–493:5; 503:22–505:8; 505:12–506:14; 580:14–581:2.

Those calculations do not bear any resemblance to reality.[5] Neither County currently operates its own treatment facilities; they pay third-party contractors to treat uninsured patients. Neither County is proposing to build a facility that must be maintained regardless of patient count. Dkt. 4455, May 16 trial tr., vol. 4, at 966:10–970:13. Thus, the only relevant figure is how many non-insured individuals will seek treatment in each county. Plaintiffs' "slot"-based cost methodology does not address that question. They have thus failed to prove the need for any OUD treatment funds, and certainly not at the exorbitant levels they ask the Court to award.

These missteps were predictable given that Plaintiffs' experts relied exclusively on social-science generalizations, rather than tailoring those generalizations to the on-the-ground reality in the Counties. Plaintiffs' experts did not do the sort of work experts in their fields need to do to offer an opinion about the needs of these Counties in particular, and they did not purport to offer such opinions. *See, e.g.*, Dkt. 4446, May 11 trial tr., vol. 2, at 468:25–471:21. Dr. Keyes, for example, testified that she did not interview any people with OUD in Lake or Trumbull Counties, did not do any survey work in Lake or Trumbull Counties, and did not look at any data about OUD treatment in Lake or Trumbull Counties. *See* Dkt. 4438, May 10 trial tr., vol. 1, at

---

[5] Plaintiffs' acrobatics in trying to turn a number that undeniably was calculated to quantify people with OUD into the recently concocted "slots" itself establishes that they are padding the numbers, and consequently inflating the money needed to treat phantom slots.

92:6–92:14; *id.* at 107:5–107:8; *id.* at 149:9–149:12. Her testimony was thus necessarily not specific to the Counties and their needs.

Similarly, Plaintiffs' expert Dr. Nancy Young, who testified about opioid-related harms to pregnant women, children, and other special populations, acknowledged that she did not speak to any parents, pregnant women, or children in Lake or Trumbull County to determine whether they had unmet needs and how much those would cost. *See* Dkt. 4446, May 11 trial tr. vol. 2, at 311:3–311:5; *id.* at 311:6–311:8; *id.* at 311:9–311:16; *id.* at 311:17–311:20. It is thus unclear how Dr. Young could possibly have reliably come to the figures she testified about at trial—and, because she refused to provide the basis for those numbers, the Court cannot possibly fill in the gaps. Her testimony should be rejected in its entirety as irrelevant and unreliable.

Dr. Alexander likewise testified that he did not conduct any qualitative interviews of any individuals in Lake or Trumbull County who use drugs, suffer from OUD, or are in recovery from OUD. *Id.* at 469:18–469:20; *id.* at 469:21–469:24; *id.* at 475:23–476:2. In conducting his analysis, he spoke to only one official from Lake County and two officials in Trumbull County, each for about 45 minutes. *Id.* at 477:19–477:23; *id.* at 477:25–478:7; Dkt. 4447, May 12 trial tr., vol. 3, at 528:1–528:12.[6] Dr. Alexander did not conduct any fieldwork, focus groups, or surveys

---

[6] To the extent that Plaintiffs claim these brief conversations somehow created the bridge they need from their experts' more general testimony to the Counties' on-the-ground needs, that claim must fail.  Dr. Alexander never testified to the content of those discussions, or that they allowed him to tailor his plan to the Counties' needs. And even if he had testified regarding the content of those conversations, it would be improper to accept those hearsay statements for their truth. The Court may consider only admissible evidence. The "Evidence Rules do not allow for any departures in non-jury trials," meaning the Court cannot consider any evidence that a jury could not consider in jury trial, including inadmissible hearsay.  21 Wright & Miller, Fed. Prac. & Proc. Evid. § 5013.2 (2d ed. Apr. 2022 update).  Doing so would be reversible error. *See, e.g.*, *Moore v. United States*, 429 U.S. 20, 22 (1976) (vacating judgment below "where the trial judge expressly relied upon the inadmissible evidence in finding the defendant guilty"); *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988) ("The district court erred when it admitted this evidence on the ground that hearsay is admissible in a bench trial; it is not."); *Price*

in the Counties. Dkt. 4446, May 11 trial tr. vol. 2, at 466:18–466:25; *id.* at 469:3–469:6; *id.* at 470:11–470:22. He also did not speak to any doctors or treatment professionals in Lake or Trumbull County or visit any treatment or residential facilities there. *Id.* at 476:3–476:6; *id.* at 476:7–476:10; *id.* at 476:11–476:13; *id.* at 476:14–476:24.[7]

Another Plaintiffs' expert, John Burke, took a similar path and did not review *any* county-specific documents before rendering his opinion. Dkt. 4447, May 12 trial tr., vol. 3, at 662:20–662:24. The lack of diligence showed. For example, Mr. Burke's cost estimate included costs for over 70 Law Enforcement Assisted Diversion ("LEAD") programs in Lake County alone by 2035. *Id.* at 672:16–673:14; 678:17–679:5. He reached that number by purporting to rely on Dr. Alexander's estimate that one LEAD program would be needed for every four police departments in the Counties throughout the 15-year plan. But he got the numbers wrong. In reality, there are only 19 police departments in Lake County (which would require only 4.8 LEAD programs) and there are only 20 police departments in Trumbull County (requiring 5 LEAD programs). *See* P-23105a; P-23105b; Dkt. 4447, May 12 trial tr., vol. 3, at 523:19–524:23. In other words, because Mr. Burke never bothered to learn the structure and needs of the Counties' police departments, he inflated the cost estimate for the program more than sevenfold. This is but one example of many showing how Plaintiffs' plan is untethered to the Counties' actual needs.

---

*Bros. Co. v. Phila. Gear Corp.*, 649 F.2d 416, 419 (6th Cir. 1981) ("A judge presiding at a bench trial may not directly or indirectly . . . conduct an investigation outside the record and use the results of that investigation in determining the facts of a case.").

[7] As CVS pointed out in its post-trial submission, Dr. Alexander's testimony is speculative and unreliable for these reasons and others laid out in the brief. Defendants incorporate Section III of CVS's brief by reference.

15

Plaintiffs' experts also made no effort to determine the cost the Counties would likely pay for the services and programs set out in Plaintiffs' plan. Dr. Burke testified that he did not consider what the Counties currently spend, or have historically spent, on similar services or programs in developing his estimates. Dkt. 4447, May 12 trial tr., vol. 3, at 663:6–663:11. In fact, Dr. Burke did not review any budgets, financial statements, or books and records for the Counties whatsoever. *Id.* at 661:6–661:13; *id.* at 661:14–666:17; *id.* at 661:18–666:21. Nor did he review any historical expenditures or financial records for third-party service providers. *Id.* at 661:22–662:13. Drs. Alexander and Young similarly testified that they did not review historical claims data for their analyses. *See, e.g.*, Dkt. 4446, May 11 trial tr., vol. 2, at 463:10–464:14; *id.* at 312:19–312:24; *id.* at 323:5–324:10.

This lack of diligence in determining likely actual costs renders Plaintiffs unable to prove a calculation of forward-looking relief in a non-speculative manner, as required under Ohio law. *See infra* Section II.B. Plaintiffs' reliance on national averages is especially speculative here given that services and facilities tend to cost less in non-urban areas and because there may be cost synergies to expanding pre-existing County programs, rather than starting new ones.

The only non-speculative and supported cost estimates presented at trial came from defendants' cost expert, Matt Bialecki. By considering what the Counties have historically paid for the services and programs called for by their plan, he arrived at a much lower estimate than Plaintiffs' experts. *See, e.g.*, Dkt. 4455, May 16 trial tr., vol. 4, at 749:12–749:17 (Mr. Bialecki testifying that his "estimate of the counties' future treatment costs" is "based on historical information that was contained in the treatment data," *i.e.*, what they "have been paying historically"). If the Court is to award any relief at all, it must use Mr. Bialecki's cost estimates—the only reliable and non-speculative evidence of costs in the record. Thus, for the

16

reasons Mr. Bialecki discussed during his testimony, the Court may award, at most, $648,545 for both Counties. *See* CVS-MDL-05022; CVS-MDL-05021.

In all, Plaintiffs produced no evidence regarding the effect their abatement plan would have on the nuisance in Lake and Trumbull Counties and produced no localized basis for their cost estimates that would account for what Plaintiffs already have in place, available funding, and projected funding requirements. As a result, Plaintiffs have not presented a cognizable claim for abatement. *See Oberhaus*, 274 N.E.2d at 772.

## II.     ANY ABATEMENT RELIEF MUST FOLLOW CERTAIN LIMITING PRINCIPLES

Defendants understand from the Court's comments that it disagrees with many of Defendants' factual and legal arguments and intends to make an abatement award that includes treatment of individuals with OUD. *See, e.g.*, Dkt. 4438, May 10 trial tr., vol. 1, at 5–6 (court intends to craft "abatement plan to remedy . . . the addiction and dependence of a large number of people in Lake and Trumbull Counties"). Although Defendants preserve their objections to any such award aimed at claimed effects of the nuisance and not the nuisance condition found by the jury, as outlined in this brief and elsewhere, if the Court grants such relief, it should follow the legal guardrails set out below.

For starters, any relief must conform to traditional relief awarded by equity courts, particularly the English Court of Chancery as of 1789. As discussed below, under the Supreme Court's decision in *Grupo Mexicano*, this Court lacks authority to award any non-traditional relief. Next, the Court should also consider third-party payors, settlements, state and federal government assistance programs, and other funds available to Plaintiffs to ensure that defendants are required to fund abatement costs not otherwise covered by these alternative sources. Unlike a damages award, an equitable abatement award is designed solely to avoid out-of-pocket costs to

Plaintiffs, and thus does not require defendants to pay costs to abate any aspect of the nuisance that has been or will be abated by third parties. Any abatement award, moreover, should also be limited in scope and duration, with clear and definite terms that specify when defendants' abatement responsibility will end. And any payment structure should include provisions to guard against the acute risk of fraud and waste in the health care context.

### A.     Any Relief Awarded Must Be Traditional Relief of the Type Awarded by the English Court of Chancery.

To be within this Court's equitable authority, any relief awarded must be traditional relief awarded by equity courts, particularly the English Court of Chancery as of 1789. The Court lacks authority to award any non-traditional relief in equity.

As the Supreme Court has "long held," the equitable authority of the federal courts is "confined" by the boundaries of "traditional equitable relief." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 322 (1999). When relying on their equitable authority, federal courts possess only "an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Id.* at 318 (quoting *Atlas Life Ins. Co. v. W.I. S., Inc.*, 306 U.S. 563, 568 (1939)). In other words, "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary [in] 1789." *Id.* As a result, federal courts have "no authority" to award remedies that were "historically unavailable" from the Court of Chancery. *Id.* at 333; *see also Boyle v. Zacharie*, 31 U.S. 648, 658 (1832) (Story, J.) ("[T]he settled doctrine of this court is, that the remedies in equity are to be administered . . . according to the practice of courts of equity in the parent country, as contradistinguished from that of courts of law.").

18

These principles limit the relief that the Court may grant here. To the extent that the Court of Chancery had *any* practice of awarding abatement relief as to public nuisances in 1789,[8] such relief did not remotely resemble the relief Plaintiffs seek. Traditional public nuisance abatement relief generally required a defendant to stop engaging in a discrete harmful activity, such as the obstruction of a highway or waterway, the maintenance of an offensive business, or the storage of dangerous materials. *See, e.g.*, 5 Blackstone, Commentaries *166–68 (Tucker ed. 1803); 2 Story, Commentaries on Equity Jurisprudence § 923 (12th ed. 1877). Such relief did not traditionally require a defendant to pay a plaintiff to abate the nuisance itself. *See* 2 Story, Commentaries § 923 (equitable abatement was traditionally "confined" to "preventive relief"); *see also In re Acushnet River & New Bedford Harbor: Proc. re Alleged PCB Pollution*, 712 F. Supp. 994, 1001–03 (D. Mass. 1989) (recovery of public-nuisance abatement costs is not an equitable remedy). Nor did it require a defendant to address the downstream effects of a nuisance or abate a nuisance defined as the community of affected people, as the Court has articulated the nuisance here. Dkt. 4420, May 4 Pretrial Conf. tr., at 31. Indeed, Plaintiffs have identified no decision of the Court of Chancery awarding relief comparable to the extraordinary relief contemplated in this case.

---

[8] Defendants maintain that this Court lacks equitable authority to award any abatement relief as to a public nuisance because such relief was not traditionally available from the Court of Chancery as of 1789. *See, e.g.*, *Att'y Gen. v. Utica Ins. Co.*, 2 Johns. Ch. 371, 390 (N.Y. Ch. 1817) (Kent, Ch.) (concluding based on a review of English authorities that "[i]t is well understood, that public nuisances are public offences, over which the Courts of law [rather than the Court of Chancery] have had a uniform and undisputed cognizance"); J.R. Spencer, *Public Nuisance: A Critical Examination*, 48 Cambridge L.J. 55, 59–74 (1989) (explaining that public nuisance abatement was traditionally a matter for the English criminal courts and law courts rather than the Court of Chancery until the Nineteenth Century); Arthur C. Rounds, *Injunctions Against Liquor Nuisances*, 9 Harv. L. Rev. 521, 522–26 (1896) (similar). Although this argument appears to conflict with Supreme Court decisions that preceded *Grupo Mexciano*, *see In re Debs*, 158 U.S. 564, 591 (1895); *Mugler v. Kansas*, 123 U.S. 623, 672–73 (1887), Defendants preserve the argument for further review.

Recognizing as much, this Court has observed that "[n]o judge in history"—let alone an equity court circa 1789—has ever granted an award like the "completely uncharted" one Plaintiffs seek here. Dkt. 4464, May 18 trial tr., vol. 6, at 1326:5–1326:12; *see also* Dkt. 4438, May 10 trial tr., vol. 1, at 5:21–5:22 ("I've been tasked with doing something no other federal judge in our country has ever been required to do."). The Court is right. And because such relief was "historically unavailable" from the Court of Chancery, this Court has "no authority" to award it. *Grupo Mexicano*, 527 U.S. at 333.

Plaintiffs may argue that modern developments, such as the challenges of ameliorating opioid abuse, require the Court to craft a creative remedy in this case. But the Supreme Court has rejected that argument. Although equitable power is "flexible" to a degree, "that flexibility is confined within the broad boundaries of traditional equitable relief." *Id.* at 322. Thus, developments like the "increasing complexities" of modern governance and business relations do not license courts to depart from the historical practices of the Court of Chancery. *Id.* at 322, 330. "When there are . . . new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than [courts] both to perceive them and to design the appropriate remedy"; courts therefore must "leave[] any substantial expansion of past practice to Congress." *Id.* at 322, 329. Any other approach would be "incompatible" with the Supreme Court's holding that equitable authority "d[oes] not include the power to create remedies previously unknown to equity jurisprudence." *Id.* at 329, 332.

In short, although the Court may award relief rooted in historical practice, such as an order directing defendants to cease discrete activities, it cannot award the non-traditional relief that Plaintiffs request, such as the design of an unprecedented, multi-dimensional, and untested

program for the treatment of health, societal, and other downstream effects of all opioid use and abuse.

**B.    Any Abatement Relief Should be Final, Non-Speculative, And Limited to One Year.**

Any abatement award must be definite and final enough to inform defendants of their obligations. To warrant monetary relief, Plaintiffs were required to prove their future cost for the abatement services in a non-speculative manner. As discussed above, they failed to do so. Ordering open-ended relief beyond one year would compound that failure and violate each of these principles.

"Nuisance abatement actions seek injunctive relief and, as such, are governed by the same equitable principles that apply to injunctive actions generally." *State ex rel. Miller v. Anthony*, 647 N.E.2d 1368 (Ohio 1995). To be legally enforceable, "an injunction . . . should be sufficiently clear and definite in its terms to enable a person bound by the injunction or restraining order to determine what he may and may not do." 43A C.J.S. Injunctions § 451 (May 2022 update). Indeed, "where the terms of an injunction are overbroad, vague, ambiguous, and so uncertain and indefinite as to be impossible of compliance, the injunction is void." 43A C.J.S. Injunctions § 376 (May 2022 update). "[T]he decree must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him." *Collette v. Collette*, No. 20423, 2001 WL 986209, at *3 (Ohio Ct. App. Aug. 22, 2001); *see also, e.g.*, *Miami Twp. Bd. of Trs. v. Weinle*, 174 N.E.3d 1270, 1281 (Ohio Ct. App. 2021) (injunction must be "specific enough to permit the defendant to comply without fear of committing an unwilling violation"); *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 291 S.W.2d 697, 702 (Tex. 1956) (injunction "should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions

about which persons might well differ and *without leaving anything for further hearing*"
(emphasis added)). Furthermore, "[e]quity requires that an injunction should be narrowly tailored
to prohibit only the complained of activities," *Eastwood Mall, Inc. v. Slanco*, 626 N.E.2d 59, 62
(Ohio 1994), and must not be "overly broad," *Sharon Twp. Bd. of Trs. v. Crutchfield*, No. 3286-
M, 2002 WL 31015601, at *3 (Ohio Ct. App. 2002).

Moreover, the Court must limit any forward-looking abatement costs to the amount that
can be shown in a non-speculative manner, which becomes increasingly difficult as the temporal
scope of the requested relief expands. This limiting principle follows the general tort rule that a
party seeking compensatory damages must prove (1) certainty that damages will occur; and
(2) reasonable certainty as to the amount of those damages. Restatement (Second) of Torts § 912
(1979) ("One to whom another has tortiously caused harm is entitled to compensatory damages
for the harm if, but only if, he establishes by proof the extent of the harm and the amount of
money representing adequate compensation with as much certainty as the nature of the tort and
the circumstances permit."); *Galayda v. Lake Hosp. Sys., Inc.*, 644 N.E.2d 298, 301 (Ohio 1994)
("In Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is
reasonably certain to incur in the future."). The same principle is true under contract law. *See*
Restatement (Second) of Contracts § 352 (1981) ("Damages are not recoverable for loss beyond
an amount that the evidence permits to be established with reasonable certainty."); *Palmer v.
Conn. Ry. & Lighting Co.*, 311 U.S. 544, 559 (1941) (limiting damages for breach of lease to
eight years, noting that future damages must be limited to "as far as reasonable, intelligent men
can foresee the future").

Based on these principles, the only court to have awarded an abatement remedy in a
prescription opioids case limited that remedy to one year, rejecting the plaintiff's 20-year

abatement plan because the State "did not present sufficient evidence of the amount of time and costs necessary, beyond year one, to abate the Opioid Crisis." *See State v. Purdue Pharma L.P.*, No. CJ-2017-816, 2019 WL 9241510, at *15 (Okla. Dist. Ct. Nov. 15, 2019), *rev'd on other grounds by State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021).

Plaintiffs propose a vast social science and medical experiment, unbounded by any reasonable budgetary or logistical constraints, with no indication that the services they propose will be effective. Given this uncertainty and consistent with the precedent of the Oklahoma litigation, the Court should limit any award of abatement costs to one year. Projecting the elements and costs of the sort of treatment programs and other interventions Plaintiffs seek becomes more unreliable with each passing year. *See, e.g.*, Dkt. 4050, Oct. 19 trial tr., vol. 11, at 2762 (Plaintiffs' liability-phase witness Captain Villanueva testifying that "drug trends will change on a weekly basis"); Dkt. 4464, May 18 trial tr., vol. 6, at 1331:5–1331:7 ("I mean, only a fool would just say, 'I know what's going to happen in the next 15 years, and here it is, and I'm not looking at it again.'"). Forward-looking projections necessarily speculate about whether, among other things: (i) addiction and its related expenses in the future will stem in any way from diversion of an "oversupply" of prescription opioids; (ii) addiction patterns in the community will remain the same; (iii) opioids will remain a drug of choice; (iv) recovery rates will hold constant; (v) treatment will be the same; (vi) the number of individuals with OUD that may seek treatment (or for how long) will follow the path Plaintiffs predict; and (vii) the use of safe storage and drug disposal of unused medication will reduce opioid overdose or other opioid-related harm. For example, the uncontroverted evidence shows that without *any* abatement measures, the number of prescription opioids entering the marketplace has been lower and lower each year since 2012, with the most recent figures being the lowest in the past fifteen years.

CDC, *U.S. Opioid Dispensing Rate Maps*, https://www.cdc.gov/drugoverdose/rxrate-maps/index.html (last updated Nov. 10, 2021). Any period beyond one year would be speculative and would lead to program elements and funding that would be even more disconnected from the nuisance the jury found.

If the Court nevertheless orders abatement measures beyond one year, payments to any abatement fund should be staggered. In addition, if Plaintiffs do not spend the funds provided in the first year for legitimate abatement expenses, defendants should not have to pay any additional sums. Dkt. 4446, May 11 trial tr., vol. 2, at 506:24–507:16 ("[THE COURT:] And I don't plan to give anyone a whole, you know, 15 years worth of money. My thought is whatever I do, I'll do annually . . . And if they haven't spent the money because, you know, the estimates proved idealistic or Congress gave them a huge amount of money or whatever, they'll return it."). As the Court suggested, funds should revert to defendants if not spent as contemplated in the abatement plan. *Id.* The plan should also include concrete benchmarks and quantifiable metrics so that all parties know precisely what these defendants must do, and for how long. Without a clear endpoint, the Court's abatement order would be overbroad, and would become "so uncertain and indefinite as to be impossible of compliance" and therefore be void. 43A C.J.S. Injunctions § 376. The order must contemplate that, even in the best-case scenario, at least 50% of opioid abuse in the Counties will remain, and should not require continued payment simply because opioid abuse persists in the Counties. Dkt. 4446, May 11 trial tr., vol 2, at 349:18–349:24; *id.* at 417:12–417:15.

C.     **The Court Should Exclude the Most Remote Categories of Abatement Relief.**

Much of the plan Plaintiffs propose has little or nothing to do with abating the oversupply and diversion of legal prescription opioids, which was the basis of the jury's verdict, let alone the dispensing conduct on which Plaintiffs based their case at trial. By Plaintiffs' own admission,

24

their plan is designed to "abate" the constellation of societal issues they label the Counties' "opioid crisis." In fact, Plaintiffs go a step further: they argue that defendants are liable to remediate harms related to individuals who never took an opioid dispensed by any defendant. The Court should not (and as explained earlier, including in Section II(A), cannot) indulge such overreach.

As the Court is aware, it is Defendants' position that except for safe disposal and drug take-back boxes, all the relief Plaintiffs request is too remote. *See* Dkt. 4299 at 11. Defendants understand that the Court disagrees. But even accepting the Court's position *arguendo*, much of the relief Plaintiffs request, even under their own causation theory, is far too remote from the three pharmacy defendants' dispensing conduct to be justifiable. A series of actors, including drug dealers, cartels, and users of illicit opioids, among others, intervene before illicit opioid use can harm the community. Awarding relief for such remote harms here would be incompatible with Sixth Circuit precedent. *See, e.g.*, *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (city had not shown proximate cause in nuisance case where its "damages are difficult to connect to [the defendant's] actions and nearly impossible to disaggregate from other potential causes" of the undesirable effects); *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010) ("The directness requirement [of the proximate cause inquiry] requires some direct relation between the injury asserted and the injurious conduct alleged.") (quotation marks omitted).

The plan attached as Exhibit A includes remedies for harms that are relatively more closely tied to the three pharmacy defendants' dispensing conduct, while excluding more remote harms—the ones most clearly too far removed from any pharmacy conduct. For example, Exhibit A assumes, based on the Court's comments, that treatment for OUD will be part of the

Court's award. And it includes measures that would prevent medicine cabinet diversion, such as lock boxes and public education campaigns designed to curb such diversion. But Exhibit A excludes harms at least one step removed from ingesting prescription opioids, such as treatment of HIV (which is caused by needles used with illicit opioids, not prescription opioids), vocational training (which even Plaintiffs do not argue is required simply because someone ingested a diverted prescription opioid), and expenses related to broader societal problems that long predated the opioid crisis (such as expenses associated with adopted children or homelessness). Such indirect harms are not cognizable. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 271 (1992) (rejecting claim that defendants' stock manipulation led to insolvency of broker-dealers, which caused broker-dealers to default on financial obligations to plaintiff as too remote, because the harm to plaintiff was "purely contingent on the harm suffered by the broker-dealers"); *Ameriquest*, 615 F.3d at 504 (harms that "could have been caused by many other factors unconnected to the Defendants' conduct" are too remote to be cognizable). The programs that are not listed in Exhibit A should not be included in the Court's final award.

**D.    Any Final Award Must Set Off Settlements From Third Parties.**

The Court should also take precautions to protect against double recovery by Plaintiffs. "The law of Ohio," after all, "is well-settled that an injured party is entitled to only one satisfaction for his injuries." *Seifert v. Burroughs*, 526 N.E.2d 813, 814 (Ohio 1988); *see* Ohio Rev. Code § 2307.28(A) ("[T]he plaintiff shall not recover more than the total amount of the plaintiff's compensatory damages awarded by the trier of fact.").

"Setoff of settlement funds has been recognized as a means to protect against the danger of a double recovery in cases where settlement agreements have been entered into by co-defendants" or other alleged tortfeasors. *Celmer v. Rodgers*, No. 2004-T-0083, 2005 WL 3610479, at *4 (Ohio Ct. App. Dec. 29, 2005) (collecting cases); *see, e.g.*, *Spalla v. Fransen*, 936

N.E.2d 559, 566 (Ohio Ct. App. 2010). Indeed, by statute, settlement for "the same

injury . . . reduces the claim against the other tortfeasors" by the greater of the settlement amount

or the amount actually paid. Ohio Rev. Code § 2307.28(A).

Lake and Trumbull Counties will each receive $1.5 million from their settlement with

Giant Eagle from this very litigation. *See* DEF-MDL-15069 at 7. They will receive $6 million

($3 million per county) from their settlement with Rite Aid. DEF-MDL-14530 at 9. Plaintiffs are

also participating in national settlements with AmerisourceBergen, Cardinal, McKesson, and

Johnson & Johnson. *Id.* at 8. Lake County projects to receive up to $4.2 million from the

distributors and another $974,000 from J&J. *Id.* Trumbull County, meanwhile, projects to

receive up to $6 million from the distributors and up to $1.4 million from J&J. *Id.* The Counties

also stand to receive funds from the reorganizations of Purdue Pharma and Mallinckrodt, which

are still the subject of dispute. *Id.* at 8–9. These sums must be deducted from the total amount of

the abatement plan the Court would otherwise award, before the Court apportions Defendants'

share, *see infra* Section III. Failure to set off these settlement funds would violate the time-

honored principle that "that there can be but one satisfaction" for Plaintiffs' injuries. *Royal*

*Indem. Co. v. Becker*, 173 N.E. 194, 196 (Ohio 1930).

### E. The Court Should Exclude Amounts Paid By Insurance and Other Third Parties.

The final abatement plan should also not award any amounts for OUD treatment or any

other portion of the abatement plan that are covered by third-party insurers and federal

government assistance programs, for those are not costs incurred *by Plaintiffs*. The only injury

giving Plaintiffs standing to sue is *the Counties'* out-of-pocket costs. *See, e.g.*, *Lewis v. Lead*

*Indus. Ass'n*, 178 N.E.3d 1046 (Ill. 2021) (holding that plaintiffs who sued for economic loss but

had no out-of-pocket expense had not shown injury-in-fact sufficient to give rise to a claim);

*Gillespie v. Travelscape LLC*, No. C13-0622, 2014 WL 4243706 (W.D. Wash Aug. 26, 2014) (same). And the Counties will incur no out-of-pocket expense for programs funded through any source other than their own treasuries. They will not be injured, in short, for expenses they do not incur—and thus may not recover those expenses from Defendants.

Many of the costs Plaintiffs seek to recover here are paid for by third parties. Dr. Kessler's uncontradicted trial testimony established that 91.6% of individuals with OUD, and 62.3% of heroin users, have public or private health insurance that would cover the costs of OUD treatment as well medical treatment for complications arising from injection drug use such as HCV, HIV, and endocarditis. Dkt. 4455, May 16 trial tr., vol. 4, at 978:6–978:10; *id.* at 978:11– 978:25. Mr. Bialecki reviewed actual claims data for the Counties and confirmed that about 85% to 90% of costs of procedures in Trumbull County provided to patients for opioid-related diagnoses were covered by Medicaid. *Id.* at 759:5–795:20. He also testified at length about various federal grants the Counties receive for the very services they seek to have these pharmacies pay for here. *See id.* at 808:19–830:22. To take just one example, Lake County spent $729,378 from a U.S. Department of Health & Human Services grant for the prevention and treatment of substance abuse in 2020 alone, while Trumbull County spent $492,966 from the same grant source. *See id.* at 809:10–830:16; *id.* at 823:5–823:14. These alternative sources of funding eliminate most if not all of the prospective economic loss at the heart of Plaintiffs' abatement claim.[9] Allowing Plaintiffs to recover these unincurred expenses would constitute a pure windfall, for Plaintiffs (the Counties) are suffering no out-of-pocket loss.

---

[9] Defendants maintain and do not waive their position that because the abatement claim is really just a request for money to compensate harms allegedly caused by prior conduct, Plaintiffs are seeking damages, not abatement.

Trying to fend off this commonsense, equitable conclusion, the Counties have argued (Dkt. 4387 at 16) that the Court can ignore this fundamental problem because of the collateral source rule, which holds that "the plaintiff's receipt of benefits from sources other than the wrongdoer is deemed irrelevant and immaterial on the issue of damages." *Robinson v. Bates*, 857 N.E.2d 1195, 1199 (Ohio 2006); *see* Ohio Rev. Code § 2315.20. But that rule does not apply here for several fundamental reasons.

First and foremost, the collateral source rule does not create injury where it otherwise would not exist. *Lewis*, 178 N.E.3d at 1059 ("The problem with plaintiffs' reliance here upon the collateral source rule is that the rule prescribes the methodology of awarding damages but does not prescribe rules for determining whether plaintiff has suffered an injury."). Here, the Counties simply have not suffered an economic injury if a third party funded their programs.

As important, the collateral source rule applies only when the plaintiff seeks traditional, compensatory damages at law. *Robinson*, 857 N.E.2d at 1199; *see* Ohio Rev. Code § 2315.20. And this Court has repeatedly held—at Plaintiffs' request—that Plaintiffs' claim is equitable, not a claim at law for damages. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2019 WL 4621690, at *2 (N.D. Ohio Sept. 24, 2019). That is why the Court did not provide defendants a jury for the abatement phase of the trial. *Id.* Plaintiffs cannot have it both ways. If this is an action in equity, then the collateral source rule does not apply.

The rules of equity counsel against applying the collateral source rule here. Put simply, the "sole purpose" of the abatement remedy is to "eliminate the hazard that is causing prospective harm to the plaintiff." *ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th at 132. To the extent that the harm is already abated by a third party, a court in equity cannot order a defendant to pay for those abatement measures. *See, e.g.*, *Szedlock v. Tenet*, 139 F. Supp. 2d 725, 736 (E.D.

29

Va. 2001), *aff'd*, 61 F. App'x 88 (4th Cir. 2003) (requiring offset of annuity benefits to back pay award because of the "equitable nature of a back pay award" and because "equitable principles require an appropriate offset to ensure that plaintiff is only made whole and is not awarded a windfall"); *Lussier v. Runyon*, 50 F.3d 1103, 1110 (1st Cir. 1995) (recognizing that courts "possess the authority" to "tailor awards of front pay" for collateral sources like veteran's benefits given "the nature of equity itself"); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 967 (4th Cir. 1985) ("If such benefits would not have been granted but for the termination, it is equally appropriate to offset them from an award for back pay and benefits. Otherwise, plaintiff would enjoy the rewards from the employer both of working and not working."). So too here, where Plaintiffs have received significant sums from other governmental bodies and third-party payors are otherwise paying for the cost of OUD treatment.

In the CERCLA context, where courts are required to "allocate response costs among liable parties using . . . equitable factors," 42 U.S.C. § 9613(f)(1), court after court has found the collateral source rule inapplicable under this same windfall reasoning. *See, e.g.*, *Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1125 (D. Nev. 2008) (refusing to apply the collateral source rule because "[e]quity and common sense . . . dictate that Plaintiffs cannot recover the remediation costs paid for by their insurance policies."); *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1189 (9th Cir. 2000) ("[O]ne equitable factor is preventing someone from recovering for the same harm twice."); *United States v. Davis*, 31 F. Supp. 2d 45, 64 (D.R.I. 1998) ("There is nothing 'equitable' about [the] kind of an allocation" that permits the plaintiff "to recover a portion of the costs for which it already has been or will be compensated.").

But Plaintiffs' argument fails even if this is an action for damages. In Ohio, "[t]he General Assembly has expressly established that evidence of collateral benefits is admissible,"

30

except for when "the source of the payment has a contractual right of subrogation," which is not the case here. *Jaques v. Manton*, 928 N.E.2d 434, 437 (Ohio 2010). By statute, "[i]n any tort action, the defendant may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the damages that result from an injury, death, or loss to person or property that is the subject of the claim upon which the action is based." Ohio Rev. Code § 2315.20.

By law and by equity, then, any abatement award must be reduced by this money to ensure that any award addresses only actual, out-of-pocket costs Plaintiffs will incur. *See* 66 C.J.S. Nuisances § 166 (May 2022 update) (court's discretion to order abatement must account for "all the facts and special circumstances of each case"; it may deny equitable relief to the extent that the nuisance has already been abated).

### F. Any Abatement Relief Must Have Clear Mechanisms to Prevent Waste and Fraud.

If adopted, Plaintiffs' proposed abatement plan would dramatically increase the sums flowing into the counties. For example, the proposed abatement plan would increase Trumbull County's expenditures each year by almost 50%. *Compare* Dkt. 4455, May 16 trial tr., vol. 4, at 819:5–819:9 (Trumbull County 2020 net position $190 million) *with* P23127_00012 (requesting over $87.1 million in abatement for Trumbull County for 2021). Even Plaintiffs' expert Dr. Alexander testified that it is "important that [any awarded abatement] funds are used for the purposes that they're intended and that there is an administrative structure in order to facilitate such." Dkt. 4446, May 11 trial tr., vol. 2, at 448:7–448:15. Yet Plaintiffs offer no solution to ensure that the Counties control and spend the proposed influx of cash efficiently and for its intended purposes. Any abatement award must mitigate the risks of waste and fraud—as well as speculation about future costs—by requiring mechanisms beyond a vague and unchecked

certification from a county official to ensure that the funds are spent to abate the nuisance the

jury found, on expenses actually incurred to implement the Court-ordered abatement plan.

"Health care fraud drains billions of dollars from public and private payers annually."

*United States v. Lucien*, 347 F.3d 45, 48 (2d Cir. 2003); *see* Comm. on Gov't Reform and

Oversight, Health Care Fraud: All Public and Private Payers Need Federal Criminal Anti-Fraud

Protections, H.R. Rep. No. 104-747 (1996). The National Health Care Anti-Fraud Association

estimates that the financial losses due to health care fraud are in the tens of billions of dollars

each year. *See* National Health Care Anti-Fraud Association, *The Challenge of Health Care

Fraud*, https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-

care-fraud/ (last visited June 10, 2022). Courts have recognized that "[f]raud is a well-known

contributor to increased costs for health care services." *Ironworkers Loc. Union 68 v.

AstraZeneca Pharms., LP*, 634 F.3d 1352, 1368 (11th Cir. 2011).

Given the risks of fraud and waste, the Court should follow the example of *Liddell v.

Board of Education of City of St. Louis*, 771 F. Supp. 1496, 1498 (E.D. Mo. 1991). There, a court

reviewed the City Board's asbestos abatement program, funded by the state and governed by the

federal Asbestos Hazard Emergency Response Act and its implementing regulations. The court

rejected an open-ended quarterly payment schedule for projected costs as they accrued, because

the proposed schedule "prevent[ed] review by the State as to accuracy and reasonableness of the

costs and [was] open to abuse." *Id.* at 1502. Instead, the court stated that a "checks and balance"

system should "be developed which affords the State the opportunity to review the costs while

allowing the City Board to continue the prompt implementation of its asbestos abatement

program." *Id.*

The same is true here. Plaintiffs' abatement plan is a novel experiment of massive scale, providing an influx of cash to the Counties with no safeguards to ensure such a program is run efficiently and effectively, with money being spent only for its intended purpose. *See* Dkt. 4455, May 16 trial tr., vol. 4, at 813:14–814:13; *id.* at 820:8–822:9.

Because health care fraud is so common, the Court can and should avail itself of certain fraud-prevention mechanisms that have already been developed.  For example, if the abatement plan is to involve OUD treatment, the Court must ensure that providers paid by the program are appropriately vetted. That provides yet another reason to continue to require treatment providers to submit requests for payment to Medicaid and/or private insurance, where applicable, before drawing from any abatement fund. Both systems have well-developed fraud-prevention mechanisms, which would help deter abuse of large sums of money flowing into the Counties.

Unfortunately, no existing fraud prevention mechanism would satisfactorily prevent fraud in an abatement plan like the one Plaintiffs seek. To the extent that it awards abatement at all, the Court should award it in a form that allows Defendants or an administrator to audit the expenditures against an approved and detailed abatement plan outlining what expenditures are permissible. Such a system will mitigate the risk of waste and fraud. Defendants reiterate their prior request for a third-party administrator, and incorporate by reference the portion of the Track 3 Defendants' Abatement Plan setting out the proposed terms for an administrator. *See* Doc. 4337 at 9-10.

## III.    THE AWARD MUST BE APPORTIONED AMONG DEFENDANTS AND OTHER TORTFEASORS

The three defendant pharmacies—which by all accounts are responsible for at most a tiny fraction of the nuisance in question, no matter how defined—cannot be ordered to pay for the entire harm caused by the opioid crisis, or even the total abatement for pharmacies generally.

Instead, after determining the proper total abatement for these defendants, the Court should apportion any award so that no defendant pays more than its share of individual responsibility. Any other approach would not only be unjust and inequitable, punishing the pharmacies for conduct they had nothing to do with, but it also would transgress the Restatement, Ohio case law, and the Constitution.

> ### A. Under the Restatement and Ohio Nuisance Cases, Defendants Can Be Liable Only for the Portion of the Abatement Award Reasonably Attributable to Them.

As this Court has observed, Ohio law on public nuisance follows the common-law rules set forth in the Restatement. Dkt. 2572 at 1; *see, e.g.*, *Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *3 (Ohio Ct. App. Mar. 21, 2013). The Restatement, in turn, contains a specific section on apportionment in nuisance cases. Restatement (Second) of Torts § 840E cmt. b (1979). The general nuisance rule is for "apportionment . . . on the basis of the extent of the contribution of each party," so that "each person contributing to the nuisance is subject to liability only for his own contribution." *Id.*

This nuisance-specific apportionment section aligns with, and cross-references, the general apportionment discussion in Sections 433A and 433B. Under those sections, monetary relief must be apportioned among two or more causes either when "(a) there are distinct harms," or when "(b) there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A (1965). Even though "the burden of proof as to the apportionment" generally rests on the defendant, *id.* § 433B(2), when, as here, there are a large "number of actors, each of whom contributes a relatively small and insignificant part to the total harm," the Restatement instructs courts not to impose joint liability even if the defendant "cannot show the amount of his contribution," *id.* § 433B cmt. e.

Ohio courts have long followed these principles. In nuisance cases in which "different parties [have taken actions that] . . . intermingle and cause an actionable nuisance," Ohio courts have held that the tortfeasors "are not jointly liable," at least when "there is no common design or concert of action," but "each is liable only for his proportion" of the harm. Syl. ¶ 2, *City of Mansfield v. Brister*, 81 N.E. 631 (Ohio 1907). For example, "where different parties pollute a stream by the discharge of sewage therein, each in his own premises, and each acting separately and independently of the others, one of the number is not liable for all of the injury suffered by another, because of the nuisance they created. Each is liable only to the extent of the wrong committed by him." *Id.* at 633. The general rule for apportionment in nuisance cases is thus: "[T]he acts of the various parties [are] several and not joint, the rule being that there is no joint liability for damages where there is no common design or concert of action, and that each is liable only for his proportion." *Oyler & Oyler v. Louisville & Nashville R.R. Co.*, 18 Ohio App. 481, 485–86 (1923). The Restatement fairly summarizes all this when it provides that "many nuisances are capable of apportionment among two or more persons who contribute to them, because a reasonable basis can be found for dividing the harm done on the basis of the extent of the contribution of each party." Restatement § 840E cmt. b.

All of this reflects general principles of equity in nuisance actions. The plaintiff has no entitlement to abatement, and the district court must consider the rights of all the parties, including the defendants, with an eye toward "effecting the ends of justice." 66 C.J.S. Nuisances § 166. When there are many tortfeasors over many years that each had various roles in creating a public nuisance, it would be highly unjust to force a small subset of defendants into presumptive joint liability. Restatement § 433B cmt. e (offering the example of a lawsuit with "a hundred factories" that contributed to "the entire damage"); *cf., e.g.*, *State ex rel. Brown v. BASF*

35

*Wayandotte Corp.*, Nos. 33533, 33545, 33549, 1975 WL 182459, at *5 (Ohio Ct. App. Apr. 24, 1975) (per curiam) (requiring apportionment even in a legal nuisance action for pollution to Lake Erie, because "the deteriorated condition of Lake Erie . . . was caused by innumerable contributors over hundreds of years").

Applied here, "each [pharmacy] is liable only for [its] proportion" of the total amount the Court finds to be the proper abatement award. *Oyler*, 18 Ohio App. at 485–86. The Court should thus divide the award "in proportion to the contribution of each [pharmacy] or upon some other reasonable basis afforded by the evidence." Restatement § 840E cmt. b.

### B. Plaintiffs' Arguments for Joint Liability Are Meritless and Would Result in Constitutional Violations.

Plaintiffs have advanced two arguments against apportionment on these facts—first that apportionment is improper under *Pang v. Minch*, 559 N.E.2d 1313 (Ohio 1990), and next that apportioning only a small percentage of responsibility to defendants would conflict with the jury's "substantial factor" finding. Neither argument has merit, and imposing joint liability in these circumstances would violate the Constitution.

#### 1. The framework set forth in *Pang v. Minch* does not apply here.

Plaintiffs focus on the framework set forth by *Pang* to argue that defendants have not sustained *their burden* to show that the harm is apportionable. But *Pang* is irrelevant here—as evidenced by the Restatement, which *Pang* itself adopted.

In *Pang*, which notably was not a case in equity, an injured driver had been in three separate car accidents, each involving one discrete tortfeasor, and had suffered an irreparable spinal injury. 559 N.E.2d at 1317. Expressly adopting Sections 433A and 433B of the Restatement (Second) of Torts, the Ohio Supreme Court determined that "where a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof

36

is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm." *Id.* at 1324. Once a plaintiff has done so, "the burden of persuasion shifts to the defendants to demonstrate that the harm produced by their separate tortious acts is capable of apportionment." *Id.*

*Pang* does not apply here because, unlike this case, it involved three (and only three) possible tortfeasors. In that kind of limited-tortfeasor case, by far the most typical kind of apportionment case, *see* Restatement § 433B cmt. e, courts properly shift the burden to the small number of defendants to affirmatively show how the damages should be apportioned.

The Restatement, however, in the very section expressly adopted by *Pang*, explains that a different framework applies in this kind of case—where, as Plaintiffs themselves recognize, there are "[m]any, many, many causes" of the nuisance, Dkt. 4064, Oct. 21 trial tr., vol. 13, at 3558. In the words of the Restatement, when there are not "two or three" actors involved, but "so large a number of actors" who each "contribute[d] a relatively small and insignificant part" to the total injury, the Court must apportion. Restatement § 433B cmt. e. That is the case here, where the large number of actors includes the government, all the pharmacies in the two counties (*i.e.*, Defendants, CVS, Rite Aid, Giant Eagle, other chain pharmacies, and the independent pharmacies), all the manufacturers of opioids, all the distributors of opioids, all the doctors prescribing opioids in the counties, and many others. *See, e.g.*, Dkt. 4153, Nov. 15 trial tr., vol. 28, at 7177 (Plaintiffs' counsel recounting the "host of people to blame," from "the doctors" to the "manufacturers" and from the "drug cartels" to the DEA, FDA, and Ohio Board of Pharmacy). Without apportionment in this kind of multi-tortfeasor case, the court's award would be "unjust" and would "cause disproportionate hardship" to the small subset of defendants who would be forced to pay for the entire nuisance rather than only their proportionate share of it.

Restatement § 433B cmt. e. It would be improper and inequitable, in other words, to force these three pharmacies to *presumptively* pay for the entire nuisance, even while all involved acknowledge the pharmacies' limited role in creating and sustaining it.

This analysis, moreover, applies no matter how the "nuisance" is defined. If the nuisance were what Plaintiffs' abatement plan tries to address—the opioid crisis writ large—there are countless causes. *See, e.g.*, Dkt. 4153, Nov. 15 trial tr., vol. 28, at 7177. And even if the nuisance is limited (as it should be) to what the jury found—oversupply and diversion of prescription opioids—there are still a host of other actors, including the government, non-defedant pharmacies, prescribing doctors, and manufacturers, to blame. No matter what, therefore, the abatement award of any nuisance must be apportioned.

Any non-apportioned award here would be especially unjust because defendants were blocked from obtaining the kind of evidence needed for a detailed proof of allocation. For one thing, the Court structured the bellwether trials to separate these three pharmacy chains from other potential tortfeasors at trial. Neither the Court nor the jury, therefore, could hear extensive evidence about those other tortfeasors—many or all of whom played much more substantial roles in creating the alleged nuisance. Even then, the Court, over defendants' repeated objections, allowed Plaintiffs to prove their case against these three pharmacies *in the aggregate*. Plaintiffs were therefore able to repeatedly block precisely the sort of individualized discovery that would even *allow* a detailed proof of allocation. Plaintiffs intentionally omitted from trial obvious bases for apportionment, including individual patients' case histories, facts regarding what percentage of red-flagged prescriptions in the Counties were influenced by manufacturer marketing, and the like.

Having elected to present their case in such a high-level, statistical fashion—against only three defendants rather than all tortfeasors together—Plaintiffs cannot now shift the burden to these defendants to come forward with more granular proof that is not within their possession by Plaintiffs' own design. Indeed, Plaintiffs even opposed the jury instructions and special interrogatories that defendants submitted on the apportionment topic. *See* Dkt. 4146 (preserving objection that jury should decide issue of apportionment); Dkt. 3579 at 2 (objecting to all proposed changes in Dkt. 3449); *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804, 2020 WL 7330956, at *3 (N.D. Ohio Dec. 9, 2020) (ruling that "apportionment of the costs of abatement" will be decided in Phase II of trial and concluding that the Court "will not instruct the jury on apportionment as requested by Defendants"); Dkt. 3449 at 119, 126 (defendants propose apportionment interrogatories on verdict form and Plaintiffs object to the proposed verdict form "in its entirety"); Dkt. 3449, Ex. B at 45–46 (defendants propose apportionment instruction).

These principles, reflected in the Restatement and requiring apportionment, also explain why courts have refused to impose joint liability in public-nuisance cases in which not all the "innumerable contributors" to the harm "have been joined as defendants." *E.g.*, *BASF Wayandotte*, 1975 WL 182459, at *5. Courts have even held that "in no instance may defendants be held jointly and severally liable" for the "damage done . . . by persons or entities not made defendants in the lawsuit." *Id.*; *see In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 372 n.69 (S.D.N.Y. 2005) (collecting cases). When fewer than "all possible tort-feasors [are] before the court" and when "there is a great number of possible wrongdoers," liability "is several only," with each defendant liable only for its proportionate share. *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, 1074, 1076, 1078 (N.Y. 1989) (examining

39

and applying the Restatement); *see, e.g.*, *Smith v. Cutter Biological, Inc., a Div. of Miles Inc.*, 823 P.2d 717, 725 (Haw. 1991) (same because fewer than "all [the many] responsible parties [were] joined"). That certainly describes this case, where the Court not only severed the manufacturer and distributor defendants and Plaintiffs settled with Giant Eagle and Rite Aid, but also where there are so many other tortfeasors and wrongdoers left unnamed, such as the doctors, the manufacturers, and the government itself.

The supposedly contrary cases on which Plaintiffs rely, *see* Dkt. 4321 at 25–28, all from outside of Ohio, are inapposite because they involved a limited and discrete number of tortfeasors. *See, e.g.*, *United States v. Twp. of Brighton*, 153 F.3d 307, 319–20 (6th Cir. 1998) (applying a "federal common law" standard to a strict-liability case with two alleged CERCLA tortfeasors with control over the dumpsite, and yet still finding that divisibility was "possible"). Plaintiffs have cited no case like the present one, with so many tortfeasors, known and unknown, sharing responsibility for a broad nuisance, where any court has imposed joint liability for the *entire* nuisance on a small subset of the tortfeasors named as defendants.

### 2. The award can be apportioned even under *Pang*'s limited-and-discrete-tortfeasor framework.

Even under Plaintiffs' distinguishable cases, and even applying *Pang*'s framework for limited-and-discrete-tortfeasor cases rather than the framework for this kind of many-tortfeasor case, and even accounting for the limitations that were imposed on defendants during discovery, the award is still apportionable. Under *Pang*, the defendant must show that "there is a reasonable basis for determining the contribution of each cause to a single harm." 559 N.E.2d at 1322. The Restatement also uses the "reasonable basis" formulation. Restatement § 433A(1)(b). An earlier Ohio Supreme Court case (overruled on a different point by *Pang*) likewise provides that "tort-feasors generally will not be held jointly and severally liable where [1] their independent,

concurring acts have caused distinct and separate injuries to the plaintiff, or where [2] some reasonable means of apportioning the damages is evident." *Ryan v. Mackolin*, 237 N.E.2d 377, 381 (Ohio 1968).

For reasons already explained, the Court's award must exclude any amount caused by tortfeasors other than these three pharmacy defendants or from an injury distinct and separate from the oversupply of prescription opioids. For example, someone suffering from a pure fentanyl addiction has a harm "separate" from any harm these defendants caused; that harm was caused by tortfeasors other than these defendants and by actions other than filling prescriptions and cannot be included in any award. So too for reeducating physicians and paying for them to attend classes, when Plaintiffs have not even *alleged* (nor could they) that pharmacies are responsible for prescribing habits. These sorts of distinct injuries, caused by others, must be excised from the award before the Court even reaches the question of a reasonable basis to apportion. Restatement § 433A(1); *see Pang*, 559 N.E.2d at 1322; *Ryan*, 237 N.E.2d at 381.

Then, there are numerous reasonable bases for apportioning any proper abatement award. For example, Drs. Kessler and Chandra each presented their own, separate analyses of the apportionment of opioid-related harm in the counties. Dr. Kessler found that the pharmacy defendants contributed 1.3% in Lake County and 1.2% in Trumbull County, and Dr. Chandra found that the pharmacy defendants contributed 6.7% in Lake County and 2.8% in Trumbull County. Dkt. 4455, May 16 trial tr., vol. 4, at 998:15–1000:5; Dkt. 4460, May 17 trial tr., vol. 5, at 1255:1–1257:3; WMT DEM 002 at 13; CVS Demo-16. Other scenarios that Defendants disagree with as a factual matter, but nevertheless would present reasonable alternatives if the Court views the facts differently, are set forth below in Section IV. Each scenario incorporates elements from the various experts who testified at trial. They each begin with Alexander's

bloated "redress" model, offset by amounts received by the Counties in previous opioid settlements. They then reduce that figure to correct for certain overstatements Dr. Kessler described at trial, or to more directly address the appropriate abatement concern. Each scenario then apportions in accord with the analyses provided by Drs. Chandra or Kessler.

These scenarios are also supported by the case law, which have ordered apportionment with far less a reasonable basis for doing so. In *Mays v. Moran*, Nos. 97CA2385, 97CA2386, 1999 WL 181400, at *7 (Ohio Ct. App. Mar. 18, 1999), for instance, the court held that there was a reasonable basis to apportion in a nuisance case because different defendants each could have stopped the harm by ceasing their conduct. In other words, the simple fact that each defendant had a discrete role showed that the defendants' conduct was not in concert and thus that the award was apportionable. Similarly, in *BASF Wayandotte*, the court reversed a grant of summary judgment against apportionment, holding that if *the plaintiffs* did not offer "some rational way" to divide up the harm from the nuisance, they could not recover from the defendants; the defendants could not be "liable for damage done to Lake Erie by persons or entities not made defendants in the lawsuit." 1975 WL 182459, at *5. This also is reflected in earlier Ohio Supreme Court cases, most notably *City of Mansfield v. Brister*, 81 N.E. 631 (Ohio 1907), where the defendant was only one of the five sources of pollution, and yet the only polluter sued. *Id.* at 632. The Court held that "each [polluter] is liable only for his proportion of the damages." Syl. ¶ 2, *id.*; *see id.* at 633–38 (collecting and discussing cases). The only equitable path is to require pharmacies to pay only their share of the total abatement cost. *See infra* Section IV.

Previously, Plaintiffs argued that apportionment is not possible in this case by analogizing apportionment to a baked cake: "[Y]ou can take flour, you can take salt, you can

take sugar, you can take baking soda, eggs, oil, you can mix sugar, you can mix it all together, and you get a cake. Once you've made that cake, it's impossible to parse out the baking powder, it's impossible to parse out the flour, the sugar. You've just got a cake." Doc. 4438 at 8. That analogy fails.  Indeed, if anything, the cake analogy *supports* apportionment.  While it is no longer possible to extract separate ingredients from a fully baked cake, that misses the point. We know the amount and proportion of each ingredient that contributed to the final cake—just as we have detailed data about the defendants' respective participation in the dispensing of prescription opioids in the Counties. Plaintiffs' own experts refined that data even further by isolating the specific prescriptions they believe defendants should not have dispensed without further inquiry and documentation about purported red flags. Apportionment seeks to hold defendants accountable for their share of the conduct contributing to the nuisance.  And, like a cake, that share is ascertainable by consulting the "recipe."

### 3. Apportionment does not conflict with the jury's "substantial factor" finding.

The Court has indicated that apportioning a small percentage of responsibility to Defendants conflicts with the jury's finding that each Defendant was a "substantial factor" in the opioid epidemic. But that is not so for at least two reasons.

*First*, the Court previously ruled that the jury could have rested a "substantial factor" finding on *less than 1% culpability*. Indeed, the Court rejected Walmart's summary-judgment argument in Track 1B that its "market share of less than 1.3% of the total opioids" distributed in Track 1 counties meant that it could not have been a substantial factor. *Nat'l Prescription Opiate Litig.*, 2020 WL 425965, at *2. In the process, the Court noted that a jury could find a defendant a substantial factor even for a market share of "only 0.03%." *Id.* If the Court thinks that 0.03%

could constitute a substantial factor for *liability*, then the Court should be able to apportion that small a percentage for the *remedy*.

      ***Second***, and anyway, this argument is foreclosed by the Restatement and Ohio law. *See, e.g.*, *BASF Wyandotte*, 1975 WL 182459, at *5. The Restatement requires apportionment when the defendants are only a fraction of the "large . . . number of actors, each of whom contribute[d] a relatively small and insignificant part to the total harm," Restatement § 433B cmt. e. Thus, apportionment is only at issue when "two or more causes have combined to bring about harm to the plaintiff, and *each has been a substantial factor in producing the harm*." Restatement § 433A cmt. a (emphasis added). It will *always* be the case that a defendant seeking apportionment has already been found to be "a substantial factor in producing the harm." *Id.* Apportionment thus *must* require a separate inquiry, apart from a jury's "substantial factor" inquiry.

### 4.      Refusing to apportion would violate the Constitution.

      If this Court instead imposes joint liability, that would do more than transgress Ohio law and the principles set out in the Restatement. It would also create "an award [that] is grossly excessive" compared to Defendants' conduct, violating the Constitution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416–17 (2003); *see Kidis v. Reid*, 976 F.3d 708, 715 (6th Cir. 2020). When Plaintiffs themselves agree that "the *major causes* of the opioid epidemic" were *other* actors not before the Court in this case, including "[m]anufacturers, the FDA, and the DEA," Dkt. 4064, Oct. 21 trial tr., vol. 13, at 3532:24–3533:4 (emphasis added), "it furthers no legitimate purpose and constitutes an arbitrary deprivation of property" to make these three pharmacy defendants pay for everything or prove that they should not have to. *State Farm*, 538 U.S. at 416–17.

      As the Supreme Court has explained, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a

tortfeasor" and "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.*

Making an actor with only a small amount of culpability jointly liable for an entire award payable to the government would also violate the Excessive Fines Clause. *See Timbs v. Indiana*, 139 S. Ct. 682, 686–87 (2019) (incorporating this Clause against the States). "[A]t the time the Constitution was adopted, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 327 (1998) (quotation marks omitted). "The Excessive Fines Clause thus limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Id.* (quotation marks omitted); *see Austin v. United States*, 509 U.S. 602, 609–10 (1993).

The key question, then, is whether the government here is extracting payments as *punishment*. And the answer here, at least if Plaintiffs get their way, is yes: the government would be punishing these defendants. "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law"; those labels are not dispositive. *Austin*, 509 U.S. at 610. Instead, courts look to the character of the monetary award. An award that merely remedies a wrong proximately caused by the defendant is "wholly remedial" and thus not punishment. *F.P. Dev., LLC v. Charter Twp. of Canton*, 16 F.4th 198, 209 (6th Cir. 2021). A properly tailored abatement award—and one that is several only— theoretically would be "wholly remedial" and thus would not violate the Constitution. But an award that "even in part" strays from that narrowly tailored and remedial purpose becomes punishment. *Id.*; *see, e.g.*, *Austin*, 509 U.S. at 621–22. What Plaintiffs are seeking—placing all the blame and all the costs of the "opioid crisis" on three pharmacies that had at most a tiny role, with no deductions for funds received from other sources—is the furthest thing from remedial.

45

Plaintiffs' plan seeks costs going well beyond the direct harm caused by defendants and funding a substantial percentage of the Counties' full budgets for all operations for a year. Such an award would be grossly disproportionate to the harm the jury found these pharmacy defendants proximately caused, and it could not "fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving . . . retributive . . . purposes." *Austin*, 509 U.S. at 610. It would therefore violate the Excessive Fines Clause. *See id*. at 627 (Scalia, J., concurring in part and concurring in the judgment) (explaining how the "touchstone" of the excessiveness inquiry is the "value" of the award "in relation to the offense").

Moreover, in this case it would be particularly unfair to place the burden of showing allocability on each defendant because Plaintiffs' proof was so general that it could not prove the sort of indivisible harm needed to impose joint liability in the first place. To put a finer point on this, while Plaintiffs seek money to treat individuals suffering from opioid abuse, they chose, over defendants' repeated objections, to prove their case at trial without addressing the circumstances of any of the persons around whom their abatement requests now are centered. Their proof—which they termed "aggregate proof"—instead consisted of statistics on the number of prescriptions each defendant filled and expert opinions on the general correlation in certain epidemiologic studies between this asserted oversupply and opioid abuse. The discovery process only enhanced the unfairness and undue prejudice that would result from anything but several liability. Plaintiffs refused to respond to discovery requests for information on the individuals suffering from opioid abuse whom they seek to treat under their abatement plan, and the Court sustained their position. *See, e.g.*, Dkt. 4275 (ruling that defendants are not "entitle[d] . . . to extensive personal information about every individual contemplated by Plaintiffs' abatement plan"). Plaintiffs cannot argue, on one hand, that the burden should be shifted to

46

defendants to prove apportionment and then, on the other hand, block discovery that defendants could use to prove apportionment.

## IV.    POTENTIAL APPORTIONMENT FRAMEWORKS

The Court has indicated it will award abatement costs and has requested that the parties propose compromises between Plaintiffs' and defendants' positions. Defendants submit that their proposed remedy—funding drug safe disposal and take-back programs only—is the only abatement remedy that could possibly comply with the binding legal principles above and in other briefs. Nevertheless, and without waiving that position and in response to this Court's request, Defendants have attempted to fashion a one-year apportionment framework that addresses certain of the most glaring flaws in the wildly excessive plan Plaintiffs have proposed. Those five options are set forth below.[10]

### A.    Option 1: Corrected Cost Figures

The first framework begins with Plaintiffs' one-year cost projections corrected (1) for overstatements of individuals with OUD, those with OUD who will seek treatment, and OUD treatment length, (2) to exclude projected costs covered by insurance, and (3) to account for other smaller overstatements, all supported by Dr. Kessler's testimony. *See* WMT DEM 002 at 13–14; Dkt. 4455, May 16 trial tr., vol. 4, at 955:10–955:25, 961:9–961:16, 970:20–971:8, 975:18–975:24, 976:14–977:9, 984:20–986:10. The framework then subtracts from that figure the total amount of settlements Plaintiffs have received from other opioid defendants in this litigation.

---

[10] Calculations of these same options as a 5-year abatement plan are attached hereto as Ex. B.

That adjusted amount is then apportioned to Defendants in two steps. First, the sum is divided by two because for each challenged opioid prescription a pharmacy filled, the prescriber who wrote the prescription (as well as many others) share responsibility for the prescription. Allocating 50% responsibility to the pharmacy is very generous to Plaintiffs, given the undisputed evidence that a physician wrote each prescription, and that numerous other causal factors led to oversupply and diversion of prescription opioids, including FDA and DEA, manufacturers, distributors, the criminals who divert prescription opioids outside of medical channels, and many others.

### Option 1: Corrected Cost One-Year Cost Projections

1-Year Corrected Cost Projection:                        $68,002,548

Less Combined County Settlements:       $68,0002,548 − $19,770,073[11] = $48,232,475

Less Prescribers' Responsibility:                $\frac{\$48,232,475}{2} = \$24,116,237$

From that figure, costs are apportioned in one of two ways: by total pharmacy dispensing market share,[12] or by total red flag market share[13] (which Defendants submit is a fairer allocation, and indeed the only one connected to the dispensing conduct challenged at trial).

---

[11] Plaintiffs provided defendants with estimated ranges they would receive from their settlements with opioid manufacturers and distributors. To provide the Court with a true middle ground, Defendants selected the mid-point for each of those ranges and incorporated those figures in here and throughout Defendants' proposals.

[12] Total market share is 19.2% for Walgreens (averaging percentages for Lake and Trumbull Counties), *see* CVS-MDL-05013; CVS-MDL-05014, and 3.15% for Walmart. WMT-MDL-01541A.

[13] Red flag market share is 18.9% for Walgreens, CVS-MDL-05013; CVS-MDL-5014 (averaging percentages for Lake and Trumbull Counties) and 0.9% for Walmart, WMT-MDL-01577.

| Option 1 Market Share Apportionment: | | |
| --- | --- | --- |
| <u>Pharmacy</u> | <u>Lake County</u>[14] | <u>Trumbull County</u> |
| Walgreens: | $2,009,558 | $2,620,760 |
| Walmart: | $329,693 | $429,968 |

| Option 1 Red-Flag Market Share Apportionment: | | |
| --- | --- | --- |
| <u>Pharmacy</u> | <u>Lake County</u> | <u>Trumbull County</u> |
| Walgreens: | $1,978,158 | $2,579,810 |
| Walmart: | $94,198 | $122,848 |

### B.     Option 2: Eliminating the Most Remote Relief

Option 2 starts with Dr. Alexander's inflated and unproven projections, without any of the corrections applied in Option 1. Option 2 then removes the most remote categories of Plaintiffs' plan, including relief to address allege harms that are at least one step removed from dispensing conduct, *see supra* Section II.C. This method includes only the programs listed in Ex. A: (1) take-back boxes at pharmacies; (2) OUD treatment for residents of the Counties; and (3) education campaigns addressing medicine cabinet diversion of prescription opioids. The calculation then proceeds as in Option 1.

---

[14] In these apportionment frameworks, Defendants allocate funding between the Plaintiff counties based on the percentage attributed by Dr. Alexander's uncorrected 5-year abatement plan proposal: 56.6% to Trumbull County and 43.3% to Lake County.

**Option 2 Eliminating Most Remote Relief**

Adjusted One-Year Cost Projections:　　　　　　　　$84,093,471[15]

Less Combined County Settlements:　　　　$84,093,471 − $19,770,073 = $64,323,398

Less Prescribers' Responsibility:　　　　　　$$\frac{\$64,323,398}{2} = \$32,161,699$$

| Option 2 Market Share Apportionment: | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $2,679,970 | $3,495,076 |
| Walmart: | $439,683 | $573,411 |

| Option 2 Red-Flag Market Share Apportionment: | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $2,638,096 | $3,440,466 |
| Walmart: | $125,624 | $163,832 |

### C.　　Option 3: Adjusted OUD Population Estimate

Option 3 also begins with Dr. Alexander's uncorrected, inflated projections, and then adjusts the projections by modifying Alexander's projected OUD population, which he based on Dr. Keyes' OUD population estimate. The evidence showed that Dr. Keyes' estimate is based on her faulty formula, which caused her to misapply her multiplier method. *See supra* Section I.C; Dkt. 4455, May 16 trial tr., vol. 4, at 920:5–920:16. Instead of relying on Keyes's OUD

---

[15] *See* Ex. B and figures cited therein.

population estimate, Option 3 divides in half Dr. Kessler's correction to Plaintiffs' overstatement of the number of individuals with OUD. The calculation then proceeds as in Options 1 and 2.

### Option 3 OUD Population Correction:

Uncorrected One-Year Cost Projection:        $155,197,257

Adjusted Projection Based on OUD Correction:        $\dfrac{\$195,648,274}{2} = \$97,824,137$

Less Combined County Settlements:        $\$97,824,137 - \$19,770,073 = \$78,054,064$

Less Prescribers' Responsibility:        $\dfrac{\$78,054,064}{2} = \$39,027,032$

| Option 3 Market Share Apportionment: | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $3,252,045 | $4,241,146 |
| Walmart: | $533,539 | $695,813 |

| Option 3 Red-Flag Market Share Apportionment: | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $3,201,231 | $4,174,878 |
| Walmart: | $152,440 | $198,804 |

### D.  Option 4: Eliminating Projected Costs Not Attributable to Prescription Opioids

Option 4 begins with Plaintiffs' full scope of programs and inflated cost estimate projections. It then deducts the settlement amounts due and further reduces the costs by 35% as a conservative estimate of the contribution of illicit opioids to the opioid-related harms in the

Counties. This 35% adjustment is based on Dr. Keyes' testimony that 34% and 37% of the

opioid mortalities from 2015 to 2019 in Lake and Trumbull County, respectively, were not

directly or indirectly attributable to prescription opioids. *See* May 10 trial tr., vol. 1, at 102:17–

104:9; WAG Demo-32. The remainder of the calculations reflect those in Options 1 through 3.

### **Option 4: Eliminating Projected Costs Not Attributable to Prescription Opioids**

Plaintiffs' Uncorrected 1-Year Costs:                          $155,197,257

Less Combined County Settlements:        $155,197,257 − $19,770,073  = $135,427,184

Less 35%:                        $135,427,184 − 47,399,514.32 = $88,027,669

Less Prescribers' Responsibility:                $$\frac{\$88,027,669}{2} = \$44,013,835$$

| Option 4 Market Share Allocation: | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $3,667,585 | $4,783,071 |
| Walmart: | $601,713 | $784,723 |

| Option 4 Red-Flag Market Share Allocation: | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $3,610,279 | $4,708,336 |
| Walmart: | $171,918 | $224,206 |

### E.    Option 5: Plaintiffs' Uncorrected Projections

Finally, Option 5 makes no corrections or adjustments to Dr. Alexander's proposed

programs and projected costs, except to deduct the Counties' opioid settlements with other

parties. It then conducts similar market share apportionments as in Options 1 through 4.

**Option 5: Plaintiffs' Uncorrected Projections**

Plaintiffs' Uncorrected 1-Year Costs:     $155,197,257

Less Combined County Settlements:     $155,197,257 − $19,770,073 = $135,427,184

Less Prescribers' Responsibility:     $\dfrac{\$135,427,184}{2} = \$67,713,592$

| Option 5 Market Share Apportionment: | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $5,642,438 | $7,358,571 |
| Walmart: | $925,713 | $1,207,266 |

| Option 5 Red-Flag Market Share Apportionment | | |
|---|---|---|
| Pharmacy | Lake County | Trumbull County |
| Walgreens: | $5,554,275 | $7,243,594 |
| Walmart: | $264,489 | $344,933 |

\*               \*               \*

For the reasons set forth throughout this brief and in prior briefing, Defendants object to an award under any of the five options described above. Nevertheless, without waiving any of their arguments as to liability or remedy, Defendants describe the options above in a good-faith attempt to comply with the Court's specific instruction to provide apportionment methods that would produce an award somewhere between the parties' respective positions.

53

## V.  ANY INJUNCTIVE RELIEF THE COURT ORDERS MUST BE CONCRETE, FEASIBLE, AND SUPPORTED BY THE EVIDENCE PRESENTED AT TRIAL

In addition to requesting "middle ground" paths forward for abatement relief, the Court also requested the parties to submit proposals for injunctive relief. Defendants object to the need for an injunctive order for a variety of reasons. If the Court chooses to enter an injunctive order, over Defendants' objections, Defendants request that the order substantially follow the form of the draft order attached as Ex. C.

Two of Defendants' objections to injunctive relief warrant particular discussion.

*First*, imposing extra-statutory requirements on pharmacy practice in two Ohio counties will interfere with the regulation of the practice of pharmacy by the legislative and executive branches of state and federal governments, including the Ohio Board of Pharmacy and the U.S. Drug Enforcement Administration.

With respect to federal regulatory authority, Congress enacted the Controlled Substances Act to "control the supply and demand of controlled substances." *Gonzales v. Raich*, 545 U.S. 1, 19 (2005). The Act's regulatory scheme is designed to strike a balance between "foster[ing] the beneficial use of [FDA-approved prescription] medications" while also "prevent[ing] their misuse." *Id.* at 24. DEA must strike this balance; not Plaintiffs or any other individual county or municipality. A patchwork of hundreds or thousands of differing dispensing requirements and barriers nationwide, besides being completely unworkable for national chains, would inevitably hinder DEA's ability to ensure access to much-needed medications. Plaintiffs' proposed County-specific requirements for dispensing of controlled substances would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and thus be preempted. *Arizona v. United States*, 567 U.S. 387, 399–400 (2012).

Plaintiffs' proposed injunctive relief also would interfere with State of Ohio's regulatory authority over pharmacy practice. Chapter 4729 of Revised Code Title XLVII, titled "Pharmacists; Dangerous Drugs," regulates in detail all aspects of pharmacists' professional conduct and the dispensing of prescription medications, including opioid medications. Among other things, this chapter comprehensively addresses the licensing and discipline of pharmacists; defines what constitutes the unlawful practice of pharmacy or the unlawful selling of drugs without an adequate prescription; and sets forth rules on dispensing opioid medications and record-keeping. *See* Ohio Rev. Code §§ 4729.01–4729.99. The Statute creates a State Board of Pharmacy, which is given extensive and exclusive rulemaking authority to implement the law. Ohio Rev. Code §§ 4729.24, 4729.26. The Board of Pharmacy, in turn, has enacted highly detailed "rules pertinent to the practice of pharmacy," which cover virtually every aspect of a pharmacist's professional conduct as well as pharmacy operations. *See* Ohio Admin. Code §§ 4729.01–4729.11 (capitalization altered).

Each of these laws and regulations operates on a state-wide basis by design. Yet Plaintiffs' injunctive relief would create special dispensing-related obligations only in Lake and Trumbull Counties, creating a patchwork, county-by-county regulatory scheme—the very evil the Ohio legislature sought to prevent by centralizing authority in the Board of Pharmacy. The Court should not supplant the judgment of pharmacy regulations vested to state agency discretion with Plaintiffs' suggestions, through injunctive relief or otherwise. *See* 2 Ohio Juri. 3d Admin. Law § 160 (June 2022 update); *Brannon v. Bd. of Educ. of Tiro Consol. Sch. Dist. of Crawford Cnty.*, 124 N.E. 235, 236 (Ohio 1919) (noting that "a court has no authority to control the discretion vested in a" state board "by the statutes of this state, or to substitute its judgment for the judgment of such board, upon any question it is authorized by law to determine.");

*Springfield City Sch. Support Pers. v. State Emp. Rels. Bd.*, 616 N.E.2d 983, 986 (1992) ("When the legislature contemplates such a quasi-prosecutorial role for an administrative agency, courts cannot and should not interfere in the process."). Indeed, under Ohio law, "caution should be exercised in granting injunctions, and especially so in cases affecting a public interest where the court is asked to interfere with . . . the action of another department of government." *White v. Long*, 231 N.E.2d 337, 340 (Ohio Ct. App. 1967); *Country Club Hills Homeowners Ass'n v. Jefferson Metro. Hous. Auth.*, 449 N.E.2d 460, 464 (Ohio Ct. App. 1981); *Cannell v. Mahoning Cnty. Comm'rs*, No. 94 C.A. 32, 1995 WL 152500, at *4 (Ohio Ct. App. Mar. 31, 1995).

**Second**, there is no evidence that awarding injunctive relief would be effective—let alone necessary—to resolve the oversupply and diversion of prescription opioids in the Counties. *See Plain Dealer Publ'g Co. v. Cleveland Typographical Union No. 53*, 520 F.2d 1220 (6th Cir. 1975) (injunction should be "used sparingly and only in a clear and plain case."). Indeed, Plaintiffs' theory at trial expressly focused on dispensing conduct from many years ago, and Plaintiffs highlighted many changes in Defendants' dispensing practices that have already taken place, but that Plaintiffs claimed should have been implemented earlier. That provides yet another reason why the Court should decline Plaintiffs' request for injunctive relief.

Nevertheless, if the Court is to issue an injunctive order, that order must be sufficiently definite that Defendants can tell whether they are complying with it. *See* Fed R. Civ. P. 65(d)(1)(B), (C) (injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (Federal Rule of Civil Procedure 65(d) "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."). *See also Mia. Twp. Bd. of Trs. v. Weinle*, 174

N.E.3d 1270, 1281 (Ohio Ct. App. 2021) (an injunction must "be specific enough to permit the defendant to comply without fear of committing an unwilling violation."). Any injunction must also be narrowly tailored to order only what the evidence at trial has shown will abate the nuisance the jury found in the Counties. *See Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437 (6th Cir. 1982) (scope of equitable relief must be "strictly tailored to accomplish only that which the situation specifically requires and which cannot be attained through legal remedy"); *Eastwood Mall, Inc.*, 626 N.E.2d at 62 ("Equity requires that an injunction should be narrowly tailored to prohibit only the complained of activities."); *Mia. Twp. Bd. of Trs.,* 174 N.E.3d at 1280 (an injunction must be narrowly tailored); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (a preliminary injunction should be grated "only when the party seeking the relief, by a clear showing, carries the burden of persuasion."). For the reasons outlined above, Defendants do not believe any injunctive order meets that standard.  Nevertheless, Defendants attempt to follow these principles as much as possible in the draft order in Exhibit C.

## VI.    ANY "ABATEMENT" AWARD IS IMPROPER FOR REASONS RAISED ELSEWHERE AND EXPRESSLY PRESERVED HERE

As noted at the outset, Defendants maintain that ordering any relief, in any amount and in any form, would be inappropriate for a host of reasons. Defendants incorporate their arguments from briefing during the liability phase and earlier, including their post-trial briefs. *See* Dkt. 4202, 4204, 4256, 4258.

Abatement relief is also inappropriate for a variety of issues specific to this phase of proceedings. These issues are briefed here or were briefed before. They are also laid out in the proposed Conclusions of Law found in Exhibit D, which Defendants hereby incorporate by reference and request that the Court adopt.

## CONCLUSION

For the reasons outlined above, the Court should decline to order abatement relief other than, at most, safe disposal and take-back boxes. To the extent that the Court awards additional abatement relief, it must (1) abate the nuisance the jury found—oversupply and diversion of prescription opioids caused by the three defendants' alleged dispensing conduct; (2) follow traditional forms of equity; (3) be non-speculative; (4) exclude remote categories of requested relief; (5) set off prior third-party settlements; (6) award monetary relief only to compensate for actual economic loss to the Counties and only with appropriate mechanisms to prevent fraud and waste.  Furthermore, the Court should apportion liability according to each defendant's red-flag market share and liability should be several only. Furthermore, the Court should decline to award any mandatory injunctive relief, but, to the extent that it does make such an award, the order should take the form of the order attached hereto as Ex. C.

Dated:  June 13, 2022                                   Respectfully submitted,

                                                        /s/  John M. Majoras
                                                        John M. Majoras
                                                        JONES DAY
                                                        51 Louisiana Avenue, N.W.
                                                        Washington, DC 20001
                                                        Phone: (202) 879-3939
                                                        Fax: (202) 626-1700
                                                        E-mail: jmmajoras@jonesday.com

                                                        Tina M. Tabacchi
                                                        Tara A. Fumerton
                                                        JONES DAY
                                                        77 West Wacker
                                                        Chicago, IL 60601
                                                        Phone: (312) 269-4335
                                                        Fax: (312) 782-8585
                                                        E-mail: tmtabacchi@jonesday.com
                                                        E-mail: tfumerton@jonesday.com

                                                        *Counsel for Walmart Inc.*

*/s/* Jeffrey A. Hall
Kaspar J. Stoffelmayr
Jeffrey A. Hall
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
jeff.hall@bartlitbeck.com

Katherine L.I. Hacker
Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
kat.hacker@bartlitbeck.com
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,
Walgreen Co., and Walgreen Eastern Co., Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via email on all counsel of record on June 13, 2022.

/s/  John M. Majoras

John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*