## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**

THIS DOCUMENT RELATES TO:

*County of Lake, Ohio v. Purdue Pharma L.P., et al.*,
Case No. 18-op-45032 (N.D. Ohio)

*County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,
Case No. 18-op-45079 (N.D. Ohio)

MDL No. 2804

Case No. 17-md-2804

Judge Dan Aaron Polster

## CVS ABATEMENT PHASE POST-TRIAL BRIEF

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   BURDEN OF PROOF ........................................................................................ 3

II.  LEGAL DEFECTS OF THE ALEXANDER PLAN ........................................... 4

III. FACTUAL DEFECTS OF THE ALEXANDER PLAN ....................................... 9

    A.   The Alexander Plan Is Admittedly Unfinished ...................................... 9

    B.   The Estimates in the Alexander Plan Are Speculative, Unreliable and Legally Unviable ................................................................................. 10

        1.   Dr. Alexander Admits More Data Is Needed ............................ 11

        2.   Dr. Alexander Layers Estimates on Top of Estimates ............. 12

        3.   Many of the Estimates Fall Outside Dr. Alexander's Expertise .............. 13

        4.   Dr. Alexander's Estimates Are Undercut by County Data ...................... 13

    C.   The Alexander Plan Fails to Account for the Counties' Existing Programs ....... 15

        1.   The Counties' Existing Programs Are Extensive ..................... 15

        2.   The Alexander Plan Neither Considers the Counties' Actual Costs Nor Quantifies How Much More Is Needed ............................ 17

IV.  NONPARTY FUNDING SOURCES ............................................................... 18

    A.   Equity Prohibits Relief in Favor of Nonparties ................................... 18

    B.   The Collateral Source Rule Does Not Apply ...................................... 20

V.   ALLOCATION AND SETOFF ....................................................................... 22

    A.   Joint-and-Several Liability Does Not Apply Because the Harm Is Divisible .............................................................................................. 22

    B.   Plaintiffs Have the Burden to Prove CVS's Allocable Share .............. 23

    C.   A Failure to Apportion Would Violate Due Process ........................... 23

    D.   A Reasonable Basis for Apportionment Exists in This Case ............... 24

    E.   Settlement Amounts from Other Tortfeasors Must Be Set Off ........... 26

VI.  ABATEMENT PROPOSALS .......................................................................... 26

    A.   Oversupply ......................................................................................... 27

    B.   Treatment ........................................................................................... 29

    C.   Other Effects ...................................................................................... 32

    D.   Administration .................................................................................... 34

    E.   Dispensing Terms ............................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Akerstrom v. 635 W. Lakeside, Ltd.*,
105 N.E. 3d 440 (Ohio Ct. App. 2018) .................................................................................... 19

*Andler v. Clear Channel Broad., Inc.*,
670 F.3d 717 (6th Cir. 2012) .................................................................................................... 3

*Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R., Co.*,
417 U.S. 703 (1974) .......................................................................................................... 19, 21

*Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*,
102 N.E.3d 579 (Ohio Ct. App. 2017) .............................................................................. 20, 22

*Cavins v. S&B Healthcare, Inc.*,
39 N.E.3d 1287 (Ohio Ct. App. 2015) .................................................................................... 21

*City of Chicago v. Beretta U.S.A. Corp.*,
821 N.E.2d 1099 (Ill. 2004) ...................................................................................................... 9

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
863 F.3d 474 (6th Cir. 2017) .................................................................................................... 8

*City of Cleveland v. Ameriquest Mortg. Secs., Inc.*,
615 F.3d 496 (6th Cir. 2010) .................................................................................................... 8

*City of Gahanna v. Eastgate Props., Inc.*,
521 N.E.2d 814 (Ohio 1988) .................................................................................................... 3

*City of Huntington v. AmerisourceBergen Drug Corp.*,
2021 WL 1556788 (S.D.W. Va. Apr. 20, 2021) .................................................................... 21

*City of Larkspur v. Jacobs Engr. Grp., Inc.*,
2010 WL 2164406 (Cal. Ct. App. May 28, 2010) ................................................................. 21

*Edmonds v. Compagnie Generale Transatlantique*,
443 U.S. 256 (1979) ................................................................................................................ 22

*Ferrell v. Summa Health Sys.*,
844 N.E.2d 1233 (Ohio Ct. App. 2005) .................................................................................. 20

*Galayda v. Lake Hosp. Sys., Inc.*,
644 N.E.2d 298 (Ohio 1994) .............................................................................................. 3, 11

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308, 318 (1999) .......................................................................................................... 7

ii

*Hamlin v. Charter Township of Flint*,
   165 F.3d 426 (6th Cir. 1999) ............................................................. 21

*Hammerschmidt v. Mignogna*,
   685 N.E.2d 281 (Ohio Ct. App. 1996) .................................................. 10

*In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PBC Pollution*,
   712 F. Supp. 994 (D. Mass. 1989) ..................................................... 5–6

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   497 F. Supp. 3d 552 (N.D. Cal. 2020) ................................................... 9

*In re Rhone-Poulenc Rorer Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ............................................................... 6

*In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*,
   2015 WL 7776911 (E.D. Pa. Dec. 2, 2015) ........................................... 10

*La. Dept. of Transp. & Dev. v. Kansas City S. Ry. Co.*,
   846 So. 2d 734 (La. 2003) ................................................................ 21

*Liu v. SEC*,
   140 S. Ct. 1936 (2020) ...................................................................... 19

*Messenger v. Norfolk S. Ry. Co.*,
   2015 WL 999852 (N.D. Ind. Mar. 5, 2015) ........................................... 10

*Moretz v. Muakkassa*,
   998 N.E.2d 479 (Ohio 2013) ............................................................. 20

*Nithiananthan v. Toirac*,
   2015 WL 1619097 (Ohio Ct. App. Apr. 13, 2015) ................................. 5, 6

*People v. Conagra Grocery Prods. Co.*,
   227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017) ............................................. 5

*Pryor v. Webber*,
   263 N.E.2d 235 (Ohio 1970) ............................................................. 20

*R&R Int'l, Inc. v. Manzen, LLC*,
   2010 WL 3605234 (S.D. Fla. Sept. 12, 2010) ........................................ 17

*Rasimas v. Michigan Department of Mental Health*,
   714 F.2d 614 (6th Cir. 1983) ............................................................. 21

*Robinson v. Bates*,
   857 N.E.2d 1195 (Ohio 2006) ............................................................ 20

*Roundhouse v. Owens-Illinois, Inc.*,
  604 F.2d 990 (6th Cir. 1979) ................................................................... 21

*Rutherford v. Owens-Illinois, Inc.*,
  941 P.2d 1203 (Cal. 1997) ...................................................................... 26

*Scioto Twp. Zoning Inspector v. Puckett*,
  31 N.E.3d 1254 (Ohio Ct. App. 2015) ...................................................... 6

*State ex rel. Hunter v. Johnson & Johnson*,
  499 P.3d 719 (Okla. 2021) ................................................................. 5, 27

*State ex rel. Miller v. Anthony*,
  647 N.E.2d 1368 (Ohio 1995) .................................................................. 5

*State ex rel. v. Batavia Local Sch. Dist.*,
  829 N.E.2d 298 (Ohio 2005) .................................................................. 20

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) .......................................................................... 22, 23

*Tamraz v. Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) ............................................................ 11, 13

*Thompson v. City of Brook Park*,
  2004 WL 2340071 (Ohio Ct. App. Sept. 23, 2004) .................................... 5

*Thurman v. Yellow Freight Systems, Inc.*,
  90 F.3d 1160 (6th Cir. 1996) ................................................................. 21

*Tilghman v. Proctor*,
  125 U.S. 136 (1888) ............................................................................... 19

*Town of E. Troy v. Soo Line R. Co.*,
  653 F.2d 1123 (7th Cir. 1980) ............................................................... 21

*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995) ............................................................................... 18

*White v. Vrable*,
  1999 WL 771053 (Ohio Ct. App. Sept. 30, 1999) ...................................... 8

*Williams v. Owens*,
  937 F.2d 609 (Table), 1991 WL 128775 (6th Cir. 1991) ...................... 18–19

**STATUTES**

Ohio Rev. Code § 309.01 ............................................................................ 8

Ohio Rev. Code § 309.08 ............................................................................ 8

Ohio Rev. Code § 311.01 .................................................................................................. 8

Ohio Rev. Code § 311.07 .................................................................................................. 8

Ohio Rev. Code § 329.01 .................................................................................................. 8

Ohio Rev. Code § 340.02 .................................................................................................. 8

Ohio Rev. Code § 340.03 ............................................................................................ 8, 14

Ohio Rev. Code § 340.011 ................................................................................................ 8

Ohio Rev. Code § 2307.28 .............................................................................................. 26

Ohio Rev. Code § 2315.20 .............................................................................................. 20

**RULES**
Fed. R. of Evid. 702(b) ................................................................................................... 11

**TREATISES**
Dan B. Dobbs, 1 Law of Remedies § 5.7(3) ..................................................................... 5

Joseph Story, 2 Commentaries on Equity Jurisprudence § 923 (12th ed. 1877) ............................ 7

Restatement (Second) of Torts § 433A ...................................................................... 22, 24

Restatement (Second) of Torts § 433B ............................................................................ 23

Restatement (Second) of Torts § 840E ............................................................................ 22

W. Page Keeton et al., Prosser & Keeton on Torts § 52 (5th ed. 1984) ....................................... 24

William Blackstone, 3 Commentaries on the Laws of England (Tucker ed. 1803) ...................... 7

William Blackstone, 4 Commentaries on the Laws of England (Tucker ed. 1803) ...................... 7

Plaintiffs are calling on the Court to award impermissible relief that never before has been sustained—money to remedy the potential *effects* of the nuisance rather than the nuisance itself (*i.e.*, money to remedy drug addiction and its societal impact).

Plaintiffs then call on the Court to extend even further by awarding a giant sum of money that is untethered to what the counties actually pay and what they actually need. The sum plaintiffs seek is based instead on layers of speculative estimates drawn up by university professors. CVS respectfully submits that the Court must reject the Alexander plan and, subject to its legal rulings on the scope of abatement, adopt one or more of the approaches outlined in this brief.

In addition to the legal restrictions on the scope of abatement set forth *infra* Section II, CVS highlights for the Court the following issues at the outset:

<u>First</u>, plaintiffs bear the burden of proving what relief they need and what it costs. This is undisputed. Plaintiffs must prove their need—and the costs to meet it—to a reasonable certainty.

<u>Second</u>, per the testimony of Dr. Alexander, his plan is not fit for implementation. Dr. Alexander made clear that it still must be customized ***to*** each county ***by*** each county. Trial Tr. (Doc. 4446) at 423–25. Plaintiffs have not performed this essential step. No witness from either county even took the stand. The counties therefore have made no record of whether they need all, most, some or none of the Alexander plan. The counties have made no record of how much of the plan replicates the services they already have and the margin, if any, they need to supplement existing measures. And the counties have made no record of what their existing measures actually cost. The Court therefore is left with a grandiose proposal that is unfinished and that would require the Court to guess at how to shape it to the counties' needs.

<u>Third</u>, the Alexander plan also is too speculative and uncertain to be accepted. It is based on estimates stacked on top of one another in an effort to try to predict the health needs of unknown

persons. For addiction treatment, the main feature of Dr. Alexander's plan, the projections are based on "an estimate, followed by a target, followed by a target, followed by estimates." *Id.* at 494–95. Dr. Alexander candidly admits that more data is needed to "better understand" what is happening in the counties and what is needed. *Id.* at 434–35. The informational shortcoming is so substantial that Dr. Alexander opines that "surveillance" units are needed in each county to gather data, analyze it, and identify needs. Without this additional data, Dr. Alexander opines that the communities are "flying blind." *Id.* at 435–36.

Fourth, if the Court awards funding for addiction treatment over CVS's objection, it must base its award on the county data that shows the actual number of residents who receive treatment through county-funded programs and the actual costs the counties pay for that treatment. Then, in determining how such funding may be used, the Court must set a process that calls on CVS to screen patients through its dispensing data. This is necessary to tailor the use of CVS funds to patients who actually filled opioid prescriptions at CVS pharmacies in the counties. Dr. Alexander himself endorsed the use of dispensing data to guide abatement. These data sets are the best available sources of information on which to base treatment costs, far superior to the stacks of estimates submitted by plaintiffs' experts.

Fifth, under no circumstances may the Court award relief in favor of nonparties—such as Medicaid. The Court's role in equity is limited to awarding what the counties *themselves* need to remedy the nuisance. The Court is strictly prohibited from crafting relief to spare expense to nonparties in an effort to punish CVS and expand the sanction against it. The Court most certainly cannot restructure statutory and contractual payment obligations of nonparties to achieve this result. Likewise, the counties themselves have preexisting obligations to fund, among other things, police departments, courts, emergency medical services, and addiction treatment programs. Under

2

no circumstances may the Court transfer wholesale to CVS plaintiffs' governmental obligations to serve their citizens. Any award must be limited accordingly.

Finally, if the Court rejects CVS's position and awards funding for any of the programs in the Alexander plan, it must apportion the costs among the many other actors acknowledged by plaintiffs to have contributed. Given the sheer volume of these other actors, the law requires apportionment, and the Court should use Dr. Chandra's method to do so. Plaintiffs have proposed no alternatives.

For these reasons and those set forth below, CVS respectfully submits that the Court must reject the Alexander plan and, subject to CVS's objections, impose one or more of the proposals set forth herein. For the Court's reference, this brief is divided into the following sections:

      I.   Burden of Proof (p. 3, below);

     II.   Legal Defects of the Alexander Plan (pp. 4-9);

    III.   Factual Defects of the Alexander Plan (pp. 9-18);

    IV.   Nonparty Funding Sources (pp. 18-22);

     V.   Allocation and Setoff (pp. 22-26); and

    VI.   Abatement Proposals (pp. 26-36).

## I.    **BURDEN OF PROOF**

Plaintiffs have the burden to prove what is needed to abate the nuisance and to prove any associated costs with "reasonable certainty." *See Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 726 (6th Cir. 2012) (a plaintiff must prove future damages "with reasonable certainty"); *Galayda v. Lake Hosp. Sys., Inc.*, 644 N.E.2d 298, 301 (Ohio 1994) (a plaintiff may receive damages for future costs that it is "reasonably certain to incur"); *City of Gahanna v. Eastgate Props., Inc.*, 521 N.E.2d 814, 817–18 (Ohio 1988) (a plaintiff must prove the existence and amount of future damages with "reasonable certainty").

## II.  <u>**LEGAL DEFECTS OF THE ALEXANDER PLAN**</u>

The remedy in this case must be strictly limited to measures to reduce the excess supply of legal prescription opioids found by the jury. The Alexander plan extends far beyond this limit. Dr. Alexander admitted as much when he testified that his plan is intended to abate the "opioid epidemic" in its entirety, rather than the oversupply found by the jury, and that his plan in this case "would look very similar" to the public policies he would propose if a governor asked him "to design a plan for her state" to address the epidemic. Trial Tr. (Doc. 4446) at 407–09, 416.

In this regard, the Alexander plan encompasses treatment for people who never filled a prescription opioid at CVS, *id.* at 380; it encompasses addiction to illegal opioids, *id.* at 381; and it encompasses polysubstance abuse involving non-opioids, *id.* at 382–83. It would provide funding to expand the health care workforce, *id.* at 393; it would expand the number of medical providers who can treat pain, *id.*; it would create or expand pretrial diversion programs, *id.* at 395; it would expand the capacity of the courts, *id.*; it would provide vocational training for people with opioid use disorder ("OUD"), *id.* at 396–97; it would fund new police units, *id.* at 395; it would fund programs "to strengthen social bonds," *id.* at 389; it would fund programs to address "stigma," "compassion fatigue" and "decreased empathy" associated with opioid addiction, *id.* at 393–95; it would fund free needle exchanges for illegal drug users and provide them tests to examine their illegal drugs for unsafe ingredients, *id.* at 389–90; and it would provide medical care to individuals with HIV, hepatitis C and endocarditis, *id.* at 392–93. The Alexander plan would even reach individuals who have never used an opioid as of today but may in the future, as well as their children (who may not even be born yet), *id.* at 404, 406.

Such a plan—which seeks to address potential *effects* of the oversupply nuisance rather than the oversupply itself—is legally impermissible for at least two reasons.

First, under well-accepted principles of common law, the remedy of abatement is limited to "eliminat[ing] the hazard that is causing prospective harm to the plaintiff." *People v. Conagra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 569 (Cal. Ct. App. 2017); *see also State ex rel. Miller v. Anthony*, 647 N.E.2d 1368, 1371 (Ohio 1995) ("Nuisance abatement actions seek injunctive relief . . . ."). Here, per the plain words of the verdict form, that hazard is the "oversupply of legal prescriptions opioids, and the diversion of those opioids into the illicit market." Doc. 4176 at 2, 6. Any abatement award therefore must be restricted to reducing that oversupply and may not extend to the potential effects of the oversupply, such as addiction and the potential societal or individual harms that may flow from it.

As the Supreme Court of Oklahoma recently held, it would be impermissible to award as abatement "a cash payment from a defendant that the district court line-item apportioned to address social, health, and criminal issues arising from conduct alleged to be a nuisance." *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 729 (Okla. 2021). Such an award "does not stop the act or omission that constitutes a nuisance" and, thus, is not abatement. *Id.* Indeed, cash payments for such future costs amount to damages, not equitable abatement.[1] Plaintiffs elected not to seek such future damages here and cannot now undo that decision by recharacterizing a claim for future damages as abatement. *See In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PBC Pollution*, 712 F. Supp. 994, 1001–03 (D. Mass. 1989) (rejecting the argument that "the

---

[1] *See Nithiananthan v. Toirac*, 2015 WL 1619097, at *2, *10 (Ohio Ct. App. Apr. 13, 2015) (issuing an injunction to "abate the nuisance" (the offensive use of lights and cameras), awarding damages to "combat [its] effects" (the costs of landscaping the plaintiff had installed to block the cameras), and explaining that if "costs associated with . . . medical treatment" had been awarded, they would have been "damages"); *Thompson v. City of Brook Park*, 2004 WL 2340071, at *1 (Ohio Ct. App. Sept. 23, 2004) (awarding "damages" for injuries suffered as a result of a nuisance); Dan B. Dobbs, 1 Law of Remedies § 5.7(3) ("[d]amages" in a nuisance case "might be based on . . . the cost of eliminating the nuisance effects").

equitable remedy provided a governmental entity which seeks to enjoin a public nuisance includes reimbursement of costs incurred in abating the nuisance"). To avoid undue repetition, CVS hereby adopts and incorporates by reference its prior briefing on this subject (Doc. 4299 at 8–12; Doc. 4342 at 7–13) and Section I.A of the Walmart-Walgreens post-trial brief.

Second, the Seventh Amendment similarly restricts the remedy to measures to reduce the "oversupply of legal prescription opioids," because that is the nuisance identified in the verdict form. It would violate the Seventh Amendment to award relief—like that set out in the Alexander plan—beyond what the jury found. *See In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) (the right conferred by the Seventh Amendment "is a right to have juriable issues determined by the first jury impaneled to hear them . . . , and not reexamined by another finder of fact"); *Nithiananthan*, 2015 WL 1619097, at *8 (affirming the refusal to award an abatement remedy that extended beyond the nuisance actually found). Again, to avoid undue repetition, CVS hereby adopts and incorporates by reference its prior briefing on this subject (Doc. 4299 at 13–14; Doc. 4342 at 13–15) and Section I.A of the Walmart-Walgreens post-trial brief.

If the Court nevertheless were to consider awarding some or all of the Alexander plan and imposing relief that goes beyond reduction of the oversupply of legal prescription opioids, the Court would face additional legal obstacles:

1. Plaintiffs must prove that the nuisance is "abatable." Trial Tr. (Doc. 4064) at 3476–78. An "abatable nuisance" is one "that reasonable persons would regard as being removable by reasonable means." *Scioto Twp. Zoning Inspector v. Puckett*, 31 N.E.3d 1254, 1264 (Ohio Ct. App. 2015) (quoting Black's Law Dictionary (9th ed. 2009)I ). Plaintiffs, however, have not shown that the potential effects of the oversupply nuisance are removable by reasonable means. The Court itself acknowledged that opioid abuse existed before the conduct at issue in this case and will

continue to exist in the future. Trial Tr. (Doc. 4464) at 1331. And Dr. Alexander testified that he "believed" that, if his plan were implemented in full *over 15 years* at a total cost of *over $2.8 billion*, it only would reduce opioid-related harms in the counties by *50%*. Trial Tr. (Doc. 4446) at 417. Even then, he testified that was speculative. He testified that "further extrapolation would be required to fully estimate the impact" of his plan—extrapolation that he has not yet performed and that, by his own estimation, would be "prone to uncertainty." *Id.*

       2.      An award addressing the potential effects of the oversupply nuisance would exceed the Court's equitable powers. A federal court's power to award equitable relief "depend[s] on traditional principles of equity jurisdiction" and is confined to the "jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act [in] 1789." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 319 (1999). Traditionally, the equitable remedy of abatement was limited to eliminating or stopping the harmful activity that constituted the nuisance. William Blackstone, 3 Commentaries on the Laws of England, at *5 (Tucker ed. 1803); William Blackstone, 4 Commentaries on the Laws of England, at *166–68 (Tucker ed. 1803); Joseph Story, 2 Commentaries on Equity Jurisprudence § 923 (12th ed. 1877). It did not include a monetary award for the costs of addressing potential *effects* of the nuisance—much less the costs to fund far-reaching government initiatives to cure illness, put people to work, and care for children. The Court must hew to the traditional contours of abatement.

       3.      Any award reaching the potential effects of the oversupply nuisance would reach conditions and conduct—outside the scope of the verdict—that are far too attenuated from CVS to attribute to CVS. The potential effects of the oversupply nuisance that are addressed in the Alexander plan involve superseding actors and events that break the causal chain—such as an

individual's decision to use prescription opioids recreationally or non-medically, to steal prescription opioids from family or friends, and to sell or use heroin and other illegal drugs. *See City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480 (6th Cir. 2017) (government plaintiff had not shown proximate cause in nuisance case where its "damages are difficult to connect to [the defendant's] actions and nearly impossible to disaggregate from other potential causes" of the nuisance's effects); *White v. Vrable*, 1999 WL 771053, at *5–6 (Ohio Ct. App. Sept. 30, 1999) (diverting and illegally using prescription opioids were intervening and superseding causes in claims against pharmacy related to drug overdose).[2]

4.      A far-reaching abatement award also would include funding for programs and services that the counties are obligated to provide to their residents as government entities. The Alexander plan, for instance, seeks costs for the operation of basic municipal services such as law enforcement, judicial administration, job and family services and mental health and drug addiction services. *See, e.g.*, P-23105A at 15–18, 28–32, 37–38. These services are funded in large part by county appropriations,[3] and the counites have a legal obligation to provide them. For example:

- The counties are required to have ADAMHS boards that fund mental health and drug addiction services. Ohio Rev. Code §§ 340.011, 340.02, 340.03;

- The counties are required to operate a department of job and family services. *Id.* § 329.01;

- The counties are required to have a sheriff's department and a prosecutor's office. *Id.* §§ 309.01, 309.08, 311.01, 311.07; and

_____

[2] *See also City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 615 F.3d 496, 504–06 (6th Cir. 2010) (a "'complex assessment' [is] needed to determine which municipal expenditures increased . . . because of the ills caused by [the defendants' conduct] rather than" other causes).

[3] *See, e.g.*, DEF-MDL-14968 at 36 (in fiscal year 2020, the Lake County ADAMHS Board received $8.4 million from property taxes); DEF-MDL-14944 at 80 (in fiscal year 2020, the Trumbull County Mental Health & Recovery Board received $2.9 million from property taxes).

- The counties are required to operate county or municipal courts. *Id.* § 1907.01.

Under the municipal cost recovery rule, "public expenditures made in the performance of governmental functions are not recoverable in tort." *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1144 (Ill. 2004). This rule can "limit . . . the scope of damages [government entities] might recover" even if it does "not mandate dismissal of their entire public nuisance . . . claims." *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 645 n.71 (N.D. Cal. 2020). As the Court recently explained, "the costs of Plaintiff[s'] governmental services are recoverable *to the extent that they exceed the ordinary costs of providing those services*." Doc. 4295 at 53 (emphasis added). Therefore, if the Court were to award, over CVS's objections, abatement costs for municipal services like law enforcement and addiction services, the award must be limited accordingly.

## III. FACTUAL DEFECTS OF THE ALEXANDER PLAN

Separate and apart from the legal infirmities of the Alexander plan, it fails on the facts and must be rejected for the additional reasons set forth below.

### A. The Alexander Plan Is Admittedly Unfinished.

By Dr. Alexander's own admission, his plan cannot be implemented as is. One essential step remains: Lake and Trumbull Counties must "customize" the plan for their communities. *See* Trial Tr. (Doc. 4446) at 423, 424. Dr. Alexander testified that he left it to the counties to "determine the right mix of services to go into their abatement plan." *Id.* at 424. According to Dr. Alexander, this process should involve input from multiple local stakeholders including county officials, mayors, sheriffs, judges and others in the communities. *Id.* at 424–25. But no evidence was presented at trial that the counties have customized Dr. Alexander's plan. No representative of either county even testified during the abatement trial. The work that Dr. Alexander deemed necessary to the implementation of his plan simply has not been done. The plan is unfinished, it is

not fit for implementation, per the testimony of Dr. Alexander himself, and it must be stricken. *See In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, 2015 WL 7776911, at *16 (E.D. Pa. Dec. 2, 2015) (excluding expert in part because he failed to apply the methods he articulated); *Messenger v. Norfolk S. Ry. Co.*, 2015 WL 999852, at *12 (N.D. Ind. Mar. 5, 2015) (same).

It most certainly is not sufficient that Dr. Alexander spoke with Kim Fraser from Lake County for 45 minutes and with April Caraway and Lauren Thorp from Trumbull County for another 45 minutes. Trial Tr. (Doc. 4446) at 477–78. Even if these paltry conversations were of sufficient depth to be meaningful enough to support a multi-billion-dollar plan (they obviously are not), Dr. Alexander made clear that his plan, as presented to the Court, still requires customization.

## B. The Estimates in the Alexander Plan Are Speculative, Unreliable and Legally Unviable.

Plaintiffs are calling on the Court to fund future medical care (specifically, addiction treatment) for persons who are wholly unknown—because plaintiffs refused to identify them. Doc. 4275. Through layers of estimates, Dr. Alexander attempts to divine how many of these unknown persons exist, how many will seek and agree to treatment, what kind of treatment they will need, how long they will need it, what accompanying assistance they many need (*e.g.*, vocational training, housing assistance), and what assistance their families may need. Plaintiffs then call on the Court to accept these layers of estimates about these unknown persons and to award the counties billions of dollars. In cases where there is a single known patient—where medical examinations can be conducted, medical records can be reviewed, and expert opinions dedicated to the needs of the individual patient can be considered—the plaintiff must still prove future medical costs to a "reasonably certain" degree. *See, e.g.*, *Hammerschmidt v. Mignogna*, 685 N.E.2d 281, 284–85 (Ohio Ct. App. 1996) (affirming trial court decision *in a case involving a single, known plaintiff* not to include instructions on future medical expenses because "it was not

10

reasonably certain that there would be permanent damages in the future, and, if so, what they would consist of"); *Galayda*, 644 N.E.2d at 301 ("In Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future."). As a matter of law, that standard cannot be met here—where the patients are not even known and no information about them has been provided.

Even if plaintiffs could overcome this hurdle, their estimates about the unknown care and assistance needed for these unknown persons still would not be viable. They are uncertain, speculative and unreliable. *See* Fed. R. of Evid. 702(b) (requiring expert testimony to be "based on sufficient facts or data"); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("No matter how good [an] expert's credentials may be, they are not permitted to speculate."). Accordingly, as set forth more fully below, the Alexander plan's estimates are insufficient as a matter of law.

       1.    <u>Dr. Alexander Admits More Data Is Needed.</u>

Dr. Alexander admitted at trial that more data is needed to "better understand . . . the epidemic." Trial Tr. (Doc. 4446) at 434–35. The need is so extreme that he proposed as one of his abatement measures the creation of a surveillance program, staffed with epidemiologists and data scientists, to "gather a wide array of data and put it to use to inform abatement." *Id.* at 433. The purpose of the data gathering would be, among other things, to "identify" the needs of the communities and "to make informed decisions on resource allocation." *Id.* at 434–35. Dr. Alexander testified that the need for such data is so pronounced that "the communities [would be] flying blind, no better off than an airplane without access to the flight instrument panel" if they do not obtain it. *Id.* at 435–36. These are implicit admissions by Dr. Alexander that his own estimates are insufficient.

2.    Dr. Alexander Layers Estimates on Top of Estimates.

The numbers underpinning the Alexander plan and driving the counties' proposed abatement costs do not come from county data on OUD treatment or other county data showing need for the programs in the plan. Plaintiffs' experts did not consider—or even review—local OUD treatment data. Trial Tr. (Doc. 4438) at 148; Trial Tr. (Doc. 4446) at 463, 464.

They rely instead on academic estimates. Dr. Keyes begins the process by estimating the number of people with OUD in Lake and Trumbull counties in 2019 to be 5,934 and 7,560, respectively. Trial Tr. (Doc. 4438) at 58–59. Rather than going into the field and actually researching the size of the OUD population in the counties, she extrapolates the OUD population from the total number of drug overdose deaths in the counties using a formula she developed that plays on rates from an academic article containing a "meta-analysis" of 56 studies from all over the world that date back to the 1980s and up to 2014. *Id.* at 109–11, 126–27, 130–31.[4]

Dr. Alexander then builds off this estimate to derive a successive estimate of the number of "slots" needed for treatment in each county for each of the next 15 years. Dr. Alexander does not rely on local data or other county-level information to do so, but instead resorts to studies. Trial Tr. (Doc. 4446) at 485. While Dr. Alexander initially testified that his treatment percentages are "estimates," he later clarified that they are mere "targets" based not on the data showing the number of persons who actually seek treatment, but on a more generous policy target that he believes the counties should aspire to. *Id.* at 502.[5]

---

[4] Dr. Alexander relies on Dr. Keyes's OUD population estimates despite the fact that, in expert reports he has submitted in other opioids cases, he himself has estimated the OUD population using methodologies entirely different from that used by Dr. Keyes here. Trial Tr. (Doc. 4447) at 569.

[5] National treatment data, cited by Dr. Alexander, shows actual treatment percentages of 20-30%. *See, e.g.*, P-23105A at 16; P-23105B at 16. The target Dr. Alexander uses enlarges the numbers to 40% in Year One.  *Id.*; Trial Tr. (Doc. 4446) at 487.

To get to his ultimate cost estimates, Dr. Alexander layers on more estimates. Using the estimate of the number of persons in the counties with OUD, and the number of persons from that estimate who Dr. Alexander "targets" for treatment, Dr. Alexander estimates the numbers of those targeted persons who will receive in-patient treatment and the number who will receive out-patient treatment. *Id. at* 495. He also estimates (or "targets") from this hypothetical universe of persons the number of persons who will receive MAT and what particular drugs they will be prescribed. *Id.* at 487–94. And he estimates the duration of treatment, through his "slot" terminology, for this estimated universe of unknown persons. *Id.* at 503–06. In the end, the Court is left with an absurdity—namely, a sum of future medical costs based on "an estimate, followed by a target, followed by a target, followed by estimates," all concerning unknown, hypothetical persons. *See Tamraz*, 620 F.3d at 671–72 (vacating jury verdict because expert's testimony "contain[ed] not just one speculation but a string of them" and that "[a]t some point, the train becomes too long to pull and the couplings too weak to hold the cars together").

3.    Many of the Estimates Fall Outside Dr. Alexander's Expertise.

Compounding the problem further, many of the estimates in Dr. Alexander's plan are outside his expertise. Dr. Alexander is not a social worker; he has no degree in law enforcement; he has never worked in a court; and he has never operated an addiction treatment clinic or a syringe services program. *Id.* at 428, 431. He has never even prescribed buprenorphine or methadone. *Id.* at 430. It is beyond peradventure that he lacks the qualifications to opine on items such as how to staff a drug court, a law enforcement team, or a clinic.

4.    Dr. Alexander's Estimates Are Undercut by County Data.

Based on Dr. Alexander's estimates, plaintiffs seek over $2.8 billion to abate the nuisance in Lake and Trumbull Counties over a 15-year period. P-23127 at 9, 11. These numbers exceed by many, many orders of magnitude the actual sums expended by the counties on OUD treatment and

other services by the Lake County ADAMHS Board and the Trumbull County Mental Health & Recovery Board. They are not plausible.

Per the testimony of Mr. Bialecki, defendants' expert in accounting, data from Lake County shows that, in 2019, Lake County paid the costs of OUD treatment for 232 individuals for a total of $362,712. CVS-MDL-05022. Likewise, the Trumbull County data shows that, in 2019, Trumbull County paid the costs of treatment for 481 individuals for a total of $285,833. CVS-MDL-05021.[6] The combined payments for treatment by the counties thus were $648,545 in 2019. This excludes treatment funded by Medicaid (but includes treatment paid for with federal and state grants). In contrast, plaintiffs—based on their successive layers of estimates and targets—ask this Court to award approximately $36 million in Year One treatment costs for Lake County and approximately $46 million for Trumbull County. P-23127 at 65–92 and 234–61. Given the actual numbers from the counties' own treatment data, plaintiffs' proposed costs simply are not credible.

Comparing plaintiffs' numbers to other information on actual county expenditures compels the same conclusion. In 2020, the Lake County ADAMHS Board spent a total of $16.11 million, and the Trumbull County Mental Health & Recovery Board spent a total of $7.97 million. *See* DEF-MDL-14968 at 36; DEF-MDL-14944 at 80; *see also* Trial Tr. (Doc. 4455) at 804–07, 819–22. These total expenditures covered not only opioid-related programs, but also programs for persons suffering from mental health challenges as well as for other substance abuse issues. *See* Ohio Rev. Code § 340.03(A); *see also* Trial Tr. (Doc. 4093) at 4358; Trial Tr. (Doc. 4090) at 4237.

---

[6] The data shows that treatment for an additional 966 patients in Trumbull County was covered by Medicaid and therefore was not paid for by the counties. CVS-MDL-05022. The Lake County ADAMHS Board did not produce data for treatment covered by Medicaid but, again, that treatment was not paid for by Lake County.

Even with the breadth of programs covered by these expenditures, the two agencies spent less money than they budgeted and left substantial amounts of money unspent.[7]

The annual amounts sought by plaintiffs to cover Year One of their abatement plan exceed the combined expenditures of these two county agencies by many multiples. This exponential increase cannot be explained by minor differences in methodologies; it instead lays bare the artificial inflation inherent in plaintiffs' numbers—numbers that are not based on actual data and expenditures, but instead on layers of expert-derived estimates and targets.

**C.      The Alexander Plan Fails to Account for the Counties' Existing Programs.**

The counties have made substantial investments to address the opioid epidemic, and their existing programs overlap with the programs in the Alexander plan. Trial Tr. (Doc. 4446) at 418-19. Yet, by his own admission, Dr. Alexander did not assess these other programs quantitatively or subtract them out from his plan. *Id.* at 421–22. This makes the Alexander plan insufficient in two additional respects. First, it does not consider the counties' actual costs for these existing programs. Second, it fails to identify what resources are needed above and beyond what already is in place and therefore what resources, if any, may be appropriate for abatement.

1.      The Counties' Existing Programs Are Extensive.

Both Lake and Trumbull Counties offer a wide array of programs and services. They offer these services primarily through local providers that are funded by the Lake County ADAMHS Board and the Trumbull County Mental Health & Recovery Board. In Lake County, the ADAMHS Board funds a variety of treatment programs and other services. It funds, for example, the

---

[7] In 2020—the most recent year for which audited financials are available—the Lake County ADAMHS Board spent $1.4 million less than it budgeted and had $4.2 million left over at the end of the year, while the Trumbull County Mental Health & Recovery Board spent $420,000 less than it budgeted and had $5.6 million left over at the end of the year. *See* DEF-MDL-14968 at 36; DEF-MDL-14944 at 80; Trial Tr. (Doc. 4455) at 806–07, 821.

following types of treatment: medication-assisted treatment, intensive out-patient treatment, in-patient treatment, and residential treatment.[8] The Lake County ADAMHS Board funds additional programs and services such as early childhood prevention programs, school-based prevention programs, naloxone programs, NAS baby treatment programs, recovery housing, peer recovery supporters, ambulatory detox services, withdrawal management centers, a help line, drug screening services, family counseling programs and self-care training for front-line workers. *See* CVS-MDL-04963 at 3–5.

The Trumbull County Mental Health & Recovery Board, through its service providers, also offers "all levels of support" for individuals with OUD, including "intensive outpatient to group therapy, individual therapy, counseling, [and] 12-step programs." Trial Tr. (Doc. 4090) at 4289, 4239. This support includes funding for detox beds, residential treatment, recovery housing, staff members in emergency departments to encourage individuals who overdose to seek treatment, and peer recovery coaches. *Id.* at 4253–55; *id.* at 4291; DEF-MDL-14765 at 8–11, 14. Trumbull County has other programs related to opioid abuse, including education and outreach efforts and drug takeback initiatives. DEF-MDL-14765 at 7. And it has been involved in a number of media campaigns and outreach efforts regarding addiction, including anti-stigma messaging and addiction prevention, as well as drug disposal. DEF-MDL-14765 at 17.

Lake County documents show that many of the treatment and other services provided by Lake County treatment providers had no or minimal waitlists in 2021 and the same was projected for 2022. *See* DEF-MDL-14329 at 66, 70, 74, 78; DEF-MDL-14329 at 24; DEF-MDL-14385 at

---

[8] *See, e.g.*, CVS-MDL-04963 at 6-7 (MAT); Ex. DEF-MDL-14329 at 103 (intensive out-patient treatment); DEF-MDL-14396 at 2 (inpatient treatment); CVS-MDL-04963 at 9 (residential treatment).

23; DEF-MDL-14329 at 101; 90–91.[9] The vast unmet need claimed by Dr. Alexander is not corroborated by the information presented by local treatment providers to the Lake County ADAMHS Board in real time.

> 2.     The Alexander Plan Neither Considers the Counties' Actual Costs Nor Quantifies How Much More Is Needed.

Dr. Alexander testified that he was aware of these existing programs and that they overlapped with his plan. Trial Tr. (Doc. 4446) at 418–21. But he failed to assess them quantitatively and subtract them out of his plan. *Id.* at 422–23; *see R&R Int'l, Inc. v. Manzen, LLC*, 2010 WL 3605234, at *14 (S.D. Fla. Sept. 12, 2010) (finding expert's future lost profits calculation unreliable and finding "[o]f significant concern" that the expert "did not really rely upon [the plaintiff's] actual financial data in the valuation of [its] potential lost profits").

The failure of the Alexander plan to assess quantitatively the counties' existing programs hamstrings the Court from awarding the relief plaintiffs seek. First, because Dr. Alexander did not assess the counties' existing programs, his plan does not provide—much less use—the actual costs paid by the counties for those programs. Many of the counties' programs overlap with those in the Alexander plan. Dr. Alexander and Dr. Burke could have used actual cost information—the most reliable possible information—to cost out the Alexander plan. They failed to do so and instead used unreliable estimates. *See* Section III.B, *supra*.

Second, because it does not net out the counties' existing programs, the Alexander plan does not identify what it would cost to bridge the gap between what the counties already have in place and what the plan recommends (*i.e.*, what they actually need). The plan, therefore, does not identify the margin that may be needed for abatement. As set forth above, abatement may not

---

[9] *See also* DEF-MDL-14713 (showing that Trumbull County did not have a single provider who reached 90% capacity for treatment of intravenous drug abuse during Fiscal Year 2021).

include the counties' future damages; it is strictly limited to the margin of what is needed to abate the nuisance.

## IV.    **NONPARTY FUNDING SOURCES**

The costs of OUD treatment comprise over 65% of the Alexander plan's total costs. But the counties do not pay for the overwhelming majority of the OUD treatment that they oversee. It is paid for by Medicaid and by federal and state grants. Trial Tr. (Doc. 4455) at 751, 758–60; CVS-MDL-05019; CVS-MDL-05020; *see also* Trial Tr. (Doc. 4455) at 759 (Medicaid has paid for 85-to-90% of the treatment-related services provided by facilities that contract with Trumbull County). Nor do the counties pay for OUD treatment that is funded in large part by private insurance. Trial Tr. (Doc. 4455) at 761–63.

To the extent the Court orders CVS, over its objections, to fund addiction treatment or other measures to address the potential effects of the oversupply nuisance, such funding cannot include costs that these nonparties pay. This Court has recognized that it "can exercise its equitable powers to deviate from the full costs of abatement to a more just and appropriate amount" if there are "additional sources of funding." Doc. 2519 at 2, 5. As set forth below, the Court not only *may* subtract funding provided by nonparty sources from any award, it *must*.

### A.    **Equity Prohibits Relief in Favor of Nonparties.**

The Court recognized in Track One that "an abatement remedy is intended to compensate *the plaintiff* for the costs of rectifying the nuisance, going forward." Doc. 2519 at 2 (emphasis added). It may not reach beyond that and provide compensation in favor of nonparties.

Indeed, the U.S. Supreme Court has stated that "[w]e neither want nor need to provide [injunctive] relief to **nonparties** when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995) (emphasis added). The Sixth Circuit likewise has held that a court "abused its discretion in fashioning its injunctive relief to run

18

in favor of **nonparties**." *Williams v. Owens*, 937 F.2d 609 (Table), 1991 WL 128775, at *3 (6th Cir. 1991) (emphasis added). And Ohio courts have held that "[a]warding damages against a defendant in favor of **nonparties** raises serious due process concerns . . . ." *Akerstrom v. 635 W. Lakeside, Ltd.*, 105 N.E. 3d 440, 446 (Ohio Ct. App. 2018) (emphasis added).

Any abatement award that covers costs paid by Medicaid is essentially granting equitable relief in favor of the United States and the State of Ohio. Neither has brought claims here, let alone had them adjudicated. There is no basis in the record to grant relief in their favor or to relieve them of their statutory obligations to fund claims for treatment.[10] Nor does it make any difference to the counties if costs are paid by nonparties or defendants. Either way, the costs will be paid.

Ruling that CVS should pay the obligations of Medicaid and private insurers would violate, as well, the rule against using equitable remedies to punish. "It is not the function of courts of equity to administer punishment." *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R., Co.*, 417 U.S. 703, 717 n.14 (1974); *see also Liu v. SEC*, 140 S. Ct. 1936, 1942–43 (2020) (explaining that courts may not "transform[] an equitable remedy into a punitive sanction" and further recognizing the "equitable principle that the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person wronged'") (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145–46 (1888)). Because abatement cannot be used to punish, concerns that a defendant may pay too little—or receive an "undeserved windfall"—are misplaced.

---

[10] Both the Court and the counties' expert witnesses have concluded that the federal government itself was a cause of the opioid crisis. *E.g.*, Doc. 4296 at 68; Trial Tr. (Doc. 4064) at 3558–59. The federal government approved opioid medications as safe and effective, set production quotas that permitted the "oversupply," and even funded prescriptions for opioid medications through Medicare and Medicaid. The federal government's rights and obligations cannot be adjudicated unless and until those rights and obligations are before the Court. There is no basis in the record of this case to *de facto* grant it relief.

19

**B.      The Collateral Source Rule Does Not Apply.**

The counties, in their trial brief, invoke the collateral source rule to argue that the Court should ignore nonparty payments of certain abatement costs and should award the counties those costs anyway. Doc. 4387 at 16–24. The collateral source rule does not apply here.

<u>First</u>, the Ohio legislature "largely abrogated the common-law collateral source rule" with the enactment of Ohio Revised Code § 2315.20(A) in 2005. *Moretz v. Muakkassa*, 998 N.E.2d 479, 497 (Ohio 2013). To the extent the collateral source rule ever applied to equitable claims (as set forth below, it has not), Ohio has eliminated its applicability by statute.

<u>Second</u>, the collateral source rule does not apply to equitable claims. The seminal case on the collateral source rule in Ohio, *Pryor v. Webber*, 263 N.E.2d 235 (Ohio 1970), states that the rule is "an exception to the general rule of *compensatory damages* in a tort action." *Id.* at 236 (emphasis added). Many other cases in Ohio have described it similarly.[11]

The counties do not cite a single case that has applied the collateral source rule to an equitable remedy under Ohio law. The counties acknowledge that the collateral source rule "typically has been applied in the context of compensatory damage awards" and then cite three discrimination cases under federal statutes to try to suggest that the rule *could* apply to equitable claims. Doc. 4387 at 17. But those cases do not concern Ohio law and are otherwise

---

[11] *See, e.g.*, *Robinson v. Bates*, 857 N.E.2d 1195, 1199 (Ohio 2006) ("The rule is an exception to the general rule that in a tort action, the measure of *damages* is that which will compensate and make the plaintiff whole") (emphasis added); *Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*, 102 N.E.3d 579, 587 (Ohio Ct. App. 2017) (explaining that, under the collateral source rule, "benefits received by the plaintiff from a source collateral to the wrongdoer *will not diminish the damages* otherwise recoverable from the wrongdoer") (emphasis added); *Ferrell v. Summa Health Sys.*, 844 N.E.2d 1233, 1234 (Ohio Ct. App. 2005) ("The collateral source rule is an exception to the general rule of *compensatory damages* in a tort action"; quoting *State ex rel. v. Batavia Local Sch. Dist.*, 829 N.E.2d 298 (Ohio 2005)) (emphasis added).

distinguishable.[12] While the counties elsewhere claim that "courts regularly apply the collateral source rule to funds and benefits provided by federal, state, and local governments," Doc. 4387 at 20, those cases involved damages, not equitable relief.[13]

Judge Faber addressed the collateral source rule in Track Two. He allowed the defendants to introduce evidence of other funding sources because "[t]he collateral source rule's application in cases seeking only equitable relief is far from clear." *City of Huntington v. AmerisourceBergen Drug Corp.*, 2021 WL 1556788, at *1 (S.D.W. Va. Apr. 20, 2021). He found that, like the counties here, the Track Two plaintiffs "cite[d] very little persuasive authority to show that [the rule] applies in [equitable] cases." *Id.*[14]

---

[12] For instance, *Hamlin v. Charter Township of Flint*, 165 F.3d 426 (6th Cir. 1999), did not involve an "equitable monetary remed[y]" as the counties claim; it involved a jury award for damages. *Id.* at 429. Indeed, the court described the collateral source rule as a bar on "reducing damages." *Id.* at 433. Likewise, *Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614 (6th Cir. 1983), involved the duty of a Title VII plaintiff to mitigate damages. *Id.* at 623. And *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160 (6th Cir. 1996), similarly involved a Title VII remedy aimed at deterrence. *Id.* at 1171. As one Ohio court explained, "[t]he fact that damages awards in civil rights cases may not be offset is *not based on the common law collateral source rule*, but on the policy of deterrence." *Cavins v. S&B Healthcare, Inc.*, 39 N.E.3d 1287, 1315 n.10 (Ohio Ct. App. 2015) (emphasis added). Deterrence is not a cognizable basis for relief in an equitable abatement proceeding, where the singular goal is to eliminate a nuisance. *See Bangor Punta*, 417 U.S. at 717 n.14 ("It is not the function of courts of equity to administer punishment.").

[13] *See Roundhouse v. Owens-Illinois, Inc.*, 604 F.2d 990, 994 (6th Cir. 1979) (judgment of money damages); *Town of E. Troy v. Soo Line R. Co.*, 653 F.2d 1123, 1127 (7th Cir. 1980) (the "sole relief sought by the town is damages"); *La. Dept. of Transp. & Dev. v. Kansas City S. Ry. Co.*, 846 So. 2d 734, 741 (La. 2003) ("Like conventional tort cases, environmental law statutory remedies involve claims to recover damages for harm caused by a defendant's acts."); *City of Larkspur v. Jacobs Engr. Grp., Inc.*, 2010 WL 2164406, at *8 (Cal. Ct. App. May 28, 2010) ("[T]he court . . . awarded Larkspur damages in the amount of $8,300,000.").

[14] The counties cite Judge Breyer's ruling in Track Four granting summary judgment for the plaintiff on the defendants' collateral source defense. Doc. 4387 at 16 n.7. But that ruling was based on California law, and Judge Breyer found that the defendants in Track Four had failed to "identify any sources of collateral funds that may be relevant." Doc. 4387-2 at 10. Here, however, substantial evidence was introduced at trial showing that other funding sources, such as Medicaid and private insurers, would pay for certain costs of the Alexander plan.

Third, the collateral source rule applies only to payments made to or for the benefit of *a plaintiff* for her own injuries. *See Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*, 102 N.E.3d 579, 587 (Ohio Ct. App. 2017) ("Under the common law collateral source rule, evidence of compensation *a plaintiff received* from collateral sources was not admissible . . . .") (emphasis added). It does not apply to payments made to or for the benefit of nonparty OUD patients.

## V.  ALLOCATION AND SETOFF

Nuisances are subject to apportionment. As the Restatement explains, "many nuisances are capable of apportionment" because "a reasonable basis can be found for dividing the harm done on the basis of the extent of the contribution of each party." Restatement (Second) of Torts § 840E cmt. b.; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409–10 (2003). Accordingly, to the extent the Court awards, over CVS's objections, funding for the potential effects of the oversupply nuisance, the award must be apportioned. CVS adopts and incorporates by reference its prior arguments on this issue.  Doc. 4299 at 17–24; Doc. 4342 at 19–25.

### A.  Joint-and-Several Liability Does Not Apply Because the Harm Is Divisible.

Joint-and-several liability may be imposed only when the harm is indivisible. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 (1979) ("[T]he common law . . . allows an injured party to sue a tortfeasor for the full amount of damages for an *indivisible injury* that that tortfeasor's negligence was a substantial factor in causing.") (emphasis added). Joint-and-several liability does not apply, and apportionment is required, when the harm is divisible. *Id.* at 260 n.8. Plaintiffs have not met their burden to show that the harm is indivisible. Their own litigation decision to prove their case in the aggregate does not make the harm indivisible.

Harm is divisible when it is "capable of division upon a reasonable and rational basis." Restatement (Second) of Torts § 433A cmt. d. There is a rational basis for allocating the primary harm that plaintiffs seek to remedy—opioid addiction and the resulting complications to the lives

22

of addiction patients and their families—because it is discernible whether addiction patients ever obtained prescription opioids from CVS. CVS can determine it from its dispensing data. Doc. 4299 at 18–19; Doc. 4342 at 20–21.

### B.    Plaintiffs Have the Burden to Prove CVS's Allocable Share.

Even if the harm were indivisible (it is not), the burden remains on plaintiffs to prove CVS's allocable share. The Restatement, which Ohio follows, recognizes that "there may be so large a number of actors" that placing the burden of proving apportionment on a defendant "may cause disproportionate hardship to defendants." Restatement (Second) of Torts § 433B cmt. e (cases that have put the burden on a defendant "have involved a small number of tortfeasors, such as two or three"). That certainly is true here. Dr. Alexander, for instance, testified that there are "many, many, many causes" of the opioid epidemic that his plan seeks to remedy, Trial Tr. (Doc. 4064) at 3558, and the Court itself has recognized that "the opioid crisis was caused by a confluence of failures by virtually everyone." Doc. 4296 at 68.[15]

### C.    A Failure to Apportion Would Violate Due Process.

The Due Process Clause of the Fourteenth Amendment "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Campbell*, 538 U.S. at 416–17 ("To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property."). It would be arbitrary, excessive, and fundamentally unfair not to apportion the costs of a far-reaching government spending plan addressing drug addiction and its

---

[15] The "disproportionate hardship" of placing the burden on CVS is amplified by (1) the Court's severance of one set of actors who were causes (the manufacturers), Doc. 3315; (2) the Court's refusal to allow defendants to bring another set of actors (prescribers) into these cases, Doc. 3561; (3) the Court's order permitting plaintiffs to withhold discovery that could have been used to apportion, Doc. 4275; and (4) the Court's rejection of defendants' proposed verdict form that would have asked the jury to apportion. Doc. 3579 at 2; Doc. 4146-1 at 30.

societal effects when plaintiffs admit that other actors were causes (in some cases, the "major" causes), when the Court severed some of those actors from these cases and did not permit defendants to bring others into these cases, and when, as discussed below, CVS has provided a reasonable basis for apportioning the costs.

D.      A Reasonable Basis for Apportionment Exists in This Case.

Even though the burden rests with plaintiffs, CVS has shown, through the expert testimony of Dr. Chandra, that the Court can "reasonably apportion" the harm in this case. Trial Tr. (Doc. 4460) at 1218. Dr. Chandra, an expert in health economics, provided the Court with a three-step process for apportionment. *See* Restatement (Second) of Torts § 433A cmt. d (all that is required is a "reasonable and rational basis" for apportioning harm); W. Page Keeton et al., Prosser & Keeton on Torts § 52, at 345 (5th ed. 1984) ("Where a factual basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm of which that defendant's conduct has been a cause in fact, it is likely that the apportionment will be made."). Dr. Chandra's testimony was not rebutted by any of plaintiffs' experts.

Dr. Chandra's three-step process is summarized below:

Step One. Because the Alexander plan encompasses illicit opioid use, Dr. Chandra apportions harm between prescription and illicit opioids. To do that, Dr. Chandra uses as a measure Dr. Katherine Keyes's estimate of the overdose deaths in the counties in 2019 that were directly or indirectly attributable to prescription opioids—66.2% of overdose deaths in Lake County and 60.7% in Trumbull County. Trial Tr. (Doc. 4460) at 1226–37; CVS-MDL-05012.[16]

---

[16] To be conservative, Dr. Chandra used the percentage of overdose deaths that were both directly or (allegedly) indirectly attributable to prescription opioids, per Dr. Keyes, rather than just the percentage of deaths that were directly attributable to prescription opioids (which, by comparison, were 26.5% in Lake County and 14.6% in Trumbull County). Trial Tr. (Doc. 4460) at 1234–35.

Step Two. Dr. Chandra apportions the resulting percentage for prescription opioids among certain sectors, namely: (1) FDA and DEA; (2) manufacturers; (3) prescribers; (4) pharmacies; and (5) diverters. Trial Tr. (Doc. 4460) at 1237–38. These sectors were identified by plaintiffs and their experts as having caused opioid-related harms in the counties. *Id.* at 1238–44.[17]

Using a principle of economic theory called Shapley's value, Dr. Chandra apportions 20% shares to each of these five sectors. He uses equal shares because each sector is a "link in the chain" for a prescription opioid to be diverted. Trial Tr. (Doc. 4460) at 1244–47.[18] Thus, Dr. Chandra's method apportions 20% of prescription-opioid related harms to the pharmacy sector.[19]

Step Three. Dr. Chandra then determines CVS's share within the pharmacy sector. To do this, Dr. Chandra uses the Ohio Board of Pharmacy's OARRS data and computes CVS's share using six different metrics. *See* CVS-MDL-05013; CVS-MDL-05014; Trial Tr. (Doc. 4460) at 1250–52. Although Dr. Chandra recommends the fifth metric—share of plaintiffs' red-flag prescriptions as measured by MMEs—the Court could select any of the six metrics. Trial Tr. (Doc. 4460) at 1253–54. Using the fifth metric, CVS's share is 21.4% for Lake County and 5.4% for

---

Dr. Chandra, however, does not take a position on which percentage should be used; that is for the Court to decide. *Id.*

[17] Plaintiffs filed complaints against the manufacturers alleging they were causes, *id.* at 1240–42; DEF-MDL-11897; DEF-MDL-11899; Dr. Keyes and Dr. Alexander testified that these other actors were among the causes, Trial Tr. (Doc. 4064) at 3558–59; Trial Tr. (Doc. 4065) at 3688–99; and Dr. Alexander testified that FDA, DEA, and manufacturers were the "major" causes. Trial Tr. (Doc. 4064) at 3532–33.

[18] This is conservative. If Dr. Chandra had used the more complex sequential method, larger percentages would have been assigned to upstream actors like the manufacturers and lower percentages would have been assigned to downstream actors like the pharmacies. Trial Tr. (Doc. 4460) at 1248–49.

[19] Step Two of Dr. Chandra's methodology is flexible. Should the Court decide that the harm should be apportioned among a greater or fewer number of actors, the methodology could be adjusted accordingly. Trial Tr. (Doc. 4460) at 1257–58.

Trumbull County. *Id.*; *see also id.* at 1254. Applying that percentage to the pharmacy sector's share results in a total allocable share for CVS of 2.83% for Lake County and 0.66% for Trumbull County. Trial Tr. (Doc. 4460) at 1255–56; CVS-DEMO-016.

This small percentage does not conflict with the jury's finding that CVS was a substantial factor in causing the oversupply nuisance. A defendant that is found to be a substantial cause may be apportioned a small percentage of the liability. *See, e.g.*, *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1225 (Cal. 1997) ("allocat[ing] only 1.2 percent of the total legal cause" to a defendant that "the jury found . . . was a substantial causative factor"). The Court itself has recognized that "even a very small proportional contribution by one of numerous defendants" could be a substantial cause. Doc. 3102 at 4–5.

### E. Settlement Amounts from Other Tortfeasors Must Be Set Off.

Any abatement costs awarded to plaintiffs must set off settlement amounts that plaintiffs have received, or will receive, from other tortfeasors. Ohio Rev. Code § 2307.28(A) (a settlement amount "reduces the claim against the other tortfeasors to the extent of the greater of any amount stipulated by the release or the covenant or the amount of the consideration paid for it"); Doc. 4387 at 16 n.6 (plaintiffs agree that settlements should be set off). Therefore, any award to plaintiffs must be reduced by the settlement amounts that plaintiffs have received, or will receive, from Giant Eagle ($3 million); Rite Aid (between $3 and $6 million); AmerisourceBergen, Cardinal, and McKesson (collectively $10,319,212.40); and Johnson & Johnson ($2,348,446.97). DEF-MDL-14530 at 9; DEF-MDL-15069 at 7.

## VI.    ABATEMENT PROPOSALS

At the Court's request, and subject to and without waiving CVS's objections, CVS sets forth below approaches for the Court to consider. This section is broken into five categories: (A) oversupply, (B) treatment, (C) other effects, (D) administration, and (E) dispensing terms.

For the reasons set forth above, the Court's abatement order should be limited to terms to reduce the oversupply of legal prescription opioids found by the jury; no funding should be awarded. CVS's proposal to reduce the oversupply is set forth below in section (A). If, however, the Court rejects CVS's position and includes in its order funding for addiction treatment or other potential effects of the oversupply, the approaches set out in sections (B) and (C) address that scenario and reflect the following principles:

First, the amount of initial treatment funding must be derived from the county data that identifies the number of persons that county-funded facilities treat and the costs the counties actually pay for that treatment.

Second, due to the inherent uncertainty associated with predicting the assistance needs of unknown persons and the Alexander plan's unviable attempts to overcome the uncertainty, any funding must be limited to one year as it was in Oklahoma. *State ex rel. Hunter*, 499 P.3d at 722–23. If the Court rejects this position, the uncertainty permeating plaintiffs' plan requires that funding be determined annually. Dr. Alexander himself endorsed annual, if not even more frequent, assessments "to iteratively inform further abatement." Trial Tr. (Doc. 4446) at 438–41.

Third, which patients will receive CVS funding for treatment must be guided by CVS's dispensing data to tailor the relief to CVS's conduct. Dr. Alexander testified that it is appropriate to employ prescription records to assist in abatement on a move-forward basis. *Id.* at 437–38.

Fourth, the costs of treatment must be apportioned. While dispensing data must be used as one means of determining CVS's share of any treatment costs, Dr. Chandra's allocation methodology must be used as well.

## A.    Oversupply

As stated in the verdict form, the public nuisance found by the jury was an "oversupply of legal prescription opioids." Doc. 4176 at 2, 6. CVS objected to the legal rulings, jury instructions,

and jury argument that led to this verdict, and they will be the subject of CVS's appeal. But subject to those objections, the relief that flows from the counties' claims is an abatement order directed at reducing the volume of prescription opioids in the counties, namely an order that:

1.  Prohibits CVS from dispensing from its pharmacies in Lake and Trumbull Counties the prescription opioids at issue in the trial (Schedule II prescription opioids). It would not be right from a patient-care perspective, or legally, to prohibit the dispensing of medication. But it is the relief that flows directly from plaintiffs' claims and that most directly abates the oversupply that they seek to remediate.[20]

    —and—

2.  Requires CVS to provide for disposal of any excess prescription opioids that it dispensed through the following means in its pharmacies in Lake and Trumbull counties: (a) making available either drug disposal kiosks or drug disposal pouches, and (b) displaying or otherwise providing information about the need for drug disposal and the means available to do so.[21]

The order should remain in effect for a maximum of three years. CVS hereby incorporates by reference its prior submissions on these measures. *See* Docs. 4316 & 4336.

For the reasons set forth in Sections II and III, *supra*, no other relief can be awarded.

---

[20] For instance, under the Court's instruction on the intentional conduct theory of public nuisance (to which CVS objected) and plaintiffs' arguments thereon, the jury was allowed to find CVS liable even if it complied with all applicable laws and regulations.

[21] Because CVS can implement these disposal measures itself in a manner that is tailored to its dispending conduct, plaintiffs should not be awarded any further relief from CVS to fund disposal measures.

### B. Treatment

If the Court goes on to award funding for treatment over CVS's objections, the Court should include in its order the following terms, to be administered by a neutral third-party Administrator appointed by the Court (as set forth Section VI.D, *infra*.).

Screening. A county may seek funds to pay for the costs of treating a person for OUD upon (a) a showing that the person is a resident of one of the counties, and (b) a determination that the person does not have Medicaid or private insurance that would pay for the treatment.

If a resident meets these criteria, the Administrator shall call on CVS to provide a history of the opioid prescriptions that it has filled for the person in its Lake or Trumbull County pharmacies. CVS shall provide the history within five (5) business days of the request. If the resident's CVS prescription history indicates that CVS pharmacies in the counties filled opioid prescriptions for the resident and shows that such prescriptions were sufficient to be deemed a cause of the person's condition, then a county may draw on CVS funds deposited with the Administrator to pay for an appropriate portion of the costs.

The Administrator, in consultation with the parties, shall set criteria to govern whether the resident's CVS prescription history is sufficient to trigger CVS funding. If CVS filled no opioid prescriptions for a resident or only a small number of them, it would not be sufficient. Conversely, if CVS filled opioid prescriptions for the resident on a regular basis, it may be. The criteria shall be subject to Court approval.

Apportionment. If the Administrator determines that a resident's CVS prescription history is sufficient to trigger CVS funding, the amount drawn from CVS funds shall be apportioned as follows. Under Step Two of Dr. Chandra's analysis, which accounts for other actors that plaintiffs'

experts identified as causes, CVS's share should be 20% of the cost of treating the resident.[22] While the Court may decide to adjust the allocation to increase CVS's share, Trial Tr. (Doc. 4460) at 1257–58, CVS's share of the costs of treating one of its patients could not possibly exceed 50%. If CVS is responsible for the costs of treating a patient, then the doctors who wrote the prescriptions for the patient are at least equally responsible. *Id.* at 1258; CVS-DEMO-019. If the Court elects not to employ CVS's dispensing data to reasonably tailor treatment costs to CVS's role, it must apply all three steps of Dr. Chandra's methodology to reach a fair and just sum.

Funding. The Court should set the amount of funding for treatment by reference to the counties' own treatment data. This data shows how many persons receive treatment through county-funded facilities, the treatment each person receives, and how much, if anything, the counties pay for it. Mr. Bialecki was the only witness to analyze this data. Plaintiffs called no counter-witness on its content.

As discussed in Section III.B.4, *supra*, the Lake County data shows that, in 2019, Lake County paid the costs of OUD treatment for 232 individuals for a total of $362,712, CVS-MDL-05022, and the Trumbull County data shows that, in 2019, Trumbull County paid the costs of treatment for 481 individuals for a total of $285,833. CVS-MDL-05021. The combined payments therefore totaled $648,545 in 2019 (which, again, excludes treatment funded by Medicaid).

These numbers are conservative. They assume no funding from grants. They are based on 2019 data (the data from later years show a *decrease* in the number of patients served). Trial Tr. (Doc. 4455) at 767. And they are adjusted for inflation. *Id.* at 768. They are conservative in other respects as well—they include treatment costs for patients using illegal opioids. Trial Tr. (Doc.

---

[22] The use of dispensing data to limit funding to persons for whom CVS has filled sufficient opioid prescription reduces the need to apply Steps One and Three of Dr. Chandra's methodology.

4090) at 4266–67. And they include patients receiving county-funded treatment regardless of whether they filled opioid prescriptions at CVS.

Accordingly, if the Court awards funding for treatment over CVS's objection, the Court should allocate to CVS in Year One an appropriate portion of this $648,545 to be deposited with the Administrator for potential use. While this number is far lower than what plaintiffs want and the Court may have contemplated, it comes from the best available data. In this regard, the only county record that plaintiffs themselves introduced regarding either county's actual spend on opioid-related services supports this sum. *See* P-4900.[23]

Assuming that any excess funds would be returned to CVS or rolled over to the following year (if the Court orders more than one year of funding over CVS's objection), the Court could add an appropriate cushion for Year One out of an abundance of caution. But it would not be appropriate for any such cushion to exceed a reasonable percentage (*e.g.*, 50%) of the total. In determining CVS's portion of the sum, the Court should consider the screening process outlined above, which would limit the use of CVS funds to residents who filled sufficient prescriptions at CVS pharmacies and CVS's share of the opioid dispensing in the counties.[24]

---

[23] This exhibit shows that Medicaid covers 90.6% of the treatment expenditures of the Trumbull County Mental Health & Recovery Board. P-4900 at 5 ($24 million of $26.5 million). It shows that Medicaid covers all MAT expense. *Id.* at 2–4. When the OUD expense is reduced to reflect not only Medicaid but also the 15-month time frame of the document (per the representation of the counties' counsel, Trial Tr. (Doc. 4460) at 1094, 1189, it indicates an annual OUD spend of approximately $605,229. And this sum includes services beyond treatment, such as gas cards, cell phones, job coaching, and housing. *Id.* at 2–3. Plaintiffs adduced no testimony about this document and made no record of who prepared it, what information was used to prepare it, and how it should be interpreted. But if the Court is to consider it nevertheless, this is what the document shows.

[24] *See* CVS-MDL-05013 (showing CVS dispensed only 21.3% of the MMEs in Lake County); CVS-MDL-05014 (showing CVS dispensed only 6.8% of the MMEs in Trumbull County).

Funds deposited by CVS that are unused after application of the screening and apportionment procedures shall be returned to CVS. If the Court awards more than one year of funding over CVS objection, the Court should determine what funding is necessary for a subsequent year at the conclusion of the prior year.

### C.      Other Effects

The Court should not award abatement costs to address any other potential effects of the oversupply nuisance for the reasons discussed *supra* Sections II and III. If the Court rejects this position and orders funding for other potential effects that are so attenuated from CVS and the verdict, it must limit the funding to programs and services that prevent overdose and connect individuals who used prescription opioids to addiction treatment. Those programs are naloxone distribution and training (plaintiffs estimate the Year One costs to be $1,034,054), the helpline (plaintiffs estimate the Year One costs to be $307,550), peer-recovery coaches (plaintiffs estimate the Year One costs to be $629,078), the Quick Response Team (plaintiffs estimate the Year One costs to be $101,153) and bridge programs to connect people in emergency rooms who have overdosed to addiction treatment (plaintiffs estimate the Year One costs to be $933,433).

Even if the Court extends this far over CVS's objection, it most certainly should not include funding to address any other potential effects. They are even more attenuated from CVS's dispensing conduct and the jury verdict. The funding that plaintiffs seek for these effects—which, as previously discussed, involve any number of superseding causes that were not the subject of any jury findings—is significant. For example, plaintiffs seek the following amounts *for only Year One* of their program:

- $20,478,237 to provide HIV, hepatitis C, and endocarditis treatment to illegal drug users, P-23127 at 93–100, 262–29;

- $1,507,103 to provide drug checking services, needle exchange services, and fentanyl testing strips to illegal drug users, *id.* at 32–39, 201–08;

- $7,528,804 to provide vocational training and job placement services to people with prescription or illicit opioid addiction, *id.* at 136–37, 305–06;

- $23,685,537 for social programs and services for children and families of people with prescription or illicit opioid addiction, *id.* at 330–47, 161–78;

- $684,728 to provide housing for homeless people with prescription or illicit opioid addiction, *id.* at 179–80, 348–49;

- $722,254 for their law enforcement departments, including $106,864 for training to reduce stigma against people with opioid addition, *id.* at 124–29, 293–98;

- $3,240,650 for the criminal justice system, including $1,214,280 to provide transitional housing for people released from prison, *id.* at 130–35, 299–304; and

- $673,170 for data surveillance programs to help the counties "better understand" what they even need and how they should deploy their resources, *id.* at 40–49, 209–18; Trial Tr. (Doc. 4446) at 434–35.

Even if the law of abatement permitted funding for effects of the nuisance (it does not), the societal and individual harms that these proposed expenditures seek to address are far too remote from the verdict, and far too attenuated under the law, to be the subject of an abatement award.

With regard to funding, plaintiffs have not presented the Court with a plausible means of determining what sums are needed for any of the measures targeting these other effects. This is discussed in Section III, *supra*. For this reason alone, the Court cannot award funding for any of these additional measures. If the Court, in spite of this and over CVS's many objections, awards funding for any of these measures based on Dr. Alexander's estimates, it must apply Dr. Chandra's allocation methodology in full.

Given plaintiffs' failure to provide meaningful information about the actual costs of their existing programs and any unmet need, an alternative reference point for determining funding could be the annual expenditures of the Lake County ADAMHS Board and the Trumbull County Mental Health & Recovery Board. In 2020, the Lake County ADAMHS Board spent $16.11 million, and the Trumbull County Mental Health & Recovery Board spent $7.97 million. DEF-

MDL-14968 at 36; DEF-MDL-14944 at 80; *see* Trial Tr. (Doc. 4455) at 804–07, 819–22. Of these sums, funding for opioid-related programs comprised only a portion. *See* Section III.B.4., *supra*

Significantly, the programs funded by these agencies include many of the measures proposed in the Alexander plan. *See* Section III.C., *supra*  Equally significantly, neither agency used its full budget in 2020. Lake County left $1.4 million unused, and Trumbull County left $420,000 unused. *See* Section III.B.4., *supra*

With the exception of addiction treatment, on which there is county data, the opioid-related spend of each county's ADAMHS Board provides the only credible benchmark in the record for setting an amount of funding. Given that substantial portions of each agency's expenditures are devoted to non-opioid issues, that treatment would be funded separately, that neither agency is spending its full budget, and that each county already possesses an additional $3 million for abatement via their settlements with Giant Eagle and Rite Aid, the total of any 12-month award for these additional measures (if ordered over CVS's objections) should not exceed 20% of the ADAMHS Board budgets.

### D.  Administration

Although CVS disagrees that the relief plaintiffs seek is recoverable as abatement, if the Court orders any funding, that funding should be administered by a neutral third party agreed to by the parties and appointed by the Court (the "Administrator"). The terms applicable to the Administrator are set forth in the Track 3 Defendants' Abatement Plan and are incorporated by reference herein. Doc. 4337 at 9–10.

### E.  Dispensing Terms

The Court has indicated that, as part of its abatement order, it may require defendants to adopt certain policies and procedures to govern their filling of opioid prescriptions in the counties. While, to assist the Court, CVS attaches at Exhibit A draft terms that attempt to capture what the

Court envisioned (and are identical to the draft terms attached to the Walmart-Walgreens brief), CVS objects to the entry of such terms.

First, the imposition of rules governing pharmacy practice is committed to the legislative and executive branches of state and federal government, including the Ohio Board of Pharmacy and the U.S. Drug Enforcement Administration. The Court does not have the power to impose rules of its own and is preempted from using state common law claims to do so. It may not, for instance, impose requirements regarding particular "red flags," and documentation of those flags, that appear nowhere in either the Controlled Substances Act or the Ohio statutory analog. To avoid undue repetition, CVS hereby adopts and incorporates Section V of the Walmart-Walgreens post-trial brief.

Second, plaintiffs presented no evidence that any such procedures would reduce the number of opioid prescriptions filled by CVS or otherwise reduce the "oversupply of legal prescription opioids" in their communities. This hole in the evidence is particularly prohibitive given that the Court allowed plaintiffs to argue—and plaintiffs did argue—that even "superb" dispensing contributed to this nuisance. Trial Tr. (Doc. 4153) at 7169; Doc. 4156 at 10; Doc. 4172 at 7 n.6. The policies and procedures contemplated by the Court would not abate the "superb" dispensing that plaintiffs argued contributed to the nuisance.

Third, depending on what the Court orders, there may be no evidence in the record on whether a particular procedure is feasible or reasonably capable of implementation. The Court may not impose procedures without a basis in the record to do so.

Finally, the Court may not consider the injunctive terms included in CVS's settlement with the State of Florida. In addition to the Rule 408 prohibition on using them, the Florida terms were the subject of a voluntary agreement between CVS and the sovereign charged with regulating it in

35

Florida. They are not relevant to what a court may impose, over objection, in a case brought by municipalities with no regulatory authority over pharmacy practice.

Dated:  June 13, 2022

Respectfully submitted,

/s/ *Eric R. Delinsky*
Eric R. Delinsky
Alexandra W. Miller
Paul B. Hynes, Jr.
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC  20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com
E-mail: phynes@zuckerman.com

*Counsel for CVS Pharmacy, Inc., Ohio CVS Stores, L.L.C., CVS TN Distribution, L.L.C., CVS Rx Services, Inc., and CVS Indiana, L.L.C.*

36