**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION** | **MDL 2804** |
| **OPIATE LITIGATION** | **Case No. 17-md-2804** |
| *This document relates to:* | **Hon. Dan Aaron Polster** |
| **Track Three Cases** | |

# PLAINTIFFS' CLOSING BRIEF FOR PHASE 2 TRIAL

June 13, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 1

I.    PLAINTIFFS SHOULD BE AWARDED EQUITABLE ABATEMENT. ........................................ 1

    A.  Plaintiffs' proposed abatement plans are both reasonable and necessary to materially abate the public nuisance caused by Defendants ........................................ 2

    B.  Defendants offered no legitimate defense against Plaintiffs' abatement plans. .......... 6

    C.  Plaintiffs should be awarded the full amount required to implement their abatement plans or, alternatively, a reduced amount based on a modified estimate of individuals with OUD in the Counties. ...................................................... 19

        1. Plaintiffs demonstrated that the full amount required to implement their abatement plans is necessary to materially abate the public nuisance. ........................................... 19

        2. Alternatively, the Court can award a reduced amount of abatement costs based on a modified estimate of individuals with OUD in the Counties. ...................................... 20

        3. The Court should consider certain additional issues when determining how and when the awarded abatement costs are paid and used. ......................................................... 23

    D.  Defendants failed to demonstrate that the amount of abatement awarded should be reduced. ............................................................................................................... 27

        1. Defendants failed to satisfy their burden of proof on apportionment. .......................... 27

        2. Defendants failed to prove that the abatement award should be reduced by collateral source payments from non-defendant third parties. .................................................... 33

II.   INJUNCTIVE RELIEF IS NECESSARY TO PREVENT DEFENDANTS FROM CONTINUING THEIR WRONGFUL DISPENSING CONDUCT .................................................35

CONCLUSION .................................................................................................................. 41

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Buchman v. Wayne Trace Loc. Sch. Dist. Bd. of Edn.*,
  652 N.E.2d 952 (Ohio 1995) ................................................................................. 35

*Carter-Jones Lumber Co. v. Dixie Distribg. Co.*,
  166 F.3d 840 (6th Cir. 1999) .............................................................................. 19

*Day v. NLO, Inc.*,
  144 F.R.D. 330 (S.D. Ohio 1992) ................................................................... 23, 24

*Howe v. City of Akron*,
  17 F. Supp. 3d 690 (N.D. Ohio 2014) ................................................................ 37

*Howe v. City of Akron*,
  801 F.3d 718 (6th Cir. 2015) ........................................................................ 36, 37

*Loc. 28 of Sheet Metal Workers' Intern. Ass'n v. E.E.O.C.*,
  478 U.S. 421 (1986) ............................................................................................. 37

*In re NLO, Inc.*,
  5 F.3d 154 (6th Cir. 1993) ................................................................................. 24

*In re Peterson (State Rpt. Title: Ex Parte Peterson)*,
  253 U.S. 300 (1920) ............................................................................................. 37

*Reed v. Cleveland Bd. of Ed.*,
  607 F.2d 737 (6th Cir. 1979) ........................................................................ 37, 38

*Yslava v. Hughes Aircraft Co.*,
  845 F. Supp. 705 (D. Ariz. 1993) ....................................................................... 24

STATUTES

OHIO REV. CODE § 1343.03 (2016) .......................................................................... 24

OHIO REV. CODE § 4729.55 (2021) .......................................................................... 41

OTHER AUTHORITIES

7 AM. JUR. 2D ATTORNEYS AT LAW § 249 .............................................................. 25

FED. R. CIV. P. 53 ........................................................................................... 37, 38

Jeffrey R. Gleit and Matthew R. Bentley, *The Texas Two-Step: a Problematic Reframing of the Bankruptcy Code Toolkit or an Equitable Solution for Productive Conglomerates and their Mass Tort Claimants* No. 2 J. Bankr. L. & Prac. NL Art. 1 (Apr. 2022) .................................................................................................................25

RESTATEMENT (SECOND) OF TORTS § 433 (1965) ...........................................................29

## INTRODUCTION

As Plaintiffs' experts explained during the Phase 2 trial, the public nuisance caused by Defendants can be materially abated through the funding and implementation of a comprehensive fifteen-year abatement plan in each County, consisting of four categories of opioid abatement interventions.  These abatement interventions are reasonable, necessary, and effective, and Defendants offered no evidence at trial demonstrating otherwise.  As originally proposed, the Lake County abatement plan costs ~$1.43 billion and the Trumbull County abatement plan costs ~$1.83 billion, if paid in annual installments.  However, in order to address certain concerns raised by the Court, Plaintiffs also offer an alternative, less expensive abatement plan for each County. This alternative proposal is based on reduced estimates of the OUD population in the Counties, derived by subtracting the OUD population numbers as of 1999, which was before the bulk of the oversupply and diversion of prescription opioids in the Counties began, from the current estimated OUD population numbers.  Utilizing Plaintiffs' alternative abatement proposal would reduce the total cost of the Lake County abatement plan by approximately 24.4% and the total cost of the Trumbull County abatement plan by approximately 33%.  Regardless of which abatement proposal is chosen, Defendants failed to demonstrate at trial that any further reduction of the abatement award is warranted.  They also failed to demonstrate that there is a legally sustainable basis to apportion the award among Defendants or to others.  Accordingly, Defendants should be deemed jointly and severally liable for the entire award.  Finally, because Defendants will continue to dispense prescription opioids into the Counties, certain injunctive relief is required to ensure that Defendants do not continue to exacerbate the public nuisance they have caused.

## ARGUMENT

### I.  PLAINTIFFS SHOULD BE AWARDED EQUITABLE ABATEMENT.

As demonstrated in the Phase 1 trial, Plaintiffs continue to be harmed in a variety of ways by the public nuisance found by the jury.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 3-13. Rates of opioid addiction, overdose deaths, and many other opioid-related harms have skyrocketed. *Id.* at pp. 5, 8-12.  Additionally, a significant number of prescription opioid users have transitioned

to stronger drugs like heroin or illegally-manufactured fentanyl.  *Id.* at pp. 4, 6-8.  The public nuisance continues to exact tragic costs from Plaintiffs' communities, including by increasing crime rates, overburdening law enforcement, crowding the Counties' jails and addiction treatment facilities, undermining the employability of the workforce, and devastating families.  *Id.* at pp. 8-13.  These ongoing interferences with public health and safety cannot be significantly reduced without the implementation of programs and services related to the prevention, treatment, and recovery of opioid abuse and addiction.  Moreover, given the extensive evidence adduced in the Phase 1 trial demonstrating that Defendants' wrongful conduct led to both an oversupply and diversion of legal prescription opioids in the Counties and an increase in the abuse of heroin and illegally-manufactured fentanyl, and the associated harms related thereto,[1] it is important that any abatement plan include measures to reduce the harms associated with both legal prescription opioids and illegally manufactured/obtained opioids.[2]

### A. Plaintiffs' proposed abatement plans are both reasonable and necessary to materially abate the public nuisance caused by Defendants.

During the Phase 2 trial, Plaintiffs demonstrated that the public nuisance found by the jury can be materially abated through the funding and implementation of a comprehensive, long-term abatement plan in each County.  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 417:12-15 ("Q:…. You believe that the measures set out in your report in concert with one another can reduce opioid-related harms in the counties by 50 percent over 15 years, correct?  A: Yes.  That's true.").[3]

---

[1]  *Id.* at pp. 4, 6-8; *see also, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 67:24 – 78:5, 91:7 – 92:5, 196:20 – 199:6; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 381:18-19, 385:5-18, 453:10-17; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 547:5-10, 554:22 – 555:5, 602:13 – 603:13.

[2]  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 380:25 – 381:6, 381:15-19, 381:24 – 382:6, 385:5-18 ("Well, I've spoken about these being part and parcel of the same problem.  And, you know, there are individuals using heroin that started with prescription opioids, and, frankly, there are individuals using heroin that may not have even used a prescription opioid before but wouldn't have started with the heroin but for the opioid epidemic and the oversupply of prescription opioids.  So I think that as with other abatement plans that I've carefully reviewed, they're all highly consistent in tackling the opioid epidemic, which includes people using illicit opioids."), 385:19 – 386:6, 407:25 – 409:9; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 556:17-22, 599:3 – 600:5, 602:13 – 603:21.

[3]  *See also id.* at 329:15 – 364:18, 370:5 – 377:25, 406:15 – 407:23, 409:23-25, 487:12-23, 488:22 – (footnote continues on next page)

In support of their abatement plans, Plaintiffs offered the opinion testimony of four highly-qualified expert witnesses: (1) Dr. Katherine Keyes, Ph.D., an Associate Professor at Columbia University with a Ph.D. in epidemiology;[4] (2) Dr. Nancy Young, Ph.D., the co-founder and Executive Director of Children and Family Futures with a Ph.D. in social work (with a concentration in social policy);[5] (3) Dr. Caleb Alexander, MD, MS, a practicing general internist, pharmaco-epidemiologist, and professor of epidemiology and medicine at Johns Hopkins Bloomberg School of Public Health;[6] and (4) Dr. John Burke, Jr., Ph.D., an Associate Professor Emeritus at Cleveland State University and an Adjunct Professor at John Carroll University with a Ph.D. in economics.[7]  Plaintiffs' proposed abatement plans consist of four categories of prospective measures and interventions specifically tailored to abate the public nuisance in these Counties over the next fifteen years.  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 332:13-16,

---

489:18, 490:19-25, 491:18 – 492:2; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 599:3 – 600:5, 600:18-21, 607:20 – 608:1.

[4]  Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 44:6-18.  Dr. Keyes (i) testified regarding the harms the Counties have suffered as a result of Defendants' substantial contribution to the oversupply of prescription opioids, (ii) quantified the number of OUD patients who will likely need treatment in the Counties and the number of children exposed to, and harmed by, parental opioid use in the Counties, (iii) quantified the proportion of death in the Counties directly or indirectly attributable to prescription opioids, and (iv) opined that the harms caused by the public nuisance are indivisible because they "build off of each other and interact to create a system of harm to the community[.]"  *See, e.g., id.* at 45:6 – 78:5, 90:2 – 92:5, 194:23 – 195:7, 196:20 – 199:25.

[5]  Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 232:25 – 233:10, 234:14 – 243:18.  Dr. Young (i) testified regarding the harms to communities caused by the opioid epidemic, particularly the impact on child welfare systems and related agencies in the Counties, and some of the County programs needed to remedy those harms, and (ii) estimated the number of children affected by parental substance use disorder, the number of pregnant women who use prescription opioids in the Counties, and the number of children with opioid exposure and neonatal abstinence syndrome born each year in the Counties. *See, e.g., id.* at 244:20 – 276:11.

[6]  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 326:20 – 328:2, 328:3-16, 328:18-23, 425:17 – 426:3, 426:9-11, 429:7-11.  Dr. Alexander testified regarding the abatement plans he tailored for the Counties to remedy the opioid-related harms in their communities over the next fifteen years.  *See, e.g., id.* at 329:15 – 327:25.

[7]  Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 624:14 – 627:1.  Dr. Burke testified regarding the costs associated with Dr. Alexander's abatement plans, both in terms of annual costs over fifteen years and the present value of those future cost computations.  *See, e.g., id.* at 630:20 – 642:11, 644:4 – 646:18, 724:22 – 725:7.

333:2-6, 334:19 – 335:1, 335:7-22, 343:17 – 344:5, 345:3-22, 356:1-6, 364:10-18, 410:1-11.

First, there are prevention measures geared towards "reducing opioid oversupply and improving safe opioid use." Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 332:19-21, 336:3 – 337:9, 338:1 – 342:8; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 586:8-21, 594:3-4, 594:8-11, 595:7-13. These critical measures include:

- **Education of the public and providers**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 336:11-16, 338:3-22, 339:1-12, 384:3-5; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 584:6-21, 595:7-13, 614:4-6; *see also* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 110:5-14; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 638:12 – 641:8, 705:3-24).

- **Safe storage and drug disposal**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 338:18-22, 388:20 – 389:3; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 586:22 – 589:7, 591:11 – 592:12, 593:23 – 595:6, 614:7 – 615:12.

- **Community prevention and resiliency**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 339:21 – 340:11, 389:4-9.

- **Harm reduction**. *Id*. at 340:14 – 341:8, 382:7-20, 389:10 – 390:15; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 600:22 – 602:8; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 706:3 – 708:6, 725:9 – 726:7.

- **Surveillance, evaluation, and leadership**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 341:9 – 342:2, 342:3-8, 432:18 – 435:1, 436:1-8.

Second, there are treatment measures geared towards better identifying individuals with OUD in the communities and removing clinical, economic, and social barriers diminishing their access to comprehensive, coordinated high-quality care. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 332:24 – 333:1, 339:12-14, 342:9 – 354:9, 370:5 – 374:21; *see also* Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 320:13 – 322:8. These critical measures include:

- **Connecting individuals to care**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 342:9 – 343:6, 343:7 – 345:7, 390:21 – 392:20; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 528:18 – 530:19, 531:12-23, 534:5 – 535:2, 535:21 – 538:22, 610:21-22, 611:7 – 612:7.

- **Treatment for OUD**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 346:3-14, 346:15 – 351:16, 370:5 – 374:21, 384:15 – 386:15, 487:12 – 492:2, 493:2 – 494:24, 496:6-11; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 535:21 – 536:6, 536:10-13.

- **Managing complications attributable to the epidemic**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 351:17 – 352:16, 392:21 – 393:9; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 708:12 – 710:11.

- **Workforce expansion and resiliency**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 352:17 – 353:12, 391:18-25, 393:10 – 394:14; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 711:10 – 712:6.

- **Naloxone distribution and training**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 352:23 – 354:9, 394:17-22.

<u>Third</u>, there are recovery measures geared towards "recovery and enhancing public safety and reintegration." Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 333:7-10, 354:13 – 359:16. These critical measures include those related to:

- **Public safety**. *Id.* at 354:20 – 355:12, 394:23 – 395:10; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 522:15 – 524:12, 524:18-23.

- **The criminal justice system**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 356:7 – 357:10, 395:11 – 396:8, 407:6-8; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 514:12 – 515:16, 516:3 – 519:5, 519:9-14, 520:1-21, 521:22 – 522:8, 609:22 – 610:13.

- **Vocational training, education, and job placement**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 357:11-24, 357:25 – 358:24, 396:9 – 397:18.

- **Mental health counseling and grief support**. *Id.* at 358:25 – 359:16, 384:8-14, 399:8 – 400:13; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 524:25 – 527:8, 610:14-20.

<u>Fourth</u>, there are critical measures intended specifically to address the needs of the following special populations who have been uniquely affected by the opioid epidemic:[8]

- **Pregnant women, new mothers, and infants**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 359:22 – 360:13, 360:14 – 361:24; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 543:21 – 546:20, 612:9-24.

- **Adolescents and young adults**. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 361:25 – 362:10, 362:25 – 363:5, 406:19 – 407:5.

- **Families and children**. *Id.* at 363:6-12, 400:14-23, 405:11 – 406:7, 406:15-18.

---

[8]   Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 333:11-16, 336:17 – 337:1, 337:10-25, 359:17 – 362:10, 362:25 – 364:3; *see also* Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 244:20 – 276:11, 285:15-18, 285:23 – 286:9, 313:9 – 314:25, 315:6 – 316:9, 316:18 – 318:10, 319:17 – 320:8.

- **Homeless and housing insecure individuals**.  *Id*. at 363:13 – 364:3, 386:20-22, 400:24 – 401:11; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 602:3-8.

- **Individuals with opioid misuse**.[9]

Plaintiffs' proposed abatement plans mirror many of the governmental and epidemiological reports and literature that predict that abating the nuisance requires long-term solutions. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 330:6 – 331:21, 335:7-22, 346:12 – 347:10, 355:21-23, 356:1-6, 375:4 – 376:13 ("And just analogously with tobacco, if you imagine everyone in, you know, Trumbull County quitting smoking tomorrow, we wouldn't see many of the gains, the salutary gains from that, for months and years and years.  And that's exactly what we found and empirically demonstrated in this report."), 412:15-20, 413:1-9, 414:4-24, 417:8-15, 439:3-5 ("You know, there need to be sustained long-term investments and sustained long-term commitments to the very programs that I advise."); Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 607:20 – 608:1; *see also* Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 245:22-25, 249:3-12, 256:6-14, 319:6-11 ("It is a long-term need and it is a long-term solution just to build the infrastructure of human resources that we need to implement these programs.").  Due to the pervasiveness of the opioid epidemic and the rate of relapse of OUD in this population, only a robust and continuous plan with periodic measurements of success followed by reaction and modification of the remedies can really work. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 333:2-6, 335:7-22, 341:9 – 342:8, 348:19 – 349:24, 375:4 – 376:13, 403:11 – 404:12, 417:8-15, 432:18 – 435:1, 438:23 – 440:15, 610:23 – 611:5, 611:24 – 612:7.

### B.    Defendants offered no legitimate defense against Plaintiffs' abatement plans.

Significantly, Defendants offered no evidence during the Phase 2 trial refuting either the necessity or efficacy of any of Dr. Alexander's proposed abatement interventions.   Indeed,

---

[9]    Although Dr. Alexander identified individuals with opioid misuse as a special population, he explained that the measures directed to those individuals are "[s]ubsumed in the[ ] other categories."  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 364:4-8.

Defendants' experts expressly disclaimed any intention of doing so.[10]  Nor did Defendants offer any abatement plan of their own at trial, in contravention of the Court's request that they do so.[11] Instead, Defendants offered the testimony of three expert witnesses: Matthew Bialecki, CPA, CFF, CGMA (certified public accountant); Dr. Daniel Kessler, J.D., Ph.D. (economist); and Dr. Amitabh Chandra, Ph.D. (economist).  None of these experts are epidemiologists or medical doctors,[12] nor do they have any independent opioid-related experience.[13]  Dr. Chandra opined only on apportionment and did not address the substance of Plaintiffs' abatement plans at all. Dkt. #4460 (5/17/22 Trial Tr.) [*Chandra*] at 1199:8-11, 1216:24 – 1217:2, 1217:17 – 1218:16, 1219:17-25.  And Mr. Bialecki and Dr. Kessler merely offered a handful of criticisms to certain calculations associated with Plaintiffs' abatement plans.  Each of these criticisms are without merit, however, and should be rejected.

At trial, Mr. Bialecki offered his own estimates of the Counties' future treatment costs over the next five years based on historical treatment data showing what the Counties paid for opioid-

---

[10]  Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 750:5-10, 750:11-14, 855:23 – 856:7, 856:21 – 857:4; Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 914:14-18, 986:16-18, 1007:15-21; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1054:15-24, 1055:18-21; Dkt. #4460 (5/17/22 Trial Tr.) [*Chandra*] at 1219:17-25.

[11]  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 1007:12-14 ("Q:….  Do you have an abatement plan? A: No."); *see also* Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 855:17 – 856:7, 856:21 – 857:4; Dkt. #4464 (5/18/22 Trial Tr.) at 1324:2-9 (Court: "I had ordered the defendants to produce their abatement plan, their plan which they thought over – you know, they're objecting that there should even be one because they think they should have won the first phase of the trial or get a new trial, or whatever, but assuming the verdict stands, what they think a fair abatement plan would be, and I never got one.  So there are obviously consequences to that.").

[12]  Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 742:19-21, 743:20 – 744:6, 842:20-25, 843:14-15; Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 900:18-19, 904:20-23, 1007:23 – 1008:2; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1056:12-19, 1100:14-24, 1111:21 – 1112:8, 1178:22-25; Dkt. #4460 (5/17/22 Trial Tr.) [*Chandra*] at 1208:16-18, 1217:24-25, 1261:1-3; *see also* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 200:4-7.

[13]  Defendants' experts did not start working on opioid-related issues until they were retained as experts/consultants by the opioid industry.  Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 840:22 – 841:21, 850:20-25, 851:14 – 852:13; Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 1025:16-23; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1046:4-18, 1051:7-10; Dkt. #4460 (5/17/22 Trial Tr.) [*Chandra*] at 1220:19 – 1221:5, 1260:7-13, 1261:5-17.

related treatment in the past.[14] *See, e.g.,* Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 749:12-17, 764:21-24, 765:12-17 ("Q:…. [Y]our estimate was based on all patients in the past who had received treatment for an opioid-related primary diagnosis. Is that correct? A: That's correct."), 767:8 – 769:8, 774:7-11, 777:12 – 779:1, 780:13 – 781:4, 831:13-20, 870:11-25.[15] But historical treatment data is not a reliable basis for determining future treatments costs for a variety of reasons. For example, such data does not account for the many individuals with OUD in the Counties who have not yet sought treatment, or the fact that treatment has historically been underfunded and limited in capacity.[16] Notably, Mr. Bialecki admitted that he did not take these limitations into account nor did he have the necessary expertise to do so.[17] Using historical treatment data also fails to account for the effectiveness of Dr. Alexander's proposed abatement interventions in increasing the treatment population over time.[18]

---

[14]  Mr. Bialecki excluded from his abatement cost estimates any future costs that could potentially be paid by third parties (Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 749:18-22), which is inappropriate for the reasons discussed in § I.D.2 below.

[15]  Although Mr. Bialecki's expert report included certain other criticisms related to Plaintiffs' abatement plans, he did not offer those opinions at trial. *Id*. at 837:13-24, 838:1-12.

[16]  *See, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 106:23 – 107:8, 108:20 – 109:5, 147:17 – 148:2, 148:3-13, 200:9-24; Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 318:24-25, 320:13-18; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 394:6-14, 464:3-5, 464:21-24, 465:16-23, 466:6-8, 466:16-17, 500:8-15, 501:23 – 502:6.

[17]  Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 871:2-6 ("Q:…. And would you agree that that data is unreliable in predicting the number of people within the counties who have some sort of opioid-related disorder? A: That's outside of my expertise. I wouldn't know."), 871:21 – 872:6 ("Q: And are you aware of the fact that both of these epidemiologists have testified in court that the use of claims data is not a reliable source for predicting the number of people with Opioid Use Disorders in any particular county or city? A: That's not what I'm determining here. Q: Okay. You have neither the background nor the expertise to dispute that concept, right? A: Yeah, that's not my area. I'm an accountant."), 872:7-24 ("Q: So is the answer, 'You are correct, Mr. Weinberger, I did not include in my numbers the number of OUD patients who have not sought treatment'? A: That's not in my – that's outside of my expertise. Q: So you didn't do that, correct? A: So I did not, no. I wouldn't do it because it's outside of my expertise.").

[18]  *See, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 109:23 – 110:14; Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 275:7 – 276:11, 319:6-11, 319:21 – 322:8; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 339:1-14, 340:22 – 341:1, 342:15 – 343:6, 348:19 – 349:13, 353:10-12, 354:20 – 355:1, 356:15 – 357:5, 358:17-24, 382:13-16, 407:6-8, 486:12-21, 491:21-24 ("I mean, the entire plan is predicated, as we (footnote continues on next page)

Dr. Kessler's criticisms of Plaintiffs' abatement plans are similarly without merit.  He pointed to five "overstatements" in Plaintiffs' abatement cost estimates that he claimed should be corrected.  Dkt. #4455 (5/16/22 Trial Tr.) [Kessler] at 915:1-19.[19]  Plaintiffs will address each purported overstatement in turn.

First, Dr. Kessler argued that Dr. Keyes and Dr. Alexander overstate the number of individuals in the Counties with OUD.  Dkt. #4455 (5/16/22 Trial Tr.) [Kessler] at 917:6-10.[20]  Not so.  As Dr. Keyes explained, because there is no official count of the numbers of individuals with OUD in the Counties, Dr. Keyes used well-established epidemiological methods to estimate those numbers.  Dkt. #4438 (5/10/22 Trial Tr.) [Keyes] at 48:9 – 53:16.  Specifically, using the Larney meta-analysis, she applied the multiplier method, "which has been used for decades, if not longer, in epidemiology[,]" to estimate the OUD population by dividing the number of people in the Counties who died of a drug overdose by the probability of that outcome occurring in the OUD population.  *Id*. at 49:1 – 50:13, 50:19-22.  She then included two additional adjustments to that calculation based on County-specific data and to account for "the increased lethality from opioids in more recent years[.]"  *Id*. at 50:14-16, 50:23 – 51:13, 51:24 – 53:16, 111:9 – 112:7, 117:16 – 119:24, 137:24 – 140:4, 172:22 – 173:4.  She also explained how her estimated numbers actually *underestimated* the total number of individuals who may need services to manage the reduction or cessation of opioid use because, for example, her calculations did not include "people who are on

---

reviewed this morning, on many, many different interventions to improve the access to and uptick of treatment."), 497:18 – 498:14, 501:21-22; Dkt. #4447 (5/12/22 Trial Tr.) [Alexander] at 523:7-13, 529:11-17, 537:22-25, 538:7-10, 601:6-13.

[19]  He also argued that several categories of abatement costs, particularly treatment costs, are "overstated" because they include costs that potentially would be paid by third parties (*e.g.*, Medicaid, private insurers, etc.) as opposed to the Counties.  Dkt. #4455 (5/16/22 Trial Tr.) [Kessler] at 977:11 – 978:25.  This argument is without merit for the reasons discussed in § I.D.2 below.

[20]  Dr. Kessler also offered some vague criticisms of Dr. Alexander's use of a trend ratio to reduce the OUD population numbers over time.  *Id*. at 952:12-25.  But as Dr. Alexander explained, the decreasing OUD population is based on the estimated effectiveness of the proposed abatement interventions implemented during the abatement period.  *See, e.g., infra* at fn.43.  Notably, despite Dr. Kessler's criticisms, he also applied Dr. Alexander's reduction to his own proposed numbers.  *Id*. at 953:16 – 955:4.

high doses of opioids that have been prescribed to them and may need medical attention upon cessation of use." *Id*. at 51:14-23, 56:12-21.

Despite not being an epidemiologist himself (*supra* at fn.12), Dr. Kessler criticizes Dr. Keyes' use of a multiplier method based on the Larney meta-analysis.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 918:1-16, 918:25 – 920:16.[21]  He first claimed that Dr. Keyes' reliance on the meta-analysis to calculate a death rate of 0.52 per 100 person years is flawed because (i) most of the studies in that meta-analysis were from outside the United States and too old, and (ii) "it's combining death rates from studies that are based on very disparate populations, time periods and impacts . . . [(*e.g.*, some study participants have OUD and some do not necessarily have OUD)]." Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 920:11-13, 921:3-21, 922:3-7, 924:14 – 925:10, 928:6 – 929:5, 937:24 – 938:9.  He also noted that "[t]he most recent U.S. study in Larney reports a mortality rate of 2.10, more than four times the rate [Dr.] Keyes uses."  Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1066:6-10.

As Dr. Keyes explained, however, there are no County-specific or Ohio-specific estimates for the overdose death rate for individuals with OUD, which is why she used the multiplier method. Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 116:24 – 117:15.  She further explained the benefits of using a meta-analysis to estimate the OUD population because the data are weighted and averaged across hundreds of thousands of individuals, and noted that her use of the Larney meta-analysis in particular was reasonable because it is "the most recent [and] most rigorous study that's been done, [as] it included the most datasets" and "the most people[.]"  *Id.* at 127:2-7, 188:17-22, 191:25 – 192:12, 193:18 – 194:7, 205:3-8; *see also* Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1076:10 – 1077:3.  Dr. Keyes also: (i) noted that she performed a sensitivity analysis where she considered only the United States data from the Larney meta-analysis, and the results were similar to her

---

[21]  Notably, Dr. Kessler has never conducted a meta-analysis and admitted he is not qualified to do so. Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1060:13-19, 1061:14 – 1062:3, 1064:5-7, 1065:5-8.  And although he claimed at trial to have "consult[ed] the epidemiology literature about Professor Keyes' use of the Larney study to see what epidemiologists thought about this sort of thing[,]" he admitted that he did not timely disclose those reliance materials to Plaintiffs.  *Id.* at 1067:8-23.

overall analysis (Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 130:16-20, 193:10-17, 203:3-12); (ii) explained how she accounted for the time variance of the various papers underlying the Larney meta-analysis by doing a weighted average (*id.* at 131:24 – 132:11, 172:22 – 173:4); and (iii) explained that it would be inappropriate to apply a death rate of 2.1 based on a single outlier study within the Larney meta-analysis (*id.* at 185:2 – 189:23, 190:9-18, 191:9 – 193:4).[22]

Dr. Kessler also argued that the mortality multiplier formula that Dr. Keyes used is mathematically incorrect. Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 920:14-16. Specifically, he criticized her for deriving her multiplier formula by dividing "the number of any drug-related deaths of anyone . . . by the any-drug-related-death rate of extramedical opioid users" instead of "taking the number of any drug-related deaths of people with OUD and dividing it by the any-drug-related-death rate of people with OUD." *Id.* at 929:12-22. He claimed she relied on two erroneous assumptions: (i) "that extramedical opioid users are the same as people with OUD[;]" and (ii) "that everyone who suffers a drug-related death must have OUD." *Id.* at 929:23 – 930:5. Dr. Kessler's criticisms are without merit. To begin with, he is simply incorrect that Dr. Keyes used the death rate of extramedical opioid users as the denominator in her formula. Although Dr. Kessler claimed that the Larney meta-analysis tabulates the death rate of extramedical opioid users (*id.* at 930:25 – 931:9, 936:2-17), Dr. Keyes explained that the particular portions of the Larney paper on which she relied were specifically discussing people *with OUD*. Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 55:15 – 56:21, 133:1-10, 135:12-17, 157:14-23.[23] Dr. Keyes further explained why it was appropriate for her to use the number of drug-related deaths as the numerator in her formula, as the multiplier method relies on a benchmark outcome that does not require

---

[22] *See also* Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1068:24 – 1069:24; WMT-MDL-01614 at 001. Notably, the population of that outlier study was individuals who had a previous non-fatal overdose, which Dr. Keyes opined is not an appropriate population. Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 189:18-23.

[23] Dr. Kessler himself acknowledged that some of the studies within the Larney meta-analysis "definitely are based on populations with Opioid Use Disorder[.]" Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 937:13-19.

the exposure to be present.[24]  Notably, Dr. Kessler conceded that he did not know if the "number of any drug-related deaths of people with OUD" in the Counties was available and that he "was not able to find it in the searches that [he] did."  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 930:17-24.

Dr. Kessler asserted that his own OUD population estimates, based on data from the National Household Survey on Drug Use and Health ("NSDUH"), are more accurate than Dr. Keyes' estimates.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 934:7-12, 943:10 – 950:4; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1091:12-15.[25]  NSDUH is a survey conducted by the federal government "based on annual in-person interviews with a random sample of about 70,000 people [in which] they ask an extensive battery of questions to try to allow users of the survey to distinguish disorders like OUD from mere misuse."  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 943:14-24.  But as Dr. Keyes and Dr. Alexander explained, the NSDUH data *dramatically* underestimates the number of people with OUD and thus is not reliable for this purpose.[26]

---

[24]   Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 49:17 – 50:16 ("I don't have a registry of the number of people with OUD, but I know the number of people who have a certain outcome, and I know the probability of that outcome occurring in the OUD population.  So from there, I can estimate the number of people with OUD.  And the outcome that I used was the number of people dying of a drug overdose.  So I know how many people – there is a registry for the number of people who die of a drug overdose in Lake and Trumbull County.  So if I know the number of people who died of a drug overdose, and I know the probability of that event, dying of a drug overdose, among people with OUD, then I can divide the number of people who died of a drug overdose by that probability to estimate the population size. . . .  And then I included some additional adjustments to that calculation based on the increased lethality from opioids in more recent years[.]").

[25]   Specifically, Dr. Kessler calculated the OUD population in 2019-2020 in Lake and Trumbull counties as 2,414 and 2,048, respectively (compared to Dr. Keyes' estimates of 5,934 and 7,560, respectively). Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 949:22 – 950:4.

[26]   Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 54:10 – 55:6 ("It's very well-known in the field that the National Survey on Drug Use and Health pretty dramatically underestimates the number of people with opioid use disorder, the total number of people in the population with opioid use disorder. . . .  So many publications and the literature by epidemiologists and people who are addiction experts have talked a lot about how we can't use [NSDUH] to estimate the size of the OUD population.") (emphasis added), 55:9-14, 160:5-18, 206:14-25; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 377:18-25; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 613:10-12; *see also* Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 974:23-25; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1076:10 – 1077:7, 1080:18 – 1081:4, 1082:3-8 (2018 Barocas paper analyzing OUD rates in Massachusetts found prevalence estimate that was 4.49%

(footnote continues on next page)

To begin with, NSDUH is a national survey that only includes individuals in civilian households who are over the age of 12.  Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 54:18-21, 947:19-24; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1079:17 – 1080:3, 1080:12-13.  Thus, it excludes numerous categories of individuals (*e.g.*, incarcerated individuals; unhoused or homeless individuals; individuals in hospitals, residential treatment facilities, or other institutions; individuals in the military, etc.), many of whom are particularly likely to have high rates of OUD.[27] NSDUH is also dependent on the willingness of interview participants to admit to the government that they are misusing or addicted to prescription opioids, heroin, or fentanyl.  Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 54:21 – 55:1; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1072:15 – 1073:2. Dr. Kessler conceded this is "an important concern[,]" but claimed NSDUH protects against misrepresentations by assuring the interview subjects that their answers will remain confidential. Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1072:15 – 1073:13; *see also* Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 943:25 – 945:1.  He provided no explanation, however, as to why these interview subjects would be willing to believe or rely on these assurances from complete strangers who work for the government.  Indeed, a 2020 peer-reviewed article indicates the opposite is true, finding

---

higher than the NSDUH estimate), 1085:21 – 1087:4 (2019 Midgette study states: "Because NSDUH misses many cocaine, heroin, and methamphetamine users, we follow previous ONDCP adjustments for occasional drug users in NSDUH, and multiply this population by four."), 1088:19-24, 1089:22 – 1090:11.

[27] Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 54:18 – 55:1; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 356:15-17; Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 945:17 – 946:3, 947:1-3; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1079:25 – 1080:3, 1080:10-17, 1091:16-22, 1092:22 – 1093:5, 1093:10-12. Dr. Kessler does not dispute this, but instead claims that the number of people who are "institutionalized, incarcerated or homeless . . . without fixed address is something in the ballpark of one percent of the population[,]" which is "really not going to move the needle on the population average calculation all that much[.]"  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 946:22-25, 947:3-5. But even assuming, *arguendo*, that his 1% estimate of the excluded population was accurate, that would still mean approximately 5,000 individuals in the two Counties are excluded and he has no idea how many of those individuals have OUD.  Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1092:22 – 1093:4.

there to be "credible evidence that NSDUH underestimates the number of frequent heroin users[28] by at least three-quarters, and perhaps much more[.]"[29]

Dr. Kessler's argument that NSDUH data is reliable because Dr. Alexander has used it in other contexts is unavailing. When Dr. Alexander used NSDUH data in one of his published papers, he did so for another purpose entirely. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 376:20 – 377:25; *see also* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 206:2-25. Defendants also point to Dr. Alexander's use of NSDUH data to calculate the state-wide OUD population for Rhode Island and Washington for abatement plans in other litigations, but as he explained that was one of *many* sources of data he used and it was used to calculate *state-wide* OUD numbers.[30]

That Dr. Kessler's NSDUH-based OUD population estimates are unreasonably low is further supported by a recent report stating that 1,695 Trumbull County Mental Health and

---

[28] Dr. Kessler acknowledged that "frequent heroin users are highly likely to have OUD." Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1077:21-22.

[29] *Id.* at 1076:10 – 1077:3 ("Q: Sir, NSDUH is in this Reuter article, the Reuter article is dated 2020, it's in a peer-reviewed publication of *Addiction*, and it says, findings, 'Underreporting and selective nonresponse in NSDUH are likely to lead to substantial underestimation. Small sample size leads to imprecise estimates and erratic year-to-year fluctuations. The alternative estimate provides credible evidence that NSDUH underestimates the number of frequent heroin users by at least three-quarters, and perhaps much more.' 'GPS' – those are general population surveys – 'even those as strong as NSDUH, are doomed by their nature to estimate poorly a rare and stigmatized behavior concentrated in a hard-to-track population: Although many European nations avoid reliance upon these surveys, many other follow the U.S. model. Better estimation requires models that draw upon a variety of data sources, including global population surveys, to provide credible estimates.' Do you see where I was reading that? A: Yes.").

[30] Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 561:1-13 ("I used dozens of sources. I believe it would be helpful to see the report, but if the report is based on Apollo, which is an epidemiological model of the opioid epidemic, Your Honor, then it would have incorporated dozens or more sources of information. [NSDUH] would be one of those sources."), 561:23 – 562:1 ("[T]he bottom line is that NSDUH is incorporated into the Apollo model, and at a state level, it is more feasible and I often have tried to use the Apollo model in order to estimate the OUD population."), 569:4-13, 569:21 – 570:17 (explaining that he did not run an Apollo model for Lake and Trumbull Counties because he "did not have the data to do so"), 613:1-17 ("Q: NSDUH usage in Rhode Island. Can you explain why you used that number in Rhode Island specifically in the Apollo model? A: Well, I use it in Apollo to estimate the number of individuals with nonmedical prescription opioid use and Opioid Use Disorder, heroin use disorder, but . . . I don't take the number straight out of NSDUH, and we modify it and we do so appropriately, based on scientific information that demonstrates unequivocally that NSDUH undercounts the population, especially the population with heroin use disorder.").

Recovery Board clients collectively submitted 169,148 claims for OUD-related services over a fifteen-month period in 2019-2020 (averaging approximately 113 clients per month). P-04900; Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 882:15-24, 883:18-23; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1096:1-5, 1189:16-19, 1191:13-18.[31]  If Dr. Kessler's one-year OUD population estimate for Trumbull County (2,048) was correct, that would indicate that approximately 66.2% of OUD population sought treatment that year. Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 949:22 – 950:4. Yet he previously testified that even 40% was too high of an estimated treatment rate. Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1098:3-5, 1100:4-8.[32]  Using Dr. Keyes' OUD population estimate for Trumbull County (7,560), on the other hand, would indicate that approximately 18% of the OUD population sought treatment during that time period, which is more in line with the historical treatment data relied on by Dr. Kessler. Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 958:16-20; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1098:9-20.

The second purported "overstatement" claimed by Dr. Kessler relates to Dr. Alexander's calculation of OUD treatment numbers over time. Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 956:7 – 957:15. Specifically, he claimed Dr. Alexander offered no basis for his assumption that the percentage of individuals with OUD who seek treatment will increase over the abatement period, starting at 40% in year one and increasing to 60% by year fifteen. *See, e.g., id.* at 956:12-16; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 487:12-23, 497:18 – 498:17. Dr. Kessler instead offered his own approach, which was to take the NSDUH data, calculate the percentage of respondents who stated that they were either in treatment or felt the need for treatment, and apply

---

[31]  Notably, approximately half of this time was during a period when most of the country was shut down due to the COVID-19 pandemic, which likely affected the treatment numbers. Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1189:21-24.

[32]  Dr. Kessler claimed that it is unclear from the report whether each client constitutes a unique individual. Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1095:19-25, 1097:4-7. However, at the top of the report it states: "Profile of the 12,949 Trumbull County Mental Health and Recovery Board *clients* (9,666 Adults, 3,284 Children) served in SFY 2020 through 10/7/2020[,]" indicating that each "client" is a unique individual (either an adult or child). P-04900 at 001 (emphasis added).

15

that same percentage (38.4%)[33] across each year of the abatement period.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 956:16 – 957:15, 958:6-15.  Dr. Kessler's criticisms are wholly without merit.  First, Dr. Alexander explained (i) his basis for estimating an increasing percentage of the OUD population seeking treatment over the abatement period, and (ii) why his estimated targets are reasonable despite certain NSDUH data and treatment data indicating that, in 2018, actual treatment levels were closer to 20-30%.[34]  Moreover, as previously discussed, NSDUH data dramatically undercounts the OUD population, so it is similarly unreliable for estimating the OUD treatment population.  *Supra* at fns. 26, 29.  Finally, Dr. Kessler's use of a static treatment percentage across the abatement period erroneously assumes that Plaintiffs' proposed abatement

---

[33]  Notably, Dr. Kessler's estimated percentage (38.4%) is very close to Dr. Alexander's estimated percentage for year one (40%).

[34]  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 348:19 -349:13 ("A:…. I trend up the proportion of individuals receiving treatment over time, so that's input two.  And whereas in year one, I believe that we can achieve and should achieve 40 percent of individuals receiving treatment.  By the end of the 15 years, I estimate and believe that we can achieve 60 percent receiving treatment that have opioid use disorder.  Q: And is that in part because of the education, both patient and public education, that you have talked about under the prevention tab?  A: It's a function of many different – many of these categories ultimately will help to feed the pipeline of individuals entering treatment, so connecting individuals to care, LEAD programs that are a part of public safety initiatives, drug courts that are a part of the criminal justice system. . . .  [T]here are many different components of the abatement plan that will allow for an increase in the proportion of people with addiction receiving a treatment over time."), 349:15-24, 486:12-21, 499:2 – 500:2, 500:8-15 ("Q: Okay.  If you compare what that TEDS data and the NSDUH would show, your 40 percent target for 2021 is higher than that data correct?  A: It is higher than that data, although, I think it's a reasonable number to begin with in year one, and it's one that I considered and consulted with the local experts about and one that I think is supported by the totality of evidence that I provide here to support the estimate."), 500:16-24, 501:11 – 502:6 ("So [the TEDS data and NSDUH data] are from 2018.  They're from national rather than local sources.  And they are not reflecting the totality of interventions that I propose as part of this abatement plan.  So they reflect the 2018 standard, which nobody would argue in their right mind is one that we should be proud of or reflect a gold standard.  And so, I think that the 40 percent strikes a reasonable compromise between a number that is higher than this 2018 estimates but one that is achievable.  And it's also one that I was – it's the type of estimate that I also rely on local input as I make, such is the input that I received from Ms. Fraser and Caraway and Thorp."), 502:11 – 503:6; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 609:16-25; *see also* Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1108:7 – 1109:6.  Notably, even Dr. Kessler's estimated treatment percentage (38.4%) is higher than the percentage of persons in treatment provided in the 2018 NSDUH data.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 958:9-20.

interventions involving outreach, education, and stigma reduction will have no impact whatsoever on the number of people seeking treatment for OUD. *See, e.g., supra* at fn.18.[35]

The third purported "overstatement" that Dr. Kessler criticized is that the estimated treatment costs for people with OUD are inflated because they erroneously assume those people will receive treatment 365 days per year. Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 961:20 – 962:16. This is simply incorrect. As Dr. Alexander explained, his treatment estimates are based not on the number of unique individuals seeking treatment but rather on the number of treatment *slots* that are needed in a given year.[36] Dr. Kessler claimed that estimating treatment costs based on slots does not "fix the problem" because it necessarily assumes that an unrealistically high percentage of the OUD population would be seeking treatment, given the number of slots and the average length of treatment. Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 965:4 – 966:9. But he failed to take into account that: (i) some individuals may seek treatment multiple times in a given year; (ii) the current average length of treatment time is often too short to be effective; and (iii) there are fixed costs (*e.g.*, rent, utilities, staffing, etc.) associated with the provision of OUD treatment that must be paid even if not all slots are filled at a given time. *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 370:16-24; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 577:6-7, 577:11-14, 609:3-5; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 676:1 – 677:2; Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 967:2-6, 967:18 – 968:13.

The fourth purported "overstatement" that Dr. Kessler criticized is Dr. Alexander's estimate of the number of heroin users in the Counties (which relates to Dr. Alexander's cost

---

[35] He has no basis for this assumption since he admittedly offered no opinions on the efficacy of any abatement interventions and is not qualified to do so. *Supra* at fns. 10, 12-13.

[36] Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 370:5 – 371:2 ("I estimate treatment needs for the counties based on a model that works to project what the capacity needs will be in each community. And in doing so, I use treatment slots; in other words, slots that may be occupied by a given individual in treatment. But my model is not predicated on any requirement that a particular individual be in treatment for any particular length of time."), 371:14 – 373:3, 484:16 – 485:23, 486:22-25, 492:17-22, 503:22 – 506:14; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 576:3-6, 576:24 – 577:16, 578:21 – 581:6, 608:4 – 609:25; *see also* Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 695:16 – 696:3, 696:15 – 697:4, 720:2 – 721:21.

17

estimates for managing complications attributable to the epidemic).  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 971:11-17.  Specifically, he noted that Dr. Alexander's estimate is "almost double the number in NSDUH" and contended that Dr. Alexander's adjustment to the NSDUH numbers was unwarranted because he previously used the unadjusted NSDUH numbers in his other published works.  *Id.* at 971:11 – 975:24.[37]  To begin with, Dr. Kessler inaccurately characterized how Dr. Alexander used NSDUH data in his other published works.  Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1100:11 – 1106:2.  Moreover, the adjustment was necessary because, as discussed above, the scientific information on which Dr. Alexander relied "demonstrates unequivocally that NSDUH undercounts the [OUD] population, *especially the population with heroin use disorder*."  Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 613:10-12 (emphasis added).[38]

The fifth and final purported "overstatement" that Dr. Kessler criticized is Dr. Alexander's estimate of the number of pregnant women with OUD in Trumbull County.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 976:4 – 977:9.  Specifically, he noted that when calculating the number for Lake County, Dr. Alexander multiplied the number of births in Lake County with the prevalence of OUD per thousand hospital deliveries in Ohio, but for Trumbull County, he multiplied the number of births in Trumbull County with the prevalence of OUD per thousand hospital deliveries in West Virginia.  *Id.*  Dr. Kessler posited that this "must be a mistake."  *Id.* at 977:4-5.  However, he has no factual basis to dispute the appropriateness of Dr. Alexander's use of West Virginia data for this purpose.  Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1115:10 – 1116:2, 1116:3-5

---

[37]  Dr. Kessler admitted that he "understand[s] the concern [Dr. Alexander is] expressing" to justify the adjustment.  *Id.* at 972:8-10.

[38]  *See also* Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 974:23-25; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1076:10 – 1077:3 (2020 peer-reviewed article notes there is "credible evidence that NSDUH underestimates the number of frequent heroin users by at least three-quarters, and perhaps much more"), 1077:18 – 1078:3, 1086:1 – 1087:4, 1088:19-24, 1089:22 – 1090:11 (discussing Midgette study; "Q:…. 'The inadequacy of NSDUH to describe heroin use is more apparent.  Our estimate of 2.3 million chronic heroin users in 2016 is nearly five times larger than the NSDUH estimate for past month use, a more inclusive definition of heroin users.'  Do you see that?  A: Yes.  Q: 'Our exploration of available data make clear NSDUH is not a useful measure of the level of heroin use in the United States.'  Do you see that?  A: Yes."); *supra* at fns. 26, 29.

18

("Q: Trumbull County is an outlier within Ohio because of their rates, isn't that true?  A: It could – it could be.  I don't know."), 1117:2-7.  Dr. Alexander repeatedly stated during trial that he based all the figures in his abatement plan on "the most relevant scientific information[.]" Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 334:19 – 335:1.  *See also id.* at 335:7-13, 347:7-9, 361:17-24, 364:10-15, 462:19 – 463:9, 502:22-24; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 609:16-25, 610:11-13 (noting that all his inputs "reflect [his] best scientific and epidemiologic judgment").

### C. Plaintiffs should be awarded the full amount required to implement their abatement plans or, alternatively, a reduced amount based on a modified estimate of individuals with OUD in the Counties.

#### 1. Plaintiffs demonstrated that the full amount required to implement their abatement plans is necessary to materially abate the public nuisance.

As noted above, Plaintiffs demonstrated both the necessity and the efficacy of the interventions and measures included in their fifteen-year abatement plans and Defendants offered no legitimate defense against same.  *Supra* at § I.A-B.  And, as discussed further below, Defendants offered no reasonable or legitimate basis to reduce the abatement award requested by Plaintiffs.  *Infra* at § I.D.  Accordingly, the Court should exercise its broad equitable discretion to award Plaintiffs the full amount required to implement their fifteen-year abatement plans.[39]  *See, e.g., Carter-Jones Lumber Co. v. Dixie Distribg. Co.,* 166 F.3d 840, 846 (6th Cir. 1999) (courts of equity have broad discretion "to fashion any remedy deemed necessary and appropriate to do justice in a particular case"); *see also* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 6-7.

Dr. Burke calculated that the total cost for Lake County to implement the abatement plan is $1,433,261,070.00 if paid in annual installments over fifteen years (or $1,242,838,379.00 for a lump sum payment at present value).  P-23127 at 007-010; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 644:17 – 646:4.  He further calculated that the total cost for Trumbull County to implement the

---

[39]  Dr. Alexander opined that if his abatement plans are fully implemented, they can reduce the opioid-related harms in the Counties by 50% over fifteen years.  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 417:12-15.  Notably, Defendants offered no evidence at trial disputing that fifteen years of abatement is both necessary and reasonable.

abatement plan is $1,833,702,580.00 if paid in annual installments over fifteen years (or $1,592,107,640.00 for a lump sum payment at present value). P-23127 at 008, 011-012; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 646:6-18.[40] Significantly, these cost estimates are based on the assumption that 2021 would be the first year of the abatement period. As it is already mid-2022, it is unlikely Plaintiffs will receive any abatement funds before 2023. Thus, Dr. Burke's cost estimates should be increased to account for this delay.[41]

### 2. Alternatively, the Court can award a reduced amount of abatement costs based on a modified estimate of individuals with OUD in the Counties.

Plaintiffs understand that the Court has previously raised some concerns regarding the size and scope of Plaintiffs' proposed abatement plans. To the extent these concerns were not fully alleviated by the evidence adduced at trial, Plaintiffs propose, as an alternative, a smaller abatement plan based on a modified estimate of individuals with OUD in the Counties. As previously discussed, Dr. Keyes estimated the OUD population in each County for every year between 1999 and 2019:

---

[40] These cost estimates do not take into consideration one minor mathematical error made by Dr. Alexander, which he corrected during his trial testimony. Specifically, he underestimated the number of children residing in a household with a parent with OUD; the correct numbers are 1,208 children instead of 1,197 for Lake County and 1,438 children instead of 1,425 for Trumbull County. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 366:17 – 369:19. Correcting such error would actually incrementally *increase* the total abatement costs associated with Category 4C.1 (support for children living with parents with OUD). *Id.* For example, the costs for 2021 alone would increase by approximately $81,606.00 for Lake County and $123,069.00 for Trumbull County. P-23105A at 037-038; P-23105B at 037-038; P-23127 at 161, 163, 330, 332.

[41] Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 644:18 – 645:11 ("If, if I were to redo this report again now, I would have to use new interest rates because interest rates have gone up. I would also have to use new growth rates because as we all know inflation has soared. So I – that would add another five percent to the growth side of it."), 645:13 – 646:4 ("And you can see that present value column. Last year, 2022 was one year in the future. It's no longer in the future. It's the present. So everything in that queue would move up one slot. . . . And everything would move up one slot and would increase. But as I said a minute ago, in addition, we've all seen the figures on inflation coming out at 8.3 percent yesterday. That would cause all of these figures in the future to grow even faster than Harvey and I had.").

| | US | | Ohio | | Lake County | | Trumbull County | |
|---|---|---|---|---|---|---|---|---|
| | N | Moving average | N | Moving average | N | Moving average | N | Moving average |
| 1999 | 2,990,919 | | 81,294 | | 1,923 | | 3,322 | |
| 2000 | 3,095,085 | | 96,669 | | 1,717 | | 2,747 | |
| 2001 | 3,386,189 | | 123,988 | | N/A | | 2,699 | |
| 2002 | 4,032,624 | 3,376,204 | 159,856 | 115,452 | 2,232 | 1,957 | 5,151 | 3,480 |
| 2003 | 4,502,448 | 3,754,087 | 132,898 | 128,353 | N/A | N/A | 3,606 | 3,551 |
| 2004 | 4,703,468 | 4,156,182 | 191,633 | 152,094 | 3,205 | 2,719 | 7,254 | 4,678 |
| 2005 | 5,111,092 | 4,587,408 | 205,570 | 172,489 | 3,813 | 3,083 | 5,802 | 5,453 |
| 2006 | 5,700,763 | 5,004,443 | 250,497 | 195,150 | 5,139 | 4,052 | 6,300 | 5,741 |
| 2007 | 6,177,370 | 5,423,173 | 268,219 | 228,980 | 5,229 | 4,347 | 11,302 | 7,665 |
| 2008 | 6,249,141 | 5,809,592 | 297,218 | 255,376 | 4,979 | 4,790 | 7,727 | 7,783 |
| 2009 | 6,236,336 | 6,090,903 | 208,502 | 256,109 | 2,868 | 4,554 | 5,229 | 7,640 |
| 2010 | 6,347,812 | 6,252,665 | 294,071 | 267,003 | 6,891 | 4,992 | 7,853 | 8,028 |
| 2011 | 7,093,750 | 6,481,760 | 335,544 | 283,834 | 8,289 | 5,757 | 9,947 | 7,689 |
| 2012 | 7,122,596 | 6,700,124 | 358,468 | 299,146 | 8,266 | 6,579 | 6,242 | 7,318 |
| 2013 | 7,412,955 | 6,994,278 | 395,749 | 345,958 | 7,928 | 7,844 | 7,254 | 7,824 |
| 2014 | 7,292,649 | 7,230,488 | 366,052 | 363,953 | 7,612 | 8,024 | 8,013 | 7,864 |
| 2015 | 7,406,957 | 7,308,789 | 365,606 | 371,469 | 5,682 | 7,372 | 11,159 | 8,167 |
| 2016 | 7,552,707 | 7,416,317 | 404,033 | 382,860 | 8,230 | 7,363 | 9,868 | 9,074 |
| 2017 | 7,415,786 | 7,417,025 | 412,734 | 387,106 | 7,803 | 7,332 | 11,572 | 10,153 |
| 2018 | 6,673,870 | 7,262,330 | 318,830 | 375,301 | 5,709 | 6,856 | 6,868 | 9,867 |
| 2019 | 6,654,789 | 7,074,288 | 332,317 | 366,979 | 5,934 | 6,919 | 7,560 | 8,967 |

Table 2. Estimated number of individuals with OUD in the US, Ohio, Lake County and Trumbull County

P-23116 at 059; *see also* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 56:22 – 57:5.  Notably, the increases in OUD patient volume over time correlates with Defendants' increased dispensing of opioids into the Counties.  *See, e.g.,* P-26319-A (CVS); P-26321-A (WAG); P-26322-A (WMT).

In crafting his abatement plans, Dr. Alexander started with Dr. Keyes' 2019 numbers for individuals with OUD in Lake and Trumbull Counties (5,934 and 7,560, respectively)[42] and applied a trend ratio to estimate the numbers of individuals with OUD in Lake and Trumbull

---

[42]  Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 57:24 – 58:14, 121:5-11, 122:19-25; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 347:11-24, 482:13-17, 484:5-8.

Counties in 2021 (5,668 and 7,221, respectively) and later years.[43]  However, in an effort to address the Court's potential concerns about holding Defendants responsible for treating the *entire* OUD population,[44] Plaintiffs offer alternative abatement plans in which the Counties' baseline OUD population numbers from 1999, which was before most (though not all) of the oversupply and diversion of prescription opioids occurred in the Counties, are subtracted from the estimated 2021 OUD population numbers.  Although this would not be an epidemiological approach to calculating the OUD population attributable to the public nuisance found by the jury, it is a potential legal approach that has support in the evidence.[45]  Using these modified 2021 numbers would reduce the costs of the abatement interventions that are specifically based on OUD population (Categories 2B, 2E.4, 3C) by 34% for Lake County and 46% for Trumbull County:

| County | Category | Total Costs Under Original Plan[46] | Total Costs Under Alternative Plan |
|--------|----------|-------------------------------------|------------------------------------|
| Lake | 2B (Treatment for OUD) | $975,150,592.00 | $643,599,390.72 |
| Lake | 2E.4 (Naloxone for High-Risk Patients) | $3,367,832.00 | $2,222,769.12 |
| Lake | 3C (Vocational Training Programs) | $51,515,937.00 | $34,000,518.42 |
| Trumbull | 2B (Treatment for OUD) | $1,242,016,106.00 | $670,688,697.24 |

---

[43]  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 347:11 – 348:11 ("I trend down the need for services over time in order to account for what I estimate to be an improving situation on the ground over time, and I do so by applying a – what I call a trend ratio, which is depicted as input 24.  And in some sense, I take a conservative approach, because in year one, I already apply a modest reduction in the level of services and programs.  And so I apply this trend ratio of 0.96, so essentially I take 96 percent of the estimate that Dr. Keyes provided."); Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 580:14-17; P-23105A at 015-016; P-23105B at 015-016.

[44]  *See, e.g.,* Dkt. #4464 (5/18/22 Trial Tr.) at 1331:21-23 (Court: "Everyone knows there was an opioid problem before there was an oversupply and diversion of prescription opioids.").

[45]  This reduction in the OUD population is a mathematical calculation only.  It does not take into account any analysis of how many of the current OUD population actually began suffering OUD pre-1999 (or if that analysis is even possible).

[46]  P-23127 at 009, 011, 115, 136-137, 284, 286, 305-306; P-23105A at 015-018, 025-027, 031; P-23105B at 015-019, 025-026, 030.

| Trumbull | 2E.4 (Naloxone for High-Risk Patients) | $4,290,665.00 | $2,316,959.10 |
| Trumbull | 3C (Vocational Training Programs) | $65,997,011.00 | $35,638,385.94 |

As a result, under Plaintiffs' proposed alternative plans, the total abatement costs for Lake County would be reduced by approximately $350 million, and the total abatement costs for Trumbull County would be reduced by approximately $603.7 million.[47]

### 3. The Court should consider certain additional issues when determining how and when the awarded abatement costs are paid and used.

Regardless of the amount awarded, there are several important matters that the Court should take into consideration when crafting the abatement remedy in this case.

First, the Court should retain jurisdiction over the abatement plans throughout the entire abatement period and exercise judicial oversight over its administration.

Second, all abatement funds paid by Defendants should be deposited into dedicated interest-bearing abatement fund accounts ("Abatement Fund Accounts") for each County, from which all disbursements to Plaintiffs will be made.  The Abatement Fund Accounts, and the annual disbursements to Plaintiffs from same, should be monitored by a Court-appointed administrator (or the Court itself).[48]  The creation of a court-supervised fund is a proper exercise of a federal court's equitable discretion.[49]

---

[47]  Again these estimates are based on the assumption of abatement beginning in 2021 and should be adjusted to account for the fact that abatement is not likely to begin until at least 2023.  *Supra* at p. 20.

[48]  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 448:7-15 ("Q: Okay.  And you agree, do you not, that it would be prudent to appoint an administrator to ensure that funds are disbursed and used for appropriate opioid abatement purposes?  A: I think that it's important that the funds are used for the purposes that they're intended and that there is an administrative structure in order to facilitate such.  But whether or not that's a court-appointed administrator or another mechanism is for the courts to decide.").

[49]  For example, the creation of a court-supervised fund as equitable relief commonly occurs in medical monitoring cases.  *See, e.g., Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D. Ohio 1992) ("[A] court may also establish an elaborate medical monitoring program of its own, managed by court-appointed court-supervised trustees, pursuant to which a plaintiff is monitored by particular physicians and the medical data produced utilized for group studies.  In this situation, a defendant, of course, would finance the program as well as being required by the court to address issues as they develop during program (footnote continues on next page)

23

Third, Plaintiffs do not oppose the implementation of annual payments from the Abatement Fund Accounts to Plaintiffs throughout the abatement period.  However, regardless of when Plaintiffs themselves receive the money, it is important that Defendants pay the entirety of any abatement award into the Abatement Fund Accounts at the beginning of the abatement period. Thus, to the extent the Court awards the full fifteen years of abatement costs, Defendants should pay the entirety of that award (along with any accrued post-judgment interest)[50] up front. Alternatively, the Court may decide, for example, to award only the first five years of abatement costs at this time and retain jurisdiction to make a final determination regarding the amount of any further abatement award at the end of that five-year period, based on its review of the effect of the plans at that time.[51]  Under those circumstances, Defendants should be required to pay the entirety of the five years of abatement costs (along with any accrued post-judgment interest) up front. Requiring Defendants to pay the abatement award upfront will ensure Plaintiffs' ability to collect the full amount (or at least the first five years) of abatement costs awarded by this Court.  The fact that Defendants are large corporations does not preclude the possibility of them filing for bankruptcy within the next fifteen years.  They are being sued in hundreds (if not thousands) of opioid-related lawsuits within this MDL and across the country.  Indeed, just last month Walgreens settled *one* lawsuit with the State of Florida for $683 million.  **Ex. 1** (WAG FL Settlement

---

administration.  Under these circumstances, the relief constitutes injunctive relief[.]"), *vacated in part sub nom. on other grounds, In re NLO, Inc.*, 5 F.3d 154, 159 (6th Cir. 1993) (granting writ on other grounds, but denying writ regarding medical monitoring claims and noting that the cases relied on by the district court "generally support the proposition that such relief is injunctive in nature"); *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993) ("Plaintiffs seek to implement a court-supervised program requiring ongoing, elaborate medical monitoring.  Accordingly, plaintiffs' relief qualifies as injunctive relief[.]").

[50]  OHIO REV. CODE § 1343.03(B) (2016).

[51]  Dkt. #4464 (5/18/22 Trial Tr.) at 1331:1-4 (Court: "I'll probably, you know, have another – another sort of an assessment hearing proceeding in some period of time to see how it's working and whether the amount of money was adequate, whether it's accomplishing anything.").  The five-year time period would permit sufficient time to perform necessary outreach, initiate infrastructure, and implement the first phase of the abatement strategies.  The abatement plans also provide for surveillance and evaluation of the abatement remedies which will allow Plaintiffs in five years to present evidence of the effectiveness of the plans and whether they requires modification at that time.  *Supra* at p. 4.

24

Excerpts) at p. 10.  Moreover, in recent years several large companies, most notably Johnson & Johnson, have manipulated the Bankruptcy Code to protect themselves from mass tort liability.[52] If that were to occur here before the particular Defendant had paid the abatement award in full, there is a legitimate risk that the funds received by Plaintiffs would be significantly reduced and/or unreasonably delayed.

Finally, Plaintiffs should be given flexibility in their use of the abatement funds.  For example, Plaintiffs will need to use a portion of these funds to pay their attorneys' fees and expenses associated with bringing this litigation (including any amounts that must be paid into the common benefit fund, *see, e.g.,* Dkt. #4428 (Ongoing Common Benefit Order)).[53]  Moreover, Plaintiffs request that the funds needed to pay their attorneys' fees and expenses not be disbursed annually, but rather in a lump-sum payment once Defendants have deposited the abatement funds into the Abatement Fund Accounts.

Plaintiffs should also be given discretion regarding how they internally allocate the abatement funds among the various abatement interventions.[54]  Plaintiffs agree that, after deducting attorneys' fees and expenses, any funds they receive must only be used for abatement

---

[52]  *See, e.g.,* Jeffrey R. Gleit and Matthew R. Bentley, *The Texas Two-Step: a Problematic Reframing of the Bankruptcy Code Toolkit or an Equitable Solution for Productive Conglomerates and their Mass Tort Claimants,* 31 No. 2 J. Bankr. L. & Prac. NL Art. 1 (Apr. 2022).  In what is colloquially known as a "Texas Two Step" bankruptcy, a large company with massive tort liabilities will convert to a Texas entity and then "initiate[ ] a divisive merger in which the pre-merger company is dissolved, and two new, post-merger entities are created[,] one of which will hold "nearly all of the pre-merger company's assets" and the other which will hold "all of the mass tort liabilities[.]"  *Id.*  The post-merger entity holding the tort liabilities then files for bankruptcy.  *Id.*

[53]  The entire purpose of a contingency fee agreement is to allow plaintiffs to pay their attorneys out of any recovery.  7 AM. JUR. 2D ATTORNEYS AT LAW § 249.  It also compensates the attorneys for the risk that they will receive no fee whatsoever if they lose the case.  *Id.*

[54]  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 341:15-19 ("[I]t's also vital that interventions are made and iteratively evaluated and so that measures are tracked and so that we know what programs are working, what programs may have fulfilled their objectives, where resources should reallocated."), 424:4-11 ("Q: And you leave it to the counties ultimately to tailor and customize your plan to their specific needs?  A: Yes.  The counties or the courts, other parties involved.  Q: Okay.  You leave to the counties themselves to ultimately determine the right mix of services to go into their abatement plan, correct?  A: Yes."), 424:12 – 425:16; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 531:12 – 532:9, 532:23 – 534:3, 611:16 – 612:7.

purposes.  However, Plaintiffs are in the best position to determine which particular abatement interventions will best serve their communities.  Moreover, circumstances change over time and may require Plaintiffs to make adjustments regarding how the funds are utilized for abatement purposes.  Appropriate procedures should be put in place that give Plaintiffs the necessary flexibility to successfully abate the public nuisance while ensuring they are using the abatement funds appropriately.

In this regard, assuming the Court decides that Plaintiffs should receive annual disbursements from the Abatement Fund Accounts, Plaintiffs do not oppose the following procedure: (1) prior to receiving each annual disbursement, Plaintiffs will submit a certification to the Court and/or any Court-appointed fund administrator providing their best good-faith expectations as to how they intend to allocate the money for that year; and (2) within ninety (90) days from the end of each year, Plaintiffs will submit a certified accounting to the Court and/or any Court-appointed fund administrator of how the funds were actually spent (which would include an explanation for any deviation from the expected use of funds set forth in Plaintiffs' prior certification).  If the Court has concerns regarding how certain funds were spent, it can hold a hearing with Plaintiffs to address and resolve the issue.[55]

Another important consideration is how unspent funds are dealt with.  To the extent Plaintiffs do not spend every dollar awarded to them in a given year, they should not be required to forfeit the unspent amounts (or return them to Defendants).  Rather, any unused money should simply roll over to the following year to be used by Plaintiffs for abatement purposes.  Such flexibility is required because it takes time to put the various abatement interventions into place and for them to start being effective.[56]  This is particularly important for the first few years of abatement as the infrastructure is being created.  For example, it is possible that Plaintiffs may not

---

[55]  Defendants should have no control or input as to how Plaintiffs use the abatement funds.

[56]  It also takes time for Plaintiffs to create and approve their County budgets for a given year.  Plaintiffs cannot even begin to allocate any money from the abatement award until they know exactly how much they will be receiving, when they will receive it, and what restrictions will be associated with it.

meet targeted levels of individuals with OUD in the first few years because of the time required (i) to ramp up the necessary infrastructure to fully implement the abatement plans (*e.g.*, increasing treatment facility capacity, retaining qualified personnel, etc.) and/or (ii) for certain prevention measures (*e.g.*, public education, etc.) to successfully convince reluctant or previously uninformed individuals with OUD to seek treatment.  As Dr. Young explained when discussing funds previously received by communities across the country to address the opioid epidemic:

> Because the substance abuse treatment prevention field has been unfunded and inadequately funded for so long, that we don't have the infrastructure in communities to spend that money right away.  It sounds like, oh, great, Congress put money into this, you know, I like to say the taxpayers put money into it, and it went unspent.  No.  They're still building the infrastructure.

> It takes trained professionals.  It takes getting people on the ground to implement these programs.  It's not something that you can turn on a dime and get one allocation and say we solved the problem.  It is a long-term need and it is a long-term solution just to build the infrastructure of human resources that we need to implement these programs.

Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 318:24 – 319:11.  *See also id.* at 319:21 – 320:2 ("Those kinds of resources take infrastructure over a longer period of time to build those programs, to train the staff, to provide the expertise that's needed."), 320:13 – 322:8.

> **D.**  **Defendants failed to demonstrate that the amount of abatement awarded should be reduced.**

> ### *1.*     *Defendants failed to satisfy their burden of proof on apportionment.*

As explained in detail in their prior briefing, the jury's finding that each Defendant's conduct was a substantial factor in causing Plaintiffs' harm establishes a prima facie evidentiary foundation supporting the imposition of joint and several liability against Defendants.  *See, e.g.,* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at § III; Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 7-9.  It was thus Defendants' burden at the Phase 2 trial to demonstrate *with concrete and specific evidence* that a *reasonable* basis exists for apportioning the abatement plans among Defendants and any other non-defendants whose conduct constitutes a substantial factor in producing the harm.  *Id*.  Defendants failed to satisfy this burden.

At trial, Defendants offered the testimony of two economists (Dr. Kessler and Dr. Chandra) on the issue of apportionment.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 913:11-20, 915:21 – 916:12, 987:5 – 1004:3; Dkt. #4460 (5/17/22 Trial Tr.) [*Chandra*] at 1199:8-11, 1217:8 – 1260:17.[57]  They proposed two distinct methods to allocate costs in this case.

Dr. Kessler purported to use a regression model to allocate the costs attributable to each Defendant's challenged conduct (as opposed to costs attributable to Defendants' non-challenged conduct or other contributing forces to the opioid epidemic).  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 987:14 – 988:12, 989:9 – 1004:3; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1132:3-7.  Using this model, he opined that: (i) Walmart is responsible for 0.176% of the total abatement costs for Lake County and 0.031% of the total abatement costs for Trumbull County; (ii) CVS is responsible for 0.445% of the total abatement costs for Lake County and 0.308% of the total abatement costs for Trumbull County; (iii) Walgreens is responsible for 0.693% of the total abatement costs for Lake County and 0.821% of the total abatement costs for Trumbull County.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 999:15 – 1000:5; *see also* Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1150:11-23.

As demonstrated at trial, however, Dr. Kessler's regression model, and his opinions related to same, have a multitude of flaws rendering them unreliable and unreasonable, including, but not limited to the following: (i) his model apportioned abatement costs based only on the portion of opioid-related mortality he estimated to be associated with prescription opioid shipments;[58] (ii) his

---

[57]  Mr. Bialecki offered no opinions on apportionment.  Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 750:15-19, 856:8-16, 857:6-9.

[58]  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 989:9 – 993:5; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1132:8 – 1133:17, 1133:18-22 ("Q: So when you are isolating defendants' challenged conduct, you mean challenged conduct that leads to death but not challenged conduct that leads to other elements of crime, addiction, et cetera, that are non-death, right?  A: Yes."), 1135:9-17 ("Q: Okay.  So where does your model, your regression model, take into account plaintiffs' complaints that lax business practices all around the country, including in Florida, caused an inflow of drugs that are not shown in the MMEs filled by the defendants in the county?  A: It is – it is true that the data on shipments that I used which are the ARCOS data do not account for these potential inflows from other areas due to illicit trafficking."), 1136:3-10, 1138:9-24, 1139:20 – 1141:7, 1141:15 – 1143:10, 1146:1-4, 1180:10-11.  Dr. Kessler initially claimed that the use of mortality as a method of apportioning abatement costs has (footnote continues on next page)

three-step allocation method was prepared for litigation and has not been peer-reviewed or otherwise published in the scientific literature;[59] (iii) there are limitations on using multiple linear regression to formulate policy recommendations;[60] (iv) he does not calculate the percentages of the cost attributable to each purported non-Defendant contributor to the nuisance;[61][62] and (v) his model relied on inappropriate assumptions and utilized a large number of statistically insignificant variables.[63]

Unlike Dr. Kessler, Dr. Chandra chose not to use a regression method, which he deemed "[o]ne of the more complicated methods" of allocating abatement.  Dkt. #4460 (5/17/22 Trial Tr.)

---

been accepted by Plaintiffs' experts (specifically Dr. Alexander and Dr. Cutler).  *See, e.g.,* Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at at 991:16-21, 993:3-5, 1022:19-24.  But, as this Court is aware, Dr. Cutler has not testified in either phase of this trial.  Moreover, Dr. Kessler conceded on cross-examination that neither Dr. Cutler nor Dr. Alexander used Dr. Kessler's methodology to apportion abatement costs.  Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1120:12-20, 1121:16 – 1122:21, 1134:12-16, 1135:2-7.

[59]  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 1009:3-8, 1010:14-15, 1011:19 – 1012:22, 1013:23 – 1014:4 ("Q:…. I'll pull these articles on Footnote 58, and these are going to tell us to use the three-step process to evaluate and allocate costs to defendants' challenged conduct?  A: No, they won't . . . They won't."), 1021:9 – 1022:2; Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1122:10-13 ("Q: And Step 3, calculating the abatement costs allocable to defendants' challenged conduct through an MLR has never been done in science, including by Dr. Cutler, true?  A: Yes."), 1128:14-17, 1128:22-23, 1155:3-6.

[60]  Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1124:7-16, 1125:15 – 1127:1.

[61]  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 916:8-20 ("Q: And in the opinions you offer, you focused on what you consider to be the costs appropriately allocated to the defendant pharmacies.  Right?  A: Yes.  Q: In other words, you don't – you don't then try to break down separately where you think other costs might be appropriately allocated?  A: No.  Q: So among the other potential parties who have a role in opioid distribution, for example, you don't try to define what their respective allocations are?  A: No."); Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1145:18-21, 1147:10 – 1148:7, 1175:12-15, 1185:11 – 1188:10, 1188:11-18 ("Q: By the same token, if we take that portion that you can't calculate and look at what's remaining of the other two buckets, bucket two and three, the market share of the defendants and the red flag share and other entities, isolate for his Honor how much you are assigning to other entities.  A: Well, I – I mean, I can't – I just can't do that physically sitting here today.").

[62]  An important consideration when determining whether a particular non-Defendant's conduct was a substantial factor in causing the public nuisance is "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it[.]"  RESTATEMENT (SECOND) OF TORTS § 433(a) (1965).

[63]  *See, e.g.,* Dkt. #4460 (5/17/22 Trial Tr.) [*Kessler*] at 1129:8 – 1132:2, 1180:18 – 1182:1, 1183:19 – 1184:5, 1184:15-24; P-04905.

[*Chandra*] at 1219:1-11.  Instead, he used a three-step methodology based on game theory in which he (i) calculated the share arising from prescription opioids (as opposed to illicit opioids), (ii) allocated shares among five categories of responsible parties, and (iii) calculated the portions of the pharmacy category attributable to Defendants.  *Id*. at 1222:8 – 1223:10, 1225:16-24, 1235:25 – 1236:8, 1237:23 – 1239:7, 1244:20 – 1258:17, 1261:18-21, 1261:22-25, 1269:18-21.  Using this methodology, he opined that: (i) Walmart is responsible for 1.07% of the total abatement costs for Lake County and 0.19% of the total abatement costs for Trumbull County; (ii) CVS is responsible for 2.83% of the total abatement costs for Lake County and 0.66% of the total abatement costs for Trumbull County; (iii) Walgreens is responsible for 2.82% of the total abatement costs for Lake County and 1.99% of the total abatement costs for Trumbull County.  *Id*. at 1256:11 – 1257:3.

As demonstrated at trial, however, Dr. Chandra's methodology, and his opinions related to same, have a multitude of flaws rendering them unreliable and unreasonable, including, but not limited to the following: (i) his three-step allocation method was prepared for litigation, has not been peer-reviewed or otherwise published in the scientific literature, and is not appropriate for use in courts;[64] (ii) he admittedly prioritized simplicity over accuracy when deriving his opinions;[65] (iii) he used an allocation method meant to apply when multiple actors act simultaneously, despite the evidence establishing they acted sequentially in this case;[66] (iv) he

---

[64]    *Id*. at 1223:14-22 ("Q: And was your analysis and work in this case very specifically tailored to this case?  A: Yes, it was.  Q: Has this methodology for allocating abatement in an opioids case been the subject of scholarly articles or peer review?  A: I think this is a novel case.  I think this is one of the first cases, so I'm not aware of any peer-reviewed literature on how to do this allocation."), 1224:3-7, 1284:15 – 1285:13, 1285:14-23 (discussing Ferey paper; "Q: Well, but note number 2.  'Surprisingly enough, the theory of cooperative games and solution concepts has never been elaborated in the law and economics literature to analyze multiple causation issues.'  Do you see that?  A: Yes.  Q: So the very cite that you use in your report for his Honor is one that betrays that this is novel, your approach in a courtroom, right?  A: If they say so, yes."), 1285:24 – 1286:8, 1296:5-8.

[65]    Dkt. #4460 (5/17/22 Trial Tr.) [*Chandra*] at 1218:20 – 1219:11, 1247:18 – 1248:11, 1249:10-12, 1270:11 – 1271:2, 1271:3-8 ("Q: And you opted for simplicity over accuracy, didn't you?  A: For the – with the information I had, sir, I felt like I only had information to assume equal shares.  Somebody else with more information might be able to apportion differently than I have."), 1271:9-19, 1283:7 – 1284:9, 1304:25 – 1305:4.

[66]    *Id*. at 1283:9-21 ("Q:…  First of all, your Shapley model says that they all get equal shares if it's (footnote continues on next page)

erroneously assumed that applying a sequential methodology in this case would reduce Defendants' share because they acted later than other responsible parties;[67] (v) he conceded his methodology is not an appropriate way of determining the culpability of other parties;[68] (vi) he does not have adequate subject-matter expertise regarding the opioid epidemic or abatement, and the factual evidence on which he relied is incomplete and/or not a sufficient basis for his opinions in this case;[69] and (vii) he provided little actual guidance to the Court as to how his framework should be applied under the facts of this case.[70]

---

simultaneous, right? A: If it's simultaneous and all equally essential. Q: All equally essential and simultaneous, true? A: Yes, sir. Q: In this case they're not simultaneous, true? A: Yeah, I think there's a strong reason to think it may not be simultaneous in this case. Q: Well, not strong reasons to think. If you're blaming the FDA for approving the drug in the first place, that's got to be done before the doctors write the prescription before the pharmacies sell the drugs, right? A: Yes."), 1283:22 – 1294:9; *see also id.* at 1244:20 – 1245:12, 1246:5-11, 1246:16 – 1246:24 ("Q: Did you use the simultaneous model here? A: Yes."), 1246:25 – 1247:17, 1248:15-22 ("Q:... Is one of the more complicated applications of Shapley something called the sequential application of Shapley? A: It is. Q: Is that an application that might apply when there's sequential actions? A: Yes. Q: Might that model apply here? A: It very well could."), 1249:10-12, 1290:17-18, 1291:16 – 1292:8.

[67] *Id.* at 1248:23 – 1249:3, 1249:13-24, 1284:10-14, 1287:9 – 1288:4, 1288:5-23, 1288:25 – 1292:8.

[68] *Id.* at 1246:12-15, 1305:11-22 ("Q: Dr. Alexander listed causes, the manufacturers, the FDA and the DEA, that he testified about that. You were asked, 'Would that cause you to higher a value for sequential game theory assignment.' You said, "Yes." That doesn't tell you anything about culpability, does it? A: No, sir. This exercise, my report – and I'm very clear in my report. . . . So I'm not making statements about culpability here at all, sir.").

[69] *Id.* at 1216:24-25, 1220:19 – 1221:5, 1238:24 – 1239:7 ("Q: Okay. What did you rely on to identify this body of actors, given that you are not an expert in the opioid epidemic or in opioids generally? A: I relied on three sources, sir. I relied on statements and evidence from plaintiffs' experts. I relied on the complaint and the complaints themselves. And I also relied on the verdict form."), 1239:9 – 1244:18, 1260:7-13, 1261:1-25, 1262:9 – 1264:18, 1267:23 – 1268:4, 1268:18 – 1269:12, 1271:3-19, 1271:24 – 1272:3, 1273:1-17, 1274:25 – 1275:25, 1276:23 – 1283:5, 1290:17-23 (admitting one of the reasons he did not do a sequential analysis was because he did not have enough expertise or experience), 1290:24 – 1292:14, 1304:25 – 1305:4.

[70] *Id.* at 1235:11-24 ("Q: Okay. And these bottom line percentages, did you use in your framework, are you recommending to Judge Polster that he use only the directly attributable percentages or are you recommending to Judge Polster that he total the directly attributable with the indirectly attributable? A: I don't have a position on that, sir. That is for Judge Polster to decide. I wanted to illustrate for Judge Polster what – that the methodology I've proposed allows me to bring in the deaths indirectly attributable to prescription opioids and provide a sense of what the magnitudes of those numbers would be, but the decision on whether to use them or not is his, sir. Q: For the judge, correct? A: For the judge."), 1253:21 – 1254:8, 1257:8 – 1258:17, 1286:19 – 1287:6, 1288:5-23, 1291:2-15, 1291:16 –

(footnote continues on next page)

For these reasons, and as this Court itself acknowledged,[71] neither defense expert offered a reasonable method for allocation sufficient to satisfy Defendants' burden.  Plaintiffs, on the other hand, offered evidence at trial demonstrating that the harms to the Counties resulting from the public nuisance are indivisible.  Specifically, Dr. Keyes explained how, from an epidemiological perspective, it is not possible to apportion the harms caused solely by Defendants because there were numerous synergistic factors working together to produce those harms:

> This is a concept that we teach in all of our graduate [c]ourses in epidemiology and really formalizes how we quantify risks in epidemiology, which is through this concept of synergy and interaction, which is that for a lot of the – a lot of the causes that we study in epidemiology, they interact with other causes to produce harm.

> ***

> And the same thing really applies in the opioid epidemic.  You know, if we look at the progression of the opioid epidemic, we have synergy and interaction in that classical epidemiological sense.

> For example we have an oversupply of prescription opioids in Lake and Trumbull County.  That created a population of people who had opioid use disorder.  Once you have a population of people with opioid use disorder, we see the introduction of heroin and other illicitly manufactured opioids into Lake and Trumbull County that is responding to and meeting that underlying vulnerability that's been created in the community.

> And so, these different aspects really build off of each other and interact to create a system of harm to the community that really started with the prescription opioid

---

1292:8 ("Q:…  This attribute 20 percent is based upon simultaneous, and it is not what the evidence is in this case, true?  A: You could – it's a framework, it's a methodology, sir, and so you could change Step 2 to invoke a sequential framework.  That is the beauty of the framework.  You can apply the framework as you see fit, sir.  Q: And so if the judge applies the framework where he decides instead of 66.2 and 60.7 percent, that synergy of epidemiology, which is the only epidemiology testimony in this case, is that it's north of that, perhaps anywhere, who knows, but that you've got the synergy column that's been left out, and if he decides that culpability is relevant and so the 20 percent might be much higher, then all of a sudden you're in a radical different world before you even begin to look at defendants' individual shares, true?  A: True.").

[71]   Dkt. #4464 (5/18/22 Trial Tr.) at 1324:14-21 (Court: "But Dr. Kessler's conclusion that in his expert opinion these three defendants together should bear 1.3 percent of the abatement cost, I have to categorically reject out of hand.  And you know that.  And you know why.  Because the jury found that these three defendants, their conduct had a substantial effect, you know – substantial cause of the opioid epidemic in these two counties."), 1325:8-12 ("Dr. Chandra had a little bit more, but even his bottom line, again, not a substantial – not a substantial cause.  So I've got to categorically reject that.  I don't know what you're suggesting to me.  So I'm not getting anything from the defendants.").

oversupply and then transitioned to these other illicitly manufactured distribution systems.

But they can't be considered in isolation in this formal epidemiological thinking. They have to be considered as interacting factors that produce the harms that we see today.

Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 72:2 – 73:19.[72]

Accordingly, because Defendants failed to satisfy their burden on apportionment, the Court should hold each Defendant jointly and severally liable for the entire abatement award.

### 2. Defendants failed to prove that the abatement award should be reduced by collateral source payments from non-defendant third parties.

It was Defendants' burden to demonstrate their entitlement to, and the amount of, any proposed offset from the overall abatement award based on collateral-source payments. Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 10-18. They entirely failed to satisfy this burden.[73]

Defendants adduced some evidence during the trial that, *in the past*, (i) some individuals' OUD treatment costs were paid in part by third parties (*e.g.*, Medicaid, private insurers, etc.), and (ii) Plaintiffs received certain state and federal grant money to address the opioid epidemic. *See, e.g.,* Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 751:23 – 753:2, 758:21 – 760:2, 763:1-10, 789:1-6, 790:24 – 791:6, 793:14-18, 831:13-20; Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at

---

[72] *See also id.* at 73:20 – 74:4 ("Q: So is it not possible – or is it possible under epidemiology to say, well, the only responsibility of a pharmacy for contributing to this epidemic that you have assessed from an epidemiology perspective, the only responsibility is for the drug sold by that pharmacy to that individual?  Is that fairly done?  A: That's not a public health approach.  That's not how we think about how harms are distributed in communities in public health and epidemiology.  We think of them as these synergistic factors that work together."), 74:5-15, 74:17 – 75:4 ("Q:…. But explain why it is, in your opinion as an epidemiologist expert, impossible to take the cake apart and segregate out responsibilities in that way?  A:  Well, because of the scientific literature.  That's just how we know how harms get distributed in communities.  The – it's not apportionable.  Or another way that we often describe it in epidemiology is that the risks don't add up to one, right?  Like, we can't take a pie chart of the opioid crisis in Lake and Trumbull County and then have one piece of pie for every component, because the components are working together.  And so, when the components work together, those risks are going to add up to more than one because of that interaction."), 75:5 – 77:6, 77:14 – 78:5, 82:15-16, 194:23 – 195:7, 198:1 – 199:6; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 385:5-18.

[73] As previously noted in their Trial Brief (Dkt. #4387 at p. 10 n.6), Plaintiffs do not oppose the overall abatement award being reduced by the amount of any settlement proceeds previously received (or currently guaranteed to be received) by Plaintiffs from other opioid-litigation defendants.

977:25 – 978:10.  Plaintiffs anticipate that Defendants will argue in their closing brief that any abatement award should be reduced to compensate for these and similar future collateral payments.[74]  This argument should be rejected.  As Plaintiffs explained at length in their Trial Brief, the common law collateral source rule, which precludes deducting collateral source payments to reduce a tortfeasor's liability, should apply to any abatement award in this case. Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 10-16.  And even if the rule did not automatically apply as a general matter, Defendants have failed to offer *any* evidence at trial of specific *future* collateral source payments that should be deducted from the abatement award.  It is well established that a collateral source payment can only be deducted, if at all, from the specific portion of an award to which the payment directly relates.  *Id.* at p. 16 & n.17.  Any testimony regarding Medicaid or other insurance coverage of OUD treatment costs *in the past* or grant money received by the Counties *in the past* to address the opioid epidemic would only potentially be relevant if Plaintiffs were seeking an award of past damages.  But they are not.  Abatement is a *forward-looking* equitable remedy.  *See, e.g.,* Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 5; Dkt. #2519 (CT1 Order on Abatement *Daubert* Motion) at p. 2.  Defendants offered no evidence whatsoever that Plaintiffs is guaranteed to receive any particular collateral payment in the future, let alone evidence demonstrating the existence and amount of such benefit "with a reasonable degree of certainty."  *Buchman v. Wayne Trace Loc. Sch. Dist. Bd. of Edn.,* 652 N.E.2d 952, 961 (Ohio 1995); *see also* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 17-18.[75]  Any purported expectation

---

[74]  Dr. Kessler so argued at trial.  *See, e.g.,* Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 977:11 – 978:25.

[75]  *See, e.g.,* Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 773:1-3 ("I mean I'm not a Medicaid expert so I don't know what the rules are and how they determine how their reimbursement rates work[.]"), 784:10 – 785:5 (acknowledging that the past treatment data he relied on did not indicate what percentage of the Medicaid patients were on Medicaid solely because of Medicaid expansion); Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 981:25 – 982:9 (not aware of any studies "that talk about if a Government option is available for treatment and someone has private insurance, the likelihood they access the Government versus the private insurance method of treatment"), 983:20-21 (same), 984:8-18 ("Q: Dr. Kessler, do you have an expert opinion as a health care economist to a reasonable degree of certainty in that field as to whether individuals with choices of Government-provided care for these addiction-type issues as opposed to private providers of their choice covered by health insurance, whether they're likely to avail themselves of one or the other?  A: Not with regard – with regard to that specific question. . . .  I don't (footnote continues on next page)

34

that Plaintiffs will receive future collateral payments is entirely speculative.[76]  Moreover, there is no justification for awarding Defendants, the proven wrongdoers in this case, a windfall at the expense of the American taxpayer or private insurers.  Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 14-16; Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 266:20 – 268:9, 288:20-22.[77]  Finally, there is no legitimate risk of Plaintiffs receiving any windfall in this case.  Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 13-14.[78]

## II.    INJUNCTIVE RELIEF IS NECESSARY TO PREVENT DEFENDANTS FROM CONTINUING THEIR WRONGFUL DISPENSING CONDUCT.

Because Defendants will continue to dispense prescription opioids into the Counties, certain injunctive relief is required to ensure that Defendants do not continue to exacerbate the public nuisance they have caused.  District courts have "broad discretionary powers to craft an injunction to the specific violations found[.]"  *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) ("*Howe II*") (citation omitted).  As Plaintiffs demonstrated in the Phase 1 trial, Defendants' controlled substance dispensing policies and procedures were and continue to be

---

have an answer for that.").

[76]  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 318:11-19 ("Q: Dr. Young, you were asked about government funding, including funding through the recent rescue plan, the passage of the recent rescue plan, and H.R. 133.  Do you know how much of that has gone into Lake or Trumbull County?  A: No, I don't.  Q: Do you know how long it will last?  A: Until it's spent and it will be gone.  *There will be no long-term resources available to Lake and Trumbull or to the rest of the country*.") (emphasis added), 318:21 – 320:8; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 422:14-16 ("I have no way of knowing next year or the year after or the year after that whether the current provision is going to increase, decrease, or stay the same.").

[77]  Indeed, when questioned by the Court on this particular issue, Dr. Kessler offered no reasonable explanation as to why these (or any other) third parties should continue to bear the brunt of paying to fix the public nuisance Defendants caused.  Dkt. #4455 (5/16/22 Trial Tr.) [*Kessler*] at 979:2 – 980:4, 980:5-7 ("[O]bviously I would defer, you know, to Your Honor about if these costs should be charged to defendants . . ."), 980:11 – 981:6, 981:7-12 ("Well, I mean, I certainly defer, obviously defer to you, Your Honor, about that.  I mean, if this is going to be used to pay for this, and it is, you know, your opinion that that is the right way to do this, then, yeah, this would not be an overstatement.").

[78]  As noted above, a portion of the funds recovered from Defendants will have to be used to pay the attorneys' fees and expenses incurred by Plaintiffs in having to bring this lawsuit.  *Supra* at § I.C.3.  Moreover, if the Court ultimately orders Defendants to pay only a portion of the total costs needed to abate the public nuisance they caused (which it should not for reasons explained above, *supra* at § I.D.1), Plaintiffs will not even be receiving a full recovery for their harm, let alone a windfall.

35

woefully inadequate and/or not internally enforced.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 24-35, 38-43, 46-57, 60-64, 66-76, 78-82.  Accordingly, Plaintiffs ask that the Court enter the injunctive relief attached hereto as **Ex. 2** to ensure that, going forward, Defendants and their employees fully comply with their legal obligations related to the dispensing of prescription opioids.  This injunctive relief should be in place for at least ten years.  At the conclusion of ten years, Defendants' compliance should be evaluated to determine whether an extension and/or modification of the injunctive relief is warranted.

The injunctive relief Plaintiffs propose is based in part on certain injunctive relief recently agreed to by CVS and Walgreens to resolve their opioid-related litigation with the State of Florida and its Office of the Attorney General (the "Florida Settlements").  Dkt. #4387-1 (CVS Florida Settlement); **Ex. 1** (WAG FL Settlement Excerpts) at Exhibit F.  However, because the injunctive relief set forth in the Florida Settlements is a negotiated compromise, it does not go far enough to fully and adequately protect the public.  Thus, Plaintiffs have incorporated certain important modifications that should be included in the injunctive relief awarded in this case.  On May 26, 2022, Plaintiffs sent a proposed list of bulleted items to Defendants and offered to meet and confer as to the various elements contained in our proposed injunctive relief.  Defendants did not agree to meet with Plaintiffs' counsel and offered no specific comments to, or criticisms of, Plaintiffs' proposals.  Instead, on June 12, 2022, the day before the parties' closing briefs were due, defense counsel forwarded their own injunctive relief proposal to Plaintiffs' counsel.  Defendants' proposal is drastically more limited (in both scope and time frame) than even the inadequate injunctive relief agreed to by Walgreens and CVS in the Florida Settlements.  They offered no justification whatsoever for such insufficient terms.  Defendants' proposal should be rejected in favor of the modified injunctive relief proposed by Plaintiffs.  Plaintiffs summarize, and explain the basis for, some of their more substantive modifications to the injunctive relief agreed to in the Florida Settlements below.

The first modification is that the Court should appoint a Special Master to oversee Defendants' compliance with the imposed injunctive relief.  **Ex. 2** (Proposed Injunctive Relief) at

p. 1.  As the evidence clearly demonstrated in the Phase 1 trial, even when Defendants had certain controlled substance policies in place, they failed to internally monitor and enforce those policies. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 26, 42-43, 50, 63-64, 70, 81-82.  It is therefore crucial that Defendants' compliance with the injunctive relief ordered be monitored by a Court-appointed Special Master, or by the Court itself.  This Court has the power to order the appointment of a Special Master to oversee judicially-ordered injunctive relief pursuant to Federal Rule of Civil Procedure 53 and its inherent authority.  FED. R. CIV. P. 53(a)(1)(C).[79]  Appointing a Special Master to guide implementation of the injunctive relief will: (i) provide substantial assistance to the Court and the parties and can reduce unnecessary delays and litigation over disputes regarding compliance; and (ii) serve the interests of all parties by facilitating the early and unbiased detection of non-compliance or barriers to compliance.  The Special Master should operate in close coordination with this Court and be subject to its supervision and orders.  FED. R. CIV. P. 53. Among other things, he or she should: (i) regularly conduct compliance and progress reviews to assess the extent to which Defendants have implemented and complied with the injunctive relief; (ii) provide the Court and Plaintiffs with regular reports, at least on an annual basis, detailing Defendants' compliance; and (iii) take all appropriate measures to enforce the injunctive relief including, if necessary, imposing sanctions for non-compliance.  FED. R. CIV. P. 53(c), (e).[80] Additionally, at the end of ten years, the Special Master should evaluate each Defendant's compliance and offer a recommendation to the Court, after reviewing submissions from the parties,

---

[79]  *See also Loc. 28 of Sheet Metal Workers' Intern. Ass'n v. E.E.O.C.*, 478 U.S. 421, 482 (1986); *In re Peterson (State Rpt. Title: Ex Parte Peterson)*, 253 U.S. 300, 312-14 (1920); *Howe II*, 801 F.3d at 754-56; *Reed v. Cleveland Bd. of Ed.*, 607 F.2d 737, 743 (6th Cir. 1979); *Howe v. City of Akron*, 17 F. Supp. 3d 690, 690-91 & n.1 (N.D. Ohio 2014), *aff'd as modified, Howe II*, 801 F.3d at 754, 756; FED. R. CIV. P. 53, Adv. Comm. Notes, 2003 Amendment ("Courts have come to rely on masters in framing and enforcing complex decrees. . . .  Reliance on a master is appropriate when a complex decree requires complex policing, particularly when a party has proved resistant or intransigent.  This practice has been recognized by the Supreme Court.  The master's role in enforcement may extend to investigation in ways that are quite unlike the traditional role of judicial officers in an adversary system.") (internal citation omitted).

[80]  Any objections to the Special Masters' rulings, reports, or recommendations would be addressed by this Court.  FED. R. CIV. P. 53(f).

as to whether the injunction should remain in place or be modified and/or whether further supervision of the injunctive relief is needed to further abate the public nuisance. The Special Master's appointment should last for as long as the injunctive relief is in place, and Defendants should be responsible for his or her reasonable costs and fees (as well as the reasonable costs and fees of any staff or experts the Special Master retains). FED. R. CIV. P. 53(g); *Reed*, 607 F.2d at 746.

Plaintiffs also propose several modifications as it relates to "red flags." The red flags identified in the Florida Settlements (Dkt. #4387-1 (CVS Florida Settlement) at pp. 7-8; **Ex. 1** (WAG FL Settlement Excerpts) at Exhibit F, pp. 7-8) are not consistent with the evidence presented in this trial, and are not consistent with DEA guidance, industry trade group standard (*e.g.*, NACDS), and Defendants' own internal policies and procedures. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 28-29, 51-52, 71. Accordingly, Plaintiffs' proposed injunctive relief incorporates a broader, more accurate list of red flags. **Ex. 2** (Proposed Injunctive Relief) at pp. 8-9. Additionally, as it is not possible to create an exhaustive list of red flags (and red flags may evolve over time), Plaintiffs propose that Defendants be required to create an internal process that utilizes dispensing data, patient data and prescriber information (*e.g.*, licensure status, prescribing patterns, prescribing statistics) to identify and update red flags, communicate to, and train pharmacists on, the updated information, and revise their policies and procedures to reflect the revised on new red flags. *Id.* at p. 9. Moreover, given Defendants' consistent failure to properly document the resolution of red flagged prescriptions,[81] Plaintiffs propose more detailed requirements regarding how and where the resolution of red flags should be documented. **Ex. 2** (Proposed Injunctive Relief) at pp. 6-7, 9. These documentation requirements are consistent with Defendants' own policies and procedures concerning documentation. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 30 n.36, 52-53, 72.

---

[81] *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 29-31, 35-36, 52-53, 57-58, 72, 76-77.

Another modification relates to the data provided to pharmacists. As demonstrated during the Phase 1 trial, Defendants failed to provide their pharmacists with the data, resources, and tools necessary to assist them in fulfilling their corresponding responsibility duties. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 31-35, 38-39, 53-57, 60, 72-76, 78. The Florida Settlements lack specific requirements for the settling pharmacies to provide these critical data, resources, and tools to their pharmacists as part of the dispensing process. Plaintiffs therefore propose that Defendants be required to integrate into their pharmacy management software tools to fight prescription drug abuse such as NARxCHECK, which has been integrated into proprietary pharmacy management systems such as QS/1, to assist Defendants' pharmacists in analyzing a patient's prescription profile again red flags and various PDMPs and allow them to determine whether a patient might be obtaining prescriptions for controlled substances that have the potential for abuse or diversion. **Ex. 2** (Proposed Injunctive Relief) at p. 9. The integration of such tools as part of the dispensing process would provide an invaluable risk assessment to reduce inappropriate access to opioids, improve patient safety and prevent addiction and abuse of prescription drugs. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 23-24.

Additionally, the Florida Settlements do not appear to contain any separate or specific requirements for prescriptions that are refused for fill or identified as possibly being diverted or abused. Testimony during the Phase 1 trial made clear that even though Walmart was required to report refusals to fill to the DEA, they did not share that valuable information with their pharmacists. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at p. 85. Walgreens also failed to make their refusal to fill information readily available to its pharmacists. *See, e.g., id.* at pp. 31-32. And CVS never even had a program to document refusals to fill or share that information with its pharmacists. *See, e.g., id.* at p. 50. Accordingly, Plaintiffs propose that Defendants be required to develop a program designed to specifically manage and report Designated Controlled Substance prescriptions that have been refused for fill. **Ex. 2** (Proposed Injunctive Relief) at p. 9. For example, Defendants should require that, when one of their pharmacists makes a determination to refuse to fill a Designated Controlled Substance prescription, such determination be

(i) documented within the electronic management system so as to be immediately visible and available to all pharmacists in Defendants' retail pharmacies, and (ii) reported to the Controlled Substance Compliance Committee, the DEA, and State authorities.  *Id*.  The Controlled Substance Compliance Committee should then be required to review and analyze the information and report its findings to the Defendant's retail pharmacies in a manner that alerts all pharmacists in the retail pharmacies.  *Id*.

The Prescriber Review section of the Florida Settlements (Dkt. #4387-1 (CVS Florida Settlement) at p. 8; **Ex. 1** (WAG FL Settlement Excerpts) at Exhibit F, p. 8) should also be expanded to include patients, or a separate section should be created to provide for patient review. **Ex. 2** (Proposed Injunctive Relief) at p. 10.  A provision should also be added that requires Defendants to provide direct and timely responses to concerns raised by their pharmacists as to patients and prescribers of concern.  *Id*.  Additionally, each Defendant must provide critical data to all of its pharmacists related to patients and prescribers of concern in their area.  *Id*.[82]

Finally, Plaintiffs propose that the Florida Settlements be modified to require the Controlled Substance Compliance Personnel to do a review of the employment conditions, metrics and staffing levels at each of its pharmacies in the Counties to (i) ensure that they operate in a safe and effective manner pursuant to § 4729.55 of the Revised Code of Ohio, (ii) address whether its pharmacies, in each location, are sufficiently staffed to provide for breaks, a reasonable length of shift, to meet their Controlled Substance Due Diligence obligations, including those set forth in the Court's order for injunctive relief, and (iii) ensure that the various tasks requested by pharmacists and pharmacy staff (*e.g.*, automatic refills, increased market share initiatives, customer loyalty programs, waiting bin tracking, Rx return rate, overall satisfaction tracking of customer experiences, fill-time waits for waiting customers, ready-when-promised programs,

---

[82]  Data related to prescribers of concern may include those prescribers who are in the top percentiles for volume of controlled substances, share of controlled versus non-controlled drugs, and red flags by specialty.  *Id*.  Data related to patients of concern may include those patients prescribed excessive doses of controlled substance, or evidencing doctor or pharmacy shopping and/or behavior indicative of abuse or diversion.  *Id*.

drive-thru service times, voicemail retrieval rates, flu shots, vaccines, etc.) and the metrics employed do not impede with patient safety or the pharmacists' responsibilities concerning the dispensing of controlled substances. *Id*. at pp. 4-5.[83]

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court award Plaintiffs the equitable abatement and injunctive relief discussed herein and any such other and further relief as the Court deems just and proper.

Dated: June 13, 2022

Respectfully submitted,

*/s/ Jayne Conroy*
Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

*/s/ Joseph F. Rice*
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

---

[83] Plaintiffs demonstrated during the Phase 1 trial that Defendants implemented employment evaluation policies and performance metrics that impeded its pharmacists' efforts to comply with applicable laws and regulations and meet standards of care. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 26-27, 50-51, 70-71.

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com
mca@lanierlawfirm.com

*Trial Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

42

Hunter J. Shkolnik
Salvatore C. Badala
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com
sbadala@napolilaw.com

*Counsel for Plaintiffs Lake County and*
*Trumbull County, Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger

43