# APPENDIX B

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement is made and entered into this 29th day of March 2022, among Allergan (defined below), the State of Florida and its Office of the Attorney General ("Plaintiff" or "State") (collectively, the "Parties" or "Settling Parties"), and State Outside Litigation Counsel (defined below) in the lawsuit captioned *State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma L.P., et al.* (Case No. 2018-CA-001438) (Fla. Cir. Ct. Pasco County) (the "Florida AG Action"). This Settlement Agreement is intended by the Settling Parties to fully, finally, and forever resolve, discharge and settle the Released Claims (defined below), upon and subject to the terms and conditions hereof (the "Settlement").

WHEREAS, Plaintiff filed its complaint in the Florida AG Action (i) alleging, among other things, that Allergan, among others, violated Florida law by deceptively marketing opioid pain medications so as to overstate their efficacy and downplay the associated risk of addiction, which resulted in a public nuisance in Florida; (ii) alleging that Allergan, among others, violated the law by failing to monitor, report and not ship allegedly suspicious orders of opioid pain medications; (iii) alleging that Allergan, among others, violated Fla. Stat. § 895.03(3), (4); and (iv) asserting Claims (defined below) for damages, equitable abatement, civil penalties, attorneys' fees and reimbursed litigation costs, and other relief;

WHEREAS, Plaintiff brought the Florida AG Action in its sovereign capacity as the people's attorney in order to protect the public interest, including the interests of the State of Florida, its governmental subdivisions and its citizens;

WHEREAS, numerous Litigating Subdivisions (defined below) have filed Actions (defined below) in various forums against Allergan, among others, raising Claims or allegations concerning, related to, based upon, or in connection with the Covered Conduct (defined below) and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action;

1

WHEREAS, there are numerous Subdivisions (defined below) that are not Litigating Subdivisions ("Non-Litigating Subdivisions," defined below) that could seek to file additional Actions raising Claims or allegations concerning, related to, based upon, or in connection with the Covered Conduct and seeking relief that overlaps in whole or in part with the relief sought in the Florida AG Action and the Actions filed by Litigating Subdivisions;

WHEREAS, Allergan (i) denies each and all of the Claims and allegations of wrongdoing made by Plaintiff in the Florida AG Action and by the Litigating Subdivisions in each of the Actions and maintains that it has meritorious defenses; (ii) denies all assertions of wrongdoing or liability against Allergan arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Florida AG Action or in other Actions already brought by Litigating Subdivisions or that could be brought by such plaintiffs or by Non-Litigating Subdivisions, and contends that the factual allegations made in the Florida AG Action and the Litigating Subdivisions' Actions relating to Allergan are false and materially inaccurate; (iii) denies that Plaintiff, or any Litigating Subdivision, or any other Subdivision, or any Florida resident, was harmed by any conduct of Allergan alleged in the Florida AG Action, the Litigating Subdivisions' Actions, or otherwise; (iv) denies liability, expressly denies any wrongdoing, and denies Allergan violated any federal or state statute or common law; and (v) maintains that Allergan would be able to successfully defend against Plaintiff's Claims and allegations at trial, that the facts do not support the allegations that Allergan engaged in any misconduct or unlawful activity, and caused no harm to Plaintiff or to the Litigating Subdivisions, other Subdivisions, or any Florida residents;

WHEREAS, the Parties have investigated the facts and analyzed the relevant legal issues regarding the Claims and defenses that have been or could have been asserted in the Florida AG Action and any other Actions;

WHEREAS, the Parties have each considered the costs and delays and uncertainty associated with the continued prosecution and defense of the Florida AG Action and the other Actions;

WHEREAS, the Parties believe the Settlement set forth herein avoids the uncertainties of litigation and assures that the benefits reflected herein are obtained;

WHEREAS, Plaintiff has concluded that the terms of the Settlement are fair, reasonable and adequate and in the best interest of Plaintiff and all Subdivisions and Florida citizens and residents;

WHEREAS, Plaintiff has determined that continuation or commencement of Actions against Allergan by Litigating Subdivisions or other Subdivisions would unduly interfere with Plaintiff's litigation authority to bring and resolve litigation in which the State has an interest and frustrate Plaintiff's efforts to obtain a favorable settlement;

WHEREAS, the Parties agree that neither this Agreement nor any statement made in the negotiation thereof shall be deemed or construed to be a concession as to any Claim, an admission, evidence of any violation of any statute or law, evidence of any liability or wrongdoing by Allergan, or evidence of the truth of any of the Claims, allegations, denials, or defenses made in the Florida AG Action or the Litigating Subdivisions' Actions; and

WHEREAS, arm's-length settlement negotiations have taken place over the course of several weeks between Allergan and Plaintiff;

WHEREAS, Plaintiff views prompt settlement on the terms enclosed herein to be in the public interest and crucial to the State of Florida and its citizens; recognizes that Subdivisions may, notwithstanding their willingness to sign on to this settlement, wish to reserve the right to challenge the Attorney General's authority to bind them in other litigation that does not arise out of or relate to the Covered Conduct; and represents that Plaintiff shall not use those Subdivisions' acceptance

3

of the terms of this Settlement as precedent in any litigation matter that does not arise out of or relate to the Covered Conduct;

NOW, THEREFORE, IT IS HEREBY AGREED by and between Plaintiff and Allergan, by and through their respective counsel, as follows:

A. **Definitions.** As used in this Agreement, the following capitalized terms have the meanings specified below.

1. "Actions" means the Florida AG Action and any lawsuit by a Subdivision or other Releasor asserting any Released Claim, including but not limited to the Litigating Subdivisions' Actions listed in **Exhibit A**, against any Releasee.

2. "Affiliated Companies" (i) when used with respect to AbbVie Inc. ("AbbVie") shall mean all of the entities listed in **Exhibit K**; (ii) when used with respect to Allergan shall mean all of the entities listed in **Exhibit L**; and (iii) additionally shall include other entities owned now or in the past either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents, but only to the extent those other entities played any role relating to Covered Conduct, Opioid Products (defined below), Products (defined below), and/or Released Claims during the period when they were owned either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents. The Parties intend this definition to cover each and every entity that is now or was ever part of AbbVie and/or Allergan and/or each of their past parents' corporate families to the extent they ever played any role relating to Covered Conduct, Opioid Products, Products, and/or Released Claims.

3. "Agreement," "Settlement" or "Settlement Agreement" means this Settlement Agreement, together with any exhibits attached hereto, which are incorporated herein by reference.

4.      "<u>Allergan</u>" means Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.), Allergan Sales, LLC, Allergan USA, Inc. and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc). For the avoidance of doubt, Allergan does not include <u>Teva</u> (defined below) or <u>Divested Actavis Generic Entities</u> (defined below).

5.      "<u>Bar</u>" means either:  (1) a law barring all Subdivisions and other Releasors in the State of Florida from maintaining Released Claims against Releasees (either through a direct bar or through a grant of authority to release Claims and the exercise of such authority in full) or (2) a ruling by the Florida Supreme Court (or a District Court of Appeal if a decision is not subject to further review by the Florida Supreme Court) setting forth the general principle that Subdivisions and other Releasors in the State of Florida may not maintain any Released Claims against Releasees, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Releasee (apart from the payments by Allergan contemplated under this Agreement) shall not constitute a Bar.

6.      "<u>Claim</u>" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or

unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative or regulatory remedy whatsoever.

7.     "Claim-Over" means a Claim asserted by any entity that is not a Releasor against a Releasee on the basis of contribution, indemnity, or other claim-over on any theory relating to Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee) asserted by a Releasor.

8.     "Consent Judgment" means a consent decree, order, judgment, or similar action; in connection with this Agreement, the Parties have agreed to the entry of the Consent Judgment attached hereto as **Exhibit H**, which provides for the release set forth below and the dismissal with prejudice of any Released Claims that the State of Florida Office of the Attorney General has brought against Releasees, on the terms and conditions specified herein.

9.     "Court" means the Sixth Judicial Circuit Court in and for Pasco County, State of Florida.

10.     "Covered Conduct" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date of the Release (defined below) (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) arising from or relating in any way to: (1) the discovery, development, manufacture, packaging,

6

repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including, but not limited to, any unbranded or branded promotion, marketing, programs or campaigns relating to any Product or class of Products; (2) the characteristics, properties, risks or benefits of any Product; (3) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders placed with any Releasee; (4) the purchasing, selling, acquiring, disposing of, importing, exporting, applying for quota for, procuring quota for, handling, processing, packaging, supplying, distributing, converting, or otherwise engaging in any activity relating to, precursor or component Products, including, but not limited to, natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, active pharmaceutical ingredients, drug substances or any related intermediate Products; and (5) diversion control programs or suspicious order monitoring.

11.     "Divested Actavis Generic Entities" means Actavis LLC (f/k/a Actavis Inc.), Watson Laboratories, Inc., Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc. - Florida), Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc. - Utah), Actavis Mid Atlantic LLC, Actavis South Atlantic LLC, Actavis Totowa LLC, and Warner Chilcott Company, LLC.

12.     "Divested Entities" means those companies listed on **Exhibit M**.

13.     "Effective Date of the Agreement" means three (3) business days after the Initial Participation Date (defined below), provided that either a Bar exists or a sufficient number of Subdivisions have become Participating Subdivisions by the Initial Participation Date. The Parties may alter the Effective Date of the Agreement by mutual written agreement.

7

14.    "Effective Date of the Release" means the date on which the Court enters the Consent Judgment.

15.    "Execution Date" means the date on which this Agreement is executed by the last Party to do so.

16.    "Initial Participation Date" means the date by which Litigating Subdivisions must join to become initial Participating Subdivisions.  The Initial Participation Date shall be 30 days after the Execution Date.  The Parties may alter the Initial Participation Date by mutual written agreement.

17.    "Health Care Provider(s)" means any physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical medications and any medical facility, practice, hospital, clinic, pharmacy, or any other health facility that provides health care services or prescribes or dispenses pharmaceutical medications.

18.    "In-Kind Support" means payment or assistance in the form of goods, commodities, services, or anything else of value.

19.    "Litigating Subdivision" means a Subdivision (or Subdivision official) that has brought any Released Claim against any Releasees on or before the Execution Date, including, but not limited to, the agreed list of Litigating Subdivisions set forth in **Exhibit A.**

20.    "Litigation Costs" means attorneys' fees and investigative and litigation costs and expenses incurred in connection with Claims asserted against any Releasee in the Florida AG Action or any Litigating Subdivision's Action.

21.    "Non-Joining Subdivision" means any Litigating Subdivision or Principal Subdivision that does not execute a subdivision settlement participation form attached as **Exhibit D** by the Post Effective Date Sign-on Deadline.

22.    "Non-Litigating Subdivision" means a Subdivision that is not a Litigating

8

Subdivision.

23.     "Non-Participating Subdivision" means a Subdivision that is not or is not yet a Participating Subdivision.

24.     "Opioid(s)" means all naturally occurring, synthetic, or semisynthetic substances that interact with mu-opioid receptors primarily in the central nervous system and have demonstrated addictive properties.

25.     "Opioid Product(s)" means all past, current, and future medications containing Opioids approved by the U.S. Food & Drug Administration ("FDA") and listed by the U.S. Drug Enforcement Agency ("DEA") as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Product(s)" shall not include (i) methadone and other substances when used exclusively to treat opioid abuse, addiction, OUD (defined below), or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients ("APIs") used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers. Also, by way of example, the terms "Opioid(s)" and "Opioid Product(s)" shall not include pharmaceutical medications that may relieve pain but not by interacting with mu-opioid receptors primarily in the central nervous system, such as BOTOX®, HUMIRA®, LINZESS®, ORIAHNN®, ORILISSA®, QULIPTA®, RINVOQ®, SAVELLA®, UBRELVY®, or VIBERZI®.

26.     "Opioid Remediation" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures, except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address

9

the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic. **Exhibit C** provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.[1]

27. "OUD" means opioid use disorder defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5), as updated or amended.

28. "Participating Subdivision" means any Subdivision that executes a subdivision settlement participation form attached as **Exhibit D**.

29. "Parties" and "Settling Parties" means Allergan and Plaintiff, with each being a "Party" and a "Settling Party."

30. "Post-Effective Date Sign-on Deadline" means the deadline for Subdivisions to execute a subdivision settlement participation form attached as **Exhibit D**, which shall be 150 days after the Effective Date of the Agreement.

31. "Principal Subdivision" means: (1) a County, regardless of population; or (2) a Subdivision that is not a County, but is a General Purpose Government entity (defined below; including a municipality, city, town, township, parish, village, borough, gore or any other entities that provide municipal-type government) with a population of more than 10,000, including, but not limited to, the agreed list of Principal Subdivisions attached hereto as **Exhibit B.**

32. "Product" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is: (1) an opioid or opiate, as well as any product containing any such substance; or (2) benzodiazepine, carisoprodol, or gabapentin;

---

[1] Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person.

or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought or dispensed to be used together that includes opioids or opiates. "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance.  Further, "Product(s)" includes, but is not limited to, the following: (a) Anexsia, Bancap HC, Combunox, Dilaudid, Duradyne, Esgic with Codeine, Fiorinal with Codeine, Fioricet with Codeine, Kadian, Lorcet, Lorcet Plus, Maxidone, MoxDuo, Norco, Procet, Reprexain, Vicodin, and Vicoprofen, and any type, version, strength, or dosage of the foregoing; and (b) Fentanyl citrate injection, Fentanyl citrate tablet, Fentanyl transdermal, Hydrocodone + acetaminophen, Meperidine hydrochloride injection, Meperidine hydrochloride tablet, Morphine sulfate injection, Morphine sulfate capsule, Morphine sulfate tablet, Oxycodone + acetaminophen, Oxycodone + aspirin, Oxycodone + ibuprofen, Tramadol hydrocholoride, Aspirin + butalbital + caffeine + codeine phosphate, Hydrocodone + acetaminophen, Hydrocodone + ibuprofen, Hydromorphone tablet, Oxycodone + aspirin, Homotropine methylbromide + hydrocodone bitartrate, Oxycodone + acetaminophen, Oxycodone + hydrochloride, Homatropine methylbromide + hydrocodone bitartrate, Morphine sulfate capsule, Morphine sulfate tablet, Oxycodone + acetaminophen, Oxycodone + hydrochloride, Oxycodone + ibuprofen, Oxymorphone tablet, Tramadol hydrochloride, Tramadol hydrochloride, Homatropine methylbromide + hydrocodone bitartrate, Oxymorphone tablet, Fentanyl transdermal, Oxycodone, and Morphine sulfate, and any type, version, strength, or dosage of the foregoing.   Notwithstanding the foregoing, nothing in this definition prohibits a Releasor from taking administrative or regulatory action related to benzodiazepine (including, but

11

not limited to, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, and midazolam), carisoprodol, or gabapentin that is wholly independent from the use of such drugs in combination with opioids, *provided* such action does not seek money (including abatement and/or remediation) for conduct prior to the Execution Date.

33. "Qualified Settlement Fund" means the Florida Qualified Settlement Fund contemplated by this Agreement, into which all payments by Allergan shall be made and which shall be established under the authority and jurisdiction of the Court and which shall be a "qualified settlement fund" within the meaning of 26 C.F.R. § 1.468B-1.

34. "Qualified Settlement Fund Administrator" means the Administrator appointed to administer the Qualified Settlement Fund under the authority and jurisdiction of the Court. The duties of the Qualified Settlement Fund Administrator shall be governed by this Agreement. The identity of the Qualified Settlement Fund Administrator and a detailed description of the Qualified Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Qualified Settlement Fund Administrator's fees and costs, will be set forth in a separate document to be prepared by the Parties and filed with the Court to establish the fund and be attached later to this Agreement as **Exhibit E**.

35. "Released Claims" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date of the Release, whether known or unknown. Without limiting the foregoing, Released Claims include any Claims that have been asserted against the Releasees by Plaintiff or any Litigating Subdivision in any federal, state or local Action or proceeding (whether judicial, arbitral or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those Actions or in any comparable Action or proceeding brought by Plaintiff, any of its

12

Subdivisions, or any Releasor (whether or not such State, Subdivision, or Releasor has brought such Action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to this Agreement, whether or not such Claims relate to Covered Conduct. The Parties intend that this term, "Released Claims," be interpreted broadly. This Agreement does not release Claims by private individuals for damages for any alleged personal injuries arising out of their own use of any Product. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought or maintained by any Releasor in the future that would have been Released Claims if they had been brought by a Releasor against a Releasee.

36. "Releasee(s)" means: Allergan and (i) all of Allergan's past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, agents (all of the foregoing solely in their capacity as such with respect to the Released Claims), and insurers (solely in their role as insurers, if any, with respect to the Released Claims), including, but not limited to, (a) AbbVie and (b) Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva and Teva's subsidiaries and affiliates) but solely as to the branded opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and other Divested Entities related to those branded opioid drugs that are Opioid Products or Products before August 2, 2016; (ii) the respective past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, partners, manufacturers, contractors, agents, and insurers (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (i), including Abbott Laboratories and Abbott Laboratories Inc.; (iii)

13

the respective past and present employees, officers, directors, members, shareholders, partners, trustees, contractors, consultants, and agents (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (i) and (ii); and (iv) any person or entity to the extent, and only to the extent, that such person or entity may have a Claim based on such person or entity having a business relationship with Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies, including, but not limited to, for contractual indemnity, equitable or implied indemnity, contribution, comparative fault, reimbursement, or apportionment (including, but not limited to, Halo Pharmaceuticals, Inc., Shionogi Inc., Mikart, LLC, PDI, Inc., TMS Health, LLC, National Health Information Network, Inc., Ventiv Commercial Services, LLC, inVentiv Commercial Services, LLC, UPS Supply Chain Solutions, Inc., and King Pharmaceuticals, Inc., and their respective past and current parents, subsidiaries, and affiliates) against Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies relating to any Covered Conduct, Opioid Products, Products, and/or Released Claims arising from such business relationship. Notwithstanding the foregoing (and subject to certain provisions, including, but not limited to, Non-Party Settlement provisions at **Section E(3)(c)**), Releasees shall exclude Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva and Teva's subsidiaries and affiliates, but not Allergan and other Releasees), but solely as to: (x) their generic opioid drugs that are Opioid Products or Products, and/or (y) the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioid Products or Products for which Releasors have also sought to hold Allergan and/or other Releasees liable. For the avoidance of doubt, nothing in this Agreement shall release or impair any Claims against Walgreens or CVS, and nothing in this Agreement will reduce the

14

Total Payment to be paid to the State by Allergan under this Agreement or the settlement amount to be paid by Teva under its separate agreement with the State.

37.    "Releasors" means with respect to Released Claims: (1) the State; (2) without limitation, all of the State of Florida's departments, agencies, divisions, boards, commissions, instrumentalities of any kind, including without limitation the Florida Attorney General, Florida Board of Pharmacy, Florida Department of Health, and Florida Department of Business and Professional Regulation, and any person in his or her official capacity, whether elected or appointed to lead or serve any of the foregoing, and any agency, person or entity claiming by or through any of the foregoing; (3) each Participating Subdivision; and (4) without limitation and to the maximum extent of the power of each of the State, the Florida Attorney General and/or Participating Subdivision to release Claims of (a) the State of Florida's and each Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and any person in his or her official capacity, whether elected or appointed to lead or serve any of the foregoing, and any agency, person or entity claiming by or through any of the foregoing; (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, School Districts (defined below), hospital districts, General Purpose Government entities, and other Special Districts (defined below) in the State of Florida, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Florida or any Subdivision in the State of Florida, whether or not any of them participates in this Agreement.  Nothing in this definition shall be construed to limit the definition of "Subdivision" in **Section A(40)** below.  In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide a subdivision settlement

15

participation form (attached as **Exhibit D**) providing for a release to the fullest extent of the Participating Subdivision's authority, an executed copy of which shall be attached as an exhibit to and deemed to be a part of this Agreement.

38. "State Outside Litigation Counsel" means Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.; Drake Martin Law Firm, LLC; Harrison Rivard Duncan & Buzzett, Chartered; Newsome Melton, P.A.; and Curry Law Group, P.A.

39. "State-Subdivision Agreement" means a separate agreement among Plaintiff and all Participating Subdivisions providing for an allocation of, among other things, the Remediation Payment (defined below). The State-Subdivision Agreement is attached hereto as **Exhibit I**.

40. "Subdivision" means (1) any General Purpose Government entity (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore or any other entities that provide municipal-type government), (2) School Districts or Special Districts within the State (collectively, "Special Purpose Government Entities"), and (3) any other Subdivision or Subdivision official or sub-entity of or located within a State (whether political, geographical or otherwise, whether functioning or non-functioning, regardless of population overlap, and including, but not limited to, nonfunctioning governmental units and public institutions) that has filed or could file a lawsuit that includes a Released Claim against a Releasee in a direct, parens patriae, or any other capacity.  "General Purpose Government," "School District," and "Special District" shall mean and correspond to the "five basic types of local governments" recognized by the U.S. Census Bureau and match the 2017 list of Governmental Units.  The three (3) General Purpose Governments are county, municipal (which include cities and towns), and township governments; and the two (2) Special Purpose Government Entities are School Districts and Special Districts.  "Fire District," "Health District," "Hospital District," and "Library District" shall mean and correspond to categories of Special

16

Districts recognized by the U.S. Census Bureau. References to a State's Subdivisions or to a Subdivision "in," "of," or "within" a State include Subdivisions located within the State even if they are not formally or legally a sub-entity of the State.

41.  "Teva" means Teva Pharmaceutical Industries Ltd.; Teva Pharmaceuticals USA, Inc.; Cupric Holding Co., Inc.; Teva Pharmaceutical Holdings Cooperative U.A.; Teva Pharmaceuticals Europe B.V.; Cephalon, Inc.; and Anda, Inc.

42.  "Third Party(ies)" means any person or entity other than Allergan, other Releasees, or Releasors.

43.  "Treatment of Pain" means the provision of therapeutic modalities to alleviate or reduce pain.

44.  "Unbranded Information" means any information that does not identify a specific branded or generic product.

**B.  Release of All Claims, and Dismissals in the Florida AG Action and Litigating Subdivisions' Actions.**

1.  It is the intention of the Settling Parties to fully and finally resolve all Released Claims that have been or could be brought against the Releasees by Plaintiff or any Releasor with respect to the Covered Conduct, and that the release of such Claims does not affect Plaintiff's or the Releasors' Claims as to any other defendant (except to the extent expressly stated herein, including but not limited to Claims as to Teva, Divested Actavis Generic Entities, and other Divested Entities). The State represents and warrants that **Exhibit N** contains a list of all Subdivisions. Plaintiff represents and warrants that it will use its best efforts to obtain a consensual release of any and all Claims involving Covered Conduct that Plaintiff and all Subdivisions, including any Litigating Subdivision or Non-Litigating Subdivision, have asserted or could assert against the Releasees. Regardless whether such consensual release is obtained, Plaintiff represents

17

and warrants under this Agreement that it is exercising its authority under law to release any and all Claims involving Covered Conduct that Plaintiff and all Releasors, including any Litigating Subdivision or Non-Litigating Subdivision, have asserted or could assert against the Releasees. Plaintiff further represents and warrants that it will use all available authority to bind, and under this Agreement is exercising such authority to bind, Plaintiff and all Releasors, including all Litigating Subdivisions and Non-Litigating Subdivisions, regardless of whether they become Participating Subdivisions or Non-Joining Subdivisions, to the terms of this Agreement.

2.        In addition to the general release and dismissal to be provided by Plaintiff set forth in **Sections E & G**, Plaintiff will deliver to Allergan signed agreements from: (a) each Subdivision that executes a signed agreement by the Initial Participation Date; and (b) each Subdivision that executes a signed agreement by the Post-Effective Date Sign-on Deadline (i.e., within 150 days following the Effective Date of the Agreement). Such agreements shall include: (a) the Subdivision's acceptance of the terms and conditions of this Agreement by signing the subdivision settlement participation form attached as **Exhibit D**; (b) in the case of a Litigating Subdivision, such Litigating Subdivision's agreement to implement an immediate cessation of any and all litigation activities relating to such Litigating Subdivision's Action as to all Releasees; (c) in the case of a Litigating Subdivision, an agreement that Plaintiff may represent that the Litigating Subdivision supports the Consent Judgment to be entered in accordance with **Section G** below; and (d) in the case of a Litigating Subdivision, such Litigating Subdivision's agreement to file, within the later of seven (7) days of the Effective Date of the Release, or seven (7) days of signing the subdivision settlement participation form, a notice or stipulation of voluntary dismissal with prejudice of any and all Released Claims asserted by the Litigating Subdivision against the Releasees, with each party to bear its own costs.

3.      Between the Execution Date and the Initial Participation Date, Plaintiff agrees to furnish to Allergan a report listing the Subdivisions that have executed the signed agreements described in **Section B(2)** and copies of such signed agreements on a weekly basis.  Plaintiff further agrees to furnish to Allergan no later than noon Eastern Time on the day after the Initial Participation Date a final report listing the Subdivisions that have executed the signed agreements described in **Section B(2)** by the Initial Participation Date and copies of all such signed agreements. After the Initial Participation Date, the Parties shall confer and establish a schedule for the regular provision of such reports and copies of signed agreements.

4.      Plaintiff represents and warrants that, if any Action remains pending against one or more Releasees after the Effective Date of the Agreement or is filed by a Releasor against any Releasee on or after the Execution Date, Plaintiff will seek to obtain dismissal of such Action as to such Releasees as soon as reasonably possible.  Depending on facts and circumstances, Plaintiff may seek dismissal, among other ways, by intervening in such Action to move to dismiss or otherwise terminate the Releasor's Claims in the Action or by commencing a declaratory judgment or other action that establishes a Bar to the Releasor's Claims and Action.  For avoidance of doubt, Plaintiff will seek dismissal of an Action under this section regardless of whether the Subdivision in such Action is a Participating Subdivision.

5.      In the event that the actions required of Plaintiff in **Section B(4)** fail to secure the prompt dismissal or termination of any Action by any Releasor against any Releasee, Plaintiff shall seek enactment of a legislative Bar as defined in **Section A(5)(1)** and will endeavor to achieve enactment as soon as is practicable.  Participating Subdivisions agree not to oppose any effort by Plaintiff to achieve enactment of a legislative Bar.

6.      Plaintiff further represents and warrants that no portion of the Remediation Payment or the Litigation Costs Payments (defined below) will be distributed to or used for the

19

benefit of any Subdivision unless and until Plaintiff has delivered to Allergan a signed agreement from such Subdivision providing for the Subdivision's acceptance of the terms and conditions of this Agreement, including its express agreement to be bound by the irrevocable releases set forth in **Section E** below.

      **C.**     **Settlement Consideration.**

      1.     **Remediation Payment and Litigation Costs Payments.**

      (a)     On the payment schedule provided in **Section C(2)**, Allergan shall pay into the Qualified Settlement Fund the sum of $134,200,000 (the "Total Payment"). Fifty-six percent (56%) of the Total Payment constitutes consideration for the settlement of Claims concerning, related to, based upon, arising from, or in connection with generic opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioid Products or Products before August 2, 2016 that the Releasors are asserting or might otherwise assert or could assert that Allergan or any other Releasee is directly or indirectly and/or jointly or severally liable based on parent or control liability or a substantially similar theory.  Forty-four percent (44%) of the Total Payment constitutes consideration for the settlement of Claims concerning, related to, based upon, arising from, or in connection with branded opioid drugs that are Opioid Products or Products of or attributable to Allergan or any other Releasee (including but not limited to branded opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and other Divested Entities related to those branded opioid drugs that are Opioid Products or Products before August 2, 2016) that the Releasors are asserting or might otherwise assert or could assert against Allergan or any other Releasee, of which seventy-seven

percent (77%) is specifically concerning, related to, based upon, arising from, or in connection with Kadian® (including but not limited to Kadian manufactured, distributed, marketed, and/or sold from 1997 through 2008 by King Pharmaceuticals, Inc. and/or Alpharma Inc.) For the avoidance of doubt, nothing in this section will reduce the Total Payment to be paid to the State by Allergan under this Agreement or the settlement amount to be paid by Teva under its separate agreement with the State.

(b)     The Total Payment shall be broken down as follows: (i) $122,000,000 for opioid remediation and restitution (the "Remediation Payment"), to be allocated in accordance with the State-Subdivision Agreement; (ii) $6,100,000 to be available to reimburse Allergan's share of the State's Litigation Costs in accordance with **Section C(1)(d)** below (the "State Litigation Cost Payment"); and (iii) $6,100,000 to be available to reimburse Allergan's share of the Litigation Costs of Litigating Subdivisions in accordance with **Section C(1)(d)** below (the "Litigating Subdivision Litigation Cost Payment"). The State Litigation Cost Payment and the Litigating Subdivision Litigation Cost Payment shall collectively be referred to herein as the "Litigation Costs Payments." The Qualified Settlement Fund Administrator shall allocate each of the Remediation Payment, the State Litigation Cost Payment, and the Litigating Subdivision Litigation Cost Payment into separate sub-funds within the Qualified Settlement Fund. Release of the Remediation Payment and the Litigation Costs Payments from the Qualified Settlement Fund shall be subject to the conditions specified below.

(c)     The Parties agree that, unless required otherwise by law, the Remediation Payment pursuant to **Section C(1)(b)** above shall be directed to remediation and restitution of harms allegedly caused by Allergan and/or other Releasees. The Parties also agree that the purpose of the Remediation Payment will be to receive from Allergan and pay over to the State and Participating Subdivisions monies to remediate the harms allegedly caused by Allergan and/or

other Releasees or to provide restitution for such alleged harms that were previously incurred, none of which amount constitutes a fine or penalty. The State by executing this Agreement and each Participating Subdivision by agreeing to the terms of this Agreement in the subdivision settlement participation form attached as **Exhibit D**, certify that: (a) the entity suffered harm allegedly caused by Allergan and/or other Releasees; (b) the payments to be received by the entity from Allergan represent an amount that is less than or equal to the actual monetary damage allegedly caused by Allergan and/or other Releasees; and (c) the entity shall use such payments for the sole purpose of remediating the harm allegedly caused by Allergan and/or other Releasees and/or to provide restitution for such alleged harms that were previously incurred. All costs incurred related to any request for a private letter ruling from the I.R.S. affirming the tax deductibility of the Remediation Payment, and/or the tax-exempt status of the Remediation Payment pursuant to IRC Section 115 shall be borne in their entirety by Allergan and shall not be directly paid or reimbursed from the corpus of the fund, escrow, or trust. The State shall complete and file Form 1098-F with the Internal Revenue Service. On the Form 1098-F, the State shall identify the aggregate Remediation Payment as remediation and restitution amounts. The State shall also, on or before January 31, 2023, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Allergan.

(d)     An agreement on the handling of Litigating Subdivision Litigation Costs is attached as **Exhibit G** and incorporated herein by reference. The Litigating Subdivision Litigation Cost Payment is to be available to reimburse counsel for Litigating Subdivisions that become Participating Subdivisions and who waive any other right(s) they may have to compensation in connection with this Settlement for reasonable Litigation Costs incurred in connection with their Claims against Releasees.

(1)     The Qualified Settlement Fund Administrator shall allow eligible counsel reimbursement for reasonable Litigation Costs as provided in **Exhibit G**. Such Litigation

22

Costs shall be divided among Participating Subdivisions as provided in **Exhibit G** under the jurisdiction and authority of the Court.  Any amount remaining in the Litigating Subdivision Litigation Cost Payment sub-fund after such allocation shall be returned to Allergan.

   **(2)** No funds may be used to compensate Litigation Costs incurred by Non-Participating Subdivisions, Non-Joining Subdivisions, or Non-Litigating Subdivisions, or Litigation Costs arising out of representation of any such Subdivision.

   **(e)** No attorney for any Litigating Subdivision may receive any share of the Litigating Subdivision Litigation Cost Payment unless the following eligibility requirements are met and certified by the attorney:

   **(1)** The attorney must represent that s/he has no present intent to represent or participate in the representation of any Subdivision or any Releasor with respect to the litigation of any Released Claims against any Releasees.

   **(2)** The attorney must represent that s/he will not charge or accept any referral fees for any Released Claims asserted or maintained against Releasees by any Subdivision or any Releasor.

   **(3)** The attorney may not have, and must represent that s/he does not have, a claim for fees, costs or expenses related to the litigation of any Released Claims against any Releasees by any Subdivision or any Releasor after the Effective Date of this Agreement.

   **(4)** Notwithstanding the foregoing, nothing in this **Section C(1)(e)** is intended to operate as a "restriction" on the right of any attorney to practice law within the meaning of Rule 5.6(b) of the Florida Rules of Professional Conduct or any equivalent provision of any other jurisdiction's rules of professional conduct.

   **(f)** Plaintiff shall file in the Court a motion for the State's Litigation Costs up to $6,100,000 of the Total Payment by Allergan into the Qualified Settlement Fund.  Allergan will

not oppose the motion so long as the State does not seek more than $6,100,000 of the Total Payment by Allergan into the Qualified Settlement Fund as its Litigation Costs. If any amount of the State Litigation Cost Payment is not awarded by the Court to the State, then that remaining amount shall be returned to Allergan. As set forth in **Section C(2)** below, in the event the Court awards the State Litigation Costs in excess of the amount listed above, the Releasees shall have no obligation to pay any amount in excess of the State Litigation Cost Payment.

2. **Payment Schedule.** The Total Payment shall be paid in eleven installments on the following schedule:

(a)    First Payment: $23,290,909.10 due on the later date of (i) seven (7) days after the Effective Date of the Release, or (ii) fourteen (14) days after (a) the Qualified Settlement Fund has been established under the authority and jurisdiction of the Court, and (b) Allergan has received a W-9 and wire instructions for the Qualified Settlement Fund and Allergan's bank verification form process is completed.

(b)    Second Payment: $11,090,909.09 due on March 28, 2023.

(c)    Third Payment: $11,090,909.09 due on March 28, 2024.

(d)    Fourth Payment: $11,090,909.09 due on March 28, 2025.

(e)    Fifth Payment: $11,090,909.09 due on March 28, 2026.

(f)    Sixth Payment: $11,090,909.09 due on March 28, 2027.

(g)    Seventh Payment: $11,090,909.09 due on March 28, 2028.

(h)    Eighth Payment: $11,090,909.09 due on March 28, 2029.

(i)    Ninth Payment: $11,090,909.09 due on March 28, 2030.

(j)    Tenth Payment: $11,090,909.09 due on March 28, 2031.

(k)    Eleventh Payment: $11,090,909.09 due on March 28, 2032.

3. **No Other Payments by Releasees as to Covered Conduct, Released Claims, the**

24

**Florida AG Action, Other Actions, Plaintiff, Subdivisions or State Outside Litigation Counsel or Litigation Costs.**  Other than the Remediation Payment and the Litigation Costs Payments by Allergan referenced in **Section C(1)(b)**, none of the Releasees shall have any obligation to make any further or additional payments in connection with Claims for Covered Conduct or Litigation Costs or this Settlement.

      4.    **Apportionment of the Remediation Payments.**

      (a)    It is the intent of the Parties that the Remediation Payment in **Section C(1)(b)** be used exclusively for Opioid Remediation.

      (b)    In accordance with the State-Subdivision Agreement in **Exhibit I**, each Remediation Payment shall be allocated by the Qualified Settlement Fund Administrator into three sub-funds:  an Abatement Accounts Sub-Fund (also known as a regional fund), a State Sub-Fund, and a Subdivision Sub-Fund to be allocated to the Abatement Accounts Sub-Fund or to another Participating Subdivision.

      (c)    A detailed mechanism consistent with the foregoing for a Qualified Settlement Fund Administrator to follow in allocating, apportioning and distributing payments will be filed with the Court and later attached as **Exhibit J**.

      (d)    Allergan shall have no duty, liability, or influence of any kind with respect to the apportionment and use of the Remediation Payment by the Qualified Settlement Fund Administrator.  Plaintiff specifically represents, however, that any such apportionment and use by the Qualified Settlement Fund Administrator shall be made in accordance with all applicable laws.

      5.    **Release of the State Sub-Fund.**  Within a reasonable period after the Effective Date of the Release or otherwise as ordered by the Court, the Qualified Settlement Fund Administrator shall release the State Sub-Fund to Plaintiff.

6.    **Subdivision Payments to Subdivisions that Become Participating Subdivisions Prior to the Initial Participation Date.**  A Participating Subdivision that (a) completes a subdivision settlement participation form prior to the Initial Participation Date, (b) joins the State-Subdivision Agreement (**Exhibit I**), and (c) in the case of a Litigating Subdivision, dismisses with prejudice any and all Released Claims asserted by the Litigating Subdivision against the Releasees, shall be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Effective Date of the Release.

7.    **Subdivision Payments to Subdivisions that Become Participating Subdivisions After the Initial Participation Date.**  A Participating Subdivision that (a) completes a subdivision settlement participation form after the Initial Participation Date and by no later than the Post-Effective Date Sign-on Deadline, (b) joins the State-Subdivision Agreement (**Exhibit I**), and (c) in the case of a Litigating Subdivision, dismisses with prejudice any and all Released Claims asserted by the Litigating Subdivision against the Releasees, shall be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Post-Effective Date Sign-on Deadline.

8.    **Reversion to Allergan of Amounts Forfeited by Non-Joining Subdivisions.**  Any Litigating Subdivision or Principal Subdivision that does not sign a participation form by the Post-Effective Date Sign-on Deadline will be deemed a Non-Joining Subdivision.  At Allergan's request to the Qualified Settlement Fund Administrator, any Non-Joining Subdivision's share of the Remediation Payment (and to the extent any such Subdivision is a Litigating Subdivision, the Litigation Costs Payments) shall be returned to Allergan within a reasonable time after the Post-Effective Date Sign-on Deadline.   The Non-Joining Subdivisions' shares are as listed in **Exhibit B**.

9.    **Agreement Null and Void if the Agreement Does Not Become Effective.** In the

event that the Effective Date of the Agreement does not occur and the Parties fail to agree to extend the Effective Date of the Agreement, the Agreement shall be null and void.

10.    **Use of Evidence at Trial in the Florida AG Action.** Plaintiff agrees that none of the Releasees will be a defendant in any trial of the Florida AG Action, that it will not subpoena or call to testify live any Releasees in any trial of the Florida AG Action and that any evidence that references the Releasees or the Products will be used solely against other defendants in the Florida AG Action.

11.    **Verdict Form.** Plaintiff agrees that it will not seek to have any of the Releasees included on the verdict form in any trial related to the Florida AG Action and will oppose the efforts of any other party in the Florida AG Action to include any of the Releasees on the verdict form.

**D.**    **Injunctive Relief.** As part of the Consent Judgment to be entered in accordance with **Section G** below, the Parties agree to the entry of injunctive relief terms attached as **Exhibit F.**

**E.**    **Settlement of Claims and General Release.**

1.    **Scope.** On the Effective Date of the Release, Plaintiff and each Releasor shall be deemed to have fully, finally and forever released all Releasees from all Released Claims. Plaintiff, on behalf of itself and all other Releasors (whether or not they have signed this Agreement or the subdivision settlement participation form in **Exhibit D**), hereby absolutely, unconditionally and irrevocably covenants not to bring, file, or claim, or to cause, assist, or permit to be brought, filed, or claimed, any Released Claims of any type in any forum whatsoever against Releasees. For the avoidance of doubt, Plaintiff agrees that this Settlement Agreement and the releases contained herein shall fully and completely resolve any past, present or future liability that any Releasee may have arising from, relating to or based on the Covered Conduct occurring prior to

27

the Effective Date of the Release, whether in the Actions or otherwise. The releases provided for in this Agreement are intended by the Settling Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any and all Released Claims. This Settlement Agreement is, will constitute, and may be pleaded as a complete bar to any Released Claim asserted against Releasees, whether against Plaintiff, any Participating Subdivision, any other Subdivision, including any Non-Participating Subdivision, or any other Releasor.

2.   **General Release.**   In connection with the releases provided pursuant to this Settlement Agreement, Plaintiff, on behalf of itself and all other Releasors referenced in **Section E(1)**, expressly waives, releases and forever discharges any and all provisions, rights and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those that he, she, or it knows or believes to be true with respect to the Released Claims, but Plaintiff, on behalf of itself and all other Releasors, hereby expressly waives and fully, finally and forever settles, releases and discharges, upon the Effective Date of the Release, any and all Released Claims against the Releasees that may exist as of this date but which they do not know or suspect to exist, whether through ignorance, oversight, error, negligence or otherwise, and which, if known, would materially affect their decision to enter into this Settlement Agreement.

3.   **Claim-Over and Non-Party Settlement.**

(a)   **Statement of Intent.**  It is the intent of the Parties that:

(1)     The Remediation Payment and Litigation Costs Payments made under this Agreement shall be the sole payments made by the Releasees to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee);

(2)     Claims by Releasors against non-Parties should not result in additional payments by Releasees, whether through contribution, indemnification or any other means; and

(3)     The Settlement effects a good faith "release and covenant not to sue" within the meaning of Florida Statute § 768.31(5) and meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine, including, but not limited to, Fla. Stat. § 768.31(5), that reduces or discharges a released party's liability to any other parties, such that Releasees are discharged from all liability for contribution to any other alleged tortfeasor in the Florida AG Action and in any other Action, whenever filed.

(4)     The provisions of this **Section E(3)** are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

(b)     No Releasee shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory, from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner; *provided* that a Releasee shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it or with respect to any person or entity that brings any other form of action against Allergan or any other Releasee arising out of or related to Opioid Products, Products, or Covered Conduct. For the avoidance of doubt, nothing herein shall prohibit a Releasee from recovering amounts owed pursuant to insurance contracts. However,

29

and notwithstanding the foregoing, this provision shall not preclude Allergan or the Affiliated Companies from seeking indemnification, contribution, or any other theory from and against Pfizer Inc., King Pharmaceuticals, Inc., Alpharma Inc., and Teva, and/or each of their respective past and current parents, subsidiaries, and/or affiliates. For the avoidance of doubt, nothing in this section will reduce the Total Payment to be paid to the State by Allergan under this Agreement or the settlement amount to be paid by Teva under its separate agreement with the State.

(c)     To the extent that, on or after the Effective Date of the Agreement, any Releasor settles any Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Releasee) ("Non-Party Covered Conduct Claims") it may have against any entity that is not a Releasee (a "Non-Released Entity") that is, as of the Effective Date of the Agreement, a defendant in the Florida AG Action or Litigating Subdivisions' Actions, and provides a release to such Non-Released Entity (a "Non-Party Settlement"), including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will seek to include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement, a prohibition on seeking contribution or indemnity of any kind from Releasees substantially equivalent to that required from Allergan in the first sentence of **Section E(3)(b)** (except limited to such claims against Releasees), or a release from such Non-Released Entity in favor of the Releasees (in a form equivalent to the releases contained in this Agreement) of any Claim-Over.

(d)     **Claim-Over.** In the event that any Releasor obtains a settlement or judgment with respect to a Non-Party Covered Conduct Claim against a Non-Released Entity that does not contain a prohibition like that in **Section E(3)(b)**, or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented

for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in **Section E(3)(c),** and such Non-Released Entity asserts a Claim-Over against a Releasee, Allergan and that Releasor shall meet and confer concerning any additional appropriate means by which to ensure that Releasees are not required to make any payment with respect to Covered Conduct (beyond the amounts that will already have been paid by Allergan under this Settlement Agreement).

        (e)     In no event shall a Releasor be required to reduce the amount of a settlement or judgment against a Non-Released Entity in order to prevent additional payments by Releasees, whether through contribution, indemnification, or any other means.

        4.     **Cooperation.** Releasors, including Plaintiff and Participating Subdivisions, agree that they will not publicly or privately encourage any other Releasor to bring or maintain any Released Claim.  Plaintiff further agrees that it will cooperate in good faith with the Releasees to secure the prompt dismissal of any and all Released Claims.

        **F.**     **Cessation of Litigation Activities.**  It is the Parties' intent that all litigation activities in the Florida AG Action relating to Released Claims against the Releasees shall immediately cease as of the Execution Date.  Within three (3) days after the Execution Date, Plaintiff agrees to take all steps reasonably necessary to implement the prompt cessation of such litigation activities, including by, for example, jointly requesting a severance of Allergan from any trial in the Florida AG Action and/or a stay of further proceedings against Allergan pending the implementation of this Settlement.

        **G.**     **Entry of Consent Judgment Providing for Dismissal of All Claims Against Allergan in the Florida AG Action with Prejudice.**  As soon as practicable following the Effective Date of the Agreement, Plaintiff shall file in the Court a Consent Judgment substantially in the form of **Exhibit H**, including a dismissal of the Florida AG Action with prejudice.

31

Notwithstanding the foregoing, the Consent Judgment shall provide that the Court shall retain jurisdiction for purposes of enforcing compliance with the injunctive terms set forth in **Exhibit F**. The Parties shall confer and agree as to the final form and time of filing prior to filing of the Consent Judgment.

      **H.**    **No Admission of Liability.**  The Settling Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between Releasees and Plaintiff and between Releasees and all Releasors.  Allergan is entering into this Settlement Agreement solely for the purposes of settlement, to resolve the Florida AG Action and all Actions and Released Claims and thereby avoid significant expense, inconvenience and uncertainty.  Releasees deny the allegations in the Florida AG Action and the other Actions and deny any civil or criminal liability in the Florida AG Action and the other Actions.  Nothing contained herein may be taken as or deemed to be an admission or concession by Releasees of:  (i) any violation of any law, regulation, or ordinance; (ii) any fault, liability, or wrongdoing; (iii) the strength or weakness of any Claim or defense or allegation made in the Florida AG Action, in any other Action, or in any other past, present or future Action relating to any Covered Conduct or any Product; or (iv) any other matter of fact or law.

      1.    The State, the Participating Subdivisions, and/or other Releasors may reach a settlement agreement with Teva, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates that resolves some or all of their respective Claims (including but not limited to the Claims of the State in the Florida AG Action).  Plaintiff and Participating Subdivisions agree that any payment(s) that the State, Participating Subdivisions, or other Releasors receive from Teva (other than Anda), Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates reflects the amount over and above $75,152,000 that each and all of

32

them deem to reflect a fair overall settlement value for liability attributable to the generic opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and/or attributable to the operation of the Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioid Products or Products before August 2, 2016. Plaintiff and Participating Subdivisions also agree that the agreed settlement amount between and among the State, the Participating Subdivisions, Teva (other than Anda), the Divested Actavis Generics Entities, and other Divested Entities reflects the value the parties to the agreement deem a fair settlement value over and above the payments made or due to be paid under this Agreement for generic opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or relate to the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioids or Opioid Products before August 2, 2016. For the avoidance of doubt, nothing in this section will reduce the Total Payment to be paid to the State by Allergan under this Agreement or the settlement amount to be paid by Teva under its separate agreement with the State.

I.      **Most Favored Nation.** If, after execution of this Agreement, there is a collective resolution—through settlement or other mechanism—of substantially all claims against Allergan brought by states, counties, and municipalities nationwide (a "Global Resolution") under which, but for this Agreement, the Florida allocation of the Remediation Payment, the Litigation Costs Payments, the payment period or the terms of Injunctive Relief would be more favorable to the State, Allergan shall pay the excess amounts, adjust the payment period and/or agree to modify the terms of the Consent Judgment to reflect changes to the Injunctive Relief that would apply to Florida, if requested to do so by the Florida Attorney General's Office. Any reduction in the

payment period under this section shall be subject to an appropriate reduction in net present value calculated at seven percent (7%) per annum.

**J.    Miscellaneous Provisions.**

1.    **Use of Agreement as Evidence.**  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement:  (i) is or may be deemed to be or may be used as an admission or evidence relating to any matter of fact or law alleged in the Florida AG Action or the other Actions, the strength or weakness of any claim or defense or allegation made in those cases, or any wrongdoing, fault, or liability of any Releasees; or (ii) is or may be deemed to be or may be used as an admission or evidence relating to any liability, fault or omission of Releasees in any civil, criminal or administrative proceeding in any court, administrative agency, or other tribunal.  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Settlement, and except that Releasees may file this Agreement in any action in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim or to support a claim for contribution and/or indemnification.

2.    **Voluntary Settlement.**  This Settlement Agreement was negotiated in good faith and at arm's-length over several weeks, and the exchange of the Remediation Payment and Litigation Costs Payments for the releases set forth herein is agreed to represent appropriate and fair consideration.

3.    **Authorization to Enter Settlement Agreement.**  Each Party specifically represents and warrants that this Settlement Agreement constitutes a legal, valid, and binding obligation of such Party.  Each signatory to this Settlement Agreement on behalf of a Party

34

specifically represents and warrants that s/he has full authority to enter into this Settlement Agreement on behalf of such Party. Plaintiff specifically represents and warrants that it has concluded that the terms of this Settlement Agreement are fair, reasonable, adequate and in the public interest, and that it has satisfied all conditions and taken all actions required by law in order to validly enter into this Settlement Agreement. Plaintiff specifically represents and warrants that, other than the Claims asserted in the Florida AG Action and the other Actions (whether filed previously or in the future), it has no interest (financial or otherwise) in any other Claim against any Releasee related to the Covered Conduct. In addition, Plaintiff specifically represents and warrants that (i) it is the owner and holder of the Claims asserted in the Florida AG Action; (ii) it has not sold, assigned or otherwise transferred the Claims asserted in the Florida AG Action, or any portion thereof or rights related thereto, to any Third Party; and (iii) it believes in good faith that it has the power and authority to bind all persons and entities with an interest in the Florida AG Action and all other Actions.

4.     **Representation With Respect to Participation Rate.**  The State of Florida represents and warrants for itself that it has a good-faith belief that all Litigating Subdivisions and all Principal Subdivisions will become Participating Subdivisions. State Outside Litigation Counsel, in good faith, believe this is a fair Settlement. Therefore, State Outside Litigation Counsel will use their best efforts to recommend this Settlement to all Subdivisions within Florida.

5.     **Dispute Resolution.**  If Plaintiff believes Allergan is not in compliance with any terms of this Settlement Agreement, then Plaintiff shall (i) provide written notice to Allergan specifying the reason(s) why Plaintiff believes Allergan is not in compliance with the Settlement Agreement; and (ii) allow Allergan at least thirty (30) days to attempt to cure such alleged non-compliance (the "Cure Period"). In the event the alleged non-compliance is cured within the Cure Period, Allergan shall not have any liability for such alleged non-compliance. The State may not

35

commence a proceeding to enforce compliance with this Agreement before the expiration of the Cure Period.

6.  **No Third-Party Beneficiaries.** Except as to Releasees, nothing in this Settlement Agreement is intended to or shall confer upon any Third Party any legal or equitable right, benefit, or remedy of any nature whatsoever.

7.  **Effectiveness.** The releases provided for in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

8.  **Compliance with Laws.** Nothing in this Agreement shall be construed to authorize or require any action by Allergan or other Releasees in violation of applicable federal, state, or other laws, rules, regulations, or guidance.

9.  **Notices.** All notices under this Agreement shall be in writing and delivered to the persons specified in this paragraph via: (i) e-mail; and (ii) either hand delivery or registered or certified mail, return receipt requested, postage pre-paid.

Notices to Plaintiff shall be delivered to:

*For the State of Florida:*

Attorney General
Florida State Capitol, PL-01
Tallahassee FL 32399-1050


*Copy to Florida's Counsel:*

David C. Frederick
Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C.

36

1615 M Street, NW
Washington D.C. 20036
dfrederick@kellogghansen.com

Notices to Allergan shall be delivered to:

*For Allergan:*

Office of General Counsel
One North Waukegan Road
North Chicago, IL 60064

*Copy to Allergan Counsel:*

James F. Hurst
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
james.hurst@kirkland.com

10.     **Binding Agreement.**  This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto.

11.     **Choice of Law.**  Any dispute arising from or in connection with this Settlement Agreement shall be governed by Florida law without regard to its choice-of-law provisions.

12.     **Jurisdiction.**  The Parties agree to submit and consent to the jurisdiction of the Court for the resolution of any disputes arising under the Settlement Agreement.

13.     **No Conflict Intended.**  The headings and sub-headings used in this Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Agreement.   The definitions contained in this Agreement or any Exhibit hereto are applicable to the singular as well as the plural forms of such terms.

14.     **No Party Deemed to be the Drafter.**  None of the Parties hereto shall be deemed to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law

or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

15. **Amendment; Waiver.** This Agreement shall not be modified in any respect except by a writing executed by all the Parties hereto, and the waiver of any rights conferred hereunder shall be effective only if made by written instrument of the waiving Party. The waiver by any Party of any breach of this Agreement shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous.

16. **No Waiver.** This Agreement is agreed upon without trial or adjudication of any issue of fact or law or finding of liability of any kind and shall not be construed or used as a waiver or limitation of any defense otherwise available (including, but not limited to, jurisdictional defenses) to Allergan or any other Releasee in the Florida AG Action, Litigating Subdivisions' Actions, or other Actions that could be brought by such plaintiffs, Non-Litigating Subdivisions, or other Releasors. This Agreement shall not be construed or used as a waiver of any Releasee's right to defend itself from, or make any legal or factual arguments in, any other regulatory, governmental, private party, or class claims or suits relating to the subject matter or terms of this Agreement. For the avoidance of doubt, nothing in this Agreement is intended to or shall be construed to prohibit Allergan or any other Releasee in any way whatsoever from taking legal or factual positions with regard to any Opioids, Opioid Products, or Products in defense of litigation or other legal proceedings.

17. **No Private Right of Action**. No part of this Agreement shall create a private right of action for any Third Party or confer any right to any Third Party for violation of any federal or state statute, common law, rule, regulation, or ordinance, nor shall it be used as an admission of fault, liability, or wrongdoing in any subsequent proceeding.

18.     **Execution in Counterparts.**  This Agreement may be executed in one or more counterparts and an email, facsimile, or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.  All executed counterparts and each of them shall be deemed to be one and the same instrument.

19.     **Severability.**  In the event any one or more non-material provisions of this Settlement Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

20.     **Statements to the Press and Others.**  Any press release or other public statement concerning this Settlement Agreement will describe it positively and will not disparage any other Party.

21.     **Integrated Agreement.**  This Agreement constitutes the entire agreement between the Settling Parties and no representations, warranties, or inducements have been made to any Party concerning this Agreement other than the representations, warranties, and covenants contained and memorialized herein.

IN WITNESS WHEREOF, the Parties hereto, through their fully authorized representatives, have executed this Agreement as of the dates set forth below.

**ALLERGAN FINANCE, LLC**

By: _____

Name: Robert A. Michael
        Vice Chairman, Finance and Commercial
        Operations and Chief Financial Officer of
        AbbVie Inc.
        President and Chief Executive Officer of
        Allergan Limited
        President of Allergan Finance, LLC
        1 North Waukegan Road
        North Chicago, IL 60064
        *On Behalf of Allergan and AbbVie*

**PLAINTIFF**

**STATE OF FLORIDA,
including the OFFICE
OF THE ATTORNEY
GENERAL**

By: _____

Name: John Guard
        Chief Deputy Attorney General of Florida
        Pursuant to the authority delegated to him by
        Ashley Moody, Attorney General of Florida

Date: _____

**STATE OUTSIDE LITIGATION COUNSEL**

**Kellogg, Hansen, Todd, Figel & Frederick,
 P.L.L.C.**

By: _____

Name:  David C. Frederick

Date: _____

40

**Drake Martin Law Firm, LLC**

By: _____

Name:  Drake Martin

Date:  ___3/29/2022_____

**ALLERGAN FINANCE, LLC**

By: _____

Name: Robert A. Michael
       Vice Chairman, Finance and Commercial
       Operations and Chief Financial Officer of
       AbbVie Inc.
       President and Chief Executive Officer of
       Allergan Limited
       President of Allergan Finance, LLC
       1 North Waukegan Road
       North Chicago, IL 60064
       *On Behalf of Allergan and AbbVie*

**PLAINTIFF**

**STATE OF FLORIDA,
including the OFFICE
OF THE ATTORNEY
GENERAL**

By: _____

Name: John Guard
       Chief Deputy Attorney General of Florida
       Pursuant to the authority delegated to him by
       Ashley Moody, Attorney General of Florida

Date: _____3-29-2022_____

**STATE OUTSIDE LITIGATION COUNSEL**

Kellogg, Hansen, Todd, Figel & Frederick,
P.L.L.C.

By: _____

Name:  David C. Frederick

Date: _____3.29.2022_____

40

## **EXHIBIT A**

## **LITIGATING SUBDIVISIONS**

### **Counties**

Alachua County
Bay County
Bradford County
Brevard County
Broward County
Calhoun County
Clay County
Dixie County
Escambia County
Gilchrist County
Gulf County
Hamilton County
Hernando County
Hillsborough County
Holmes County
Jackson County
Lake County
Lee County
Leon County
Levy County
Manatee County
Marion County
Miami-Dade County
Monroe County
Okaloosa County
Orange County
Osceola County
Palm Beach County
Pasco County
Pinellas County
Polk County
Putnam County
Santa Rosa County
Sarasota County
Seminole  County
St. Johns County
St. Lucie County
Suwannee County

Union County
Volusia County
Walton County
Washington County

**<u>Cities</u>**

City of Apopka
City of Bradenton
City of Clearwater
City of Coconut Creek
City of Coral Springs
City of Daytona Beach
City of Daytona Beach
Shores
City of Deerfield Beach
City of Delray Beach
City of Deltona
City of Florida City
City of Fort Lauderdale
City of Fort Pierce
City of Hallandale Beach
City of Homestead
City of Jacksonville
City of Lauderhill
City of Lynn Haven
City of Miami
City of Miami Gardens
City of Miramar
City of New Port Richey
City of Niceville
City of North Miami
City of Ocala
City of Ocoee
City of Orlando
City of Ormond Beach
City of Oviedo
City of Palatka
City of Panama City
City of Pembroke Pines
City of Pensacola
City of Pinellas Park

City of Pompano Beach
City of Port St. Lucie
City of Sanford
City of St. Augustine
City of St. Petersburg
City of Stuart
City of Sweetwater
City of Tallahassee
City of Tampa
Town of Eatonville

## **Hospital Districts**

Lee Memorial Health System
Sarasota County Public Hospital District
West Volusia Hospital Authority

## **School Board**

School Board of Miami-Dade County

## PRINCIPAL SUBDIVISIONS

| County | Principal Subdivisions | Regional % by County for Abatement Fund | City/County Fund % (Principal Subdivisions Only) |
|---|---|---|---|
| Alachua | | 1.24106016444867% | |
| | Alachua County | | 0.846347404896564% |
| | Alachua | | 0.013113332456932% |
| | Gainesville | | 0.381597611347118% |
| Baker | | 0.19317380413017% | |
| | Baker County | | 0.193173804130173% |
| Bay | | 0.83965637331199% | |
| | Bay County | | 0.539446037057239% |
| | Callaway | | 0.024953825526948% |
| | Lynn Haven | | 0.039205632014689% |
| | Panama City | | 0.155153855595736% |
| | Panama City Beach | | 0.080897023117378% |
| Bradford | | 0.18948420408137% | |
| | Bradford County | | 0.189484204081366% |
| Brevard | | 3.87879918044396% | |
| | Brevard County | | 2.387076812679440% |
| | Cape Canaveral | | 0.045560750208993% |
| | Cocoa | | 0.149245411423089% |
| | Cocoa Beach | | 0.084363286155357% |
| | Melbourne | | 0.383104682233196% |
| | Palm Bay | | 0.404817397481049% |
| | Rockledge | | 0.096603243797586% |
| | Satellite Beach | | 0.035975416223927% |
| | Titusville | | 0.240056418923581% |
| | West Melbourne | | 0.051997577065795% |
| Broward | | 9.05796267257777% | |
| | Broward County | | 4.062623697836280% |
| | Coconut Creek | | 0.101131719448042% |
| | Cooper City | | 0.073935445072532% |
| | Coral Springs | | 0.323406517663960% |
| | Dania Beach | | 0.017807041180440% |
| | Davie | | 0.266922227152987% |
| | Deerfield Beach | | 0.202423224724969% |
| | Fort Lauderdale | | 0.830581264530524% |
| | Hallandale Beach | | 0.154950491813518% |
| | Hollywood | | 0.520164608455721% |
| | Lauderdale Lakes | | 0.062625150434726% |
| | Lauderhill | | 0.144382838130419% |
| | Lighthouse Point | | 0.029131861802689% |
| | Margate | | 0.143683775129045% |
| | Miramar | | 0.279280208418825% |
| | North Lauderdale | | 0.066069624496039% |

| | | | |
|---|---|---|---|
| | Oakland Park | | 0.100430840698613% |
| | Parkland | | 0.045804060448432% |
| | Pembroke Pines | | 0.462832363602822% |
| | Plantation | | 0.213918725664437% |
| | Pompano Beach | | 0.335472163492860% |
| | Sunrise | | 0.286071106146452% |
| | Tamarac | | 0.134492458472026% |
| | Weston | | 0.138637811282768% |
| | West Park | | 0.029553115351569% |
| | Wilton Manors | | 0.031630331127078% |
| Calhoun | | 0.04712774078090% | |
| | Calhoun County | | 0.047127740780902% |
| Charlotte | | 0.73734623337592% | |
| | Charlotte County | | 0.690225755587238% |
| | Punta Gorda | | 0.047120477788680% |
| Citrus | | 0.96964577660634% | |
| | Citrus County | | 0.969645776606338% |
| Clay | | 1.19342946145639% | |
| | Clay County | | 1.193429461456390% |
| Collier | | 1.55133337642709% | |
| | Collier County | | 1.354822227370880% |
| | Marco Island | | 0.062094952002516% |
| | Naples | | 0.134416197053695% |
| Columbia | | 0.44678115079207% | |
| | Columbia County | | 0.342123248620213% |
| | Lake City | | 0.104659717919908% |
| DeSoto | | 0.11364040780249% | |
| | DeSoto County | | 0.113640407802487% |
| Dixie | | 0.10374458089993% | |
| | Dixie County | | 0.103744580899928% |
| Duval | | 5.43497515693510% | |
| | Jacksonville | | 5.295636466902910% |
| | Atlantic Beach | | 0.038891507601085% |
| | Jacksonville Beach | | 0.100447182431112% |
| Escambia | | 1.34163444924367% | |
| | Escambia County | | 1.010997622822650% |
| | Pensacola | | 0.330636826421023% |
| Flagler | | 0.38986471224388% | |
| | Flagler County | | 0.305009358365478% |
| | Palm Coast | | 0.084857169626457% |
| Franklin | | 0.04991128255001% | |
| | Franklin County | | 0.049911282550008% |
| Gadsden | | 0.12365607407671% | |
| | Gadsden County | | 0.123656074076710% |
| Gilchrist | | 0.06433376935497% | |

| | | | |
|---|---|---|---|
| | **Gilchrist County** | | 0.064333769354966% |
| Glades | | 0.04061283675771% | |
| | **Glades County** | | 0.040612836757713% |
| Gulf | | 0.05991423858784% | |
| | **Gulf County** | | 0.059914238587842% |
| Hamilton | | 0.04794119590977% | |
| | **Hamilton County** | | 0.047941195909773% |
| Hardee | | 0.06711004813185% | |
| | **Hardee County** | | 0.067110048131850% |
| Hendry | | 0.14446091529681% | |
| | **Hendry County** | | 0.144460915296806% |
| Hernando | | 1.51007594910967% | |
| | **Hernando County** | | 1.510075949109670% |
| Highlands | | 0.35718851023682% | |
| | **Highlands County** | | 0.293187022776017% |
| | **Avon Park** | | 0.025829016089707% |
| | **Sebring** | | 0.038172471371100% |
| Hillsborough | | 8.71098411365711% | |
| | **Hillsborough County** | | 6.523111204400210% |
| | **Plant City** | | 0.104218491142418% |
| | **Tampa** | | 1.975671881252980% |
| | **Temple Terrace** | | 0.107980721113446% |
| Holmes | | 0.08161242785125% | |
| | **Holmes County** | | 0.081612427851251% |
| Indian River | | 0.75307605878085% | |
| | **Indian River County** | | 0.654117789755259% |
| | **Sebastian** | | 0.038315915467486% |
| | **Vero Beach** | | 0.060642353558104% |
| Jackson | | 0.15893605879538% | |
| | **Jackson County** | | 0.158936058795375% |
| Jefferson | | 0.04082164778410% | |
| | **Jefferson County** | | 0.040821647784097% |
| Lafayette | | 0.03191177207568% | |
| | **Lafayette County** | | 0.031911772075683% |
| Lake | | 1.13921122451870% | |
| | **Lake County** | | 0.781548804039386% |
| | **Clermont** | | 0.075909163208877% |
| | **Eustis** | | 0.041929254097962% |
| | **Fruitland Park** | | 0.008381493024259% |
| | **Groveland** | | 0.026154034991644% |
| | **Lady Lake** | | 0.025048244425835% |
| | **Leesburg** | | 0.091339390184647% |
| | **Minneola** | | 0.016058475802978% |
| | **Mount Dora** | | 0.041021380070204% |
| | **Tavares** | | 0.031820984672908% |

| | | | |
|---|---|---|---|
| Lee | | 3.32537188335925% | |
| | Lee County | | 2.150386790650790% |
| | Bonita Springs | | 0.017374893143227% |
| | Cape Coral | | 0.714429677167259% |
| | Estero | | 0.012080171813344% |
| | Fort Myers | | 0.431100350584635% |
| Leon | | 0.89719924493933% | |
| | Leon County | | 0.471201146390692% |
| | Tallahassee | | 0.425998098548636% |
| Levy | | 0.25119240174806% | |
| | Levy County | | 0.251192401748057% |
| Liberty | | 0.01939945222513% | |
| | Liberty County | | 0.019399452225127% |
| Madison | | 0.06354028745471% | |
| | Madison County | | 0.063540287454706% |
| Manatee | | 2.72132334623483% | |
| | Manatee County | | 2.288523455470230% |
| | Bradenton | | 0.379930754632155% |
| | Palmetto | | 0.052869136132442% |
| Marion | | 1.70117616896044% | |
| | Marion County | | 1.332181664866660% |
| | Ocala | | 0.368994504093786% |
| Martin | | 0.86948729811605% | |
| | Martin County | | 0.788263440348682% |
| | Stuart | | 0.081223857767371% |
| Miami-Dade | | 5.23211978417292% | |
| | Miami-Dade County | | 4.322006939062770% |
| | Aventura | | 0.024619727884733% |
| | Coral Gables | | 0.071780152130635% |
| | Cutler Bay | | 0.009414653667847% |
| | Doral | | 0.013977628531358% |
| | Florida City | | 0.003929278792135% |
| | Hialeah | | 0.098015895784777% |
| | Hialeah Gardens | | 0.005452691410713% |
| | Homestead | | 0.024935668046393% |
| | Key Biscayne | | 0.013683477346364% |
| | Miami | | 0.292793005447970% |
| | Miami Beach | | 0.181409572478489% |
| | Miami Gardens | | 0.040683650931878% |
| | Miami Lakes | | 0.007836768607605% |
| | Miami Shores | | 0.006287935516250% |
| | Miami Springs | | 0.006169911892641% |
| | North Bay Village | | 0.005160355973775% |
| | North Miami | | 0.030379280716828% |
| | North Miami Beach | | 0.030391990953217% |

| | | | |
|---|---|---|---|
| | Opa-locka | | 0.007847663095938% |
| | Palmetto Bay | | 0.007404620570392% |
| | Pinecrest | | 0.008296152865650% |
| | South Miami | | 0.007833137111493% |
| | Sunny Isles Beach | | 0.007693324511219% |
| | Sweetwater | | 0.004116300841853% |
| Monroe | | 0.47638873858530% | |
| | Monroe County | | 0.388301353168081% |
| | Key West | | 0.088087385417219% |
| Nassau | | 0.47693346300195% | |
| | Nassau County | | 0.393774017807404% |
| | Fernandina Beach | | 0.083159445194550% |
| Okaloosa | | 0.81921286595494% | |
| | Okaloosa County | | 0.634511342251804% |
| | Crestview | | 0.070440130065665% |
| | Destin | | 0.014678507280787% |
| | Fort Walton Beach | | 0.077837487643835% |
| | Niceville | | 0.021745398712853% |
| Okeechobee | | 0.35349527869191% | |
| | Okeechobee County | | 0.353495278691906% |
| Orange | | 4.67102821454589% | |
| | Orange County | | 3.130743665036610% |
| | Apopka | | 0.097215150892295% |
| | Eatonville | | 0.008325204834538% |
| | Maitland | | 0.046728276208689% |
| | Ocoee | | 0.066599822928250% |
| | Orlando | | 1.160248481489900% |
| | Winter Garden | | 0.056264584996256% |
| | Winter Park | | 0.104903028159347% |
| Osceola | | 1.07345209294015% | |
| | Osceola County | | 0.837248691390376% |
| | Kissimmee | | 0.162366006872243% |
| | St. Cloud | | 0.073837394677534% |
| Palm Beach | | 8.60159437205259% | |
| | Palm Beach County | | 5.964262083621730% |
| | Belle Glade | | 0.020828445944817% |
| | Boca Raton | | 0.472069073961229% |
| | Boynton Beach | | 0.306498271771001% |
| | Delray Beach | | 0.351846579457498% |
| | Greenacres | | 0.076424835656644% |
| | Jupiter | | 0.125466374880059% |
| | Lake Worth | | 0.117146617297688% |
| | Lantana | | 0.024507151505292% |
| | North Palm Beach | | 0.044349646255964% |
| | Palm Beach Gardens | | 0.233675880256500% |

| | | | |
|---|---|---|---|
| | Palm Springs | | 0.038021764282493% |
| | Riviera Beach | | 0.163617057282493% |
| | Royal Palm Beach | | 0.049295743959188% |
| | Wellington | | 0.050183644758335% |
| | West Palm Beach | | 0.549265602541466% |
| Pasco | | 4.69208726049375% | |
| | Pasco County | | 4.429535538910390% |
| | New Port Richey | | 0.149879107494464% |
| | Zephyrhills | | 0.112672614088898% |
| Pinellas | | 7.93488981677650% | |
| | Pinellas County | | 4.793536735851510% |
| | Clearwater | | 0.633863120195985% |
| | Dunedin | | 0.102440873796068% |
| | Gulfport | | 0.047893986460330% |
| | Largo | | 0.374192990776726% |
| | Oldsmar | | 0.039421706033295% |
| | Pinellas Park | | 0.251666311990547% |
| | Safety Harbor | | 0.038061710739714% |
| | Seminole | | 0.095248695748172% |
| | St. Petersburg | | 1.456593090134460% |
| | Tarpon Springs | | 0.101970595049690% |
| Polk | | 2.15048302529773% | |
| | Polk County | | 1.601687701502640% |
| | Auburndale | | 0.028636162583534% |
| | Bartow | | 0.043971970660417% |
| | Haines City | | 0.047984773863106% |
| | Lakeland | | 0.294875668467647% |
| | Lake Wales | | 0.036293172133642% |
| | Winter Haven | | 0.097033576086743% |
| Putnam | | 0.38489319406788% | |
| | Putnam County | | 0.337937949352250% |
| | Palatka | | 0.046955244715628% |
| Santa Rosa | | 0.70126731951283% | |
| | Santa Rosa County | | 0.654635277951081% |
| | Milton | | 0.046632041561747% |
| Sarasota | | 2.80504385757853% | |
| | Sarasota County | | 1.968804722107020% |
| | North Port | | 0.209611771276754% |
| | Sarasota | | 0.484279979634570% |
| | Venice | | 0.142347384560186% |
| Seminole | | 2.14114826454432% | |
| | Seminole County | | 1.508694164839420% |
| | Altamonte Springs | | 0.081305566429869% |
| | Casselberry | | 0.080034542791008% |
| | Lake Mary | | 0.079767627826847% |

| | | | |
|---|---|---|---|
| | Longwood | | 0.061710013414747% |
| | Oviedo | | 0.103130858057164% |
| | Sanford | | 0.164243490361646% |
| | Winter Springs | | 0.062262000823623% |
| St. Johns | | 0.71033334955402% | |
| | St. Johns County | | 0.663822963111989% |
| | St. Augustine | | 0.046510386442027% |
| St. Lucie | | 1.50662784355224% | |
| | St. Lucie County | | 0.956289133909966% |
| | Fort Pierce | | 0.159535255653695% |
| | Port St. Lucie | | 0.390803453988581% |
| Sumter | | 0.32639887045945% | |
| | Sumter County | | 0.312364953738371% |
| | Wildwood | | 0.014033916721079% |
| Suwannee | | 0.19101487969217% | |
| | Suwannee County | | 0.191014879692165% |
| Taylor | | 0.09218189728241% | |
| | Taylor County | | 0.092181897282406% |
| Union | | 0.06515630322411% | |
| | Union County | | 0.065156303224115% |
| Volusia | | 3.13032967447995% | |
| | Volusia County | | 1.784428217305820% |
| | Daytona Beach | | 0.447556475211771% |
| | DeBary | | 0.035283616214775% |
| | DeLand | | 0.098983689498367% |
| | Deltona | | 0.199329190038370% |
| | Edgewater | | 0.058042202342606% |
| | Holly Hill | | 0.031615805142634% |
| | New Smyrna Beach | | 0.104065968305755% |
| | Orange City | | 0.033562287058147% |
| | Ormond Beach | | 0.114644516477187% |
| | Port Orange | | 0.177596501561906% |
| | South Daytona | | 0.045221205322611% |
| Wakulla | | 0.11512932120801% | |
| | Wakulla County | | 0.115129321208010% |
| Walton | | 0.26855821615101% | |
| | Walton County | | 0.268558216151006% |
| Washington | | 0.12012444410873% | |
| | Washington County | | 0.120124444108733% |

<u>**EXHIBIT C**</u>

<u>**OPIOID REMEDIATION**</u>

**Schedule A**
**Core Strategies**

Subdivisions shall choose from among the abatement strategies listed in Schedule B.  However, priority shall be given to the following core abatement strategies ("*Core Strategies*").[1]

A. <u>**NALOXONE OR OTHER FDA-APPROVED MEDICATION TO REVERSE OPIOID OVERDOSES**</u>

1. Expand training for first responders, schools, community support groups and families; and

2. Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B. <u>**MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**</u>

1. Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2. Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3. Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4. Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

C.  **PREGNANT & POSTPARTUM WOMEN**

1.  Expand Screening, Brief Intervention, and Referral to Treatment ("*SBIRT*") services to non-Medicaid eligible or uninsured pregnant women;

2.  Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3.  Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

D.  **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

1.  Expand comprehensive evidence-based and recovery support for NAS babies;

2.  Expand services for better continuum of care with infant-need dyad; and

3.  Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E.  **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2.  Expand warm hand-off services to transition to recovery services;

3.  Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.  Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

5.  Hire additional social workers or other behavioral health workers to facilitate expansions above.

F.  **TREATMENT FOR INCARCERATED POPULATION**

    1.    Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

    2.    Increase funding for jails to provide treatment to inmates with OUD.

G.  **PREVENTION PROGRAMS**

    1.    Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

    2.    Funding for evidence-based prevention programs in schools;

    3.    Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

    4.    Funding for community drug disposal programs; and

    5.    Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H.  **EXPANDING SYRINGE SERVICE PROGRAMS**

    1.    Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

I.  **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE:  TREATMENT |
| --- |

**A.      TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:[2]

1.      Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2.      Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions.

3.      Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.      Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.      Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.      Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

8.    Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.    Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.    Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.    Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including, but not limited to, training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.    Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.    Disseminate of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14.    Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

**B.**    **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1.    Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.    Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.    Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.      Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.      Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.      Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.      Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.      Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.     Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.     Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.     Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.     Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.     Create and/or support recovery high schools.

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.  CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.  Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.  Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.  Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.  Expand warm hand-off services to transition to recovery services.

12.  Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.  Develop and support best practices on addressing OUD in the workplace.

14.     Support assistance programs for health care providers with OUD.

15.     Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.**     **ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

    2.     Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

    3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

    5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E.      ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.     Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

6.     Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.     Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.     Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.     Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including, but not limited to, parent skills training.

10.    Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

| PART TWO:  PREVENTION |
|---|

**F.     PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.     Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.     Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.     Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.     Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including, but not limited to, improvements that:

1.     Increase the number of prescribers using PDMPs;

2.     Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

3.     Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.     Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.     Increasing electronic prescribing to prevent diversion or forgery.

8.     Educating dispensers on appropriate opioid dispensing.

## G.     PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Funding media campaigns to prevent opioid misuse.

2.     Corrective advertising or affirmative public education campaigns based on evidence.

3.     Public education relating to drug disposal.

4.     Drug take-back disposal or destruction programs.

5.     Funding community anti-drug coalitions that engage in drug prevention efforts.

6.     Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7.     Engaging non-profits and faith-based communities as systems to support prevention.

8.     Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.     School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.    Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.    Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.    Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.      **PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.     Public health entities providing free naloxone to anyone in the community.

3.     Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.     Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.     Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6.     Public education relating to emergency responses to overdoses.

7.   Public education relating to immunity and Good Samaritan laws.

8.   Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.   Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.  Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.  Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.  Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.  Supporting screening for fentanyl in routine clinical toxicology testing.

---

PART THREE:  OTHER STRATEGIES

---

**I.   FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.   Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.   Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.   LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment

intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.      A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.      Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.      Provide resources to staff government oversight and management of opioid abatement programs.

## K.      TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1.      Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.      Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

## L.      RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.      Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.      Research non-opioid treatment of chronic pain.

3.      Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.    Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.    Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.    Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

7.    Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("*ADAM*") system.

8.    Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.    Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## EXHIBIT D

## SUBDIVISION SETTLEMENT PARTICIPATION FORM

| Governmental Entity: | State: |
|---|---|
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

The governmental entity identified above ("*Governmental Entity*"), in order to obtain and in consideration for the benefits provided to the Governmental Entity pursuant to the Settlement Agreement dated _____ ("*Allergan Settlement*"), and acting through the undersigned authorized official, hereby elects to participate in the Allergan Settlement, release all Released Claims against all Releasees, and agrees as follows.

1. The Governmental Entity is aware of and has reviewed the Allergan Settlement, understands that all terms in this Subdivision Settlement Participation Form have the meanings defined therein, and agrees that by signing this Subdivision Settlement Participation Form, the Governmental Entity elects to participate in the Allergan Settlement and become a Participating Subdivision as provided therein.

2. The Governmental Entity shall immediately cease any and all litigation activities as to the Releasees and Released Claims and, within the later of 7 days following the entry of the Consent Judgment or 7 days of the Execution Date of this Subdivision Settlement Participation Form voluntarily dismiss with prejudice any Released Claims that it has filed.

3. The Governmental Entity agrees to the terms of the Allergan Settlement pertaining to Subdivisions as defined therein.

4. By agreeing to the terms of the Allergan Settlement and expressly agreeing to the releases provided for therein, the Governmental Entity is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date of the Agreement.

5. The Governmental Entity agrees to use any monies it receives through the Allergan Settlement solely for the purposes provided therein.

6. The Governmental Entity submits to the jurisdiction of the Court for purposes limited to the Court's role as provided in, and for resolving disputes to the extent provided in, the Allergan Settlement.

7. The Governmental Entity has the right to enforce those rights given to them in the Allergan Settlement.

8. The Governmental Entity, as a Participating Subdivision, hereby becomes a Releasor for all purposes in the Allergan Settlement, including, but not limited to, all provisions of Section D and E, and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority.  As a Releasor, the Governmental Entity hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Releasee in any forum whatsoever.  The releases provided for in the Allergan Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Governmental Entity to release Claims.  The Allergan Settlement shall be a complete bar to any Released Claim.

9. The Governmental Entity hereby takes on all rights and obligations of a Participating Subdivision as set forth in the Allergan Settlement.

10. In connection with the releases provided for in the Allergan Settlement, each Governmental Entity expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Governmental Entity hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date of the Release, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Governmental Entities' decision to participate in the Allergan Settlement.

11. Nothing herein is intended to modify in any way the terms of the Allergan Settlement, to which the Governmental Entity hereby agrees.  To the extent this Subdivision Settlement

Participation Form is interpreted differently from the Allergan Settlement in any respect, the Allergan Settlement controls.

I have all necessary power and authorization to execute this Subdivision Settlement Participation Form on behalf of the Governmental Entity.

Signature:    _____

Name:    _____

Title:    _____

Date:    _____
(the "<u>Execution Date of this Subdivision Settlement Participation Form</u>")

<u>**EXHIBIT E**</u>

*draft*

<u>**Qualified Settlement Fund Administrator Terms**</u>

## I.  Definitions

A.  This Qualified Settlement Fund Administrator Terms document incorporates all defined terms in the Settlement Agreement and the Escrow Agreement, unless otherwise defined herein, and shall be interpreted in a manner consistent with the Settlement Agreement and Escrow Agreement to the greatest extent feasible.

B.  *Settlement Fund Administrator*.  Wilmington Trust, National Association ("Wilmington Trust" or "Settlement Fund Administrator") shall serve as the Settlement Fund Administrator and is intended to serve as an "administrator" as defined in *Treas. Reg*. § 1.468B-2(k)(3).  In the event that Wilmington Trust becomes unable to continue to serve as the Settlement Fund Administrator, the Parties shall meet and confer and agree upon a replacement.

## II.  Establishment of the Settlement Fund Administrator

A.  *Selection of the Settlement Fund Administrator.*

i.  Wilmington Trust is selected as the Settlement Fund Administrator.

ii.  The Qualified Settlement Fund ("QSF") is being established pursuant to order of the Court to resolve or satisfy one or more contested claims that have resulted or may result from an event (or a related series of events) that has occurred and that is alleged to have given rise to at least one claim asserting liability arising out of a tort, breach of contract or violation of law.  The QSF is subject to the continuing jurisdiction of the Court and is intended to qualify as a "qualified settlement fund" as defined in *Treas. Reg*. § 1.468B-1(a).  The purpose of the QSF includes, but is not necessarily limited to, (i) receiving, holding, and investing the payment to be made by Allergan under the Settlement Agreement, and (ii) distributing amounts in accordance with the Settlement Agreement and the Escrow Agreement.  The duties of the Settlement Fund Administrator shall be to serve these purposes and are subject to the terms of the Escrow Agreement.  The Settlement Fund Administrator shall manage the QSF in a manner designed to preserve principal and accrue income by investing in instruments/securities comprised of (a) United States Agency, Government Sponsored Enterprises or Treasury securities or obligations (or a mutual fund invested solely in such instruments); (b) cash equivalent securities including SEC registered money market funds and collateralized money market accounts; and/or (c) deposit and similar interest-bearing, or non-interest bearing accounts, and certificates of deposit subject to Federal Depository Insurance Corporation protections as available.  The

        Settlement Fund Administrator shall hold and distribute the funds deposited in the QSF as provided in the Settlement Agreement and subject to the procedural and security requirements set forth in sections 1.3 to 1.5 of the Escrow Agreement.

    iii. The term of the Settlement Fund Administrator shall continue until all funds are distributed pursuant to the terms of the Settlement Agreement unless the Settlement Fund Administrator is removed pursuant to the Escrow Agreement.

B. *Governance of the Settlement Fund Administrator.*

    i. The Settlement Fund Administrator will administer and disburse funds from the Abatement Accounts Sub-Fund, State Sub-Fund, Subdivision Sub-Fund and State and Subdivision Litigation Costs Sub-Funds as provided in the Settlement Agreement and subject to the procedural and security requirements set forth in sections 1.3 to 1.5 of the Escrow Agreement. The Settlement Fund Administrator will also perform other duties as described in these terms and in the Settlement Agreement.

    ii. All parties to the Settlement Agreement are entitled to rely upon information received from the Settlement Fund Administrator, whether in oral, written, or other form. On Allergan's request, the State will instruct the Settlement Fund Administrator to promptly provide statements setting forth the activity in the QSF to Allergan. The State shall also notify Allergan regarding any payments or expenses paid from the QSF upon receipt of a request for such information from Allergan. No Party to the Settlement Agreement shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any other party for or in connection with any action taken or not taken by the Settlement Fund Administrator, except as between the State and the Settlement Fund Administrator to the extent provided for in the Escrow Agreement.

C. *Removal of the Settlement Fund Administrator.*

    i. The Settlement Fund Administrator may be removed pursuant to the Escrow Agreement or for failure to perform its duties.

    ii. The terms of this Exhibit E shall apply to any replacement Settlement Fund Administrator.

D. *Funding of the Settlement Fund Administrator.*

    i. The costs and fees associated with or arising out of the duties of the Settlement Fund Administrator shall be paid out of the State Sub-Fund.

    ii. The costs and fees associated with the Settlement Fund Administrator shall be established in the Escrow Agreement.

## III. Calculation and Allocation of Annual Payments

A. *General Principles.*

i.   This Section is intended to implement the relevant provisions of the Settlement Agreement and the exhibits therein, including the Florida Opioid Allocation and Statewide Response Agreement.  To the extent this Section III conflicts with the Settlement Agreement and the exhibits therein, the Settlement Agreement shall control.

ii.  With respect to the payment instructions to be provided by the State as described in the following subsection III.B, the Settlement Fund Administrator is entitled to rely upon the State's instructions, provided in written form and copied to Allergan, for the purpose for which it was submitted, provided that neither Allergan nor any Participation Subdivision has objected to those instructions pursuant to the procedures described in the following subsection III.B.

B.  *Payments*

i.   The State shall calculate the distributions due to Participating Subdivisions and shall provide those calculations to the Participating Subdivisions and Allergan in advance of the payment date.  Notice as to Allergan shall be made in accordance with subsection H.7 of the Agreement and notice as to Participating Subdivisions shall be made as instructed by each Participating Subdivision.

ii.  Objections to distributions proposed to be made by the State may be made within seven (7) calendar days of receipt of notice by sending a written objection by email to the following addresses: john.guard@myfloridalegal.com; greg.slemp@myfloridalegal.com; sabrina.donovan@myfloridalegal.com. In the event the email address to which objections are to be sent changes, the State shall notify Allergan and the Participating Subdivision of such change, and any deadline to provide an objection shall be suspended until the State has confirmed Allergan and the Participating Subdivisions' receipt of such notice.

iii. In connection with the notice, the State shall request from each Participating Subdivision: (i) a completed W-9, and (ii) instructions concerning how the subdivision wishes to be paid (check or wire), and, if applicable, wiring instructions or the address where the payment should be mailed. Any costs for the form of payment to the Participating Subdivision shall be deducted from the calculated settlement payment.

iv.  In the absence of any timely objection, the State's proposed calculations shall be final, and the State shall provide the final calculations to the Settlement Fund Administrator along with the W-9s, payment instructions, and other required information under the Escrow Agreement and direct the Settlement Fund Administrator to pay those amounts in accordance with the Escrow Agreement.

v.   In all events, the State shall provide notice to Allergan in the event of any objection regarding the distribution of any payment and, at its option, Allergan may elect to join any objection that is made by a Participating Subdivision.  In the case of any objection, whether by Allergan or a

3

Participating Subdivision, the State and the entity or entities (including Allergan, if applicable) objecting to the payment shall resolve that objection. If that resolution made by one entity affects other entities (including Allergan, if applicable), the State shall provide notice to those affected and resolve the objection in accordance with the Settlement Agreement or the Florida Opioid Allocation and Statewide Response Agreement.

vi.  Pending the resolution of any objections as provided above, the State may provide instructions to the Settlement Fund Administrator to pay any undisputed portion. Before doing so, it shall provide notice to Allergan and the Participating Subdivisions of the dispute and a breakdown of the proposed partial payments. Upon such notice, Allergan and the Participating Subdivisions shall have an opportunity to object to the proposed partial payments in accordance with the procedures outlined in the foregoing subsections.

vii.  In consultation with the State, and subject to the terms of the Settlement Agreement, the Settlement Fund Administrator may set reasonable limits on the frequency with which it makes payments and may set other reasonable restrictions on complying with requests made by the State or the Participating Subdivisions, to limit the burdens and costs imposed on the Settlement Fund Administrator.

C.  *Extensions.*

i.  The schedule provided for in this Section III shall be adjusted based on what is practicable. The Settlement Fund Administrator shall provide notice to the State and Allergan regarding whether the deadlines provided for in Section III or in the Escrow Agreement need to be adjusted. The State shall communicate that notice to the Participating Subdivisions.

ii.  The deadlines in this Section III may be extended by the written agreement of the State and Allergan.

## IV.  Reporting Obligations

The Settlement Fund is intended to be classified as a "qualified settlement fund" within the meaning of Treasury regulations Section 1.468B-1, et seq. (and corresponding or similar provisions of state, local, or foreign law, as applicable). The Settlement Fund Administrator shall not take any action or tax position inconsistent with such treatment. The State shall obtain any necessary orders from the Court to qualify the Settlement Fund as a "qualified settlement fund." The Settlement Fund Administrator shall promptly take all other steps necessary for qualifying and operating the QSF as a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1. These obligations include, without limitation, the following:

i.  Regulation § 1.468B-3 Statement. The Settlement Fund Administrator will prepare a "Regulation § 1.468B-3 Statement" pursuant to Treas. Reg. § 1.468B-3(e) on behalf of Allergan and provide copies to Allergan's counsel for review and approval by January 15 of each year pertaining to

transfers to or from the Settlement Fund involving Allergan that were made in the preceding calendar year.  The "Regulation § 1.468B-3 Statement" may be a joint statement as permitted under Treas. Reg. § 1.468B-3(e)(2)(ii).

ii.   <u>Regulation § 1.468B-1 Relation Back Election.</u>  If required, the Settlement Fund Administrator will prepare and attach to the income tax return of the QSF a "Regulation § 1.468B-1 Relation Back Election" pursuant to Treas. Reg. § 1.468B-1(j) for approval and execution by Allergan and the Settlement Fund Administrator.  The Settlement Fund Administrator will forward a copy of the "Regulation § 1.468B-1 Relation Back Election" to Allergan promptly after filing the same.

iii.   <u>Income Tax Returns.</u>  The Settlement Fund Administrator shall obtain federal (and, if applicable, state) taxpayer identification number(s) for the Settlement Fund and provide the same to Allergan.  The Settlement Fund Administrator shall also timely and properly prepare and file on behalf of the QSF:  (i) federal tax, information and withholding returns in accordance with Treas. Reg. § 1.468B-2 and the other provisions of the Internal Revenue Code of 1986, as amended; and (ii) all necessary state and local tax returns.

iv.   <u>Tax Detriment.</u>  Notwithstanding any effort or failure of the Settlement Fund Administrator and/or the parties hereto to treat the QSF as a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1 effective as of the date hereof, if Allergan incurs any taxes or additional tax liability, interest, penalties or other tax-related losses of any kind (such tax liability, interest, penalties and/or losses hereinafter collectively referred to as "Tax Detriments") resulting from income earned by the QSF, such Tax Detriment shall be paid out of the State Sub-Fund or the Abatement Accounts Sub-Fund of the QSF, as the State may direct, or in the absence of sufficient funds in these Sub-Funds or at the State's option, by the State.

v.   Notwithstanding any other provision of this Exhibit E or the Settlement Agreement, the parties hereto acknowledge and agree that Allergan has made no representations or warranties regarding the tax consequences and shall have no liability to the State, the Settlement Fund Administrator, the Participating Subdivisions or any other party with respect to matters related to such tax consequences.  Further, the Settlement Agreement, including this Exhibit E, shall be binding on the Parties and the Settlement Fund Administrator, and shall continue to apply, notwithstanding the tax consequences of any payments made pursuant to the Settlement Agreement and this Exhibit E.

## EXHIBIT F

## ALLERGAN INJUNCTIVE RELIEF TERMS

**A.    Injunctive Relief Terms**

1.      Allergan does not currently manufacture, sell, or promote any Opioids or Opioid Products.  As provided below, Allergan shall not manufacture, sell, or promote any Opioids or Opioid Products in or for distribution in the State of Florida.  However, the Parties acknowledge that certain Opioids or Opioid Products sold by Allergan prior to 2021 may still be circulating in the marketplace outside the possession and control of Allergan and the same is not a breach of any terms within this Settlement Agreement. For purposes of this **Exhibit F** only, Allergan means Allergan Finance, LLC, Allergan Limited, and AbbVie Inc., and each of their respective parents (as applicable), subsidiaries, successors, affiliates, and officers, directors, employees, representatives, and agents under the control of the foregoing.

2.      **Compliance Duration.**

(a)      **Exhibit F** of this Agreement shall be effective until March 3, 2032 and is limited to conduct in the United States that involves or affects the State of Florida.

(b)      Nothing in this Agreement shall relieve Allergan of its independent obligation to fully comply with the laws of the State of Florida before or after expiration of the injunction period specified in this section.

3.      **Ban on Selling and Manufacturing Opioids.**  Allergan shall not manufacture or sell any Opioids or Opioid Products for distribution in the State.  Allergan represents that Kadian® and Norco® were voluntarily discontinued by the end of 2020 and that the last inventory shipped will expire on or before June 30, 2023.

4.      **Ban on Promotion.**

(a)      Allergan shall not engage in promotion of Opioids or Opioid Products, including but not limited to, by:

**(1)** Employing or contracting with sales representatives, <u>Health Care Providers</u>, any <u>Third Party</u>, or other persons to promote Opioids or Opioid Products to (i) Health Care Providers, (ii) patients, (iii) third-party payors (e.g., any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to manage care organizations and pharmacy benefit managers), or (iv) persons involved in determining formulary access or treatment guidelines to promote Opioids or Opioid Products;

**(2)** Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for promotion of Opioids or Opioid Products; and

**(3)** Creating or distributing promotional materials (such as advertisements) that promote Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, guides, websites or internet advertisements, social media accounts or networks, and providing hyperlinks, engaging in internet search engine optimization, or otherwise directing internet traffic by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet to promote Opioids or Opioid Products.

(b) Notwithstanding **Section A(4)(a)** directly above, Allergan may engage in other conduct, including but not limited to the following:

(1) Maintain a corporate website that includes Opioid Products on company's list of products that contains principally the following content: the FDA-approved package insert, medication guide, and labeling;

(2) Maintain a product website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and

2

labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

(3)     Provide factual information about Opioid Products sold by Allergan prior to 2021 which may still be circulating in the marketplace outside the possession and control of Allergan (including but not limited to an Opioid Product's NDC, SKU, or other relevant information such as formulation, package size, dosage, or pricing);

(4)     Provide or collect information or support the provision or collection of information as expressly required by law or any state or federal government agency with jurisdiction in Florida (including but not limited to collecting and/or reporting adverse events related to Opioid Products);

(5)     Provide the following by mail, electronic mail, on or through Allergan's corporate or product websites, or through other electronic or digital methods: FDA-approved package insert, medication guide, and labeling for Opioid Products, or other prescribing information for Opioid Products that are published or approved by a state or federal government agency with jurisdiction in Florida;

(6)     Provide scientific and/or medical information to a Health Care Provider consistent with FDA standards, rules, regulations, and/or guidance, including, but not limited to, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

(7)    Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved package insert, medication guide, and labeling for Opioid Products, to speak with a licensed Health Care Provider without describing the safety or effectiveness of any Opioid Product or naming any specific Health Care Provider, or to speak with their health insurance carrier regarding coverage of an Opioid Product;

(8)    Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with FDA standards, rules, regulations, and/or guidance, including, but not limited to, FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

(9)    Conduct or provide financial support or <u>In-Kind Support</u> for bona fide scientific research; and

(10)    Draft, publish, or provide financial support or In-Kind Support for bona fide scientific publications.

(c)    Promotion of <u>Treatment of Pain</u> to promote Opioids or Opioid Products.

(1)    Allergan shall not promote the Treatment of Pain with or by referring directly to Opioids or Opioid Products (including with Unbranded Information) or with the intent and purpose of promoting Opioids or Opioid Products.

(2)    Allergan shall not promote the concept that pain is undertreated to promote Opioids or Opioid Products.

4

(3)     For the avoidance of doubt, this **Section A(4)** is not intended and shall not be interpreted to prohibit any and all discussions or references to Opioids or Opioid Products when doing so is not to promote Opioids or Opioid Product, including, for example, if certain patient populations, such as those with a history of abuse of Opioids or Opioid Products, are identified as having a higher prevalence of other conditions, such as Hepatitis C, or being appropriate candidates for treatment of those other conditions.

5.     **No Financial Reward or Discipline Based on Volume of Opioid Product Sales.**

(a)     Allergan shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products; and

(b)     Allergan shall not offer or pay any remuneration (including any compensation or rebate), directly or indirectly, to any person in return for the prescribing, sale, use, or distribution of an Opioid Product (except to the extent a pre-existing contractual or legal requirement exists related to Opioid Products sold by Allergan before 2021).

6.     **Ban on Funding/Grants to Third Parties.**

(a)     Allergan shall not directly or indirectly provide financial support or In-Kind Support to any Third Party regarding conduct that promotes Opioids or Opioid Products, including educational programs, brochures, newsletters, pamphlets, journals, books, guides, websites, or social media accounts or networks that promote Opioids or Opioid Products, but excluding financial support otherwise required by the Agreement, a court order, a federal or state agency (e.g., FDA-approved Risk Evaluation and Mitigation Strategy (REMs)), or a federal or state law or regulation.

5

(b)     Allergan shall not directly or indirectly provide financial support or In-Kind Support to any Third Party for medical education programs with the intent and purpose of promoting Opioids or Opioid Products.

(c)     Allergan shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group related to conduct that promotes Opioids or Opioid Products.

(d)     Allergan shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of promoting Opioids or Opioid Products.

(e)     Allergan shall not use, assist, or employ any Third Party to engage in any activity that Allergan itself would be prohibited from engaging in pursuant to the Agreement.

(f)     Allergan shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids or Opioid Products.

(g)     Allergan shall play no role in appointing persons to the board, or hiring persons to the staff, of any Third Party that primarily engages in conduct that promotes Opioids or Opioid Products. For avoidance of doubt, nothing in this section shall prohibit Allergan from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or board member at any such Third Party.

7.     **Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product.**  Allergan shall comply with all applicable state laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids

6

or Opioid Products, provided that nothing in this **Section A** requires Allergan to violate federal law or regulations, including but not limited to:

       **(a)**     Florida controlled substances statutes, including all guidance issued by the applicable state regulator(s);

       **(b)**     Florida consumer protection laws; and

       **(c)**     Florida laws, regulations, and guidelines related to the prescribing, distribution, and disposal of Opioid Products.

       **B.**    **Clinical Data Transparency.**

    1.    Allergan agrees to make available to an independent Third-Party data center or platform owner (e.g., Vivli) anonymized clinical data generated from Allergan-sponsored Phase II-IV interventional clinical studies—regardless of whether that data was submitted to a regulatory authority (e.g., FDA)—for branded opioid drugs that are Opioids or Opioid Products that have received an initial marketing authorization from a regulatory authority to the extent Allergan conducts a reasonable, good faith investigation to locate any such data and it is in Allergan's possession.  For the avoidance of doubt, anonymized clinical data includes:

       (a)     Full analyzable data set(s) (including individual participant-level data de-identified);

       (b)     The clinical study report(s) redacted for commercial or personal identifying information;

       (c)     The full protocol(s) (including the initial version, final version, and all amendments); and

       (d)     Full statistical analysis plan(s) (including all amendments and documentation for additional work processes); and Dataset Specifications, which describe

7

the available dataset variables (such as age, race, blood pressure, lab values, etc.).

2.      The independent Third Party will facilitate the disclosure of such clinical data to qualified researchers with a bona fide scientific research proposal as reviewed and approved by an independent review panel for scientific merit consistent with the panel's assessment criteria and pursuant to an agreed upon data use agreement.

3.      Allergan shall not interfere with decisions made by the staff or reviewers associated with the independent Third-Party data center or platform owner.

4.      Allergan shall bear all costs for making clinical data available pursuant to **Section B** of this Agreement.

**EXHIBIT G**

*draft*

| Litigating Subdivision | Local Litigation Cost Share |
| --- | --- |
| Alachua County | 1.0580563941118500% |
| Apopka | 0.1215329679172490% |
| Bay County | 0.6743853947971450% |
| Bradenton | 0.4749682718143620% |
| Bradford County | 0.2368825999247740% |
| Brevard County | 2.9841904994087900% |
| Broward County | 5.0788659071877600% |
| Calhoun County | 0.0589164770693348% |
| Clay County | 1.4919590528781900% |
| Clearwater | 0.7924203742280190% |
| Coconut Creek | 0.1264292438193310% |
| Coral Gables | 0.0897355488925041% |
| Coral Springs | 0.4043048184848150% |
| Daytona Beach | 0.5595101817342350% |
| Daytona Beach Shores | 0.0049121655318066% |
| Deerfield Beach | 0.2530582429837640% |
| Delray Beach | 0.4398589999657240% |
| Deltona | 0.2491902531195310% |
| Dixie County | 0.1296956977011560% |
| Escambia County | 1.2638929275031100% |
| Florida City | 0.0049121655318066% |
| Fort Lauderdale | 1.0383464434128300% |
| Fort Pierce | 0.1994420924009210% |
| Gilchrist County | 0.0804264958213678% |
| Gulf County | 0.0749014445716371% |
| Hallandale Beach | 0.1937104759647790% |
| Hamilton County | 0.0599334133716682% |
| Hernando County | 1.8878128582969600% |
| Hillsborough County | 8.1548303679879300% |
| Holmes County | 0.1020273124575380% |
| Homestead | 0.0311731835713032% |
| Jackson County | 0.1986930098567910% |
| Jacksonville | 6.6203098069205700% |
| Lake County | 0.9770487918320040% |
| Lauderhill | 0.1804993838228590% |
| Lee County | 2.6882938146892400% |

| | |
|---|---|
| Leon County | 0.5890694329150050% |
| Levy County | 0.3140267522345930% |
| Lynn Haven | 0.0490126978571018% |
| Manatee County | 2.8609845804763200% |
| Marion County | 1.6654193307333400% |
| Miami | 0.3660335103211090% |
| Miami Gardens | 0.0508604347992879% |
| Miami-Dade County | 5.4031323908059000% |
| Miramar | 0.3491405639774380% |
| Monroe County | 0.4854327279611400% |
| New Port Richey | 0.1873705137049190% |
| Niceville | 0.0271848865105896% |
| North Miami | 0.0379784849873643% |
| Ocala | 0.4612963804104470% |
| Ocoee | 0.0832593898064393% |
| Okaloosa County | 0.7932307453439410% |
| Orange County | 3.9242890922912800% |
| Orlando | 1.4504780395102400% |
| Ormond Beach | 0.1433221901630030% |
| Osceola County | 1.0466816891766000% |
| Oviedo | 0.1289284555802000% |
| Palatka | 0.0587008320945097% |
| Palm Bay | 0.5060801668138730% |
| Palm Beach County | 7.4561883184436100% |
| Palmetto | 0.0660940498103573% |
| Panama City | 0.1939647100403620% |
| Pasco County | 5.5375586582705800% |
| Pembroke Pines | 0.5786072467153300% |
| Pensacola | 0.4133437478506440% |
| Pinellas County | 5.9926126841466200% |
| Pinellas Park | 0.3146192084285860% |
| Polk County | 2.0023407694530500% |
| Pompano Beach | 0.4193886169870580% |
| Port St. Lucie | 0.4885607150696560% |
| Putnam County | 0.4224712051535060% |
| Sanford | 0.2053280652400960% |
| Santa Rosa County | 0.8183885690911740% |
| Sarasota | 0.6054198619009580% |
| Sarasota County | 2.4612900245585600% |
| Seminole County | 1.8860854285512600% |

| | |
|---|---|
| **St. Augustine** | 0.0581446950541711% |
| **St. Johns County** | 0.8298745014344930% |
| **St. Lucie County** | 1.1954994212769900% |
| **St. Petersburg** | 1.8209515663656500% |
| **Stuart** | 0.1015415437774050% |
| **Suwannee County** | 0.2387961653329590% |
| **Sweetwater** | 0.0051459700834591% |
| **Tallahassee** | 0.5325590997752980% |
| **Tampa** | 2.4698749645037000% |
| **Taylor County** | 0.1152406745465610% |
| **Town of Eatonville** | 0.0049121655318066% |
| **Union County** | 0.0814547818592183% |
| **Volusia County** | 2.2307927858357100% |
| **Walton County** | 0.3357365263317270% |
| **Washington County** | 0.1501728905211320% |

**EXHIBIT H**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, STATE OF FLORIDA
WEST PASCO CIVIL DIVISION

STATE OF FLORIDA, OFFICE OF THE
ATTORNEY GENERAL, DEPARTMENT
OF LEGAL AFFAIRS,

       Plaintiff,

v.                                    No. 2018-CA-001438

PURDUE PHARMA L.P., et al.,

       Defendants.

_____

**CONSENT JUDGMENT**

       Plaintiff, the State of Florida, Office of the Attorney General, Department of Legal

Affairs ("Plaintiff" or "Florida AG"), brought the above-captioned action against Defendant

Allergan Finance, LLC ("Allergan"), among others, alleging:  that Allergan violated Florida law

by deceptively marketing opioid pain medications so as to overstate their efficacy and downplay

the associated risk of addiction, which resulted in what Florida has alleged is a public nuisance in

Florida; that Allergan violated the law by failing to monitor, report and not ship allegedly

suspicious orders of opioid pain medications; that Allergan violated Fla. Stat. § 501.204(1); and

that Allergan violated Fla. Stat. § 895.03(3) & (4) (the "Florida AG Action").  Plaintiff brought

the Florida AG Action in its sovereign capacity as the people's attorney in order to protect the

public interest, including the interests of the State of Florida, its governmental subdivisions and

its citizens.

In addition, numerous governmental entities in Florida ("Subdivisions") have brought separate lawsuits ("Actions") in various forums against Allergan, among others. These Actions assert claims that arise out of or relate to alleged conduct that is substantially similar to or overlaps with the conduct alleged in the Florida AG Action (the "Covered Conduct").

Allergan denies the allegations in the Florida AG Action and other Actions and claims to have no liability to Plaintiff or to any Subdivision or other governmental entity (whether such governmental entity has brought or is a party to another Action or not). Plaintiff and Allergan (the "Parties"), by their counsel, have agreed to a resolution of the Florida AG Action ("Agreement," attached to this judgment) and the entry of this Consent Judgment (including the injunctive terms incorporated herein) by the Court without trial or finding of admission or wrongdoing or liability of any kind. Furthermore, under the Agreement, and as effectuated in this Consent Judgment, the Florida AG is exercising its authority to act in the public interest and release its own Claims as well as those of all Subdivisions, whether asserted previously or in the future, that arise out of or relate to the Covered Conduct. Unless otherwise specified, capitalized terms used herein shall have the meanings specified in the Agreement.

NOW THEREFORE, without trial or adjudication of any issue of fact or law presented in the Florida AG Action or the other Actions, without this Consent Judgment constituting evidence against or admission by anyone with respect to any issue of fact or law, and upon the Parties' consent, IT IS HEREBY ORDERED AS FOLLOWS:

## I. PARTIES

1. Defendant Allergan Finance, LLC is a limited liability corporation with its principal places of business in North Chicago, Illinois.

2.      Plaintiff has the authority to act in the public interest and on behalf of the people of Florida as the people's attorney.

## II.      JURISDICTION

3.      This Court has jurisdiction over the Parties and the subject matter of this action and all Litigating Subdivisions and all other Participating Subdivisions, each of which submits to the jurisdiction of the Court for purposes limited to the Court's role as provided in, and for resolving disputes to the extent provided in, the Allergan Settlement.

## III.      AGREEMENT

4.      The Parties have agreed to resolution of the Florida AG Action under the terms of their Agreement, which is attached hereto as Exhibit A.  In the event of a conflict between the terms of the Agreement and this summary document, the terms of the Agreement shall govern.

## IV.      FINANCIAL TERMS

5.      On or before the later of (a) seven (7) days after the entry of this Consent Judgment, or (b) fourteen (14) days after (i) the Qualified Settlement Fund contemplated by the Agreement has been established under the authority and jurisdiction of the Court, and (ii) Allergan has received a W-9 and wire instructions for the Qualified Settlement Fund, Allergan Finance, LLC shall pay the sum of $134,200,000 into the Qualified Settlement Fund according to the terms specified in the Agreement, consisting of $122,000,000 to be allocated for opioid remediation, $6,100,000 to be available to reimburse State Litigation Costs, and $6,100,000 to be available to reimburse Litigating Subdivision Litigation Costs.

6.      As contemplated by the Settlement Agreement, Plaintiff has filed a motion to establish a Qualified Settlement Fund and appoint a settlement fund administrator, which is contained in Exhibit B to this Consent Judgment, and a motion for State Litigation Costs, which

is contained in <u>Exhibit C</u> to this Consent Judgment.  The Court will enter separate orders with respect to these motions.

7.      Subsection C.1(b) of the Parties' Agreement specifies the portion of the payment to be allocated for opioid remediation and that this portion of the payment shall be allocated by the Qualified Settlement Fund Administrator into three sub-funds:  an Abatement Accounts Sub-Fund (also known as a regional fund), a State Sub-Fund, and a Subdivision Sub-Fund.  Subsection C.1(b) of the Parties' Agreement also provides that the amount to be available to reimburse State Litigation Costs shall be allocated by the Qualified Settlement Fund Administrator to a State Litigation Cost Payment Sub-Fund and that the amount to be available to reimburse Litigation Subdivision Litigation Costs shall be allocated by the Qualified Settlement Fund Administrator to a Litigating Subdivision Litigation Cost Sub-Fund.  The Court approves the allocations set forth in the Agreement and the requirements governing distribution from each, the satisfaction of which will be determined at the appropriate time.

8.      The Parties' Agreement provides that Subdivisions that elect to participate in the settlement by the Initial Participation Date and complete other requirements specified in the Agreement may be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Effective Date of the Agreement.  The Parties' Agreement further provides that Subdivisions that elect to participate in the settlement after the Initial Participation Date and complete other requirements specified in the Agreement may be eligible to receive payment of a share of the Remediation Payment within a reasonable period after the Post-Effective Date Sign-on Deadline.

9.    The Parties previously agreed to an Initial Participation Date of April 28, 2022. Pursuant to the Agreement's terms, the Effective Date of the Agreement is May 3, 2022, and the Post-Effective Date Sign-on Deadline is September 30, 2022.

## V.    INJUNCTIVE TERMS

10.    The Parties have agreed that Allergan shall be subject to the injunctive terms set forth in Exhibit D to this Judgment.  In doing so, the Parties agree that the terms and injunctive relief set out in Exhibit D to this Judgment shall supersede and take the place of any injunctive relief previously set out in Exhibit F to the Agreement..  The agreed injunctive terms in Exhibit D to this Judgment are expressly incorporated into and are given full force and effect by this Consent Judgment, and Allergan shall comply with the injunctive terms within 180 days of the entry of this Consent Judgment.

11.    Compliance with injunctive terms may be enforced in this Court consistent with the terms specified in the injunctive provisions set forth in Exhibit D to this Judgment.

## VI.    RELEASES AND DISMISSAL WITH PREJUDICE

12.    Plaintiff and Allergan have agreed to the Release of certain Claims as provided in Sections B and E of the Agreement.  Such Releases are given in good faith within the meaning of Fla. Stat. § 768.31(5) and upon entry of this Consent Judgment shall be effective as to all Releasors.

13.    Plaintiff's Claims against Allergan are hereby DISMISSED WITH PREJUDICE, with each Party to bear its own costs except as specified in the Agreement.

## VII.    MISCELLANEOUS

14.    This Court retains jurisdiction to enforce the terms of this Consent Judgment.  The parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court.  This Consent Judgment may be modified only by order of this Court.

15.     This Consent Judgment shall remain in full force and effect for eight years from the date it is entered, at which time Allergan's obligations under the Consent Judgment shall expire.

16.     Entry of this Consent Judgment is in the public interest.

IT IS SO ORDERED, ADJUDGED AND DECREED in Chambers at New Port Richey, Pasco Cunty, Florida, this __ day of April 2022.


_____
Honorable Kimberly Sharpe Byrd
Circuit Court Judge

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:

**<u>ALLERGAN FINANCE, LLC</u>**

By:_____
Name: James F. Hurst
       Kirkland & Ellis LLP
       300 North LaSalle
       Chicago, IL 60654
       james.hurst@kirkland.com

Date:  _____

**<u>PLAINTIFF</u>**

**STATE OF FLORIDA, including the
OFFICE OF THE ATTORNEY GENERAL**


By: _____
Name: John Guard
       Chief Deputy Attorney General of Florida
       Pursuant to the authority delegated to him by
       Ashley Moody, Attorney General of Florida

Date:  _____

**<u>STATE OUTSIDE LITIGATION COUNSEL</u>**

**Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.**


By: _____
Name:  David C. Frederick

Date:  _____

**Drake Martin Law Firm, LLC**


By: _____
Name:  Drake Martin

Date:  _____

**EXHIBIT I**

**FLORIDA OPIOID ALLOCATION AND
STATEWIDE RESPONSE
AGREEMENT**

BETWEEN

STATE OF FLORIDA DEPARTMENT OF LEGAL AFFAIRS,
OFFICE OF THE ATTORNEY GENERAL

And

CERTAIN LOCAL GOVERNMENTS IN THE STATE OF FLORIDA

This Florida Opioid Allocation and Statewide Response Agreement (the "Agreement") is entered into between the State of Florida ('State") and certain Local Governments ("Local Governments" and the State and Local Governments are jointly referred to as the "Parties" or individually as a "Party").  The Parties agree as follows:

Whereas, the people of the State and its communities have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain; and

Whereas, the State, through its Attorney General, and certain Local Governments, through their elected representatives and counsel, are separately engaged in litigation seeking to hold many of the same Pharmaceutical Supply Chain Participants accountable for the damage caused by their misfeasance, nonfeasance and malfeasance as the State; and

Whereas, certain of the Parties have separately sued Pharmaceutical Supply Chain participants for the harm caused to the citizens of both Parties and have collectively negotiated settlements with several Pharmaceutical Supply Chain Participants; and

Whereas, the Parties share a common desire to abate and alleviate the impacts of that misfeasance, nonfeasance and malfeasance throughout the State; and

Whereas, it is the intent of the State and its Local Governments to use the proceeds from any Settlements with Pharmaceutical Supply Chain Participants to increase the amount of funding presently spent on opioid and substance abuse education, treatment, prevention and other related programs and services, such as those identified in Exhibits "A" and "B," and to ensure that the funds are expended in compliance with evolving evidence-based "best practices;" and

Whereas, the State and its Local Governments enter into this Agreement and agree to the allocation and use of the proceeds of any settlement described herein

Wherefore, the Parties each agree to as follows:

1

A.    **Definitions**

As used in this Agreement:

1.    "Approved Purpose(s)" shall mean forward-looking strategies, programming and services used to expand the availability of treatment for individuals impacted by substance use disorders, to: (a) develop, promote, and provide evidence-based substance use prevention strategies; (b) provide substance use avoidance and awareness education; (c) decrease the oversupply of licit and illicit opioids; and (d) support recovery from addiction. Approved Purposes shall include, but are not limited to, the opioid abatement strategies listed in Exhibits "A" and "B" which are incorporated herein by reference.

2.    "Local Governments" shall mean all counties, cities, towns and villages located within the geographic boundaries of the State.

3.    "Managing Entities" shall mean the corporations selected by and under contract with the Florida Department of Children and Families or its successor ("DCF") to manage the daily operational delivery of behavioral health services through a coordinated system of care. The singular "Managing Entity" shall refer to a singular of the Managing Entities.

4.    "County" shall mean a political subdivision of the state established pursuant to s. 1, Art. VIII of the State Constitution.

5.    "Dependent Special District" shall mean a Special District meeting the requirements of Florida Statutes § 189.012(2).

6.    "Municipalities" shall mean cities, towns, or villages located in a County within the State that either have: (a) a Population greater than 10,000 individuals; or (b) a Population equal to or less than 10,000 individuals and that has either (i) filed a lawsuit against one or more Pharmaceutical Supply Chain Participants; or (ii) executes a release in connection with a settlement with a Pharmaceutical Supply Chain participant.  The singular "Municipality" shall refer to a singular city, town, or village within the definition of Municipalities.

7.    " 'Negotiating Committee" shall mean a three-member group comprised by representatives of the following: (1) the State; and (2) two representatives of Local Governments of which one representative will be from a Municipality and one shall be from a County (collectively, "Members") within the State.  The State shall be represented by the Attorney General or her designee.

8.    "Negotiation Class Metrics" shall mean those county and city settlement allocations which come from the official website of the Negotiation Class of counties and cities certified on September 11, 2019 by the U.S. District for the Northern District of Ohio in *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio).   The website is located at https://allocationmap.iclaimsonline.com.

9.    "Opioid Funds" shall mean monetary amounts obtained through a Settlement.

2

10.     "Opioid Related" shall have the same meaning and breadth as in the agreed Opioid Abatement Strategies attached hereto as Exhibits "A" or "B."

11.     "Parties" shall mean the State and Local Governments that execute this Agreement. The singular word "Party" shall mean either the State or Local Governments that executed this Agreement.

12.     "PEC" shall mean the Plaintiffs' Executive Committee of the National Prescription Opiate Multidistrict Litigation pending in the United States District Court for the Northern District of Ohio.

13.     "Pharmaceutical Supply Chain" shall mean the entities, processes, and channels through which Controlled Substances are manufactured, marketed, promoted, distributed or dispensed.

14.     "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in, or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic.

15.     "Population" shall refer to published U.S. Census Bureau population estimates as of July 1, 2019, released March 2020, and shall remain unchanged during the term of this Agreement. These estimates can currently be found at *https://www.census.gov*. *For purposes of Population under the definition of Qualified County, a County's population shall be the greater of its population as of the July 1, 2019, estimates or its actual population, according to the official U.S. Census Bureau count, which was released by the U.S. Census Bureau in August 2021.*

16.     "Qualified County" shall mean a charter or non-chartered County that has a Population of at least 300,000 individuals and: (a) has an opioid taskforce or other similar board, commission, council, or entity (including some existing sub-unit of a County's government responsible for substance abuse prevention, treatment, and/or recovery) of which it is a member or it operates in connection with its municipalities or others on a local or regional basis; (b) has an abatement plan that has been either adopted or is being utilized to respond to the opioid epidemic; (c) is, as of December 31, 2021, either providing or is contracting with others to provide substance abuse prevention, recovery, and/or treatment services to its citizens; and (d) has or enters into an interlocal agreement with a majority of Municipalities (Majority is more than 50% of the Municipalities' total Population) related to the expenditure of Opioid Funds. The Opioid Funds to be paid to a Qualified County will only include Opioid Funds for Municipalities whose claims are released by the Municipality or Opioid Funds for Municipalities whose claims are otherwise barred. For avoidance of doubt, the word "operate" in connection with opioid task force means to do at least one of the following activities: (1) gathers data about the nature, extent, and problems being faced in communities within that County; (2) receives and reports recommendations from other government and private entities about activities that should be undertaken to abate the opioid epidemic to a County; and/or (3) makes recommendations to a County and other public and private leaders about steps, actions, or plans that should be undertaken to abate the opioid epidemic. For avoidance of doubt, the Population calculation required by subsection (d) does not include Population in unincorporated areas.

17.     "SAMHSA" shall mean the U.S. Department of Health & Human Services, Substance Abuse and Mental Health Services Administration.

18.     "Settlement" shall mean the negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the State and Local Governments or a settlement class as described in (B)(1) below.

19.     "State" shall mean the State of Florida.

**B.     Terms**

1.     **Only Abatement** - Other than funds used for the Administrative Costs and Expense Fund as hereinafter described or to pay obligations to the United States arising out of Medicaid or other federal programs, all Opioid Funds shall be utilized for Approved Purposes. In order to accomplish this purpose, the State will either: (a) file a new action with Local Governments as Parties; or (b) add Local Governments to its existing action, sever any settling defendants. In either type of action, the State will seek entry of a consent judgment, consent order or other order binding judgment binding both the State and Local Governments to utilize Opioid Funds for Approved Purposes ("Order") from the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division New Port Richey, Florida (the "Court"), except as herein provided.  The Order may be part of a class action settlement or similar device.  The Order shall provide for continuing jurisdiction by the Court to address non-performance by any party under the Order.

2.     **Avoid Claw Back and Recoupment** - Both the State and Local Governments wish to maximize any Settlement and Opioid Funds. In addition to committing to only using funds for the Expense Funds, Administrative Costs and Approved Purposes, both Parties will agree to utilize a percentage of funds for the Core Strategies highlighted in Exhibit A. Exhibit A contains the programs and strategies prioritized by the U.S. Department of Justice and/or the U.S. Department of Health & Human Services ("Core Strategies"). The State is trying to obtain the United States' agreement to limit or reduce the United States' ability to recover or recoup monies from the State and Local Government in exchange for prioritization of funds to certain projects. If no agreement is reached with the United States, then there will be no requirement that a percentage be utilized for Core Strategies.

3.     **No Benefit Unless Fully Participating** - Any Local Government that objects to or refuses to be included under the Order or refuses or fails to execute any of documents necessary to effectuate a Settlement shall not receive, directly or indirectly, any Opioid Funds and its portion of Opioid Funds shall be distributed to, and for the benefit of, the Local Governments. Funds that were a for a Municipality that does not join a Settlement will be distributed to the County where that Municipality is located. Funds that were for a County that does not join a Settlement will be distributed pro rata to Counties that join a Settlement. For avoidance of doubt, if a Local Government initially refuses to be included in or execute the documents necessary to effectuate a Settlement and subsequently effectuates such documents necessary to join a Settlement, then that Local Government will only lose those payments made under a Settlement while that Local Government was not a part of the Settlement. If a Local Government participates in a Settlement, that Local Government is  thereby releasing the claims of its Dependent Special District claims, if any.

4

4.      **Distribution Scheme** – If a Settlement has a National Settlement Administrator or similar entity, all Opioids Funds will initially go to the Administrator to be distributed. If a Settlement does not have a National Settlement Administrator or similar entity, all Opioid Funds will initially go to the State, and then be distributed by the State as they are received from the Defendants according to the following distribution scheme. The Opioid Funds will be divided into three funds after deducting any costs of the Expense Fund detailed below.  Funds due the federal government, if any, pursuant to Section B-2, will be subtracted from only the State and Regional Funds below:

(a)      City/County Fund- The city/county fund will receive 15% of all Opioid Funds to directly benefit all Counties and Municipalities.  The amounts to be distributed to each County and Municipality shall be determined by the Negotiation Class Metrics or other metrics agreed upon, in writing, by a County and a Municipality, which are attached to this Agreement as Exhibit "C."  In the event that a Municipality has a Population less than 10,000 people and it does not execute a release or otherwise join a Settlement that Municipalities share under the Negotiation Class Metrics shall be reallocated to the County where that Municipality is located.

(b)      Regional Fund- The regional fund will be subdivided into two parts.

(i)      The State will annually calculate the share of each County within the State of the regional fund utilizing the sliding scale in paragraph 5 of the Agreement, and according to the Negotiation Class Metrics.

(ii)      For Qualified Counties, the Qualified County's share will be paid to the Qualified County and expended on Approved Purposes, including the Core Strategies identified in Exhibit A, if applicable.

(iii)      For all other Counties, the State will appropriate the regional share for each County and pay that share through DCF to the Managing Entities providing service for that County. The Managing Entities will be required to expend the monies on Approved Purposes, including the Core Strategies as directed by the Opioid Abatement Task Force or Council. The Managing Entities shall expend monies from this Regional Fund on services for the Counties within the State that are non-Qualified Counties and to ensure that there are services in every County. To the greatest extent practicable, the Managing Entities shall endeavor to expend monies in each County or for citizens of a County in the amount of the share that a County would have received if it were a Qualified County.

(c)      State Fund - The remainder of Opioid Funds will be expended by the State on Approved Purposes, including the provisions related to Core Strategies, if applicable.

(d)      To the extent that Opioid Funds are not appropriated and expended in a year by the State, the State shall identify the investments where settlement funds will be deposited. Any gains, profits, or interest accrued from the deposit of the Opioid Funds to the extent that any funds are not appropriated and expended within a calendar year, shall be the sole property of the Party that was entitled to the initial amount.

(e)      To the extent a County or Municipality wishes to pool, comingle, or otherwise transfer its share, in whole or part, of Opioid Funds to another County or Municipality, the comingling Municipalities may do so by written agreement. The comingling Municipalities shall provide a copy of that agreement to the State and any settlement administrator to ensure that monies are directed consistent with such agreement. The County or Municipality receiving any such Opioid Funds shall assume the responsibility for reporting how such Opioid Funds were utilized under this Agreement.

5.      Regional Fund Sliding Scale- The Regional Fund shall be calculated by utilizing the following sliding scale of the Opioid Funds available in any year after deduction of Expenses and any funds due the federal government:

> A. Years 1-6:          40%
>
> B. Years 7-9:          35%
>
> C. Years 10-12:  34%
>
> D. Years 13-15:  33%
>
> E. Years 16-18:  30%

6.      Opioid Abatement Taskforce or Council - The State will create an Opioid Abatement Taskforce or Council (sometimes hereinafter "Taskforce" or "Council") to advise the Governor, the Legislature, DCF, and Local Governments on the priorities that should be addressed by expenditure of Opioid Funds and to review how monies have been spent and the results that have been achieved with Opioid Funds.

(a)      Size - The Taskforce or Council shall have ten Members equally balanced between the State and the Local Government representatives.

(b)      Appointments Local Governments - Two Municipality representatives will be appointed by or through Florida League of Cities. Two county representatives, one from a Qualified County and one from a county within the State that is not a Qualified County, will be appointed by or through the Florida Association of Counties. The final representative will alternate every two years between being a county representative (appointed by or through Florida Association of Counties) or a Municipality representative (appointed by or through the Florida League of Cities). One Municipality representative must be from a city of less than 50,000 people. One county representative must be from a county of less than 200,000 people and the other county representative must be from a county whose population exceeds 200,000 people.

(c)      Appointments State -

(i)      The Governor shall appoint two Members.

(ii)      The Speaker of the House shall appoint one Member.

(iii)    The Senate President shall appoint one Member.

(iv)    The Attorney General or her designee shall be a Member.

(d)    Chair - The Attorney General or designee shall be the chair of the Taskforce or Council.

(e)    Term - Members will be appointed to serve a four-year term and shall be staggered to comply with Florida Statutes § 20.052(4)(c).

(f)    Support - DCF shall support the Taskforce or Council and the Taskforce or Council shall be administratively housed in DCF.

(g)    Meetings - The Taskforce or Council shall meet quarterly in person or virtually using communications media technology as defined in section 120.54(5)(b)(2), Florida Statutes.

(h)    Reporting - The Taskforce or Council shall provide and publish a report annually no later than November 30th or the first business day after November 30th, if November 30th falls on a weekend or is otherwise not a business day.  The report shall contain information on how monies were spent the previous fiscal year by the State, each of the Qualified Counties, each of the Managing Entities, and each of the Local Governments.  It shall also contain recommendations to the Governor, the Legislature, and Local Governments for priorities among the Approved Purposes or similar such uses for how monies should be spent the coming fiscal year to respond to the opioid epidemic. Prior to July 1st of each year, the State and each of the Local Governments shall provide information to DCF about how they intend to expend Opioid Funds in the upcoming fiscal year.

(i)    Accountability - The State and each of the Local Governments shall report its expenditures to DCF no later than August 31st for the previous fiscal year. The Taskforce or Council will set other data sets that need to be reported to DCF to demonstrate the effectiveness of expenditures on Approved Purposes. In setting those requirements, the Taskforce or Council shall consider the Reporting Templates, Deliverables, Performance Measures, and other already utilized and existing templates and forms required by DCF from Managing Entities and suggest that similar requirements be utilized by all Parties to this Agreement.

(j)    Conflict of Interest - All Members shall adhere to the rules, regulations and laws of Florida including, but not limited to, Florida Statute §112.311, concerning the disclosure of conflicts of interest and recusal from discussions or votes on conflicted matters.

7.    **Administrative Costs**- The State may take no more than a 5% administrative fee from the State Fund and any Regional Fund that it administers for counties that are not Qualified Counties. Each Qualified County may take no more than a 5% administrative fee from its share of the Regional Funds. Municipalities and Counties may take no more than a 5% administrative fee from any funds that they receive or control from the City/County Fund.

7

8.      **Negotiation of Non-Multistate Settlements** - If the State begins negotiations with a Pharmaceutical Supply Chain Participant that is separate and apart from a multi-state negotiation, the State shall include Local Governments that are a part of the Negotiating Committee in such negotiations. No Settlement shall be recommended or accepted without the affirmative votes of both the State and Local Government representatives of the Negotiating Committee.

9.      **Negotiation of Multistate or Local Government Settlements** - To the extent practicable and allowed by other parties to a negotiation, both Parties agree to communicate with members of the Negotiation Committee regarding the terms of any other Pharmaceutical Supply Chain Participant Settlement.

10.     **Program Requirements-** DCF and Local Governments desire to make the most efficient and effective use of the Opioid Funds. DCF and Local Governments will work to achieve that goal by ensuring the following requirements will be minimally met by any governmental entity or provider providing services pursuant to a contract or grant of Opioid Funds:

a.      In either performing services under this Agreement or contracting with a provider to provide services with the Opioid Funds under this Agreement, the State and Local Governments shall be aware of and comply with all State and Federal laws, rules, Children and Families Operating Procedures (CFOPs), and similar regulations relating to the substance abuse and treatment services.

b.      The State and Local Governments shall have and follow their existing policies and practices for accounting and auditing, including policies relating to whistleblowers and avoiding fraud, waste, and abuse. The State and Local Governments shall consider additional policies and practices recommended by the Opioid Abatement Taskforce or Council. c. In any award or grant to any provider, State and Local Governments shall ensure that each provider acknowledges its awareness of its obligations under law and shall audit, supervise, or review each provider's performance routinely, at least once every year.

d. In contracting with a provider, the State and Local Governments shall set performance measures in writing for a provider.

e. The State and Local Governments shall receive and report expenditures, service utilization data, demographic information, and national outcome measures in a similar fashion as required by the 42.U.S.C. s. 300x and 42 U.S.C. s. 300x-21.

f. The State and Local Governments, that implement evidenced based practice models will participate in fidelity monitoring as prescribed and completed by the originator of the model chosen..

g. The State and Local Governments shall ensure that each year, an evaluation of the procedures and activities undertaken to comply with the requirements of this Agreement are completed.

8

h. The State and Local Governments shall implement a monitoring process that will demonstrate oversight and corrective action in the case of non-compliance, for all providers that receive Opioid Funds. Monitoring shall include:

(i)   Oversight of the any contractual or grant requirements;

(ii)   Develop and utilize standardized monitoring tools;

(iii)   Provide DCF and the Opioid Abatement Taskforce or Council with access to the monitoring reports; and

(iv)   Develop and utilize the monitoring reports to create corrective action plans for providers, where necessary.

11.   **Reporting and Records Requirements-** The State and Local Governments  shall follow their existing reporting and records retention requirements along with considering any additional recommendations from the Opioid Abatement Taskforce or Council. Local Governments shall respond and provide documents to any reasonable requests from the State or Opioid Abatement Taskforce or Council for data or information about programs receiving Opioid Funds.  The State and Local Governments shall ensure that any provider or sub-recipient of Opioid Funds at a minimum does the following:

(a)   Any provider shall establish and maintain books, records and documents (including electronic storage media) sufficient to reflect all income and expenditures of Opioid Funds. Upon demand, at no additional cost to the State or Local Government, any provider will facilitate the duplication and transfer of any records or documents during the term that it receives any Opioid Funds and the required retention period for the State or Local Government. These records shall be made available at all reasonable times for inspection, review, copying, or audit by Federal, State, or other personnel duly authorized by the State or Local Government.

(b)   Any provider shall retain and maintain all client records, financial records, supporting documents, statistical records, and any other documents (including electronic storage media) pertinent to the use of the Opioid Funds during the term of its receipt of Opioid Funds and retained for a period of six (6) years after its ceases to receives Opioid Funds or longer when required by law. In the event an audit is required by the State of Local Governments, records shall be retained for a minimum period of six (6) years after the audit report is issued or until resolution of any audit findings or litigation based on the terms of any award or contract.

(c)   At all reasonable times for as long as records are maintained, persons duly authorized by State or Local Government auditors shall be allowed full access to and the right to examine any of the contracts and related records and documents, regardless of the form in which kept.

(d)   A financial and compliance audit shall be performed annually and provided to the State.

9

(e)     All providers shall comply and cooperate immediately with any inspections, reviews, investigations, or audits deemed necessary by The Office of the Inspector General (section 20.055, F.S.) or the State.

(f)     No record may be withheld nor may any provider attempt to limit the scope of any of the foregoing inspections, reviews, copying, transfers or audits based on any claim that any record is exempt from public inspection or is confidential, proprietary or trade secret in nature; provided, however, that this provision does not limit any exemption to public inspection or copying to any such record.

12.     **Expense Fund** - The Parties agree that in any negotiation every effort shall be made to cause Pharmaceutical Supply Chain Participants to pay costs of litigation, including attorneys' fees, in addition to any agreed to Opioid Funds in the Settlement.  To the extent that a fund sufficient to pay the full contingent fees of Local Governments is not created as part of a Settlement by a Pharmaceutical Supply Chain Participant, the Parties agree that an additional expense fund for attorneys who represent Local Governments (herein "Expense Fund") shall be created out of the City/County fund for the purpose of paying the hard costs of a litigating Local Government and then paying attorneys' fees.

(a)     The Source of Funds for the Expense Fund- Money for the Expense Fund shall be sourced exclusively from the City/County Fund.

(b)     The Amount of the Expense Fund- The State recognizes the value litigating Local Governments bring to the State in connection with the Settlement because their participation increases the amount of Incentive Payments due from each Pharmaceutical Supply Chain Participant.  In recognition of that value, the amount of funds that shall be deposited into the Expense Fund shall be contingent upon on the percentage of litigating Local Government participation in the Settlement, according to the following table:

| Litigating Local Government Participation in the Settlement (by percentage of the population) | Amount that shall be paid into the Expense Fund from (and as a percentage of) the City/County fund |
|---|---|
| 96 to 100% | 10% |
| 91 to 95% | 7.5% |
| 86 to 90% | 5% |
| 85% | 2.5% |
| Less than 85% | 0% |

If fewer than 85% percent of the litigating Local Governments (by population) participate, then the Expense Fund shall not be funded, and this Section of the Agreement shall be null and void.

(c)     The Timing of Payments into the Expense Fund- Although the amount of the Expense Fund shall be calculated based on the entirety of payments due to the City/County fund over a ten-to-eighteen-year period, the Expense Fund shall be funded entirely from payments made by Pharmaceutical Supply Chain Participants during the first two payments of the Settlement.  Accordingly, to offset the amounts being paid from the

City/County Fund to the Expense Fund in the first two years, Counties or Municipalities may borrow from the Regional Fund during the first two years and pay the borrowed amounts back to the Regional Fund during years three, four, and five.

For the avoidance of doubt, the following provides an illustrative example regarding the calculation of payments and amounts that may be borrowed under the terms of this MOU, consistent with the provisions of this Section:

| | |
|---|---|
| Opioid Funds due to State of Florida and Local Governments (over 10 to 18 years): | $1,000 |
| Litigating Local Government Participation: | 100% |
| City/County Fund (over 10 to 18 years): | $150 |
| Expense Fund (paid over 2 years): | $15 |
| Amount Paid to Expense Fund in 1st year: | $7.5 |
| Amount Paid to Expense Fund in 2nd year | $7.5 |
| Amount that may be borrowed from Regional Fund in 1st year: | $7.5 |
| Amount that may be borrowed from Regional Fund in 2nd year: | $7.5 |
| Amount that must be paid back to Regional Fund in 3rd year: | $5 |
| Amount that must be paid back to Regional Fund in 4th year: | $5 |
| Amount that must be paid back to Regional Fund in 5th year: | $5 |

(d)     Creation of and Jurisdiction over the Expense Fund- The Expense Fund shall be established, consistent with the provisions of this Section of the Agreement, by order of the Court.  The Court shall have jurisdiction over the Expense Fund, including authority to allocate and disburse amounts from the Expense Fund and to resolve any disputes concerning the Expense Fund.

(e)     Allocation of Payments to Counsel from the Expense Fund- As part of the order establishing the Expense Fund, counsel for the litigating Local Governments shall seek to have the Court appoint a third-neutral to serve as a special master for purposes of allocating the Expense Fund.  Within 30 days of entry of the order appointing a special master for the Expense Fund, any counsel who intend to seek an award from the Expense Fund shall provide the copies of their contingency fee contracts to the special master.  The special master shall then build a mathematical model, which shall be based on each litigating Local Government's share under the Negotiation Class Metrics and the rate set forth in their contingency contracts, to calculate a proposed award for each litigating Local Government who timely provided a copy of its contingency contract.

13.     **Dispute resolution-** Any one or more of the Local Governments or the State may object to an allocation or expenditure of Opioid Funds solely on the basis that the allocation or expenditure at issue (a) is inconsistent with the Approved Purposes; (b) is inconsistent with the distribution scheme as provided in paragraph,; (c) violates the limitations set forth herein with respect to administrative costs or the Expense Fund; or (d) to recover amounts advanced from the Regional Fund for the Expense Fund. There shall be no other basis for bringing an objection to the approval of an allocation or expenditure of Opioid Funds. In the event that there is a National Settlement Administrator or similar entity, the Local Governments sole action for non-payment of

11

amounts due from the City/County Fund shall be against the particular settling defendant and/or the National Settlement Administrator or similar entity.

### C. Other Terms and Conditions

1. **Governing Law and Venue:** This Agreement will be governed by the laws of the State of Florida. Any and all litigation arising under the Agreement, unless otherwise specified in this Agreement, will be instituted in either: (a) the Court that enters the Order if the matter deals with a matter covered by the Order and the Court retains jurisdiction; or (b) the appropriate State court in Leon County, Florida.

2. **Agreement Management and Notification:** The Parties have identified the following individuals as Agreement Managers and Administrators:

    a.    State of Florida Agreement Manager:

    Greg Slemp

    PL-01, The Capitol, Tallahassee, FL 32399

    850-414-3300

    Greg.slemp@myfloridalegal.com

    b.    State of Florida Agreement Administrator

    Janna Barineau

    PL-01, The Capitol, Tallahassee, FL 32399

    850-414-3300

    Janna.barineau@myfloridalegal.com

    c.    Local Governments Agreement Managers and Administrators are listed on Exhibit C to this Agreement.

Changes to either the Managers or Administrators may be made by notifying the other Party in writing, without formal amendment to this Agreement.

3. **Notices**. All notices required under the Agreement will be delivered by certified mail, return receipt requested, by reputable air courier, or by personal delivery to the designee identified in paragraphs C.2., above. Either designated recipient may notify the other, in writing, if someone else is designated to receive notice.

4. **Cooperation with Inspector General:** Pursuant to section 20.055, Florida Statutes, the Parties, understand and will comply with their duty to cooperate with the Inspector General in any investigation, audit, inspection, review, or hearing.

5.     **Public Records**:  The Parties will keep and maintain public records pursuant to Chapter 119, Florida Statutes and will comply will all applicable provisions of that Chapter.

6.     **Modification**:  This Agreement may only be modified by a written amendment between the appropriate parties. No promises or agreements made subsequent to the execution of this Agreement shall be binding unless express, reduced to writing, and signed by the Parties.

7.     **Execution in Counterparts**:  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

8.     **Assignment:**     The rights granted in this Agreement may not be assigned or transferred by any party without the prior written approval of the other party. No party shall be permitted to delegate its responsibilities or obligations under this Agreement without the prior written approval of the other parties.

9.     **Additional Documents:**  The Parties agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be reasonably necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

10.     **Captions:**  The captions contained in this Agreement are for convenience only and shall in no way define, limit, extend or describe the scope of this Agreement or any part of it.

11.     **Entire Agreement:**  This Agreement, including any attachments, embodies the entire agreement of the parties.  There are no other provisions, terms, conditions, or obligations.  This Agreement supersedes all previous oral or written communications, representations or agreements on this subject.

12.     **Construction:**  The parties hereto hereby mutually acknowledge and represent that they have been fully advised by their respective legal counsel of their rights and responsibilities under this Agreement, that they have read, know, and understand completely the contents hereof, and that they have voluntarily executed the same. The parties hereto further hereby mutually acknowledge that they have had input into the drafting of this Agreement and that, accordingly, in any construction to be made of this Agreement, it shall not be construed for or against any party, but rather shall be given a fair and reasonable interpretation, based on the plain language of the Agreement and the expressed intent of the parties.

13.     **Capacity to Execute Agreement:**  The parties hereto hereby represent and warrant that the individuals signing this Agreement on their behalf are duly authorized and fully competent to do so.

14.    **Effectiveness:** This Agreement shall become effective on the date on which the last required signature is affixed to this Agreement.

**IN WITNESS THEREOF**, the parties hereto have caused the Agreement to be executed by their undersigned officials as duly authorized.

STATE OF FLORIDA

By: _John Guard_                11/15/2021
                                DATED
Its: _Chief Deputy Attorney General_

14

# EXHIBIT A

**Schedule A**

**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**")[, such that a minimum of __ % of the [aggregate] state-level abatement distributions shall be spent on [one or more of] them annually].[1]

A. Naloxone or other FDA-approved drug to reverse opioid overdoses

1. Expand training for first responders, schools, community support groups and families; and

2. Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

B. Medication-Assisted Treatment ("MAT") Distribution and other opioid-related treatment

1. Increase distribution of MAT to non-Medicaid eligible or uninsured individuals;

2. Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3. Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4. Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication with other support services.

C. Pregnant & Postpartum Women

1. Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("OUD") and other Substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3. Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

D. Expanding Treatment for Neonatal Abstinence Syndrome

1. Expand comprehensive evidence-based and recovery support for NAS babies;

2. Expand services for better continuum of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Term Sheet.

E. Expansion of Warm Hand-off Programs and Recovery Services

1. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions. ;

4. Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansions above.

F. Treatment for Incarcerated Population

1. Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2. Increase funding for jails to provide treatment to inmates with OUD.

G. Prevention Programs

1. Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2. Funding for evidence-based prevention programs in schools.;

3. Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4. Funding for community drug disposal programs; and

5. Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

H. Expanding Syringe Service Programs

1. Provide comprehensive syringe services programs with more wrap-around services including linkage to OUD treatment, access to sterile syringes, and linkage to care and treatment of infectious diseases.

I. Evidence-based data collection and research analyzing the effectiveness of the abatement strategies within the State.

# EXHIBIT B

**Schedule B**

**Approved Uses**

PART ONE: TREATMENT

## A.  TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:[2]

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.  Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training,

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.  Priorities will be established through the mechanisms described in the Term Sheet.

scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. [Intentionally Blank – to be cleaned up later for numbering]

13. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B. SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in treatment for or recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved medication with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C. CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically-appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D. ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   c. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   e. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

f. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions

4. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

## E. ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   a. Increase the number of prescribers using PDMPs;

   b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

## G. PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Fund community anti-drug coalitions that engage in drug prevention efforts.

6. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7. Engage non-profits and faith-based communities as systems to support prevention.

8. Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address

mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

## H. PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, individuals at high risk of overdose, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities provide free naloxone to anyone in the community

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.

PART THREE: OTHER STRATEGIES

**I. FIRST RESPONDERS**

In addition to items in sections C, D, and H relating to first responders, support the following:

1. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J. LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitation, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local, or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services; to support training and technical assistance; or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to share reports, recommendations, or plans to spend opioid settlement funds; to show how opioid settlement funds have been spent; to report program or strategy outcomes; or to track, share, or visualize key opioid-related or health-related indicators and supports as identified through collaborative statewide, regional, local, or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

**K. TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

**L. RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection, and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

# EXHIBIT C

| County | Allocated Subdivisions | Regional % by County for Abatement Fund | City/County Fund % |
|---|---|---|---|
| Alachua | | 1.24106016449% | |
| | Alachua County | | 0.82168954630% |
| | Alachua | | 0.01311333245% |
| | Archer | | 0.00021970551% |
| | Gainesville | | 0.38159761134% |
| | Hawthorne | | 0.00027054640% |
| | High Springs | | 0.01198756863% |
| | La Crosse | | 0.00097505670% |
| | Micanopy | | 0.00211353073% |
| | Newberry | | 0.00610272921% |
| | Waldo | | 0.00298872129% |
| Baker | | 0.19317380413% | |
| | Baker County | | 0.16944924003% |
| | Glen St. Mary | | 0.00009623464% |
| | Macclenny | | 0.02362832944% |
| Bay | | 0.83965637331% | |
| | Bay County | | 0.50877260515% |
| | Callaway | | 0.02495382552% |
| | Lynn Haven | | 0.03920563201% |
| | Mexico Beach | | 0.00561429298% |
| | Panama City | | 0.15515385559% |
| | Panama City Beach | | 0.08089702311% |
| | Parker | | 0.00870469617% |
| | Springfield | | 0.01635444273% |
| Bradford | | 0.18984204081% | |
| | Bradford County | | 0.15142430909% |
| | Brooker | | 0.00042488504% |
| | Hampton | | 0.00283982995% |
| | Lawtey | | 0.00340089610% |
| | Starke | | 0.03139246813% |
| Brevard | | 3.87879918044% | |
| | Brevard County | | 2.32302668525% |
| | Cape Canaveral | | 0.04556075020% |

| | | City | Percentage |
|---|---|---|---|
| | | Cocoa | 0.1492454114223% |
| | | Cocoa Beach | 0.0843632861550% |
| | | Grant-Valkaria | 0.0003213874060% |
| | | Indialantic | 0.0241367389020% |
| | | Indian Harbour Beach | 0.0210899136650% |
| | | Malabar | 0.0025057323170% |
| | | Melbourne | 0.3831046822330% |
| | | Melbourne Beach | 0.0120910663020% |
| | | Melbourne Village | 0.0037822032000% |
| | | Palm Bay | 0.4048173974810% |
| | | Palm Shores | 0.0001271023640% |
| | | Rockledge | 0.0966032437980% |
| | | Satellite Beach | 0.0359754162240% |
| | | Titusville | 0.2400564189240% |
| | | West Melbourne | 0.0519975770660% |
| Broward | | | 9.0579626725780% |
| | | Broward County | 3.9664035768780% |
| | | Coconut Creek | 0.1011317194480% |
| | | Cooper City | 0.0739354450730% |
| | | Coral Springs | 0.3234065176640% |
| | | Dania Beach | 0.0178070411800% |
| | | Davie | 0.2669222271530% |
| | | Deerfield Beach | 0.2024232247250% |
| | | Fort Lauderdale | 0.8305812645310% |
| | | Hallandale Beach | 0.1549504918140% |
| | | Hillsboro Beach | 0.0124070064630% |
| | | Hollywood | 0.5201646084560% |
| | | Lauderdale-By-The-Sea | 0.0228076113250% |
| | | Lauderdale Lakes | 0.0626251504350% |
| | | Lauderhill | 0.1443828381300% |
| | | Lazy Lake | 0.0000217889770% |
| | | Lighthouse Point | 0.0291318618030% |
| | | Margate | 0.1436837751290% |
| | | Miramar | 0.2792802084190% |
| | | North Lauderdale | 0.0650696244960% |

| County | Location | % | % |
|---|---|---|---|
| | Oakland Park | | 0.1004308406999% |
| | Ocean Breeze | | 0.0053818772737% |
| | Parkland | | 0.0458040604448% |
| | Pembroke Park | | 0.0245979389908% |
| | Pembroke Pines | | 0.4628323636303% |
| | Plantation | | 0.2139187256664% |
| | Pompano Beach | | 0.3354721634993% |
| | Sea Ranch Lakes | | 0.0050241748700% |
| | Southwest Ranches | | 0.0259797231780% |
| | Sunrise | | 0.2860711061468% |
| | Tamarac | | 0.1344924584472% |
| | Weston | | 0.1386378112833% |
| | West Park | | 0.0295531152535% |
| | Wilton Manors | | 0.0316303311270% |
| Calhoun | | 0.0471277407810% | |
| | Calhoun County | | 0.0388660871280% |
| | Altha | | 0.0003667811070% |
| | Blountstown | | 0.0078966882930% |
| Charlotte | | 0.7373462333760% | |
| | Charlotte County | | 0.6902257555870% |
| | Punta Gorda | | 0.0471204777890% |
| Citrus | | 0.9696457766060% | |
| | Citrus County | | 0.9297156611170% |
| | Crystal River | | 0.0219287892660% |
| | Inverness | | 0.0180013262220% |
| Clay | | 1.1934294614560% | |
| | Clay County | | 1.0557648911310% |
| | Green Cove Springs | | 0.0577625771420% |
| | Keystone Heights | | 0.0007535354430% |
| | Orange Park | | 0.0785892073390% |
| | Penney Farms | | 0.0005610661490% |
| Collier | | 1.5513333764270% | |
| | Collier County | | 1.3546733360300% |
| | Everglades | | 0.0001488913410% |
| | Marco Island | | 0.0620949520030% |

| County | City | County % | City % |
|---|---|---|---|
| Columbia | | 0.44678115079% | |
| | Naples | | 0.13441619705% |
| | Columbia County | | 0.34188720137% |
| | Fort White | | 0.00023604724% |
| | Lake City | | 0.10465971792% |
| DeSoto | | 0.11364040780% | |
| | DeSoto County | | 0.09688468474% |
| | Arcadia | | 0.01675572305% |
| Dixie | | 0.10374458090% | |
| | Dixie County | | 0.09882208079% |
| | Cross City | | 0.00463923628% |
| | Horseshoe Beach | | 0.00028144094% |
| Duval | | 5.43497515693% | |
| | Jacksonville | | 5.27057006499% |
| | Atlantic Beach | | 0.03889150760% |
| | Baldwin | | 0.00225152758% |
| | Jacksonville Beach | | 0.10044718243% |
| | Neptune Beach | | 0.02281487431% |
| Escambia | | 1.34163444924% | |
| | Escambia County | | 1.00586087157% |
| | Century | | 0.00513675124% |
| | Pensacola | | 0.33063682642% |
| Flagler | | 0.38986471224% | |
| | Flagler County | | 0.27975593440% |
| | Beverly Beach | | 0.00015433858% |
| | Bunnell | | 0.00950180957% |
| | Flagler Beach | | 0.01548288366% |
| | Marineland | | 0.00011439212% |
| | Palm Coast | | 0.08485716962% |
| Franklin | | 0.04991128255% | |
| | Franklin County | | 0.04625436596% |
| | Apalachicola | | 0.00176853860% |
| | Carabelle | | 0.00188837797% |
| Gadsden | | 0.12365607407% | |
| | Gadsden County | | 0.09021181064% |

| County | Place | Subtotal % | % |
|---|---|---|---|
|  | Chattahoochee |  | 0.004181667772% |
|  | Greensboro |  | 0.000492067723% |
|  | Gretna |  | 0.002240633101% |
|  | Havana |  | 0.005459544403% |
|  | Midway |  | 0.001202025213% |
|  | Quincy |  | 0.019867915223% |
| Gilchrist | Gilchrist County | 0.064333769355% | 0.061274233881% |
|  | Bell |  | 0.000998661430% |
|  | Fanning Springs |  | 0.000388570084% |
|  | Trenton |  | 0.002571099247% |
| Glades | Glades County | 0.040612836758% | 0.040420367464% |
|  | Moore Haven |  | 0.000192469294% |
| Gulf | Gulf County | 0.059914238588% | 0.054715751905% |
|  | Port St. Joe |  | 0.004817179591% |
|  | Wewahitchka |  | 0.000381307092% |
| Hamilton | Hamilton County | 0.047941195910% | 0.038817061931% |
|  | Jasper |  | 0.004869836285% |
|  | Jennings |  | 0.002623755940% |
|  | White Springs |  | 0.001630541754% |
| Hardee | Hardee County | 0.067110048132% | 0.058100306280% |
|  | Bowling Green |  | 0.001797590575% |
|  | Wauchula |  | 0.006667428600% |
|  | Zolfo Springs |  | 0.000544724417% |
| Hendry | Hendry County | 0.144460915297% | 0.122147187443% |
|  | Clewiston |  | 0.017589151414% |
|  | LaBelle |  | 0.004724576440% |
| Hernando | Hernando County | 1.510075949110% | 1.447521612849% |
|  | Brooksville |  | 0.061319627583% |

| County | City | Percentage |
|---|---|---|
| | Weeki Wachee | 0.0012347086788% |
| Highlands | | 0.3571885102377% |
| | Highlands County | 0.2876217549286% |
| | Avon Park | 0.0258290160090% |
| | Lake Placid | 0.0055652677790% |
| | Sebring | 0.0381724713717% |
| Hillsborough | | 8.7109841136570% |
| | Hillsborough County | 6.5231112044000% |
| | Plant City | 0.1042184911142% |
| | Tampa | 1.9756718812253% |
| | Temple Terrace | 0.1079807211113% |
| Holmes | | 0.0816124278516% |
| | Holmes County | 0.0668050024591% |
| | Bonifay | 0.0068980268639% |
| | Esto | 0.0062697780361% |
| | Noma | 0.0012782866311% |
| | Ponce de Leon | 0.0001797590571% |
| | Westville | 0.0001797590571% |
| Indian River | | 0.7530760587811% |
| | Indian River County | 0.6235714602171% |
| | Fellsmere | 0.0049170457341% |
| | Indian River shores | 0.0253224223821% |
| | Orchid | 0.0003086861421% |
| | Sebastian | 0.0383159154671% |
| | Vero Beach | 0.0606423535581% |
| Jackson | | 0.1589360587957% |
| | Jackson County | 0.0752137317041% |
| | Alford | 0.0003032299251% |
| | Bascom | 0.0000617354341% |
| | Campbellton | 0.0016486992341% |
| | Cottondale | 0.0010930803291% |
| | Graceville | 0.0027944362571% |
| | Grandridge | 0.0000308677171% |
| | Greenwood | 0.0012928126161% |
| | Jacob City | 0.0000481173235% |

| County | Municipality | County % | Percentage |
|---|---|---|---|
| | Malone | | 0.0000926031513% |
| | Marianna | | 0.0735196387868% |
| | Sneads | | 0.0024040504026% |
| Jefferson | | 0.0408216477884% | |
| | Jefferson County | | 0.0375841690019% |
| | Monticello | | 0.0032374787838% |
| Lafayette | | 0.0319117720769% | |
| | Lafayette County | | 0.0315558584577% |
| | Mayo | | 0.0003558866199% |
| Lake | | 1.1392112245199% | |
| | Lake County | | 0.7574538273433% |
| | Astatula | | 0.0027272535799% |
| | Clermont | | 0.0759091632099% |
| | Eustis | | 0.0419292540989% |
| | Fruitland Park | | 0.0083814930249% |
| | Groveland | | 0.0261540349929% |
| | Howey-In-The-Hills | | 0.0029814583079% |
| | Lady Lake | | 0.0250482444269% |
| | Leesburg | | 0.0913390185% |
| | Mascotte | | 0.0114156080259% |
| | Minneola | | 0.0160584758039% |
| | Montverde | | 0.0013472850579% |
| | Mount Dora | | 0.0410213800709% |
| | Tavares | | 0.0318209846739% |
| | Umatilla | | 0.0056233717289% |
| Lee | | 3.3253718833599% | |
| | Lee County | | 2.1152684075099% |
| | Bonita Springs | | 0.0173748931439% |
| | Cape Coral | | 0.7144296771679% |
| | Estero | | 0.0120801718139% |
| | Fort Myers | | 0.4311003505859% |
| | Fort Myers Beach | | 0.0005229354409% |
| | Sanibel | | 0.0345954477029% |
| Leon | | 0.8971992449399% | |
| | Leon County | | 0.4712011463919% |

| County | Place | | |
|---|---|---|---|
| Levy | Tallahassee | 0.251192401748% | 0.425998098549% |
| | Levy County | | 0.200131750679% |
| | Bronson | | 0.005701448894% |
| | Cedar Key | | 0.005180329202% |
| | Chiefland | | 0.015326729337% |
| | Fanning Springs | | 0.000808007885% |
| | Inglis | | 0.004976965420% |
| | Otter Creek | | 0.000408543312% |
| | Williston | | 0.017774357715% |
| | Yankeetown | | 0.000884269303% |
| Liberty | Liberty County | 0.019399452225% | 0.019303217578% |
| | Bristol | | 0.000962346447% |
| Madison | Madison County | 0.063540287455% | 0.053145129837% |
| | Greenville | | 0.000110760631% |
| | Lee | | 0.000019973229% |
| | Madison | | 0.010264423758% |
| Manatee | Manatee County | 2.721323346235% | 2.201647174006% |
| | Anna Maria | | 0.009930326116% |
| | Bradenton | | 0.379930754632% |
| | Bradenton Beach | | 0.014012127744% |
| | Holmes Beach | | 0.028038781473% |
| | Longboat Key | | 0.034895046131% |
| | Palmetto | | 0.052869136132% |
| Marion | Marion County | 1.701176168960% | 1.303728928237% |
| | Belleview | | 0.009799592256% |
| | Dunnellon | | 0.018400790795% |
| | McIntosh | | 0.000145259844% |
| | Ocala | | 0.368994504094% |
| | Reddick | | 0.000107129135% |
| Martin | | 0.869487298116% | |

| | | |
|---|---|---|
| | Martin County | 0.7507627957758% |
| | Jupiter Island | 0.0208738396646% |
| | Ocean Breeze Park | 0.0082707323393% |
| | Sewall's Point | 0.0083560725551% |
| | Stuart | 0.0812238577767% |
| Miami-Dade | | 5.23211978417317% |
| | Miami-Dade County | 4.2827976555525% |
| | Aventura | 0.0246197278885% |
| | Bal Harbour | 0.0100410867477% |
| | Bay Harbor Islands | 0.0042724551755% |
| | Biscayne Park | 0.0011348425353% |
| | Coral Gables | 0.0717801521313% |
| | Cutler Bay | 0.0094146536668% |
| | Doral | 0.0139776285313% |
| | El Portal | 0.0009242157600% |
| | Florida City | 0.0039292787792% |
| | Golden Beach | 0.0028470929513% |
| | Hialeah | 0.0980158957853% |
| | Hialeah Gardens | 0.0054526914113% |
| | Homestead | 0.0249356680463% |
| | Indian Creek | 0.0025438630263% |
| | Key Biscayne | 0.0136834773463% |
| | Medley | 0.0087482741313% |
| | Miami | 0.2927930054483% |
| | Miami Beach | 0.1814095724783% |
| | Miami Gardens | 0.0406836509323% |
| | Miami Lakes | 0.0078367686083% |
| | Miami Shores | 0.0062879355163% |
| | Miami Springs | 0.0061699118933% |
| | North Bay Village | 0.0051603559743% |
| | North Miami | 0.0303792807173% |
| | North Miami Beach | 0.0303919900953% |
| | Opa-locka | 0.0078476630963% |
| | Palmetto Bay | 0.0074046205703% |
| | Pinecrest | 0.0082961528663% |

| County | County % | City/Area | Percentage |
|---|---|---|---|
| | | South Miami | 0.0078333137111% |
| | | Sunny Isles Beach | 0.0076933245111% |
| | | Surfside | 0.0048698836285% |
| | | Sweetwater | 0.0041163008042% |
| | | Virginia Gardens | 0.0011729733244% |
| | | West Miami | 0.0026546236357% |
| Monroe | 0.476388738585% | Monroe County | 0.3301247854696% |
| | | Islamorada | 0.0223573058086% |
| | | Key Colony Beach | 0.0047518126616% |
| | | Key West | 0.0880873854176% |
| | | Layton | 0.0001507070896% |
| | | Marathon | 0.0309167421416% |
| Nassau | 0.476933463002% | Nassau County | 0.3927063579516% |
| | | Callahan | 0.0002251527596% |
| | | Fernandina Beach | 0.0831594451956% |
| | | Hillard | 0.0008425070986% |
| Okaloosa | 0.819212865955% | Okaloosa County | 0.6120596175456% |
| | | Cinco Bayou | 0.0007335622146% |
| | | Crestview | 0.0704401300666% |
| | | Destin | 0.0146785072816% |
| | | Fort Walton Beach | 0.0778374876446% |
| | | Laurel Hill | 0.0000798929146% |
| | | Mary Esther | 0.0093565497306% |
| | | Niceville | 0.0217453987136% |
| | | Shalimar | 0.0018248267966% |
| | | Valparaiso | 0.0104568930526% |
| Okeechobee | 0.353495278692% | Okeechobee County | 0.3145438514056% |
| | | Okeechobee | 0.0389514272876% |
| Orange | 4.671028214546% | Orange County | 3.0633303869796% |
| | | Apopka | 0.0972151508926% |

| County | City | | |
|---|---|---|---|
| | Bay Lake | | 0.0235665940013% |
| | Belle Isle | | 0.0107982536886% |
| | Eatonville | | 0.0083252204835% |
| | Edgewood | | 0.0097160678645% |
| | Lake Buena Vista | | 0.0103552111161% |
| | Maitland | | 0.0467282762089% |
| | Oakland | | 0.0054290866886% |
| | Ocoee | | 0.0665998229928% |
| | Orlando | | 1.1602484841490% |
| | Windemere | | 0.0075480646667% |
| | Winter Garden | | 0.0562645849996% |
| | Winter Park | | 0.1049030281590% |
| Osceola | | 1.0734520929940% | |
| | Osceola County | | 0.8372486913906% |
| | Kissimmee | | 0.1623660068772% |
| | St. Cloud | | 0.0738373946788% |
| Palm Beach | | 8.6015943720053% | |
| | Palm Beach County | | 5.5525484750265% |
| | Atlantis | | 0.0187512301696% |
| | Belle Glade | | 0.0208284459456% |
| | Boca Raton | | 0.4720690739616% |
| | Boynton Beach | | 0.3064982717716% |
| | Briny Breezes | | 0.0032574520126% |
| | Cloud Lake | | 0.0001888377986% |
| | Delray Beach | | 0.3518465794576% |
| | Glen Ridge | | 0.0000526566946% |
| | Golf | | 0.0042833496636% |
| | Greenacres | | 0.0764248356576% |
| | Gulf Stream | | 0.0106711513226% |
| | Haverhill | | 0.0010840015896% |
| | Highland Beach | | 0.0325109689346% |
| | Hypoluxo | | 0.0051530929826% |
| | Juno Beach | | 0.0167575388046% |
| | Jupiter Island | | 0.1254663748886% |
| | Jupiter Inlet Colony | | 0.0052765638496% |

| | | |
|---|---|---|
| | Lake Clarke Shores | 0.0075607749039% |
| | Lake Park | 0.0294332759800% |
| | Lake Worth | 0.1171466172988% |
| | Lantana | 0.0245071515050% |
| | Loxahatchee Groves | 0.0025311527898% |
| | Manalapan | 0.0216328223338% |
| | Mangonia Park | 0.0106965717958% |
| | North Palm Beach | 0.0443496462568% |
| | Ocean Ridge | 0.0127864978078% |
| | Pahokee | 0.0040182504478% |
| | Palm Beach | 0.1854768481238% |
| | Palm Beach Gardens | 0.2336758802578% |
| | Palm Beach Shores | 0.0141355986128% |
| | Palm Springs | 0.0380217642828% |
| | Riviera Beach | 0.1636170572828% |
| | Royal Palm Beach | 0.0492957439598% |
| | South Bay | 0.0018302740408% |
| | South Palm Beach | 0.0058666819678% |
| | Tequesta | 0.0318936145958% |
| | Wellington | 0.0501836447588% |
| | West Palm Beach | 0.5492656025418% |
| Pasco | | 4.6920872604949% |
| | Pasco County | 4.3192052398138% |
| | Dade City | 0.0558197267238% |
| | New Port Richey | 0.1498791074948% |
| | Port Richey | 0.0495299754588% |
| | San Antonio | 0.0021897921558% |
| | St. Leo | 0.0027908047618% |
| | Zephyrhills | 0.1126726140898% |
| Pinellas | | 7.9348898167778% |
| | Pinellas County | 4.5465931845538% |
| | Belleair | 0.0180957451218% |
| | Belleair Beach | 0.0042615606868% |
| | Belleair Bluffs | 0.0075026709658% |
| | Belleair Shore | 0.0004394110298% |

| | | |
|---|---|---|
| | Clearwater | 0.633863120196% |
| | Dunedin | 0.102440873796% |
| | Gulfport | 0.047893986460% |
| | Indian Rocks Beach | 0.008953453662% |
| | Indian Shores | 0.011323004874% |
| | Kenneth City | 0.017454786058% |
| | Largo | 0.374192990777% |
| | Madeira Beach | 0.022616957779% |
| | North Reddington Beach | 0.003820333909% |
| | Oldsmar | 0.039421706033% |
| | Pinellas Park | 0.251666311991% |
| | Redington Beach | 0.003611522882% |
| | Redington Shores | 0.006451352841% |
| | Safety Harbor | 0.038061710740% |
| | Seminole | 0.095248695748% |
| | South Pasadena | 0.029968921656% |
| | St. Pete Beach | 0.071791046619% |
| | St. Petersburg | 1.456593090134% |
| | Tarpon Springs | 0.101970595050% |
| | Treasure Island | 0.040652783215% |
| Polk | | 2.150483025298% |
| | Polk County | 1.558049828484% |
| | Auburndale | 0.028636162584% |
| | Bartow | 0.043971970660% |
| | Davenport | 0.005305615818% |
| | Dundee | 0.005579951255% |
| | Eagle Lake | 0.002580177987% |
| | Fort Meade | 0.007702403251% |
| | Frostproof | 0.005857603227% |
| | Haines City | 0.047984773863% |
| | Highland Park | 0.000063551182% |
| | Hillcrest Heights | 0.000005447244% |
| | Lake Alfred | 0.007489960729% |
| | Lake Hamilton | 0.002540231530% |
| | Lakeland | 0.294875668468% |

| County | Subtotal | Item | Percentage |
|---|---|---|---|
|  |  | Lake Wales | 0.0362931721234% |
|  |  | Mulberry | 0.0054145607702% |
|  |  | Polk City | 0.0010803700093% |
|  |  | Winter Haven | 0.0970335760870% |
| Putnam | 0.3848931940680% |  |  |
|  |  | Putnam County | 0.3292259901820% |
|  |  | Crescent City | 0.0055616362940% |
|  |  | Interlachen | 0.0018774834890% |
|  |  | Palatka | 0.0469552447160% |
|  |  | Pomona Park | 0.0003794913440% |
|  |  | Welaka | 0.0008933480430% |
| Santa Rosa | 0.7012673195130% |  |  |
|  |  | Santa Rosa County | 0.5925239842160% |
|  |  | Gulf Breeze | 0.0619515079060% |
|  |  | Jay | 0.0001597858290% |
|  |  | Milton | 0.0466320415620% |
| Sarasota | 2.8050438575790% |  |  |
|  |  | Sarasota County | 1.9243152632510% |
|  |  | Longboat Key | 0.0448945885560% |
|  |  | North Port | 0.2096117712770% |
|  |  | Sarasota | 0.4842797963500% |
|  |  | Venice | 0.1423473845600% |
| Seminole | 2.1411482645440% |  |  |
|  |  | Seminole County | 1.5086941644390% |
|  |  | Altamonte Springs | 0.0813055664300% |
|  |  | Casselberry | 0.0800345427910% |
|  |  | Lake Mary | 0.0797676278270% |
|  |  | Longwood | 0.0617100134150% |
|  |  | Oviedo | 0.1031308580570% |
|  |  | Sanford | 0.1642434903620% |
|  |  | Winter Springs | 0.0622620008240% |
| St. Johns | 0.7103333495540% |  |  |
|  |  | St. Johns County | 0.6563348181310% |
|  |  | Hastings | 0.0000108944880% |
|  |  | Marineland | 0.0000000000000% |

| County | | |
|---|---|---|
| | St. Augustine | 0.0465103864442% |
| | St. Augustine Beach | 0.0074772504993% |
| St. Lucie | 1.50662784353552% | |
| | St. Lucie County | 0.9561565843402% |
| | Fort Pierce | 0.1595352556454% |
| | Port St. Lucie | 0.3908034539989% |
| | St. Lucie Village | 0.0001325496608% |
| Sumter | 0.3263988704459% | |
| | Sumter County | 0.3022730260046% |
| | Bushnell | 0.006607507174% |
| | Center Hill | 0.001312785844% |
| | Coleman | 0.000748088199% |
| | Webster | 0.001423546476% |
| | Wildwood | 0.014033916721% |
| Suwannee | 0.191014879692% | |
| | Suwannee County | 0.161027800555% |
| | Branford | 0.000929663004% |
| | Live Oak | 0.029057416132% |
| Taylor | 0.092181897282% | |
| | Taylor County | 0.069698513119% |
| | Perry | 0.022212045963% |
| Union | 0.065156303224% | |
| | Union County | 0.063629259109% |
| | Lake Butler | 0.001398126003% |
| | Raiford | 0.000012710236% |
| | Worthington Springs | 0.000116207876% |
| Volusia | 3.13032967444480% | |
| | Volusia County | 1.7085753422287% |
| | Daytona Beach | 0.447556475212% |
| | Daytona Beach Shores | 0.039743093439% |
| | DeBary | 0.035283616215% |
| | DeLand | 0.098983689498% |
| | Deltona | 0.199329190038% |
| | Edgewater | 0.058042202343% |
| | Flagler Beach | 0.000223337011% |

| County | City | City % | Subtotal % | Total % |
|---|---|---|---|---|
| | Holly Hill | 0.0316158051143% | | |
| | Lake Helen | 0.0049188614482% | | |
| | New Smyrna Beach | 0.1040659683066% | | |
| | Oak Hill | 0.0048208110877% | | |
| | Orange City | 0.0335622870558% | | |
| | Ormond Beach | 0.1146445164770% | | |
| | Pierson | 0.0023332362510% | | |
| | Ponce Inlet | 0.0238135355748% | | |
| | Port Orange | 0.1775965015620% | | |
| | South Daytona | 0.0452212053230% | | |
| Wakulla | | | 0.1151293212080% | |
| | Wakulla County | 0.1149531936470% | | |
| | Sopchoppy | 0.0001071291350% | | |
| | St. Marks | 0.0006899984260% | | |
| Walton | | | 0.2685582161510% | |
| | Walton County | 0.2242684895810% | | |
| | DeFuniak Springs | 0.0170571372340% | | |
| | Freeport | 0.0032901354770% | | |
| | Paxton | 0.0239424538600% | | |
| Washington | | | 0.1201244441090% | |
| | Washington County | 0.1049084754040% | | |
| | Caryville | 0.0014017574990% | | |
| | Chipley | 0.0125504505600% | | |
| | Ebro | 0.0002215212630% | | |
| | Vernon | 0.0003613338630% | | |
| | Wausau | 0.0006809055210% | | |
| | | | 100.00% | 100.00% |



<u>**EXHIBIT J**</u>
*draft*

# ESCROW AGREEMENT

This Escrow Agreement dated this ____ day of _____, 2022 (the "**Escrow Agreement**"), is entered into by and among <u>STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL – DEPARTMENT OF LEGAL AFFAIRS</u>, a <u>GOVERNMENT ENTITY LOCATED IN THE UNITED STATES</u> ("**State**"), and Wilmington Trust, National Association, as escrow agent ("**Escrow Agent**").

## RECITALS

<u>**WHEREAS**, the people of the State and its communities allege that they have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain with respect to the manufacture, distribution, and dispensing of opioid products; and</u>

<u>**WHEREAS**, the State, through its Attorney General, and certain counties, cities, towns, and other municipalities, through their elected representatives and counsel, are separately engaged in litigation against many of the same Pharmaceutical Supply Chain Participants in connection with the manufacture, distribution, and dispensing of opioid products (collectively referred to as the "**Litigation**"); and</u>

<u>**WHEREAS**, certain of the Pharmaceutical Supply Chain entities have separately settled or may separately settle with the State (collectively referred to as the "**Settlements**" or individually as a "**Settlement**") conditioned on obtaining joinder and participation in those settlements from the certain of the State's counties, cities, towns, and other municipalities (collectively referred to as the "**Local Governments**"); and</u>

<u>**WHEREAS**, the State and its Local Governments have entered into an agreement entitled the Florida Opioid Allocation and Statewide Response Agreement (the "**Agreement**") under which the State and its Local Governments have agreed to the allocation and distribution from the Settlements relating to the Litigation; and</u>

<u>**WHEREAS**, it is necessary for the State to enter into this Escrow Agreement with the Escrow Agent to allow for the distribution of proceeds from each of the Settlements to the Local Governments and the State pursuant to the Agreement; and</u>

<u>**WHEREAS**, the State seeks to establish this account as a Qualified Settlement Fund as that term is utilized in section 468B of the Internal Revenue Code of 1986, as amended, and Treasury Regulation Sections 26 C.F.R. §1.468B-1 et seq.; and</u>

<u>**WHEREAS**, the State has sought and received an order from the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division New Port Richey, Florida (the "**Court**") ordering the creation of this account and approving the form of this Escrow Agreement and the State is subject to continuing jurisdiction by the Court; and</u>

<u>**WHEREAS**, the State is establishing this account to resolve or satisfy one or more contested claims with respect to the manufacture, distribution, and dispensing of opioid products against Pharmaceutical Supply Chain Participants who have settled their claims against the State and/or Local Governments arising out of alleged tortious conduct and/or violations of law; and</u>

<u>**WHEREAS**, the funds placed in the account are segregated from other funds and assets belonging to the State; and</u>

1

**NOW, THEREFORE,** in consideration of the premises, and further consideration of the covenants set forth hereafter, it is hereby agreed mutually as follows:

# ARTICLE 1
## ESCROW DEPOSIT

1.1.  <u>Receipt of Escrow Property</u>.

(a)  Upon execution of this Escrow Agreement by each of the parties hereto, the State shall cause funds from a Settlement in the amount of **$134,200,000** to be deposited into a United States Dollar denominated account (the "**Escrow Account**") established by the Escrow Agent.  The Escrow Account is set forth below:

> Manufacturers & Traders Trust Co.
> ABA# 031100092
> A/C# 155084-000
> A/C Name: Florida Opioid Settlement Fund Allergan
> Attn: Global Capital Markets

(b)  The Escrow Agent will hold the deposit and any subsequent deposits in the Escrow Account, together with all investments thereof and all interest accumulated thereon and proceeds therefrom (the "**Escrow Property**"), in escrow upon the terms and conditions set forth in this Escrow Agreement and shall not disburse funds from the Escrow Account except as provided herein.

(c)  <u>The State may further request that Escrow Property in the Allergan Account be further subdivided into sub-accounts within the Allergan Account in accordance with the State's settlement agreement with Allergan Finance, LLC (the "Allergan Agreement").  The State shall provide directions prior to or soon after deposit on how Escrow Property shall be subdivided. The State may adjust or transfer Escrow Property between sub-accounts within the Allergan Account after receipt consistent with the terms of the Allergan Agreement.  Based on the Allergan Agreement it is expected that the Allergan Account may be divided into five sub-accounts: (1) a State sub-account; (2) a city/county or subdivision sub-account; (3) an abatement sub-account; (4) a State attorney's fees and costs sub-account; and (5) a Local Government attorney's fee and costs sub-account.</u>

1.2.  <u>Investments</u>.

(a)  The Escrow Agent shall invest the Escrow Property in accordance with the written instructions provided to the Escrow Agent and signed by the State in such investments (i) as shall from time to time be selected by the State and (ii) be investments the Escrow Agent is able to hold.  In all events, the proceeds shall be managed in a manner designed to preserve principal and accrue income by investing in instruments/securities comprised of (a) United States Agency, Government Sponsored Enterprises or Treasury securities or obligations (or a mutual fund invested solely in such instruments); (b) cash equivalent securities including SEC registered money market funds and collateralized money market accounts; and/or (c) deposit and similar interest-bearing, or non-interest bearing accounts, and certificates of deposit subject to Federal Depository Insurance Corporation protections as available.  In the absence of written investment instructions from the State, the Escrow Agent shall hold the Escrow Property un-invested, without interest thereon.  For the avoidance of doubt, any investment earnings and income on the Escrow Property shall become part of the Escrow Property, and shall be disbursed in accordance with Section 1.3 below. The Escrow Agent shall make no disbursement, investment or other use of funds until and unless it has collected

2

funds. The Escrow Agent shall not be liable for collection items until such proceeds have been received or the Federal Reserve has given the Escrow Agent credit for the funds.

(b)     The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement.  The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement.  The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account.  The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

(c)     In the event that market conditions are such that negative interest applies to amounts deposited with the Escrow Agent, the State shall be responsible for the payment of such interest and the Escrow Agent shall be entitled to deduct from amounts on deposit with it an amount necessary to pay such negative interest. For the avoidance of doubt, the indemnification protections afforded to the Escrow Agent under Section 3.1 of this Agreement shall cover any interest-related expenses (including, but not limited to, negative interest) incurred by the Escrow Agent in the performance of its duties hereunder.

1.3.     <u>Disbursements</u>.

(a)     <u>The State shall provide direction to Escrow Agent of any disbursement of Escrow Property and all directions shall be in writing (a "**Written Direction**" and as used herein, the term "**Written Direction**" may refer, variably, to a writing substantially in the form of either Exhibit "A-1" or Exhibit "A-2," as the context may require). It is expected that disbursements of Escrow Property will happen periodically depending on the terms of the Settlements. It is expected that at least two disbursements will be made in the first calendar year of the Escrow Agreement.</u>

(b)     In the event that Escrow Agent makes any payment to any other party pursuant to this Escrow Agreement and for any reason such payment (or any portion thereof) is required to be returned to the Escrow Account or another party or is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a receiver, trustee or other party under any bankruptcy or insolvency law, other federal or state law, common law or equitable doctrine, then the recipient shall repay to the Escrow Agent upon written request the amount so paid to it.

(c)     The Escrow Agent shall, in its sole discretion, comply with judgments or orders issued or process entered by any court with respect to the Escrow Property, including without limitation any attachment, levy or garnishment, without any obligation to determine such court's jurisdiction in the matter and in accordance with its normal business practices.  If the Escrow Agent complies with any such judgment, order or process, then Escrow Agent shall not be liable to the State or any other person by reason of such compliance, regardless of the final disposition of any such judgment, order or process.

(d)     The State understands and agrees that the Escrow Agent shall have no obligation or duty to act upon a Written Direction delivered to the Escrow Agent for the disbursement of Escrow Property under this Escrow Agreement if such Written Direction is not (i) in writing, (ii) signed by, in the case of the State, any individual designated by the State on <u>Exhibit B</u> hereto (each such individual an "**Authorized Representative**"), and (iii) delivered to, and able to be authenticated by, the Escrow Agent in accordance with Section 1.5.

(e)     Upon request, the Escrow Agent will furnish monthly statements to the State setting forth the activity in the Escrow Account.  Upon request by the State, the Escrow Agent will furnish monthly statements to Allergan Finance, LLC setting forth the activity in the Allergan Account (including all constituent sub-accounts of the Allergan Account). the Escrow Agent will furnish monthly statements to that Pharmaceutical Supply Chain Participant setting forth the activity in that Pharmaceutical Supply Chain Participant's Sub-Fund (including all constituent sub-funds of that Sub-Fund) within the Escrow Account.

(f)     The State may specify in a Written Direction whether the Escrow Property shall be disbursed by way of wire transfer or check.  If the written notice for the disbursement of funds does not so specify the disbursement means, the Escrow Agent may disburse the Escrow Property by any means chosen by the Escrow Agent.

1.4.     <u>Written Direction and Other Instruction</u>.

(a)     With respect to any Written Direction or any other notice, direction or other instruction required to be delivered by the State to the Escrow Agent under this Escrow Agreement, the Escrow Agent is authorized to follow and rely upon any and all such instructions given to it from time to time if the Escrow Agent believes, in good faith, that such instruction is genuine and to have been signed by an Authorized Representative of the State.  The Escrow Agent shall have no duty or obligation to verify that the person who sent such instruction is, in fact, a person duly authorized to give instructions on behalf of the State, other than to verify that the signature of the Authorized Representative on any such instruction appears to be the signature of such person   The State acknowledges and agrees that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Escrow Agent, and that there may be more secure methods of transmitting instructions other than the method selected by the State. The Escrow Agent shall have no responsibility or liability for any loss which may result from:

(i)  any action taken or not taken by the Escrow Agent in good faith reliance on any such signatures, telephonic and email confirmations or instructions;

(ii)  the State's reliance upon or use of any particular method of delivering instructions to the Escrow Agent, including the risk of interception of such instruction and misuse by third parties; or

(iii) any officer or Authorized Representative named in an incumbency certificate or <u>Exhibit B</u> delivered hereunder prior to actual receipt by the Escrow Agent of a more current incumbency certificate or an updated <u>Exhibit B</u> and a reasonable time for the Escrow Agent to act upon such updated or more current certificate or Exhibit.

(b)     The State may, at any time, update <u>Exhibit B</u> by signing and submitting to the Escrow Agent an updated Exhibit.  An updated <u>Exhibit B</u> shall constitute a Written Direction that is subject to the authentication and security requirements set forth in Section 1.5 below.  Any updated Exhibit shall not be effective unless the Escrow Agent countersigns a copy thereof.  The Escrow Agent shall be entitled to a reasonable time to act to implement any changes on an updated Exhibit.

1.5.     <u>Delivery and Authentication of Written Direction</u>.

(a)     A Written Direction must be delivered to the Escrow Agent by one of the delivery methods set forth in Section 4.3.

(b)    The State and the Escrow Agent hereby agree that the following security procedures will be used to verify the authenticity of a Written Direction delivered by the State to the Escrow Agent under this Escrow Agreement:

(i)    The Written Direction must include the name and signature of the person delivering the disbursement request to the Escrow Agent.  The Escrow Agent will check that the name and signature of the person identified on the Written Direction appears to be the same as the name and signature of an Authorized Representative;

(ii)    The Escrow Agent will make a telephone call to the Authorized Representative purporting to deliver the Written Direction (which Authorized Representative shall be the same as the Authorized Representative who delivered the Written Direction) at any telephone number for such Authorized Representative as set forth on <u>Exhibit B</u>, as applicable, to obtain oral confirmation of delivery of the Written Direction; and

(iii)    If the Written Direction is sent by email to the Escrow Agent, the Escrow Agent also shall review such email address to verify that it appears to have been sent from an email address for an Authorized Representative as set forth on <u>Exhibit B</u>, or from an email address for a person authorized under <u>Exhibit B</u>, to email a Written Direction to the Escrow Agent on behalf of the Authorized Representative).

(c)    The State acknowledges and agrees that given its particular circumstances, including the nature of its business, the size, type and frequency of its instructions, transactions and files, internal procedures and systems, the alternative security procedures offered by the Escrow Agent and the security procedures in general use by other customers and banks similarly situated, the security procedures set forth in this Section 1.5 are a commercially reasonable method of verifying the authenticity of a payment order in a Written Direction.

(d)    The Escrow Agent is authorized to execute and the State expressly agrees to be bound by any payment order in a Written Direction issued in its name (and associated funds transfer) (i) that is accepted by the Escrow Agent in accordance with the security procedures set forth in this Section 1.5, whether or not authorized by the State and/or (ii) that is authorized by or on behalf of the State or for which the State is otherwise bound under the law of agency, whether or not the security procedures set forth in this Section 1.5 were followed, and to debit the Escrow Account for the amount of the payment order. Notwithstanding anything else, the Escrow Agent shall be deemed to have acted in good faith and without negligence, gross negligence or misconduct if the Escrow Agent is authorized to execute the payment order under this Section 1.5.  Any action taken by the Escrow Agent pursuant to this Section 1.5 prior to the Escrow Agent's actual receipt and acknowledgement of a notice of revocation, cancellation or amendment of a Written Direction shall not be affected by such notice of revocation, cancellation or amendment of a Written Direction.

(e)    The security procedures set forth in this Section 1.5 are intended to verify the authenticity of payment orders provided to the Escrow Agent and are not designed to, and do not, detect errors in the transmission or content of any payment order.  The Escrow Agent is not responsible for detecting an error in the payment order, regardless of whether the State believes the error was apparent, and the Escrow Agent is not liable for any losses arising from any failure to detect an error.

(f)    When instructed to credit or pay a party by both name and a unique numeric or alpha-numeric identifier (e.g. ABA number or account number), the Escrow Agent, and any other banks participating in the funds transfer, may rely solely on the unique identifier, even if it identifies a party

different than the party named. The State agrees to be bound by the rules of any funds transfer network used in connection with any payment order accepted by the Escrow Agent hereunder.

(g)     The Escrow Agent shall not be obliged to make any payment requested under this Escrow Agreement if it is unable to validate the authenticity of the request by the security procedures set forth in this Section 1.5.  The Escrow Agent's inability to confirm a payment order may result in a delay or failure to act on that payment order. Notwithstanding anything else in this Escrow Agreement, the Escrow Agent shall not be required to treat a payment order as having been received until the Escrow Agent has authenticated it pursuant to the security procedures in this Section 1.5 and shall not be liable or responsible for any losses arising in relation to such delay or failure to act.

1.6.     Income Tax Allocation and Reporting.

(a)     The Escrow Account shall be treated at all times as a "Qualified Settlement Fund" within the meaning of Treas. Reg. § 1.468B-1.   The State and Escrow Agent, in cooperation with settling Pharmaceutical Supply Chain Participants shall jointly and timely take such actions as necessary or advisable to qualify the Escrow Account as a "Qualified Settlement Fund" within the meaning of Treas. Reg. § 1.468B-1 and fulfill the requirements of such Treasury Regulation, including making a "relation-back election" under Treas. Reg. § 1.468B-1(j)(2), if applicable, to the earliest permitted date.  If applicable, Settlement Fund Administrator (as defined below) will prepare, or cause to have prepared, the "relation-back election" pursuant to Treas. Reg. §  1.468B-1(j)(2) for execution by the relevant settling Pharmaceutical Supply Chain Participants and the State and attach to it the Escrow Account's first income tax return.  For purposes of § 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" of the Escrow Account shall be Wilmington Trust National Association as the settlement fund administrator (the "Settlement Fund Administrator") and Settlement Fund Administrator shall take all actions to ensure that the Settlement Fund Administrator qualifies as such. Settlement Fund Administrator shall timely and properly prepare, deliver to all necessary parties for signature, and file all necessary documentation for any elections required or advisable under Treas. Reg. §1.468B-1.  Settlement Fund Administrator will obtain an employer identification number for the Escrow Account and timely prepare, or cause to have prepared,a "Regulation Section 1.468B-3 Statement" pursuant to Treas. Reg. §1.468B-3(e) on behalf of the settling Pharmaceutical Supply Chain Participants and provide copies to each settling Pharmaceutical Supply Chain Participant's counsel for review and approval. Settlement Fund Administrator shall timely and properly prepare and file any informational and other tax returns (including state, local or foreign) necessary or advisable with respect to the Escrow Account and the distributions and payments therefrom including without limitation the returns described in Treas. Reg. §1.468B-2(k), and to the extent applicable Treas. Reg. §1.468B-2(1).

(b)     Prior to the execution of this Escrow Agreement, or within two days thereafter, the State shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request.   The State understands that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

(c)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property.  Settlement Fund Administrator shall be responsible for the timely and proper preparation and delivery of any necessary documentation for signature by all necessary parties, and the timely filing of all tax returns and other tax reports required by law.  No settling

Pharmaceutical Supply Chain Participant nor their respective counsel shall have any liability or responsibility for taxes or tax expenses, for preparing (or paying for others to prepare) tax returns, tax reports, or calculation of any tax payments, or for obtaining or maintaining the tax status desired for the Escrow Account.  If any portion of the Escrow Account is returned to a settling Pharmaceutical Supply Chain Participant pursuant to the terms of a Settlement, that settling Pharmaceutical Supply Chain Participant shall provide Escrow Agent with a properly completed IRS Form W-9.

1.7.   Termination.  This Escrow Agreement shall terminate on December 31, 2039, at which time the Escrow Agent is authorized and directed to disburse the Escrow Property in accordance with Section 1.3 (Disbursements) and this Escrow Agreement shall be of no further force and effect, except that the provisions of Sections 1.6 (Tax Allocation and Reporting), and 3.2 (Limitation of Liability) hereof shall survive termination.

# ARTICLE 2
# DUTIES OF THE ESCROW AGENT

2.1.   Scope of Responsibility.  Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties expressly and specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature.  Under no circumstances will the Escrow Agent be deemed to be a fiduciary to the State or any other person under this Escrow Agreement or otherwise.  The Escrow Agent will not be responsible or liable for the failure of the State to perform in accordance with this Escrow Agreement.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the parties and the Escrow Agent has no duties or obligations with respect thereto.  The Escrow Agent acts hereunder as escrow agent only, and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof.  The Escrow Agent shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of the Escrow Property, written instructions, or any other documents in connection therewith, and will not be regarded as making nor be required to make, any representations thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement, any other agreement or otherwise.

All rights, protections, privileges, indemnities and benefits granted or afforded the Escrow Agent under this Agreement shall be deemed applicable to all actions taken, suffered or omitted by the Settlement Fund Administrator under this Agreement. Additionally, information provided to Wilmington Trust in its capacity as Escrow Agent will not be imputed to be known by the Settlement Fund Administrator unless Wilmington Trust in that capacity has been made aware of such information as well.

2.2.   Rights of the Escrow Agent. No provision of this Escrow Agreement shall require the Escrow Agent to expend or risk its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with

this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.  The Escrow Agent shall be protected in acting upon any written instruction, notice, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which the Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, items directing investment or non-investment of funds, items requesting or authorizing release, disbursement or retainage of the subject matter of this Escrow Agreement and items amending the terms of this Escrow Agreement, provided that the Escrow Agent complies with the security procedures governing written instructions set forth in Section 1.5 above.

2.3.    <u>Attorneys and Agents</u>.  The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the advice of counsel or other professionals retained or consulted by the Escrow Agent.  The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals.  The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees and shall not be responsible for the acts or omissions of such agents, representatives, attorneys, custodians or nominees appointed with due care.

2.4.    <u>Right Not Duty Undertaken</u>.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

# ARTICLE 3
## PROVISIONS CONCERNING THE ESCROW AGENT

3.1.    <u>Indemnification</u>.  The Escrow Agent shall have a first lien against the Escrow Account to secure the obligations of the parties hereunder.  The terms of this paragraph shall survive termination of this Escrow Agreement.

3.2.    <u>Limitation of Liability</u>.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF OR IN CONNECTION WITH THIS ESCROW AGREEMENT, THE ESCROW ACCOUNT, THE ESCROW PROPERTY, OR THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S NEGLIGENCE, OR WILLFUL MISCONDUCT, (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, OR (III) ANY AMOUNT IN EXCESS OF THE VALUE OF THE ESCROW PROPERTY.

3.3.    <u>Resignation or Removal</u>.  The Escrow Agent may, at any time, resign as escrow agent hereunder by furnishing written notice of its resignation to the State. At such time, all fees and expenses to which the Escrow Agent is entitled shall be immediately due and payable to Escrow Agent. The State may remove the Escrow Agent by furnishing to the Escrow Agent a written notice of its removal along with payment of all fees and expenses to which it is entitled through the date of termination.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the State, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If

8

the State has failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, the Escrow Agent shall be entitled, at its sole discretion and at the expense of State, to petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the State.

3.4.    <u>Compensation</u>. (a) The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as <u>Exhibit C</u>, which compensation shall be paid by the State.  Such compensation is intended for the Escrow Agent's services as contemplated by this Escrow Agreement. In addition to such compensation, in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, then the Escrow Agent shall be compensated for such extraordinary services and any services or work performed by Escrow Agent in connection with any delay, controversy, and reimbursed for all costs and expenses.

The terms of this Section 3.4 shall survive termination of this Escrow Agreement.

3.5.    <u>Disagreements</u>.  If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, refuse to act until the Escrow Agent (a) receives a final non-appealable order of a court of competent jurisdiction directing delivery of the Escrow Property or (b) receives a written instruction, executed by each of the parties involved in such disagreement or dispute, in a form reasonably acceptable to the Escrow Agent, directing delivery of the Escrow Property.  The Escrow Agent will be entitled to act on any such written instruction or final, non-appealable order of a court of competent jurisdiction without further question, inquiry or consent.  The Escrow Agent may file an interpleader action in a state or federal court, and upon the filing thereof, the Escrow Agent will be relieved of all liability as to the Escrow Property and will be entitled to recover reasonable and documented out-of-pocket attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. In the event the Escrow Agent receives conflicting instructions hereunder, the Escrow Agent shall be fully protected in refraining from acting until such conflict is resolved to the satisfaction of the Escrow Agent.

3.6.    <u>Merger or Consolidation</u>.  Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

3.7.    <u>Attachment of Escrow Property; Compliance with Legal Orders</u>.  In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction.  In the event that the Escrow Agent obeys or complies with any such writ, order or

decree it shall not be liable to the State or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

3.8.    Force Majeure.  The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Escrow Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions; loss or malfunctions of utilities including but not limited to, computer (hardware or software), payment systems, or communications services; hacking, cyber-attacks or other unauthorized infiltration of Escrow Agent's information technology infrastructure; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

3.9.    Compliance with Legal Orders.  The Escrow Agent shall be entitled to consult with legal counsel in the event that a question or dispute arises with regard to the construction of any of the provisions hereof, and shall incur no liability to the State premised on the contention that the Escrow Agent should not have sought or relied on the advice of counsel.

3.10.    No Financial Obligation. The Escrow Agent shall not be required to use its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Escrow Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security which it deems, in its sole and absolute discretion, to be satisfactory.

# ARTICLE 4
# MISCELLANEOUS

4.1.    Successors and Assigns.  This Escrow Agreement shall be binding on and inure to the benefit of the State and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement.  No assignment of the interest of any of the State and the Escrow Agent shall be binding unless and until written notice of such assignment shall be delivered to the other party and the Escrow Agent and shall require the prior written consent of the other party and the Escrow Agent (such consent not to be unreasonably withheld).

4.2.    Escheat.  The State is aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state.  The Escrow Agent shall have no liability to the State or any other party, should any or all of the Escrow Property escheat by operation of law.

4.3.    Notices.  All notices, requests, demands, and other communications required under this Escrow Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by overnight delivery with a reputable national overnight delivery service, (iv) by mail or by certified mail, return receipt requested, and postage prepaid, or (v) by electronic transmission; including by way of e-mail (as long as such email is accompanied by a PDF or similar version of the relevant document bearing the signature of an Authorized Representative for the party sending the notice) with email confirmation of receipt.  If any notice is mailed, it shall be deemed given five business days after the date such notice is deposited in the United States mail.  If notice is given to a party, it shall be given at the address for such party set forth below.  It shall be the responsibility of the State to notify the Escrow Agent in writing of any name or

address changes.  In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to the State:

STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Attention:  John Guard, Chief Deputy Attorney General
Telephone: (850) 544-8303
Facsimile:
Email address: john.guard@myfloridalegal.com

With a copy to:
STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Attention:  Sabrina Donovan, Director of Administration
Telephone: (850) 414-3535
Facsimile:
Email address: Sabrina.donovan@myfloridalegal.com

And a copy to:
STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399-1050
Attention:  Greg Slemp, Senior Assistant Attorney General
Telephone: (850) 414-3300
Facsimile:
Email address: greg.slemp@myfloridalegal.com

And a copy to:
Drake Martin
Drake Martin Law Firm
PO Box 4787
Santa Rosa Beach, FL 32459-4787
Telephone: (850) 608-3140
Facsimile:
Email address: drake@drakemartinlawfirm.com

And a copy to:
Robert A. Michael
Vice Chairman, Finance and Commercial Operations and Chief Financial Officer of AbbVie, Inc.
President and Chief Executive Officer of Allergan Limited
President of Allergan Finance, LLC
1 North Waukegan Road
North Chicago, IL 60064
Telephone: (847) 932-7900
Email address:

11

And a copy to:
James F. Hurst
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-5230
Email address: james.hurst@kirkland.com
Attorney for Allergan

If to the Escrow Agent:

Wilmington Trust, National Association
Corporate Client Services
1100 N. Market Street
Wilmington, DE  19890
Attn: Beth Andrews
Telephone: (302) 636-6680
Email address:  bandrews@wilmingtontrust.com

4.4.     <u>Governing Law</u>.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to any laws relating to choice of laws (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

4.5.     <u>Venue</u>.   The State and the Escrow Agent hereby consent to the exclusive personal jurisdiction of the courts located in **New Castle County in the State of Delaware** in the event of a dispute arising out of or under this Escrow Agreement.  The State and the Escrow Agent hereby irrevocably waives any objection to the laying of the venue of any suit, action or proceeding and irrevocably submits to the exclusive jurisdiction of such court in such suit, action or proceeding.

4.6.     <u>Entire Agreement.</u>  This Escrow Agreement and the exhibits hereto set forth the entire agreement and understanding of the parties related to the Escrow Property and supersedes all prior agreements and understandings, oral or written.  If a court of competent jurisdiction declares a provision invalid, it will be ineffective only to the extent of the invalidity, so that the remainder of the provision and Escrow Agreement will continue in full force and effect.   In the event of any direct conflict of the terms of this Escrow Agreement with the terms of the <u>Agreement</u>, as with respect to the rights of the State and <u>the Local Governments</u>, the terms of the <u>Agreement</u> shall control and prevail; provided, in no event shall the Escrow Agent be bound by the terms of the <u>Agreement</u>.  This Escrow Agreement is not intended to confer upon any person other than the parties hereto any rights or remedies.

4.7.     <u>Amendment</u>.  This Escrow Agreement may be amended, modified, supplemented, superseded, rescinded, or canceled only by a written instrument executed by the State and the Escrow Agent; provided that <u>Exhibit B</u>, as applicable, may be amended at any time in accordance with Section 1.4.

4.8.     <u>Waivers</u>.  The failure of any party to this Escrow Agreement at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.   A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such

12

condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

4.9.     Interpretation.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement. Unless otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Any references to an Exhibit is a reference to an Exhibit of this Escrow Agreement.

4.10.    Electronic Signatures; Facsimile Signatures; Counterparts.  This Escrow Agreement may be executed in one or more counterparts.  Such execution of counterparts may occur by manual signature, electronic signature, facsimile signature, manual signature transmitted by means of facsimile transmission or manual signature contained in an imaged document attached to an email transmission, and any such execution that is not by manual signature shall have the same legal effect, validity and enforceability as a manual signature.  Each such counterpart executed in accordance with the foregoing shall be deemed an original, with all such counterparts together constituting one and the same instrument.  The exchange of executed copies of this Escrow Agreement or of executed signature pages to this Escrow Agreement by electronic transmission, facsimile transmission or as an imaged document attached to an email transmission shall constitute effective execution and delivery hereof. Any copy of this Escrow Agreement which is fully executed and transmitted in accordance with the terms hereof may be used for all purposes in lieu of a manually executed copy of this Escrow Agreement and shall have the same legal effect, validity and enforceability as if executed by manual signature.

4.11.    Waiver of Jury Trial.  **THE STATE HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN RESOLVING ANY CLAIM OR COUNTERCLAIM RELATING TO OR ARISING OUT OF THIS ESCROW AGREEMENT.**

[The remainder of this page left intentionally blank.]

13

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

STATE

By: _____
Name:
Title:
Date:

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Escrow Agent

By: _____
Name:
Title:
Date:

WTNA – Form of Single Party Escrow Agreement (05/2021)



**EXHIBIT A-1**
**Form of Written Direction**

**VIA [DELIVERY METHOD]:**

[date]


Wilmington Trust, National Association
[Corporate Client Services
1100 N. Market Street
Wilmington, DE  19890]
Attention: [name]

**Re:  Escrow Account No.:  [##],  [escrow account name]**

Ladies and Gentlemen:

       Reference is made to the Escrow Agreement, dated as of _____, 20__ entered into by and among STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL- DEPARTMENT OF LEGAL AFFAIRS ("**State**"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, as escrow agent (the "**Escrow Agent**").  Capitalized terms defined in the Escrow Agreement shall have the same meanings when used herein. This letter is a Written Direction referred to in Section 1.3(a) of the Escrow Agreement.

       The State of Florida, Office of Attorney General- Department of Legal A hereby instructs the Escrow Agent to release the funds in the Escrow Account in the amounts, and to the account(s), as follows:

| | |
|---|---|
| Amount: | |
| Beneficiary Bank Name: | |
| Beneficiary Bank Address Line 1: | |
| Beneficiary Bank Address Line 2: | |
| Beneficiary Bank Address Line 3: | |
| ABA#: | |
| SWIFT#: | |
| Beneficiary Account Title: | |
| Beneficiary Account No./IBAN: | |
| Beneficiary Address Line 1: | |
| Beneficiary Address | |

15



| Line 2: | |
|---|---|
| Beneficiary Address Line 3: | |
| Additional Information: | |

**STATE OF FLORIDA**
**OFFICE OF ATTORNEY GENERAL**
**DEPARTMENT OF LEGAL AFFAIRS**


By:_____
Name:
Title:
Date:

16



## EXHIBIT A-2
### Form of Written Direction

<u>**VIA [DELIVERY METHOD]:**</u>

[date]

Wilmington Trust, National Association
[Corporate Client Services
1100 N. Market Street
Wilmington, DE  19890]
Attention: [name]

<b>Re:  Escrow Account No.:  [##],  [escrow account name]</b>

Ladies and Gentlemen:

Reference is made to the Escrow Agreement, dated as of _____, 20__ entered into by and among STATE OF FLORIDA, OFFICE OF ATTORNEY GENERAL- DEPARTMENT OF LEGAL AFFAIRS ("**State**"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, a national banking association, as escrow agent (the "**Escrow Agent**").  Capitalized terms defined in the Escrow Agreement shall have the same meanings when used herein. This letter is a Written Direction referred to in Section 1.3(a) of the Escrow Agreement.

The State of Florida, Office of Attorney General- Department of Legal Affairs hereby instructs the Escrow Agent to release the funds in the Escrow Account in the amounts, and to the account(s), according to the attached spreadsheet.

**STATE OF FLORIDA**
**OFFICE OF ATTORNEY GENERAL**
**DEPARTMENT OF LEGAL AFFAIRS**


By: _____
Name:
Title:
Date:



**[SEE ATTACHED]**



**EXHIBIT B**

**CERTIFICATE AS TO AUTHORIZED SIGNATURES
OF THE STATE**

The State hereby designates each of the following persons as its Authorized Representative for purposes of this Escrow Agreement, and confirms that the title, contact information and specimen signature of each such person as set forth below is true and correct. Each such Authorized Representative is authorized to initiate and approve transactions of all types for the Escrow Account established under this Escrow Agreement to which this <u>Exhibit B</u> is attached, on behalf of the State.

| **Name** (print): | |
|---|---|
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required): *If more than one, list all* | Office: Cell: Home: Other: |
| **E-mail** (required): *If more than one, list all* | Email 1: Email 2: |
| **Facsimile:** | |

| **Name** (print): | |
|---|---|
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required): *If more than one, list all* | Office: Cell: Home: Other: |
| **E-mail** (required): *If more than one, list all* | Email 1: Email 2: |
| **Facsimile:** | |

| **Name** (print): | |
|---|---|
| **Specimen Signature:** | |
| **Title:** | |
| **Telephone Number** (required): *If more than one, list all* | Office: Cell: Home: Other: |

WTNA – Form of Single Party Escrow Agreement (05/2021)



| **E-mail** (required): | Email 1: |
|---|---|
| *If more than one, list all* | Email 2: |
| **Facsimile:** | |

---

**COMPLETE BELOW TO UPDATE <u>EXHIBIT B</u>**

If the State wishes to change the names or details of any of its Authorized Representatives, the State must complete, sign and send to Escrow Agent an updated copy of this <u>Exhibit B-1</u> with such changes.  Any updated <u>Exhibit B</u> shall be effective once signed by the State and Escrow Agent and shall entirely supersede and replace any prior <u>Exhibit B</u> attached to this Escrow Agreement or submitted to Escrow Agent.

**STATE**

By:_____
Name:
Title:
Date:


**WILMINGTON TRUST, NATIONAL ASSOCIATION**


By:_____
Name:
Title:
Date:

---

*Internal Use Only:*
☐   Updated details of Authorized Representatives completed in full
☐   Signed by a representative of the State per relevant board resolutions/certificate of incumbency on file (if relevant).
☐   Call-back performed to the State to confirm authenticity of updated <u>Exhibit B</u>:

Person Called:_____ Date of Call:_____ Time of Call:_____am/pm

Reviewed by (name):_____Signature:_____Date: _____



# EXHIBIT C

### Fees of Escrow Agent

**Acceptance Fee:**                                                                                         **waived**

Initial Fees as they relate to Wilmington Trust, N.A. acting in the capacity of Escrow Agent – includes review of the Escrow Agreement; acceptance of the Escrow appointment; setting up of Escrow Account(s) and accounting records; and coordination of receipt of funds for deposit to the Escrow Account(s). **Acceptance Fee payable prior to, or within one business day after, the Escrow Agreement is executed by all parties.**

**Escrow Agent Administration Fee:**                                                           **$10,000.00**

For ordinary administrative services by Escrow Agent – includes daily routine account management; investment transactions; cash transaction processing (including wire and check processing); monitoring claim notices pursuant to the agreement; disbursement of funds in accordance with the agreement; and mailing of trust account statements to all applicable parties.  This fee shall be payable annually**.**

**Disbursement Fee:**

| | |
|---|---|
| Initial disbursement by wire: | $100/disbursement |
| Initial disbursement by check: | $75/disbursement |
| For each subsequent disbursement to an existing payee: | $40/disbursement |

*Wilmington Trust, N.A.'s fees are based on the following assumptions:*

- Number of Escrow Accounts to be established: One (1)
- Estimated Term of Escrow Agreement: TBD
- Investment of Escrow Property in: TBD

**Out-of-Pocket Expenses:**                                                                    **Billed At Cost**

EXHIBIT K

Exhibit 21

## List Of Subsidiaries

The following is a list of subsidiaries of AbbVie Inc. as of December 31, 2021. AbbVie is not a subsidiary of any other corporation.

| Domestic Subsidiaries | Incorporation |
|---|---|
| AbbVie Aviation LLC | Illinois |
| AbbVie Biopharmaceuticals LLC | Delaware |
| AbbVie Bioresearch Center Inc. | Delaware |
| AbbVie Biotech Ventures Inc. | Delaware |
| AbbVie Biotherapeutics Inc. | Delaware |
| AbbVie Domestic Holdings Inc. | Delaware |
| AbbVie Endocrine Inc. | Delaware |
| AbbVie Endocrinology Inc. (d/b/a Pharmacy Solutions) | Delaware |
| AbbVie Finance Corporation | Delaware |
| AbbVie Finance LLC | Delaware |
| AbbVie Global Inc. | Delaware |
| AbbVie Global Holdings Inc. | Delaware |
| AbbVie Holdco Inc. | Delaware |
| AbbVie Holdings Inc. | Delaware |
| AbbVie International Inc. | Delaware |
| AbbVie Investments Inc. | Delaware |
| AbbVie Pharma Inc. | Delaware |
| AbbVie Pharmaceuticals LLC | Delaware |
| AbbVie Products LLC | Georgia |

| | |
|---|---|
| AbbVie Purchasing LLC | Delaware |
| AbbVie Resources Inc. | Delaware |
| AbbVie Resources International Inc. | Delaware |
| AbbVie Respiratory LLC | Delaware |
| AbbVie Sales Inc. | Delaware |
| AbbVie Services Inc. | Delaware |
| AbbVie Stemcentrx LLC | Delaware |
| AbbVie Subsidiary LLC | Delaware |
| AbbVie US Holdings LLC | Delaware |
| AbbVie US LLC | Delaware |
| AbbVie Ventures LLC | Delaware |
| Aeropharm Technology, LLC | Delaware |
| AGN International Inc. | Delaware |
| AGN Kythera, LP | Delaware |
| AGN Labs LLC | Delaware |
| AGN LLC | Delaware |
| AGN Sundry, LLC | Delaware |
| Allergan Akarna LLC | Delaware |
| Allergan Finance, LLC | Nevada |
| ALLERGAN FINCO 2 INC. | Delaware |
| ALLERGAN FINCO INC. | Delaware |
| Allergan GI Corp | Delaware |

| | |
|---|---|
| Allergan GP Holding LLC | Delaware |
| Allergan Holdco US, Inc. | Delaware |
| Allergan Holdings B1, Inc. | Delaware |
| Allergan Holdings, Inc. | Delaware |
| Allergan, Inc. | Delaware |
| Allergan Laboratories, LLC | Delaware |
| Allergan Lending 2 LLC | Delaware |
| Allergan Lending LLC | Delaware |
| Allergan Pharma Inc. | Delaware |
| Allergan Property Holdings, LLC | Delaware |
| Allergan Puerto Rico Holdings, Inc. | Delaware |
| Allergan Sales Puerto Rico, Inc. | California |
| Allergan Sales, LLC (d/b/a Allergan; d/b/a Bioscience Laboratories) | Delaware |
| Allergan Therapeutics LLC | Delaware |
| Allergan USA, Inc. (d/b/a Pacificom / Pacific Communications) | Delaware |
| Allergan W.C. Holding Inc. | Delaware |
| Anterios, Inc. | Delaware |
| Aptalis Pharma US, Inc. | Delaware |
| AqueSys, Inc. | Delaware |
| BioDisplay Technologies, Inc. | Illinois |
| Bonti, Inc. | Delaware |

| | |
|---|---|
| Cearna Aesthetics, Inc. | Delaware |
| Chase Pharmaceuticals Corporation | Delaware |
| Del Mar Indemnity Company LLC | Hawaii |
| Durata Holdings, Inc. | Delaware |
| Durata Therapeutics, Inc. | Delaware |
| Durata Therapeutics U.S. Limited | Delaware |
| Eden Biodesign, LLC | Delaware |
| Envy Medical, Inc. | Delaware |
| Exemplar Pharma, LLC | Delaware |
| Foresight Vision5, Inc. | Delaware |
| Fremont Holding L.L.C. | Delaware |
| Furiex Pharmaceuticals LLC | Delaware |
| IEP Pharmaceutical Devices, LLC | Delaware |
| Keller Medical, Inc. | Delaware |
| Knoll Pharmaceutical Company | New Jersey |
| KOS Pharmaceuticals, Inc. | Delaware |
| Life Properties Inc. | Delaware |
| LifeCell Corporation | Delaware |
| MAP Pharmaceuticals, LLC | Delaware |
| Mavupharma, Inc. | Delaware |
| MPEX Pharmaceuticals, Inc. | Delaware |

| | |
|---|---|
| Naurex Inc. | Delaware |
| Oculeve, Inc. | Delaware |
| Organics L.L.C. | Delaware |
| Pacific Pharma, Inc. | Delaware |
| Pharmacyclics LLC | Delaware |
| Pharmax Holding Limited | Delaware |
| Repros Therapeutics Inc. | Delaware |
| Rowell Laboratories, Inc. | Minnesota |
| RP Merger Sub, Inc. | Delaware |
| Sapphire Merger Sub, Inc. | Delaware |
| Silicone Engineering, Inc. | California |
| Soliton Inc. | Delaware |
| Suffolk Merger Sub, Inc. | Delaware |
| TeneoOne, Inc. | Delaware |
| Tobira Therapeutics, Inc. | Delaware |
| Topokine Therapeutics, Inc. | Delaware |
| Transderm, Inc. | Delaware |
| Unimed Pharmaceuticals, LLC | Delaware |
| Venice Subsidiary LLC | Delaware |
| Vicuron Pharmaceuticals LLC | Delaware |
| Vitae Pharmaceuticals, LLC | Delaware |
| Warner Chilcott Leasing Equipment Inc. | Delaware |

| | |
|---|---|
| Warner Chilcott Sales (US), LLC | Delaware |
| Zeltiq A LLC | Delaware |
| Zeltiq Aesthetics, Inc. | Delaware |
| Zeltiq International, LLC | Delaware |

| Foreign Subsidiaries | Incorporation |
|---|---|
| AbbVie S.A. | Argentina |
| Allergan Productos Farmaceuticos S.A. | Argentina |
| Allergan Australia Pty Limited | Australia |
| Elastagen Pty Ltd | Australia |
| Kythera Biopharmaceuticals Australia Pty Ltd | Australia |
| AbbVie Pty Ltd | Australia |
| AbbVie GmbH | Austria |
| AbbVie Bahamas Ltd. | Bahamas |
| AbbVie SA | Belgium |
| Allergan N.V. | Belgium |
| Odyssea Pharma SPRL | Belgium |
| AbbVie Ltd | Bermuda |
| AbbVie Biotechnology Ltd | Bermuda |
| AbbVie Finance Limited | Bermuda |
| AbbVie Global Enterprises Ltd. | Bermuda |
| AbbVie Holdings Unlimited | Bermuda |
| Allergan Development Ventures I, LP | Bermuda |
| Allergan Holdings B Ltd. | Bermuda |
| Allergan Holdings B2, Ltd. | Bermuda |
| Kythera Holdings Ltd | Bermuda |
| Warner Chilcott Holdings Company II, Limited | Bermuda |

| | |
|---|---|
| Warner Chilcott Holdings Company III, Limited | Bermuda |
| Warner Chilcott Limited | Bermuda |
| AbbVie d.o.o. | Bosnia |
| AbbVie Farmacêutica Ltda. | Brazil |
| Allergan Productos Farmaceuticos Ltda. | Brazil |
| AbbVie EOOD | Bulgaria |
| Allergan Bulgaria EOOD | Bulgaria |
| AbbVie Corporation | Canada |
| AbbVie Holdings Corporation | Canada |
| Allergan Inc. | Canada |
| Aptalis Pharma Canada ULC | Canada (Alberta) |
| Allergan Holdings C, Ltd. | Cayman Islands |
| Allergan Overseas Holding | Cayman Islands |
| Pharmacyclics Cayman Ltd. | Cayman Islands |
| Stemcentrx Cayman Ltd. | Cayman Islands |
| AbbVie Productos Farmacéuticos Limitada | Chile |
| Allergan Laboratorios Limitada | Chile |
| AbbVie Pharmaceutical Trading (Shanghai) Co., Ltd. | China |
| Allergan (Chengdu) Medical Aesthetics Clinic Co., Ltd. | China |
| Allergan Information Consulting (Shanghai) Co., Ltd. | China |
| Allergan Medical Device (Shanghai) Co., Ltd. | China |

| | |
|---|---|
| AbbVie S.A.S. | Colombia |
| Allergan de Colombia S.A. | Colombia |
| Allergan Costa Rica S.R.L. | Costa Rica |
| AbbVie d.o.o. | Croatia |
| AbbVie Limited | Cyprus |
| AbbVie s.r.o. | Czech Republic |
| Allergan CZ, s.r.o. | Czech Republic |
| AbbVie A/S | Denmark |
| Allergan ApS | Denmark |
| AbbVie, S.R.L. | Dominican Republic |
| AbbVie L.L.C. | Egypt |
| AbbVie OÜ | Estonia |
| AbbVie Oy | Finland |
| Allergan Finland Oy | Finland |
| AbbVie SAS | France |
| Allergan France SAS | France |
| Allergan Holdings France SAS | France |
| Allergan Industrie SAS | France |
| Eurand France S.A.S. | France |
| Forest Holdings France S.A.S. | France |
| AbbVie Biotechnology GmbH | Germany |
| AbbVie Deutschland GmbH & Co. KG | Germany |

| | |
|---|---|
| AbbVie Komplementär GmbH | Germany |
| AbbVie Pharmaceuticals GmbH | Germany |
| AbbVie Real Estate Management GmbH | Germany |
| Allergan GmbH | Germany |
| AbbVie (Gibraltar) Holdings Limited | Gibraltar |
| AbbVie (Gibraltar) Limited | Gibraltar |
| AbbVie Pharmaceuticals Societe Anonyme | Greece |
| Allergan Hellas Pharmaceuticals S.A. | Greece |
| AbbVie, Socieded Anonima | Guatemala |
| AbbVie Limited | Hong Kong |
| Allergan Hong Kong Limited | Hong Kong |
| AbbVie Gyogyszerkereskedelmi Korlatolt Felelossegu Tarsasag | Hungary |
| Allergan Hungary Kft. | Hungary |
| Allergan Healthcare India Private Limited | India |
| Allergan India Private Limited* | India |
| AbbVie International Holdings Unlimited Company | Ireland |
| AbbVie Ireland Holdings Unlimited Company | Ireland |
| AbbVie Ireland Unlimited Company | Ireland |
| AbbVie Limited | Ireland |
| AbbVie Manufacturing Management Unlimited Company | Ireland |

| | |
|---|---|
| Allergan Botox Unlimited Company (In voluntary liquidation) | Ireland |
| Allergan Equities Unlimited Company | Ireland |
| Allergan Furiex Ireland Limited (In voluntary liquidation) | Ireland |
| Allergan Holdings Unlimited Company | Ireland |
| Allergan Ireland Holdings Unlimited Company | Ireland |
| Allergan Ireland Limited | Ireland |
| Allergan Limited | Ireland |
| Allergan Pharma Limited | Ireland |
| Allergan Pharmaceuticals Holdings (Ireland) Unlimited Company (In voluntary liquidation) | Ireland |
| Allergan Pharmaceuticals International Limited | Ireland |
| Allergan Pharmaceuticals Ireland Unlimited Company | Ireland |
| Allergan Services International, Unlimited Company | Ireland |
| Allergan WC Ireland Holdings Limited | Ireland |
| Forest Laboratories Ireland Limited | Ireland |
| Fournier Laboratories Ireland Limited | Ireland |
| Pharmacyclics (Europe) Limited | Ireland |
| Tosara Exports Limited (In voluntary liquidation) | Ireland |
| Warner Chilcott Intermediate (Ireland) ULC | Ireland |
| Zeltiq Ireland International Holdings Unlimited Company | Ireland |
| Zeltiq Ireland Unlimited Company | Ireland |
| AbbVie Biopharmaceuticals Ltd. | Israel |

| | |
|---|---|
| Allergan Israel Ltd. | Israel |
| Marbelle Threads Ltd. | Israel |
| AbbVie S.r.l. | Italy |
| Allergan S.p.A. | Italy |
| Aptalis Pharma S.r.l. | Italy |
| AbbVie GK | Japan |
| Allergan International YK | Japan |
| Allergan Japan KK | Japan |
| Allergan K.K. | Japan |
| Allergan NK | Japan |
| AbbVie Ltd | Korea, South |
| Allergan Korea Ltd. | Korea, South |
| AbbVie SIA | Latvia |
| AbbVie UAB | Lithuania |
| Allergan Baltics, UAB | Lithuania |
| AbbVie Biotherapeutics S.àr.l. | Luxembourg |
| AbbVie Holdings S.à r.l. | Luxembourg |
| AbbVie Global S.à r.l. | Luxembourg |
| Allergan AHI S.à r.l. | Luxembourg |
| Allergan Capital 2 S.à r.l. | Luxembourg |
| Allergan Capital S.à r.l. | Luxembourg |
| Allergan Europe S.à r.l. | Luxembourg |

| | |
|---|---|
| Allergan Finance S.à r.l. | Luxembourg |
| Allergan Funding SCS | Luxembourg |
| Allergan Global S.à r.l. | Luxembourg |
| Allergan Holdings S.à r.l. | Luxembourg |
| Allergan International Holding S.à r.l. | Luxembourg |
| Allergan Luxembourg International S.à r.l. | Luxembourg |
| Allergan WC 1 S.à r.l. | Luxembourg |
| Allergan WC 2 S.à r.l. | Luxembourg |
| AbbVie Sdn. Bhd. | Malaysia |
| Allergan Malaysia Sdn Bhd | Malaysia |
| Allergan Malta Holding Limited | Malta |
| Allergan Malta II Limited | Malta |
| Allergan Malta Limited | Malta |
| AbbVie Farmacéuticos, S.A. de C.V. | Mexico |
| Allergan Servicios Profesionales, S. de R.L. de C.V. | Mexico |
| Allergan, S.A. de C.V. | Mexico |
| AbbVie B.V. | Netherlands |
| AbbVie Central Finance B.V. | Netherlands |
| AbbVie Enterprises B.V. | Netherlands |
| AbbVie Finance B.V. | Netherlands |
| AbbVie Ireland NL B.V. | Netherlands |

| | |
|---|---|
| AbbVie Japan Holdings B.V. | Netherlands |
| AbbVie Logistics B.V. | Netherlands |
| AbbVie Nederland Holdings B.V. | Netherlands |
| AbbVie Pharmaceuticals B.V. | Netherlands |
| AbbVie Research B.V. | Netherlands |
| AbbVie Venezuela B.V. | Netherlands |
| AbbVie Venezuela Holdings B.V. | Netherlands |
| Allergan B.V. | Netherlands |
| Aptalis Holding B.V. | Netherlands |
| Aptalis Netherlands B.V. | Netherlands |
| Forest Finance B.V. | Netherlands |
| Warner Chilcott Nederland B.V. | Netherlands |
| AbbVie Limited | New Zealand |
| Allergan New Zealand Limited | New Zealand |
| AbbVie AS | Norway |
| Allergan AS | Norway |
| AbbVie, S. de R.L. | Panama |
| Allergan Healthcare Philippines, Inc. | Philippines |
| AbbVie Polska Sp. z o.o. | Poland |
| AbbVie Sp. z o.o. | Poland |
| Allergan Sp. z o.o. | Poland |
| AbbVie, L.da | Portugal |

| | |
|---|---|
| AbbVie Promoção, L.da | Portugal |
| AbbVie Corp | Puerto Rico |
| Knoll LLC | Puerto Rico |
| AbbVie S.R.L. | Romania |
| AbbVie Trading S.R.L. | Romania |
| Allergan S.R.L. | Romania |
| AbbVie Limited Liability Company | Russia |
| Allergan C.I.S. S.a.r.l. | Russia |
| Allergan Saudi Arabia LLC* | Saudi Arabia |
| Allergan d.o.o. Beograd | Serbia |
| AbbVie Operations Singapore Pte. Ltd. | Singapore |
| AbbVie Pte. Ltd. | Singapore |
| Allergan Singapore Pte. Ltd. | Singapore |
| AbbVie Holdings s.r.o. | Slovakia |
| AbbVie s.r.o. | Slovakia |
| Allergan SK s.r.o. | Slovakia |
| AbbVie Biofarmacevtska druzba d.o.o. | Slovenia |
| AbbVie (Pty) Ltd. | South Africa |
| Allergan Pharmaceuticals (Proprietary) Limited | South Africa |
| AbbVie Spain, S.L. | Spain |
| Allergan S.A. | Spain |

| | |
|---|---|
| AbbVie AB | Sweden |
| Allergan Norden AB | Sweden |
| AbbVie AG | Switzerland |
| AbbVie Biopharmaceuticals GmbH | Switzerland |
| Allergan AG | Switzerland |
| Pharmacyclics Switzerland GmbH | Switzerland |
| VarioRaw Percutive S.à r.l. | Switzerland |
| Warner Chilcott Pharmaceuticals S à rl | Switzerland |
| Allergan Pharmaceuticals Taiwan Co. Ltd. | Taiwan |
| AbbVie Ltd. | Thailand |
| Allergan (Thailand) Limited | Thailand |
| AbbVie Sarl | Tunisia |
| AbbVie Tıbbi İlaçlar Sanayi ve Ticaret Limited Şirketi | Turkey |
| Allergan Ilaclari Ticaret Anonim Sirketi | Turkey |
| Allergan Ukraine LLC | Ukraine |
| Allergan Middle East Limited | United Arab Emirates |
| AbbVie Australasia Holdings Limited | United Kingdom |
| AbbVie Biotherapeutics Limited | United Kingdom |
| AbbVie Investments Limited | United Kingdom |
| AbbVie Ltd | United Kingdom |
| AbbVie Trustee Company Limited | United Kingdom |
| AbbVie UK Holdco Limited | United Kingdom |

| | |
|---|---|
| Akarna Therapeutics, Limited | United Kingdom |
| Allergan Holdco UK Limited | United Kingdom |
| Allergan Holdings Limited | United Kingdom |
| Allergan Limited | United Kingdom |
| Lifecell EMEA Limited (In voluntary liquidation) | United Kingdom |
| Renable Pharma Ltd. | United Kingdom |
| Zeltiq Limited (In voluntary liquidation) | United Kingdom |
| AbbVie S.A. | Uruguay |
| AbbVie Pharmaceuticals SCA. | Venezuela |

\* Ownership of such subsidiary is less than 100% by AbbVie or an AbbVie subsidiary

## EXHIBIT L

EX-21.1 10 agn-ex211_448.htm EX-21.1

Exhibit 21.1

| Name | Jurisdiction of Incorporation |
|---|---|
| AGN International Inc. | US - Delaware |
| AGN Kythera, L.P. | US- Delaware |
| AGN Labs LLC | US - Delaware |
| AGN LLC | US - Delaware |
| AGN Sundry LLC | US - Delaware |
| Akarna Therapeutics, Limited | UK |
| Allergan  WC 1 S.a r.l. | Luxembourg |
| Allergan (Chengdu) Medical Aesthetics Clinic Co., Ltd. | China |
| Allergan (Thailand) Limited | Thailand |
| Allergan AG | Switzerland |
| Allergan AHI  S.à r.l. Management (DIFC Branch) | UAB |
| Allergan AHI S.á r.l. | Luxembourg |
| Allergan AHI S.á r.l.,  Luxembourg, Zweigniederlassung Zug Branch | Switzerland |
| Allergan Akarna LLC | US - Delaware |
| Allergan ApS | Denmark |
| Allergan AS | Norway |
| Allergan Australia Pty Limited | Australia |
| Allergan B.V. | Netherlands, The |
| Allergan Baltics, UAB | Lithuania |
| Allergan Baltics, UAB Eesti filiaal | Estonia Branch |
| Allergan Baltics, UAB Latvijas filias | Latvia |
| Allergan Biologics Ltd. | UK |
| Allergan Botox Unlimited Company | Ireland |
| Allergan Bulgaria EOOD | Bulgaria |
| Allergan C.I.S. SARL | Russian Federation |
| Allergan Capital  S.à r.l. | Luxembourg |
| Allergan Capital 2 S.à r.l. | Luxembourg |
| Allergan Capital 2 Sarl, Luxembourg, Zweigniederlassung, Zug | Switzerland |
| Allergan Capital S.à r.l., Luxembourg, Zweigniederlassung Zug Branch | Switzerland |
| Allergan Cayman Islands Irish Branch | Ireland |
| Allergan Costa Rica S.R.L | Costa Rica |
| Allergan CZ, s.r.o. | Czech Republic |
| Allergan d.o.o. Beograd | Serbia |
| Allergan de Colombia S.A. | Colombia |
| Allergan de Venezuela, C.A. | Venzuela |
| Allergan Development Ventures I Ireland Unlimited Company | Ireland |
| Allergan Development Ventures I LP | Bermuda |
| Allergan Development Ventures I UK | UK |
| Allergan Equities Unlimited Company | Ireland |
| Allergan Europe S.à r.l. | Luxembourg |
| Allergan Finance  S.à r.l. | Luxembourg |
| Allergan Finance, LLC | US - Nevada |
| Allergan Finco 2 Inc. | US - Delaware |
| Allergan Finco Inc. | US - Delaware |

**Exhibit 21.1**

| | |
|---|---|
| Allergan Finland Oy | Finland |
| Allergan France SAS | France |
| Allergan Funding SCS | Luxembourg |
| Allergan Furiex Ireland Limited | Ireland |
| Allergan GI Corp. | US - Delaware |
| Allergan Global S.à r.l. | Luxembourg |
| Allergan GmbH | Germany |
| Allergan GP Holding LLC | US- Delaware |
| Allergan Healthcare India Private Limited | India |
| Allergan Healthcare Philippines, Inc. | Philippines |
| Allergan Hellas Pharmaceuticals S.A. | Greece |
| Allergan Holdco UK Limited | UK |
| Allergan Holdco US, Inc. | US - Delaware |
| Allergan Holdings B Ltd. | Bermuda |
| Allergan Holdings B1, Inc. | US - Delaware |
| Allergan Holdings B2 Limited | Bermuda |
| Allergan Holdings C Ltd | Cayman Island |
| Allergan Holdings France SAS | France |
| Allergan Holdings Limited | UK |
| Allergan Holdings S. à r.l. | Luxembourg |
| Allergan Holdings Unlimited Company | Ireland |
| Allergan Holdings, Inc. | US - Delaware |
| Allergan Hong Kong Limited | Hong Kong |
| Allergan Hungary Kft. | Hungary |
| Allergan Ilaclari Ticaret A.S. | Turkey |
| Allergan Inc. | Canada |
| Allergan India Private Limited | India |
| Allergan Industrie SAS | France |
| Allergan Information Consulting (Shanghai) Co., Ltd. | China |
| Allergan International Holding  S.à r.l. | Luxembourg |
| Allergan International YK | Japan |
| Allergan Ireland Finance Limited | Ireland |
| Allergan Ireland Holdings Unlimited Company | Ireland |
| Allergan Ireland Limited | Ireland |
| Allergan Israel Limited | Israel |
| Allergan Japan KK | Japan |
| Allergan KK | Japan |
| Allergan Korea Ltd | Korea |
| Allergan Laboratories, LLC | US - Delaware |
| Allergan Laboratorios Limitada | Chile |
| Allergan Lending 2 LLC | US - Delaware |
| Allergan Lending LLC | US - Delaware |
| Allergan Limited | UK |
| Allergan Luxembourg International S.à r.l. | Luxembourg |
| Allergan Malaysia Sdn. Bhd. | Malaysia |

Exhibit 21.1

| | |
|---|---|
| Allergan Malta Holding Limited | Malta |
| Allergan Malta II Limited | Malta |
| Allergan Malta Limited | Malta |
| Allergan Medical Device  (Shanghai) Co., Ltd. | China |
| Allergan Middle East Limited | United Arab Emirates |
| Allergan N.V. | Belgium |
| Allergan New Zealand Ltd. | New Zealand |
| Allergan NK | Japan |
| Allergan Norden AB | Sweden |
| Allergan Norden AB Finnish branch | Finland |
| Allergan Overseas Holding | Cayman Island |
| Allergan Pharma Inc. | US - Delaware |
| Allergan Pharma Limited | Ireland |
| Allergan Pharmaceuticals  (Proprietary) Ltd. | South Africa |
| Allergan Pharmaceuticals Holdings (Ireland) Unlimited Company | Ireland |
| Allergan Pharmaceuticals International Limited | Ireland |
| Allergan Pharmaceuticals International Limited Jordan Office | Jordan |
| Allergan Pharmaceuticals International Limited Lebanon Office | Lebanon |
| Allergan Pharmaceuticals Ireland | Ireland |
| Allergan Pharmaceuticals Taiwan Co. Ltd. | Taiwan |
| Allergan Productos Farmaceuticos S.A. | Argentina |
| Allergan Produtos Farmaceuticos Ltda. | Brazil |
| Allergan Property Holdings, LLC | US - Delaware |
| Allergan Puerto Rico Holdings, Inc. | US - Delaware |
| Allergan S.A. | Spain |
| Allergan S.p.A. | Italy |
| Allergan Sales Puerto Rico, Inc. | US - California |
| Allergan Sales, LLC (d/b/a Allergan; d/b/a Bioscience Laboratories) | US - Delaware |
| Allergan Saudi Arabia LLC | Saudi Arablia |
| Allergan Scientific Office | Egypt |
| Allergan Services International Unlimited Company | Ireland |
| Allergan Servicios Profesionales, S. de R.L. de C.V. | Mexico |
| Allergan Singapore Pte. Ltd. | Singapore |
| Allergan Singapore Pte. Ltd. Indonesia Rep Office | Indonesia |
| Allergan Singapore Pte. Ltd. Vietnam Rep Office | Vietnam |
| Allergan SK s.r.o. | Slovak Republic |
| Allergan Sp. z.o.o. | Poland |
| Allergan S.R.L. | Romania |
| Allergan Therapeutics LLC | US- Delaware |
| Allergan UK LLP | UK |
| Allergan Ukraine, LLC | Ukraine |
| Allergan USA, Inc. (d/b/a Pacificom / Pacific Communications) | US - Delaware |
| Allergan W.C. Holding Inc. | US - Delaware |
| Allergan WC 2 S.a r.l. | Luxembourg |
| Allergan WC Ireland Holdings Ltd. | Ireland |

**Exhibit 21.1**

| | |
|---|---|
| Allergan, Inc. | US - Delaware |
| Allergan, S.A. de C.V. | Mexico |
| Anterios, Inc. | US - Delaware |
| Aptalis Holding B.V. | Netherlands, The |
| Aptalis Netherlands B.V. | Netherlands, The |
| Aptalis Pharma Canada ULC | Canada |
| Aptalis Pharma S.r.l. | Italy |
| Aptalis Pharma UK Limited | UK |
| Aptalis Pharma US, Inc. | US - Delaware |
| AqueSys, Inc. | US - Delaware |
| Bonti, Inc. | US - Delaware |
| Cearna Aesthetics, Inc | US - Delaware |
| Chase Pharmaceuticals Corporation | US - Delaware |
| Collagen Luxembourg SA | Luxembourg |
| Del Mar Indemnity Company, LLC | US - Hawaii |
| Durata Holdings, Inc. | US - Delaware |
| Durata Therapeuctics U.S. Limited | US - Delaware |
| Durata Therapeutics, Inc. | US - Delaware |
| Eden Biodesign, LLC | US - Delaware |
| Elastagen Pty Limited | Australia |
| Envy Medical, Inc. | US - Delaware |
| Eurand France S.A.S. | France |
| Exemplar Pharma LLC | US - Delaware |
| Forest Finance B.V. | Netherlands, The |
| Forest Holdings France S. A.S. | France |
| Forest Laboratories Holdings Limited | Ireland |
| Forest Laboratories Ireland Ltd | Ireland |
| ForSight VISION5, Inc. | US - Delaware |
| Furiex Pharmaceuticals, LLC | US - Delaware |
| Keller Medical, Inc. | US - Delaware |
| Kythera Biopharmaceuticals Australia Pty Ltd. | Australia |
| Kythera Holdings Ltd. | Bermuda |
| LifeCell Corporation | US - Delaware |
| LifeCell EMEA Limited | UK |
| LifeCell EMEA Limited Austria branch | Austria |
| LifeCell EMEA Limited Italy branch | Italy |
| LifeCell EMEA Limited Sucursal en España | Spain |
| LifeCell EMEA Limited, Zweigniederlassung Zürich | Switzerland |
| LifeCell Medical Resources Limited in voluntary liquidation | Ireland |
| MAP Pharmaceuticals LLC | US - Delaware |
| McGhan Ireland Holdings Ltd. | Ireland |
| McGahn Limited | Ireland |
| MPEX Pharmaceuticals, Inc. | US - Delaware |
| Naurex Inc. | US - Delaware |
| Northwood Medical Innovation, Ltd. | UK |

**Exhibit 21.1**

| | |
|---|---|
| Oculeve, Inc. | US - Delaware |
| Odyssea Pharma SPRL | Belgium |
| Pacific Pharma, Inc. | US - Delaware |
| Pharm-Allergan GmbH Austria branch | Austria |
| Pharmax Holding Limited | US - Delaware |
| Renable Pharma Limited | UK |
| Repros Therapeutics Inc,. | US- Delaware |
| RP Merger Sub, Inc. | US - Delaware |
| Seabreeze Silicone Unlimited Company | Ireland |
| Silicone Engineering Inc. | US - California |
| Tobira Therapeutics, Inc. | US - Delaware |
| Topokine Therapeutics, Inc. | US - Delaware |
| Tosara Exports  Limited | Ireland |
| Transderm, Inc. | US - Utah |
| Varioraw Percutive Sàrl | Switzerland |
| Vicuron Pharmaceuticals LLC | US - Delaware |
| Viokace LLC | US - Delaware |
| Vitae Pharmaceuticals LLC | US - Delaware |
| Warner Chilcott Holdings Company II, Limited | Bermuda |
| Warner Chilcott Holdings Company III, Limited | Bermuda |
| Warner Chilcott Intermediate (Ireland) Limited | Ireland |
| Warner Chilcott Leasing Equipment Inc. | US - Delaware |
| Warner Chilcott Limited | Bermuda |
| Warner Chilcott Nederland B.V. | Netherlands, The |
| Warner Chilcott Pharmaceuticals S. àr.l. | Switzerland |
| Warner Chilcott Sales (US), LLC | US - Delaware |
| ZELTIQ A, LLC | US - Delaware |
| ZELTIQ Aesthetics, Inc. | US - Delaware |
| ZELTIQ International, LLC | US - Delaware |
| ZELTIQ International, LLC - Singapore Branch | Singapore |
| ZELTIQ Ireland International Holdings UC | Ireland |
| ZELTIQ Ireland Unlimited Company | Ireland |
| ZELTIQ Limited | United Kingdom |
| Zeltiq Limited Spanish branch | Spain |
| Zenpep LLC | US - Delaware |

**EXHIBIT M**

**DIVESTED ENTITIES**

**Schedule  4.6(c)-Transferred  Group**

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 1. | Warner Chilcott Company, LLC | Puerto Rico |
| 2. | Warner Chilcott (Ireland) Limited | Ireland |
| 3. | Warner Chilcott Finance LLC. | Delaware |
| 4. | Warner Chilcott Australia Pty. Ltd. | Australia |
| 5. | Warner Chilcott Pharmaceuticals B.V.B.A. | Belgium |
| 6. | Warner Chilcott France SAS | France |
| 7. | Warner Chilcott Italy S.r.l. | Italy |
| 8. | Actavis Pharma Iberia S.L. (f7k/a Warner Chilcott Iberia S.L.) | Spain |
| 9. | Robin Hood Holdings Ltd. | Malta |
| 10. | Paomar plc | Cyprus |
| 11. | Actavis Phanna Pty Ltd. | Australia |
| 12. | Makoff R&D Laboratories, Inc. | California |
| 13. | R&D Pharmaceutical, Inc. | California |
| 14. | R&D Ferriecit Capital Resources, Inc. | California |
| 15. | R&D Research & Development Corp. | California |
| 16. | R&D New Media Services, Inc. | California |
| 17. | Royce Laboratories, Inc. | Florida |
| 18. | Royce Research Group, Inc. | Florida |
| 19. | Royce Research & Development Limited Partnership I | Florida |
| 20. | The Rugby Group, Inc. | New York |
| 21. | Watson Laboratories, Inc. Ohio | New York |

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 22. | Rugby Laboratories, Inc. | New York |
| 23. | Changzhou Siyao Pharmaceuticals Co.,Ltd. | China |
| 24. | Watson Pharnaceuticals (Asia) Ltd. | BVT |
| 25. | WP Holdings, Ltd. | BVI |
| 26. | Watson Pharn l aceuticals, China Ltd | BVI |
| 27. | Med All Enterprise Consulting (Shanghai) Co. Ltd. | China |
| 28. | Nicobrand Limited | Northern Ireland |
| 29. | Watson Pharmaceuticals International Ltd. | BVI |
| 30. | Watson Diagnostics, Inc. | Delaware |
| 31. | Del Mar Indemnity Co. Inc. | Hawaii |
| 32. | Actavis Laboratories NY, Inc. | New York |
| 33. | Circa Pharmaceuticals West, Inc. | California |
| 34. | Circa Sub | New York |
| 35. | Andrx Corporation | Delaware |
| 36. | Andrx South Carolina I, Inc. | South Carolina |
| 37. | Andrx Pharnrceuticals (Mass), Inc. | Florida |
| 38. | Andrx Pharnrceuticals Equipment #1, LLC | Florida |
| 39. | Andrx Pharmaceuticals (NC) Inc. | Florida |
| 40. | Andrx Pharmaceuticals, (NC) Equipment LLC | Delaware |
| 41. | SR Six, Inc. | Florida |
| 42. | Ancirc Pharmaceuticals | New York |
| 43. | RxAPS, Inc. | Florida |
| 44. | Andrx Pharmaceuticals Sales and Marketing, Inc. | Florida |

ALLERGAN_MDL_03367099

AL-NY-00831.00052

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 45. | Actavis Laboratories FL, Inc. | Florida |
| 46. | Watson Management Corporation | Florida |
| 47. | Watson Therapeutics, Inc. | Florida |
| 48. | Valmed Pharmaceuticals, Inc. | New York |
| 49. | Andrx Pharmaceuticals, LLC | Delaware |
| 50. | Andrx Labs LLC | Delaware |
| 51. | Andrx Laboratories (NJ) Inc. | Delaware |
| 52. | Watson Cobalt Holdings, LLC | Delaware |
| 53. | Watson Manufacturing Services, Inc. | Delaware |
| 54. | Natrapac, Inc. | Utah |
| 55. | Coventry Acquisition, LLC | Delaware |
| 56. | Cobalt Laboratories, LLC | Delaware |
| 57. | Watson Phanna Private Ltd. | India |
| 58. | Watson Laboratories, LLC | Delaware |
| 59. | Actavis Puerto Rico Holdings Inc. | Delaware |
| 60. | Actavis US Holding LLC | Delaware |
| 61. | Actavis LLC | Delaware |
| 62. | Actavis South Atlantic LLC | Delaware |
| 63. | Actavis Elizabeth LLC | Delaware |
| 64. | Actavis Kadian LLC | Delaware |
| 65. | Actavis Mid Atlantic LLC | Delaware |
| 66. | Actavis Totowa LLC | Delaware |
| 67. | Actavis Phannaceuticals NJ, Inc. | Delaware |

ALLERGAN_MDL_03367100

AL-NY-00831.00053

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 68. | Watson Laboratories, Inc. | Connecticut |
| 69. | Watson Laboratories, Inc. | Delaware |
| 70. | Schein Bayer Pharmaceutical Services, Tnc. | Delaware |
| 71. | Schein Pharmaceutical International, Inc. | Delaware |
| 72. | Schein Pharmaceutical Ltd | Bermuda |
| 73. | Marsam Pharma, LLC | Delaware |
| 74. | MSI, Inc. | Delaware |
| 75. | Actavis Holding 2 Sarl | Luxembourg |
| 76. | Actavis Services (Asia) Ltd. | Malta |
| 77. | Arrow Laboratories, Ltd. | Malta |
| 78. | Arrow Supplies, Ltd. | |
| 79. | Arrow Pharma HK Ltd. | Hong Kong |
| 80. | Marrow Pharmaceuticals Research & Development Co Ltd. | China |
| 81. | Actavis S.a.r.l. | Luxembourg |
| 82. | Paomar Plc. | Cyprus |
| 83. | "Specifar" | Greece |
| 84. | Alet | Greece |
| 85. | Actavis Pharma Pty Ltd | Australia |
| 86. | Ascent Pharm l ahealth Pty Ltd | Australia |
| 87. | Actavis Australia Pty Ltd | Australia |
| 88. | Ascent Australia Pty Ltd | Australia |
| 89. | Actavis Pty Ltd | Australia |
| 90. | Ascent Pharm l a Pty Ltd. | Australia |

ALLERGAN_MDL_03367101

AL-NY-00831.00054

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 91.  Ascent Pharmahealth Asia Pte Ltd | Singapore |
| 92.  Drug Houses of Australia Pte Ltd. | Singapore |
| 93.  Ascent Pharm,ahealth Hong Kong Ltd. | Hong Kong |
| 94.  Actavis Sdn. Bhd. | Malaysia |
| 95.  Arrow Group ApS | Denmark |
| 96.  Arrow ApS | Denmark |
| 97.  Makewhey Products Pty. Ltd. | South Africa |
| 98.  Actavis Holdings South Africa (Pty) Ltd. | South Africa |
| 99.  Actavis Pharma (Pty) Ltd. | South Africa |
| 100. Actavis (Pty) Ltd. | South Africa |
| 101. Scriptpham1 Marketing (Pty) Ltd | South Africa |
| 102. Referral-Net (Pty) Ltd. | South Africa |
| 103. Spear Pharmaceuticals (Pty) Ltd | South Africa |
| 104. Pharmascript Pharm,aceuticals Ltd. | South Africa |
| 105. Arrow Pharma Tender (Pty) Ltd. | South Africa |
| 106. Scriptphann Risk Management (Pty) Ltd. | South Africa |
| 107. Imbani Pharmaceuticals (Pty) Ltd. | South Africa |
| 108. Zelphy 1308 (Pty) Ltd. | South Africa |
| 109. Arrow Poland SA | Poland |
| 110. Arrowblue Produtos Farmaceuticos SA | Portugal |
| 111. Bowmed Ltd | UK |
| 112. Selamine Ltd. | Ireland |
| 113. Arrow Blue Ltd | Israel |

ALLERGAN_MDL_03367102

AL-NY-00831.00055

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 114. Seeker Investments Ltd. | BVI |
| 115. SC Pharma (Pty) Ltd. | Australia |
| 116. Spirit Pharmaceuticals NZ Pty Ltd. | New Zealand |
| 117. Willow Pharmaceuticals Pty Ltd. | Australia |
| 118. Medis Pharma Pty Ltd | Australia |
| 119. Eremad Pty Ltd. | Australia |
| 120. Arrow Lakemedel AB | Sweden |
| 121. Arrow Generics Ltd. | UK |
| 122. Arrow No 7 Ltd | UK |
| 123. Breath Ltd | UK |
| 124. Soosysoo Ltd. | BVI |
| 125. Actavis New Zealand Limited | New Zealand |
| 126. Watson Laboratories, S. de R.L. de C.V | Mexico |
| 127. Actavis Canada Company | Canada |
| 128. Actavis Pharma Company | Canada |
| 129. 3242038 Nova Scotia Company | Canada |
| 130. Abri Pharmceuticals Company | Canada |
| 131. Actavis Pharma Holding 4 ehf. (APH4) | Iceland |
| 132. Actavis Pharma Holding 5 ehf. (APH5) | Iceland |
| 133. Actavis Group ehf. | Iceland |
| 134. Actavis Group PTC ehf. | Iceland |
| 135. Actavis Dutch Holding BV | Netherlands |
| 136. LLC Actavis | Russia |

ALLERGAN_MDL_03367103

AL-NY-00831.00056

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 137. Actavis Ilaclari AS# TU0000001 | Turkey |
| 138. Opening Pharma Bulgaria EOOD | Bulgaria |
| 139. Open Pharma LLC | Russia |
| 140. Actavis ehf. | Iceland |
| 141. Medis ehf. | Iceland |
| 142. Medis Pharma France SAS | France |
| 143. Medis-Danmark A/S. # DA000003 | Denmark |
| 144. Actavis Ireland Ltd. | Ireland |
| 145. Actavis Italy S.p.A. # IT000001 | Italy |
| 146. Actavis Isle of Man Ltd. | Isle of Man |
| 147. Actavis Nordic A/S # DA000002 | Denmark |
| 148. Actavis Oy | Finland |
| 149. UAB Actavis Baltic | Lithuania |
| 150. Actavis Holding AB | Sweden |
| 151. Actavis AB | Sweden |
| 152. Actavis Holding Germany GmbH | |
| 153. Medis Pharma GmbH | Germany |
| 154. Actavis A/S #DA000001 | Denmark |
| 155. Actavis Norway AS | Norway |
| 156. Actavis, S. de. R.L. de C.V. | Mexico |
| 157. Actavis Pharma S. de R.L. de C.V. | Mexico |
| 158. Actavis Hungary Kft. | Hungary |
| 159. Arrow Phann (Malta) Ltd. | Malta |

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 160. Medis Pharma BV | Netherlands |
| 161. Pharma Pack International B.V. | Netherlands |
| 162. Actavis Polska Sp. z.o.o. | Poland |
| 163. Actavis International Ltd. | Malta |
| 164. Actavis Malta Ltd. | Malta |
| 165. Actavis Export International Ltd. | Malta |
| 166. Actavis Ltd. | Malta |
| 167. Actavis GmbH | Austria |
| 168. Actavis Holdings UK Ltd. | UK |
| 169. Actavis Holdings UK II Ltd. | UK |
| 170. Actavis UK Ltd. | UK |
| 171. Warner Chilcott Acquisition Limited | UK |
| 172. Chilcott UK Limited | UK |
| 173. Warner Chilcott Research Laboratories Ltd. | UK |
| 174. Warner Chilcott UK Limited | UK |
| 175. Warner Chilcott Pharmaceuticals UK Limited | UK |
| 176. Warner Chilcott Deutschland GmbH | Germany |
| 177. Millbrook (NI) Limited | UK |
| 178. Auden Mckenzie Holdings Ltd. | UK |
| 179. Auden Mckenzie (Pharma Division) Ltd. | UK |
| 180. NRIM Ltd. | UK |
| 181. Lime Pharma Ltd. | UK |
| 182. D3 Pharma Ltd. | UK |

ALLERGAN_MDL_03367105

AL-NY-00831.00058

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 183. Actavis d.o.o. Belgrade | Serbia |
| 184. Lotus Laboratories Private Ltd. | India |
| 185. Actavis Ukraine LLC | Ukraine |
| 186. Zdravlje AD | Serbia |
| 187. Actavis Switzerland AG | Switzerland |
| 188. Oncopharma AG# SZ000001 | Switzerland |
| 189. Sindan Phamla SRL | Romania |
| 190. Actavis SRL | Romania |
| 191. Sindan Foundation | Romania |
| 192. Actavis CZ a.s. # EZ000001 | Czech Republic |
| 193. Actavis S.r.o. | Slovak Republic |
| 194. Biovena Pharma Sp. z.o.o. | Poland |
| 195. Actavis (Cyprus) Ltd. | Cyprus |
| 196. Actavis Operations EOOD | Bulgaria |
| 197. Balkanpharma Troyan AD | Bulgaria |
| 198. Balkanpharma Dupnitsa AD | Bulgaria |
| 199. Balkanpharma Security EOOD | Bulgaria |
| 200. Balkanpharma Healthcare International (Cyprus) Ltd. | Cyprus |
| 201. Actavis EAD | Bulgaria |
| 202. Actavis Istanbul Ilac Sanayive Ticaret Ltd. Sirketi | Turkey |
| 203. Actavis (MEEA) FZE | UAE |
| 204. Actavis Farmaceutica Limitada | Brazil |
| 205. Actavis Holding Asia BV | Netherlands |

ALLERGAN_MDL_03367106

AL-NY-00831.00059

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 206. Actavis Hong Kong Limited | Hong Kong |
| 207. China Medical & Chemical Industrial Development Group Ltd. | China |
| 208. Actavis Phanna Development Centre Private Ltd. | India |
| 209. Actavis Pharma Private Ltd. | India |
| 210. PT Actavis Indonesia | Indonesia |
| 211. Actavis ASKA KK | Japan |
| 212. Actavis KK # JA0000001 | Japan |
| 213. Actavis (Asia Pacific) Pte. Ltd. | Singapore |
| 214. Actavis Thailand Co., Ltd. (flk/a Silom Medical Co., Ltd) | Thailand |
| 215. Silom Medical International Co., Ltd. | Thailand |
| 216. Forest Laboratories UK Ltd. | UK |
| 217. Pharmax Ltd. | UK |
| 218. Forest Pharma BV | Netherlands |
| 219. Forest Laboratories Osterreich GmbH | Austria |
| 220. Forest Laboratories Denmark ApS | Denmark |
| 221. Forest Laboratories France S.A.S. | France |
| 222. Forest Laboratories Deutschland GmbH | Germany |
| 223. Forest Laboratories Italy S.r.L. | Italy |
| 224. Forest Laboratories Spain, SL | Spain |
| 225. Forest Laboratories Switzerland GmbH | |
| 226. Axcan France (Invest) SAS | France |
| 227. Actavis Biophanna SAS | France |
| 228. Aptalis Pharma SAS | France |

| Company Name | Jurisdiction of Incorporation |
|---|---|
| **229.** Forest Tosara Ltd. | Ireland |
| **230.** Allergan UK LLP | UK |
| **231.** Actavis Laboratories UT, Tnc. | Delaware |
| **232.** Watson Laboratories, Inc. | Nevada |
| **233.** Actavis Pham 1 a, Inc. | Delaware |
| **234.** Arrow International Ltd. | Malta |
| **235.** Allergan UK Group Ltd. | UK |

**236**. Actavis France ehf.

**237**. Actavis Holdco Us, Inc.

| Name | Population (2020) |
|------|-------------------|
| Alachua County | 278,468 |
| Baker County | 28,259 |
| Bay County | 175,216 |
| Bradford County | 28,303 |
| Brevard County | 606,612 |
| Broward County | 1,944,375 |
| Calhoun County | 13,648 |
| Charlotte County | 186,847 |
| Citrus County | 153,843 |
| Clay County | 218,245 |
| Collier County | 375,752 |
| Columbia County | 69,698 |
| DeSoto County | 33,976 |
| Dixie County | 16,759 |
| Duval County | 995,567 |
| Escambia County | 321,905 |
| Flagler County | 115,378 |
| Franklin County | 12,451 |
| Gadsden County | 43,826 |
| Gilchrist County | 17,864 |
| Glades County | 12,126 |
| Gulf County | 14,192 |
| Hamilton County | 14,004 |
| Hardee County | 25,327 |
| Hendry County | 39,619 |
| Hernando County | 194,515 |
| Highlands County | 101,235 |
| Hillsborough County | 1,459,762 |
| Holmes County | 19,653 |
| Indian River County | 159,788 |
| Jackson County | 47,319 |
| Jefferson County | 14,510 |
| Lafayette County | 8,226 |
| Lake County | 383,956 |
| Lee County | 760,822 |
| Leon County | 292,198 |
| Levy County | 42,915 |
| Liberty County | 7,974 |
| Madison County | 17,968 |
| Manatee County | 399,710 |
| Marion County | 375,908 |
| Martin County | 158,431 |

| | |
|---|---|
| Miami-Dade County | 2,701,767 |
| Monroe County | 82,874 |
| Nassau County | 90,352 |
| Okaloosa County | 211,668 |
| Okeechobee County | 39,644 |
| Orange County | 1,429,908 |
| Osceola County | 388,656 |
| Palm Beach County | 1,492,191 |
| Pasco County | 561,891 |
| Pinellas County | 959,107 |
| Polk County | 725,046 |
| Putnam County | 73,321 |
| St. Johns County | 273,425 |
| St. Lucie County | 329,226 |
| Santa Rosa County | 188,000 |
| Sarasota County | 434,006 |
| Seminole County | 470,856 |
| Sumter County | 129,752 |
| Suwannee County | 43,474 |
| Taylor County | 21,796 |
| Union County | 16,147 |
| Volusia County | 553,543 |
| Wakulla County | 33,764 |
| Walton County | 75,305 |
| Washington County | 25,318 |

| Name | County | Population (2020) | Label |
|------|--------|------------------|-------|
| Alachua | Alachua | 10,574 | City |
| Archer | Alachua | 1,140 | City |
| Gainesville | Alachua | 141,085 | City |
| Hawthorne | Alachua | 1,478 | City |
| High Springs | Alachua | 6,215 | City |
| LaCrosse | Alachua | 316 | Town |
| Micanopy | Alachua | 648 | Town |
| Newberry | Alachua | 7,342 | City |
| Waldo | Alachua | 846 | City |
| Glen St. Mary | Baker | 463 | Town |
| Macclenny | Baker | 7,304 | City |
| Lynn Haven | Bay | 18,695 | City |
| Panama City | Bay | 32,939 | City |
| Callaway | Bay | 13,045 | City |
| Mexico Beach | Bay | 916 | City |
| Panama City Beach | Bay | 18,094 | City |
| Parker | Bay | 4,010 | City |
| Springfield | Bay | 8,075 | City |
| Brooker | Bradford | 322 | Town |
| Hampton | Bradford | 432 | City |
| Lawtey | Bradford | 636 | City |
| Starke | Bradford | 5,796 | City |
| Cape Canaveral | Brevard | 9,972 | City |
| Cocoa | Brevard | 19,041 | City |
| Cocoa Beach | Brevard | 11,354 | City |
| Grant-Valkaria | Brevard | 4,509 | Town |
| Indialantic | Brevard | 3,010 | Town |
| Indian Harbour Beach | Brevard | 9,019 | City |
| Malabar | Brevard | 2,949 | Town |
| Melbourne | Brevard | 84,678 | City |
| Melbourne Beach | Brevard | 3,231 | Town |
| Melbourne Village | Brevard | 681 | Town |
| Palm Bay | Brevard | 119,760 | City |
| Palm Shores | Brevard | 1,200 | Town |
| Rockledge | Brevard | 27,678 | City |
| Satellite Beach | Brevard | 11,226 | City |
| Titusville | Brevard | 48,789 | City |
| West Melbourne | Brevard | 25,924 | City |
| Coconut Creek | Broward | 57,833 | City |
| Coral Springs | Broward | 134,394 | City |
| Cooper City | Broward | 34,401 | City |
| Deerfield Beach | Broward | 86,859 | City |

| Dania Beach | Broward | 31,723 | City |
|---|---|---|---|
| Davie | Broward | 105,691 | Town |
| Fort Lauderdale | Broward | 182,760 | City |
| Hallandale Beach | Broward | 41,217 | City |
| Lauderhill | Broward | 74,482 | City |
| Miramar | Broward | 134,721 | City |
| Pembroke Pines | Broward | 171,178 | City |
| Pompano Beach | Broward | 112,046 | City |
| Hillsboro Beach | Broward | 1,987 | Town |
| Hollywood | Broward | 153,067 | City |
| Lauderdale Lakes | Broward | 35,954 | City |
| Lauderdale-by-the-Sea | Broward | 6,198 | Town |
| Lazy Lake | Broward | 33 | Village |
| Lighthouse Point | Broward | 10,486 | City |
| Margate | Broward | 58,712 | City |
| North Lauderdale | Broward | 44,794 | City |
| Oakland Park | Broward | 44,229 | City |
| Parkland | Broward | 34,670 | City |
| Pembroke Park | Broward | 6,260 | Town |
| Plantation | Broward | 91,750 | City |
| Sea Ranch Lakes | Broward | 540 | Village |
| Southwest Ranches | Broward | 7,607 | Town |
| Sunrise | Broward | 97,335 | City |
| Tamarac | Broward | 71,897 | City |
| West Park | Broward | 15,130 | City |
| Weston | Broward | 68,107 | City |
| Wilton Manors | Broward | 11,426 | City |
| Altha | Calhoun | 496 | Town |
| Blountstown | Calhoun | 2,266 | City |
| Punta Gorda | Charlotte | 19,471 | City |
| Crystal River | Citrus | 3,396 | City |
| Inverness | Citrus | 7,543 | City |
| Green Cove Springs | Clay | 9,786 | City |
| Orange Park | Clay | 9,089 | Town |
| Penney Farms | Clay | 821 | Town |
| Keystone Heights | Clay Bradford | 1,446 | City |
| Everglades City | Collier | 352 | City |
| Marco Island | Collier | 15,760 | City |
| Naples | Collier | 19,115 | City |
| Fort White | Columbia | 618 | Town |
| Lake City | Columbia | 12,329 | City |
| Arcadia | DeSoto | 7,420 | City |

| Cross City | Dixie | 1,689 | Town |
|---|---|---|---|
| Horseshoe Beach | Dixie | 165 | Town |
| Atlantic Beach | Duval | 13,513 | City |
| Baldwin | Duval | 1,396 | Town |
| Jacksonville | Duval | 949,611 | City |
| Jacksonville Beach | Duval | 23,830 | City |
| Neptune Beach | Duval | 7,217 | City |
| Century | Escambia | 1,713 | Town |
| Pensacola | Escambia | 54,312 | City |
| Beverly Beach | Flagler | 474 | Town |
| Bunnell | Flagler | 3,276 | City |
| Flagler Beach | Flagler | 5,160 | City |
| Palm Coast | Flagler | 89,258 | City |
| Marineland | Flagler St. Johns | 15 | Town |
| Apalachicola | Franklin | 2,341 | City |
| Carrabelle | Franklin | 2,606 | City |
| Chattahoochee | Gadsden | 2,955 | City |
| Greensboro | Gadsden | 461 | Town |
| Gretna | Gadsden | 1,357 | City |
| Havana | Gadsden | 1,707 | Town |
| Midway | Gadsden | 3,537 | City |
| Quincy | Gadsden | 7,970 | City |
| Bell | Gilchrist | 518 | Town |
| Trenton | Gilchrist | 2,015 | City |
| Moore Haven | Glades | 1,566 | City |
| Port St. Joe | Gulf | 3,357 | City |
| Wewahitchka | Gulf | 2,074 | City |
| Jasper | Hamilton | 3,621 | City |
| Jennings | Hamilton | 749 | Town |
| White Springs | Hamilton | 740 | Town |
| Bowling Green | Hardee | 2,405 | City |
| Wauchula | Hardee | 4,900 | City |
| Zolfo Springs | Hardee | 1,737 | Town |
| Clewiston | Hendry | 7,327 | City |
| LaBelle | Hendry | 4,966 | City |
| Brooksville | Hernando | 8,890 | City |
| Avon Park | Highlands | 9,658 | City |
| Lake Placid | Highlands | 2,360 | Town |
| Sebring | Highlands | 10,729 | City |
| Tampa | Hillsborough | 384,959 | City |
| Plant City | Hillsborough | 39,764 | City |
| Temple Terrace | Hillsborough | 26,690 | City |

| Bonifay | Holmes | 2,759 | City |
|---|---|---|---|
| Esto | Holmes | 341 | Town |
| Noma | Holmes | 208 | Town |
| Ponce de Leon | Holmes | 504 | Town |
| Westville | Holmes | 261 | Town |
| Fellsmere | Indian River | 4,834 | City |
| Indian River Shores | Indian River | 4,241 | Town |
| Orchid | Indian River | 516 | Town |
| Sebastian | Indian River | 25,054 | City |
| Vero Beach | Indian River | 16,354 | City |
| Alford | Jackson | 484 | Town |
| Bascom | Jackson | 87 | Town |
| Campbellton | Jackson | 191 | Town |
| Cottondale | Jackson | 848 | Town |
| Graceville | Jackson | 2,153 | City |
| Grand Ridge | Jackson | 882 | Town |
| Greenwood | Jackson | 539 | Town |
| Jacob City | Jackson | 217 | City |
| Malone | Jackson | 1,959 | Town |
| Marianna | Jackson | 6,245 | City |
| Sneads | Jackson | 1,699 | Town |
| Monticello | Jefferson | 2,589 | City |
| Mayo | Lafayette | 1,055 | Town |
| Astatula | Lake | 1,889 | Town |
| Clermont | Lake | 43,021 | City |
| Eustis | Lake | 23,189 | City |
| Fruitland Park | Lake | 8,325 | City |
| Groveland | Lake | 18,505 | City |
| Howey-in-the-Hills | Lake | 1,643 | Town |
| Lady Lake | Lake | 15,970 | Town |
| Leesburg | Lake | 27,000 | City |
| Mascotte | Lake | 6,609 | City |
| Minneola | Lake | 13,843 | City |
| Montverde | Lake | 1,655 | Town |
| Mount Dora | Lake | 16,341 | City |
| Tavares | Lake | 19,003 | City |
| Umatilla | Lake | 3,685 | City |
| Bonita Springs | Lee | 53,644 | City |
| Cape Coral | Lee | 194,016 | City |
| Estero | Lee | 36,939 | Village |
| Fort Myers | Lee | 86,395 | City |
| Fort Myers Beach | Lee | 5,582 | Town |
| Sanibel | Lee | 6,382 | City |

| Tallahassee | Leon | 196,169 | City |
|---|---|---|---|
| Bronson | Levy | 1,140 | Town |
| Cedar Key | Levy | 687 | City |
| Chiefland | Levy | 2,316 | City |
| Inglis | Levy | 1,476 | Town |
| Otter Creek | Levy | 108 | Town |
| Williston | Levy | 2,976 | City |
| Yankeetown | Levy | 588 | Town |
| Fanning Springs | Levy Gilchrist | 1,182 | City |
| Bristol | Liberty | 918 | City |
| Greenville | Madison | 746 | Town |
| Lee | Madison | 375 | Town |
| Madison | Madison | 2,912 | City |
| Anna Maria | Manatee | 968 | City |
| Bradenton Beach | Manatee | 908 | City |
| Holmes Beach | Manatee | 3,010 | City |
| Bradenton | Manatee | 55,698 | City |
| Palmetto | Manatee | 13,323 | City |
| Longboat Key | Manatee Sarasota | 7,505 | Town |
| Belleview | Marion | 5,413 | City |
| Dunnellon | Marion | 1,928 | City |
| Ocala | Marion | 63,591 | City |
| McIntosh | Marion | 463 | Town |
| Reddick | Marion | 449 | Town |
| Indiantown | Martin | 6,560 | Village |
| Jupiter Island | Martin | 804 | Town |
| Stuart | Martin | 17,425 | City |
| Ocean Breeze | Martin | 301 | Town |
| Sewall's Point | Martin | 1,991 | Town |
| Aventura | Miami-Dade | 40,242 | City |
| Bal Harbour | Miami-Dade | 3,093 | Village |
| Bay Harbor Islands | Miami-Dade | 5,922 | Town |
| Biscayne Park | Miami-Dade | 3,117 | Village |
| Coral Gables | Miami-Dade | 49,248 | City |
| Cutler Bay | Miami-Dade | 45,425 | Town |
| Doral | Miami-Dade | 75,874 | City |
| El Portal | Miami-Dade | 1,986 | Village |
| Golden Beach | Miami-Dade | 961 | Town |
| Hialeah | Miami-Dade | 223,109 | City |
| Hialeah Gardens | Miami-Dade | 23,068 | City |
| Indian Creek | Miami-Dade | 84 | Village |

| | | | |
|---|---|---|---|
| Key Biscayne | Miami-Dade | 14,809 | Village |
| Florida City | Miami-Dade | 13,085 | City |
| Medley | Miami-Dade | 1,056 | Town |
| Homestead | Miami-Dade | 80,737 | City |
| Miami Beach | Miami-Dade | 82,890 | City |
| Miami | Miami-Dade | 442,241 | City |
| Miami Lakes | Miami-Dade | 30,467 | Town |
| Miami Shores | Miami-Dade | 11,567 | Village |
| Miami Springs | Miami-Dade | 13,859 | City |
| Miami Gardens | Miami-Dade | 111,640 | City |
| North Miami | Miami-Dade | 60,191 | City |
| Sweetwater | Miami-Dade | 19,363 | City |
| North Bay Village | Miami-Dade | 8,159 | City |
| North Miami Beach | Miami-Dade | 43,676 | City |
| Opa-locka | Miami-Dade | 16,463 | City |
| Palmetto Bay | Miami-Dade | 24,439 | Village |
| Pinecrest | Miami-Dade | 18,388 | Village |
| South Miami | Miami-Dade | 12,026 | City |
| Sunny Isles Beach | Miami-Dade | 22,342 | City |
| Surfside | Miami-Dade | 5,689 | Town |
| Virginia Gardens | Miami-Dade | 2,364 | Village |
| West Miami | Miami-Dade | 7,233 | City |
| Islamorada | Monroe | 7,107 | Village |
| Key Colony Beach | Monroe | 790 | City |
| Key West | Monroe | 26,444 | City |
| Layton | Monroe | 210 | City |
| Marathon | Monroe | 9,689 | City |
| Callahan | Nassau | 1,526 | Town |
| Fernandina Beach | Nassau | 13,052 | City |
| Hilliard | Nassau | 2,967 | Town |
| Cinco Bayou | Okaloosa | 457 | Town |
| Crestview | Okaloosa | 27,134 | City |
| Destin | Okaloosa | 13,931 | City |
| Fort Walton Beach | Okaloosa | 20,922 | City |
| Laurel Hill | Okaloosa | 584 | City |
| Mary Esther | Okaloosa | 3,982 | City |
| Niceville | Okaloosa | 15,772 | City |
| Shalimar | Okaloosa | 737 | Town |
| Valparaiso | Okaloosa | 4,752 | City |
| Okeechobee | Okeechobee | 5,254 | City |
| Bay Lake | Orange | 29 | City |
| Belle Isle | Orange | 7,032 | City |
| Edgewood | Orange | 2,685 | City |

| Lake Buena Vista | Orange | 24 | City |
|---|---|---|---|
| Maitland | Orange | 19,543 | City |
| Oakland | Orange | 3,516 | Town |
| Apopka | Orange | 54,873 | City |
| Eatonville | Orange | 2,349 | Town |
| Ocoee | Orange | 47,295 | City |
| Orlando | Orange | 307,573 | City |
| Windermere | Orange | 3,030 | Town |
| Winter Garden | Orange | 46,964 | City |
| Winter Park | Orange | 29,795 | City |
| Kissimmee | Osceola | 79,226 | City |
| St. Cloud | Osceola | 58,964 | City |
| Atlantis | Palm Beach | 2,142 | City |
| Belle Glade | Palm Beach | 16,698 | City |
| Boca Raton | Palm Beach | 97,422 | City |
| Boynton Beach | Palm Beach | 80,380 | City |
| Briny Breezes | Palm Beach | 502 | Town |
| Cloud Lake | Palm Beach | 134 | Town |
| Glen Ridge | Palm Beach | 217 | Town |
| Golf | Palm Beach | 255 | Village |
| Greenacres | Palm Beach | 43,990 | City |
| Gulf Stream | Palm Beach | 880 | Town |
| Haverhill | Palm Beach | 2,187 | Town |
| Highland Beach | Palm Beach | 4,295 | Town |
| Hypoluxo | Palm Beach | 2,687 | Town |
| Juno Beach | Palm Beach | 3,858 | Town |
| Jupiter | Palm Beach | 61,047 | Town |
| Jupiter Inlet Colony | Palm Beach | 405 | Town |
| Lake Clarke Shores | Palm Beach | 3,564 | Town |
| Lake Park | Palm Beach | 9,047 | Town |
| Lake Worth Beach | Palm Beach | 42,219 | City |
| Lantana | Palm Beach | 11,504 | Town |
| Loxahatchee Groves | Palm Beach | 3,355 | Town |
| Manalapan | Palm Beach | 419 | Town |
| Mangonia Park | Palm Beach | 2,142 | Town |
| North Palm Beach | Palm Beach | 13,162 | Village |
| Ocean Ridge | Palm Beach | 1,830 | Town |
| Delray Beach | Palm Beach | 66,846 | City |
| Pahokee | Palm Beach | 5,524 | City |
| Palm Beach | Palm Beach | 9,245 | Town |
| Palm Beach Gardens | Palm Beach | 59,182 | City |
| Palm Beach Shores | Palm Beach | 1,330 | Town |
| Palm Springs | Palm Beach | 26,890 | Village |

| Riviera Beach | Palm Beach | 37,604 | City |
|---|---|---|---|
| Royal Palm Beach | Palm Beach | 38,932 | Village |
| South Bay | Palm Beach | 4,860 | City |
| South Palm Beach | Palm Beach | 1,471 | Town |
| Tequesta | Palm Beach | 6,158 | Village |
| Wellington | Palm Beach | 61,637 | Village |
| Westlake | Palm Beach | 906 | City |
| West Palm Beach | Palm Beach | 117,415 | City |
| Dade City | Pasco | 7,275 | City |
| New Port Richey | Pasco | 16,728 | City |
| Port Richey | Pasco | 3,052 | City |
| San Antonio | Pasco | 1,297 | City |
| St. Leo | Pasco | 2,362 | Town |
| Zephyrhills | Pasco | 17,194 | City |
| Belleair | Pinellas | 4,273 | Town |
| Belleair Beach | Pinellas | 1,633 | City |
| Belleair Bluffs | Pinellas | 2,311 | City |
| Belleair Shore | Pinellas | 73 | Town |
| Dunedin | Pinellas | 36,068 | City |
| Gulfport | Pinellas | 11,783 | City |
| Indian Rocks Beach | Pinellas | 4,286 | City |
| Indian Shores | Pinellas | 1,190 | Town |
| Kenneth City | Pinellas | 5,047 | Town |
| Largo | Pinellas | 82,485 | City |
| Madeira Beach | Pinellas | 3,895 | City |
| North Redington Beach | Pinellas | 1,495 | Town |
| Oldsmar | Pinellas | 14,898 | City |
| Clearwater | Pinellas | 117,292 | City |
| Pinellas Park | Pinellas | 53,093 | City |
| St. Petersburg | Pinellas | 258,308 | City |
| Redington Beach | Pinellas | 1,376 | Town |
| Redington Shores | Pinellas | 2,176 | Town |
| Safety Harbor | Pinellas | 17,072 | City |
| Seminole | Pinellas | 19,364 | City |
| South Pasadena | Pinellas | 5,353 | City |
| St. Pete Beach | Pinellas | 8,879 | City |
| Tarpon Springs | Pinellas | 25,117 | City |
| Treasure Island | Pinellas | 6,584 | City |
| Auburndale | Polk | 15,616 | City |
| Bartow | Polk | 19,309 | City |
| Davenport | Polk | 9,043 | City |
| Dundee | Polk | 5,235 | Town |
| Eagle Lake | Polk | 3,008 | City |

| Fort Meade | Polk | 5,100 | City |
|---|---|---|---|
| Frostproof | Polk | 3,273 | City |
| Haines City | Polk | 26,669 | City |
| Highland Park | Polk | 264 | Village |
| Hillcrest Heights | Polk | 243 | Town |
| Lake Alfred | Polk | 6,374 | City |
| Lake Hamilton | Polk | 1,537 | Town |
| Lake Wales | Polk | 16,361 | City |
| Lakeland | Polk | 112,641 | City |
| Mulberry | Polk | 3,952 | City |
| Polk City | Polk | 2,713 | Town |
| Winter Haven | Polk | 49,219 | City |
| Crescent City | Putnam | 1,654 | City |
| Interlachen | Putnam | 1,441 | Town |
| Palatka | Putnam | 10,446 | City |
| Pomona Park | Putnam | 784 | Town |
| Welaka | Putnam | 714 | Town |
| Gulf Breeze | Santa Rosa | 6,302 | City |
| Jay | Santa Rosa | 524 | Town |
| Milton | Santa Rosa | 10,197 | City |
| North Port | Sarasota | 74,793 | City |
| Sarasota | Sarasota | 54,842 | City |
| Venice | Sarasota | 25,463 | City |
| Altamonte Springs | Seminole | 46,231 | City |
| Casselberry | Seminole | 28,794 | City |
| Lake Mary | Seminole | 16,798 | City |
| Longwood | Seminole | 15,087 | City |
| Oviedo | Seminole | 40,059 | City |
| Sanford | Seminole | 61,051 | City |
| Winter Springs | Seminole | 38,342 | City |
| St. Augustine | St. Johns | 14,329 | City |
| St. Augustine Beach | St. Johns | 6,803 | City |
| Fort Pierce | St. Lucie | 47,297 | City |
| St. Lucie Village | St. Lucie | 613 | Town |
| Port St. Lucie | St. Lucie | 204,851 | City |
| Bushnell | Sumter | 3,047 | City |
| Center Hill | Sumter | 846 | City |
| Coleman | Sumter | 642 | City |
| Webster | Sumter | 778 | City |
| Wildwood | Sumter | 15,730 | City |
| Branford | Suwannee | 711 | Town |
| Live Oak | Suwannee | 6,735 | City |
| Perry | Taylor | 6,898 | City |

| Lake Butler | Union | 1,986 | City |
|---|---|---|---|
| Raiford | Union | 224 | Town |
| Worthington Springs | Union | 378 | Town |
| DeBary | Volusia | 22,260 | City |
| DeLand | Volusia | 37,351 | City |
| Edgewater | Volusia | 23,097 | City |
| Holly Hill | Volusia | 12,958 | City |
| Lake Helen | Volusia | 2,842 | City |
| New Smyrna Beach | Volusia | 30,142 | City |
| Oak Hill | Volusia | 1,986 | City |
| Orange City | Volusia | 12,632 | City |
| Pierson | Volusia | 1,542 | Town |
| Ponce Inlet | Volusia | 3,364 | Town |
| Port Orange | Volusia | 62,596 | City |
| South Daytona | Volusia | 12,865 | City |
| Daytona Beach | Volusia | 72,647 | City |
| Daytona Beach Shores | Volusia | 5,179 | City |
| Deltona | Volusia | 93,692 | City |
| Ormond Beach | Volusia | 43,475 | City |
| Sopchoppy | Wakulla | 426 | City |
| St. Marks | Wakulla | 274 | City |
| DeFuniak Springs | Walton | 5,919 | City |
| Freeport | Walton | 5,861 | City |
| Paxton | Walton | 556 | Town |
| Caryville | Washington | 301 | Town |
| Chipley | Washington | 3,660 | City |
| Ebro | Washington | 237 | Town |
| Vernon | Washington | 732 | City |
| Wausau | Washington | 371 | Town |

| School Districts |
| --- |
| Alachua County Public Schools |
| Baker County School District |
| Bay District Schools |
| Bradford County School District |
| Brevard County Public Schools |
| Broward County Public Schools |
| Calhoun County School District |
| Charlotte County Public Schools |
| Citrus County School District |
| Clay County Schools |
| Collier County District School Board |
| Columbia County School District |
| DeSoto School District |
| Dixie County School District |
| Dozier-Okeechobee School District |
| Okeechobee Youth Development Center |
| Duval County Public Schools |
| Escambia County School District |
| Flagler County Public Schools |
| Franklin County School District |
| Gadsden County School District |
| Gilchrist County School District |
| Glades County School District |
| Gulf County Schools |
| Hamilton County School District |
| Hardee County School District |
| Hendry County Schools |
| Hernando County School Board |
| Highlands County Schools |
| Hillsborough County Public Schools |
| Holmes County School District |
| Indian River County School District |
| Jackson County School District |
| Jefferson County School District |
| Lafayette County School District |
| Lake County Schools |
| Lee County School District |
| Leon County Schools |
| Levy County School Board |
| Liberty County School District |
| Madison County Schools |
| Manatee County School District |

| |
|---|
| Marion County Public Schools |
| Martin County School District |
| Miami-Dade County School Board |
| Monroe County School District |
| Nassau County School District |
| Okaloosa County School District |
| Okeechobee County School Board |
| Orange County Public Schools |
| Osceola County School District |
| Palm Beach County School District |
| Pasco County Schools |
| Pinellas County Schools |
| Polk County Public Schools |
| Putnam County School District |
| St. Johns County School District |
| St. Lucie County School Board |
| Santa Rosa County School District |
| Sarasota County Public Schools |
| Seminole County Public Schools |
| Sumter District Schools |
| Suwannee County School District |
| Taylor County School District |
| Union County School Board |
| Volusia County Schools |
| Wakulla County School Board |
| Walton County School District |
| Washington County School District |

| District Name |
| --- |
| A. Max Brewer Memorial Law Library |
| A.H. at Turnpike South Community Development District |
| Abbott Square Community Development District |
| Aberdeen Community Development District |
| Academical Village Community Development District |
| Acme Improvement District |
| Alachua Community Redevelopment Agency |
| Alachua County Health Facilities Authority |
| Alachua County Housing Authority |
| Alachua County Housing Finance Authority |
| Alachua County Library District |
| Alachua Soil and Water Conservation District |
| Alafia Preserve Community Development District |
| Alligator Point Water Resources District |
| Almarante Fire District |
| Alta Lakes Community Development District |
| Altamonte Springs Health Facilities Authority |
| Alva Fire Protection and Rescue Service District |
| Amelia Concourse Community Development District |
| Amelia Island Mosquito Control District |
| Amelia National Community Development District |
| Amelia Walk Community Development District |
| American Beach Water and Sewer District |
| Anabelle Island Community Development District |
| Anastasia Mosquito Control District of St. Johns County |
| Anastasia Sanitary District |
| Anthem Park Community Development District |
| Apalachicola Community Redevelopment Agency |
| Apalachicola Housing Authority |
| Apopka Community Redevelopment Agency |
| Aqua By The Bay Community Development District |
| Aqua One Community Development District |
| Arbor Greene Community Development District |
| Arborwood Community Development District |

| |
|---|
| Area Housing Commission |
| Area Housing Commission of Clewiston, LaBelle and Hendry County |
| Argyle Fire District |
| Arlington Ridge Community Development District |
| Arlington Special Dependent District |
| Armstrong Community Development District |
| Artisan Lakes Community Development District |
| Artisan Lakes East Community Development District |
| Astonia Community Development District |
| Asturia Community Development District |
| Atlantis Safe Neighborhood Improvement District |
| Auburndale Community Redevelopment Agency |
| Aucilla Area Solid Waste Administration |
| Avalon Beach / Mulat Fire Protection District |
| Avalon Groves Community Development District |
| Avalon Park West Community Development District |
| Ave Maria Stewardship Community District |
| Avelar Creek Community Development District |
| Avenir Community Development District |
| Aventura Isles Community Development District |
| Aviary at Rutland Ranch Community Development District |
| Avon Park Community Redevelopment Agency |
| Avon Park Housing Authority |
| Babcock Ranch Community Independent Special District |
| Babcock Street Community Redevelopment Agency |
| Bahia Lakes Community Development District |
| Bainebridge Community Development District |
| Baker County Development Commission |
| Baker County Hospital District |
| Baker Fire District |
| Ballantrae Community Development District |
| Ballentrae Hillsborough Community Development District |
| Bannon Lakes Community Development District |
| Banyan Cay Community Development District |
| Barefoot Bay Recreation District |
| Barefoot Bay Water and Sewer District |

| |
|---|
| Barron Water Control District |
| |
| Bartow Community Redevelopment Agency |
| Bartow Municipal Airport Development Authority |
| Bartram Park Community Development District |
| |
| Bartram Springs Community Development District |
| Bay County Law Library |
| Bay Creek Community Development District |
| Bay Crest Park Special District |
| Bay Laurel Center Community Development District |
| Bay Medical Center |
| |
| Bayfront Community Redevelopment Agency |
| |
| Bayi Community Development District |
| Bayshore Fire Protection and Rescue Service District |
| Bayshore Gardens Park and Recreation District |
| |
| Bayside Improvement Community Development District |
| Baytree Community Development District |
| Baywinds Community Development District |
| Beach Community Development District |
| |
| Beach Mosquito Control District |
| Beach Road Golf Estates Community Development District |
| Beacon Lakes Community Development District |
| Beacon Meadows Special Dependent Tax District |
| Beacon Tradeport Community Development District |
| Beaumont Community Development District |
| Beeline Community Development District |
| |
| Bella Collina Community Development District |
| Bella Vida Community Development District |
| Bellagio Community Development District |
| Bellalago Educational Facilities Benefit District |
| |
| Bellaviva at Westside Community Development District |
| Bellaviva Community Development District |
| Belmond Reserve Community Development District |
| Belmont Community Development District |
| Belmont II Community Development District |

| Belmont Lakes Community Development District |
|---|
| Bent Creek Community Development District |
| Bermont Drainage District |
| Berry Bay Community Development District |
| Bexley Community Development District |
| Big Bend Water Authority |
| Big Cypress Stewardship District |
| Biscayne Drive Estates Community Development District |
| Black Creek Community Development District |
| Blackburn Creek Community Development District |
| Blackman Fire District |
| Blackwater Soil and Water Conservation District |
| Bloomingdale Oaks Special Dependent Tax District |
| Bloomingdale Special Taxing District |
| Blountstown Community Redevelopment Agency |
| Blue Lake Community Development District |
| Blueprint Intergovernmental Agency |
| Bluewaters Community Development District |
| Bobcat Trail Community Development District |
| Boca Grande Fire Control District |
| Boca Raton Airport Authority |
| Boca Raton Community Redevelopment Agency |
| Boca Raton Housing Authority |
| Boggy Branch Community Development District |
| Boggy Creek Improvement District |
| Bolles Drainage District |
| Bonaventure Development District |
| Bonita Landing Community Development District |
| Bonita Springs Fire Control and Rescue District |
| Bonita Village Community Development District |
| Bonnet Creek Resort Community Development District |
| Bonterra Community Development District |
| Botaniko Community Development District |
| Boyette Park Community Development District |
| Boyette Springs Special Dependent District |
| Boynton Beach Community Redevelopment Agency |
| Boynton Village Community Development District |
| Bradenton Beach Community Redevelopment Agency |

| |
|---|
| Bradenton Community Redevelopment Agency |
| Bradford County Development Authority |
| Bradford County Health Facilities Authority |
| Bradford Soil and Water Conservation District |
| Brandon Hills Special Dependent District |
| Brandy Creek Community Development District |
| |
| Brevard County Educational Facilities Authority |
| Brevard County Free Public Library District |
| Brevard County Health Facilities Authority |
| Brevard County Housing Finance Authority |
| Brevard County Special Recreation District IV |
| Brevard Mosquito Control District |
| Brevard Soil and Water Conservation District |
| Bridgewalk Community Development District |
| Bridgewater Community Development District |
| Bridgewater North Community Development District |
| Bridgewater of Wesley Chapel Community Development District |
| Briger Community Development District |
| Brighton Lakes Community Development District |
| Brightwater Community Development District |
| Brooks of Bonita Springs Community Development District |
| Brooks of Bonita Springs II Community Development District |
| Brookstone Community Development District |
| Brooksville Housing Authority |
| Broward County Community Redevelopment Agency |
| |
| Broward County Educational Facilities Authority |
| Broward County Health Facilities Authority |
| |
| Broward County Housing Authority |
| Broward County Housing Finance Authority |
| Broward County Water Control District 2 |
| Broward County Water Control District 3 |
| Broward County Water Control District 4 |
| Broward Soil and Water Conservation District |
| Broward Solid Waste Disposal District |
| Brownwood Community Development District |
| Buckeye Park Community Development District |

| |
|---|
| Buckhead Ridge Mosquito Control District |
| Buckhead Trails Community Development District |
| Buckhorn Estates Special Dependent District |
| Buckhorn Oaks Special Dependent District |
| Bullfrog Creek Community Development District |
| Bunnell Community Redevelopment Agency |
| Burnt Store Isles Canal Maintenance Assessment District |
| Business Improvement District of Coral Gables |
| Callaway Community Redevelopment Agency |
| Campbellton-Graceville Hospital District |
| Campo Bello Community Development District |
| Canaveral Port District |
| Candler Hills East Community Development District |
| Canopy Community Development District |
| Cape Canaveral Community Redevelopment Agency |
| Cape Canaveral Free Public Library |
| Cape Canaveral Hospital District |
| Cape Coral Community Redevelopment Agency |
| Capital Region Community Development District |
| Capron Trail Community Development District |
| Captain's Key Dependent District |
| Captiva Erosion Prevention District |
| Captiva Island Fire Control District |
| Caribe Palm Community Development District |
| Carlton Lakes Community Development District |
| Caroline Street Corridor and Bahama Village Community Redevelopment Agency |
| Carrabelle Community Redevelopment Agency |
| Carrabelle Hospital Tax District |
| Carrollwood Meadows Special Dependent District |
| Carrollwood North Special Dependent Tax District |
| Carrollwood Recreation District |
| Carrollwood South Special Dependent Tax District |
| Carver Heights / Montclair Community Redevelopment Agency |
| Cascades At Groveland Community Development District |

| |
|---|
| Catalina At Winkler Preserve Community Development District |
| CBL / BM Port Orange West Community Development District |
| Cedar Hammock Community Development District |
| Cedar Hammock Fire Control District |
| Cedar Key Water and Sewer District |
| Cedar Pointe Community Development District |
| Celebration Community Development District |
| Celebration Pointe Community Development District No. 1 |
| Central Broward Water Control District |
| Central Charlotte County Drainage District |
| Central County Water Control District |
| Central Florida Expressway Authority |
| Central Florida Regional Transportation Authority |
| Central Lake Community Development District |
| Central Parc Community Development District |
| Centre Lake Community Development District |
| Century Community Redevelopment Agency |
| Century Gardens at Tamiami Community Development District |
| Century Gardens Community Development District |
| Century Gardens Village Community Development District |
| Century Parc Community Development District |
| Century Park Place Community Development District |
| Century Park South Community Development District |
| CFM Community Development District |
| Champion's Reserve Community Development District |
| ChampionsGate Community Development District |
| Channing Park Community Development District |
| Chaparral of Palm Bay Community Development District |
| Chapel Creek Community Development District |
| Chapel Crossings Community Development District |
| Charles Cove Community Development District |
| Charlotte County Airport Authority |
| Charlotte County Industrial Development Authority |

| |
|---|
| Charlotte Harbor Community Redevelopment Agency |
| Charlotte Soil and Water Conservation District |
| Cheval West Community Development District |
| Children's Board of Hillsborough County |
| Children's Services Council of Broward County |
| Children's Services Council of Leon County |
| Children's Services Council of Martin County |
| Children's Services Council of Okeechobee County |
| Children's Services Council of Palm Beach County |
| Children's Services Council of St. Lucie County |
| Children's Trust of Alachua County |
| Chipley Housing Authority |
| Chipley Redevelopment Agency |
| Chipola River Soil and Water Conservation District |
| Choctawhatchee River Soil and Water Conservation District |
| Citrus County Fire Protection Taxing District |
| Citrus County Hospital Board |
| Citrus County Mosquito Control District |
| Citrus County Port Authority |
| Citrus County Special Library District |
| Citrus Information Cooperative |
| Citrus, Levy, Marion Regional Workforce Development Board |
| City Center Community Development District |
| City Gate Community Development District |
| City of Belle Glade Community Redevelopment Agency |
| City of Bowling Green Community Redevelopment Agency |
| City of Brooksville Community Redevelopment Agency |
| City of Cape Coral Health Facilities Authority |
| City of Casselberry Community Redevelopment Agency |
| City of Cedar Key Community Redevelopment Agency |
| City of Clewiston Community Redevelopment Agency |
| City of Coral Springs Community Redevelopment Agency |
| City of Crescent City Community Redevelopment Agency |
| City of DeLand Downtown Tax Increment District |

| |
|---|
| City of Dunnellon Community Redevelopment Agency |
| City of Eagle Lake Community Redevelopment Agency |
| City of Edgewater Community Redevelopment Agency |
| City of Fort Meade Community Redevelopment Agency |
| City of Holly Hill Community Redevelopment Agency |
| City of Inverness Community Redevelopment Agency |
| City of Lake Alfred Community Redevelopment Agency |
| City of Lake Wales Library Board |
| City of Lauderhill Community Redevelopment Agency |
| City of Live Oak Community Redevelopment Agency |
| City of Marianna Community Redevelopment Agency |
| City of Mascotte Community Redevelopment Agency |
| City of Miami Health Facilities Authority |
| City of Midway Community Redevelopment Agency |
| City of Minneola Community Redevelopment Agency |
| City of Moore Haven Affordable Housing Finance Authority |
| City of Moore Haven Redevelopment Agency |
| City of Mulberry Community Redevelopment Agency |
| City of Naples Airport Authority |
| City of Naples Community Redevelopment Agency |
| City of North Port Solid Waste District |
| City of Oakland Park Community Redevelopment Agency |
| City of Palmetto Community Redevelopment Agency |
| City of Pensacola Community Redevelopment Agency |
| City of Perry Community Redevelopment Agency |
| City of Plantation Community Redevelopment Agency |
| City of Port St. Lucie Community Redevelopment Agency |
| City of Punta Gorda Community Redevelopment Agency |
| City of Riviera Beach Utility Special District |
| City of Rockledge Community Redevelopment Agency |
| City of Sanford Community Redevelopment Agency |
| City of Sarasota Community Redevelopment Agency |
| City of Sebastian Community Redevelopment Agency |
| City of South Miami Health Facilities Authority |

| |
|---|
| City of St. Cloud Community Redevelopment Agency |
| City of St. Marks Redevelopment Agency |
| City of St. Petersburg Health Facilities Authority |
| City of Stuart Community Redevelopment Agency |
| City of Sunrise Special Tax District No. 1 |
| City of Tallahassee Community Redevelopment Agency |
| City of Tampa Community Redevelopment Agency |
| City of Tarpon Springs Community Redevelopment Agency |
| City of Trenton Community Redevelopment Agency |
| City-County Public Works Authority |
| CityPlace Community Development District |
| Civil Service Board of Santa Rosa County |
| Clay County Development Authority |
| Clay County Utility Authority |
| Clay Soil and Water Conservation District |
| Clearwater Cay Community Development District |
| Clearwater Community Redevelopment Agency |
| Clearwater Downtown Development Board |
| Clearwater Housing Authority |
| Clewiston Drainage District |
| Cobblestone Community Development District |
| Coco Palms Community Development District |
| Cocoa Community Redevelopment Agency |
| Cocomar Water Control District |
| Coconut Cay Community Development District |
| Coconut Grove Business Improvement District |
| Coddington Community Development District |
| Cold Springs Improvement District |
| Coleman Community Redevelopment Agency |
| Collier County Airport Authority |
| Collier County Community Redevelopment Agency |
| Collier County Educational Facilities Authority |
| Collier County Health Facilities Authority |

| |
|---|
| Collier County Housing Authority |
| Collier County Housing Finance Authority |
| Collier County Industrial Development Authority |
| Collier County Water-Sewer District |
| Collier Mosquito Control District |
| Collier Soil and Water Conservation District |
| Colonial Country Club Community Development District |
| Columbia County Housing Authority |
| Columbia County Industrial Development Authority |
| Community Redevelopment Agency of Escambia County |
| Community Redevelopment Agency of the City of Fellsmere |
| Community Redevelopment Agency of the City of New Smyrna Beach |
| Community Redevelopment Agency of the City of Parker |
| Community Redevelopment Agency of the City of Pinellas Park |
| Community Redevelopment Agency of the City of South Daytona |
| Community Redevelopment Agency of the City of Temple Terrace |
| Community Redevelopment Agency of the City of Umatilla |
| Community Redevelopment Agency of the City of Winter Haven |
| Community Redevelopment Agency of the Town of Cinco Bayou |
| Community Redevelopment Agency of the Town of Havana |
| Community Redevelopment Agency of the Town of Lake Park |
| Concord Station Community Development District |
| Concorde Estates Community Development District |
| Connected City Stewardship District |
| Connerton East Community Development District |

| |
|---|
| Connerton West Community Development District |
| Contrada Hills Community Development District |
| Cooperative Producers Water Control District |
| Copper Creek Community Development District |
| Copper Oaks Community Development District |
| Copperhead Community Development District |
| Copperspring Community Development District |
| Copperstone Community Development District |
| Coquina Water Control District |
| Coral Bay Community Development District |
| Coral Keys Homes Community Development District |
| Coral Springs Improvement District |
| Cordoba Ranch Community Development District |
| Cordova Palms Community Development District |
| Corkscrew Farms Community Development District |
| Coronado Community Development District |
| Cory Lakes Community Development District |
| Country Greens Community Development District |
| Country Lakes Special Dependent Tax District |
| Country Place Maintenance District |
| Country Run Maintenance District |
| Country Village Special Dependent District |
| Country Walk Community Development District |
| County Line Drainage District |
| Cove At Bayport Colony, The |
| Covington Park Community Development District |
| Cow Slough Water Control District |
| Creek Preserve Community Development District |
| Creekside at Twin Creeks Community Development District |
| Creekside Community Development District |
| Creekview Community Development District |
| Crescent Lakes Common Facilities District |
| Crestview Community Redevelopment Agency |
| Crestview Housing Authority |
| Crestview II Community Development District |
| Crestview West Community Development District |
| Cross Creek North Community Development District |
| CrossCreek Community Development District |
| Crossings At Fleming Island Community Development District, The |

| |
|---|
| Crossings Community Development District |
| Crossroads Village Center Community Development District |
| Crosswinds West Community Development District |
| Crystal Cay Community Development District |
| Crystal River Redevelopment Agency |
| Currents Community Development District |
| Cutler Cay Community Development District |
| Cypress Bluff Community Development District |
| Cypress Cove Community Development District |
| Cypress Creek of Hillsborough County Community Development District |
| Cypress Grove Community Development District |
| Cypress Lakes Community Development District |
| Cypress Mill Community Development District |
| Cypress Park Estates Community Development District |
| Cypress Preserve Community Development District |
| Cypress Ridge Community Development District |
| Cypress Shadows Community Development District |
| Dade City Community Redevelopment Agency |
| Dania Beach Community Redevelopment Agency |
| Dania Beach Housing Authority |
| Davenport Road South Community Development District |
| Davie Community Redevelopment Agency |
| Daytona Beach Community Redevelopment Agency |
| Daytona Beach Downtown Development Authority |
| Daytona Beach Housing Authority |
| Daytona Beach Racing and Recreational Facilities District |
| Deer Island Community Development District |
| Deer Run Community Development District |
| Deerfield Beach Community Redevelopment Agency |
| Deerfield Beach Housing Authority |
| Deering Park Center Community Development District |
| Deering Park Stewardship District |
| DeFuniak Springs Community Redevelopment Agency |
| DeFuniak Springs Housing Authority |

| |
|---|
| Del Webb Bexley Community Development District |
| DeLand Housing Authority |
| Delray Beach Community Redevelopment Agency |
| Delray Beach Downtown Development Authority |
| Delray Beach Housing Authority |
| Delta Farms Water Control District |
| |
| Department of Off-Street Parking of The City of Miami |
| DeSoto County Hospital District |
| Destin Community Redevelopment Agency |
| Destin Fire Control District |
| Devil's Garden Water Control District |
| DG Farms Community Development District |
| Diamond Hill Community Development District |
| Diamond Square Community Redevelopment Agency |
| Disston Island Conservancy District |
| District Community Development District |
| Dixie Soil and Water Conservation District |
| Doctors Memorial Hospital |
| Dog Island Conservation District |
| Donaldson Knoll Community Development District |
| Dorcas Fire District |
| |
| Double Branch Community Development District |
| Dovera Community Development District |
| Dowden West Community Development District |
| Downtown / Historic Ybor Tourism Marketing District |
| |
| Downtown and East Town Redevelopment Agency |
| Downtown Belleview Community Redevelopment |
| Agency |
| Downtown Clermont Redevelopment Agency |
| Downtown Cocoa Beach Community Redevelopment |
| Agency |
| Downtown Development Authority City of Miami |
| Downtown Development Authority of the City of Fort |
| Lauderdale |
| Downtown Development Board |
| Downtown Doral Community Development District |
| |
| Downtown Doral South Community Development District |
| Downtown Improvement District |
| Downtown Investment Authority |

| |
|---|
| Downtown Kissimmee Community Redevelopment Agency |
| Downtown South Neighborhood Improvement District |
| DP1 Community Development District |
| Duette Fire and Rescue District |
| Dunedin Community Redevelopment Agency |
| Dunedin Housing Authority |
| Dunes Community Development District |
| Dupree Lakes Community Development District |
| Durbin Crossing Community Development District |
| Duval County Research and Development Authority |
| Duval Soil and Water Conservation District |
| DW Bayview Community Development District |
| Eagle Pointe Community Development District |
| Eagle Ridge Community Development District |
| Eagle's Crest Community Development District |
| East 547 Community Development District |
| East Beach Water Control District |
| East Bonita Beach Road Community Development District |
| East Charlotte Drainage District |
| East Flagler Mosquito Control District |
| East Hendry County Drainage District |
| East Homestead Community Development District |
| East Lake Park Special Dependent District |
| East Lake Tarpon Special Fire Control District |
| East Manatee Fire Rescue District |
| East Mulloch Water Control District |
| East Naples Bay Special Taxing District |
| East Nassau Stewardship District |
| East Niceville Fire District |
| East Park Community Development District |
| East Shore Water Control District |
| Eastlake Oaks Community Development District |
| Easton Park Community Development District |
| Eastpoint Water and Sewer District |
| Eastport Business Center |
| Eden Hills Community Development District |

| |
|---|
| Edgewater East Community Development District |
| Elevation Pointe Community Development District |
| Elkton Drainage District |
| Eloise Community Redevelopment Agency |
| Emerald Coast Utilities Authority |
| Emerald Hills Safety Enhancement District |
| Emerald Lakes Community Development District |
| Enbrook Community Development District |
| Enclave at Black Point Marina Community Development District |
| Encore Community Development District |
| Englewood Area Fire Control District |
| Englewood Community Redevelopment Agency |
| Englewood Water District |
| Enterprise Community Development District |
| Entrada Community Development District |
| Epperson North Community Development District |
| Epperson Ranch Community Development District |
| Epperson Ranch II Community Development District |
| Escambia Children's Trust |
| Escambia County Housing Finance Authority |
| Escambia County Law Library |
| Escambia Health Facilities Authority |
| Escambia Soil and Water Conservation District |
| Esplanade Lake Club Community Development District |
| Estancia at Wiregrass Community Development District |
| Estates at Cherry Lake Community Development District |
| Estero Fire Rescue District |
| Eureka Grove Community Development District |
| Everest GMR Community Development District |
| Everglades Agricultural Area Environmental Protection District |
| Evergreen Community Development District |
| Everlands Community Development District |
| Falcon Trace Community Development District |
| Fallschase Community Development District |
| Fellsmere Water Control District |

| |
|---|
| Fernandina Beach Community Redevelopment Agency |
| |
| Fiddler's Creek Community Development District |
| Fiddler's Creek Community Development District Number 2 |
| Fieldstone Community Development District |
| Finley Woods Community Development District |
| |
| First Coast Workforce Development Consortium |
| Fishhawk Community Development District IV |
| Fishhawk Ranch Community Development District |
| Flaghole Drainage District |
| Flagler Beach Community Redevelopment Agency |
| |
| Flagler County Housing Authority |
| Flagler Estates Road and Water Control District |
| Fleming Island Plantation Community Development District |
| Flora Ridge Education Facilities Benefit District |
| Florida Atlantic Research and Development Authority |
| Florida City Community Redevelopment Agency |
| Florida Crown Workforce Board, Inc. |
| |
| Florida Green Finance Authority |
| |
| Florida Inland Navigation District |
| Florida Keys Aqueduct Authority |
| Florida Keys Mosquito Control District |
| |
| Florida PACE Funding Agency |
| |
| Florida Resiliency and Energy District |
| Florosa Fire Control District |

| |
|---|
| Flow Way Community Development District |
| Fontainbleau Lakes Community Development District |
| Forest Brooke Community Development District |
| Forest Creek Community Development District |
| Forest Lake Community Development District |
| Fort Lauderdale Community Redevelopment Agency |
| Fort Lauderdale Housing Authority |
| Fort Myers Beach Fire Control District |
| Fort Myers Beach Mosquito Control District |
| Fort Myers Beach Public Library District |
| Fort Myers Community Redevelopment Agency |
| Fort Myers Housing Authority |
| Fort Myers Shores Fire Protection and Rescue District |
| Fort Pierce Farms Water Control District |
| Fort Pierce Redevelopment Agency |
| Fort Walton Beach Community Redevelopment Agency |
| Fort Walton Beach Housing Authority |
| Forty-Ninth Street Corridor Redevelopment District |
| Founders Ridge Community Development District |
| Four Seasons at Crystal Springs Community Development District |
| Fox Branch Ranch Community Development District (2021) |
| Franklin Soil and Water Conservation District |
| Fred R. Wilson Memorial Law Library |
| Freedom Walk Community Development District |
| FRERC Community Development District |
| Fronterra Community Development District |
| Fruitland Park Community Redevelopment Agency |
| Gadsden County Hospital |
| Gadsden County Industrial Development Authority |
| Gadsden Soil and Water Conservation District |
| Gainesville Housing Authority |
| Gainesville-Alachua County Regional Airport Authority |
| Gardens at Hammock Beach Community Development District |
| Gasparilla Island Bridge Authority |
| Gateway Services Community Development District |

| |
|---|
| George E. Weems Memorial Hospital |
| Gerber Groves Water Control District |
| Gilchrist County Industrial Development Authority |
| Gilchrist Soil and Water Conservation District |
| Glades Soil and Water Conservation District |
| Gladeview Water Control District |
| Glen St. Johns Community Development District |
| Golden Gate Point Streetscape Special District |
| Golden Isles Safe Neighborhood District |
| Golden Lakes Community Development District |
| |
| Gracewater Sarasota Community Development District |
| Gramercy Farms Community Development District |
| Grand Bay at Doral Community Development District |
| Grand Hampton Community Development District |
| Grand Haven Community Development District |
| Grand Oaks Community Development District |
| Grande Pines Community Development District |
| Greater Boca Raton Beach and Park District |
| Greater Lakes / Sawgrass Bay Community Development District |
| |
| Greater Leesburg Community Redevelopment Agency |
| |
| Greater Naples Fire Rescue District |
| Greater Orlando Aviation Authority |
| Greater Seminole Area Special Recreation District |
| Green Corridor Property Assessment Clean Energy (PACE) District |
| GreeneWay Improvement District |
| |
| Gretna Housing Authority |
| Gretna Neighborhood Improvement District |
| Greyhawk Landing Community Development District |
| Griffin Lakes Community Development District |
| Grove Community District |
| Grove Resort Community Development District |
| Groveland Community Redevelopment Agency |
| Groves Community Development District, The |
| Gulf Breeze Community Redevelopment Agency |

| |
|---|
| Gulf Consortium |
| Gulfport Waterfront Community Redevelopment Agency |
| Gulfstream Polo Community Development District |
| Habitat Community Development District |
| Habitat Safe Neighborhood Improvement District |
| Hacienda Lakes Community Development District |
| Haines City Community Redevelopment Agency |
| Haines City Water Control District |
| Halifax Hospital Medical Center |
| Hallandale Beach Community Redevelopment Agency |
| Hamal Community Development District |
| Hamilton Bluff Community Development District |
| Hamilton County Development Authority |
| Hamilton County Memorial Hospital |
| Hamilton County Soil and Water Conservation District |
| Hammock Bay Community Development District |
| Hammock Reserve Community Development District |
| Hammock Woods Special Dependent Tax District |
| Hammocks Community Development District |
| Harbor Bay Community Development District |
| Harbor Village Community Development District |
| Harbour Isles Community Development District |
| Harbour Waterway Special District |
| Harbourage at Braden River Community Development District |
| Hardee County Economic Development Authority |
| Hardee County Housing Authority |
| Hardee County Indigent Health Care Special District |
| Hardee County Industrial Development Authority |
| Hardee Soil and Water Conservation District |
| Harden / Parkway Community Redevelopment Agency |
| Harmony Community Development District |

| |
|---|
| Harmony on Lake Eloise Community Development District (2021) |
| Harmony Village Community Development District |
| Harmony West Community Development District (2017) |
| Harrison Ranch Community Development District |
| Hastings Drainage District |
| Hawk's Point Community Development District |
| Hawkstone Community Development District |
| Hawthorne Community Redevelopment Agency |
| Hawthorne Mill North Community Development District (2021) |
| Health Care District of Palm Beach County |
| Heartland Library Cooperative |
| Heights Community Development District, The |
| Hemingway Point Community Development District |
| Hendry County Hospital Authority |
| Hendry County Industrial Development Authority |
| Hendry Soil and Water Conservation District |
| Hendry-Hilliard Water Control District |
| Hendry-La Belle Recreation Board |
| Heritage Bay Community Development District |
| Heritage Greens Community Development District |
| Heritage Harbor Community Development District |
| Heritage Harbour Market Place Community Development District |
| Heritage Harbour North Community Development District |
| Heritage Harbour South Community Development District |
| Heritage Isle at Viera Community Development District |
| Heritage Isles Community Development District |
| Heritage Lake Park Community Development District |
| Heritage Landing Community Development District |
| Heritage Oak Park Community Development District |
| Heritage Palms Community Development District |
| Heritage Park Community Development District |
| Heritage Pines Community Development District |
| Heritage Springs Community Development District |

| |
|---|
| Hernando County Housing Authority |
| Hernando County Law Library |
| Hernando County Port Authority |
| Hernando County Water and Sewer District |
| Heron Isles Community Development District |
| Herons Glen Recreation District |
| Hialeah Housing Authority |
| Hialeah Redevelopment Agency |
| Hickory Hill Special Dependent Tax District |
| Hidden Creek Community Development District |
| Hidden Creek North Community Development District |
| Hideaway Beach District |
| High Ridge / Quantum Community Development District |
| High Springs Community Redevelopment Agency |
| Highland Glades Water Control District |
| Highland Meadows Community Development District |
| Highland Meadows II Community Development District |
| Highland Meadows West Community Development District |
| Highland Trails Community Development District |
| Highlands Community Development District |
| Highlands County Health Facilities Authority |
| Highlands County Hospital District |
| Highlands County Housing Authority |
| Highlands County Industrial Development Authority |
| Highlands Soil and Water Conservation District |
| Highway 79 Corridor Authority |
| Hillcrest Community Development District |
| Hills of Minneola Community Development District |
| Hillsboro Inlet District |
| Hillsborough County Aviation Authority |
| Hillsborough County Hospital Authority |
| Hillsborough County Industrial Development Authority |
| Hillsborough Soil and Water Conservation District |
| Hillsborough Transit Authority |

| |
|---|
| Hilltop Point Community Development District |
| Hobe-Saint Lucie Conservancy District |
| Holiday Park, Park and Recreation District |
| Holley-Navarre Fire Protection District |
| Holly Hill Road East Community Development District |
| Hollywood Beach Community Development District I |
| Hollywood Community Redevelopment Agency |
| Hollywood Housing Authority |
| Holmes County Development Commission |
| Holmes County Housing Authority |
| Holmes Creek Soil and Water Conservation District |
| Holt Fire District |
| Homestead 50 Community Development District |
| Homestead Community Redevelopment Agency |
| Homosassa Special Water District |
| Housing Authority of Bartow |
| Housing Authority of Brevard County |
| Housing Authority of Springfield |
| Housing Authority of Tarpon Springs |
| Housing Authority of The City of Arcadia |
| Housing Authority of The City of Belle Glade |
| Housing Authority of The City of Bradenton |
| Housing Authority of The City of Cocoa |
| Housing Authority of The City of Eustis |
| Housing Authority of The City of Fernandina Beach |
| Housing Authority of The City of Fort Pierce |
| Housing Authority of The City of Homestead |
| Housing Authority of The City of Lakeland |
| Housing Authority of The City of Mulberry |
| Housing Authority of The City of New Smyrna Beach |
| Housing Authority of The City of Orlando |
| Housing Authority of The City of Pompano Beach |
| Housing Authority of the City of Stuart, Florida |
| Housing Authority of The City of Tampa |

| |
|---|
| Housing Authority of The City of Titusville |
| Housing Finance Authority of Clay County |
| Housing Finance Authority of Hillsborough County |
| Housing Finance Authority of Lee County, Florida |
| Housing Finance Authority of Manatee County |
| Housing Finance Authority of Palm Beach County |
| Housing Finance Authority of Pinellas County |
| Housing Finance Authority of Polk County |
| Housing Finance Authority of St. Johns County |
| Housing Finance Authority of Volusia County |
| Howard Creek Fire Control District |
| Hunter's Lake Special Dependent Tax District |
| Hunter's Ridge Community Development District No. 1 |
| Hunter's Ridge Oaks Community Development District No 1 |
| Hyde Park Community Development District 1 |
| Hypoluxo / Haverhill Community Development District |
| Immokalee Fire Control District |
| Immokalee Water and Sewer District |
| Indian Creek Common Facilities District |
| Indian Hills-Hickory Ridge II Special Dependent Tax District |
| Indian Point Common Facilities District |
| Indian Ridge Villas Common Facilities District |
| Indian River County Emergency Services District |
| Indian River County Hospital District |
| Indian River County Housing Authority |
| Indian River Farms Water Control District |
| Indian River Mosquito Control District |
| Indian River Soil and Water Conservation District |
| Indian Trace Development District |
| Indian Trail Improvement District |
| Indiantown Community Development District |
| Indigo Community Development District |
| Indigo East Community Development District |
| Industrial Development Authority of Calhoun County |

| |
|---|
| Interlaken Community Development District |
| |
| International Drive Community Redevelopment Agency |
| International Drive Master Transit and Improvement District |
| Iona-McGregor Fire Protection and Rescue Service District |
| |
| IRL Council |
| |
| Islands at Doral (NE) Community Development District |
| |
| Islands at Doral (SW) Community Development District |
| Islands at Doral III Community Development District |
| Islands at Doral Townhomes Community Development District |
| Isle of Palms Special District |
| |
| Isles of Bartram Park Community Development District |
| Isles of Inverrary Safe Neighborhood Improvement District |
| Istokpoga Marsh Watershed Improvement District |
| J. Ben Harrill Villages of Pasadena Hills Stewardship District |
| Jackson County Agricultural Center |
| Jackson County Hospital District |
| Jackson Soil and Water Conservation District |
| Jacksonville Aviation Authority |
| |
| Jacksonville Beach Community Redevelopment Agency |
| Jacksonville Health Facilities Authority |
| Jacksonville Housing Authority |
| |
| Jacksonville Housing Finance Authority |
| Jacksonville International Airport Area Redevelopment Agency |
| Jacksonville Port Authority |
| Jacksonville Public Library |
| Jacksonville Transportation Authority |
| Jefferson Soil and Water Conservation District |
| John A. H. Murphree Law Library |
| Joint West Melbourne-Brevard County Community Redevelopment Agency |

| |
|---|
| Joshua Water Control District |
| Journey's End Community Development District |
| Julington Creek Plantation Community Development District |
| Juniper Cove Community Development District |
| Jupiter Inlet District |
| Jupiter Island Beach Protection District |
| Juvenile Welfare Board of Pinellas County |
| Kass Circle Community Redevelopment Agency |
| K-Bar Ranch Community Development District |
| K-Bar Ranch II Community Development District |
| Kendall Breeze Community Development District |
| Kendall Breeze West Community Development District |
| Key Largo Fire Rescue and Emergency Medical Services District |
| Key Largo Wastewater Treatment District |
| Key Marco Community Development District |
| Key West Housing Authority |
| Keys Cove Community Development District |
| Keys Cove II Community Development District |
| Keys Edge Community Development District |
| Keystone Airpark Authority |
| Keystone Grove Lakes Special Dependent District |
| Keystone Heights Community Redevelopment Agency |
| Kingman Gate Community Development District |
| KingSoutel Crossing Community Redevelopment Agency |
| La Collina Community Development District |
| Lafayette Soil and Water Conservation District |
| Lago Vista Maintenance District |
| Laguna Lakes Community Development District |
| Lake Apopka Natural Gas District |
| Lake Asbury Municipal Service Benefit District |
| Lake Ashton Community Development District |
| Lake Ashton II Community Development District |
| Lake Beluthahatchee Community Development District |
| Lake Bernadette Community Development District |

| |
|---|
| Lake Brant Special Dependent District |
| Lake Butler Community Redevelopment Agency |
| Lake City Community Redevelopment Agency |
| Lake Clarke Shores Community Redevelopment Agency |
| Lake Conway Water and Navigation Control District |
| Lake County Water Authority |
| Lake Deer Community Development District |
| Lake Emma Community Development District |
| Lake Frances Community Development District |
| Lake Heather Special Dependent Tax District |
| Lake Hideaway Community Development District |
| Lake Lucie Community Development District |
| Lake Magdalene Estates West Special Dependent Tax District |
| Lake Magdalene Special Dependent District |
| Lake Padgett Estates Independent Special District |
| Lake Powell Residential Golf Community Development District |
| Lake Region Lakes Management District |
| Lake Shore Hospital Authority |
| Lake Soil and Water Conservation District |
| Lake St. Charles Community Development District |
| Lake Strawberry Special Dependent District |
| Lake Wales Airport Authority |
| Lake Wales Community Redevelopment Agency |
| Lake Wales Housing Authority |
| Lake Worth Beach Community Redevelopment Agency |
| Lake Worth Drainage District |
| Lakeland Area Mass Transit District |
| Lakeland Community Redevelopment Agency |
| Lakeland Downtown Development Authority |
| Lakes by the Bay South Community Development District |
| Lakes of Sarasota Community Development District |
| Lakeshore Ranch Community Development District |
| Lakeside Community Development District |
| Lakeside Landings Community Development District |
| Lakeside Plantation Community Development District |
| Lakeside Preserve Community Development District |

| |
|---|
| Lakewood Park Community Development District |
| Lakewood Ranch Community Development District 1 |
| Lakewood Ranch Community Development District 2 |
| Lakewood Ranch Community Development District 4 |
| Lakewood Ranch Community Development District 5 |
| Lakewood Ranch Community Development District 6 |
| Lakewood Ranch Stewardship District |
| Landings at Miami Community Development District |
| Landmark at Doral Community Development District |
| Largo Community Redevelopment Agency |
| Lauderdale Isles Water Management District |
| Lauderdale Lakes Community Redevelopment Agency |
| Lauderhill Housing Authority |
| Laurel Road Community Development District |
| Lawson Dunes Community Development District |
| Lealman Special Fire Control District |
| Lee County Educational Facilities Authority |
| Lee County Housing Authority |
| Lee County Hyacinth Control District |
| Lee County Industrial Development Authority |
| Lee County Mosquito Control District |
| Lee County Port Authority |
| Lee County Trauma Services District |
| Lee Memorial Health System |
| Legends Bay Community Development District |
| Lehigh Acres Fire Control and Rescue District |
| Lehigh Acres Municipal Services Improvement District |
| Lely Community Development District |
| Leomas Landing Community Development District |
| Leon County Educational Facilities Authority |
| Leon County Energy Improvement District |
| Leon County Housing Finance Authority |
| Leon County Research and Development Authority |

| |
|---|
| Leon Soil and Water Conservation District |
| Levy Soil and Water Conservation District |
| Lexington Community Development District |
| Lexington Oaks Community Development District |
| Liberty Cove Community Development District |
| Liberty Fire District |
| Lincoln Road Business Improvement District |
| Live Oak Housing Authority |
| Live Oak Lake Community Development District |
| Live Oak No. 1 Community Development District |
| Live Oak No. 2 Community Development District |
| Live Oak-Suwannee County Recreation Board |
| Logan Gate Village Special Dependent District |
| Long Lake Ranch Community Development District |
| Long Lake Reserve Community Development District |
| Longboat Key Bayside District |
| Longboat Key Gulfside District |
| Longleaf Community Development District |
| Longleaf Pine Community Development District |
| Lower Florida Keys Hospital District |
| Loxahatchee Groves Water Control District |
| Loxahatchee River Environmental Control District |
| LT Ranch Community Development District |
| LTC Ranch West Residential Community Development District |
| Lucaya Community Development District |
| Lucerne Park Community Development District |
| Lynn Haven Community Redevelopment Agency |
| Lynwood Community Development District |
| Macclenny Housing Authority |
| Madeira Community Development District |
| Madison Community Redevelopment Agency |
| Madison County Health and Hospital District |
| Madison County Soil and Water Conservation District |
| Magic Place Community Development District |
| Magic Reserve Community Development District |
| Magnolia Creek Community Development District |
| Magnolia Park Community Development District |
| Magnolia West Community Development District |

| |
|---|
| Maitland Downtown Community Redevelopment Agency |
| Majorca Isles Community Development District |
| |
| Manatee County Housing Authority |
| Manatee County Mosquito Control District |
| Manatee County Port Authority |
| Manatee River Soil and Water Conservation District |
| Mandarin Grove Community Development District |
| Mangrove Point and Mangrove Manor Community Development District |
| Manors of Inverrary Safe Neighborhood Improvement District |
| Maple Ridge Community Development District |
| Margate Community Redevelopment Agency |
| |
| Marianna Health and Rehabilitation Center |
| Marianna Housing Authority |
| Marianna Municipal Airport Development Authority |
| Marion County Community Redevelopment Agency |
| Marion County Hospital District |
| Marion County Housing Finance Authority |
| |
| Marion County Industrial Development Authority |
| Marion County Law Library |
| Marion County Utility Authority |
| Marion Soil and Water Conservation District |
| Marsh Harbour Community Development District |
| Marshall Creek Community Development District |
| Martin County Community Redevelopment Agency |
| |
| Martin County Health Facilities Authority |
| Martin County Industrial Development Authority |
| Matlacha / Pine Island Fire Control District |
| Mayfair Community Development District (Brevard County) |
| |
| McJunkin at Parkland Community Development District |
| Meadow Pines Community Development District |
| Meadow Pointe Community Development District |
| Meadow Pointe II Community Development District |
| Meadow Pointe III Community Development District |
| Meadow Pointe IV Community Development District |

| |
|---|
| Meadow Pointe V Community Development District |
| Meadow View at Twin Creeks Community Development District |
| Mediterra Community Development District |
| Mediterranea Community Development District |
| Melbourne Airport Authority |
| Melbourne Downtown Community Redevelopment Agency |
| Melbourne Housing Authority |
| Melbourne-Tillman Water Control District |
| Merrick Square Community Development District |
| Merritt Island Public Library District |
| Merritt Island Redevelopment Agency |
| Metropica Improvement District |
| Miami Beach Health Facilities Authority |
| Miami Beach Housing Authority |
| Miami Beach Redevelopment Agency |
| Miami Beach Visitor and Convention Authority |
| Miami World Center Community Development District |
| Miami-Dade County Educational Facilities Authority |
| Miami-Dade County Health Facilities Authority |
| Miami-Dade County Housing Finance Authority |
| Miami-Dade County Industrial Development Authority |
| Miami-Dade County Library District |
| Miami-Dade Expressway Authority |
| Miami-Dade Fire and Rescue Service District |
| Mid-Bay Bridge Authority |
| Middle Village Community Development District |
| Midtown Community Redevelopment Agency |
| Midtown Improvement District |
| Midtown Miami Community Development District |
| Midway Fire District |
| Millers Creek Special District |
| Milton Community Redevelopment Agency |
| Milton Housing Authority |
| Mira Lago West Community Development District |
| Mirabella Community Development District |

| |
|---|
| Mirada Community Development District (Lee) |
| Mirada Community Development District (Pasco) |
| Mirada II Community Development District |
| Miromar Lakes Community Development District |
| Mitchell Ranch Community Development District |
| Monroe County Comprehensive Plan Land Authority |
| Monroe County Housing Authority |
| Monroe County Industrial Development Authority |
| Montecito Community Development District |
| Monterey / Congress Community Development District |
| Monterra Community Development District |
| Moody River Estates Community Development District |
| Moore Haven Capital Projects Finance Authority |
| Moore Haven Mosquito Control District |
| Moorings Bay System Special Taxing District |
| Mount Dora Community Redevelopment Agency |
| Mount Dora Health Facilities Authority |
| Mt. Plymouth-Sorrento Community Redevelopment Agency |
| MTERC Community Development District |
| Municipal Service District of Ponte Vedra Beach |
| Murdock Village Community Redevelopment Agency |
| Myakka Ranch Community Development District |
| Myrtle Creek Improvement District |
| Naples Heritage Community Development District |
| Naples Reserve Community Development District |
| Naranja Lakes Community Redevelopment Agency |
| Narcoossee Community Development District |
| Nassau County Housing Finance Authority |
| Nassau Soil and Water Conservation District |
| Nature Coast Regional Water Authority |
| Naturewalk Community Development District |
| Naval Properties Local Redevelopment Authority |
| New Port - Tampa Bay Community Development District |
| New Port Richey Community Redevelopment Agency |

| |
|---|
| New River Community Development District |
| New River Public Library Cooperative |
| New River Solid Waste Association |
| |
| Newfield Community Development District |
| Niceville Community Redevelopment Agency |
| Niceville Housing Authority |
| Normandy Shores Local Government Neighborhood |
| Improvement District |
| |
| North AR-1 of Pasco Community Development District |
| North Bay Fire District |
| North Beach Community Redevelopment Agency |
| North Boulevard Community Development District |
| North Brevard County Hospital District |
| North Brevard County Public Library District |
| North Brevard Economic Development Zone Dependent |
| Special District |
| North Brevard Recreation Special District |
| North Broward Hospital District |
| North Central Florida Regional Housing Authority |
| North Collier Fire Control and Rescue District |
| North Dade Community Development District |
| North Fort Myers Fire Control and Rescue Service |
| District |
| |
| North Lake County Hospital District |
| North Lakes Maintenance District |
| North Lauderdale Housing Authority |
| North Lauderdale Water Control District |
| North Mainland / Ormond Crossings Community |
| Redevelopment Agency |
| |
| North Miami Beach Community Redevelopment Agency |
| North Miami Community Redevelopment Agency |
| North Miami Health Facilities Authority |
| North Okaloosa County Fire District |
| |
| North Palm Beach Heights Water Control District |
| North Park Isle Community Development District |
| North Pointe Special Dependent Tax District |
| North Port Fire Rescue District |

| |
|---|
| North Port Road and Drainage District |
| North Powerline Road Community Development District |
| North River Fire District |
| North River Ranch Community Development District |
| North River Ranch Improvement Stewardship District |
| North Springs Improvement District |
| North St. Lucie River Water Control District |
| North Sumter County Utility Dependent District |
| Northdale Special District |
| Northeast Community Redevelopment Agency |
| Northern Palm Beach County Improvement District |
| Northern Riverwalk Community Development District |
| Northwest Florida Regional Housing Authority |
| Northwest Florida Water Management District |
| Northwest Focal Point Senior Center District |
| Northwood Community Development District |
| NW 79th Street Corridor Community Redevelopment Agency |
| NW 7th Avenue Corridor Community Redevelopment Agency |
| Oak Creek Community Development District |
| Oak Stone East Community Development District |
| Oakridge Community Development District |
| Oaks at Shady Creek Community Development District |
| Oakstead Community Development District |
| Ocala Community Redevelopment Agency |
| Ocala Downtown Development District |
| Ocala Housing Authority |

| |
|---|
| Ocala Preserve Community Development District |
| Ocean City - Wright Fire Control District |
| Ocean Highway and Port Authority |
| Ocoee Community Redevelopment Agency |
| Okaloosa Gas District |
| Okaloosa Island Fire Control District |
| Okeechobee Soil and Water Conservation District |
| Okeechobee Utility Authority |
| Old Hickory Community Development District |
| Old Palm Community Development District |
| Old Plantation Water Control District |
| Old Town Floridian Community Development District |
| Olde Eau Gallie Riverfront Community Redevelopment Agency |
| Oldsmar Community Redevelopment Agency |
| Oleta River Community Development District |
| Olympus Community Development District |
| Omni Redevelopment District Community Redevelopment Agency |
| One Daytona Community Development District |
| Opa-Locka Community Redevelopment Agency |
| Orange Blossom Groves Community Development District |
| Orange Blossom Ranch Community Development District |
| Orange Blossom Trail Community Redevelopment Agency |
| Orange Blossom Trail Local Government NID |
| Orange City Community Redevelopment Agency |
| Orange County Health Facilities Authority |
| Orange County Housing Finance Authority |
| Orange County Industrial Development Authority |
| Orange County Library District |
| Orange County Research and Development Authority |
| Orange Hill Soil and Water Conservation District |
| Orange Soil and Water Conservation District |

| |
|---|
| Orchid Grove Community Development District |
| Orlandia Heights Special Neighborhood Improvement District |
| Orlando Community Redevelopment Agency |
| Ormond Beach Community Redevelopment Agency |
| Ormond Beach Housing Authority |
| Osceola Chain of Lakes Community Development District |
| Osceola County Community Redevelopment Agency - East U.S. 192 |
| Osceola County Health Facilities Authority |
| Osceola County Housing Finance Authority |
| Osceola County Library District |
| Osceola Soil and Water Conservation District |
| Osceola Village Center Community Development District |
| Osceola Water District 1 |
| Osceola Water District 2 |
| Osceola Water District 3 |
| Osceola Water District 4 |
| Osceola Water District 5 |
| Osprey Oaks Community Development District |
| OTC Community Development District |
| Overoaks Community Development District |
| Overstreet Fire Control District |
| Oviedo Community Redevelopment Agency |
| Pace Fire Rescue District |
| Pace Property Finance Authority |
| Pacific Ace Community Development District |
| Pahokee Housing Authority, Inc. |
| Pahokee Water Control District |
| PAL Public Library Cooperative |
| Palace at Coral Gables Community Development District |
| Palatka Downtown Redevelopment Agency |
| Palatka Gas Authority |
| Palatka Housing Authority |
| Palermo Community Development District |
| Palm Aire Special Recreation District |

| |
|---|
| Palm Bay Community Development District |
| Palm Beach County Educational Facilities Authority |
| Palm Beach County Health Facilities Authority |
| Palm Beach County Housing Authority |
| Palm Beach County Library District |
| Palm Beach Municipal Services Special District |
| Palm Beach Plantation Community Development District |
| Palm Beach Soil and Water Conservation District |
| Palm Beach Workforce Development Consortium |
| Palm Coast 145 Community Development District |
| Palm Coast Park Community Development District |
| Palm Glades Community Development District |
| Palm Harbor Special Fire Control and Rescue District |
| Palm River Community Development District |
| Palm Springs Community Redevelopment Agency |
| Palma Sola Trace Community Development District |
| Pal-Mar Water Control District |
| Palms of Terra Ceia Bay Community Development District |
| Panama City Beach Community Redevelopment Agency |
| Panama City Community Redevelopment Agency |
| Panama City Downtown Improvement Board |
| Panama City Housing Authority |
| Panama City Port Authority |
| Panama City-Bay County Airport and Industrial District |
| Panhandle Public Library Cooperative System |
| Panther Trace Community Development District |
| Panther Trace II Community Development District |
| Panther Trails Community Development District |
| Park Creek Community Development District |
| Park East Community Development District |
| Park Place Community Development District |
| Parker Road Community Development District |
| Parkland Preserve Community Development District |

| |
|---|
| Parklands Lee Community Development District |
| Parklands West Community Development District |
| Parkside Community Redevelopment Agency |
| Parkview at Long Lake Ranch Community Development District |
| Parkway Center Community Development District |
| Parrish Fire District |
| Parrish Lakes Community Development District |
| Parrish Plantation Community Development District |
| Pasco County Educational Facilities Authority |
| Pasco County Health Facilities Authority |
| Pasco County Housing Authority |
| Pasco County Housing Finance Authority |
| Pasco County Mosquito Control District |
| Pasco County Road and Bridge District |
| Paseo Community Development District |
| PBR Community Development District |
| Peace Creek Community Development District |
| Peace River Soil and Water Conservation District |
| Peace River-Manasota Regional Water Supply Authority |
| Pebble Ridge Community Development District |
| Pelican Lake Water Control District |
| Pelican Marsh Community Development District |
| Pembroke Harbor Community Development District |
| Pensacola Downtown Improvement Board |
| Pensacola-Escambia Promotion and Development Commission |
| Pentathlon Community Development District |
| Performing Arts Center Authority |
| Pier Park Community Development District |
| Pine Air Lakes Community Development District |
| Pine Hills Local Government Neighborhood Improvement District |
| Pine Hollow Special Dependent District |
| Pine Isle Community Development District |
| Pine Meadows Special Dependent District |
| Pine Ridge Plantation Community Development District |
| Pine Tree Water Control District (Broward County) |
| Pine Tree Water Control District (Palm Beach County) |

| |
|---|
| Pinellas County Community Redevelopment Agency |
| Pinellas County Construction Licensing Board |
| Pinellas County Educational Facilities Authority |
| Pinellas County Emergency Medical Services Authority |
| Pinellas County Health Facilities Authority |
| Pinellas County Housing Authority |
| Pinellas County Industrial Development Authority |
| Pinellas County License Board |
| Pinellas Park Water Management District |
| Pinellas Planning Council |
| Pinellas Suncoast Fire and Rescue District |
| Pinellas Suncoast Transit Authority |
| Piney-Z Community Development District |
| Pioneer Community Development District |
| Plant City Community Redevelopment Agency |
| Plant City Housing Authority |
| Plantation Acres Improvement District |
| Plantation Gateway |
| Plantation Midtown Development District |
| Poinciana Community Development District |
| Poinciana West Community Development District |
| Poitras East Community Development District |
| Polk County Industrial Development Authority |
| Polk Regional Water Cooperative |
| Polk Soil and Water Conservation District |
| Polk Transit Authority |
| Pollard Road Community Development District |
| Pompano Beach Community Redevelopment Agency |
| Pompano Beach Emergency Medical Services District |
| Ponce De Leon Inlet and Port District |
| Ponte Vedra Zoning and Adjustment Board |

| |
|---|
| Port Labelle Community Development District |
| Port Malabar Holiday Park, Mobile Home Park Recreation District |
| Port Manatee Improvement District |
| Port of Palm Beach District |
| Port of The Islands Community Improvement District |
| Port Orange Town Center |
| Port Richey Community Redevelopment Agency |
| Port St. Joe Port Authority |
| Port St. Joe Redevelopment Agency |
| Portico Community Development District |
| Portofino Isles Community Development District |
| Portofino Landings Community Development District |
| Portofino Shores Community Development District |
| Portofino Springs Community Development District |
| Portofino Vineyards Community Development District |
| Portofino Vista Community Development District |
| Preserve at Savannah Lakes Community Development District |
| Preserve at South Branch Community Development District, The |
| Preserve at Wilderness Lake Community Development District, The |
| Preston Cove Community Development District |
| Principal One Community Development District |
| Prosperity Lakes Community Development District |
| Punta Gorda Housing Authority |
| Punta Gorda Isles Canal Maintenance Assessment District |
| Putnam County Development Authority |
| Putnam County Port Authority |
| Putnam County Solid Waste Disposal District |
| Putnam Soil and Water Conservation District |
| Quail Roost Community Development District |
| Quantum Park Overlay Dependent District |
| Quarry Community Development District |
| Quincy Community Redevelopment Agency |

| |
|---|
| Quincy-Gadsden Airport Authority |
| |
| Rainbow Lakes Estates Municipal Service District |
| Ranches at Lake McLeod Community Development District |
| Randal Park Community Development District |
| Ranger Drainage District |
| Recreation and Water Conservation and Control District No. 1 |
| |
| Reedy Creek Improvement District |
| Remington Community Development District |
| Renaissance Commons Community Development District |
| Renaissance Community Development District |
| Renew Arlington Community Redevelopment Agency |
| Reserve at Pradera Community Development District |
| Reserve Community Development District |
| Reserve Community Development District 2 |
| Reunion East Community Development District |
| Reunion West Community Development District |
| Rhodine Road North Community Development District |
| Ridge at Apopka Community Development District |
| |
| Ridge at Heath Brook Community Development District |
| Ridge Water Control District |
| Ridgewood Trails Community Development District |
| Ritta Drainage District |
| River Bend Community Development District |
| River Glen Community Development District |
| |
| River Hall Community Development District |
| River Landing Community Development District |
| River Place on the St. Lucie Community Development District |
| River Ridge Community Development District |
| Riverbend West Community Development District |
| Rivercrest Community Development District |
| RiverPark Community Development District |
| |
| Rivers Edge Community Development District |
| Rivers Edge II Community Development District |
| Rivers Edge III Community Development District |

| |
|---|
| Riverside Park Community Development District |
| Riverwood Community Development District |
| Riverwood Estates Community Development District |
| Riviera Beach Community Redevelopment Agency |
| Riviera Beach Housing Authority |
| Rivington Community Development District |
| Rolling Hills Community Development District |
| Rolling Oaks Community Development District |
| Rupert J. Smith Law Library of St. Lucie County |
| Rustic Oaks Community Development District |
| Ryals Creek Community Development District |
| Sabal Palm Community Development District |
| Saddle Creek Preserve of Polk County Community Development District |
| Safety Harbor Community Redevelopment Agency |
| Sail Harbour Community Development District |
| Sampson Creek Community Development District |
| San Carlos Estates Water Control District |
| San Carlos Park Fire Protection and Rescue Service District |
| San Simeon Community Development District |
| Sanctuary Cove Community Development District |
| Sandmine Road Community Development District |
| Sandridge Community Development District |
| Sanford Airport Authority |
| Sanford Housing Authority |
| Sanibel Fire and Rescue District |
| Sanibel Public Library District |
| Santa Fe Soil and Water Conservation District |
| Santa Rosa Bay Bridge Authority |
| Santa Rosa County Health Facilities Authority |
| Santa Rosa County Housing Finance Authority |
| Santa Rosa Island Authority |
| Sarasota Bay Estuary Program |
| Sarasota County Health Facilities Authority |
| Sarasota County Law Library |
| Sarasota County Mental Health Care District |
| Sarasota County Mosquito Control District |
| Sarasota County Public Hospital District |
| Sarasota Housing Authority |

| |
|---|
| Sarasota National Community Development District |
| Sarasota Soil and Water Conservation District |
| Sarasota-Manatee Airport Authority |
| Satellite Beach Community Redevelopment Agency |
| Sausalito Bay Community Development District |
| Sawyer's Landing Community Development District |
| Scenic Highway Community Development District |
| Scenic Terrace North Community Development District |
| Scenic Terrace South Community Development District |
| Sebastian Inlet Tax District |
| Sebastian River Improvement District |
| Sebring Airport Authority |
| Sebring Community Redevelopment Agency |
| Sebring Regional Airport and Industrial Park CRA |
| Seminole County Housing Authority |
| Seminole County Industrial Development Authority |
| Seminole County Port Authority |
| Seminole Improvement District |
| Seminole Soil and Water Conservation District |
| Seven Oaks Community Development District |
| Shawano Water Control District |
| Shell Point Community Development District |
| Sherwood Manor Community Development District |
| Shingle Creek at Bronson Community Development District |
| Shingle Creek Community Development District |
| Siena North Community Development District |
| Silver Oaks Community Development District |
| Silver Palms Community Development District |
| Silver Palms West Community Development District |
| Silverado Community Development District |
| Silverleaf Community Development District |
| Simmons Village North Community Development District |

| |
|---|
| Six Mile Creek Community Development District |
| Solid Waste Authority of Palm Beach County |
| Solid Waste Disposal District |
| Solterra Community Development District |
| Solterra Resort Community Development District |
| Somerset Bay Community Development District |
| Somerset Community Development District |
| Sonoma Bay Community Development District |
| South Bay Community Development District (Hillsborough County) |
| South Brevard Recreation Special District |
| South Broward Drainage District |
| South Broward Hospital District |
| South Central Regional Wastewater Treatment and Disposal Board |
| South Creek Community Development District |
| South Dade Soil and Water Conservation District |
| South Dade Venture Community Development District |
| South Florida Conservancy District |
| South Florida Regional Transportation Authority |
| South Florida Water Management District |
| South Fork Community Development District |
| South Fork East Community Development District |
| South Fork III Community Development District |
| South Indian River Water Control District |
| South Kendall Community Development District |
| South Pointe Special Dependent Tax District |
| South Seminole and North Orange County Wastewater Transmission Authority |
| South Shore Corporate Park Industrial Community Development District |
| South Shore Drainage District |
| South Trail Fire Protection and Rescue Service District |
| South Village Community Development District |
| South Walton County Mosquito Control District |

| |
|---|
| South Walton Fire District |
| Southaven Community Development District |
| Southbay Community Development District (Manatee County) |
| Southeast Overtown / Park West Community Redevelopment Agency |
| Southeast Volusia Hospital District |
| Southern Grove Community Development District No. 1 |
| Southern Grove Community Development District No. 2 |
| Southern Grove Community Development District No. 3 |
| Southern Grove Community Development District No. 4 |
| Southern Grove Community Development District No. 5 |
| Southern Grove Community Development District No. 6 |
| Southern Hills Plantation I Community Development District |
| Southern Hills Plantation II Community Development District |
| Southern Hills Plantation III Community Development District |
| Southern Manatee Fire and Rescue District |
| Southshore Bay Community Development District |
| Southwest County Improvement District |
| Southwest Deltona Community Redevelopment Agency |
| Southwest Florida Water Management District |
| Space Florida |
| Spencer Creek Community Development District |
| Spicewood Community Development District |
| Spring Hill Community Redevelopment Agency |

| |
|---|
| Spring Lake Community Development District |
| Spring Lake Improvement District |
| Spring Ridge Community Development District |
| Springfield Community Redevelopment Agency |
| St. Armands Special Business Neighborhood Improvement District |
| St. Augustine Community Redevelopment Agency |
| St. Augustine Lakes Community Development District |
| St. Augustine Port, Waterway and Beach District |
| St. Johns County Airport Authority |
| St. Johns County Community Redevelopment Agency |
| St. Johns County Industrial Development Authority |
| St. Johns Forest Community Development District |
| St. Johns Improvement District |
| St. Johns River Water Management District |
| St. Johns Soil and Water Conservation District |
| St. Joseph Fire Control District |
| St. Lucie County Erosion District |
| St. Lucie County Fire District |
| St. Lucie County Housing Finance Authority |
| St. Lucie County Mosquito Control District |
| St. Lucie County Sustainability District |
| St. Lucie County Water and Sewer District |
| St. Lucie Soil and Water Conservation District |
| St. Lucie West Services District |
| St. Petersburg Community Redevelopment Agency |
| St. Petersburg Housing Authority |
| State Road 100 Corridor Community Redevelopment Agency |
| State Road Community Development District |
| Steeplechase Neighborhood Improvement District |
| Stellar North Community Development District |
| Sterling Hill Community Development District |
| Stevens Plantation Community Development District |

| |
|---|
| Stevens Plantation Improvement Project Dependent Special District |
| Stillwater Community Development District |
| Stonebrier Community Development District |
| Stonegate Community Development District |
| StoneLake Ranch Community Development District |
| Stonewater Community Development District |
| Stoneybrook at Venice Community Development District |
| Stoneybrook Community Development District |
| Stoneybrook North Community Development District |
| Stoneybrook South at ChampionsGate Community Development District |
| Stoneybrook South Community Development District |
| Stoneybrook West Community Development District |
| Storey Creek Community Development District |
| Storey Drive Community Development District |
| Storey Park Community Development District |
| Sugarfoot Oaks / Cedar Ridge Preservation and Enhancement District |
| Sugarland Drainage District |
| Sugarwood Groves Special District |
| Summer Woods Community Development District |
| Summerstone Community Development District |
| Summerville Community Development District |
| Summit at Fern Hill Community Development District |
| Summit View Community Development District |
| Sumter County Industrial Development Authority |
| Sumter Landing Community Development District |
| Sumter Soil and Water Conservation District |
| Sunbridge Stewardship District |
| Suncoast Community Development District |
| Sun'n Lake of Sebring Improvement District |
| Sunny Hills Units 12-15 Dependent District |
| Sunnyland Farms Community Development District |
| Sunrise Key Neighborhood Improvement District |
| Sunrise Lakes Phase IV Recreation District |
| Sunshine Water Control District |
| Suwannee County Conservation District |
| Suwannee County Development Authority |

| |
| --- |
| Suwannee River Water Management District |
| Suwannee Valley Transit Authority |
| Suwannee Water and Sewer District |
| Sweetwater Creek Community Development District |
| SWI Community Development District |
| Talavera Community Development District |
| Talis Park Community Development District |
| Tallahassee Downtown Improvement Authority |
| Tallahassee Housing Authority |
| Tamarac Village Community Development District |
| Tamarindo Community Development District |
| Tampa Bay Area Regional Transit Authority |
| Tampa Bay Estuary Program |
| Tampa Bay Water, A Regional Water Supply Authority |
| Tampa Palms Community Development District |
| Tampa Palms Open Space and Transportation CDD |
| Tampa Port Authority |
| Tampa Shores Special Dependent District |
| Tampa Sports Authority |
| Tampa-Hillsborough County Expressway Authority |
| Tapestry Community Development District (New) |
| Tara Community Development District |
| Tara Oaks Community Development District |
| Tarawood Special Dependent Tax District |
| Tavares Greater Downtown TIF District |
| Taylor Coastal Water and Sewer District |
| Taylor County Development Authority |
| Taylor Soil and Water Conservation District |
| Tern Bay Community Development District |
| Terra Bella Community Development District |
| Terracina Community Development District |

Tesoro Community Development District

The Children's Trust

Thousand Oaks Community Development District

Three Islands Safe Neighborhood District

Three Rivers Community Development District

Three Rivers Regional Library System

Tice Fire Protection and Rescue Service District

Timber Creek Community Development District

Timber Creek Southwest Community Development

District

Tindall Hammock Irrigation and Soil Conservation

District

Tison's Landing Community Development District

Titusville Community Redevelopment Agency

Titusville-Cocoa Airport District

Tohopekaliga Water Authority

Tohoqua Community Development District

Tolomato Community Development District

Tomoka Community Development District

Tomoka North Community Development District

Tomoka Town Center Community Development District

Toscana Isles Community Development District

Touchstone Community Development District

Town Center at Palm Coast Community Development

District

Town of Davie Neighborhood Improvement District

Town of Eatonville Community Redevelopment Agency

Town of Jupiter Community Redevelopment Agency

Town of Kindred Community Development District

Town of Kindred Community Development District II

Town of Lake Placid Community Redevelopment

Agency

Town of Marineland Community Redevelopment Agency

Towne of Seahaven Community Development District

Towne Park Community Development District

| |
|---|
| Tradition Community Development District No. 1 |
| Tradition Community Development District No. 10 |
| Tradition Community Development District No. 2 |
| Tradition Community Development District No. 3 |
| Tradition Community Development District No. 4 |
| Tradition Community Development District No. 5 |
| Tradition Community Development District No. 6 |
| Tradition Community Development District No. 7 |
| Tradition Community Development District No. 8 |
| Tradition Community Development District No. 9 |
| Trailer Estates Fire Control District |
| Trailer Estates Park and Recreation District |
| Trails at Monterey Community Development District |
| Trails Community Development District |
| Treasure Coast Education, Research and Development Authority |
| Tree Island Estates Community Development District |
| Treeline Preserve Community Development District |
| Trevesta Community Development District |
| Tri-County Airport Authority |
| Tri-Par Estates Park and Recreation District |
| Triple Creek Community Development District |
| Troup-Indiantown Water Control District |
| Trout Creek Community Development District |
| TSR Community Development District |
| Tuckers Pointe Community Development District |
| Tupelo Fire Control District |
| Tupelo Soil and Water Conservation District |
| Turnbull Creek Community Development District |
| Turtle Run Community Development District |
| Twelve Oaks Special District |
| Twin Creeks North Community Development District |
| Twin Lakes Water Control District |
| Two Creeks Community Development District |
| Two Lakes Community Development District |
| Two Rivers North Community Development District |
| Two Rivers West Community Development District |
| U.S. Highway 17-92 Corridor Redevelopment Agency |
| U.S. Highway 441 / 27 Community Redevelopment Agency |

| |
|---|
| Union County Housing Authority |
| Union County Special Library District |
| Union Park Community Development District |
| Union Park East Community Development District |
| Union Soil and Water Conservation District |
| University Park Recreation District |
| University Place Community Development District |
| University Square Community Development District |
| University Village Community Development District |
| Upper Captiva Fire Protection and Rescue Service District |
| Urban Orlando Community Development District |
| Utopia of Marion Community Development District |
| Valencia Acres Community Development District |
| Valencia Water Control District |
| Valparaiso Cable Authority |
| Valrico Manor Special Dependent Tax District |
| Varrea South Community Development District |
| Vasari Community Development District |
| V-Dana Community Development District |
| Venetian Community Development District |
| Venetian Isles Community Development District |
| Venetian Parc Community Development District |
| Venice Housing Authority |
| Ventana Community Development District |
| Veranda Community Development District |
| Veranda Community Development District II |
| Verandah East Community Development District |
| Verandah West Community Development District |
| Verandahs Community Development District, The |
| Verano 1 Community Development District |
| Verano 2 Community Development District |
| Verano 3 Community Development District |
| Verano 4 Community Development District |
| Verano 5 Community Development District |
| Verano Center Community Development District |
| Vero Lakes Water Control District |
| Verona Community Development District |
| Verona Walk Community Development District |
| Viera East Community Development District |

| |
|---|
| Viera Stewardship District |
| Vilano Beach Street Lighting District |
| Villa Portofino East Community Development District |
| Villa Portofino West Community Development District |
| Village at Gulfstream Park Community Development District, The |
| Village Center Community Development District |
| Village Community Development District No. 1 |
| Village Community Development District No. 10 |
| Village Community Development District No. 11 |
| Village Community Development District No. 12 |
| Village Community Development District No. 13 |
| Village Community Development District No. 14 |
| Village Community Development District No. 2 |
| Village Community Development District No. 3 |
| Village Community Development District No. 4 |
| Village Community Development District No. 5 |
| Village Community Development District No. 6 |
| Village Community Development District No. 7 |
| Village Community Development District No. 8 |
| Village Community Development District No. 9 |
| Village Estates West Special District |
| Villages of Bloomingdale Community Development District |
| Villages of Glen Creek Community Development District |
| Villages of Westport Community Development District |
| Villagewalk of Bonita Springs Community Development District |
| VillaMar Community Development District |
| VillaSol Community Development District |
| Vine Street Community Redevelopment Agency |
| Vista Community Development District |
| Vista Lakes Community Development District |
| Vizcaya in Kendall Community Development District |
| Volusia County Educational Facilities Authority |
| Volusia County Industrial Development Authority |
| Volusia County Unified Fire District |
| Volusia Growth Management Commission |
| Volusia Soil and Water Conservation District |
| W192 Development Authority |

Wakulla County Industrial Development Authority (2016)

Wakulla Soil and Water Conservation District

Walden Lake Community Association Local Government NID

Walkabout Community Development District

Walkers Green Community Development District

Walnut Creek Community Development District

Walton / Okaloosa / Santa Rosa Regional Utility Authority

Water Cooperative of Central Florida

Water Street Tampa Improvement District

Waterchase Community Development District

Waterford Estates Community Development District

Waterford Landing Community Development District

Waterford Special Dependent District

WaterGrass Community Development District I

WaterGrass Community Development District II

Waterleaf Community Development District (Hillsborough County)

Waterlefe Community Development District (Manatee County)

Water's Edge Community Development District (Manatee County)

Waters Edge Community Development District (Pasco County)

Waterset Central Community Development District

Waterset North Community Development District

Waterstone Community Development District

Wauchula Community Redevelopment Agency

Wentworth Estates Community Development District

Wesbridge Community Development District

West Atlantic Avenue Neighborhood Improvement District

West Coast Inland Navigation District

West Lakeland Water Control District

West Manatee Fire and Rescue District

West Orange Healthcare District

West Palm Beach Community Redevelopment Agency

| |
|---|
| West Palm Beach Downtown Development Authority |
| West Palm Beach Golf Commission |
| West Palm Beach Housing Authority |
| West Perrine Community Redevelopment Agency |
| West Port Community Development District |
| West Villages Improvement District |
| West Volusia Hospital Authority |
| Westchase Community Development District |
| Westchester Special Dependent District |
| Westgate / Belvedere Homes Community Redevelopment Agency |
| Westridge Community Development District |
| Westside Community Development District |
| Westside Haines City Community Development District |
| Westview North Community Development District |
| Westwood / OCC Community Development District |
| WildBlue Community Development District |
| Wildcat Preserve Community Development District |
| Wilderness Coast Public Libraries |
| Wildwood Community Redevelopment Agency |
| Wildwood Utility Dependent District |
| Wilford Preserve Community Development District |
| Williams Community Development District Number Five |
| Williams Community Development District Number Four |
| Williams Community Development District Number One |
| Williams Community Development District Number Seven |
| Williams Community Development District Number Six |
| Williams Community Development District Number Three |
| Williams Community Development District Number Two |
| Williston Community Redevelopment Agency |
| Willow Creek Community Development District |
| Willow Hammock Community Development District |

| |
|---|
| Willow Walk Community Development District |
| Willows Community Development District |
| Wilton Drive Improvement District |
| |
| Wind Meadows South Community Development District |
| Windemere Special Dependent District |
| Windermere / Tree Gardens Safe Neighborhood Improvement District |
| Windermere Water and Navigation Control District |
| |
| Winding Cypress Community Development District |
| |
| Windsor at Westside Community Development District |
| Windward at Lakewood Ranch Community Development District |
| Windward Community Development District |
| |
| Winston Trails Community Development District (East) |
| Winter Garden Community Redevelopment Agency |
| Winter Garden Village at Fowler Groves Community Development District |
| |
| Winter Haven Housing Authority |
| Winter Park Community Redevelopment Agency |
| Winter Park Housing Authority |
| |
| Wiregrass Community Development District |
| Wiregrass II Community Development District |
| Withlacoochee Regional Water Supply Authority |
| Woodlands Community Development District, The |
| World Commerce Community Development District |
| Wyld Palms Community Development District |
| Wyndam Park Community Development District |
| Wynnfield Lakes Community Development District |
| Wynnmere East Community Development District |
| Wynnmere West Community Development District |
| Wynwood Business Improvement District |
| Xentury City Community Development District |
| Yellow River Soil and Water Conservation District |
| Zephyr Lakes Community Development District |
| Zephyr Ridge Community Development District |
| Zephyrhills Community Redevelopment Agency |