# EXHIBIT B

## CORRECTED ENDO/PAR TEXAS STATE-WIDE OPIOID
## SETTLEMENT AGREEMENT AND SETTLEMENT TERM SHEET

### I.    Overview

This Agreement sets forth the principal terms and conditions of a settlement agreement between and among the State of Texas (defined herein), all Texas Participating Subdivisions (defined herein), and Endo/Par (defined herein) (collectively, "the Parties") to resolve opioid-related Claims against Endo/Par.

Endo/Par has agreed to the below terms for the sole purpose of settlement, and nothing herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Endo/Par expressly denies. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Endo/Par. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

This Agreement resolves, among other things, Endo/Par's portion of: investigations by the Attorney General of the State of Texas relating to opioids; *County of Dallas v. Purdue Pharma, L.P., et al.*, MDL Pretrial Cause No. 2018-77098 and *County of Bexar v. Purdue Pharma, L.P., et al.*, MDL Pretrial Cause No. 2018-77066, both bellwether cases in *In re: Texas Opioid Litigation*, MDL No. 18-0358 (Harris County, Texas); *County of Harris v. Purdue Pharma, L.P., et al.*, Case No. 1:18-op-45677-DAP (N.D. Ohio); *Tarrant County v. Purdue Pharma, L.P., et al.*, Case No. 1:18-op-45274-DAP (N.D. Ohio); and cases brought by Participating Subdivisions.

The Parties previously entered into an agreement to resolve opioid-related Claims against Endo/Par as of December 22, 2021 (the "December 2021 Agreement").  The Parties now wish to execute this corrected Agreement pursuant to Section XII.E of the December 2021 Agreement to clarify certain dates set out in Section III below.  This corrected Agreement shall supersede the December 2021 Agreement in all respects.

### II.    Definitions

A.    "*Actions*" means the investigations of Endo/Par undertaken by the Attorney General of Texas relating to opioids and opioid-related claims brought by Participating Subdivisions against Endo/Par, including but not limited to *County of Dallas v. Purdue Pharma, L.P., et al.*, MDL Pretrial Cause No. 2018-77098 and *County of Bexar v. Purdue Pharma, L.P., et al.*, MDL Pretrial Cause No. 2018-77066, both bellwether cases in *In re: Texas Opioid Litigation*, MDL No. 18-0358 (Harris County, Texas); *County of Harris v. Purdue Pharma, L.P., et al.*, Case No. 1:18-op-45677-DAP (N.D. Ohio); and *Tarrant County v. Purdue Pharma, L.P., et al.*, Case No. 1:18-op-45274-DAP (N.D. Ohio).

B.    "*Agreement*" means this term sheet together with the exhibits thereto.

C.    "*Bar*" means either (1) a ruling by the highest court of the State setting forth the general principle that no Subdivisions or Special Districts in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release

in it) or otherwise; (2) a law barring Subdivisions and Special Districts in the State from maintaining or asserting Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (3) a Settlement Class Resolution in the State with full force and effect. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payment of the Settlement Amount) shall not constitute a Bar.

D.    "*Case-Specific Resolution*" means either (1) a law barring specified Subdivisions or Special Districts from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); (2) a ruling by a court of competent jurisdiction over a particular Subdivision or Special District that has the legal effect of barring the Subdivision or Special District from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) in the case of a Special District, a release consistent with Section VII below. For the avoidance of doubt, a law, ruling, or release that is conditioned or predicated upon a post-Effective Date payment by a Released Entity (apart from payment of the Settlement Amount) shall not constitute a Case-Specific Resolution.

E.    "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

F.    "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the date of execution of this Agreement (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) arising from or relating in any way to (a) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy, or advocacy relating to any Product

2

or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

G.     "*Consent Judgment*" means a consent decree, order, judgment, or similar action.

H.     Except with respect to the Consent Judgment, "*Court*" means the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation*, MDL No. 18-0358, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas.  With respect to the Consent Judgment, "Court" means the court to which the Consent Judgment is presented for approval and/or entry.

I.      "*Effective Date*" means the date of entry of a final Consent Judgment, which shall be filed or otherwise submitted by the Parties to the Court no later than 30 days after the Initial Participation Date if the conditions set forth in Section III.B.1 are met.

J.      "*Endo/Par*" means Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Endo International plc, Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc. (collectively, "Endo/Par" or "Defendants").

K.     "*Finality*" means:

     a.     the Agreement and the Consent Judgment have been approved and entered by the Court as to Endo/Par, including the release of all Released Claims against Released Entities as provided in this Agreement;

     b.     for all lawsuits brought by the State against Released Entities for Released Claims, either previously filed or filed as part of the entry of the Consent Judgment, the Court has stated in the Consent Judgment or otherwise entered an order finding that all Released Claims against Released Entities asserted in the lawsuit have been resolved by agreement; and

     c.     (1) the time for appeal or to seek review of or permission to appeal from the approval and entry as described in subsection (a) hereof and entry of such order described in subsection (b) hereof has expired; or (2) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described in (a) hereof and the order described in subsection (b) hereof have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and

such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

L.      "*Initial Participation Date*" means the date by which Subdivisions must join to become initial Participating Subdivisions. The Initial Participation Date shall be March 10, 2022.

M.      "*Later Litigating Special District*" means a Special District (or Special District official asserting the right of or for the Special District to recover for alleged harms to the Special District and/or the people thereof) that is not a Litigating Special District and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the execution date of this Agreement. It may also include a Litigating Special District whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Special District takes any affirmative step in its lawsuit other than seeking a stay or removal.

N.      "*Later Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that is not a Litigating Subdivision and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date. It may also include a Litigating Subdivision whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the Effective Date, when such Litigating Subdivision takes any affirmative step in its lawsuit other than seeking a stay or removal.

O.      "*Litigating Special District*" means a Special District (or Special District official) that brought any Released Claims against any Released Entities on or before the execution date of this Agreement that were not separately resolved prior to that date.  Exhibit E includes Litigating Special Districts identified by the Parties as of the execution date but is subject to amendment in the event it proves to be incomplete and other entities that satisfy the definition for "Litigating Special District" are subsequently identified.

P.      "*Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that brought any Released Claims against any Released Entities on or before the execution date that were not separately resolved prior to that date. Exhibit E includes Litigating Subdivisions identified by the Parties as of the Execution Date but is subject to amendment in the event it proves to be incomplete and other entities that satisfy the definition for "Litigating Subdivision" are subsequently identified.

Q.      "*Non-Litigating Special District*" means a Special District that is neither a Litigating Special District nor a Later Litigating Special District.

R.      "*Non-Litigating Subdivision*" means a Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

S.      "*Non-Participating Subdivision*" means a Subdivision or Special District that is not a Participating Subdivision.

4

T.  "*Participating Subdivision*" means a Subdivision or Special District that signs the Election and Release Form annexed as Exhibit A and meets the requirements for becoming a Participating Subdivision under subsection VIII.A. Outside Counsel for Dallas, Bexar, Harris and Tarrant Counties shall execute the Election and Release Form annexed as Exhibit A concurrently with their execution of this Agreement, subject to approval by the Commissioner's Court by the Initial Participation Date, and shall be Participating Subdivisions.

U.  "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the avoidance of doubt, "Product" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. "Product" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

V.  "*Qualified Settlement Fund*" means the Texas Qualified Settlement Fund contemplated by this Agreement, into which all payments by Endo/Par shall be made and which shall be established under the authority and jurisdiction of the Court.

W.  "*Qualified Settlement Fund Administrator*" means the Administrator appointed to administer the Texas Qualified Settlement Fund under the authority and jurisdiction of the Court.

X.  "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the State or any of its Litigating Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by the State, any of its Subdivisions or Special Districts, or any Releasor (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly.

5

This Agreement does not release Claims by individuals for damages for any alleged personal injuries arising out of their own use of any opioid product. It is the intent of the Parties that such Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought by a Later Litigating Subdivision or other non-party Subdivision or Special District that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

Y.  "*Released Entities*" means (i) Endo/Par, (ii) all of their respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, assigns, and insurers (in their capacity as such), and (iii) all of the foregoing respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys, and insurers of the foregoing entities and persons referenced in clauses (i) and (ii) above for actions or omissions that occurred during and related to their work for, or employment with, any of the foregoing entities with respect to the Released Claims.

Z.  "*Releasors*" means (1) the State of Texas; (2) each Participating Subdivision, including Dallas, Bexar, Harris and Tarrant Counties; and (3) without limitation and to the maximum extent of the power of the State of Texas's Attorney General, and/or each Participating Subdivision to release Claims, (a) the State of Texas's and/or Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts, and other Special Districts in the State, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Texas or Subdivisions in the State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide an Election and Release Form providing for a release to the fullest extent of the Participating Subdivision's authority, which shall be attached as an exhibit to the Agreement. The State of Texas's Attorney General represents that he or she has or has obtained the authority set forth in the Representation and Warranty Section.

AA.  "*Settlement Amount*" means the aggregate total sum to be paid pursuant to this Agreement by or on behalf of Endo/Par and all Released Entities as specified in Section III.A.1 below. Except as provided in Section X and Section XII.D below, neither Endo/Par nor any Released Entities shall be called upon to make any payments pursuant to this Agreement in addition to the amount set forth in Section III.A.1 below. Endo/Par has no responsibility for any allocation of the Settlement Amount as set forth in this Agreement.

BB.  "*Settlement Class Resolution*" means a class action resolution in a court of competent jurisdiction in the State with respect to a class of Subdivisions and Special Districts in the State that (1) conforms with the State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in the State and has achieved Finality; (3) is binding on all Non-Participating Subdivisions in the State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Endo/Par other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable State law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing 1% or more of the State's population opt out. In seeking certification of any Settlement Class, the applicable State and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

CC.  "*Special District*" means a formal and legally recognized sub-entity of the State that is authorized by State law to provide one or a limited number of designated functions, such as school districts, fire districts, healthcare & hospital districts, and emergency services districts. Special Districts do not include sub-entities of the State that provide general governance for a defined area that would qualify as a Subdivision.  A list of Texas Special Districts will be agreed to by the Parties.

DD.  "*State*" means the State of Texas, including all of its executive departments, agencies, divisions, boards, commissions, instrumentalities and officers, including the Attorney General.

EE.   "*Subdivision(s)*" means a formal and legally recognized sub-entity of the State that provides general governance for a defined area, including a county, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and other functional levels of sub-entities of the State that provide general governance for a defined area. Historic, non-functioning sub-entities of the State are not Subdivisions, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, parens patriae, or any other capacity. A list of Texas Subdivisions will be agreed to by the Parties.

## III.  **Monetary Relief and Payments**

A.  Remediation and Restitution Payments

1.  On or before January 10, 2022, Endo Pharmaceuticals Inc. ("EPI") shall pay into the Texas Qualified Settlement Fund the sum of $63,000,000.00. Release of these funds from the Qualified Settlement Fund is contingent upon the satisfaction of the

conditions described in Section III.B below. If the conditions described in Section III.B.1 below are not satisfied, the amount paid under this Section shall revert forthwith to EPI.

2. The Settlement Amount shall be allocated in accordance with the Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet annexed hereto as Exhibit B and incorporated herein by reference (the *"Texas Intrastate Term Sheet"*). Accordingly, the Subdivision Share shall be $8,373,408.75; the Texas Opioid Abatement Fund Share shall be $39,075,907.50; the State Share shall be $8,373,408.75; and $7,177,275 shall be allocated to the attorney's fee sub-fund within the Texas Qualified Settlement Fund pursuant to Section IX.

B. Release of Payment for Full Joinder of Litigating Subdivisions and Special Districts and Support of Legislative Bar

1. If the Texas Attorney General notifies Endo/Par on or before March 11, 2022, that (1) Litigating Subdivisions and Litigating Special Districts representing at least 96% of the population of Litigating Subdivisions have become Participating Subdivisions or had their claims released consistent with Section VII, and (2) all such Participating Subdivisions support the legislative enactment of a Bar as defined in Section II.C.2 and are using their best efforts to achieve enactment as soon as is practicable and will continue to employ such best efforts until such legislation is enacted, the Settlement Amount, less amounts withheld pursuant to Section IX below, shall be disbursed as provided in this Agreement on March 14, 2022. The amounts withheld pursuant to Section IX below shall be disbursed in accordance with Section IX. The State and counsel for Dallas, Bexar, Harris and Tarrant Counties acknowledge the materiality of their becoming Participating Subdivisions, release of claims consistent with Section VII, and their meaningful support for legislative enactment of a Bar to qualify for an accelerated payment under this subsection.

## IV.    Intra-State Allocation

A. The Settlement Amount shall be allocated according to this Agreement and the Texas Intrastate Term Sheet, and according to Texas law, including the guidelines established in Tex. Gov't Code Ann. Chapter 403, Subchapter R, Statewide Opioid Settlement.

## V.    Injunctive Relief

A. The State and Endo/Par agree to the injunctive relief as specified in Exhibit C.

## VI.    Dismissal of Claims

A. Upon the execution of this Agreement, while awaiting formal approval of the Agreement by the Commissioners Courts of Dallas, Bexar, Harris and Tarrant Counties, the Parties agree to stay or extend all deadlines and proceedings in the Actions as to Endo/Par and to jointly move for the claims against Endo/Par to be severed from the Actions. It is the Parties' intent that all litigation activities in the Actions relating to the Claims against

Endo/Par shall immediately cease as of the date of the execution of this Agreement and that the Claims against Endo/Par not be included in any the trial of the Actions against the other defendants. Concurrently with the execution of this Agreement, the State of Texas and Dallas, Bexar, Harris and Tarrant Counties will execute an Agreed Motion to Dismiss with Prejudice, in the form annexed hereto as Exhibit D. The Parties will hold Dallas, Bexar, Harris and Tarrant Counties' Agreed Motion to Dismiss with Prejudice in escrow until the Counties' Commissioners Courts approve the Agreement or a resolution is passed satisfying the approval process of the Agreement and notice is given to Endo/Par in accordance with Section III.B.1. Dallas, Bexar, Harris and Tarrant Counties and Endo/Par shall promptly submit the executed Agreed Motion to Dismiss with Prejudice to the courts in which their actions are pending with a request that it be so ordered. In the event that Dallas, Bexar, Harris and/or Tarrant Counties' Commissioners Courts fail to approve the Agreement or the courts in which those Counties' Actions are pending decline to so-order the discontinuance of such Actions with prejudice as against Endo/Par, Endo/Par shall be entitled to terminate the Agreement and shall be excused from all obligations under it. Concurrently with the execution of this Agreement, Endo/Par and the State will execute a separate Agreed Motion to Dismiss with Prejudice covering the State's claims against Endo/Par. The State's Agreed Motion to Dismiss with Prejudice will be held in escrow until the Effective Date and shall be submitted to the Court with a request that it be so ordered concurrently with the entry of the Consent Judgment implementing this Agreement.

## VII.  <u>Release</u>

A.  *Scope*. As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. The State of Texas (for itself and its Releasors), Dallas, Bexar, Harris and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability arising from or relating in any way to the Released Claims and extend to the full extent of the power of the State of Texas, its Attorney General, and each Releasor to release claims. The Release shall be a complete bar to any Released Claim.

B.  Claim Over and Non-Party Settlement.

    1.  *Statement of Intent.* It is the intent of the Parties that:

        a.  Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

        b.  The payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related

to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

c.    Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

d.    The Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

e.    The provisions of this subsection VII.B are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2.    *Contribution/Indemnity Prohibited*. No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3.    *Non-Party Settlement*. To the extent that, on or after the Effective Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Endo/Par in subsection VII.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4.    *Claim-Over*. In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection VII.B.2, or any Releasor files a Non-Party Covered Conduct Claim against a non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection VII.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, that Releasor and Endo/Par shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Settlement Agreement by Endo/Par:

10

a.    Endo/Par shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Settlement Agreement, whichever is later;

b.    Endo/Par and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that Released Entities are not required to make any payment with respect to Covered Conduct (beyond the amounts which will already have been paid by Endo/Par under this Settlement Agreement).

c.    That Releasor and Endo/Par shall take steps sufficient and permissible under Texas law to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to make any payment with respect to Covered Conduct (beyond the amounts which will already have been paid by Endo/Par under this Settlement Agreement). Such steps may include, where permissible:

i.    Filing of motions to dismiss or such other appropriate motion by Endo/Par or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

ii.    Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

iii.    Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

iv.    Return of monies paid by Endo/Par to that Releasor under this Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

v.    Payment of monies to Endo/Par by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

vi.    Credit to Endo/Par under this Settlement Agreement to reduce the overall amounts to be paid under the Settlement Agreement such that it is held harmless from the Claim-Over; and

vii.    Such other actions as that Releasor and Endo/Par may devise to hold Endo/Par harmless from the Claim-Over.

      d.       The actions of that Releasor and Endo/Par taken pursuant to paragraph (c) must, in combination, ensure Endo/Par is not required to pay more with respect to Covered Conduct than the amounts owed by Endo/Par under this Agreement.

      e.       In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), such dispute may be heard by the Court. The Court shall have authority to require Releasors to implement a remedy that includes one or more of the actions specified in paragraph (c) sufficient to hold Released Entities fully harmless. In the event that the Court's actions do not result in Released Entities being held fully harmless, Endo/Par shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold Endo/Par harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Endo/Par may have.

C.     *General Release.* In connection with the releases provided for in the Agreement, the State of Texas (for itself and its Releasors), Dallas, Bexar, Harris and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors), Dallas, Bexar, Harris and Tarrant Counties (each for itself and its Releasors), and each Participating Subdivision (for itself and its Releasors) will expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Subdivisions' decision to participate in the Agreement.

D.     *Cooperation.* Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims. The State shall use its best efforts to secure releases consistent with this Section from all Litigating or Later Litigating Subdivisions and Special Districts.

E.    *Res Judicata.* Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement, and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

F.    *Representation and Warranty.* The signatories of this Agreement on behalf of the State of Texas and its Participating Subdivisions expressly represent and warrant that they will, on or before the Effective Date, have (or have obtained) the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) the State of Texas, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State of Texas's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license; and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

G.    *Effectiveness.* The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

H.    *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by individuals for damages for any alleged personal injuries arising out of their own use of any opioid product and any claims arising under the Agreement for enforcement of the Agreement.

## VIII. <u>Participation by Subdivisions</u>

A.    *Requirements for Becoming a Participating Subdivision: Litigating or Later Litigating Subdivisions or Litigating or Later Litigating Special Districts.* A Litigating or Later Litigating Subdivision or Litigating or Later Litigating Special District in the State may become a Participating Subdivision either by executing an Election and Release Form and upon prompt dismissal of its legal action or by having its claims extinguished by operation of law or released by the State's Office of the Attorney General.

B.    *Notice.* The State's Office of the Attorney General shall send notice to all Non-Litigating Subdivisions in the State of Texas eligible to participate in the settlement and the

requirements for participation. Such notice may include publication, email, and other standard forms of notification.

C. *Requirements for Becoming a Participating Subdivision: Non-Litigating Subdivisions and Non-Litigating Special Districts*. A Non-Litigating Subdivision or a Non-Litigating Special District may become a Participating Subdivision either by executing an Election and Release Form specifying (1) that the Subdivision or Special District agrees to the terms of this Agreement pertaining to Subdivisions, (2) that the Subdivision or Special District releases all Released Claims against all Released Entities, and (3) that the Subdivision or Special District submits to the jurisdiction of the Court for purposes limited to the Court's role under the Agreement or by having their claims extinguished by operation of law or released by the State's Office of the Attorney General.

D. *Non-Participating Subdivisions*. Non-Participating Subdivisions shall not directly receive any portion of any payments paid to the Texas Qualified Settlement Fund and the State may choose that its Non-Participating Subdivisions are ineligible for benefits from the fund.

E. *Representation With Respect to Participation Rate.* The State of Texas represents and warrants for itself that it has a good faith belief that virtually all of Texas's Litigating Subdivisions and Litigating Special Districts will become Participating Subdivisions. The State acknowledges the materiality of the foregoing representation and warranty. Counsel for Dallas, Bexar, Harris and Tarrant Counties, in good faith, believe this is a fair Settlement. Therefore, counsel for Dallas, Bexar, Harris and Tarrant Counties will, in their best efforts, recommend this Settlement to their Subdivision clients within Texas. Further, the State of Texas and counsel for Dallas, Bexar, Harris and Tarrant Counties will use their best efforts to secure participation by all Subdivisions within Texas.

F. Within 5 days of entry of the Notice of Dismissal per subsection VI, the Parties will seek to have entered the Case Management Order annexed hereto as Exhibit F. And, further, Endo/Par will participate in making motions to dismiss barred claims upon their release.

## IX. <u>Attorney Fee and Cost Payments</u>

A. The terms for attorney fee and cost payments to be allocated from the Settlement Amount are as follows:

1. $5,917,275.00, representing 9.3925% of the Settlement Amount, shall be allocated to the attorney fee sub-fund within the Texas Qualified Settlement Fund, to be available to reimburse Participating Subdivision attorney fees, upon application by eligible counsel who waive their contingency fees.

   a. These fees shall be divided amongst Participating Subdivisions, including Dallas, Bexar, Harris and Tarrant Counties, as provided in the Texas Intrastate Term Sheet. Nothing in Section IX.A.1 is intended to limit the application of Sections C.5 and C.6 of the Texas Intrastate Term Sheet.

14

2.      $1,260,000.00 shall be set aside within the Qualified Settlement Fund as the State's allocation for attorney's fees.

3.      The Qualified Settlement Fund Administrator shall withhold expenses, to be available to compensate Participating Attorneys for costs and expenses arising out of representation of Participating Subdivisions related to their litigation against Endo/Par. The costs and expenses shall be divided under the jurisdiction of the Court. No funds in the Litigating Subdivision Cost Fund may be used to compensate the costs incurred by Non-Participating Subdivisions, Non-Litigating Subdivisions or Non-Litigating Special Districts or costs and expenses arising out of representation of any such Subdivision or Special District.

4.      In addition to the compensation contemplated in the foregoing paragraph, the Qualified Settlement Fund Administrator shall allow reimbursement for reasonable costs and expenses as allowed by the Texas Intrastate Term Sheet from the Subdivision Share and Texas Abatement Fund Share, as provided in the Texas Intrastate Term Sheet, to be available to reimburse Participating Subdivision attorney costs and expenses upon application by eligible counsel who waive their contingency fees. These costs and expenses shall be divided under the jurisdiction and authority of the Court, amongst Participating Subdivisions, including Dallas, Bexar, Harris and Tarrant Counties, as provided in the Texas Intrastate Term Sheet. Any excess costs or expenses not allocated to reimburse Participating Subdivision attorney's costs and expenses pursuant to this Agreement under Exhibit B shall be replaced into to the Subdivision Share and Abatement Share Funds by the Qualified Settlement Fund Administrator.

5.      Nothing in this agreement is intended to limit the application of the Texas Intrastate Term Sheet, which includes the calculation and process for allocation of fees and costs for Texas Political Subdivisions.

6.      For the avoidance of doubt, nothing in this Section IX shall require any payment by Endo/Par beyond the Settlement Amount.

B.      An attorney may not receive any reimbursement of fees, costs, or expenses unless the following eligibility criteria are met and annually certified by the Attorney:

1.      The attorney must expressly waive the enforcement against the Litigating Subdivision client of all Claims for fees, costs or expenses arising out of or related to any or all representations of any Participating Subdivision prior to applying for attorneys' fees in connection with this Agreement. All applications for attorneys' fees or costs in connection with this Agreement shall include an affirmation by the attorney of such waiver and notice to the client(s) of such waiver. For the avoidance of doubt, no attorney may recover fees or costs in connection with this Agreement unless the attorney expressly agrees not to seek fees, costs or expenses from each and every Participating Subdivision represented by that attorney.

2.      The attorney must represent that s/he has no present intent to represent or participate

in the representation of any Later Litigating Subdivision or any Releasor with respect to Released Claims against Released Entities.

3.      The attorney must represent s/he will not charge or accept any referral fees for any Released Claims brought against Released Entities.

4.      The attorney may not have and must represent that s/he does not have a Claim for fees, costs or expenses related to a Later Litigating Subdivision.

## X.      __Bankruptcy__

A.      __Bankruptcy__.  Nothing in this agreement shall preclude the State or any Participating Subdivision from receiving a distribution from a potential bankruptcy of Endo/Par to the extent that the State or Participating Subdivision has a right to receive a payment or distribution in accordance with this Agreement. Subject to the terms of this Agreement (including all releases, covenants and payment terms contained herein), all of the State's and the Participating Subdivisions' rights with respect to any bankruptcy case of Endo/Par are specifically reserved by the State and the Participating Subdivisions. If for any reason, the State or any Participating Subdivision must remit any portion of the Settlement Amount to a bankruptcy court or other party as a result of the commencement of a case with respect to Endo/Par under Title 11 of the United States Code (the "Bankruptcy Code") then Endo International plc shall make such payment to Plaintiffs as soon as reasonably practicable.

## XI.      __Enforcement and Dispute Resolution__

A.      The terms of the Agreement are enforceable by the Participating Subdivisions before the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation, MDL No. 18-0358*, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas, and by the State for the Consent Judgment in the court where the Consent Judgment is filed. Endo consents to the jurisdiction of the Texas MDL Court, and to the court in which the Consent Judgment is filed, limited to resolution of disputes identified in subsection X1.C.

B.      The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this section to resolve the dispute.

C.      Disputes not resolved informally shall be resolved in the Court that entered the Consent Judgment for disputes with the Attorney General, or the Texas MDL Court for disputes with Participating Subdivisions. Texas law will apply.

## XII.      __Miscellaneous__

A.      *Taxes*.  Each of the Parties acknowledges, agrees, and understands that it is its intention that, for purposes of Section 162(f) of the Internal Revenue Code, the provision of the Settlement Amount by Endo/Par (other than amounts directed to attorneys' fees and costs) constitutes restitution for damage or harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law. The Parties acknowledge, agree and understand that, other than the amounts directed to attorneys' fees

and costs, no other portion of the Settlement Amount represents reimbursement to the State, any Participating Subdivision or other person or entity for the costs of any investigation or litigation, and no portion of the Settlement Amount represents or should properly be characterized as the payment of fines, penalties, or other punitive assessments. The State and Participating Subdivisions acknowledge, agree and understand that Endo/Par intends to allocate the cost of the Settlement Amount among the Released Entities using a reasonable basis. If reasonably requested by Endo/Par, the State and every Participating Subdivision shall complete and file Form 1098-F with the Internal Revenue Service, identifying the Settlement Amount (other than amounts directed to attorney fees and costs) as remediation/restitution amounts, and shall furnish Copy B of such Form 1098-F to Endo/Par. Endo/Par makes no warranty or representation to the State or any Participating Subdivision as to the tax consequences of the Settlement Payment or any portion thereof.

B.     Nothing in this Agreement shall be construed to authorize or require any action by Endo/Par in violation of applicable federal, state, or other laws.

C.     *Future Litigation Contracts*.  The State of Texas, by and through its Attorney General, represents that, to the extent permissible by law, it will not approve any future Subdivision or Special District outside counsel contracts for litigation arising out of or related to Covered Conduct against Endo/Par.

D.     *Most Favored Nations*.  If, after execution of this Agreement, there is a collective resolution—through settlement, bankruptcy or other mechanism—of substantially all claims against Endo/Par brought by states, counties, and municipalities (a "Global Resolution") under which, but for this Agreement, the Texas allocation would be greater than the Settlement Amount on a net present value basis, Endo/Par shall pay the difference between the Settlement Amount and the amount that would have been allocated to Texas under the terms and in accordance with any such Global Resolution.

E.     *Modification*. This Agreement may be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court. For purposes of modifying this Agreement or the Consent Judgment, Endo/Par may contact the Texas Attorney General and Counsel for Dallas, Bexar, Harris and Tarrant Counties for purposes of coordinating this process. Modifications must be in writing to be enforceable.

F.     Any failure by any party to this Agreement to insist upon the strict performance by any other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Judgment.

G.     *Entire Agreement*. This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto, except as provided herein. In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

H.    *Counterparts*. This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

I.    *Notice*. All notices under this Agreement shall be provided to the following via email and Overnight Mail:

> *Defendant:*
>
> Matthew J. Maletta
> Executive Vice President and Chief Legal Officer
> Endo
> 1400 Atwater Drive
> Malvern, PA 19355
> maletta.matthew@endo.com
>
> *Copy to Endo/Par's attorneys at:*
>
> Henninger S. Bullock
> Mayer Brown LLP
> 1221 Avenue of the Americas
> New York, NY 10020
> hbullock@mayerbrown.com
>
> Geoffrey M. Wyatt
> Skadden, Arps, Slate, Meagher & Flom LLP
> 1440 New York Avenue
> Washington, DC 20005
> geoffrey.wyatt@skadden.com
>
> *For the Attorney General:*
>
> Stephanie Eberhardt
> Assistant Attorney General
> Office of the Attorney General
> PO Box 12548
> Austin, Texas 78711-2548
> stephanie.eberhardt@oag.texas.gov
>
> *For Dallas County:*
>
> Jeffrey B. Simon
> Simon Greenstone Panatier, P.C.
> 1201 Elm Street, Suite 3400
> Dallas, Texas 75270
> Phone: (214) 276-7680
> jsimon@sgptrial.com

*For Bexar County:*

Mikal C. Watts
Watts Guerra LLC
4 Dominion Dr.,
Bldg 3, Suite 100
San Antonio, Texas 78257
Phone: (210) 447-0500
mcw@wattsguerra.com

*For Harris County:*

Dan Downey
1609 Shoal Creek Blvd., #100
Austin, TX 78701
dan@dandowney.com

*For Tarrant County:*

Dara Hegar
The Lanier Law Firm P.C.
10940 West Sam Houston Pkwy N., Suite 100
Houston, Texas 77064
Phone: (713) 659-5200
Dara.Hegar@LanierLawFirm.com

**Approved:**

Date: 01/07/22

ENDO HEALTH SOLUTIONS INC.

By:
Name: Blaise Coleman
Title: President and CEO

Date: 01/07/22

ENDO PHARMACEUTICALS INC.

By:
Name: Blaise Coleman
Title: President and CEO

19

Date: 01/07/22

ENDO INTERNATIONAL PLC

By: _____
Name: Blaise Coleman
Title: President and CEO

Date: 01/07/22

PAR PHARMACEUTICAL, INC.

By: _____
Name: Blaise Coleman
Title: President and CEO

Date: 01/07/22

PAR PHARMACEUTICAL COMPANIES, INC.

By: _____
Name: Blaise Coleman
Title: President and CEO

Date: _____

THE STATE OF TEXAS

By: _____
Name:   Brent Webster
Title:    First Assistant Attorney General
          Office of the Texas Attorney General

Date: _____

THE COUNTY OF DALLAS, TEXAS

By: _____
Name:
Title:

*Attorneys for the County of Dallas, Texas*

Date: _____

THE COUNTY OF BEXAR, TEXAS

By: _____
Name:
Title:

20

Date: _____        ENDO INTERNATIONAL PLC


By: _____
    Name:
    Title:

Date: _____        PAR PHARMACEUTICAL, INC.


By: _____
    Name:
    Title:

Date: _____        PAR PHARMACEUTICAL COMPANIES, INC.


By: _____
    Name:
    Title:

Date: _1/1/22_____        THE STATE OF TEXAS


By: _____
    Name:  Brent Webster
    Title:  First Assistant Attorney General
            Office of the Texas Attorney General

Date: _____        THE COUNTY OF DALLAS, TEXAS


By: _____
    Name:
    Title:

*Attorneys for the County of Dallas, Texas*

Date: _____        THE COUNTY OF BEXAR, TEXAS


By: _____
    Name:
    Title:

20

Date: _____          ENDO INTERNATIONAL PLC


                                 By: _____
                                      Name:
                                      Title:


Date: _____          PAR PHARMACEUTICAL, INC.


                                 By: _____
                                      Name:
                                      Title:


Date: _____          PAR PHARMACEUTICAL COMPANIES, INC.


                                 By: _____
                                      Name:
                                      Title:


Date: _____          THE STATE OF TEXAS


                                 By: _____
                                      Name:  Brent Webster
                                      Title:   First Assistant Attorney General
                                               Office of the Texas Attorney General


Date: 01/07/22 _____           THE COUNTY OF DALLAS, TEXAS

                                 By: _____
                                      Name:  Jeffrey Simon
                                      Title:   Shareholder

                                 *Attorneys for the County of Dallas, Texas*


Date: 01/07/22 _____           THE COUNTY OF BEXAR, TEXAS


                                 By: _____
                                      Name: Mikal Watts
                                      Title:   Capital Partner


                                 20

Date: _____

*Attorneys for the County of Bexar, Texas*

THE COUNTY OF HARRIS, TEXAS

By: _____
    Name: Dan Downey
    Title: COUNSEL

*Attorneys for the County of Harris, Texas*

Date: 01/07/22

THE COUNTY OF TARRANT, TEXAS

By: _____
    Name: Dara Hegar
    Title: Managing Attorney

*Attorneys for the County of Tarrant, Texas*

21

## Exhibit A

**TEXAS SUBDIVISION AND SPECIAL DISTRICT
ELECTION AND RELEASE FORM**

This Election and Release Form for Texas Participating Subdivisions[1] resolves opioid-related Claims against Endo/Par under the terms and conditions set forth in the Corrected Endo/Par Texas State-Wide Opioid Settlement Agreement between Endo/Par, the State of Texas, and the Counties of Dallas, Bexar, Harris and Tarrant (the "Agreement"), the provisions of which are here incorporated by reference in their entirety. Upon executing this Election and Release Form, a Participating Subdivision agrees that, in exchange for the consideration described in the Agreement, the Participating Subdivision is bound by all the terms and conditions of the Agreement, including but not limited to the Release found in Section VII of the Agreement and the provisions concerning participation by Subdivisions or Special Districts in Section VIII, and the Participating Subdivision and its signatories expressly represent and warrant on behalf of themselves that they have, or will have obtained on or before the Effective Date or on or before the execution of this Election and Release Form if executed after the Effective Date, the authority to settle and release, to the maximum extent of the Subdivision's and Special District's power, all Released Claims related to Covered Conduct. If this Election and Release Form is executed on or before the Initial Participation Date, the Participating Subdivision shall dismiss Endo/Par and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Endo/Par or a Released Entity no later than the Initial Participation Date. If this Election and Release Form is executed after the Initial Participation Date, the Participating Subdivision shall dismiss Endo/Par and all other Released

---

[1] The Agreement defines a "Participating Subdivision" as a Subdivision or Special District that signs this Election and Release Form and meets the requirements for becoming a Participating Subdivision under subsection VIII.A. of the Agreement.

745274877.20

Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Endo/Par or a Released Entity concurrently with the execution of this form. By executing this Election and Release Form, the Participating Subdivision submits to the jurisdiction of the Honorable Robert Schaffer, *In Re: Texas Opioid Litigation*, MDL No. 18-0358, Master File No. 2018-63587, in the 152nd Judicial District Court, Harris County, Texas.

Dated: _____

[TX SUBDIVISION OR SPECIAL DISTRICT]

By: _____
[COUNSEL]
[FIRM]
[ADDRESS]
[TELEPHONE]
[EMAIL ADDRESS]

*Counsel for [TX SUBDIVISION OR SPECIAL DISTRICT]*

745274877.20

**Exhibit B**

**TEXAS OPIOID SETTLEMENT SHARING AGREEMENT**

# TEXAS OPIOID ABATEMENT FUND COUNCIL AND SETTLEMENT ALLOCATION TERM SHEET

**WHEREAS**, the people of the State of Texas and its communities have been harmed through the National and Statewide epidemic caused by licit and illicit opioid use and distribution within the State of Texas; and now,

**WHEREAS**, the State of Texas, though its elected representatives and counsel, including the Honorable Ken Paxton, Attorney General of the State of Texas, and certain Political Subdivisions, through their elected representatives and counsel, are separately engaged in litigation seeking to hold those entities in the supply chain accountable for the damage caused; and now,

**WHEREAS**, the State of Texas, through its Attorney General and its Political Subdivisions, share a common desire to abate and alleviate the impacts of the epidemic throughout the State of Texas; and now,

**THEREFORE**, the State of Texas and its Political Subdivisions, subject to completing formal documents effectuating the Parties' agreements, enter into this State of Texas and Texas Political Subdivisions' Opioid Abatement Fund Council and Settlement Allocation Term Sheet (Texas Term Sheet) relating to the allocation and use of the proceeds of any Settlements as described.

## A. Definitions

As used in this Texas Term Sheet:

1. "The State" shall mean the State of Texas acting through its Attorney General.

2. "Political Subdivision(s)" shall mean any Texas municipality and county.

3. "The Parties" shall mean the State of Texas, the Political Subdivisions, and the Plaintiffs' Steering Committee and Liaison Counsel (PSC) in the Texas Opioid MDL, *In Re: Texas Opioid Litigation*, MDL No. 2018-63587, in the 152d District Court of Harris County, Texas.

4. "Litigating Political Subdivision" means a Political Subdivision that filed suit in the state courts of the State of Texas prior to the Execution Date of this Agreement, whether or not such case was transferred to Texas Opioid MDL, or removed to federal court.

5. "National Fund" shall mean any national fund established for the benefit of the Texas Political Subdivisions.  In no event shall any National Fund be used to create federal jurisdiction, equitable or otherwise, over the Texas Political Subdivisions or those similarly situated state-court litigants who are included in the state coalition, nor shall the National Fund require participating in a class action or signing a participation agreement as part of the criteria for participating in the National Fund.

6. "Negotiating Committee" shall mean a three-member group comprising four representatives for each of (1) the State; (2) the PSC; and (3) Texas'

Political Subdivisions (collectively, "Members"). The State shall be represented by the Texas Attorney General or his designees. The PSC shall be represented by attorneys Mikal Watts, Jeffrey Simon, Dara Hegar, Dan Downey, or their designees. Texas' Political Subdivisions shall be represented by Clay Jenkins (Dallas County Judge), Terrence O'Rourke (Special Assistant County Attorney, Harris County), Nelson Wolff (Bexar County Judge), and Nathaniel Moran (Smith County Judge) or their designees.

7. "Settlement" shall mean the negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant that includes the State and Political Subdivisions.

8. "Opioid Funds" shall mean monetary amounts obtained through a Settlement as defined in this Texas Term Sheet.

8. "Approved Purpose(s)" shall mean those uses identified in Exhibit A hereto.

9. "Pharmaceutical Supply Chain" shall mean the process and channels through which opioids or opioids products are manufactured, marketed, promoted, distributed, or dispensed.

10. "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution, or dispensing of an opioid analgesic.

11. "Texas Opioid Council" shall mean the Council described in Exhibit A hereto, which has the purpose of ensuring the funds recovered by Texas (through the joint actions of the Attorney General and the Texas Political Subdivisions) are allocated fairly and spent to remediate the opioid crisis in Texas, using efficient and cost-effective methods that are directed to the hardest hit regions in Texas while also ensuring that all Texans benefit from prevention and recovery efforts.

**B. Allocation of Settlement Proceeds**

1. All Opioid Funds distributed in Texas shall be divided with 15% going to Political Subdivisions ("Subdivision Share"), 70% to the Texas Opioid Abatement Fund through the Texas Opioid Council (Texas Abatement Fund Share) identified and described on Exhibits A and C hereto, and 15% to the Office of the Texas Attorney General as Counsel for the State of Texas ("State Share"). Out of the Texas Opioid Abatement Fund, reasonable expenses up to 1% shall be paid to the Texas Comptroller for the administration of the Texas Opioid Council pursuant to the Opioid

Abatement Fund (Texas Settlement) Opioid Council Agreement, Exhibit A hereto.

2. The Subdivisions Share shall be allocated in accordance with the division of proceeds on Exhibit B hereto.

3. The Texas Abatement Fund Share shall be allocated to the Opioid Council to be apportioned in accordance with the guidelines of Exhibit A, and Exhibit C hereto.

4. In the event a Subdivision merges, dissolves, or ceases to exist, the allocation percentage for that Subdivision shall be redistributed as directed by the settlement document, and if not specified, equitably based on the composition of the successor Subdivision. If a Subdivision for any reason is excluded from a specific settlement, the allocation percentage for that Subdivision shall be redistributed as directed by the settlement document, and if not specified, equitably among the participating Subdivisions.

5. Funds obtained from parties unrelated to the Litigation, via grant, bequest, gift or the like, separate and distinct from the Litigation, may be directed to the Texas Opioid Council and disbursed as set forth below.

6. The Subdivision share shall be initially deposited and paid in cash directly to the Subdivision under the authority and guidance of the Texas MDL Court, who shall direct any Settlement funds to be held in trust in a

segregated account to benefit the Subdivisions and to be promptly distributed as set forth herein and in accordance with Exhibit B.

7. Nothing in this Texas Term Sheet should alter or change any Subdivision's rights to pursue its own claim. Rather, the intent of this Texas Term Sheet is to join all parties to disburse settlement proceeds from one or more defendants to all parties participating in that settlement within Texas.

8. Opioid Funds from the Texas Abatement Fund Share shall be directed to the Texas Opioid Council and used in accordance with the guidelines as set out on Exhibit A hereto, and the Texas Abatement Fund Share shall be distributed to the Texas Opioid Council under the authority and guidance of the Texas MDL Court, consistent with Exhibits A and C, and the by-laws of the Texas Opioid Council documents and disbursed as set forth therein, including without limitation all abatement funds and the 1% holdback for expenses.

9. The State of Texas and the Political Subdivisions understand and acknowledge that additional steps may need to be undertaken to assist the Texas Opioid Council in its mission, at a predictable level of funding, regardless of external factors.

## C. Payment of Counsel and Litigation Expenses

1. Any Master Settlement Agreement settlement will govern the payment of fees and litigation expenses to the Parties. The Parties agree to direct control of any Texas Political Subdivision fees and expenses to the "Texas Opioid Fee and Expense Fund," which shall be allocated and distributed by the Texas MDL Court, *In re: Texas Opioid Litigation*, MDL No. 2018-63587, in the 152nd District Court of Harris County, Texas, and with the intent to compensate all counsel for Texas Political Subdivisions who have not chosen to otherwise seek compensation for fees and expenses from any federal MDL common benefit fund.

2. The Parties agree that no portion of the State of Texas 15% allocation share from any settlement shall be administered through the National Fund, the Texas MDL Court, or Texas Opioid Fee and Expense Fund, but shall be directed for payment to the State of Texas by the State of Texas.

3. The State of Texas and the Texas Political Subdivisions, and their respective attorneys, agree that all fees – whether contingent, hourly, fixed or otherwise – owed by the Texas Political Subdivisions shall be paid out of the National Fund or as otherwise provided for herein to the Texas Opioid Fee and Expense Fund to be distributed by the 152nd

District Court of Harris County, Texas pursuant to its past and future orders.

4. From any opioid-related settlements with McKesson, Cardinal Health, ABDC, and Johnson & Johnson, and for any future opioid-related settlements negotiated, in whole or in part, by the Negotiating Committee with any other Pharmaceutical Supply Chain Participant, the funds to be deposited in the Texas Opioid Fee and Expense Fund shall be 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions of each payment (annual or otherwise) to the State of Texas for that settlement, plus expenses from the National Fund, and shall be sought by Texas Political Subdivision Counsel initially through the National Fund. The Texas Political Subdivisions' percentage share of fees and expenses from the National Fund shall be directed to the Texas Opioid Fee and Expense Fund in the Texas MDL, as soon as is practical, for allocation and distribution in accordance with the guidelines herein.

5. If the National Fund share to the Texas Political Subdivisions is insufficient to cover the guaranteed 9.3925%, plus expenses from the National Fund, per subsection 4, immediately *supra*, or if payment from the National Fund is not received within 12 months after the date the

first payment is made by the Defendants pursuant to the settlement, then the Texas Political Subdivisions shall recover up to 12.5% of the Texas Political Subdivision Share to make up any difference.

6. If the National Fund and the Texas Political Subdivision share are insufficient to cover the guaranteed 9.3925%, plus expenses from the National Fund, or if payment from the National Fund is not received within 12 months after the date the first payment is made by the Defendants pursuant to the settlement, then the Texas Political Subdivisions shall recover up to 8.75% of the Abatement Fund Share to make up any difference.  In no event shall the Texas Political Subdivision share exceed 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions of any settlement, plus expenses from the National Fund.  In the event that any payment is received from the National Fund such that the total amount in fees and expenses exceeds 9.3925%, the Texas Political Subdivisions shall return any amounts received greater than 9.3925% of the combined Texas Political Subdivision and Texas Abatement Fund portions to those respective Funds.

7. For each settlement utilizing a National Fund, the Texas Political Subdivisions need only make one attempt at seeking fees and expenses there.

8. The total amount of the Texas Opioid Fee and Expense Fund shall be reduced proportionally, according to the agreed upon allocation of the Texas Subdivision Fund, for any Texas litigating Political Subdivision that (1) fails to enter the settlement; and (2) was filed in Texas state court, and was transferred to the Texas MDL (or removed before or during transfer to the Texas MDL) as of the execution date of this Agreement.

## D. The Texas Opioid Council and Texas Abatement Fund

The Texas Opioid Council and Texas Abatement Fund is described in detail at Exhibit A, incorporated herein by reference.

## E. Settlement Negotiations

1. The State and Negotiating Committee agree to inform each other in advance of any negotiations relating to a Texas-only settlement with a Pharmaceutical Supply Chain Participant that includes both the State and its Political Subdivisions and shall provide each other the opportunity to participate in all such negotiations. Any Texas-only Settlement agreed to with the State and Negotiating Committee shall be subject to the approval

of a majority of litigating Political Subdivisions. The Parties further agree to keep each other reasonably informed of all other global settlement negotiations with Pharmaceutical Supply Chain Participants and to include the Negotiating Committee or designees. Neither this provision, nor any other, shall be construed to state or imply that either the State or the Negotiating Committee is unauthorized to engage in settlement negotiations with Pharmaceutical Supply Chain Participants without prior consent or contemporaneous participation of the other, or that either party is entitled to participate as an active or direct participant in settlement negotiations with the other. Rather, while the State's and Negotiation Committee's efforts to achieve worthwhile settlements are to be collaborative, incremental stages need not be so.

2. Any Master Settlement Agreement (MSA) shall be subject to the approval and jurisdiction of the Texas MDL Court.

3. As this is a Texas-specific effort, the Committee shall be Chaired by the Attorney General. However, the Attorney General, or his designees, shall endeavor to coordinate any publicity or other efforts to speak publicly with the other Committee Members.

4. The State of Texas, the Texas MDL Plaintiff's Steering Committee representatives, or the Political Subdivision representatives may withdraw

from coordinated Settlement discussions detailed in this Section upon 10 business days' written notice to the remaining Committee Members and counsel for any affected Pharmaceutical Supply Chain Participant. The withdrawal of any Member releases the remaining Committee Members from the restrictions and obligations in this Section.

5. The obligations in this Section shall not affect any Party's right to proceed with trial or, within 30 days of the date upon which a trial involving that Party's claims against a specific Pharmaceutical Supply Chain Participant is scheduled to begin, reach a case specific resolution with that particular Pharmaceutical Supply Chain Participant.

## F. Amendments

The Parties agree to make such amendments as necessary to implement the intent of this agreement.

### Acknowledgment of Agreement

We, the undersigned, have participated in the drafting of the above Texas Term Sheet, including consideration based on comments solicited from Political Subdivisions. This document has been collaboratively drafted to maintain all individual claims while allowing the State and its Political Subdivisions to cooperate in exploring all possible means of resolution. Nothing in this agreement binds any party to any specific outcome. Any resolution under this document will require

acceptance by the State of Texas and a majority of the Litigating Political Subdivisions.

We, the undersigned, hereby accept the STATE OF TEXAS AND TEXAS POLITICAL SUBDIVISIONS' OPIOID ABATEMENT FUND COUNCIL AND SETTLEMENT ALLOCATION TERM SHEET. We understand that the purpose of this Texas Term Sheet is to permit collaboration between the State of Texas and Political Subdivisions to explore and potentially effectuate earlier resolution of the Opioid Litigation against Pharmaceutical Supply Chain Participants. We also understand that an additional purpose is to create an effective means of distributing any potential settlement funds obtained under this Texas Term Sheet between the State of Texas and Political Subdivisions in a manner and means that would promote an effective and meaningful use of the funds in abating the opioid epidemic throughout Texas.

Executed this __13__ day of May, 2020.

FOR THE STATE OF TEXAS:

KENNETH PAXTON, JR.
ATTORNEY GENERAL

FOR THE SUBDIVISIONS
AND TEXAS MDL PSC:

MIKAL WATTS
WATTS GUERRA LLP

JEFFREY SIMON
SIMON GREENSTONE PANATIER, PC

DARA HEGAR
LANIER LAW FIRM, PC

DAN DOWNEY
DAN DOWNEY, PC

:sas

# EXHIBIT A

**Opioid Abatement Fund (Texas) Settlement**

**Opioid Council**

As part of the settlement agreement and upon its execution, the parties will form the Texas Opioid Council (Council) to establish the framework that ensures the funds recovered by Texas (through the joint actions of the Attorney General and the state's political subdivisions) are allocated fairly and spent to remediate the opioid crisis in Texas, using efficient and cost-effective methods that are directed to the hardest hit regions in Texas while also ensuring that all Texans benefit from prevention and recovery efforts.

## I.    Structure

The Council will be responsible for the processes and procedures governing the spending of the funds held in the Texas Abatement Fund, which will be approximately 70% of all funds obtained through settlement and/or litigation of the claims asserted by the State and its subdivisions in the investigations and litigation related to the manufacturing, marketing, distribution, and sale of opioids and related pharmaceuticals.

Money paid into the abatement fund will be held by an independent administrator, who shall be responsible for the ministerial task of releasing funds solely as authorized below by the Council, and accounting for all payments to and from the fund.

The Council will be formed when a court of competent jurisdiction enters an order settling the matter, including any order of a bankruptcy court. The Council's members must be appointed within sixty (60) days of the date the order is entered.

A.  Membership

The Council shall be comprised of the following thirteen (13) members:

1.  *Statewide Members.*

Six members appointed by the Governor and Attorney General to represent the State's interest in opioid abatement. The statewide members are appointed as follows:

   a.  The Governor shall appoint three (3) members who are licensed health professionals with significant experience in opioid interventions;
   b.  The Attorney General shall appoint three (3) members who are licensed professionals with significant experience in opioid incidences; and
   c.  The Governor will appoint the Chair of the Council as a non-voting member. The Chair may only cast a vote in the event there is a tie of the membership.

2.  *Regional Members.*

Six (6) members appointed by the State's political subdivisions to represent their designated Texas Health and Human Services Commission "HHSC" Regional Healthcare

1

Partnership (Regions) to ensure dedicated regional, urban, and rural representation on the Council. The regional appointees must be from either academia or the medical profession with significant experience in opioid interventions. The regional members are appointed as follows:

    a.   One member representing Regions 9 and 10 (Dallas Ft-Worth);

    b.   One member representing Region 3 (Houston);

    c.   One member representing Regions 11, 12, 13, 14, 15, 19 (West Texas);

    d.   One member representing Regions 6, 7, 8, 16 (Austin-San Antonio);

    e.   One member representing Regions 1, 2, 17, 18 (East Texas); and

    f.   One member representing Regions 4, 5, 20 (South Texas).

## B.  Terms

All members of the Council are appointed to serve staggered two-year terms, with the terms of members expiring February 1 of each year. A member may serve no more than two consecutive terms, for a total of four consecutive years. For the first term, four (4) members (two (2) statewide and two (2) for the subdivisions) will serve a three-year term. A vacancy on the Council shall be filled for the unexpired term in the same manner as the original appointment. The Governor will appoint the Chair of the Council who will not vote on Council business unless there is a tie vote, and the subdivisions will appoint a Vice-Chair voting member from one of the regional members.

## C.  Governance

### 1.  Administration

The Council is attached administratively to the Comptroller.  The Council is an independent, quasi-governmental agency because it is responsible for the statewide distribution of the abatement settlement funds.  The Council is exempt from the following statutes:

    a.   Chapter 316 of the Government Code (Appropriations);

    b.   Chapter 322 of the Government Code (Legislative Budget Board);

    c.   Chapter 325 of the Government Code (Sunset);

    d.   Chapter 783 of the Government Code (Uniform Grants and Contract Management);

    e.   Chapter 2001 of the Government Code (Administrative Procedure);

    f.   Chapter 2052 of the Government Code (State Agency Reports and Publications);

    g.   Chapter 2261 of the Government Code (State Contracting Standards and Oversight);

    h.   Chapter 2262 of the Government Code (Statewide Contract Management);

      i.  Chapter 262 of the Local Government Code (Purchasing and Contracting Authority of Counties); and

      j.  Chapter 271 of the Local Government Code (Purchasing and Contracting Authority of Municipalities, Counties, and Certain Other Local Governments).

### 2. *Transparency*

The Council will abide by state laws relating to open meetings and public information, including Chapters 551 and 552 of the Texas Government Code.

    i.  The Council shall hold at least four regular meetings each year. The Council may hold additional meetings on the request of the Chair or on the written request of three members of the council. All meetings shall be open to the public, and public notice of meetings shall be given as required by state law.

    ii.  The Council may convene in a closed, non-public meeting:

        a.  If the Commission must discuss:

           1.  Negotiation of contract awards; and

           2.  Matters specifically exempted from disclosure by federal and state statutes.

        b.  All minutes and documents of a closed meeting shall remain under seal, subject to release only order of a court of competent jurisdiction.

### 3. *Authority*

The Council does not have rulemaking authority.  The terms of each Judgment, Master Settlement Agreement, or any Bankruptcy Settlement for Texas control the authority of the Council and the Council may not stray outside the bounds of the authority and power vested by such settlements. Should the Council require legal assistance in determining their authority, the Council may direct the executive director to seek legal advice from the Attorney General to clarify the issue.

### D.  Operation and Expenses

The independent administrator will set aside up to one (1) percent of the settlement funds for the administration of the Council for reasonable costs and expenses of operating the foregoing duties, including educational activities.

### 1. *Executive Director*

The Comptroller will employ the executive director of the Council and other personnel as necessary to administer the duties of the Council and carry out the functions of the Council. The executive director must have at least 10 years of experience in government or public administration and is classified as a Director V/B30 under the State Auditor's State Classification.   The Comptroller will pay the salaries of the Council employees from the

one (1) percent of the settlement funds set aside for the administration of the Council. The Comptroller will request funds from the Texas Abatement Fund Point of Contact.

### 2. *Travel Reimbursement*

A person appointed to the Council is entitled to reimbursement for the travel expenses incurred in attending Council duties.  A member of the Council may be reimbursed for actual expenses for meals, lodging, transportation, and incidental expenses in accordance with travel rates set by the federal General Services Administration.

## II.    Duties/Roles

It is the duty of the Council to determine and approve the opioid abatement strategies and funding awards.

### A.  Approved Abatement Strategies

The Council will develop the approved Texas list of abatement strategies based on but not limited to the existing national list of opioid abatement strategies (see attached Appendix A) for implementing the Texas Abatement Fund.

1. The Council shall only approve strategies which are evidence-informed strategies.
2. The Texas list of abatement strategies must be approved by majority vote.  The majority vote must include a majority from both sides of the statewide members and regional members in order to be approved, e.g., at least four (4) of six (6) members on each side.

### B.  Texas Abatement Fund Point of Contact

The Council will determine a single point of contact called the Abatement Fund Point of Contact (POC) to be established as the sole entity authorized to receive requests for funds and approve expenditures in Texas and order the release of funds from the Texas Abatement Fund by the independent administrator.  The POC may be an independent third party selected by the Council with expertise in banking or financial management.  The POC will manage the Opioid Council Bank Account (Account).  Upon a vote, the Council will direct the POC to contact the independent administrator to release funds to the Account.  The Account is outside the State Treasury and not managed by any state or local officials. The POC is responsible for payments to the qualified entities selected by the Council for abatement fund awards.  The POC will submit a monthly financial statement on the Account to the Council.

### C.  Auditor

An independent auditor appointed by the Council will perform an audit on the Account on an annual basis and report its findings, if any, to the Council.

### D.  Funding Allocation

The Council is the sole decision-maker on the funding allocation process of the abatement funds. The Council will develop the application and award process based on the parameters outlined below. An entity seeking funds from the Council must apply for funds; no funds will be awarded without an application. The executive director and personnel may assist the Council in gathering and compiling the applications for consideration; however, the Council members are the sole decision-makers of awards and funding determination. The Council will use the following processes to award funds:

1. *Statewide Funds.* The Council will consider, adopt and approve the allocation methodology attached as Exhibit C, based upon population health data and prevalence of opioid incidences, at the Council's initial meeting. Adoption of such methodology will allow each Region to customize the approved abatement strategies to fit its communities' needs. The statewide regional funds will account for seventy-five (75) percent of the total overall funds, less the one (1) percent administrative expense described herein.

2. *Targeted Funds.* Each Region shall reserve twenty-five (25) percent of the overall funds, for targeted interventions in the specific Region as identified by opioid incidence data. The Council must approve on an annual basis the uses for the targeted abatement strategies and applications available to every Region, including education and outreach programs. Each Region without approved uses for the targeted funds from the Council, based upon a greater percentage of opioid incidents compared to its population, is subject to transfer of all or a portion of the targeted funds for that Region for uses based upon all Regions' targeted funding needs as approved by the Council on an annual basis.

3. *Annual Allocation.* Statewide regional funds and targeted funds will be allocated on an annual basis. If a Region lapses its funds, the funds will be reallocated based on all Regions' funding needs.

E. Appeal Process

The Council will establish an appeal process to permit the applicants for funding (state or subdivisions) to challenge decisions by the Council-designated point of contact on requests for funds or expenditures.

1. To challenge a decision by the designated point of contact, the State or a subdivision must file an appeal with the Council within thirty (30) days of the decision. The Council then has thirty (30) days to consider and rule on the appeal.
2. If the Council denies the appeal, the party may file an appeal with the state district court of record where the final opioid judgment or Master Settlement Agreement is filed. The Texas Rules of Civil Procedure and Rules of Evidence will govern these proceedings. The Council may request representation from the Attorney General in these proceedings.

      In making its determination, the state district court shall apply the same clear error standards contained herein that the Council must follow when rendering its decision.

3. The state district court will make the final decision and the decision is not appealable.
4. Challenges will be limited and subject to penalty if abused.
5. Attorneys' fees and costs are not recoverable in these appeals.

    F.  Education

The Council may determine that a percentage of the funds in the Abatement Fund from the targeted funds be used to develop an education and outreach program to provide materials on the consequences of opioid drug use, prevention and interventions. Any material developed will include online resources and toolkits for communities.

# APPENDIX A

# OPIOID ABATEMENT STRATEGIES

| PART ONE:  TREATMENT |
| --- |

**A. <u>TREAT OPIOID USE DISORDER (OUD)</u>**

1. Expand availability of treatment for Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) issues, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse services that include the full American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH issues, including but not limited to:

   a. Medication-Assisted Treatment (MAT);

   b. Recruiting MAT Providers and Training;

   c. Abstinence-based treatment;

   d. Treatment, recovery, or other services provided by states, subdivisions, community health centers; non-for-profit providers; or for-profit providers; or

   e. Treatment by providers that focus on OUD treatment as well as treatment by providers that offer OUD treatment along with treatment for other SUD/MH issues;

   f. Recovery high schools

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH issues, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. "Support the establishment of the hub-and-spoke model of OUD treatment in all counties where possible, and across county lines where necessary."

5. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-informed, promising, or emerging practices such as adequate methadone dosing.

6. Support mobile intervention, treatment, and recovery services, offered by qualified professionals, for persons with OUD and any co-occurring SUD/MH issues or persons who have experienced an opioid overdose.

7. Treatment of mental health trauma issues resulting from the traumatic experiences of the opioid user (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such mental health trauma.

8. Support detoxification (detox) services for persons with OUD and any co-occurring SUD/MH issues, including medical detox, referral to treatment, or connections to other services or supports.

9. Training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists.

10. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH issues.

11. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

12. Scholarships and supports for certified addiction counselors and other mental and behavioral health providers involved in addressing OUD any co-occurring SUD/MH issues, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

13. Provide training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

16. Support State or local learning collaboratives so that physicians involved in the care and treatment of those with OUD are kept abreast of the latest developments in evidence-based treatment.

17. Support State or local drop-in centers where those with OUD may go to seek assistance with recovery when they are ready to begin the process.

18. Support creation of teams in hospitals and emergency rooms to work with those with OUD and direct them to appropriate facilities for evidence-based treatment of OUD, including MAT.

**B.  <u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>**

1. Provide the full continuum of care of recovery services for OUD and any co-occurring SUD/MH issues, including supportive housing, residential treatment, medical detox services, peer support services and counseling, community navigators, case management, and connections to community-based services.

2. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH issues.

3. Provide access to housing for people with OUD and any co-occurring SUD/MH issues, including supportive housing, housing assistance programs, or training for housing providers.

4. Provide community support services to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH issues

5. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH issues.

6. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH issues.

7. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH issues.

8. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

9. Engage non-profits, the faith community, and community coalitions to support people in treatment and recovery and to support family members in their efforts to manage the opioid user in the family.

10. Training and development of procedures for government staff to appropriately interact and provide social and other services to current and recovering opioid users, including reducing stigma.

11. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

### C.  CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs and appropriate training for all health care providers  to identify those with potential problems in order to reduce the transition from use to disorders.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

6. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH issues, or persons who have experienced an opioid overdose, into community treatment or recovery services through a bridge clinic or similar approach.

7. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH issues or persons that have experienced an opioid overdose.

8. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

9. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH issues or to persons who have experienced an opioid overdose.

10. Provide funding for peer navigators, recovery coaches, care coordinators, or care managers that offer assistance to persons with OUD and any co-occurring SUD/MH issues or to persons who have experienced on opioid overdose.

11. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

12. Develop and support best practices on addressing OUD in the workplace.

13. Support assistance programs for health care providers with OUD.

14. Engage non-profits and the faith community as a system to support outreach for treatment.

15. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH issues.

16. Develop or support a National Treatment Availability Clearinghouse – a multistate/nationally accessible database whereby health care providers can list locations for currently available in-patient and out-patient OUD treatment services that are accessible on a real-time basis by persons who seek treatment.

**D. ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS AND RURAL COUNTY UNATTENDED DEATHS**

1. Address the needs of persons with OUD and any co-occurring SUD/MH issues who are involved or are at risk of becoming involved in the criminal justice system.

2. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH issues, including established strategies such as:

   a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   c. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model; or

   e. Officer intervention strategies.

3. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH issues to evidence-informed treatment, including MAT, and related services.

4. Implementing or supporting pilot programs for the voluntary testing of individuals who enter local (city or county) criminal justice facilities, and for those identified with OUD, offer induction of evidence-based treatment, including MAT.

5. Support treatment and recovery courts for persons with OUD and any co-occurring SUD/MH issues, but only if they provide referrals to evidence-informed treatment, including MAT.

6. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH issues who are incarcerated in jail or prison.

7. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH issues who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

8. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

9. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH issues to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section;

10. Provide training to Justices of the Peace on unattended deaths involving drug use and reimbursement of transfer to and costs or expenses of a Medical Examiner to enhance better death understanding, statistics and recording on overdose involved deaths.

**E. ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

1. Support evidence-informed, promising, or emerging treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH issues.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs and training for all health care providers  to identify women with potential opioid

6

use disorder so that they might be given the option of referral to a proper treatment program.

3.  Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH issues.

4.  Other measures to address Neonatal Abstinence Syndrome, including prevention, education, and treatment of OUD and any co-occurring SUD/MH issues.

5.  Provide training to health care providers that work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.  Child and family support for parenting women with OUD and any co-occurring SUD/MH issues.

7.  Enhanced family supports and childcare services for parents with OUD and any co-occurring SUD/MH issues.

8.  Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.  Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH issues, including but not limited to parent skills training.

10. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

11. Provision of education and psychosocial support services to children born with Neonatal Abstinance Syndrome.

12. Support family and baby reunification in recovery housing.

---

PART TWO:  PREVENTION

---

F.  **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

1.  Trainingand continuing education of health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

2.  Academic counter-detailing to educate prescribers on appropriate opioid prescribing.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    a.  Increase the number of prescribers using PDMPs;

    b.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    c.  Enable states to use PDMP data in support of surveillance or intervention strategies.

6.  Development and implementation of a national PDMP – Fund development of a multistate/national PDMP that permits information sharing while providing appropriate safeguards on sharing of private health information, including but not limited to:

    a.  Integration of PDMP data with electronic health records, overdose episodes, and decision support tools for health care providers relating to OUD.

    b.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database.

7.  Increase electronic prescribing to prevent diversion or forgery

8.  Educate Dispensers on appropriate opioid dispensing.

9.  Develop and train physicians on algorithm for proper evidence-based pain management.

10.    Fund State or local hotline so health care providers with questions regarding proper pain management or opioid prescribing can call and have an expert answer their questions.

11. Support for health information systems consistent with State regulations.

## G.  PREVENT MISUSE OF OPIOIDS

1. Corrective advertising or affirmative public education campaigns.

2. Public education relating to drug disposal.

3. Drug take-back disposal or destruction programs.

4. Fund community anti-drug coalitions that engage in drug prevention efforts.

5. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

6. Engage non-profits and faith community as a system to support prevention.

7. School and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

8. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

9. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

10. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

11. Support local law enforcement task forces aimed at disrupting and eliminating the manufacturers and distributers of illegal opioids.

## H.  PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

1. Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, opioid users, families and friends of opioid users, schools, community navigators and outreach workers, drug offenders upon release from jail/prison, or other members of the general public.

2. Public health entities provide free naloxone and training to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH issues.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH issues.

PART THREE:  OTHER STRATEGIES

**I.** **FIRST RESPONDERS**

1. Law enforcement expenditures relating to the opioid epidemic.

2. Educate first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

**J.** **LEADERSHIP, PLANNING AND COORDINATION**

1. Community regional planning to identify goals for reducing harms related to the opioid epidemic, to identify areas and populations with the greatest needs for treatment intervention services, or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A government dashboard to track key opioid-related indicators and supports as identified through collaborative community processes.

3. Invest in infrastructure or staffing at government and not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH issues, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

**K.** **TRAINING**

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH issues, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.);

3. Medical Provider education;

4. Media Campaigns

**L.** **RESEARCH**

1. Support opioid abatement research, including but not limited to:

   a. Monitoring, surveillance, and evaluation of programs and strategies described in this opioid abatement strategy list.

   b. Research non-opioid treatment of chronic pain.

   c. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

   d. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

   e. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

   f. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

   g. Research on expanded modalities such as prescription methadone that can expand access to MAT;

   h. Research on the effectiveness of Recovery High Schools and other educational interventions;

   i. Research to track abatement progress in urban and rural areas.

M.  MISCELLANEOUS

1. It is the intent of the Parties to the Texas Term Sheet in adopting the Abatement Strategies herein that the Council be guided by the allocation methodology in Exhibit C to the Texas Term Sheet in approving Regional strategies and that the Council consider the proportional share of the individual members in each Region when allocating the funds for approved abatement strategies within each Region.

2. It is the intent of the Parties to the Texas Term Sheet in adopting the Abatement Strategies herein that the Opioid Council have the flexibility to add, change or alter the Abatement Strategies herein as necessary to fulfill the intent that opioid abatement strategies best meet the needs of the Regions, subdivisions and intent of this document.

# EXHIBIT B

Exhibit B: Municipal Area Allocations: 15% of Total ($150 million)

(County numbers refer to distribution to the county governments after payment to cities within county borders has been made. Minimum distribution to each county is $1000.)

| Municipal Area | Allocation | Municipal Area | Allocation |
|---|---|---|---|
| Abbott | $688 | Lakeport | $463 |
| Abernathy | $110 | Lakeside | $4,474 |
| Abilene | $563,818 | Lakeside City | $222 |
| Ackerly | $21 | Lakeview | $427 |
| Addison | $58,094 | Lakeway | $31,657 |
| Adrian | $181 | Lakewood Village | $557 |
| Agua Dulce | $43 | Lamar County | $141,598 |
| Alamo | $22,121 | Lamb County | $50,681 |
| Alamo Heights | $28,198 | Lamesa | $29,656 |
| Alba | $3,196 | Lampasas | $28,211 |
| Albany | $180 | Lampasas County | $42,818 |
| Aledo | $331 | Lancaster | $90,653 |
| Alice | $71,291 | Laredo | $763,174 |
| Allen | $315,081 | Latexo | $124 |
| Alma | $1,107 | Lavaca County | $45,973 |
| Alpine | $29,686 | Lavon | $7,435 |
| Alto | $3,767 | Lawn | $58 |
| Alton | $11,540 | League City | $302,418 |
| Alvarado | $29,029 | Leakey | $256 |
| Alvin | $113,962 | Leander | $88,641 |
| Alvord | $358 | Leary | $797 |
| Amarillo | $987,661 | Lee County | $30,457 |
| Ames | $5,571 | Lefors | $159 |
| Amherst | $22 | Leon County | $67,393 |
| Anahuac | $542 | Leon Valley | $23,258 |
| Anderson | $19 | Leona | $883 |
| Anderson County | $268,763 | Leonard | $8,505 |
| Andrews | $18,983 | Leroy | $176 |
| Andrews County | $37,606 | Levelland | $46,848 |
| Angelina County | $229,956 | Lewisville | $382,094 |
| Angleton | $62,791 | Lexington | $2,318 |
| Angus | $331 | Liberty | $72,343 |
| Anna | $9,075 | Liberty County | $531,212 |
| Annetta | $5,956 | Liberty Hill | $2,780 |
| Annetta North | $34 | Limestone County | $135,684 |

(Table continues on multiple pages below)

| | | | |
|---|---|---|---|
| Annetta South | $602 | Lincoln Park | $677 |
| Annona | $738 | Lindale | $24,202 |
| Anson | $5,134 | Linden | $3,661 |
| Anthony | $4,514 | Lindsay | $1,228 |
| Anton | $444 | Lipan | $44 |
| Appleby | $1,551 | Lipscomb County | $10,132 |
| Aquilla | $208 | Little Elm | $69,326 |
| Aransas County | $266,512 | Little River-Academy | $798 |
| Aransas Pass | $57,813 | Littlefield | $7,678 |
| Archer City | $10,554 | Live Oak | $32,740 |
| Archer County | $45,534 | Live Oak County | $39,716 |
| Arcola | $7,290 | Liverpool | $1,435 |
| Argyle | $11,406 | Livingston | $73,165 |
| Arlington | $735,803 | Llano | $23,121 |
| Armstrong County | $974 | Llano County | $115,647 |
| Arp | $2,009 | Lockhart | $49,050 |
| Asherton | $112 | Lockney | $3,301 |
| Aspermont | $9 | Log Cabin | $1,960 |
| Atascosa County | $176,903 | Lometa | $1,176 |
| Athens | $105,942 | Lone Oak | $1,705 |
| Atlanta | $30,995 | Lone Star | $8,283 |
| Aubrey | $15,141 | Longview | $482,254 |
| Aurora | $1,849 | Loraine | $188 |
| Austin County | $76,030 | Lorena | $3,390 |
| Austin | $4,877,716 | Lorenzo | $11,358 |
| Austwell | $109 | Los Fresnos | $11,185 |
| Avery | $138 | Los Indios | $159 |
| Avinger | $1,115 | Los Ybanez | $0 |
| Azle | $32,213 | Lott | $1,516 |
| Bailey | $950 | Lovelady | $249 |
| Bailey County | $15,377 | Loving County | $1,000 |
| Bailey's Prairie | $5,604 | Lowry Crossing | $783 |
| Baird | $2,802 | Lubbock | $319,867 |
| Balch Springs | $27,358 | Lubbock County | $1,379,719 |
| Balcones Heights | $23,811 | Lucas | $5,266 |
| Ballinger | $9,172 | Lueders | $508 |
| Balmorhea | $63 | Lufkin | $281,592 |
| Bandera | $2,893 | Luling | $29,421 |
| Bandera County | $86,815 | Lumberton | $36,609 |
| Bangs | $3,050 | Lyford | $3,071 |

| | | | |
|---|---|---|---|
| Bardwell | $362 | Lynn County | $6,275 |
| Barry | $200 | Lytle | $7,223 |
| Barstow | $61 | Mabank | $19,443 |
| Bartlett | $3,374 | Madison County | $49,492 |
| Bartonville | $8,887 | Madisonville | $11,458 |
| Bastrop | $46,320 | Magnolia | $26,031 |
| Bastrop County | $343,960 | Malakoff | $12,614 |
| Bay City | $57,912 | Malone | $439 |
| Baylor County | $29,832 | Manor | $12,499 |
| Bayou Vista | $6,240 | Mansfield | $150,788 |
| Bayside | $242 | Manvel | $12,305 |
| Baytown | $216,066 | Marble Falls | $37,039 |
| Bayview | $41 | Marfa | $65 |
| Beach City | $12,505 | Marietta | $338 |
| Bear Creek | $906 | Marion | $275 |
| Beasley | $130 | Marion County | $54,728 |
| Beaumont | $683,010 | Marlin | $21,634 |
| Beckville | $1,247 | Marquez | $1,322 |
| Bedford | $94,314 | Marshall | $108,371 |
| Bedias | $3,475 | Mart | $928 |
| Bee Cave | $12,863 | Martin County | $10,862 |
| Bee County | $97,844 | Martindale | $2,437 |
| Beeville | $24,027 | Mason | $777 |
| Bell County | $650,748 | Mason County | $3,134 |
| Bellaire | $41,264 | Matador | $1,203 |
| Bellevue | $56 | Matagorda County | $135,239 |
| Bellmead | $14,487 | Mathis | $15,720 |
| Bells | $1,891 | Maud | $423 |
| Bellville | $7,488 | Maverick County | $115,919 |
| Belton | $72,680 | Maypearl | $986 |
| Benavides | $152 | McAllen | $364,424 |
| Benbrook | $43,919 | McCamey | $542 |
| Benjamin | $951 | McGregor | $9,155 |
| Berryville | $14,379 | McKinney | $450,383 |
| Bertram | $182 | McLean | $14 |
| Beverly Hills | $4,336 | McLendon-Chisholm | $411 |
| Bevil Oaks | $549 | Mcculloch County | $20,021 |
| Bexar County | $7,007,152 | Mclennan County | $529,641 |
| Big Lake | $547 | Mcmullen County | $1,000 |
| Big Sandy | $4,579 | Meadow | $1,121 |

| | | | |
|---|---|---|---|
| Big Spring | $189,928 | Meadowlakes | $905 |
| Big Wells | $236 | Meadows Place | $18,148 |
| Bishop | $8,213 | Medina County | $48,355 |
| Bishop Hills | $323 | Megargel | $611 |
| Blackwell | $31 | Melissa | $15,381 |
| Blanco | $6,191 | Melvin | $345 |
| Blanco County | $49,223 | Memphis | $7,203 |
| Blanket | $147 | Menard | $991 |
| Bloomburg | $1,010 | Menard County | $14,717 |
| Blooming Grove | $352 | Mercedes | $21,441 |
| Blossom | $198 | Meridian | $3,546 |
| Blue Mound | $2,888 | Merkel | $10,117 |
| Blue Ridge | $1,345 | Mertens | $239 |
| Blum | $1,622 | Mertzon | $29 |
| Boerne | $45,576 | Mesquite | $310,709 |
| Bogata | $3,649 | Mexia | $21,096 |
| Bonham | $100,909 | Miami | $455 |
| Bonney | $2,510 | Midland County | $279,927 |
| Booker | $1,036 | Midland | $521,849 |
| Borden County | $1,000 | Midlothian | $95,799 |
| Borger | $69,680 | Midway | $78 |
| Bosque County | $71,073 | Milam County | $97,386 |
| Bovina | $173 | Milano | $904 |
| Bowie | $83,620 | Mildred | $286 |
| Bowie County | $233,190 | Miles | $93 |
| Boyd | $6,953 | Milford | $6,177 |
| Brackettville | $8 | Miller's Cove | $97 |
| Brady | $27,480 | Millican | $417 |
| Brazoria | $11,537 | Mills County | $19,931 |
| Brazoria County | $1,021,090 | Millsap | $34 |
| Brazos Bend | $462 | Mineola | $48,719 |
| Brazos Country | $902 | Mineral Wells | $92,061 |
| Brazos County | $342,087 | Mingus | $189 |
| Breckenridge | $23,976 | Mission | $124,768 |
| Bremond | $5,554 | Missouri City | $209,633 |
| Brenham | $54,750 | Mitchell County | $20,850 |
| Brewster County | $60,087 | Mobeetie | $52 |
| Briarcliff | $572 | Mobile City | $2,034 |
| Briaroaks | $57 | Monahans | $5,849 |
| Bridge City | $80,756 | Mont Belvieu | $19,669 |

| | | | |
|---|---|---|---|
| Bridgeport | $33,301 | Montague County | $94,796 |
| Briscoe County | $977 | Montgomery | $1,884 |
| Broaddus | $31 | Montgomery County | $2,700,911 |
| Bronte | $99 | Moody | $828 |
| Brooks County | $20,710 | Moore County | $40,627 |
| Brookshire | $6,406 | Moore Station | $772 |
| Brookside Village | $1,110 | Moran | $50 |
| Brown County | $193,417 | Morgan | $605 |
| Browndell | $152 | Morgan's Point | $3,105 |
| Brownfield | $14,452 | Morgan's Point Resort | $8,024 |
| Brownsboro | $3,176 | Morris County | $53,328 |
| Brownsville | $425,057 | Morton | $167 |
| Brownwood | $166,572 | Motley County | $3,344 |
| Bruceville-Eddy | $1,692 | Moulton | $999 |
| Bryan | $246,897 | Mount Calm | $605 |
| Bryson | $1,228 | Mount Enterprise | $1,832 |
| Buckholts | $1,113 | Mount Pleasant | $65,684 |
| Buda | $10,784 | Mount Vernon | $6,049 |
| Buffalo | $11,866 | Mountain City | $1,548 |
| Buffalo Gap | $88 | Muenster | $4,656 |
| Buffalo Springs | $188 | Muleshoe | $4,910 |
| Bullard | $7,487 | Mullin | $384 |
| Bulverde | $14,436 | Munday | $2,047 |
| Bunker Hill Village | $472 | Murchison | $2,302 |
| Burkburnett | $37,844 | Murphy | $51,893 |
| Burke | $1,114 | Mustang | $7 |
| Burleson County | $70,244 | Mustang Ridge | $2,462 |
| Burleson | $151,779 | Nacogdoches | $205,992 |
| Burnet | $33,345 | Nacogdoches County | $198,583 |
| Burnet County | $189,829 | Naples | $4,224 |
| Burton | $937 | Nash | $7,999 |
| Byers | $77 | Nassau Bay | $11,247 |
| Bynum | $380 | Natalia | $625 |
| Cactus | $4,779 | Navarro | $334 |
| Caddo Mills | $43 | Navarro County | $103,513 |
| Caldwell | $18,245 | Navasota | $37,676 |
| Caldwell County | $86,413 | Nazareth | $124 |
| Calhoun County | $127,926 | Nederland | $44,585 |
| Callahan County | $12,894 | Needville | $10,341 |
| Callisburg | $101 | Nevada | $237 |

| | | | |
|---|---|---|---|
| Calvert | $772 | New Berlin | $4 |
| Cameron | $11,091 | New Boston | $6,953 |
| Cameron County | $537,026 | New Braunfels | $307,313 |
| Camp County | $28,851 | New Chapel Hill | $288 |
| Camp Wood | $422 | New Deal | $338 |
| Campbell | $1,116 | New Fairview | $2,334 |
| Canadian | $1,090 | New Home | $9 |
| Caney City | $2,005 | New Hope | $1,024 |
| Canton | $56,734 | New London | $4,129 |
| Canyon | $26,251 | New Summerfield | $442 |
| Carbon | $620 | New Waverly | $2,562 |
| Carl's Corner | $48 | Newark | $520 |
| Carmine | $385 | Newcastle | $914 |
| Carrizo Springs | $1,671 | Newton | $6,102 |
| Carrollton | $310,255 | Newton County | $158,006 |
| Carson County | $29,493 | Neylandville | $163 |
| Carthage | $18,927 | Niederwald | $16 |
| Cashion Community | $322 | Nixon | $2,283 |
| Cass County | $93,155 | Nocona | $16,536 |
| Castle Hills | $12,780 | Nolan County | $50,262 |
| Castro County | $4,420 | Nolanville | $4,247 |
| Castroville | $4,525 | Nome | $391 |
| Cedar Hill | $70,127 | Noonday | $226 |
| Cedar Park | $185,567 | Nordheim | $697 |
| Celeste | $1,280 | Normangee | $6,192 |
| Celina | $18,283 | North Cleveland | $105 |
| Center | $58,838 | North Richland Hills | $146,419 |
| Centerville | $385 | Northlake | $8,905 |
| Chambers County | $153,188 | Novice | $76 |
| Chandler | $17,364 | Nueces County | $1,367,932 |
| Channing | $2 | O'Brien | $76 |
| Charlotte | $4,257 | O'Donnell | $27 |
| Cherokee County | $156,612 | Oak Grove | $2,769 |
| Chester | $1,174 | Oak Leaf | $612 |
| Chico | $2,928 | Oak Point | $9,011 |
| Childress | $37,916 | Oak Ridge | $358 |
| Childress County | $50,582 | Oak Ridge North | $33,512 |
| Chillicothe | $172 | Oak Valley | $7 |
| China | $522 | Oakwood | $148 |
| China Grove | $598 | Ochiltree County | $15,476 |

| | | | |
|---|---|---|---|
| Chireno | $1,568 | Odem | $7,420 |
| Christine | $354 | Odessa | $559,163 |
| Cibolo | $13,690 | Oglesby | $29 |
| Cisco | $7,218 | Old River-Winfree | $21,653 |
| Clarendon | $114 | Oldham County | $10,318 |
| Clarksville | $20,891 | Olmos Park | $9,801 |
| Clarksville City | $54 | Olney | $6,088 |
| Claude | $26 | Olton | $1,197 |
| Clay County | $72,050 | Omaha | $4,185 |
| Clear Lake Shores | $6,682 | Onalaska | $31,654 |
| Cleburne | $228,184 | Opdyke West | $479 |
| Cleveland | $96,897 | Orange | $311,339 |
| Clifton | $9,939 | Orange County | $689,818 |
| Clint | $375 | Orange Grove | $1,677 |
| Clute | $51,350 | Orchard | $867 |
| Clyde | $17,287 | Ore City | $6,806 |
| Coahoma | $2,291 | Overton | $7,900 |
| Cochran County | $3,389 | Ovilla | $13,391 |
| Cockrell Hill | $512 | Oyster Creek | $9,633 |
| Coffee City | $1,087 | Paducah | $125 |
| Coke County | $5,522 | Paint Rock | $141 |
| Coldspring | $447 | Palacios | $14,036 |
| Coleman | $5,442 | Palestine | $178,009 |
| Coleman County | $4,164 | Palisades | $240 |
| College Station | $258,147 | Palm Valley | $1,918 |
| Colleyville | $46,049 | Palmer | $12,666 |
| Collin County | $1,266,721 | Palmhurst | $4,660 |
| Collingsworth County | $19,234 | Palmview | $7,577 |
| Collinsville | $1,831 | Palo Pinto County | $124,621 |
| Colmesneil | $2,211 | Pampa | $67,227 |
| Colorado City | $8,405 | Panhandle | $9,536 |
| Colorado County | $49,084 | Panola County | $80,699 |
| Columbus | $6,867 | Panorama Village | $1,292 |
| Comal County | $396,142 | Pantego | $12,898 |
| Comanche | $16,503 | Paradise | $52 |
| Comanche County | $50,964 | Paris | $201,180 |
| Combes | $1,710 | Parker | $10,307 |
| Combine | $1,892 | Parker County | $476,254 |
| Commerce | $33,869 | Parmer County | $15,866 |
| Como | $415 | Pasadena | $356,536 |

| | | | |
|---|---|---|---|
| Concho County | $3,859 | Pattison | $1,148 |
| Conroe | $466,671 | Patton Village | $9,268 |
| Converse | $27,693 | Payne Springs | $1,770 |
| Cooke County | $200,451 | Pearland | $333,752 |
| Cool | $731 | Pearsall | $11,570 |
| Coolidge | $243 | Pecan Gap | $719 |
| Cooper | $362 | Pecan Hill | $229 |
| Coppell | $86,593 | Pecos | $7,622 |
| Copper Canyon | $489 | Pecos County | $46,997 |
| Copperas Cove | $133,492 | Pelican Bay | $1,199 |
| Corinth | $75,298 | Penelope | $415 |
| Corpus Christi | $1,812,707 | Penitas | $312 |
| Corral City | $143 | Perryton | $23,364 |
| Corrigan | $21,318 | Petersburg | $1,691 |
| Corsicana | $87,310 | Petrolia | $17 |
| Coryell County | $123,659 | Petronila | $5 |
| Cottle County | $875 | Pflugerville | $86,408 |
| Cottonwood | $289 | Pharr | $144,721 |
| Cottonwood Shores | $1,203 | Pilot Point | $11,613 |
| Cotulla | $1,251 | Pine Forest | $3,894 |
| Coupland | $266 | Pine Island | $3,141 |
| Cove | $387 | Pinehurst | $32,671 |
| Covington | $519 | Pineland | $4,138 |
| Coyote Flats | $1,472 | Piney Point Village | $15,738 |
| Crandall | $12,094 | Pittsburg | $20,526 |
| Crane | $10,599 | Plains | $129 |
| Crane County | $26,146 | Plainview | $60,298 |
| Cranfills Gap | $128 | Plano | $1,151,608 |
| Crawford | $383 | Pleak | $270 |
| Creedmoor | $16 | Pleasant Valley | $308 |
| Cresson | $1,086 | Pleasanton | $29,011 |
| Crockett | $23,403 | Plum Grove | $258 |
| Crockett County | $18,210 | Point | $1,519 |
| Crosby County | $18,388 | Point Blank | $355 |
| Crosbyton | $1,498 | Point Comfort | $447 |
| Cross Plains | $4,877 | Point Venture | $588 |
| Cross Roads | $244 | Polk County | $370,831 |
| Cross Timber | $542 | Ponder | $1,282 |
| Crowell | $6,335 | Port Aransas | $31,022 |
| Crowley | $22,345 | Port Arthur | $367,945 |

| | | | |
|---|---|---|---|
| Crystal City | $19,412 | Port Isabel | $9,802 |
| Cuero | $24,689 | Port Lavaca | $11,752 |
| Culberson County | $789 | Port Neches | $38,849 |
| Cumby | $5,320 | Portland | $76,517 |
| Cuney | $606 | Post | $2,332 |
| Cushing | $1,120 | Post Oak Bend City | $1,034 |
| Cut and Shoot | $2,141 | Poteet | $6,767 |
| DISH | $19 | Poth | $3,974 |
| Daingerfield | $12,476 | Potter County | $371,701 |
| Daisetta | $5,370 | Pottsboro | $12,302 |
| Dalhart | $11,609 | Powell | $110 |
| Dallam County | $21,686 | Poynor | $1,180 |
| Dallas County | $8,538,291 | Prairie View | $7,600 |
| Dallas | $2,999,902 | Premont | $3,321 |
| Dalworthington Gardens | $6,060 | Presidio | $148 |
| Danbury | $4,231 | Presidio County | $787 |
| Darrouzett | $101 | Primera | $2,958 |
| Dawson | $600 | Princeton | $19,245 |
| Dawson County | $46,911 | Progreso | $8,072 |
| Dayton | $47,122 | Progreso Lakes | $39 |
| Dayton Lakes | $38 | Prosper | $22,770 |
| De Kalb | $1,035 | Providence Village | $508 |
| De Leon | $8,218 | Putnam | $14 |
| De Witt County | $68,895 | Pyote | $22 |
| DeCordova | $13,778 | Quanah | $207 |
| DeSoto | $72,400 | Queen City | $4,837 |
| Deaf Smith County | $34,532 | Quinlan | $7,304 |
| Dean | $141 | Quintana | $492 |
| Decatur | $56,669 | Quitaque | $8 |
| Deer Park | $49,388 | Quitman | $15,619 |
| Del Rio | $59,056 | Rains County | $53,190 |
| Dell City | $15 | Ralls | $3,967 |
| Delta County | $30,584 | Rancho Viejo | $3,836 |
| Denison | $210,426 | Randall County | $278,126 |
| Denton | $458,334 | Ranger | $12,186 |
| Denton County | $1,132,298 | Rankin | $1,613 |
| Denver City | $2,104 | Ransom Canyon | $930 |
| Deport | $42 | Ravenna | $685 |
| Detroit | $965 | Raymondville | $7,466 |
| Devers | $191 | Reagan County | $25,215 |

| | | | |
|---|---|---|---|
| Devine | $4,354 | Real County | $5,073 |
| Diboll | $25,533 | Red Lick | $23 |
| Dickens | $71 | Red Oak | $26,843 |
| Dickens County | $1,873 | Red River County | $29,306 |
| Dickinson | $83,683 | Redwater | $1,058 |
| Dilley | $2,633 | Reeves County | $103,350 |
| Dimmit County | $33,294 | Refugio | $8,839 |
| Dimmitt | $1,012 | Refugio County | $46,216 |
| Dodd City | $1,211 | Reklaw | $1,136 |
| Dodson | $447 | Reno | $3,791 |
| Domino | $196 | Reno | $11,164 |
| Donley County | $22,370 | Retreat | $52 |
| Donna | $13,798 | Rhome | $12,285 |
| Dorchester | $231 | Rice | $1,972 |
| Double Oak | $4,765 | Richardson | $260,315 |
| Douglassville | $574 | Richland | $210 |
| Dripping Springs | $811 | Richland Hills | $24,438 |
| Driscoll | $39 | Richland Springs | $2,234 |
| Dublin | $14,478 | Richmond | $77,606 |
| Dumas | $26,229 | Richwood | $12,112 |
| Duncanville | $58,328 | Riesel | $1,118 |
| Duval County | $49,109 | Rio Bravo | $8,548 |
| Eagle Lake | $4,882 | Rio Grande City | $25,947 |
| Eagle Pass | $56,005 | Rio Hondo | $3,550 |
| Early | $14,838 | Rio Vista | $4,419 |
| Earth | $242 | Rising Star | $1,933 |
| East Bernard | $5,554 | River Oaks | $11,917 |
| East Mountain | $2,494 | Riverside | $858 |
| East Tawakoni | $2,723 | Roanoke | $275 |
| Eastland | $15,896 | Roaring Springs | $461 |
| Eastland County | $52,275 | Robert Lee | $85 |
| Easton | $329 | Roberts County | $547 |
| Ector | $1,108 | Robertson County | $44,642 |
| Ector County | $480,000 | Robinson | $18,002 |
| Edcouch | $4,101 | Robstown | $40,154 |
| Eden | $497 | Roby | $428 |
| Edgecliff Village | $2,232 | Rochester | $674 |
| Edgewood | $13,154 | Rockdale | $20,973 |
| Edinburg | $120,884 | Rockport | $54,253 |
| Edmonson | $136 | Rocksprings | $25 |

| | | | |
|---|---|---|---|
| Edna | $18,194 | Rockwall | $114,308 |
| Edom | $2,149 | Rockwall County | $168,820 |
| Edwards County | $975 | Rocky Mound | $280 |
| El Campo | $31,700 | Rogers | $3,818 |
| El Cenizo | $621 | Rollingwood | $4,754 |
| El Lago | $5,604 | Roma | $16,629 |
| El Paso | $1,224,371 | Roman Forest | $8,610 |
| El Paso County | $2,592,121 | Ropesville | $2,122 |
| Eldorado | $50 | Roscoe | $778 |
| Electra | $15,716 | Rose City | $4,012 |
| Elgin | $26,284 | Rose Hill Acres | $2,311 |
| Elkhart | $301 | Rosebud | $1,489 |
| Ellis County | $315,372 | Rosenberg | $126,593 |
| Elmendorf | $746 | Ross | $147 |
| Elsa | $7,720 | Rosser | $549 |
| Emhouse | $83 | Rotan | $1,493 |
| Emory | $3,878 | Round Mountain | $454 |
| Enchanted Oaks | $1,299 | Round Rock | $475,992 |
| Encinal | $1,515 | Round Top | $140 |
| Ennis | $81,839 | Rowlett | $99,963 |
| Erath County | $102,616 | Roxton | $47 |
| Escobares | $40 | Royse City | $23,494 |
| Estelline | $909 | Rule | $800 |
| Euless | $92,824 | Runaway Bay | $6,931 |
| Eureka | $334 | Runge | $255 |
| Eustace | $2,089 | Runnels County | $33,831 |
| Evant | $2,068 | Rusk | $17,991 |
| Everman | $7,692 | Rusk County | $151,390 |
| Fair Oaks Ranch | $8,077 | Sabinal | $1,811 |
| Fairchilds | $81 | Sabine County | $46,479 |
| Fairfield | $1,245 | Sachse | $23,400 |
| Fairview | $32,245 | Sadler | $925 |
| Falfurrias | $2,221 | Saginaw | $31,973 |
| Falls City | $41 | Salado | $3,210 |
| Falls County | $34,522 | San Angelo | $536,509 |
| Fannin County | $131,653 | San Antonio | $4,365,416 |
| Farmers Branch | $94,532 | San Augustine | $25,182 |
| Farmersville | $10,532 | San Augustine County | $37,854 |
| Farwell | $343 | San Benito | $40,015 |
| Fate | $3,473 | San Diego | $11,771 |

| | | | |
|---|---|---|---|
| Fayette County | $92,440 | San Elizario | $7,831 |
| Fayetteville | $391 | San Felipe | $1,498 |
| Ferris | $13,873 | San Jacinto County | $197,398 |
| Fisher County | $5,518 | San Juan | $28,845 |
| Flatonia | $5,661 | San Leanna | $36 |
| Florence | $3,949 | San Marcos | $325,688 |
| Floresville | $21,699 | San Patricio | $4,213 |
| Flower Mound | $215,256 | San Patricio County | $271,916 |
| Floyd County | $9,049 | San Perlita | $2,219 |
| Floydada | $6,357 | San Saba | $10,057 |
| Foard County | $5,764 | San Saba County | $17,562 |
| Follett | $212 | Sanctuary | $17 |
| Forest Hill | $26,132 | Sandy Oaks | $9,863 |
| Forney | $80,112 | Sandy Point | $1,637 |
| Forsan | $576 | Sanford | $308 |
| Fort Bend County | $1,506,719 | Sanger | $22,237 |
| Fort Stockton | $4,411 | Sansom Park | $223 |
| Fort Worth | $2,120,790 | Santa Anna | $329 |
| Franklin | $3,931 | Santa Clara | $87 |
| Franklin County | $25,783 | Santa Fe | $33,272 |
| Frankston | $274 | Santa Rosa | $2,138 |
| Fredericksburg | $56,486 | Savoy | $2,349 |
| Freeport | $72,973 | Schertz | $60,110 |
| Freer | $3,271 | Schleicher County | $5,695 |
| Freestone County | $50,495 | Schulenburg | $2,560 |
| Friendswood | $140,330 | Scotland | $148 |
| Frio County | $19,954 | Scottsville | $708 |
| Friona | $2,848 | Scurry | $1,110 |
| Frisco | $405,309 | Scurry County | $73,116 |
| Fritch | $4,548 | Seabrook | $30,270 |
| Frost | $321 | Seadrift | $991 |
| Fruitvale | $2,344 | Seagoville | $17,106 |
| Fulshear | $5,272 | Seagraves | $7,531 |
| Fulton | $1,602 | Sealy | $20,637 |
| Gaines County | $54,347 | Seguin | $376,538 |
| Gainesville | $153,980 | Selma | $22,429 |
| Galena Park | $13,093 | Seminole | $16,092 |
| Gallatin | $1,253 | Seven Oaks | $3,917 |
| Galveston | $488,187 | Seven Points | $7,452 |
| Galveston County | $1,124,093 | Seymour | $14,218 |

| | | | |
|---|---|---|---|
| Ganado | $5,510 | Shackelford County | $1,288 |
| Garden Ridge | $11,351 | Shady Shores | $594 |
| Garland | $420,244 | Shallowater | $1,907 |
| Garrett | $2,510 | Shamrock | $4,328 |
| Garrison | $3,555 | Shavano Park | $3,178 |
| Gary City | $450 | Shelby County | $109,925 |
| Garza County | $8,944 | Shenandoah | $47,122 |
| Gatesville | $26,994 | Shepherd | $147 |
| George West | $6,207 | Sherman | $330,585 |
| Georgetown | $225,896 | Sherman County | $7,930 |
| Gholson | $1,505 | Shiner | $4,042 |
| Giddings | $12,674 | Shoreacres | $958 |
| Gillespie County | $63,191 | Silsbee | $66,442 |
| Gilmer | $33,951 | Silverton | $14 |
| Gladewater | $24,638 | Simonton | $1,906 |
| Glasscock County | $1,000 | Sinton | $23,658 |
| Glen Rose | $540 | Skellytown | $400 |
| Glenn Heights | $16,593 | Slaton | $154 |
| Godley | $3,115 | Smiley | $655 |
| Goldsmith | $677 | Smith County | $758,961 |
| Goldthwaite | $1,225 | Smithville | $17,009 |
| Goliad | $3,563 | Smyer | $300 |
| Goliad County | $34,660 | Snook | $1,422 |
| Golinda | $100 | Snyder | $9,018 |
| Gonzales | $14,882 | Socorro | $11,125 |
| Gonzales County | $33,230 | Somerset | $1,527 |
| Goodlow | $221 | Somervell County | $57,076 |
| Goodrich | $9,643 | Somerville | $3,806 |
| Gordon | $365 | Sonora | $7,337 |
| Goree | $749 | Sour Lake | $17,856 |
| Gorman | $3,107 | South Houston | $25,620 |
| Graford | $23 | South Mountain | $154 |
| Graham | $235,428 | South Padre Island | $30,629 |
| Granbury | $71,735 | Southlake | $70,846 |
| Grand Prairie | $445,439 | Southmayd | $7,096 |
| Grand Saline | $36,413 | Southside Place | $885 |
| Grandfalls | $65 | Spearman | $14,000 |
| Grandview | $6,600 | Splendora | $7,756 |
| Granger | $2,741 | Spofford | $7 |
| Granite Shoals | $11,834 | Spring Valley Village | $16,404 |

| | | | |
|---|---|---|---|
| Granjeno | $43 | Springlake | $3 |
| Grapeland | $7,287 | Springtown | $14,244 |
| Grapevine | $129,195 | Spur | $427 |
| Gray County | $65,884 | St. Hedwig | $111 |
| Grays Prairie | $17 | St. Jo | $7,360 |
| Grayson County | $539,083 | St. Paul | $21 |
| Greenville | $203,112 | Stafford | $75,145 |
| Gregg County | $243,744 | Stagecoach | $3,036 |
| Gregory | $4,697 | Stamford | $398 |
| Grey Forest | $474 | Stanton | $3,838 |
| Grimes County | $94,878 | Staples | $19 |
| Groesbeck | $5,745 | Star Harbor | $151 |
| Groom | $965 | Starr County | $99,896 |
| Groves | $40,752 | Stephens County | $35,244 |
| Groveton | $8,827 | Stephenville | $83,472 |
| Gruver | $1,166 | Sterling City | $62 |
| Guadalupe County | $146,824 | Sterling County | $939 |
| Gun Barrel City | $36,302 | Stinnett | $4,097 |
| Gunter | $4,609 | Stockdale | $741 |
| Gustine | $34 | Stonewall County | $1,822 |
| Hackberry | $94 | Stratford | $8,378 |
| Hale Center | $6,042 | Strawn | $987 |
| Hale County | $79,150 | Streetman | $5 |
| Hall County | $8,933 | Sudan | $32 |
| Hallettsville | $6,895 | Sugar Land | $321,561 |
| Hallsburg | $272 | Sullivan City | $6,121 |
| Hallsville | $10,239 | Sulphur Springs | $124,603 |
| Haltom City | $71,800 | Sun Valley | $4 |
| Hamilton | $3,581 | Sundown | $2,592 |
| Hamilton County | $66,357 | Sunnyvale | $3,248 |
| Hamlin | $4,656 | Sunray | $2,571 |
| Hansford County | $16,416 | Sunrise Beach Village | $2,083 |
| Happy | $327 | Sunset Valley | $9,425 |
| Hardeman County | $15,219 | Surfside Beach | $6,530 |
| Hardin | $100 | Sutton County | $6,541 |
| Hardin County | $379,800 | Sweeny | $4,503 |
| Harker Heights | $113,681 | Sweetwater | $68,248 |
| Harlingen | $165,429 | Swisher County | $7,251 |
| Harris County | $14,966,202 | Taft | $5,861 |
| Harrison County | $185,910 | Tahoka | $430 |

| | | | |
|---|---|---|---|
| Hart | $86 | Talco | $372 |
| Hartley County | $786 | Talty | $9,124 |
| Haskell | $10,829 | Tarrant County | $6,171,159 |
| Haskell County | $22,011 | Tatum | $972 |
| Haslet | $1,908 | Taylor | $57,945 |
| Hawk Cove | $674 | Taylor County | $351,078 |
| Hawkins | $7,932 | Taylor Lake Village | $412 |
| Hawley | $931 | Taylor Landing | $153 |
| Hays | $506 | Teague | $1,714 |
| Hays County | $529,489 | Tehuacana | $12 |
| Hearne | $16,824 | Temple | $280,747 |
| Heath | $28,751 | Tenaha | $4,718 |
| Hebron | $687 | Terrell | $148,706 |
| Hedley | $70 | Terrell County | $5,737 |
| Hedwig Village | $13,067 | Terrell Hills | $9,858 |
| Helotes | $15,790 | Terry County | $25,423 |
| Hemphill | $8,035 | Texarkana | $192,094 |
| Hemphill County | $14,394 | Texas City | $298,702 |
| Hempstead | $21,240 | Texhoma | $156 |
| Henderson | $59,966 | Texline | $865 |
| Henderson County | $327,965 | The Colony | $114,297 |
| Henrietta | $2,720 | The Hills | $1,004 |
| Hereford | $20,423 | Thompsons | $1,897 |
| Hewitt | $19,776 | Thorndale | $1,595 |
| Hickory Creek | $16,510 | Thornton | $270 |
| Hico | $5,534 | Thorntonville | $87 |
| Hidalgo | $26,621 | Thrall | $825 |
| Hidalgo County | $1,253,103 | Three Rivers | $4,669 |
| Hideaway | $922 | Throckmorton | $29 |
| Higgins | $43 | Throckmorton County | $5,695 |
| Highland Haven | $320 | Tiki Island | $2,178 |
| Highland Park | $43,383 | Timbercreek Canyon | $369 |
| Highland Village | $50,315 | Timpson | $12,642 |
| Hill Country Village | $6,485 | Tioga | $2,390 |
| Hill County | $127,477 | Tira | $185 |
| Hillcrest | $5,345 | Titus County | $70,611 |
| Hillsboro | $46,609 | Toco | $4 |
| Hilshire Village | $859 | Todd Mission | $1,680 |
| Hitchcock | $28,796 | Tolar | $2,369 |
| Hockley County | $46,407 | Tom Bean | $2,293 |

| | | | |
|---|---|---|---|
| Holiday Lakes | $1,795 | Tom Green County | $282,427 |
| Holland | $77 | Tomball | $34,620 |
| Holliday | $5,910 | Tool | $14,787 |
| Hollywood Park | $9,424 | Toyah | $40 |
| Hondo | $115,288 | Travis County | $4,703,473 |
| Honey Grove | $7,196 | Trent | $63 |
| Hood County | $292,105 | Trenton | $3,089 |
| Hooks | $2,702 | Trinidad | $5,859 |
| Hopkins County | $149,518 | Trinity | $23,652 |
| Horizon City | $7,520 | Trinity County | $105,766 |
| Horseshoe Bay | $48,173 | Trophy Club | $29,370 |
| Houston County | $78,648 | Troup | $7,918 |
| Houston | $7,021,793 | Troy | $5,320 |
| Howard County | $89,330 | Tulia | $8,911 |
| Howardwick | $84 | Turkey | $737 |
| Howe | $9,177 | Tuscola | $138 |
| Hubbard | $3,635 | Tye | $1,766 |
| Hudson | $6,840 | Tyler | $723,829 |
| Hudson Oaks | $15,637 | Tyler County | $131,743 |
| Hudspeth County | $985 | Uhland | $1,545 |
| Hughes Springs | $4,442 | Uncertain | $185 |
| Humble | $73,952 | Union Grove | $994 |
| Hunt County | $309,851 | Union Valley | $666 |
| Hunters Creek Village | $14,708 | Universal City | $28,428 |
| Huntington | $8,792 | University Park | $50,833 |
| Huntsville | $80,373 | Upshur County | $128,300 |
| Hurst | $99,187 | Upton County | $8,499 |
| Hutchins | $9,551 | Uvalde | $18,439 |
| Hutchinson County | $74,630 | Uvalde County | $36,244 |
| Hutto | $38,346 | Val Verde County | $117,815 |
| Huxley | $738 | Valentine | $207 |
| Idalou | $1,999 | Valley Mills | $2,228 |
| Impact | $8 | Valley View | $1,824 |
| Indian Lake | $473 | Van | $6,206 |
| Industry | $604 | Van Alstyne | $43,749 |
| Ingleside on the Bay | $142 | Van Horn | $211 |
| Ingleside | $40,487 | Van Zandt County | $248,747 |
| Ingram | $5,243 | Vega | $974 |
| Iola | $3,164 | Venus | $9,792 |
| Iowa Colony | $4,090 | Vernon | $81,337 |

| | | | |
|---|---|---|---|
| Iowa Park | $23,487 | Victoria | $84,598 |
| Iraan | $56 | Victoria County | $520,886 |
| Iredell | $216 | Vidor | $95,620 |
| Irion County | $9,105 | Vinton | $622 |
| Irving | $427,818 | Volente | $333 |
| Italy | $5,349 | Von Ormy | $513 |
| Itasca | $8,694 | Waco | $512,007 |
| Ivanhoe | $26 | Waelder | $3,427 |
| Jacinto City | $14,141 | Wake Village | $174 |
| Jack County | $14,799 | Walker County | $184,624 |
| Jacksboro | $23,254 | Waller County | $126,206 |
| Jackson County | $37,984 | Waller | $11,295 |
| Jacksonville | $80,179 | Wallis | $2,698 |
| Jamaica Beach | $4,913 | Walnut Springs | $183 |
| Jarrell | $2,423 | Ward County | $67,920 |
| Jasper | $78,422 | Warren City | $66 |
| Jasper County | $248,855 | Washington County | $83,727 |
| Jayton | $63 | Waskom | $5,346 |
| Jeff Davis County | $8,500 | Watauga | $33,216 |
| Jefferson | $11,194 | Waxahachie | $152,094 |
| Jefferson County | $756,614 | Weatherford | $207,872 |
| Jersey Village | $36,347 | Webb County | $505,304 |
| Jewett | $9,338 | Webberville | $1,280 |
| Jim Hogg County | $12,718 | Webster | $53,202 |
| Jim Wells County | $166,539 | Weimar | $5,830 |
| Joaquin | $810 | Weinert | $234 |
| Johnson City | $3,581 | Weir | $443 |
| Johnson County | $408,692 | Wellington | $9,111 |
| Jolly | $26 | Wellman | $383 |
| Jones County | $22,001 | Wells | $1,357 |
| Jones Creek | $5,078 | Weslaco | $73,949 |
| Jonestown | $6,419 | West | $3,522 |
| Josephine | $881 | West Columbia | $17,958 |
| Joshua | $20,619 | West Lake Hills | $17,056 |
| Jourdanton | $9,600 | West Orange | $42,452 |
| Junction | $4,825 | West Tawakoni | $6,995 |
| Justin | $8,575 | West University Place | $34,672 |
| Karnes City | $11,632 | Westbrook | $43 |
| Karnes County | $35,249 | Westlake | $41,540 |
| Katy | $52,467 | Weston | $266 |

| | | | |
|---|---|---|---|
| Kaufman | $27,607 | Weston Lakes | $189 |
| Kaufman County | $353,047 | Westover Hills | $4,509 |
| Keene | $38,296 | Westworth Village | $7,842 |
| Keller | $79,189 | Wharton | $31,700 |
| Kemah | $28,325 | Wharton County | $72,887 |
| Kemp | $6,419 | Wheeler | $447 |
| Kempner | $330 | Wheeler County | $26,273 |
| Kendall County | $100,643 | White Deer | $1,273 |
| Kendleton | $13 | White Oak | $15,305 |
| Kenedy | $676 | White Settlement | $23,304 |
| Kenedy County | $1,000 | Whiteface | $155 |
| Kenefick | $416 | Whitehouse | $29,017 |
| Kennard | $132 | Whitesboro | $18,932 |
| Kennedale | $21,024 | Whitewright | $7,098 |
| Kent County | $939 | Whitney | $73 |
| Kerens | $1,924 | Wichita County | $552,371 |
| Kermit | $5,652 | Wichita Falls | $832,574 |
| Kerr County | $218,452 | Wickett | $87 |
| Kerrville | $190,357 | Wilbarger County | $55,124 |
| Kilgore | $105,583 | Willacy County | $24,581 |
| Killeen | $535,650 | Williamson County | $1,195,987 |
| Kimble County | $20,480 | Willis | $24,384 |
| King County | $1,000 | Willow Park | $26,737 |
| Kingsville | $20,083 | Wills Point | $43,765 |
| Kinney County | $2,142 | Wilmer | $426 |
| Kirby | $8,752 | Wilson | $12 |
| Kirbyville | $10,690 | Wilson County | $121,034 |
| Kirvin | $2 | Wimberley | $724 |
| Kleberg County | $124,109 | Windcrest | $12,908 |
| Knollwood | $1,160 | Windom | $1,087 |
| Knox City | $1,962 | Windthorst | $3,385 |
| Knox County | $11,730 | Winfield | $290 |
| Kosse | $2,468 | Wink | $120 |
| Kountze | $19,716 | Winkler County | $61,163 |
| Kress | $186 | Winnsboro | $28,791 |
| Krugerville | $1,508 | Winona | $319 |
| Krum | $9,661 | Winters | $6,229 |
| Kurten | $686 | Wise County | $289,074 |
| Kyle | $51,835 | Wixon Valley | $441 |
| La Feria | $10,381 | Wolfe City | $5,466 |

| | | | |
|---|---:|---|---:|
| La Grange | $9,623 | Wolfforth | $4,022 |
| La Grulla | $1,708 | Wood County | $267,048 |
| La Joya | $8,457 | Woodbranch | $9,617 |
| La Marque | $98,930 | Woodcreek | $358 |
| La Porte | $91,532 | Woodloch | $1,012 |
| La Salle County | $14,975 | Woodsboro | $1,130 |
| La Vernia | $3,217 | Woodson | $122 |
| La Villa | $572 | Woodville | $20,340 |
| La Ward | $321 | Woodway | $25,713 |
| LaCoste | $159 | Wortham | $376 |
| Lacy-Lakeview | $11,599 | Wylie | $114,708 |
| Ladonia | $2,011 | Yantis | $2,072 |
| Lago Vista | $13,768 | Yoakum County | $34,924 |
| Laguna Vista | $3,689 | Yoakum | $20,210 |
| Lake Bridgeport | $232 | Yorktown | $5,447 |
| Lake City | $2,918 | Young County | $44,120 |
| Lake Dallas | $25,314 | Zapata County | $56,480 |
| Lake Jackson | $75,781 | Zavala County | $38,147 |
| Lake Tanglewood | $613 | Zavalla | $1,088 |
| Lake Worth | $20,051 | | |

# EXHIBIT C

Exhibit C: TX Opioid Council & Health Care Region Allocations plus Administrative Costs
70% of Total ($700 million)

| Region | Counties in Health Care Region | Allocation |
|---|---|---|
| | Health Care Region Allocation*: $693 million; Administrative Costs: $7 million | |
| 1 | Anderson, Bowie, Camp, Cass, Cherokee, Delta, Fannin, Franklin, Freestone, Gregg, Harrison, Henderson, Hopkins, Houston, Hunt, Lamar, Marion, Morris, Panola, Rains, Red, River, Rusk, Smith, Titus, Trinity, Upshur, Van, Zandt, Wood | $38,223,336 |
| 2 | Angelina, Brazoria, Galveston, Hardin, Jasper, Jefferson, Liberty, Nacogdoches, Newton, Orange, Polk, Sabine, San Augustine, San Jacinto, Shelby, Tyler | $54,149,215 |
| 3 | Austin, Calhoun, Chambers, Colorado, Fort Bend, Harris, Matagorda, Waller, Wharton | $120,965,680 |
| 4 | Aransas, Bee, Brooks, De Witt, Duval, Goliad, Gonzales, Jackson, Jim Wells, Karnes, Kenedy, Kleberg, Lavaca, Live Oak, Nueces, Refugio, San Patricio, Victoria | $27,047,477 |
| 5 | Cameron, Hidalgo, Starr, Willacy | $17,619,875 |
| 6 | Atascosa, Bandera, Bexar, Comal, Dimmit, Edwards, Frio, Gillespie, Guadalupe, Kendall, Kerr, Kinney, La Salle, McMullen, Medina, Real, Uvalde, Val Verde, Wilson, Zavala | $68,228,047 |
| 7 | Bastrop, Caldwell, Fayette, Hays, Lee, Travis | $50,489,691 |
| 8 | Bell, Blanco, Burnet, Lampasas, Llano, Milam, Mills, San Saba, Williamson | $24,220,521 |
| 9 | Dallas, Kaufman | $66,492,094 |
| 10 | Ellis, Erath, Hood, Johnson, Navarro, Parker, Somervell, Tarrant, Wise | $65,538,414 |
| 11 | Brown, Callahan, Comanche, Eastland, Fisher, Haskell, Jones, Knox, Mitchell, Nolan, Palo Pinto, Shackelford, Stephens, Stonewall, Taylor | $9,509,818 |
| 12 | Armstrong, Bailey, Borden, Briscoe, Carson, Castro, Childress, Cochran, Collingsworth, Cottle, Crosby, Dallam, Dawson, Deaf Smith, Dickens, Donley, Floyd, Gaines, Garza, Gray, Hale, Hall, Hansford, Hartley, Hemphill, Hockley, Hutchinson, Kent, King, Lamb, Lipscomb, Lubbock, Lynn, Moore, Motley, Ochiltree, Oldham, Parmer, Potter, Randall, Roberts, Scurry, Sherman, Swisher, Terry, Wheeler, Yoakum | $23,498,027 |
| 13 | Coke, Coleman, Concho, Crockett, Irion, Kimble, Mason, McCulloch, Menard, Pecos, Reagan, Runnels, Schleicher, Sterling, Sutton, Terrell, Tom Green | $5,195,605 |
| 14 | Andrews, Brewster, Crane, Culberson, Ector, Glasscock, Howard, Jeff Davis, Loving, Martin, Midland, Presidio, Reeves, Upton, Ward, Winkler | $12,124,354 |
| 15 | El Paso, Hudspeth | $17,994,285 |
| 16 | Bosque, Coryell, Falls, Hamilton, Hill, Limestone, McLennan | $9,452,018 |
| 17 | Brazos, Burleson, Grimes, Leon, Madison, Montgomery, Robertson, Walker, Washington | $23,042,947 |
| 18 | Collin, Denton, Grayson, Rockwall | $39,787,684 |
| 19 | Archer, Baylor, Clay, Cooke, Foard, Hardeman, Jack, Montague, Throckmorton, Wichita, Wilbarger, Young | $12,665,268 |
| 20 | Jim Hogg, Maverick, Webb, Zapata | $6,755,656 |
| | Administrative Costs | $7,000,000 |

* Each Region shall reserve 25% of its allocation for Targeted Funds under the guidelines of Exhibit A.

**Exhibit C**

**Injunctive Relief**

**I.**    **Definitions Specific to this Exhibit**

A.    "Cancer-Related Pain Care" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

B.    "End-of-Life Care" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

C.    "Endo" shall mean Endo Pharmaceuticals Inc. ("EPI"), Par Pharmaceutical, Inc. ("PPI") and all of their parents, subsidiaries, predecessors, successors, joint ventures, divisions, assigns, officers, directors, agents, partners, principals, current employees, and affiliates acting on behalf of EPI or PPI in the United States.

D.    "Downstream Customer Data" shall mean transaction information that Endo collects relating to its direct customers' sales to downstream customers, including chargeback data tied to Endo providing certain discounts, "867 data" and IQVIA data.

E.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services and/or prescribe pharmaceutical products and any medical facility, practice, hospital, clinic or pharmacy.

F.    "Including but not limited to", when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

G.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

H.    "Lobby" and "Lobbying" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality.  As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

I.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium.  For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone or naltrexone.

J.      "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration ("FDA") and listed by the Drug Enforcement Administration ("DEA") as Schedule II, III, or IV pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol).  The term "Opioid Products(s)" shall not include (i) methadone, buprenorphine, or other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients ("APIs") used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

K.      "OUD" shall mean opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

L.      "Promote," "Promoting," "Promotion," and "Promotional" shall mean dissemination of information or other practices intended or reasonably anticipated to increase sales or prescriptions, or that attempts to influence prescribing practices of Health Care Providers in the United States.

M.      "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

N.      "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder and analogous Texas state laws and regulations.

O.      "Third Party" shall mean any person or entity other than Endo or a government entity.

P.      "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

Q.      "Unbranded Information" shall mean any information that does not identify a specific branded or generic product(s).

**II.    Injunctive Relief**

A.    General Provisions

      1.      Endo shall not make any written or oral statement about Opioids or any Opioid Product that is false, misleading, and/or deceptive as defined under the law of Texas.

      2.      Endo shall not represent that Opioids or any Opioid Products have approvals, characteristics, uses, benefits, or qualities that they do not have.

B.    Ban on Promotion

C-2

1.      Endo shall not engage in Promotion of Opioids or Opioid Products, including but not limited to, by:

      a.      Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers, patients, or persons involved in determining the Opioid Products included in formularies;

      b.      Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

      c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to Opioids or Opioid Products;

      d.      Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

      e.      Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

      f.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; or

      g.      Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

2.      Notwithstanding subsection II.B.1 directly above, Endo may:

      a.      Maintain a corporate website;

      b.      Maintain a website that contains principally the following content for any Opioid Product:  the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

745274877.20

c.  Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in the state where the information is provided;

d.  Provide the following by mail, electronic mail, on or through Endo's corporate or product websites or through other electronic or digital methods:  FDA-approved package insert, medication guide, approved labeling for Opioid Products or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in the state where the information is provided;

e.  Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011), as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009), as updated or amended by the FDA;

f.  Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.  Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h.  Provide information relating solely to the pricing of any Opioid Product;

i.  Provide information, through a product catalog or similar means, related to an Opioid or Opioid Product, including, without limitation, pricing information, weight, color, shape, packaging size, type, reference listed drug, National Drug Code ("NDC") label, and

C-4

such other descriptive information (including information set forth in a standard Healthcare Distribution Alliance Form or technical data sheet and the FDA approval letter) sufficient to identify the products available, to place an order for a product, and to allow the product to be loaded into a customer's inventory and ordering system or Third Party pricing compendia;

j.   Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy ("REMS") program or other federal or state law or regulation applicable in the state where the program is provided through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of Endo;

k.   Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Endo as the source of the information; and

l.   Provide rebates, discounts, and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, and Pharmacy Benefit Managers, except as prohibited by Section II.G.

3.   Endo shall not engage in the following specific Promotional activity relating to any products indicated for the treatment of Opioid-induced side effects (for the avoidance of doubt, "Opioid-induced side effects" does not include addiction to Opioids or Opioid Products):

a.   Employing or contracting with sales representatives or other persons to Promote products indicated for the treatment of Opioid-induced side effects to Health Care Providers or patients;

b.   Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote products indicated for the treatment of Opioid-induced side effects;

c.   Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote products indicated for the treatment of Opioid-induced side effects; or

d.   Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products indicated for the treatment of Opioid-induced side effects, including but not

C-5

limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4.    Notwithstanding subsection II.B.3 directly above, Endo may Promote products for the treatment of Opioid-induced side effects (i) so long as such Promotion does not associate the product with Opioids or Opioid Products, or (ii) where such Promotion concerns a product's indication to reverse overdoses and/or treat Opioid addiction.  Nothing herein shall prevent Endo from linking to the FDA label associated with a product.

5.    Treatment of Pain

    a.    Endo shall not, either through Endo or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that encourages the utilization of Opioids or Opioid Products.

    b.    Endo shall not, either through Endo or through Third Parties, Promote the concept that pain is undertreated in a manner that encourages the utilization of Opioids or Opioid Products.

    c.    Endo shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or otherwise Promotes Opioids or Opioid Products.

6.    Notwithstanding subsection II.B.5 directly above, Endo may Promote or provide educational information about the Treatment of Pain with non-Opioid products or therapies, including Promoting or providing educational information about such non-Opioid products or therapies as alternatives to Opioid use, or as part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

C.    No Financial Reward or Discipline Based on Volume of Opioid Sales

1.    Endo shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products.  For the avoidance of doubt, this provision shall not prohibit financial incentives (*e.g.*, customary raises or bonuses) based on the performance of the overall company or business segment, as measured by EBITDA, revenue, cash flow, or other similar financial metrics.

2.    Endo shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to or from any person in return for the prescribing, sale, or use of an Opioid Product.  For the avoidance of doubt, this provision shall not prohibit rebates or chargebacks to the extent permitted by other sections of this Consent Judgment.

3.     Endo's compensation policies and procedures shall ensure compliance with this Consent Judgment.

D.     <u>Ban on Funding/Grants to Third Parties</u>

1.     Endo shall not, directly or indirectly, provide financial support or In-Kind Support to any Third Party for Promotion of or education about Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6). For the avoidance of doubt, this provision does not prohibit support expressly allowed by this Consent Judgment or required by a federal or state agency.

2.     Endo shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids or Opioid Products.

3.     Endo shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6).

4.     Endo shall not use, assist, or employ any Third Party to engage in any activity that Endo itself would be prohibited from engaging in pursuant to this Consent Judgment.

5.     Endo shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or reasonably foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.     Endo shall not compensate or provide In-Kind Support to Health Care Providers (other than Endo employees) or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payers, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. Nothing in this provision, however, prohibits Endo from using independent contractors who operate under the direction of Endo to provide information to a payor, formulary committee, or other similar entity as permitted in subsection II.B.2 provided that any such persons are bound by the terms of this Consent Judgment. Nor does this provision prohibit the payment of customary rebates or other pricing concessions to third-party payers, including state Medicaid programs, as part of an overall pricing agreement.

745274877.20

7. No officer or management-level employee of Endo may concurrently serve as a director, board member, employee, agent, or officer of any entity other than Endo International plc or a direct or indirect wholly-owned subsidiary thereof, that primarily engages in conduct that Promotes Opioids, Opioid Products, or products indicated for the treatment of Opioid-related side effects.  For the avoidance of doubt, nothing in this provision shall preclude an officer or management-level employee of Endo from concurrently serving on the board of a hospital.

8. Endo shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects.  For the avoidance of doubt, nothing in this paragraph shall prohibit Endo from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or board member at any such entity.

9. For the avoidance of doubt:

   a. Nothing in this Section II.D shall be construed or used to prohibit Endo from providing financial or In-Kind Support to:

      i. medical societies and patient advocate groups, who are principally involved in issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose; or

      ii. universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose.

   b. The prohibitions in this Section II.D shall not apply to engagement with Third Parties based on activities related to (i) medications with an FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage," to the extent they are sold to addiction treatment facilities; (ii) raw materials, APIs and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials, APIs and/or immediate precursors are sold or marketed exclusively to DEA registrants or sold outside the United

C-8

States or its territories; or (iii) education warning about drug abuse or promoting prevention or treatment of drug misuse.

c.     Endo will be in compliance with subsections II.D.2 and II.D.3 with respect to support of an individual Third Party to the extent that the State of Texas determines that such support does not increase the risk of the inappropriate use of Opioids and that Endo has not acted for the purpose of increasing the use of Opioids.

E.     <u>Lobbying Restrictions</u>

1.     Endo shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

a.     encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids; or

b.     pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.     Endo shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

a.     The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

b.     The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

c.     The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

d.     The limitation of initial prescriptions of Opioids to treat acute pain;

e.     The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

f.     The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

C-9

g. Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

h. The implementation or use of Opioid drug disposal systems.

3. Endo shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of prescription drug monitoring programs ("PDMPs"), including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4. Notwithstanding the foregoing restrictions in subsections II.E.1-3, the following conduct is not restricted:

a. Lobbying against the enactment of any provision of any state, federal, municipal, or county taxes, fees, assessments, or other payments;

b. Challenging the enforcement of, or suing for declaratory or injunctive relief with respect to legislation, rules or regulations referred to in subsection II.E.1;

c. Communications made by Endo in response to a statute, rule, regulation, or order requiring such communication;

d. Communications by an Endo representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

e. Responding, in a manner consistent with this Consent Judgment, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to Endo from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

f. Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections II.E.1-3, so long as Endo does not support specific portions of such legislation or regulation covered by subsection II.E.1 or oppose specific portions of such legislation or regulation covered by subsections II.E.2-3;

g. Communicating with a federal or state agency in response to a Federal Register or similar notice or an unsolicited federal or state

legislative committee request for public comment on proposed legislation;

h.    Responding to requests from the DEA, the FDA, or any other federal or state agency, and/or participating in FDA or other agency panels at the request of the agency; and

i.    Participating in meetings and other proceedings before the FDA, FDA advisory committee or other FDA committee in connection with the approval, modification of approval, or oversight of Endo's own products.

5.    Endo shall provide notice of the prohibitions in Section II.E to all employees engaged in Lobbying; incorporate the prohibitions in Section II.E into trainings provided to Endo employees engaged in Lobbying; and certify that it has provided such notice and trainings to Endo employees engaged in Lobbying.

F.    <u>Ban on Prescription Savings Programs</u>

1.    Endo shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

2.    Endo shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

G.    <u>Monitoring and Reporting of Direct and Downstream Customers</u>.

1.    Endo shall operate an effective monitoring and reporting system in compliance with federal law, that shall include processes and procedures that:

a.    Utilize all reasonably available transaction information to identify a Suspicious Order of an Opioid Product by a direct customer;

b.    Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product;

c.    Utilize all information Endo receives that bears upon a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by Endo's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media; and

    d.    Upon request (unless otherwise required by law), report to the Texas Attorney General or State controlled substances regulatory agency any direct customer or downstream customer in Texas identified as part of the monitoring required by (a)-(c), above, and any customer relationship in such State terminated by Endo relating to diversion or potential for diversion.  These reports shall include the following information, to the extent known to Endo:

        i.    The identity of the downstream registrant and the direct customer(s) identified by Endo engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number;

        ii.    The dates of reported distribution of controlled substances by direct customers to the downstream registrant during the relevant time period;

        iii.    The drug name, drug family or NDC and dosage amounts reportedly distributed;

        iv.    The transaction or order number of the reported distribution; and

        v.    A brief narrative providing a description of the circumstances leading to Endo's conclusion that there is a risk of diversion.

2.    Endo shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless Endo investigates and finds that the order is not suspicious.

3.    Endo agrees that it will refrain from providing an Opioid Product directly to a retail pharmacy or Health Care Provider.

H.    <u>Miscellaneous Terms</u>

1.    To the extent that any provision in this Consent Judgment conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail.  To the extent that any provision in this Consent Judgment is in conflict with federal or relevant state law or regulation such that Endo cannot comply with both the law or regulation and the provision of this Consent Judgment, Endo may comply with such law or regulation.

2.    Endo will enter into this Consent Judgment solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Endo expressly denies.  No part of this Consent Judgment,

including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Endo.  This Consent Judgment is not intended for use by any Third Party for any purpose, including submission to any court for any purpose.

3.　　　For the avoidance of doubt, this Consent Judgment shall not be construed or used as a waiver or limitation of any defense otherwise available to Endo in any action, and nothing in this Consent Judgment shall be construed or used to prohibit Endo in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in litigation or other legal or administrative proceedings.

4.　　　Nothing in this Consent Judgment shall be construed to limit or impair Endo's ability (a) to communicate its positions and respond to media inquiries concerning litigation, investigations, reports, or other documents or proceedings relating to Endo or its Opioid Products, or (b) to maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products.

5.　　　Upon the request of the Attorney General of the State of Texas, Endo shall provide the Attorney General of the State of Texas with copies of the following, within 30 days of the request:

a.　　　Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Endo's Opioid Product(s); and

b.　　　Warning or untitled letters issued by the FDA regarding Endo's Opioid Product(s) and all correspondence between Endo and the FDA related to such letters.

6.　　　The parties by stipulation may agree to a modification of this Consent Judgment; provided that the parties may jointly agree to a modification only by a written instrument signed by or on behalf of both Endo and the Attorney General of the State of Texas.

I.　　　<u>Compliance with State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product</u>

1.　　　Subject to subsection II.G.1 above, Endo shall comply with all applicable state laws and regulations that relate to the sale, Promotion, distribution, and disposal of Opioids or Opioid Products, including but not limited to:

a.　　　Texas Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

b.　　　Texas Consumer Protection Laws; and

745274877.20

      c.    Texas laws and regulations related to opioid prescribing, distribution, and disposal.

## III. <u>Clinical Data Transparency</u>

A.    <u>Data to Be Shared</u>

    1.    Endo shall continue to share truthful and balanced summaries of the results of all Endo-Sponsored Studies through its publicly available website (*see* http://www.endo.com/endopharma/r-d/clinical-research):

        a.    "Endo-Sponsored Studies" means pre-marketing clinical research and post-marketing clinical research that Endo "takes responsibility for and initiates" as "sponsor," as "sponsor" is defined in 21 C.F.R. § 312.3(b), and that involves an intervention with human subjects with an Opioid Product.

        b.    The summaries may include redactions to protect personal identifying information, trade secret and confidential commercial information, and information that may provide a road map for defeating a product's abuse-deterrent properties.

    2.    With respect to any Endo-Sponsored Studies relating to any new Endo Opioid Product or new indication for an existing Endo Opioid Product, Endo shall, within 30 days after regulatory approval or 18 months after study completion, whichever occurs later, make the following clinical data available through a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal:

        a.    Fully analyzable data set(s) (including individual de-identified participant-level data);

        b.    The clinical study report(s) redacted for commercial or personal identifying information;

        c.    The full protocol(s) (including the initial version, final version, and all amendments); and

        d.    Full statistical analysis plan(s) (including all amendments and documentation for additional work processes) and analytic code.

B.    <u>Third-Party Data Archive</u>

    1.    The third-party data archive referenced above shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

745274877.20

2. The panel may exclude research proposals with a commercial interest.

3. Endo shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

4. Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for Endo's pharmacovigilance staff. Every agreement shall require the lead Qualified Researcher to inform Endo's pharmacovigilance staff within 24 hours of any determination that research findings could bear on the risk-benefit assessment regarding the product. The lead Qualified Researcher may also share findings bearing on the risk-benefit assessment regarding the product with regulatory authorities. Endo's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying the appropriate regulatory authorities or the public.

5. Endo shall bear all costs for making data and/or information available to the third-party data archive.

## IV.  **Compliance**

A. Compliance Duration

1. Sections II and III of this Exhibit shall be effective for 10 years from the Effective Date.

2. Nothing in this Consent Judgment shall relieve Endo of its independent obligation to fully comply with the laws of the State of Texas after expiration of the 10-year period specified in this subsection.

B. Compliance Deadlines

1. Endo must be in full compliance with the provisions included in this Consent Judgment by the Effective Date. Nothing herein shall be construed as permitting Endo to avoid existing legal obligations.

## V.  **Enforcement**

A. If the State believes that Endo is not in compliance with any term of this Final Consent Order, then the State shall:

1. Provide written notice specifying the reason(s) why the State believes Endo is not in compliance with this Final Consent Order; and

2. Allow Endo at least thirty (30) days to attempt to cure such alleged non-compliance (the "Cure Period").

745274877.20

B.      The State may not commence a proceeding to enforce compliance with this Final Consent Order before the expiration of the Cure Period, provided that the State may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

C.      Endo agrees to venue for any proceedings related to this paragraph in the Court in which the State of Texas files this Consent Judgment.

C-16

**Exhibit D**

MDL PRETRIAL CAUSE NO. _____

| | | |
|---|---|---|
| _____, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| _____, | § | |
| *Defendants.* | § | _____ COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | 152ND JUDICIAL DISTRICT |
| | § | |
| | § | HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AGREED MOTION TO DISMISS WITH PREJUDICE CLAIMS AGAINST DEFENDANTS [INSERT APPLICABLE ENDO AND PAR DEFENDANTS].

Plaintiff _____ and Defendants [INSERT APPLICABLE ENDO AND PAR DEFENDANTS] (together "Defendants"), file this Agreed Motion to Dismiss with Prejudice and, in support thereof, respectfully show the Court as follows:

Plaintiff and Defendants (collectively, the "Parties") have settled their disputes by mutual agreement. Therefore, Plaintiff no longer desires to pursue this lawsuit against Defendants. Accordingly, the Parties jointly move that the Court enter an Order dismissing all claims against Defendants with prejudice.

WHEREFORE, PREMISES CONSIDERED, Plaintiff _____ and Defendants [LIST ALL APPLICABLE ENDO AND PAR DEFEDANTS], respectfully request that this Court enter an Order granting this Agreed Motion to Dismiss with Prejudice, dismissing Plaintiff's claims with prejudice to the re-filing of same.

D-1

Dated: _____, 202__

Respectfully submitted,

*/s/ Henninger S. Bullock*

Henninger S. Bullock
HBullock@mayerbrown.com
Ilana D. Cohen
ICohen@mayerbrown.com
Maura K. McDevitt
Mmcdevitt@mayerbrown.com
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
T: (212) 506-2500
F: (212) 262-1910

Jessica D. Miller
jessica.miller@skadden.com
Geoffrey M. Wyatt
geoffrey.wyatt@skadden.com
Jordan M. Schwartz
jordan.schwartz@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 371-7000
F: (202) 393-5760

Thomas E. Fox
thomas.fox@skadden.com
Kelsey M. Byler
kelsey.castleberry@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001-8602
T: (212) 735-3000
F: (212) 735-2000

Karen D. Smith
Texas Bar No.  00785001
kasmith@bakerdonelson.com
Bradley E. Chambers
Texas Bar No. 24001860
bchambers@bakerdonelson.com

D-2

Katriel Statman
Texas Bar No. 24093197
kstatman@bakerdonelson.com
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
1301 McKinney Street., Suite 3700
Houston, Texas 77010
(713) 650-9700 - Telephone
(713) 650-9701 – Facsimile
**Attorneys for Defendants**


[SIGNATURE BLOCK OF COUNSEL FOR
SETTLING PLAINTIFF]

745274877.20

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record are being served with a copy of this document on _____ in accordance with the Texas Rules of Civil Procedure.


*s/ Henninger S. Bullock*_____
Henninger S. Bullock

**Exhibit E**

**List of Litigating Subdivisions and Litigating Special Districts**

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Angelina County | Dies & Parkhurst, L.L.P.; Simon Greenstone Panatier Bartlett, P.C. | | 86,715 |
| Bailey County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 7,000 |
| Bastrop County | Phipps Deacon Purnell PLLC | | 88,723 |
| Bee County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 32,565 |
| Bexar County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 2,003,554 |
| Bexar County Hospital District | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Phipps Deacon Purnell PLLC | Bexar County | [TBD] |
| Blanco County | Simon Greenstone Panatier Bartlett, P.C.; Deborah F. Earley; Martin Walker, P.C.; James M. Harris, Jr.; Jeffrey Law Firm; Chris Byrd Law | | 11,931 |
| Bowie County | Simon Greenstone Panatier Bartlett, P.C.; Dunn Nutter & Morgan; Martin Walker, P.C. | | 93,245 |
| Brazos County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough; Matthew S. Daniel | | 229,211 |
| Brooks County | Phipps Deacon Purnell PLLC | | 7,093 |
| Burleson County | Burleson County Attorney's Office; Fibich, Leebron, Copeland & Briggs; ONeill Law LLP; The Gallagher Law Firm; Watts Guerra LLP | | 17,642 |
| Burnet County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 48,155 |
| Caldwell County | Phipps Deacon Purnell PLLC | | 43,664 |
| Calhoun County | Phipps Deacon Purnell PLLC | | 21,290 |

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
| --- | --- | --- | --- |
| Cameron County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 423,163 |
| Camp County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 13,094 |
| Cass County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 30,026 |
| Castro County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 7,530 |
| Cherokee County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Richards Penn; Ament & Peacock | | 52,646 |
| Childress County | Altman Legal Group; Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 7,306 |
| City of Eagle Pass | Napoli Shkolnik PLLC; Luis R. Vera & Associates | Maverick County | 29,684 |
| City of Houston | The Lanier Law Firm; Law Office of Richard Schechter, P.C.; Reich and Binstock LLP; Baker Wotring LLP | Harris County | 2,320,268 |
| City of Laredo | Napoli Shkolnik PLLC; Luis R. Vera & Associates | Webb County | 262,491 |
| City of Leon Valley | Phipps Deacon Purnell PLLC; Denton Navarro Rocha Bernal & Zech P.C. | Bexar County | 12,306 |
| City of San Antonio | The Herrera Law Firm; Baron & Budd, P.C.; Greene, Ketchum, Farrell, Bailey & Tweel LLP; Hill Peterson Carper Bee & Deitzler PLLC; Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A.; McHugh Fuller; Powell & Majestro | Bexar County | 1,547,253 |
| Clay County | Harrison Davis Steakley Morrison Jones, P.C.; Altman Legal Group; Haley & Olson | | 10,471 |
| Colorado County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 21,493 |
| Cooke County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 41,257 |

E-2

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Coryell County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 75,951 |
| Dallas County | Simon Greenstone Panatier Bartlett, P.C.; Lanier Law Firm; Cochran Firm | | 2,635,516 |
| Dallas County Hospital District. | Burns Charest LLP; Harrison Davis Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | Dallas County | [TBD] |
| Delta County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 5,331 |
| Dimmit County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC; The Armstrong Firm, PLLC | | 10,124 |
| Duval County | The Barrera Law Firm; The Snapka Law Firm | | 11,157 |
| Ector County | Simon Greenstone Panatier Bartlett, P.C.; Law Office of Robert E. White | | 166,223 |
| El Campo Memorial Hospital | Beggs & Lane, RLLP; Frazer PLC; Law Office of Grant D. Amey, LLC; The Bilek Law Firm, LLP; The Kykendall Group | | TBD |
| El Paso County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 839,238 |
| Ellis County | Motley Rice LLC; Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 184,826 |
| Falls County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 17,297 |
| Fannin County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 35,514 |
| Fort Bend County | Roy L. Cordes, Jr. (County Attorney) | | 811,688 |
| Franklin County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 10,725 |

E-3

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Freestone County | Simon Greenstone Panatier Bartlett, P.C.; The Beckham Group | | 19,717 |
| Galveston County | Watts Guerra LLP; O'Neill Law | | 342,139 |
| Gonzales Healthcare Systems | Beggs & Lane, RLLP; Frazer PLC; Law Office of Grant D. Amey, LLC; The Kykendall Group | | [TBD] |
| Grayson County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Sanders, Motley, Young & Gallardo, PLLC | | 136,212 |
| Guadalupe County | Phipps Deacon Purnell PLLC | | 166,847 |
| Guadulupe Valley Hospital | Burns Charest LLP; Harrison Davis Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | Guadalupe County | [TBD] |
| Hardin County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 57,602 |
| Harris County | Gallagher Law Firm; Fibich Leebron Copeland Briggs; Dan Downey, P.C. | | 4,713,325 |
| Harris County Hospital District | Gallagher Law Firm; Fibich Leebron Copeland Briggs; Dan Downey, P.C. | Harris County | [TBD] |
| Harrison County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Truelove Law Firm, PLLC | | 66,553 |
| Haskell County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 5,658 |
| Hays County | Phipps Deacon Purnell PLLC | | 230,191 |
| Henderson County | Motley Rice LLC; Fears Nachawati, PLLC; Mathew S. Daniel; Ferrer Poirot & Wansbrough | | 82,737 |
| Hidalgo County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Hinojosa Law Firm, P.C. | | 868,707 |

E-4

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Hopkins County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 37,084 |
| Houston County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Griffith & Griffith, P.C. | | 22,968 |
| Irving Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | Dallas County | [TBD] |
| Jasper County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 35,529 |
| Jefferson County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 251,565 |
| Jim Hogg County | The Barrera Law Firm; The Snapka Law Firm | | 5,200 |
| Jim Wells County | The Barrera Law Firm; The Snapka Law Firm; The Gutierrez Law Firm; Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 40,482 |
| Johnson County | Fears Nachawati, PLLC; McLean Law Firm, P.C.; Ferrer Poirot & Wansbrough | | 175,817 |
| Jones County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 20,083 |
| Kaufman County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 136,154 |
| Kendall County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Armstrong Firm, PLLC | | 47,431 |
| Kerr County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 52,600 |
| Kinney County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 3,667 |
| Kleberg County | Michael J. Krueger; The Snapka Law Firm | | 30,680 |
| Lamar County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 49,859 |

E-5

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| La Salle County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 7,520 |
| Leon County | Watts Guerra LLP; O'Neill Law; The Gallagher Law Firm | | 17,404 |
| Liberty County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs; Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz; Husain Law & Associates, PC; Law Offices of Randall P. Gunter, P.C. | | 88,219 |
| Limestone County | The Beckham Group | | 23,437 |
| Lubbock County | Phipps Deacon Purnell PLLC | | 310,569 |
| Madison County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 14,284 |
| Marion County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 9,854 |
| Maverick County | Napoli Shkolnik PLLC | | 58,722 |
| Maverick County Hospital District | The Law Firm of Oscar A. Garza; Wayne Wright, LLP | | [TBD] |
| McLennan County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 256,623 |
| McMullen County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Armstrong Firm, PLLC | | 743 |
| Milam County | Simon Greenstone Panatier Bartlett, P.C.; Fisher, Boyd, Johnson & Huguenard, L.L.P; Richard A. Dodd, LC | | 24,823 |
| Mitchell County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 8,545 |
| Montgomery County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 607,391 |
| Morris County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 12,388 |
| Nacogdoches County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Lanier Law Firm | | 65,204 |

E-6

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Newton County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 13,595 |
| Nolan County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 14,714 |
| Nueces County | The Law Office of Richard Schechter, P.C.; The Lanier Law Firm; The Law Office of James B. Ragan; Reich & Binstock, LLP; The Purnell Law Firm; Phipps Anderson Deacon LLP | | 362,294 |
| Nueces County Hospital District | The Law Office of Richard Schechter, P.C.; The Lanier Law Firm; The Law Office of James B. Ragan; Reich & Binstock, LLP; The Purnell Law Firm; Phipps Anderson Deacon LLP | Nueces County | [TBD] |
| Orange County | Simon Greenstone Panatier Bartlett, P.C.; Paul D. Henderson, P.C.; Dies & Parkhurst, L.L.P. | | 83,396 |
| Ochiltree County Hospital District | Beggs & Lane RLLP; Frazer PLC; The Bilek Law Firm, L.L.P.; The Kuykendall Group; Law Office of Grant D. Amey, LLC | Ochiltree County | [TBD] |
| Palo Pinto County Hospital District | Burns Charest LLP; Harrison Davis Steakley Morrison Jones, P.C.; Barrett Law Group, P.A.; Cuneo Gilbert & Laduca, LLP; Taylor Martino, P.C. | Palo Pinto County | [TBD] |
| Panola County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Love Law Firm, P.C.; Adkison Law Firm | | 23,194 |
| Parker County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC | | 142,878 |
| Polk County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 51,353 |
| Potter County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; The Lanier Law Firm; Templeton, Smithee, Hayes, Heinrich & | | 117,415 |

745274877.20

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| | Russell, LLP; Mullin, Hoard & Brown, LLP | | |
| Red River County | Simon Greenstone Panatier Bartlett, P.C. | | 12,023 |
| Roberts County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 854 |
| Robertson County | Simon Greenstone Panatier Bartlett, P.C.; Richard A. Dodd, LC; The Beckham Group | | 17,074 |
| Rockwall County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 104,915 |
| Rusk County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Love Law Firm, P.C.; Adkison Law Firm | | 54,406 |
| San Patricio County | Alexander Dubose Jefferson Townsend; Joel H. Thomas; Phipps Deacon Purnell LLP | | 66,730 |
| San Saba County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 6,055 |
| Shackelford County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 3,265 |
| Shelby County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Adkison Law Firm | | 25,274 |
| Smith County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 232,751 |
| Socorro Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | El Paso County | [TBD] |
| Stephens County | Fears Nachawati, PLLC; Ferrer Poirot & Wansbrough | | 9,366 |
| Tarrant County | The Lanier Law Firm; Law Offices of Tom Hall | | 2,102,515 |
| Tarrant County Hospital District | Wick Phillips Gould & Martin, LLP | Tarrant County | [TBD] |
| Terrell County | The Coffman Law Firm; Mitchell A. Toups, Ltd. | | 776 |
| Texarkana Independent School District | The Coffman Law Firm; Mitchell A. Toups, Ltd. | Bowie County | [TBD] |

E-8

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Throckmorton County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson | | 1,501 |
| Titus County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 32,750 |
| Travis County | Hendler Flores; Law Office of Richard Schechter, P.C.; Reich and Binstock LLP; The Lanier Law Firm | | 1,273,954 |
| Trinity County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 14,651 |
| Upshur County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C.; Tefteller Law PLLC | | 41,753 |
| Uvalde County | Phipps Deacon Purnell PLLC | | 26,741 |
| Van Zandt County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 56,590 |
| Walker County | Correro & Leisure, P.C.; Park & Durham; G. Allan Van Fleet, P.C. | | 72,791 |
| Waller County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 55,246 |
| Webb County | Cicala Law Firm; Sanford Heisler Sharp | | 276,652 |
| West Wharton County Hospital District | Beggs & Lane RLLP; Frazer PLC; The Bilek Law Firm, L.L.P.; The Kuykendall Group; Law Office of Grant D. Amey, LLC | Wharton County | [TBD] |
| Wichita County | Harrison Davis Steakley Morrison Jones, P.C.; Haley & Olson; Altman Law Group | | 132,230 |
| Williamson County | Watts Guerra LLP; The Gallagher Law Firm; Fibich Leebron Copeland Briggs | | 590,551 |
| Wilson County | Phipps Deacon Purnell PLLC | | 51,070 |
| Wilson County Memorial Hospital District | Phipps Deacon Purnell PLLC | Wilson County | [TBD] |
| Wood County | Simon Greenstone Panatier Bartlett, P.C.; Martin Walker, P.C. | | 45,539 |

E-9

| SUBDIVISION OR SPECIAL DISTRICT NAME | COUNSEL | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 POPULATION ESTIMATE |
|---|---|---|---|
| Zavala County | Napoli Shkolnik PLLC; Luis R. Vera & Associates | | 11,840 |

E-10

**Exhibit F**

MASTER FILE NO. 2018-63587

| | | |
|---|---|---|
| | § | IN THE DISTRICT COURT |
| | § | |
| IN RE: TEXAS OPIOID LITIGATION | § | |
| MDL No. 18-0358 | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| *This Document Relates to All Cases* | § | 152ND JUDICIAL DISTRICT |

**CASE MANAGEMENT ORDER**

This Case Management Order ("CMO") shall apply to all plaintiffs with cases pending as of [*Date of Final Court Approval of Settlement*] against Defendants and to all new plaintiffs filing cases after that date against Defendants (collectively, "Plaintiff" or "Plaintiffs"), whose claims are pending in this coordinated proceeding and not released by the Settlement Agreement in this action entered into on [*settlement date*] ("Settlement Agreement"). As used herein, "Defendants" refers to Endo Health Solutions Inc., Endo Pharmaceuticals Inc., Endo International plc, Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc. Pursuant to the order of the Texas Multidistrict Litigation Panel, all subsequent related and tag-along proceedings filed in the State of Texas and transferred to this Multidistrict Litigation Proceeding, *In re: Texas Opioid Litigation*, MDL No. 18-0358, pending before this Court and docketed under Master File No. 2018-63587, shall be subject to the terms of this CMO.

Good cause appearing, it is ordered as follows:

A.     **Filing of Amended Petitions**

1.     Each Plaintiff with an existing case as of [*Date of Final Court Approval of Settlement*], shall file and serve on Defendants within ninety (90) days of that date an Amended

Petition satisfying the requirements of the Texas Rules of Civil Procedure and this CMO, if that Plaintiff's case is not dismissed with prejudice prior to this deadline pursuant to the Settlement Agreement.  Plaintiff's counsel shall comply with Texas Rule of Civil Procedure 65 when filing any such Amended Petition.

2.      The time for Defendants to file a response to a new Petition or Amended Petition shall not begin to run until after the receipt by counsel for the Defendants of the Case-Specific Expert Report(s) required pursuant to this CMO, and after the claims process is concluded as described in Section B.3 below, whichever is later.

**B.      Plaintiffs' Requirement to Produce Certain Specified Information About Their Claims**

1.      **Plaintiffs' Production Requirements.** Each Plaintiff shall serve the following documents and/or information upon counsel for Defendants:

(a)      **Fact Sheet.** If not already completed, executed, and served, each Plaintiff shall serve upon the Defendants within the deadlines specified herein a completed copy of the Fact Sheet, attached as Exhibit A to this Case Management Order. Each Plaintiff that has already completed, executed, and served a compliant Fact Sheet shall serve upon the Defendants within the deadlines specified herein an updated Fact Sheet reflecting any material change in the facts underlying the Plaintiff's claims or shall affirm that no such material change applies. Simultaneously with its service of its Fact Sheet or affirmation, each Plaintiff shall serve upon Defendants a verified statement under oath setting forth how each element of their claims has not been resolved pursuant to the terms of the Settlement and the state and regional abatement fund provided therein.

F-2

(b)    **Record Production.**

(i)    Each Plaintiff shall produce all records establishing the existence of a public nuisance within the Plaintiff's territory or borders, including a definition of the nuisance and evidence to support its existence.

(ii)    Each Plaintiff shall produce all records supporting a claim for nuisance "abatement" relief within the Plaintiff's territory or borders, including a categorization and itemization of any requested nuisance abatement relief and evidence to support each component of such relief.

(iii)    Each Plaintiff shall produce all records supporting a claim of damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages. Each Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.

(iv)    For any other relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that will make the expenditures, when and how long those entities will make the expenditures, and the nature of the expenditures, including how they will address any and all alleged harms. Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

(v)    Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly unnecessary prescriptions shall identify those prescriptions, to whom and by whom the prescriptions were written, the pharmacy that filled each such prescription, whether the Plaintiff was reimbursed for them, and the Plaintiff's basis for identifying the prescriptions.

745274877.20

(c)     **Affidavit.** An affidavit signed by each Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit A to this Case Management Order; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO. If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d)     **Expert Reports.** Each Plaintiff shall serve on counsel for Defendants a case-specific expert report or reports executed by a qualified expert, under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report"). The Case-Specific Expert Report shall include all matter required to comply with Texas Rule of Civil Procedure 195, Texas law, and at least:

(i)     *Plaintiff's Information.* The Plaintiff's name;

(ii)     *Expert's Information.* The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii)     *Plaintiff's Records.* All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv)     *Reliance Materials.* All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v)     *Locations.* If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity

how Plaintiff has been affected by such public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi)     *Subjects of Report(s)*. The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to rely, including but not limited to the following:

(1)     Whether the Plaintiff's records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2)     Whether the Plaintiff's records reviewed by the expert(s) indicate the existence of a nuisance and, if so, the nature of the nuisance;

(3)     Whether the Plaintiff's records reviewed by the expert(s) indicate that Defendants engaged in any wrongful conduct and, if so, the nature of that conduct;

(4)     An opinion that there is in fact a causal relationship between the individual Plaintiff's claims and Defendants' alleged conduct and the basis for that opinion;

(5)     An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

2.    **Deadline to comply.**

(a)    For each Plaintiff with claims pending against Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced no later than [DATE], or ninety (90) days after the date such Plaintiff elects not to settle its claims, whichever is sooner.

(b)    For each Plaintiff with claims newly filed in or transferred to this proceeding against Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

3.    **Failure to comply.**

(a)    *Notice of Non-Compliance and Opportunity to Cure*. If any Plaintiff fails to comply with any provision of this Order, Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance. Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's petition, shall be held in abeyance.

(b)    *Failure to Cure*. If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Defendants.

(c)    *Extensions of Time*. The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

F-6

C.    **Discovery on Statute of Limitations and Other Time-Based Defenses**

1.    Plaintiffs must, within the time frames established by Section B.2, serve upon counsel for the Defendants an affidavit signed by the Plaintiff and its counsel providing the following information: (1) the date the Plaintiff first learned that the harms alleged in its petition may be related to Defendants' conduct; (2) how the Plaintiff first learned the harms alleged in its petition may be related to Defendants' conduct; (3) the date the Plaintiff first spoke to or corresponded with an attorney about potential litigation in this matter; and (4) the date the Plaintiff first retained counsel for litigation in this matter. Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each such Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

D.    **Case-Specific Discovery and Related Dispositive Motion Practice**

1.    If a Plaintiff complies with the production requirements outlined above in Sections B and C, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that: (a) grants the Parties one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct discovery on issues raised by the productions; and (b) sets a briefing schedule that gives the Parties forty-five (45) days from the close of discovery for the Parties to submit summary judgment motions and *Daubert/Robinson* motions, twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

2.    During such discovery, the Parties are permitted to: serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of both fact and expert witnesses for the Plaintiff for up to seven hours each, with counsel for Defendants questioning first at each deposition. If a Plaintiff serves any written discovery upon

Defendants, the Parties shall meet and confer about an appropriate deadline for responding to such discovery, which deadline shall be at least sixty (60) days after service of such discovery. The Court's use of the term "specific to the Plaintiff" is intended to express the Court's intention not to permit additional "generic" discovery against the Defendant at this time. No other depositions may be taken during the expedited discovery period absent prior leave granted by the Court upon a showing of good cause.

3.      If a case survives the Defendant's summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative discovery is necessary and to discuss other case management issues. Discovery with regard to any other defendants will be addressed at this time as well. The filing and briefing of summary judgment motions and *Daubert/Robinson* motions after the expedited discovery discussed above shall not prejudice or otherwise foreclose the opportunity for any Party or other defendant to file later, non-duplicative summary judgment and *Daubert/Robinson* motions after completing full fact and expert discovery. The Court's use of the term "non-duplicative" is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period or *Daubert/Robinson* motions concerning witnesses addressed in *Daubert/Robinson* motions filed at the conclusion of the expedited discovery period.

4.      The foregoing provisions do not preclude any Party or other defendant from filing non-duplicative dispositive motions, including motions relating to personal jurisdiction.

SO ORDERED.

Dated: _____          _____

                                                  Hon. Robert K. Schaffer
                                                  Presiding Judge

745274877.20