# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | |
| **This document relates to:** | |
| *County of Lake, Ohio v. Purdue Pharma L.P., et al.*, Case No. 18-op-45032 (N.D. Ohio) | **MDL No. 2804** **Case No. 17-md-2804** **Judge Dan Aaron Polster** |
| *County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*, Case No. 18-op-45079 (N.D. Ohio) | |
| **"Track 3 Cases"** | |

## <u>WALGREENS' AND WALMART'S</u>
## <u>JOINT RESPONSE TO PLAINTIFFS' CLOSING BRIEF</u>

# TABLE OF CONTENTS

                                                                                          **Page**

TABLE OF AUTHORITIES ............................................................................................ iii

I.    PLAINTIFFS DID NOT CARRY THEIR BURDEN TO PROVE
      ENTITLEMENT TO THE "ABATEMENT" RELIEF THEY REQUEST ..................... 2

      A.    Plaintiffs Commit Three Cross-Cutting Errors That Preclude Relief. .................. 2

      B.    Plaintiffs Did Not Carry Their Burden To Prove That the Requested Relief
            Is Reasonable and Necessary To Abate the Nuisance the Jury Found. ................. 5

            1.    The Evidence Does Not Prove That Plaintiffs' Proposed
                  Abatement Is Warranted as to These Particular Counties. ........................ 5

            2.    Plaintiffs' Abatement Proposals Are Speculative and Unfounded. ........... 8

                  a.    A 15-Year Abatement Award Is Neither Reasonable Nor
                        Necessary. ...................................................................................... 8

                  b.    Significant Errors in Methodology Render Plaintiffs'
                        Expert Cost Estimates Unreliable and Speculative. ...................... 9

                  c.    Plaintiffs' Experts Ignored Compelling Evidence Presented
                        by Defendants. .............................................................................. 15

      C.    The Court Should Exclude from Any Award Amounts That Will Not Be
            Paid by Plaintiffs. ............................................................................................. 20

II.   THE AWARD MUST BE APPORTIONED AMONG DEFENDANTS AND
      OTHER TORTFEASORS ......................................................................................... 22

      A.    Plaintiffs Ignore the Restatement and Ohio Law, Both of Which Establish
            That Any Award Must Be Apportioned. ............................................................ 22

      B.    Plaintiffs' Factual Counterarguments on Apportionment Do Not Persuade. ...... 23

      C.    Plaintiffs' Brief Only Emphasizes the Constitutional Problems With Their
            Request. ............................................................................................................. 27

III.  PLAINTIFFS' AWARD MUST BE GOVERNED BY AN ABATEMENT
      PLAN. ..................................................................................................................... 27

      A.    Defendants Should Not Be Required To Deposit All Abatement Funds
            Into a Dedicated Account at the Beginning of the Abatement Period. ................ 28

      B.    Plaintiffs Are Not Entitled to "Flexibility" and "Discretion" in Their Use
            of the Abatement Funds. .................................................................................... 29

            1.    Plaintiffs Should Not Be Permitted To Use Abatement Funds To
                  Pay Attorneys' Fees. ................................................................................ 29

            2.    Plaintiffs Should Not Be Permitted To Deviate From the
                  Abatement Plan. ....................................................................................... 32

# TABLE OF CONTENTS
(continued)

|  |  |  | **Page** |
|---|---|---|---|
| | 3. | Plaintiffs Should Not Be Permitted To Internally Allocate the Abatement Funds. | 33 |
| | 4. | Plaintiffs Should Not Be Granted Indefinite and Unlimited "Roll Over." | 34 |
| C. | | Plaintiffs' Proposal Fails To Include Adequate Safeguards and Oversight. | 35 |
| D. | | The Court Should Institute the Oversight Measures Proposed by Defendants. | 36 |
| IV. | | PLAINTIFFS' PLAN IS SUSCEPTIBLE TO FURTHER ALLOCATION | 37 |
| V. | | PLAINTIFFS' REQUESTED INJUNCTION SHOULD BE DENIED. | 40 |
| A. | | An Injunction To "Obey the Law" Is Inappropriate. | 40 |
| B. | | Even if the Court Could Enjoin a Defendant To "Obey the Law," the Record Would Not Support that Relief Here. | 43 |
| C. | | Plaintiffs' Requested Injunctive Relief Is Unnecessary, Unfeasible, Vague, and Overbroad. | 45 |
| | 1. | Special Master | 45 |
| | 2. | "Red Flags" | 46 |
| | 3. | Software Programs | 47 |
| | 4. | Duration | 48 |
| | 5. | Vague and Overbroad Provisions | 48 |
| VI. | | THE COURT SHOULD NOT AWARD ANY ABATEMENT BECAUSE THE SUPREME COURT'S RUAN DECISION REQUIRES A DIRECTED VERDICT ON LIABILITY OR, AT MINIMUM, A NEW TRIAL. | 51 |
| CONCLUSION | | | 54 |

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ackerman Bros. Farms, LLC, v. U.S. Dep't of Agric.*,
No. 17-cv-11779, 2021 WL 6133910 (E.D. Mich. Dec. 29, 2021) ...................................28, 29

*Alemite Mfg. Corp. v. Staff*,
42 F.2d 832 (2d Cir. 1930) (L. Hand, J.) ..............................................................................3

*Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol.*
*Aluminum Corp.*,
696 F.2d 437 (6th Cir. 1982) ......................................................................41, 43, 47

*Austin v. United States*,
509 U.S. 602 (1993)...................................................................................................27

*Baker Botts L.L.P. v. ASARCO LLC*,
576 U.S. 121 (2015)...................................................................................................30

*Barnett v. Carr ex rel. Est. of Carr*,
No. CA2000-11-219, 2001 WL 1078980 (Ohio Ct. App. Sept. 17, 2001)...........................43

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980)...................................................................................................31

*Carter-Jones Lumber Co. v. Dixie Distrib. Co.*,
166 F.3d 840 (6th Cir. 1999) ...............................................................................3, 29

*City of Huntington v. AmerisourceBergen Drug Corp.*,
No. 17-cv-1362 (S.D. W. Va. July 4, 2022), ECF 1530 ................................................. *passim*

*Collette v. Collette*,
No. 20423, 2001 WL 986209 (Ohio Ct. App. Aug. 22, 2001) ............................33, 34, 35, 36

*Davis v. Carter*,
452 F.3d 686 (7th Cir. 2006) ....................................................................................49

*Day v. NLO, Inc.*,
144 F.R.D. 330 (S.D. Ohio 1992).............................................................................28

*E.E.O.C. v. AutoZone, Inc.*,
707 F.3d 824 (7th Cir. 2013) ....................................................................................42

*E.E.O.C. v. Wooster Brush Co. Emps. Relief Ass'n*,
727 F.2d 566 (6th Cir. 1984) ....................................................................................41

*Gen. Bldg. Contractors Ass'n v. Pennsylvania*,
458 U.S. 375 (1982)......................................................................................................4

*Gonzales v. Raich*,
545 U.S. 1 (2005).......................................................................................................42

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) .................................................................................3, 41

*Howe v. City of Akron*,
   801 F.3d 718 (6th Cir. 2015) ...........................................................................45

*In re Foote Mem'l Hosp./Patient Care Info. Sys. Litig.*,
   25 F.3d 406 (6th Cir. 1994) .............................................................................20

*In re Nat'l Prescription Opiate Litig.*,
   No. 17-MD-2804, 2019 WL 4043938 (N.D. Ohio Aug. 26, 2019)..................32, 33

*In re Peterson*,
   253 U.S. 300 (1920)..........................................................................................45

*Jaques v. Manton*,
   928 N.E.2d 434 (Ohio 2010) ...........................................................................21

*Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty.*,
   836 F.2d 986 (6th Cir. 1987) .............................................................................4

*Lealao v. Beneficial Cal., Inc.*,
   82 Cal. App. 4th 19 (2000) ..............................................................................31

*Lewis v. Lead Indus. Ass'n*,
   178 N.E.3d 1046 (Ill. 2020) .............................................................................21

*Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
   478 U.S. 421 (1986)..........................................................................................45

*MCI Worldcom Network Servs., Inc. v. W.M. Brode Co.*,
   413 F. Supp. 2d 868 (N.D. Ohio 2005)............................................................21

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*,
   945 F.2d 150 (6th Cir. 1991) ...........................................................................51

*Missouri v. Jenkins*,
   495 U.S. 33 (1990)..............................................................................................3

*N.L.R.B. v. Express Publ'g Co.*,
   312 U.S. 426 (1941)..........................................................................................41

*N.L.R.B. v. Teamsters, Chauffeurs, Helpers & Taxicab Drivers, Loc. Union 327*,
   419 F.2d 1282 (6th Cir. 1970) .........................................................................48

*Netjets Aviation, Inc. v. U.S. Dep't of Agric.*,
   No. 20-cv-4464, 2021 WL 3603323 (S.D. Ohio Aug. 13, 2021) .....................18

*Oberhaus v. Alexander*,
   274 N.E.2d 771 (Ohio Ct. App. 1971)..............................................................20

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pang v. Minch*,
   559 N.E.2d 1313 (Ohio 1990) ......................................................................................22

*Payne v. Travenol Lab'ys, Inc.*,
   565 F.2d 895 (5th Cir. 1978) ......................................................................................41

*Pearce v. Chrysler Grp. LLC Pension Plan*,
   893 F.3d 339 (6th Cir. 2018) .......................................................................................3

*People v. ConAgra Grocery Prods. Co.*,
   17 Cal. App. 5th 51 (2017) ........................................................................................31

*Reed v. Cleveland Bd. of Ed.*,
   607 F.2d 737 (6th Cir. 1979) ......................................................................................45

*Ruan v. United States*,
   597 U.S.---, 2022 WL 2295024 (June 27, 2022) ....................................51, 52, 53, 54

*Schmidt v. City of Lima*,
   No. 20-cv-4971, 2022 WL 874923 (S.D. Ohio Mar. 24, 2022)............................13

*Schmidt v. Lessard*,
   414 U.S. 473 (1974).....................................................................................................41

*Scott v. Schedler*,
   826 F.3d 207 (5th Cir. 2016) ......................................................................................48

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003)...............................................................................................27, 28

*State v. United States*,
   986 F.3d 618 (6th Cir. 2021) ......................................................................................30

*Tharo Sys., Inc. v. Cab Produkttechnik GMBH & Co. KG*,
   196 F. App'x 366 (6th Cir. 2006) ..............................................................................18

*Triangle Props., Inc. v. Homewood Corp.*,
   3 N.E.3d 241 (Ohio Ct. App. 2013)...........................................................................27

*Union Home Mortg. Corp. v. Cromer*,
   31 F.4th 356 (6th Cir. 2022) ........................................................................48, 49, 50

*United States v. Harris*,
   331 F.2d 600 (6th Cir. 1964) ......................................................................................13

*Whitcomb v. Chavis*,
   403 U.S. 124 (1971).......................................................................................................3

*Whole Woman's Health v. Jackson*,
   142 S. Ct. 522 (2021)......................................................................................................3

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

STATUTES

21 U.S.C. § 829 ................................................................................................................52

21 U.S.C. § 841 ................................................................................................................51

OH. STAT § 3719.06 .........................................................................................................42

Ohio Rev. Code § 2315.20 ................................................................................................21

OTHER AUTHORITIES

21 C.F.R. § 1306.04(a) ..........................................................................................51, 52, 53

Fed. R. Civ. P. 53 .............................................................................................................45

Fed. R. Civ. P. 65 ........................................................................................................41, 48

Fed. R. Evid. 201 .............................................................................................................13

Restatement (Second) of Torts § 840E ..............................................................................22

Plaintiffs ask the Court to award them a lump sum of more than $3 billion, payable immediately, that they can use "flexib[ly]"—spending the money on whichever proposed abatement programs they choose with minimal oversight over the next 15 years. Dkt. 4513 at 19–27. So outrageous is the demand that even Plaintiffs did not present it at the outset of this trial, when they assured the Court that they would ask for only five years of abatement costs. *See* Dkt. 4232 at 2; Dkt. 4387 at 4. And, like the Track 2 proposed abatement plan that Dr. Alexander fashioned—and Judge Faber recently rejected—Plaintiffs' plan "addresses harms caused by opioid abuse and addiction[]" rather than "defendants' conduct." *See City of Huntington v. AmerisourceBergen Drug Corp.*, No. 17-cv-1362 (S.D. W. Va. July 4, 2022), ECF 1530 at 148 (hereafter, "*City of Huntington*"). In short, in their closing submission Plaintiffs reveal their purported "abatement plan" for what it actually is—an overblown and speculative demand for damages dressed up as equitable relief, and not tailored to abating oversupply and diversion of prescription opioids.

Plaintiffs argue that Walgreens and Walmart ("Defendants") did not present an abatement plan, implying that the Court must therefore grant their demands. But Defendants *did* submit an abatement plan: safe-storage and takeback boxes, the only measures that could plausibly be described as "abating" the nuisance of oversupply and diversion of prescription opioids that the jury found. *See, e.g.*, Dkt. 4299 at 11; Dkt. 4511 at 25, 58; *City of Huntington* at 148, 182 ("Only one element of [Dr. Alexander's] Abatement Plan, a safe drug disposal program for unused pills, is even arguably addressed at the volume of prescription opioids in the [Track 2 communities].."). As explained in Section I, the rest of Plaintiffs' plan is factually and legally unsupported. But should the Court choose a middle ground between Defendants' proposed plan and Plaintiffs' proposed windfall, Plaintiffs' "compromise" position—after it is reduced to a reasonable time

frame and properly apportioned (*see* Section II)—is comparable to Options 3 and 4 from Defendants' post-trial submission. The calculations for each option are set out in Section IV and Exhibit A.

Finally, there is no basis for injunctive relief in this case given the trial record. *See* Section V. Indeed, Plaintiffs did not even ask for injunctive relief initially. *See* Dkt. 4232. If the Court nevertheless awards injunctive relief, the order should take the form requested by Defendants subject to their objections, *see* Ex. B, not the overbroad draft order proposed by Plaintiffs.

I.     **PLAINTIFFS DID NOT CARRY THEIR BURDEN TO PROVE ENTITLEMENT TO THE "ABATEMENT" RELIEF THEY REQUEST**

Plaintiffs fail to show that they are entitled to the extraordinary so-called abatement relief they seek.

A.     **Plaintiffs Commit Three Cross-Cutting Errors That Preclude Relief.**

As an initial matter, three fundamental flaws permeate Plaintiffs' closing argument. Each of these errors in the framework of Plaintiffs' request violates principles set out in Defendants' closing submission and independently confirms that Plaintiffs have failed to prove that they are entitled to the requested "abatement" relief.

*First*, Plaintiffs attempt to shift to Defendants their burden of proving a foundational element of their claims—the form and amount of relief necessary to abate the nuisance found by the jury. Plaintiffs simply list their preferred relief and then argue that Defendants failed to "refut[e] either the necessity or efficacy of any of Dr. Alexander's proposed abatement interventions." Dkt. 4513 at 3–6. As Defendants explained in their closing submission, however, it is Plaintiffs' burden to justify each of their proposed abatement programs, not Defendants' burden to affirmatively rule out every unsupported item on Plaintiffs' wish list. *See* Dkt. 4511 at 3–4. The Court should hold Plaintiffs to their burden and deny any form of relief that Plaintiffs

have not proven is necessary, non-speculative, and effective abatement of the nuisance the jury found.

*Second*, Plaintiffs erroneously assert that courts have "broad equitable discretion" to "'fashion any remedy deemed necessary and appropriate to do justice in a particular case.'" Dkt. 4513 at 19 (quoting *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999)). The only support Plaintiffs offer for that contention is *Carter-Jones*, which was decided before the Supreme Court reiterated that the equitable power of federal courts is distinctly limited in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). In any event, *Carter-Jones* does not—and could not—grant unfettered power to judges sitting in equity. Equitable power is "not unlimited." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971)). Quite the contrary, "[a] court of equity is as much so limited as a court of law." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930) (L. Hand, J.)). True, equitable power is "flexible" to a degree, but "that flexibility is confined within the broad boundaries of traditional equitable relief," *Grupo Mexicano*, 527 U.S. at 322, including the limiting principles set forth in Defendants' closing submission, *see* Dkt. 4511, § II; *see also Pearce v. Chrysler Grp. LLC Pension Plan*, 893 F.3d 339, 348 (6th Cir. 2018) (identifying "guideposts" that govern equitable power). As Defendants have explained, binding case law and foundational treatises make clear that any award the Court issues must: (1) take the form of traditional relief of the type awarded by the English Court of Chancery, per *Grupo Mexicano*; (2) be non-speculative, final, and limited to one year; (3) exclude remote categories of requested relief; (4) set off third-party settlements; (5) exclude amounts paid by insurance and other third parties; and (6) have clear mechanisms to prevent waste and fraud. *See* Dkt. 4511, § II. Plaintiffs do not even attempt to

3

square their abatement proposals with these limitations. That is a serious problem because, as detailed below, the Court lacks authority to grant Plaintiffs much of their requested relief. *See infra* §§ I, V(A).

*Third*, Plaintiffs seek relief that goes far beyond abating the public nuisance found by the jury: the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels." Dkt. 4176 at 2, 6; *see* Dkt. 4511 at 5. Instead, Plaintiffs' plan seeks to address the alleged downstream harms they claim are connected to that oversupply. Although Plaintiffs concede that the Court may not award relief that goes beyond abating the "public nuisance found by the jury," Dkt. 4513 at 2, they nevertheless seek massive funding for a broad suite of programs that are loosely related to a sprawling social problem they call the "opioid epidemic" (driven substantially by illicit opioid use). *Id.* at 2–6. The jury verdict provides no basis for such an award. *See* Dkt. 4511 at 7; *see also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 399 (1982) (equitable power may be exercised "only on the basis of a violation of the law" and extends "no farther than required by the nature and the extent of that violation"); *Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty.*, 836 F.2d 986, 1000 (6th Cir. 1987) (similar).

Indeed, earlier this week, the United States District Court for the Southern District of West Virginia rejected a similarly sweeping public nuisance "Abatement Plan" proposed by localities that relied on many of the same experts as Plaintiffs. *See City of Huntington* at 148–49. According to that court, the plan was not a proper abatement remedy because it was "directed at treating or otherwise addressing drug use and addiction" and their "downstream harms," not at abating the "wrongful conduct" of distributors that allegedly caused an oversupply and diversion of opioids. *Id.* at 148, 181–83. Whereas *damages* properly "compensat[e] a plaintiff for 'the cost[s] of

4

eliminating the nuisance effects,'" *abatement* is limited to "enjoin[ing]" or "stop[ping]" "nuisance-causing conduct." *Id.* (quoting 1 Dobbs, Law of Remedies § 5.7(3) (2d ed. 1993)). Like the plan rejected in *City of Huntington*, Plaintiffs' proposals impermissibly sweep well beyond that limit.

For these reasons, Plaintiffs falter right out of the gate. The Court may award them only abatement relief that they have proven is reasonably necessary to abate the nuisance the jury found, and that the Court has the legal authority to grant. The Court must reject any other requested relief.

### B.    Plaintiffs Did Not Carry Their Burden To Prove That the Requested Relief Is Reasonable and Necessary To Abate the Nuisance the Jury Found.

Even if Plaintiffs were entitled to a remedy beyond abating the narrow nuisance that the jury actually found, Plaintiffs have failed to carry their burden to prove that the requested award is reasonable and necessary.

#### 1.    The Evidence Does Not Prove That Plaintiffs' Proposed Abatement Is Warranted as to These Particular Counties.

As Defendants have explained, any abatement award must be narrowly tailored to address the specific nuisance that the jury found in Lake and Trumbull Counties. Dkt. 4511 at 10, 57. Plaintiffs do not and cannot dispute this legal point, nor can they point to any evidence showing that their proposed abatement plans are properly tailored to these two particular counties.

Although Plaintiffs promised in their pretrial briefs to present witnesses to speak to the Counties' specific abatement needs, they never did. *See* Dkt. 4387 at 3 (promising to call county witnesses to testify about, among other things, "the current programs" that each county "has to deal with the opioid epidemic and how those programs are inadequate," as well as "how Dr. Alexander's plan fills the gaps in the needed abatement programs" in each county). As a result, they never established that the requested relief would effectively remedy a nuisance in Lake and Trumbull Counties, let alone that it is necessary. *See* Dkt. 4511, § I.C.

Now, Plaintiffs baldly assert that Dr. Alexander's plan is "specifically tailored to abate the public nuisance in these Counties." Dkt. 4513 at 3 (citing Dkt. 4446, May 11 trial tr., vol. 2, at 332:13–16, 333:2–6, 334:19–335:1, 335:7–22, 343:17–344:5, 345:3–22, 356:1–6, 364:10–18, 410:1–11). But most of the testimony they cite is conclusory, irrelevant, or both, as it merely asserts that Dr. Alexander's plan is based on "the most relevant scientific information," Dkt. 4446, May 11 trial tr., vol. 2, at 334:19–335:1; *see id.* at 364:10–18 (similar), is verifiable and sets forth costs on a yearly basis for multiple funding categories, *id.* at 343:17–344:5, 345:3–22, and will "abate the opioid epidemic" (a claim that cannot even withstand Dr. Alexander's own testimony that his plan will reduce opioid-related harms by only 50% over 15 years), *id.* at 332:13–16, 333:2–6, 335:7–22; *see* Dkt. 4511 at 9; Dkt. 4513 at 19 n.39. None of this testimony proves that Dr. Alexander's plan is tailored in any way to resolve the nuisance the jury found *in the Counties*. The rest of the testimony Plaintiffs cite actually confirms that the plan was *not* tailored to the Counties. *See* Dkt. 4446, May 11 trial tr., vol. 2, at 356:1–6, 410:1–11 (relying on "abatement programs around the country" and Dr. Alexander's experiences in "other cases" involving "other communities" rather than any County-specific programs and experiences).

The fact that Dr. Alexander's plan is not tailored to the Counties is confirmed by other testimony that Plaintiffs hope the Court will ignore. As Defendants have explained at length, all four of Plaintiffs' expert witnesses failed to do the sort of work necessary to opine on the needs of these particular Counties, such as on-the-ground fieldwork, interviews with affected individuals, and consideration of existing programs in the Counties. *See* Dkt. 4511 at 13–16. Thus, Plaintiffs' experts have no basis to testify that Plaintiffs actually need any of the abatement measures they seek. In fact, the evidence shows that the Counties do *not* need all of the requested services. For instance, Trumbull County did not have a single provider who reached 90% capacity for treatment

of intravenous drug abuse during Fiscal Year 2021, DEF-MDL-14713, and the agencies within Lake and Trumbull Counties responsible for addressing substance abuse and addiction had multi-million-dollar surpluses in their fund balances at the end of 2019 and 2020. Dkt. 4455, May 16 trial tr., vol. 4, at 803:23–804:5; 807:3–22; 813:14–814:13; 819:5–819:9; 820:8–822:9; 826:20–827:18; *see also* DEF-MDL-14968; DEF-MDL-14940; DEF-MDL-14944; DEF-MDL-14928.

While Plaintiffs assert in passing that "treatment has historically been underfunded and limited in capacity," the evidence Plaintiffs cite does not support that assertion. Dkt. 4513 at 8 & n.16. Dr. Young testified about funding in the "substance abuse treatment [and] prevention field" generally; she did not claim that substance abuse treatment in the Counties—much less OUD treatment in the Counties—has been historically underfunded or limited. Dkt. 4446, May 11 trial tr., vol. 2, at 318:24–25. In fact, she admitted that she did not "offer[] *any* opinions or estimates … about the costs of the various programs or interventions [she] recommend[ed]" for the Counties, let alone the funding previously available in the Counties. *Id.* at 297:24–298:2 (emphasis added). So too, Dr. Alexander testified (based on brief conversations with only three individuals from the Counties) that compassion fatigue and burnout have "resulted in people not being interested in working in this field," not that treatment providers or the Counties have ever lacked funding or capacity needed to meet demand for treatment. *See id.* at 394:3–14; *see also* Dkt. 4511 at 14.

The gulf between Plaintiffs' multi-billion-dollar demand and the Counties' actual needs is illustrated by the Walgreens-Florida settlement Plaintiffs cite, as well as Plaintiffs' own settlements in this very litigation. The Walgreens-Florida settlement resolved similar claims brought by the entire state of Florida—the home to nearly 900 Walgreens stores—for about $680 million, yet Plaintiffs insist that the Court should award many multiples of that state-wide settlement amount to two counties served by a mere *12* Walgreens stores. Dkt. 4513-1. And in this

case, Plaintiffs settled their claims against Giant Eagle and Rite Aid, which together had greater market share in the Counties than any of the remaining defendants, for a combined total of only $9 million—or approximately 0.3% of the award they claim is necessary here. *See* DEF-MDL-15069 at 7; DEF-MDL-14530 at 9; *see also* Dkt. 4511 at 27.

Plaintiffs' failure to adduce county-specific proof is fatal. Following Judge Faber's reasoning, *see City of Huntington* at 180-82, the Court should reject Dr. Alexander's plan, except for the portion relating to safe disposal and take-back boxes. *See also* Dkt. 4511, § I.C. That portion of the plan at least arguably abates the nuisance the jury found—the oversupply and diversion of prescription opioids in these two counties.

### 2.     Plaintiffs' Abatement Proposals Are Speculative and Unfounded.

Plaintiffs also failed to present non-speculative proof that they are entitled to the requested abatement relief, as Defendants have explained. *See* Dkt. 4511 at 10–17, 21–22.

> a.     *A 15-Year Abatement Award Is Neither Reasonable Nor Necessary.*

At the outset of Phase II, even Plaintiffs did not seriously contend that a 15-year, multi-billion-dollar abatement plan was necessary. Instead, they argued that they would seek only "the funds necessary to pay for the elements of abatement for the first five years" of their plan, because "[t]he five-year time period would permit sufficient time to perform necessary outreach, initiate infrastructure, and implement the first phase of the abatement strategies." Dkt. 4387 at 4. In an about-face, Plaintiffs now insist that a 15-year abatement plan is not only reasonable, but necessary. They are wrong.

Plaintiffs do not dispute that abatement costs must be proven in a non-speculative manner, and that the only court to have awarded an abatement remedy in a prescription opioids case limited the remedy to one year and rejected the plaintiff's 20-year abatement proposal (before the entire

award was vacated for failure to state a valid nuisance claim). Dkt. 4511 at 22–23. Nor do Plaintiffs even attempt to provide any non-speculative evidence to support their 15-year plan. Dr. Alexander did not even estimate the number of individuals who will seek treatment in the Counties in Year 1 or any other year, *see* Dkt. 4447, May 12 trial tr., vol. 3, at 576:8–23, 577:19–25, 581:3–6 (Trumbull), and Plaintiffs do not address the many variables that will inevitably change dramatically over the next decade and a half—including opioid availability, opioid use, addiction patterns, and recovery rates, to name a few. *See* Dkt. 4511 at 23. Indeed, Plaintiffs offered no evidence suggesting that these patterns would remain the same, while their own trial evidence suggests the opposite. *See id.* (citing testimony); Dkt. 4446, May 11 trial tr., vol. 2, at 417 (Alexander testified that "estimating the expected impact of specific interventions within specific communities is prone to uncertainty"); *id.* at 435 (Alexander agrees that "[t]he opioid epidemic continues to change and evolve" at "every level," with changes at the "local level" "at times" being "more profound"); *id.* at 440 (Alexander testifies that "[e]ach measure" of his proposed abatement plan "should be assessed on a quarterly, biannual, or annual basis").

Plaintiffs must do more than assemble a list of potential programs and insist that funding for these programs should continue for 15 years. *See* Dkt. 4513, § I.A. In the Court's words, "only a fool would just say, 'I know what's going to happen in the next 15 years, and here it is, and I'm not looking at it again." Dkt. 4464, May 18 trial tr., vol. 6, at 1331:5–1331:7. The Court should follow its own advice and decline Plaintiffs' invitation for an expansive and lengthy abatement program that even they conceded was unnecessary mere months ago. *See* Dkt. 4387 at 4.

> b. *Significant Errors in Methodology Render Plaintiffs' Expert Cost Estimates Unreliable and Speculative.*

Plaintiffs' abatement plan also results from indefensible analytic errors and basic math mistakes—four of which are especially bad. *See* Dkt. 4511 at 11–17.

*First*, Dr. Keyes' "mortality multiplier formula" is mathematically incorrect. Attempting to calculate the population of persons with OUD in the Counties, Dr. Keyes divided the number of drug-related deaths of *any person*—with or without OUD—by the rate of drug-related deaths "*among people with OUD*." Dkt. 4513 at 11–12 & n.24 (emphasis added) (quoting Dkt. 4438, May 10 trial tr., vol. 1, at 49:17–50:16). As Dr. Kessler explained, however, that formula is flawed because the numerator is not based on the same population as the denominator. *See* Dkt. 4455, May 16 trial tr., vol. 4, at 920:5–920:16. For the formula to be correct, the numerator must be the number of drug-related deaths *among people with OUD*. For instance, if 100 drug-related deaths occurred among the OUD population, and the drug-related death rate among the OUD population is 10%, a reliable formula should result in an estimate of an OUD population of 1,000 people (100 divided by 10%). But if 100 drug-related deaths occurred among the total population, and half of the deaths resulted from drug use by people who do not have OUD, then Dr. Keyes's formula would wrongly double the estimated number of people with OUD.

Plaintiffs do not seriously dispute this point. Instead, attempting to defend Dr. Keyes' erroneous math, they emphasize that it is unclear whether the proper numerator—the number of drug-related deaths among people with OUD—was "available" to Dr. Keyes. Dkt. 4513 at 12. Of course that would just mean that Dr. Keyes may have lacked the data necessary to use the formula correctly and, as a result, her estimate is unreliable and speculative. It does not give her license to use inaccurate data or formulas. Dr. Keyes' mistake is indefensible.

Beyond the erroneous numerator in her formula, Dr. Keyes also used incorrect data for the denominator (the rate of drug-related deaths among the OUD population). The Larney "meta-analysis" she relied on drew from studies involving OUD *and non-OUD* populations. Contrary to Plaintiffs' contention, Dr. Keyes did not rely solely on "portions of the [meta-analysis] specifically

10

discussing people *with OUD.*" *Id.* at 11. Rather, the meta-analysis and the death rate on which Dr. Keyes relied were plainly based on non-OUD populations as well as OUD populations, as the meta-analysis itself confirms. *See* Dkt. 4455, May 16 trial tr., vol. 4, at 935:7–937:23; WMT-MDL-01488 ("We included cohort studies of people who used extramedical opioids …. *Cohorts did not need to be opioid dependent or have opioid use disorder to be included.*" (emphasis added)).[1]

*Second*, Dr. Keyes relied on an unjustified and inflated estimate of the OUD death rate in the Counties by erroneously relying exclusively on the Larney meta-analysis, *see* Dkt. 4513 at 10–11, which analyzed data on opioid use from 48 non-U.S. studies and only 7 U.S. studies, *see* WMT-MDL-01614. Plaintiffs seek to justify Dr. Keyes' use of predominantly non-U.S. data by arguing that "there are no County-specific or Ohio-specific estimates for the overdose death rate for individuals with OUD." Dkt. 4513 at 10. That is both wrong and irrelevant. It is wrong because there *are* Ohio-specific estimates: Dr. Kessler calculated and applied an Ohio-specific OUD rate to the Counties' populations using the National Survey on Drug Use and Health ("NSDUH") data. *See* Dkt. 4455, May 16 trial tr., vol. 4, at 948:2–950:4; WMT-DEM-002 at 8. And it is irrelevant because the alleged lack of "County-specific or Ohio-specific estimates" does not address why Dr. Keyes did not at least use *U.S.-specific* rates. Dr. Keyes could have used one of the 7 U.S. studies,

---

[1] *See also* WMT-MDL-01614 at 2 (Chen study involved "[f]irst time drug offenders who served at least 1 day in correctional facilities between 1998-2001 as identified through judiciary records of the Ministry of Justice, Taiwan"), 3 (Espelt study involved "[s]treet recruited participants aged 18–30 via snowball sampling in Barcelona and Madrid between 2001–2003, self-reporting use of opioid and enrolled into ITINERE Project study," Gjersing study involved "[s]treet-recruited people who inject drugs outside an Oslo needle exchange programme facility in March, June and September 1997," Langerdam study involved "people who use heroin within Amsterdam Cohort Study"), 4 (Nambiar study involved "people who inject opioids in Melbourne as identified using MIX cohorts," Quan study involved "[m]ales who inject drugs in Thai Nguyen province, Vietnam).

combined those studies to calculate a weighted rate, or relied on other U.S. data. *See* WMT-MDL-01614. Dr. Keyes ignored those readily available options, and gave no good reason why she did so. Although she asserted that she "performed a sensitivity analysis where she considered only the United States data from the Larney meta-analysis" and that the results were "similar" to her overall analysis, Dkt. 4513 at 10–11 (citing Dkt. 4438, May 10 trial tr., vol. 1, at 130:16–20, 193:10–17, 203:3–12), she did not disclose the results of her sensitivity analysis, how she performed it, or what she means by "similar"—a vague assertion that cannot be squared with the available evidence: a straightforward average of the death rates in the 7 U.S. studies, weighted as provided in Figure 7.21 of Larney's meta-analysis, is 0.7 per 100 person years, which is more than 33% higher than the 0.52 rate Dr. Keyes inexplicably used. *See* WMT-MDL-01614.

Plaintiffs also offer the post-hoc rationalization that using non-U.S. data enabled Dr. Keyes to pool the "most datasets" about "the most people." Dkt. 4513 at 10 (citation omitted). But pooling population data in this way is valuable only if the populations are sufficiently similar. *See* Dkt. 4455, May 16 trial tr., vol. 4, at 907:2–17. Here, Plaintiffs never demonstrated that the global meta-analysis is based on populations similar to the relevant population in Lake and Trumbull Counties. Nor could they, because, as Dr. Kessler testified, the distinct populations studied in the meta-analysis represent a broad range of different time periods from the 1970s to 2010s; different geographic regions from Taiwan to Germany to Australia; different inclusion criteria from heroin users to drug-related offenders to patients who meet the criteria for OUD; and different effects measured using different methods. *See* Dkt. 4455, May 16, 2022, trial tr., vol. 4, at 937:24-938:9. There is no evidence in the record that this facially disparate global evidence reflects the current circumstances in the Counties, much less proof that it does so more accurately than U.S.-specific

evidence Dr. Keyes could have used but chose to ignore. Any estimates based on such assumptions are facially speculative.

*Third*, as Dr. Kessler explained, Dr. Alexander overstated the number of pregnant women with OUD in Trumbull County by basing that number on the *West Virginia* delivery incidence rate rather than the *Ohio* rate—despite using the Ohio rate for Lake County calculations—which increased the cost of his abatement plan by more than $2 million over five years. *See id.* at 976:4–977:9; WMT-DEM-002 at 13–14. Dr. Alexander did not provide any justification for this odd decision, nor have Plaintiffs done so. Instead, Plaintiffs simply attempt to shift the burden, asserting that Dr. Kessler "ha[d] no factual basis" to dispute the use of the West Virginia rate and could not say for certain whether Trumbull County was an "outlier" in Ohio. Dkt. 4513 at 18–19. But the burden to justify abatement calculations and justify their "fit" with the Counties rests squarely on Plaintiffs, *see supra* at 2, and in any event there are two obvious bases on which to object to the West Virginia rate: (1) the judicially noticeable fact that Trumbull County is not in West Virginia and (2) Dr. Alexander's own use of the Ohio rate when evaluating another Ohio county. *See* Fed. R. Evid. 201(b); *see also Schmidt v. City of Lima*, No. 20-cv-4971, 2022 WL 874923, at *4 (S.D. Ohio Mar. 24, 2022) ("The District Court may take judicial notice of established geographical facts." (quoting *United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964)).

*Fourth*, Dr. Alexander's "slots" approach overestimated treatment costs. The approach, which Dr. Alexander disclosed for the first time at trial and which is inconsistent with his report and prior testimony, is also illogical. The Counties do not operate or maintain treatment facilities, and there is no suggestion in the abatement plan submitted by Plaintiffs that they plan to build, operate, or maintain them in the future. Rather, Plaintiffs pay third-party contractors to provide

OUD treatment to County residents in the rare circumstance that a resident does not have Medicaid or other insurance coverage for treatment. As for medication-assisted treatment, as the Court observed, "clearly you're not going to need the drugs if the person isn't taking them." Dkt. 4455, May 16 trial tr., vol. 4, at 968:9–13.

Thus, contrary to Plaintiffs' assertion, there was no need for Defendants to account for "fixed costs (*e.g.*, rent utilities, staffing, etc.) associated with the provision of OUD treatment that must be paid even if not all slots are filled at a given time." *See* Dkt. 4513 at 17. The Counties are not, themselves, establishing and maintaining a physical treatment slot. They only pay for the days where someone actually uses the slot, just as a person who seeks care at a hospital only pays for the days they actually receive the care. *Id.* Even Plaintiffs' own experts costed out treatment under the abatement plan not by projecting the costs of building a facility, hiring staff, and performing treatment, but by projecting the per-day cost of contracting with an existing treatment facility to provide a specific treatment service (*i.e.*, on a per-treatment-delivered basis). Dkt. 4455, May 16 trial tr., vol. 4, at 966:10–970:13.

Moreover, even using Plaintiffs' own numbers, the "slots" approach represents at least an 80% treatment rate for Year 1—a highly unrealistic rate. *See id.* at 965:6–970:4; *see also infra* at 19 n.4. Plaintiffs do not and cannot rebut that critique. To the contrary, they acknowledge that it likely will take significant time (indeed years) to encourage people with OUD to seek treatment. *See, e.g.*, Dkt. 4153 at 8–9 & n.18 ("[T]he entire plan is predicated … on many, many different interventions to improve the access to and uptick of treatment." (quoting Dkt. 4446, May 11 trial tr. vol. 2, at 491:21–24).[2]

---

[2] Plaintiffs' other critiques of Dr. Kessler's estimates regarding treatment costs in the Counties fall equally flat. They argue that Dr. Kessler overlooked that "some individuals may seek treatment multiple times in a given year," but they are mistaken. *See* Dkt. 4513 at 17. In calculating

These flaws—particularly when taken together—show that Plaintiffs' cost estimates are speculative and unreliable. Because Plaintiffs elected not to correct these flaws, they have not carried their burden of proving that their experts' monetary proposals are reasonable and necessary to abate the epidemic the jury found.

> c.    *Plaintiffs' Experts Ignored Compelling Evidence Presented by Defendants.*

Unable to defend their own critical failures of proof, Plaintiffs pivot to criticizing the more reliable methods used by Defendants' experts and ignored by Plaintiffs' experts, particularly NSDUH data concerning OUD populations and historical treatment data that helps project future treatment populations and costs. *See* Dkt. 4513 at 7–8, 12–14. This data is far more reliable than the estimates upon estimates and targets Plaintiffs rely on for their proposed relief and confirms that Plaintiffs are not entitled to the massive award they seek.

*1. NSDUH data.* The NSDUH data Defendants used to calculate OUD populations is reliable and widely accepted—so much so that Plaintiffs' own expert Dr. Alexander has used it to estimate OUD populations in his prior work. As he testified in this case, "[t]he NSDUH is a valuable resource, and it can be applied well to answer important questions relevant to the public health and the matters at hand." Dkt. 4446, May 11 trial tr., vol. 2, at 377:1–4. Indeed, the data is regularly used by scholars and government agencies, and it has been the basis for hundreds of

---

average lengths of treatment, Dr. Kessler used TEDS data measuring an individual's length of treatment from the date of first contact to the date of last contact, so even if an individual sought treatment, left, and then sought treatment again within the course of a year, that individual's length of treatment included the full time they were in treatment as well as the days in between. *See* Dkt. 4455, May 16 trial tr., vol. 4, at 962:6–964:1; Substance Abuse and Mental Health Services Administration, Treatment Episode Data Set Discharges (TEDS-D) 2019 Codebook at 38, https://bit.ly/3bLuIvh. In other words, Dr. Kessler conservatively assumed that an individual will occupy a slot for the full period of time between first and last contact, even if the individual actually left treatment for months in between and thus freed up the slot. Thus, if anything, Dr. Kessler *overestimated* the treatment rate represented by Dr. Alexander's approach.

studies, including in top peer-reviewed journals. Dkt. 4455, May 16 trial tr., vol. 4, at 945:2–12. Yet Dr. Alexander and Plaintiffs' other experts did not use the NSDUH data in this case.

Plaintiffs fail to justify this misguided approach. To start, the Court should dismiss out of hand Plaintiffs' attempt to deflect from Dr. Alexander's previous use of the NSDUH data by characterizing his use as for "another purpose entirely." Dkt. 4513 at 14. As Plaintiffs concede, Dr. Alexander relied on the NSDUH data to estimate OUD populations, specifically the national OUD population and "state-wide OUD population[s] for Rhode Island and Washington for abatement plans in other litigations." *Id.* Although Plaintiffs observe that these estimates were not County-wide estimates, they do not show that this difference is meaningful in any way. *See id.* Nor does it matter that Dr. Alexander used "*many* sources of data" in addition to the NSDUH data in his prior work; that simply highlights that he lacked a good reason to limit the sources of data he relied upon in this case. *See id.*

Even more to the point, the NSDUH data does not, as Plaintiffs contend, "dramatically underestimate[]" the OUD population in Ohio or the Counties. *See id.* at 12–13. Although Plaintiffs note that the data does not count certain narrow categories of individuals (*e.g.*, incarcerated, homeless, and institutionalized individuals), *id.* at 13, they do not dispute that such categories constitute only about "one percent of the population," *id.* at 13 n.27 (quoting Dkt. 4455, May 16 trial tr., vol. 4, at 946:22–25, 947:3–5). This 1% undercount at best justifies principled adjustments in using the NSDUH data, not the rejection of the data altogether. And a principled adjustment would need to be small, given that Medicaid—not the Counties—likely would cover the vast majority of OUD treatment for these particular populations. *See*, *e.g.*, Dkt. 4455, May 16 trial tr., vol. 4 at 759:5–10 (Medicaid covered 85–90% of costs of Trumbull County opioid-related procedures or services).

In a similar vein, Plaintiffs erroneously invoke a 2020 article finding that the NSDUH survey "underestimates the number of frequent heroin users … by at least three-quarters." Dkt. 4513 at 13–14. That, of course, is not the same as finding that *the OUD population* is underestimated by three-quarters. And Plaintiffs did not even attempt to quantify what effect any undercount of frequent heroin users would have here—likely because any principled method of doing so would not meaningfully change any expert's bottom line in this case. In any event, regardless of the potential for an undercount, the NSDUH data still remains widely accepted and far superior to the alternative presented by Dr. Keyes, which was the product of her erroneous formula, *see supra* at 10–13.

Furthermore, no evidence supports Plaintiffs' speculation that the NSDUH data is skewed by "the [un]willingness of interview participants to admit to the government that they are misusing or addicted to prescription opioids, heroin, or fentanyl." *See* Dkt. 4513 at 13. The survey addresses this concern through "extensive procedures" to "assur[e] very strict confidentiality to respondents." Dkt. 4455, May 16 trial tr., vol. 4, at 944:4–945:12. For instance, the survey limits the availability of information connected to particular areas, which "prevent[s] people from being able to back out the identity of any of the respondents." *Id.* at 944:7–12. The survey also allows respondents to answer sensitive questions through a computerized self-interviewing process that ensures anonymity. *Id.* at 944:13–945:1. In contrast to these undisputed facts, Plaintiffs identify no evidence that potential OUD participants have declined to participate in the survey due to concerns about confidentiality.

In short, Plaintiffs do not and cannot offer any justification for refusing to incorporate the NSDUH data into their estimates of OUD populations.

**2. *Historical treatment data.*** Plaintiffs' experts also erred in failing to use historical treatment data to project future treatment populations or costs, even though the data was readily available and provided non-speculative, County-specific evidence of the measures necessary to abate the nuisance found by the jury. *See* Dkt. 4511 at 16–17. Plaintiffs' after-the-fact rehabilitation efforts fail to justify their experts' misguided approach.

Plaintiffs start off on the wrong foot by contending that historical treatment data is "not … reliable" because it "does not account for the many individuals with OUD in the Counties who have not yet sought treatment." *See* Dkt. 4513 at 8 & n.16. The testimony they cite in support of that statement says nothing of the sort; it merely indicates that historical treatment data should not be used to estimate *overall OUD populations in the Counties*.[3] But the current *treatment* population in the Counties is known, and it cannot reasonably be said that actual, real world data is not a fair starting point for empirical analyses of likely future treatment needs—the critical inquiry here. *See, e.g.*, *Tharo Sys., Inc. v. Cab Produkttechnik GMBH & Co. KG*, 196 F. App'x 366, 376 (6th Cir. 2006) (finding that an expert's estimates using historical data was reliable); *Netjets Aviation, Inc. v. U.S. Dep't of Agric.*, No. 20-cv-4464, 2021 WL 3603323, at *4 (S.D. Ohio Aug. 13, 2021) (describing a governmental agency's process of "estimat[ing]" future payments "using historical data and trends"). Indeed, none of Plaintiffs' experts questioned the use of historical treatment data to estimate the future treatment populations or costs that the Counties are likely to encounter.

---

[3] *See* Dkt. 4438, May 10 trial tr., vol. 1, at 106:23–107:8 (Dr. Keyes declining to use historical treatment data for the "OUD estimate"); *id.* at 108:20–109:5 (Dr. Keyes declining to use historical treatment data to estimate "a population of people with OUD"); *id.* at 147:17–148:2, 148:3–13 (similar); Dkt. 4446, May 11 trial tr., vol. 2, at 320:13–18 (Dr. Young declining to use historical treatment data to estimate "the number of people … suffering from opioid use disorder"); *id.* at 464:3–5, 464:21–24 (Dr. Alexander declining to use historical treatment data to estimate the "population with opioid use disorder").

Moreover, even if Plaintiffs are correct that some increase over the historical treatment data is warranted because Plaintiffs' proposed abatement interventions would "increase[e] the treatment population over time," Dkt. 4513 at 8—a speculative assumption—that cannot justify departing from the historical data in Year 1. Yet Plaintiff's estimates assume a Year 1 treatment-slot rate of 40% (and imply a treatment rate of over *80%*),[4] when the undisputed historical rates are 20–30%. *See* Dkt. 4446, May 11 trial tr., vol. 2, at 500:16–24. Regardless of any increases in treatment that may occur over time, Plaintiffs fail to explain this disregard of historical data in Year 1.

Finally, Plaintiffs discount historical treatment data on the ground that treatment in the Counties "has historically been underfunded and limited in capacity." Dkt. 4513 at 8 & n.16. But as noted, the record evidence does not support that claim: neither Dr. Young nor Dr. Alexander testified that treatment providers or the Counties have historically lacked funding or capacity needed for OUD treatment. *See supra* at 6–7. Far from supporting Plaintiffs, the evidence confirms that treatment in the Counties *has not* been historically inadequate. *See id.* Plaintiffs ultimately provide no basis for their refusal to use historical treatment data to project treatment populations and costs.

---

[4] Dr. Alexander explained that his 40% treatment-slot rate reflected the number of treatment slots needed, not the number of individuals with OUD who will receive treatment. Dkt. 4447, May 12 trial tr., vol. 3, at 576:8–19; 580:14–581:2. Dr. Alexander acknowledged that more than one individual could occupy each treatment slot and admitted that if, for instance, two individuals occupied each slot, 80% of the OUD population would receive treatment in Year 1 under his projections. *Id.* at 576:3–6, 577:1–18. This means that his projected treatment rate *is* at least 80% because, as Dr. Kessler testified, at least two individuals *are* likely to occupy each slot based on the average OUD treatment duration from TEDS treatment data, which shows that the average treatment duration for all treatment settings is less than half a year. *See* Dkt. 4455, May 16 trial tr., vol. 4, at 965:4–966:9.

In sum, due to their experts' significant errors, Plaintiffs' abatement proposals rest on speculative and unfounded evidence. The Court should not award the requested relief. *See Oberhaus v. Alexander*, 274 N.E.2d 771, 772 (Ohio Ct. App. 1971).

### C. The Court Should Exclude from Any Award Amounts That Will Not Be Paid by Plaintiffs.

As Defendants have explained, appropriate abatement cannot include payment to Plaintiffs for costs that will be incurred by third parties instead of by Plaintiffs themselves. *See* Dkt. 4511 at 26–31. In response, Plaintiffs argue that Defendants bear the burden "to prove that the abatement award should be reduced by collateral source payments." *See* Dkt. 4513 at 33–35. Plaintiffs are mistaken for four reasons.

*First*, Plaintiffs ignore the principle that the collateral-source rule applies only in cases of damages, not in equity. *See* Dkt. 4511 at 29–30 (collecting authorities). When it comes to the remedy of equitable abatement, in particular, a monetary award to Plaintiffs can be justified only if it pays the costs that Plaintiffs actually have incurred or will incur in abating the nuisance. To the extent that opioid-related costs will be borne by third parties—for example, to the extent that Medicaid or other sources will pay for treating individuals with OUD—it would be inequitable to require Defendants to pay *Plaintiffs* for those costs. That would be a pure windfall, contrary to "[t]he basic legal principle . . . that a plaintiff should be made whole for *his injuries*," not for others' injuries, and "should not receive a windfall." *In re Foote Mem'l Hosp./Patient Care Info. Sys. Litig.*, 25 F.3d 406, 410 (6th Cir. 1994) (emphasis added).

*Second*, even when it applies, the collateral-source rule applies only *after* the plaintiff has proved that he or she actually incurred an injury for which money is "otherwise recoverable." *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1059–60 (Ill. 2020) (citation omitted); *see MCI Worldcom Network Servs., Inc. v. W.M. Brode Co.*, 413 F. Supp. 2d 868, 871 (N.D. Ohio 2005)

(money may be awarded only for a plaintiff's "actual loss"). Here, with respect to future payments that Plaintiffs themselves will not have to pay, Plaintiffs have incurred no loss and no injury in the first place—there is nothing for them to "recover" from Defendants. The collateral-source rule thus has nothing to say about those payments.

*Third*, even supposing that this is a legal damages claim where the common-law collateral source rule applied, it would still be appropriate for this Court to take third-party payments into account. The common-law collateral source rule no longer bars the admission of "collateral source" payments in Ohio: "[Ohio's] General Assembly has expressly established that evidence of collateral benefits is admissible." *Jaques v. Manton*, 928 N.E.2d 434, 437–38 (Ohio 2010). Plaintiffs ignore this statute, not even citing it, Ohio Rev. Code § 2315.20, much less arguing that they can meet any of its narrow exceptions (none of which applies here). *See* Dkt. 4511 at 30–31.

*Fourth*, to the extent Plaintiffs argue that third-party payments are speculative, they are wrong. Plaintiffs cannot seriously deny that Medicaid and other forms of state and federal assistance will continue to exist and will cover a significant portion of the costs of OUD treatment for the foreseeable future. Nor did they offer any evidence to contradict the evidence Defendants presented regarding the substantial percentages of costs that these and other third-party sources typically cover. Plaintiffs fault Defendants for using historical data, but using historical data to estimate going-forward costs is common and reasonable. *See supra* at 18. Indeed, Plaintiffs have not explained, and cannot explain, how concrete, historical costs that actually occurred in the real world are *more* speculative than the abstract estimates upon estimates and assumptions upon assumptions that underlie their entire abatement plan.

## II. THE AWARD MUST BE APPORTIONED AMONG DEFENDANTS AND OTHER TORTFEASORS

Plaintiffs cannot explain why it would be appropriate to foist the entire cost of the opioid crisis on three pharmacies with a small market share in the Counties and an even smaller role in contributing to the problem. Their approach contravenes Ohio law (which Plaintiffs do not bother to cite in their apportionment section); it gets the facts wrong; and it exacerbates the constitutional problems that would flow from forcing just three pharmacies to pay for *all* opioid-related harms (including those the jury did not find, Plaintiffs will not incur, and Defendants did not cause).

### A. Plaintiffs Ignore the Restatement and Ohio Law, Both of Which Establish That Any Award Must Be Apportioned.

Plaintiffs cannot dispute that Ohio public nuisance law requires several liability, not joint liability, when a defendant acts "separately and independently of the others." Dkt. 4511 at 35 (collecting cases). Nor can Plaintiffs dispute that Ohio courts have adopted the Restatement, which says that apportionment is generally appropriate in nuisance cases, Restatement (Second) of Torts § 840E cmt. b (1979), and that joint liability is impermissible when there are a large "number of actors, each of whom contributes a relatively small and insignificant part to the total harm," *id*. § 433B cmt. e (1965); *see also Pang v. Minch*, 559 N.E.2d 1313 (Ohio 1990) (adopting Restatement approach).

Plaintiffs have virtually nothing to say about these points, despite Defendants having raised them well before the Phase II trial even began. *See* Dkt. 4299 at 13–17. Instead, Plaintiffs' only argument is that once the jury finds a defendant was a "substantial factor" in causing a nuisance, several liability is never appropriate (at least not in small percentages). Dkt. 4513 at 27; *see id.* at 32 n.71. But Defendants have already refuted this argument, including by pointing out this Court's earlier ruling that a pharmacy could be a "substantial factor" in causing the so-called opioid epidemic in Lake and Trumbull Counties even if its percentage of responsibility were "only

0.03%." *See* Dkt. 4511 at 43–44 (citation omitted). Holding a pharmacy jointly liable for remedying all opioid-related harms in these two counties based on such a small percentage of responsibility has no possible basis in law, logic, or equity.

This leaves Plaintiffs with no arguments to refute the case law and Restatement providing that several liability applies in this context. The Court should follow the law and award several liability only.

**B.      Plaintiffs' Factual Counterarguments on Apportionment Do Not Persuade.**

Even if Defendants had the legal burden to show a reasonable basis for apportionment, which they do not, Defendants would meet it: Their experts showed "reasonable" methods of apportionment. Plaintiffs' attacks on these experts miss the mark.

To begin, Plaintiffs are wrong to say that the Court should categorically reject the defense experts' apportionment methodologies because they are not "peer-reviewed" and were "prepared for litigation." Dkt. 4513 at 29–30. For one thing, if case-specific expert reports were somehow forbidden, then the Court would likewise have to throw out all of Plaintiffs' expert reports, along with their entire made-for-litigation abatement plan. In reality, the question is not whether an expert's testimony was prepared for trial or peer reviewed, but whether the expert's methods were reliable. Here the defense experts' methods *were* reliable. Plaintiffs offer no reason why Dr. Chandra's apportionment method and his straightforward math were unreliable. And Dr. Kessler, for his part, repeatedly testified that using regression models to isolate the portion of harm attributable to specific conduct (such as prescription opioid shipments) is a well-established economic method of apportionment. Dkt. 4455, May 16 trial tr., vol. 4, at 915:23–916:7; 987:9– 12. Plaintiffs do not and cannot dispute that point. The fact that no one has previously used regression to apportion abatement costs for these two specific counties to these three specific

23

pharmacy defendants does not mean that this method is unreliable; it just means that it has not yet been applied in this particular lawsuit.

Next, Plaintiffs point out that Dr. Kessler's "model apportioned abatement costs based only on the portion of opioid-related mortality he estimated to be associated with prescription opioid shipments." Dkt. 4513 at 28. That is true, but entirely proper. Dr. Kessler testified that he used mortality as a proxy for opioid-related harm in calculating the proportion of overall opioid harm (including non-mortality harm) attributable to the pharmacy defendants; so his method apportioned total opioid-related harm and was not limited to mortality-related harm. The testimony during the liability phase concerned red-flagged prescriptions that Plaintiffs allege should not have been filled (without additional diligence) by Defendants' pharmacies in the Counties. Dr. Kessler's model assumes that all of those prescriptions should not have been dispensed (despite Plaintiffs' lack of evidence on this point) and determines how opioid-related mortality would have changed in that counterfactual world.

After that, Plaintiffs broadly insist that Dr. Kessler "relied on inappropriate assumptions and utilized a large number of statistically insignificant variables." *Id.* at 29. Here, Plaintiffs display a fundamental misunderstanding of Dr. Kessler's regression—and regression analysis more generally. The purpose of running the regression was to identify whether prescription opioid shipments have a statistically significant effect on prescription and illicit opioid-related mortality. The inclusion of control variables helps isolate the effect of the independent variables and is a standard part of the regression process. The model informs the Court on whether those control variables had a statistically significant effect on opioid-related mortality or not, but Dr. Kessler did not then go on to "utilize" the statistically insignificant variables to reduce the effect of shipments on mortality. In other words, he tested the potential variables to determine whether they

24

*should* be factored into the model. Indeed, the only time Dr. Kessler used a statistically insignificant variable ran to Plaintiffs' favor: He charged the pharmacy defendants with the effect of prescription opioid shipments on illicit opioid-related mortality, even though there was a statistically insignificant relationship between the two.

Relatedly, Plaintiffs argue that Dr. Kessler "does not calculate the percentages of the cost attributable to each purported non-Defendant contributor to the nuisance." *Id.* at 29. But there is no reason why Dr. Kessler would have needed to calculate percentages attributable to *non-Defendant* contributors. His task—like the Court's—was to determine what portion of harm is attributable to the three pharmacy defendants. Dr. Kessler could have sought to analyze how the remaining harm could be apportioned among other actors, but, of course, this trial was only about the responsibilities of these defendants.

Plaintiffs argue that "there are limitations on using multiple linear regression to formulate policy recommendations." *Id.* at 29. But this single-sentence assertion contains no substance. The extent of the testimony Plaintiffs cite here (*id.* at 29 n.60) is that Dr. Kessler is "familiar with the idea that there are limitations on multiple linear regressions in formulating policy recommendations," that "some applications of MLR techniques are misleading," and that there are judgment calls involved in designing any regression model. None of these broad and obvious points supports rejecting Dr. Kessler's particular regression, at least without any specific testimony to suggest that it (as opposed to other possible regression analyses) is not reliable for these purposes. Plaintiffs cannot and do not attack Dr. Kessler's fundamental expertise at designing regression models for the specific purpose here—isolating the proportionate responsibility of individual parties.

Plaintiffs also briefly attack "Dr. Chandra's methodology, and his opinions related to same," but the only unique arguments Plaintiffs make as to Dr. Chandra are that (1) he "used an allocation method meant to apply when multiple actors act simultaneously, despite the evidence establishing they acted sequentially in this case"; and (2) he "conceded his methodology is not an appropriate way of determining the culpability of other parties." *Id.* at 30–31. Neither argument has merit.

As to the first, Dr. Chandra's use of the Shipley model (including using the simultaneous-actors scenario) is the most appropriate application under the circumstances in this case. Dkt. 4460, May 17 trial tr., vol. 5, at 1301:15–1302:2. This was, in part, to simplify and streamline the apportionment process—and was designed to be conservative. *Id.* at 1248:15–1249:12. In a scenario with sequential actors, those earlier in the chain (*e.g.*, FDA, manufacturers, prescribers) would be assigned *greater* responsibility than those later in the chain, such as pharmacies. Had Dr. Chandra applied the sequential method as Plaintiffs appear to desire, it would have *decreased* the ultimate shares of each of the three Defendants. *Id.* at 1249:13–24; 1273:21–1274:7; 1284:6–14; 1287:15–22; 1300:13–1301:14.

Plaintiffs' second point—that Dr. Chandra "conceded his methodology is not an appropriate way of determining the culpability of other parties," Dkt. 4513 at 31—does not help them. As Dr. Chandra's testimony makes clear, his methodology does not even *attempt* to determine culpability for Defendants or otherwise. It need not do so to be reliable or helpful to the Court at this stage. The question before the Court is not whether Dr. Chandra, who testified that he is "not making statements about culpability," can independently establish the culpability of various actors, including the three defendants. Rather, the question now is whether Dr. Chandra can reliably apportion harm (and therefore costs) among those actors. As to that question, Dr.

Chandra repeatedly testified that his methodology was both reliable and the most appropriate under the circumstances to apportion harm to Defendants and to non-defendant third parties. In short, that Dr. Chandra did not offer a *liability* opinion does not make his *apportionment* opinion unreliable.

### C.     Plaintiffs' Brief Only Emphasizes the Constitutional Problems With Their Request.

Plaintiffs do not address the due-process or excessive-fines problems with the award they seek. *See* Dkt. 4511 at 44–47 (describing these problems). And Plaintiffs' other arguments only emphasize the problems. They ask for hundreds of millions of dollars to "reduce … opioid-related harms," Dkt. 4513 at 19 n.39, but that is not remedial, because the Counties are seeking money both for things they will never have to pay for and for a "nuisance" the jury did not find. This would represent a windfall for the Counties, and a windfall is "clearly a penalty." *Triangle Props., Inc. v. Homewood Corp.*, 3 N.E.3d 241, 255 (Ohio Ct. App. 2013); *see Austin v. United States*, 509 U.S. 602, 609–10 (1993). The relief Plaintiffs request would also be "grossly excessive" compared to the misconduct the jury actually found and compared to Plaintiffs' proven out-of-pocket costs, violating the Constitution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416–17 (2003). Indeed, if Plaintiffs get their way, they will not even "be required to forfeit the unspent amounts (or return them to Defendants)." Dkt. 4513 at 26. At that point, the only way to interpret the award would be punishment—not wholly remedial and proportionate abatement as the Constitution requires.

## III.    PLAINTIFFS' AWARD MUST BE GOVERNED BY AN ABATEMENT PLAN.

As to the mechanics of any abatement relief the Court may grant, Plaintiffs' proposed supervision measures would transform what should be an award of carefully crafted relief into a

slush fund that lacks adequate oversight and diverts significant sums to Plaintiffs' attorneys. The Court should reject Plaintiffs' proposals.

### A.  Defendants Should Not Be Required To Deposit All Abatement Funds Into a Dedicated Account at the Beginning of the Abatement Period.

Plaintiffs urge the Court to require Defendants to deposit "the entirety" of the abatement funds into a dedicated account "at the beginning of the abatement period." Dkt. 4513 at 23–24. If Plaintiffs obtain the full award they seek, this would require Defendants to immediately deposit more than $3 billion dollars "up front"—even though under Dr. Alexander's plan much of that money would not be spent until the mid- to late-2030s—and would result in a massive windfall through interest earnings until then. *Id.* There is no basis for this extraordinary request. Plaintiffs identify no case requiring an abatement account to be immediately and completely funded, let alone a case requiring *15 years* of upfront funding. Instead, Plaintiffs merely cite one case observing that a defendant may be required to "finance" a medical monitoring program through payments at unspecified intervals. *Id.* at 23 n.49 (quoting *Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D. Ohio 1992)). That case never even remotely suggests that such financing must be immediate and complete, and if anything, "financing" connotes partial payments over time rather than a lump-sum deposit on Day 1. *See Day*, 144 F.R.D. at 336. Because Plaintiffs have identified no supporting authority, they have failed to carry their burden and their request should be denied. *See, e.g.*, *Ackerman Bros. Farms, LLC*, *v. U.S. Dep't of Agric.*, No. 17-cv-11779, 2021 WL 6133910, at *3 (E.D. Mich. Dec. 29, 2021) (denying request for relief because the plaintiffs failed to identify a case granting similar relief and explaining that "the lack of any authority supporting the[] request suggests that it is neither necessary nor appropriate").[5]

---

[5] Plaintiffs cannot salvage their request by suggesting that there is a "possibility" that Defendants might go bankrupt at some point "within the next fifteen years." Dkt. 4513 at 24–25. Plaintiffs again identify no supporting case law, nor any evidence establishing that Defendants'

**B.      Plaintiffs Are Not Entitled to "Flexibility" and "Discretion" in Their Use of the Abatement Funds.**

The Court also should reject Plaintiffs' various requests for "flexibility" and "discretion" in their use of any abatement funds. Dkt. 4513 at 25. To qualify as abatement relief, the funds must be used in accord with an abatement plan. Otherwise, the award will impermissibly be used to pay for tangentially opioid-related expenses that loosely fall within the categories in Dr. Alexander's abatement plan. The abatement funds cannot be used to pay attorneys, fund expenses not outlined in the abatement plan, or be re-allocated from what the final abatement plan orders, much less "roll over" funds from year to year indefinitely.

**1.      Plaintiffs Should Not Be Permitted To Use Abatement Funds To Pay Attorneys' Fees.**

For the first time in this case and with no support, Plaintiffs now ask permission to use a portion of their abatement award "to pay their attorneys' fees and expenses associated with bringing this litigation"—a substantial expenditure from the abatement fund that Plaintiffs acknowledge would go to their lawyers, not their communities. Dkt. 4513 at 25; *see id.* at 25–26 ("Plaintiffs agree that, *after* deducting attorneys' fees and expenses, any funds they receive must only be used for abatement purposes." (emphasis added)). That request contradicts the purpose of an abatement fund and violates the deeply engrained principle in the American legal system that parties bear their own attorneys' fees. While the Counties might appropriately pay a contingency fee from a legal *damages* award, which would be the Counties' money to spend as they chose, the same is not true of *abatement*, which is a particularized form of equitable relief that, as Judge Faber

---

bankruptcy is likely. *See id.* Moreover, even if Defendants *were* to go bankrupt, Plaintiffs' approach would unjustifiably punish other municipalities and litigants that were not prioritized for bellwether litigation by drastically reducing any funds available to them in bankruptcy—hardly an equitable or "just[]" result. *See id.* at 19 (quoting *Carter-Jones Lumber Co.*, 166 F.3d at 846).

recently emphasized in Track 2, can be used only to stop nuisance-causing activity or remove nuisance-causing material—not to fund measures that concededly do not serve "abatement purposes." *Id.* at 25–26; *see City of Huntington* at 182–83. In other words, Plaintiffs would only be entitled to the requested $3 billion abatement fund if they prove that the whole $3 billion is necessary to abate the public nuisance. If they so demonstrate, they could not then raid a substantial percentage of the abatement fund ($1 billion, if a standard 33% contingency fee is used) to pay their attorneys without conceding that either (1) they do not intend to completely abate the nuisance (because they would be spending only $2 billion on abatement rather than the $3 billion the Court ruled was necessary) or (2) they in fact believe that the nuisance can be abated with only 66% of the money they ask the Court to award. Neither concession can be squared with the premise of the abatement award.

Because Plaintiffs seek relief under a theory of abatement as opposed to damages, they will have to pay their attorneys from some fund other than the abatement fund. Forcing Defendants to pay them would be inconsistent with centuries of precedent. The "basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (citation omitted). The roots of this rule "stretch back to the 18th Century, and courts should 'not deviate from the American Rule absent explicit statutory authority.'" *State v. United States*, 986 F.3d 618, 631 (6th Cir. 2021) (quoting *Baker Botts*, 576 U.S. at 126). Plaintiffs cite no statute that would allow them to recover attorneys' fees and expenses from Defendants in this case, and Defendants are aware of none.

Plaintiffs argue that the Court's Ongoing Common Benefit Order somehow overrules these bedrock legal principles. (Dkt. 4428.) Plaintiffs are wrong. The common fund doctrine requires *plaintiffs* to pay portions of settlements or awards to attorneys if they would not have collected such payments but for the attorney's efforts. It does not require the defendant to pay that sum or otherwise change the rule against fee-shifting absent statutory authorization: "Because the common fund doctrine 'rests squarely on the principle of avoiding unjust enrichment,' attorney fees awarded under this doctrine are not assessed directly against the losing party (fee shifting)." *Lealao v. Beneficial Cal., Inc.*, 82 Cal. App. 4th 19, 27 (2000) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). Rather, the rule requires "the beneficiaries of the litigation, *not the defendant*, bear this cost (fee spreading)." *Id.* (emphasis added). Ordering portions of settlements or monetary damages to be put into a common benefit fund to pay the plaintiffs' attorneys participating in this MDL does not speak to the question presented here: whether an abatement award can not only take the form of money (contrary to traditional abatement, which takes the form of injunctive relief), but be used, in substantial part, to pay attorneys instead of to abate a nuisance. The answer to that question is plainly "no."

Here Plaintiffs ask to pay attorneys' fees from an award that the Court and Plaintiffs have repeatedly emphasized will only be for abatement, not monetary damages. *See, e.g.*, Dkt. 2175 at 8 ("[U]nder their public nuisance claim, Plaintiffs do not seek damages for themselves but rather to have the Court create and supervise a trust . . . that would be used to abate the nuisance."); Dkt. 2519 at 5 ("[T]he Court will keep in mind the . . . critical distinction between an award of *past* damages and an award of the *future* costs of abatement."). The sole purpose of such an abatement award must be "to eliminate the hazard that is causing prospective harm to the plaintiff." *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 132 (2017); *see City of Huntington* at 180–

82. Plaintiffs cannot have it both ways. Having reaffirmed throughout this case that they only seek funds supposedly necessary to abate the nuisance found by the jury, Plaintiffs cannot now in the final stages of this trial treat an abatement fund as legal damages that they can spend as they desire, whether to pay attorneys' fees or otherwise.

### 2. Plaintiffs Should Not Be Permitted To Deviate From the Abatement Plan.

Plaintiffs also suggest that the Court should authorize them to deviate from the abatement plan because changing circumstances "may require Plaintiffs to make adjustments regarding how the funds are utilized for abatement purposes." Dkt. 4513 at 26; *see also id.* (proposing that Plaintiffs may "deviat[e] from the expected use of funds set forth in [their] certification" so long as they provide an "explanation" subject to a court hearing). By conceding that "expected use[s]" of funds under the plan ultimately may not be appropriate, Plaintiffs confirm that the plan is far too speculative and that any relief should not extend beyond one year. Further, authorization to "deviate" from the plan threatens to allow Plaintiffs to expend abatement funds on measures that have not been proven necessary to abatement, in contravention of the entire premise of the award.

Indeed, allowing Plaintiffs to spend abatement funds however they wish to address the opioid crisis would violate longstanding equitable principles. As this Court has emphasized, abatement and damages are distinct remedies. *See In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804, 2019 WL 4043938, at *1 (N.D. Ohio Aug. 26, 2019). While a damages award generally allows for "flexible" spending of the funds awarded, *see* Dkt. 4513 at 25, the Court cannot, consistent with the Seventh Amendment, make such an award now. Instead, it is limited to an abatement plan—an injunctive remedy that must be set out in definite and final terms that the parties must follow. *See* Dkt. 4511 at 21–22. Indeed, the abatement plan "must spell out the details of compliance in clear, specific and unambiguous terms so that [each] person will readily know

exactly what duties or obligations are imposed upon him." *Id.* at 21 (quoting *Collette v. Collette*, No. 20423, 2001 WL 986209, at *3 (Ohio Ct. App. Aug. 22, 2001)). Allowing unidentified "adjustments" to the abatement plan would conflict with these principles and, at this stage of the proceedings, the Constitution. Plaintiffs are not eligible for a damages award they can use flexibly to address the opioid crisis, whether awarded as damages or under the guise of abatement. *See City of Huntington* at 181–83 ("compensation … for 'the cost[s] of eliminating the nuisance effects'" or "addressing drug use and addiction" and their "downstream harms" are "not properly understood as in the nature of abatement" (citation omitted)).

### 3. Plaintiffs Should Not Be Permitted To Internally Allocate the Abatement Funds.

Plaintiffs also ask for permission to "internally allocate the abatement funds among the various abatement interventions." Dkt. 4513 at 25. The Court should reject this request as well.

Internal re-allocation is fundamentally inconsistent with the nature of abatement relief and Plaintiffs' insistence that their abatement plan is non-speculative. If the Court awards abatement relief, it will be based on the determination that Plaintiffs have carried their burden of non-speculatively proving that certain programs—projected to cost certain sums—are necessary to abate the public nuisance the jury found. *See supra* at 4; *see also* Dkt. 4513 at 2–3, 19 (stating that relief depends on whether Plaintiffs show that the requested "interventions and measures" are "reasonable and necessary" and "specifically tailored" to abatement). Permitting Plaintiffs to re-allocate those sums would undermine the whole premise of the Court-ordered award by showing that the originally allocated measure was not in fact necessary or, at minimum, that the measure's projected cost was incorrect. For instance, if the Court awards relief upon finding that certain "safe storage," "drug disposal," and "treatment" measure are necessary but then permits Plaintiffs to re-allocate "safe storage" funds to "treatment" measures, the premise of the "safe storage" award

dissipates and any remaining funds that were not necessary for the measure should be returned to Defendants.

Internal re-allocation is particularly problematic if the Court awards some relief that is contingent on certain benchmarks. *See* Dkt. 4513 at 25 n.54. If a benchmark is reached, that shows there is no need to spend any further sums allocated to that benchmark. It does not show that diverting those sums to other, already funded measures is necessary. And if a benchmark has not been reached, the sums allocated to that benchmark should be spent as contemplated in the Court-ordered abatement plan, not "re-allocated" to other measures. Indeed, if Plaintiffs are allowed to unilaterally re-allocate money away from the programs that would meet the benchmark, it could create perverse incentives to maximize payment over real abatement progress. Plaintiffs should not be permitted to unilaterally re-allocate any abatement funds.

Relatedly, internal re-allocation among abatement programs would render the plan insufficiently specific. *See supra* III.B.2. If the plan allows internal re-allocation, it necessarily has not identified its terms clearly and specifically because those terms are subject to modification at Plaintiffs' election. *See Collette*, 2001 WL 986209, at *3.

### 4. Plaintiffs Should Not Be Granted Indefinite and Unlimited "Roll Over."

Again tacitly admitting that their plan is completely speculative, Plaintiffs propose to "roll over" unspent funds from year to year. *See* Dkt. 4513 at 26–27. The Court should reject this request as well.

To begin, a "roll over" would be possible only if the awarded relief extends beyond one year. As Defendants have explained, the Court should limit any relief to one year, as did the only court to have awarded abatement in an opioids case to date (before being reversed and having the

entire abatement award thrown out). *See* Dkt. 4511 at 22–24. If the Court does so, it need not address whether funds may roll over to following years.

If the Court grants relief that extends beyond one year, it still should not authorize indefinite and unlimited rollover because that would impermissibly enable Plaintiffs to obtain a windfall from presenting a speculative and inflated abatement plan. *See id.* at 30 (collecting cases supporting that windfalls are barred by equitable principles). If the Counties actually use the funds they seek in their abatement plan to abate the nuisance the jury found, and if the funds really are proportionate to the Counties' actual need, the Counties will use the funds in the time frame predicted by the plan. If not, then Plaintiffs' requested relief for that year was either unnecessary or less expensive than Plaintiffs predicted. In either event, the remainder should revert to Defendants.

Plaintiffs assert that they need to be able to roll over unspent funds in order to "create[]" "infrastructure" under their abatement plans. Dkt. 4513 at 26–27. But Plaintiffs' plans do not call for them to build treatment infrastructure; the plans instead reimburse contractors for services. And those contractors should not need to build additional infrastructure. They have at least 10% unused capacity. *See supra* at 6–7.

### C. Plaintiffs' Proposal Fails To Include Adequate Safeguards and Oversight.

Plaintiffs' proposal is not only substantively inappropriate, it also lacks adequate safeguards and oversight. Plaintiffs propose a twice-yearly oversight process in which Plaintiffs would estimate their "expect[ed]" expenditures at the beginning of each year and then certify their "actual[]" expenditures to the Court or administrator at the end of the year, with an "explanation for any deviation from the expected use of the funds." Dkt. 4513 at 26. The Court or administrator accordingly would not review the expenditures and resolve disagreements over them until *after* the expenditures have already been made. *Id.*

First, this proposal is inappropriate because any abatement plan must specify how funds are to be spent, *see supra* at 32–33, and Plaintiffs may not "deviat[e]" from that plan, whether in estimating or making expenditures, Dkt. 4513 at 26. As a result, there is no justification for an oversight process that allows Plaintiffs to depart from the uses of abatement funds specified in the Court-ordered abatement plan.

Additionally, Plaintiffs' proposal does not come close to adequately supervising expenditures. As Defendants have explained, Plaintiffs' abatement plan is a novel experiment of a massive scale that presents serious risks of fraud, waste, and abuse. *See* Dkt. 4511 at 31–33. Yet Plaintiffs merely propose a limited twice-yearly oversight process in which the Court or administrator and Defendants essentially must take a county official at his or her word that the county spent funds as the plan requires. Review and approval by the Court or administrator is post hoc and based mostly on the Counties' say-so. Worse still, the proposal lacks any procedure by which misspent funds can be recovered. *See* Dkt. 4513 at 26. This is a recipe for egregious misuse of the large influx of cash Plaintiffs seek. After-the-fact review cannot be justified by Plaintiffs' claim that it "takes time for [them] to create and approve their County budgets for a given year." *Id.* at 26 n.56. Plaintiffs could seek final approval of expenditures after a budget is finalized but before the expenditures are made. Plaintiffs' proposed oversight measures are wholly inadequate.

### D.     The Court Should Institute the Oversight Measures Proposed by Defendants.

Rather than relying on Plaintiffs' inadequate proposal, if the Court awards any monetary sum, it should institute the equitable oversight measures Defendants have proposed. In particular, the Court should (1) require all expenditures to be approved—and disagreements resolved—before funds are spent; (2) ensure that treatment providers paid by the abatement plan are properly vetted; (3) require treatment providers to submit requests for payment to Medicaid or private insurance, where applicable, before drawing from any abatement fund; (4) award abatement in a form that

allows Defendants or an administrator to audit the expenditures against an approved and detailed abatement plan outlining what expenditures are permissible; and (5) appoint a third-party administrator to oversee the abatement plan. *See* Dkt. 4511 at 31–33. These measures, at minimum, are necessary to mitigate the significant risks of abuse present here.

## IV. PLAINTIFFS' PLAN IS SUSCEPTIBLE TO FURTHER ALLOCATION

Despite the Court's request to offer a realistic, compromise approach to abatement damages here, Plaintiffs have proposed a 15-year, multi-billion-dollar, joint-and-several liability plan. That is hardly a "compromise."

To the extent that the Court favors Plaintiffs' proffered compromise methodology for calculating the abatement award, however, Defendants offer their suggestion of how to use that methodology to create a more defensible abatement figure.

If the Court awarded one year of abatement relief, rather than Plaintiffs' proposed 15 years, using the compromise methodology in Plaintiffs' closing brief, it would award $53,104,338 to Lake County and $63,507,126 to Trumbull County (for a total of $116,611,465)[6] before apportionment to Defendants. *See* Ex. C, Kessler Declaration. Applying the settlement offsets, prescriber liability, and reduction for market share outlined in Defendants' brief results in an allocation as follows:

| One-Year Calculation Using Plaintiffs' OUD Population Reduction Method: |
|---|

| | |
|---|---|
| **Population-Corrected 1-Year Costs:** | $116,611,465 |
| **Less Combined County Settlements:** | $116,611,465 − $19,770,073 = $96,841,392 |
| **Less Prescribers' Responsibility:** | $\dfrac{$96,841,392}{2} = $48,420,696$ |

---

[6] This award would be more than *12 times* the amount for which the Counties settled similar claims against two other Defendants in this litigation with larger combined market share in the Counties than any of the three remaining pharmacy defendants. *See supra* at 8.

| One-Year Market Share Allocation: | | |
|---|---|---|
| **Pharmacy** | **Lake County**[7] | **Trumbull County** |
| Walgreens: | $4,415,967 | $4,880,806 |
| Walmart: | $724,495 | $800,757 |

| One-Year Red Flag Market Share Allocation: | | |
|---|---|---|
| **Pharmacy** | **Lake County** | **Trumbull County** |
| Walgreens: | $4,346,968 | $4,804,544 |
| Walmart: | $206,998 | $228,788 |

These results are similar to Options 3 and 4 from Defendants' brief.

As the Court might recall, Option 3 uses Dr. Kessler's correction methodology, but divides in half his correction to Dr. Alexander's overstatement of the number of individuals with OUD. It then reduces for settlement offsets, prescriber responsibility, and market share. The one-year final calculations for that scenario are below:

| Option 3 Market Share Appointment | | |
|---|---|---|
| **Pharmacy** | **Lake County** | **Trumbull County** |
| Walgreens: | $3,252,045 | $4,241,146 |
| Walmart: | $533,539 | $695,813 |

---

[7] In these apportionment frameworks, Defendants allocate funding between the Counties to mirror the percentages going to each County in Plaintiffs' revised 15-year calculations they included in their brief: 52.5% to Trumbull County and 47.5% to Lake County. *See* Dkt. 4513 at 22–23.

| Option 3 Red-Flag Market Share Appointment | | |
|---|---|---|
| **Pharmacy** | **Lake County** | **Trumbull County** |
| Walgreens: | $3,201,231 | $4,174,878 |
| Walmart: | $152,440 | $198,804 |

Option 4 achieves similar results. In that option, Defendants first reduced the costs of Plaintiffs' cost estimate projects by the settlement set off, then by 35%, according to Dr. Keyes' trial testimony that approximately that percentage of opioid-related mortality was not directly or indirectly attributable to prescription opioids. Dkt. 4438, May 10 trial tr., vol. 1, at 102:17–104:9; WAG Demo-32. They then reduced for prescriber responsibility and market share:

| Option 4 Market Share Allocation: | | |
|---|---|---|
| **Pharmacy** | **Lake County** | **Trumbull County** |
| Walgreens: | $3,667,585 | $4,783,071 |
| Walmart: | $601,713 | $784,723 |

| Option 4 Red-Flag Market Share Allocation: | | |
|---|---|---|
| **Pharmacy** | **Lake County** | **Trumbull County** |
| Walgreens: | $3,610,279 | $4,708,336 |
| Walmart: | $171,918 | $224,206 |

The calculation of all three options on a five-year basis is attached as Exhibit A. *See also* Ex. C (Kessler declaration setting forth basis for calculations in Exhibit 1).

## V.    PLAINTIFFS' REQUESTED INJUNCTION SHOULD BE DENIED.

The Court should deny Plaintiffs' request for injunctive relief. As explained in Defendants' closing submission, no injunctive relief is warranted. *See* Dkt. 4511 at 54–56 (explaining that an injunction regulating dispensing practice in two counties is preempted and no evidence suggests it would abate the nuisance the jury found). Plaintiffs' requested injunction takes an impermissible form, lacks support from the record, and suffers from numerous other flaws.

If the Court issues an injunction over Defendants' objections, however, it should limit the order to a definite, narrowly tailored injunction that substantially follows the form of the draft order attached as Exhibit B.[8] Defendants' draft order is derived from the CVS Florida Settlement Agreement, as directed by the Court, and includes provisions addressing the same "Red Flags" (i.e., "Trinity" prescriptions, patient distance, prescriber distance, early fills, doctor shopping, and forged or fraudulent prescriptions), directives about resolution and documentation of those "Red Flags," and additional obligations regarding drug disposal, Naloxone, training and certifications. Plaintiffs' requested injunction, however, takes an impermissible form, lacks support from the record, and suffers from numerous other flaws.

### A.    An Injunction To "Obey the Law" Is Inappropriate.

A fatal threshold defect with Plaintiffs' requested injunction is that it takes the impermissible form of an "obey the law" injunction. The injunction Plaintiffs seek would order Defendants to "comply with applicable federal and Ohio state laws, including regarding the

---

[8] After meeting with Plaintiffs' counsel as directed by the Court, the pharmacies have added additional "Red Flags" and other obligations to the draft injunctive relief order originally attached as C to Walgreens' and Walmart's closing submission. Dkt. 4511-3. Those additional obligations are reflected in the revised Order attached hereto as Exhibit B. The draft largely tracks comparable provisions of the Florida Settlement Agreement with certain modifications to clarify the language and address the difference in the parties involved (Lake and Trumbull Counties as opposed to the State of Florida).

dispensing of controlled substances." Dkt. 4513-2, § 1(E)(1); *see also id.* § XV; *id.* § IX(B)(1); Dkt. 4513 at 36 ("Accordingly, Plaintiffs ask that the Court enter the injunctive relief attached [to their closing submission] as Ex. 2 to ensure that, going forward, Defendants and their employees fully comply with their legal obligations related to the dispensing of prescription opioids.").

"Such 'obey the law' injunctions cannot be sustained." *E.E.O.C. v. Wooster Brush Co. Emps. Relief Ass'n*, 727 F.2d 566, 576 (6th Cir. 1984) (quoting *Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 897–98 (5th Cir. 1978)); *see also N.L.R.B. v. Express Publ'g Co.*, 312 U.S. 426, 435–36 (1941). Federal Rule 65(d) of Civil Procedure mandates that any injunctive order be definite in terms and narrowly tailored to redress the specific conduct proven at trial. *See* Dkt. 4511 at 56–57; *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *Aluminum Workers Int'l Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 446 (6th Cir. 1982). An "'obey the law' injunction[]" such as the one sought by Plaintiffs, in contrast, is "too general" and "overbroad." *Wooster Brush Co.*, 727 F.2d at 576 (quoting *Payne*, 565 F.2d at 898). Indeed, by ordering Defendants to comply with "applicable federal and Ohio state laws" regarding dispensing generally, Dkt. 4513-2, § 1(E)(1), the requested injunction does not adequately indicate how to determine whether Defendants are in compliance with the order. It also sweeps in activities that were not at issue in this case, let alone tied to the nuisance found by the jury. Given "the seriousness of the consequences which may flow from the violation of an injunctive order," such an "obey the law" injunction cannot stand. *Wooster Brush Co.*, 727 F.2d at 576 (quoting *Payne*, 565 F.2d at 897).

The bar on "obey the law" injunctions follows not only from the requirements of Rule 65(d) but also from the limited scope of this Court's equitable authority, which is "confined" to awarding "traditional equitable relief." *Grupo Mexicano*, 527 U.S. at 318, 322; *see also* Dkt. 4511

at 18–20. As the Seventh Circuit has explained, "[a]n obey-the-law injunction departs from the traditional equitable principle that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013).

To the extent that the requested injunctive order goes further than a general command to "obey the law" and mandates *how* to comply with the law, it is preempted by the very laws it would order Defendants to obey. By design, the federal and Ohio regulatory regimes entrust the U.S. Drug Enforcement Administration ("DEA") and the Ohio Board of Pharmacy—not Plaintiffs or any other county or municipality—with regulating controlled substances on a nationwide and statewide basis respectively. By mandating *how* to comply with federal and Ohio state laws regarding the dispensing of controlled substances, Plaintiffs' proposal would intrude on the authority of the DEA and the Board of Pharmacy. *See* Dkt. 4511 at 54–56; Dkt. 4202 at 35–36.[9]

For instance, the "Prescription Validation Process" set forth in § VIII of the requested injunction would impermissibly encroach into DEA's and the State Board of Pharmacy's regulatory domain by purporting to regulate the procedures that must be undertaken before a "prescription can be filled." Dkt. 4513-2, § VIII(B). Similarly, Section IX(B)(1) of Plaintiffs' proposed injunctions allows Plaintiffs, not the Ohio Board of Pharmacy, to decide when a prescription "fails to meet the requirements of law, *e.g.*, OH. STAT § 3719.06." Dkt. 4513 at Ex. 2, p. 8. The CSA preempts such transfer of regulatory authority. *See Gonzales v. Raich*, 545 U.S. 1, 19 (2005) (CSA covers and preempts the field of controlled substances).

---

[9] For this reason, the Florida injunction on which Plaintiffs rely is irrelevant. Unlike their requested injunction, the Florida injunction was negotiated *with the State*, and the federal scheme contemplates further state regulation of controlled substances.

**B.**      **Even if the Court Could Enjoin a Defendant To "Obey the Law," the Record Would Not Support that Relief Here.**

Even assuming the Court has authority to enjoin Defendants to "comply with applicable federal and Ohio state laws, including regarding the dispensing of controlled substances," Dkt. 4513-2, § I(E)(1), the record would not support such relief. Equitable relief must be "strictly tailored to accomplish only that which the situation specifically requires." *Aluminum Workers Int'l Union*, 696 F.2d at 446. Plaintiffs assert that "injunctive relief is necessary to prevent Defendants from continuing their wrongful dispensing conduct" and "to ensure that, going forward, Defendants and their employees fully comply with their legal obligations." Dkt. 4513 at 35–36 (capitalization altered). But the jury never found that Defendants' dispensing practices were unlawful, let alone that they continue to be.

*First*, this Court's prior rulings compel the conclusion that the jury did not find that Defendants ever engaged in *unlawful* conduct. The Court instructed the jury that it could hold a Defendant liable for creating a public nuisance if, among other elements, that Defendant engaged in *either* "unlawful conduct" *or* "intentional conduct." Dkt. 4206-1 at 19, 22; *see also, e.g.*, *Barnett v. Carr ex rel. Est. of Carr*, No. CA2000-11-219, 2001 WL 1078980, at *10–11 (Ohio Ct. App. Sept. 17, 2001). Defendants sought a directed verdict on the intentional prong, arguing that Plaintiffs had, at best, presented evidence of unlawful conduct. Dkt. 4202 at 12–15. The Court denied the motion and, over Defendants' objection, *see* Dkt. 4146-2 at 36–37, the verdict form did not ask the jury to indicate which of these alternative elements it found. *See* Dkt. 4176. Thus, the parties and the Court must assume that the jury's public nuisance verdict could have rested on a finding of intentional yet lawful conduct. The verdict therefore cannot be read to support Plaintiffs' argument that an injunction is necessary to require Defendants to comply with the law.

*Second*, Defendants' *current* dispensing practices were not at issue in the trial. Plaintiffs' theory at trial expressly focused on dispensing conduct from many years ago. To the extent that they presented evidence of current dispensing practices, Plaintiffs claimed that the changes should have been implemented earlier. *See, e.g.*, Dkt. 4000, Oct. 6, 2021 trial tr., vol. 3, at 630:25–631:15, 693:14–21; Dkt. 4153, Nov. 15, 2021 trial tr., vol. 28, at 7113:18–7114:11. As a result, the jury could not have found on this record that Defendants' current dispensing practices are problematic. While the Court's order denying Defendants' renewed motions for judgment as a matter of law stated that "the evidence at trial showed that, even as late as August of 2020, CVS's policies to ensure compliance were incomplete or inadequate," Dkt. 4295 at 22, the only evidence of unimplemented policies in 2020 was testimony about a single program for one Defendant that was on hold. *See id.* at 7 & n.7 (citing Dkt. 4090, Oct. 26, 2021 trial tr., vol. 16, at 4057:17–4058:6). And while the Court's order also referred to evidence of the quantities of prescription opioids that Defendants dispensed into the Counties from 2006 to 2018 (in Walmart's case), 2019 (in CVS's case), and 2020 (in Walgreens's case), this evidence either did not break down quantities by year or showed that quantities had in fact *substantially decreased* in recent years. *See id.* at 11 & n.22 (citing Dkt. 4046-14); *id.* at 15 & n.41 (citing Dkt. 4032, Oct. 15, 2021 trial tr., vol. 9, at 2238:16–19); *id.* at 19 & nn.59, 64 (citing Dkt. 4032, Oct. 15, 2021 trial tr., vol. 9, at 2239:19–22, 2246:12–13 and Dkt. 4046-16). Thus, Plaintiffs' requested injunction cannot be entered on the purported basis of Defendants' "continuing" conduct.

In sum, the record does not support Plaintiffs' assertion that the injunction they seek is "necessary to prevent Defendants from continuing their wrongful dispensing conduct" and "to ensure that, going forward, Defendants and their employees fully comply with their legal obligations." Dkt. 4513 at 35–36 (capitalization altered). The jury did not find that Defendants'

underlying conduct was unlawful, and Defendants' current dispensing practices were not even at issue.

### C. Plaintiffs' Requested Injunctive Relief Is Unnecessary, Unfeasible, Vague, and Overbroad.

The specific provisions of Plaintiffs' requested injunctive order are also flawed. The following examples underscore how the provisions are unnecessary, unfeasible, vague, and overbroad. In addition to the objections laid out below, Defendants incorporate the objections in Section L of CVS's responsive closing submission.

#### 1. Special Master

Plaintiffs have not even come close to establishing "exceptional" circumstances justifying a post-trial special master under Fed. R. Civ. P. 53(a)(1)(C). *Howe v. City of Akron*, 801 F.3d 718, 726, 756 (6th Cir. 2015) ("*Howe II*"). As the Court itself recognized, a monitor is neither necessary nor appropriate because the Court can oversee any suitable relief itself, and "the last thing [the Court] want[s] is some monitor … to be sort of regulating pharmacies." Dkt. 4438, May 10, 2022 trial tr., vol. 1, at 29:9–30:4.

The cases Plaintiffs cite related to the intractable problems of racial discrimination and segregation in an attempt to justify a special master are not analogous to this one. They involved "constitutional violations in public institutions." *Reed v. Cleveland Bd. of Ed.*, 607 F.2d 737, 743 (6th Cir. 1979); *see also Howe II*, 801 F.3d at 726, 756. Even for statute-based claims (unlike the common law claim at issue here), there was an "established record of resistance to prior state and federal court orders designed to end their discriminatory … practices." *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 482 (1986).[10] While Plaintiffs assert that

---

[10] Plaintiffs' reliance on *In re Peterson*, 253 U.S. 300 (1920), is even more of a distraction, given it concerned the appointment of a *pre-trial* auditor. *See id.* at 313–14.

Defendants "failed to internally monitor and enforce" their controlled substance policies, as noted above, the jury verdict does not support that argument. Indeed, there was ample evidence that Defendants' dispensing policies were effective and that they monitored to ensure policies were followed. *See, e.g.*, Dkt. 4106, Oct. 28, 2021 trial tr., vol. 18, at 4546:11–4547:11, 4562:22–4562:21; Dkt. 4109, Nov. 1, 2021 trial tr., vol. 20, at 5098:19–5099:17, 5107:10–5116:11, 5248:21–5249:15; Dkt. 4050, Oct. 19, 2021 trial tr., vol. 11, at 2833:12–2834:3, 2839:2–6, 2846:11–21, 2873:17–2875:1; Dkt. 4057, Oct. 20, 2021 trial tr., vol. 12 at 3095:20–3096:17, 3118:12–3121:24.[11]

## 2.    "Red Flags"

The "red flags" that Plaintiffs' proposed order would require Defendants to identify are even more restrictive than the made-for-litigation red flags they presented at trial. For example, one "red flag" set out in the proposed order is if "[a] Patient seeks to fill a Designated Controlled Substance prescription more than three days prior to the contemplated exhaustion date of an earlier prescription of the same Designated Controlled Substance." Dkt. 4513-2, § IX(A)(1). At trial, by contrast, Plaintiffs argued that it was a "red flag" only if the refill was sought more than *five* days early. *See* Dkt. 4005, Oct. 7, 2021 trial tr., vol. 4, at 1036:10–1037:15. What is more, the draft order's "red flag" for a patient seeking to fill prescriptions from more than three unaffiliated prescribers within a six-month period, *see* Dkt. 4513-2, § IX(A)(2), was not even among the 16 "red flags" set out in Carmen Catizone's expert report.

For other "red flags" in Plaintiffs' proposed order, the evidence contradicts that they are in fact "red flags" at all. For example, multiple experts explained that it was not particularly

---

[11] It is interesting to contrast the purported need for a monitor of Defendants' business operations with Plaintiffs' facially insufficient proposal that a twice-yearly certification process provides adequate safeguards against fraud and abuse over how $3 billion would be spent.

concerning if "[a] Patient resides more than 25 miles from the prescriber's office," *id.* at § IX(A)(4), because prescribers tend to be concentrated in hub cities like Cleveland and patients must often travel some distance for care by medical specialists. *See* Dkt. 4005, Oct. 7, 2021 trial tr., vol. 4, at 1009:17–1010:22; Dkt. 4008, Oct. 8, 2021 trial tr., vol. 5, at 1246:10–1247:7; Dkt. 4109, Nov. 1, 2021 trial tr., vol. 20, at 5124:13–5125:1–9; Dkt. 4115, Nov. 3, 2021 trial tr., vol. 22, at 5736:19–5737:3; Dkt. 4118, Nov. 4, 2021 trial tr., vol. 23, at 6118:18–6119:25. A more appropriate threshold, as stated in the draft order attached to Defendants' post-trial brief, would be 50 miles. *See* Dkt. 4511-3, § III(A)(2).

Many of the "red flags" in the proposed order are also not feasible, let alone necessary, to track. For example, Plaintiffs' order would require flagging every prescriber who "prescribes the same medication, with the same directions, for the same quantity for four or more individuals"— without any temporal limitation on these criteria and despite the fact that many specialists (*e.g.*, orthopedic surgeons) regularly prescribe similar medications in similar quantities for surgery patients. Dkt. 4513-2, § IX(C)(2); Dkt. 4107, Nov. 21, 2021 trial tr., volume 19, at 4804:12–4806:22.

### 3.    Software Programs

Plaintiffs' requested injunction would require Defendants to "integrate into their pharmacy management software tools designed to fight prescription drug abuse," Dkt. 4513-2, § X, and to "develop a program designed to specifically manage and report Designated Controlled Substance prescriptions that have been refused for fill," *id.* at § XI. Yet Plaintiffs never called their software expert Dan Malone, who had issued a report before trial, or otherwise introduced evidence on this topic to try to prove that these programs are feasible or necessary to abate the nuisance found by the jury. *See Aluminum Workers Int'l Union*, 696 F.2d at 446 (scope of equitable relief must be

47

"strictly tailored to accomplish only that which the situation specifically requires"). This proposed injunctive provision is unsupported by any evidence in the record.

### 4.    Duration

Plaintiffs' proposed injunction has a term of ten years and extends indefinitely for "good cause." Dkt. 4513-2, § II. This timeframe is unsupported and excessive. Plaintiffs have offered no reasons to justify a ten-year duration. *See* Fed. R. Civ. P. 65(d)(1)(A) (an injunctive order must "state the reasons why it issued"). Indeed, Plaintiffs' opening submission suggested that the Court should order five years of relief. *See* Dkt. 4232 at 2. Moreover, the possibility of indefinite duration contravenes the Sixth Circuit's longstanding bar on such injunctions. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 363 (6th Cir. 2022) (citing *N.L.R.B. v. Teamsters, Chauffeurs, Helpers & Taxicab Drivers, Loc. Union 327*, 419 F.2d 1282, 1283 (6th Cir. 1970)).

### 5.    Vague and Overbroad Provisions

Injunctive orders must be definite and narrowly tailored. *See* Dkt. 4511 at 56–57. The Sixth Circuit recently reiterated that "[t]he specificity provisions of Rule 65(d) are no mere technical requirements." *Union Home Mortg. Corp.*, 31 F.4th at 362 (citation omitted). "[A]n injunction must be couched in specific and unambiguous terms," the court instructed, "such that 'an ordinary person reading the court's order [is] able to ascertain from the document itself exactly what conduct is proscribed.'" *Id.* (quoting *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016)). The injunctive relief Plaintiffs seek is "impermissibly vague and overly broad" under this standard. *Id.* For example:

- Despite referring to "the Effective Date of the Order (as defined in the Order, the 'Effective Date')," Dkt. 4513-2, § I, the draft order never defines the effective date. Plaintiffs cannot operate using unclear deadlines. If the Court is to enter an injunction, it should adopt Defendants' definition of the Effective Date—90 days from the issuance

of the final mandate. Alternatively, if a stay is not issued pending appeal, the effective date of the order should be 90 days after the date of the order. *See* Dkt. 4511-3, § VIII(A) ("Effective Date" provision in Defendants' draft injunctive order).

- The requested order requires Defendants to provide copies of unspecified "objective monitoring tools and assessments" within 90 days of the "Effective Date" (whenever that is). The order does not specify what these materials are, so no "ordinary person reading the court's order" will know how to comply. *Union Home Mortg. Corp.*, 31 F.4th at 362 (citation omitted).

- The requested order defines the "Designated Controlled Substances" subject to the injunction too broadly, including "methadone," Dkt. 4513-2, § III(B), a drug used to *treat* opioid use disorder. *See also Davis v. Carter*, 452 F.3d 686, 688 n.3 (7th Cir. 2006) ("Methadone is a synthetic narcotic that is used to treat narcotic withdrawal and dependence."). Restricting access to that treatment hardly serves to abate the nuisance found by the jury; in fact, Plaintiffs' abatement plan asks Defendants to fund methadone treatment in the Counties. By contrast, Defendants' draft injunctive order appropriately defines "Designated Controlled Substances" to mean the drugs actually at issue in this lawsuit: "(a) oxycodone; (b) hydrocodone; (c) hydromorphone; (d) oxymorphone; (e) morphine; and (f) fentanyl." Dkt. 4511-3, § II(B).

- In addition to the problems with the "Red Flags" provisions identified above, several of those provisions are impermissibly vague. For instance, the requested order requires Defendants to "identify . . . 'Patient Red Flags' identified by the DEA and the State, including *but not limited to*" six enumerated flags. Dkt. 4513, § IX(A) (emphasis added). This command leaves Defendants' responsibilities under the injunction open-

ended and uncertain. As another example, the draft order makes it a "red flag" if "[a] Prescriber provides a Patient with prescriptions in combination with other Designated Controlled Substance prescriptions that present a serious risk to the patient or lack legitimate medical purpose." *Id.* § IX(C)(1). The criteria applicable to this "red flag" are not clear because the terms "serious risk" and "legitimate medical purpose" are undefined.

- Section XII requires Defendants to "employ algorithms, or other means, to review the Defendants' retail dispensing data" to identify potential prescribers and patients "of concern." *Id.* § XII. Yet the draft order fails to specify what qualifies as a permissible "algorithm" or "other means" or who are potential prescribers and patients "of concern." And Plaintiffs did not even attempt to establish through an expert that such algorithms are feasible, let alone necessary to abate oversupply and diversion of prescription opioids.

- Section XVII states that "Defendants shall retain records they are required to create pursuant to their obligations hereunder in an electronic or otherwise readily accessible format." *Id.* § XVII. But it does not state how long those records should be retained, rendering the requirement vague and—if they need to be retained for the potentially indefinite duration of the injunction—overbroad. Nor is there any evidence in the record that such electronic recordkeeping is even feasible.

Because "[a]n injunction order is typically vacated when it violates [the] standard" that it be "couched in specific and unambiguous terms," the Court should not enter Plaintiffs' proposed order. *Union Home Mortg. Corp.*, 31 F.4th at 362. Instead, if the Court chooses to award injunctive relief over Defendants' objections, it should enter the draft order submitted by Defendants subject

50

to their objections or one that substantially follows it in form. *See* Ex. B. Finally, if the Court enters injunctive relief of any kind, it should at least stay that order pending appeal, given that any injunctive relief presents "close question[s]" as to whether it is merited, *see* Dkt. 4511 at 54–56, and, for all the reasons above, will impose substantial and irreparable burdens on Defendants to implement. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 155 (6th Cir. 1991).

## VI. THE COURT SHOULD NOT AWARD ANY ABATEMENT BECAUSE THE SUPREME COURT'S *RUAN* DECISION REQUIRES A DIRECTED VERDICT ON LIABILITY OR, AT MINIMUM, A NEW TRIAL.

An abatement award is inappropriate if the underlying liability ruling is defective. Defendants recognize that the Court denied their Rule 50 and Rule 59 post-trial motions. Dkt. 4295; Dkt. 4296. But the Supreme Court's recent decision in *Ruan v. United States*, 597 U.S.---, 2022 WL 2295024 (June 27, 2022), confirms that the denial was in error.

In *Ruan*, the Supreme Court interpreted 21 U.S.C. § 841(a), which provides that it is a crime "except as authorized . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance[.]" *Ruan*, 2022 WL 2295024, at *3. The Court was faced with competing interpretations of that statute. Under one interpretation, to violate the statute, the defendant doctors were required to know that the prescriptions they wrote were not authorized, *i.e.*, not written "for a legitimate medical purpose . . . in the usual course of [the doctor's] professional practice." *Id.* (quoting 21 C.F.R. § 1306.04(a)). Under another interpretation, the doctor needed only to "knowingly" "manufacture, distribute, or dispense" a controlled substance through a prescription that, under an objective standard, was not authorized. *See id.* at *4.

The Supreme Court rejected the latter interpretation and ruled that, in order to be convicted under 21 U.S.C. § 841(a), a physician must subjectively know that the prescription he or she wrote

is not "authorized," *i.e.*, is not for legitimate medical purpose or not in the usual course of the physician's practice. *Ruan*, 2022 WL 2295024, at *5. It reached this conclusion, in part, because only it could separate wrongdoing (a physician writing a prescription that she knows is not for legitimate medical purposes) from "socially necessary conduct" (a physician writing a prescription that she believes her patient needs). *Id.* at *5, *8. Moreover, the "severe penalties" for violating the Controlled Substances Act also "counsel in favor of a strong scienter requirement." *Id.* at *6.

*Ruan*'s logic applies equally to the regulation setting forth Defendants' "corresponding responsibility" in this case. That regulation provides:

> The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person **knowingly** filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

21 C.F.R. § 1306.04(a) (emphasis added).

Like the statute at issue in *Ruan*, Section 1306.04(a) subjects those it governs to the steep penalties of the Controlled Substances Act. And like the statute at issue in *Ruan*, interpreting the "knowingly" *mens rea* standard to require a pharmacist to know that a prescription is improper, as opposed to merely knowing that it has been filled, separate unlawful conduct from "socially necessary conduct." *Ruan*, 2022 WL 2295024, at *8. Thus, *Ruan* makes clear that 21 C.F.R. § 1306.04(a) requires more than knowingly filling a prescription. It requires knowing that the prescription is illegitimate.

Plaintiffs presented no evidence that any pharmacist employed by any defendant knowingly filled illegitimate prescriptions. In fact, they argued to the jury that Defendants could be held liable even with "superb" dispensing based merely on the volume of medications

dispensed. Dkt. 4153, Nov. 15, 2021 trial tr., vol. 28, at 7169. For that reason, Plaintiffs could not possibly have proven the mens rea requirement consistent with *Ruan*, and a directed verdict is appropriate. *See Ruan*, 2022 WL 2295024, at \*5, \*8; *cf also City of Huntington* at 94–95, 161 (holding that distributor defendants could not be held liable based only on "the volume of prescription opioids in [the Track 2 communities]").

At minimum, a new trial is required. The jury was instructed: "A violation of corresponding responsibility occurs when a person knowingly fills or allows to be filled an illegitimate prescription. In this context, 'knowingly' includes when a person acts with deliberate ignorance or willful blindness to information in their possession." Dkt. 4146-3 at 304. As Defendants pointed out in their objections the jury instructions, *see* Dkt. 4146-2 at 22–23, this instruction erroneously implies that neither the "knowingly" standard nor the willful blindness standard require subjective knowledge that the prescription was unauthorized (or, in the case of willful blindness, that there was a high probability the prescription was not authorized).[12] *Ruan* has now confirmed that the law is to the contrary.

The jury instructions allowed a verdict against Defendants without first requiring the jury to find that a pharmacist employed by a defendant filled a prescription she subjectively knew was not for a legitimate medical purpose or was written outside of the prescriber's usual course of

---

[12] Defendants' proposed instructions, by contrast, would have made clear that, consistent with Ruan, the "knowingly" requirement applied to the legitimacy of the prescription, as opposed to the mere fact that it was filled. They proposed the following instruction: "It is unlawful for a pharmacist to fill a prescription knowing that it was not issued for a legitimate medical purpose in the usual course of professional treatment." Dkt. 4146-1 at 15. Defendants also objected to the willful blindness instruction as being unclear regarding the subjective knowledge required to meet the standard. Dkt. 4146-2 at 22–23. Taken together, the two sentences in the instruction the Court gave the jury misleadingly imply that subjective knowledge of wrongdoing (or high probability of wrongdoing) is not required for a pharmacist to violate Section 1306.04(a).

professional practice (or subjectively knew there was a high probability of same). That is inconsistent with *Ruan* and requires, at minimum, a new liability trial.

## CONCLUSION

For these reasons, and without waiving any of Defendants' earlier objections regarding liability or abatement, the Court should reject Plaintiffs' inflated abatement plan and should award Defendants' proposed plan of safe storage and take-back boxes. To the extent that the Court is inclined to award a more extensive award, it should make an award of several liability only, and should set forth how those funds will be spent in a detailed abatement plan with mechanisms to ensure that the awarded funds are not dissipated through fraud, waste, and abuse.

Dated: July 8, 2022                    Respectfully submitted,

*/s/*  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

*/s/* Jeffrey A. Hall
Kaspar J. Stoffelmayr
Jeffrey A. Hall
BARTLIT BECK LLP
54 West Hubbard Street

Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
jeff.hall@bartlitbeck.com

Katherine L.I. Hacker
Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
kat.hacker@bartlitbeck.com
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,
Walgreen Co., and Walgreen Eastern Co., Inc.*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that the foregoing document was filed via CM/ECF on

July 8, 2022, effecting service on all counsel of record.

/s/  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*

56