**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>    *County of Lake, Ohio v. Purdue Pharma L.P., et al.*,<br>    Case No. 18-op-45032 (N.D. Ohio)<br><br>    *County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,<br>    Case No. 18-op-45079 (N.D. Ohio) | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

<u>**CVS'S RESPONSE TO PLAINTIFFS' ABATEMENT PHASE CLOSING BRIEF**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

Introduction ............................................................................................................... 1

A.   Plaintiffs Omit Key Testimony About the Potential Impact of the Plan. .......................... 4

B.   Plaintiffs Admit That the Plan Is To-Be-Determined. ........................................ 4

C.   Plaintiffs Illustrate the Unreliability of Their Layers of Estimates................................... 5

D.   Plaintiffs Minimize—or Ignore—the Real Data Points...................................... 6

E.   Plaintiffs Overlook the Infrastructure They Already Have in Place.................................. 7

F.   Plaintiffs Ignore Dr. Alexander's Repudiation of the Gateway Effect. ............................ 8

G.   Plaintiffs Meet Medicaid with Fiction. ............................................................... 9

H.   Plaintiffs Ignore Pharmacy Data to Try to Show Indivisibility. ..................................... 10

I.   Plaintiffs Do Not Meaningfully Challenge Dr. Chandra's Allocation Methodology. ....... 11

J.   Plaintiffs Ignore the Court's Directives on Duration and Payment Terms. ..................... 13

K.   Plaintiffs Impermissibly Seek the Flexibility of a Damages Award................................ 14

L.   Plaintiffs' Injunctive Terms Are Impermissible. .............................................. 15

   1.   Special Master Impermissible ............................................................... 16

   2.   No Fact Record on Supply Reduction ...................................................... 17

   3.   No Fact Record on Plaintiffs' Proposed Policy Changes ........................... 19

   4.   No Court Authority to Promulgate Pharmacy Practice Rules ..................... 20

   5.   Consideration of Florida Settlement Prohibited ........................................ 21

   6.   Terms Are Replete with Imprecision ....................................................... 23

   7.   The Parties Met and Conferred .............................................................. 23

M.   A Final Word on Plaintiffs' Burden of Proof. ................................................... 24

N.   Incorporation .......................................................................................... 25

i

# **TABLE OF AUTHORITIES**

## CASES

*Alterna Mortg. Income Fund, LLC v. GS Holdings-Brookside, Ltd.*,
2012 WL 5897578 (S.D. Ohio Nov. 21, 2012).....................................................................25

*Arizona v. United States*,
567 U.S. 387 (2012)............................................................................................................21

*Bevens v. Wooten Landscaping, Inc.*,
2012 WL 5391961 (Ohio App. Ct. 4th Dist. Oct. 25, 2012) ...............................................25

*Bowers v. NCAA*,
563 F.Supp.2d 508 (D.N.J. 2008) .......................................................................................22

*Buchman v. Wayne Trace Local Sch. Dist. Bd. Of Educ.*,
652 N.E.2d 952 (Ohio 1995) ..................................................................................................9

*Callahan v. Federal Bureau of Prisons*,
965 F.3d 520 (6th Cir. 2020) ..............................................................................................21

*City of Huntington v. AmerisourceBergen Drug Corp., et al.*,
2022 WL 2399876 (S.D.W.V. July 4, 2022) ..........................................................................3

*Complex Sys. v. ABN Ambro Bank*,
2014 WL 1055263 (S.D.N.Y. March 13, 2004) ...................................................................22

*Geiser v. Amer. Honda Motor Co.*,
529 U.S. 861 (2000)............................................................................................................21

*Gonzales v. Raich*,
545 U.S. 1 (2005).................................................................................................................21

*Norfolk & W. Ry. Co. v. U.S. Ry. Equip. Co.*,
563 F. Supp. 747 (N.D. Ill. 1983) .......................................................................................25

*People v. Atl. Richfield Co.*,
2014 WL 1385821 (Cal. Super. Ct. Mar. 26, 2014) ............................................................15

*Richardson v. Trump*,
496 F. Supp. 3d 165 (D.D.C. 2020) .....................................................................................16

*Ruan v. United States*,
597 U.S.---, 2022 WL 2295024 (June 27, 2022) .................................................................25

*S. Ohio Coal Co. v. United Mine Workers of Am.*,
    551 F.2d 695 (6th Cir. 1977) ........................................................... 15

*Sharp v. Clark*,
    1992 WL 107849 (Ohio App. Ct. 2d Dist. May 20, 1992) ......................................... 25

*State ex rel. Miller v. Anthony*,
    647 N.E.2d 1368 (Ohio 1995) ........................................................... 14

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (6th Cir. 2010) ........................................................... 5, 6

*Union Home Mortg. Corp. v. Cromer*,
    31 F.4th 356 (6th Cir. 2022) ........................................................... 14

*United States v. City of Parma, Ohio*,
    661 F.2d 562 (6th Cir. 1981) ........................................................... 16

**OTHER AUTHORITIES**

23 Charles Alan Wright & Victor Gold,
    *Federal Practice and Procedure* § 5304 (2d ed. 2018) ................................... 21, 22

Samuel Frey and Pierre Dehez, *Multiple Causation, Apportionment,
    and the Shapley Value*, 45 Journal of Legal Studies 143 (2016) ........................... 12

**RULES**

Fed. R. Civ. P. 53 ................................................................................. 16

Fed. R. Evid. 408 ........................................................................... 21, 22

**TREATISES**

Restatement (Second) of Torts § 433A ................................................... 11, 12

## Introduction

In their closing brief, plaintiffs continue to disregard what they *actually spend* to combat opioid addiction. They continue to replace their true opioid-related expenditures with layers of estimates drawn up by academics which result in much higher—indeed astronomical—numbers. They then highlight the unreliability of their successive estimates by introducing new assumptions and adjustments that show just how manipulable they are. These stacks of estimates are not remotely sufficient to justify an award to cover even one year of supposed expense. Plaintiffs' request for an award covering hypothetical expenses *15 years* into the future—payable immediately—is specious.

Plaintiffs simultaneously make clear that they do not even seek to implement the Alexander plan. Instead, they seek flexibility to determine "which" parts of the plan they need. Doc. 4513 at 29-30.[1] They seek to exercise this flexibility *after the Court rules.* Plaintiffs therefore confirm that they have not even put before the Court a plan that they intend to implement. They rather seek to make decisions after-the-fact—outside the adversarial process—on how to spend any monetary award. Plaintiffs have not carried their burden of putting their actual plan before the Court.

With little analysis, plaintiffs claim that the Court's award should encompass heroin and other illegal drugs even though CVS never dispensed them. Plaintiffs fail to explain how this position can be reconciled with their own expert's testimony that their gateway theory "just . . . doesn't pass muster." Nor do they explain how it could possibly square with the jury's verdict, which was limited to "legal" prescription opioids.

Plaintiffs go on to make the outlandish assertion that funding provided by Medicaid—and other forms of insurance—is too speculative to consider. How plaintiffs can take this position

---

[1] Citations to docket entries are to the ECF page numbers appearing at the top of the page.

1

when they build their own case on layers of speculative estimates about the future needs of unknown numbers of unknown persons is a question plaintiffs neglect to answer. But even if it were credible to suggest that government-funded and commercial health insurance were somehow too speculative to consider, plaintiffs ignore the screening process, first set out months ago, that would resolve the concern.

Plaintiffs then call on the Court to adopt injunctive terms from CVS's settlement with the State of Florida. If the Court uses terms of this agreement over CVS's many objections, then the Court also must use the counties' own settlements with Rite Aid and Giant Eagle. Those settlements include no injunctive terms at all. And they result in total payments to each county of $1.5 million from Giant Eagle and $1.5 to $3 million from Rite Aid. Likewise, if the Court considers the Florida injunctive terms, then it must consider the Florida settlement sum. Adjusted for population, that sum would result in annual payments of $264,000 to Lake County and $229,000 to Trumbull County.

Plaintiffs' proposed injunctive terms suffer other flaws. Plaintiffs adduced no testimony on them. They did not even propose them until after the close of the evidence. Accordingly, there is a complete absence of proof on whether they will reduce the supply of prescription opioids (the only permissible purpose for injunctive terms) or whether they simply will impose more procedure. Beyond that, while the counties' proposed terms would require CVS to implement programs to ban certain patients and to adopt other practices that are without basis in rule or regulation, there is no evidence on whether such programs even would be appropriate.

On the law, plaintiffs still fail to cite a single sustained case awarding the relief they seek—funds to address the societal *effects* of a nuisance rather than the nuisance itself. In this regard, plaintiffs' closing brief confirms what defendants have been saying all along: plaintiffs are seeking

future damages, not equitable relief. Even if the abatement remedy could extend so far, plaintiffs cite not a single case determining that the scope and cost of future medical treatment could be estimated with reasonable certainty when none of the patients has been identified, much less examined. And while the jury verdict was limited to the excess volume of "legal prescription opioids" and the diversion of those lawful medications, plaintiffs cite no case that would allow the Court to award relief that reaches far beyond that—to heroin abuse, joblessness, homelessness, and parental neglect. Because plaintiffs do not address these threshold legal issues, they are not addressed further below. But they are paramount. They alone require outright rejection of the Alexander plan.

Judge Faber's ruling in the Track Two case makes this clear. Judge Faber holds that the abatement remedy is strictly limited to an injunction to constrain the volume of prescription opioids. It does not, he rules, permit funding "to treat opioid addiction" and address other "attendant harms" caused by opioid abuse. *City of Huntington v. AmerisourceBergen Drug Corp., et al.*, 2022 WL 2399876, at *55 (S.D.W.V. July 4, 2022). Because Dr. Alexander's Track Two plan—which is "highly consistent" with his Track Three plan, Trial Tr. (Doc. 4446) at 410, 12— exceeds these parameters, Judge Faber rejects it. *City of Huntington*, 2022 WL 2399876, at *67-69. For the reasons stated in CVS's prior briefs, the same rulings are required here. *See* Doc. 4299 at 13-14; Doc. 4342 at 13-15; Doc. 4512 at 10-12.

For these reasons and those set forth below, plaintiffs' arguments are insufficient to justify the relief they seek. While CVS objected to the theories that plaintiffs presented to the jury and will continue to challenge those theories in its appeal, the relief that flows from the counties' infirm theories and the resulting jury verdict are strictly limited to the volume-reduction remedies set forth by CVS in its closing brief. *See* Doc. 4512 at 33-34. No monetary award is permitted.

### A.    Plaintiffs Omit Key Testimony About the Potential Impact of the Plan.

According to plaintiffs, "[d]uring the Phase 2 trial, [they] demonstrated that the public nuisance found by the jury can be materially abated through the funding and implementation of a comprehensive, long-term abatement plan in each County." Doc. 4513 at 6. Plaintiffs stretch the truth. They quote Dr. Alexander for the proposition that he "believes" his plan can achieve a 50 percent reduction in opioid-related harms. Doc. 4513 at 6, 23 n. 39. But they omit what he says next—that he has not done the work to "fully estimate" the degree to which his plan would have such an impact. Trial Tr. (Doc. 4446) at 417. They also omit his follow-on testimony that any such estimation would be "prone to uncertainty." *Id.* Putting on a witness to say he merely "believes" that a 50 percent reduction may be achieved—when the witness admits that any such prediction is "prone to uncertainty" and that he has not conducted the work to arrive at an actual estimate—is insufficient to carry plaintiffs' burden.

### B.    Plaintiffs Admit That the Plan Is To-Be-Determined.

Plaintiffs confirm that the plan is unfinished and that they have not customized it to their needs as Dr. Alexander himself required. *See* Trial Tr. (Doc. 4446) at 424 ("Q: Your plan must be customized for each of the counties, correct? A: Yes."). They state that they will determine "which" parts of Dr. Alexander's proposal they need, but only after the Court issues its award. Doc. 4513 at 29-30. Plaintiffs not only admit that they lack a final plan to present to the Court, but they make plain that they seek to bypass the adversarial process regarding the scope of the award— and make up for their failure to sustain their burden at trial—by asking the Court to grant them discretion to define their plan post-judgment. Plaintiffs have it backwards. Evidence of a defined plan, reflecting defined needs, provides the basis for an award and therefore must come before it.

Plaintiffs are not entitled to any award—much less a multi-billion-dollar one payable immediately—for unspecified, to-be-determined abatement programs.

###### C.   Plaintiffs Illustrate the Unreliability of Their Layers of Estimates.

As explained in CVS's opening brief, plaintiffs do not base their monetary request on *actual* county data and *actual* county costs. Instead, they achieve large dollar numbers by using expert witnesses to develop an array of estimates—or sometimes "targets"—which the experts then layer on top of one another. *See, e.g.*, Trial Tr. (Doc. 4446) at 494-95 (testimony that treatment numbers are based on "an estimate, followed by a target, followed by a target, followed by estimates"). Rather than address this flaw, plaintiffs make their proposal even more unreliable. They add more and different estimation. To provide an alternative abatement number, they rejigger Dr. Keyes' estimate of the number of individuals with OUD in the counties, and Dr. Alexander's estimates that flow from it. Doc. 4513 at 24-27. Plaintiffs' post-trial adjusted option—arrived at by subtracting from Dr. Alexander's estimated 2021 OUD population Dr. Keyes' estimated 1999 population—demonstrates the malleability and inherent unreliability of their experts' estimates.

These adjusted numbers fail for the same reasons as plaintiffs' original versions—they are based not on actual county data but on stacks of estimates about future needs of wholly unknown persons. They amount to guesswork. "But the courtroom is not the place for scientific guesswork, even of the inspired sort." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (citation omitted) (vacating jury verdict because expert's testimony "contain[ed] not just one speculation but a string of them"). Indeed, "[n]o matter how good [an] experts' credentials may be, they are not permitted to speculate." *Id.* (quotations marks and citation omitted). As the Sixth Circuit has explained:

> The sort of hypothesis [plaintiff's expert] presented can play a valuable role both in medicine . . . and in science generally . . . . But

> that is not the issue. The issue is the reliability of his opinion from a *legal* perspective. And what science treats as a useful but untested hypothesis the law should generally treat as inadmissible speculation.

*Id.* at 677. Plaintiffs' estimates must be rejected.

To avoid undue repetition, CVS hereby adopts and incorporates by reference Section I of Walgreens' and Walmart's Joint Response to Plaintiffs' Closing Brief.

**D.      Plaintiffs Minimize—or Ignore—the Real Data Points.**

As noted in CVS's opening brief, plaintiffs did not consider the counties' actual OUD treatment data or any of their actual opioid-related expenditures in devising their estimates of abatement costs. These data points show the extent to which plaintiffs' litigation numbers are grossly inflated and patently unreliable. In response, plaintiffs at times turn a blind eye to this information and other times try to critique it. But they do not—and cannot—negate it.

<u>First</u>, plaintiffs attempt to minimize the counties' own OUD treatment data, which is the best data point in the record. That data shows that what the counties actually paid for treatment—$648,545 of combined costs in 2019—is a mere fraction of the $80 million they seek for treatment under Year One of their plan. *See* Doc. 4512 at 20. The counties' treatment data puts the lie to the inflated estimates that drive the Alexander plan.

Plaintiffs do not challenge the accuracy of the treatment data. Instead they attack it as insufficiently predictive because it does not account for the number of people with OUD who have not yet sought treatment. Doc. 4513 at 12. But the best estimate of the number of persons who might seek treatment in the future remains the number of persons who actually have sought treatment in the past. Moreover, subject to its objections, CVS has proposed a cushion to accommodate for a hypothetical growth in the numbers. *See* Doc. 4512 at 37. And perhaps most importantly, plaintiffs' criticism of the data misses its core feature—the amount the counties

6

actually pay to treat each patient. The data shows that the per-patient costs of treatment are far less than plaintiffs' built-for-litigation estimates. Accordingly, the per-patient costs contained in the counties' data would result in a tiny fraction of plaintiffs' litigation estimate *even if applied to Dr. Alexander's speculative treatment population.* *See* CVS-MDL-05023; CVS-MDL-05024. Plaintiffs' population-based criticism is a red herring.[2]

Second, plaintiffs ignore completely the counties' actual ADAMHS Board expenditures. In 2020, the Lake County ADAMHS Board spent a *total* of $16.11 million, and the Trumbull County Mental Health & Recovery Board spent a *total* of $7.97 million. Doc. 4512 at 20. These expenditures were not limited to opioid-related programs; they also included extensive programs to assist individuals struggling with mental health challenges, alcohol, and other drugs. *Id.* Even with the breadth of these expenditures, these two county agencies spent less money than they budgeted and left substantial sums unspent. *Id.* at 20-21. The reality of these expenditures refutes any supposed need for the grandiose sums sought by plaintiffs.

### E.      Plaintiffs Overlook the Infrastructure They Already Have in Place.

Plaintiffs suggest that they need large sums of money in order to build "infrastructure." Doc. 4513 at 30-31. But the counties already have infrastructure in place. As set out in CVS's post-trial brief, they fund local providers that offer a full range of treatment options, from in-patient to out-patient treatment, to residential treatment facilities and recovery centers. Doc. 4512 at 21-22. They also have, for example, help lines, drug courts, school-based prevention programs, naloxone

---

[2] Plaintiffs' other criticisms of the treatment data are no more meaningful. They rely on a snippet of testimony by one of their experts about underfunding in the "substance abuse treatment prevention field." Doc. 4513 at 12 & n.16. This testimony is not based on any analysis of the counties themselves. Plaintiffs separately contend that the treatment data does not account for a lack of a treatment capacity. But no testimony supports this attorney assertion. And the evidence showed otherwise: the counties had money left over in their ADAMHS Board budgets and county documents show available capacity to treat additional patients. Doc. 4512 at 20-23.

programs, NAS baby treatment programs, recovery housing, peer recovery supporters, withdrawal management centers and family counseling programs. Doc. 4512 at 22. Plaintiffs do not identify for the Court what, if any, *new* infrastructure they need on top of what they already have or what it would cost. In the absence of this information, the Court lacks the information needed to determine the counties' infrastructure needs and to formulate a monetary award.

### F.    Plaintiffs Ignore Dr. Alexander's Repudiation of the Gateway Effect.

Plaintiffs continue to claim that CVS should fund measures to reduce harms associated with heroin and other illegal drugs. Doc. 4513 at 6. They contend that CVS must not only pay to treat individuals addicted to these illegal drugs, but that CVS also must pay for other programs and services for illegal drug users, including testing strips, needle exchanges, treatment for diseases (such as HIV and Hepatitis C) that result from illegal drug use, and job, housing, and transportation assistance. Doc. 4512 at 10.

Plaintiffs ignore that Dr. Alexander himself rejected the gateway theory. During the liability phase, Dr. Alexander testified that "most people with chronic opioid use don't go on to use heroin and illicit fentanyl," and that "it's not like if you use prescription opioids, . . . you're going to be shooting up at some point." Trial Tr. (Doc. 4064) at 3474. Then, during the abatement phase, Dr. Alexander agreed with a study determining that "nonmedical prescription opioid use . . . is neither necessary nor sufficient for the initiation of heroin use." Trial Tr. (Doc. 4447) at 557.  He testified that "I don't think anyone in their right mind could" say that prescription opioid use is sufficient for the initiation of heroin use. *Id.* at 558. Such an argument, he explained, "just . . . doesn't pass muster." *Id.* This testimony—from plaintiffs' own expert—leaves no basis to impose liability on CVS for illegal drugs.

Nor would this be permitted by the jury verdict—which was limited to "legal prescription opioids," Doc. 4176 at 2, 6—or common law. The criminal importation, trafficking, and use of illegal drugs not only is impermissibly remote from CVS pharmacies, it implicates a long string of superseding acts that break the causal chain. Doc. 4512 at 13-14.

### G.    Plaintiffs Meet Medicaid with Fiction.

The record demonstrates that Medicaid, federal and state grants, and private insurance pay for the vast majority of addiction treatment in the Alexander plan. Doc. 4512 at 24. Yet plaintiffs claim that funding from these nonparty sources should be disregarded because it is "entirely speculative." Doc. 4513 at 35.[3] Plaintiffs, however, are the ones speculating. Medicaid has been in place since 1968, Medicaid expansion has been in effect in Ohio since 2014, and private insurance is an entrenched feature of the U.S. healthcare system. The record is replete with evidence on the degree to which these payors cover treatment costs in the counties. *See* Doc. 4512 at 24 (collecting record cites); *see also id.* at 37 n.23. Plaintiffs presented no evidence to the contrary and no evidence that the payor landscape will suddenly change in the years to come.[4]

In any event, if the Court awards funding for treatment over CVS's objections, the screening process proposed by CVS would address any theoretical concern about the availability of Medicaid and private insurance. As set out in defendants' March abatement submission, Doc. 4337 at 4-5, and again in CVS's post-trial brief, Doc. 4512 at 35, that screening process would make funding available for treatment only if it has been determined that the individual

---

[3] Plaintiffs claim that the burden of proving future nonparty reimbursement rests with CVS. That is incorrect. Plaintiffs indisputably have the burden of identifying what they *actually need* to remedy the nuisance.

[4] In the one case plaintiffs cite, *Buchman v. Wayne Trace Local Sch. Dist. Bd. of Educ.*, 652 N.E.2d 952 (Ohio 1995), the jury award in a personal injury case indeed was reduced to account for what Medicare would cover for future medical expenses *over the next ten years*. *Id.* at 966.

seeking treatment lacks government-funded or private insurance. In other words, the availability of such insurance will be determined on an individualized basis at the time treatment is sought, eliminating any need to make predictions about what will be available in the future.

Plaintiffs repeat their argument that the collateral source rule bars consideration of nonparty funding sources. Doc. 4513 at 37-38. Plaintiffs are wrong. They ignore the Court's prior determination that it may "deviate from the full costs of abatement" to account for "additional sources of funding." Doc. 2519 at 5. And they do not cite a single case that has applied the collateral source rule to an equitable remedy under Ohio law. For good reason—as set forth in CVS's opening brief, the collateral source rule does not apply in equity. Doc. 4512 at 24-28.[5]

## H. Plaintiffs Ignore Pharmacy Data to Try to Show Indivisibility.

Plaintiffs contend that joint-and-several liability should apply because "the harms to the Counties resulting from the public nuisance are indivisible." Doc. 4513 at 36. But joint and several liability is not available here as a legal matter. *See* Doc. 4512 at 28-30. Even if it were, plaintiffs do not—and cannot—make the requisite factual showing of indivisibility. The primary harm they seek to abate is addiction. That harm is divisible. It can be determined from CVS's dispensing data whether an individual seeking addiction treatment was dispensed prescription opioids by CVS. Doc. 4512 at 35. CVS repeatedly proposed using dispensing data for this purpose before and during trial. Doc. 4299 at 18-19; Doc. 4342 at 20-21; Doc 4386 at 8; Trial Tr. (Doc. 4438) at 22-23; Trial Tr. (Doc. 4460) at 1302. Yet plaintiffs continue to ignore it.

---

[5] Plaintiffs argue that the collateral source rule is needed to avoid a windfall for defendants "at the expense of the American taxpayer or private insurers." Doc. 4513 at 39. But as plaintiffs readily admit, any "windfall" would not be at the counties' expense. The counties are not impacted in any way if costs are paid by a nonparty versus a defendant. And as CVS explained in its opening brief, to award relief to nonparties—or to craft remedies for the purpose of punishing CVS—would violate the rules of equity. Doc. 4512 at 24-25.

Plaintiffs rely on Dr. Keyes's testimony that the harms in this case are indivisible because "[t]hat's not how we think about how harms are distributed in public health and epidemiology." Doc. 4513 at 36-37. But the question here is whether the harms are divisible *under the law*, and all that is required under the law is "division upon a reasonable and rational basis." Restatement (Second) of Torts § 433A cmt. d. Dr. Keyes did not consider divisibility under that legal standard, nor would she have been qualified to. Her testimony on divisibility must be disregarded.

I.     **Plaintiffs Do Not Meaningfully Challenge Dr. Chandra's Allocation Methodology.**

Whether or not the harm is divisible, apportionment still is appropriate and, in fact, required. *See* Doc. 4512 at 23-24. 23 While plaintiffs criticize the method of doing so offered by Dr. Chandra, they offer no allocation methodology of their own, offer no expert testimony to rebut Dr. Chandra, and limit their criticisms of Dr. Chandra to one sentence. Doc. 4513 at 34-35.

Plaintiffs do not challenge Step One of Dr. Chandra's methodology. Nor could they. Step One uses *Dr. Keyes's own analysis* to apportion between prescription and illicit opioids. Plaintiffs also do not criticize Step Three. That step uses "red flag" market share (or at the Court's election, other market share measurements) to apportion among all of the pharmacies in the counties.

Plaintiffs' criticisms focus on Step Two of Dr. Chandra's methodology. That step apportions between five different sets of actors: the federal government (FDA and DEA), manufacturers, prescribers, pharmacies, and diverters. Plaintiffs argue that Dr. Chandra did not make findings about culpability and that the evidence he relies on is incomplete. But plaintiffs do not dispute that each of these actors caused opioid-related harms in the counties. Nor could they. Dr. Chandra made clear that Step Two is based on *their own experts' testimony* and *their own statements* in court filings. Trial Tr. (Doc. 4460) at 1238-44, 1300-01.

11

Plaintiffs contend that Step Two "prioritize[s] simplicity over accuracy" by "us[ing] an allocation method meant to apply when multiple actors act simultaneously." Doc. 4513 at 34. As Dr. Chandra testified, however, applying the more complex sequential method would have resulted in a *lower* share for CVS because it acted later than other actors. Trial Tr. (Doc. 4460) at 1248-49.[6] The application he chose therefore resulted in an allocation that is less favorable to CVS and more favorable to plaintiffs.

Plaintiffs argue that Dr. Chandra's methodology has not been peer-reviewed. Doc. 4513 at 34. But the use of Shapley's Value (Step Two) to apportion liability has been subject to peer-review. Trial Tr. (Doc. 4460) at 1298-99; Samuel Frey and Pierre Dehez, *Multiple Causation, Apportionment, and the Shapley Value*, 45 Journal of Legal Studies 143 (2016). More importantly, there is no requirement that an apportionment methodology be subject to peer-review—plaintiffs do not cite a single case requiring it. All that is required is a "reasonable and rational basis" for apportionment. Restatement (Second) of Torts § 433A cmt. d. Indeed, to the extent that a customized approach is required to apportion the harms in this case, that should come as no surprise—as this Court explained at trial, this abatement trial is among the first of its kind. "No judge in history has ever had to do this, so I have no model." Trial Tr. (Doc. 4464) at 1326.

Insofar as plaintiffs contend that Dr. Chandra is not qualified to offer an allocation methodology, they are wrong. He is a professor of health care policy at the Harvard Kennedy School of Government, he serves as its Director of Health Policy Research, and he teaches, among other subjects, causal methods. Trial Tr. (Doc. 4460) at 1206-08. The Court must apportion, and Dr. Chandra has offered a reasonable and rational basis to do so.

---

[6] While plaintiffs say this is "erroneous[]," Doc. 4513 at 35, they offer no evidence to support that contention. They merely cite, without explanation, Dr. Chandra's answers to hypothetical questions put to him by Mr. Lanier.

### J.      Plaintiffs Ignore the Court's Directives on Duration and Payment Terms.

Before trial, plaintiffs represented that they would seek the funds necessary to pay for the first five years of their abatement plan. They made this representation in their January submission, Doc. 4232 at 2, and then again in their pretrial brief, Doc. 4387 at 10. In response, the Court explained at the pretrial conference that five years is "about as far out as people can reasonably predict." Doc. 4420 at 26. "[N]o one," the Court stated, "can readily determine with any reasonable degree of certainty what's going to happen in 15 years." *Id.* at 26-27. But plaintiffs have reversed course. They now argue that the Court should award "the full amount required to implement their fifteen-year abatement plan." Doc. 4513 at 23-24, 27-28. As the Court already has recognized, there is no reasonably certain basis in the record to award fifteen years of abatement costs.  Indeed, there is no reasonably certain basis to award even five years of costs. Doc. 4512 at 15-24.

As for the plan's funding, the Court indicated before and during trial that funding would be determined annually. The Court explained that "I don't think it's a good idea to hand the count[ies] . . . five years of payments." Doc. 4420 at 28. Yet, plaintiffs contend that future funding should be set now—even though it is too uncertain to do so and even though Dr. Alexander himself testified that "each measure" of the plan "should be assessed on a quarterly, biannual, or annual basis." Trial Tr. (Doc. 4446) at 440-41. Plaintiffs take it even further and assert defendants should pay the "entirety" of the award "up front." Doc. 4513 at 28. If the Court's award is to include multi-year funding, there is no viable basis in the record to determine the amount, much less to require a defendant to pay "up front" sums that the counties cannot even access until future years.

The Court also made clear that if plaintiffs do not spend the funds they are awarded for a given year, the unspent amount will be "returned" or will be "applied to the next year, and then [the Court will] adjust the next year." Trial Tr. (4464) at 1330; *see also* Trial Tr. (4446) at 507

13

("And if they haven't spent the money because . . . the estimates proved idealistic or Congress gave them a huge amount of money or whatever, they'll return it."). Plaintiffs also ignore this direction from the Court. They argue that if they do not spend all of the funds awarded for a given year—which they acknowledge is a real possibility—"they should not be required to forfeit the unspent amounts" but should be able to "roll over" the unspent funds to the following year without any adjustment for that year. Doc. 4513 at 30-31. This violates the Court's directive and would result in an improper overpayment to the counties.

### K.     Plaintiffs Impermissibly Seek the Flexibility of a Damages Award.

Plaintiffs make clear that they want the power to determine how they will allocate and use any abatement funds awarded by the Court. Doc. 4513 at 29. They want the "flexibility" and the "discretion" to determine which interventions in the Alexander plan to implement, to allocate abatement funds among those interventions, and to make adjustments to those interventions over time. *Id.* at 29-30. They want the flexibility to use abatement funds to pay their lawyers, even though this is prohibited. *Id.*[7] Plaintiffs also want to subject their use of abatement funds to their respective political processes. *Id.* at 30 n.56.

This is not how an abatement order works. It is a judgment of the Court that imposes strict requirements on how plaintiffs may allocate and use the funds. Under Ohio law, "nuisance abatement actions seek injunctive relief and, as such, are governed by the same equitable principles that apply to injunctive actions generally." *State ex rel. Miller v. Anthony*, 647 N.E.2d 1368, 1371 (Ohio 1995). Such relief "must be couched in specific and unambiguous terms," *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022), so that the parties "know what the

---

[7] *See* Walgreens' and Walmart's Joint Response to Plaintiffs' Closing Brief at Section III.B.1. Notably, plaintiffs want the flexibility to use abatement funds awarded for Year One to make an immediate "lump-sum payment" to their lawyers. Doc. 4513 at 25.

court intends to require" and "what it is that the [c]ourt expects of them," *S. Ohio Coal Co. v. United Mine Workers of Am.*, 551 F.2d 695, 711 (6th Cir. 1977). The abatement order in the *Conagra* lead-paint case illustrates this point. It set out with granularity which types of properties were excluded, which types of properties were to be prioritized, how abatement funding would be administered, how properties would be screened for enrollment, what level of lead would require remediation (*e.g.,* "≥ 1 mg/cm$^2$"), what should be used to measure it (*e.g.*, "XRF lead paint analyzers"), and what specific lead removal activities were to be performed—*i.e.*, how lead should be remediated in walls versus windows versus floors versus cabinets, etc. Amended Judgment, *People v. Atl. Richfield Co.*, 2014 WL 1385821, at *2-6 (Cal. Super. Ct. Mar. 26, 2014).

While a plaintiff may use a damages award in any fashion it sees fit, an abatement award is not a damages award, and plaintiffs cannot treat it as such. It is a different form of relief, it must be reduced to specific terms by the Court, and plaintiffs must strictly abide by those terms.

**L.    Plaintiffs' Injunctive Terms Are Impermissible.**

In their proposed injunctive terms, plaintiffs seek to impose standards of pharmacy practice that are not set forth in any statute or regulation. Plaintiffs called no witness and made no fact record to support these terms. As set forth further below, they lack basis in law and fact.

It bears emphasis that the only viable purpose of injunctive terms would be to reduce any excess supply of legal prescription opioids and any diversion of those legal prescription opioids that may result from such an excess supply. Injunctive terms cannot be imposed for any other purpose. They cannot be imposed to punish. Nor can they be imposed to try to establish supposed "best practices" that the counties—or the Court—believe would be more desirable than the laws on the books. They must be narrowly tailored to reducing any excess supply.

In addition to the points below, CVS hereby adopts and incorporates by reference Section V of the Walgreens' and Walmart's Joint Response to Plaintiffs' Closing Brief.

### 1.  Special Master Impermissible

The Court stated at the start of the remedy trial that "the last thing I want is some monitor or me to be sort of regulating pharmacies." Trial Tr. (Doc. 4438) at 30. "That is not appropriate," the Court declared. *Id.* Nevertheless, the counties propose that the Court appoint a special master to act as a judicial regulator.[8] The counties do so even though the State of Florida did not require a monitor in connection with its settlement with CVS, on which plaintiffs rely over CVS's objection.  They do so even though no witness testified that a special master was necessary. *See United States v. City of Parma, Ohio*, 661 F.2d 562, 578–79 (6th Cir. 1981) (rejecting appointment of master because, among other reasons, there was no testimony it was needed). And they do so even though the prerequisites for a special master are not met.

Appointment of a post-trial special master is appropriate under Rule 53 "when a complex decree requires complex policing, particularly when a party has proved resistant or intransigent." Fed. R. Civ. P. 53 advisory committee notes. Thus in *Richardson v. Trump*, 496 F. Supp. 3d 165, 190 (D.D.C. 2020), *appeal dismissed sub nom. Richardson v. Biden*, No. 20-5367, 2021 WL 672397 (D.C. Cir. Feb. 8, 2021), the court determined that it was inappropriate to appoint a master to supervise implementation of its injunction because, among other things, "there is no history of Defendants failing to comply with Court orders." In so ruling, the court distinguished a case where a special master was appointed only after defendants engaged in "numerous" violations of an already-issued injunction. *Id.*

---

[8] Per plaintiffs' proposal, the special master would, among other things, "regularly conduct compliance and progress reviews" and "take all appropriate measures to enforce the injunctive relief." Doc. 4513 at 41.

Nevertheless, plaintiffs have adduced no evidence to show that CVS has ever been "intransigent" or "resistant" in response to an order of the Court, that it would be so here, and that any injunctive terms therefore would require "complex policing." Nor do plaintiffs address the fact that the filling of opioid prescriptions in CVS pharmacies in Lake and Trumbull Counties already is regulated by federal and state agencies. A system of "policing" already is in place.

Plaintiffs also do not address the range of initiatives that CVS has implemented to help prevent the filling of illegitimate prescriptions—initiatives which are patently inconsistent with "intransigence" or "resistance." These initiatives range from programs that block the filling of prescriptions written by concerning doctors to computer alerts that identify potential concerns with a prescription. Plaintiffs likewise do not address CVS's current policies, which prohibit pharmacists from knowingly filling prescriptions that bear unresolved red flags, or the extent to which CVS re-trains pharmacists every year. These policies and programs were the subject of Nicole Harrington's testimony in Phase One. *See* Trial Tr. (Doc. 4115) at 5667-5764. At the outset of plaintiffs' cross-examination of her, plaintiffs' counsel said he would be "remiss" if he did not "thank the people at CVS for making a lot of good changes" in recent years. *Id.* at 5765.

It is no response for plaintiffs to say that the jury verdict alone justifies appointment of a special master. The Court allowed the jury to find against CVS—and the counties urged the jury to so find—even if CVS's policies, procedures and dispensing were "superb." Trial Tr. (Doc. 4153) at 7169. No finding of unlawfulness, much less intransigence to court orders, was made.

### 2.   No Fact Record on Supply Reduction

As noted above, the only permissible purpose for injunctive terms is to reduce any excess supply of legal prescription drugs in the counties. Yet plaintiffs have made no factual record on whether their proposed measures would accomplish this. Plaintiffs called no witness to testify

about their proposed terms—much less on whether they would achieve a supply reduction. The record is silent on the subject. This leaves the Court no basis to find that a rule requiring pharmacists to document their work, for instance, would result in fewer prescriptions being filled. Nor, by way of further example, does it provide any basis for the Court to determine that a 10-year term is warranted. The absence of any fact record on the supply impact of the proposed terms requires outright rejection of them.

Plaintiffs' failure of proof on this subject is all the more dispositive given that CVS already has reduced its dispensing of opioids in the counties by orders of magnitude. *See* CVS-MDL-04346a. Plaintiffs have made no record of whether any further supply reductions beyond this are warranted. Adding to the problem, and as explained above, CVS has implemented many initiatives to help prevent the filling of illegitimate prescriptions, prompting plaintiffs to commend CVS for its efforts. Trial Tr. (Doc. 4115) at 5765. Plaintiffs have adduced no evidence—and made no record—on whether the margin supplied by their proposed measures (if any) would have any effect.

Finally, plaintiffs ignore the fact that CVS accounts for only a small slice of opioid dispensing in the counties. *See* CVS-MDL-5013; CVS-MDL-5014. They offer no evidence on whether their proposed terms would impact the *overall* supply of prescription opioids that the jury found to be the nuisance. If opioid dispensing flows to other pharmacies, or if other pharmacies—such as Rite Aid and Giant Eagle who have much larger share than CVS in Trumbull County and who were the subject of comparable opinions from Carmen Catizone, *see* Trial Tr.(Doc. 4460) at 1252—were to fuel an alleged oversupply, then plaintiffs' proposed terms may have no impact at all. This is a consequence of plaintiffs' litigation decision to pursue claims against only a fraction of the pharmacies within their borders and not to seek injunctive terms against the pharmacies they

settled with. Their failure to offer any evidence on how their terms would effect an overall reduction in the supply of prescription opioids underscores the failure of proof.

### 3.    No Fact Record on Plaintiffs' Proposed Policy Changes

Plaintiffs have made no factual record on whether key aspects of their proposed terms are desirable or even capable of implementation. For instance, plaintiffs seek to require CVS to conduct data review of patients and to ban patients from filling controlled-substance prescriptions if it identifies concerns with them. *See* Doc. 4513-2 at § XII.C-D. But no state or federal law calls for any such program. Nor is it included in the Florida settlement on which plaintiffs rely. Nor did plaintiffs adduce any testimony indicating that it would make for appropriate policy. It very well may be *bad* policy to prevent patients from receiving medicine regardless of whether they have a true—or dire—medical need. There is no basis in the record for the Court to require such an untested and controversial program.

Another example is plaintiffs' proposal to require CVS pharmacists to electronically document instances in which they refuse to fill a prescription—a requirement that, again, appears in no rule or regulation or in the Florida terms. *See id.* at § XI. It very well may be that a policy that imposes *no requirements* for a pharmacist to refuse to fill a prescription—and that makes refusals easier—is better policy. There is no basis in the record for the Court to pick one or the other and to divest CVS of its ability to use its own expertise to decide which policy fits it best.

A third example is plaintiffs' proposal to require CVS policies to identify a red flag when "a prescriber prescribes the same medication, with the same directions, for the same quantity for four or more individuals." *Id.* at § IX.C.2. The record, again, is silent on such a flag—including

19

on whether it even is capable of implementation.[9]  This supposed flag would capture virtually every prescription written by, for instance, knee surgeons who write the same 5-day prescription for all post-surgery ACL patients or for oral surgeons who write the same 3-day prescription for post-surgery wisdom-teeth patients. There is no evidence that this would be appropriate.[10]

### 4.  No Court Authority to Promulgate Pharmacy Practice Rules

Even though the Court stated that it "is not appropriate" for it to serve as a pharmacy regulator, plaintiffs seek to impose terms that are not required (or even referenced by) state and federal law and that would make the Court a new regulator of pharmacy practice. These terms include the implementation of certain corporate-level data-review programs, like prescriber and patient review programs. *See id.* at § XII. They include new requirements for pharmacists to document decisions to refuse to fill a prescription, as well as technological requirements to allow other pharmacists to view such documentation. *See id.* § XI. They include requirements to share data with pharmacists and to implement technologies such as Narxcare. *See id.* § X.B. And they seek to impose a list of highly particularized "red flags" and to require pharmacists to document their resolution of them with "clear description[s]" and "sufficient details." *See id.* §§ at VIII.F & IX. None of this is required by any statute, rule, or regulation.

The executive branch agencies that are charged with regulating pharmacies—the U.S. Drug Enforcement Administration and the Ohio Board of Pharmacy—have not required any of these

---

[9] When this occurs "on the same day," Mr. Catizone designated it a red flag. Trial Tr. (Doc. 4005) at 1032. But plaintiffs removed the "same day" requirement and, in so doing, transformed it.

[10] Other supposed "red flags" in plaintiffs' proposal suffers the same shortcoming. For instance, plaintiffs seek to attribute a "red flag" to any patient who "seeks to fill a Designated Controlled Substance Prescription from more than three Prescribers, from separate practices, in a given six-month period." *Id.* at § IX.A.2. This flag not only deviates from the Florida terms (which triggers the flag at four prescribers), there is no record evidence to support it.

programs, procedures, policies or systems, and this Court lacks the authority to second guess those judgments and craft new judicial regulations. Imposition of the new rules proposed by plaintiffs is preempted by federal and state law on the operation of pharmacies and the filling of prescriptions. *See, e.g.*, *Geiser v. Amer. Honda Motor Co.*, 529 U.S. 861, 874-75 (2000); *Arizona v. United States*, 567 U.S. 387, 406-07 (2012). It would convert this Court to rule-maker and exceed its Article III authority. *Callahan v. Federal Bureau of Prisons*, 965 F.3d 520, 524-25 (6th Cir. 2020) ("separation-of-powers principles" counsel against judicial action that "risk[s] . . . interfering with the authority of the other branches"). The balance between ensuring access to medicine and guarding against diversion has been entrusted to the DEA and the Board of Pharmacy. *See Gonzales v. Raich*, 545 U.S. 1, 24 (2005). The Court lacks both the authority and the expertise to re-write the regulations—and to reconfigure the balance—that these executive agencies deemed suitable. It is precisely what this Court determined "is not appropriate."

### 5.  Consideration of Florida Settlement Prohibited

Plaintiffs use the injunctive terms to which CVS agreed in Florida as the foundation of their proposed terms (subject to significant modifications and additions).[11] Those terms, however, are part of a litigation settlement between CVS and the State of Florida. Rule 408 prohibits their use here. As explained in a leading treatise:

> The policy of encouraging settlement applies with equal strength whether the claim being settled seeks monetary or non-monetary relief. Thus, Rule 408 should apply to exclude compromise evidence where offered for the purpose of proving the availability of non-monetary relief where that is in dispute.

---

[11] Modifications include, for instance, narrowing the distance red flag from 50 miles to 25 miles—irrespective of the fact that patients often travel more than 25 miles to visit hospitals or medical centers. Additions include, for instance, the plaintiffs' patient-blocking program.

23 Charles Alan Wright & Victor Gold, *Federal Practice and Procedure* § 5304 (2d ed. 2018).[12]

Even if Rule 408 did not prohibit use of the Florida terms here, they remain inapposite. They reflect a compromise with a sovereign that regulates pharmacy practice. They say nothing about what terms a court has legal authority to impose in a contested proceeding, or about what terms may be entered in favor of a locality with no regulatory authority over pharmacy practice.

If, despite this, the Court considers the Florida terms and adopts them as a the foundation of its order, then it must reject plaintiffs' attempt to take what they like, delete what they do not like, add entirely new terms, and otherwise disrupt the balance struck by the document.[13] If the Court considers the Florida terms, it also must consider the counties' own settlements with Rite Aid and Giant Eagle. There would be no conceivable basis to consider the Florida terms but not the counties' own settlements. Significantly, the counties' settlements with Giant Eagle and Rite Aid included no injunctive terms. They also included payments amounting to $1.5 million to each county from Giant Eagle and no more than $3 million to each county from Rite Aid. If the Court determines that settlement evidence may be considered, then these aspects of the counties' settlements with Giant Eagle and Rite Aid must cabin the award.

Similarly, if the Court is to consider the Florida injunctive terms, then it also must consider the Florida settlement sum. Adjusted for population, it would result in annual payments of

---

[12] *See also Bowers v. NCAA*, 563 F.Supp.2d 508, 535-36 (D.N.J. 2008) (excluding under Rule 408 consent decree requiring changes to NCAA rules; "Rule 408 is plainly applicable to the 1998 Consent Decree, and the policies underlying the rule would be undermined by permitting Plaintiff to introduce the Consent Decree into evidence."); *Complex Sys. v. ABN Ambro Bank*, 2014 WL 1055263, at *3 (S.D.N.Y. Mar. 13, 2004) (excluding under Rule 408 settlement communications regarding injunctive relief).

[13] By way of example, plaintiffs revise the Florida red flags, add language that would make certain requirements—like documentation—excessive, add a monitor, and delete important language. *See, e.g.*, Doc. 4513-2 at § XVIII.A.1 (deleting sentence stating that "[a] violation of this Agreement does not occur when a pharmacist . . . violates the Settling Pharmacy's CSCP Policies").

$264,000 to Lake County and $229,000 to Trumbull County. If the terms of CVS's settlement with Florida are to be considered, these financial terms must be given the same weight.

### 6. Terms Are Replete with Imprecision

Finally, plaintiffs' proposed terms are riddled with imprecision. By way of example, they list certain "patient red flags" that must be included in CVS's policies. But the required flags "are not limited to" the listed flags, leaving CVS to guess at what other flags would be required. Doc. 4513-2 at § IX.A. The terms use "including but not limited to" elsewhere as well, making the scope of the requirement ambiguous in each instance. *See, e.g.*, *id.* at § VI.C. Similarly, the terms state that CVS "shall provide critical data to pharmacists as part of the dispensing process." *Id.* at § X.B. But they do not specify what "critical data" includes. The terms call on pharmacists to provide "clear description[s]" and "sufficient details" in their documentation of their due diligence, even though what is "clear" and "sufficient" is subjective. *Id.* at § VIII.F. The terms state that "specific pharmacy store sales, profitability targets" should be excluded from compensation, yet the language is garbled. *Id.* at § V.A. It is entirely unclear what it means and to whom it applies. There was no testimony on the language, and it does not even appear in the Florida terms. A final example is a provision that requires CVS to identify a red flag when "[a] patient is seeking to fill a controlled substance prescription from three or more pharmacies." *Id.* at § IX.A.5. It is entirely unclear how a patient could seek to fill a single prescription at three or more pharmacies and what this therefore means. Terms such as these are not capable of implementation.

### 7. The Parties Met and Conferred

In response to the Court's order, the parties met and conferred about these terms. The parties participated in the discussions in good faith and offered meaningful explanations for their respective positions. The parties recognized, however, that they could not reach agreement.

As set forth above, CVS objects to any injunctive terms that regulate pharmacy practice. Subject to these objections and exclusively to assist and respond to the Court, CVS previously submitted a set of dispensing terms that attempted to capture what the Court envisioned. Doc. 4512 at 40-41. A supplemented version of these dispensing terms is submitted with Walgreens' and Walmart's Joint Response to Plaintiffs' Closing Brief. While CVS has provided these dispensing terms to assist and respond to the Court, it objects to the entry of either version. As set forth in CVS's prior submissions, the injunctive relief that flows from the counties' infirm claims is instead (1) a prohibition on the dispensing of Schedule II opioids in the counties and (2) the provision of means for drug disposal. It would not be right from a patient-care perspective, or legally, to prohibit the dispensing of medication. But it is the relief that flows from the objectionable theories that the counties advanced to obtain the verdict and that most directly abates the oversupply they seek to remediate.

### M.    A Final Word on Plaintiffs' Burden of Proof.

In their closing brief, plaintiffs repeatedly claim that they are entitled to "full" relief because defendants did not challenge the efficacy of certain interventions or provide alternative calculations for plaintiffs' abatement costs.[14] This is unfair. CVS has included proposed remedies in its submissions. Doc. 4336; Doc. 4512 at 32-42. Subject to its objections, it even has proposed processes for screening patients for treatment. Doc. 4512 at 35. But plaintiffs' position suffers a more essential error. Their complaints about supposed shortcomings in CVS's presentation constitute an attempt to improperly shift their own burden of proof to defendants. The Court must reject this summarily.

---

[14] *See, e.g.*, Doc. 4513 at 10; *id.* at 11; *id.* at 23.

"As a general rule, evidence of damages is part of *the plaintiff's* case . . . . Thus, the plaintiff may not recover damages upon the weakness of the defendant's case, but only upon the strength of his own proof." *Sharp v. Clark*, 1992 WL 107849, at *3 (Ohio App. Ct. 2d Dist. May 20, 1992) (citations omitted) (emphasis added). Accordingly, if a plaintiff "establishes that he is entitled to damages, yet fails to establish a proper basis from which those damages can be computed, he is entitled to only nominal damages." *Norfolk & W. Ry. Co. v. U.S. Ry. Equip. Co.*, 563 F. Supp. 747, 750 (N.D. Ill. 1983) (internal quotation marks and citation omitted). Even if a defendant comes forth with nothing, a plaintiff may still fail to meet this burden. *See, e.g.*, *Bevens v. Wooten Landscaping, Inc.*, 2012 WL 5391961, at *3 (Ohio App. Ct. 4th Dist. Oct. 25, 2012) (stating that a "plaintiff must show its entitlement to damages in an amount ascertainable with reasonable certainty"; affirming judgment for defendant because plaintiff's damages amount was a "guesstimate" (citations omitted)); *Alterna Mortg. Income Fund, LLC v. GS Holdings-Brookside, Ltd.*, 2012 WL 5897578, at *2 (S.D. Ohio Nov. 21, 2012) (denying request for *default judgment*—where the defendant had not even appeared in the case—because plaintiff had not presented evidence "showing the extent of its damages with reasonable certainty").

The counties disregard actual county data in favor of expert extrapolations layered on top of one another that are neither reliable nor reasonably certain. They have not met their burden. No showing from the defense is needed, even though a substantial one has been made.

### N.    Incorporation

To avoid repetition, CVS hereby adopts and incorporates by reference Sections I, II, III, and V of Walgreens' and Walmart's Joint Response to Plaintiffs' Closing Brief. CVS also adopts Section of VI, which draws the Court's attention to the recent Supreme Court opinion in *Ruan v. United States*, 597 U.S.---, 2022 WL 2295024 (June 27, 2022). Preserving its position that the

liability verdict should have been set aside for the reasons set forth in its post-trial motions (Doc. 4202; Doc. 4207), CVS joins in the relief sought by Walmart and Walgreens on the basis of *Ruan*.


Dated:  July 8, 2022                                     Respectfully submitted,

                                                        /s/ *Eric R. Delinsky*
                                                        Eric R. Delinsky
                                                        Alexandra W. Miller
                                                        Paul B. Hynes, Jr.
                                                        Anthony M. Ruiz
                                                        ZUCKERMAN SPAEDER LLP
                                                        1800 M Street NW, Suite 1000
                                                        Washington, DC  20036
                                                        Tel: (202) 778-1800
                                                        E-mail: edelinsky@zuckerman.com
                                                        E-mail: smiller@zuckerman.com
                                                        E-mail: phynes@zuckerman.com
                                                        E-mail: aruiz@zuckerman.com

                                                        *Counsel for CVS Pharmacy, Inc., Ohio CVS Stores, L.L.C., CVS TN Distribution, L.L.C., CVS Rx Services, Inc., and CVS Indiana, L.L.C.*