**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track Three Cases | |

**PLAINTIFFS' OMNIBUS RESPONSE TO (I) WALGREENS' AND WALMART'S JOINT ABATEMENT PHASE CLOSING SUBMISSION (DKT. #4511), AND (II) CVS ABATEMENT PHASE POST-TRIAL BRIEF (DKT. #4512)**

July 8, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

**I.** **Plaintiffs Sufficiently Demonstrated at Trial That They Are Entitled To the
Abatement Relief They Requested.** ......................................................................... 1

    A. Each of the abatement interventions in Dr. Alexander's abatement plan is properly
recoverable as abatement of the public nuisance found by the jury. ................................ 1

    B. The evidence adduced at trial sufficiently demonstrates that the funding and
implementation of Plaintiffs' abatement plans would abate the public nuisance in
the Counties.. ............................................................................................................... 8

    C. Defendants' additional criticisms of Dr. Alexander's abatement plan are without
merit and should be rejected. ....................................................................................... 20

**II.** **Defendants' Unreasonable and Unwarranted Limitations on the Abatement
Relief Should Be Rejected.** ..................................................................................... 24

    A. The abatement relief is not limited to the type of relief that would have been awarded
by the English Court of Chancery. ............................................................................... 24

    B. The abatement relief requested is sufficiently final and non-speculative and should not
be limited to one year. ................................................................................................. 28

    C. No categories of abatement relief in Plaintiffs' plans should be excluded. ...................... 32

    D. To the extent Defendants are held jointly and severally liable for the abatement award,
a setoff in the amount of Plaintiffs' settlements with other opioid-litigation defendants
is appropriate. ............................................................................................................. 36

    E. Aside from settlements, the abatement award should not be reduced by any purported
future collateral payments. .......................................................................................... 38

    F. Plaintiffs do not oppose certain reasonable mechanisms being put in place to prevent
waste and fraud, but Defendants' proposed restrictions are unreasonable and should
be rejected. ................................................................................................................. 50

**III.** Plaintiffs' Harm from the Public Nuisance Is Indivisible and Defendants Failed To
Prove It Can Be Reasonably Apportioned ................................................................ 59

    A. Under Ohio law, Defendants are jointly and severally liable for the entire abatement
award unless they satisfy their burden to prove Plaintiffs' harm can be reasonably
apportioned.. .............................................................................................................. 59

B.  Defendants failed to satisfy their burden of proof that the harm can be reasonably apportioned between them and any other substantial contributors to the public nuisance…......................................................................................................... 68

1. Walgreens' and Walmart's proposed apportionment frameworks should be rejected…..... ............................................................................................................ 68

2. CVS's proposed apportionment frameworks should be rejected.................................. 72

**IV. Plaintiffs' Proposed Injunctive Relief Is Concrete, Feasible, and Supported by the Evidence Presented at Trial**................................................................................................. 74

A.  Defendants' arguments against awarding injunctive relief in this case should be rejected…....................................................................................................................... 75

B.  Defendants' proposed injunctive relief terms are insufficient and should be rejected. ... 80

**V.  Defendants' Other Preserved Arguments Against Abatement Should Be Rejected for the Reasons Set Forth in Prior Briefing**........................................................................ 83

**CONCLUSION** ............................................................................................................................ 83

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*,
  712 F. Supp. 994 (D. Mass. 1989) ............................................................................5

*Adelphia Commun. Corp. v. Rigas*,
  02 CIV.8495 GBD, 2003 WL 21297258 (S.D.N.Y. June 4, 2003) ........................................28

*Akerstrom v. 635 W. Lakeside, Ltd.*,
  105 N.E.3d 440 (Ohio App. 8th Dist. 2018)...........................................................40

*Andler v. Clear Channel Broad., Inc.*,
  670 F.3d 717 (6th Cir. 2012) ..............................................................................18

*Animale Grp. v. Sunny's Perfume, Inc.*,
  256 Fed. Appx. 707 (5th Cir. 2007).......................................................................27

*Austin v. U.S.*,
  509 U.S. 602 (1993).........................................................................................68

*Baker v. Goldblatt*,
  955 F.2d 402 (6th Cir. 1992) ..............................................................................49

*Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*,
  417 U.S. 703 (1974).....................................................................................41, 43

*Basic Mgt. Inc. v. U.S.*,
  569 F. Supp. 2d 1106 (D. Nev. 2008).....................................................................47

*Biechele v. Norfolk & W. Ry. Co.*,
  309 F. Supp. 354 (N.D. Ohio 1969)........................................................................25

*Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*,
  102 N.E.3d 579 (Ohio App. 10th Dist. 2017)...........................................................45, 49

*Boeing Co. v. Cascade Corp.*,
  207 F.3d 1177 (9th Cir. 2000) ............................................................................47

*Bowles v. Skaggs*,
  151 F.2d 817 (6th Cir. 1945) ..............................................................................25

*Boyle v. Zacharie*,
  31 U.S. 648 (1832)..........................................................................................27

*Bracket v. Moler Raceway Park LLC*,
  960 N.E.2d 484 (Ohio Ct. App. 2011)....................................................................78

iii

*Broad. Music, Inc. v. Xanthas, Inc.*,
    855 F.2d 233 (5th Cir. 1988) ................................................................................14

*State ex rel. Brown v. BASF Wayandotte Corp.*,
    NOS. 33533, 33545, 3, 1975 WL 182459 (Ohio App. 8th Dist. Apr. 24, 1975).........64, 65, 66

*Buchman v. Wayne Trace Loc. Sch. Dist. Bd. Of Edn.*,
    652 N.E.2d 952 (Ohio 1995)....................................................................................49

*Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*,
    123 F. Supp. 2d 245 (D.N.J. 2000), *aff'd*, 273 F.3d 536 (3d Cir. 2001) ................................37

*Carter-Jones Lumber Co. v. Dixie Distrib. Co.*,
    166 F.3d 840 (6th Cir. 1999) ...........................................................................24, 25

*Cavins v. S & B Health Care, Inc.*,
    39 N.E.3d 1287 (Ohio App. 2d Dist. 2015) ...........................................................43

*Celmer v. Rodgers*,
    No. 2004-T-0083, 2005 WL 3610479 (Ohio. Ct. App. Dec. 29, 2005).....................37, 38, 50

*City and County of San Francisco v. Purdue Pharma L.P.*,
    491 F. Supp. 3d 610 (N.D. Cal. 2020) .................................................................34, 77

*City of Chicago v. Beretta U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004)................................................................................35, 36

*City of Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002)................................................................................80

*City of Cincinnati v. Deutsche Bank Natl. Tr. Co.*,
    863 F.3d 474 (6th Cir. 2017) .................................................................................33

*City of Cleveland v. Ameriquest Mort. Securities, Inc.*,
    615 F.3d 496, 498-99 (6th Cir. 2010) .....................................................................33

*City of Gahanna v. Eastgate Properties, Inc.*,
    521 N.E.2d 814 (Ohio 1988)................................................................................18

*City of Huntington v. AmerisourceBergen Drug Corp.*,
    CV 3:17-01362, 2021 WL 1556788 (S.D.W. Va. Apr. 20, 2021) ...................................44, 45

*City of Huntington v. AmerisourceBergen Drug Corp.*,
    CV 3:17-01362, 2022 WL 2399876 (S.D.W. Va. July 4, 2022) .........................................6, 7

*City of Larkspur v. Jacobs Engr. Group, Inc.*,
    A123486, 2010 WL 2164406 (Cal. App. 1st Dist. May 28, 2010) (unpublished) ...........43, 44

*City of Mansfield v. Brister,*
  81 N.E. 631 (Ohio 1907)............................................................................................63, 66

*Collette v. Collette,*
  20423, 2001 WL 986209 (Ohio App. 9th Dist. Aug. 22, 2001) .............................................30

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013)...................................................................................................................4

*In re Debs,*
  158 U.S. 564 (1895)...............................................................................................................28

*Eastwood Mall, Inc. v. Slanco,*
  626 N.E.2d 59 (Ohio 1994)....................................................................................................30

*Edmonds v. Compagnie Generale Transatlantique,*
  443 U.S. 256 (1979)...........................................................................................................66, 67

*F.P. Dev., LLC v. Charter Township of Canton, Michigan,*
  16 F.4th 198 (6th Cir. 2021) ..................................................................................................68

*Fariss v. Lynchburg Foundry,*
  769 F.2d 958 (4th Cir. 1985) .............................................................................................46, 47

*Folino v. Hampden Color and Chemical Co.,*
  832 F. Supp. 757 (D. Vt. 1993)..............................................................................................48

*Galayda v. Lake Hosp. Sys., Inc.,*
  644 N.E.2d 298 (Ohio 1994)..................................................................................................18

*Gasperini v. Ctr. for Humans., Inc.,*
  518 U.S. 415 (1996)................................................................................................................24

*Gillespie v. Travelscape LLC,*
  C13-0622 RSM, 2014 WL 4243706 (W.D. Wash. Aug. 26, 2014) .......................................40

*Gonzalez v. Raich,*
  545 U.S. 1 (2005)....................................................................................................................76

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999)....................................................................................................26, 27, 28

*Gucci Am. v. Bank of China,*
  768 F.3d 122 (2d Cir. 2014)...................................................................................................27

*Hamlin v. Charter Tp. of Flint,*
  165 F.3d 426 (6th Cir. 1999) .............................................................................................42, 43

*Hammerschmidt v. Mignogna,*
    685 N.E.2d 281 (Ohio App. 8th Dist. 1996) ................................................................. 18

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ........................................................................................................ 25

*Holmes v. Securities Inv'r Protec. Corp.,*
    503 U.S. 258 (1992) ........................................................................................................ 34

*Howe v. City of Akron,*
    801 F.3d 718 (6th Cir. 2015) .......................................................................................... 78

*Hymowitz v. Eli Lilly and Co.,*
    539 N.E.2d 1069 (N.Y. 1989) ........................................................................................ 64

*Jaques v. Manton,*
    928 N.E.2d 434 (Ohio 2010) .......................................................................................... 48

*In re JUUL Labs, Inc., Mktg., Sales Practices, and Products Liab. Litig.,*
    497 F. Supp. 3d 552 (N.D. Cal. 2020) ..................................................................... 36, 37

*Kelley v. Thomas Solvent Co.,*
    714 F. Supp. 1439 (W.D. Mich. 1989) ........................................................................... 60

*Kidis v. Reid,*
    976 F.3d 708 (6th Cir. 2020) .......................................................................................... 67

*Kiss v. Kmart Corp.,*
    CIV. A. 97-7090, 2001 WL 568974 (E.D. Pa. May 22, 2001) ................................. 10, 12

*Lewis v. Lead Industries Assn.,*
    178 N.E.3d 1046 (Ill. 2020) ...................................................................................... 39, 40

*Liddell v. Bd. of Educ. of City of St. Louis, Mo.,*
    771 F. Supp. 1496 (E.D. Mo. 1991) ......................................................................... 55, 56

*Liu v. Securities and Exch. Commn.,*
    140 S. Ct. 1936 (2020) .............................................................................................. 41, 42

*Louisiana Dept. of Transp. and Dev. v. Kansas City S. Ry. Co.,*
    846 So. 2d 734 (La. 2003) .............................................................................................. 44

*Lussier v. Runyon,*
    50 F.3d 1103 (1st Cir. 1995) .......................................................................................... 46

*Magpul Industries Corp. v. Mayo,*
    1:13 CV 01782, 2013 WL 4511929 (N.D. Ohio Aug. 23, 2013) .................................... 26

*Matter of Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995). Dkt. #4512 .................................................................5

*Matthews v. State*,
    25 Ohio St. 536, 1874 WL 108 (Ohio 1874) ...........................................................41

*Mays v. Moran*,
    97CA2385, 1999 WL 181400 (Ohio App. 4th Dist. Mar. 18, 1999), *cause dismissed,*
    709 N.E.2d 173 (Ohio 1999)..............................................................................60, 66

*Messenger v. Norfolk S. Ry. Co.*,
    3:13CV1098, 2015 WL 999852 (N.D. Ind. Mar. 5, 2015) ......................................15

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
    379 F. Supp. 2d 348 (S.D.N.Y. 2005)...............................................................64, 65

*Miami Twp. Bd. of Trustees v. Weinle*,
    174 N.E.3d 1270 (Ohio App. 1st Dist. 2021) .....................................................29, 78

*State ex rel. Miller v. Anthony*,
    647 N.E.2d 1368 (Ohio 1995)...................................................................................41

*Molten Metal Equipment Innovations Inc. v. Metaullics Systems Co., L.P.*,
    No. 1:05 CV 561, 2005 WL 8170800 (N.D. Ohio Aug. 22, 2005) .....................79, 80

*Moore v. U. S.*,
    429 U.S. 20 (1976)....................................................................................................14

*Moretz v. Muakkassa*,
    998 N.E.2d 479 (Ohio 2013)....................................................................................48

*Mugler v. Kansas*,
    123 U.S. 623 (1887)..................................................................................................28

*In re Nat'l Prescription Opiate Litig.*,
    2019 WL 4043938 (N.D. Ohio Aug. 26, 2019) ......................................................24

*In re Natl. Prescription Opiate Litig.*,
    1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019) .............................35

*In re Natl. Prescription Opiate Litig.*,
    1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) .............................39

*In re Natl. Prescription Opiate Litig.*,
    1:18-OP-45090, 2018 WL 4895856 (N.D. Ohio Oct. 5, 2018) ...............................39

*In re Natl. Prescription Opiate Litig.*,
    440 F. Supp. 3d 773 (N.D. Ohio 2020)....................................................................34

*In re Natl. Prescription Opiate Litig.*,
    458 F. Supp. 3d 665 (N.D. Ohio 2020)............................................................................35, 36

*Nichols v. Hanzel*,
    674 N.E.2d 1237 (Ohio App. 4th Dist. 1996).......................................................................63

*Oberhaus v. Alexander*,
    274 N.E.2d 771 (Ohio App. 3d Dist. 1971)............................................................................9

*Oyler & Oyler v. Louisville & N. R. Co.*,
    18 Ohio App. 481 (Ohio App. 1st Dist. 1923).....................................................................63

*Palmer v. Connecticut Ry. & Lighting Co.*,
    311 U.S. 544 (1941)..............................................................................................................31

*Pang v. Minch*,
    559 N.E.2d 1313 (Ohio 1990).........................................................................................63, 65

*People v. ConAgra Grocery Products Co.*,
    227 Cal. Rptr. 3d 499 (Cal. App. 6th Dist. 2017)...............................................................1, 67

*Price Bros. Co. v. Philadelphia Gear Corp.*,
    649 F.2d 416 (6th Cir. 1981) ...............................................................................................14

*Rasimas v. Michigan Dept. of Mental Health*,
    714 F.2d 614 (6th Cir. 1983) ...............................................................................................43

*Revolutions Med. Corp. v. Med. Inv. Group LLC*,
    CIV.A. 12-10753-GAO, 2013 WL 1087693 (D. Mass. Mar. 13, 2013)............................26, 27

*R & R Intern., Inc. v. Manzen, LLC*,
    09-60545-CIV, 2010 WL 3605234 (S.D. Fla. Sept. 12, 2010).........................................23, 24

*Royal Indem. Co. v. Becker*,
    173 N.E. 194 (Ohio 1930)................................................................................................37, 64

*Rutherford v. Owens-Illinois, Inc.*,
    941 P.2d 1203 (Cal. 1997), *as modified on denial of reh'g* (Oct. 22, 1997) ....................74, 75

*Ryan v. Mackolin*,
    237 N.E.2d 377 (Ohio 1968).................................................................................................65

*S. New England Tel. Co. v. Global Naps, Inc.*,
    595 F. Supp. 2d 155 (D. Mass. 2009) ..................................................................................27

*San Antonio B. Ass'n v. Guardian Abstract & Title Co.*,
    291 S.W.2d 697 (Tex. 1956).................................................................................................30

*Schindler v. Stand. Oil Co.*,
    143 N.E.2d 133 (Ohio 1957)........................................................................63

*Scioto Twp. Zoning Inspector v. Puckett*,
    31 N.E.3d 1254 (Ohio App. 4th Dist. 2015). Dkt. #4511 ..........................9

*Seifert v. Burroughs*,
    526 N.E.2d 813 (Ohio 1988)........................................................................37

*Shaoxing Bon Textiles Co., Ltd. v. 4-U Performance Group LLC*,
    16 CIV. 6805 (JSR), 2017 WL 737315 (S.D.N.Y. Feb. 6, 2017)...................27, 28

*Sharon Township Bd. of Trustees v. Crutchfield*,
    No. 3286-M, 2002 WL 31015601 (Ohio Ct. App. Sept. 11, 2002) ........................30

*Shoemaker v. Crawford*,
    603 N.E.2d 1114 (Ohio App. 10th Dist. 1991) .........................................67

*Smith v. Cutter Biological, Inc., a Div. of Miles Inc.*,
    823 P.2d 717 (Haw. 1991) ...........................................................................64

*Spalla v. Fransen*,
    936 N.E.2d 559 (Ohio App. 11th Dist. 2010)................................................37, 38

*Springfield City School Support Personnel v. State Employment Relations Board*,
    616 N.E.2d 983 (Ohio Ct. App. 1992)..........................................................78

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003).....................................................................................67

*State v. Purdue Pharma L.P.*,
    No. 32CIV18-000065, 2021 WL 5873046 (S.D. Cir. Ct. Jan. 13, 2021) ..............77

*State, Dep't of Nat. Res., Div. of Wildlife v. Prescott*,
    537 N.E.2d 204 (Ohio 1989)........................................................................24

*State of Oklahoma v. Purdue Pharma L.P.*,
    No. CJ-2017-816, 2019 WL 9241510 (Okl. Dist. Ct. Nov. 15, 2019) ...................32

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*,
    402 U.S. 1 (1971).........................................................................................25

*Szedlock v. Tenet*,
    139 F. Supp. 2d 725 (E.D. Va. 2001), *aff'd,* 61 Fed. Appx. 88 (4th Cir. 2003)
    (unpublished) ...............................................................................................46

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (6th Cir. 2010) .......................................................................22

*Thurman v. Yellow Freight Sys., Inc.*,
    97 F.3d 833 (6th Cir. 1996) ...................................................................43

*Tilghman v. Proctor*,
    125 U.S. 136 (1888)............................................................................42

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019)...........................................................................67

*U.S. v. Bajakajian*,
    524 U.S. 321 (1998)........................................................................67, 68

*U.S. v. Davis*,
    31 F. Supp. 2d 45 (D.R.I. 1998).........................................................47

*U.S. v. Monsanto Co.*,
    858 F.2d 160 (4th Cir. 1988) .........................................41, 48, 66, 74

*U.S. v. Natl. Treas. Employees Union*,
    513 U.S. 454 (1995)............................................................................40

*U.S. v. Odabashian*,
    95-2361 G/BRE, 1999 WL 33944059 (W.D. Tenn. May 18, 1999), *amended on other*
    *grounds,* 95-2361 G/BRE, 2000 WL 34508805 (W.D. Tenn. Feb. 9, 2000)..........................74

*United States v. Twp. of Brighton*,
    153 F.3d 307 (6th Cir. 1998) ..............................................................60

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937)............................................................................25

*White v. Long*,
    231 N.E.2d 337 (Ohio Ct. App. 1967).................................................78

*White v. Vrable*,
    98AP-1351, 1999 WL 771053 (Ohio App. 10th Dist. Sept. 30, 1999) ............................33, 34

*Williams v. Owens*,
    937 F.2d 609, 1991 WL 128775 (6th Cir. 1991) (unpublished) ..............................40

*Wind v. State*,
    130 N.E. 35 (Ohio 1921)....................................................................41

*In re: Zoloft (Sertraline Hydrocloride) Products Liab. Litig.*,
    12-MD-2342, 2015 WL 7776911 (E.D. Pa. Dec. 2, 2015), *aff'd sub nom. In re Zoloft*
    *(Sertraline Hydrochloride) Products Liab. Litig.*, 858 F.3d 787 (3d Cir. 2017) ....................15

STATUTES

42 U.S.C. § 9613 ..............................................................................................................47

21 U.S.C. § 903 ..........................................................................................................76, 77

Judiciary Act of 1789 ...............................................................................................25, 29

OHIO REV. CODE § 2307.28 ......................................................................................37, 38

OHIO REV. CODE § 2315.20 ............................................................................................48

OHIO REV. CODE Ch. 4729 ...........................................................................................77

OTHER AUTHORITIES

18 OHIO JUR. 3D CONTRIBUTION, INDEMNITY, ETC. § 73 (June 2022) ...........................67

21 C.F.R. § 1306.04 ........................................................................................................82

42 C.F.R. §§ 2.1-2.67 ......................................................................................................58

45 C.F.R. § 164.502 .........................................................................................................58

45 C.F.R. § 164.514 .........................................................................................................58

66 C.J.S. NUISANCES § 166 .............................................................................................40

City and County of San Francisco v. Purdue Pharma L.P., et al.,
    Case No. 3:18-cv-07591-CRB (N.D. Cal.), Dkt. #1076 (CT4 Ds' Joint Opp. to Ps'
    MSJ) .........................................................................................................................44

DEA Notice, Dispensing Controlled Substances for the Treatment of Pain,
    71 FR 52716-01, 2006 WL 2540907 (Sept. 6, 2006) ...........................................77

FED. R. EVID. 408 .............................................................................................................79

FED. R. EVID. 703 ......................................................................................................13, 14

Kristin A. Collins, "A Considerable Surgical Operation":  Article III, Equity, and Judge-
    Made Law in the Federal Courts,
    60 DUKE L.J. 249, 270 (2010) ..........................................................................39, 40

OHIO ADMIN. CODE § 5122-1-04 .....................................................................................58

OHIO ADMIN. CODE § 5122-26-08 ...................................................................................58

OHIO ADMIN. CODE § 5122-27-06 ...................................................................................58

RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981)................................................................31

RESTATEMENT (SECOND) OF TORTS § 433A (1965)...................................................60, 61, 63, 65

RESTATEMENT (SECOND) OF TORTS § 433B (1965)...................................................60, 61, 62, 63

RESTATEMENT (SECOND) OF TORTS § 840E (1979) ...............................................................60, 61

RESTATEMENT (SECOND) OF TORTS § 912 (1979).......................................................................18

## INTRODUCTION

Plaintiffs demonstrated during the Phase 2 trial that the public nuisance caused by Defendants can be materially abated through the funding and implementation of a comprehensive fifteen-year abatement plan in each County, consisting of four categories of reasonable, necessary, and effective opioid abatement interventions. Defendants failed to rebut this evidence at trial. Now, through their Closing Briefs,[1] they offer a litany of legal and factual arguments (both new and old) as to why the relief requested by Plaintiffs should be limited or denied entirely. Not one of these arguments is persuasive.

## ARGUMENT

### I. PLAINTIFFS SUFFICIENTLY DEMONSTRATED AT TRIAL THAT THEY ARE ENTITLED TO THE ABATEMENT RELIEF THEY REQUESTED.

As explained in detail in their Closing Brief, Plaintiffs have demonstrated that they are entitled to the equitable abatement relief they have requested in this case. *See* Dkt. #4513 (Ps' Closing Brief) at pp. 1-35; *see also* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 3-13, 115-116. Defendants' arguments to the contrary are without merit and should be rejected for the reasons set forth below and in Plaintiffs' prior briefing. *Id.*

### A. Each of the abatement interventions in Dr. Alexander's abatement plan is properly recoverable as abatement of the public nuisance found by the jury.

Defendants repeat many of the same arguments they have made before, which have already been briefed extensively. They argue that: (i) abatement's sole purpose is to eliminate the nuisance condition and not the effects of the nuisance;[2] (ii) the only nuisance found by the jury is the oversupply and diversion of legal prescription opioids and not the consequences thereof; and thus, (iii) Plaintiffs can only recover for abatement measures that directly address the oversupply and

---

[1] Despite the Court's clear instruction that only one closing brief be filed on behalf of Defendants collectively (Dkt. #4322 (CT3 Abatement Phase Trial Order) at p. 3), they filed two separate closing briefs (one on behalf of Walgreens and Walmart (Dkt. #4511) and another on behalf of CVS (Dkt. #4512)).

[2] Defendants' reliance on *People v. ConAgra Grocery Products Co.*, 227 Cal. Rptr. 3d 499 (Cal. App. 6th Dist. 2017), for this proposition is misplaced, as explained in Plaintiffs' prior briefing. *See* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 14-15.

diversion of legal prescription opioids. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 1, 3, 5-6, 8, 10-11; Dkt. #4512 (CVS Closing Brief) at pp. 1, 4-5, 27-28, 32. Defendants are wrong on all counts. Rather, as explained in Plaintiffs' prior briefing: (i) the public nuisance found by the jury is not as limited as Defendants contend;[3] (ii) the purpose of abatement is to rectify the unreasonable interference with public health and safety resulting from the nuisance; and (iii) the interventions and measures proposed in Plaintiffs' abatement plans are appropriately tailored to the public nuisance found by the jury. *See, e.g.,* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 3-23; Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 5-6; Dkt. #4513 (Ps' Closing Brief) at pp. 1-6; *see also* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 5-13, 84-86, 88, 90, 92-93.[4]

Defendants also criticize Plaintiffs' abatement plans for including measures addressing harms associated with illicit opioids, claiming "Plaintiffs have never established, through their experts or otherwise, that prescription opioids, much less these Defendants' dispensing of prescription opioids, directly caused the effects of illicit opioid abuse their plan is designed to abate." Dkt. #4511 (WAG/WMT Closing Brief) at pp. 5-7. This is simply untrue. Plaintiffs adduced extensive evidence at trial demonstrating that: (i) the oversupply and diversion of legal prescription opioids in the Counties led to an increase in the abuse of illegally manufactured or obtained drugs, such as heroin and fentanyl, and the associated harms related thereto; and (ii) it is crucial that any abatement plan include measures to reduce the harms associated with both

---

[3]   Specifically, considering the verdict form together with the jury instructions (as the Sixth Circuit demands) makes clear that the jury could not have found that the "oversupply" and "diversion" of prescription opioids constituted a public nuisance unless it also found that such oversupply and diversion interfered with public health or safety; thus, the consequential effects of the oversupply and diversion (*i.e.*, the interference with public health and safety) are an inextricable component of the nuisance itself. *See* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 3-6. This Court has previously recognized as much. *See* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 54-55 (rejecting Defendants' argument that they "are not responsible for the subsequent consequences of the oversupply and diversion of legal prescription opioids into illegitimate markets"; "This authority confirms that, even if, as Defendants assert, they discontinued the conduct that led to the existence of the nuisance, they are still subject to liability for abatement of any ongoing consequential effects of the nuisance.").

[4]   Plaintiffs distinguished much of the legal authority Defendants rely on in their prior briefing. *See, e.g,* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 8-9, 11-15, 23.

2

legal prescription opioids and illegally manufactured/obtained opioids.  *See, e.g.*, Dkt. #4513 (Ps' Closing Brief) at pp. 1-2; Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 4, 6-8, 84 n.68.[5]  Plaintiffs' experts also explained why each of the specific interventions and measures in their abatement plan was necessary to abate the nuisance in their communities.  *See, e.g.*, Dkt. #4513 (Ps' Closing Brief) at pp. 3-6.

Defendants point to certain testimony from Plaintiffs' experts where they "admit" that a certain percentage of heroin users have never previously used a prescription opioid.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 6.  But as Plaintiffs' experts explained at trial, the oversupply and diversion of legal prescription opioids fueled an expanded illicit drug market in the Counties, making them attractive locations to drug dealers and cartels looking to sell heroin and fentanyl.[6]

---

[5] Although Plaintiffs dispute that any of Defendants' arguments on this issue have merit, Plaintiffs' alternative abatement plans would certainly address any concerns Defendants may have about being held responsible for the entire OUD population.  Specifically, Plaintiffs have proposed an alternative, reduced-cost abatement plan for each County based on a modified estimate of the OUD population in the Counties calculated by subtracting the Counties' baseline OUD population numbers from 1999 (which was before most, though not all, of the oversupply and diversion of prescription opioids occurred in the Counties) from the estimated 2021 OUD population numbers.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 20-22.

[6] *See, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 73:3-19, 76:1 – 77:6 ("If you have a whole population of people who have a high degree of opioid use disorder due to prescription opioids, then that's going to be a community vulnerable to the introduction of heroin and other illicit distribution networks.  You have people who started on prescription opioids who then transitioned to heroin, and then you have other people, once the heroin dealers are in your neighborhood, who are going to use heroin, perhaps not having been exposed to prescription opioids, but those heroin dealers are there because there was a ready and available population of people with OUD who would have a high demand for the product."), 77:24 – 78:5, 198:1 – 199:6 ("[T]he concept of synergy in epidemiology, you know, we think about these types of environmental transitions all the time where, for example, you have prescription opioid oversupply in a particular community.  That renders people in that community more vulnerable to OUD.  Now you've got a bunch of people with new OUD in your community, and that provides a market for illicit drug sales, for example, from drug dealers because now you have people who are more primed to transition from prescription opioids to heroin use.  And, in fact, that's what we saw in a lot of places in this country.  So once kind of you have this opioid-rich environment, it is fertile soil for a broader array of harms to the community that may unfold over years. . . .  You know, we know from the epidemiological literature and other kinds of literature from other kinds of disciplines as well that heroin dealers and distributors went to areas where they thought more people had OUD."); Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 385:9-14 ("[T]here are individuals using heroin that started with prescription opioids, and, frankly, there are individuals using heroin that may not have even used a prescription opioid before but wouldn't have started with the heroin but for the opioid epidemic and the oversupply of prescription opioids.").

Defendants further argue that, by Dr. Keyes' "own analysis, approximately 35% of opioid mortality in the Counties cannot be attributed—directly or indirectly—to prescription opioids." Dkt. #4511 (WAG/WMT Closing Brief) at p. 6; *see also* Dkt. #4512 (CVS Closing Brief) at p. 24. But as she explained, although that 35% cannot be indirectly attributed to prescription opioids *specifically through the gateway transition pathway*, there are other pathways by which at least some portion of this percentage can be indirectly attributed to the oversupply and diversion of prescription opioids.  Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 102:17-22, 103:14 – 104:2, 197:8-23 ("So in that analysis, I was estimating the proportion of those deaths that were attributed to people transitioning from prescription opioids to nonprescription opioids.  So that – that analysis was just limited to that one pathway, but, of course, there could be other pathways more broadly linking the oversupply of prescription opioids in Lake and Trumbull County to these deaths."), 209:4-24; *supra* at fn.6.[7]

Plaintiffs' abatement plans are entirely consistent with the jury's verdict.  For these and other reasons, Defendants' reliance on *Comcast Corp. v. Behrend* is misplaced.  569 U.S. 27, 31-32, 35 (2013) (in class action alleging violations of federal antitrust laws, regression model developed by plaintiffs' expert could not be accepted as evidence that damages were susceptible of measurement across entire class, as required for class certification, because it failed to measure damages resulting from the only theory of antitrust impact accepted for class-action treatment; "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violations.'") (internal citation omitted).

Defendants also argue that "money to address the health consequences and other downstream effects of a nuisance constitutes damages, not abatement[,]" which the Court cannot

---

[7]    Plaintiffs would also note that their alternative proposed abatement plans are consistent with, if not more conservative than, the 35% estimate discussed by Dr. Keyes.  Dkt. #4513 (Ps' Closing Brief) at pp. 20-23 (using modified OUD numbers "would reduce the costs of the abatement interventions that are specifically based on OUD population . . . by 34% for Lake County and 46% for Trumbull County").

award because it would violate the Seventh Amendment.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 1, 4-5, 7-8, 10-11; Dkt. #4512 (CVS Closing Brief) at pp. 5-6.  Not so.  The Court has repeatedly held that the relief Plaintiffs seek constitutes equitable abatement, not damages. *See, e.g.,* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at p. 31 & n.97; Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 5; Dkt. #2519 (CT1 Order Denying Abatement *Daubert*) at pp. 2-3.  This issue has been briefed *ad nauseum* and Plaintiffs incorporate their prior briefing as if fully set forth herein.  *See, e.g.,* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 1-2 & n.1, 8-9, 12-15, 28-35.[8]

Importantly, Defendants continue to confuse abatement with future damages, and this fundamental misunderstanding undermines many of their arguments.  Although there is certainly some overlap between future damages and abatement, the two remedies are analytically and quantitatively different.  Future damages would consist only of the costs Plaintiffs would be required to pay out of pocket, within the limited constraints of their County budgets, to address the effects of the opioid epidemic.  This is nowhere near enough to abate the nuisance.  Unless Plaintiffs can go further, and address the ongoing causes of the epidemic, take proactive measures with respect to drug treatment and harm reduction, and otherwise put into place a comprehensive program to treat patients with OUD and to support communities affected by the crisis, opioid misuse and addiction will continue to plague the Counties at unprecedented levels and with tragic

---

[8]  Much of the legal authority relied on by Defendants has been distinguished in Plaintiffs' prior briefing and the Court's prior orders.  *See, e.g., id.* at pp. 8-9, 11-14; Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 35-39.  CVS also cites *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F. Supp. 994 (D. Mass. 1989), and *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995).  Dkt. #4512 (CVS Closing Brief) at pp. 5-6.  Both cases are inapposite.  In *Acushnet* the court was addressing whether "reimbursement" of abatement costs the plaintiff had expended was a legal remedy.  *Id.* at 1001 ("It is beyond question . . . that an action by the state to enjoin *future* maintenance of a public nuisance presents *equitable* issues.  The claims for *'reimbursement'* of expenses *incurred* in abating the nuisance are separate matters, however.") (emphasis added).  Plaintiffs do not dispute that if they were seeking to recover costs they *previously* expended to abate the nuisance, that remedy would constitute damages.  But that is not the remedy Plaintiffs seek here.  Rather, Plaintiffs ask that Defendants prospectively fund the costs necessary to abate the nuisance.  *Rhone-Poulenc*, which had nothing to do with nuisance abatement, is also distinguishable.  51 F.3d 1293, 1302–03 (7th Cir. 1995) (district judge exceeded his authority by bifurcating class action trials in such a way that multiple juries would be examining the same issue).

consequences, and continue to cause quantifiable harm to them. Some costs could be considered *both* future damages (because Plaintiffs will have to pay for them in any event) *and* equitable abatement (because they are necessary to abate the nuisance). Other costs, however, may be part of an abatement plan, because they are required for a truly effective redress of the problem, but cannot be considered future damages because the Counties will not be in a position to provide these measures outside the context of an abatement remedy. It is precisely because future damages are inadequate to fix the public nuisance that Plaintiffs sought broader relief in the form of abatement. An analogy helps illustrate the distinction. Future damages are like using a bandage on a bullet wound. It may somewhat alleviate the bleeding and keep the wound covered, but it is a superficial remedy at best. Even if the bandage is regularly replaced with a new one, this does not fix the source of the wound which, if left untreated, runs the risk of infection that can spread throughout the body. Abatement is more akin to having the bullet removed, having the wound irrigated, stitched up, and properly dressed, and taking antibiotics to prevent infection. It is a multi-pronged approach that actually addresses the root cause of the problem rather than only the symptoms.

Defendants will undoubtedly point to Judge Faber's recent decision in the Track 2 case to support their argument that Plaintiffs cannot recover the abatement relief they seek in this case. *See City of Huntington v. AmerisourceBergen Drug Corp.*, CV 3:17-01362, 2022 WL 2399876 (S.D.W. Va. July 4, 2022). In *City of Huntington*, Judge Faber held that three opioid *distributors* could not be held liable for public nuisance under West Virginia law for a variety of reasons. *Id.*[9]

---

[9] Significantly, when explaining the bases for his rulings, Judge Faber repeatedly distinguished opioid distributors from opioid dispensers. *Id.* at *65 ("Distributors also are not pharmacists with expertise in assessing red flags that may be present in a prescription. . . . 'There is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances. Pharmacies are obviously best equipped to decide whether to fill prescriptions. . . . [D]istributors have no ability to stop pills on a prescription-by-prescription basis and none of the expertise with which to determine whether prescriptions are good or bad. . .") (internal citation omitted); *see also id.* at *34-35 (noting that plaintiffs had provided no evidence at trial of pharmacy-level diversion from any of defendants' pharmacy customers), *53 ("Plaintiffs offered no evidence that defendants ever distributed controlled substances to any entity that it knew was dispensing for any purpose other than to fill legitimate prescriptions written by doctors."), *55 ("[D]etecting and (footnote continues on next page)

6

He then proceeded to note, in *dicta*, that almost all of the relief sought by the plaintiffs did not constitute "abatement" because it was "directed at treating or otherwise addressing drug use and addiction, not at any of defendants' alleged nuisance-causing conduct." *Id*. at \*67-69.

Importantly, Judge Faber based this determination on his interpretation of *West Virginia* public nuisance law. He claimed that "[u]nder West Virginia law, a public nuisance consists of wrongful *conduct*[,]" and, thus, he interpreted abatement under West Virginia law as limited to relief directed at "enjoin[ing] or stop[ping]" the conduct itself. *Id*. at \*67-68 (emphasis added). Even assuming, *arguendo*, that Judge Faber's interpretation of West Virginia law is correct,[10] his *dicta* statements have no bearing on the issue of the proper scope of an abatement remedy under *Ohio* public nuisance law. This Court has repeatedly held that, under both Ohio law and the Restatement (Second) of Torts, a public nuisance can be *either* the conduct *or* a condition caused by the conduct:

> Although couched in terms of conduct, the Restatement is clear that the nuisance
> is **the harm caused** by human activity **or** physical condition. Thus, it is important
> to understand that a nuisance can exist when **either** the **activity**, **itself**, is

---

thwarting illegal prescribing is not the duty *of distributors*. Their role, instead, is to detect and avoid supplying pharmacies that are themselves no part of the 'legitimate medical . . . channel[ ].'") (emphasis added), \*64 ("Nor does the record evidence support any assertion that defendants' pharmacy customers were engaging in diversion. . . . *The lack of evidence of pharmacy-level diversion on the part of defendants' pharmacy customers is fatal to plaintiffs' claims*."; "In this world, maintaining effective controls would require cutting off dispensers completely because the distributor (which is not a medical doctor *or pharmacist*) has a hunch that some of the pharmacy's customers may be engaged in misconduct such as doctor shopping, feigned injuries, and similar fraud to obtain an unnecessary prescription. That is not a reasonable conception of what maintaining effective controls requires of *distributors* . . .") (emphasis added), \*67 ("Such oversupply and diversion were made possible, beyond the supply of opioids by defendants, by overprescribing by doctors, *dispensing by pharmacists of the excessive prescriptions*, and diversion of the drugs to illegal usage—all effective intervening causes *beyond the control of defendants*.") (emphasis added).

10 Plaintiffs dispute Judge Faber's characterization of West Virginia law and note that it contradicts other West Virginia state court authority. *See, e.g.,* Dkt. #4321-4 (6/29/20 WV Mass Litigation Panel Order) at p. 9 ("[T]he cost of providing opioid education programs or treatment centers might be part of the equitable relief to abate Plaintiffs' alleged public nuisance—the opioid crisis[.] . . . The Court further concludes that prospective costs for addiction treatment and services may be sought as part of the necessary measures to abate or remediate the alleged public nuisance of the opioid epidemic. Such costs are akin to the 'clean up' costs that were assumed to be recoverable to remediate the public nuisance in *Kermit Lumber*[.]").

the harm . . . *or* when the ***condition resulting from the activity is the harm*** . . . . In other words, the conduct itself (*i.e.*, the human activity) may, but need not necessarily, be the interference. Per the Restatement, the physical condition resulting from the activity can also be the interference.

Dkt. #4296 (CT3 Order Denying Ds' MNTs) at pp. 59-60 (internal citations omitted) (emphasis in original). *See also* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 54-55 ("A nuisance may result either from harm caused by human activity *or* by a physical condition that results from the activity and continues after the conduct leading to the condition ceases. . . . This authority confirms that, even if, as Defendants assert, they discontinued the conduct that led to the existence of the nuisance, they are still subject to liability for abatement of any ongoing consequential effects of the nuisance.") (emphasis in original). Accordingly, the relief sought by Plaintiffs in this case, which seeks to abate the harmful condition caused by Defendants' misconduct, is properly recoverable as abatement under Ohio law.

> **B.** **The evidence adduced at trial sufficiently demonstrates that the funding and implementation of Plaintiffs' abatement plans would abate the public nuisance in the Counties.**

Defendants argue that Plaintiffs failed to prove that the public nuisance in the Counties is abatable by reasonable means. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 3-4; Dkt. #4512 (CVS Closing Brief) at pp. 6-7. Not so. As explained in their prior briefing, Plaintiffs provided ample evidence at trial demonstrating that the public nuisance found by the jury can be materially abated through the funding and implementation of the measures and interventions contained in Plaintiffs' abatement plans. *See* Dkt. #4513 (Ps' Closing Brief) at pp. 2-6. The evidence further demonstrates that these measures and interventions are reasonable, workable, and effective. *Id.* Significantly, Defendants offered no evidence at trial refuting either the necessity or efficacy of any of Plaintiffs' proposed abatement measures and interventions. *Id.* at pp. 6-7.

Defendants appear to believe that a nuisance is not "abatable" unless it can be completely eliminated. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 1, 4, 9-10; Dkt. #4512 (CVS Closing

Brief) at pp. 6-7.[11]  Thus, according to Defendants, the public nuisance in this case is not abatable because Plaintiffs' abatement plans would "only" reduce opioid-related harms by 50% after fifteen years.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 1, 9; Dkt. #4512 (CVS Closing Brief) at p. 7.  Effectively, they are arguing that the problem they were a substantial factor in causing is so massive and complicated in scope that it is unfixable and, thus, they cannot be ordered to try to fix any portion of it.  This position is illogical and not supported by Ohio nuisance law.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 5-6.

Defendants next argue that Plaintiffs have not presented a cognizable claim for abatement because they failed: (i) "to prove that any aspect of their abatement plan is necessary to abate the nuisance the jury found *in these Counties*[;] and (ii) "failed to present a non-speculative basis for the cost of abatement services in their Counties."  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 10-17;[12] *see also* Dkt. #4512 (CVS Closing Brief) at pp. 1, 9-10.  Both arguments are without merit.

Defendants try to make much of the fact that no County witnesses testified during the Phase 2 trial.  *See, e.g.,* Dkt. #4511 (WAG/WMT Closing Brief) at p. 11; Dkt. #4512 (CVS Closing Brief) at pp. 1, 9.  But they ignore that three County witnesses testified during the Phase 1 trial regarding the ongoing nuisance in the Counties, the Counties' previous efforts to address that nuisance, and the Counties' need for additional programs, services, and funding to abate the nuisance.[13]

---

[11]  Defendants claim that the nuisance here is not "removable by reasonable means" as required by *Scioto Twp. Zoning Inspector v. Puckett,* 31 N.E.3d 1254 (Ohio App. 4th Dist. 2015).  Dkt. #4511 (WAG/WMT Closing Brief) at p. 9; Dkt. #4512 (CVS Closing Brief) at pp. 6-7.  But *Scioto* is factually distinguishable, as explained in Plaintiffs' prior briefing.  *See* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at p. 10.

[12]  Defendants rely on *Oberhaus v. Alexander*, but that case is entirely distinguishable, 274 N.E.2d 771 (Ohio App. 3d Dist. 1971).  In *Oberhaus*, various county residents filed an action to enjoin further development of a nearby public airport and for damages for the loss in their land value.  *Id*. at 771.  The plaintiffs failed to offer sufficient evidence to support either remedy.  *Id*. at 772 ("[A]lthough a continuing trespass is a basis for injunctive relief, it is not sufficient to have merely a speculative, anticipated trespass. . . .  [T]here is [also] no proof of damages.  The possibility of low flying aircraft causing property damage or personal injury is purely speculative at this time.").

[13]  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2727:14-23, 2730:9-20, 2731:10-19, 2750:10 (footnote continues on next page)

Defendants also claim that Plaintiffs' experts "relied exclusively on social-science generalizations, rather than tailoring those generalizations to the on-the-ground reality in the Counties." Dkt. #4511 (WAG/WMT Closing Brief) at pp. 13-15; *see also* Dkt. #4512 (CVS Closing Brief) at pp. 9-10 (claiming Dr. Alexander's abatement plans are "unfinished" because they have not been customized to the Counties).[14] That simply is not true. In forming their opinions, Plaintiffs' experts relied on, *inter alia*: (i) extensive county-specific data for Lake County and Trumbull County;[15] (ii) the deposition testimony of various County witnesses;[16] and/or (iii) their direct

---

– 2756:7, 2770:8-15, 2795:3 – 2796:20, 2821:8 – 2822:3; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4222:21-24, 4227:18 – 4237:17, 4239:14 – 4240:8, 4242:21 – 4264:17, 4266:5 – 4267:19, 4277:1-4, 4278:19 – 4279:19, 4284:18 – 4285:14, 4289:3 – 4292:5; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4348:19-25, 4350:24 – 4352:5, 4353:9 – 4354:7, 4357:19 – 4366:2, 4367:8 – 4369:23, 4374:11 – 4380:4, 4382:25 – 4383:7, 4384:19 – 4386:13, 4393:14 – 4394:18, 4395:17 – 4396:21, 4399:14-24, 4400:20-24.

[14] CVS argues that Dr. Alexander's abatement plans "must be stricken" because they are "unfinished" and "not fit for implementation." Dkt. #4512 (CVS Closing Brief) at pp. 9-10. Notably, CVS failed to assert any such objection to his testimony at trial. *See, e.g., Kiss v. Kmart Corp.*, CIV. A. 97-7090, 2001 WL 568974, at *6 (E.D. Pa. May 22, 2001) ("Plaintiff did not object at trial to the [expert's] testimony of which she now complains; therefore, Plaintiff has waived the objection."). CVS lodged *only* three objections to Dr. Alexander's testimony: (i) a "leading" objection to a question asking Dr. Alexander to describe his experience; (ii) a "calls for speculation" objection to a question regarding the potential impact of his abatement plans on schools; and (iii) an objection (no basis stated) to a question regarding whether the effectiveness of his abatement plans would make Plaintiffs "models" for Ohio. Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 328:3-9, 362:11-23; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 600:6-16.

[15] *See, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 45:6-21, 90:2-5, 177:18-24, 178:12-17; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 330:6-19, 392:1-7, 417:24 – 418:9, 462:1-3, 466:23-24; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 528:4-8, 538:18-19, 593:9-15; P-23117 (Keyes Materials Considered) at 061, 070, 072, 079, 085-086, 096, 100-102, 104-109, 123-131; P-23128 (Young Rep.) at 006-007, 010, 014, 015, 019-020, 022-023; P-23129 (Young Rep. Appendices) at 010; P-23105A (Alexander Lake Redress Model) at 009, 013, 020, 028-029, 032-035, 038; P-23105B (Alexander Trumbull Redress Model) at 009, 013, 021, 027-028, 031-033, 035, 038; Dkt. #4219-1 (Alexander Rep. & Reliance Materials) at 76, 78-80, 83-84, 87-89, 92-95, 97, 99-102, 224-34; P-23127 (Burke Rep.) at 055-056, 165-166, 224-225, 334-335.

[16] *See, e.g.,* P-23117 (Keyes Materials Considered) at 066 (reviewed deposition testimony of Kathleen Meszaros (Trumbull), Mark Komar (Lake), and Mary Pshock (Lake)); P-23128 (Young Rep.) at 006-007 ("As mentioned, I have also had the opportunity to read the depositions of Trumbull and Lake County administrators regarding their impressions of the impact of opioids and needed solutions."), 067-068 (reviewed deposition testimony of Richard Tvaroch (Trumbull) and Lori O'Brien (Lake)); P-23129 (Young Rep. Appendices) at 019 (reviewed deposition testimony of Matthew Battiato (Lake), Lori O'Brien (Lake), Timothy Schaffner (Trumbull), and Richard Tvaroch (Trumbull)); (footnote continues on next page)

communications with County officials.[17]

Defendants also cherry-pick various things Plaintiffs' experts purportedly did not do, or data they did not rely on, to argue that they "did not do the sort of work experts in their field need to do" to offer their opinions in this case.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 13-15; *see also* Dkt. #4512 (CVS Closing Brief) at pp. 2, 10, 12, 17.  Each of their criticisms is without merit.[18]

They criticize Dr. Keyes for "not interview[ing] any people with OUD" in the Counties, "not do[ing] any survey work" in the Counties, and "not look[ing] at any data about OUD treatment" in the Counties.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 13-14; *see also* Dkt. #4512 (CVS Closing Brief) at p. 12.  But as Dr. Keyes explained, such data sources and methods would not have provided her with accurate estimates of the OUD population in the

---

Dkt. #4219-1 (Alexander Rep.) at 89 (reviewed deposition testimony of Ronald Walters (Lake), Kim Fraser (Lake), and April Caraway (Trumbull), 97 (reviewed deposition testimony of Kim Fraser (Lake)), 101-102 (reviewed deposition testimony of Lauren Thorp (Trumbull), April Caraway (Trumbull), and Kim Fraser (Lake)); Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 248:6-9, 310:20-22.

[17]  *See, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 45:22 – 46:2, 51:3-13, 146:14-18, 177:18-24; Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 248:6-19, 310:14-19, 319:17-20; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 330:6-24, 331:17-22, 335:15-22, 352:17-23, 392:1-7, 417:2-7, 417:24 – 418:9, 466:24-25, 469:13-17, 477:15 – 478:7, 480:9-17, 500:12-13, 502:3-6; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 527:4-8, 527:21 – 528:3, 593:9-15; P-23117 (Keyes Materials Considered) at 063-064 (communications with April Caraway (Trumbull), Kathleen Mezsaros (Trumbull), Kim Fraser (Lake), Lauren Thorp (Trumbull), Mark Komar (Lake), and Mary Pshock (Lake)); P-23129 (Young Rep. Appendices) at 019 (had telephone calls with Lori O'Brien (Lake) and Richard Tvaroch (Trumbull)); Dkt. #4219 (Alexander Rep.) at 6 ("I, along with some of my team members, have also spoken with local stakeholders including: [Lauren Thorp (Trumbull), April Caraway (Trumbull) and Kim Fraser (Lake).]").  Defendants criticize the length of Dr. Alexander's conversations with County officials (Dkt. #4511 (WAG/WMT Closing Brief) at p. 14; Dkt. #4512 (CVS Closing Brief) at p. 10), but Dr. Alexander explained that those conversations, combined with all the other County-related information he relied on, were sufficient to support his opinions.  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 470:17-22, 476:17-21, 480:9-17; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 526:25 – 527:8.

[18]  Plaintiffs note that Drs. Alexander, Keyes, and Young have previously withstood *Daubert* challenges in this MDL. *See, e.g.,* Dkt #3946 (CT3 Order Denying Keyes *Daubert*); Dkt. #3948 (CT3 Order Denying Alexander *Daubert*); Dkt. #2519 (CT1 Order Denying Abatement *Daubert*) (denying motion to exclude testimony of Dr. Alexander, Dr. Keyes, and Dr. Young); *see also* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 55-58 (affirming its prior *Daubert* rulings on Drs. Alexander and Keyes).

11

Counties and were not necessary for her to form her opinions. *See, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 106:19 – 107:8, 146:7-22, 147:17 – 148:13, 149:9-12, 199:20-25, 201:1-18; *see also* Dkt. #4513 (Ps' Closing Brief) at pp. 8-14.  Rather, her opinions are amply supported by the County-specific information and scientific/medical literature on which she relied, as well as her experience as an epidemiologist and her extensive work in opioid-related matters.[19]

Defendants criticize Dr. Young for not "speak[ing] to any parents, pregnant women, or children in Lake or Trumbull County to determine whether they had unmet needs and how much those would cost." Dkt. #4511 (WAG/WMT Closing Brief) at p. 14.  But it was not necessary for Dr. Young to speak with those individuals to form her opinions in this case.  Rather, her opinions are amply supported by the County-specific information and scientific/medical literature on which she relied, as well as her extensive experience related to the impact of the opioid epidemic on pregnant women, parents, and children (including, but not limited to, her conversations with impacted individuals throughout the country).  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 234:17 – 243:18, 246:1 – 249:12, 275:2 – 276:11, 311:12-13, 313:9 – 318:10, 320:9 – 322:8; *supra* at fns.15-17.  They also claim that she "refused to provide the basis for" the figures she testified about at trial.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 14.  Notably, they provide no citation for this assertion.  Regardless, Dr. Young provided the basis for her opinions in her reports and at trial.  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 244:20-23, 246:1 – 276:11, 313:9 – 322:8; P-23128 (Young Rep.).[20]

Defendants criticize Dr. Alexander for "not conduct[ing] any qualitative interviews of any individuals in Lake or Trumbull County who use drugs, suffer from OUD, or are in recovery from

---

[19]   *See, e.g.,* Dkt. #4438 (5/10/22 Trial Tr.) [*Keyes*] at 44:8 – 46:5, 47:2-12, 49:1 – 56:21, 58:19 – 78:5, 90:2 – 92:14, 106:19 – 110:14, 116:6 – 117:23, 129:17 – 130:20, 131:24 – 132:11, 137:24 – 140:4, 146:14-22, 147:5-10, 147:17 – 148:17, 149:21 – 150:4, 160:5-23, 161:7-20, 172:18 – 173:23, 178:20 – 179:8, 187:13 – 188:22, 190:10-18, 191:9 – 194:7, 194:23 – 195:7, 197:8 – 201:18, 202:21 – 206:25; *supra* at fns.15-17.

[20]   Defendants argue that Dr. Young's "testimony should be rejected in its entirety as irrelevant and unreliable." Dkt. #4511 (WAG/WMT Closing Brief) at p. 14.  But Defendants failed to lodge a single objection to her testimony at trial.  *See, e.g., Kiss*, 2001 WL 568974, at *6.

OUD[,]" "not conduct[ing] any fieldwork, focus groups, or surveys in the Counties[,]" and "not speak[ing] to any doctors or treatment professionals in Lake or Trumbull County or visit[ing] any treatment or residential facilities there." Dkt. #4511 (WAG/WMT Closing Brief) at pp. 14-15. But as Dr. Alexander explained, such data sources and methods were not necessary for him to form his opinions in this case. *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 470:16-22 ("I didn't survey or engage individually with patients. I didn't feel that it was – I felt confident, based on the resources that I had available to me and the methods that I used and the individuals that I spoke with and my professional experience in other settings, that the information that I had was sufficient in order to produce these recommendations for the Court."), 470:23 – 471:21, 476:16-21, 477:3-9, 477:15 – 478:7, 479:7-13, 480:9-17; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 604:4 – 607:5. Rather, his opinions are amply supported by the County-specific information and scientific/medical literature on which he relied, as well as his experience as an epidemiologist and medical doctor, and his extensive work on opioid-related matters.[21]

Incredibly, immediately after arguing that Dr. Alexander's opinions are unreliable because he did not interview any County residents with OUD, Defendants then claim that the conversations Dr. Alexander *did have* with County officials are inadmissible hearsay that cannot support his opinions. Dkt. #4511 (WAG/WMT Closing Brief) at p. 14 & n.6. Defendants' hearsay arguments are entirely specious. As Defendants are well aware, Federal Rule of Evidence 703 permits experts to base their opinions on otherwise inadmissible evidence where, as here,[22] "experts in the

---

[21]  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 327:3 – 328:23, 330:6 – 331:22, 334:14 – 335:22, 346:12 – 351:2, 352:17 – 353:12, 355:21 – 356:6, 360:21 – 361:24, 364:10-15, 370:5 – 374:21, 375:4 – 377:25, 381:15 – 382:16, 385:5-25, 392:1-7, 394:3-14, 404:9-12, 408:2 – 409:9, 409:16-18, 412:7 – 417:15, 418:2-20, 419:2-11, 420:3 – 421:11, 425:17 – 426:11, 427:1-4, 427:21-24, 428:5-6, 428:15-17, 428:19 – 430:9, 431:3-4, 461:18 – 462:3, 462:23 – 463:14, 463:25 – 464:5, 464:21 – 466:25, 469:13-17, 470:17 – 471:21, 476:17-21, 477:1 – 478:7, 478:24 – 479:13, 480:9-17, 482:13-17, 484:5-8, 485:6 – 486:25, 489:5-18, 490:16-25, 493:15-19, 494:22-24, 496:6-11, 499:2 – 503:6; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 518:3 – 519:14, 522:20-25, 526:22 – 527:8, 527:21 – 528:17, 537:22 – 538:22, 543:5-12, 544:15-22, 545:8-17, 553:17 – 554:8, 554:22 – 555:5, 556:17-22, 570:2-17, 577:11-16, 582:5-6, 585:7-19, 593:9-15, 599:3 – 608:1, 609:6 – 610:22, 612:9-24; *supra* at fns.15-17.

[22]  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 328:10-16, 330:6 – 331:22, 335:7-22, 355:21-23, 392:3-7, 417:2-10, 461:18 – 462:3, 466:18-25, 480:9-17, 500:8-15, 502:3-6, 502:22-24; Dkt. #4447 (footnote continues on next page)

particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject[.]" FED. R. EVID. 703.[23]

Thus, contrary to Defendants' assertions, Dr. Alexander *did* specifically tailor his abatement plans to these particular Counties. That he has deferred to the Counties the final decisions as to which particular abatement interventions to implement, and to what extent, does not render his plan "unfinished" or "not fit for implementation." Dkt. #4512 (CVS Closing Brief) at pp. 9-10. He has provided the Court with a framework for the categories of interventions needed to abate the nuisance in the Counties, and he and Dr. Burke have provided reasonable cost estimates for the implementation of each of those interventions over the next fifteen years. As they have previously noted, Plaintiffs cannot even begin to allocate any money from the abatement award until they know exactly how much they will be receiving, when they will receive it, and what restrictions will be associated with it. Dkt. #4513 (Ps' Closing Brief) at p. 26 n.56. The proposals set forth in Plaintiffs' Closing Brief regarding the disbursement and use of any abatement funds will ensure that Plaintiffs are able to customize Dr. Alexander's abatement plans to their specific needs. *Id.* at pp. 23-27. The cases cited by CVS (Dkt. #4512 (CVS Closing Brief) at p. 10) are inapposite.[24]

---

(5/12/22 Trial Tr.) [*Alexander*] at 526:25 – 527:8, 570:8-15, 593:9-15.

[23] The cases cited by Defendants are factually distinguishable as none of them involved evidence relied on by experts in forming their opinions. *See Moore v. U. S.*, 429 U.S. 20, 21-22 (1976) (in criminal bench trial, trial judge erred in relying on inadmissible hearsay, an out-of-court declaration by an unidentified informant that the defendant resided at the apartment where the heroin was found, in finding the defendant guilty); *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 419-21 (6th Cir. 1981) (involving law clerk's report to the judge of his *off-the-record* viewing of the pipe-wrapping machine at the center of the controversy; machine was under plaintiff's control and defendant was not present for the viewing); *Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 237–38 (5th Cir. 1988) (testimony from plaintiff's in-house attorney, in which he "read the responses of proprietors of establishments with jukeboxes to questionnaires that [the plaintiff] had sent asking who owned the jukebox in their establishment" constituted inadmissible hearsay where the "proprietors themselves did not testify" and the letters did not fall within any hearsay exception).

[24] *See In re: Zoloft (Sertraline Hydrocloride) Products Liab. Litig.*, 12-MD-2342, 2015 WL 7776911, at *5-16 (E.D. Pa. Dec. 2, 2015) (excluding causation expert in personal injury action where he, *inter alia*, took "a results-driven approach to [the] question, molding his methodology and selectively relying upon data so as to confirm his preconceived opinion" and failed to provide any methodological or (footnote continues on next page)

Finally, Defendants criticize Dr. Burke for "not review[ing] *any* county-specific documents before rendering his opinion."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 15; *see also* Dkt. #4512 (CVS Closing Brief) at p. 17.  But as Dr. Burke explained, he relied on the various inputs provided in Dr. Alexander's abatement plans and calculated the costs associated therewith using well-established economic methods.  *See, e.g.,* Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 627:25 – 628:2, 632:1 – 635:25, 636:21 – 637:6, 642:8-11, 652:5 – 653:11, 662:20-21 ("My assignment was to cost out the program set up by Dr. Alexander."), 724:22 – 725:7.[25]  Notably, the only example Defendants provide of Dr. Burke's alleged "lack of diligence" was his cost estimates for LEAD programs in the Counties.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 15.  Specifically, they claim his "cost estimate included costs for over 70 [LEAD] programs in Lake County alone by 2035" despite Dr. Alexander opining that only 4.8 LEAD programs are needed for that County.  *Id.*  Defendants misconstrue Dr. Burke's testimony.  He was not calculating the costs for 70+ separate LEAD programs in Lake County over the fifteen-year period, but rather the costs needed to create the 4.8 LEAD programs and then run them for fifteen years.  *See, e.g.,* Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 673:23 – 677:2; P-23127 (Burke Rep.) at 124-25.

Defendants' complaints that Plaintiffs "failed to present a non-speculative basis for the cost of abatement services in their Counties" are similarly unfounded.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 10-13, 16-17; *see also* Dkt. #4512 (CVS Closing Brief) at pp. 1-2, 7, 10-15.

_____

statistical explanation to support his methods), *aff'd sub nom. In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 858 F.3d 787 (3d Cir. 2017); *Messenger v. Norfolk S. Ry. Co.*, 3:13CV1098, 2015 WL 999852, at *7-18 (N.D. Ind. Mar. 5, 2015) (excluding causation expert in personal injury action where he, *inter alia*, "claimed to have followed AMA Guidelines in his methodology, [but] could not name the epidemiologic evidence or literature he used, did not have an individualized measurement, nor did he have any objective observations of the conductor position he was opining on"; "[His] testimony shows his causation was based on pure conjecture and not a reliable basis or methodology.  He did not rely on any literature and could not show in an objective and testable fashion whether or not any of [plaintiff's] health factors were the cause of his injuries.  Additionally, because [he] failed to reliably rule out [other causes], it is just as likely that one of those factors combined with [plaintiff's] many health factors to cause his injuries.  Without a more reliable and scientific methodology, however, it is impossible for one to discern.").

[25]  He did rely on certain additional County-specific data as well.  P-23127 (Burke Rep.) at 055-056, 165-166, 224-225, 334-335.

15

Defendants argue that Plaintiffs' estimated abatement costs are "inflated and speculative" because: (i) Dr. Keyes miscalculated and overestimated the OUD population in the Counties and Dr. Kessler's estimates are more reliable; and (ii) Dr. Alexander provides no estimate of the proportion of the OUD population who will actually seek treatment and his estimate for the number of necessary treatment slots "do[es] not bear any resemblance to reality." Dkt. #4511 (WAG/WMT Closing Brief) at pp. 11-13; Dkt. #4512 (CVS Closing Brief) at pp. 12-15.

Dr. Kessler's criticisms of Dr. Keyes' OUD population estimates are without merit, as explained at length in Plaintiffs' Closing Brief. *See* Dkt. #4513 (Ps' Closing Brief) at pp. 9-15. Dr. Keyes appropriately used well-established epidemiological methods to estimate the OUD population in the Counties and her estimates are actually conservative. *Id.* at pp. 9-12. Moreover, basing OUD population estimates on NSDUH data, as Dr. Kessler proposes, is inappropriate because that data dramatically underestimates the number of people with OUD and thus is not reliable for that purpose. *Id.* at pp. 12-15.[26]

Dr. Alexander's estimates for the treatment capacity needed to materially abate the nuisance are also reliable. As he explained, many of his proposed interventions are meant to connect more individuals with OUD to treatment. *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 342:15 – 343:6, 349:1-24, 382:13-16.[27] As a result, additional treatment capacity will be required to meet this increased need. Defendants note that Plaintiffs do not currently operate their own treatment facilities, but rather pay third-party contractors to treat uninsured patients, and, thus, Plaintiffs have no fixed costs associated with treatment services. Dkt. #4511 (WAG/WMT Closing Brief) at p. 13. Defendants are missing the point. To abate the nuisance, treatment capacity will have to increase. Plaintiffs cannot force any third-party treatment facility

---

[26]  Regardless of the fact that he has read epidemiological studies before, Dr. Kessler is not an epidemiologist (or a medical doctor) and has no independent opioid-related experience. *Id.* at p. 7.

[27]  Historical treatment data also does not reliably indicate treatment need because the current average length of treatment time is often too short to be effective, and some individuals may seek treatment multiple times in a given year. *See* Dkt. #4513 (Ps' Closing Brief) at p. 17.

currently available in the Counties to increase its capacity where it does not have sufficient space, staff, and/or funds to do so.  Thus, Plaintiffs will either need to pay these third-party contractors more money to increase capacity or they will need to provide increased treatment capacity themselves.[28]  Either way, there are fixed costs associated with providing this increased treatment capacity that will have to be paid.

Consider the following illustrative hypothetical.  There are an estimated 1000 individuals in County X with OUD, only 300 of whom are currently in treatment.  County X offers addiction treatment services by contracting with three third-party contractors, each of which operates its own treatment facility in the County.  Each facility has the capacity to treat 120 patients at any given time.  One facility (Facility A) has the physical space to be able to treat 150 individuals at a given time but does not have the funds to retain the additional staffing needed to do so.  The other two facilities (Facility B and Facility C) neither have the physical space nor the staffing resources required to increase treatment capacity.  Abatement interventions implemented in County X successfully increase the number of individuals with OUD seeking treatment at any given time to 420 individuals in the first year.  Because County X currently only has the capacity to treat 360 individuals at one time, it will need to use some of the abatement funds to increase treatment capacity.  It may, for example, use some of the funds to pay Facility A to retain more staff to be able to treat 150 individuals at a time.  But this still leaves 30 individuals for whom there is currently no capacity to treat.  Thus, some abatement funds would be needed to create treatment facility space for these 30 individuals.  This could occur in a number of ways.  County X could use these funds to: (i) pay Facility B and/or Facility C to acquire additional space and staffing to either expand their current facilities or create a new treatment facility; (ii) pay another third-party contractor to acquire the space and staffing needed to operate a new treatment facility; and/or (iii) acquire the space and staffing needed to operate its own new treatment facility.  But with each

---

[28]  That Plaintiffs do not currently operate their own treatment facilities does not mean they will not in the future if given sufficient funds to do so.

of these potential options, there are fixed costs (*e.g.*, rent, utilities, staff salaries, etc.) associated with the provision of OUD treatment that must be paid even if not all the treatment slots are filled at a given time.  *See* Dkt. #4513 (Ps' Closing Brief) at p. 17.

Defendants next argue that Plaintiffs have failed to prove their abatement costs with "reasonable certainty."  Dkt. #4512 (CVS Closing Brief) at pp. 1-3, 10-11; *see also* Dkt. #4511 (WAG/WMT Closing Brief) at pp. 22-23.  Not so.  As a preliminary matter, all the cases Defendants cite for this proposition involve claims for future *damages*, not equitable abatement.[29] As discussed above, they are not the same thing.  *Supra* at pp. 5-6.  Regardless, Plaintiffs have demonstrated with reasonable certainty the amounts needed to significantly abate the public nuisance in their communities.  Specifically, Drs. Alexander and Burke explained the factual bases for their cost estimates in their reports and at trial.  P-23127 (Burke Rep.); P-23105A (Alexander Lake Redress Model); P-23105B (Alexander Trumbull Redress Model); Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 325:13 – 506:14; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 514:1 – 619:8; Dkt. #4447 (5/12/22 Trial Tr.) [*Burke*] at 624:10 – 726:7.

Defendants argue that "Plaintiffs offered no evidence regarding whether the Counties

---

[29]  *See Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 726 (6th Cir. 2012) (plaintiff seeking future economic damages for loss of earning capacity caused by her injury must prove her damages with "reasonable certainty"); *Galayda v. Lake Hosp. Sys., Inc.*, 644 N.E.2d 298, 301 (Ohio 1994) ("In Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future."); *City of Gahanna v. Eastgate Properties, Inc.*, 521 N.E.2d 814, 818 (Ohio 1988) ("We hold that in order for a plaintiff to recover lost profits in a breach of contract action the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty."); *Hammerschmidt v. Mignogna*, 685 N.E.2d 281, 284 (Ohio App. 8th Dist. 1996) (personal injury action; "Given the uncertainty of whether plaintiff would eventually have the surgery and the uncertainty of plaintiff's condition after surgery is performed, it was not reasonably certain that there would be permanent damages in the future, and if so, what they would consist of.").  Notably, RESTATEMENT (SECOND) OF TORTS § 912, which also specifically refers to damages, recognizes in its comments that, although it is "desirable . . . that there be definiteness of proof of the amount of damages *as far as is reasonably possible*[,]" "[i]t is *even more* desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered.  *Particularly is this true . . . where the harm is of such a nature as necessarily to prevent anything approximating accuracy of proof*, as when anticipated profits of a business have been prevented."  RESTATEMENT (SECOND) OF TORTS § 912 cmt. a (1979) (emphasis added).

currently offer the services they ask defendants to fund, let alone whether the Counties would incur out-of-pocket costs if they were to implement them."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 11; *see also id.* at p. 16 ("Plaintiffs' experts also made no effort to determine the costs the Counties would likely pay for the services and programs set out in Plaintiffs' plan."); Dkt. #4512 (CVS Closing Brief) at pp. 1-2, 14-18.  According to Defendants, the only abatement costs Plaintiffs could possibly recover are the out-of-pocket costs related to opioid abatement that they would be obligated to pay in the future, and those can only be calculated by looking at the historical costs of what Plaintiffs have paid in the past before any abatement plan was implemented.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 11, 16-17; Dkt. #4512 (CVS Closing Brief) at pp. 1-2, 12, 14-18.[30]  That is not the case.  Defendants are again conflating equitable abatement (the prospective costs necessary to abate the nuisance) and future damages (the out-of-pocket costs Plaintiffs would be required to pay in the future as a result of the nuisance).  *Supra* at pp. 5-6.  Regardless of what Plaintiffs have been able or required to pay in the past with their limited budgets, the abatement remedy they seek is the amount needed to abate the nuisance as it exists today.

Moreover, as Plaintiffs' experts have explained, historical treatment data is not a reliable basis for determining future treatment costs for a multitude of reasons, including that it fails to account for: (i) the many individuals with OUD in the Counties who have not yet sought treatment; (ii) the fact that treatment has historically been underfunded and limited in capacity; and (iii) the effectiveness of the proposed abatement interventions in increasing the treatment population over time.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 8-9, 16.  Mr. Bialecki did not take those limitations into account, nor did he have the necessary expertise to do so.  *Id.* at p. 8 n.17.

Defendants further argue that the Counties do not "actually need the abatement measures

---

[30]  Defendants further claim that the "only non-speculative and supported cost estimates presented at trial came from defendants' cost expert, Matt Bialecki."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 16; *see also* Dkt. #4512 (CVS Closing Brief) at pp. 14, 30.  Plaintiffs explain in their Closing Brief why Mr. Bialecki's estimates are incorrect.  Dkt. #4513 (Ps' Closing Brief) at pp. 7-8.

they seek[,]" pointing to certain evidence that: (i) "Trumbull County did not have a single provider who reached 90% capacity for treatment of intravenous drug abuse during Fiscal Year 2021[;]" and (ii) "the specific agencies within Lake and Trumbull County responsible for addressing substance abuse and addiction—the Lake ADAMHS Board and the Trumbull Mental Health and Recovery Board—each had multi-million dollar surpluses in their fund balances at the end of 2019 and 2020."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 11; Dkt. #4512 (CVS Closing Brief) at p. 15 & n.7.[31]  But they ignore the fact that (i) there are currently many difficulties in connecting the OUD population to treatment and other services that would be addressed by implementing Plaintiffs' abatement plans, thus increasing the use of such treatment and services, and (ii) many of the abatement interventions require significant investments in infrastructure, which the County Boards' budget surpluses would be insufficient to cover.  *See, e.g.,* Dkt. #4513 (Ps' Closing Brief) at pp. 4, 6, 8-9 n.18, 16 n.34, 24 n.51, 26-27.

Finally, Defendants claim that the abatement award cannot include any costs that could potentially be paid by third parties in the future.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 27-31; Dkt. #4512 (CVS Closing Brief) at pp. 15-22.  This argument is without merit for the reasons discussed below.  *Infra* at § II.E.

### C.  Defendants' additional criticisms of Dr. Alexander's abatement plan are without merit and should be rejected.

In addition to the criticisms discussed above, Defendants offer various additional criticisms of Dr. Alexander's abatement opinions.  Dkt. #4512 (CVS Closing Brief) at pp. 9-18; *see also* Dkt. #4511 (WAG/WMT Closing Brief) at p. 15 n. 7 (adopting the arguments made in CVS's Closing Brief).  Specifically, they argue that the estimates in Dr. Alexander's abatement plans are speculative, unreliable, and legally unviable because: (i) the individuals who would be receiving

---

[31]  Defendants also claim that "Plaintiffs' reliance on national averages is especially speculative here given that services and facilities tend to cost less in non-urban areas and because there may be cost synergies to expanding pre-existing County programs, rather than starting new ones."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 16.  Notably, they cite no evidence to support these propositions.  *Id.*  Regardless, as explained in this section, the estimates of abatement costs provided by Drs. Alexander and Burke are reasonable, reliable, and supported by the evidence in this case.

the various opioid-related treatment and services provided by the plans are unknown; (ii) he "admitted at trial that more data is needed[;]" (iii) he utilized too many "estimates" and "targets[;]" (iv) "many of the estimates in [his] plan are outside his expertise[;]" and (v) his estimates are undercut by County data. Dkt. #4512 (CVS Closing Brief) at pp. 10-15.[32]  Each of these criticisms is without merit and should be rejected.

To begin with, Defendants' complaint that the abatement plans must be rejected because they do not identify every single individual who will receive the treatment or services funded by the plan for the next fifteen years is nonsensical. Dkt. #4512 (CVS Closing Brief) at pp. 10-11. Not only would that be impossible for anyone to do (and would raise significant privacy concerns), such level of specificity is not required here. *See, e.g., infra* at p. 58 & fn.88, § III. The cases cited by Defendants (Dkt. #4512 (CVS Closing Brief) at pp. 10-11) are entirely distinguishable. *Supra* at fn.29. Moreover, Dr. Alexander's testimony regarding the importance of additional data certainly does not render his opinions "unreliable" as Defendants claim. Dkt. #4512 (CVS Closing Brief) at p. 11. He clearly stated that he had sufficient data on which to base his estimates. *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 470:16-22, 476:16-21, 479:7-13, 480:9-17. He also recognized that as the abatement plans are implemented, data about their effectiveness should be tracked in order to determine whether any changing needs require that modifications be made.[33] Plaintiffs' proposals regarding the disbursement and use of the awarded abatement funds provide a mechanism through which such data can be taken into consideration. *See* Dkt. #4513 (Ps' Closing Brief) at pp. 23-27.

Third, the estimates and targets utilized by Dr. Alexander are supported by the evidence

---

[32]  Notably, although Defendants now take issue with the reliability and relevance of Dr. Alexander's opinions, and his qualifications to offer them, they failed to assert any such objections to his testimony at trial. *Supra* at fn.14.

[33]  *See, e.g., id.* at 433:2-23, 434:15 – 435:1 ("Q: Okay. And the purpose of the surveillance program and this data would be to identify and respond to *changing needs* in the community, correct?  A: Yes. Q: Quality surveillance data on a moving-forward basis is key to identifying the responding to *changing needs* in the community?  A: Yes.  Q: The data is needed to better understand key aspects of the *dynamic nature* of the epidemic that are not visible through existing data channels?  A: Yes.") (emphasis added).

and the scientific literature, and were derived from a reliable methodology.  *See, e.g., supra* at fn.21.[34]  As discussed above, he explained the basis for his estimates for the OUD population and treatment capacity needs.  *Supra* at pp. 16-18.[35]  And he also explained why he chose not to utilize certain County-specific data to derive his estimates.  *Supra* at pp. 13, 16, 19-20; Dkt. #4513 (Ps' Closing Brief) at pp. 8-9, 16-17.  For these reasons, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010), is entirely distinguishable.  In that personal injury case, the Sixth Circuit vacated a jury verdict in favor of the plaintiffs because the causation opinion of their neurologist expert (*i.e.*, that manganese exposure caused the plaintiff's injuries) constituted inadmissible speculation.  *Id*. at 667-68.  Specifically, the court found that "the etiological component of [the expert's] conclusion—the 'manganese-induced' part—was at most a working hypothesis, not admissible scientific 'knowledge.'"  *Id*. at 670.[36]

---

[34]  Defendants put much emphasis on the terms "estimates" and "targets," but calculating future abatement costs necessarily requires estimation, as no one can predict the future.  *See, e.g.*, Dkt. #2519 (CT1 Order Denying Abatement *Daubert*) at p. 5 ("Any time an expert is asked to make predictions about the future, those predictions necessarily include some degree of speculation.").  What matters is that Dr. Alexander has a reasonable factual basis for each of his estimates and targets.  *Id*. at pp. 5-6 ("The Sixth Circuit has provided that '[w]here an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony; but where the opinion has a reasonable factual basis, it should not be excluded.") (citation omitted).

[35]  That Dr. Alexander has utilized other methods to estimate the OUD population under different factual circumstances is irrelevant for the reasons discussed in Plaintiffs' Closing Brief.  Dkt. #4513 (Ps' Closing Brief) at p. 14.

[36]  The court reasoned: "Dr. Carlini acknowledged the speculative jumps involved in steps 4, 5 and 6 of [his] chain of causation—the steps necessary to his theory that manganese exposure may cause Parkinson's Disease in general.  At step 4, he described the literature hypothesizing a link between environmental toxins and latent genetic Parkinson's Disease as 'all theoretical.'  At step 5, he conceded he knew of no studies finding a link between manganese and Parkinson's Disease and that 'studies that have looked at that . . . have not found a very strong correlation.'  At step 6, he conceded that 'speculation' led him to guess that [the plaintiff] had 'an underlying predisposition to Parkinson's disease,' even though [he] has not family history of Parkinson's Disease[.] . . .  The final step required a leap of faith as well, even ignoring the jumps required to get there.  That manganese *could cause* Parkinson's Disease in someone like [the plaintiff] does not show that manganese *did cause* [the plaintiff's Parkinson's Disease. . . .  Dr. Carlini never explained how he made this leap—how *this* case stemmed from manganese exposure.  When asked how to 'tell the difference between a welder with idiopathic Parkinson's disease and a welder . . . tipped into the Parkinson's disease by welding,' he answered with tests he *might* do, not tests he had done."  *Id*. at 670-71 (internal citations omitted).  *See also id*. at 674 ("[T]he problem is that he failed to cite *any* non-speculative evidence for his conclusion

(footnote continues on next page)

Defendants also claim that "many of the estimates in Dr. Alexander's plan are outside his expertise." Dkt. #4512 (CVS Closing Brief) at p. 13. To the contrary, Dr. Alexander has extensive expertise regarding the opioid epidemic and the particular measures and interventions that are necessary to effectively abate that nuisance. *See, e.g., supra* at fn.21. This Court has previously recognized as much. *See* Dkt. #2519 (CT1 Order Denying Abatement *Daubert*) at p. 2 ("The Court has reviewed the qualifications of [Dr. Alexander] and finds [him] qualified to testify on the [abatement] topics regarding which [he] ha[s] opined."); *cf.* Dkt. #3948 (CT3 Order Denying Alexander *Daubert*) at pp. 2; Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at p. 55.

Defendants' claim that Dr. Alexander's estimates are undercut by County data is similarly without merit. Dkt. #4512 (CVS Closing Brief) at pp. 13-15. As discussed above and in Plaintiffs' prior briefing, the Counties' historical expenditures on OUD treatment and other opioid-related programs and services do not provide an accurate estimate as to the amount needed to materially abate the nuisance Defendants caused. *Supra* at pp. 16-17, 19-20; Dkt. #4513 (Ps' Closing Brief) at pp. 8-9, 16.

Finally, Defendants criticize Dr. Alexander's abatement plans for failing to account for the Counties' existing programs. Dkt. #4512 (CVS Closing Brief) at pp. 15-18. This argument also fails for reasons discussed elsewhere in this response and in Plaintiffs' prior briefing. *See, e.g., infra* at §§ II.C, E; *supra* at § I.B; Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 10-18; Dkt. #4513 (Ps' Closing Brief) at pp. 33-35. *R & R Intern., Inc. v. Manzen, LLC* is entirely distinguishable, as the expert in that case was not estimating abatement costs but rather opining on the value of the plaintiff's potential lost profits in a breach of contract action. 09-60545-CIV, 2010 WL 3605234, at *1, *14 (S.D. Fla. Sept. 12, 2010) (expert's valuation of plaintiff's lost profits deemed unreliable because, *inter alia*, "he did not really rely upon [plaintiff's] actual financial data in the valuation of [plaintiff's] lost profits[,]" despite admitting that "the actual financial data of a company, as

---

that manganese causes Parkinson's Disease.").

limited as it may be, constitutes the starting point for any future-looking financial analysis").[37]

## II. DEFENDANTS' UNREASONABLE AND UNWARRANTED LIMITATIONS ON THE ABATEMENT RELIEF SHOULD BE REJECTED.

### A. The abatement relief is not limited to the type of relief that would have been awarded by the English Court of Chancery.

Here, where the Court is sitting in diversity, the Court applies Ohio law on substantive matters. *See Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."). Abatement of a public nuisance is one such substantive matter. *See State, Dep't of Nat. Res., Div. of Wildlife v. Prescott*, 537 N.E.2d 204, 207 (Ohio 1989) ("Traditionally, a nuisance abatement proceeding has been governed by the substantive law relating to civil actions."). Defendants do not attempt to argue that the relief sought by Plaintiffs is precluded by Ohio law, and indeed it is not. As this Court has previously stated:

> In Ohio, "[w]hen a nuisance is established, the form and extent of the relief designed to abate the nuisance is within the discretion of the court." Thus, the Court, exercising its equitable powers, has the discretion to craft a remedy that will require Defendants, if they are found liable, to pay the prospective costs that will allow Plaintiffs' to abate the opioid crisis.

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043938, at *2 (N.D. Ohio Aug. 26, 2019) (internal citation omitted). This ends the matter.

Notwithstanding, even if the Court were to consider Defendants' inapposite arguments on its equitable powers, it would find them lacking. The relief sought here is consistent with the broad discretion granted to federal courts sitting in equity "to fashion *any* remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999) (emphasis added). *See also Bowles v. Skaggs*, 151 F.2d 817, 820 (6th Cir. 1945) ("It is undoubtedly within the power of equity courts to mould their remedies to the needs of particular situations"). Moreover, as the Supreme Court has made clear, "[t]he

---

[37] The court was applying Nevada law, under which "[a] plaintiff may recover lost profits if it can show a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty." *Id.* at *9.

essence of equity jurisdiction" is "to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). As relevant here, "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937).[38]

Ignoring this authority entirely, Defendants attempt to muddy the waters by relying on a strained interpretation of the federal courts' historical equitable powers to argue that "[t]o be within this Court's equitable authority, any relief awarded must be traditional relief awarded by equity courts, particularly the English Court of Chancery as of 1798." Dkt. #4511 (WAG/WMT Closing Brief) at p. 18; Dkt. #4512 (CVS Closing Brief) at p. 7. In essence, Defendants contend that because "Plaintiffs have identified no decision of the [English] Court of Chancery awarding relief comparable to the . . . relief contemplated in this case," Plaintiffs' abatement-related relief is foreclosed under the Judiciary Act of 1789. Dkt. #4511 (WAG/WMT Closing Brief) at p. 19; *see also* Dkt. #4512 (CVS Closing Brief) at p. 7. Not so. As a preliminary matter, "nothing in the 1789 Act determined what source or sovereign would provide equity principles in the newly created federal courts."[39] Moreover, "any analysis that attempts to draw an easy line connecting modern limitations on federal judge-made law and historical beliefs and practices deserves skeptical scrutiny."[40]

---

[38] *See also Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Biechele v. Norfolk & W. Ry. Co.*, 309 F. Supp. 354, 359 (N.D. Ohio 1969) ("Under the principles of equity, the Court has broad powers to fashion effective relief").

[39] Kristin A. Collins, *"A Considerable Surgical Operation": Article III, Equity, and Judge-Made Law in the Federal Courts*, 60 DUKE L.J. 249, 270 (2010). Indeed, "equitable remedies were by their very nature 'outcome determinative' relative to legal remedies." *Id.* at 280.

[40] *Id.* at 335. *See also id.* at 335-36 (legal historians "have long lamented lawyers' and jurists' efforts to simplify the past for expedient purposes").

Defendants also cherry-pick certain statements from the Supreme Court's holding in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)—a case concerning private creditors' rights under well-established law—but such reliance is misplaced. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 18, 20; Dkt. #4512 (CVS Closing Brief) at p. 7. Unlike here, where Plaintiffs seek equitable relief, *Grupo Mexicano* presented "the question whether, *in an action for money damages*, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Id.* at 310 (emphasis added). The Supreme Court held that the equitable relief requested under the specific facts of that case was of "a type of relief that has been specifically disclaimed by longstanding judicial precedent." *Id.* at 322. *See also Magpul Industries Corp. v. Mayo*, 1:13 CV 01782, 2013 WL 4511929, at *5 (N.D. Ohio Aug. 23, 2013) ("In [*Grupo Mexicano*], the Supreme Court reversed the district court's order enjoining a debtor from disposing of its assets pending adjudication of the creditor's contract claim. The Court, while acknowledging exceptions, reaffirmed the longstanding rule that a judgment fixing the debt was necessary before a court in equity would interfere with the debtor's use of his property."). In essence, because the requested relief was available at law, the court declined to add "through judicial fiat, a new powerful weapon to the creditor's arsenal" because "the new rule could radically alter the balance between debtor's and creditor's right which has been developed over centuries through many laws—including those relating to bankruptcy, fraudulent conveyances, and preferences." *Grupo Mexicano*, 527 U.S. at 331.

Accordingly, it is no surprise that "courts have interpreted *Grupo Mexicano*'s holding to be restricted to actions at law where the plaintiff seeks only money damages." *Revolutions Med. Corp. v. Med. Inv. Group LLC*, CIV.A. 12-10753-GAO, 2013 WL 1087693, at *6 (D. Mass. Mar. 13, 2013) (collecting cases). *See also Gucci Am. v. Bank of China*, 768 F.3d 122, 130 (2d Cir. 2014) ("We turn next to BOC's argument that the district court lacked the equitable authority under [*Grupo Mexicano*] to issue the prejudgment . . . [i]njunction. This argument is without merit. . . . [T]he district court had the inherent equitable authority to issue

the . . . [i]njunction."); *Animale Grp. v. Sunny's Perfume, Inc.*, 256 Fed. Appx. 707, 709 (5th Cir. 2007) ("The issue before us, then, is whether *Grupo Mexicano* governs equitable as well as legal actions. Other circuits have determined that the case is limited to actions at law. . . . We agree."); *S. New England Tel. Co. v. Global Naps, Inc.*, 595 F. Supp. 2d 155, 160 (D. Mass. 2009) (rejecting argument that federal court "does not have the power to issue a preliminary injunction" based on *Grupo Mexicano* and noting that *Groupo Mexicano* "has been consistently interpreted by lower courts to preclude injunctions only in cases where strictly monetary relief is sought." (collecting cases)).[41]

By contrast, *Shaoxing Bon Textiles Co., Ltd. v. 4-U Performance Group LLC*, 16 CIV. 6805 (JSR), 2017 WL 737315 (S.D.N.Y. Feb. 6, 2017), is instructive. There, the "defendants argue[d] that the Supreme Court's decision in [*Grupo Mexicano*], prevents the Court from issuing an injunction that restrains the proceeds defendants have obtained from the sale of the goods they received from plaintiff." *Id.* at *2. The court rejected that argument because the "relief at issue here is in furtherance of the ultimate equitable relief that plaintiff seeks . . . ." *Id.* Likewise here, Plaintiffs seek an abatement order that is in furtherance of the ultimate equitable relief they seek. *See also Adelphia Commun. Corp. v. Rigas*, 02 CIV.8495 GBD, 2003 WL 21297258, at *5 (S.D.N.Y. June 4, 2003) ("As plaintiff has asserted equitable relief in the complaint, *Grupo*

---

[41] Defendants' argument that "federal courts have 'no authority' to award remedies that were 'historically unavailable' from the Court of Chancery" also misreads the holding. Dkt. #4511 (WAG/WMT Closing Brief) at p. 18 (citing *Grupo Mexicano*, 527 U.S. at 333). The Supreme Court held that "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Grupo Mexicano*, 527 U.S. at 332. Indeed, the court specifically recognized that it did "not question the proposition that equity is flexible" in applicable cases. *Id.* at 322. Furthermore, by replacing a semi-colon with a period, Defendants provide a misleading picture of the holding in *Boyle v. Zacharie*, 31 U.S. 648 (1832), omitting the "subject to" clause. Dkt. #4511 (WAG/WMT Closing Brief) at p. 18. While the Supreme Court held that "the settled doctrine of this court is, that the remedies in equity are to be administered . . . according to the practice of courts of equity in the parent country, as contradistinguished from courts of law," the sentence does not end there, but goes on as follows: "subject, of course, to the provisions of the acts of congress, and to such alterations and rules as in the exercise of the powers delegated by those acts, the courts of the United States may from time to time prescribe." *Boyle*, 31 U.S. at 654. As such, even the holding in *Boyle* acknowledges that equitable remedies are designed to be flexible.

27

*Mexicano* is inapplicable.").

Finally, even if Defendants' tortured reading on the limits of federal courts' equitable powers was correct (and it is not), Defendants acknowledge (at the end of a lengthy footnote) that the Supreme Court has addressed English Court of Chancery cases where defendants were required to abate a public nuisance. Dkt. #4511 (WAG/WMT Closing Brief) at p. 19 n.8. In *Mugler v. Kansas*, the Supreme Court noted:

> 'In regard to public nuisances,' Mr. Justice Story says, 'the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable, not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. * * * *In case of public nuisances, properly so called, an indictment lies to abate them, and to punish the offenders. But an information also lies in equity to redress the grievance by way of injunction*.'

123 U.S. 623, 672-73 (1887) (citation omitted; emphasis added) (ellipses in original). The *Mugler* court went on to conclude that, in cases of public nuisance, federal courts sitting in equity

> cannot only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury.

*Id.* at 673.[42] Accordingly, while their arguments are irrelevant, even under Defendants' interpretation of the remedies available at the time of the Judiciary Act in 1789, Plaintiffs are entitled to equitable abatement.

> **B.** **The abatement relief requested is sufficiently final and non-speculative and should not be limited to one year.**

---

[42] Similarly, in *In re Debs*, 158 U.S. 564 (1895), the Supreme Court cited numerous authorities addressing the English Court of Chancery's historic role in addressing public nuisance. 158 U.S. 564, 591 (1895) ("'The jurisdiction of the court of chancery with regard to public nuisances is founded on the irreparable damage to individuals, or the great public injury which is likely to ensue.' Indeed, it may be affirmed that *in no wellconsidered [sic] case has the power of a court of equity to interfere by injunction in cases of public nuisance been denied*, the only denial ever being that of a necessity for the exercise of that jurisdiction under the circumstances of the particular case.") (internal citations omitted; emphasis added).

28

Defendants argue that the "abatement award must be definite and final enough to inform [them] of their obligations," and that it should be limited to one year because anything more would be too speculative.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 21-24; Dkt. #4512 (CVS Closing Brief) at p. 27.[43]  But here the abatement relief requested by Plaintiffs is sufficiently definite and clear to inform Defendants of their obligations.  Plaintiffs ask that Defendants be ordered to pay a specific amount of money into designated abatement fund accounts for Plaintiffs to use to abate the public nuisance Defendants caused.  Dkt. #4513 (Ps' Closing Brief) at pp. 19-25.[44]  The cases cited by Defendants, none of which dealt with equitable abatement, are factually distinguishable.  *See Miami Twp. Bd. of Trustees v. Weinle*, 174 N.E.3d 1270, 1281 (Ohio App. 1st Dist. 2021) ("While the trial court properly exercised its broad discretion to enjoin the opening and operation of the Dirt Track, restricting Weinle 'from further construction' on the Dirt Track and ordering Weinle to remove the barrier fence, concrete barrier, lights, etc. went beyond the scope of Miami Township's complaint.  The barrier fence, concrete barrier and lights were not claimed to create a nuisance, and the injunction does not explain the reasoning for removing these items.  Should Weinle choose to construct the space where the Dirt Track lies for a different activity, he is at risk of violating the injunction by engaging in activity that is not related to dirt track racing.  Its restriction of any construction on the Dirt Track lacks specificity, putting Weinle at risk of unwillingly violating the order."); *Collette v. Collette*, 20423, 2001 WL 986209, at *1, *3 (Ohio App. 9th Dist. Aug. 22, 2001) (motion for contempt brought against ex-husband for alleged failure to comply with divorce decree; "It is an accepted rule of law that for a person to be held in contempt for disobeying a court decree, the decree must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties

---

[43]  Defendants also propose certain restrictions to be imposed if the Court awards more than one year of abatement costs.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 24; Dkt. #4512 (CVS Closing Brief) at pp. 27, 32.  Plaintiffs explain in § II.F below why these proposed restrictions should be rejected.

[44]  It also has "a clear endpoint," as the proposed abatement period is set for fifteen years.  *Id*. at pp. 19-20.

or obligations are imposed upon him.") (citation omitted); *San Antonio B. Ass'n v. Guardian Abstract & Title Co.*, 291 S.W.2d 697, 698-704 (Tex. 1956) (permanent injunction to stop allegedly unauthorized or improper joint conduct of defendants related to the practice of law was sufficiently "definite, clear and precise" such that modification was not warranted).[45]

Moreover, the abatement relief requested is not overly broad, but rather narrowly tailored to address the public nuisance that Defendants caused. *See, e.g., supra* at § I; *infra* at § II.C.[46] And, as discussed above, the abatement costs requested by Plaintiffs are not speculative and have been proven with reasonable certainty. *Supra* at § I.B.

The Court should also reject Defendants' request that it award only one year of abatement costs. Defendants rely in part on contract principles to justify their proposed one-year limitation for the abatement award. Dkt. #4511 (WAG/WMT Closing Brief) at p. 22 (citing RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981) and *Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S.

---

[45] Notably, the *San Antonio* court also acknowledged: "[O]bviously the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or (what is far more likely) in somewhat different form calculated to circumvent the injunction as written. . . . Nor should it be greatly concerned with rights of the defendants that are asserted largely in the abstract. Otherwise it would probably take longer to write the decree than it would to try the case, and the injunction might well become unintelligible and self-destructive." *Id.* at 702; *see also id.* at 704-05 ("No injunction decree will ever be perfectly just to both sides. In this case we consider it best to leave it as the trial court entered it, so that, if the respondents wish to pursue in future a somewhat similar course to what they have followed in the past, they will have the burden of justifying alleged new situations as they arise, rather than, by a purported modification, forcing the petitioners to carry all over again the burden they have carried for the public and the profession up to this point.").

[46] The cases on which Defendants rely (Dkt. #4511 (WAG/WMT Closing Brief) at p. 22), which involved prohibitory injunctions, are distinguishable. *See Eastwood Mall, Inc. v. Slanco*, 626 N.E.2d 59, 62 (Ohio 1994) (modifying portion of injunction prohibiting protestor from demonstrating on private commercial property by deleting language making it overbroad; "The injunction prohibits, in part: 'Picketing, patrolling, handbilling, soliciting, or engaging in any other similar activities to *communicate* or demonstrate on any subject on the private property of [the plaintiffs.] This injunction can be read to prohibit [the defendant] from 'communicating' on any subject without written permission from [the plaintiffs]. Thus, [the defendant] could conceivably be found in violation of the injunction even if he were to encounter a friend on [the plaintiffs'] properties and strike up a conversation on politics, or any subject."); *Sharon Township Bd. of Trustees v. Crutchfield*, No. 3286-M, 2002 WL 31015601, at *1-3 (Ohio Ct. App. Sept. 11, 2002) (district court's judgment enjoining and restraining property owner from operating his business on his residentially-zoned property was "not overly broad and [wa]s narrowly tailored in scope to prohibit only the complained of activities").

544 (1941)).  Notably, the comments to RESTATEMENT § 352 recognize that "[c]ourts have traditionally required greater certainty in the proof of damages for breach of a contract than in the proof of damages for a tort."  RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a.[47]  Moreover, the factual circumstances in *Palmer* are distinguishable from those in the present case,[48] where Plaintiffs have offered sufficient evidence supporting their fifteen-year abatement plans.  *Supra* at § I; *Palmer*, 311 U.S. at 557 ("The number of years to be considered depends upon the fullness and quality of the evidence offered to establish the damages."), 559 ("All that can be done is to place before the court such facts and circumstances as are available to enable an estimate to be made based upon judgment and not guesswork.").[49]  Notably, the Supreme Court permitted *eight* years of future damages in *Palmer* and in the present case Plaintiffs have proposed a potential option for the Court to award five years' worth of abatement costs up front and then re-assess at the end of that five-year period to determine the amount of any further abatement award. Dkt #4513 (Ps' Closing Brief) at pp. 24-25.

Defendants also argue that a one-year limitation is warranted because that is what a district court did in Oklahoma.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 22-23; Dkt. #4512 (CVS Closing Brief) at p. 27.  But in *State of Oklahoma v. Purdue Pharma L.P.*, the court found that "though several of the State's witnesses testified that the plan will take 20 years to work, the State did not present sufficient evidence of the amount of time and costs necessary, beyond year one, to abate the Opioid Crisis."  No. CJ-2017-816, 2019 WL 9241510, at *15 (Okl. Dist. Ct. Nov. 15,

---

[47]  The comments also recognize that, even for contract claims, "damages may be established with reasonable certainty with the aid of expert testimony[.]"  *Id*. at cmt. b.

[48]  *See* 311 U.S. at 551-562 (in railroad bankruptcy proceeding wherein lessor filed claims for damages from rejection of 999-year lease which still had 969 years to run, evidence of average annual earnings for preceding 14-year period furnished fair base for estimating probable earnings for eight years of future operation, notwithstanding that business of lessee changed from trolley to bus within two years of the end of base period, that management changed from lessee to lessor, and that lessor failed to produce further evidence to prove damages, either through experts or transportation surveys).

[49]  *See also id.* at 560-61 ("The injured party is not to be barred from a fair recovery by impossible requirements.  The wrongdoer should not be mulcted, neither should he be permitted to escape under cover of a demand for nonexistent certainty.").

2019).  In the present case, on the other hand, Plaintiffs provided ample evidence of the needed abatement measures, and their respective costs, for the next fifteen years.  *Supra* at § I.

    **C.**    **No categories of abatement relief in Plaintiffs' plans should be excluded.**

    As discussed above, each of the abatement interventions in Plaintiffs' proposed abatement plans is properly recoverable to abate the public nuisance caused by Defendants.  *Supra* at § I. Defendants argue, however, that even if the Court agrees that an abatement remedy can address the effects of a nuisance, many of the categories of requested abatement relief must still be excluded here because they are "far too remote from [Defendants'] dispensing conduct to be justifiable" because there are numerous "superseding actors and events that break the causal chain[.]"  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 25-26; Dkt. #4512 (CVS Closing Brief) at pp. 7-8.

    Notably, Defendants made similar arguments about the conduct of third parties and independent factors constituting superseding causes that broke the chain of causation during the liability trial; yet, the jury still found that Defendants' conduct was a substantial factor in causing the public nuisance in the Counties.  *See* Dkt. #4176 (Verdict Forms) at pp. 3-4, 7-8; Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 28-29.  Moreover, the evidence at trial demonstrates that the conduct of these other contributors was connected to Defendants' wrongful conduct and foreseeable by them.  *See* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 6-8, 96-97 n.80. The Court confirmed that the jury's causation finding was supported by the trial evidence:

> Defendants point to other potentially contributing causes, including opioid manufacturers, opioid distributors, governmental entities, prescribing doctors, illicit opioids, and criminal acts.  However, none of these potential causes shifts Defendants' independent responsibility to take effective measures to prevent diversion, or otherwise mandates a verdict for Defendants as a matter of law.  In other words, as a matter of law and a matter of fact, the existence of other possible causation factors did not preclude the jury from determining that the conduct of each Defendant played a substantial role in creating the nuisance.

Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 28-29 (internal citations and footnote omitted).

    The cases cited by Defendants are inapposite.  Both *City of Cincinnati v. Deutsche Bank*

*Natl. Tr. Co.* and *City of Cleveland v. Ameriquest Mort. Securities, Inc.* involved dismissals of nuisance claims at the *pleading* stage, did not address the scope of an abatement remedy, and are otherwise factually distinguishable. *See City of Cincinnati*, 863 F.3d 474, 480-81 (6th Cir. 2017) (city failed to plead proximate cause in nuisance action based on bank's alleged failure to maintain numerous properties following foreclosure where it failed to allege any facts showing that decreased tax revenue, increased police and fire expenditures, and increased administrative costs resulted from bank's purported policy of non-conformance); *City of Cleveland*, 615 F.3d 496, 498-99, 502-06 (6th Cir. 2010) (dismissing city's nuisance action against financial entities seeking damages based on their "financing of subprime mortgages [which allegedly] led to a foreclosure crisis in Cleveland that devastated its neighborhoods and economy[,]" for various reasons including that the plaintiff had not adequately pled causation because there was not a sufficiently direct relationship between the injuries asserted—eyesores, drug deals, and looting—and the tortious conduct alleged—financing subprime mortgages).

*White v. Vrable* is not a nuisance case at all, but rather a personal injury action involving negligence claims against a pharmacy and its owner based on the drug overdose of its employee's son. 98AP-1351, 1999 WL 771053, at *1 (Ohio App. 10th Dist. Sept. 30, 1999). While working for the pharmacy, the employee stole drugs that he then provided to his wife and son. *Id.* His son ultimately overdosed, suffering permanent injuries. *Id.* In its summary judgment motion, the defendants "admitted that they negligently permitted [its employee] to order, control and distribute dangerous drugs, failed to control and supervise the distribution of drugs, and failed to monitor [his] activities[,]" but argued that they were still entitled to summary judgment because, *inter alia*, the son's "actions in voluntarily ingesting drugs and [his father's] criminal conduct constituted intervening, superseding causes of [the son's] injuries[.]" *Id.* at *2. The court agreed with the defendants, noting that there was no evidence in the record that the employee's criminal conduct was intended by the defendants, or that that the defendants should have reasonably foreseen that their employee would steal drugs from the pharmacy and provide them to his son, who would then voluntarily ingest or inject enough of the drugs to cause an overdose. *Id.* at *5-6.

*Holmes v. Securities Inv'r Protec. Corp.*, 503 U.S. 258 (1992), is also not a nuisance case, but rather a RICO action.  In *Holmes*, the Securities Investor Protection Corporation (SIPC) asserted a RICO claim based on the defendant's participation "in a stock-manipulation scheme that disabled two broker-dealers from meeting obligations to customers, thus triggering SPIC's statutory duty to advance funds to reimburse the customers." *Id.* at 261.  The Supreme Court held that SIPC's damages claims were too indirect to permit recovery under RICO because the losses were entirely contingent upon the insolvency of the third-party brokers. *Id.* at 271-74.[50]

In the present case, for each example of an abatement category Defendants identify as being too "remote" to be recoverable (Dkt. #4511 (WAG/WMT Closing Brief) at pp. 25-26 & Ex. A), Plaintiffs provided sufficient evidence at trial supporting its inclusion.  *See, e.g.,* Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 332:13 – 334:1, 334:19 – 335:22, 336:1 – 337:9, 339:20 – 342:8, 342:9 – 344:19, 345:3-22, 351:17 – 353:12, 353:23 – 364:15, 366:17 – 369:19, 381:15 – 383:10, 384:3 – 397:18, 398:6 – 401:18, 405:7 – 409:9, 412:7 – 417:15, 432:18 – 436:8; Dkt. #4447 (5/12/22 Trial Tr.) [*Alexander*] at 514:12 – 521:2, 521:22 – 524:12, 524:25 – 527:16, 529:8 – 530:19, 533:1 – 539:10, 542:22 – 546:20, 547:5-10, 599:3 – 603:21, 607:20 – 608:1, 609:12 – 612:24, 614:4-6; *see also* Dkt. #4446 (5/11/22 Trial Tr.) [*Young*] at 244:20 – 276:11, 285:15 – 286:9, 303:10-21, 304:13-15, 313:9 – 322:8.  Dr. Alexander also provides further discussion regarding the bases for his opinions regarding these abatement interventions in his expert report. *See, e.g.,* Dkt. #4219-1 (Alexander Rep.) at pp. 14-18, 24-34, 40-67; Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 333:17 – 334:1.

CVS also argues that the municipal cost recovery doctrine limits the abatement relief that can be awarded in this case because the Counties are legally obligated to provide some of the

---

[50]   As this Court has previously noted, "RICO's directness requirement is more stringent than most state-law requirements." *In re Natl. Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 790 (N.D. Ohio 2020). *See also City and County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 679 (N.D. Cal. 2020) ("Unlike RICO, courts place great emphasis on 'foreseeability of harm' in determining whether a public nuisance claim sufficiently alleges proximate cause.").  Regardless, in the present case, the evidence demonstrates, and both the jury and the Court found, that Defendants' conduct proximately caused the public nuisance in the Counties.  *Supra* at pp. 32-33.

services and programs encompassed therein.  Dkt. #4512 (CVS Closing Brief) at pp. 8-9.  Not so.

As discussed in prior briefing, the municipal cost recovery doctrine does not apply to Plaintiffs'

claims.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 114-115; Dkt. #654 (CT1 Ps' MTD

Opp.) at pp. 21-23.  Indeed, this Court has repeatedly rejected the application of the doctrine to

this case.  *See, e.g.,* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 52-53 ("[T]his

Court has repeatedly refused to find the Rule precludes recovery for public costs when 'an ongoing

and persistent course of intentional misconduct creates an unprecedented, man-made crisis

that a governmental entity plaintiff could not have reasonably anticipated as part of it normal

operating budget . . .'") (citing prior rulings).[51]  The Court concluded that "the costs of Plaintiff's

governmental services are recoverable to the extent that they exceed the ordinary costs of providing

those services and evidence establishes that they were incurred due to the Defendants' violation of

state law."  Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at p. 53 (citations omitted).[52]

Here, the abatement costs sought by Plaintiffs exceed their normal costs of providing

governmental services.  Plaintiffs are not asking that Defendants fully fund the Counties' police

departments, court systems, or child and family welfare agencies; nor are they seeking funding to

cover the entirety of the addiction, mental health, and vocational services they provide within their

---

[51]  *See also In re Natl. Prescription Opiate Litig.*, 1:17-MD-2804, 2019 WL 3737023, at *8 (N.D. Ohio June 13, 2019) ("The current trend among state court judges ruling in opioid-related cases around the country is that the municipal cost recovery rule does not apply when, as alleged here, an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its normal operating budget for municipal, [or] county . . . services.").

[52]  The Court rejected Defendants' reliance on *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), noting it is not an Ohio case and does not "provide[ ] a basis for the Court to reverse its prior decisions concluding that the Rule does not apply."  *Id.*  The Court also previously distinguished the facts at issue in *Beretta* from those at issue in opioid-related public nuisance litigation.  *See In re Natl. Prescription Opiate Litig.*, 458 F. Supp. 3d 665, 685 (N.D. Ohio 2020) ("Although *Beretta* dismissed plaintiff's damages claim, it found the public resources at issue there were merely 'ordinary,' involving the 'normal provision of police, fire, and emergency services,' and therefore not recoverable.  By contrast, this Court has found the opioid crisis, allegedly created by Defendants, resulted in new and additional costs for protecting the public welfare that went 'far beyond what a government entity might ordinarily be expected to pay.  These increased costs are recoverable even *under Beretta*.") (internal citations omitted).

communities.  Rather, they seek funding to add or expand programs and services in the Counties that will specifically enable them to address and abate the ongoing *opioid-related* harms resulting from the public nuisance.  *See, e.g.,* P-23127 (Burke Rep.); P-23105A (Alexander Lake Redress Model); P-23105B (Alexander Trumbull Redress Model); Dkt. #4513 (Ps' Closing Brief) at pp. 1-6; *supra* at § I.

*In re JUUL Labs, Inc., Mktg., Sales Practices, and Products Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020), does not support CVS's argument.  In *JUUL*, the California district court, relying in part on prior rulings by this Court and others in opioid-related litigation, rejected the defendant's argument that the municipal cost recovery rule barred public nuisance claims of government entities seeking monetary damages.  *Id*. at 643-45.  Notably, the court deemed the same *Beretta* case cited by CVS here to be "unpersuasive in light of the numerous courts that have allowed these public entity claims to proceed where private individuals' intentional misconduct created the sort of ongoing and persistent man-made crisis that could not have been reasonably anticipated."  *Id*. at 644.  The court also merely raised the *possibility* of the doctrine being applied to limit the scope of *damages* the plaintiffs might recover in that case: "I note that *even if* the doctrine prevented the government entities from recovering damages *incurred* to combat the alleged youth e-cigarette crisis, 'it would entail only a limit on the scope of damages that the [government entities] might recover' and not mandate dismissal of their entire public nuisance or negligence claims."  *Id*. at 645 n.71 (emphasis added).  Notably, in support of this proposition, the court quoted a New Jersey district court case holding that the plaintiff's "request for injunctive and equitable relief would be unaffected by this doctrine."  *Id.* (quoting *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 265 (D.N.J. 2000), *aff'd,* 273 F.3d 536 (3d Cir. 2001)).

    **D.**    **To the extent Defendants are held jointly and severally liable for the abatement award, a setoff in the amount of Plaintiffs' settlements with other opioid-litigation defendants is appropriate.**

Defendants argue that a setoff in the amount of Plaintiffs' settlements with other tortfeasors must be applied to any final abatement award, in accordance with the Ohio's "one satisfaction" rule and OHIO REV. CODE § 2307.28(A).  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 26-27; Dkt. #4512 (CVS Closing Brief) at p. 26.  Plaintiffs do not necessarily concede that the authorities relied on by Defendants require such a setoff in the context of an equitable abatement award under the circumstances in this case.[53]  Notwithstanding, as previously stated, Plaintiffs do not oppose the overall abatement award being reduced by the amount of settlement funds Plaintiffs have received (or are currently guaranteed to receive) from other opioid-litigation defendants.[54] *However*, such reduction would *only* be warranted if the Court determines that the Plaintiffs' harms from the public nuisance are indivisible such that Defendants are jointly and severally liable.[55] If, on the other hand, the Court determines that the harms are divisible such that some portion of the harm can be specifically allocated to each Defendant, there should be no reduction

---

[53]  *See* OHIO REV. CODE § 2307.28(A) (precluding a plaintiff from recovering "more than the total amount of the plaintiff's *compensatory damages* awarded by the trier of fact" in situations where the plaintiff has released and/or settled its claims against one or more other tortfeasors, but the amount received by the other tortfeasor(s) has not been deducted from the plaintiff's award) (emphasis added); *Seifert v. Burroughs*, 526 N.E.2d 813, 814 (Ohio 1988) ("The law of Ohio is well-settled that an injured party is entitled to only one satisfaction for his injuries, 'and that the *receipt of full compensation* from one of several persons whose concurrent acts of negligence are the basis of a *suit for damages for personal injuries* releases all.'") (citation omitted); *Royal Indem. Co. v. Becker*, 173 N.E. 194, 196 (Ohio 1930) (same); *Spalla v. Fransen*, 936 N.E.2d 559, 566 (Ohio App. 11th Dist. 2010) (affirming setoff of settlement amount against damages award for breach of fiduciary duty); *Celmer v. Rodgers*, No. 2004-T-0083, 2005 WL 3610479, at *4 (Ohio. Ct. App. Dec. 29, 2005) (trial court "erred when it setoff the sum of $325,000 obtained through settlement, against the jury award" where jury "failed to make a determination of total loss" and instead awarded damages solely as to the negligence of the non-settling defendants).

[54]  Plaintiffs' settlements with Rite Aid, Giant Eagle, AmerisourceBergen, Cardinal, McKesson, and Johnson & Johnson are the subject of executed settlement agreements.  However, any funds that Plaintiffs may potentially receive from the Purdue Pharma and Mallinckrodt bankruptcy proceedings, which Defendants admits "are still the subject of dispute" (Dkt. #4511 (WAG/WMT Closing Brief) at p. 27), are too speculative to be included in any setoff.

[55]  *See, e.g., Spalla*, 936 N.E.2d at 566 (plaintiff sued two tortfeasors for breach of fiduciary duty, one of which settled and the other was adjudged liable by the court; "*Because the court found them jointly liable*, a setoff [of the settlement amount] is proper.") (emphasis added)

for settlement funds received from other opioid defendants.[56]  By its plain language, Section 2307.28 applies only when multiple tortfeasors are liable "for the *same* injury or loss to person or property . . ."  OHIO REV. CODE § 2307.28 (emphasis added).  If the harm is apportionable amongst multiple tortfeasors then, by definition, the harm resulting from Walgreens' conduct is not the same as the harm resulting from Giant Eagle's conduct, and thus a settlement by Giant Eagle should not be applied so as to reduce Walgreens' liability.[57]

> ### E. Aside from settlements, the abatement award should not be reduced by any purported future collateral payments.

The jury found that Defendants' conduct was a substantial factor in causing the public nuisance that has ravaged Plaintiffs' communities for almost two decades.  Dkt. #4176 (Verdict Form) at pp. 3-4, 7-8.  To date, Plaintiffs and other innocent third parties (*e.g.*, the American taxpayer, private insurers, etc.) have had no choice but to pick up the slack as best they could, using their own resources in an attempt to address the various harms resulting from this nuisance.  Defendants now claim that, despite them having been deemed liable tortfeasors, any abatement award must be reduced so that Plaintiffs and other innocent third parties can continue to pay to fix what Defendants broke.  *See, e.g.*, Dkt. #4511 (WAG/WMT Closing Brief) at pp. 27-31; Dkt. #4512 (CVS Closing Brief) at pp. 18-22.  Defendants' argument should be soundly rejected.

---

[56]  *See, e.g., Celmer*, 2005 WL 3610479, at *4 (trial court erred in reducing jury's damage award against two defendants by the amount of plaintiff's pretrial settlement with other co-defendants where "the jury failed to make a determination of total loss" and instead "awarded damages solely as to the negligence of the [two defendants]"; "[I]t is clear that the damages awarded to [the plaintiff] and later subjected to a setoff, did not include damages for which the settling doctors may have been responsible as a result suffered by [the two defendants].  Thus, the danger of double recovery was not present in this case.").

[57]  A hypothetical example may help illustrate this point.  There is a nuisance abatement case with four defendants, two of which settle before trial (one for $1 million, the other for $3 million), and the other two proceed to trial.  The court determines at trial that it will take $10 million to abate the nuisance and allocates 20% of the harm ($2 million) to each settling defendant and 30% of the harm ($3 million) to each defendant that went to trial.  Under those circumstances, the settlement proceeds received from each settling defendant only discharges *that defendant's* allocated percentage of the harm; the non-settling defendants still must pay the full amount they were allocated ($3 million each).  What Defendants in this case propose, on the other hand, is that the $4 million in settlements be deducted from the $10 million total, leaving $6 million, and then they each should only have to pay their 30% of that amount ($1.8 million each).  This would be inequitable, as each non-settling defendant would only be paying 18% of the award, despite being responsible for 30% of the harm.

Even putting aside the fact that it is inconsistent with both Ohio law and principles of equity, Defendants utterly failed to satisfy their burden of proving the existence and amount of any *future* collateral source payments with reasonable certainty.  Accordingly, no deduction should be made.

Defendants first argue that the abatement award cannot include any costs typically paid by third parties because they are not incurred by Plaintiffs and the only injury giving Plaintiffs standing to sue is their out-of-pocket costs.  This Court has previously rejected Defendants' argument that Plaintiffs lacked standing to bring their nuisance claim.[58] If Plaintiffs were seeking future damages, it would be true that they could only recover their own out-of-pocket costs that they were obligated to incur as a result of the nuisance.  But abatement is broader.  *Supra* at pp. 5-6.  The public nuisance caused by Defendants continues to significantly and unreasonably interfere with public health and safety in the Counties.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 3-13.  In order for Plaintiffs to be able to materially abate this nuisance, they will need significantly more than they have been able to pay in the past or would be required to pay in the future.  They need the full amount of the abatement relief they requested.  And as the wrongful tortfeasors, it is Defendants who should bear these costs, not Plaintiffs or innocent third parties. The cases cited by Defendants are distinguishable.  *See Lewis v. Lead Industries Assn.*, 178 N.E.3d 1046, 1049-52, 1054-61 (Ill. 2020) (plaintiffs' action seeking to recover costs of their children's blood lead screening dismissed for lack of standing where Medicaid had paid those costs in full; "Plaintiffs claim that their injury was the cost they *incurred* to pay for their children's testing, even though they never actually paid for the cost of the testing themselves."); *Gillespie v. Travelscape LLC*, C13-0622 RSM, 2014 WL 4243706, at *1-3 (W.D. Wash. Aug. 26, 2014) (dismissing plaintiff's claim against hotel for its alleged unfair business practice of overcharging hotel room consumers on standing grounds; plaintiff had been reimbursed by her employer for the money she

---

[58]  Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 49-50; *In re Natl. Prescription Opiate Litig.*, 1:18-OP-45090, 2018 WL 4895856, at *48-49 (N.D. Ohio Oct. 5, 2018), *report and recommendation adopted in relevant,* 1:17-MD-2804, 2018 WL 6628898, at *1 & n.2 (N.D. Ohio Dec. 19, 2018); *see also, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 12-13.

paid the hotel prior to her filing suit and she failed to allege that she had been damaged in any way).[59]

CVS next argues that the failure to deduct collateral source payments would result in the Court awarding relief in favor of nonparties, which it is prohibited from doing. Dkt. #4512 (CVS Closing Brief) at pp. 18-19.  But the cases it cites for this proposition are entirely inapposite.[60] Those responsible for creating the public nuisance should be required to pay to fix it.  This is not punishment, it is equitable abatement.  *See, e.g., State ex rel. Miller v. Anthony*, 647 N.E.2d 1368, 1372–74 (Ohio 1995) (rejecting argument that abatement measures constitute punishment or penalties and distinguishing abatement from forfeiture); *Wind v. State*, 130 N.E. 35, 36 (Ohio 1921); *Matthews v. State*, 25 Ohio St. 536, 541, 1874 WL 108 (Ohio 1874) ("The abatement of the nuisance is not . . . a punishment for the offense, but the removal of a thing injurious to the

---

[59] Nor does 66 C.J.S. NUISANCES § 166 support Defendants' argument that "any abatement award must be reduced by [collateral benefits] to ensure that any award addresses only actual, out-of-pocket costs Plaintiffs will incur."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 31.  Defendants claim that the treatise states the Court "may deny equitable relief to the extent that the nuisance has already been abated" (*id.*) but what it actually says is: "If a nuisance is found to exist at the time the complaint is filed *but not at the time of trial*, the trial court has the discretion not to issue an injunction or order of abatement."  66 C.J.S. NUISANCES § 166 (emphasis added).

[60] *See U.S. v. Natl. Treas. Employees Union*, 513 U.S. 454, 457-64, 477-80 (1995) (in action in which court found subsection of Ethics in Government Act prohibiting receipt of honoraria by government employees unconstitutional, relief would be limited to parties before Supreme Court, *i.e.*, lower level executive branch employees, and would not be extended to senior executives in that branch; granting full relief to lower level employees did not require passing on applicability of prohibition to senior executives who, unlike lower level employees, received salary increase to offset honoraria ban's disincentive to speak and write, and, furthermore, government might advance different justification for honoraria ban limited to senior executives); *Williams v. Owens*, 937 F.2d 609, 1991 WL 128775, at *1-3 (6th Cir. 1991) (unpublished) (dissolving preliminary injunction entered by district court in § 1983 action brought by individual for constitutional deprivations involving his medical care as a pre-trial detainee in the Shelby County Jail; plaintiff did not bring his suit as a class representative, yet the injunction benefitted not just him, but all inmates suffering from sickle cell anemia; "[T]here is no basis for an injunction running to the benefit of other inmates, where the only evidence elicited in this case relates to one incident involving one paramedic and only one inmate."); *Akerstrom v. 635 W. Lakeside, Ltd.*, 105 N.E.3d 440, 444-46 (Ohio App. 8th Dist. 2018) (president of condominium association was not authorized to bring an action in her individual capacity on behalf of non-party association against the owner of certain unsold units and others, alleging a failure to pay monthly assessment obligations; association was a separate legal entity capable of bringing its own suit and president admittedly was not seeking any individual damages incurred by her, but solely damages incurred by the association).

public.").[61] Neither Plaintiffs,[62] nor any other innocent third parties,[63] should be expected to continue to bear the burden of fixing what Defendants broke.

The cases cited by CVS do not support its position in this case. Dkt. #4512 (CVS Closing Brief) at p. 19. In *Bangor Punta*, the Supreme Court held that deterrence of wrongdoing was not itself a sufficient ground to allow a plaintiff *that had suffered no injury* to maintain its action against the defendants for corporate mismanagement. 417 U.S. at 705, 711-18.[64] In both *Liu v. Securities and Exch. Commn.*, 140 S. Ct. 1936 (2020), and *Tilghman v. Proctor*, 125 U.S. 136 (1888), the Supreme Court was addressing certain limitations as to the amount of equitable *disgorgement* awards. *See Liu*, 140 S. Ct. at 1940 (holding that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [the Securities Exchange Act]"); *Tilghman*, 125 U.S. at 144–46 (noting "that in equity the profits made by the infringer of a patent belong to the patentee and not to the infringer" and "that it is inconsistent with the ordinary principles and practice of courts of chancery, either, on the one

---

[61]  *Cf. Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 717 n.14 (1974) ("When one person has wronged another in a matter within [a court's] jurisdiction, equity will spare no effort to redress the person injured, and will not suffer the wrongdoer to escape restitution to such person through any device or technicality. But this is because of its desire to right wrongs, not because of a desire to punish all wrongdoers.") (citation omitted); *U.S. v. Monsanto Co.*, 858 F.2d 160, 175 & n.33 (4th Cir. 1988) (CERCLA action; "The restitution of cleanup costs was not intended to operate, nor does it operate in fact, as a criminal penalty or a punitive deterrent."; "The existence of joint and several liability in cases of indivisible harm does not transform an otherwise constitutional obligation into one that exacts punishment.").

[62]  As explained above, Plaintiffs are only seeking abatement costs that exceed their normal costs of providing governmental services. *Supra* at pp. 35-36.

[63]  CVS argues that the federal government itself was a cause of the opioid crisis. Dkt. #4512 (CVS Closing Brief) at p. 19 n.10. Putting aside that Defendants have failed to demonstrate that any conduct by the DEA or FDA was a "substantial factor" in causing the nuisance, Medicaid is not funded by the DEA or the FDA, but rather by the American taxpayers through federal and state taxes. CVS offers no explanation as to why American taxpayers should be required to pay for harms that Defendants caused.

[64]  "If deterrence were the only objective, then in logic any plaintiff willing to file a complaint would suffice. No injury or violation of a legal duty to the particular plaintiff would have to be alleged. The only prerequisite would be that the plaintiff agree to accept the recovery, lest the supposed wrongdoer be allowed to escape a reckoning. Suffice it to say that we have been referred to no authority which would support so novel a result, and we decline to adopt it." *Id.* at 717.

hand, to permit the wrongdoer to profit by his own wrong, or, on the other hand, to make no allowance for the cost and expense of conducting his business, or to undertake to punish him by obliging him to pay more than a fair compensation to the person wronged").

As Plaintiffs explained at length in their Phase 2 Trial Brief and Closing Brief, the principles underlying the common law collateral source rule warrant the rule's application here. *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 10-18; Dkt. #4513 (Ps' Closing Brief) at pp. 33-35. Defendants' arguments to the contrary are without merit.

Defendants first argue that the collateral source rule "does not create injury where it otherwise would not exist[,]" and Plaintiffs "simply have not suffered an economic injury if a third party funded their programs."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 29.  This is simply another iteration of Defendants' standing argument, which should be rejected for the reasons discussed above. *Supra* at pp. 39-40.  Defendants next argue that the collateral source rule applies only to claims for compensatory damages, not equitable monetary relief. Dkt. #4511 (WAG/WMT Closing Brief) at p. 29; Dkt. #4512 (CVS Closing Brief) at pp. 20-21.  Certainly the collateral source rule is typically applied in the context of compensatory damages, as Plaintiffs have previously acknowledged.  Dkt. #4387 (Ps' Phase 2 Trial Brief) at p. 11.  However, Plaintiffs have also cited cases where the rule has been applied to equitable monetary remedies such as back pay and front pay.  *Id.* at pp. 11-12.[65]  CVS dismisses these cases because they were federal discrimination actions that did not apply Ohio law and were otherwise factually distinguishable.

---

[65]  CVS argues that *Hamlin v. Charter Tp. of Flint*, 165 F.3d 426 (6th Cir. 1999) involved only damages and not equitable monetary remedies. Dkt. #4512 (CVS Closing Brief) at p. 21 n.12.  Upon further review of that case, Plaintiffs acknowledge that it is not entirely clear.  The jury awarded a lump sum amount in an employment discrimination action without differentiating which portions of the award addressed which claims.  *Hamlin,* 165 F.3d at 429.  The court appears to assume that some portion of the award represented front pay, based on its repeated references to front pay and backpay cases when analyzing the collateral source issue (*id.* at 432-35), although there is a possibility that the award included no front pay at all.  *Id.* at 441 ("[I]t is impossible to tell how much (if any) of the future damages awarded by the jury in this case represented front pay.") (Nelson, J., concurring in judgment). It is also true that the court repeatedly refers to the award as a "damages" award, although that may be because it was unclear to what extent the award included front pay, which the Sixth Circuit has previously stated is an equitable remedy.  *See Thurman v. Yellow Freight Sys., Inc.,* 97 F.3d 833, 835 (6th Cir. 1996).

Dkt. #4512 (CVS Closing Brief) at pp. 20-21.[66] But it offers no explanation for why the rule should apply to certain equitable monetary remedies but not to others.[67]

CVS further notes that the cases Plaintiffs cited in their Trial Brief, in which the collateral source rule was applied to funds and benefits provided by the government, all involved damages, not equitable relief. Dkt. #4512 (CVS Closing Brief) at p. 21 & n.13. But, again, CVS offers no argument or explanation as to why the principles underlying the rule's application in those cases should not equally apply in the context of equitable abatement relief in a public nuisance action. *See, e.g., City of Larkspur v. Jacobs Engr. Group, Inc.*, A123486, 2010 WL 2164406, at *27–28 (Cal. App. 1st Dist. May 28, 2010) (unpublished) ("[P]ublic policy supports imposing the rule. [The city] has an interest in having its officials pursue all possible sources of funding and a tort recovery made after securing such a benefit is not a windfall to the government agency, although it clearly would be a windfall to [the defendant] were it permitted to escape liability based on [the city's] efforts to secure alternative funding to protect the public's safety. 'No reason exists in these circumstances to confer a bonanza upon the party causing the injury.'") (citation omitted).[68]

---

[66] Contrary to CVS's assertions, in *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614 (6th Cir. 1983), the Sixth Circuit discussed the applicability of the collateral source rule to an equitable backpay remedy (separate and apart from its discussion of mitigation of damages). *Id.* at 626-28. Because the district court "never fully addressed the backpay issue[,]" the Sixth Circuit provided guidance for the district court to apply on remand when awarding backpay. *Id.* ("Unemployment benefits also should not be deducted from backpay awards.").

[67] CVS quotes *Cavins v. S & B Health Care, Inc.*, 39 N.E.3d 1287, 1315 n.10 (Ohio App. 2d Dist. 2015), for the proposition that the refusal to offset damages awards in civil rights cases is based on the policy of deterrence and not the common law collateral source rule. Dkt. #4512 (CVS Closing Brief) at p. 21 n.12. The *Cavins* court relied on *Hamlin* for this proposition, but as it noted elsewhere in the opinion, the *Hamlin* court simply stated that deterrence was *one of* the reasons to apply the rule in employment discrimination cases: "[a]pplying the collateral source rule in the employment discrimination context prevents the discriminatory employer from avoiding liability and experiences a windfall, *and also* promotes the deterrence functions of discrimination statutes." *Cavins*, 39 N.E.3d at 1315 (quoting *Hamlin*, 165 F.3d at 434) (emphasis added). CVS also cites *Bangor* for the proposition that deterrence is not an appropriate goal of equitable abatement. Dkt. #4512 (CVS Closing Brief) at p. 21 n.12. *Bangor* is factually distinguishable for reasons discussed above. *Supra* at p. 41.

[68] *See also Louisiana Dept. of Transp. and Dev. v. Kansas City S. Ry. Co.*, 846 So. 2d 734, 741, 743 (La. 2003) ("The welfare of our environment and the health of our citizens command that those persons or entities which are found to have polluted our state pay full restitution for the consequences of their

(footnote continues on next page)

CVS is quick to dismiss Judge Breyer's decision rejecting the Track 4 defendants' collateral source and setoff defenses (Dkt. #4387 (Ps' Phase 2 Trial Brief) at p. 10 n.7), claiming it is inapposite because it was based on California law.  Dkt. #4512 (CVS Closing Brief) at p. 21 n.14.[69]  Yet it is equally quick to point to a decision by Judge Faber in Track 2, which addressed *West Virginia* law, to support its argument.  Dkt. #4512 (CVS Closing Brief) at p. 21 (citing *City of Huntington v. AmerisourceBergen Drug Corp.*, CV 3:17-01362, 2021 WL 1556788 (S.D.W. Va. Apr. 20, 2021)).  Regardless, Judge Faber's ruling in that case addressed the plaintiff's *pretrial* motion *in limine* to exclude *evidence* of collateral source payments at trial.  *City of Huntington*, 2021 WL 1556788, at *1.  Notably, he explicitly *did not decide* whether West Virginia's collateral source rule applied to equitable relief, but rather ruled only that the defendants would be permitted to introduce such evidence at trial.  *Id*. at *2 ("Plaintiffs present a colorable argument that the evidence is irrelevant, but the risk of admitting irrelevant evidence is less than the risk of wrongfully blocking relevant evidence that defendants say is integral to their theory of the case."), *3 n.3.  *City of Huntington* is therefore inapposite, as Defendants in this case were permitted to introduce collateral source evidence during the Phase 2 trial.

CVS also argues that the collateral source rule applies only to payments made to or for the benefit of *Plaintiffs* for their own injuries and not to payments made to or for the benefit of

---

acts.  Violators of the LEQA should not be allowed to escape the consequences of their actions because the federal government chooses to provide financial assistance to states in essential and time-sensitive clean-up operations."; "A wrongdoer's liability should not be reduced by the amount of collateral source payments to an injured plaintiff, even where the nature of the collateral source is a public relief provided to the plaintiff by application of federal or state law.").

[69]  CVS also claims that Judge Breyer found that the Track 4 defendants had failed to identify any collateral funds that may be relevant, whereas in the present case "substantial evidence was introduced at trial showing other funding sources, such as Medicaid and private insurers, would pay for certain costs of the Alexander plan."  *Id*.  However, that is precisely the type of evidence the Track 4 defendants presented to Judge Breyer that he deemed to be irrelevant.  *See City and County of San Francisco v. Purdue Pharma L.P., et al.*, Case No. 3:18-cv-07591-CRB (N.D. Cal.), Dkt. #1076 (CT4 Ds' Joint Opp. to Ps' MSJ) at p. 16 ("[D]iscovery in this case has uncovered ample evidence to support Defendants' collateral source and setoff defenses, including, but not limited to, expert opinions that 'a significant portion of the claimed abatement costs would likely be paid for by other sources, be it insurance payers, federal funding, or state funds.'") (citations omitted).

nonparty OUD patients. Dkt. #4512 (CVS Closing Brief) at p. 22. But CVS cannot have it both ways. The evidence demonstrates that Plaintiffs have been harmed, and continue to be harmed, by the unreasonable interference with public health and safety in their communities caused by CVS and the other Defendants. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 3-13. If a health insurer's potential future coverage of a Lake County resident's OUD treatment confers no benefit to Lake County for its harm, then there is no basis for deducting it from the abatement award. If, on the other hand, that insurance coverage does confer an indirect benefit to Lake County for its harm, it should not be deducted from the abatement award pursuant to the principles underlying the collateral source rule discussed herein and in Plaintiffs' prior briefing. *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 10-18; Dkt. #4513 (Ps' Closing Brief) at pp. 33-35.[70]

Defendants next argue it would be inequitable to apply the collateral source rule to an equitable abatement award, because "[t]o the extent that the harm is already abated by a third party, a court in equity cannot order a defendant to pay for those abatement measures." Dkt. #4511 (WAG/WMT Closing Brief) at pp. 29-30. But, as previously explained, Plaintiffs seek an abatement award in the amount necessary to prospectively abate the public nuisance as it *currently exists*. Dkt. #4387 (Ps' Phase 2 Trial Brief) at p. 17. Defendants are already receiving the benefit of any past collateral payments because the current nuisance presumably is not as severe as it otherwise might have been without those payments. Thus, the Court would not be ordering Defendants to pay for harm that has "*already* [been] abated by a third party[.]" Dkt. #4511

---

[70] CVS cites *Bluemile, Inc. v. Atlas Indus. Contractors, Ltd.*, 102 N.E.3d 579 (Ohio App. 10th Dist. 2017), in support of its position. In *Bluemile*, the issue was whether a plaintiff's damage award against a defendant should be reduced by the amount of the defendant's pre-trial settlement with the plaintiff's insurer. *Id.* at 586-88. The court addressed the tension between the collateral source rule and the one satisfaction rule: "[O]n the one hand, a plaintiff should not receive more than one recovery for the same set of damages, but on the other hand, a tortfeasor should not be granted a windfall by allowing him credit for payments made by a third party." *Id.* at 587. But that is not a concern here. If Plaintiffs are awarded the full costs needed to treat the OUD population in their communities, then it will not be necessary for those individuals to turn to Medicaid or private insurance for coverage. It is reasonable to assume that an individual suffering from OUD would more likely accept free treatment provided with the County's abatement funds rather than relying on private or governmental insurance coverage which potentially may not cover the entire amount needed or may require the individual to pay a deductible. Thus, Plaintiffs will not be receiving more than one recovery for the same harm.

(WAG/WMT Closing Brief) at p. 29 (emphasis added).

None of the cases cited by Defendants require the deduction of speculative future collateral benefits from a prospective abatement award. *See Lussier v. Runyon*, 50 F.3d 1103, 1108-12 (1st Cir. 1995) ("[W]hether a front pay award, if granted, may be tailored to take collateral benefits into account is also within this court's equitable discretion."; evidence was adduced at trial estimating the amount of future collateral benefits plaintiff was expected to receive);[71] *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 966 & n.10 (4th Cir. 1985) (plaintiff's award in age discrimination action against employer offset by *employer-provided* pension benefits he *previously received*; "A payment made entirely by the employer directly to the employee is not a 'collateral benefit' . . . . Collateral benefits are those received from a source distinct from the employer; they are not offset because they do not discharge an obligation of the employer, but serve an independent social policy."); *Szedlock v. Tenet*, 139 F. Supp. 2d 725, 736–37 & n.26 (E.D. Va. 2001) ("[H]ere, as in *Fariss*, the offset is warranted as plaintiff's FERS annuity payments are from her employer, not a collateral source."; "The proper offset is the amount of contributions the defendant made to the FERS system. The portion of the FERS annuity attributable to contributions by plaintiff is collateral, and defendant is not entitled to an offset of these payments."), *aff'd,* 61 Fed. Appx. 88, 94 (4th Cir. 2003) (unpublished) ("FERS benefits are not 'received from a source distinct from the employer, and therefore are not collateral under *Fariss*. . . . The district court was therefore correct in deducting ninety-four percent of [the plaintiff's] FERS benefits from her backpay award.") (internal citation omitted).

Defendants claim that, in CERCLA cases, courts regularly find "the collateral source rule inapplicable under this same windfall reasoning." Dkt. #4511 (WAG/WMT Closing Brief) at p. 30. What Defendants fail to mention is that the CERCLA cases they cite for this proposition all

---

[71] Notably, the First Circuit reversed the trial court's decision in part because it had also relied on certain extra-record information that had not been presented at trial to reduce the front pay award further. *Id.* at 1115 ("[B]ecause the court, in calculating a particular offset, relied on evidence *dehors* the record, we vacate the judgment and remand for further proceedings relating to that offset.").

involved *contribution* actions by one responsible party against other responsible parties.[72]  Indeed, the *Basic Mgt.* court specifically differentiated CERCLA contribution actions from tort actions brought by injured parties in this context:

> Unlike cases that sound in tort, including those under the Jones Act, CERCLA contribution actions are not injury actions in which the injured party is seeking compensation for damages to be made whole again.  Rather, in the context of a CERCLA contribution action, the environment is the injured party and the parties responsible for causing that injury who fronted the money to fund the repair of that environmental damage are entitled to reimbursement from the other responsible parties to the extent of their shared or allocated liability.  *In other words, Plaintiffs have not been damaged and are not "entitled" to money as a damaged party; but rather, Plaintiffs can only receive reimbursement for the costs they expended beyond their share of actual responsibility for the environmental damage*.  There is an actual dollar amount associated with those costs, and in this case, almost all of those costs have been paid directly by Plaintiffs' insurers, and without further right of subrogation in the insurers.  In other words, no party or potential party here has incurred a cost as a PRP for which they could seek "contribution" from another PRP.  Allowing Plaintiffs to recover those costs "again" from Defendants would in essence allow Plaintiffs *to profit from their own and prior contamination of the site simply because they are in the subsequent chain of title*.  The purpose of the Contribution element of CERCLA was to reallocate the remedial cost to those who were ultimately responsible for the pollution, not to provide a windfall recovery for parties who happen to be in the chain of title.  That is undoubtedly the reason for the addition of the prohibition against double recovery in this very statute.

569 F. Supp. 2d at 1123-24 (emphasis added).[73]

---

[72] *See Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1180 (9th Cir. 2000) ("The issue in this case is how [the] respective expenses [of two polluters] ought to be allocated in a contribution action."); *Basic Mgt. Inc. v. U.S.*, 569 F. Supp. 2d 1106, 1109–10, 1112, 1125 (D. Nev. 2008) ("The Court declines to apply the collateral source rule to the recovery of response costs in this CERCLA contribution action."); *U.S. v. Davis*, 31 F. Supp. 2d 45, 50, 62-69 (D.R.I. 1998) (resolving one polluter's "request for a declaratory judgment allocating responsibility for future cleanup costs among the fifteen remaining contribution defendants"; "It is . . . well established that a defendant's liability *for contribution* is 'several' rather than 'joint and several.' . . . *In this respect, contribution liability under § 9613(f) differs from the liability imposed in a cost recovery action under § 9607, where one liable defendant may be required to pay the entire cost*.") (emphasis added); *see also* 42 U.S.C.A. § 9613(f)(1) ("In resolving *contribution* claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.") (emphasis added).

[73] *See also Monsanto*, 858 F.2d at 171 n.22 ("The site-owners limit their joint and several liability argument to the contention that it is inequitable under the circumstances of this case, *i.e.*, their limited degree of participation in waste disposal activities at Bluff Road.  As we have stated, however, such equitable factors are relevant in subsequent actions for contribution.  They are not pertinent to the (footnote continues on next page)

47

Defendants also argue that regardless of whether the common law collateral source rule could have applied to equitable claims in the past, it no longer can because it was "largely abrogated" by the Ohio Legislature when it enacted Ohio Revised Code § 2315.20(A).  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 30-31; Dkt. #4512 (CVS Closing Brief) at p. 20.  Not so. Section 2315.20 partially abrogated the common-law collateral source rule only in certain specific actions (*i.e.*, "civil action[s] for *damages* for injury, death, or loss *to person or property*"). OHIO REV. CODE § 2315.20(A), (D)(1) (emphasis added).  Plaintiffs' public nuisance action seeking equitable abatement and injunctive relief does not fall within the scope of § 2315.20. Moreover, § 2315.20 does not *require* the deduction of collateral source payments; rather, it simply allows evidence of such payments to be introduced at trial and the jury (or the court) is then permitted to decide whether or not deduction is warranted.  OHIO REV. CODE § 2315.20(A).[74]

Here, consistent with § 2315.20(A), Defendants were allowed to introduce collateral benefit evidence in the Phase 2 trial.  The evidence they chose to introduce, however, was simply insufficient to warrant any deduction from the abatement award.  A collateral source payment can only be deducted, if at all, from the specific portion of an award to which the payment directly relates.  *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 16-18.  Thus, it was Defendants' burden to demonstrate both the existence and the amount of specific collateral source payments that are directly related to the prospective abatement award.  *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at p. 16; *see also, e.g., Bluemile*, 102 N.E.3d at 587.  Yet the *only* evidence Defendants offered at

---

question of joint and several liability, which focuses principally on the divisibility among responsible parties of the harm to the environment."); *Folino v. Hampden Color and Chemical Co.*, 832 F. Supp. 757, 763–64 (D. Vt. 1993) ("In government cost recovery actions, public policy favors efficiency and full recapture of government expenditures, even if that means one responsible party pays for more than its fair share.  In furtherance of these goals, courts appear to have made it difficult for liable parties to evade joint and several liability.  For example, the burden is on the polluter to show divisibility in a government cost recovery action.").

[74]  *See also Moretz v. Muakkassa*, 998 N.E.2d 479, 497 (Ohio 2013) ("We explained that R.C. 2315.20 pertains only to *evidence* of any amount payable as a benefit to the plaintiff.") (cleaned up; emphasis added); *Jaques v. Manton*, 928 N.E.2d 434, 437 (Ohio 2010) (noting that § 2315.20 establishes "that *evidence* of collateral benefits is *admissible*") (emphasis added).

trial is that some OUD treatment costs have been paid by Medicaid or private insurers *in the past*, and that the Counties have received some federal or state grants *in the past*.  Dkt. #4513 (Ps' Closing Brief) at pp. 33-34.[75]  There is no guarantee such payments will continue in the future or, if they do, to what extent.  *See, e.g.,* Dkt. #4513 (Ps' Closing Brief) at pp. 34-35.[76]  Courts have not hesitated to deny an offset where the future collateral benefits are speculative in nature, particularly where such benefits come from the government (*e.g.*, Medicaid payments, governmental grants, etc.).  *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 17-18.  Moreover, as discussed above, Defendants offer no explanation as to why private insurers or the American taxpayer should bear the burden of paying to rectify the effects of the public nuisance *Defendants* caused.  The fact that they have borne this burden in the past certainly does not mean they should have to continue to do so now that a jury has held Defendants liable for creating this public nuisance.[77]  Accordingly, it would not be equitable to deduct any collateral source payments from the abatement award in this case.

Indeed, deducting collateral-source payments from the abatement award could only even arguably comport with equity if Plaintiffs would be receiving a windfall.  But contrary to

---

[75]  Even this evidence was not demonstrated with reasonable certainty.  Defendants' experts state that historically most individuals who received OUD treatment were covered by Medicaid or private insurance.  But they could not identify what percentage of the Medicaid-covered individuals qualified for such coverage due solely to Medicaid expansion.  Dkt. #4455 (5/16/22 Trial Tr.) [*Bialecki*] at 784:10 – 785:5.  Nor is there any indication as to whether Medicaid typically covers the entirety of an individual's opioid addiction treatment or has any limitations in the scope of its coverage.  Private insurance similarly may limit the scope of its coverage, and often individuals have to pay deductibles.  Given these numerous variables, it would be impossible to reasonably calculate the amount of any offset even if a deduction was warranted (which it is not).

[76]  To receive an offset based on future collateral benefits, the party seeking the offset must demonstrate that such benefits can be determined "with a reasonable degree of certainty[,]" so that the award is not arbitrarily reduced by collateral benefits "that are not reasonably certain to be received."  *Buchman v. Wayne Trace Loc. Sch. Dist. Bd. Of Edn.*, 652 N.E.2d 952, 961 (Ohio 1995).  *See also Baker v. Goldblatt*, 955 F.2d 402, 408 (6th Cir. 1992) (recognizing that the "calculation of [the plaintiff's] future collateral benefits . . . is fraught with uncertainty").

[77]  Similarly, with respect to grants, Defendants should not be allowed to escape the consequences of their actions because the federal and Ohio governments chose to provide financial assistance to the Counties to help fix the mess Defendants made.  *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 15-16.

Defendants' assertions,[78] there is no potential for a windfall here.  *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at p. 13; *see also Celmer*, 2005 WL 3610479, at *4 ("[I]t follows where there is no risk of double recovery, setoff should not be permitted.").  To begin with, the total abatement relief requested by Plaintiffs is estimated to reduce opioid-related harms in the Counties by approximately 50%.  Dkt. #4446 (5/11/22 Trial Tr.) [*Alexander*] at 417:12-15.  So even if Plaintiffs receive every dollar they are asking for from Defendants, they will continue to suffer harms related to the public nuisance Defendants caused.[79]  There is no risk of Plaintiffs somehow receiving more money than they need to fully abate the nuisance.[80]  And this is particularly true here, as Plaintiffs will need to pay their attorneys' fees and expenses (including common benefit payments) out of the abatement award they receive.  Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 13-14.  Moreover, if Plaintiffs receive the funds to provide OUD treatment to individuals (either directly or indirectly) such that those individuals do not need to use Medicaid or private insurance in the future to pay those costs, Plaintiffs are not receiving a windfall.  It simply means that Defendants, the wrongdoers, will pay for the treatment rather than innocent private insurers or American taxpayers.

### F.   Plaintiffs do not oppose certain reasonable mechanisms being put in place to prevent waste and fraud, but Defendants' proposed restrictions are unreasonable and should be rejected.

As noted in their Closing Brief, Plaintiffs do not oppose *reasonable* mechanisms being put in place to prevent waste and fraud.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 23-27.  Specifically, Plaintiffs propose: (i) that the Court retain jurisdiction over the abatement plans throughout the entire abatement period and exercise judicial oversight over its administration; (ii) that the

---

[78]   Dkt. #4511 (WAG/WMT Closing Brief) at p. 28.

[79]   And certainly if the Court ultimately decides to apportion the abatement award such that Defendants are required to pay only a portion of the total abatement costs (it should not for reasons discussed *infra*), there is no risk of Plaintiffs receiving a windfall, as they will not even be receiving a full recovery for their harm.  *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at p. 14.

[80]   Even assuming a windfall was theoretically possible (it is not), it would be inequitable for Defendants, the tortfeasors, to benefit from that windfall.  *See* Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 14-16; Dkt. #4513 (Ps' Closing Brief) at p. 35.

abatement funds be deposited into dedicated Abatement Fund Accounts for each County from which all disbursements to Plaintiffs will be made; (iii) that the Abatement Fund Accounts, and all disbursements to Plaintiffs from same, be monitored by a Court-appointed administrator or the Court itself; (iv) that Plaintiffs receive annual payments from the Abatement Fund Accounts to Plaintiffs throughout the abatement period; (v) that, to the extent the Court does not want to award the entire fifteen years of abatement costs at once, it award the first five years of abatement costs now and retain jurisdiction to make a final determination regarding the amount of any further abatement award at the end of that five-year period based on its review of the effect of the plans at that time; (vi) that, after deducting their attorneys' fees and expenses, any funds received by Plaintiffs only be used for abatement purposes; (vii) that, prior to receiving each annual disbursement, Plaintiffs will submit a certification to the Court and/or any Court-appointed fund administrator providing their best good-faith expectations as to how they intend to allocate the money for that year; (viii) that, within ninety days from the end of each year, Plaintiffs will submit a certified accounting to the Court and/or any Court-appointed fund administrator of how the funds were actually spent (which would include an explanation for any deviation from the expected use of funds set forth in Plaintiffs' prior certification); and (ix) to the extent the Court and/or the Court-appointed administrator has concerns regarding how certain funds were spent, a hearing can be held with Plaintiffs to address and resolve the issue.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 23-26.  These mechanisms are more than sufficient to prevent fraud and waste in Plaintiffs' use of the abatement funds.

Defendants' suggestions, on the other hand, are overly (and unnecessarily) restrictive, unduly burdensome (and in some instances completely infeasible), and/or not supported by the law or the facts of this case.  Dkt. #4337 (Ds' Abatement Plan) at pp. 9-10; *see also* Dkt. #4511 (WAG/WMT Closing Brief) at pp. 31-33; Dkt. #4512 (CVS Closing Brief) at p. 26-36.  Their proposals can be grouped into three broad categories: (i) restrictions as to the scope of abatement relief that should be awarded; (ii) procedural and logistical requirements; and (iii) restrictions on how abatement funds are disbursed and used.  Plaintiffs will address each in turn.

To begin with, CVS proposes various limitations regarding the substantive scope of the abatement award.  First it argues that "no funding should be awarded" at all because any abatement order "should be limited to terms to reduce the oversupply of legal prescription opioids found by the jury[.]"  Dkt. #4512 (CVS Closing Brief) at pp. 27-28.[81]  Alternatively, it argues that, to the extent the Court disagrees and "orders funding for other potential effects that are so attenuated from CVS and the verdict, it must limit the funding to programs and services that prevent overdose and connect individuals who used prescription opioids to addiction treatment" (*i.e.*, "naloxone distribution and training;" "the helpline;" "peer-recovery coaches;" "the Quick Response Team;" and "bridge programs to connect people in emergency rooms who have overdosed to addiction treatment").  Dkt. #4512 (CVS Closing Brief) at p. 32.  Both arguments should be rejected.  As explained above and in Plaintiffs' Closing Brief, the public nuisance found by the jury is not as limited as CVS contends, and each of the proposed abatement interventions are narrowly tailored to, and properly recoverable as abatement for, that public nuisance.  *Supra* at § I.A-B; Dkt. #4513 (Ps' Closing Brief) at pp. 1-6; Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 3-23.[82]

CVS also argues that, to the extent the Court awards abatement costs related to OUD treatment, "the amount of initial treatment funding must be derived from the county data that identifies the number of persons that county-funded facilities treat and the costs the counties actually pay for that treatment."  Dkt. #4512 (CVS Closing Brief) at pp. 27, 30-31.  This argument

---

[81]  According to CVS, the only abatement that the Court can award is an order (i) prohibiting CVS from dispensing prescription opioids in the Counties, and (ii) requiring CVS to provide for the disposal of excess prescription opioids it dispensed in the Counties by making drug disposal kiosks or pouches available and displaying or otherwise providing information regarding drug disposal in their pharmacies in the Counties.  *Id.*  Of course, Plaintiffs have never requested that CVS (or any Defendant) be broadly prohibited from dispensing all prescription opioids, and the Court has rejected this argument by CVS.  Dkt. #4420 (Phase 2 Pretrial Conf. Tr.) at 30:6-17 ("And again, I know the defendants are somehow arguing that the only thing that can be abated is the drugs themselves, so I either prevent the defendants from selling opioids, dispensing opioids, or I do nothing.  Well, I've told the parties I'm categorically rejecting that.  First, I have no intention of prohibiting the defendants from dispensing opioids.  I think that would probably be illegal, and I can't imagine any court upholding that, and I can't imagine – under no circumstances would I do it.").

[82]  Defendants' suggestion that any award should consist of no more than one year of abatement costs should also be rejected for the reasons discussed in § II.B above.

should be rejected for the reasons discussed herein and in Plaintiffs' Closing Brief. *See, e.g., supra* at pp. 16-20, 23 & § II.E; Dkt. #4513 (Ps' Closing Brief) at pp. 8-9, 33-35. CVS further suggests that in determining the amount of any abatement award, the Court should take into consideration the prior expenditures by the Lake County ADAMHS Board and the Trumbull County Mental Health & Recovery Board for opioid-related services and the fact that those Boards had budget surpluses in 2020. Dkt. #4512 (CVS Closing Brief) at pp. 33-34. Plaintiffs explain above why such information does not provide a useful or accurate depiction of the costs needed to abate the public nuisance in their communities. *Supra* at p. 20.

Defendants next propose various procedural and logistical restrictions regarding the abatement award. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 24, 31-33; Dkt. #4512 (CVS Closing Brief) at pp. 27, 29, 31-32, 34; Dkt. #4337 (Ds' Abatement Plan) at pp. 9-10.[83] First, they request that any abatement funds "be administered by a neutral third-party Administrator appointed by the Court." Dkt. #4512 (CVS Closing Brief) at pp. 29, 34; *see also* Dkt. #4511 (WAG/WMT Closing Brief) at p. 33; Dkt. #4337 (Ds' Abatement Plan) at p. 9. Plaintiffs agree that the abatement funds should be monitored by a Court-appointed administrator and/or the Court itself. Dkt. #4513 (Ps' Closing Brief) at p. 23. Plaintiffs do not agree, however, with some of Defendants' proposals regarding the administrator's duties. For example, Defendants propose having the administrator establish procedures for auditing the use of the funds that are disbursed to the Counties, to ensure that the funds are used for their intended and approved purposes and to prevent fraud on the fund. Dkt. #4337 (Ds' Abatement Plan) at p. 10. Plaintiffs do not oppose having procedures in place by which the Court or the administrator, to the extent they have concerns regarding any particular proposed or paid abatement expenses, may request that Plaintiffs substantiate such expenses with additional information. However, as Plaintiffs explained in their Closing Brief, it is crucial that Plaintiffs be given some flexibility in their use of

---

[83] Defendants specifically incorporate the proposed terms set forth on pp. 9-10 of their purported "abatement plan" that they filed prior to trial. Dkt. #4511 (WAG/WMT Closing Brief) at p. 33; Dkt. #4512 (CVS Closing Brief) at p. 34; Dkt. #4337 (Ds' Abatement Plan) at pp. 9-10.

the abatement funds.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 25-27.  Requiring that every decision by the Counties be micromanaged in real time is not warranted, feasible, or efficient. Defendants also propose having the administrator provide a written report to the Court and the parties on a quarterly basis identifying the disbursements for the prior quarter and specifying each Defendant's balance.  Dkt. #4337 (Ds' Abatement Plan) at p. 10.  Plaintiffs do not necessarily oppose having the administrator providing status reports to the Court.  However, since Plaintiffs would be providing their annual certifications to both the administrator and the Court, Plaintiffs suggest that any written reports by the administrator would only be warranted if concerns had been raised by either the administrator or the Court regarding particular expenses proposed or paid.

Defendants also request certain limitations be imposed if the Court awards more than one year of abatement costs.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 24; Dkt. #4512 (CVS Closing Brief) at pp. 27, 32.  Specifically, Defendants ask that: (i) the amount of funding be determined annually, either by the Court or the administrator; (ii) they be permitted to stagger their payments to the abatement fund, as opposed to having to deposit the entirety of the funding the Court orders; (iii) the funds should not be disbursed to Plaintiffs annually, but rather be disbursed on an as-needed basis, upon written request by Plaintiffs and approval by the administrator; (iv) they should not be required to pay any additional sums "if Plaintiffs do not spend the funds provided in the first year for legitimate abatement expenses[;]" and (v) any funds that are "unused" or "not spent as contemplated in the abatement plan" should revert back to Defendants.  *Id.*  These proposals should be rejected.

To begin with, while Plaintiffs do not oppose receiving annual abatement fund disbursements, the Court should award the entire abatement amount (or at least the first five years) at this time and require all Defendants to deposit the full amount awarded upfront.  Dkt. #4513 (Ps' Closing Brief) at pp. 23-25.  Additionally, Defendants' suggestion that funds be disbursed only on an "as-needed basis," with Plaintiffs having to submit each individual request for funds in writing and have each individual request approved by the Court-appointed administrator, is highly inefficient and unduly burdensome (not just for Plaintiffs, but for the Court and the administrator

as well).  Plaintiffs' proposal for annual disbursements with written certifications, both before the funds are received and after the year is over, provides sufficient oversight over Plaintiffs' use of the funds.  *Id*. at pp. 25-27.  Finally, Defendants' "use it or lose it" approach to the abatement award is unwarranted.  As discussed in Plaintiffs' Closing Brief, there must be flexibility regarding Plaintiffs' use of the funds, particularly in the first few years, because it takes time to create the necessary infrastructure and for the various abatement interventions put into place to start being effective.  *Id.*  Moreover, Defendants should not be granted any reversionary interest in the abatement funds.  Plaintiffs should be able roll over any unused funds at the end of a particular year to the next year to be used for abatement purposes.  *Id.* at pp. 26-27.  As previously noted, Plaintiffs do not oppose the Court awarding the first five years of abatement costs now and then making a determination as to future amounts at the end of the five-year period.  *Id.* at p. 24.  There is no legitimate risk of there being unused funds at the end of the overall abatement period, particularly since Plaintiffs will have to use some of the funds to pay their attorneys' fees and expenses.  *Id.* at p. 25.

Defendants point to *Liddell v. Bd. of Educ. of City of St. Louis, Mo.*, 771 F. Supp. 1496 (E.D. Mo. 1991), as an example of abatement program procedures that the Court should look to for guidance.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 32.  But the circumstances in that case are entirely distinguishable as it involved the allocation of certain abatement costs between a state and a municipality within that state, as opposed to a tort action seeking an abatement award from a tortfeasor who caused a public nuisance.  Specifically, in *Liddell*, the City of St. Louis implemented an asbestos abatement program in its public schools, in accordance with the Asbestos Hazard Emergency Response Act, the National Emission Standard for Asbestos, and various EPA regulations.  *Id*. at 1498-99.  The State of Missouri was obligated to reimburse the city for a percentage of the costs associated with this abatement program.  *Id*. at 1502.  The city sought partial reimbursement from the State for the actual abatement costs it previously incurred and requested that a quarterly payment schedule be put in place to address the State's funding obligations for future or projected abatement costs as they accrue.  *Id*. at 1499.  The court

found the city's "proposed 'quarterly payment voucher' system [to be] impractical" because "[i]t prevent[ed] review by the State as to [the] accuracy and reasonableness of the costs and [wa]s open to abuse." *Id*. at 1502.  The court further noted that it would be "[e]qually impractical" for it to have to hold "a hearing [on these matters] every three months or even twice a year." *Id*.  Thus, the court ordered the city and the State to "meet with the Financial Advisor to discuss and develop a payment schedule for future asbestos abatement costs as they accrue" that would "afford[ ] the State the opportunity to review the costs [for accuracy and reasonableness] while allowing the [city] to continue the prompt implementation of its asbestos abatement program." *Id*. at 1502-03. Because the State and the city shared responsibility for the abatement costs as governmental entities, it was logical to provide the State with some oversight over the accuracy and reasonableness of the costs expended by the city in that case.  Nothing in *Liddell* indicates that Defendants, as the non-governmental tortfeasors who caused the public nuisance, are entitled to dictate how Plaintiffs use the abatement funds or decide whether particular costs are reasonable.

Finally, Defendants propose a number of unreasonable and unrealistic restrictions regarding how the abatement funds can be used and how the amount to be disbursed should be calculated.  Dkt. #4512 (CVS Closing Brief) at pp. 27-32; Dkt. #4511 (WAG/WMT Closing Brief) at p. 33; Dkt. #4337 (Ds' Abatement Plan) at p. 10.  Most egregiously, Defendants propose that for all funding requests, Plaintiffs be required to identify each individual receiving the specific treatment or services funded so that the individual's name can be run through each Defendant's dispensing data to determine whether one or more Defendants ever dispensed prescription opioids to that individual "to a sufficient degree" to warrant allocating the expenses to those Defendants. Dkt. #4337 (Ds' Abatement Plan) at p. 10; Dkt. #4512 (CVS Closing Brief) at p. 29.

CVS lays out a detailed explanation as to how this procedure would apply to treatment costs in its Closing Brief.  Dkt. #4512 (CVS Closing Brief) at p. 29.  Plaintiff would first have to prove that the individual is a County resident *and* that his or her costs are not covered by Medicaid or private insurance.  *Id*.  Plaintiff would then have to identify this resident to CVS so that it can review its dispensing data to determine whether its pharmacies in the Counties ever dispensed

prescription opioids to him or her.  *Id.*  Only if the resident's "CVS prescription history indicates that CVS pharmacies in the counties filled opioid prescriptions for the resident *and* shows that such prescriptions *were sufficient to be deemed a cause of the person's condition*," would Plaintiff be permitted use CVS-provided funds "to pay for *an appropriate portion* of the costs."  *Id.* (emphasis added).[84]  And even if a particular resident makes it through this screening gauntlet, CVS contends that any "amount drawn from CVS funds" *must* be apportioned under Step 2 of Dr. Chandra's apportionment methodology, such that CVS would only be responsible for 20% of the individual's treatment costs.  *Id.* at pp. 29-30.[85]  Alternatively, to the extent "the Court elects not to employ CVS's dispensing data to reasonably tailor treatment costs to CVS's role," CVS argues that the Court "must apply all three steps of Dr. Chandra's methodology to reach a fair and just sum."  *Id.*[86]

Defendants' proposals are nonsensical.  Even putting aside the fact that Plaintiffs' harm is not apportionable (*infra* at § III),[87] and that Defendants are responsible for the full amount of treatment costs regardless of whether the individual is otherwise covered by Medicaid or private insurance (*supra* at § II.E), micro-managing Plaintiffs' use of abatement funds down to the individual level would be entirely unworkable.  To begin with, having to provide Defendants with the identities of each individual seeking treatment for OUD in Plaintiffs' communities raises

---

[84]  CVS proposes that the criteria used to determine "whether the resident's CVS prescription history is sufficient to trigger CVS funding" be set by the administrator, "in consultation with the parties," and approved by the Court.  *Id.*  However, CVS suggests that if it "filled no opioid prescriptions for a resident or only a small number of them, it would not be sufficient[,]" but if it "filled opioid prescriptions for the resident on a *regular* basis, it *may be*."  *Id.* (emphasis added).

[85]  CVS notes that, to the extent the Court adjusts Dr. Chandra's framework to increase CVS's share, it cannot "possibly exceed 50%" because doctors who wrote the opioid prescriptions are at least equally responsible for the opioid-related harms.  *Id.* at p. 30.  Plaintiffs explain below why this argument is incorrect.  *Infra* at § III.B.2.

[86]  CVS also argues that to the extent the Court awards abatement costs to address "other effects" of the nuisance, Dr. Chandra's apportionment methodology must be applied "in full."  *Id.* at p. 33.

[87]  Specifically, Plaintiffs' harm is indivisible and neither Dr. Chandra nor Dr. Kessler provide a reliable framework to apportion the harm on a rational and reasonable basis.  *Id.*; Dkt. #4513 (Ps' Closing Brief) at pp. 27-33.

considerable privacy concerns.[88]  Moreover, Plaintiffs may decide to use certain abatement funds for treatment-related purposes before they even know the identities of the individuals who will benefit from that treatment (*e.g.*, if Plaintiffs decide to build a new treatment center or increase capacity at an existing one, etc.).[89]  Additionally, requiring a subjective assessment of whether Defendants dispensed a "sufficient" number of prescription opioids to a particular individual is inefficient, costly, and would inevitably result in endless litigation.[90]  Moreover, Defendants' contribution to opioid-related harms in the Counties is not limited to only individuals that filled opioid prescriptions at Defendants' pharmacies.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 3-13, 84-97.[91]

Finally, Defendants request that for any abatement plan involving OUD treatment, "the Court must ensure that providers paid by the program are appropriately vetted[,]" noting that "[t]his provides yet another reason to continue to require treatment providers to submit requests for payment to Medicaid and/or private insurance, where applicable, before drawing from any abatement fund." Dkt. #4511 (WAG/WMT Closing Brief) at p. 33.  But as discussed above (*supra*

---

[88]   Defendants make a vague statement that the individuals' names would be run through Defendants' dispensing data "in a fashion sufficient to protect their privacy." Dkt. #4337 (Ds' Abatement Plan) at p. 10.  But they offer no suggestion as to how that would be possible.  Their proposal requires Plaintiffs to provide Defendants and the administrator with the name of every single individual receiving opioid-related treatment, programs, or services funded by the abatement award.  Even if that was practically feasible (it is not), it would clearly violate HIPAA and other privacy laws to disclose an individual's private health information.  *See, e.g.,* 42 C.F.R. §§ 2.1-2.67 (confidentiality requirements relating to treatment for substance abuse disorders); 45 C.F.R. § 164.502 (prohibition against disclosing individually identifiable health information); 45 C.F.R. § 164.514 (requirements for de-identification of protected health information); OHIO ADMIN. CODE §§ 5122-1-04, 5122-26-08, 5122-27-06.

[89]   This would also be the case for the costs of the non-treatment abatement measures.

[90]   It would be impossible to apply objective across-the-board criteria as to how many prescription opioids are sufficient to cause an individual's opioid-related harm.  It would vary based on a particular individual's characteristics and the particular opioid-related harm he or she suffered.

[91]   For example, CVS may have improperly dispensed certain red-flagged prescription opioids to a dealer, who subsequently sold them to a non-CVS customer who then became addicted, necessitating treatment.  This addicted individual may have never filled an opioid prescription at CVS himself, yet his opioid-related harm is still a foreseeable result of the oversupply and diversion of legal prescription opioids caused by CVS's wrongful dispensing conduct.

at § II.E), there is no basis for requiring private insurers or the American taxpayer to bear the costs of fixing the nuisance Defendants caused.  Moreover, to the extent Plaintiffs use certain abatement funds to directly hire treatment providers as County employees, they can describe their vetting process in their annual certifications.  But Plaintiffs cannot be expected to personally vet every single provider (independent or employed by third parties) who could possibly provide OUD treatment services to individuals in the Counties.

**III.**  **PLAINTIFFS' HARM FROM THE PUBLIC NUISANCE IS INDIVISIBLE AND DEFENDANTS FAILED TO PROVE IT CAN BE REASONABLY APPORTIONED.**

    **A.**  **Under Ohio law, Defendants are jointly and severally liable for the entire abatement award unless they satisfy their burden to prove Plaintiffs' harm can be reasonably apportioned.**

As discussed extensively in Plaintiffs' prior briefing and the Court's prior orders, under Ohio law, once Plaintiffs established that Defendants' conduct was a substantial factor in causing the public nuisance, the burden shifted to Defendants to demonstrate that the harm produced by their conduct is capable of apportionment.  *See* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 24-28; Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 8-9; Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 7; Dkt. #2561 (CT1 Order on Ds' Causation MSJs) at p. 6 n.5.  This is a demanding burden that required Defendants to provide concrete and specific evidence demonstrating that the harm is apportionable.  *See* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 26-27; Dkt. #4387 (Ps' Phase 2 Trial Brief) at p. 8.  An arbitrary or theoretical basis for apportionment is insufficient.[92]  Moreover, to the extent Defendants were unable to satisfy this burden (which is the case here, *infra*), the Court should not "split the difference" by "settling on a compromise amount that it thinks best approximates the relative responsibility of the parties;" rather, if there is any doubt, the Court "should impose joint and several liability."  *United States v. Twp. of Brighton*,

---

[92]  *Cf. Kelley v. Thomas Solvent Co.*, 714 F. Supp. 1439, 1448–49 (W.D. Mich. 1989) (in CERCLA action, "[t]o sustain their burden of proof [as to divisibility of harm], defendants may not propose an arbitrary or theoretical basis for apportioning response costs").

153 F.3d 307, 319 (6th Cir. 1998) (cleaned up).[93]

Defendants offer a litany of arguments contesting these well-established legal principles. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 34-47; Dkt. #4512 (CVS Closing Brief) at pp. 22-24. All are without merit and should be rejected.

Defendants claim that apportionment is required in this case pursuant to Restatement (Second) of Torts §§ 433A, 433B, and 840E. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 34-38, 40-41, 44; Dkt. #4512 (CVS Closing Brief) at pp. 22-24. Unsurprisingly Defendants simply cherry-pick the language they like from these provisions (and their comments) while ignoring any language that does not support their position. For example, Defendants repeatedly cite § 840E cmt. b to support their argument for apportionment. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 34-36; Dkt. #4512 (CVS Closing Brief) at pp. 22. But that comment specifically refers to nuisances that "are capable of apportionment . . . because a reasonable basis can be found for dividing the harm done on the basis of the extent of the contribution of each party." Restatement (Second) of Torts § 840E, cmt. b (1979). Notably, that same comment emphasizes that the burden of proving apportionment is on the defendant. *Id.* ("Under the rule stated in § 433B, the burden rests upon the defendant to produce sufficient evidence to permit the apportionment to be made."). Moreover, Defendants completely ignore comment c, which states:

> There are other cases in which the harm resulting from a nuisance is not capable of apportionment to the several contributors upon any reasonable or rational basis. . . . When the apportionment cannot be made or when the defendant does not sustain his burden of proof as to the extent of his own contribution (see § 433B), he is held liable for the entire harm. As in other cases of multiple causes bringing

---

[93] *See also Mays v. Moran*, 97CA2385, 1999 WL 181400, at *7 (Ohio App. 4th Dist. Mar. 18, 1999) ("[W]here two or more causes combined to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.") (citation omitted), *cause dismissed,* 709 N.E.2d 173 (Ohio 1999); Restatement (Second) of Torts § 433A, cmt. i ("Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.").

about a single indivisible result, the fact that other persons have caused the harm
and are liable for it does not relieve the defendant of liability.

RESTATEMENT (SECOND) OF TORTS § 840E, cmt. c.

Defendants similarly cherry-pick language from RESTATEMENT §§ 433A and 433B to
support their arguments.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 34-38, 40-41, 44;
Dkt. #4512 (CVS Closing Brief) at pp. 22-24.  Section 433A states that there are only two scenarios
in which damages for harm can be apportioned among multiple causes: (i) where "there are distinct
harms[;]" or (ii) where "there is a reasonable basis for determining the contribution of each cause
to a single harm."  RESTATEMENT (SECOND) OF TORTS § 433A(1) (1965).  "Damages for any other
harm *cannot* be apportioned among two or more causes."  *Id.* at § 433A(2) (emphasis added).
Defendants unsurprisingly do not mention comment h, which states that "[n]othing in this Section,
or in the Comments, is intended to say that the court may not, in a case where justice requires it,
refuse to apply the rule stated in [§ 433A(1)(b),]" or comment i, which states:

> Certain kinds of harm, by their very nature, are normally incapable of any logical,
> reasonable, or practical division. . . .  Where two or more causes combine to produce
> such a single result, incapable of division on any logical or reasonable basis, and
> each is a substantial factor in bringing about the harm, the courts have refused to
> make an arbitrary apportionment for its own sake, and each of the causes is charged
> with responsibility for the entire harm.

RESTATEMENT (SECOND) OF TORTS § 433A cmts. h, i.

Defendants also rely on RESTATEMENT § 433B cmt. e to argue that, in cases where there
are a large number of contributors to the harm, "the Restatement instructs courts not to impose
joint liability even if the defendant 'cannot show the amount of his contribution.'"  Dkt. #4511
(WAG/WMT Closing Brief) at p. 34 (quoting RESTATEMENT (SECOND) OF TORTS § 433B cmt. e
(1965)); *see also id.* at pp. 35, 37 (stating that, under those circumstances, "[i]n the words of the
Restatement . . . the Court *must* apportion") (emphasis added); Dkt. #4512 (CVS Closing Brief) at
p. 23.[94]  But the scenario described in comment e is not analogous to the circumstances in this

---

[94]  Walgreens and Walmart at least concede that "'the burden of proof as to the apportionment' generally
rests on the defendant[,]" although they argue comment e should be applied to relieve Defendants of
that burden in this case.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 34 (quoting RESTATEMENT
(footnote continues on next page)

case, and, regardless, the comment does not say the imposition of several liability is *required*:

> The possibility arises that there may be so large a number of actors, each of whom contributes *a relatively small and insignificant part* to the total harm, that the application of the rule may cause disproportionate hardship to defendants.  Thus if a hundred factories each contribute a *small*, but still uncertain, amount of pollution to a stream, to hold each of them liable for the entire damage because he cannot show the amount of his contribution *may perhaps* be unjust.

RESTATEMENT (SECOND) OF TORTS § 433B cmt. e (emphasis added).

RESTATEMENT § 433B cmt. e is inapplicable here.  Defendants' repeated arguments that they are responsible only for a "tiny" fraction of the nuisance is entirely belied by the evidence adduced at trial.  As this Court held:

> At [the Phase 1] trial, the evidence showed each Defendant dispensed millions of prescription opioids in the Counties, and that even a small portion of diverted pills could have a significant impact on opioid-related deaths and harms in the community.  Further, experts described the importance of the pharmacies' role as the "last stop" or "last line of defense" to ensure that prescriptions are correct and patients are not harmed.  This evidence amply supports the jury's conclusion that the conduct of each Defendant played a substantial role in creating the nuisance.

Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 27-28 (internal footnotes omitted).

*See also* Dkt. #4153 (11/15/21 Trial Tr.) at 7077:10-13 (jury was instructed that "[a] defendant's conduct is substantial if a reasonable person would regard that conduct as the cause, or one of the *material, meaningful, or considerable* causes, of the nuisance") (emphasis added); Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 19-20, 44-45, 64-65, 84-94.  Plaintiffs also demonstrated at trial that their harms resulting from the public nuisance found by the jury are indivisible.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 32-33.  Significantly, the Ohio Supreme Court has emphasized that "the criterion for application of both 433A(2) and 433B is the indivisibility of *harm*, *not* the indivisibility of *causation*."  *Pang v. Minch*, 559 N.E.2d 1313, 1323 (Ohio 1990) (emphasis added).  *See also Nichols v. Hanzel*, 674 N.E.2d 1237, 1244 (Ohio App. 4th Dist. 1996) ("The criterion for joint and several liability is indivisibility of harm, not the indivisibility of causation.").

---

(SECOND) OF TORTS § 433B(2) & cmt. e).  CVS continues to maintain, citing no authority other than RESTATEMENT § 433B cmt. e, that Plaintiffs bear the burden of proving apportionment.  Dkt. #4512 (CVS Closing Brief) at p. 23.

Defendants cite two century-old Ohio cases for the proposition that concerted action is required to impose joint and several liability.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 35. As a preliminary matter, those cases are factually distinguishable.[95]  But more importantly, they are not consistent with current Ohio law.  *See, e.g., Pang*, 559 N.E.2d at 1315 Syl. 7 ("[Restatement] § 433B2 is applicable where a single, indivisible injury is proximately caused by the successive tortious acts of multiple defendants.");[96] *Schindler v. Stand. Oil Co.*, 143 N.E.2d 133, 136 (Ohio 1957) ("There was formerly a theory of law that there could be no joint recovery in tort against persons, in the absence of a common duty, common design, or concerted action by them in reference to the injury they caused.  However, that theory, if it ever did obtain in Ohio, has long since been abandoned."); *Nichols*, 674 N.E.2d at 1244 (the "individuals causing the injury need not act in concert" for joint and several liability to be imposed).

Defendants' argument that they cannot be held jointly and severally liable because other contributors to the nuisance have not been joined as defendants (Dkt. #4511 (WAG/WMT Closing Brief) at pp. 39-40) is similarly specious and inconsistent with Ohio law.  *See, e.g., Royal Indem.*, 173 N.E. at 196 ("[T]here is no line of separation between the liability of joint tort-feasors, but that if the concurrent negligence of two or more persons result in an injury to a third person they are jointly and severally liable to the injured person, who may pursue one separately, or may pursue all or any lesser number jointly.").  The cases cited by Defendants are distinguishable.  Both *Smith* and *Hymowitz* dealt with situations in which it was impossible to identify the specific manufacturer whose product caused the plaintiff's injury.  *See Smith v. Cutter Biological, Inc., a Div. of Miles*

---

[95] *See City of Mansfield v. Brister*, 81 N.E. 631, 632-33 (Ohio 1907) (*private* nuisance action against city for *failing to abate* nuisance *caused by third parties* depositing sewage into stream through various drains); *Oyler & Oyler v. Louisville & N. R. Co.*, 18 Ohio App. 481, 481-87 (Ohio App. 1st Dist. 1923) (refusing to impose joint liability in negligence action against intermediate carriers seeking damages resulting from delayed shipment of goods, relying on federal rule that "the liability of an intermediate common carrier for the safety of goods delivered to him for carriage is discharged by their delivery to and acceptance by a succeeding carrier or its authorized agent") (citation omitted).

[96] Contrary to Defendants' assertions, there is no language in *Pang* indicating that the court's holding was limited to legal actions or actions involving only three tortfeasors. 559 N.E.2d 1313.

*Inc.*, 823 P.2d 717, 720, 723-29 (Haw. 1991) (adopting market share liability theory in suit against manufacturers of blood products where the identity of the actual tortfeasor could not be proven; under this theory, defendants are severally liable based on their market share: "It seems at least a fair trade-off, *where the plaintiff cannot identify which party actually caused his injuries*, to at least allow the defendants to limit their share of liability to their relative proportion of the market.") (emphasis added);[97] *Hymowitz v. Eli Lilly and Co.*, 539 N.E.2d 1069, 1071-72, 1074-78 & n.3 (N.Y. 1989) (in DES product liability cases, where it was impossible to identify the manufacturer of the drug that injured the plaintiff, court adopted market share theory to determine liability and apportionment of damages such that each defendant was severally liable for the amount of risk it created to the national public-at-large in marketing DES for use during pregnancy; "We are confronted here with an unprecedented identification problem, and have provided a solution that rationally apportions liability."). *State ex rel. Brown v. BASF Wayandotte Corp.*, NOS. 33533, 33545, 3, 1975 WL 182459 (Ohio App. 8th Dist. Apr. 24, 1975), and *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005), also do not support Defendants' position, for reasons discussed in prior briefing. *See* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 20-21, 27-28.

Nor would it be "unjust" to impose presumptive joint and several liability in this case.[98] As noted above, the evidence adduced at trial demonstrates that Plaintiffs' harm is indivisible. *Supra* at p. 63.[99]  Defendants were given the opportunity to rebut that evidence at trial and

---

[97]  The specific language quoted by Defendants regarding joint and several liability being inappropriate where not all defendants are joined in the action (Dkt. #4511 (WAG/WMT Closing Brief) at pp. 39-40) actually comes from the section of the opinion in which the court was discussing the *alternative liability* theory.  *Smith*, 823 P.2d at 725.  The court rejected the applicability of that theory in favor of the market share theory, where a defendant is only liable for its market share, regardless of how many defendants are joined in the suit.  *Id*. at 725, 728-29.

[98]  *See, e.g.,* Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 20-21 (explaining why the circumstances in *BASF Wayandotte* are distinguishable).

[99]  Defendants argue that certain "harms," such as individuals suffering from fentanyl addiction or poorly educated doctors, are discrete and separate from the harms resulting from the oversupply of prescription opioids.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 41.  Unsurprisingly, they cite no evidentiary (footnote continues on next page)

prove that Plaintiffs' harm is "capable of division upon a reasonable and rational basis, and of fair apportionment among the causes responsible."  RESTATEMENT (SECOND) OF TORTS § 433A cmt. d.[100]  As discussed further below, they failed to do so.  *Infra* at § III.B.[101]  Moreover, the cases cited by Defendants to support their arguments are inapposite.[102]  Accordingly, Defendants should

---

support for this proposition.  *Id*.  Indeed, the evidence adduced at trial demonstrates that the oversupply and diversion of prescription opioids caused or contributed to all the harms sought to be addressed through Plaintiffs' abatement plans.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 84-94.  The cases cited by Defendants do not support their argument.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 41.  In *Ryan v. Mackolin*, the plaintiff was injured in two separate car accidents involving two different drivers.  237 N.E.2d 377, 378-79 (Ohio 1968), *overruled by Pang*, 559 N.E.2d 1313.  He sued both drivers in the same action.  *Id*. at 379.  The Ohio Supreme Court held that joint and several liability would not be imposed because the defendants were two independent (not concurrent) tortfeasors, whose torts were "separated and unrelated in time, place or source," and the plaintiff's injuries were capable of separation as to cause.  *Id*. at 378, 382-83.  *Pang* actually supports Plaintiffs' position as, in that case, the Ohio Supreme Court held that multiple tortfeasors could be held jointly and severally liable for indivisible harm.  559 N.E.2d at 1325.

[100]  Importantly, apportionment can only be made among "causes" that have "been a substantial factor in producing the harm, as stated in §§ 431 and 433."  *Id*. at cmt. a.

[101]  Defendants' argument that they should not bear the burden of proving apportionability because they were denied certain individualized discovery should be rejected.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 38, 46-47; Dkt. #4512 (CVS Closing Brief) at p. 23 n.15.  As a preliminary matter, the Court's limitations on individualized discovery were appropriate for the reasons set forth in its numerous rulings on the issue over the length of this MDL (in addition to the reasons set forth in various plaintiffs' prior briefing).  But even assuming, *arguendo*, that it would have been appropriate (or even possible) for Plaintiffs or others to provide Defendants with individual information on every single person in the Counties who has been impacted (directly or indirectly) by the opioid epidemic, Defendants fail to explain how such information would provide a rational or reasonable basis on which to apportion Plaintiffs' harm.

[102]  *BASF Wayandotte* is distinguishable for reasons discussed in Plaintiffs' prior briefing (Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) at pp. 20-21), and *City of Mansfield* is distinguishable for reasons discussed above (*supra* at fn.95).  In *Mays*, there were effectively two defendants: the Morans (three individuals, presumably family members, working together) and Bunem, an individual.  1999 WL 181400, at *1.  The plaintiffs were a couple who owned a neighboring property.  *Id*.  The plaintiffs sued the defendants for unreasonably interfering with the natural flow of surface waters on the plaintiffs' property (presumably a *private* nuisance claim, although the opinion does not say).  *Id*.  The trial court found the defendants jointly and severally, but the appellate court reversed, finding the plaintiffs' harm was divisible and remanding the case back to the trial court to apportion damages between the Morans and Bumen.  *Id*.  The appellate court reasoned that the Morans presented sufficient evidence at trial demonstrating that Bumen was primarily responsible for the plaintiffs' harm and such harm was apportionable.  *Id*. at *7-8.  Significantly, the court noted that apportionment would not have been appropriate had the defendants not satisfied their burden of showing divisibility.  *Id*. at *7 ("Apportionment applies to contribution among the various tortfeasors and not to an individual joint (footnote continues on next page)

be held jointly and severally liable to Plaintiffs.[103]

Defendants can later try to seek contribution from other non-defendants to the extent they believe they are so entitled.[104]  But that does not affect Plaintiffs' ability to receive the full amount of abatement costs from Defendants where, as here, there was no evidence adduced at trial of any reasonable basis on which to apportion the harm.  *See, e.g., Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n.8 (1979) ("A tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also a factor in effecting the injury. 'Nor are the damages against him diminished.'  Likewise, under traditional tort law, a plaintiff obtaining a judgment against more than one concurrent tortfeasor may satisfy it against any one of them.  A concurrent tortfeasor generally may seek contribution from another, but he is not relieved from liability for the entire damages even when the nondefendant tortfeasor is immune from liability.") (internal citations omitted).[105]

---

tortfeasor's liability to the plaintiff.  If the defendants fail to establish that the harm suffered by the plaintiff is divisible, the plaintiff satisfies the judgment against the defendants for the entire amount.") (internal citation omitted).

[103]  *Cf. Monsanto*, 858 F.2d at 174 ("CERCLA operates remedially to spread the costs of responding to improper waste disposal among all parties that played a role in creating the hazardous conditions.  Where those conditions are indivisible, joint and several liability is logical, and it works to ensure complete cost recovery.  We do not think these consequences are 'particularly harsh and oppressive[.]'") (citation omitted).

[104]  Plaintiffs take no position as to whether Defendants would be entitled to contribution from any non-party.

[105]  *See also id.* at 272 n.30 ("[T]he general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury.  Normally, the chosen tortfeasor may seek contribution from another concurrent tortfeasor. . . . Contribution remedies the unjust enrichment of the concurrent tortfeasor, and while it may sometimes limit the ultimate loss of the tortfeasor chosen by the plaintiff, it does not justify allocating more of the loss to the innocent employee, who was not unjustly enriched.") (internal citation omitted); *Shoemaker v. Crawford*, 603 N.E.2d 1114, 1122 (Ohio App. 10th Dist. 1991) ("[T]he issue of proportionality of payment is an issue simply between the tortfeasors themselves and not between an individual tortfeasor and plaintiff.  Plaintiff, if she so chooses, may collect the entire judgment from any joint tortfeasor and that tortfeasor is then left to pursue her remedies against the other joint tortfeasors."); *ConAgra*, 227 Cal. Rptr. 3d at 556 ("If defendants are independent tort feasors and thus each liable for the damage caused by him alone, and, at least, where the matter of apportionment is incapable of proof, the innocent wronged party should not be deprived of his right to redress.  The

(footnote continues on next page)

Finally, Defendants' constitutional arguments against joint and several liability are without merit. Defendants argue that imposing joint and several liability in this case would be a "grossly excessive" award in violation of due process. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 44-45; Dkt. #4512 (CVS Closing Brief) at pp. 23-24. But the cases they cite addressed the constitutional concerns associated with *punitive damages*, not joint and several liability or equitable abatement. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 412-29 (2003); *Kidis v. Reid*, 976 F.3d 708, 714–19 (6th Cir. 2020). They also argue that imposing joint and several liability in this case would violate the Excessive Fines Clause of the Eighth Amendment. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 45-46. But yet again they do not cite any cases addressing joint and several liability or equitable abatement; instead, they cite cases dealing with *forfeiture*.[106]

Both of Defendants' constitutional arguments are based on a faulty premise: that joint and several liability for abatement costs is a *punishment*, rather than solely a remedial remedy. To the contrary, abatement is purely remedial, intended to rectify the nuisance Defendants caused. *Supra* at § I.A-B & p. 41. *F.P. Dev., LLC v. Charter Township of Canton, Michigan*, 16 F.4th 198 (6th Cir. 2021), actually *supports* Plaintiffs' position. In that case, the Sixth Circuit rejected the argument that a town ordinance requiring a company to mitigate the removal of certain trees on its

---

wrongdoers should be left to work out between themselves an apportionment.") (citation omitted); 18 OHIO JUR. 3D CONTRIBUTION, INDEMNITY, ETC. § 73 (June 2022) ("When parties are jointly and severally liable, the plaintiff may obtain a judgment against any of the joint tortfeasors for the entire amount, and the tortfeasors may apportion their liability and seek contribution among themselves.").

[106] *See Timbs v. Indiana*, 139 S. Ct. 682, 690 (2019) ("We thus decline the State's invitation to reconsider our unanimous judgment in *Austin* that civil *in rem* forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive."); *U.S. v. Bajakjian*, 524 U.S. 321, 324 (1998) (forfeiture of currency, when ordered for violation of statute requiring person to report the transportation of more than $10,000 outside of the United States, is punishment and thus constitutes a "fine" within the meaning of the Excessive Fines Clause); *Austin v. U.S.*, 509 U.S. 602, 621-22 (1993) (Eighth Amendment's excessive fines clause applies to *in rem* civil forfeiture proceedings brought under 21 U.S.C. §§ 881(a)(4) and (a)(7); "In light of the historical understanding of forfeiture as punishment, the clear focus of §§ 881(a)(4) and (a)(7) on the culpability of the owner, and the evidence that Congress understood those provisions as serving to deter and to punish, we cannot conclude that forfeiture under [that statute] serves solely a remedial purpose.").

land, by either replacing the removed trees or paying a specified amount of money into a tree fund, constituted "punishment that is grossly disproportionate to its tree removal" in violation of the Excessive Fines Clause: "[T]hat law is designed to remedy the harm that removing trees causes, and it purports to estimate the monetary demands it makes based on the cost it expects to incur replacing them.  That purpose is remedial, not punitive, so it does not implicate the Eighth Amendment."  *Id.* at 201, 209.

**B.    Defendants failed to satisfy their burden of proof that the harm can be reasonably apportioned between them and any other substantial contributors to the public nuisance.**

As explained in detail in Plaintiffs' Closing Brief, Defendants failed to satisfy their burden of proof on apportionment at trial.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 27-32.  The additional apportionment frameworks proposed in their Closing Briefs should also be rejected.

*1.    Walgreens' and Walmart's proposed apportionment frameworks should be rejected.*

At trial, defense expert Dr. Kessler testified that the abatement costs could be allocated between Defendants and others using a three-step process based on a regression model.  *See, e.g.,* Dkt. #4513 (Ps' Closing Brief) at p. 28.  Plaintiffs explained in their Closing Brief the many reasons why Dr. Kessler's apportionment opinions are unreliable and unreasonable, and fail to provide the Court with a "reasonable" or "rational" basis on which to apportion Plaintiffs' harm. *Id.* at pp. 28-29, 32-33.

In their Closing Brief, Walgreens and Walmart offer five alternative "apportionment frameworks" for the Court to pick from.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 47-53.  In actuality, they propose only two distinct frameworks for apportionment; the differences among the five options are based primarily on the starting number for total recoverable abatement costs to which their apportionment frameworks are to be applied.  *Id.*  Each option provides for one year of abatement costs (although in a footnote they state that calculations based on a five-year plan are provided in an attached exhibit).  *Id.*  Not one of these options provides the Court with a "reasonable" or "rational" basis on which to apportion Plaintiffs' harm.  They should all be

68

rejected.

Option 1 takes Plaintiffs' one-year cost projections and "corrects" them "(1) for overstatements of individuals with OUD, those with OUD who will seek treatment, and OUD treatment length, (2) to exclude projected costs covered by insurance, and (3) to account for other smaller overstatements, all supported by Dr. Kessler's testimony."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 47.  As discussed herein and in Plaintiffs' Closing Brief, none of these "corrections" are appropriate.  Dkt. #4513 (Ps' Closing Brief) at pp. 9-19, 33-35.  They then take this "corrected" amount and reduce it by the amount of Plaintiffs' settlements with other opioid defendants.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 47.  As discussed above, such a reduction would be appropriate if Defendants were held jointly and severally liable, but it is improper where Defendants are held liable for only their allocated portions of the total abatement costs.  *Supra* at § II.D.  It is to this reduced amount that they apply their two-step apportionment framework.

First, they divide the number by two, so that 50% is allocated to the pharmacies and 50% is allocated to the prescribers, which they claim is "very generous to Plaintiffs[.]"  Dkt. #4511 (WAG/WMT Closing Brief) at p. 48.  Notably, they cite no trial evidence whatsoever to support this proposed allocation.  A 50/50 split does not take into consideration that pharmacies are the "last line of defense" against diversion, and that Defendants specifically set up policies and procedures that prevented and disincentivized their pharmacists from keeping track of, and refusing to fill for, "bad prescribers."  *See, e.g.,* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 7-9, 13-15, 17-18, 21-24, 27-28; Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 22, 24-27, 30-35, 38-43, 45, 47-57, 60-64, 66-76; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 562:12 – 564:11.  There are also certain red flags that are visible to pharmacies but not to prescribers (*e.g.*, the patient pays in cash, the patient comes into the pharmacy intoxicated, etc.), putting pharmacies in a better position to stop opioid pills that are likely to be diverted from being dispensed.  *See* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 567:24 – 568:3, 569:10 – 571:5, 572:1 – 573:11, 574:23 – 575:10; *see also, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 28-29, 51-52,

71.

The second step to their allocation framework is to take the 50% allocated to pharmacies and derive Walgreens' and Walmart's share of that percentage by one of two ways: (i) by total pharmacy market share; or (ii) by total red flag market share.  Dkt. #4511 (WAG/WMT Closing Brief) at p. 48.  They contend the latter is the preferable allocation.  *Id*.  Dr. Kessler calculated the total red flag market share by applying thirteen of Mr. Catizone's fifteen red flags to the OARRS data for each County.  *See, e.g.,* CVS-MDL-05013; CVS-MDL-05014.  But market share (either red flag or total) is not a reasonable or rational basis on which to apportion harm in this case.[107] Dr. Kessler only specifically calculates the market share for each defendant in this case (Defendants, Rite Aid, and Giant Eagle).  *Id*.  He groups all the remaining non-defendant pharmacies together, as if they were one single entity.  *Id*.  But that it not an appropriate method for allocation.  As noted above, an award can only be apportioned, if at all, amongst those whose conduct was a *substantial factor* in causing the harm.  *Supra* at fn.100.  Each of the non-defendant pharmacies would need to be analyzed individually to determine whether its particular conduct was a substantial factor; if it was not, it cannot be included in the apportionment analysis. Dr. Kessler fails to do this.  Dkt. #4513 (Ps' Closing Brief) at p. 29.  A market share apportionment method is also inequitable because it fails to take into account that chain pharmacies (such as Defendants) have significantly more data and resources available to them to identify and resolve red flags than do smaller, independent pharmacies.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 33-34, 55-56, 74; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1015:6 – 1016:2.  Yet Defendants intentionally and unlawfully failed to sufficiently use those resources to prevent diversion.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 31-34, 38-41, 53-56, 60-62, 72-74, 78-80.

---

[107]  Walgreens' and Walmart's proposed market share approach further illustrates why the settlement deduction they suggest is not appropriate in the context of apportioned harms.  They want to deduct Giant Eagle's and Rite Aid's settlements from the total abatement award, yet *also* want to deduct those settling defendants' percentage of market share.

Options 2, 3, and 5 use the same inappropriate two-step apportionment methods as Option 1; they just calculate the total abatement costs (before apportionment) differently. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 49-53.[108] Option 2 assumes Defendants are only responsible for the costs associated with: "(1) take-back boxes as pharmacies; (2) OUD treatment for residents of the Counties; and (3) education campaigns addressing medicine cabinet diversion of prescription opioids. Dkt. #4511 (WAG/WMT Closing Brief) at p. 49.[109] This is inappropriate, as Plaintiffs have demonstrated that all of the abatement interventions set forth in their abatement plans are reasonable, necessary, and tailored to the nuisance found by the jury. *Supra* at § I.A-B. Option 3, on the other hand, adjusts the total abatement costs by modifying the OUD population numbers. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 50-51. They claim Dr. Keyes' OUD population estimates are inaccurate, and instead take "Dr. Kessler's correction to Plaintiffs' overstatement of the number of individuals with OUD" and divide that number in half. But, as discussed above and in Plaintiffs' Closing Brief, Defendants' criticisms of Dr. Keyes' OUD population estimates are without merit. *Supra* at pp. 11-12, 16; Dkt. #4513 (Ps' Closing Brief) at pp. 9-15. Moreover, even assuming Dr. Kessler's OUD population estimates were more accurate (they are not), Walgreens and Walmart offer no explanation whatsoever as to why those numbers should be divided in half. Option 5 makes no corrections or adjustments to the total costs proposed by Plaintiffs other than the deduction of settlement amounts. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 52-53. This deduction is inappropriate for the reasons discussed above. *Supra* at § II.D.

Option 4 also uses the inappropriate two-step apportionment methods from Option 1, but adds another layer of apportionment as well. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 51-52. It takes the total costs proposed by Plaintiffs and then (inappropriately) deducts the settlement

---

[108] Each of these Options also inappropriately deducts settlement amounts from the adjusted total numbers, before moving to allocation. *Id.* at pp. 50-51, 53; *supra* at § II.D.

[109] They make no "corrections" to Dr. Alexander's projections in Option 2. *Id.*

amounts. *Id*. at p. 51. It then "further reduces the costs by 35% as a conservative estimate of the contribution of illicit opioids to the opioid-related harms in the Counties[,]" based on "Dr. Keyes' testimony that 34% and 37% of the opioid mortalities from 2015 to 2019 in Lake and Trumbull County, respectively, were not directly or indirectly attributable to prescription opioids." Dkt. #4511 (WAG/WMT Closing Brief) at pp. 51-52. At that point, it applies the two-step allocation methods from Option 1. The 35% reduction is inappropriate. As Dr. Keyes explained, those percentages did not include opioid mortalities that were indirectly attributable to prescription opioids by pathways other than the gateway transition pathway. *Supra* at p. 4. For example, they do not account for those who began using illicit opioids (without prior prescription opioid use) because of the increases in the illicit opioid market that resulted from the oversupply and diversion of legal prescription opioids. *Supra* at pp. 3-4 & n.6.

None of the apportionment options proposed by Walgreens and Walmart are appropriate for the reasons discussed above.[110] As Walgreens and Walmart failed to provide the Court with a "reasonable" or "rational" basis on which to apportion Plaintiffs' harm, based on concrete and specific evidence, they should be held jointly and severally liable for the entire abatement award. Dkt. #4513 (Ps' Closing Brief) at pp. 27-29, 32-33.

### 2. *CVS's proposed apportionment frameworks should be rejected.*

In its Closing Brief, CVS relies solely on Dr. Chandra's three-step game theory methodology as its basis for apportionment. Dkt. #4512 (CVS Closing Brief) at pp. 24-26. But

---

[110] Plaintiffs' evidence demonstrates that, *for the first year alone* (assuming abatement began in 2021), Lake and Trumbull Counties would need $67,479,714 and $87,717,543, respectively, to implement the reasonable and necessary interventions and measures set forth in their abatement plans. P-23127 (Burke Rep.) at 010, 012. Dr. Kessler opined at trial that, using his regression model method of apportionment, (i) Walgreens can only be allocated 0.693% of Lake County's costs and 0.821% of Trumbull County's costs, and (ii) Walmart can only be allocated 0.176% of Lake County's costs and 0.031% of Trumbull County's costs . Dkt. #4513 (Ps' Closing Brief) at p. 28. The Court categorically rejected these numbers. Dkt. #4464 (5/18/22 Trial Tr.) at 1324:14-21. The apportionment options provided in Walgrens' and Walmart's Closing Brief are similarly insufficient. For Walgreens, they range from approximately 2.9% to 8.4% for each County; for Walmart, they range from approximately 0.14% to 1.4% for each County. Dkt. #4511 (WAG/WMT Closing Brief) at pp. 49-53.

as explained in Plaintiffs' Closing Brief, Dr. Chandra's apportionment opinions are unreliable and unreasonable, and they do not provide the Court with a "reasonable" or "rational" basis on which to apportion Plaintiffs' harm.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 29-33.  In addition to the arguments made in their Closing Brief, Plaintiffs would also note that: (i) Dr. Keyes' testimony does not support Dr. Chandra's reduction based on opioid mortality purportedly not directly or indirectly attributable to prescription opioids (*supra* at pp. 4, 72); (ii) Dr. Chandra's assumption that pharmacies share an equal proportion of the harm as the other four sectors (or less, if the sequential method is applied) does not take into account, *inter alia*, that pharmacies are the last line of defense to prevent diversion;[111] and (iii) using market share metrics to apportion CVS's share of the harm is inappropriate (*supra* at § III.B.1).

CVS argues that the percentages Dr. Chandra determined to be its allocable share of the harm (2.83% for Lake County; 0.66% for Trumbull County), which the Court categorically rejected,[112] do not conflict with the jury's finding that CVS's conduct was a substantial factor. Dkt. #4512 (CVS Closing Brief) at p. 26.  It is certainly true that a defendant's conduct may be deemed a "substantial cause" of the public nuisance despite having distributed or dispensed only a small proportion of the prescription opioids distributed or dispensed in the relevant jurisdiction.  *See, e.g.,* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 26-28.  But that does not mean that market share provides a rational or reasonable basis on which to apportion harm (or even liability).  As this Court previously acknowledged, "even a small portion of diverted pills could have a significant impact on opioid-related deaths and harms in the community."  *Id*. at p. 27 & n.89.  Moreover, CVS's conduct did not occur in a vacuum; it worked in synergy with other contributing factors.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 32-33.  It is for these reasons

---

[111]  *See, e.g.,* Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) at pp. 27-28 & n.90 (noting that Plaintiffs "experts described the importance of the pharmacies' role as the 'last stop' or 'last line of defense' to ensure that prescriptions are correct and patients are not harmed"); *supra* at p. 70.

[112]  Dkt. #4464 (5/18/22 Trial Tr.) at 1325:8-12.

that the harm suffered by Plaintiffs is indivisible.  *Id*.[113]

The case relied on by CVS does not support its argument.  Dkt. #4512 (CVS Closing Brief) at p. 26 (citing *Rutherford v. Owens-Illinois, Inc.* 941 P.2d 1203 (Cal. 1997), *as modified on denial of reh'g* (Oct. 22, 1997)).  *Rutherford* involved an asbestos-related product liability action against various defendants, under California law, seeking damages for the personal injuries and wrongful death of the plaintiff's husband.  *Id*. at 1207-08.  After several phases of trial, all defendants but the appellant had settled with the plaintiffs.  *Id*. at 1208.  Notably, despite the jury only apportioning 1.2% of the fault to the appellant (*id*. at 1209), judgment was entered against the appellant for far more than 1.2% of the damages.  *Id*. at 1209-10.[114]  The case was ultimately reversed and remanded for new trial on other grounds.  *Id*. at 1225.

## IV. PLAINTIFFS' PROPOSED INJUNCTIVE RELIEF IS CONCRETE, FEASIBLE, AND SUPPORTED BY THE EVIDENCE PRESENTED AT TRIAL.

As discussed in prior briefing, the Court has considerable discretion when crafting equitable remedies such as injunctive relief, particularly where the public interest is involved. Dkt. #4387 (Ps' Phase 2 Trial Brief) at pp. 6-7.  Plaintiffs demonstrated in the Phase 1 trial that Defendants' controlled substance dispensing policies and procedures were and continue to be

---

[113] *Cf. U.S. v. Odabashian*, 95-2361 G/BRE, 1999 WL 33944059, at *9 (W.D. Tenn. May 18, 1999) ("In the present case, the court finds that volume is not an adequate indicator of harm.  An allocation on the basis of volume fails to take into account the relative toxicity, migratory potential, or effect of commingling of different hazardous substances.  This is particularly important in cases such as this one where chemicals have commingled."), *amended on other grounds,* 95-2361 G/BRE, 2000 WL 34508805 (W.D. Tenn. Feb. 9, 2000); *Monsanto*, 858 F.2d at 172 ("[I]n light of the commingling of hazardous substances, the district court could not have reasonably apportioned liability without some evidence disclosing the individual and interactive qualities of the substances deposited there.  Common sense counsels that a million gallons of certain substances could be mixed together without significant consequences, whereas a few pints of others improperly mixed could result in disastrous consequences.").

[114] The jury found "that a total of $278,510 in economic damages had been incurred by plaintiffs, and $280,000 in noneconomic damages suffered by plaintiffs as a result of decedent's death."  *Id*. at 1208. After an adjustment for pretrial settlements, the court entered a judgment against the appellant of $177,047 in economic damages (~64% of the total) and $2,160 in noneconomic damages (~0.8% of the total).  *Id*. at 1209-10.  (Pursuant to California statute, in tort actions governed by comparative fault, a defendant is not jointly liable for a plaintiff's *noneconomic* damages, but rather is severally liable in direct proportion to the defendant's percentage of fault.  *Id*. at 1207 n.1.).

woefully inadequate and not internally enforced.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 24-35, 38-43, 46-57, 60-64, 66-76, 78-82.  Plaintiffs further explained in their Closing Brief why the injunctive relief set forth in their Proposed Order for Injunctive Relief ("Proposed Order"), attached thereto, is warranted and supported by the evidence adduced at trial.  *See* Dkt. #4513 (Ps' Closing Brief) at pp. 35-41; Dkt. #4513-2 (Ps' Proposed Order).

Defendants have asserted various legal and factual arguments against the injunctive relief requested by Plaintiffs.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 54-57; Dkt. #4512 (CVS Closing Brief) at pp. 34-36.  As explained in § IV.A below, each of these arguments is without merit and should be rejected.  Defendants further argue that, to the extent any injunctive relief is awarded, it should be limited to the proposed terms attached to Defendants' Closing Briefs.  Dkt. #4511 (WAG/WMT Closing Brief) at pp. 54, 57; Dkt. #4512 (CVS Closing Brief) at pp. 34-35; Dkt. #4511-3 (Ds' Draft Injunction Order).[115]  As ordered by this Court, Plaintiffs met and conferred with Defendants in an effort to reach agreement on the scope of any injunctive relief ordered on June 27 and July 1.  The parties participated in the discussions in good faith, with each side offering meaningful explanations for their respective positions.  Ultimately, however, the parties concluded that they were unable to reach agreement.  Accordingly, in § IV.B below, Plaintiffs detail why Defendants' proposed injunctive relief terms are insufficient.

## A.  Defendants' arguments against awarding injunctive relief in this case should be rejected.

The injunctive relief set forth in Plaintiffs' Proposed Order (Dkt. #4513-2) is necessary and appropriate to ensure that, going forward, Defendants will comply with their legal obligations, the breach of which gave rise to the public nuisance as found by the jury.  Defendants nonetheless oppose the Court's entry of *any* injunction based primarily on arguments they have made, and the Court properly has rejected, throughout these proceedings.

---

[115]  Both CVS and Walgreens/Walmart submitted identical draft injunctive relief orders with their Closing Briefs.  Dkt. #4511-3 (Ds' Draft Injunction Order); Dkt. #4512-1 (Ds' Draft Injunction Order).  For ease of reference, when discussing this draft order herein, Plaintiffs will cite to the one attached to Walgreens/Walmart's Closing Brief (Dkt. #4511-3).

First, Defendants renew their failed argument that the Controlled Substances Act and Drug Enforcement Administration (DEA) regulations preempt any enforcement of state-law requirements through an injunction. Dkt. #4511 (WAG/WMT Closing Brief) at p. 54; Dkt. #4512 (CVS Closing Brief) at p. 35. The Court has already rejected this argument. *See* Dkt. #2565 (CT1 Opinion and Order Re: Preemption) at p. 22 ("The Court has previously rejected this obstacle preemption argument with respect to the FDA, and now does so with respect to the DEA."). The Court ruled correctly on this point. In drafting the CSA, Congress expressly *disavowed* wholesale preemption of state laws regulating controlled substances dispensing.[116] The DEA has been equally or even more protective of state law enforcement.[117] In light of these pronouncements, numerous courts have echoed this Court in rejecting federal preemption arguments based on the CSA and DEA regulation akin to those renewed by Defendants here.[118]

Moreover, with respect to case-specific conflict preemption, the Proposed Order averts any federal-state conflict by reaffirming Defendants' duties to comply with applicable federal laws and

---

[116] 21 U.S.C. § 903 ("No provision of this subchapter shall be construed as indicating an intent on the part of Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together."). Nothing in *Gonzalez v. Raich*, 545 U.S. 1 (2005), *see* Dkt. #4511 (WAG/WMT Closing Brief) at p. 54, is to the contrary. *Gonzalez* held that applying the CSA's provisions criminalizing the manufacture, distribution, or possession of marijuana to intrastate growing and use does not violate the U.S. Constitution's Commerce Clause. 545 U.S. at 24-33; *see also* Dkt. #3403 (CT3 MTD Order) at p. 9 n.12 (describing *Gonzalez* holding). This holding on the scope of permissible *federal* authority does nothing to restrict *state* authority.

[117] *See* DEA Notice, *Dispensing Controlled Substances for the Treatment of Pain*, 71 FR 52716-01, 2006 WL 2540907 (Sept. 6, 2006) at 52717 ("Accordingly, it has been the case for more than 70 years that a practitioner who dispenses controlled substances for other than a legitimate medical purpose, or outside the usual course of professional practice, is subject to legal liability under both State and Federal law.").

[118] *See, e.g., City and County of San Francisco*, 491 F. Supp. 3d at 662 (holding that § 903 "precludes any argument that Congress intended to preempt state laws that enforce the CSA absent a positive conflict" and that "[n]o such conflict exists" with respect to state-law public nuisance claims); *State v. Purdue Pharma L.P.*, No. 32CIV18-000065, 2021 WL 5873046, at *4 (S.D. Cir. Ct. Jan. 13, 2021) ("In 21 U.S.C. § 903, the [CSA] contemplates that states' traditional enforcement of tort law will supplement the federal enforcement scheme.").

providing for informal party and formal Court procedures to resolve any alleged conflict that may arise between the order and Defendants' federal-law duties.  *See* Dkt. #4513-2 (Ps' Proposed Order) at p. 2, § I.E.  Defendants' federal preemption arguments thus fail as grounds for prohibiting any injunction.

Second, Defendants' renewed *state-law* preemption arguments fail for similar reasons. Defendants contend that Ohio Revised Code Ch. 4729 "regulates in detail all aspects of pharmacists' professional conduct and the dispensing of prescription medications," and that "[t]he Court should not supplant the judgment of pharmacy regulations vested to state agency discretion with Plaintiffs' suggestions, through injunctive relief or otherwise."  Dkt. #4511 (WAG/WMT Closing Brief) at p. 55.  This again is exactly the type of "field preemption" argument that the Court has resoundingly rejected.  *See* Dkt. #3403 (CT3 MTD Order) at pp. 8-9 (finding no intent by General Assembly "to abolish common law *causes of action* ***or available remedies***.") (first emphasis in original; second emphasis added).  The case law Defendants cite, addressing judicial interference with administrative agency *adjudication* or ongoing supervision of specific conduct,[119] does not apply here, where Defendants identify no Ohio Board of Pharmacy adjudication or disapproval of the specific dispensing practices addressed by the proposed injunction.  Moreover, since the Proposed Order expressly reaffirms Defendants' duties to comply with state laws and provides procedures for resolving any alleged conflict that may arise between these duties and the order's requirements (Dkt. #4513-2 (Ps' Proposed Order) at p. 2 § I.E), any allegation of a likely future conflict with state law also fails.  In sum, neither Ohio nor federal law preempts this Court's authority to enter the Proposed Order.

Third, the Court likewise should reject Defendants' argument that there is no evidence that

---

[119] *See, e.g., Springfield City School Support Personnel v. State Employment Relations Board*, 616 N.E.2d 983, 986 (Ohio Ct. App. 1992) ("When the legislature contemplates such a quasi-prosecutorial role for an administrative agency, courts cannot and should not interfere in the process."); *White v. Long*, 231 N.E.2d 337, 339 (Ohio Ct. App. 1967) (vacating injunction against operation of sewage disposal plant where defendants "sought and obtained the approval of all public officials concerned with sanitation and health at all governmental levels, as to the situs and location of the plant, its type and construction and equipment . . . and the operation thereof").

the Proposed Order will be effective in abating the public nuisance by reducing the supply and diversion of opioids in their communities.  *See* Dkt. #4511 (WAG/WMT Closing Brief) at p. 56; Dkt. #4512 (CVS Closing Brief) at p. 35.  As Plaintiffs have demonstrated, Defendants' controlled substance dispensing policies and procedures continue to be inadequate and/or not internally enforced, so as to fail to effectively prevent diversion of opioids in Plaintiffs' communities. *See* Dkt. #4513 (Ps' Closing Brief) at pp. 35-36; Dkt. #4241 (Ps' Rule 50(b) Opposition) at pp. 24-43, 46-64, 66-82.  The Proposed Order thus is both permissible[120] and necessary[121] to abating the continuing public nuisance and its effects, as found by the jury.

Fourth, the Court also should reject CVS's arguments that "there may be no evidence in the record on whether a particular procedure is feasible or reasonably capable of implementation[,]" and that "the Court may not consider the injunctive terms included in CVS's settlement with the State of Florida" based on FED. R. EVID. 408.  Dkt. #4512 (CVS Closing Brief) at pp. at 35-36. These arguments are mutually self-defeating.

Rule 408 prohibits the use of a settlement agreement "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction[,]" but allows the use of this evidence "for another purpose[.]"  FED. R. EVID. 408(a)(1), (b).  The Court has applied this rule on numerous occasions.  *See, e.g.*, Dkt. #3546 (CT1B Evidentiary Order) at p. 29 ("[S]uch [settlement-related] evidence could be admissible for purposes other than to show liability, that is, to show, *inter alia*, a Defendant's knowledge, state of mind, or notice of potential harm.") (citing Dkt. #3058 (CT1A Evidentiary Order) at pp. 14-15).

Here, Plaintiffs do not use the Florida Settlements' injunction terms to prove liability.

---

[120]  *See Bracket v. Moler Raceway Park LLC*, 960 N.E.2d 484, 487 (Ohio Ct. App. 2011) ("Regardless of the label placed on a nuisance, a trial court retains broad discretion in fashioning the terms of an injunction."); *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) ("A district court has broad discretionary powers to craft an injunction to the specific violations found . . . .") (internal quotation marks and citation omitted).

[121]  *See Miami Twp. Bd.*, 174 N.E.3d at 1280 ("The evidence clearly and convincingly demonstrated that a permanent injunction was necessary to protect Miami Township and its residents from the threats posed against their health, safety and properties . . . .").

The jury already has found Defendants liable for public nuisance. *See* Dkt. #4176 (Verdict Form). Nor do Plaintiffs use the Florida Settlements' injunction to prove the "amount" or scope of appropriate injunctive relief. Plaintiffs have proven this through their evidence establishing Defendants' ongoing unlawful conduct and the continuing harms it foreseeably caused and continues to cause. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 2-97. Moreover, the Proposed Order is not identical to the Florida injunction. Rather, it is tailored to the jury's liability verdict and the evidence on which it was based. *See* Dkt. #4513 (Ps' Closing Brief) at pp. 36-41 (describing differences in proposed injunction terms, and reasons therefor). Plaintiffs thus do not use the Florida injunction as liability evidence.

Instead, Plaintiffs permissibly use the Florida Settlements' injunction terms to demonstrate that it is *feasible* for the Court to enter the Proposed Order here governing Defendants' opioid dispensing in Plaintiffs' jurisdictions.[122] The Florida Settlement evidence helps rebut CVS's contention that "there may be no evidence in the record on whether a particular [injunction] procedure is feasible or reasonably capable of implementation." Dkt. #4512 (CVS Closing Brief) at p. 35. CVS tries to resist this conclusion by arguing that a "voluntary agreement" is different from "what a court may impose, over objection." *Id.* at pp. 35-36. But CVS nowhere explains what if any source of law empowers it to wield a unilateral veto, whereby it can block the Court from ordering limitations on its opioid dispensing that are similar to those CVS itself can effectuate by entering into an enforceable agreement.

CVS also argues that the Florida case is different because the State of Florida is a sovereign with regulatory authority, whereas Plaintiffs Lake and Trumbull Counties have "no regulatory authority over pharmacy practice." *Id.* at p. 36. This argument, too, fails because this Court has recognized on numerous occasions that Ohio County Plaintiffs *do* have authority to bring suit to

---

[122] *See, e.g., Molten Metal Equipment Innovations Inc. v. Metaullics Systems Co., L.P.*, No. 1:05 CV 561, 2005 WL 8170800, at *11 (N.D. Ohio Aug. 22, 2005) ("As Rule 408 explicitly provides, exclusion of such evidence is not required when the evidence is offered for another purpose. Here, the court uses the evidence merely to show that it was feasible that MMEI would have accepted monetary payment in exchange for a license to infringe the patent.").

abate a public nuisance in their communities.  *See, e.g.*, Dkt. #3403 (CT3 MTD Order) at pp. 12-13 (recognizing viability of Plaintiffs' common law public nuisance claim); Dkt. #1203 (CT1 MTD Order) at p. 28 (recognizing viability of CT1 Plaintiffs' common law absolute public nuisance claim).[123]  In sum, Plaintiffs permissibly use the Florida Settlements' injunction terms as evidence of the feasibility of the similar injunction terms the Court should order here to help abate the public nuisance in their communities as found by the jury.

Finally, Defendants' argument that an injunction order "must be sufficiently definite that Defendants can tell whether they are complying with it" (Dkt. #4511 (WAG/WMT Closing Brief) at p. 56), is of no moment because the Proposed Order *is* sufficiently definite.  *See, e.g.*, Dkt. #4513-2 (Ps' Proposed Order) at pp. 3-4, § IV (personnel requirements); at p. 6, § VII (training requirements); at pp. 6-7, § VIII (prescription validation steps); at pp. 8-9, § IX (specified red flags for diversion).  Moreover, the Proposed Order also contains provisions for addressing and resolving any questions or disputes concerning either general compliance, *id.* at pp. 13-14, § XIII, or (as discussed) the relationship between the Order's requirements and those of other applicable federal and state laws.  *Id.* at p. 2, § I.E.

In sum, the Proposed Order satisfies all requirements for an injunction, is appropriately tailored to the evidence, and does not conflict with any other applicable law.  The Court therefore should enter Plaintiffs' Proposed Order for Injunctive Relief.

### B.     Defendants' proposed injunctive relief terms are insufficient and should be rejected.

Notably, Defendants' proposed injunctive relief terms are drastically more limited (in both scope and time frame) than even the inadequate injunctive relief recently agreed to by Walgreens and CVS in the Florida Settlements.  Dkt. #4511-3 (Ds' Draft Injunction Order); Dkt. #4387-1 (CVS Florida Settlement); Dkt. #4513-1 (WAG Florida Settlement); Dkt. #4513 (Ps' Closing

---

[123]  *See also City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1150 (Ohio 2002) ("[R]ecovery by a governmental entity is allowed where the acts of a private party create a public nuisance which the government seeks to abate.").

Brief) at pp. 35-41.  Plaintiffs explained in their Closing Brief why the injunctive relief in the Florida Settlements does not go far enough to fully and adequately protect the public and, thus, why the modifications provided in Plaintiffs' Proposed Order are reasonable, necessary, and narrowly tailored to the wrongful conduct for which Defendants have been found liable. Dkt. #4513 (Ps' Closing Brief) at pp. 35-41; Dkt. #4513-2 (Ps' Proposed Order).  For these reasons, Plaintiffs' Proposed Order should be adopted in full and any of Defendants' proposed injunctive relief terms that are inconsistent with Plaintiffs' Proposed Order should be rejected. Defendants' proposed injunctive relief terms are also inadequate for a multitude of other reasons, including, but not limited to:

- Defendants ask that the injunctive relief apply only to the pharmacies specifically identified by store number and address in their draft order.  Dkt. #4511-3 (Ds' Draft Injunction Order) at p. 1 & Ex. 1.  However, it is possible that Defendants will open new pharmacies in the Counties (or move a current one to a new location).  Thus, the final order should make clear that the injunctive relief applies to *all* of Defendants' pharmacies in the Counties that dispense Controlled Substances at any point during the injunction period.

- Defendants ask that they only be required to identify *four* red flags in their policies. Dkt. #4511-3 (Ds' Draft Injunction Order) at pp. 1-2.  This is not only fewer than the number of red flags Plaintiffs propose, it is fewer than the number of red flags CVS and Walgreens agreed to identify in their policies pursuant to the Florida Settlements. Dkt. #4513-2 (Ps' Proposed Order) at pp. 8-9; Dkt. #4387-1 (CVS Florida Settlement) at pp. 7-8; Dkt. #4513-1 (WAG Florida Settlement) at pp. 7-8.  The final order should include Plaintiffs' expanded list of red flags which are consistent with the evidence presented at trial, DEA guidance, industry trade group standards, and Defendants' own internal policies and procedures.  Dkt. #4513 (Ps' Closing Brief) at p. 38.

- Defendants ask that red flags be considered "resolved" if, after investigation, the pharmacist does not "believe that the prescription was written or is being submitted for an illegitimate purpose." Dkt. #4511-3 (Ds' Draft Injunction Order) at p. 2.  However, CSA regulations state that a controlled substance prescription is effective if it is "issued for a legitimate medical purpose by an individual practitioner *acting in the usual course of his professional practice*." 21 C.F.R. § 1306.04(a) (emphasis added).  Thus, the final order should state that red flags are "considered 'resolved' such that the prescription can be filled" if, after investigation, the pharmacist does not "believe that the prescription was written or is being submitted for an illegitimate medical purpose *or outside the usual course of a Prescriber's professional practice*."  Dkt. #4513-2 (Ps' Proposed Order) at p. 6 (emphasis added).

- Defendants' proposed terms related to documentation are wholly insufficient.  First,

they indicate that documentation should only be required when the prescription is filled. Dkt. #4511-3 (Ds' Draft Injunction Order) at p. 2.  Additionally, their proposal lacks specification regarding the necessary content of the documentation or its accessibility to Defendants' other pharmacists. *Id*.  The evidence adduced at trial demonstrated that documentation (i) is equally, if not more, important for red-flagged prescriptions that the pharmacist refuses to fill, (ii) must include sufficient detail to allow subsequent reviewers to have a clear understanding as to how each red flag was resolved, and (iii) must be immediately visible to, and easily accessible by, all pharmacists in Defendants' retail pharmacies. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 28-30, 35-36, 51-53, 57-58, 71-72, 76.  Accordingly, the final order should include the more detailed documentation requirements set forth in Plaintiffs' Proposed Order. Dkt. #4513-2 (Ps' Proposed Order) at pp. 6-7, 9.

- Defendants' proposed terms regarding training are wholly inadequate.  They indicate that they should only have to send the relevant pharmacies their policy once and after that an annual "reminder notice" of the policy should suffice.  Dkt. #4511-3 (Ds' Draft Injunction Order) at p. 2.  They also include a provision that their pharmacists in the Counties "shall undergo training on the Policy" without any additional specification regarding the content or frequency of that training. *Id*. The evidence adduced at trial demonstrated that training is vitally important and Defendants' pharmacists had not received sufficient training regarding the dispensing of prescription opioids. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 23, 31-33, 38-39, 53-55, 60, 72-74, 78.  Defendants' vague proposed training requirements do not address these issues.  Accordingly, the final order should include the more detailed training requirements set forth in Plaintiffs' Proposed Order.  Dkt. #4513-2 (Ps' Proposed Order) at pp. 5-6, 9.

- Defendants' proposed terms wholly fail to address several important aspects of their wrongful dispensing conduct that contributed to the public nuisance.  For example, the evidence adduced at trial demonstrated that Defendants: (i) lacked adequate systems in place to ensure refusals to fill were adequately documented and disseminated to all their pharmacists; (ii) lacked adequate systems in place to identify, review, and potentially block problematic prescribers and patients, and to provide information related to same to their pharmacists; and (iii) failed to sufficiently utilize their dispensing data to prevent diversion. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 23-26, 31-35, 38-43, 46-50, 52-57, 60-64, 67-70, 72-76, 78-82.  Defendants do not offer any proposed terms that address these concerns. Dkt. #4511-3 (Ds' Draft Injunction Order).  Accordingly, the final order should include the detailed requirements related to these issues set forth in Plaintiffs' Proposed Order.  Dkt. #4513-2 (Ps' Proposed Order) at pp. 6-7, 9-10.

- Defendants ask that the injunctive relief only be in effect for a period of three years. Dkt. #4511-3 (Ds' Draft Injunction Order) at p. 3.  Defendants offer no explanation as to the basis for this limited time frame.  Notably, it is seven years less than the ten-year injunctive relief period agreed to by CVS and Walgreens in the Florida Settlements. Dkt. #4387-1 (CVS Florida Settlement) at p. 2; Dkt. #4513-1 (WAG Florida Settlement) at p. 2.  Plaintiffs' ability to materially abate the public nuisance

Defendants caused will be hampered if Defendants are simply able to resume their wrongful dispensing conduct after three years. Accordingly, the injunctive relief should be in place for at least ten years, at the end of which time Defendants' compliance should be evaluated to determine whether an extension and/or modification of the injunctive relief is warranted. Dkt. #4513-2 (Ps' Proposed Order) at p. 3.

## V. DEFENDANTS' OTHER PRESERVED ARGUMENTS AGAINST ABATEMENT SHOULD BE REJECTED FOR THE REASONS SET FORTH IN PRIOR BRIEFING.

Defendants also incorporate their arguments from prior briefing to support their argument that "ordering any relief, in any amount and in any form, would be inappropriate for a host of reasons." Dkt. #4511 (WAG/WMT Closing Brief) at p. 57. In response to these arguments, Plaintiffs similarly incorporate their own prior briefing, as well as this Court's prior rulings.[124]

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court award Plaintiffs the equitable abatement and injunctive relief set forth in their Closing Brief (Dkt. #4513) and Proposed Order (Dkt. #4513-2) and any such other and further relief as the Court deems just and proper.

Dated: July 8, 2022

Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

---

[124] *See, e.g.*, Dkt. #4295 (CT3 Order Denying Ds' Rule 50(b) Motions) (including all prior orders cited therein); Dkt. #4513 (Ps' Closing Brief) (including all prior briefing and orders cited therein); Dkt. #4387 (Ps' Phase 2 Trial Brief) (same); Dkt. #4349 (Ps' Sur-Reply to Ds' Legal Brief) (same); Dkt. #4321 (Ps' Opp. to Ds' Legal Brief) (same); Dkt. #4242 (Ps' Opp. to Ds' MNT) (same); Dkt. #4241 (Ps' Rule 50(b) Opp.) (same).

83

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com
mca@lanierlawfirm.com

*Trial Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

84

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
Salvatore C. Badala
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com
sbadala@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger

85