# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>Case No. 1:18-op-46326-DAP<br><br>THE MONTGOMERY COUNTY BOARD OF COUNTY COMMISSIONERS and THE STATE OF OHIO *EX REL.* MATHIAS H. HECK, JR., PROSECUTING ATTORNEY,<br>                                Plaintiff,<br>    v.<br>CARDINAL HEALTH, INC. et al.,<br>                                Defendants. | MDL No. 2804<br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

**Pharmacy Defendants' Objection to Special Master's Discovery Ruling No. 25**

1. The Track 7 Pharmacy Defendants[1] (or "Defendants") object to the Special Master's ruling on three interrogatories served on Plaintiff Montgomery County, Ohio ("Plaintiff" or "the County").

2. As set forth below, the Special Master erred in his rulings on Defendants' motion to compel as to three specific interrogatories that seek information directly relevant to the claims and defenses at issue in this case. Defendants therefore ask that the Court sustain Defendants' objections and require the County to provide relevant and responsive information.

3. The Special Master originally ruled on this dispute via email on June 22, 2022. Defendants timely sought formalization of the ruling on June 24, 2022, and the Special Master

---

[1] CVS Indiana L.L.C., CVS Rx Services, Inc., CVS TN Distribution, LLC, CVS Pharmacy, Inc., Ohio CVS Stores, LLC, The Kroger Co., Kroger Limited Partnership I, Kroger Limited Partnership II, Rite Aid of Maryland, Inc., Rite Aid Hdqtrs. Corp., Rite Aid of Ohio, Inc., Meijer, Inc., Meijer Distribution, Inc., Meijer Stores Limited Partnership, Walgreens Boots Alliance, Inc., Walgreen Co., and Walmart, Inc.

filed Discovery Ruling No. 25 Regarding Defendants' Interrogatories (MDL ECF No. 4566, the "Ruling") on July 4, 2022.[2] The Ruling called for objections by July 11, 2022. (Ruling at 6.[3]) This objection is therefore timely.

### Interrogatory No. 1 (First Set)

4. Defendants' Interrogatory No. 1 asked the County to "[i]dentify each prescription for a Prescription Opioid or Cocktail Medication that you contend was diverted." (Ruling at 2.) As the Court will recall, the word "diversion" or some variation thereon appears approximately 373 times in the redacted version of the County's operative pleading. (*See* MoCo ECF No. 46.) For example, pages 22 through 141 of that pleading purport to allege that Defendants (and each of them) "Deliberately Disregarded Their Duties To Maintain Effective Controls Against Diversion." (*Id.* pp. 22-141.) The County expressly alleges that each Defendant had notice of, and contributed to, "Illegal Diversion of Prescription Opioids." (*Id.* p. 22.) It is no overstatement to say that "diversion" is at the very heart of the County's allegations in this case. Thus, this interrogatory asked the County to either identify each prescription that was in fact diverted, or to state that it has no such knowledge.

5. The County refused to provide the information requested, and refused to identify *any* prescription that allegedly was diverted. Instead, as the Ruling acknowledged, the County "point[s] to prescriptions that it contends are at a 'high risk of diversion[.]" (Ruling at 2.) The

---

[2] References to "MDL ECF No. __" are to the main MDL docket (17-md-2804), and references to "ECF No. __" are to the docket specific to this case (18-op-46326). The materials submitted to the Special Master are attached as Exhibits 1 through 4 hereto. Group Exhibit 2 includes 14 exhibits to Defendants' original submission. The Ruling is attached as Exhibit 5.

[3] That seven-day deadline appears to be a violation of both Rule 53(f)(2) and the Court's January 11, 2018 Order, which states that objections to special master rulings may be made "within 21 calendar days" or, if a special master deems appropriate, "some period *longer than* 21 calendar days[.]" (*See* MDL ECF No. 69 at 4-5 (emphasis added).)

Ruling's attempt to justify the County's refusal reflects a misunderstanding of what this interrogatory seeks. To reiterate, Defendants merely seek an answer as to whether the County has knowledge that any particular prescription was diverted (and, if so, which one(s)), or whether the County instead lacks knowledge of any prescription actually being diverted. (*See* Ex. 4 ("Defendants have a right to a clear statement to this effect that they can present to the jury.").)

6.  The Ruling hypothesizes that "the burden of tracing each of these inappropriately dispensed pills to its end point is disproportionate to the needs of the case, especially given a public nuisance claim does not require this type of individualized proof." (Ruling at 3 (quoting Plaintiff's objection to the interrogatory).) Setting aside both the unsupported assumption that any prescription was "inappropriately dispensed,"[4] and the incorrect statement about what Plaintiff is required to demonstrate,[5] the interrogatory at issue is not asking the County to "trac[e]" anything. Defendants simply want to know whether the County has knowledge that any prescriptions were in fact diverted. Notwithstanding the County's commitment to prove its case *without* any individualized proof, Defendants are still entitled to know whether the County has knowledge of any actual prescription diversion and to present that fact to a jury during trial.

---

[4] If the Special Master intended to rule that these prescriptions were "inappropriately dispensed," as opposed to simply acknowledging the County's allegations and objections, Defendants object to that premature and unsupported finding of fact as well. There is no evidence that *any* prescription was dispensed inappropriately, much less that all of the "red flag" prescriptions identified by the County were dispensed inappropriately.

[5] Defendants disagree with the Special Master's statement of what Plaintiff must prove and reserve all rights. Assuming a public nuisance claim can arise from the dispensing of FDA-approved medications pursuant to prescriptions written by licensed and DEA-registered prescribers (it cannot), Plaintiff must demonstrate that prescriptions improperly dispensed by a Defendant caused harm that continues to exist today. But these issues need not be decided here, because the information requested above should be provided even under the Special Master's incorrect recitation of the applicable standard.

7.      It is no justification to say, as the Ruling does, that it is "not possible to know every prescription that was diverted." (Ruling at 3.) That is not what this interrogatory asked, and the County may well try to make the same argument to a jury. But it does not change the fact that Defendants are entitled to know whether the County is aware of *any* prescriptions being diverted. Moreover, to the extent Plaintiff cannot or will not identify prescriptions that were diverted, it cannot attempt to introduce evidence at trial, or argue at trial, that any prescription was diverted.[6]

8.      Finally, the Ruling opines that referring to prescriptions "at an 'especially high risk of diversion' … comports with the standard of proof in a civil action." (Ruling at 3.) That opinion is incorrect; proving that there was a *risk* of diversion, especially one based only on Plaintiff's (and its paid experts') say-so, would not prove that diversion actually occurred; and without proof of *actual* diversion, Defendants maintain that the County cannot prevail in proving that they contributed to any alleged nuisance. But the Court need not rule on that issue now, because the information sought by this interrogatory is also relevant to Defendants' defenses. *See* Fed. R. Civ. P. 26(b) (permitting discovery into "any nonprivileged matter that is relevant to any party's claim *or defense*") (emphasis added). Defendants likely will defend themselves at trial by pointing out the lack of evidence that prescriptions dispensed from their stores were in fact diverted. Defendants are entitled to put Plaintiff to its burden of proof, as well as to test Plaintiff's *ipse dixit* that the majority of prescriptions written by licensed prescribers and dispensed in Montgomery County by licensed pharmacists over the course of 15+ years were at a "high risk" of diversion. Regardless, the Ruling completely ignores the relevance of this information to Defendants' defenses,

---

[6] Similarly, with respect to Interrogatory No. 11, which is discussed below, to the extent Plaintiff cannot or will not identify prescriptions that allegedly were not issued for a legitimate medical purpose, it cannot attempt to introduce evidence at trial, or argue at trial, that any prescription was not issued for a legitimate medical purpose.

notwithstanding that Defendants specifically called out this relevance in their papers. (*See* Ex. 1, Defs. May 13, 2022 Letter, at 5.) Simply put, Defendants are entitled to discover whether the County has evidence that any prescription was in fact diverted, not just whether the County believes a prescription *might have been* diverted.

9. Defendants also note that the Track 3 plaintiffs were required to provide virtually identical information. On December 31, 2020, the Special Master directed Lake and Trumbull Counties to "supply[] as completely as reasonably possible the responsive information/knowledge they have" regarding "Prescription Opioids dispensed by Pharmacy Defendant that (Trumbull/Lake) County contends were diverted." (*See* Exhibit 2.13.)

10. This interrogatory is therefore both relevant and proportionate. It is relevant because it seeks information that is pertinent to both the claims and defenses in this case, as made clear by both the County's allegations and Defendants' intended defense of those allegations. And it is proportionate because it does not require the County to do anything other than disclose its knowledge, if any, regarding prescriptions that were diverted. The Court should sustain this objection and order the County to respond to Interrogatory No. 1 (First Set) as written.

### Interrogatory No. 11 (First Set)

11. Defendants' Interrogatory No. 11, in relevant part, asked the County to identify each prescription the County asserts "should not have been dispensed because it was not written for a legitimate medical purpose by a practitioner acting in the usual course of his or her professional practice and that caused the alleged damage, nuisance, or other harm for which [the County] seek[s] to recover in this case." (Ruling at 3.) In addition to seeking certain data fields for those prescriptions, the interrogatory asked the County to "explain why the prescription should not have been dispensed, including any and all criteria used to determine that the prescription should

5

not have been dispensed and the support or sources for that criteria," and "explain how the prescription caused the alleged damage, nuisance, or other harm for which you seek to recover in this case." (*Id.*)

12. The notion that Defendants filled prescriptions that were not written for a legitimate medical purpose is ever-present in the County's allegations. For example, "legitimate medical purpose" and variations thereon appear more than 50 times in the County's operative pleading, including when the County alleges that Defendants "contributed substantially to the opioid crisis by helping to inflate the opioid market beyond any legitimate bounds and by flooding that market with far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses[.]" (*E.g.*, Supplemental Complaint, ECF No. 46, ¶ 22.) As this Court is aware, 21 CFR § 1306.04(a) states in part: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Thus, this interrogatory asked the County to either identify each prescription that was not written for a legitimate medical purpose, or to state that it has no such knowledge.

13. Once again, the County refused to provide the information requested, and refused to identify *any* specific prescription. Instead, the County simply pointed to its red-flagged prescription disclosure. The Special Master remarked that the County "included a spreadsheet identifying alleged red-flag prescriptions" in response to this interrogatory. That spreadsheet, however, merely lists alleged "red flag" prescriptions, and *does not* list (or even *purport* to list) prescriptions that were not written for legitimate medical purposes. In this instance, at least, the Special Master ordered the County to "identify[] responsive known specific prescriptions from

6

specific doctors (e.g., a 'pill mill' doctor), if [the County] has not already done so." (Ruling at 5.) The County has not done so, but Defendants expect that it will—and soon—in light of the Ruling.[7]

14. Defendants appreciate the Special Master's ruling that the County must identify prescriptions it knows were not written for a legitimate medical purpose. But Defendants are left puzzled as to why the remainder of the interrogatory—an explanation of *why* and *how* the prescriptions were identified by the County—was denied. Simply saying "these prescriptions may be bad," without being required to explain *why* they were "bad" or *how* they were identified as "bad," is little help. This is especially true when Plaintiff points to its "red flag" prescriptions, many of which were written by well-respected doctors who have never been disciplined, have worked with the County's committees, and so on.[8]

15. As the Court is aware, the County alleges that Defendants failed to do a variety of things that the County believes they should have done—monitoring self-distribution of prescription opioid medications in the way the County proposes, monitoring dispensing of prescription opioid medications in the way the County proposes, evaluating and documenting resolution of County-proposed "red flags" in the way the County proposes, and so on. What Defendants requested in the remainder of this interrogatory was an explanation of (a) how the County identified prescriptions that were not issued for a legitimate medical purpose, *i.e.*, how the County performed the task it is now alleging that Defendants failed to perform in a way that caused a public nuisance, and (b) how that alleged failure led to harm that the County is attempting to

---

[7]   Defendants' understanding is that the County will identify specific prescriptions, if any, that it knows were not issued for a legitimate medical purpose, not simply that it will identify every prescription written by a particular doctor.

[8]   Indeed, when Defendants have deposed some of the thousands of prescribers who were flagged by Plaintiff's red-flag methodology, counsel for Plaintiff has repeatedly asserted, through speaking objections on the record, that Plaintiff has not alleged any prescriber did anything wrong.

7

rectify through this lawsuit. In other words, Defendants simply want to understand what it is they allegedly failed to do in this regard, and how that alleged failure caused the harm of which the County now complains.

16. The Special Master refused to compel a response because "Plaintiff intends to prove its case in the aggregate, and not by pointing to individual prescriptions[.]" (Ruling at 4.) Even though the County has disavowed any individualized proof, Defendants are still entitled to understand how and why the County identified the hundreds of thousands of "aggregate" prescriptions that form the basis for its claims, including whether the County has knowledge that any of those prescriptions allegedly were not issued for a legitimate medical purpose. In other words, even though the County will rely on "aggregate proof," Defendants are still entitled to understand the methodology underlying that "aggregate proof" so that they can respond to it.

17. The Special Master also expressed a belief that Defendants "do not need the requested information … because they already have much of the information regarding their own dispensed prescriptions." (Ruling at 4.) That statement is incorrect. First, Defendants do not concede, and it is Plaintiff's burden to demonstrate, that "red flag" prescriptions were not issued for a legitimate medical purpose in the usual course of professional practice. Defendants are entitled to discover whether Plaintiff knows a prescription was improper and, if so, how that determination was made. There has not yet been any showing that whether a prescription was issued for a legitimate medical purpose or issued in the usual course of professional practice can be determined from data analysis. Second, Plaintiff must prove that a prescription that was improperly dispensed led to harm. Such information is not contained in Defendants' dispensing data, as the Special Master suggests, and Defendants are entitled to know whether Plaintiff possesses information that a prescription that was allegedly improperly dispensed caused harm.

8

18. Once again, the Track 3 plaintiffs were required to provide virtually identical information. On December 31, 2020, the Special Master directed Lake and Trumbull Counties to "supply[] as completely as reasonably possible the responsive information/knowledge they have" regarding "Opioid prescriptions filled by Pharmacy Defendants that (Trumbull/Lake) County contends were not issued for a legitimate medical purpose or were not issued by an individual practitioner acting in the usual courses of his or her professional practice." (*See* Exhibit 2.13.) The information sought by this interrogatory—how and why Plaintiff came to understand that certain prescriptions were not written for a legitimate medical purpose—falls well within the scope of the "as completely as reasonably possible" standard set down in Track 3.

19. This interrogatory is therefore both relevant and proportionate. It is relevant because it seeks information that pertains to both the claims and defenses in this case, as made clear by both the County's allegations and Defendants' intended defense of those allegations. And it is proportionate because it does not require the County to do anything other than disclose its existing knowledge (or state that it has none to disclose). Accordingly, the Court should sustain this objection and order the County to respond to Interrogatory No. 11 (First Set) as written.

**Interrogatory No. 5 (Second Set)**

20. In its red-flag disclosure, the County asserted that Defendants "had or should have had actual or constructive notice" that 115 specific prescribers (1) "were engaged in activity indicative of possible or actual diversion," (2) issued prescriptions "without a legitimate medical purpose or outside the usual course of professional practice," and/or (3) "were not authorized to issue controlled substance prescriptions." (Ruling at 5.) Interrogatory No. 5 therefore asked the County to describe how it identified each of those prescribers, including without limitation what facts the County asserts should have provided actual or constructive notice of these issues. (*Id.*)

9

21. The County responded to this interrogatory only in part, by providing "examples" of the types of information that theoretically *could be used* to identify such prescribers, but failing or refusing to disclose the information *the County actually used* to identify such prescribers. (Ruling at 5; Exhibit 2.9 at p. 15 of 18 ("There are a number of other metrics which may have been used to identify prescribers at higher risk of diversion.").) The County also failed to disclose what, about each prescriber, should have given Defendants actual or constructive notice of wrongdoing.

22. As with Interrogatory No. 11, Defendants are entitled to know what they allegedly failed to do that supposedly contributed to a public nuisance. If the County engaged in an analysis that purportedly revealed certain prescribers were engaged in wrongdoing, it should be no burden for the County to explain how it reached that conclusion. If the County did not engage in such an analysis, it should simply say so. Regardless, Defendants are entitled to discover *how* the County identified the 115 prescribers it alleges Defendants should have identified as problematic.

23. The Special Master ruled that an explanation of why the County believes Defendants should have had actual or constructive notice of these specific prescribers "is overly broad and not proportional to the needs of the case." (Ruling at 6.) But it is not "overly broad" to seek an explanation of why one is being accused of contributing to a public nuisance, and this interrogatory is entirely proportional because all it seeks is an explanation of the work the County suggests it has already done.

24. The Special Master also ruled that "much of what the Interrogatory asks for is already in Defendants' possession." (Ruling at 6.) Again, that is incorrect. Defendants do not have in their possession an explanation of "how [the County] identified each of these prescribers, including without limitation what facts [the County] claim[s] should have provided 'actual or constructive notice' to Defendants[.]" (*Id.* at 5 (quoting Interrogatory No. 5).) If Defendants had

that information, they would not have sought it in Interrogatory No. 5, asked the Special Master to order its production, or filed this objection seeking to obtain it.

25. Once again, the information sought is both relevant and proportional. All Defendants want is an explanation of the basis for the County's assertion that Defendants knew or should have known 115 prescribers were violating the law. If the County has that information, it should provide it. Or, if the County has no information to substantiate that claim, it should say so.

WHEREFORE, for the foregoing reasons and those set forth in Defendants' briefing before the Special Master, Defendants respectfully request that the Court sustain this objection and order the County to provide the information sought in Interrogatories 1 and 11 (First Set) and Interrogatory 5 (Second Set) as set forth herein.

Dated: July 11, 2022

Respectfully submitted,

*/s/ Trevor K. Scheetz*
Trevor K. Scheetz
Joseph M. Vanek
Greg Shinall
David P. Germaine
Sperling & Slater, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
(312) 641-3200 (p)
(312) 641-6492 (f)
tscheetz@sperling-law.com
jvanek@sperling-law.com
shinall@sperling-law.com
dgermaine@sperling-law.com

*Counsel for Meijer, Inc., Meijer Distribution, Inc., and Meijer Stores Limited Partnership*

11

/s/ *Kelly A. Moore (consent)*
Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
T: 212-309-6612
F: 212-309-6001
kelly.moore@morganlewis.com

Elisa P. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
T: 215-963-5917
F: 215-963-5001
elisa.mcenroe@morganlewis.com

*Counsel for Rite Aid of Maryland, Inc. d/b/a Rite Aid Mid-Atlantic Customer Support Center, Rite Aid of Ohio, Inc., and Rite Aid Hdqtrs. Corp.*

/s/ *Alex J. Harris (consent)*
Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
E-mail: alex.harris@bartlitbeck.com

Kaspar J. Stoffelmayr
Katherine M. Swift
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
E-mail: kaspar.stoffelmayr@bartlitbeck.com
E-mail: kate.swift@bartlitbeck.com

Alec H. Schultz
HILGERS GRABEN PLLC
1221 Brickell Avenue
Suite 900
Miami, Florida 33131
Tel: (305) 630-8304
E-mail: aschultz@hilgersgraben.com

12

Michael Burns
HILGERS GRABEN PLLC
601 Pennsylvania Ave. NW
South Building Suite 900
Washington, D.C. 20004
Tel: (202) 985-1664
E-mail: mburns@hilgersgraben.com

*Counsel for Walgreens Boots Alliance, Inc. and Walgreen Co.*

 */s/ Eric R. Delinsky (consent)*
Zuckerman Spaeder
1800 M Street NW, Ste. 1000
Washington, DC 20036
Phone: 202-778-1831
Fax: 202-822-8106
Email: edelinsky@zuckerman.com

*Counsel for CVS Indiana L.L.C., CVS Rx Services, Inc., CVS TN Distribution, LLC, CVS Pharmacy, Inc., and Ohio CVS Stores, LLC*

*/s/ Tara A. Fumerton (consent)*
Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
Email: tmtabacchi@jonesday.com
Email: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

*/s/ Ronda L. Harvey (consent)*
Ronda L. Harvey, Esq. (WVSB 6326)
Fazal A. Shere, Esq. (WVSB 5433)
Jennifer B. Hagedorn, Esq. (WVSB 8879)
BOWLES RICE LLP
600 Quarrier Street
Charleston, West Virginia  25301
304-347-1100
rharvey@bowlesrice.com
fshere@bowlesrice.com
jhagedorn@bowlesrice.com

*Counsel for Defendants The Kroger Co., Kroger Limited Partnership I, Kroger Limited Partnership II*

13

**Certificate of Service**

  I, Trevor K. Scheetz, an attorney, hereby certify that on July 11, 2022, I filed a copy of the foregoing document using the Court's electronic case filing system, which will deliver notice and a copy of the filing to all counsel of record.

                 */s/ Trevor K. Scheetz*