# Principles for the Use of Funds From the Opioid Litigation

DEFENDANT'S EXHIBIT
CVS-MDL-04997

# Principles for the Use of Funds From the Opioid Litigation

States, cities, counties, and tribes will soon be receiving funds from opioid manufacturers, pharmaceutical distributors, and pharmacies as a result of litigation brought against these companies for their role in the opioid epidemic that has claimed more than half a million lives over the past two decades.

Governors, attorneys general, and legislators will face difficult decisions in determining the best use of these funds. We support the following principles:

1. **Spend money to save lives.**
   *Given the economic downturn, many states and localities will be tempted to use the dollars to fill holes in their budgets rather than expand needed programs. Jurisdictions should use the funds to supplement rather than replace existing spending.*

2. **Use evidence to guide spending.**
   *At this point in the overdose epidemic, researchers and clinicians have built a substantial body of evidence demonstrating what works and what does not. States and localities should use this information to make funding decisions.*

3. **Invest in youth prevention.**
   *States and localities should support children, youth, and families by making long-term investments in effective programs and strategies for community change.*

4. **Focus on racial equity.**
   *States and localities should direct significant funds to communities affected by years of discriminatory policies and now experiencing substantial increases in overdoses.*

5. **Develop a fair and transparent process for deciding where to spend the funding.**
   *This process should be guided by public health leaders with the active engagement of people and families with lived experience, clinicians, as well as other key groups.*

This document describes these principles in greater detail.

# Background

Addiction is an ongoing public health crisis in the United States; an estimated 20 million people have a substance use disorder related to alcohol or illicit drugs. Recent attention has understandably focused on the role of opioids—which have killed more than 500,000 people over the past two decades. Driven in large part by increases in overdose deaths and suicides (which are often associated with substance misuse), life expectancy in the United States dropped from 2014 to 2017, the first three-year decline in nearly a century.

Already dire, the situation has worsened with the COVID-19 pandemic. The economic downturn and social distancing mandates have increased the chance of overdose among people who use drugs. Preliminary data indicate that overdose deaths have increased in most states compared to a year ago, with some states reporting an estimated 30% increase in opioid-related deaths so far in 2020. Early evidence also indicates a significant increase in alcohol consumption, anxiety, and depression during the pandemic. Accordingly, addressing mental health and addiction should be part of any COVID-19 response.

Confronting this new crisis, many localities are already adopting interventions that save lives. Fortunately, new financial resources that can help states and communities fund additional programs are close at hand as a result of lawsuits brought by States, cities, counties, and tribes against opioid manufacturers, pharmaceutical distributors, and pharmacies. This is an unprecedented opportunity to invest in solutions to address the needs of people with substance use disorders.

For this to happen, jurisdictions must avoid what happened with the dollars that states received as part of the litigation against tobacco companies. Those landmark lawsuits were hailed as an opportunity to help current smokers quit and prevent children from starting to smoke. Unfortunately, most states have not used the dollars to fund tobacco prevention and cessation programs. Overall, less than 3% of revenue from the settlement and tobacco taxes went to tobacco control efforts. Failure to invest these dollars in tobacco prevention and cessation programs has been a significant missed opportunity to address the greatest cause of preventable death in the United States.

To guide jurisdictions in the use of these funds, we encourage the adoption of five guiding principles through specific actions outlined here. The principles are as follows:

1. **Spend money to save lives.**
2. **Use evidence to guide spending.**
3. **Invest in youth prevention.**
4. **Focus on racial equity.**
5. **Develop a transparent, inclusive decision-making process.**

## Principle 1: Spend money to save lives.

*Given the economic downturn, many states and localities will be tempted to use the dollars to fill holes in their budgets rather than expand needed programs. Jurisdictions should use the funds to supplement rather than replace existing spending.*

In addition to its dramatic health impacts, the COVID-19 pandemic has also harmed the U.S. economy, leaving gaps in localities' operating budgets. Despite the increasing number of overdose deaths, many state and local governments have already made cuts to substance use and behavioral health programs.

However, at current funding levels, these programs are already not meeting the needs of people who use drugs. For example, only an estimated 10% to 20% of people with opioid use disorder are receiving any treatment at all. Accordingly, groups like the American Medical Association and the American Bar Association have called for all settlement funds to address the substance use epidemic.

**How can jurisdictions adopt this principle?**

1) *Establish a dedicated fund.*
   Ensuring that funds from the opioid lawsuits are being used to help people with substance use disorders is easier if dollars resulting from the various legal actions go into a dedicated fund. When establishing such a fund, jurisdictions should include specific language that the money from the fund cannot be used to replace existing state investments and outline the acceptable uses of the dollars when establishing this fund. (See *Principle 2—Use evidence to guide spending* for examples.)

2) *Supplement rather than supplant existing funding.*
   In order to be sure that funds are being used to expand programs, jurisdictions should understand their baseline level of spending on substance use disorders, including prevention efforts. This will help ensure that dollars from any legal actions are additive to existing efforts. Most jurisdictions have already developed comprehensive strategic plans focused on opioids; these plans can be used as a starting point for prioritizing new investments.

3) *Don't spend all the money at once.*
   Ameliorating the toll of substance use, and addressing the underlying root causes, will require sustained funding by states and localities. Jurisdictions should avoid the temptation to exchange future payments that result from the opioid litigation for an upfront lump sum payment, as happened in many states with dollars from the tobacco settlements. Should the opioid lawsuits result in a lump sum payment to jurisdictions, they should consider establishing an endowment so that the dollars can be used over time.

4) *Report to the public on where the money is going.*
   Jurisdictions should publicly report on how funds from opioid litigation are being spent. The expenditures should be categorized such that it is easy to understand the goals of a particular program and the measures that they are using to determine success, such as, for naloxone distribution programs, the amount of naloxone distributed.

## Principle 2: Use evidence to guide spending.

*At this point in the overdose epidemic, researchers and clinicians have built a substantial body of evidence demonstrating what works and what does not. States and localities should use this information to make funding decisions.*

Jurisdictions run the risk of using new dollars on programs that do not work or are even counterproductive if they do not rely on evidence to guide the spending. As one example, people with opioid use disorder in many residential treatment facilities are prohibited from being treated with methadone or buprenorphine, despite evidence that these medications reduce the chance of overdose death by 50% or more. To address this gap, jurisdictions can use the dollars to help residential programs transition to offering a full range of medication treatment options.

### How can jurisdictions adopt this principle?

1) *Direct funds to programs supported by evidence.*
   Jurisdictions should fund initiatives demonstrated by research to work and not fund programs shown not to work. Interventions that work, ranging from youth prevention efforts to harm reduction programs to communications campaigns that address stigma, have been compiled by a number of different organizations. See *Appendix 1* for examples of these summaries, which should serve as references as jurisdictions determine which interventions to fund. Additionally, state and local agencies that oversee substance use interventions have significant expertise regarding programs that work.

   Should jurisdictions fund programs that have not been studied, they should also allocate sufficient dollars to confirm their effectiveness.

2) *Remove policies that may block adoption of programs that work.*
   In many jurisdictions, state and local policy change may need to occur in order for affected communities to implement evidence-based models. For example, state restrictions may cap the number of methadone clinics that may operate in the state, may make it difficult for nurse practitioners to prescribe buprenorphine, or may impede good harm reduction practices by banning syringe service programs. States should ensure that their regulations are not more restrictive than federal guidelines.

3) *Build data collection capacity.*
   An important part of determining which programs are working in a given jurisdiction is collecting sufficient data. Jurisdictions should consider using opioid settlement funds to build the capacity of their public health department to collect data and evaluate policies, programs, and strategies designed to address substance use.

   In particular, jurisdictions should be sure that they have sufficient data to ensure that they are meeting the needs of minority populations. Localities should make data available to the public in annual reports and on publicly facing data dashboards.

## Principle 3: Invest in youth prevention.

*States and localities should support children, youth, and families by making long-term investments in effective programs and strategies for community change.*

Any comprehensive effort to reduce the toll of substance use generally—and opioids specifically—must invest in youth primary prevention programs.
- Overdoses among children have increased steadily over the past decade; nearly 8,000 adolescents ages 15–19 died of an opioid overdose between 1999 and 2016.
- Substance use by children often persists into adulthood; approximately one-half of all people with substance use disorders start their substance use before age 14.

Primary prevention efforts—which are designed to stop use before it starts—can interrupt the pathways to addiction and overdose. Youth primary prevention also reduces the risk of substance use and lessens other negative outcomes, including low educational status, under- and unemployment, unintended parenthood, and an increased risk of death from a variety of causes.

Youth prevention programs also have a very favorable return on investment—$18 dollars for every dollar spent by one estimate.

### How can jurisdictions adopt this principle

*Direct funds to evidence-based interventions.*
Youth primary prevention programs address individual risk factors (such as a favorable attitude towards substance use) and strengthen protective factors (such as resiliency); they can also address elements at the family and community levels.

Research demonstrates that not all prevention programs are created equal. While there are many examples of effective prevention programs, investments in ineffective prevention initiatives persist. Jurisdictions should be sure that the programs that they are funding are supported by a solid evidence base.

Numerous compilations of effective youth primary prevention interventions already exist, including the following:
- Blueprints for Healthy Youth Development.
- Facing Addiction in America, the Surgeon General's Report on Alcohol, Drugs, and Health, 2016.

Jurisdictions should also fund long-term evaluations of youth prevention programs to ensure that they are having their desired effect.

Principles for the Use of Funds from the Opioid Litigation

## Principle 4: Focus on racial equity.

*States and localities should direct significant funds to communities affected by years of discriminatory policies and now experiencing substantial increases in overdoses.*

Although minority communities experience substance use disorders at similar rates as other racial groups, in recent years the rate of opioid overdose deaths has been increasing more rapidly in Black populations than in white ones. Additionally, historically racist policies and practices have led to a differential impact of the epidemic. In particular, minorities are more likely to face criminal justice involvement for their drug use. Black individuals represent just 5% of people who use drugs, but 29% of those arrested for drug offenses and 33% of those in state prison for drug offenses. Minority groups are also more likely to face barriers in accessing high-quality treatment and recovery support services.

These disparities have contributed to ongoing discrimination as well as racial gaps in socioeconomic status, educational attainment, and employment. Without a focus on racial equity when allocating settlement funds, localities run the risk of continuing a cycle of inequity.

### How can jurisdictions adopt this principle?

1) *Invest in communities affected by discriminatory policies.*
Historical patterns of discrimination will take sustained focus to overcome. Jurisdictions should fund programs in minority communities that will tackle root causes of health disparities and eliminate policies with a discriminatory effect.

2) *Support diversion from arrest and incarceration.*
Localities should:
   - Elevate and expand diversion programs with strong case management and link participants to community-based services such as housing, employment, and other recovery support services.
   - Fund community-based harm reduction programs that provide support options and referrals to promote health and understanding for people who use drugs
   - Increase equitable access to treatments for opioid use disorder including medications for opioid use disorder.

3) *Fund anti-stigma campaigns.*
Stigma against people who use drugs is pervasive and frames drug use as a moral failure. This stigmatization may contribute to the use of discriminatory punitive approaches to address the epidemic, particularly among racial minority communities, as opposed to more effective ones grounded in public health. In order to address this, jurisdictions should use funds to support campaigns based in evidence that reduce stigma.

4) *Involve community members in solutions.*
Jurisdictions should fund programs in minority communities with diverse leadership and staff, and a track record of hiring from the surrounding neighborhood. Programs with a diverse workforce of staff, supervisors, and peers are more likely to provide relatable and effective services.

## Principle 5: Develop a fair and transparent process for deciding where to spend the funding.

*This process should be guided by public health leaders with the active engagement of people and families with lived experience, as well as other key groups.*

### How can jurisdictions adopt this principle?

1) *Determine areas of need.*
   Jurisdictions should use data to identify areas where additional funds could make the biggest difference. For example, data may show that various groups in the state are not reached by current interventions; or that certain geographic areas would benefit from specific programs such as housing assistance or syringe services programs. Existing strategic plans may contain much of this information.

2) *Receive input from groups that touch different parts of the epidemic to develop the plan.*
   Jurisdictions should draw upon public health leaders with expertise in addiction and substance use to guide discussions and determinations around the use of the dollars. They should also include groups with firsthand experience working with youth and people who use drugs—including prevention and treatment providers, law enforcement personnel, recovery community organizations, social service organizations, and others—who have insights into strategies that are working, those that need to be revised, and areas where new investments are needed. Once a jurisdiction has conducted an initial assessment of areas where additional resources would be helpful, it should solicit and integrate broad feedback to design a plan that will meet the needs of the local community.

   Jurisdictions should be sure to include people with lived experience, including those receiving medications as part of their treatment, as part of the decision-making process. The Ryan White Program, which distributes HIV funds to affected communities, demonstrates one way to do this; at least one-third of the members of the community Planning Councils that allocate funds to treatment providers must receive program services themselves.

   In addition to the groups from which a jurisdiction may formally seek input, they should also solicit and use input from the public. This will help raise the profile of the newly developed plan and give those with particular insights—such as families and other members of the recovery community—a chance to weigh in.

3) *Ensure that there is representation that reflects the diversity of affected communities when allocating funds.*
   To ensure equitable distribution of funds to communities of color, representation from these communities should be [included in the decision-making process](). Community representatives, leaders, and residents can help leverage community resources and expertise while giving insights into community needs.

# Appendix 1: Compilations of Evidence-Based Interventions

- *From the War on Drugs to Harm Reduction*, FXB Center for Health and Human Rights at Harvard University, December 2020.

- *Evidence Based Strategies for Abatement of Harms from the Opioid Epidemic*, Coordinated by Richard Frank, Harvard University, Arnold Ventures, November 2020.

- *Bringing Science to Bear on Opioids*, Association of Schools & Programs of Public Health, November 2019.

- *Opioid Settlement Priorities,* Addiction Solutions Campaign, May 2018.

- *Addressing Access to Care in the Opioid Epidemic and Preventing a Future Recurrence,* American Psychiatric Association, American Society for Addiction Medicine, and other groups, April 2020.

- Substance Abuse and Mental Health Services Administration's Evidence-Based Practices Resource Center.

- Curated Library about Opioid Use for Decision-makers (CLOUD).

For a complete list of resources, visit our website: http://opioidprinciples.jhsph.edu/